IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DZHOKHAR TSARNAEV | No. 13-CR-10200-GAO |

## MOTION TO VACATE SPECIAL ADMINISTRATIVE MEASURES ("SAMs") IMPOSED ON DEFENDANT AND DEFENSE COUNSEL

By memorandum dated August 27, 2013 ("Aug. 27 Memorandum") — more than four months after the defendant, Dzhokhar Tsarnaev, was arrested — the Attorney General, at the behest of United States Attorney Carmen Ortiz, implemented Special Administrative Measures ("SAMs") that impose extraordinary and severe restrictions impairing the ability of defense counsel to provide competent representation. Among other things, the SAMs limit Mr. Tsarnaev's interactions with individuals assisting defense counsel and restrict the communications and other activities of the defense team in furtherance of the defense. A copy of the Aug. 27 Memorandum is attached hereto as Exhibit A.

Defense counsel first learned of the SAMs on Friday, August 30, 2013, after members of the defense team were denied entrance to FMC Devens for a previously-scheduled and approved visit with Mr. Tsarnaev. Attorney-client meetings were permitted to resume only after members of the defense team signed agreements to abide by the SAMs. A blank copy of the SAMs agreement is attached hereto as Exhibit B.

In the circumstances of this case, SAMs are unlawful and unwarranted. The government has provided scant factual support for its conclusory assertion that SAMs are required now, more than four months into Mr. Tsarnaev's already highly restrictive pretrial confinement, in order to

protect others from "death or serious bodily injury."  The government has not alleged that Mr.

Tsarnaev has done or said anything since his arrest to commit violence, incite violence, or

engage in communications that pose a security threat.  Moreover, the SAMs violate the First,

Fifth, and Sixth Amendments to the United States Constitution.  The Court therefore should

declare that the SAMs are unlawful and order that they be vacated.

## **Background**

### A.  **Purported Factual Basis for SAMs.**

The purported factual basis for the SAMs is set forth in the introduction to the Aug. 27

Memorandum, quoted here in its entirety:

> Federal Bureau of Prisons (BOP) pretrial inmate Dzhokhar Tsarnaev is charged in
> a thirty-count indictment with, among other things, use of a weapon of mass
> destruction, bombing a place of public use, carjacking, conspiracy, and firearms
> violations. Tsarnaev is currently housed by BOP at the Federal Medical Center
> Devens in Ayer, Massachusetts, pending trial. The United States Attorney for the
> District of Massachusetts (USA/DMA) has requested that Special Administrative
> Measures (SAM) be imposed on Tsarnaev because there is a substantial risk that
> his communications or contacts with persons could result in death or serious
> bodily injury to persons. The Federal Bureau of Investigation (FBI) concurs in
> this request.
>
> As detailed in the attached request from the USA/DMA and as later supplemented
> telephonically, on April 15, 2013, Tsarnaev and his brother, Tamerlan Tsarnaev,
> carried out a pre-meditated and coordinated detonation of improvised explosive
> devices in Boston, Massachusetts, that killed, dismembered, or injured dozens of
> people during the Boston Marathon. Tsarnaev and his brother were inspired to
> commit the attack by Anwar al-Aulaqui, a deceased leader of al-Qaeda, and used
> bomb-making instructions from "Inspire," an al-Qaeda publication. Tsarnaev
> employed operational tradecraft in communicating during the time leading up to
> the bombing (including purchasing a dedicated cell phone to communicate with
> respect to the bombings), and in disposing of evidence after the attack, including
> discarding a remaining bomb detonator and smashing his cell phones.
>
> During the days following the attacks, as law enforcement engaged in a massive
> manhunt for the perpetrators, Tsarnaev and his brother made additional bombs,
> and Tsarnaev convinced his associates to attempt to destroy evidence related to
> the Boston Marathon bombing. In addition, on April 19, 2013, Tsarnaev and his
> brother killed a Massachusetts Institute of Technology police officer, carjacked a

civilian, and attempted to kill law enforcement officers during a violent confrontation. Tsarnaev's brother was killed during the drawn-out altercation, while Tsarnaev evaded capture and eventually hid inside a drydocked boat in a residential neighborhood. While hiding, Tsarnaev scrawled messages on the boat including: "The U.S. Government is killing our innocent civilians"; "I can't stand to see such evil go unpunished"; "We Muslims are one body, you hurt one you hurt us all"; "Now I don't like killing innocent people it is forbidden in Islam but due to said [unintelligible] it is allowed"; and "Stop killing our innocent people and we will stop."

On or about April 22, 2013, following his capture, Tsarnaev was interviewed by the FBI. During the interview, Tsarnaev reaffirmed his commitment to jihad and expressed hope that his actions would inspire others to engage in violent jihad. There is no indication that Tsarnaev's intentions have changed since.

