## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                                     )
       v.                     )       Crim. No.13-10200-GAO
                                     )
DZHOKHAR A. TSARNAEV,     )
              Defendant    )

### GOVERNMENT'S OPPOSITION TO TSARNAEV'S MOTION
### TO VACATE SPECIAL ADMINISTRATIVE MEASURES ("SAMs")

The United States of America, by and through its undersigned counsel, respectfully opposes Tsarnaev's motion to vacate the Special Administrative Measures ("SAMs") imposed upon him pursuant to Title 28, C.F.R. § 501.3(a), and requests that the Court deny the motion in its entirety. As basis for its opposition, the government states as follows:

1. The court lacks jurisdiction to hear the motion as because Tsarnaev has failed to exhaust his administrative remedies as required by 28 C.F.R. § 501.3(e).

2. The SAMs are lawful because there is a substantial risk that Tsarnaev's communications and/or contacts with persons could result in death or serious bodily injury to persons, and the SAMs are reasonably necessary to protect against that risk. See 28 C.F.R. § 501.3(a).

3. The SAMs are constitutionally valid and do not impose unauthorized restrictions upon counsel or violate the First, Fifth, or Eighth Amendments.

4. The SAMs are not punitive.

## I. TSARNAEV HAS FAILED TO EXHAUST REQUIRED ADMINISTRATIVE REMEDIES.

All of Tsarnaev's current claims are subject to adjudication under the Prison Litigation Reform Act "(PLRA") found at 42 U.S.C. § 1997e.  Under the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 532 U.S. 731, 741 (2002).

The PLRA is applicable to all prisoners, including a pre-trial detainee.  "The term 'prisoner' means any person incarcerated or detained in any facility who is accused of . . . a violation of criminal law." 42 U.S.C. § 1997(e)(2)(h).  "As the term 'inmate' is used in the regulation authorizing the Attorney General to direct the implementation of SAMs, 'inmate means all persons in the custody of the Federal Bureau of Prisons or Bureau contract facilities, including persons charged with or convicted of offenses against the United States; D.C.Code felony

2

offenders; and persons held as witnesses, detainees, or otherwise.'"   United States v. Ali, 396 F.Supp.2d 703, 708 (E.D. Va. 2005) (citing 28 C.F.R. § 500.1(c)).

The available administrative remedies are set forth at 28 CFR § 501.3(e). "The affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program, ["ARP"], 28 C.F.R. part 542."  The purpose of the ARP "is to allow an inmate to seek formal review of an issue relating to any aspect of his . . . own confinement."  28 C.F.R. § 542.10(a). "An inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." 28 C.F.R. § 542.13(a).

Here, as in all cases where detainees seek to end-run the administrative process and take their complaints about prison life straight to district court, there are good reasons to require Tsarnaev to address his complaints first to the prison administrators who have knowledge and expertise in responding to prisoner complaints.  As the Supreme Court explained in Porter:

> Congress enacted section 1997e(a) to reduce the
> quantity and improve the quality of prisoner
> suits; to this purpose, Congress afforded
> corrections officials time and opportunity to
> address complaints internally before allowing the
> initiation of a federal case.  In some instances,
> corrective action taken in response to an

inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. [citing Booth v. Churner, 531 U.S. 731, 737 (2001)]. In other instances, the internal review might 'filter out some frivolous claims.' Ibid. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy. See ibid.

534 U.S. at 524. In this case, as set forth below, the Bureau of Prisons ("BOP") has already agreed to several defense-requested modifications and clarifications of the SAMs without any need for district court interference.

