IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DZHOKHAR  TSARNAEV | No.  13-CR-10200-GAO |

## REPLY  TO  GOVERNMENT'S  OPPOSITION  TO  DEFENDANT'S  MOTION  TO VACATE  SPECIAL  ADMINISTRATIVE  MEASUES  ("SAMs")

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this Reply to the government's Opposition ("Opp.") [DE # 127] to his Motion to Vacate Special Administrative Measures ("SAMs") [DE # 110].  As explained below:

- This Court has jurisdiction to adjudicate the SAMs Challenge.
- The SAMs are Unwarranted and Exceed Regulatory Authority.
- The SAMs Violate the Constitution.
- The SAMs are Improperly Punitive.

## I.   THIS COURT HAS JURISDICTION TO ADJUDICATE THE SAMS CHALLENGE.

The government contends that the Court lacks jurisdiction to adjudicate this motion (Opp. at 2-5) because Mr. Tsarnaev has failed to exhaust administrative remedies as purportedly required under the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.  § 1997e(a) (emphasis added).

The government's invocation of a technical "exhaustion" defense would only have the effect of delaying resolution on the merits of important issues affecting the ability of defense counsel to represent Mr. Tsrarnaev effectively.  The government is also wrong as a matter of

law.  First, a motion challenging SAMs in a criminal case is not an "action" within the meaning

of the PLRA.  *See, e.g., United States v. Hashmi*, 621 F. Supp. 2d 76, 84 (S.D.N.Y. 2008).

Second, this Court has jurisdiction over the Motion to Vacate SAMs ancillary to its jurisdiction

over Mr. Tsarnaev's criminal case, pursuant to its inherent authority to regulate practice before

it, and pursuant to its pretrial detention order.  *See United States v. Mikhel*, 552 F.3d 961, 963

(9th Cir. 2009); 18 U.S.C. § 3142(i).  Third, whatever administrative remedies may be available

for Mr. Tsarnaev to address conditions of his confinement, the regulations authorizing SAMs

contain no express mechanisms, much less obligatory ones, for counsel to challenge restrictions

on the conduct and speech of the defense team.

### A.  The Instant Motion is Not an "Action" Subject to the PLRA Exhaustion Requirement.

None of the cases cited by the government examines the plain language of the PLRA,

which expressly applies an exhaustion requirement only to "actions," such as civil lawsuits under

42 U.S.C. § 1983, that may be "brought" by a prisoner.  *See* 42 U.S.C. § 1997e(a).  As the court

reasoned in *Hashmi*, "whether the defendant in this case must exhaust his BOP remedies turns on

whether the instant motion constitutes an 'action' within the meaning of the PLRA."  621 F.

Supp. 2d at 84 (emphasis in original).  After examining that question, the court concluded that

"the instant motion is not an 'action' and the Court can proceed to the defendant's constitutional

challenge."  *Id.*

The *Hashmi* court explained that an "action" is best understood as "a civil or criminal

judicial proceeding."  *Id*. at 85 (quoting BLACK'S LAW DICTIONARY at 28 (7th ed. 1999) and

citing *United States v. Ayala Lopez*, 327 F. Supp. 2d 138, 141 n.1 (D. P.R. 2004)).  This

definition is entirely consistent with the one and only example of an "action" in the statutory text

of the PLRA:  a civil rights lawsuit under section 1983.  In contrast, a "motion" that is filed in an

already-pending proceeding is "a written or oral application requesting a court to make a specified ruling or order." *Id.* (quoting BLACK'S LAW DICTIONARY at 1031 and citing *Ayala Lopez*, 327 F. Supp. 2d at 141 n.1).

While no further analysis is necessary where statutory language is plain and clear, the court in *Hashmi* went on to confirm that its straightforward construction of "action" is fully consistent with congressional intent:

> The PLRA was passed in the wake of a sharp rise in prisoner litigation in federal courts. The Supreme Court has recognized that Congress's purpose in enacting this exhaustion requirement was to reduce the quantity and improve the quality of prisoner suits.
> . . . .
> Finding that the current motion is not an "action" would not lead to an absurd result. Congress's clear purpose in enacting the PLRA, as the Supreme Court has recognized, was to reduce the quantity of lawsuits related to prison conditions. The initiation of a new lawsuit is certainly a more costly process than an application for a specific ruling or order brought to a court in the context of an already-pending action.

