UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,        )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE



**STATUS CONFERENCE**



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, February 12, 2014
10:01 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Nadine Pellegrini,
 3         Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Esq.
 7             Timothy G. Watkins, Esq.
               William W. Fick, Esq.
 8         51 Sleeper Street
           Fifth Floor
 9         Boston, Massachusetts  02210
           - and -
10         CLARKE & RICE, APC
           By: Judy Clarke, Esq.
11         1010 Second Avenue
           Suite 1800
12         San Diego, California  92101
           On Behalf of the Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2            THE CLERK:  All rise.
3            (The Court enters the courtroom at 10:01 a.m.)
4            THE CLERK:  United States District Court for the
5    District of Massachusetts.  Court is in session.  Be seated.
6            For a status conference in the case of United States
7    versus Dzhokhar Tsarnaev, 13-10200.  Will counsel identify
8    yourselves for the record, please.
9            MR. CHAKRAVARTY:  Good morning, your Honor.  For the
10   government, Assistant U.S. Attorney Aloke Chakravarty.
11           MS. PELLEGRINI:  Nadine Pellegrini for the United
12   States.
13           MR. CHAKRAVARTY:  And Mr. Weinreb is en route and may
14   join us during the hearing.
15           THE COURT:  Okay.
16           MS. CLARKE:  Judy Clarke, Miriam Conrad, Tim Watkins
17   and Bill Fick on behalf of Mr. Tsarnaev, whose presence has
18   been waived.
19           THE COURT:  All right.  Good morning.  Thank you for
20   your status report -- your joint status report.  I appreciate
21   it.
22           I think it is appropriate to do some scheduling.  You
23   both, in the status report, suggested an outline of what you
24   think the schedule should be.  I have to say that by and large,
25   with some exceptions, I think the government's suggestion is
```

1    the more reasonable of the two.  And so I will set the trial

2    date for November 3rd, 2014.  I do that because the other dates

3    will obviously be set in reference to that date.  And so I

4    think the first is for discovery motions.

5          Now, I understand from the report that there are some

6    outstanding discovery issues to be resolved, perhaps by

7    negotiation and, if not, by motion.  I think the date that the

8    government suggested for any motions for the present discovery

9    disputes is an appropriate one, which is March 12th.  By

10   setting that, I don't preclude the possibility that if there

11   are further discovery disputes, we can address them as

12   necessary.  So that's not necessarily a final deadline for all

13   discovery if there are other issues that arise after that, but

14   I think that's an appropriate date.

15         And basically I adopt the government's three

16   suggestions for the timetable for this spring, which would be

17   motions to suppress evidence by April 9th, and then I think as

18   a sort of catch-all date of May 7th for all other motions of, I

19   guess, addressing legal issues, is the way to put it.  I won't

20   try to circumscribe them by cataloging, but I think you get the

21   idea.  The discovery is kind of a category, and any evidence

22   suppression is, and then whatever other legal issues, except

23   venue, are to be filed by May 7th.

24         As to the venue issue, I think we can delay on that a

25   little bit, and I think a deadline of June 11th is an

 1    appropriate time for a venue motion.  I will permit it to be

 2    resolved, if there is one, during the summer, in advance of the

 3    need to summon jurors for a November trial.

 4            I suggest a status conference on June 11th.  We will

 5    probably see each other between now and then on motion

 6    hearings, but I don't think we should leave without at least a

 7    status date set in the record as a continuance date.  So that

 8    may or may not be adjusted.

 9            I want to have a discussion with you about the expert

10    disclosures before we talk about scheduling those.  And so

11    finally, the other final date that I think we can put down in

12    light of the November 3rd -- by that I mean that will be when

13    empanelment would begin, on November 3rd.  Obviously, we're

14    going to take some time with empanelment.  So evidence

15    presentation would begin sometime thereafter, whatever that may

16    be as we work toward it.  But a final pretrial two weeks before

17    the beginning of evidence -- I'm sorry -- jury selection would

18    make the pretrial date October 20th, and I would say ten

19    o'clock in the morning on October 20th.

