UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        v.                     )          Crim. No. 13-10200-GAO
                               )
DZHOKHAR TSARNAEV              )


**FURTHER MOTION TO COMPEL DISCOVERY OF FAVORABLE EVIDENCE**

**A.  Introduction[1]**

The defendant, Dzhokhar Tsarnaev, is charged with having conspired with his older brother Tamerlan to bomb the Boston Marathon on April 15, 2013, and with a series of violent crimes ending with his arrest on April 19, 2013.  At the time of the bombing, Tamerlan was 26 and Dzhokhar was 19.   The government has now served notice of its intention to seek the death penalty.  In so doing, it has activated the Eighth Amendment's requirement that Dzhokhar be permitted to offer, and that the jury be allowed to consider, "any relevant circumstance that could cause it to decline to impose the penalty."  McCleskey v. Kemp, 481 U.S. 279, 306 (1987).  Among the most apparent of these are Dzhokhar's young age, Tamerlan's and Dzhokhar's relative roles and prior histories, and the relationship between them.

---

[1] This motion is one of three discovery motions filed this date.   The present motion seeks disclosure of specified favorable evidence pursuant to Fed. R. Crim. P.  16(a)(1)(E) and Brady v. Maryland, 373 U.S. 83 (1963).  By separate motion, the defendant seeks an order requiring the government to fully comply with its automatic discovery obligations under Rule 16 and Rule 116.1(c) of the Local Rules of the United States District Court for the District Of Massachusetts.  A final motion filed herewith seeks notice of whether the government possesses evidence gathered  under the Foreign Intelligence Surveillance Act (FISA) or other electronic surveillance.

Because the Federal Death Penalty Act, 18 U.S.C. § 3593, affords sentencing juries almost unlimited discretion to choose between the death penalty and life imprisonment upon conviction of each of the capital offenses charged in the indictment, the jury's sentencing verdict in this case could well turn on how it apportions the brothers' relative responsibility for conceiving and carrying out the attacks, and on the extent to which it views Tamerlan Tsarnaev as having induced or coerced his younger brother to help commit them.  For this reason, any evidence tending to show that Tamerlan supplied the motivation, planning, and ideology behind the Boston Marathon attack, and that his younger brother acted under his domination and control, is "material" under Fed. R. Crim. P. 16(a)(1)(E) and is also subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. See e.g., Smith v. Cain, 132 S.Ct. 627, 630 (2012) ("Under Brady, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.")

The government possesses evidence shedding light on these questions but has refused to disclose it to the defense, despite having received from the defense repeated requests and a detailed written summary of the mitigation theories that the defense is pursuing.[2]   Mindful of the Court's recent admonition that a defendant seeking disclosure

---

[2] In a cover letter accompanying their initial discovery disclosures on September 3, 2013, counsel for the government stated that "we have repeatedly invited you to share with us your theory of the defense in order to sharpen our inquiry into potential Brady material. That invitation remains open."  Thereafter, on December 18, 2013, defense counsel submitted a letter to the Capital Case Review Committee of the Department of Justice pursuant to the government's death penalty authorization protocol.  USAM 9-10.080(F).

of prosecution evidence under Brady "should be able to articulate with some specificity
what evidence he hopes to find in the requested materials, why he thinks the materials
contain this evidence, and finally, why this evidence would be both favorable to him and
material," Order, DE 151 (November 27, 2013) (quoting United States v. Prochilo, 629
F.3d 264, 269 (1st Cir. 2011)), defense counsel has set out the mitigating factors which
most of the undisclosed evidence likely tends to support.

