**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Crim. No.13-10200-GAO |
| | ) |
| DZHOKHAR A. TSARNAEV, | ) |
| Defendant | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO COMPEL

The United States of America, by and through its undersigned counsel, respectfully submits this combined opposition to the "Motion to Compel Compliance With Automatic Discovery Obligations" and "Further Motion to Compel Production of Favorable Evidence" filed by defendant, Dzhokhar Tsarnaev ("Tsarnaev"), on March 28, 2014.  As grounds for this combined opposition, the government relies on the following.

### INTRODUCTION

During the nearly 12 months that have elapsed since Tsarnaev's arrest, the government has provided extensive information about this case to the defense.  The government provided the vast bulk of it even though it had no obligation to do so under the rules of discovery.  In addition, the government has spent enormous amounts of time, energy and money copying discovery items for the defense, even though the rules entitle Tsarnaev only to inspect and copy those items on his own.

1

An appreciation of the extensive discovery provided to Tsarnaev so far is helpful in understanding why his motions to compel are utterly without merit.

On May 10, 2013 -- less than four weeks after Tsarnaev's arrest, and long before the due date for automatic discovery -- the government voluntarily copied key items of evidence for his attorneys (surveillance video showing Tsarnaev placing a bomb at the Marathon and written records of Tsarnaev's statements to police) so that he could begin preparing his defense.

On August 16, 2013 -- still before the due date for automatic discovery -- the government voluntary copied and produced other key items of evidence for Tsarnaev, including forensic images of:  his laptop computer and cell phones; his brother's computers and cell phones; external hard drives recovered from his apartment, his abandoned car, and his friends' apartment; and GPS devices recovered from the hijacked Mercedes and his brother's minivan.  The government also culled from the massive number of surveillance videos and photos it collected during the investigation hundreds of the most important photos and videos (including those picturing Tsarnaev and his brother immediately before, during, and after the Marathon bombings, and those associated with the murder of Officer Collier, the carjacking, the robbery, and the Watertown

shoot-out) and copied and produced these for the defense.

On September 3, 2013, the due date for automatic discovery, the government copied and produced, among other things: detailed lists of physical evidence recovered during the investigation; laboratory reports of ballistics, DNA, and trace evidence analysis; extensive material relating to virtually all of the search warrants obtained during the investigation (including the warrants, applications, supporting affidavits, diagrams, maps, photographs, logs, and inventories of items seized); reports of nearly 500 witness interviews; search results for Tsarnaev's Facebook, Instagram, Skype, and Twitter accounts; pertinent 911 calls and radio traffic from the Cambridge, MIT, and Watertown Police Departments and the State Police; cell phone records for Tsarnaev, his brother, and others; Tsarnaev's complete Alien Registration File; and email service subscriber information for numerous accounts associated with Tsarnaev and his brother.

Also on September 3, 2013, the government informed Tsarnaev that it would make available for his inspection and review at any mutually convenient time "[a]ll other books, papers, documents, tangible items, and digital information that are within the possession, custody or control of the government, and that are material to the preparation of the defense or are

intended for use by the government as evidence chief at trial, or were obtained from the defendant."

Between September 3, 2013 and the date of this filing, the government, sometimes at Tsarnaev's request and sometimes on its own initiative, has copied and produced numerous other items for the defense, including:  thousands of additional photos and surveillance videos; additional information from social media accounts belonging to Tsarnaev and others; over 1,000 additional reports of witness interviews; various hospital records, telephone records, bank records, credit reports, employment records, and school records for Tsarnaev and others; autopsy reports for Krystle Marie Campbell, Officer Collier, Lingzi Lu and Martin Richard; and recordings of officer and witness interviews.  It has also spent several days at four different locations retrieving, unpackaging, and laying out virtually all of the physical evidence collected in this case so that Tsarnaev could inspect, photograph, and videotape it.

