```
               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )
```

               BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE


                         **<u>MOTION HEARING</u>**


               John J. Moakley United States Courthouse
                           Courtroom No. 9
                          One Courthouse Way
                     Boston, Massachusetts  02210
                     Wednesday, April 16, 2014
                            10:01 a.m.



                    Marcia G. Patrisso, RMR, CRR
                       Official Court Reporter
                    John J. Moakley U.S. Courthouse
                    One Courthouse Way, Room 3510
                     Boston, Massachusetts  02210
                          (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript

 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty, Nadine Pellegrini and
 3         William D. Weinreb, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Esq.
 7         51 Sleeper Street
           Fifth Floor
 8         Boston, Massachusetts  02210
           - and -
 9         LAW OFFICES OF DAVID I. BRUCK
           By: David I. Bruck, Esq.
10         220 Sydney Lewis Hall
           Lexington, Virginia  24450
11         On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2          THE CLERK:  All rise.
 3          (The Court enters the courtroom at 10:01 a.m.)
 4          THE CLERK:  United States District Court for the
 5  District of Massachusetts.  Court is in session.  Be seated.
 6          For a motion hearing in the case of United States
 7  versus Dzhokhar Tsarnaev, Docket 13-10200.  Will counsel
 8  identify yourselves for the record.
 9          MR. WEINREB:  Good morning, your Honor.  William
10  Weinreb for the United States.
11          MR. CHAKRAVARTY:  Aloke Chakravarty for the United
12  States, your Honor.
13          MS. PELLEGRINI:  Nadine Pellegrini for the United
14  States.
15          MS. CONRAD:  Good morning, your Honor.  Miriam Conrad
16  and David Bruck for the defendant.
17          THE COURT:  Good morning.  Mr. Bruck, welcome to the
18  case.
19          MR. BRUCK:  Thank you, your Honor.
20          THE COURT:  All right.  We have a number of matters to
21  address this morning.  Let me take a couple off the table which
22  I don't want to hear any argument on.  I think the papers are
23  sufficient.  First is the government's motion for a protective
24  order regarding autopsy photos is denied.  Second, the
25  defendant's motion to dismiss surplus counts is denied without
```

 1    prejudice.  I think it's premature.  That we can address at

 2    trial if necessary.

 3          So I'd like to talk first about the supplemental

 4    materials with respect to the SAMs and the issue that that

 5    raises.  I'm not sure I have a full understanding of what the

 6    dimensions of the controversy are because it seems rather minor

 7    to me, but I'll hear you on it.

 8          MR. BRUCK:  Thank you, your Honor.

 9          The papers have already covered our contention that

10    there is no basis for the SAMs to begin with, and I'm not going

11    to belabor that point.  Mr. Fick covered it when you were here

12    last.  The Court at that time said -- asked us to tell you what

13    the real problems were, and since that time real problems have

14    cropped up.

15          The one that I'd like to focus on and that we focus on

16    in the papers is the presence of an FBI agent at meetings

17    between scheduled -- rather infrequent meetings between the

18    defendant's sisters and our client in the presence of a defense

19    investigator who is there to help prepare the case.

20          Now, why is this a big deal?  The defendant,

21    Dzhokhar Tsarnaev, is the youngest of four children.  The

22    eldest, Tamerlan, is dead, and that leaves his two oldest

23    sisters.  I am constrained in what I can talk about here in

24    this setting, but I don't think there is anybody that has seen

25    what has unfolded in the last year and a day who doesn't

1  understand that if the government's indictment is true, this is

2  about a family and that the search for an understanding of what

3  happened is, in large measure, a story of this family and the

4  relationships between the people in it.

5          It is our job to plumb that, to consider that, to

6  learn about it.  And we, the defense, are the ones who are

7  positioned in our system of justice to do that.  That is what

8  we're here for.  That is why it is of great value to have an

9  investigator who is trained in the sorts of things that are

10  described in Ms. Holdman's ex parte affidavit that you have to

11  observe the relationships between these three people.  And

12  that's what we're trying to do.

13          The problem is that these visits are monitored by an

14  FBI agent.  And not just monitored by an FBI agent, but

15  monitored by a member of the prosecution team who, as we have

16  seen from the newspapers and the television coverage in the

17  last couple of months, is positioned to take the most casual

18  remark, an ironic comment, and provide it to the prosecution in

19  a way that then finds its way into a pleading spun to mean

20  something it doesn't mean to reflect badly on this man -- this

21  young man.  It becomes -- anything that can happen in this

22  discussion becomes ammunition for the penalty phase in a death

23  penalty case.

24          Well, the problem with that is that what's left of the

25  human interaction between this man and his older sisters?

1    Nothing.  It is impossible for there to be any real meaningful

2    communication.  It is, as a result, stilted and fearful and

3    cautious, and nothing will be learned.

4          Now, we have asked for the SAMs to be -- to be

5    vacated, and we have asked, failing that, for these visits to

6    be completely private.  But failing all of that, we at least

7    have asked for the obvious thing, which is that the FBI agent

8    who sits there with these family members not be a part of the

9    prosecution team such that he relays anything that might be

10   useful to the prosecution -- not with respect to national

11   security.  There is nothing to be said about national security.

12   There is no more conspiracy.  If the government's evidence is

13   right, there were two people, and one of them is dead and

14   that's that.

15         But allowing the theoretical possibility that there

16   could be something having to do with public safety or public

17   protection, that of course could be relayed to the prosecution.

18   But if it's just the sort of thing that has come out already,

19   the so-called statement to his detriment which was neither a

20   statement nor to his detriment, if it were known what it was,

21   that ought not go to the prosecution.  And if it didn't, there

22   would be some possibility that these communications could be

23   more meaningful.

24         Now, this is important.  This has to do with the

25   question that everyone wants answered.  It is very

1    short-sighted to intrude into the work we're trying to do in

2    this way.  And in the end if there is this sort of intrusion,

3    this stifling of the ability to have communication between

4    these three people, real communication, it will not help

5    anyone, and it will not help us or anyone else provide answers.

6           Now --

7           THE COURT:  Is your concern about these matters

8    limited to the context that you've described; that is, the

9    visits with the sisters?

10          MR. BRUCK:  Yes.  There is one other thing

11   which -- and I should say that we made -- counsel for the

12   government and Ms. Conrad and I made one last effort to narrow

13   the issues in the last half-hour before coming in here, and the

14   other issue that's outstanding, I can say we're in discussions

15   again, and that is the problem of BOP personnel inspecting

16   defense materials that counsel bring to meet with the client.

17   We are hoping to be able to generate an agreement that will

18   ensure that anything that is read by BOP will not be relayed to

19   the government, period.  That is in our materials.  So I don't

20   think I need to argue that.  That is the second large area that

21   is addressed in the pleadings.

22          So if the Court is inclined not to grant the overall

23   relief with regard to the SAMs or with regard to the sisters'

24   visits, we at least think that the presence of an FBI agent

25   ought not to be a windfall to the adversarial process, to the

1    government's prosecution of this case in court; it ought to be

2    what the SAMs contemplates, which is protecting the security --

3    the institution and security of the public, and that's all.

4    And in the end, everyone potentially can benefit if that is

5    done.

6              Thank you.

7              THE COURT:  For the government?  Ms. Pellegrini.

8              MS. PELLEGRINI:  Thank you, your Honor.

9              Your Honor, as the Court knows, Dzhokhar Tsarnaev is a

10   prisoner, and as such, it's understandable that there are

11   restrictions on his conduct, on his behavior, on who visits, on

12   material he receives, on material that can go out.

13             The focus of this started -- or the focus started to

14   change, with respect to the SAMs, at our last hearing on this

15   matter when the first motion was filed and the Court indicated

16   that -- asked the government if there were concessions, for

17   lack of a better word, that could be made.

