UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

### MOTION TO STRIKE "BETRAYAL OF THE UNITED STATES" AS A NONSTATUTORY AGGRAVATING FACTOR

The first nonstatutory aggravating factor that the government has listed in its Notice of Intent to Seek the Death Penalty reads as follows:

> **Betrayal of the United States.** DZHOKHAR TSARNAEV received asylum from the United States; obtained citizenship and enjoyed the freedoms of a United States citizen; and then betrayed his allegiance to the United States by killing and maiming people in the United States.

Since Congress enacted the first post-*Gregg* death penalty sentencing statute in 1988, the federal government has filed notices of intent to seek the death penalty against 493 defendants.[1] But in not one of the 492 cases before Mr. Tsarnaev's has the government cited the fact of a defendant's American citizenship, the way he became a citizen, any aspect of his immigration history, or his enjoyment of the freedoms of an American citizen, as a reason to sentence him to death.[2] By making this unprecedented allegation, the gov-

---

[1] This figure is calculated from data maintained by the Federal Death Penalty Resource Counsel Project, https://capdefnet.org/FDPRC/pubmenu.aspx?menu_id=94&id=2094.

[2] The defendants against whom death penalty notices were filed in these 492 prior cases include two recently-discharged U.S. veterans charged with the politically-motivated destruction of a federal building that killed 169 people, including 19 young children and babies; an active-duty soldier charged with murdering four members of an Iraqi family during wartime to eliminate all of the witnesses to his rape of one of the victims; and a

ernment seeks this Court's imprimatur on the proposition that an asylum seeker and naturalized citizen who commits a fatal bombing is more blameworthy, and deserving of more severe punishment, than a native-born citizen who commits the identical crime. For the reasons that follow, the defendant submits that the Court should dismiss this aggravating factor as a violation of the Fifth and Eighth Amendments, and so deny the government's attempt---made in the face of the Federal Death Penalty Act's express prohibition---to enlist the defendant's foreign birth and immigration history as reasons to sentence him to death.

> **1. The "betrayal" factor has no legally permissible role in this case, and can only serve to promote invidious discrimination based on national origin and immigration status.**

The government's accusation, plainly expressed, is that the defendant received asylum (that he was eight years old at the time goes unmentioned), became a naturalized citizen, and then attacked the United States. The government has nevertheless already attempted to recast the "betrayal" allegation, insisting (in connection with another pretrial motion) that all it meant to allege is that the defendant betrayed his country by carrying

---

career Air Force NCO charged with capital espionage for having peddled top-secret military intelligence to the leaders of Iraq and Libya, during a time of active hostilities in Iraq. In none of these cases, all of which involved native-born United States citizens, did the government cite the defendant's citizenship, or his breach of the duties and responsibilities of citizenship, as a fact weighing in favor of imposing the death penalty. *United States v. Timothy McVeigh and Terry Lynn Nichols*, No. Crim. 95-110-A, Notice of Intent to Seek the Death Penalty (October 20, 1995); *United States v. Steven D. Green*, 5:06 CR-00019-R, Notice of Intent to Seek the Death Penalty (July 3, 2007); *United States v. Brian Patrick Regan*, Crim. No. 01-405A, Notice of Intent to Seek the Death Penalty (April 19, 2002). The notices of intent in McVeigh, Nichols, Green, and Regan are reproduced in the Appendix to this motion.

out the Marathon attack only seven months after taking the oath of citizenship at the age of 19:

> By taking the oath of citizenship, Tsarnaev sought and received the trust of his fellow Americans. Among other things, he was granted the right to vote in American elections, run for public office, and thus to influence American foreign policy by peaceful means.
>
> Just seven months after swearing an oath to defend his adopted country and stand by his fellow Americans, Tsarnaev violated that oath by attacking America and terrorizing and murdering people on American soil. He did so, by his own account, to punish America for the actions of American soldiers who, in fulfilling their own oaths to protect and defend the Constitution, were waging a war against terrorism overseas.

Government's Opposition to Defendant's Motions to Compel, DE 245, at 17-18 (April 11, 2014).

There are several problems with the government's defense of the "betrayal" factor. First, it does not line up with the allegation itself. The government does not allege that Mr. Tsarnaev harbored any intent to attack the United States when he took the oath of citizenship in September 2012. Nor could it, because there is no evidence to suggest that he did. That is presumably why the government has not charged that his acceptance of U.S. citizenship was any part of the Marathon bombing conspiracy. Rather, the government alleges that he "received asylum from the United States" and "obtained citizenship and enjoyed the freedoms of a United States citizen," and later killed and maimed people in the United States. The oath of citizenship, moreover, is not even mentioned in the allegation.

