UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DZHOKHAR  TSARNAEV | No.  13-CR-10200-GAO |

## MOTION TO SUPPRESS STATEMENTS

Defendant, Dzokhar Tsarnaev, by and through counsel, respectfully moves that this Court suppress all statements that he made to law enforcement agents while he was hospitalized at Beth Israel Deaconess Medical Center.  The agents began interrogating him approximately 20 hours after he arrived at the hospital.  They questioned him on and off over a period of 36 hours, despite the fact that he quickly allayed concerns about any continuing threats to public safety, repeatedly requested a lawyer, and begged to rest as he recovered from emergency surgery and underwent continuing treatment for multiple and serious gunshot wounds.

Suppression is required for the following reasons:

1)      The statements were involuntary, *see Mincey v. Arizona*, 437 U.S. 385 (1978);

2)      The so-called "public safety exception" does not permit admission of the statements; and

3)      The delay in presenting Mr. Tsarnaev to a court, for the purpose of prolonging interrogation without counsel, violated his due process rights.

## Facts

In the early morning hours of April 19, 2013, Mr. Tsarnaev was shot and his brother, Tamerlan, was killed during a gun battle in the streets of Watertown.  Mr. Tsarnaev fled.  He was arrested some 20 hours later, after suffering multiple gunshot wounds when police unleashed a

barrage of bullets into the boat where he was hiding, unarmed.  Before he surrendered to law

enforcement, he also was subjected to a number of "flash-bang" grenades, designed to disorient a

suspect.

Mr. Tsarnaev was transported by ambulance to Beth Israel Deaconess Medical Center

("BIDMC") at approximately 9 p.m. on April 19.  He was in critical condition, with numerous

serious injuries from gunshot wounds to his head, face, throat, jaw, left hand, and both legs.[1]

Although oriented upon arrival, Mr. Tsarnaev's mental status suddenly declined and he required

intubation to keep him alive during the initial examination of his injuries.  After being stabilized,

he underwent emergency surgery to address life-threatening wounds.  At about 7 a.m. on April

20, he was transferred to the Surgical Intensive Care Unit.  He was given narcotic pain

medication throughout the following days.

The news media publicized Mr. Tsarnaev's arrest and hospitalization around the world.

Many of these news accounts highlighted federal officials' announcement that they intended to

interrogate him without first giving him constitutionally-required Miranda warnings.   *See, e.g.*,

ABC News, "Feds Make Miranda Rights Exception for Marathon Bombing Suspect Dzhokhar

Tsarnaev"  April 19, 2013,  http://abcnews.go.com/blogs/politics/2013/04/next-for-bombing-

suspect-high-value-detainee-interrogation-group/.

Agents from the FBI "High Value Interrogation Group" began questioning Mr. Tsarnaev

at 7:22 p.m. on April 20.  *See* FBI 302 report dated April 21, 2013 (filed under seal as Exhibit

1S), at 6-7; agent notes dated April 20, 2013 (filed under seal as Exhibit 2S).  The interrogation

continued, with breaks ranging from 30 minutes to 3 hours and 13 minutes, until 7:05 a.m. the

next day.  *Id.*  The agents resumed interrogation at 5:35 p.m. on April 21, and continued, with

---

[1] The description of Mr. Tsarnaev's medical condition and treatment is based on a review of
records from the Beth Israel Deaconess Medical Center.

breaks of varying lengths, until 9:00 a.m. the following day, April 22, when counsel was appointed to represent Mr. Tsarnaev.  FBI 302 Report dated April 22, 2013 (filed under seal as Exhibit 3S), at 8-9; agent notes dated April 21, 2013 (filed under seal as Exhibit 4S).   A complaint charging Mr. Tsarnaev with crimes carrying a potential death sentence had been filed the previous evening, under seal.  *See* DE 1, 3.  Throughout the time that Mr. Tsarnaev was being questioned, lawyers from the Federal Public Defender's Office repeatedly asked the court to appoint them to represent Mr. Tsarnaev.

