UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                          No.  13-CR-10200-GAO

DZHOKHAR  TSARNAEV

## MOTION TO SUPPRESS FRUITS OF SEARCHES AT
## NORFOLK STREET AND UNIVERSITY OF MASSACHUSETTS

Defendant, by and through counsel, moves this Court to suppress any physical evidence seized, observed, or photographed, or any fruits of such evidence, that was unlawfully obtained during searches of the defendant's home on Norfolk Street in Cambridge and of his dorm room and property at the University of Massachusetts ("U-Mass") at Dartmouth.

As grounds for this motion, undersigned counsel state that the searches violated Mr. Tsarnaev's rights under the Fourth Amendment to the U.S. Constitution because:

1)        The lists of items to be searched for and seized were overly broad and lacking in particularity;

2)        Law enforcement agents observed, seized, and photographed items that fell outside the scope of the warrants; [1]

---

[1] By letter dated December 9, 2013, the defense asked the government, "[i]n anticipation of filing motions to suppress evidence," for notice under Fed. R. Crim. P. 12(b)(4) of "the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16."  The government responded by letter on February 7, 2014:  "The government has not yet identified all of the evidence that it intends to introduce in its case-in-chief, and it is too early for the government to rule anything out . . . Accordingly, at least for the time being, please treat everything that we have produced to you in discovery as something we may offer in our case-in-chief."

3)      The warrantless inspection of Mr. Tsarnaev's dorm room and personal property at the University of Massachusetts at Dartmouth  was not justified by any recognized exception to the warrant requirement; and

4)      The July search warrant for the dorm room did not have an independent source.

### Background

On April 15, 2013, two bombs exploded at the Boston Marathon, killing three spectators and injuring many others.  The suspects remained unidentified until the evening of April 18, when Tamerlan Tsarnaev was killed in a shoot-out with law enforcement agents in Watertown. Tamerlan's younger brother, Dzhokhar, fled the scene of the gun battle.  A lengthy manhunt ensued.

On April 19, after Tamerlan was identified through fingerprints and while law enforcement agents sought Dzhokhar, the FBI applied for and received a search warrant for 410 Norfolk Street, Apartment 3, where Tamerlan and Dzhokhar lived.[2]  The search warrant for the Norfolk Street apartment issued at 11:50 a.m.  *See* April 19 Search Warrant (filed under seal as Exhibit 1).  The search began an hour later and lasted for nearly 12 hours, according to discovery.

At about 9 p.m. on April 19, Mr. Tsarnaev was arrested and rushed to Beth Israel Hospital, in critical condition.  On the evening of April 20, through the morning of April 21, members of the FBI's High Value Interrogation Team questioned him.

Just after midnight on the morning of April 21, the FBI obtained a search warrant for Mr. Tsarnaev's dormitory room at U-Mass Dartmouth.  *See* April 21 U-Mass Search Warrant (filed under seal as Exhibit 2).  The search began at 2:43 a.m. and lasted approximately 6½ hours.

---

[2] The FBI simultaneously obtained search warrants for two cars associated with the Tsarnaev family.  We are not challenging those searches, as Mr. Tsarnaev lacks standing with respect to those cars.

2

On May 3, the FBI obtained a second search warrant for the Norfolk Street apartment, which was executed on May 5.  *See* May 3 Search Warrant (filed under Seal as Exhibit 3).  On June 27, FBI agents entered Mr. Tsarnaev's dorm room a second time, without a warrant, and observed and photographed various items while U-Mass police collected Mr. Tsarnaev's property and removed it.  The university police also took a swab of a "reddish-brown powder" seen on a window sill.  *See* FBI Report dated July 1, 2013 (filed under seal as Exhibit 4).  On July 24, the government obtained a second search warrant for Mr. Tsarnaev's dorm room and for property that had been removed by university officials from the room.  .  *See* Search Warrant dated July 24 (filed under Seal as Exhibit 5).  The search was executed on July 26

<u>The April 19 and 21 Search Warrants</u>

The lists of items to be seized under the April search warrants for the apartment and the dorm room are substantially similar.  The April warrant for the apartment specified the following:

