AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Personal Property of Dzhokhar Tsarnaev Obtained from<br>Room 7341 of Pine Dale Hall | )<br>)<br>)  Case No.  13 – MJ – 2263 – MBB<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Personal Property of Dzhokhar Tsarnaev from Room 7341 of Pine Dale Hall, as further described in Attachment B.

located in the _____ District of _____ Massachusetts _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment D.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. ss2332a, 2332f, 844<br>(i), 1951, 924(c), 2119 and 371 | Use of Weapon of Mass Destruction, Public Bombing, Malicious Destruction of<br>Property Resulting in Death, Interference with Commerce by Violence, Use of<br>Firearm in a Crime of Violence, and Conspiracy to Violate the Laws |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Steven A. Kimball

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Steven A. Kimball, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___07/24/2013___ @ 3:00 PM

*Judge's signature*

City and state:  Boston, Massachusetts

Marianne B. Bowler, U.S. Magistrate Judge

*Printed name and title*

DT-0000968

## AFFIDAVIT OF SPECIAL AGENT

I, Steven A. Kimball, being duly sworn, depose and state:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have
been so employed since 2005.  I am currently assigned to one of the Boston Field Office's
Counter-terrorism Squads.  Among other things, I am responsible for conducting national
security investigations of potential violations of federal criminal laws as a member of the Joint
Terrorism Task Force ("JTTF").  During my tenure as an agent, I have participated in numerous
national security investigations.  I have received extensive training and experience in the conduct
of national security investigations and matters involving domestic and international terrorism.  I
have also participated in the execution of numerous federal search and arrest warrants in a
variety of criminal investigations.

2.      I am currently participating in the investigation of the two explosions that
occurred on April 15, 2013 in Boston during the Boston Marathon and a subsequent carjacking
and shootout that occurred on April 18-19, 2013 in Cambridge and Watertown, Massachusetts.  I
believe that the same individuals, Dzhokhar Tsarnaev ("Dzhokhar") and his brother Tamerlan
Tsarnaev ("Tamerlan"), were involved in the Marathon bombing, the carjacking, and the
shootout.  Dzhokhar is also known as Jahar, and both he and many of his friends say and spell
his name that way.

3.      This affidavit is submitted in support of warrants authorizing, respectively, a
search of **Personal Property of Dzhokhar Tsarnaev Obtained from Room 7341 of Pine Dale
Hall** held at the University of Massachusetts at Dartmouth (UMD)**,** in the custody of the UMD
police **(the "Target Materials")**, and a second search of Dzhokhar's now-vacated dormitory

1

DT-0000969

room, **Room 7341 of Pine Dale Hall at UMD (the "Target Location")**. UMD is located at 285 Old Westport Road, North Dartmouth, Massachusetts. This Court issued a warrant authorizing the initial search of **Room 7341 of Pine Dale Hall** on April 21, 2013 (13-MJ-2104-MBB). The affidavit submitted in support of that search warrant is incorporated herein by reference. Since that time, with the exception of entry into the room for purposes of escorting Dzhokhar's roommate out of the room, removing the roommate's belongings, inspecting the premises, and securing Dzhokhar's abandoned belongings, the dorm room has been secured and is in substantially the same condition as when the prior search warrant was executed. For reasons stated herein, certain items that constitute evidence of the crimes listed above were not seized during the initial search and thus remain inside the room. The places to be searched are more particularly described in Attachments A and B hereto, which are incorporated herein by reference.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Tamerlan and Dzhokhar have committed numerous criminal offenses, in violation of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S.C. § 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting). There is also probable cause to

2

DT-0000970

believe that the places described in Attachments A and B contain evidence of those crimes, as described in Attachments C and D, respectively.

