13-MJ-2103-MBB

## AFFIDAVIT OF SPECIAL AGENT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Gregory D. Squire, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HIS), assigned to the office of the Special Agent in Charge, Boston, Massachusetts, and have been employed as a Special Agent since 2007. As part of my daily duties as a Special Agent for ICE, I investigate criminal violations relating to child exploitation and child pornography, as well as other computer-based crimes. Based on my training and experience, I am familiar with how people, including those who commit crimes, use e-mail accounts and social media to plan, discuss, or commit their crimes.

2. I am currently participating in the investigation of the two explosions that occurred on April 15, 2013 in Boston during the Boston Marathon and a subsequent shootout that occurred on April 18-19, 2013 in Cambridge and Watertown, Massachusetts. I believe that the same individuals were involved in both the Marathon bombing and the shootout. I have probable cause to believe Tamerian Tsarnaev ("Tamerian") and Dzhokhar Tsarnaev ("Dzhokar") carried out the bombings at the Boston Marathon and other crimes described in greater detail below.

3. I am submitting this affidavit in support of an application for a warrant to search Yahoo! e-mail accounts **J.tsarnaev@yahoo.com** and **Tamerlan_tsarnaev@yahoo.com** ("the Subject Accounts"). I have probable cause to believe that the Subject Accounts contain evidence, fruits and instrumentalities of the commission of criminal offenses, including 18 U.S.C. §§ 2332a(a)(2)(d) (Using and Conspiring to Use A Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death), 2119

1

(Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Firearm During a Crime of Violence) and 371 (Conspiracy to Commit Offenses).

4.  Based on the e-mail addresses' domain name, I have probable cause to believe that the accounts and relevant data are maintained by Yahoo! which, government databases indicate, accepts service of process at:

> Yahoo!, Inc.
> 701 First Avenue
> Sunnyvale, CA   94089

as described in Attachment A.

5.  This affidavit is based upon information supplied to me by other law enforcement officers, including other special agents employed by the FBI, task force officers of the JTTF, and the state and local law enforcement personnel who are participating in the investigation of these events. It is also based upon my personal involvement in this investigation and on my training and experience.  In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

6.  The contents of the Subject Accounts were provided by Yahoo! earlier today on an emergency basis pursuant to the emergency authority in 18 U.S.C. §2702(b)(8).  I have seen a portion of these contents but have not relied on them in applying for this warrant.

### *STATUTORY BACKGROUND OF VIOLATIONS*

5.  Based on my training, experience, and discussions with the United States Attorney's Office for the District of Massachusetts, I have learned the following:

7.  Title 18, United States Code, Section 2332a provides that, "A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . .

2

against any person or property within the United States, and . . . the offense, or the results of the offense affect interstate or foreign commerce . . . and if death results, shall be punished by death or imprisoned for any terms of years or life." The term "weapon of mass destruction" is defined in 18 U.S.C. § 2332aI(2) and includes "any destructive device" as defined in 18 U.S.C. § 921(a)(4). Section 921 provides that bombs, grenades, rockets, mines and similar objects are destructive devices.

8. Title 18, United States Code, Section 844(i) makes unlawful malicious destruction of property by means of an explosive, and if death results, the violator shall be "subject to imprisonment for any term of years, or to the death penalty or to life imprisonment."

9. Title 18, United States Code, Section 1951 provides that anyone who interferes with commerce by threats or violence may be punished by up to twenty years imprisonment.

10. Title 18, United States Code, Section 924I makes unlawful the use or carrying of a firearm during and in relation to a crime of violence. If the weapon has been used, the term of imprisonment is not less than five years. If the weapon has been brandished, the term of imprisonment is not less than seven years. If the weapon has been discharged, the term of imprisonment is not less than ten years.

*PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

**A. The Boston Marathon Explosions**

11. The Boston Marathon is an annual race that attracts runners from all over the United States and the world. According to the Boston Athletic Association, which administers the Marathon, over 23,000 runners participated in this year's race. The race has a substantial impact on interstate and foreign commerce. For example, based on publicly available information, I believe that the runners and their families -- including those who travel to the Boston area from other

3

states and countries -- typically spend tens of millions of dollars each year at local area hotels, restaurants and shops, in the days before, during, and after the Marathon. In addition, a number of the restaurants and stores in the area near the finish line have special events for spectators.

12. The final stretch of the Boston Marathon runs eastward along the center of Boylston Street in Boston from Hereford Street to the finish line, which is located between Exeter and Dartmouth Streets. Low metal barriers line both edges of the street and separate the spectators from the runners. Many businesses line the streets of the Marathon route. In the area near the finish line, businesses are located on both sides of Boylston Street, including restaurants, a department store, a hotel and various retail stores.

13. On April 15, 2013, at approximately 2:49 p.m., while the Marathon was still underway, two explosions occurred on the north side of Boylston Street along the Marathon's final stretch. The first explosion occurred in front of 671 Boylston Street and the second occurred approximately one block away in front of 755 Boylston Street. The explosive devices were placed near the metal barriers where hundreds of spectators were watching runners approach the finish line. Each explosion killed at least one person, maimed, burned and wounded scores of others, and damaged public and private property, including the streets, sidewalk, barriers, and property owned by people and businesses in the locations where the explosions occurred. Surgeons removed BBs and nails and other shrapnel from the victims. Preliminary forensic review of the explosive devices has revealed that pressure cookers were used in the construction of the explosive devices. BBs and nails were also used in the construction of the explosive devices.

14. The explosions had a substantial impact on interstate and foreign commerce. Among other things, they forced a premature end to the race and the evacuation and temporary closure of numerous businesses along Boylston Street for several days after the race ended.

## B. Surveillance Evidence

15. I have reviewed videotape footage taken from a security camera located on Boylston Street near the corner of Boylston and Gloucester Streets. At approximately 2:38 p.m. (based on the video's duration and timing of the explosions) -- i.e., approximately 11 minutes before the first explosion -- two young men can be seen turning left (eastward) onto Boylston from Gloucester Street. Both men are carrying large knapsacks. The first man, who I refer to in this affidavit as the First Bomber, is a young, light-skinned male, wearing a dark-colored baseball cap, sunglasses, a white shirt, dark coat, and tan pants. The second man, who I refer to in this affidavit as the Second Bomber, is a young, light-skinned male, wearing a white baseball cap backwards, a gray hooded sweatshirt, a lightweight black jacket, and dark pants. As set forth below, there is probable cause to believe that the Bomber One is Tamerian Tsarnaev and Bomber Two is his brother, Dzhokhar Tsarnaev.

16. After turning onto Boylston Street, Bomber One and Bomber Two can be seen walking eastward along the north side of the sidewalk towards the Marathon finish line. Bomber One is in front and Bomber Two is a few feet behind him. Additional security camera video taken from a location further east on Boylston Street, as well as contemporaneous photographs taken from across the street, show the men continuing to walk together eastward along Boylston Street towards Fairfield Street.

17. I have also reviewed video footage taken from a security camera affixed above the doorway of the Forum Restaurant located at 755 Boylston Street, which was the site of the second explosion. This camera is located approximately midway between Fairfield and Exeter Streets and points in the direction of Fairfield. At approximately 2:41 p.m. (based on the video's duration and the timing of the explosions), Bomber One and Bomber Two can be seen standing

5

together approximately half a block from the restaurant.

18. At approximately 2:42 p.m. (i.e., approximately seven minutes before the first explosion), Bomber One can be seen detaching himself from the crowd and walking east on Boylston Street towards the Marathon finish line. Approximately 15 seconds later, he can be seen passing directly in front of the Forum Restaurant and continuing in the direction of the location where the first explosion occurred. His knapsack is still on his back.

