## AFFIDAVIT OF SPECIAL AGENT

I, Daniel R. Genck, being duly sworn, depose and state:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2009. I am currently assigned to one of the Boston Field Office's Counter-terrorism Squads. Among other things, I am responsible for conducting national security investigations of potential violations of federal criminal laws as a member of the Joint Terrorism Task Force ("JTTF"). During my tenure as an agent, I have participated in numerous national security investigations. I have received extensive training and experience in the conduct of national security investigations, and those matters involving domestic and international terrorism.

2. During my employment with the FBI, I have conducted and participated in many investigations involving violations of United States laws relating to the provision of material support to terrorism. I have participated in the execution of numerous federal search and arrest warrants in such investigations. I have had extensive training in many methods used to commit acts of terrorism contrary to United States law.

3. I am currently participating in the investigation of the two explosions that occurred on April 15, 2013 in Boston during the Boston Marathon and a subsequent shootout that occurred on April 18-19, 2013 in Cambridge and Watertown, Massachusetts. I believe that the same individuals were involved in both the Marathon bombing and the shootout. This affidavit is submitted in support of a search warrant for a black-colored **Sony Vaio laptop, bearing serial number 2752856393000903** ("the Target Computer"), retrieved from 69A Carriage Road, New Bedford, Massachusetts, as more particularly described in Attached A hereto, which is

incorporated herein by reference. The Target Computer is currently in the possession of the FBI. As set forth below, I have probable cause to believe that the Target Computer belongs to Dzhokhar Tsarnaev ("Dzhokhar"). Furthermore, I have probable cause to believe that Dzhokhar and Tamerlan Tsarnaev ("Tamerlan") carried out the bombings at the Boston Marathon and other crimes described in greater detail below. I also have probable cause to believe that the Target Computer contains evidence of the commission of criminal offenses, contraband, fruits of crime and things otherwise criminally possessed as well as property designed and intended for use, and that has been used, as a means of committing violations of 18 U.S.C. §§ 2332a(a)(2)(D) (Using and Conspiring to Use A Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Firearm During a Crime of Violence) and 371 (Conspiracy to Commit Offenses).

4. This affidavit is based upon my personal involvement in this investigation, my training and experience, my review of relevant evidence, and information supplied to me by other law enforcement officers. It does not include each and every fact known to me about the investigation, but rather only those facts that I believe are sufficient to establish the requisite probable cause.

## STATUTORY BACKGROUND OF VIOLATIONS

5. Based on my training, experience, and discussions with the United States Attorney's Office for the District of Massachusetts, I have learned the following:

6. Title 18, United States Code, Section 2332a provides that, "A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . .

Page 2

against any person or property within the United States, and . . . the offense, or the results of the offense affect interstate or foreign commerce . . . and if death results, shall be punished by death or imprisoned for any terms of years or life." The term "weapon of mass destruction" is defined in 18 U.S.C. § 2332a(c)(2) and includes "any destructive device" as defined in 18 U.S.C. § 921(a)(4). Section 921 provides that bombs, grenades, rockets, mines and similar objects are destructive devices.

7. Title 18, United States Code, Section 844(i) makes unlawful malicious destruction of property by means of an explosive, and if death results, the violator shall be "subject to imprisonment for any term of years, or to the death penalty or to life imprisonment."

8. Title 18, United States Code, Section 2119 provides that anyone who "with intent to cause death or serious bodily harm takes a motor vehicle" that has been shipped through interstate commerce by force or violence shall be punished by up to twenty-five years if serious bodily injury results.

9. Title 18, United States Code, Section 1951 provides that anyone who interferes with commerce by threats or violence may be punished by up to twenty years' imprisonment.

10. Title 18, United States Code, Section 924(c) makes unlawful the use or carrying of a firearm during and in relation to a crime of violence. If the weapon has been used, the term of imprisonment is not less than five years. If the weapon has been brandished, the term of imprisonment is not less than seven years. If the weapons have been discharged, the term of imprisonment is not less than ten years.

11. Title 18, United States Code, Section 371 makes it unlawful for two persons to conspire to commit an offense against the United States. Violations of Section 371 can result in a

Page 3

Exhibit D to Motion to Suppress Electronically Stored Information
Page 3

DT-0000327

sentence of imprisonment for up to five years.

