## AFFIDAVIT OF SPECIAL AGENT

I, Steven A. Kimball, being duly sworn, depose and state:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2005.   I am currently assigned to one of the Boston Field Office's Counter-terrorism Squads.   Among other things, I am responsible for conducting national security investigations of potential violations of federal criminal laws as a member of the Joint Terrorism Task Force ("JTTF").   During my tenure as an agent, I have participated in numerous national security investigations.  I have received extensive training and experience in the conduct of national security investigations, and those matters involving domestic and international terrorism.

2.     During my employment with the FBI, I have conducted and participated in many investigations involving violations of United States laws relating to the provision of material support to terrorism.  I have participated in the execution of numerous federal search and arrest warrants in a variety of criminal investigations.  I have had extensive training in many methods used to commit acts of terrorism contrary to United States law.

3.     I am currently participating in the investigation of the two explosions that occurred on April 15, 2013 in Boston during the Boston Marathon and a subsequent carjacking and shootout that occurred on April 18-19, 2013 in Cambridge and Watertown, Massachusetts.  I believe that the same individuals, Tamerlan Tsarnaev ("Tamerlan") and his brother Dzhokhar Tsarnaev ("Dzhokhar"), were involved in the Marathon bombing, the carjacking, and the shootout.  Dzhokhar also uses the phonetic pronunciation of his name, Jahar, and both he and many of his friends refer to his name as being spelled as Jahar.  This affidavit is submitted in

1

support of search warrants for the **Electronic Mail and Social Media Accounts of Dzhokhar Tsarnaev** ("the Target Accounts"), including Google E-Mail Accounts **jahar1tsar@gmail.com** and **tsar1jahar@gmail.com**; Google+ (plus) Account **Jay Maister**; YouTube (owned by Google) Accounts **Jay Maister** and **straightborz**;Facebook Account User Profile Jahar Tsarnaev, ID **1450312685**; Instagram (owned by Facebook) Account **jmaister1**; Twitter Accounts **Al_FirdausiA** and **J_tsar**; and Skype (owned by Microsoft) Account **jahar8**, as more particularly described in Attachments A-F hereto, which are incorporated herein by reference.

4. Based on the Target Accounts' domain names, I have probable cause to believe that the accounts and relevant data are maintained variously by Google, Facebook, Twitter and Skype which, government databases indicate, accept service of process at:

> Google, Inc. and YouTube, 1600 Amphitheatre Parkway, Mountain View, California
>
> Facebook, Inc. and Instagram, Inc., 1601 Willow Park Road, Menlo Park, California.
>
> Twitter, Inc., 1355 Market Street, San Francisco, California
>
> Skype, Skype Communications Sarl, 23-29 Rives de Clausen, L-2165 Luxembourg, and has USA corporate headquarters at Skype Inc. North America, 3210 Porter Drive, Palo Alto, California

as described in Attachments A-F respectively. Only the warrants and attachments directed to each respective company will be served upon that company if the Court issues these warrants.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Tamerlan and Dzhokhar have committed numerous criminal offenses, in violation of 18 U.S.C. §§ 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an

2

Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Firearm During a Crime of Violence) and 371 (Conspiracy to Commit Offenses). There is also probable cause to believe that the information described in Attachments A-F contains evidence of these crimes as described in Attachments G-L.

6. On April 21, 2013, Dzhokhar was charged in a federal criminal complaint with violating 18 U.S.C. §§ 2332a(a)(2)(D) (Using and Conspiring to Use Weapons of Mass Destruction) and 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death). See *United States v. Dzhokhar Tsarnaev*, No. 13-MJ-2106 (MBB). On June 27, 2013, a federal grand jury handed up a thirty count federal Indictment charging Dzhokhar with violations of 18 U.S.C. § 2332a (Use of a Weapon of Mass Destruction and Conspiracy); 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of Property and Conspiracy); 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence); 18 U.S.C. § 924(j) (Use of a Firearm During and in Relation to a Crime of Violence Causing Death); 18 U.S.C. § 2119(2) (Carjacking Resulting in Serious Bodily Injury); 18 U.S.C. § 1951 (Interference With Commerce by Threats or Violence). See *United States v. Dzhokhar Tsarnaev*, No. 13-MJ-10200 (GAO). The facts alleged in the Indictment are incorporated herein by reference.

7. This affidavit is based upon information supplied to me by other law enforcement officers, including other special agents employed by the FBI, task force officers of the JTTF, and the state and local law enforcement personnel who are participating in the investigation of these events. It is also based upon my personal involvement in this investigation and on my training and experience. In submitting this affidavit, I have not included each and every fact known to

3

me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

## STATUTORY BACKGROUND OF VIOLATIONS

8.    Based on my training, experience, and discussions with the United States Attorney's Office for the District of Massachusetts, I have learned the following:

9.    Title 18, United States Code, Section 2332a provides that, "A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . against any person or property within the United States, and . . . the offense, or the results of the offense affect interstate or foreign commerce . . . and if death results, shall be punished by death or imprisonment for any terms of years or for life." The term "weapon of mass destruction" is defined in 18 U.S.C. § 2332a(c)(2) and includes "any destructive device" as defined in 18 U.S.C. § 921(a)(4). Section 921 provides that bombs, grenades, rockets, mines and similar objects are destructive devices.

10.    Title 18, United States Code, Section 844(i) makes unlawful malicious destruction of property by means of an explosive, and if death results, the violator shall be "subject to imprisonment for any term of years, or to the death penalty or to life imprisonment."

11.    Title 18, United States Code, Section 2119 provides that anyone who "with intent to cause death or serious bodily harm takes a motor vehicle" that has been shipped through interstate commerce by force or violence shall be punished by up to twenty-five years imprisonment if serious bodily injury results.

12.    Title 18, United States Code, Section 1951 provides that anyone who interferes with commerce by threats or violence may be punished by up to twenty years' imprisonment.

4

13.     Title 18, United States Code, Section 924(c) makes unlawful the use or carrying of a firearm during and in relation to a crime of violence.  If the weapon has been used, the term of imprisonment is not less than five years.  If the weapon has been brandished, the term of imprisonment is not less than seven years.  If the weapon has been discharged, the term of imprisonment is not less than ten years.

