```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
          v.                )    Crim. No.13-10200-GAO
                            )
DZHOKHAR A. TSARNAEV,       )
          Defendant         )
```

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
CONCERNING ALLEGED "LEAKS" AND PUBLIC COMMENTS BY LAW ENFORCEMENT**

The United States of America, by and through its undersigned counsel, respectfully opposes defendant Dzhokhar Tsarnaev's motion concerning alleged "leaks" and public comments by law enforcement.

**INTRODUCTION**

Tsarnaev committed one of the most serious terrorist attacks on American soil since September 11. From the start, press interest in the attacks has been commensurate with the enormity of the crimes. The recent one-year anniversary of the attacks prompted a new spate of articles and television programs about them. Tsarnaev claims that some of these articles and programs contain information newly "leaked" by law enforcement officers involved in the investigation and prosecution of the case. He also claims that government personnel involved in the case have made prejudicial comments about him or the evidence. As shown below, he is mistaken on both counts.

The prosecution team has scrupulously avoided releasing any non-public information about this case to the press. As Tsarnaev

acknowledges, the government also has repeatedly reminded law enforcement officers, both orally and in writing, of their duty to avoid public disclosure of investigative materials.  Despite Tsarnaev's claim to the contrary, there have been no "leaks" whatsoever of grand jury material; that is simply reckless speculation by Tsarnaev unsupported even by specific allegations.

Virtually all of the alleged "leaks" Tsarnaev complains of in his motion fall into one of three categories: information that was public to begin with (e.g., photos given to the press by eyewitnesses); information created by the producers of television programs for dramatic effect; and information that was released by the government in the days immediately following the bombings for legitimate public safety purposes.  These non-"leaks" of information plainly do not warrant a hearing, let alone any form of relief.

The comments by former law enforcement officials of which Tsarnaev complains likewise do not merit any form of relief. Tsarnaev's chief quarrel seems to be with Richard DesLauriers, former Special Agent-in-Charge of the FBI's Boston Division, and Stephanie Douglas, former Executive Assistant Director of the FBI's National Security Branch, who appeared on two television programs that aired on or near the anniversary of the Marathon bombings (namely, a National Geographic special and a Sixty Minutes episode).  Tsarnaev

characterizes these individuals as "law enforcement agents" and argues that they gave "emotional descriptions and opinions" of "the alleged evidence and the defendant." (Deft. Mot. at 5). Tsarnaev claims that their comments violate 28 C.F.R. 50.2(b), which are "guidelines for all personnel of the Department of Justice" concerning the disclosure of information in criminal cases. (Deft. Mot. at 6-7).

But Tsarnaev's argument completely disregards the fact that neither Mr. DesLauriers nor Ms. Douglas were "personnel of the Department of Justice" when they recorded their television appearances. Mr. DesLauriers and Ms. Douglas both retired in July 2013 and were private citizens when they made their remarks. More important, neither commented on the evidence in a manner prejudicial to Tsarnaev. Both mainly recounted the events that led up to the identification of a person wearing a white hat as one of the bombing suspects and the subsequent release of photos of this suspect to the public. Neither of them commented on the investigation after that point -- yet it was only after that point that the individual wearing the white hat was identified as Tsarnaev. Similarly, both also talked about the emotions they experienced while watching a videotape of the second bomb exploding; but neither of them expressed any opinions about Tsarnaev's guilt or innocence, or the strength of the evidence against him. In short, even had Mr. DesLauriers or Ms.

Douglas been "personnel of the Department of Justice" at the time they made their remarks, it is doubtful that those remarks would have violated DOJ guidelines, let alone prejudiced Tsarnaev.

**ARGUMENT**

Tsarnaev cites four specific news reports (in four numbered paragraphs) that he mistakenly claims are "recent media release[s] of non-public, investigative information" or contain inappropriate comments by "personnel of the Department of Justice." (Deft. Mot. at 2). We address each of them in turn.

