UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Crim. No.13-10200-GAO** |
| | ) | **(Leave to file granted on 05/21/14 and** |
| **DZHOKHAR A. TSARNAEV,** | ) | **05/22/14)** |
| **Defendant** | ) | |
| | ) | **UNDER SEAL** |

### GOVERNMENT'S OPPOSITION TO
### DEFENDANT'S MOTION TO SUPRESS STATEMENTS

The United States of America, by and through its undersigned counsel, respectfully opposes

the motion of defendant, Dzhokhar Tsarnaev ("Tsarnaev"), to suppress statements he made to FBI

agents at Beth Israel Deaconess Medical Center ("Beth Israel"). As grounds for this opposition, the

government states the following.

Tsarnaev committed one of the most sophisticated and successful terrorist attacks on

American soil since September 11, 2001. The attacks began with the deadly bombing of individuals

at an iconic American event on April 15, 2013, and continued with additional bomb attacks on law

enforcement officers on April 18 and 19, 2013. The circumstances of these crimes gave law

enforcement strong reason to believe that the public was at risk from additional bombs, bombers, or

bomb plots. In light of the history of coordinated terrorist attacks (and planned attacks) such as the

ones in Mumbai, India, Times Square, the New York subway system, and on September 11, the FBI

had a duty to be absolutely sure that no additional attacks were imminent. Interviewing Tsarnaev as

soon as possible was therefore essential to protect the public from possible harm.

The fact that Tsarnaev was in the hospital recovering from bullet wounds does not mean the

interview was coercive or that the agents who conducted it did anything wrong. As Justice

Kennedy has explained, "There is no rule against interrogating suspects who are in anguish and

pain. The police may have legitimate reasons, borne of exigency, to question a person who is

suffering or in distress. Locating the victim of a kidnaping, ascertaining the whereabouts of a dangerous assailant or accomplice, or determining whether there is a rogue police officer at large are some examples." Chavez v. Martinez, 538 U.S. 760, 796 (2003) (Kennedy, J., concurring in part and dissenting in part). The question is always whether the police took actions that they "may not take if the prohibition against the use of coercion to elicit a statement is to be respected." Id. at 797. Because the agents in this case did not coerce Tsarnaev into making statements against his will, his statements were "voluntary" for Fifth Amendment purposes. And because the government does not intend to use his statements in its case-in-chief, the Miranda and Edwards issues are moot. Accordingly, the motion to suppress should be denied.

## INTRODUCTION

On April 15, 2013, Tsarnaev and his brother Tamerlan detonated two powerful, remote-controlled pressure-cooker bombs seconds apart along the final stretch of the Boston Marathon, killing a little boy and two young women and maiming and injuring approximately 260 others. The bombings were one of the bloodiest terrorist attacks ever against American civilians and drew worldwide attention.

After detonating the bombs, both Tsarnaevs escaped and remained at large until the night of April 18, 2013, when they ambushed and executed an MIT police officer. Then they violently carjacked, kidnaped, and robbed a civilian before fleeing to Watertown, where police finally caught up with them. During a fierce confrontation, they fired numerous gunshots and hurled several additional bombs at the police. Tsarnaev eventually returned to the vehicle he had helped carjack, deliberately drove at top speed toward a group of police officers, ran over his brother before police could drag him to safety, crashed through a police barricade, and escaped. He eluded a massive police manhunt for approximately 20 hours before officers found him hiding in a drydocked boat and arrested him. (His brother died on the way to the hospital.)

2

A.  Basis for reasonable belief that there was an imminent danger to public
    safety

The facts known to law enforcement at the time they interviewed Tsarnaev provided reason

to believe that the Tsarnaevs had accomplices and might have built additional bombs that posed a

continuing danger to public safety:

- The Tsarnaevs had access to a small arsenal of bombs. They used two of them at the
  Marathon and several days later used four more in Watertown. They also indicated to the
  man they carjacked that they planned to travel to New York to explode additional bombs.
  These facts suggested the existence of a larger plot to wage a multi-pronged attack on
  different cities, as well as the possible existence of yet more unused bombs and other
  bombers waiting to pick up where the Tsarnaevs had left off.

- Of the two remote-control detonators used during the Marathon bombings, only one was
  recovered, suggesting that the Tsarnaevs (or someone else) had retained the other one for
  possible use with additional bombs.

- During the week of April 15, 2013, police received multiple reports from people in the
  Boston area of suspicious objects that might be bombs. Although none of those reports
  proved accurate, they heightened police concern about the existence of additional bombs.

- The Marathon bombs were constructed using improvised fuses made from Christmas lights
  and improvised, remote-control detonators fashioned from model car parts. These relatively
  sophisticated devices would have been difficult for the Tsarnaevs to fabricate successfully
  without training or assistance from others.

- The Tsarnaevs also appeared to have crushed and emptied hundreds of individual fireworks
  containing black powder in order to obtain explosive fuel for the bombs. The black powder
  used in fireworks is extremely fine; it was therefore reasonable to expect that if the
  Tsarnaevs had crushed the fireworks and built the bombs all by themselves, traces of black
  powder would be found wherever they had done the work. Yet searches of the Tsarnaevs'
  residences, three vehicles, and other locations associated with them yielded virtually no
  traces of black powder, again strongly suggesting that others had built, or at least helped the
  Tsarnaevs build, the bombs, and thus might have built more.

- For years after September 11, 2001, one of Al-Q'aeda's chief goals was to carry out another
  high-profile, spectacular attack on the United States. The spectacular nature and devastating
  carnage of Tsarnaev's attack -- which targeted a high-profile, iconic American event, and
  was followed by the execution of a police officer in Cambridge and the attempted murder of
  other police officers in Watertown -- suggested that it might have been planned, directed,
  and even assisted by a terrorist group.

- The note Tsarnaev wrote in pencil on the inside of the boat where he was found hiding
  underscored the possible involvement of a terrorist group. Tsarnaev wrote:

> I'm jealous of my brother who ha[s] [re]ceived the reward of jannutul Firdaus (inshallah) before me. I do not mourn because his soul is very much alive. God has a plan for each person. Mine was to hide in this boat and shed some light on our actions. I ask Allah to make me a shahied (iA) to allow me to return to him and be among all the righteous people in the highest levels of heaven. He who Allah guides no one can misguide. A[llah Ak]bar!
>
> The US Government is killing our innocent civilians but most of you already know that. As a [UI] I can't stand to see such evil go unpunished, we Muslims are one body, you hurt one you hurt us all. Well at least that's how muhhammad (pbuh) wanted it to be [for]ever, the ummah is beginning to rise/[UI] has awoken the mujahideen, know you are fighting men who look into the barrel of your gun and see heaven, now how can you compete with that. We are promised victory and we will surely get it. Now I don't like killing innocent people it is forbidden in Islam but due to said [UI] it is allowed. All credit goes [UI].
>
> Stop killing our innocent people and we will stop.

