**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 13-10200-GAO** |
| | ) | **Leave to File Granted June 3, 2014** |
| **DZHOKHAR A. TSARNAEV,** | ) | |
| **Defendant** | ) | |

**GOVERNMENT'S COMBINED OPPOSITION TO**
**DEFENDANT'S MOTIONS TO SUPRESS PHYSICAL AND DIGITAL EVIDENCE**

The United States of America, by and through its undersigned counsel, respectfully submits this combined opposition to defendant Dzhokhar Tsarnaev's Motion to Suppress Fruits of Searches at Norfolk Street and University of Massachusetts (Dkt. 297) (hereinafter "Motion to Suppress Physical Evidence") and Motion to Suppress Fruits of Searches: Electronically Stored Information, Including Email Communications and Data Contained in the Sony Vaio Laptop Computer (Dkt. 303) (hereinafter "Motion to Suppress Digital Evidence").

The government submits herewith, under seal, an appendix of exhibits, consisting of the search warrants at issue, the items seized, and other documents related to the issue of standing. As set forth below, Tsarnaeav lacks standing to challenge the seizures of physical evidence and the search of the laptop computer; and, in any event, all of the searches were authorized by validly-issued search warrants. No evidentiary hearing is required because there are no issues of disputed fact; the Court can decied the motion on the papers.  If the Court deems an evidentiary hearing necessary, the government reserves the right to offer evidence that exceptions to the warrant requirement also applied to most of the searches.

**The First Norfolk Street Apartment Search (April 19, 2013)**

A.     Tsarnaev lacks standing to challenge the search and seizure of items from the
       <u>Norfolk Street apartment on April 19, 2013.</u>

"[An] expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis." United States v. Lipscomb, 539 F.3d 32, 35-36 (1st Cir. 2008).   To establish standing, Tsarnaev must show that he, personally, had a privacy interest in the Norfolk Street apartment or a possessory interest in the items that were seized.  See United States v. Salvucci, 448 U.S. 83, 91-92 (1980) ("[An] illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.'")  (quoting Rakas, 439 U.S. 128, 140 (1978)).  To establish that his own privacy was violated, Tsarnaev must prove two things.  First he must show "that he had . . . a subjective expectation of privacy" in the place or item searched.  United States v. Vilches-Navarrete, 523 F.3d 1, 13 (1st Cir. 2008) (citing cases).  A subjective expectation of privacy exists only if "the individual, *by his conduct*, has exhibited an actual expectation of privacy; that is . . . he has shown that 'he [sought] to preserve [something] as private.'"  Bond v. United States, 529 U.S. 334, 338 (2000) (quoting Smith v. Maryland, 442 U.S. 735 (1979) (emphasis added; internal quotation marks omitted)).  Second, if Tsarnaev is able to prove that he had a subjective expectation of privacy, he must then show "that society accepts that expectation as objectively reasonable." Vilches-Nararrete, 523 F.3d at 13.  In both cases, "[t]he burden to establish a reasonable expectation of privacy lies squarely on the movant." United States v. Symonevich, 688 F.3d 12, 21 n.6 (1st Cir. 2012).

      i.      Tsarnaev lost his expectation of privacy in the apartment when he moved out.

Tsarnaev has not shown, and cannot show, that at the time of the first Norfolk Street search he had a subjective expectation of privacy in the apartment that society would regard as objective reasonable.  "When evaluating whether a person has a reasonable expectation of privacy, courts examine a variety of factors, such as ownership of the premises, possession,

access or control, ability to control or exclude others, and legitimate presence on the premises at the time of the search." United States v. Lnu, 544 F.3d 361, 365 (1st Cir. 2008).  Tsarnaev has not established any of these things.  Yet, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  United States v. Ocampo, 402 Fed.Appx. 90, 96 (6th Cir. 2010) (citing Rakas, 439 U.S. at 130 n. 1).

Tsarnaev's failure to demonstrate a reasonable expectation of privacy in the Norfolk Street apartment is not surprising, because the facts show that the opposite is true.  He did not pay rent and was not on the lease.  Although he was raised in the apartment, he moved out in September 2011 after he became an adult, enrolled at UMass-Dartmouth, and leased a dorm room there, for which he paid rent.  His father and mother moved out for good approximately a year later, and both sisters also had moved out, which left a single family consisting of Tamerlan and Katherine Tsarnaev and their daughter as the sole occupants.  That family's residency was itself tenuous:  the family was served with a notice to vacate in November 2012. See Exhibit N. Even so, the members of that family still slept in the apartment every night and kept all of their clothing and belongings there.  Tsarnaev, in contrast, slept nearly every night in his dorm room at UMass-Dartmouth and kept virtually all of his clothing and belongings there, just as his parents and sisters did in their respective dwellings.  Tsarnaev was only an occasional overnight guest in the Norfolk Street apartment and kept only a few belongings there, and was not staying there overnight at the time of the search.  Cf. United States v. Romain, 393 F.3d  262, 268 (1st Cir. 2004)(holding regular overnight guest invited into a home at the time of the search could have standing).  His old bedroom had effectively become an extension of the living room and

was used by Tamerlan Tsarnaev's family as a storage and computer room.  It is clear that he, like his parents and sisters, ceased residing in the apartment well before the search took place.

Tsarnaev might claim as a fallback position that he at least had an expectation of privacy in his former bedroom if not in the apartment as a whole; but the undisputed facts belie that claim.   Although Tsarnaev kept some personal possessions in his former bedroom, where he also slept when he visited, he did not "by his conduct" exhibit "an actual expectation of privacy" in those items.  <u>Bond</u>, 529 U.S. at 338.  The former bedroom was being used as a storage and computer room by Tamerlan Tsarnaev and his wife.  It was separated from the living room only by a curtain that usually remained open.  Virtually all of the seized items belonging to Tsarnaev were on shelves out in the open.  These circumstances make it impossible for Tsarnaev to demonstrate that he had either a subjective expectation of privacy in the items or one that society would regard as legitimate.  <u>See</u>, <u>e.g.</u>, <u>United States. v. McCarthy</u>, 77 F.3d 522, 535 (1st Cir. 1996) (holding that defendant lacked privacy interest in contents of unlocked and open suitcase kept in a third-party's residence).

In short, unless and until Tsarnaev establishes both a subjective and objective expectation of privacy in the Norfolk Street apartment, or a possessory interest in the items that were seized, the Court cannot and should not "proceed with any Fourth Amendment analysis."  <u>Lipscomb</u>, 539 F.3d at 35-36.

ii.     Tsarnaev abandoned any residual expectation of privacy in the apartment and any <u>possessory interest in his things on the evening of April 18, 2013.</u>

Even assuming Tsarnaev retained some residual expectation of privacy in the Norfolk Street apartment after he moved out, he abandoned that expectation on the evening of April 18, 2013.  "[W]hen an individual abandons property, he forfeits any reasonable expectation of privacy in it, and consequently police may search it without a warrant."  <u>United States. v. Sealey</u>,

4

30 F.3d 7, 10 (1st Cir. 1994)  (citing <u>United States v. Lewis</u>, 921 F.2d 1294, 1302

(D.C.Cir.1990)).  At approximately 5:00 p.m. on the evening of April 18, the FBI posted

photographs of Tsarnaev and his brother on its website and identified them as the Marathon

bombers.  Almost immediately, Tsarnaev left UMass-Dartmouth, drove back to Cambridge, and

met his brother at the Norfolk Street apartment, where they collected a small arsenal of weapons,

including at least six bombs, a handgun and other weapons, and then embarked on a murderous

crime spree:  they executed an MIT police officer, carjacked and robbed a civilian, and, when the

police caught up to them while they were driving, chose not to flee but instead fired on the

police, threw bombs at them and drove at them.  Shortly before Tsarnaev embarked on this crime

spree, one of his friends sent him a text stating that he (Tsarnaev) looked like one of the

Marathon bombing suspects; Tsarnaev texted back, "if y[o]u want y[o]u can go to my room and

take what's there," indicating that he was abandoning his possessions.  <u>See</u> Exhibit H at 13;

Exhibit I. He also sent an email to his mother in which he told her he loved her and ended with,

"Inshallah [i.e. God willing] if I don't see you in this life I will see you in the akhira [i.e.

afterlife]."  <u>See</u> Exhibit J. These circumstances leave little doubt that when Tsarnaev left the

Norfolk Street apartment on April 18, he did not expect to return alive, and thus abandoned his

expectation of privacy in everything left behind.  <u>See</u> <u>United States v. Wider</u>, 951 F.2d 1283,

1285 (D.C.Cir. 1991) (determining whether property has been "abandoned" involves an

objective test "under which intent may be inferred from words spoken, acts done, and other

objective facts.").

