UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S COMBINED OPPOSITION TO MOTIONS TO STRIKE AGGRAVATING FACTORS ("BETRAYAL OF THE UNITED STATES")**

The defendant submits this reply to so much of the government's "Combined Opposition to Defendant's Motions to Strike Aggravating Factors" as concerns the "Betrayal of the United States" aggravating factor. In its response, the government first invokes a nonexistent constitutional rule that it thinks requires "a comprehensive list of aggravating factors," including, apparently, factors designed to focus the jury's attention on the process by which Mr. Tsarnaev became a United States citizen. Next, it describes as a "straw man" the defendant's analysis of the plain meaning of the aggravating factor at issue, namely, that Mr. Tsarnaev's crime was aggravated – *i.e.* made worse – by the fact that he had only recently become a citizen. Finally, after insisting that nothing was wrong with the "betrayal" factor as originally alleged, the government proposes to substitute two new factors in its place, both of which would focus – for the first time in the modern history of the federal death penalty – on the defendant's citizenship status.

1. As Mr. Tsarnaev pointed out in his original motion, this is by no means the first time that the government has brought a capital prosecution against a United States citizen for a crime that could be characterized as a "betrayal" of the United States. But this case,

1

which happens to involve a foreign-born Muslim teenager, is the first time that the government has chosen to make such an allegation.  Oddly, the government's initial justification for this unprecedented allegation is that leaving it out would have risked "an arbitrary and capricious sentencing decision,"  Gov. Combined Opp., at 2, the government even goes so far as to invoke *Furman v. Georgia,* 408 U.S. 238, 309-310 (1972) (Stewart, J., concurring) (describing the death sentences under review as "cruel and unusual in the same way as being struck by lightning is cruel and unusual") as support.  If the government were correct that neglecting to provide sentencing juries with "comprehensive list[s] of aggravating factors" would open the federal death sentencing scheme to a successful Eighth Amendment attack under *Furman,* the government's failure to provide such a list before this case might have dire consequences for the enforceability of the Federal Death Penalty Act.  But fortunately for the government, the constitutional rule it cites does not exist.  While the Eighth Amendment requires consideration of all relevant *mitigating* factors, *Tennard v. Dretke*, 542 U.S. 274 (2004), there is no corresponding constitutional rule for aggravating factors.  Indeed, the Federal Death Penalty Act's provision for case-by-case enumeration of nonstatutory aggravating factors is very rare among present-day capital sentencing schemes, and the Supreme Court has upheld state statutes that prohibit *any* consideration of aggravating factors beyond the statutory list defining capital eligibility.  *Proffitt v. Florida*, 428 U.S. 242 (1976); *Wainwright v. Goode,* 464 U.S. 78, 82 n. 3 (1983); *see Grossman v. State,* 525 So.2d 833 (Fla. 1988) ("Florida's death penalty statute, section 921.141, limits the aggravating circumstances on which a sentence of death may be imposed to the circumstances listed in the statute. §921.141(5)").

What the constitution does require is that in administering the final, sentencing stage of any capital sentencing scheme, the government "must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994).

2. Turning to the merits of the "betrayal" factor (or factors, since the original allegation now appears to be replicating) the government insists that it merely wishes to draw the sentencer's attention to the allegedly relevant considerations of Mr. Tsarnaev's anti-American motivation, and his violation of an oath of citizenship taken just seven months before the bombing. Gov. Combined Opp. at 3-4. But the first of these explanations does nothing to justify the government's single-minded focus on the fact of Mr. Tsarnaev's *citizenship,* while the second fails to suggest any principled distinction between one citizen-offender and any other.

