# NINTH JUDICIAL CIRCUIT OF FLORIDA
## INVESTIGATIONS SECTION
### Law Enforcement Use of Deadly Force SAO Review

**INVESTIGATION REPORT**
SAO Case Number: 48-2013-UF-000014          Investigation Number: 2013-IN-0063

**DECEDENT:**                    **Ibragim Todashev**    White / Male
                                 Date of Birth:  9/22/1985

**USE OF DEADLY FORCE by**
**LAW ENFORCEMENT OFFICER:**     FBI Boston Massachusetts Field Office
                                 Special Agent ███████████████

> **Note:** Due to safety concerns and circumstances surrounding open and ongoing investigations of criminal cases, all references to this FBI Special Agent will be made by the use of the title **FBI Agent** throughout the following narration.

**PRIMARY WITNESS**
**LAW ENFORCEMENT OFFICER:**     Massachusetts State Police
                                 Trooper ████████████

> **Note:** Due to safety concerns and circumstances surrounding open and ongoing investigations of criminal cases, all references to this Massachusetts State Trooper will be made by the use of the title **Trooper One** throughout the following narration.

**SECONDARY WITNESS**
**LAW ENFORCEMENT OFFICER(S):**  Massachusetts State Police
                                 Trooper ████████

> **Note:** Due to safety concerns and circumstances surrounding open and ongoing investigations of criminal cases, all references to this Massachusetts State Trooper will be made by the use of the title **Trooper Two** throughout the following narration.

                                 ██████████ Police Department
                                 Task Force Officer ████████████

> **Note:** Due to safety concerns and circumstances surrounding open and ongoing investigations of criminal cases, all references to this Task Force Officer will be made by the use of the title **TF Officer** throughout the following narration.

**DATE OF OCCURRENCE:**          May 21 & 22, 2013

**LOCATION OF**                  6022 Peregrine Avenue
**OCCURRENCE:**                  Orlando, Florida  32819

D012799

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

**INVESTIGATORS ASSIGNED:**              Chief Investigator Eric Edwards
                                        Investigator Nelson Espinosa

**DATE ASSIGNED:**                       July 16, 2013

**FEDERAL LAW ENFORCEMENT CONTACT INFORMATION:**

Chief Division Counsel Tampa FBI Field Office
Supervisory Special Agent (SSA/CDC) ███████████      **Office:** ███████████

Orlando FBI Assistant Special Agent-in-Charge
(ASAC) ████████████                                   **Office:** ███████████

FBI Office of Inspections
Chief Inspector ████████████                          **Office:** ███████████

Department of Justice Criminal Section Civil Rights Division
**Barry Kowalski, Esq**                               **Office:** ███████████

United States Attorney for the Middle District of Florida
**A. Lee Bentley III**                                **Office:** ███████████

FBI Inspector-in-Charge ████████████                  **Office:** ███████████

FBI Assistant Inspector (AI) ████████████             **Office:** ███████████

FBI Assistant Inspector (AI) ████████████             **Office:** ███████████

**PERSONS CONTACTED DURING STATE ATTORNEY'S OFFICE REVIEW**

District Nine Medical Examiner's Office
Doctor **Gary Utz**                                   **Office:** 407-836-9400

Attorney **Eric Ludin**                               **Office:** 866-282-5260

Office of the Medical Examiner, District Nine
Investigator **Jack Cuccia**                          **Office:** 407-836-9400

Central Florida First Call Services Inc.
**Dan Coughlin**                                      **Office:** 407-599-4159

Central Florida First Call Services Inc.
**Russ Drummond**                                     **Office:** 407-599-4159

Office of the Medical Examiner, District Nine
Investigator **Lora Zedick**                          **Office:** 407-836-9400

D012800

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Resident of 5943 Windhover Drive, Orlando, Florida
**Jaimen Marin-Montes**                                     **Phone**: 407-860-6538

Resident of 6016 Peregrine Avenue, Orlando, Florida
**Diego Farah**                                            **Phone**: 321-946-9019

Resident of 6032 Peregrine Avenue, Orlando, Florida
**Jason Hayes**                                            **Phone**: 321-652-3411

Resident of 6024 Peregrine Avenue, Orlando, Florida
**Xiomara L. Molina**                                      **Phone**: NONE

Association Manager for Windhover Condominium Association
**Richard Murphy**                                         **Phone**: 407-791-6617

Resident of 5941 Windhover Drive, Orlando, Florida
**Kevin E. Wojteczko**                                     **Phone**: 321-662-7186

Orange County Sheriff's Office Deputy First Class
**Anthony Riccaboni**                                      **Phone**: 407-254-7000

Listed as *Victim 1* in Orange County Sheriff's case number 13-38070
**Lester Garcia Perez**                                    **Phone:** 787-697-1936

Listed as *Victim 2* in Orange County Sheriff's case number 13-38070
**Lester Garcia Baez**                                     **Phone:** 787-642-9807

Listed as *Witness 1* in Orange County Sheriff's case number 13-38070
**Tariq Alli**                                             **Phone:** 321-947-5365

Listed as the *Victim* in Osceola County Sheriff's case number 12I059561
**Youness Ait-Dammou**                                     **Phone:** 407-729-3908

Business owner of *Wai Kru Gym* in Allston, Massachusetts
**John Allen**                                             **Phone:** 617-254-2222

D012801

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

# Table of Contents

**ATTACHMENTS** ................................................................pages 5-11

**CASE BACKGROUND** ..........................................................pages 12-14

**FLORIDA STATE STATUTES CONSIDERED** ...........................pages 15-17

**REVIEW of FBI DOCUMENTS and RELATED MATERIALS**....................pages 18-99

**INVESTIGATIVE EFFORTS by STATE ATTORNEY'S OFFICE** ...............pages 100-151

**CONCLUSION** ...................................................................pages 152-161

D012802

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

**ATTACHMENTS**:

1. Ibragim Todashev's *Report of Autopsy* # 2013-000623 (Doctor Gary Utz) .........pages 1-16

2. Preliminary ME Investigation report (ME Investigators Zedick & Cuccia) .........pages 17-19

3. Compact disc containing photographs (x229) (ME report # 2013-000623) .........page 20

4. Electronic mail requesting autopsy report on *Tuesday, July 16, 2013*.................page 21

5. Letter from CDC ▇▇▇ to State Attorney Jeffrey L. Ashton on *July 16, 2013* ..page 22

> **Note**: The following quotations are taken from the body of the aforementioned:

> *"**These records are being loaned to your office for purposes of your investigation and remain the property of the FBI.  As such, they should not be further used or disseminated outside your agency without the written approval of the FBI**."*
> [**Emphasis added**, Paragraph one]

> *"…**Furthermore, these or any other FBI record that has been loaned to your office, should not become part of the investigative file or your prosecution file or otherwise retained in a manner where they would become part of a Florida system of state records such that they would be subject to release under the Public Records Law without first consulting with the FBI.  Should FBI records in your possession be determined to be responsive to a records request, please notify the FBI as soon as possible.  Your assistance and cooperation in regard to these matters is appreciated**…"*
>  [**Emphasis added**, Paragraph three]

6. Compact disc provided by CDC ▇▇▇ (Labeled *Shooting Incident Review*) .....page 23

> **Note**: The following attachments, 7 through 44, were taken from the compact disc, attachment 6.

7. Document labeled *RECEIPT FOR DOCUMENTS* on *05/24/2013* ......................pages 24-26

8. Document labeled *Synopsis Agent-Involved Shooting on 05/22/2013*.................pages 27-28

D012803

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

9. Documents related to the FBI interview of **Trooper One** on *05/23/2013*............pages 29-36

10. Documents related to the FBI interview of the **FBI Agent** on *05/23/2013* ........pages 37-48

11. Report regarding FBI interview of ASAC ███████ on *05/23/2013* .........pages 49-50

12. Report regarding FBI interview of CDC ██████ on *05/23/2013*......................pages 51-52

13. Report regarding FBI interview of the **TF Officer** on *05/22/2013* ...................pages 53-54

14. Report regarding FBI interview of **Trooper Two** on *05/22/2013*.....................pages 55-57

15. Report regarding FBI interview of SSA[1] ███████ on *05/23/2013*..........pages 58-59

16. Report regarding case opening by SSA ███████ on *05/22/2013*............page 60

17. Document labeled FBI *Electronic Communication* on *05/23/2013*...................pages 61-62

18. Report regarding research by SSA ███████ on *05/23/2013* .................page 63

19. An NCIC[2] report regarding **Ibragim Todashev** related to attachment 18 .........pages 64-68

20. Report regarding research by AI ███████ on *05/23/2013* .....................page 69

21. Boston Police Department report #*100077429* related to attachment 20............pages 70-73

22. Report regarding research by AI ███████ on *05/23/2013* .....................page 74

23. Osceola County Sheriff's report #12IO59561 related to attachment 22.............pages 75-87

24. Report regarding research by SSA ███████ on *05/24/2013* .................pages 88-90

25. Report regarding research by AI ███████ on *05/29/2013* .....................page 91

26. Orlando Fire Department Ambulance Record related to attachment 25............page 92

27. Report related to weather research by SSA ███████ on *05/23/2013* ......pages 93-98

28. Report and map research by AI ███████ on *05/23/2013* ......................pages 99-100

29. Report and aerial photograph by AI ███████ on *05/23/2013* ................pages 101-102

30. Report, photo log & scene sketch by AI ███████ on *05/23/2013* ..........pages 103-106

31. Report regarding scene sketch by AIIP[3] ███████ on *05/24/2013* ...............pages 107-110

32. Report regarding *Receipt of Property* by AIIP ███████ on *05/23/2013* .......pages 111-112

33. Report regarding *Evidence Logs* (x4) by AIIP ███████ on *05/24/2013*........pages 113-121

34. Report regarding *Photographic Log* by AIIP ███████ on *05/23/2013* .........page 122

35. Four (4) photographs taken of the scene related to attachment 31 ....................pages 123-126

---

[1] The acronym **SSA** is utilized to reference the job title of a FBI Supervisory Special Agent.
[2] The acronym **NCIC** is utilized to reference the National Crime Information Center which tracks criminal arrest histories and provides the data for the use of Law Enforcement.
[3] The acronym **AIIP** is utilized to reference the job title of a FBI Assistant Inspector in Place.

D012804

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

---

**Note:** The report indicated, *"...and a Photographic Log displaying 360 crime scene photographs."* It was later determined the number *360* was referencing the type of photograph equipment, *Total Station*, utilized at the scene. Three hundred and thirty-six (336) crime scene photographs were provided by the FBI on 11/26/2013.

36. Report & three (3) photographs by AIIP ███████ on *05/23/2013* ...............pages 127-130

**Note:** The report indicated, *"... The CD contained 37 different photographs of...* [The **FBI Agent's**] *injuries and blood soaked clothing."* Thirty-seven (37) photographs were later provided by the FBI on 08/08/2013.

37. Report of *head injury* photographs by SSA ███████ on *05/23/2013* ......page 131
38. Report, regarding the autopsy, by ███████ on *05/23/2013* .............page 132
39. Report, regarding the issued *Glock 23,* by AI ████ on *05/24/2013* ...............page 133
40. Report of *Glock 23* qualification by AIIP ███████ on *05/23/2013* ........pages 134-136
41. *FBI Deadly Force Policy Training* report by AI ████ on *05/23/2013* ...........pages 137-141
42. Document of FBI interview of CTOC[4] Specialist ███████ on *05/23/2013* ...pages 142-143
43. Reports (x4) regarding media by AIIP ███████ on *05/23/2013* .............pages 144-159
44. Report of FBI contact with Mr. Ashton by AI ████ on *05/23/2013* ...............page 160
45. Orlando Police Department report # 2013-209173 ...........................................pages 161-187
46. Typed initial State Attorney's Office case review notes & questions.................pages 188-192
47. Typed **draft** memorandum to State Attorney Ashton ........................................page 193

**Note:** During a meeting held at the State Attorney's Office on 07/25/2013 the following attachments, 48 through 57, were provided by Inspector-in-Charge ██████ & AI ██████:

48. Document labeled *Executive Summary Update* on *06/13/2013* .........................pages 194-195
49. Document labeled *AD Talking Points* on *07/10/2013* ........................................pages 196-199
50. Photograph & chart of text messages regarding **Trooper One's** telephone .......pages 200-202

---

[4] The acronym **CTOC** Specialist is utilized to reference the job title of a FBI Command and Tactical Operations Center Specialist.

D012805

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

51. Scene photographs labeled *Slide A* through *Slide G* ..........................................pages 203-209

52. Documents related to computerized scene sketch & *Photograph Log* ...............pages 210-214

53. Chronological investigative report by the **FBI Agent** on *06/07/2013* ...............pages 215-227

54. A copy of the initial interview reports listed as attachments 9, 10, 13 & 14.......pages 228-247

55. Photographs of the Glock 23, seven (7) rounds, one (1) magazine & One (1) holster
 ....................................................................................................................pages 248-253

56. FBI *Laboratory Report* for projectiles, shell casings & the Glock 23 ...............pages 254-260

57. Document labeled *Advice of Rights* on *05/21/2013* at *10:25 pm*........................page 261

**Note:** The following attachments, 58 through 64, were provided to the State Attorney's Office by Inspector-in-Charge ▮▮▮▮▮ & AI ▮▮▮▮▮:

58. Letter from Inspector ▮▮▮▮▮ to State Attorney Ashton on *August 8, 2013*.....pages 262-263

59. Compact disc labeled *TP ORA SIRT*.  The disc was marked *Videos, Audio, SMS, Text, ME Photos, ERT Hospital Photos, and Total Station – 360*................................page 264

**Note**: The following quotation is taken from the top of the compact disc:

*"These records are being loaned to your office for purposes of your investigation and remain the property of the FBI.   As such, they should not be further used or disseminated without the written approval of the FBI.  Furthermore, these or any other FBI records that have been loaned to your office should not become part of the investigative file or your prosecution file or otherwise retained in a manner where they would become part of a Florida system state of records such that they would be subject to release under the Florida Sunshine Laws."* [**Emphasis added**]

60. A DVD-R marked *U/FOUO TRP ORA SIRT Videos, Audio, SMS, & Text* ........page 265

61. Report regarding the evidence markers by ▮▮▮▮▮ on *08/07/2013*...........page 266

62. Report regarding sketch *Item 15* by ▮▮▮▮▮ on *07/24/2013*...........page 267

D012806

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

63. Report regarding FBI interview of ADA[5] █████████ on *07/15/2013*........page 268

64. Compact disc labeled *(U/FOUO) TP ORA SIRT*.  The disc was marked *ME Photos, ERT Hospital Photos, Total Station – 360, and three FD – 302s*......................page 269

    **Note**: Attachment 64 displayed the same quotation as attachment 59.

65. Initial interview questions for the **TF Officer** interview on 08/29/2013 ............pages 270-271

66. Initial interview questions for **Trooper One's** interview on 09/06/2013 ...........pages 272-274

67. Initial interview questions for **Trooper Two's** interview on 09/06/2013...........pages 275-276

    **Note:** The following attachments, 68 through 70, were provided to the State Attorney's Office for review by Inspector ████████ & AI ██████ while in Boston conducting interviews:

68. Report related to a secondary FBI interview of **Trooper Two** on *06/13/2013,* by AI ████████ on *09/04/*2013 ...................................................................................pages 277-282

69. Documents related to the FBI interview of **Trooper One** on *09/04/2013*..........pages 283-289

70. Documents related to the FBI interview of the **FBI Agent** on *09/04/2013* ........pages 290-296

71. Typed revised case notes, attachment 46, updated on 07/30/2013 ....................pages 297-301

72. Electronic mail sending attachment 71 to Inspector ████████ on 07/30/2013 ....page 302

73. Electronic mail receiving *ludin@tuckerludin.com* address on 09/10/2013.........page 303

74. Orange County Sheriff's Office *Aggravated Battery* report # 13-38070............pages 304-310

75. Electronic mail receiving attachment 71 from AI ██████ on 09/18/2013 ..........page 311

76. Letter to *Eric E. Ludin* from State Attorney Ashton on 09/19/2013..................page 312

77. Electronic mails from *Barry A. Cohen* from 9/30/2013 thru 10/1/2013 .............pages 313-317

78. Documents related to the interview of Investigator Cuccia on 10/14/2013 ........pages 318-323

79. Document related to the interview of Dan Coughlin on 10/14/2013 .................page 324

80. Electronic mailing from *Nick Ferdig* on *October 18, 2013*...............................pages 325-339

81. Electronic mailing to *Nick Ferdig* on *October 22, 2013* ...................................page 340

82. Electronic mailing from *Barry Kowalski* on *October 23, 2013*..........................pages 341-342

---

[5] The acronym **ADA** is utilized to reference the job title of Assistant District Attorney.

D012807

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

83. Documents related to the interview of Investigator Zedick on 11/08/2013 ........pages 343-348

84. Electronic mail from AI ██████ on *November 20,* 2013....................................page 349

85. Letter from Chief Inspector ██████ on *November 22, 2013*...................pages 350-351

86. Six (6) FBI Laboratory reports from 07/07/2013 thru 11/13/2013....................pages 352-376

87. Photo copy of the decal attached to each of the FBI scene photographs ...........page 377

88. Seventeen (17) color photocopies of FBI scene photographs...........................pages 378-394

89. Report of neighborhood canvass by AI ██████ on *12/05/2013*........................pages 395-397

90. Electronic mail to *Barry Kowalski* on *December 11, 2013*...............................page 398

91. Web link sheet for links to **Mr. Todashev's** fights viewed ...............................page 399

92. Compact disc containing all audio recorded sworn interviews ........................page 400

93. **Transcripts**:

    #1.) **Task Force Officer** (Interviewed on 08/29/2013) ......................................40 pages

    #2.) Massachusetts State **Trooper One** (Interviewed on 09/06/2013) ...............36 pages

    #3.) Massachusetts State **Trooper Two** (Interviewed on 09/06/2013)...............23 pages

    #4.) ME Investigator **Jack Cuccia** (Interviewed on 10/14/2013) .....................11 pages

    #5.) **Mr. Dan Coughlin** (Interviewed on 10/14/2013) ......................................9 pages

    #6.) **Mr. Russ Drummond** (Interviewed on 10/14/2013) ................................7 pages

    #7.) ME Investigator **Lora Zedick** (Interviewed on 11/08/2013) ..................... 10 pages

    #8.) **Mr. Kevin Wojteczko** (Interviewed on 01/06/2014)................................ 10 pages

    #9.) Deputy **Anthony Riccaboni** (Interviewed on 01/07/2014) ....................... 16 pages

    #10.) **Mr. Lester Garcia Perez** (Interviewed on 01/13/2014) .........................No pages

    #11.) **Mr. Lester Garcia** (Interviewed on 01/13/2014)...................................  7 pages

    #12.) **Mr. Tariq Alli** (Interviewed on 01/13/2014)..........................................  6 pages

    #13.) **Mr. Youness Ait-Dammou** (Interviewed on 01/10/2014) ...................... 15 pages

    #14.) **Mr. Youness Ait-Dammou** (Interviewed on 01/10/2014) ......................  3 pages

    #15.) **Mr. John Allen** (Interviewed on 01/24/2014) ......................................... 18 pages

94. Orange County Sheriff's Office *Use of Force* Matrix ......................................pages 401-402

95. Letter from FBI Chief Inspector ██████ received on 12/23/2013.........pages 403-404

96. Report of FBI meeting with Doctor Utz, by AI ██████ on *12/05/2013*............pages 405-406

97. Compact disc containing audio recorded telephone call by **TF Officer**.............page 407

98. Sworn written statement from Jaimen Marin-Montes on 01/03/2014 ...............pages 408-409

D012808

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

99. Sworn written statement from Diego Farah on 01/03/2014 .............................page 410

100. Sworn written statement from Richard Murphy on 01/03/2014 ......................page 411

101. Sworn written statement from Jason Hays on 01/06/2014 ..............................page 412

102. Sworn written statement from Xiomara Molina on 01/06/2014 ......................pages 413-414

103. Compact disc of recorded OCSO police radio traffic on 05/04/2013 ..............page 415

104. OCSO *CALLS-FOR-SERVICE* sheet for the call on 05/04/2013 ....................pages 416-418

105. Color copy of OCSO evidentiary photographs taken on 05/04/2013 ..............pages 419-427

106. Sheet listing the web links for the audio/video recorded media interviews ......page 428

107. Article and photographs by *www.bostonmagazine.com* on 12/30/2013............pages 429-451

108. Article by *WebMD* regarding *Cauliflower* Ear ................................................pages 452-453

109. Article by *Lawfuluse.com* of *Graham V. Connor-The "Graham Factors"* ......page 454

110. Article regarding *Officer Involved Shootings* by *FBI-LEEDA Insighter* ..........pages 455-457

111. Supplemental SAO report by Investigator Espinosa on 01/30/2014................pages 458-463

112. Article regarding *The Double-Leg Takedown in MMA and Wrestling* .............pages 464-470

113. FBI letter from Chief Inspector ████████████ received on 01/23/2014..........pages 471-481

114. Sixteen (16) color photographs related to neighborhood canvass interviews ...pages 482-497

115. Electronic mail to AI████ on *November 20, 2013*........................................page 498

116. Business card of *The Busquest Group* private investigation agency ...............page 499

117. **Mr. Todashev's** State of Florida *MMA Participant* license ...........................pages 500-502

118. **Mr. Todashev's** State of Massachusetts *MMA Amateur* license application ...pages 503-508

119. **Mr. Todashev's** State of Massachusetts *MMA Amateur* license ....................pages 509-512

120. **Mr. Todashev's** State of Florida certified copy *MMA* license ......................pages 513-517

121. FBI letter from Chief Inspector ████████████ received on 02/26/2014..........pages 518-529

**Note:** The three (3) compact discs and one (1) DVD-R, listed as attachment numbers 6, 59, 60, and 64, have been returned to the FBI. They are listed as attachments to memorialize the fact they were reviewed during the course of this investigation.

**Note:** Throughout this report many quotations are taken from reviewed documents, interview transcriptions and sworn statements. The use of [**Emphasis added**], indicating this author's desire to stress a point(s) in the applicable portion of narrative will be located at the conclusion of quotations, rather than making individual entries throughout the narrative. This was done in an effort to minimize its use throughout this report.

D012809

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

## CASE BACKGROUND:

Shortly after the Boston Marathon bombing, which occurred on April 15, 2013, Federal and State law enforcement agencies identified bombing suspects, **Dzhokhar** and **Tamerlan Tsarnaev**, as criminally responsible for the deaths of three (3) civilians, one (1) police officer and for the injuries of numerous others.   According to documents provided by the Federal Bureau of Investigation (FBI), **Ibragim Todashev** was contacted on April 21, 2013, due to his association with bombing suspect **Tamerlan Tsarnaev**.  During the course of the FBI's ongoing, open and active criminal investigation, members of the Massachusetts State Police and the FBI Field Office in Boston established **Mr. Todashev** was residing in Orlando, Florida.  The assistance of the FBI Field Office in Tampa was then requested by the investigators in Boston. The FBI Resident Agency (ORA) in Orlando was contacted and the **TF Officer** was assigned to assist with the investigation of **Mr. Todashev**.   Based on information discovered by law enforcement officers in Boston, **Mr. Todashev** was determined to be a person of interest regarding a triple homicide, which occurred in Waltham, Massachusetts on September 11, 2011.

> **Note:**  The spelling of **Mr. Todashev's** name, by the authors of the FBI documents; "***Todaschev***" and "***Todoshev***," are quoted as they actually appear throughout the narratives reviewed.

In one of the first FBI documents[6] reviewed, titled *Synopsis Agent-Involved Shooting*, the narration indicates the following:

> "*... In the weeks following, Tampa* [**TF Officer** *and other members of the* ▇▇▇▇ *FBI Office*] *conducted interviews with Todaschev and received information indicating Todaschev's possible involvement in a triple homicide in Waltham, Massachusetts on 09/11/2011.  Based on this information Boston (BS) Field Office SA...* [**FBI Agent**], *Massachusetts State Police (MSP) Troopers...* [**Trooper One** *and* **Trooper Two**], *and TP TFO…* [**TF Officer**] *planned to conduct an interview of Todaschev in Orlando, Florida at Todaschev's apartment. ...*" [Paragraph one]

The interview of **Mr. Todashev** was conducted inside his home address of 6022 Peregrine Avenue.  The following excerpt is also taken from this document:

> "*... On 05/22/2013 the interview of Todaschev took place at his apartment located at 6022 Peregrine Avenue, Orlando, Florida 32819.  The interview was conducted by the LEOs* [Law Enforcement Officers] *and lasted approximately five hours from 7:30 PM to 12:00 AM.  During that time...* [**FBI Agent**] *and the two Troopers were in the apartment questioning Todaschev about his connection to the triple homicide. ...* [**TF Officer**] *remained outside of the apartment providing security for the duration of the interview. About 12:00 AM ...* [**Trooper Two**] *stepped outside of the apartment to call a prosecutor in Boston, to explain Todaschev had confessed to a role in the triple homicide* ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.*" [**Emphasis added**, Paragraph two]

---

[6] The aforementioned FBI document is memorialized as attachment number 8, pages 27-28.

D012810

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Based on the information provided, when **Trooper Two** exited **Mr. Todashev's** apartment for the purpose of making contact with the prosecutor in Boston, **Mr. Todachev** attacked the two remaining officers, **Trooper One** and the **FBI Agent**.  What is described as a sudden attack by **Mr. Todashev** led to a serious head injury to the **FBI Agent**.  Reportedly, the ongoing aggressive behavior of **Mr. Todashev** led to the use of deadly force by the injured **FBI Agent**. The following excerpts are taken from the aforementioned FBI document:

> "... *At approximately 12:04 AM Todashev was in the process of writing a confession ... when he suddenly attacked.  He flipped the table he was writing on which was believed to have struck ...* [the **FBI Agent**] *in the head and ran to the kitchen.  Todashev was heard frantically grabbing items in the kitchen and reappeared in the doorway wielding a long metal handle of a mop or broom.  He* [**Mr. Todashev**] *took an attack stance with the weapon, ...* [the **FBI Agent**] *issued verbal commands, to which Todaschev did not comply, and violently lunged towards ...* [the **FBI Agent**] *and ...* [**Trooper One**]." [Paragraph three]

> "*Having already been wounded and fearing for his safety, ...* [**FBI Agent**] *fired 3-4 rounds striking Todaschev.  Todaschev went down on his knees momentarily then 'sprang' to his feet and launched to attack again.  ...* [**FBI Agent**] *fired another 3-4 rounds dropping Todaschev to the floor.  ...* [**FBI Agent**] *fired seven shots in total, Todaschev was hit seven times with fatal shots to his head and piercing his heart.  He* [**Mr. Todashev**] *was instantly incapacitated and died on the scene...*"  [Paragraph three]

The scene was secured by the officers involved and an investigation was initiated by the FBI. **Mr. Todaschev's** body was later recovered by the District Nine Medical Examiner's Office and an autopsy[7] was conducted on "*May 22, 2013 at 11:00 am.*"  The *Report of Autopsy* authored by Doctor Gary Lee Utz indicates the cause of **Mr. Todashev's** death was due to "*Multiple gunshot wounds*" and the manner of his death was ruled a "*Homicide.*"

FBI Inspector-in-Charge (IIC) ▉▉▉▉▉▉▉▉, FBI Assistant Inspectors (AI) ▉▉▉▉▉▉▉▉ and ▉▉▉▉▉▉ responded to the scene of incident from Washington, DC.  The FBI initiated an investigation, referred to as a *Shooting Incident Response Review* of the use of deadly force by the **FBI Agent** on May 22, 2013.  An FBI report document[8], dated *05/24/2013* and authored by AI ▉▉▉▉, indicates the following:

> "*On 05/23/2013, Inspector-in-Charge (IIC)* ▉▉▉▉▉▉▉▉ *and ASAC* ▉▉▉▉▉▉▉ *telephonically contacted Jeffrey Ashton, the Ninth Circuit State Attorney (SA) and provided a briefing of the Agent-involved shooting which occurred on 05/22/2013 at 6022 Peregrine Avenue, Orlando, Florida 32819.  SA Ashton requested the documentation of the facts from the Shooting Incident Response Review.  ...*"

---

[7] The aforementioned autopsy was documented by Medical Examiner report case number ***ME 13-00623*** and is memorialized as attachment numbers 1, pages 1-16, and 2, pages 17-19.
[8] The aforementioned FBI document is memorialized as attachment number 44, page 160.

D012811

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

When local law enforcement officers use deadly force or attempt to use deadly force in the prosecutorial jurisdiction of Florida's Ninth Judicial Circuit, a review of the incident is conducted at the direction of State Attorney Jeffrey L. Ashton.  These reviews normally occur at the conclusion of an official investigation conducted either by the Florida Department of Law Enforcement (FDLE) or the primary law enforcement agency of the officer(s) involved.

The determination of which agency investigates a deadly force encounter is determined by agreements drafted between local law enforcement agencies and not at the direction of the State Attorney's Office.  Upon the completion of these official investigations, the State Attorney's Office is provided all documents and attachments generated during the course of the investigation.   All related investigative documents and attachments are scanned and/or downloaded, for the purpose of complying with Florida's Sunshine Laws.  These records are maintained in the applicable State Attorney's Office Use of Force review file.

> **Note:**  Many of the attachments listed on previous pages are the property of the FBI; therefore, the release of documents belonging to the FBI is subject to applicable laws.

The following report narrative outlines the State Attorney's Office independent review of the circumstances leading to the death of **Mr. Todaschev**.  This review was conducted to determine whether or not the **FBI Agent's** use of deadly force against **Mr. Todashev** was justified.

D012812

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

## FLORIDA STATE STATUTES CONSIDERED:

The following excerpts are definitions, which have been taken from Florida State Statutes (F.S.S.) and were considered during this review:

F.S.S. 776.05.  *Law enforcement officers; use of force in making an arrest.*

> *A law enforcement officer, or any person whom the officer has summoned or directed to assist him or her, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.  The officer is justified in the use of any force:*
>
> > *(1) Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest;*
> > *(2) When necessarily committed in retaking felons who have escaped; or*
> > *(3) When necessarily committed in arresting felons fleeing from justice. However, this subsection shall not constitute a defense in any civil action for damages brought for the wrongful use of deadly force unless the use of deadly force was necessary to prevent the arrest from being defeated by such flight and, when feasible, some warning had been given, and:*
> > > *(a) The officer reasonably believes that the fleeing felon poses a threat of death or serious physical harm to the officer or others; or*
> > > *(b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to another person.*

F.S.S. 776.051. *Use of force in resisting arrest or making an arrest or in the execution of a legal duty; prohibition.*

> *(1) A person is not justified in the use of force to resist an arrest by a law enforcement officer, or to resist a law enforcement officer who is engaged in the execution of a legal duty, if the law enforcement officer was acting in good faith and he or she is known, or reasonably appears, to be a law enforcement officer.*
> *(2) A law enforcement officer, or any person whom the officer has summoned or directed to assist him or her, is not justified in the use of force if the arrest or execution of a legal duty is unlawful and known by him or her to be unlawful.*

F.S.S. 776.06.  *Deadly force.*

> *(1) The term "deadly force" means force that is likely to cause death or great bodily harm and includes, but is not limited to:*
> > *(a)  The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and*
> > *(b) The firing of a firearm at a vehicle in which the person to be arrested is riding.*

D012813

F.S.S. 776.08.  **Forcible felony.**

*"Forcible felony" means treason; murder; manslaughter; sexual battery; carjacking; home-invasion robbery; robbery; burglary; arson; kidnapping; aggravated assault; aggravated battery; aggravated stalking; aircraft piracy; unlawful throwing, placing, or discharging of a destructive device or bomb; and any other felony which involves the use or threat of physical force or violence against any individual.*

F.S.S. 782.02.  **Justifiable use of deadly force.**

*The use of deadly force is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or her or upon or in any dwelling house in which such person shall be.*

F.S.S. 782.04.  **Murder.**

*(1) (a) The unlawful killing of a human being:*
    *1.  When perpetrated from a premeditated design to effect the death of the person killed or any human being;*
    *2.  When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any:*
        *... d.  Robbery,*
        *... g.  Escape,*
        *... k.  Unlawful throwing, placing, or discharging of a destructive device or bomb,*
        *... m.  Home-invasion robbery,*
        *... o.  Murder of another human being,*
        *... p.  Resisting an officer with violence to his or her person,*
        *... q.  Felony that is an act of terrorism or is in furtherance of an act of terrorism; or ...*

F.S.S. 784.011.  **Assault.**

*(1)  An "assault" is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.  ...*

F.S.S. 784.021.  **Aggravated assault.**

*(1) An "aggravated assault" is an assault:*
    *(a) With a deadly weapon without intent to kill; or*
    *(b) With an intent to commit a felony. ...*

D012814

F.S.S. 784.03.   ***Battery; felony battery.***

> *(1) (a) The offense of battery occurs when a person:*
> *1.  Actually and intentionally touches or strikes another person against the will of the other; or*
> *2.  Intentionally causes bodily harm to another person.  ...*

F.S.S. 784.045.   ***Aggravated battery.***

> *(1) (a) A person commits aggravated battery who, in committing battery:*
> *1.  Intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement; or*
> *2. Uses a deadly weapon.  ...*

F.S.S. 843.01.   ***Resisting officer with violence to his or her person***

> *Whoever knowingly and willfully resists, obstructs, or opposes any officer as defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9); member of the Parole Commission or any administrative aide or supervisor employed by the commission; parole and probation supervisor; county probation officer; personnel or representative of the Department of Law Enforcement; or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, by offering or doing violence to the person of such officer or legally authorized person, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.*

**Note:**  Though each of these Florida State Statutes were reviewed and considered, not all were determined to be directly relevant to the circumstances surrounding this particular use of force incident.

D012815

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

## REVIEW of FBI DOCUMENTS and RELATED MATERIALS:

On July 16, 2013, I was informed by State Attorney Ashton that FBI Tampa Field Office Chief Division Counsel (CDC) ███████ would be visiting the Office of the State Attorney on the same date. I was instructed to collect information, which was provided by the FBI via CDC ████, regarding the FBI's investigation of the law enforcement use of deadly force on May 22, 2013. I later met with CDC ██████, who provided a letter[9] and a compact disc[10], which were both reviewed for general content in his presence. The letter indicated the circumstances under which the FBI was providing the information contained on the compact disc (CD) to the State Attorney's Office. The contents of the compact disc, which are listed as attachments number seven (7) through forty-four (44), were not thoroughly reviewed for specific content at the time of their receipt. There were no recorded interviews or transcriptions on the compact disc provided by the FBI. CDC ██████ briefly described the circumstances in which statements are taken by the FBI during the course of an investigation. He explained that no recorded interviews were collected from any of the officers involved in the incident. CDC ██████ explained the report narrations[11] provided, as they relate to the interviews of the **FBI Agent** and **Trooper One**, were considered sworn statements. He also indicated all additional narrations, regarding information collected from other individuals interviewed, are not considered to be sworn statements by the FBI. Upon my cursory review of the files contained on the compact disc, I requested CDC ██████ provide additional information, which would be needed for the purpose of conducting a thorough review of the incident. The items initially requested are as follows:

    #1.) ME report and all related photographs of **Mr. Todashev's** recovery and autopsy.
    #2.) Medical records related to the medical treatment for the injuries to the **FBI Agent**.
    #3.) The FBI's policy regarding sworn statements collected from suspects and witnesses.
    #4.) The FBI's Use of Force Policy.
    #5.) The case number and information related to the Waltham, Massachusetts homicides.
    #6.) The report related to the processing of the **FBI Agent's** weapon.
    #7.) All photographs taken by the FBI forensics team while they processed the scene.
    #8.) The results of the neighborhood canvass conducted by the FBI.

A short time after leaving the State Attorney's Office, I was contacted telephonically by CDC ██████. CDC ██████ questioned whether or not the aforementioned letter, provided with the attached compact disc, would become public record due to Florida's Sunshine Laws. CDC ██████ was instructed to contact State Attorney Ashton directly, which he then did. During their conversation, CDC ██████ informed State Attorney Ashton of the existence of recordings made during the interview of **Mr. Todashev**. The recordings were collected during portions of the interview of **Mr. Todashev** by law enforcement officers. A short time later, State Attorney Ashton was again contacted and a meeting was requested, by the FBI and the U.S. Department of Justice (DOJ), regarding the State Attorney's Office request for additional information. The meeting was scheduled for July 25, 2013.

---

[9] The aforementioned FBI document is memorialized as attachment number 5, page 22.
[10] The aforementioned FBI compact disc is memorialized as attachment number 6, page 23.
[11] The aforementioned FBI documents are memorialized as attachment numbers 9 & 10.

D012816

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On July 16, 2013, the State Attorney's Office formally initiated a review of the **FBI Agent's** use of deadly force, which ultimately led to the death of **Mr. Todashev** on May 22, 2013. A request was made of the Medical Examiner's Office, via electronic mail[12], for **Mr. Todashev's** *Report of Autopsy*.

On July 17, 2013, I received a copy of **Mr. Todashev's** *Report of Autopsy* # 2013-000623. The report did not contain a compact disc of case related photographs. A second request was made, which specifically asked for any and all case related photographs. The Medical Examiner Investigator's report, report attachment two (2), was not initially provided and was not reviewed by me prior to contact with Doctor Utz on August 27, 2013. It was later determined some of the information on the document was incorrect. This will be explained in greater detail in following narratives.

On July 18, 2013, I received a compact disc[13], which contained two hundred and twenty-nine (229) color photographs related to the recovery of **Mr. Todashev's** body from the scene as well as his autopsy, which both occurred on May 22, 2013.

I made contact with Orlando Police Department Homicide Detective Sergeant Esan, in an effort to locate any and all documentation related to the Orlando Police Department's (OPD) initial response to the scene on May 22, 2013. Sergeant Esan informed, Orlando Police Department patrol units assisted with the initial response by securing the perimeter as the FBI processed the scene for evidence. Sergeant Esan indicated, due to the fact it was an FBI agent involved use of force; the Orlando Police Department did not conduct any investigation related to the incident. He provided me with the Orlando Police Department incident report[14], which was generated as a result of the patrol officer's initial response to the scene and their lengthy efforts to secure the outer perimeter of the scene for the FBI.

On this date, I conducted a thorough review of the information provided by the Medical Examiner's Office. This was done prior to reading the documents provided by CDC ███████ on July 16, 2013. The following are excerpts taken from the autopsy report authored by Doctor Utz:

> "***Autopsy Findings***
>
> I.      *Gunshot wound of head (Gunshot Wound "A"),* **indeterminate range**…
> II.     *Gunshot wound of torso (Gunshot Wound "B"),* **indeterminate range**…
> III.    *Gunshot wound of torso (Gunshot Wound "C"),* **indeterminate range**…
> IV.     *Gunshot wound of torso (Gunshot Wound "D"),* **indeterminate range**…
> V.      *Gunshot wound of torso (Gunshot Wound "E"),* **indeterminate range**…
> VI.     *Gunshot wound of torso (Gunshot Wound "F"),* **indeterminate range**…
> VII.    *Gunshot wound of torso (Gunshot Wound "G"),* **indeterminate range**…

---

[12] The aforementioned electronic mail is memorialized as attachment number 4, page 21.
[13] The aforementioned ME compact disc is memorialized as attachment number 3, page 20.
[14] The aforementioned OPD report case number *2013-209173* is memorialized as attachment number 45, pages 161-187.

D012817

"*CONCLUSION:  In consideration of the circumstances surrounding the death, and after examination of the body, and review of the available investigative records, it is my opinion that the death of Ibragim Todashev, a 27 year old white man who was shot by a Federal Bureau of Investigation agent, is due to **multiple gunshot wounds**.  The deceased suffered at* [sic] *total of 7 gunshot wounds.  One projectile entered the **top of the head**, passed through the brain and the base of the skull.  It was recovered.  **Three projectiles entered the back**; one exited and two were recovered in the body.  Two projectiles passed through the left upper arm and re-entered the left chest.  An additional projectile also entered the left chest.  All three projectiles were recovered.  **<u>There is no evidence of close range firing in any of the gunshot wounds</u>**.  The manner of death is homicide.*"
[**Emphasis added**, Report pages 1 through 3]

**Note:** The following information is taken from a book titled **Forensic Pathology Principles and Practice** (Dolinak, Matshes, & Lew, 2005)**:**

"***Indeterminate range*** *is preferable and more accurate than distant range gunshot wound.  An indeterminate range gunshot wound is one that lacks features that define an intermediate range or a contact gunshot wound, regardless of the range of fire.  … When a gun is fired, pieces of burnt and unburned gunpowder and soot are expelled along with the projectile.  **Intermediate-range** gunshot wounds are defined by the presence of punctate abrasions caused by pieces of gunpowder striking and abrading the skin.  These red punctate abrasions are collectively termed **stippling** and are not washed away … **Intermediate range is usually within 2 to 3 feet**, but the stippling pattern is contingent on the firearm and the ammunition.*"  [**Emphasis added,** Pages 165 & 168]

As I read the *Report of Autopsy* and viewed the Medical Examiner's color photographs, I compiled a list of questions, which are referred to as *typed initial case review notes & questions*[15].  During the course of the thorough review of the FBI documents initially provided, I attempted to locate answers for these questions.  The following material is taken from attachment fifteen (15):

"**<u>Questions</u>** *… Review of ME report.*

*#1.)  Six (6) projectiles recovered by ME.*
*-Who has them?*
*-Are they the same caliber?*
*-Have they been matched to the weapon?*

*#2.)  Seven gunshot wounds.*
*\*\*(No soot or stippling was present at any point of entry, **all** <u>INDETERMINATE RANGE</u>*)

---

[15] The aforementioned documents are memorialized as attachment number 46, pages 188-192.

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

A.) Head  (***no mention in interviews***)
    a.  *Projectile recovered from base of skull.*
    b.  *Left posterior parietal scalp.*
    c.  ***The projectile travels downward, slightly toward the right, and slightly toward rear.***  ( ***shooter position consistent with this finding* )

B.) Left upper back   (***no mention in interviews***)
    a.  *Projectile recovered from left lung.*
    b.  *Left upper back.*
    c.  ***The projectile travels left to right, back to front, and downward.***
       *( ***shooter position consistent with this finding* )*

C.) Right upper back  (***no mention in interviews***)
    a.  *Projectile recovered from right chest wall.*
    b.  ***ENTERING*** *right upper back.*
    c.  ***The projectile travels <u>left to right</u>, back to front, and downward.***
       *( ***shooter position <u>not</u> consistent with this findings thus far* )*

D.) Right back        (***no mention in interviews***)
    a.  *Projectile EXITED right lower chest.*
    b.  ***ENTERING*** *right back.*
    c.  ***The projectile travels <u>left to right</u>, back to front, and downward.***
       *( ***shooter position <u>not</u> consistent with this findings thus far* )*
       ***Item #15 on FBI hand sketch shows a projectile recovered at the scene.*
       *Questions:*
          *#1.)  Is this a 40 caliber projectile?*
          *#2.)  Is this item damaged?*
          *#3.)  Has this item been tested for DNA?*
          *#4.)  This item is close to the blood on the tables and the carpet.*
             *Did these areas have blood collection samples taken/tested?*

E.) Left chest
    a.  *Projectile ENTERED left chest.*
    b.  *Projectile RECOVERED from lower back.*
    c.  *Projectile caused perforation to HEART-AORTA.*
    d.  ***The projectile travels left to right, back to front, and downward.***
       *( ***shooter position consistent with this finding* )*

F.) Left upper arm
    a.  *Projectile ENTERED left upper arm – reentry into torso.*
    b.  *Projectile RECOVERED from the heart.*
    c.  ***The projectile travels left to right, back to front, and downward.***
       *( ***shooter position consistent with this finding* )*
    d.  *Note:  This would indicate the upper arm close to the chest and not elevated.*

G.) Left upper arm
    a.  *Projectile ENTERED left upper arm – reentry into torso.*
    b.  *Projectile RECOVERED from the stomach.*
    c.  ***The projectile travels left to right, back to front, and downward.***
       *( ***shooter position consistent with this finding* )*
    d.  *Note:  This would indicate the upper arm close to the chest and not elevated.*

D012819

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Questions as viewing ME crime scene photos*:
*#1.)  How did the table & 2ⁿᵈ table top come to be in their locations?*
    ***Flipped away from the location of the FBI Agent's chair/location.*
*#2.)  Did blood samples get collected from the tables and carpet?*
*#3.)  Did blood samples get collected from the broom handle?*
*#4.)  Can latent prints be lifted from the broom handle?*
*#5.)  Can latent prints and DNA samples be lifted and collected from the sword?*
*#6.)  What is #5 marking in the doorway OUTSIDE of the apartment?*
*#7.)  Can FBI sketch # 15 be seen in any of the ME photos?*
***#8.)  Did anyone collect a photo of the suspect's hand placement when rolled over?***"
[**Emphasis added**, Pages 1 through 2]

After completing a review of the documents and color photographs provided by the Medical Examiner's Office, which indicated **Mr. Todashev** had been shot seven (7) times from a distance of at least two (2) feet away, I reviewed the initial documents provided by CDC ███████. The first FBI document reviewed was titled *Synopsis of Agent-Involved Shooting Orlando Florida* and was dated *05/22/2013*. This document, previously referred to as attachment eight (8), presented the circumstances surrounding the necessity for the FBI and Massachusetts State Police to conduct an additional interview of **Mr. Todashev** on May 21, 2013. The following excerpts are taken from the document:

"*... In the weeks following, Tampa conducted interviews with Todaschev and received information indicating Todaschev's possible involvement in a triple homicide in Waltham, Massachusetts on 09/11/2011. Based on this information ...* [the **FBI Agent**, **Trooper One**, **Trooper Two** and **TF Officer**] *planned to conduct an interview of Todaschev in Orlando, Florida at Todaschev's apartment. Todaschev was a known Mixed Martial Arts (MMA) fighter and had a prior history of assault which was known to ...* [**FBI Agent**, **Trooper One**, **Trooper Two** and **TF Officer**]."    [Paragraph one]

"*... On 05/* [21 through] *22/2013 the interview of Todaschev took place at his apartment located at 6022 Peregrine Avenue, Orlando, Florida 32819. The interview was conducted by the LEOs and lasted approximately five hours from 7:30 PM to 12:00 AM. During that time ...* [**FBI Agent**, **Trooper One** & **Trooper Two**] *were in the apartment questioning Todaschev about his connection to the triple homicide. ...* [**TF Officer**] *remained outside of the apartment providing security for the duration of the interview. About 12:00 AM ...* [**Trooper Two**] *stepped outside of the apartment to call a prosecutor in Boston, to explain Todaschev had confessed to a role in the triple homicide ...*" [Paragraph two]

"*... At approximately 12:04 AM Todaschev was in the process of writing a confession ... when he suddenly attacked. He flipped the table he was writing on which was believed to have struck ...* [**FBI Agent**] *in the head and ran to the kitchen. Todaschev was heard frantically grabbing items in the kitchen and reappeared in the doorway wielding a long metal handle of a mop or broom. He took an attack stance with the weapon, ...* [**FBI Agent**] *issued verbal commands, to which Todaschev did not comply, and violently lunged towards ...* [**FBI Agent**] *and ...* [**Trooper One**]." [Paragraph three]

PAGE 22

D012820

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*"Having already been wounded and fearing for his safety, ... [**FBI Agent**] fired 3-4 rounds striking Todaschev. Todaschev went down on his knees momentarily then 'sprang' to his feet and launched to attack again. ... [**FBI Agent**] fired another 3-4 rounds dropping Todaschev to the floor. ... [**FBI Agent**] fired seven shots in total, Todaschev was hit seven times with fatal shots to his head and piercing his heart. He [**Mr. Todashev**] was instantly incapacitated and died on the scene... [**Trooper Two & TF Officer**], who were outside, heard the shots and ran to the apartment door. By the time they entered the apartment Todaschev was dead. EMS was called, Todaschev was declared dead and ... [**FBI Agent & Trooper One**] were taken to the hospital. ... [**FBI Agent**] was treated for a large gash on his head, ... [**Trooper One**] sustained no injuries."* [Paragraph three]

The second set of documents[16] reviewed were those related to the FBI's interview of **Trooper One** on *5/23/2013* at *0850 AM*. According to the documents, **Trooper One** reviewed and signed his statement on the *29 day of May 2013, in Boston, Massachusetts*. Prior to the signature line the document states, *"I have read the statement consisting of 6 pages and a diagram, and it is true and correct to the best of my recollection."* Both ends of this sentence display initials consistent with the name of **Trooper One**.

According to the information provided in the statement signed by **Trooper One**, he had recently been assigned to assist with the investigation of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ a triple homicide which had occurred in Waltham, Massachusetts in September of 2011. Due to developments in the case, **Trooper One** traveled to Orlando with the **FBI Agent** and **Trooper Two** for the purpose of conducting an interview of **Mr. Todashev**. Due to the fact the ▮▮▮▮▮ based **TF Officer** had previous contacts with **Mr. Todashev**, the **TF Officer** coordinated the efforts to arrange the meeting with **Mr. Todashev**.

The following excerpts are taken from the interview documents signed by **Trooper One**:

*"In preparing for the interview, ... [**FBI Agent**, **Trooper One** & **Trooper Two**] discussed Todaschev's skills in Mixed Martial Arts and had viewed open-source videos of one of his fights. We had also learned of his recent violent altercation in an Orlando area parking lot, as well as Todaschev's criminal history which contained acts of violence.*

*Due to our knowledge of Todaschev's physical abilities, the initial plan was to have him come to the ▮▮▮▮▮▮ Police Department for the interview; however, he refused. ... [**TF Officer**] was able to arrange the interview at the apartment where Todaschev had been living with his girlfriend before she was taken into federal custody on immigration matters. ... We [**FBI Agent**, **Trooper One**, **Trooper Two** & **TF Officer**] arrived at the apartment at approximately 7:30 PM and met with Todaschev. He invited us inside ... [**Trooper One**] ... noticed a large, Samurai type sword mounted on the wall near the entrance to the kitchen. ..."* [Page 2]

---

[16] The aforementioned documents are memorialized as attachment number 9, pages 29-36.

D012821

**Trooper One** explained **Mr. Todashev** was fully cooperative during the initial stages of the interview. He reported **Mr. Todashev's** demeanor changed as they discussed his possible involvement in the triple murders which occurred in Waltham, Massachusetts. **Trooper One** advised **Mr. Todashev** eventually confessed to his involvement ███████ of the three homicides being investigated. The following excerpts are taken from the interview documents signed by **Trooper One**:

> "*As Todashcev continued to confess his involvement in the murders, ...* [**Trooper Two**] *gave him a sheet of paper and asked that he write a statement.* … [**Trooper Two**] *then left the room to go outside to make phone calls.*" [Page 3]

**Trooper One** reported **Mr. Todashev** later requested additional cigarettes, though **Mr. Todashev** was in possession of what reportedly appeared to be a full pack. He then requested to go to the bathroom. **Trooper One** expressed he felt **Mr. Todashev** was attempting to minimize the number of law enforcement officers in the room, based on what appeared to be an unnecessary request for additional cigarettes. According to **Trooper One**, he and the **FBI Agent** accompanied **Mr. Todashev** to the upstairs bathroom. **Trooper One** described **Mr. Todashev's** behavior in the following manner:

> "*... On this trip to the bathroom I noticed that Todaschev was moving noticeably slow, almost methodical in his movements.*
>
> *When Todaschev was returning down the stairs,* **I was more and more concerned that he might try to flee or attack us.** *As I came down the stairs and turned toward the main room, I grabbed the sword from the wall and quickly stashed it in the kitchen to keep it from Todaschev's reach. Although Todaschev was still on the stairs, I believe he saw me hide the sword in the kitchen due to a large mirror positioned at the bottom of the stairway.*" [**Emphasis added**, Pages 3 & 4]

**Trooper One's** statement indicated **Mr. Todashev's** behavior caused increased concern, which led him to send a text message to **Trooper Two** and the **FBI Agent**. The text warned, "*Be on guard, He* [**Mr. Todashev**] *is in a vulnerable position to do something bad. Be on guard now. I see him looking around at time.*" According to **Trooper One,** he was looking down at his telephone, due to the text message, when **Mr. Todashev** suddenly became violent. The following excerpts are taken from the interview documents signed by **Trooper One**:

> "*After about a minute, I check my phone to make sure the text went through. As I was looking at my phone, I heard a roaring noise, looked up and saw the table between Todaschev and ...* [**FBI Agent**] *rise up and fly toward ...* [**FBI Agent**]. *I immediately yelled ...* [for **Trooper Two**] *to alert ...* [**Trooper Two**] *there was trouble inside the residence. Todaschev ran from the bed toward the door near the kitchen area* [where **Trooper One** had recently placed a Samurai sword] *and began quickly scanning left to right as if looking for something. He then darted toward the door, I thought he was trying to flee and began to give chase. As Todaschev reached the door he grabbed a red approximately five-foot long pole that was leaning against the wall near the door.* **Todaschev moved incredibly quickly, almost like something in a movie.**

D012822

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*As he grabbed the pole, Todaschev turned quickly toward me and raised the pole above his head with both hands, **which appeared to me to be a trained fighting position**, and **charged toward me as if he was going to impale me with the pole**. I then heard shots fired off to my right and **saw Todaschev make two movements which indicated to me he had been impacted by the shots**. Todaschev fell to his hands and knees in front of me and then, almost immediately, he sprang forward, coming up in a fighting stance. I heard more shots and Todaschev fell to the ground again, this time apparently incapacitated. ... I turned to look toward ...* [**FBI Agent**] *and saw he was bleeding profusely from the head.*

*...* [**Trooper Two** *and* **TF Officer**] *had come to the residence door and I announced to them it was clear to come inside. I moved toward ...* [**FBI Agent**] *and applied pressure to a large laceration near the back of his head. ...*

***Todaschev had several opportunities to escape during the altercation, but instead chose to obtain a weapon and attack. Todaschev's actions placed me in fear of imminent physical injury or even death.*** *I am certain ...* [**FBI Agent's**] *actions saved me from serious physical injury or death.*" [**Emphasis added**, Pages 4 & 5]

The third set of documents[17] reviewed were those related to the FBI's interview of the **FBI Agent** on *5/23/2013* at *0950 AM*. According to the documents, the **FBI Agent** reviewed and signed his statement on the *28 day of May 2013, in Boston, Massachusetts*. Prior to the signature line the document states, "*I have read the statement consisting of 9 pages and a diagram, and it is true and correct to the best of my recollection.*" This series of documents contained a form, which appeared to have been signed by the **FBI Agent** on *5/23/13*, titled ***WARNING AND ASSURANCE TO THE EMPLOYEE REQUESTED TO PROVIDE INFORMATION FOLLOWING A SHOOTING INCIDENT***. The following excerpts are taken from the aforementioned document:

"*You are being asked to provide a* **voluntary statement** *regarding the facts pertaining to and the circumstances surrounding ...* [the use of deadly force]

*The matter under investigation to determine whether there has been any misconduct or improper performance of official duties and whether there has been any violation of criminal law.*

*The information you provide in this statement will be used to resolve the issues relevant to this investigation. Any voluntary statement you make can be used as evidence against you in any future criminal proceeding or agency disciplinary proceeding. While your statement is being requested to assist this investigation, your refusal to make a statement on the grounds that your statement may tend to incriminate you will not subject you to any disciplinary action by the FBI or the United States Department of Justice.*

***WAIVER***

---

[17] The aforementioned documents are memorialized as attachment number 10, pages 37-48.

D012823



**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*I understand that my statement is **voluntary**, and I will not be subjected to discipline if I refuse to make a statement. ...* [Followed by the signatures of AIIP ███████, AI ██████ and the **FBI Agent**]"

According to the statement provided by the **FBI Agent**, he was assigned to assist the Massachusetts State Police (MSP) with the investigation of the triple homicide, which occurred in Waltham, Massachusetts on *09/11/2011*. The following excerpts are taken from the series of statement related documents:

*"... I was tasked to work with the Tampa Field Office, Orlando Resident Agency (ORA) to conduct an interview of Todashev about the homicide and any connections he may have to the Boston bombings on 04/15/2013.*

*I studied the background of Todashev and had a very good understanding of how much training he had in Mixed Martial Arts (MMA) and wrestling. During our investigation, I personally viewed several of Todashev's **MMA fights on YouTube**. Various **interviews of Todashev's associates also indicated that he was an adept wrestler, and had competed in the sport for many years**.*

*I also understood that Todashev had been previously arrested in a road rage incident in Boston, Massachusetts, as well as an incident in Orlando, Florida. The arrest in Florida stemmed from a fight over a parking space in which **Todashev fought with two individuals, one of which was knocked unconscious and lost several teeth. FBI Agents surveilling [sic] Todashev witnessed this event and relayed the details directly to me. On a scale of one to 10, I believe Todashev was an eight as far as his inclination and ability for physical violence**.*

*... The TFO's [**Troopers One & Two**] and I were instructed to travel back ███████ in order to interview Todashev regarding the triple homicide. We arrived on ███████ and asked ...* [**TF Officer**] *to call Todashev to negotiate an interview. On 05/21/2013, ...* [**TF Officer**] *convinced Todashev to meet with us. **Todashev stated that he would not meet with us at the** ███████ **Police Department as he did previously, and that if we wanted to meet, we had to come to him. Todashev eventually agreed to meet with us for one hour at his apartment**.*

*On 05/21/2013, at 7:30 PM, myself, the MSP Troopers, and ...* [**TF Officer**] *met Todashev at his apartment in the parking lot. He was calm and respectful and led us to his apartment. I and the MSP Troopers went to the apartment and ...* [**TF Officer**] *remained outside in the parking lot. **Prior to entering Todashev's apartment, we observed a large image of an AK-47 at the top of the front door**. ... Upon entering the apartment, Todashev asked us to remove our shoes and I noticed the room was very dark and hot. ... As I proceeded into the living room, **I immediately noticed a sward** [sic] **hanging on the wall near the stairs**. ... Todashev then opened the louver blinds covering the sliding glass door at the rear of the apartment's first floor. ... Todashev sat on the floor directly across from ...* [**Trooper Two**] *and in front of me to my left.*

D012824

*... For the next three hours we continued to question Todashev in regards to the Waltham triple homicide. Todashev eventually alluded to the fact that he was going to tell us some information regarding the homicides, but that he first wanted to smoke a cigarette. Todashev also started twitching and looked very uncomfortable.* **Todashev signed a Miranda waiver form at the point we felt he made enough statements to incriminate himself**. *At the end of the questioning ...* [**Trooper Two**] *asked Todashev to write his statement down, and he agreed to do so.*

**Todashev began to ask whether he would be able to smoke in jail**, **how much time he would get, and if he would get a deal**. *We made no comment back to him indicating in any fashion that he was going to be arrested or go to jail. However,* **I felt at this point that Todashev knew he was going to jail** *and he began to appear resigned to that fact. He had written approximately ¾ of a page of his confession when ...* [**Trooper Two**] *left the apartment to make a phone call to the Middlesex Assistant District Attorney* **and I took his chair**. *Todashev moved to the edge of the bed 6 to 7 feet* **directly in front of me and was writing on a small table.** *...* [**Trooper One**] *stood in the same location against the wall. At this point Todashev was still writing and had not made any overt actions.*

*Todashev then requested to use the restroom for the third or fourth time. It should be noted that on each prior trip to the bathroom, which was located at the top of the stairs,* **it created a heightened sense of awareness for our safety**. *On this last trip to the bathroom, Todashev urinated only one quick burst, which led me to question whether he had to really go to the bathroom at all. ...* [**Trooper One**] *and* **I made eye contact and gestured to one another that we need to be well aware of the threat Todashev posed in this position**. *The bathroom door was open, and ...* [**Trooper One**] *and I were able to observe Todashev from the back. After he was done urinating, Todashev reached over the sink with his left hand and turned on the water. He then ran the water over his left hand, slowly brought his hand in front of his face. While looking down, he let the water drip from his fingers into the toilet. He slowly opened and closed his hand while waving his fingers. He repeated this process three to four times before slowly closing his fly and wiping his hands on the front of his pants. When he had finished in the bathroom, ...* [**Trooper One**] *and I went down the stairs with Todashev, where we returned to our previous positions. Todashev then resumed writing his statement.*

<u>**I was reading my notepad when I heard a loud noise and suddenly felt a blow to the back of my head**</u>. *I was knocked partially off my chair, but I caught myself. I saw Todashev running past me and I tried to grab him.* <u>**I removed my weapon from the holster and aimed the gun at Todashev who had run towards the kitchen. I shouted 'Show me your hands!'**</u> *I saw ...* [**Trooper One**] *to my left, but don't know if he had his weapon drawn. I stood in the middle of the room and saw Todashev partially in the kitchen.* <u>**I continuously yelled for Todashev to show me his hands**</u>, *but he did not comply.* **I heard the sound of metal banging together like knives in a very hurried fashion. I believe that Todashev was trying to retrieve a weapon, and that he was successful in doing so. Todashev instantly ran at full speed from the kitchen directly towards me and** *...* [**Trooper One**]. **I saw Todashev's left shoulder drop as he rounded the corner from the kitchen to the living room**.

D012825

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

---

*__It was obvious to me that Todashev was in an attacking posture__. In the split second available to me to assess the threat posed by Todashev's wholly non-compliant actions, __I was in fear for my life and the life of__ ... [__Trooper One__]. __There was no doubt in my mind that Todashev intended to kill both of us__.*

*__In order to stop this threat, I shot Todashev three to four times__. __Todashev fell backwards, but did not go to the ground__. __He then re-established his footing and suddenly lunged again towards us__. __I then shot him 3 or 4 more times in order to stop his continuing deadly threat__. __This time Todashev fell to the ground face first and I believed the threat had been eliminated__.*

*... [__Trooper One__] applied first aid to my head and ... [__Trooper Two__ & __TF Officer__] entered the room. I yelled that everything was okay. ... [__Trooper One__] checked Todashev for a pulse, but could not locate one. ... [__TF Officer__] __called 911 for medical assistance__. Once the fire department arrived I was transported to the hospital for my head injury."* [__Emphasis added__, Pages 1 through 8]

During my review of an FBI report document[18], authored by AIIP ▮▮▮▮▮▮ after his interview with the witness, **TF Officer**, on *05/22/2013*, the following was noted:

*"... [__TF Officer__] was an officer with the ▮▮▮▮▮ Police Department (▮▮▮▮) for ▮▮▮ years and held the rank of ▮▮▮▮▮▮▮▮. ... [__TF Officer__] was assigned to the ▮▮▮▮ JTTF [Joint Terrorism Task Force] for ▮▮▮▮▮▮ months. ... [__TF Officer__] ▮▮▮▮▮▮▮▮▮▮▮ to FBI Boston's (BS) investigation into the Boston Marathon bombings. ... [__TF Officer__] contacted and interviewed ▮▮▮▮▮▮▮▮▮▮, Ibragim Todaschev, three times since 04/21/2013.*

*On 05/21/2013, ... [__TF Officer, FBI Agent__ & __Troopers One__ & __Two__], convened at the ORA to plan an interview with Todashev regarding a triple homicide in the Boston, Massachusetts area. ... [__TF Officer__] telephoned Todaschev, who agreed to the interview, three separate times between 10:19 AM and 6:34 PM to negotiate where they would meet. __It was agreed the interview would take place at Todaschev's residence__.*

*On 05/21/2013, at 7:35 PM, ... [__TF Officer, FBI Agent__ & __Troopers One__ & __Two__] met Todaschev and his friend, Khusn LNU [Last Name Unknown], in the parking lot of Todaschev's residence. The Boston investigators went inside the residence with Todaschev and ... [__TF Officer__] remained outside with Khusn LNU, who provided no statements contributing to the investigation. __Khusn LNU advised Todaschev was very upset about his girlfriend being deported and he believed the FBI was responsible for that action__. At 10:30 PM Khusn LNU was told he could leave and Todaschev would be brought to him after the interview was competed. Before leaving, Khusn LNU provided ... [__TF Officer__] Todaschev's cellular telephone and wallet. ... [__TF Officer__] provided the cellular telephone to the Boston investigators.*

---

[18] The aforementioned documents are memorialized as attachment number 13, pages 53-54.

D012826

*Between 7:40 PM and 11:32 PM, ... [**TF Officer**] received text messages from the Boston investigators who advised Todaschev had confessed and was to provide a written statement. They made no indication to ... [**TF Officer**] of any problems or difficulties with Todaschev inside the residence.*
*At 11:40 PM, ... [**Trooper Two**] exited the residence, stood next to ... [**TF Officer**], and had a cellular telephone conversation with the District Attorney from Boston. At no time did any investigator ask ... [**TF Officer**] to go inside the residence to replace ... [**Trooper Two**].*

*On 05/22/2013, at 12:05 AM, ... [**TF Officer**] **heard three gunshots** come from the residence. Instantly he and ... [**Trooper Two**] took their weapons out and ran towards the residence door. Prior to getting to the door, they heard another **four gunshots** from the same location. Once at the door ... [**Trooper Two**] opened the door all the way, ... [**TF Officer**] **instantly observed** a body lying face down with significant amounts of blood around and a **red broom stick protruding from underneath the torso**.*

*... [**TF Officer**] also **observed a sword leaning against the wall**. ... [**TF Officer**] then observed ... [**FBI Agent**] standing in front of the body with blood coming from his head area. ... [**TF Officer**] asked ... [**FBI Agent**] if he had been shot, and ... [**FBI Agent**] advised 'No he had not been shot.' ... [**TF Officer**] determined the threat had been resolved and then said 'don't talk anymore about the shooting.' ... [**TF Officer**] then went back outside of the residence and called OPD Dispatch for uniform police officers and the fire department (FD) to respond to the scene.*

*... [**TF Officer**] observed the FD go into the residence and declare Todaschev dead on the scene. ... [**TF Officer**] had no further involvement inside the residence.*"
[**Emphasis added**, Pages 1 & 2]

> **Note:** The instruction, provided by the **TF Officer**, "*don't talk anymore about the shooting,*" is indicative of some types of training provided to law enforcement officers, usually by investigators and police unions. This instruction is designed to keep witness officers and officers involved in use of force incidents from influencing one another's testimony inadvertently. This step also keeps responding officers from becoming administrative witnesses, due to statements made to them by officers involved in the incidents being investigated.

During my review of an FBI report document[19], authored by AI , on *05/29/2013,* after an interview with the witness, **Trooper Two**, which was conducted by AIIP ███████ and AI ███████ on *05/22/2013,* the following information, was noted:

"... [**Trooper Two**] *primary responsibility was the investigation of unattended deaths including homicides within the jurisdiction of the MCDAO* [Middlesex County District Attorney's Office].

---

[19] The aforementioned documents are memorialized as attachment number 14, pages 55-57.

D012827

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Following the 04/15/2013 Boston Marathon bombings, ... [**Trooper Two**] was assigned as a liaison officer from the MCDAO to the Boston FBI Field Office.  While serving in this capacity, ... [**Trooper Two**] was assigned as the primary case officer for a triple homicide investigation which occurred in Waltham, Massachusetts on 09/11/2011. During the course of this homicide investigation, ... [**Trooper Two**]* ███████████ *persons of interest* ████████ *and Orlando, Florida based Ibragim Todaschev.  **Tsarnaev and Todaschev were associates and participated in Mixed Martial Arts (MMA) training and fighting in the Boston area.***

*On* ██████████*, ... [**Trooper Two**] along with FBI Boston [**FBI Agent**] travelled from Boston to Orlando in order to observe an interview of Todaschev conducted by* ██████ ██ *JTTF personnel.  The interview was conducted at an* ██████ *Police Department facility.  The interview focused on establishing a timeline regarding Todaschev's travel in and out of the Boston area in September 2011 and his association with Tsarnaev.*

*On 05/21/2013, ... [**Troopers One & Two & FBI Agent**] travelled from Boston to Orlando in order to conduct a follow-up interview of Todaschev in connection with the Waltham triple homicide investigation.  The interview strategy focused on solidifying Todaschev's travel timeline in the Boston area in September 2011 and to subsequently confront Todaschev with forensic evidence associated with the triple homicide.  The **Boston interview team was made aware of Todaschev's previous criminal history, past physical confrontations, his association with Tsarnaev, and his MMA fighting abilities**.  Further, ... [**Trooper Two**] conducted open source research which yielded video footage of Todaschev's participation in MMA fights.*

*On 05/22 [21] /2013, [sic] FBI* ██████████ *... [**TF Officer**] assisted in setting up an interview with Todaschev.  Initially, the Boston interview team requested the interview take place at the same* ██████ *Police Department facility in which the prior interview was conducted, however, Todaschev refused and only agreed to be interviewed at his girlfriend's residence located at 6022 Peregrine Avenue, Orlando, Florida.  ... [**Trooper Two**] was made aware the ORA was conducting surveillance of Todaschev prior to the scheduled interview.  **Due to Todaschev's previous violent history and his MMA fighting ability**, ... [**Trooper Two**] **wanted three law enforcement personnel to conduct the interview**.*

*On 05/22 [21] /2013, [sic] at approximately 7:30 PM, Todaschev arrived at the pre-designated interview location.  ... [**Trooper Two**] was informed the FBI surveillance observed Todaschev arrive at the interview location accompanied by another male.  Upon entering the residence, ... [**Trooper Two**] **conducted a visual sweep of the residence and noticed a sword attached to the wall and several glass bowls on top of a table**.*

D012828

*Initially, the interview focused on the aforementioned timeline and Todashev's* [the author spells **Mr. Todashev's** name, *"Todoshev,"* in a different manner] *association with Tsarnaev. Several hours into the interview, Todoshev was asked about his involvement with the triple homicide and subsequently agreed to provide details of his participation in the crime. ...* [**Trooper Two**] **stopped the interview and provided Todoshev with Miranda warnings**.

**Todoshev executed a signed Miranda waiver at approximately 10:25 PM**. *After waiving his Miranda rights, Todoshev began to detail his participation in the triple homicide and* ██████████████████████████████████████ *...* [**Trooper Two**] *offered Todoshev an opportunity to write out a statement and Todoshev agreed. ...* [**Trooper Two**] *noticed Todoshev's demeanor began to change after he started providing information regarding his participation in the triple homicide. ...* [**Trooper Two**] *described Todoshev was looking around the room and smoking heavily. ...* [**Trooper Two**] *also stated Todoshev asked if this was going to be* [the] *last time he would be able to smoke and how much jail time he was facing.*

*At approximately 11:55 PM, ...* [**Trooper Two**] *informed ...* [**Trooper One** & **FBI Agent**] *he was going to step out of the residence for a few minutes. ...* [**Trooper Two**] *then stepped outside in order to call the district attorney and provide an update. During the call, ...* [**Trooper Two**] *received a text message from ...* [**Trooper One**], *however, he was on the phone at the time and was unaware of the incoming text message. Shortly thereafter, ...* [**Trooper Two**] *heard yelling coming from inside the residence followed by several gunshots. ...* [**Trooper Two**] *drew his sidearm and then heard additional gunshots. ...* [**Trooper Two**] *rushed to the front door of the residence whereupon he kicked it open. He announced his presence and received a response from either ...* [**Trooper One**] *or* [**FBI Agent**] *that it was clear to enter. Once inside the door, ...* [**Trooper Two**] *observed Todaschev face down just in front of the door. He saw ...* [**Trooper One** & **FBI Agent**] *with their weapons drawn and took notice ...* [**FBI Agent**] *was bleeding from a wound to his head. ...* [**Trooper Two**] *looked at Todoschev and opined he had suffered gunshot wounds and was deceased.*

*...* [**Trooper Two**] *provided ...* [**Trooper One**] *with a latex glove and observed while ...* [**Trooper One**] *checked Todoshev for a pulse. ...* [**Trooper Two**] *asked ...* [**FBI Agent**] *if he was ok and subsequently rendered first aid to him by applying a piece of cloth to the back of his head. ...* [**Trooper Two**] *then assisted in securing the scene until Emergency Medical Services (EMS) arrived on scene.*

*After the shooting incident, ...* [**Trooper Two**] *read the text message sent just prior to the shooting incident by ...* [**Trooper One**] *which read, 'He is in vulnerable position to do something bad. Be on guard now. I see him looking around at times.' The text message was time stamped at 12:04 AM."* [**Emphasis added**, Pages 1 through 3]

D012829

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The *Orlando Fire Department Ambulance Record*[20] indicated **Mr. Todashev** suffered *Cardiac Arrest, "...Prior to EMS Arrival"* and the determination of death was made at approximately *00:15* hours on *05-22-2013.*

During my review of an FBI report document[21], authored by AI █████████, on *05/23/2013,* after an interview with the witness, *Assistant Special Agent-in-Charge* (ASAC) █████████, which was conducted by *Inspector-in-Charge* ██████████ and *Assistant Inspector* ██████ ██████ on *05/23/2013,* the following information was noted:

> "*... On 05/22/2013, ASAC* ██████ *served as the A/SAC for the TP Field Office.  He was also the ASAC assigned to the ORA and oversaw Counterterrorism and Counterintelligence matters for the field office.*
>
> *At approximately 12:30 AM on 05/22/2013, ASAC* ██████ *received a telephone call from ASAC* ██████████ *who advised there was an Agent-involved shooting at the residence of TP's subject Ibragim Todaschev.  As ASAC* ██████ *was the A/SAC, he served as the FBI on-scene commander during the incident.  He arrived on-scene at approximately 12:52 AM.  ...*
>
> *... ASAC* ██████ *deployed TP ERT to the scene and Agents to assist with securing the scene.  The Agent involved with the shooting was injured during the incident and both the Agent and one of the Massachusetts State Police Troopers was transported to the local hospital.  ASAC* ██████ *detailed two Agents to the hospital to accompany both the Agent and the Trooper.*
>
> *The Principle Firearms Instructor took possession of ...* [**FBI Agent's**] *weapon and provided him with a temporary weapon.  ASAC* ██████ *also coordinated with the Orlando Police Department Deputy Chief Charles Robinson.  Deputy Chief Robinson advised his officers would hold and secure the scene for the FBI.*
>
> *... ASAC* ██████ **was aware of the history of the subject, Ibragim Todaschev, and that Todaschev was considered armed and dangerous due to his training as a Mixed Martial Artist.** *ASAC* ██████ *was also aware that TP Agents and Task Force Officers had met Todachev multiple times in the past without incident.*
>
> *ASAC* ██████ *contacted SAC Danny Banks from the Florida Department of Law Enforcement to provide a briefing of the Agent-involved shooting.  SAC Banks offered his assistance with no further questions concerning the incident."* [**Emphasis added**]

Based on this document, ASAC ██████ telephonically made contact with two (2) of the local law enforcement agencies, the Orlando Police Department and the Florida Department of Law Enforcement, having local jurisdictional authority over the address of occurrence on the date of the incident.

---

[20] The aforementioned document is memorialized as attachment number 26, page 92.
[21] The aforementioned documents are memorialized as attachment number 11, pages 49-50.

D012830

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

During my review of an FBI report document[22], authored by AI ███████████, on *05/23/2013*, after an interview with the witness, *Tampa Field Office Chief Division Counsel* (CDC) ███████, which was conducted by *Assistant Inspector-in-Place* ███████ and *Assistant Inspector* ███████ on *05/23/2013*, the following information was noted:

> "... *On 05/22/2013, at approximately 12:45 AM, CDC* ███████ *received a telephone call ... from an agent who ... advised him that there had been an Agent-involved shooting. ... At no time did CDC* ███████ *review an ops plan for the multi-divisional interview of Ibragim Todashev. CDC* ███████ *contacted the CDC at BS to coordinate efforts. CDC* ███████ *also contacted the local AUSA in Orlando, FL to ensure they were aware of the incident.*
>
> *During a conference call with the Evidence Response Team Unit (ERTU) at Quantico, VA, Tampa's ERT was asked whether it could collect evidence from the scene of the Agent-involved shooting. When this question was later conveyed to CDC* ███████ *by SSA* ███████, *CDC* ███████ *advised that Tampa's ERT* **should only process the immediate scene but should not expand its collection beyond the immediate scene until a search warrant was obtained**.*"   [**Emphasis added**]

Based on this document, CDC ███████ provided legal guidance during the FBI's efforts to process the scene for evidence. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

During my review of an FBI report document[23], authored by AI ███████████ on *05/23/2013*, after an interview with the witness *Supervisory Special Agent* (SSA) ███████████, which was conducted by *Assistant Inspector-in-Place* ███████ and *Assistant Inspector* ███████ on *05/23/2013*, the following information was noted:

> "... *SSA* ███████ *supervised the Joint Terrorism Task Force (JTTF) in the* ███████, ███████ *squad* ███████ *on Ibragim Todashev since the* ███ *was sent a lead as a result of the 04/15/2013 Boston Marathon bombing.* ███ *Todaschev* ███ *had the interest of the Director and was being closely monitored and coordinated with the Boston Field Office as well as the Counterterrorism Division. SSA* ███████ **was aware Todaschev was a suspect in a triple homicide which occurred in Waltham, Massachusetts on 09/11/2011 and was also a Mixed Martial Arts fighter who had a proclivity towards violence.**
>
> *SSA* ███████ *was aware Todaschev canceled his flight to Russia on 05/21/2013.* ███████ *believes this cancellation was due to the fact Todaschev*['*s*] *girlfriend was arrested on immigration charges as well as charges he was facing from a violent confrontation in a parking lot in Orange County* [Florida].



---

[22] The aforementioned documents are memorialized as attachment number 12, pages 51-52.
[23] The aforementioned documents are memorialized as attachment number 15, pages 58-59.

D012831



*Through the course of the day* [May 21, 2013], *SSA* ▮▮▮ *received updates regarding the location of an upcoming interview with Todaschev. After several phone calls between Todaschev and ...* [**TF Officer**] *a meeting location was agreed upon which was Todaschev's home. Once the interview began SSA* ▮▮▮ *received periodic updates from ...* [**TF Officer**] *indicating the interview was going well. The last update SSA* ▮▮▮ *received was around 10:45 PM saying all was going well and they were still interviewing Todaschev. The next time SSA* ▮▮▮ *received an update it was from the Tampa radio room patching a call through ... advising there had been an agent-involved shooting. ..."* [**Emphasis added**]

During my review of an FBI report document[24], authored by SSA ▮▮▮, on *05/24/2013,* after receiving items of evidentiary value from ASAC ▮▮▮, the following information was noted:

"*Pursuant to an Inspection Division Shooting Incident Review of an Agent-involved shooting which occurred on 05/22/2013 at 6022 Peregrine Avenue, Orlando, Florida 32819, Tampa Field Office A/SAC* ▮▮▮ *provided one CD-ROM (labeled 6022 Penegrine* [sic] *5/22/2013) and a two page incident report from the Orlando Police Department dated 5/22/2013. Assistant Inspector-in-Place* ▮▮▮ *reviewed the CD-ROM and listened to a series of 911 calls which were organized onto two tracks as follows:*

***Track One***

- *On 05/22/2013 at 12:05 AM, A male who identified himself as ...* [**TF Officer**] *stated he was located at 6022 Peregrine Avenue and was requested* [sic] *police and Emergency Medical Services (EMS) at his location. ...* [**TF Officer**] *stated an FBI Agent had been struck in the head with a blunt object and a subject had been shot multiple times and was down. ...* [**TF Officer**] *further stated that* [the] *scene was secure and requested a watch commander be deployed to the scene.*

***Track Two***

- *On 05/22/2013 at 12:07 AM, An Unknown female 911 operator directed several responding police and EMS responders to the scene at 6022 Peregrine Avenue. ..."*

Based on this document, the **TF Officer** reportedly made contact with the Orlando Police Department's Communication Center *at 12:05 AM* on *05/22/2013* for the purpose of reporting the incident and requesting assistance.

Additional FBI documents[25], titled *Evidence Data-Loading Form* and *Evidence Chain-of-Custody*, were also reviewed. These documents and related FBI report narratives, authored by AIIP ▮▮▮ and AI ▮▮▮, explained the steps initially taken by the FBI during

---

[24] The aforementioned documents are memorialized as attachment number 24, page 88.
[25] The aforementioned documents are memorialized as attachment numbers 25-37.

D012832

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

the processing of the scene.  The documents also provided the chain of custody, related to the collection of the **FBI Agent's** firearm.  Items collected from the **FBI Agent** were a *Glock 23* with serial number *NM56922, one Glock magazine, seven .40 caliber Smith and Wesson rounds, and one Glock holster,*  serial number *0702-83.*  The following was authored by AIIP ███ ███:

> "*Special Agent* ████████████, *of the Evidence Response Team (ERT), assigned to the Tampa Field Office (TP), Orlando Resident Agency provided AIIP* ███ *with a FBI ERT Casebook.  The case book documented an Agent-involved shooting on 05/22/2013, at 6022 Peregrine Avenue, Orlando, Florida 32819.  The casebook included: an Administrative Worksheet that documented the ERT Roster and timeline of processing the scene; an Evidence Recovery Log; and a Photographic Log **displaying 360 crime scene photographs**.  A CD-ROM accompanied the casebook which contained the same crime scene photographs.*" [**Emphasis added**]

The following FBI crime scene sketches were provided for review:




D012833

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**



D012834

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The compact disc provided by CDC ▮▮▮▮ had a total of six (6) color photographs. **Mr. Todashev's** final location within the scene is clearly depicted in two (2) of the photographs provided by the FBI.




Three (3) photographs show the injury sustained by the **FBI Agent**. One (1) photograph is of a written confession, purportedly authored by **Mr. Todashev**, on a legal sized notepad.



PAGE 37

D012835

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The autopsy of **Mr. Todashev** was attended by SA ███████████.  The following is taken from the *Preliminary Autopsy Report* authored by SA ███████ on *05/23/2013*:

> "On May 22 and May 23, 2013 an autopsy was conducted on IBRAGIM TODASHEV by District 9's Deputy Chief Medical Examiner, Dr. Gary Utz.  Dr. Utz determined that TODASHEV was shot seven (7) times.  **TODASHEV was shot six (6) times in the torso and one (1) time in the head.**  Dr. Utz **located five (5) bullets in the torso** during the autopsy.  Dr. Utz believed the bullets in the torso entered from the left side of the body and traveled to the right side of the body in a downward direction.  Two (2) of the bullets entered TODASHEV via his left upper arm and continued through to the left side of his chest.  Dr. Utz **located one (1) bullet in the head** and **believed the bullet entered the top of the skull and traveled in a downward direction**.  Cause of death of TODASHEV was believed to be via multiple gun shot wounds.  Dr. Utz will finish his formal report and it will be forthcoming the week of May 27, 2013."   [**Emphasis added**]

The information provided in the aforementioned FBI report[26] appeared to be consistent with the following images as well as with the information provided in the Medical Examiner's Office report narrative.




Two (2) additional police reports[27] were provided and reviewed.  **Both reports**, one authored by the Boston Police Department and the other by the Osceola County Sheriff's Office, **indicated Mr. Todashev became physically violent when faced with conflict**. [**Emphasis added**]

---

[26] The aforementioned document is memorialized as attachment number 38, page 132.
[27] The aforementioned documents are memorialized as attachment numbers 21 & 23.

D012836

The *Boston Police Incident Report*[28], *Complaint No. 10007749*, indicated **Mr. Todashev** was involved in a physical altercation on *02/11/2010*.  The following narration is taken from the police report and the names of other civilians involved have been omitted:

> "*About 3:21 PM on Thursday 2/11/10 Officers Hester and Cordasco in the TS16 unit were patrolling in the Downtown Crossing area when a radio call came in for a fight in the area of 172 Tremont St.  Upon arrival Officers witnessed several people struggling to restrain a white male, later determined to be the suspect, Ibragim Todashev.  Officers heard Todashev yell, 'You say something about my mother; I will kill you.'  **Officers struggled to physically restrain and handcuff Todashev.**  Once Todashev was under control Officers spoke to the victims and witnesses.  Officers spoke to ... who stated that the incident started around the corner on Washington St when the driver of a grey van (Todashev) and the driver of a red Mazda 3 ... appeared to be arguing with each other in traffic.  All three vehicles Todashev in the van, ... in the Mazda 3, and ... in a blue Pontiac Vibe turned left onto West St and then left onto Tremont St while the argument continued.  Both ... stated ... Todashev pulled directly in front of both ... and ... and abruptly stopped the van causing ... vehicle to slam into the back of Todashev's van.  ... According to the witnesses Todashev came running out of the van and started a fight with the occupants of the Mazda 3 ... and ...* [witness] *... stated that he observed that Todashev was clearly the aggressor.  Mr. ... became so concerned that he ran outside and attempted to help restrain Todashev and that police arrived as he was restraining him. ...*" [**Emphasis added**]

The *Osceola County Sheriff's Office* report[29], *#12OI59561*, indicated **Mr. Todashev** was involved in a physical altercation on July 07, 2012.  The following narration is taken from the initial police report:

> "*... Ait* [victim Youness Ait Dammou] *is employed at Alibaba Hookah Bar as a manager, and was working in that capacity at the time of this investigation.  Ait said two white males of Russian descent entered the bar and sat down for service.  Once they sat down, suspect #1 (who was identified as Ibrahim /unknown last name) and suspect #2 (who was later identified as Muslim Chapkhanou) began requesting Sofia and another female employee to serve them.  Ait made contact with them and told them that the requested servers were off and were leaving.  A verbal altercation began Ait and the suspects at which time Ait told them to leave in which they did.*
>
> *According to Ait, once they left, he exited the Alibaba en route to the Cairo Supermarket (one business door down) to purchase some items for the bar.  As Ait was walking towards the store, Ibrahim approached behind them and began another verbal argument.  Ait continued to walk towards Cairo in order to avoid the confrontation but Ibrahim threatened to batter Ait.  Ait informed Ibrahim if he (Ibrahim) did 'hit' him, he would notify law enforcement.  At that time, **Ibrahim struck Ait in his facial area (right ear/jaw area), grabbed Ait and threw him onto the ground** causing a small abrasion on Ait's left elbow. ...*"  [**Emphasis added**]

---

[28] The aforementioned document is memorialized as attachment number 21, pages 70-73.
[29] The aforementioned document is memorialized as attachment number 23, pages 75-87.

D012837

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The following excerpt is taken from the handwritten sworn statement provided by battery victim *Youness Ait Dammou* on the date of the initial report:

> "*... I said if you touch me I am going to call the police.  I start walking, then he hit me to my face **I turned to defend myself then <u>he took me from my legs</u> and put me in the floor** ...*"  [**Emphasis added**]

Mr. Ait Dammou signed a *Declination of Prosecution Affidavit* on 08/01/2012 and **Mr. Todashev** was never arrested for this reported incident.

Based on the initial review of the documents and photographs available, several of the initial questions compiled during the review remained to be answered.  At this point in the investigation, I felt the following list of information would be needed by the State Attorney's Office.  This list is taken from the aforementioned note sheets, attachment forty-six (46):

> "*Needs and Questions:*
>
> *-FBI  **360 crime scene photos??***
> *-Area canvass of neighborhood?*
> *-**More detail from witness officer**.*
> ***Suspect path of travel.***
> ***When and how could he have been shot in the back twice.**[**?**]*
> *Question for the purpose of describing the meaning of his commets regarding the suspect raising the pole above his head with both hands.*
> *-**More detail from the shooter**...*"

[**Emphasis added**]

On July 22, 2013, I received a telephone call from ASAC ███████████.  ASAC ████████ explained the FBI review process, as it relates to **FBI Agent's** use of deadly force, and he offered the contact information for the primary FBI Inspectors conducting the related investigation.  ASAC ██████ explained, to the best of his knowledge, the only member of the FBI in attendance during the autopsy of **Mr. Todashev** was SA ███████.  ASAC ██████ was in possession of the related Medical Examiner's report of autopsy, authored by Doctor Utz, and was unaware of the fact **Mr. Todashev** was shot twice in the back prior to our conversation on this date.  ASAC ██████ did not know if the interviewing FBI Investigators knew of this fact or if they made contact with SA ███████ for the purpose of determining **Mr. Todashev's** injuries prior to conducting the interviews of the **FBI Agent** and **Trooper One**.  ASAC ██████ expressed his willingness to assist the State Attorney's Office.

At the direction of State Attorney Ashton, I drafted a letter[30] which outlined the need for additional information from the FBI.  State Attorney Ashton's intent was to make the request formally via a letter.  The following is taken from the draft:

---

[30] The aforementioned document is memorialized as attachment number 47, page 193.

PAGE 40

D012838

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*"On July 7, 2013 I was provided with a compact disc by Mr. ▆▆▆▆▆▆▆▆. According to ▆▆▆▆▆▆, the CD contained documents and images related to a deadly force encounter involving an FBI Field Agent which ultimately led to the shooting of Mr.* [**Todashev**] *by the FBI Field Agent. The incident was reportedly witnessed by a second law enforcement officer. I have reviewed the content of the CD, as well as the related Medical Examiner's report, and would like to note the following:*

*#1.) The CD does not contain a final report. There is no final summary narration to explain the efforts of the shoot review team and the investigator's findings.*
*#2.) The CD does not contain the Medical Examiner's Report or photographs.*
*#3.) The CD does not contain all of the photographs taken from the scene by those who processed for evidence.*
*#4.) The CD does not contain a search warrant for the address.*
*#5.) The CD does not contain documents which would indicate the present location of all of the evidence collected, to include that which was recovered by the Medical Examiner's Office, and what processing has been done or initiated on the same.*
*#6.) No recorded statements were collected.*
*#7.) No mention of an area canvass is made in the documents made available.*
*#8.) No clear answer is provided regarding what caused the injury to the FBI Agent.*
*#9.) The narrations, which purportedly summarize the information originally provided by the FBI Agent and the single witness, make no mention of when the deceased was shot twice in the back.*

*Based on my initial review of the information provided by* ▆▆▆▆▆▆▆ *coupled with my review of the Medical Examiner's report requested by this office, I do not feel a complete review of the facts and circumstances surrounding this event can be made at this time."*

State Attorney Ashton decided to make the request for these additional items verbally during the following meeting.

On July 25, 2013, State Attorney Ashton hosted a meeting, which was requested by the FBI and the Department of Justice (DOJ), and the following individuals were in attendance:

> #1.) Chief Inspector ▆▆▆▆▆▆▆▆▆▆, FBI Office of Inspections
> #2.) **Barry Kowalski, Esq**, Department of Justice Civil Rights Division
> #3.) **Lee Bentley III**, United States Attorney for the Middle District of Florida
> #4.) FBI Inspector-in-Charge ▆▆▆▆▆▆▆▆
> #5.) FBI Assistant Inspector ▆▆▆▆▆▆▆▆
> #6.) State Attorney Jeffrey L. Ashton
> #7.) Chief Assistant State Attorney Linda Drane Burdick
> #8.) Chief of Investigations Eric Edwards

D012839

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

During the course of the meeting, Inspector ███████ and AI ███████ informed of their ongoing investigative efforts. They provided a three ring binder with additional case related information. They explained the manner in which the existence of audio recordings and video recordings, related to portions of the interview with **Mr. Todashev**, were eventually brought to the attention of the FBI by the officers involved.

They explained the existence of the recordings was not mentioned by **Troopers One** or **Two** during the initial interviews. Inspector ███████ explained secondary interviews were conducted due to this development. We discussed the initial questions generated during the course of the aforementioned document review. Inspector ███████ was provided a copy of the document, attachment forty-six (46). Inspector ███████ and AI ███████ indicated they met with Dr. Utz on July 24, 2013, for the purpose of discussing the findings of **Mr. Todashev's** report of autopsy. Inspector ███████ and AI ███████ provided a reenactment of how they believed the incident may have occurred, as the **FBI Agent** fired his duty weapon and struck **Mr. Todashev** seven (7) times.

Members of the FBI expressed concerns surrounding their open and ongoing active criminal investigation efforts. The primary concerns expressed were regarding the investigation of classified matters related to the Boston Marathon bombing as well as case specific information related to the triple murders in Waltham, Massachusetts. Safety concerns surrounding the potential release of the identity of officers involved was also expressed by the FBI. With these topics in mind, the lines of communication were opened between the FBI investigators and the State Attorney's Office.

A review of the documents provided during this meeting, listed as attachments forty-eight (48) through fifty-seven (57), was later initiated. The first document[31] reviewed was titled *Tampa Field Office, Orlando Residence Agency Shooting Incident Review Executive Summary Update*. The following excerpts are taken from this document:

> "... *On 05/21/2013 the interview of Todashev was conducted by the LEOs and lasted approximately five hours from 7:30 p.m. to 12:00 a.m. At approximately 12:04 a.m. on 05/22/2013 Todashev attacked the investigators which resulted in his fatal shooting. Since that time the SIRT has worked closely with DOJ/Civil Rights to fully investigate the shooting. On 06/06/2013 the SIRT obtained audio and video recordings from the MSP that were conducted at the time of the interview. Three recording devices were used by the MSP at various times during the interview due to battery life. This resulted in a total of **four video recordings with audio and one audio only recording**. The recordings captured the majority of the interview and confession of Todashev, none captured the shooting incident. Florida is a two-party consent state with a law enforcement exception. Therefore, the MSP Troopers, as law enforcement officers, were within authority to record Todashev without his consent. DOJ/Civil Rights concurs with this analysis and reviewed the audio and video recordings.*

---

[31] The aforementioned document is memorialized as attachment number 48, pages 194-195.

D012840

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

... [**Trooper Two**] *advised Todashev of his Miranda Rights, had him sign the Advice of Rights form, and proceeded with the interview.* ***The Advice of Rights was captured on the recordings****. The recordings also indicate Todashev's* ▮▮▮▮▮▮▮ *participation in the triple homicide.* ... ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *DOJ/Civil Rights indicated they do not intend to open a criminal investigation at this time but will continue to work with the SIRT on this matter.*

... *On 06/13/2013 the SIRT re-interviewed ... [****Troopers One*** & ***Two****] ... The Troopers indicated they did not mention the recordings in their initial interviews as they focused on the immediate circumstances surrounding the shooting."*
[**Emphasis added**, Pages 1 through 2]

A color photograph[32] of a cellular telephone screen, reportedly belonging to **Trooper One**, displayed a color image depicting three (3) text messages. The photograph, titled *Slide H*, displays a text sent to the **FBI Agent** and **Trooper Two** on *May 22* at *12:03 am.* The content of the text message is as follows:

> ***"Be on guard. He is in vulnerable position to do something bad. Be on guard now. I see him looking around at times"*** [**Emphasis added**]

**Note**: According to the information provided in the FBI document, attachment sixteen (16), the **TF Officer** called the Orlando Police Department requesting assistance at *12:05 AM*, approximately two minutes after this text message was sent by **Trooper One**.



---

[32] The aforementioned documents are memorialized as attachment number 50, pages 200-202.

D012841

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

A two page chart, which outlined the text messages sent and received by **Trooper One** between *22:28:26* hours on May 21, 2013 through *00:57:11* hours on May 22, 2013 was provided and reviewed.  The following text messages and times, presented in the chart, were noted for the purposes of reviewing the timeline of **Trooper One's** texting activities prior to the incident:

#1.) On *05/21/13* at *22:28:26* hours **Trooper One** sent the following text message:

"*He signed Miranda. About to tell is* [sic] *his involvement*" [**Emphasis added**]

#2.) On *05/21/13* at *22:28:46* hours **Trooper One** sent the following text message:

"*Standby to standby*"

#3.) On *05/21/13* at *22:29:27* hours **Trooper One** received the following text message:

" *Amazing.*"

#4.) On *05/21/13* at *23:06:45* hours **Trooper One** sent the following text message:

"*He will be in custody after interviews*"

#5.) On *05/21/13* at *23:25:05* hours **Trooper One** received the following text message:

"***Don't put him in custody until we get a warrant.*** " [**Emphasis added**]

#6.) On *05/21/13* at *23:53:02* hours **Trooper One** sent the following text message:

"***Okay he's writing a statement now in his apt***" [**Emphasis added**]

#7.) On *05/21/13* at *23:55:10* hours **Trooper One** sent the following text message:

"*Who*[']*s your daddy*"  [sic]

#8.) On *05/21/13* at *23:55:23* hours **Trooper One** sent the following text message:

"*Who*[']*s your daddy*" [sic]

#9.) On *05/21/13* at *23:55:59* hours **Trooper One** received the following text message:

"*???*"  [sic]

#10.) On *05/21/13* at *23:56:23* hours **Trooper One** sent the following text message:

"*Getting confession as we speak*"  [sic]

#11.) On *05/21/13* at *23:57:34* hours **Trooper One** received the following text message:

D012842

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

> *"Shut the hell up…thought that's what u were saying.  Who doin*[g] *interview?  Any other suspects?"*  [sic]

#12.) On *05/21/13* at *23:59:00* hours **Trooper One** sent the following text message:

> *"Me FBI guy And* ▇▇▇▇*.* ***He. Is now writing the statement.*** *Gonna be a long night.  Still in his apt in Orlando.* ***Admitted his role"***  [sic, **Emphasis added**]

The text message sent by **Trooper One**, at *12:03 am May 22*, was sent in an effort to warn the other officers of what **Trooper One** perceived to be a heightened threat level.  In approximately four (4) minutes **Trooper One's** text messages evolved from,      ***"He. Is now writing the statement"*** to ***"Be on guard, He is in vulnerable position to do something bad.  Be on guard now.  I see him looking around at times"***.  **Mr. Todashev** was in the process of providing a handwritten statement regarding his involvement ▇▇▇▇▇▇▇▇ of a triple homicide.  The last line written by **Mr. Todashev**, "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ ▇▇▇▇ ▇▇▇▇▇▇▇▇, demonstrates the gravity of his involvement with the crimes being investigated at the time.  **Mr. Todashev** was faced with the reality he formally confessed to his role in the triple homicide case.  The text messages sent by **Trooper One** provide insight as to the evolution of the situation moments prior to the spontaneous attack by **Mr. Todashev**.  [**Emphasis added**]



D012843

These text messages also display **Trooper One** was actively utilizing his cellular phone throughout the interview of **Mr. Todashev**. The content provided demonstrates **Trooper One** witnessed **Mr. Todashev's** confession to his involvement in the triple murders being investigated. The times of these text messages also adds clarity to the timeline of events. **Trooper One** appeared to believe **Mr. Todashev** was eventually going to be placed into custody for his confessed involvement in three murders, which occurred within the jurisdiction boundaries of the State Police of Massachusetts. **Trooper One** was instructed, "***Don't put him in custody until we get a warrant***", at *23:25:05* hours. **Trooper One's** use of his cellular phone, for the purpose of sending and receiving text messages, appears to have been taking place at the time of the reported attack by **Mr. Todashev**. **Trooper One** also utilized his cellular telephone to record portions of the interview with **Mr. Todashev**.

One of the documents[33] provided was a chronological investigative report, authored by the **FBI Agent** on *06/07/2013*. The following excerpts are taken from the thirteen page document, which primarily contains specific details regarding the open and ongoing criminal investigations:

> "*... After being confronted on his story that he was not involved in the triple homicide, TODASHEV stated, '**Okay, I'm telling you I was involved in it, okay, I, I, had no idea** ▮▮▮▮ **gonna kill anyone**.' At this point ...* [**Trooper Two**] *advised TODASHEV of his miranda rights. After being provided with an FBI advice of rights form (FD-395), ...* [**Trooper Two**] *again advised TODASHEV of his rights and had him sign the form. This occurred at approximately 10:25 P.M.*" [**Emphasis added**, Page 8]

> "*... TODASHEV was offered an opportunity to write out a confession using a pen and paper. He advised that he would like the opportunity to do so, and he was provided with a pad of paper and a pen. **While writing out a confession, TODASHEV attacked the interviewing agents and was shot and killed in a violent confrontation**. For a more detailed account of the incident, please refer to the shooting incident review board investigation that was conducted.*" [**Emphasis added**, Page 12]

An FBI document[34] titled *Advice of Rights* and dated *05/21/2013*, and showing a handwritten time of *10:25 pm*, was also provided. This document appears to have been signed, reportedly by **Mr. Todashev**, during the course of the interview. **The video recordings collected by Trooper One captured the event of Mr. Todashev being presented this document by the investigators**. [**Emphasis added**]

---

[33] The aforementioned document is memorialized as attachment number 53, pages 215-227.
[34] The aforementioned document is memorialized as attachment number 57, page 261.

D012844



An *FBI Laboratory*[35] report was provided.   The report indicated six (6) projectiles were recovered during the autopsy of **Mr. Todashev**, and that the seven (7) shell casings recovered by the FBI at the scene, were all fired from the Glock model 23 collected from the **FBI Agent** on May 22, 2013.  The FBI Laboratory report provided an explanation as to the methods utilized while making the abovementioned determination.   This report did not contain information regarding the seventh (7th) projectile, which was later determined to have been recovered at the scene by the FBI.

---

[35] The aforementioned document is memorialized as attachment number 56, pages 254-260.

D012845

INVESTIGATION REPORT
CASE NUMBER: **2013-IN-0063**

Photographs[36] of the Glock model 23, and seven (7) rounds, and one (1) magazine and one (1) holster, which were collected from the **FBI Agent**, were also provided.





Additional documents[37] pertaining to the computerized scene sketch and photograph log were provided. The sketch reviewed, similar to the hand sketch completed while at the scene, displayed item *#15* as being recovered from the carpet near **Mr. Todashev's** final location. I conducted a second review of the color photographs taken by the Medical Examiner Investigators who responded to the scene. Item *#15*, listed as one (1) projectile, was not observed in any of the Medical Examiner's photographs.




---

[36] The aforementioned photographs are memorialized as attachment number 55, pages 248-253.
[37] The aforementioned documents are memorialized as attachment numbers 51 & 52, pages 203-214.

D012846

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

**Note:**  Upon later review of the overall FBI color scene photographs, it appeared item **#15** was somehow relocated during the recovery of **Mr. Todashev** by the Medical Examiner's contracted body recovery team.  The projectile was photographed on top of the brown paper, which was placed on the floor by the FBI prior to the Medical Examiner's recovery shroud being present.  The following information was provided by the FBI:




On July 30, 2013, after a thorough review of the information provided by the FBI during the meeting on July 25, 2013 was completed, the initial case note sheets were updated and forwarded, via electronic mail, to Inspector ████████.

Some issues required additional clarity, as sworn recorded statements were not collected from the witnesses, **TF Officer**, or **Troopers One** and **Two** in a manner consistent with the common practice utilized by local law enforcement during similar investigations.  Therefore, I made the request via State Attorney Ashton, to be afforded an opportunity to conduct sworn recorded interviews of all of the officers involved.

On August 6, 2013, it was discovered portions of the compact disc provided by the FBI, which was marked *TP ORA SIRT Videos, Audio, SMS, Text, ME Photos, ERT Hospital Photos, and Total Station - 360*  and dated *05/22/2013,* could not be opened and viewed.  A request was made for another compact disc.

D012847

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On August 12, 2013, the State Attorney's Office received additional documentation from the FBI. The first document reviewed was a cover letter[38] provided by *Inspector-in-Charge* ███████ ███████ and was dated *August 8, 2013*. The content of the letter is as follows:

*"Dear State Attorney Ashton:*

*This letter is in response to questions posed after the initial review of the information provided by the Shooting Incident Review Team (SIRT) of the Orlando, Florida, Agent-involved shooting.*

*As a guideline, Signed Sworn Statements (SSS) are utilized for FBI Agent shooters and other FBI personnel involved in a shooting incident. SSSs are generally utilized for FBI employees only and statements of Task Force Officers (TFOs) and other law enforcement officers who are shooters or witnesses to an Agent-involved shooting are documented via FD-302. Interviews of additional FBI witnesses and personnel may also be documented via FD-302. Decisions on the utilization of SSSs or FD-302s for FBI personnel are made by the FBI Inspector-in-Charge leading the SIRT, in consultation with the FBI Inspection Division Chief Inspector.*

*As the Waltham triple homicide is being investigated by the Massachusetts State Police (MSP) in coordination with the Middlesex County District Attorney Office (DAO), the FBI requests the SAO coordinate directly with the Middlesex DAO regarding the investigative case file number.*

*The FBI Deadly Force Policy is unclassified and can be located on the internet under the FBI Vault documents within the Domestic Investigation and Operations Guide:*

*http://vault.fbi.gov/fbi%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011-version/fbi-domestic-investigations-and-operations-guide-diog-october-15-2011-part-03-of-03/view*

*The FBI is providing the attached binder in addition to the original CD of information based on the SIRT's investigation. Included within the binder are photographs of the FBI Agent's Weapon used in this incident. Also included are the results of the FBI Laboratory Firearms and Toolmarks Report.*

*During the incident on 05/22/2013, officers from the Orlando Police Department (OPD) were the only local officers who responded to the scene. Tampa Field Office confirmed with the OPD no individuals, to include any neighbors, were observed, nor did anyone approached* [sic] *the OPD. OPD checked for 911 calls regarding the incident and did not find any calls other than from the FBI TFO involved in the incident. A neighborhood canvass was not conducted.*

*Your assistance and cooperation in regard to this matter is appreciated. ..."*

---

[38] The aforementioned document is memorialized as attachment number 58, pages 262 -263.

D012848

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

A review of the compact disc's contents, attachment fifty- nine (59), was initiated:

> **Note**: The following quotation is taken from the top of the aforementioned CD:

> *"These records are being loaned to your office for purposes of your investigation and remain the property of the FBI. As such, they should not be further used or disseminated without the written approval of the FBI. Furthermore, these or any other FBI records that have been loaned to your office, should not become part of the investigative file or your prosecution file or otherwise retained in a manner where they would become part of a Florida system state of records such that they would be subject to release under the Florida Sunshine Laws."* [**Emphasis added**]

Regarding questions surrounding FBI *Item 15,* which was listed in the previously mentioned FBI documents, a report[39] authored by SA ███████ dated *07/24/2013* informed of the following:

> *"Writer is attempting to reconcile the location of Item 15 in the sketch of 6022 Peregrine Avenue, Orlando, Florida compared to where the item was physically located the night of the search. This is in response to a question from the Inspection Division's Shoot* [sic] [Shooting] *Incident Review Team who noted a difference between the evidentiary sketch of the scene and the photographs taken at the crime scene. Writer spoke to Special Agent* ███████████████ *who was the drawer of the sketch and the following is the reasoning of the discrepancy between the location of item 15 on the sketch and the actual location of item 15.*

> *A deceased person was located by FBI Evidence Response Team members face down on the floor in the residence in the approximate location depicted in the sketch. Crime scene photographs show the exact location of where the body was lying in the residence. The physical evidence in question, marked Item 15 on the sketch, was found on the floor where the deceased individual's body was lying after the Orange County Medical Examiners (ME) Office personnel turned the body over from the stomach to the back.*

> *It is believed that in the process of moving the body, sketch item 15 came dislodged from the torso of the deceased and fell out onto the floor where the body was lying before the ME personnel turned the body over. As the body was being flipped, a large amount of fluids came out of the body and it is believed item 15 came out with the fluids. Item 15 was erroneously marked in the sketch so it appeared it was closer to the middle of the living room area because item 15 was not seen until the body was moved. Item 15 was actual* [sic] *positioned underneath where the body was lying."* [**Emphasis added**]

---

[39] The aforementioned document is memorialized as attachment number 62, page 267.

D012849

Regarding questions surrounding **Trooper Two** making contact with the Assistant District Attorney, on the date of the incident, a report[40] authored by AI ███ dated *07/15/2013* informed of the following:

> "*Assistant Inspectors* ███ *and* ███ *interviewed Assistant District Attorney (ADA)* ███ *via telephone, telephone number* ███ *After being informed of the identity of the interviewers and the nature of the interview ADA* ███ *provided the following information:*
>
> *... ADA* ███ *remembers receiving a text from Massachusetts State Police (MSP) ...* [**Trooper Two**] *around 10:30 p.m. on May 21, 2013. ADA* ███ *does not remember exactly what was said but remembers it being very good news about the Waltham triple homicide investigation on which the MSP were interviewing Ibragim Todashev. ADA* ███ *headed to his office in anticipation of drafting an indictment. ADA* ███ *received another telephone call later in the evening from ...* [**Trooper Two**] *around 11:50 p.m., although he does not remember the exact time.*
>
> *... [**Trooper Two**] told ADA* ███ *the interview was going well and Todashev was writing out his confession. ADA* ███ *thought the investigators were doing a good job from a legal stand point, stating they gave Todashev cigarette breaks, bathroom breaks, and allowed him to move around the room freely. ... [**Trooper Two**] and ADA* ███ *continued to talk about certain aspects of the investigation when the call ended abruptly. ADA* ███ **did not think anything of the abrupt ending to the telephone call and in his experience, many law enforcement calls of that nature end abruptly**.
>
> *... ADA* ███ *then contacted* ███ *the Assistant United States Attorney (AUSA) in Boston. ADA* ███ *knew AUSA* ███ *would want to know Todashev was talking to the investigators. ADA* ███ **did not know the interview was going to be recorded and did not authorize or suggest the interview be recorded.** *ADA* ███ *was well aware of Todashev's violent history and criminal record. ADA* ███ **stated everyone involved in the case knew Todashev was a Mixed Martial Arts fighter and had a violent nature**. *...*"

Based on the information in this report, the *Assistant District Attorney* confirmed he was in contact with the investigators during the course of the interview with **Mr. Todashev**. This report indicates the attorney recalled receiving, "*…another telephone call later in the evening from ...* [**Trooper Two**] *around 11:50 p.m., although he does not remember the exact time.*" The report makes no mention of whether or not the *Assistant District Attorney* heard gunfire while on the phone with **Trooper Two**.

---

[40] The aforementioned document is memorialized as attachment number 63, page 268.

D012850

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On August 13, 2013, the State Attorney's Office received another compact disc, containing the previously mentioned information, sent via the postal mail by AI ███. Thirty-seven (37) color photographs were received, showing a laceration type injury to the **FBI Agent** and his blood soaked clothing. The photographs displayed the injury sustained by the **FBI Agent** during the incident.

 

**Note:** The following is taken from a book titled **Forensic Pathology Principles** and **Practice** (Dolinak, Matshes, & Lew, 2005)**:**

> "*The three key manifestations of the blunt force injury spectrum are abrasions, contusions, and* **lacerations**, *each of which is created in response to the direct application of force to the body. ... A* **laceration** *forms when an object impacts the body with a force that exceeds the elastic capacity of the skin and underlying tissues.  Thus, a laceration is a* **forceful tearing of the skin**."
> [**Emphasis added,** Pages 121 & 129]

D012851

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The compact disc provided also contained four (4) color photographs, which appeared to have been taken from the video footage captured during the interview of **Mr. Todashev**. Only two (2) of the four (4) photographs had clarity. The two (2) images displayed **Mr. Todashev's** locations within the apartment at approximately 11:42 p.m. and 11:52 p.m. on May 21, 2013. **Mr. Todashev** is sitting on the mattress, near what appears to be an open sliding glass door to the apartment in both photographs. The photographs display the **<u>white coffee table</u>** was moved, from what appears to be a location near one of the apartment's interior walls, to a position closer to the center of the room during the course of the interview. [**Emphasis added**]





D012852

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The compact disc contained two additional (2) files titled by the last names of **Trooper One** and **Trooper Two**.  The file showing **Trooper One's** name contained a subfolder which was titled *Videos From JVC*.  Reviews of each of the videos located in the subfolder were conducted and the following information was noted:

A video approximately *3:59* minutes in length was viewed.  During the course of this review, the following observations were noted:

    #1.)    **Mr. Todashev** was sitting on the mattress while answering questions.  **He was sitting near the sliding glass door**.  At approximately 01:04 minutes into this second video, **Mr. Todashev** appeared calm as his eyes scanned the room. **[Emphasis added]**

    #2.)    At approximately 03:55, **Mr. Todashev** stated, … *Like I said, I didn't kill nobody and I need your help.*  He then looked directly into the camera and stated, … *Can you turn that off please?*

A video approximately *26:03* minutes in length was viewed.  During the course of the review, the following observations were noted:

    #1.)    The investigators are speaking with **Mr. Todashev** regarding the motive for the triple homicide.

    #2.)    **Trooper Two** is sitting in a chair facing **Mr. Todashev**, **who appears to be sitting on the mattress near the open sliding glass door of the apartment**. **[Emphasis added]**

    #3.)    **Mr. Todashev**, appears to be calmly drinking a bottle of water as he informed the investigators ███████████████████████ ██ ████████████ ████████████████

    #4.)    It appeared **the sliding glass door was partially open**, due to the loud background noise cause by crickets outside of the apartment.  **[Emphasis added]**

    #5.)    At approximately 8:15 minutes into this video, the investigators challenge **Mr. Todashev** about the information he is providing.  Approximately 10:50 minutes into the video, **Mr. Todashev** asked, … *If I tell you my involvement, is there any chance … you need me to testify?*  Approximately 13:10 minutes into the video, **Mr. Todashev** stated, *I was involved in it.*

    #6.)    At this point, **Trooper Two** read **Mr. Todashev** **his rights according to _Miranda_**.  Mr. Todashev asked, … *Will you guys help me?*  At approximately 14:20 minutes all three law enforcement officer can be seen in the video footage.  **Mr. Todashev** is believed to have signed the document related to *Miranda* outside of the view of the recording camera.

D012853

This occurred at approximately *10:09 hours,* according to an unidentified voice proclaiming the time during this portion of the recording. [**Emphasis added**]

#7.) **Mr. Todashev** asks the law enforcement officers if he can close the sliding glass door at approximately 17:30 minutes and he then turns on the air conditioning unit.

#8.) As the conversation continued, **Mr. Todashev** appears to become more anxious. At approximately 21:40 hours he asked, *… After I tell you, are you going to take me to jail right away?* **Mr. Todashev** is observed rolling his thumbs and appears nervous at this time. At approximately 23:02 minutes, **Mr. Todashev** drops his head and asked, *… How much time will I get?*

A video approximately *30:42* minutes in length was viewed. During the course of this review, the following observations were noted:

#1.) **Mr. Todashev** stated, *… Don't video anymore.* At this time he was sitting on the mattress, **near the open sliding glass door, smoking a cigarette.** Approximately 01:40 minutes into this video **Mr. Todashev** closed the screen and a small table was positioned between the **FBI Agent** and **Mr. Todashev.** At approximately 02:10 minutes **Mr. Todashev** again confessed to specific knowledge and involvement of detailed information pertaining to ████████ the triple homicide case being investigated. [**Emphasis added**]

#2.) From approximately 03:05 minutes thru 18:40 minutes, **Mr. Todashev** shared specific information, related to the triple homicide, with the investigators. At approximately 26:30 minutes, **Mr. Todashev** began to author a handwritten statement. Approximately 29:20 minutes, as the **FBI Agent** was sitting in the chair, **Mr. Todashev** was observed smoking a cigarette. The situation appeared to be calm and non-confrontational.

An audio recorded file, titled with **Trooper Two's** name, approximately *1:53:48* in length was reviewed. The content of this recording is information which is believed to be case specific regarding the open and ongoing criminal investigations. The content of the video recordings demonstrated probable cause related to **Mr. Todashev's** firsthand knowledge ████████ ████████ in the Waltham, Massachusetts triple homicide case.

**Note:** *Probable Cause* is defined in the Florida Legal Guidelines as being the following:

*"The highest level of contact a law enforcement officer may have with a citizen is probable cause to arrest. An officer may make a warrantless arrest if he or she has probable cause. Florida v. White, 526 U.S. 559 (1999). Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in belief that an offense has been or is being committed. Draper v. U.S., 358 U.S. 307 (1959)*

D012854

*Probable cause (or reasonable cause) means that an officer need not have information which excludes every conceivable possibility of innocence. Probable cause depends upon probabilities, not certainties. Thus, it must appear to the officer that it is at least more probable than not that a crime has taken place and that the one arrested is the perpetrator. Conduct equally compatible with guilt or innocence will not constitute probable cause. 'The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.' Maryland v. Pringle, 540 U.S. 366 (2003)"*

On August 26, 2013, I reviewed the following information regarding potentially applicable FBI policies. The following excerpts were specifically considered during this review:

*http://vault.fbi.gov/fbi%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011-version/fbi-domestic-investigations-and-operations-guide-diog-october-15-2011-part-03-of-03/view*

"**FBI Records:** *The Vault Legal Handbook for Special Agents Part 1 of 1*

***3-6 Use of Force*** *...*

***3-6.1 Identification***

*A person to be arrested should be aware of the intention of the arresting Agent to deprive him/her of his/her liberty by legal authority. Therefore, it is the responsibility of the arresting Agent to identify himself/herself, before effecting the arrest, in a clear, audible voice, as Special Agent of the FBI. ...*

***3-6.2 Physical Force***

*Agents are permitted to use that amount of physical force reasonable and necessary to impose custody and overcome all resistance, and to ensure the safety of the arresting Agents, the arrestee, and others in the vicinity of the arrest. ...*

***3-6.4 FBI Deadly Force Policy – Instructional Outline***

*(1) INTRODUCTION: This outline provides guidance to FBI Agents in the use of deadly force. The following general principles are to govern application of the FBI's deadly force policy:*

*(a) The policy is not to be construed to require Agents to assume unreasonable risks. In assessing the need to use deadly force, the paramount consideration should always be the safety of the Agents and the public.*

*(b) The reasonableness of an Agent's decision to use deadly force under this policy must be viewed from the perspective of the Agent on the scene – who may often be forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving – and without the advantage of 20/20 hindsight.*

D012855

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*(2) POLICY TEXT:*

    *(a)* **Defense of Life** *– Agents may use deadly force only when necessary, that is, when the* **Agents have probable cause to believe that the subject of such force poses an imminent danger of death or serious physical injury to the Agents or other person***s.*

    *(b)* **Fleeing Subject** *– Deadly force may be used to prevent the escape of a fleeing subject if there is* **probable cause to believe***:*

        *1.* **the subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death***, and*

        *2.* *the* **subject's escape would pose an imminent danger of death or serious physical injury to the Agents or other persons***.*

    *(c)* *Verbal Warnings – If feasible, and if to do so would not increase the danger to the Agent or others, a verbal warning to submit to the authority of the Agent shall be given prior to the use of deadly force. …*

*(3) DEFINITIONS*

    *(a)* **Deadly Force***:   Force that is likely to cause death or serious physical injury.*

    *(b)* *Necessity:* **In evaluating the necessity to use deadly force, two factors are relevant***:*
        *1)* *The* **presence of an imminent danger to the Agents or others; and**
        *2)* *The absence of safe alternatives to the use of deadly force. Deadly force is never permissible under this policy when the sole purpose is to prevent the escape of a suspect.*

*(1)* **Imminent Danger***:   "Imminent" does not mean "immediate" or "instantaneous," but that an action is pending.  Thus, a subject may pose an imminent danger even if he/she is not at that very moment pointing a weapon at the Agent.  For example, imminent danger may exist if Agents have probable cause to believe any of the following:*

    *(a)* *The* **subject possesses a weapon***, or* **is attempting to gain access to a weapon***, under circumstances indicating an intention to use it against the Agent or others; or,*

    *(b)* *The subject is armed and running to gain the tactical advantage of cover; or,*

D012856

(c) *A **subject with the capability of inflicting death or serious physical injury** – or otherwise incapacitating Agents – without a deadly weapon, is demonstrating an intention to do so; or,*

(d) *The subject is attempting to escape from the vicinity of a violent confrontation in which he/she inflicted or attempted the infliction of death or serious physical injury. ...*

(2) *Absence of a safe alternative: Agents are not required to use or consider alternatives that increase danger to themselves or to others. If a safe alternative to the use of deadly force is likely to achieve the purpose of averting an imminent danger, deadly force is not necessary. Among the factors affecting the ability of Agents to SAFELY seize a suspect, the following are ... cover provides a tactical advantage. An armed suspect attempting to gain a position of cover may necessitate the use of deadly force; conversely, an Agent in a position of cover may gain additional time to assess the need to use deadly force without incurring significant additional risks. ...*

(c) *Time constraints – The inherent disadvantages posed by the issue of action/reaction, coupled with the lack of a reliable means of causing an instantaneous halt to a threatening action, impose significant constraints on the time-frame in which Agents must assess the nature and imminence of a threat.*

(4) *APPLICATION OF DEADLY FORCE*

(a) *When the decision is made to use deadly force, **Agents may continue its application until the subject surrenders or no longer poses an imminent danger**.*

(b) *When deadly force is permissible under this policy, attempts to shoot to cause minor injury are unrealistic and can prove dangerous to Agents and others because they are unlikely to achieve the intended purpose of bringing an imminent danger to a timely halt.*

(c) *Even when deadly force is permissible, Agents should assess whether its use creates a danger to third parties that outweighs the likely benefits of its use. ...*

**4-2  Detention** *...*
**4-2.1 Justification**

*The legality of a full custody arrest depends upon whether the arresting Agent has facts sufficient to constitute **probable cause**; ... Agent's inquiries should be conducted in such a manner as to uncover additional facts regarding the suspected criminal activity. Such additional facts may be sufficient to meet the test of probable cause and justify an immediate arrest. ...*

D012857

### 4-2.3  Duration of Detention

*An Agent may detain a suspect for a reasonable period of time or until the suspicions of the Agent are dispelled, whichever comes first.  What constitutes a reasonable period of time is a flexible concept requiring assessment of a variety of factors, such as the suspect's cooperation, the nature of the criminal activity being investigated, and whether the Agent pursued a diligent course of investigation thus avoiding unnecessary delay.  For example, whether the suspect is answering logical questions such as who he/she is and what he/she is doing may be considered when determining whether a detention should be extended.  An Agent should diligently pursue logical investigation and avoid unnecessarily extending the length of time of the detention. ... **Finally, it is recognized that some types of criminal activity cannot be sufficiently investigated in the amount of time other types of illegal activity may be investigated.** …*

### 4-3.2  Permissible Scope of a Limited Search for Weapons

*(1)  General Rule:  In conducting a limited search for weapons, Agent's actions must not only be justified at their inception but also be reasonable in scope.  Generally, a limited search for weapons should begin with a pat-down of the detainee's outer clothing.  Further intrusions into areas, such as an unlocked briefcase or a purse, would be reasonable if the Agent was unable to determine from the outside whether there was a weapon within.*
*An exception would be when the Agents have specific information (firsthand information, a reliable tip, etc.) **regarding the location of a weapon**. ... **In other words, the degree of intrusion that is permitted is that which is necessary to protect the Agent against possible harm.** ...*

### 7-2  VOLUNTARINESS  [regarding statements]

*A conviction based on an involuntary statement, without regard to its truth or falsity, is a denial of the accused's right to due process of law.  /A/ coerced confession will undermine the legitimacy of a conviction.*

### 7-2.1  Policy …

*(1)  It is the policy of the FBI that no attempt be made to obtain a statement by force, threats, or promises.  **Whether an accused or suspect will cooperate is left entirely to the individual.**  If after being advised of his/her rights, an in-custody suspect indicates that he/she wishes to remain silent or that he/she wishes an attorney, all interrogation must cease at that time.  Agents are reminded, however, that certain questions, such as standard booking questions and public safety questions, do not amount to interrogation for purposes of Miranda. ...*

D012858

### 7-8  RECORDING OF INTERVIEWS …

(1)  *Use of electronic recording devices to record the confessions or interviews of witnesses is permissible when authorized by the SAC, or his or her designee. …*

*b.  When recording a confession, the recording should include an advice and waiver of Miranda rights, as well as a question and answer segment designed to demonstrate that the subject's statements are voluntary and not the product of coercion.*
*c.  The subject may provide a complete confession in his or her own words. …*
*d.  Statements may be recorded surreptitiously if approved by the SAC, or his or her designee.  … If a subject is aware of and objects to the use of an electronic recorder, the recorder should be turned off and the subject's objection should be made part of the interrogation log …*
*g.  The recordings must not be edited or altered, and the original tapes must be sealed in an FD-504a or FD-504b (Chain of Custody – ELSUR Evidence Envelope) and stored in such a manner as to ensure the chain of custody.*

### 7-12.1  In General

***Where possible, written statements should be taken in all cases in which any confession or admission of guilt is obtained unless the confession was obtained during an electronically recorded interrogation session.*  …"** [**Emphasis added**]

**Note:**  Though each of these topics were reviewed and considered, this is not an administrative investigation regarding potential policy violations.   The review of the previously listed material was in an effort to determine if the **FBI Agent** was acting within acceptable parameters, established by the FBI, at the time of the incident.   The FBI policy deemed most applicable has been provided in the conclusion portion of this report.

On September 4, 2013, I met Inspector ████ and AI ████ in Boston, Massachusetts for the purpose of collecting additional documents, which needed to be reviewed in preparation for the upcoming interviews of **Troopers One** and **Two**.   AI ████ provided three additional documents related to the ongoing FBI investigation.   The first document[41] reviewed was an FBI report authored by AI ████ and dated *09/04/2013*.   The report was related to a secondary interview of **Trooper Two**, conducted telephonically by AI ████ and AI ████ on *June 13, 2013*. The following excerpts are taken from the document:

---

[41] The aforementioned FBI document is memorialized as attachment number 68, pages 277-282.

D012859

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*"... The purpose of this interview was to clarify information about a recording device ...* [**Trooper Two**] *possessed during the interview. As arrangements to meet Todashev were being made, it became apparent they were not going to conduct the interview at the* ███████ *Police Department (*███*). The previous interviews of Todashev took place at the* ███ *and were recorded. According to ...* [**Trooper Two**], *there was a brief comment made in passing about recording the interview when ...* [**Trooper Two**] *mentioned he had a recording device, and MSP ...* [**Trooper One**] *added that he had audio and visual recording capabilities.*

*This comment was made between himself, ...* [**FBI Agent**], *and ...* [**Trooper One**]. *This brief conversation took place in ...* [**FBI Agent's**] *hotel room prior to the interview. ... As a practice, MSP often records subject interviews as most of the time the interviews are conducted in the police station in rooms equipped for recording. The* ███ *had audio and video recording capability. Despite the change of venue for the interview, there was no further in-depth discussion on whether or not the interview would be recorded. ...*

*...* [**TF Officer**] *called to advise Todashev would only agree to an interview at Todashev's apartment. Due to the short notice, ...* [**Trooper Two**], [**Trooper One**], *and* [**FBI Agent**] *hurried to prepare for the interview and arrive at the apartment. ... After arriving and entering Todashev's apartment, ...* [**Trooper Two**] *turned on his small portable MSP audio recording device, which was located in his left breast pocket. ...* [**Trooper Two**] *did not know if it would work but thought he would try it anyway. Todashev was not aware of the recorder concealed in the pocket of ...* [**Trooper Two**]. *...* [**Trooper Two**] *described Todashev as calm, articulate, and not excited or agitated. ...* [**Trooper Two**] *advised Todashev was allowed to smoke cigarettes and take water and bathroom breaks throughout the interview. ... After 10 p.m., ...* [**Trooper Two**] *verbally provided Todashev with his Miranda Rights. ...* [**FBI Agent**] *provided a Miranda Rights form to ...* [**Trooper Two**] *which Todashev signed. Todashev did not ask for legal representation even after he was read his Miranda Rights. ...*

*...* [**Trooper Two**] *observed a sword hanging on the wall with a couple of screws near the plant and then after the Agent-involved shooting, observed the sword behind the shoe rack near the kitchen. After the shooting, ...* [**Trooper Two**] *became aware that during one of these bathroom breaks, ...* [**Trooper One**] *moved the sword from the wall within Todashev's apartment. ... As ...* [**Trooper Two**] *was outside the apartment on the telephone, he heard a commotion to include yelling and gunshots from inside Todashev's apartment. ...* [**Trooper Two**] *drew his weapon, announced himself, and came through the front door of the apartment along with ...* [**TF Officer**]. *The front door of the apartment was not locked. When he entered the apartment he saw Todashev laying on the floor, it was apparent to ...* [**Trooper Two**] *he was dead.* ***Immediately after entry into the apartment, ...*** [**TF Officer**] ***called 911 for medical assistance.*** *He also saw ...* [**FBI Agent**] *bleeding from the head profusely. ...*

*... Once ...* [**Trooper Two**] *returned to his department in Boston he checked his audio recorder and found it had recorded a large portion of the interview with Todashev. He submitted the recorder to his department for retrieval and dissemination to the FBI."*

D012860

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Attached to this FBI report were three (3) sheets of paper showing overhead computerized images, which appeared to depict the inside of **Mr. Todashev's** apartment and the evolution of the individual locations of each person during the contact. The images, titled *DURING INTERVIEW, DURING HANDWRITTEN CONFESSION* and *AFTER INCIDENT*, were all dated *9/4/2013* and appear to have been signed by **Trooper Two**.

The image titled *DURING INTERVIEW* is marked by handwritten notes showing the location of the **FBI Agent** who is positioned on the stairs leading to the upstairs of the apartment. **Trooper One** is standing on the large rug located in the middle of the living room. **Trooper Two** is sitting in a *Folding Chair* directly in front of **Mr. Todashev**, who was reportedly on the *Mattress* near the *Sliding Glass Door to Patio*.



D012861

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled ***DURING HANDWRITTEN CONFESSION*** is marked by handwritten notes showing the location of the **FBI Agent**, on the stairs leading to the upstairs of the apartment. **Trooper One** is standing on the large rug located in the middle of the living room and **Trooper Two** is sitting in a *Folding Chair*. The ***White Table*** is displayed between **Trooper Two** and **Mr. Todashev**, who is sitting on the *Mattress* near the *Sliding Glass Door to Patio*.



D012862

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled ***AFTER INCIDENT*** is marked by handwritten notes showing the location of the **FBI Agent**, who is on the large rug near the *Folding Chair*. **Trooper One** is depicted as being on the left hand side of the **FBI Agent**. **Trooper One** is standing on the large rug in the middle of the living room. **Trooper Two** entered the apartment through the doorway near the kitchen. **Mr. Todashev** is on the floor by the *shoe rack* near the entry into both the kitchen and living room. The image also shows the **TF Officer** near the entry point to the apartment, a short distance behind **Trooper Two**.



The second document[42] reviewed was of a second sworn FBI statement taken from **Trooper One**. The documents displayed, *Sworn and subscribed before me this 4th day of September 2013, in Boston, Massachusetts,* below the name and signature of **Trooper One**. The document is also signed by *Inspector-In-Charge* ▮▮▮▮▮▮▮ and *Assistant Inspector* ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

---

[42] The aforementioned FBI document is memorialized as attachment number 69, pages 283-289.

D012863

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*"... This interview focused on the existence of a consensual recording of the interview of Ibragim Todashev which included both audio and video. ... Our original thought was Todashev would meet us at the* ▮▮▮▮ *Police Department (*▮▮▮*), where he had been interviewed before, and the interviews were recorded. As the evening drew closer, it became increasingly apparent that he did not want to meet with us. ...* [**TF Officer**] *managed to get Todashev to agree to meet with us at Todashev's apartment. I mentioned that I had my high-definition recorder in my bag. When we asked ...* [**TF Officer**] *what time the interview was scheduled to start, he replied right now, or words to that effect.*

*… Once we arrived at Todashev's apartment, we quickly began the interview. Todashev was talking and all three of us were taking notes. It was at this time I remembered about the personal digital recorder in my bag. I walked over to the dining room table where I had placed my bag when we first arrived, and got the recorder out. I deleted some family videos from the recorder prior to turning it on in order to be able to record the interview. I then placed it upright on the table facing Todashev in full view. It was about 20 minutes into the interview when I started the recording.*

*As Todashev was talking, I would walk over to check on the recorder. I watched to make sure it was still recording and at one point when it had stopped, the screen said the video card was full. I deleted some additional family videos and turned the recorder on again. After awhile, I again noticed the recorder had stopped recording due to lack of space to record. I again deleted additional family videos,* **as well as the first portion of the interview which contained what I thought was general conversation, nothing specific about the homicides.** *I then resumed recording when the conversation about the Waltham murders took place. My JVC recorder captured the Miranda Warning as Todashev walked right up to the recorder that was now placed on his kitchen counter.*

*At some point the battery failed and I pulled out my personal cellular telephone to record the interview. I was standing against the wall where the flag was located; and began to video with my Droid Razor cellular telephone. After a few minutes, Todashev looked in my direction and said, 'don't do that,' or words to that effect. I turned off my cellular telephone. After sometime, I again began to record the interview with my cellular telephone. Todashev again said to turn it off, which I did. Later when Todashev took a cigarette break, I placed my cellular telephone on the dining room table and then resumed recording, while leaning my cellular phone upright against my bag.* **It remained there recording the interview until I needed to use it which was after Todashev had begun to write out his confession***.*

*While Todashev was writing and no questions were being asked, I turned off my cellular telephone recording device in order to use my phone. It was then that I saw a text message had come from the Assistant District Attorney stating 'Don't put him in custody until we get a warrant.' I then displayed this message to ...* [**FBI Agent**]*. As Todashev was writing his statement, I heard him ask ...* [**FBI Agent**] *how to spell* ▮▮▮▮▮▮▮

PAGE 66

D012864

*... [**FBI Agent**] responded stating, ▮▮▮ Todashev asked to go to the bathroom and ... [**FBI Agent**] and I walked him up the stairs. ... [**FBI Agent**] was at the top of the stairs and I was standing on the stairs about halfway up where I could maintain visual contact. We were on alert due to Todashev's strange behavior. He was moving extremely slow and looking around. As I came back down the stairs, **I grabbed the sword on the wall near the flag and moved it behind a rack at the kitchen. I presumed Todashev saw me move the sword due to a large mirror placed at the bottom of the stairs** that was strategically placed where as to see the door and hallway.*

*Todashev returned to his position sitting on the bed and resumed writing out his confession on the coffee table he was using as a desk. ... [**FBI Agent**] was sitting on a folding chair directly in front of Todashev. I moved back to the stairs.*

*As I sat on the stairs, I began texting ... [**Trooper Two**] (who was now outside) and ... [**FBI Agent**] to alert them to the feeling I had about Todashev's strange and nervous behavior. I sent a text message to ... [**Trooper Two** & **FBI Agent**] to be on alert and on guard. **It was while I was sitting on the stairs when Todashev flipped the coffee table***.*

*I did not mention the recordings in the initial interview because I was concentrating on the actual shooting incident itself. Furthermore, I was never asked. The recordings were made known to other people involved in the handling of this case. Also, the recordings were provided to District Attorney's Office the day after we arrived back in Massachusetts. Nothing was out of the ordinary, as MSP tends to record subject interviews. Had I known the Shooting Incident Review Team was not aware of the recordings, I would have told them. ..."* [**Emphasis added**]

Attached to this sworn FBI statement were three (3) sheets of paper showing overhead computerized images, which appeared to depict the inside of **Mr. Todashev's** apartment, and the evolution of the individual locations of each person during the contact. The images, titled ***DURING INTERVIEW, DURING HANDWRITTEN CONFESSION*** and ***AFTER INCIDENT***, were all dated *9/4/2013* and appear to have been initialed by **Trooper One**.

D012865

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled ***DURING INTERVIEW*** is marked by handwritten notes showing the location of the **FBI Agent**, on the stairs leading to the upstairs of the apartment.  **Trooper One** is standing on the large rug in the middle of the living room.  **Trooper Two** is sitting in a *Folding Chair* directly in front of **Mr. Todashev**, who is on the *Mattress* near the *Sliding Glass Door to Patio*.  The document also displayed a marking of *BAD Recorder* on the image labeled *Dining Table*.  Another marking displayed a *Recorder* location on the countertop positioned between the kitchen and the living room.  These markings were consistent with video footage previously viewed.



D012866

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled **DURING HANDWRITTEN CONFESSION** is marked by handwritten notes showing the location of the **FBI Agent**, sitting in a *Folding Chair* with the **White Table** displayed between the **FBI Agent** and **Mr. Todashev**.   The location of **Trooper One** is on the stairs leading to the upstairs of the apartment.  The image also shows a handwritten marking of the word *sword* near **Trooper One**.  **Trooper Two** is exiting the apartment via the door by the kitchen.  **Mr. Todashev** is on the *Mattress* near the *Sliding Glass Door to Patio.*  There is a handwritten line, indicating movement between two points, running from the location of **Trooper One** on the stairs to the corner of the item marked *Dining Table.*  The words *Remove Recorder* are handwritten on the corner of the *Dining Table* as well.



D012867

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled *AFTER INCIDENT* is marked by handwritten notes showing the location of the **FBI Agent**, moving from the area of the *Folding Chair* to large rug, to the right of **Trooper One**. The position of **Trooper One** changed from the being on the stairs to a spot where he was standing on the large rug in the middle of the living room and to the left of the **FBI Agent**. The locations of **Mr. Todashev** began on the *Mattress* and move across the large carpet, towards the area of the hallway near the door recently exited by **Trooper Two**. **Mr. Todashev's** track continued through the entry to the kitchen, and then back towards the doorway area. A small circular mark, titled *Red Pole*, is shown by the hinge side of the door to the apartment. The handwritten track depicts **Mr. Todashev** moving from inside the kitchen directly to the area of the *Red Pole*, and then back towards the location of **Trooper One**. Near the image labeled *Shoe rack*, which is in the small hallway where the words *Todashev (Down) & Sword* are handwritten. The image indicates **Trooper Two** is outside of the apartment.



D012868

The third document[43] reviewed was of a second sworn FBI statement taken from the **FBI Agent**. The documents displayed, *Sworn and subscribed before me this 4th day of September 2013, in Boston, Massachusetts,* below the name and signature of the **FBI Agent**. The document is also signed by *Inspector-In-Charge* ████████ and *Assistant Inspector* ████████████. The following excerpts are taken from the document:

> "... *With respect to the recording of the interview of Ibragim Todashev,* **I want to make it clear I did not know the interview of Todashev was being recorded**. *My responses during my previous interview were focused on the shooting inquiry and the events which led up to me having to discharge my weapon.* [**Emphasis added**]
>
> ... *During most of the interview of Todashev, I was sitting on the stairs and ...* [**Trooper One**] *was standing to my left and behind me. I did not see any recording devices or video cameras at the time we interviewed Todashev.*
>
> ... *I first learned the interview was recorded on Friday, May 24, 2013, when I received a message from ...* [**Trooper One**] *who advised videos were uploaded to the Google cloud. Once I located the recordings on the computer I found there were both audio and video recordings of the interview of Todashev. I found out after the fact, ...* [**Trooper One**] *had used a high definition recorder which he had placed on the kitchen counter which eventually ran out of battery life, at which point ...* [**Trooper One**] *switched to his telephone to continue recording. I also found out after returning to Boston that ...* [**Trooper Two**] *had a recorder in his pocket during the interview. At the time of the interview, I did not know the interview was being recorded by anyone.*
>
> ... [**Trooper One**] *advised he had passed the videos to other individuals who had a need to know in his department. After this had happened, I did not think about the recording. When I returned to work after being off for the injury I received as a result of the assault on my person by Todashev, I was contacted by* ████████ *with some additional questions regarding my initial signed sworn statement. I mentioned to* ████████ *something to the effect of, it would be nice if we released the video because it would refute many of the press' allegations.* ████████ *was very surprised by this because he did not know about the video's existence. He advised he would need a copy. I mentioned to* ████████ *that I had only learned of the videos after the incident. ...*"

Attached to this sworn FBI statement were three (3) sheets of paper showing overhead computerized images, which appeared to depict the inside of **Mr. Todashev's** apartment, and the reported evolution of the individual locations of each person during the contact. The images, titled ***DURING INTERVIEW, DURING HANDWRITTEN CONFESSION*** and ***AFTER INCIDENT***, were all dated *9/4/2013* and appear to have been initialed by the **FBI Agent**.

---

[43] The aforementioned FBI document is memorialized as attachment number 70, pages 290-296.

D012869

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled **DURING INTERVIEW** is marked by handwritten notes showing the location of the **FBI Agent**, who is on the stairs leading to the upstairs of the apartment.  **Trooper One** is standing on the large rug located in the middle of the living room.  **Trooper Two** is sitting in a *Folding Chair* directly in front of **Mr. Todashev**, who was on the *Mattress* near the *Sliding Glass Door to Patio.*



D012870

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled ***DURING HANDWRITTEN CONFESSION*** is marked by handwritten notes showing the location of the **FBI Agent**, sitting in a *Folding Chair* with the ***White*** **[coffee]** ***Table*** displayed between the **FBI Agent** and **Mr. Todashev**.   The location of **Trooper One** was near the stairs leading to the upstairs level of the apartment.  [**Emphasis added**]



PAGE 73

D012871

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The image titled ***AFTER INCIDENT*** is marked by handwritten notes showing the location of the **FBI Agent**, moving from the area of the *Folding Chair* to a spot near the large rug, to the right of **Trooper One**.  The location of **Trooper One** is changed from being near the stairs to a position where he is standing to the left of the **FBI Agent**.   **Mr. Todashev** is initially shown on the *Mattress* and then illustrates how he moved across the large carpet towards the area of the foyer.   **Mr. Todashev's** reported path of travel continued through the entry way into the kitchen. The handwritten markings depict **Mr. Todashev's** final location near the image labeled *Shoe rack*, which is located in the small hallway/foyer area directly in front of **Trooper One** and slightly to the left of the **FBI Agent**.



D012872

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On September 18, 2013, AI ███████ provided a copy, via electronic mail[44] of the Orange County Sheriff's Office case report[45] #13-38070 and a review of the document was then conducted. The report, authored by Deputy Sheriff Larry Clifton, indicated **Mr. Todashev** was arrested for the charge of *Aggravated Battery* on *05/04/2013*. The report indicated Deputy Clifton was working an off duty job at the Premium Outlet Mall when he responded to a physical altercation being reported in *lot number 19*. The following excerpts are taken from the *Incident Report*:

> "... *I approached the location where the incident occurred and saw a male laying on the ground. I could see a considerable amount of blood on the ground and the subject appeared unconscious.* ...
>
> *I identified the secured subject as defendant Ibragim Todashev. He continuously asked to speak to me to explain his side of the story. I read him his* **Miranda Right**[s] *via pre-printed text, he waived his rights and chose to speak with me. Todashev stated that he and Baez got into an argument over a parking space. He said during the argument Baez got into his face at which time Todashev pushed Baez. Baez's son, victim Lester Garcia Perez referred to as Perez, got involved and Todashev began fighting with him. Todashev said that Perez came at him swinging. Todashev said he was only* **fighting to protect his knee because he had surgery in March**. *Also by his own admission Todashev was recently a former* **mixed martial arts fighter**. *The skill puts his fighting ability way above that of a normal person.* ..." [**Emphasis added**]

The following excerpts are taken from the supplemental *Incident Report* authored by assisting Deputy Brent Bagshaw:

> "... *I was directed to go to Dr. Phillips Hospital where the victim, Lester Garcia, was transported by Orange County Rescue Medic 9. Lester was on a stretcher and was immobile due to being on a backboard with neck support. His entire forehead was wrapped in gauze so injuries beneath were not visible. There was blood that could be seen in spots under the gauze. Lester's upper lip was split on the left side and he had* **several teeth that appeared to be significantly out of place** *(not missing). Other injuries visible to me was a large 'goose egg' next to his left eye and ear was well as a laceration at the base of the back of his head.* ...
>
> *Lester was conscious and alert when I spoke with him. He gave me a verbal statement about what had happened and I wrote a sworn statement for him. Lester told me the following occurred:*
>
> *Lester was driving in the Premium Outlet Mall parking lot searching for a space. The mall was very crowded and available parking spots were not plentiful. Lester asked two ladies that were walking if they were going to their car to leave. They told him yes so he followed them to their vehicle, put his turn signal on and waited for them to leave.*

---

[44] The aforementioned document is memorialized as attachment number 75, page 311.
[45] The aforementioned document is memorialized as attachment number 74, pages 304-310.

D012873

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

> *After they pulled out, Lester began to pull into the spot when he was blocked by a white Mercedes Benz that was trying to pull into the spot as well. The driver of the Mercedes rolled down his window and yelled at Lester that he was taking the spot and was there first. Lester yelled back 'no way I was here first and had my blinker on' and started to try to park. The Mercedes started to back up as if it was going to hit Lester's car so Lester's father jumped out of the car and asked the driver what was going on. The driver of the Mercedes got out of his vehicle and started yelling obscenities and derogatory remarks at Lester and his father. Lester said he remained in his vehicle until the driver of the Mercedes shoved his father at which point he got out to go defend his father. Lester said he and the driver of the Mercedes started fighting and did so for several minutes. Lester eventually got knocked to the ground and he believes he was unconscious for an unknown period of time. ..."* [**Emphasis added**]

The following excerpts are taken from the supplemental *Incident Report* authored by Deputy Anthony Riccaboni, who assisted with the apprehension of **Mr. Todashev**:

> *"... I exited my patrol car with handgun drawn and began to give the suspect verbal commands. Deputy Clifton approached with his gun drawn. I could see in the front windshield the suspect's face, chest, arms and hands. The suspect immediately put his hands up. **I could see the features of suspect[']s ears. I immediately recognized the marks on his ears as a cage fighter/jujitsu fighter**.*
>
> *I verbally yelled to Deputy Clifton, '**Watch him he is a cage fighter**'. Deputy Clifton had the suspect exit the car and go directly on the ground face down. I know **from training, experience, and watching a lot** [of] **sanctioned fights how dangerous these men can be. I told this suspect if he tried to fight with us I would shoot him**. This suspect was compliant and was secured without incident.*
>
> *I had this suspect roll over to his buttocks and helped him to his feet. Once on his feet **the suspect commented that the vehicles behind us are FBI agents that have been following him. I noticed 3 (three) vehicles with dark tint. These vehicles began to leave the area. I noticed one vehicle was driven by a male**, had a computer stand and* [he] *appeared to be talking on a radio. ..."* [**Emphasis added**]



D012874

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

The aforementioned police report and physical arrest of **Mr. Todashev** occurred on *05/04/2013*. Based on information provided during the interview of the **TF Officer**, **Mr. Todashev** was being followed by members of the FBI as well as video recorded at the time of this incident.   During this incident, **Mr. Todashev** engaged in a physical altercation with two individuals simultaneously.   Responding Deputy Sheriff Riccaboni immediately identified a physical characteristic of **Mr. Todashev's** cauliflower type deformities of the ears as being indicative of what he described as those of a "…*cage fighter/jujitsu fighter."*   Due to the observation, the deputy "…***told this suspect if he tried to fight with us I would shoot him***."

> **Note:**  The following definition for and photograph of a cauliflower ear are taken from a *WebMD* article[46] located by visiting the following web site address:
>
> http://www.webmd.com/skin-problems-and-treatments/cauliflower-ear-symptoms-auses-treatments:
>
> > *"The term cauliflower ear refers to a deformity of the ear caused by blunt trauma or other injury, such as what may occur during a boxing or wrestling match. Left untreated, the injury leads to a blockage that prevents blood flow and damages tissue. This results in a bumpy or lumpy appearance on part of the ear, similar to a cauliflower. Early treatment can help prevent permanent deformity."*



---

[46] The aforementioned document is memorialized as attachment number 108, pages 452-453.

D012875

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

**Mr. Todashev** would be interviewed and once again provided his rights according to *Miranda* by law enforcement officers seventeen (17) days after this incident and arrest. The assisting **TF Officer** and the other officers involved with the interview of **Mr. Todashev** were aware of the event. **Mr. Todashev**, who appeared to be in sufficient physical condition to engage in the physical altercation with two individuals simultaneously, had recently been told by one of the arresting deputies "…*if he tried to fight with us I would shoot him*." The following crime scene photographs were taken by the Orange County Sheriff's Office on May 4, 2013:







D012876

INVESTIGATION REPORT
CASE NUMBER: **2013-IN-0063**

Based on the information provided in the Orange County Sheriff's Office incident report, I conducted another review of the Medical Examiner's Office report authored by Doctor Utz. The following excerpts are taken from **Mr. Todashev's** *Report of Autopsy:*

"***EXTERNAL EXAMINATION***

...*There is marked bony deformity of the nose.* **Both ears display cauliflower type deformities***. The nose and ears are without evidence of acute trauma.*

***IDENTIFYING MARKS AND SCARS:*** *A faint, linear scar oriented in the coronal plane, is present on the undersurface of the chin. There is a **faint, discontinuous linear scar over the anterior aspect of the right knee**.*"

[**Emphasis added**, Report pages 4 & 5]

The following photograph of **Mr. Todashev** and his left *cauliflower* ear is taken from an online Boston Magazine article[47] located by visiting the following web site address:

http://www.bostonmagazine.com/news/blog/2013/12/30/ibragim-todashevs-father-writes-open-letter-obama-releases-photos-surrounding-sons-death-warning-graphic/



**Note:** This color photograph displays a bruise on **Mr. Todashev's** left upper cheek. An additional review of the Medical Examiner's color photographs, taken prior to **Mr. Todashev** being removed from the scene, shows the left side of **Mr. Todashev's** face in direct contact with the floor of the apartment. This area of contact is also noted in the Medical Examiner's Investigative report, attachment two (2).

---

[47] The aforementioned document is memorialized as attachment number 107, pages 429-451.

D012877

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On November 26, 2013, a box mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office. This box contained items previously requested, to include three hundred and thirty-six (336) color crime scene photographs[48] collected by the FBI during the processing of the scene. The box contained a cover letter[49] authored by *Chief Inspector* ████████████████ The following excerpts are taken from the letter:

> "*Dear State Attorney Ashton:*
>
> *This letter is in response to a request for additional information after the initial review of the information provided by the Shooting Incident Review Team (SIRT) of the Orlando, Florida, Agent-involved shooting.*
>
> *The FBI is providing the attached six FBI Laboratory Reports:*
>
> - *Two Latent Print Operations Unit reports dated October 24, 2013 and November 13, 2013*
> - *Two Nuclear DNA Unit reports dated September 18, 2013 and October 28, 2013*
> - *Two Firearms/Toolmarks Unit report[s] dated July 7, 2013 and September 30, 2013*
>
> *In addition, the FBI is providing the attached photographs taken of Ibragim Todashev's residence by the Tampa Field Office Evidence Response Team based on the SIRT's investigation.*
>
> ***These records are being loaned to your office purposes of your investigation and remain the property of the FBI. As such, they should not be further used or disseminated without the written approval of the FBI. Furthermore, these or any other FBI records that have been loaned to your office should not become part of the investigative file or your prosecution file or otherwise retained in a manner where they would become part of the Florida system state of records such that they would be subject to release under the Florida Sunshine Laws.***
>
> ***Your assistance and cooperation in regards to this matter is appreciated. …"***

**[Emphasis added]**

> **Note:** A decal was attached to the backside of each of the color crime scene photographs provided by the FBI. Each decal displayed the same caption quoted above.

---

[48] The aforementioned FBI photograph decal is memorialized as attachment number 87, page 377.
[49] The aforementioned FBI document is memorialized as attachment number 85, pages 350-351.

D012878

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

A thorough review of the aforementioned three hundred and thirty-six (336) crime scene photographs and *attached six FBI Laboratory Reports*[50] was conducted.   The following information, which includes quotations taken from the body of the reports provided, is as follows:

#1.)   "*FBI Laboratory Report of Examination,* dated *October 24, 2013 ...*

*Date specimens received:  August 8, 2013*

*The specimens listed below were examined in the Latent Print Operations Unit:*

Q24     *Sword* █████████████
Q25     *Broomstick* ████████████████

*This report documents the friction ridge print examinations.*

**Results of Examinations:**

*One latent fingerprint of value was detected on Q24.  No latent prints of value were detected on the remaining specimen* [Q25].

*The latent fingerprint is not a fingerprint of IBRAGIM TODASHEV, ...* [**Trooper Two**] *...* [**Trooper One**] *or ...* [**FBI Agent**]. *...*"

Based on the information provided in this FBI Laboratory report, the "*Sword*" which was moved by **Trooper One** prior to the incident was found to have only one latent print specimen of value. The identification of the individual, who at an unknown time and place made contact with the sword, is unknown.  The "*Broomstick*" in the possession of **Mr. Todashev** during the incident was found to have, "*No latent prints of value were detected...*" On page two (2) of this report the following information is provided:

"***Interpretations:***

*Due to the many factors involved in the deposition of a friction ridge print,* ***neither the absence of a friction ridge print on evidence nor the exclusion of a friction ridge print with a given source disassociate that source from having touched the evidence***."   [**Emphasis added**]

---

[50] The aforementioned FBI Laboratory Reports are memorialized as attachment number 86, pages 352-376.

D012879

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#2.)   "*FBI Laboratory Report of Examination,* dated *November 13, 2013 ...*

*Date specimen received:  October 10, 2013 and October 22, 2013*

*The specimen listed below was submitted under cover of communication dated October 9, 2013, assigned Laboratory number* ████████*, and examined in the Latent Print Operations Unit:*

*Q31     One (1) notebook* ████████████

*The specimen listed below was submitted under cover of communication dated October 18, 2013, assigned Laboratory number* ████████*, and examined in the Latent Print Operations Unit:*

*K6       Fingerprints and palm prints of Ibragim Todashev* ██████████████
*This report documents the friction ridge print examinations.*

**Results of Examinations:**

*Six latent fingerprints and two latent palm prints of value were detected on Q31.*

*The six latent fingerprints and one latent palm print detected on Q31, a notebook, have been identified as fingerprints and a palm print of IBRAGIM TODASHEV, UCN 20549HD1.   The remaining latent palm print is not a palm print of Todashev. ...*"

Based on the information provided in this FBI Laboratory report, the "*One (1) notebook*" which was being written on by **Mr. Todashev** prior to the incident, was found to have six (6) latent fingerprints and two (2) latent palm prints of value.  According to this report, "***The six latent fingerprints and one latent palm print detected on Q31, a notebook, have been identified as fingerprints and a palm print of IBRAGIM TODASHEV****... The remaining latent palm print is not a palm print of Todashev.*"  [**Emphasis added**]  The identification of the individual, who at an unknown time and place made contact with the notebook, is unknown.  On page three (3) of this report the following information is provided:

"***Interpretations:***

*The presence of a friction ridge print on an item of evidence indicates contact was made between the source and the item of evidence.  The presence of a friction ridge print alone does not necessarily indicate the significance of the contact or the time frame during which the contact occurred.*

*Due to the many factors involved in the deposition of a friction ridge print, neither the absence of a friction ridge print on evidence nor the exclusion of a friction ridge print with a given source disassociate that source from having touched the evidence.*"

D012880

#3.) "*FBI Laboratory Report of Examination,* dated *September 18, 2013 …*

*Date specimens received:  August 8, 2013 and August 16, 2013*

*THE FOLLOWING ITEMS WERE SUBMITTED TO THE FBI LABORATORY BY FBI TAMPA PER REQUEST OF FBI INSPECTION DIVISION:*

*The specimen listed below was Examined in the Nuclear DNA Unit under cover of communication dated August 6, 2013* ████████████

*Q22    Suit coat* ████████████

*The specimens listed below were examined in the Nuclear DNA Unit under cover of communication dated August 15, 2013* ████████████

*Q26    White table* ████████████
*Q27    Shelf from table* ████████████

*This report contains the results of the serological and nuclear DNA analyses.*

**Results of Serological Examinations:**

*Blood was identified on specimens Q22, Q26, and Q27.*

**Results of Nuclear DNA Examinations:**

*Specimens Q22-1 (cutting from bloodstain on suit coat), Q22-2, Q22-4, Q22-7, Q22-10 (cuttings from stains on the suit coat), Q26-1, Q26-2(swabbings of bloodstains on table), Q26-3(swabbing of stain on the table), Q27-1 (swabbing of bloodstain on shelf), Q27-4 (swabbing of stain on shelf), Q27-5, and Q27-6 (swabbings of bloodstains on shelf) were subjected to deoxyribonucleic acid (DNA) typing by the polymerase chain reaction (PCR).  …*

*Based on the typing results from the amelogenin locus, male DNA is present in the DNA obtained from specimens Q22-1, Q22-2, Q22-4, Q22-7, Q22-10, Q26-1, Q26-2, Q26-3, Q27-1, Q27-4, Q27-5, and Q27-6.*

*The STR typing results from specimens Q22-1, Q22-2, Q22-4, Q22-7, Q22-10, Q26-1, Q26-2, Q26-3, Q27-1, Q27-4, Q27-5, and Q27-6 were compared to the STR typing results from specimen K70 (TODASHEV), a known sample from IBRAGIM TODASHEV [submitted under FBI Laboratory Number* ████████, ████████ ████████████, *and reported in the FBI Laboratory report dated May 19, 2013].*

D012881

*Based on the STR typing results, specimen K70 (TODASHEV) is excluded as a potential contributor of the DNA obtained from specimens Q22-7, Q26-2, and Q27-4.*

*The STR typing results from specimen Q27-1 [swabbing of bloodstain on the shelf] indicate the presence of DNA from two or more individuals. A male major contributor can be discerned and is suitable for comparison purposes. The STR typing results for the minor contributor to specimen Q27-1 are suitable for matching purposes. Specimen K70 (TODASHEV) is excluded as a potential contributor of the DNA obtained from specimen Q27-1.*

*The STR typing from specimens Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3, Q27-5, and Q27-6 indicate the presence of DNA from two or more individuals. The STR typing results for the minor contributor to specimens Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3, Q27-5, and Q27-6 are not suitable for matching purposes; however, they may be utilized for exclusionary purposes. Specimen K70 (TODASHEV) is excluded as a potential contributor of the DNA obtained from specimens Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3, Q27-5, and Q27-6*

*It is noted that DNA profile obtained from specimens Q22-7, Q26-2, and Q27-4, and the major DNA profile obtained from specimens Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3, Q27-1, Q27-5, and Q27-6 are consistent with having originated from the same male individual. ..."*

#4.)  *"FBI Laboratory Report of Examination, dated October 28, 2013 ...*

*Date specimens received:  October 8, 2013*

*The specimens listed below examined in the Nuclear DNA Unit:*

*THE FOLLOWING ITEMS WERE SUBMITTED TO THE FBI LABORATORY BY FBI TAMPA PER REQUEST OF FBI INSPECTION DIVISION:*

Q28    *Dark pants* █████████████
Q29    *Dark coat* ███████████████
Q30    *Dress shirt* ████████████

*This report contains the results of the serological and nuclear DNA analyses.*

**Results of Serological Examinations:**

*Blood was identified on specimens Q28, Q29, and Q30.*

D012882

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Results of Nuclear DNA Examinations:*

*Specimens Q28-1 and Q28-2 (cuttings from bloodstains on pants), Q29-1 (cutting from bloodstain on coat), and Q30-1 (cutting from bloodstain on dress shirt) were subjected to deoxyribonucleic acid (DNA) typing by the polymerase chain reaction (PCR). ...*

*Based on the typing results from the amelogenin locus, male DNA is present in the DNA obtained from specimens Q28-1, Q28-2, Q29-1, and Q30-1.*

*The STR typing results from specimens Q28-1, Q28-2, Q29-1, and Q30-1 are consistent with having arisen from a single individual and are suitable for comparison purposes.*

*It is noted that for comparison purposes, specimen Q30-1 is being used as alternate reference samples for ...* **[FBI Agent]** *and hereafter will designated specimen Q30-1 ...* **[FBI Agent]** *to further differentiate it from the other questioned (Q) specimens analyzed.*

*The STR typing results from specimen Q30-1...* **[FBI Agent]** *were compared to the STR typing results from specimens Q22-1 (cutting from bloodstain on suit coat), Q22-2, Q22-4, Q22-7, Q22-10 (cuttings from stains on the suit coat), Q26-1, Q26-2 (swabbings of bloodstains on table), Q26-3 (swabbing of stain on the table), Q27-1 (swabbing of bloodstain on shelf), Q27-4 (swabbing of stain on shelf), Q27-5, and Q27-6 (swabbing of bloodstains on shelf) [submitted under FBI Laboratory numbers* ███████████████████████ *and reported in the FBI Laboratory report dated September 18, 2013].*

*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 ...* **[FBI Agent]** ***is the source of the DNA obtained from specimens Q22-7, Q26-2, and Q27-4.*** **[Emphasis added]**

*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 ...* **[FBI Agent]** ***is the major contributor of the DNA obtained from specimens Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3, Q27-1, Q27-5, and Q27-6. ...***" **[Emphasis added]**

According to the information provided in the two (2) aforementioned FBI DNA Laboratory reports (#3 and #4), it can be discerned that, "*Based on the STR typing results and to a reasonable degree of scientific certainty ...* [indicated the **FBI Agent**] *... is the major contributor of the DNA obtained from specimens...*"

D012883

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#5.)   *"FBI Laboratory Report of Examination,* dated *July 7, 2013 …*

*Date specimens received:  May 31, 2013, June 14, 2013 and June 26, 2013*

*The following items were received in the Firearms/Toolmarks Unit:*

*THE FOLLOWING ITEMS WERE ACQUIRED FROM THE DISTRICT 9 MEDICAL EXAMINER, 2350 EAST MICHIGAN STREET ORLANDO, FLORIDA AND SUBMITTED TO THE LABORATORY FOR EXAMINATION (Communication dated May 29, 2013 assigned Laboratory number* ████████ ████████

| | |
|---|---|
| Q9 | *Projectile from right chest wall (Your* ████ *)* |
| Q10 | *Projectile from heart (Your* ████ |
| Q11 | *Projectile from left base of skull (Your* ████ *)* |
| Q12 | *Projectile from right back (Your* ████ *)* |
| Q13 | *Projectile from left lower lung lobe (Your* ████ *)* |
| Q14 | *Projectile from stomach (Your* ████ *)* |

*THE FOLLOWING ITEMS WERE ACQUIRED BY FBI TAMPA AND SUBMITTED TO THE LABORATORY FOR EXAMINATION (Communication dated June 12, 2013 assigned Laboratory number* ████████████

| | |
|---|---|
| Q15 | *Shell Casing (EV2) (Item* ████ |
| Q16 | *Shell Casing (EV3) (Item* ████ |
| Q17 | *Shell Casing (EV4) (Item* ████ |
| Q18 | *Shell Casing (EV5) (Item* ████ |
| Q19 | *Shell Casing (EV6) (Item* ████ |
| Q20 | *Shell Casing (EV7) (Item* ████ |
| Q21 | *Shell Casing (EV12) (Item* ████ |

*THE FOLLOWING ITEM WAS ACQUIRED BY FBI TAMPA AND SUBMITTED TO THE LABORATORY FOR EXAMINATION (Communication dated June 25, 2013 assigned Laboratory number* ████████████

| | |
|---|---|
| K5 | *Glock #23, Serial* ████ *(Item* ████ *,* ████████ |

*The results of the firearms examination are included in this report.*

**Results of Examinations:**

*Specimens Q9 through Q14 are .40/10mm caliber copper jacketed hollow point bullets which were fired from a polygonal rifled barrel with six grooves, right twist.  The Q9 through Q14 bullets were identified as having been fired from the barrel of the K5 pistol.*

D012884

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Specimens Q15 through Q21 are .40 S&W caliber cartridge cases which bear the headstamp of Winchester ammunition.  The Q15 through Q21 cartridge cases were identified as having been fired in the K5 pistol.*

*Specimen K5 is a .40 S&W caliber Glock pistol, Model 23, Serial Number NMS622.  The K5 pistol functioned normally when test fired in the Laboratory. ...*"

#6.)   "*FBI Laboratory Report of Examination, dated September 30, 2013 ...*

*Date specimens received:  May 31, 2013, June 26, 2013 and August 8, 2013*

*The following items were received in the Firearms/Toolmarks Unit:*

*THE FOLLOWING ITEMS WERE ACQUIRED FROM THE DISTRICT 9 MEDICAL EXAMINER, 2350 EAST MICHIGAN STREET ORLANDO, FLORIDA AND SUBMITTED TO THE LABORATORY FOR EXAMINATION (Communication dated May 29, 2013 assigned Laboratory number* ███████ *):*

*Q9     Projectile from right chest wall (Your* ████ *)*
*Q10    Projectile from heart (Your* ████ *)*
*Q11    Projectile from left base of skull (Your* ████ *)*
*Q12    Projectile from right back (Your* ████ *)*
*Q13    Projectile from left lower lung lobe (Your* █████ *)*
*Q14    Projectile from stomach (Your* ████ *)*

*THE FOLLOWING ITEM WAS ACQUIRED BY FBI TAMPA AND SUBMITTED TO THE LABORATORY FOR EXAMINATION (Communication dated June 25, 2013 assigned Laboratory number* ████████ *:*

*K5     Glock [model] #23, Serial* █████ *(Item* ████ *,* ████████*.*

*THE FOLLOWING ITEM WAS SUBMITTED TO THE FBI LABORATORY BY FBI TAMPA PER REQUEST OF FBI INSPECTION DIVISION (Communication dated August 6, 2013 assigned Laboratory number* ███████ *:*

*Q23    Projectile (* ████ *,* ██████ *)*

*The results of the firearms examinations are included in this report.  This report supplements FBI Laboratory report dated July 7, 2013 from the Firearms/Toolmarks Unit.*

D012885

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Results of Examinations:*

> *Specimen Q23 is a .40/10mm caliber copper jacketed hollow point bullet which was fired from a polygonal rifled barrel with six grooves, right twist. The Q23 bullet was identified has* [sic] *having been fired from the barrel of the K5 pistol. ..."*

Based on the information provided in the two abovementioned FBI *Firearms/Toolmarks Unit* Laboratory reports (#5 and #6), each of the seven (7) *Projectiles* recovered were fired from the .40 caliber Glock model 23 hand gun collected from the **FBI Agent** on May 22, 2013. All seven (7) of the .40 caliber *Shell casings* were also fired from the Glock model 23 hand gun collected from the **FBI Agent** on May 22, 2013.

During my review of the three hundred and thirty-six (336) color crime scene photographs, the following seventeen (17) photographs[51] were copied for the purpose of specific reference. The following information was observed when reviewing the following crime scene photographs:

| | |
|---|---|
| Report *Attachment 88 page 378* is a color photocopy of an FBI crime scene photograph. The photograph shows the front door located at the address of 6022 Peregrine Avenue on May 22, 2013. The door displayed a white decal depicting the shape of an assault type rifle. |  |

---

[51] The aforementioned FBI photographs are memorialized as attachment number 88, pages 378-394.

D012886

INVESTIGATION REPORT
CASE NUMBER: **2013-IN-0063**

Report *Attachment 88 page 379* is a color photocopy of an FBI crime scene photograph. The photograph shows Mr. Todashev lying face down, **with the left side of his face on the carpet**, resting on top of the *Q25 Broomstick*. [**Emphasis added**]

According to the FBI Laboratory reports, *No latent prints of value were detected on the remaining specimen* [Q25].



Report *Attachment 88 page 380* is a color photocopy of an FBI crime scene photograph. The photograph shows the first floor level of the apartment, to include the staircase, from a vantage point taken from the area of the sliding glass door.



Report *Attachment 88 page 381* is a color photocopy of an FBI crime scene photograph. The photograph shows the final location of the table, which struck the **FBI Agent** as it was thrown by **Mr. Todashev**. According to the FBI Laboratory reports testing of *Q26* the *White table*, *Q26-1* and *Q26-2 (swabbings of bloodstains on table)* and *Q26-3 (swabbing of stain on the table)*, had the following results:

"*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 …* [**FBI Agent**] *is the source of the DNA obtained from specimens* Q22-7, *Q26-2*, and Q27-4. [**Emphasis added**]

*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 …* [**FBI Agent**] *is the major contributor of the DNA obtained from specimens* Q22-1, Q22-2, Q22-4, Q22-10, *Q26-1*, *Q26-3*, Q27-1, Q27-5, and Q27-6. …*" [**Emphasis added**]



D012887

Report *Attachment* 88 *page 382* is a color photocopy of an FBI crime scene photograph. The photograph shows the final location of the table shelf after it was thrown by **Mr. Todashev**. According to the FBI Laboratory reports testing of *Q27* the *Shelf from table,* ***Q27-1,*** ***Q27-5*** and ***Q27-6*** *(swabbing of bloodstains on shelf)* and ***Q27-4*** *(swabbing of stain on the shelf),* had the following results:

"*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 …* **[FBI Agent]** ***is the source of the DNA obtained from specimens*** *Q22-7, Q26-2, and* ***Q27-4**.* **[Emphasis added]**

*Based on the STR typing results and to a reasonable degree of scientific certainty, specimen Q30-1 …* **[FBI Agent]** ***is the major contributor of the DNA obtained from specimens*** *Q22-1, Q22-2, Q22-4, Q22-10, Q26-1, Q26-3,* ***Q27-1,*** *Q27-5, and* ***Q27-6**. …*" **[Emphasis added]**



Report *Attachment* 88 *page 383* is a color photocopy of an FBI crime scene photograph. The photograph shows the final location of the folding chair, which was being utilized by the **FBI Agent** as **Mr. Todashev** was writing a statement on the aforementioned table, *Q26* and *Q27*.

The notebook utilized by **Mr. Todashev**, *Q31*, is partially under a large multi-color carpet. The notebook is near blood soaked clothing, utilized to render aid to the **FBI Agent**, and a letter addressed to **Mr. Todashev**.



D012888

Report *Attachment* 88 *page 384* is a color photocopy of an FBI crime scene photograph. The photograph shows the final location of the notebook, which was being utilized by **Mr. Todashev** as he was writing a statement on the aforementioned table, *Q26* and *Q27*. The notebook utilized by **Mr. Todashev**, *Q31*, is partially under a large multi-color carpet. The notebook is near blood soaked clothing and a letter addressed to **Mr. Todashev** addressed to 6022 Peregrine Avenue.



Report *Attachment* 88 *page 385* is a color photocopy of an FBI crime scene photograph. The photograph shows the final location of the notebook, which was being utilized by **Mr. Todashev** as he was writing a statement on the aforementioned table, *Q26* and *Q27*. The notebook utilized by **Mr. Todashev**, *Q31*, is partially under a large multi-color carpet. The notebook is near blood soaked clothing and a letter addressed to **Mr. Todashev** addressed to 6022 Peregrine Avenue.



Report *Attachment* 88 *page 386* is a color photocopy of an FBI crime scene photograph. The photograph shows the notebook utilized by **Mr. Todashev**, *Q31*, with what appears to be numerous blood droplets on attached pages of paper.

According to the FBI Laboratory reports, "*The six latent fingerprints and one latent palm print detected on Q31, a notebook,* **_have been identified as fingerprints and a palm print of IBRAGIM TODASHEV_**...*"
[**Emphasis added**]



D012889

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

| | |
|---|---|
| Report *Attachment 88 page 387* is a color photocopy of an FBI crime scene photograph. The photograph shows the photograph marker and the notebook, which was being utilized by **Mr. Todashev** as he was writing a statement on the aforementioned table *Q26* and *Q27,* after being moved by the FBI. |  |
| Report *Attachment 88 page 388* is a color photocopy of an FBI crime scene photograph. The photograph shows a close up of the handwritten document, which was authored by **Mr. Todashev**, prior to him flipping the coffee table and striking the FBI Agent.<br><br>The information provided in the narrative clearly indicates **Mr. Todashev** implicated himself, in regards to the triple murders being investigated. |  |
| Report *Attachment 88 page 389* is a color photocopy of an FBI crime scene photograph. The photograph shows the photograph marker and the location of the *Q24 Sword* at the time the scene was being processed by the FBI. |  |

D012890

Report *Attachment 88 page 390* is a color photocopy of an FBI crime scene photograph. The photograph shows the *Q24 Sword* at a point in the recovery by the FBI.

According to the FBI Laboratory reports, *One latent fingerprint of value was detected on Q24. ... The latent fingerprint is not a fingerprint of IBRAGIM TODASHEV, ...* [**Trooper Two**] … [**Trooper One**] or … [**FBI Agent**]. ..."



Report *Attachment 88 page 391* is a color photocopy of an FBI crime scene photograph. The photograph shows the *Q25 Broomstick* at a point in the recovery by the FBI.

According to the FBI Laboratory reports, "*No latent prints of value were detected on the remaining specimen* [Q25]."



Report *Attachment 88 page 392* is a color photocopy of an FBI crime scene photograph. The photograph shows the *Q23 Projectile*, previously described as article #15, at a point in the recovery by the FBI.

According to the FBI Laboratory reports, "*Specimen Q23 is a .40/10mm caliber copper jacketed hollow point bullet which was fired from a polygonal rifled barrel with six grooves, right twist. The Q23 bullet was identified has* [sic] *having been fired from the barrel of the K5 pistol. ...*"



D012891

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Report *Attachment* 88 *page 393* is a color photocopy of an FBI crime scene photograph. The photograph shows the *Q23 Projectile,* previously described as article #15, at a point in the recovery by the FBI.

The projectile is resting in blood on top of the brown paper placed on the floor by the FBI crime scene investigators.



Report *Attachment* 88 *page 394* is a color photocopy of an FBI crime scene photograph. The photograph shows the *Q23 Projectile,* previously described as article #15, at a point in the recovery by the FBI.



D012892

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On December 11, 2013, FBI Chief Inspector ███████████ and Department of Justice Attorney Barry Kowalski visited the State Attorney's Office. During the course of the meeting, with State Attorney Jeffrey Ashton and Chief Assistant/Executive Director Richard Wallsh, I was provided an additional FBI report. The document[52] authored by AI ███████████ and SA ███████████ on *12/10/2013* outlined the findings of an area canvass recently conducted by the FBI. Several topics were discussed during the course of the meeting. I requested any and all information which may have been provided to the Department of Justice by the attorneys representing **Mr. Todashev's** family. Attorney Kowalski informed they had only been provided the medical records related to **Mr. Todashev's** knee surgery.

After the meeting, I sent an electronic mail[53] to FBI Chief Inspector ████████ and Department of Justice Attorney Kowalski, for the purpose of it serving as a polite reminder, enumerating the outstanding requests being made of the FBI for additional information. The body of the electronic mail is as follows:

> *Hello Mr. Kowalski and Mr.* ████████
>
> *Thank you both for taking the time to visit our office today.*
> *I would like to remind you of some of the topics we discussed.*
>
> *#1.) We would like an official response to our request to view the surveillance video, of the altercation recorded in Orlando, which was described in the LEO interviews.*
> *#2.) We would like a copy of the 302 report which purportedly outlines the FBI's contact with the ME's Office.*
> *#3.) We would like an official response regarding the use of the initial interview of the FBI Agent for the purposes of our case review.*
>
> *I believe any other topics discussed will be handled directly with Mr. Ashton and Mr. Wallsh.*
> *Thank you again,*
> *Eric Edwards*

A review of the FBI report provided by FBI Chief Inspector ████████ was conducted. The report outlined the FBI's efforts as they related to an neighborhood canvass conducted on *12/04/2013*. The following excerpts are taken form the report:

> *"*████████████████████ *... and* ████
> *... were interviewed at their residence located at* ████████████ *with regard to the shooting incident on May 22, 2013. On May 21, 2013, at approximately 10:30 p.m.,* ████ *came home from work and observed the lights on and the sliding glass door blinds open at the condominium across the lake (referring to 6022 Peregrine Avenue).* ████ *thought this was odd, because the blinds were never open. As* ████ *looked at the condominium across the lake, he observed several males inside the condominium.*

---

[52] The aforementioned FBI report is memorialized as attachment number 89, pages 395-397.
[53] The aforementioned electronic mail is memorialized as attachment number 90, page 398.

PAGE 95

D012893

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*As ███ was watching TV, at approximately 12:00 a.m. on May 22, 2013, ███ heard **four loud pops, followed by three additional pops**. ███ could not see where the noise came from because his television and wall obstructed his view. ███ believed the individuals across the lake were doing construction and looked out the window to see what they were doing. When ███ looked out the window, **he saw several individuals 'hovering' over something on the ground**. ███ wife ███ was awaken by the noise and described the sound as someone 'hammering' on the wall. Neither ███ nor ███ called the police to report what they heard because they believed the noise was attributed to construction.*

*███, ... and ███ ... were interviewed at their residence located at ███ with regard to the shooting incident on May 22, 2013. ███ did not speak English, so husband ███ translated ███ statement for the interviewing agents. On May 22, 2013, at approximately 12:00 a.m., ███ was upstairs in her bedroom listening to gospel music. As ███ shut off the music, **she heard two gunshots and loud banging**. ███ ran to her kids bedrooms to check on them and looked out the window. When ███ looked out the window **she observed a bald white male talking on a cellular telephone**. ███ did not go outside or call the police. ███ was working at the time of the incident.*

*███, ... and ███ ... were interviewed at their residence located at ███ ███ with regard to the shooting incident on May 22, 2013. On May 22, 2013, at approximately 12:00 a.m., ███ heard a noise like a gunshot and did not go outside. ███ did not know where the noise came from and did not observe anything else out of the ordinary on the evening of May 21, 2013 or the early morning hours of May 22, 2013. ███ husband, ███, was out of the country at the time of the incident."*

**[Emphasis added]**

The remainder of the report indicated the FBI made contact with additional individuals, who reportedly had not heard or observed anything related to the event. The report also listed numerous other addresses which had been visited by the FBI; however, contact with any resident(s) was unable to be made at the time.

**Note:** This supplemental FBI report indicated a witness, "…███ was watching TV, at approximately 12:00 a.m. on May 22, 2013, ███ heard four loud pops, followed by three additional pops. In one of the previously viewed FBI reports, the **TF Officer** reportedly indicated, "On 05/22/2013, at 12:05 AM, ... [**TF Officer**] heard three gunshots come from the residence. Instantly he and ... [**Trooper Two**] took their weapons out and ran towards the residence door. Prior to getting to the door, they heard another four gunshots from the same location." The newly discovered witness heard the inverse of the **TF Officer's** recollection of the sequence of gunfire on May 22, 2013.

D012894

On December 16, 2013, a letter mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office. The envelope contained the requested *302* report which outlines contact with the Medical Examiner's Office by the FBI. This correspondence contained a cover letter[54] authored by *Chief Inspector* ██████████████ The following excerpts are taken from the letter:

> *Dear State Attorney Ashton:*
>
> > *On December 11, 2013, myself and DOJ Civil Rights Special Legal Counsel, Barry Kowalski met with you and provided a FD-302 regarding the December 4th, 2013, neighborhood canvass. In addition, **the FBI is providing the attached FD-302 regarding the July 24, 2013, meeting with the Medical Examiner's Office**. As previously discussed:*
> >
> > *'**These records are being loaned to your office for the purposes of your investigation and remain the property of the FBI. As such, they should not be further used or disseminated without the written approval of the FBI. Furthermore, these or any other FBI records that have been loaned to your office should not become part of the investigative file or your prosecution file or otherwise retained in a manner where they would become part of a Florida system state of records such that they would be subject to release under the Florida Sunshine Laws…***
> >
> > **[Emphasis added]**

A review of the, "*…attached FD-302 regarding the July 24, 2013, meeting with the Medical Examiner's Office*" FBI report[55] authored on *11/12/2013* was conducted. The following excerpts are taken from the document provided:

> "*…On 07/24/2013, Chief Inspector* ████████████*, Inspector-in-Charge* ████████████*, Assistant Inspector* ██████████████*, and Department of Justice, Civil Rights Division, Special Legal Counsel Barry Kowalski met with the Ninth Circuit Chief Medical Examiner (ME) Jan Garavaglia and Deputy Chief ME Gary Lee Utz who provided an overview of the results of Ibragim Todashev's autopsy.*
>
> *The Chief ME explained the ME report is made up of the investigative portion, based on hearsay, and the autopsy report. According to the Chief ME, the ME report is usually provided to the agency involved which would be the FBI and the State Attorney's Office.*
>
> *The Chief ME advised the overall the* [sic] *results of the autopsy were consistent with Todashev falling forward toward the shooter with head down. There was no stipulating* [sic] *and no close contact shots. The shooter* [**FBI Agent**] *was not standing over Todashev nor behind Todashev.*

---

[54] The aforementioned FBI document is memorialized as attachment number 95, pages 403-404.
[55] The aforementioned FBI document is memorialized as attachment number 96, pages 405-406.

D012895

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*The Chief ME further noted Todashev's cause of death was 'multiple gunshot wounds.' Gunshot wound 'A' to the head was almost straight down and probably incapacitating, meaning no purposeful movement after sustaining the injury. Gunshot wound 'B' to the back torso (upper shoulder, left of spine) was at a similar angle to the head shot and hit the spine. This shot could have caused Todashev to drop, but was not incapacitating. The ME stated, during these shots, Todashev was diagonal to the shooter and would have been bent forward. Gunshot wounds 'A' and 'B' likely occurred as Todashev was falling down.*

*The ME stated Gunshot wound 'C' to the back torso (upper right shoulder) was not incapacitating. The ME stated the bullet traveled left to right, back to front and downward. Gunshot would 'D' to the back torso (lower right shoulder) was consistent with Gunshot wound 'C,' however it was at a sharper angle and was not incapacitating. The ME stated the bullet traveled left to right, back to front and downward. Gunshot wounds 'C' and 'D' likely occurred as Todashev was twisting his body. Gunshot wounds 'E,' 'F,' and 'G' in the left side torso and left arm were likely grouped, consistent with the shooter being at an angle to Todashev. These three shots made seven holes; to hit Todashev's heart and would have been incapacitating, although not immediately. The ME stated the results of the autopsy were consistent with Todashev falling forward toward the shooter* [**FBI Agent**] *with his head down. There was no evidence of close range firing in any of the gunshot wounds, no stipulating* [sic] *and no close contact shots.*

*The Chief ME advised the trajectory of the head and shoulder wounds, the combination of the seven entrance wounds to include the paths of the bullets, were inconsistent with other possible scenarios. First, due to the extreme downward trajectory of the wounds to the head ('A') and upper shoulder ('B'), were inconsistent with the shooter being behind Todashev as if Todashev was running away. Rather, those extreme downward trajectories could have occurred when Todashev had his back to the shooter, only if:*

*1.) Todashev leaned backwards at a severe angle toward the shooter; or*
*2.) Todashev was standing below a shooter who was above him; or*
*3.) Todashev was shot while both he and the shooter were prone on the floor.*

*Todashev sustained seven gunshot wounds. Five projectiles were recovered in the torso, and one was recovered in the head. One projectile exited the body and was recovered at the scene. Toxicology results revealed a presence of nicotine and caffeine."*

This report outlines the FBI and the Department of Justice meeting with, "…*Ninth Circuit Medical Examiner (ME) Jan Garavaglia and Deputy Chief ME Gary Lee Utz who provided an overview of the results of Ibragim Todashev's autopsy*", and provides insight as to the FBI interpretation of the manner in which **Mr. Todashev** may have been shot seven (7) times by the **FBI Agent**.

D012896

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On January 23, 2014, a letter[56] mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office. The envelope contained the FBI responses regarding outstanding State Attorney's Office requests for information. The following excerpts are taken from the letter, authored by *Chief Inspector* ████████████:

> "*Dear State Attorney Ashton:*
>
> *This letter is in response to a request from your office for additional information made after our in-person meeting on December 11, 2013. With regard to your request to view a surveillance video obtained by the FBI on May 4, 2013, the FBI Tampa Field Office will make available the video for your review at the Orlando Resident Agency. **As the video is part of an ongoing investigation, the FBI requests you do not refer to it in any investigative report/file, or other document created by you, nor should you mention it in a public setting. The FBI further requests you discuss the video solely on a need-to-know basis and you advise any listener of the FBI's request.***
>
> *With regard to the use of the FBI Agent's Signed Sworn Statement dated May 28, 2013, regarding the shooting of Ibragim Todashev, the FBI requests certain sensitive information be redacted before inclusion in your report or release to the public. Enclosed please find the Signed Sworn Statement with the portions highlighted which the FBI requests be redacted. It is our understanding that your office may defer the redaction for our review; however, for your later benefit, we highlighted the requested redactions. As you consider the redactions, **please keep in mind the FBI is greatly concerned with the safety and well-being of the law enforcement personnel who participated in the interviews of Mr. Todashev and the need to maintain the integrity of ongoing investigations.** Specifically, the FBI requests the following types of information be protected from disclosure to the public:*
>
> *(a) Any part of the names and identifying information of the FBI Agent, the Massachusetts State Troopers, and the ████████ task force officer who were involved in the Todashev interview or shooting, as well as any part of the names and identifying information of any other FBI or U.S. Department of Justice ("DOJ") employees, including task force officers; and FBI case file numbers;*
>
> *(b) Any information related to the Waltham homicides as an active investigation of those homicides is ongoing; and*
>
> *(c) Any information related to other FBI pending investigations. ...*"
> [**Emphasis added**]

All of the information provided by the FBI has been taken into consideration during the course of the State Attorney's Office investigation. The investigative efforts of the State Attorney's Office are narrated in the following report pages.

---

[56] The aforementioned FBI document is memorialized as attachment number 113 pages 471-481.

D012897

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

## STATE ATTORNEY'S OFFICE INVESTIGATIVE EFFORTS

State Attorney Ashton was provided several updates as the review of the documents and related materials provided by the FBI was conducted.  As requests for additional information were made of the FBI Investigators, who were actively conducting their own ongoing case related investigation, the complexity of conducting an independent parallel inquiry was discussed with State Attorney Ashton.  The initial plan of action was:

> #1.) Meet with Doctor Utz regarding the findings of **Mr. Todashev's** autopsy.
> #2.) Collect sworn recorded statements from **TF Officer** and **Troopers One** and **Two**.
> #3.) Make contact with **Mr. Todashev's** family regarding their independent findings.

On August 14, 2013, Chief Assistant/Executive Director Richard Wallsh advised he had been contacted by Attorney Eric Ludin, who represented **Mr. Todashev's** family.  According to the information provided by Mr. Ludin, his office was in possession of a report authored by an expert in the field of blood spatter.  Mr. Ludin requested an opportunity to meet with State Attorney Ashton.  Mr. Wallsh requested Mr. Ludin bring any and all information the family wished to have reviewed and consented to the meeting requested.  Mr. Wallsh facilitated the request, and a meeting was scheduled for August 20, 2013.

On August 15, 2013, I spoke with Inspector ██████ regarding the State Attorney's Office desire to conduct witness interviews.  Inspector ██████ indicated a member of the FBI Inspections Team would be in attendance for any secondary interviews of the Law Enforcement Officers involved due to the fact the FBI investigation was ongoing.  I then made contact with ASAC ██████ regarding our request to interview the **TF Officer**.  ASAC ██████ indicated he had discussed the matter with ██████ Police Chief ██████, due to the fact the **TF Officer** was employed by the ██████ Police Department. ASAC ██████ explained the decision to grant the request would be up to Chief ██████.  I later made contact with Chief ██████; he expressed his agency would assist in anyway possible, and indicated the **TF Officer** would provide a sworn statement.

On August 20, 2013, I received a telephone call from the **TF Officer**, and the process of setting an appointment for the collection of a sworn recorded witness statement was initiated.

On August 20, 2013, I met with State Attorney Ashton, Chief Assistant/Executive Director Wallsh and Chief Assistant State Attorney Drane Burdick.  State Attorney Ashton, who had been assisting with the efforts to facilitate interviews with the Massachusetts State Troopers, provided the contact number for Attorney ██████.  Mr. ██████, an attorney affiliated with the *State Police Association of Massachusetts*, was representing both **Troopers One** and **Two**.  We also discussed the upcoming meeting with **Mr. Todashev's** family.  At the request of State Attorney Ashton, I provided a business card; so as to become the point of contact for any materials the family would provide the State Attorney's Office.

D012898

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On this same date, State Attorney Ashton and Mr. Wallsh met with Attorney Eric Ludin and an associate from his law firm, a representative of a Tampa based organization identified by the acronym *CAIR*[57] and Mr. Abdulibake Todashev, the father of **Ibragim Todashev**. The group provided no documents at the time of the meeting.

On August 26, 2013, I was contacted by AI ▮▮▮▮▮▮. AI ▮▮▮▮, who assisted with many of the previously mentioned FBI interviews, explained he was assigned the task of attending the upcoming State Attorney's Office interview of the **TF Officer**.

On August 27, 2013, State Attorney Ashton and I traveled to the District Nine Medical Examiner's Office and met with Doctor Utz. Doctor Utz described the point of impact and the direction of travel for each of the seven (7) projectiles which entered **Mr. Todashev's** body. A reviewed of relevant Medical Examiner's autopsy photographs was conducted. Doctor Utz explained his findings. We provided Doctor Utz with specific facts discovered during our review of the FBI documents. The position of the **FBI Agent** at the time of the use of deadly force appeared to be consistent with the direction of travel of each of the rounds fired.

When informed of facts surrounding **Trooper One's** statement, "***I then heard shots fired off to my right and saw Todashev make two movements which indicated to me he had been impacted by the shots.***" Doctor Utz agreed this was a plausible explanation for how and when **Mr. Todashev** may have been impacted by wounds *"C"* and *"D"*. These two (2) shots impacted **Mr. Todashev's** right upper back.

When informed of facts surrounding **Trooper One's** statement, "***Todashev fell to his hands and knees in front of me and then, almost immediately, he sprang forward, coming up in a fighting stance, I heard more shots and Todashev fell to the ground again, this time apparently incapacitated***." Doctor Utz agreed this was a plausible explanation for how and when **Mr. Todashev** may have been impacted by wounds *"A"* and *"B"*. These two (2) shots impacted the top of **Mr. Todashev's** head and his left upper back.

Regarding the two shots entering **Mr. Todashev's** back (listed as gunshot wounds *"C"* and *"D"* in the autopsy report), more clarification would be required during the upcoming interview of **Trooper One**.

Doctor Utz provided a photocopy of the related *Medical Examiner's Office Investigative Narrative – Preliminary Information* report. This was the first time I had viewed this document. The document, attachment two (2), displayed the following:

> "*Case Summary*
>
> *Positively identified 27 y/o male **shot multiple times by FBI agents** during a case related interview. ... FBI requesting blood specimen.*

---

[57] The acronym *CAIR* is utilized when referring to *The Council on American-Islamic Relations*.

D012899

*Circumstances*

*FBI agents responded to the decedent's apartment style residence for an arranged case interview. At some point during the interview the FBI agents were physically threatened by the decedent.* **FBI agents opened fire**; *decedent sustained multiple gun shot wounds. Decedent was pronounced on scene by Orlando Fire Engine 10 @ 0015. UPDATED 5-22-13 @ 1000 BY INVESTIGATOR CUCCIA. The following was obtained from FBI agent ...* [**TF Officer**]. *The incident took place at 0007 on 5-22-2013. The* **FBI agents fired approximately seven times from their** *glock 23. ...* [**TF Officer**] *stated a red stick was found under the decedent and a sword located leaning up against the wall with no fluid stains. The sword was removed prior to my arrival and placed on evidence paper away from the decedent.*

*Observations*

*... I was advised that the scene was actually an officer involved* **shooting involving two FBI agents** *and the decedent during an arranged case interview. ... FBI agents discovered a projectile in the living room after OCMEO left the scene. ..."*

[**Emphasis added**]

This document, determined to have been authored collectively by Medical Examiner's Office Investigators Lora Zedick and Jack Cuccia, indicated two (2) *FBI agents opened fire.* Doctor Utz explained the two investigators visited the scene at different times at the request of the FBI. Though the document contained information suggesting there was more than one individual shooting at **Mr. Todashev**, Doctor Utz was not aware of the origin of this information. Due to this document and the information it contained, plans to interview the responding Medical Examiner's Office Investigators were initiated.

On August 29, 2013, a sworn recorded[58] statement was collected from the **TF Officer**. The interview was conducted at the State Attorney's Office and AI ███ was in attendance. Prior to starting the interview, the **TF Officer** and his Attorney ███████, were afforded an opportunity to review a document[59] which displayed the initial questions to be asked.

> **Note:**   The quotations utilized throughout the following narration are taken from the interview transcription created from the recorded sworn statement of the **TF Officer**.

In the presence of Attorney ████ and AI ███, the **TF Officer** swore to tell the truth and indicated the information was being provided freely. The **TF Officer** was asked if he recalled being present during the aforementioned use of force incident and he indicated, *"Yes, I was outside during that incident."*

---

[58] The aforementioned recording is memorialized on a CD and as attachment number 92, page 400.
[59] The aforementioned document is memorialized as attachment number 65, pages 270-271.

D012900

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

When asked for the circumstances in which the **TF Officer** came into contact with **Mr. Todashev**, he explained, "*Ok. Um, our first contact with ah, Mr. Todashev occurred on 4/21, which was a Sunday, in the afternoon. Um, we were requested to ah, try to locate this individual, ah in reference to a connection with one of the indivi....individuals from the Boston bombing.*" He recalled having contact with **Mr. Todashev** a total of three times, stating, "*Um, we had two interviews, two somewhat lengthy interviews and then we had one where we ah, gave him back some of his property that he gave us to look at. ...he was cooperative all three times.*"

The **TF Officer** reported he has been a law enforcement officer for approximately ▆▆ years, and previously served as a ▆▆▆[60] *Officer.* The **TF Officer's** experience with defensive tactics was limited to his experiences as a sworn law enforcement officer and those of a ▆▆▆ Officer; He has no training in any form of martial arts. When asked of his perception and knowledge regarding **Mr. Todashev's** fighting abilities, he stated, "*Ah, he was a trained fighter. He was, he was, he was pretty good at what he did. ... Just the sheer toughness of the individual.*" The **TF Officer** recalled viewing two of **Mr. Todashev's** previously recorded fights, which he indicated were available on line. He also viewed an FBI surveillance video captured on *05/04/2013* related to Orange County Sheriff's Office case number *13-38070.* He recalled, "*...Um, yeah we witnessed the video of him fighting ah, in the parking lot of, of one of the malls. ... Ah, two unknown individuals at that time. ... Um, I believe he, from what I saw he knocked one guy unconscious and he knocked another guy down to the ground with ah, punches. ... He* [**Mr. Todashev**] *fought two individuals.*"

The **TF Officer** was asked why **Mr. Todashev** did not wish to be re-interviewed at the ▆▆▆▆ Police Department to which he responded, "*Ah, he, he basically um, when I talked to him to s...to set up the interview on the 21st, um, **he stated that he did not want to go back to** ▆▆ **or the FBI, um, because of his girlfriend being arrested the second time he was interviewed at** ▆▆. ... Yeah, I, I talked to him, I think two times on the phone um, in reference to um, the um, Mass State Police and Boston FBI wanting to talk to him about um, an incident that occurred in, in Massachusetts. Um, the ah, the two times that I talked to him was basically trying to set up a, a time and a place for those, those um, Troopers and Agent to talk to him in regards to the ah, an incident in Boston. We eventually decided that um,* ▆▆▆ *and the FBI Headquarters were out of, out of play. Um, he wanted to meet at a hookah bar. I told him that was not going to be a good plan and I said, '**What would make you comfortable?**' and he agreed to meet at his house at 66, 6602 Peregrine.*" The **TF Officer** was asked about the tactical considerations discussed prior to making contact with **Mr. Todashev** and he informed, "*Ah, they had discussed, I mean there was four of us that were there and um, **he** [**Mr. Todashev**] **said that he would be there by himself**, um, which he wasn't. We showed up and there was a friend with him, outside in the parking lot and um, just based on that I mean, with the amount of officers that were there, they believed ah, the scene would be safe to talk to him at his house. ... Um, ... when we first showed up, um, um, we went up to Mr. Todashev and, and that was the first time I met the Khusen ah, person. Um, I introduced the, the agents from, from Boston, ah, to Mr. Todashev. Told him that these were the guys that needed to ask him questions. ... Um, the three officers ah, were introduced to Mr. Todashev, um, I stayed outside with, with um, his friend, um, Khusen.*"
**[Emphasis added]**

---

[60] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

D012901

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

I asked, *"How did the conversation go in the lot with Mr. Todashev as far as um, consent to enter the apartment? Do you remember any specific verbal exchange that lead you to obviously believe that it was consensual or to the contrary?"* The **TF Officer** responded by stating, *"Um, I, I didn't really hear them talk. I, when I introduced, I said there were the individuals that were gonna be, you know, 'asking you some questions in reference to,' you know, 'certain things' and um, they, they all walked off towards the apartment."*

The **TF Officer** explained he remained outside due to, *"Um, I had…I didn't, based on what they were talking about, there was no reason for me to be in there because they were talking about a case that dealt with an incident in Massachusetts, so therefore, I decided that it would be best that I just stay outside and not have four officers inside the building. ... Ah, it was ah, reference to a ah, triple homicide. ... ah, they* [**Troopers One** & **Two** & **FBI Agent**] *were looking at him* [**Mr. Todashev**] *as a suspect."*

I asked the **TF Officer**, *"On the way there, was there any conversation about recording that contact with Mr. Todashev?"* He informed, *"Ah, no, not that I, not that I'm aware of."* The length of the interview was discussed and the **TF Officer** stated, *"Yeah, I, I, I didn't think it would last more than an hour, to tell you the truth. That's what we kind of talked about. I said, 'This probably won't even last more than an hour'...* He received several text messages from the interviewing officers as the interview exceeded the initial timeframe anticipated.

**Mr. Todashev's** friend *"Khusen,"* was in possession of **Mr. Todashev's** cellular telephone and wallet during the interview. The **TF Officer** was instructed, by one of the officers inside the apartment, to collect the items from *"Khusen"* and inform him the interview was going to take longer than expected. The **TF Officer** recalled, *"Um, I just told him, I said, "Hey listen, they, it's, it's", you know, "they, they're discussing some things that happened and it's gonna be a lot longer than", you know, "what we've been already been out here for, so if you'd like to leave", you know, um, "the agents inside said that they would take him to wherever he needed to be dropped off at."* The **TF Officer** reported, *"Ah, I think right away I just texted him and said, 'Hey, I got the, I got his cellphone and um, and wallet. Come and get it."* He recalled one of the Troopers, later determined to be **Trooper One**, exited the apartment at approximately 10:30 p.m., and collected the items from him at which time he recalled being informed, *"Ah, that the individual was, um, um, basically confessing to being involved in the ah, in the triple homicide. He had implicated himself."* **Trooper One** then returned to **Mr. Todashev's** apartment with the items.

The **TF Officer** recalled: *"We're talking about 11:40 time frame now? ... Um, actually one of the Troopers* [**Trooper Two**] *had come outside at that time and ah, and was on the phone with, I want to say like the, their version of the State Attorney, District Attorney or whoever was, he was on the phone with. ... Um, he was on the phone for a while, um, like I said, he was, he was, he came out around 11:40. I kind of like just stood by, just waiting to see what was going on, trying to get some updates. … Ah, I was just kind of listening to his thing. He basically said that the guy had started ah, to write down a statement in regards to confessing to the ah, triple homicide and that he was on the phone with the District Attorney, which I assume he was probably getting a, a warrant, more than likely, so… Um, I remember looking down at my watch. It was like around midnight. I basically said, 'Man this is a long time.'"*

D012902

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*Um, and then around like 1202, I remember I, I, **I hear three**, **three shots**, bang-bang, bang. **Three shots**. We kind of look at each other, he's still on the phone with, with the ah, District Attorney, kind of look at each other a little bit like, we kind of like mouthed 'Gun shots?', you know like, 'Was that a gunshot?' and um, we both drew our guns and started running towards the door and then **we heard four more shots**, you know, right away, bang, bang, bang, bang. And then that Trooper grabbed the door and opened the door and…"* **[Emphasis added]**

The **TF Officer** explained he was in close proximately to the scene when he heard the gun fire. I asked, *"…you're fully convinced that the first volley was three rounds."* The **TF Officer** responded by informing, *"Yes, **I distinctly remember hearing three rounds**. … It was, it was, no it was like bang, bang, bang, like three shots, um, cause I just remember, I mean, from the SWAT days, I'm like man those, that, that was, those were gunshots and ah… Yeah, and then, like I said we kind of looked at each other so, give or take a couple of seconds, we both kind of like grabbed our guns and started to go, run towards the door, figuring they came from that area and as we were going towards the door, **four more shots rang out**."* **[Emphasis added]**

Regarding their entry of the apartment the **TF Officer** stated, *"Ah, he [**Trooper Two**] ran to the door first. Ah, he grabbed the door and ah, I mean, I, the, the four shots had already gone off, so when we got to the door, he had grabbed it, pushed it open, we both like looked in to make sure everything was tactically safe, cause we heard gunshots so we didn't know really what was going on inside the apartment."*

*When we opened it up, **I immediately saw ah, the agent, the FBI agent ah covered in blood with his, you know, on top of his head and his face** and… when it opened up, um, ah, the Trooper ah went in. I was right behind him. We, I, again, I saw, I saw Mr. Todashev on the ground like in between, if you can picture the house when, you got the entry, you got ah, foyer area, and then it went off into like a little kitchen area and then it was like a little, I don't know, place where you put your shoes, like a little hallway area. Mr. Todashev was lying between that area and like the living room and the **Trooper was probably five to ten feet from him**, like I said, covered with blood on his head … the FBI Agent, I'm sorry. **The FBI Agent was covered with blood**."* **[Emphasis added]**

According to the **TF Officer**, the **FBI Agent** was armed with his firearm upon their entry. He could not say if **Trooper One** was armed explaining, *"No, I did not see, I did not see a weapon in his hands. … I just don't recall seeing one with him."* He recalled, *"Ah, I immediately stopped right at the door, ah, ah, the other Trooper went inside um, I started, **based on my training and experience in**  ▮▮▮▮  **and having gone through a couple of situations, ah, I, I, immediately asked the agent, the FBI agent, 'Are you shot?'** because of all the blood that was on his head. He responded, 'No' or 'I don't think so.' Or…along those lines, so it was either 'No' or 'I don't think so' or, I'm pretty sure, it was one of those things. Um, I told the Trooper, 'Hey, start applying pressure, do whatever you need to do', you know, I, I, 'I need to make, I need to', you know, 'notify what just happened.' … I said, 'Hey, get your guy to sit down', you know, 'apply pressure to', you know, 'the agent's head' and stuff like that and 'I need to make some phone calls real quick.' … I did a quick assessment of Mr. Todashev, um, once I looked at him and said ah, 'Have you been shot?' and he replied, 'No', I immediately started looking at the, at you know, Mr. Todashev on the ground and there was no signs of life, what so ever in Mr.*

D012903

*Todashev. ... **There was a, there was a ah, um, um, Samurai sword that was to the left hand side of him on the ground, um, it was standing up against where that shoe rack I told you was, it was like right near that shoe rack**. ... Um, when I, when I did my general assessment of Mr. Todashev to see if I could see if there was any signs of life, I did notice that he was lying on top of a um, a, a, **some type of broom stick** or, or, or **handle of something**.  **It was under his body**.*"
**[Emphasis added]**

The **TF Officer** recalled providing instructions informing, "*...I, immediately told everybody when we went in the, once, once we, once I assessed the situation, I immediately told everybody, don't, don't say anything, we, we need to make some phone calls and get some people here.*" When asked why he would make the instruction he stated, "*Ah, just based on police shootings and stuff like that, we're always told, 'Don't say anything to anybody.  Let's just keep everything fresh in your minds' and stuff like that, so, I mean that was just a general, 'Don't say anything to anybody.'*"

The **TF Officer** contacted the Orlando Police Department's dispatch at the time of the incident and assisted with securing the scene.

He recalled speaking with the Medical Examiner's Office Investigator, Lora Zedick, upon her arrival at the scene.  When asked if he recalled providing information which may have led the investigator to believe there was more than one shooter he replied, "*No, I don't remember, no, I, I didn't say anything about more than one FBI shooting. ... **It may have been taken out of context when I said there was agents inside and there was a shooting**, so, it could have been taken out of context, if that's what you're implying. ... Based on what I saw, I, I only saw one guy with one, what with one gun, so I was under the assumption it was only one guy that shot. ... And again, like I said, **it may have been taken out of context, like I said, there were agents inside**.  I don't, and I, **I don't remember ever, remember recalling saying that there was more than one shooter**.*"   **[Emphasis added]**

At the conclusion of the interview the **TF Officer** once again swore to the truthfulness of his statements.  The information provided by the **TF Officer** was consistent with the information previously collected by the FBI.  During the course of the interview, it was clear the **TF Officer** facilitated the meeting with **Mr. Todashev** on May 21, 2013.  He was aware of **Mr. Todashev's** Mixed Martial Arts style fighting capabilities, and the officer safety considerations caused by the same.

The **TF Officer's** years of experience as a ███████ Officer exposed him to training situations in which he would hear multiple volleys of gunfire on a regular basis.  The **TF Officer** was certain he heard three gunshots, which were then followed by a second volley of four gunshots, as he stood outside of **Mr. Todashev's** apartment on May 22, 2013.  His years of law enforcement experience, specifically regarding officer involved shootings, led him to express to the other officers, "*Don't say anything to anybody.*"

D012904

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

As the **TF Officer** entered the address shortly after the incident, he made observations pertinent to this review. He observed the **FBI Agent**, who was armed with his issued firearm, was bleeding and standing in close proximity to **Mr. Todashev**. He also observed **Trooper One** standing near the **FBI Agent**. He observed the Samurai sword in the area between the living room and the kitchen which was also in close proximity to **Mr. Todashev**. He reported seeing **Mr. Todashev** in possession of, "*…some type of broom stick or, or, or handle of something. It was under his body.*" **[Emphasis added]**

Based on the review of the information provided by the FBI and the results of this interview, it is apparent the **TF Officer** was aware **Mr. Todashev** was an associate of individuals known to have committed a series of *Forcible Felony* crimes, to include *Murder* and *Discharging a Destructive Device or Bomb*, in the State of Massachusetts. He was also aware of the ongoing Massachusetts State Police investigation regarding a triple homicide case and **Mr. Todashev** was identified as being a person of interest. He had knowledge of **Mr. Todashev's** propensity towards violence, to include viewing a recent surveillance video captured by the FBI on May 4, 2013.

As the **TF Officer** waited outside of the apartment, he was made aware of the fact **Mr. Todashev** implicated himself ██████████████████ of the triple homicides. He also witnessed **Trooper Two** as he spoke with the charging authority in Massachusetts, via cellular telephone, moments prior to the use of deadly force by the **FBI Agent**.

At the conclusion of this interview and out of the presence of others, I expressed to AI ███ my desire to view the aforementioned FBI surveillance video reportedly captured by the FBI on May 4, 2013. AI ███ indicated he would forward my request up his chain of command.

On September 3, 2013, I received a telephone call from Attorney ████████████. He explained he was in the process of identifying a location to conduct the sworn recorded interviews of **Troopers One** and **Two**. At the request of State Attorney Ashton, the location was to be capable of having the official proceedings available to him in Florida via Skype.

In preparation for the upcoming interviews, a second review of the partially video recorded interview of **Mr. Todashev** on May 21, 2013, was conducted. I also viewed two amateur type videos of **Mr. Todashev** involved in controlled environment physical altercations, which were located on the following *YouTube* web address:

*http://www.youtube.com/user/renidjan?feature=watch*

During the course of this case review, a total of five (5) videos of **Mr. Todashev** actively engaging in Mixed Martial Arts style fights and wrestling were reviewed. These five (5) videos can be viewed by visiting the following web links, which are also listed on a document[61] attached to this report.

---

[61] The aforementioned document is memorialized as attachment number 91, page 399.

D012905

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

1. Todashev, Ibragim
   http://www.youtube.com/watch?v=X5-Eb766YVo
2. Todashev, Ibragim – 1
   http://www.youtube.com/watch?v=t_k1QB_t6P0
3. Todashev, Ibragim – 2
   http://www.youtube.com/watch?v=Xy_Q3TQWYus
4. Todashev, Ibragim – 3
   http://www.youtube.com/watch?v=5OpvfdCvsYc
5. Todashev, Ibragim – 4
   http://www.youtube.com/watch?v=QpNgm4PwbK0

Based on my review of the available video footage of **Mr. Todashev**, it appeared me **Mr. Todashev** was a confident and skilled fighter. The videos demonstrate **Mr. Todashev's** ability to deliver strikes and kicks and he also continues to engage his opponents as he is struck and kicked repetitively. The videos demonstrate **Mr. Todashev** possessed a high tolerance for pain. Though **Mr. Todashev** was being struck in the head and body by his opponents, he appeared extremely focused during these physically aggressive encounters.

On September 4, 2013, I met Inspector ██████ and AI ██████ in Boston, Massachusetts for the purpose of collecting additional documents to review prior to the upcoming interviews of **Troopers One** and **Two**. AI ██████ provided me with three additional documents related to the ongoing FBI investigation. The first document[62] reviewed was an FBI report authored by AI ██████ and dated *09/04/2013*. The report explained a secondary interview, conducted telephonically by SSAs ██████ and ██████ on *June 13, 2013*, of **Trooper Two**.

On September 6, 2013, at approximately 11:25 hours, a sworn recorded[63] statement was collected from the Massachusetts State Police Officer, who has been referred to throughout this narration as **Trooper Two**. The interview was conducted at 11 Beacon Street, Suite 700, in the City of Boston, Massachusetts. The following individuals were in attendance:

    #1.)   State Attorney Jeffrey Ashton, via Skype
    #2.)   **Trooper Two**
    #3.)   Attorney ████████
    #4.)   Sergeant ████████
    #5.)   DOJ Attorney Barry Kowalski
    #6.)   Major ████████
    #7.)   Detective Captain ████████
    #8.)   Detective Lieutenant ████████
    #9.)   Inspector ████████
    #10.)  Assistant Inspector ████████
    #11.)  Sergeant ████████
    #12.)  State Attorney's Office Chief Investigator Eric Edwards

---

[62] The aforementioned FBI document is memorialized as attachment number 68, pages 277-282.
[63] The aforementioned recording is memorialized on a CD and as attachment number 92, page 400.

D012906

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Prior to starting the interview, **Trooper Two** and his representative Attorney ████████
were afforded an opportunity to review a document[64] which displayed the initial questions to be asked.

In the presence of all of those in attendance, **Trooper Two** swore to tell the truth and indicated the information was being provided freely. **Trooper Two** informed his law enforcement career began in ████. As he described his relevant employment history he stated, "…*I bega* the State Police Academy, finishing ████████ *ah, worked on the road until ah,* ████ ████, *when I entered the ah* ████████████ *out of Middlesex District Attorney's Office.*" **Trooper Two** was exposed to law enforcement related defensive tactics training throughout his career. He is not an instructor in any of the defensive tactics related training topics.

**Trooper Two** was asked to explain his contact with **Mr. Todashev** and he stated, "*Ah, my first contact with him, ah, face to face was on, on the, the evening of ah, May 21ˢᵗ.*" **Trooper Two** explained he had witnessed **Mr. Todashev** being interviewed at the ████ Police Department on ████████; however, he did not have any direct interaction with him at the time. When asked what types of crimes **Mr. Todashev** was suspected of being involved in **Trooper Two** stated, "*For, for my purposes specifically, ah, I was looking to see if he had any involvement in the September 11, 20, ah, September 11, 2011, triple homicide in Waltham, Mass … He was a person of interest. Ah, we didn't have anything concrete at that point, that, that tied him into that homicide.*"

When asked why **Mr. Todashev** would not agree to be interviewed at the ████ Police Department again **Trooper Two** advised, "*Yeah, he was upset, ah, the last interaction at the prior, the prior, ah, interaction at* ████ *Police Department, his ah, girlfriend, Tatiana was taken into custody by Immigration officials. He felt that it was connected to the fact that he came in voluntarily to speak with agents and ah, subsequently she was removed and placed in Immigration custody, I, I think he felt slighted about that.*"

**Trooper Two** was asked to describe any conversations regarding **Mr. Todashev's** fighting skills. He replied, "*Yeah, originally when we had gone down to Orlando and we went with the, our* ████ *contacts, ah, they expressed to us some, some incidents that had occurred that they were investigating. Um, while one was an **altercation that occurred in a ah parking lot** with two individuals where Ibragim personally was physically involved in an altercation with two people and came out of it ahead. Ah, they also ah, explained that they had been to the Martial Arts ah, or the gym that he was training at and ah, that upon interviewing people involved there, that, that ah, and this was the term that these people used, **they thought that he might be retarded ah, because of the level of force and, and ah, injuries that he was taking and he wouldn't submit**. So a lot of people were reluctant to fight with him, because of that. Ah, we also were aware of another incident they had explained to us where he got into an **altercation outside of a hookah bar** where he had, ah, subsequently dumped somebody on their head who, who sustained injuries as well, so there was, and **this is on top of his MMA fights, which, you can openly see in YouTube** and so forth, that **we were aware of that he's had numerous physical altercations**.*" [**Emphasis added**]

---

[64] The aforementioned document is memorialized as attachment number 67, pages 275-276.

D012907

**Trooper Two** explained he had observed video footage of **Mr. Todashev** fighting and discussed the topic prior to contact with **Mr. Todashev** on May 21, 2013.  He explained, "*Eh, between the time that we first went down and, and the 21st, I had seen videos.  Ah, I've also seen the altercation, the video of the altercation in the parking lot with the two individuals um, but ah, so I, I had seen a few fights, yes.  … It had been brought up on a few occasions ah, it was expressed to us on a first encounter when, when* ▮▮▮▮ *first encountered him.  They, they went in with a ah, elevated level of ah, ah, I don't know if, just, personal protection I guess when they first approached him to bring him in to talk to him.  So, he, you know, they had talked about their concerns at that point and, and those are discussions that we had had*." [**Emphasis added**]

When asked who coordinated the contact with **Mr. Todashev** on May 21, 2013, **Trooper Two** stated, "*That would have been our* ▮▮▮▮ *contact* [**TF Officer**].  *… Yeah, he was ah, he advised us that ah, Todashev was reluctant to meet at all, ah, and, you know, he, he was doing his best to try to ah, make him comfortable enough to, to meet with us, you know, he, my understanding was that he was complaining about the situation with Tatiana and that ah, he just felt like, ah, you know, 'I came in voluntarily and, and had these discussions and this is what happened, now why would I want to talk to you anymore?'  Um, and that was what was being relayed to us.*" [**Emphasis added**]

**Trooper Two** indicated **Mr. Todashev** was not informed by the **TF Officer** of the fact they wished to discuss the triple homicide with him prior to the meeting.  I asked **Trooper Two**, "*Was there additional information that, that made itself available to you between that visit on the* ▮▮ *and the 21st, that made you suspect him more or…?*"  He replied, "*It was ah, it was more his reluctance to a, a, ah, acknowledge that he was in um, the Boston area in the early, ah, the early week of September.  Originally he had put himself outside of ah, outside of Boston area, in August,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and those are the things that we had wanted to approach him on.*" [**Emphasis added**]

When asked to describe **Mr. Todashev's** demeanor, **Trooper Two** recalled, "*We met outside his apartment.  Ah, he was there with a friend and ah, the four of us initially ah, approached him in the ah, parking lot, introduced ourselves, and ah, asked him if he was willing to speak to us separately and he brought us into his apartment.*"

When **Trooper Two** explained the **TF Officer** remained outside I asked, "*Was there a, a tactical consideration there, ah, for that?*"  He answered by stating, "*So when it became apparent that he was not going to meet us at* ▮▮▮▮ *Police Department, ah, our initial plan was to have a two person interview.  Ah, just, it's a more comfortable setting for the person, just, you're speaking to and ah, we didn't want to show intimidation.  We wanted to have a nice, friendly conversation.  When it became apparent that he was not willing to meet with us at* ▮▮▮▮ *and would only meet with us at, in the apartment under his, under his ah, that was his, his decision, and his conditions then we ah, we wanted to make it as secure of a situation for all of us and collectively agreed that we should have three people present in, inside for safety reasons.*" [**Emphasis added**]

I asked, "*Ok. Did Todashev ever ask you to leave the apartment?*" **Trooper Two** replied, "*Never.*" According to **Trooper Two**, **Mr. Todashev** was relaxed prior to investigators expressing their interest in discussing the triple homicide which later led to **Mr. Todashev** being advised of his rights according to *Miranda*. I asked, "*…what point in time did you establish probable cause for his involvement in that triple murder?*" **Trooper Two** replied, "*I don't know, time-wise, I couldn't tell ya the, the time. It was, it was probable an hou-couple hours into it. It was ah, it wasn't until he started to make comments referencing the fact that, you know, ah, how much jail time would I get or I never killed anybody and, and that's when we, we stopped him, you know, at that point prior to him going in and making any statements.*"

When asked how the investigators planned to collect the existing interview videos, **Trooper Two** stated, "*Ah, it wasn't.* **It wasn't really planned**. *Ah, initially, and all along,* **we assumed it was going to happen at** ▮▮▮▮▮ **PD**. *It was kind of last minute, ok, he's not coming into* ▮▮▮▮▮. *What are, what are some of the things that are going to change? And like I mentioned earlier,* **the safety aspect is definitely a factor, because we're at his home environment. That, that's not ideal**. *Ah, and ah, we have the person, but in, another additional thought at that point was, 'Well we're not going to be able to record, you know, we're not going to have the recording capabilities that are provided inside an interview room and ah, there was a comment about, I, I, had a, you know, I have a, a, recorder similar to yours ah, and ah, the other ah, Massachusetts agent ah, Trooper had mentioned that he had a recording device, (inaudible) as well. It wasn't really in-depth conversation at that point about who was going to record, how are we going to record.* **We really didn't prepare for that**. *You know…*" [**Emphasis added**]

When asked why an audio recording was not collected for the entire length of the interview **Trooper Two** informed, "*The um, my recorder died. It ah, shut off and I, I think there was another part, I may have went to pause it, inside my pocket and then restart it when he came down from the bathroom, I think is maybe when I paused it. Ah, I don't recall, but ah, I tried to turn it back on and it died again. I didn't realize it was not working, until after everything was said and done and realized it had…*"

**Trooper Two** was then asked, "*On the ah, other trooper's phone information or recorder information, Mr. Todashev is captured in an image, in a video, sitting approximately 2352 hours, sitting next to an open slider, smoking a cigarette and um, I even go back, I want to say 17 minutes and 29 seconds into the recorded interview, Todashev even asked if he could shut the door. Um, did Todashev ever appear as if he wanted to escape or exit through any of those ingress and egress points?*" **Trooper Two's** response was, "**No, he was sitting by that door, frequently, throughout that evening and ah, it was just a screen, often, and he never, ah, never made any indication to me that he wanted to leave through the door**." [**Emphasis added**]

**Trooper Two** was asked to describe his recollection as it related to the position of the folding chair and the small table prior to him leaving the room to call the Assistant District Attorney. He informed, "*So, throughout the, ah, the interview, the table was up against the wall. But when it, where he was sitting more the, the table is ah, at the end by the bed, almost like a nightstand, in the position of a nightstand to the bed. But he was sitting more at the foot of the bed, so when he was going to sit and write, we slid the table over so that the table would be in front of him and*

D012909

***more accessible to him***. *The chair, ah, I backed up at that point, but ah, initially throughout the interview, it was, there was nothing between the chair and the ah, the bed.*" [**Emphasis added**] **Trooper Two** was asked, "…*when did you first notice the large sword, ah sword that's mentioned in the document?*" He replied, "***That was ah, when you came into the apartment, you know, you can do a scan to see what, is around, who's around, if there's anybody else or if there's weapons visible and it was, was hanging on the wall***." According to **Trooper Two** he was not present when the sword was moved. [**Emphasis added**]

**Trooper Two** recalled being outside of the apartment, speaking with the Assistant District Attorney, when he heard yelling emanating from inside of the apartment. He stated, "*It was yelling. I think I heard my name, um, but it was kind of, you know, the doors were closed, the windows were closed, the air conditioner was on, and, but **I thought I heard my name**, but I heard some yelling and then ah, **shortly thereafter I heard some, some ah, pops, sounded like gunshots**. … It was, in my mind, I've gone over it a hundred times, I, I, believe it was three and four or four and three. I couldn't, I don't remember hearing two, so **I think it was at least three and then four, or four then three**. I don't remember exactly what order, but it was more than two, when I heard the shots.*" He explained his actions and observations after hearing the gun shots by informing, "*I get to the door. I ah, paperwork and everything that I had, I kind of discarded. I get to the door, ah, with my weapon drawn ah, I kind of kick the door and announce myself at the same time and went, went inside. I just wanted to make sure when the door opened, I wasn't taking any, I didn't know. I assumed that the shots came from the agents, but wanted to be sure so I wanted make sure they knew I was coming through the door and went inside. … The ah,* ▮▮▮▮▮ *contact* [**TF Officer**], *he was still outside. Um, he came to the door after I had gone through. I don't remember the exact lag time, but initially when I went through the door it was just ah, it was just me and then he came in, behind me at some point. … Ah, **I could see Todashev on the floor, ah, with apparent gunshot wounds**. … With apparent gunshot wounds and I saw ah, **the FBI agent** and the, the, ah, trooper, both inside the room. Um, the, ah, it was kind of, **he was still in a position with his firearm trained on the, ah, on Todashev. Ah, could still see the smoke coming out of the barrel. Ah, and I could see ah, blood coming down the side of his head**.*" [**Emphasis added**]

**Trooper Two** then stated, "*I kind of looked at him, and to me it was clear that there was no, no sign of life, ah. I, I remember I grabbed a glove off the counter, ah, like a latex dishwashing glove or something to be able to check him after, which I ended up giving to the ah, trooper* [**Trooper One**] *and then I proceeded to assess the injury on the agent. … Yeah, he had already started, ah, the other trooper had, had grabbed something to, to kind of put on his head to slow the bleeding, but I proceeded upstairs, after we kind of, the situation was clear, we, ah, the trooper checked him, ah, the, Todashev, ah, no, no pulse and he had  sig, significant injuries. Ah, I went upstairs and grabbed a t-shirt; I wanted something clean. I grabbed a t-shirt that was hanging up and ah, brought it down to stick on his head. … we remained inside, ah, we were all downstairs. The* ▮▮▮▮▮ *contact* [**TF Officer**] *had made the call for ah, for ah, first aid and ah, you know, appropriate phone calls and um, I held the t-shirt on, on the agent's head for a while to, to apply pressure. It was bleeding pretty good. Um, everybody kind of showed up and, and we all left.*"

D012910

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

When asked about the location of the sword at the time of entry, **Trooper Two** recalled, "*…when I entered, I, I  saw that when I entered and I saw Todashev on the floor, there was like a shoe rack to the left and it was placed behind, between the wall and the shoe rack, kind of wedged in there.  I, I could see that at the same time. …  **I saw a red pole coming out from underneath him** as well.  … That was upon my entry, **I could see it and as I climbed over him**, I could, I kind of didn't take my eyes off him as I climbed over him, but, ah, **I just remember seeing a red pole sticking out from underneath him**.*" [**Emphasis added**]

At the conclusion of the interview **Trooper Two** once again swore to the truthfulness of his statements.  The information provided by **Trooper Two** was consistent with the information previously collected by the FBI.  During the course of the interview, it was clear **Trooper Two** was the lead investigator of the triple homicide case and the primary interviewing law enforcement officer during the meeting with **Mr. Todashev** on May 21, 2013.  **Trooper Two** appeared to be solely responsible for making the decision to collect the digital recordings of **Mr. Todashev's** interview.  The recording device shut off, unbeknownst to **Trooper Two**, without capturing the entire interview.  **Trooper Two** was clearly aware of **Mr. Todashev's** Mixed Martial Arts style fighting capabilities, and the officer safety considerations.

**Trooper Two** stated, "*…we wanted to make it as secure of a situation for all of us and collectively agreed that we should have three people present in, inside for safety reasons.*" Reportedly, the officers "*collectively agreed*" the safest manner to have contact with **Mr. Todashev** was by having three officers present during the interview inside while the **TF Officer** remained outside of the apartment.   This was in response to **Mr. Todashev's** enhanced abilities to fight and his unwillingness to be interviewed at the ▮▮▮▮ Police Department.  Once the location of the interview was determined, by **Mr. Todashev**, the officers agreed upon this course of action.

There was a deviation from the plan when **Trooper Two** left the apartment, to make contact with the Assistant District Attorney, while **Mr. Todashev** was authoring a handwritten confession regarding his involvement in the triple homicide.

On September 6, 2013, at approximately 12:10 hours, a sworn recorded[65] statement was collected from the Massachusetts State Police Officer who has been referred to throughout this narration as **Trooper One**.   **Trooper One** was reportedly the only eye witness to the **FBI Agent's** use of deadly force.  The interview was conducted at 11 Beacon Street, Suite 700, in the City of Boston, Massachusetts.  The following individuals were in attendance:

---

[65] The aforementioned recording is memorialized on a CD and as attachment number 92, page 400.

D012911

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#1.)   State Attorney Jeffrey Ashton, via Skype
#2.)   **Trooper One**
#3.)   Attorney █████████
#4.)   Sergeant █████████
#5.)   DOJ Attorney Barry Kowalski
#6.)   Major █████████
#7.)   Detective Captain █████████
#8.)   Detective Lieutenant █████████
#9.)   Inspector █████████
#10.)  Assistant Inspector █████████
#11.)  Sergeant █████████
#12.)  State Attorney's Office Chief Investigator Eric Edwards

Prior to starting the interview, **Trooper One** and his representative Attorney █████████ were afforded an opportunity to review a document[66] which displayed the initial questions to be asked.

In the presence of all of those in attendance, **Trooper One** swore to tell the truth and indicated the information was being provided freely.  **Trooper One** informed his law enforcement career began in ███.  As he described his relevant employment history, he stated, "*…since two, ah,* ███████████████████████████████████, *State Police.*"  **Trooper One** was exposed to law enforcement related defensive tactics training throughout his carrier.  He is not an instructor of any form of law enforcement related defensive tactics.

**Trooper One** reported he was not present when **Mr. Todashev** was interviewed at the █████ Police Department on ████████.  The first time he had contact with **Mr. Todashev** was on May 21, 2013.  **Trooper One** was asked to explain his knowledge regarding **Mr. Todashev's** fighting abilities and his knowledge of **Mr. Todashev's** violent history.

 **Trooper One** replied, "*Um, I was aware that um, when he was in Boston, he had an incident where he was arrested, I believe by the Boston Police Department that was on his ah, charged with some type of assault after a **road rage incident**.  I was aware that he um, had a, was to be criminally charged or was facing charges, possibly, on a incident that occurred in Florida at a **hookah bar**, ah, where he had ah, assaulted the bar owner, um, and I was a…I was aware that he ah, had also been in an altercation, probably a couple weeks earlier in Orlando where there was a **parking lot altercation** with, ah, a couple male individuals that ah, he took ah, assaulted and I was aware of his **MMA experience** through, ah, **videos** and actually had done an interview with another FBI agent prior to that trip at the ah, gym that he had trained at in the Boston area of Massachusetts. … I had gone to an interview, um, just ah, as part of the investigation, prior to that and spoken with some people at the gym.*" [**Emphasis added**]

---

[66] The aforementioned document is memorialized as attachment number 66, pages 272-274.

D012912

INVESTIGATION REPORT
CASE NUMBER: 2013-IN-0063

**Trooper One** was asked what information was gleaned as to **Mr. Todashev's** fighting skills during his contact with individuals at the gym. He stated, "*Um, spoke to ah, to a party there, I don't recall his name off-hand. I don't have my notes with me, but he was, he was um, ah, based upon, he was a worked out there and **he was a trainer** at whatever and he had, had dealing with him and just basically um, **talked about his skills** and I had look...I observed him, ah, in a photo on the wall with a bunch of fighters and it was just ah, more and more general um, as it pertains to the whole marathon investigation and, and, finding out who this person was. ... **I viewed the YouTube videos**. I have not seen, I only had heard, I have not seen the, ah [REDACTED] one in the parking lot. I've only seen the ah, the YouTube videos of him MMA and excuse me an MMA ring. ... Um, **He was a professional, professional fighter who is dangerous**, dangerous with his, ah, his, his skills were um, **highly spoken of among people who were um, who knew him** and who, from him, observing the video, and from his actions that had been observed.*" [**Emphasis added**]

**Trooper One** recalled **Mr. Todashev's** fighting abilities were discussed by the group of law enforcement officers on May 21, 2013. When asked about the tactical considerations discussed by the group, **Trooper One** informed by stating, "*The considerations were um, which I think you'll lead into it was to ah, **interview him at the** [REDACTED], that, that was the safest area that he had, I was not privy to that interview before, but that was the whole mind set of our interview and that was where **we anticipated it was going to take place because of, we knew how dangerous he was**. ... I was um, not on the phone, the special agent in the room was talking to um, you know, an [REDACTED] Police Officer, and um, he did not want to meet us at the PD. He had said, made a comment that he would ah, ah, meet us at the, **he was apparently a hookah bar, ah, with a bunch of his friends**. We, we tried to convince him that that wasn't a good place where we could talk to him and they ah, ...*[TF Officer] *was able to convince him...*" [**Emphasis added**]

According to **Trooper One**, **Mr. Todashev's** demeanor at the time of contact was, "*Um, nothing remarkable, um, I introduced myself, ah, to him and his friends. We shook hands and then we walked to his apartment and um, he made a comment, right from the very, **there was a picture of ah, a sticker of ah, I believe a AK47** or something on the door, ah, exterior door of the apartment. He made a comment that it wasn't his or it was a friend's apartment or something to that, I think and then ah, asked us to remove his* [sic] [their] *shoes and went to the apartment.*" [**Emphasis added**]

**Trooper One** indicated, **Mr. Todashev's** responses during questioning were in a consensual manner and at no time were the interviewing officers asked to leave the apartment by **Mr. Todashev**. He recalled, "*Um, his* [**Mr. Todashev's**] *first stages was um, nonchalant talking. He initially wanted to talk about his case* [the recent altercation in the parking lot] *that he had pending, um, which ...* [**Trooper Two**] *told him that ah, we couldn't talk about that cause he already had an attorney assigned to him and **he made a comment that um, it was self-defense and um, used the term he dislocated the, the gentleman, the person's teeth**. Um, but then after we got through that, we began to do ah, questions on a time line, more related to Boston and that's how the interview went.*" [**Emphasis added**]

D012913

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

When asked, *"...when you went there, he was suspected of what crime?"* **Trooper One** replied, *"**He was suspected of a triple homicide or being involved in a triple homicide** that occurred in the city of Watha – or Town of Waltham, Massachusetts on September 1st, ah, September 11th of 2001* [sic] [2011]. ... *He was a person of interest that we had um, conducted background on to see if he was in Boston at that time, and **we were going to um, either confront, either confirm or dispel any type of involvement if we could do through an interview***." **Trooper One** recalled, during the course of the interview, probable cause was established for **Mr. Todashev's** involvement in the triple homicide case being investigated. [**Emphasis added**]

Based on the information previously provided by **Trooper Two** during his interview, I asked **Trooper One** if he recalled discussing the need for three officers to be present during the interview with **Mr. Todashev** on May 21, 2013. **Trooper One** replied, *"Yes I was going to stay outside* [the interview room at the ███████ Police Station] *and ah, observe ah, the interview through a room and then that was the original plan was to interject with um, empirical data or something that would aid in the furtherance of any questionable answers that came forward, but at this point, um, **all three of us, decided**, we had to go, **we decided that all three of us were going to go into the apar**… [apartment] … well the consideration, it, it changed when we were told that that's where it was going to be."* [**Emphasis added**]

**Trooper One** recalled he observed **Mr. Todashev** being provided his rights according to *Miranda*, which was consistent with the observations I made during my review of the video footage provided by the FBI. He advised **Mr. Todashev**, *"…seemed to be cooperative."* **Trooper One** reiterated, *"For me, I believe, um, **the probable cause existed when he put himself ah,** ███████ **and made the comment that it was ah, just gonna be a robbery**."* [**Emphasis added**]

**Trooper One** was asked to explain the overall process and planning regarding the group's efforts to record the interview of **Mr. Todashev**. He indicated, *"The original plan was ah,* ███ *Headquarters, and presumably as it was recorded before, he'd be in a room, a sterile environment and it would be recorded. ... It wasn't um, it wasn't, it was ah, **it wasn't a thought out plan** that it was, it was, **we were moving on the fly**. It was very quick and to the, when we, he agreed to meet us, it was well, when? And it was like, get there now, and we hustled and made plans to drive as fast as we could to, to make this meeting and it was on the move."* [**Emphasis added**] **Trooper One** explained the battery of his video recorder failed during the course of the interview.

When asked if **Mr. Todashev** ever appeared as if he was going to take flight from the apartment while confessing to his involvement in the murders, **Trooper One** informed, *"He was confessing, he was, at prior when, he observed, when he implicated himself, when I had gone outside to obtain cigarettes for him, I had told the, ah,* ███████ [**TF Officer**]. *I told* ███████ *to ah, what was going on that he was confessing and to please cover the back in case he decided to flee. Um, **he made no move to flee at all**. Ah, **we allowed him to smoke at the open door**, um, except when he [**Mr. Todashev**] finally shut it to turn the air conditioner on."* [**Emphasis added**]

**Note:** This information was consistent with the video footage provided by the FBI.

D012914

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

**Trooper One** explained how he utilized his personal cellular telephone in an effort to record the interview by saying, "*After the, he was writing his confession and there was no more questions being asked of him, I took, went to the phone, stopped the recording and began to check my text messages and use that to communicate. … Oh, ok. So, he ah, I had gone to the stairs, um, and **I was on the stairs**, observing him as ah, the other **FBI was in front of him** ah, and he had asked some questions, but I saw, **I caught him looking up at the agent, caught him looking over toward where the ah, the sword was hanging** and then he, when I would make, when he would see me looking at him, he'd look down and it seemed like he wasn't right. … The sword was hanging, um, right to the, ah, outside the stairwell that goes up. There was a plant there and it was hanging on a wall, um, just with a couple ah, drywall screws holding it up underneath the, the thing on the handle. … Um, **he asked to go to the bathroom** and um, we ah, special, FBI goes up first and he goes up and then I'm behind and it has an open half wall at the top of the stairs so he goes over to the bathroom and he, he's walking toward the bathroom extremely slow and I'm up at the top, like halfway the stairs where I can, I can see right over and he goes into the bathroom and I make a (whistle sound) like a whistle to FBI. He looks at me and I, I make a hand motion with my eyes because ah, **his movements, was just seemed slow and methodical**. Then I observed him go to the ah, toilet and begin to urinate and then, this was the only time I had gone in the bathroom, so I hadn't seen with it* [sic ]*before but I saw him take the water and it was very slow and he would just break his hand like this and he would let it drip over his, well I believe it was hitting his penis and he did it like three times, like that slow and we just kept watching and that's when it went, **my senses was very heightened at that point because I wasn't sure what was going on**. … my indication was that **we should be on heightened awareness** because of **his demeanor had changed** ah, where things were, I saw him looking around and now, **he's moving extremely slow, um, as if he's calculating in his mind**. I, this is just my presump…my, **my training and experience had me alert, um, to let the other people know what I was thinking**.*"   [**Emphasis added**]

**Trooper One** explained what happened as they returned downstairs by stating, "*I'm in, I'm in the front, going down the stairs, so FBI lets him go and then he starts to come down the stairs and I'm turned sideways, watching him come down the stairs and FBI is at the top of the stairs, behind him. **When he gets down about three steps, four steps and he almost stops and I looked at him and then he just was standing there for a couple split seconds and then he started to, well he started to continue to walk again, I went down the next few steps real quick, run around the corner, grab the sword off the wall and went right to the kitchen area and I stuck it behind a ah, ah, right at the base of the kitchen there was a, a like a tray, ah a cart, you'd call it a cart that was in the hallway there and I tried to put it right there standing upright and stuck it right there.** … Because I didn't want him to have any ah, I didn't want him to get the sword. I saw him looking around at it and then his actions by going extremely slow, it, I just ah, I just didn't want to have that in play.*"   [**Emphasis added**]

**Trooper One** reported once they returned to the first floor, "*…he* [**Mr. Todashev**] *goes and sits back down. Um, ah, **FBI takes up his position, ah, sitting in front of him in the chair and I go back over to the stairs** and then that's when **I send the text to um, my partner and ah, FBI, that "be on guard, he's in, I see him looking around, gonna go bad'** something to that effect.*"   [**Emphasis added**]

D012915

**Trooper One** continued, "*Um, at that point, um, there was really ah, no ah, no further communication, verbally.  He would, I was just ah, had sent the text to those two individuals and I was waiting for the specific sound of his phone to ding so I knew he would get it. ... I send the text and the agent sitting in front of him, and um, I had sent the thing and I had looked over at ah, Todashev and the ah, FBI to, waiting for him to, his phone to go off. ... Um, I look back at my phone, cause there was no ding, and then **I um, heard a sound, a loud sound, looked over and I saw the table going up in the air and him** [**Mr. Todashev**] **pushing it forward** and going toward... ... Ah, Todashev.  Todashev springing up and there was like a, describe it as a roar or some sound.  Table goes up in the air and um, toward the agent*." [**Emphasis added**]

**Trooper One** could not say definitively if **Mr. Todashev** was the origin of the noise.  When asked if he observed the coffee table striking the **FBI Agent**, he responded, "*I don't recall if I saw it.  I saw it in the air, um, and objects were in the air and I don't recall if I physically saw him, it strike him.  I just saw it. ... Ah, **I immediately screamed** '*[**Trooper Two**]*!' as loud as I could, because... ... I yelled ah, for my partner, ah, his name, verbally and um, **saw ah, Todashev go toward ah, the hallway, um, in that little hallway toward the kitchen** as if to go toward the door...*" [**Emphasis added**]

**Trooper One** continued, "*He then took a right and went behind the, into the kitchen where the kitchen sink was. ... he turned toward us, so he was facing us, not looking at us, but **he was looking left and right as if he was looking for something**. ... It's wi-it's a half, half kitchen type thing so I could see, could see him looking left and right*." [**Emphasis added**]

I asked **Trooper One** if he believed **Mr. Todashev** was looking for the sword he had recently moved to that area of the address and he replied, "*I be-I believe he saw it.  He had a um, mirror that was ah, positioned at an angle at the base of the stairs in that apartment and it was ah, where you could see, I would presume you would put it there if somebody were to come into your house and knock, you could look down the stairs and see who it was.  Um, in my ... **I believed he was looking for it, or a weapon of some sort, because he looked left and right**. ... And he went to the corner of the door, where ah, depending on which side, I'm not sure which way the door is hinged, but I believe it would be the hinged side of the door and **there was a red ah, five foot ah, pole, stick, or something that was propped up in the corner and he grabbed the**, went right to the thing, **turned immediately, stuck it above (inaudible) his ah, with two hands above his thing like a javelin or like a, that, and started to charge at me**.*" [**Emphasis added**]

**Trooper One** provided his recollection of the actions taken by **Mr. Todashev,** and continued by informing, "*I put my arm up, turned to the right, my body and **then a burst of shots came in from my right side**. ...  He had the broom handle up and **he began to run at me**, I put my arm up, went to the right, and the sh-burst of shots came in um, and **I observed Todashev, his body um, went like this**, **after the impact**, like he was hit in the torso...*"  According to **Trooper One**, he estimated ten (10) feet in front of him, charging towards him, when he observed **Mr. Todashev** being shot by the **FBI Agent**.  As he demonstrated, by twisting his upper torso from right to left several times in an effort to explain the motion he observed, **Trooper One** explained, "*I saw him go the two times, I saw, I'm not, I don't know if it was left-right or right-left, but I was observing his body go boom, boom. ... His twisted, it twisted and he was, he was hit, um, in the, ah, the torso area*." [**Emphasis added**]

D012916

**Trooper One** provided additional information as he stated, "*I observed ah, Todashev grab the red um pole, turn to me ah, immediately, hold it up above his arms and I don't know if it was left hand in front of right or right hand and left front, but he came from, it was on his, over his right shoulder, so... ... The broom handle was over his right shoulder, in the air in a position as if um, if it came and struck, it would impale someone. ... And I, as he came running toward me, I put my left arm up in the air... in case he continued to, ah, in case, I put my left arm to protect myself from ah, from being impaled by that object.*"  [**Emphasis added**]

**Trooper One** recalled, "*I observed, I heard ah, gunshots and as I was facing Todashev I observed his body to make a motion that appeared that he was struck in the torso. As his body twisted left and right or right-left, it twisted two times. I watched him, from the impact of the shots. ... I observed, after the impact of the shots to his torso, him come down to his hands and knees, ah... ... He came down to his hands and knees, and then immediately sprung right back up. ... he went down to his knees and then wasn't even a second came right back up. ... He springs back up and then immediately there's a second burst of gun fire and then he falls forward. He begins to fall forward and then to the ground and then that's where he ah, finally rested.*"  [**Emphasis added**]

**Trooper One** explained, "*Um, I heard, immediately heard ah, FBI yell, 'Call 911!' and then um, partner and* ▮▮▮ *were at the door. I ah, yelled to them that it was clear to come in. I turned to ah, over to FBI and could see blood was profusely running down his head and onto his clothing and I had um ah, limited hearing out of my right side. I checked myself to make sure that I hadn't been hit and I went over to FBI and immediately applied pressure to the left rear or ah, of the skull where he had a large laceration.*"  [**Emphasis added**]

As **Trooper One** described the actions of **Mr. Todashev**, he physically reenacted the manner in which **Mr. Todashev** *sprung back up*. He was asked to attempt to verbally articulate **Mr. Todashev's** actions at which time he stated, "*The way I can describe it is that when he went down and immediately sprung back up, he was coming toward us and um, how do I say, um, not run, not running straight at ah, more, more of a coming up at an angle. Coming up at an angle toward us. ... Yes, yes. That would be a, that would be a, it was, it was not a straight up thing, it was coming in at an angle and down and up.*"

As **Trooper One** verbally articulated his recollection of the manner in which **Mr. Todashev** reengaged the officers, he elevated his arms to shoulder level as he stretched them out forward. At the same time he leaned forward towards my location. Based on my training and personal experiences, the manner in which **Trooper One** was demonstrating the actions of **Mr. Todashev** was consistent with what is known as a Double-Leg Takedown.

> **Note:** An article[67] titled *The Double-Leg Takedown in MMA and Wrestling* describes the technique. The article was located on the following internet page:
>
> *http:www.mixed-martial-arts-training.org/the-double-leg-takedown-in-mma-and-wresting*

---

[67] The aforementioned document is memorialized as attachment number 112, pages 464-470

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

I asked **Trooper One**, "*…can you articulate for me the, the actions of Mr. Todashev ah, did they place you in fear for your life?*"  He then explained the following, as if he were reliving the event in his mind's eye, "*Well, um, he picked up that weapon and came at me,* **I described it as something you'd see in a movie, it was extremely fast** *and I moved to the right and* **if FBI hadn't have taken the actions of, of ah, using force to put, to, to incapacitate the, the threat, there might be a different story.**  *I know it would be, because he was a trained individual and* **there was no question in my mind that as fast as it happened,** *he had chances to flee as I stated in my initial statement.  He didn't take a chance to go out the open door.*  **He didn't take a chance to go out the front door and then go back at it again.**  *He chose to get a weapon, ah, I guess, um, how do I say it, um, there's no question in my mind that if he had gotten a weapon from us or if it hadn't turned out the way, we might not be here today.*"  [**Emphasis added**]

State Attorney Ashton inquired if **Trooper One** was armed at the time of the attack.  **Trooper One** responded, "*Yes, Sir. … , I had, I had pulled my weapon and then went back down because he was attempting, ah, my opinion* [**Mr. Todashev**] *was attempting to flee out the front door and then that's when I went back down and then* **that's where he caught me** *in the, the, I call it the little tunnel there, the, by the thing and came at me… ah, in close proximity where FBI um, took the action, was in the position to take the action.*"  Based on the facial expressions of **Trooper One** during this line of questioning, I perceived **Trooper One** appeared to be disappointed in the fact he was somewhat caught off guard by the actions of **Mr. Todashev**.  **Trooper One's** gratitude for what he perceived to be the life saving actions of the **FBI Agent** were expressed in nonverbal facial expressions as he provided his recollection of the incident. [**Emphasis added**]

State Attorney Ashton asked **Trooper One**, "*…Um, what was the reason that you stopped recording on your phone?*"  **Trooper One** responded, "*The reason I stopped recording on the phone was, at that point, I had used the phone as a back-up, which as I stated earlier, there was not really a plan to record cause, if I had thought about it in hindsight, I could have used the high definition phone the whole time and I wouldn't have had an issue.  It was on the cuff. … I, and when he was just writing, I needed to check, because* **periodically I had checked in with the District Attorney to let them know and also seek advisement of what they wanted us to do.**  *At that point, I stopped the recording, picked up the phone and seen that the text message had come in from the District Attorney, telling us not to lock him up until they had gotten a warrant.  I displayed that to FBI, so we both were on the same page of what we were trying to do and then um, begin to text and check to see if I had any pertinent things so it wasn't recording at that time.*" [**Emphasis added**]

Department of Justice Attorney Barry Kowalski requested an opportunity to ask **Trooper One** a question.  **Trooper One** and Attorney ████████████ left the room, prior to the question being asked, for a brief period of time to discuss the request.  Upon their return, **Trooper One** voluntarily agreed to answer Attorney Barry Kowalski's question.  Attorney Barry Kowalski asked, "*Yeah, just one question and I recognize that you told us you, you had put your gun back down again.  If you had had your gun in a position as Todashev was charging at you with the pole, so that you could have fired at him, ah, would you have felt it was necessary to shoot him to protect yourself and the oth-and the agent?*"  Without hesitation, **Trooper One** responded, "**Absolutely, yes, without question.**" [**Emphasis added**]

D012918

At the conclusion of the interview, **Trooper One** once again swore to the truthfulness of his statements.  The information provided by **Trooper One** was consistent with the information previously collected by the FBI and reviewed by the State Attorney's Office.  During the course of the interview, it was clear **Trooper One** was assisting the lead investigator, **Trooper Two,** with the investigation of the triple homicide. He was a secondary interviewing officer during the meeting with **Mr. Todashev** on May 21, 2013.  **Trooper One** appeared to be solely responsible for making the decision to collect the video recordings of **Mr. Todashev's** interview.  **Trooper One** was specifically instructed, via text message from the Assistant District Attorney, not to take **Mr. Todashev** into custody prior to having an arrest warrant.  **Trooper One** was left inside the apartment with **Mr. Todashev** and the **FBI Agent**, as **Trooper Two** left for the purpose of speaking with the Assistant District Attorney.

Based on the information provided during the course of this interview, **Trooper One** and the **FBI Agent** were each taken off guard by **Mr. Todashev's** attack.  **Trooper One** was caught off guard as he was **looking down at his cellular telephone** at the point in time when **Mr. Todashev** flipped the coffee table, striking the **FBI Agent** as he **looked down at his note pad**. Regarding the manner in which **Trooper One** reacted as he observed **Mr. Todashev** arming himself near the kitchen he explained, "…*I described it as something you'd see in a movie, it was extremely fast ... and then that's where he caught me in the, the, I call it the little tunnel there, the, by the thing and came at me... ah, in close proximity where FBI um, took the action*." As **Trooper One** provided his account, he displayed facial expressions of disbelief and surprise as he appeared to relive the incident in his mind's eye.  [**Emphasis added**]

On September 10, 2013, I obtained Attorney Eric Ludin's contact information, via electronic mail[68] from Chief Assistant/Executive Director Richard Wallsh.   The electronic mailing address provided was ludin@tuckerludin.com and the telephone number was 1-866-282-5260.   That same day at approximately 1610 hours, I called and spoke with Mr. Ludin.  Mr. Ludin explained members of his investigative team had collected information relevant to **Mr. Todashev's** location at the time of the triple murders.   Mr. Ludin did not provide specific details regarding this topic during this conversation.

Attorney Ludin also informed **Mr. Todashev's** father provided his office information regarding **Mr. Todashev's** perceptions regarding his contacts with the FBI prior to his death. Again, Mr. Ludin did not provide specific details about this topic during this conversation.  He also claimed **Mr. Todashev** would not have been able to resist the interviewing officers due to a recent knee surgery.  Mr. Ludin indicated his office was willing to provide the medical records related to the surgery.  Mr. Ludin reported his office was in the process of collecting information during an independent ongoing investigation.   He asked whether or not the information they collected would be of any value to the State Attorney's Office.   Mr. Ludin was advised the State Attorney's Office would like to review any and all documents, records, and photographs his office possessed.  Due to the nature of the conversation with Mr. Ludin, State Attorney Ashton formally requested the items from Mr. Ludin's office, via a letter mailed on September 19, 2013.

---

[68] The aforementioned FBI document is memorialized as attachment number 73, page 303.

D012919

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On September 18, 2013, AI ▆▆▆▆ provided a copy, via electronic mail[69] of the Orange County Sheriff's Office case report[70] # 13-38070. A review of this report was conducted. The report, authored by Deputy Sheriff Larry Clifton, indicated **Mr. Todashev** was arrested for the charge of *Aggravated Battery* on *05/04/2013*. The report indicated Deputy Clifton was working an off duty job at the Premium Outlet Mall when he responded to a physical altercation being reported in parking lot number 19. The initial review of this information is outlined in previous narration.

The aforementioned police report and physical arrest of **Mr. Todashev** occurred on *05/04/2013*. Based on information provided during the interview of the **TF Officer**, **Mr. Todashev** was being followed by members of the FBI, as well as video recorded, at the time of this incident.

During this incident, **Mr. Todashev** reportedly engaged in a physical altercation with two individuals simultaneously. Responding Deputy Sheriff Riccaboni immediately identified a physical characteristic of **Mr. Todashev** as being indicative of what he described as a "…*cage fighter/jujitsu fighter.*" Due to the observation of **Mr. Todashev's** cauliflower type deformities of the ears, the deputy "…*told this suspect if he tried to fight with us I would shoot him*."

According to the report, **Mr. Todashev** spontaneously informed the arresting deputy he was being followed by the FBI at the time of his arrest. **Mr. Todashev** would be interviewed by the law enforcement officers from the state of Massachusetts seventeen (17) days after this incident. The assisting **TF Officer**, as well as the other officers involved with the interview, were all aware of the event and made it part of their overall tactical considerations.

On September 19, 2013, a letter[71] from State Attorney Ashton was mailed to Attorney Ludin. The following quoted narration is taken from the body of the letter:

> "*Dear Mr. Ludin,*
>
> *We are in the process of conducting an independent review* [sic] *circumstances surrounding the death of Mr. Ibragim Todashev. It has been brought to my attention by Chief Investigator, Eric Edwards, made contact with you on September 6th* [sic] [10th], *2013. As I previously stated in our initial meeting on August 20th 2013, I would like to afford the Todashev Family the opportunity to provide any and all relevant items collected, during the course of your inquiry, to my office for review and consideration. In essence, if specific information was collected by your office which the Todashev family would like considered; please contact Chief Investigator Eric Edwards to arrange for your delivery of such items as soon as possible. …*"

---

[69] The aforementioned document is memorialized as attachment number 75, page 311.
[70] The aforementioned document is memorialized as attachment number 74, pages 304-310.
[71] The aforementioned SAO document is memorialized as attachment number 76, page 312.

D012920

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On September 30, 2013, an electronic mail[72] from Attorney *Barry A. Cohen,* *bcohen@tampalawfirm.com,* was received by State Attorney Ashton.  The following is taken from the body of the electronic mailing:

> *Dear Mr. Ashton, Eric Ludin has forwarded to me your September 19, 2013 correspondence to him, so that I can respond to you directly.*
>
> *I am sorry that I was unable to meet with you when you met with Mr. Todashev, but I do want to express my appreciation to you for agreeing to meet with him and letting him express his concerns to you.*
>
> *I will be forwarding to you some medical records, which I think should be helpful to you, and I'm in the process of having some interviews recorded transcribed, and once they are transcribed, I will try to determine if they have any probative value.  It may be that you and your investigators are in the best position to evaluate the probative value of such interviews and perhaps it would be prudent to forward those on to you.*
>
> *I would like to reserve that right until such time as I have them and then make an independent determination about what I can learn of your investigation and the investigation of the federal government.*
>
> *You may have seen public statements that I have made regarding my belief that you are conducting an objective and good-faith investigation…*

October 01, 2013, State Attorney Ashton received a second electronic mailing from Attorney Cohen.  The following is taken from the body of the electronic mailing:

> *Dear Mr. Ashton, I so apologize for my email to you yesterday, in that it was sent prior to the time I was finished, and I will finish it now so that it makes some sense to you.*
>
> *I had told you that I made some public statements regarding my belief that you are conducting a good-faith investigation.  I said that because I am told that during your campaign for election to the State Attorneys [sic] Office, as part of your platform you indicated that you were not going to 'rubber-stamp' the shootings that police were involved automatically, and that each case would be evaluated on its own merits, and that you would follow the evidence and act accordingly.  I was very impressed with your concern about that because as I know, and as you should know, the political component in the past has tainted many of these 'so called' investigations stemming from the fact that it's always nice to have the support of the police department and their unions at election time; and what unites the State Attorneys [sic] Office and the police is much stronger than what divides them, therefore, no objective investigation.*

---

[72] The aforementioned SAO document is memorialized as attachment number 77, pages 313-317.

D012921

*I would be less than honest with you if I told you I was not becoming solicitous of your investigation now, given the amount of time that has passed, and the few people that were in the room when the shooting occurred all know what happened, and if you have not pierced the veil of 'brotherhood' and gotten to the truth, I would be very surprised.*

*You should also know that I have little confidence in the Department of Justice investigating their own, particularly when the investigating agency is a branch of the FBI investigating their own.  Some of my skepticism emanates from the fact that statistics show that approximately 150 investigations have been conducted by the FBI of their own, and each time they have been exculpated.  They have not concluded their investigation, and I cannot imagine what's taking so long with their investigation as well.  Each of you have tremendous resources, both investigatively [sic] and forensically, which further creates an enigma in my mind as to why the investigation is taking so long.*

*I don't mean to sound disrespectful, and if you take it this way please accept my apology, but as I say, I am becoming more and more solicitous about these investigations and hope that someday my skepticism is found to be untenable.*

*Thank you for taking the time to read this email…*

On October 02, 2013, State Attorney Ashton replied to Attorney Cohen, via electronic mail.  The following is taken from the body of the electronic mailing:

*Dear Mr. Cohen*

*I am in receipt of the below emails.  I appreciate the kind words.  As you know, a thorough and fair investigation can not and should not be rushed.  I assure you this office is devoting time and resources to ensure a fully informed decision.  That said, I would be remiss not to point out that your colleagues have consistently indicated that they would be forwarding probative information for our consideration and yet, to date, we have received no information at all.  I do not mean to imply that you and the rest of Mr. Todashev's team is responsible for the on-going nature of the investigation but it is a factor over which you have some control.  I look forward to receipt of whatever information you would like me to consider.  In that some time has passed since our original invitation to your team to submit information, I would like to set a reasonable deadline for its submission.  Do you see any reason that the information could not be provided to us by October 15 2013?*

*Once again, thank you for your thoughts.*

On October 9, 2013, I received a telephone call from FBI Investigator AI ███. She indicated the final FBI Laboratory reports would be completed within a few weeks.  AI ███ explained she was in the process of authoring a case related report.  I informed AI ███ of my intentions to interview the Medical Examiner's Investigators.  On this date, I sent an electronic mailing to Chief Medical Examiner Investigator Carol Crosby, at which time I requested an opportunity to speak with Investigators Zedick and Cuccia.

D012922

On October 14, 2013, contact was made with District Nine Medical Examiner's Office Investigator Jack Cuccia at Medical Examiner's Office, which is located at 2350 East Michigan Street in Orlando, Florida. Investigator Jack Cuccia provided me with a photocopy of Medical Examiner investigation report number *ME13-00623*. The document[73] was titled *DISTRICT NINE MEDICAL EXAMINER'S OFFICE ... INVESTIGATIVE NARRATIVE – PRELIMINARY INFORMATION* and it displayed the name of **Ibragim Todashev**. Two (2) portions of the report narrative were highlighted in yellow. Investigator Cuccia explained he was a co-author of the document and he authored the two (2) areas highlighted. He explained the remainder of the report was authored by Investigator Lora Zedick. The following excerpts, taken from the areas of the report highlighted, are in their entirety:

> "*UPDATED 5-22-13 @ 1000 BY INVESTIGATOR CUCCIA. The following was obtained from FBI agent ...* [**TF Officer**]. *The incident took place at 0007 on 5-22-2013. The **FBI agents** fired approximately seven times from **their** glock 23. ...* [**TF Officer**] *stated a red stick was found under the decedent and a sword located leaning up against the wall with no fluid stains. The sword was removed prior to my arrival and placed on evidence paper away from the decedent.*" [**Emphasis added**, Report page one]

> "*UPDATE 5-22-13 @ 0730 BY INVESTIGATOR CUCCIA who returned to the scene of the decedent apartment. The decedent apartment was noted with a bed in the living room area, multiple clothes and shoes. A sword was noted on brown evidence paper. The room temperature was cool, no alcohol, illicit drugs noted. Evidence markers 2,3,4,5,6, 7 & 12 were shell casings. **FBI agents discovered a projectile in the living room after OCMEO left the scene.** The decedent was observed clothed lying on the foyer floor that is covered by carpet. The decedent* [sic] *left side of his face was in contact with the carpeted floor. Multiple shoes were noted around the decedent. **A red round stick was located under the decedent and a portion of the stick was noted exposed above his head**. Multiple wounds were noted to the decedent. The decedent was cool to touch, complete rigor and lividity was consistent with body position.*" [**Emphasis added**, Report page two]

Investigator Cuccia and I reviewed the color photographs, via his desktop computer, taken by him while on scene on May 22, 2013. He explained the first forty (40) color photographs were taken by Investigator Zedick when she initially responded to the scene. He explained Investigator Zedick was asked to return to the scene at a later time by the FBI. Investigator Cuccia took the remaining photographs of the scene. Three of the color photographs, also memorialized as attachment seventy-eight (78), were printed off for the purpose of clarification. At approximately 1100 hours, a sworn recorded interview was collected.

Investigator Cuccia has been employed by the Medical Examiner's Office for "*Thirty-five years*". His primary duties have been investigating deaths. His duties involve, "*Responding to scenes, working with law enforcement, obtaining synopsis of the circumstances and preliminary onset of the investigation and forward it to the medical examiner. ... obtaining dates, times, address and a synopsis of the preliminary ah, investigation that's on-going at that point and*

---

[73] The aforementioned ME document is memorialized as attachment number 78, pages 318-323.

D012923

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*continuing with photographs and transporting the decedent back to the Medical Examiner's Office for the Medical Examiner to review and determine direction. … The Medical Examiner seeing the general overview of the entire scene and get an understanding of, perhaps what the ah, incident was about.*"

I asked Investigator Cuccia, "*…when you arrive there and you get to the point where you're gonna take full custody and possession of the remains, or the deceased, um, who assists you with that process? Actually removing the body?*"  He replied, "*The, ah, county authorized transport service under contract to the Medical Examiner's Office.*"

Investigator Cuccia was then asked to provide his recollection of the Medical Examiner's Office response to the scene on May 22, 2013.  He explained, "*Best I can recollect is she* [Investigator Zedick] *received the primary call and was on the midnight shift and towards the end of her shift. Ah, she needed assistance cause she was getting off and also,* **law enforcement agencies were processing what was necessary before the Medical Examiner's investigator could go forward with the part of his procedures.**"   [**Emphasis added**]

Investigator Cuccia was asked, "*Now is that, is that a common event or is it, does it make sense the way that happened where the Medical Examiner responded but then was asked or told that they would need additional time and have to send someone back out to the scene later?*"  He replied, "*Yes, … it didn't happen just because of this particular case*."  Due to the FBI needing additional time to process the scene, Investigator Zedick left the scene and Investigator Cuccia later returned and removed **Mr. Todashev** from the address.

Investigator Cuccia recalled he made contact with the **TF Officer** upon his arrival at the scene.  I asked, "*…And do you remember specifics about what he may have told you about that scene or that incident?*"  He recalled, "*Just other than the statement that ah,* **FBI agents fired** *ah seven times from a Glock 23.*"  I asked, "*So somewhere along the way you were operating under the assumption that there, under the assumption there was more than one officer involved?*"  He answered, "*Yes.*" According to Investigator Cuccia, the **TF Officer** was the only source of the information which led to his perception of more than one law enforcement officer shooting **Mr. Todashev**.

> **Note:**   Though the narrative of the Medical Examiner's Office Investigator's report, collectively authored by Investigators Zedick and Cuccia, indicates "*…FBI agents fired approximately seven times from their glock 23…*" this information is inaccurate.  Based on statements made by the **TF Officer** to the responding Medical Examiner's Office Investigators**,** they assumed there was more than one law enforcement officer discharging a handgun at the time of the incident.  The possibility of more than one law enforcement officer discharging a weapon has been refuted by the investigation conducted by the FBI. During the course of the State Attorney's Office investigation, nothing was discovered which would support the theory of more than one person shooting **Mr. Todashev**. Therefore, the possibility of more than one law enforcement officer discharging a weapon has been refuted by the investigation conducted by the State Attorney's Office as well.

D012924

When Investigator Cuccia first observed **Mr. Todashev**, he recalled, "*Ah, the deceased lying face down on a fluided* [sic]*, carpeted floor and there was obviously a red round, some type of stick protruding, ah, from under him, extended above his head.*" We reviewed color photograph number forty-eight (48), which displayed **Mr. Todashev's** final position at the scene. Due to the manner in which the photograph was taken by Investigator Cuccia, it initially appeared there was not a red stick protruding from under **Mr. Todashev**. Based on a closer review of the photograph, the red stick can in fact be seen near the top of **Mr. Todashev's** head. Investigator Cuccia circled the area of the red stick, on a color photocopy of the crime scene photograph, for the purpose of clarification. He also provided his initials near the hand drawn circle and dated the photograph during this portion of the interview.

Investigator Cuccia was asked to explain, "*Now, when Mr. Todashev is in that position, explain to me the process that, that you go through as a medical examiner, investigator at that scene.*" He explained, "*The process that I went through as far as the investigator representing the office was continuous documentation of photographs for the Medical Examiner's review from all areas and angles that I was able to provide. … The ah, image in this photograph* [number sixty (60)] *is ah, showing that he's fully clothed and he was turned over from his face down position and placed in this white shroud.*"

As he explained the process, I asked who would have placed the brown paper on the floor, which was observed under the white shroud. Investigator Cuccia explained the paper would have been put down by the law enforcement forensics investigators. He recalled bagging **Mr. Todashev's** hands without assistance prior to the transport staff moving him over the shroud.

I asked Investigator Cuccia, "*Um, looking at your narrative portion on page two, you write, 'FBI agents discovered a projectile* [FBI article number *15*] *in the living room after OCMEO left the scene.' Do you recall where you came across that knowledge or that information? No?*" He verbally replied, "*Can't recall at this time.*" I asked, "*Do you remember ever seeing a projectile or any kind of article drop from the deceased in, in any of this activity, ah, in an effort to remove and recover his body?*" and he replied, "*No.*" I then asked, "*Did you remember any from, anyone from the, ah, recovery team or the two individuals contracted to assist you, making any comment or any reference to watching or seeing something fall from the deceased body?*" and he again replied, "*No.*"

At the conclusion of the interview, Investigator Cuccia once again swore the information he provided was true. Three (3) color photocopies of crime scene photographs taken by Investigator Cuccia were utilized during the interview. They have all been provided for the purpose of clarification as attachments. Investigator Cuccia assisted with the identification and provided the contact information for the two members of the recovery team, Mr. Dan Coughlin and Mr. Russ Drummond.

D012925

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On this same date, at approximately 1317 hours, I collected a sworn recorded statement from Mr. Coughlin. During the course of the interview, Mr. Coughlin, the owner *Central Florida First Call Services Incorporated*, provided a document[74] titled *Contract Transport Control Sheet* which was dated *5/22/13*. The document listed the *Scene Street Address* as being a response to the address of *6022 Peregrine Ave*. The *ME Case #13-00623* was displayed and time shown on the document was *0925* a.m.

Mr. Coughlin recalled responding to the address with Mr. Russ Drummond. He recalled, "*There were a lot of police there. We waited a while, while they were doing inve-* **my men had already been there at three o'clock. They sent them away**. *We went back at eight, left at seven, got there at eight. There were a lot of people in the apartment or in the townhouse, I guess it is and they had us wait outside. We dressed up in our coveralls with the hair cover, the eye, the glass, everything, feet cover and went in.* **The body was face down on the floor**, *about three feet in from the door, right by the side of the kitchen door. Ah, they were doing investigation and taking pictures at the time. We laid down our sheet, our shroud, our bag,* **then Jack asked us to turn the body over so they could take pictures** *of the, ah, face and ah, front of bo-front of the remains. We did so. We then bagged the body in the shroud and everything and in the, in the, yeah...and then put it on our stretcher, went back to the Medical Examiner.*" [**Emphasis added**]

Mr. Coughlin did not recall seeing anything, such as the projectile listed as FBI article number *15*, fall as they moved **Mr. Todashev** into the shroud. I asked Mr. Coughlin if he knew why the first recovery team left the scene and he stated, "*They* [FBI personnel on scene] *were waiting for the people from Tampa to come in.*" At the conclusion of the interview, Mr. Coughlin once again swore the information he provided was true.

On this same date, at approximately 1403 hours, I collected a sworn recorded statement from Mr. Drummond. During the course of the interview, Mr. Drummond recalled his employment on May 22, 2013 by stating, "*I was with Central Florida First Call Incorporated. It's a removal service that ah, has a contract ah, for the removal of all Orange County, District Nine Medical Examiner's ah, bodies.*" Mr. Drummond reported his recollection of the response to the scene on May 22, 2013. When asked, "*When ya'll picked up the deceased and moved him, is there anything that stands out in your mind's eye about any articles that may have ah, dropped from his person?*" and he replied, "*No, Sir. I , I'm positive of that. I, I don't recall anything like that.*" At the conclusion of the interview, Mr. Drummond once again swore the information he provided was true.

On October 18, 2013, State Attorney Ashton received an electronic mailing[75] from *Nick Ferdig, nferdig@tamplawfirm.com*. The *Subject* line indicated "*FW: Ibragim Todashev / Medical Records – Knee (2b or 2b).pdf.*"

The following narration is taken from the body of the electronic mailing:

---

[74] The aforementioned document is memorialized as attachment number 79, page 324.
[75] The aforementioned electronic mailing is memorialized as attachment number 80, pages 325-339.

D012926

*Good afternoon, Gentlemen.*

*Mr. Cohen asked that I provide to you a copy of the medical records we have regarding Ibragim Todashev's knee surgery – a copy of these records is attached for your review and consideration.*

*Please let me know if the document is not attached, or if you encounter any difficulties opening it.*

*Thank you!*

*Nick*

The attached documents were of low quality and very difficult to review.  The documents, related to a knee surgery, displayed "*Discharge Date: 03/18/2013*".  They appear to have been "*Electronically Signed by* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮*.*" and this occurred "*On 03/17/2013* [at] *09:14* [hours]".  The attachment contained a photograph of what appears to be a knee at an unknown time after surgery.  It was later determined this same image was provided to media outlets as well.  The following image was provided in report attachment one hundred and seven (107), and was taken from an article located on the following web site:

http://www.bostonmagazine.com/news/blog/2013/12/30/ibragim-todashevs-father-writes-open-letter-obama-releases-photos-surrounding-sons-death-warning-graphic/



D012927

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On October 22, 2013, I sent an electronic mailing[76] to *Nick Ferdig, nferdig@tamplawfirm.com*. The following narration is taken from the body of the electronic mailing:

> *Hello Mr. Ferdig,*
>
> *I am assisting Mr. Ashton with his review of this case.*
> *I have been forwarded three email chains regarding medical records.*
> *It is very difficult to view these documents.*
> *Could you possibly scan each document individually and then email them to me directly.*
> *I am available to discuss this request at my desk number of* ▮▮▮▮▮▮▮.
>
> *Thank*[s] *for your time and consideration regarding this topic,*
> *Eric Edwards*

**Note:** As of the final date of this report the State Attorney's Office has not received any response to this request or any additional information from the attorneys representing **Mr. Todashev's** family.

On October 23, 2013, I sent an electronic mailing[77] to Department of Justice Attorney Barry Kowalski ▮▮▮▮▮▮▮▮▮▮. The electronic mailing contained the information provided to State Attorney Ashton by The *Cohen Law Firm*. Attorney Kowalski replied, by way of electronic mailing, on this same date. The following narration is taken from the body of the electronic mailing:

> *Eric – Thanks.*
>
> *Received these emails that you sent. Also, received same medical records you forward from Barry Cohen but only yesterday by fedx* [sic].
>
> *Questions: ...*
> *2 – the Cohen medical records that I received and that you also forwarded, only relate to the March surgery itself (limited to 'prognosis excellent'). Did you receive any later dated records that would reflect Todachev's medical condition as of May? If not, any thoughts on a way to get such records?*
> *3 – last, we do not have the transcripts of your interviews with the troopers and the* ▮▮▮▮▮ *investigator. I want to check my notes against your transcripts on the trooper interviews and I was not present for the third interview?*
>
> *As I told Jeff* [State Attorney Ashton], *we are finishing lab and other info we still owe you. Want to wrap this up as quickly as we can. Barry*

---

[76] The aforementioned electronic mailing is memorialized as attachment number 81, page 340.
[77] The aforementioned electronic mailing is memorialized as attachment number 82, pages 341-342.

D012928

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On November 8, 2013, AI ███ and I made contact with District Nine Medical Examiner's Office Investigator Lora Zedick at Medical Examiner's Office, which is located at 2350 East Michigan Street in Orlando, Florida. Investigator Zedick provided me with a photocopy of Medical Examiner investigation report number *ME13-00623*. The document[78] was titled *DISTRICT NINE MEDICAL EXAMINER'S OFFICE … INVESTIGATIVE NARRATIVE – PRELIMINARY INFORMATION* and it displayed the name or **Ibragim Todashev**. Three (3) portions of the report narrative were highlighted in yellow. Investigator Zedick explained she was a co-author of the document and she authored the three (3) areas highlighted. She explained the remainder of the report was authored by Investigator Cuccia. The following excerpts, taken from the areas of the report highlighted, are in their entirety:

> "*Positively identified 27 y/o* [year old] *male **shot multiple times by FBI agents** during a case related interview. No other information provided at this time…*" [**Emphasis added**, Report page one]

> "*FBI agents responded to the decedent's apartment style residence for an arranged case interview. At some point during the interview the FBI agents were physically threatened by the decedent. **FBI agents opened fire**; decedent sustained multiple gun shot wounds. Decedent was pronounced on the scene by Orlando Fire Engine 10 @ 0015.*" [**Emphasis added**, Report page one]

> **Note:** The portion of the last sentence marked by the underscoring was not highlighted by Investigator Zedick.

> "*On 5/22/13 at 0205 hours I was contacted by Sgt Ford of the Orlando Police Department who advised they were working a homicide scene along with the FBI. Sgt Ford could not provide any other information. I arrived on scene to an apartment style residence located on the bottom floor of a two story apartment building. **I was advised that the scene was actually an officer involved shooting involving two FBI agents and the decedent during an arranged case interview**. I entered the residence in full Tyvek, booties, hair net and mask. I took overall photographs* [the first forty (40) color photographs] *of the first floor of the residence to include the decedent who was lying fully clothed in a prone position in the foyer of the residence. The decedent's left arm was tucked under his torso with his right arm resting along his right side with the right palm facing upward. I observed suspected blood on the floor around the decedent's torso, on the back of his shirt and along an opened wound on the left tricep. I photographed a Florida issued driver license removed from a wallet on the kitchen counter by Special Agent* ███████. *At this time I was notified by SA* ███████ *that they needed to diagram the interior of the residence and placement of the decedent using a total station system before the OCMEO removed him* [**Mr. Todashev**]. *SA* ███████ *advised she would notify the OCMEO when this was completed so that an investigator could remove the decedent from the scene. I departed the scene at 0314 hours.*" [**Emphasis added**, Report page two]

---

[78] The aforementioned ME document is memorialized as attachment number 83, pages 343-348.

D012929

At approximately 1346 hours a sworn recorded interview was collected from Investigator Lora Zedick.   A summary of the interview is as follows:

Investigator Zedick has been with the Medical Examiner's Office, "*Since February of 2013*". Investigator Zedick was previously employed, by both the Orange County Sheriff's Office and the Orlando Police Department, as a Crime Scene Investigator (CSI).   Investigator Zedick provided two sheets of paper which displayed color photocopy arrays of the color photographs she collected while at the scene on May 22, 2013.  These photograph arrays are provided as attachments.   Investigator Zedick recalled her response to the scene by stating, "*Um, upon arrival ah, OPD was working the perimeter.  I was directed to the ah location within the apartment complex to respond to.  I um, walked up in between two buildings and there was ah, couple of who I identified as um, FBI agents standing outside of an apartment. I identified myself and asked for a briefing. Um, I was then asked by one, one of the agents um, what information I needed to know.  Um, I told them I, I was told to respond for a homicide.  I needed to know, um, what, what kind of homicide there was.  I explained um, what I would be doing and that I would be documenting the scene using photographs and ah, taking possession of the body. I would also need to document any weapons that might be on scene.  **I was told that um, the agents that had been involved in the shooting um, were no longer on scene as, as well as their weapons and it was at that time that I realized that it was an officer involved shooting**. … Um, that's correct, because **I was told that the agents involved, agents plural**, in, involved had, had already left the scene and, and…*"  [**Emphasis added**]

I asked Investigator Zedick, "*And so at that point, you thought that there was more than one law enforcement officer involved in the shootin*g?" and she replied, "*That's correct*."  I then asked, "*And that's what led to you writing that in this document that we're looking at here*?" and she again replied, "*That's correct*."  She recalled, "*Um, so again, **I was told that the agents involved were no longer on scene, nor were their weapons**, um, **and that at least one of them had, had gone to the hospital for injuries**.  Um, I asked, you know, under what, what circumstances they were there.  Was it a, you know, like a raid type thing where they were coming to serve a warrant, um, just trying to get information a, again, when I had asked for a briefing, um, I was asked to tell them specifically what they needed, or what I needed, so I was just trying to, to think of questions.  Um, so again, I asked, you know, under what circumstances they were there to try and figure out, you know, what had happened at the scene.  Um, and I was told that it was an arranged interview that the um, deceased knew they were coming and wasn't like a surprise that had been arranged and during that arranged meeting um, he had in, in some way, and I wasn't told specifically how or with what, but in some way had um, become a threat and um, that he was shot.*"  [**Emphasis added**]

She explained, "*Um, I was then introduced to ████████ and was told that she um, was running the, the scene.  And um, so I identified myself to her and, and spoke with her a little bit about, again my, my duties and what I would be there to do. … Um, my perception was that she was in, in charge of the, the scene.  She was um, you know, wearing booties and, you know, was, was in the scene.  I believe she was also, um, taking photographs. … Again, I identified myself, um, told her what I was there to do, how I was there um, to document the scene and um, what I would be doing.  I um, asked if they were going to be doing any um, or if they were going to be requesting any DNA analysis.  Um, and if so, I, that would basically tell me what I needed*

*to wear into the scene. Um, if they were going to be um, doing DNA, because we, as the ME's Office are in such close proximity to the decedents, we will dress, um, all in Tyvek, with hairnets and gloves and booties and um, just try and prevent any kind of cross contamination. They told me it was a possibility that they would be doing um, swabbing the body um, so I dressed in my full attire, before entering the scene. I entered and started just taking overall photographs of the first floor, um, basically just to show the layout of the residence, the condition. Um, I photographed the thermostat to show the temperature at the time that I was there. Once I got ready to um, document the body, which would entail me um, doing an actual examination of the body, um, **I notified her that I was, I was ready to move the body and she advised that she had spoken to someone, um, I, I believe a, a supervisor of some sort, who was not on location, but had spoken to that person over the phone and found out that they would need to do a diagram of the residence, which would include his location** and that… They, they would um, need the decedent to remain in place, while they did this diagram and that she was not aware that they were going to be doing that at first and therefore did not have the equipment on scene with her to do that. That um, they would have to wait for someone to bring that to her. I asked if she knew how long that would take. Um, she said so she didn't and **I told her at that time that I would, um, be leaving the scene and that they could notify us when they were ready for us to be able to come in and, and actually move the body and do our examination with the body*."*
[**Emphasis added**]

For the purpose of clarification, I asked, "*And again, when you speak in plural, that's just based on the information or the statements were made that there was two officers that were transported or removed from the scene or officers, plural?*" and she replied, "*Um, yes, it was, it was the, it was a, arranged interview and the agents plural.*" I then asked, "*Ok. So you have nothing to, that would ah, would have led you to believe that day that there was more than one, or ah, more than one shooter, more than one actual agent involved in that incident, other than the fact that two were taken and they told you the two were taken from the scene?*" and she replied, "*Um, the, that's right. I was, **I was not told that there were, there was more than one agent who actually fired a weapon. I was told that there was more than one agent who was, um, in, in the arranged meeting**.*" [**Emphasis added**]

At the conclusion of the interview, Investigator Zedick once again swore to the information she provided was true. Two (2) sheets of color photocopies, displaying the arrays of crime scene photographs taken by Investigator Zedick, were utilized during the interview. They have both been provided for the purpose of clarification as attachments.

> **Note:** The possibility of more than one law enforcement officer discharging a weapon has been refuted by the investigation conducted by the FBI. During the course of the State Attorney's Office Investigation, nothing was discovered which would support the theory of more than one person shooting **Mr. Todashev**. Investigator Zedick indicated, "*Um, the, that's right. I was, I was not told that there were, there was more than one agent who actually fired a weapon. I was told that there was more than one agent who was, um, in, in the arranged meeting.*" This may have been when the information provided by the **TF Officer** was taken out of context. Therefore, the possibility of more than one law enforcement officer discharging a weapon has been refuted by the investigation conducted by the State Attorney's Office as well.

D012931

On November 20, 2013, I notified AI ███, via an electronic mailing[79], the review of seven (7) transcripts related to interviews conducted by the State Attorney's Office was complete.  The following narration is taken from the body of the electronic mailing:

> *Hello* ███*,*
> *I have all seven transcriptions reviewed at this time.*
> *I am sending you a scanned copy of the four regarding the interviews of the Medical Examiner's personnel.*
> *These will not have the crime scene photographs discussed attached in the emails.*
> *In the envelope will be a full set of each transcription on a CD containing all seven recorded interviews, the word documents, and the related documents covered in the interviews.*
> *Please forward these to the appropriate people on your end.*
> ***We are awaiting the photographs we discussed as well as the final lab reports****.*
> *Thanks,*
> *Eric*  [**Emphasis added**]

After sending this electronic mailing, I then spoke with AI ███ Shortly after this telephone conversation, AI ███ sent me an electronic mailing[80].  The following narration is taken from the body of the electronic mailing:

> *Hello, Thank you for the telephone call today and the transcripts.  I will FedEX the photos and the Laboratory reports to you tomorrow.  Please let me know once you received them or if you have any questions.  Thanks,* ███

On November 26, 2013, a box mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office.  This box contained items previously requested, to include three hundred and thirty-six (336) color crime scene photographs collected by the FBI and six (6) *FBI Laboratory Reports*.  A thorough review of the information provided was conducted.

Based on the information provided in the FBI Laboratory reports, the "*sword*" which was moved by **Trooper One** prior to the incident was found to have only one latent print specimen of value. The identification of the individual, who at an unknown time and place made contact with the sword, is unknown.  The "*Broomstick*" in the possession of **Mr. Todashev** during the incident was determined to have, "*No latent prints of value were detected…*"  On page two (2) of this report the following information is provided:

> **Interpretations:**
>
> *Due to the many factors involved in the deposition of a friction ridge print, **neither the absence of a friction ridge print on evidence nor the exclusion of a friction ridge print with a given source disassociate that source from having touched the evidence***"  [**Emphasis added**]

---

[79] The aforementioned electronic mailing is memorialized as attachment number 115, page 498.
[80] The aforementioned electronic mailing is memorialized as attachment number 84, page 349.

D012932

Based on the information provided in the FBI Laboratory reports, the "*One (1) notebook*" which was being written on by **Mr. Todashev**, prior to the incident, was found to have six latent fingerprints and two latent palm prints of value.   According to this report, "*The six latent fingerprints and one latent palm print detected on Q31, a notebook, have been identified as fingerprints and a palm print of IBRAGIM TODASHEV… The remaining latent palm print is not a palm print of Todashev.*"   The identification of the individual, who at an unknown time and place made contact with the notebook, is unknown.   On page three (3) of this report the following information is provided:

> *Interpretations:*
>
> *The presence of a friction ridge print on an item of evidence indicates contact was made between the source and the item of evidence.  The presence of a friction ridge print alone does not necessarily indicate the significance of the contact or the time frame during which the contact occurred.*
>
> *Due to the many factors involved in the deposition of a friction ridge print, neither the absence of a friction ridge print on evidence nor the exclusion of a friction ridge print with a given source disassociate that source from having touched the evidence.*

Based on the information provided in the two (2) FBI *DNA Laboratory* reports, the aforementioned items, "*Based on the STR typing results and to a reasonable degree of scientific certainty … [indicated the **FBI Agent** … is the major contributor of the DNA obtained from specimens…*"

Based on the information provided in the two (2) FBI *Firearms/Toolmarks Unit* Laboratory reports, each of the seven (7) *Projectiles* recovered were fired from the .40 caliber Glock model 23 hand gun collected from the **FBI Agent** on May 22, 2013.  All seven (7) of the .40 caliber *Shell casings* were fired from the Glock model 23 hand gun collected from the **FBI Agent** on May 22, 2013.

On December 11, 2013, FBI Chief Inspector  and Department of Justice Attorney Barry Kowalski visited the State Attorney's Office.  During the course of the meeting, with State Attorney Jeff Ashton and Chief Assistant/Executive Director Richard Wallsh, I was provided an additional FBI report.  The document authored by AI ▮▮▮▮▮▮▮ and SA ▮▮▮▮▮▮▮ on *12/10/2013* outlined the findings of an area canvass recently conducted by the FBI. Several topics were discussed during the course of the meeting.  I requested any and all information which may have been provided to the Department of Justice by the attorneys representing **Mr. Todashev's** family.  Attorney Kowalski informed they had only been provided the medical records related to **Mr. Todashev's** knee surgery.

D012933

After the meeting, I sent an electronic mail[81] to FBI Chief Inspector ▇▇▇▇ and Department of Justice Attorney Kowalski, for the purpose of it serving as a polite reminder, enumerating the outstanding requests being made of the FBI for additional information.   I then conducted a review of the FBI report provided by FBI Chief Inspector ▇▇▇▇.

On December 16, 2013, a letter mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office.   The envelope contained the requested *302 report which purportedly outlines the FBI's contact with the ME's Office*.   The letter contained a cover letter authored by *Chief Inspector* ▇▇▇▇▇▇▇▇  My review of these documents is provided in previous narration.

On January 23, 2014, a letter mailed by the U.S. Department of Justice and Federal Bureau of Investigation was received at the State Attorney's Office.   The envelope contained the FBI responses regarding outstanding requests for information.   During this investigation, the FBI indicated any and all items provided by them would be subject to redaction.   Due to the fact the State Attorney's Office was not present during the initial interview of the **FBI Agent**, the request was made to have the **FBI Agent's** sworn statement, listed as attachment ten (10), made public. The following excerpt is in response to the request.

> *"...With regard to the use of the FBI Agent's Signed Sworn Statement dated May 28, 2013, regarding the shooting of Ibragim Todashev, the FBI requests certain sensitive information be redacted before inclusion in your report or release to the public. Enclosed please find the Signed Sworn Statement with the portions highlighted which the FBI request be redacted.  It is our understanding that your office may defer the redaction for our review; however, for your later benefit, we highlighted the requested redactions. As you consider the redactions, please keep in mind the FBI is greatly concerned with the safety and well-being of the law enforcement personnel who participated in the interviews of Mr. Todashev and the need to maintain the integrity of ongoing investigations.  Specifically, the FBI requests the following types of information be protected from disclosure to the public ..."* [**Emphasis added**]

On January 3, 2014, an independent canvass of **Mr. Todashev's** neighborhood was initiated by the State Attorney's Office.  With the assistance of Investigator Nelson Espinosa, who speaks the Spanish language fluently, attempts were made to contact any potential witnesses at numerous addresses surrounding 6022 Peregrine Avenue.   Business cards were left on the doors of addresses visited when contact was unable to be made with anyone.   The following are individual contacts made on this date:

#1.)  At approximately 13:40 hours we made contact with Mr. Jaimen Marin-Montes at his home address, 5943 Windhover Drive.   Investigator Espinosa spoke with Mr. Marin-Montes, due to the fact he spoke Spanish.  He advised, on May 22, 2013, at approximately 02:00 hours, he was in bed when thought he heard voices coming from across the lake.   Investigator Espinosa authored a sworn handwritten statement[82] on behalf of Mr. Marin-Montes at his request.  The following excerpts are taken from the document:

---

[81] The aforementioned electronic mail is memorialized as attachment number 90, page 398.
[82] The aforementioned sworn statement is memorialized as attachment number 98, pages 408-409.

D012934

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

> *"I went back to bed and at about 6 AM I woke up and noticed the police at the building behind my house.  ...  I have seen the male* [and] *female that lived in the apartment behind me on several occasions. ... At no point did I hear gun shots or anything that sounded like gun shots.  ..."*

Two photographs were taken of 6022 Peregrine Avenue, from the vantage point of Mr. Marin-Montes' back porch.  The photographs[83] taken at the time are as follows:




After numerous attempts to make contact with residents in the area of Windhover Drive were conducted, Investigator Espinosa and I walked towards the area of 6022 Peregrine Avenue.  The following photographs[84] were taken from the sidewalk located behind 6022 Peregrine Avenue.  The images depict the distance between Mr. Marin-Montes's address and the general area surrounding 6022 Peregrine Avenue.




---

[83] The color photographs are memorialized as attachment number 114, pages 482- 497
[84] The color photographs are memorialized as attachment number 114, pages 481 & 492.

D012935

The following three (3) photographs[85] were taken of the back sliding glass door, the front door and the walkway to the address of 6022 Peregrine Avenue.

  

#2.) Contact was made with Mr. Syed Salauddin at his home address of 6014 Peregrine Avenue. Mr. Salauddin explained while he and his family were watching television on May 22, 2013, he heard what he believed was a single "shot." He recalled this occurred around "mid-night." He explained he left for a business trip the following morning, at which time he observed the presence of law enforcement officers. Mrs. Salauddin came to the door as we were speaking with Mr. Salauddin. She provided the same account as Mr. Salauddin. They explained they had provided the information to the FBI as well as an unidentified private investigator. They refused to provide sworn written statements.

#3.) Contact was made with Mr. Diego Farah in front of his home address of 6016 Peregrine Avenue. He authored a sworn handwritten statement[86] after verbally providing his recollection of observations he made on May 22, 2013. He arrived home from work at approximately 22:30 hours. He observed a white male in a suit standing alone near the large tree, which was near the sidewalk leading to 6022 Peregrine Avenue. He recalled, "*The gentleman looked to be a detective.*" Mr. Farah was in his home for fifteen (15) to twenty (20) minutes prior to leaving for the night. The next morning, Mr. Farah observed media coverage of the incident and later observed media outlets showing a photograph of **Mr. Todashev**. He indicated the image of **Mr. Todashev** was the same man who he believed lived in the apartment.

#4.) Contact was made with Mr. Jason Hays in front of his home address of 6032 Peregrine Avenue. Mr. Hays would see **Mr. Todashev** walking around the parking lot frequently. He could not recalled seeing **Mr. Todashev** utilizing crutches for any period of time. Mr. Hays explained, **Mr. Todashev** walked in the area frequently. He later perceived this activity to be an effort to rehabilitate an injury. Mr. Hays could not provide a specific timeline; however, he did recall **Mr. Todashev** was walking without crutches for quite some time prior to his death.

---

[85] The color photograph is memorialized as attachment number 114, pages 489-491.
[86] The aforementioned sworn statement is memorialized as attachment number 99, page 410.

D012936

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#5.)   Contact was made with Mr. Richard Murphy at the clubhouse of the Windhover Condominiums.  Mr. Murphy, the Association Manager, had approximately ten (10) contacts with **Mr. Todashev**.  He reported **Mr. Todashev** was the resident of 6022 Peregrine Avenue for approximately six (6) or seven (7) months and he would visit the office for the purpose of paying the homeowner dues on behalf of the condominium owner.   Prior to providing a handwritten sworn statement, Mr. Murphy expressed how impressed he was regarding **Mr. Todashev's** level of physical fitness.  He stated, he observed **Mr. Todashev** "*shadow boxing*" at the clubhouse pool "*five (5) or six (6) times before his knee surgery."*   He stated, "*I would not want to be caught in a dark alley with him, I'll tell you that*".  Mr. Murphy explained he was contacted by the FBI, as they conducted surveillance in the area of **Mr. Todashev's** apartment.   In Mr. Murphy's sworn statement[87] he reported, "*I was approached by 2 agents of FBI about 2 wks* [weeks] *before Mr. Todashev's death.   They had questions about* [the] *resident of 6022 Peregrine.   I shared* [the] *story about his shadow boxing and physical condition.   I did not mention the knee surgery to the FBI*."   Mr. Murphy identified the location near the pool where **Mr. Todashev** would shadow box. The following four (4) color photographs[88] were taken from inside the clubhouse.









---

[87] The aforementioned sworn statement is memorialized as attachment number 100, page 411.
[88] The color photographs are memorialized as attachment number 114, pages 484 & 487.

D012937

A request was made of Orlando Police Department Homicide Sergeant Esan to determine if any telephone calls for police service were made from area of the Windhover Condominiums Community on May 22, 2013. Sergeant Esan reported his inquiry revealed only one call related to the incident was received by the Orlando Police Department on May 22, 2013. Sergeant Esan provided a copy of the recorded telephone call[89], which was made to the Orlando Police Department Communication Center by the **TF Officer** at 12:05 a.m. on May 22, 2013. The **TF Officer** identified himself by name to the call taker. During the telephone call, the **TF Officer** stated, "*...I'm at six zero two-two Peregrine Avenue ... I need OFD* [Orlando Fire Department] *we have ah, FBI agent who has been stabbed ah, or hit in the head with ah, ... with a blunt object. And* **we have a suspect down on the ground**, *shots fired. ... The suspect is down on the ground.* **We got an FBI guy bleeding in the head**... *We're out at sixty twenty-two Peregrine Avenue. ... Everything's secured. ... I'm gonna need OFD... Like I said,* **I gotta FBI agent who's been hit in the head ah, with a blunt object and I have a suspect down on the ground who's been shot multiple times**..." [**Emphasis added**]

> **Note:** According to the information provided by the FBI and confirmed during additional sworn interviews, **Trooper One** sent a text message to the **FBI Agent** and **Trooper Two** informing them to, *"Be on guard, He is in vulnerable position to do something bad. Be on guard now. I see him looking around at times."* This occurred at 12:03 a.m. and the **TF Officer** called the Orlando Police Department requesting assistance at 12:05 a.m. The telephone call was approximately two minutes after the text message was sent by **Trooper One**.

On January 6, 2014, Investigator Espinosa and I made contact with witness Kevin Wojteczko. He explained his recollection of the events on May 21 through 22, 2013 by stating, "*Ah, I work the night shift, as I was doing at that time for my job, ah, which I normally work around 10pm so* **I get home around 10:30 to 11:00**. *I walk in. I, I notice an apartment/condo across the way that normally, the blinds are completely shut with no lights, ah, almost feels like there is no one living there. Ah, this instance in this day, ah,* **all the blinds were open**, *ah many,* **a lot of lights were on** *and ah,* **I noticed several gentleman**. *They were ah, walking around. Ah, all the gentleman were ah silhouetted so I couldn't get very detailed in terms of their race, ah, what type of clothing they were wearing, um, but in terms of their body style, they definitely appeared to be male. Ah, so I thought that was a little unusual, ah, seeing, ah, people in this apartment that I've never noticed in the previous 2 years. Um, after a while, after I got changed, um, sat down and relaxed in the recliner, watched TV, um, which ah, put me out of the sight of the apartment. Ah, I would say between 11:30pm and 12 midnight, ah, I heard multiple sounds, which ah, at first did sound like gunshots, but also kind of sounded like construction noise, almost like a hammer ah, hammering aluminum would be my best description. And then um, I heard the, the sounds were* **4 repetitive soun-ah, knocks or shots and then 3 consecutive ones after that**, *after about a two second pause. Ah, I looked over um, where I could see the view of the apartment, across the lake and noticed that the ah,* **gentlemen in that room, ah, were moving around**, *not really noticing what they were doing, some were bending down,* **some were just kind of walking around the room**. *Ah, at that time, my wife was woken up by the noise and she ah, asked what was going on. I just told her, I think they are doing construction across the way and*

---

[89] The aforementioned telephone call is memorialized as attachment number 97, page 407.

D012938

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

*ah, had her go back to bed and within about five minutes or so, ah, pretty much all of Orlando Police Department was here.  And ah, so that confirmed my, my worst fears that someone got shot…*"  [**Emphasis added**]

We discussed the point in time when Mr. Wojteczko first arrived home on May 21, 2013.  I asked him, "*Now, can you say definitively how many figures you saw moving around inside that* [apartment]?"  He replied, "*I would definitely say at least four.*"  The following four (4) color photographs[90] were taken from vantage point of inside Mr. Wojteczko's second floor apartment.







The rear sliding glass door of the address 6022 Peregrine Avenue can clearly be observed in the background of each of the four (4) color photographs shown above.

---

[90] The color photographs are memorialized as attachment number 114, pages 482 & 497.

D012939

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Mr. Wojteczko explained he could see the following, "*Ah, I couldn't really see any furniture, I mean, from this angle, **you can see a staircase**.  It is like a loft, um, condo, so you can see a staircase behind him and ah, all the light was coming from behind the, the subjects or behind the people in the room.  ... Um, **you can see a little bit of maybe some cabinets of what may be a kitchen, um, but I'm not a hundred percent sure on that**.  ... Ah, there was just movement in um, with my first guess of being ah, maybe construction, maybe they were just moving stuff around. Maybe they were actually hammering something.  Um, but there wasn't, wasn't anything frantic. It didn't seem like a lot of people like running around or waving hands in the air.  It just seemed ah…*"  [**Emphasis added**]

When asked if he was certain he heard four (4) gunshots followed by three (3) gunshots he stated, "*Absolutely, Yes. ... I, at the time I was pretty solid on, set on 4 and 3.  ... I remember at the time, I remember just 4 and 3 and I remembered for several days afterwards thinking it's 4 and 3, 4 and 3.*"

> **Note**:  Mr. Wojteczko's recollection of the order in which he reportedly heard the gunfire was the inverse of the recollection provided by the **TF Officer**.  This type of discrepancy commonly occurs when collecting statements from witnesses. Mr. Wojteczko's account supports the information provided by the law enforcement officers regarding two separate volleys of gunshots being fired during the incident.

Contact was made with Mrs. Xiomara Molina at her home address of 6024 Peregrine Avenue. Investigator Espinosa spoke with Mrs. Molina, due to the fact she only spoke Spanish.  Mrs. Molina advised she heard two (2) gunshots on May 22, 2013.  Investigator Espinosa authored a sworn handwritten statement[91] on behalf of Mrs. Molina at her request.  The following excerpts are taken from the document:

> "*…I turned my radio off to go to bed and immediately I heard two gun shots coming from the apartment next door.  I then heard a noise that sounded like something was falling. ... I then looked out of my upstairs window and saw a white man wearing a grey undershirt on the phone with someone. The man had a look of concern on his face.  ... After the uniform officers arrived, I realized the man with the gray undershirt was a police officer.  ... The man in the gray undershirt went back inside with the police officers and paramedics.*"

Contact was once again made with Mr. Jason Hays in front of his home address of 6032 Peregrine Avenue.  On this date Mr. Hays authored a sworn handwritten statement[92] and the following excerpts are taken from the document:

---

[91] The aforementioned sworn statement is memorialized as attachment number 102, pages 413-414.
[92] The aforementioned sworn statement is memorialized as attachment number 101, page 412.

D012940

*"…I saw the individual in question [**Mr. Todashev**] most days walking from his condo to the end of the parking lot. He had an apparent limp and after seeing the news broadcasts about the shooting where the media stated he had had a knee surgery. … **He was wearing a cast of some sort for his apparent rehab over a period of a couple months**. I seem to recall that **he eventually was walking without a cast. I do not recall him ever using a cane or crutches to walk.**"* [**Emphasis added**]

Mr. Hays explained he was previously contacted by a private investigator, who also asked questions in regards to **Mr. Todashev**. Mr. Hays provided the business card[93] of *The Busquest Group* which was given to him at the time. The card displayed the name *Ed Busquest Lead Investigator* and indicated Mr. Busquest was a private investigator from Tampa, Florida.

**Note:** As of the date of this report, no information has been provided to the State Attorney's Office by Mr. Busquest or by the Busquest Group.

On January 7, 2014, Investigator Espinosa obtained the audio recording of the Orange County Sheriff's Office police radio transmissions[94] and *Calls-For-Service* sheets[95] related to the takedown and arrest of **Mr. Todashev** on May 4, 2013. Color copies of the crime scene photographs[96] were also obtained. Each of these case related attachments were thoroughly reviewed. During the police radio transmissions an unidentified law enforcement officer stated, *"So far no weapons involved… ah… other than a fist… ah… the one victim is down. He's bleeding pretty good here though."* The following radio transmission by another unidentified law enforcement office is, *"This guy's a cage fighter."*

On this same date, at approximately 1411 hours, a sworn recorded interview was collected from Orange County Deputy Sheriff Anthony Riccaboni at the State Attorney's Office. During the course of the interview, Deputy Riccaboni provided the following information regarding his involvement and independent observations during the arrest of **Mr. Todashev** on May 4, 2013.

Deputy Riccaboni explained he has been a sworn law enforcement officer for approximately twenty (20) years. When asked what additional types of training he has participated in, he explained by stating, *"Um, prior to coming to work for the Sheriff's Office, I practiced Ty Kwon Do, locally. Um, I received my black belt from them in 1984. Um, I had quit training with them, while I was in high school. I did other things…."* [**Emphasis added**]

Regarding Deputy Riccaboni's contact with **Mr. Todashev** on May 4, 2013, he recalled, *"…I got out of my vehicle, challenged him with my firearm, and ah, he was compliant, hands went up. I could see him from basically, like the chest, shoulder area, up and looking at his face, I recognized the, the shape of his ears as to be a mixed martial arts cage fighter. And I yelled out to Deputy Clifton and Brent Bagshaw, who was just coming up and getting out of his vehicle, cause they were gonna go to his driver's door and get him out, um, not to snatch his driver's door open and try and go hands on with him, cause I figured it was going to end badly. … I*

---

[93] The aforementioned business card is memorialized as attachment number 116, page 499.
[94] The aforementioned police radio transmissions are memorialized as attachment number 103, page 415.
[95] The aforementioned call sheets are memorialized as attachment number 104, pages 416-418.
[96] The aforementioned photographs are memorialized as attachment number 105, pages 419-427.

D012941

*kept him at gunpoint. They were able to get his driver's door open. We basically made him crawl out, kind of go out to his belly before we even went hands on and I, **I told him if his tries to, I think I used the term, if he's tries to fight us, I was gonna shoot him**.*" I asked, "*Is that something you normally would say to someone on a... on a vehicle exit?*" Deputy Ricconi replied, "*No. ... From the experience I have, **it only takes a split second for those guys to get ahold of you and they're hurting you bad**. ... I mean, I'm a huge follower of the UFC* (Ultimate Fighting Championship). *I watch a lot of the smaller events. I've been to a couple live events out at UCF and Lakeland...*" [**Emphasis added**]

Investigator Espinosa asked, "*I'm not familiar with the cage fighter. I, I've seen commercials and stuff, but I've never sat and watched 'em. You, you're describing their ears a certain way. I'd like for you, if you could, if you could tell me what, what you see, what, you know, what do you see, what, what you saw that day and what's typical of these fighters and then how it gets that way.*"

Deputy Ricconi responded, "*If you can picture, um, what cauliflower looks like, or broccoli, and if you put that underneath somebody's skin, that's what their ears look like. They're real thick, they're puffy, they're hard. Um, it gets that way from different techniques, different pressure, um, when you're doing these techniques and I train probably three months straight and I haven't gone in four weeks and my ears were sore, but they never got puffy. My ears are not changed shape at all from my training, but I wasn't going in there, like a high level fighter. When you start talking, just the guy that's practicing, like myself, you normally aren't gonna get that kind of ears. ... When you are a high level fighter, or you're in there, I guess I would describe you as a, a gym rat. You're in there for every class, maybe doing 2 a days, 2 classes a day, things like that, your ears don't have time to heal and not get big and...*"

I asked Deputy Ricconi, "*So prior to seeing this individual* [**Mr. Todashev**] *on that date, how many other people in the past do you think you've seen with similar ears that, that you had exposure to?*" and he replied, "*Hundreds. I mean, I've watched, I've followed the UFC since the very beginning when they wouldn't even do it in the United States because it was too barbaric....*"

Deputy Ricconi had extensive exposure to individuals with similar identifiable physical characteristics, such as those displayed by **Mr. Todashev** on May 4, 2013. Based on Deputy Ricconi's reported training and life experiences, coupled with his observations at the time of contact, he immediately assessed **Mr. Todashev** as being an above average threat to the safety of the deputies on scene.

Investigator Espinosa made contact with the two individuals battered by Mr. Todashev on May 4, 2013 and the one individual battered by him on July 7, 2012. For addition information regarding the follow up investigation and secondary contacts with victims of the crimes reported in Orange and Osceola Counties see Investigator Espinosa's supplemental report[97].

---

[97] The aforementioned sworn statement is memorialized as attachment number 111, pages 458-463.

D012942

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On January 21, 2014, I reviewed twelve case related interviews located by searching several web sites. This review was conducted in an effort to locate any additional information which may have been provided to the media by **Mr. Todashev's** friends and/or family members. As of the date of this report, the attorneys representing **Mr. Todashev's** family have not provided statements believed to be in their possession. The following twelve (12) links were visited and the videos were viewed in their entirety.

#1.)  Boston Bombing Was a False Flag More Proof
      http://www.youtube.com/watch?v=xXb3j-Xoy7A

        **Note:**   During this *Fox 35 News* interview of "*Khusen Taramov*" [sic], Mr. Taramov claims to have been a friend of **Mr. Todashev**. He informed **Mr. Todashev** was followed and questioned by the FBI.

#2.)  Friend of Todashev Talks About FBI Interviews
      http://www.youtube.com/watch?v=jKtk9c6iwhw

        **Note:**  This is an interview of Khusen Taramov by the Boston Globe. During this interview, Mr. Taramov reported **Mr. Todashev** had been told by the FBI that this would be that last time they would need to interview him. Mr. Taramov stated he was questioned by the FBI, for a period of three and a half hours, as other investigators interviewed **Mr. Todashev**. Based on the information being provided, Mr. Taramov was obviously the individual who remained outside of the apartment with the **TF Officer** during the interview on May 21, 2013.

#3.)  Gym Owner Talks Tsarnsev, Todashev
      http://youtube.com/watch?v=G2pA4MiNSqE

        **Note:**   This is a *WGBH* interview with Mr. John Allen, a gym owner who reportedly provided MMA type training to **Mr. Todashev**. Mr. Allen explained he was introduced to **Mr. Todashev** by Tamerlan Tsarnaev, one of the Boston Marathon bombing suspects. During this lengthy interview, Mr. Allen detailed his knowledge of the social links which existed between Tamerlan Tsarnaev, **Mr. Todashev** and one of the victims of the triple homicide being investigated. Mr. Allen explained, **Mr. Todashev** fought for his gym in a professional manner on eight (8) or nine (9) occasions. Mr. Allen expressed he was responsible for initially bringing **Mr. Todashev** to the attention of the FBI.

#4.)  Ibragim Todashev Execution – Q&A with Family, Friends and Law
      http://www.youtube.com/watch?v=1HAa2b-MQm8

        **Note:** This is a press conference. During the course of the press conference, the following claims were made and questions were asked by **Mr. Todashev's** friends and family:

D012943

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

-The only weapon inside the apartment was a model sword.
-The sword was a decorative piece.
-**Mr. Todashev** and Tamerlan Tsarnaev were not friends.
-They did attend the same gym.
-They did come from the same area.
-**Mr. Todashev** was interviewed for five (5) hours.
-Khusen Taramov was not allowed to go inside the apartment.
-**Mr. Todashev** was shot three (3) or four (4) times in the heart.
-**Mr. Todashev** was shot one (1) time in the head.
-Khusen Taramov was not allowed to remain in the area.
-**TF Officer** informed Mr. Taramov he felt **Mr. Todashev** was innocent.
-**TF Officer** informed Mr. Taramov the case was going to be closed.
-**TF Officer** requested Mr. Taramov trust him.
-**Mr. Todashev** was nervous prior to meeting with the FBI.
-**Mr. Todashev** asked the FBI if they could drive to his address.
-Why wasn't the interview process recorded?
-There were four (4) agents, three (3) from Boston.
-They, the FBI, were always following **Mr. Todashev**.
-They have proof **Mr. Todashev** was in Atlanta during the triple murders.
-FBI sources confirm **Mr. Todashev** was unarmed.
-**Mr. Todashev's** cellular numbers may have been in Tsarnaev's phone.
-Tamerlan Tsarnaev called **Mr. Todashev** after his knee surgery.
-Based on independent review, they feel **Mr. Todashev** was unarmed.
-They question the professionalism of the officers involved.
-**Mr. Todashev** was unarmed when he was shot seven (7) times.

#5.) Ibragim Todashev, Questioned In Connection With Marathon Bombing
   http://www.youtube.com/watch?v=qd0X3WESMPs

   **Note:** This is an interview conducted of "*Khusn Taramiv*" [sic] by *WESH TV*. Mr. Taramov, who appears to be the same individual referred to "*Khusen Taramov*" in previously mentioned interviews, informed **Mr. Todashev** provided him his father's telephone number prior to the interview conducted by law enforcement. **Mr. Todashev** reportedly felt as if he was being set up. No specific details regarding this claim were noted.

#6.) Interview – Friends Says Todashev Knew Boston Bombing Suspect
   http://www.youtube.com/watch?v=MTC9J9qcI5k

   **Note:** This is an interview conducted of "*Khusn Taramiv*" [sic] by *WESH TV* on what appears to be the morning of May 22, 2013. Mr. Taramov informed, **Mr. Todashev** knew Tamerlan Tsarnaev while they were in Boston. He explained **Mr. Todashev** and Tamerlan Tsarnaev were not close friends. He recalled **Mr. Todashev** received a telephone call from Tamerlan Tsarnaev approximately one (1) month prior to the incident.

D012944

Mr. Taramov reported he was interviewed for approximately three (3) hours the night before as **Mr. Todashev** was being interviewed by three (3) agents. He expressed **Mr. Todashev** had no weapons. He informed **Mr. Todashev** was an MMA fighter.

#7.) Khusen Taramov Talks About Deceased Friend Ibragim Todashev
http://www.youtube.com/watch?v=zNI4arqVsTQ

   **Note:** This is an interview conducted of "*Khusn Taramov*" while a microphone displaying *Local 6 WKMG* can be seen. Mr. Taramov explained **Mr. Todashev** was contacted by the **TF Officer** and informed of three (3) agents from Boston who wished to speak with him. Mr. Taramov expressed **Mr. Todashev** initially did not want to meet with the agents; however, he decided to do so.

#8.) The Unexplained FBI Assassination of Ibragim Todashev
http://www.youtube.com/watch?v=uIszGEUx7N0

   **Note:** This is an interview of **Mr. Todashev's** wife Reniya Manukyan, who apparently was in *Grozny, Russia* at the time this interview. During the course of this interview, the following information was provided to the reporter:

   -**Mr. Todashev** and Tamerlan Tsarnaev trained at the same gym.
   -**Mr. Todashev** had a knee surgery at the end of March, 2013.
   -**Mr. Todashev** was limping at the time of his death.
   -Tamerlan Tsarnaev called **Mr. Todashev** after his knee surgery.
   -They had a sword inside of their apartment.
   -**Mr. Todashev** was limping and in pain due to his knee surgery.
   -**Mr. Todashev** had a bruised eye.
   -They punched him before he was shot.
   -We have a private investigator.
   -The FBI is holding back the release of the autopsy report.

#9.) Todashev Family Press Conference in U.S. Demanding Answers
http://www.youtube.com/watch?v=1pHiLQNgY8k

   **Note:** This is a lengthy press conference held by the attorneys representing **Mr. Todashev's** family. **Mr. Todashev's** father was present during this event.

#10.) WFTV – Wife Interview
http://www.wftv.com/videos/news/ibragim-todashevs-wife-talks-to-wftv-about/v3bFG/

   **Note:** This is an interview of Khusn Taramov conducted by WFTV Channel 9. During this story it was reported Mr. Taramov informed the media **Mr. Todashev** had never mentioned being questioned about the triple murders.

D012945

#11.)  WFTV – Friend Speaks Out
http://www.wftv.com/videos/news/friends-of-fbi-suspect-speak-out/v3bPZ/

#12.)  WKMG – Friend Speaks Out
http://www.clickorlando.com/news/raw-video-suspects-friend-speaks-out/-/1637132/20254702/-/600rq1z/-/index.html

**Note:** These news stories, #11 and #12, containing similar information as to what had previously been discovered.

On January 22, 2014, I reviewed each of the video recordings collected by **Trooper One** during the course of the interview with **Mr. Todashev** on May 21, 2013 for a third time. The recordings were also viewed by Chief Assistant State Attorney Linda Drane Burdick, Chief Assistant/Executive Director Richard Wallsh and Investigator Espinosa for the first time during this investigation. At the conclusion of the review, everyone in attendance agreed the manner in which the interviewing officers communicated with **Mr. Todashev** was not coercive. During this review, we collectively identified how well **Mr. Todashev** appeared to be walking as he moved about the room. After observing the manner in which **Trooper Two** advised **Mr. Todashev** of his *Miranda* rights, the group did not observe any violation of his legal rights.

On January 24, 2014, at approximately 09:30 hours, a sworn recorded statement was collected from Mr. John Allen telephonically. Mr. Allen, the owner of the *Wai Kru Gym* in Boston, explained he instructs, "…*Wrestling, Jujitsu, Muay Thai, and Mixed Martial Arts*…" and has done so, "…*since 2006.*" Mr. Allen has been involved in these areas of athletics for approximately nineteen (19) years. Mr. Allen was asked how he came to know **Mr. Todashev** and he stated, "…*Ibragim came into the gym. He was, at the time, wrestling with the Harvard, ah Harvard wrestling team, ah, not as a Harvard student, you know when the official practice is over, they open the wrestling room to like, good wrestlers and they'll stick around.* …"

He continued, "…*he* [**Mr. Todashev**] *hadn't been in the United States long and he, you know, he was looking to do Mixed Martial Arts or MMA cage fighting. Um, he had some experience with ah, you know, fighting back in, I guess he was from Chechnya, so, and that would be um, you know, he, he also wrestled extensively and did Sambo, which is kind of a, is a Russian form of Mixed Martial Arts. … I think it was, it was actually Tamerlan. He met Tamerlan ah, one weekend and told him that he was looking to fight. Tamerlan told him that he was boxing out of a MMA gym. … And um, he brought Ibragim in and Ibragim ah, you know, he trained for the day and ah, you know, expressed interest. He wanted to fight. He wanted to ah, fight as much as possible, as often as possible. He wanted to be a professional fighter and that's how I met him.*" [**Emphasis added**]

D012946

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

Mr. Allen was asked if he could provide any document related to Mr. Todashev's training and he explained, "*Um, sure. What I'd be able to find, I mean the type of documents I'd have would be an insurance waiver from him. Um, **there are all sorts of licensing documents with the state**, ah, **because he competed in amateur Mixed Martial Arts** and then eventually he switched to **professional**. And I think that actually, that would be, **those documents would be out of Florida or Georgia**. But all of his amateur, um, you know, which includes his medicals, blood work, you know, whatever he needed to fill out with the state, he definitely filled out. ... **Because um, as a professional athlete, as a professional fighter, you'd need to go through the state commission in order to compete and he definitely competed in a professional bout, so he definitely went through that process.**" [**Emphasis added**]

Mr. Allen provided his impression of **Mr. Todashev's** abilities by stating, "*He's very flexible, very um, **a very high level of skill**. He really understood a lot of moves and knew how to do them. Um, it's, it's (inaudible) for a European style. They tend to know how to do everything very well, very technical, where as American wrestlers seem to focus on a few techniques and focus on strength and speed, they're, so the Americans tend to be a lot more one dyna-dyna-ah, one dimensional, whereas **Ibragim really ah, being very technical and very flexible. He really understood the wide variety of wrestling techniques**.*"  [**Emphasis added**]

According to Mr. Allen, **Mr. Todashev** fought several professional matches on behalf of his gym. He reported, "*Ah, what mean, for my gym. He fought for Wai Kru. He was a Wai Kru fighter.*" In Mr. Allen's opinion, "*…I mean one things for sure, he took it very, very serious, you know? I'm ah, you know, you could, **you could beat this kid to within an inch of his life and he would keep coming**. He really, **he really had a, a deep routed desire and necessity to win**, you know. And ah, like you said, his nose, I mean, his nose, when I met him, his nose was fairly straight. You know, (laughs) and, I, his nose got broken several times, but I mean, and a lot of, some fight*[ers], *especially amateur fighters, a lot of them would stop if that happened, you know, but he, he always continued. **He always tried his hardest to win.**" [**Emphasis added**]

Mr. Allen described a double leg taken down, "*…The best way to understand a double leg take down, I think, <u>in layman's terms is it's very similar to a football tackle</u>. What you're, the person's doing is they're, **they're lowering their center of gravity and essentially tackling by grabbing both of the legs and driving through their opponent**.*"  [**Emphasis added**]

Mr. Allen described **Mr. Todashev's** proficiency while taking down his opponents by informing, "*…single legs and double legs, um, he was very good at shooting. **He did a lot of practice on his penetration step**, duck walk, and what these terms are, are, you know shooting in wrestling is one of the most unnatural things you'd ever do in your life. It, it's like very counter intuitive to walking so, um, people practice it a lot, you know, like his front knee touches the ground, which brings his back leg up behind him and this enables you to get underneath someone's center of gravity. If **you're attacking their legs, it gives you control over them**. So it's a very awkward motion that he, **he practiced a lot. I mean I witnessed him do it for hours and hours and hours.**" [**Emphasis added**]

D012947

INVESTIGATION REPORT
CASE NUMBER: **2013-IN-0063**

**Note:** This information was consistent with the description of **Mr. Todashev's** actions, after being shot by the first volley of gunfire, provided by **Trooper One** during his sworn recorded interview. On September 6, 2013, **Trooper One** explained, "*The way I can describe it is that when he went down and immediately sprung back up, **he was coming toward us** and um, how do I say, um, not run, **not running straight** at ah, more, **more of a coming up at an angle. Coming up at an angle toward us.** ... That would be a, that would be a, it was, it was not a straight up thing, **it was coming in at an angle and down and up**.*"   [**Emphasis added**]

On January 23, 2014, a letter mailed by the U.S. Department of Justice and the Federal Bureau of Investigation was received at the State Attorney's Office. The envelope contained the FBI responses regarding outstanding requests for information. Due to the fact the State Attorney's Office was unable to collect a sworn recorded statement from the **FBI Agent**; a formal request was made to allow the release of his sworn statement collected by the FBI on May 22, 2013. The FBI rendered a final decision allowing the State Attorney's Office to release a majority of the statement. Based on the information discovered while reviewing the items provided by the FBI, coupled with the facts gleaned during the course of the State Attorney's investigation, it was determined the **FBI Agent's** initial sworn statement was sufficient to render an opinion. Therefore, there is no need to re-interview the **FBI Agent** at this time.

> **Note:** The **FBI Agent** provided two sworn statements, listed as attachments ten (10) and seventy (70); both have previously been mentioned on report pages twenty-five (25) through twenty-eight (28), and report pages seventy-one (71) through seventy-four (74).

On January 24, 2014, contact was made with the *Florida Boxing Commission*. According to the information provided via electronic mail, **Mr. Todashev** was issued a *Federal Identification Card* by the *Florida State Boxing Commission*. The photo identification card[98] displayed **Mr. Todashev's** *Federal Professional Fighter Registration* number, *FED# 129-225*.



On January 24, 2014, contact was made with the *Commonwealth of Massachusetts Department of Public Safety*. A public records request was made for documents related to **Mr. Todashev's** State of Massachusetts license(s).

On February 7, 2014, a letter[99] dated *January 29, 2014* was received from *The Commonwealth of Massachusetts Department of Public Safety*. The documents attached to the letter were photocopies of the *Application for Fighter's License,* marked *Amateur* and *MMA*, filed by ***Ibragim Todashev*** on *7/15/2011*.

---

[98] The identification card and related documents are memorialized as attachment number 117, pages 500-502.
[99] The letter and attached documents are memorialized as attachment number 118, pages 503-508.

D012948

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On February 13, 2014, a letter[100] dated *February 7, 2014* was received from *The Commonwealth of Massachusetts Department of Public Safety*. The documents attached to the letter were photocopies of **Mr. Todashev's** official Massachusetts *State Athletic Commission MMA Amateur* license, number *A3105*.



On February 10, 2014, Mr. Wallsh and I visited the FBI Office in Orlando and met with ASAC ▮▮▮▮▮▮▮▮ and SSA ▮▮▮▮▮▮▮▮. At the conclusion of this meeting, all requests made of the FBI by the State Attorney's Office were satisfied.

On February 19, 2014, two letters[101] dated *January 30, 2014* were received from *The Department of Business and Professional Regulation* of Florida. The documents attached to the letters were photocopies of **Mr. Todashev's** official State of Florida *MMA Participant* license, number *PART4184*, and **Mr. Todashev's** *Federal Identification Card –MMA*, number *FED#-106-992*.

> **Note:** Within many of the above-mentioned documents and sworn recorded interviews, **Mr. Todashev** was described as being a Mixed Martial Arts fighter. These two licenses support the claims and confirm **Mr. Todashev** was in fact a licensed *MMA Participant*.

On February 26, 2014, a letter[102] mailed by the U.S. Department of Justice and the Federal Bureau of Investigation was received at the State Attorney's Office. The following excerpt is taken from the letter:

> "*Dear State Attorney Ashton,*
>
> *This letter is in response to a request from your office to use the FBI Agent's Signed Sworn Statement dated May 28, 2013, regarding the shooting of Ibrahim Todashev. The FBI requests certain sensitive information be redacted before inclusion in your report or release to the public. Enclosed please find the redacted Signed Sworn Statement which replaces the one previously provided on January 16, 2014. The enclosed Signed Sworn Statement has the portions highlighted which the FBI and Department of Justice ("DOJ") requests be redacted. It is our understanding your office may defer the redaction for our review; however, for your later benefit, we highlighted the requested redactions.*"

---

[100] The letter and attached documents are memorialized as attachment number 119, pages 509-512.
[101] The letter and attached documents are memorialized as attachment number 120, pages 513-517.
[102] The letter and attached documents are memorialized as attachment number 121, pages 518-529.

D012949

INVESTIGATION REPORT
CASE NUMBER: 2013-IN-0063

## CONCLUSION:

This investigation was conducted in order to determine if the **FBI Agent** violated any Florida State Statutes, pertaining to a law enforcement officer's use of deadly force within the State of Florida.

The State Attorney's Office of the Ninth Judicial Circuit of Florida has sixteen (16) sworn law enforcement officers. The Orange County Sheriff's Office Training Division provides State Attorney's Office Investigators with up-to-date training regarding many high liability areas, such as defensive tactics and use of force techniques. Each State Attorney's Office Investigator is required to have a clear understanding of the curriculum pertaining to the Orange County Sheriff's Office *Use of Force Matrix*, and apply the same if and when faced with a defensive tactics use of force scenario; therefore, this *Use of Force Matrix* is being referenced in this review.

The following information is taken from the *Use of Force Matrix*[103] training provided by the Orange County Sheriff's Office. This matrix provides an outline for sworn law enforcement officers to consider while training for, and when placed in, a situation requiring a defensive tactics use of force. During my nineteen (19) years of training and experience as a sworn law enforcement officer, fifteen (15) years of which were as a sworn employee of the Orange County Sheriff's Office, I have become familiar with this *Use of Force Matrix*. The following excerpts are applicable to this review:

> *Subject* Resistance Levels (x6) …
>
> #6.) *Aggravated Physical Resistance – great bodily harm: A subject makes overt, hostile attacking movements with or without a weapon with the apparent ability to cause death or great bodily harm to the deputy* [law enforcement officer] *or others.*
>
> > **Findings:** Based on the sworn testimony of the **FBI Agent** and **Trooper One**, **Mr. Todashev**, a trained Mixed Martial Arts fighter, struck the **FBI Agent** in the head with a **coffee table** and then armed himself near the front door of the address. As he then re-engaged the **FBI Agent** and **Trooper One**, they both perceived **Mr. Todashev's** movements towards them as being potentially life threatening.
>
> *Officer* Response Levels (x6) …
>
> #6.) *Deadly Force – high potential for great bodily harm or death. Techniques that may result in death, great bodily injury, permanent disability or permanent disfigurement, such as impact weapon strikes to the head, or use of firearms as defined in F.S.S. 776.06. Deadly force techniques are a last resort.*

---

[103] The aforementioned document is memorialized as attachment number 94, pages 401-402.

D012950

**Findings:**  Based on the sworn testimony of the **FBI Agent** and **Trooper One**, the **FBI Agent** was struck in the head by the **coffee table** thrown by **Mr. Todashev** which resulted in a *laceration* to the back of the **FBI Agent's** head. **Mr. Todashev** then armed himself with a **red broom handle**.  **Mr. Todashev** then charged towards the officers.  The **FBI Agent** engaged the impending threat twice, by discharging his issued handgun a total of seven (7) times during two volleys of gunfire.

*Additional factors* *that must be considered when making use of force decisions include:*

*Subject Factors –*

1.  ***Seriousness of the crime committed by the subject****.*

    **Findings:**  Based on the sworn testimony of the law enforcement officers involved and the physical evidence reviewed, law enforcement's contact with **Mr. Todashev** was initially based on his association with the Boston Marathon bombing suspect Tamerlan Tsarnaev, who was known to have criminally caused the deaths of others.  During the course of contact with **Mr. Todashev** on May 21, 2013, **Mr. Todashev confessed to his involvement** ▮▮▮▮▮▮ **of a triple homicide in Waltham, Massachusetts**.    While authoring a handwritten confession, **Mr. Todashev** struck the **FBI Agent** with a coffee table, committing an ***aggravated battery*** as defined by Florida State Statute 784.045.

2.  *Size, age and weight of subject.*  (See Medical Examiner's Report)

3.  *Apparent physical ability of the subject.*

    **Findings:**  Based on the sworn testimony of the law enforcement officers involved, they were all aware **Mr. Todashev** was a skilled Mixed Martial Arts (MMA) fighter prior to the interview.   During the course of this investigation it was discovered **Mr. Todashev** received licenses, related to his involvement in *MMA* style fighting, in both the State of Massachusetts and the State of Florida.

4.  *Number of suspects present who are involved, or who may become involved.*  (N/A)

5.  *Weapons possessed by or available to the subject.*

    **Findings:**  Based on the sworn testimony of the law enforcement officers involved, upon entry into **Mr. Todashev's** apartment, law enforcement officers observed what is described as being a, *"…Samurai type sword mounted on the wall near the entrance to the kitchen."*  (**Trooper One's** initial FBI interview document, Page 2).  Based on the sworn testimony of the **FBI Agent** and **Trooper One**, **Mr. Todashev** armed himself with a broomstick type pole and used it as a weapon as he re-engaged the **FBI Agent** and **Trooper One**.

D012951

6. *Known history of violence by the subject.*

> **Findings:**   Based upon multiple interviews and previously authored police reports, **Mr. Todashev** displayed a **propensity for violence**, which has been thoroughly documented in the attached law enforcement reports.   During the course of the interview **Mr. Todashev** confessed to his association with the Boston Marathon bombing suspect Tamerlan Tsarnaev, and **to his involvement ████████ of the triple homicide being investigated**.

7. *Presence of innocent or potential victims in the area.*  (N/A)

8. *Whether the subject can be recaptured at a later time.*  (N/A)

9. *Whether evidence is likely to be destroyed.* (N/A)

***Deputy*** [Law Enforcement Officer] ***Factors –***

1. *Size, physical ability, and defensive tactics expertise of the deputy.*

> **Findings:**  The **TF Officer** and **Troopers One** and **Two** were all experienced law enforcement officers with basic defensive tactics experience.   None of them possessed additional skills acquired by training in any form of martial arts.   None of them were certified law enforcement Defensive Tactics Instructors.   It is unknown if the **FBI Agent** has any form of a defensive tactics expertise.   Given the totality of the circumstances, any attempt(s) to take **Mr. Todashev** into custody by going hands on or attempting to utilize countermoves would have been impractical.   Such an attempt would have exposed the officers to greater risk of harm, and would have been inappropriate under the circumstances.

2. *Number of deputies present or available.*

> **Findings:**   Due to the initial threat assessment, the group of law enforcement officers involved collectively decided three (3) officers would be present during the interview of **Mr. Todashev**.   A deviation in the original plan occurred when **Trooper Two** exited the apartment, leaving the **FBI Agent** and **Trooper One** inside with **Mr. Todashev**.

3. *Immediate reaction in the case of sudden attack.*

> **Findings:**  Both the **FBI Agent** and **Trooper One** were taken off guard by **Mr. Todashev's** attack.   The **FBI Agent** was injured by the initial attack.   Both officers drew their issued firearms and the **FBI Agent** initiated verbal commands.

D012952

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

4. *Weapons or restraint devices available to the deputy.*

> **Findings:** The officers involved were working in a plainclothes capacity at the time of the incident. They were all armed with their agency issued firearms.

5. *Legal requirements.*

> **Findings:** This topic will be addressed in the letter authored by State Attorney Ashton.

6. *Environment.*

> **Findings:** This incident occurred within the confined space of **Mr. Todashev's** apartment. At the request of **Mr. Todashev**, the officers removed their shoes as they entered the home. For a period of approximately five (5) hours, the officers conducted an interview while in close proximity to a sword hanging on the wall.

Immediately preceding the use of deadly force, **Mr. Todashev** struck the **FBI Agent** in the head with a coffee table. The area of impact, the **FBI Agent's** head, and the *laceration* caused by the blunt force, which required metal stitches to close, would be classified in the attached Orange County Sheriff's Office *Use of Force Matrix* as being a **Subject Resistance Level** titled **Aggravated Physical Resistance**. The same *Use of Force Matrix* outlines the appropriate **Officer Response Level** to an **Aggravated Physical Resistance** as being **Deadly Force**. The same interpretation would apply to **Mr. Todashev's** actions as he armed himself with the red broomstick type pole and re-engaged the officers.




D012953

**Note:** The following is taken from a book titled **Forensic Pathology Principles and Practice** (Dolinak, Matshes, & Lew, 2005)**:**

> "*The three key manifestations of the blunt force injury spectrum are abrasions, contusions, and **lacerations**, each of which is created in response to the direct application of force to the body. ... A **laceration** forms when an object impacts the body with a force that exceeds the elastic capacity of the skin and underlying tissues. Thus, a laceration is a **forceful tearing of the skin**.*"
> [**Emphasis added,** Pages 121 & 129]

The following information was gleaned during a review of the FBI's *Use of Force* policy. This information would have/should have been taken into consideration by the **FBI Agent** at the time he considered using deadly force. The information can be located by visiting following internet address:

*http://vault.fbi.gov/fbi%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011-version/fbi-domestic-investigations-and-operations-guide-diog-october-15-2011-part-03-of-03/view*

"***3-6 Use of Force***

***3-6.1 Identification***

> *A person to be arrested should be aware of the intention of the arresting Agent to deprive him/her of his/her liberty by legal authority. Therefore, it is the responsibility of the **arresting Agent to identify himself**/herself, before effecting the arrest, in a clear, audible voice, as Special Agent of the FBI. ...*"

> **Findings:** Based on observations made while reviewing the video recordings, **Mr. Todashev** was aware each of the investigators was a law enforcement officer. **Mr. Todashev** inquired as to how much time he would have to serve in prison. This indicated **Mr. Todashev** knew his arrest was imminent.

"***3-6.2 Physical Force***

> *Agents are permitted to use that amount of physical force reasonable and necessary to impose custody and overcome all resistance, and to ensure the safety of the arresting Agents, the arrestee, and others in the vicinity of the arrest. ...*

"***3-6.4 FBI Deadly Force Policy – Instructional Outline***

> *(1) INTRODUCTION: This outline provides guidance to FBI Agents in the use of deadly force. The following general principles are to govern application of the FBI's deadly force policy:*

D012954

(a) *The policy is not to be construed to require Agents to assume unreasonable risks. In assessing the need to use deadly force, the paramount consideration should always be the safety of the Agents and the public.*

(b) ***The reasonableness of an Agent's decision to use deadly force under this policy must be viewed from the perspective of the Agent on the scene – who may often be forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving – and without the advantage of 20/20 hindsight.*** [**Emphasis added**]

(2) *POLICY TEXT:*

(a) ***Defense of Life*** *–* ***Agents may use deadly force only when necessary****, that is, when the* ***Agents have probable cause to believe that the subject of such force poses an imminent danger of death or serious physical injury to the Agents or other persons.*** *…* [**Emphasis added**]

(3) *DEFINITIONS*

(a) ***Deadly Force****:   Force that is likely to cause death or serious physical injury.*

(b) *Necessity:* ***In evaluating the necessity to use deadly force, two factors are relevant:***

1) *The* ***presence of an imminent danger to the Agents or others****; and* [**Emphasis added**]

2) *The absence of safe alternatives to the use of deadly force. Deadly force is never permissible under this policy when the sole purpose is to prevent the escape of a suspect.*

(1) ***Imminent Danger****:   "Imminent" does not mean "immediate" or "instantaneous,"* ***but that an action is pending****.  Thus,* ***a subject may pose an imminent danger even if he/she is not at that very moment pointing a weapon at the Agent****.  For example, imminent danger may exist if Agents have probable cause to believe any of the following:* [**Emphasis added**]

(a) *The* ***subject possesses a weapon****, or* ***is attempting to gain access to a weapon****, under circumstances indicating an intention to use it against the Agent or others; or,* [**Emphasis added**]

D012955

(b) *The subject is armed and running to gain the tactical advantage of cover; or,*

(c) *A **subject with the capability of inflicting death or serious physical injury** – or otherwise incapacitating Agents – without a deadly weapon, is demonstrating an intention to do so; or,*   [**Emphasis added**]

(d) *The subject is attempting to escape from the vicinity of a violent confrontation in which he/she inflicted or attempted the infliction of death or serious physical injury. ...*

### (4) APPLICATION OF DEADLY FORCE

(a) *When the decision is made to use deadly force, <u>**Agents may continue its application until the subject surrenders or no longer poses an imminent danger**</u>.*   [**Emphasis added**]

(b) *When deadly force is permissible under this policy, attempts to shoot to cause minor injury are unrealistic and can prove dangerous to Agents and others because they are unlikely to achieve the intended purpose of bringing an imminent danger to a timely halt.*

(c) *Even when deadly force is permissible, Agents should assess whether its use creates a danger to third parties that outweighs the likely benefits of its use. ...*"

On May 23, 2013, the **FBI Agent** provided sworn testimony detailing the events as follows: "…***<u>I was reading my notepad</u> when I heard a loud noise and suddenly felt a blow to the back of my head**. I was knocked partially off my chair, but I caught myself. I saw Todashev running past me and I tried to grab him. I removed my weapon from the holster and aimed the gun at Todashev who had run towards the kitchen. I shouted 'Show me your hands!' … Todashev instantly ran at full speed from the kitchen directly towards me and ... [**Trooper One**]. I saw Todashev's left shoulder drop as he rounded the corner from the kitchen to the living room. It was obvious to me that Todashev was in an attacking posture. In the split second available to me [to] assess the threat posed by Todashev's wholly non-compliant actions, **I was in fear for my life and the life of** ... [**Trooper One**]. **There was no doubt in my mind that Todashev intended to kill both of us**. In order to stop this threat, I shot Todashev three to four times. Todashev fell backwards, but did not go to the ground. **He then re-established his footing and suddenly lunged again towards us**. I then shot him 3 or 4 more times in order to stop his continuing deadly threat. This time **Todashev fell to the <u>ground face first</u> and I believed this threat has been eliminated**.*"   [**Emphasis added**]

On May 23, 2013, **Trooper One** provided sworn testimony detailing the events as follows: "…***Todashev's actions placed me in fear of imminent physical injury or even death. <u>I am certain</u>* ... [**FBI Agent**] <u>*saved me from serious physical injury or death.*</u>"   [**Emphasis added**]

D012956

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

On September 6, 2013, **Trooper One** provided sworn testimony detaining the events as follows: "…***He was a professional, professional fighter who was dangerous*** *… **highly spoken of among people who um, who know him** … he came running toward me, **I put my left arm up in the air** … **I put my left arm to protect myself from ha, from being impaled by that object**. … there's no question in my mind that if he had gotten a weapon from us or if it hadn't turned out the way, we might not be here today*." [**Emphasis added**]

The following excerpts are taken from a relevant article, which can be located by visiting the following web site:

*http://lawfuluse.com/graham-v-conner-the-graham-factors/*

"***Graham v. Connor*** *(US 1989)* [sic] *is the landmark US Supreme Court case that defines reasonable use of force by police officers in the line of duty. All officers are taught about this case in the academy; most are periodically reminded of it throughout their careers.*

*The "**reasonableness**" of a particular use of force must be judged from the perspective of a **reasonable officer on the scene**, rather than with the "20/20 vision of hindsight."*

[#1.)] *The **severity of the crime** at issue,*

[#2.)]*Whether the suspect poses an **immediate threat to the safety of the officers or others**, and*

[#3.)]*Whether he is **actively resisting arrest** or attempting to evade arrest by flight.*

*The question is whether the "**totality of the circumstances**" justifies a particular use of force applied in the situation. The most important factor is #2—**whether the suspect poses an immediate threat to the safety of the officer or others**.*"
[**Emphasis added**]

*Graham v. Connor, (U.S. 1989)*, provides several fundamental topics to consider which are referred to as the "*Graham Factors*". The "*Graham Factors*" were taken into consideration while conducting this review.

The following five (5) Florida State Statutes were taken into consideration while preparing this final summary. [**Emphasis added**]

#1.) F.S.S. 784.045. ***Aggravated battery.***

*(1) (a) A person commits aggravated battery who, in committing battery:*
*1. **Intentionally or knowingly causes great bodily harm**, permanent disability, or permanent disfigurement; or*
*2. **Uses a deadly weapon**. … [**Emphasis added**]*

D012957

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#2.)  F.S.S. 843.01.  *Resisting officer with violence to his or her person*

*Whoever knowingly and willfully resists*, *obstructs, or opposes any officer as defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9); member of the Parole Commission or any administrative aide or supervisor employed by the commission; parole and probation supervisor; county probation officer; personnel or representative of the Department of Law Enforcement; or other person* **legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, by offering or doing violence to the person of such officer or legally authorized person, is guilty of a felony of the third degree, punishable as provided in** *s. 775.082, s. 775.083, or s. 775.084.* **[Emphasis added]**

#3.)  F.S.S. 776.05.  *Law enforcement officers; use of force in making an arrest.*

*A law enforcement officer, or any person whom the officer has summoned or directed to assist him or her,* **need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest**. ___The officer is justified in the use of any force___:
    *(1)* **Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest;**
    *(2) When necessarily committed in retaking felons who have escaped; or*
    *(3) When necessarily committed in arresting felons fleeing from justice. However, this subsection shall not constitute a defense in any civil action for damages brought for the wrongful use of deadly force unless the use of deadly force was necessary to prevent the arrest from being defeated by such flight and, when feasible, some warning had been given, and:*
        *(a) The officer reasonably believes that the fleeing felon poses a threat of death or serious physical harm to the officer or others; or*
        *(b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to anther person.*
    **[Emphasis added]**

#4.)  F.S.S. 776.051. *Use of force in resisting arrest or making an arrest or in the execution of a legal duty; prohibition.*

*(1) A person is not justified in the use of force to resist an arrest by a law enforcement officer, or to resist a law enforcement officer who is engaged in the execution of a legal duty, if the law enforcement officer was acting in good faith and he or she is known, or reasonably appears, to be a law enforcement officer.*

D012958

**INVESTIGATION REPORT**
**CASE NUMBER: 2013-IN-0063**

#5.) F.S.S. 776.06.   ***Deadly force.***

*(1) The term "deadly force" means force that is likely to cause death or great bodily harm and includes, but is not limited to:*
   *(a)  The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and*
   *(b)  The firing of a firearm at a vehicle in which the person to be arrested is riding.*

<u>**Summary**</u>

During the course of Federal and State investigative efforts surrounding Boston Marathon bombing suspect Tamerlan Tsarnaev, **Ibragim Todashev** became a person of interest in a triple homicide which occurred in Waltham, Massachusetts on September 11, 2011. On May 21, 2013, Federal and State Law Enforcement Officers from Massachusetts and Florida made contact with **Mr. Todashev** in Orlando, Florida. Prior to contact being made on this date, each of the officers involved was aware **Mr. Todashev** was a skilled Mixed Martial Arts (*MMA*) fighter. During the course of a non-custodial, consensual interview, which occurred in the confined space of **Mr. Todashev's** apartment, **Mr. Todashev** spontaneously attacked and struck the **FBI Agent** with a coffee table, causing a *laceration* to the back of the **FBI Agent's** head. **Mr. Todashev** then ran past both officers towards the kitchen area of the apartment. As **Mr. Todashev** armed himself with a broomstick type pole, he aggressively charged back towards **Trooper One** and the **FBI Agent** in a manner they both perceived as being life threatening.

Based on the actions of **Mr. Todashev,** the **FBI Agent** responded to the imminent threat by discharging his firearm at **Mr. Todashev**. During the initial volley of gunfire, **Mr. Todashev** twisted his upper torso twice as he was being struck by the projectiles. This caused **Mr. Todashev** to pause during his attack. As **Mr. Todashev** regained his footing and made a headlong lunge towards the officers, the **FBI Agent** continued to engage the threat by discharging a second volley of gunfire at **Mr. Todashev**. The **FBI Agent** fired his issued handgun a total of seven (7) times in an effort to eliminate the threat posed by **Mr. Todashev**.

Given the totality of the circumstances at the time of this incident, in my opinion, the use of deadly force by the **FBI Agent** on May 22, 2013, was reasonable and justified, and therefore, lawful.

*Eric Edwards*                                   03/17/2014
State Attorney's Office                           Date
Ninth Judicial Circuit of Florida
Chief of Investigations
Eric Edwards

D012959