UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13-CR-10200-GAO |
| v. | ) | |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

## MOTION FOR CHANGE OF VENUE

The defendant, Dzhokhar Tsarnaev, by and through counsel, and pursuant to Fed.

R. Crim. P. 21, and the Fifth, Sixth and Eighth Amendments to the United States

Constitution, hereby moves for a change of venue and asks that the Court move his trial

outside the District of Massachusetts.[1]

Venue survey data obtained during the month of May 2014 reveals:

1. An overwhelming presumption of guilt in the District of Massachusetts,

2. Prejudgment as to the penalty that should be imposed, and

3. An extraordinarily high number of individuals in the potential jury pool who either attended or participated in the 2013 Boston Marathon, or personally know someone who did.

Our preliminary review of the information collected leads us to conclude that

prejudice must be presumed in the District of Massachusetts, while public attitudes in two

---

[1] In this Motion, counsel rely on a preliminary review of still-to-be-finalized survey data, and on counsel's own estimate of the volume of news media coverage and of the obvious impact of the offenses on the citizens of Massachusetts.  Funding to permit a detailed analysis of the survey data and a qualitative and quantitative evaluation of the media coverage currently awaits court approval.  As soon as this work is authorized and completed, counsel expect to be able to establish by evidence that prejudice must be presumed in the District of Massachusetts.  At present, counsel can offer only a preliminary assessment of survey results and the presumption of prejudice that these data suggest.

other surveyed jurisdictions do not warrant that presumption.  Accordingly, we seek a change of venue.  In making this motion, however, we reiterate the need for an in-depth analysis of the news media coverage and circumstances that account for the survey results, as well as further analysis of the survey data, in order to determine the full extent of the presumption against the Mr. Tsarnaev.   According to our retained venue expert, who has performed such venue analyses in more than 100 state and federal cases, these further analyses are essential to establish the necessity for a change of venue.

Before summarizing what we know now about the condition of public opinion in the District of Massachusetts, we add a word of explanation.  The government has claimed, in effect, that the defense is dragging its feet [DE 366], while the Court has expressed confidence that we are prepared to set forth the factual and legal reasons why a change of venue is necessary or advisable [DE 368].  Neither the government's claim, nor the Court's confidence, is well-founded.

By December 16, 2013, we had identified an experienced venue expert to assist the defense in evaluating the complex venue-related issues in the case, and sought funding for his work.  [DE 156, sealed].   The work covered by the funding request was divided into two stages.  The first stage involved public opinion polling, and was requested to allow the defense to make an informed decision as to whether to seek a change of venue at all.  If the survey data indicated a need to request a change of venue, the second stage would consist of the additional work necessary to probe the depth of potential prejudice, and to provide legal and factual support for the motion.

It was not until March 10, 2014, however, that all necessary court approvals of the

defense funding for the first stage of the venue investigation were obtained.  Only then

was the defense expert able to begin the initial work necessary to permit the defense to

make an informed decision as to whether to seek a change of venue.

This first stage work itself was necessarily time-consuming.  In order to design

and implement a reliable and objective venue survey, the defense expert first had to

arrange for a preliminary collection of news media coverage in the District of

Massachusetts, and then draft the survey instrument.  In scheduling the survey, moreover,

he was obligated to consider the potential impact of the impending first-year anniversary

of the bombings.  By the time the survey funding was approved and the necessary

preparatory work completed, an immediate public opinion survey would have occurred in

mid-April, the period surrounding the anniversary.  To avoid distortions of responses

occasioned by the often emotional publicity surrounding the first-year anniversary and

this year's Boston Marathon, it became necessary to delay the survey until May.  Counsel

received a preliminary summary of the results on May 30, 2014, and consulted with the

expert about them one week later, on June 5, 2014.[2]   After concluding that the data did

warrant a presumption of prejudice in the District of Massachusetts, counsel promptly (on

June 10, 2014) sought the additional funding to permit the second stage of the venue

investigation and, on June 11, 2014, filed the request for an extension of time that

included a notice of intention to file a motion to change venue.

---

[2] In the midst of this, the defense expert had surgery, and needed an additional day to review and organize the data.

