UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA<br><br>v.<br><br>DZHOKHAR TSARNAEV | No. 13-CR-10200-GAO |
|---|---|

**REPLY TO GOVERNMENT'S OPPPOSITION TO**
**MOTION TO SUPPRESS PHYSICAL AND DIGITAL EVIDENCE**

Defendant respectfully submits this reply to the Government's Combined Opposition to Defendant's Motions to Suppress Physical and Digital Evidence ("Govt. Opp.") DE 343.

I. **DEFENDANT HAS STANDING TO CHALLENGE THE SEARCHES OF THE NORFOLK STREET APARTMENT.**

The government argues that Dzhokhar Tsarnaev lacks standing to challenge the searches of 410 Norfolk St, Apt #3 because he "lost his expectation of privacy in the apartment when he moved out" to attend the University of Massachusetts at Dartmouth ("UMD") as a student (Govt. Opp. at.2) and because he "abandoned any residual expectation of privacy in the apartment and any possessory interest in his things on the evening of April 18, 2013" when, as described by the government, he and his brother left the apartment, not "expect[ing] to return alive." (Govt. Opp. at 4-5). Neither of these assertions can withstand scrutiny.

A. **Facts Set forth in the Warrant Applications Establish Standing.**

The government's claims concerning standing contradict the assertions in its own applications for the warrants. The affidavit of Special Agent Daniel Genck in support of the April 19, 2013 application states that the apartment at 410 Norfolk St. "is the residence of Tamerian (sic) Tsarnaev ('Tamerian') and Dzhokhar Tsarnaev ('Dzhokhar')." Exhibit A in Government Sealed Appendix ("Govt. Appx.") (DE 349), at 1. It also reports that public

1

database records "indicated that Dzhokhar Tsarnaev and others resided at [410 Norfolk St.] apartment 3" and cites Registry of Motor Vehicle records that list Dzhokhar Tsarnaev's residence as 410 Norfolk St.  Affidavit at ¶ 34.  Attachment A to the application describes the premises to be searched as "the residence of Tamerian (sic) Tsarnaev ('Tamerian') and Dzhokhar Tsarnaev ('Dzhokhar')."  The same attachment states that "[t]here is a mailbox beside the front door that lists Dzhokhar's name on it."

The affidavit of Agent Sarah Wheeldon in support of the May 3, 2013 application also describes 410 Norfolk St. as "the residence of Tamerlan and Dzhokhar."  Affidavit in Exhibit B of Govt. Appx., ¶¶ 3 and 52**).**  It asserts that RMV and UMD records list Mr. Tsarnaev's home address as 410 Norfolk St.  ¶ 35).[1] Attachment A repeats the description of the premises to be searched contained in the April 19, 2013 application.

### B.     Other Documents and Evidence in the Government's Possession Support a Finding of Standing.

Items seized from the Norfolk Street apartment include Dzhokhar's school and naturalization papers and his 2012 tax return.  The latter, dated February 2, 2013, lists his address as 410 Norfolk Street.  These are precisely the types of important personal documents that usually are found in one's home.  A bank statement for the period March 1, 2013 through March 31, 2013, produced in discovery, lists Mr. Tsarnaev's address as 410 Norfolk Street.  DT-00018626-29.

Mr. Tsarnaev's landlady told the FBI that Dzhokhar stayed at the 410 Norfolk St. apartment during school vacations and lived there during the entire summer of 2012.  DT-0008394-85.  His roommate told the FBI that "[w]hen Jahar was absent from campus on

---

[1] Ex. M to Govt. Appx.  "University of Massachusetts Dartmouth, Housing and Dining Services Contract, 2012-2013 Academic Year, Upper Class Contract," at.1.

weekends, it was seldom for the entire weekend." DT-0008313.  This latter statement seems to be the flimsy basis for the government's otherwise unsupported claim that "Tsarnaev . . . slept nearly every night in his dorm room at UMass-Dartmouth and kept virtually all of his clothing and belongings there[.]"  Govt. Opp. at 3.

