UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA    ) | |
| ) | |
| v.                                                   ) | Crim. No.13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV,      ) | |
| Defendant    ) | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR CHANGE OF VENUE

The United States of America, by and through its undersigned counsel, respectfully opposes defendant Dzhokhar Tsarnaev's motion for a change of venue.

## INTRODUCTION

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amdt. 6. It also secures to criminal defendants the right to trial by "an impartial jury," Amdt. 6, and to due process of law, Amdt. 5. Taken together, these provisions require a change of venue at a defendant's request if, but only if, "extraordinary local prejudice will prevent a fair trial." United States v. Skilling, 561 U.S. 358, 378 (2010).

The mechanism for seeking a change of venue based on pretrial prejudice is Federal Rule of Criminal Procedure 21(a), which provides:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

A Rule 21(a) motion "is addressed to the sound discretion of the trial court." United States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984). So is the request for an evidentiary hearing on such a

motion.  See United States v. Wilcox, 631 F.3d 740, 747 (5th Cir. 2011); United States v. Peters, 791 F.2d 1270, 1295 (7th Cir. 1986).  "A district court abuses its discretion [only] when it makes an error of law or if it bases its decision on a clearly erroneous assessment of the evidence." Wilcox, 631 F.3d at 747 (citation and internal quotation marks omitted).  The burden of establishing pretrial prejudice that warrants a change of venue is on the defendant.  Wansley v. Slayton, 487 F.2d 90, 94 (4th Cir. 1973); Stafford v. Saffle, 34 F.3d 1557, 1566 (10th Cir. 1994).

The Court should reject Tsarnaev's contention that pretrial prejudice will prevent him from obtaining a fair trial in the Eastern Division of Massachusetts – a large and diverse area with a population of over five million.  Tsarnaev argues the Court must accept that contention without first questioning even one potential juror about his or her ability to be fair and impartial.  The Supreme Court, however, has held that it is proper to presume juror prejudice only where pretrial publicity has effectively displaced the judicial process, which has not happened here.  Tsarnaev certainly has not met his burden of showing that it has:  he has submitted no examples of negative news articles and has offered only unreliable, unexplained poll results regarding alleged juror bias.

Courts have long recognized the strong public interest in trying criminal cases in the district where they occurred.  United States v. Burge, 2009 WL 2386147 (N.D. Ill. 2009), is an example:

> The government argues, and the court agrees, that a change of venue would be inconvenient and contrary to the administration of justice.  All of the witnesses necessary to prove the government's case are likely to be located within the Northern District of Illinois, where the alleged torture and physical abuse took place.  Given the court's familiarity with this case and the Seventh Circuit's admonition in Peters that it is appropriate and preferable for the court to determine juror prejudice during voir dire, it would also be inefficient and inappropriate to change venue at this time.  Finally, this forum has a strong interest in this case, not only because the intended effects of the crimes with which Burge is charged were directed at the justice system in the county where this court sits, but also because

the public has had a long-standing interest in the allegations of police torture and physical abuse underlying the case.

Given the strong public interest in prosecuting crimes in the district where they occur, and the near impossibility of showing that a fair jury cannot be empanelled in a district the size of Massachusetts, Tsarnaev's motion for change of venue must be denied.

## ARGUMENT

    A.    A Finding of Presumed Prejudice in this Case is Foreclosed by Supreme Court Precedent.

Normally, screening questionnaires and voir dire are sufficient to "detect and defuse juror bias" and ensure a fair trial.  See Skilling, 561 U.S. at 381, 385.  Accordingly, most courts agree that

> [w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity. . . .   Indeed, we have ruled that a trial court's method of holding its decision . . . in abeyance until the conclusion of the voir dire is clearly the preferable procedure.

United States v. Campa, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006) (citation and internal quotation marks omitted); accord United States v. Gullion, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); United States v. Yousef, 327 F.3d 56 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); United States v. Bakker, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); United States v. Peters, 791 F.2d 1270, 1295 (7th Cir. 1986) ("[It] was an appropriate exercise of

the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors."); United States v. Haldeman, 559 F.2d 31, 61 (D.C. Cir. 1976) ("[If] an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial.").

It is true that, "[in] rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law." United States v. Abello-Silva, 948 F.2d 1168, 1176-77 (10th Cir. 1991). Tsarnaev argues that this is one of those rare cases, but Supreme Court precedent dictates otherwise.

