UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  )
                           )
        Plaintiff,         )
                           )        Criminal Action
v.                         )        No. 13-10200-GAO
                           )
DZHOKHAR A. TSARNAEV, also )
known as Jahar Tsarni,     )
                           )
        Defendant.         )
                           )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**STATUS CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 18, 2014
10:01 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         On Behalf of the Government

6         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Esq.
7              Timothy G. Watkins, Esq.
          51 Sleeper Street
8         Fifth Floor
          Boston, Massachusetts  02210
9         - and -
          CLARKE & RICE, APC
10        By: Judy Clarke, Esq.
          1010 Second Avenue
11        Suite 1800
          San Diego, California  92101
12        - and -
          LAW OFFICE OF DAVID I. BRUCK
13        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
14        Lexington, Virginia  24450
          On Behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  All rise.
 3          (The Court enters the courtroom at 10:01 a.m.)
 4          THE CLERK:  The United States District Court for the
 5   District of Massachusetts.  Court is in session.  Be seated.
 6          For a status conference in the case of United States
 7   versus Dzhokhar Tsarnaev, Docket 13-10200.  Will counsel
 8   identify yourselves for the record, please.
 9          MR. WEINREB:  Good afternoon, your Honor.  William
10   Weinreb for the United States.
11          MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your
12   Honor.
13          MS. PELLEGRINI:  Nadine Pellegrini, your Honor.
14          MS. CLARKE:  Judy Clarke, Miriam Conrad, David Bruck
15   and Timothy Watkins on behalf of Mr. Tsarnaev, whose presence
16   has been waived.
17          THE COURT:  Good morning.
18          Thank you for your status report.  There are a number
19   of items to be addressed.  I have my list.  I think we'll start
20   with old business, and that relates to the defense objections
21   to the arrangements at Devens for family visits under the SAMs.
22   I don't know -- well, I guess I need to be brought up to date
23   as to what controversy there continues to exist or not.
24          Mr. Bruck?
25          MR. BRUCK:  If it please the Court, the only
```

1    outstanding matter is our request that legal visits with a

2    member of the defense team and the defendant's sisters be

3    treated as legal visits, which is to say confidential.  We

4    explored that last time.

5         The government made a proposal to have a fire-walled

6    person present in the room.  We object to that and think that

7    the inclination expressed by the Court, although there was no

8    final ruling, is the way it should go, that these simply are

9    legal visits with cleared members of the defense team.  There

10   has been no showing of any security reason whatsoever why those

11   visits can't be private.  They need to be in order for their

12   purpose to be accomplished.  And we would ask that the Court so

13   rule.

14        That's the only outstanding matter.

15        THE COURT:  How many such visits have there been since

16   our last conference?

17        MR. BRUCK:  Since our last one, I think one.

18        MS. CONRAD:  Two.

19        MR. BRUCK:  I'm sorry.  Two.  Excuse me.

20        And there have been problems.  I mean, it has

21   not -- we have not been able to accomplish the work that -- as

22   we think it needs to be accomplished under these conditions.

23        THE COURT:  Well, is it just a matter of

24   inconvenience?

25        MR. BRUCK:  No, it's a matter of having an FBI agent

1    sitting and taking notes and listening to everything that's

2    said.

3            THE COURT:  He's not there when you're there without

4    the sisters?

5            MR. BRUCK:  He is not there when we're there without

6    the sisters.  That's correct.  And if the sisters had a purely

7    social visit where there was no member of the defense team and

8    no defense work going on, that would be a different matter.

9    But those have not been the conditions.  And we need the

10   sisters to work with us and our client on legal matters, and to

11   confer in a protected confidential setting.  And that's why we

12   made the motion.  We think these are legal visits and we think

13   they should be treated like any other legal visit.

14           THE COURT:  Ms. Pellegrini?

15           MS. PELLEGRINI:  Your Honor, as the government

16   suggested in its proposal, we agreed that we would wall off and

17   have essentially a taint agent.  In the interim since the

18   government filed that proposal, there has also been discussions

19   between the defense and the government regarding a potential

20   agreement where there would be a further walling off, if you

21   will; that is, that the agent would only communicate with an

22   assistant United States attorney who is not part of the

23   prosecution team.  And there would only be discussions with the

24   prosecution team if by a preponderance of the evidence the

25   taint agent and the taint AUSA felt that there would be a

1    violation of the SAMs.  Other than that, we received no

2    information.

