UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**MOTION TO COMPEL THE GOVERNMENT TO COMPLY WITH ITS EXPERT DISCLOSURE OBLIGATIONS, AND TO SUSPEND DEFENDANT'S EXPERT DISCLOSURE DEADLINE**

This Court's Scheduling Order set a deadline of June 30, 2014 for the government to produce "affirmative expert discovery pertaining to ballistics, fingerprint, blood, and DNA evidence," with the remainder of the government's affirmative expert discovery due by August 1. The Order set a deadline of September 2 for affirmative defense expert discovery.

To date, the expert witness disclosures that the government has produced are deficient because they fail to provide what the Rules of Criminal Procedure expressly require: "a written *summary of testimony*" by each anticipated expert, which "must *describe* the witness' opinions, the bases and reasons for those opinions, and the witness' qualifications." Fed. R. Crim. P. 16 (a)(1)(G) (emphasis added).

Moreover, in connection with its so-called expert disclosures, the government since July 8, 2014, has produced more than 10,000 electronic files comprising reports of various forensic examinations, tests, and underlying data. Some of the individual electronic files are hundreds of pages long; together they fill nearly 90 gigabytes of digital media. The government has not provided any index to the files, and the materials

do not appear to be grouped or organized in any particular way. An initial cursory review of these materials indicates that a substantial number were completed in 2013, many within weeks of the Boston Marathon Bombing and the defendant's arrest. But the government did not produce these "results or reports of . . . scientific test[s] or experiments" until now, despite repeated assurances to the Court that it had fully complied with its automatic discovery obligations.[1] *See* Fed. R.Crim. P. 16(a)(1)(F). The timing and sheer volume of these disclosures place the defense in an untenable position, and preclude defense expert disclosures by September 2.

In light of these developments, defendant Dzhokhar Tsarnaev, pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, Fed. R. Crim. P. 16(a)(1)(G) and 16(d)(2), and Local Rules 116.1(c)(1)(A), 116.3(g), 116.7, and 116.10, respectfully moves this Court for an order

    (1)    requiring the Government to produce expert disclosures in compliance with Fed. R. Crim. P. 16(a)(1)(G) and this Court's Scheduling Order;

    (2)    requiring the government to produce an index and/or usable organizational structure for the underlying lab reports and data that it has provided; and

    (3)    suspending the deadline for defendant's responsive expert disclosures to permit the defense team to make sense of the government's disorganized disclosures, to identify and retain its own experts, and to determine whether *Daubert* and other challenges to the admissibility of the proposed evidence and testimony may be warranted.

---

[1] E.g., 9/23/2013 Status Conference Tr. at 5 ("Your Honor, it's the government's view [that] automatic discovery is complete."); 11/12/2103 Status Conference Tr. at 9 ("We have, in fact, provided . . . all the material that is called for under automatic discovery.").

- 2 -

The factual and legal bases for the requested relief are set forth in detail below.

## BACKGROUND

1.      The Court's June 23, 2014 Scheduling Order set a deadline of June 30, 2104 for "Government affirmative expert discovery pertaining to ballistics, fingerprint, blood and DNA evidence." [DE 385]. At the June 18 status conference giving rise to the Order, the government suggested that its disclosure would actually occur on a rolling basis until its final disclosures on August 1, 2014. 7/8/14 Tr. at 12-19. On June 30, 2014, the government provided a spreadsheet that it described as its "first set of expert disclosures" although, as discussed below, it admitted that the disclosures were incomplete. The government's letter of June 30, 2014 is attached hereto as Sealed Exhibit A; the accompanying spreadsheets listing FBI and the Massachusetts State Police Forensic Services Group ("MSP") laboratory reports are attached hereto as Sealed Exhibits B and C, respectively. The spreadsheet contained links to a number of forensic lab reports and C.V.'s that were also provided.

2.      The June 30 "disclosure spreadsheet" includes columns for "summary of results," the name of the examiner, and (in some cases) the C.V. of the examiner. The disclosure spreadsheet covered 14 different areas, including ballistics, chemistry, digital media, DNA, electronics, explosives, fingerprints, gunshot residue, metallurgy, navigation devices, toolmark, trace evidence, questioned documents and video image analysis. Links from this spreadsheet lead to 72 individual reports from 33 individuals

- 3 -

identified as experts.  CV's were provided for 17 of the 33 individuals.  All but 11 of the 72 reports were dated in 2013.  The last of the 2014 reports was dated May 12, 2014.

