UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**FILED UNDER SEAL**

UNITED STATES OF AMERICA,       )
                                )
        v.                      )       CRIMINAL NO. 13-10200-GAO
                                )
DZHOKHAR TSARNAEV               )

**SEALED SUPPLEMENTAL MOTION TO COMPEL THE GOVERNMENT
TO COMPLY WITH ITS EXPERT DISCLOSURE OBLIGATIONS**

In his July 25, 2014 *Motion To Compel the Government to Comply with its Expert*

*Disclosure Obligations, and to Suspend Defendant's Expert Disclosure Deadline* [DE

440], the defendant Dzhokhar Tsarnaev informed the Court of the government's lack of

compliance with its disclosure obligations under Fed. R. Crim. P. 16 (a)(1)(G), and

requested appropriate relief.  At the same time, he further moved for an order clarifying

that his own September 2, 2014, expert disclosure deadline extended only to experts who

will testify at the guilt-or-innocence phase of the trial [DE 442], and that neither this nor

any other defense disclosure obligation should be enforced until the government first

complied with its own obligations.

At 7:16 p.m. on August 1, 2014, the final day for government's expert disclosures

under this Court's scheduling order, defense counsel received by e-mail a 12-page letter

with 21 attachments.[1]  Bearing out the Court's wry prediction at the last status conference

---

[1] The attachments included 12 CVs, two articles written by one of the government's experts on radicalization and violent jihad, six articles purporting to document widespread traumatization of children following the Marathon Bombing and the New York 9/11 attack, and one FBI Firearms/Toolmarks Lab report,

that the government's "real date then is August, I guess, for the interesting experts,"

6/18/2014 Tr. at 15, the letter reveals the government's intention to call as many as three

experts on "terrorism and geopolitics," two FBI computer forensic specialists,  two

linguists, an FBI cell phone analyst, four medical doctors to provide numerous details

about the grievous wounds suffered by the deceased and surviving bombing victims, a

pediatric psychologist to describe his own research studies that predict long-lasting

psychological harm to countless thousands of Boston-area schoolchildren, a FBI

toolmarks expert, and as many as three FBI explosives experts.

The government's letter is filed as an exhibit to this Supplemental Motion (also

under seal, because it is subject to a protective order).   Once again, as with its massive

June 30-July 7 disclosure, the government has failed to provide anything close to what

Fed. R. Crim. P. 16 (a)(1)(G)  expressly requires:  "a written *summary of testimony*" by

each anticipated expert, which "must *describe* the witness' *opinions*, the bases and

reasons for those opinions, and the witness' qualifications." (Emphasis added). The

government's letter does little more than identify myriad subject matters about which the

experts will testify, without revealing the actual substance of their testimony or the

particular facts and evidence in the case upon which their prospective testimony is based.

It is well-settled that an expert disclosure is deficient where, as here, "[t]he government's

notice provided a list of the general subject matters to be covered, but did not identify

what opinion the expert would offer on those subjects." *United States v. Duvall*, 272 F.3d

- 2 -

825, 828 (7th Cir. 2001); *see also United States v. Capleton*, 199 F.R.D. 25, 27 (D. Mass. 2001) ("Here, the government has notified Defendant of little more than the subject matter of [the expert's] testimony.").

**1.     Terrorism and geopolitics – Mr. Evan Kohlmann, Dr. Matthew Levitt and Dr. Sebastian Gorka**

The government's letter begins by announcing that the prosecution intends to call "one or more" of three named expert witnesses on the topic of terrorism and geopolitics. The description of their anticipated testimony is almost wholly generic and could apply to virtually any Islamic terrorism case or defendant in the internet age

Where the letter makes reference to "the defendant," the references are vague and unsupported by even a single reference to any specific item of evidence in the case.   For example, the government's letter states:

> Various statements of the defendant, as well as writings, recordings, photographs, and videos in his possession contain phrases, images and symbols, or refer to concepts, relating to global jihad and terrorism.   The witnesses will explain the meanings of these phrases, images, symbols and concepts, which include:  fard ayn (the duty to engage in terrorism), Islamism, al wala a barra (enmity and loyalty), kufar, Hijra, Caliphate, al Sham, Khorosan, Janna, Jahannam, Firdaws, Akhira, Quiyamat, Tawhid, Jahalliyyah, the Battles of Badr and Uhd, shahada, flags with shahada, Mujahideen, martyrdom, shahid, and rewards in the afterlife.

