# EXHIBIT A

# GOVERNMENT
# AUGUST 1, 2014
# EXPERT DISCLOSURE LETTER



**U.S. Department of Justice**

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

**BY EMAIL DELIVERY**                    August 1, 2014
Timothy Watkins, Esq.
William Fick, Esq.
Miriam Conrad, Esq.
Judy Clarke, Esq.
David Bruck, Esq.
Federal Defender's Office
51 Sleeper Street, 5th Floor
Boston, MA  02210

Re: United States v. Dzhokhar Tsarnaev, Crim. No. 13-10200-GAO

Dear Counsel:

We write to provide additional expert disclosures consistent with Rule 16 and the schedule set by the court.  This disclosure covers affirmative experts whom the government currently intends to call in its case-in-chief during the liability phase as well as in the sentencing phase of this matter.  To the extent that the following witnesses will provide expert testimony, we include a summary of that testimony including opinions, the basis and reasons for the opinions, and the experts' qualifications.

### 1. Terrorism and geopolitics – Mr. Evan Kohlmann, Dr. Matthew Levitt and Dr. Sebastian Gorka

A. Summary

The government intends to call one or more experts who specialize in the study of terrorism.  If the government calls more than one such witness, their testimony will not substantially overlap.  Reports of testifying witnesses will be provided when received.

The government's theory of the case is that the defendant considered himself to be part of the global jihad movement and committed acts of terrorism to help achieve the movement's ends.  Becoming part of the global jihad movement is sometimes referred to as radicalization, and the government will seek to show that the defendant's statements, reading and viewing materials,  criminal acts, and other actions, shed light on his radicalization.

Timothy Watkins, Esq, et al.
August 1, 2014
Page 2

The witnesses named in this section will assist the jury in understanding the defendant's motives by explaining features of the global jihad movement. Specifically, the witnesses will explain the movement's objectives, the methods it employs to achieve those objectives, and the ways in which items of evidence in this case relate to those objectives and methods. We expect the witnesses to testify that the defendant's statements, reading and viewing materials, and other evidence, demonstrate that he became radicalized, shared the movement's objectives, and adopted its methods for achieving them. We also expect the witnesses to explain terrorist tactics, tools and tradecraft.

If there is a sentencing phase, the witnesses will also testify that the defendant's crimes, relative to other acts of terrorism, were especially heinous, had an extraordinary impact on victims and the community, reflect an extraordinary commitment to violent jihad, and demonstrate that he poses a risk of continuing harm.

B. Qualifications

C.V.s for each of the experts are enclosed, along with lists of their relevant publications and some additional documents.

Each of the experts has employed social scientific skills and methodology to develop a basis of knowledge that is reliable and will be helpful to the jury. Each witness will explain his education, research, observations and the methods he used to become proficient in the areas of terrorism and geopolitics. Each of the witnesses has been recognized as an expert by colleagues around the world and two by various federal courts. To the extent that the witnesses provide opinion testimony, they will do so based upon their qualifications and experience, the evidence provided to them in this case, and the facts as alleged in the indictment and presented at trial.

C. Categories of Testimony

These witnesses are expected to do the following:

a. explain little-understood concepts to the jury – specifically those relating to violent jihad and the lexicon used by those encouraging and engaging in it;

b. explain relevant geopolitical history pertaining to violent jihad and the use of terrorism;

c. explain the significance of specific items of evidence;

d. explain the global jihadist movement, its origins, ideology, and its operational tactics;

e. explain the radicalization processes;

f. opine how the facts in this case fit into the global jihadist movement.

