UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )  | |
| ) | No. 13-CR-10200-GAO |
| v. ) | |
| ) | |
| DZHOKHAR TSARNAEV ) | |

**REPLY TO GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION FOR CHANGE OF VENUE
AND SUBMISSION OF SUPPLEMENTAL MATERIAL IN SUPPORT**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully files this reply, attached Declaration of Edward J. Bronson, and appended Exhibits in support of the Defendant's Motion for Change of Venue [DE 376] and in response to the Government's Opposition to the Defendant's Motion for Change of Venue [DE 405].

The Government acknowledges that a change of venue is required on motion of the Defendant if "extraordinary local prejudice will prevent a fair trial." Opp. at 1 (citing *United States v. Skilling*, 561 U.S. 358, 378 (2010)). As *Skilling* reaffirmed, this entitlement is a "'basic requirement of due process.'" *Id.* (quoting *In re Murchison*, 249 U.S. 133, 136 (1955)). Additionally, Fed. R. Crim. P. 21(a) obligates a trial court to transfer proceedings to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

The Government urges the Court to attempt to select a jury in Boston, arguing that other high-profile cases have not been moved, that the admittedly extensive publicity in

1

this case has been factual and not inflammatory, that it contained no confession or other blatantly prejudicial information, and that this case is unlike *McVeigh* (the Oklahoma City bombing case) despite an "admitted similarity between McVeigh and this case [in] the large number of people in the district who were personally affected by the crime." Opp. at 7-10. The Government also criticizes the defense motion, arguing that the defense did not accompany the motion with news articles or information about the survey methodology employed. Opp. at 10-12.

All of these objections are met by the analysis of the media coverage of this case and opinion surveys set forth in the attached Declaration of Edward Bronson ("Bronson Decl."), and supporting exhibits. On the basis of both the media content analysis and survey data, Dr. Bronson, who is perhaps the most experienced and well-known venue expert in the United States, concludes

> that an overwhelming presumption of guilt and prejudgment as to the penalty exists in the District of Massachusetts, and that in order to protect the fair trial rights of Mr. Tsarnaev, his trial should be transferred to a site outside the District of Massachusetts. Based on data obtained and reviewed in investigating whether a change of venue was appropriate in this case, the District of Columbia appears to be the least prejudiced venue for the trial of this case.

Bronson Decl. ¶¶ 1, 127.

Dr. Bronson's declaration addresses the logical question of whether an intra-district transfer to the Western Division of the District of Massachusetts (Springfield)[1]

---

[1] Again, as noted in our request to file this Reply [DE 417], the Eastern Division of the District of Massachusetts is referred to for convenience as "Boston," the Western Division of the District of Massachusetts as "Springfield," the Southern District of New York as "Manhattan," and the District of Columbia U.S. District as "Washington, D.C."

2

would adequately protect the defendant's fair trial rights. His conclusions:

- "Springfield, Massachusetts is the site with prejudice closest to the Boston area" (¶94); "Springfield runs a close second to Boston [in presuming guilt], while Washington, D.C. seems least affected" (¶98);

- "Boston (36.7%) and Springfield (35.1%) are on a different and higher plane of favoring the death penalty for Mr. Tsarnaev than Manhattan (27.7%) and Washington, D.C. (19.0%), is again substantially lower" (¶100);

- "Boston residents show on [the survey] and overall a considerable recognition of case specifics than those in the other three venues, and as was true as to the definitely-guilty and penalty issues, Springfield was second and Washington, D.C. residents showed the least exposure to the case" (¶112).

Dr. Bronson ultimately concludes:

> Considering Springfield as an alternative, it is a clear second in ranking to Boston on bias against the defendant with respect to the two major criteria of bias, guilt and penalty. It is also second most biased on knowledge of additional facts, and it was third on salience. Its salience rating was lowered only because an unusually high number of people discussed the case in Manhattan. But the more important sub-factor of salience related to some aspect of participation in a Boston Marathon. Springfield was a close second to Boston (when compared to Manhattan and Washington, D.C.), as a negative factor that is likely to create greater salience and greater prejudice. Thus, Springfield is the least acceptable alternative venue of the three tested. Washington, D.C. has the lowest level of anti-defendant bias against Defendant Tsarnaev.

Bronson Decl.¶118. Dr. Bronson also notes another very practical consideration with regard to Springfield:

> No matter where the trial is transferred, predictably the press will intensify in that venue, but the effect of the intense press and attention is likely to have much more impact in Springfield than in Manhattan or Washington D.C. That is because Springfield is a neighbor of Boston, only about 90 miles away, although a difficult commute. Boston is a sports, cultural, and educational center for the area, and Boston events

---

The opinion survey conducted by Dr. Bronson covered each division in its entirety, not just the named city.

