UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Crim. No.13-10200-GAO |
| | ) | |
| **DZHOKHAR A. TSARNAEV,** | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL
COMPLIANCE AND SUSPEND DEFENDANT'S EXPERT DISCLOSURE DEADLINE**

The United States of America, by and through its undersigned counsel, respectfully opposes Tsarnaev's "Motion to Compel The Government to Comply With Its Expert Discovery Obligations And to Suspend Defendant's Expert Disclosure Deadline." As set forth below, the government has fully complied with its obligations under Federal Rule of Criminal Procedure 16(a)(1)(G) and the Court's June 23, 2014 scheduling order. Indeed, the government has gone over and above those obligations by complying with Tsarnaev's request for numerous documents relating to the experts' work that are not covered by Rule 16(a)(1)(G). Tsarnaev's familiar complaint that he has been deprived of "crucial" information should be rejected.

**INTRODUCTION**

Federal Rule of Criminal Procedure 16(a)(1)(G) mandates disclosure of "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the

1

Federal Rules of Evidence during its case-in-chief at trial . . . [which] must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  In keeping with the Court's June 23, 2014 scheduling order, the government on June 30, 2014, produced full Rule 16(a)(1)(G) discovery pertaining to ballistics, fingerprint, blood, and DNA evidence.  The government did not limit its production to the relatively small amount of expert testimony that it actually intends to offer in its case-in-chief at trial; rather, at Tsarnaev's express written request, it produced discovery relating to all of the many scientific tests and experiments conducted in this matter, no matter how fruitless those tests proved or how irrelevant the results.

With respect to ballistics, fingerprint, blood, and DNA evidence, the government provided the following reports:

| Number of Reports | Type of Report | Agency | Analyst |
|---|---|---|---|
| 3 | DNA | FBI | Giusti |
| 2 | DNA | FBI | Stewart |
| 4 | DNA | MSP | Montgomery |
| 3 | Fingerprint | MSP | Donahue |
| 1 | Fingerprint | MSP | MacDougal |
| 2 | Fingerprint | MSP | Moynihan |

| 1  | Fingerprint | MSP | Setalsingh |
|----|-------------|-----|------------|
| 1  | Fingerprint | MSP | Tanguary   |
| 20 | Fingerprint | FBI | Graff      |
| 3  | Ballistics  | MSP | Cahill     |

Each of these reports is a summary that "describe[s] the witness's opinions" and "the bases and reasons for those opinions."  The government followed up its disclosures with the production of numerous supporting documents (e.g., lab notes, worksheets, photos, evidence logs, transmission letters, manuals, quality-control reports, etc.) that are not within the scope of Rule 16(a)(1)(G) but that might in some cases qualify as Jencks Act material and in other cases are items expressly requested by the defense in a discovery letter.

As the following examples demonstrate, none of Tsarnaev's complaints about the adequacy or timing of the government's disclosures has merit.  One of the FBI's DNA reports is attached to this opposition as Sealed Exhibit "A."  It describes in detail various "questioned" items, various "known" items, and the methods the FBI examiner used to compare them (e.g., "deoxyribonucleic acid (DNA) typing by the polymerase chain reaction (PCR)" using "[t]he AmpFSTR Identifier Plus PCR Amplification Kit" or in some specified cases "the AmpFSTR

3

Yfiler PCR Amplification Kit.")  Additional information about the comparison methods is included in footnotes (e.g., "The AmpFtSTR® Yfiler™ PCR Amplification Kit includes the STR loci DYS456, DYS389I, DYS390, DYS38911, DYS458, DYS 19, DYS385ab, DYS393, DYS391, DYS439, DYS635, DYS392, Y_GATA_H4, DYS437, DYS438 and DYS448.  These STR loci are located on the male Y-chromosome and are transmitted through a paternal lineage from father to son. . . . ").  The report then summarizes the examiner's opinions (e.g., "The STR typing results obtained from [certain identified specimens] . . . indicate the presence of DNA from three or more individuals.  Based on the autosomal STR or Y-STR results, all the reference samples listed in this report are excluded as potential contributors. . .").  Although not required by Rule 16(a)(1)(G), all of the examiner's lab notes, which disclose in great detail precisely how he performed his analysis, were produced on July 7, 2014.  The same is true for the other FBI DNA reports.

