UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL THE GOVERNMENT TO COMPLY
WITH ITS EXPERT DISCLOSURE OBLIGATIONS AND TO
<u>SUSPEND DEFENDANT'S EXPERT DISCLOSURE DEADLINE</u>**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this Reply to the Government's Opposition [DE 464] to Defendant's Motion to Compel the Government to Comply with its Expert Disclosure Obligations and to Suspend Defendant's Expert Disclosure Deadline [DE 440].

The government's repeated assurances in its Opposition that it has fully and timely complied with the expert disclosure requirements of Fed. R. Evid. 16(a)(1)(G) are unfounded.[1]  The government's opposition also ignores Fed. R. Evid. 16(a)(1)(F), which

---

[1] Notably, the Government's Opposition addresses only the matters raised in the defendant's original motion concerning the government's voluminous disclosures (on June 30, July 7, and July 18) in connection with forensic disciplines such as DNA, fingerprints, and ballistics.  The government has not yet addressed any of the matters raised in the defendant's Sealed Supplemental Motion to Compel the Government to Comply with its Expert Disclosure Obligations [DE 460], covering such disciplines as "terrorism and geopolitics," and "computer forensics," which, as the Court has recognized, promise to be even more critical to the defense of this case.  As one example, the government in this case has produced forensic copies of dozens of computers and other electronic devices seized by investigators but, in its entirely generic August 1 disclosures, has failed to identify any particular files extracted from particular devices, specific relevant attributes of those files (*e.g.*, date of creation, access, deletion), or their

required production of the results of examinations and tests within 28 days or arraignment (or promptly upon creation thereafter).  Close scrutiny of the examples that the government has cherry-picked from its 10,000+ file (90 gigabyte) disclosure, purportedly to show its compliance, in fact demonstrates the opposite.  This Reply first will address the broad claims and representations in the government's opposition and then will examine each of its specific examples (and accompanying exhibits), in turn.

Ultimately, whether or not the government's disclosures concerning forensic disciplines covered by its June 30 letter and ensuing data dumps were timely or may now be close to complete, the fact remains that the defense cannot possibly process the extraordinarily voluminous (and essentially unindexed) materials, retain relevant experts, and produce reciprocal expert reports by September 2.

## Argument

**A.  The Government's Broad Claims and Representations.**

The government's core claim that its production of various raw "Report[s] of Examination" authored by anticipated experts fulfills the requirements of Rule

---

evidentiary significance.  A forensic examiner could spend every working hour for months poring through the content of a single seized device (much of it in foreign languages) in search of possible relevant evidence.  Without any indication of what the government (supported by hundreds of investigating agents) deems to have evidentiary significance, defense review of seized electronic devices, alone, could quite literally require years of work.  A second example described in the defendant's Supplemental Motion concerns the glaring deficiencies in the government's disclosures concerning its "terrorism and geopolitics" experts.

16(a)(1)(G) is simply incorrect.[2] These reports are not, themselves, a "summary" of "*testimony* that the government intends to use . . . during its case in chief at trial." The reports are nothing more or less than what they purport to be on their face: reports documenting raw results of "examinations and tests" that should have been produced much earlier under Rule 16(a)(1)(F). Such reports are both over- and under-inclusive viewed through the lens of Rule 16(a)(1)(G). On one hand, they lack background and contextual information that experts customarily provide in testimony about their respective disciplines and the particular examinations or tests conducted. On the other hand, they appear to contain extensive technical detail about various tests and procedures, including many tests that are unlikely to be mentioned in trial testimony at all. Such reports surely are subject to disclosure and comprise one of the *bases* for an expert's testimony, but they are not a "summary" of the anticipated *testimony* itself. The government's reference to "the near-universal practice of federal prosecutors," Opp. at 8-9, in this regard is ironic. In the lengthy collective experience of defense counsel, the common practice of federal prosecutors, consistent with Rule 16, is to disclose various reports of examination as they are created pursuant to Rule 16(a)(1)(F) and then to produce a separate *narrative* summary of actual anticipated expert *testimony* at the Rule

---

[2] Oddly, in its Opposition, the government now claims that the Excel spreadsheet it produced was "created for [the government's] own use. . . . The spreadsheet is not meant to be a "written summary of . . . the witness[es'] opinions . . . ." Opp. at 8-9. Yet in the cover letter accompanying its June 30 production, the government offered this description of the same spreadsheet: "The [Excel spreadsheet] index provides a summary of the opinion of each expert witness. The final forensic lab reports provide the bases and reasons for each witness's opinions."

