UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 13-10200-GAO |
| ) | |
| DZHOKHAR TSARNAEV ) | |

**MOTION TO DISMISS INDICTMENT AND STAY PROCEEDINGS PENDING RECONSTITUTING JURY WHEEL TO CONFORM WITH STATUTORY AND CONSTITUTIONAL REQUIREMENTS**

Defendant, Dzhokhar Tsarnaev, by and through counsel, moves pursuant to Fed.R.Crim.P. Rules 6(b)(2) and 12(b)(3), and 28 U.S.C. §1867(e), that this Court dismiss the indictment returned in this case, and stay further proceedings pending reconstitution of the jury wheel to conform with the Jury Selection and Service Act, 28 U.S.C §1861 et seq., the Jury Selection Plan for the District of Massachusetts, and the fair cross-section requirement of the United States Constitution.

The defendant sought and the Court ordered production of records maintained by the District of Massachusetts which are used or relied upon by the Clerk of the Court, the jury commission and Jury Commissioner for the Commonwealth of Massachusetts in connection with the selection process of the grand and petit juries during calendar years 2011, 2012 and 2013.  DE 305.  But for objecting to the release of the identities of individuals (something that the defendant did not request), the government did not object.

1

DE 373.  Several violations – including substantial violations of the Jury Selection and Service Act and of the fair cross section requirement – surfaced during the review[1]:

    1.    The District of Massachusetts Plan for Random Selection of Jurors ("Plan") has been violated by the failure to send replacement summons for those returned as "undeliverable."  Section 8a of the Plan requires:  "For each summons returned by the United States Postal Service to the Court as 'undeliverable,' the Clerk shall draw at random from the Supplemental Jury Wheel the name of a resident who lives in the same zip code area to which the undeliverable summons had been sent and prepare and cause to be mailed to such resident a new one-step juror summons/qualification form."   There has been a substantial violation of this provision of the Plan generally (over the three years evaluated), as well as specifically with regard to this case:

    (a)    Four hundred (400) juror summons/qualification forms were selected to create the pool used to create the Grand Jury that returned the indictment in this case.  Nineteen (19), or approximately 5% of those juror summons/qualification forms were returned as undeliverable by the United States Postal Service.  There were *no* draws from the Supplemental Jury Wheel, as required by the Plan, to fill the gap.

    (b)    In addition, during the period examined by the defense (2011-2013), only 64% of the undeliverable summonses were replaced; 42% of replacement summonses actually resulted in replacement jurors.  The failure to send any replacement summonses in the pool used in this case and the replacement of only 64% of the summonses in pools over three years constitutes a substantial violation of the plan.

---

[1] See Declaration of Jeffrey Martin, attached as Exhibit A.

2.	The Plan, as applied by the Clerk, violates the Constitutional fair cross section requirement by permitting the excuse, upon request, of any person over the age of 70 years.  Record for 2011-2013 from the Eastern Division of the District of Massachusetts, show that of the qualified jurors over age 70 – members of the so-called "Silent Generation" born before or during the Depression and World War II –, 96.52% opted out, and were automatically excused by the Clerk.  The same is true of the Grand Jury that indicted Mr. Tsarnaev – approximately 96% of the individuals over 70 opted out of service.  This age-based excusal appears to be the only excuse under Section 9(c) that is automatically granted.  Individuals over age 70 make up approximately 16.74% of the population in the Eastern Division, yet only 5.15% of the Qualified Jury Wheel, an absolute disparity of 11.59%.[2]

3.	The substantial under-representation of African Americans identified in 2005 in *United States v. Green*, 389 F.Supp.2d 29 (D. Mass. 2005) has not abated even in the face of the 2009 amendment to the Plan that appears to have been the District's attempt to address the under-representation.  African Americans remain under-represented by approximately the same percentage as in 2005.  African Americans make up 6.00% of the jury eligible population (U.S. Citizens 18 and over), but only 3.94% of

---

[2] There is also a substantial underrepresentation of young people – the Millenial generation – those born between 1981 and 2000, who constitute 25.59% of the population and 20.44% of the qualified jury wheel – an absolute disparity of 5.15% and a comparative disparity of 20.13%.  However, unlike the probability that the source lists are the direct cause of under-representation of African Americans, to date, we are unable to identify the cause of the under-representation of young people.

the Qualified Jury Wheels of 2011, 2012 and 2013 (where race was known). This is an absolute disparity of 2.06% and a comparative disparity of 34.29%, meaning that over one-third of the group of African Americans in the jury-eligible population is missing from the Qualified Jury Wheel.

