## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.13-10200-GAO** |
| | ) | |
| **DZHOKHAR A. TSARNAEV,** | ) | |
| **Defendant** | ) | |

### GOVERNMENT'S SURREPLY TO
### DEFENDANT'S MOTION FOR CHANGE OF VENUE

"[T]he Colonists believed in the concept that the community which had suffered injury should be allowed to judge those charged with the injury. . . . To this day, the interest of a community in trying those who violate its laws remains a central tenet of our judicial system." United States v. Dubon Otero, 76 F.Supp.2d 161, 164 (D.P.R. 1999) (internal quotation marks and citations omitted).

In keeping with this principle, the Supreme Court has made it nearly impossible to demonstrate that a jury pool has been so contaminated by negative pretrial publicity that a court cannot lawfully even attempt to seat an impartial jury using the traditional tools of jury questionnaires and voir dire.   The Court has found that a defendant made the necessary showing in only one case:   Rideau v. Louisiana, 373 U.S. 723 (1963).   There, a film of the sheriff interrogating the defendant in jail and eliciting a confession to robbery, kidnapping and murder was broadcast on three successive days to two thirds of the venue's population less than two months before the trial.   Id. at 724-25.   Since that case was decided, over fifty years ago, hundreds of defendants in federal cases have moved for a change of venue based on claims of presumed prejudice; virtually every one of those motions has been denied, and to the government's knowledge, not a single such denial has been reversed on appeal.

In many highly publicized cases where courts have denied a change of venue, the defendant based his motion on an affidavit from Edward Bronson.   As set forth below, courts often disagree with Mr. Bronson's media analyses and dismiss his use of polling data as unhelpful. They also reject many of his fundamental assumptions about jury behavior, which are at odds with established law.   Courts generally hold instead that in determining whether it is possible to seat an impartial jury, a thorough voir dire of actual potential jurors is far more helpful and reliable than the opinions of a paid social scientist.

There are reasons to be especially skeptical of Mr. Bronson's opinions here.   This is a capital case, and Mr. Bronson is a lifelong opponent of the death penalty.   See, e.g., Pemore v. Cullen, 2011 WL 1044633, at *54 (S.D. Cal. 2011) (quoting from 1991 affidavit in which Mr. Bronson testified:   "[I] believe that the death penalty is imposed at best in an arbitrary and capricious manner in San Diego County, the State of California, and the United States as a whole.").   Mr. Bronson recently gave a talk at California State University entitled "My Life Fighting the Death Penalty" in which he spoke about fighting the death penalty by testifying as an expert witness in capital cases.   See http://theorion.com/blog/2014/03/04/former-professor-fights-death-penalty.   A person who attended the talk commented to a reporter that "[t]t is kind of interesting . . . [to have visited] death row and have this expert talk about how it's so wrong."   Id.   Mr. Bronson boasted during the talk that he has "testified in most of the death penalty cases in our country."   Id.   He admitted that "he gets very involved in the cases he testifies for" and that it is "sort of how I define myself."   Id.   Despite Mr. Bronson's obvious biases, however, it is his position that his own claims of impartiality can be trusted while those of Massachusetts jurors cannot be.

A.    Courts in other cases involving highly-publicized trials have found Mr. Bronson's
      opinions unhelpful, misleading or wrong.

A review of three of the most highly publicized cases in which Mr. Bronson has testified shows that courts often find his testimony inaccurate and unhelpful:

**1.    The Skilling case.**   In United States v. Skilling, Case No. 04-25 (S.D. Tex.) (Dkt. 199 - Declaration of Edward Bronson), the defense offered a survey showing that four times as many respondents in Houston than in other jurisdictions believed the defendant, Jeffrey Skilling, was guilty.   Id. ¶ 57.   It also showed that 33% of Houston residents personally knew someone who was harmed by Enron's collapse.   Id. ¶ 68.

Based on those survey results and his analysis of media coverage, Mr. Bronson offered many of the same arguments for a change of venue that he makes here.   He opined:   (1) that the **extent** of news coverage about the Skilling case in the Houston Chronicle -- 4,400 news articles by his count -- was the second-highest he had ever seen, id. ¶ 26; that the **nature** of the coverage was inflammatory, using "emotionally charged" terms to describe Skilling such as "asshole, axe murderer, backstabber, bastard, devil, dirty, evil, murderer, pig, rotten, screwed his employees, scumbag, should be hanged, sleazebag, slimebag, slimy rat, snake, terrorist, terrible, weasel, and dozens of others," id. ¶ 64; that the coverage created a **presumption of guilt** ("Rightly or wrongly, the Houston Chronicle has focused and cast blame largely on Mr. Skilling and his co-defendants."), id. ¶ 32; and that the case had **remarkably high salience**, because, in Mr. Bronson's opinion, "[t]he number of alleged victims, the impact on the community, and many other factors make it a brooding omnipresence in the Houston community," id. ¶ 37.

The district court reviewed all of the same news articles on which Mr. Bronson based his opinion and came to a different conclusion.   It wrote that aside from "isolated incidents of

intemperate commentary about the alleged crimes and their perpetrators . . . the reporting appears to have been objective and unemotional." United States v. Causey et al., No. 04-25, at *12 (E.D. Tex. Nov. 8, 2004). The United States Supreme Court agreed. It quoted with approval an observation made in one of the briefs that "Skilling-employed experts selected and emphasized negative statements in various news stories," Skilling, 561 U.S. at 370 n.3, and wrote that its own review of the stories revealed that coverage of Skilling, while "not kind," also was not "blatantly prejudicial," id. at 383.

