UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 13-cr-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT
AND STAY PROCEEDINGS PENDING RECONSTITUTION OF JURY WHEEL**

The United States, by and through undersigned counsel, respectfully opposes Tsarnaev's Motion to Dismiss the Indictment and Stay Proceedings Pending Reconstitution of the Jury Wheel. As set forth below, the Court should deny the motion in its entirety because Tsarnaev has established neither a prima facie case of unconstitutional disproportionality nor a failure to comply with the Jury Selection and Service Act ("JSSA") that violated his right to a grand jury composed of a fair-cross section of the community.

**BACKGROUND**

The JSSA directs each district court to devise and execute "a written plan for random selection of grand and petit jurors" in accordance with the statute's requirements. 18 U.S.C. § 1863. In most states jurors must be selected from voter lists. See 18 U.S.C. § 1863(b)(2). But the JSSA provides that "[t]he plan for the district of Massachusetts may require the names of prospective jurors to be selected from the resident list provided for in chapter 234A, Massachusetts General Laws, or comparable authority, rather than from voter lists." Id. Because the resident lists include not just registered voters but all adults who live in every Massachusetts city and town, see M.G.L. 234a, § 10, Congress found that their use "both improves the representativeness of juries and enhances administrative efficiency," H.R. Rep. 102-1006(I), *23, 102nd Cong., 2nd Sess 1992, 1992 WL 187372.

Under the Plan For Random Selection of Jurors for the Eastern District of Massachusetts, the Jury Commissioner selects names at random from the resident lists and transmits them to the Clerk of the Court, who then places at least 35,000 names into the Master Jury Wheel in a manner that ensures each county is proportionally represented.  *See* United States District Court for the District of Massachusetts Jury Plan for Random Selection of Jurors § 6(a) (Mar. 3, 2009) ("Jury Plan").  At periodic intervals, the Clerk draws at random a large number of names from the Master Jury Wheel.  These individuals receive summonses and qualification questionnaires by mail.  Id. § 7(c)-(d).  The Jury Plan exempts active duty military personnel, police officers, firefighters, and public officers from jury service.  Id. § 9(b).  It further directs the Clerk to excuse certain individuals from jury service upon request:  any person over age 70, any person who has served on a jury within the last three years, and volunteer safety personnel.  Id. § 9(c).  The Clerk reviews the questionnaires upon their return and, after excluding disqualified individuals, places the remaining names into a pool of qualified jurors.  The Clerk sends notices to appear to individuals in this pool randomly and at a pace consistent with the district's need for jurors in any given month.

In 2005, then-U.S. District Court Judge Nancy Gertner concluded that African-Americans were underrepresented in the qualified jury pool because (among other things) summonses to members of this community were often returned to the Clerk by the United States Postal Service as "undeliverable."  See United States v. Green, 389 F. Supp. 2d 29, 61 (D. Mass. 2005).  Based on this and other factors, the appearance of African-Americans in the qualified jury pool (3 percent) was lower than their population in the Eastern District (over 6 percent).  Id. at 44-45.  Judge Gertner held that although this disparity did not violate the Sixth Amendment's fair cross-section requirement, see id. at 63, it did violate the JSSA's cognate fair cross-section

requirement, 18 U.S.C. § 1863(b)(3), by failing to "prescribe some other source or sources of names" in addition to the usual source list "where necessary to foster the policy and protect the rights secured by" the fair cross-section guarantee. See Green, 389 F.Supp.2d at 63-66 (quoting 18 U.S.C. § 1863(b)(2)). Judge Gertner ordered, among other things, that every time a summons is returned as "undeliverable," the Clerk send a new summons to an individual from the same Zip Code chosen at random from the Master Jury Wheel.

The government petitioned for mandamus, and the First Circuit effectively reversed. See In re United States, 426 F.3d 1 (1st Cir. 2005). It agreed with Judge Gertner that the then-existing jury plan complied with the Sixth Amendment's fair cross-section requirement, but it held that the JSSA's fair cross-section requirement was no broader and therefore did not require the supplemental summonses that Judge Gertner had ordered. See id. at 7-8. Finding "cause for concern," however, in the underrepresentation of African-Americans among qualified potential jurors, the First Circuit noted that "[t]he district court has always been free to revise its jury plan in compliance with the statute." Id. at 9.

