UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )
        Plaintiff,             )
                              )   Criminal Action
v.                            )   No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE



**STATUS CONFERENCE**



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, August 14, 2014
10:03 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1     APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty, Nadine Pellegrini and
3         William D. Weinreb, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         On Behalf of the Government

6         FEDERAL PUBLIC DEFENDER OFFICE
          By: Timothy G. Watkins, Esq.
7             William W. Fick, Esq.
          51 Sleeper Street
8         Fifth Floor
          Boston, Massachusetts  02210
9         - and -
          LAW OFFICES OF DAVID I. BRUCK
10        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
11        Lexington, Virginia  24450
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          On Behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              (The Court enters the courtroom at 10:03 a.m.)

 4              THE CLERK:  The United States District Court for the

 5    District of Massachusetts.  Court is in session.  Be seated.

 6              For a status conference in the case of Dzhokhar

 7    Tsarnaev, 13-10200.  Would counsel identify yourselves for the

 8    record.

 9              MR. WEINREB:  Good morning, your Honor.  William

10    Weinreb for the United States.

11              MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your

12    Honor.

13              MS. PELLEGRINI:  Nadine Pellegrini for the United

14    States, your Honor.

15              THE COURT:  Good morning.

16              MS. CLARKE:  Judy Clarke, David Bruck, Tim Watkins and

17    William Fick on behalf of Mr. Tsarnaev, whose presence was

18    waived.

19              THE COURT:  All right.  Good morning.

20              There are a number of pending motions, some of which

21    we'll address and some of which we'll not because for some

22    reason -- for some, the briefing may not be complete.

