UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10200-GAO

UNITED STATES OF AMERICA

v.

DZHOKHAR A. TSARNAEV,
Defendant.

OPINION AND ORDER
October 17, 2014

O'TOOLE, D.J.

## I. Introduction

On June 27, 2013, a grand jury returned an indictment that charges the defendant with multiple crimes arising from the detonation of two improvised explosive devices at the 2013 Boston Marathon. The defendant has moved to dismiss the indictment and stay proceedings, arguing various violations of the District of Massachusetts Plan for Random Selection of Jurors, the Jury Selection and Service Act, and the Sixth Amendment to the United States Constitution. The government opposes the motion.

## II. Background of the Massachusetts Jury Plan for Random Selection of Jurors

The Jury Selection and Service Act (the "Act") directs each district court to "devise and place into operation a written plan for random selection of grand and petit jurors" in accordance with the statute's requirements. 28 U.S.C. § 1863(a). Pursuant to that directive, this Court adopted the Plan for Random Selection of Jurors. U.S. District Ct. for the District of Mass. Jury Plan for Random Selection of Jurors (Mar. 3, 2009) (the "Plan").

The Plan relies on the Massachusetts Office of Jury Commissioner to furnish randomly generated lists of current residents for use in constituting jury pools.[1] Plan § 6(a). In brief, the Clerk randomly selects the names of at least 35,000 residents in the Eastern Division for inclusion in the "master jury wheel," taking care that the counties within the division are proportionally represented. Id. The Clerk randomly selects and assigns numbers to names from the master jury wheel to identify what residents will receive summons and qualification forms. Id. § 7(a), (c)-(d). Certain classes of individuals are exempt from jury service, including active members of the armed forces, police officers, firefighters, and certain public officers. Id. § 9(b).[2] Additionally, the Plan directs the Clerk to excuse upon individual request certain classes of persons, including "any person over the age of 70 years old." Id. § 9(c). After returned questionnaires are reviewed, the names of jurors who appear to be qualified for service are placed in sequence based on their assigned number in a "qualified jury wheel" from which jurors are drawn in numerical order as needed.

The Plan, as revised in 2009, also includes a supplemental draw procedure.[3] Pursuant to the Plan, the Clerk must create a supplemental jury wheel using the same procedures as for the

---

[1] The Act authorizes courts generally to select prospective jurors from voter registration lists or lists of actual voters, but it also specifically authorizes this District to use the annual resident lists required to be prepared by Massachusetts General Laws chapter 234A, §10. 28 U.S.C. § 1863(b)(2). Since all voters must be residents, but all residents need not be voters, the resident list is broader than a list of registered or actual voters.

[2] These exemptions are mandated by the Act. 28 U.S.C. § 1863(b)(6).

[3] The Plan was revised after Judge Gertner identified disproportionately high rates of undeliverable summonses and non-responses in localities with higher proportions of African-Americans. United States v. Green, 389 F. Supp. 2d 29 (D. Mass. 2005), rev'd, In re United States, 426 F.3d 1 (1st Cir. 2005). Judge Gertner ordered a supplemental draw procedure to help cure the deficiencies. Id. at 78-79. On the government's petition for mandamus, the First Circuit held that the existing jury plan complied with fair cross section requirements of the Act and that Judge Gertner's imposition of a supplemental draw procedure had exceeded the scope of her authority. In re United States, 426 F.3d 1, 7-9 (1st Cir. 2005). It noted, however, "cause for concern" in the lower proportional representation of African-Americans among qualified

master jury wheel. Id. § 6(b). For each summons returned as "undeliverable," the Clerk "shall draw at random from the supplemental jury wheel the name of a resident who lives in the same zip code to which the undeliverable summons had been sent" and mail the resident a summons and qualification form. Id. § 8(a). The step was added in order to further the policy of the Court that all citizens have the opportunity to be considered for service and to ensure, to the greatest extent possible, that juries are drawn randomly from source lists in the relevant division that represent a fair cross section of the community of each division. Id. §§ 5(a)-(b), 6(b).

