UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             )
                             )   Criminal Action
v.                           )   No. 13-10200-GAO
                             )
DZHOKHAR A. TSARNAEV, also   )
known as Jahar Tsarni,       )
                             )
        Defendant.           )
                             )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**STATUS CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 12, 2014
10:03 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: William W. Fick, Esq.
10             Timothy G. Watkins, Esq.
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101

15

16

17

18

19

20

21

22

23

24

25
```

1          (The Court enters the courtroom at 10:03 a.m.)

2          THE CLERK:  The United States District Court for the

3     District of Massachusetts.  Court is in session.  Be seated.

4          For a status conference in the case of the United

5     States versus Dzhokhar Tsarnaev, 13-10200.  Will counsel

6     identify yourselves for the record.

7          MR. WEINREB:  Good morning, your Honor.  William

8     Weinreb for the United States.

9          MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your

10    Honor.

11         MS. PELLEGRINI:  Good morning, your Honor.  Nadine

12    Pellegrini.

13         MR. MELLIN:  Good morning, your Honor.  Steve Mellin

14    for the United States as well.

15         THE COURT:  All right.

16         MS. CLARKE:  Judy Clarke, William Fick and Timothy

17    Watkins for Mr. Tsarnaev, whose presence has been waived.

18         THE COURT:  Yes.

19         There are a couple of pending motions that have been

20    fully briefed relating to discovery and, for lack of a better

21    term, "leaks."  I'll give you the opportunity if you want to

22    address those orally as well.  As I say, they have been

23    thoroughly briefed, but since we're here, if you want to...

24         MR. FICK:  Thank you, your Honor.  I guess I'll start

25    with the discovery motion.

1          There were nine discrete categories of issues raised

2     in the motion.  They were, in fact, rather exhaustively

3     briefed.  I'll mention a few of them, I think by way of

4     highlighting and emphasis.  One issue that continues to vex us

5     in particular is the issue of the triple homicide in Waltham.

6     And, of course, as the Court is aware, there was the prior

7     round about a year ago concerning that issue where the

8     government invoked the law enforcement privilege.  The Court

9     looked at some documents in camera, is our understanding, and

10    denied the motion at that time.

11         The government now chiefly, I think, responds to the

12    new request by saying, "Well, what's changed?"  And several

13    things have changed.  The first is that time has passed.  We're

14    now on essentially the eve of trial and the weighing that the

15    Court would do in evaluating the application of the law

16    enforcement privilege, the equities, I think, require a new

17    weighing at this point.  And, in fact, if there's a legitimate

18    law enforcement reason to continue withholding the information,

19    then, in fact, perhaps we ought to put this issue on hold so

20    there's not a need for a do-over later.

21         I really can't overemphasize the potential importance

22    of this information, particularly now that the government's

23    position seems to have perhaps even changed on what actually

24    may have happened in Waltham.  The disclosure a year ago

25    essentially consisted of the government telling us that Ibragim

1    Todashev, the young man who was shot in unknown circumstances

2    in Florida, had confessed to committing the murders with

3    Tamerlan Tsarnaev, but they wouldn't provide us with the actual

4    substance of the confession, the privilege was invoked, and it

5    sort of stopped there.

6          Now the position the government seems to have taken is

7    that, "Well" -- I think the words they use is that "We have no

8    evidence of Tamerlan's participation in the Waltham murders.

9    And that's a very puzzling statement.  It's not clear if the

10   government simply means that it may not be in their physical

11   possession and is in the hands of the Middlesex investigators;

12   are they suggesting that the so-called Todashev confession has

13   been disproven?  It's really all very much up in the air.  But,

14   again, I can't overemphasize the importance potentially of the

15   information.  If, indeed, there is evidence that Tamerlan

16   Tsarnaev participated in a brutal triple murder in Waltham,

17   that could be extraordinarily -- would be extraordinarily

18   relevant at a prospective sentencing phase in this case.

19         One of the tasks of the jury in a sentencing phase

20   would be to evaluate the relative personal characteristics,

21   relative culpability of those involved in these charged crimes.

22   And to the extent there is evidence that Tamerlan Tsarnaev

23   previously committed a brutal triple murder, that would be an

24   important thing for the jury to know and weigh.

25         The second new wrinkle, I guess you would say, the

1   government has added in recent months is by providing us with

2   information that there is a witness who potentially would

3   testify that Tamerlan Tsarnaev told our client that he had

4   committed the Waltham murders.  That even on the government's

5   earlier arguments about relevance, even the government can see

6   that that would be relevant because it could suggest a kind of

7   influence, coercion, something -- something that might in that

8   sense also be mitigating.  But now we're really in a position

9   where it's not clear what the evidence even would show, to the

10  extent it exists.  I mean, did Tamerlan Tsarnaev participate;

11  did he not participate?  What does the evidence show in either

12  direction?  The government's position has changed, although the

13  ubiquitous high-level law enforcement officials don't seem to

14  have changed their tune in the things that are appearing in the

15  media.

16          So on that particular question I would suggest that if

17  indeed there is a law enforcement reason to continue

18  withholding the information, then this trial ought to be put on

19  hold, and if not, then the equities now weigh in favor of

20  disclosing that information to the defense so that we can make

21  sense of whether and how to use it.  Because either way that

22  information is extraordinarily potentially relevant at a

23  sentencing phase in this case.

