UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        v.                       )         Crim. No. 13-10200-GAO
                                 )
DZHOKHAR TSARNAEV                )

**DEFENDANT'S MEMORANDUM OF LAW
RESPECTING VOIR DIRE EXAMINATION
OF PROSPECTIVE JURORS ON DEATH-PENALTY VIEWS**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully files this

Memorandum of Law regarding legal issues that are likely to arise as prospective jurors

are questioned regarding the death penalty in this case, and to provide the legal authority

that governs their resolution.  These issues are:

1. The legal standards that *limit* the power to exclude jurors for cause because
   of *opposition* to the death penalty, *Wainwright v. Witt* (1985), *Uttecht v.
   Brown,* 551 U.S. 1 (2007).

2. The legal standards that *require* exclusion of all jurors whose *support* for
   the death penalty in some or all cases is so categorical as to impair their
   ability to fairly consider mitigating factors or vote for a sentence of less
   than death in the case to be tried.  *Ross v. Oklahoma,* 487 U.S. 81 (1988);
   *Morgan v. Illinois,* 504 U.S. 719 (1993).

3. Why the complexities of juror death- and life-qualification justify (a) spe-
   cial instructions to acquaint jurors with the capital sentencing process, and
   (b) a reasonable opportunity for attorney-conducted voir dire questioning.
   .

**1.      The legal standards that restrict disqualification of jurors based on death
        penalty views: *Witherspoon* and *Witt*.**

Jury selection in capital cases has long been distinguished by this peculiar fea-

ture: each potential juror's eligibility to serve in such cases is conditioned on his or her

ability to participate in the morally and religiously controversial practice of capital pun-

ishment.  As Americans' opposition to the death penalty grew in the decades following
World War II,[1] the once-common practice of excluding all jurors who entertained
doubts about capital punishment collided with the constitutional requirement of a representative jury.  The Supreme Court first grappled with this problem in *Witherspoon v.
Illinois*, 391 U.S. 510 (1968), a case decided just as opposition to the death penalty
appeared to have gained plurality support in the United States.  *Id.* at 520, n. 16.  In
*Witherspoon,* the Court squarely addressed the implications of diminishing public
support for capital punishment:

> A jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. Yet, in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment —of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.

391 U.S. at 519-520 (footnotes omitted).

    *Witherspoon* resolved this conundrum by holding that the exclusion of prospective jurors from service solely because they held reservations or scruples regarding capital punishment violated capital defendants' due process right not to be placed on trial before a "tribunal organized to return a verdict of death."  *Id.,* 391 U.S. at 521. Although *Wainwright v. Witt,* 469 U.S. 412 (1985), would later modify *Witherspoon*'s

---

[1] *See*, *e.g.,* Gallup, "Americans' Support for Death Penalty Stable," (Oct. 23, 2014)
http://www.gallup.com/poll/178790/americans-support-death-penalty-stable.aspxyears.aspx

subsidiary holding that cause challenges could be granted only where jurors made it "unmistakably clear" that "they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them," *Id.* at 523 n.21 (emphasis added), *Witherspoon*'s basic principle remains good law today:

> A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  No defendant can constitutionally be put to death at the hands of a tribunal so selected.

391 U.S. at 522.  And the Supreme Court has repeatedly held that when even a single juror has been excluded in violation of this rule, harmless error review is inapplicable, and the death penalty must be vacated.  *Davis v. Georgia*, 429 U. S. 122 (1976) (per curiam), *Gray v. Mississippi*, 481 US 648 (1987).

In *Wainwright v. Witt*, the Court reformulated *Witherspoon's* constitutional rule to forbid courts from disqualifying any juror on the basis of opposition to the death penalty unless that opposition was so categorical that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 421; *see also United States v. Chanthadara*, 230 F.3d 1237, 1268-1272 (10th Cir. 2000) (reversing, on *Witherspoon* grounds, a sentence of death imposed pursuant to the Federal Death Penalty Act).  And since *Witt*, the Court has consistently held that even strong opposition to capital punishment does not necessarily disqualify a prospective juror from serving on a capital case.

