UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13-CR-10200-GAO |
| v. | ) | |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

## MEMORANDUM IN SUPPORT OF SECOND MOTION
## FOR CHANGE OF VENUE

The 2013 Boston Marathon and its aftermath have received extensive local media coverage.  This coverage, including "leaks" of non-public information attributed to law enforcement, has continued through the present time.  The steady flow of reminders, whether factual or emotional, evoke memories of horrific events personally experienced by the prospective jurors in this case.  The crimes charged in the indictment are understood by the public at large and will be expressly depicted in the government's trial presentation as having victimized not only those persons killed and injured, but also the Marathon, Marathon spectators and participants, the City of Boston, the communities through which the Marathon passes, and the communities, such as Watertown and Cambridge, impacted during the search for the perpetrators.

The nature and extent of the impact of the Marathon bombings and related events and the pretrial publicity engendered by those events require a change of venue if Mr. Tsarnaev is to receive the "fair trial by a panel of impartial, 'indifferent' jurors" guaranteed by the United States Constitution.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

**Argument**

A change of venue is required on motion of the Defendant if "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States,* 561 U.S. 358, 378 (2010). As *Skilling* reaffirmed, this entitlement is a "'basic requirement of due process.'" *Id.* (quoting *In re Murchison*, 249 U.S. 133, 136 (1955)). In addition, Fed. R. Crim. P. 21(a) obliges a trial court to transfer proceedings to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

The defense brings this second request for a change of venue because the need for such a change has increased, due in part to continuing prejudicial publicity and leaks, since the first motion was filed last July. In *Skilling*, after the defendant's initial motion for change of venue was denied, juror questionnaires were returned and a codefendant pled guilty. The defendant then renewed his request for a change of venue arguing that questionnaires revealed bias, and that the news accounts of the plea further tainted the jury pool. *See Skilling*, 561 U.S. at 370-73. The Fifth and Sixth Amendment guarantees of due process and a fair trial by an impartial jury can only be effectuated if courts monitor new threats to the fairness of the proceedings as they arise. Here, as in *Skilling*, additional new publicity and leaks necessitate a second look. The nature, scope, and extent of that pretrial publicity must be evaluated and weighed again in conjunction with all of the factors that threaten Mr. Tsarnaev's due process and fair trial rights.

## I.    THE NATURE AND EXTENT OF CONTINUING PRETRIAL PUBLICITY REQUIRE A CHANGE OF VENUE.

Extensive pre-trial publicity, both that submitted with the prior motion for change of venue (DE 46,  Ex. 2a) and that submitted with this motion (Ex. 1 (Declaration of Josie Smith) and attachments, Ex. 1a (search terms), Ex. 1b (more recent *Boston Globe* log and articles), and Ex. 1c (more recent *Boston Herald* log and articles)), supports the conclusion that a fair and impartial jury cannot be selected in the Eastern Division of the District of Massachusetts.

The *Boston Globe* coverage of the Boston Marathon bombing and its aftermath from April 16, 2013 to July 11, 2014, and its impact on Mr. Tsarnaev's ability to obtain a fair trial in the District of Massachusetts were presented to the Court and discussed in DE 461 and its attachment and exhibits.[1]   That submission included emotionally-charged coverage and reports of inculpatory statements by the defendant that will not be presented in the government's case in chief.

More recent  pre-trial publicity repeats many of these matters and further includes reports on proceedings resulting in the convictions of  Mr. Tsarnaev's friends, who were charged with removing evidence from his dorm room and lying to law enforcement (*see,*

---

[1] The government's surreply to the defendant's first venue motion [DE 512] contained a lengthy attack on Dr. Bronson and his methodology, and also included the results of media searches conducted by some unidentified person at the government's behest.  The government's critique of Bronson and his methodology was based on factually erroneous and misleading premises and the government's own searches were seriously flawed.  The declaration of Josie Smith (Ex. 1) addresses in detail the government's media-search methodology, and explains how the articles used by Dr. Bronson were collected.  The declaration of Dr. Neil Vidmar (Ex.2) defends the methodology employed by Dr. Bronson.

