UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 01-10384-MLW |
| | ) | |
| GARY LEE SAMPSON | ) | |

## ORDER CONCERNING GRAND JURY DISCOVERY

WOLF, D.J.                                    November 14, 2014

For the reasons stated at the November 12, 2014 hearing, it is hereby ORDERED:

1.   The Government's Motion for Reconsideration of Portion of Court's August 19, 2014 Discovery Order (Docket No. 1505) is DENIED.

2.   The government shall, by November 14, 2014, comply with paragraph 4(b) of the August 19, 2014 Order Memorializing Decisions at the August 12 and 14, 2014 Hearings (Docket No. 1505).  Specifically, the government shall produce to Sampson the transcript(s), if any, of the instructions to the grand jury that returned the Second Superseding Indictment, including but not limited to any instruction(s) that the special findings would make Sampson eligible for the death penalty.  If the government did not instruct the grand jury that the special findings would make Sampson eligible for the death penalty, it shall so state.  The government shall simultaneously file its response with the court, under seal.

3. Sampson shall, by December 8, 2014, file a supplemental memorandum concerning his Motion to Strike the Death Notice for Failure to Inform the Grand Jury of the Consequences of Its Special Findings (Docket No. 1436) or state that the Motion to Strike is withdrawn. If he files a supplemental memorandum, Sampson shall address the appropriate remedy for any alleged violation of his rights.

4. The government shall file any reply by December 22, 2014.

5. Sampson shall file any sur-reply by January 6, 2015.[1]

6. The attached June 10, 1976 testimony of Attorney General Edward Levi, to a Subcommittee of the House Judiciary Committee, regarding Grand Jury Reform is provided to the parties for their consideration.

UNITED STATES DISTRICT JUDGE

---

[1] January 6, 2014 may be several days later than the deadline stated in court.

2



# Department of Justice

FOR RELEASE UPON DELIVERY
THURSDAY, JUNE 10, 1976

STATEMENT

OF

THE HONORABLE EDWARD H. LEVI
ATTORNEY GENERAL OF THE UNITED STATES

BEFORE

THE HOUSE JUDICIARY COMMITTEE
SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, AND INTERNATIONAL LAW

ON

GRAND JURY REFORM

10:00 A.M.
THURSDAY, JUNE 10, 1976
RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, D.C,

Mr. Chairman and Members of the Subcommittee

I am pleased to respond to your invitation to address this subcommittee in connection with its consideration of your bills, H.J. Res 46 and H.R. 1277, and other proposals to alter federal law with respect to grand juries.

The grand jury has long been an important institution in the criminal justice system. Recently in this country it has come under attack, as it has at other times and in other places. Recent proposals concerning the grand jury have ranged from its abolition (following the British example) or its modification in ways that would fundamentally alter its character to reforms that would serve to protect grand jury witnesses while not altering the core of the grand jury process.

The goals to be served by suggested reforms are diverse and in some respects inconsistent. There is the proper desire that investigations, particularly where there is a nearness to first amendment rights, be limited in such a way as to protect fundamental political and civil liberties. On the other hand there is concern about the growing crime rate and the problem of developing mechanisms and investigative techniques in the criminal justice system to cope with it and ultimately, it is hoped, bring the increase to a halt. Finally, in this era which goes by the name post-Watergate, there is a

- 2 -

particular concern with white collar crime and official corruption, matters in which the grand jury serves an extraordinarily important function.

These diverse concerns are reflected in the diverse nature of suggested grand jury reform. On the one hand, there are proposals that would impose upon grand jury proceedings safeguards of individual rights to remain silent and to be represented by counsel now required at trial or during interrogations by police. On the other hand, there are proposals to unfetter the grand jury and to increase its power as an investigatory unit. It has been suggested, for example, that special prosecutors independent of the executive branch be made available to grand juries and supervising judges and that such prosecutors be empowered to command the assistance of investigative agencies.

