# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.13-10200-GAO** |
| | ) | |
| **DZHOKHAR A. TSARNAEV,** | ) | |
| **Defendant** | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MEMORANDUM OF LAW RESPECTING
## <u>VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS</u>

The United States of America, by and through its undersigned counsel, respectfully submits this response to Tsarnaev's memorandum of law respecting voir dire examination of prospective jurors.

      A.      The legal standard that governs disqualification of jurors opposed to the death penalty.

Tsarnaev's discussion of the legal standard that governs disqualification of anti-death penalty jurors needlessly complicates the issue. "The baseline rule is that a court appropriately may excuse a juror for his views on capital punishment if those views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>United States v. Sampson</u>, 486 F.3d 13, 39 (1st Cir. 2007) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)); <u>accord</u> <u>Morgan v. Illinois</u>, 504 U.S. 719, 728 (1992). One of a juror's duties in a capital case is to fairly and impartially consider imposing the death penalty; if a juror's anti-death penalty views would "substantially impair" him from doing so, he must be excused. This standard does not require that a juror's anti-death penalty bias be so strong that he would "automatically" vote against the death penalty. <u>See</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 423 (1985). It "likewise does not require that a juror's anti-death penalty bias be proved with 'unmistakable clarity,'" because that is not realistic. <u>Id.</u> As the Supreme Court has explained:

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.  What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.  Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . .  [T]his is why deference must be paid to the trial judge who sees and hears the juror.

Id. at 424-426.

Tsarnaev's suggestion that jurors are "substantially impaired" in their ability to impose a death sentence only if they are "categorically opposed" to the death penalty is wrong.  [Def. Mem. at 3, 5].  For instance, it is appropriate to excuse a potential juror who is not categorically opposed to the death penalty but who states that he could impose it only in cases of multiple murder, see, e.g., United States v. Moore, 149 F.3d 773, 780 (8th Cir. 1998); United States v. Tipton, 90 F.3d 861, 880 (4th Cir. 1996), or in cases of mutilation,  see Riles v. McCotter, 799 F.2d 947, 949-50 (5th Cir. 1986), or in cases where the defendant is as bad as some other notorious murderer such as Charles Manson or Ted Bundy, see United States v. Mitchell, 502 F.3d 931, 956 (9th Cir. 2007), or Adolf Hitler, see Antwine v. Delo, 54 F.3d 1357, 1369 (8th Cir. 1995), or only if the defendant has confessed, see Drew v. Collins, 964 F.2d 411, 416-17 (5th Cir. 1992).

It is also appropriate to excuse prospective jurors whose answers to key voir dire questions are equivocal, uncertain, ambiguous, contradictory, or conflicting.  In Uttecht v. Brown, 551 U.S. 1 (2007), for example, the Supreme Court held it was proper to excuse a potential juror who "demonstrated no general opposition to the death penalty or scruples against its infliction," said he "believe [d] in the death penalty in severe situations," and stated six

2

separate times "that he could consider the death penalty or follow the law," merely because

"these responses were interspersed with more equivocal statements" that betrayed "confus[ion]

about the conditions under which the death penalty could be imposed." Id. at 1415, 17.  The

Court reasoned that the juror's "assurances that he would consider imposing the death penalty

and follow the law do not overcome the reasonable inferences from his other statements." Id. at

18.  Similarly, in Mitchell, supra, the Ninth Circuit held it was proper to strike a juror who stated

firmly on her questionnaire that she could never impose the death penalty even though during

voir dire she said only that "she would have 'a difficult time' imposing the death penalty" and

added, "I like to think I would listen; I would be open.  It would be up to the prosecution and the

defense to convince me.  I can't give a definitive answer at this time."  502 F.3d at 955-56; see

also Morales v. Mitchell, 507 F.3d 916, 942 (6th Cir. 2007) (upholding removal of venire

member who expressed general opposition to the death penalty but said he might be able to

impose it in limited circumstances); Tipton, 90 F.3d at 880-81 (affirming excusal of jurors who

expressed strong opposition to the death penalty and gave equivocal, ambiguous and

contradictory voir dire responses).

