UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

### SECOND MOTION TO CONTINUE TRIAL DATE

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully requests a further continuance. The trial in this case is currently set to begin just 18 months after the defendant was indicted, which would bring this case to trial faster than 99 of the 119 federal capital trials to get under way since 2004. *See* DE 518, Ex. D. Despite the continuing best efforts of counsel, we cannot provide constitutionally effective representation at a trial that commences on January 5. We continue to believe, based on our collective experience and judgment, that a September 2015 trial date would be most realistic and fair given the extraordinary complexity and international dimensions of this case. But any amount of additional time would afford counsel a better opportunity to address the challenges and issues identified in the defendant's first Motion for Continuance and accompanying papers [DE 518, 526 (sealed and *ex parte*), 549], incorporated herein by reference, as well as the additional information and reasons provided below and in an accompanying sealed *ex parte* submission. To commence trial

as scheduled on January 5 would threaten both the fairness and finality of the proceedings.[1]

**The Volume of Discovery and the Volume/State of the Government's Pre-Trial Disclosures.**

The defense continues to struggle to digest the terabytes and hundreds of thousands of pages of discovery produced in this case. Since September, when the prior motion for continuance was litigated, the government has produced a substantial volume of additional materials, including additional electronic devices (*e.g.*, seized phones and computers) on a nearly weekly basis.

Moreover, over the last week the government made the following voluminous disclosures, the scope and content of which we are still struggling merely to assess, much less review:

- On December 15, the government provided a witness list (comprised of 590 "law enforcement personnel" and 142 "civilian witnesses") and an exhibit list (naming 1,238 exhibits and an additional 413 "files contained on digital exhibits"). The government provided copies to the Court under seal.

- Also on December 15, the government produced 5 disks and two hard drives (collectively, 166.87 gigabytes) containing witness-related

---

[1] Notably, by decision issued today, in *United States v. Sampson*, No. 01-CR-10384-MLW, the court granted a motion to continue the defendant's sentencing-only retrial from February 2015 to October 2015, extending the time available to defense counsel between appellate remand and sentencing-only retrial from 15 months to 23 months. The court explained, *inter alia*: "The work remaining to be done is substantial and fundamental to the defense . . . . The court now concludes that all of this work cannot be properly performed by February 17, 2015. Beginning the retrial on February 17, 2015 would, therefore, create a risk that counsel would not be able to represent Sampson effectively, thus threatening both the fairness and finality of the proceedings." *Sampson*, DE 1747.

information and other discovery. The government did not include copies (or photographs) of actual listed exhibits, the materials were not Bates-numbered, and no index was provided.

- On December 17, the government produced a single disk (2.41 gigabytes) containing what it described as "392 records" comprised of 2,623 individually Bates-stamped pages and other items, including more than 33 hours of audio recordings. No index was provided.

- On December 18, the government produced a single disk (3.00 gigabytes) containing 16,825 individually Bates-stamped pages and other items. No index was provided. At least some of the material appears to duplicate the non-Bates-labeled materials produced on December 15, but the defense lacks ready means, other than ongoing manual comparison, to identify the overlap precisely.[2]

The sheer volume of material, alone, requires a continuance. As a practical matter, it impossible for the defense to digest this information, much less attempt to pursue investigative leads it may suggest, in time to make effective use of it at trial.

The need for follow-up investigation of these disclosures is real, not merely theoretical. As just one example, while the defense was aware of the prosecution of Stephen Silva and the prospect that the government would seek to tie the gun allegedly used by Tamerlan in the Collier murder and Watertown shootout to Dzhokhar via Silva, only the disclosures from last week (including statements by Silva and other witnesses) permit the defense to conduct an informed investigation into these allegations and other newly-revealed testimony that Silva appears poised to provide under his cooperation and plea agreement with the government.

---

[2] Since the 3-gigabyte size of the 16,000-plus-page December 17 production is but a tiny fraction of 166.87 gigabytes produced on December 15, it follows that the page-equivalent of the un-numbered December 15 production was much larger.

