FILED
IN CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

'14 DEC 23  PM 4 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No.13-10200-GAO |
| | ) | |
| DZHOKHAR A. TSARNAEV, | ) | UNDER SEAL |
| Defendant | ) | |

### GOVERNMENT'S MOTION FOR ORDER THAT LAW ENFORCEMENT WITNESSES'HOME ADDRESSES NEED NOT BE PROVIDED TO THE DEFENDANT

The United States of America, by and through its undersigned counsel, respectfully moves for an order pursuant to 18 U.S.C. § 3432 that the government need not furnish the defense with a list of the home addresses of prospective law enforcement witnesses on the ground that providing such a list may jeopardize the life or safety of law enforcement agents and their families. The government also requests that the Court establish an expedited briefing schedule in light of Section 3432's timing requirements.

### BACKGROUND

On December 15, 2014, the government provided Tsarnaev with a preliminary witness list of approximately 750 witnesses. Approximately 600 of those witnesses are law enforcement agents who either collected evidence, took photographs, or were in the chain of custody of evidence that the government may offer at trial. The list identified law enforcement agents by their name and agency affiliation and civilian witnesses by their city and state of residence. On December 22, 2014 -- one week later -- Tsarnaev sent the government a letter stating, "We believe that 'place of abode' in 18 U.S.C. §3432 requires that the defense be provided with the home addresses of the venire as well as the government witnesses, including law enforcement."

Title 18, United States Code, Section 3432 provides:

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial, excluding intermediate weekends and holidays, be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

From the outset, the courts have interpreted this statute in a pragmatic fashion, taking into account the realities of trial practice. The Supreme Court, for example, held in Goldsby v. United States, 160 U.S. 70 (1895), that the statute's requirements do not apply to rebuttal witnesses; it reasoned, "[T]hat they do not apply to rebuttal is obvious from the very nature of things, for if they did, as was well said by the trial judge, it would be impossible to conduct any trial." Id. Similarly, courts have held that, notwithstanding section 3432's requirements, "'particular witnesses, afterwards coming to the knowledge of the government, or becoming necessary by reason of unexpected developments at the trial, might be permitted, on special reasons shown, and at the discretion of the court, to testify in the case.'" United States v. Fulks, 454 F.3d 410, 422-23 (4th Cir. 2006) (quoting Logan v. United States, 144 U.S. 263, 306 (1892)); United States v. Rosenberg, 195 F.2d 583, 599-600 (2nd Cir.1952); United States v. Greene, 497 F.2d 1068, 1082 (7th Cir. 1974)

Courts have also held that "a defendant claiming a violation of the right to access that § 3432 is designed to protect must show actual prejudice from any impairment or interference with the right." United States v. Tipton, 90 F.3d 861, 889 (4th Cir. 1996) (citing United States v. Pepe, 747 F.2d 632, 654–55 (11th Cir. 1984)); see United States v. Greene, 497 F.2d 1068, 1082 (7th Cir. 1974); Brown v. United States, 375 F.2d 310, 317 (D.C. Cir. 1996); McNabb v. United States, 123 F.2d 848, 853 (6th Cir. 1941) (holding that trial court's failure to order compliance

with section 3432's requirements was harmless error), rev'd on other grounds, 318 U.S. 332 (1943).

In keeping with this pragmatic approach, ever since Congress amended the statute in 1994 to eliminate the need for a witness list where it might jeopardize witness safety, courts have not hesitated to apply the exception in appropriate cases.  See, e.g., United States v. Lee, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008), aff'd 715 F.3d 215 (8th Cir. 2013); United States v. James, 2007 WL 914242 (E.D.N.Y. Mar. 21, 2007); United States v. Henderson, 461 F.Supp.2d 140 (S.D.N.Y. 2006); United States v. Williams, 2005 WL 664791 (S.D.N.Y. Mar. 22, 2005). Courts have also applied the exception numerous times to seat anonymous juries.

## ARGUMENT

This clearly is a case in which furnishing the home addresses of law enforcement agents, even pursuant to a protective order, "may jeopardize" the safety of those witnesses and their families.  Terrorist organizations commonly commit (and encourage others to commit) retaliatory attacks against law enforcement personnel and others who they deem guilty of threatening or harming fellow jihadis.  Tsarnaev's worldwide fame in the jihadi community ensures that his trial will be of great interest to terrorists around the globe, and there is a concomitant risk that law enforcement witnesses who participate in that trial (and their family members) will be targeted for retaliatory threats or violence.

Law enforcement agents in the United States and elsewhere face a significant risk of attack from terrorists and their sympathizers in retaliation for the perceived persecution of jihadis and other Muslims.  In recent months, for example, the Islamic State of Iraq and the Levant ("ISIL") has posted messages on violent extremist web forums and social media calling for attacks on law enforcement agents (among others) in retaliation for ongoing US airstrikes in Iraq

and Syria.[1]  Examples of these postings include the following:

- On 21 September 2014, a forum participant posted a message containing links to download an English-language translation of an audio message attributed to Abu-Muhammad al-Adnani, the ISIL spokesman, titled "Indeed Your Lord Is Ever Watchful [Koranic verse, al-Fajr, 89:14]."  Al-Adnani in the message advocated for lone offenders in the West to attack "soldiers, patrons, and troops…their police, security, and intelligence members."  He claimed lone offenders should kill such government personnel "in any manner" and that potential attackers should "not ask for anyone's advice" prior to striking because such attacks are legitimate.

