UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 13-10200-GAO |
| | ) |
| DZHOKHAR TSARNAEV | ) |

**UNDER SEAL**

### MOTION IN LIMINE REGARDING TESTIMONY OF GOVERMENT TERRORISM EXPERTS

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully moves that the Court limit the testimony of the government's "terrorism experts" by requiring, as a foundation for admission of testimony concerning the biographies, political opinions or alleged histories of violence of the authors of digital materials found on the defendant's computer, that the government first establish that the facts being recounted were known to and endorsed by the defendant.  This motion is based on Fed. Rules of Evid. 401 and 403, *United States v. Mehanna,* 735 F.3d 32 (1st Cir. 2013), 18 U.S.C. § 3593(c), the Due Process Clause of the Fifth Amendment, and the Cruel and Unusual Punishments Clause of the Eighth Amendment.  It is made on the following grounds.

**The government's experts should not be permitted to impute to the defendant support for jihadist writers, historical events and political opinions beyond what can be fairly inferred from his own statements, or from documents whose contents he actually endorsed.**

Among the many challenges to a fair and constitutional trial and sentencing hearing in this case is that of ensuring that the defendant is judged on the basis of his own actions, character and record, rather than as a stand-in for the entire array of adversaries and

threats against which the United States has been engaged in what is commonly referred to

as the War on Terror.  One likely source of such prejudice is the anticipated testimony of

between one and three "terrorism experts" — Mr. Evan Kohlmann, Dr. Matthew Levitt,

and Dr. Sebastian Gorka — whom the government intends to call at the guilt-or-

innocence phase of the trial, and then to recall at the sentencing phase.

Judging by the government's summary of these experts' opinions, and the 99 pages of

reports that followed, the government intends to use its terrorism experts primarily to

help establish the defendant's motive for committing the crimes alleged in the

indictment.[1]  They will do so by explicating statements by the defendant that were found

written on a boat where he was found hiding, and by discussing a collection of extremist

and other writings that were either saved on or accessed by means of his notebook

computer.  As the government explained,

> [t]he witnesses named in this section will assist the jury in understanding
> the defendant's motives by explaining features of the global jihad
> movement. Specifically, the witnesses will explain the movement's
> objectives, the methods it employs to achieve those objectives, and the
> ways in which items of evidence in this case relate to those objectives and
> methods. We expect the witnesses to testify that the defendant's statements,
> reading and viewing materials, and other evidence, demonstrate that he
> became radicalized, shared the movement's objectives, and adopted its
> methods for achieving them.

Govt. Rule 16 Expert Disclosure at 2 (August 1, 2014).

While this disclosure appears unremarkable, the experts' 99 pages of reports

demonstrate a serious risk of greatly exaggerating the actual culpability of the 19-year-

---

[1] The Court is already in possession of the three government experts' reports, having
ordered the government to file them under seal at the September 18, 2014 motions
hearing.  [DE 569, 565, 566]

old defendant in this case.  The risk arises from the government's apparent intention to elicit detailed descriptions of many terrorist leaders, strategies, tactics and propagandistic writings without any showing that the defendant endorsed or even knew about the people or matters being described.

A few examples from the report of Evan Kohlmann [EK Rpt.] will illustrate the danger.

1. Kohlmann describes at length a 2011 al-Qaeda video entitled "You Are Held Responsible Only For Thyself" that features "'martyred' Al-Qaida leader Abu Yahya al-Liby" extolling specific terrorists who had been convicted of various attacks within the United States and the Netherlands, and explaining al-Qaeda's strategic shift to reliance on what Kohlmann refers to as "self-selection and indirect radicalization." [EV Rpt. at 5-6].  Neither the video nor any of the speakers cited by Kohlmann are contained on the defendant's computer, or otherwise appear in the evidence in this case.  Nevertheless, the effect of the discussion is to create the inference that "Al-Qaida" — the organization that virtually every juror will likely identify with the 9/11 attacks on New York and Washington — created the strategy that the defendant followed in this case.

2. Kohlmann provides an account of the career of Shaykh Omar Abdel Rahman ("the blind Shaykh") whom he ties to the defendant by virtue of his having written an preface to a 147-page Salafi tract by another author (unnamed by Kohlmann) entitled "In Pursuit of Allah's Pleasure" that was found on the defendant's Sony Vaio laptop computer.  The government's forensic analysis of the Vaio does not

include any evidence that the PDF file containing "In Pursuit of Allah's Pleasure" was ever actually opened on the Vaio.   Nevertheless, on the strength of this gossamer-thin connection between the defendant and Shaykh Omar Abdel Rahman, Kohlmann provides an account of a 1994 aircraft hijacking in Algeria: in Kohlmann's recounting, the perpetrators unsuccessfully demanded the liberation of Omar Abdel Rahman from jail in the United States soon after his arrest here in connection with a terrorist plot, and threatened to fly their plane into the Eiffel Tower if this demand was not met.  EK Rpt. at 10-11. [2]

3.  Starting from the presence of a folder on the desktop of the defendant's computer containing three books by the Saudi radical Abu Mohamed al-Maqdisi, Kohlmann launches into a discussion of notorious jihadi figures who have admired, praised or followed al Maqdisi, including the al Qaeda leader Ayman al-Zawahiri, the founder of al Qaeda in Iraq, Abu Musab al-Zarqawi, and an unnamed Saudi terrorist who confessed to the bombing of a "joint U.S. Saudi National Guard Office" in Riyadh in 1995.  Kohlmann adds that "Eighteen books and articles written by al-Maqdisi were reported found by German police investigators in the former Hamburg apartment of lead 9/11 hijacker Mohammed Atta."  EK Rpt. at 14-15.

