# EXHIBIT A

| CLARKE & RICE, APC | FEDERAL PUBLIC DEFENDER OFFICE | DAVID I. BRUCK |
|---|---|---|
| 1010 Second Avenue, Ste. 1800 | DISTRICT OF MASSACHUSETTS | 220 Sydney Lewis Hall |
| San Diego, California 92101 | 51 Sleeper Street, Fifth Floor | Lexington, VA 24450 |
| (619) 308-8484 | Boston, Massachusetts 02210 | (540) 458-8188 |
|  | (617) 223-8061 |  |

October 2, 2014

Donald Cabell
Aloke Chakravarty
Nadine Pellegrini
William Weinreb
Assistant U.S. Attorneys
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210

      Re:    United States v. Dzhokhar Tsarnaev
                Criminal No. 13-10200- GAO

Dear Counsel:

      We write to provide reciprocal discovery, which the Court required to be produced by October 2, 2014 [DE 578]. We will supplement the disclosure as our work progresses.

      Rule 16(b)(1)(A). We do not have any documents or objects obtained independently from the disclosures made by the government that we intend to use in our case in chief at trial.

      Rule 16(b)(1)(B). We currently do not have any results or reports of examinations and tests but will make production if, and when, we obtain any.

      Rule 16(b)(1)(C). Our potential FRE 702, 703 or 705 witnesses at trial:

**Gerald R. Grant**. Mr. Grant is a Computer Forensics Investigator for the Western District of New York Federal Public Defender Office. He also operates JR Computer Consulting, a computer forensics investigation and consulting firm. His CV is enclosed. As his CV indicates, Mr. Grant is an Access Data Certified Examiner and has been trained in the use of cell phone forensic tools such as Cellebrite UFED, Mobile Phone Examiner, and Neutrino Mobile Phone Examiner.

363

- 2 -

Mr. Grant will explain the mechanics of cellphone communications. He will testify that it is not possible to pinpoint the location of a cellphone based upon signals to nearby cell site towers with precision; the area from which a single cell tower might obtain a cellphone signal could stretch to several square miles.







- 4 -



**Michael Reynolds**. Michael A. Reynolds is an Associate Professor of Near Eastern Studies at Princeton University. His CV is attached. Prof. Reynolds is a historian focusing on the Middle East, Russia, and Eurasia, including the Caucasus. He holds a BA in Government and Slavic Languages from Harvard University, an MA in Political Science from Columbia University, and a PhD in Near Eastern Studies from Princeton University. He has more than two decades experience with the Caucasus and is an internationally recognized expert on the region. He has written on the history and politics of the region in scholarly books and journals as well as publications for the wider public, and he has lectured in the US, Europe, and Asia on the Caucasus. He regularly consults for the Office of the Secretary of Defense. His research on the region has been supported by Harvard University's Olin Institute for Strategic Studies, the Smith-Richardson Foundation, Fulbright IIE, the National Council for Eurasian and East European Research, the International Research and Exchange Board, and the National Security Education Project among others. He is fluent in Russian.

Prof. Reynolds will testify in response to the government's three "terrorism and geopolitics" experts, and will testify at the guilt or penalty phase depending on when the government elects to call its own experts in these areas, and what testimony it elicits. His testimony will be directed to the following issues:

1. Prof. Reynolds will provide context to the government experts' brief mention of the conflicts in Chechnya and Dagestan, the defendant's references to Chechnya in high school essays, and the presence of Russian-language violent extremist materials emanating from or concerning the North Caucasus on various electronic devices seized by the government. He will do so by briefly describing the history of the Chechen people and the culture of self-reliance, independence, and the very powerful familial and clan-based norms of behavior that grew out of that history. He will then describe the traumatic recent history of the Chechen people (including the defendant's family), starting with Stalin's forcible deportation of the Chechens to Central Asia in the winter of 1944.

2. Prof. Reynolds will describe the enduring demographic, physical and psychological impact of the 1944 deportations on the Chechen people, their subsequent partial repatriation after 1956, and the Chechen diaspora in Kyrgyzstan and Kazakhstan where the defendant's family remained until the 1990s, and to which they returned after

- 5 -

the outbreak of the First Chechen War in 1994. He will also explain the course of the First and Second Chechen Wars during the 1990s and 2000s, including how what began as a primarily nationalist struggle for independence was transformed into a Salafi-jihadist insurgency.

3. One result of the takeover of the Chechen independence struggle by Salafi violent extremists is that young Chechens living in the West who search for information (especially on-line) about their Chechen origins and identities will encounter Chechnya through the lens of violent Islamic extremism combined with the already-familiar narrative of Chechen suffering.

4. The government's expert summary depicts "global jihadis" providing "narratives of historical events in which, generally speaking, the so-called Muslim nation is victimized, often violently, by oppressive non-Muslim powers." This statement fails to convey the sustained and extreme violence visited upon Chechnya by Russian forces during the First and Second Chechen Wars between 1994 and 2009. This in turn has permitted the dissemination an enormous amount of graphic on-line imagery of civilian death and suffering that might be expected to have an especially potent effect on youthful viewers in the West and elsewhere.

