UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 14-_____
_____

In re
DZHOKHAR TSARNAEV,
Petitioner
_____

## PETITION FOR WRIT OF MANDAMUS

Dzhokhar Tsarnaev is facing the death penalty.  The government has

charged that he, together with his brother, Tamerlan, set off explosive devices near

the finish line of the 2013 Boston Marathon killing three people and seriously

injuring many more.  It also has charged that he and his brother murdered an MIT

police officer three days after the Marathon bombings and then kidnaped and

carjacked an individual (who escaped from the car and called 911), telling him

they were going to drive his car to New York.   Tamerlan Tsarnaev was killed

while the police were attempting to apprehend the brothers in Watertown, MA,

during a shootout allegedly punctuated by the detonation of additional explosive

devices.  Dzhokhar Tsarnaev was found the following night, wounded and hiding

in a boat in a backyard in Watertown after an intensive search during a "lockdown"

in which residents were told to remain indoors by the Governor of Massachusetts

and other public officials.

The crimes charged in the indictment are understood by the public at large and will be expressly depicted in the government's trial presentation as having victimized not only those persons killed and injured, but also the Marathon, Marathon spectators and participants, the City of Boston, the communities through which the Marathon passes, and the communities, such as Watertown and Cambridge, impacted during the search for the perpetrators.   Thus, every member of the jury pool is, in effect, an *actual* victim of the charged offenses.  The trial, itself, is set to take place at the Federal Courthouse in Boston, less than two miles from the Marathon finish line.

These events and their aftermath have received extensive local media coverage.  This coverage, including "leaks" of non-public information attributed to law enforcement, has continued through the present time.  Indeed, the Associated Press found that the aftermath of the Marathon bombings "dominated headlines in Massachusetts in 2014, much as the attack itself did last year."  Associated Press, *Marathon Bombing Aftermath Was Top Massachusetts Story of 2014* (Dec. 26, 2014).[1]  The governor-elect of the Commonwealth publicly declared that Dzhokhar

---

[1] The article is available at <http://www.masslive.com/news/index.ssf/2014/12/marathon_bombing_aftermath_was.html>.

Tsarnaev is the living person he "most despises."   Yvonne Abraham, "Charlie

Baker Takes the Proust Questionnaire," THE BOSTON GLOBE (Oct. 15, 2014).

These and other steady reminders, whether factual or emotional, accurate or

inaccurate, can only evoke memories of horrific events personally experienced by

prospective jurors in this case.

    The nature and extent of the impact of the Marathon bombings and related

events, and the pretrial publicity engendered by those events, require a change of

venue if Mr. Tsarnaev is to receive the "fair trial by a panel of impartial,

'indifferent' jurors" guaranteed by the United States Constitution.  *Irvin v. Dowd*,

366 U.S. 717, 722 (1961).

    While mandamus is an extraordinary writ, this is an extraordinary situation.

The notion of nearly universal local victimization is not merely theoretical or

rhetorical.  The government itself has proffered expert testimony that every juror,

and in particular every child close to every juror, who was "exposed in some way

to the events of the week of April 15, 2013" is an actual victim of the alleged

offenses facing "a significantly increased risk" of serious mental health

consequences that "will continue to traumatize them for years to come" and will

leave many "permanently compromised."  District Court Docket Entry

(hereinafter, "D.E.") 686 at 10.  Just as the victimization of the Oklahoma

community described in *United States v. McVeigh*, 918 F.Supp. 1467 (W.D. Okla. 1996), required a change of venue to a place outside Oklahoma, so the victimization of the community in this case — a community that includes those killed or injured and their families, relatives, friends, and acquaintances; those employed at any of the hospitals to which the injured were brought; those who participated in or watched the Marathon; those who live in Boston or any of the communities through which the Marathon passes; those who live in the communities affected by the unprecedented lockdown during the search for the perpetrators (Watertown, Newton, Waltham, Belmont, Brookline, Cambridge and the Allston-Brighton neighborhood of Boston[2]); those affected by the suspension of public transit services through the MBTA; those participating in Boston Strong and One Fund campaigns; etc. — requires a change of venue to a location outside Massachusetts.  If the Constitution and Rule 21 do not require a change of venue in *this* case, it is difficult to conceive of *any* case that could ever warrant such relief in the future.  The entire body of law on venue would be left an empty shell.

## Relief Sought

Pursuant to 28 U.S.C. §1651 and Rule 21(a) of the Rules of this Court,

---

[2] *See* Herman B. Leonard et al., "*Why* Was Boston Strong?", *Harvard Kennedy School Program on Crisis Leadership* at 24 (April 2014) (listing lockdown communities).

Dzhokhar Tsarnaev petitions for a writ of mandamus ordering the district court to grant a change of venue in the case of *United States v. Tsarnaev*, No.13-CR-10200-GAO, pending in the United States District Court for the District of Massachusetts.  He further requests that this Court stay jury empanelment and trial, scheduled to begin at 9 a.m. on January 5, 2015, pending resolution of this petition.[3]  A stay will promote judicial economy and ensure public confidence in the fairness of the proceedings.

Alternatively, Mr. Tsarnaev requests that this Court order the district court to hold an evidentiary hearing to resolve disputed factual issues and to reconsider the previously-filed motions for change of venue after that hearing, all to occur prior to the beginning of any jury empanelment.

## Procedural History

Mr. Tsarnaev was indicted on June 27, 2013.  On November 12, 2013, the district court ordered that any change of venue motion be filed on or before February 28, 2014.  On December 16, 2013, the defense requested funds to retain the services of a consultant to evaluate venue-related issues and to assist in determining whether to file a request for a change of venue.  The defense motion

---

[3] Separate motions for stay are being filed contemporaneously with this petition in both this Court and the district court.

5

requested that the February 2014 filing deadline be vacated, and set out the steps

and factual research needed to determine whether a motion for change of venue

was warranted and, if so, to prepare that motion and appropriate accompanying

analysis and documentation.  One of the reasons offered for extending the time was

the potential impact of a death penalty authorization decision by the government

on the public attitudes relevant to venue.  The government opposed that motion.

The court vacated the deadline on January 14, 2014 (D.E. 158).

