UNITED STATES DISTRICT COURT FILED
DISTRICT OF MASSACHUSETTS CLERKS OFFICE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 2014 DEC 31  PM 5 28 |
| | ) | |
| v. | ) | Crim. No. 13-10200-GAO  U.S. DISTRICT COURT |
| | ) | DISTRICT OF MASS. |
| DZHOKHAR A. TSARNAEV, | ) | **UNDER SEAL** |
| Defendant | ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through its undersigned attorneys, respectfully submits the following Trial Brief.

### A.     Facts of the offenses

The Boston Marathon is an annual race that attracts runners from all over the United States and the world.  The final stretch of the Marathon runs eastward along the center of Boylston Street in Boston from Hereford Street to the finish line, which is located between Exeter and Dartmouth Streets.  Low metal barriers line both edges of the street and separate the spectators from the runners.  Many businesses line the streets of the Marathon route.

On April 15, 2013, at approximately 2:49 p.m., while the Marathon was still underway, two explosions occurred on the north side of Boylston Street along the Marathon's final stretch. The first explosion occurred in front of Marathon Sports at 671 Boylston Street, less than a half a block from the finish line.  That explosion killed 29 year-old Krystle Campbell, maimed or seriously injured numerous others, and resulted in extensive damage to Marathon Sports and nearby businesses and residences.  The second explosion occurred approximately one block away in front of the Forum Restaurant at 755 Boylston Street.  That explosion killed eight year-old Martin Richard and 23 year-old Lingzi Lu.  It also maimed or seriously injured numerous

individuals and resulted in extensive damage to the Forum Restaurant and nearby businesses and
residences.

On April 18, 2013, at approximately 5:00 p.m., the FBI posted images of Tamerlan and
Dzhokhar Tsarnaev on its web site, identifying them as suspects in the Marathon bombing case.
That night, at approximately 10:25 p.m., MIT Police Officer Sean Collier was murdered in his
cruiser on the MIT campus. He was shot multiple times in the hand and head with a Ruger 9mm
pistol. Less than an hour later, a 26 year-old named Dun Meng who was driving a Mercedes in
Boston was carjacked at gunpoint by a man who claimed responsibility for the Marathon
bombings and the murder of Officer Collier. The man ordered Mr. Meng to drive to Watertown,
where a second man, who had been following in another car, got into the Mercedes. The two
men then drove with Mr. Meng to a Bank of America ATM machine, where the second man
used Mr. Meng's ATM card and password to withdraw $800 from Mr. Meng's account. After
that, the men drove with Mr. Meng to a Shell Station on Memorial Drive in Cambridge, where
Mr. Meng escaped and called 911. Mr. Meng later identified the two men as the Tsarnaev
brothers.

Police officers were able track the Mercedes to Watertown. They followed it and a
Honda Civic, which were driving in tandem, to Laurel Street in Watertown, where both cars
stopped in the middle of the street. Tamerlan Tsarnaev emerged from the Mercedes and
Dzhokhar Tsarnaev emerged from the Honda. The brothers began shooting and hurling bombs
at the police. Eventually, Tamerlan Tsarnaev ran out of ammunition and was tackled to the
ground. As officers tried to handcuff him, the defendant got into the Mercedes, turned it around,
and drove directly at the officers. The officers tried to drag Tamerlan Tsarnaev to safety but did
not succeed before the defendant ran over his brother and dragged his body down the street. The

2

defendant crashed into a police car, dislodged his brother's body, and sped off. He abandoned the Mercedes several blocks away and hid inside a drydocked boat in a Watertown back yard.

As the defendant sped through a gantlet of officers while making his escape, they fired on the Mercedes. One of the bullets struck MBTA Police Officer Richard Donohue, nearly killing him. Tamerlan Tsarnaev was placed in an ambulance and died on his way to the hospital. Governor Patrick asked the residents of Watertown and several other cities to shelter in place while police searched house to house for the defendant. They eventually found him inside the boat and arrested him.

### B.    Evidence collection

Minutes after the two bombs exploded on Boylston Street, police halted the Marathon, evacuated the area, and began collecting physical evidence. FBI agents, with the assistance of other federal, state and local offices, collected thousands of items and sent them to the FBI Laboratory for analysis. Before collecting each item, agents marked it with an evidence placard, photographed it, and used the Global Positioning System to record its precise location. FBI Lab personnel also took photos of virtually every item they received.

