UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 13-CR-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

## DEFENDANT'S STATUS REPORT AND
## NOTICE OF GUILT PHASE EVIDENTIARY ISSUES AND OBJECTIONS

The defendant, through counsel, submits the following status report and notice of

guilt phase evidentiary issues and objections to assist the Court to identify (a) still-

pending matters and (b) additional issues to be resolved before opening statements.

The defendant asked the Court to suspend the due date for motions *in limine*

regarding exhibits until the government had produced the exhibits, [DE 841], and the

Court extended the deadline to January 9, 2015.  The defense is today filing motions

and/or identifying herein the basis for evidentiary objections regarding the first 41

government exhibits (those identified for introduction during the first two weeks of trial).

In addition, we are today identifying other issues past the first two-week period that we

presently are able to anticipate.  However, we are still the process of analyzing the well

over 1000 government exhibits that have only recently been produced.  Among these

individual exhibits are collections of voluminous materials, including government-

created spreadsheets of computer forensic data and compilations of electronic messages

and files that will require time to verify and analyze.  As in any trial, evidentiary issues

will continue to emerge as the testimony unfolds and as the foundation and context of

proposed exhibits becomes apparent. The defense will endeavor to raise such issues and

file appropriate motions, including additional motions *in limine*, as early as possible.

## PENDING MATTERS

I.     **Jury Data**

The defendant filed a request for production of jury data related to the wheel and

pool for the petit jury.  [DE 912 (sealed)].  The government has been given until January

12, 2015, to advise the Court if it objects to production of this requested information. [DE

917 (sealed order)].

II.     **Foreign Deposition**

The defendant moved for a deposition of Magomed Kartashov, a witness who is in

custody in Russia.  [DE 669 (sealed)]; Government Opposition [DE 698 (sealed)];

Defendant's Reply [DE 723 (sealed)].

III.     **Foreign Witness Identification**

The defendant filed a Motion to Limit Defense Penalty Phase Foreign Witness

Disclosure [DE ___ (sealed), filed December 29, 2014].  The government filed an

Opposition. [DE ___ (sealed), filed January 4, 2015].  The defendant expects to file a

Reply.

IV.     ***Daubert* Motions**

The following *Daubert* motions are currently pending, and need to be resolved

before opening statements, or before the government intends to mention or introduce the

evidence at issue:

A.    Defendant's Motion to Exclude Testimony Regarding Matching
      Transmitter-Receiver Binding Codes [DE 727 (sealed)]; Government
      Opposition [DE 789 (sealed)]; Defendant's Reply [DE __ (sealed), filed
      December 29, 2014][1];

B.    Defendant's Motion to Exclude Testimony of Certain Conclusions
      Regarding DNA Matching [DE 728 (sealed)]; Government Opposition [DE
      788 (sealed)]; Defendant's Reply [DE __ (sealed), filed December 29,
      2014];

C.    Defendant's Motion to Exclude Toolmark Identification Evidence and
      Request for *Daubert* Hearing [DE 729 (sealed)]; Government Opposition
      [DE 784 (sealed)]; Defendant's Reply [DE __ (sealed), filed January 2,
      2015];

D.    Defendant's Motion to Exclude Cellphone Geolocation Evidence and
      Request for *Daubert* Hearing [DE 730 (sealed)]; Government Opposition
      [DE 787 (sealed)]; Defendant's Reply [DE __ (sealed), filed December 29,
      2014] (given government concession, agreeing no *Daubert* hearing required
      at this time);

E.    Defendant's Motion to Exclude Opinion Testimony Concerning Polymer,
      Tapes, and Fiber Matching and request for evidentiary hearing [DE 818
      (sealed)]; Government Opposition [DE 904 (sealed)]; Defendant's Reply
      [DE __ (sealed), filed January 9, 2015]; and

F.    Defendant's Motion to Exclude Unsupported "Scientific" Opinions of
      Government Terrorism Experts [DE 731 (sealed)]; Government Opposition
      [DE 785 (sealed)].