On May 3, 2013, the FBI arrested three associates of Tsarnaev for their involvement, at Tsarnaev's behest, in attempting to destroy evidence and obstruct the government's investigation. On August 8, 2013, two of these associates were indicted on charges of obstruction of justice and conspiracy to obstruct justice. The FBI continues to investigate whether additional accomplices remain at large.

On May 24, 2013, while incarcerated, Tsarnaev was permitted to call his mother in Russia, who recorded the call and subsequently released portions of the call to the media, in an apparent effort to engender sympathy for Tsarnaev.  Tsarnaev has also gained widespread notoriety while incarcerated, as evidenced by his receipt of nearly one thousand pieces of unsolicited mail.

On June 27, 2013, a federal grand jury in the District of Massachusetts indicted Tsarnaev on thirty counts that included use of a weapon of mass destruction, bombing a place of public use, carjacking, conspiracy, and firearms violations.

The USA/DMA believes there is a substantial risk that Tsarnaev's communications may result in the death of or serious bodily injury to persons, based on: Tsarnaev's participation in planning and executing the Boston Marathon bombings; his ensuing acts of violence and flight to avoid apprehension; his extensive obstruction of justice; and his explicit and continuing desire to incite others to engage in violent jihad.

Based upon information provided to me of Tsarnaev's proclivity for violence, I find that there is a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons. Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.3, implement SAM to restrict Tsarnaev's access to the mail, the media, the telephone, and visitors. Implementation of the SAM will commence immediately upon notice to the inmate, and the SAM will be in effect for one year from the date of my approval, subject to my further direction.

Ex. A at 1-3.

### B. Summary of Key Restrictions.

The SAMs impose a wide variety of restrictions on the defense team, and Mr. Tsarnaev,

including the following:

### 1. Provisions Related to Defense Counsel.

*SAMs affirmation*. Each attorney representing Mr. Tsarnaev must sign an affirmation acknowledging awareness of and understanding of the SAMs and agreement to abide by its restrictions, particularly those that relate to contact between the inmate and his attorneys and the attorneys' staff. Each attorney must acknowledge the restriction that they will not forward third party messages to or from Mr. Tsarnaev. Ex. A ¶ 2.a.

*Restrictions on disseminating Mr. Tsarnaev's communications*. An attorney may disseminate the contents of the inmate's communications to third parties "for the sole purpose of preparing the inmate's defense — and not for any other reason." Only an attorney, and not an attorney's staff, may disseminate such communications. Ex. A ¶ 2.d.

*Restrictions on Legal Visits.* Only the attorney's pre-cleared paralegal (a paralegal who has passed background checks and signed the SAMs affirmation) may meet with Mr. Tsarnaev unaccompanied by an attorney. Ex. A ¶ 2.e. Investigators and interpreters may not meet alone with Mr. Tsarnaev. Ex. A ¶ 2.f.[1]

*Restrictions on Legal Phone Calls.* Only pre-cleared attorneys and staff are permitted to communicate with Mr. Tsarnaev by telephone, and then only when an attorney is physically present and participating in the call. Ex. A ¶ 2.g.i. No person, other than pre-cleared attorneys, paralegals, or investigators may participate in the calls or even "listen to or overhear" any part of the calls. Ex. A. ¶ 2.g.ii.(1). The calls may not "be in an any manner recorded or preserved" except that an attorney may make written notes. Ex. A ¶ 2.g.ii.(3)(d). A footnote

---

[1] By letter dated September 11, 2013 (attached hereto as Exhibit C), the government agreed in principle to amend the SAMs to permit visits without attorney/paralegal accompaniment by pre-cleared investigators who are full-time Federal Public Defender employees. However, no amended SAMs have yet been issued and the BOP continues to enforce the existing provision to the letter. The government also declined to permit a mitigation specialist (essentially, an investigator) with decades of experience in capital cases, appointed under the CJA and previously cleared for multiple prior visits with Mr. Tsarnaev at FMC Devens, to continue meeting him without attorney/paralegal/FDO staff investigator accompaniment.

exempts USMS/BOP/DF, FBI, and DOJ from the prohibition on recording attorney-client calls, but then goes on to state that this section nevertheless "does not allow monitoring of attorney-client privileged communications."  Ex. A at 8, n.5.

*Restrictions on Documents Provided by Attorney*.  An attorney may provide Mr. Tsarnaev with, or review with him, "documents related to his defense, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney."  Ex. A ¶ 2.h.  Materials provided may not "include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/DMA and FBI.  Ex. A ¶ 2.h.i.[2]

*Legal Mail*.  Any attorney "may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise) to third parties . . . . [O]nly case-related documents will be presented to the inmate, and … neither the attorney or his or her staff will forward third party mail to or from the inmate."  Ex. A ¶ 2.i.