Relying on Porter and Booth, courts routinely dismiss prisoner lawsuits challenging SAMs and other conditions of confinement where a prisoner has failed to exhaust his administrative remedies. See, e.g., Yousef v. Reno, 254 F.3d 1214, 1222 (10th Cir. 2001) ("[D]espite the BOP's inability to address challenges to the SAM's overall validity, [defendant] was required to exhaust all of his administrative remedies before seeking judicial consideration of his claims."); United States v. Abu Ali, 528 F.3d 210, 244 (4th Cir. 2008) ("The defendant must exhaust his administrative remedies before challenging the SAMs in federal court."); United States v. Al-Marri, 239 F.Supp.2d 366, 367 (S.D.N.Y. 2002 )("[T]he Supreme Court's decision in Porter . . . makes clear that courts should not intervene in matters regarding prison conditions until

corrections officials have had the time and opportunity to address such complaints internally."); United States v. Troya, 2008 WL 2537145, at *4-5 (S.D.Fla. Jun. 24, 2008) (rejecting argument that "a defendant facing the death penalty need not exhaust administrative remedies before challenging SAM restrictions" and holding that "until Defendant has exhausted his available administrative remedies this Court is jurisdictionally barred from adjudicating Defendant's claim."). To be sure, Troya cites two cases in which district courts found that exhaustion is not required when a detainee files a motion in his own case as opposed to a separate civil action.  Those cases are obviously incorrect. PLRA specifically applies to detainees as well as prisoners.  All detainees have pending actions. If these case are correct, the exception they create would swallow the rule.

Because Tsarnaev has not exhausted his administrative remedies, his motion must be denied.

## II. THERE IS A SUBSTANTIAL RISK THAT TSARNAEV'S UNRESTRICTED COMMUNICATIONS AND CONTACT WITH OTHERS COULD ENDANGER THE PUBLIC, AND THE SAMs ARE REASONABLY NECESSARY TO PROTECT AGAINST THAT RISK.

Although the Court need not address Tsarnaev's motion in light of his failure to exhaust administrative remedies, it would find it completely lacking in merit if it did.  In arguing that SAMs are unwarranted in this case, Tsarnaev focuses on what

he has not done since his arrest rather than on the things he actually did when he still had the opportunity and thus might do again in the absence of SAMs.  As set forth in the Attorney General's August 27th Memorandum directing implementation of the SAMs, Tsarnaev's avowed wish to incite others to engage in violent jihad, coupled with his world-wide notoriety, his previous use of others to assist him in his own crimes, and his successful use of terrorist tradecraft to avoid detection, create a substantial risk of public harm absent reasonable restrictions on his ability to communicate with others.[1]

Tsarnaev's desire to inspire others to commits acts of terrorism is evident in the message he wrote in pen on the inside of the boat where he took refuge after his own ability to commit terrorist acts was exhausted.  He wrote:  "The U.S. government is killing our innocent civilians but most of you already know that.  As a M[uslim] I can't stand to see such evil go unpunished, we Muslims are one body, you hurt one you hurt us all . . . [T]he ummah [i.e. the Muslim people] is beginning to rise]. . . .  Know you are fighting men who look into the barrel

---

[1] Defendant's reliance on <u>Mohammed v. Holder</u>, 2011 WL 4501959 (D.CO. 2011) misreads the denial of a motion for summary judgment as a standard for judgment of the reasonableness of SAMs. In <u>Mohammed</u>, the court found only that the defendant's request was sufficient to set out a prima facie case but the final judgment on the reasonableness of the SAMs with respect to limitation of communication was not decided at that point.

of your gun and see heaven, now how can you compete with that. We are promised victory and we will surely get it."   This was a clarion call to radical militants to follow in his wake. Tsarnaev's self-evident goal in writing these words was to motivate others to commit acts of the same or similar nature, putting the American people at constant risk.

Contrary to Tsarnaev's claim, see Tsarnaev Mot. at 8, there is nothing speculative about his ability to inspire others through his words in light of his past deeds.  Among those who have already picked up the gauntlet thrown down by Tsarnaev were the writers and editors of the July 2013 issue of *Inspire* magazine, a publication of al-Qaeda in the Arabian Peninsula, which lauded Tsarnaev and his brother as heroes and martyrs. The magazine applauded the choice of Boston as a terrorism target and noted how easy it was for Tsarnaev (and therefore would be for others) to carry out the Boston bombings.  A Boston Globe article about the Inspire issue noted the existence of a Facebook group calling Tsarnaev a "brave freedom fighter."  See Bryan Bender, "Some radicals make heroes of Tsarnaev brothers," Boston Globe, July 14, 2013.  The August 2013 issue of Rolling Stone magazine suggests that it would be a media coup to speak with Tsarnaev and publicize his views. Tsarnaev's world-wide notoriety as a successful terrorist, coupled with his avowed desire to inspire others and his attempt to do so even under the