*Hashmi*, 621 F. Supp. 2d at 85 (internal citations and quotation marks omitted); *see also United States v. Savage,* 2010 WL 4236867, *4 (E.D. Pa. 2010) (collecting cases); *Ayyad v. Gonzales*, 2008 WL 203420, *3 (D. Colo. 2008) (same); *Ayala Lopez*, 327 F.Supp.2d at 142 ("We will not ratchet out the PRLA and read the word motion into the Act in order for it to be applicable to Defendant's motion").[1]

---

[1] All but one of the cases cited by the government simply assume, erroneously and without analysis, that the PLRA applies to a motion in a pending criminal case. *See, e.g., Hashmi*, 621 F. Supp. 2d at 85 (finding unpersuasive, *e.g., United States v. Al-Marri*, 239 F. Sup. 2d 366 (S.D.N.Y. 2002) because it "did not address the textual question . . . *i.e.*, whether a motion constitutes an 'action.'"); *see also Savage*, 2010 WL 4236867 at *5 (distinguishing contrary cases for same reason). The remaining case cited in the government's Opposition, *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001), was a civil *Bivens* action and is thus inapposite here.

**B. The Court Has Jurisdiction over the SAMs Pursuant to its Ancillary Jurisdiction and Authority to Regulate Practice Before it.**

In *Mikhel*, although the government strenuously urged enforcement of an administrative exhaustion requirement, the Ninth Circuit nevertheless reached the merits of a defense motion challenging SAMs:

> We have jurisdiction ancillary to our authority to regulate practice in a particular case [before us] in any manner consistent with federal law."  Fed. R. App. P. 47(b)*; see Daccarett-Ghia v. Comm'r*, 70 F.3d 621, 623 (D.C. Cir. 1995) ("[A] court's authority to control its own proceedings . . . is both an inherent power and, in the federal circuit courts, embodied in Federal Rule of Appellate Procedure 47").

552 F. 3d at 963.  The Court went on to order certain modifications requested by the defense. *See id.* at 963-65.

In the district courts, Fed. R. Crim. P. 57(b) contains language identical to the appellate rule cited in *Mikhel*.  In addition, 18 U.S.C. § 3142(i) requires that any detention order "direct that the person be afforded reasonable opportunity for private consultation with counsel."   This Court therefore has jurisdiction to adjudicate this motion pursuant to this rule and its inherent authority over the pending criminal case.

**C. No Administrative Remedies are Expressly Available, Much Less Required, for Counsel to Address SAMs Restrictions on the Defense Team.**

The regulation under which SAMs are implemented provides that the "affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program, 28 CFR part 542." 28 C.F.R. § 501.3(e). As the government itself points out (Opp. at 3), the purpose of the referenced Administrative Remedy Program "is to allow an inmate to seek formal review of an issue relating to his own . . . confinement,"  28 C.F.R. § 542.10(a), after first attempting "informal" resolution with prison

staff.  28 C.F.R. § 542.13(a).  Neither the SAMs regulation nor the Administrative Remedy

Program provide any mechanism for counsel to address restrictions on the defense team's

speech, conduct, and use of information provided by Mr. Tsarnaev in the course of investigating

the case and preparing his defense.  Restrictions on the defense team outside prison walls have

little or nothing to do with conditions of confinement and the BOP mission of maintaining

institutional order and security.  Moreover, Mr. Tsarnaev, who has no legal training, is not in a

position to engage meaningfully with the BOP (or any authority) about the impact of such

restrictions on the work of counsel.[2]  In short, with regard to restrictions in the SAMs on the

defense team, no defined administrative remedy is even "available" within the meaning of the

PLRA.

Of course, prior to filing this motion, the defense did attempt informally to clarify and

seek modification of the SAMs, as reflected in the correspondence from the prosecuting

attorneys appended to the original motion papers.  To the extent an informal "remedy" is

available, it thus has been exhausted.  The government obviously has no intention of lifting the

SAMs and has made clear its position on other issues both in its correspondence and opposition

to the defense motion.

The lead role of the United States Attorney's Office in this correspondence also belies the

government's suggestion in its Opposition that the Bureau of Prisons was the decision-making

authority that "agreed" to modifications or clarifications (Opp. at 4).  The notion of BOP

primacy is a legal fiction.  It was the Attorney General, at the request of the U.S. Attorney, who

directed the BOP to implement the SAMs and it is the prosecutors to whom the BOP has

---

[2] Moreover, the fact that section 501.3(e) provides a remedy only for restrictions imposed "in
accordance with section (a)" of 28 C.F.R. § 501.3 further supports the defense argument, *infra*,
that section 501.3(a) only authorizes restrictions on conditions of confinement and does not
provide a legal basis for restrictions on counsel.

deferred in any inquiries concerning their meaning, scope, and application.  Indeed, when the SAMs were first implemented, the BOP would not even reveal their existence or tell the defense team why access to Mr. Tsarnaev was being denied.  FMC Devens staff instructed the defense to direct all inquiries to the prosecutors.