20            So that's the calendar.  I think it is a realistic and

21    a fair one.  I will say to both sides that this is undoubtedly

22    going to be a lengthy trial, but you should keep in mind that

23    not everything that can be presented for either side needs to

24    be presented necessarily.  There are interests of justice that

25    can help you make those selections.  In my experience it's not

1    uncommon for people in cases such as this, although this is a

2    unique case, obviously, to seek to do everything they can

3    conceivably do.  That goes for both the prosecution and the

4    defense.  And I foresee a role for Rule 403 in the actual

5    presentation of the evidence to avoid unnecessary cumulation of

6    even relevant evidence.  Just a general observation.

7            Now, I thought we might, if you wanted to, talk

8    briefly about current discovery issues just to let me know what

9    the nature might be.  I don't know who wants to...

10           MR. CHAKRAVARTY:  With the understanding that there

11   may be a dispute, the defense has given us three discovery

12   letters.  We've responded to the first one essentially

13   recently, and we have not yet responded to the remainder of the

14   discovery letters which were filed -- which were given to us in

15   the past week or so.

16           The defense has had an opportunity to view a large

17   volume of exhibits that are actual physical evidence.  They

18   have received on the order of six to seven terabytes' worth of

19   digital evidence; they have had access to the entire sum of

20   relevant evidence as the FBI recognizes it to be.  We've given

21   them an exhibit list and said, you know, "This is what we have.

22   If you want to see something, let us know and we'll make it

23   available."

24           There are a few categories of evidence which are not

25   physically here; for example, items that are down at the FBI

1   lab in Quantico.  They include items as small, but individually

2   marked, as a ball-bearing, a BB that may have been found in the

3   street, all the way to components of the devices that exploded

4   on April 15, 2014 -- 2013.  Excuse me.

5          There are approximately 2,000 in number of those

6   individualized exhibits which the defense has not yet had an

7   opportunity to physically examine.  They are available.  They

8   can be made available if -- our hope, for logistics purposes

9   and, frankly, expense, is to have those materials come back to

10  the Boston area for more facile viewing.  We don't know what

11  the time schedule is for that.

12         But in the interim, in addition to viewing evidence at

13  the FBI, there are some other locations locally where there are

14  larger exhibits, shall we say, vehicles, other large bulky

15  exhibits, which we've made arrangements to have scheduled

16  viewings for into -- for the next three or four weeks into the

17  first week of March for which they will be able to inspect.

18         We have taken an additional step to index what we have

19  produced in discovery.  We've provided courtesy copies of a

20  number of the digital exhibits and other pieces of evidence

21  which may or may not be relevant but are -- it's more

22  convenient, frankly, for both counsel, as well as ourselves, to

23  provide them to defense as opposed to have them come view them

24  somewhere.  And to the extent that there has been an exchange

25  if they've wanted to see something more, we're certainly

1    receptive to that.  We haven't responded to the latest requests

2    after they have viewed some 1,500 or so exhibits at the FBI.

3    And we'll work through that and, obviously, if we refuse to

4    produce some of that material, then the defense can file a

5    motion.

6         One of the difficulties in responding to the defense

7    requests is that they are not asking regularly for specific

8    pieces of evidence, but rather, as an example, the way that

9    certain evidence was gathered, they're seeking kind of

10   production of any materials gathered in a specific way, which

11   is not necessarily conducive to us responding to, as a matter

12   of saying, "This is what we obtained through a certain

13   technique."

14        Those types of -- this is just an insight as to some

15   of the issues that we're having in terms of how we're going to

16   respond to the defense.  But, in sum, what we have that is

17   relevant to either the liability phase or the penalty phase we

18   have made available to the defense.  We'll continue to do so,

19   and we'll continue to provide courtesy copies to the extent

20   that we can.

21        In some cases the defense, for the understandable

22   reason of not wanting to tip their defense strategy to the

23   government, has sought a filter team to make photocopies of

24   things that they particularly spent their energies focused on.