## B.  Brady materiality at the pretrial stage of a death penalty case

Before proceeding further, a word should be said about the meaning of
"materiality" in the context of a pretrial capital case.  Ever since United States v. Bagley,
473 U.S. 667 (1985), the Supreme Court has held that "evidence is material only if there
is a reasonable probability that, had the evidence been disclosed to the defense, the result
of the proceeding would have been different," and has further defined "'reasonable
probability' [as] a probability sufficient to undermine confidence in the outcome."  473
U.S. at 682.  Although this standard imposes a substantial burden on a convicted
defendant who alleges that the prosecution suppressed favorable evidence in violation of
Brady, this formulation of the burden applies to post-trial appellate review, and does not
justify suppression of favorable evidence prior to trial.  As one district court has
explained,

> [w]hether disclosure would have influenced the outcome of a trial can only be
> determined after the trial is completed and the total effect of all the inculpatory

---

In this letter counsel set out the mitigating factors that defense counsel are attempting to
establish, and summarized the mitigating evidence already uncovered.  The government's
continued denials of numerous disclosure requests since mid-December have thus been
made in full awareness of the "theory of the defense."

evidence can be weighed against the presumed effect of the  undisclosed <u>Brady</u> material. <u>See</u>, <u>e.g.</u>, <u>Giglio [v. United States]</u>, 405 U.S. [150,] 154 (finding violation because "the Government's case depended almost entirely" on the cooperating witness's testimony, making impeachment crucial). This analysis obviously cannot be applied by a trial court facing a pretrial discovery request.

<u>United States v. Sudikoff</u>, 36 F.Supp.2d 1196, 1199 (C.D.C. 1999). The Judges of this

Court who served on the committee that drafted Local Rule 116.1 made a similar point in

their 1998 report explicating the then-new Local Rules:

> A determination of the materiality of information helpful to the defendant may be more difficult to make reliably in the pretrial context than post-conviction. See <u>Daughtry v. Dennehy</u>, 946 F. Supp. 1053, 1059 n.2 (D. Mass. 1996) (Young, J.). This challenge is not unique, however, to the pretrial determination of whether information favorable to the accused is material. Federal Rule of Criminal Procedure 16(a) (1) (C) requires pretrial production by the government of documents "which are material to the preparation of the defendant's defense." Although neither the Supreme Court nor the Court of Appeals for the First Circuit has addressed the definition of materiality in this context, and this issue may have to be resolved in the litigation of future cases in this District, the D.C. Circuit has held that Federal Rule of Criminal Procedure 16(a) (1) (C) requires production when there is:
>
>> [S]ome indication that the pretrial disclosure of the disputed evidence would enable the defendant significantly to alter the quantum of proof in his favor. This materiality standard normally is not a heavy burden, rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.

> <u>United States v. Lloyd</u>, 992 F.2d 348, 351 (D.C. Cir. 1993) (citations, internal quotations and ellipses omitted). See also <u>United States v. Scott</u>, 7 F.3d 1046 (table), 1993 WL 411596 at *3 (l0th Cir. 1993) , <u>cert. denied</u>, 510 U.S. 1135 (1994) ; <u>United States v. Ross</u>, 511 F.2d 757, 763 (5th Cir.), cert. denied, 423 U.S. 836 (1975); 2 Charles Alan Wright, Federal Practice and Procedure § 254 (2d ed. 1982 & Supp. 1998).

REPORT OF THE JUDICIAL MEMBERS OF THE COMMITTEE ESTABLISHED TO REVIEW AND

RECOMMEND REVISIONS OF THE LOCAL RULES OF THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS CONCERNING CRIMINAL CASES, 18-19 (October 28, 1998).

This point is especially apt with respect to mitigating evidence in a capital case, since (as pointed out a moment ago), the range of relevant mitigating evidence is so broad, each juror has almost limitless discretion to vote for life on the basis of any particular mitigating factor, no quantum of evidence ever requires the jury to impose the death penalty, and experience has shown that juries often reject the death penalty even in highly aggravated cases.[3]  In advance of trial, therefore, cases in which a prosecutor or court can have sufficient "confidence" in a death-sentence outcome to justify pretrial suppression of favorable mitigating evidence will be few and far between.