## ARGUMENT

In view of the extensive discovery provided to date, Tsarnaev's repeated complaints that he is being deprived of "critical" evidence should be seen for what they are: hyperbole.  As the Court emphasized in denying Tsarnaev's previous motion to compel, Federal Rule of Criminal Procedure

16(a)(1)(E)(1) requires production of information only if it is
"material" to the defense.  "In the Rule 16 context, materiality
depends on 'not only the logical relationship between the
information and the issues in the case, but also the importance
of the information in light of the evidence as a whole.'"
United States v. Tsarnaev, Crim. No. 13-10200, Mem. and Order at
6 (D. Mass. Nov. 27, 2013) (quoting In re Terrorist Bombings of
U.S. Embassies in East Africa, 552 F.3d 93, 125 (2nd Cir. 2008)
(citation omitted)).  None of the evidence that Tsarnaev seeks
to compel in his recently-filed motions meets that standard.

        Below we respond first to Tsarnaev's motion respecting
automatic discovery (Items 1 - 5) and then to his motion
respecting purportedly favorable evidence (Items 6 - 9).  In our
discussion of Items 1 - 5, "Deft. Mot." refers to Tsarnaev's
"Motion to Compel Compliance With Automatic Discovery
Obligations."  In our discussion of Items 6 - 9, "Deft. Mot."
refers to Tsarnaev's "Further Motion to Compel Production of
Favorable Evidence."

    1.   Organization records

        In the course of investigating the Marathon bombings and
related matters, the government requested records from various
organizations (e.g., cell phone providers, financial
institutions, social media companies).  Some records it

received, some it did not (often because they did not exist).
Of the ones it received, some are discoverable under Federal
Rule of Criminal Procedure 16 (hereinafter "the discoverable
organization records"), some are not.  Of the discoverable
organization records, some the government received as hard
copies, some as Excel files, some as pdf files, and some in
other digital formats.

    On September 3, 2013 -- the due date for automatic
discovery -- we produced a list of records that included the
discoverable organizational records and invited the defense to
view them at our office at any mutually convenient time.  The
defense never took us up on that invitation.

    Instead, on December 9, 2013, the defense requested that
the government make copies for them of all of the records on the
list.  Even though the government had no obligation to copy
these (or any) records for the defense, the government
nevertheless scanned, digitally processed, Bates-stamped, and
made searchable a first installment of approximately 13,000
pages of the discoverable organization records and produced them
on February 7, 2014.  The government then scanned, digitally
processed, Bates-stamped, and made searchable a second
installment of approximately 1,300 pages of the discoverable
organization records and produced them on March 28, 2014.  (In

between February 7 and March 28, the government produced
thousands of other pages of documents and terabytes of
additional digital information in response to other defense
requests.)

In sum, the government complied with its automatic
discovery obligations on September 3, 2013, when it made all of
the discoverable organization records available to the defense
for inspection and copying.  In addition, at the cost of a great
deal of time and effort, the government has now scanned,
digitally processed, Bates-stamped, and made searchable over
14,000 pages of those records so that the defense team would not
have to do that for itself.  The remaining records Tsarnaev
requests either do not exist or are not discoverable under Rule
16 or the Local Rules.  This portion of defendant's second
motion to compel should therefore be denied as moot.

2.   <u>MIT Police reports</u>

As a general matter, Rule 16 does not require the
production of police reports.  <u>See</u>, <u>e.g.</u>, <u>United States v. Fort</u>,
472 F.3d 1106 (9th Cir. 2007); <u>United States v. Wilson</u>, 117 F.3d
1427 (9th Cir. 1997).  Nevertheless, the government frequently
provides police investigative reports as a courtesy to
defendants.  The government previously informed Tsarnaev that it
would provide him with MIT police reports relating to Officer

Collier's murder when it received them from MIT.  The government
has since received all of them and will produce them shortly.
This portion of Tsarnaev's motion should be denied both because
there is no legal basis to compel production of the MIT police
reports under Rule 16 and because the request is moot.

    3.   Watertown police reports

    The government has not alleged, and does not intend to
offer evidence, that Tsarnaev shot Officer Richard Donahue.
Rather, the government alleges and will prove that Tsarnaev is
responsible for Officer Donahue's injuries because Officer
Donahue was shot while he and other officers were attempting to
prevent Tsarnaev from escaping.