18             As of right now, your Honor, there are 12 members of

19   the defense team that can visit this one defendant.  We have

20   modified the SAMs to allow not only the five attorneys of

21   record, but mental health specialists and mitigation

22   specialists, and the remaining people are paralegals and

23   investigators.  We also modified the SAM, but with the proviso

24   that the defense understand, that if an investigator or a

25   paralegal were to be present at the social visit, that they

1    were under the advisement that, in fact, the social visit

2    remains just that, a social visit.  And there is no such thing

3    either under the SAMs or under BOP regulations for some kind of

4    mixed social and legal visit.

5          So really, your Honor, the focus isn't actually the

6    presence of the FBI agent here which is, of course, allowable

7    under the SAMs, but the whole focus of this is the presence of

8    the investigator.  The windfall isn't to the government, and

9    the government may never have, in fact, made any kind of

10   statement relating to what the defendant said or didn't say had

11   not this motion been filed, but facts have to be brought on the

12   record.

13         So what has happened here is, under the circumstances

14   of allowing the investigator or paralegal to be present, first

15   of all, their argument was initially that it was some kind of

16   attorney work product, which doesn't seem to have any basis in

17   law whatsoever.  I understand, and we've heard time and time

18   again, that the issue of mitigation and what can be provided is

19   somewhat -- is limitless -- virtually limitless, I think is the

20   phrase, but that does not give rise to virtually limitless

21   privileges at other procedures that adversely affect a SAMs

22   that is properly in place.

23         I note that while counsel has just said that the

24   conversations were fearful and cautious, actually, given the

25   fact of both motions and what they say, what's quite clear is

1  that the defendant felt free to say whatever he wanted.  And

2  that is actually the problem.  It was -- as the government has

3  stated, it was the defendant's and the defense's inability,

4  frankly, to control what their client might respond to despite

5  the presence of the investigator and despite the presence of

6  the FBI.

7          The SAMs, your Honor, is intended to shift the burden

8  from BOP officials to the FBI who are, in fact, most familiar

9  with the case and with the SAMs so that they can, in fact,

10  determine whether or not things have been said which might

11  violate the SAMs.  It's not a windfall, but it's an observation

12  of something that occurred not at the behest of the government,

13  not at the request, not at the machinations by the government,

14  but by the defense.

15          And as stated in our papers, we don't believe there is

16  any basis for the SAMs to be further modified or, in fact, for

17  the SAMs to be vacated, and we would ask the Court to deny the

18  motion.

19          THE COURT:  Is your objection to the identity of the

20  defense team member who is present?  In other words, do I

21  understand that if it were a lawyer, you would classify it as a

22  legal visit?

23          MS. PELLEGRINI:  No, your Honor.  Regardless of who

24  comes from the defense team, there is no such animal as a mixed

25  social/legal visit.

1          THE COURT:  Why not?

2          MS. PELLEGRINI:  Under BOP -- well, because --

3          THE COURT:  I may agree with that, by the way, but I

4    might classify it on the other side of the line.  If a lawyer

5    brings, say, a potential witness to meet with the defendant so

6    that they can explore a defense strategy of some sort, you

7    would say that's not germane to the preparation of the defense?

8          MS. PELLEGRINI:  I think that -- it's not a question

9    of it being germane; it's a question of under what

10   circumstances does that occur?  There are restrictions -- even

11   under regular BOP regulations without the SAMs being in place,

12   this mixed meeting that you described would not take place.

13   Because of the very issue of trying to balance the security of

14   the facility, of the inmates, of the officials at the facility,

15   there has to be that oversight and the ability to control who

16   visits and under what circumstances.

17          If, in fact, what the Court just described were the

18   norm, then there would be many, many times third parties,

19   whether or not they're family members or whatever or witnesses

20   who may or may not -- would be allowed in without any kind of

21   oversight by BOP.  That would be an untenable situation.

22          THE COURT:  Well, I'm not sure it's without any kind

23   of oversight.  I mean, it's without the presence of an agent.

24   That's perhaps two different things.  I assume that there's --

25   the same people would be screened through security -- normal

1    security procedures.

2         MS. PELLEGRINI:  But even without a SAMs, your Honor,

3    there's always a concern in a confinement situation of

4    information being forwarded outside the institution or

5    information being forwarded to an inmate in an institution or a

6    pretrial detainee in an institution that would be monitored,

7    and that's what's at issue here.

8         THE COURT:  Well, I said at the beginning, that is, in

9    November, that my interest in the SAMs was not a broad one but

10   whether it could work in inhibition on the development of the

11   defense case, and I think in this instance it does.  Now, I

12   would suggest -- and I think this is a pretty limited

13   circumstance, because as I hear it, it is limited to identified

14   visitors, that is, his sisters -- it's not a broader

15   proposition -- and it is with the presence of a member of the

16   defense team who's actively working on preparation of the

17   defense.  So I think it's a very limited circumstance.

18        So I would be inclined to do one of two things:  One

19   is -- which I think is simpler, is to simply regard it as a

20   legal visit, and, therefore, exempt from the monitoring.  And I

21   don't really think that the safety/security issue limits very

22   large on the facts as I can appreciate them on what I have.

23        If it seems that the security interest as opposed to

24   the investigative interest is higher than it appears to me,

25   then I would agree with the defense proposal that it be someone

 1    unassigned and unaffiliated with the prosecution and

 2    investigative team, in a sense, you know.  And their papers

 3    refer to it as a tank officer of some kind.  I think that's

 4    more complex.  But if you think that there's an important issue

 5    of security that has to be addressed in that way, then I think

 6    that.

 7         But I do think that the defense team, whether it's an

 8    attorney or an investigator or a mitigation specialist, ought

 9    to have an opportunity in this limited way to have a two- or

10    three-way conversation among the siblings.

11         MS. PELLEGRINI:  Your Honor, if I may, that -- and of

12    course the Court really may go further than I think -- I see

13    what the Court is saying with respect to the SAMs, but I think

14    I have to at least put on the record that under BOP regulations

15    the warden would be entirely free to impose a condition outside

16    of the SAMs that would, in fact, not permit such a visit

17    because it is not within the norm of activities that occurs

18    within the institution.

19         THE COURT:  Well, we're not necessarily adhering to

20    the norm in all respects in this case.

21         MS. PELLEGRINI:  And that -- well, which brings up

22    another point, which is that it seems that -- as the government

23    has argued previously, that what we're getting here is a

24    special situation for this defendant which would not apply were

25    he in general population or subject to just general BOP

1  regulations.

2          So what I'm saying is, and advising the Court, that it

3  may very well be that the Court's order relating to the SAMs

4  may have that effect.  But is the Court saying it is also

5  ordering BOP not to impose further conditions that it sees fit?

6          THE COURT:  Well, if they're imposing it in response

7  to the order, yes, I would.  In other words, if it's a reflex

8  to reimpose what I'm taking out of the way, then I think that

9  we would have to instruct them.

10          MS. PELLEGRINI:  Well, may I ask, then, that BOP

11  counsel at least be given an opportunity to respond?

12          THE COURT:  Well, okay.  I'm not going to crystalize

13  the order at this point.  My thought was if we had to choose

14  the course of some non-investigative prosecutorial

15  participation, then I would ask you to make a concrete proposal

16  with respect to the execution of that.  And I suppose that

17  could include, you know, if you wanted to have a BOP input.

18  But it's going to have to be pretty convincing in terms of the

19  genuineness, the immediacy, the palpability, if you want, of

20  the security problem.  So what I'd suggest is a response along

21  those lines in, perhaps, two weeks.

22          MS. PELLEGRINI:  That's fine, your Honor.  Thank you.

23          THE COURT:  Okay.  I gather that the other issue is

24  being worked out, from what Mr. Bruck has said?

25          MR. BRUCK:  We hope so and we think so.