To be sure, the government has already attempted to explain away this part of its allegation as well. As it recently stated,

3

> [a]lthough the "betrayal" allegation includes the statement that Tsarnaev "received asylum from the United States," that statement is only a background fact explaining how Tsarnaev came to be in a position to obtain citizenship. The government does not allege that Tsarnaev's derivative status as an asylee, which ended when he obtained citizenship, is in itself an aggravating factor. That portion of the allegation is surplussage.

Government's Opposition to Defendant's Motions to Compel at 18.  But having deployed the "betrayal" aggravating factor as it did, the government cannot so easily recall it.   For the allegation, as written, openly invites resentment of Mr. Tsarnaev *as an immigrant and as a recently-naturalized citizen.* The unstated but unmistakable inference is that Mr. Tsarnaev's culpability for attacking people in the United States is compounded by his having repudiated a special debt of gratitude to the United States---a debt that he owed *because* he was an asylee and a naturalized citizen.  Or stated differently, the government's "betrayal" allegation expresses the emotionally powerful but legally spurious idea that Dzhokhar Tsarnaev is *more* deserving of the death penalty than a native-born offender because he attacked "us" after "we" took him in.

The government's citation of Mr. Tsarnaev's status as a former asylee and a naturalized citizen means that the factor cannot be salvaged, even if (which we do not concede) some part of it might have been constitutionally permissible on its face.  See *Hunter v. Underwood,* 471 U.S. 222 (1985) (relying on historical evidence of racially discriminatory purpose to invalidate facially race-neutral Alabama felon-disenfranchisement law under the Equal Protection Clause).  Resentment of Tsarnaev's immigration status and history is perhaps natural, given the nature of the crimes charged, and it is surely very widespread.  But the fact that he had only recently become a citizen,

standing alone, does not increase his moral or legal guilt, and it should not be permitted to weigh on death's side of the scale.  And having exposed this discriminatory impulse in the very wording of the "betrayal" factor itself, the government's belated claim that its own inflammatory language should be ignored as "surplassage" is unconvincing.

Even if one were to take the government's latest explanation at face value, it raises more questions than it answers.  The government now recasts the "betrayal" allegation as mainly concerned with the shortness of the interval—seven months---between Tsarnaev's oath of citizenship and his participation in the Marathon attack.  But absent any evidence ---and there is none---that he was planning the attack when he took the oath, what does this mean?  Given that no other federal capital defendant has ever been charged with "betrayal of the United States" as an aggravating factor, what is it about the seven-month interval that distinguishes Tsarnaev's culpability from that of any other United States citizen who commits a like crime?  What if a full year had elapsed?  Or five years?  Has the government identified some moral statute of limitations, a period after which a naturalized citizen's obligations finally become the same as those of a native-born citizen?  Or does an American citizen who "received asylum from the United States [and] obtained citizenship" remain in a special status forever, subject to greater condemnation and punishment than a native-born offender as long as he lives?

To ask these questions is to answer them.  Every citizen of this country stands before the law on an equal footing with every other.  "Once naturalized, a person enjoys the same rights and opportunities as a native born citizen," for "'the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coexten-

5

sive.'" *United States v. Klimavicius*, 847 F.2d 28, 32 (1st Cir. 1988) (quoting *Schneider v. Rusk*, 377 U.S. 163, 165 (1964).  There are not two categories of American citizens---one comprised of native-born Americans who owe only "ordinary loyalty" to this country, and a second category of naturalized immigrants whose duty of loyalty is greater because they were not born here, and could at one time have been turned away.  See *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.").  Once this self-evident proposition is accepted, the "betrayal" factor loses its meaning.  *Every* citizen has a duty to refrain from killing and maiming people in the United States.  And every citizen who violates this duty deserves to be punished.  But whether Tsarnaev was given asylum when he was eight years old, whether he took an oath of citizenship when he was nineteen, whether seven months (or seven years, or seventy) elapsed between the oath and the crime---none of that increases his legal or moral culpability.  For this reason alone, the Court should strike the "betrayal" factor.

2.  **In light of the constitutional function of aggravating factors in death penalty cases, injection of the "betrayal" factor into the jury's sentencing deliberations would violate the Fifth and Eighth Amendments.**

The preceding discussion has referred several times to the notion of relative or comparative culpability---that is, whether the "betrayal" factor identifies anything about Mr. Tsarnaev that makes him *more* deserving of the death penalty than a native-born offender would be.  The government may deny that it intends the betrayal factor to invite such comparison with the culpability of any native-born offender.  But comparison be-

tween offenders and offenses is the very purpose of aggravating factors in capital sentencing.