Before interrogation began, two lawyers from the Federal Public Defender Office and a private lawyer who had been appointed by the state public defender's office (pursuant to its authority to assign lawyers before charges are filed in homicide cases) attempted to meet with Mr. Tsarnaev at the hospital.   They were turned away by FBI agents, who refused to accept a letter to Mr. Tsarnaev notifying him of counsel's availability.   *See* Affidavit of Charles P. McGinty ("McGinty Aff."), attached as Exhibit 1.  One of the agents insisted, nonsensically, that Mr. Tsarnaev was not in custody.  *Id.*

Hospital records show that Mr. Tsarnaev suffered gunshot wounds, including one to the head, which likely caused traumatic brain injury.   Following emergency surgery, Mr. Tsarnaev was prescribed a multitude of pain medications, including Fentanyl, Propofol and Dilaudid.[2] The side effects of these medications include confusion, light-headedness, dizziness, difficulty concentrating, fatigue, and sedation.   Damage to cranial nerves required that his left eye be

---

[2] The FBI reports state that, according to two nurses, Mr. Tsarnaev was taking only "phenatyl" (presumably Fentanyl) and antibiotics.  The medical records reflect that Mr. Tsarnaev received Dilaudid during this time period and may have received Propofol as well.  "**Fentanyl, which is used to relieve severe pain and is often given to end-stage cancer patients, can be as much as 40 times more powerful than heroin and 100 times more powerful than morphine.**" Brian MacQuarrie, *Deadly opioid Fentanyl confirmed in Boston overdose,* Boston Globe, April 30, 2014, *available at* http://www.bostonglobe.com/metro/2014/04/29/fentanyl-deadly-opiod-confirmed-boston-overdose/LVVkH6Jzng1CJypurWWM1L/story.html .

sutured shut; his jaw was wired closed; and injuries to his left ear left him unable to hear on that side.  Although apparently able to mouth words when asked about his medical condition by hospital staff, he was unable to talk, in part because of a tracheotomy.   He was handcuffed to the bed railing and under heavy guard.

A "high powered" gunshot wound had fractured the base of his skull.  *See* transcript of April 22, 2013 testimony of Dr. Stephen Odom, at 4, DE 13.  This injury would likely have caused a concussion.  Immediately before the initial appearance on April 22, Dr. Odom, who was treating Mr. Tsarnaev, described his condition at that time  — approximately 36 hours after the agents began their interrogation and two hours after it ended — as "guarded."  *Id*.  Mr. Tsarnaev had received Dilaudid, a narcotic painkiller, at 10 a.m. on April 22.  *Id.*

The first interrogation began at 7:22 p.m. on April 20 and continued through the night until 7 a.m. on April 21.  Exhibit 1S, 2S.  Mr. Tsarnaev wrote answers to questions in a notebook because he was unable to speak.  These notes reflect his attempt to respond to urgent questions (he assured the agents that no public safety threat remained), as well as his poor functioning and limited cognitive ability.  On the first page, he wrote his address in Cambridge incorrectly the first time.  *See* notes (filed under seal as Exhibit 5S).  His next note assured the agents that there were no more bombs.  On the fourth page, he wrote, "is it me or do you hear some noise," an indication of how those injuries were interfering with his cognitive processes.[3]  The notes contain repeated requests to be allowed to rest and for a lawyer.

Interspersed with these pleas are his assurances that no one other than his brother was involved, that there was no danger to anyone else, and that there were no remaining bombs.  In all, he wrote the word "lawyer" ten times, sometimes circling it.  At one point, he wrote, "I am

---

[3] It is unclear whether Mr. Tsarnaev was hearing actual sounds or experiencing auditory hallucinations at that point.  A later note reads, "whats that noise, she made it stop can you tell her please".

tired.  Leave me alone.  I want a l[illegible]." His pen or pencil then trails off the page, suggesting that he either fell asleep, lost motor control, or passed out.  At least five other times in these pages, he begged the agents to leave him alone and to let him sleep.   He also wrote, "I'm hurt," "I'm exhausted," and "Can we do this later?"  At one point, he wrote, "You said you were gonna let me sleep."  Another note reads, "I need to throw up."

According to the FBI report regarding the interrogation on April 20-21, Exhibit 1S, Mr. Tsarnaev "asked to speak to a lawyer on multiple occasions" sometime between 8:35 pm and 9:05 pm on April 20.   "JAHAR was told that he first needed to answer questions to ensure that the public safety was no longer in danger from other individuals, devices, or otherwise."  *Id.*  The reports omit any mention of Mr. Tsarnaev's repeated pleas for sleep.