> All evidence inside the premises and curtilage located at the Target Residence, related to violations of 18 U.S.C. §§ 2332(a) (Using and Conspiring to Use A Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Weapon During a Crime of Violence) and 371 (Conspiracy to Commit Offenses), including but not limited to:

> 1.  Property, records, items, or other information, related to violations of the aforementioned statutes, including but not limited to, bomb making material and equipment, ammunition, weapons, explosive material, components of bomb delivery devices;

> 2. Property, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of explosives;

> 3. Property, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of firearms;

> 4. Property, records, or other information related to the ordering and purchasing of pressure cooker devices, BBs, nails, and other small metallic objects;

> 5. Property, records, or information related to the Boston Marathon;

6. Property, records, or information related to any plans to initiate or carry out any other attacks inside or outside the United States, or any records or information related to any past attacks;

7. Property, records, or information related to the state of mind and/or motive of Tamerian [sic][3] and Dzhokhar to undertake the Boston Marathon bombings;

8. Property, records, or other information related to the identity of Tamerian and Dzhokhar;

9. Property, records, or other information related to the identity of any individuals who were in contact with, or were associates of Tamerian and Dzhokhar;

10. Property, records, or information, related to any organization, entity, or individual in any way affiliated with Tamerian and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein;

11. Property, records, or other information, related to Tamerian's and/or Dzhokhar's schedule of travel or travel documents;

12. Property, records, or information related to any bank records, checks, credit card bills, account information, and other financial records.

The attachment goes on to define "digital evidence" and to provide a protocol for seizure and search of digital evidence.

The list of the items to be seized in the April 21 warrant for the dorm room was identical except for the omission of "[p]roperty, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of firearms[.]"

Neither warrant attached the application and supporting affidavit or incorporated them by reference.

---

[3] Mr. Tsarnaev's brother Tamerlan's name was repeatedly misspelled in the April search warrants and applications.

Items Seized during the April Searches

The items seized from the Norfolk Street apartment during the first search included[4]

tools, car keys, knives, notebooks and printed books written in Russian, a book called "Milady's

Standard Fundamental for Esthetician's book," tax documents from 2009 and 2010, immigration

files, nail clippers,  and  a receipt from a beauty supply company.

During the April 21 search of the dorm room, agents seized, among other things, a pizza

box with a receipt, a notebook, a book called "Muslims in the West," articles of clothing, a book

called "Soldiers of God," personal documents, and school records.

Second search of 410 Norfolk on May 5

On May 3, 2013, FBI agents sought a second search warrant for 410 Norfolk Street,

citing the need to conduct a further search for "low-explosive powder residue,"[5] kitchen

appliances purchased at a Macy's store on February 23, 2013, as well as clothing matching that

worn by an individual believed to be Tamerlan Tsarnaev during a visit to a fireworks store in

New Hampshire.  The items to be seized were listed as:

> Evidence, in whatever form inside the premises and curtilage located at the Target
> Residence, related to violations of 18 U.S.C. §§ 2332a (Using and Conspiring to Use A
> Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an
> Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with
> Commerce by Violence), 924(c) (Use of a Firearm During a Crime of Violence) and 371
> (Conspiracy to Commit Offenses), including but not limited to:
>
> 1. Low-explosive powder residue from locations within the Target Residence, including
> but not limited to table tops, countertops, under furniture, and concealed locations;

---

[4] In the interest of space, the defendant provides only examples of the items seized, but seeks to
suppress all items seized that either were seized under an overly broad provision or fall outside
the scope of the warrant.  As noted above, it is not clear which of the items will be offered by the
government at trial.

[5] The warrant application reports that  swabs taken during the April 19 search yielded no residue.

2. Low-explosive powder residue from the plumbing system of the Target Residence, including but not limited to the drains and pipes;

3. Male and/or female clothing consistent with clothing worn by the two individuals in the February 23, 2013 surveillance video from Macy's department store, located at 450 Washington Street, in Boston, Massachusetts.

4. A five-quart perforated colander, an eleven-inch teal-colored frying pan, and an eleven-inch stainless steel frying pan, all of which are Martha Stewart brand products.

5. Chrome-colored shoes consistent with the description of the individual present in the fireworks store in Seabrook, New Hampshire in February 2013.