5.      On April 21, 2013, Dzhokhar was charged in a federal criminal complaint with violating 18 U.S.C. § 2332a(a)  (Using and Conspiring to Use Weapons of Mass Destruction) and 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death).  See *United States v. Dzhokhar Tsarnaev*, No. 13-MJ-2106 (MBB).  On June 27, 2013, a federal grand jury handed up a thirty-count Indictment charging Dzhokhar with violations of 18 U.S.C. § 2332a (Use of a Weapon of Mass Destruction and Conspiracy);  18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy);  18 U.S.C. § 844(i) & (n) (Malicious Destruction of Property and Conspiracy); 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence); 18 U.S.C. § 924(j) (Use of a Firearm During and in Relation to a Crime of Violence Causing Death); 18 U.S.C. § 2119(2) (Carjacking Resulting in Serious Bodily Injury); 18 U.S.C. § 1951 (Interference With Commerce by Threats or Violence); and 18 U.S.C. § 2 (Aiding and Abetting).  See *United States v. Dzhokhar Tsarnaev*, No. 13-MJ-10200 (GAO).  The facts alleged in the Indictment, which I believe are true and accurate, are incorporated herein by reference.

6.      This affidavit is based upon information supplied to me by other law enforcement officers, including other special agents employed by the FBI, task force officers of the JTTF, and state and local law enforcement personnel who are participating in the investigation of these events.  It is also based upon my personal involvement in this investigation and on my training and experience.  In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient

DT-0000971

to establish the requisite probable cause.

## STATUTORY BACKGROUND OF VIOLATIONS

7.      Based on my training, experience, and discussions with the United States Attorney's Office for the District of Massachusetts, I have learned the following:

8.      Title 18, United States Code, Section 2332a provides that, "A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . against any person or property within the United States, and . . . the offense, or the results of the offense affect interstate or foreign commerce . . . and if death results, shall be punished by death or imprisonment for any terms of years or for life." The term "weapon of mass destruction" is defined in 18 U.S.C. § 2332a(c)(2) and includes "any destructive device" as defined in 18 U.S.C. § 921(a)(4). Section 921 provides that bombs, grenades, rockets, mines and similar objects are destructive devices.

9.      Title 18, United States Code, Section 844(i) makes unlawful malicious destruction of property by means of an explosive, and if death results, the violator shall be "subject to imprisonment for any term of years, or to the death penalty or to life imprisonment."

10.     Title 18, United States Code, Section 2119 provides that anyone who "with intent to cause death or serious bodily harm takes," by force and violence, a motor vehicle that has been shipped through interstate commerce, shall be punished by up to twenty-five years imprisonment if serious bodily injury results.

11.     Title 18, United States Code, Section 1951 provides that anyone who interferes with commerce by threats or violence may be punished by up to twenty years' imprisonment.

12.     Title 18, United States Code, Section 924(c) makes unlawful the use or carrying

DT-0000972

of a firearm during and in relation to a crime of violence. If the weapon has been used, the minimum term of imprisonment is five years. If the weapon has been brandished, the minimum term of imprisonment is seven years. If the weapon has been discharged, the minimum term of imprisonment is ten years. If the weapon is a destructive device, the minimum term of imprisonment is 30 years. In the case of a second or subsequent conviction under section Section 924(c), the minimum term of imprisonment is 25 years for a firearm and life for a destructive device.

## FACTS AND CIRCUMSTANCES

13.     The 2013 Boston Marathon, held on April 15, 2013, attracted runners and spectators from all over the United States and the world. At approximately 2:49 p.m. on April 15, 2013, while the Marathon was still underway, two explosions occurred on the north side of Boylston Street along the Marathon's final stretch. The first explosion occurred in front of 671 Boylston Street and the second occurred approximately one block away in front of 755 Boylston Street. The explosive devices were placed near the metal barriers where hundreds of spectators were watching runners approach the finish line. Each explosion killed at least one person, maimed, burned and wounded scores of others, and damaged public and private property, including the streets, sidewalk, barriers, and property owned by people and businesses in the locations where the explosions occurred. In total, three people were killed and over two hundred individuals were injured.

14.     The explosions had a substantial impact on interstate and foreign commerce. Among other things, they forced a premature end to the Marathon and the evacuation and temporary closure of numerous businesses along Boylston Street for several days.