19. At approximately 2:45 p.m., Bomber Two can be seen detaching himself from the crowd and walking east on Boylston Street toward the Marathon finishing line. He appears to have the thumb of his right hand hooked under the strap of his knapsack and a cell phone in his left hand. Approximately 15 seconds later, he can be seen stopping directly in front of the Forum Restaurant and standing at the metal barrier with his back to the camera, facing the runners. Approximately five seconds later, he can be seen slipping his knapsack onto the ground. A photograph taken from the opposite side of the street shows the knapsack on the ground at Bomber Two's feet.

20. The Forum Restaurant video shows that Bomber Two remained in the same spot for approximately four minutes, occasionally looking at his cell phone and once appearing to take a picture with it. At some point he appears to look at his phone, which is held at approximately waist level, and may be manipulating the phone. Approximately 30 seconds before the first explosion, he lifts his phone to his ear as if he is speaking on his cell phone, and keeps it there for approximately 18 seconds. A few seconds after he finishes the call, the large crowd of people around him can be seen reacting to the first explosion. Virtually every head turns to the east (towards the finish line) and stares in that direction in apparent bewilderment and alarm. Bomber Two, virtually alone among the individuals in front of the restaurant, appears calm. He glances to

the east and then calmly but rapidly begins moving to the west, away from the direction of the finish line. He is no longer wearing or carrying his knapsack. Approximately 10 seconds later, an explosion occurs in the spot where Bomber Two had placed his knapsack.

21. I have observed video and photographic footage of the spot where the second explosion occurred from a number of different viewpoints and angles, including from directly across the street. I can discern nothing in that spot in the period before the explosion that might have caused that explosion, other than Bomber Two's knapsack.

22. The explosions had a substantial impact on interstate and foreign commerce. Among other things, they forced a premature end to the race and the evacuation and temporary closure of numerous businesses along Boylston Street for several days after the race ended.

### C.  Photographic Identifications

23. I have compared a Massachusetts Registry of Motor Vehicles ("RMV") photograph of Dzhokhar A. Tsarnaev with photographic and video images of Bomber Two, and I believe, based on their close physical resemblance, there is probable cause that they are one and the same person. Similarly, I have compared an RMV photograph of Tamerian Tsarnaev with photographic and video images of Bomber One, and I likewise believe, based on their close physical resemblance, there is probable cause that they are the same person.

### D.  The Bombers Emerge

24. I base the information set forth in paragraphs 25 through 32 on information that has been provided to me by fellow law enforcement officers, including members of the JTTF and state and local law enforcement who responded to the crime scenes, as well as on publicly available information and media reports that I deem reliable.

25. At approximately 5:00 p.m. on April 18, 2013, the FBI published video and

7

photographic images of Bomber One and Bomber Two on its web site. Those images were widely rebroadcast by media outlets all over the country and the world.

26. At approximately 10:48 P.M. on April 18, 2013, at Massachusetts Institute of Technology ("MIT"), two men approached an MIT Police Officer and shot him dead.

27. A short time later -- at approximately 12:19 a.m. -- an individual hijacked a vehicle at gunpoint in Cambridge, MA. A victim of the carjacking was interviewed by law enforcement and provided the following information. The victim stated that while he was sitting in his car on a road in Cambridge, another car approached from the rear. A man exited, approached the victim's car, and brandished a gun. The man said words to the effect of, "Did you hear about the explosion?" and "I did that." The man removed the magazine from his gun and showed the victim that it had a bullet in it, then re-inserted the magazine.

28. The man with the gun then entered the victim's car and forced the victim to drive to another location, where they picked up a second man. The man with the gun and the second man spoke in a foreign language. One of the men took the victim's wallet and compelled the victim to give them his ATM password. They then drove to an ATM machine and extracted approximately forty-five dollars from the machine. The two men and the victim then drove to a gas station/convenience store in the vicinity of 816 Memorial Drive, Cambridge. The two men exited the vehicle, at which point the victim managed to escape.