## FACTS AND CIRCUMSTANCES

### A. The Boston Marathon Explosions

12. The Boston Marathon is an annual race that attracts runners from all over the United States and the world. According to the Boston Athletic Association, which administers the Marathon, over 23,000 runners participated in this year's race. The Marathon has a substantial impact on interstate and foreign commerce. For example, based on publicly available information, I believe that the runners and their families -- including those who travel to the Boston area from other states and countries -- typically spend tens of millions of dollars each year at local area hotels, restaurants and shops, in the days before, during, and after the Marathon. In addition, a number of the restaurants and stores in the area near the finish line have special events for spectators.

13. The final stretch of the Boston Marathon runs eastward along the center of Boylston Street in Boston from Hereford Street to the finish line, which is located between Exeter and Dartmouth Streets. Low metal barriers line both edges of the street and separate the spectators from the runners. Many businesses line the streets of the Marathon route. In the area near the finish line, businesses are located on both sides of Boylston Street, including restaurants, a department store, a hotel and various retail stores.

14. On April 15, 2013, at approximately 2:49 p.m., while the Marathon was still underway, two explosions occurred on the north side of Boylston Street along the Marathon's final stretch. The first explosion occurred in front of 671 Boylston Street and the second occurred approximately one block away in front of 755 Boylston Street. The explosive devices were

Page 4

placed near the metal barriers where hundreds of spectators were watching runners approach the finish line. Each explosion killed at least one person, maimed, burned and wounded scores of others, and damaged public and private property, including the streets, sidewalk, barriers, and property owned by people and businesses in the locations where the explosions occurred. In total, three people were killed and over two hundred individuals were injured.

15.  The explosions had a substantial impact on interstate and foreign commerce. Among other things, they forced a premature end to the Marathon and the evacuation and temporary closure of numerous businesses along Boylston Street for several days.

B.  Surveillance Evidence

16.  I have reviewed videotape footage taken from a security camera located on Boylston Street near the corner of Boylston and Gloucester Streets. At approximately 2:38 p.m. (based on the video's duration and timing of the explosions) -- i.e., approximately 11 minutes before the first explosion -- two young men can be seen turning left (eastward) onto Boylston from Gloucester Street. Both men are carrying large knapsacks. The first man, whom I refer to in this affidavit as Bomber One, is a young male, wearing a dark-colored baseball cap, sunglasses, a white shirt, dark coat, and tan pants. The second man, whom I refer to in this affidavit as Bomber Two, is a young male, wearing a white baseball cap backwards, a gray hooded sweatshirt, a lightweight black jacket, and dark pants. As set forth below, there is probable cause to believe that Bomber One is Tamerlan and Bomber Two is his brother, Dzhokhar.

17.  After turning onto Boylston Street, Bomber One and Bomber Two can be seen walking eastward along the north side of the sidewalk towards the Marathon finish line. Bomber One is in front and Bomber Two is a few feet behind him. Additional security camera video taken

from a location farther east on Boylston Street, as well as contemporaneous photographs taken from across the street, show the men continuing to walk together eastward along Boylston Street towards Fairfield Street.

18.  I have also reviewed video footage taken from a security camera affixed above the doorway of the Forum Restaurant located at 755 Boylston Street, which was the site of the second explosion. This camera is located approximately midway between Fairfield and Exeter Streets and points out in the direction of Boylston and is turned slightly towards Fairfield. At approximately 2:41 p.m. (based on the video's duration and the timing of the explosions), Bomber One and Bomber Two can be seen standing together approximately one half-block from the restaurant.

19.  At approximately 2:42 p.m. (i.e., approximately seven minutes before the first explosion), Bomber One can be seen detaching himself from the crowd and walking east on Boylston Street towards the Marathon finish line. Approximately 15 seconds later, he can be seen passing directly in front of the Forum Restaurant and continuing in the direction of the location where the first explosion occurred. His knapsack is still on his back.

20.  At approximately 2:45 p.m., Bomber Two can be seen detaching himself from the crowd and walking east on Boylston Street toward the Marathon finishing line. He appears to have the thumb of his right hand hooked under the strap of his knapsack and a cell phone in his left hand. Approximately 15 seconds later, he can be seen stopping directly in front of the Forum Restaurant and standing near the metal barrier among numerous spectators with his back to the camera, facing the runners. He then can be seen apparently slipping his knapsack onto the ground. A photograph taken from the opposite side of the street shows the knapsack on the

ground at Bomber Two's feet.