14.     Title 18, United States Code, Section 371 makes it unlawful for two or more persons to conspire to commit an offense against the United States.  Violations of Section 371 can result in a sentence of imprisonment of up to five years.

## FACTS AND CIRCUMSTANCES

### A.  The Boston Marathon Explosions

15.     The Boston Marathon is an annual race that attracts runners from all over the United States and the world.  According to the Boston Athletic Association, which administers the Marathon, over 23,000 runners participated in this year's race.  The Marathon has a substantial impact on interstate and foreign commerce.  For example, based on publicly available information, I believe that the runners and their families -- including those who travel to the Boston area from other states and countries -- typically spend tens of millions of dollars each year at local area hotels, restaurants and shops, in the days before, during, and after the Marathon.  In addition, a number of the restaurants and stores in the area near the finish line have special events for spectators.

16.     The final stretch of the Boston Marathon runs eastward along the center of Boylston Street in Boston from Hereford Street to the finish line, which is located between Exeter and Dartmouth Streets.  Low metal barriers line both edges of the street and separate the

5

DT-0000877

spectators from the runners. Many businesses line the streets of the Marathon route. In the area near the finish line, businesses are located on both sides of Boylston Street, including restaurants, a department store, a hotel and various retail stores.

17.     On April 15, 2013, at approximately 2:49 p.m., while the Marathon was still underway, two explosions occurred on the north side of Boylston Street along the Marathon's final stretch. The first explosion occurred in front of 671 Boylston Street and the second occurred approximately one block away in front of 755 Boylston Street. The explosive devices were placed near the metal barriers where hundreds of spectators were watching runners approach the finish line. Each explosion killed at least one person, maimed, burned and wounded scores of others, and damaged public and private property, including the streets, sidewalk, barriers, and property owned by people and businesses in the locations where the explosions occurred. In total, three people were killed and over two hundred individuals were injured.

18.     The explosions had a substantial impact on interstate and foreign commerce. Among other things, they forced a premature end to the Marathon and the evacuation and temporary closure of numerous businesses along Boylston Street for several days.

B. Surveillance Evidence

19.     I have reviewed videotape footage taken from a security camera located on Boylston Street near the corner of Boylston and Gloucester Streets. At approximately 2:38 p.m. (based on the video's duration and timing of the explosions) -- i.e., approximately 11 minutes before the first explosion -- two young men can be seen turning left (eastward) onto Boylston from Gloucester Street. Both men are carrying large knapsacks. The first man, whom I refer to

6

in this affidavit as Bomber One, is a young male, wearing a dark-colored baseball cap, sunglasses, a white shirt, dark coat, and tan pants. The second man, whom I refer to in this affidavit as Bomber Two, is a young male, wearing a white baseball cap backwards, a gray hooded sweatshirt, a lightweight black jacket, and dark pants. As set forth below, there is probable cause to believe that Bomber One is Tamerlan and Bomber Two is his brother, Dzhokhar.

20.     After turning onto Boylston Street, Bomber One and Bomber Two can be seen walking eastward along the north side of the sidewalk towards the Marathon finish line. Bomber One is in front and Bomber Two is a few feet behind him. Additional security camera video taken from a location farther east on Boylston Street, as well as contemporaneous photographs taken from across the street, show the men continuing to walk together eastward along Boylston Street towards Fairfield Street.

21.     I have also reviewed video footage taken from a security camera affixed above the doorway of the Forum Restaurant located at 755 Boylston Street, which was the site of the second explosion. This camera is located approximately midway between Fairfield and Exeter Streets and points out in the direction of Boylston and is turned slightly towards Fairfield. At approximately 2:41 p.m. (based on the video's duration and the timing of the explosions), Bomber One and Bomber Two can be seen standing together approximately one half-block from the restaurant.

22.     At approximately 2:42 p.m. (i.e., approximately seven minutes before the first explosion), Bomber One can be seen detaching himself from the crowd and walking east on Boylston Street towards the Marathon finish line. Approximately 15 seconds later, he can be

7

DT-0000879

seen passing directly in front of the Forum Restaurant and continuing in the direction of the location where the first explosion occurred. His knapsack is still on his back.

23.     At approximately 2:45 p.m., Bomber Two can be seen detaching himself from the crowd and walking east on Boylston Street toward the Marathon finishing line. He appears to have the thumb of his right hand hooked under the strap of his knapsack and a cell phone in his left hand. Approximately 15 seconds later, he can be seen stopping directly in front of the Forum Restaurant and standing near the metal barrier among numerous spectators with his back to the camera, facing the runners. He then can be seen apparently slipping his knapsack onto the ground. A photograph taken from the opposite side of the street shows the knapsack on the ground at Bomber Two's feet.

24.     The Forum Restaurant video shows that Bomber Two remained in the same spot for approximately four minutes, occasionally looking at his cell phone and once appearing to take a picture with it. At some point he appears to look at his phone, which is held at approximately waist level, and may be manipulating the phone. Approximately 30 seconds before the first explosion, he lifts his phone to his ear as if he is speaking on his cell phone, and keeps it there for approximately 18 seconds. A few seconds after he finishes the call, the large crowd of people around him can be seen reacting to the first explosion. Virtually every head turns to the east (towards the finish line) and stares in that direction in apparent bewilderment and alarm. Bomber Two, virtually alone among the individuals in front of the restaurant, appears calm. He glances to the east and then calmly but rapidly begins moving to the west, away from the direction of the finish line. He walks away without his knapsack, having left it on the ground where he had been standing. Approximately 10 seconds later, an explosion occurs in the

8

location where Bomber Two had placed his knapsack.

25.     I have observed video and photographic footage of the location where the second explosion occurred from a number of different viewpoints and angles, including from directly across the street. I can discern nothing in that location in the period before the explosion that might have caused that explosion, other than Bomber Two's knapsack.

### C. Photographic Identifications

26.     I have compared a Massachusetts Registry of Motor Vehicles ("RMV") photograph of Dzhokhar with photographic and video images of Bomber Two, and I believe, based on their close physical resemblance, there is probable cause that they are one and the same person. Similarly, I have compared an RMV photograph of Tamerlan with photographic and video images of Bomber One, and I likewise believe that they are one and the same person.

### D. The Bombers Emerge

27.     I base the allegations set forth in paragraphs 28 through 32 on information that has been provided to me by fellow law enforcement officers, including members of the JTTF and state and local law enforcement who responded to the crime scenes, as well as on publicly available information that I deem reliable.