1.  In this paragraph, Tsarnaev complains that a National Geographic "docudrama" prominently "featured previously-undisclosed video footage showing 'white hat' (identified as Mr. Tsarnaev) in the Marathon crowd, talking on a phone, and putting a backpack on the ground." (Deft. Mot. at 2-3). This video footage was not "leaked" by the government. In fact, the government had never seen it before it appeared in the National Geographic special. It appears to be a dramatization staged with actors by the show's producers. Mr. DesLauriers' comment that the video is "dramatic and tragic" and "brought tears to our eyes each time we watched it" must therefore refer to some other video, most likely the Forum Restaurant surveillance video ("Forum video") described in detail in the Complaint, which shows the explosion that killed Martin Richard and Lingzi Lu. Even assuming Mr. DesLauriers

4

had been a government employee when he made those comments, they are not the kind of prejudicial commentary on the evidence or the defendant prohibited by 28 C.F.R. § 50.2.  It is not as if Mr. DesLauriers said, "Looking at the Forum Restaurant video, I personally am convinced that the man who detonated the bomb is Dzhokhar Tsarnaev."  Mr. DesLauriers did not even mention Tsarnaev.  He merely made the rather unremarkable observation that watching a video of a child and a young woman being killed by a bomb is an emotional experience.

  Tsarnaev also complains that the National Geographic story disclosed "photographs of evidence collection activities at the bombing scene that had not been previously been made public."  To the best of the government's knowledge, these video segments are also staged dramatizations that contain no footage "leaked" by the government.

  2. This paragraph complains about evidence shown or discussed in a segment of the CBS news show "Sixty Minutes."  Tsarnaev first complains that the show features a photograph depicting "white hat" at the Marathon standing behind a line of children.  This photo was not "leaked" by the government.  To the best of the government's knowledge, it was taken by a member of the public and given to Fox News's local Boston affiliate, which broadcast it on its own initiative on April 18, 2013, at approximately 4:30 p.m.  All Mr.

DesLauriers says about the photo is, "I can see the subject who has been charged and people who were grievously injured." Although the government agrees that the first part of this remark would arguably have been contrary to 28 C.F.R. 50.2(b)(2) if Mr. DesLauriers had been a DOJ employee when he made it, the comment essentially just repeats an allegation of the Complaint and therefore is not substantially prejudicial. Ms. Douglas's comments on the photo, which reference only incontrovertible facts (namely, the presence in the photo of a backpack and of Martin Richard), are even more innocuous. See 28 C.F.R. 50.2(b) ("Disclosures should include only incontrovertible, factual matters.").

Tsarnaev also complains about Ms. Douglas's description of the Forum video, which has never been made public. But her description of it is identical to the description in the Complaint and thus disclosed no non-public information. Finally, Tsarnaev complains that "[c]lips show the collection of evidence, as well as close-ups of specific items of evidence." The items of evidence in question are remnants of the bombs used at the Marathon (e.g., batteries, wires, pressure cooker parts) and of the backpacks in which they were carried. All of those images became public on April 16, 2013 -- the day after the bombings -- before Tsarnaev was even a suspect. Publication of those photos at that time served an important public safety purpose: it prompted leads from members of the public who

6

recognized some of the items and notified law enforcement of their likely origins.

Finally, Mr. DesLauriers' comment that Tsarnaev "smirked" at his arraignment merely repeats an observation made by many eyewitnesses and reported by dozens of news outlets at the time. The comment was unnecessary, but Mr. DesLauriers' one-voice-among-many hardly threatens Tsarnaev's right to a fair trial.

3. This paragraph complains about an ABC news article concerning "an analysis of the bombs done by the FBI technicians at the Terrorist Explosive Device Analytical Center (TEDAC) in Quantico, Virginia in late April 2013." The article states that the TEDAC analysis "found that the bombs in Boston had a much more sophisticated design than in the online magazine [i.e. Inspire], including difference in the initiators, power source and switch trigger, which utilized a toy car remote control."