This writing, which bears hallmarks of al-Q'aeda-inspired rhetoric, suggested that Tsarnaev might have received instruction from a terrorist group. In addition, the fact that Tsarnaev used the word "we" (i.e. "We are promised victory and we shall surely get it") suggested that others might be poised to commit similar attacks and that Tsarnaev was urging them on.

- Before hiding in the boat, Tsarnaev smashed both of his cell phones to avoid being located through them. One of them appeared to be a "burner" phone: it contained a SIM card purchased the day before the Marathon and was used by Tsarnaev on April 15 to coordinate the attacks with his brother. These basic elements of apparent terrorist tradecraft provided additional grounds for believing that Tsarnaev had received training and direction from a terrorist group.

In short, the facts and circumstances known to law enforcement at the time they interviewed

Tsarnaev provided ample reason to believe that the Tsarnaevs did not act alone; that others might

have radicalized them, directed them, trained them, assisted them, and/or concealed them; and that

these others might be planning or poised to carry out additional attacks. Finding out if there were

other bombs, other bombers, or others plotting similar and coordinated attacks was a public safety

matter of the utmost urgency.

4

B.      Tsarnaev's physical and mental condition during questioning

Following Tsarnaev's arrest he was taken directly by ambulance to Beth Israel hospital in

Boston.  He arrived at approximately 9:00 p.m.  According to medical records, he was awake, alert,

and conversing fluently both during the ambulance ride and at Beth Israel.  He had no internal

injuries, and his psychological condition appeared normal.  Shortly after his arrival, his mental

status began to decline and he was intubated, but after receiving a single unit of blood he quickly

stabilized.  He was given pain medication, examined by various doctors, and then transferred to the

operating room for treatment of multiple gunshot wounds.  He underwent surgery to repair his

wounds, which was successful.

On April 20, 2013, at approximately 5:00 a.m., Tsarnaev was transferred to the surgical

intensive care unit to begin his recovery.  He spent the next 14 hours sleeping, resting, and receiving

care.  By 6:30 p.m., according to a note in his chart, he had been weaned off propofol, a short-acting

sedative that normally wears off quickly, and was receiving only Fentanyl for pain.  At 11:30 p.m.

that night, the Fentanyl was discontinued, and Tsarnaev was given Dilaudid as needed for pain.  At

6:00 a.m. the next morning, a nurse noted on Tsarnaev's chart, "Pain adequately controlled with low

doses of Dilaudid."  Tsarnaev signed informed consent forms for various procedures on April 21 at

4:00 a.m., 7:15 a.m., and 2:30 p.m.

Two FBI agents started interviewing Tsarnaev on April 20 at 7:22 p.m., nearly 24 hours

after he arrived at the hospital.  Before they began, the nurse overseeing Tsarnaev's care informed

them that the interview would pose no medical risk to him.  The nurse also told them that Tsarnaev

had suffered no brain injuries and that his only medications at that time were an antibiotic and

Fentanyl, neither of which, at their current dose, would inhibit his mental faculties.  The agents then

introduced themselves to Tsarnaev, and he confirmed that he could hear and understand them, could

respond to them notwithstanding his tracheostomy, and was not in too much pain.  (The agents

sought and obtained these same assurances a second time at the beginning of the second day of questioning.)

The interview proceeded as follows:

| Questioning | Rest/sleep/medical treatment |
|---|---|
| 43 min | 30 min |
| 30 min | 90 min |
| 45 min | 140 min |
| 67 min | 197 min |
| 65 min | 10hrs, 30 min |
| 60 min | 80 min |
| 83 min | 27 min |
| 45 min | 15 min |
| 35 min | 125 min |
| 50 min | 17 min |
| 13 min | 112 min |
| 43 min | 90 min |
| 75 min | 19 min |
| 36 min | End |

Tsarnaev was able to speak despite his tracheostomy by covering it. To spare him the effort, the agents began by asking mostly yes or no questions. Tsarnaev at first answered mainly by nodding or writing in a notebook; later he answered virtually all questions orally. Throughout the entire interview he appeared alert, mentally competent, and lucid.

On April 22, 2013, at 11:00 a.m., two hours after the interview concluded, Tsarnaev's attending physician testified in a hearing before United States Magistrate Judge Marianne B. Bowler. He described Tsarnaev's condition as "guarded" but "not critical." He stated that Tsarnaev had received .5 mg of Dilaudid at 7:00 a.m. and another .5 mg at 10:00 a.m., and that this was the only pain medication or sedation that Tsarnaev had received during the preceding eight hours. He testified that, despite Tsarnaev's injuries, medical treatment, and this medication, Tsarnaev was lucid enough to understand and respond to basic questions. On the basis of this expert testimony, Judge Bowler proceeded forthwith to conduct an initial appearance.

During the initial appearance, Tsarnaev was told the charges against him, the maximum penalties, and certain legal rights, among other things.  He repeatedly indicated that he understood everything that was being said to him.  At the conclusion of the hearing, having had the benefit of observing Tsarnaev and hearing his answers in person, the court stated:  "I find that the defendant is alert, mentally competent, and lucid."

C.      The FBI interview of Tsarnaev

From the moment the agents began questioning Tsarnaev about the Marathon bombings, he readily admitted his own involvement, and soon afterwards admitted that he had personally detonated one of the bombs and that he was motivated by a radical extremist agenda, namely, to punish America for "killing innocent people" in Afghanistan and Iraq.

But Tsarnaev steadfastly denied that any other bombs existed or that anyone else was involved in the bombings.  Specifically, he said that he and his brother had purchased all of the fireworks and had built the bombs together at their home in Cambridge; that they alone had chosen to bomb the Marathon; that he (Tsarnaev) had chosen on his own where to detonate the bomb he was carrying; that the gun they used to kill Officer Collier belonged to the two of them and no one else; that the decision to target other police officers in Watertown was theirs alone; and that the plan to travel to New York and explode additional bombs in Times Square was also theirs alone.