          B.      Even assuming Tsarnaev has standing to challenge the search, it was conducted <u>pursuant to a validly obtained warrant.</u>

       i.      <u>Background</u>

On April 15, 2013, Tsarnaev and his brother Tamerlan detonated two powerful, remote-controlled bombs seconds apart along the final stretch of the Boston Marathon, killing a little boy and two young women and maiming and injuring approximately 260 others.  The bombs were constructed from pressure cookers filled with black powder and shrapnel.  After detonating the bombs, the brothers fled and remained at large until the night of April 18, 2013, when they carjacked, kidnaped, and robbed a civilian before fleeing to Watertown, where police finally caught up with them.  During a fierce confrontation, they fired numerous gunshots and hurled several additional bombs at the police.  Tsarnaev eventually returned to the vehicle he had helped carjack, deliberately drove at top speed at a group of police officers, in the process running over his brother and escaped.  He eluded a massive police manhunt for approximately 20 hours before officers found him hiding in a boat and arrested him.  Tsarnaev's brother was put in an ambulance and died on his way to the hospital.

Agents learned the Tsarnaev brothers' names only after Tamerlan Tsarnaev was fingerprinted at the hospital.  Comparisons of the brothers' Registry of Motor Vehicle photos with photos taken of the suspected Marathon bombers confirmed that the brothers were in fact the bombers.  Database checks revealed that Tamerlan Tsarnaev lived with his wife and daughter at 410 Norfolk Street, Apt. 3, and that his brother, Dzhokhar Tsarnaev, who was a sophomore at UMass-Dartmouth, had also lived there.  They also revealed that both brothers had immigrated from Russia and that Tamerlan was still a foreign national.  Little else was known about the brothers at that time.

On April 19, 2013 -- hours after learning the brothers' identities, and while Tsarnaev was still at large -- an FBI agent applied for a warrant to search the Norfolk Street apartment.  The warrant affidavit recited all of the facts set forth above.  Those facts gave the agents reason to

believe, among other things, that the Tsarnaevs were terrorists who had carried out a

sophisticated and successful attack against American citizens on American soil; that they alone

or with the assistance of others had constructed or obtained numerous powerful bombs; that they

might have constructed or obtained additional bombs and might have been planning additional

attacks; that they might have links to a foreign power; and that they might be radical extremists.

Accordingly, the FBI obtained a warrant authorizing a search of the Norfolk Street

apartment for the following items, which were listed in "Attachment B" to the warrant:

<u>Items To Be Seized</u>

All evidence inside the premises and curtilage located at the Target Residence,
related to violations of 18 U.S.C. §§ 2332(a) (Using and Conspiring to Use A
Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by
Means of an Explosive Device Resulting in Death), 2119 (Carjacking), 1951
(Interference with Commerce by Violence), 924(c) (Use of a Weapon During a
Crime of Violence) and 371 (Conspiracy to Commit Offenses), including but not
limited to:

1. Property, records, items, or other information, related to violations of the
aforementioned statutes, including but not limited to, bomb making material and
equipment, ammunition, weapons, explosive material, components of bomb
delivery devices;

2. Property, records, or other information related to the ordering, purchasing,
manufacturing, storage, and transportation of explosives;

3. Property, records, or other information related to the ordering, purchasing,
manufacturing, storage, and transportation of firearms;

4. Property, records, or other information related to the ordering and purchasing
of pressure cooker devices, BBs, nails, and other small metallic objects;

5. Property, records, or information related to the Boston Marathon;

6. Property, records, or information related to any plans to initiate or carry out any
other attacks inside or outside the United States, or any records or information
related to any past attacks;

7. Property, records, or information related to the state of mind and/or motive of
Tamer[l]an and Dzhokhar to undertake the Boston Marathon bombings;

8. Property, records, or other information related to the identity of Tamer[l]an and Dzhokhar;

9. Property, records, or other information related to the identity of any individuals who were in contact with, or were associates of Tamer[l]an and Dzhokhar;

10. Property, records, or information, related to any organization, entity, or individual in any way affiliated with Tamer[l]an and Dzhokhar, that might have been involved in planning, encouraging, promoting the actions described herein;

11. Property, records, or other information, related to Tamer[l]an's and/or Dzhokhar's schedule of travel or travel documents;

12. Property, records, or information related to any bank records, checks, credit card bills, account information, and other financial records.

13. [Digital evidence]

 ii. <u>The warrant described the items to be seized with sufficient particularity.</u>

Tsarnaev claims that the phrase "including but not limited to" in the warrant's first paragraph deprived it of sufficient particularity (Deft. Mot. re Phys. Ev. at 11), but that argument is foreclosed by <u>United States v. Kuc</u>, 737 F.3d 129 (1st Cir. 2013). The warrant in <u>Kuc</u> authorized the seizure of:

> All records, in whatever form, and tangible objects that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), 2315 (storage and sale of stolen property in interstate commerce), and 2 (aiding and abetting), *including, without limitation*: [list of 23 categories of items].

<u>Id.</u> at 131-32 (emphasis added). The First Circuit held that the phrase "including, without limitation" did not deprive the warrant of sufficient particularity because the list of violations that preceded it, and the 23 categories of items that followed it, limited the scope of the challenged phrase. <u>See id.</u> at 132-34. Numerous other cases have held the same thing. <u>See</u>, <u>e.g.</u>, <u>United States v. Ballard</u>, 551 Fed.Appx. 33, 38 (3rd Cir. 2014) ("Similarly, the phrase 'any other items of evidentiary value' that appears in the First Local Warrant was limited by the specified

list of [items to be seized] . . . and by the warrant's identification of the violations that were being investigated, namely, burglary, theft, and receiving stolen property."); United States v. Riley, 906 F.2d 841, 844-45, 847 (2nd Cir. 1990) (holding that holding that warrant including illustrative list of seizable items was sufficiently particular despite authorization to search for "[all] other items that constitute evidence of the offenses of  conspiracy to distribute controlled substances and distribution of the same" because "the language of a warrant is to be construed in light of an illustrative list of seizable items" where one is included); United States v. Fiorito, 640 F.3d 338, 347 (8th Cir. 2011) ("The broad phrase at the opening [of the items-to-be-seized list] must be read in the context of the specific list that follows."); See generally Andresen v. Maryland, 427 U.S. 463, 480-81 (1976) (holding that catch-all phrase in warrant had to be read in context and together with the warrant's "lengthy list of specified and particular items to be seized").

Tsarnaev also criticizes the warrant's failure to "provide a particular date, place, or event when [the crimes listed in the first paragraph] . . . occurred," but that is only one way – and not a necessary way -- of supplying a warrant with sufficient particularity.  In United States v. Bucuvalas, 970 F.2d 937 (1st Cir. 1992), for example, the court considered a warrant for "records, documents, notes and physical objects which constitute evidence of and instrumentalities of [RICO, mail fraud, and conspiracy] . . . and, in particular, records, documents, notes and physical objects evidencing the ownership or control of [certain] businesses in the Combat Zone in Boston . . . and the payment of bribes to public officials with regulatory authority over such licensed premises. . . ."  Id. at 941 n.5.  The defendant in Bucuvalas argued that "the warrant description should have been limited to documents prepared after 1980, the alleged date of the commencement of the conspiracy," id. at 942 n.7, but the First

Circuit disagreed.  It wrote:  "[We] have never required such arbitrary limitations in warrant descriptions.  Temporal delineations are but one method of tailoring a warrant description to suit the scope of the probable cause showing."  Id. (internal citations omitted).

In this case, no date, place or event limitation was needed to prevent the warrant from being a "general warrant" that would permit "a general, exploratory rummaging in a person's belongings."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The warrant authorized a search for violations of specific crimes:  use of a weapon of mass destruction, malicious destruction of property, carjacking, Hobbs Act robbery, committing those offense while armed, and conspiring to commit them.  It further narrowed the authorized scope of the search to 12 specific categories of physical evidence that could provide evidence of those crimes.  That is sufficient to satisfy the Fourth Amendment's particularity requirement.  See, e.g., United States v. Timpani, 665 F.2d 1, 5 (1st Cir. 1981) (holding that challenged warrant was sufficiently particular because it "breaks the items [to be seized] into categories" and "[e]ach item is plausibly related to [one of] the crime[s] . . . that is specifically set out.").  In re Application of Lafayette Academy, 610 F.2d 1 (1st Cir. 1979), on which Tsarnaev relies, is not on point, because the warrant in that case authorized the seizure of evidence relating to "any type of federal conspiracy or fraud" and did not break the items to be seized into categories.  See id. at 3-4.

Moreover, this is not the kind case where the agents seeking the warrant knew that the criminal conduct was limited to particular individuals or particular instrumentalities or had begun and ended at particular dates and places.  On the contrary, this case involves sophisticated terrorist attacks that were committed using multiple improvised explosive devices in different locations over the course of several days.  When the FBI obtained the warrant, it was investigating, among other things, whether the Tsarnaevs had been planning the attacks for

weeks, months, or years; whether they had built only six bombs or more; whether they had acted

alone or with accomplices; and whether they were motivated by simple hatred, an extremist

ideology, or something else.  The warrant properly authorized the police to search for evidence

of all those things.  Consequently, the Fourth Amendment did not require the magistrate judge to

include a date, place or event limitation in the warrant.