The latter point has already been made in Mr. Tsarnaev's original motion, and since the government has not offered an answer to the questions posed there,[1] no further discussion is called for. But the government's first point does require a response. The government believes it can "allay any uncertainty" about the propriety of the betrayal factor by rewriting it to refer only to the defendant's citizenship (and to the "solemn oath" by which he acquired it), rather than to his asylee status and naturalization as such. According to the government, only Mr. Tsarnaev's groundless "doubts about the fairness

---

[1] "[W]hat is it about the seven-month interval that distinguishes Tsarnaev's culpability from that of any other United States citizen who commits a like crime? What if a full year had elapsed? Or five years? Has the government identified some moral statute of limitations, a period after which a naturalized citizen's obligations finally become the same as those of a native-born citizen?" Mot. To Strike at 5.

of Massachusetts jurors, or Americans in general" can account for our concern that the betrayal factor invites invidious discrimination based on national origin.  Gov. Combined Opp. at 6.  For its part, the government is "confident that, after a thorough voir dire, the Court will seat only fair-minded jurors who will obey its instructions and disregard irrelevant considerations."  *Id.*  We hope that the government's prediction will come true. But if it does, it will have been despite the government's own efforts, epitomized by the "betrayal" allegation, to increase the risk of biased decision-making by framing the issues before the jury in terms that are calculated to inflame.

      3.  Despite its protestations, the government's stubborn determination to place the defendant's citizenship front-and-center in the jury's sentencing deliberations makes a kind of unfortunate sense in light of modern psychological research about how bias operates.  By way of illustration, counsel have attached to this reply an empirical research paper, approved for publication within the last few days, that is partially based on opinion survey responses to this very case.  Kteily, N.S., Cotterill, S., Sidanius, J., Sheehy-Skeffington, J., & Bergh, R., *"Not One of Us:" Predictors and Consequences of Denying Ingroup Characteristics to Ambiguous Suspects In the Aftermath of Terrorist Acts,* PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN (in press, 2014)(attached hereto as Exhibit A).  Within two days of the Boston Marathon Bombing, a team of Harvard social psychologists working in the field of intergroup relations launched a two-stage survey of white Americans drawn from a national pool of respondents. The researchers first administered two widely-used attitudinal surveys designed to measure "right-wing authoritarian" views and orientation in favor of socially-dominant groups. In a follow-up

4

survey some two weeks later, after the Tsarnaev brothers had been identified and the defendant arrested, the same respondents were shown the Boylston Street photos of the two brothers that had been released by law enforcement on April 18, 2013, and asked to rate how "white" the two young men appeared to be.  The researchers also asked the respondents about how the perpetrators of the Marathon Bombing should be treated, using a scale that included items about their legal rights and another concerning the sentence that should be imposed upon conviction (ranging from 20 years imprisonment to the death penalty).  Although, as one might expect, some of the variation in punishment views reflected the participants' underlying political and social views, the researchers also found that respondents' ratings of the brothers' "whiteness" inversely and independently predicted support for harsher treatment on this scale.   In other words, holding other attitudes constant, white Americans who viewed the brothers as less "white" were more likely to exhibit punitive sentiments towards the Tsarnaev brothers than those who placed the brothers higher on a "whiteness" scale.  As Dr. Kteily and his colleagues summarize their findings, "the perception of targets in ingroup versus outgroup terms matters: seeing ambiguous perpetrators of an attack in outgroup terms [*i.e.* as less "white"] was associated with endorsing harsher treatment of the attackers themselves . . ." Kteily et al., at 39-40.

     This finding suggests something important about how bias actually operates in capital sentencing.  Decision-makers are more likely to endorse dispensing with the *Miranda* protections, or to support imposing the death penalty upon conviction, if they have first categorized the offender as a member of an out-group – as "not one of us."  And once this intuitively-plausible psychological mechanism is taken into account, it can be

5

seen why the government's insistence on highlighting the facts surrounding the defendant's acquisition of American citizenship is so potentially unfair.  Even without a formal allegation (or two) referring to Mr. Tsarnaev's recently-acquired citizenship, this case would still present that grave risk of biased decision-making that led Congress to mandate the unusual anti-discrimination "thought experiment" of 18 U.S.C. § 3593(f).[2]  But seemingly dissatisfied with the built-in advantages flowing to the prosecution from the defendant's status as a Muslim from a Russian immigrant family, the government is determined to highlight these out-group characteristics by formal allegations that must, under the Federal Death Penalty Act, be conveyed to the jury by the Court itself in oral and written jury instructions and special verdict forms.  18 U.S.C. § 3593(d) ("The jury . . . shall return special findings identifying any [statutory] aggravating factor . . . and any other aggravating factor for which notice has been provided . . . found to exist.")