## A.  Relevant legal standard

The Sixth Amendment secures to an accused the right to trial "by an impartial jury of the state and district wherein the crime shall have been committed."  *See also* U.S. Const., Art. III, §2, cl. 3.  However, the constitutional place-of-trial prescriptions do not prevent transfer to a different location at the defendant's request if extraordinary local prejudice will prevent a fair trial.  *United States v. Skilling*, 561 U.S. 358, 130 S. Ct. 2896, 2913 (2010), citing *In Re Murchison*, 349 U.S. 133, 136 (1955).  Fed. R. Crim. P. 21 provides that "[u]pon the defendant's motion, a court must transfer the proceeding … to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

The Supreme Court has long held that, when the community from which jurors are drawn is sufficiently affected by adverse publicity or by the effects of the events at issue, or both, there arises a presumption of prejudice such that voir dire cannot perform the usual function of securing a fair and impartial jury.  *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 55051 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961).  To be sure, a presumption of prejudice will only arise in the extreme case.  *Skilling*, 130 S. Ct. at 2915.  But this is such a case.  The publicity, tremendous local impact and galvanizing community reaction compelled a change of venue in the Oklahoma City bombing case.  *United States v. McVeigh*, 918 F. Supp. 1467 (D. Colorado 1996).  The community impact here is even greater than that present in *McVeigh*, given that the

4

bombings occurred at the Boston Marathon on the day thousands of Bostonians and others from the region gathered to celebrate the runners, the Red Sox, and Patriots Day, the indelible fear that friends and family could have been killed or injured, the trauma experienced by those in the region for four more days while the police sought the perpetrators, and the hundreds of thousands of Boston area residents who sheltered in place during the climactic final day of the search.  If a change of venue was warranted in *McVeigh*, it is even more compelled by the facts presented here.[3]

## B.  Survey Data

In an attempt to obtain objective data bearing on the question of whether a fair and impartial trial can be had in the current venue, the defense expert surveyed four locations: the Eastern and Western Divisions of the District of Massachusetts, the Southern District of New York, and the District of District of Columbia.[4]  The key preliminary finding is that of the four potential venues, Boston ranked as the most prejudiced on all of the critical measures:  case awareness, case knowledge, pre-judgment of guilt, case-specific support for the death penalty if Mr. Tsarnaev is convicted, and case salience.

---

[3] Assuming that a presumption of prejudice is rebuttable, a question about which there appears to be a conflict in the circuits and which the Supreme Court did not resolve in *Skilling* (130 S. Ct. at n. 18), we believe that the strength of the yet-to-be-obtained content and polling data analysis will make rebutting the presumption impossible.

[4] The two out-of-district sites (Manhattan and Washington, D.C.) were selected because they are reasonably close, accessible to witnesses and interested persons, and able to logistically accommodate a trial of this magnitude.

To cite some of the numbers from the survey that support these findings:[5]

|  | Def. Guilty | Death Penalty | Partic./ knew 2013 | Ever Partic. |
|---|---|---|---|---|
| Boston | 57.9% | 37.0% | 51.9% | 49.3% |
| Springfield | 51.7 | 35.0 | 19.0 | 16.7 |
| Manhattan | 47.9 | 27.6 | 9.4 | 7.8 |
| D.C. | 37.4 | 19.0 | 11.8 | 5.6 |

The last two columns, measuring those who attended the 2013 Marathon or who know someone who attended, and those who have ever attended the Boston Marathon, are just two of several measures of salience, an important determinant of the need to change of venue.  Boston measures highest on these criteria; Springfield is second.[6]  As previously noted, it is imperative that we be authorized to obtain further expert analysis to explain the full import of the data obtained.

---

[5] Def. Guilty = Those who recognized the case were asked if they believed the defendant was definitely guilty, probably not guilty, or definitely not guilty.
Death Penalty = Those who recognized the case were asked if they believed that if the defendant were convicted he should receive the death penalty or life without possibility of parole.
Partic. 2013 = Respondents were asked, Do you or did someone you know participate in or attend the Boston Marathon held last year, in 2013?
Ever Partic. = Have you ever participated in or attended the Boston Marathon?