### C. Mr. Tsarnaev's Campus Residence during the School Year does not Deprive him of Standing in his Family Home.

The "Housing and Dining Services Contract" from the University of Massachusetts at Dartmouth ("UMD"), illustrates the temporary nature of college residence.  Duration of occupancy is during the academic year and excludes vacation periods.  Govt. Ex. M.  On that contract, Tsarnaev listed 410 Norfolk St. Apt. 3 as his home address.  *Id*.  The owner of the Norfolk Street building – the Tsarnaev's landlady and neighbor – told the FBI in an April interview that Dzhokhar "stayed with Tamerlan and Katherine when he was on school vacation, and . . . stayed at the apartment the entire summer of 2012."  DT-0008394-8395.

The government does not cite a single case in support of its contention that a college student lacks standing to challenge a search of the family home where he stores belongings and stays during school breaks.  Instead, the government concedes, as it must, that an occasional overnight visitor has standing in a home.  *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004), citing *Minnesota v. Olson*, 495 U.S. 91 (1990).

### D. The Use of the Room and the Location of Items found in it do not Defeat Standing.

The government claims, without cited support, that Mr. Tsarnaev's "former bedroom was being used as a storage and computer room by Tamerlan Tsarnaev and his wife.  It was separated from the living room by a curtain that usually remained open."  Govt. Opp. at 4.  This information does not appear in the discovery and is contradicted by photographs taken during the

first search.[2]  The photographs, provided in discovery, clearly show bunk beds in the room.  DT-0001797-98.  Moreover, Mr. Tsarnaev's personal documents, including his naturalization certificate and a school identification card were found in that room.  DT-0001842.

The government's claim that Mr. Tsarnaev lacks standing because "[v]irtually all of the seized items belonging to Tsarnaev were on shelves out in the open" rests on its erroneous claim that the Norfolk Street apartment was not his home.  Its reliance on *United States v. McCarthy*, 77 F.3d 522 (1st Cir. 1996), is misplaced.  In that case, the First Circuit held that defendants who had stayed with an acquaintance for a few days and left behind an unlocked suitcase when they left "assumed the risk that [the friend] might consent to a search of the room." *Id*. at 535.  That does not support the government's argument that defendant lacks standing to object to a search of his bedroom in his family home, especially where consent is not an issue.

Finally, the government suggests that Tamerlan Tsarnaev and his wife lacked standing in the apartment.  Apart from the irrelevance of this claim, the government relies on a distorted presentation of the facts relating to the family's residence.  While it is true that the property owner provided a notice to vacate to the Tsarnaevs in the fall of 2012 (but apparently never initiated formal eviction proceedings),  the landlady told FBI agents that she later agreed to allow the family to remain in the apartment and reduced the rent.  DT-0008392.  She also told agents that Tamerlan had paid the April 2013 rent, in person, at the beginning of the month.  DT-0008394.

---

[2] The defense has requested from the government discovery supporting this claim.

**E.     The Government has not Shown that Mr. Tsarnaev Abandoned his Expectation of Privacy on April 18.**

The government claims that Mr. Tsarnaev's text to a friend inviting him to take property from his dorm room and an email he allegedly wrote to his mother warrant a finding that Mr. Tsarnaev abandoned his privacy interest in the apartment. Govt. Opp. at 4-5. This argument misapprehends both the doctrine of abandonment and the facts of this case.

"Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004). "Proof of intent to abandon property must be established by clear and unequivocal evidence." *Id.*[3]

*United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) outlined three types of abandonment: (1) discarding an item while fleeing from police; (2) placing an item in an outdoor trash can or in another location accessible to the public, or (3) denying ownership when confronted by police. *Id*. at 837. This case, like *Basinski*, fits into none of these categories and "stands in stark contrast to the three scenarios because [the defendant] never explicitly disclaimed a privacy interest in [the property]." *Id.* For the same reason, the government's contention regarding abandonment of the apartment by the Tsarnaev family after the events of April 19, Govt. Opp. at 17-18, must fail. *See United States v. Eden*, 190 Fed. Appx. 416, 425 (6th Cir. Tenn. 2006) (walking away from property does not provide conclusive evidence that defendant abandoned it); *United States v. Garzon*, 119 F.3d 1446 (10th Cir. 1997).

---

[3] In *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000), the Seventh Circuit held that the government must prove abandonment by a preponderance of the evidence.