The Supreme Court has presumed jury prejudice on the basis of negative community sentiment and pretrial publicity in only three cases, all of which were decided nearly 50 years ago: Rideau v. Louisiana, 373 U.S. 723 (1963), Estes v. Texas, 381 U.S. 532 (1965), and Sheppard v. Maxwell, 384 U.S. 333 (1966). The facts of those cases are instructive. Wilbert Rideau was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnaping, and murder. Rideau, 373 U.S. at 724. Police interrogated him in jail following his arrest and filmed his confession. Id. On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Id. In reversing Rideau's conviction, the Supreme Court wrote:

> What the people saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . . this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could but be a hollow formality.

Id. at 726.

The trial in Estes was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment."  Murphy v. Florida, 421 U.S. 794, 799 (1975).  And in Sheppard, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard."  Sheppard, 384 U.S. at 355. Each of these cases, the Supreme Court later wrote, involved "a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage."  Murphy, 421 U.S. at 798.

Four years ago, in United States v. Skilling, the Court made clear that prejudice may not be presumed from negative community sentiment or pretrial publicity except under circumstances that equal those of Rideau, Estes, and Sheppard, i.e. in cases where "inflammatory pretrial publicity so permeated the community . . . that the publicity in essence displaced the judicial process."  United States v. McVeigh, 153 F.3d 1166, 1181 (10th Cir. 1998).  Skilling was the former CEO of Enron, a large Houston-based corporation that collapsed into bankruptcy as a result of fraud.  Skilling, 561 U.S. at 368.  A "large number of victims [lived] in Houston — from the [t]housands of Enron employees . . . [who] lost their jobs, and . . . saw their 401(k) accounts wiped out, to Houstonians who suffered spillover economic effects."  Id. at 385-86 (internal citations and quotation marks omitted).

Skilling was charged in federal district court in Houston and moved for a change of venue, contending that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors."  Id. at 369.  To support this claim, "Skilling, aided by media experts, submitted hundreds of news reports detailing Enron's downfall; he also presented affidavits from

5

the experts he engaged portraying community attitudes in Houston in comparison to other potential venues." Id. at 369-70. Notwithstanding these submissions, the district court held that Skilling had not "establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice" such that "questionnaires and voir dire . . . [could not] ensure an impartial jury." Id. at 372-73.

The Supreme Court agreed that a presumption of prejudice was unwarranted. After reviewing the facts of Rideau, Estes, and Sheppard, the Court held that "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." Skilling, 561 U.S. at 381-82. It wrote:

> First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In Rideau, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. . . . Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. . . . Third, unlike cases in which trial swiftly followed a widely reported crime, e.g., Rideau, 373 U.S., at 724, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.

Id. at 382-83.

The circumstances of this case are far closer to those of Skilling than to those of Rideau, Estes, or Sheppard. Boston is one of the 25 largest cities in the nation, and the Eastern Division of the District of Massachusetts, from which jurors will be summoned, covers approximately 4,800 square miles and includes approximately five million people. It comprises a mixture of urban, suburban, rural, and coastal communities, and its population is multi-ethnic, multi-racial, and

6

economically diverse. All sectors of the economy are well-represented, including the professions, manufacturing, agriculture, trade, and the arts. The City of Boston itself represents only a tenth of the Eastern Division's population and only a 100th of its land mass.

Here, as in Skilling, it strains credulity to assert that 12 fair and impartial jurors cannot be found in so large, widespread, and diverse a population. See, e.g., People v. Charles Manson, 132 Cal. Rptr. 265, 309-10 (App. Dep't Super. Ct. 1976) (refusing to transfer Charles Manson trial out of Los Angeles in part because "adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area.") (collecting cases); United States v. Salameh, 1993 WL 364486, *1 (S.D.N.Y. Sep. 15, 1993) (declining to move trial of first World Trade Center bomber out of the Southern District of New York in part because "jurors from this district, one of the largest and most diverse districts in the country," are as likely to be fair and impartial "as jurors from other parts of the country"); New York v. David Berkowitz, 93 Misc.2d 873, 879 (1978) (declining to transfer "Son of Sam" murder trial out of Brooklyn).

Press coverage of the Boston Marathon bombings has undoubtedly been extensive, but "[e]xtensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair." Drougas, 748 F.2d at 29. That is especially true where, as here, the coverage has been largely "factual, as opposed to inflammatory." United States v. Misla-Aldarondo, 478 F.3d 52, 58 (1st Cir. 2007). While news stories about Tsarnaev have not all been kind, they have "contained no confession or other blatantly prejudicial information" as in Rideau. Skilling, 561 U.S. at 381. That alone is enough to defeat a claim of presumed prejudice. See, e.g., United States v. Haldeman, 559 F.2d 31, 61-62 (D.C. Cir. 1976) (holding that Watergate defendants were not entitled to change of venue because "the pretrial

7

publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession.  It is true that some of the pieces . . . are hostile in tone and accusatory in content . . . [but the bulk] consists of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations.").