3          The government believes that that suffices for both

4    the concerns on the defense and for the government.  As the

5    government reiterated again in its proposal, we do have

6    concerns about what we call a mixed social and legal visit,

7    which has previously not been recognized by BOP and which is

8    not recognized under the SAMs, and so we've taken steps to

9    address those concerns by walling off both the agent and the

10   government.

11         THE COURT:  Okay.  I think the government's proposal

12   as amended is satisfactory.  And so you will put that

13   into -- including the addition of a fire-walled AUSA --

14         MS. PELLEGRINI:  AUSA.

15         THE COURT:  -- from another district?

16         MS. PELLEGRINI:  We hadn't discussed where that person

17   would come from.  That's possible, your Honor.  We could do

18   that if the Court so --

19         THE COURT:  You could get somebody from New Hampshire

20   or Rhode Island or someplace like that.

21         MS. PELLEGRINI:  Certainly.

22         THE COURT:  Okay.

23         MR. BRUCK:  If I may make one last comment.

24   Obviously, we will do what we can to do our mitigation work and

25   investigation under those conditions, but we can't promise that

1    we may not apply to the Court for further relief depending on

2    how it goes.

3            THE COURT:  Okay.

4            MR. BRUCK:  Thank you.

5            THE COURT:  The defense also has filed a motion for a

6    hearing regarding public comments and what the defense

7    characterizes as "leaks."  I don't know who wants to address

8    that.

9            Let me just say I saw both interviews in real time

10   when they occurred and I was not very happy about it.  I

11   thought they were completely unnecessary opportunities for the

12   communication of information which would be inappropriate from

13   active members of the prosecution team.  I recognize the

14   government's position that neither DesLausriers nor Douglas

15   were at the time employed by the government.

16           I do think that the prosecution has practical, if not

17   legal, control over them.  And I expect that the government

18   will remind people involved in the case, even formerly, of

19   their responsibility to the integrity of the trial.  I don't

20   know whether either of those people were intended to be -- or

21   are intended to be government witnesses?

22           MR. WEINREB:  No, your Honor.

23           THE COURT:  But if you have not done so, you should

24   communicate to them that it is unwise for them to -- and for

25   anybody else in their position to engage in similar interviews.

1          With respect to the prospect of having a hearing on

2     the matter, I actually think that would make things worse

3     rather than better, and I think it is better left as it is,

4     with the government reminding everyone on its team, and

5     formerly on its team, of the sensitivity of the matter and the

6     obligations under our local rules to avoid comment on any of

7     the aspects of the case.  Yes.

8          MS. CLARKE:  Your Honor, thank you for that

9     admonition.  The problem is without the Court actually weighing

10    in -- and I understand the Court's concern about, you know, the

11    hearing and what it would bring out.  But to admonish

12    government counsel to admonish people that they've already

13    admonished by way of that document that we attached to our

14    reply I don't think does it.

15         THE COURT:  Well, they've now heard what I've said as

16    well.

17         MS. CLARKE:  Well, and I just wonder if a Court order

18    is the way to go because there's got to be some sense of

19    sanctions that people would face if they are exposed to

20    continue the conduct or to violate the Court's order.

21         There's been, you know, a high level of rhetoric which

22    will -- the prosecution team has not been able to stop, and I

23    think the Court weighing in would be the next necessary step.

24         THE COURT:  I don't think a formal order would add

25    that much.  If something happens that it's similar, with or

1   without a formal order I can take appropriate action.

2          MS. CLARKE:  I think the sanction power of the Court

3   is important to us.

4          THE COURT:  I understand.

5          There are two motions related to jury matters.  The

6   defense moved for access to the instructions given to the grand

7   jury.  I reviewed the papers on that.  That motion is denied

8   essentially for the reasons argued by the government.