3.  The "summary of results" column that purports to show the opinion of the putative expert contains short clauses separated by semi-colons and appears to have been copied directly from underlying reports of the experts.  The summaries typically refer to lab and item numbers.  Although each link contained in the spreadsheet correlates to a single report, the lab and item numbers actually are correlated to multiple reports.

4.  What each listed opinion in the "summary of results" column does *not* contain is "a written summary of testimony . . . [which] describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G).  Instead, the summary of results consists of cut-and-pasted excerpts of observations made during the testing and examination done by each purported expert.  The contents of the summary of results field fail to disclose the actual opinion that the expert will give at trial, or the bases for it.

5.  Moreover, virtually none of the reports linked from the spreadsheet, which purportedly contain the bases and reasons for the opinions, include

> a description of the sample received, what the examiner did to ready the sample for the test(s), a description of the tests performed, how the tests worked to detect the item, what physically was done with the questioned items during the tests, what physically occurred to the sample as a result of the tests, what occurred which led the examiner to his or her conclusion that the item was the examiner purported it to be, any steps taken to review the tests results to insure accuracy, any other action with respect to the item or its testing, and what the examiner did with the item after examination."

*United States v. Wilkerson*, 189 F.R.D.14, 16-17 (D. Mass. 2002) (elaborating requirements of expert disclosure).

6.      One week later, on July 7, 2014 – a week after the June 30 deadline set by the Court – the government provided defense counsel with three Blu-ray disks containing in excess of 9,000 electronic files. These disks were provided without any index, cover letter, or other organizing guide. The disks appear to contain reports of examinations and tests supporting the opinions to be introduced at trial on the subjects identified as the "first set of expert disclosures" referred to in the government's June 30 letter. Some of the 9,000 files are hundreds of pages long.

7.      To the defense team's request for an index of these reports, the government responded by email on July 9:

> The version of the Lab Reports discs we sent over is intended to be extracted onto some media as essentially parts 1-3, so its [sic] reassembled in the essentially the form that we received it in. From that we extracted the final reports and provided you with the spreadsheet of those, but have not yet done an index of all of the underlying bench notes, etc. We've started the process of further organizing these, but given the volume and the fact that there are additional bench notes, etc. which we expect to turn over, it will take some time and manpower to comprehensively organize it. If and when we prepare some type of index or Bates number this stuff, we plan to provide you with an index. That being said, it's not certain that we will have such a product at the end of this, or what the timing will be for that to happen.

8.      On July 18, 2014, two and one-half weeks after the deadline, the government provided several hundred additional reports of examinations and tests by the

- 5 -

FBI and the Massachusetts State Police ("MSP"), as well as extensive electronic data connected to some of the tests performed. In connection with this disclosure, the government provided two documents entitled "Crime Lab Reports File Lists." The first of the two lists is 297 pages; the second of the lists is 1,024 pages long. Despite their length, the lists contain no index or organizational guide showing which reports underlie and support which expert's work. Apparently recognizing the flaw, the government in a July 17 email delivered the following caveat regarding this disclosure:

> We recently received some additional supporting information from the labs which took up a Bluray disc[2] and a DVD. We're sending those over in the morning, but here are the lists of files on them. We do not have these organized in some other way at this time.

9. Three weeks after the disclosure deadline set by the Court, the government continues to provide information in connection with its June 30 "first set of disclosures," including a supplemental disclosure dated yesterday, July 24, 2014.

---

[2] A Blu-ray disc is capable of storing up to 25 gigabytes of data, more than five times that of a traditional DVD. Added to the 9,000 reports produced on July 7, which were provided on three Blu-ray discs containing approximately 20 gigabytes each — the reports of tests and examinations are approaching 90 gigabytes of data.

**ARGUMENT**

The government's expert witness disclosures to date do not comply with Rule 16(a)(1)G.  The so-called "summaries" compiled in spreadsheet form do not constitute "a written summary of testimony. . . [which] describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).   Additionally, the government has yet to include the qualifications or C.V.s, of many of the named experts in fourteen different areas of extremely complex forensic evidence.