The deficiencies of this disclosure are plain.  Which *particular* statements, writings, recordings, photographs, and videos" purportedly "in the defendant's possession" will the expert(s) testify about?  What "phrases, images . . . symbols [and] concepts" are contained in or referenced by each such item?  What, specifically, will the expert(s) say

about the meaning of the various listed "phrases, images, symbols, and concepts"?  The
government's letter provides no answers.  Virtually every paragraph of the government's
letter, in similar fashion, raises more questions than it answers.

After three pages of mostly boilerplate references to the entire universe of
contemporary violent jihadist movements, the government's closest approach to
specificity is this:

> [W]e expect the witnesses to testify that radicalization can occur with little
> or no urging from others, and that the evidence in this case is consistent
> with the defendant's having largely self-radicalized. The witnesses will
> testify that the defendant has much in common with other young men who
> are known to have self-radicalized, including similar family relationships,
> family background, religious identity, external influences, intelligence, and
> exposure to jihadi propaganda. The witnesses will discuss circumstances
> associated with family members' playing a substantial role in the
> radicalization process *and their absence in this case.*

Letter at 5 (emphasis added).

In this last sentence, the government indicates that its three experts (or some
subset of them) plan to take aim at a self-evident mitigating factor in this case – the
powerfully dominant role of the defendant's older brother Tamerlan.  It appears that the
government intends to deploy one or more of these experts to disprove this mitigating
factor by contrasting the evidence in this case to some unknown set of comparable
"circumstances associated with family members' playing a substantial role in the
radicalization process." The goal of this exercise, apparently, is to show that Dzhokhar
"self-radicalized," and by inference that Tamerlan did not greatly influence his actions.

This opaque passage merits closer examination.  What *are* the circumstances "associated with family members' playing a substantial role in the radicalization process?"  How do the government's experts know what they are?  What are the underlying facts and research data on which these expert opinions are based?  And most critically, how did the government expert(s) conclude that these unnamed "circumstances" are "absen[t] in this case?"

The answers to these fundamental questions are the "the bases and reasons" for the experts' opinions, and thus Fed. R. Crim. P. 16 (a)(1)(G) and the Court's scheduling order require the government to provide the information in advance of trial.  Here the government has done nothing of the sort.  Its "disclosures" leave the defense no more able to prepare for trial than before the government made them.  Counsel now know who (or at least have been given a 33 percent chance of guessing who) will be called to testify on these crucial matters.  But what any of them will say about Dzhokhar Tsarnaev himself and about the actual evidence in the case remains unknown, as does the experts' methodology (if any) for drawing the conclusions about him that the government proposes to place before the jury.

Moreover, to the extent that the government identifies the sources of information on which its Islamic radicalism experts' opinions will be based, these turn out to be the experts' own "qualifications and experience, the [unspecified] evidence provided to them in this case, and the facts as alleged in the indictment and presented at trial."  Letter at 2.

There is no need to belabor the inadequacy of such "notice." Nor is the situation helped by the government's assurance that "[r]eports of testifying witnesses will be provided when received," Letter at 1, as none have been provided, and the final deadline for the government's expert disclosures has now passed.

Another observation must be made about the government's discussion of its "terrorism" experts. Despite its failure to provide the "bases and reasons" for any of the experts' opinions, or even clear statements of what those opinions are, the "terrorism" disclosure is studded with extraordinarily prejudicial statements and claims. For example, the government states that at sentencing,

> the witnesses will also testify that the defendant's crimes, relative to other acts of terrorism, were especially heinous, had an extraordinary impact on victims and the community, reflect an extraordinary commitment to violent jihad, and demonstrate that he poses a risk of continuing harm.