Timothy Watkins, Esq, et al.
August 1, 2014
Page 3

D. Geopolitics and The Global Jihad Movement

The witnesses will explain that the central belief of the global jihad movement is that the Muslim people constitute a nation oppressed by non-Muslims and must use violence, specifically acts of terrorism, to strengthen the Muslim nation and weaken, repel, and ultimately defeat perceived oppressors. Key geopolitical events in the formation and continuation of the global jihad movement include the rise and fall of various Muslim rulers, Russian and U.S. involvement in Afghanistan, the American invasion of Iraq, the American use of drones in various countries, and the conflicts in Chechnya, Dagestan, and Syria. (Many of these events, as well as references to the global jihad movement, are referred or adverted to in statements of the defendant and/or in writings, recordings, photographs, and videos that were in his possession.) Members of the global jihad movement often think of themselves, and refer to themselves, as mujahideen or "holy warriors." Some are veterans of armed conflicts.

The witnesses will explain that the global jihad movement is a decentralized one in which members make extensive use of social media (among other things) to communicate, coordinate, and recruit others. The lack of a central organization means that members need to rely on others with various degrees of affiliation to the movement for support, succor, and new recruits.

The witnesses will explain that the global jihad movement seeks to recruit members and justify violence in a variety of ways such as: formulating and publicizing narratives of historical events in which, generally speaking, the so-called Muslim nation is victimized, often violently, by oppressive non-Muslim powers; appealing to individuals' racial, ethnic, and cultural grievances as a proxy for religious oppression; promoting interpretations of religious concepts -- particularly jihad and martyrdom -- that promote and justify violence. (Once again, all of these concepts are referred or adverted to in statements of the defendant and/or in writings, recordings, photographs, and videos that were in his possession.)

E. Terrorism

The witnesses will explain that global jihadis believe that terrorist acts -- especially spectacular terrorist attacks on Western powers that draw worldwide attention and cause large amounts of death, suffering, and economic disruption -- will serve to unite, strengthen, and inspire Muslims, weaken Western powers, rid so-called Muslim lands of non-Muslims, and ultimately establish a broadbased Caliphate. They will explain how terrorists construct and use various weapons, choose targets, plan and execute violent attacks, securely communicate operational information, and avoid detection, and how they learn to do the same. They will also describe terrorist organizations such as Al Qaeda and its affiliates, Imarat Kavkaz, the Chechnyan and Dagestan mujahideen, and Syrian jihadist groups, as well as groups that seek similar ends but do not encourage violence such as Hizb ut Tahrir and its affiliates and elements of the Muslim Brotherhood.

F. Phrases, Images, Symbols, and Concepts relating to Global Jihad and Terrorism

Timothy Watkins, Esq, et al.
August 1, 2014
Page 4

Various statements of the defendant, as well as writings, recordings, photographs, and videos in his possession, contain phrases, images and symbols, or refer to concepts, relating to global jihad and terrorism.  The witnesses will explain the meanings of the these phrases, images, symbols, and concepts, which include:  fard ayn (the duty to engage in terrorism), Islamism, al wala al barra (enmity and loyalty), kufar, Hijra, Caliphate, al Sham, Khorosan, Janna, Jahannam, Firdaws, Akhira, Qiyamat, Tawhid, Jahalliyyah, the Battles of Badr and Uhud, shahada, flags with shahada, Mujahideen, martyrdom, shahid, and rewards in the afterlife.

G.  Media, Propaganda and the Internet

The witnesses will describe how terrorist groups and members of the global jihadi movement use the internet and digital propaganda to inspire individuals to participate in terrorist acts.  In particular, they will discuss writings, recordings, photographs, and videos that the defendant possessed and/or appears to have reviewed that form the ideological underpinning for terrorism by or about such influential people such as Abdullah Azzam, Al Maqdisi, Abdel Rahman, Qutb, General Malik, al Uyayri, al Ahdal, as Suri, Sayyid Qutb, Ibn al Kahttab, Muhammad al Maqdisi, Khalid Yasin, Saad Abu Said, Tarek Mehanna, and Anwar al Awlaki, as well as several documents from propaganda websites such at-Tibyan Publications.  They will explain the impact of these writings, recordings, photographs and video on the worldwide growth of terrorism and their successful use in recruiting terrorists.  The witnesses will discuss the use of the internet in this context as well, including certain websites such as theunjustmedia, jamaatshariat, guraba, at-Tibyan Publications, and Kavkaz Center, as well as YouTube, Facebook, Twitter, and others.