> are salient to people from Springfield. In a sense, Boston news is almost local news, at least in comparison to its impact in Manhattan and Washington, D.C. Also, in New York City or Washington D.C. the press about this trial would be diluted to a great extent due to many other attention-grabbing headlines generated locally from those cities. They produce news stories of national and international importance on a daily basis, which would deny this case the more prominent role it would have in Springfield. If the trial were to move to Springfield, this would likely instantly become the stand-out biggest news story there, and continue to be so until the conclusion of the trial. In addition, the Globe, the Times, and the Post are all national newspapers, and tend to focus more on national and international news than does the Republican. Thus, the pretrial publicity will have a greater effect on potential jurors in that venue.

Bronson Decl. ¶ 119.

With regard to whether voir dire examination of prospective jurors can be relied on to ferret out bias flowing from this extraordinary level of pretrial publicity and demonstrated by the polling data, Dr. Bronson writes:

> Research has demonstrated the danger of "conformity prejudice" – fear of community disapproval for rendering an unpopular verdict and has shown the limitations of voir dire to weed out jurors biased by such adverse publicity. *See* N. Vidmar, *Case Studies of Pre-and Midtrial Prejudice in Criminal and Civil Litigation*, 26 L. & Hum. Behav. 73, 81-82 (2002). It is not much of a leap to conclude that individuals with a close personal connection to the Boston Marathon and, thus to the bombings, will be less able to set aside preconceived notions regarding guilt and punishment. Thus, in this case, I believe that even a well conducted, probing voir dire by the parties and the Court, may well fail to surface bias and prejudice against Mr. Tsarnaev.

Bronson Decl.¶18. In applying his experience and research to the practical question of whether voir dire should be considered an adequate substitute in this case, Dr. Bronson writes:

> Some might suggest that a thorough voir dire is a solution that can adequately remedy the effects of intense, pervasive, prejudicial pretrial

4

> publicity, but there are problems with that approach. Community prejudice can affect jurors who do not themselves harbor bias, even assuming those jurors can be accurately identified. Jurors may feel pressure from their community, and in this instance, from the individuals they know and see in their daily lives who are victims, or were in the zone of danger at the time of the explosions. Jurors should not have to consider how they will face victims or potential victims of the events in this case, who may be their friends, co-workers or family members, if they render a verdict that is favorable to the defendant. Finding jurors in the Boston area who have not read or watched extensive media coverage, have not engaged in community efforts to assist those affected by the bombing, who do not know members of their community affected by the events of this case may be people who are generally uninterested and disconnected. These individuals hardly comport with our ideal of jurors serving as a cross-section and as the conscience of the community.

Bronson Decl. ¶19.[2]

Given the limits of time, Dr. Bronson could not obtain or review the substantial television or internet media coverage of this case, and only collected print media from one major newspaper in each of the divisions or districts surveyed. Given another month or more, his media content analysis could have been extended to electronic media and to the *Boston Herald* and other major news sources in the Boston area. However, it is clear from the thousands of newspaper articles about this case that he was able to gather from

---

[2] Dr. Bronson also reminds us of practical concerns with waiting until voir dire to determine whether it is possible to empanel an impartial jury to decide whether Mr. Tsarnaev is guilty, and if so, to decide whether he should live or die: "A trial of this magnitude, with the expected duration being several months, could not be moved to another venue on short notice. If this were to occur, a change of venue after an unsuccessful voir dire would only create additional pretrial publicity, and would have involved a great deal of expense, and investment of time and resources on the part of all parties involved." *Id.*

the four locations surveyed, Exhibits 2a-2d, that no amount of further data collection and analysis would alter the picture of an overwhelmingly massive and prejudicial storm of media coverage in this case.

As of July 26, 2014,[3] the *Boston Globe* had published approximately 2,420 news articles, an extraordinarily high number that exceeds even the number published throughout Oklahoma in *McVeigh*. In addition, as Dr. Bronson's media content analysis shows, the *Globe*'s coverage was marked by an overload of inflammatory themes, words, phrases, and passages. Dr. Bronson remarked that frequency of use of inflammatory terms in the *Globe* "is simply overwhelming" and "matches or exceeds any other capital case I have studied in over 40 years." Bronson Decl. ¶¶ 33, 35, 37. Contrary to the Government's argument that the news stories "have 'contained no confession or other blatantly prejudicial information,'" Opp. at 7, and in contrast to S*killing,* Dr. Bronson found the *Globe's* coverage replete with references to Mr. Tsarnaev's alleged admissions of guilt, both spontaneous and in response to custodial interrogation. Bronson Decl. ¶¶ 43-50. The persistent leaks of information by law enforcement officials are also prejudicial, and provide further support for a change of venue. *Id*. ¶¶ 51-55. Although the Government insists that Mr. Tsarnaev has not been portrayed in a negative light, "but rather [as] the sympathetic young man who appeared on the cover of Rolling Stone,"

---

[3] In order to comply with the schedule imposed by this case, Dr. Bronson had to impose a cutoff date for the collection of news articles. However, since that date, public discussion of this case in the media has continued unabated, and has recently seen spikes following the arrest of Stephen Silva and the first of several trials of individuals who knew the Tsarnaevs. These and other events have kept this case on the front pages in Boston, *see, e.g.,* Bronson Decl. ¶28, and are likely to continue to do so between now and November 3.