One of the MSP DNA reports is attached to this opposition as Sealed Exhibit "B."  It likewise relates its author's opinions and fully discloses the bases and reasons for those opinions.  This particular report was first produced over a year ago; all of the MSP DNA reports were first produced no later than April 4, 2014.  Once again, although not required by Rule

4

16(a)(1)(G), all of the MSP examiner's lab notes, which detail precisely how she performed her analysis, were produced on April 4, 2014. The same is true for the other MSP DNA reports.

One of the FBI fingerprint reports is attached to this opposition as Sealed Exhibit "C." It names various items that contained latent prints and various people who provided known prints and then describes, in both tabular and narrative form, the results of a comparison between the latent prints and the known prints. It also states that the method the examiner used to compare them was the "Analysis, Comparison, Evaluation, and Verification methodology (ACE-V), which includes an assessment of the quantity and quality of the information present." The ACE-V method is further described in the report. The report's supporting documents, a sample of which are attached to this opposition as Sealed Exhibit "D," include evidence receipts, a chain-of-custody log, a worksheet that records the methods used to visualize the latent prints, the examiner's notes, and photographs showing the precise analysis of each print. Although not required by Rule 16(a)(1)(G), these documents were all produced on July 7, 2014. Also provided were high-resolution digital images of each print suitable for use by any defense expert who wishes to make his or her own fingerprint comparisons. The same is true for all of the other FBI

fingerprint reports.

One of the MSP fingerprint reports is attached to this opposition as Sealed Exhibit "E." (For simplicity, only the first two pages of the report are included.) The report states, among other things, that a latent print found on the rear passenger door of the carjacked Mercedes matched a particular person's left middle finger. The report's supporting documents, some of which are attached as Sealed Exhibit "F" to this opposition, identify precisely where the latent print was found, how it was lifted, how it was compared to the known print, and how the examiner concluded that it was a match. Both the report and the supporting documents were first produced in discovery several months ago, on April 18, 2014. Supporting documents have likewise been produced for all of the other MSP fingerprint reports.

One of the ballistics reports is attached to this opposition as Sealed Exhibit "G." In it, the examiner writes:

> It is my opinion that:
>
> A/The 9mm Luger caliber discharged cartridge casings mentioned in items 7-6, 7-7, 7-8, 7·9 and 7-10 above were all fired by the Ruger model P95 semi-automatic pistol mentioned in item 4-1 of case #13-08140.
>
> B/The copper jacketed lead spent projectiles mentioned in items 7-11, 7-12, 7-13, 7-14 and 7-15 above were all fired from the Ruger model P95 semi-

>automatic pistol, serial number obliterated mentioned in item 4-1 of case #13-08140.

The report also explains the methods used to make the comparisons: "physical and microscopic examination of the recovered evidence against the test specimens." All of the ballistics reports are similar and were produced on June 30, 2014. Although not required by Rule 16(a)(1)(G), notes and photographs made by the examiner in support of his comparisons have also been produced; several are attached to this opposition as Sealed Exhibit "H."

One of the gunshot residue reports is attached to this opposition as Sealed Exhibit "I." It describes various items that were examined for gunshot primer residue (e.g., "GSR Stub-R glove"), the methods used (e.g., "SEM-EDS," which is shorthand for energy dispersive x-ray spectroscopy analysis), and a summary of the examiner's opinions (e.g., "SEM-EDS examination on the pair of [g]loves . . . identified particles characteristic of Gunshot Primer Residue. This result indicates that this item may have been in the vicinity of a firearm when it was discharged, or may have come into contact with an item with gunshot primer residue on it."). The other gunshot residue reports are similar. Although not required by Rule 16(a)(1)(G), notes and photographs made by the examiner in the course of his

7

comparisons have also been produced.

Finally, c.v.'s for all of the ballistics, fingerprint, blood, and DNA examiners were produced on June 30, 2014.

## ARGUMENT

None of Tsarnaev's complaints about this production has any merit or warrants the relief he seeks.  Tsarnaev complains that the examiners' reports should have been provided earlier because many of them bear dates indicating that they were drafted a long time ago.  But drafts are not final reports; the FBI laboratory employs a lengthy and elaborate review process to ensure that reports are accurate, and the reports are not finalized until that process is completed.  The government has produced all of the final reports of examinations and tests in this case on a rolling basis as it received them from the respective examiners.