16(a)(1)(G) deadline.³ The government's resistance to proceeding in that commonsense manner here is mystifying, particularly given the volume of forensic analysis conducted and the aggressive trial schedule. A result described in a report is not an opinion or a summary of testimony, and the government's conflation of these things does not excuse its failure to comply with its disclosure obligations.

The government's claim that it produced "all final reports of examinations and tests in this case on a rolling basis as it received them from the respective examiners," Opp. at 8, is puzzling to say the least. For example, the government's June 30 disclosure referenced 20 reports concerning FBI fingerprint examinations. Of those, it appears that eight had been earlier disclosed in prior discovery productions (reports dated, respectively, 7/1/13; 6/17/13; 6/13/13; 7/25/13; 5/20/13; 7/8/13; 6/6/13; and 8/26/13). The remaining 12 reports, disclosed for the first time on June 30, 2014, were dated, respectively:  1/8/14; 12/5/13; 12/11/13; 10/31/13; 10/10/13; 8/27/13; 8/8/13; 4/29/13; 5/23/13; 5/22/13; 5/17/13; and 7/5/13.⁴   Moreover, *none* of the backup (bench notes, photos, etc.) for *any* of these reports had been included in earlier productions.

---

³ Indeed, the government's August 1 letter more closely resembles a typical prosecution expert disclosure in *form*, except that the letter merely outlines *topics* of testimony without disclosing actual *opinions* or specific *substance* as the Rule requires.

⁴ If the government is suggesting that some of these reports were not "finalized" until an unidentified date after the date contained in the report itself, the government has not provided any documentation or explanation for the discrepancy. If that is the case, the fact that it required the FBI many months to "finalize" an earlier-produced report of its own making only highlights the impossibility of analyzing the now-produced law enforcement materials and generating reciprocal defense disclosures by September 2.

The government's extraordinary claim, Opp. at 3, that it had no obligation to produce "supporting documents" such as lab notes, worksheets, photographs, and other data, cannot withstand scrutiny. Rule 16(a)(1)(G) requires disclosure of the "bases" for proffered testimony, which can only be found in the underlying materials. Rule 16(a)(1)(F) further requires production of the results of examinations and tests, which are meaningless without underlying data. For example, no defense-retained fingerprint expert can evaluate the accuracy or integrity of work by government fingerprint experts without access to the underlying worksheets, photographs of latent prints, and copies of exemplar prints. Likewise, no defense-retained DNA expert can evaluate the accuracy or integrity of DNA "match" or "exclude" conclusions without access to the underlying electronic data that is interpreted with the assistance specialized DNA processing equipment.[5]

The government's related claim that the defense is essentially drowning in a flood of its own making, Opp. at 15, therefore is unfounded. Expert disclosures can only be evaluated substantively with access to underlying data. Earlier production, as the Local Rules envision, of reports of tests and examinations along with the underlying materials would have avoided the extraordinary data dumps that the defense must now try to process.

---

[5] As explained below, the government's disclosure on this score continues to be insufficient with regard to FBI DNA testing. Despite its claim that it has now disclosed "all of the examiner's lab notes, which disclose in great detail precisely how he performed his analysis," Opp. at 4, the government has not disclosed the underlying electronic data necessary to insure that the testing methods were reliably applied.