## MEMORANDUM IN SUPPORT

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010). The fair cross section requirement also applies to the composition of the grand jury. 28 U.S.C. §1861. Extra precautions must be taken to protect the defendant's right to an impartial and representative jury in a capital case because of "the broad discretion given the jury at the death-penalty hearing" and "the special seriousness of the risk of improper sentencing." *Turner v. Murray*, 476 U.S. 28, 37 (1986); *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013 July 25, 2013)("The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life.")

The Supreme Court noted one of the rationales behind the constitutional fair cross section requirement in *Taylor v. Louisiana*, 419 U.S. 522, 532 n.12 (1975) (quoting *Peters v. Kiff*, 407 U.S. 493, 502-504 (1972)):

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

4

The constitutionally mandated fair cross section requirement is incorporated into the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §1861 et seq. which provides, in §1861:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.  It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

The local Plan, promulgated pursuant to the JSSA must also further the right to a jury selected at random from a fair cross section of the community.

### A.   Substantial Violation of the Massachusetts Plan For Random Selection of Jurors

Section 8 of the Massachusetts Plan provides that where a summons is returned to the Court by the Postal Service as "undeliverable," the clerk shall draw a new name of a resident from the same zip code area at random from the supplemental wheel and send a summons to that new name.  This amendment to the Plan by the District Court followed the First Circuit's decision in *In Re United States*, 426 F.3d 1 (1st Cir. 2005), in which the court found that imposition of such a procedure to address the under-representation of African-Americans in the Eastern Division jury pool (*see United States v. Green*, 389 F.Supp.2d 29 (D. Mass. 2005)) exceeded the scope of a single judge's authority.

Nineteen of the four hundred summonses (4.75%) issued to obtain the grand jury that returned the indictment in this case were undeliverable.  No replacement summonses

were sent (Martin declaration, par. 15). In the 71 pools from 2010-2013 for which data was supplied, 4,964 summonses (7.28%) were "undeliverable" and replacement summonses were sent only 64.18% of the time (Martin declaration, par. 14).

28 U.S.C. §1867(a) provides, in pertinent part, that a defendant may move to dismiss an indictment "on the ground of substantial failure to comply with the provisions of this title in selecting the grand…jury." The term "substantial failure" is not defined in the JSSA, but as explained in *United States v. Green*, 389 FD.Supp.2d 29, 68-69 and n.69 (D. Mass. 2005), it does not, as discussed in the legislative history, require a showing of prejudice. It does require more than a mere technical violation (*id.*). As set out below, the failure here is more than technical; it goes to the objective of obtaining a fair cross section of the community.

The JSSA requires a district plan for the random selection of jurors designed to achieve the objective of, *inter* alia, selection at random from a fair cross section of the community. 28 U.S.C. §1863(a). The Plan requirement of replacement summonses to the same zip code as undeliverable summonses, is designed to further the goal of obtaining a jury wheel representing a fair cross section of the community. The failure to send replacement summonses for undeliverable summonses required by the Plan in over one-third of the instances in which replacement summonses were required (36% of the undeliverables not replaced) undermines that goal and, therefore, constitutes a substantial violation of both the Plan and the JSSA. *United States v. Coleman*, 429 F. Supp. 792, 795 (D.C.Mich.1977) ("a substantial violation of the plan is equally a substantial violation of the Act and warrants dismissal of an indictment"). The substantial failure is

highlighted by the failure to issue *any* replacement summonses for undeliverable summonses in connection with constituting the grand jury returning the indictment in this case – a total failure that occurred in connection with only one other of the 71 pools examined. (Martin declaration, par. 16).

The failure to comply with the provision of the Plan designed to remedy under-representation of minorities cannot be dismissed as a mere technicality.

**B. Constitutional and Statutory Fair Cross Section Violations**

Evaluating whether there has been a violation of the fair cross section requirement is a three-step process. First, the court must determine whether the group allegedly excluded is a "distinctive group" in the community. The court must then determine whether the representation of that group in the venire is "not fair and reasonable" compared to its numbers in the community. Finally, the court must determine whether the under-representation is due to systematic exclusion of the group during the selection process. *See United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999); *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

**(1) Distinctive Group**

Neither the Supreme Court nor the JSSA mandates a particular test for defining a distinctive group for purposes of fair cross section analysis. It does not require showing that the group has suffered an historical experience of discrimination, as is the case in an equal protection analysis. *See e.g. Commonwealth v. Bastarche*, 382 Mass. 86, 97, 414 N.E.2d 984, 992 (Mass. 1980) (comparing Supreme Court's discussions of requirements of equal protection clause and Sixth Amendment).