Further, just as Mr. Bronson has opined in this case that Massachusetts jurors will feel irresistible peer pressure to convict the defendant and sentence him to death, he opined in Skilling that the entire population of the Houston area (over 4.5 million people) should be considered irremediably prejudiced because the crime was seen as an attack on *their* city and on *their* friends and neighbors. Skilling, supra, Bronson Decl. ¶ 39. He opined that all of "the citizens of the Houston area [have] experienced the anger, shock, and pain surrounding this case -- many personally and others vicariously through the media," id., and that "the nature of the media coverage of this event, coupled with the way it has affected the entire Houston community, will create an unusual amount of pressure on local jurors, perhaps consciously, perhaps not, to return a verdict of guilty lest they incur the wrath or displeasure of their friends, neighbors, and co-workers," id. ¶ 40. He opined further, as he does here, that "[t]he hostile feelings about the Enron case are so deep and pervasive in Houston, as revealed in the media and the survey, that it will be nearly impossible for well-intentioned venirepersons to put aside those feelings even if they say they can." Id. ¶ 100.

Mr. Bronson was wrong. After a lengthy trial, the jury acquitted Skilling of a third of the charges against him –- proving, to the Supreme Court's satisfaction, "that the media coverage did

not" prevent the jury from undertaking "a fair minded consideration of the issues."   Skilling, 561

U.S. at 383-84 (internal quotation marks and citations omitted).   In a group interview given by all

12 jurors after the trial, moreover, not a single word was said about the damage to Houston or the

harm suffered by friends and neighbors; instead, the jurors spoke at length about their methodical

efforts to sift through the mountains of evidence and their struggles to determine which witnesses

to believe.   See http://articles.latimes.com/2006/may/26/business/fi-jury26.

   **2. The W.R. Grace case.**   Mr. Bronson was also hired as a defense expert in United States

v. W.R. Grace, 408 F.Supp.2d 998 (D. Mont. 2005), a criminal case in which the government

accused W.R. Grace of knowingly exposing Libby, Montana's 3,000 residents to asbestos for

decades, resulting in more than 200 deaths and 1,000 illnesses.   The defense motion for a change

of venue was supported by "1,900 newspaper articles and other written accounts of the events

involving Grace's mine in Libby; a compilation of recent television news coverage of the events in

Libby; two documentary films focusing on the Libby asbestos situation; two books examining

Grace's role in the Libby asbestos situation; and the results of a telephone survey."   Id. at 1003.

The survey showed that "92% of respondents had been exposed to news stories about Grace and

Libby; 55% of those surveyed believe Grace is guilty of the charges in the Indictment, with 90% of

those believing in Grace's guilt strongly; [and] 53% of those surveyed believe the individual

Defendants are guilty of the charges in the Indictment, with 88% of those holding that view

strongly."   Id. at 1002.

   In words nearly identical to those he used in the Skilling case, and that he uses again in this

case, Mr. Bronson opined:   "The coverage of this case is among the most inflammatory I have

ever encountered [in 22 years], full of pathos and anger.   It may be characterized as inflammatory

overload."   United States v. W.R. Grace, Crim. No. 05-7, ¶ 33 (Dkt. 192, Attachment 22 -

Affidavit of Edward Bronson).   He noted "the repeated use of terms like 'horrible,' 'terrible,' 'deadly,' 'tragic' and 'tragedy,' 'hysteria,' 'fear' and 'frightening,' and 'disaster' associated with W.R. Grace's alleged conduct."   Id. ¶ 35.   As he does here, Mr. Bronson opined that the defendant had been "demonized in the media" and "portray[ed] . . . as the ultimate villain -- an outsider."   Id. ¶¶ 37-38.   He opined further that "[t]he entire tenor of the coverage reflects the view that Grace is guilty, even if the stories often include de rigeuer terms such as 'alleged' or 'charged.'"   Id. ¶ 45.

As Mr. Bronson also did in Skilling, and does again here, he opined: "This is a case of high salience locally and in Montana generally.   The number of victims, the cost in lives and money, the danger to the environment, and other factors make it a brooding omnipresence in the community."   Id. ¶ 43.   And, as he does in every case, Mr. Bronson invoked the concept of the "story model."   He opined:   "Given the extraordinary extent of the media coverage of this case, plus the prejudicial nature of that coverage, I believe that the coverage of this case presents one of the strongest and most prejudicial story models I have ever seen."   Id. ¶ 53.   He concluded, "Those exposed to this story will have their view of the case shaped by [it].   It will be difficult to dislodge this view from a jury pool exposed to it."   Id. ¶ 44.

Mr. Bronson could not have been more wrong.   After a seven-week trial, W.R. Grace and its codefendants were acquitted on all charges by a jury selected from the 14,282 adults eligible for jury service in the Missoula Division, where virtually all of the harm occurred and virtually all of the purportedly prejudicial publicity was focused.   In earlier denying W.R. Grace's motion for a change of venue, the district court expressly disagreed with Mr. Bronson's opinions that "that the extent of the coverage of this case in the Missoula area is 'remarkable'" and that the content of the coverage reflected "inflammatory overload."   408 F.Supp.2d at 1014.   The Court wrote instead,

just as the Skilling court had, that "[a]fter a careful review of the publicity that has appeared over the past year and a half, I find that the coverage of this case is predominately factual in nature." Id.