In the wake of the First Circuit's decision, a District Court Jury Plan Committee ("the Committee") consisting of five judges of this Court was established "to review the court's jury plan in light of the district court's findings in Green." Modifications to the Jury Plan of the United States District Court for the District of Massachusetts: Notes of the Jury Plan Committee at 7. The Committee began by noting that the First Circuit had rejected all previous "challenges to the representativeness of jury venires in this court," including the one raised in Green. Id. at 3-6. It then wrote that it had investigated whether there were more reliable sources of data on Massachusetts residents than the annual resident lists and had found none. Id. at 7. Finally, it recommended a new, two-step procedure for summonsing potential jurors, which was adopted by

the full Court.  This new procedure requires the Clerk to summons potential jurors at random from the Master Jury Wheel (the "initial draw"), and, for each summons returned as "undeliverable," summons an additional person from the same Zip Code selected at random from a Supplemental Jury Wheel (the "supplemental draw").  The Committee wrote that this procedure "would achieve an overall improvement in [the Court's] ability to develop a jury pool that assures that every litigant entitled to a jury trial in this district will get a jury randomly selected from a fair cross section of the community of the relevant division."  Id. at 9.

Tsarnaev now moves to dismiss the indictment and stay these proceedings, alleging that (1) the Clerk substantially violated the JSSA by failing to conduct an adequate supplemental draw; and (2) the Jury Plan itself violates the Sixth Amendment and the JSSA's fair cross-section requirements by systematically excluding African-Americans and individuals over age 70.  The motion should be denied because both of these claims lack merit.

## ARGUMENT

A. Even assuming for the sake of argument that there was a violation of the Jury Plan's supplemental draw requirement, there was no substantial violation of the JSSA.

The JSSA authorizes a defendant to seek dismissal of the indictment or a stay of the proceedings "on the ground of substantial failure to comply with the provisions of [the JSSA] in selecting the grand or petit jury."  28 U.S.C. § 1867(a).  Tsarnaev argues that the Clerk substantially violated the JSSA by failing to comply with the Jury Plan's supplemental draw requirement.  He reasons that "[t]he Plan requirement of replacement summonses . . . is designed to further the goal of obtaining a jury wheel representing a fair cross section of the community" and that "[t]the failure to send replacement summonses . . . in over one-third of the instances in

which replacement summonses were required . . . undermines that goal and, therefore, constitutes a violation of both the Plan and JSSA." Id. at 6.

Tsarnaev's argument lacks merit because his reasoning is faulty. The Jury Plan in existence today is no different from the one the First Circuit upheld against a JSSA-based fair cross-section challenge in In re United States, with one difference -- it includes the supplemental draw procedure. It follows that the supplemental draw procedure is not required by the JSSA. The Court added that procedure not to cure a fair cross-section violation in the existing plan, but to make an already lawful plan even better. Any failure to follow the supplemental draw procedure is therefore not a "substantial violation" of the JSSA. Accord United States v. Royal, 174 F.3d 1, 11 (1st Cir. 1999) ("The failure to follow up on the qualification forms, enclosed with summonses, that are not completed and returned does not constitute a substantial violation of the Act in this case, where no fair cross-section violation has been established.").

Although the issue has no legal significance, Tsarnaev also has not established a substantial violation of the supplemental draw requirement by the Clerk. The Jury Administrator has informed undersigned counsel that it issues replacement summons in accordance with the Jury Plan's supplemental draw procedure whenever "undeliverables" are returned by the Post Office in time for a replacement summons to be of use (i.e. before the corresponding jury pool has been exhausted or is on the verge of exhaustion); but that frequently does not occur. Furthermore, as the First Circuit noted in In re United States, "we have upheld convictions despite deviations from a jury selection plan where the deviation did not frustrate core concerns of the statute, specifically, random selection of jurors and objective criteria for juror disqualification." Id. at 8 (citations omitted). By Tsarnaev's own count, of the 400 summonses issued to create the pool from which the grand jurors in this case were chosen, only 19 were

returned as "undeliverable." See Deft. Mot. at 2. That number -- fewer than five percent -- is hardly sufficient to "frustrate" the statute's "random selection" concern.