23              Let's start with the motion regarding what's described

24    as leaks and public comments.  I appreciate the government's

25    response to my expressed concern at the last conference, and I
```

1    refer to the July 18th letter that was sent to law enforcement

2    personnel in the case.  The timing of was apparently

3    coincidental with events in the Silva case which led to the

4    comments, so I don't think it was effective to ward off those

5    comments, but I appreciate the content and the communication of

6    it, and I just want to underscore my concern that it be taken

7    to heart by all the ranks.

8           I would only ask if the government has not done so,

9    whether it might, and should, get an affirmative response from

10   the people to whom the letter was sent that they have, in fact,

11   communicated it to their staffs, again, to underscore my

12   concern.  Other than that, I think no further inquiries are

13   necessary at this time.  So to the extent the motion seeks

14   relief beyond that, it is denied.

15          Let me address now the motion for firewall procedures.

16   I think that the requirement that everything -- that the

17   firewall the AUSA says or does in his duties with respect to

18   this case be in writing is a little too onerous.  The thought I

19   had was -- I appreciate that there is some concern, and perhaps

20   prudence, in monitoring it in some way.  And my thought was

21   perhaps he could -- is it a he?

22          MS. PELLEGRINI:  It is, your Honor.

23          THE COURT:  All right.

24          He could maintain a log of his communications, the

25   fact of them, without the substance.  In other words, "Talked

1    to Assistant Warden Smith Tuesday afternoon" -- sort of like a

2    billing record, I guess, that a lawyer would do.  That would

3    keep track of what interactions there were without adding the

4    burden of having to conduct them in a cumbersome way.

5            Is that something the government would find

6    acceptable?

7            MS. PELLEGRINI:  Yes, your Honor.  And I'll

8    communicate that to the firewall.

9            THE COURT:  Okay.  Other than, with respect to

10   communications to the Court, I would expect them to be in

11   writing in the ordinary course anyway, so I don't think we have

12   to provide for that.  To the extent they would not be in

13   writing, they would likely be on the record.  So I don't think

14   we have to take any steps on that.

15           So beyond that, adding the requirement of the log for

16   communications, I see no reason for any further relief.  There

17   were four points raised, and the government agreed with 1 and

18   4.  So this addresses Number 2, I think.  So that resolves that

19   motion.

20           To the extent there is a still outstanding issue about

21   further discovery of what we might call Todashev matters, I

22   thought actually we had resolved it.  I had reviewed the

23   matters that the government submitted in camera, including

24   recordings, and I see no reason to compel any further discovery

25   from that material.

1          Now, I think the remaining issues pertain to in one

2    way or another discovery.  Let's take up the motion for what is

3    called a motion for clarification which is about the schedule

4    for defense disclosure of non-Rule 12.2 expert materials,

5    information, summaries.

6          Mr. Bruck?

7          MR. BRUCK:  Thank you, your Honor.

8          Of course this concerns penalty phase non-12.2

9    discovery.  And the Court's scheduling order did not specify or

10   differentiate.  As we looked further at this issue, we were

11   struck by the fact that this is a disclosure requirement which

12   is generally foreign to federal death penalty cases throughout

13   the country, and that is really illustrated, I think, by the

14   fact that the government's only recent case is a single Puerto

15   Rico District Court decision involving, we think, quite

16   inapposite facts and involving what ended up to be mid-trial

17   disclosure of -- or actually postconviction -- post-guilt-phase

18   disclosure of two expert witnesses, I think one of which was

19   eventually withdrawn.

20         So the government's authority for the idea that there

21   is broad-ranging discovery of defense penalty-phase expert

22   witnesses prior to the guilt phase even beginning is razor

23   thin, and that's for a reason.  Even beyond mental health

24   evaluations which involve direct interviews with the client and

25   have obvious Fifth Amendment implications, so does the entire

1   range of the life history investigation and the expert

2   consideration of the implications of the defense case in

3   mitigation that is raised by -- that is at issue in this

4   motion.

5          This is the laying bare of a defendant's past, of his

6   upbringing, of his history, his relationships, in a way that

7   simply implicates the right to remain silent, the right against

8   compelled self-incrimination and the right to counsel.  The

9   leading case that is codified in 12.2, *United States versus*

10  *Beckford*, the seminal case dealing with mental health discovery

11  provides a good example where Judge Payne in that case denied

12  the government's request for the sort of broad-ranging

13  discovery of non-testimonial, non-interview information from

14  the defense on the grounds -- prior to trial on the grounds

15  that it would chill the defense pretrial investigation.

16         In other words, the government's insistence that we

17  lay bare prior to the beginning of voir dire, prior to the

18  calling of the first witness of the guilt phase, our case in

19  mitigation through our experts is uncharted territory.  It has

20  been implicitly rejected by the federal courts in the 500 cases

21  that have been over the -- that have been through the process,

22  almost 500 cases until now.

23         We think there's no authority for it.  We think

24  it -- I certainly understand why the government would like to

25  have it.  Every lawyer wants to know as early as possible what

1    the other side is up to.  I get that.  But even in mental

2    health evaluations the government doesn't get their own

3    evaluation, let alone the defense evaluation, until after the

4    guilt phase is over, and the same ought to be true here.  And

5    there is certainly no authority for the other proposition.

6         And for that reason we think the ambiguity -- I

7    understand the government says we should have raised this a few

8    weeks earlier.  We feel -- frankly, we are on a bobsled ride

9    and these issues are coming at us in the middle of all the

10   discovery, issues that are the subject of other motions, a

11   million miles an hour.  And if we are two weeks late in raising

12   this, we're two weeks late, but I think the important thing is

13   that we are raising it timely.

14        The government says, no, because we raised it a week

15   or so before they made their penalty-phase expert disclosures.

16   But when you look at what their penalty-phase expert

17   disclosures consist of, it turns out there's nothing there.  Of

18   the 17 experts that they saved until the last day and served at

19   six o'clock at night on August the 1st, 16 of the 17 are

20   guilt-phase experts, some of whom they propose to re-call

21   mostly because the additional evidence that they intend to

22   elicit from these guilt-phase experts of the penalty phase is

23   so prejudicial that it's probably inadmissible at any phase.

24   And then there's one additional expert that they propose to

25   call only at the penalty phase.

1          There could be such a thing as detrimental reliance,

2     but there is no detrimental reliance here because there are no

3     penalty-phase disclosures worthy of the name.  And even if the

4     experts they had disclosed were penalty-phase experts, when you

5     read the disclosures, they're not disclosures.  They are, for

6     the most part, with a handful of exceptions, just a listing of

7     the sorts of subjects that their experts intend to opine about

8     without even the opinions, let alone the reasons and bases for

9     those opinions.

10          So the government has not made penalty-phase

11     disclosures worthy of the name.  And even if they had, we don't

12     think that there is authority under federal law.  There is no

13     really substantial precedent under -- in federal capital case

14     practice to require us to make these full-blown disclosures in

15     advance of a trial on guilt or innocence.

16          THE COURT:  You will have some experts who will

17     testify to matters not personal to the defendant, won't you?