### III.   Discussion

28 U.S.C. § 1867(a) provides:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

Pursuant to this provision, the defendant moves to dismiss his indictment, arguing first that the purported failure of the Clerk to send replacement summonses for summonses returned as undeliverable constitutes a substantial violation of the Plan and therefore a "substantial failure to comply with the provisions" of the Act. See id. According to the defendant, of the 400 summonses issued to obtain the grand jury that returned his indictment, 19 (4.75% of the total) were returned as undeliverable, and the Clerk did not issue replacement summonses for any of

---

potential jurors and remarked that the district court "has always been free to revise its jury plan in compliance with the statute." Id. at 9. The Court thereafter acted to amend the plan to provide for a supplemental draw. See Revisions to the Jury Plan of the United States District Court of the District of Massachusetts: Notes of the Jury Plan Committee, March 2007, available at www.mad.uscourts.gov/general/pdf/a2007/NotesofJuryPlanCommittee.pdf (last visited Oct. 14, 2014).

the 19 undeliverable summonses, as the supplemental jury wheel provision of the Plan required.[4] (Mot. to Dismiss Indictment Ex. A ¶ 15 (Decl. of Jeffrey Martin) (dkt. no. 506-1).) Additionally and more generally, in the pools for which data was supplied for the years 2011 through 2013, 4,964 of the 68,201 summonses, or 7.28%, were returned as undeliverable. Of those, 3,186, or 64.18%, were sent replacement summonses, while the rest were not. (See id. ¶¶ 11, 14.) The government does not contest these figures.

For present purposes, the figures that matter are those pertaining to the pool from which the grand jury in question was drawn. Neither compliance nor non-compliance with the Plan in the establishment of pools for other juries would affect the issue addressed here. Other than the bare fact that there were 19 undeliverable summonses out of 400 sent out, the Martin Declaration contains no further information about those summonses. In particular, no information is presented about what zip codes were implicated, so it cannot be determined what zip codes might have been underrepresented, or to what degree, in the pool as a result of the failure to send replacement summonses. Without knowing whether the replacement summonses should have been sent to Dorchester or to Dover, for example, there is no way to assess any possible impact of the omission on the composition of the jury pool.

The lack of information on these matters is critical because, even if the omission to send replacement summonses for the 19 undeliverable ones was a violation of the Plan *strictissimi juris*, to obtain relief the defendant would have to show that the omission resulted in a

---

[4] The defendant previously received authorization for disclosure of various jury records, such as AO-12 Forms or JS-12 Forms completed for 2011, 2012, and 2013 master and supplemental Jury wheels; 2011, 2012, and 2013 master and supplemental jury wheel data; all draws from the 2011, 2012, and 2013 master and supplemental jury wheel; and various source data, including municipal resident lists and statistical analyses of municipal resident lists. (Order for Disclosure of Jury Records (dkt. no. 393).)

"substantial failure to comply" with the Act. United States v. Royal, 174 F.3d 1, 11 (1st Cir. 1999).

> A substantial failure is one that contravenes one of . . . two basic principles . . . : (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria. Technical violations, or even a number of them, that do not frustrate [the random selection and cross section requirements] and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply.

Id. (quoting United States v. Savides, 787 F.2d 751, 754 (1st Cir. 1986)); see also In re United States, 426 F.3d at 8.

The limited statistical information the defendant has offered does not establish that the failure to send 19 replacement summonses "frustrated" the fair cross section requirements of the Act. Specifically he has failed to show that the omission to send replacement summonses compromised either the principle of random selection of jurors or the principle that juror qualification is to be assessed on objective criteria.

The defendant also argues that the Plan itself violates the fair cross section requirements of the Sixth Amendment and the Act. First, he argues that a comparative analysis methodology demonstrates that African-Americans are not fairly and reasonably represented in the jury wheel as the result of systematic exclusion. Second, he argues that the Plan's opt-out opportunity for persons aged 70 or older amounts to systematic exclusion and underrepresentation of that group.

The Sixth Amendment requires that the jury venire be drawn from a fair cross section of the community. Taylor v. Louisiana, 419 U.S. 522, 530 (1975); Royal, 174 F.3d at 5-6. The Act "impose[s] essentially the same obligation." In re United States, 426 F.3d at 8 (relying on Royal, 174 F.3d at 6); see 28 U.S.C. § 1861.

However, the fair cross section requirement does not guarantee that a jury will be of any "particular composition" or that venires will be "a substantially true mirror of the community."

5

Royal, 174 F.3d at 6 (quoting Taylor, 419 U.S. at 538, and Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985) (en banc)). Rather, what is required is that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. (quoting Taylor, 419 U.S. at 538).