24          THE COURT:  If you were going to move to the other

25  motion, let's deal with this one and then we'll come back to

1    the other one.

2              MR. FICK:  To the other segments of this or --

3              THE COURT:  Oh, I'm sorry.  Okay.  Go ahead.

4              MR. FICK:  Again, I don't want to belabor some of the

5    other points in the papers.  I mean, one of the other issues

6    that we had raised, for example, are these documents provided

7    by the government to the defense purportedly sourced from the

8    Russian government.  The government here has provided us with

9    essentially disembodied words on a page stripped with all of

10   the attributes that you usually associate with the document:  a

11   header, a letterhead, dates, authors.  And the government says,

12   "Well, those things aren't relevant.  The only thing that's

13   relevant is the context, which we've given you."

14              But absent the attributes of a document, it limits our

15   ability to investigate the provenance of that, whether we can,

16   in fact, find a witness who is able and willing to testify on

17   these issues.  And it also diminishes the weight that these

18   materials might have in front of a jury.  I mean, one of the

19   reasons a document is a document and why a document itself is

20   discoverable and not merely disembodied information is because

21   those attributes are things that a jury or that any fact-finder

22   would naturally consider in attributing significance or weight

23   to this.  So the government really has offered no reason why

24   they've withheld that information, why they've given this

25   disembodied text and not the document itself.

1          The third thing I would highlight from the motion

2    are -- is the issue of the government's reports of examination

3    of electronic devices and computers.  And here again, we sort

4    of reached a standoff where it's not clear whether we and the

5    government are talking past each other.  The government says,

6    "We know our discovery obligations," but the fact remains that

7    the only report of examination of any electronic device of the

8    dozens seized in this case that the government has produced is

9    that 50-odd-page undated so-called ongoing description of

10   certain examination of the defendant's -- the computer

11   associated with the defendant.

12         If the government is saying that they have not done --

13   that the FBI has not done anything similar with regard to other

14   devices, well, it's somewhat hard to believe that's the case,

15   but if that is the case, they ought to say it.  If, in fact,

16   such materials exist as to the other devices, well, then they

17   ought to be produced because under Rule 16(a)(1)(F) they are

18   reports of examinations and tests, the government itself calls

19   them that, that's what they are, and they were subject to

20   production as they are created.

21         So with that, I think I will leave the rest to the

22   papers.  I don't mean to, you know, attribute less significance

23   to the other issues, but those are the three, I think, that

24   really bear commentary at the moment.

25         THE COURT:  Thank you.

1          Mr. Weinreb?

2          MR. WEINREB:   Your Honor, I think that there's some

3     misunderstanding on the defense's part about what the

4     government said in its response about the Waltham triple

5     homicide.   What the government said is that we have no

6     additional information of Tamerlan Tsarnaev's involvement in

7     that -- or alleged involvement in that homicide other than what

8     has been disclosed previously.

9          So the government previously disclosed that -- as

10    Mr. Fick correctly says, that Ibragim Todashev claimed to have

11    participated in that homicide and claimed that Tamerlan

12    Tsarnaev participated in it as well.   The government has no

13    additional information other than that of Tamerlan Tsarnaev's

14    alleged involvement in that homicide.   We have no idea whether

15    Mr. Todashev was telling the truth when he said that he

16    participated in it, and we certainly have no evidence that he

17    was telling the truth when he said that Tamerlan Tsarnaev

18    participated in it.

19          The Middlesex District Attorney's Office informs us

20    that they are actively investigating that triple homicide,

21    which was a very important case for them, naturally.   They are

22    not part of the prosecution team, contrary to what the defense

23    asserts in their motion.   The Middlesex District Attorney's

24    Office is not prosecuting this case with the government.   What

25    they have in their files is in their files; it is not in our

1    possession, custody or control.

2        We also believe that the main argument that we raised

3    in our first response to their request for this information,

4    and that we have continued to maintain over and above any law

5    enforcement privilege, is that the information is entirely

6    irrelevant and would not be admissible at a sentencing hearing.

7    Tamerlan Tsarnaev's possible involvement in another crime

8    unrelated to the crimes that are charged in this case has

9    nothing to do with his relative culpability when it comes to an

10   individualized sentencing hearing for Dzhokhar Tsarnaev, and

11   I'm sure that this particular question will be the issue of

12   briefing down the road.

13       But it is the government's position that to the extent

14   that relative culpability makes a difference to an

15   individualized decision about a defendant's sentence, it is his

16   relative culpability for the crimes with which he's charged,

17   not his culpability relative to a codefendant who may have

18   committed other crimes at some other time.

19       We also did not inform the defense at any time that

20   any witness was prepared to testify that Tamerlan Tsarnaev told

21   Dzhokhar Tsarnaev that he had participated in the Waltham

22   triple homicide.  What we informed the defense is, as we said

23   in our pleading, that a third party informed the government

24   that there was an individual who had informed this third party

25   that Dzhokhar Tsarnaev had informed the individual or had said

1   something to the individual about Tamerlan Tsarnaev's

2   involvement in the Waltham triple homicides.  We have no idea

3   whether any witness would actually testify that that took

4   place, that conversation took place; we have no idea what the

5   source of Dzhokhar Tsarnaev's belief might have been if, in

6   fact, he actually harbored the belief; if, in fact, he actually

7   said it to this individual.  And so that is simply a red

8   herring and there is nothing there.