- 3 -

It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Lockhart v. McCree,* 476 U.S. 162, 176 (1986).  Reaffirming this principle in *Uttecht*

*v.Brown*, 551 U.S. 1 (2007), the Court summarized its 40 years of precedents as estab-

lishing "at least four principles of relevance here."

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon,* 391 U.S., at 521.  Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt,* 469 U.S.at 416. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.,* at 424. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Id.*, at 424-434.  And restating the 38-year-old *Witherspoon* rule, the Court concluded,

"Capital defendants have the right to be sentenced by an impartial jury. The State may

not infringe this right by eliminating from the venire those whose scruples against the

death penalty would not substantially impair the performance of their duties." *Id.,* at 22.

Jury selection in this case will present the *Witherspoon* problem in an especially

stark form.  It will be tried in a jurisdiction that has long rejected the death penalty as a

matter of state law, and where a very large segment of the population opposes it—

whether on grounds of morality, religious faith, public policy, or some combination.  The

- 4 -

more the jury pool is culled of jurors who oppose the death penalty, the risk increases that those who remain will be unable to express "the conscience of the community on the ultimate question of life or death." *Witherspoon,* 391 U.S. at 519.  It is thus especially important to ensure that the Court excludes only those jurors whose opposition to the death penalty is so categorical as to prevent or substantially impair their ability to apply the highly discretionary sentencing scheme created by the Federal Death Penalty Act.

This has practical implications for the conduct of voir dire examination.  First, jurors who oppose the death penalty must be clearly informed—and must actually understand—that serving on a capital case never requires any juror to *impose* the death penalty, but only to fairly consider it.  Such jurors must also understand that the law entrusts all decisions regarding mitigating factors and whether to impose the death penalty to the unfettered discretion of each individual juror.[2]  In other words,

---

[2]With respect to the power of a single juror to find and give effect to mitigating factors, the Federal Death Penalty Act codifies the Eighth Amendment holding of *Mills v. Maryland,* 486 U.S. 367 (1988) as follows:

> A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

18 U.S.C. § 3593(d).  Each juror's virtually unlimited discretion to reject the death penalty is embodied in the Federal Death Penalty Act's requirement that death not be imposed unless the entire jury unanimously agrees that "the aggravating factor or factors found to exist *sufficiently* outweigh all the mitigating factor or factors found to exist to justify a

- 5 -

each juror the question, "Could you ever vote for the death penalty?" assumes a sit-uation in which that individual juror has first found the death penalty to be the appro-priate sentence; no juror is ever required or expected to impose a death sentence with which he or she does not personally agree.

All of this is counter-intuitive. Many members of the jury venire will arrive at court assuming that the law prescribes a particular punishment for each crime, and thus that to be able to apply the death penalty sentencing scheme, jurors must be pre-pared to impose a death sentence even if they personally believe it to be unwarranted. In short, jurors are unlikely to appreciate the highly discretionary sentencing scheme created by the Federal Death Penalty Act unless it is carefully explained in under-standable terms that non-lawyers can grasp and apply.  And unless jurors have such an appreciation, no reliable determination can ever be made that any given juror's opposition to the death penalty rises to the level of a substantial impairment suffi-cient to justify a challenge for cause.

Moreover, after being questioned about whether they can impartially decide the defendant's guilt or innocence, jurors must be made aware that "impartiality" re-garding the death penalty accommodates a much wider range of attitudes than is true with respect to guilt or innocence.  After all, as the Supreme has recognized, "it is en-tirely possible [that] even a juror who believes that capital punishment should never

---

sentence of death . . . ."  18 U.S.C. § 3593(e) (emphasis added).  The statute nowhere de-fines "sufficiently," and so entrusts each juror's ultimate sentencing decision to the exer-cise of his or her own factual and moral judgment.

- 6 -

be inflicted and who is irrevocably committed to its abolition could nonetheless sub-ordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon*, 391 U.S. at 514 n. 7.  Thus the fact that a juror may feel strongly inclined against imposing the death penalty does not justify a finding that he or she is "substantially impaired" within the mean-ing of *Witt*, and disqualifying even one such juror for cause on that basis would be reversible error.