*e.g.*, Ex.1b, *Boston Globe* articles 25, 26, 74, 77, 80, 81, 84, 92, 94-97, 102, 107, 109-111, 129; Ex.1c, *Boston Herald* articles 15-17, 53-55, 57-59, 62-64, 66, 68, 74-77).  It also includes  reports on the Marathon bombing's impact on victims and the City of Boston and the recovery of victims (*see, e.g.,* Ex.1b, *Boston Globe* articles 2, 3, 8, 13, 32, 37, 38, 46, 138; Ex.1c, *Boston Herald* articles 8, 26, 33, 41, 67, 93); reports of legal proceedings in this case (*see, e.g.,* Ex.1b, *Boston Globe* articles 1, 11, 15, 27, 31, 56, 65, 98, 106, 108, 133, 141; Ex.1c, *Boston Herald* articles 23, 27, 37, 45, 60, 65, 90, 94); and references to the Marathon bombing in articles more directly concerned with other matters.

Notably among the recent coverage, one article links the Marathon bombings to the terrorist attacks of September 11, 2001.  *See* Ex. 1b, *Boston Globe* article 45.  Another article, commentary, castigating the defense for filing the earlier motion for change of venue, notes that "many [of the people near the finish line] still suffer with the physical and emotional aftermath of the attack that day in April 2013." Ex. 1b, *Boston Globe* article 67.

In addition to the coverage from the *Globe* and the *Herald* compiled by the defense, this Court can take judicial notice that the Marathon bombings and related events (including the cases and charges brought against others for obstruction of justice and lying to authorities in connection with the investigation) also have received extensive attention on television, radio, and in other electronic and social media.  Some of this local coverage recently has connected the Marathon Bombings to other current "hot button" events, including the threat believed to be posed by the group known as the Islamic State

in Iraq and Syria ("ISIS") and by implication the atrocities, including graphic beheadings widely disseminated on video, that ISIS has perpetrated against civilians.  *See, e.g,* <http://www.wcvb.com/news/military-syria-airstrikes-stop-imminent-threat-of-attack-in-us/28229230>  (segment from the WCVB 6:00 p.m. news on September 24, 2014 linking the Marathon bombing and Tsarnaev to ISIS).

All of these media references serve to keep the Marathon bombings and subsequent events fresh and raw in the public consciousness.  For the reasons first set forth in the Declarations of Edward Bronson (attached to DE 461) and Neil Vidmar (attached hereto as Exhibit 2), the continuing adverse pre-trial publicity and effects of the events at issue in this case give rise to a presumption of prejudice requiring a change of venue.

Social science research has shown that potential jurors exposed to extensive pretrial publicity develop a "story model," that is, a framework or theory of events through which subsequent information is filtered.  *See* Bronson Decl. (attachment to DE 461), ¶¶ 14-17, Vidmar Decl. (Ex. 2).  A person who has developed a story model of the defendant's guilt based on exposure to pre-trial publicity will be less likely to consider evidence at trial in a way that conflicts with that previously-developed story of guilt. The prevailing "story" of guilt in this case recently has been reinforced by the widely-reported convictions and guilty plea of three of defendant's friends who were charged with obstructing justice and lying to investigators.

Studies have demonstrated the impact of pretrial publicity in a number of contexts. A recent study, Tarika Daftary-Kapur, et al., "Examining Pretrial Publicity in a Shadow

Jury Paradigm: Issues of Slant, Quantity, Persistence and Generalizability," 38 Law and Hum. Behav. 462 (2014), examined the effect of pretrial publicity in a manslaughter case in New York involving a police shooting resulting in the death of one of three persons in a car.  The case had generated extensive pretrial publicity and was emotionally charged because the victims were African-American and Hispanic.  The study involved both a shadow jury tracking the criminal trial as it proceeded in New York City and a mock jury in Boston that received manipulated exposure to the pretrial publicity naturally occurring in New York.  Some received pro-prosecution publicity; some received pro-defense publicity.  All participants received the same trial summaries in Q/A format as the case was presented.