A review of how the grand jury squares with our constitutional principles is unquestionably desirable. Since federal courts have not relinquished their jurisdiction over grand juries, we must recognize that the issues that are of concern to this committee have also been of continuing and recent concern to the United States Supreme Court, which has spoken to many of them and which has emphasized the supervisory function of the courts. This, of course, does not excuse the Congress and the executive branch of their responsibility to consider the issues, but the analysis of the Supreme Court can be of considerable help in the task.

- 3 -

The recent concern about the grand jury, with its diversity of perspectives and goals, develops out of a double function assumed by that institution during its development in Anglo-American legal history.

Historians are generally agreed that the grand jury began as an investigatory tool for the crown.  By the mid-fourteenth century the accusing jury, known as "le grande inquest," consisted of twenty-three members drawn from the county at large.  The grand jury system was originally based on the expectation that its members would have personal knowledge of the crimes committed in the areas in which they lived.  Societal changes made exclusive reliance upon the jurors' personal knowledge increasingly unfeasible, so grand jurors gradually began investigating charges laid before them by others, and this required the taking and weighing of testimony.

The protective role of the grand jury was in some ways a natural outgrowth of vesting the accusatorial and investi-gative functions of the criminal justice system in a body of ordinary citizens.  As early as the fourteenth century, legislation provided that no man could be held to answer for treason or any other capital crime except upon accusation of the grand jury.  It was not until some three hundred years later, however, during the growth of regal power under the Stuarts, that the grand jury became highly prized as a safeguard

- 4 -

against arbitrary prosecution.  In two widely acclaimed cases in 1681--one involving the Earl of Shaftsbury and the other Stephen Cooledge--grand juries refused to return treason indictments that had been sought by the crown.  By the end of the seventeenth century, the grand jury was firmly established as an important safeguard of the rights and privileges of English citizens and was among the institutions brought to this country by the colonists.

It was against this background that the fifth amendment to our Constitution was adopted, guaranteeing that "no person shall be held to answer for a capital, or otherwise infamous crime except on a presentment or indictment of a Grand Jury." The present federal grand jury retains many of the characteristic features of its English predecessors.  It operates in secret as an ex parte accusatory and investigative body free from the rules of evidence which apply at trial.

The rationale for the latitude accorded to the grand jury derives from its special and  traditional role in the criminal justice system.  Although the grand jury determines whether there is probable cause to hold an accused for trial, it is not itself the trier of fact.  Because the grand jury's inquiry is not an adversary proceeding, the procedural and evidentiary rules designed to bring about a fair verdict at trial have been considered largely unnecessary and irrelevant to the proper discharge of its functions.  Similarly, because

- 5 -

the grand jury's action stands at the initiation and not the conclusion of the criminal process, restrictions have been placed upon the litigation of issues involving the conduct of grand jury proceedings -- such as challenges to the type or sufficiency of the evidence upon which an indictment was based.  These restrictions are designed to avoid precipitating the adjudication of issues properly reserved for trial on the merits.

Moreover, the existence of the grand jury's plenary investigative powers cannot be separated from the fact that in general  it alone possesses such powers.  As the Supréme Court has noted, "the investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen."[1]/ Subpoenaing witnesses and documentary evidence, taking testimony under oath, and compelling testimony by providing immunity against its use in any subsequent proceedings are all basic steps in uncovering and prosecuting crime,but all, in general, are available to the government prosecutor in the investigative stage only through the grand jury.

The relationship between the investigative powers and the procedural role of the Grand Jury has been expressed by the Supreme Court.  "Because [the grand jury's] task is to inquire into the existence of possible criminal conduct, and to return only well founded indictments its investigative powers

- 6 -

are necessarily broad."2/  Its powers "must be broad if its
public responsibility is adequately to be discharged." 3/

The plurality opinion in the Supreme Court's recent
decision in United States v. Mandujano contains a succinct
summary of the grand jury's history and current role:4/

> The grand jury is an integral part of our
> constitutional heritage which was brought
> to this country with the common law.  The
> Framers, most of them trained in the English
> law and traditions, accepted the grand jury
> as a basic guarantee of individual liberty;
> notwithstanding periodic criticism, much of
> which is superficial, overlooking relevant
> history, the grand jury continues to function
> as a barrier to reckless or unfounded charges.