        Tsarnaev argues, incorrectly, that the Court should be especially reluctant to exclude anti-

death penalty jurors because this case "will be tried in a jurisdiction that has long rejected the

death penalty as a matter of state law, and where a very large segment of the population opposes

it," such that the Sixth Amendment's "fair cross-section" requirement mandates an anti-death

penalty jury.  The first problem with this argument is its faulty premise.  In 1982, Massachusetts

voters amended the Commonwealth's constitution to make clear that it does not prohibit the

death penalty.  See Mass. Const. art. 116.  That is still the case today.  As soon as the voters

passed that amendment, the legislature enacted a law authorizing capital punishment for first-

degree murder, Mass. St. 1982, c. 554, Sections 3-8, and the then-governor signed it.  That law

was later invalidated, but not by the voters; rather, the Supreme Judicial Court held that, in

conjunction with other laws, it impermissibly burdened a defendant's right to a jury trial.  See

Commonwealth v. Colon-Cruz, 393 Mass. 150 (1984).  In 1997, both the House and Senate

passed bills to reinstate the death penalty, and the then-governor endorsed the legislation; it did

not become law only because the conference committee version of the bill failed on a tie vote in

the House after a single legislator switched his position.   To say in light of these facts that this

state "has long rejected the death penalty" is simply wrong.

  The second problem with Tsarnaev's argument is its faulty logic.  How recently this state

has rejected the death penalty, and how large a segment of the population opposes it, has no

bearing on the rules that govern jury selection.  Otherwise, in states such as Texas where polls

suggest "overwhelming support" for the death penalty, see http://www.texastribune.org/

2012/05/24/uttt-poll-life-and-death, the law would require courts to bend over backwards to pick

jurors who favor the death penalty -- a view one safely can assume Tsarnaev does not endorse.

The constitutional imperative is not to pick a jury that will express the death-penalty views of a

majority of Massachusetts citizens, but rather a fair and impartial jury that will make "an

individualized determination on the basis of the character of the individual and the circumstances

of the crime."  Zant v. Stephens, 462 U.S. 862, 879 (1983).

  Indeed, the central teaching of Wainwright v. Witt is that the standard for excluding

jurors in capital cases is exactly the same as it is in other cases.  The goal, as in all cases, is to

find jurors who will faithfully and impartially follow the law, including the laws governing

capital punishment, notwithstanding their personal beliefs.  Witt cautions judges *not to* bend over

backwards to seat jurors with scruples about the death penalty, but rather to exercise their

discretion to excuse jurors in exactly the same way they do in non-capital cases.  The <u>Witt</u> Court

put it this way:

> [T]here is nothing talismanic about juror exclusion . . . because it involves capital
> sentencing juries. . . .  Here, as elsewhere, the quest is for jurors who will
> conscientiously apply the law and find the facts.  That is what an "impartial" jury
> consists of, and we do not think, simply because a defendant is being tried for a
> capital crime, that he is entitled to a legal presumption or standard that allows
> jurors to be seated who quite likely will be biased in his favor.

<u>Witt</u>, 469 U.S. at 427.

Similarly, the First Circuit has made it clear that a trial court's discretion to exclude

jurors is exactly the same in capital cases as in other cases.  <u>See</u> <u>United States v. Gonzalez–</u>

<u>Soberal</u>, 109 F.3d 64, 69–70 (1st Cir.1997)  ("'There are few aspects of a jury trial where we

would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in

ruling on challenges for cause in the empaneling of a jury.'")  (quoting <u>United States v.</u>

<u>McCarthy</u>, 961 F.2d 972, 976 (1st Cir.1992)); <u>Sampson</u>, 486 F.3d at 39 ("We normally review a

trial court's for-cause dismissal of a juror for abuse of discretion.  This standard of review applies

equally in capital cases.") (internal citation omitted).  Even in the context of capital cases, the

Supreme Court has emphasized that because excusals for cause are "based upon determinations

of demeanor and credibility that are peculiarly within a trial judge's province . . . deference must

be paid to the trial judge who sees and hears the juror."  <u>Witt</u>, 469 U.S. at 426-29.

A few examples from <u>Sampson</u> illustrate the Court's discretion to find that a juror's antipathy

to the death penalty "would prevent or substantially impair the performance of his duties as a

juror in accordance with his instructions and his oath."  <u>Adams</u>, 448 U.S. at 45.  The <u>Sampson</u>

court held that all of the following for-cause strikes were properly granted by the trial judge:

- After the court inquired whether she automatically would vote against the death penalty, Juror 19 stated: 'I can't think of what the government would prove that would make me change my opinion on the death penalty.'