Earlier this year, the Editorial Board of *Massachusetts Lawyers Weekly* made the following observation in connection with the 21-day pretrial disclosure of more than 10,000 pages of *Jencks* material in *United States v. O'Brien*, No. 12-CR-40026-WGY, a high-profile case concerning patronage hiring in the state Probation Department:

> In the absence of some legitimate reason for prosecutors to have waited until the eve of trial to produce critical information to individuals it seeks to deprive of their liberty, this is sheer gamesmanship. And it's the type of "gotcha" justice that should be eliminated by U.S. Attorney Carmen Ortiz.
> . . . .
> Even if prosecutors are permitted to wait until just before trial to share certain types of information with the defense, why would they choose to exercise that right when a defendant's liberty, and the public's perception of the system's fairness, is on the line?
>
> Federal prosecutors accuse O'Brien and his co-defendants of rigging the hiring process. It is ironic that they would rig the deck themselves to make their case, rather than simply rely on the evidence they believe warrants conviction.

Editorial, *U.S. Attorney Should Stop 'Gotcha' Litigation Tactics*, MASSACHUSETTS LAWYERS WEEKLY, Jan. 16, 2014.  Analogous concerns resound even more strongly in a death penalty prosecution which is already on a very "fast track" compared to other capital cases nationwide.

Even putting sheer volume aside, however, the unfocused scope, incompleteness, and general disarray of these disclosures erect yet more obstacles to effective defense preparation and representation.  Specifically, of note:

- **The enormous witness list does not permit the defense to focus trial preparation efforts**.  Far from narrowing the field of potential witnesses for whom the defense must prepare with the trial date now less than two

4

weeks away, in listing 732 individuals the government apparently has chosen to include anyone who might, conceivably, be called to testify. As a result, the defense must spend a considerable amount of scarce time simply to determine *whether* the government has produced *Jencks* statements for all of these witnesses, to say nothing of actually digesting the statements and undertaking whatever follow-up investigation those statements may suggest.

- **The government has not provided actual exhibits or any ready means to identify them**. Among the government's 1,238 numbered exhibit list entries, many of the individual items are obviously larger compilations or collections of materials, including more than a dozen listed DVDs containing unspecified digital content extracted from various electronic devices. The government did not produce copies of the actual exhibits (or photographs of those that are physical objects) and has indicated it will not be in a position to do so before December 29, at the earliest. The list provided on December 15 does not associate the numbered entries with Bates numbers or otherwise identify the exhibit in a manner that would permit the defense readily to determine precisely what the exhibit consists of/contains or its location in the terabytes of previously-produced discovery.[3] Even photographs in the list that are identified by a computer file name (*e.g.*, "*.jpg") cannot be specifically identified by the defense because the government produced most photographs in discovery as bates-numbered PDFs stripped of any computer file name. Since receipt of the exhibit list last week, the defense already has expended scores of hours in an attempt to identify each of the government's proposed exhibits, with limited success. This effort continues, with no end in sight. Until the defense can determine what each exhibit actually consists of or includes, it is impossible to plan, much less draft, appropriate motions *in limine* and prepare for the government's trial presentation

---

[3] Many of the exhibits that are physical objects are listed with "Q" numbers, which are assigned at the FBI Laboratory in Quantico, Virginia. However, the government has never provided the defense with a comprehensive list of "Q" numbers and thus the defense can only correlate such numbers with specific objects for the small subset of items that the defense examined in person at Quantico. For most of the objects in the exhibit list, the defense has no ready way reliably and efficiently to correlate the "Q" number with a particular object (or Bates-numbered photographs of the object, which should have been produced in discovery), leaving educated guesswork based on an often-oblique description as the only means to positively identify the proposed exhibit.