- On 16 September 2014, an ISIL supporter posted to an ISIL-dominated forum an Arabic-language document—also readily available via an English translation—titled "A Message to 2.6 Million Muslims in the United States: This Is How To Respond to Obama's War on Islam."  In the 11-page document, the author advocates "open source jihad, or lone wolf operations," and offers a list of potential targets, including military, law enforcement, FBI personnel, government officials, and media figures.

Id.

Recent experience demonstrates that these are not idle threats.  On October 23, 2014, for example, Zale Thompson struck two New York Police Department officers in the head with an axe, critically injuring one and wounding the other.  According to widespread reports, Thompson was "consumed by jihadi philosophy and a desire to attack U.S. government and authority figures."[2] Detectives reportedly found 277 sites he had visited within nine months of the attack that had something to do with al Qaeda, ISIS, beheadings or jihad." Id.

Two recent, unrelated attacks in Canada underscore the reality of the threat.  An attack in October 2014 resulted in two deaths and three injuries of Canadian military and law enforcement

---

[1]  See FBI and DHS Joint Intelligence Bulletin, Islamic State of Iraq and the Levant and Its Supporters Encouraging Attacks Against Law Enforcement and Government Personnel (Oct 11, 2014) (attached hereto as Exhibit A).

[2]  http://abcnews.go.com/US/nyc-ax-attacker-consumed-desire-strike-us-authority/story?id=26664787

personnel.[3]  Specifically, on October 22, 2014, Canadian national Michael Zahaf-Bibeau shot

and killed a Canadian soldier on guard at the National War Memorial in Ottawa, according to the

Royal Canadian Mounted Police (RCMP).  The subject then proceeded to the Canadian

Parliament building where he entered the foyer and fired numerous rounds of ammunition,

injuring two guards before law enforcement fatally shot him, according to media reports.  Bibeau

has been identified as "[a] petty criminal with a string of minor convictions dating back to 2001 .

. . [who] had recently converted to Islam" and was known to the Canadian government as a

terrorist.[4]

Similarly, on October 20, 2014, Canadian national Martin Rouleau-Couture struck three

soldiers with an automobile outside a Canadian military facility located at a strip mall in Saint-

Jean-sur-Richelieu, Quebec, killing one, wounding one, and grazing a third.  Following the

incident, police pursued the subject by car until the subject lost control of his vehicle and crashed

into a ditch.  He then exited the car and was shot and killed by Canadian police after threatening

officers with a knife.  Like Bibeau, Rouleau-Couture had been radicalized and was classified by

Canada as a "potential important threat."[5]

And on December 20, 2014, a Burundi-born French national, Bertrand Nzohabonayo,

seriously injured two police officers in a police station in the suburbs of Tours, in central

France.[6]  The 20-year-old attacker allegedly cried "Allahu Akbar" during the assault.

Nzohabonayo reportedly held radical views and had an ISIL flag on his Facebook page.  The

---

[3]  FBI and DHS Joint Intelligence Bulletin, Islamic State of Iraq and the Levant and Its
Supporters Encouraging Attacks Against Military Personnel (Nov 30, 2014) (attached hereto as
Exhibit B).

[4]  http://www.independent.co.uk/news/world/americas/michael-zehafbibeau-terrorist-
ottawa-shooting-suspect-was-known-to-canadian-officials-as-a-highrisk-traveller-9812556.html

[5]  http://www.cnn.com/2014/10/21/us/canada-soldiers-killed-officer-attack/

[6]  NYPD Shield Terrorism Assessment, Separate Attacks in Dijon and Tours, France
(Dec. 22, 2014) (attached hereto as Exhibit C)

assault prompted the French government to step up security at police and fire stations nationwide.

The possibility that jihadi sympathizers armed with home addresses will threaten or attack law enforcement witnesses in retaliation for their participation in this case is especially high because of Tsarnaev's notoriety in the jihadi community. Tsarnaev is charged with carrying out the largest mass-casualty terrorist attack on American soil since September 11, 2001. The attack killed three people and maimed and injured hundreds more. Several days later, Tsarnaev and his brother executed a police officer by shooting him between the eyes at point blank range, then threw bombs and fired numerous shots at police officers in Watertown in an effort to kill as many more as possible. Tsarnaev eventually escaped by driving a carjacked Mercedes SUV directly at three officers who were trying to pull his wounded brother to safety and then took refuge inside a drydocked boat in a Watertown backyard.