---

[2] Other accounts of the Algiers hijacking include no mention of Omar Abdel Rahman. E.g. Thomas Sancton, *Anatomy of a Hijack*, TIME (June 24, 2001) ("Using the pilot, Bernard Delhemme, to speak for them, the terrorists demanded the release from house arrest of Abassi Madani and Ali Belhadj, the leaders of the Islamic Salvation Front (F.I.S.), the political party that was banned by the Algerian government in 1992."

These examples could be extended almost indefinitely. They all "explain" the defendant's digital library and a few lines of jihadi rhetoric inscribed in his hiding place by recounting the militant associations and background of the authors represented on his computer, stretching back into the 1980s, of which the teenaged defendant in this case would almost certainly have been unaware (even if one indulges the unwarranted assumption that he had actually read all the documents stored on his computer). And they all leave the abiding but largely groundless impression that the defendant personally endorsed and supported all of the specific terrorist acts thus woven into the expert's narrative.

While the use of inflammatory evidence of no or marginal relevance in a death penalty case raises issues of constitutional magnitude, *see e.g. Dawson v. Delaware*, 503 US 159 (1992), the admissibility of such inflammatory "background" information is governed first by Rules 401 and 403 of the Federal Rules of Evidence. And *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013), provides the framework for applying Rules 401 and 403 to this case.

*Mehanna* was, as the Court will recall, a prosecution for terrorism-related conspiracy, providing material support to terrorism, and making false statements to federal officers. The government introduced a large volume of what the Court of Appeals characterized as "emotionally charged evidence," including "a video in which Abu Musab al-Zarqawi extolled the decapitation of American businessman Nicholas Berg while images of deceased American soldiers were displayed on screen . . . al-Qa'ida's State of the Ummah; statements of Osama bin Laden and Ayman al-Zawahiri in

book and interview form; and dozens of images portraying gripping scenes, such as the

World Trade Center engulfed in flames." 735 F.3d at 40, 60.

The First Circuit began by dismissing an argument for admitting all of this

evidence that will likely be the government's mainstay here.

> The first reason (stressed by the government at oral argument) is
> breathtaking in its scope: the government labeled the defendant's crimes
> "ideological" and argued that, as a result, his speech and beliefs, as well as
> the writings and videos that he consumed were integral to the charged
> crimes. We do not accept this sweeping proposition.
>
> Courts must be wary of the particular perils associated with
> prosecutions centered on ideology (which include, to use the government's
> phrase, prosecutions centered on "propaganda"). An objective observer
> might well regard the sprawling taxonomy suggested by the government as
> a thinly disguised effort to saddle defendants indiscriminately with the
> criminal and cultural baggage of internationally notorious terrorists. The
> government's embrace of such a theory smacks of overreaching, and we
> give that theory no weight.

735 F.3d at 60.

To be sure, the government fared better with its narrower and "more traditional

reason for urging a finding of relevance," which was that "that the defendant's motive

and intent are material facts and that the disputed media have probative value with

respect to those facts." *Id.* The court continued:

> Specifically, the government posits that the defendant, inspired by terrorist
> rants, developed an anti-American animus, which culminated in his
> decision to travel to Yemen to join in al-Qa'ida's struggle. The pictures,
> videos, and literature that he absorbed and endorsed during that
> evolutionary process, as well as the materials that he used to recruit others
> to follow a similar path, doubtless bear on his motive and intent.

*Id.* This passage from *Mehanna* highlights two reasons why the "back-stories" of the

materials found on the defendant's computer in this case must be excluded. First,

*Mehanna* was concerned with materials that the defendant "absorbed and endorsed," or that "he used to recruit others."  Mr. Kohlmann's exegesis of the histories and terrorist connections of the authors or editors of materials on the defendant's Sony Vaio does not fit this description, both because the masses of information about the history of contemporary jihadist violent extremism contained in Kohlmann's lengthy narratives are nowhere to be found on the computer, and as for the materials that are, because there is little or no evidence that the defendant "absorbed and endorsed" or "used" most of it.