5. No summary of Dzhokhar's apparent radicalization is likely to be accurate or complete if it does not take into account the very strong cultural patriarchal traditions of deference within Chechen families. Chechen society is highly patriarchal, with the father or the eldest son exercising great authority over younger siblings, and a younger brother expected to show deference to his older brother. The Tsarnaev family's deracination from Kyrgyzstan, and from Chechnya and Dagestan, may have weakened their conformity to some Chechen norms of behavior. But Tamerlan and Dzhokhar's longing to feel and be seen as "real" Chechens is suggested by their choice of sports – boxing and wrestling – and is attested to in Dzhokhar's high school essays.

6. Why Tamerlan expressed his apparent alienation from his adopted country so violently is beyond the scope of Prof. Reynolds' testimony. But in seeking an explanation, it may be useful to consider

   (a) that one's self-identification as a Chechen is central to the self-concept of a young Chechen man,

   (b) that this self-identification carries with it special expectations and obligations of proper social relationships, behavior and comportment, but

   (c) circumstances both internal and external to the individual can make it impossible to maintain and live up to these demands of Chechen identity, particularly after

- 6 -

368

emigrating to a new country and a new language as a teenager, and if one lacks effective parental or other role models.

The violent jihadist propaganda emanating from Chechnya and Dagestan that Tamerlan and Dzhokhar watched on-line conveys not only distressing scenes of suffering, but also powerful themes of courage, masculine camaraderie, and redemption in an against-all-odds struggle with the forces of injustice and oppression. As such, this propaganda was likely to have been especially seductive to a young man like Tamerlan to the extent that he felt himself to have failed both as a Chechen and as an American. Although Dzhokhar immigrated to the United States at an earlier age, and appears to have assimilated more fully and easily than his older brother, Tamerlan's culturally-determined authority over his younger brother should also be taken into account in any evaluation of the reasons for Dzhokhar's turn to violence.

7. The Tsarnaev family never spent an appreciable time in Chechnya, living in Kyrgyzstan and Dagestan before moving to the United States. Zubeidat Tsarnaeva, Tamerlan and Dzhokhar's mother, is not Chechen but Avar. The Avars comprise the largest of more than 30 major ethnic groups in Dagestan. Although the histories of the two peoples have been intertwined – Avars played a leading role in the gradual conversion of the Chechens to Islam and Avars led the Chechens and other mountain peoples in the struggle against the Russian empire in the 19th century – and share important social and cultural conventions, they are distinct peoples and draw social boundaries between each other. Avar (like Chechen) social structure is patriarchal, and thus one would not expect Tamerlan and Dzhokhar's mother's ethnicity to have affected the brothers' self-identification as Chechen.

8. In sum, while the ideology of violent Salafi extremism may indeed help to account for Dzhokhar Tsarnaev's involvement in the Boston Marathon attacks, any attempt to understand both why he was susceptible to this ideology and why he acted upon it will benefit from an appreciation of his and his family's historical and cultural background as migrants in the Chechen diaspora, and of the allocation of authority and control in a Chechen family.

**Mark Spencer**. Mark Spencer is an expert in computer forensics. He is President of Arsenal Consulting, a computer forensics and forensic tool development firm. While we expect Mr. Spencer to do be the testifying expert, it is conceivable that, depending on the government's case in this regard, certain aspects of the forensic analysis may require that certain of his employees, including Brian Gerdon and Emina Sabitova, may also be required to testify. Mr. Spencer and the listed employees of his firm all have extensive training and experience in forensic digital investigation. Mr. Spencer was qualified as an expert by Judge O'Toole in United States v. Mehanna. His CV and the CV's of the named Arsenal employees are enclosed.

Mr. Spencer will authenticate digital data the defense offers as evidence, all of which has been provided to us in discovery and thus is already in the possession of the government. We have not yet identified specific items we intend to offer; we will update and modify this disclosure as his analysis continues. Mr. Spencer will describe the source of the evidence, how it was obtained, and how it was preserved. He will describe how information is stored on digital media, how it is organized and manipulated by various computer operating systems, and how it is forensically analyzed and preserved for use at trial. He will explain the significance of file types, folders, applications, pathnames, slackspace, allocated/unallocated space, history, metadata, carved files, registry information, caches, internet history files, URLs, and webpages. In connection with specific items of evidence, he will describe whether and how to determine how and when digital items first appeared on a digital device as well as subsequent digital activity regarding the items.

Mr. Spencer may discuss features of email, chat, text, Skype and other digital communications programs; Twitter, Facebook, and other social media sites; and Google, Yahoo, and other popular search engines. He may discuss how persons at issue in this case accessed these programs and websites using different digital devices based on analysis of the data available from particular devices. He may also discuss private messaging, the lack of security measures, encryption, and file-sharing.

Mr. Spencer will testify about the forensic analysis and extraction of digital media from the digital storage devices that were provided in discovery to us and through us to him. If necessary, Mr. Spencer will also discuss the forensic analysis of digital media provided to us from internet service providers and remote computing services and forwarded to him.

Mr. Spencer will rely on his training and experience and his expertise with the leading computer and phone forensic software, tools, and methods relied upon by forensic analysts in the field.

Sincerely,

/s/
David I. Bruck
Judy Clarke
Miriam Conrad
William Fick
Timothy Watkins

Counsel for Dzhokhar Tsarnaev

- 8 -