On January 30, 2014, the government filed a notice of intent to seek the

death penalty.  At a status conference on February 12, 2014, the court set June 18,

2014, as the filing date for any motion to change venue.  On February 20, 2014, the

district court recommended approval of *partial* funding (*i.e.,* funding for

preliminary analysis only, to permit the defense to make an informed

determination *whether* a motion to change venue was warranted) for a venue

expert pursuant to the defense description of a multi-step process.  This Court

authorized the funding on March 10, 2014.

On June 11, 2014, the defense requested an additional six-and-one-half

weeks (to August 3, 2014) for filing a motion to change venue, explaining that

while preliminary research (pursuant to the partial grant of expert funding) showed

that a motion to change venue should be filed, the additional time was needed for

the defense, aided by its venue expert, to gather and analyze the evidence required

to support the motion as described in the original defense funding request.  The

government opposed that motion.  The court denied the motion on June 13, 2014,

stating:

> It is fair to infer from that statement [that the defense has determined a
> motion to change venue should be filed] that the defense team has
> investigated and considered the pertinent issues and has formed a
> reasoned conclusion that a factual and legal basis exists to support a
> change of venue.  Therefore it is practicable for the defense to file a
> timely motion on the present schedule setting forth the factual and legal
> reasons why a change of venue is necessary or advisable.

D.E. 368.

In compliance with the court's order, the defense filed a motion for change

of venue on June 18, 2014 (D.E. 376).  The defense reiterated:

> the need for an in-depth analysis of the news media coverage and
> circumstances that account for the survey results, as well as further
> analysis of the survey data, in order to determine the full extent of the
> presumption against Mr. Tsarnaev.  According to our retained venue
> expert, who has performed such venue analyses in more than 1000 state
> and federal cases, these further analyses are essential to establish the
> necessity for a change of venue.

D.E. 376 at 2.  The defense reminded the court that it had identified an expert and

sought funding in December, 2013, for a two-stage process (public opinion polling

to determine whether to pursue a change of venue and, if supported by that data,

the additional work needed to provide legal and factual support for a motion for

change of venue) but that the necessary court approvals of defense funding for the first stage were not complete until March 2014.  The defense explained that the survey was delayed until May 2014 to avoid distortion from publicity surrounding the first-year anniversary of the bombing and the 2014 Marathon in mid-April. Counsel received a preliminary summary of the findings on May 30, 2014.  Based on those findings, counsel sought additional funding for the second stage of the analysis on June 10, 2014, and requested an extension of time on June 11, 2014, that the court denied (D.E. 376 at 2-3).

The June 18, 2014, motion included some preliminary findings from the survey data, showing that of four potential venues,[4] Boston was the most prejudiced on measures of case awareness, case knowledge, pre-judgment of guilt, case-specific support for the death penalty should Tsarnaev be convicted, and case salience.  The motion did not include the raw data or an analysis; it reiterated the need for further expert analysis of the data obtained and the need for the collection and analysis of additional data (D.E. 376 at 5-8).

On July 1, 2014 the government filed an opposition to the defendant's

---

[4]  The venues examined were the Eastern Division of the District of Massachusetts ("Boston"); the Western Division of the District of Massachusetts ("Springfield"); the Southern District of New York ("Manhattan"); and the District of Columbia ("D.C.").

motion for change of venue, focusing on the size and population of the Eastern Division and its view of the press coverage as largely factual rather than inflammatory.  It asserted that the motion should be denied because defendant had chosen not to submit any news articles in support of the motion and that the polling data should be disregarded for a variety of reasons.

On July 15, 2014, defendant filed a motion for leave to file a reply to the government's opposition and to submit supplementary material in support.  The defense reiterated that its motion had clearly articulated the preliminary nature of the information on which it had been based, as the request for additional time to complete the survey data analysis and to conduct an evaluation of the media coverage had been denied and the request for funding had been awaiting court action.  In the interim, that funding had been approved and the expert was in the process of completing his work.  The defense also pointed out that a number of the government's objections to the polling data had been noted in the defendant's motion as areas that needed to be addressed by the expert, but had not been addressed at the time the motion was filed, due to lack of sufficient time and funding.

The government opposed the motion (D.E. 418).  The court granted the motion by electronic order on July 22, 2014.

On August 7, 2014 the defendant filed a reply to the government's opposition and submitted supplemental materials, including a declaration from Dr. Edward Bronson,  a professor emeritus of political science at California State University, Chico[5], and the opinion poll information and newspaper articles the government had complained were missing from the initial motion.   The defense requested that the court either grant a change of venue to Washington, D.C. or hold an evidentiary hearing on the need for a change of venue (D.E. 461 at 9).[6]

---

[5]  Dr. Bronson received a JD from the University of Denver, an LLM from New York University and a PhD in political science emphasizing public law from the University of Colorado (D.E. 461-1 at 2).  He has been studying and doing research on pretrial publicity for 44 years and had been qualified as an expert witness in nearly 300 cases, including over 100 cases on change of venue motions. His December 16, 2013 declaration in support of the request for authorization to retain a consultant noted that he had recommended and or testified against the need for a change of venue in 189 cases and that in the 21 federal cases in which he had consulted he had recommended against the need for a change of venue ten times (*Id*. at 3-4).

[6]  However, the defense noted that given the time constraints, Dr. Bronson's analysis had been based on print media from one major newspaper in each of the divisions or districts surveyed, and had not included the substantial television or internet media coverage (D.E. 461 at 5).  He had also cut off coverage at July 26, 2014 in order to comply with the filing schedule (*Id.* at 6).   Dr. Bronson concluded, based on his analysis that a change of venue was necessary to protect Mr. Tsarnaev's fair trial rights given the "overwhelming presumption of guilt and prejudgment as to the penalty" extant in the District of Massachusetts (D.E. 461-1 at 2).   Based on his comparison of data from the Eastern and Western Division of the District of Massachusetts, the Southern District of New York, and the District of Columbia, Dr. Bronson concluded that Washington, D.C. had the lowest level of anti-defendant bias (*Id*. at 3).

On August 14, 2014, the court granted the government's oral motion for leave to file a "surreply" (Tr. Status conference 8/14/2014 at 3). On August 25, 2014, the government filed a "surreply" (D.E. 512) attacking Dr. Bronson's[7] opinions based on his involvement in other cases in which changes of venue had been denied and on the government's conclusions about Dr. Bronson's media analysis derived from some internet searches apparently run by someone in the United States Attorney's office using some of the search terms used by Dr. Bronson. According to the government, these searches produced articles not related to the Marathon bombing or this case.