In addition to collecting physical evidence, the FBI collected thousands of images and videos of the Marathon from members of the public. It also collected surveillance video from numerous area businesses and other locations. Some of the images and videos show victims of the bombings in the minutes after they were killed or injured. Some show the Tsarnaev brothers walking down Boylston Street, standing in the areas where the bombs exploded, and fleeing afterwards.

A similar evidence collection process occurred on Laurel Street, which was littered with shell casings and bomb components. Officers identified hundreds of items of ballistics and

3

explosives evidence, marked them with placards, photographed them, recorded their location (either using GPS coordinates or street location), bagged them, and sent them to the MSP Laboratory for analysis. Officers also collected evidence from the abandoned Mercedes and the boat in which the defendant was found hiding.

Following the defendant's arrest, officers searched and seized evidence from various locations, including the brothers' apartment on Norfolk Street in Cambridge, the defendant's dormitory room at UMass - Dartmouth, and an apartment on Carriage Drive in New Bedford where several of the defendant's friends had brought his computer among (among other things). They also recovered from a landfill a back containing fireworks (among other things) that the friends had removed from the defendant's dorm room and thrown into a dumpster. Officers also searched and seized many items of digital evidence, including several computers and phones belonging to the Tsarnaev brothers.

### C.   The charges

The Indictment charges Tsarnaev with the following 30 crimes:

1.  Conspiracy to use a weapon of mass destruction resulting in the deaths of Krystle Campbell, Sean Collier, Lingzi Lu, and Martin Richard, in violation of 18 U.S.C. § 2332a

2.  Use of a weapon of mass destruction (Pressure Cooker Bomb #1) resulting in the death of Krystle Cambpell, in violation of 18 U.S.C. § 2332a

3.  Use of a firearm (Pressure Cooker Bomb #1) during and in relation to a crime of violence (namely, Count Two) resulting in the death by murder of Krystle Campbell, in violation of 18 U.S.C. §§ 924(c) and 924(j)

4.  Use of a weapon of mass destruction (Pressure Cooker Bomb #2) resulting in the deaths of Lingzi Lu and Martin Richard, in violation of 18 U.S.C. § 2332a.

5.  Use of a firearm (Pressure Cooker Bomb #2) during and in relation to a crime of violence (namely, Count Four) resulting in the deaths by murder of Lingzi Lu and Martin Richard, in violation of 18 U.S.C. §§ 924(c) and 924(j).

6.     Conspiracy to bomb a place of public use resulting in the deaths of Krystle Campbell, Sean Collier, Lingzi Lu, and Martin Richard, in violation of 18 U.S.C. § 2332f.

7.     Bombing of a place of public use (Marathon Sports) resulting in the death of Krystle Campbell, in violation of 18 U.S.C. § 2332f

8.     Use of a firearm (Pressure Cooker Bomb #1) during and in relation to a crime of violence (namely, Count Seven) resulting in the death by murder of Krystle Campbell, in violation of 18 U.S.C. §§ 924(c) and 924(j)

9.     Bombing of a place of public use (Forum restaurant) resulting in the death of Lingzi Lu and Martin Richard, in violation of 18 U.S.C. § 2332f

10.    Use of a firearm (Pressure Cooker Bomb #2) during and in relation to a crime of violence (namely, Count Nine) resulting in the deaths by murder of Lingzi Lu and Martin Richard, in violation of 18 U.S.C. §§ 924(c) and 924(j)

11.    Conspiracy to maliciously destroy property resulting in the deaths of Krystle Campbell, Sean Collier, Lingzi Lu, and Martin Richard, in violation of 18 U.S.C. §§ 844(i) and (n)

12.    Malicious destruction of property resulting in the death of Krystle Campbell, in violation of 18 U.S.C. § 844(i)

13.    Use of a firearm (Pressure Cooker Bomb #1) during and in relation to a crime of violence (namely, Count Twelve) resulting in the death by murder of Krystle Campbell, in violation of 18 U.S.C. §§ 924(c) and 924(j)

14.    Malicious destruction of property resulting in the death of Lingzi Lu and Martin Richard, in violation of 18 U.S.C. §§ 844(i)