---

[1] Many pleadings, including all of the *Daubert*-related pleadings, have been filed under
seal. Counsel cannot determine the Docket Entry numbers for many of these pleadings,
including, *e.g.,* the replies filed December 29, 2014 and January 2 and 5, 2015.

V.     **Already-Pending Motions *In Limine***

      A.      Defendant's Motion *in Limine* Regarding Testimony of Government Terrorism Experts [DE__ (sealed), filed December 29, 2014]; Government Opposition [DE__ (sealed), filed January 5, 2015], Defendant's Motion for Leave to File Reply [DE__ (sealed), filed January 9, 2015)];

      B.      Defendant's Motion *in Limine* to Exclude Testimony of Trauma Surgeon David King, M.D. [DE__ (sealed), filed December 29, 2014]; Government Opposition [DE__ (sealed), filed January 5, 2015].

VI.    **"Boat Writings"/Spoliation Issue**

      The government notified the defense of its intention to cut and remove the surfaces of the boat containing writings to introduce the pieces at trial in lieu of the entire boat. On Friday, January 2, 2015, government counsel advised that the cutting is scheduled to take place on Friday, January 9, 2015. That afternoon, defense counsel advised government counsel by email that the defense objects to cutting pieces out of the boat, and would be filing a motion seeking relief from the Court. A sealed motion addressing this issue was filed on January 6, 2015 [DE 918 (sealed)]. On January 8, 2015, the Court ordered a temporary stay pending final resolution of the motion. [DE 922 (sealed)].

## NEW ISSUES

**VII.  FRE 404(b)**

The government's trial brief, filed on December 31 [DE 909], referred to a

404(b) notice that it claimed to have filed in a separate pleading. *See* Trial Brief at 20,

section G.  It appears that this "separate pleading" was not filed until after the trial brief,

on Monday, January 5, 2015.  [DE 921 (sealed)].  The defendant will separately file a

motion *in limine* seeking to exclude the 404(b) evidence.

**VIII.  Government Exhibits**

Pursuant to direction by the Court, the government has identified the first 20

witnesses, and the 41 exhibits to be introduced through these witnesses.   These first 41

exhibits include multiple photographs and videos of the Marathon scene, as well as

scenes of the aftermath of the explosions – photographs and videos either taken by the

witnesses themselves, or which depict the various victims and witnesses before and after

the explosions.  Also among the first 41 exhibits is a "3D Model of Boylston Street,"

more than 50 still photographs derived from a surveillance video at the Forum Restaurant

(where the second explosion occurred), the "Boston Bombing Timeline," (a compilation

of video clips and still photos showing the Tsarnaev brothers walking down Boylston

Street, standing in various locations on Boylston Street, and departing the area after the

explosions), and the "Boylston Street Animation," a computer-generated animation that

purports to depict the movements of the Tsarnaev brothers on a map of Boylston Street.

A.    3D Model

We have not yet seen the actual 3D model, but have been provided with a photograph.  We are not aware of the specifications for the model, or its scale.  It is not clear whether the government intends to use the model for demonstrative purposes or introduce into evidence.   Pending further information, we object to use of the model.

B.    Boston Bombing Timeline Compilation Video

We have, by letter to government counsel, requested specific information regarding the source, order, and time-stamping of images and video footage included in the compilation.  We will await the government's response before determining if we have objections to this exhibit.

C.    Boylston Street Animation

It is not clear whether the government intends to use the animation for demonstrative purposes or introduce it into evidence.   In any event, the defendant objects to this exhibit.  The animation conveys an unfounded and prejudicially misleading account of the speed, timing, and direction of the Tsarnaev brothers' movements on and around Boylston Street.