## 2.   Other Provisions.

*Outside Contacts*.  The SAMs restrict Mr. Tsarnaev's non-legal mail, phone calls, and visits to immediate family members only – defined narrowly as spouse (he has none), natural children (he has none), parents, and siblings.  Ex. A ¶¶ 3.a.i., n.7; 3.a.i.; 3.f.i.; 3.g.i.  He can send no more than one letter, comprised of no more than three double-sided pages, to one adult recipient per week.    Ex. A ¶ 3.g.i. Only one adult may visit at a time, without any physical contact.  Ex. A ¶ 3.f.ii. Family members may not record telephone calls or divulge the contents of any communication to any third party.  Ex. A ¶¶ 3.b.; 3.f.; 3.g.  All such non-legal contacts will be monitored, copied, and/or recorded.  Ex. A ¶¶ 3.d.; 3.f.; 3.g. Review of incoming mail may take 14 days for English-language mail and 60 days for foreign-language mail.  Ex. A ¶ 3.g.iv.

*Media access*.  Mr. Tsarnaev may not communicate, directly or indirectly, with the news media.  Ex. A ¶ 4.  He is, however, permitted to receive pre-screened publications and books.  Ex. A ¶¶ 9; 10. While the SAMs permit access to radio and television, Ex. A ¶ 9.b, the unit where Mr. Tsarnaev is housed at FMC Devens does not.

*Isolation and restrictions within detention facility*.   Mr. Tsarnaev may not participate in group prayer services with other inmates.  Ex. A ¶ 5.a.  He may not

---

[2] In its September 13 letter, the government stated that "all discovery materials in this case are precleared by the USA and FBI for review by the defendant," even though some of those materials may otherwise violate this provision of the SAM.  Ex. C.

share a cell and is to be prevented from communicating orally or in writing with other inmates.  Ex. A ¶¶ 6, 7.

### C.  Purported "Reasonable Necessity" of the Restrictions.

The "Conclusion" of the Aug. 27 Memorandum, set forth here in its entirety, purports to

explain why the foregoing restrictions are "reasonably necessary":

> The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

> With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to co-conspirators to arrange terrorist or criminal activities.

> With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate from receiving or passing along critically timed messages. Although I recognize that eliminating the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or to assist in, violent and/or terrorist activities. Under these procedures, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information.

> To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to the inmate is worthy of trust.

> The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates terrorist, criminal, and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or terrorist act to justify such media restrictions.

> The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated

through other means, such as the television and/or radio. Although I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that furthers terrorist, violent, and/or criminal activities.

Ex. A at 16-17.

## Argument

### I.      THE SAMs ARE UNWARRANTED.

Title 28 of the Code of Federal Regulations, section 501.3 ("Prevention of acts of violence and terrorism") vests power in the Director of the Bureau of Prisons ("BOP"), upon direction of the Attorney General, to authorize the warden of a detention center or prison to implement Special Administrative Measures ("SAMs") that are "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a).  The Attorney General may authorize SAMs upon finding that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."  *Id.*  SAMs may include, but are not limited to:  housing in administrative detention and/or restrictions on privileges such as correspondence, telephone, visits, and access to the media — in essence, any measure "reasonably necessary to protect persons against the risk of acts of violence or terrorism."  *Id.*

In addition, the BOP Director, if specifically ordered by the Attorney General, is empowered to implement "appropriate procedures for the monitoring or review of communications" between an inmate and "attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege."  28 C.F.R. § 501.3(d).  The Attorney General may issue such an order based upon a finding of "reasonable suspicion" that an "inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism."  *Id.*  The

Attorney General must make an additional, specific certification of findings to impose SAMs under this section, 501.3(d), beyond any findings underlying measures imposed under section 501.3(a). *See* 28 C.F.R. § 501.3(d)(1).   Monitoring may be conducted "for the purpose of "deterring future acts that could result in death or serious bodily injury to persons . . . ." 28 C.F.R. § 501.3(d).

Here, there is an insufficient factual basis to justify imposition of any SAMs.  Moreover, neither section 501.3(a) nor section 501.3(d) authorizes restrictions on attorney-client contact of the sort contained in the SAMs here.  The SAMs as a whole, and the attorney-client provisions in particular, are therefore arbitrary, capricious, an abuse of discretion, lack basis in substantial evidence, and are otherwise not in accordance with the law.  *See Cracker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013) (court may invalidate administrative action "if it is arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with the law.").