direst conditions while evading capture, alone provide a
reasonable basis for concluding that reasonable restrictions on
his freedom to communicate with others are needed to protect the
public.

As noted in the Attorney General's memo, Tsarnaev has
already demonstrated his willingness to use others to advance
his illegal ends.  On May 3, 2013, the FBI arrested three of
Tsarnaev's associates after they removed incriminating evidence
-- including his computer and a backpack containing pyrotechnics
and a thumb drive -- from his dormitory room at his invitation.
He has also shown that others are willing to be a mouthpiece for
him while he detained.  On May 24, 2013, after Tsarnaev called
his mother from prison, she reported on the call to the press.
Echoing Tsarnaev's own previous statement that "The U.S.
government is killing our innocent civilians," she told the
press, "I could just feel that he [Tsarnaev] was being driven
crazy by the unfairness that happened to us, that they
[referring to Americans, specifically law enforcement] killed
our innocent Tamerlan."  Max Seddon and Musa Sadulayev,
Associated Press, AP, "Boston bombing suspect is walking, mother
says," reported May 30, 2013.  Tsarnaev's mother also taped the
call and released portions of it to the media.

Finally, Tsarnaev has also demonstrated a knowledge of
basic tradecraft used by terrorists seeking to avoid detection.

He smashed both of his cell phones before finding a hiding place, knowing that they could be used to geo-locate him.  His past efforts to hide his actions from law enforcement create a substantial risk that he will do so again.

Tsarnaev appears to argue, incorrectly, that there cannot be a substantial risk that his unrestricted communications could harm others unless he has already harmed or tried to harm others through his communications *while in prison*.  He cites no authority for that proposition, and we are aware of none.  On the contrary, courts have long recognized that SAMs are a lawful means of preventing dangerous actions by detainees before any ever occur.  See Al-Owhali v. Ashcroft, 279 F.Supp.2d 13, 16 (D.D.C. 2003); United States v. Ali, 396 F.Supp.2d 703, 710 (E.D.Va. 2005) ("Terrorism matters present special security concerns because of the risk posed by the *possible exchange* of information by a defendant in such a case with someone outside of the detention center.") (emphasis added).  In dismissing the possibility that Tsarnaev could aid or inspire others to commit acts of terrorism through unrestricted communication with third parties, see Tsarnaev Mot. at 9, Tsarnaev ignores the lessons of history.  For example, imprisoned Sheikh Abdel Rahman urged his followers to wage jihad to obtain his release.  Violent attacks and murders followed release of those communications.  See United States v. Sattar, 314 F.Supp.2d 279, 288-89 (S.D.N.Y. 2004); see

9

also Savage, 2012 WL 424993 (inmate ordered firebombing of cooperator's house).

Tsarnaev's argument that section 501.3(d) restrictions have been placed on his attorneys without the requisite certification is a red herring.  Under 25 C.F.R. § 501.3(d), the Bureau of Prisons may "provide appropriate procedures for the monitoring or review of communications between [the] inmate and [his] attorneys" to ensure the public's safety.  As Tsarnaev knows perfectly well, however, the government has not requested such procedures and BOP has not imposed them.  Tsarnaev's communications with the many members of his defense team are neither monitored nor reviewed.  Indeed, at least half a dozen defense lawyers and paralegals regularly meet with Tsarnaev without any supervision, and the government, at Tsarnaev's request, recently modified the SAMs so that an additional two defense investigators could meet with him unaccompanied by even a supervising defense attorney.