II.     THE SAMS ARE UNWARRANTED AND EXCEED REGULATORY AUTHORITY.

   A.  The SAMs Are Unwarranted.

In its effort to explain the factual basis for  SAMs, the government continues to rely exclusively on Mr. Tsarnaev's alleged pre-arrest offense conduct coupled with the subsequent independent behavior of others, which Mr. Tsarnaev has done nothing since his arrest to abet or encourage.  (Opp. at 5-9.)  The purported risk of "death or serious bodily injury" cited by the government entails purely theoretical concerns about what any inmate might possibly attempt to do (*e.g.*, communicate in "code," solicit violence by others).  Absent are any indicia, in the months after Mr. Tsarnaev's arrest and before SAMs were imposed, that Mr. Tsarnaev has either the ability or desire to engage in such activity, much less the "substantial risk" required  to justify SAMs.

The government's continuing and repeated references to Mr. Tsarnaev's alleged writings inside of the boat where he was hiding are ironic.  On their face, Mr. Tsarnaev's alleged words simply state the motive for his actions, a declaration in anticipation of his own death.  There is no express call for others to take up arms.  While the government may view these words as an implied "clarion call" to other would-be radicals (Opp. at 7), it was law enforcement that originally leaked existence of the alleged boat writings to the press and it is the government that continues to broadcast the "clarion" by repeating, emphasizing, and attributing inspirational significance to these words in the SAMs implementation memorandum and public court filings.

*See, e.g.*, Indictment at 4 (quoting alleged boat writings); Opp. at 6-7 (quoting additional language from alleged boat writings).

That others, including *Inspire* magazine, have praised the Tsarnaev brothers and the Boston Marathon bombing in its immediate aftermath (Opp. at 7) is both predictable and regrettable but does nothing to support the assertion that Mr. Tsarnaev, himself, poses a continuing danger in custody that SAMs are necessary to thwart. The government has offered no evidence — and the defense is unaware of any — that Mr. Tsarnaev coordinated the offense conduct with others still at large or that he has any current desire, much less ability, to engage in communications that could instigate violence by others in the future.

The government's latest characterization of statements to the press by Mr. Tsarnaev's mother[3] just weeks after his arrest as reflecting willingness to be a "mouthpiece" for him in expressing radical views (Opp. at 8) is patently inaccurate. Mr. Tsarnaev's mother referred to the fact of innocent civilian deaths around the world in the press coverage quoted by the government not as justification for what her sons were alleged to have done but to express her distraught belief at the time that they, too, had become innocent victims of violence. She then went on to play portions of a recorded call with Mr. Tsarnaev concerning his physical recovery and ability to eat. These actions of a grieving mother in the immediate aftermath of shocking events, thousands of miles away from her dead and wounded sons, have nothing to do with inspiring further violence and do not justify restrictions on Mr. Tsarnaev or his counsel. In any event, Mr. Tsarnaev's mother has not played any other recordings of calls with her son since that time, including multiple calls that took place before SAMs were implemented.

---

[3] In the memorandum implementing the SAMs, the government originally derided these statements as "an apparent effort to engender sympathy" to justify the SAMs. (DE # 110-1.)

The government's continued reliance on the foolish alleged decision of Mr. Tsarnaev's friends to discard evidence and the observation that Mr. Tsarnaev allegedly had the wherewithal to smash cell phones as he hid — hardly an unusual or sophisticated step for someone in his position at the time, which belies the government's ominous "terrorist tradecraft" moniker — only highlights the threadbare justification for extraordinary measures such as SAMs.[4]

In short, there is scant basis to conclude that the particular SAMs enacted here, individually or collectively, are "reasonably necessary" to avert a "substantial risk" of death or serious bodily injury as the authorizing regulation requires.  They should be vacated in their entirety.

**B.  The SAMs Restrictions on Counsel Are Unauthorized.**

The government confirms in its opposition that the SAMs here were imposed solely under the authority of 28 C.F.R. § 501.3(a) (concerning conditions of confinement), <u>not</u> under 28 C.F.R. § 501.3(d) (concerning attorney-client communications).   (Opp. at 10.)  The government emphasizes that Mr. Tsarnaev's communications with the defense team "are neither monitored nor reviewed" and argues that the lack of requisite certification under section 501.3(d) is therefore a "red herring."