25   Understandable.  We're accommodating that.  But that does

1    provide an additional time lapse between when they inspect

2    something, when that process is completed, and when those

3    copies of physical evidence that they may have inspected can be

4    made available.

5              But we're -- I say that to emphasize that there

6    are -- we're going above and beyond what we probably need to do

7    in order to make that information available to them.  We want

8    them to obviously be well prepared for the trial whenever it

9    is.  That's our assessment of discovery.

10             THE COURT:  Well, just a moment.  On the last point,

11   the government's cooperation will facilitate adhering to the

12   schedule that we've set.  And if it becomes too difficult, the

13   government's preferred trial date may be in jeopardy.  I don't

14   encourage that because it's my preferred trial date in the

15   public interest, but I just caution the government that

16   disagreements could endanger the schedule.

17             MR. CHAKRAVARTY:  We understand that, your Honor.

18   Thank you.

19             THE COURT:  Ms. Clarke?

20             MS. CLARKE:  I think that we have a slightly different

21   view of where the discovery sits.  We scheduled the week of

22   January 13th to review physical evidence.  We were told shortly

23   before that date, "Okay.  You have to let us know which scenes

24   you want to look at," and we scrambled around to do that.  We

25   had said we want to look at the list of physical evidence that

1    had been seized.

2           So we did that and we provided that, and we went over

3    to the FBI.  And some six to eight hundred items were available

4    for our review.  There were a number of items we were told were

5    at two different locations and we would have to reschedule

6    dates to go out and do that, and we did that onsite.  And we

7    just yesterday, I think, got confirmation from the government

8    that one of those sites is set up on the dates that we've asked

9    for.

10          So we've had a little bit of a sluggish, shall I say,

11   start to reviewing physical evidence and not due to our

12   recalcitrance.  We were told some 1,500 items were at the FBI

13   lab in Quantico.  When we were sharing drafts of the status

14   report, we were then told there were some 2,000 items.  And I

15   don't think, with all due respect to the prosecutor, that those

16   are all BB's from the list of items that we were ultimately

17   shown when we did that January 13th review.

18          At the pace of some six to eight hundred items in a

19   full week, an additional 2,000 items will take some time unless

20   they are all, indeed, BB's.  What that tells me, though, is the

21   2,000 items that are being evaluated are going to generate some

22   more reports of the examination and tests, which also is a

23   burden on us to figure out what to do with that.

24          I mean, the process is this:  We set up a time to

25   review some physical evidence, we go and review, we look at it

1    and determine whether we want a copy of it.  And some of that

2    could be paper copies, photocopies; some of it could be digital

3    items.  There are a whole host of digital items that are

4    pending copying.

5         We left that review the week of the 13th with a list

6    given to the FBI.  And it's not a matter of courtesy, it's a

7    matter of case law, that the prosecution team is not supposed

8    to see what the defense is interested in copying.  And the

9    prosecution said, "Okay.  We'll have the FBI copy it."

10        We were advised just a couple of days ago that the

11   prosecution hadn't cleared the chain-of-custody waiver letter

12   that we had sent some many, many days ago.  So it's not the

13   defense dragging its feet; it's we're really struggling with

14   getting access to information.  With 2,000 items in Washington,

15   D.C., automatic discovery simply is not near complete.

16        But what we do is we go through it; we make a

17   determination of needing copies of it, which we haven't gotten

18   any of; we then have to analyze it and decide how much of that

19   needs to be investigated and then how much of that needs to be

20   seen by experts.  I doubt we'll get experts access to

21   information before the summer, which makes a trial date in

22   November virtually impossible.

23        Discovery has been a laborious process, and in my

24   experience, way outside the norm.  It is perplexing to all of

25   us why prosecutors would tack as close as they have to the wind

1    and not just produce.  Disputes about, "You asked for X but you

2    haven't narrowed your request.  Please narrow your request."