Strickler v. Greene, 527 U.S. 263 (1999), exemplifies how pre-trial disclosure decisions necessarily differ from post-trial Brady analysis.  Strickler was a capital carjacking case in which the prosecutor failed to obtain — and so failed to disclose — police files from a  neighboring jurisdiction that would have destroyed the credibility of the prosecution's only eyewitness to the carjacking by showing that she had probably fabricated most of her very detailed and riveting trial testimony in the weeks after the crime.  The undisclosed files included

---

[3] See e.g., In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93 (2nd Cir. 2008) (life sentences for two al-Qaeda terrorists who murdered 224 people in coordinated attacks). United States v. Nichols, 169 F.3d 1255 (10th Cir. 1999) (life sentence for co-conspirator in Oklahoma City bombing that killed 169); United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010) (life sentence for defendant who admitted participation in 9/11 plot);  United States v. Candelario-Santana, No. Crim. 09-427 (JAF), 2013 WL 2470876 (D. P.R., Mar. 23, 2013) (life sentence for eight murders, including one of a full-term unborn child, committed by a recently-released criminal who had already served time for 12 previous murders).

- police notations that the witness initially said that she could not identify either of the two perpetrators;

- her apologies to the officer for her poor memory;

- gratitude for the "help" that others had provided in "making associations:" and "jogging" her memory;

- a claim (not repeated at trial) that she had made and later torn up a contemporaneous notation of the perpetrators' license number; and

- ever-changing descriptions of both the victim and the carjackers.

See 527 U.S. at 273-275.  These and many other details of the undisclosed evidence fully justified Justice Souter's reference to "the likely havoc that an informed cross-examiner could have wreaked upon [the witness]" had the police files been turned over.  527 U.S. at 304 (Souter, J., concurring in part and dissenting in part).  The suppressed evidence, in short, was classic impeachment material of the most potent sort, and it is inconceivable that any prosecutor aware of his or her Brady obligations would have knowingly failed to turn it over to the defense before trial.

And yet the Supreme Court ultimately concluded that this devastating impeachment evidence was not "material" within the meaning of Brady.  Although the eyewitness's contribution to the prosecution's case may have seemed critical when she testified in the guilt phase of the trial, by the end of the sentencing phase the prosecution had established both Strickler's identity and most of the details of his crime with other unimpeached direct and circumstantial evidence.  Viewing the eyewitness's testimony through this retrospective lens, the Court found no reasonable likelihood that a successful

attack on her credibility would have affected the jury's verdicts as to either guilt or punishment.

Cases like <u>Strickler</u> highlight the "significant practical difference between the pretrial decision of the prosecutor and the post-trial decision of the judge." <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976).  This difference explains why "a trial prosecutor's speculative prediction about the likely materiality of favorable evidence . . .  should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial." <u>United States v. Olsen</u>, 704 F.3d 1172, 1183, n.3  (9th Cir. 2013).   Senior Judge James Cacheris recently summarized the point in <u>United States v. Danielczyk</u>, 2013 WL 142460 (E.D.Va. 2013), as follows:

> the . . . definition of "materiality" discussed in *Bagley, Strickler,* and other appellate cases is a standard articulated in the post-conviction context for appellate review. In this pretrial setting, such a standard is far less useful, and courts have held that circumstances necessitate a somewhat different inquiry.
>
> > The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial.
>
> <u>United States v. Safavian</u>, 233 F.R.D. 12, 16 (D.D.C.2005) (citing <u>United States v. Sudikoff</u>, 36 F.Supp.2d 1196, 1198–1199 (C.D.Cal.1999)).

<u>Id.</u>

Finally, this distinction between prospective and retrospective disclosure applies with special force here, not only because this is a capital case, where any one of many

- 7 -

aggravating or mitigating factors may prove decisive on the issue of life or death, but because much of the evidence and information sought by this motion is relevant not to impeachment of the government's witnesses, but as building blocks of the defendant's affirmative case for life.  See, e.g., Cone v. Bell, 556 U.S. 449 (2009) (remanding for determination of whether suppression of evidence supporting defendant's claim of drug intoxication around the time of a violent crime spree violated Brady).  In cases like Strickler v. Greene that involve the suppression of impeachment material, a prosecutor (or a reviewing court after trial) can at least imagine the trial without the witness's testimony, and so evaluate the likely effect of the missing impeachment on the jury's verdict.   But when the government withholds important information concerning a teenaged defendant's family of origin, and circumstantial evidence concerning the power relationships within a family, the impact of the nondisclosure on the development of a coherent and accurate picture of the defendant's formative environment and relative moral culpability may never be known.  For all of these reasons, the Court should decline the impossible task of calculating the likely effect of suppressed evidence on the jury's future verdict, but should simply require that the government disclose to the defense all information that is both relevant to the defendant's culpability or punishment, and potentially favorable to him.