    With respect to the five specific document requests in
defendant's motion, the government responds as follows:

    a.   The government has produced or will shortly produce
all documents responsive to this request in its possession,
custody or control.

    b.   These reports are of an unrelated shooting.  They
contain no Rule 16 or Brady information.

    c.   As a general matter, the government does not regard
memoranda or reports prepared by attorneys in the Middlesex
District Attorney's Office to be in its custody, possession or
control, unless that Office chooses to provide them to us.  The

government has been informed by the Middlesex District Attorney's Office that it has not yet prepared such a report.

d.   The government has not obtained Officer Donahue's medical or treatment records.  They are not in the government's possession, custody or control.

e.   The government has produced or will shortly produce all documents responsive to this request in its possession, custody or control.

4.   Laboratory tests

Rule 16(a)(1)(F) requires the government to produce the results or reports of certain examinations and tests.  It does not require the government to conduct such tests or create such reports.  Various law enforcement laboratories have been conducting tests and creating reports in connection with this case.  The government has passed on to the defense any such reports that have been finalized and sent and will continue to do so.

The government has, thus far, redacted only one category of information from lab reports:  the names and DNA profiles of individuals whose DNA was compared to -- but did not match -- questioned samples.  This information has been redacted because it is irrelevant.  It certainly is not favorable material information or information that is material to preparing the

9

defense.

The remaining information the production of which defendant seeks to compel is commonly referred to as expert discovery. As defendant acknowledges, the Court has not yet set deadlines for expert discovery. Once it does, the government will comply with them.

    5.   FTK reports

FTK reports are not "results or reports of [a] scientific test or experiment" within the meaning of Rule 16(a)(1)(F). FTK is a commercially-available software program that enables a user conveniently to view the contents of a computer storage device, search for and "bookmark" items of interest, and create reports that memorialize the results of particular FTK sessions. (A full description of FTK's capabilities can be found in the FTK User Manual, which is available on line at: http://myweb.cwpost.liu.edu/cmalinow/ftk/ftkusersguide.pdf.)

Agents in this case have used FTK (and other commercially-available software) to identify potentially useful items of digital evidence. Typically, they have copied those items of interest onto a compact disc along with an automatically-generated "FTK report" that provides links to the items and some information about them. These are the "FTK reports" Tsarnaev erroneously characterizes as "results or reports of [a]

scientific test or experiment."

An analogy will help show why FTK reports are not reports of a "scientific test or experiment."  FTK is functionally equivalent to programs such as Concordance, which allow users to scan documents into a database and then conveniently view the documents on a computer, as well as to query the document database using search terms.  In this case, for example, the government has provided many thousands of pages of police reports and other documents to the defense in digital form.  The documents are searchable and have been electronically Bates-stamped.  The government has loaded these documents into a database program (Concordance) so that it can easily view and search them, and the defense has no doubt done the same with its copies.  If an FBI agent were to query this database for combined references to, say, "Dzhokhar Tsarnaev" and "Anwar al-Awlaki," copy any responsive documents to a compact disc, and then generate a "Concordance report" consisting of links to the documents and some information about them (<u>e.g.</u>, interviewee name, report date, Bates Number, etc.), no one would suggest that this "Concordance report" constituted a report of a "scientific test or experiment" under Rule 16.  An "FTK report" is essentially no different.

Even if FTK reports did constitute reports of a "scientific

test or experiment" under Rule 16, the ones generated so far in
this case still would not be discoverable, because they do not
meet the requirements of Rule 16(a)(1)(F)(iii).  They are not
"material to preparing the defense" because the defense has
their own copies of the discoverable digital storage devices and
the means to examine them.  See, e.g., United States v.
Robinson, 439 F.3d 777, 780 (8th Cir. 2006) (holding, in a tax
case, that defendant was not entitled to "internal documents
used by the government to calculate gross receipts, business
expenses and taxes owed," despite claim that failure to produce
these materials "made trial preparation extremely difficult,"
because defendant had adequate access to the data underlying the
government reports); United States v. Koskerides, 877 F.2d 1129,
1333 (2nd Cir. 1989) (same).  And they are not intended for use
in the government's case-in-chief.  Although the government
intends to generate FTK reports (and other trial exhibits) for
use in its case-in-chief once it is done responding to
Tsarnaev's discovery requests, it has not yet done so; the
government will disclose any such exhibits to the defense in a
timely fashion.