```
 1            THE COURT:  Okay.

 2            All right.  Let's turn to the two discovery motions.

 3     And as a preliminary, I know that the defense filed a motion

 4     for leave to file replies yesterday.  That's denied.  I have

 5     plenty of information about these issues, and I'll hear more

 6     from you now, but I don't think there's any need for further

 7     briefing on them.

 8            MS. CONRAD:  May I just be very briefly heard on that,

 9     your Honor?

10            Your Honor, first of all, we received the government's

11     response on Friday, April 11th.  In addition, there were

12     numerous disclosures in the newspapers and in the media last

13     week both from the House Committee on Homeland Security, which

14     we have not had a full opportunity to digest, and also from

15     other reports from the Florida prosecutor, for example, about

16     the shooting of Ibragim Todashev.

17            One of the issues all along with respect to discovery

18     is both the government and your Honor have taken the position

19     that we have not made a sufficient showing.  There is

20     information contained in those disclosures in the public eye

21     that bolster the showing that we can make, but we have not had

22     an opportunity to fully marshal those facts and put them

23     together in a way that would be most meaningful for your Honor.

24     So I'm a little -- I'm more than a little concerned that we're

25     going to be heard now that we can't file a reply.  The
```

1    government -- I just want to give the Court a little

2    background.

3            Your Honor originally set a date of March 12th for

4    filing of discovery motions.  That filing date I believe

5    contemplated both our filing, the government's response, and

6    time for a reply.  We did not file on March 12th; we filed on

7    March 28th with the government's assent.  The reason we didn't

8    file on March 12th is because as of March 12th the government

9    had not yet responded to some of our letter discovery requests.

10           The local rules contemplate that the way discovery

11   requests and the way discovery is litigated in this district is

12   that first the defense sends a letter to the government, then

13   the government within two weeks responds, and then two weeks

14   after the government's response as to whether or not it will

15   voluntarily disclose certain information, at that point the

16   issue is ripe for filing motions.

17           We simply could not file on March 12th because the

18   government had failed to timely respond to our discovery

19   requests.  I understand they're busy, we're busy, things fall

20   between the cracks.  But that's why we didn't file until March

21   28th.

22           It seems to me as a result of the government's lax, if

23   you will, we are now disadvantaged in having the issues

24   presented to your Honor both in terms of having sufficient time

25   to digest the government's response, which we just received on

1    Friday, and on having an opportunity to submit a written

2    response.

3            THE COURT:  Okay.  I adhere to the ruling.  I don't

4    think it's necessary.  I mean, I think you know what the issues

5    are.  This is, frankly, reconsidering prior ground already in

6    many respects, and I think the briefing is enough to crystalize

7    the issues.  Obviously, it's a dynamic situation, and if there

8    are things that develop, I expect there will be further

9    discovery issues presented.  But on the ones that are presented

10   in the motions, I think the briefing is sufficient.

11           So I guess -- well, some of the -- from the

12   government's response, some of the issues have been taken off

13   the table, I gather, in the sense that the government has

14   said -- has responded that some of the materials will be

15   provided.  It looks like --

16           MR. WEINREB:  That's correct, your Honor.

17           THE COURT:  -- a modification of their prior position.

18           MR. WEINREB:  Your Honor, that's correct, although we

19   can maintain that with respect to the materials that weren't

20   previously provided, that there is no legal obligation to

21   produce them.  In keeping with the Court's encouragement that

22   we try to preserve the speedy trial date that we've been given

23   by voluntarily producing materials that we don't necessarily

24   have any obligation to in order to satisfy the defense, that

25   they've got what they need, we've agreed to make certain things

1   available to them, in particular, the A files that were

2   requested, so that request is now moot.  There was a request

3   for certain interviews that took place in 2011.  We intend to

4   make those available.  That request is moot.  And the third one

5   is certain reports from MIT which the government itself had

6   never received.  We've since received them.  We will make those

7   available, all of them, so that issue is moot.

8          MS. CONRAD:  There was one more area which I believe

9   were interviews with Todashev.

10          MR. WEINREB:  So with respect to the interviews with

11  Todashev, as we state in our motion, the Middlesex District

12  Attorney's Office is continuing to actively investigate the

13  Waltham triple homicide.  And we maintain what we said in our

14  first motion and continue to say in this motion, which is that

15  it would jeopardize that investigation unnecessarily by

16  publicizing details of it just as it would in the case of any

17  homicide investigation.

18          The defense has since narrowed its focus to certain

19  areas of information that relates specifically to their client

20  and the degree to which he may have been radicalized at

21  different points in his life and other materials which they

22  laid out in their motion.  We have agreed to provide all

23  information in the reports responsive to those four areas and

24  have omitted only the ones that relate specifically to the

25  triple homicide and that fit within the perimeter of our

1    earlier concerns about jeopardizing the investigation.

2              THE COURT:  Okay.  Mr. Bruck?

3              MR. BRUCK:  Your Honor, I would like to just respond

4    to the last area and then Ms. Conrad will deal with the rest.

5              We do not yet have the Todashev interview materials

6    that the government has agreed to disclose, so I'm a little bit

7    at a disadvantage in responding to those disclosures, but the

8    one thing that we know we're not going to get under the

9    government's latest response is the information that Todashev

10   provided about the Waltham murders, which as we understand it

11   and as anybody who reads the newspapers knows, apparently

12   implicated himself and Tamerlan Tsarnaev, not our client.  I

13   think Mr. Weinreb may have misspoken.  We were not looking for

14   materials from Todashev about our client's radicalization, but

15   about his brother Tamerlan's.

16             MR. WEINREB:  I did misspeak.  I meant to say

17   Tamerlan's.

18             MR. BRUCK:  What I said at the beginning of this

19   hearing continues to loom large.  This case is largely about a

20   family and the relationships between it -- between, in this

21   instance, these two brothers.  And the fact, if it is a fact,

22   that Tamerlan Tsarnaev slit the throats of three helpless

23   people, one of whom was described as a close friend, whether

24   the defendant ever learned of it or not is clearly a very

25   important part of the story in terms of who is the motivating,

1    the leading, the active participant in what happened later.

2         We think we're entitled to know what Todashev said

3    about this crime.  We realize that he was apparently -- or from

4    accounts he was apparently shot and killed before he could