When the Supreme Court invalidated all then-existing death penalty statutes in *Furman v. Georgia,* 408 U.S. 238 (1972), it did so primarily on the basis of its conclusion that under the purely discretionary capital sentencing schemes then in effect, "there is no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not," *id.,* at 313 (White, J., concurring), and that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.,* at 310 (Stewart, J., concurring). Since *Furman,* each death penalty jurisdiction has given effect to *Furman's* recognition that "the culpability of the average murderer is insufficient to justify imposition of death," *Atkins v. Virginia*, 536 U.S. 304, 319 (2002), by providing legal guidelines—aggravating factors---to ensure that "the determination of whether a human life should be taken or spared . . . [is] suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U. S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

It follows from this fundamental precept of the Supreme Court's death penalty jurisprudence that a valid aggravating factor cannot simply identify something "bad" about a crime or offender. Rather, a valid aggravating factor must identify something that a sentencer could fairly regard as making the crime or the offender "worse" than if the factor were not present. Stated differently, a valid aggravating factor must tend to justify executing one murderer rather than another, for "[i]f the sentencer fairly could conclude

7

that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave v. Creech,* 507 U.S. 463, 474 (1993). Thus, when the prosecution in a death penalty case designates a fact or circumstance as "aggravating," it is claiming that the fact fairly differentiates a given crime or criminal from all or many others, and tends to justify a more severe punishment.

In keeping with this overarching Eighth Amendment requirement, the Federal Death Penalty Act employs statutory aggravating factors to identify which murderers should be *considered* for the death penalty, and then permits the government to allege and prove additional nonstatutory factors as a means to *select* which such murderers should actually be executed from among the much larger number whose lives are to be spared. Section 3593(c) of Title 18 includes a list of statutory aggravating factors that Congress enacted to perform the "constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 878 (1983). In addition, because "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death," *id.,* the FDPA permits the prosecution to allege and the sentencer to consider additional "nonstatutory" factors before deciding whether to impose the death penalty upon a particular defendant. The Supreme Court has summarized this two-level structure as follows:

> Since *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), we have required States to limit the class of murderers to which the death penalty may be applied. This narrowing requirement is usually met when the trier of fact

>finds at least one statutorily defined eligibility factor at either the guilt or penalty phase. See *Tuilaepa v. California*, 512 U.S. 967, 971–972, (1994). Once the narrowing requirement has been satisfied, the sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it. Most States channel this function by specifying the aggravating factors (sometimes identical to the eligibility factors) that are to be weighed against mitigating considerations.

*Brown v. Sanders,* 546 U.S. 212, 216 (2006).

The Federal Death Penalty Act further structures the sentencer's consideration of such aggravating factors:

- by requiring that the government provide written pretrial notice of all such factors---nonstatutory as well as statutory--- that it proposes to prove at sentencing, 18 U.S.C. § 3593(a), and

- by further requiring the sentencing jury to return written special findings "identifying any [statutory] aggravating factor or factors . . . and any other aggravating factor for which notice has been provided under subsection (a)" that the government has proven to exist beyond a reasonable doubt. 18 U.S.C. § 3593(d).

Finally, the jury is required to weigh both the statutory and nonstatutory aggravating factors that it has found to exist against any mitigating factors in order to determine whether to impose the death penalty rather than life imprisonment without possibility of release. 18 U.S.C. § 3593(e).

Most successful Eighth Amendment challenges to sentencing factors have involved statutory factors (or, as the Court refers to them, "eligibility" factors. *Brown v. Sanders, supra,* 216 n. 2). *See, e.g., Godfrey v. Georgia*, 446 U.S. 420 (1980), *Maynard v. Cartwright*, 486 U.S. 356 (1988). But the Supreme Court has made clear that nonstatutory factors ("selection" factors) must also meet constitutional standards. Above all, in administering the selection stage of the death penalty sentencing process, the government

9

"must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). This means, at a minimum, that the government may not

> attach[] the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, or to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness.

*Zant v. Stephens,* 462 U.S. 862, 885 (1983) (citations omitted). Thus the Court has reversed a death sentence imposed in part upon stipulated evidence that the defendant was a member of a racist prison gang, the Aryan Brotherhood, where the prosecution did not establish that this association bore any relation to the defendant's prior criminal behavior or to his own likely future behavior in prison. *Dawson v. Delaware,* 503 U.S. 159 (1992). And the justices have long treated as self-evident that "[i]t would indeed be improper for a prosecutor to urge that the death penalty be imposed because of the race, religion, or political affiliation of the victim." *South Carolina v. Gathers,* 490 U.S. 805, 821 (1989) (O'Connor and Kennedy, JJ, and Rehnquist, CJ, dissenting).