 Mr. Tsarnaev also asked the agents several times about his brother, who, by the time of questioning, had been dead for nearly 48 hours.  It is apparent that the agents falsely told him that Tamerlan was alive.  One of Mr. Tsarnaev's notes reads:  "Is my brother alive I know you said he is are you lying Is he alive? One person can tell you that."   Exhibit 5S.  Another asked: "Is he alive, show me the news! Whats today? Where is he?"  *Id.*  In his last note,[4] Mr. Tsarnaev wrote, "can I sleep? Can you not handcuff my right arm? Where is my bro Are you sure."  *Id.*

Despite Mr. Tsarnaev's entreaties to be left alone, allowed to rest, and provided with a lawyer, the agents persisted in questioning him throughout the night and into the morning of April 20.  The FBI report and notes makes it clear that the interrogation was wide-ranging, covering everything from how and where the bombs were made to his beliefs about Islam and U.S. foreign policy, as well as his sports activities, future career goals, and school history.  The interrogation resumed on the afternoon of April 21.  *See* FBI report dated April 22, Exhibit 3S;

---

[4] The notes do not contain any indication of when they were written.   Apart from the sequence in which they were provided, it is impossible even to determine on what day they were written.

Agent notes, Exhibit 4S.  This second round of interrogation covered many of the same topics as the first one, eliciting a detailed description of the brothers' activities during the days after the bombings.

It is hard to ascertain exactly what questions the agents posed, since their reports simply summarize his statements in a continuous narrative format and their notes reflect only a few questions.  In keeping with its controversial and much-criticized practice, the FBI chose not to make any audio or video recording of the questioning.  Such a recording would have permitted the Court to assess Mr. Tsarnaev's condition and functioning, to hear the actual words he used and the way he used them, and to verify the sequence of events.   Instead, the FBI reports reconfigure Mr. Tsarnaev's statements into an unbroken narrative.  Mr. Tsarnaev's handwritten notes provide a much clearer picture of the circumstances of the interrogation than the 302 reports do.

At 6:45 p.m. on Sunday evening, April 21, a criminal complaint was filed under seal.  DE 3.  However, counsel were not appointed until the next morning.  It was only at that point that the agents ceased interrogation.

<u>**Argument**</u>

I.     **THE STATEMENTS WERE NOT VOLUNTARY AND THEREFORE MUST BE SUPPRESSED.**

Any use of an involuntary statement against a defendant is a denial of due process.  *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978).  A statement is involuntary if it was not "the product of a rational intellect and a free will."  *Townsend v. Sain*, 372 U.S. 293, 306 (1963) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).   The government bears the burden of proving that any statements it seeks to introduce were made voluntarily.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

In *Mincey*, the Supreme Court ordered a new trial based on its conclusion that statements made in a hospital bed by an injured suspect, who repeatedly requested a lawyer, should not have been used to impeach him.  The Court wrote:

> It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's.  He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician.  Although he had received some treatment, his condition at the time of [the] interrogation was still sufficiently serious that he was in the intensive care unit.

*Mincey*, 437 U.S. at 398.

The facts presented here may be distinguishable in some respects; for example, Mr. Tsarnaev did not complain of "unbearable pain," as Mincey did, although hospital records reflect that  Mr. Tsarnaev's  pain level fluctuated during this period[5] and increased as medications started to wear off.  Of course, Mincey had not been shot in the head or subjected to flash-bang grenades.  Like Mincey, Mr. Tsarnaev "was questioned [while] lying on his back on a hospital bed," connected to tubes and medical equipment.  Like Mincey, "[h]e was, in short, 'at the complete mercy' of [his interrogators], unable to escape or resist the thrust of [the] interrogation."  *Id*. at 399 (citation omitted).

Mincey was questioned for four hours, with breaks for medical treatment.   Mr. Tsarnaev was questioned during two sessions, lasting a total of more than 27 hours, with breaks.  During these breaks, he was receiving medical treatment.  The government may argue that Mr. Tsarnaev,

---

[5] The hospital records reflect "generalized" complaints of pain on April 20 and "significant surgical pain" on April l 21 at 3:28 pm.  On April 21, he had "incisional pain and generalized discomfort".  On April 22, he rated the pain in his hand as 7 on a scale of 1 to 10, which is considered "severe" and "very intense."  It is defined as pain that "completely dominates your senses, causing you to think unclearly about half the time."  *See* https://lane.stanford.edu/portals/cvicu/HCP_Neuro_Tab_4/0-10_Pain_Scale.pdf.

unlike the defendant in *Mincey*, did not give incoherent answers.[6]   That is not necessarily true.