6. Evidence not previously seized, which based on information available at the time of the search, is related to violations of the aforementioned statutes, including but not limited to, bomb making material and equipment, ammunition, weapons, explosive material, and components of bomb delivery devices.

A description of the clothing worn in the February 23, 2013 Macy's videotape appears in the affidavit accompanying the search warrant application, but neither the affidavit nor the warrant or application was attached to the warrant or incorporated by reference.

The second warrant was executed on May 5, 2013.  Agents seized, among other things, clothing, a Sovereign newspaper, a cell phone, a U.S. Customs patch, The Report of the Citizens Commission on 9/11, knives, a notebook, and a thumb-drive.

Subsequent Searches of the Dorm Room and Property at U-Mass Dartmouth

On June 27,[6] two months after the FBI search of Mr. Tsarnaev's dorm room, an FBI agent accompanied campus police into the room while the U-Mass police collected Mr. Tsarnaev's personal property.   Neither the U-Mass police nor the FBI agent had a warrant. According to an FBI report, the agents entered "at the invitation and with the consent of the University of Massachusetts Dartmouth Police Department."  FBI Report dated July 1, 2013, (Exhibit 4).  The FBI report includes a detailed list of items that the FBI observed and

---

[6] An FBI report regarding the execution of the July 26 warrant describes the removal of property as having occurred on May 27, 2013. This appears to be an error.

photographed, and notes that a U-Mass detective took a sample of a reddish-brown powder seen on a window sill.  *Id*.

On July 24, 2013, the FBI applied for a search warrant for Mr. Tsarnaev's dorm room and personal property.  According to the warrant application, this property included three notebooks, clothing, a Gap store receipt, an accident report, and "reddish-brown powder" found on the window sill.  "UMD police officers collected these items, including a sample of the reddish-brown powder, in the presence of the FBI, whom they had invited into the room."  Search Warrant Application  (filed under seal as Exhibit 6) at 13.  The warrant specified, among the items to be seized, the things that had been observed during the June 27 warrantless search.

The July 24, 2013 warrant listed the following as the items to be seized from the dorm room:

> All evidence inside the premises of the Target Location relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U .S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S.C. § 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

> 1. Reddish-brown powder residue observed within the Target Location, including, but not limited to, the window sill and floor;

> 2. Blood, tissue, DNA, hair, fingerprints, bodily fluids, and explosive powder and small pellets or ball bearings (bbs).

The warrant authorized the seizure of the following from Mr. Tsarnaev's personal property:

> All evidence contained within the Target Materials relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S .C.§ 2119 (Carjacking Resulting in

Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S. C. § 924( c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

1. Blood, tissue, DNA, hair, fingerprints, bodily fluids;

2. Fibers and other trace evidence;

3. Clothing;

4. Shoes and other footwear;

5. The specific items listed[.][7]

6. Property, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of explosives;

7. Property, records, or other information related to the ordering and purchasing of pressure cooker devices, BBs, nails, and other small metallic objects;

8. Property, records, or information related to the Boston Marathon;

9. Property, records, or information related to any plans to initiate or carry out any other attacks inside or outside the United States, or any records or information related to any past attacks;

10. Property, records, or information related to the state of mind and/or motive of Tamerlan and Dzhokhar to undertake the Boston Marathon bombings;

11. Property, records, or other information related to the identity of Tamerlan and Dzhokhar;

12. Property, records, or other information related to the identity of any individuals who were in contact with, or were associates of Tamerlan and Dzhokhar;

13. Property, records, or information, related to any organization, entity, or individual in any way affiliated with Tamerlan and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein;

14. Property, records, or other information, related to Tamerlan's and/or Dzhokhar's schedule of travel or travel documents;

---

[7] Paragraph 5 lists all of the items noted by the FBI when U-Mass Dartmouth police removed items from Mr. Tsarnaev's room, including the "reddish-brown powder" found on top of the window sill.

15.   Property, records, or information related to any bank records, checks, credit card bills, account information, and other financial records;

16.  Personal property, including articles of clothing, which could contain trace, DNA, explosives, blood or other evidence.