5

DT-0000973

15.     Videotape footage and photographs taken from numerous surveillance cameras and citizen submissions following the explosions depict the two individuals who placed each of the devices that resulted in the explosions. The first man, whom I refer to in this affidavit as Bomber One, is a young male, wearing a dark-colored baseball cap, sunglasses, a white shirt, dark coat, and tan pants. The second man, whom I refer to in this affidavit as Bomber Two, is a young male, wearing a white baseball cap backwards, a gray hooded sweatshirt, a lightweight black jacket, and dark pants. Photographs provided from the Registry of Motor Vehicles and other attributable sources demonstrate that Bomber One is Tamerlan and Bomber Two is Dzhokhar.

16.     Videotape footage and photographs show Tamerlan and Dzhokhar walking and standing together along the route of the Marathon, each carrying a backpack. They also show Tamerlan in the vicinity of the first explosion and Dzhokhar in the vicinity of the second explosion.

17.     The images show that Dzhokhar dropped his backpack to the ground in the vicinity of the second blast and engaged in a brief telephone call. Immediately afterwards, the first explosion occurred. Dzhokhar then rapidly left the area without the knapsack that he brought, and within seconds, the second explosion occurred.

18.     Telephone records and telephone location information provided by T-Mobile show that a telephone subscribed to Dzhokhar was in contact with a telephone subscribed to Tamerlan immediately before the first explosion. Both phones were located near the Marathon finish line at the time of the two explosions. At approximately 5:00 p.m. on April 18, 2013, the FBI published video and photographic images of Bomber One and Bomber Two on its web site

DT-0000974

as the FBI had not yet identified these individuals as Tamerlan and Dzhokhar. Those images were widely rebroadcast by media outlets all over the country and the world.

19.   Near midnight on April 18, 2013, an individual reported to police that he had been carjacked at gunpoint in Boston, Massachusetts, and had just escaped. In sum and substance, the victim said that one of the carjackers entered his car, pointed a firearm at the victim and said something to the effect: "Did you hear about the Boston explosion?" and "We did that." The carjacker then forced the victim to drive to another location, while the second carjacker followed in a separate vehicle. In Watertown, the victim was ordered to pull the vehicle over, where they picked up the second carjacker. According to the victim, the two carjackers drove (with him in the car) to various locations in Cambridge and Watertown, Massachusetts, including to a bank where they used his ATM card and Personal Identification Number against his will to rob him of $800. The victim also said that the carjackers claimed to have just killed a police officer. Approximately forty-five minutes after carjacking the vehicle, the two carjackers stopped at a gas station on Memorial Drive in Cambridge, where the victim escaped and immediately contacted 911.

20.   A short time later, Watertown police officers located the carjacked vehicle and began following it. Tamerlan, who was driving the carjacked vehicle, got out of the car and began shooting a pistol at the police officers. Dzhokhar, who had driven a second vehicle to the scene, got out and joined Tamerlan. For nearly ten minutes, the brothers fired on the officers and threw several improvised explosives at them. Tamerlan eventually threw his pistol at an officer and began moving down the street towards other officers, who, together with the first officer, tackled him and tried to subdue him. While they did so, Dzhokhar re-entered the carjacked

7

DT-0000975

vehicle and drove directly at the police officers, ultimately striking Tamerlan and then a parked police cruiser. Dzhokhar drove a short distance, abandoned the vehicle, at some point smashed both his phones, and hid in a boat parked in a Watertown backyard until he was captured approximately eight hours later, after a massive manhunt. While Dzhokhar was hiding in the boat, he wrote a diatribe on inside walls of the boat in which he indicated that he and his brother carried out the Marathon bombings to punish the United States and its citizens for actions taken abroad in Muslim lands.

21.     The pistol Tamerlan threw at the officer was recovered and ballistics testing was done. The ballistics analysis revealed that the same pistol was used to shoot and kill a police officer at the Massachusetts Institute of Technology approximately one half hour before the carjacking.