29. I have reviewed images of two men taken at approximately 12:17AM by a security camera at the gas station/convenience store and, based on the men's close physical resemblance to RMV photos of Tamerin and Dzhokhar Tsarnaev, I believe the two men who carjacked and kidnapped the victim are Tamerin and Dzhokhar Tsarnaev.

30. A short time later, the stolen vehicle was located in Watertown, Massachusetts. A

8

gun fight ensued between the car's occupants and law enforcement agents who were pursuing them. As the men drove down Dexter Street in Watertown, they threw two small improvised explosive devices ("IEDs") out of the car. Police shot one of the men while he was in the vehicle. That man exited the vehicle and police shot him several more times. I have seen a photograph of the man who was shot, and I believe, while the man's face is disfigured in the photo, it matches the RMV photo of Tamerian Tsarnaev.

31. The second man, who was still in the stolen car, continued to drive away. Police pursued him, but by the time they reached the car, which was in a very poorly lit area, the man had abandoned it. That man remains at large.

32. Police have so far recovered five IEDs from the scene of the car chase. Three had already exploded and two had not. The remnants of at least one of the exploded IEDs indicates that the explosives had been contained in a pressure cooker. In addition, two intact pipe bombs were located and seized. The bombs were made of steel in 90 degree elbows containing internal plugs. The type of explosive is not yet known. The pipe bombs were located at 53 Laurel Street in Watertown.

### E. Identification of the Bombers

33. The man who was shot died at the scene and was taken to Beth Israel Hospital. FBI fingerprint analysis confirms that he is Tamerian Tsarnaev. Registry of Motor Vehicle records indicate that Tamerian Tsarnaev, whose RMV photograph is consistent with the appearance of the person described above as Bomber One, has a listed address of 410 Norfolk St., Apt. 3, Cambridge, MA 02139. Tamerian's date of birth is in 1986.

34. A publicly accessible database check of records related to Tamerian Tsarnaev also revealed a listed address of 410 Norfolk St., Apt. 3, Cambridge, MA. In the same database, a

Page 9

DT-0000127

query of other individuals residing at 410 Norfolk St., Apt. 3, Cambridge, MA, indicated that Dzhokhar Tsarnaev and others resided at apartment 3. An RMV photograph of Dzhokhar Tsarnaev is consistent with the appearance of Bomber Two. RMV records further indicate that he was born in 1993 and also resides at 410 Norfolk St., Apt. 3, Cambridge, MA. According to the Department of Homeland Security immigration records, Dzhokhar and Tamerian Tsarnaev are brothers. According to Department of Homeland Security, Tamerian Tsarnaev entered the United States on 7/19/2003 and appeared to be a Lawful Permanent Resident. Dzhokhar Tsaernaev entered the United States on April 12, 2002, and is a naturalized U.S. citizen. At that time, the father indicated that the family was ethnically Chechen. According to internet searches, Tamerian Tsarnaev appears on Youtube and other social media sites. Dhzokhar maintained a Facebook account under the name "Jahar Tsarnaev," and there are photos that resemble Dhzokhar on the site. On April 19, 203, a resident of the first floor of 410 Norfolk Street exited the residence as an FBI team approached the residence. The resident said that she recognized one of the residents of the third floor apartment as one of the individuals in the FBI-disseminated videos of the bombers at the Boston Marathon. The resident also said that she thought his name was something akin to (phonetically) Jhahar, and that she hasn't seen him for a few months. The resident said that his brother, who she called Tamarian lives there

### E. The E-mail Accounts

35.    The J.tsarnaev@yahoo.com e-mail account was used by Dzhokhar Tsarnaev to apply for FAFSA Federal student aid through the Department of Education for his schooling at UMass-Dartmouth, according to documents provided to law enforcement by the Department of Education. That application contains what I believe to be Dzhokhar's social security number and date of birth. As noted above, Dzokhar has used the name "Jahar Tsarnaev," which explains the

10

"J.tsarnaev" e-mail address.