21. The Forum Restaurant video shows that Bomber Two remained in the same spot for approximately four minutes, occasionally looking at his cell phone and once appearing to take a picture with it. At some point he appears to look at his phone, which is held at approximately waist level, and may be manipulating the phone. Approximately 30 seconds before the first explosion, he lifts his phone to his ear as if he is speaking on his cell phone, and keeps it there for approximately 18 seconds. A few seconds after he finishes the call, the large crowd of people around him can be seen reacting to the first explosion. Virtually every head turns to the east (towards the finish line) and stares in that direction in apparent bewilderment and alarm. Bomber Two, virtually alone among the individuals in front of the restaurant, appears calm. He glances to the east and then calmly but rapidly begins moving to the west, away from the direction of the finish line. He walks away without his knapsack, having left it on the ground where he had been standing. Approximately 10 seconds later, an explosion occurs in the location where Bomber Two had placed his knapsack.

22. I have observed video and photographic footage of the location where the second explosion occurred from a number of different viewpoints and angles, including from directly across the street. I can discern nothing in that location in the period before the explosion that might have caused that explosion, other than Bomber Two's knapsack.

C. Photographic Identifications

23. I have compared a Massachusetts Registry of Motor Vehicles ("RMV") photograph of Dzhokhar with photographic and video images of Bomber Two, and I believe, based on their close physical resemblance, there is probable cause that they are one and the same person.

Similarly, I have compared an RMV photograph of Tamerlan with photographic and video images of Bomber One, and I likewise believe that they are one and the same person.

### D. The Bombers Emerge

24. I base the allegations set forth in paragraphs 25 through on information that has been provided to me by fellow law enforcement officers, including members of the JTTF and state and local law enforcement who responded to the crime scenes, as well as on publicly available information that I deem reliable.

25. At approximately 5:00 p.m. on April 18, 2013, the FBI published video and photographic images of Bomber One and Bomber Two on its web site. Those images were widely rebroadcast by media outlets all over the country and the world.

26. Near midnight on April 18, 2013, an individual carjacked a vehicle at gunpoint in Brighton, Massachusetts. A victim of the carjacking was interviewed by law enforcement and provided the following information. The victim stated that while he was sitting in his car at a parking lot in Brighton, a man approached and tapped on his passenger-side window. When the victim rolled down the window, the man reached in, opened the door, and entered the victim's vehicle. The man pointed a firearm at the victim and stated, "Did you hear about the Boston explosion?" and "I did that." The man removed the magazine from his gun and showed the victim that it had a bullet in it, and then re-inserted the magazine. The man then stated, "I am serious."

27. The man with the gun forced the victim to drive to another location, where they picked up a second man. The two men put something in the trunk of the victim's vehicle. The man with the gun took the victim's keys and sat in the driver's seat, while the victim moved to the front passenger seat. The second man entered the victim's vehicle and sat in the rear passenger

seat. The man with the gun and the second man spoke to each other in a foreign language.

28. While they were driving, the man with the gun demanded money from the victim, who gave the man 45 dollars. One of the men compelled the victim to hand over his ATM card and password. They then drove to an ATM machine and attempted to withdraw money from the victim's account. The two men and the victim then drove to a gas station/convenience store in the vicinity of 816 Memorial Drive, Cambridge. The two men got out of the car, at which point the victim managed to escape.

29. A short time later, the stolen vehicle was located by law enforcement in Watertown, Massachusetts. As the men drove down Dexter Street in Watertown, they threw at least two small improvised explosive devices ("IEDs") out of the car. A gun fight ensued between the car's occupants and law enforcement officers in which numerous shots were fired. One of the men was severely injured and remained at the scene; the other managed to escape in the car. That car was later found abandoned a short distance away, and an intact low-grade explosive device was discovered inside it. In addition, from the scene of the shootout on Laurel Street in Watertown, the FBI has recovered two unexploded IEDs, as well as the remnants of numerous exploded IEDs.