28.     At approximately 5:00 p.m. on April 18, 2013, the FBI published video and photographic images of Bomber One and Bomber Two on its web site. Those images were widely rebroadcast by media outlets all over the country and the world.

29.     Near midnight on April 18, 2013, an individual carjacked a vehicle at gunpoint in Brighton, Massachusetts. A victim of the carjacking was interviewed by law enforcement and provided the following information. The victim stated that while he was sitting in his car in

9

Brighton, a man approached and tapped on his passenger-side window. When the victim rolled down the window, the man reached in, opened the door, and entered the victim's vehicle. The man pointed a firearm at the victim and stated, "Did you hear about the Boston explosion?" and "I did that." The man removed the magazine from his gun and showed the victim that it had a bullet in it, and then re-inserted the magazine. The man then stated, "I am serious."

30.     The man with the gun forced the victim to drive to another location, where they picked up a second man. The two men put something in the trunk of the victim's vehicle. The man with the gun took the victim's keys and sat in the driver's seat, while the victim moved to the front passenger seat. The second man entered the victim's vehicle and sat in the rear passenger seat. The man with the gun and the second man spoke to each other in a foreign language.

31.     While they were driving, the man with the gun demanded money from the victim, who gave the man 45 dollars. One of the men compelled the victim to hand over his ATM card and password. They then drove to an ATM machine and withdrew money from the victim's account. The two men and the victim then drove to a gas station/convenience store in the vicinity of 816 Memorial Drive, Cambridge. The two men got out of the car, at which point the victim managed to escape.

32.     A short time later, the stolen vehicle was located by law enforcement in the vicinity of Dexter Street in Watertown, Massachusetts. When they arrived, law enforcement observed that there was a second vehicle, a green Honda Civic, which accompanied the stolen vehicle. As a police car approached the stolen vehicle, the driver of the vehicle got out and began shooting a pistol at the police officer. A gun fight ensued between the two individuals

10

DT-0000882
913

who had been driving the stolen vehicle and the Honda Civic, and law enforcement officers. Numerous shots were fired. Several improvised explosives were also thrown by the men at the police officers. One of the men was severely injured and remained at the scene; the other managed to escape in the car, the stolen Mercedes. That Mercedes was later found abandoned a short distance away, and an intact low-explosive device was discovered inside it. In addition, from the scene of the shootout on Laurel Street in Watertown, the FBI has recovered two unexploded improvised explosive devices ("IEDs"), as well as the remnants of numerous exploded IEDs.

### E. Identification of the Carjackers

33.     I have reviewed images of two men taken at approximately 12:17 a.m. by a security camera at the ATM and the gas station/convenience store where the two carjackers drove with the victim in his car, a Mercedes. Based on the men's close physical resemblance to RMV photos of Tamerlan and Dzhokhar, I believe the two men who carjacked, kidnapped, and robbed the victim are Tamerlan and Dzhokhar. In addition, the carjacker who was severely injured during the shoot-out in Watertown was taken to Beth Israel Hospital, where he was pronounced dead. FBI fingerprint analysis confirms that he is Tamerlan, and the man's face matches the RMV photograph of Tamerlan. According to Department of Homeland Security immigration records, Tamerlan and Dzhokhar are brothers. Tamerlan was a Lawful Permanent Resident. Dzhokhar entered the United States on April 12, 2002, and is a naturalized U.S. citizen.

### F. Preliminary Examination of the Explosives

34.     A preliminary examination of the remains of the explosive devices that were used

11

DT-0000883
914

at the Boston Marathon revealed that they were low explosives that were housed in pressure cookers. Both pressure cookers were of the same brand. The pressure cookers also contained metallic BBs and nails. Many of the BBs were contained within an adhesive material. Green-colored hobby fuse was recovered at the sites of the explosions.

### G. Dzhokhar is Located

35. On the evening of April 19, 2013, police investigation revealed that there was an individual in a covered boat located at 67 Franklin Street in Watertown. After a stand-off between the boat's occupant and the police involving gunfire, the individual was removed from the boat and searched. A University of Massachusetts at Dartmouth identification card, credit cards, and other forms of identification were found in his pockets. All of them identified the man as Dzhokhar. He had visible injuries, including apparent gunshot wounds to the head, neck, legs, and hand. Dzhokhar's wounds were triaged and he was taken to an area hospital.

36. On April 21, 2013, the FBI searched Dzhokhar's dormitory room at 7341 Pine Dale Hall at the University of Massachusetts at Dartmouth, pursuant to a search warrant. The FBI seized from his room, among other things, a large pyrotechnic, a black jacket and a white hat of the same general appearance as those worn by Bomber Two at the Boston Marathon on April 15, 2013, and BBs.

### H. Dzhokhar's Laptop Computer and Yahoo! E-mail Account

37. During the course of this investigation, I have learned that Dzhokhar maintained and operated a number of e-mail and social media accounts, the Target Accounts, that he used to communicate with others about his and others' activities, beliefs, and intentions. I have also learned specifically that Dzhokhar and Tamerlan used social networking sites, including

12

DT-0000884

Instagram, Facebook, Twitter, YouTube, and vKontakte, a Russian social networking site, to post pictures and communicate with friends and associates. I believe that Dzhokhar used the Target Accounts, to self-radicalize, communicate with coconspirators, prepare for criminal activity, and conceal criminal activity. For example, I know that Dzhokhar used social media sites to communicate with Dias Kadyrbayev ("Kadyrbayev"), who was recently charged with conspiring to destroy evidence belonging to Dzhokhar in connection with the Marathon bombing and subsequent events. A forensic review of Kadyrbayev's phone and interview of Kadyrbayev have revealed that on April 18, 2013, Dzhokhar sent a text message to Kadyrbayev inviting him to take whatever he wanted from Dzhokhar's dormitory room, and Kadyrbayev immediately responded that they should continue the discussion on "vk", an abbreviation for vKontakte, the Russia-based social networking site. I also have learned that Kadyrbayev posted pictures of Dzhokhar and himself on his (Kadyrbayev's) social networking sites, but deleted some of the pictures following identification of Dzhokhar as one of the Marathon bombers.