Once again, this article does not reflect a recent "leak" of information and is not an instance of unfair pretrial publicity. TEDAC's mission, as set forth on its website, is to "coordinate[] the efforts of the entire government, from law enforcement to intelligence to military, to gather and share intelligence about these devices [i.e. terrorist improvised explosive devices or IEDs] -- helping to disarm and disrupt IEDs, link them to their makers,

and most importantly, to prevent future attacks."[1]  The TEDAC report referenced in the article was prepared in the days after the attack and made available to hundreds of law enforcement and intelligence agencies for the protection of individuals all over the world.  Given the TEDAC report's wide distribution, news articles about it began appearing as early as 11 days after the bombing.[2]  The reference to it in the April 15, 2014 ABC news article thus is not a "recent media release of non-public, investigative information," as Tsarnaev claims in his motion.  (Deft. Mot. at 2).

Tsarnaev's main complaint in this paragraph seems to be that he has not received the TEDAC report in discovery.  The reason for that has to do with TEDAC's mission.  The FBI Laboratory is (at least in this case) the chief source of forensic evidence that the government intends to offer at trial.  FBI Laboratory scientists have analyzed the bombs, reconstructed them, written reports, and will testify about their findings at trial.  All FBI Laboratory reports are being produced to the defense as they are finalized.  Although TEDAC is physically located at the FBI Laboratory at Quantico, it is not primarily a law enforcement component of that agency; rather, again

---

[1] http://www.fbi.gov/about-us/lab/terrorist-explosive-device-analytical-center-tedac/tedac

[2] See e.g., http://investigations.nbcnews.com/_news/2013/04/26/17932143-exclusive-government-doc-shows-how-closely-boston-marathon-bombers-followed-al-qaeda-plans.

according to its web site, it is "a collaborative, multi-agency, single-point advanced IED analytical center . . . [that] is able to identify actionable intelligence, make associations between devices, and communicate findings to a broad customer base consisting of state and local law enforcement, the U.S. military, the intelligence community, and partner nations." TEDAC's purpose in preparing its report was to quickly alert members of the law enforcement and intelligence communities worldwide about the nature of the Marathon bombs; it was not to produce forensic evidence for use in this case.

4. This paragraph complains about an April 17, 2014 ABC News report that includes a purported image of a portion of the note Tsarnaev wrote on the inside of the boat where he was found hiding in Watertown. The report does not "source" the photo, and the government is still researching its origin and authenticity. Assuming the photo is genuine, it is possible a law enforcement officer could have disclosed it, but that is not certain; for several days after the Watertown shoot-out, the boat was in a semi-public space where it might have been photographed by individuals not associated with this investigation; and since that time, the defense team itself has inspected the boat and was permitted to photograph it. In any event, because the boat statement itself is quoted extensively in the Indictment, the disclosure of a portion of the

9

statement in a photograph is not a "recent media release of non-public" information, nor is it substantially prejudicial.

In sum, Tsarnaev is simply wrong when he claims that "leaks of investigative materials continue seemingly unabated." (Deft. Mot. at 5). The recent news reports of which he complains contain video footage created by television producers, information that was made public in court filings, or information that became public long ago and served legitimate public safety purposes. The "leaks" of grand jury information that he speculates may have occurred are non-existent and not even described with sufficient particularity to permit investigation. Finally, "the emotional descriptions and opinions of law enforcement regarding the alleged evidence and the defendant" of which he complains were neither overly emotional nor made by current law enforcement agents. Tsarnaev has established no need for a hearing, let alone a factual or legal basis for a court order or contempt finding. His motion should therefore be denied.

## CONCLUSION

The government is fully aware of the DOJ guidelines respecting disclosure of non-public information and has done its utmost to respect them. It will continue to do so. It has also taken reasonable steps to ensure that members of the law enforcement community involved in this case are aware of the guidelines and respect them. It would be unfair, however, to hold the government

accountable for the actions of private citizens, reporters, media outlets, or others whom it cannot control.  Accordingly, the government respectfully requests that the Court deny Tsarnaev's motion in its entirety.