In the face of these denials, the agents continued to question Tsarnaev not to extract a confession, which they already had, but because of their reasonable belief that Tsarnaev was concealing information about impending attacks, accomplices, and/or the existence of additional bombs.  For example, Tsarnaev's claim that he and his brother had built the bombs in their Cambridge apartment and hidden them under Tsarnaev's bed seemed implausible given the absence of any traces of black powder in the apartment.  The agents also needed to determine whether Tsarnaev was unaware of the existence of accomplices who might be plotting additional attacks but

might still have information that, in combination with other information known to law enforcement, could help law enforcement identify accomplices and stop them in time.

To determine if there were additional bombs, bombers or bomb plots, the agents asked only those questions likely to reveal that information, namely: who constructed the bombs, and how, when, and where they were constructed; where any additional bombs were stored; who if anyone had assisted the brothers; who made the decision to target the Boston Marathon, murder an MIT Policeman, kidnap a civilian and attack additional policemen in Watertown; who Tsarnaev had contacted immediately before and after the bombings, and why; and how and when he and his brother had become radicalized.

## ARGUMENT

I. The Agents Did Not Violate Tsarnaev's Fifth Amendment Rights By Coercing Him to Make Statements Against His Will.

A. A statement is "voluntary" for Fifth Amendment purposes unless it is coerced.

The Self-Incrimination Clause of the Fifth Amendment prohibits the government from using a defendant's "involuntary" statements against him in a judicial proceeding. See Dickerson v. United States, 530 U.S. 428, 434 (2000). Although the Supreme Court wrote a half century ago that a statement is "involuntary" for Fifth Amendment purposes if it is not "the product of a rational intellect and a free will," Blackburn v Alabama, 361 U.S. 199, 208 (1960), it has since clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986). The trial court in Connelly suppressed a defendant's confession as "involuntary" based on expert testimony that it was prompted by "psychosis" and "command hallucinations" rather than a "free and rational choice[]" to confess. Id. at 161-62. The Colorado Supreme Court affirmed. See 702 P.2d 722 (1985). It held that the proper test of "voluntariness" is whether statements are "the product of a rational intellect and a free will,"

8

and that "the absence of police coercion or duress does not foreclose a finding of involuntariness." Id. at 728.

The Supreme Court reversed.  It squarely rejected the proposition that a defendant's statements are ever "involuntary" in the constitutional sense absent "the crucial element of police overreaching."  479 U.S. at 163.  The Court eschewed "inquiries into the state of mind of a criminal defendant who has confessed . . . [that are] divorced from any coercion brought to bear on the defendant by the State."  Id. at 167.  It held instead that a suspect's decision to confess is "involuntary" only if "governmental conduct coerced his decision."  Id.  Accord United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998) ("[O]nly confessions procured by *coercive official tactics* should be excluded as involuntary.") (emphasis in original); United States v. Newman, 889 F.2d 88, 95 n.3 (6th Cir. 1989) (same).

It follows that even assuming, for the sake of argument, Tsarnaev made self-incriminating statements to the police because he was worn down by pain and fatigue, or confused and light-headed from taking pain medication, or was hoping to find out information about his brother, his statements were still "voluntary" unless the police engaged in misconduct.  See United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) ("[The facts must] add up to 'police overreaching' . . . for a holding of coercion."); United States v. Fruchter, 137 Fed. Appx. 390, 393 (2nd Cir. 2005) ("The district court properly found that no police overreaching or misconduct occurred during Yague's interrogation and that, in the absence of coercion, the statement was not involuntary."); United States v. Sauseda, 526 Fed. Appx. 349. at *3 (5th Cir. 2013) (holding that statement was "voluntary" because suspect "has not shown the presence of 'police overreaching,' the crucial element in a voluntariness analysis"); see also Moran v. Burbine, 475 U.S. 412, 466 (Stevens, J., dissenting) ("[A]nalysis of the 'voluntariness' of a confession is frequently a convenient shorthand for reviewing objectionable police methods.")

In determining the "voluntariness" of Tsarnaev's statements, the Court must consider "the totality of the circumstances, including both the nature of the police activity and the defendant's situation." United States v. Hughes, 640 F.3d 428, 438 (1ˢᵗ Cir. 2011). The statements are "voluntary" if the evidence shows that the agents did not use official coercive tactics, or, if they did, that those tactics were not so coercive that Tsarnaev's "will was overborne." United States v. Jacques, 744 F.3d 804, 809 (1ˢᵗ Cir. 2014); see Byrom v. Epps, 518 Fed. Appx. 243, 256 (5ᵗʰ Cir. 2013) ("[It] is essential that there be a link between the coercive conduct of the police and the confession of the defendant.") (internal quotation marks and citations omitted); Burnett v. Duckworth, 952 F.2d 1398, *2 n.5 (7ᵗʰ Cir. 1992) (same); Ryals v. Ingle, 990 F.2d 1259 (9th Cir. 1993) (to warrant exclusion, the "alleged coercive conduct must be causally related to the confession"). The government bears the burden of proof by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972).

> The Sixth Circuit has described the proper analysis this way:

> Threshold to the determination that a confession was 'involuntary' for due process purposes is the requirement that the police 'extorted [the confession] from the accused by means of coercive activity.' Once it is established that the police activity was objectively coercive, it is necessary to examine [a defendant's] subjective state of mind to determine whether the 'coercion' in question was sufficient to overbear the will of the accused. . . . If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed.

McCall v. Dutton, 863 F.2d 454, 459 (6ᵗʰ Cir. 1988).

B.   The agents did not coerce Tsarnaev into making statements against his will.

1.   The agents did not use coercive tactics.

An evidentiary hearing will establish that the agents who questioned Tsarnaev did not use coercive tactics that forced him to make statements against his will. Notwithstanding the dire threat to public safety, they waited 24 hours before questioning Tsarnaev to ensure that he was medically

stable, lucid, and capable of giving accurate answers to their questions. They did not touch him, except to make him more comfortable; they did not threaten him physically or verbally; they did not deprive him of food, water, medical treatment, bathroom breaks, or adequate rest; they did not offer him any promises, rewards, or inducements; and they did not employ forbidden types of trickery or deceit. They also made no efforts psychologically to intimidate him. (The agents did not tell Tsaranev about his brother's death, or the manner of that death, to spare him emotional trauma.) Only two agents questioned Tsarnaev, and they wore plain clothes and did not have their weapons visible. They were polite and spoke quietly. They assured him that he was going to be fine. They took steps to increase his comfort, such as removing his handcuff every time they entered the room, adjusting his pillows as needed, and summoning nurses for him at his request. Tsarnaev never dozed or drifted off during the interview; whenever the agents believed he was growing tired, they ceased questioning him and advised him to rest or sleep.