This case is analogous to United States v. Zanche, 541 F.Supp. 207 (W.D.N.Y. 1982), a

fraud case in which a warrant authorized agents to search for "any and all business records

relating to present and past disbursements and payments made by Gabriel's Services and Supply

Corp., including [nine specific categories of records]."  Id. at 208.   The court rejected the

defendant's argument "that the failure of the warrant to circumscribe the dates of the records to

be seized waters down whatever particularity otherwise exists to the point of total dilution."  Id.

at 210.  It noted that "if the fraud operation under investigation was ongoing, evidence of illegal

activity in the past would be relevant to the conspiracy, while records of legitimate transactions

prior to the conspiracy will help determine how and when the fraud scheme began."  Id. at 210.

It also held that the warrant properly authorized the seizure of broad categories of documents

because "the scope, number of individual and other business participants, time period, and

amount of the fraud remained unknown . . . [and the] business records sought . . . were needed to

uncover this information."  Id. at 208.

Tsarnaev's overbreadth and vagueness challenges to individual categories in the list of

items to be seized fail for the same reason:  the categories were only as broad as necessary to

obtain evidence of the listed crimes, and they were worded as definitely as they could be under

the circumstances.  Categories of items to be seized may be drafted broadly "when the

surrounding circumstances render it reasonable."  United States v. Morris, 977 F.2d 677, 681 (1st

Cir.1992).  In determining whether a category is overbroad, "[t]he proper metric ... is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation."  United States v. Blair, 214 F.3d 690, 697 (6th Cir. 2000).  "'When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of the items he is seeking.'"  United States v. Timpani, 665 F.2d 1, 5 (1st Cir. 1981) (citation omitted). In light of these principles, none of the categories in the first Norfolk Street warrant lacked sufficient particularity.

The warrant properly authorized police to search for evidence of "the state of mind and/or motive of Tamer[l]an and Dzhokhar to undertake the Boston Marathon bombings."  This category could not be drafted more narrowly because the brothers' motive for carrying out the bombing was completely unknown.  Tsarnaev is mistaken, however, in claiming that these words authorized the agents to "seize every item in the apartment in the hope that it might shed light on the religious, political, or other beliefs of the Tsarnaev brothers, as well as anything that might provide the slightest insight into their psychological makeup."  (Deft. Mot. re Phys. Ev. at 12). Agents executing a search warrant must exercise "judgment in selecting where to search and what to seize."  Kuc, 737 F.3d at 133.  The purpose of the categories in an items-to-be-seized list is to "guide and control" their judgment.  Id.  State of mind and motive are concepts familiar to law enforcement officers and thus provided the kind of guidance required by the First Circuit's precedents.  "That agents may have to perform some initial screening to locate the particularized documents does not render the warrant unconstitutional."  United States v. Beckett, 321 F.3d 26, 33 (1st Cir. 2003).

The warrant also properly authorized a search for evidence of "the identity of Tamer[l]an and Dzhokhar." When the warrant was drafted and executed, agents knew very little about Tamerlan and Dzhokhar Tsarnaev, including their involvement in the Marathon bombings. Tsarnaev himself was still at large. The agents were thus investigating whether the brothers had used different names, appearances, or had attempted to do so; how long they had had their current identities; their various identifying characteristics; and whether they had obtained or tried to obtain false identification, among other things. Once again, identity and the kinds of things that shed light on identity are concepts familiar to law enforcement officers and thus served to "guide and control" their judgment in determining where to search and what to seize.

Tsarnaev argues that the authorization to search for evidence of "the identity of any individuals who were in contact with, or were associates of Tamer[l]an and Dzhokhar" should have been limited to "a particular time frame or specific events" (Deft. Mot. re Phys. Ev. at 13), but such a limitation was unnecessary and unwarranted. For one thing, the warrant already authorized agents to search for associate and contact information only to the extent it related to violations of the statutes identified in the items-to-be-seized list's first paragraph; that limitation alone supplied sufficient particularity. See Kuc, 737 F.3d at 132-34. For another thing, as noted earlier, the warrant affidavit established probable cause that Tamerlan and Dzhokhar were terrorists who had carried out an audacious multi-pronged attack using sophisticated improvised explosive devices. Those circumstances made it reasonable to believe the Tsarnaevs were aided by associates with whom they might have been in contact. But the facts provided no basis for limiting those associations or contacts to a particular time frame. See United States v. Hershenow, 680 F.2d 847, 851 (1st Cir. 1982) (holding that even extremely broad categories in a

warrant do not lack sufficient particularity so long as they are definite and supported by probable cause).

Tsarnaev's argument that the authorization to search for "any bank records, checks, credit card bills, account information, and other financial records" should have been limited "by a time frame, the identity of an individual, or the nature of the transactions reflected in these records" (Deft. Mot. at 12) fails for the same reason. The authorization to search for financial documents was already limited by the items-to-be-seized list's first paragraph. Moreover, it was reasonable to believe that any and all financial documents in the Norfolk Street apartment could shed light on the sources of funding for the Tsarnaevs' terrorist attacks.

    iii.    The agents conducting the search were entitled to presume that the warrant was <u>validly issued.</u>

Whether the warrant satisfied the Fourth Amendment depends not on whether it was sufficiently particular but on whether "a reasonably well trained officer should have known that the search was illegal despite the magistrate's authorization." <u>United States v. Leon</u>, 468 U.S. 897, 922-933 & n.23 (1984). Here, as in <u>Kuc</u>, "the warrant, read comprehensively and in context, was not so 'facially deficient . . . that the executing officers [could not] reasonably presume it to be valid.'" <u>Kuc</u>, 737 F.3d at 134 (quoting <u>Leon</u>, 468 U.S. at 923) (brackets in original).

    iv.    <u>The search was not unconstitutionally overbroad.</u>

Tsarnaev has not demonstrated that the search exceeded the warrant's scope. <u>See United States v. Rogers</u>, 521 F.3d 5, 9-10 (1st Cir. 2008). He bears the sole burden of proving that each and every item he seeks to suppress on overbreadth grounds was seized without legal authority; he cannot simply assert that they all were and demand that the government prove that they were not. <u>See Jarabo v. United States</u>, 158 F.2d 509, 515 (1st Cir. 1947) ("[T]he burden of proving

that evidence has been unlawfully obtained rests upon the party objecting to it"); United States v. Rodriguez–Suazo, 346 F.3d 637, 643 (6th Cir.2003) ("[T]he burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."). Tsarnaev has not satisfied that burden with respect to any of the seizures that that he actually complains about in his motion.

Tsarnaev claims that in the course of the first Norfolk Street and dorm room searches, the agents seized "almost every book, document, paper, and household item they saw." (Deft. Mot. re Phys. Ev. at 14). That is obvious hyperbole and underscores the weakness of his overbreadth argument. The agents seized a total of 100 items during the first Norfolk Street search and 27 items during the first dorm room search, leaving behind hundreds of books, documents, papers and household items. Indeed, they later obtained additional search warrants for both locations precisely in order to seize items left behind during the first searches.

In evaluating whether agents exceeded their seizing authority it is important to keep in mind that "[a] warrant is not intended to impose a constitutional strait jacket on investigating officers." United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir.1988) (internal quotation marks omitted). Instead, courts must interpret the words in a warrant in a "commonsense and realistic" manner so as to preserve "the flexibility of law enforcement to adapt to the unforeseen circumstances that necessarily arise in an investigation predicated on incomplete information." United States v. Dargan, 738 F.3d 643, 647 (4th Cir. 2013) (internal quotation marks and citations omitted). Moreover, "[c]ourts have recognized that 'officers executing a search warrant are "required to interpret it," and they are "not obliged to interpret it narrowly."'" Tiem Trinh, 665 F.3d at 16 (quoting United States v. Stiver, 9 F.3d 298, 302 (3rd Cir. 2003) (quoting Hessel v. O'Hearn, 977 F.2d 299, 302 (7th Cir.1992)). A search is not overbroad so long as an officer

has "a reasonable basis" for believing that an item is included on the list of items to be seized.

See Tiem Trinh, 665 F.3d at 15.