To be sure, the government has twice repackaged this nonstatutory aggravating factor since unveiling it last January, each time attempting to take back its original acknowledgment that the "betrayal" factor encompasses the defendant's status as an asylee and naturalized citizen.  But while the government's most recent proposed rewriting of the betrayal factor seems designed to obscure its likely discriminatory effect, there is no mistaking the government's determination to place this defendant's citizenship front-and-center for the first time in the history of the modern federal death penalty.  Because the "betrayal" factor (in any of its formulations) fails to meaningfully differentiate this case

---

[2] By "thought experiment," we refer to the requirement of 18 U.S.C § 3593(f) that, before any sentence can be returned in a federal capital case,  each juror must reflect on whether his or her sentencing verdict would have been the same had the race, color, religious beliefs, national origin, or sex of the defendant and the victim been different.

6

from every other case involving native-born US. citizens, and because the injection of such structured, formal allegations appears likely to exacerbate the risk that the sentence in this case will be affected by impermissible factors such as national origin, the Court should grant the motion to strike.

    4.  Before concluding, it is worth reflecting on the likely pathways by which outgroup bias could operate undetected in this case.  We do not contend that jurors are likely to sentence asylees, naturalized citizens, Muslims or anyone else more harshly due to consciously-held dislike or hostility.  Rather, the problem lies elsewhere.  To take one example:  an obvious mitigating factor in this case is that Mr. Tsarnaev was only 19 years old on April 15, 2013.  Neither this fact nor the constitutional relevance of youth as a mitigating factor is open to dispute. But we know from psychological research that to an observer, the *significance* of an offender's youth can be greatly affected (and even nullified) by extraneous factors such as ethnicity and race.

    To illustrate this, we attach a second piece of recent implicit bias research dealing with how groups of college students and active-duty police officers understand and demarcate "childhood" among black and white teenaged offenders.  Phillip Atiba Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 526 (April 2014) (attached hereto as Exhibit B).  Among the disturbing findings of this series of experimental surveys are that a group of urban police officers erroneously over-estimated the ages of black teenaged felony suspects – but not white suspects – by an average of more than four-and-a-half years (meaning that officers typically saw 13-year-old black child offenders as

7

chronological adults, while correctly recognizing such offenders as children when they happened to be white). *Id.,* at 535. This finding was only one of many powerfully suggesting that the perceived significance (and even the apparent reality) of an offender's youth may depend more on his race than his actual age.

This short reply does not allow for a full summary of the numerous relevant findings of the Goff study and of the previous implicit bias research on which it builds. Nor does Mr. Tsarnaev's position depend on the validity of any particular study. But we think it worth noting the large and growing body of social science evidence showing that assessment of even such straightforward and undeniably relevant mitigating circumstances such as an offender's young age can be profoundly affected by the evaluators' unconscious attitudes towards the offender's race (and, we suggest, towards his national origin and religion as well). For this additional reason, the government should not be allowed to heighten the salience of such invidious factors in the jury's sentencing deliberations without a much more convincing showing that the defendant's citizenship status and history actually serves to differentiate his character or his crime from those of native-born offenders.

To be sure, the "betrayal" allegation, in whatever formulation the government finally settles on, is not the only threat to the fairness of defendant's trial. But the same can be said of almost any invidious or arbitrary factor that threatens to infect a capital case; the question for decision is simply whether a given practice creates "an unacceptable risk . . . of impermissible factors coming into play." *Estelle v. Williams*, 425 U.S. 501, 505 (1976). Ensuring an acceptable level of fairness in a case such as this one will require

vigilance, and an appreciation of the unconscious mechanisms by which stereotyping of disfavored groups can substitute for the careful, individualized assessment that the constitution guarantees.

## CONCLUSION

For the foregoing reasons and those set forth in the defendant's initial motion, DE 279, the Court should strike the "Betrayal of the United States" aggravating factor from the Notice of Intent to Seek the Death Penalty, and should not permit the government's proposed substitutions.

Respectfully submitted,
DZHOKHAR TSARNAEV
By his attorneys

 /s/  David I. Bruck

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 4, 2014.

                                        */s/  Judy Clarke*