[6] Research has demonstrated the danger of "conformity prejudice" – fear of community disapproval for rendering an unpopular verdict and has shown the limitations of voir dire to weed out jurors biased by such adverse publicity.  *See*, N. Vidmar, *Case Studies of Pre-and Midtrial Prejudice in Criminal and Civil Litigation*, 26 L. & Hum. Behav. 73, 81-82 (2002).  It is not much of a leap to conclude that individuals with a close personal connection to the Boston Marathon and, thus to the bombings, will be less able to set aside preconceived notions regarding guilt and punishment.

6

### C.  Media/Community Activities and Impact

If it were not necessary to gauge the impact of the publicity in this case, the Court could simply take judicial notice of the intense and sustained intense media coverage, including

- the repeated public release of now-familiar photos of the Marathon explosions, the Tsarnaev brothers at the bombing site, and a wounded and bloody Dzhokhar Tsarnaev climbing out of the boat in Watertown,

- the coverage of events honoring those killed or severely injured in the bombing or its aftermath,

- the outpouring of support for bombing victims during the first anniversary period,

- the Boston Strong billboards and T-shirts,  and

- the continuing investigations and prosecutions of individuals who knew Tamerlan and Dzhokhar Tsarnaev.

However, an accurate and reliable assessment of the influence of both the publicity and the impact of the offenses on the ability of Massachusetts jurors to provide a fair trial – an influence reflected in the preliminary survey data – requires the full evidentiary record and expert analysis that we have requested but have not yet obtained.[7]

To be specific, the media analysis that remains to be done includes a careful examination of the following features of the news coverage in this case:

---

[7] It is crucial to analyze the content of the pretrial publicity both from a social science and legal perspective in order to determine if it is prejudicial.  In the absence of the analytical framework, any expert opinion would simply be unfounded intuition or guesswork, with little bases to assess its validity.  Rendering a valid conclusion requires laying out the criteria used and systematically examining the facts; preparation for this is a time-consuming process involving the collection, collation and analysis of the relevant media and related facts.

1. **The Nature and Extent of the publicity**. "Extent" is a quantitative analysis, but not simply a counting of the number of newspaper articles. Assessment of impact requires taking into account the dates and pattern of the articles, their location in the newspaper, number of pictures, types of articles (news, opinion, letter to the editor, etc.), length, and other aspects. "Nature" is a qualitative analysis that examines the contents of the articles, and identifies material that is (a) inflammatory, (b) possibly inadmissible, (c) possibly inaccurate, or that (d) presumes guilt.

2. **The Nature and Gravity of the Crime.** "Gravity" deals with the status of the charged crime(s) in the criminal code, focusing on the attention paid to that aspect of the case in the newspaper coverage. The "nature of the crime" refers to the coverage that deals with those aspects of the case that single it out from others of the same class, looking at qualities that make it worse or more serious.

3. **The Status of the Victims in the Community.** This factor focuses on the number of victims, the community's response to them or their families, or the lack of such status. This is examined through the actual news coverage.

4. **The Status of the Defendant in the Community.** This criterion involves the portrayal of the defendant in the newspaper, whether it is hostile or negative, or whether it tends to be sympathetic.

5. **The Size and Nature of the Population.** The size of the population is the starting point, but in some cases, large populations are likely to behave in the same fashion as small ones, reflecting the reasons that make small communities more susceptible to prejudice from hostile pretrial publicity. A related issue is the problem of high salience of some cases to a local population, when the facts of those cases have a special relevance and meaning locally.

The other remaining major task is the in-depth review and analysis of the survey results themselves. That will require, among other things, validity checks of the survey results, content analysis of the responses to open-ended queries on the questionnaire, writing methodological descriptions, and consulting with the survey call center to assist with the statistical analysis and with obtaining certain descriptive material.

## CONCLUSION

For the foregoing reasons, the defendant moves for a change of venue and preliminarily recommends the District of Columbia as the venue with the least prejudicial attitudes.  However, counsel seek the funding and time necessary to analyze the data obtained and to permit the work crucial to a reliable assessment of the necessity for a change of venue.  We therefore request leave to file a supplemental memorandum once funding and all relevant data has been obtained and analyzed, and request that the Court establish a timeline that permits preparation of adequate factual support for the motion and our recommendation of alternative venues.

Respectfully submitted,
DZHOKHAR TSARNAEV
by his attorneys

/s/   Judy Clarke

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061

MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 18, 2014.

*/s/ Judy Clarke*