The government's argument that Mr. Tsarnaev's text and email show that he did not intend to return alive and therefore abandoned any expectation of privacy and possessory interest in the apartment or his property, Govt. Opp. at 5, rests on two flawed assumptions.  First, the fact that Tsarnaev allegedly told a friend by text that he could take items from Tsarnaev's UMD dorm room says nothing about Tsarnaev's intentions as to his Cambridge home or whether he intended to return to that home.  Second, while an email to his mother including a statement that *if* he did not see her again he would see her in the afterlife may indicate a recognition of the possibility of death, that recognition cannot be equated with abandonment of a home.  A person who makes a will or takes out life insurance before taking a trip or embarking on a risky venture, recognizing the possibility that death could occur, would not consider himself to be abandoning his home by doing so.

## II.   THE SEARCH WARRANTS FOR 410 NORFOLK STREET WERE TOO BROAD.

The government attempts to provide a narrower interpretation of the "items to be searched" than the plain language of the warrants will bear.

The government's reliance on cases that permit the use of phrases such as "including but not limited to" fails to note that, in those cases, the words were limited by specific categories related to specific events.  *See United States v. Kuc*, 737 F.3d 129, 131-32 (1st Cir. 2013); *United States v. Fiorito*, 640 F.3d 338, 347 (8th Cir. 2011); *United States v. Ballard*, 551 Fed. Appx. 33 (3rd Cir. 2014).  The government's reliance on *United States v. Zanche*, 541 F. Supp. 207 (W.D.N.Y. 1982) is not only misplaced, but illustrates the deficiencies of the Norfolk Street warrant:  in *Zanche*, the warrant provided detailed descriptions of the documents that were sought.  That specificity is lacking here, where both the introductory paragraph and the list of items sought that followed were written in general terms.

6

The case cited by the government that comes closest to addressing the type of general terms that are found in the warrants at issue is *United States v. Riley*, 906 F.2d 841 (2nd Cir. 1990). There, the court reversed a district court's order suppressing documents seized under a warrant authorizing seizure of records of the distribution of cocaine" including

> records of distribution made and/or payments given or received, the investment of proceeds of drug trafficking in tangible or intangible objects and things, including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same

*Id*. at 843.

But that list – and the storage locker lease agreement that was held to be properly seized – at least provide examples of the types of documents that may be seized, as opposed to the broad topics of interest set forth in the warrants used in this case. This distinction is supported by the language in *Riley* describing the amount of discretion that a warrant may permissibly allow to officers executing it.

> Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.

*Id*. at 845.   But here, the warrant lacked such a description.

The government's arguments that the scope of the warrant was necessarily broad essentially boils down to a concession that, because the government did not know what it was looking for, it could seize whatever items could potentially provide investigative leads. Govt. Opp. at 11-12. That argument ignores the requirement that a warrant application must provide probable cause that the items to be sought are evidence of a crime. Eliminating that requirement would permit the type of general search that the Fourth Amendment forbids. *See In Re Lafayette*

*Academy*, 610 F.2d 1, 5-6 (1st Cir. 1979); *Riley*, 906 F.2d at 852 (Weinstein, J., dissenting), citing *Arizona v. Hicks*, 480 U.S. 321 (1987).

The government asserts the uncontroversial proposition that the level of specificity depends upon the level of detail that investigators can reasonably be expected to provide, but stretches that principle to an extent that would eviscerate the particularity and probable cause requirements. One of the cases it cites, *United States v. Timpani,* 665 F.2d 1, 5 (1st Cir. 1981), illustrates how the warrant here exceeds those boundaries.

> The warrant breaks the items into categories. Each item is plausibly related to the crime-loansharking or gambling-that is specifically set out. The items, for the most part, are the very instrumentalities of those crimes. The items are not likely to be mixed up with a far larger set of similar, but innocent, items as if, for example, they were in an accountant's office. The warrants provide a standard for segregating the "innocent" from the "culpable" in the form of requiring a connection with a specific, identifiable crime.

*Id.* No such limitation appears in the warrants issued in this case.