Moreover, the Supreme Court has repeatedly held that "pretrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial."  Nebraska Press Assn. v. Stuart, 427 U.S. 539, 554 (1976); accord Gannett Co., Inc. v. DePasquale, 443 U.S. 368 404 n.1 (1970) (Rehnquist, J., concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare.") (collecting cases).  Even in the notorious Sheppard case, where the defendant was subjected to unimaginably prejudicial publicity, see Sheppard, 335-49, 353-61, the Court held that, absent the "carnival atmosphere" that pervaded the trial, the "months [of] virulent publicity about Sheppard and the murder" would not have been sufficient to create a presumption of prejudice.  Id. at 354-55.

Finally, in contrast to Rideau, the trial in this case will take place not two months after the crime, but rather more than 18 months after it – long enough for the immediate impact to dissipate and well after the first anniversary of the bombings.

Tsarnaev cites Skilling, Rideau, Estes, and Sheppard only to ignore them.  Instead, he compares this case to United States v. McVeigh, 918 F.Supp. 1467 (W.D. Okla. 1996).  But McVeigh, unlike Skilling, is not binding in this Circuit (or any other), and no Court of Appeals has ever cited it except to distinguish it.  That is hardly surprising, because several unique features of

8

the McVeigh case make it relatively uninstructive as a precedent. First, the parties in McVeigh *agreed* that the case could not be tried in the district where the bombing occurred (the main courthouse had been severely damaged and the only alternative was unsuitable). Id. at 1470. The question decided in McVeigh therefore was not *whether* to move the trial but only *where* to move it. Id. Second, because "special precautions and logistical arrangements" needed to be made in advance at whatever courthouse was ultimately chosen, the court considered it "impracticable and inimical to the public interest in [a speedy trial]" to follow the ordinary and "preferred practice" of gauging "the effects of pretrial publicity by a careful and searching voir dire examination." Id. Accordingly, the court presumed prejudice and transferred the case to the District of Colorado.

In choosing to move the trial out of Oklahoma, the district court relied on several key facts not present here. It found, for example, that McVeigh and his codefendant had "been demonized" in the press, adding that "[all] of the Oklahoma television markets have been saturated with stories suggesting the defendants are associated with 'right wing militia groups.'" Id. at 1472. The opposite is true in this case. Far from "demonizing" Tsarnaev, the local press has largely humanized him, portraying him not as a member of a violent or terrorist group but as a popular and successful student and the beloved captain of his high school wrestling team.[1] Teachers, classmates, friends, and neighbors have almost uniformly been quoted as saying that they were baffled by Tsarnaev's alleged role in the Marathon bombings.[2]

---

1
http://www.bostonglobe.com/metro/2013/04/19/cambridge-wrestling-coach-recalls-dzhokhar-tsarnaev-dedicated-kid/ubkgTSfu8Se7yTrrGv8DjP/story.html

2 See, e.g.,
http://www.ibtimes.com/dzhokhar-tsarnaev-former-classmates-co-workers-share-shocked-reactions-over-manhunt-boston-marathon

9

Similarly, the McVeigh district court found that the "dominant theme" voiced by people in television interviews was effectively a belief "that only a guilty verdict with a death sentence could be considered a just result."  Id.  No such "dominant theme" has emerged in the comments of people interviewed about Tsarnaev. For many, the iconic image of Tsarnaev is not a lurid arrest photo (as in the McVeigh case), or the photo of a bloody Tsarnaev being pulled from his hiding place in Watertown (as the defense claims), but rather the sympathetic young man who appeared on the cover of Rolling Stone magazine.

One point of admitted similarity between McVeigh and this case is the large number of people in the district who were personally affected by the crime; but in Skilling, the Supreme Court rejected the argument that "Enron's sheer number of victims trigger[ed] a presumption of prejudice."  561 U.S. at 384.  The Court held instead that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and that "the extensive screening questionnaire and follow-up voir dire . . . were well suited to that task."  Id.[3]  The same is true here.

> B. Tsarnaev Has Not Met His Burden of Demonstrating Negative Community Sentiment and Pretrial Publicity Sufficient to Warrant a Presumption of Prejudice.