9          There is also a defense motion for access to jury

10  selection materials.  And that motion will be granted and we

11  will issue an order that slightly amends the draft order that

12  the defense submitted.  We have been working with our jury

13  clerk to get the best information that is possible to get off

14  the systems, and he is working -- I checked with him within the

15  hour to see what his progress was.  It is a big job, I should

16  say.

17          He told me that with respect to one of the requests,

18  he spent essentially full time for the last five and a half

19  days going through records to essentially remove personal

20  identifying information.  He's mostly done with that, and I

21  expect that we will be able to issue an order and grant access

22  to the materials that we have shortly, I hope within a few

23  days.

24          Some of the material does not exist as requested, but

25  we'll give you the best -- the clerk will give you the best

1    information that is available and practical subject, of course,

2    to the privacy concerns with respect to the individual juror

3    identification.

4        There are several motions to suppress.  Let me ask

5    first about the motion to suppress statements.  I see from the

6    status report that -- I think it indicated the parties were in

7    agreement that there would need to be an evidentiary hearing.

8    I had thought that the government's position was that it wasn't

9    offering any of the statements so no hearing was necessary.

10        MR. WEINREB:  Your Honor, we have stipulated that we

11    will not offer any of the statements in our case in chief, but

12    we did also state that we would use the statements for

13    impeachment purposes or in rebuttal if the defendant offered

14    statements.  And if they were, in fact, involuntary in the

15    constitutional sense, that wouldn't be permitted.  So --

16        THE COURT:  Right.  I think we can defer on that until

17    the time that that occurs.  In other words, if during -- we

18    could have a hearing on suppression during the course of the

19    trial if impeachment or rebuttal appears to be a prospect.

20        MR. WEINREB:  We agree.

21        THE COURT:  Okay.  So I think we can pass on that

22    motion for now, it being clear that the government will not

23    offer any of the statements in its case-in-chief.

24        As to the other motions, I think -- I'm not

25    sure -- the briefing is complete yet.  I think there may be

1    some replies coming.  We'll assess that.  I'm not sure yet

2    whether a hearing will be necessary.  The papers are pretty

3    complete.  If there is a hearing necessary, we'll set it up.

4    But it will not -- it will be an argument on the papers, I

5    would think.

6             MS. CONRAD:  Well, your Honor, I'll address this in

7    the reply -- excuse me.  But I think there may be some issues

8    that would require an evidentiary hearing, particularly with

9    respect to standing abandonment and any -- the extent to which

10   the search exceeded the scope of the warrant.

11            THE COURT:  All right.  Well, that will appear from

12   the papers and that will be part of what I'll consider.

13            I have reviewed the papers on the defense motion to

14   strike the aggravating factor that relies on a formulation of

15   betrayal of the United States, and I agree with the defense

16   position that it was unduly prejudicial and I will strike that.

17   I do that under the authority of 3593(c), I think, which I read

18   as an analog to Rule 403.

19            I think to draw a distinction between naturalized and

20   natural born citizens is highly inappropriate.  Only the former

21   take an oath, and I think to invite the jury to consider that

22   as a factor would be very inappropriate.  And I think that both

23   formulations are finned in that respect, both the original and

24   the proposed.  I think the government has -- the aggravating

25   factors that are not obnoxious, in that sense, are adequate to

1    the government's purpose.

2          So I think the big topic for the morning is

3    scheduling.  And we have to talk about a couple of matters:

4    One is 12.2, notice; one is reciprocal discovery; and one is

5    expert discovery that is not implicated under 12.2.  There are

6    two kinds of experts, I guess.

7          Somewhere -- I guess it was in the government's prior

8    submitted proposed schedule of dates -- the government had

9    suggested that it would make affirmative expert disclosures on

10   June 30th.  I don't know whether that still is a date the

11   government expects to meet.  I know that the date was suggested

12   some time ago.