Furthermore, the volume and form of the materials provided – more than 10,000 reports and electronic data without any understandable organizing principle or index – is insufficient to allow any reader to discern the bases of expert witnesses' opinions, if indeed the bases are contained therein.

### A. Rule 16(a)(1)(G) Requires that Disclosures Concerning Scientific and Technical Expert Testimony Provide a Summary of the Witnesses' Opinions, the Bases and Reasoning Underlying the Testimony, and the Experts' Qualifications.

Rule 16 requires the government to provide "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).  The Rule is "intended to minimize surprise that often results from unexpected expert testimony,

- 7 -

reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Advisory Committee Notes to 1993 Amendment to Fed. R. Crim. P. 16.

As the Second Circuit has noted, "Rule 16 provides markedly broader discovery with respect to expert witnesses for the government than is required for other types of information *from* the government. Rule 16 provides that the defense is entitled to discovery of a written summary of expert testimony that the government intends to use in its case-in-chief." *United States v. Dukagjini,* 326 F.3d 45, 56 (2d Cir. 2002)*; see also United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The government's notice provided a list of the general subject matters to be covered, but did not identify what opinion the expert would offer on those subjects.").

Where, as here, a case involves technical and scientific evidence over a wide variety of subjects, detailed expert disclosures are essential to permit the defendant to adequately prepare for trial. *See United States v. Jackson,* 51 F.3d 646, 651 (7th Cir. 1995) ("[C]ases involving technical or scientific evidence, may require greater disclosure, including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed. R. Evid. 703."). Counsel cannot adequately cross-examine the prosecution's scientific experts or prepare *Daubert* challenges where such challenges may be warranted without understanding the bases underlying the testimony and opinions. *See, e.g.*, *United States v. Caputo*, 382 F.

Supp. 2d 1045 (N.D. Ill. 2005) ("It is exceedingly difficult to cross-examine a scientific expert witness about the results of a scientific test without an opportunity to first review the test giving rise to the results."); *United States v. Robinson*, 44 F. Supp. 2d 1345, 1346 (N.D. Ga. 1997) (holding that in a fingerprint case, Rule 16(a)(1)(G) required disclosure of all the points of identification on which the government's expert would rely as a basis for her opinion that the defendant's prints appeared on evidence; "If a defendant does not have the bases for the government's opinion, there is no way the defendant's counsel can effectively cross-examine the expert. It is this issue, which goes to the fairness of the trial, that the court must always keep in mind in dealing with discovery issues in a criminal case."); *Wilkerson*, 189 F.R.D at 16-17 (explaining that Rule 16(1)(1)(G) requires detailed summary of scientific tests performed).

### B. The Government's Expert Disclosures Fail to Comply with Rule 16(a)(1)(G).

The cases cited make clear that the government's disclosure to date is deficient under Rule 16(a)(1)(G). The Court should therefore order the government to supplement its disclosures by clearly identifying the opinions to be given and the bases for those opinions.

This case involves an extraordinary amount of scientific and technical expert testimony concerning several crime scenes. The defendant should be able to analyze and understand all of this scientific evidence prior to filing any *Daubert* motions, a goal implicit in the Court's scheduling order. That goal cannot be achieved when the government discloses numerous experts whose testimony is apparently important to the

prosecution, yet provides only a disjointed list of observations and laboratory conclusions, and does not provide the opinions that its experts will render, nor disclose in an intelligible format the bases of the expected testimony.   The defense should not be required to evaluate and confront this testimony on the spot at trial, or to try to guess which of thousands of pages of discovery serve as the bases of the expert's testimony, if indeed any of them do.  *See 1993 Advisory Committee Note to Rule 16* ("[Rule 16 (a)(l)(G)] is intended to permit more complete pretrial preparation by the requesting party.").

With few exceptions, the government's disclosures do not come close to providing the required "summary of testimony" by each expert.  And none contain the necessary information about the expert's findings or opinions, beyond the regurgitation of certain observations in their lab reports.  The disclosures give few if any specifics as to the actual opinions that will be offered, and it is unclear that the disorganized underlying reports contain information of which tests, if any, a particular expert conducted, what methodologies were employed, or what specific documents or other material were reviewed.