The disclosures give no clue as to how the experts intend to substantiate such "worst-of-the-worst" testimony. It is therefore impossible to evaluate it or its admissibility under either the Federal Death Penalty Act or the Constitution. This omission is particularly serious with respect to the claim that the defendant "poses a risk of continuing harm." Such "dangerousness" allegations must take into account that, if convicted of any of the capital crimes charged in the indictment, the defendant will necessarily live out the entire remainder of his life in a high-security federal prison. Any risk assessment that fails to take such a foundational circumstance into account cannot possibly aid a sentencing jury. See *Simmons v. South Carolina,* 514 U.S. 154 (1994) (due

- 6 -

process entitles capital defendant to rebut future dangerousness allegation by showing

that he will never be released from prison); *United States v. Llera Plaza*, 179 F.Supp.2d

464, 487-488 (E.D. Pa. 2001) (jury must evaluate federal defendants' future

dangerousness in the context of life imprisonment, so "the government will be requested

to limit its sentencing phase evidence to that which is relevant to a context of life

imprisonment.")  But in the absence of any suggestion that the government's experts are

prepared to support their risk assessment with reliable and relevant data about Mr.

Tsarnaev's own prison behavior, or about the behavior of other convicted offenders like

him, the defense is at a loss as to whether and how to respond.

Even more perplexing is the government's unelaborated predictions that its

terrorism experts will

- speculate about the possible dire consequences had the Tsarnaev brothers "succeeded in carrying out additional bombings in another large city such as New York," Letter at 5,

- testify about the "glorification of the defendant and his brother" in the on-line jihadist publication *Inspire*, id., at 3, and

- suggest that his "incarceration in a non-Muslim country" might "serve to inspire additional acts of violence by sympathizers." Id. at 5.

Once again the government offers no factual bases for any of these opinions (or even

what the actual opinions are), let alone any theory under the FDPA or the Eighth

Amendment that would allow such prejudicial appeals to death-sentencing by fear.

In sum, the government's long-awaited "terrorism" expert disclosures are not Rule

16(a)(1)(G) disclosures at all, because they fail to summarize the *substance* of the
experts' testimony and fail to identify the experts' actual opinions, much less the bases
and reasons for them.  In addition (though the skimpiness and disorganization of the
government's discussion makes any conclusions difficult), the government appears to
view these experts' sentencing phase testimony as a vehicle for introducing extremely
prejudicial and legally inadmissible justifications for the death penalty before the jury —
again without first disclosing the bases for these opinions.

2.      **Computer Forensics – FBI Supervisory Special Agent Kevin Swindon and
         Computer Scientist Nicholas Nathans**

         Like its disclosures in connection with most, if not all, of its proposed experts, the
government's disclosure regarding computer forensics is wholly generic and could apply
to virtually any case or defendant where electronically stored information is at issue.  The
letter notes that two experts will testify, and discloses that the testimony will include the
following topics:

- They "will *authenticate digital data offered as evidence*, describing the
  source of the evidence, how it was obtained, and how it was preserved."

- They "will describe both in general and *in connection with specific items* of
  evidence how to determine how and when digital items first appeared on a
  digital device."

- They "will discuss how users access [social media and search engines]
  using different digital devices and the user experience one would have
  *based on analysis of the data available from particular devices*;

- They "will also discuss private messaging, security measures, encryption,
  and file-sharing;"

- In connection with at least eighteen digital devices, they "*will describe certain digital activity and when it occurred*, including file creation, file access, file deletion, internet searches, other internet history, and digital communications. They will base this testimony largely on their *analysis of stored files, metadata, registry entries, deleted data, and data in so-called slackspace*;"

- Finally, they "will describe how they *recreated websites and files from data on certain digital devices, and opine, based on an analysis of data from various devices, who was likely using them at particular times.*"

Letter at pp. 6-7 (emphasis added).  As to each of these topic areas, the government's disclosure letter fails to identify any particular item of digital evidence or the specific expert testimony to be elicited about each such item.  In addition, the government to date still has not disclosed the underlying FTK (or other computer forensic software) reports that would show the underlying forensic work performed, and that surely provide the basis for whatever specific testimony the government ultimately may hope to elicit.