The witnesses will also discuss writings, recordings and videos that glorify mujahideen leaders such as Ibn al Khattab, Shamil Basayev, Awlaki, Usama bin Laden, and the role of videos and nasheeds in the global jihad movement.

In addition, the witnesses will discuss writings, recordings and videos that glorify operational terrorists and others who sacrificed for the cause of jihad.  The witnesses will discuss Inspire Magazine, its purpose, history and impact, and will analyze several issues, and for sentencing, will discuss its glorification of the defendant and his brother.  They will analyze the content of various issues of Inspire, in particular the ones that explain how to create and deploy improvised explosive devices, how to choose targets, and how the proper use of such devices can advance the cause of the global jihad movement.

H.  Radicalization

The witnesses will describe the ways in which young men raised in Western countries who maintain an ethnic or religious identity that they perceive to be at odds with so-called Western values become radicalized.  In particular, they will discuss the role played in the radicalization process by jihadi propaganda available on the internet such as the teachings of, and commentary about, Usama bin Laden, Anwar al Awlaki, and Ibn al Khattab, among others.  We expect the witnesses to opine that the defendant's statements, the writings, recordings, photographs, and videos that were in his possession and/or viewed by him, and his criminal

4

Timothy Watkins, Esq, et al.
August 1, 2014
Page 5

actions, among other things, suggest that he was radicalized for a substantial period of time in a recognizable fashion.

## I. Specific Items of Evidence

Many items of evidence produced in discovery -- including the defendant's statements, other writings, video files, audio files, and photographs -- reference words, concepts, individuals, or places that are well-known to students of global jihad and terrorism but unfamiliar to ordinary people. The experts will explain how these references relate to global jihad, terrorism, and the radicalization process. We expect the witnesses to testify that some of these materials promote and justify acts of terrorism, particularly against the United States, and are evidence of radicalization. The witnesses will also describe the significance of evidence related to terrorist operations, such as information related to physical training, firearms and explosives assembly and use, and other tools of terrorists.

## J. Sentencing phase testimony

If there is a sentencing phase, we expect the witnesses to testify that radicalization can occur with little or no urging from others, and that the evidence in this case is consistent with the defendant's having largely self-radicalized. The witnesses will testify that the defendant has much in common with other young men who are known to have self-radicalized, including similar family relationships, family background, religious identity, external influences, intelligence, and exposure to jihadi propaganda. The witnesses will discuss circumstances associated with family members' playing a substantial role in the radicalization process and their absence in this case. We also expect them to testify that newly radicalized individuals are often the most zealous. Finally, they will likely explain that although some terrorists wear their intentions and allegiances on their sleeves, it is also common for terrorists to conceal their intentions from others, especially in the mainstream worlds in which they live before they become operational.

The witnesses will testify that by many measures the defendant's terrorist acts were among the most successful of their kind. They provided a huge boost to the global jihadi movement and had a substantial impact on the public -- an impact that was enhanced by the decision to bomb the Marathon (as opposed to some other site). The witnesses will describe the defendant's success in terrorizing the public and influencing government action. They will discuss the aggravating impact of the defendant's use of multiple devices, coordinated attacks, multiple forms of violence, multiple targets, delays between attacks, and evasion of law enforcement. They will also describe the long-lasting impact on communities of terrorist attacks. The witnesses will opine that if the defendant and his brother had succeeded in carrying out additional bombings in another large city such as New York, the resulting terror would have been even greater.

We also expect the witnesses to describe how terrorists, especially successful ones, are often lionized by the global jihad community and, if incarcerated in a non-Muslim country, serve to inspire additional acts of violence by sympathizers. They will testify that al Qaeda and other

Timothy Watkins, Esq, et al.
August 1, 2014
Page 6

global jihadist groups have used the defendant's actions in propaganda materials to help recruit others and will likely continue to do so.