6

Opp. at 10, the actual data show he has been portrayed as a monster, a terrorist, depraved, callous, and vile.  Bronson Decl. ¶¶ 69, 73.  He is viewed as an outsider, a foreigner, disloyal and ungrateful.  *Id*. ¶¶ 70-73.

The fact that the Eastern Division of the District of Massachusetts has a large population – a point much stressed by the government, Opp. at 6-7 – is also addressed by Dr. Bronson.   Having previously studied the issue of community size, *id.*¶ 78, fn. 39, he concludes that the usual protective factors offered by a large community are substantially absent or much weaker in this case.  Bronson Decl. ¶¶ 77-81.

Dr. Bronson also addresses the critical issue of salience, an important factor in assessing the need for a change of venue.  This case has a remarkably high salience in Boston, comparable to that the Oklahoma City bombing case.  As Dr. Bronson found, "this case is more like the Oklahoma City bombing case, where a whole state was found by the trial court to be biased, than the city of Houston in the *Skilling* case."  Bronson Decl. ¶ 89.  The Marathon attack has been portrayed, and is likely perceived, as a direct attack on Boston, its institutions, its traditions, and each of its residents.   This high salience led to widespread participation and support of civic activities triggered by the bombing – including numerous ceremonies, commemorations, honors, fundraisers, and other events – including many that were held in connection with professional sporting events attended by many thousands of local citizens.  The motto "Boston Strong" appears

on many thousands of T-shirts and was mentioned in the *Globe* 421 times.  Bronson Decl. ¶¶ 82-89.[4]

In addition to this media analysis, Dr. Bronson conducted and has now provided the results of public opinion surveys in Boston and three other potential trial sites.  Dr. Bronson's survey data show:

- The pretrial prejudice to Mr. Tsarnaev's fair trial rights in the Boston area is extremely high.

- While the prejudice in the three other divisions or districts surveyed, Springfield, Manhattan, and Washington, D.C., is also somewhat high, the differences justify a change of venue.

- Washington, D.C. is generally the least prejudicial venue, and

- Springfield, Massachusetts is the site with prejudice closest to that in the Boston area.

Bronson Decl. ¶ 94.  The tables included in Dr. Bronson's declaration, and Exhibit 4f, show over half the population in both Boston and Springfield believe Mr. Tsarnaev is "definitely guilty" and over a third of the population in both Boston and Springfield already favor the death penalty for Mr. Tsarnaev.  Washington, D.C. is by far the most neutral venue as to both the issues of guilt and penalty.  *Id.* ¶¶ 97-100. Dr. Bronson found the 37 percent of Boston residents who already endorse the death penalty *in this case* to be "significant and disturbing" especially in light of the fact that only half that many

---

[4] In addition, in contrast to any other known case in the country, over half the population of Boston (the Eastern Division) were either at the scene or knew someone who was – meaning essentially that half the jury pool are potential witnesses or know someone who is.  *See* Bronson Decl.¶ 113, Table 7.

(19%) favored the death penalty in Washington, D.C. Bronson Decl. ¶ 107.  Boston also has the most intense support for the death penalty for Mr. Tsarnaev (26.3%), compared to less than half that in Washington, D.C. (12.9%).  *Id.* ¶ 109, Table 5.

The prejudice in Boston at all levels is clear.  And, as noted above, Dr. Bronson concludes that a transfer to Springfield will not cure the prejudicial effect of the pretrial publicity in this case.  The data from the polling in the Western Division (Springfield) shows that it runs a close second in prejudice to the Eastern Division.

## Conclusion

The defense requests that the Court grant a change of venue to Washington, D.C., or alternatively, that it hold a hearing at which the defendant may produce further testimony regarding the need for a pretrial change of venue, and about the venue that should be selected to ensure that the defendant receives a fair trial.

Respectfully submitted,
DZHOKHAR TSARNAEV
by his attorneys

*/s/   Judy Clarke*

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

9

                                                Miriam Conrad, Esq. (BBO # 550223)
                                                Timothy Watkins, Esq. (BBO # 567992)
                                                William Fick, Esq. (BBO # 650562)
                                                FEDERAL PUBLIC DEFENDER OFFICE
                                                51 Sleeper Street, 5th Floor
                                                (617) 223-8061
                                                MIRIAM_CONRAD@FD.ORG
                                                TIMOTHY_WATKINS@FD.ORG
                                                WILLIAM_FICK@FD.ORG

<b><u>Certificate of Service</u></b>

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 7, 2014.

                                                */s/ Judy Clarke*