Tsarnaev's complaint about the Excel spreadsheet produced by the government misstates its purpose.  The government created the spreadsheet for its own use; we found it to be a convenient method of quickly accessing the underlying reports.  The spreadsheet is not meant to be "a written summary of . . . the witness[es'] opinions, the bases and reasons for those opinions, and the witness[es'] qualifications;" the examiners' reports and c.v.'s are.  In the government's experience, it is the near-universal practice of federal prosecutors to disclose a forensic

examiner's opinions and methods by providing the examiner's actual report, which states the examiner's opinions and methods in the examiner's own words. We included the spreadsheet as a courtesy to Tsarnaev because we find it useful; if Tsarnaev does not find it useful, he is free to ignore it.

Tsarnaev should not be heard to complain that the government has overwhelmed him with information because he specifically requested all of it. On February 6, 2014, Tsarnaev sent the government a letter requesting the following:

- Un-redacted copies of all books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items that was in any way relied upon by any expert witness that the government intends to use in its case-in-chief;

- Un-redacted copies of the laboratory case file for any scientific test or experiment that is material to preparing the defense or that the government intends to use in its case-in-chief, including any "bench notes";

- All instrumental, electronic or other data generated in the course of any scientific test or experiment that is material to preparing the defense or that the government intends to use in its case-in-chief, including any data generated in the course of maintenance, quality control, or quality assurance testing of any equipment used in any testing, and any data relating to the use or attempted use of any control samples;

- All relevant laboratory protocols for any scientific test or experiment that is material to preparing the defense or that the government intends to use in its case-in-chief;

- The results of any relevant proficiency testing performed by any analyst who performed any scientific test or experiment that is material to preparing the defense or

that the government intends to use in its case-in-chief;

- Un-redacted copies of any audits, whether internal or external, conducted with respect to any laboratory that performed any scientific test or experiment that is material to preparing the defense or that the government intends to use in its case-in-chief; and

- All DNA, fingerprint, firearm identification, tool mark identification, gunshot residue, explosive residue or other testing results performed on any item of evidence or on any suspect, victim or witness in this case.

The government has endeavored to provide all of this information to Tsarnaev, even though only a fraction of it is actually required under the Federal Rules according to the very decision that Tsarnaev cites as authoritative. See United States v. Wilkerson, 189 F.R.D. 14, 15-16 (D. Mass. 1999) (Collings, J.) (holding that a defendant "is plainly not entitled to" "all written records, notes, and documentation relating to specimen acceptance, identification, chain-of-possession, transport, receipt, storage, processing, and testing" or "copies of all laboratory procedures utilized in the testing of these specimen(s) including scientific equipment, preparation and verification of chemical or test reagents, step-by-step description or instruction of the testing process, examples of test data produced or obtained by test analysis, criteria for the review of test data, quality assurance and standardization relating to test analysis, [or] a copy of the

test analysis data including instrument tracings and computer output obtained from the testing of the specimen(s), standards, control, and blank samples.").

In providing Tsarnaev with the information he requested, the government produced it in virtually the same form in which the government received it from the FBI and MSP laboratories. Those laboratories name their files according to a convention that provides a convenient way for them to identify the contents of each file and its relation to other files.  The government was under no obligation to rename or reorganize those files for Tsarnaev's convenience -- especially since virtually all of the information was provided to Tsarnaev as a courtesy rather than as a matter of legal obligation.  The vast bulk of the reports the government provided, moreover, report negative findings, e.g., that latent prints had insufficient detail to be usable, or irrelevant findings, e.g., that a particular recovered shell matched a particular officer's firearm.  If Tsarnaev had not insisted on receiving virtually every single report in this case, no matter how irrelevant, along with virtually every single supporting document, no matter how unimportant, the materials the government produced would undoubtedly have been easier to sort through.