Finally, with regard the lack of any index or organizing principle to the 10,000+ file (90 gigabyte) disclosure, the government states that the "FBI and MSP labs produced the information to the government in the same manner in which the labs organize it, and the government passed it on to the defense in virtually the same form." Opp. at 15.  Be that as it may, Local Rule 116.10 recognizes the dangers of disorganized discovery to good trial management and requires the government to supply a "table of contents" when producing voluminous discovery.  Whatever the government's obligations or the form in which it received materials from law enforcement agencies, the defense is confronted with a daunting challenge in processing and analyzing such a mass of information without an index or apparent organizational scheme.   Unlike government counsel, the defense does not have access to the government experts, or the ability simply to call each government's expert to request that he or she identify all of the backup materials associated with a particular individual report.

### B. Specific Exhibits and Examples.

The exhibits to the government's Opposition contain a handful of cherry-picked examples of examinations, reports and supporting materials intended to demonstrate the government's compliance with its expert disclosure obligations Apart from the over-arching deficiencies noted above, other problems, detailed below, plague even these government "showpiece" disclosures.

Exhibit A to the government's Opposition is one of five FBI DNA reports referenced in the government's June 30, 2014 disclosures, dated June 5, 2013.  While the government claims to have produced associated "bench notes," the defense has to date

been unable to identify such notes related to particular FBI DNA reports in the government's 10,000+ file dump.  The file dump also does not appear to contain the underlying electronic DNA data analyzed in the FBI tests, data which a defense expert will require in order to perform independent analysis.

Exhibit B is one of 4 DNA reports by the Massachusetts State Police, dated June 5, 2013.  While the MSP DNA reports and examiner lab notes were produced by April 2014, the underlying electronic data for the MSP DNA test (data that will permit verification testing by a defense expert, the category of data that still appears to be entirely missing for the FBI DNA disclosures) were only provided in the government's July 18, 2014 discovery dump, three weeks after the expert notice and disclosure date.

Exhibit C is one of 20 FBI fingerprint reports, dated July 8, 2013 and Exhibit D is a collection of materials including lab notes, latent prints, photographs, and known exemplar prints.  While the report describes the expert's conclusions and general methodology, it does not describe specific reasons (points of comparison) for identification or exclusion of particular prints.  The conclusions are meaningless without reference to the lab notes and photographs that show the actual analysis of each print.

The materials in Exhibit D apparently were contained in the government's  90 gigabyte data dump, but defense counsel have still been unable to identify which electronic files produced by the government contain the Exhibit D materials; little in Exhibit D itself obviously connects those notes and photographs to the report contained in Exhibit C, and nothing in the disorganized nature of the dump readily links the notes and photographs to the report at issue.   Defense counsel face similar difficulty with

- 7 -

regard to each of the other 19 FBI fingerprint reports:  there is no ready means to identify which supporting materials (notes, photos, exemplars) in the government's massive electronic production correlate to which particular FBI report.

Exhibit E is one of 8 MSP fingerprint reports, dated April 28, 2013 and Exhibit F is a collection of materials including lab notes, latent prints, photographs, and known exemplar prints.  While the report describes the expert's conclusions and general methodology, it does not, itself, describe specific reasons (the *application* of the general ACE-V methodology) for identification or exclusion of particular prints.  Only a review of the supporting materials in Exhibit F gives meaning to the report.  The MSP fingerprint reports and supporting materials were produced in April 2014, nearly a year after they were created.

Exhibit G is one of 3 MSP ballistics reports dated April 24, 2013.  Exhibit H is a pair of annotated photographs apparently related to one of the items examined in the report.  While the ballistics reports were produced on June 30, 2014, supporting materials such as the Exhibit H photographs apparently were contained in one of the government's 10,000+ file July productions.  The reports themselves contain conclusions that certain items of ammunition were fired from the Ruger pistol recovered in the case, based on "physical and microscopic examination of the recovered evidence against the test specimens."  Beyond this generic description of methodology, however, the reports do not describe the *application* of the methodology, *i.e.*, the bases of the opinions: what specific common marks or characteristics found on the recovered evidence and test specimens demonstrate a match of exclusion?  In order to make sense of the report's

conclusions, it is necessary to examine the photographs and notes.  The defense has no ready means to locate particular notes and photographs among the government's 10,000+ recently-produced files, and to correlate particular notes and photographs to particular ballistics reports.