In *Taylor*, 419 U.S. 522, 530 (1975), the Court stated that the purpose of the jury cannot be met "if the jury pool is made up of only special segments of the populace or if large distinctive groups are excluded from the pool." It reiterated that "excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." Moreover, "[c]ommunity participation in the administration of the criminal law…is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." In concluding that women were a distinctive group the Court recognized that women may not act as a class and are influenced by the same factors that influence men, but, nonetheless, there was an "imponderable" difference requiring recognition of women as a distinctive group for fair cross section purposes. 419 U.S. at 531-532.

African-Americans, women, and Mexican-Americans have been recognized as distinctive groups by the Supreme Court. *See Berghuis v. Smith*, 130 S. Ct. 1382 (2010); *Taylor v. Louisiana*, *supra*; *Castaneda v. Partida*, 430 U.S. 482 (1977) (equal protection claim). Here, Tsarnaev maintains that African-Americans are a distinctive group at issue.

Tsarnaev also submits that persons over 70 should be recognized as a distinctive group. While persons over 70 have been found not to be a distinctive group by some courts (s*ee e.g. Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990)), the First Circuit has not

addressed that proposed classification.[3]   Although distinctive groups have not been defined as limited to those with immutable characteristics, distinctive groups recognized to date have been of that nature.  Being over age 70, like race, sex, and national origin, is an immutable characteristic – one cannot get younger – and exclusion on the basis of such a characteristic gives rise to the appearance of unfairness.

Congress has recognized the problematic nature of distinctions based on age in a variety of anti-discrimination legislation.  The Age Discrimination in Employment Act, 29 U.S.C. §621 et seq., was passed to, *inter alia*, "prohibit arbitrary age discrimination in employment."  29 U.S.C. §621(b).   The Congress found, *inter alia*, that "older workers find themselves disadvantaged in their efforts to retain employment,…"  §621(a)(1).  In the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq., Congress has also made it unlawful to for a creditor to discriminate against an applicant "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)."  15 U.S.C. §1691(a)(1). That statute further provides that while an "empirically derived credit system which considers age" may, if "demonstrably and statistically sound", be used, "the age of an elderly person may not be assigned a negative factor or value" in such a system.  15 U.S.C. §1691(b)(3).  The purpose of the Age Discrimination Act of 1975, 42 U.S.C. §6101 et seq. is "to prohibit discrimination on the basis of age in programs or activities receiving Federal financial assistance."  42 U.S.C. §6101.

---

[3]  Courts, including the First Circuit, have rejected classification of young adults as a distinctive group for Sixth Amendment purposes.  *See e.g. Barber v. Ponte*, 772 F.2d 982, 996, 1000 (1st Cir. 1995) (en banc) (people between the ages of 18 and 34).

The Silent Generation has been described as shaped by the Great Depression and World War II, factors not shaping later generations, and as sharing a complex of characteristics, lifestyles, and attitudes different from those of other generations. *See* Kaylene C. Williams and Robert A. Page, "Marketing to the Generations", 3 Journal of Behavioral Studies in Business, April 2011, available at: www.aabri.com/manuscripts/10575.pdf. Most members of the Silent Generation, people born before 1946, are age 70 and over (Martin declaration, par.23). Accordingly, Tsarnaev submits that persons over 70 are a definable group sharing experiences, characteristics, attitudes, and lifestyles different from other groups and that this Court should view persons over 70 as a distinctive group for purposes of fair cross section analysis.

**(2) Under-representation**

While neither the Supreme Court nor the JSSA has established a particular test to be used in determining whether a distinctive group is under-represented in a jury venire or whether any under-representation is significant (*see Berghuis v. Smith*, 130 S.Ct. 1382, 1393 (2010))[4], most courts, including the First Circuit, have utilized an absolute disparity standard in making those determinations. *See United States v. Royal*, *supra*. "Absolute disparity measures the difference between the percentage of members of the distinctive

---

[4] *Berghuis* noted that lower court have used at least three tests for measuring representation of groups in jury pools: absolute disparity, comparative disparity, and standard deviation. 130 S. Ct. at 1393. The Court declined to adopt a particular test or measure.

group in the relevant population and the percentage of group members on the jury wheel." *Royal*, 174 F.3d at 6-7.

In *United States v. Royal*, *supra* and *In re United States*, 426 F.3d 1 (1st Cir. 2005) the First Circuit recognized the under-representation of African-Americans in juries in the Eastern Division of the District of Massachusetts. The *Royal* court called the statistics presented at that time "disquieting" and the process, while not a violation of law, "a situation leaving much to be desired." (174 F.3d at 12). African-Americans were 4.86% of the 1990 census count for the population 18 and over in the Eastern Division, only 1.89% of the prospective jurors on the 1994 Master Jury Wheel, only 2.2% of prospective jurors not deemed exempt, disqualified or excused, and only 2.9% of jurors appearing for jury orientation. This produced an absolute disparity of 2.97% (174 F.3d at 10).