    3.  **The State Farm cases.**   Mikelonis et al. v. State Farm Fire and Cas. Co., Case No. 06-886 (S.D. Miss. Apr. 25, 2007) (Dkt. 54-2 - Affidavit of Edward Bronson), is yet another case involving extensive pretrial publicity in which Mr. Bronson testified about the need for a change of venue.   This was one of the many lawsuits against State Farm by southern Mississippi homeowners whose houses were destroyed by Hurricane Katrina.   Mr. Bronson opined there, as he does here, that "[t]he extent of coverage of this case in the area was remarkable, almost off the scale."  Id. ¶ 31.   "In terms of the number of newspaper articles . . . [it] ranks number 4, exceeded only by the two Oklahoma City bombing trials and the recent Enron/Skilling/Lay case."   Id. ¶ 35. As he does here, Mr. Bronson opined that the coverage was "very inflammatory," "very emotional," id. ¶ 81, and was rife with inadmissible material, inaccuracies, and presumptions of guilt, id. ¶¶ 92-106; that "[t]he unusual magnitude and near universality of the tragedy meant that this case hit more members of the community than any case I have previously ever dealt with," making the case "salience writ large," id. ¶ 85; and that news stories highlighted "the pathos of the victims" but demonized State Farm, characterizing State Farm as an "outsider," id. ¶¶ 107-134.

    The district court found none of this persuasive.   It noted that it had already conducted voir dire in three other nearly identical cases against State Farm drawn from the same jury pool, and that its experience in those cases demonstrated that Mr. Bronson was simply wrong in opining "that the publicity surrounding the issues to be tried is so pervasive that the selection of a fair and impartial jury is not possible."   Mikelonis et al., Case No. 06-886 (S.D. Miss. Oct. 2, 2007) (Dkt. 94).

B.      Mr. Bronson's media analysis is unreliable and misleading and should be given no weight.

1.      The extent of the publicity is much smaller than Mr. Bronson claims.

An examination of Mr. Bronson's media analysis in this case shows that his testimony here is every bit as unreliable and unhelpful as it was in the Skilling, W.R. Grace, and State Farm cases.   For example, Mr. Bronson attests that between April 1, 2013 and July 11, 2014, "the Globe published approximately [2,420 articles or] 5.2 articles per day referring to the bombing." Bronson Aff. ¶¶ 26-27.   Anyone who actually lives in Boston and reads the Boston Globe every day knows, however, that that number is absurd.   How did Mr. Bronson arrive at it?   An examination of his list of search terms reveals the answer.[1]

Among the thousands of articles that, in Mr. Bronson's professional opinion, "refer[] to the bombing" are any that include the phrases "Boston Marathon" or "Boylston Street" -- no matter what the articles are actually about.   See id. Ex. 2E, Dkt. 461-13 (listing search terms).   If one searches the Globe's archives during the relevant time period using the search term "Boston Marathon" OR "Boylston Street" and looks at the first 50 articles to appear (in reverse chronological order), they include the following 30 that have little or nothing to do with the Marathon bombing or this case:

- Events (Subjects: Crustaceans; Reading programs; Parks & recreation areas; Restaurants)
- A $10m overhaul rooted in the rock-club past
- US border policies defeat Boston's spirit of inclusion
- A different way to serve (Subjects: Food; Farms; Colleges & universities; Military personnel)
- Return of police horses would be welcome
- Cushy lives demand extreme races

---

1 Although Mr. Bronson states that his search extended through July 26, 2014, see Bronson Aff. ¶ 25 n.11, it appears that it may actually have extended only to July 11, 2014, see id. Ex. 3A (Dkt. 461-14) (Boston Globe log).   To give Mr. Bronson the benefit of the doubt, we have assumed the actual cut-off date was July 11, 2014.

- Robert Gardner; anthropologist reinvented films about cultures
- Immigration activists march in Boston
- Hub officials laud dispensary action
- Brigham OK's plans to give filmmaker two arm transplants
- An Olympic-sized split over bringing games to Boston
- Going for the gold
- AG candidates pin their hopes on politicking
- Walsh to sign act limiting ICE holds
- William F. Hoss, Jr. (Obituary; Awards & honors; Marathons; Running; Age)
- Delay in ruling on comments expected
- Pair's sentence cut in One Fund fraud
- Crash kills couple on a stroll in Back Bay
- Champions pull off repeats
- Protesters slam MBTA plan to cut jobs
- Strawberry shortcake at Forum
- Newton North freshman raises $1,500 by selling candy to fight cancer
- Advocates call for more work on prostate cancer
- Every 4 years, Olympic spirit exploited for its glitz value
- Marathon announces registration dates
- Boston-area To Do list
- Disability benefits? Focus first on what veterans can do
- One Step Ahead (Subjects: Ankle; Medicare; Amputation; Prostheses)
- Racing to Help (Subjects: Awards & honors; Colleges & universities)
- Bentley grad Carleton inducted into national academic hall of fame

In other words, using a commonsense understanding of what it means for an article to "relate to" the Marathon bombings or this case, a full 60% of the first 50 articles produced using Mr. Bronson's search terms are, if not wholly *unrelated*, than at least completely innocuous. Yet he swears in his affidavit that only "[a] few of the included articles are not relevant to the Marathon Bombing case." See Bronson Aff. ¶ 27 n.15. That sworn statement is irresponsible, if not outright misleading, and casts doubt on the accuracy and reliability of all of Mr. Bronson's testimony. Mr. Bronson's time (and the Court's money) would have been better spent on a more thorough vetting of the news articles themselves than on the drafting of his lengthy affidavit.

b.      <u>The publicity is not nearly as emotional or "inflammatory" as Mr. Bronson claims.</u>

Mr. Bronson's next dubious opinion is that "[t]he Boston Marathon case involves inflammatory overload in the coverage's themes, words, phrases, and passages."   <u>Id.</u> ¶ 33. Although he claims to have arrived at this opinion using a "selective," "scientific," and "systematic" method of analyzing the data, <u>id.</u> ¶ 24, he did not actually "code" the data, i.e. read each article and assign it to a particular category depending on how relevant, prejudicial or inflammatory it actually is; instead, his "scientific" method was simply to search for particular words (such as "brutal," "awful," "chilling" "fear" and "anguish") in the mass of articles he has identified as relevant and count the number of times each word appears.   <u>Id.</u> ¶ 35-36.   (Again, it is hard to understand why this simplistic method of analyzing the articles required so much time and such great expense –- or the use of an "expert" at all.)