      B.      The Jury Plan does not violate the fair cross-section requirements of the JSSA or Sixth Amendment.

`      The requirement that juries be drawn from a fair cross-section of the community does not guarantee that "venires . . . [be] a substantially true mirror of the community." Barber v. Ponte, 772 F.2d 982, 997 (1st Cir.1985) (en banc). It requires only that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor v. Louisiana, 419 U.S. 522, 538 (1975). Accordingly, to prove a violation of fair cross-section requirement, a defendant must first establish a prima facie case by demonstrating (1) "that the group alleged to be excluded is a 'distinctive' group in the community," (2) "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and (3) "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). If a defendant establishes a prima facie case, the burden shifts to the government to demonstrate that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." Id. at 367-368. This test applies regardless of whether the fair-cross section claim is made under the JSSA or the Sixth Amendment. See United States v. Royal, 174 F.3d 1, 6 (1st Cir. 1999).

      1.      Tsarnaev's claim that African-Americans are unfairly, unreasonably and systematically excluded from venires is foreclosed by First Circuit precedent.

As Tsarnaev acknowledges, the two-percent disparity between the proportion of African-Americans in the jury-eligible population and the proportion in the Qualified Jury Wheels does not establish a prima facie violation of the fair cross-section argument under First Circuit precedent.  See Royal, supra; United States v. Hafen, 726 F.2d 21 (1st Cir.1984).  Tsarnaev's arguments about the relative merits of measuring underrepresentation using a comparative disparity test as opposed to an absolute disparity test have been considered by the First Circuit (and many other Courts of Appeals) and rejected.  See Royal, 174 F.3d at 9 (holding that comparative disparity analysis "exaggerates the effect of any deviation" and "reaches absurd results."  Id.  Furthermore, even if Tsarnaev could show that African-Americans were unfairly and unreasonably underrepresented in the qualified jury pool, he has not established that the underrepresentation stemmed from "systematic exclusion."  The Jury Plan relies on Massachusetts resident lists and random draws -- two facially neutral means of selecting potential jurors.  It is therefore readily distinguishable from the laws in Taylor and Duren v. Missouri, 439 U.S. 357 (1979), that specifically exempted women (or allowed women to exempt themselves) from jury service.  See Duren, 439 U.S. at 359-360; Taylor, 419 U.S. at 523.  Although Tsarnaev challenges the accuracy of the Massachusetts resident lists used to constitute the Master Jury Wheel, claiming that they underrepresent Boston residents and, therefore, African-Americans, he offers no data documenting the magnitude of that purported underrepresentation, nor any evidence that it results from official action.  See Green, 389 F. Supp. 2d at 61 & n.59 (observing that African-American residents "have higher-than-average rates of mobility" and that "a whopping 24% of Boston's population changed residences" between 1999 and 2000).  After examining similar allegations with respect to the resident lists,

Judge Gertner in <u>Green</u> found no systemic exclusion of African Americans under <u>Duren</u>'s third prong. *Id.* at 58-63. Tsarnaev offers no reason to revisit that conclusion here.

    2.    The provision of the Jury Plan that permits jurors over age 70 to exclude themselves is not unlawful because they are not a "distinctive" group.

Tsarnaev has not shown, and cannot show, that individuals over age 70 constitute a "distinctive" group for purposes of the <u>Duren</u> test. As the First Circuit held in <u>Barber v. Ponte</u>, 772 F.2d 982 (1st Cir. 1985) (en banc):

> This requires (1) that the group be defined and limited by some clearly identifiable factor (for example, sex or race), (2) that a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) that there be a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. The reason for these requirements is readily apparent. In choosing a jury we are looking not merely for a statistical mirror of arbitrary segments of the population's composition. The goal that we seek is that the jury generally represent the attitudes, values, ideas and experience of the eligible citizens that compose the community where the trial is taking place.

<u>Id.</u> at 997. Simply put, a "distinctive" group is defined by "attitudinal representativeness." <u>Id.</u> at 999.