18          MR. BRUCK:  At the penalty phase?

19          THE COURT:  Yeah.

20          MR. BRUCK:  Not --

21          THE COURT:  Not directly.  I guess not directly

22     personal; in other words, not about his thoughts or statements

23     or anything like that.

24          MR. BRUCK:  Well, they will concern his thoughts and

25     statements as they're reflected in evidence.  There will be

1    experts that are not -- that do not base their opinions on

2    interviews with him, if that's what the Court intends to ask.

3          THE COURT:  It won't speak to his mental condition.

4    Or to -- and since they haven't spoken to him or to any -- any

5    information or statements that he may have made.

6          MR. BRUCK:  That he may have made since his arrest?  I

7    mean, this is not an easy line to draw.  And that, I think, is

8    why the courts don't go here.  It's if it were a mental

9    health -- if it went to his mental condition and were based on

10    statements he made, it would be 12.2.

11          THE COURT:  Right.  So we'll put that aside because --

12          MR. BRUCK:  So we can put that aside.  And then the

13    rest is a gray area.  And it's not an either/or proposition.  I

14    mean, I have to say, in all candor, that we're not going to be

15    ready by September 2nd to make those disclosures in any event,

16    but that's another subject.  And so this is not simply a matter

17    of we have something that we don't want to disclose until

18    later.  We don't want to be in default.  We don't want to be

19    late.  And we think we have to raise this in advance, but

20    that's the situation in which we find ourselves.

21          THE COURT:  When both sides filed proposed schedules

22    for discovery in the spring, the end of April, the defense

23    proposed that penalty-phase summaries and exhibits would be

24    disclosed by the end of October, which would be before the

25    trial.

1           MR. BRUCK:  Yes.  And I have to say that that would

2    have been four days before the beginning of trial under the

3    Court's then-existing schedule, if I'm not mistaken.  I think

4    the trial schedule had already been established by then.

5           THE COURT:  But my point is it was before the trial.

6           MR. BRUCK:  Yes.  And I have to say that we have

7    looked at the authority and taken a more careful look at

8    the -- at the realities of litigating this and indeed every

9    other federal case, and that -- I should point out that that

10   proposal was rejected by the government.  We did not come to an

11   agreement.

12          So that was an attempt to -- that was an attempt to

13   compromise and the government did not find it acceptable.  I

14   can understand that we may have contributed to the ambiguity or

15   the confusion that has given rise to our motion to clarify.  I

16   don't deny that.  But I appreciate the Court's question.

17          THE COURT:  One of my previously expressed concerns

18   was that the experts who would be involved in the case would be

19   known before we selected the jury.  Don't you think that's an

20   important --

21          MR. BRUCK:  Yes.  And that involves their names and

22   their domiciles.  This is quite different from -- that really

23   is a different matter.  That's jury selection.  And, sure,

24   absolutely.  We -- that is not at issue here.  The question is

25   whether we're required to provide the testimony that they're

1    going to -- the summary -- the sorts of things that aren't in

2    the, obviously, first disclosure, the summary, the reasons, the

3    basis, the underlying facts for their opinions, that's not

4    required to seat a jury.

5              THE COURT:  Okay.

6              MR. BRUCK:  Thank you, your Honor.

7              THE COURT:  Who's for the government?  Mr. Weinreb?

8              MR. WEINREB:  Your Honor, the whole theory of the

9    federal rules which is expressed in many of the individual

10   rules is that federal criminal trials should not be waged by

11   surprise.  Each side is supposed to have notice of, generally

12   speaking, what the other side intends to prove, and then is

13   supposed to have discovery of the materials that may be used to

14   prove those points.

15             As the Court knows in the vast, vast majority of

16   criminal cases, the defense doesn't put on a case at all.  They

17   certainly often don't put in any exhibits and they frequently

18   don't call any witnesses.  But this case is going to be very

19   different.  There is going to be a single trial here divided

20   into two phases, and in the second phase the defense is going

21   to put on all sorts of exhibits and evidence and put on all

22   sorts of witnesses.

23             The rules provide for reciprocal discovery for what

24   the defense intends to put on in its case-in-chief in trial.

25   And that is, in every sense, the defense's case-in-chief at

1    trial.  And yet we have gotten absolutely nothing from them.

2    Since the moment this case began, we have not gotten a single

3    item of discovery, not anything from which they're going to

4    draw their evidence, not a single bit of notice of what they

5    intend to prove at the penalty phase.

6         And their theory seems to be that they are entitled to

7    take us completely by surprise, that we will not learn what it

8    is that they are going to be putting on as evidence through

9    experts or otherwise in the penalty phase until we hear in

10   opening statement at the beginning of the penalty phase, a

11   phase that may last just a few weeks.  And under those

12   circumstances we will have absolutely no opportunity to

13   identify our own experts, hire them, retain them, get them set

14   up to be paid, show them all the evidence that they need,

15   educate them about the case, get preliminary opinions from

16   them, disclose them, put on that evidence.  It's just

17   impossible.

18        And the result would be that the jury will hear one

19   side of the story instead of two sides of the story, which is

20   what they're supposed to hear.  So it's doing a disservice to

21   the jury to the case, as well as putting the government at an

22   unfair disadvantage.

23        The defense says that the government has only cited

24   three cases in support of the power of the court under the

25   federal rules and its inherent authority to order penalty-phase

discovery in advance of trial.  And it draws from

the -- it -- not -- I'm not saying that the government

exhausted the whole universe of cases.  We did some research,

we found some cases and we cited them.  And there well may be

more.  But the absence of cases enforcing it certainly as a

logical matter doesn't give rise to the necessary implication

that it's been denied in all the other cases.  It may simply

have been granted in all the other cases, it may have never

been an issue.  The defense never may have even disputed it in

other cases.

I think the more pertinent fact is that the defense

could cite only a single case that -- in which the issue was

litigated and that the court came out the other way and said

that the rules did not empower the defense.  That's this case

they cite, *United States v. Beckford*.  And even in that case

the Court said that the authority to impose notice and

reciprocal discovery is an inherent judicial power which need

not be grounded in a specific statute or rule and may be

exercised in exactly the same manner as prescribed by Rules

12.2 and Rule 16(b).

One can draw from the fact that Rule 12.2 exists the

implication that other types of expert discovery need not be

withheld from the government until a certain point.  And that

makes perfect sense.  And that dovetails with the -- with the

defense's next argument, which is that somehow the defendant's

1   Fifth Amendment rights are implicated by the pre-penalty phase

2   disclosure of penalty phase information.

3        But the Supreme Court has ruled repeatedly that there

4   is no Fifth Amendment implication in the timing of disclosures.

5   Compelling the defense to disclose at a particular point

6   something that they will disclose anyway, later on in the

7   proceedings, does not implicate a defendant's Fifth Amendment

8   rights, and that is why the federal rules provide, for example,

9   the notice of alibi has to be given very early in the

10  proceedings, notice of an insanity defense can be -- has to be

11  given early in the proceedings, notice of other defenses has to

12  be given.

13       We filed a motion for a list of mitigating factors,

14  simply a list of what they are going to be.  The defense argued

15  that would be a violation of the defendant's Fifth Amendment