In order to establish a prima facie case of a violation of the fair cross section requirement, a defendant must show: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the group is not fairly and reasonably represented in venires from which juries are selected; and (3) that the underrepresentation is due to systematic exclusion in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364 (1979); Royal, 174 F.3d at 6.

    A.    African-Americans

There is no dispute in this case that African-Americans represent a "distinctive" group in the community. United States v. Hafen, 726 F.2d 21, 23 (1st Cir. 1984) (citing Peters v. Kiff, 407 U.S. 493, 498-99 (1972)). However, as the defendant concedes, he has failed to demonstrate that the representation of African-Americans on the jury wheel was not "fair and reasonable" when assessed using the absolute disparity methodology that has been approved by the First Circuit. Under that method, the 2.06% absolute disparity between the proportion of African-Americans in the jury-eligible population and the proportion in the qualified jury wheel is insufficient to establish a prima facie violation of the fair cross section requirement.[5] See, e.g., Royal, 174 F.3d at 7-11 (no violation where absolute disparity was 2.97%); United States v. Joost, 94 F.3d 640, at

---

[5] Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of that group on the jury wheel. Royal, 174 F.3d at 7. Here, according to the defendant, African-Americans make up 6.00% of the Eastern Division jury eligible population and, for the years 2011, 2012, and 2013, 3.94% of the qualified jury wheel. The difference between those rates is 2.06%.

6

*8 (1st Cir. 1996) (table) (no violation where absolute disparity was 7.13%); Hafen, 726 F.2d at 23 (no violation where absolute disparity was 2.02%). The defendant's argument that the Court should instead look at the comparative disparity to measure underrepresentation has been considered and consistently rejected by the First Circuit, which the defendant acknowledges.[6] Royal, 174 F.3d at 7-11; Hafen, 726 F.2d at 23-24.

### B.   Persons 70 and Older

The Plan permits persons 70 and older to be excused from jury service on request. The defendant argues that persons 70 and older should be considered a distinctive group and that they are underrepresented because they are systematically excluded by the excusal option the Plan gives them.

The Supreme Court has treated African-Americans, Mexican-Americans, and women as distinctive groups for purposes of assessing "jury-representativeness" claims under both the fair cross section standard of the Sixth Amendment and the equal protection standard of the Fifth and Fourteenth Amendments. See Taylor, 419 U.S. at 532-33 (women); Castaneda v. Partida, 430 U.S. 482, 494-95 (1977) (Mexican-Americans); Peters v. Kiff, 407 U.S. 493, 498-99 (1972) (African-Americans). It has not spoken to the question whether persons within a specified age group may be deemed a distinctive group for such purposes.

The First Circuit, however, has declined to regard a proposed age group as distinctive in this context. Barber, 772 F.2d at 997 (1st Cir. 1985) (declining to recognize "young adults" between the ages of 18 and 34 as a distinctive group). In that case, the Court of Appeals said that distinctiveness for fair cross section purposes requires that (1) the group be defined or limited by

---

[6] Comparative disparity is measured by calculating the percentage difference between the proportion of the distinctive group eligible to serve as jurors and the deficit in the distinctive groups' representation. Royal, 174 F.3d at 7.

7

some clearly identifiable factor, such as sex or race; (2) the group share a common thread or basic similarity "in attitude, ideas, or experience"; and (3) there be a "community of interest" among group members such that "the group's interests cannot be adequately represented if the group is excluded." Id. These requirements, the Court said, serve the ultimate goal of choosing a jury which represents the "attitudes, values, ideas and experience of the eligible citizens that compose the community where the trial is taking place." Id. The Court concluded that there was a lack of evidence that those within the 16-year proposed age range had any more in common than the members of any arbitrarily constructed age group or, for that matter, everyone else. The Court noted various social indicators and statistics pointing to differences within the age range, such as differences in marital and divorce rates, school enrollment, economic status, and attitude toward important social issues. Id. at 998-99. Simply to posit common experiences and attitudes on the basis of similar age, the Court said, would be to act "by arbitrary fiat superimposed on intuition." Id. at 998.

Other Circuits considering proposed age groups have similarly rejected those categories as distinctive, including the very category the defendant proposes here. See, e.g., Brewer v. Nix, 963 F.2d 1111, 1112-13 (8th Cir. 1992) (persons over the age of 65); Silagy v. Peters, 905 F.2d 986, 1010-11 (7th Cir. 1990) (persons aged 70 and over); Wysinger v. Davis, 886 F.2d 295, 296 (11th Cir. 1989) (per curiam) (persons aged 18 to 25); Ford v. Seabold, 841 F.2d 677, 682 (6th Cir. 1988) ("young adults" between the ages of 18 and 29).