9        As for the Russian government evidence, the government

10  produced the information that the Russians produced to the

11  government.  The only thing that was redacted from those

12  documents is essentially irrelevant information which would not

13  go to the matters that Mr. Fick claims they would; in other

14  words, the identity of any person who actually obtained the

15  underlying information is not revealed.  There's simply nothing

16  in it -- the information that was redacted from the documents

17  is totally peripheral and sheds little if no light on the

18  provenance of the underlying information.

19        And as for the FTK reports, I do believe the parties

20  are talking past each other because we have litigated this

21  issue twice now about whether simply imaging a computer using a

22  document -- using -- and then examining what's on it using a

23  tool like FTK produces anything discoverable.  What the

24  government produced to the defense was something different:  It

25  was an analysis of what was on the computer; not simply a

1    report of the data on it, but an analyst's interpretation of

2    the evidentiary significance of that data which was -- which

3    was prepared at the government's request for potential use at

4    trial.  Essentially, the *Jencks* material of an expert witness,

5    or to put it another way, the summary of the testimony of a

6    potential expert witness.

7         We have no other such reports.  If any are produced,

8    we will provide them to the defense when they are produced.

9         MR. FICK:  If I might very briefly, your Honor?

10        THE COURT:  Go ahead.

11        MR. FICK:  On the Waltham issue, first the government

12   suggested that Middlesex is not part of the prosecution team.

13   And that strikes me as an extraordinarily artificial and

14   erroneous distinction given the way events in all of this

15   transpired.

16        The investigation of Waltham involving Mr. Tsarnaev

17   that led to all of this sort of hubbub began with the marathon

18   bombings.  A joint team of Massachusetts state troopers and FBI

19   agents, according to the Florida Attorney General's report,

20   went down and interviewed Mr. Todashev when the supposed

21   confession was made and when Mr. Todashev was killed.  So we

22   have joint federal and state involvement at that point from

23   inception.

24        We also have in this case a second search warrant for

25   Tamerlan Tsarnaev's Honda CR-V that we cited -- a federal

1    search warrant, approved in federal court, submitted by federal

2    agents, that we cited chapter and verse the supposed probable

3    cause they had to believe Tamerlan Tsarnaev might have been

4    involved in the Waltham murders.

5          So from the very beginning the investigation of

6    Waltham has been a joint federal-state enterprise that flowed

7    out of the marathon bombing investigation.  And so for the

8    government to suggest now that they're taking a see-no-evil,

9    hear-no-evil approach, "We don't want to know what Middlesex

10   knows anymore," I would suggest is an artificial attempt to

11   evade its discovery obligations that are clearly set forth in

12   all of the case law.

13         The second thing that the government argues is that it

14   would not be relevant.  And here I think there likely will be

15   litigation around a potential sentencing phase, but for the

16   government to say the only thing that matters is the relative

17   culpability of two individuals within the four corners of what

18   is charged in this case clearly can't stand up for the case law

19   which says that any potential sentencing phase in terms of

20   mitigation and aggravation, all kinds of factors, both

21   aggravating and mitigating about participants in the crime, can

22   be taken into consideration.  So to suggest that Waltham can't

23   be part of that I think is simply not supported in the law.

24         And the third point the government makes is about the

25   so-called third-party witness.  And here again, the Court has

the underlying papers that were submitted under seal.  A lawyer

for a witness told the government, and the government then

disclosed to the defense, that that witness is prepared to

say -- or would be prepared to say that Tamerlan Tsarnaev told

Dzhokhar Tsarnaev that he participated in the Waltham murders.

So, you know, this is not just some kind of eight levels of

removed speculative information.  A lawyer for a potential

witness told something to the government; the government

disclosed it to us.  That information, even on the government's

theory then, makes the Waltham information relevant.

        Finally, I'll jump from the computer issue.  We are

not, in this request -- and the government, I think, is sort of

confusing two things.  We're not at this point asking for the

FTK computer-generated initial forensic report of things that

are on a computer.  If I could make an analogy, if you

take -- if you analogize a computer to a book, what this FTK or

other forensic software does is it allows an analyst to go

through and essentially insert bookmarks in the book.

        We're not asking for that.  What we're asking for are

narrative reports such as the one they produced for the

defendant's computer that describe the examinations and tests

that were conducted on the computer and what, if anything, of

evidentiary significance was found.  A narrative report of

examination.  The government says there aren't any for any of

the other devices?  It seems -- given the number of devices

1    seized, the amount of man-hours put into the case, it seems

2    extraordinarily difficult to believe that that's the case.  If

3    it is, I stand flummoxed.  But it's really -- given the

4    investigation that's occurred here, it's strange to think that

5    that's true.

6              MR. WEINREB:  I just want to add one thing about the

7    Waltham issue that --

8              THE COURT:  Could you just confirm that

9    that's -- Mr. Fick's understanding is correct, that there are

10   no other narrative --

11             MR. WEINREB:  There are no other analytical reports

12   that were prepared for evidentiary use at trial.  We initially

13   litigated, way back in their very first motion to compel, the

14   question of whether a report prepared by the FBI at the request

15   of the prosecutors to explore what evidence we might want to

16   use at trial was producible, whether it was protected by the

17   work-product privilege and so on, and that issue was settled.

18             Of the reports of the type -- so the motion to compel

19   was a motion to compel reports similar to the one that the

20   government produced most recently in discovery.  There were no

21   such other reports.

22             THE COURT:  Okay.

23             MR. WEINREB:  I can confirm that.

24             And as for Waltham, I just wanted to clarify that.  To

25   the extent that there was any joint investigation with the

1    Middlesex District Attorney's Office of anything, we have

2    treated that as being within our position, custody and control,

3    and have produced what we believe is producible, and anything

4    that's not producible was given to the Court for in camera

5    review.

6            The federal government obviously has no jurisdiction

7    over a homicide that occurred in Waltham.  That's a state

8    matter.  And the Middlesex District Attorney's Office has been

9    actively investigating that homicide since it occurred,

10   sometimes more actively than others, depending on what leads

11   they got.

12           The government's involvement in that -- the federal

13   government's involvement in that investigation was limited

14   essentially to the investigation of Mr. Todashev because he was

15   a close friend of Tamerlan Tsarnaev, the marathon bomber, and

16   it was the federal JTTF that was spearheading the investigation

17   of the bombing.

18           So to the extent that information was discovered

19   during the bombing investigation, jointly or by the federal

20   government alone, we have treated that as discoverable.  To the

21   extent that the Middlesex District Attorney's Office has been

22   conducting its own individual investigation of a state

23   homicide, that is their information.  They have not shared it

24   with us, we don't know what's in their files, and we do not

25   view that as a joint investigation.

1           THE COURT:  Okay.  Let's move to the next motion.

2           MS. CLARKE:  What we've been calling "the leaks"?

3           THE COURT:  Yes.

4           MS. CLARKE:  Yes.  You know, I think maybe we -- we've

5    said "leaks."  What we mean is public comments by law

6    enforcement.  And now we've brought it to the Court's attention

7    three times.  And the government's response this time is a

8    little concerning because they say, "Well, maybe law

9    enforcement read it in the paper and said it to this reporter

10   or maybe they didn't say it," but the point is the reporter for

11   *Newsweek* magazine, a rather reputable magazine, quotes multiple

12   law enforcement sources and a high-ranking law enforcement

13   source close to the investigation of this case.  So the

14   information continues to be spoken about by law enforcement

15   contrary to the admonitions of this Court and contrary to the

16   letters that the government has sent.

17           It seems to me the only way to stop this is for the

18   Court to invite those responsible in law enforcement for

19   implementing the Court's direction and the prosecutor's request

20   into the court and to have a hearing.  I don't know how else we

21   bring the -- how important the issue is to the fair trial

22   interest in this case without doing that.

23           The Court, the last time we were -- maybe not the last

24   time, but in June or July the Court said, "Well, maybe you

25   could follow up to make sure that the letter got directed to

1    the right people."  I don't know if that's happened.  That

2    wasn't in the response.  But somehow it seems to me that the

3    level of importance to law enforcement needs to be increased by

4    the Court inviting them in for a hearing.

5         THE COURT:  Is your idea that the hearing would simply

6    be a point of emphasis or that it would actually produce some

7    information that would be useful?

8         MS. CLARKE:  It could produce some information that

9    would tell the Court who is not acting in accordance with the

10   Court's direction and the government's orders, and the Court

11   could impose sanctions.  There has to be some action taken by

12   the Court.  It wouldn't just be a hearing to -- you know, for

13   the sake of a hearing, but so that the Court could uncover

14   who's responsible, what's happening, why this is happening, and

15   take some action.

16        THE COURT:  Mr. Weinreb?

17        MR. WEINREB:  Your Honor, the letter that the

18   government drafted and which the Court saw was sent to the

19   heads of all the major law enforcement organizations involved

20   in the investigation of this matter previously or currently,

21   and we received confirmations from all of them that it had been

22   received and distributed to the people within those agencies.

23        Our main argument here is not that it's okay for law

24   enforcement agents not involved in this case to be commenting

25   on it, certainly not that it's okay for law enforcement agents

1   involved in it to be commenting on it.  We wish that all law

2   enforcement agents would keep their counsel and not talk to

3   reporters about the case at all.  But this is a high-profile

4   case, and there are always going to be people who are

5   interested in talking to reporters.

6         Our main point here is that there is nothing in these

7   articles, in these disclosures, that points in any direction

8   that would provide a fruitful avenue for inquiry.  There's no

9   claim, for example, that a high-ranking FBI official provided

10  this information or something that would actually suggest that

11  a law enforcement officer who is actually participating in this

12  investigation is somebody who commented to law enforcement.  It

13  could be any law enforcement officer anywhere.

14        These comments are essentially being made about

15  material that is not -- information that is public or easy to

16  surmise, and presumably it enhances the authoritativeness of

17  the information in the article to be able to say that a

18  high-ranking law enforcement official has confirmed or has said

19  the thing that is being reported.  But in these cases the thing

20  that is being reported is public knowledge.  It's either been

21  made public by the individuals themselves, by their attorneys,

22  or by other reporters who were speculating about it.

23        We simply see no reason to assume, based on anything

24  that has been written here, that anybody who is actually

25  charged with some ethical obligation not to talk to the press

1    about this particular case has violated it.  And even if there

2    were some indication of that, there's no clue given in any of

3    these articles as to who it might be or even where to begin

4    looking.

5            And so a hearing on the matter at which the heads of

6    agencies were brought in here and questioned by the defense

7    would serve nothing but to be a distraction.

8            THE COURT:  Okay.  I'll reserve on both motions.

9            I believe, according to a schedule that was previously

10   established, the government was to serve responsive expert

11   discovery at the beginning of this month.  If that was done,

12   could I have a copy of it under seal?

13           MR. WEINREB:  Yes, your Honor, but there was none.

14           THE COURT:  There was none?

15           MR. WEINREB:  No.

16           THE COURT:  Okay.  So I can't get a copy of it under

17   seal.

18           MR. WEINREB:  To the extent --

19           THE COURT:  So in other words, there was original

20   disclosure, affirmative by the government, there was then

21   affirmative disclosure by the defense, both of which I have

22   seen, and no responsive government's service of materials with

23   respect to the defense disclosures.  Is that accurate?

24           MR. WEINREB:  With respect to the liability phase

25   disclosures, yes.  There will be presumably -- and we will

1    provide that under seal at the time.

2              THE COURT:  Correct.  Correct.  Which is yet

3    unscheduled?

4              MR. WEINREB:  No, it's been scheduled, your Honor, but

5    it's in the future.

6              THE COURT:  Response to?

7              MR. WEINREB:  The defense affirmative penalty-phase

8    expert disclosures have not yet been made.

9              THE COURT:  Are they scheduled?

10             MR. WEINREB:  They are.

11             THE COURT:  I just am forgetting that.

12             MR. WEINREB:  They are.

13             MS. CLARKE:  One has been made, and the new date, once

14   the dates got rearranged, is November the 24th, I believe.

15             MR. WEINREB:  That's true.

16             THE COURT:  Okay.  All right.

17             MR. WEINREB:  Yes.  And to the extent that there is

18   responsive discovery, there's a date for the responsive --

19             MR. FICK:  We'll provide that.

20             THE COURT:  Fine.  Okay.

21             I think the next issue is a date for the disclosure of

22   defense witness list and exhibits as to which there is some

23   controversy.  The government's dates are the 15th and 29th of

24   December for a preliminary and final, and there is not

25   agreement, which we had hoped there might be.  And I don't know

1   if you want to address that, but we should deal with that as

2   well.

3          Ms. Clarke.

4          MS. CLARKE:  Well, your Honor, as the Court knows,

5   we're scrambling, and we've made that clear in our motion for

6   continuance and in discussions with the Court.

7          We have suggested that our defense exhibits could

8   be -- the exhibit list could be provided January 30th.  We're

9   predicting that that's about the time that the government's

10  guilt phase would begin.  You know, it depends on how long jury

11  selection takes.

12         With regard to witness lists, we've made our points

13  clear in our pleading.  We don't want to do it.  We had some

14  discussions with the government about a protected way to

15  provide names of witnesses, which the government ultimately did

16  not follow through on discussing with us.  We don't believe

17  that the rules envision it or require it, and to talk about a

18  tactical advantage that Mr. Tsarnaev is trying to get is to

19  ignore what the rules actually say.

20         Congress rejected the idea of production of witness

21  lists.  A lot of courts came up with, you know, the community

22  sort of deciding that there should be a mutual exchange.  But

23  in capital cases there is no mutuality; the statute requires

24  the government to produce a witness list and not the defense.

25         In a case other than this, I think that we might be in

1    a slightly different position to discuss the witness list, but

2    here we're already struggling with getting people to actually

3    talk with us, and to have the names revealed to the government

4    and the follow-up interviews or re-interviews, which there

5    probably would be, we think we would then lose whatever

6    potential witnesses we may have anyway.

7         So this is a very serious issue to us and one with

8    which we are not playing games or seeking any unfair advantage

9    that the rules do not envision.  We are seeking to stand behind

10   the rules and resist the production of a witness list.

11        We've offered to the Court and to the government a way

12   in which the Court could at least let prospective jurors know

13   about names so that there could be some voir dire.  I'm

14   doubting that jurors will know the names.  But we are really

15   worried about losing the slim list of real potential witnesses

16   that we really would like to have.  So we resist that, and we

17   ask the Court not to order it.

18        And with regard to the exhibit list, in the eternal

19   hope that we'll have something actually to provide, we've asked

20   for January 30th.  If we have to provide an exhibit list in mid

21   December, we probably simply won't have anything to put on it.

22   And we have talked to the government about trying to provide

23   them with something that's more real than not real.

24        Our Rule 16 disclosures are set for, I think, the 24th

25   of November.  Our list of mitigating factors are set for the

1    middle of December.  So to the extent the government is curious

2    or concerned, they should be getting some information that, you

3    know, may or may not be helpful to them in their prep.

4           MR. WEINREB:  I just want to emphasize two points,

5    your Honor.  The first is the defense does not assert nor can

6    they assert any legal right of theirs would be implicated by

7    the Court ordering the production and exchange of witness

8    lists.  I'd simply say the Court lacks authority to do it.  But

9    the local rules plainly provide the Court authority to do it.

10   In fact, that's the presumption, is that the parties will

11   exchange witness lists.

12          There is a provision for either side to object, but

13   the Court is given the power to hear argument and rule on those

14   objections.  So clearly the Court is given the authority to

15   order the exchange of witness lists.

16          The reasons for exchanging witness lists in advance of

17   trial is obvious.  It gives both sides an opportunity to

18   prepare, to cross-examine the other side's witnesses and,

19   therefore, give the jury what it's supposed to get, which is an

20   adversarial presentation of information.  The jury is supposed

21   to be in a position to try and understand, to evaluate the

22   testimonial capacities of the witnesses, any biases they might

23   have, whether they're telling the truth or lying.  The

24   government is simply not going to be in a position to prepare

25   to give that helpful information to the jury if we don't know

1    who the witnesses are until they're called to the stand, or

2    even the day before.

3            THE COURT:  Go ahead.  Maybe you were going to address

4    this, but let me ask the question:  For this point of

5    scheduling, do you distinguish between witness lists and

6    exhibit lists?

7            MR. WEINREB:  Well, the exhibit lists -- we do

8    distinguish between them.  If I may just finish with the

9    witnesses, the only other point I wanted to make is that the

10   defense has said that they do not want to produce a witness

11   list because they don't want the government to talk to any of

12   the potential defense witnesses before they testify.  And that

13   simply is contrary to the system that we have in place.

14   Witnesses are not supposed to belong to either party; they are

15   supposed to be witnesses for the jury and they are supposed to

16   be accessible to both sides.  And the defense, by simply

17   withholding who their witnesses are until the last possible

18   moment, is trying to undermine that principle and prevent --

19   effectively prevent the government from talking to potential

20   witnesses.

21           With respect to the exhibit list, the dates that we

22   have proposed -- we accept that the defense's exhibit list may

23   grow over time.  And we don't have any problem with that.  We

24   would simply like to have on December 15th and 29th, or

25   whatever the exact dates were, the exhibits that the defense at

1    that point knows that they -- or reasonably intend to

2    introduce.  We have no problem with the defense supplementing

3    its exhibit list as time goes on provided there's sufficient

4    information for the government to review whatever the potential

5    exhibits are, object to them if we have any objections, and

6    file motions in limine and have the Court have time to decide

7    them.

8            And I think that's the way it's normally done in most

9    cases, which is that both sides frequently supplement their

10   exhibit list as time goes on in good faith, meaning that these

11   are not exhibits they knew from the start they were going to

12   introduce but things that it became apparent during the course

13   of the trial would be useful.  Maybe they weren't thought about

14   before or maybe something happened in the trial that made them

15   useful when before they wouldn't have been useful.  And we have

16   no problem with that for either side, provided that reasonable

17   notice is given to the other side to permit, you know,

18   reasonable opportunities by both parties and the Court to rule

19   on the admissibility of the exhibits.

20           THE COURT:  And to be clear, we're talking about

21   affirmative use of exhibits, right?  It's not impeachment use?

22           MR. WEINREB:  That's correct.

23           THE COURT:  Okay.  What about a separate schedule for

24   a guilt phase and penalty phase?

25           MR. WEINREB:  Yeah, I think that makes sense.  In

1    fact, initially the defense had proposed -- when we were

2    discussing this had proposed a date for penalty phase motions

3    in limine.  And I -- we were concerned that the date might turn

4    out to seem arbitrary in the end because we don't know when the

5    penalty phase, if there is one, will begin.

6              So we don't have a problem with a set of dates for the

7    production of penalty phase exhibits and for motions in limine

8    respecting those exhibits and so on when the date that -- of

9    the beginning of the penalty phase becomes clear.

10             THE COURT:  So I take it you're content in your

11   present request for exhibit lists pertaining to the first phase

12   of the trial?

13             MR. WEINREB:  Yes.  With this caveat, which is I would

14   say to the extent we know what exhibits we will be introducing

15   in the penalty phase, we would propose to disclose them at the

16   same time as we disclose the liability-phase exhibits, because

17   the phases will proceed somewhat seamlessly, and we would ask

18   that the defense be ordered to do the same.  They may

19   already -- presumably are formulating their penalty-phase

20   presentation, if one is going to be required by them, and they

21   may have exhibits that they've identified.  And there's no

22   reason why the parties shouldn't exchange those before trial

23   gets underway and, you know, the parties get distracted by the

24   need to be preparing witnesses and other things and don't have

25   as much time to draft motions in limine and so forth.

1          So, you know, I think if the Court simply orders that

2    the parties produce the exhibits that they reasonably intend to

3    introduce in both phases on the 29th with the understanding

4    that that can be, in good faith, supplemented seasonably with

5    sufficient notice to the other side, I think that would be the

6    ideal arrangement.

7          THE COURT:  Ms. Clarke, anything else?

8          MS. CLARKE:  No.

9          THE COURT:  Well, okay.  First of all, I don't have

10   any doubt of the Court's authority to set a date for disclosure

11   by the defense.  And I think for the proper conduct of jury

12   selection, it's necessary for the disclosure to precede that as

13   to the witnesses, not necessarily to the exhibits.  So I think

14   by the 29th -- December 29th the defense should disclose its

15   expected witnesses for both phases of the case.

16         With respect to exhibits, I think a simultaneous

17   disclosure of those exhibits the defense expects to use in its

18   first phase of the case -- and we can postpone the

19   identification of exhibits relative to a penalty-phase.  I

20   suspect there will be a significant difference in the volume as

21   to the first and the second, although, of course, some --

22   perhaps the government already -- to the extent there will be

23   any expert testimony offered in a guilt phase that might rebut

24   or counter government expert witness, that is something that

25   could be anticipated and disclosed.  It probably already has

1    been.

2          Okay.  Let me just give you a general outline of what

3    I think the trial procedure will be once we get started.  I

4    think once the case begins, it's important that we move

5    efficiently and productively, so my idea is that we will sit

6    full days rather than nine-to-one days but four days a week to

7    give some relief to the jurors primarily, and to some extent

8    the trial teams who can use probably the day to do something.

9    I'll find some other things to do on that day myself.

10         So my thought is we will try Monday through Thursday

11   on a nine-to-four schedule, and I reserve the right to make

12   that a longer day if it seems feasible and prudent, but right

13   now, we'll presume it's nine to four with Fridays not a trial

14   day.

15         There are a couple of anticipated Monday holidays in

16   the time frame we're talking about.  In those days we'll use

17   the four non-holiday days.  We won't -- so we'll use a Friday

18   in that case.  So one would be Martin Luther King Day; one

19   would be Presidents' Day.  We would treat that holiday as the

20   day off for everybody.

21         So now let's turn to additional scheduling of matters

22   relating to pretrial motions.  I think your proposal in the

23   status report that was filed was December 5th.  This is

24   whatever in limine motions the parties may have in mind,

25   including *Daubert* motions.  December 5th with responses by the

1    19th, and then you suggested replies by the 29th.  I would

2    really like to shorten the reply time to the 23rd.  I don't

3    know how -- what the volume of motions is going to be, but on

4    our side we'll need some time to absorb them.  And I think I

5    would like to have them earlier than the 29th, which -- both

6    the weeks are shortened weeks because of holidays, obviously,

7    but I think -- so we have fewer business days anyway.  But I

8    think to the extent these are replies, then a true reply should

9    be feasible on a shortened schedule.  So I would just amend the

10   proposed schedule to the 5th, 19th and 23rd for pretrial

11   motions -- for motions, oppositions, replies.

12          Now, with respect to both proposed jury questionnaires

13   and proposed preliminary instructions to the jury, again, I'm

14   thinking that we'll need to move it along a little bit faster

15   than the parties have suggested.  And I would like both

16   the -- well, let's -- I guess we could hope that the parties

17   might be able to provide joint submissions on that, but let's

18   provide for the occasion that they don't.  Both as to the

19   instructions and as to the proposed questionnaire, I'd like to

20   have them filed by December 1st and replies by December 8th, a

21   week later.  There's going to be a lot of work to be done on

22   those.  I anticipate that there will be broad areas of

23   agreement; I anticipate there will be areas of disagreement.

24   And even where there are areas of agreement, I may have my own

25   ideas.  So we'll need some time to work through those.

1            And I want -- the reason I'm selecting the 8th -- I

2     know you have a later date, the 15th, suggested.  I don't want

3     it that close to the pretrial conference.  I want some time to

4     absorb all that before we have the pretrial conference.  And

5     that is scheduled for the 18th, and we'll proceed.

6            I want to confirm the jury process starting on the

7     5th.  We've had a little internal rearranging of cases.  Some

8     of my colleagues have accommodated us by moving cases they had

9     scheduled for the 5th so that we can monopolize the jury pool.

10    And we'll begin -- we'll -- I think the outline is -- we're

11    going to be fine-tuning some of this -- but we expect the

12    procedure that I think you had both discussed before, bringing

13    in lots of 200, having the questionnaires filled out.  Right

14    now we anticipate three days of that, which would give us 1,200

15    questionnaires.

16           I'm not sure exactly what after that.  We'll -- I want

17    to think a little bit more about that.  I know you've asked for

18    some time to absorb the questionnaires, and I think that

19    judgment may best be made after we know what the questionnaire

20    looks like.  We may do some fine-tuning on that.  It has to be

21    practical, obviously.  We'll do what we have to do.

22           So I think that's pretty much my agenda.  Is there

23    anything else?

24           MR. WEINREB:  Your Honor, just a couple of things with

25    respect to that schedule.  The government has taken to heart

1    the Court's admonition a long time ago not to try -- to try and

2    not to over-prepare this case, that to keep in mind that not

3    everything that could be put into evidence should be and to

4    streamline things as much as possible.

5            THE COURT:  I'm glad you remember that.

6            MR. WEINREB:  Yes.

7            Having said all of that, the government, at least,

8    would like to make our pitch for doing nine-to-one days, as is

9    common, with the understanding that it could be changed at any

10   time to longer days if it seemed as if things were not moving

11   expeditiously.  And the reason is partly that we anticipate,

12   given the unusual nature of the case, that there may be more

13   litigation going on during the trial than normal, and there's

14   going to need to be time to brief and address these issues and

15   have the Court decide them, but also logistical issues.  That

16   we're going to be bringing in a lot of people from out of town.

17   And it's not practical for us to bring a lot of people in

18   twice, try to prepare them, have them go back, bring them back

19   in.  So that we were really anticipating using the afternoons

20   and the evenings to get witnesses ready for the next day, so

21   that they can come in, get prepared, testify and leave.

22           So it's obvious the Court's put a lot of thought into

23   this, and I won't belabor it, but our only suggestion would be

24   let's give it a try, at least at the start.  If things seem to

25   be moving along quickly, then all to the good; if not, then we

1    understand it could change.

2         Secondly, the Court didn't mention anything about

3    school vacation week --

4         THE COURT:  We will try through school vacation weeks.

5         MR. WEINREB:  We will?  Okay.

6         With respect to --

7         THE COURT:  I guess I'm assuming that people who have

8    a serious school vacation issue will not be seated.  That's

9    what typically happens in cases.

10        MR. WEINREB:  Okay.

11        (Government counsel confer off the record.)

12        MR. WEINREB:  Just two other quick things.  There had

13   been some discussion -- or the Court had mentioned at an

14   earlier point if a hearing were necessary on the

15   motion-to-suppress statements on the voluntariness, that it

16   would be done in the afternoons.  And there may not be

17   afternoons, so just to put on the Court's radar --

18        THE COURT:  I don't think I said "afternoons"; I think

19   I said we'd deal with it.

20        MR. WEINREB:  Very well.  In any event, that *Daubert*

21   hearings and so on that might otherwise have been done in the

22   afternoons, just think about scheduling those.

23        THE COURT:  All right.

24        MR. WEINREB:  And does the Court want to schedule a

25   status hearing to discuss the jury questionnaires at this point

1    or should we --

2            THE COURT:  I don't want to schedule it now.  I think

3    there are some matters like that that we will have to schedule

4    but --

5            MR. WEINREB:  So we'll be back before the pretrial

6    conference?

7            THE COURT:  Probably, yes.

8            MR. WEINREB:  Very well.

9            THE COURT:  Let me say on -- well, go ahead.

10           MS. CLARKE:  No, you first.

11           THE COURT:  On the schedule:  I mean, I have thought

12   about various combinations of configurations of the trial day,

13   and I think I'll just put the presumption in the other

14   direction.  We'll start on a full day.  If it becomes a

15   problem, we can adjust.  If there's a substantial motion that

16   needs some evidentiary attention, we can just make an

17   exception, and that Wednesday afternoon we won't sit with the

18   jury; we'll take up something else.

19           So I think we can do it, but I would like to -- I

20   think it's important.  It's going to be a long trial under any

21   circumstances, and I think lengthening the trial day will

22   hopefully have some effect on shortening the overall length of

23   the trial.  So we'll at least start that way.  If it turns out

24   to be a disaster, we can readjust.

25           MR. WEINREB:  The only other request is that if there

1    is no interim hearing between now and the 18th, we would renew

2    our request that the defendant be brought in on the 18th just

3    to ensure that --

4            THE COURT:  I believe it was indicated at the last

5    status conference that he would be.  I expect that he would be.

6    It is common practice in this court for defendants not to be

7    physically personally present at status conferences, but of

8    course they would be expected to be present at a final pretrial

9    conference.  So I expect that will be the case, and I think

10   that was what Ms. Clarke indicated, or Mr. Bruck, last time.

11           MS. CLARKE:  Yes.  Absolutely.  And, you know, lest

12   anyone get confused or concerned that the government make a

13   request that Mr. Tsarnaev be here, that seems to get everybody

14   excited, that there's been something wrong or improper about

15   his lack of presence.  And I thank the Court for its comments.

16   We've just been following local practice.

17           THE COURT:  Right.

18           MS. CLARKE:  Could I just ask for a clarification of a

19   couple of things, your Honor?  On the jury questionnaire, then,

20   I understand that the parties should submit them on the 1st?

21           THE COURT:  Correct.

22           MS. CLARKE:  Not on the 8th?

23           THE COURT:  Correct.

24           MS. CLARKE:  Okay.  Then in limine, the Court

25   indicated that there would be in limine motions on the 5th.  I

1    think the parties envisioned trial briefs and guilt-phase in

2    limine motions on the 29th and responses on the 5th.  We were

3    envisioning *Daubert* and any other pretrial motions, whatever

4    they might be, on the 5th.

5             MR. WEINREB:  Your Honor, we join in that.  The

6    parties obviously need to see each other's exhibit lists before

7    -- and potential witness lists --

8             THE COURT:  Yes.  Okay.  Right.  Perhaps I misspoke in

9    including in limine motions.  I was referring to the schedule

10   you proposed.  And the only date I was adjusting in

11   that -- well, adjusting the date with respect to the jury

12   questionnaire and preliminary instructions, that section.  With

13   respect to trial briefs and those motions in limine, the dates

14   you suggest are fine.

15            MS. CLARKE:  Thank you, your Honor.

16            THE COURT:  But *Daubert* or other anticipatable

17   pretrial motions that aren't dependent on the disclosures by

18   December 5th.

19            MS. CLARKE:  Thank you.

20            THE COURT:  Okay.

21            MS. CLARKE:  Thank you, your Honor.

22            THE COURT:  Thank you all.

23            MR. WEINREB?  Thank you.

24            MR. CHAKRAVARTY:  Thank you, your Honor.

25            THE CLERK:  All rise for the Court.

1          (The Court exits the courtroom at 10:54 a.m.)

2          THE CLERK:  Court will be in recess.

3          (The proceedings adjourned at 10:54 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3              I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  11/24/14
13

14

15

16

17

18

19

20

21

22

23

24

25