    As noted above, the challenge here similar to the one that the Supreme Court confronted nearly five decades ago in *Witherspoon*.  Given that death penalty may once again enjoy the support of only a "dwindling minority" of the population from which the Court must draw a jury in this case, great care will have to be taken to avoid disqualifying broad swathes of the population of eastern Massachusetts simply on the basis of general opposition to capital punishment.  Unless this is done, the Court runs the risk of empanelling a jury that cannot speak for the people of this dis-trict on the question of life or death, and of violating the defendant's due process right not to be condemned by "a tribunal organized to return a verdict of death." *Witherspoon,* at 521.

**2.    The legal standards that *require* disqualification of jurors whose ability to consider mitigation or vote against the death penalty is substantially im-paired:  *Morgan v. Illinois*.**

    At the other end of the attitudinal spectrum, the difficulty of reliably identifying "substantial impairments" in prospective jurors' ability to vote for a *life* sentence,

*Morgan v. Illinois,* 504 U.S. 719 (1993), is even more daunting.   In *Morgan*, the Supreme Court held that any juror who would automatically impose the death penalty upon conviction of the capital offense charged must be disqualified for cause, and that capital defendants are constitutionally entitled to examine prospective jurors on voir dire with enough specificity to identify and challenge any juror holding such views.   To be sure, there will be occasional easy cases: "eye-for-an-eye" jurors who simply declare that they would automatically impose the death penalty in every murder case, without regard to any mitigating evidence that might be adduced.   But such jurors are but a small subset of the much larger group whose attitudes in favor of capital punishment would "substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and [their] oath." *Uttecht v. Brown,* 551 at 7 (*quoting* Witt, 469 U.S., at 424 (internal quotation marks omitted)).   This is so because "life-qualification" under *Morgan* requires that each juror have the capacity to weigh mitigating factors and to consider a sentence other than death *in the case to be tried*.   And that's where much potential for confusion lies.

The Supreme Court has long held that a mandatory death penalty scheme—one mandating a death sentence without allowing for consideration of any reasons why death should not be imposed—violates the Eighth Amendment no matter how egregious or narrowly-defined the capital crime.   *Sumner v. Shuman,* 483 U.S. 66 (1987) (invalidating mandatory death-sentencing statute applicable only to prison inmates who commit murder while serving life sentences).   Even in the most highly aggra-

vated murder cases, then, every constitutional death-sentencing scheme—including the Federal Death Penalty Act—requires each juror to weigh all relevant mitigating factors, and to fairly consider imposition of a sentence less than death.

In this case, the defendant is charged with multiple counts of use of a weapon of mass destruction resulting in death, 18 U.S.C. § 2332a(a)(2), bombing of a place of public use resulting in death (18 U.S.C. § 2332f(a)(1) & (c), malicious destruction of property resulting in personal injury and death (18 U.S.C. § 844(i), and firearms violations resulting in death.  18 U.S.C. §924(j).  It is these offenses, not simply "murder," that the government has elected to charge.  Upon conviction for these crimes, therefore, he is entitled not only to twelve jurors who could consider impos-ing life imprisonment rather than the death penalty for *some* kinds of murder, but for *these* kinds.  And that is the relevant question that *Morgan v. Illinois* entitles him to put to each prospective juror.

Nor is that all.  For the statutory offenses alleged in the indictment are not, standing alone, capital crimes.  Rather, those statutory crimes do not become death-eligible unless and until the jury finds both intentionality and at least one statutory aggravating factor.  For this reason, the mental state gateway factors and statutory aggravating factors set forth  in 18 U.S.C. §§ 3591(a)(2) and 3592(b)—factors that the government has charged here both by way of special findings in the indictment, DE 58, ¶¶ 155-156, and in the Notice of  Intent to Seek the Death Penalty, DE 167, pp. 2-5,—are the "functional equivalent" of elements of a greater offense than "'murder' *simpliciter*."

- 9 -

*Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003) (plurality opinion); see *also Ring v. Arizona*, 536 U.S. 584, 592-93 (2002) (holding that "[b]ecause Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense, [*Apprendi v. New Jersey*, 530 U.S. 466, 494, n. 19 (2000)], the Sixth Amendment requires that they be found by a jury.").

This means that the capital crimes charged in this case include, for example, that the defendant

1.  used a weapon of mass destruction that resulting in death, 18 U.S.C. § 2332a(a)(2)

2.  that in doing so he intentionally killed the victim(s), 18 U.S.C. §§ 3591(a)(2)(A),

3.  and that

    a.  The defendant committed the offense in an especially heinous, cruel, or depraved manner, 18 U.S.C. § 3592(c)(6), or

    b.  the killings were committed after substantial planning and premeditation to cause the death of a person or commit an act of terrorism, 18 U.S.C. § 3592(c)(9), or

    c.  the defendant intentionally killed or attempted to kill more than one person in a single criminal episode, 18 U.S.C. § 3592(c)(16), or

    d.  one of the victims was particularly vulnerable due to youth. 18 U.S.C. § 3592(c)(11).

Both the Federal Death Penalty Act and the jurors' oaths will require them to consider mitigating factors, and to fairly weigh *both* possible punishments of death and life imprisonment, only after they have found these offenses and statutory intent and aggravat-

- 10 -

ing factors to have been proven beyond a reasonable doubt.  It will therefore be essential to frame "life-qualifying" questions to each prospective juror in terms of the capital crimes alleged by the government in this case.  Failing to do so risks qualifying jurors whose ability to consider a life sentence in the case before them will be substantially impaired by their belief that the death penalty should be imposed in every case—without regard to mitigating factors— involving terrorist offenses, or intentional killings, or premeditated killings, or killings of children, or other specific types of statutorily death-eligible murders.

   Abstract or general questions risk eliciting answers that obscure disqualifying bias rather than expose it.  For example,  an affirmative answer to the question, "Could you weigh all of the aggravating and mitigating evidence and return either a death sentence or a sentence of life imprisonment, depending on the evidence presented?" could mean easily that the juror could vote against the death penalty so long as:

1.  the evidence did not conclusively establish guilt;

2.  the killing was accidental or committed in sudden heat and passion;

3.  the killing was not intentional;

4.  the defendant was insane;

5.  the defendant acted in self-defense or was otherwise provoked;

6.  the victim was engaged in criminal conduct at the time of his or her death;

7.  only a single victim was killed;

8.  the victim was not a child; or

9.  the crime did not involve terrorism.

This list could be extended indefinitely.  The point is simply that a "yes" response to such a question is virtually meaningless unless the juror first understands that the question pre-supposes the defendant's guilt of both the charged offenses and the statutory aggravating factors *that the government has actually alleged in the case to be tried.*  Otherwise a seemingly qualifying response is likely to mean only that the juror might not favor the death penalty in cases where it is legally unavailable in any event, or in categories of cases far removed from the one about to be tried.

Such juror confusion is a common and recurring problem.  In a thorough discussion of the propriety of  "case-specific" voir dire questions as part of the death- and life-qualification process in capital cases, *United States v. Johnson*, 366 F.Supp.2d 822 (N.D. Iowa 2005),  Judge Mark Bennett wrote:

> [T]his court's own experience with jury selection in the  . . .  federal death-penalty case against Dustin Honken, *United States v. Honken*, No. CR 01–3047–MWB (N.D. Iowa) . . . suggests the insufficiency of purely "abstract" questions to determine the ability of jurors to perform their duties. In Honken, there were numerous examples of the phenomenon of jurors who agreed that they could "fairly consider" both life and death sentences in the abstract, but quickly acknowledged that they could only consider one penalty in a case involving certain facts. For example, in Honken, several potential jurors readily agreed that they could "fairly consider" both life and death sentences in the case if they found the defendant guilty. However, several of those same potential jurors stated that they were either doubtful that they could consider, or stated expressly that they could not consider, a life sentence if they found the defendant guilty of the murder of children. These responses highlight the ineffectiveness of purely ''abstract'' questions to probe, in these cases, whether or not a juror would be able to fulfill his or her duty to give fair consideration to both life and death sentences no matter what the facts are. See *Morgan*, 504 U.S. at 728.

*Id.* at 847-48. *See also*, *United States v. Fell,* 372 F.Supp.2d 766 (D. Vt. 2005) (explaining why *Morgan* requires questioning concerning jurors' ability to consider both life and death as possible punishments in the context of the actual case before them).

Attached as Exhibit A to this memorandum is a brief excerpt from the transcript of jury selection in a Virginia federal capital case, *United States v. Beckford et al.,* No. 3:96 CR 66 (E.D.Va. 1997), that exemplifies the problem that Judge Bennett described in *Johnson,* and shows just one of the many ways that a juror's death penalty views can "prevent or substantially impair" her ability to serve, and yet pass undetected. In this example, the juror responded affirmatively to both the trial judge's and prosecutor's questions about to her ability and willingness to consider aggravating and mitigating factors and her ability to follow the court's instructions, stating, "I think I would have to consider them, yes." She further stated that she would not impose death automatically, but "would consider both options, both sides," and could be "a fair and impartial juror." *Beckford,* Tr. 1273-1276. But she responded very differently when defense counsel listed for her the elements of the specific capital crime charged in the indictment:

> BY [Defense Counsel]: If the jury found one of the defendants, one or more of them, guilty of the following crime: A knowing, intentional, and unlawful murder in furtherance of a conspiracy to distribute crack cocaine . . . would you then, regardless of the aggravating or mitigating circumstances, believe that the death penalty was the only appropriate punishment for that crime?
>
> VENIREMAN: I think I would have to vote for the death penalty if it was a knowing crime, based on my religious beliefs, yes."

- 13 -

Q. Okay. That is based on religious beliefs?

VENIREMAN: Right.

Q. So that the crime that is at issue here you would believe that that would be the only appropriate punishment, am I correct?

VENIREMAN: Right.

* * *

BY [counsel for the government]: Ma'am, I think - - I want to understand, because I think your answer to my question and answer - -

VENIREMAN: He explained it to me I think a little better. He read the whole thing there, and I understood more about what the question was when he read it. I am having a little problem with aggravating and mitigating here, so I what he said, the whole crime, I can answer my question from that,

Q. That is fine . . . .

At this juncture, the prosecutor described aggravating and mitigating factors, and told the juror that he had earlier described the crime to her as defense counsel had, "that is, of an intentional, knowingly, unlawfully killing someone in furtherance of a drug punishment (sic). . . . Tr. 1279.  But the transcript actually shows that he had done no such thing.  Rather, he had simply described the crime as "murder in furtherance of the drug trafficking offense." Tr. 1276.   The prosecutor presumably knew the mental elements implied by his use of "murder," but it was clearly a mistake to assume this juror did, or that any other juror would.   And once this juror was clearly informed that she was being asked about the appropriate range of punishment *for intentional murder*, she restated her views in terms that persuaded even government counsel of her inability to serve:

- 14 -

VENIREMAN: Based on my religious beliefs, if it was a knowing crime, committed by someone who knew what they were doing, I would vote for the death penalty.

* * *

BY [counsel for the government]: Move to strike. Tr. 1277-1279.

The findings of the Capital Jury Project (CJP) show that the type of juror misunderstanding that surfaced in *Johnson* and *Beckford* is not rare but pervasive, and that it often goes undetected.  The CJP is a federally-funded research project involving in-depth interviews with hundreds of jurors who actually served on capital juries.  *See generally,* Valerie P. Hans, *How Juries Decide Death: The Contributions of the Capital Jury Project,* 70 IND. L. J. 1233 (1995).  CJP interviews with capital-case jurors in 11 states revealed that very large numbers of such jurors had been found qualified to serve—and actually rendered life-or-death decisions—despite views which should have caused their disqualification under *Morgan.* William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making,* 83 CORNELL L. REV. 1476, 1504 (1998).  For example, 912 former capital trial jurors were asked whether the death penalty was "the only acceptable punishment" for seven types of murder, as well as two other serious violent crimes.

Astonishingly, more than half of the jurors said that they believed that death was the only acceptable punishment for three of the seven kinds of murder: repeat murder, premeditated murder, and multiple murder. Nearly half of the jurors identified death as the only acceptable punishment for the killing of either a police officer or prison guard or for a murder by a drug dealer.  Almost a quarter of the jurors said that death was the only acceptable punishment for three of the remaining four crimes-- including rape without murder, for which the imposition of the death penalty would be unconstitutional.  Only for a planned murder in which the victim survives did

- 15 -

decidedly fewer than one in four jurors (15.7%) say that death was the only acceptable punishment.

*Id.,* at 504-505 (footnotes omitted).

It is also worth noting that these large cohorts of jurors who believed only death to be an acceptable punishment were not "balanced out" by jurors at the other end of the spectrum—that is, by jurors who were allowed to serve despite believing that *life imprisonment* was the only acceptable punishment. Rather, the CJP researchers found that number of jurors who held such hard-and-fast pro-life views was vanishingly small— between 2.2% and 7.6% for each of the seven categories of murders. *Id.,* at 1505. This indicates that the capital jury selection process has been much more effective at identifying and removing jurors who are biased in favor of life than at identifying jurors with disqualifying pro-death biases under *Morgan.*

It is sobering, to say the least, that so many capital trial jurors entertained disqualifying beliefs in favor of the death penalty despite having undergone voir dire examination, and having sat through trial, jury instructions, and sentencing deliberations. Even more disturbing is that these undetected biases have been shown to line up with the actual sentencing rationales offered by many jurors. In a follow-up analysis of interviews with 240 jurors in six states who had actually imposed death sentences, more than 40 percent told CJP researchers that they regarded the death penalty in the cases on which they served to be *required by law* once the prosecution had proved one or another aggravating factor. Ursula Bentele & William J. Bowers, *How Jurors Decide On Death: Guilt Is*

- 16 -

*Overwhelming; Aggravation Requires Death; And Mitigation Is No Excuse,* 66 BROOK.

L. REV. 1011, 1071-1073 (2001).  Such evidence—and the CJP findings have been repli-

cated in state after state—underscores the necessity for probing voir dire examination to

ensure that no juror is seated despite a categorical belief that only one of the two statuto-

rily-authorized punishments is ever acceptable for the crimes charged in this case.

3.   **The unique features of juror death-qualification and life-qualification justify (a) special instructions to orient prospective jurors to the capital sentencing process, and (b) a reasonable opportunity for attorney-conducted voir dire questioning.**

**(a) <u>Preliminary instructions.</u>**   The foregoing discussion of the complexities of jury se-

lection in a capital case shows why jurors must be fully oriented to the capital legal pro-

cess *before* they are questioned about their ability to carry out their responsibilities in that

process.  To that end, defense counsel has reached agreement with the government con-

cerning a set of proposed pre-voir dire instructions that the parties are jointly submitting.

**(b) <u>Attorney participation in voir dire questioning.</u>**   Although attorney participation in

voir dire questioning is rare in federal courts throughout the nation, the practice is com-

monplace in federal *capital* cases.  In fact, federal judges have permitted attorney-

conducted questioning of prospective jurors in the large majority—over 80 percent—of

death penalty cases to have been tried in the post-*Gregg* era.  Exhibit B, Declaration of

Kevin McNally Regarding Jury Selection Practices at 5 (Aug. 14, 2014) (stating that fed-

eral courts permitted attorneys to question jurors in 186 of 227 capital trials to date).  The

authors of the Federal Judicial Center's *Resource Guide for Managing Capital Cases*

(rev. 2004) likewise report:

> Judges in death-penalty cases have taken a number of approaches with re-
> spect to allowing attorney participation in the voir dire process. Most have
> allowed attorney participation in some form, even if this is not their stand-
> ard procedure in criminal cases. Most frequently, judges allow attorneys to
> question the jurors directly, often placing a time limit on the questioning of
> each juror.

*Resource Guide* at 35 (http://www.fjc.gov/library/fjc_catalog.nsf).

This near-complete reversal of the federal courts' usual approach to attorney-

conducted voir dire likely reflects that the usual objections to such questioning—that

lawyers waste time and try to "indoctrinate" jurors with their view of the case—have

much less force in capital cases.  Simply put, there is no time to waste, and the parties'

need to probe and test jurors' actual beliefs and views concerning capital punishment is

too pressing for counsel to get off-track.  As the *Beckford* transcript excerpt illustrates,

biases concerning capital punishment can be difficult to bring to the surface.  Jurors often

struggle to identify and articulate what their true feelings are, and disqualifying attitudes

can be hidden by common misunderstandings of the sentencing process.  A very high-

profile case such as this one, moreover, presents additional challenges, including the risk

that some prospective jurors will be motivated by self-interest or a desire to see a particu-

lar verdict or sentence.   While no system for screening jurors will ever be foolproof, *see*

*United States v. Sampson*, 820 F.Supp.2d 151 (D. Mass. 2011) (juror's dishonest re-

sponses on voir dire required court to order new capital sentencing trial), allowing coun-

sel for the parties a brief opportunity to probe jurors' views directly enhances the likelihood that any disqualifying biases will be detected in time.

The ability to question jurors directly also enhances the usefulness of peremptory challenges. The very large number of additional challenges allotted in capital cases by Rule 24(b) (40 in all, rather than the 16 allowed in non-capital felony cases) would have much less utility if the parties were unable to probe the views of prospective jurors in some efficient but direct manner. It is interesting to note in this connection that when Congress disapproved a 1977 Supreme Court proposal to amend Rule 24(b) to equalize the number of challenges in felony cases, its expressed rationale rested in large part on the general unavailability of attorney-conducted voir dire in the federal courts:

> The Committee has concluded that changes to Rule 24 should be studied further by the Judicial Conference. The basic problem seems to be in the voir dire procedures. The testimony before the House Subcommittee on Criminal Justice indicates that in most Federal courts the judge conducts voir dire. Only rarely are counsel permitted to question prospective jurors directly. Witnesses indicated that this makes it difficult for counsel to identify biased jurors and develop grounds to challenge for cause. The committee believes the Judicial Conference should have the benefit of the comments that have been made on this rule since it was submitted to Congress in deciding whether to make such a change in the future.

Senate Report No. 95-354, 95th Cong., 1st Sess., 1977 WL 16013, at 16-17 (July 20, 1977); *accord, United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977) ("Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes."). The issue has not been revisited since. Although Congress apparently viewed the lack of attorney questioning of jurors as

- 19 -

a sufficient reason to retain the 10-6 defense advantage in peremptory challenges, no such advantage exists when the government seeks the death penalty.  *See* DE ___, *Defendant's Motion for Extra Peremptory Challenges* (filed Dec. 1, 2014).  Thus in capital cases, the need for counsel to intelligently exercise peremptory challenges further weighs in favor of permitting attorney participation in voir dire.

Finally, the Supreme Court has cited the ability of defense counsel to participate in voir dire questioning as evidence of the fairness of the process, and of the reliability of the trial judge's eventual rulings on cause and venue challenges.  *E.g., Wainwright v. Witt,* 469 U.S. at 434-435 (defense counsel's decision not to question anti-death penalty juror supports inference that she was properly excused); *Skilling v. United States,* 561 U.S. at 372, 374, 388 n. 22, 389 (noting, as evidence of the adequacy of the voir dire examination, that trial court allowed counsel to pose follow-up questions to prospective jurors).  Allowing brief attorney-conducted questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias, and creates a more reliable record for appellate review.   For all these reasons, attorney-conducted voir questioning in very highly-publicized capital cases ultimately makes the jury selection process more rather than less efficient, and should be allowed in this case.

Dated:  December 1, 2014                    Respectfully Submitted,

                                            DZHOKHAR TSARNAEV
                                            By his attorneys

- 20 -

/s/      David I. Bruck

Judy Clarke, Esq. (CA Bar# 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET
David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 458-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2014.

/s/ David I. Bruck