The study found that:

1) "[t]here was a significant effect of slant of PTP [pretrial publicity] on decision making in both the natural and controlled exposure conditions. Specifically, those exposed to proprosecution oriented PTP tended to be more punitive in their guilt ratings as compared with those exposed to prodefense oriented PTP.…[D]espite admonitions, participants wittingly or unwittingly were biased by the content of the PTP in their decisionmaking….The results speak to the strong biasing effect of pretrial publicity."

2) "the greater the quantity of exposure (for both naturally and experimentally manipulated exposure) the more biasing the effects.  This provides support to the claim that the more expansive the PTP coverage, the greater the effect on potential jurors."

3) "PTP effects [from PTP experienced up to 14 months prior to trial for the natural exposure participants] persisted throughout the course of the trial", "presentation of trial evidence does not eliminate a PTP effect that continues to persist in the face of the evidence.", and "jury instructions…failed to protect against PTPs influence in this study."

*Id.* at 474.

A meta-analysis of 44 empirical tests representing 5,755 subjects examined the effect of pretrial publicity on juror verdicts.  *See* Nancy M. Steblay et al., "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review," 23 Law and Human Behavior 219 (1999).  The analysis concluded that "[t]he data support the hypothesis that negative pretrial publicity significantly affects jurors' decisions about the culpability of the defendant.  Jurors exposed to publicity which presents negative information about the defendant and crime are more likely to judge the defendant as guilty than are jurors exposed to limited PTP." *Id*. at 229.  It also  stated that "[o]f particular importance in change of venue motions is the jurors' prejudgment of the defendant at pretrial; the data show the greatest PTP effect at this point in time….The second point of measurement (posttrial but before jury deliberation) still revealed a significant impact of PTP, though with a reduced effect size.  The third and final point – the final and postdeliberation verdict – is the ultimate issue in any case.  Here the data support the existence of continued PTP effects at this crucial time." *Id*.

While the data did not directly address remediation of PTP effects, "the few data sets available here suggest that proposed remedies of brief continuance of the case, expanded voir dire, judicial instruction, trial evidence or jury deliberation do not provide an effective balance against the weight of PTP."  *Id*. at 230.  This conclusion was supported by a review of remediation literature by others.  *See id*.

The analysts also concluded that their meta-analysis provided "indirect support for the story model…through the persistent PTP effect throughout trial proceedings and jury

deliberation." *Id.* at 231.  The story model "provides a context for understanding the persistence of PTP effects, suggesting that negative publicity provides not just isolated fragments of information, but a belief framework about defendant culpability.  This biased schema then directs the juror's attention and provides a filter through which subsequent evidence is perceived." *Id.*

Here, the story model generated by the pretrial publicity is one of guilt, complete with reports of admissions by the defendant and convictions of his friends in related cases.  In denying a prior motion for change of venue, this Court noted the passage of time between the crime and the trial and the diminished media coverage during that time as a factor decreasing the need for a change of venue.  *See* DE 577 at 10.  However, the impact from the development of a story-model based on the initial flush of pre-trial publicity remains notwithstanding the passage of time.  Moreover, as noted, significant publicity with potential impact on the jury venire continues to the present and consistently reinforces the existing story framework.

## II.   THE NATURE AND SCOPE OF VICTIMIZATION SUPPORT A CHANGE OF VENUE.

The effect of the extensive pretrial publicity, much of it emotionally charged, is exacerbated by the scope of the impact of the bombing and its aftermath.  The victims in this case are not limited to those killed or injured or their families, friends and acquaintances.  The offenses charged here are widely viewed as an attack on the City of Boston and the Boston Marathon, an event described by the Boston Globe as the "most iconic sporting event" in the city.  *See* DE 461, Ex.2a, article 644.  The aftermath of the

bombing also had a direct and dramatic effect on the cities of Watertown and Cambridge, their residents, and those involved in the events in those locations. It impacted Marathon spectators and their families, friends, and acquaintances. It impacted those who treated and cared for the injured. All of these persons, places and events should be viewed as victims in this case. Just as a defendant charged with killing an individual would not be tried by a jury including relatives, friends, and acquaintances of the victim, and people connected to the events that resulted in the killing, so, here, such a substantial portion of the Eastern Division of the District of Massachusetts has been victimized by the attack on the Marathon and the related events or is connected to those victimized, that the effect on the jury pool requires a change of venue.

The notion of nearly universal local victimization is not merely theoretical. Indeed, the government has disclosed that one of its expert witnesses will testify, in substance, that the Marathon bombings and their aftermath have inflicted tangible injury on the entire local population, especially children:

> We expect [the expert] to . . . describe clinical phenomena that demonstrate the terrifying impact that the defendant's actions had upon the community. [The expert] will first describe generally the impact of terrorism and catastrophic events on children. For example, [the expert] will describe that likely PTSD symptoms typically increase among children who have been impacted by a catastrophic event. The intensity and duration of the events, as well as the manner in which responsible adults deal with the event, affect the types of symptoms manifested. In this case, all of these factors were extraordinarily traumatic. [The expert] will further explain that although most children develop mechanisms to outgrow or overcome these experiences, many, especially those who have previously experienced trauma, become especially vulnerable. [The expert] is expected to explain how, statistically, even modest symptoms of PTSD, for a child, lead to dramatically different outcomes upon matriculation and on social,

academic, professional and overall adjustment gauges as compared to children without such symptoms.

[The expert] will present the findings of his work related to the impact of the Boston Marathon and Watertown events. For example, [the expert's] team surveyed families in the Boston area, including Watertown and Dorchester, as relates to the behaviors and symptoms evident in students who were exposed in some way to the events of the week of April 15, 2013. The survey found significantly increased exhibition of likely PTSD symptoms among school aged children.
. . . .

Based on his training and experience as well as the studies he has conducted and reviewed, [the expert] is expected to opine that the defendant's selection of manner and means of committing the instant crimes will continue to traumatize individuals for years to come and that many will be permanently compromised by the defendant's actions.

Ex. 3 (Government letter dated August 1, 2014, filed herewith under seal).  Put another way, the government will elicit evidence at trial that every juror, and in particular every child close to every juror, who was "exposed *in some way* to the events of the week of April 15, 2013" is an actual victim of the charged offense facing a "significantly increased risk" of serious mental health consequences that "will continue to traumatize [them] for years to come" and will leave many "permanently compromised."  It is difficult to conceive how a juror confronted with such testimony could possibly remain impartial.[2]

The nature and scope of victimization here, coupled with the pretrial publicity, compel a change of venue.  While the Court in *Skilling* rejected the defendant's claim that the impact of hostility towards him in Houston, coupled with extensive pretrial publicity

---

[2] Whether or not the court permits such testimony trial, the underlying fact remains that, even in the government's view, every prospective local juror is an actual victim of the charged crimes.

required a change of venue, it noted that only 12.3% of Houstonians contacted in a survey named Skilling in a list of Enron executives they believed guilty, 43% had never heard of him; and 23% associated his name with Enron but reported no opinion about him.  *See* 561 U.S. at 382, n. 15.   Here, in contrast, 88.6% of those surveyed recognized the name Dzhokhar Tsarnaev; 57% believed he was definitely guilty and 34.5% believed he was probably guilty.  *See* DE 461, Ex.4f.

Moreover, in this case, the victimization of the city of Boston and the surrounding communities arising from the bombing at the Boston Marathon is much greater in both extent and kind than was the alleged victimization of Houston arising from a corporate bankruptcy.  The *Skilling* Court also noted that the news stories there contained "no confession or other blatantly prejudicial information." 561 U.S. at 382.  Here, the news stories did contain that kind of blatantly prejudicial information.  The *Skilling*  Court also noted that four years had passed between Enron's bankruptcy and Skilling's trial.  *See id*. Here trial is scheduled for approximately twenty-one months after the Marathon events and their immediate aftermath.

The defense submits that the analysis employed by the court in *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla.1996),  is more appropriate to the facts of this case,  and that employing that analysis here demonstrates that a change of venue should be granted, as it was in *McVeigh*.  *McVeigh* involved the bombing of the Murrah Federal Office Building in Oklahoma City.  That attack initially generated extensive publicity both nationally and in Oklahoma.  The publicity in Oklahoma, including "continuing coverage of the victims and their families" continued for a longer period of time after

national coverage abated.  *Id*. at 1471.  So, too, here.  "The Oklahoma coverage was more personal, providing individual stories of grief and recovery." *Id*.  So, too, here.[3]  The "Oklahoma family" was "a common theme in the Oklahoma media coverage, with numerous reports of how the explosion shook the entire state, and how the state has pulled together in response." *Id*.  Here, "Boston Strong" became a rallying cry, a civic response embraced by Boston's sports teams along with civic figures and the general population.[4]

Here, as in *McVeigh,* the strong emotional and community response evidenced in the pretrial publicity demonstrates that potential jurors from the Eastern Division of the District of Massachusetts can only be presumed to feel a personal stake in the outcome. As in *McVeigh,* a change of venue is required to provide Mr. Tsarnaev with a fair trial by an impartial jury.[5]

---

[3] Here, as in Oklahoma, media coverage has, from the beginning to today, reported extensively on individual stories of grief and recovery.  *See, e.g.,* DE 461, Ex.2a: 4, 5, 8, 46, 48, 49, 80, 109, 110, 158, 176, 296, 329, 342, 343, 396, 398, 413, 528, 571, 619, 774, 802, 926, 996, 1925, 1033, 1077, 1209, 1390, 1455, 1721, 1727, 1792, 2996, 2029, 2102, 2012, 2151, 2159, 2166, 2204, 2207, 2256, 2257, 2325; Ex.1b: 32, 37, 131, 138;  Ex.1c: 33, 41.

[4] "Boston Strong" has a Wikipedia page, is found on many types of merchandise, and has been repeatedly referenced in the news coverage.  *See, e.g.*, http://en.wikipedia.org/wiki/Boston_Strong; http://www.bostonstrongbracelet.org; http://www.cafepress.com/+boston-strong=gifts?utm_campaign=AKE-I-D&utm_content=search; DE 461, Ex. 2a: 138, 230, 241, 246, 252, 344, 375, 429, 430, 489, 523, 537, 580, 583, 683, 802, 822; Ex. 1b: 104, 143; Ex. 1c: 69, 84.

[5]   In rejecting an analogy to *McVeigh* in a case involving a defendant charged with perjury arising from his grand jury testimony denying he knew the name of  one of the 9/11 hijackers he had seen in the company of another 9/11 hijacker whom he testified he had met in San Diego and last seen in December 2000, and denying handwriting of that

### III.    Public Opinion Supports a Change of Venue.

The survey data discussed in Dr. Bronson's Declaration [DE 461 attachment] further supports a change of venue, finding the following percentages of persons interviewed in the Eastern Division of the District of Massachusetts who believe the defendant was guilty; should receive the death penalty if guilty; participated in, or knew someone who participated in the 2013 Boston Marathon; ever participated in or attended the Boston Marathon:

| Def. Guilty | Death Penalty | Partic./ knew 2013 | Ever Partic. |
|---|---|---|---|
| 57.9% | 37.0% | 51.9% | 49.3% |

This compared with the following percentages from the Western Division of the District of Massachusetts, the Southern District of New York and the District of Columbia:

| | | | | |
|---|---|---|---|---|
| W.Div. MA | 51.7 | 35.0 | 19.0 | 16.7 |
| S.D.N.Y. | 47.9 | 27.6 | 9.4 | 7.8 |
| D.C. | 37.4 | 19.0 | 11.8 | 5.6 |

### IV.    Voir Dire  Cannot Assure Selection of a Fair and Impartial Jury.

In denying the earlier motion for change of venue, this Court stated that voir dire will be adequate to identify prejudice during jury selection.  *See* DE 577 at 6.  The

---

name in his examination book was his, the court stated: "If [defendant] was actually charged with participating in the September 11 attacks, it is possible to imagine that the prejudice in this case would be comparable to the community scrutiny and outrage that justified a change of venue in *McVeigh*.  But [defendant] is charged with perjury, not terrorism, and this fact distinguishes his case from the *McVeigh* matter." *United States v. Awadallah*, 457 F.Supp.2d 246, 252 (S.D.N.Y. 2006).  Here, of course, Mr. Tsarnaev *is* charged with terrorism.

efficacy of voir dire as a safeguard against the impact of prejudicial pretrial publicity has been questioned in many social science studies.  *See, e.g.,* Christina A. Studebaker and Steven D. Penrod, "Pretrial Publicity The Media, the Law, and Common Sense", 3 Psychology, Public Policy, and Law 428,440-442 (1997); *see also* Bronson Decl. (attachment to DE 461) and Vidmar Decl. (Ex.2).

        The First Circuit has also questioned the adequacy of voir dire as a safeguard against the effect of pretrial.  In *United States v. Delaney*, 199 F.2d 107 (1st Cir. 1952), the Collector of Internal Revenue for the District of Massachusetts was indicted for receiving bribes and other offenses. This "occasioned widespread publicity in the public press, particularly in the Boston area." *Delaney*, 199 F.2d at 109.  During the course of the proceedings, a Congressional investigation into corruption in Collectors' Offices took evidence about the Boston office and Delaney, including information about matters for which Delaney had not been charged.  The Boston press also covered these hearings extensively.  The coverage "thoroughly blackened and discredited" Delaney's character prior to trial.  *Id*. at 111.  Delaney's motions for a continuance based on prejudicial pretrial publicity were denied.  *See id*. at 111-112.  He went to trial and was convicted. The First Circuit reversed, finding the district court abused its discretion in denying the requested continuances.  In so doing, the court recognized the inefficacy of voir dire as a cure, stating:

>  No doubt the district court conscientiously did all he could, both in
> questions he addressed to the jurors at the time of their selection and in
> cautionary remarks in his charge to the jury, to minimize the effect of this
> damaging publicity….But,[quoting Justice Jackson]… "The naïve
> assumption that prejudicial effects can be overcome by instructions to the

jury all practicing lawyers know to be unmitigated fiction."…One cannot
assume that the average juror is so endowed with a sense of detachment, so
clear in his introspective perception of his own mental processes, that he
may confidently exclude even the unconscious influence of his
preconceptions as to probable guilt, engendered by a pervasive pre-trial
publicity.

*Id.* at 112-113.

Here, for the reasons discussed by the First Circuit and by contemporary scientific
researchers, this Court should reconsider its conclusion that voir dire can cure the effects
of the extensive prejudicial pre-trial publicity generated by the Marathon bombing and its
aftermath.

## Conclusion

For the foregoing reasons, as well as those set forth in prior filings, this Court
should grant Mr. Tsarnaev's motion for a change of venue to an appropriate location
outside the District of Massachusetts.  The Court should hold a hearing on this motion
and to determine the district of transfer.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

*/s/   William W. Fick*

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall

Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2014.

*/s/ William Fick*