Since the grand jury's broad investigative powers are
for use in performing its particular functions, and since
secrecy is essential to the proper functioning of the grand
jury, restrictions have been placed upon the disclosure and
use of grand jury materials.  Under the rules and statutes
which generally govern disclosure of materials in the
possession of the government, defendants can obtain trans-
cripts of the grand jury testimony of prosecution witnesses who
testify at trial, as well as transcripts of their own testimony,
and any exculpatory materials.  Apart from these exceptions,
however, grand jury materials may be disclosed to persons other
than government attorneys and necessary personnel only by court
order upon a showing of some particularized need.  It has

- 7 -

been suggested that all grand jury materials should be made available to a defendant, or that a witness should be made available to a defendant, or that a witness should be entitled to receive a copy of a transcript of his testimony. But such a practice might be seriously prejudicial to those witnesses who, sometimes in fear of physical violence or even threats upon their lives, wish their cooperation to remain secret. It must be recognized that, if a transcript can be obtained as a matter of right, witnesses could be pressured into obtaining them so that those being investigated could see whether they had been implicated in the witness' testimony.

The disclosure of grand jury materials to government attorneys, authorized by Rule 6(e) of the Federal Rules of Criminal Procedure, is for the purpose of assisting the government attorney in conducting the grand jury investigation and any litigation related to the grand jury's inquiry. It is not designed to make grand jury materials available to other government agencies for use in pursuing investigations that are solely their own. At times it is necessary that grand jury materials be disclosed to government personnel other than attorneys to obtain assistance in evaluating that material. Particularly in cases of complex investigations involving complicated financial transactions and oftentimes massive documentary evidence, neither the grand jury nor the government attorney is likely to be capable of understanding or interpreting

- 8 -

evidence without the assistance of other experts. For
example, in tax investigations it is sometimes necessary to
obtain the assistance of Internal Revenue agents in order to
assess the tax consequences of particular transactions so as
to determine whether an indictment is warranted. In recognition
of the increasingly frequent need for technical assistance,
the Supreme Court has recently promulgated an amendment of
Rule 6(e) which provides that grand jury materials may be
disclosed, without court order, not only to government attorneys
but also to such other government personnel as are necessary
to assist the attorneys in performing their duties. In
instances where disclosure of grand jury materials to another
government agency is sought for reasons unrelated to the grand
jury's investigation, prior court approval must be obtained.

Until recent years, the only issues commonly raised
concerning the grand jury related to the central question of
whether the institution of the grand jury continued to perform
a sufficiently useful role in the criminal justice system to
warrant its retention. Following a century-long debate,
England abolished the grand jury in 1933. No state has
abolished the grand jury, but fewer than half presently
require grand jury indictment to initiate criminal charges.

- 8 a -

One argument which is made against the grand jury
is that it is so much under the thumb of the prosecutor
that it merely follows his wishes.  This overlooks some
historic examples where this has not been the case.   There
is an estimate that in only five percent of the cases
brought before a grand  jury will the jury disagree with
the prosecutor.  But five percent is a significant figure.
Moreover, experience indicates that prosecutors in the
formation of their own judgments will take into account the
reactions they perceive to exist among the grand jurors.

Another argument against the grand jury as it currently
functions is that individuals when they appear before it
do not have the same protection they would have in a
courtroom or in a police interrogation.

- 9 -

During the last twenty years, we have seen major develop-
ments in the law concerning the due process rights accorded to
suspects and defendants. Among them, the requirement of so-
called "Miranda warnings," the right to appointment of counsel,
and the exclusionary rule have focused attention on the question
of what is to be considered appropriate governmental conduct in
the investigation and prosecution of crime. As is reflected by
your proposals, Mr. Chairman, and the others before this committee,
questions have arisen whether modern concepts of due process re-
quire a reassessment of the rights accorded to grand jury witnesses.

The first and perhaps the most important issue is whether a
witness called before the grand jury should be granted rights to
refuse to respond to its inquiry beyond those accorded by the fifth
amendment privilege -- that no person shall be compelled in any
criminal case to be a witness against himself. This question must
be viewed in light of the realization that the fifth amendment
privilege itself reflects a balance which has been drawn between
a witness' need for protection, and society's need for information.
The witness summoned to appear before the grand jury is being for-
mally called upon to perform a long recognized duty of citizenship.
The duty of providing testimony has been regarded as "'so necessary
to the administration of justice' that the witness' personal inter-
est in privacy must yield to the public's overriding interest in
full disclosure." 5/

- 10 -

The fifth amendment privilege is an exception to "the longstanding principle that the public has a right to every man's evidence," a principle which is "particularly applicable to grand jury proceedings." 6/  On occasion, however, immunity provisions have for a considerable time filled the need of achieving a further balance -- some say implementing the balance -- between the individual's right not to provide information incriminatory of himself  and society's need for his information to pursue its investigation of the criminal activity of others.  The practice of providing immunity against the use of compelled incriminatory testimony has an unquestioned tradition in English legal history.  Certain offenses, such as bribery, are of such a character that the only persons possessing helpful knowledge thereof are oftentimes those who themselves are implicated in the offense. If the investigation of crime is not frustrated in such circumstances, there must be a means of both securing the citizen's privilege against compulsory self-incrimination and obtaining the necessary information.

Compelling a witness to testify under a provision of immunity has been the subject of criticism.  On the one hand, it is argued, that no form of immunity actually places a witness in precisely the same situation he would be in had he remained silent.  Against this it is urged that such an argument confuses the interests protected by the fifth amendment privilege with the effect of its assertion.  The privilege was designed to assure only that a citizen

- 11 -

is not "forced to give testimony leading to the infliction of penalties affixed to. . .criminal acts.'" 7/  The current federal compulsion statute has also been criticized on the ground that it affords so-called "use" rather than "transactional" immunity.  The labels of "use" and "transactional" immunity are oversimplifications.  The earliest statute, purporting to provide "use" immunity, protected the witness only against the direct use of the specific compelled testimony.  It did not prevent the use of that testimony to uncover other evidence against him.  This statute was held unconstitutional in 1892 on the ground that it did not protect the witness to the same extent as a claim of privilege would. 8 /  This Supreme Court decision and others that followed led to the belief that only a "transactional" immunity statute, prohibiting any prosecution for events the witness testified about under the grant of immunity, could square with the fifth amendment.  This view, however, was not taken by the Supreme Court, and the current federal statute has been upheld.  It provides the witness who is compelled to testify with protection against self-incrimination that is commensurate with that of the fifth amendment privilege.  It does so by providing for a total prohibition on the use of the witness' compelled testimony against him in any fashion, barring not only the use of the compelled testimony in evidence or as an investigatory lead but also the use of "any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." 9/  In the event of any

- 12 -

subsequent prosecution of an immunized witness, under this form of "use" immunity, the prosecution carries the heavy burden of proving that the evidence it will use is derived from legitimate sources wholly independent of the compelled testimony.

One might wish that our society were so structured that the investigation of crime could rely solely upon the wholly voluntary cooperation of citizens.  But it is not and has never been.  If the grand jury is to perform its historic function of investigating crime and returning only well founded indictments, it must have available to it compulsory process and the testimony of witnesses who sometimes are themselves involved in the matters under inquiry. Increasing the rights of witnesses to refuse to comply with a grand jury inquiry, whatever the merits of the suggestion, would serious- ly hamper the grand jury in its investigative efforts.

An additional question is whether the grand jury witness should affirmatively be informed of his fifth amendment rights. An affirmative reminder of a person's rights has been required in the context of custodial police interrogation, on the rationale that the circumstances of such interrogation are so potentially compulsive as to require that the privilege receive "practical reinforcement." 10/  The question of whether the Constitution requires that "putative defendants" called as grand jury witnesses be advised of their fifth amendment privilege or be given full "Miranda warnings" was recently before the Supreme Court in United States v. Mandujano. 11/  Although the case was decided on other grounds, four members of the Court joined in an opinion concluding that warnings need not be given to a grand jury witness who is

- 1 3 -

called to testify about criminal conduct in which he was per-
sonally involved. This opinion pointed out that the potential
for coercion which led the Court to require warnings in the con-
text of custodial police interrogation is not similarly present
in the setting of a grand jury's inquiry.

Underlying the argument for the imposition of a general
notification requirement is the premise that witnesses would be
less likely to volunteer potentially incriminatory information if
informed explicitly of their right not to do so. The question
is, do we wish in the circumstances of a grand jury to adopt a
policy of affirmatively discouraging witnesses from providing evi-
dence?

The question takes on different considerations with regard
to testimony by "targets" -- those whose conduct is itself the ob-
ject of the grand jury's investigation. Here there are specifica-
tions with respect to "fair play" because of the target's special
situation. Policy considerations may argue in favor of informing
such a witness that he is considered to be a target, that his
testimony may be used against him, and that he cannot be required
to incriminate himself. Such warnings are already given in many
districts as a matter of course. The Supreme Court has recently
agreed to hear two cases involving the question of whether such
warnings are required as a matter of constitutional law.

Closely related to these fifth amendment issues is the ques-
tion whether counsel should be permitted to accompany the witness

into the grand jury room. Advocates of such a position contend
that the presence of counsel is crucial to alerting the witness
to his rights. Under current federal practice, counsel must re-
main outside the grand jury room, but the witness is free to inter-
rupt his testimony to consult with his attorney as he desires.

Given the witness' ability to consult with counsel con-
cerning his testimony, barring counsel from the jury room itself
may then seem to be at best a meaningless formality and at worst
a device to isolate grand jury witnesses and dissuade them from
asserting their rights. But the restriction serves two important
interests. In the first place, the grand jury inquiry's continued
ability to function as an informal, non-adversarial proceeding would
be deeply affected by the presence of witnesses' counsel, even if
counsel were restricted solely to the role of advising their cli-
ents of their rights. Permitting counsel to accompany witnesses
into the grand jury room would introduce aspects of the adversarial
process into grand jury proceedings, but without the presence of
the judicial figure necessary to prevent adversarial proceedings
from becoming bogged down in interminable delay. The Supreme
Court has emphasized those likely consequences.

- 15 -

An equally important concern relates to violation of
the secrecy of the grand jury proceeding.  Not infrequently,
particularly in investigations of organized crime and of
business frauds and other white collar offenses, one attorney
represents several potential witnesses.  At times, counsel
is retained by the very organization whose activities are
under investigation to represent all persons connected with
an organization.  In such situations, the individual witness
may have relevant information and may be willing to cooperate
with the investigation.  But he may understandably not want
his cooperation to be known to the organization which has
retained counsel to represent him.  Under the present system
the witness is able to disclose to counsel as much of his
testimony as he chooses and to secure whatever advice he
deems necessary while retaining the important right to
conceal the extent of his cooperation or the fact that he
was required to supply evidence against others.  Were the
practice changed to admit counsel into the jury room, the
witness might feel less free to testify; as a practical
matter, he could not bar his attorney from the grand jury
room without his action being given the worst possible
interpretation by those who might wish that the investigation
be thwarted.

On a more general level one has to ask whether it is wise
to have the grand jury, either as an investigative body or a

- 16 -

protective screen, take on more and more of the aspects of a
trial.

It is, of course, impossible to detail all of the issues
which have been raised concerning the scope of the grand
jury's investigative powers and the rights of witnesses.  It
has been suggested  that witnesses should be given greater
rights to challenge the reasonableness of subpoenas or the
relevance of requested information; that the exclusionary rule,
although not constitutionally applicable, should be
legislatively applied to grand jury proceedings; and that
grand jurors should be restricted to acting upon legal and,
competent evidence.  All of these proposals are designed to
increase the rights of witnesses and defendants, and to restrict
the possibilities of abuse of the grand jury's investigative
powers.

But, as with questions concerning the role of the fifth
amendment in grand jury proceedings and the presence of witness
counsel in the jury room, any benefits to witnesses or the
accused must be balanced against the potential effect of the
proposed change upon the proper functioning of the grand
jury itself.

There are two primary disadvantages which one would hope
could be avoided in attempting to revise grand jury procedures:
increasing the potential for time-consuming litigation and delay
in pretrial proceedings, and decreasing the necessary

- 17 -

flexibility of the grand jury's investigative authority.   In considering any proposal for augmenting the rights of grand jury witnesses and the accused, the central inquiry must be how the basic goal can best be obtained without unnecessarily impeding the functioning of the grand jury or burdening the criminal process with a series of mini-trials unrelated to the proper determination of guilt or innocence.

The underlying role of the grand jury must also be remembered.  If we are to keep the grand jury, its effectiveness as an investigative body is extremely important.   As the Supreme Court has stated: [12]/

> The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and the over-zealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigation unhindered by external influence or supervision, so long as it does not trench upon the legitimate rights of any witness called before it.

This discussion is not meant to suggest that the grand jury's powers are not subject to abuse, or that measures should not be taken to prevent such abuse.  But the broad investigative powers of the grand jury serve a necessary function.   I would suggest that ultimately in seeking to prevent abuse we must look primarily to those authorities that  are responsible for the proper conduct of grand jury

- 18 -

proceedings, that is, the courts and the prosecutors.   "Grand
juries are subject to judicial control and subpoenas to
motions to quash."13/   The courts have traditionally been
sensitive to potential abuses of the rights of citizens, as
is evidenced by the procedural safeguards which have been
promulgated to protect the rights of an accused. Many of these
procedural safeguards have not been held applicable to grand
jury   proceedings. But the Supreme Court has consistently
reaffirmed that judicial supervision will be exercised over
the conduct of these proceedings.

- 19 -

We must also of course not overlook one often-ignored safeguard against abuses of the grand jury's powers -- the citizens who themselves comprise the grand jury.  Justice John Marshall Harlan explained his reluctance to impose judicial restraints upon legislative inquiry in terms which are particularly appropriate to the grand jury.  He stated:  14/

> In the last analysis, it is the independence,
> alertness, and common sense of our people that
> are the final bulwark of our way of life, whether
> it be in protecting civil liberties, economic
> freedom and property rights, or in preventing
> erosion of our institutions.

For centuries, the grand jury has operated as the voice of the citizenry in the criminal justice system.  It is this which has accounted for its historic vitality, and it is the "independence, alertness, and common sense" of the grand jurors themselves which must ultimately be relied upon to prevent the erosion of this important institution.

The Department of Justice has a special responsibility with respect to the grand jury.  Like the traditional role of the grand jury itself, the responsibility is twofold.  As the prosecutorial agency of the federal government, the Department needs the effective investigative mechanisms which the grand jury can provide.  But the Department also has the duty to preserve and protect individual rights guaranteed by the Constitution.

Even when it is not compelled to do so by statute or judicial decision, the Department has instituted procedures designed to protect individual rights in connection with the use of the

grand jury's power. For example, while the Supreme Court in Branzburg v. Hayes 15/ held that the First Amendment does not give newsmen a privilege against revealing information provided to them in confidence by their sources, the Department of Justice has put into effect regulations that set standards for the issuance of subpoenas to newsmen and require the specific authorization of the Attorney General before such a subpoena may be issued. The Court in Branzburg explicitly recognized this and stated of an earlier version of these regulations which was less protective than the current one that the regulations "may prove wholly sufficient to resolve the bulk of disagreements and controversies between the press and federal officials." 16/  Similar Departmental guidelines in other areas may offer a solution to other legitimate concerns.

I realize that my testimony today has not solved the problems we face. What those problems appear to be depends in many instances upon the special, individual experiences of the person who is considering the proper functions of the grand jury. What I have meant to suggest today is that we must take a more complete view of the place of the grand jury in our legal system and of the derivation of the institution's strengths and weaknesses if we are to achieve reforms that will reinforce the proper and multiple functions it has served while repairing the flaws we find.