- Juror 77 stated during voir dire that he did not 'really believe that [the death penalty was] the appropriate sentence for anybody.'

- Juror 205 . . . stated during voir dire that he did not know whether he could perform the duties required of a juror in a capital case. He added that he would have trouble following the law if it differed from his personal views.

The court reasoned:

> There is no precise formula to guide judges in juror-qualification matters. Particularly near the margins, on-the-spot judgment plays an important part in screening out those whose ability to serve may be compromised. In each of the three instances we have just chronicled, the district court determined that the juror's personal circumstances were such as to substantially impair his or her ability to serve impartially in a capital case. Each of these instances presented a judgment call. They are, therefore, paradigmatic examples of a trial court's exercise of informed discretion. In no instance do we discern an abuse of that discretion.

Id. at 41.

Finally, contrary to Tsarnaev's suggestion, the Court should not inform potential jurors that "the law entrusts all decisions regarding mitigating factors and whether to impose the death penalty to the unfettered discretion of each individual juror." [Deft. Mem. at 5]. That is not the law. The Supreme Court has repeatedly held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." Tennard v. Dretke, 542 U.S. 274, 291 (2004). Congress fashioned just such a guided-discretion scheme in the Federal Death Penalty Act. To consider a mitigating factor at all, a juror must find that the defendant has proved its existence by a preponderance of the evidence. See 18 U.S.C. § 3593(d). Then all the jurors together must

weigh the aggravating factors against any mitigating factors and must base their penalty decision on that weighing process.  Id. § 3593(e).  These are important constraints on jurors' discretion that make their death-penalty decisions non-arbitrary.  The Court should not instruct jurors otherwise and should bar Tsarnaev from attempting to do so during voir dire.

        B.      The legal standard that governs disqualification of jurors who favor the death penalty.

The government agrees with Tsarnaev that Morgan v. Illinois, 570 U.S. 719 (1993), stands for the following propositions:  like a juror "who in no case would vote for capital punishment, regardless of his or her instructions," a juror "who will automatically vote for the death penalty in every case" is not impartial and must be struck for cause.  Id. at 728-29.   In addition, "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors," id. at 729, and "general fairness and 'follow the law' questions . . . are [not] enough to detect those in the venire who automatically would vote for the death penalty," id. at 734.

The government does not agree, however, that Morgan entitles Tsarnaev to ask jurors whether they could consider a life sentence if faced with specific facts or evidence drawn from the indictment or notice of intent in this case.  [See Deft. Mem. at 9].  All the Supreme Court held in Morgan is that courts must go beyond "general questions of fairness and impartiality" and instead ask venirepersons specifically whether "they will always vote to impose death for conviction of a capital offense," id. at 735 n.9, or whether, as the law requires, they will consider imposing a lower sentence.  Morgan does not require Courts to ask potential jurors whether they will consider a sentence less than death in face of a laundry list of potential crime elements and aggravating factors.

Tsarnaev essentially seeks permission to read out for jurors one by one the crimes and aggravating factors charged in the indictment and notice of intent, and then ask them whether, assuming the defendant is guilty of those crimes and the aggravating factors exist, they could consider imposing a life sentence rather than a death sentence.  The problem with this approach is that it asks jurors to commit (or "precommit") to a penalty decision before they have heard any mitigation evidence or been told that the law requires them to weigh aggravating and mitigating factors and consider whether the aggravating factors "sufficiently outweigh" all the mitigating factor[s] . . . to justify a sentence of death."  18 U.S.C. § 3593.  Once a juror has made such a precommitment and voiced it -- on the record, under oath, to the parties and Court, in a proceeding as solemn as voir dire -- it can be difficult for the juror to retreat from that precommitment, even if it was induced by providing the juror only an incomplete and one-sided view of the case.  (Although asking jurors if they could "consider" a life sentence despite the existence of certain facts sounds like the opposite of asking for a precommitment, it is effectively no different from asking them if they would automatically vote for death assuming the existence of those same facts.)

The Supreme Court has never held that a defendant is entitled to ask case-specific questions during capital voir dire.  In fact, in Witherspoon v. Illinois, 391 U.S. 510, the Court wrote:

> [A] prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by . . . law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

Id. at 522 n.21.  In light of the dangers of allowing case-specific questions during voir dire, many

(albeit not all) courts forbid them.  In United States v. McVeigh, 153 F.3d 116 (10th Cir. 1998),

for example, the Tenth Circuit held that the district court had correctly barred McVeigh from

posing case-specific Morgan questions during voir dire.  It wrote:

> Morgan does not require courts to allow questions regarding the evidence
> expected to be presented during the guilt phase of the trial.  Further, we have held
> that Morgan does not  require a court to allow questions regarding how a juror
> would vote during the penalty phase if presented with specific mitigating factors.
> Other courts have issued similar rulings, holding that Morgan does not require
> questioning about specific mitigating or aggravating factors.  See United States v.
> Tipton, 90 F.3d 861, 879 (4th Cir.1996); People v. Jackson, 695 N.E.2d 391, 407
> (Ill. 1998); Evans v. State, 637 A.2d 117, 124–25 (Md. 1994); Holland v. State,
> 705 So.2d 307, 338–39 (Miss.1997); Witter v. State, 921 P.2d 886, 891–92 (Nev.
> 1996); State v. Fletcher, 500 S.E.2d 668, 679 (N.C.1998); State v. Wilson, 659
> N.E.2d 292, 300–01 (Ohio 1996); State v. Hill, 501 S.E.2d 122, 127 (S.C. 1998).
> In fact, some of these courts have held that such questions not only are not
> required by Morgan, but are also simply improper. See Evans, 637 A.2d at 125
> (explaining why 'stake-out' questions are impermissible); Witter, 921 P.2d at 892
> (same); Fletcher, 500 S.E.2d at 679 (same).

Id. at 1208.

Similarly, in Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004), the Fourth Circuit upheld a

North Carolina ruling barring a defendant from asking jurors whether they could consider a life

sentence despite a particular aggravating factor (the defendant's previous murder conviction).

The North Carolina court had barred this and all other so-called stake out questions "because

[they] sought to 'discover in advance what a prospective juror's decision will be under a certain

state of the evidence . . .  [and] how a certain set of facts would affect his or her decision.'"  Id. at

329 (quoting State v. Richmond, 495 S.E.2d 677, 684 (N.C. 1998)).  The Fourth Circuit

reasoned:

> Morgan does not require that a capital defendant be allowed to determine at voir
> dire what a prospective juror's sentencing decision will be if presented with a
> specific state of evidence or circumstances.  Rather, Morgan requires that a capital

9

defendant be afforded an adequate opportunity at voir dire to identify prospective
jurors 'who, even prior to the State's case in chief, [have] predetermined . . . to
impose the death penalty.' 504 U.S. at 736. Consequently, the Supreme Court's
holding in Morgan mandates that a capital defendant be allowed to make an
essential inquiry at voir dire: 'the [prospective] jurors' ability to give due
consideration to mitigating evidence at sentencing.'

Id. at 330. Accord United States v. Henderson, 450 F. Supp. 2d 438, 439 (S.D.N.Y. 2006)

(denying a request for "punishment- related voir dire").

The findings of the Capital Jury Project [see Deft. Mem. at 15-17] are not a reason to

allow case-specific Morgan questions during voir dire. For one thing, those findings are suspect

because they rely on former jurors' recollections of cases on which they served years earlier. For

another thing, the CJP data is widely described as proving that jurors chronically misunderstand

-- and thus fail to follow -- capital jury instructions. But the Supreme Court has firmly rejected

the view that jurors do not understand and cannot be trusted to follow instructions. On the

contrary, "[a] 'crucial assumption' underlying the system of trial by jury . . . [is] that juries will

follow the instructions given them by the trial judge." Marshall v. Lonberger, 459 U.S. 422, 438

n.6 (1983). That presumption "'represents a reasonable practical accommodation of the interests

of the state and the defendant in the criminal justice process.'" United States v. Casamento, 887

F.2d 1141, 1151 (2nd Cir. 1989) (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). The

presumption is, therefore, "almost invariabl[e]." United States v. Jass, 569 F.3d 47, 55 & n.4

(2nd Cir. 2009); United States v. Lampley, 127 F.3d 1231, 1238 (10th Cir. 1997). Federal courts

have uniformly and repeatedly rejected the argument that juries cannot apply capital jury

instructions. See, e.g., United States v. Taylor, 635 F. Supp.2d 1243, 1247 (D.N.M. 2009);

United States v. Hammer, 2011 WL 6020164 at *3 (M.D. Pa. Dec. 1, 2011); United States v.

Green, 2008 WL 4000901 at *1–2 (W.D. Ky. Aug. 26, 2008); United States v. Duncan, 2008

WL 544847 at *1–2 (D. Idaho Feb.26, 2008); <u>United States v. Sablan</u>, 2006 WL 1028780 at *7–8 (D. Colo. Apr.18, 2006); <u>United States v. Fell</u>, 372 F.Supp.2d 753, 756 (D. Vt. 2005); <u>United States v. Perez</u>, 2004 WL 935260 at *2–3 (D. Conn. Apr.29, 2004); <u>United States v. Mikos</u>, 2003 WL 22110948 at *17–19 (N.D. Ill. Sept.11, 2003); <u>United States v. Regan</u>, 228 F.Supp.2d 742, 746–47 (E.D. Va. 2002); <u>United States v. Llera Plaza</u>, 179 F.Supp.2d 444, 449–50 (E.D. Pa.2001)).

In short, questions that effectively ask jurors to predetermine the weight they would give particular facts or evidence at sentencing, or that ask them how they would vote when faced with certain facts or evidence, are certain to confuse and mislead venire members about their duty to weigh and consider the evidence. They are also certain to yield answers that will require lengthy and involved follow-up to ensure that the answers actually reflect a juror's nability or unwillingness to follow the law. The Court need not and should not force jurors through this unnecessary process. Such questions are not constitutionally required by <u>Morgan</u> or any other case and should be prohibited.

C.    Attorney-led voir dire is not required in capital cases and is no likelier than judge-led voir to yield a fair and impartial jury.

Tsarnaev concedes, as he must, that he has no legal right to attorney-led voir dire. Federal Rule of Criminal Procedure 24 provides in relevant part:

(a) Examination.

(1) In General. The court may examine prospective jurors or may permit the attorneys for the parties to do so.

(2) Court Examination. If the court examines the jurors, it must permit the attorneys for the parties to:

(A) ask further questions that the court considers proper; or

11

(B) submit further questions that the court may ask if it considers them
proper.

This Rule applies to capital cases as well as ordinary ones.  In addition, the First Circuit has held:

[T]he district court has broad discretion as to the manner in which it conducts the
voir dire and the inquiries it chooses to make, subject only to the essential
demands of fairness.  It need not permit counsel to dominate the process, nor pose
every voir dire question requested by a litigant.  It is more than enough if the
court covers the substance of the appropriate areas of concern by framing its own
questions in its own words. We review the trial judge's choices in this regard only
for abuse of discretion.

Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987) (internal citations omitted); accord  Rosales-Lopez

v. United States, 451 U.S. 182, 189 (1981) ("[F]ederal judges [are] accorded ample discretion in

determining how best to conduct the  voir dire.").

Although Tsarnaev may be correct that a high percentage of federal trial judges allow

attorney-led voir dire, that does not make it a good idea.  Permitting attorneys to question

potential jurors directly paves the way for them to ask jurors improper questions, misinform

them about the law, and pressure them into adopting positions that will result in their excusal.  It

also threatens to prolong the jury-selection process unnecessarily.  There is no reason to believe

the Court cannot do the job just as well -- and far more expeditiously -- than the attorneys.  Judge

Weinfeld may have said it best in United States v. Wilson, 571 F.Supp 1422 (S.D.N.Y. 1983):

This Court, throughout its more than three decades of judicial service, has
always conducted the voir dire examination in civil and criminal cases. . . . [T]hat
method, without exception, has resulted in the empanelling of fair and impartial
juries.  They have been selected expeditiously and with full protection of a
defendant's constitutional right to an impartial jury.  And this has been true of
cases that have attracted in advance of trial the widest publicity in the news media
over extended periods of time.  United States v. Corallo, 284 F.Supp. 240
(S.D.N.Y. 1968); United States v. Kahaner, 204 F.Supp. 921 (S.D.N.Y. 1962). . . .

While lawyers often speak of the constitutional importance of . . . an
impartial and unbiased jury, in fact they do not seek an impartial jury.  What they
generally want selected is a jury fairly disposed toward the principles of their

12

client's cause. . . .  It is notorious that in the state courts, where lawyers conduct the examination, the selection of a jury may take longer than the trial proper and in cases that have received publicity, even a month or more may be consumed before a jury is empanelled . . .  all with little effect on the ultimate fairness of the trial. . . .

> The voir dire . . . is of critical importance to protect a defendant's Sixth Amendment right to a trial free of prejudice.  However, the right is not a license to 'propound any question' nor does it mean that limitless time must be devoted to preliminary voir dire. . . .  [T]here are countervailing state interests in the expeditious conduct of criminal trials and the avoidance of jury intimidation.

Id. at 1428-29 (citations and footnotes omitted).

This Court should adopt the jury-selection procedure that was upheld (and thus implicitly approved) by the Supreme Court in United States v. Skilling, 561 U.S. 358 (2010).  Skilling argued that the massive amount of pretrial publicity in that case meant "jurors need to be questioned individually by both the Court and counsel" concerning their opinions of Enron and "publicity issues."  Id. at 372.  The Court denied Skilling's request for attorney-led voir dire, stating that, in 17 years on the bench, "I've found . . . I get more forthcoming responses from potential jurors than the lawyers on either side.  I don't know whether people are suspicious of lawyers — but I think if I ask a person a question, I will get a candid response much easier than if a lawyer asks the question."  Id. at 373.  The court instead adopted a two-step process in which it first questioned the jurors as a group, then brought them to the bench for limited follow-up questioning with input from the attorneys.  Id. at 373-74.  The jury was selected in a single day. Id. at 374.

Other examples of fair, expeditious judge-led voir dire in capital cases abound.  In United States v. Caro, 597 F.3d 608, 613 (4th Cir. 2010), for example, 150 prospective jurors completed a questionnaire, and then those who were note excused were questioned by the court in groups of ten.  When a prospective juror's response was unsatisfactory, the court recalled him individually

and asked follow-up questions.  Counsel were permitted to suggest questions but not to question

the jurors directly.  The Fourth Circuit found that this procedure did not violate any

constitutional requirements.  Similarly, in <u>United States v. Ortiz</u>, 315 F.3d 873 (8th Cir. 2002),

three co-defendants were prosecuted for their participation in a multi-national drug distribution

and murder-for-hire scheme.  Two were sentenced to death.  The trial court selected the jury by

conducting a group voir dire with individual follow-up that supplemented by questions submitted

by the parties (but asked by the court).  Jury selection took three days.  The Eighth Circuit upheld

this procedure against constitutional challenge, holding that it was within the trial court's

discretion.  Although examples of much lengthier, attorney-led jury selection procedures no

doubt also abound, there is no reason for this Court to take them as a model when the law

permits it to do otherwise.

      D.     The Court should permit appropriately limited questioning about exposure to
             <u>pretrial publicity.</u>

      When pretrial publicity is an issue, the trial judge is required to assess through

questioning whether prejudicial publicity or community sentiment has affected the impartiality

of potential jurors.  <u>See</u> <u>Patton v. Yount</u>, 467 U.S. 1025, 1032 (1984).  But the Supreme Court's

cases "have stressed the wide discretion granted to the trial court in conducting voir dire in the

area of pretrial publicity."  <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 427 (1991).  That is in part

because the trial judge "sits in the locale where the publicity is said to have had its effect" and

may base his questioning on his "own perception of the depth and extent of news stories that

might influence a juror."  <u>Id.</u>  The Supreme Court made clear in <u>Mu'Min</u> that it is sufficient for a

judge to ask potential jurors as a group whether any of them has formed an opinion about the

defendant's guilt based on pretrial publicity or other information, and, if any have, to follow-up

with those jurors individually about their ability to decide the case on the evidence.  Id. at 431.

A defendant has no right, however, to insist that "questions to jurors specifically dealing with the

content of what each juror has read be asked."  Id.  Especially in this case, where the juror

questionnaire already asks jurors to identify in detail the sources of any pretrial publicity they

have been exposed to, the Court should not prolong voir dire by repeating those legally

unnecessary questions (or allowing the parties to do so).

                                    Respectfully submitted,

                                    CARMEN M. ORTIZ
                                    United States Attorney

                          By:    /s/ William D. Weinreb
                                    WILLIAM D. WEINREB
                                    ALOKE S. CHAKRAVARTY
                                    NADINE PELLEGRINI
                                    Assistant U.S. Attorneys


                          CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper
copies will be sent to those indicated as non-registered participants
on this date.

                                    /s/ William D. Weinreb
                                    WILLIAM D. WEINREB