- **The government has not provided its digital exhibits or any ready means to identify them**.  In addition to the 1,238 numbered items, the government's exhibit list also contains 413 numbered "files contained on digital exhibits," identified for the most part by computer file name.[4]  The government did not produce the actual listed files, and the exhibit list does not identify the source of each file among its digital exhibit DVDs or the various digital devices produced in discovery.[5]  Moreover, many of the files appear to be summary spreadsheets and lists of the government's creation, which the defense has never seen, *e.g.*, ## 33, 62, 86, 120, 151, 163, 295, 402, 410 ("Spreadsheet of File Listing and File Attributes for files offered into evidence"); ## 34, 63, 87, 121, 152, 164, 302, 409, 411 ("User and Volume information"); ## 296-301, 403-408 (various other "spreadsheets" of forensic information).  Verifying the claimed "attributes" and other data in such spreadsheets once the defense finally receives them will, itself, be very time-consuming.

- The *Jencks* and other documentary materials produced in the massive December 15 production were not indexed or Bates-numbered.  Multiple named subfolders in the identified "Jencks" collection of that production were empty.

---

[4] Some of the file names are familiar to the defense because the names are relatively unique and the files can be found on one or more of the multiple seized devices provided by the government in discovery.  However, some of the files appear to have been named by the government (*e.g.*, # 148, "unknown russian") and there is no way for the defense to determine independently what the file actually contains or its source.  Other file names are so generic as to be meaningless (*e.g.,* ##367-74, variations on "image.jpeg").  Furthermore, for the large number of listed files that were forensically recovered from deleted space on various devices ("carved"), the file name (*e.g.*, "Carved[86791168].jpeg") is of no use in identifying the particular exhibit because each employment of forensic software creates a different, unique name for carved files. In other words, when the FBI forensically extracts a "carved" file, the file name has no relation to the file name that the same file would be given when forensically extracted from the same device by the defense.

[5] The source(s), creation date(s), and movements of computer files that will be offered into evidence at trial will provide important information probative of the depth and timing of the defendant's alleged radicalization in comparison to his brother and others.  It is therefore critical for the defense to know the particular forensic source of each such file the government intends to offer in evidence.  That information cannot be determined from the government's exhibit list.

- The government's deficient response to a defense request for documents concerning the acquisition, chain of custody, and forensic processing of digital devices will require a separate motion to compel.

Very little time remains before the trial is set to begin. Even if the government narrows its witness list, produces and/or clearly identifies exhibits, and rectifies the other most glaring production deficiencies in the coming days, on the current schedule the volume and scope of pretrial disclosures on top of the mountains of previously-produced discovery represent an insurmountable obstacle to constitutionally-effective representation in a death penalty case.

### Delayed Rule 16(a)(1)(E)-(G) Expert Disclosures

While the government has maintained for more than a year that it timely complied with its Rule 16(a)(1)(E)-(G) obligations, its actual compliance continues to be belated and incomplete. The Court's deadlines for *Daubert* motions *in limine* have brought those flaws into sharp focus. In response to (often repeated) defense requests for discovery as well as defendant's motions *in limine*, the government within the past weeks has provided the following materials that will require significant defense resources to process and understand during the critical days leading up to the presently-scheduled trial date. A substantial continuance is warranted in order to resolve these issues prior to trial. Examples include:

- **The government's delayed response to information underlying polymer and tape match conclusions**. On November 24, 2014, the defendant requested specific information underlying proposed expert testimony matching detritus recovered from the Boylston Street scene to certain items

seized from 410 Norfolk Street. The government did not respond until December 15, 2014, and then only incompletely. (The defendant anticipates that the filing of a motion to compel will be required.) As a result of the government's delay in responding, the defendant was twice required to ask for an extension of time to file a motion *in limine* regarding this testimony, and was only able to file an informed motion *in limine* on December 19, 2014. The government's opposition is now due on or before January 2, 2015, just as the defendant is preparing for the start of trial. The issue raised is dense and fact-bound. The government's opposition will certainly require a response by the defense and, as requested by the defendant, an evidentiary hearing.

- **Materials underlying the electronics triggering opinion were provided late and remain incomplete.** On October 29, 2014, the defendant made a specific and targeted request for materials underlying the government's proposed expert opinion testimony regarding the matching of a transmitter obtained from the Watertown scene with a receiver recovered from the Boylston Street bomb site. On November 24, 2014, and then again on November 28, 2014, the defendant by letters reminded the government that the requests were outstanding. The government's responses have as a general matter been incomplete, unresponsive, and contradictory. As part of its massive and disorganized production on December 15, 2014, the government disclosed that its witness, Michael McFarlane, was conducting additional analysis, apparently in response to defendant's requests and motion *in limine*. The government also produced, for the first time, new materials in connection with the proposed testimony. This past Friday, December 19, 2014, the government produced a summary of Mr. McFarlane's new analysis. The recently produced new analysis and discovery materials are highly technical and will require significant defense resources to evaluate. Without adjustment of the presently scheduled trial date, the government's tardy disclosure will put the defense at a serious disadvantage as it tries to prepare for trial and reviews materials that should have been provided months ago.

- **The government has proposed to add a new expert and associated testing materials in a wholly new, previously undisclosed area of expertise**. In its response to the defendant's motion *in limine* regarding DNA testimony filed after-hours on December 19, 2014 and docketed on December 22, 2014, the government has proposed an additional, new expert witness to testify about statistical analysis of DNA results and has provided highly technical reports and underlying data in support of this proposed testmiony. Without changing the present trial date, the government's tardy disclosure — the defense alerted the government to this

8

>weakness in its DNA expert in its October 2, 2014 expert disclosure letter — will put the defense at a serious disadvantage as it tries to prepare for trial and reviews complex materials associated with a new expert witness.

**Overseas Mitigation Investigation**.

The difficulty of thoroughly investigating Mr. Tsarnaev's life history in the time available across barriers of language, culture, and suspicion in distant and conflict-torn lands — Chechnya, Dagestan, and Central Asia — continues to loom large. We provide an update of the current state of the international defense investigation in a sealed *ex parte* submission that accompanies this motion. While we have made substantial progress, unanticipated new obstacles have emerged. Much work remains to collect foreign family history documents and to identify and interview potential overseas family history and mitigation witnesses. We also have grave concerns about our ability, given the limited time remaining, to secure the attendance at trial even of the potential witnesses we have managed, tentatively, to identify thus far.

**The Atmosphere of Fear and its Impact on Domestic Mitigation Investigation**.

As noted in the first motion for continuance, the defense investigation within the United States has been hampered by fear of law enforcement and reluctance of anyone who knew Tsarnaevs to acknowledge and talk about their relationships and experiences. While patient work among these potential witnesses continues to bear fruit, the process it is time-consuming and far from complete.

9

**<u>Continuing Pretrial Publicity and Leaks</u>**.

As noted in other recent filings, pretrial publicity remains intense and apparent "leaks" of non-public information continue unabated. *See, e.g.*, DE 376, 461, 686 (concerning venue); DE 280, 336, 438, 616, 680 (concerning leaks). The Massachusetts governor-elect recently identified the defendant by name as the living person he most despises. *See* Yvonne Abraham, "Charlie Baker Takes the Proust Questionnaire," BOSTON GLOBE Oct. 15, 2014. On the current schedule, his inauguration will take place while jury empanelment is under way. Only time can help to blunt the prejudicial impact of all of this publicity and of the truly extraordinary enmity with which the defendant is regarded in advance of his trial.

**Prospective Timing of a Penalty Phase**.

The current trial schedule would likely result in jury deliberations and penalty phase proceedings around the time of the second anniversary of the bombing (April 15, 2015) and this year's Boston Marathon itself (April 20, 2015), events that will produce an intense surge of inevitably emotional publicity that could threaten the fairness of the proceedings.  Given the ubiquity and intensity of anniversary news coverage and related public activities, even the most conscientious jurors are likely to be exposed to influences that would require a mistrial.  This risk could be avoided — and the fairness of the trial increased — by waiting to begin trial until after the anniversary has passed.

## Conclusion

For the foregoing reasons, as well as those set forth in the first motion, the Court should continue the trial.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

*/s/ William W. Fick*

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450

(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 23, 2014.

/s/   William Fick