While in hiding Tsarnaev wrote the following manifesto in pencil on an inside wall of the boat:

> The US Government is killing our innocent civilians but most of you already know that. As a [UI] I can't stand to see such evil go unpunished, we Muslims are one body, you hurt one you hurt us all. Well at least that's how muhhammad (pbuh) wanted it to be [for]ever, the ummah is beginning to rise/[UI] has awoken the mujahideen, know you are fighting men who look into the barrel of your gun and see heaven, now how can you compete with that. We are promised victory and we will surely get it. Now I don't like killing innocent people it is forbidden in Islam but due to said [UI] it is allowed. All credit goes [UI].

These words are an example of jihadi rhetoric and indicated to the jihadi community that Tsarnaev is one of them and acted in furtherance of their ideals.

The spectacular success of Tsarnaev's crimes drew worldwide attention and made him a celebrity in the world of violent extremists. For example, in spring 2013, Al-Qa'ida in the Arabian Peninsula devoted an entire issue of its on-line magazine, Inspire, to a celebration of the

Tsarnaevs and their attacks.  In keeping with the magazine's name (and purpose), it held up

Tsarnaev's successful attack as an inspiration to others, encouraging them to commit similar

attacks.  For example, the magazine states:

> Americans, you should understand this simple equation: as you kill you will be
> killed. The war is yet to cease, it has barely started.  Yesterday it was Baghdad,
> today it is Boston.  The question of 'who and why' should be kept aside. You
> should be asking, "Where is next?"

And then, quoting a portion of the manifesto that Tsarnaev wrote on the inside of the boat, the

magazine continues:  "Stop killing our innocent people and we will stop."

These facts demonstrate by a preponderance of the evidence that disclosing the home

addresses of prospective law enforcement witnesses in this case "may jeopardize the life or

safety of any person" -- namely, the witnesses themselves and their family members.  As noted

earlier, because of the sprawling nature of the criminal activity in this case and the large amount

of physical and digital evidence, the government's witness list includes approximately 600 law

enforcement witnesses.  If their home addresses became known, each and every one of them and

their family members would become a potential target for jihadi sympathizers seeking to punish

the government for seeking to put one of their heroes to death.

A protective order barring disclosure of the home addresses is an insufficient safeguard in

light of the gravity of the risk to law enforcement agents and their families.  Protective orders are

not infallible; information can leak accidentally or through carelessness or inadvertence.  In

United States v. Savage, 2013 WL 420294 (E.D. Pa. Feb. 4, 2013), for example, the court held

that 18 U.S.C. § 3432 did not require production of a government witness list in light of witness-

safety concerns, even pursuant to a protective order.  Id. at *3.  The court stated it was "not

convinced that a protective order would assuage concerns of witness protection" and could not

"risk the chance that those addresses will inadvertently become public during the course of trial

preparation." Id. (Although the court in United States v. Sampson, 335 F.Supp.2d 166 (D.

Mass. 2004), did order production of law-enforcement home address information pursuant to a

protective order, its memorandum and order does not indicate that the government sought, let

alone obtained, a ruling that the information "need not be furnished . . . [based on a finding] by a

preponderance of the evidence that providing the . . . [information] may jeopardize the life or

safety of any person," 18 U.S.C. §  3432.)

Even if the home address information did not become public, it would be available to all

members of the large defense team, as well as to Tsarnaev himself.  The government does not

know the identity of all members of the defense team and has had no opportunity to conduct

even minimal background checks to assess the risk of disclosing law enforcement home-address

information to them.  Nor can there be any guarantee that Tsarnaev himself will never, under any

circumstances, make nefarious use of the information.  Again, in light of the substantial risk to

law enforcement officers from those sympathetic to Tsarnaev or his cause, disclosure of home-

address information, even pursuant to a protective order, is an unacceptable risk.

Tsarnaev, for his part, cannot point to any legitimate need for law-enforcement home-

address information, let alone one that would counterbalance the risk to officer safety.  The

Supreme Court has held that the purpose of 18 U.S.C. §  3432 "is to inform the defendant of the

testimony which he will have to meet, and to enable him to prepare his defense." Logan v.

United States, 144 U.S. 263, 304 (1892).  That purpose has been met in this case by the

production of (1) a list identifying the law enforcement witnesses by name and agency

affiliation; (2) police reports -- usually written by the witnesses themselves -- that identify their

respective roles in the case and/or their expected testimony; and (3) copious amounts of

additional case-related information produced by the government pursuant to Rule 16, the Local

Rules, or voluntarily.  Disclosure of the home addresses of the 600+ plus potential law-enforcement witnesses, three days before trial, will add little or nothing to Tsarnaev's knowledge of their expected testimony or his ability to prepare his defense.

## CONCLUSION

WHEREFORE, the government respectfully moves the Court to order that the government need not furnish a list stating the "place of abode" of law-enforcement witnesses based on a finding by a preponderance of the evidence that providing such a list may jeopardize the life or safety of the witnesses and their families.  The government also respectfully requests that the Court order the defendant to respond to this motion by December 24, 2014, and that the Court rule on the motion before December 29, 2014.

Respectfully submitted,
CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:    /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
STEVEN D. MELLIN
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served by electronic mail on Dzhokhar Tsarnaev's attorney, Judy Clarke, Esq., on December 23, 2104.

/s/  William D. Weinreb
WILLIAM D. WEINREB