The government may respond that the crimes themselves, and the defendant's explanation of them that was found on the boat in Watertown, provide the link between everything in Mr. Kohlmann's report and the defendant.  But this argument, if it made, only shows why most of the inflammatory Islamic extremism evidence should be excluded under Rule 403.  In *Mehanna*, the central issue was whether the defendant's motive in travelling to Yemen and in supporting various extremist endeavors was innocent or criminal.  Because Mehanna had not actually committed any terrorist act, the government's proof of criminal motive was necessarily circumstantial, and relied heavily on showing that he "absorbed," "endorsed," and "used" the very extremist materials to which he later objected at trial.  "[T] he evidence of which the defendant complains," the *Mehanna* court observed,  "was . . . central to the government's narrative: the govern-ment's case depended on proving that the defendant's actions emanated from views that, over time, had aligned with al-Qa'ida's." *Id.* at 62.  Under these circumstances, the probative value of the evidence was held sufficient to overcome its undeniably prejudicial impact.  But here, motive is not an element of any of the crimes charged in the indict-

ment, and so the government's case does *not* "depend" on proving it. Moreover, unlike in *Mehanna,* the defendant's motive here is not seriously in dispute. The government can show motive by evidence written in the defendant's own hand, and has no need to bring in his entire digital library, including masses of materials that he neither "absorbed," "endorsed," nor "used," much less the life stories and violent activities of numerous extremist figures from the last three decades whose names appear in, or can be linked to, materials found on the computer. The unfair prejudice of this "kitchen sink" approach will, in other words, substantially outweigh the minimal probative value of Mr. Kohlmann's explications of the contents of the Sony Vaio. Fed. R. Evid. 403.

In sum, the test to be derived from *Mehanna* is that prejudicial evidence about terrorist leaders and attacks in which the defendant was not involved should be admitted only where the government can show

(1)     that the defendant actually "absorbed" or at least knew of the evidence,

(2)     that he in some way endorsed or used it, and

(3)     that the government's need for the evidence—that is, its probative value—outweighs its prejudicial effect.

The mere presence of jihadi materials among the gigabytes of digital material on his laptop computer is not, standing alone, enough. And *Mehanna* further instructs that in performing a Rule 403 analysis regarding evidence of motive, the Court should give due regard to the government's need to prove motive in the first place, and to whether it can

8

do so by means of more direct and less problematic evidence of the defendant's motive and intent.

This discussion has focused on examples from Mr. Kohlmann's report, but similar examples abound in those of Drs. Matthew Levitt and Sebastian Gorka. For example, Dr. Levitt's report includes many pages of explication of the connections between the authors of several documents found on the defendant's computer and Usama bin Laden, Abu Musab al-Zarqawi (whom Dr. Levitt describes as "infamous for his thuggish brutality in the Iraq insurgency of the mid-2000s"), and "9/11 mastermind Khaled Sheikh Muhammad," as well as analysis of many individual articles from each issue of the on-line publication *Inspire Magazine*. No purpose would be served by identifying and analyzing every item of digital evidence mentioned in the terrorism experts' reports, particularly since the government may ultimately decide not to offer many of them in any event. The defendant submits simply that, applying the principles laid down in the First Circuit's *Mehanna* opinion, the Court should exclude any allegedly jihadist or extremist evidence found on the defendant's computer unless the government can first show that

- the defendant was aware of the specific material at issue,
- he endorsed or used it in some way, and
- the government's actual need for the material to prove motive (or some other material fact) is not substantially outweighed by its prejudicial effect.

By implementing *Mehanna* in this way, the Court would streamline the proceedings while guarding against unfair prejudice, and against the danger of diverting attention from the defendant's own motive and his personal legal and moral culpability. The

defendant is not charged with the September 11 attacks, with the insurgency against American forces in Iraq in the mid-2000s, or with hijacking a plane in Algiers in 1994. The Court should ensure that he is tried only for the crimes alleged in the indictment, and that these charges are not conflated with the entire history of violent Islamic radicalism since the 1980s. *See generally*, *United States v. Al–Moayad*, 545 F.3d 139 (2d Cir.2008) (reversing convictions under Rules 403 due in part to admission of graphic evidence of Hamas terror attacks to which defendant was only tenuously connected), *cf. United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) (distinguishing *Al-Moayad* where challenged evidence of Hamas violence found on defendants' premises rebutted their denial that they supported Hamas).

Faithful adherence to *Mehanna* would also reduce, although not eliminate, the risk that the jury will be unable to follow the express requirement of 18 U.S.C. § 3593(f) to wholly divorce anti-Muslim feeling from its capital sentencing decision. Allowing excessive and inflammatory evidence concerning religious extremism to infect either stage of the trial would also threaten to violate the cardinal Due Process and Eighth Amendment principle that all capital sentencing decisions "be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). For all of these reasons, the Court should require the government to satisfy *Mehanna*'s strictures regarding relevance and unfair prejudice with respect to each item of evidence about which its terrorism experts intend to opine, and should prohibit the experts from extrapolating from evidence on his computer to matters not connected to the defendant or of which he is was unaware.

10

## Conclusion

The Court should grant the motion in limine and require the government to lay an adequate foundation under FRE 401 and 403 for the admission of any political, religious or historical evidence as set forth here.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

11

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 29, 2014.