The government's response to the defense submission of Dr. Bronson's declaration placed a number of facts in dispute. Based on its own experimental searches, the government dismissed Dr. Bronson's statement that "a few of the included articles are not relevant to the Marathon bombing case" as "irresponsible, if not outright misleading" (D.E. 512 at 9). The government's rejection ignored, however, the caveats in Dr. Bronson's declaration (D.E. 461-1 at 9). The government's attack on Dr. Bronson's assessment of the inflammatory nature of publicity again relied on its own computer searches by an unidentified

---

[7] The government's attacks include referring to him as "Mr. Bronson" rather than recognizing his professional credentials.

individual(s) and its own characterization of the coverage as "predominantly

factual and accurate" (D.E. 512 at 11), which apparently assumed that headlines,

which is all the government listed, necessarily reflect the nature of the complete

contents of the articles (D.E. 512 at 11-13).

Other factual disputes concerned the extent of the publicity and the

relevance of polling data.  Citing circulation statistics, but ignoring the availability

of articles on the internet, the government concluded that "only 15% of the jury

pool reads the Globe every day" (*Id*. at 13-14).  The government rejected the

opinion poll, maintaining that voir dire suffices regardless of any polling results

(*Id*. at 18-19).  It also deemed the poll "unreliable and misleading" based on a less

than 3% response rate and lack of representative sampling (*Id.* at 20-21).

Given the factual disputes raised by the government's surreply, and the

nature of the government's attacks on Dr. Bronson's declaration, the defense

obtained a review of Dr. Bronson's declaration and materials from another

nationally-recognized expert, Professor Neil Vidmar, a professor of law at Duke

University School of Law.  Dr. Vidmar concluded that the government's efforts to

discredit Dr. Bronson's methodology and the reports of its own search efforts and

results reflected "a misunderstanding of basic research methodology" and was

"both misleading and at variance with standards used in social science research."

(D.E. 686-5 at 3-4)[8].  He also concluded that it contained "a number of critical
inaccuracies." (*Id*. at 4).

The defense sought leave to file a response to the government's "surreply"
on August 29, 2014 (D.E. 516).   That same day, the government opposed that
motion and moved to strike the response filed with the motion for leave to file
(D.E. 519).[9]  The court granted the government's motion, denying Tsarnaev's
motion for leave to respond to the government's surreply and striking the defense
response from the record.  (D.E. 527).   Mr. Tsarnaev then sought to supplement
the record on the motion for change of venue or alternatively for an evidentiary
hearing to resolve issues of disputed fact.  He also asked that the response and
Vidmar declaration remain part of the record in the event of an appeal (D.E. 531).
The government opposed that motion (D.E. 537); the court denied it (D.E. 569).

---

[8]   While Dr. Vidmar's declaration was stricken from the record in
connection with the first motion for change of venue, it was later submitted in
connection with Tsarnaev's Second Motion for Change of Venue and may be
found at D.E. 686-5.

[9]  The government erroneously asserted that "[t]he Local Rules do not
authorize the filing of a response to a surreply" (D.E. 519 at 1).  The Rules
authorize the filing of motion papers beyond a motion and opposition with leave of
court.  *See* Local Rule 7.1.  If the Local Rules did not authorize the defendant's
response, they did not authorize the filing of the government's surreply.  In any
event, the fact that the pertinent pleadings were styled as a defense "reply" and a
government "surreply" was nothing more than an artifact of the bifurcated funding
for the defense expert's work.

On September 24, 2014, the court issued an opinion and order denying defendant's motion for change of venue. It agreed with "the reasons articulated in the government's sur-reply" (D.E. 577 at 4) — reasons the defense sought to challenge either by way of a response to that surreply or an evidentiary hearing, both of which were denied.  The court also relied on the passage of time since the bombings and its belief that voir dire would suffice to identify prejudice during jury selection.  *See id.*

Tsarnaev filed a second motion for change of venue on December 1, 2014. He presented evidence of continuing publicity concerning this case and related events (D.E. 686-3 and 686-4)  and discussed the impact of that publicity on a jury venire where most, perhaps even all, of the venire has been described as victimized by the Marathon bombing and its aftermath  (D.E. 684, 686).  He discussed the unfair prejudice arising from the widespread victimization  in this case, a victimization recognized by one of the government's own proposed experts, the impact of leaked information, and the inadequacy of voir dire as a measure to redress this type of prejudice  (D.E. 686).  He also submitted the declaration of Neil Vidmar addressing Edward Bronson's initial analysis and the government's response to that analysis (D.E. 686-5), and the declaration of Josie Smith, who collected the publicity for both Dr. Bronson's initial analysis and the presentation

in the second venue motion (D.E. 686-1).  In her declaration Ms. Smith also addressed the government's media-search set out in its surreply to Tsarnaev's first motion for change of venue (D.E. 686-1at 2-3).  The government moved to strike Dr. Vidmar's declaration and the paragraphs of Ms. Smith's declaration addressing the government's search methodology and analysis in its surreply to Tsarnaev's first motion for change of venue, asserting that it was a response to the government's surreply that should not be allowed (D.E. 760).  Mr. Tsarnaev filed an opposition to that motion (D.E. 774).  The government also filed an opposition to the second motion for change of venue (D.E. 796).  Tsarnaev filed a reply (D.E. 779) and supplemental authority (D.E. 780 and 852).

On December 31, 2014, the district entered an order denying the Second Motion for Change of Venue (DE 876).

### Reasons Why the Writ Should be Issued

I.   MANDAMUS IS AVAILABLE TO ORDER A CHANGE OF VENUE IN ORDER TO
     EFFECTUATE A DEFENDANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL
     BY AN IMPARTIAL JURY.

Defendant requests mandamus to order that the district court change venue
or hold an evidentiary hearing to resolve disputed factual issues and reconsider
defendant's motions for change of venue after that hearing, all prior to beginning
any jury empanelment, currently scheduled to begin at 9 a.m. on January 5, 2015.

Mandamus is a writ available under 28 U.S.C. §1651.  It is, as the Supreme
Court and this Court have explained, an exceptional remedy available under
limited circumstances.  As explained in *In re Bulger*, 710 F.3d 42, 45 (1st Cir.
2013):

> Before the writ will issue, "the petitioner must satisfy 'the burden of
> showing that [his] right to issuance of the writ is clear and
> indisputable.'"...[citations omitted].  A petitioner for mandamus relief
> must also demonstrate that he has no other adequate source of relief;
> that is, he must show "irreparable harm."...[citations omitted].   And
> finally, a petitioner must demonstrate that, on balance, the equities
> favor issuance of the writ. [citations omitted]

"The primary condition of mandamus is that the petitioner be clearly entitled to
relief."  *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997).   Mr. Tsarnaev
submits that his requests meet the requirements for issuance of the writ.

While counsel do not believe that this Court has issued an opinion deciding

whether an order denying change of venue would be subject to mandamus review, it has suggested that would be the case.  In *Ecker v. United States*, 575 F.3d 70, 76 n.2 (1st Cir. 2009), this Court noted, in a civil commitment case in which the individual committed had been transferred from Minnesota to Massachusetts and the government was appealing the denial of its motion that the individual be retransferred to Minnesota, that "[i]f the government opposed the initial transfer it should have sought a stay from the District of Minnesota or filed a mandamus petition with the Eighth Circuit to halt the transfer."  If mandamus is a proper remedy to seek to halt a venue transfer, it is also a proper remedy to compel one. In *In re Kouri-Perez*, 134 F.3d 361 (1st Cir. 1998) (unpublished), this Court assumed, without deciding, that mandamus would be available to challenge the denial of a motion for change of venue.

Other courts also have held that the denial or granting of a motion to transfer a criminal or a civil case may be challenged by mandamus.  *See, e.g.*, *Matter of Balsimo*, 68 F.3d 185 (7th Cir. 1995) (denial of motion for change of venue in criminal case); *In re Horseshoe Entertainment*, 337 F.3d 429 (5th Cir. 2003) (denial of motion to transfer civil case); *In re United States*, 273 F.3d 380 (3rd Cir. 2001) (granting of motion for transfer of criminal case); *In re Link_A_Media Devices Corp.*, 662 F.3d 1221 (Fed. Cir. 2011); *In re Nintendo of America, Inc*,

17

756 F.3d 1363 (Fed. Cir. 2014) (ordering district court to grant motion to sever and transfer claims).

## II.   THE NATURE AND SCOPE OF VICTIMIZATION AND PREJUDICIAL PRETRIAL PUBLICITY GENERATED BY THE EVENTS GIVING RISE TO THE PENDING CHARGES AND THEIR AFTERMATH REQUIRE A CHANGE OF VENUE.

### A.   Victimization.

A fair trial by an impartial jury — an unbiased tribunal — is an undoubted constitutional right, guaranteed by the Fifth and Sixth Amendments to the United States Constitution.  *See Irvin v.* Dowd, 366 U.S. 717 (1961).  As this Court stated in *United States v. Cooper*, 872 F.2d 1 (1st Cir. 1989), "since '[a] fair trial in a fair tribunal is a basic requirement of due process,'…motions for change of venue to escape a biased tribunal raise constitutional issues both relevant and essential." *Id.* at 3 (internal quotation marks omitted) (quoting  *Holt v. Virginia*, 381 U.S. 131 (1965)).

The nature and ongoing community impact of the Marathon bombing and its aftermath, and the extensive prejudicial and emotional publicity that this sequence of crimes generated, , take this case outside the realm of other high-profile murder cases make it clear that a change of venue is required to effectuate Mr. Tsarnaev's right to a fair trial in a fair tribunal.

The victims in this case are not limited to those killed or injured or to their families, friends, and acquaintances.  They are not limited to those participating in or watching the Marathon and their families, friends, and acquaintances, or to those who worked at the hospitals treating and caring for the injured. The offenses alleged here have been widely viewed as attacks on the city of Boston and on the "most iconic sporting event" in the city.[10]  The Boston Marathon is an annual event begun in 1897.  Its 26.2 mile course runs through eight communities from Hopkinton to Boston, all within the Eastern Division of the District of Massachusetts from which a jury would be selected.  The Marathon is televised and followed well beyond those communities as it is one of six world marathon "majors."  The communities of Cambridge and Watertown were also dramatically and directly affected by shootings in the aftermath of the Marathon bombings and, together with the communities of Belmont, Newton, Waltham, Brookline, and the Allston-Brighton neighborhood of Boston, were placed in an unprecedented state of "lockdown" during the search for the suspect.  These communities are within the Eastern Division of the District of Massachusetts from which a jury would be selected.

---

[10] *See* D.E 461, Ex.2a, article 644.

All of these persons, places and events should be viewed as victims in this case.  Just as a defendant charged with killing an individual would not be tried by a jury including relatives, friends, and acquaintances of the victim, and people connected to the events that resulted in the killing, so, here, such a substantial portion of the Eastern Division of the District of Massachusetts has been victimized by the attack on the Marathon and the related events or is connected to those victimized, that the effect on the jury pool requires a change of venue.

The ongoing nature of the victimization is illustrated by an article in the *Boston Globe*, castigating the defense for filing its initial motion for change of venue.  It notes that "many [of the people near the finish line still suffer with the physical and emotional aftermath of the attack that day in April 2013."  D.E. 684 Ex.1b, *Boston Globe* article 67.

Recognition of nearly universal local victimization is not merely theoretical.  Indeed, the government has disclosed that one of its expert witnesses will testify[11], in substance, that the Marathon bombings and their aftermath have inflicted tangible injury on the entire local population, especially children:

> We expect [the expert]  to  . . . describe clinical phenomena that
> demonstrate the terrifying impact that the defendant's actions had

---

[11] Whether or not the trial court permits such testimony, the underlying fact remains that, in the government's view, every prospective local juror is an actual victim.

upon the community. [He] will first describe generally the impact of terrorism and catastrophic events on children. For example, [he] will describe that likely PTSD symptoms typically increase among children who have been impacted by a catastrophic event. The intensity and duration of the events, as well as the manner in which responsible adults deal with the event, affect the types of symptoms manifested. In this case, all of these factors were extraordinarily traumatic. [He] will further explain that although most children develop mechanisms to outgrow or overcome these experiences, many, especially those who have previously experienced trauma, become especially vulnerable. [He] is expected to explain how, statistically, even modest symptoms of PTSD, for a child, lead to dramatically different outcomes upon matriculation and on social, academic, professional and overall adjustment gauges as compared to children without such symptoms.

[The Expert] will present the findings of his work related to the impact of the Boston Marathon and Watertown events. For example, [his] team surveyed families in the Boston area, including Watertown and Dorchester, as relates to the behaviors and symptoms evident in students who were exposed in some way to the events of the week of April 15, 2013. The survey found significantly increased exhibition of likely PTSD symptoms among school aged children.
. . . .

Based on his training and experience as well as the studies he has conducted and reviewed, [he] is expected to opine that the defendant's selection of manner and means of committing the instant crimes will continue to traumatize individuals for years to come and that many will be permanently compromised by the defendant's actions.

D.E. 686 at 9-10 (quoting government letter dated August 1, 2014, filed under seal

in the district court). In short, the government will attempt to elicit evidence at

trial that every juror, and in particular every child close to every juror, who was

"exposed *in some way* to the events of the week of April 15, 2013" is an actual

victim of the charged offense facing a "significantly increased risk" of serious

mental health consequences that "will continue to traumatize [them] for years to

come" and will leave many "permanently compromised." *Id*. It is difficult to

conceive how a juror confronted with such testimony could possibly remain

impartial.

     **B**.    **Pretrial Publicity.**

     Both the events from the day of the Marathon through the capture of the

defendant in Watertown and subsequent events related to the bombings and the

victims of the bombings have been the subject of extensive news coverage. A

limited portion of this coverage, consisting of 2,420 articles from the Boston Globe

from April 15, 2013 through July 11, 2014 and  238 articles from the Boston Globe

and the Boston Herald from July 26, 2014 through November 15, 2014, was

submitted to the district court.  *See* D.E. 461(exhibits), 686 (exhibits).  This

coverage continues.  On December  26, 2014, the Associated Press reported that

the "legal aftermath of the Boston Marathon attacks dominated headlines in

Massachusetts in 2014, much as the attack itself did last year . . . ." Associated

Press, *Marathon Bombing Aftermath Was Top Massachusetts Story of 2014* (Dec.

26, 2014), *available at*

<http://www.masslive.com/news/index.ssf/2014/12/marathon_bombing_aftermath_was.html>.  The report corroborates the defense analysis presented to the district court showing that intense pretrial publicity has continued unabated.

While some of the coverage is simply factual, some can only be viewed as prejudicial.  Articles submitted to the district court included emotionally-charged coverage and reports of inculpatory statements that will not be presented in the government's case in chief.  *See* D.E. 461 exhibits (discussing the *Boston Globe* coverage from April 16, 2013 through July 11, 2014 and its impact on Mr. Tsarnaev's ability to obtain a fair trial in the District of Massachusetts);  *see also* D.E. 684 and 686 (discussing the more recent coverage in the *Boston Globe* and the *Boston Herald*, including an article linking the Marathon bombings to the terrorist attacks of September 11, 2001);  *see also* a segment on the 6:00 p.m. news on WCVB on September 24, 2014, http://www.wcvb.com/news/military-syria-airstrikes-stop-imminent-threat-of-attack-in-us/28229230 , linking the Marathon bombing and Mr. Tsarnaev to ISIS.[12]

In an interview reported in a column in the Boston Globe published on

---

[12]    While no thorough analysis of television, radio, or other electronic or social media has been undertaken, this Court can take judicial notice that the Marathon bombings and related events (including the cases and charges brought against others for obstruction of justice and lying to authorities in connection with the investigation) have received extensive coverage in those media.

October 15, 2014, the incoming governor of the Commonwealth of Massachusetts, Charlie Baker was asked: "Which living person do you most despise?"  He answered: "Dzhokhar Tsarnaev."  Yvonne Abraham, "Charlie Baker Takes the Proust Questionnaire," THE BOSTON GLOBE (Oct. 15, 2014).

All of the recurring media references keep the Marathon bombings and subsequent events fresh and raw in the public consciousness.  As set out in the pleadings filed in the district court, the continuing adverse pre-trial publicity and effects of the events at issue in this case give rise to a presumption of prejudice requiring a change of venue.  *See* D.E. 461, the attached declaration of Edward Bronson, and D.E. 684 -2, the declaration of Neil Vidmar.

Even factual news coverage can give rise to a need for a change of venue based on prejudicial pretrial publicity.  Social science research has shown that potential jurors exposed to extensive pretrial publicity develop a "story model," that is, a framework or theory of events through which subsequent information is filtered. *See* Bronson Decl. (attachment to DE 461), ¶¶ 14-17, Vidmar Decl. (D.E. 684-2). A person who has developed a story model of the defendant's guilt based on exposure to pre-trial publicity will be less likely to consider evidence at trial in a way that conflicts with that previously-developed story of guilt.  *See also* Tarika Daftary-Kapur, et al., "Examining Pretrial Publicity in a Shadow Jury Paradigm:

24

Issues of Slant, Quantity, Persistence and Generalizability," 38 LAW AND HUM.

BEHAV. 462 (2014) (finding a strong biasing effect from pretrial publicity

increasing with the quantity of exposure and persisting through the trial); Nancy

M. Steblay et al., "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-

Analytic Review," 23 LAW AND HUMAN BEHAVIOR 219, 229 (1999) (a meta-

analysis of 44 empirical studies concluded that the data "support the hypothesis

that negative pretrial publicity significantly affects jurors' decisions about the

culpability of the defendant.").  Here, the prevailing "story" of guilt in this case

recently has been reinforced by the widely-reported convictions and guilty plea of

three of defendant's friends who were charged with obstructing justice and lying to

investigators.

### C.    The Clear Need For a Change of Venue.

The nature and degree of victimization of the jury venire in this case is

unprecedented in this district.  Together with the pretrial publicity it compels a

change of venue.  While the district court dismissed *United States v. McVeigh*, 918

F.Supp. 1467 (W.D.Okla.1966) as not pertinent in its denial of Mr. Tsarnaev's first

motion for change of venue (D.E. 577 at 6, n.3), this Court should reexamine and

reject that conclusion, for the situation here is indeed comparable to that in

*McVeigh*.  In that case, the court held that the venue of the trial of the defendant

charged with bombing the Murrah Federal Office Building in Oklahoma City should be changed from Oklahoma City to Denver, Colorado rather than to another location in Oklahoma as urged by the government.  The analysis employed by the court in that case is apposite here.

The attack on the Murrah Federal Building initially generated extensive publicity both nationally and in Oklahoma. The publicity in Oklahoma, including "continuing coverage of the victims and their families" continued for a longer period of time after national coverage abated.  *Id*. at 1471.  So, too, here. "The Oklahoma coverage was more personal, providing individual stories of grief and recovery." *Id*.  So, too, here.[13]  The "Oklahoma family" was "a common theme in the Oklahoma media coverage, with numerous reports of how the explosion shook the entire state, and how the state has pulled together in response." *Id*.  Here, "Boston Strong" became a rallying cry, a civic response embraced by Boston's sports teams along with civic figures and the general population.[14]

_____

[13]   Here, as in Oklahoma, media coverage has, from the beginning to today, reported extensively on individual stories of grief and recovery. *See, e.g.,* D.E. 461, Ex.2a: 4, 5, 8, 46, 48, 49, 80, 109, 110, 158, 176, 296, 329, 342, 343, 396, 398, 413, 528, 571, 619, 774, 802, 926, 996, 1925, 1033, 1077, 1209, 1390, 1455, 1721, 1727, 1792, 2996, 2029, 2102, 2012, 2151, 2159, 2166, 2204, 2207, 2256, 2257, 2325; Ex.1b: 32, 37, 131, 138; Ex.1c 33, 41.

[14]   "Boston Strong" has a Wikipedia page, is found on many types of merchandise, and has been repeatedly referenced in the news coverage. *See, e.g.,*

Here, as in *McVeigh,* the strong emotional and community response evidenced in the pretrial publicity demonstrates that potential jurors from the Eastern Division of the District of Massachusetts can only be presumed to feel a personal stake in the outcome. As in *McVeigh,* a change of venue is required to provide Mr. Tsarnaev with a fair trial by an impartial jury. [15]

The district court relied heavily on *Skilling v. United States*, 561 U.S. 358 (2010) for its denial of a change of venue here.  Mr. Tsarnaev submits that the nature and degree of victimization in this case and the emotions the events at issue here have generated in this community render *Skilling* inapposite.  While the Court in *Skilling* rejected defendant's claim that the impact of hostility towards him in

---

http://en.wikipedia.org/wiki/Boston_Strong; http://www.bostonstrongbracelet.org; http://www.cafepress.com/+boston-strong=gifts?utm_campaign=AKE-ID& utm_content=search; DE 461, Ex. 2a: 138, 230, 241, 246, 252, 344, 375, 429, 430, 489, 523, 537, 580, 583, 683, 802, 822; D.E 684 Ex. 1b: 104, 143; D.E.684 Ex. 1c: 69, 84.

[15]  In *United States v. Awadallah*, 457 F.Supp.2d 246, 252 (S.D.N.Y. 2006), the defendant was charged with perjury arising from his grand jury testimony denying he knew the name of  one of the 9/11 hijackers he had seen in the company of another 9/11 hijacker whom he testified he had met in San Diego and last seen in December 2000, and denying handwriting of that name in his examination book was his.  Rejecting the defendant's reliance on *McVeigh,* the court conceded that if the defendant "was actually charged with participating in the September 11 attacks, it is possible to imagine that the prejudice in this case would be comparable to the community scrutiny and outrage that justified a change of venue in *McVeigh*.  But [defendant] is charged with perjury, not terrorism, and this fact distinguishes his case from the *McVeigh* matter."  Here, of course, Mr.

Houston, coupled with extensive pretrial publicity required a change of venue, it

noted that only 12.3% of Houstonians contacted in a survey named Skilling in a list

of Enron executives they believed guilty, 43% had never heard of him; and 23%

associated his name with Enron but reported no opinion about him.  *See* 561 U.S.

at 382, n. 15.   Here, in contrast, 88.6% of those surveyed recognized the name

Dzhokhar Tsarnaev; 57% believed he was definitely guilty and another 34.5%

believed he was probably guilty.  *See* D.E. 461, Ex.4f.

Moreover, the victimization of the city of Boston and the surrounding

communities arising from the bombing at the Boston Marathon is much greater in

both extent and kind than was the alleged victimization of Houston arising from a

corporate bankruptcy.  The *Skilling* Court also noted that the news stories there

contained "no confession or other blatantly prejudicial information." 561 U.S. at

382.  Here, the news stories did contain that kind of blatantly prejudicial

information.  The *Skilling* Court noted that four years had passed between Enron's

bankruptcy and Skilling's trial.  *See id*.  Here, trial is scheduled to begin

approximately twenty-one months after the Marathon events and their aftermath.

In sum, the facts and circumstances of this case, unprecedented in the

District of Massachusetts, clearly dictate a change of venue to a different district to

---

Tsarnaev *is* charged with terrorism.

provide Mr. Tsarnaev with the fair trial by an impartial jury to which he is constitutionally entitled.

### D.   Jury Voir Dire Cannot  Substitute for a Change of Venue.

In denying the first motion for change of venue, the district court stated that voir dire will be adequate to identify prejudice during jury selection. *See* D.E. 577 at 6.  However, this Court has questioned the adequacy of voir dire to obtain an impartial jury in the light of prejudicial pretrial publicity.  In *United States v. Delaney*, 199 F.2d 107 (1st Cir. 1952), the Collector of Internal Revenue for the District of Massachusetts was indicted for receiving bribes and other offenses. This "occasioned widespread publicity in the public press, particularly in the Boston area." *Delaney*, 199 F.2d at 109.  During the course of the proceedings, a congressional investigation into corruption in Collectors' Offices took evidence about the Boston office and Delaney, including information about matters for which Delaney had not been charged.  The Boston press also covered these hearings extensively.  The coverage "thoroughly blackened and discredited" Delaney's character prior to trial.  *Id*. at 111.  Delaney's motions for a continuance based on prejudicial pretrial publicity were denied. *See id*. at 111-112.  He went to trial and was convicted.  This Court reversed, finding the district court abused its

discretion in denying the requested continuances.  In so doing, the court recognized

the inefficacy of voir dire as a cure, stating:

> No doubt the district court conscientiously did all he could, both in
> questions he addressed to the jurors at the time of their selection and
> in cautionary remarks in his charge to the jury, to minimize the effect
> of this damaging publicity….But,[quoting Justice Jackson]… "The
> naïve assumption that prejudicial effects can be overcome by
> instructions to the jury all practicing lawyers know to be unmitigated
> fiction."…One cannot assume that the average juror is so endowed
> with a sense of detachment, so clear in his introspective perception of
> his own mental processes, that he may confidently exclude even the
> unconscious influence of his preconceptions as to probable guilt,
> engendered by a pervasive pre-trial publicity.

*Id*. at 112-113.

The efficacy of voir dire as a safeguard against the impact of prejudicial

pretrial publicity also has been questioned in many social science studies.  *See,*

*e.g.,* Christina A. Studebaker and Steven D. Penrod, "Pretrial Publicity The Media,

the Law, and Common Sense", 3 PSYCHOLOGY, PUBLIC POLICY, AND LAW

428,440-442 (1997) (describing, *inter alia* results of study showing that well

informed jurors who later return a guilty verdict are also highly likely to assert

impartiality) ; *see also* Bronson Decl. (attachment to DE 461) and Vidmar Decl.

(D.E.684-2).

Other courts have also expressed skepticism about the efficacy of voir dire

in overcoming bias.  "Determining whether a juror is biased or has prejudged a

case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Smith v. Phillips*, 455 U.S. 209, 221-222 (1982) (O'Connor, J. concurring).   As the Court stated in *Irvin v. Dowd*, 366 U.S. 717 (1961), "[n]o doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father." *Id*. at 728.  Judge Mark W. Bennett has discussed the problems of implicit bias in jury selection and the inadequacy of judge-dominated voir dire to address that bias. *See* Judge Mark W. Bennett, "Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions,"  4 HARVARD LAW & POLICY REVIEW 149 (2010).

That the Court in *Skilling*, reviewing the voir dire conducted there, found no actual prejudice in Skilling's jury notwithstanding  extensive pretrial publicity, *see* 561 U.S. at 385-395,  does not support the conclusion that voir dire can produce an impartial jury here.  The Marathon bombing and its aftermath are far different from a corporate bankruptcy, even one on the scale of Enron.  The victimization of the communities from which the jury will be selected and the nature of that victimization, as described by one of the government's own experts, sets this case apart.

Here, for the reasons discussed by this Court in *Delaney* and by contemporary scientific researchers, this Court should reject the district court's conclusion that voir dire can cure the effects of the extensive and pervasive prejudicial impacts arising from  the Marathon bombing and its aftermath, including  the extensive community victimization and prejudicial pretrial publicity.

### III.    A WRIT OF MANDAMUS ORDERING A CHANGE OF VENUE IS NEEDED TO PREVENT IRREPARABLE HARM.

If, as Mr. Tsarnaev maintains, he is clearly entitled to a change of venue, relegating him to post-trial appellate review in the event of a conviction will cause irreparable harm.  First, the government represented at the status conference of November 12, 2013, that "a trial on the merits would be approximately 90 days, and that the sentencing phase to follow would be six weeks for both sides…. And that's assuming a half-day – typical half-day schedule."  D.E. 149 at 12. Assuming, *arguendo*, conviction and a death penalty sentencing phase, this trial will undoubtedly generate additional months of publicity, some of which is likely to reach other districts.  If a change of venue is ordered after appeal the potential for impaneling an impartial jury elsewhere will be adversely impacted by the publicity.

Second, as in *In re Bulger*, 710 F.3d 42 (1st Cir. 2013), there would be damage to the judicial system.  In *Bulger*, this Court addressed a petition for a writ

of mandamus directing the district court to recuse itself from a high-profile

criminal case.  This Court concluded that the petitioner had established a clear

right to relief and found irreparable harm in damage to the judicial system.   Relief

was warranted "for here the prior disclosures make it imperative to act promptly to

preclude any reasonable question whether untoward Government action in the past

may affect the fairness of the judicial branch in the present."[16]  710 F.3d at 48.   In

this case, conducting a months-long trial, including a death-penalty sentencing

phase, under circumstances where it is clear that the trial should have been held

elsewhere, can only raise questions about the fairness of the judicial branch in

subjecting not only the defendant, but also the community, to a trial that will have

to be repeated in a different forum.

## IV.   IN THE ALTERNATIVE, THIS COURT SHOULD REMAND FOR AN EVIDENTIARY HEARING AND RECONSIDERATION OF VENUE RULINGS AFTER THE HEARING.

As detailed in the procedural history, Mr. Tsarnaev has twice moved for a

change of venue.  The first motion involved a series of pleadings on the issue,

beginning with Tsarnaev's motion for change of venue filed on June 18, 2014.

---

[16] Bulger claimed he had received immunity from criminal prosecution from a prosecutor who was head of the Strike force at that time, but was, at other times, an Assistant United States attorney and acting United States Attorney.  The judge Bulger sought to recuse had held a variety of managerial and supervisory positions in the United States Attorney's office during a significant period of the time

D.E. 376.  In that motion, he explained that his expert had not yet completed his

review of the publicity or other data under review.  The government's opposition

was filed on July 1, 2014.  D.E. 405.   On August 7, 2014 Tsarnaev filed a reply,

with a declaration from his expert discussing the publicity and its impact and a

number of exhibits containing and summarizing the pretrial publicity examined in

connection with the motion and the survey data.  D.E. 461.   The government filed

a surreply attacking the defense expert on venue in general and his work in this

case.  D.E.512.   The court denied Tsarnaev's motion to respond to the

government surreply attack on the defense expert on venue and his work in this

case, granted the government's motion to strike the defense response, which had

been filed with a motion for leave to file the document, from the record, and denied

defendant's motion to supplement the record.  *See*  D.E.  516, D.E. 517 (motion for

leave to file response and response, August 29, 2014),  D.E. 519 (motion to strike

response (August 29, 2014), D.E. 527 (Order denying D.E. 516, granting D.E. 519

and striking D.E. 517, September 2, 2014), D.E. 531 (motion to supplement record

or for evidentiary hearing, September 4, 2014); D.E. 569 (electronic notes

reflecting denial of D.E. 531, September 18, 2014).

The Second Motion for Change of Venue also involved a series of pleadings

---

covered by the indictment.  710 F.3d at 44, 46.

raising factual issues.  *See* D.E. 684 and D.E. 686 (second motion to change venue, exhibits and memorandum, December 1, 2014), D.E. 780 and D.E. 852 (notices of supplemental authority, December 22, 2014 and December 29, 2014), D.E. 760 (government motion to strike defense exhibits, December 16, 2014), D.E. 774 (Opposition to government motion to strike), D.E. 766 and D.E.796 (government opposition to venue motion, December 17 and  2, 2014), D.E.779 (reply to government response, December 22, 2014).  The Court entered an order denying the Second Motion for Change of Venue on December 31, 2014 with the statement, "Explanatory opinion[] will be issued shortly."  D.E. 876.

The district court's actions in denying the defendant's motion to respond to the government's factual presentation in connection with the first motion to change venue constituted a clear denial of Tsarnaev's due process rights.  The Due Process Clause of the Fifth Amendment to the United States Constitution includes a "guarantee of fair procedure."  "A fundamental requirement of due process is 'the opportunity' to be heard.' [citation omitted].  It is an opportunity which must be granted at a meaningful time and in a meaningful manner."  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  A meaningful opportunity to be heard requires an opportunity to present the relevant facts to the court and requires the court to consider all of the relevant facts.  In *United States v. Curtin*, 489 F.3d 935 (9th Cir.

2007) (en banc) the trial court, over objection, admitted stories found on defendant's PDA containing graphic descriptions of sexual acts with minors in a prosecution for traveling across state lines with intent to engage in a sexual act with a minor and using an interstate facility to attempt to persuade a minor to engage in sexual acts without reading the stories.  The court of appeals found "as a matter of law that a court does not properly exercise its balancing discretion under Rule 403 when it fails to place on the scales and personally examine and evaluate *all* that it must weigh.  Relying only on the descriptions of adversary counsel is insufficient to ensure that a defendant receives the due process and fair trial to which he is entitled under our Constitution."   *Id*. at 958.  The court in *United States v. Cunningham*, 694 F.3d 372, 384 (3rd Cir. 2012) quoted that language in holding that a district court abused its discretion in failing to view videos prior to admitting them at trial; its refusal to view the excerpts "was 'arbitrary...[and] unreasonable." *Id*. at 387.  There, the trial court had admitted videos of child pornography found on defendant's computer over F.R.E. Rule 403 objections, made prior to trial without watching the videos.[17]   *See also United States v.*

---

[17]   At the final pretrial conference in *Cunningham*, the defense reported that it intended to move for reconsideration of the admissibility of the videos and requested that the Court review the excerpts prior to ruling; the court immediately denied that motion stating counsel had had enough time to file motions and had done so, but then said counsel could file a motion that day; counsel did so; the

*Loughry*, 660 F.3d 965 (7th Cir. 2011) (district court's admission of uncharged

videos over F.R.E. Rule 403 objection without reviewing the contents of the videos

requires reversal) (quoting *Curtin*, 660 F.3d at 971 )).

In *United States v. Syphers*, 426 F.3d 461 (1st Cir. 2005), this Court

recognized the need for the magistrate judge determining whether there is probable

cause for a warrant to search for child pornography based on images of alleged

child pornography to review either the images or a sufficiently specific description

to permit an independent determination of probable cause.  In *United States v.

D'Andrea*, 648 F.3d 1 (1st Cir. 2011) this Court held that an evidentiary hearing

was required to address questions concerning the applicability of the private

search, exigent circumstances and inevitable discovery  doctrines because the

record was insufficient to support the district court's conclusions on those issues or

enable this Court to make determinations of applicability.

While the district court is not required to provide endless opportunities for

filings in support of a motion, a defendant must have the opportunity to present

relevant facts to address facts presented for the first time in a government filing.

Here, the government presented its own factual analysis of the pre-trial publicity in

its surreply and argued, *inter alia*, that its factual analysis, done by some unnamed

---

court denied the motion; the court of appeals reversed.

person, rendered Dr. Bronson's sworn declaration "irresponsible, if not downright misleading, and casts doubt on the accuracy and reliability of all of Mr. Bronson' testimony." (D.E. 512, at 9, 11).  The court accepted this surreply yet denied defendant an opportunity to submit the declaration of Neil Vidmar, preliminarily addressing the government's new factual analysis and Dr. Bronson's methodology. The court then denied a change of venue without a hearing to explore and resolve the conflicts in the factual presentations made in the written submissions.

The second motion to change venue incorporated and expanded the factual submissions that Mr. Tsarnaev submits demonstrate the clear need for a change of venue.  The government again moved to strike exhibits.  The motion to change venue has been denied without a hearing and, as of the filing of this petition, there has been no explanation of reasons.

The exclusion of factual rebuttal has denied Mr. Tsarnaev a meaningful opportunity to be heard on the merits of his motions for change of venue in the district court.  If this Court declines to enter an order directing the district court to order a change of venue, it should, alternatively, order the district court to hold an evidentiary hearing to permit the defense to present evidence responsive to the government's factual assertions and the court's initial interpretations of some of the data submitted, so that the court can consider all of the relevant facts in making

a critical determination as to whether Mr. Tsarnaev can obtain a fair trial by an

impartial jury in the District of Massachusetts.

### Conclusion

For the foregoing reasons, this Court should grant the writ.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys,

/s/ Judith Mizner
Judith Mizner (1st Cir. No. 11056 )
William W. Fick (1st Cir. No. 82686)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
JUDITH_MIZNER@FD.ORG
WILLIAM_FICK@FD.ORG


### CERTIFICATE OF SERVICE

I, William Fick, hereby certify that I have caused this document to be served by e-mail PDF upon the trial judge, Hon. George A. O'Toole, and upon counsel of record for the United States, William Weinreb (william.weinreb@usdoj.gov), Aloke Chakravarty (aloke.chakravarty@usdoj.gov), Nadine Pellegrini (nadine.pellegrini@usdoj.gov), Steve Mellin (steve.mellin2@usdoj.gov), and Donald Cabell (donald.cabell@usdoj.gov) on this 31st day of December 2014.

/s/ William W. Fick