15.    Use of a firearm (Pressure Cooker Bomb #2) during and in relation to a crime of violence (namely, Count Fourteen) resulting in the deaths by murder of Lingzi Lu, and Martin Richard, in violation of 18 U.S.C. §§ 924(c) and 924(j)

16.    Use of a firearm (Ruger 9mm handgun) during and in relation to a crime of violence (namely, Count One) causing the death by murder of Sean Collier, in violation of 18 U.S.C. §§ 924(c) and 924(j)

17.    Use of a firearm (Ruger 9mm handgun) during and in relation to a crime of violence (namely, Count Six) causing the death by murder of Sean Collier, in violation of 18 U.S.C. §§ 924(c) and 924(j)

18.  Use of a firearm (Ruger 9mm handgun) during and in relation to a crime of violence (namely, Count Eleven) causing the death by murder of Sean Collier, in violation of 18 U.S.C. §§ 924(c) and 924(j)

19.  Carjacking resulting in serious bodily injury to Richard Donohue, in violation of 18 U.S.C. §§ 2119(2)

20.  Use of a firearm (Ruger 9mm handgun) during and in relation to a crime of violence (namely, Count Nineteen), in violation of 18 U.S.C. §§ 924(c)

21.  Interference with commerce by threats or violence, in violation of 18 U.S.C. § 1951

22.  Use of a firearm (Ruger 9mm handgun) during and in relation to a crime of violence (namely, Count Twenty-One), in violation of 18 U.S.C. § 924(c)

23.  Use of a weapon of mass destruction (Pressure Cooker Bomb #3), in violation of 18 U.S.C. § 2332a

24.  Use of a firearm (Ruger and Pressure Cooker Bomb #3) during and in relation to a crime of violence (namely, Count Twenty-Three), in violation of 18 U.S.C. § 924(c)

25.  Use of a weapon of mass destruction (Pipe Bomb #1), in violation of 18 U.S.C. § 2332a

26.  Use of a firearm (Ruger and Pressure Cooker Bomb #1) during and in relation to a crime of violence (namely, Count Twenty-Five), in violation of 18 U.S.C. § 924(c)

27.  Use of a weapon of mass destruction (Pipe Bomb #2), in violation of 18 U.S.C. § 2332a

28.  Use of a firearm (Ruger and Pipe Bomb #2) during and in relation to a crime of violence (namely, Count Twenty-Seven), in violation of 18 U.S.C. § 924(c)

29.  Use of a weapon of mass destruction (Pipe Bomb #3), in violation of 18 U.S.C. § 2332a

30.  Use of a firearm (Ruger and Pipe Bomb #3) during and in relation to a crime of violence (namely, Count Twenty-Nine), in violation of 18 U.S.C. § 924(c)

**D.** **The offenses and their elements**

**1.** **Counts One through Five**

Count One charges a conspiracy to use a weapon of mass destruction resulting in death,

and Counts Two and Four charge substantive violations of the statute (one for each of the two

bombs detonated at the Marathon).

Title 18, United States Code, Section 2332a provides in relevant part:

A person who, without lawful authority, uses . . . or conspires to use, a weapon of mass destruction . . . against any person or property within the United States, and

(A)    the mail or any facility of interstate or foreign commerce is used in furtherance of the offense;

(B)    such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;

(C)    any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or

(D)    the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce;

shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.

Section 2332a(c) defines a "weapon of mass destruction" as, among other things, any

"destructive device" defined in 18 U.S.C. § 921. Section 921 defines "destructive device" as,

among other things, "any explosive, incendiary, or poison gas . . . bomb." 18 U.S.C.

§ 921(a)(4)(A)(i).

The elements of a section 2332a offense resulting in death are:

1.    the defendant knowingly used a weapon of mass destruction;

2.    the defendant lacked the lawful authority to do so;

7

3.      the defendant knew he was using the weapon against a person or property within the United States;

4.      such property was used in interstate or foreign commerce or in an activity that affected interstate or foreign commerce; the mail or any facility of interstate or foreign commerce was used in furtherance of the offense; any perpetrator traveled in or caused another to travel in interstate or foreign commerce in furtherance of the offense; or the offense, or the results of the offense, affected interstate or foreign commerce; and

5.      The death of any person resulted.

See, e.g., United States v. Mann, 701 F.3d 274, 285 (8th Cir. 2012).  Although the statue does not expressly include a mens rea requirement, the Tenth Circuit has held that it implicitly requires proof that the defendant (1) knowingly used, or attempted or conspired to use, a weapon of mass destruction, and (2) knowingly did so against persons in the United States.  See United States v. McVeigh, 153 F.3d 1166, 1194 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999). The government need not, however, prove that the defendant intended to kill anyone.  Id. ("[E]ven if the phrase 'if death results' were to be construed as an element of the offense rather than a sentencing enhancement, it would not be an intent element but only an element of factual consequences.  Nothing in § 2332a(a) links the 'if death results' language of the statute to any scienter whatsoever.").  As for the requirement that the bombing be done "without lawful authority," the only court to consider the question has held that this is not an element, but rather gives rise to an affirmative defense.  See United States v. Wise, 221 F.3d 140 (5th Cir. 2000), cert. denied, 532 U.S. 959 (2001).

Count Three charges use of a firearm (i.e. a bomb) during and in relation to the crime charged in Count Two (i.e. use of a weapon of mass destruction).  Count Five charges the same in connection with Count Four.  Title 18, United States Code, Section 924 provides:

(a) - (b) * * * *

(c)(1)(A)  Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime:

    (i)   be sentenced to a term of imprisonment of not less than 5 years;

    (ii)  if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

(B) If the firearm possessed by a person convicted of a violation of this subsection:

    (i)   * * * *

    (ii)  is a machinegun or a destructive device . . . the person shall be sentenced to a term of imprisonment of not less than 30 years.

(C) In the case of a second or subsequent conviction under this subsection, the person shall:

    (i)   be sentenced to a term of imprisonment of not less than 25 years; and

    (ii)  if the firearm involved is a machinegun or a destructive device . . . be sentenced to imprisonment for life.

(d) - (i) * * * *

(j) A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall:

(1)   if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life * * * *

Because section 924(c) does not specify a maximum sentence, all courts to consider the question have held the maximum sentence is life imprisonment.  See United States v. Lucas, 670 F.3d 784, 796 (7th Cir. 2012) (collecting cases) .  The minimum sentence, as set forth above,

depends on whether the firearm was "brandished" or "discharged" (or neither), whether it was a machine gun or "destructive device," whether it was used to murder someone, and whether the conviction is a "second or subsequent" one, among other things.  In Alleyne v. United States, 133 S.Ct. 2151 (2013), the Supreme Court held that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense."  Id. at 2162.  It follows that "because the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense."  Id.  The same necessarily must be true with respect to whether the firearm was "discharged" and whether it is "a destructive device."  See United States v. O'Brien, 130 S.Ct. 2169, 2175-80 (2010) (holding that Congress intended the firearm type related words it used in section 924(c) to refer to an element of a separate, aggravated crime).

As noted above, 18 U.S.C. § 924(j) provides for a penalty of death or up to life imprisonment if a defendant, in the course of violating 18 § 924(c), causes the death of a person through the use of a firearm and the killing is a murder.  Because the death penalty is a greater maximum punishment than life imprisonment, it follows that section 924(j) must also be a "separate, aggravated offense," as most courts have held.  See, e.g., United States v. Garcia-Ortiz, 657 F.3d 25, 28 (1st Cir. 2011); United States v. Allen, 247 F.3d 741, 769 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002); United States v. Battle, 289 F.3d 661, 666 69 (10th Cir. 2002); see generally Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).

Because a defendant can be convicted of a section 924(c) offense as an aider and abettor, and can also be convicted of a violation of 18 U.S.C. § 1111(a) under a felony murder theory, the Tenth Circuit has held that a defendant can be convicted and sentenced under section 924(j) for causing a death with a firearm during a crime of violence even though the defendant did not

personally use the firearm, and neither encouraged nor knew the homicide was going to take place. All that is required for a section 924(j) conviction under this theory is proof that the defendant was a willing participant in the underlying felony and proof that a co-participant caused the death of the victim through the use of a firearm. See United States v. Chanthadara, 230 F.3d 1237, 1252 (10th Cir. 2000) (citing United States v. Kayarath, 962 F.Supp. 1399, 1400 02 (D. Kan. 1997)), cert. denied, 534 U.S. 992 (2001).

**2.  Counts Six through Ten**

Counts Six through Ten charge conspiracy to bomb, and bombing of, a place of public use, resulting in death, and use of a firearm during an in relation to those crimes, resulting in death. These counts parallel Counts One through five. Count Six charges conspiracy to bomb a place of public use resulting in the deaths of all three Boston Marathon decedents. Counts Seven and Nine charge substantive section 2332f violations based on the Marathon Sports and Forum bombings, respectively, and Counts Eight and Ten charge section 924(j) violations based on the two substantive 2332f counts.

Title 18, United States Code, Section 2332f provides in relevant part:

(a) Offenses --

   (1)   In general.  Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility --

            (A)     with the intent to cause death or serious bodily injury, or

            (B)     with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss,

         shall be punished as [provided under section 2332a(a) of this title, i.e. shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or life].

11

(2)    Attempts and conspiracies.  Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished [in the same manner].

(b) Jurisdiction.  There is jurisdiction over the offenses in subsection (a) if:

(1)   the offense takes place in the United States and --

(A)    * * * *

(B)    the offense is committed in an attempt to compel another state or the United States to do or abstain from doing any act;

(C-E)   * * * *

(F)    a victim is a national of another state or a stateless person;

(d) Exemptions to Jurisdiction.  This section does not apply to --

(1-2)  * * * *

(3) offenses committed within the United States, the alleged offender and the victims are United States citizens and the alleged offender is found in the United States, or where jurisdiction is predicated solely on the nationality of the victims or the alleged offender and the offense has no substantial effect on interstate or foreign commerce. .

(e) Definitions.  As used in this section, the term --

(1-5)  * * * *

(6) "place of public use" means those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally, and encompasses any commercial, business, cultural, historical, educational, religious, governmental, entertainment, recreational, or similar place that is so accessible or open to the public;

(7)    * * * *

(8)    "explosive" has the meaning given in section 844(j) of this title insofar that it is designed, or has the capability, to cause death, serious bodily injury, or substantial material damage;

This 12 year-old statute implements the International Convention for the Suppression of

Terrorist Bombings.  See G.A. Res. 52/164, 1, U.N. Doc A/RES/52/164 (Dec. 15, 1997); Dec.

15, 1997, S. Treaty Doc No.106 6 (1998); <u>Almog v. Arab Bank, PLC</u>, 471 F.Supp.2d 257, 276-77 (E.D.N.Y. 2007).  The Convention aims to forestall acts that "are intended or calculated to provoke a state of terror in the general public or in a group of persons or particular persons."  <u>Id.</u> It does so in part by requiring party-countries "to criminalize the act of terrorist bombing aimed at public or governmental facilities, or public transportation or infrastructure facilities."  H. Rep. No. 307, 107th Cong., 1st Sess. 7 (2001).

A straightforward reading of the statute adapted to the facts of this case suggests that the following elements would have to be proved:

1.      the defendant knowingly delivered, placed, discharged, or detonated an explosive or other lethal device in, into, or against a specified place;

2.      the defendant lacked the lawful authority to do so;

3.      the specified place was a place of public use;

4.      the defendant intended to cause death, serious bodily injury, or extensive destruction likely to result in major economic loss;

5.      the offense took place in the United States;

6.      (a) the offense was committed in an attempt to compel the United States to do or abstain from doing any act, or (b)(i) a victim or the alleged offender is a foreign national and (b)(ii) the offense had a substantial effect on interstate or foreign commerce;

7.      the death of any person resulted.

The House Report's section-by-section analysis of the bill states that, "when determining whether [an] act resulted in, or was likely to result in major economic loss, the physical damage to the targeted facility may be considered, as well as other types of economic loss including, but not limited to, the monetary loss or other adverse effects resulting from the interruption of its activities.  The adverse effects on non-targeted entities and individuals, the economy and the government may also be considered in this determination."  H. Rep. No. 307 at 10.

Count Six of the Indictment alleges a conspiracy to bomb a place of public use that embraces the two Marathon bombings as well as the Watertown bombings. Count Seven is based on the Marathon Sports bombing, and Count Nine is based on the Forum restaurant bombing. Element three requires proof that the conspirators agreed to bomb "a place of public use" and, with respect to Counts Seven and Nine, in fact did so. Under the statute, a place of public use includes "those parts of any . . . street . . . that are accessible or open to members of the public." A place of public use also includes any "building . . . open to members of the public, whether continuously, periodically, or occasionally," specifically including "a commercial, business . . . or similar place that is so accessible or open to the public." 18 U.S.C. § 2332f(e)(6).

### 3.    Counts Eleven through Fifteen

Counts 11 through 15 charge conspiracy to maliciously destroy, and malicious destruction of, property, resulting in death, and use of a firearm during and in relation to those crimes, resulting in death. These counts follow the same pattern as Counts One through Five and Six through Ten: a conspiracy count and two substantive counts paired with two section 924(c) and (j) counts. The underlying offense here is malicious destruction of property.

Title 18, United States Code, Section 844(i) provides:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the

14

death penalty or to life imprisonment.

The elements of a section 844(i) offense, adapted to the facts of this case, are:

1.      the defendant damaged or destroyed a building;

2.      the defendant did so by means of an explosive;

3.      the defendant did so maliciously;

4.      the building was being used in interstate commerce or in an activity affecting interstate commerce;

5.      death resulted to any person;

See, e.g., United States. v. Sevens, 559 F.3d 274, 289 (5th Cir. 2009).

Count Eleven charges a conspiracy to violate 18 U.S.C. § 844(i) based on the two Marathon bombings and the Watertown bombings, in violation of 18 U.S.C. § 844(n). Section 844(n) provides that "a person who conspires to commit any offense defined in this chapter shall be subject to the same penalties (other than death) as the penalties prescribed" for the underlying offense. Count Twelve is based on the Marathon Sports bomb, and Count Fourteen is based on the Forum restaurant bomb. Both of those buildings suffered extensive damage and had to close during repairs. The Supreme Court has held that a commercial establishment such as a store or restaurant that is viable at the time of the alleged violation is a building "used" in interstate commerce for purposes of 18 U.S.C. § 844(i). See Jones v. United States, 529 U.S. 848 (2000); accord United States v. Troy, 618 F.3d 27, 31-32 (1st Cir. 2010).

### 4.      Counts Sixteen through Eighteen

Counts 16 through 18 charge use of a firearm during and in relation to a crime of violence (namely, the conspiracies charged in Counts One, Six, and Eleven) resulting in death. Each of these counts alleges a single section 924(j) violation in connection with one of the three

conspiracy counts, and each alleges that the offense resulted in the death of Officer Sean Collier.

**5.      Counts Nineteen and Twenty**

Counts 19 and 20 charge carjacking resulting in serious bodily injury, and use of a

firearm during and in relation to the carjacking offense, in violation of 18 U.S.C. § 2119(2).

That statute provides:

> Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall B

>> (1)   be fined under this title or imprisoned not more than 15 years, or both,

>> (2)   if serious bodily injury . . . results, be fined under this title or imprisoned not more than 25 years, or both, and

>> (3)   if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

The elements of a carjacking resulting in serious bodily injury are

> 1.      the defendant took or attempted to take a motor vehicle from the person or presence of another;

> 2.      the motor vehicle was transported, shipped, or received in interstate or foreign commerce;

> 3.      the defendant took the motor vehicle through the use of force, violence, or by intimidation;

> 4.      the defendant acted with the intent to cause death or serious bodily harm;

> 5.      the carjacking resulted in serious bodily injury.

See United States v. Rodriguez Adorno, 695 F.3d 32, 42 (1st Cir. 2012): United States v. Castro

Davis, 612 F.3d 53, 60 (1st Cir.2010); United States v. Martinez Bermudez, 387 F.3d 98, 101 (1st

Cir. 2004).

The first three elements require no discussion. The fourth element requires proof only of conditional intent, i.e. that "the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car." Holloway v. United States, 526 U.S. 1, 12, (1999); accord Rodriguez Adorno, 695 F.3d at 42. In United States v. Lebrón Cepeda, 324 F.3d 52 (1st Cir.), the court held that the jury could infer conditional intent where, as here, the perpetrator "placed a loaded and cocked revolver against [the victim's] head at the inception of the carjacking and verbally threatened him." Id. at 56-57; accord United States v. Jones, 188 F.3d 773, 777 (7th Cir.) (1999). The Lebrón Cepeda court further held that the jury could make the same inference with respect to a codefendant who "willfully and knowingly participated in the initiation of the carjacking while fully cognizant of how [the first defendant] intended to . . . use the revolver." Id.

With respect to the fifth element, the government's theory is that the carjacking resulted in serious bodily injury to Officer Richard Donohue. The First Circuit has held that "the injuries covered [by section 2119(2)] are not limited to those resulting from the 'taking' of a vehicle, but also include those caused by the carjacker at any point during his or her retention of the vehicle." United States v. Vazquez Rivera, 135 F.3d 172, 178 (1st Cir. 1998) (holding that rape-related emotional trauma "resulted" from carjacking where carjacker raped victim while still in possession of her car). The facts of this case are closely analogous to those in Martinez-Bermudez, where a carjacker was spotted in the stolen car 45 minutes after the carjacking and during his flight from law enforcement ran over and killed a police officer. The First Circuit held, albeit in dicta (it was a sentencing guidelines decision), that this constituted a violation of 18 U.S.C. § 2119(3).

17

Count Twenty charges use of a firearm during and in relation to the carjacking offense.

### 6.    Counts Twenty-One and Twenty-Two

Counts 21 and 22 charge Hobbs Act robbery, in violation of 18 U.S.C. § 1951, and use

of a firearm during and in relation to that offense.  The Hobbs Act provides:

> (a)    Whoever in any way or degree obstructs, delays, or affects
> commerce or the movement of any article or commodity in commerce, by robbery
> or extortion or attempts or conspires so to do, or commits or threatens physical
> violence to any person or property in furtherance of a plan or purpose to do
> anything in violation of this section shall be fined under this title or imprisoned
> not more than twenty years, or both.

> (b)(1)  As used in this section . . . [t]he term 'robbery' means the unlawful
> taking or obtaining of personal property from the person or in the presence of
> another, against his will, by means of actual or threatened force, or violence, or
> fear of injury, immediate or future, to his person or property, or property in his
> custody or possession, or the person or property of a relative or member of his
> family or of anyone in his company at the time of the taking or obtaining.

The Hobbs Act charge in this case is based on the robbery of Dun Meng.  As noted

earlier, the Tsarnaev brothers drove Mr. Meng to a Bank of America branch in Watertown, made

him hand over his ATM card and PIN, and then the defendant withdrew $800 from Mr. Meng's

bank account.  See, e.g., United States v. McCarter, 406 F.3d 460, 462 (7th Cir. 2005); United

States v. McCormack, 371 F.3d 22, 28-29 (1st Cir. 2004), rev'd on other grounds, 543 U.S. 1098

(2005); United States v. Atecheson, 94 F.3d 1237 (9th Cir. 1996).

### 7.    Counts Twenty-Three through Thirty

Counts 23 through 30 charge use of a weapon of mass destruction and use of a firearm

during and in relation to those offenses (four paired counts).  Each paired count is based on a

different bomb that the Tsarnaev brothers hurled at the police during the shoot-out on Laurel

Street in Watertown.

### E.    Evidentiary issues

Of the thousands of items of evidence collected on Boylston Street, the government intends to offer approximately 600 into evidence. Those 600 are the ones on which government witnesses and experts primarily relied to reach conclusions about the bombs' construction, operation, effects, and triggering mechanisms. Each item will be marked as a separate exhibit, but the government will likely not seek to publish each one to the jury during trial. Also, to expedite the items' admission, the government does not intend to call all of the individuals who collected the items, or all of the individuals in each item's chain of custody, but rather one or two witnesses who supervised the entire collection process and can testify that items were located, marked with placards, photographed in place, mapped using GPS coordinates, collected, and marked for identification in a manner calculated to preserve their integrity and certain information about them.

The government also intends to offer approximately 2,000 - 3,000 photographs of these items into evidence. The photographs will be marked as a single exhibit. Again, the government will likely seek to publish only a fraction of them to the jury during trial. Also, as with the items of evidence themselves, the government does not intend to call all of the photographers to authenticate the photos, but rather will call one or two witnesses who supervised the photographing and can say that all of the photographers were assigned to photograph items in place and only submit photos that fairly and accurately depicted the things photographed.

Finally, the government will offer into evidence several diagrams of the Boylston Street crime scene, each of which illustrates where a particular type of evidence was found. These diagrams are in the form of a single digital exhibit that makes it possible to switch easily from one to the other and to "overlay" one or more over another so that the locations of different types of evidence can be seen separately and together. In addition, each icon on the diagrams that

19

represents an item of evidence is hyperlinked to one or more photographs of that item, making it easy to publish the photos of particular items to the jury merely by "clicking" on the corresponding item on the diagram.

The presentation of the evidence collected from Laurel Street in Watertown will be similar but less "hi tech." As with the Boylston Street evidence, all of the ballistics and explosives evidence collected from Laurel Street (along with the corresponding photographs) will be introduced by one or two witnesses who oversaw the process; but the diagrams showing the locations of those items will be static, and the photos will not be hyperlinked to the diagrams.

F.      Cooperating witnesses

Currently, the government intends to call two witnesses -- Azamat Tazhayakov and Stephen Silva -- who have signed agreements requiring them to provide truthful testimony in exchange for consideration at their respective sentencings.

G.      Other "bad acts" evidence.

As the government has already noticed in a separate  pleading, it intends to offer evidence that the defendant sold and used drugs, and that he obtained the Ruger used to kill Officer Collier (among other things) by telling Stephen Silva that he needed it to rob other drug dealers.

H.      Expert witnesses.  The government intends to offer expert testimony to prove the following things (among others):

1.      that the ballistics evidence recovered from the MIT crime scene and Sean Collier's body matches the Ruger recovered from the ground on Laurel Street;

2.      that Sean Collier's blood was found on several items in the Honda Civic that the defendant abandoned on Laurel Street, including a pair of gloves that also bore traces of the Tsarnaev brothers' DNA;

20

3.      that the Tsarnaev brothers' fingerprints were found on the Honda Civic, the carjacked Mercedes, and several other items recovered from the Laurel Street crime scene, including the Ruger;

4.      that the two bombs that exploded on Boylston Street, and one of the bombs that exploded on Laurel Street, were fashioned from pressure cookers, low explosive powder, shrapnel, and, in the case of the Boylston Street bombs, remote triggering devices;

5.      that the defendant committed the charged crimes in part to terrorize the public as a way of advancing a violent extremist agenda.

G.      Minimum sentence.  Under the FDPA, "the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18 U.S.C. § 3593(e).  If no lesser sentence than life imprisonment is actually permissible under the law, the jury must be told that the only possible recommendations are death or life imprisonment without possibility of release. Simmons v. South Carolina, 512 U.S. 154 (1994).

In this case, none of the offenses charged in the Indictment, standing alone, requires the Court to impose a sentence of life imprisonment if the jury does not recommend a death sentence.   In Deal v. United States, 508 U.S. 129 (1993), however, the Supreme Court held that when a defendant is charged in a single indictment with multiple section 924(c) offenses, his convictions on all but the first one count as "second or subsequent" under the statute.  Relying on Deal, the lower courts have held that multiple section 924(c)(1) convictions are "second or subsequent" even where (as here) the underlying crimes of violence are part of a single criminal episode.  See United States v. Casiano, 113 F.3d 420, 425 (3rd Cir.), cert. denied, 522 U.S. 887 (1997); United States v. Camps, 32 F.3d 102 (4th Cir. 1994), cert. denied, 513 U.S. 1158 (1995);

21

United States v. Andrews, 75 F.3d 552, 558 (9th Cir.), cert. denied, 517 U.S. 1239 (1996); United States v. Romero, 122 F.3d 1334, 1343 (10th Cir. 1997), cert. denied, 523 U.S. 1025 (1998). Accordingly, if the defendant is found guilty of any two section 924(c) counts charging that he used an explosive device to commit a crime of violence resulting in death, he will face a mandatory minimum sentence of life imprisonment on the second of those two counts. See 18 U.S.C. § 924(c)(1)(C)(ii).  Given the likelihood of that outcome, the government agrees for purposes of this case that prospective jurors should be informed that the only two possible sentences in this case are death or life imprisonment without release.

Respectfully submitted,
CARMEN M. ORTIZ
UNITED STATES ATTORNEY
By: /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document will be sent via electronic mail to Judy Clarke, Esq., counsel for Dzhokhar Tsarnaev, on this date.

/s/ William D. Weinreb
WILLIAM D. WEINREB