D.    Scene photos and videos

Among the exhibits that the government intends to offer through its first 20 witnesses are photos and videos of the aftermath of the two explosions.    Not surprisingly, they are extremely graphic.  The defense recognizes that the government has a right to introduce evidence that depicts the crime scene and illustrates the witnesses' testimony.  That does not mean, however, that there should be no limit on the quantity

and gruesomeness of such evidence.  The benchmark is whether Fed. R. Evid. 403

prohibits the admission of at least some of this evidence as either cumulative or unduly

inflammatory.  The proffered exhibits include a 13-minute segment of video taken

outside the Forum restaurant (where the second bomb exploded),  along with 52 stills

extracted from that video; a video recording lasting more than 5 minutes, taken by a

camera hanging around a witness' neck (much of which consists of audio recordings of

people screaming in pain and horror); two photos of William Richards holding his

daughter, Jane, after her lower leg was blown off, along with two videos showing her

bloody stump; and numerous photos of survivors' mutilated legs.  In addition, a photo of

a police officer shows him holding a crying boy with blood on the side of his hair; other

discovery suggests that the boy was uninjured and that this photo has been cropped to

emphasize the image of the officer and the boy.

      "'Unfair prejudice' within [the context of Rule 403] means an undue tendency to

suggest decision on an improper basis, commonly, though not necessarily, an emotional

one." Advisory Committee Notes to Fed. R. Evid. 403.  The heart-wrenching scenes

shown in the photos and videos inevitably trigger an emotional reaction.  That fact, in and

of itself, does not mean that the government cannot introduce them.  But this Court

should be vigilant to ensure that the evidence is not being introduced "to inflame the

jury." *Ferrier v. Duckworth*, 902 F.2d 545, 549 (7th Cir. 1990) (criticizing introduction

of photos of blood spattered floor and "lurid and disgusting photographs . . . of the corpse

and the wound").

      At a minimum, the Court should exclude the following:

- multiple images of tattered limbs, including those of Jane Richards (Exhibits 38-41) and Roseanne Sodoia (Exhibits 25 and 26;

- a close-up image of a boy with blood in his hair, held by a police officer (Exhibit 32); and

- the *audio* portion of the videos being offered during the testimony of Colton Kilgore (D494, Ex.11) and Sydney Corcoran (Exhibit 14).

In addition, the Court should order the government to reduce the number of photos and the length of the videos. *See United States v. Mitchell*, 502 F.3d 931, 968 (9th Cir. 2007) (affirming introduction of gruesome photos where "district court painstakingly scrutinized graphic photographs . . . making refined judgments about which should be received into evidence, and how they should be cropped or displayed to minimize prejudicial impact." )

An examination of the photos and videos readily demonstrates the danger they present of cumulativeness and unfair prejudice. As to the audio portion of Exhibit 11, defendant notes that this includes comments from first responders, including "I'm worried about secondaries," presumably secondary explosions, "she's bleeding really bad," and "her leg is really bad." Much of the video simply shows the pavement, while the audio plays anguished screams. On another video, exhibit 14, a bystander or first responder can be heard, asking, "What the f--- happened?" Another person responds, "a bomb."

E.     Autopsy photographs

The government intends to offer autopsy photographs of the four deceased victims

as exhibits.   These photos, which the government itself described as "extremely

graphic," show the bodies of the three bombing victims, "who are all badly mutilated, in

varying stages of dress, including completely naked." Government's Motion for

Protective Order, DE 225, at 4.[2]  The images are quite disturbing, showing organs spilling

out of the victims, and, in the case of Lingzi Lu, a large chunk of her body missing.

The cause of the deaths of the three bombing victims[3] is not in dispute in this case.

To the extent that the government has a right to prove the cause and manner of death,

despite the defendant's willingness to stipulate to these facts, it may and presumably will

make that showing through testimony of medical examiners, treating physicians, and

diagrams.   Therefore, the Court should prohibit the admission of these multiple autopsy

photographs under Fed. R. Evid. 403 as unduly inflammatory and cumulative.

The government has included on its exhibit list three photos of Martin Richards'

body (exhibits 846, 849, and 850); in two of them (849 and 850) he is naked and in all

three his entire body is shown.   Four photos of Krystle Campbell are included; in all of

these, she is naked and, aside from one close-up of a wound (Exhibit 865), the rest

---

[2]  The government's motion purported to address only those autopsy photographs that
would not be used as exhibits at trial.  However, the government filed the motion after
previously refusing to provide copies of *any* autopsy photographs to defense counsel.

[3]  The government's exhibits include four photos of Officer Collier taken during the
autopsy.  These show his hand only (Exhibit 938), a close-up of his face (Exhibit 941)
and two views of his head and upper chest (Exhibits 939 and 940).  Each of these show
different views of different wounds.  We do not object to these.

(Exhibits 863, 864, and 866) show most or all of her body. Three photos of Lingzi Lu, naked, are listed; two of these (Exhibits 873 and 878) show her entire body, the third (Exhibit 879) shows her body from the chest down.

The government plans to present testimony from each of the four pathologists who conducted the autopsies. The autopsy reports include diagrams showing the injuries. Thus, the government will present ample evidence of the cause of death and the extent of the injuries. The minimal probative value of the photographs is vastly outweighed by their potential to inflame and disturb the jury. *See United States v. Tsosie*, 2011 WL 2731187 (D.N.M. Jun. 23, 2011) (excluding autopsy photos where defendant did not dispute cause of death).

In its motion for a protective order, the government cited the need to "safeguard the dignity and privacy of the victims and protect their families from unnecessary grief[.]" DE 225 at 2. The government compared the photographs to child pornography, in which "each new viewing…causes new injury," and argued that "each unnecessary viewing of the autopsy photos is an avoidable harm." *Id.* at 5. Of course, in that motion, the government was seeking to prevent Mr. Tsarnaev himself from seeing the photos. But the government's recognition that the viewing of these photographs is upsetting – and that the grieving families' knowledge that the photos are being displayed would cause further pain – counsels a more cautious approach, especially where the photographs are not necessary to the government's case. *Cf. United States v. Moore,* 38 F.3d 977, 980 (8th Cir. 1994) (where defense argued that he acted negligently, photos were relevant). In *Moore*, the photos were held to be at least marginally relevant to intent. *See also*

*United States v. Sampson*, 335 F.Supp.2d 166, 177-78 (D. Mass. 2004) (holding that a limited number of photos showed intent regarding special finding of aggravated factor regarding whether killings were heinous, depraved and cruel). In *Sampson*, two victims were stabbed and one was strangled; here, in contrast, the injuries do not shed light on the defendant's intent beyond what is incontrovertibly shown by the bombs themselves.

The trial court has a duty to weigh the probative value of each photo against its potential for unfair prejudice. *See United States v. Allen*, 247 F.3d 741 (8th Cir. 2001); *see also United States v. Analla,* 975 F.2d 119, 126 (4th Cir. 1992) (affirming admission of single autopsy photo where court excluded all the other photos of the victim and only allowed introduction of "one that showed the least amount of blood.").   Courts have been more inclined to permit or uphold the admission of photographs that only depict specific features of wounds that, for example, illustrate the angle at which a bullet entered the body or the force of a stab wound.   *See, e.g., United States v. Cruz-Kuilan,* 75 F.3d 59, 61 (1st Cir. 1996).   Courts have held that photographs "which depict each individual wound, rather than the entire body of the victim, are not unfairly prejudicial." *Allen,* 247 F.3d at 793.   Here, all but one of the photos of the bombing victims depict most or all of their bodies.

"Photographs of gore may inappropriately dispose a jury to exact retribution." *United States v. Rezaq,*  134 F.3d 1121, 1137 (D.C. Cir. 1997) (affirming admission of "fairly antiseptic" autopsy photographs and holding that admission of "notably graphic" close-up of removal of bullet from victim's skull did not amount to "grave abuse" of

discretion by trial court).[4] *See also Gomez v. Ahitow*, 29 F.3d 1128 (7th Cir. 1994) (where neither fact nor cause of death were at issue in trial, "'only conceivable reason for placing [photos] in evidence was to inflame the jury against [the defendant]'") (quoting *Ferrier v. Duckworth*, 920 F.2d 545, 548 (7th Cir. 1990)).

The fact that the government is offering numerous full-color photos and extensive video recordings that show the impact of the bombs in graphic detail further minimizes the government's need for the upsetting autopsy photos.

F.    Testimony of Officer Lauren Woods

One of the government's first 20 witnesses is Boston Police Officer Lauren Woods, whose report recounts her valiant but unsuccessful efforts to revive Linzi Lu. This includes descriptions of how Woods repeatedly used her fingers to try to clear vomit from Lu's airway.  Even after medical personnel reported that Lu "wasn't going to make it," Woods kept working on her, performing chest compressions.  Lu continued vomiting.  Woods reports, "I kept talking to Lingzi telling her to stay with us."  Lu then was placed in an ambulance, but quickly removed and pronounced dead.

This graphic and wrenching testimony should be excluded under Fed. R. Evid. 403.  The image of Lu vomiting and Woods urging her to "stay with us" has minimal probative value.  It does not reflect on Woods' pain and suffering as it appears that she was in shock or dead at the time.  While Woods' efforts to revive her are commendable,

---

[4] In *Rezaq*, the prosecution did not introduce two proffered photographs of the victim's naked body.  *Id*. at 1137 n.9.

the description does nothing more than play on the emotions of the jury. *See Ferrier v. Duckworth*, 920 F.2d 545, 548 (7th Cir. 1990)).

      G.      Video of April 18 law enforcement press conference

      The government has included on its exhibit list a videotape of a press conference held on the afternoon of April 18, 2013, at which the FBI and state and local law enforcement authorities released surveillance photos of the Marathon bombing suspects to the news media. The fact that this release occurred is relevant to the government's theory of the events that culminated with the death of Officer Collier and the shoot-out in Watertown on the night of April 18-19. But the videotape of the actual news conference, which consists of a -six-minute announcement by FBI Special-Agent-in-Charge Richard Deslauriers followed by two minutes of news media questions and answers, should not be admitted or played for the jury.

      Understandably, the April 18 press announcement was both an appeal for public confidence in the thoroughness and competence of the law enforcement response to the bombing, and an urgent and emotional request for the assistance of the public to help "bring those responsible to justice." However appropriate Special Agent Deslauriers' performance in this press conference may have been as an emergency law enforcement communication with the general public at a moment of crisis, it is not suitable for a criminal trial. A jury will likely hear in Special Agent Deslauriers' repeated pleas to help bring the suspects to justice a slightly different message – that the jurors should

- 13 -

demonstrate with their verdicts the highest possible level of support for law enforcement. There are at least three reasons why this is so.

First is the poignancy of the situation itself, since the jurors will know (or will soon learn) that the violence of April 18-19 might have been prevented had someone only responded a little more quickly to Mr. Deslauriers' urgent request for help.  Second is the emotional tone of Mr. Deslauriers' performance, which was intended to – and still does – pressure his listeners to rally behind the law enforcement effort.  And third is Mr. Deslauriers' rather emotional performances in two heavily-promoted, nationally-televised programs (a CBS *60 Minutes* segment and a National Geographic Channel docudrama) that aired shortly before the first anniversary of the bombing, and that anyone who saw then – including trial jurors – will likely recall now.  *See* DE 280 (Defendant's Motion for a Hearing and Appropriate Relief Concerning Leaks and Public Comments by Law Enforcement) at 2-4.

More than six months ago, the Court expressed its displeasure at these unauthorized media appearances by Mr. Deslauriers, and asked the government whether he would be a trial witness; the government responded that he would not be.  DE **, Tr. of 6/18/2014 Status Conf. at 7. Now, the government apparently proposes to present Agent Deslauriers after all, by means of the April 18 press conference video.  At a minimum, the Court should ensure that the government does not benefit from the powerful emotional association that jurors who saw Mr. Deslauriers' televised performances last year may make when he again appears on video at so dramatic a moment of the Marathon bombing story.

- 14 -

Were there any evidentiary need to show the April 18 video, the issue might be different. But the facts that the video show can be easily and completely established in other ways. The material points are that law enforcement released photos of the suspects, when the photos were released, and how rapidly they were disseminated on television and the internet. A video of the actual press conference at which the images were first shown to the news media adds nothing to this narrative except unfair prejudice, and should be excluded.

## IX.   Authentication/Chain of Custody Issues

The government continues to make disclosures to the defense regarding seizure and collection of various items that it recently identified as exhibits. We expect that there may be objections on authentication and chain-of-custody grounds, but we are unable to determine with specificity those objections unless and until the government provides adequate discovery.

## X.   Exclusion of Victim Impact Evidence Related to Bombing Survivors

The government has listed a number of witnesses who were injured, some very severely, in the Marathon bombing. Reports of interviews with these witnesses that the government recently provided as *Jencks* material include much information about the long-term physical, psychological, economic and social effects of the injuries that the witnesses have suffered. While the government has not expressly indicated any intent to elicit testimony from these witnesses (or from their relatives) concerning long-term effects of the bombing, it seems prudent to move *in limine* to ensure strict adherence to the limitations imposed by law in this very sensitive area.

In both capital and non-capital cases, "Victim-impact" evidence and testimony –
testimony concerning the effects of a violent crime upon the victim and his or her
immediate family – has long been recognized as a part of the sentencing process that
follows conviction, and the prosecution is normally not permitted to offer such evidence
as part of its proof of guilt. The importance of maintaining this distinction is especially
great here, because in a case such as this one, where both capital and non-capital charges
are joined in a single indictment, responsibility for sentencing on the capital counts falls
on the trial jury, while sentencing for all non-capital counts is conducted entirely by the
court. For this reason, a capital trial jury, having no sentencing responsibility for non-
capital crimes, will never receive victim-impact evidence concerning those crimes.

The Federal Death Penalty Act makes clear that in federal capital sentencing
hearings, victim-impact testimony and evidence is limited to the death-eligible homicide
counts. Section 3593(a) of Title 18 provides that aggravating factors "may include
factors concerning the effect *of the offense* on the victim and the victim's family"
(emphasis added). As the court recognized in *United States v. Sampson*, 335 F. Supp. 2d
166, 193 (D. Mass. 2004), "the offense" referred to is the death-eligible homicide itself,
not other crimes for which the jury is not imposing sentence. Reaching the same
conclusion in *United States v. Gooch,* 2006 WL 3780781 (D. D.C. 2006), the court
succinctly set forth its reasons as follows:

> Clearly, the FDPA refers to the victims of a capital crime. Whether Mr.
> Gooch committed additional, noncapital murders will be determined in the
> guilt phase by the jury and may be noted as a nonstatutory aggravating
> factor if the trial advances to the selection phase. That does not mean,
> however, that the families of his other alleged victims can properly testify

> at the selection phase. Mr. Gooch's sentence for any noncapital crimes of
> which he is found guilty will be determined by the Court. The families of
> any other murder victims will have the opportunity to address the Court for
> that sentencing. Their losses and emotions are not relevant to whether the
> jury selects the death penalty for the alleged murders of Mr. Cooper and
> Ms. Miller and would also be more prejudicial than probative. See 18
> U.S.C. § 3593(c).

*Id.* at 22.

The difference here – that the victim-impact testimony at issue mainly concerns non-homicide offenses, and thus consists of the testimony of surviving victims rather than family members of decedents – requires no different result. While surviving victim-witnesses may certainly testify at the guilt-or-innocence phase of trial to describe their own experiences and injuries at the blast site, their experiences and those of their loved ones in the ensuing weeks and months are legally relevant to the sentence for *those* crimes, and are not admissible as "victim-impact" evidence with respect to the capital homicide counts. Since the same jury will render verdicts on all counts and then sentence on the capital counts of conviction only, it is especially important that victim-impact evidence unconnected to the homicides not be admitted before the jury at either stage of this case. The proper time for such evidence to be introduced, heard and considered is as part of the non-capital sentencing before the judge. This will assure that surviving victims' testimony will be taken into consideration with respect to the crimes committed against them, while also protecting against the risk that the capital sentencing jury – which has no sentencing authority as to those counts – may in effect attempt to sentence the offender for the non-capital counts as part of its capital sentencing verdict.

This risk is hardly theoretical.  The stories of many of the Marathon bombing survivors in the months after April 15, 2013 are searing and haunting.  They include instances of extraordinary resilience, courage, and inspiration.  They arouse the most powerful human emotions of sympathy and solidarity.  A capital sentencing jury exposed to such evidence will feel an overwhelming desire to convey understanding, admiration, and support for these witnesses.  And the jurors will have no vehicle with which to do so except by imposing a harsher sentence – that is, a death sentence – on the accused.  Such misplaced victim-impact evidence is thus a paradigmatic example of "information" which should be excluded because its "probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  And unless such evidence is also excluded from the first phase of trial, where it lacks any legal relevance, it will be too late to protect the integrity of the capital sentencing process.

## XI.    Inflammatory and Irrelevant References to other Highly-Publicized Attacks

Finally, this is an appropriate time to ask the Court to ensure that recent events involving violent Islamic radicalism for which the defendant bears no responsibility are not allowed to infect the trial of this case.  Specifically, the Court should permit no references to highly-publicized atrocities – including the beheadings of American and British hostages – committed during 2014 by the Islamic State in Iraq and the Levant (ISIL).  *See, e.g.*, Editorial, "Beheading of Foley exposes true nature of 'Islamic State,'" BOSTON GLOBE A-14 (Aug. 21, 2014).  Likewise, the January 7, 2015 murders of at least twelve journalists and police officers in Paris by killers who appear to be Islamic

religious fanatics have absolutely no connection to this case, and should not be permitted

to affect the jury's consideration of the defendant's guilt or punishment in any way. *See*

Liz Alderman, "Survivors of Charlie Hebdo attack recount massacre," BOSTON GLOBE

(January 8, 2014).   For similar reasons, and given that one of the victims in this case was

a police officer who was shot to death while sitting in his squad car, care must be taken to

minimize the risk that jurors will allow their consideration of this case to be affected by

the very recent murders of two New York City police officers by an attacker who appears

to have been motivated by a desire for retribution for recent police killings of civilians.

*See* Associated Press, "New York marks officers' deaths with moment of silence,"

BOSTON GLOBE, A-7 (Dec. 24, 2014). While the overwhelming emotional impact of this

high-profile series of attacks may well further interfere with any Massachusetts jury's

ability to give the defendant a fair trial whether the attacks are mentioned or not during

court proceedings, it is clear at a minimum that they must not be affirmatively injected

into the defendant's trial or sentencing in any way.

        The Court should also prohibit the government from arguing or eliciting testimony

to the effect that the Boston Marathon bombing was the worst terrorist attack on U.S. soil

since 9/11, or in any other way comparing the offenses charged in this case to the

September 11, 2001 attacks on New York and Washington.  Without minimizing the

gravity of the Marathon bombings, the fact remains that the death toll on 9/11 was almost

one thousand times greater, and only unfair prejudice can result from rhetorical

comparisons between these two incommensurable events.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

/s/

David I. Bruck, Esq.
Judy Clarke, Esq.
Miriam Conrad, Esq.
Timothy Watkins, Esq.
William Fick, Esq.

## Certificate of Service

I hereby certify that this document has been served upon counsel for the United States by e-mail PDF this 9th day of January, 2015.