### A.  There is No Factual Basis to Conclude that SAMs are Necessary to Avoid Death or Serious Bodily Injury.

The government attempts to justify the SAMs based on Mr. Tsarnaev's alleged "participation in planning and executing the Boston Marathon bombings; his ensuing acts of violence and flight to avoid apprehension; his extensive obstruction of justice; and his explicit and continuing desire to incite others to engage in violent jihad."  Ex. A at 2.  Notably absent in the government's litany is reference to any problematic behavior or efforts to incite others whatsoever in the months after his arrest before SAMs were imposed.  The government's leap to find "substantial risk" that mere "communications or contacts" could "result in death or serious bodily injury" amounts to rank speculation without any basis in fact.  *See Mohammed v. Holder*, 2011 WL 4501959 (D. Colo. Sept. 29, 2011) (denying, in part, defendant prison officials' motion

for summary judgment in civil action by convicted prisoner challenging SAM; "The Government's general justifications for SAMs — involvement in terrorist activities and dangerous communications by others during incarceration — do not address Mr. Mohammed's conduct or his particular risks . . . . [T]here has been no showing that new circumstances justify greater restriction.").

To be sure, the underlying charges arising from the Marathon bombing and ensuing events in Watertown, for which Mr. Tsarnaev is awaiting trial, are grave. However, the government has not alleged, nor is the defense aware of any evidence to suggest, that these events were directed by others still at large or that Mr. Tsarnaev ever had operational authority to direct the activities of others. Since his arrest, Mr. Tsarnaev has been in a highly secure federal prison. He is incapacitated and obviously could not engage in similar behavior now. Nor is there any evidence whatsoever of the existence of co-conspirators with whom Mr. Tsarnaev could arrange further terrorist or criminal activities, much less a "high probability" that he would make calls to do so, as alleged by the government.

The government's suggestion of "extensive obstruction of justice" by Mr. Tsarnaev is an overwrought characterization of its own allegations, and, again, only concerns conduct prior to arrest. Specifically, the government alleges that, prior to his arrest, Mr. Tsarnaev discarded evidence (including a leftover "detonator") and smashed cell phones. The government also claims that he "convinced his associates to attempt to destroy evidence." However, the government's own allegations against those associates belie this characterization. By separate indictment, the government charged three college friends of Mr. Tsarnaev with removing and disposing of certain items from Mr. Tsarnaev's dorm room and/or lying to investigators. *See United States v. Kadyrbaev et al*, 13-CR-10238-DPW (D. Mass.). According to that indictment,

the defendants removed and then disposed of certain items from Mr. Tsarnaev's dorm room after receiving a text message from him: ""If yu [sic] want yu [sic] can go to my room and take what's thereO but ight [sic] bra [sic] Salam aleikum."  *Id.*, DE 36 (Indictment) at 7, Count One, "Overt Acts" ¶ b.   The plain meaning of this alleged text message is that Mr. Tsarnaev gave his friends permission to take his worldly goods in anticipation of his own arrest or demise.  The alleged text message does not instruct them to dispose of evidence or lie to investigators.  Moreover, the government makes no suggestion that Mr. Tsarnaev has done anything to obstruct justice since his arrest, nor does it explain how Mr. Tsarnaev could possibly obstruct justice in the future absent SAMs, or how SAMs might prevent such obstruction.

The government also fails to explain how Mr. Tsarnaev's alleged commitment to "jihadist" ideology, and alleged hope that his actions would inspire others, justify the SAMs. While the government focuses on Mr. Tsarnaev's "notoriety" and states that he has received "nearly one thousand pieces of unsolicited mail," it fails to mention that Mr. Tsarnaev has not responded to any of this mail and ignores the significance of the fact that it was "unsolicited." To punish Mr. Tsarnaev, in effect, for something he has done nothing to encourage, is perverse. The government also fails to mention that none of this unsolicited mail could be characterized as "jihadist" in nature.  Rather, it consisted almost entirely of letters and cards from individuals who believe he is innocent and people urging him to repent and convert to Christianity. All of this mail was screened under ordinary BOP procedures and deemed acceptable to be transmitted to him.

The government's further reliance on an incident in May, barely a month after his arrest, when Mr. Tsarnaev's mother released portions of a recorded phone call with him to the media "in an apparent effort to engender sympathy" is telling.  While the government may not want

anyone to feel "sympathy" for Mr. Tsarnaev, that is not a proper basis to impose SAMs.  Mr. Tsarnaev's mother was distraught and sought to reassure the world that her son was, in fact, alive, recuperating from his wounds, ambulatory, eating, etc. She has not released any call recordings since that time and her further contact with Mr. Tsarnaev could easily be conditioned on her agreement not to record or release future calls, without the need for draconian and wide-reaching SAMs.

### B.  The SAM Restrictions on Counsel are Not Authorized Under the Regulation.

Section 501.3(a) allows various restrictions on a detainee's conditions of confinement but does not mention any restrictions on attorney-client contact or communications.[3]  Only section 501.3(d) addresses attorney-client communications, and even that provision does not contemplate restrictions on attorney speech or activities outside prison walls.[4]  In addition, any measures under section 501.3(d) would require a separate and specific certification and finding by the Attorney General that "reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism . . . ." 28 C.F.R. § 501.3(d).  Here, defense counsel have not received any written notice under section

---

[3] Indeed, section 501.3(a) speaks only to administrative segregation and curtailment of various "privileges."  No one could plausibly contend that the right of a defendant to communicate with his or her attorney is a mere "privilege"; it is a fundamental constitutional right.

[4] A regulation that did expressly authorize restrictions on attorney speech would raise separate constitutional concerns.  Courts have upheld such restrictions only where they are necessary to protect the integrity of the judicial process.  *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071 (1991) ("The First Amendment protections of speech and press have been held . . . to require showing of 'clear and present danger' that a malfunction in the criminal justice system will be caused before a State may prohibit media speech or publication about a particular pending trial" by an attorney.); *United States v. Scarfo*, 263 F.3d 80, 95 (3d Cir. 2001) ("[W]e can see no valid reason to interdict a lawyer's First Amendment right of speech" unless there is evidence that the proscribed speech would "jeopardize[ ] the fairness of the trial or in any way materially impair[ ] or prejudice[ ] the judicial power of the court.").

501.3(d) and cannot fathom how they reasonably could be suspected of facilitating acts of terrorism.  In other words, no order under section 501.3(d) has been issued.

Instead, the existing SAMs apparently have been issued under section 501.3(a), which does not authorize any restrictions on attorney-client contact or communications.  *See Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("[W]e will construe narrowly all delegated powers that curtail or dilute" fundamental constitutional rights).  The government's attempt to use its physical custody of Mr. Tsarnaev, custody it possesses solely by virtue of this Court's detention order and for no other reason, as a lever to control the attorney-client relationship is a misuse of authority that does not belong to it.

Even assuming, for the sake of argument only, that restrictions on attorney contact, speech, and conduct were authorized under section 501.3(a), the government has failed to demonstrate that contacts with court-appointed attorneys create a "substantial risk" of "death or serious bodily injury."  There is no basis whatsoever to suspect that appointed attorneys and those assisting them would intentionally pass dangerous communications to others.  The speculative and theoretical possibility that such communications could be passed unintentionally does not constitute a "substantial risk" as a matter of law.  *Cf. Leocal v. Ashcroft*, 543 U.S. 1 (2004) (holding that unintentional conduct does not constitute substantial risk of use of force).

The restrictions relating to counsel in the SAMs are therefore contrary to underlying regulatory authority and lacking a basis in substantial evidence.  They should be stricken.

## II.    THE SAMS VIOLATE THE U.S. CONSTITUTION.

The legitimate purpose of pretrial detention is not punishment but rather to ensure public safety and the defendant's presence at trial.  *See generally*, *Bell v. Wolfish*, 441 U.S. 520 (1979).  Pretrial detainees "retain at least those constitutional rights that we have held are enjoyed by

convicted prisoners," *id.* at 545, and their conditions of confinement may not be punitive in nature.  *Id.* at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against the deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that the due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner.").  In addition, when "an institutional restriction infringes a specific constitutional guarantee," such as the First Amendment or Sixth Amendment, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security."  *Bell*, 441 U.S. at 547.

The First Circuit has held that *Bell* requires a balancing test, weighing the "scope of the particular intrusion" against the government's justification for that measure.  *Roberts v. Rhode Island*, 239 F.3d 107, 110 (1st Cir. 2001).  While prison officials are entitled to deference,[5] the court does not abdicate its role in reviewing their conduct. *See id.* at 113 (affirming lower court decision holding that search policy of intake facility was unconstitutional).

Here, the SAMs violate the Constitution in a variety of ways without a sufficient justification related to institutional order and security or public safety.

### A.  The SAMs Violate Due Process and Thwart Effective Assistance of Counsel.

Mr. Tsarnaev is entitled to the effective assistance of counsel for his defense under the Due Process Clause and the Sixth Amendment.  Access to counsel is particularly critical during the pre-trial stage.  *See, e.g.*, *Maine v. Moulton*, 474 U.S. 159, 170 (1985) ("[T]o deprive a

---

[5] Notably, the SAMs at issue here were not initiated by prison officials during the first four-plus months of Mr. Tsarnaev's confinement.  Rather, they were implemented by order of the Attorney General at the behest of U.S. Attorney Ortiz, who is not a "prison official" with specialized correctional knowledge and experience that warrants deference in this context.

person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."); *Wolfish v. Levi*, 573 F.2d 118 (2d Cir. 1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds*, *Bell v. Wolfish*, 441 U.S. 520 (1979); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) (when access to counsel "is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."). The Supreme Court has held that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (citing *Ex Parte Hull*, 312 U.S. 546 (1941)), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989).

Professor LaFave's CRIMINAL PROCEDURE (3d ed. 2012) begins subsection (a) ("Restrictions Upon Counsel's Assistance") of section 11.8 ("Ineffective Assistance Claims Based Upon State Interference and other Extrinsic Factors") with the following analysis:

> The "right to the assistance of counsel," the Supreme Court noted in *Herring v. New York*, "has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process." Accordingly, state action, whether by statute or trial court ruling, that prohibits counsel from making full use of traditional trial procedures may be viewed as denying defendant the effective assistance of counsel. In considering the constitutionality of such "state interference," courts are directed to look to whether the interference denied counsel "the opportunity to participate fully and fairly in the adversary factfinding process." If the interference had that effect, then both the overall performance of counsel apart from the interference and the lack of any showing of actual outcome prejudice become irrelevant. The interference in itself establishes ineffective assistance and requires automatic reversal of the defendant's conviction.

Wayne R. LaFave, et al., CRIMINAL PROCEDURE § 11.8 (3d ed. 2012) (citations omitted).

The SAMs severely impair the defense function in this case in a variety of ways.  They have a dramatic chilling effect on the defense team's ability to prepare a thorough and vigorous defense and they also erect a variety of practical obstacles.

    **1.   Areas of Interference with the Defense.**

    **a.   "Dissemination" of Communications.**

The SAMs provide that counsel may "disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason . . ."  Ex. A ¶ 2.d.  This provision is inconsistent with the provision governing Legal Mail, which states that counsel "may not send, communicate distribute, or divulge the inmate's mail, or any portion of its contents (legal otherwise), to third parties," without exception. Ex. A ¶ 2.i.  Reading these provisions together, the SAMs apparently permit counsel to share information obtained from Mr. Tsarnaev orally or in person[6] "for the purpose of preparing the defense" but prohibit counsel from sharing information obtained from him by mail under any circumstances for any purpose.  The disparate treatment of information obtained from Mr. Tsarnaev based on the medium of communication is the very definition of "arbitrary and capricious."  It is also completely impractical for members of the defense team to keep track of the means by which they have learned individual pieces of information from Mr. Tsarnaev.

Moreover, the prohibition on dissemination of information obtained from Mr. Tsarnaev for purposes other than "preparing the . . . defense" is unconstitutionally vague.  It is difficult for undersigned counsel to conceive why they would ever share Mr. Tsarnaev's communications for a purpose unrelated to preparing the defense.  But the SAMs do not define "preparing the

---

[6] The SAMs do not expressly address a situation where Mr. Tsarnaev might provide a writing that he has composed to defense counsel in person during a meeting.  Transmittal of such writings in person is not prohibited by the SAMs and defense counsel therefore assume that the content of such writings would be covered under ¶ 2.d.

defense" nor is it clear who might seek to arrogate to themselves the authority to decide in hindsight what such preparation properly may include.

This is a capital case. Defense counsel must necessarily seek input from Mr. Tsarnaev on many issues, including his family history. The information he provides may well inform follow-up investigation. Because of the SAMs, information from Mr. Tsarnaev will have to be segregated from all other information in the case to avoid inadvertent disclosures. Information obtained from Mr. Tsarnaev prior to the SAMs will also have to be segregated from information obtained post-SAMs. While it is impossible to detail all instances in which information from Mr. Tsarnaev might need to be disseminated, they are numerous and various. Would the government second-guess the defense team for interviewing prospective witnesses based on information obtained from Mr. Tsarnaev? Identifying and interviewing witnesses lie at the core of defense counsel's obligations. *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelilnes") (2003) at 79, 104 (requiring counsel to interview "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), [and/or] the degree of culpability for the offense. . . ."). Would the government second-guess the defense team for discussing information about Mr. Tsarnaev's medical condition and about the case with his parents? *See* ABA Guidelines at 70 ("It is also essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.").

In the end, the defense is left to operate in the shadow of fear that the government may charge, after the fact, that some "dissemination" violated the SAMs.[7] The restrictions imposed

---

[7] New York defense attorney Lynne Stewart was sentenced to 10 years in federal prison on charges that included violation of SAMs. *See United States v. Stewart*, No. 02-CR-00395-JGK

by the SAM (and looming threat of prosecution for any "violation") will chill the informed judgment of the attorneys appointed to defend Mr. Tsarnaev, unnecessarily burden the legal process, and threatens to warp their representation from zealous advocacy to overly cautious and indeed timid advocacy.  *See* Joshua L. Dratel, *Ethical Issues in Defending a Terrorism Case: How Secrecy and Security Impair the Defense of a Terrorism Case*, 2 CARDOZO PUB. L. POL'Y & ETHICS J. 81, 88 (2003) ("The S.A.M.s also unquestionably exert a chilling effect upon counsel. Given the nature and scope of the proscriptions, it is doubtful that any lawyer could maintain a perfect record of compliance.  Thus, the government has maximum discretion regarding whom to prosecute, for what conduct, and when.  The question is willfulness, and the government has the power to decide to whom it wishes to afford the benefit of the doubt.").

### b.  Documents Provided by Attorney to Inmate.

The SAMs provide that during a visit "the attorney may provide the inmate, or review with the inmate, documents related to his defense, including discovery materials, court papers (including indictments, court orders, motions, etc.) and/or material prepared by the inmate's attorney . . ."  Ex. A ¶ 2.h.  This provision suffers a constitutional vagueness problem similar to the "communications" provision discussed above – who may second-guess defense counsel's determination of whether a document is properly "related to . . . the defense"?[8]

---

(S.D.N.Y.), DE 1041 (judgment dated July 29, 2010).   While undersigned counsel do not condone the conduct underlying her conviction — among other things, Stewart apparently announced to the press that her client, a prominent Egyptian Sheikh and cleric, was withdrawing his support for a cease-fire — the particulars of that case highlight the excessiveness of SAMs here, where there is no allegation that Mr. Tsarnaev has any connection to any outside organization.

[8] This is not merely a theoretical concern.  For example, in early September, BOP personnel at FMC Devens prohibited defense counsel from showing photographs, some of which depicted family members, to Mr. Tsarnaev.  After initial discussions between the government and defense counsel, the government maintained that family photographs were "non-legal materials."  Ex. C. After further consultations, the government reconsidered its position and acknowledged that

In addition, the government and BOP apparently take the position that the BOP has the discretion to review materials brought into the facility, not only for "contraband" that could threaten institutional security (a standard part of custodial legal visits at any institution), but also for substantive content:

> BOP needs to review all materials brought into BOP facilities to ensure the safety and security of the institution, its inmates, and BOP personnel. The review is normally performed by an officer at the front desk. In the case of purported legal materials brought in by a member of an inmate's defense team, the review is only as extensive as needed to ensure that the materials are in fact legal materials. If the officer determines that the materials are in fact legal, he or she does not normally report on the contents of the materials to higher level BOP officials (let alone to the prosecution team) except in extraordinary circumstances; the officers therefore effectively operate as a taint team.

> If, however, an officer has a question about certain material, he or she may bring it to the attention of the supervising lieutenant, who may in turn seek guidance from other BOP personnel, including BOP attorneys. In addition, if BOP has reason to believe that members of the defense team have attempted to carry non-legal materials into the facility in violation of the SAM, they may bring that to the attention of the US Attorney's Office.

Ex. B at 2.  Any such content-based review of defense materials violates the confidentiality of defense work product and exposes the privileged subject matter of planned attorney-client communications.

### c.  Practical Obstacles.

The SAMs' restrictions on attorney conduct also erect a number of other unnecessary and unwarranted practical obstacles to the defense team's work.

In addition to the problems with restrictions on dissemination of communications highlighted above, the SAMs provide that only an attorney – not a paralegal or investigator – may make a "permitted" dissemination for purposes of preparing this defense.  This creates a

---

family photographs could be shown "as long as they are related to his defense." Ex. D.  While this particular issue was resolved, it highlights the chilling and uncertain environment in which the defense must operate under the SAMs, and the intrusions into attorney work product and privileged communications that result along the way.

host of practical problems both internally – a paralegal or investigator may not distribute his or her write-up of a meeting with Mr. Tsarnaev among other defense team members – and externally – an investigator may not reference information obtained from Mr. Tsarnaev during a witness interview.  These provisions are completely unworkable.  *See United States v. Mikhel*, 552 F.3d 961, 964 (9th Cir. 2009) (ordering modification of SAM, unopposed by government, permitting investigators to disseminate communication for purpose of preparing defense).

The government's continued refusal to permit the defense team mitigation specialist (investigator) who is not an FDO employee (but is appointed under the CJA, experienced in such matters, and previously cleared into FMC Devens) to visit Mr. Tsarnaev unless in the company of counsel or full-time Federal Public Defender staff is also without reasonable basis.  In *Mikhel*, the Court could find no "valid rational justification" for distinguishing between paralegals and investigators employed by the Federal Defender.  *Id.* Likewise, here, there is no valid basis to distinguish between an FDO-employed investigator and an otherwise experienced and reliable investigator appointed under the CJA, who is also under the supervision of appointed counsel.

Finally, the SAMs make no express provision for admission of defense-retained expert witnesses (whether or not anticipated to testify) to visit with Mr. Tsarnaev, and contain no provision to insulate defense requests for additional access to Mr. Tsarnaev from prosecutors of record in the case, thereby vitiating the confidentiality of attorney work product.

### 2. The Purported "Security" Justification for Interference with Counsel Is Unpersuasive.

To justify the wide-ranging impairments of the defense function contained in the SAMs, the government has offered nothing but speculation about possible security risks.   The government must do more than allege that Mr. Tsarnaev is dangerous.  The government must

also make out a rational case that appointed counsel may assist him in dangerous activity absent the SAMs.  As the Seventh Circuit has noted:

> To justify his impairment of communication between attorneys and inmates in the name of security, a prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of established preventive measures, <u>but that their attorneys are engaged in the smuggling</u>. We ground the last requirement on our unwillingness to assume that attorneys–admittedly the partisan advocates in court of their clients' cause–are more willing or more inclined to smuggle contraband past prison officials than are other outsiders who deal directly with inmates, as well as on our recognition of the constitutional importance of the business which an attorney typically conducts with an inmate, a status not attending the affairs which prison personnel carry on with an inmate . . . .

*Adams v. Carlson*, 488 F.2d 619, 632-33 (7th Cir. 1973) (emphasis added).  Like the Seventh Circuit, this Court should be unwilling to assume – as the government apparently has – that court-appointed counsel, who have no previous connection to Mr. Tsarnaev and are financially independent of his family and any supporters, would be willing to assist in illegal activity. The attorney-client provisions of the SAM are unwarranted and should be vacated.

**B.  The SAMs Violate the First Amendment.**

The blanket prohibition of non-legal communications with persons other than immediate family members (as narrowly defined in the SAMs), including the media, plainly burden free speech and association rights.  *See, e.g., Mohammed v. Holder*, 2009 WL 529549 (D. Colo. 2009) (denying defendants' motion to dismiss; holding that complaint regarding restrictions on family contacts states colorable claim of First Amendment violation); *Hale v. Ashcroft*, 2008 WL 4426095 at *4 (D. Colo. 2008) (SAMs' restrictions on communications with family members clearly "impaired" his  "First Amendment interests").  The restriction on group prayer also infringes the free exercise of religion.  *See, e.g., Reid v. Wiley*, 2009 WL 1537879 (D. Colo.

2009) (denying motion to dismiss free exercise claim by prisoner denied group prayer under SAMs).

The government has not made any persuasive showing why these restrictions are necessary, nor has it demonstrated that less restrictive alternatives would not suffice.   Mr. Tsarnaev has made no effort to communicate with non-family or media, and is unlikely to do so. The blanket prohibitions in the SAMs are nevertheless improper.   There is no allegation or evidence that Mr. Tsaranev acted in concert with outside groups, that any such groups have sought to communicate with him, or that his receipt of such communications while detained would pose any danger.

### C. Other Provisions of the SAMs are Effectively Punitive and Therefore Violate Due Process.

The restrictions on Mr. Tsarnaev leave him in nearly total isolation.   He is confined to his cell except for legal visits and very limited access to a small outdoor enclosure, on weekdays, weather-permitting.   The purported basis for these conditions lies in the crimes he is alleged to have committed prior to arrest, not any behavior during his confinement.

The negative effects of isolation on detainees are well-documented.  *See generally, e.g.*, Laura Rovner and Jeanne Theoharis, *Preferring Order to Justice*, 61 AM. U. L. REV. 1331, 1358-1371 (June 2012) (summarizing literature and cases concerning effects of SAM-imposed isolation, including harmful effects on physical/mental health, coercive impact of those effects, and deterioration of client's ability to assist in his own defense);  Atul Gawande, *Hellhole*, THE NEW YORKER, Mar. 30, 2009.    Indeed, the United Nations identifies long-term solitary confinement as a form of torture.  *See* Human Rights Committee, General Comment 20, Article 7 (44th session, 1992).

Inmates may not be subjected to unnecessarily harsh and isolating conditions of confinement.  *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995));  (holding that protected liberty interest arises where prison regulations impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and finding liberty interest in avoiding placement in Ohio's "supermax" facility).  In the absence of a showing that there is a reasonable necessity for particular SAMs that impose harsh conditions of confinement, they are unlawful and should be vacated.

## Conclusion

For the foregoing reasons, this Court should vacate the SAMs.

Respectfully submitted,

DZHOKHAR  TSARNAEV
by his attorneys

/s/  William W. Fick

Judy Clarke, Esq.
California Bar:  76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 2, 2013.

/s/ William W. Fick