The only restriction on the defense is that they may disseminate Tsarnaev's communications to third parties "for the sole purpose of preparing the inmate's defense."  That restriction -- which arises under section 501.3(a) rather than 501.3(d) -- is reasonably necessary to ensure that members of the defense team do not inadvertently pass on forbidden messages from Tsarnaev to third parties.  The courts have long recognized

this as a legitimate concern justifying special administrative measures under section 501.3(a).  See <u>Turner v. Safely</u>, 482 U.S. 78, 93 (1987) ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); <u>United States v. Salameh</u>, 152 F.3d 88, 108 (2nd Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); <u>United States v. Johnson</u>, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); <u>United States v. Hammoud</u>, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code").  In sum, Tsarnaev's avowed desire to inspire others to commit acts of terrorism, coupled with his world-wide notoriety, his demonstrated willingness to use others to achieve his ends, and his past efforts at concealing his illegal activities from law enforcement, create a substantial risk that his communication and contact with others could result in grave harm to the public.  The SAMs are reasonably necessary to protect against that risk.

### III. THE SAMs ARE CONSTITUTIONAL.

Tsarnaev attempts to convert quarrels with the particular wording or content of individual SAMs into violations of the United States Constitution by overwrought characterizations of the SAMs' actual effect on his defense preparation (e.g., "dramatic chilling effect"). All of his concerns can likely be addressed simply and efficiently through discussions with the government or minor amendments to the SAM, as many of them already have been. The nature of his concerns underscores Congress's wisdom in requiring that a detainee first bring his concerns to prison administrators before seeking relief in district court under strained legal theories that simply do not apply.

The Supreme Court has repeatedly "confirmed the importance of deference to correctional officials." Florence v. Board of Chosen Freeholders, 132 S.Ct. 1510, 1515 (2012). Accord Brown v. Plata, 131 S.Ct. 1910, 1928 (2012) ("Courts must be sensitive to the . . . need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of" running prisons); Overton v. Bazzetta, 539 U.S. 126, 132 (2006) ("[Courts owe] substantial deference to the expert judgment of prison administrators."). Because prison administrators have difficult responsibilities, as well as experience and expertise that courts normally lack, prison regulations such as SAMs are

evaluated under an extremely deferential standard:  "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"  Florence, 132 S.Ct. at 1515 (quoting Turner 482 U.S. at 89).

All of the challenged SAMs in this case must be upheld, even assuming they meaningfully impinge on Tsarnaev's constitutional rights, because they are reasonably related to the legitimate penological interest of ensuring that Tsarnaev does not cause harm either inside or outside the prison walls by engaging in forbidden communications with third parties. Tsarnaev's attempts to characterize the SAMs as unconstitutionally unreasonable depend on overblown concerns that involve either hypothetical facts or unnecessarily tortured readings of the SAMs that, if necessary, could likely be cleared up by an exchange of letters.

Indeed, after implementation of the SAMs in this case, Tsarnaev contacted the government to request certain clarifications and amendments.  In a letter dated September 11, 2013, government counsel, after consultation with the Bureau of Prisons, provided the requested clarifications and agreed to the proposed amendments.  Specifically, the government (1) clarified that the SAMs permitted defense counsel to share Tsarnaev's communications about his medical condition with an outside

13

physician if it was for purposes of preparing the defense; (2) agreed that the SAMs could be amended to allow two defense investigators the same unsupervised visitation privileges as paralegals; (3) clarified that irrespective of the SAMs, BOP officers screen all materials brought into the prison by all defense counsel for non-legal items (e.g., contraband such as pornography) but do not report on the contents to higher-level BOP officials (let alone the prosecution) except in extraordinary circumstances; (4) confirmed that all discovery materials in this case had been precleared by the government for review by Tsarnaev; (5) explained that the prohibition on mixed legal and social visits was a standard BOP rule independent of the SAMs, but that if Tsarnaev articulated a need for such a meeting, an exception would be considered; and (6) advised that the review of outside publications by BOP personnel would normally require a few days.  In a follow-up letter on September 17, 2013, the government clarified that the only reason defense counsel had been prohibited from bringing Tsarnaev certain family photos on one particular occasion was that the attorney who brought them expressly told a BOP officer that the photos were not related to the defense.  This exchange of letters demonstrates the ease and efficiency with which Tsarnaev's concerns about particular SAMs can be resolved.

14

A.  The SAMs Do Not Violate The Fifth or Sixth Amendment.

In the portion of his motion challenging particular SAMs, Tsarnaev first complains that there is an irreconcilable conflict between Para. 2.d, which permits his attorneys to disseminate his communications for the sole purpose of preparing his defense, and Para. 2.i, which prohibits his attorneys from sending his legal mail or divulging its contents to third parties.  We disagree.  Like all legal documents, the SAMs must be read as a whole, and the most natural and commonsense way to harmonize these provisions is to read them as prohibiting defense counsel from divulging the contents of legal mail except as provided in Para 2.d, which permits counsel to disseminate Tsarnaev's communications for the purpose of preparing his defense.  If Tsarnaev's counsel remain unduly concerned about this language, or any other language in the SAMs, they can ask the Bureau of Prisons for official clarification, which they have already twice successfully done.  In any event, the conflict between the two cited paragraphs, if there is one, does not render either provision unconstitutionally unreasonable.

Tsarnaev next complains that the restriction in Para. 2.d on dissemination of information from him for purposes other than "preparing the  . . .  defense" is so vague as to make it impossible to follow; yet he admits in his next breath that it is difficult for defense counsel to conceive why they would ever

disseminate Tsarnaev's communications for any other reason.
Defense counsel, who among them have many years' experience,
plainly share an understanding of what it means to prepare a
defense to criminal charges, and they have no reason to suspect
that the SAMs contemplate a different understanding.  If they
do, they can always ask for clarification.  The fact that
Tsarnaev can invent hypothetical problems that might arise from
this restriction does not render it unconstitutionally
unreasonable.

It may indeed be burdensome for Tsarnaev to monitor and
consider the source of information before disseminating it to
third parties, but the burdensomeness of a penal restriction
reasonably related to legitimate penal goals does not render it
unconstitutional. See United States v. Kassir, 2008 WL 2695307
(S.D.N.Y. 2008).  The government is not required to show that
the SAMs are the least restrictive means of achieving a
particular penal goal.  See Turner, 482 U.S. at 90 ("Where
'other avenues' remain available for the exercise of the
asserted right . . . courts should be particularly conscious of
the 'measure of judicial deference owed to corrections officials
. . . in gauging the validity of the regulation.").

Tsarnaev's complaint about Para. 2.h, which restricts
defense counsel from providing him with documents unless they
are "related to . . .  the defense," is purely a claim of

16

inconvenience.  As noted earlier, standard BOP regulations
sensibly require that all tangible items provided to a detainee,
including documents, be screened for contraband.  See BOP
Program Statement, § 540.10.  Normally, the only way to provide
tangible items such as documents or photographs to a detainee is
through the mail, and the items are screened during the normal
mail-review process.  Defense counsel, however, are allowed to
carry defense-related items into the prison with them and bring
them directly to the detainee, provided they are first screened
by a security officer at the prison's front desk.  Para 2.h of
the SAMs merely codifies this standard BOP rule.  To the extent
Tsarnaev's counsel have a concern that a particular item might
not be legitimately defense-related under the SAMs, they are
always free to either seek clarification or simply send it to
him through the mail.  This minimal burden hardly renders Para
2.h unconstitutionally unreasonable, especially since the burden
on defense counsel would be the same even in the absence of Para
2.h.

Tsarnaev's challenge to Para. 2.h based on the alleged
intrusiveness of the screenging process fails for the same
reason.  The need for BOP officials to screen all items brought
or sent to detainees in order to maintain the safety and
security of the institution is self-evident.  This process would
take place even in the absence of Para 2.h, and it is obviously

17

reasonably related to a legitimate penological goal.  Any
infringement of Tsarnaev's privacy rights is minimal and amply
justified.

Tsarnaev's remaining complaints concededly relate only to
"practical obstacles" to the defense team's work, i.e. he finds
the restrictions inconvenient.  But inconvenience to Tsarnaev is
not the touchstone of the inquiry under the constitution, nor
does the law require deference to Tsarnaev's judgment of which
restrictions are needed and which are not.  The Supreme Court's
cases require deference to prison administrators so long as the
restrictions they impose meet the minimal standard of being
reasonably related to a legitimate goal.  Here, the requirement
that attorneys rather than paralegals or investigators assume
certain responsibilities is based on the attorneys' higher
levels of training, supervisory authority, and ethical
obligation.  That is plainly a reasonable requirement.

B.   The SAMs Do Not Violate The First Amendment

The Supreme Court has long recognized that "[t]he fact of
confinement and the needs of the penal institution impose
limitations on constitutional rights, including those derived
from the First Amendment, which are implicit in incarceration."
"  Jones v. North Carolina Prisoners' Labor Union, Inc., 433
U.S. 119, 125 (1977) The provisions of the SAMs restricting
Tsarnaev's non-legal communications to family members are

reasonable in light of the substantial risks he poses.

Moreover, Para. 3.a.i provides that requests for additional non-legal contacts will be considered on a case-by-case basis.

### IV. The SAMs Are Not Punitive.

The Supreme Court held in Turner that "[if] a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment'."  482 U.S. at 539.  We have already shown that the SAMs are reasonably related to legitimate governmental objectives and thus are not punitive. In implementing the SAMs, moreover, the government has taken a flexible approach and been sensitive to Tsarnaev's concerns. Tsarnev's claim of "near total isolation" is belied by the FMC-Devens visitor logs, which indicate that, with the sole exception of the day on which the SAMs were implemented, defense counsel have been given every opportunity to visit with Tsarnaev, and no request for a visit has been denied.  From the date of Tsarnaev's initial confinement at FMC-Devens on April 26, 2013 until the filing of Tsarnaev's motion on October 2, 2013, members of the defense team visited him on 80 of the 162 days, often two persons at a time.  If counsel appeared late, or without the required entrance memo, BOP personnel permitted the visit to go forward anyway.

As for Tsarnaev's apparent wish to associate with other inmates, the Supreme Court has recognized that an "inmate's 'status as a prisoner' and the operational realities of a prison dictate restrictions on the associational rights among inmates." Jones, 433 U.S. at 126.  Tsarnaev is no position to second-guess BOP's judgment that allowing him to mix with other inmates could jeopardize the safety and security of both him and others.  It bears repeating that "[b]ecause the realities of running a penal institution are complex and difficult . . . wide-ranging deference [is] to be accorded the decisions of prison administrators."  Id.

Tsarnaev neglects to mention that many accommodations have and continue to be made on his account, including the closure of the facility for the protection of counsel and staff during every visit.  A separate room in a separate area is provided for counsel to meet in confidence with their client.  Since the implementation of the SAMs, those procedures have not changed. With respect to the SAMs provision regarding phone calls, although the SAMs and BOP policy only require a minimum of one call per month, Tsarnaev has been permitted weekly social calls to his family since July 24 and such continue to the present.

Based upon information and belief, only one request was made for a family visit before this motion was filed.  That request was made after the SAMs were implemented, and sufficient

notice under the SAMs was not provided by the defense.   BOP offered to accommodate the visit the following day but Tsarnaev declined to reschedule the meeting.

**CONCLUSION**

Based upon all of the foregoing, the motion to vacate the Special Administrative Measures should be denied in its entirety.

Very truly yours,

CARMEN M. ORTIZ
United States Attorney
District of Massachusetts


By:   /s/Nadine Pellegrini
NADINE PELLEGRINI
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
Assistant U.S. Attorneys


**CERTIFICATE OF SERVICE**

I hereby certify that these document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

/s/Nadine Pellegrini
Nadine Pellegrini
Assistant United States Attorney


Date: October 21, 2013