---

[4] The obvious contrasts between Mr. Tsarnaev and the defendants in cases cited by the government (Opp. at 9-10) further highlight the unwarranted imposition of SAMs here.  Both *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13 (D.D.C. 2003) and *United States v. Ali*, 396 F. Supp. 2d 703 (E.D. Va. 2005) involved defendants alleged to be active members  of Al Qaeda, the most notorious organized terrorist group with global reach.  *United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) involved attorney Lynne Stewart's client, Sheikh Abdel Rakhman, a prominent Egyptian cleric with a large established following and specific well-documented influence in an ongoing foreign armed conflict.  In *United States v. Savage*, 2012 WL 424933 (E.D. Pa. 2012), the court ordered certain modifications to SAMs imposed on a defendant convicted of drug distribution who had actually directed multiple murders from within a detention facility.  Mr. Tsarnaev has neither the external ties nor the record of instigating violence while incarcerated that justified SAMs in these cases.

The government has missed the point of the original argument.  Section 501.3(a) only authorizes restrictions on various conditions of confinement.  It must be construed narrowly.  *See Kent v. Dulles*, 357 U.S. 116, 129 (1958).  It does not address attorney conduct or attorney-client communications at all, and therefore it cannot be read to authorize the restrictions on the defense team included in the SAMs here.  Those provisions of the SAMs are *ultra vires*; they lack basis in legal authority and must be vacated as null and void.  *See Cracker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013).[5]

## III.    THE SAMS VIOLATE THE CONSTITUTION.

The government's opposition belittles the defense challenges to the SAMs restrictions on counsel as "overwrought," urges deference to the judgment of correctional officials, and suggests that future concerns can be resolved informally just as a handful of issues were handled initially. (Opp. at 12-14.)  The government's arguments fail.  The SAMs gravely impair the ability of counsel to provide effective assistance to Mr. Tsarnaev.

---

[5] In this section of its opposition, the government also cites a string of cases for the proposition that courts have "long recognized" the risk of "coded" communications as "a legitimate concern justifying special administrative measures" of the sort imposed on counsel in this case. (Opp. at 10.)  In fact, none of the cases the government cites in this section involved SAMs and none of them addressed a supposed risk of attorneys disseminating dangerous communications. Specifically, *Turner v. Safely*, 482 U.S. 78 (1987) concerned ordinary prison restrictions on direct correspondence between inmates.  *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) was a criminal case where the offense conduct included members of a terrorist cell communicating with each other in code during recorded jail calls. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000) was an appeal of a death sentence where the quoted language concerned the possible dangerousness of the condemned inmate, a high-ranking member of a notorious Chicago street gang, while incarcerated.   The discussion of "seem[ingly] innocuous" communications in *United States v. Hamoud*, 381 F.3d 316 (4th Cir. 2004) arose in relation to the "minimization" requirement for wire intercepts under the Foreign Intelligence Surveillance Act.  Collectively, these cases perhaps support the unremarkable proposition that "coded" criminal communications are always theoretically possible.  But none of them supports imposition of SAMs in the particular circumstances of this case, much less the extraordinary restrictions on attorney conduct and communications that the government has imposed here.

As an initial matter, the government's reliance on legal boilerplate urging deference to prison officials (Opp. at 12-13) is misplaced here.  The SAMs were not a product of considered BOP judgment to which deference might be due.  Indeed, FMC Devens was getting by without incident for four months before the SAMs appeared.  Rather, the SAMs were ordered by the Attorney General at the belated behest of the U.S. Attorney, neither of whom is a correctional official steeped in the "difficult responsibility" managing the day-to-day order and security of prisons or detention facilities.  Even if some deference were due to the SAMs restrictions on Mr. Tsarnaev's conditions of confinement, prison officials obviously lack relevant experience in the challenges of defending a capital prosecution pertinent to the SAMs restrictions on counsel.

Contrary to the government's assertion (Opp. at 14), the exchange of correspondence between defense counsel and the government does not demonstrate "the efficiency with which [defense] concerns about particular SAMs can be resolved" going forward.  Rather, it simply confirms that the defense attempted in good faith to resolve and/or narrow certain issues before filing this motion.  Remaining disagreements require judicial decision; the government has offered no further concessions in response to this motion.

Notably, the defense disputes the government's account of the incident when BOP personnel prohibited defense counsel from showing certain photographs depicting family members to Mr. Tsarnaev (Opp. at 14).  The attorney who brought the photos to FMC Devens never "told a BOP officer that the photos were not related to the defense."  *See* Affidavit of AFPD William Fick, appended as Exhibit A.  But the BOP's purported account of this incident, whether grounded in mere misunderstanding, miscommunication, or after-the-fact rationalization, is beside the point.  The government, in its September 11, 2013 letter [DE # 110-3], initially took a categorical position that "the family photographs the defense attempted to

bring in to the defendant are not legal materials."[6]  While the government ultimately modified its position after further discussion, the incident highlights the likelihood that the BOP or prosecutors will make arbitrary judgments that certain conduct is not properly undertaken for the purpose of preparing Mr. Tsarnaev's defense and the extent to which the SAMs pierce the veil of confidentiality to which the defense team is entitled.  Since defense counsel face the real possibility of prosecution for violating the SAMs, such uncertainty is chilling.

        The government downplays these concerns, noting that defense counsel "have many years' experience, plainly share an understanding of what it means to prepare a defense to criminal charges, and [ ] have no reason to suspect that the SAMs contemplate a different understanding."  (Opp. at 16.)  This response is puzzling:  if the government trusted the judgment of defense counsel, there would be no need for the SAMs to restrict the activities and speech of counsel in the first place.  Plainly, the issue is not the "shared understanding" among defense counsel but rather the understanding of BOP officials and prosecutors who may have occasion to enforce the SAMs and second-guess the judgment of defense counsel.   The suggestion that defense counsel "can always ask for clarification" (Opp. at 16) is not a remotely satisfactory solution.  It is impossible to imagine all of the circumstances in which the defense team will need to use or share information obtained from Mr. Tsarnaev and it would be a gross violation of defense autonomy, confidentiality, and work product to seek pre-approval from the government in every such instance.  The restrictions on defense "dissemination" of information are unconstitutionally restrictive and vague.

---

[6]  At the time, government counsel used the phrase "legal materials" to describe those items that counsel could permissibly bring with them during prison visits.  That phrase does not appear in the SAMs.  Instead, the SAMs restrict counsel to review of "documents related to his defense."  This misinterpretation of the SAMs, which prosecutors corrected once the defense pointed it out, reflects the practical difficulties posed by the SAMs and the broad discretion they vest in government counsel.

The government's assertion that screening of materials brought into the prison under the SAMs merely "codifies [the] standard BOP rule" (Opp. at 17) is incorrect.  Of course, the defense recognizes that all detention facilities must screen materials entering the facility for contraband — hidden objects, metal clips inadvertently left attached to documents, and the like. It is the notion that such screening of legal materials also may include substantive review of content, and a determination by BOP officials and/or the prosecutors whether the content is, in their opinion, properly "related to preparation of the defense," that is extraordinary and objectionable.  At a minimum, if such review and discussion is to occur it should be done by a "taint team" prohibited from sharing information with prosecutors on the case.

The various obstacles that the SAMs impose on the defense team are not matters of mere "inconvenience" (Opp. at 18).   Courts have recognized this, and, tellingly, the government has not even attempted to offer a justification for most of them.  For example:

- Defense mitigation specialists, investigators, and paralegals working under the supervision of counsel simply cannot function if they are not permitted to share information obtained from Mr. Tsarnaev for purposes of preparing the defense — *e.g.*, during witness interviews — to the same extent as defense counsel are permitted to do so.  *See Mikhel*, 552 F.3d at 964 (ordering modification of SAM to permit investigators to disseminate communications for purpose of preparing defense).  If SAMs are to remain in place, non-attorney members of the defense team working under the supervision of counsel must be included within ¶ 2.d of the SAMs, which permits sharing information obtained from Mr. Tsarnaev for the purpose of preparing the defense.

- The government's continued refusal to permit the defense team's principal mitigation specialist (investigator) who is not an FDO employee (but is appointed under the CJA and has decades of experience in such matters) to visit Mr. Tsarnaev unless in the company of counsel or full-time FDO staff is also without reasonable basis.  *See id.* (finding no "valid rational justification" for distinguishing between paralegals and investigators).

- To the extent questions arise under the SAMs and/or materials shown to Mr. Tsarnaev are subject to content-based review, a "taint team" segregated from the prosecutors must be established to protect attorney work product.

In short, the SAMs thwart the ability of defense counsel to provide effective representation to Mr. Tsarnaev, ostensibly to avoid a possibility of violence that is so theoretical and remote as to be practically non-existent.  The SAMs restrictions on counsel should be vacated.

## Conclusion

For the foregoing reasons, as well as those set forth in Mr. Tsarnaev's original motion papers, this Court should vacate the SAMs.

Respectfully submitted,

DZHOKHAR  TSARNAEV
by his attorneys

/s/  William W. Fick

Judy Clarke, Esq.
California Bar:  76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**<u>Certificate of Service</u>**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 4, 2013.

/s/ William W. Fick   