3    We narrow it, and then we're told that's not sufficient, or

4    we're asked for different information.  It's just a laboriously

5    slow, cumbersome process.

6         And we thought asking for a May discovery motion date

7    was fairly aggressive given the sluggishness and the resistance

8    that we've received to the production of discovery.  It's one

9    thing to say we've got six to seven terabytes of information;

10   it's another thing to say are we getting the information that

11   is important to us.  So it's a real problem.

12        And I have to say, Judge, I understand the Court's

13   desire to move a trial date along, but the litigation schedule

14   that the government set out and that the Court had adopted will

15   be impossible for us to meet.  We simply know enough about our

16   case to know what we don't know.  We have, as the Court knows,

17   a tremendous amount of family history investigation to do, and

18   that's halfway around the globe, with a number of logistical

19   challenges involved, not the least of which is weather,

20   Olympics, travel.  There's just a tremendous amount of

21   logistical hurdles in our way to make the trial date that the

22   Court has suggested.

23        I'm not sure how we're going to make any of the

24   litigation dates.  We can certainly file motions for discovery

25   by March 12th, but it will be piecemeal, because we are in the

1    laborious process of trying to work out on an informal basis

2    with the prosecution --

3              Ms. Conrad cannot help herself.

4              THE COURT:  There is precedent for that.

5              (Laughter.)

6              MS. CONRAD:  I just want to -- just a couple of quick

7    examples on this discovery issue, your Honor.  Because -- and I

8    just want to speak to this because of the local rule.

9              As the local rule -- under the local rule the

10   government is supposed to respond to a discovery letter request

11   within two weeks, and then two weeks later the defense files a

12   motion.  We sent a discovery letter to the government on

13   December 9th.  On December 18th we got an email saying, "We'll

14   get back to you after the holidays.  We're reviewing your

15   request."  Well, I thought the holidays were Christmas and New

16   Year's.  Apparently, they included Martin Luther King Day as

17   well, because we didn't get a response until February 7th,

18   nearly two months.

19             And in that response the government said with respect

20   to -- "What's your support for this request?"  You know, we

21   have telephones.  We have emails.  If they want us to clarify

22   one of our requests, they could contact us.  Instead, we got

23   radio silence from December 18th until February 7th.

24             Now, with that kind of response date, I don't know how

25   we can file discovery motions by March.  And with that kind of

1    response, I don't know how we can possibly move forward.

2         And the other thing I just want to say is I still

3    haven't heard the government tell us when those 2,000 items at

4    the lab are going to be available for our review.  If they're

5    at the lab, they're not accessible to us.  They can say they're

6    accessible, but until they tell us when and where we can view

7    them, we have not completed automatic discovery.

8         And I think that it's very important for the Court to

9    know from the government today, before it sets any further

10   dates, when those 2,000 items will actually be shown to us.

11        MS. CLARKE:  I suppose it's my southern roots that

12   made me substantially too slow to get to those points, and I

13   thank you very much.

14        Your Honor, we also need to discuss with the Court a

15   production of *Jencks* material date.

16        THE COURT:  Okay.  Let me reach the subject of

17   experts.  My inclination at this point is to defer on timing

18   expert disclosure because until some -- perhaps even, I think,

19   as Ms. Clarke was saying, until some of the other discovery

20   issues are resolved, decisions about -- reliable decisions

21   about experts may not be in the works.

22        I did want to discuss in general terms, apart from

23   whatever the dates are, whether the disclosures should be

24   alternating or simultaneous because your proposals differ on

25   that.  I think it's not realistic to have it only simultaneous,

1      although in some cases, civil cases, for example, where there

2      are experts, both parties might disclose their first round and

3      then have response experts, or responses to others and perhaps

4      additional.

5            But I just -- since you differed on that, I wanted to

6      hear from you as to your views.

7            MR. CHAKRAVARTY:  So this case is different than the

8      typical criminal case in that it's very likely that as part of

9      the penalty phase of the trial that the defense intends to call

10     a number of experts who are not presently, and may not be for

11     several months, apparent to the government.

12           The government's case for liability is very

13     straightforward.  The types of experts that we will call are

14     likely similar -- going to be similarly straightforward.  So

15     the staggering of expert disclosure dates, as in the typical

16     case where a defense expert is called to respond to the

17     government's theory of the case and/or to present a defense

18     strategy, is kind of on its ear, because we don't know what the

19     defense mitigation strategy is, or will be, as supported by

20     expert testimony, and it's not exclusively related to a -- what

21     is otherwise a legal defense, you know, "He didn't do it."

22           The exact nature and the tenor of that disclosure by

23     the defense is going to be crucial to the government to find

24     out -- to be able to find a rebuttal expert, to be able to do

25     research on that particular expert, and to challenge whether,

1  in fact, that that is a legitimate mitigation strategy

2  under -- as a non-statutory factor.

3      THE COURT:  I guess I'm not following you.  It sounds

4  like you're arguing for a staggered schedule.

5      MR. CHAKRAVARTY:  Well, I'm not sure that the Court

6  would order the defense to have an earlier disclosure than the

7  government just because it's so unconventional, but in many

8  ways we think that that's where the equities lie, your Honor.

9      THE COURT:  Well, I think it also may be complicated

10  by the different interests and strategies in the two phases of

11  the trial, and so it may be that -- and this is to air the

12  possibilities.  It may be that the first disclosures are only

13  liability or guilt-phase disclosures, and there will be a

14  second, later disclosure for a penalty phase.

15      MR. CHAKRAVARTY:  I think frankly, your Honor, the

16  government would be disadvantaged by that strategy, the thought

17  being that in the few months that we'll have before trial and

18  we're preparing our responses to and preparing our liability

19  case, we have to at the same time, both as early as jury

20  selection and throughout the entire liability phase of trial,

21  the -- it's -- you know, let's not kid ourselves that the issue

22  here is going to be the penalty.

23      And if we are not transparent in understanding for the

24  liability phase what the defense strategy is going to be and,

25  similarly, what our strategy ought to be, then we will be at

1   the disadvantage when beginning a liability phase we'll have a

2   much compressed time schedule in order to prepare for what may,

3   at that time, be a very novel litigation strategy that we could

4   not have anticipated during the month or so that we're actively

5   engaged in the liability phase.

6        THE COURT:  Okay.  Ms. Clarke?

7        MS. CLARKE:  Well, I think that the staggered

8   disclosure is about the only way to go.  I mean, we are

9   responsive to the government, and to say that there should be a

10  simultaneous exchange, we have no way of knowing what experts

11  they intend to call.  They held back.  You know, we can't get

12  forensic reports on computers, you know?  So we have no real

13  good idea what they're putting on.  So their expert disclosure

14  for the guilt phase and then our expert disclosure for the

15  guilt phase would work very well.

16       You know, frankly, I don't see -- I mean, you know, I

17  understand the Court's desire to move this case along, but I

18  don't see us identifying experts by the time the -- for the

19  mitigation phase by the time the Court has set the trial date.

20       THE COURT:  Okay.  I understand your view.  I took it

21  into account.

22       Let me ask -- well, I guess one thing Mr. Chakravarty

23  said that struck me about separating the potential two phases

24  of the trial is that it's the same jury and it probably would

25  be necessary to have all disclosures before the selection of

1   the jury.  We'll take that into account.

2            Anyway, I wanted to begin the discussion of that.  As

3   I say, I'm not going to set dates for that at this point.

4   We'll monitor proceedings.

5            What else?  It sounded like -- it looked like you were

6   about to rise to say something.  No?

7            Well, we will probably -- as I think the parties know,

8   the defense has filed a supplemental memorandum on the SAM's

9   issue just yesterday, and so that the government will be

10  responding.  I don't know that -- because it was just submitted

11  yesterday, whether the clerical attention to it has completed

12  or not.  There's a motion to seal it.  The full supplemental

13  filing will be sealed but there will be a redacted version

14  which the defense very appropriately presented for inclusion in

15  the public record.

16           So there will be a response to that in the usual

17  course.  I expect we'll have a hearing on that.  At some time

18  that will be set up.

19           Anything else?

20           MR. CHAKRAVARTY:  Just, I'd ask for exclusion of time,

21  your Honor.  Given the firm date is the June 11th date, I

22  suppose --

23           THE COURT:  Yes.  That's why, in part, I set that as a

24  status date, even though I expect we'll be seeing each other.

25  I presume there's no objection to the exclusion of time under

1    the Speedy Trial Act?

2           MS. CLARKE:  Not at all, your Honor.

3           Just a small request.  Could we move that June 11th

4    date one week?

5           THE COURT:  To the 18th?

6           MS. CLARKE:  Either forward or back.

7           THE COURT:  Okay.  The 18th?

8           MS. CLARKE:  That would be fine.

9           THE COURT:  So we'll do that for both -- that was the

10   date that served two purposes, which was any venue motion and a

11   status conference.

12          MS. CLARKE:  Thank you, your Honor.

13          THE COURT:  The 18th is fine.

14          MS. CLARKE:  I don't know, could the Court assist us

15   in determining when these 2,000 items might be available for

16   our review?

17          THE COURT:  Well --

18          MR. CHAKRAVARTY:  Yeah, we're aware of the exigency of

19   our interest in making it available as quickly as possible,

20   whether it be down in Quantico, Virginia, or up here.  Our

21   preference is obviously to do it up here.  We simply don't

22   have --

23          THE COURT:  Can you give a list or a catalog of them

24   so that at least they can assess how much commonality there is?

25   I mean --

```
 1           MR. CHAKRAVARTY:  Yes.  Yes.
 2           THE COURT:  -- are these two things of which there are
 3    a thousand copies each, or are they a thousand different things
 4    and so on?  It may --
 5           MR. CHAKRAVARTY:  I think that has been done, but
 6    we'll further narrow that and communicate with Quantico as well
 7    to ensure that we make it --
 8           THE COURT:  If you can supply --
 9           MS. CLARKE:  I don't believe that's been done.
10           THE COURT:  Yeah.  If you could supply a roster or a
11    list of them, there may be some that they could tell by the
12    list they're not interested in seeing.
13           MR. CHAKRAVARTY:  It may not have already been
14    provided, although -- but I think that the process to do that,
15    anticipating that that is going to be the issue so we can
16    identify with the --
17           THE COURT:  Is there any impediment to that?
18           MR. CHAKRAVARTY:  No.  No.  That's my point.  I think
19    that process -- anticipating once we learned that this material
20    was down there and cataloging what it was, the FBI has been
21    diligently identifying what is down in Quantico and we're
22    preparing and we can provide --
23           THE COURT:  I mean, I assume -- you referred to chain
24    of custody.  I assume somebody knows what they have, right?
25           MR. CHAKRAVARTY:  Yes.
```

 1              THE COURT:  In other words, somebody has made a list

 2    of it.  So can you get that to them by the end of the week?

 3              MR. CHAKRAVARTY:  I think that's reasonable, your

 4    Honor.

 5              MS. CLARKE:  Your Honor, you have a black robe and it

 6    took you some time to get that answer out, so you can imagine

 7    the problems we're having.

 8              MR. CHAKRAVARTY:  Quite frankly, we weren't asked for

 9    that, your Honor.  We weren't asked for a list of the items.

10              THE COURT:  You're going to get it.

11              MS. CLARKE:  Thank you, your Honor.

12              THE COURT:  All right.  If there's nothing else, we'll

13    be in recess.

14              MR. CHAKRAVARTY:  Thank you, your Honor.

15              THE CLERK:  All rise.  Court will be in recess.

16              (The proceedings adjourned at 10:30 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8     United States of America v. Dzhokhar A. Tsarnaev.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  2/14/14
13

14

15

16

17

18

19

20

21

22

23

24

25
```