Before turning to the individual requests for disclosure, we make two additional general points.   First, favorable mitigation evidence bearing on a capital defendant's formative environment and mental functioning can take many forms.  For example, psychological domination of one family member by another may be supported not only

by proof of violence or abuse, but also by evidence of pervasive and longstanding distortions of reality that controlling  members of a family impose upon the family unit as a whole.  Such evidence can be "favorable" to an accused even if — indeed, because — it contradicts the image that the family may have projected to outsiders, since growing up in a closed environment of pretense, suspicion, and fear is likely to impair a youthful defendant's capacity to perceive reality in the outside world.  In short, negative traits or evidence concerning the defendant's family of origin may be "favorable" for the light they shed on his formative environment, his motivation, and his susceptibility to domination and control.[4]   Because this type of favorable evidence will be especially difficult for the prosecution to recognize, its likely salience in a case of this nature weighs in favor of requiring disclosure.

Second, in evaluating the requests for disclosure that follow, the Court should be mindful of the unusual degree of government control over relevant information concerning the defendant's history and family background.  Because the Tsarnaevs were asylum-seekers and lawful immigrants to the United States, the government possesses far more information about their backgrounds, behavior, and functioning than it normally possesses about most families of capital defendants.  And because such a large proportion of the defendant's network of friends and acquaintances are also immigrants, with well-

---

[4] The relationship between adverse childhood experiences and violent criminal behavior is no longer a matter of dispute.  See generally, Michael Shader, U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *Risk Factors for Delinquency: An Overview*, 4 (n.d.) (listing as violence risk factors "poor parent-child relationship, harsh or lax discipline, poor monitoring, supervision, low parental involvement, antisocial parents, broken home, low socioeconomic status/poverty, abusive parents, family conflict.").

founded fears of severe repercussions from even slight involvement with the accused, the

defense faces special barriers in mounting its own investigation.  Under these

circumstances, basic fairness dictates that the Court enforce the government's <u>Brady</u>

obligations with due regard to the unusually great imbalance of investigative capacity

between the government and the defense.

## C.  Categories of undisclosed evidence.

    1.   <u>Digital evidence analysis and reports</u>

In a separate motion filed today, the defense has shown that Rule 16(a)(1)(F)

requires disclosure of the government's FTK and similar reports because they are

"scientific tests or experiments" conducted on the many items of digital evidence in this

case.  But even if the digital analyses and reports did not fall under Rule 16's automatic

disclosure requirement, the reports have sufficient mitigating value to mandate their

disclosure under <u>Brady v. Maryland</u>.  As the defendant explains in his separate pleading,

the FTK examinations and reports will help provide a chronology of the two Tsarnaev

brothers' respective exposure to and engagement with jihadist materials, as well as their

respective states of mind during the months and years before the Boston Marathon

Bombing.  While evidence in the reports might be marshaled to argue opposing

inferences, the underlying data concerning the brothers' activities, state of mind, and

respective trajectories is critical.  The mitigating significance of such evidence is obvious

— even before, as also seems probable, the government attempts at trial to persuade the

jury that the brothers were equally culpable, despite the marked differences in their ages,

personalities, and levels of prior involvement in violent activity.

Of course, as in most situations involving disclosure under <u>Brady</u>, the defendant cannot definitively establish the exculpatory or mitigating value of suppressed material until the government discloses it.[5]  In this respect, the present case is similar to <u>United States v. Rosario–Peralta</u>, 175 F.3d 48 (1st Cir. 1999).   There, the First Circuit found a district court to have abused its discretion by declining to inspect withheld government logs that, the defendants claimed, would have supported their alibi/misidentification theory by showing that law enforcement had lost contact during nighttime with the suspect vessel it had been tracking before eventually capturing the defendants at sea. Under these circumstances, the court held that that the district court could not fairly determine the issue of the logs' materiality without examining them, and remanded the case to the district court with instructions to inspect the records in camera.

<u>Rosario-Peralta</u> illustrates that courts do not demand an unattainable level of certainty before concluding that a defendant has met his burden to show that undisclosed "evidence would be both favorable to him and material."  <u>See</u> <u>United States v. Prochilo</u>, <u>supra</u>.  The defendant has met this burden with respect to the FTK and similar reports regarding the computers and other digital storage devices that the government has submitted for analysis, and his request for disclosure of all such reports should therefore be granted.

---

[5] "[I]f a record 'be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?' <u>United States v. Burr</u>, 25 F.Cas. 187, 191 (C.C.D.Va. 1807) (No. 14,694). There being no answer from the Government to Chief Justice Marshall's perennially confounding question, the Court determines that Mr. Poulin has made a prima facie showing that the Exxacom system is material to the preparation of his defense." <u>United States  v. Poulin</u>, 592 F.Supp.2d 137, 144 (D. Me. 2008).

2.      Family "A-files" relevant to alienage, asylum and citizenship

The United States Citizenship and Naturalization Services (USCIS) maintains an "Alien file" — commonly referred to as an "A-file" — on each non-citizen who seeks to immigrate to or obtain citizenship in the United States.  A-files can run to hundreds of pages, and USCIS describes them as "a rich source of biographical information."  USCIS, "A-Files Numbered Below 8 Million," available at http://www.uscis.gov/history-and-genealogy/genealogy/files-numbered-below-8-million#WhatAreAFiles.

The government has provided in automatic discovery a copy of Mr. Tsarnaev's own A-file, which includes portions of his father's asylum application.   In a September 30, 2013 response to defense counsel's follow-up request for "[i]nformation concerning our client and his family's U.S. or foreign citizenship status, immigration, ICRE investigations, and asylum proceedings," the government stated:

> The government has already produced the defendant's immigration file, which includes the facts of his immediate family members' asylum claim.  We do not intend to examine the immigration files of any of the other individuals named in this request for exculpatory information unless you can identify specific grounds for believing that the files actually contain such information.

The government subsequently filed a Notice of Intent to Seek the Death Penalty (NOI) that includes, as a non-statutory aggravating factor, the following allegation:

> **Betrayal of the United States.** DZHOKHAR TSARNAEV received asylum from the United States; obtained citizenship and enjoyed the freedoms of a United States citizen; and then betrayed his allegiance to the United States by killing and maiming people in the United States.

On February 14, 2014, in a letter containing discovery requests relating to the allegations contained in the NOI, defense counsel noted that "Dzhokhar received a derivative asylum

and was assisted in the asylum and citizenship process by his parents and other family members," and renewed the request for disclosure of his parents' A-files.  The defense letter continued, "We also believe that this allegation raises another relative culpability issue with Tamerlan Tsarnaev and again seek production of his A file."  By letter dated March 6, the government again declined to provide the defendant's parents' and brother's A-files.  The defense therefore requests that the Court order disclosure of these three A-files.

By including Dzhokhar's derivative asylum while a small boy as part of the reason why he should be sentenced to death, the government has established the materiality of the parents' immigration history to his sentencing defense.  While Dzhokhar's own A-file contains his father's claim that he had been arbitrarily arrested and tortured in the family's home country of Kyrgyzstan, and that he had a well-founded fear of further persecution justifying political asylum in the United States, the documents in Dzhokhar's file do not include any of the reasons why the United States government concluded that the father's asylum claim was valid.  Anzor Tsarnaev's A-file will presumably contain the results of the United States government's investigation into his asylum claim — including the notes and conclusions of the officer who conducted Anzor's asylum interview.  Since asylum was ultimately granted, it is reasonable to infer that Anzor's file provides objective substantiation of his claims.

Assuming, as seems reasonable, that his father's A-file provides objective verification of his claims of torture and persecution in Kyrgyzstan and Russia, the file is material to Dzhokhar's defense for at least four reasons.

1. The USICS files on both of Dzhokhar's parents are an indispensable source of documentation and verification for his family's collective biography, and thus for a reliable investigation of the environment that formed him. The file will likely chronicle the family's movements from the remote region of central Asia to which Stalin had deported their forbearers during World War II, his parents' and grandparents' medical and social histories, and many other facets of the family and the environment into which Dzhokhar was born.

2. More specifically, the profoundly destabilizing effect of Anzor's post-traumatic stress disorder and his other mental and physical afflictions on the Tsarnaev family's life in America is a critical part of the developmental histories of both of Anzor's sons. Independent proof of the events underlying Anzor's severe disabilities − including the experiences which were the basis for his application for asylum − is essential to an accurate telling of both Tamerlan's and Dzhokhar's life stories, and so to Dzhokhar's case in mitigation.

3. The government's "betrayal" aggravating factor suggests that the U.S. government's decision to admit Dzhokhar along with his parents when he was eight years old was a gratuitous act of generosity rather than a moral and legal imperative based on the facts that the government itself knew to exist at the time the family was granted asylum. Only the A-files themselves can help establish the true reason for the government's asylum decision that it now wields against Anzor's youngest child.

4. And finally, to the extent that the parents' A-files do corroborate Anzor's claim for asylum, this corroboration is needed to permit the defense to overcome the anti-immigrant bias and stereotyping that the government's "betrayal" allegation will inevitably exacerbate.

This last point requires further explanation. Whatever counsel for the government may have meant to express with the "betrayal" aggravating factor, its legal significance is well-established under the Supreme Court's Eighth Amendment jurisprudence. Because "the culpability of the average murderer is insufficient to justify imposition of death," Atkins v. Virginia, 536 U.S. 304, 319 (2002), capital sentencing schemes employ aggravating factors to winnow out those few murderers deserving of execution from the much larger number who should − and do − receive lesser sentences. Thus, when the

prosecution in a death penalty case designates a fact or circumstance as "aggravating" in this sense, it is claiming that the fact fairly differentiates a given crime or criminal from all others, while "ensur[ing] that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." Tuilaepa v. California, 512 U.S. 967, 973 (1994).

By deploying the "betrayal" allegation as a nonstatutory aggravating factor, the government is asserting that an asylum seeker and naturalized citizen who commits a fatal bombing is more blameworthy, and deserving of more severe punishment, than a native-born citizen who commits the identical crime.  The sentencing jury is much more likely to accept such a contention if the defense is prevented from demonstrating the dire circumstances that led to the Tsarnaev family's emigration to the United States. Deprived of the government's own verification of Anzor's asylum claim, the defense will be hard-pressed to rebut the invidious counter-narrative — magnified by the distorting lens of hindsight — that the Tsarnaev family must have "played the system" to gain entry into the United States.

The inclusion of the "betrayal" factor poses an undeniable risk of encouraging anti-immigrant stereotyping and bias, and so endangers the fairness of the proceedings in this case.  While openly expressed hatred of racial and religious minorities has greatly decreased in recent decades (with the highly relevant exception of Muslims), the same is not true of animus against immigrants.  Unlike overtly racist or sexist attitudes towards African-Americans or women, relatively little social stigma attaches to the expression of hostility against immigration and immigrants.  In the absence of actual information about

the forces and pressures that cause any particular family to seek to emigrate to the United

States, derogatory stereotypes will fill the vacuum.  The defense must be prepared to

counter these invidious notions.

The unfairness of withholding the parents' A-files while citing the government's

decision to grant asylum and citizenship as a factor justifying the death penalty should

not require further elaboration.   The Federal Death Penalty Act itself reflects Congress's

appreciation of the special risks of discrimination based on national origin in its

requirement that each capital sentencing jury be able to certify that that the national

origin of the defendant or the victim played no part in its sentencing verdict. 18 U.S.C. §

3593(f).[6]  This provision will ring hollow if the defense is not permitted to rebut with

evidence from the government's own official files the invidious and widespread

presumption that the Tsarnaevs are members of a class of immigrant families that should

be categorically barred from this country and whose members should not, once admitted

---

[6] This provision reads as follows:

**"Special Precaution To Ensure Against Discrimination.—** In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

and charged with crime, be entitled to the full protections of American law on an equal

footing with native-born citizens.   For all of these reasons, Dzhokhar's parents' A-files

are clearly material to his defense and should be disclosed to him.

Tamerlan's A-file is material for a somewhat different reason.  Evidence that

shows Tamerlan to have had a substantially longer and deeper engagement than his

younger brother with extremist and violent ideology is mitigating for the light that it

sheds on their relative culpability.  It was the responsibility of the USCIS to monitor and

document Tamerlan's activities as a lawfully-admitted alien and applicant for U.S.

citizenship.  While such monitoring obviously did not prove adequate to prevent

Tamerlan from conceiving, planning, and carrying out the Boston Marathon Bombing,

his A-file is nevertheless highly likely to provide evidentiary support for the view that he

was the instigator and leader of the plot, and that his younger brother's role was

commensurately smaller.  Evidence tending to support this view would include

- any corroboration of statements attributed to U.S. government officials that "it was the record of the F.B.I. interview [with Tamerlan] that threw up red flags and halted, at least temporarily, Mr. Tsarnaev's citizenship application,"  Julia Preston, "F.B.I. Interview Led Homeland Security to Hold Up Citizenship for One Brother," <u>New York Times</u> A-15 (April 20, 2013);

- any governmental monitoring of Tamerlan's travel to and activities in Dagestan;

- information concerning the dates when informants or government agents first reported Tamerlan's extremist ideology;

- information concerning his violent nature and suspected criminal behavior; and

- reports or intelligence that would show by how long Tamerlan's extremist ideology predated Dhzokhar's.

For all of these reasons, Tamerlan's A-file is material to mitigation, and should be disclosed under both Fed. R. Crim. P. 16(a)(1)(E) and the constitutional rule of <u>Brady v. Maryland</u>.

3.     <u>Information corroborating and documenting FBI contacts with Tamerlan</u>

By letters dated December 9, 2013 and February 28, 2014, defense counsel requested disclosure of all records or documentation concerning FBI contacts with Tamerlan Tsarnaev prior to April 15, 2013.  The February 28 defense letter explained:

> We seek this information based on our belief that these contacts were among the precipitating events for Tamerlan's actions during the week of April 15, 2014, and thus material to the defense case in mitigation. We base this on information from our client's family and other sources that the FBI made more than one visit to talk with Anzor, Zubeidat and Tamerlan, questioned Tamerlan about his internet searches, and asked him to be an informant, reporting on the Chechen and Muslim community. We further have reason to believe that Tamerlan misinterpreted the visits and discussions with the FBI as pressure and that they amounted to a stressor that increased his paranoia and distress. We do not suggest that these contacts are to be blamed and have no evidence to suggest that they were improper, but rather view them as an important part of the story of Tamerlan's decline. Since Tamerlan is dead, the government is the source of corroboration that these visits did in fact occur and of what was said during them.

The government responded on March 14, 2014 that:

> [t]he government has no evidence that Tamerlan Tsarnaev was solicited by the government to be an informant.  As for information about any contacts between the government and other Tsarnaev family members, it appears from your letter that this information is already available to you through the family members themselves.

The defense has learned of the FBI's contacts with Tamerlan through other sources (including hearsay references contained in FBI 302s from various community

sources).  No one other than Tamerlan and the agents involved were actual witnesses to

what transpired, and absent verification from the government itself, the defense will have

no direct evidence to establish the reasons for these contacts, or their number, nature, and

content.  This information is critical to explain Tamerlan's changes in behavior and

functioning, and should be disclosed.

4.    <u>Information obtained during law enforcement interviews with Ibragim
Todashev concerning Tamerlan and the 2011 Waltham murders</u>

FBI agents reportedly interviewed Tamerlan's friend Ibragim Todashev on at least

two occasions prior to May 22, 2013, when he was shot and killed during questioning by

the FBI and state police.  Law enforcement has publicly disclosed that Todashev

confessed during his final interview that he and Tamerlan Tsarnaev committed the

September 11, 2011 Waltham murders together.  Todashev's statements to the FBI are

also highly likely to have focused on Tamerlan's religious beliefs, his mental condition,

his violent behavior apart from the Waltham murders, his trip to Dagestan, and his

relationship with his younger brother. The materiality of this information to the question

of the brothers' relative culpability has already been explained.  Indeed, media reports of

interviews with Todashev's girlfriend, Tatiana Gruzdeva – who has since been deported –

indicate that the earlier police interviews of Todashev focused on Tamerlan and the

Boston bombings, and did not even touch on the Waltham murders.  The government's

unexplained claim that all of this information is protected by the law enforcement

investigative privilege – a claim which should be evaluated by the Court, and balanced

against the defendant's need for the evidence, see generally, <u>Association for Reduction of</u>

Violence v. Hall, 734 F.2d 63 (1ˢᵗ Cir, 1984) – does not excuse its failure to disclose any of the information provided by Todashev and his friends.

As for the Waltham crimes themselves, it should be added that Tamerlan's having committed a gruesome triple murder — and having included a "close friend" among the victims — would powerfully support the inference that Dzhokhar experienced his older brother as an all-powerful force who could not be ignored or disobeyed.  Since Todashev was shot and killed by FBI agents while confessing to his role in the Waltham murders, the defense has no remaining source for what Todashev knew other than the government. The Todashev 302s and any other memorialization or records of his May, 2013 interviews are Brady material and should be disclosed.

5.      Withheld memoranda of FBI interviews with immediate family members

The defendant's prior Motion to Compel Discovery sought production of unedited FBI 302 (Memoranda of Interviews) with his close family members (hereinafter "Family 302s"), over and beyond the short summaries of "Brady" material from the 302s that the government had provided.  The Court denied this request as overly broad, and because the motion did not specifically identify why the Family 302s themselves were likely to contain exculpatory material.  DE 151, at 1-4.  The defendant has now spelled out with greater specificity why a broad range of information concerning the defendant's family is not merely material but critical to his case in mitigation, and on this basis he renews his request for disclosure of these 302s.

It is no answer to this disclosure request that that the defense has access to the defendant's own family members.  FBI interviews conducted very soon after the

bombing and Tamerlan's death will capture parents' and other family members' early reactions, unbridled thoughts, cultural beliefs, and diverse frailties in the immediate aftermath of the offense.  They are therefore likely to provide a picture of the defendant's family of origin at the most devastating moment of their lives.  The setting of emotion, tension and fear in which these interviews were conducted can never be recreated. Simply picking out for disclosure, as the government has done, a few  references to the differences between Tamerlan's and Dzhokhar's behavior or personalities does not substitute for the wealth of evidence concerning Dzhokhar's familial environment that their full 302s almost certainly contains. The government's continued withholding of these materials can have no purpose or effect other than to unfairly hobble the defense's effort to develop an accurate picture of the forces and influences that formed both Tamerlan and Dzhokhar.  The defense therefore renews its request for full disclosure of the Family 302s.

### D.  Conclusion

For the forgoing reasons, the defense submits that the government should be required to disclose the specific items of favorable and material evidence enumerated in this motion.  At a minimum, we respectfully request that the Court examine the requested evidence in camera, see Pennsylvania v. Ritchie, 480 US 39 (1987), and that the requested disclosures be granted.

Respectfully submitted,

DZHOKHAR TSARNAEV
By his attorneys

/s/  David I. Bruck

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
        51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

        I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
March 28, 2014.

/s/  Miriam Conrad