     FTK reports also constitute "information not subject to
disclosure" under Federal Rule of Criminal Procedure 16(a)(2),
which excludes from discovery "reports, memoranda, or other

internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Most of the FTK reports in this case were prepared at the prosecutors' request to explore and evaluate the usefulness of particular items of digital evidence in proving the defendant's guilt. Some were prepared to explore and evaluate possible criminal activity by others, or to search the digital evidence for possible leads. These are all examples of core work product exempt from disclosure under Rule 16(a)(2).

An argument similar to Tsarnaev's was rejected in <u>United States v. Schmidt</u>, Case No. 04-00103, 207 WL 1232180 (D. Colo. Apr. 25, 2007). In that case, an IRS agent used a computer database of "voluminous" bank records to produce summary exhibits for use as evidence at trial. <u>Id.</u> The defense argued that it needed access to the database to "determine the accuracy, completeness, and fairness of the summary exhibits." <u>Id.</u> The court rejected that argument, noting that "access to the computer database would reveal what queries [the IRS agent] ran in order to prepare the spreadsheets." <u>Id.</u> That, in turn, "would clearly invade the province of the agent's work product by giving defendants insight into the agent's thought processes as he analyzed and compiled the underlying documents. The

database, therefore, is not discoverable." Id. (citing Fed. R.
Crim. P. 16(a)(2)). The court also noted that the defendants
"have not shown that they are not equally as capable as [the IRS
agent] of reviewing and analyzing the underlying records." Id.
The same is true here.

The case of Government of the Virgin Islands v. Fahie, 419
F.3d 249 (3rd Cir. 2005), on which defendant relies, is not on
point. The defendant in Fahie was charged with possession of an
unlicensed firearm. Id. at 250. It emerged at trial that a
detective had run a trace on the gun through an ATF database and
had received an ATF report containing the name of the gun's
registered owner and a statement that the gun had not been
reported stolen. Id. at 251. The Third Circuit held that this
report was Brady material. Id. at 252-257. It also held that
the report was not protected from disclosure under Rule 16(a)(2)
as work product because it did not reflect the "mental
impressions, conclusions, opinions or legal theories concerning
litigation of an attorney or other representative of a party."
Id. at 257 (internal quotation marks and citation omitted).

Fahie is clearly distinguishable from this case because the
defendant in Fahie did not have a copy of the ATF database or
the means to query it on its own. Here, in contrast, the
defense has been given copies of the discoverable digital media

14

and can run its own FTK searches of those items if it so
desires.  Moreover, although the lower court in Fahie deemed the
ATF trace report a report of a "scientific test[] or
experiment[]" under Rule 16(a)(1)(F), the Third Circuit referred
to it as "evidence material to Fahie's defense," using the more
apt language of Rule 16(a)(1)(E).  See 419 F.3d at 257.  Here,
anything "material to preparing the defense" can be found in the
underlying digital data; that category does include an agent's
(or prosecutor's) thoughts about the best way to query that
data, or the results of those queries.

     Finally, disclosure of FTK reports is not mandated by
Brady, because the underlying data -- and thus any Brady
information it might contain -- has been produced to the
defense.  As the judge in another well-known capital case once
observed, Brady requires only the disclosure of favorable
material evidence; it "does not require the government's lawyers
to defend against the evidence they present or to take
affirmative action to prepare a defense for the accused."
United States v. McVeigh, 954 F.Supp. 1441, 1449 (D.Colo. 1997);
accord United States v. Marrero, 904 F.2d 251, 261 (5th Cir.
1990) ("While the Supreme Court in Brady held that the
Government may not properly conceal exculpatory evidence from a
defendant, it does not place any burden upon the Government to

15

conduct a defendant's investigation or assist in the presentation of the defense's case."). The defense in this case is perfectly capable of examining the digital evidence for itself; the government is not obligated to do it for the defense. See, e.g., United States v. Skilling, 554 F.3d 529, 576-77 (5th Cir. 2009) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." Finding no Brady violation even though government produced "several hundred million pages of documents" and "never directed Skilling to a single Brady document contained in the open file"), vacated in part on other grounds, 130 S.Ct. 2896 (2010); United States v. Warshak, 631 F.3d 266, 297 (6th Cir. 2010) (no Brady violation despite defense claim that the government "simply hand[ed] over millions of pages of evidence and forc[ed] the defense to find any exculpatory information contained therein."); United States v. Pelullo, 399 F.3d 197, 212 (3rd Cir. 2005) (holding that the government is not obliged to "ferret out" potentially favorable information from materials made available to defense).

In sum, there is no legal basis for an order compelling the government to produce FTK reports.

6.   Tsarnaev family A-files and the "betrayal" allegation

On September 11, 2012, at the age of 19, Dzhokhar Tsarnaev

16

attended a naturalization proceeding at Faneuil Hall where he

took the following oath of citizenship:

> I hereby declare, on oath, that I absolutely
> and entirely renounce and abjure all
> allegiance and fidelity to any foreign
> prince, potentate, state, or sovereignty, of
> whom or which I have heretofore been a
> subject or citizen; that I will support and
> defend the Constitution and laws of the
> United States of America against all
> enemies, foreign and domestic; that I will
> bear true faith and allegiance to the same;
> that I will bear arms on behalf of the
> United States when required by the law; that
> I will perform noncombatant service in the
> Armed Forces of the United States when
> required by the law; that I will perform
> work of national importance under civilian
> direction when required by the law; and that
> I take this obligation freely, without any
> mental reservation or purpose of evasion; so
> help me God.

The significance of that oath cannot be overstated.  As the

Supreme Court recently observed, "naturalization ceremonies

bring together men and women of different origins who now share

a common destiny.  They swear a common oath to renounce fidelity

to foreign princes, to defend the Constitution, and to bear arms

on behalf of the country when required by law."  Arizona v.

United States, 132 S.Ct. 2492, 2509 (2012).  By taking the oath

of citizenship, Tsarnaev sought and received the trust of his

fellow Americans.  Among other things, he was granted the right

to vote in American elections, run for public office, and thus

to influence American foreign policy by peaceful means.

Just seven months after swearing an oath to defend his adopted country and stand by his fellow Americans, Tsarnaev violated that oath by attacking America and terrorizing and murdering people on American soil.  He did so, by his own account, to punish America for the actions of American soldiers who, in fulfilling their own oaths to protect and defend the Constitution, were waging a war against terrorism overseas.  The government's Notice of Intent to Seek the Death Penalty thus alleges as a non-statutory aggravating factor that Tsarnaev "betrayed his allegiance to the United States by killing and maiming people in the United States."

Although the "betrayal" allegation includes the statement that Tsarnaev "received asylum from the United States," that statement is only a background fact explaining how Tsarnaev came to be in a position to obtain citizenship.  The government does not allege that Tsarnaev's derivative status as an asylee, which ended when he obtained citizenship, is in itself an aggravating factor.  That portion of the allegation is surplussage.  The government also does not intend to argue, as Tsarnaev claims, that "immigrant families . . . once admitted and charged with a crime, [are not] entitled to the full protections of American law on an equal footing with native-born citizens."  (Deft. Mot.

at 16-17).  They certainly are.  The "betrayal" allegation is
based solely on Tsarnaev's voluntary, adult decision to swear an
oath of allegiance to America and his fellow citizens, and then
to betray that oath seven months later by committing a terrorist
attack against America that killed and maimed hundreds of
people.

There is no merit whatsoever to Tsarnaev's argument that
the "betrayal" factor entitles him to offer evidence that the
government's decision 12 years ago, in 2002, to grant the
Tsarnaev family asylum was justified by Anzor Tsarnaev's
treatment in his native land.  The government has not alleged
that the asylum decision was unjustified, and whether it was or
not is entirely irrelevant to the question whether Dzhokhar
Tsarnaev's murderous acts more than ten years later warrant the
death penalty.  Tsarnaev nevertheless argues that if he does not
affirmatively prove the asylum decision was justified, jurors
will engage in "anti-immigrant bias and stereotyping" and assume
"that the Tsarnaev family must have 'played the system' to gain
entry into the United States."  (Deft. Mot. at 14, 15).

That argument is also without merit.  The government does
not share Tsarnaev's doubts about the fairness of Massachusetts
jurors, or Americans in general, and we are confident that after
a thorough *voir dire* the Court will seat only fair-minded

jurors.  In addition, as Tsarnaev acknowledges, the jurors will
be instructed not to recommend a sentence of death on the basis
of Tsarnaev's race, color, religious beliefs, or national
origin, and they will be required to sign a certificate that
they have not done so.  See 18 U.S.C. § 3593(f).  The Court can
further instruct the jury not to question the correctness of the
government's decision to grant the Tsarnaevs asylum.  Those
safeguards are more than sufficient to obviate any need to
relitigate the government's 12 year-old asylum decision in the
middle of Tsarnaev's sentencing hearing, or review in detail the
persecution Anzor Tsarnaev experienced in his native land 15-25
years ago.

Tsarnaev argues that "[in] the absence of actual
information about the forces and pressures that cause any
particular family to seek to emigrate to the United States,
derogatory stereotypes will fill the vacuum." (Deft. Mot. at
15-16).  That is just another way of claiming that the average
juror is a bigot, or at least anti-immigrant.  There is
absolutely no basis for such an invidious assumption, and the
Court should not give it a legal imprimatur by indulging it.
Detailed evidence of Anzor Tsarnaev's experiences in Central
Asia is simply not relevant to the question of whether his adult
son deserves the death penalty, and Tsarnaev cannot make it

relevant simply by imputing anti-immigrant animus to the jury pool.

Tsarnaev's assumption "that Anzor's file provides objective substantiation of his claims" of persecution in his native land is wrong:  the file shows, instead, that the Citizenship and Immigration Services examiner who interviewed Anzor essentially took the claims of past persecution at face value.  (Anzor's asylum application, including his 30-page account of his experiences in his native land, was produced to the defense over seven months ago as part of automatic discovery.)  Even if it did, the defense has made no showing of materiality because it has proffered no evidence whatsoever that Anzor's experiences or the effects they had on him in any way affected Dzhokhar Tsarnaev, let alone contributed to his acts of terrorism, murder, and mayhem.

The same is true of Tamerlan Tsarnaev's A-file:  contrary to Tsarnaev's speculation, it contains no evidence of governmental monitoring of Tamerlan's travel to or activities in Dagestan (other than routine immigration records); no information concerning any reports of Tamerlan's being an extremist; no information concerning Tamerlan's propensity for violence or any suspected criminal behavior (other than a standard police records check); and no evidence that an FBI

interview of Tamerlan temporarily halted his citizenship
application.  Indeed, the file indicates that Tamerlan was on
track to become a citizen when he died on April 19, 2014 after
being shot by law enforcement and then run over by Dzhokhar
Tsarnaev.

Although the government maintains its position that Anzor
and Tamerlan's A-files are not discoverable under either Rule 16
or Brady, it will nevertheless produce them based on the defense
representation that receipt of this information will save them
considerable time and effort and therefore help ensure that
there are no delays in the existing motion and trial schedule.

7.   Information relating to FBI contacts with Tamerlan

On April 14, 2011, an FBI agent interviewed Anzor Tsarnaev
(with Zubeidat Tsarnaev present).  On April 22, 2011, an FBI
agent interviewed Tamerlan Tsarnaev (with Anzor Tsarnaev
present).  The government will provide both interviews to the
defense shortly.  The FBI did not ask Tamerlan Tsarnaev to be a
government informant in either of those interviews (or in any
other interaction of which the government is aware).  Indeed, we
are not aware of any other FBI interviews of Tamerlan Tsarnaev
at all.

8.   Ibragim Todashev interviews

Ibragim Todashev's interviews with the FBI do not contain

22

information that is favorable and material within the meaning of
Brady or material to preparing the defense within the meaning of
Rule 16.  Moreover, the Middlesex District Attorney's Office is
actively investigating the Waltham triple homicide and continues
to believe that disclosure of Todashev's statements concerning
that crime would jeopardize its ongoing investigation.
Nevertheless, with the exception of information relating to the
triple homicide, we will produce all information in the Todashev
interviews that relates to Tamerlan Tsarnaev.

Tsarnaev's speculation about the contents of the Todashev
interview reports is wrong.  Tsarnaev speculates that Todashev's
statements about the triple homicide "focused on Tamerlan's
religious beliefs, his mental condition, his violent behavior
apart from the Waltham murders, his trip to Dagestan, and his
relationship with his younger brother."  (Deft. Mot. at 19).  In
fact, Todashev's statements regarding the Waltham murders
mention none of those things.  All of Todashev's statements to
the FBI that relate to Tamerlan's religious beliefs, his mental
condition, his violent behavior apart from the Waltham murders,
his trip to Dagestan, and his relationship with his younger
brother will be produced to the defense.

The government does not agree with the defense that
Tamerlan's having committed a gruesome triple murder -- and

having a 'close friend' among the victims -- would powerfully
support the inference that Dzhokhar experienced his older
brother as an all-powerful force who could not be ignored or
disobeyed." (Deft. Mot. at 20).  Even assuming Tamerlan
participated in the triple homicide, the defense has not even
alleged that Dzhokhar Tsarnaev knew about Tamerlan's purported
involvement.  Absent such knowledge, there is simply no logical
connection between Tamerlan's purported involvement in the
murders and Dzhokhar Tsarnaev's experience of Tamerlan.

Indeed, whether Tamerlan Tsarnaev actually participated in
the Waltham triple homicide is irrelevant to the question of
whether Dzhokhar Tsarnaev's crimes warrant the death penalty.
If the defense theory is that Dzhokhar Tsarnaev heeded and
obeyed Tamerlan because he believed Tamerlan was a murderer,
then it is Tsarnaev's belief that matters, not whether Tamerlan
actually committed the Waltham murders.  The Court should not
permit Tsarnaev to conduct a mini-trial of Tamerlan's
involvement in the Waltham murders because it has nothing to do
with the brothers' relative culpability for the murders they
committed together.  And in any case, Todashev, now deceased,
could not be a witness at such a mini-trial, making his
statements legally immaterial.

24

9.  <u>Verbatim police reports of family interviews</u>

The defense already moved once to compel the information sought in this request.  The government opposed the motion, the parties argued the matter, and the Court denied the motion to compel.  The purpose of allowing the defense to file additional motions to compel was not to give the defense a chance to litigate the exact same issue twice; it was to allow litigation of new matters.  The Court should deny this portion of the motion for that reason alone.

To summarize what we said in opposition to Tsarnaev's first motion to compel:  the government has produced complete and accurate accounts of all information provided by family members that qualifies as Rule 16 or <u>Brady</u> material.  Indeed, it has provided much more information than the law requires.  Verbatim statements as opposed to complete and accurate accounts are not "critical" to "develop an accurate picture of the forces and influences that formed both Tamerlan and Dzhokhar."  (Deft. Mot. at 21).  That is simply hyperbole.  With few exceptions, verbatim statements as opposed to complete and accurate accounts also will not reveal the "emotion, tension and fear" or "unbridled thoughts" and "diverse frailties" of family members in the "immediate aftermath" of the offense.  (<u>Id.</u>)  For the most part these are merely reports of police interviews, after

all.  And even if they did reveal those things, those are not things that mitigate Tsarnaev's culpability for his crimes. Evidence that family members experienced "emotion, tension and fear" or exhibited "diverse frailties" in the "immediate aftermath" of the offense, even assuming it exists, is not <u>Brady</u> material.

There is little doubt that the imaginative defense team can describe every unseen document in the government's possession in such a way as to make it seem critical to preparing the defense. Their descriptive powers, however, cannot create a lawful basis for a compulsion order where none actually exists.  The fact remains that to the extent anything in the statements of family members is "material" for Rule 16 or <u>Brady</u> purposes, it is the information itself that is "material," not the exact words chosen to convey that information, let alone the exact words chosen by FBI agents who wrote reports of family member interviews.

**CONCLUSION**

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's Motions to Compel Production.


Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:  /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
Assistant U.S. Attorneys