5    finish describing the Waltham murders, but we think it's

6    critically important to find out what he said about Tamerlan

7    Tsarnaev's involvement as long as the interview lasted.  The

8    government says no unless we apparently make some greater

9    showing of relevance to our own client's state of mind, but I

10   think what I've said is gracious plenty and that we ought to

11   know that.

12        This is not disclosing to the public anything about an

13   ongoing investigation.  We obviously are subject to a

14   protective order.  We don't share this with anybody who's not

15   entitled to have it, that doesn't need to have it on the

16   defense team.  It's information in the broad strokes that seem

17   to have been leaked out or published in all different sorts of

18   ways already anyway, so it's a little difficult to see how this

19   additional part of the Todashev interviews is going to

20   prejudice anything about an ongoing investigation that

21   apparently is directed, as far as we know, as two people who

22   are both dead.

23        We think this is important and we're entitled to it,

24   and we would like the Court to order that that additional

25   portion of the Todashev information be disclosed.

1          THE COURT:  What's the volume of this material?

2          MR. WEINREB:  Are you referring to the material --

3          THE COURT:  The 302s.

4          MR. WEINREB:  Solely related to any purported

5    involvement by Tamerlan Tsarnaev in both murders?

6          THE COURT:  Both, I guess.

7          MR. WEINREB:  I would say not great.

8          THE COURT:  Well, my thought is I may review it in

9    camera.

10         MR. WEINREB:  We have no dispute with that, your

11   Honor.  But I would like to emphasize we have noticed a

12   tendency in the defense pleadings to attempt to establish the

13   materiality of large categories of information simply by

14   labeling it critically important.  We really dispute the idea

15   that details about Tamerlan Tsarnaev's purported involvement in

16   the Waltham homicides is critically important, particularly in

17   the absence of any allegation that Dzhokhar Tsarnaev knew

18   anything about it.

19         We have already disclosed that Tamerlan Tsarnaev was

20   implicated by this man, Todashev, in the triple homicides.

21   Unless there is something that -- in it that somehow relates to

22   Dzhokhar Tsarnaev, either that he knew about it, that he

23   somehow participated in it, anything like that, it has -- far

24   from being critically important, it really seems to have no

25   relevance.  Their mitigation theory, which is that Mr. Tsarnaev

1    was influenced by his older brother, depends on what

2    Mr. Tsarnaev believed to be the case, not what Mr. Todashev may

3    or may not have said was the case.  And there is nothing in

4    those statements that would indicate that Tamerlan Tsarnaev, to

5    the extent that he was involved in the triple homicide at all,

6    conveyed that to the younger Mr. Tsarnaev.

7              So we don't think it has any relevance at all, let

8    alone critical importance, to the mitigation strategy.

9              THE COURT:  I understand the parties' disagreement

10   about the critical importance and materiality issue.  And let

11   me just say that as a general matter, it seems that a good part

12   of the defense argument is -- sort of going over that ground by

13   way of general advisory, I'm not inclined to change the view

14   that I took last November about materiality as it relates to

15   discovery issues either as a *Brady* matter or as a Rule 16

16   matter.  That's a general observation occasioned by

17   Mr. Weinreb's comments.

18             So with respect to this particular problem, then why

19   don't we follow that course.  If the government would make a

20   submission in camera indicating what has been provided, what --

21   the portions that have been provided to the defense and what is

22   at issue and the government would seek to withhold, and I'll

23   examine it and make a determination.

24             I'm not sure that there are a lot of issues that -- I

25   mean, the papers -- as I've said, I think the papers are pretty

1    complete on setting forth your positions on this, so I guess

2    I'd look to anything that you really want to highlight and --

3           MS. CONRAD:  Sure.  Thank you, your Honor.  I will try

4    not to go over old ground.

5           THE COURT:  And, again, I say it in the context of

6    what I've just said, which is I think a lot of the defense

7    argument was asking, in a sense, for a reconsideration of the

8    materiality assessment.

9           MS. CONRAD:  But it apparently succeeded in getting

10   the government to reconsider on some of these issues.

11          THE COURT:  On some of the things you did?

12          MS. CONRAD:  So in that respect I suppose I should

13   maybe on those issues quit while I'm ahead.

14          Your Honor, I would like to focus my attention on two

15   matters primarily, and that is the FTK, Forensic Toolkit, and

16   the FISA.  I do think there are outstanding issues with respect

17   to lab reports.  I just want the Court to know that we are

18   working very hard.  We've had a team go down to Quantico to

19   review discovery there.  We've gone to the Mass. State Police.

20   We've gone to two FBI locations.  We have reviewed thousands

21   and thousands of items.  We have -- are in the process of

22   organizing and reviewing the information provided to date.

23          We are working very hard on this case.  But the Court

24   should know that there are a lot of things -- if you review the

25   government's opposition, as I'm sure you have, that the

1    government says, "We will provide additional lab reports"; "We

2    will" -- and the lab reports I think are absolutely crucial in

3    this case.

4         But putting that aside for a second, the government

5    maintains that FTK reports are not discoverable under Rule

6    16(a)(1)(F).  16(a)(1)(F) requires that any results or

7    reports -- not just reports but results or reports of

8    examination and tests be provided to the defendant.  And under

9    local Rule 116.1 that is discovery that is to be provided

10   within 28 days of arraignment.

11        In this case we agreed to the government's request to

12   extend the due date for automatic discovery to September 3rd of

13   2013.  But at any rate, that date is long past.  Again, we

14   understand that much of this work is ongoing.

15        So it is -- the 16(a)(1)(F) says the government must

16   permit a defendant to inspect and to copy results or reports of

17   any physical or mental examination if the item is within the

18   government's possession, custody or control, which it clearly

19   is; if the attorney for the government knows that the item

20   exists, which it clearly does; and if the item is material to

21   preparing the defense or the government intends to use the item

22   in its case-in-chief at trial.  And I would submit that with

23   respect to the FTK reports, that both of those things are true.

24        Now, the government maintains that this is not

25   discoverable because, first of all, we could conduct an

1    equivalent search which doesn't appear anywhere in the rule.

2    It doesn't say we only get these reports if we can't conduct

3    the tests ourself.  We're entitled to know what the results are

4    of the tests that the government has.  And secondly, the

5    government's response is that it is not really results of

6    reports or tests; it is really expert opinion.

7          It seems to me -- I don't know how a search, an

8    examination of a computer hard drive is anything other than an

9    examination within the meaning of this rule.  But go beyond

10   that for a moment, your Honor.  These computers were searched

11   pursuant to search warrants.  Those search warrants set

12   parameters for what could be searched for.  The FTK reports

13   reflect the search that was conducted by the government, and,

14   therefore, they are material to any possible motion to suppress

15   the results of that computer search.

16         So we very much need to know what those searches were

17   and what they revealed.  There is nothing in 16(a)(1)(F) that

18   says the government cannot -- doesn't have to provide this if

19   doing so would reveal information the government would rather

20   not reveal.  It's just not something that's in there.  It's

21   very broad.  Any test that the government knows of.

22         Now, I don't know how the government can argue with a

23   straight face that this is not material to the preparation of

24   the defense.  The government obviously thought it was material

25   to obtain search warrants for dozens of computers and

1      telephones and then to spend hours examining those computers

2      and phones, so obviously the government would not have exerted

3      that expenditure of time and effort if it didn't think it was

4      material to the preparation of its case.

5            The government says, Well, this provides a window into

6      their thought process in terms of what the search terms were.

7      But it seems to me that that is no answer, because anytime the

8      FBI or any law enforcement agency conducts a test, it compares

9      fingerprints, it compares blood samples, it compares other

10     physical evidence.  It is deciding against whom to compare

11     those samples, and that is part of its investigatory process.

12     So I think that's really all I have to say about the FTK

13     reports.  The government has not cited any case that says it

14     should be delayed until expert disclosure.

15           I would note as a practical matter, however, that, you

16     know, to the extent the government says this is expert

17     disclosure, it means that sooner or later, presumably, the

18     government is going to disclose this.  So really what we're

19     arguing about now is not whether it's discoverable but when

20     it's discoverable.  And in the interest of moving this case

21     forward, although we still have our doubts that we can make a

22     November trial date --

23           THE COURT:  I'll make you a believer.

24           (Laughter.)

25           MS. CONRAD:  The sooner we get this information, the

1    better.  If we have to start from scratch conducting our own

2    very expensive, I would point out, forensic examinations of

3    these hard drives in a case where counsel is appointed, it's

4    going to take time and it's going to take a lot of money.  It

5    would be much more efficient if we knew sooner rather than

6    later what searches the government had conducted.

7         THE COURT:  You mentioned that the government doesn't

8    have any case that says FTK is exempt outside the rule.  Do you

9    have any case on the other side?

10        MS. CONRAD:  No.

11        THE COURT:  I was a little surprised at that myself

12   because it's been around a while.

13        MS. CONRAD:  It is surprising.

14        THE COURT:  Okay.  Come back to the search warrant

15   point.  I'm not sure I follow you there.

16        MS. CONRAD:  So we have --

17        THE COURT:  And a potential suppression motion.

18        MS. CONRAD:  Okay.  So we have suppression motions for

19   physical searches which include the computers are due, I

20   believe, currently April 7th, and one --

21        THE COURT:  May.  May 7th.

22        MS. CONRAD:  Right.  May 7th.  Thank you.  I'm still

23   in March, your Honor, so I hope you'll forgive me.

24        The searches that were conducted of the computers were

25   conducted pursuant to search warrants; in other words, the

1  government obtained warrants to permit their technicians, if

2  you will, or professionals, to conduct searches of the

3  computer.  You don't just open up a computer and turn it on;

4  you conduct searches of it.  So the extent -- and this is, I

5  have to confess, an issue I haven't looked at closely, but an

6  issue that I plan to look on before May 7th, is whether the

7  government's search exceeded the scope of what that

8  authorization was.  In other words, if the items to be searched

9  for lists, you know, discussions of jihad and so forth and the

10 government is searching for discussions about some other topic,

11 that would be an indication that they exceeded the scope of the

12 search warrant, just as if they had a search warrant to search

13 an apartment, a car or a facility and they went in and started

14 opening drawers looking for other things other than what's in

15 the search warrant.

16      THE COURT:  All right.  That's what I thought, but I

17 wasn't quite sure.  Okay.

18      MR. WEINREB:  I'll just respond briefly to those two

19 points.  Your Honor, if the government in a tax case served a

20 search warrant on a business and took some ledgers and some

21 accounting books, checkbooks, tax returns and so on, and an FBI

22 agent -- or the prosecutor, for that matter, went through them,

23 taking notes about what was in them and which documents the

24 particular excerpts came from and so on to have a sense of

25 whether there was a case there or not, nobody would suggest

1  that that was a report of a scientific examination or test.

2  But that is exactly what an FTK report is.

3        In this case the items that were seized are not in the

4  form of books that can be read simply by turning pages; they're

5  in the form of digital information.  And in order to read the

6  digital information, you need to use a computer program that

7  allows you to scroll through files and other spaces on the

8  computer and see what's in there.

9        And FTK essentially allows you to take notes of what

10  you're seeing.  It allows you -- those notes are called

11  "bookmarks."  You can bookmark a particular item.  If the item

12  is a file or some other digital construct, you can export it.

13  And in that sense you're essentially taking notes.  And in

14  exporting it, the program keeps track of where you got it from

15  just in the same way your notes might keep track of I got this

16  from the ledger and I got this from the tax return.

17        Those are not scientific examinations and tests.  They

18  are not like a DNA test or anything like that.  They are simply

19  the prosecutors or the agents, at the prosecutor's request,

20  looking at evidence and takes notes in order to have that

21  information more easily available.  And because that's what

22  they are, and because in particular the FTK reports that have

23  been made so far were largely done at our request, it is work

24  product.  It is core work product.  It is something that

25  reflects the mental impressions of the prosecutors and agents

1   about what evidence may be useful in the case to prove the

2   defendant's guilt or to use at sentencing.

3          As for the search warrant issue, the

4   motion-to-suppress issue, that is a complete red herring.

5   Because as we state clearly in our response, none of the FTK

6   reports that have been generated so far are going to be

7   evidence at the trial, so there's nothing to suppress.  None of

8   it is going to be used against the defendant.  As I say, these

9   are scratch notes.  These are notes taken for purposes of

10  investigating the case, of getting ready to prosecute the case.

11         When it comes time to actually prepare exhibits of

12  evidence to introduce at the trial, we will probably use FTK to

13  do that, although there are various other programs we might use

14  as well, and we will have somebody on the witness stand testify

15  about how they found that information on the computer so that

16  the jury can be confident that it's a reliable and accurate and

17  truthful reproduction of information that was on the computer.

18  And there may be other information that the person says, like

19  "I can tell from where I took this that it landed on the

20  computer at a certain time" or "it was deleted on a certain

21  date."

22         And to the extent that that requires expertise, that's

23  information not available to the ordinary juror, that may be

24  regarded as expert opinion testimony.  And the person will

25  explain how they know that what they were doing works.  But as

1    we've said, those reports haven't been created.  We can't

2    create them yet because we haven't decided yet what evidence

3    we're going to use at the trial.

4          So producing the reports that have been made so far

5    would not give rise to a motion to suppress, would reveal just

6    what our thinking is about what we think may be important in

7    the case, and would not give the defense anything to which they

8    are entitled.

9          In this case whatever ledgers, tax return, checkbook

10   equivalents that were seized pursuant to the search warrant

11   have been given to the defense.  They have had all of that

12   information since the date for automatic discovery.  And they

13   are perfectly capable -- FTK is a commercial program that you

14   can buy off the shelf at the store for a few hundred dollars.

15   There's a manual for using it that's available on the web.

16   I've read the whole thing myself.  It's not that hard to

17   understand.  I'm no computer expert.  And they can use FTK to

18   search those disks and the computer media and find items that

19   are of interest to them on them.

20         I assume that if they were doing that and we tried to

21   get that information somehow, they would claim that that was a

22   reflection of their mental thought processes.  So all the

23   arguments that we've heard today I think are either based on a

24   misunderstanding of what the evidence is or a misunderstanding

25   of what FTK is or both, but there is nothing that has been

1  produced to date that is discoverable.

2         THE COURT:  Okay.

3         MS. CONRAD:  Can I just make two very quick points in

4  response to that, your Honor?

5         THE COURT:  Yes.

6         MS. CONRAD:  First of all, I think Mr. Weinreb

7  misunderstands the search argument.  The search argument is not

8  that the FTK report itself is the fruit of the search; it is

9  that the FTK is the means by which the search was conducted in

10  order to extract certain things that the government will

11  presumably seek to introduce at trial.

12         The other one is, you know, to the extent that there

13  are notations that the government believes are work product, I

14  believe those work product -- those notations could be

15  redacted.  The government certainly hasn't been shy to date

16  about redacting items in discovery.

17         THE COURT:  Okay.  Why don't you turn to the FISA

18  issue.

19         MS. CONRAD:  FISA.  Thank you, your Honor.

20         Your Honor, I have to say I have been puzzled all

21  along by the government's rather opaque responses to our

22  request for FISA notice, and I continue to be puzzled.  The

23  government says, first, that it doesn't have to disclose FISA

24  because we haven't met the criteria.  It doesn't say which

25  criteria we don't meet, but let's assume for the moment that

1    it's not -- the criteria is that they do not intend to

2    introduce any FISA-obtained or FISA-derived evidence.  If

3    that's the case, then obviously I have no response to that.

4    They know that better than I.

5            However, there are indications with respect to

6    Homeland Security -- the Congressional Committee on Homeland

7    Security -- that there were database searches and electronic

8    searches conducted after the FBI or after government agencies

9    were notified by the Russian authorities of concerns about

10   Tamerlan Tsarnaev.  The government takes, I think, the curious

11   position that we are not entitled to notice with respect to

12   that kind of data-mining that we all learned about recently

13   with the disclosures made by Eric Snowden.

14           I frankly just don't understand what the government's

15   argument is with respect to that.  There are two possibilities,

16   I would suggest, under which we would be required to notice --

17   and keep in mind we're only talking about notice right now --

18   first, if the government intends to introduce that evidence or

19   fruits of that evidence at trial; and, second, if there is

20   information there that would be helpful to the defense.

21           Under the provisions for CIPA, CIPA, the Classified

22   Information Procedures Act, is not tied to any particular

23   method of gathering information; it's simply a procedural

24   device by which the defendant's rights can be addressed when

25   classified information is at issue.  I would assume that this

1    kind of data-mining and the results of this kind of data-mining

2    are, in fact, classified information.  If the government

3    intends to either withhold it or intends to use it, it seems to

4    me notice is required.

5          Now, the reason, generally speaking, notice is

6    required of information that the government intends to use,

7    including derivative information, is because the defendant has

8    a right to challenge the method by which that information was

9    obtained and its admissibility.  The fact that the information

10   may have been obtained under the auspices of a program

11   established under an executive order as opposed to under the

12   USA Patriot Act or some statutory authority does not erase

13   those concerns.  If anything, it heightens those concerns.

14         If the government is intending to introduce evidence

15   derived from those kinds of surveillance, those kinds of

16   searches, the defendant would have a right to challenge the

17   admissibility of that evidence.  That's what we're asking for

18   at this juncture, is notice.  The government says we're not

19   entitled to notice.  That just completely flies in the face of

20   the structure of CIPA and the structure of FISA.

21         THE COURT:  Well, is this just a scheduling issue as

22   to when the notice is given?  Is that what this is about?

23         MS. CONRAD:  Well, the government says we're not

24   entitled to notice, so I don't know.  Maybe it is for your

25   Honor, but apparently --

1          THE COURT:  Well, you're not entitled to notice if

2     they're not going to use the information.  They can't use the

3     information without giving you notice.  So is it just a

4     question of when you get the notice?  Is that what -- if you

5     get the notice.

6          MS. CONRAD:  We believe we are entitled to notice at

7     some point if they're going to use it.  They believe with

8     respect to data-mining, as I understand their position, we are

9     not entitled to notice.  I also believe that we are entitled to

10    notice with respect to information that is helpful to the

11    defense under *Yunis* and under -- well, I'm going to mangle the

12    name -- *Amawi* which say that in those circumstances the CIPA

13    procedures should be followed.

14          Of course your Honor knows better than we do whether

15    any CIPA procedures or notice has been filed because we don't

16    generally -- but we should be at least --

17          THE COURT:  Well, CIPA procedures presume as a

18    predicate that there is an obligation otherwise to disclose the

19    information.

20          MS. CONRAD:  Right.

21          THE COURT:  Right?

22          MS. CONRAD:  Right.

23          So, I mean, the government takes the position with

24    respect to CIPA they know what their obligations are and that

25    they will follow them.  I have concerns about that for two

1    reasons -- well, maybe three reasons.  One reason I have a

2    concern about that is because it took seven months for them to

3    agree that we should get Tamerlan Tsarnaev's A file, and they

4    still take the position that that is not mitigating or

5    exculpatory despite disclosures we've read in the newspapers

6    about it.

7            Second of all, I'm troubled by it because it puts them

8    in the position of -- well, I guess it's related -- them in the

9    position of judging that, but also, because it does not permit

10   the procedures to be filed -- followed in the way contemplated

11   by CIPA, which is we should at least be aware that there is

12   something that may be helpful to the defense in the language of

13   *Yunis* and *Amawi*.  So -- and finally, because they take the

14   position that this data-mining doesn't even fall within that

15   area.  So I think I'm repeating myself so I'll sit down.

16           THE COURT:  Mr. Chakravarty?

17           MR. CHAKRAVARTY:  Thank you, your Honor.

18           So obviously, when dealing with a defense request for

19   anything related to classified information, the implications

20   transcend just this case.  We certainly should not be in a

21   litigation posture where simply filing a motion asking for what

22   information the government might have that is not going to be

23   used against the defendant or that is not under the *Brady*

24   doctrine something that's exculpatory to the defendant's crime,

25   that that -- they would be able to provoke a response to that.

1          And that's kind of the operating presumption.  As your

2     Honor correctly pointed out, the notice provision revolves

3     around the ability for the defendant to challenge evidence that

4     is actually going to be used against them for, in this case,

5     penal liability.

6          Similarly, CIPA -- regarding their second point, CIPA

7     does not grant some new discovery right, as your Honor

8     correctly pointed out, if there was a preexisting discovery

9     obligation under criminal rules, including *Brady*, if there was

10    a CIPA hearing related to whether something should be turned

11    over to the defense despite a national security privilege.  In

12    that very narrow context, that's the context in which *Yunis* and

13    the progeny come up.

14         So both of the defense requests for notice are kind of

15    misplaced in terms of when they mature.  And the bottom line

16    is -- and, again, mindful of the Court's date of trial date,

17    and to the extent that the Court wants to relieve the defense

18    from expending energies on whether there's going to be some

19    kind of secret evidence that's going to be posed against the

20    defendant, there is no secret evidence that's going to be posed

21    against the defendant.

22         What the government is providing to the defense is the

23    evidence that is going to be posed -- is going to be -- the

24    universe of evidence that is going to be used against the

25    defendant.  The position the government does not want to be in

1  is there are specific criteria that require FISA notice.  Those

2  criteria have not been met as we sit here today, so we have not

3  filed notice.  We don't want to be in the position of being

4  foreclosed from that indefinitely, whether it be in this case

5  or in other cases, simply because the defense provoked such a

6  response by filing a notice -- excuse me -- filing a motion.

7         Similarly, with regards to the CIPA issue, from what I

8  gathered from Ms. Conrad's argument, she takes issue with the

9  government's position on the business records, the

10 702 -- excuse me -- 702 -- 215 business records that were

11 obtained through a certain provision of FISA and whether that

12 requires notice.

13        But the government's position on that, number one, is

14 we have not produced any such records to the defense so they're

15 not going to be used against the defendant, so take that issue

16 off the table.  But even if we had, a business record is a

17 substantively -- and for Fourth Amendment purposes a very

18 different creature than something that was obtained through a

19 surveillance warrant or through a search warrant, something

20 where they would have standing to contest.

21        And so for that reason we wouldn't concede that they

22 would have -- a defendant, any defendant, would have standing

23 to contest and, thereby, would have required notice with

24 regards to these issues.  So, again, that's a red herring issue

25 that is not applicable in this case.

1          The government does not encourage the Court to set a

2     date, although, as in the ordinary course, if a date were set

3     and we did not file a notice, then the -- at least

4     presumptively the Court would understand that we're not using

5     any such evidence against the defense.  And if that's the

6     course that the Court wants to take, then we'll obviously

7     respect that as much as we can.

8          But the whole point of the FISA and CIPA motion, it

9     seems to me from the defendants, is to find out what the

10    government might have in its bowels to figure out whether

11    there's any secret evidence that's going to be used against the

12    defendant.  And we could put that to rest right now.  There's

13    not.

14         MS. CONRAD:  Your Honor, it would be nice to have put

15    to rest the question of whether there's any derivative evidence

16    as well.  That's a position that DOJ recently changed its

17    position on with respect to what notice is required with

18    respect to FISA-derived evidence, and I haven't heard a

19    commitment from the government on that point.

20         THE COURT:  All right.  Well, I think there

21    really -- you addressed FISA and CIPA in the same motion, but

22    they're really two different issues, and it seems to me that --

23    the FISA notice obligation is contingent on the government's

24    intent to offer evidence derived, to use your word, from

25    surveillance.  Put another way, they may not offer it unless

1    they've given the notice.

2          So in light of what's been said here, I'm not sure any

3    action needs to be taken.  They say they're not going to offer

4    anything.  If they try to offer something that they should have

5    given notice on, then they'll have trouble.

6          On the other hand, the CIPA issue is really a version

7    of the general discovery debate, including a materiality

8    debate.  And, again, until there's an obligation independent of

9    the classified or non-classified nature of the information, the

10   question doesn't arise.

11         I take it from the government's response that it has

12   considered its discovery obligations generally in light of how

13   they might apply to potentially classified information and have

14   determined that there is not the preexisting obligation that

15   would invoke CIPA, and that -- I presume that if they were to

16   at some point have a different determination, that there was

17   some evidence that would otherwise be discoverable under the

18   normal rules but that it wanted -- the government wanted to

19   keep classified, it would have to invoke CIPA in order to

20   proceed properly.  So I don't think we're at that point either.

21   Again, I understand the differences in view as to how you

22   assess materiality for discovery purposes generally.

23         So I think there's just nothing to be done.  So I

24   guess just to take that motion off the table, I think that's

25   denied as well as, I guess, unsupported by the facts.  I mean,

1    it just doesn't appear there's a problem.

2          With respect to the general discovery motion, I'll

3    reserve that and issue a written order shortly on that, on

4    those issues.

5          But that brings us back a bit to scheduling.  And one

6    thing I wanted to talk about, which I think Ms. Conrad raised,

7    is expert disclosures.  Oh, there is one other matter, I guess,

8    before we get to that which may also be a timing question.

9          The government has a motion for compliance --

10   the defense compliance with reciprocal discovery obligations

11   and so on and so forth.  That was just filed on Friday so

12   that's not ripe yet.  Let me just say that my initial

13   reaction -- this may save some briefing -- is that it may not

14   yet be time to require the defense to do that, which may

15   present another scheduling problem or question, so -- and I

16   guess there's a -- a more specific request from the government,

17   which is the 12.2 question, which also is a scheduling

18   question, I think.

19          So my proposal, having in mind that we have already

20   set a date of the June 18th for further status conference, is

21   that those matters, initial offensive, if I can call it that,

22   of expert disclosures, the 12.2 notice from the defendant, if

23   any, and defendant's reciprocal discovery disclosures all be

24   made by effectively the day before the status conference, so

25   we'll at least have those disclosures available to us to talk

 1   about at the status conference, not necessarily to resolve it.

 2   So my thought was by noon on the 17th, the day before, that

 3   those matters could be filed.  And so I'd look for your

 4   reaction to that.

 5            MS. CONRAD:  If I may have one moment, your Honor?

 6            (Discussion off the record.)

 7            MR. BRUCK:  First a question:  Does that schedule

 8   envision disclosures as to both guilt-phase and

 9   penalty-phase --

10            THE COURT:  Good question.

11            MR. BRUCK:  -- evidence?

12            And, of course, 12.2 is both.  I must say, you know, I

13   would appreciate the opportunity --

14            THE COURT:  Let me just add another option to your

15   thinking.  I put those three things together.  They don't

16   necessarily have to travel together.  There could be some

17   difference in dates.

18            MR. BRUCK:  Okay.  I was --

19            THE COURT:  Let me just add to that that what I was

20   concerned about with respect to experts is, one, some period of

21   time for a designation of perhaps responsive experts after

22   you've had the affirmative ones, and then any *Daubert* issues

23   that we may have and so on.  So that is the one that I guess I

24   invest the greatest interest in getting done so that we can

25   begin the expert process.  The others, probably not as urgent

1    in that respect.

2          MR. BRUCK:  You're including 12.2 as one of the ones

3    that --

4          THE COURT:  Well, I think 12.2 is going to go hand in

5    hand with some expert.

6          MR. BRUCK:  It could.  I mean, yes.  By definition it

7    could if such a notice were filed.

8          I have to say that June 17th is, what, four and a half

9    months before the beginning of jury selection, which is a right

10   long time in comparison to many other federal cases --

11         THE COURT:  As I say, because I think that it may be

12   necessary for the expert process.  For the others, maybe that

13   is too long a time in advance, and so I'll -- I don't

14   necessarily -- by having suggested them all to be the same

15   date, I don't -- that's not necessary.

16         MR. BRUCK:  Would the Court be willing to allow us to

17   confer with the rest of the team and respond very promptly?

18         THE COURT:  I think that's fair.  Actually, both sides

19   can confer with each other perhaps about it.  It's just that I

20   was trying to make the June 18th date useful in some way, and

21   I'm sure it will be in other ways as well.

22         MR. BRUCK:  I understand.

23         MR. WEINREB:  Your Honor, for the record, we're

24   strongly in favor of a June 18th date for disclosure of notice

25   of what the Court is calling -- for experts that each side will

1    use in its respective case as opposed to responding to the

2    other side's experts, and I think that one thing that we can

3    consider, and we'd be willing to discuss with the defense, is

4    what is meant by notice.  In other words, if we have no- -- we

5    don't necessarily have to have complete expert discovery

6    concluded by June 18th, but to the extent that we have notice

7    of what the -- each of what kinds of experts are going to be

8    called and maybe some sense of what they're going to be

9    testifying about, then each side can begin the process of

10   searching for, engaging its own experts, figuring out who's

11   qualified to be a responsive expert.

12             THE COURT:  Right.

13             MR. WEINREB:  And that would go, of course, for both

14   the liability and the sentencing phase, unless there's going to

15   be a lengthy space of time between them.

16             THE COURT:  I don't envision that.

17             MR. WEINREB:  I don't assume that there would be one.

18   The government obviously needs that notice just as the defense

19   does.

20             The Rule 12.2 notice, of course, and the possibility

21   of a mental health expert has its own special procedures set

22   out in that rule.  But, again, what's required -- or what we

23   have moved for in our motion, our 12.2 motion, is simply that

24   notice again.  And, you know, we can have a discussion both

25   among us and with the Court, if necessary, about -- you know,

 1   what the timing of the Rule 12.2 procedure is.

 2         THE COURT:  Well, with respect to the experts

 3   generally as opposed to 12.2 particularly, the language of the

 4   rule refers to a written summary of what the evidence would be,

 5   and I think that's what I had in mind, just so you know what

 6   each side is proposing to address as expert evidence, and then

 7   we can formulate some procedures for following that out.

 8         So I guess you'll confer about those matters,

 9   including that, and suggest some timing considerations.

10         I think that's what I had on my list.  Is there

11   anything else?

12         MR. WEINREB:  Not from the government, your Honor.

13         THE COURT:  Okay.  We have the existing

14   deadline -- I'm sorry.

15         MS. CONRAD:  Nothing from the defense either.

16         THE COURT:  And so the next scheduled court event will

17   be the 18th.  Depending on what motions are filed, we may have

18   an intervening date to address those motions.  Okay.

19         And so we'll look for the submission from

20   Ms. Pellegrini that we talked about earlier.

21         MS. PELLEGRINI:  Yes, your Honor.  Two weeks.

22         THE COURT:  As well as the in camera matter.

23         MR. WEINREB:  Yes, your Honor.

24         THE COURT:  Okay.  Thank you.  We'll be in recess.

25         COUNSEL IN UNISON:  Thank you, your Honor.

1          THE CLERK:  All rise for the Court.

2          (The Court exits the courtroom at 11:10 a.m.)

3          THE CLERK:  The Court will be in recess.

4          (The proceedings adjourned at 11:10 a.m.)

5

6

7

8                    C E R T I F I C A T E

9

10         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

11   the United States District Court, do hereby certify that the

12   foregoing transcript constitutes, to the best of my skill and

13   ability, a true and accurate transcription of my stenotype

14   notes taken in the matter of Criminal Action No. 13-10200-GAO,

15   United States of America v. Dzhokhar A. Tsarnaev.

16

17   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
18   Official Court Reporter

19
     Date:  4/28/14
20

21

22

23

24

25