Against this backdrop, the defendant submits that it is constitutionally impermissible to designate his status as a naturalized citizen as an aggravating factor in a death penalty case. See *United States v. Borrero-Isaza*, 887 F.2d 1349 (9th Cir. 1989) (holding that court's imposition of heavier sentence on defendant because of his national origin and alienage violated due process). As the First Circuit has observed, "Emphasizing a person's national origin not only may raise concerns of relevancy, undue prejudice, and prosecutorial misconduct, but also may pose issues of constitutional dimension." *United*

*States v. Saccoccia*, 58 F.3d 754, 774 (1st Cir. 1995). And even if injecting national origin or alienage might not invariably amount to a constitutional violation in an ordinary criminal case, use of a defendant's national origin and naturalization status as an aggravating factor in a capital sentencing proceeding clearly invites rather than "guard[s] against bias or caprice in the sentencing decision," and so violates the Eighth Amendment. *Tuilaepa, supra*.

3. **The "Betrayal" factor violates the Special Precaution to Ensure Against Discrimination contained in 18 U.S.C. § 3593(f).**

The bedrock constitutional rule that all capital sentencing factors---nonstatutory as well as statutory---must satisfy some minimal test of rationality and even-handedness is reinforced by a unique feature of the Federal Death Penalty Act. This is the requirement of 18 U.S.C. § 3593(f) that trial courts instruct every federal capital sentencing jury that "the race, color, religious beliefs, national origin, or sex of the defendant or of any victim" should play no role in the jury's sentencing decision, and that the jury explicitly certify in writing that each juror followed these instructions. In its entirety, § 3593(f) provides:

> **"Special Precaution To Ensure Against Discrimination.—** In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regard-

11

ing a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

The government may contend that each member of a sentencing jury in this case can perform the mental gymnastics required to weigh, as a reason to impose the death penalty, the defendant's having "received asylum from the United States [and] obtained citizenship" before committing a capital crime, while simultaneously certifying "that consideration of the . . . [defendant's] national origin . . . was not involved in reaching [the juror's] individual decision."  Or the government may urge a very narrow interpretation of § 3593(f) under which the provision's "Special Protection" bars only bias against (or for) people of *particular* national origins, rather than barring consideration of a defendant's foreign birth and naturalized status as such.  But this crabbed reading of the statute would conflict with long-established general federal sentencing policy, *see* 28 U.S.C. § 994(d) (Sentencing Reform Act) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders.") and United States Sentencing Guidelines Manual § 5H1.10 ("[N]ational origin . . . [is] not relevant in the determination of a sentence."), and there is no reason to suppose that the same Congress that enacted § 3593(f) nevertheless intended to permit juries to sentence foreign-born defendants, including foreign-born United States citizens, more harshly that those born in this country.

Nor is it plausible that all twelve members of a sentencing jury in this case will be able to navigate the invisible line between (1) considering in aggravation the defendant's legal immigration history, and (2) giving no consideration whatever to his nationality and

12

his history and status as a naturalized citizen.  Because the "betrayal" aggravating factor creates a grave risk of permitting just such contaminating consideration of the defendant's foreign birth and immigration history, in violation of 18 U.S.C. § 3593(f) as well as of the Fifth and Eighth Amendments, the Court should strike the factor.

> **4.    Even if the "betrayal" aggravating factor did not violate both the Fifth and Eighth Amendments to the Constitution and the Federal Death Penalty Act, the Court should exercise its discretion to strike the factor from the government's Notice.**

The Federal Death Penalty Act vests considerable discretion in the trial court to control the admission of evidence (or "information") in capital sentencing hearings:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. . . . The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials *except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.*

18 U.S.C. § 359(c) (emphasis added).  For the reasons already discussed, the "betrayal" factor is especially likely to "creat[e] unfair prejudice" while furnishing no permissible basis for a more severe sentence that would be justified in the factor's absence.  Compared to the factor's minimal relevance, the danger of distracting the jury from an impartial consideration of the defendant's crime, offense role, age, and background is simply too great.  The Court could therefore strike the "betrayal" factor without reaching whether the factor independently violates either the Fifth or Eighth Amendments or 18 U.S.C. § 3593(f), and the defendant submits that it should do so.

**Conclusion**

The Court should strike the "Betrayal of the United States" aggravating factor from the government's Notice of Intent to Seek the Death Penalty, and should prohibit the government from using the defendant's immigration history or his status as a naturalized citizen to persuade the jury to sentence him to death.

Respectfully submitted,

DZHOKHAR TSARNAEV

By his attorneys

 /s/  David I. Bruck

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 1, 2014.

                                      /s/ Miriam Conrad