Mr. Tsarnaev gave inconsistent responses — for example, in answering questions about when he

first learned of the bombing plan — and his written notes are at times illegible or simply trail off.

But more to the point, the medication that Mr. Tsarnaev was administered before and during both

interrogation sessions — including the opioid painkiller Dilaudid, given intravenously — had

disinihibiting and sedative effects and impaired his judgment, increasing his susceptibility to

pressure.   *Cf. Townsend v. Sain*, 372 U.S. 293, 307-08 (1963) (confession given after "truth

serum" administered to suspect).

   Like Mincey, Mr. Tsarnaev "clearly expressed his wish not to be interrogated."   *Id.*

These entreaties — along with his pleas for a lawyer, for a chance to rest, and to be left alone —

were ignored by the agents.   The *Mincey* Court's conclusion is equally applicable here:

> [T]he undisputed evidence makes clear that Mincey wanted *not* to answer
> Detective Hurst.  But Mincey was weakened by pain and shock, isolated from
> family, friends, and legal counsel, and barely conscious, and his will was simply
> overborne. Due process of law requires that statements obtained as these cannot
> be used in any way against a defendant at his trial.

*Mincey*, 437 U.S. at 402.

   In some respects, moreover, the interrogation in *Mincey* was less coercive than the

agents' relentless interrogation here.  In *Mincey*, the interrogator at least told the suspect, "If you

want a lawyer now, I cannot talk to you any longer, however you don't have to answer any

questions if you don't want to."  *Id*. at 401.  No such assurances were given to Mr. Tsarnaev.

Instead, agents made clear by word and deed that they would not allow him to see a lawyer until

---

[6] At the initial appearance, which occurred an hour or two after the last round of interrogation
ended, the magistrate judge found Mr. Tsarnaev to be "alert, mentally competent, and lucid."
DE 11 at 7.  That finding does not, however, demonstrate that he was competent to waive his
rights and voluntarily submit to questioning.

they had finished questioning him.[7]   He was thus given no choice but to submit to lengthy

interrogation.   That fact distinguishes this case from others where a defendant who was

questioned while recovering from injuries challenged the use of statements against him or her.

*Cf. United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) (agent routinely asked defendant

hospitalized in Afghanistan if she wished to speak with them; if she said she did not, the agent

remained silently in the room).

     *United States v. Abdulmutallab*, No. 10-20005, 2011 U.S. Dist. LEXIS 105462 (E.D.

Mich. Sept. 16, 2011), and *United States v. Khalil*, 214 F.3d 111 (2d Cir. 2000), are not to the

contrary.   In *Abdulmutallab*, unlike here, "there was no evidence that Defendant was reluctant to

answer questions."   *Abdulmutallab,* 2011 U.S. Dist. LEXIS 105462 at *4.   Nor did he apparently

request a lawyer.   The same was true in *Khalil*, 214 F.3d 111 (2d Cir. 2000).

     The undisputed fact that the agents expressly told Tsarnaev that he would not get a

lawyer until they were done questioning him also renders the statements involuntary.   *See*

*Haynes v. Washington*, 373 U.S. 503 (1963) (pre-*Miranda* case holding that written statements

obtained from suspect by police who rejected his request to contact his wife so she could get him

a lawyer until he cooperated and signed a confession rendered his ensuing statements

inadmissible).   In *Haynes*, the Court emphasized that "[t]hough the police were in possession of

evidence more than adequate to justify his being charged without delay . . . Haynes was not taken

before a magistrate and granted a preliminary hearing until he had acceded to demands that he

give and sign the written statement."   *Id.* at 510.   Based on those facts, the Court found that

Haynes "was alone in the hands of the police, with no one to advise or aid him, and he had 'no

reason not to believe that the police had ample power to carry out their threats . . . to continue,

---

[7] Here, there is the additional fact that counsel unsuccessfully tried to see Mr. Tsarnaev, who was
not informed of their availability.

for a much longer period if need be, the incommunicado detention – as in fact was actually done." *Id.* at 514.  Despite a half-century of precedents since *Haynes* forbidding the use of such tactics, law enforcement resorted to them here.

Before leaving this issue, a word must be said about the government's failure to record the interrogation.  Presumably, given the fact that the FBI arranged for members of its High Value Intelligence Group to travel to Boston, it could easily have arranged for electronic recording of the questions asked and the answers given.  Such recordings would have provided this Court with direct evidence of Mr. Tsarnaev's condition, his demeanor, and the manner in which the questions were posed.  It is clear that government officials — who surely conferred at the highest levels about the scope and timing of the questioning, given the U.S. Attorney's televised announcement of how it would proceed — made a deliberate decision not to create such a record.   Indeed, a 2006 internal FBI memorandum, cited as among the reasons not to tape a defendant's statement, explains that techniques used by investigators to question suspects "do not always come across in recorded fashion to lay persons as proper means of obtaining information from defendants."  FBI Memorandum dated March 23, 2006, attached as Exhibit 2.  The memorandum goes on:  "Initial resistance may be interpreted as involuntariness and misleading a defendant as to the quality of the evidence against him may appear to be unfair deceit."  *Id.*

According to recent disclosures, current FBI policy permits interviews to be recorded with prior approval of the Assistant Special Agent in Charge.  *See* FBI Domestic Investigations and Operations Guide (2011) ("DIOG") at18.6.[8]  Given the massive mobilization of FBI

---

[8]  The memorandum and policy have been widely criticized for being too restrictive.  *See, e.g.,* Steve Chapman, *The FBI shuts a window on the truth: recording interrogations is way overdue*," THE CHICAGO TRIBUNE, July 8, 2010, *available at* http://articles.chicagotribune.com/2010-07-08/news/ct-oped-0708-chapman-20100708_1_recording-interrogations-fbi-device.   In one

personnel and resources, this could have easily been obtained — if the government wished to create a record. The FBI policy is not intended to "indicate that the FBI disfavors recording. Indeed, there are many circumstances in which audio or video recording of an interview may be prudent." Exhibit 2. If this case did not present such circumstances, it is hard to imagine one that would. The government's apparently deliberate refusal to create an electronic record should weigh against any claim it now makes that Mr. Tsarnaev's hospital statements were voluntarily given.

If the statements were not voluntary, they must be excluded. The public safety exception to *Miranda*, first recognized in *New York v. Quarles*, 467 U.S. 649 (1984) does not apply to involuntary statements. *United States v. DeSantis*, 870 F.3d 536, 540 (9th Cir. 1989). *Cf. Quarles* at 654 (case involved "no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist").

## II.   THE PUBLIC SAFETY EXCEPTION TO *MIRANDA* DOES NOT PERMIT ADMISSION OF THE STATEMENTS.[9]

In *Quarles*, the Supreme Court addressed the admissibility of a rape suspect's response to a police officer's question, posed before *Miranda* warnings were given, concerning the location of a missing gun. The suspect, who was wearing an empty holster when arrested, told police

---

highly publicized case, a U.S. Attorney in Arizona was fired after requiring agents in his district to record statements by defendants. *See* E. Lipton, J. Steinhauer, *Battle Over F.B.I. Policy Against Taping of Suspects Comes to Light in Firing Inquiry*, THE NEW YORK TIMES, April 2, 2007, *available at* http://query.nytimes.com/gst/fullpage.html?res=9C03E5D71E30F931A35757C0A9619C8B63.

[9] This issue may be moot, as government counsel informed defense counsel by e-mail on the afternoon of May 7, as this motion was being finalized, "that it does not intend to use Mr. Tsarnaev's statements at Beth Israel in its case-in-chief at trial or sentencing." Because, however, the government has not agreed to forego all potential uses of the statement, e.g., in rebuttal, and has explicitly declined to disavow reliance on *Quarles*, defendant seeks by this motion to preserve all issues regarding the admissibility of the statements.

where to find the weapon.  The Supreme Court held that the statement was admissible, where the police, "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket."  *Quarles*, 467 U.S. at 657.

The scope of the public safety exception has been debated ever since the Supreme Court first recognized its existence in *Quarles*.  Defense counsel submit that, however broad it may be, applying it to the facts of this case cannot be justified.

A.     **The Public Safety Exception does not Apply Here.**

In *Quarles*, the Supreme Court upheld the admission of statements made moments after arrest to officers who, "in the very act of apprehending a suspect, were confronted with the immediate necessity" of determining where the suspect had discarded a gun.  *Quarles*, 467 U.S. at 657.   As soon as the suspect told them where the gun was, they read him his *Miranda* rights before asking further questions.  *Id*. at 652.

The prolonged and comprehensive interrogation at issue here is the very opposite of what the Court approved in *Quarles*.  When Mr. Tsarnaev's interrogation began, more than five days had passed since the bombings and he had been in custody for nearly 24 hours.  His brother was dead.  Agents had spent nearly 12 hours searching the Tsarnaev family's Cambridge home.  They had also searched and secured all cars known to have been used by the Tsarnaev brothers.  Whatever emergent circumstances might have existed earlier in the week had largely, if not completely, dissipated.

The first round of interrogation lasted nearly 12 hours, with breaks.  The second round, resumed on the afternoon of April 21, lasted more than 15 hours and ended only when counsel

were appointed.  Mr. Tsarnaev had assured his interrogators — apparently within the first few minutes — that there were no other bombs, that no one else had been involved in the plot, and that no further danger remained.   He provided them with details about how the bombs were built.   But still the questioning continued for hours, in what was obviously an effort to extract as much incriminating information as possible, without regard for  the protections of the Fifth Amendment.

The FBI agents elicited information about the brothers' activities before and after the bombings, about the murder of Sean Collier, about the carjacking, and about their family relationships and history.   These questions went well beyond even the Department of Justice's own written policy regarding use of the public safety exception to interrogate members of terrorist organizations.  This policy contemplates limited questioning outside of *Miranda* about "possible impending or coordinated terrorist attacks; the location, nature and threat posed by weapons that might post (sic) an imminent danger to the public; and the identities, locations, and activities or intentions of accomplices who may be plotting additional imminent attacks."  FBI, "Custodial Interrogation for Public Safety and Intelligence-Gathering Purposes of Operations Terrorists Inside the United States," (October 21, 2010), as published in *The New York Times* on March 25, 2011, attached as Exhibit 3.  The memorandum encourages agents to "ask any and all questions that are reasonably prompted by an immediate concern for the safety of the public or the arresting agents without advising the arrest (sic) of his Miranda rights."  *Id*.   Here, the agents instead used the opportunity to conduct a thorough debriefing of Mr. Tsarnaev, with no regard for constitutional restrictions.

Some courts have extended the *Quarles* exception to situations lacking the immediacy presented in *Quarles* itself.  *See, e.g.*, *Trice v. United States*, 662 A.2d 891 (D.C. App. 1995)

(questioning regarding presence of gun in apartment where defendant was arrested four days after shooting).   But undersigned counsel is unaware of any case that has applied the public safety exception to an interrogation as prolonged, wide-ranging, and remote in time from the public safety emergency as this one.

The use of the "public safety" exception in terrorism cases was brought into sharp focus by the arrest of the so-called "underwear bomber" on Christmas Day in 2009.   In that case, agents questioned the suspect within four hours of his arrival at the hospital.  *See Abdulmutallab*, 2011 U.S. Dist. LEXIS 105462 at *3.   The agents gave Abdulmutallab *Miranda* warnings after questioning him for 50 minutes.   *Id*. at *4.   The pre-*Miranda* questions "sought to identify any other attackers or other potentially imminent attacks[.]"   *Id*. at *17.   The suspect told the agents that he was not in pain and expressed no reluctance to answer questions.  *Id*. at *4.   In that case, the agents knew that Abdulmutallab "claimed to be acting on behalf of al-Qaeda," *id*. at *3, a circumstance which made the threat of other attacks far more grave.   *Cf. Khalil*, 214 F.3d at 121 (brief questioning of suspected terrorist at hospital immediately after bombs were discovered and before they were disarmed produced admissible statements).   These cases illustrate the narrow scope of the *Quarles* exception to *Miranda* and provide no support for the radical expansion of *Quarles* that would be required to uphold admission of the statements obtained here.

**B.  The Public Safety Exception does not Permit Admission of Statements Obtained after a Defendant Invokes his Right to Counsel and Seeks to Stop Questioning.**

Neither the Supreme Court nor the First Circuit have decided whether *Quarles* provides a public safety exception to the rules requiring police to cease interrogation when a suspect invokes his right to counsel under  *Edwards v. Arizona*, 451 U.S. 477 (1981) and right to remain silent under *Michigan v. Mosley*, 423 U.S. 96 (1975).   Those cases held that once a suspect

asserts his rights to counsel or against self-incrimination, questioning must stop and can only begin again if initiated by the suspect. As the *Mosley* court put it: "Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id*. at 103.

That is precisely the option that Mr. Tsarnaev sought to exercise, by pleading with the agents to let him rest and to allow him to see a lawyer. The entreaties were ignored.

The Fourth and Ninth Circuits have held that the public safety exception permits police to override a suspect's request for a lawyer. *United States v. Mobley*, 40 F.3d 688, 693 (4th Cir. 1990); *United States v. DeSantis*, 870 F.2d 536 (9th Cir. 1989). We submit that these cases were wrongly decided, and are, in any event, factually distinguishable. First, *Mobley* recognized that "the reasoning of *Quarles* is not on all points with the situation in which the accused has claimed his right to counsel[.]" *Id*. at 692. After all, *Quarles* permits police to forego a prophylactic warning about a defendant's right to remain silent; it does not permit police to override those rights once they are asserted.

Second, the *Mobley* court found that the facts of that case did not support the application of the *Quarles* exception, stressing that:

> the [*Quarles*] "public safety" exception applies only where there is "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id*. at 659 n. 8, 104 S.Ct. at 2633 n. 8. Absent such circumstances posing an objective danger to the public or police, the need for the exception is not apparent, and the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper."

*Id*. at 693. In *Mobley*, officers executing a search warrant asked the defendant, after he had invoked his right to counsel and they were preparing to leave his apartment with him in custody, if there were any guns or weapons in the apartment. *Id*. at 690-91. The Fourth Circuit concluded

that his response — informing police of the presence of a gun — was not covered by the public safety exception, where officers had already conducted a sweep of the apartment, determined that no one else was present or resided there, and had arrested the defendant. *Id*. at 693.

*United States v. DeSantis*, 870 F.2d 536 (9th Cir. 1989) also concluded that the *Quarles* exception can be applied to a claimed violation of *Edwards*. *Id*. at 541. In that case, officers arresting the defendant on a warrant asked him whether there were any weapons in his bedroom before allowing him to enter the room to get dressed. "The inspectors lawfully were entitled to question DeSantis for the purpose of securing their safety, even after he had asserted his desire to speak with counsel." *Id*. No such compelling, immediate threat to safety was present here, where Mr. Tsarnaev was in custody, gravely injured, and heavily guarded. Even assuming *arguendo* that some limited questioning was permissible, it should have ceased after Mr. Tsarnaev assured the agents that no other bombs existed and there were no accomplices who posed a danger to public safety.

The government may argue that the interrogation that began on the afternoon of April 21 does not suffer from the same flaws as the first one. It is unclear whether Mr. Tsarnaev repeated his request for a lawyer during the second night of interrogation. But neither a failure to do so nor the lapse of time between the morning and afternoon of the April 21 constitute a "break" sufficient to permit renewed questioning despite Mr. Tsarnaev's earlier request for counsel. *See Edwards*, 451 U.S. at 484-85 (once defendant asserts right to counsel, police may not further interrogate him unless he initiates further contact with them); *Mosley*, 423 U.S. at 104 (police must "scrupulously honor" invocation of right to remain silent).

It is undisputed that Mr. Tsarnaev was not provided with *Miranda* warnings before this second session, either. The argument that these statements fall within the public safety exception

is even weaker, since any danger to the public was further diminished by the passage of time and by the information that Mr. Tsarnaev already had provided.

III.   **THE POSTPONEMENT OF MR. TSARNAEV'S INITIAL APPEARANCE BEFORE A JUDICIAL OFFICER IN ORDER TO PROLONG INTERROGATION REQUIRES SUPPRESSION OF HIS STATEMENTS.**

Even before suspects were identified in the Boston Marathon bombing, lawyers with the Federal Public Defender Office notified officials in the U.S. Attorney's office that they were available on a 24-hour basis to represent any suspect taken into custody.   While thousands of officers searched for Mr. Tsarnaev in Watertown, this offer was repeated.

Mr. Tsarnaev was arrested on the night of April 19 and rushed to Beth Israel Deaconess Medical Center, where he arrived in critical condition.  During the press conference that immediately followed his capture, government officials announced that agents would not read the suspect his rights and were invoking "the public safety exception."   Lawyers from the Federal Public Defender Office contacted prosecutors and court officials in an effort to provide representation.  Two of the lawyers went to the hospital in the early morning hours of April 20. McGinty Aff.  They were turned away.  The agent with whom they spoke refused to accept a letter to him from the lawyers, although she did take a business card, on which a cell phone number was written.

A lawyer assigned by the state public defender agency also went to the hospital on the night of April 19 and again in the afternoon on April 20, in an attempt to see Mr. Tsarnaev.  He, too, was turned away and a law enforcement officer refused to accept a letter from him to Mr. Tsarnaev.  The lawyer sent two emails to a federal prosecutor, asking to be permitted to see Mr. Tsarnaev and to have Mr. Tsarnaev informed of his availability and of his advice that Mr. Tsarnaev remain silent until he could speak to counsel.  The prosecutor did not respond.

Throughout April 20 and 21, the Federal Public Defender and other lawyers from her office contacted court officials, asking to be appointed.   Court personnel informed the lawyers that they would be appointed as soon as a complaint was filed.  McGinty Aff.

This turned out to be incorrect.  A complaint was signed at 6:47 pm on April 21, DE 3, and filed under seal.  Interrogation continued through the night and well into the morning of April 22.  The government's motion to seal, DE 1, explained that "public disclosure of these materials might jeopardize the ongoing investigation of this case."  This baffling assertion ignores the fact, well-known to anyone with access to a television, radio, newspaper, smartphone or computer, that Mr. Tsarnaev was in custody.  Nothing in the application for the complaint revealed information that had not already been reported by media around the world.   It thus appears that the sole reason to seal the complaint was to allow the interrogation to continue by delaying the defendant's initial appearance before a judicial officer and the appointment of counsel.

Here, as in *Haynes v. Washington,* "the only fair inference to be drawn under all the circumstances is that" the defendant would not be charged and brought to court "until the police had secured the additional evidence they desired[.]"  *Haynes*, 373 U.S. at 512.  In *Haynes*, decided before *Miranda*, the Supreme Court held that the confession was involuntary and its use at trial violated the Due Process Clause of the Fourteenth Amendment.

Fed. R. Crim. P. 5(a)(1)(A) requires that an arresting officer "must take the defendant without unnecessary delay before a magistrate judge."  The Supreme Court has held that even a voluntary confession must be suppressed if this rule is violated.  *See Mallory v. United States*, 354 U.S. 449 (1957) (holding that delay for purpose of interrogation is, by definition, unnecessary delay).

Section 3501 of Title 18 prohibits exclusion of a voluntary confession, based on a delayed presentment, if the statement was made within six hours of arrest.   In *Corley v. United States*, 556 U.S. 303 (2009), the Supreme Court interpreted this statute in light of the *McNabb-Mallory* line of cases, noting,  "In a world without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to."  *Id.* at 320.   As a result, the Supreme Court held, statements made more than six hours after arrest are admissible only if the delay in presentment s is shown to be reasonable and necessary.

Here, the delay meets neither requirement.  The government cannot contend that presentment was delayed due to the unavailability of the magistrate-judge.  On April 21, the magistrate-judge approved five search warrant applications in connection with the investigation of the bombing.

Furthermore, the complaint and arrest warrant issued on the evening of April 21, shortly after the second round of interrogation began.  Nevertheless, appointment of counsel and the initial appearance were delayed until the following morning, despite the fact that counsel were ready, willing, and available to immediately represent Mr. Tsarnaev.  During that time, agents continued to interrogate him for another 15½ hours.

The 2010 Department of Justice policy regarding interrogation of terrorism suspects who are under arrest but not yet indicted specifically warns, "Presentment of an arrestee may not be delayed simply to continue the interrogation, unless the defendant has timely waived prompt presentment."   DOJ Memo, Exhibit 3.  No such waiver occurred here.

## Conclusion

For the reasons set forth above, this Court should suppress the statements made by Mr.

Tsarnaev to FBI agents at Beth Israel Deaconess Medical Center on April 20 through 22.

## Request for Evidentiary Hearing

Defendant requests an evidentiary hearing on this motion.

Respectfully submitted,

DZHOKHAR  TSARNAEV
by his attorneys

/s/  Miriam Conrad_____

Judy Clarke, Esq.
California Bar:  76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 7, 2014.


/s/ Miriam Conrad