Among the items seized were notebooks, identification cards, sales receipts, and "six books and one DVD about history, politics, and/or religion."

## ARGUMENT

## I.    THE SEARCH WARRANTS WERE LACKING IN PARTICULARITY.

We begin with the basic proposition that the Warrant Clause of the Fourth Amendment prohibits the issuance of a warrant, except one "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A search "intruding upon [an individual's] privacy interest . . . must satisfy the particularity requirement, which limits the scope and intensity of the search." *United States v. Mousli*, 511 F.3d 7, 12 (1st Cir. 2007) (alteration in original) (quoting *United States v. Bonner*, 808 F.2d 864, 867 (1st Cir. 1986)) (internal quotation mark omitted).

*United States v. Tiem Trinh*, 665 F.3d 1, 15 (1st Cir. Mass. 2011).   "General warrants, of course, are prohibited by the Fourth Amendment."  *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). General warrants are impermissible because they permit "a general, exploratory rummaging in a person's belongings[.]"  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).   To avoid this problem, the Fourth Amendment requires "a 'particular description' of the things to be seized." *Id*.  "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  *Stanford v. Texas*, 379 U.S. 476, 485 (1965), quoting *Marron v. United States*, 275 U.S. 192, 196 (1927).  "The *Marron* standard finds its derivation in Colonial America's aversion to writs of assistance and general warrants which placed broad discretionary authority with British Custom officials to search anywhere for smuggled goods and seize anything they pleased."  *United States v. Klein*, 565 F.2d 183, 186 (1st Cir. Mass. 1977).

The particularity requirement demands that a valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to

search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized.

*United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013); *see also United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999).   "Where a warrant is accompanied by an affidavit, the 'affidavit may be referred to for purposes of providing particularity,' provided that 'the warrant uses suitable words of reference which incorporate the affidavit.' *United States v. Klein*, 565 F.2d 183, 186, n. 3 (1st Cir. 1977)." *United States v. Tiem Trinh*, 665 F.3d 1, 15 (1st Cir. Mass. 2011).

In evaluating particularity, courts look to whether the agents could have narrowed the scope of what they sought, based on the information that they had when they applied for the warrant.  *See Klein*, 565 F.2d at 190 (holding warrant inadequate where agents had information available that would have allowed more specificity).  *See also Montilla Records of Puerto Rico v. Morales*, 575 F.2d 324, 326 (1st Cir. 1978); *United States v. Fuccillo*, 808 F.2d 173, 176-77 (1st Cir. 1987).   Here, that is certainly the case.

The lists of items to be seized under the April 19 warrant for the Norfolk Street apartment and the April 21 warrant for the U-Mass dormitory room begin with an introductory clause referring to evidence related to violations of 18 U.S.C. §§ 2332(a) (Using and Conspiring to Use A Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Weapon During a Crime of Violence) and 371 (Conspiracy to Commit Offenses)".   The list of violations refers only to general statutes and does not provide a particular date, place, or event when any such crimes occurred, with a single exception:   in the provision authorizing the seizure of "property, records, or information related to the state of mind and/or motive of Tamerian and Dzhokhar to undertake the Boston Marathon bombings[.]"   That

isolated mention cannot be interpreted as applying to all of the other provisions.  Indeed, the absence of any mention of the Marathon bombings or any other specific crime from the other provisions, coupled with a provision that refers to past or future attacks, suggests the opposite: that all of the other provisions relate to evidence of *any* violations of the listed statutes.

The detailed description of the events in the *application* for the warrant does not save the generality of the description of the violations where, as here, the affidavit was neither attached to the warrant nor incorporated by reference.  *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980).

> (T)he requirement that the warrant itself particularly describe the material to be seized is not only to circumscribe the discretion of the executing officers but also to inform the person subject to the search and seizure what the officers are entitled to take. . . .
>
> Moreover, self-restraint on the part of the instant executing officers does not erase the fact that under the broadly worded warrant appellees were subject to a greater exercise of power than that which may have actually transpired and for which probable cause had been established.

*In re Application of Lafayette Academy*, 610 F.2d 1, 5 (1st Cir. 1979).

Here, the general citation of statutory violations is not sufficiently limited by the list that follows, especially where that section begins with the phrase "including but not limited to".  The First Circuit upheld the use of a similar phrase, while recognizing that it "is certainly not a model of precise drafting," where it was "a transitional phrase linking to the second very particular clause, and it must be read in that context[.]"  *Kuc*, 737 F.3d at 133.   In *Kuc*, the warrant included a detailed list of "the companies that Kuc was suspected of defrauding, as well as the aliases, street addresses, and email addresses he was believed to have used in his scheme."  *Id*. That is not the case here.  Moreover, the defendant in *Kuc* did not challenge the specificity of any of the 23 particular categories that followed the transitional phrase.  *Id*.  We do.

The list of items to be seized includes "property, records, or information related to . . . the state of mind and/or motive of Tamerlan and Dzhokhar to undertake the Boston Marathon

bombings"; "the identity of Tamerlan and Dzhokhar", "the identity of any individuals who were in contact with, or were associates of Tamerlan and Dzhokhar", "any organization, entity, or individual in any way affiliated with Tamerlan and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein"  and "any bank records, checks, credit card bills, account information, and other financial records."   No time period or other limitation narrows these categories.  *Cf. Lafayette Academy*, 610 F.2d at 5 n.4 (even a list of documents relating to a particular crime may be overly broad, as "efforts may also be required to narrow the documents by category, time periods, and the like").

These categories do not provide sufficient limitations on what the agents could search for and seize.  The "state of mind and/or motive" could have been construed to allow the agents to examine or seize every item in the apartment in the hope that it might shed light on the religious, political, or other beliefs of the Tsarnaev brothers, as well as anything that might provide the slightest insight into their psychological makeup.   No temporal limitation is provided.  The same is true of "any bank records, checks ... and other financial records."  This provision is not limited by a time frame, the identity of an individual, or the nature of the transactions reflected in these records.  Among the items seized from the Norfolk Street apartment was a paystub for Tamerlan from a 2010 job at a pizza restaurant.  Agents seized a pizza box from Mr. Tsarnaev's dorm room.

Similar deficiencies doom the provision permitting a search for evidence relating to "the identity of Tamerlan and Dzhokhar".   While search warrants in drug and gun investigations frequently permit the police to search for and seize documents that show occupancy or control of the target location, this provision is far broader.  Agents seized from the Norfolk Street

apartment, among other things, academic, immigration, and tax records, dating back to 2009, as well as Dzhokhar's middle school identification card.

The provision authorizing a search for "[p]roperty, records, or other information related to the identity of any individuals who were in contact with, or were associates of Tamerlan and Dzhokhar" also fails to provide guidance or limitations, lacking any mention of a particular time frame or specific events.  Many of the items seized during the April search of the Norfolk Street apartment had nothing to do with either of the brothers.  They included a letter from Ailina Tsarnaeva to a friend (written in Russian), a letter from Zubeidat Tsarnaeva to friends of the family (in English), an innocuous note from the Tsarnaevs' landlady to Zubeidat (in English), a domestic airplane itinerary from 2006 for Anzor and Zubeidat Tsarnaev, and medical imaging for Anzor Tsarnaev.

The government may argue that these items fall within the provision permitting them to search for "[p]roperty, records, or information, related to any organization, entity, or individual in any way affiliated with Tamerlan and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein[.]"  It is true that family members are individuals "affiliated with" the brothers.  But the provision apparently was read expansively – and impermissibly – to permit a search for anything relating to anyone affiliated with them, regardless of whether there was probable cause to believe that those individuals were somehow involved in the attack.   Moreover, the reference to "the actions described herein" is meaningless, since the affidavit describing the "actions" was neither attached nor incorporated into the warrant.

The wholesale seizure of foreign-language books and documents cannot be justified under the search warrant.  It is possible, of course, that the FBI did not have a Russian-speaking

agent or interpreter on hand to identify those documents.  But nothing in the warrant permitted the seizure of those items, absent a belief that they fell within the scope of the warrant. Presumably, the government could have anticipated this problem by requesting a warrant that permitted the seizure of such items for later inspection, with a protocol such as the one set forth regarding digital data.

The breadth of the warrant is illustrated by the large volume and expansive nature of the items seized.  The agents' actions in seizing almost every book, document, paper, and household item they saw demonstrate that they were engaged in an impermissible general search.

Although the second warrant for the Norfolk Street apartment may, at first glance, seem more particularized because it specified certain types of trace evidence, this specificity was nullified by the broad catch-all provision in paragraph 6:  "Evidence not previously seized, which *based on information available at the time of the search*, is related to violations of the aforementioned statutes, *including but not limited to*, bomb making material and equipment, ammunition, weapons, explosive material, and components of bomb delivery devices." (emphasis added).   This provision explicitly left to the searching agents the judgment of what was to be seized.  The use of the phrase "including but not limited to" is used expansively here, in contrast to *Kuc*, allowing agents to take whatever they believed might be relevant.  Indeed, the agents' actions during the second search demonstrate the breadth of their interpretation of this provision:   they seized notebooks, "The Report of the Citizens Commission on 9/11," and a newspaper called "The Sovereign."  If the phrase "including but not limited to" is read out of the warrant, it is difficult to see how these items relate to "bomb making material and equipment, ammunition, weapons, explosives, and components of bomb delivery devices."

The July warrant for Mr. Tsarnaev's personal property included the same broad language contained in the April warrants, along with a list of specific items seen during the June 27 warrantless entry.

To the extent that the list of specific items in paragraph 5 of the July search provided sufficient particularity, the warrant nonetheless is constitutionally invalid because the affidavit did not establish probable cause for the seizure of those items.  These included "academic materials, including notebook, papers, calculator, and an implement designed to record presence at lectures,"  a notebook labeled "Chem. Nutrition Dzhokhar,"  Mr. Tsarnaev's Masshealth card, his high school identification card, and paperwork related to a car accident and insurance claim. The only portion of the affidavit that conceivably relates to these mundane items is the assertion that "there is probable cause to believe that Dzhokhar's fingerprints will be found on other surfaces in his abandoned dormitory room and on his personal possessions as well."  But this sweeps too broadly, as it would permit the seizure of any item that he ever might have touched, without regard to whether it provides evidence of a crime, as opposed to simply being personal items that he touched in his dorm room.   Moreover, it ignores the fact that the listed items had all been removed from the dorm room a month earlier and two months after the crime under investigation.[8]

The searches cannot be saved under the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984).  "[A] warrant may be so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.  .Here, as in *United States v. Fuccillo*, 808

---

[8] The affidavit reports that, after Mr. Tsarnaev's property was removed by U-Mass police from his dorm room on June 27, 2013, it "was catalogued and stored in the custody of UMD police and is in substantially the same condition now as when it was removed."   Search Warrant Affidavit (Exhibit 6) at 12.  The affidavit does not report what steps, if any, were taken to preserve fingerprints or particulate evidence between April and July.

F.2d 173, 177 (1ˢᵗ Cir. 1987), agents "[a]rmed with warrants already drawn in the broadest

manner . . .  exceeded even that authority."

## II.      IF THE WARRANTS ARE FOUND TO BE SUFFICIENTLY PARTICULAR, THE AGENTS EXCEEDED THE SCOPE OF THE WARRANTS.

The diversity and volume of items seized – personal letters to and from family members,

a textbook on cosmetology, receipts for beauty supplies, pay stubs from 2010, financial and

immigration documents dating back to 2009, academic textbooks and notes  – illustrate the lack

of particularity in the search warrant.   If the Court concludes, however, that the warrant was

sufficiently particular in identifying the items to be seized, then it should find that at least some

of the items seized fell outside the scope of the warrant and that, therefore, those items and their

fruits should be suppressed.

To be sure, it is likely that the government will not seek to introduce most or even any of

these items at trial.  But, to date, the government has declined to identify which of the seized

items it will offer as evidence.  Moreover, items that were seized but will not be used directly as

evidence may have led the government to other evidence that it does intend to introduce.

Defendant seeks suppression of any fruits of these impermissibly seized items.

## III.     THE ENTRY INTO THE DORM ROOM BY THE FBI AND CAMPUS POLICE ON JUNE 27, 2013 WAS AN IMPERMISSIBLE WARRANTLESS SEARCH.

On June 27, two months after  the April 21 search of Mr. Tsarnaev's dorm room with a

search warrant, an FBI agent accompanied campus police into the dorm room to observe as they

collected his personal property.  According to an FBI report on this event, the agent entered "at

the invitation and with the consent of the University of Massachusetts Dartmouth Police

Department."  Exhibit  4.   The report provides a detailed list of the items observed and states

that the agent photographed some items.  *See* Exhibit 4.  Furthermore, the agent noted the

presence of a reddish-brown powder on the window sill.  A campus police officer took a sample of it.

Defendant submits that this entry was an unconstitutional warrantless search and that its fruits – which include photographs taken by the FBI, a videotape made by U-Mass police, the powder sampled by the campus police, and the items seized during the execution of a second search warrant a month later – must be suppressed.

"The right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution applies when the police search a dormitory room in a public college."  *Commonwealth v. Neilson*, 423 Mass. 75, 77 (1996) (footnote omitted).  *See also Morale v. Grigel*, 422 F .Supp. 988, 997 (D.N.H.  1976).   In *Neilson*, the search occurred at a state college.  There, as here, the defendant was a resident of a college dormitory and "consented to reasonable searches to enforce the college's health and safety regulations when he signed the residence contract."  *Id*. at 79.   "While the college officials were entitled to conduct a health and safety inspection, they 'clearly . . . had no authority to consent to or join in a police search for evidence of crime.'"  *Id*., quoting *Piazzola v. Watkins,* 442 F.2d 284, 290 (5th Cir. 1971).

> While the college officials were legitimately present in the room to enforce a reasonable health and safety regulation, the sole purpose of the warrantless police entry into the dormitory room was to confiscate contraband for purposes of a criminal proceeding. An entry for such a purpose required a warrant where, as here, there was no showing of express consent or exigent circumstances.

*Neilson,* 423 Mass. at 79.

A university has no more right to consent to a search of a student's on-campus home than a motel clerk or landlord has a right to consent to a search of an occupied room.  *See Stoner v. California*, 376 U.S. 483, 489 (1964) (motel clerk); *Chapman v. United States*, 365 U.S.610 (1961) (landlord).

> The fact that the University officials agreed to the search gives it no validity. . . . [S]tudents and their college share a special relationship, which gives to the college certain special rights including the right to enter into and inspect the rooms of its students under certain situations. However, the fact that the college has this right -- for a restricted purpose -- does not mean that the college may exercise the right by admitting a third party.

*Piazzola v. Watkins*, 316 F. Supp. 624, 628 (M.D. Ala. 1970).

The entry at issue here took place more than two months after the Marathon bombing, after Mr. Tsarnaev's roommate had moved out, and after the room was secured. There was no justification for failing to obtain a search warrant.

 Nor can the property be treated as abandoned. The warrant itself refers to the property to be searched as "Personal Property of Dzhokhar Tsarnaev Obtained from Room 7341 of Pine Dale Hall." Mr. Tsarnaev had not voluntarily relinquished the property. He was in custody, under arrest. *See United States v. Robinson*, 430 F.2d 1141 (6th Cir. 1970) (incarcerated defendant did not abandon property). "Whether premises have been abandoned so as to sanction the warrantless searches raises a significant issue of the intent of the occupier of the premises, since his mere absence from the premises without an intent to abandon could not legitimate such a search." *Id.* at 1143. *Cf. United States v. Stevenson*, 396 F.3d 538, 540 (4th Cir. 2005) (affirming finding that defendant abandoned apartment where he wrote letter from jail to his girlfriend, giving her all of the property he had in the apartment and referring to himself as the "former renter").

The fact that Mr. Tsarnaev allegedly texted a friend on April 18, 2013, telling him, "If yu want yu can go to my room and take what's there :) but ight bro Salam aleikum" does not indicate abandonment of everything that remained. After all, he did not indicate whether he wanted the friend to take the items for safekeeping or forever. He gave no indication that he

intended to inform the university that he was terminating his housing contract or abandoning his room and its contents.

Undersigned counsel is unaware of any efforts made by university officials to contact Mr. Tsarnaev or his counsel, who had been appointed more than two months earlier, to notify him that he was being evicted or to find out how he wished to dispose of his property.

## IV.   THE FRUITS OF THE JULY 26 SEARCH OF THE DORM ROOM AND OF MR. TSARNAEV'S  PERSONAL PROPERTY MUST BE SUPPRESSED AS THEY LACK A SOURCE INDEPENDENT OF THE JUNE 27 ENTRY.

When a search warrant is executed after a prior illegal search of the same property or location, the second search is permissible only if the second search was an independent source for the evidence seized.  *Murray v. United States*, 487 U.S.  533, 535-36 (1988).   It is the government's burden to establish, by a preponderance of the evidence, that the second search was an independent source.  *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. Mass. 2009) (affirming district court's suppression order).  The search conducted under a warrant "would not be an independent source: (1) 'if the agent's decision to seek the warrant was prompted by what they had seen during the initial entry'; and (2) 'if information obtained during that entry and was presented to the Magistrate and affected his decision to issue the warrant.'"  *United States v. Dessesaure*, 429 F.3d 350 (1st Cir. 2005), quoting *Murray*, 487 U.S. at 542.

The government first searched the dorm room on April 21.  During the next two months, agents apparently made no effort to obtain a second warrant, in order to permit a search for additional material not noted or seized during the first search.   It was only after the unlawful entry on June 27 that they decided to seek a second search warrant.   That warrant application included a detailed list of items observed and photographed during the June entry among the items to be seized.

The application for the second search warrant for Mr. Tsarnaev's dorm room and for his personal property, taken from his dorm room,  recites facts gleaned from the investigation of the Boston Marathon bombings, a search of Mr. Tsarnaev's laptop computer (the subject of a separate motion to suppress),  another search of material found in a backpack located in a landfill, and the observations made by FBI agents during the June 27warrantless entry .   Some of this information was available well before the June 27 entry, yet the FBI had not sought a second warrant.

It appears that the warrant was aimed in large part at seizing the "reddish-brown powder" observed on the window sill of the room.  The warrant application's claim that this was seen during the April search by agents, who inexplicably failed to seize it, strains credulity.   Reports regarding the April 21 search do not mention the powder.  Photographs taken of the pyrotechnic found on the window sill do not show it.  And the Evidence Recovery Team casebook twice states that the room was reviewed by a chemist "for potential areas for swabbing.  None were located."

As recounted in the July warrant application, "UMD police officers collected these items, including a sample of the reddish-brown powder, in the presence of the FBI, whom they had invited into the room."  Exhibit 6.  The affiant asserts, "I therefore have probable cause to believe that collecting and forensically analyzing items among the Target Materials for trace, DNA, fingerprint and explosive transfer evidence will yield additional evidence of Dzhokhar's involvement in the crimes described above."  *Id.*

Presumably, the possibility of retrieving trace evidence from Mr. Tsarnaev's property existed well before July.   But it was only after the campus police found and collected the

powder – presumably at the behest of the FBI – that the government sought a second search warrant.

Under these circumstances, it appears that the agents' decision to seek a second warrant was prompted by their unlawful observations on June 27.  Therefore, all items seized during the second search must be suppressed.  *See Siciliano*, 578 F.3d at 67, 72 (affirming suppression of evidence seized pursuant to warrant prompted by unlawful observations, despite the fact that striking the unlawfully obtained information from the warrant application did not alter the quantum of probable cause).

<u>CONCLUSION</u>

For the foregoing reasons, the defendant requests that this Court suppress items of physical evidence seized as a result of searches of 410 Norfolk, Cambridge, Massachusetts and Mr. Tsarnaev's dorm room at U-Mass Dartmouth.

<u>REQUEST FOR EVIDENTIARY HEARING</u>

Defendants requests an evidentiary hearing to determine whether items were seized outside the scope of the warrants, the circumstances of the warrantless June 27 entry, and the role that the June 27 entry played in the agents' decision to seek a second search warrant in July for the dorm room and its contents.

DZHOKHAR  TSARNAEV
by his attorneys

/s/  Miriam Conrad

Judy Clarke, Esq.
California Bar:  76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.    (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 7, 2014.

/s/ Miriam Conrad