### USE OF LOW-EXPLOSIVES

22.     A preliminary examination of the remains of the explosive devices that were used at the Boston Marathon revealed that they were low explosives that were housed in pressure cookers. Both pressure cookers were of the same brand. The pressure cookers also contained metallic ball bearings (BBs) and nails. Many of the BBs were contained within an adhesive material. Green-colored hobby fuse, along with electronic components, were recovered at the sites of the explosions. A preliminary examination of the remains of the explosive devices that were used at the Watertown shootout, as well as some intact explosive devices from that scene, also reveal that they were low explosives housed in containment vessels, including one that was housed in a pressure cooker of the same brand as the pressure cookers used at the Marathon.

23.     According to FBI explosives technicians who analyzed the remnants and residue

8

DT-0000976

of the explosions and the remaining intact devices, their construction is consistent with instructions that appear in the first issue of Inspire Magazine, a periodical published by Al Qaeda in the Arabian Peninsula. The two explosive devices used at the Marathon were triggered using components of remote-controlled toy vehicles, one of the methods recommended in the Inspire magazine article.

24.     All of the explosives used by the brothers contained a material consistent with a pyrotechnic mixture commonly found in the manufacture of commercially available fireworks. FBI bomb technicians estimate that both of the explosive devices used in the Boston Marathon bombings and the ones used in the Watertown shootout required a substantial amount of low-explosive powder.

25.     Records from a fireworks purveyor in Seabrook, New Hampshire reveal that Tamerlan purchased a large quantity of fireworks on or about February 20, 2013.

26.     On April 18, 2013, following the Marathon bombings and the FBI's publication of photographs of the suspected bombers, some of Dzhokhar's friends removed Dzhokhar's personal laptop computer, a Sony Vaio, from Dzhokhar's dormitory room at 7341 Pine Dale Hall at UMD and brought it to a residence at 69A Carriage Dr., New Bedford, Massachusetts, where it was later recovered by the FBI and searched pursuant to a warrant from this Court. The FBI conducted a preliminary forensic examination of the computer, which revealed that Dzhokhar used the laptop to communicate about violent jihad and to obtain documents and videos about it from a variety of known and unknown sources. Dzhokhar's laptop contains numerous issues of Inspire magazine. Among the issues of Inspire found on Dzhokhar's computer is the summer 2010 issue, which contains the article, "How to Make a Bomb in the Kitchen of Your Mom," an

9

DT-0000977

instruction manual for creating IEDs similar to those used by Dzhokhar and Tamerlan the week of April 15, 2013. The article includes instructions on how to open fireworks to obtain explosive powder, use small BBs and nails as shrapnel, and use pressure cookers and sections of pipe as vessels, as well as step-by-step instructions with accompanying pictures about how to construct these devices.

27.     Also found on Dzhokhar's laptop computer is the fall 2010 edition of Inspire, which Dzhokhar accessed on April 16, 2013, before he and Tamerlan carjacked a vehicle and engaged in a shootout with police in Watertown on April 18-19, 2013. The fall 2010 edition contains articles such as "What to Expect in Jihad" and "Tips for our brothers in the United States of America." It also includes the following passage in a section describing different options for engaging in violence:

> Another option for the individual jihad is the idea we proposed in "Make a bomb in the kitchen of your mom" [an article in issue number 1 of Inspire]. The pressurized cooker should be placed in a crowded place and left to blow up. More than one of these could be planted to explode at the same time. However, keep in mind that the shrapnel in this operation is short range, so the pressurized cooker or pipe should be placed close to the intended targets and should not be concealed from them by barriers such as walls.

28.     In addition to removing Dzhokhar's laptop computer from Dzhokhar's dormitory room, Dzhokhar's UMD friends also removed a backpack. According to the friends, the backpack contained several fireworks containers emptied of their explosive powder. The friends explained that they threw the backpack in the trash. The FBI searched the landfill to which the trash was taken, and on or about April 26, 2013, recovered a backpack matching the description given by Dzhokhar's friends. It contained, among other things, a UMD homework assignment for a class that Dzhokhar was taking as well as several emptied fireworks containers.

29.     From my training and experience, I know that individuals engaged in illegal

10

DT-0000978

explosives activity must engage in this activity in secret, often utilizing their residences for the production and concealment of explosives and explosive devices.

30.     I have been informed by FBI bomb technicians that low-explosive powder is a very fine particulate matter and the movement of a substantial amount of low-explosive powder would create powder residue in the area where the devices were assembled, such as on countertops or tables.  Residue can also be found long after the assembly process is completed in areas not cleaned thoroughly, such as under furniture or in hard to reach areas.  Furthermore, if the devices were stored in or around the Target Location and the Target Materials, low-explosive powder residue could likely be found in that location and on those materials.

## PRIOR SEARCH OF DZHOKHAR'S DORMITORY ROOM

31.     On April 21, 2013, the FBI searched Dzhokhar's dormitory room at 7341 Pine Dale Hall at UMD pursuant to a search warrant.  The FBI seized from his room, among other things, a large pyrotechnic (a stand-alone firework that consisted of a base and launch tube that stood several inches high), a black jacket and a white hat of the same general appearance as those worn by Bomber Two at the Boston Marathon on April 15, 2013, and BBs.  Laboratory analysis of the white hat has revealed traces of Dzhokhar's DNA.

32.     The pyrotechnic seized on April 21, 2013, was located on the window sill on Dzhokhar's side of the dormitory room.  Agents observed a reddish-brown powder on the window sill near the seized pyrotechnic, but did not seize it at that time.  Agents also observed, but did not seize, numerous personal possessions belonging to Dzhokhar.

33.     After the search of the dormitory room on April 21, 2013, UMD police changed the lock on the dormitory room door and have permitted no one to enter without a police escort.

11

DT-0000979

Since April 21, 2013, the dormitory room has been entered three times. On or about April 21, 2013, Dzhokhar's roommate was permitted to enter and retrieve his personal belongings. On or about May 31, 2013, UMD police entered the room, took photographs, and assessed the room's condition without disturbing its contents. On or about June 27, 2013, UMD police entered again and removed Dzhokhar's remaining personal property, which they considered to have been abandoned. (They also disposed of articles of food and liquid that had spoiled). Dzhokhar's personal property was cataloged and stored in the custody of UMD police and is in substantially the same condition now as when it was removed.

34.    Dzhokhar's property obtained from his dormitory room included the following:

    a.    A notebook labeled "Chem. Nutrition Dzhokhar"

    b.    A notebook with rust-colored exterior containing handwritten notes

    c.    An opened 10-pack of AAA batteries with 8 batteries remaining

    d.    A pair of black Ray Ban sunglasses

    e.    A yellow notebook bearing the name "Dzhokhar" containing handwritten chemistry notes.

    f.    Various boots and shoes

    g.    A black jacket with puffed horizontal ribbing

    h.    A black Nike backpack containing academic materials, including notebook, papers, calculator, and an implement designed to record presence at lectures

    i.    Two notebooks bearing the name "Timur Mugynov"

    j.    A copper-colored ball bearing (BB)/pellet found on the far right floor

    k.    A Massachusetts State Police accident form documenting a collision

DT-0000980

l.   A Gap store receipt

m.   Two empty glass jars sealed with metal tops containing strong odor of marijuana

n.   Correspondence related to a Progressive Insurance claim for event on January 28, 2013

o.   Cambridge Rindge and Latin High School identification card for Dzhokhar

p.   Masshealth card for Dzhokhar

q.   Gray plastic piece appearing to have been a component of an electronic remote control device

r.   Reddish-brown powder atop the window sill

s.   Various items of clothing

t.   Luggage

u.   Books and documents, including those about history, politics and religion

35.   UMD police officers collected these items, including a sample of the reddish-brown powder, in the presence of the FBI, whom they had invited into the room.

## EVIDENCE LIKELY TO BE OBTAINED DURING SEARCH

36.   I respectfully submit that the above listed facts demonstrate probable cause that Tamerlan and Dzhokhar carried out the bombings at the Boston Marathon on April 15, 2013. Moreover, I submit that there is probable cause to believe that additional evidence of these crimes will be found at the Target Location and among the Target Materials.

37.   Specifically, just as Dzhokhar's DNA was found on the white hat seized from his dormitory room during the April 21, 2013 search, there is probable cause to believe that

13

DT-0000981

Dzhokhar's fingerprints and DNA will be found on other surfaces in his abandoned dormitory room and on his personal possessions as well. In addition, in light of the fact that fireworks, fireworks containers and other remnants, and reddish-brown powder, have all been recovered from Dzhokhar's dormitory (or from a backpack that was taken from the room by his friends), there is also probable cause to believe that trace explosive evidence will be found in the room and in or on his personal belongings. Explosive residue may also have been transferred from other locations where Dzhokhar has traveled or otherwise been exposed. I therefore have probable cause to believe that collecting and forensically analyzing items among the Target Materials for trace, DNA, fingerprint and explosive transfer evidence will yield additional evidence of Dzhokhar's involvement in the crimes described above.

38.     Specifically as relates to explosives, based on my training and experience, and that of explosives experts, I know the following:

(a) Individuals engaged in illegal explosives activity must engage in this activity in secret, often utilizing their residences as a hub for communication and for the production and concealment of explosives and explosive devices.

(b) Individuals engaged in explosives activity, including the manufacture and use of explosives, maintain materials and equipment for constructing bombs and other explosive devices.

(c) Individuals who are engaged in the illegal use and production of explosives often maintain in their residences documents relating to or memorializing the ordering, purchasing, storage and transportation of explosives, including U.S. currency used in the purchase of explosives, personal telephone/address books and notes containing the names

14

and addresses and telephone numbers of other engaged in such illegal activity, telephone answering pads, bank and financial records, computers, computer equipment and computer disks (and their contents), mail envelopes and receipts, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, frequent flyer cards and statements, receipts and records, and storage records, such as storage locker receipts and safety deposit box rental records, and Federal Express or other shippers' records and receipts.

(d)  Individuals engaged in illegal explosives activity often maintain in their residences articles of personal property evidencing the existence of a conspiracy to engage in such activity, including personal address/telephone books, telephone bills, photographs, papers and documents consisting of lists of names and/or numbers.

(e)  Individuals engaged in illegal explosives activity often maintain in their residences articles of personal property evidencing the obtaining, secreting, transfer, expenditure and/or concealment of money and assets derived from or to be used in furtherance of illegal activities, including records, books, receipts, bank statements and records, business records, money drafts, money orders and cashier check receipts, vehicle titles, registrations, purchase documents, property deeds, escrow papers, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

(f)  Individuals engaged in illegal explosives activity often maintain in their residences documents and articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the locations to be searched or property therein, including keys, rental agreements and records, property acquisition

15

DT-0000983

records, utility and telephone bills and receipts, photographs, answering machines and tape records (and their contents), Rolodexes, telephone answering pads, storage records, vehicle and/or vessel records, mail envelopes and receipts, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card and bank records, and personal identification and travel documents.

(g)  Individuals engaged in illegal explosives activity often maintain in their residences safes, duffle bags, any type of cloth bag, gym bag, luggage, suitcases, plastic bags, zip-lock bags, and/or large cardboard boxes that can be used in the storage, transportation and delivery of explosives or other dangerous items.

## CONCLUSION

39.    Based on the information described above, I respectfully submit that there is probable cause to believe, and do in fact believe, that Tamerlan Tsarnaev and Dzhokhar Tsarnaev committed the crimes set forth in paragraph 4 above, and that evidence of those crimes can be found at the Target Location and among the Target Materials.  Accordingly, I respectfully request that a search warrant be issued for **Room 7341 of Pine Dale Hall at UMD (the "Target Location"),** and for the **Personal Property of Dzhokhar Tsarnaev Obtained from Room 7341 of Pine Dale Hall at University of Massachusetts at Dartmouth (UMD) and held in the custody of the UMD police (the "Target Materials"),** at the University of Massachusetts at

16

DT-0000984

Dartmouth, located at 285 Old Westport Road, North Dartmouth, Massachusetts.

Steven A. Kimball
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 24th day of July, 2013.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

17

DT-0000985

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The location to be searched is **Room 7341 of Pine Dale Hall** (the "Target Location") at the University of Massachusetts at Dartmouth, located at 285 Old Westport Road, North Dartmouth, Massachusetts.  Pine Dale Hall is a student residence located on the campus of the University of Massachusetts at Dartmouth.  Pine Dale Hall is a four-story brown building, which contains 208 double rooms and is equipped with two elevators for student use.  The words "Pine Dale Hall" are written in black letters above the doorway.

The room has been searched previously by the FBI and it has been secured by the University of Massachusetts at Dartmouth.

**ATTACHMENT B**

PREMISES TO BE SEARCHED

The location to be searched is the **Personal Property of Dzhokhar Tsarnaev Obtained from Room 7341 of Pine Dale Hall,** held at the University of Massachusetts at Dartmouth (UMD), in the custody of the UMD police (the "Target Materials"). UMD is located at 285 Old Westport Road, North Dartmouth, Massachusetts.

DT-0000987

**ATTACHMENT C**

ITEMS TO BE SEIZED

All evidence inside the premises of the Target Location relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S.C. § 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

1. Reddish-brown powder residue observed within the Target Location, including, but not limited to, the window sill and floor;

2. Blood, tissue, DNA, hair, fingerprints, bodily fluids, and explosive powder and small pellets or ball bearings (bbs).

## ATTACHMENT D

### ITEMS TO BE SEIZED

All evidence contained within the Target Materials relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S.C. § 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

1. Blood, tissue, DNA, hair, fingerprints, bodily fluids;
2. Fibers and other trace evidence;
3. Clothing;
4. Shoes and other footwear;
5. The specific items listed:

   a. A notebook labeled "Chem. Nutrition Dzhokhar";
   b. A notebook with rust-colored exterior containing handwritten notes;
   c. An opened 10-pack of AAA batteries with 8 batteries remaining
   d. A pair of black Ray Ban sunglasses;
   e. A yellow notebook bearing the name "Dzhokhar" containing handwritten Chemistry notes;
   f. Various boots and shoes;
   g. A black jacket with puffed horizontal ribbing;
   h. A black Nike backpack containing academic materials, including notebook, papers, calculator, and an implement designed to record presence at lectures;
   i. Two notebooks bearing the name "Timur Mugynov";
   j. A copper-colored ball bearing (BB)/pellet found on the far right floor;
   k. A Massachusetts State Police accident form documenting a collision;
   l. A Gap store receipt;
   m. Two empty glass jars sealed with metal tops containing strong odor of marijuana;
   n. Correspondence related to a Progressive Insurance claim for event on January 28, 2013;
   o. Cambridge Rindge and Latin High School identification card for Dzhokhar;
   p. Masshealth card for Dzhokhar;
   q. Gray plastic piece appearing to have been a component of an electronic

DT-0000989

remote control device;
r. Sample of reddish-brown powder seized from atop the window sill of Room 7341 Pine Dale Hall;
s. Various items of clothing;
t. Luggage;
u. Books and documents, including those about history, politics and religion;
6. Property, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of explosives;
7. Property, records, or other information related to the ordering and purchasing of pressure cooker devices, BBs, nails, and other small metallic objects;
8. Property, records, or information related to the Boston Marathon;
9. Property, records, or information related to any plans to initiate or carry out any other attacks inside or outside the United States, or any records or information related to any past attacks;
10. Property, records, or information related to the state of mind and/or motive of Tamerlan and Dzhokhar to undertake the Boston Marathon bombings;
11. Property, records, or other information related to the identity of Tamerlan and Dzhokhar;
12. Property, records, or other information related to the identity of any individuals who were in contact with, or were associates of Tamerlan and Dzhokhar;
13. Property, records, or information, related to any organization, entity, or individual in any way affiliated with Tamerlan and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein;
14. Property, records, or other information, related to Tamerlan's and/or Dzhokhar's schedule of travel or travel documents;
15. Property, records, or information related to any bank records, checks, credit card bills, account information, and other financial records;
16. Personal property, including articles of clothing, which could contain trace, DNA, explosives, blood or other evidence.
17. All digital evidence, as that term is used herein, means the following:

A. Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

DT-0000990

B. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

C. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

D. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

E. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

F. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

G. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

H. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software.