36. The Tamerlan_tsarnaev@yahoo.com e-mail account was provided to law enforcement by Bunker Hill Community College. Tamerlan was a student a Bunker Hill Community College, and he used the Tamerlan_tsarnaev@yahoo.com in information that he provided to the college.

### PROBABLE CAUSE TO BELIEVE THAT THE ACCOUNTS CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

37. I also have probable cause to believe that the Subject Accounts and the data associated with those accounts contain evidence, fruits, and instrumentalities of the crimes identified above. I base this conclusion in part on my training and experience. I know that many people regularly use e-mail to provide contact information to others, as well as to discuss future plans and to make logistical arrangements. I also know, based on my training and experience, that many criminals use e-mail to plan and discuss their criminal schemes.

38. Furthermore, the characteristics of both Tamerlan and Dzhokhar Tsarnaev make it likely that the Subject Accounts contain evidence, fruits, and instrumentalities of the crimes identified above. It appears that both Tamerlan and Dzhokhar used social media. It appears that Tamerlan had a YouTube page containing several videos. It appears that Dzokhar has a Facebook page. Given their ages (19 for Dzokhar and 26 for Tamerlan), their use of social media, and the fact that they provided Yahoo! E-mail addresses to the Department of Education and Bunker Hill Community College, there is probable cause to believe that they used these e-mail accounts regularly, and that evidence of the crimes described in this affidavit would be found in them.

### TECHNICAL BACKGROUND

39. In my training and experience and through discussions with other agents, I have

11

learned that e-mail hosting companies, such as Yahoo!, maintain computer servers connected to the Internet. Their customers use those computers to send e-mail on the Internet.

40. Customers can access their accounts on the company's e-mail servers from any computer connected to the Internet.

41. Yahoo! has storage capacity that allows customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

42. E-mail providers also typically maintain electronic records relating to their customers. These records include account application information, account access information, and e-mail transaction information.

43. Some e-mail providers can also provide the following additional information associated with a subscriber's account: address books; buddy lists; photos, files, data, or other information; and World-Wide Web profiles or homepages.

## *LEGAL AUTHORITY*

44. The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

45. Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e-mail provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

46. If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A),

2703(c)(3).

### *REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBER(S)*

47.    I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise. I further request that, pursuant to 18 U.S.C. § 2705(b), the Court order Yahoo! not to notify any person (including the subscribers or customers to which the materials relate) of the existence of this application, the warrant, or the execution of the warrant unless and until authorized to do so by the Court. Such an order is justified because notification of the application, the warrant, or the execution of the warrant could seriously jeopardize the ongoing investigation by giving the subscriber an opportunity to destroy evidence, notify confederates, or flee from prosecution.

### *FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT*

48.    Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days (formerly 10 days) of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Yahoo! as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data. This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

49.    Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant. I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

50. The United States does not ask for this extra data or participate in its production

51. Should Yahoo! produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Yahoo! including subscriber, IP address, logging, and other transactional data, without a further order of the Court. This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit. However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

52. For these reasons, I request that the Court approve the procedures in Attachment B, which set forth these limitations.

## *CONCLUSION*

53. Based on the information described above, I have probable cause to believe that records and data from the Subject Accounts (as described in Attachment A), contain evidence, fruits, and instrumentalities of the crimes listed above (as described in Attachment B).

54. The procedures for copying and reviewing the relevant records are set out in Attachment B to the search warrant.

Respectfully submitted,

*[signature]*

Special Agent Gregory D. Squire
Immigration and Customs Enforcement

Subscribed and sworn to before me
on April 19, 2013
    Date

*[signature]* Marianne B. Bowler, USMJ
Hon. Marianne B. Bowler
UNITED STATES MAGISTRATE JUDGE

15