E. Identification of the Carjackers

30. I have reviewed images of two men taken at approximately 12:17 a.m. by a security camera at the ATM and the gas station/convenience store where the two carjackers drove with the victim in his car. Based on the men's close physical resemblance to RMV photos of Tamerlan and Dzhokhar, I believe the two men who carjacked, kidnapped, and robbed the victim are Tamerlan and Dzhokhar. In addition, the carjacker who was severely injured during the shoot-out in Watertown was taken to Beth Israel Hospital, where he was pronounced dead. FBI fingerprint

analysis confirms that he is Tamerlan Tsarnaev, and the man's face matches the RMV photograph of Tamerlan. RMV records indicate that Tamerlan and Dzhokhar share the same address on Norfolk Street in Cambridge, Massachusetts. According to Department of Homeland Security ("DHS") immigration records, Tamerlan and Dzhokhar are brothers. Tamerlan was a Lawful Permanent Resident. Dzhokhar entered the United States on April 12, 2002, and is a naturalized U.S. citizen.

### F. Preliminary Examination of the Explosives

31. A preliminary examination of the remains of the explosive devices that were used at the Boston Marathon revealed that they were low explosives that were housed in pressure cookers. Both pressure cookers were of the same brand. The pressure cookers also contained metallic BBs and nails. Many of the BBs were contained within an adhesive material. The explosives contained green-colored hobby fuse.

32. A preliminary examination of the explosive devices that were discovered at the scene of the shootout in Watertown and in the abandoned vehicle has revealed similarities to the explosives used at the Boston Marathon. The remnants of at least one of the exploded IEDs at the scene of the shootout indicate that a low explosive had been contained in a pressure cooker. The pressure cooker was of the same brand as the ones used in the Marathon explosions. The explosive also contained metallic BBs contained within an adhesive material as well as green-colored hobby fuse. The intact low-grade explosive device found in the abandoned car was in a plastic container and wrapped with green-colored hobby fuse.

### G. Dzhokhar is Located

33. On the evening of April 19, 2013, police investigation revealed that there was an

Page 10

individual in a covered boat located at 67 Franklin Street in Watertown. After a stand-off between the boat's occupant and the police involving gunfire, the individual was removed from the boat and searched. A University of Massachusetts at Dartmouth identification card, credit cards, and other forms of identification were found in his pockets. All of them identified the man as Dzhokhar. He had visible injuries, including apparent gunshot wounds to the head, neck, legs, and hand. Dzhokhar's wounds were triaged and he was brought to an area hospital, where he remains for medical treatment.

34. On April 21, 2013, the FBI searched Dzhokhar's dormitory room at 7341 Pine Dale Hall at the University of Massachusetts at Dartmouth, pursuant to a search warrant. The FBI seized from his room, among other things, a large pyrotechnic, a black jacket and a white hat of the same general appearance as those worn by Bomber Two at the Boston Marathon on April 15, 2013, and BBs.

H. Identification of the Target Computer

35. During the course of my investigation, I have learned that Dhzokhar is a student at the University of Massachusetts at Dartmouth, located at 285 Old Westport Road, North Dartmouth, Massachusetts. He was admitted as a mechanical engineering student in July 2011 and is listed as a member of the Class of 2015. Dzhokhar resides at 7341 Pine Dale Hall on the campus of the University of Massachusetts at Dartmouth.

36. In addition to reviewing University records, I have learned during the course of my investigation that Dhzokhar has an account with AT&T, Inc. ("AT&T"), in which he has four cellular telephones listed in his name. The cellular telephones are current and list an address of 69 Carriage Road, New Bedford, Massachusetts, which is located approximately three miles from the

University of Massachusetts at Dartmouth. During the course of this investigation, I have learned that Tamerlan and Dzhokhar purchased materials online which they used to manufacture the explosives used in the Marathon bombings. I also believe that the fireworks that were found near the laptop in Dzhokhar's dorm room may also have used in the construction of the explosives.

37. Through the course of the investigation, I have learned that one of the occupants of 69A Carriage Road is Individual A and that 69A is an apartment on the first floor of the building. Through records from DHS, I know that Individual A is a Kazakhstan national on an F-1 student visa, which has expired. Through a search of social media, I know that Individual A and Dhzokhar are friends, and Individual A has posted pictures of Dhzokhar and himself together on his website.

38. Based on exigent circumstances, law enforcement agents entered 69A Carriage Road on April 19, 2013 to conduct a protective sweep. Individual A was present, along with two other individuals. Following the sweep, Individual A was interviewed by law enforcement. In the interview, Individual A stated that he had seen and communicated with Dhzokhar in the days following the April 15, 2013 Marathon bombings, and even joked about Dhzokhar's resemblance to the widely broadcasted pictures of one of the suspects. Also during the interview, Individual A stated that on April 18, 2013, Individual A and associates went to Dhzokhar's dormitory room and took Dhzokhar's laptop. Although he initially indicated that they took the laptop as a joke, he later admitted that it was not taken as a joke. During the interview, Individual A also stated that he and associates went to Dhzokhar's dormitory room where they observed a backpack containing fireworks. Individual A stated to law enforcement that the fuses of the fireworks were intact, but the contents of the fireworks had been removed. Individual A took the backpack along with

Dhzokhar's laptop from the dormitory room to their residence at 69A Carriage Road. Individual A admitted the reason he did so was to protect Dhzokhar. Individual A stated that after a discussion with associates, Individual A placed the backpack with the fireworks into a black trash bag, along with ordinary household trash, and threw the bag in a garbage dumpster. Dhzokhar's laptop remained within the 69A Carriage Road apartment.

39. Individual A described Dhzokhar's laptop as black in color and "not a Mac," which I understand to mean that it is a Microsoft Windows-based laptop. Individual A and his associates also identified their own laptops as Apple computers which were in the apartment at 69A Carriage Road.

40. Following the interview, on April 19, 2013, Individual A and associates gave consent to search the apartment at 69A Carriage Road. During the consent search, law enforcement seized two Apple MacBook Air computers, as well as a black-colored **Sony Vaio laptop, bearing serial number 2752856393000903**, the Target Computer. The Target Computer matches the description provided by Individual A of Dhzokhar's laptop and that is currently in the possession of the FBI.

### PROBABLE CAUSE THAT THE TARGET COMPUTER CONTAINS EVIDENCE, FRUITS, OR INSTRUMENTALITIES

41. I have probable cause to believe that the Target Computer contains evidence, fruits, or instrumentalities of the crimes described above. Based on my training and experience, I know the Target Computer were abandoned by Tamerlan and/or Dzhokhar and are currently in the lawful possession of the FBI. They are likely to contain digital data of the type described in Attachment B. Therefore, while the FBI might already have all necessary authority to examine the Target Computer, I seek this additional warrant out of an abundance of caution to ensure that

Page 13

examination of the Target Computer will comply with the Fourth Amendment and other applicable laws. The Target Computer currently at the FBI is in substantially the same state as it was when it was seized from the apartment at 69A Carriage Road on April 19, 2013.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

42. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

43. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, computer-related documentation, and storage media. Some storage media, such as thumb drives, can be smaller than a stick of gum and can therefore be stored almost anywhere.

44. In this case, I have probable cause to believe that the Target Computer belongs to Dzhokhar, one of the Boston Marathon bombers. The Target Computer was taken from Dzhokar's dormitory room by Individual A and later seized by the FBI during a consent search of the apartment at 69A Carriage Road in New Bedford, Massachusetts.

45. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the

Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

46. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

Page 15

      a.    The volume of evidence — storage media such as hard disks, flash drives, CD-ROMs, and DVD-ROMs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

      b.    Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password-protected, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

47.    The Target Computer is currently in the possession of the FBI.

## CONCLUSION

48.    Based on the information described above, I have probable cause to believe that the **Sony Vaio laptop, bearing serial number 2752856393000903**, the Target Computer (as described in Attachment A), seized pursuant to a consent search of the apartment located at 69A Carriage Road, New Bedford, Massachusetts, belongs to Dzhokhar Tsarnaev, one of the Boston

Marathon bombers.   Furthermore, I have probable cause to believe the Target Computer contains evidence, fruits, and instrumentalities of the crimes listed above (as described in Attachment B).

Daniel R. Genck
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 23rd day of April 2013.

MARIANNE B. BOWLER USMJ
UNITED STATES MAGISTRATE JUDGE