38.     On April 18, 2013 Kadyrbayev took Dzhokhar's personal laptop computer, a Sony Vaio, from Dzhokhar's dormitory room and brought it to his own residence at 69A Carriage Dr., New Bedford, Massachusetts, where it was later recovered by the FBI. The FBI conducted a preliminary forensic examination of the computer, which revealed that Dzhokhar used the laptop to communicate about violent jihad and to obtain documents and videos about it from a variety of known and unknown sources. Other information on the computer distilled from metadata, Internet browsing history, and other locations of the computer's allocated and unallocated memory show that Dzhokhar was a prolific user of e-mail and social networking sites. Specifically, there are numerous hyperlinks in the stored Internet browsing history, other

13

DT-0000885

active space locations accessed by the computer's operating system, as well as within the unallocated space on the computer that demonstrate Dzhokhar used Facebook, Instagram, Twitter, Yahoo! and Skype Accounts, as well as other accounts.

39. In addition to revealing Dzhokhar's usage of social networking and e-mail sites, Dzhokhar's laptop computer contains numerous files pertaining to violent jihad, as well as metadata indicating that he accessed some of these shortly before and immediately after the Boston Marathon bombings. For example, Dzhokhar's laptop contains numerous issues of Inspire magazine, which is published on the Internet by Al Qa'ida in the Arabian Peninsula ("AQAP"). Inspire is a digital publication and therefore is distributed through Internet downloads, social media, and e-mail attachments. Inspire encourages terrorism and other acts such as those committed by Dzhokhar and Tamerlan. Among the issues of Inspire found on Dzhokhar's computer is the summer 2010 issue, which contains the article, "How to Make a Bomb in the Kitchen of Your Mom", an instruction manual for creating IEDs similar to those used by Dzhokhar and Tamerlan the week of April 15, 2013. The article includes instructions on how to open fireworks to obtain explosive powder, use small ball bearings (BBs) and nails as shrapnel, and use pressure cookers and sections of pipe as vessels, as well as step-by-step instructions with accompanying pictures about how to construct these devices. Forensic analysis of his computer shows that Dzhokhar accessed this file with an Internet browser on April 16, 2013.

40. Also found on Dzhokhar's laptop computer is the fall 2010 edition of Inspire, which Dzhokhar accessed on April 16, 2013, before he and Tamerlan carjacked a vehicle and engaged in a shootout with police in Watertown on April 18, 2013. The fall 2010 edition

14

DT-0000886

contains articles such as "What to Expect in Jihad" and "Tips for our brothers in the United States of America." It also includes the following passage in a section describing different options for engaging in violence:

> Another option for the individual jihad is the idea we proposed in "Make a bomb in the kitchen of your mom" [an article in issue number 1 of Inspire]. The pressurized cooker should be placed in a crowded place and left to blow up. More than one of these could be planted to explode at the same time. However, keep in mind that the shrapnel in this operation is short range, so the pressurized cooker or pipe should be placed close to the intended targets and should not be concealed from them by barriers such as walls.

41.     Dzhokhar's laptop computer also contains a file named "InspireJanuary2011.pdf," which is the winter 2010 issue of Inspire. This issue contains numerous articles related to violent jihad and the use of terrorist tactics against Western targets. The magazine references the status of the jihad in Chechnya, and contains articles with titles such as "Q&A with Shaykh Adil al-Abbab on targeting non-Muslim civilians and Yemeni soldiers,"[1] "Why did I choose al Qaeda?," and "Know that Jihad is your duty." In addition, referencing the first issue of Inspire magazine, Issue Four includes admonitions to utilize detection-avoidance techniques when attempting to contact the publishers on the Internet, including the use of encryption, the creation of specific e-mail accounts for such purposes, and other counter-surveillance tactics. In total, Dzhokhar's laptop contains seven separate issues of Inspire magazine.

42.     Dzhokhar's laptop computer also contains numerous videos of speeches made by Anwar al-Awlaki. Al-Awlaki, an American-born preacher, became the leader of AQAP before he was killed in Yemen in 2011. Tamerlan's wife, Katherine Tsarnaeva neé Russell, told investigators that Tamerlan and Dzhokhar had listened to Anwar al-Awlaki's lectures on many

---

[1] Al-Abbab is an AQAP senior official charged with instructing on *sharia* or Islamic law. In the article, Al-Abbab encouraged readers to support the mujahidin in any front of jihad.

15

occasions via YouTube, and had downloaded them. Dzhokhar's laptop computer also contained several links to YouTube videos.

43.    Dzhokhar's laptop also contains certain images which appear to have been designed to be distributed over the Internet. For example, there are at least two images of Dzhokhar that appear to have been taken from a camera connected to or part of his laptop computer, where he is posing in front of a black flag with the *shahada*[2] written in white Arabic letters, along with a sword. Similar flags have been used by terrorist groups such as Al Qa'ida as backdrops to video messages they have issued. Based on my training and experience, I believe there is probable cause that these images were designed to be used as profile images on social media websites or to be sent over the internet to convey Dzhokhar's support for violent jihad. Dzhokhar's laptop computer also contains thumbnails of several images suggesting that Dzhokhar viewed images sent to or downloaded by him for similar purposes. Likewise, Dzhokhar's laptop computer contains still images related to violent jihad, such as a promotional image that appeared in an issue of Inspire magazine that lionizes a group of terrorists entitled, "And Allah Selects the Martyrs, they only came to Journey to their Lord".

44.    Dzhokhar's laptop computer also contains numerous digital documents including religious justifications for engaging in violent jihad that were designed for distribution through methods such as e-mail and social networking. Many of these documents were published by At-Tibyan publications, which appears in the introductory banners to these documents. According to expert testimony presented in Federal District Court, I know that At-Tibyan publications was an Internet-based violent extremist discussion forum and a publication outlet for digital media

---

[2] The *shahada*, which literally means witness, or to give testimony, is also significant as the Islamic creed. The phrase roughly translates to "There is no god but God, and Muhammad is his prophet (messenger)." Among other functions, recitation of the *shahada* is typically required before a person can convert to the Islamic faith.

16

DT-0000888

related to violent extremism. At-Tibyan publications released many publications and videos related to Al Qa'ida, occasionally at the request of that organization. When it was active, At-Tibyan publications distributed publications and videos over the Internet to users who could download those items for personal use or for redistribution to others. Dzhokhar's laptop computer contained several files which appear to have been published by At-Tibyan publications, including:

<ol type="a">
<li>Jihad and the Effects of Intention Upon It (by Abdul-Qadir Ibn Abdil Aziz)</li>
<li>Advice Regarding Ubudiyyah (by Muhammad al-Maqdisi)[3]</li>
<li>Milaat Ibrahim (by Muhammad al-Maqdisi)</li>
<li>A Message to Every Youth (by Abdullah Azzam)[4]</li>
<li>The Slicing Sword Against Those Who Form Allegiances with the Disbelievers (by Abdallah ibn Abdalbari al Ahdal)</li>
</ol>

45.     In addition to documents published by At-Tibyan Publications and AQAP, Dzhokhar's computer contained additional videos and documents related to violent jihad from Anwar al Awlaki and Abdullah Azzam. Dzhokhar also created a collection of Arabic *nasheeds*, or devotional songs, with themes of jihad.

46.     Given that many of the files found on Dzhokhar's computer are routinely shared among users all over the world, I believe there is probable cause to believe that some or all of them were downloaded by Dzhokhar from the Internet using social media or obtained via e-mail.

47.     A search of Dzhokhar's Yahoo! account (j.tsarnaev@yahoo.com), which was authorized by this Court in 13-MJ-2103-MBB ("Yahoo! warrant"), has revealed that Dzhokhar was an avid user of e-mail and social media, and used these methods to communicate with his

---

[3] Muhammad al-Maqdisi is an influential writer who has been affiliated with a number of international terrorist organizations, including Al Qa'ida in Iraq, and who has provided religious justification to engage in violence as an appropriate exercise of jihad.
[4] Abdullah Azzam was one of the most influential writers on violent jihad in the modern era and formed an alliance with Osama bin Laden during the Soviet occupation of Afghanistan before he was killed.

17

DT-0000889

brother Tamerlan, as well as others. A public Internet search indicates that Tamerlan also had a YouTube page, under his own name, containing several videos.

48.     For example, on February 16, 2013, Tamerlan sent Dzhokhar an e-mail to his Yahoo! account that includes a message in a foreign language and a hyperlink to a YouTube video. The link leads to a video of an Arabic/English speaker dubbed in Russian. A rough translation of the title of the video is, "Umar al-Banna: I am sorry that the Ummah [Muslim world] is in decline."

49.     On March 21, 2013, Tamerlan sent Dzhokhar an e-mail to his Yahoo! account that includes a hyperlink to another YouTube video. The link leads to a video of a foreign language speaker that is not dubbed. A rough translation of the Russian title of the video is, "Another and another Muslim Kaffir [Infidel]!" The introduction of the video includes an introductory banner that reads "Imarat Kavkaz presents." Imarat Kavkaz, which roughly translates to the Caucusus Emirate, is an entity that claims sovereignty over a region in the Caucusus that includes Chechnya. The United States government has designated this group as a terrorist entity, namely, as an affiliate of Al Qa'ida.



18



52. Google is a multi-faceted technology company that also provides e-mail services. According to the results of the Yahoo! warrant, confirmation messages in the Yahoo! account show that Dzhokhar established at least two e-mail accounts with Google: the account **tsar1jahar@gmail.com,** which was established on or about March 11, 2013, the account **jahar1tsar@gmail.com,** which was established on February 4, 2013. Both of these accounts were established while Tamerlan and Dzhokhar were taking steps in furtherance of their plan to engage in a terrorist bombing campaign. For example, during this period, Tamerlan traveled to New Hampshire to buy low explosive powder and order electronic switching components over the Internet, and Dzhokhar rented 9mm handguns and purchased ammunition so that he and Tamerlan could engage in target practice at a New Hampshire shooting range. According to records provided by Twitter, the **tsar1jahar@gmail.com** account was the listed contact information for the user who established the **Al_FirdausiA** Twitter handle (another Target Account) on or about the same day, March 10, 2013. The Internet Protocol Address ("IP

19

Address") used by the person who established the **Al_FirdausiA** Twitter account resolves to the University of Massachusetts at Dartmouth, where Dzhokhar was enrolled at the time, and the Twitter IP access history for the account shows that it was also accessed from an IP address which, at the time, was assigned to Dzhokhar's residence at 410 Norfolk Street, Apartment 3, Cambridge, Massachusetts. The **Al_FirdausiA** Twitter account is described in further detail below.

ii. Google Accounts: Jay Maister

53.     YouTube is a wholly owned subsidiary of Google that provides Internet video sharing, commenting and social networking capabilities. Users of YouTube can download and upload videos and can indicate which videos they like, as well as post comments on the video content uploaded by others. YouTube can be accessed by any member of the public, although some features require a user to have a registered account with YouTube.

54.     A review of Dzhokhar's Yahoo! Account revealed that he had established a YouTube account using the Yahoo! account as his e-mail address. By providing this e-mail address, he ensured that when he would receive a courtesy email any time someone directed a message to his YouTube account. Dzhokhar's Yahoo! Account revealed that his YouTube user name was **Jay Maister** and that he used this account up until the day of the Boston Marathon Bombings. The Yahoo! account also contained e-mail messages from YouTube that show that Dzhokhar established and used a YouTube account under the name '**straightborz**' during the period August 2011 and October 2012. I have learned that Borz, in the Chechnyan language, means 'wolf', and is a title of respect.

55.     According to publicly available information on the YouTube website about **Jay**

20

DT-0000892

**Maister,** the account was established in 2007, and in or about February 2013, Dzhokhar uploaded a self-made video clip to YouTube in which he can clearly be seen repeatedly telling his niece to get out of his room. A black flag containing the *shahada* written in white is visible on the wall of the room, which appears to be Dzhokhar's former residence at 410 Norfolk Street, Apartment 3 in Cambridge, Massachusetts. A search of publicly available information on the YouTube website for **straightborz** yields the **Jay Maister** account as the responsive result. Dzhokhar used the **Jay Maister** account to indicate that he liked other videos, including an Arabic language *nasheed* (devotional song), videos on how to modify the security restrictions on the Apple iPhone, and at least two private videos. YouTube allows users to post private videos and engage in private messaging, i.e., to limit the exposure of videos and messages to selected individual users rather than to all members of the public. According to Google, YouTube integrates with another Google product, Google+ (plus), a social networking tool in which multiple Google services are consolidated and available to a user in a single place. According to a public Internet search, the **Jay Maister** YouTube account has been linked in this manner with the Google+ profile belonging to "Jay Maister", and the YouTube account is viewable on **Jay Maister's** Google+ page. According to an Internet search, the **Jay Maister** Google+ account is linked to the **Jay Maister/straightborz** YouTube Account and is identified as account number 113513584103150106087.



21

### iii. Facebook Account: "**Jahar Tsarnaev**", User Id 1450312685

57. Facebook is a social networking site that provides a variety of services. According to publicly available information on the Internet, Dzhokhar maintained a Facebook account under the name "**Jahar Tsarnaev**," and there were photos that resemble Dzhokhar on the site when the FBI searched the Internet for information about Dzhokhar on or about April 19, 2013.

58. According to records obtained from Facebook, the account with user name "**Jahar Tsarnaev**" has a corresponding user identification number **1450312685**, and the listed subscriber is Jahar Tsarnaev. Moreover, Facebook records reveal that the e-mail address associated with the Target Facebook Account is Dzhokhar's Yahoo! Account. IP records reveal that the Target Facebook Account was accessed from IP addresses that were assigned at the time to Dartmouth, Massachusetts and to Cambridge, Massachusetts, respectively. The user's profile was deactivated by the user on April 1, 2013, two weeks prior to the Boston Marathon bombings. According to Facebook, information from the account remains preserved.

59. According to information provided by Facebook, Dzhokhar posted pictures of himself, Tamerlan, and others on the Target Facebook Account. I also know that Dzhokhar posted updates about himself and Tamerlan, including Tamerlan's travel to Chechnya.

### iv. Instagram Account: **jmaister1**

60. During the course of this investigation, I have also learned that Dzhokhar

22

maintained and operated the Instagram account **jmaister1**, the Target Instagram Account.
Instagram, which is owned by Facebook, operates a social networking site that allows users to
share photographs, videos, and messages with other users and to post comments about other
users' photographs, videos, and messages. Instagram allows users to share content through
multiple social networking services, including Facebook, Twitter, and Flickr. Records from
Instagram reveal that the subscriber of the Target Instagram Account is listed as Jahar, which I
know to be a nickname used by Dzhokhar. **Jmaister1** is a phonetic variation of the above-
referenced YouTube user name of **Jay Maister**. The Target Instagram Account was created on
December 6, 2012, and is no longer active. According to the Facebook, information from this
account remains preserved.

61.     On April 25, 2013, FBI agents interviewed a another long-time friend of
Dzhokhar. The friend indicated that he has known Dzhokhar since grade school and that the two
attended high school together. The friend indicated that Dzhokhar called himself "Jahar". The
friend further stated that though he had not seen Dzhokhar in some time, he followed Dzhokhar's
Instagram site. The friend stated that Dzhokhar posted pictures and messages on the site.
Following the FBI's release of the video and photographic images of Bomber One and Bomber
Two, the friend went online in the early morning hours of April 19, 2013, but Dzhokhar's
Instagram site was no longer available. The friend could not remember the name of Dzhokhar's
Instagram account, but recalled that it started with the letter "j". I believe it is probable that the
site referred to by the friend is the Target Instagram Account.

62.     A review of past activity of the Target Instagram Account reveals that Dzhokhar
interacted with numerous individuals on Instagram who posted violent extremist and Chechen

23

separatist material. For example, Dzhokhar used the "Like" function on Instagram (commonly called "liked") to show support for several Chechen separatist images, including a photo of Shamil Basayev, one of the leaders of the Chechen rebel group that advocated violent jihad against the Russians. In addition, Dzhokhar also "liked" other pro-Chechen images which were referenced by organizational tags of "Free Chechnya", "Jihad" and "Jannah". In one case, when another Instagram user posted a disparaging picture of Chechnya, Dzhokhar posted a reply that stated, "pull that stick out of your ass."



### v. Twitter Accounts: **Al_FirdausiA** and **J_tsar**

64. A forensic review of Dzhokhar's laptop indicates that the computer was used to access the Twitter accounts **Al_FirdausiA** and **J_tsar**. As discussed above, Dzhokhar used Twitter accounts to engage in both private and public messaging. The public messages can be viewed by anyone on the Internet. A review of the public posts of the Target Twitter Accounts reveals that Dzhokhar used the accounts for different purposes. With the **Al_FirdausiA** account,

24

Dzhokhar attempted to conceal his identity, and he sent public messages referencing religion, the afterlife, and other messages that are consistent with radical religious beliefs. As described above, the **Al_FirdausiA** account was set up using the e-mail address **tsar1jahar@gmail.com**, another of the Target Accounts, on or about March 10, 2013. According to a review of publicly accessible information about the account, the user of **Al_FirdausiA** indicated that he was following the account **J_tsar**, Dzhokhar's other Target Twitter account. Conversely, the first follower of the **Al_FirdausiA** account is the Target Twitter Account **J_tsar**. The phrase "*Al Firdaus*" refers to the highest plane of paradise, or *Jannah*, achievable only by the most pious.

65. Dzhokhar gave his **Al_FirdausiA** account the title of "Ghuraba", which in Arabic refers to the word strangers. There is an avatar (symbol) set up by the user of the **Al_FirdausiA** account that is a unique piece of art called Circassian Community; it depicts a warrior, Arabic script of the *shahada*, and a hawk, along with the Ingushetia flag. Ingushetia is a neighboring territory to Chechnya and has been part of many of the anti-Russian alliances of the people of the Caucusus. The same graphic was located on Dzhokhar's laptop computer described above.

66. The **Al_FirdausiA** account contained many statements reflecting Dzhokhar's state of mind approximately one month prior to the Marathon bombings that I believe are related to the crimes listed above including the following:

  a. March 13, 2013: "It's our responsibility my brothers & sisters to ask Allah to ease the hardships of the oppressed and give us victory over kufr #islam #dua."

  b. March 10, 2013: "Guaraba, means strangers. Out here in the west, we should stand out among the nonbelievers as one body #islam [and] strive to be a better muslim, be greedy with your time, devote most of it to the Almighty for it is his satisfaction that you need #islam."

  c. March 10, 2013: "Listen to Anwar al Awlaki's (a shaheed iA) the here after

25

DT-0000897
928

series, you will gain an unbelievable amount of knowledge #islam #muslim [and] I want the highest levels of Jannah, I want to be able to see Allah every single day for that is the best of pleasures #islam #alfirdaus."

67.    With the **J_tsar** account, Dzhokhar engaged in all manner of communications, but included references to his identity as a Chechen, to Muslims who were dying overseas, and other topics. Dzhokhar titled the **J_tsar** Twitter Account with his own name, "Jahar", with a greeting Salam aleikum [peace be with you] and an avatar depicting what appears to be a lion. Dzhokhar used this account beginning at least in October 2011. Significantly, Dzhokhar used this account shortly after he had triggered the second blast at the Boston Marathon on April 15, 2013, including the following messages or "tweets" (among others) :

  a.  April 15, 2013: "Ain't no love in the heart of the city, stay safe people [and] There are people that know the truth but stay silent & there are people that speak the truth but we don't hear them cuz they're the minority."

  b.  April 16, 2013: "So then I says to him, I says, relax bro my beard is not loaded [and] Nowadays everybody wanna talk like they got something to say but nothing comes out when they move their lips; just a bunch of gibberish [and] I'm a stress free kind of guy."

68.    Prior to the Boston Marathon, the **J_tsar** account also contained many statements that I believe are related to the crimes listed above including the following:

  a.  March 28, 2013: "No one is really violent until they're with the homies."

  b.  January 7, 2013: "You can hit the gym all you want but if you're a coward at heart dudes will still step all over you."

  c.  December 24, 2012: "Brothers at the mosque either think I'm a convert or that I'm from Algeria or Syria, just the other day a guy asked me how I came to Islam."

  d.  December 23, 2012: "Beemr, Benz or Bentley? Honda, bro" (an apparent reference to the green Honda Civic that Dzhokhar drove).

  e.  November 28, 2012: "you guys know that the suicide rate for active duty

26

DT-0000898
929

American soldiers is at an all time high for 2012, a suicide a day, whats the #problem."

f. November 27, 2012: "Free Palestine."

g. May 5, 2012: "tat my name on you girl so I know it's real oh and make sure to spell it right, its spelled Dzhokhar."

h. April 29, 2012: "proud to be from #chechnya."

i. April 4, 2012: "how I miss my home land #dagestan #chechnya"

j. March 14, 2012: "sometimes you gotta follow in order to lead [and] a decade in america already, i want out [and] I hold my own I got that #chechnyanpower."

### vi. Skype Account: **jahar8**

69.     Dzhokhar had downloaded and used the Internet communication application, Skype, a company formerly based in Luxembourg that was bought by Microsoft in 2011. Skype permits users to engage in communication with other Skype and non-Skype users using a variety of digital devices, including computers, handheld devices, mobile phones, tablets, and virtually any other device that can maintain an Internet connection. Skype users can use voice-over Internet protocol ("VOIP") telephony communication to engage in audio and video chatting and conference call functions, as well as other forms of messaging, such as instant messaging and transfers of data files such as images and videos from one user to another.

70.     Skype maintains records related to the use of its various services such as when a conversation occurred. Skype also maintains records related to instant messaging conversations, and it permits users to store such data on their own electronic device. Skype records indicate that the account **jahar8** was subscribed to "Dzhokhar Tsarnaev". A review of Dzhokhar's laptop computer indicates that a Skype profile was created called **jahar8** on September 12, 2011, using

27

DT-0000899

the e-mail address of his Yahoo! Account. The previous court-authorized search of the Yahoo! Account indicates that on September 12, 2011, the Yahoo! Account received a confirmation e-mail that a new Skype account, **jahar8**, had been established. E-mails in the Yahoo! Account dated February 1, 2013, and October 4, 2012, indicate that "Dzhokhar Tsarnaev" purchased Skype-out credits on those dates, which are the credits used by Skype users to contact non-Skype telephony facilities, such as foreign telephone numbers that require a toll.

71.    A review of Skype records on Dzhokhar's laptop computer confirms that a number of telephone calls were made using the Skype Account. According to the stored Skype records, Dzhokhar placed a call to user "awliya1500" on March 8, 2012, and placed or received six calls with user "umarovjunes" on July 8-9, 2012. According to Skype records, user account awliya1500 was registered to Tamerlan. On October 4, 2012, the day Dzhokhar bought Skype-out credits, he appears to have tested the credits by placing two calls to his own mobile phone number ending in -5112. He, then placed a call to a telephone number that starts with the international code for Russia. The same number was called by Dzhokhar using the **jahar8** account fifteen (15) times between October 2012 and February 1, 2013.

72.    Dzhokhar's laptop computer also contains some of the instant messages sent to and from the **jahar8** Skype account. Approximately 220 messages were recovered from the laptop computer, some of which contain the content of the messages. In those private messages, Dzhokhar discusses all sorts of topics, such as when to meet with one of his college friends to smoke marijuana, and discussions of girls and relationships. Some of the communications, however, are not available on the computer. One of the messages from **jahar8** to **jahar8** on March 1, 2012, states "Salam aleikum Tamerlan", indicating that Tamerlan also used the **jahar8**

28

account, and the two bombers communicated with each other using the **jahar8** account.

73.     Given the above-listed facts, I submit that there is probable cause to believe that the communications, photographs, videos, and messages posted by and to Dzhokhar through the Target Accounts will reveal and relate to Dzhokhar's state of mind, motives, whereabouts, activities, interests, and travel, which will constitute evidence of Dzhokhar's involvement in the crimes set forth in paragraph five. The photographs, videos, and messages posted by Dzhokhar through the Target Accounts may also reveal planning, coordination, and communication with other conspirators about the Boston Marathon bombings. Finally, the photographs, videos, and messages posted by Dzhokhar through the Target Accounts may reveal efforts by Dzhokhar to obstruct justice or evade capture in the wake of the Boston Marathon bombings. Accordingly, I request a search warrant for the Target Accounts.

## BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL

74.     I have received training related to computer systems and the use of computers during criminal investigations. Based on my education, training and experience, and information provided to me by other law enforcement agents, I know the following:

   a.   The Internet is a worldwide computer network that connects computers and
        allows communications and the transfer of data and information across state
        and national boundaries. The term "computer", as used herein, is defined in
        18 U.S.C. § 1030(e)(1) and includes an electronic, magnetic, optical,
        electrochemical, or other high speed data processing device performing
        logical, arithmetic, or storage functions, and includes any data storage facility
        or communications facility directly related to or operating in conjunction
        with such device. A computer user accesses the Internet through a computer
        network or an Internet Service Provider (ISP). An Internet Protocol (IP)
        address is assigned to provide a unique identifying number that identifies the
        location from which a computer or other electronic device accesses the
        Internet.

   b.   E-mail, or electronic mail, is a popular method of sending messages and files

29

between computer users. When a computer user sends an e-mail, it is created on the sender's computer, transmitted to the mail server of the sender's e-mail service providers, then transmitted to the mail server of the recipient's e-mail service provider, and eventually transmitted to the recipient's computer. A server is a computer attached to a dedicated network that serves many users. Copies of e-mails are usually maintained on the recipient's e-mail server, and in some cases are maintained on the sender's e-mail server.

    c.   Social Networking also known as Social Media sites are a popular method of using the Internet to engage with multiple individuals within a user's social groups. Many social media sites allow a user to post messages, videos, music, photographs, or other media that can be distributed to many other pre-designated individuals within one or more of a user's social group(s), and in some cases to be accessible to the public. This content usually includes user's profile as well lists of social contacts, and media and messages which indicate a user's interests and activities, their beliefs about various topics, their whereabouts and social relationships. In many cases, social networking sites permit 'private messaging' or targeted messages that can function like e-mail or instant messaging and are not viewable to those who are not designated recipients of the messages. Social media hosting sites typically maintain the contents of the user profile, communications, and any media associated with the user's account on the social media provider's servers. Social networking is growing around the world, and is already used extensively by youth, in some cases serving as their primary means of communication with friends and/or family.

### Use of E-mails and Social Media for Illegal Purposes

    75.    Based on my training and experience, and information provided to me by other law enforcement agents, I know the following: First, searches of e-mail and social media accounts usually provide information that helps identify the user(s) of the accounts. This phenomenon has been already observed during the course of this investigation. Second, individuals who use the Internet in connection with criminal activity, or activity of questionable legality, are frequently required to set up e-mail or social media accounts to engage in the activity, and they often set up several different e-mail accounts for that purpose. This is often part of an effort to maintain anonymity and to separate personal communications from

Exhibit F to Motion to Suppress Electronically Stored Information
Page 30

DT-0000902

communications and information that is related to the criminal activity. This phenomenon has been already observed during the course of this investigation. Third, a search of an e-mail or social media account that is predicated on a specific violation often uncovers evidence of other violations of a similar nature. This phenomenon has been already observed during the course of this investigation. Fourth, it is common that users of one Yahoo or Google account also maintain and use alternate e-mail accounts. This phenomenon has been already observed during the course of this investigation, and by the user of the Target Accounts. Finally, when the criminal violation involves a conspiracy, a search of an e-mail account often results in the identification of co-conspirators. In the instant case, the search of the Target Accounts may result in the identification of additional co-conspirators and accomplices who were also involved, or provided assistance in the bombing or escape of Tamerlan and Dzhokhar, or of those who may have attempted to obstruct the FBI's investigation into Tamerlan and Dzhokhar's activities.

76.    I know that people who engage in conspiracies involving terrorism often use multiple means of communication in order to evade surveillance and to participate in the criminal conspiracy. With respect to the use of electronic communications over the Internet, I know that individuals participating in terrorism conspiracies frequently use numerous techniques to evade such detection, such as the use of anonymous e-mail addresses, encryption, anonymizing proxy-servers and other technical and non-technical counter-surveillance efforts. Such techniques are encouraged by organizations such as Al Qa'ida. Instructions on how to engage in Internet counter-surveillance measures have been located in issues of Inspire magazine found in this investigation on the laptop computers of Tamerlan and Dzhokhar, and such behaviors have been exhibited by several individuals throughout the investigation. The Inspire

31

DT-0000903

magazine article found on Tamerlan and Dzhokhar's computers specifically instructs that *mujahideen* [holy warriors] should create alternate non-public e-mail addresses and to use multiple methods of communication using proxies. I am aware, based on my training and experience, that terrorists frequently use multiple e-mail addresses and other social networking tools in order to communicate with each other.

77. I also know that in many terrorism investigations, including this one, given the political motive for these activities, evidence of an individual's actual path of ideological radicalization, and their beliefs and actions in conformity with a particular belief system, is valuable evidence of motive and state of mind. I know that in criminal investigations, such evidence is likely to be located through careful review of electronic communications and digital forensic exploitation of digital media used by individuals knowledgeable about the criminal conspiracy. In this case, Dzhokhar and Tamerlan each maintained multiple e-mail and social media accounts and used their computers to view, obtain and disseminate media related to violent jihad. Based on evidence obtained thus far in the investigation, the apparent motives for the commission of the Boston Marathon bombing and the crimes that followed was likely related to Tamerlan and Dzhokhar's desires to participate in violent jihad. Dzhokhar may have used the Target Accounts to communicate with Tamerlan and/or others about their motives at some point prior to or after the Boston Marathon bombings.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

78. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google (including YouTube), Facebook (including Instagram), Twitter and Skype to

32

DT-0000904

disclose to the Government copies of the records and other information (including the content of communications where available) particularly described in Section I of Attachments G-L. Upon receipt of the information described in Section I of Attachments G-L, Government-authorized persons will review that information to locate the items described in Section II of Attachments G-L.

## CONCLUSION

79. Based on the forgoing, I request that the Court issue the proposed search warrants.

80. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. See 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

81. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING AND PRECLUDE NOTICE TO THE SUBSCRIBER

82. I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise. I further request that, pursuant to 18 U.S.C. § 2705(b), the Court order Facebook not to notify any person of the existence of this application, the warrant, or the execution of the warrant unless and until authorized to do so by the Court. Such an order is justified because notification of the application, the warrant, or the execution of the warrant could seriously jeopardize the ongoing

33

DT-0000905

investigation, some aspects of which are neither public nor known to all of the targets of the

investigation.

Steven A. Kimball
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 3rd day of July, 2013.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

34

DT-0000906