These factors are ordinarily dispositive of the "voluntariness" determination. See, e.g., Moran, 475 U.S. at 421 ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Fare v. Michael C., 442 U.S. 707, 726–727 (1979) ("[The defendant was] not worn down by improper interrogation tactics or questioning or by trickery or deceit. . . .  The officers did not intimidate or threaten respondent in any way."); United States v. Verdugo, 617 F.3d 565, 575-76 (1ˢᵗ Cir. 2010) ("The circumstances surrounding Verdugo's questioning . . . contain no traces of the 'brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation' that courts have previously found when they have concluded that statements were involuntarily made.") (collecting cases); Genao, 281 F.3d at 310 ("The record establishes that the police did not apply undue or unusual pressure to Genao, use coercive tactics, or threaten him with violence or retaliation if he did not confess."); United States v. Vega-Figueroa,

11

234 F.3d 744, 749 (1st Cir. 2000) ("Defendant's statement was not the result of intimidation, coercion resulting from the setting in which the statement was made, or a deliberate plan by the agents to place defendant in an environment that would induce a confession.")

Although the questioning took some time, there was good reason for that. Tsarnaev's tracheostomy slowed the pace of conversation considerably, as did the time it took for him to write answers in a notebook. The agents took frequent and lengthy breaks (including one of more than 10 hours) to ensure that Tsarnaev received adequate time for sleep, rest, and medical care. The agents also had to cover a large number of topics in detail to flush out whether any additional attacks were planned or imminent and the identity of accomplices or perpetrators.

But most important, the length of the questioning was not designed to break down Tsarnaev's will to resist so that he would confess, nor did it have that effect. Tsarnaev freely confessed virtually from the moment the agents began speaking to him. There is simply no basis for finding on the facts of this case that the length of questioning was coercive, let alone that it overcame Tsarnaev's will to resist or is causally related to any of his statements. See Stein v. New York, 346 U.S. 156, 185 (1953) (holding that 12-hour interrogation "by a number of officers at a time and by different officers at different times" stretched out over 32-hour period was not so "oppressive as to overwhelm powers of resistance").

The police also did not question Tsarnaev continuously. On the contrary, as noted earlier, they provided frequent and lengthy breaks during which Tsarnaev slept, rested and received medical treatment. The periods of questioning on the first day were fewer, shorter, and further between than on the second, because by the second, Tsarnaev had had another day to heal and another night's sleep. Once again, on the facts of this case, there is no basis for a finding that the police denied Tsarnaev adequate breaks in order to coerce a confession from him.

Although the police did not inform Tsarnaev of his right to remain silent or to have an attorney present during questioning, and did not accommodate his repeated requests for a "human rights lawyer" (or any lawyer), the Supreme Court has ruled that such omissions are not coercive. In Procunier v. Atchley, 400 U.S. 446 (1971), a defendant "contended that his confession was involuntary [in part] because he had been denied a lawyer, [and] because he had not been advised of his right to remain silent." Id. at 453. The Court rejected that argument, holding that "denial of the right to counsel and failure to advise of the right to remain silent were not in themselves coercive. Rather they were relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect." Id. at 453-54. The Court has also held that police do not violate the constitution by failing to tell a suspect that an attorney retained to represent him is attempting to contact him. Moran, 475 U.S. at 416-18, 432 (1986). (In this case, in any event, none of the attorneys who showed up at Beth Israel seeking to communicate with Tsarnaev had been retained or appointed by the Court to represent him.)

Finally, the fact that Tsarnaev received pain medication is not evidence of coercion, because the medication was administered by medical staff for medical reasons, without input from the police. See, e.g., United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000); United States v. Chapman, 112 Fed. Appx. 469, 474 (6th Cir. 2004); United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989).

In short, the agents who questioned Tsarnaev were conducting a public-safety interview and did not "prolong or increase a suspect's suffering against the suspect's will . . . with the purpose and intent of securing an incriminating statement." Chávez, 538 U.S. at 797 (Kennedy, J., concurring in part and dissenting in part). Because the police employed no coercive tactics in questioning Tsarnaev, his motion to suppress his statements on "involuntariness" grounds must be denied for that reason alone.

13

2.     <u>Tsarnaev's will was not overborne by police questioning.</u>

Even assuming *arguendo* the existence of actual coercive tactics, it does not follow,  merely

because Tsarnaev was recovering from gunshot wounds or had received pain medication, that his

will was overborne.  Tsarnaev was a healthy young man a few months shy of 20 years' old when he

was shot in the course of his crimes.  The medical records reflect that he was alert, oriented, lucid,

and conversant when he was brought to the hospital on April 19, 2013 at 9:00 p.m.  He had suffered

bullet wounds but no internal injuries or significant loss of blood.  (Hospital records reflect he was

given only one unit of blood in the emergency room.)  He also appeared psychologically normal and

had suffered no apparent brain damage.  (Although Tsarnaev claims that he "likely" suffered both

"a concussion" and "traumatic brain injury" [Deft. Mot. at 3], that is speculative; his medical

records do not say that, and his attending nurse told the agents the opposite.)  He underwent

successful surgery lasting several hours and then began a recovery that progressed steadily without

setbacks.

Although Tsarnaev writes that he "was prescribed a multitude of pain medications" (Deft.

Mot. at 3), his hospital records show that by the time the police began questioning him he was

receiving only Fentanyl for pain, and that was changed four hours later to Dilaudid "PRN" or as

needed.  More important, Tsarnaev's pain medication, far from weakening his will to resist

questioning, appears to have had the salubrious effect of blunting his pain while leaving him lucid

and clear-headed.  He told the police at the start of each day's interview that he could hear and

understand them and was not in too much pain.  He then gave lucid, responsive, and in some cases

spirited answers to their questions.

Against this first-hand evidence that Tsarnaev's pain medication had no ill effects, Tsarnaev

offers only speculation.  He writes that "[t]he side effects of these [pain] medications include

confusion, light-headedness, dizziness, difficulty concentrating, fatigue, and sedation."  (Deft. Mot.

at 3). But courts have ruled that general allegations about the side-effects of drugs contribute little
to the analysis of whether a suspect's will was overborne by allegedly coercive police tactics. See
Wolfrath v. LaVallee, 576 F.2d 965, 972 (2nd Cir. 1978). That is because "[t]he effects of narcotic
use will vary depending on the amount of drugs taken, the degree of tolerance developed by the
individual, and the idiosyncratic reaction of the person to the drugs." Hansford v. United States,
365 F.2d 920, 923 (D.C. Cir. 1966).

In Wolfrath, for example, a defendant confessed to a robbery less than four hours after
receiving morphine and approximately one hour after receiving Demerol and sodium luminal in
connection with surgery for a bullet wound. The district court held that the defendant's statements
were "involuntary" based on medical testimony that such drugs "would create a 'fugue-like state' in
the mind of the patient and would induce a euphoric feeling of invulnerability . . . [rendering the
patient] not capable of making a serious decision." Id. at 971. But the Second Circuit reversed,
holding that mere "generalizations about the probable effect of drugs" are of little or no use in the
analysis of "voluntariness." Id. at 972.

The facts of this case are similar to those of United States v. Short, 947 F.2d 1445 (10th Cir.
1991), in which the court held that a defendant's statement was "voluntary" even though he was in
the hospital with both arms in casts and was taking the painkillers Percodan and hydrocodeine when
interviewed by police. Id. at 1448. The court explained that, like Tsarnaev, "[d]efendant's pain was
not so great, nor was his mind so clouded by pain pills that he was unable to think and converse
with the police freely and intelligently on several subjects. . . . Defendant's will [thus] was not
overborne by the police." Id. at 1450 (citations omitted). Likewise, in United States v. Martin, 781
F.2d 671 (9th Cir. 1985), the court held that the defendant's statements were "voluntary" even
though he had been hospitalized to treat explosives injuries and had received Demerol for pain. The
court wrote that the defendant

15

at 3). But courts have ruled that general allegations about the side-effects of drugs contribute little
to the analysis of whether a suspect's will was overborne by allegedly coercive police tactics. See
Wolfrath v. LaVallee, 576 F.2d 965, 972 (2nd Cir. 1978). That is because "[t]he effects of narcotic
use will vary depending on the amount of drugs taken, the degree of tolerance developed by the
individual, and the idiosyncratic reaction of the person to the drugs." Hansford v. United States,
365 F.2d 920, 923 (D.C. Cir. 1966).

In Wolfrath, for example, a defendant confessed to a robbery less than four hours after
receiving morphine and approximately one hour after receiving Demerol and sodium luminal in
connection with surgery for a bullet wound. The district court held that the defendant's statements
were "involuntary" based on medical testimony that such drugs "would create a 'fugue-like state' in
the mind of the patient and would induce a euphoric feeling of invulnerability . . . [rendering the
patient] not capable of making a serious decision." Id. at 971. But the Second Circuit reversed,
holding that mere "generalizations about the probable effect of drugs" are of little or no use in the
analysis of "voluntariness." Id. at 972.

The facts of this case are similar to those of United States v. Short, 947 F.2d 1445 (10th Cir.
1991), in which the court held that a defendant's statement was "voluntary" even though he was in
the hospital with both arms in casts and was taking the painkillers Percodan and hydrocodeine when
interviewed by police. Id. at 1448. The court explained that, like Tsarnaev, "[d]efendant's pain was
not so great, nor was his mind so clouded by pain pills that he was unable to think and converse
with the police freely and intelligently on several subjects. . . . Defendant's will [thus] was not
overborne by the police." Id. at 1450 (citations omitted). Likewise, in United States v. Martin, 781
F.2d 671 (9th Cir. 1985), the court held that the defendant's statements were "voluntary" even
though he had been hospitalized to treat explosives injuries and had received Demerol for pain. The
court wrote that the defendant

15

> was awake and relatively coherent during the questioning at the
> hospital. . . . When he became too groggy to understand the
> detective's questions, Detective Schindler terminated the interview.
> There is no evidence of extended and oppressive questioning. Nor
> had Martin received excessive quantities or unusual combinations of
> drugs. Martin's injuries, while painful, did not render him
> unconscious or comatose. Moreover, Martin said that he wanted to
> talk to the officers and was not reluctant to tell his story. The district
> court properly concluded that 'although the defendant was injured and
> under medical care at the time the statements were made, the type,
> dosage, and schedule of painkilling narcotic administered to [Martin]
> was not sufficient to overbear his will to resist the questioning or
> impair his rational faculties.'

Id. at 674.

The Beth Israel medical staff evidently did not believe that Tsarnaev's pain medication

impaired his judgment to the point where he could not make important decisions about his own

care. They had him sign informed consent forms for various medical and surgical procedures on

April 21 at 4:00 a.m., 7:15 a.m., and 2:30 p.m. This plainly indicates that the medical staff believed

Tsarnaev had a sufficiently "rational intellect" and "free will" to give informed consent at those

times.

Tsarnaev relies heavily on Mincey v. Arizona, 437 U.S. 385 (1978), in arguing that his

statement was "involuntary," but that reliance is misplaced. For one thing, Mincey arrived at the

hospital "depressed almost to the point of coma" and complained during the interview of

"unbearable" pain. Id. at 398-99. Tsarnaev, in contrast, arrived at the hospital alert, oriented, and

lucid, and he was in the same condition when the FBI interview began and ended. He also

repeatedly described his own pain level as tolerable. For another thing, although Mincey, like

Tsarnaev, was seriously wounded by gunshots, received "various drugs," and was intubated, id. at

396, 398, his compromised physical condition, standing alone, is not what led the Court to conclude

his statements were "involuntary," id. at 401-02. That conclusion was instead based on two other

factors.

16

First, Mincey "clearly expressed his wish not to be interrogated," id. at 399-401, and in keeping with that wish it appears he resisted giving any self-incriminating statements until the police finally wore him down, id. at 399 n.16. Tsarnaev, in contrast, readily answered questions about the Marathon bombings, even boasting of his success in carrying them out. Within minutes of meeting the agents, for example, Tsarnaev told them that he and his brother had constructed the bombs at home using instructions from Inspire magazine that Tsarnaev had downloaded from the Internet. Shortly afterwards he added that they had bombed the Marathon because America was killing "innocents" in Afghanistan, adding "we're at war my friend." He explained that "America is killing people overseas, they needed to feel the same pain." Still later, he wrote, "Why now? Because maybe I finally became ready. Clearly not every Muslim is inspired / But because there are those that are, we are able to protect our people and our religion."

Second, when the police interviewed Mincey, some of his written answers to their questions were "not entirely coherent" and others showed that he was "confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation." Id. at 398-99. (For example, "two of the answers written by Mincey were: 'Do you me Did he give me some money (no)' and 'Every body know Every body.'" Id. at 399 n.15.) Mincey also "gave unresponsive or uninformative answers" and "complained several times that he was confused or unable to think clearly." Id. at 399-400.

Tsarnaev, in contrast, was responsive, coherent, and clearheaded throughout his interview with the officers. With few exceptions, he wrote answers to their questions clearly, legibly, and in a strong hand. The notes reveal no sign that Tsarnaev was mentally compromised, confused, or in any way intimidated by the agents. On the contrary, they show that he answered questions when it suited him, refused to answer questions when it did not, and did not hesitate to make demands for things he wanted (notably, sleep, a "human rights lawyer," and information about his brother's

17

fate). In one early note, for example, Tsarnaev wrote, "Listen buddy / I know my rights / no one is at risk / no advisors / and I want sleep and a lawyer." In another, he wrote, "I don't have to answer that now man, let me sleep." When asked a question about the Watertown shoot-out that he did not care to answer, he replied, "did you guys ask the cops that were fighting us what happened[?]" Later, when asked why he returned to UMass-Dartmouth after the bombing, he wrote, "IDK / time I guess / I had an important test on Wednesday / joking."

Although in his first few notes Tsarnaev complained repeatedly that he was tired and wanted to sleep, the agents complied with those requests. On April 20, 2013, the day questioning began, Tsarnaev was interviewed for four periods averaging 45 minutes each, but in between those periods he rested, slept and received medical care a total of nearly eight hours. Then, after another 65-minute period of questioning, he rested, slept, and received medical care for 10-1/2 hours straight. After that, he ceased complaining about being tired, and spent roughly equal amounts of time talking to the agents and resting, sleeping, and receiving care. Moreover, unlike Mincey, Tsarnaev never said that he wanted questioning to cease altogether, writing instead, "I don't have to answer that now" and "can we do this later?"

Tsarnaev's situation is closer to that of the defendant in United States v. Abdulmutallab, 2011 WL 4345243 (E.D. Mich. Sept. 16, 2011), than to Mincey's. The defendant in Abdulmutallab attempted to ignite a bomb concealed in his underwear while aboard a plane that had begun its descent into Detroit's main airport. Id. at *1. Abdulmutallab

> suffered third degree burns to his lower extremities, was transported to the hospital, was given 350 micrograms of fentanyl [approximately seven times the dose Tsarnaev received], and then interrogated for approximately 50 minutes by federal agents while he was in the burn care unit. Like the defendant in Mincey . . . he was isolated from his family, friends, and legal counsel. Moreover, unlike Mincey, Defendant was questioned without first being read his Miranda rights.

18

Id. A nurse testified that, notwithstanding the pain medication, Abdulmutallab "was lucid, fully 'oriented times 3,' was not confused, and gave no indication that he did not or could not understand the questions being asked or the circumstances in which they were being asked." Id. at *3. An agent likewise testified that Abdulmutallab "was not confused, and understood where he was, why he was there, what he was there for, and what had happened." Id. Based on this testimony, the district court found that the defendant's statements were "voluntary."

In sum, the evidence shows that Tsarnaev's statements did not result from his will's being overborne by coercive official tactics. Although he was in a hospital bed recovering from gunshot wounds and had received pain medication, neither the length of the questioning nor any other purportedly abusive police tactic caused Tsarnaev to confess. Rather, Tsarnaev confessed virtually as soon as the interview began. As the note he wrote in Watertown on the inside of the boat reflects, Tsarnaev was eager to take credit for his crimes and "shed some light" on their meaning. That indeed is a common practice among terrorists. Although Tsarnaev might have preferred fewer questions and more sleep, especially at the very start of the interview, he never hesitated to take credit for the murder and mayhem he had caused. His own behavior during the police interview reveals unmistakably that he retained a rational intellect and sufficient willpower to choose whether to answer questions.

B.   The claimed existence of a Miranda and Edwards violation is moot because the government will not use Tsarnaev's statements against him in its case-in-chief despite the public safety nature of the interview.

Miranda v. Arizona, 384 U.S. 436 (1966), prohibits the government from using a defendant's statements against him in its case-in-chief unless the statements were preceded by Miranda warnings. In New York v. Quarles, 467 U.S. 649 (1984), however, the Supreme Court held that there are situations "where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda." Id. at 653. Quarles involved

19

a woman who told police that she had just been raped at gunpoint by a man (Quarles) who had fled into a nearby supermarket. Id. at 651-52. An officer found Quarles in the supermarket, discovered that Quarles had an empty shoulder holster, and asked him where the gun was. Id. Quarles nodded in the direction of some empty cartons and responded, "the gun is over there." Id.

The New York courts held that Quarles's statement and gun were inadmissible because the police had not first read him his Miranda rights, but the Supreme Court reversed. It held that the police need not give Miranda warnings before they "ask questions reasonably prompted by a concern for the public safety." Id. at 656. It reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657. The Court explained that if in cases like the one before it "the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding," which would impose too high a societal cost in light of the resulting "danger to the public." Id. at 657.

Tsarnaev's statements are admissible under the public-safety exception, because the questioning was reasonably prompted by a need to protect the public from the risk of additional bombs, weapons, or follow-on terrorist attacks. Although this case, unlike Quarles, did not involve a single question about a missing weapon, it would be a mistake to limit Quarles to its facts merely because the Quarles Court did not expressly authorize the more expansive public safety questioning that took place here. The Quarles Court foresaw that future cases would involve different kinds of public-safety threats and wrote that "in each case it [i.e. the scope of permissible public-safety questioning] will be circumscribed by the exigency which justifies it." Id. at 658.

The exigency in this case amply justified the questions the agents asked. Tsarnaev is not an ordinary criminal; he is a terrorist who launched a coordinated bombing attack on an

20

internationally-renowned sporting event, killing three people and maiming and wounding hundreds more. Nearly four days after the Marathon bombings, Tsarnaev was still deemed to pose such a grave threat to public safety that the Governor of Massachusetts asked nearly one million people to shelter in place for an entire day while law enforcement endeavored to find Tsarnaev and neutralize him. The possibility that other bombs existed and/or that others associated with Tsarnaev might engage in additional violence once he was captured posed a public safety threat of the highest order. The agents investigating the Marathon bombings were well aware of the danger of coordinated terrorist attacks, and they had an objectively reasonable belief that the Tsarnaev brothers might have been radicalized, trained, directed, and assisted by a terrorist group. Under the circumstances, the officers who questioned Tsarnaev were warranted in believing that the public's need for answers outweighed the need for "adherence to the literal language of the prophylactic rules enunciated in Miranda." Id. at 653.

Courts have recognized that when it comes to potential terrorist attacks, public-safety questioning necessarily encompasses more than simple inquiries like "where's the gun?" In Abdulmutallab, supra, for example, the defendant told the agents who first interviewed him that he was acting on behalf of al-Q'aeda. Approximately three hours after the defendant was taken to the hospital, other federal agents, without first administering Miranda warnings, asked him

> where he traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where Defendant had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; whether he associated with, lived with, or attended the same mosque with others who had a similar mind-set as Defendant about jihad, martyrdom, support for al-Qaeda, and a desire to attack the United States by using a similar explosive device on a plane, and what these individuals looked like -- all in an attempt to discover whether Defendant had information about others who could be on planes or about to board planes with explosive devices similar to the one Defendant used.

21

Abdulmutallab, 2011 WL 4345243, at *5.  These questions were reasonable, the district court held,

because the police reasonably believed, based upon their "training, experience, and knowledge of

earlier al-Qaeda attacks, [that] this was not a solo incident and the potential for a multi-prong attack

existed even if Defendant was unaware of any specific additional planned attack."  Id. at *6.  The

court further held that in the context of a terrorist threat, public-safety questioning includes

"information that could be used in conjunction with other U.S. government information to identify

and disrupt such imminent attacks before they could occur."  Id.  The agents could thus ask

questions designed "to determine where to go next and investigate if anyone else might be planning

to or was already in the process of carrying a similar device on an aircraft."  Id.

Similarly, in United States v. Khalil, 214 F.3d 111 (2nd Cir. 2000), police questioned a bomb

maker who had been shot and wounded during a raid on his apartment.  Id. at 115.  He was

questioned at the hospital, without Miranda warnings, about the construction and stability of the

pipe bombs and whether he intended to kill himself when he detonated them.  Id. at 115.  The

district court held that all of these questions were public-safety related and fell within the Quarles

exception to Miranda.  Id.  The Second Circuit affirmed (although only the question about the

defendant's intending to kill himself had been challenged on appeal).  See generally United States v.

Estrada, 430 F.3d 606, 611 (2nd Cir. 2005) (Sotomayor, J.) (because of the need for "flexibility in

situations where the safety of the public and the officers are at risk," courts evaluating the

applicability of the public-safety exception must eschew "template[s]" and consider "the totality of

the circumstances in a given case.") (internal citations omitted).

Although the police questioned Tsarnaev five days after the Marathon bombings and

approximately 24 hours after his arrest, the potential threat to public safety was no less real or

pressing than the one in Quarles.  Tsarnaev's arrest, his brother's death, and the searches of their

home and vehicles did not rule out the possible existence of other bombs, bombers, or terrorist

plots. See, e.g., United States v. Liddell, 517 F.3d 1007, 1008-09 (8th Cir. 2008) (holding that even after defendant told police that gun was in car, and they found it, Quarles permitted police to ask if there was "anything else in there we need to know about," because the discovery of one gun gave rise to "an objectively reasonable concern that" there might be others); Allen v. Roe, 305 F.3d 1046, 1051 (9th Cir. 2002) (holding that public-safety exception applied notwithstanding defendant's argument "that a significant amount of time had elapsed from when the shooting occurred to when the police questioned him," because "[if] the gun was discarded in a public place, it posed a continuing immediate danger . . . [that did] not dissipate over time."); United States v. Carrillo, 16 F.3d 1046, 1049 (9th Cir. 1994) (noting that a "pressing need for haste is not essential" for the public-safety exception to apply). Indeed, Quarles himself was handcuffed and in the custody of armed officers when he was questioned. See 467 U.S. at 655. Moreover, as the dissent noted, the police had no evidence that Quarles had an accomplice, the supermarket was "apparently deserted" during the late-night arrest, and the "police could easily have cordoned off the store and searched for the missing gun" rather than question Quarles about its whereabouts. Id. at 674-676 (Marshall, J., dissenting). Yet these facts did not alter the Court's analysis.

That Tsarnaev affirmatively asked for an attorney likewise does not change the analysis. As the Ninth Circuit explained in United States v. DeSantis, 870 F.2d 536 (9th Cir. 1989), the Supreme Court's judgment that public safety concerns outweigh the marginal benefits of Miranda's procedural safeguards "appl[ies] with equal force to the procedural safeguards established when the accused asks for the aid of counsel. Society's need to procure the information about the location of a dangerous weapon is as great after, as it was before, the request for counsel." Id. at 541. Accord United States v. Mobley, 40 F.3d 688, 692 (4th Cir. 1994) (holding that "'[t]he same considerations that allow the police to dispense with providing Miranda warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further

23

questioning of an accused who requests counsel.'") (quoting DeSantis, 870 F.2d at 541)); Trice v.

United States, 662 A.2d 891 (D.C. App 1995) (same).

Although the public-safety interview of Tsarnaev was non-coercive and fully justified by the

seriousness and scope of the public threat, the government does not intend to use Tsarnaev's

statements in its case-in-chief at trial or sentencing. The strength of the evidence against Tsarnaev,

which includes the confession he wrote on the inside of the boat, makes affirmative use of the Beth

Israel statements unnecessary. The government reserves its right, however, to use the Beth Israel

statements to impeach Tsarnaev, or in rebuttal, in the event Tsarnaev offers testimony or other post-

arrest statements inconsistent with them. See Harris v. New York, 401 U.S. 222, 226 (1971) ("The

shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense,

free from the risk of confrontation with prior inconsistent utterances."); Oregon v. Hass, 420 U.S.

714, 722 ("[S]ufficient deterrence flows when the evidence in question is made unavailable to the

prosecution in its case in chief."). This stipulation on the government's part effectively moots the

Miranda and Edwards issues.

III.     Tsarnaev's Initial Appearance Was Not Unreasonably Delayed.

Federal Rule of Criminal Procedure 5(a) provides in pertinent part that "[a] person making

an arrest within the United States must take the defendant without unnecessary delay before a

magistrate judge." In McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States,

354 U.S. 449 (1957), the Supreme Court, exercising "its supervisory authority over the

administration of criminal justice in the federal courts," McNabb, 318 U.S. at 341, held that

statements made by a defendant who is not brought before a judicial officer without unnecessary

delay should be excluded from evidence, id. at 346. Ten years after the Court decided Mallory,

Congress limited its scope by enacting 18 U.S.C. 3501(c), which provides in part that a defendant's

voluntary statements made "within six hours immediately following his arrest or other detention"

24

are admissible regardless of the reasons for presentment delay. In Corley v. United States, 556

U.S. 303 (2009), the Supreme Court reconciled Rule 5(a), section 3501(c), and the McNabb–

Mallory line of cases by announcing the following rule: if a voluntary statement is made within six

hours of arrest, it is admissible regardless of the reason for presentment delay; if it is made "before

presentment and beyond six hours, however, the court must decide whether delaying that long was

unreasonable or unnecessary under the McNabb–Mallory cases, and if it was, the confession is to be

suppressed." Id. at 322. See United States v. Jacques, 744 F.3d 804 (1st Cir. 2014); United States v.

McDowell, 687 F.3d 904, 909 (7th Cir.2012).

The presentment delay in this case was reasonable for several reasons. First, courts have

held that where, as here, an arrest occurs at night, on a holiday, or over the weekend, it is reasonable

to delay presentment until the following business day. See, e.g., United States v. Ortega, 471 F.2d

1350, 1362 (2nd Cir,. 1972); United States v. Mendoza, 473 F.2d 697, 702 (5th Cir. 1973); United

States v. Collins, 349 F.2d 296, 298 (6th Cir. 1965); United States v. Mills, 434 F.2d 266, 273 (8th

Cir. 1970); United States v. García–Hernández, 569 F.3d 1100, 1106 (9th Cir. 2009); Gregory v.

United States, 364 F.2d 210, 212 (10th Cir. 1966); United States v. Carter, 484 Fed.Appx. 449, 457

(11th Cir. 2012). These decisions are based on the well-established doctrine that "a delay may be

reasonable if caused by administrative concerns, such as the unavailability of a magistrate following

an arrest." Jacques, 744 F.3d at 814.

Although Tsarnaev argues that a magistrate judge could have made him- or herself available

over the weekend to conduct an initial appearance, Rule 5(a) has never been viewed as embodying

such a requirement. On the contrary, in Jacques, the First Circuit took it for granted that a

magistrate judge was unavailable for Rule 5(a) purposes because the arrest there occurred at 7:20

p.m. See id. at 807, 818. On Tsarnaev's logic, magistrate judges in this district would have to

conduct initial appearances 24 hours a day, seven days a week, because it is always possible for a

magistrate judge to make himself or herself available if needed. And not just magistrate judges: as the Ninth Circuit pointed out in United States v. Van Poyck, 77 F.3d 285 (9th Cir. 1996), the next-business-day rule "is dictated by the complex procedures needed to arraign a defendant. An arraignment requires court personnel to randomly select a judge, requires pretrial services to process the defendant, and often requires an interpreter." Id. at 289. It also normally requires the presence of a court reporter, one or more Deputy Marshals, sheriffs to transport the defendant if he is detained, and other personnel to staff the courthouse (where virtually all initial appearances take place). Tsarnaev cites no authority for the remarkable proposition that a presentment delay is unreasonable if all of these actors *could* be summoned on nights, holidays, and weekends to process arrestees. He also cites no authority for the proposition that if an ordinary defendant need not be presented on nights, holidays, or weekends, Rule 5(a) required that a special exception be made for him.

The delay in this case also was reasonable because Tsarnaev was in the hospital. Rule 5(a) contemplates that initial appearances will occur in a courthouse: it states that the arresting officer "must take the defendant without unnecessary delay before a magistrate judge," not vice-versa. It would have been reasonable for the agents to have delayed bringing Tsarnaev to the courthouse for his initial appearance until he was well enough to go. See, e.g., United States v. Isom, 588 F.2d 858, 862 (2nd Cir. 1978) ("The period during which appellant received medical treatment (at his request) and overnight lodging at the MCC should not be counted in computing unnecessary delay."); United States v. Johnson, 352 F.Supp.2d 596, 598 (D. Md. 2005) (same); see also United States v. Bear Killer, 534 F.2d 1253, 1257 (8th Cir. 1976) (holding that it is reasonable to delay presentment of an intoxicated individual until he becomes sober); United States v. Manuel, 706 F.2d 908, 914 (9th Cir. 1983) (same).

26

Finally, it is important to bear in mind that the agents began questioning Tsarnaev as soon as they received medical clearance to do so, and that Tsarnaev freely confessed his involvement within the first 45 minutes of questioning, as soon as he was asked about the Marathon bombings  In United States v. Mitchell, 322 U.S. 65 (1944), the Supreme Court held that it was error to suppress a defendant's confession given shortly after his arrest, even though he was thereafter illegally detained for eight days before being presented. Id. at 69-70. The Court noted the chief purpose of the prompt presentment requirement is to prevent police from using lengthy periods of secret detention to apply "those reprehensible practices known as the 'third degree'" to extract confessions. Id. at 66. As we have already shown, far from subjecting Tsarnaev to the "third degree" in a secluded prison cell, the agents who questioned Tsarnaev did so in a hospital where Tsarnaev received world-class medical treatment along with all of the rest, refreshment, and bathroom breaks he required; the agents themselves were polite, casually dressed, carried no visible weapons, applied no physical or psychological pressure, made no threats or promises, unhandcuffed him every time they were present, and made him as comfortable as possible.

"Jurists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." Connelly, 479 U.S. at 166. That cost is justified solely by the need to effectively deter unlawful interrogation practices. See Miranda, 384 U.S. 436 . As the Supreme Court recently observed in the Fourth Amendment context, "[a]bout all that exclusion would deter in this case is conscientious police work." Davis v. United States, 131 S. Ct. 2419, 2429 (2011).

## CONCLUSION

WHEREFORE, the government respectfully requests that Tsarnaev's motion to suppress statements be denied.


Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   /s/ William D. Weinreb
       WILLIAM D. WEINREB
       ALOKE S. CHAKRAVARTY
       NADINE PELLEGRINI
       Assistant U.S. Attorneys


## Certificate of Service

I hereby certify that a copy of this opposition was served by First Class mail on Dzhokhar Tsarnaev's counsel, Miriam Conrad, Esq., Federal Defender's Office, 51 Sleeper Street, 5th Floor, Boston, MA  02210, on May 23, 2014.

/s/ William D. Weinreb
WILLIAM D. WEINREB
Assistant U.S. Attorney