Applying these principles to the particular seizures that Tsarnaev challenges makes clear that none of them were unauthorized. The 2010 paystub for Tamerlan Tsarnaev (Deft. Mot. re Phys. Ev. at 12), car keys (id. at 5), "academic, immigration and tax records, dating back to 2009" (id. at 13), "Dzhokhar Tsarnaev's middle school identification card" (id.), and family member documents such as letters, a 2006 domestic airplane itinerary, and medical images (id.), were all "[p]roperty, records, or other information related to the identity of Tamer[l]an and Dzhokhar." The pay stub and tax records were also potential evidence of how the criminal activity was funded, and the academic and immigration records were also potential evidence of motive. The tools, knives, and nail clippers (id. at 5) might have been used in making the bombs. The same is true of the Estheticians Handbook and beauty supplies receipt (id.): beauty supply chemicals can be used in bomb making, and the Estheticians Handbook might have identified which supplies contained useful chemicals. The handbook also had handwritten notes and contact information in it. Finally, the notebooks and printed books in Russian were potential evidence of identity and motive. One of them – a Russian dictionary – contained a prayer card bearing handwritten references to convicted terrorist Tarek Mehanna and the late al-Q'aeda propagandist Anwar al-Awlaki. (Because both brothers appeared to have been educated in the United States, the agents had no reason to anticipate the discovery of Russian-language books or notebooks and thus were warranted in removing these to search them elsewhere.)

Even assuming, for the sake of argument, that any of these items were not included in at least one of the categories specified in the list of items to be seized, their seizure was still lawful because they were all in plain view. Under the plain-view doctrine, if police are lawfully in a

position from which they view an object, and if there are "enough facts for a reasonable person

to believe that the items in plain view may be contraband or evidence of a crime," they may seize

the items without a warrant.  United States v. Hamie, 165 F.3d 80, 83 (1st Cir. 1999) (internal

quotations and citations omitted).  Accord Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).

"A practical, nontechnical probability that incriminating evidence is involved is all that is

required."  Hamie, 165 F.3d at 83.  Those requirements are met here.  The police were lawfully

in a position from which they viewed the seized objects because a warrant supported by probable

cause authorized them to enter the apartment and search it.  See Tiem Trinh, 665 F.3d at 16 n.5

("[E]ven if it could plausibly be argued that the warrant in this instance lacked particularity, the

district court's denial of Trinh's motion to suppress still would have been proper because the

seized items would have been admissible under either (1) the plain view doctrine or (2) Leon's

good-faith exception.").  And there was "[a] practical, nontechnical probability" that each of the

seized items was evidence of a crime.  See Hamie, 165 F.3d at 83.

> **II.    The second Norfolk Street search (May 5, 2013)**
>
> A.     Tsarnaev lacks standing to challenge the search and seizure of items from the
> Norfolk Street Apartment on May 5, 2013.

We have already shown that Tsarnaev has not proved, and cannot prove, that he had an

expectation of privacy in the Norfolk Street apartment at the time of the April 19, 2013 search

because (1) he moved out in September 2011 and (2) he abandoned any expectation of privacy in

it on April 18, 2013.  Events occurring after April 18 only highlight his lack of an expectation of

privacy in the apartment.  As noted earlier, the apartment's landlady served Tamerlan Tsarnaev

and his wife with a notice to vacate in November 2012.  Tamerlan Tsarnaev died on April 19,

2013, and a few days later, his wife took many of her clothing and belongings and moved in with

her parents in Rhode Island.  Consequently, by the time the second search occurred on May 5,

2013, the apartment had essentially been abandoned.  These circumstances make it impossible for Tsarnaev to demonstrate that he had a subjective or objectively reasonable expectation of privacy in the Norfolk Street apartment at the time of the second search.

Once again, unless and until Tsarnaev establishes both a subjective and objective expectation of privacy in the Norfolk Street apartment at the time of the May 5 search, or a possessory interest in the items that were seized, the Court cannot and should not "proceed with any Fourth Amendment analysis."  <u>Lipscomb</u>, 539 F.3d at 35-36.

      B.    Even assuming Tsarnaev has standing to challenge the search, it was conducted <u>pursuant to a validly obtained warrant.</u>

On May 3, 2013, a federal magistrate judge issued a warrant authorizing the government to search the Norfolk Street apartment for the following items, which were listed in "Attachment B" to the warrant:

<u>Items To Be Seized</u>

Evidence, in whatever form inside the premises and curtilage located at the Target Residence, related to violations of 18 U.S.C. §§ 2332a (Using and Conspiring to Use A Weapon of Mass Destruction), 844(i) (Malicious Destruction of Property by Means of an Explosive Device Resulting in Death), 2119 (Carjacking), 1951 (Interference with Commerce by Violence), 924(c) (Use of a Firearm During a Crime of Violence) and 371 (Conspiracy to Commit Offenses), including but not limited to:

1. Low-explosive powder residue from locations within the Target Residence, including but not limited to table tops, countertops, under furniture, and concealed locations;

2. Low-explosive powder residue from the plumbing system of the Target Residence, including but not limited to the drains and pipes;

3. Male and/or female clothing consistent with clothing worn by the two individuals in the February 23, 2013 surveillance video from Macy's department store, located at 450 Washington Street, in Boston, Massachusetts.

4. A five-quart perforated colander, an eleven-inch teal-colored frying pan, and an eleven-inch stainless steel frying pan, all of which are Martha Stewart brand products.

5. Chrome-colored shoes consistent with the description of the individual present in the fireworks store in Seabrook, New Hampshire in February 2013.

6. Evidence not previously seized, which based on information available at the time of the search, is related to violations of the aforementioned statutes, including but not limited to, bomb making material and equipment, ammunition, weapons, explosive material, and components of bomb delivery devices.

    i.    <u>The warrant described the items to be seized with sufficient particularity.</u>

Tsarnaev claims, incorrectly, that this warrant did not specify with sufficient particularity the items to be seized because the words "including but not limited to" in Category 6 allowed "agents to take whatever they believed might be relevant." (Deft. Mot. re Phys. Ev. at 14). This argument fails for all the same reasons discussed above in connection with Tsarnaev's particularity challenge to the first Norfolk Street warrant. The challenged phrase may not be considered in isolation but must be viewed in context and read in a commonsense fashion. <u>See</u> <u>Andresen</u>, 427 U.S. at 480-81. Category 6 authorizes seizure only of items "related to violations of the aforementioned statutes," and it is followed by a list of defined categories ("bomb making material and equipment, ammunition, weapons, explosive material, and components of bomb delivery devices"); it is analogous to the warrant approved in <u>Kuc</u>. In <u>Kuc</u>, "the warrant, read comprehensively and in context, was not so 'facially deficient . . . that the executing officers [could not] reasonably presume it to be valid.'" <u>Kuc</u>, 737 F.3d at 134 (quoting <u>Leon</u>, 468 U.S. at 923) (brackets in original).

    ii.    <u>The search was not unconstitutionally overbroad.</u>

Tsarnaev also claims, incorrectly, that the search was overbroad because several written documents seized during the search -- namely, notebooks, "The Report of the Citizens

Commission on 9/11," and a newspaper called "The Sovereign" -- were plainly unrelated to "bomb making material and equipment, ammunition, weapons, explosive material, and components of bomb delivery devices."  That is incorrect.  It was reasonable for the agents to believe that Category 6 embraced documents that could reasonably be expected to include discussions of bombs, their effects, or their uses as well as for motive and state of mind.  Other items seized during this search of which Tsarnaev complains – namely, clothing, a cell phone, and a thumb drive – were all potential evidence of the Tsarnaevs' identity as the bombers and thus of their identity as the bomb makers as well.  In addition, trace evidence could reasonably be found on the clothing.

### III.     The First UMass-Dartmouth Dorm Room Search (April 22, 2013)

A.     Tsarnaev abandoned any expectation of privacy in his dorm room and possessory interest in its contents on the evening of April 18, 2013.

As set forth above, after Tsarnaev was publicly identified as one of the Marathon bombers, he left UMass-Dartmouth, met his brother in Cambridge, armed himself with multiple IEDs, and embarked on a murderous crime spree that he expected to end in his death.  Right before doing so, he sent a text inviting one of his friends to go to his (Tsarnaev's) dorm room and "take what you want."  These words and actions clearly indicate that he had abandoned any expectation of privacy in the dorm room and any possessory interest in its contents.  See Bond, 529 U.S. at 338.

B.     Even assuming Tsarnaev has standing to challenge the seizure of items from his dorm room on April 21, 2013, the search was conducted pursuant to a validly obtained warrant.

On April 21, 2013, approximately 48 hours after Tsarnaev was arrested, a federal magistrate judge issued a warrant authorizing the government to search his dorm room at UMass-Dartmouth for substantially the same items identified in "Exhibit B" to the first Norfolk

Street warrant.  Tsarnaev argues that the warrant was insufficiently particular and that the search itself was overbroad.  With respect to particularity, he relies on the same arguments he made in connection with the first Norfolk Street warrant; and those arguments fail here for the same reasons.  We incorporate those reasons herein by reference.

With respect to the breadth of the search, Tsarnaev once again fails to meet his burden of proving that each and every item he seeks to suppress on this ground was seized without legal authority.  He could not meet this burden even if he tried.  Although he complains that agents seized "a pizza box with a receipt, a notebook, a book called 'Muslims in the West,' articles of clothing, a book called 'Soldiers of God,' personal documents, and school records" (Deft. Mot. re Phys. Ev. at 5), it was reasonable for agents to consider all of those items to be evidence of Tsarnaev's identity.  It was also reasonable for them to regard the printed matter as potential evidence of his motive and state of mind in committing the Marathon bombings, and to consider the pizza box receipt and personal documents as a possible source of financial information as well as information about possible asociates.

C.    Even assuming the warrant was invalid, the agents had valid third-party consent to search the room, and virtually all of the items they seized were in plain view.

Tsarnaev's dorm room was a single room that he shared with a roommate.  It contained two beds, two dressers, two desks and two wardrobes (one of each for each roommate).  On April 19, 2013, two days before executing the first dorm room warrant, agents interviewed the roommate, who told them that his furniture was on the room's left side and Tsarnaev's was on the right side.  He also told them that he and Tsarnaev each controlled his own property, but that both enjoyed mutual access to and control of the common area between the two beds.  The roommate then orally consented to a search of the room.  Earlier, the roommate had signed a written consent form authorizing the FBI (and other law enforcement officers) "to conduct a

complete search" of the premises and "to take any letters, papers, and/or other property." <u>See</u>

Exhibit K.  The roommate's consent to search was open-ended and never withdrawn.

"[T]he consent of one who possesses common authority over premises or effects is valid

as against the absent, nonconsenting person with whom that authority is shared." <u>United States</u>

<u>v. Matlock</u>, 415 U.S. 164, 171 (1974).   Common authority rests "on mutual use of the property

by persons generally having joint access or control for most purposes." <u>Id.</u> at 171 n. 7.  <u>Accord</u>

<u>United States v. Meada</u>, 408 F.3d 14, 21 (1st Cir. 2005).  Police who have valid third-party

consent to enter a premises may validly seize incriminating evidence that is in plain view.  <u>See,</u>

<u>e.g.</u>, <u>Meada</u>, 408 F.3d at 22.  In this case, virtually all of the items seized during the execution of

the search warrant appeared to have been in plain view from the vantage point of someone

standing in the room's common area.  The only exceptions were the items specified on the search

warrant inventory as Items No. 9-13, 20, and 24. <u>See</u> Exhibit C at 28-29.

### IV.     The Second UMass-Dartmouth Dorm Room Entry (June 27, 2013)

The UMass-Dartmouth school year officially ended on or about May 10, 2013, one day

after the last final exam.  <u>See</u> Exhibit L**.**  Approximately six weeks later, on June 27, 2013,

University officials entered Tsarnaev's dorm room and removed everything he had left inside.

They invited the FBI to accompany them.  An FBI agent observed the collection of the

defendant's belongings, took a few photographs, and obtained an inventory of the items that

were removed.  The agent and University officials saw reddish-brown powder on the window sill

and a University official took a sample of it.  The FBI did not seize anything.

A.     Tsarnaev lacks standing to challenge the June 27, 2013 entry into his former dorm
       <u>room or the collection of any of its contents.</u>

Tsarnaev has not shown, and cannot show, that he had either a subjective or objectively

reasonable expectation of privacy in the dorm room, or a possessory interest in its contents, on

June 27, 2013.  That is because:  (1) he abandoned any expectation of privacy in the contents of

the dorm room on April 18, 2013, as explained above; and (2) he had earlier agreed in writing

that any items he left in the room after May 13, 2013 – 48 hours after the school year's end --

would become the University's property and would be removed and disposed of by the

University.

On July 22, 2012, before Tsarnaev began his sophomore year, he signed a contract with

UMass-Dartmouth that governed their respective rights to the dorm room.  See Exhibit M.  The

signed contract provided, among other things, that the lease was for the "academic year" See

Exhibit M at 1.  It also provided that the lease was subject to the Terms and Conditions of

Occupancy set forth at www.umassd.edu/housing, which in turn contained the following

provision:  "Personal property remaining in the residence hall after the term of this Contract has

expired shall become the property of the University."  See Exhibit M at 4.  The lease expired on

May 11, 2013, 24 hours after the last final exam of the spring semester.  See

http://www.umassd.edu/-uec/housing ("A student must check out of his or her room at the end of

the spring semester 24 hours after the student's last final or by the date posted in the building.");

See Exhibit L (listing May 10, 2013, as the date of the last final exam). When Tsarnaev's lease

expired and the dorm room's contents became the University's property, the University secured

the room and waited nearly six weeks; during that time, neither Tsarnaev nor anyone acting on

his behalf contacted the University about his belongings or made any effort to collect them.

Accordingly, on June 27, 2013, University officials entered the room and removed all of the

belongings.  Because Tsarnaev lost any expectation of privacy in the dorm room and any

possessory interest in its contents on or about May 11, 2013, he lacks standing to challenge the

June 27 search and seizure.

B.      UMass-Dartmouth provided valid third-party consent for the search.

Although UMass-Dartmouth officials are state actors subject to the Fourth Amendment as applied to the states through the Fourteenth Amendment, they did not conduct a Fourth Amendment "search" on June 27, 2013.  A Fourth Amendment "search" is a government "intrusion of a constitutionally protected area in order to obtain information."  United States v. Jones, 132 S.Ct. 945, 951 (2012) (internal quotation marks and citation omitted).  The University officials who cleared out Tsarnaev's former dorm room did not do so in order to obtain information:  they were not investigating Tsarnaev on their own or acting on behalf of federal investigators.  Rather, they cleared out the room to make it ready for future use.  They were acting, in effect, as landlords of an abandoned property.

Where, as here, "an apartment is abandoned, authority to consent to a search reverts to the landlord."  United States v. Paige, 543 Fed.Appx. 218, 221 (3rd Cir. 2013); accord United States v. Sledge, 650 F.2d 1075, 1077 (9th Cir.1981).  The University validly consented to the FBI search of the dorm room on June 27, 2013.  The landlord-tenant and motel-guest cases Tsarnaev cites in his motion -- see, e.g. Stoner v. California, 376 U.S. 482 (1964); Chapman v. United States, 365 U.S. 610 (1961) – do not undermine the validity of that consent, because Tsarnaev was no longer a lessee nor an occupant of the room  at the time of the search.  The one abandonment case he cites -- United States v. Robinson, 430 F.2d 1141 (6th Cir. 1970) – is also not on point, because the defendant in that case had merely been absent from his apartment for 34 days without paying rent.  See id. at 1143-44.  Here, in contrast, the school year had ended on May 9, 2013, Tsarnaev's lease had expired a day later, and Tsarnaev knew that ownership of any remaining belongings passed to the University 48 hours later, yet neither he nor anyone else made arrangement to collect his property or even notified the University of a desire to do so.  See

United States v. Buchanan, 633 F.2d 423, 426 (5th Cir. 1980) (where, as here, lease term expired and landlady changed locks, defendant had no further property interest in the premises and could not object to the search).  Those facts make it reasonable to infer that Tsarnaev had abandoned the property despite being detained following arrest.

Moreover, it makes no difference for Fourth Amendment purposes whether University officials had actual authority to consent to a search of the room so long as the agents reasonably believed they did.  "A search is constitutional if it is based on reasonable belief that a third party had authority to consent."  Bolden v. Se. Pennsylvania Transp. Auth., 953 F.2d 807, 828 n. 29 (3rd Cir.1991).  Where, as here, the school year had ended six weeks earlier and the University informed the FBI that it had authority to clear out the room and was planning to do so on June 27, the agents reasonably believed that the University had authority to consent to the search. See, e.g., United States v. Paige, 543 Fed.Appx. 218, 222 (3rd Cir. 2013) (holding that police reasonably believed landlord had authority to consent to search where landlord told them that he had had evicted apartment's residents "and intended to clean out the apartment"); United States v. Kirkpatrick, 172 F.3d 50, *4 (6th Cir. 1998) ("Based on the officer's knowledge that [the tenant] had fled the state and the landlord's stated intent to re-rent the property, the officer reasonably believed that the landlord had apparent authority to enter the premises.").

The fact that UMass-Dartmouth officials took a sample of the reddish-brown powder on the windowsill does not change the analysis, even if done in consultation with the FBI.  The requirements for a plain-view seizure were met:  the University officers were lawfully in the dorm room, an FBI agent was lawfully in the dorm room at the University's invitation, they recognized that the powder on the windowsill was probably low explosive powder and had evidentiary value in the investigation, and the University took a sample of the powder.  In fact, it

was inevitable in these circumstances, even without FBI presence during the June search, that the

University would have notified the FBI of the list of belongings taken from the room and of their

observations of the room, including the powder, and that these items would then have been

seized pursuant to a warrant, as they eventually were.  See United States v. Hughes, 640 F.3d

428, 440 (1st Cir. 2011) (describing inevitable discovery doctrine).

### V.   The Third UMass-Dartmouth Dorm Room And Personal Belongings Search (July 26, 2013)

On July 26, 2013, FBI agents searched Tsarnaev's dorm room, which had remained

secure since the June 27 search four weeks earlier, for traces of blood, tissue, DNA, hair,

fingerprints, bodily fluids, explosive powder, and small pellets or ball bearings.  They also

searched the 21 named belongings the University had removed on June 27 for the same things, as

well as many of the same categories of items that they had searched for during the first dorm

room search.  Tsarnaev claims the warrant authorizing these searches was insufficiently

particular and that the search itself was overbroad.  He also claims that the searches were not

independent of the purportedly illegal June 27 search and therefore violated the Fourth

Amendment.  None of those arguments has merit.

A.   Tsarnaev lacks standing to challenge the July 26, 2013 searches.

Tsarnaev lacks standing to challenge the July 26 searches of his former dorm room and

belongings for the same reasons he lacks standing to challenge the June 27 search of them.  We

incorporate those reasons here by reference.

B.   Even assuming Tsarnaev has standing to challenge the searches, they were conducted pursuant to a validly obtained warrant.

On July 24, 2013, a federal magistrate judge issued a warrant to search the dorm room for

the following items:

All evidence inside the premises of the Target Location relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U .S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S.C. § 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

1. Reddish-brown powder residue observed within the Target Location, including, but not limited to, the window sill and floor;

2. Blood, tissue, DNA, hair, fingerprints, bodily fluids, and explosive powder and small pellets or ball bearings (bbs).

The warrant also authorized police to search Tsarnaev's belongings that had been removed from

the dorm room for the following items:

All evidence . . . relating to violations of 18 U.S.C. § 2332a(a)(2) (Using and Conspiring to Use Weapons of Mass Destruction), 18 U.S.C. § 2332f (Bombing of a Place of Public Use and Conspiracy); 18 U.S.C. § 844(i) & (n) (Malicious Destruction of and Conspiracy to Maliciously Destroy Property by Means of an Explosive Device Resulting in Death), 18 U.S. C.§ 2119 (Carjacking Resulting in Serious Bodily Injury), 18 U.S.C. § 1951 (Interference with Commerce by Violence), 18 U.S. C. § 924( c) (Use of a Firearm During and in Relation to a Crime of Violence), 18 U.S.C. § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death); and 18 U.S.C. § 2 (Aiding and Abetting), including:

1. Blood, tissue, DNA, hair, fingerprints, bodily fluids;

2. Fibers and other trace evidence;

3. Clothing;

4. Shoes and other footwear;

5. The specific items listed:

a. A notebook labeled "Chem. Nutrition Dzhokhar";
b. A notebook with must-colored exterior containing handwritten notes;
c. An opened 10-pack of AAA batteries with 8 batteries remaining
d. A pair of black Ray Ban sunglasses;

e. A yellow notebook bearing the name "Dzhokhar" containing handwritten Chemistry notes;

f. Various boots and shoes;

g. A black jacket with puffed horizontal ribbing;

h. A black Nike backpack containing academic materials, including notebook,

papers, calculator, and an implement designed to record presence at lectures;

i. Two notebooks bearing the name "Timur Mugynov";

J. A copper-colored ball bearing (BB)/pellet found on the far right floor;

k. A Massachusetts State Police accident form documenting a collision;

1. A Gap store receipt;

m. Two empty glass jars sealed with metal tops containing strong odor of marijuana;

n. Correspondence related to a Progressive Insurance claim for event on January 28, 2013;

o. Cambridge Rindge and Latin High School identification card for Dzhokhar;

p. Masshealth card for Dzhokhar;

q. Gray plastic piece appearing to have been a component of an electronic remote control device;

r. Sample of reddish-brown powder seized from atop the window sill of Room

7341 Pine Dale Hall;

s. Various items of clothing;

t. Luggage;

u. Books and documents, including those about history, politics and religion; manufacturing, storage, and transportation of explosives;

6. Property, records, or other information related to the ordering, purchasing, manufacturing, storage, and transportation of explosives;

7. Property, records, or other information related to the ordering and purchasing of pressure cooker devices, BBs, nails, and other small metallic objects;

8. Property, records, or information related to the Boston Marathon;

9. Property, records, or information related to any plans to initiate or carry out any other attacks inside or outside the United States, or any records or information related to any past attacks;

10. Property, records, or information related to the state of mind and/or motive of Tamerlan and Dzhokhar to undertake the Boston Marathon bombings;

11. Property, records, or other information related to the identity of Tamerlan and Dzhokhar;

12. Property, records, or other information related to the identity of any
individuals who were in contact with, or were associates of Tamerlan and
Dzhokhar;

13. Property, records, or information, related to any organization, entity, or
individual in any way affiliated with Tamerlan and Dzhokhar, that might have
been involved in planning, encouraging, promoting the actions described herein;

14. Property, records, or other information, related to Tamerlan's and/or
Dzhokhar's
schedule of travel or travel documents;

15. Property, records, or information related to any bank records, checks, credit
card bills, account information, and other financial records;

16. Personal property, including articles of clothing, which could contain trace,
DNA, explosives, blood or other evidence.

    i.    <u>The warrant described the items to be seized with sufficient particularity.</u>

The July 24 dorm room warrant was sufficiently particular for the same reasons the first

Norfolk Street warrant was sufficiently particular.  We incorporate those reasons here by

reference.

    ii.    <u>The search was not unconstitutionally overbroad.</u>

Tsarnaev complains that the FBI lacked authority to seize identification cards, sales

receipts (Deft. Mot. re Phys. Ev. at 9), "an implement designed to record presence at lectures"

(<u>id.</u> at 15), and an accident report (<u>id.</u> at 7), but all of these items were evidence of Tsarnaev's

identity, as well as potential evidence of his location and activities at times relevant to the crimes

under investigation.  He also claims that the FBI lacked authority to seize books and DVDs about

"history, politics, and/or religion," as well as other notebooks and papers (<u>id.</u> at 9), but all of

these were potential evidence of motive and Tsarnaev's state of mind in committing the

Marathon bombings.  The notebook labeled "Chem Nutrition" also was potential evidence that

Tsarnaev had knowledge of chemistry that could have been helpful in constructing bombs.

iii.   <u>The search warrant was not based on a prior illegal search.</u>

The search warrant was not based on a prior illegal search.  As explained above, the June

27 dorm room entry was not illegal.  Moreover, even if the information from the June 27 search

were to be excised from the July search warrant affidavit, the affidavit would still justify the

search of the room for the same items that were sought in the first warrant of the room.  Since the

room had been secured since that time, the probable cause that evidence such as BBs and other

trace evidence was there, did not dissipate.  <u>See</u> <u>United States v. Morales-Aldahondo</u>, 524 F.3d

115, 119 (1st Cir.2008) (finding that the likely endurance of information is part of probable

cause inquiry).

**VI.    The Warrants For Electronically Stored Information and Electronic Storage
        Media**

A.     <u>The warrants were supported by probable cause.</u>

Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in

particular factual contexts."  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  "In considering

whether a warrant affidavit establishes probable cause, a magistrate judge's task is to make a

practical, common-sense decision whether, given all the circumstances set forth in the affidavit

before him . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place."  <u>United States v. Hicks</u>, 575 F.3d 130, 136 (1st Cir. 2009) (citations and internal

quotation marks omitted).  That, in turn, requires "common-sense conclusions about human

behavior."  <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (citation and internal quotation marks

omitted).  A reviewing court must "accord considerable deference to reasonable inferences the

[issuing judicial officer] may have drawn from the attested facts."  <u>United States v. Strother</u>, 318

F.3d 64, 67 (1st Cir. 2003) (citation and internal quotation marks omitted).  In addition, an agent

may rely on a warrant, even one that lacks probable cause, so long as it is not so "facially

deficient . . . that the executing officers [could not] reasonably presume it to be valid." <u>Leon</u>,

468 U.S. at 923.

        i.    <u>Tsarnaev's Yahoo email account</u>

      The affidavit in support of the Yahoo email warrant established that Tsarnaev and his

brother Tamerlan had engaged in a coordinated bombing attack on the Boston Marathon,

followed, several days later, by a violent carjacking and a coordinated bombing attack on law

enforcement officers in Watertown.  It also established that Tamerlan was a foreign national.

The scope and sophistication of the terrorist attacks made it reasonable to believe, among other

things, that the brothers had conceived the attacks days, months or even years in advance; that

they had engaged in substantial planning and coordination both before and after the Marathon

bombings; and that they might have been assisted by others.  Taken together, these facts made it

reasonable to believe that the brothers had been in communication with each other, if not also

with accomplices, and that there was a fair probability that their communications contained

evidence of their crimes.  The warrant affidavit also included the facts that both brothers

communicated with others via social media sites such as YouTube and Facebook; that Tsarnaev

had used his Yahoo email account to apply for student aid; and that Tamerlan Tsarnaev had

provided an email address to Bunker Hill Community College.  The agent seeking the warrant

added that, based on his training and experience, many criminals use e-mail to plan and discuss

their criminal schemes, and that the Tsarnaev brothers, in light of their relative youth and their

use of social media, would likely be among them.

      Based on these facts, the magistrate judge made a practical, common-sense determination

that there was a "fair probability" that Tsarnaev's email accounts would contain evidence of his

crimes.  In doing so, the judge was entitled to, and did, make "common-sense conclusions about

human behavior," namely, Tsarnaev's likely use of email to communicate and coordinate with others. Brown, 460 U.S. at 742. This is not a case in which the judge's determination was a close call and it was certainly not so "facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." Leon, 468 U.S. at 923.

      ii.   The Sony VAIO computer

      The Court need not consider whether the warrant to search Tsarnaev's Sony VAIO computer ("Tsarnaev's laptop") was supported by probable cause because he gave it away to a friend on the night of April 18, 2013, expecting never to see it again, and thus has no standing to challenge the search of it. As set forth above, shortly after the FBI identified him publicly as one of the Marathon bombing suspects, Tsarnaev traveled from UMass-Dartmouth to his brother's apartment in Cambridge, leaving his laptop – and all of his other possessions – behind. He bid his mother goodbye. He and his brother collected an arsenal of weapons from the apartment and then set out on a murderous crime spree that included the execution of a police officer, a carjacking, kidnaping, and robbery, and a shoot-out with police officers in Watertown. Shortly before Tsarnaev embarked on this crime spree, one of his friends sent him a text stating that Tsarnaev looked like one of the Marathon bombing suspects, and Tsarnaev texted back, "if y[o]u want y[o]u can go to my room and take what's there." The friend then went to Tsarnaev's dorm room, took Tsarnaev's laptop (among other things), and brought it back to his own apartment. These facts establish by a preponderance of the evidence that Tsarnaev abandoned the laptop.

      In any event, the warrant for the laptop was supported by probable cause. The agent who obtained the warrant attested that, based on his training, experience, and information provided by other agents, he was aware "that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to

online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online." The agent also attested that "individuals commonly store records of the type described in Attachment B" on their computers. Attachment B listed essentially the same categories as the "Items to be Seized" list attached to the first Norfolk Street warrant. The affidavit also stated that the Tsarnaevs had "purchased materials online which they used to manufacture the explosives used in the Marathon bombings."

Once again, in approving this warrant, the magistrate judge made a "practical, common-sense decision" based in part on "common-sense conclusions about human behavior" that evidence of Tsarnaev's crimes could be found on his computer. Hicks, 575 F.3d at 136; Brown, 460 U.S. at 742. The affidavit alleged that the types of information commonly found on computers included the types of information that could constitute evidence of Tsarnaev's crimes. The affidavit included an example in support of this allegation, namely the Tsarnaevs' apparent use of a computer to buy components for the bombs. Further support for the allegation can be found in Tsarnaev's own motion: he writes that computer media and stored communications often contain a "huge array of information" reaching into "all corners of an individual's life." (Deft. Mot. re Digital Ev. at 16-17). The magistrate judge certainly had a reasonable basis to find by a "fair probability" that the allegation was true. And even assuming for the sake of argument that she did not, the agents were at the very least entitled to place good-faith reliance on her determination. Leon, 468 U.S. at 923.

    iii.    Tsarnaev's Gmail accounts.

The July 3, 2013 warrant for Tsarnaev's Gmail accounts also was based on probable cause. The warrant affidavit included all of the same facts as the warrant affidavit for Tsarnaev's

Yahoo email account.  As we have already shown, that alone established probable cause to search the Gmail accounts.  The affidavit also stated that Tsarnaev "maintained and operated a number of e-mail and social media accounts . . . that he used to communicate with others about his and others' activities, beliefs, and intentions," as well as to "self-radicalize, communicate with coconspirators, prepare for criminal activity, and conceal criminal activity."  The affidavit provided examples of this conduct, including Tsarnaev's use of his laptop "to communicate about violent jihad and to obtain documents and videos about it from a variety of known and unknown sources," and emails between the Tsarnaev brothers (using Tsarnaev's Yahoo email account) to which were attached apparent radical extremist videos.  The affidavit described how several other internet-based accounts used by Tsarnaev also contained evidence and that it was likely similar evidence would also be found in the Gmail accounts.  This information plainly established probable cause to search the Gmail accounts for incriminating communications and information.

B.    The warrants described the items to be seized with sufficient particularity.

In arguing that the digital information warrants lacked sufficient particularity, Tsarnaev cites numerous cases for the proposition that "warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material."  United States v. Burgess, 576 F.3d 1078, 1091 (10th Cir. 2009) (citations and internal quotation marks omitted).  Each of the digital warrants in this case did both things:  it limited the search to evidence of specific federal crimes (i.e. terrorism and other violent crimes) set forth in the first paragraph of the list of items to be seized as well as to specific types of material listed after the first paragraph.  (As we have already shown, that is enough to make the warrant sufficiently particularized under the First Circuit's precedents.   See Kuc, 737 F.3d at 132-33.

The individual categories in the list of items to be seized were not overbroad.  In the Yahoo email warrant, Tsarnaev takes particular issue with Category 4, which authorized seizure of "The data described in paragraphs II(A)(3)-(5), above [i.e., the contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content, calendar data, and lists of friends, buddies, contacts, or other subscribers]."  But his attack on this category violates the rule that "phrases in a search warrant must be read in context and not in isolation." United States v. Conley, 4 F.3d 1200, 1208 (3rd Cir. 1993).  A practical and commonsense understanding of this language is that it merely extends authority to search for all of the other categories specified in the warrant to data files such as spreadsheets, images, calendar data, and contact lists.  At a minimum, in any event, the search and seizure authority granted in Category 4 was limited to evidence of the crimes listed in the opening paragraph, which alone is enough to satisfy the Fourth Amendment's particularity requirement.

Tsarnaev also claims that Category II(i) in the Gmail search warrant – which authorized seizure of "[i]nformation related to the identity of any individuals who were in contact with, or were associates of" the Tsarnaevs – effectively "swallow[ed] the other search warrant provisions" because, "[w]here the subject of the search is email accounts, the provision is tautological: all of the content is necessarily 'related to the identity of any individuals who were in contact with, or were associates' of Mr. Tsarnaev."  (Deft. Mot. re Digital Ev. at 18).  Once again, however, Tsarnaev overlooks that this category applied only to emails constituting evidence of specific federal crimes.

Finally, Tsarnaev attacks the "state of mind" and "identity" categories, but we have already shown in connection with the warrants for physical evidence that these categories were not unconstitutionally overbroad.

The absence of a pre-screening requirement (such as use of a "filter team") in the warrant likewise did not violate the "particularity" requirement.  (Deft. Mot. re Digital Ev. at 20-24). The Supreme Court has consistently rejected attempts to expand the scope of the Fourth Amendment's particularity requirement "to embrace unenumerated matters" such as how a search must be conducted.  United States v. Grubbs, 547 U.S. 90, 97-98 (2006).  Accord United States v. Brooks, 427 F.3d 1246, 1251 52 (10th Cir. 2005) ("This court has never required warrants to contain a particularized computer search strategy. We have simply held that officers must describe with particularity the objects of their search.").  The Fourth Amendment is satisfied by exposing "the manner in which a warrant is executed . . . to later judicial review as to its reasonableness."  Id.

     C.      It was reasonable for agents to search all of the digital media and electronically stored information seized pursuant to the warrants for the items specified in the warrants.

The manner of the execution of a warrant is properly left to the government's discretion. United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999) ("The warrant process is primarily concerned with identifying what may be searched or seized—not how").  Thus, the absence of a "filter team" or other pre-screening mechanism did not render the actual searches of digital media and stored communications in this case unreasonable.  "[T]he reasonableness of a search's scope depends only on whether it is limited to the area that is capable of concealing the object of the search."  Safford Unified School District No. 1, 557 U.S. 364, 387 (2009).  In people's homes, for example, "a lawful search . . . generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  United States v. Ross, 456 U.S. 798, 820-21 (1982).  "Thus, a warrant that authorizes an officer to search a home for illegal weapons also

provides authority to open closets, chests, drawers, and containers in which the weapon might be

found," id., notwithstanding the near certainty that numerous items for which the police have no

authority to search may also thereby come into plain view and, if incriminating, be seized.  The

same is true of a search for business records:  as the Supreme Court pointed out in Andresen,

supra, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at

least cursorily, in order to determine whether they are, in fact, among those papers authorized to

be seized."  427 U.S. at 482 n.11.  Accord United States v. Giannetta, 909 F.2d 571, 577 (1st Cir.

1990) ("Courts have regularly held that in searches for papers, the police may look through

notebooks, journals, briefcases, file cabinets, files and similar items and briefly peruse their

contents to determine whether they are among the documentary items to be seized.") (collecting

cases).

The Fourth Amendment principles that govern the searches of homes and filing cabinets

apply equally to digital media and electronically stored information.  As the First Circuit has

observed, "a search of a computer and co-located disks is not inherently more intrusive than the

physical search of an entire house for a weapon or drugs."  Upham, 168 F.3d at 535.  Accord

United States  v. Williams, 592 F.3d 511, 523 (4th Cir. 2010) ("[T]he sheer amount of

information contained on a computer does not distinguish the authorized search of the computer

from an analogous search of a file cabinet containing a large number of documents."); United

States v. Giberson, 527 F.3d 882, 888 (9th Cir. 2008) ("While it is true that computers can store

a large amount of material, there is no reason why officers should be permitted to search a room

full of filing cabinets or even a person's library for documents listed in a warrant but should not

be able to search a computer.").

Accordingly, just as agents searching a home for contraband are permitted to examine the entire home and to open any container in which contraband might be found, see Ross, 456 U.S. at 820-21, agents searching digital media for incriminating evidence generally are permitted to examine it in its entirety for such evidence.  That conclusion flows from the recognition that "[c]omputer files are easy to disguise or rename" and, in most cases, "a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely . . . [fail] to cast a sufficiently wide net to capture the evidence sought."  United States v. Adjani, 452 F.3d 1140, 1149-50 (9th Cir. 2006).  As the Tenth Circuit explained in United States v. Burgess, 576 F.3d 1078 (10th Cir. 2009):

> While file or directory names may sometimes alert one to the contents (e.g., "Russian Lolitas," "meth stuff," or "reagents"), illegal activity may not be advertised even in the privacy of one's personal computer—it could well be coded or otherwise disguised.  The directory structure might give hints as to an effective search strategy, but could just as well be misleading and most often could not effectively, or even reasonably, be described or limited in a warrant.  Keyword searches may be useful in locating suspect files, but not always. . . .  [In] the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files.

Id. at 1093.  Accord United States v. Fumo, 2007 WL 3232112, at *6 (E.D. Pa. Oct. 30, 2007) ("search protocols and keywords do not mark the outer bounds of a lawful search; to the contrary, because of the nature of computer files, the government may legally open and briefly examine each file when searching a computer pursuant to a valid warrant.); U.S. v. Scarfo, 180 F. Supp. 2d 572, 578 (D.N.J. 2001) ("law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular evidence which is properly specified in the warrant").

Tsarnaev urges this Court to adopt retroactively certain prophylactic measures endorsed by several Ninth Circuit judges to minimize the intrusiveness of digital media searches.  See

United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1178-1180 (9th Cir. 2010)

(en banc) (Kozinski, C.J., concurring).  That case involved the Ninth Circuit's assessment as to

whether additional procedures were appropriate to protect privacy rights of third parties during

the search of electronically stored information. Id.  Those judges would condition the issuance of

digital media warrants on the government's agreement to (1) "waive reliance on the plain view

doctrine," (2) employ "specialized personnel or an independent third party" to segregate and

redact the data, (3) "disclose the actual risks of destruction of information as well as prior efforts

to seize that information in other judicial fora," (4) include a search protocol "designed to

uncover only the information for which it has probable cause, and [specify that] only that

information may be examined by the case agents," and (5) destroy or return "non-responsive

data." Id. at 1180.  Not even the Ninth Circuit, however, appears actually to have adopted these

measures.  See id. at 1182 (Bea, J., concurring in part and dissenting in part) ("I do not join Chief

Judge Kozinski's concurrence because it is advisory and unnecessary to the current case and

controversy.").  Nor has any precedential court to our knowledge.  See, e.g., Mann, 592 F.3d at

785 (7th Cir. 2010) ("We also reject Mann's suggestion that we take our cue from the more

comprehensive rules regarding computer searches recently outlined by the Ninth Circuit.").

This Court should not be the first in the Nation to do so.  The defendant's proposals for alternate

procedures fly in the face of the law of this Circuit and are not good practice in any event.  See

Kuc, 737 F.3d at 133; United States v. Crespo-Rios, 645 F.3d 37, 43-44 (1st Cir. 2011);  Upham,

168 F.3d at 535.

 The Supreme Court has held that "[n]othing in the language of the Constitution or in this

Court's decisions interpreting that language suggests that . . . search warrants . . .  must include a

specification of the precise manner in which they are to be executed." Dalia v. United States,

441 U.S. 238, 255 (1979). "On the contrary, it is generally left to the discretion of the executing

officers to determine the details of how best to proceed with the performance of a search

authorized by warrant. Id. at 257. When it comes to search warrants for digital media in

particular,

> it is unrealistic to expect a warrant to prospectively restrict the scope of a search
> by directory, filename or extension or to attempt to structure search methods—
> that process must remain dynamic. One would not ordinarily expect a warrant to
> search filing cabinets for evidence of drug activity to prospectively restrict the
> search to "file cabinets in the basement" or to file folders labeled "Meth Lab" or
> "Customers." And there is no reason to so limit computer searches.

Burgess, 576 F.3d at 1093. Accord United States v. Khanani, 502 F.3d 1281, 1290 (11th Cir.

2007) (holding that Fourth Amendment did not require warrant for digital media to include a

written "search protocol").

## VII.  The Court Should Not Hold An Evidentiary Hearing Because One is Not Needed.

"A criminal defendant does not have a presumptive right to an evidentiary hearing on a

motion to suppress." United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011). Rather, "[a]

hearing is required only if the movant makes a sufficient threshold showing that material facts

are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. Most

importantly, the defendant must show that there are factual disputes which, if resolved in his

favor, would entitle him to the requested relief." United States v. Staula, 80 F.3d 596, 603 (1st

Cir. 1996) (citations omitted). Accord United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013).

No hearing is needed in this case for several reasons. First, the searches and seizures

were done pursuant to search warrants, on which the agents were entitled to place good-faith

reliance. Tsarnaev's challenges to these searches do not raise any issues of disputed fact –

certainly none that "cannot reliably be resolved on a paper record." Staula, 80 F.3d at 603. A

40

review of the warrant applications, warrants, and lists of items seized is all the Court needs to

ascertain the existence of probable cause in the digital media warrants, the particularity of all the

warrants, and the reasonableness of the corresponding searches.  What the agents were thinking

when they executed the searches is irrelevant for Fourth Amendment purposes.  See United

States v. Mensah, 737 F.3d 789, 795 (1st Cir. 2013) ("'[A]n officer's state of mind or subjective

intent in conducting a search is inapposite as long as the circumstances, viewed objectively,

justify the action taken.'") (quoting United States v. Hadfield, 918 F.2d 987, 993 (1st Cir. 1990)).

        As for the the entry into the dorm room on June 27, 2013 – the undisputed facts

conclusively establish that the University had apparent authority, if not actual authority, to

consent to a search of the dorm room.  The FBI only took photographs during that entry and the

University's entry into the room to clean out its contents did not constitute a Fourth Amendment

search as explained above.  If Tsarnaev wants an evidentiary hearing on the legality of this

search he bears the burden of pointing to actual "factual disputes which, if resolved in his favor,

would entitle him to the requested relief."  Staula, 80 F.3d. at 603.

        There is no merit whatsoever to Tsarnaev's contention that the searches were

"necessarily" overbroad and he is therefore entitled to an evidentiary hearing at which he can

effectively go fishing for evidence to support that claim.  His argument is based on a

misunderstanding of the particularly requirement.  Even assuming for the sake of argument that

agents opened every single seized email and computer file to look for the types of incriminating

information specified in the warrant, that is not the kind of "general search" the Fourth

Amendment forbids; it is only if the police look for items *other than those* specified in the

warrant that the execution of the search violates the Fourth Amendment's particularity

requirement and is unreasonable.  See generally United States v. Mann, 592 F.3d 779, 782-785

(7th Cir. 2010).  Tsarnaev bears the burden of proving that agents looked for items other than those specified in the warrant; he cannot shift that burden to the government simply by asserting that the searches were "necessarily" overbroad and forcing the government to prove they were not.  He also has no right effectively to depose government witnesses about their investigative methods by demanding an evidentiary hearing on his motion to suppress.  The sole purpose of evidentiary hearings is to resolve disputed issues of fact, not provide the defense with discovery.

Finally, Tsarnaev has not even alleged facts sufficient to demonstrate his standing to challenge any of the searches, let alone shown that those facts are in dispute.  Before the Court proceeds with a time-consuming and potentially unnecessary evidentiary hearing it should require Tsarnaev to submit affidavits establishing that he had both a subject and objectively reasonable expectation of privacy in each place that he claims was illegally searched or a possessory interest in each item he claims was illegally seized.  See United States v. Allen, 573 F.3d 42, 52 (1st Cir. 2009) (attorney assertion insufficient).

## CONCLUSION

WHEREFORE, the government respectfully requests that Tsarnaev's motions to suppress fruits of searches be denied.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     /s/ Aloke Chakravarty
ALOKE S. CHAKRAVARTY
WILLIAM D. WEINREB
NADINE PELLEGRINI
Assistant U.S. Attorneys

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 3, 2014.

/s/ Aloke Chakravarty
Aloke Chakravarty
Assistant U.S. Attorney