The government relies on *United States v. Beckett*, 321 F.3d 26, 33 (1st Cir. 2003) for the proposition that a warrant may permissibly require officers to perform some "initial screening." But the search in that case "was limited to paperwork relating to a .38 caliber pistol and notebooks or personal papers recording the whereabouts of [the defendant] in 1992 and 1995." *Id.* Surely such a determination requires far less discretion than the execution of a warrant authorizing seizure of evidence relating to motive, identity, and contacts, with no further definition.

Indeed, the government's argument illustrates that the categories were far broader than were necessary or justified. For example, the government asserts that the provision authorizing a search for evidence relating to the identity of the brothers was justified by the need to obtain any information regarding aliases or false identities that they used. But the warrant did not narrow the scope of the search to such evidence, although such a limitation clearly could have been

provided. The government similarly rejects the argument that the authority to search for information regarding the brothers' contacts and associates was limited because it was permissible "only to the extent it related to violations of the statutes identified in the items-to-be-seized list's first paragraph; that limitation alone supplied sufficient particularity." Govt. Opp. at 13.  Yet the government cites the identity provision to justify the seizure of family academic and immigration documents, Mr. Tsarnaev's middle school identification card, a 2010 pay stub of Tamerlan's, a 2006 domestic airplane itinerary, and family letters.  Govt. Opp. at 16.   The government is unable to even articulate how these are related to *any* violations of the identified statutes, much less to the specific crimes as to which the affidavit established probable cause.  Instead, the government offers that the academic and immigration records may have shown a motive, and that the 2010 pay stub and 2009 tax records may have provided evidence of funding for the alleged bomb plot.  The implausibility of these claims reveals what really happened: the agents grabbed what they could, without regard to whether the items were authorized by the warrant, in the hope that they might prove useful at a later time.

The government's similar arguments regarding the May 3 search warrant and its execution suffer from the same flaw.  Notably, the government makes no effort to explain or excuse the failure of the warrant to describe the clothing sought in connection with the Macy's videotape and then seeks to justify the seizure of a wide range of clothing on the ground that it could provide evidence of identity and could contain trace evidence.   Govt. Opp. at 20.  But the May 3 warrant did not authorize the seizure of evidence relating to identity, nor did its specific provisions permitting the collection of residue allow the seizure of clothing that might contain residue.[4]

---

[4] The relevant portions of the May 3 warrant authorized the seizure of:

The government claims that the provision in the May 3 warrant authorizing the seizure of evidence not previously seized that investigators believed "based on information available at the time of the search is related to violations of the aforementioned statutes" was not overly broad. Govt. Opp. at 19.  This strains credulity.  But the government disproves its own point when it goes on to contend that this provision authorized the seizure of notebooks, the Report of the Citizens Committee on 9/11, and the Sovereign newspaper, arguing that it was "reasonable for the agents to believe that Category 6 embraced documents that could reasonably be expected to include discussions of bombs, their effects, or their uses as well as for motive and state of mind." Govt. Opp. at 20.

To the extent that the government relies upon the plain view exception to justify seizure of physical[5] items that did not fall within the scope of the search warrants, it bears the burden of proving that the officers were lawfully in a position to see the items, that they had lawful access to the item, and that the incriminating nature of the items was immediately apparent.  *Horton v. California*, 496 U.S. 128, 136-37 (1990).   It has not done so at this point.

The government cannot have it both ways.  If the warrants were not overly broad, the searches exceeded their scope.  If the agents' searches didn't exceed the warrants' scope, the

---

1. Low-explosive powder residue from locations within the Target Residence, including but not limited to table tops, countertops, under furniture, and concealed locations;
2. Low-explosive powder residue from the plumbing system of the Target Residence, including but not limited to the drains and pipes;
3. Male and/or female clothing consistent with clothing worn by the two individuals in the February 23, 2013 surveillance video from Macy's department store, located at 450 Washington Street, in Boston, Massachusetts.

[5] As argued in defendant's opening brief in support of his motion to suppress, the government should not be permitted to resort to the plain view exception at all in regard to its searches through the electronically stored evidence.  Deft Motion to Suppress Physical and Digital Evidence (DE 303) at 29-29.

warrants were overly broad. We contend that the warrants and their execution suffer from both defects.

### III. THE SEARCHES ARE NOT SAVED BY THE GOOD FAITH EXCEPTION.

The government contends that, even if the warrants were deficient, they were not so defective as to deprive the officers of reliance on the good faith exception found in *United States v. Leon*, 468 U.S. 897 (1984). Govt. Opp. at 14. The government bears the burden of showing that the good faith exception applies. *United States v. George,* 975 F.2d 72, 77 (2nd Cir. 1992).

Here, the failure to specify the crimes that were under investigation or narrow the focus to those items as to which probable cause existed dooms any claim of objective good faith. *See United States v. Fuccillo*, 808 F.2d 173, 177, 178 (1st Cir. 1987).[6]

Finally, the issuance of numerous warrants that failed to identify the crime under investigation and included sweeping categories of evidence to be sought, without providing guidance to the agents, is further evidence that the Magistrate Judge did not perform a neutral role. *See United States v. Wilhelm*, 80 F.3d 116, 123 (4th Cir. 1996) (requiring suppression where affidavit so lacking in probable cause that issuance of warrant showed that magistrate acted as a "rubber stamp").

### IV. MR. TSARNAEV HAS STANDING TO CHALLENGE THE SEARCHES OF HIS DORM ROOM, WHICH HE DID NOT ABANDON.

The government does not contend that Mr. Tsarnaev lacked standing in the room as of April 21. Instead, it attempts to argue that he abandoned his interest in the room. As noted

---

[6] The government notified the defense after the filing of this motion of facts that may further bear on the question of whether the good-faith exception is even arguably available in this setting. The defense will seek leave to supplement the factual record upon completion of its investigation. See attached correspondence, filed under seal.

above, the government has the burden of proving that Mr. Tsarnaev abandoned his property in the dorm room.  *Fulani,* 368 F.3d at 354 (3d Cir.  2004)*; Basinski*, 226 F.3d at 836.

The government's reliance on a text message allegedly sent to a college friend inviting him to "take what yu want" from the room is misplaced.  Allowing another person access to one's room or property does not amount to abandonment.  In *Basinski*, the Seventh Circuit held that the government had not shown abandonment of property where the defendant gave a locked briefcase to an acquaintance and later asked him to destroy it.  The court explained that the defendant's actions "did not invite all the world to rummage through the briefcase at will, as a defendant in abandonment situations essentially does."  *Id.* at 838.  As noted above, *supra* at 4-5, abandonment generally is confined to cases where a defendant either denies ownership of an item, puts it in a place open to the public, or discards it during flight from the authorities.

V.      THE ITEMS FOUND IN THE DORM ROOM WERE UNLAWFULLY SEIZED.

      A.      The April 21 Warrant Was Too Broad or Else Officers Exceeded its Scope.

The same arguments raised with respect to the first Norfolk street search apply here, as the warrants are nearly identical.  Once again, the government's arguments that the warrant is not too broad and yet covered every item seized contradict each other.  The absurdity of the government's argument reaches its nadir with the claim that a pizza box found in the defendant's dorm room was "a possible source of financial information as well as information about possible associates."  Govt. Opp. at 21.  This argument demonstrates that the warrant provided no meaningful guidance to those executing the searches.

### B. An Evidentiary Hearing would be Necessary to Determine the Validity of the Government's Alternative Theory that the April Search was Based on the Consent of Mr. Tsarnaev's Roommate.

The government argues that, even if the April 21 warrant were invalid, the search of the room was justified by consent provided by Mr. Tsarnaev's roommate. Determining the validity of this claim would require an evidentiary hearing regarding the existence, voluntariness, and scope of consent. In addition, an evidentiary hearing would be necessary to determine whether the items seized were in plain view during a limited consent search.

The government contends that "virtually all of the items seized during the execution of the search warrant appeared to have been in plain view from the vantage point of someone standing in the room's common area." Govt. Opp. at 22. It goes on to identify the following items as not being in plain view: "Items No. 9-13, 20, and 24. See Exhibit C at 28-29." But discovery identifies other items found in areas that presumably were hidden from view: item 14 was found in a gym bag, items 15-17 were found in drawers, and item 18 was found in a suitcase. DT-0002495. At any rate, the Court should not take the government's claims at face value. If the government seeks to rely on consent and plain view exceptions, an evidentiary hearing should be held.

### C. Mr. Tsarnaev Retained Standing in his Dorm Room and Property during June and July 2013 and did not Abandon the Room.

The government contends that Mr. Tsarnaev abandoned the property on May 11, 2013 when the academic term ended. Govt. Opp. at 23. It relies upon a provision of the UMD housing contract that states that property remaining in a dorm room after the end of the term becomes the property of the university.

But a landlord's right to consent to a search of a tenant's property turns on the question of whether the tenant has voluntarily abandoned the property. *See United States v. Paige*, 543 Fed.

13

Appx. 218, 221 (3rd Cir. 2013). Here, Mr. Tsarnaev was in federal custody and had been since April 19. He did nothing affirmative to renounce his interest in the property.

The fact that the university is permitted to take control of the property for administrative and housekeeping purposes does not give it the right to conduct an investigative search or to permit the FBI to conduct one. Nothing in the housing contract provides that right. Thus, the government's argument that because UMD "informed the FBI that it had authority to clear out the room," agents reasonably believed "that the University had authority to consent to the search," Govt. Opp. at 25, is a non sequitur. The fact that the university had the right to clear out the room for maintenance and housekeeping purposes does not give it the right – or the apparent right – to authorize a search by federal agents. In any event, the fact that agents did not seize anything indicates that they did *not* believe they had the lawful right to search the room. What they failed to understand was that, by entering the room and observing (and perhaps directing) the actions of the university police, they did in fact conduct a search.

In its efforts to justify the July 24 search, the government focuses on the question of whether, without information from the June 27 entry, the warrant would have been valid. Govt. Opp. at 30. In doing so, the government entirely ignores the defendant's argument that the second search was *prompted by* the first one. *United States v. Dessesaure*, 429 F.3d 350 (1st Cir. 2005).

## VI. THE SEARCHES OF ELECTRONICALLY STORED EVIDENCE.

### A. Mr. Tsarnaev Has Standing to Challenge the Search of His Computer

The government's claim that Mr. Tsarnaev lacks standing to challenge the search of his laptop is, in reality, a claim that he abandoned it. Govt. Opp. at 32. As previously noted, the government bears the burden of proving this by a preponderance of the evidence.

It cannot be seriously disputed that the Sony Vaio computer belonged to Mr. Tsarnaev: that he used it, stored information on it, and exercised control of it. These facts establish standing. The question, then, is whether by allegedly texting a friend inviting him to go in his room and "take what yu want," he was abandoning the laptop.

"[T]he abandonment inquiry focuses on the intent of the person alleged to have abandoned the property[.]" *United States v. Wider*, 951 F.2d 1283, 1285 (D.C. Cir. 1991). Again, *United States v. Basinski*, *supra*, is instructive. Mr. Tsarnaev did not instruct his friend to place the laptop in the trash or to leave it somewhere open to the public. In fact, he did not mention the laptop *at all*. Mr. Tsarnaev's actions are less indicative of abandonment than those found to fall short in *Basinski*: he did not personally provide the item to his friend, he did not specify the item as among those he could take, and he did not instruct him to destroy it. The government may attempt to distinguish *Basinski* by arguing that Basinski instructed his friend not to look inside the locked briefcase. But closer comparison of this case with *Basinski* demonstrates that the difference is not a crucial one where, here, the defendant's message did not clearly contemplate that his friend would even take the laptop or, even more significantly, "invite all the world to rummage through the [item] at will, as a defendant in abandonment situations essentially does." *Basinski,* 226 F.3d at 838. *Cf. United States v. Fultz*, 126 F.3d 1102 (9th

Cir.1998) (holding that homeless person who stored box of property in the home of acquaintance had standing).

> B.   **The Failure of the ESI Warrants to Adequately Particularize the Items to Be Seized and to Include Prophylactic Measures Is Fatal.**

Even more so than the warrants authorizing the searches of 410 Norfolk Street, the searches of the email accounts and Tsarnaev's Sony Vaio – the digital evidence – are flawed for their lack of particularity. The nature of the electronically-stored evidence required additional measures to insure particularity, especially where the agents purported to seek "state of mind" and "identity" evidence. Defendant's Motion to Suppress Physical and Digital Evidence (DE 303) at 15-24. In its opposition, the government fails to address the need for increased judicial scrutiny where, as here, the warrant is worded so broadly as to encompass all files and communications. As the Second Circuit has noted:

> Where, as here, the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance. As numerous courts and commentators have observed, advances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain. *See United States v. Payton*, 573 F.3d 859, 861-62 (9th Cir. 2009) ("There is no question that computers are capable of storing immense amounts of information and often contain a great deal of private information. Searches of computers therefore often involve a degree of intrusiveness much greater in quantity, if not different in kind, from searches of other containers."); *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (noting computer's potential "to store and intermingle a huge array of one's personal papers in a single place"); Orin Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 569 (2005) (Computers "are postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more."). The potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous. This threat is compounded by the nature of digital storage. Where a warrant authorizes the search of a residence, the physical dimensions of the evidence sought will naturally impose limitations on where an officer may pry: an officer could not properly look for a stolen flat-screen television by rummaging through the suspect's medicine cabinet, nor search for false tax documents by viewing the suspect's home video collection. Such limitations are largely absent in the digital

> realm, where the size or other outwardly visible characteristics of a file may disclose nothing about its content.

*United States v. Galpin*, 720 F.3d 436, 446-47 (2d Cir. 2013) (footnotes omitted). *See also United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) (warrant defective in failing to link digital items to be searched and seized to suspected criminal activity); *In re Applications for Search Warrants for Information Associated with Target Email Accounts/Skype Accounts* 2013 WL 4647554, *7-9 (D.Kan.,2013) (application seeking all emails lacked particularity and overbroad). Here, the government sought and obtained warrants for electronically-stored information that were as broad or broader than those for the apartment and dorm room. The warrants failed in not requiring targeted examination of the email accounts and computer data and segregation of the files not particularly described and supported in the warrant.

Similarly, the government's argument that prophylactic measures such as a filter team are not required to control sweeping searches of electronically-stored evidence ignores the growing body of authority strongly suggesting that such measures are necessary to vindicate constitutional protections. *United States. v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1170 (9th Cir. 2011) (procedures are necessary "to maintain the privacy of materials that are intermingled with seizable materials, and to avoid turning a limited search for particular information into a general search of office file systems and computer databases"); *United States v. Khanani,* 502 F.3d 1281, 1290 (11th Cir. 2007) (culling process used to eliminate files unlikely to contain material within scope of warrant); *United States v. Taylor*, 764 F.Supp.2d 230, 234-35 (D. Me. 2011) (government should immediately seek judicial management of email search as soon as questions of constitutional protections become apparent); *United States v. Bickle,* 2011 WL 3798225 (D. Nev. 2011) (same). Such measures were necessary here where

the government's application requested wholesale access to Mr. Tsanaev's emails and the entire content of his computer.

### C.     *Leon's* Good Faith Exception Does Not Save the ESI Warrants

As argued above, *see* ¶ III, the failure to specify the crimes that were under investigation or narrow the focus to those items as to which probable cause existed dooms any claim of objective good faith. *Fuccillo*, 808 F.2d at 178, as does the lack of a neutral and detached magistrate passing on the warrants. *See Leon*, 468 U.S. at 914. Thus, the seized emails and computer data must be suppressed regardless of any claim of good faith.

### NEED FOR EVIDENTIARY HEARING

Defendant submits that, at a minimum, an evidentiary hearing is required to determine whether agents exceeded the scope of the various warrants. In regard to the searches of the electronically stored information contained in the email accounts and the Sony Vaio, such a hearing is mandatory. Rosa, 626 F.3d at 62 n.2 ("The government's position that the entire contents of Rosa's computers and related storage media could be searched under the terms of this warrant leads to the evisceration of the Fourth Amendment's requirement of an ex ante probable cause determination"), citing *United States v. Grubbs*, 547 U.S. 90, 99 (2006) (explaining that the Fourth Amendment protects property owners by interposing, ex ante, the impartial judgment of a judicial officer).

Furthermore, to the extent the Court will rely on the government's arguments regarding standing, abandonment, plain view, consent and good faith, an evidentiary hearing is required.

DZHOKHAR TSARNAEV
by his attorneys

/s/ *Miriam Conrad*

Judy Clarke, Esq.
California Bar: 76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.   (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 23, 2014.

*/s/ Timothy Watkins*