Although it is well-settled that "[t]he defendant bears the burden of establishing that prejudice should be presumed," Stafford, 34 F.3d at 1566, Tsarnaev has chosen not to submit any news articles in support of his claim of prejudicial pretrial publicity.  That alone is sufficient ground to reject it.  See, e.g., United States v. Perez-Gonzalez, 445 F.3d 39, 46 (1st Cir. 2006)

---

[3] In an important lesson for this case, the press did not lose interest in McVeigh after his case was moved to Denver; he later appealed his conviction on the asserted ground that even in Colorado, "the jury pool was flooded with negative pretrial publicity, especially media reports that he had confessed to his lawyers that he had committed the Oklahoma City bombing, [which] . . . amounted to both presumed and actual prejudice."  United States v. McVeigh, 153 F.3d 1166, 1179 (10th Cir. 1998).  Even if this case is moved, the press will surely and understandably follow.

10

("There is nothing in the record -- no statements by jurors indicating animus, no examples of inflammatory newspaper articles or prejudicial news reports, and no evidence whatsoever of the pervasiveness or tone of the media coverage -- to substantiate Pérez–González's argument."). Tsarnaev's desire for a second round of expert analysis cannot excuse his failure to support his motion with even a single press clipping; if prejudicial news articles are as numerous as he claims, his large defense team could surely have identified and attached a representative sample even without the help of a media expert.

The polling results on which Tsarnaev relies are an unreliable indicator of actual jury bias, and they certainly do not warrant a presumption that 12 fair jurors cannot be found in a population of five million. The Court is free to ignore those poll results, and in this instance, it should.

Courts facing change of venue motions have discretion to disregard polling data and often do. See, e.g., United States v. Rodriguez, 581 F.3d 775, 785-86 (8th Cir. 2009) ("This court has expressed doubts about the relevance of such polls when reviewing rejected change-of-venue motions."); Campa, 459 F.3d at 1145 ("It was entirely within the district court's prerogative to reject outright Professor Moran's survey as a basis upon which to grant a motion to change venue."); Haldeman, 559 F.2d at 64 n.43 ("It is our judgment that in determining whether a fair and impartial jury could be empanelled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II."). Even the district court in McVeigh dismissed the importance of polling data in that case, writing that "data from opinion surveys done by qualified experts who have given their

11

opinions about the results and their meaning . . . . are but crude measures of opinion at the time of the interviews.   There is no laboratory experiment that can come close to duplicating the trial of criminal charges."   McVeigh, 918 F.Supp. at 1473.

Tsarnaev's submission is of especially little use because it fails to meet even the minimal professional standards for the presentation of polling data on a change of venue motion.   The American Society of Trial Consultants' Professional Code for Venue Surveys states:

> The trial consultant's presentation of survey results to a court shall include the questionnaire that was used in the survey, identification of the primary persons who performed the work (including their qualifications), and descriptions of how each of the following standard steps for conducting a survey was completed:
>
> - Design of the survey instrument
> - Determination of eligibility and sampling measures
> - Training of interviewers and supervisors to conduct the interviewing
> - Interviewing procedures
> - Dates of data collection
> - Calculation of sample completion rate
> - Tabulation of survey data

Tsarnaev's failure to include any of this information in his motion necessarily robs the results of persuasive force.

Even taking the poll results at face value, they still do not warrant a change of venue. Tsarnaev alleges that the "key preliminary finding" in his poll is that Boston ranked higher than three other cities on five measures:   "case awareness, case knowledge, pre-judgment of guilt, case-specific support for the death penalty if Mr. Tsarnaev is convicted, and case salience." (Deft. Mot. at 5).   But Tsarnaev's narrow focus on the City of Boston renders his poll data largely irrelevant, because jurors in this case will be drawn from an area 100 times the size of Boston and ten times more populous.   Moreover, the only relevant legal question is not whether other venues might have advantages over this one, but rather whether, through the use of screening

questionnaires and voir dire, 12 fair and impartial jurors can be found among the five million residents of *this* venue.

The courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity." United States v. Bliss, 735 F.2d 294, 297–98 (8th Cir. 1984). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717 (1961):

> It is not required . . . . that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 722–23. Accord Reynolds v. United States, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); Drougas, 748 F.2d at 29 ("[T]his court has previously recognized that the sixth amendment does not require that each juror's conscious mind be tabula rasa, let alone his or her subconsciousness."); Knapp v. Leonardo, 46 F.3d 170, 176 (2nd Cir. 1995) (finding no manifest error in state court's determination that jury was impartial despite defense argument that 83% of veniremen were excused because they had prejudged the case); People v. Ramirez, 139 P.3d 64, 87-91 (Cal. 2006) (upholding lower-court decision to keep "Night Stalker" capital murder trial in

Los Angeles despite poll of prospective jurors showing that 94.3% had heard of the case, 52.7% recalled "something about defendant, such as that he was a Satanist or that he looked evil or mean," 46% "said their concern for their safety had increased when the murders were occurring," 51.7% thought the defendant was "responsible" for the Night Stalker murders, and the defendant's venue expert testified "that the levels of recognition and predisposition were the highest he had ever seen").

Another obvious flaw in the poll is the absence of control data. For example, Tsarnaev's allegation that 37% of Boston respondents favor the death penalty if he is found guilty does not represent prejudice *against Tsarnaev* if the same percentage would favor the death penalty for *any* defendant found guilty of a capital crime. Yet a Boston Globe/ WBZ-TV poll survey of 400 Massachusetts residents in April 2003 (the most recent poll the government could find) showed that 53% of those surveyed supported capital punishment for all individuals convicted of capital crimes. See Phillips, Frank, Boston Globe, Metro/Region, at A:1, Apr. 8, 2003). If anything, a polling result that only 37% of Boston respondents favor the death penalty if Tsarnaev is found guilty would buttress the opposite of the defendant's position that Massachusetts residents are biased in favor of the death penalty for Tsarnaev.

As with so many other things Tsarnaev has deemed "crucial" to his defense, he asserts it "is crucial to analyze the contents of the pretrial publicity from both a social science and legal perspective in order to determine if it is prejudicial."  (Deft. Mot. at 7 n.7).  But the courts have routinely held otherwise.  See, e.g., Gullion, 575 F.2d at 28 (holding that a defendant had no right "to call an expert witness . . . [to] testify as to the results of a poll taken at the appellant's instance"). Instead, "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court

14

makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" Skilling, 561 U.S. at 386 (quoting Mu'Min v. Virginia, 500 U.S. 415, 429 (1991)); accord Bishop v. Wainwright, 511 F.2d 664, 666 (5th Cir. 1975) ("The trial court is necessarily the first and best judge of community sentiment.").

Moreover, the Court was amply justified in ruling that Tsarnaev was not entitled to more time to develop his presumed prejudice argument. Rule 21 provides that a change of venue motion may be made as early as arraignment, and in many cases involving alleged acts of terrorism, defendants have made them within a few months after indictment. See, e.g., United Sates v. Zacarias Moussaoui, Crim. No. 01-455 (E.D. Va. Apr. 26, 2002) (four months); United States v. John Walker Lindh, Crim. No. 02-37 (E.D. Va. May 16, 2002) (three months); McVeigh, Crim. No. 95-110 (W.D. Okla. Nov 21, 1995) (two months); see also Skilling, 561 U.S. at 369 (four months). Here, in contrast, at a hearing held five months after the Marathon bombings (and three months after indictment), defense counsel stated that they had not yet even "really thought about" the issue. The Court then allowed Tsarnaev eight additional months in which to think about and develop an argument, only to receive yet another request for additional time that could well have jeopardized the trial date. Given that a court has discretion not to hear expert testimony at all, it was certainly not an abuse of discretion for the Court to deny Tsarnaev's third request for additional time.

Like Tsarnaev, the government seeks a fair trial in a venue where the Court can seat 12 impartial jurors; the government is confident, however, that screening questionnaires and voir dire will be sufficient to achieve that goal. Rule 21(a) "has been applied almost exclusively in cases in

15

which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." United States v. Walker, 665 F.3d 212, 223 (1st Cir. 2011).   That is not the case here. Tsarnaev has not shown, and cannot show, that this case meets the requirements laid down by the Supreme Court for a change of venue based on presumed prejudice.   Accordingly, Tsarnaev's motion must be denied.[4]

## CONCLUSION

Tsarnaev has not met his burden of proving that any adverse pretrial publicity or negative community sentiment measures up to the standard required by controlling Supreme Court precedent for a finding of presumptive prejudice.   Accordingly, the Court should deny Tsarnaev's motion and rely on screening questionnaires and voir dire to select a fair and impartial jury from the Eastern Division of the District of Massachusetts.

                                              Respectfully submitted,

                                              CARMEN M. ORTIZ
                                              UNITED STATES ATTORNEY

By:    /s/ William D. Weinreb
        WILLIAM D. WEINREB
        ALOKE S. CHAKRAVARTY
        NADINE PELLEGRINI
        Assistant U.S. Attorneys

---

[4] If at any point the Court decides that a change of venue is necessary, the government requests an opportunity to brief the issue of which venue would be most convenient for "the defendant, any victim, and the witnesses, and the prompt administration of justice."   Fed. R. Crim. P. 18.

## CERTIFICATE OF SERVICE

  I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

             */s/ William D. Weinreb*
             WILLIAM D. WEINREB