13         MR. WEINREB:  Your Honor, we're actually still aiming

14   for that date.  We'd like the leeway to be able to slip it

15   perhaps a week, if necessary, but we have the materials.  We

16   are actively at work.  It's a lot of materials, but we simply

17   need to process them, Bates stamp them, get them ready for the

18   defense and hand them over with respect to the areas of

19   discovery specified in the -- in our proposal, which was

20   ballistics, fingerprint, blood and DNA.

21         THE COURT:  And what did you mean to exclude by that

22   list?

23         MR. WEINREB:  Well, there are potential other experts

24   that would be on, for example, aspects of terrorism or experts

25   that might help the jury understand terms in the note that the

1   defendant left in the boat; experts relating to the harm that

2   the defendant caused.  I don't want to get too specific now

3   because we're still investigating it and still formulating it,

4   but they would be --

5              THE COURT:  This is for the first phase?

6              MR. WEINREB:  -- non-forensic experts.

7              It would mainly be for the sentencing phase but also

8   potentially for the first phase.

9              Your Honor, as the Court -- if I can just return for a

10  moment, one of the significances of alleging something is an

11  aggravating factor is that it creates the opportunity for the

12  government to put in evidence on a particular topic.  And the

13  Court is obviously mindful of that because it just said that

14  you believe that the other aggravating factors create the room

15  for the admission of such evidence.

16             I just want to emphasize, though, that the defense has

17  made clear in this case that motive is going to be central to

18  its mitigation phase.  The last time we were here Mr. Bruck

19  said why Mr. Tsarnaev committed these crimes is going to be the

20  central issue that they will pursue in mitigation.  And our

21  theory is that he committed those crimes, in part, to aid

22  America's enemies, to provide aid and comfort to those who are

23  planning violence against the United States.  That was the gist

24  of our reformulated version of the aggravator that attempted to

25  separate out the naturalization piece as much as possible.

1          We believe that evidence is still appropriately

2     admissible under the heading of motive.  And motive is an issue

3     both at the trial and at sentencing.  So the experts who we're

4     discussing could be offered during the trial phase, it could be

5     offered during the sentencing phase, especially because the

6     jury is permitted during the sentencing phase, if there is one,

7     to consider the evidence that was admitted during the trial.

8          THE COURT:  Well, that, I guess, raises the broader

9     question which we once visited which is whether we schedule

10    separately for Phase 1 and Phase 2 with respect to some of

11    these matters.

12         MR. WEINREB:  We believe that makes no sense.

13         THE COURT:  Right.  I know you said that.  But what

14    you just said seems to be inconsistent with that.  That's what

15    I -- I know that's the path we took --

16         MR. WEINREB:  In other words, the government --

17         THE COURT:  -- at the defense's urging really.

18         MR. WEINREB:  All expert discovery should be complete

19    before the trial begins, and it needs to be that way because

20    there isn't going to be a break between the trial and

21    sentencing.

22         THE COURT:  So then when would you propose the

23    non-technical experts, if it --

24         MR. WEINREB:  August 4th.

25         THE COURT:  Which is the same date as is in the --

1          MR. WEINREB:  Yes.  The only thing I was emphasizing

2     before was that the discovery that we're ready to produce now

3     is the forensic expert discovery, essentially.  The

4     non-forensic expert discovery is what we propose to delay until

5     August 4th.

6          MR. CHAKRAVARTY:  Just with the clarification that a

7     computer and some other technical experts we might also need

8     some more time for, your Honor, just to do a full,

9     comprehensive analysis.  So I'm thinking like linguistics, a

10    geolocation expert, computer forensics to say this is material

11    that was removed from the computer and analyzed.  That the

12    exhibits themselves will have been turned over but not the full

13    expert reports, to the extent there is going to be one.

14          We can obviously disclose the qualifications and the

15    type of testimony, as we would typically do in a 702 type

16    disclosure.

17          THE COURT:  So the real date then is August, I guess,

18    for the interesting experts.

19          MR. CHAKRAVARTY:  Well, just on that point, your

20    Honor, none of that, I submit, is going to be surprising to the

21    defense.  As to information on key pieces of digital evidence,

22    for example, on the defendant's computer, neither his location

23    at certain times will be surprising; in fact, some of that

24    material, the data we turned over.

25          The forensic reports of the analysis of different

1  substances that may have been found on pieces of evidence, that

2  is information that the defense hasn't had time for, and that

3  is precisely the type of information that we have accelerated

4  to try to get to them by the end of the month, or shortly

5  thereafter, so that they can actually digest -- so that is

6  actually going to be the new -- the non-controversial evidence

7  is going to be the evidence that -- with the exception of a

8  so-called terrorism expert or somebody who is going to

9  interpret the meaning of certain terms, the vast majority of

10  the surprises are going to be, for lack of a better phrase, are

11  going to be produced soon.

12          THE COURT:  And I guess to the defense now.  I expect

13  that there will be expert evidence certainly in a Phase 2.  Do

14  you anticipate Phase 1 experts?

15          MS. CLARKE:  Yes.  And while I'm standing, Judge, I

16  notice noticeably missing from the discussion, anyway, is

17  explosives, materials, handwritings, residue, chemicals, cell

18  tower, GPS.  These are the kinds of experts that it appears the

19  government would be selecting from.  I can't imagine that we're

20  omitting explosives in this case as an area of expertise.

21          MR. CHAKRAVARTY:  Yeah, that's -- this is not an

22  exhaustive list, your Honor, of the materials that the FBI

23  Quantico lab has done and the state police crime lab has done.

24  To the extent those are complete, those reports, then we intend

25  to turn those over by the end of the month or shortly

1  thereafter.  We have just received a number of them, and you'll

2  get those promptly.

3        The ones that we don't have include the geolocation,

4  which is the cell tower analysis, and the computer forensics,

5  because those are not done necessarily out of the Quantico lab,

6  your Honor.

7        THE COURT:  Yeah, I don't -- I guess when the -- if it

8  proceeds this way, when the production's made in a couple of

9  weeks, you'll know what the first batch is and you'll know what

10 is not there, and that will be the second batch, I guess, on

11 the proposal.

12       So to come back to the question.  If the government is

13 proceeding in two steps, perhaps the defense could too, and I

14 wonder if it could be separated by Phase 1 and Phase 2.

15       MS. CLARKE:  I think that's what we recommended,

16 essentially, in our proposal, was -- because we're responsive,

17 Judge, to them --

18       THE COURT:  Well, not necessarily.

19       MS. CLARKE:  In the guilt phase we're largely

20 responsive to them.  In the penalty phase we're slightly more

21 affirmative, I think.  But our work is not going to be done

22 soon.

23       THE COURT:  I guess that's what I -- I was getting

24 more at affirmative expert disclosure but I see that there may

25 be a difference in the phases that -- because the first phase

1    the defense is essentially responsive to the government's case.

2         MR. WEINREB:  Your Honor, if I may have permission to

3    interrupt for one moment.  I don't think that the two dates

4    that we listed should be mistaken for Phase 1, Phase 2.

5         THE COURT:  I understand that.

6         MR. WEINREB:  Essentially, we have --

7         THE COURT:  You're treating it as together.  But what

8    I'm getting at is the defense may have what are called -- what

9    we can call sort of affirmative expert evidence in the penalty

10   phase because it's proposing something, whereas in the guilt

11   phase the defense is resisting something, and that makes those

12   experts a little more responsive than affirmative, that's all.

13   And so it may depend on what the government -- so it may truly

14   be a response to the government's disclosures that we learn

15   what the defense intends for the first phase.

16        MR. WEINREB:  Indeed that's true, your Honor.  But to

17   the extent that the defense is going to offer affirmative

18   experts in the penalty phase, we need the same amount of time

19   pretrial to respond to them as they would need to respond to

20   us.  That's been our point all along, that this is not the

21   normal kind of case.  The defense is going to be putting on

22   affirmative experts in the penalty phase that are every bit as

23   much affirmative as the government typically puts on in the

24   guilt phase.  And there's no way to respond to that in the

25   course of the trial.  That's why we picked 90 days from the

1  beginning of trial.

2        THE COURT:  I understand that and I generally agree

3  with it, it's just putting it into the calendar, is really the

4  question.

5        All right.  So we'll work with that.

6        The other -- not the other, because there are two

7  others.  Next is 12.2, the notice and the mechanisms.  Now, you

8  could separate the date for the notice and its contents from

9  the question of what happens on a subsequent

10  government-sponsored examination, but it seems you've addressed

11  both of them in your papers.

12        Let's talk about the contents of the notice.  I think

13  the government has asked not just for a general description of

14  the areas of expertise and instruments to be used but actually

15  an identification of experts by name.  Is that correct or not?

16        MR. WEINREB:  We have asked for that, yes, sir.

17        THE COURT:  And I guess the question I have for the

18  defense is:  What's wrong with disclosing the identity of an

19  expert in addition to his or her field?  In other words, how

20  much difference is there between saying "a forensic

21  psychiatrist" and "Dr. Smith, a forensic psychiatrist"?

22        MS. CLARKE:  Well, I don't -- most courts don't order

23  that.

24        THE COURT:  I know, and I wonder why.

25        MS. CLARKE:  And for very good reason.  Because that's

1    forcing the defense to provide to the prosecution in advance of

2    the presentation of that evidence, or a decision even to

3    present that evidence --

4            THE COURT:  But it's not saying anything about the

5    content; it's just saying who it is.

6            MS. CLARKE:  Well, but the government's not entitled

7    to know who our experts are until we're prepared to actually

8    put them on.  That just doesn't seem to be the procedure that

9    courts have followed.  It's requiring more than the rule

10   requires.

11           THE COURT:  The rule is silent on it.

12           MS. CLARKE:  Well, which is notice of the intent to

13   introduce the evidence.

14           THE COURT:  Do you have any objection to the -- what

15   was required in the Samson case?

16           MS. CLARKE:  I'm sorry?

17           THE COURT:  Do you have any objection to what Judge

18   Wolf ordered in the Samson case?

19           MS. CLARKE:  I don't recall what Judge --

20           THE COURT:  That is, the fields and instruments tests

21   to be applied.

22           (Counsel confer off the record.)

23           MS. CLARKE:  I don't think we have a problem with --

24   if there's to be a 12.2 notice.  And, you know, we're not

25   there.  We don't even know.  But if there's to be a notice, it

1    seems fair to say we intend to introduce it.  And as to

2    12.2(b)(1) or (2), right?

3            THE COURT:  Right.

4            MS. CLARKE:  And what the areas to be covered are:  Is

5    there psychiatric testimony, is there neuropsychological

6    testimony, you know, that sort of area to give the government

7    some kind of an indication of what their rebuttal case would

8    focus on.

9            THE COURT:  With respect to the post-notice

10   proceedings, again, I think it was done in the Samson case, and

11   the government suggests it here, that another firewall team be

12   appointed to address issues about the execution of the

13   examination and anything else that might arise so the

14   prosecutors here aren't involved in those matters.  It seems

15   for the benefit of the defense, I guess.  So I don't know if --

16           MS. CLARKE:  I don't think we're inclined to agree to

17   a firewall or to urge the Court to implement a firewall.  The

18   rule does not envision that.  There is a Fifth Amendment shield

19   which a firewall, you know, doesn't necessarily address.  And

20   it has proved to be a very cumbersome, potentially dangerous

21   process by communication that goes on anyway between the

22   experts and the prosecution.  It's just -- we have not seen it

23   work as effectively as the initial impression was.

24           MR. BRUCK:  It's contrary to the rule.

25           MS. CLARKE:  It's contrary to Rule 12.2.

1          THE COURT:  Why is it contrary?

2          MS. CLARKE:  Because the rule sets forth the way in

3    which proceedings occur in 12.2.

4          THE COURT:  It's contrary by omission, I guess is what

5    you're saying?

6          MS. CLARKE:  Yes.

7          (Counsel confer off the record.)

8          MS. CLARKE:  Mr. Bruck is correct.  It specifies that

9    the information shall not be disclosed to any lawyer for the

10   government, which a firewall lawyer would be.

11         THE COURT:  Right.  How would controversies about the

12   manner of examination be -- legal controversy be resolved if

13   the government couldn't have a lawyer?

14         MS. CLARKE:  I think the process is this:  That the

15   defense provides the notice, the government then seeks an

16   examination --

17         THE COURT:  Right.

18         MS. CLARKE:  -- by its expert.  And the Court then

19   will have a hearing on whether that -- what that expert can do.

20   It is a rebuttal right; it is not an affirmative right of the

21   government to go trouping around through the government's head.

22   It's a rebuttal right.

23         So depending on the narrow framing of the defense

24   notice, the Court would have to make a decision as to how much

25   testing or what's permitted by the government's expert and

1    whether, in fact, an evaluation is even necessary.  We're not

2    to that point.

3          So there will be a decision point for the judge, for

4    you, after we file notice and the government then seeks to have

5    an examination.  The government may see our notice and not seek

6    to have an examination.  We may not file any notice.  We may

7    file a notice and they may seek not to have an examination.

8    They may seek to have an examination broader than our notice.

9    But we'll have to have a hearing before this Court on what is

10   permitted.

11          THE COURT:  All right.  Well, you're right that the

12   rule contemplates proceeding in steps.  And I guess I started

13   by saying it looked like you're collapsing the steps, but I

14   think probably it's prudent to just take the first step and

15   then we'll get the government's motion, which there will be

16   suggested conditions, which you'll object to, and which we'll

17   thrash it out.

18          And I guess the final category is reciprocal discovery

19   under 16(b)(1)(A) and (B), particularly.  (C) we've talked

20   about separately as the expert disclosures.  And I guess I have

21   your submissions about that.  So we'll issue an order setting

22   some dates.

23          Yesterday, I guess, the government filed a motion for

24   an order of excludable delay that takes us through today.  It's

25   said to be assented to.  I assume it is?

1          MS. CLARKE:  That's correct.

2          THE COURT:  All right.  That motion is granted.

3          I guess the next question is we shouldn't leave here

4     without a further status date.

5          MS. CLARKE:  Your Honor, there were, I think -- unless

6     I just missed it, there are three additional motions on the

7     list.

8          THE COURT:  Right.  With regard to the -- I'll rule on

9     the papers on those.

10         MS. CLARKE:  Okay.

11         THE COURT:  I think the date we looked at was August

12    14th.  I want to keep in touch with you.  That's a status date.

13    There may be a hearing date between now and then for one thing

14    or another, or maybe it will be that day.  We'll see what gets

15    filed.

16         MS. CLARKE:  At 10 a.m.?

17         THE COURT:  Yes.  That's a Thursday, I believe.

18         MR. WEINREB:  That's good for the government.

19         THE COURT:  Okay.  Anything else?

20         MR. WEINREB:  I guess we would just ask that the

21    defense consent to the exclusion of time between now and the

22    next status hearing date.

23         MS. CLARKE:  Yes.

24         THE COURT:  I think for the same reasons outlined in

25    the motion just allowed, that's appropriate.

1          MR. WEINREB:  Yes.

2          MS. CLARKE:  Thank you, your Honor.

3          THE COURT:  Okay.  Thank you.

4          THE CLERK:  All rise for the Court.

5          (The Court exits the courtroom at 10:36 a.m.)

6          THE CLERK:  Court will be in recess.

7          (The proceedings adjourned at 10:36 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4    the United States District Court, do hereby certify that the

 5    foregoing transcript constitutes, to the best of my skill and

 6    ability, a true and accurate transcription of my stenotype

 7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8    United States of America v. Dzhokhar A. Tsarnaev.

 9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:   7/18/14
13

14

15

16

17

18

19

20

21

22

23

24

25
```