While many examples could be provided, and all of the disclosures deviate from the standard prescribed by Rule 16(a)(1)(G), four examples from the disclosures are representative of the government's failure to comply with the Rule.  In the first example, the government has identified a single "Hair and Fiber Analysis" expert, whom it

proposes to have testify about head hair identification, "textile fibers found in various locations [that] were preserved for future comparisons," melted fuses, and the characteristics of various pieces of tape taken from various scenes. *See* Sealed Ex.B, FBI Laboratory Reports, Line 18. The summary indicates that certain samples are "consistent" with others, but provides no bases for any of these opinions. Expert testimony in each of these fields is controversial and subject to *Daubert* challenge.[3] The failure of the government to provide with clarity the opinion that this expert will give as to each piece of evidence, and to identify the tests that underlie the opinion, makes defense review and preparation impossible.

The second example is the government's ballistics disclosure. The government has identified a ballistics examiner who purportedly matched hundreds of shell casings and spent projectiles to at least twenty (20) weapons. *See* Sealed Ex. C, "MSP Laboratory Reports," Line 8. The "opinion" is nothing more than a listing of discharged

---

[3] *See* Giannelli, Paul, "*Daubert* and Forensic Science: The Pitfalls of Law Enforcement Control of Scientific Research" (2010) University of Illinois Law Review, Vol. 2011, at 55, fn. 11 (citing Paul C. Giannelli, *Microscopic Hair Comparisons: A Cautionary Tale*, 46 CRIM. L. BULL. 531 (2010) (discussing the DNA exoneration cases in which hair evidence was used to convict the innocent); Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 COLUM. HUM. RTS. L. REV. 227, 231 (1996) ("If the purveyors of this dubious science cannot do a better job of validating hair analysis than they have done so far, forensic hair comparison analysis should be excluded altogether from criminal trials."); see also NAT'L RESEARCH COUNCIL, NAT'L ACAD. OF SCIS., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009)(NAS Report), at 161: "testimony linking microscopic hair analysis with particular defendants is highly unreliable."

items that, he concluded, matched to the weapons (all but one belonging to law enforcement).  Missing from the report is identification of the actual opinion, *i.e.*, what piece of evidence went with which firearm belonging to which officer.  More importantly, the disclosure lacks any indication of the bases of his opinion, including what tests he conducted, what methods he used, and what specific documents or other material he reviewed in making the comparison.   Finally, there appear to be no underlying reports documenting the work conducted.  Expert testimony in toolmark and ballistic identification is also controversial and subject to *Daubert* attack.[4]  The failure of the government to provide with clarity the opinion this expert will give as to each piece of evidence and to identify the tests that underlie the opinion makes defense review and preparation impossible.

     Fingerprint analysis is a third example.  The government has indicated that it expects to call fingerprint examiners from both the FBI and MSP at trial.  While the government appears to have provided some underlying basis (such as bench notes and photographs) for its MSP examiner conclusions, none has been provided for the FBI examiner.  The FBI's fingerprint analysis procedure has been recently demonstrated to be

---

[4] *See, e.g. United States v. Green,* 405 F. Supp. 2d 104, 109–16 (D. Mass. 2005)("The more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more."); *see also United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006)(excluding the specific testimony at issue, because the experts failed to properly document their basis for identification, and because an independent examiner had not verified the experts' conclusions).

flawed.  *See generally*, United States Department of Justice, Office of Inspector General, *A Review of the FBI's Progress in Responding to the Recommendations in the Office of the Inspector General Report in the Fingerprint Misidentification in the Brandon Mayfield Case*, January 2006.[5]  Consequently, admissibility is a live issue.  But the issue cannot be joined or reliably decided without the disclosure of the basis for the FBI fingerprint examiner's opinions.

A final example concerns the government's proffered expert opinion regarding the mechanics of the devices on Boylston Street.  *See* Sealed Ex. B, "FBI Laboratory Reports," Lines 2-13.  The defense expects that the testimony will be detailed and technical and that conclusions will be drawn from the nature and location of various items of evidence collected at two Boylston Street scenes and the surrounding area.  While the government has provided some minimal information regarding the bases for the various opinions it intends to elicit, it has not provided documentation of the scene and of the procedures used to collect evidence from the scene.[6]  Analysis of the proffered

---

[5] Available at http://www.justice.gov/oig/special/s0601/exec.pdf.

[6] On May 23, 2014, defendant by letter requested that the government provide "photographs, reports, logs, and any other memoranda regarding (a) collection of evidence forwarded to the FBI Laboratory from the Boylston Street bombing sites, and (b) the chain of custody records documenting the transfer of collected evidence from the bombing sites to the FBI laboratory."  The government by letter dated June 10, 2014 responded, "[a] large amount of evidence was collected in this case, and only a fraction of it will be offered at trial.  Compiling collection and chain of custody information is burdensome and time-consuming because portions of the information often can be found only on the evidence bag (or other evidence container) itself. With respect to evidence we

expert opinions is impossible without documentation of the physical evidence that forms the subject matter of the opinion.

Rule 16(a)(l)(G) does not require that defendants wait until trial for the specifics of expert opinions and their bases, nor for the rest of the information required for effective preparation for expert testimony. The government's failure to provide all legally-mandated information regarding their experts' opinions is troubling, and casts doubt on the government's willingness or ability to provide full and complete disclosures in sufficient time to permit defense preparation.

The law regarding expert witness disclosures under Rule 16 is clear, and the government's disclosures do not meet the requirements of either Rule 16 or due process. The Court should therefore order the government to supplement its disclosures.

### C. The Court Should Suspend the Defendant's Reciprocal Expert Discovery Obligations.

The Court's June 23, 2014 Scheduling Order established a deadline of September 2, 2014 for the defense's affirmative expert disclosure and reciprocal discovery under Fed. R. Crim. P. 16(b)(1)(A), (B), & (C). [DE 385]. The government's incomplete

---

intend to offer, we regard the collection and chain of custody reports to be *Jencks* material, and will produce it at the appropriate time. Otherwise, we will produce such information only if you can identify a law requiring its production." Clearly, Fed. R. Crim. P. 16(a)(1)(F) & (G) require the production of the requested discovery for any of the items examined by the government experts. The defense also requires access to this information in order to determine whether government experts may be impeached with reference to crime scene evidence that they either chose not to review or were not provided to review.

disclosure, particularly its failure to actually set forth the opinions it expects to elicit at trial, will impede defense preparation and make it impossible to respond by the current September 2, 2014 disclosure date.

Aside from the obstacles created by the government's incomplete disclosure under Rule 16, the *manner* by which the government has provided the underlying reports makes adherence to the September deadline by the defense impossible. As noted above, the disclosure of the underlying reports is disorganized and extraordinarily voluminous. Moreover, many important laboratory reports have been provided in an unsearchable format, a feature crucial to properly categorizing and reviewing the underlying reports. The disorganization makes discovery review much more time-consuming than it would otherwise be, as it forces the defense team to pick through multiple folders of documents with unilluminating file names to attempt to determine what document might underlie the finding of a particular expert in the identified field. This needlessly tedious process is likely to lead to error.

With just over three months remaining until the November 3 trial date, the defense is faced with many other urgent and time-consuming tasks unrelated to expert witnesses that must be completed before counsel will be prepared to discharge their constitutional obligation to defend their client at trial. At this late date, defense counsel simply cannot dedicate the hundreds, if not thousands, of staff hours necessary to make sense of the discovery (with more looming as the government's August 1 deadline approaches),

identify salient issues, make further discovery requests as necessary, and obtain the expert assistance necessary to understand and respond to the government's forensic case.

The tremendous burden on the defense caused by the massive yet disorganized and still incomplete disclosure by the government could have been avoided. Review of the final reports in most of the fields identified by the government reveal conclusions drawn months ago; many were completed a year ago. The government's decision to delay disclosure of so many experts in so many fields, and to make its ultimate disclosures in such a disorganized and incomplete manner, requires suspension of the defense expert disclosure deadline.

## **CONCLUSION**

For the foregoing reasons, the defendant requests that the Court Order the government to produce (1) a disclosure that complies with Rule 16(a)(1)(G) by including actual opinions and the bases for them, and (2) an index and/or understandable organizational structure for the underlying lab reports and data provided that ties the data to each identified expert. Defendant further requests that given the incomplete, delayed, and disorganized, disclosures to date the Court (3) suspend the due date for defendant's responsive disclosures until such time as the government has complied with its own disclosure obligations, and the defense has been afforded sufficient time to evaluate them.

Respectfully submitted,
DZHOKHAR  TSARNAEV
By his attorneys

/s/ *Timothy G. Watkins*

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## **CERTIFICATE OF SERVICE**

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 25, 2014.

/s/ Timothy G. Watkins