3.     **Linguists**

The government's next disclosure, in its entirety, reads as follows:

> **Chechen and Arabic Language Translation – Muna Shishani.**
> Language Analyst Muna Shishani is employed by the FBI. Her C.V. is attached.
> We expect her to review and/or prepare translations of items written partially or entirely in Chechen and Arabic and to attest to the accuracy of those translations.
> We also expect her to testify about common cultural norms within Chechen and Caucasian society.

It is inferable from Ms. Shishani's one-page CV that while an undergraduate at the University of Jordan in the early 1990s, she taught Chechen students to read, write and speak Arabic and English.  There is no further indication of how she is qualified "to

- 9 -

testify about common cultural norms within Chechen and Caucasian society," nor of what the government expects her to say on this subject. As for her role as a Chechen and Arabic translator, the government's letter neither furnishes nor identifies any translations that she has reviewed or prepared in this case.

The government's August 1 letter also discloses its intent to rely on FBI Language Analyst **Olga LaFond**, whom it "expect[s] to review and/or prepare translations of items written partially or entirely in Russian." The letter again identifies no items that Ms. Lafond has translated (or that she is "expect[ed] to translate").

**4. Cellular Geolocation – Special Agent Chad Fitzgerald**

After indicating its intention to present expert testimony concerning the locations of Dzhokhar and Tamerlan Tsarnaev's cellphones on the day of the Marathon Bombing, the government adds that Special Agent Fitzgerald "will also testify about the locations of the subject telephones before and after April 15, 2013." Letter at 7. However, the government does not include any other information about the actual dates about which the expert will opine. This omission means that Special Agent Fitzgerald's opinions remain undisclosed, despite the requirement of Rule 16(1)(1)(G). The mere statement that he will "testify about the locations of the subject telephones before and after April 15, 2013" is a prediction about the kinds of opinions he plans to offer when he testifies at trial, rather than the opinions themselves. To comply with the Rule, the government should have disclosed which specific dates will be included in the witness's expert

testimony.

**5.  Forensic Pathologists/Medical Examiners.**

The government advises that Dr. Jennifer Hammers and Dr. Katherine Lindstrom, the forensic pathologists who conducted the autopsies on Krystle Marie Campbell and Lingzi Lu, will testify that each victim "did not die instantly from her injuries." However, neither the disclosure letter nor the autopsy reports provide any basis or reasons for these opinions.

The government further advises that Dr. Renee Robinson will testify that the manner of death of Officer Sean Collier was "homicide (shot by others)."  It is possible that the use of the plural "others" was inadvertent and not intended to convey that Officer Collier was shot by more than one person.  However,  if Dr. Robinson does intend to opine that more than one person shot Officer Collier, neither the autopsy report nor the disclosure letter provides any bases or reasons for such an opinion.

**6.  Trauma Surgeon – Dr. David King**

Although the government has failed to provide a CV for Dr. King, its August 1 letter discloses that he is a trauma surgeon at Massachusetts General Hospital, and that he "provid]ed]  military combat care during his multiple postings as Chief of Surgical Services as part of Operation Enduring Freedom and Operation Iraqi Freedom."  Dr. King's extraordinary service in the aftermath of the bombing – service he rendered immediately after completing the Marathon himself – has also been extensively

chronicled in the news media.  See e.g. ABC News, "Medical Doctor Runs Marathon and

Compares Bombings to War" (April 16, 2013); WCBV News, "President Obama

'humbled' by bombing victims' bravery, drive to recover" (April 18, 2013) (depicting Dr.

King with President during visit to Massachusetts General).[2]  The government proposes

to call Dr. King, who treated an unspecified number of non-fatal Marathon Bombing

injuries at Massachusetts General, to testify that

- the victims' injuries "were caused by ground-placed IEDs that shredded flesh, bone and vital soft tissues,"

- "the pattern of injuries was consistent with the classic presentation of an improvised explosive device blast,"

- the bombings caused a grave risk of death to one or one persons in addition to the homicide victims;

- 8-year-old Martin Richard (whom he neither treated nor saw) was especially vulnerable by reason of his youth and the Richard child experienced "excruciating and unbearable pain in the moments after the blast and leading up to his death."

Letter at 8-9.

It should be noted that Dr. King has no direct connection to any of the homicide

victims in this case, and most of the facts he is offered to establish are uncontested.   The

government's real reason for calling him appears to be to leverage Dr. King's

extraordinary life experiences and personal heroism to create for the jury a powerful

---

[2] Dr. King also cooperated extensively with the authors of a book on the bombing and its aftermath in which he is admiringly profiled.  Scott Helman and Jenna Russell, *Long Way Home:  Boston Under Attack, the City's Courageous Recovery, and the City's Epic Hunt for Justice* (2014)

emotional connection between the experience of American soldiers and others wounded by IEDs in Iraq, and those of the bombing victims in this case.

The government has again failed to provide any bases or reasons for the opinions that it proposes to elicit from this expert witness.  Indeed, the defendant cannot even hope to uncover the facts underlying his opinions by an unguided search through the massive discovery in this case, since the medical records of Dr. King's own patients have not been provided.   But the inadequacy of the government's Rule 16(a)(1)(G) disclosure is the least of the problems with this proposed testimony.  Because the government's transparent effort to use this Army medical veteran to link the nation's sacrifices and traumatic experiences in Iraq to the Marathon Bombing is so unlikely to survive an objection under 18 USC § 3593(c) ("information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice [or] confusing the issues"), judicial efficiency counsels against consideration of any discovery disputes until the admissibility of his testimony is determined.

**8. Toolmarks – FBI Physical Scientist Erich Smith**

The government's disclosure on this subject reads, in its entirety:

Consistent with the accompanying report which was just completed, FBI Examiner Erich Smith will testify about his analysis of various toolmarks present on pieces of evidence obtained in this case.

This statement fails to summarize Smith's testimony, that is: which of the specific test results listed in the report will he testify about, and what will he say about how those

results bear on relevant issues in the case.

## 9. Explosives

Again, the government's disclosures with regard to explosives list myriad subjects without substance.  How were the IEDs in this case assembled?  How did they function?  How do they compare to military ordnance and explosive devices?    How do the *Inspire* magazine instructions compare to the IEDs in this case?  What will the experts say about the significance of "additional evidence in this case, such as digital media" regarding explosives?  What will they say about the ability of lay persons to assemble such devices?  The government's letter raises all of these questions, and others, without disclosing the answers that the government's experts will seek to provide in their testimony.

## CONCLUSION

A criminal defendant's obligation under Fed. R. Crim. P. 16(b)(1)(C) to disclose his own experts' opinions, with supporting bases and reasons, does not arise "the defendant requests disclosure under subdivision (a)(1)(G) *and the government complies.*" (Emphasis added).  It would therefore be both improper  and unfair  to  require the defendant to comply with the expert disclosure requirements of Rule 16(b)(1)(C) before the government has provided its own disclosures in compliance with Rule 16.  For the reasons set forth above and in his July 25, 2014 *Motion To Compel the Government to Comply with its Expert Disclosure Obligations, etc.* [DE 440], the defendant renews his

requests for the relief requested in that motion.[3]   He further requests that the Court

consider the inadequacy of the government's final expert disclosures as detailed above in

considering the motion.

Respectfully submitted,
DZHOKHAR TSARNAEV
By his attorneys


Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

---

[3] That request was for an order

(1)    requiring the Government to produce expert disclosures in compliance with
       Fed. R. Crim. P. 16(a)(1)(G) and this Court's Scheduling Order;

(2)    requiring the government to produce an index and/or usable organizational
       structure for the underlying lab reports and data that it has provided; and

(3)    suspending the deadline for defendant's responsive expert disclosures to
       permit the defense team to make sense of the government's disorganized
       disclosures, to identify and retain its own experts, and to determine whether
       *Daubert* and other challenges to the admissibility of the proposed evidence
       and testimony may be warranted.

- 15 -

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that copies of this document filed under seal
have been served on Assistant U.S. Attorneys William Weinreb, Aloke Chakravarty, and
Nadine Pellegrini by email and will be served by hand delivery on August 6, 2014.

Timothy G. Watkins