## 2.  Computer Forensics – FBI Supervisory Special Agent Kevin Swindon and Computer Scientist Nicholas Nathans

Special Agents Swindon and Nathans are FBI specialists in computer forensics and the management of digital information.  C.V.s for each are attached.  Each has extensive training and experience in handling digital information.  These specialists will authenticate digital data offered as evidence, describing the source of the evidence, how it was obtained, and how it was preserved.  They will describe how information is stored on digital media, how it is organized and manipulated by various computer operating systems, and how it is forensically analyzed and preserved for use at trial.  They will explain the significance of file types, folders, applications, pathnames, slackspace, allocated/unallocated space, history, metadata, carved files, registry information, caches, internet history files, URLs, and webpages,.  They will describe both in general and in connection with specific items of evidence how to determine how and when digital items first appeared on a digital device.

These witnesses will describe relevant features of email, chat, text, Skype and other digital communications programs; Twitter, Facebook, and other social media sites; and Google, Yahoo, and other popular search engines.  They will discuss how users access these programs and websites using different digital devices and the user experience one would have based on analysis of the data available from particular devices.  They will also discuss private messaging, security measures, encryption, and file-sharing.

The witnesses will testify about the (sometimes only attempted) preservation, forensic analysis and extraction of digital media from particular digital storage devices, including primarily the defendant's Sony Vaio laptop computer, his destroyed cell phones, the HP Pavilion desktop computer seized from 410 Norfolk Street, the thumb drive recovered from the Crapo Landfill, the Patriot thumb drive, Tamerlan Tsarnaev's Samsung laptop computer and telephones, and, if necessary, phones belonging to Dun Meng and some of the defendant's friends such as Nathan Young, Michael Crease, Yousef Eddafali, Israpil Vakhabov, James Li, Azamat Tazhayakov, Robel Phillipos, and Dias Kadyrbayev.

As necessary, the witnesses will also discuss the authentication and forensic analysis of digital media obtained from internet service providers and remote computing services such as Yahoo, Apple, Twitter, Facebook, YouTube, Google, and others.

The computer specialists will rely on their training and experience and their familiarity with computer and phone forensic software, tools, and methods, in particular, Access Data including Forensic Toolkit ("FTK"), Internet Evidence Finder, regripper, Log2timeline, IPEX, Lantern, Mobilesync, and master file table and file registry analysis, which are among the forensic software, tools, and methods deemed reliable and widely relied upon by forensic analysts.  Similarly, the computer specialists will explain that data from the mobile phones were

Timothy Watkins, Esq, et al.
August 1, 2014
Page 7

recovered primarily using reliable software tools such as AD Labs, FTK imager, Lantern, IPEX, Blacklight and Cellbrite (including the physical analyzer software component).

In connection with various digital devices, the computer specialists will describe certain digital activity and when it occurred, including file creation, file access, file deletion, internet searches, other internet history, and digital communications. They will base this testimony largely on their analysis of stored files, metadata, registry entries, deleted data, and data in so-called slackspace.

Finally, the computer specialists will describe how they recreated websites and files from data on certain digital devices, and opine, based on an analysis of data from various devices, who was likely using them at particular times.

### 3. Linguists

#### A. Chechen and Arabic Language Translation – Muna Shishani

Language Analyst Muna Shishani is employed by the FBI. Her C.V. is attached. We expect her to review and/or prepare translations of items written partially or entirely in Chechen and Arabic and to attest to the accuracy of those translations. We also expect her to testify about common cultural norms within Chechen and Caucasian society.

#### B. Russian Language Translation – Olga LaFond

Language Analyst Olga LaFond is employed by the FBI. Her C.V. is attached. We expect her to review and/or prepare translations of items written partially or entirely in Russian.

### 4. Cellular Geolocation – Special Agent Chad Fitzgerald

Special Agent Chad Fitzgerald is currently assigned to the FBI's Cellular Analysis Survey Team (C.A.S.T.). His C.V. is attached. He will testify primarily about the activity of the cell phones assigned telephone numbers 857-928-4634 (Tamerlan Tsarnaev's phone) and 857-247-5112 and 617-286-9151 (the defendant's phones).

Special Agent Fitzgerald will explain the mechanics of cellular telephone communications and how those communications are made possible by sending signals to nearby cell site towers. He will testify that cell sites are often divided into three 120-degree sectors and that service providers capture and record the sector and the specific antenna tower that is used at the beginning of a call or text message. From this data, it is possible to determine the general geographic location of the phone at a specific time and to use commercially available software to graph that information

Special Agent Fitzgerald will testify that the call detail records (CDR) for the above-referenced cellular telephone numbers show that the users of 857-928-4634 and 617-286-9151 were in close proximity to the Boston Marathon bombing at the time it took place. He will also testify about the locations of the subject telephones before and after April 15, 2013. All of this

Timothy Watkins, Esq, et al.
August 1, 2014
Page 8

testimony will be based on cellular site data (including longitude and latitude information) that
has been produced in discovery.

### 5.  Forensic Pathologists / Medical Examiners

The government will call up to four forensic pathologists employed as medical examiners
by the Commonwealth of Massachusetts.  All of them have been trained to perform autopsies to
determine the presence or absence of disease, injury or poisoning; to evaluate historical and law-
enforcement investigative information relating to manner of death; to collect medical evidence
(such as trace evidence and secretions) to document sexual assault; and to reconstruct how a
person received injuries.  Their testimony will include an explanation of these processes.

#### A.  Dr. Henry Nields

Dr. Henry Nields is the Chief Medical Examiner for the Commonwealth of
Massachusetts.  He is certified by the American Board of Pathology in Anatomic and Clinical
Pathology and Forensic Pathology and is an expert in the field of forensic pathology.  He
performed an autopsy on Martin Richard.  His C.V. and a copy of the autopsy have already been
produced.

Based upon his training and experience, and his examination and autopsy of Martin
Richard, Dr. Nields will opine to a reasonable degree of medical certainty that Martin Richard's
death resulted from multiple injuries from a blast and that the manner of death was homicide
(victim of a bomb explosion).  Dr. Nields will also opine that Martin Richard was particularly
vulnerable to the effects of a bomb blast because of his youth and corresponding physical
characteristics, including height and blood volume.  Dr. Nields will further opine to a reasonable
medical certainty that the offenses committed by the defendant involved serious physical abuse
to the victims.

#### B.  Dr. Jennifer Hammers,

Dr. Hammers is certified by the American Board of Pathology in Anatomic and Clinical
Pathology and Forensic Pathology and is an expert in the field of forensic pathology.   She
performed an autopsy on Krystle Marie Campbell.

Based upon her training and experience and her examination and autopsy of Krystle
Marie Campbell, Dr. Hammers will opine to a reasonable degree of medical certainty that Ms.
Campbell's death resulted from multiple injuries from a blast and that the manner of death was
homicide (victim of a bomb explosion).  Dr. Hammers will opine that Ms. Campbell did not die
instantly from her injuries and that the offense involved serious physical abuse to the victim.

#### C.  Dr. Renee Robinson

Dr. Robinson is certified by the American Board of Pathology in Anatomic and Clinical
Pathology and Forensic Pathology and is an expert in the field of forensic pathology.  She

8

Timothy Watkins, Esq, et al.
August 1, 2014
Page 9

performed an autopsy on Officer Sean Collier.  Her C.V. and a copy of the autopsy have already been produced.

Based upon her training and experience and her examination and autopsy of Officer Collier, Dr. Robinson will opine to a reasonable degree of medical certainty that Officer Collier's death resulted from multiple gunshot wounds of the head and that the manner of death was homicide (shot by others).

### D.  Dr. Katherine Lindstrom

Dr. Lindstrom is certified by the American Board of Pathology in Anatomic and Clinical Pathology and Forensic Pathology and is an expert in the field of forensic pathology.  She performed an autopsy on Lingzi Lu.  Her C.V. and a copy of the autopsy have already been produced.

Based upon her training and experience and her examination and autopsy of Lingzi Lu, Dr. Lindstrom will opine to a reasonable degree of medical certainty that Lingzi Lu's death resulted from blast injuries of the lower extremities and that the manner of death was homicide (victim of bomb explosion).  Dr. Hammers will opine that Lingzi Lu did not die instantly from her injuries and that the offenses involved serious physical abuse to the victim.

### 6.  Trauma Surgeon - Dr.  David King

Dr. King is a trauma surgeon in the Division of Trauma, Massachusetts General Hospital, Emergency Surgery and Surgical Critical Care.  Dr. King is board-certified by the American Board of Surgery in the fields of surgery and surgical critical care and is an expert in the field of surgery and surgical critical care.  His expertise extends to all traumatic conditions, including traumatic brain injury, pneumothorax, hemothorax, pulmonary contusion, blunt cardiac injury, liver and splenic lacerations, pancreatic injury, mesenteric lacerations, pelvic fractures, spine fractures, renal injuries, and all injuries to the intestines and blood vessels.  To the extent that he presents opinion testimony, it will be based upon his medical training and experience as set forth in his C.V., his experience as a trauma surgeon at MGH, and his experience providing military combat care during his multiple postings as Chief of Surgical Services as part of Operation Enduring Freedom and Operation Iraqi Freedom.

Dr. King will explain the clinical manifestations and mechanisms of injury of improvised explosive devices ("IED").  He will also describe his personal observations and clinical assessments of victims in this case.

Dr. King will opine to a reasonable degree of medical certainty that the injuries suffered by those who were present at the scene of both explosions in Boston on April 15, 2013, and which Dr. King observed and treated at MGH, were caused by ground-placed IEDs that shredded

9

Timothy Watkins, Esq, et al.
August 1, 2014
Page 10

flesh, bone and vital soft tissues.  Dr. King will also opine that the pattern of injuries was consistent with the classic presentation of an improvised explosive device blast.

If there is a sentencing phase, Dr. King will provide the following additional testimony. He will opine to a reasonable degree of medical certainty that the defendant, in the commission of the offense, created a grave risk of death to one or more persons in addition to the victim(s) of the offenses.

In addition, based upon his training and experience and his review of the autopsy findings, Dr. King will opine to a reasonable degree of medical certainty that Martin Richard was particularly vulnerable to the effects of the IED because of his youth and corresponding physical characteristics, as evidenced by his injuries, including an abdominal aortic injury.

Dr. King will also opine to a reasonable degree of medical certainty that Martin Richard's injuries, including the evisceration of his abdomen, would not have killed him instantly and would have caused him excruciating and unbearable pain in the moments after the blast and leading up to his death.

### 7.  Pediatric Psychologist – Dr. Jonathan Comer

Dr. Jonathan Comer is a clinical psychologist and professor of pediatric psychology at Florida International University specializing in pediatric anxiety disorders.  His C.V. is attached, along with several studies in which he has participated and about which he will testify.  If there is a sentencing phase, Dr. Comer is expected to provide testimony that relates to several aggravating factors.

As a clinical psychologist and professor, Dr. Comer has co-authored studies measuring the impact of the Boston Marathon and related events upon school-age children in the Boston area.  Over time, he has become an expert on the impact of terrorism events on children, dating back to the Oklahoma City bombings, September 11th attacks, and others.  In addition, Dr. Comer has done epidemiological studies in order to determine mental health ramifications of catastrophic events upon children.

We expect Dr. Comer to present the results of his studies to the jury as well as describe clinical phenomena that demonstrate the terrifying impact that the defendant's actions had upon the community.  Dr. Comer will first describe generally the impact of terrorism and catastrophic events on children.  For example, Dr. Comer will describe that likely PTSD symptoms typically increase among children who have been impacted by a catastrophic event.  The intensity and duration of the events, as well as the manner in which responsible adults deal with the event, affect the types of symptoms manifested.  In this case, all of these factors were extraordinarily traumatic.  Dr. Comer will further explain that although most children develop mechanisms to outgrow or overcome these experiences, many, especially those who have previously experienced trauma, become especially vulnerable.  Dr. Comer is expected to explain how, statistically, even modest symptoms of PTSD, for a child, lead to dramatically different

Timothy Watkins, Esq, et al.
August 1, 2014
Page 11

outcomes upon matriculation and on social, academic, professional and overall adjustment gauges as compared to children without such symptoms.

Dr. Comer will present the findings of his work related to the impact of the Boston Marathon and Watertown events. For example, Dr. Comer's team surveyed families in the Boston area, including Watertown and Dorchester, as relates to the behaviors and symptoms evident in students who were exposed in some way to the events of the week of April 15, 2013. The survey found significantly increased exhibition of likely PTSD symptoms among school aged children.

Dr. Comer is also expected to describe the likely mental impact upon the families of those were killed or seriously injured in a clinical sense by describing the general clinical manifestations of the class of victims. In so doing, he will describe aspects of the psychological impact that have and have not yet manifested, and the long-term consequences of such trauma.

Based on his training and experience as well as the studies he has conducted and reviewed, Dr. Comer is expected to opine that the defendant's selection of manner and means of committing the instant crimes will continue to traumatize individuals for years to come and that many will be permanently compromised by the defendant's actions.

## 8.  Toolmarks – FBI Physical Scientist Erich Smith

Consistent with the accompanying report which was just completed, FBI Examiner Erich Smith will testify about his analysis of various toolmarks present on pieces of evidence obtained in this case.

## 9.  Explosives –FBI Special Agent Edward Knapp and Senior Forensic Scientist Dr. Kirk Yeager and Forensic Chemist Dave McCollam

As a supplement to the previous disclosures related to FBI Special Agent Knapp and David McCollam, and as preliminary notice regarding FBI Senior Forensic Scientist Kirk Yeager, these witnesses are expected to testify about analysis of the explosives evidence. Dr. Yeager's C.V. is attached. Relying on their training and experience along with their review of evidence in this case, the witnesses will explain how the IEDs in this case were assembled, how they functioned, and how they caused injury and death. They will compare these devices to other military ordnance and explosive devices. To the extent that mock-ups of the IEDs in this case are offered as evidence, the witnesses will describe how they function. The witnesses will also explain the bomb-making directions in Inspire magazine and other publicly-available sources and compare them with the IEDs in this case. To the extent that additional evidence in this case, such as digital media, relates to explosives, the witnesses will explain the significance of various notations, guides, and manuals that discuss chemical pre-cursors to assembly of an IED. Based on their training and experience, the witnesses will also opine about the ability of lay persons to assemble such devices.

Timothy Watkins, Esq, et al.
August 1, 2014
Page 12

    If there is a sentencing phase, the witnesses will opine that a person aware of the manner in which the IEDs were created would know that exploding them in a crowd of people would, at the very least, create a grave risk of death to persons, and was likely to cause multiple deaths; and that the devices were designed to cause, and were likely to cause, victims to suffer painful injuries and a lingering death.

    We will update these disclosures as necessary.


                                        Sincerely,

                                        CARMEN M. ORTIZ
                                        United States Attorney

                           By:     /s/Aloke Chakravarty
                                        Aloke Chakravarty
                                        William Weinreb
                                        Nadine Pellegrini
                                        Assistant U.S. Attorneys