The government disagrees with Tsarnaev that required

11

materials were provided after the June 30, 2014 deadline.  For one thing, the only expert discovery due on June 30 was discovery pertaining to ballistics, fingerprint, blood and DNA evidence.  All such reports were provided on time.  For another thing, the only expert discovery required by the Federal Rules is a summary of "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Proc. 16(G).  At the April 16, 2014 status hearing, the Court observed that "the language of the rule refers to a written summary of what the evidence would be, and I think that's what I had in mind, just so you know what each side is proposing to address as expert evidence, and then we can formulate some procedures for following that out."  (Trans. 04/16/14 at 45).  All materials actually required to be produced by June 30, 2014, were produced on time.

Tsarnaev offers four examples of purportedly inadequate expert discovery, but his descriptions of them are inaccurate and misleading.

First, Tsarnaev complains that the FBI hair and fiber examiner's report "indicates that certain samples are 'consistent' with others, but provides no bases for any of these opinions." (Deft. Mot. at 11).  Even a cursory look at the examiner's actual report demonstrates that the opposite is true.

12

The relevant portion of the report is attached to this opposition as Sealed Exhibit "J"; it clearly summarizes the examiner's conclusions and the methods he used to reach them. Although Rule 16(a)(1)(G) does not require it, the government also produced the examiner's work plans, worksheets, notes, chain-of-custody logs, communications logs, and draft reports, along with a large collection of protocols and manuals.  The report was produced on June 30, 2014, and the supporting documents were produced on July 7, 2014.

Second, Tsarnaev complains that a particular ballistics report matches "discharged items" to "weapons" but does not state "what piece of evidence went with which firearm belonging to which officer." (Deft. Mot. at 12).  It is hard to make sense of this complaint.  A copy of the report is attached to this opposition as Sealed Exhibit "K."  In it, each weapon is described in words and referred to by its evidence number, and each casing and projectile is described in words and referred to by its evidence number.  The final four pages of the report summarize the examiner's opinions (e.g., "The fifty-six 9mm Luger caliber cartridge casings mentioned in items 4-54 through 4-111 . . . were all fired by item 4-1 9mm Luger caliber Ruger model P95 semi-automatic pistol serial number obliterated.").  The examiner also states that the basis for this opinion is

13

"physical and microscopic examination of the recovered evidence against the test specimens." Although not required by Rule 16(a)(1)(G), the government has also provided to the defense photographs and other documents prepared by the examiner in the course of his work. Information regarding "which firearm belong[ed] to which officer" is not included in the examiner's report because it has nothing to do with ballistics testing and is not a matter on which the examiner will render an opinion.

Third, Tsarnaev is simply wrong when he states that the government has not provided "any bench notes and photographs" in connection with the work done by FBI fingerprint examiners. Although not required by Rule 16(a)(1)(G), all such bench notes and photographs have been provided to the defense. Had Tsarnaev not insisted on receiving all fingerprint "testing results performed on any item of evidence or on any suspect, victim or witness in this case," regardless of whether those results are in the least bit relevant, the fingerprint documentation would undoubtedly have been simpler to navigate.

Fourth, Tsarnaev's complaint about the explosives examiners' reports has no more merit than his earlier complaints. Like all FBI reports, these reports contain a summary of the examiners' conclusions and their methods of arriving at them. The underlying documents, all of which have

14

been produced, provide even more detail.  Tsarnaev's additional claim that the government has not disclosed "the nature and location of various items of evidence collected at two Boylston Street scenes and the surrounding area" is baffling and completely untrue.  Nearly a year ago, in October 2013, the government produced photographs of the Boylston Street scenes showing each item of evidence, in place, individually marked.  The government has also produced written lists of these items, along with additional photographs of them taken at the FBI laboratory, as well as photo logs.

    Finally, there is no merit to Tsarnaev's claim that the government produced the expert discovery to him in a "disorganized" fashion.  The FBI and MSP labs produced the information to the government in the same manner in which the labs themselves organize it, and the government passed it on to the defense in virtually the same form.  As for Tsarnaev's claim that the expert discovery is "extraordinarily voluminous," he has it only half right:  the *actual* Rule 16(a)(1)(G) discovery is not particularly voluminous, but the additional -- mostly irrelevant -- information that Tsarnaev himself requested may well be.

**CONCLUSION**

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's Motion to Compel.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

/s/ William D. Weinreb
WILLIAM D. WEINREB