Exhibit I is one of 3 gunshot residue reports dated October 30, 2013.  It was not, however, until July 18, 2014 — nine months after the tests were apparently conducted and completed — that the government disclosed the electronic data and other notes necessary to permit investigation into the reliability of the tests.

Exhibit J is a FBI hair and fiber analysis report dated April 21, 2014.  The report lists conclusions and describes methods in general but does not state what specific "microscopic characteristics and optical properties" of particular items support the conclusion of a match, exclusion, or inconclusive result.  The report notes that the "supporting records for the opinions and interpretations expressed in this report are retained in the FBI files." The government apparently believes that it has produced them, but the defense has as not yet been able to identify this material in the vast government production that covers a plethora of disciplines.

Exhibit K is a MSP ballistics report dated August 22, 2013.  The report associates specific items (shell casings, projectiles) with specific weapons based, generally, on "physical and microscopic examination" but does not explain what particular physical characteristics or microscopic marking support the conclusion that a particular item is associated with a particular weapon.  While the government states that it has produced underlying materials that might allow comprehension and verification of the examiner's

conclusions, defense counsel thus far have not identified materials associated with this particular report in the 10,000+ file (90 gigabyte) dump. Moreover, even though the expert may not render an opinion about where particular bullets or casings were recovered, or which gun belonged to which officer, the defense cannot make sense of the evidentiary significance of the expert's findings without access to this critical data.

The government's claim that the explosives' examiners reports "contain a summary of the examiner's conclusions and their methods of arriving at them," Opp. at 14, is likewise empty. A bare conclusion and generic statement of methodology is not a specific *opinion* with a *basis* that is susceptible of independent verification or evaluation. As with other reports, the government has not identified which supporting materials in its 90 gigabytes of files correlate to particular explosives examiners' reports. The thousands of government-produced photographs of the Boylston street scenes showing each item of evidence in place are singularly unhelpful because those photographs cannot readily be correlated — if they can be correlated at all — with evidentiary items referenced in the various reports of examination.

The government's representation that "c.v's for all of the ballistics, fingerprint, blood and DNA examiners were produced on June 30, 2014, " Opp. at 8, is correct but misleading because the c.v.'s of at least a dozen *other* experts contained in the government's June 30 expert notice spreadsheet remain missing as of today, August 13.

## Conclusion

At some point before the government begins calling its many expert witnesses at trial, it will have to identify what each one of them is going to say.  That is, it will have to specify the opinions that each expert will render, and it will have to identify the reasons for that opinion, and the facts and evidence on which the opinion is based.  Rule 16(a)(1)(G) requires that this process not occur on the eve of trial, or in the middle of trial, but sufficiently in advance of trial to give the defendant notice and a fair chance to subject the government's experts' opinions to cross-examination and rebuttal.

It may be that the government is simply not yet ready to follow this procedure. But whatever the reason, it has not followed it.  For that reason, and for those set forth in the defendant's original motion [DE 440] and Sealed Supplemental Motion [DE 460], the Court should order the relief requested.

        Respectfully submitted,

        DZHOKHAR TSARNAEV
        By his attorneys

        /s/  William Fick

        Judy Clarke, Esq. (CA Bar # 76071)
        CLARKE & RICE, APC
        1010 Second Avenue, Suite 1800
        San Diego, CA 92101
        (619) 308-8484
        JUDYCLARKE@JCSRLAW.NET

        David I. Bruck, Esq. (SC Bar # 967)
        220 Sydney Lewis Hall
        Lexington, VA 24450
        (540) 460-8188
        BRUCKD@WLU.EDU

          Miriam Conrad, Esq. (BBO # 550223)
          Timothy Watkins, Esq. (BBO # 567992)
          William Fick, Esq. (BBO # 650562)
          FEDERAL PUBLIC DEFENDER OFFICE
          51 Sleeper Street, 5th Floor
          (617) 223-8061
          MIRIAM_CONRAD@FD.ORG
          TIMOTHY_WATKINS@FD.ORG
          WILLIAM_FICK@FD.ORG

### Certificate of Service

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 13, 2014.

          /s/ William Fick