Six years later, the First Circuit again recognized that the issues of underrepresentation remained:

> Yet, there is asssuredly cause for concern, as this court said six years ago, *Royal*, 174 F.3d at 12, where…the proportion of blacks who return jury questionnaires is half the percentage to be expected from their presence in the division of the district concerned.

*In re United States*, 426 U.S. at 9. In that case the district court had found that African-Americans were over 6% of the Eastern Division population in the several preceding

years but only just over 3% of those who returned questionnaires and identified race. The average absolute disparity for 2001-2003 was 3.66% (426 F.3d at 3).[5]

In both cases the First Circuit applied an absolute disparity test to the data and found the disparity insufficient to establish constitutionally meaningful under-representation.

Tsarnaev recognizes that the absolute disparity of 2.06% derived from the 2011-2013 data analyzed here will not be deemed sufficient to establish constitutionally meaningful under-representation in this case under current First Circuit law and raises the following to preserve the issue of whether the under-representation of African-Americans in the jury wheel violates the constitutional and statutory fair cross section requirements for appellate review. He submits that absolute disparity is an analysis that will never be found sufficient where the population of the group alleged to be underrepresented is small, and should not be the analysis used to determine whether African-Americans are under-represented in the qualified jury wheel. As the Martin declaration explains (par.25), since absolute disparity is simply the arithmetic difference between the percentage of a group on the jury list and the percentage of the same group in the population, where the population of a group is under 10% all of that group could be excluded and no unconstitutional under-representation would be found if the standard for unconstitutional under-representation is 10%. Given the limitations of an absolute disparity analysis for evaluating small populations, Tsarnaev suggests that a comparative

---

[5] In *Green*, the court noted that the JSSA had been amended in 1992 to provide for the use of resident lists rather than voter lists in Massachusetts "because of serious concerns about the racial composition of jury pools drawn from voter lists." 389 F.Supp.2d at 42.

disparity analysis should be used. This analysis measures the rate at which a distinctive group is represented (Martin declaration, par.28). Comparative disparity analysis shows a 34.29% under-representation of African-Americans on the jury list or that "more than a third of the African-Americans we would have expected to be represented on the jury list are missing." (Martin declaration par.28). This under-representation, he submits, is constitutionally significant. Analyzing the under-representation of African-Americans using standard deviation analysis, impact analysis and disparity of risk analysis confirms the significance of the under-representation of African-Americans (*see* Martin declaration, pars.30-38).

Applying absolute disparity analysis to the representation of persons over the age of 70 in the jury wheel shows an under-representation of 12.23%. Applying comparative disparity analysis shows under-representation of 83.75% (Martin declaration, par.8). Tsarnaev submits that this under-representation of older persons is constitutionally meaningful.

### (3) Systematic Exclusion

The systematic exclusion required to establish a violation of the fair cross section requirement under the Sixth Amendment and the JSSA does not require proof of discrimination or intent. Rather, the disparity must be caused by some sort of official action or inaction. In *Taylor* the practice of excluding women unless they chose to register (an opt-in system) was held to constitute systematic exclusion. In *Duren*, the practice of giving women the option for an automatic exemption upon request (an opt-out

system) was held to constitute systematic exclusion. *See e.g. Duren*, 439 U.S. at 366-367.

As in *Duren*, the Plan for the District of Massachusetts provides an opt-out system for persons over the age of 70 (section 9c). As in *Duren* this constitutes systematic exclusion.

As explained in the Martin declaration (par.7), the largest number of African-Americans among the cities and towns of the Eastern Division resides in Boston and 22.49% of Boston's population is African-American (the third highest percentage of African-Americans in the Eastern Division and well above the Division's overall percentage of 6.00%). However, Boston is under-represented in the municipal resident lists used to create the master jury wheel. This under-representation in municipal resident lists is attributable to some form of official action or inaction in the jury selection process and is, therefore systemic exclusion. *See e.g. United States v. Jackman*, 46 F.3d 1240 (2nd Cir. 1995). This systematic exclusion is a contributing factor to the under-representation of African-Americans in the jury wheel.

## CONCLUSION

For the foregoing reasons, it is requested that the Court dismiss the indictment returned in this case, and stay further proceedings pending reconstitution of the jury wheel to conform with the Jury Selection and Service Act, 28 U.S.C §1861 et seq. and the Jury Selection Plan for the District of Massachusetts and the fair cross-section requirement of the United States Constitution.

Dated: August 22, 2104	Respectfully Submitted,

DZHOKHAR TSARNAEV
By his attorneys

*/s/ Judy Clarke*

Judy Clarke, Esq. (CA Bar# 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 458-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 22, 2014.

*/s/*