Mr. Bronson's method for analyzing the articles is as flawed as his method for identifying the relevant articles in the first place.   For one thing, it ignores the self-evident legal principle that "[m]edia coverage is not biased or "inflammatory" simply because it recounts the inherently disturbing circumstances of the case."   <u>People v. Harris</u>, 57 Cal.4th 804, 826 (Cal. 2013).   For another thing, it captures all sorts of articles that are barely related to this case at all.   For example:

- A search for "Boston Marathon" AND "brutal" during the relevant time period turns up an article titled "On CIA abuses, denial does Americans no favors" by Stephen Kinzer (Apr 20, 2014), p. K.9.

- A search for "Boston Marathon" AND "awful" turns up "Celtics fade at the finish" by Baxter Holmes (Apr 21, 2013), p. C.1; "Crash kills couple on a stroll in Back Bay" by Nicholas Jacques, (Jun 23, 2014), p. A.1; "Six ways social media can ruin your life" by Alyssa Giacobbe (May 25, 2014), p. R.16; "Bedford man puts mosquitoes at arm's length" by Billy Baker (Aug 31, 2013), p. B.1; and "Hillers winning with team play" (May 2, 2013), p. REG.7.

- A search for "Boston Marathon" AND "chilling" turns up "David Mugar's magnificent obsession" by Eric Moskowitz (Jun 23, 2013), p. R.22, and "Youths lead conference on

diversity" by Jennette Barnes (May 23, 2013), p. REG.

- A search for "Boylston Street" AND "fear" turns up "Try the sunny side of the street," Alex Beam (Jul 24, 2014), p. A.15, and "A marijuana business longs for regulation" Farah Stockman (Feb 26, 2014), p. A.13.

- A search for "Boston marathon" AND "anguish" turns up "Hillary Clinton focuses on women" by Michael Levenson (Apr 24, 2014), p. B.1, and "Reis proving he's still a keeper" by Emily Kaplan (Jul 6, 2013), p. C.2.

These are just a few of the numerous irrelevant articles that Mr. Bronson swears under oath are related to this case and are evidence of "inflammatory overload."   See id. ¶ 33.   That testimony, once again, is irresponsible and misleading and no more worthy of belief than it was in Skilling, W.R. Grace, and Mikelonis, where the identical claim was made by Mr. Bronson and rejected by the courts.

      c.     The coverage has predominantly been factual and accurate.

If one searches the relevant time period for a more pertinent universe of articles –- i.e. ones that contain the word "Tsarnaev" -- the results are dramatically different.   Virtually all of the "inflammatory" words Mr. Bronson identifies appear fewer than 20 times; more than half appear fewer than 10 times; and often the words appear together in a single article.   Indeed, a search of the relevant time period using the word "Tsarnaev" yields articles that are overwhelmingly factual and accurate in nature.   Virtually all do no more than report on developments in this and related cases.   These are the headlines of the first 50 articles to appear (in reverse chronological order) using the search term "Tsarnaev:"

- Tsarnaev lawyers demand investigation of news leaks
- Friend's arrest in '13 tied to drugs
- A Tsarnaev friend faces gun charge
- Jurors convict friend of Tsarnaev
- Verdict could affect related court cases
- A verdict hits home

- 2015 trial date set for Tsarnaev friend
- Tsarnaev friend's trial is delayed
- Coakley, Baker in virtual tie
- Case linked to bombings goes to jury
- Judge rejects claim Tsarnaev friend was coerced
- Testimony concludes in trial of bombing suspect's friend
- Pal was wary of Tsarnaev's brother
- Tsarnaev friend's texts, Web searches detailed in court
- Associate's trial turns to Tsarnaev phone texts
- This day in history
- Roommate found friends' visit odd
- Grant creates central location to help Marathon victims
- Tsarnaev in spotlight at trial of schoolmate
- Discussion about bomb is OK'd in friend's case
- Prosecutors fight Tsarnaev motion to move trial to Washington
- Tsarnaev trial must be scrupulous, even if that means moving it elsewhere
- Tsarnaev wins bid on juror fairness
- Judge says no bail for Tsarnaev friend
- Delay in ruling on comments expected
- Tsarnaev pal says FBI made offer
- Trial venue change risky
- Tsarnaev lawyers seek to move trial to Washington
- Matanov charges send a chill to those who would aid investigators
- Tsarnaev team seek accounts by brother's friend in Florida
- The Hub of fairness
- Tsarnaev will ask to have his trial moved
- Matanov charges look like a vindictive overreach
- FBI reveals surveillance of friend of Tsarnaevs
- US says Tsarnaev home was arsenal
- Bombing suspect's friend called a liar
- Accused seeks to suppress statements
- Marathon week
- Tsarnaev friend charged with obstruction
- A 'go-getter' who showed no signs of extremism
- The suspects
- Bill orders spy agency review
- Flood alert spawns its own storm
- Muslim group asks prosecutor for new review in FBI slaying
- FBI shooter's pension investigated

- US says holiday lights used in bombs
- Holiday lights were used in bombs, US says
- Tsarnaev case lawyers spar over disclosure
- This day in history
- For the record

d.  The allegations that Tsarnaev made admissions are mainly old news and will in any event be proved at trial.

Although it is true that many news articles have reported government allegations that Tsarnaev effectively admitted his role in the offense, most of those are based on Tsarnaev's written statements in the boat where he was captured -- statements that were alleged in the Indictment and other pleadings and will be introduced at trial.   Moreover, most of those articles (even by Mr. Bronson's own reckoning) date to the early months of the case (although a few have been published more recently).   That is obviously a far cry from the situation in Rideau, where the defendant's videotaped jailhouse confession was broadcast on television on three successive days to 100,000 people in a parish of 150,000 only two months before the trial.   See, e.g., Mu'Min v. Virginia, 500 U.S. 415 (1991) (holding that defendant sentenced to death was not deprived of fair trial by "substantial" pretrial publicity that included reports he had confessed to the murder); DeLisle v. Rivers, 161 F.3d 370, 384 (6th Cir. 1998) (en banc) ("The Rideau Court did not purport to create a rule that the dissemination of the fact of a defendant's confession through some other, less dramatic and compelling medium, is equally a violation of the Due Process Clause.")

It is also reasonable to conclude that a very small percentage of the jury pool has *actually read* the articles that Mr. Bronson considers prejudicial.   The Eastern Division of this district has a population of approximately five million, but the Globe's entire circulation is only 225,482. See Bronson Aff. ¶ 16.   Even allowing for Mr. Bronson's estimate that the average number of adult readers of each newspaper is 3.3, see id., that still means only 15% of the jury pool reads the

Globe every day.   And as Mr. Bronson has elsewhere testified, "[t]ypical investigations show that many newspaper readers do not read every day or they read only a portion of the newspaper, even just the sports pages."   W.R. Grace, supra, Affidavit of Edward Bronson ¶ 22 (Dkt. 192, Attachment 22).   It follows that the media impact on the jury pool as a whole is likely to be minimal.

Mr. Bronson's media analysis focuses on several factors that are important under the state law of California, where Mr. Bronson does most of his business as an expert witness -- i.e. the "nature" of the offense, the "gravity" of the offense, the "status" of the defendant, and the "status" of the victim, see, e.g., People v. Avila, 59 Cal.4th 496, 507 (Cal. 2014) -- but it gives short shrift to perhaps the single most important factor under federal law, which is the *timing* of the pretrial publicity.   In this case, as in most, the volume of newspaper articles about the case has decreased dramatically over time.   Of the 2,420 articles that Mr. Bronson swears are related to this case, 900 (or nearly 40%) of them appeared within a month of the bombings, and 1,575 (or nearly 65%) of them appeared within six months of the bombings.   But the trial will not begin until 18 months after the bombings.   Of the articles that mention Tsarnaev that have appeared in the last six months, virtually all are about others who have been charged in connection with the Marathon bombings, and those about Tsarnaev himself are almost uniformly factual accounts of developments in his court case.

     e.     The courts have rejected the "story model" of memory as a basis for changing venue.

As Mr. Bronson does in virtually all of the cases in which he testifies, he attempts to avoid the legal significance of diminishing media coverage by invoking the "story model" of memory, which holds that the public develops a fixed view of a case based on the initial wave of publicity

and never lets go of that view (or the feelings associated with it) no matter how hard it might try.

See Bronson Aff. ¶¶ 14-17.   The problem with the "story model," however, is that "cases direct

courts to make the opposite assumption."   W.R. Grace, 408 F.Supp.2d at 1014.   Accord United

States v. Moreno Morales, 815 F.2d 725, 753-54 (1st Cir. 1987) (holding that "[in] determining the

probability that pretrial publicity may have had a prejudicial effect upon the prospective jurors," a

court must consider "[t]he time elapsed between the adverse publicity and the trial, and the effect

that such a hiatus may have had on the minds of the jurors"); Hayes v. Ayers, 632 F.3d 500, 509

(9th Cir. 2011) ("The Supreme Court has repeatedly recognized that the passage of significant time

between adverse press coverage and a defendant's trial can have a profound effect on the

community and, more important, on the jury, in softening or effacing opinion.") (internal quotation

marks and citations omitted); People v. Prince, 40 Cal.4th 1179, 1214 (Cal. 2007) ("The passage of

time ordinarily blunts the prejudicial impact of widespread publicity.").

The Supreme Court's decision in Patton v. Yount, 467 U.S. 1025 (1984), demonstrates the

critical importance of the timing of negative publicity in a determination of presumed prejudice.

The defendant in Yount, who won a new trial after being convicted of the rape and murder of a

high school student, moved for a change of venue, arguing that "the widespread dissemination of

prejudicial information [before and during the first trial] could not be eradicated from the minds of

potential jurors."   Id. at 1027.   That prejudicial information included Yount's previous

conviction for murder, his prior plea of temporary insanity, and his widely publicized oral and

written confessions to the murder, which had since been suppressed, making them inadmissible at

his second trial.   Id. at 1026, 1029.   The voir dire showed that all but two of the 163 veniremen

had heard about the case, that 77% admitted they would carry an opinion into the jury box, and that

more than half admitted that at some time they had formed an opinion about the defendant's guilt.

Id. at 1029-30.   Even so, the Supreme Court held that the passage of time between the negative

publicity attending the first trial and the start of the second trial had eliminated a presumption of

prejudice.   Id.   It noted that in previous cases it had found juries irremediably biased only where

they were exposed to a "'barrage of inflammatory publicity immediately prior to trial,' 'amounting

to a huge . . . wave of public passion.'"   Id. at 1033 (quoting Murphy v. Florida, 421 U.S. 794 798

(1975) and Irvin v. Dowd, 366 U.S. 717, 728 (1961)).

The Patton Court implicitly rejected the "story model" on which Mr. Bronson relies.   It

disagreed with the idea that prejudicial information leaves indelible marks, writing instead:   "That

time soothes and erases is a perfectly natural phenomenon, familiar to all."   Id. at 1034.

Addressing the essential premise of the "story model" head on, the Court wrote that "[t]he relevant

question is not whether the community remembered the case, but whether the jurors at Yount's

trial had such fixed opinions that they could not judge impartially the guilt of the defendant."   Id.

at 1035.   The Court's answer to its own question was a direct rejection of the "story model."   It

wrote:   "It is not unusual that one's recollection of the fact that a notorious crime was committed

lingers long after the feelings of revulsion that create prejudice have passed."   Id.   Accord

Skilling, 561 U.S. at 399 n.34 ("News coverage of civil and criminal trials of public interest

conveys to society at large how our justice system operates.   And it is a premise of that system

that jurors will set aside their preconceptions when they enter the courtroom and decide cases

based on the evidence presented.")

     f.    The Court should rely on its own evaluation of local media coverage.

In sum, the many obvious defects and shortcomings in Mr. Bronson's media analysis prove

the wisdom of the Supreme Court's holding that "[w]hen pretrial publicity is at issue, 'primary

reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in

the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'"   Skilling, 561 U.S. at 386 (quoting Mu'Min, 500 U.S. at 429); accord Bishop v. Wainwright, 511 F.2d 664, 666 (5th Cir. 1975) ("The trial court is necessarily the first and best judge of community sentiment.").

> B.    Mr. Bronson's public opinion poll is flawed and provides scant support for a change of venue.

1.    Public opinion polls are no substitute for voir dire.

"Public opinion polls introduced with the purpose of demonstrating jury bias have found little favor with the courts."   Shapiro v. Kauffman, 855 F.2d 620, 621 (8th Cir. 1988).   One reason is that public opinion polls are designed by paid experts in consultation with only one side to the litigation and typically involve scripted questions read to unsworn strangers over the telephone; voir dire, in contrast, is conducted face-to-face with venirepersons sworn to tell the truth by a judge who can appraise "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty."   Skilling, 561 U.S. at 386–87.   Such "in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service."   Id.

For this reason, courts tend to trust voir dire, which has proven effective for centuries, over opinion polls.   In People v. Avila, supra, for example, California's Supreme Court upheld the trial court's decision to reject Mr. Bronson's change-of-venue opinions in a case where the defendant was sentenced to death for kidnapping, sexually molesting and asphyxiating a five-year old girl. The trial court had "reject[ed] the opinion that a cold calling survey is superior to voir dire in determining a person's depth of knowledge, prejudices, and common sense."   Id. at 506.   The

Supreme Court affirmed, holding that "it was reasonable for the trial court to conclude that actual voir dire -- during which the court and parties could question the jurors face to face -- was a more reliable way to measure the effect of pretrial publicity than a survey conducted by a person chosen by one of the parties."   Id. at 508.

Numerous other cases have held the same.   See, e.g., United States v. Haldeman, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (noting that "public opinion poll data . . . is open to a variety of errors" and that "a poll taken in private by private pollsters and paid for by one side" is inferior to voir dire of actual jurors); United States v. Rodriguez, 581 F.3d 775, 785-86 (8th Cir. 2009) ("This court has expressed doubts about the relevance of such polls when reviewing rejected change-of-venue motions."); United States v. Campa, 459 F.3d 1121, 1145 (11th Cir. 2006) ("It was entirely within the district court's prerogative to reject outright [a defense expert's] survey as a basis upon which to grant a motion to change venue."); United States v. Skilling, Case No. 04-25 (S.D. Tex. Jan 19, 2005) ("[C]ourts have commonly rejected [public opinion] polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."); United States v. Mandel, 431 F.Supp. 90, 100–01 (D.Md. 1977) ("In the opinion of the Court, a public opinion poll is no substitute for voir dire examination."); United States v. McVeigh, 918 F.Supp. at 1467, 1473 (W.D. Okla. 1996) ("[D]ata from opinion surveys . . . are but crude measures of opinion at the time of the interviews.   There is no laboratory experiment that can come close to duplicating the trial of criminal charges.").

Another reason opinion polls have found little favor in the courts is that the courts deem voir dire effective even where "virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity."   United States v. Bliss, 735 F.2d 294, 297–98 (8th Cir. 1984) (citing Dowd, 366 U.S. at 722-23 and Murphy, 421 U.S. at 799-800).   That means a judge who

believes in the efficacy of voir dire is entitled to rely on it no matter what a public opinion poll might indicate.   See, e.g., Kordenbrock v. Scroggy, 919 F.2d 1091, 1102 (6th Cir. 1991) (survey showing that "in four out of five counties over 80% of the people polled had heard about the case and in three out of five counties almost 50% of the people polled thought [the defendant] was guilty of murder" did not preclude reliance on voir dire); People v. Famalaro, 52 Cal.4th 1, 19 (2011) (trial court properly relied on voir dire in capital case despite survey designed by Mr. Bronson showing that 83 percent of respondents had heard of the case, and of those, 70 percent said the defendant was definitely or probably guilty of murder and 72 percent said he should receive the death penalty"); Harris, 57 Cal.4th at 825-26 (Cal. 2013) (trial court properly relied on voir dire in capital case despite poll designed by Mr. Bronson showing that 72 percent of the participants recognized the case, and of those, 55 percent said the defendant was definitely or probably guilty of murder and 45 percent said he should receive the death penalty); People v. Coffman 34 Cal.4th 1, 45 (2004) (voir dire sufficient in capital case charging murder, kidnapping, robbery, burglary, and forcible sodomy, despite poll designed by Mr. Bronson showing that 71 percent surveyed recognized the defendants' case, and of those, over 80 percent said the defendants were definitely or probably guilty.); People v. Ramirez, 39 Cal.4th 398, 433 (Cal. 2006) (voir dire was sufficient in capital murder trial despite poll of prospective jurors showing that 94.3% had heard of the case, 51.7% thought the defendant was "responsible" for the murders, and the defendant's venue expert testified "that the levels of recognition and predisposition were the highest he had ever seen").

2.       Mr. Bronson's polling data in this case is unreliable and misleading.

a.       A small percentage of people responded to the survey, and those who did are not representative of the population.

Several problems with the poll in this case render its results unreliable and potentially misleading.   The first problem is the exceedingly low response rate.   The pollsters calling Boston residents had to make approximately 10,000 phone calls to obtain 300 complete responses.   In over 9,000 cases, the people they called were either not home, decided not to answer the phone, or let the call go to voice mail.   Another 992 answered the phone but refused to participate in the survey.   That is a response rate of less than 3%.   The same thing happened in the other jurisdictions that were polled.   There is no reason to believe that the 3% who participated are representative of the 97% who did not.   On the contrary, in Reference Guide on Statistics (2000), a leading manual on the use of statistical studies in court cases, the authors warn that "[a] large non-response rate warns of bias."   Id. at 101.   That is because "people who do not respond to a survey are usually different from respondents."   Kaye & Freedman, Reference Manual on Scientific Evidence 102 (2nd Ed. 2000).

The tiny percentage of people who chose to respond, moreover, are not a representative sample of the population in either Boston or D.C.   The ASTC Guidelines, which Mr. Bronson himself co-authored, state that, for a survey to be useful, the respondents must constitute a representative sample of the target community; that it is important to maximize representative selection and distribution by age and gender; and that representativeness should be measured by comparing the demographic composition of the survey respondents to the population of the trial jurisdiction.   Id. at 8-11.   Mr. Bronson's survey, however, underrepresents the young and overrepresents the old, as the following chart illustrates:

|          | 18-24 | 25-34 | 35-44 | 45-54 | 54-65 | 65+   |
|----------|-------|-------|-------|-------|-------|-------|
| Boston – Census | 7.3% | 13.7% | 12.5% | 14.6% | 13.1% | 12.8% |
| Surveyed | 3.7% | 2.7% | 16.4% | 33.2% | 17.1% | 25.8% |
| D.C. – Census | 9.7% | 21.2% | 13.4% | 11.9% | 11.1% | 10.8% |
| Surveyed | 2.5% | 5.9% | 8.4% | 20.8% | 20.3% | 39.6% |

In addition, nearly 70% of respondents in Boston had a college degree (or more) while only 40% of the population does, and nearly 30% hold an advanced degree while only 20% of the population does.   The same is true (with slightly different numbers) in D.C.   And in Boston only a third of the number of black respondents whom one would expect to see based on census data are represented in the survey.   Even though Mr. Bronson apparently wrote the book on the importance of representative polling data in change-of-venue motions, he fails to mention these deficiencies in his affidavit.

The second problem with Mr. Bronson's poll is its failure to show that different responses in different jurisdictions reflect differing levels of exposure to prejudicial pretrial publicity rather than just demographic differences.   Mr. Bronson has previously testified that "[s]urveys have meaning only to the extent they reflect the content of the media coverage of the case and test for the impact of that coverage on the community."   Skilling aff. ¶ 20.   Some of the most important responses in this case, however, appear to have nothing to do with exposure to pretrial publicity and everything to do with demographic differences.   For example, the survey shows that support for giving Tsarnaev the death penalty is 50% lower in D.C. than in Boston.   Several surveys have shown, however, that blacks are approximately 40% less likely to favor the death penalty than whites, and Democrats are approximately 35% less likely to favor it than Independents and

Republications.[2]   In Mr. Bronson's survey, the Washington D.C. respondents were vastly more likely to be black, and much more likely to be Democrats, than the Boston respondents.   Those demographic differences account for the entire disparity in the death-penalty response results between the two jurisdictions, indicating that pretrial publicity has had no prejudicial effect whatsoever on the Boston jury pool when it comes to the death penalty.

The same demographic differences between Boston and D.C. are reflected in the respondents' predispositions when it comes to mitigation theories.   Although Mr. Bronson chose not to mention it in his affidavit, his own survey shows that D.C. residents are far likelier than Massachusetts residents to *agree* with the statement "Even the worst criminal should be considered for mercy" and to *disagree* with the statement "The insanity defense is a loophole that lets too many guilty people go free."   Presumably, Mr. Bronson asked these questions to establish "baseline" differences in the predispositions of the two populations so as to properly discount differences in their respective answers to more case-specific questions.   Because the results did not favor his arguments, however, he appears -– misleadingly -- to have ignored them.

2.      Even taken at face value, the survey results do not support a change of venue.

Even taking the survey's results at face value, they do not support moving the case out of

_____

[2]  A Gallup survey in October 2013 of 1,005 respondents found white support for the death penalty in a murder case to be 68% and black support to be 41%.   Support among Republicans was 81%, Independents: 60%, and Democrats: 47%.   A Pew survey in March 2014 of 4,006 people found white support for the death penalty in a murder case to be 63% and black support to be 36%.   It also found that support among Republicans was 71%, Independents: 75%, and Democrats: 45%. A survey of 1,000 people conducted by the Death Penalty Information Center in June 2007 found that overall 39% of its sample would be disqualified from a capital case because they do not support the death penalty, while fully 68% of blacks would be excluded because they feel the same way.   See Jones, J. (2013). U.S. Death Penalty Support Lowest in More than 40 Years (Gallup Survey); Pew Research Religion & Public Life Project, Shrinking Majority of Americans Support Death Penalty (March 28, 2014).

Massachusetts, let alone moving it to Washington, D.C.   Nearly 75% of Boston residents disagreed with the statement, "If the government brings someone to trial, that person is probably guilty," meaning that Massachusetts residents are naturally inclined to presume a defendant is innocent.   Although approximately 90% already believe Tsarnaev is guilty, that is simply because "[in] these days of swift, widespread and diverse methods of communication . . . scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of" a widely-publicized criminal case.   Irvin, 366 U.S. at 722-73.   It does not mean the jurors cannot set aside their beliefs and apply the presumption of innocence.   Mr. Bronson believes they won't, but the law presumes they will.   See, e.g., Skilling 561 U.S. 358 at 398 n.34 ("[It] is a premise of [our] system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented."); Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987) ("[Jurors] are presumed to be impartial . . . [and the] existence of a juror's preconceived notion as to the guilt of the accused will not by itself destroy the presumption of impartiality."); Wright v. Hedgpeth, 2012 WL 1194853 (E.D.Cal. 2012) (trial court properly refused to rely on a poll designed by Mr. Bronson in part because "it did not ask if people [who] had formed an opinion as to guilt . . . could put that opinion aside.").

Furthermore, Mr. Bronson's poll shows that 80% - 90% of potential jurors believe Tsarnaev is probably or definitely guilty *in all four jurisdictions surveyed*.   That strongly suggests that pretrial publicity has affected all of them equally (or not at all).   The only difference between Boston and D.C. is the number that believe Tsarnaev is "definitely" guilty (57% vs. 37%) and the number who believe he is "probably" guilty (34% vs. 49%).   These differences may simply reflect demographic differences between the two jurisdictions rather than exposure to pretrial publicity.   In any event, they are hardly sufficient to justify a change of venue.

3.      Mr. Bronson's' opinions are based on assumptions about voir dire and jurors that have been rejected by the courts.

Mr. Bronson's survey also suggests that people who have strong feelings about the Tsarnaev case are not shy about saying so and therefore can be questioned appropriately during voir dire.   Mr. Bronson's doubts about the likely candor of Massachusetts jurors during voir dire are little more than a social scientist's skepticism about the efficacy of voir dire in general and therefore not a basis for a change of venue.   See, e.g., United States v. Copple, 24 F.3d 535, 544 n.14 (3rd Cir. 1994) ("[J]urors are presumed to respond truthfully to" voir dire questions); Application of Cohn, 332 F.2d 976, 977 (2nd Cir. 196) (same).

The fact that many in Massachusetts have attended the Boston Marathon (or know someone who has) does not cast doubt on their impartiality or willingness to be truthful during voir dire.   See, e.g., United States v. Salim, 189 F.Supp.2d 93, 96-97 (S.D.N.Y. 2002) (rejecting Mr. Bronson's testimony that "[j]urors who were personally affected by the events of September 11 are an obvious risk to the fair trial rights of Mr. Salim" requiring a change of venue, because "[in] questioning potential jurors, it is not the fact that they may have been personally affected by the events of September 11, 2001 that is dispositive; it is their sworn response whether that connection makes it difficult for them to be fair and impartial jurors for the parties in this case.").   Similarly, there is no more reason to doubt that Boston jurors could summon the courage to render a "not guilty" verdict in this case than there was to doubt the jurors in the Skilling and W.R. Grace cases. Mr. Bronson could have asked respondents if they would fear returning to their communities after rendering a "not guilty" verdict but chose not to; his predictions on this score are therefore not social science research but just the arguments of a biased hired gun.

Finally, it is worth noting that only 36.7% of Boston respondents believe the death penalty

is appropriate for Tsarnaev even though the 2014 Pew national survey on the death penalty found

that 55% of Americans support the death penalty for murderers in general.   That suggests there

are jurors in Boston who support the death penalty but who, despite all of the "inflammatory" press

coverage cited by Dr. Bronson, do not currently believe it is an appropriate punishment for

Tsarnaev.

In sum, Mr. Bronson's polling data is flawed and misleading, and his opinions are based on

assumptions about voir dire and juror behavior that have been rejected by the courts.   The Court

can and should rely on voir dire to seat a fair and impartial jury in the Eastern Division of

Massachusetts.

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's

motion for a change of venue.


Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:   /s/ William D. Weinreb
      WILLIAM D. WEINREB
      ALOKE S. CHAKRAVARTY
      NADINE PELLEGRINI
      Assistant U.S. Attorneys


**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and that paper copies will be sent to those indicated as non-registered participants on this date.

*/s/ William D. Weinreb*
WILLIAM D. WEINREB