In <u>Barber</u>, the First Circuit rejected the argument that young adults (18-34 year olds) are a "distinctive" group for purposes of the <u>Duren</u> test. It wrote, "Unless one is prepared to say that there is an affirmative constitutional duty to produce a true cross section on the venire for every imaginable group that exists in our complex society, something which no court has even come close to holding, we should avoid the overwhelming problems and sterile solutions that will result from attempting to subdivide a continuum of ages into "distinctive groups." <u>Id.</u> at 999. It also noted:

> The <u>Duren</u> Court used the concept of "distinctive group" in a case where women were subjected to discrimination. It is fair to assume that the court wanted to give heightened scrutiny to groups needing special protection, not to all groups

> generally. There is nothing to indicate that it meant to take the further step of requiring jury venires to reflect mathematically precise cross sections of the communities from which they are selected. Yet if the age classification is adopted, surely blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications will be entitled to similar treatment. These are not the groups that the court has traditionally sought to protect from under-representation on jury venires. See, e.g., Hill v. Texas, 316 U.S. 400 (1942) (blacks); Duren (women); United States v. Brady, 579 F.2d 1121 (9th Cir.1978), cert. denied, 439 U.S. 1074 (1979) (Indians).

The same logic militates against categorizing individuals over 70 as a "distinctive" group.

Tsarnaev's sole authority for the proposition that individuals over 70 are a "distinctive" group" is a business journal article on "multi-generational marketing" that does nothing to advance his cause. The article identifies six discrete age groups for marketing purposes: the Pre-Depression Generation (born before 1930); the Depression Generation (born between 1930 and 1945); Baby Boomers (born between 1946 and 1964); Generation X (born between 1965 and 1977); Generation Y (born between 1977 and 1994); and Generation Z (born after 1994). See Kaylene C. Williams and Robert A. Page, "Marketing to the Generations," 3 Journal of Behavioral Studies in Business, at 2 (2011). The authors state that members of each generation "share a common social, political, historical, and economic environment" because they "experience[d] similar events at a similar age." Id. Such aged-based grouping, based solely on an individual's exposure to particular events at particular stages of life, might help inform a company's marketing strategy. But Barber dismissed this approach for defining a "distinctive" group under the Sixth Amendment.

Tsarnaev's claim would fare no better in other jurisdictions. Every appellate court to consider this issue has held that an excluded age group is not "distinctive" for Sixth Amendment purposes. See Barber, 772 F.2d at 1000 (collecting examples), and two circuits have rejected claims similar to Tsarnaev's. While acknowledging that "the elderly have much to offer in terms

9

of life experience and exposure," the Seventh Circuit concluded that "they cannot be classified as a 'distinctive group' for sixth amendment purposes on the basis of age alone." Silagy v. Peters, 905 F.2d 986, 1011 (7th Cir. 1990). The Eighth Circuit, in Brewer v. Nix, 963 F.2d 1111 (8th Cir. 1992), similarly dismissed the assertion that elderly individuals offer "manifestly different ideas and attitudes than those in other age groups." Id. at 1113. The court criticized the defendant's proposed class (individuals over 65 years old) as "too arbitrary, and its supposed distinctive characteristics [as] too general and ill-defined, to satisfy the Duren standards." Id.; see also United States v. Walsh, 884 F. Supp. 2d 88, 91-92 (S.D.N.Y. 2012) ("It is reasonable to presume that members of the public understand and accept as rational the obvious practical considerations upon which the seventy-plus opt-out provision is grounded. For some members of that group, requiring jury service, even an initial appearance to seek to be excused, would disproportionately pose inconveniences and hardships."). The same conclusion is warranted here.

   WHEREFORE, the Court should deny Tsarnaev's motion to dismiss the indictment or, alternatively, stay these proceedings.

                                    Respectfully submitted,
                                    CARMEN M. ORTIZ
                                    United States Attorney

                              By:   /s/Nadine Pellegrini
                                    Nadine Pellegrini
                                    William D. Weinreb
                                    Aloke Chakravarty

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        /s/Nadine Pellegrini
                                        Nadine Pellegrini
                                        Assistant U.S. Attorney

Date: September 5, 2014