16  rights.  There's simply nothing to that.

17       And as for the question of whether the defendant will

18  be compelled to disclose statements that he has made post trial

19  through an expert, that is addressed by Rule 12.2.  We're not

20  asking that the defendant be compelled -- that the defense be

21  compelled to disclose post-trial statements, if any, that he's

22  made to his attorneys or that he's made to --

23       THE COURT:  Post-arrangement is what you mean.

24       MR. WEINREB:  I'm sorry?  Post-arrangement.  I'm

25  sorry.  I misspoke.

1          But the rest of it, it seems to me, the Court clearly

2    has the authority to order.  Indeed, in our initial motion to

3    compel reciprocal discovery, which was filed many months ago,

4    we cited innumerable cases where courts have ordered the

5    defense to comply with its reciprocal discovery obligations

6    under the rule.

7          So both as a legal matter, as a practical matter and

8    as a matter of fairness, if the jury is going to hear both

9    sides of the story in this case and the defense is not going to

10   wage a trial by ambush or a trial by surprise, the government

11   needs notice of -- the very notice it is entitled to under the

12   rules, that it's entitled to under the law significantly in

13   advance of the beginning of the liability phase, or there

14   simply is going to be no opportunity to -- for the government

15   to rebut that during the penalty phase.

16         And rebutting the defense's penalty-phase evidence is

17   a right that is clearly given to it by the Federal Death

18   Penalty Act.  The act says that both parties shall have an

19   opportunity to rebut the other side's evidence.  And for that

20   opportunity to be meaningful in any way the government must

21   have notice of what that evidence is going to be in

22   advance -- sufficiently in advance that it can actually prepare

23   a rebuttal.

24         The local rules contemplate reciprocal discovery at

25   the time of automatic discovery.  That would have been 18

1   months ago.  We know the defense has spent the last 18 months

2   accumulating evidence, and yet at no point have they ever

3   disclosed a single item of it to the government.

4          So on the whole, I think that putting aside the fact

5   that it seems to the government the Court could hardly have

6   been clear in its discussions -- in the discussions leading up

7   to its order, that we were all talking about affirmative

8   penalty-phase evidence and the defense has just lately come to

9   this view that they should be filing a legal pleading to try

10  and block it, it is -- it was an appropriate order and the

11  Court should stick by it.

12          THE COURT:  Mr. Bruck?

13          MR. BRUCK:  I do have to respond to the government's

14  claim that they are in the dark about our client.  The

15  government has more information about Mr. Tsarnaev than most of

16  us have about ourselves.  They have his school records and

17  every scrap of paper; they have all of -- they have all sorts

18  of records; they have the contents of every computer, that is

19  from his home, from his dorm room; they have all of his email

20  and they have his Facebook page.  They have an enormous

21  quantity of information.  So to say that -- and clearly any

22  mitigation evaluation or expert opinion dealing with

23  Mr. Tsarnaev is going to draw on the very information that the

24  government has amassed kilobytes of already.

25          So I think we need to put in perspective this claim of

1    unfairness that the government is completely in the dark and

2    has no idea what the raw materials are that will go into a

3    penalty-phase discussion.  They have most of it already.  They

4    had most of it before we did.

5         Finally, I just have to acknowledge that what we come

6    down to is that the government is dissatisfied with the way

7    these federal cases are, in the main, litigated, and thinks

8    that the balance should be elsewhere.  The federal rules and

9    the practices of the federal courts and the Federal Death

10   Penalty Act are not an equal two-way street.  In a great number

11   of ways they reflect the fact that it is a way easier decision

12   to take a citizen's life than it is to spare it.

13        And so in lots of ways the risk of error is placed on

14   the government, the defendant is given certain protections that

15   are not reciprocated.  We plead guilty to that.  That is the

16   basis of our argument.  We have more disclosure rights than the

17   government:  More rights to know what the government is going

18   to use to send a defendant to his death than the government has

19   to find out what evidence will be offered to protect him from

20   the death penalty.

21        That's the way it's set up.  That's the way most cases

22   have handled these sorts of disputes.  The reason there is so

23   little authority is that generally the government doesn't make

24   demands of the sort you have before you this morning.  That

25   explains the mystery of the missing authority.  And we think

1   that the Court should adopt the view that we've expressed in

2   our motion.

3           THE COURT:  All right.  I'll reserve the matter and

4   consider your arguments.

5           Let's turn to the other discovery issues.  I think the

6   major one is raised by defendant's motion to compel, Docket

7   No. 440, and a supplemental filing which is 460.

8           MR. WATKINS:  That would be regarding the expert

9   testimony?

10          THE COURT:  Yes.  The expert disclosures.

11          MR. WEINREB:  May I interrupt for one moment to say I

12  believe the supplemental filing is not yet ripe for decision.

13  Our due date for --

14          THE COURT:  You're right about.  It was last week.

15  Correct.

16          (Pause.)

17          MR. WATKINS:  Mr. Fick points out 474 had to do with

18  the motion for clarification for --

19          MR. FICK:  No.

20          MR. WATKINS:  I'm sorry.

21          (Pause.)

22          MR. WATKINS:  Regardless, your Honor, I can talk about

23  the expert disclosure.

24          Just to remind the Court of what probably doesn't need

25  reminding, there is a massive amount of evidence in this case,

1   just generally six or seven terabytes of evidence.  That

2   terabytes of evidence is comprised of all different things.

3   There are thousands of reports, what we would have called paper

4   reports at one time; document files that have been produced;

5   hundreds, perhaps thousands, of hours of audio and videotape;

6   digital evidence from a variety of computers, cell phones, a

7   dozen or more hard drives' worth of evidence there; thousands,

8   if not tens of thousands, of photographs.

9        And now we've arrived at the point where we're all

10  trying to prepare for the November trial date, and it is the

11  government expert discovery that has loaded an extra layer on

12  top of all of that extra -- all of that massive discovery that

13  we've already had.

14       This is, by and large, discovery that we've asked for

15  disclosures and we've asked for on a long-term basis.  Really

16  since the inception of the case we've been asking the

17  government to provide tests and examinations.  We asked for an

18  earlier disclosure of experts.  The government resisted that

19  and the Court adopted the government's schedule, which was a

20  rolling discovery disclosure of June 30th to August 1st.

21       The scale of the disclosure is really quite

22  breathtaking.  It took place over the entirety of that two

23  weeks.  On the forensic side of the disclosure, simply the

24  summary of the fields -- not the opinions but the summary of

25  the fields of forensic evidence that was going to be at issue

1   in the government's case -- is 108 pages long.  It features a

2   dozen experts and perhaps as many technical support people that

3   may also testify about particular forensic issues.

4          Disclosures provided from the Massachusetts State

5   Police add an additional half dozen experts who will testify in

6   some pretty hotly contested areas:  Ballistics, DNA,

7   fingerprints, other kinds of disciplines that have been subject

8   to *Daubert* challenges.

9          The latest and at this point last disclosure was

10  August 1st.  That, as Mr. Bruck pointed out, added an

11  additional 18 or so experts testifying in -- or potentially

12  testifying in a variety of fields, a couple involving

13  forensics, again, ballistics that were disclosed on August 1st,

14  but a variety of fields of much more soft sciences, what the

15  Court called the interesting discovery about terrorism and

16  geopolitics.  So the disclosure has been quite massive.

17         The sheer numbers of experts and really the potential

18  areas of testimony that the government has presented, or is

19  considering presenting, presents a pretty daunting challenge, a

20  very daunting challenge regardless of everything else that's

21  going on in this case and regardless of everything else that

22  needs to be prepared for trial.

23         Nevertheless, it's possible -- it's possible to tease

24  out opinions.  It's possible to get some of the basis.  Some of

25  the disclosures we have are almost summaries of opinions as

 1    required under Rule 16.  And it's possible to get to that point

 2    where we know what the government is going to present at trial.

 3         But largely that's not true.  If, indeed, even for the

 4    ones we knew, we had been provided, you know, a couple of

 5    months ago, if we had tests and examinations all along, we

 6    would have a shot at it.  We would be able to get experts lined

 7    up.  Many of the things Mr. Weinreb just talked about regarding

 8    experts, being able to take a look at what the government is

 9    really going to put on at trial, determine whether it needs to

10    go to an expert for analysis, lining up those experts, paying

11    for those experts, getting reports back and then considering

12    whether there are any kinds of challenges to be made.

13         But we can't do that.  We come down to really a

14    standstill because of the way the government has disclosed and

15    specifically the inadequacies of the disclosure.  Expert

16    testimony is very different from other kinds of testimony

17    that's recognized by both Rule 16 and by the local rules.  Rule

18    16, in carving out specific kinds of specific things the

19    disclosure and the basis of the disclosure is supposed to

20    include, the local rules about when it's going to be disclosed.

21         It is, as Mr. Weinreb pointed out, particularly

22    important with expert testimony that there be no surprise at

23    trial.  This is one specific area where the rules have pointed

24    out not only at trial but even before trial these are things

25    that should be hammered out and should be known and should be

1    able to be litigated if appropriate.

2        The rules simply recognizes that expert testimony is

3    different and that the nature of it requires those extra kinds

4    of consideration.  And that's where the problem lies now in the

5    disclosure where what the government essentially has done is

6    given us final reports of some of the disciplines, maybe

7    all -- some of the disciplines where they say this is what the

8    expert testimony is going to be.  This is the summary.

9        But it's not.  We've attached that to the pleading and

10   the Court can see what it is is results of examinations,

11   examinations that were completed, for all intents and purposes,

12   many months ago, but they are not summary of opinions, they are

13   not the kinds of narrative form that we expect to see where the

14   government tells us, This is what this expert is going to

15   testify to and this is why that expert believes that that

16   testimony is reliable.

17       Examples we've gone back and forth in the pleadings

18   about, FBI fingerprints:  Even something as seemingly cut and

19   dried as fingerprints, the government has not yet given us all

20   of the information that we need in an accessible way to

21   determine whether what they're going to present at trial is

22   accurate and whether it's reliable or whether it's subject to

23   challenge.

24       Some of the disciplines do provide -- the

25   Massachusetts State Police fingerprint evidence, we do believe

1    that is enough.  That we can go to an expert now and determine

2    whether, in fact, what is going to happen at trial, the

3    specific things that that examiner is going to say, are

4    supported.  But that is the exception rather than the rule.

5         We don't have something similar for the FBI.  We have

6    specific things that the FBI -- it's clear the analyst will say

7    these fingerprints matched these persons from these items, but

8    to try to get beyond that, the next level, the basis of that

9    opinion is really impossible.  It's brought us to a standstill

10   now as we try to go through 90 gigabytes of data to try to

11   figure out exactly what the analyst did, the backup photographs

12   and the like.

13        It's not impossible.  It's in there.  The government

14   used one example in their sealed exhibits.  The government has

15   the advantage of being able to call up that analyst and say:

16   Tell me which of these photographs and which of these files

17   goes with which item.  We do not -- and that is the thing that

18   is bringing us to a standstill with a very disorganized

19   disclosure that they've given us -- a massive and disorganized

20   disclosure.

21        The government has faulted us really on this, saying

22   that we've asked too much.  Of course it goes without saying it

23   depends on whose ox is gored whether there's too much discovery

24   or too little discovery.  We have an obligation where the

25   stakes couldn't be higher to investigate, to make sure that

 1    every piece of evidence that the government is going to put on

 2    is reliably supported, and that's particularly true in the area

 3    of forensic evidence.

 4         It is likely, almost certain, that before 2006 AUSAs

 5    would shake their head when defense counsel would ask for the

 6    backup data to fingerprint matches, the photographs, the bench

 7    notes to fingerprint matches.  But then came Brandon Mayfield

 8    who FBI -- current and former FBI agents matched wrongfully the

 9    fingerprint that he left.  It shows us that these things are

10    required, they are part of advocacy to look at the underlying

11    data and to be able to have access to that to engage experts to

12    make sure that the evidence is reliable before it goes in,

13    otherwise, mistakes happen at trial.  And that's what the Rule

14    16 was designed to prevent.  It's particularly true here in the

15    forensic evidence.

16         We've gone through some of the examples in the

17    pleadings and the government talked about some of those.  There

18    is a difficulty of seeing the forest for the trees when we

19    start talking about specific examples.  We lose sight of

20    exactly the larger forest of this disclosure.  We included, for

21    example, the August 1st disclosures, the summaries which, as

22    Mr. Bruck has pointed out, simply aren't summaries.  There's

23    nothing there that we can grab onto at this point to go to an

24    expert and say, What can we say in response, or is this person,

25    in fact, giving reliable evidence when he or she says this?

1          We simply have nothing.  In some cases we have less

2     than nothing.  In the computer forensics issue which is going

3     to be one of the largest pieces of this trial, what we have

4     from the government is that there will be people testifying

5     about specific things that were found on specific devices.  We

6     have no idea any of the particulars about those kinds of things

7     which makes it very -- it doesn't make it very hard, it makes

8     it impossible at this stage to do our job, to investigate, to

9     hire experts, to determine whether the government is presenting

10    reliable science reliably applied.

11         It's for those reasons, your Honor, we're asking for

12    the government to go back and provide true summaries of the

13    opinions as required by Rule 16, and we're asking them for an

14    index of this massive disclosure that they gave to us.  It's

15    required under the local rules that they give us some kind of

16    organizational principle.

17         As I say, your Honor, we haven't been sitting on our

18    hands since this all came in.  We plunk around in this massive

19    disclosure trying to find out where these items might be so we

20    can keep on working, but it is almost a random process for us

21    at this point.  We're getting there.  And without some kind of

22    summary -- even with some kind of summary we're talking about

23    months before we can get to a point to be able to talk about

24    all these disciplines that the government intends to present at

25    trial.

1         So for all those reasons, your Honor, we would ask

2    that the Court order the government for a more complete

3    disclosure.

4         THE COURT:  The government's disclosure letter of June

5    30th, which I think as Mr. Weinreb points out is the one we

6    have to focus on today principally because the government's

7    response to the other one has not yet been filed, but the June

8    letter refers to a searchable Excel index on a DVD.  Do I have

9    that in the record?

10        MR. WATKINS:  You have the printed version as an

11   exhibit to our filing.

12        THE COURT:  I see.

13        MR. WATKINS:  That would be --

14        THE COURT:  Your Exhibit B, I think, is a -- is that

15   the index?

16        MR. CHAKRAVARTY:  It is, your Honor.  It's the printed

17   version.

18        MR. WATKINS:  It's the printed version of a searchable

19   Excel spreadsheet.  But all that is is cuts and pastes, by and

20   large -- there may be some exceptions to that -- cuts and

21   pastes of particular reports by the FBI or the Massachusetts

22   State Police.  It is not -- it gives no clue to the underlying

23   reasons, the underlying basis for the opinions.  In most cases

24   it doesn't give the opinion itself.  And the Court can see from

25   that, that's exactly what is on that searchable index.

1         Is it possible to search for gunshot residue or GSR?

2    It is possible but it doesn't get you anywhere.  It gets you to

3    a final report which in itself does not give the opinion and it

4    certainly doesn't give the basis and reasons for the opinion.

5         THE COURT:  All right.  Mr. Weinreb?

6         MR. WEINREB:  Your Honor, I think it's important to

7    distinguish between three different issues here.  One is the

8    disclosure that was actually ordered of opinion testimony under

9    certain Federal Rules of Evidence, 701, 702, et cetera.  The

10   defense in this case asked of us as part of their expert

11   discovery request that they receive all DNA fingerprint,

12   firearm identification, tool mark identification, gunshot

13   reside, explosive residue or other testing results performed on

14   any item of evidence or on any suspect, victim or witness in

15   this case.  And we understood that to be a general request for

16   everything that we have.  So we produced it.

17        And when the defense asks -- says they want a more

18   complete discovery, with the exception of a very few things

19   which we are -- they have mentioned to us and we are making

20   sure that we have.  And if we haven't included them we will --

21   we have given them everything.  So with respect to all of those

22   things I mentioned and more, we have produced both the reports

23   and the examiners' underlying file, which contains all their

24   materials, everything they did, everything they generated.

25   We've also included manuals and audit reports and quality

1    control documents and other things that are not generated by

2    them in the course of their work but that it was something also

3    requested by the defense.

4         Now, to return to where I started, there's opinion

5    evidence.  Much of this is not opinion evidence.  Most of these

6    examiners are not stating opinions.  So there's no opinion

7    evidence to produce.  And in cases where examiners did in their

8    reports render an opinion, those opinions are typically set

9    forth in reports.

10        One example, for example, the ballistics report that

11   we attached to our opposition is Exhibit G.  The examiner

12   states "It is my opinion that" -- and then states -- "the 9

13   millimeter Ruger caliber discharged cartridge casings mentioned

14   in" -- and it gives their numbers, and there's also written

15   descriptions of them in the report itself -- "were fired by the

16   Ruger that was recovered on the scene.  The Ruger model -- and

17   it gives the model, the obliterated serial number, and it gives

18   its identifying number.  That is the opinion of the examiner.

19        We're a bit mystified by what the defense wants beyond

20   that.  That is a narrative account of what the expert is

21   going -- the opinion that he will give at the trial.

22        In Mr. Fick's reply, which was just filed yesterday so

23   I only read it briefly, but he talks about wanting the

24   government to contextualize that.  I really don't know what

25   that means, and whatever it means, I don't think it's required

1    by the local rules.  The local rules simply require the opinion

2    and the basis for the opinion.

3           Typically, the reports state what the examiner's basis

4    for the opinion was, and to the extent that that opinion is

5    supported by underlying documents which allow you to understand

6    in ever more finely grained detail how the examiner arrived at

7    the opinion, we have produced that.

8           So the first question -- the first issue is:  Have we

9    adequately disclosed the opinions of the experts who are going

10   to testify?  And we submit with respect to the items that were

11   required to be produced on June 30th, that we have adequately

12   disclosed the opinions of the experts.  Indeed, these are

13   trained experts who worked for the government.

14          This is not a novel request that's made in this case.

15   They're accustomed to generating reports and testifying in

16   court about their opinions, and so they are trained in their

17   reports to write their opinion and the basis for that opinion.

18   And it is routine in the practice of federal prosecutors, I

19   think, with respect to professional kinds of experts like this,

20   to simply say that the experts will testify consistently with

21   the opinions and bases therefor specified in their reports.

22   And they have the reports.

23          THE COURT:  You don't anticipate calling every one of

24   the people?

25          MR. WEINREB:  No, your Honor.  As I say -- for

1    example --

2         THE COURT:  So have you indicated which ones you do

3    expect to call?

4         MR. WEINREB:  We have not yet because they requested

5    everything and there's no -- it's early in the day for a

6    witness list or an exhibit list.  But I think it's clear -- for

7    example, we have given them 20 FBI fingerprint reports,

8    virtually every one of which says "no usable prints were found

9    on this item."  And that report speaks for itself.  It was a

10   null report; it was a report without any result.  The same is

11   true with respect to the vast number of reports that we gave

12   them.  Nothing was found.  Nothing of interest or use was

13   found.

14        Now, the defense -- it is true that we have given the

15   defense -- they have requested a lot, as the Court is aware,

16   and we have given them a lot.  And generally speaking, what we

17   have given them is materials that we ourselves found useful to

18   review and to -- and in the course of reviewing them

19   we -- they're all kept stored electronically because that's how

20   we all do things these days.

21        And so, for example, there were many, many, many

22   witness interviews, or potential witness interviews.  And those

23   files, when we get them from the FBI, they just have a number

24   attached to them.  And we have renamed them last name, comma,

25   first name, because it's easier for us to search through them

1    and find them that way.

2              So these underlying documents that we got from the lab

3    are organized in the way that the lab organizes them.  They're

4    assigned numbers that correspond to lab numbers, dates.

5    Sometimes the lab number and date are concatenated to make a

6    unique file name.  And that's the way that the lab organizes

7    its documents and names them and that's the way the labs find

8    it useful to search for them and access them.

9              It's probably not the way that a non-lab person would

10   find useful.  Obviously the defense is not finding it useful.

11   But it is not our obligation to go through every single thing

12   that we produce to them, whether there's any requirement that

13   we produce it or not in the first place, and even if there is,

14   frankly, and rename it in a way that they find convenient or

15   they find useful.

16             They can do that if they want.  It's a secretarial

17   mater.  You have to look at the document, you have to -- or

18   maybe more than a secretarial matter if it's a document that's

19   not absolutely evident on its face what it is.  But many of

20   these are.  Many of these documents, you click on them and it's

21   a picture of a fingerprint and it has a lab number associated

22   with it.  And it's easy enough to rename it fingerprint, lab

23   number.  It just takes time.

24             And they apparently are arguing that we need to do

25   that for them.  And I don't believe the rules require that.

1    And they certainly don't require it for the massive amounts of

2    information they have requested and we have given them that are

3    not even discoverable in this case, that is not material to the

4    preparation of the defense, that are not items the government

5    intends to use at trial but are simply things they have

6    requested and we have given them to accommodate their desire

7    for everything.

8            I'm not going to address the other items because we're

9    in the process of addressing them in writing right now, but I

10   think that as we state in our motion in some sense the

11   defense's situation they're in right now, it's a situation of

12   their own making in that they have asked for everything and

13   in -- and they have received everything, and now they're

14   finding that they need to go through everything.  And it is

15   a -- I agree with them that it's an onerous process.  I mean,

16   to some degree we've been doing it ourselves because there are

17   things that we find interesting and useful and we want to index

18   for our own purposes.  We have people doing it.  I'm sure they

19   could have people doing it for them.

20           But I don't think that their argument that the

21   opinions are not disclosed with completeness or that the

22   underlying documents -- as I say, with a few exceptions which

23   we're willing to dig down deeper for them if it's something

24   that's important to them, we do not agree that that has not

25   been disclosed.  It has.

1           THE COURT:  Mr. Watkins?

2           MR. WATKINS:  Just a couple of things.  To

3    Mr. Weinreb's comment that it's way too early for witness

4    lists, he's got that exactly wrong for expert witnesses.

5    That's exactly the point of Rule 16 and disclosure at this

6    point, is that we do disclose the witnesses that are going to

7    testify for opinion evidence and their opinions.  And that's

8    what hasn't happened here.

9           It sounds like the government would agree that the

10   Court could order them to summarize which ones they're actually

11   going to call and which of the many opinions that they've

12   included in that spreadsheet which, by the way, they call the

13   summary of expert opinion -- which of those ones is actually

14   expert opinion that they're going to call at trial, and that

15   would certainly further the matter.  And that would be

16   compliant with Rule 16.

17          The fact that they decide that they're going to throw

18   in the bathtub, the bath water and everything else that one can

19   think of is -- does not excuse them for -- from identifying

20   what the actual opinion that is going to be testified to at

21   trial is.

22          As far as the lab names and having somebody go through

23   them, that is precisely the problem.  We're not talking about a

24   couple of dozen reports; we're talking about 50,000 files that

25   were produced to us.  Some of them were in electronic form that

1   required proprietary software.  I think we've tracked those

2   down.  But some of them are named files that are unique, that

3   the particular lab analyst chooses to do it in a particular

4   way.

5         Could we put a secretary on it?  No, because this is

6   too important.  This is expert testimony that we're talking

7   about.  Someone not schooled in the case is not going to be

8   able to do it.  Could we put one of the attorneys on it?  Two

9   of the attorneys on it?  Three of the attorneys on it?  We

10  could and maybe we'd have it done in several months, poking

11  through these individual files and doing what Mr. Weinreb

12  suggests, opening the -- seeing whether they have anything to

13  do with anything and then cataloging them.

14        Can we hand it over wholesale to experts?  We can.

15  The Court will pay for it.  The experts will bill for that

16  adventure as they try to go through and see which files are

17  interesting to them.  When a fingerprint examiner expert gets a

18  file that belongs to DNA, I'm sure he will be calling us up and

19  saying, "Why do I have this?"  And the answer will be:  "That's

20  what we have to do to get through this particular dump."

21        One other fact that Mr. Weinreb raised I just want to

22  address, as far as conceptualizing the evidence, basis of the

23  opinion is as important as the opinion itself.  It's the only

24  way we can test the opinion.  Conceptualizing the evidence

25  involves -- I'll give an example.  The jury will hear much

1    evidence about what was recovered on Boylston Street in the

2    wake of the two explosions there.  They will present examiners

3    from the Quantico laboratory to testify about pieces that were

4    found and their significance.  Part of that opinion will be

5    where -- will rely on where it was found, whether it was at

6    Scene 1, Scene 2, somewhere else, that was brought in to talk

7    about those things.

8         We have no way in the government's disclosure to match

9    those things up, to be able to take a picture of an item that

10   was found on Boylston Street and match it up to what the expert

11   is going to testify about that piece of evidence.  We could do

12   it if we had years.  We could do it.  We could catalog each one

13   of those pictures, compare it to pictures that were at the

14   Quantico laboratory, but that's not consistent with a November

15   trial date.

16        The government has that ability to do it.  Again,

17   Mr. Weinreb said "We look at it the same way they are."  It's

18   not true.  They can pick up the phone, they have an FBI agent

19   answer at the other end, they have an FBI analyst answer at the

20   other end to explain those things.  We don't have that.  That's

21   why the rule requires an index, organizational structure, so

22   that we're able to get to that quickly so that we're able to

23   start our work.  It's not there.

24        I think the Court could certainly order the government

25   to narrow it down to the opinions they are actually going to

1    present at trial in each of those, and in each of those

2    situations the basis and opinion -- or the basis and reasons

3    for the opinion, the underlying lab reports connected to that

4    particular opinion.  That's what should have happened.  I think

5    the Court can order it.  I think the government should be able

6    to do that at this point.

7          MR. WEINREB:  I would just like to add one other

8    thing, your Honor.  Just so the Court doesn't get the wrong

9    impression, we did not simply hand over 50,000 files all in one

10   directory, not divided up in any way.  The files are organized,

11   but they're not organized -- and they're within directories and

12   subdirectories and so on and so forth which correspond to

13   disciplines and experts and so on.  However, we concede that

14   they're not labeled in a way that's intuitive for attorneys;

15   they're labeled that's intuitive for lab examiners.  And so it

16   does take some work if you're an attorney and you want to

17   access it in the way that attorneys think about cases and so on

18   to re-label them.  And we are doing that work for ourselves

19   with respect to some of them, and I assume the defense is also

20   capable of doing the same kind of thing with respect to what

21   they're doing.

22          That seems to me to be, in a way, sort of classic work

23   product.  When a -- if the government subpoenas records from a

24   corporation or from, you know, in a healthcare case from a

25   medical provider and gets boxes and boxes and boxes of records

1    in return and then scans them all in, we're not obligated to

2    come up with ways of naming all the files in the directories

3    and so on that are useful to the defense before we produce that

4    stuff; we simply produce it.  They organize it the way they

5    want, we organize it the way we want.

6         So I don't think it's fair to say that the -- if the

7    Court has a characterization in its head of this as being like

8    we took those boxes and we threw them on the floor and then we

9    just pushed everything together and handed it all over in one

10   giant box or something like that.  It's simply not like that.

11        MR. WATKINS:  Thirty seconds?

12        Two responses:  The analogy to a third party producing

13   records, I understand that.  If we were both in the same

14   position, that would make sense.  The FBI is a Department of

15   Justice entity.  They have total control over when they get the

16   evidence and have the ability to call somebody up at the other

17   end.  So it's apples and oranges in that sense.

18        The other thing, concerning these files, our view has

19   always been that they are 16(a)(1)(F) -- right, 16(a)(1)(F)

20   evidence rather than 16(a)(1)(G) evidence, and so should have

21   been turned over in automatic discovery.

22        Be that as it may, the letter that Mr. Weinreb read

23   from was from February.  If we had this dump in February, if

24   they'd given us those files in February, we'd have a running

25   chance.  I'm not saying we could do it, but at least we would

1  have a running chance.  Now it's three months away from trial.

2  What Mr. Weinreb is suggesting that all of us do is simply

3  impossible to be able to effectively prepare, and effectively

4  prepare for the inevitable evidentiary hearings over *Daubert*

5  that have to occur before the evidence even comes in.

6          I'm sorry, I was 90 seconds.

7          THE COURT:  All right.  I'll reserve this one and

8  probably won't rule until the government's response on the

9  other related motion.

10          And speaking of government's responses, I think -- I'd

11  forgotten where we are now.  Did the government move for leave

12  to file a surreply on the venue motion?

13          MR. WEINREB:  We did, your Honor.

14          THE COURT:  I think you did.  Did I grant it?

15          MR. WEINREB:  You did not yet.  We stated in our

16  status hearing report that we would move orally today for

17  permission to file a surreply.

18          THE COURT:  Okay.  It's granted.

19          MR. WEINREB:  Thank you.

20          THE COURT:  When do you expect to do it?

21          MR. WEINREB:  I think we could get it in by a week

22  from today.

23          THE COURT:  All right.

24          Those are the main items I had.  Is there something

25  else -- Mr. Fick?

 1           MR. FICK:  Your Honor, there are a couple of pending

 2    motions to suppress physical evidence --

 3           THE COURT:  Yes, we're addressing the motions to

 4    suppress.

 5           MR. FICK:  Okay.

 6           THE COURT:  It's a work in progress.

 7           Any other issues?

 8           MR. WEINREB:  There are a couple of pending sealed

 9    motions.  I assume we won't be arguing those in open court.

10           THE COURT:  Can you give me the numbers?

11           MS. CLARKE:  Did the Court receive our status report?

12           THE COURT:  Yes.

13           MS. CLARKE:  We have them.

14           THE COURT:  Oh, they're on the status report?

15           MS. CLARKE:  VIII and IX on Number 1.

16           THE COURT:  Let me get the status report.

17           (Pause.)

18           MS. CLARKE:  VIII and IX.

19           (Pause.)

20           THE COURT:  Yes, the matter in Docket No. 404 in VIII

21    is under advisement.

22           MS. CLARKE:  Your Honor, the docket numbers on IX,

23    we're a little unclear to ask because we hadn't gotten them

24    back, but what we have is 472 might, in fact, be 476.  I'm not

25    sure.  And the government reply might be 482, and then we filed

1    a reply to that.  But we haven't gotten them to know.

2              MR. WEINREB:  You filed --

3              MS. CLARKE:  You filed an opposition, we filed a

4    reply.  I'm sorry.

5              THE COURT:  I think you it's actually 476, and I'll

6    resolve that as well on the papers.

7              MR. WEINREB:  Very well.

8              Your Honor, we wanted to raise the issue, at least

9    preliminarily, of jury selection and set some dates -- or ask

10   the Court to at least begin the process of setting some dates.

11   We're assuming that there will be jury summonses sent out

12   specifically for this case.

13             THE COURT:  Yes.

14             MR. WEINREB:  And we're also assuming, based partly on

15   what Judge Woodlock's experience was in the Azamat Tazhayakov

16   case, where I believe the summonses went out four weeks in

17   advance, that six weeks in advance will be sufficient.  I don't

18   know if the Court has a different view.

19             THE COURT:  Actually, I'm meeting with the jury

20   clerk's staff today to explore some of those issues.  We still

21   have enough time to have a rational schedule.  I think I've

22   sort of been informally advised that mid-September is a target

23   for sending out summonses.

24             MR. WEINREB:  Yes.  So that's actually what we were

25   going to propose.  And we had a thought in mind of the best,

1   most efficient way to obtain a jury in this case, we're

2   perfectly willing to talk it over with the defense ahead of

3   time before making a formal proposal, but it would involve

4   sending out with the summonses a hardship question so that

5   when -- and asking that those be returned by mail.  Because

6   given the potential length of the trial, that way it could be

7   possible for the parties and the Court to meet ahead of time,

8   go over these, and potentially excuse or defer the service of a

9   large number of jurors and spare them from having to fill out

10  any more extensive jury questionnaire and spare the parties

11  from having to review them.

12         Phase 2 would be to bring in the surviving potential

13  jurors in a large group or perhaps two large groups and do a

14  pretrial publicity voir dire of those groups that would just be

15  focused on that issue in order to whittle the pool further.

16  And only the people who survived that round of questioning

17  would actually be given lengthier questionnaires to fill out

18  which they could be asked to do in the courtroom -- or in

19  the -- wherever, the jury room, wherever they are.  And then

20  the parties could begin -- the Court could begin bringing the

21  remaining potential jurors into the courtroom for individual

22  voir dire in smaller groups.

23         So that was our thought.  We thought that might be the

24  best way to minimize inconvenience for both the jurors and for

25  all the parties and the Court, but again, we're willing to come

1    up with a joint proposal, but in the event decisions are about

2    to be made about the summons process, we wanted to put it on

3    the table.

4         THE COURT:  Fine.  Well, those are interesting ideas

5    and I think you should talk with the defense team about them.

6    We have, as you know, had some recent experience, both in Judge

7    Woodlock's case, and last year in Judge Casper's case, with

8    similar procedures so there's some institutional learning on

9    the matter, but I don't think either of those ideas was

10   followed in those cases and so we can explore that.

11        But what was, as far as I know informally, successful

12   in probably both cases was the cooperation of prosecution and

13   defense in a large degree in suggesting the methods.  And as

14   far as I know, they were generally accepted by the judges

15   involved.  So that could be a very productive way of doing it.

16        I would like to set a further status conference and I

17   thought, again, around the middle of September, about a month

18   from now.  I think we have to shorten the leash a little bit.

19   I was looking at the 18th, which is a Thursday.

20        MR. WEINREB:  That's good for the government.  10

21   a.m.?

22        MS. CLARKE:  That works.  Thank you.

23        THE COURT:  That works?  Okay.

24        With respect to budgeting for the defense, we'll need

25   a September budget, and I think we should shorten that time

1    frame as well.  We've been doing multiple months.  I think a

2    single month, so...

3            MS. CLARKE:  We're on it.

4            THE COURT:  Week and-a-half?

5            MS. CLARKE:  I think we're going to have to get --

6            THE COURT:  How about by -- can you get it by, say,

7    the 25th, which is the beginning of the last week of August?

8            MS. CLARKE:  I'm aiming for that.  As the Court knows,

9    we've been sending individual --

10           THE COURT:  I know.  I know all too well.  I know you

11   are too.

12           MS. CLARKE:  Okay.  Thank you.

13           THE COURT:  Okay.  If there's nothing --

14           Mr. Weinreb?

15           MR. WEINREB:  There is one other thing, your Honor.

16   Even though there are pending motions which would take care of

17   it, but to the extent it's necessary, we would ask the Court to

18   exclude the time from today to September 18th.

19           MS. CLARKE:  No objection.

20           THE COURT:  Yes, that will be done.  I think the

21   interest of justice is manifest.

22           Thank you.

23           MS. CLARKE:  Thank you, your Honor.

24           THE COURT:  We'll be in recess.

25           THE CLERK:  All rise for the Court.

1          (The Court exits the courtroom at 11:09 a.m.)

2          THE CLERK:  Court will be in recess.

3          (The proceedings adjourned at 11:10 a.m.)

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8     United States of America v. Dzhokhar A. Tsarnaev.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  9/5/14
13

14

15

16

17

18

19

20

21

22

23

24

25
```