While the Supreme Court has not directly addressed this specific question, it has suggested that a group defined by a particular shared point of view will not qualify that group as "distinctive" for fair cross section purposes. For example, in Lockhart v. McCree, 476 U.S. 162, 176-77 (1986), the Court held that potential jurors who said they would not be open to the

possibility of voting to impose a death penalty were not to be considered a "distinctive" group for fair cross section purposes. See also Buchanan v. Kentucky, 483 U.S. 402, 415 (1987) (stating that McCree established that "no fair cross section violation would be established when [jurors who would never vote to impose the death penalty] were dismissed from a petit jury, because they do not constitute a distinctive group for fair cross section purposes"). Rather, the Court has suggested, a distinctive group for fair cross section purposes will be identified "on the basis of some immutable characteristic such as race, gender, or ethnic background." McCree, 476 U.S. at 175. Age is immutable only in the sense that a person cannot change her age. At the same time, however, a person's age is in a constant state of change. A 71 year old is a former 69 year old (and 30 year old) in a way, for example, that an African-American is not a former white person. The analogy of age to race, ethnicity, and sex is for these purposes inapt.

Moreover, unlike racial or ethnic minorities and women, septuagenarians have not been the victims of historical discrimination or exclusion from participation in activities of self-government. Nor is there any persuasive evidence offered to suggest a common and distinct thread of shared experience that binds them together and distinguishes them from the community at large.[7] The cohort of seventy-somethings includes men and women of diverse heritages. In that sense, they are like any other arbitrarily defined age group.

---

[7] The defendant's attempt in his reply brief to analogize his proposed category with women, the group at issue in Duren, in order to dismiss the intra-category differences is unpersuasive. In Duren, the Supreme Court

> used the concept of "distinctive group" in a case where women were subjected to discrimination. It is fair to assume that the court wanted to give heightened scrutiny to groups needing special protection, not to all groups generally. There is nothing to indicate that it meant to take the further step of requiring jury venires to reflect mathematically precise cross sections of the communities from which they are selected. Yet if the age classification is adopted, surely blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications will be entitled to similar treatment. These are not the groups that

The most pertinent guidance remains the Circuit's opinion in Barber. Here, just as in that case, persons within the proffered age group do not constitute a distinctive group in the necessary sense based on their age alone. The defendant's argument that they should be considered a distinctive group for fair cross section purposes is entirely unconvincing.

The defendant's reliance on a business article regarding multi-generational marketing strategies does not help his argument. First of all, the article proposes that persons between 65 and 80 years old should be regarded as a distinct group, and treats persons in their 80s (who are also over 70) as members of a different distinct group. Williams & Page, Marketing to the Generations, 3 Journal of Behavioral Studies in Business, Apr. 2011, Table 1, available at www.aabri.com/manuscripts/10575.pdf (last visited Oct. 14, 2014). This illustrates the fundamental arbitrariness of any proposed age range. That was the Barber court's point exactly. It may also be noted that persons in their late sixties do not have an opt-out and do serve on juries, so that the members of the 65 to 80 year old "generation" addressed by the article are not entirely systematically excluded.

In addition, the article's narrative pertaining to the 65 to 80 year old group is little more than breezy intuitive advice about how to market to those folks:

> Stress simplicity, convenience, accessibility, ease of use, service, and support as key product and service features. While this generation has a positive attitude toward shopping, marketers still need to be aware of enhancing their shopping experience. These traditionalists will be customers for life if you provide a quality product and give them what they want.

Id. at 4 (reference notes omitted). This is a small excerpt, but it captures the flavor of the article.

---

the court has traditionally sought to protect from under-representation on jury venires.

Barber, 772 F.2d at 999 (rejecting defendant's argument that the proposed age-based category was a distinctive group).

I conclude that the persons aged 70 and above should not be regarded as a distinctive group in considering whether there was a violation of the fair cross section principle, and the defendant has consequently failed to establish a prima facie showing of a violation of that principle under the Duren criteria.

Accordingly, he has failed to prove a violation of the fair cross section requirements of either the Sixth Amendment or the Act.

## IV. Conclusion

For the reasons stated herein, the defendant's Motion to Dismiss Indictment and Stay Proceedings (dkt. no. 506) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge