# EXHIBIT C

1

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA           )
                                        )
5    vs.                                )
                                        )
6                                       )   No. 1:13-cr-10238-DPW-3
                                        )
     ROBEL KIDANE PHILLIPOS,            )
7                                       )
                      Defendant.        )
8                                       )

9

10   BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12              EXCERPT FROM DAY SIX OF JURY TRIAL
              TESTIMONY OF SPECIAL AGENT JOHN WALKER
13

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 1
16                    One Courthouse Way
                      Boston, MA 02210
17               Tuesday, October 7, 2014

18

19

20

21               Brenda K. Hancock, RMR, CRR
                    Official Court Reporter
22        John Joseph Moakley United States Courthouse
                      One Courthouse Way
23                    Boston, MA 02210
                      (617)439-3214
24

25

2

APPEARANCES:

      U.S. ATTORNEY'S OFFICE
      By:   AUSA B. Stephanie Siegmann
            AUSA John A. Capin
      1 Courthouse Way
      Suite 9200
      Boston, MA 02210
      On behalf of the United States of America.


      DEMISSIE & CHURCH
      By: Derege B. Demissie, Esq.
          Susan B. Church, Esq.
      929 Massachusetts Avenue
      Suite 01
      Cambridge, MA 02139

3

I N D E X

WITNESSES:          DIRECT     CROSS      REDIRECT     RECROSS

S.A. JOHN WALKER
By Ms. Siegmann      49                     92
By Mr. Demissie                 64

E X H I B I T S

Marked in Evidence                              Page

21 thru 24.............................13
20.................................15

4

1                              EXCERPT:

2              MS. SIEGMANN:  The Government calls Special Agent John

3    Walker.

4              SPECIAL AGENT JOHN WALKER, DULY SWORN BY THE CLERK

5              THE CLERK:  Please state your full name, spelling your

6    last.

7              THE WITNESS:  My name is John Walker, W-A-L-K-E-R.

8                         DIRECT EXAMINATION

9    BY MS. SIEGMANN:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Can you tell the jury how you are employed.

13   A.   I am a Special Agent with the FBI.

14   Q.   Just back up a little.

15   A.   Yes, thank you.

16   Q.   How long have you been employed as a Special Agent with

17   the FBI?

18   A.   For 23 years.

19   Q.   What is your current assignment?

20   A.   I'm a Special Agent in the Boston Division of the FBI, and

21   for the past 18 months I have been assigned to the Boston

22   Marathon Bombings' Task Force.

23   Q.   And could you briefly describe your duty assignments and

24   positions you have held over your career with the FBI.

25   A.   Briefly, I entered on duty with the FBI in 1993.  For my

1    first nine years during assignments in Oregon and

2    Washington D.C., I concentrated on investigation of violations

3    of domestic terrorism, violent crimes and public corruption.

4            In 2000, I was promoted to a position as a Supervisor

5    in FBI Headquarters in the Violent Crimes and Major Offenders

6    Section.

7            In 2002, I was promoted to a supervisory position here

8    in Boston, where I supervised a squad of the Boston Joint

9    Terrorism Task Force.  There, my portfolio was again domestic

10   terrorism.  I also had responsibility for our critical incident

11   response capabilities in counterterrorism preparedness.  During

12   that assignment, for instance, I was responsible for

13   supervising our efforts in support of the Boston Marathon.

14           Thereafter, for almost six years, I began overseas

15   assignments for the FBI in Jakarta, Indonesia, in Berne,

16   Switzerland.  I returned to Boston in an investigative capacity

17   in 2000, and I've been here since for the past 18 months on

18   Bos-Bomb (ph).

19   Q.   When did you first become involved in the Boston Marathon

20   Bombings investigation?

21   A.   On the afternoon of April 15, 2013.

22   Q.   If you could tell the jury, in general, what were your

23   duties between April 15th, 2013 and April 19th, 2013.

24   A.   I had a variety of duties that commenced within about an

25   hour of the blasts on Boylston Street.  They included

6

1    interviewing witnesses to the bombing, witnesses who observed

2    activity they considered suspicious or potentially linked to

3    the bombing.  I tracked down a suspicious vehicle that was seen

4    in the Back Bay.  I obtained clothing and --

5           MR. DEMISSIE:  Objection.  Not in evidence, your

6    Honor.

7           THE COURT:  Overruled.  You may continue.

8           THE WITNESS:  Thank you, Judge.

9           I obtained clothing and other physical evidence from a

10   the victim of the bombings.  I obtained still and video images

11   that potentially depicted Boylston Street on April 15, and I

12   also assisted in our Command Post operations at One Center

13   Plaza in Boston.

14   Q.   And from the moment the bombs were detonated near the

15   Finish Line, how quickly did the FBI launch an investigation?

16   A.   It was an immediate response.

17   Q.   Now, at approximately 5:15 p.m. on Thursday, April 18th,

18   2013 what happened?

19   A.   The FBI and the Office of the United States Attorney and

20   other law enforcement partners gathered in Boston, and the FBI

21   released images of suspects, two suspects that it then believed

22   were responsible for the bombings on Boylston Street.  Those

23   images were conveyed during a press conference.  At that time,

24   simultaneously the FBI published the images on its website and

25   also transmitted or broadcast those images via its YouTube

1   account.

2   Q.   For the court reporter, let's just slow down a little tiny

3   bit when you're talking.  I just want Ms. Hancock to not have

4   trouble keeping up with you.

5        Now, when the photos were released of the suspected

6   bombers at 5:15 p.m. on Thursday, did the FBI know the names of

7   those suspected bombers?

8   A.   No.

9   Q.   When did the FBI determine the names of the two people

10  depicted in the images?

11  A.   We determined the names that we believed were associated

12  with those two images during the early morning hours of Friday,

13  April 19th, 2013.

14  Q.   When were their names publicly disclosed?

15  A.   At or about 7:00 a.m. on that same day, April 19.

16  Q.   Were one of the two suspects ultimately arrested?

17  A.   Yes.

18  Q.   And can you tell the jury which one of the two suspected

19  bombers was arrested?

20  A.   Dzhokhar Tsarnaev was arrested in Watertown.

21  Q.   What happened to the other suspected bomber?

22  A.   He expired during the early morning hours of April 19 as a

23  result of a confrontation in Watertown.

24  Q.   Now, at what time was -- I'm sorry.  What time did you say

25  Dzhokhar Tsarnaev was arrested?

8

1    A.    I don't know that I did, but it was approximately 8:45 on

2    that Friday evening, April 19.

3    Q.    Where was he arrested?

4    A.    He was arrested in Watertown inside a boat in someone's

5    backyard.

6    Q.    When he was arrested at approximately 8:45 p.m. on Friday

7    evening, April 19th, was the FBI's bombing investigation over?

8    A.    No.

9    Q.    What types of investigative steps occurred after his

10   arrest at 8:45 p.m. on Friday, April 19th?

11   A.    There was a continuation and perhaps an expansion of many

12   of the same things that we had been doing in the very first

13   hour of our investigation on April 15.  We continued to

14   contact, locate and interview victims of the bombings and to

15   obtain any physical evidence related to the bombings that may

16   be obtained, collected from either those victims, literally

17   their person.

18         We continued to locate and interview witnesses to the

19   bombings or witnesses to events related to the Tsarnaevs.  We

20   continued to conduct, I describe it as, a massive analytical

21   effort to identify persons responsible for the bombings that

22   may be persons other than the Tsarnaev brothers, and leads were

23   transmitted literally around the world.  We, for months,

24   continued our examination of the remnants of the suspected

25   improvised explosive devices that were seized from Boylston

9

1    Street, and these efforts continue to date.

2    Q.    Now, I want to direct your attention to the Joint

3    Terrorism Task Force investigative activities between the dates

4    of April 19th, 2013 and April 26th, 2013.

5    A.    Please.

6    Q.    Are you aware that the defendant was interviewed on

7    April 19th, 20th, 25th and 26th, 2013?

8    A.    I am.

9    Q.    I would like to discuss what was going on in the

10   investigation on those dates with you.  On Friday, April 19th,

11   what was your assignment?

12   A.    That day and through the weekend I was in charge of the

13   FBI's -- the efforts of the Joint Terrorism Task Force in the

14   New Bedford area during the manhunt for Dzhokhar Tsarnaev, and

15   my efforts continued there in that area in that capacity after

16   his apprehension on that Friday evening, because we determined

17   that he was a student at the University of Massachusetts at

18   Dartmouth.

19   Q.    And were you the person in charge in that New Bedford area

20   on that date, April 19th?

21   A.    For the FBI and our Joint Terrorism Task Force, yes.

22   Q.    Now, did the name "Robel Phillipos" come up during the

23   course of your investigation on April 19th, 2013?

24   A.    Yes.

25   Q.    When did you first hear the defendant's name mentioned on

10

1    that date?

2    A.   Sometime during the afternoon of April 19.

3    Q.   Was this the first time you had heard the name "Robel

4    Phillipos" during the course of this investigation?

5    A.   Yes.

6    Q.   At approximately 3:20 p.m. was the defendant interviewed

7    for the first time about what was happening in the bombing

8    investigation?

9             MR. DEMISSIE:  Objection.

10            THE COURT:  Overruled.

11   A.   Yes.

12   Q.   And at this time were interviews of associates of Dzhokhar

13   Tsarnaev's still being conducted?

14            MR. DEMISSIE:  Objection to "associates."

15            THE COURT:  Overruled.

16   A.   Yes.

17   Q.   What was the purpose of the interviews on this date, on

18   April 19th, 2013?

19   A.   At that time of the day, again, prior to his apprehension

20   in the boat that evening, our predominant focus -- our bombing

21   investigation continued, but it was all hands on deck to locate

22   and apprehend Dzhokhar Tsarnaev suspected of complicity in the

23   bombings.

24   Q.   Now, you mentioned a few minutes ago that you had

25   identified Dzhokhar Tsarnaev as a student of UMass-Dartmouth.

11

1   Do you recall that?

2   A.   I do, and that's correct, yes.

3   Q.   Were any steps taken to secure evidence at that campus?

4   A.   Yes.

5   Q.   Can you tell the jury what steps were taken at that time,

6   during the afternoon of April 19th?

7   A.   But even before, his dormitory, Pine Dale Hall, on the

8   campus was evacuated.  First, it was secured.  Shortly after

9   8:00 a.m., when the University itself discovered that he was a

10  student there, they quickly determined that he was a resident

11  on campus and lived in a dormitory room there.  So, they

12  dispatched police officers to secure that room.  A decision was

13  quickly made by the University Police Department to evacuate,

14  first, that dormitory, then other dormitories and shortly

15  thereafter the entire campus.

16        From the time, that is, shortly after 8:00 in the

17  morning, when police officers first arrived at Pine Dale Hall,

18  until Sunday morning, there was a constant police and then a

19  joint police and FBI presence at that dormitory room to secure

20  evidence that we considered was likely inside the room.

21  Q.   So, the campus, in working with the FBI, determined that

22  Dzhokhar Tsarnaev lived in the Pine Dale Dormitory?

23  A.   Yes.  They made that determination almost immediately

24  around 8:00, even before the FBI -- even before I arrived down

25  in New Bedford that morning.

Q.    Now, what, if any, role did you play in the decision to interview Robel Phillipos on the evening of April 19th at approximately 9:35 p.m.?

A.    I initiated the re-interview of Mr. Phillipos that evening.

Q.    What were you doing at 9:35 p.m. on April 19th, that Friday night?

A.    I was completing a search of the dorm room of Dzhokhar Tsarnaev at Pine Dale Hall.

Q.    Why did you search Dzhokhar Tsarnaev's dormitory room that night?

A.    The FBI considered his dorm room his domicile since September of 2012 to be, if not the most likely, among the most likely places where physical evidence related to the bombings on April 15 may be located.

Q.    When you conducted the search, were you aware that items had been removed from Dzhokhar Tsarnaev's dorm room the night before?

A.    I was aware that some marijuana was likely removed the evening before from the dorm room, yes.

Q.    Were you aware of anything else that had been removed?

A.    I was not then aware of anything else, no.

Q.    At approximately 4:00 a.m. on April 20th, when the defendant was interviewed for the third time, what were you doing?

13

1   A.    I was arriving -- I was returning to the Barracks of the

2   Massachusetts State Police at North Dartmouth, having just

3   completed a search of a dumpster located near Carriage Drive in

4   New Bedford, Massachusetts.

5   Q.    Did Dias Kadyrbayev and Azamat Tazhayakov live at 69

6   Carriage Drive in New Bedford?

7   A.    Yes.

8   Q.    Did you search the dumpster closest to their apartment?

9   A.    Yes.

10  Q.    Did you take photographs of the dumpster and the area

11  surrounding the dumpster?

12  A.    I did at a later date, yes.

13        MS. SIEGMANN:  And at this point I would like to show

14  the witness what has been marked Exhibits 21 through 24.  They

15  are not objected to, your Honor.

16        THE COURT:  All right.

17        MS. SIEGMANN:  To save time, I can just move them into

18  evidence right now.

19        THE COURT:  Yes, they will be received.

20        (Exhibit Nos. 21, 22, 23 and 24 received into evidence)

21        MS. SIEGMANN:  Can we show Government Exhibit No. 21.

22  Q.    Special Agent Walker, do you see --

23        MS. SIEGMANN:  And the jury can see this too, correct?

24  Sorry.

25  Q.    Showing you now Exhibit 21, do you see that on the screen

14

1    in front of you, Special Agent Walker?

2    A.   I do.

3    Q.   And can you describe what is reflected in that picture?

4    A.   That photograph depicts a fence which surrounds what I

5    have referred to as a "dumpster."  It's actually a trash

6    compactor.  But that enclosure is located approximately a

7    hundred meters, or slightly over a hundred yards, as the crow

8    flies, from the apartment of Mr. Kadyrbayev and Mr. Tazhayakov.

9    Q.   Now, moving to Exhibit 22, can you describe to the jury

10   what's depicted in that photograph?

11   A.   I can.  To the left border of the photograph is the front

12   facade of the enclosure that we just saw.  The tree on the

13   right and in the background of that tree is in the direction of

14   69A Carriage Drive.  It's difficult for me to determine, as I

15   sit here, whether that actually depicts 69A, but I think it

16   does.  I think it depicts a corner of that apartment building.

17   Q.   Turning, now, to Exhibit 23, can you describe what's

18   depicted in this photograph?

19   A.   Yes.  That's the same enclosure.  That is another facade

20   depicted here.  That is the entrance to the area that contains,

21   encloses the trash compactor, and the dark square that one can

22   observe near the middle of the photograph is actually the

23   opening of the trash compactor into which residents of that

24   complex toss their trash.

25   Q.   Now, moving to Exhibit 24, and I believe this is the final

15

1    photograph, can you describe what that is?

2    A.    And that's the same opening into the compactor.  The

3    compactor itself is no longer visible along the left border of

4    the photograph.  Basically, trash is thrown into that opening,

5    the compactor compacts it into the large green vestibule, the

6    dumpster on the right side of the photograph.

7    Q.    Is this the same dumpster that you and other FBI Agents

8    searched in the early morning hours of April 20th, 2013?

9    A.    Actually, yes, it is.  Yes, absolutely.

10   Q.    Did you find Dzhokhar Tsarnaev's backpack during this

11   search?

12   A.    We did not.

13   Q.    Were you ever inside Mr. Kadyrbayev's and Mr. Tazhayakov's

14   apartment at 69A Carriage Drive?

15   A.    Yes.

16   Q.    How many times?

17   A.    Four.

18   Q.    Now I am going to show you Exhibit 20.

19        MS. SIEGMANN:  Again, this is an exhibit that is not

20   objected to, your Honor.

21        THE COURT:  It is received.

22            (Exhibit No. 20 received into evidence)

23        MS. SIEGMANN:  Can you zoom in on that photo?

24        The Government moves into evidence this photograph.

25        THE COURT:  Yes, it is received.

16

1    Q.    Do you recognize the persons depicted in this photo?

2    A.    I do.

3    Q.    Who are they?  Can you go through and, maybe using your

4    finger, you can mark it on the --

5    A.    I will, please.  Starting from left to right, the

6    gentleman bearing the Fitch sweatshirt is a Kazakhstan National

7    named Adlet Tkishev (indicating), the gentleman who sits next

8    to him without a shirt on is Dias Kadyrbayev (indicating),

9    Mr. Azamat Tazhayakov is depicted next to him (indicating), Mr.

10   Robel Phillipos is next to Mr. Tazhayakov (indicating), and at

11   the far right of the photograph is Dzhokhar Tsarnaev

12   (indicating).

13   Q.    Do you recognize where this photo was taken?

14   A.    I do.

15   Q.    Where was it taken?

16   A.    Inside the apartment of 69A Carriage Drive leased by

17   Kadyrbayev and Tazhayakov.

18   Q.    Do you know when the photograph was taken?

19   A.    I do.

20   Q.    When?

21   A.    On the afternoon of Saturday -- strike that -- Sunday,

22   March 10, 2013.

23          MR. DEMISSIE:  Objection.  Foundation.

24          THE COURT:  Just a moment.  Grounds?

25          MR. DEMISSIE:  Foundation.

17

```
 1            THE COURT:  Overruled.
 2   Q.   I'm sorry.  You said March 10th, 2013?
 3   A.   I did.  And it was a Sunday, not a Saturday.
 4   Q.   Now, at around 4:00 a.m. on April 20th what investigative
 5   steps were being taken by the FBI in the bombing investigation?
 6   A.   Around 4:00 a.m. on April 20th, correct?
 7   Q.   Yes.
 8   A.   Yes.  The same as I mentioned ten minutes ago.  We were
 9   literally in the infancy of our investigation.  We had moved
10   from what the FBI has always referred to as -- we have two
11   phases of investigation, typically.  Often, where we are
12   unaware of the identity of the subject and we refer to that
13   case, so we captioned that case "Unknown Subject Responsible
14   For" a certain crime.
15            Based on the events that unfolded on April 19th, we
16   then determined the identity of the subject, at least one
17   subject of our investigation, and that became a titled case; we
18   knew the subject.  That begins the phase two and, arguably, the
19   most important phase of the investigation, where we are not
20   simply attempting, it's not a simply "Who done it" anymore, but
21   then we are collecting evidence that may be presented
22   ultimately in a courtroom like this.
23            And so we were less than 24 hours into an
24   investigation where we had knowledge of who we were
25   investigating, for lack of a better phrase.
```

18

1    Q.   Now, turning to April 25th, 2013, the date of the

2    defendant's fourth interview, what was being done in the FBI's

3    bombing investigation on that date?

4    A.   All of the same investigative steps that I mentioned

5    earlier.  We also commenced a search that morning, on that

6    Thursday, of a landfill located in New Bedford, Massachusetts,

7    called the Crapo Landfill.

8    Q.   Why was the FBI searching the Crapo Landfill?

9    A.   The FBI sought to locate the backpack that belonged to

10   Dzhokhar Tsarnaev that we believed might contain evidence

11   probative of our investigation.

12   Q.   Now, were you also at this point in the investigation and

13   earlier dates also concerned that there could be also more

14   confederates that you were not aware of?

15   A.   Yes, very much so.

16   Q.   Now, directing your attention to April 26th, on the date

17   of the defendant's final interview, what was happening in the

18   FBI's bombing investigation on that date?

19   A.   All of the same steps as the day before, including day two

20   of the search of the landfill in New Bedford, the Crapo

21   Landfill.

22   Q.   And how long did that landfill search go forward?

23   A.   On that day, the landfill search went from the morning,

24   approximately 8:00, until -- personnel were on scene, about 25

25   of my colleagues were on scene until likely 5:00 or after that

19

1    day, but there was a significant development in that search at

2    or about 2:05 that afternoon.

3    Q.   What was the significant development?

4    A.   We collected what we suspected was Tsarnaev's backpack and

5    its contents.

6              MS. SIEGMANN:   Your Honor, can I just have a moment?

7              THE COURT:   Yes.

8                              (Pause)

9              MS. SIEGMANN:   No further questions, your Honor.

10             THE COURT:   All right.   Mr. Demissie.

11                         CROSS-EXAMINATION

12   BY MR. DEMISSIE:

13   Q.   Good morning, Agent Walker.

14   A.   Good morning, Mr. Demissie.

15   Q.   You are one of the senior agents in this case?

16   A.   Yes.

17   Q.   It's fair to say that you kept abreast of the developments

18   as the investigation progressed from April 18th up to today,

19   correct?

20   A.   Yes.

21   Q.   And you participated in several interviews of various

22   individuals?

23   A.   Many, yes.

24   Q.   Many students from UMass-Dartmouth?

25   A.   Yes, sir.

20

1    Q.    Many friends of Robel Phillipos?

2    A.    Yes.

3    Q.    You interviewed Jim Li?

4    A.    Yes.

5    Q.    Quan Lephan?

6    A.    Yes, sir.

7    Q.    And these were close friends of Robel, correct?

8    A.    Yes.

9    Q.    You have also interviewed several other people that Robel

10   mentioned in his statements?

11   A.    Yes.

12   Q.    Like, maybe David Borden?

13   A.    I did not, sir.

14   Q.    You received reports of the interview, though?

15   A.    Yes.

16   Q.    And one of the things as an investigator you'd look for is

17   if Mr. Robel had made any incriminating statements to any of

18   his friends?

19   A.    Yes, or exculpatory statements.  Yes, sir.

20   Q.    Exculpatory or incriminatory, correct?

21   A.    Exactly.

22   Q.    And it's fair to say that you have reviewed the reports of

23   friends that happened to be interviewed, friends of Robel that

24   were interviewed by other agents as well, in addition to your

25   own interviews?

21

1   A.   Yes.  I'm trying to think, sir, whether -- Borden's

2   interview comes to mind as an associate of Mr. Phillipos.  The

3   interview I did not personally conduct.

4        As I sit here, it's possible, yes.  I did many

5   interviews myself directly.  Some, because of the location, I

6   was not able to do myself.

7   Q.   For example -- okay, I understand.  But it's fair to say

8   that Robel did not say to any one of his friends that he saw a

9   backpack?

10       MS. SIEGMANN:  Objection.

11       THE COURT:  Well, I think I am going to sustain the

12  objection.

13       MR. DEMISSIE:  It goes to the investigation, state of

14  mind.

15       THE COURT:  It may, but it is clearly inadmissible.

16  If you want to do it bit by bit, perhaps you can do it that

17  way, but not that general kind of question.

18  Q.   Jim Li is one of the individuals who spent significant

19  time with Robel on the 18th, 19th and the 20th of April, 2013?

20  A.   Certainly on the 19th and for a good portion of the 20th,

21  yes, sir.

22  Q.   They spent the night together in Worcester?

23  A.   They did on the evening of the 19th into the 20th, yes.

24  Q.   And then they drove to Boston?

25  A.   Yes.

22

1    Q.    And you were interested in finding out if Robel told Jim

2    Li that he went to the dorm room?

3    A.    Among other things, yes.

4    Q.    Whether he saw the backpack?

5    A.    Yes.

6    Q.    What you found, though, is to the contrary.

7          MS. SIEGMANN:   Objection.

8          THE COURT:   Sustained.

9    Q.    You did learn that Robel told his friends that he was

10   accused of lying, but he did not remember going in the dorm

11   room?

12         MS. SIEGMANN:   Objection.

13         THE COURT:   Well, see, the problem with this is I am

14   not sure that it goes to the investigation, and it certainly

15   elicits hearsay.

16         MR. DEMISSIE:   I will deal with it with the witnesses,

17   your Honor.

18         THE COURT:   Yes.

19         MR. DEMISSIE:   Okay.

20   Q.    There were four face-to-face interviews of Robel Phillipos

21   that were conducted by the agents, correct?

22   A.    Allow me, please, to count.  The first, obviously, was a

23   telephonic interview that Ms. Siegmann asked about.  The

24   interview -- yes.  Yes, sir.  I think there were four

25   face-to-face interviews.  Yes, sir.

23

1    Q.    None of them were recorded?

2    A.    Electronically recorded?

3    Q.    Yes.

4    A.    Not that I am aware of, no, sir.

5    Q.    Now, at the FBI you are able to record if you wanted to

6    record an interview or interrogation, correct?

7    A.    I am now, yes.

8    Q.    Back in April you could report interviews if you wanted

9    to?

10   A.    I would have sought additional authority at that time to

11   do so, yes.

12   Q.    In fact, the roommate of Dzhokhar Tsarnaev's interview was

13   recorded, tape-recorded?

14   A.    An interview that was conducted by the Massachusetts State

15   Police, pursuant to their policy, yes, sir, on the morning of

16   April 19th, that was recorded, at least in part.

17   Q.    And you did not ask for authority to record any of the

18   interviews?

19   A.    No, I didn't.

20   Q.    And to your knowledge, no one else asked for authority to

21   record any of the interviews?

22   A.    To be clear, in this investigation broadly?

23   Q.    Regarding Mr. Robel Phillipos.

24   A.    I think that's accurate, yes.

25   Q.    Now, just to clarify, the bombs that were used that were

24

1   detonated in the Boston Marathon bombing were not made in

2   Dartmouth, Massachusetts, to your knowledge?

3   A.   I don't know that to be the case.  I can't say at this

4   point.  I have no information, as I sit here, that

5   affirmatively would indicate that they were made in North

6   Dartmouth, Massachusetts, that is correct, yes, sir.

7   Q.   You don't have evidence that they were made in North

8   Dartmouth, correct?

9   A.   Correct.

10   Q.   The evidence you have is that they were made in Cambridge,

11   in the Norfolk Street residence?

12   A.   No, sir.

13   Q.   They were made somewhere else?

14   A.   To clarify, and I think it would be helpful, are you

15   asking here my own personal knowledge or the knowledge of my

16   agency?

17   Q.   The knowledge of your agency.

18   A.   I don't know that a -- and I believe that a firm

19   determination has not been made to date as to locations where

20   IEDs were constructed.

21   Q.   But you have no evidence to suggest they were made in

22   Dartmouth, Massachusetts?

23          MS. SIEGMANN:  Objection.  I think there is a lack of

24   personal knowledge on this line of questioning.

25          THE COURT:  I think that I will sustain the objection

25

1    on that.

2    Q.    You have information that Dzhokhar Tsarnaev shot fireworks

3    in Boston?

4    A.    Yes.  Let me -- in Cambridge, sir.

5    Q.    In Cambridge?

6    A.    But very close, yes.  Along the Charles River.

7    Q.    And that was about a month before the Boston Marathon

8    bombing?

9    A.    Approximately a month before, on the last occasion that I

10   am aware of, yes.

11   Q.    And he was with some of his friends, correct?

12   A.    Yes.

13   Q.    Robel Phillipos was not there?

14   A.    Correct.

15   Q.    And the information you had was that he had fireworks in

16   the backpack and he fired some of them, correct?

17   A.    Yes.

18   Q.    And he had leftover in the backpack, correct?

19              MS. SIEGMANN:  Objection.

20              THE COURT:  Overruled.

21   A.    I don't know whether there were leftover or not.  The

22   information that I have is that he obtained fireworks from

23   inside a backpack on the banks of the Charles River in

24   mid-March of 2013.

25   Q.    And they were just doing that for fun?

26

1          MS. SIEGMANN:  Objection.

2          THE COURT:  Well, it is a problem of personal

3    knowledge here.  His source of the information appears to be

4    hearsay.

5    Q.    You interviewed people who were there, correct?

6    A.    I did.

7    Q.    One of them was his girlfriend?

8    A.    I wouldn't so characterize -- I interviewed a young woman,

9    but I have not interviewed anyone that I would characterize as

10   the girlfriend.  Are you referring to Mr. Tsarnaev?

11   Q.    Yes.

12   A.    Yeah.  I have not located anyone that I would characterize

13   as his girlfriend.

14   Q.    A friend, a female friend of his?

15   A.    Yes, sir, that's accurate.

16   Q.    Who spent significant time with him, correct?

17   A.    Yes.

18   Q.    And you learned from her that --

19          THE COURT:  This is hearsay.

20          MR. DEMISSIE:  Okay.

21          THE COURT:  Really, we have to avoid that.  If you

22   want to offer direct evidence about it, or someone does, you

23   can do so.  But you do not get it in through someone else who

24   perhaps heard someone say it.

25   Q.    You interviewed Mr. Tsarnaev's roommate?

1   A.   Yes.

2   Q.   Mr. Andrew Dwinells?

3   A.   Yes, sir.  Dwinells, yes.

4   Q.   He never saw --

5        MR. DEMISSIE:  I'll move on.

6        THE COURT:  Yes, I think you should.

7   Q.   Let's just go through some of the timeline.  The Carriage

8   Drive apartment was surrounded by around what time?

9   A.   I don't ask this without purpose, but describe what you

10  mean by "surround."  There were different activities throughout

11  the day.  I don't want to misspeak.

12  Q.   When was it first put under surveillance?

13  A.   I think it was shortly before noontime that day, that

14  afternoon.

15  Q.   Okay.  And by that, that means there were officers looking

16  at the residence and making sure that -- just keeping an eye on

17  the residents who's coming in and out of the apartment

18  building, correct?

19  A.   I know, and at the time I described it as, I believe, MSP

20  was on the apartment.  I have come to learn that --

21  Q.   What is MSP?

22  A.   Thank you.  The Massachusetts State Police is what I was

23  referring to.  That they were on the apartment sometime I

24  believe shortly before noontime.

25       I have come to learn that in the early stages of our

28

1    surveillance of that apartment, which continued from shortly

2    before noon until 5:00 or so, that in the early stages the

3    surveillance was somewhat distant.  So, it certainly at that

4    point could not be described as "surrounding," and later our

5    level of activity with regard to that apartment increased.

6    Q.    And when you say it "increased," how did it increase?

7    A.    Sometime after noon, as I and my colleagues on scene in --

8    I was then on scene at the University of Massachusetts in

9    Dartmouth, we began to -- we continued to receive a stream of

10   intelligence that suggested to me and my colleagues that it was

11   highly likely that Dzhokhar Tsarnaev, who was then a fugitive,

12   was located inside that apartment.

13          Consequently, as that information increased and

14   solidified, we thought it prudent to increase the level of

15   activity outside the apartment, and at some point a decision

16   was made that we be in a position, law enforcement, outside the

17   apartment, to initiate contact with anyone that would leave the

18   apartment either on foot or within the black BMW that

19   Mrs. Kadyrbayev and Tazhayakov owned.

20   Q.    So, is it fair to say about by 5:00 p.m. the apartment was

21   surrounded?

22   A.    Yes.  That's -- yes.

23   Q.    And agents entered the apartment by around 5:30 p.m.?

24   A.    No.  I think it was closer to 6:00.  Perhaps shortly

25   before 6:00, agents of the FBI entered the apartment to do

29

```
 1    preliminary sweeps for any -- for the fugitive as well as any
 2    physical threats, namely, any explosives that may pose a
 3    threat.
 4    Q.    This is the 19th of April, correct?
 5    A.    Yes, sir, Friday.  Yes.
 6    Q.    And you were there around 5:30?
 7    A.    I was in the vicinity.  I had left the campus sometime
 8    before 5:00, and I arrived in the vicinity.  I was about a
 9    block away at first of that apartment by 5:05 p.m.
10    Q.    And you at some point spoke to Mr. Azamat Tazhayakov and
11    Dias?
12    A.    I did.
13    Q.    What time was that?
14    A.    I believe that I initiated contact with Mr. Tazhayakov at
15    approximately 5:20 p.m.  I think that I first spoke with
16    Mr. Kadyrbayev at approximately 5:25 p.m.  And, thereafter,
17    until for perhaps the next hour, I intermittently spoke with
18    both men as we continued our investigation.
19    Q.    And later on that evening agents entered and searched the
20    apartment, correct?
21    A.    Yes.
22    Q.    What time did they enter the apartment?
23    A.    Early on, there was after preliminary -- we call it a law
24    enforcement -- sweep of the apartment, not to effect a search
25    or to collect evidence in the apartment, but, first, we needed
```

30

1   to determine whether Tsarnaev was then in the apartment.  We

2   determined that he was not in the apartment.  Immediately

3   thereafter we had two Special Agent Bomb Technicians of the FBI

4   enter the apartment and do a quick visual search, again without

5   collecting evidence, to ensure that there weren't any open and

6   obvious threats, namely, bombs or explosive components.  Later,

7   at approximately 8:00, agents of the FBI entered the apartment

8   to conduct a search of the apartment and to collect physical

9   evidence.

10  Q.   All right.  Thank you.  By 5:25 you were speaking to Dias

11  Kadyrbayev?

12  A.   At approximately that time, yes.

13  Q.   And at some point later on they were taken to the

14  Massachusetts State Barracks in Dartmouth, correct?

15  A.   Yes.

16  Q.   And they were interviewed there?

17  A.   Yes.

18  Q.   By other agents?

19  A.   Yes.

20  Q.   They were interviewed up until the morning hours of the

21  20th, until about 4:00 a.m.?

22  A.   I drove them home with my colleagues at about close to

23  4:30 in the morning.

24  Q.   So, by 4:30 in the morning they had already concluded

25  their interview and they were taken back?

31

1   A.   Well before that.  And, yes, at about that time we drove

2   them back to their apartment.

3   Q.   And their interview concluded well before 4:00, correct?

4   A.   Yes.

5   Q.   That's the 20th of April?

6   A.   Yes.

7   Q.   And both Azamat Tazhayakov and Dias Kadyrbayev had given a

8   detailed statement to the FBI by about 3:00 a.m.?

9   A.   They gave information to us, yes, certainly by that time,

10  yes.

11  Q.   And also there was a third individual named Bayan

12  Kumiskali?

13  A.   Who was also interviewed there at the Barracks, yes.

14  Q.   Who was the girlfriend of Dias Kadyrbayev?

15  A.   Yes.

16  Q.   She was also interviewed, correct?

17  A.   Yes, sir.

18  Q.   That interview was also concluded before 3:00 a.m.?

19  A.   Yes.

20  Q.   And that's, again, on April 20th?

21  A.   Yes.

22         MR. DEMISSIE:   Just one second.

23                         (Pause)

24  Q.   By that time, you'd learned a backpack was taken out of

25  Dzhokhar Tsarnaev's dorm room?

32

1    A.    Yes.  Yes, we did.

2    Q.    3:00 a.m., correct?

3    A.    Yes.

4          MR. DEMISSIE:  I have a little bit left.  I don't know

5    if this is a good time to take a break, your Honor, but I can

6    continue.

7          THE COURT:  Let me see counsel at the sidebar.

8

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10         THE COURT:  Who is the next witness?

11         MS. SIEGMANN:  Michael Delapena.

12         MR. CAPIN:  Delapena.

13         THE COURT:  And after Delapena?

14         MR. CAPIN:  Tazhayakov.

15         THE COURT:  So, we will have to take a break for

16   him --

17         MR. CAPIN:  Correct.

18         MS. SIEGMANN:  Yes.

19         THE COURT:  -- to bring him into the courtroom?

20         How much longer with this witness?

21         MR. DEMISSIE:  About 15 minutes or so.

22         THE COURT:  What about you?

23         MR. CAPIN:  For Delapena?  Oh, for redirect?

24         MS. SIEGMANN:  I have one question right now.  That's

25   all.  I don't anticipate many questions.

33

1          THE COURT:  Let's finish it.

2     (END OF SIDEBAR CONFERENCE)

3

4          THE COURT:  I would like to conclude the examination

5     of this witness before we take our break, if we can.

6     Q.    Before 3:00 a.m., you had learned that the backpack was

7     thrown in the dumpster?

8     A.    We were told that, yes.

9     Q.    And before 3:00 a.m., essentially the interviews of

10    Tazhayakov, Azamat Tazhayakov, Dias Kadyrbayev and Bayan

11    Kumiskali, all three, were concluded?

12    A.    Substantively concluded, yes, sir.

13    Q.    Now, it's fair to say that, as the interviews were being

14    conducted, the FBI Agents who were conducting the interviews

15    would send you updates throughout the interview, correct?

16    A.    The interviews at the Barracks?

17    Q.    Yes.

18    A.    No.

19    Q.    You did not receive updates from the agents?

20    A.    I didn't arrive at the Barracks until 12:30 in the

21    morning, and I had not received an update of anything of

22    substantive value before that.  I had conversation at about

23    8:00 p.m. that Friday night with one of the agents, but that

24    was solely for the purpose of coordinating a consent, but he

25    didn't tell me anything about the interview.  So, I didn't

34

1    learn anything about what had occurred in the interviews until

2    I arrived at the Barracks at 12:30 in the morning or

3    thereabouts.

4    Q.    After you arrived at the Barracks did you participate in

5    the interviews personally, or you stayed outside?

6    A.    By then, they were effectively concluded, so I did not

7    participate in those interviews.

8    Q.    So, by 12:30 in the morning the interviews were concluded?

9    A.    Again, substantively.  At or about 4:00 in the morning I

10   had a brief exchange with Mr. Tazhayakov about a transport,

11   whether in a taxi or our willingness to take them home.  But,

12   no, I did not participate in those interviews.

13   Q.    So, it's fair to say by 12:30 in the morning of

14   April 20th, you received information from the other agents who

15   conducted the interview as to the result of the interview?

16   A.    Yes.  I witnessed -- I was party to the communication of

17   the substance of those interviews by one of the interviewers

18   back to our superiors at our Command Post in Boston.

19   Q.    So, just to be sure, by 12:30 in the morning you've

20   learned a backpack was taken out of Dzhokhar Tsarnaev's dorm

21   room?

22   A.    Yes, yes.

23   Q.    That it was thrown in a dumpster located at 69 Carriage

24   Drive apartment complex?

25   A.    Yes.

35

1    Q.   One of the issues that was raised during the interviews of

2    friends of Robel Phillipos was his marijuana use on the 18th?

3         MS. SIEGMANN:  Objection.

4         THE COURT:  If he knows, he can answer.

5    A.   Um --

6    Q.   During the interviews?

7    A.   Yeah.  That topic did arise, but I infer from your

8    question that it was not something that the FBI --

9    Q.   Let me ask it again.

10   A.   Please.  Thank you.

11   Q.   You conducted interviews of Jim Li, correct?

12   A.   Yes.

13   Q.   You conducted an interview of Quan Lephan?

14   A.   Yes.

15   Q.   And you did ask him about marijuana use on the part of

16   Robel Phillipos on the 18th, correct?

17   A.   I asked both men at different times and many, many other

18   witnesses what were the activities of Mr. Phillipos on that

19   day, but I had very little interest.  I recorded the response,

20   and the responses sometimes mentioned marijuana, but I had

21   precious little interest myself in eliciting that, other than

22   to know where he was, who he was with and what he was doing.

23   Q.   Now, you've been an FBI agent for over 20 years?

24   A.   Yes.

25   Q.   And you're familiar with the system of some of the

36

1    criminal procedures employed in the federal system?

2    A.   Yes.

3    Q.   Are you familiar with the word "proffer"?

4    A.   Yes.

5    Q.   And that is something that is commonly done with people

6    who are interested in cooperating with the FBI, with the

7    Government?

8    A.   I think that's a fair description, yes.

9    Q.   And these individuals would be, most cases would be facing

10   prosecution themselves, correct?

11   A.   I think that's also fair.  Normally, we seek information

12   from witnesses, and, absent some trepidation, some concern on

13   their part that they may seek or may be exposed to criminal

14   liability, normally they just give us, furnish the information.

15         Sometimes if there is such exposure lawyers, like

16   yourself, get together with the U.S. Attorney's Office, and you

17   craft a mechanism by which such information can be provided and

18   considered by the Government and protect the person who is

19   furnishing such information in that limited context, yes.

20   Q.   Are you familiar also with "substantial assistance"?

21   A.   Yes.

22   Q.   And that is a provision in the *Sentencing Guidelines* that

23   allows for a reduction in a sentence if a person cooperates

24   with the Government?

25         MS. SIEGMANN:  Objection.

```
 1            THE COURT:  I am not sure of the relevance of this for
 2    this witness, except his general knowledge of the area, so he
 3    can answer that, but not much more.
 4    A.    I have to admit that I have always considered the
 5    Sentencing Guidelines to be extremely complicated, even for
 6    someone of my experience.  So, I know the term generally, but
 7    truly I would not -- I am not competent to testify and respond
 8    to that question.
 9    Q.    Well, you've participated in several proffers yourself,
10    haven't you?
11    A.    Yes.
12    Q.    And defendants commonly, if they are seeking a reduction
13    in a sentence, would agree to cooperate with the Government and
14    meet with you and the U.S. Attorney, correct?
15    A.    I think that is one of the motivations of a defendant or
16    prospective defendant in seeking such a proffer, to limit their
17    criminal liability, yes.
18    Q.    And one of the common practices in the Federal Court and
19    with the FBI is that, when you charge a number of people, is to
20    seek one or two of those people to be a cooperating witness?
21            MS. SIEGMANN:  Objection.
22            THE COURT:  Yes.  Sustained.
23            I think we are going to take our break at this point,
24    ladies and gentlemen.  So, we will take about 15 minutes, and
25    then we will be back to continue the examination.  I will see
```

38

1    counsel at sidebar.

2         THE CLERK:  All rise for the jury.

3         THE COURT:  You may be seated.  And, Agent Walker, you

4    can leave the courtroom.

5

6    (SIDEBAR CONFERENCE AS FOLLOWS):

7         THE COURT:  Where are you going with this?

8         MR. DEMISSIE:  Well, Azamat Tazhayakov is going to

9    testify.

10        THE COURT:  Yes, but --

11        MR. DEMISSIE:  One of the issues is --

12        THE COURT:  -- you have gotten all of that.  This is

13   just treading water.

14        MR. DEMISSIE:  One of the issues is -- it will become

15   an issue that -- I don't want to highlight it now -- but the

16   practice of getting witnesses, making witnesses --

17        THE COURT:  It is so obvious that it does not bear

18   discussion, and certainly not with this witness.

19        MR. DEMISSIE:  He is a lawyer and also an agent.

20        THE COURT:  Of course, of course, and also you have

21   gone well beyond the direct examination.  I have permitted some

22   scope to that, but you do not prove your case through somebody

23   who is more or less irrelevant to it, so I am not going to

24   indulge any more of that.

25        MR. DEMISSIE:  Okay.

39

1          THE COURT:  So, we have got five minutes more with

2     him?

3          MR. DEMISSIE:  About.

4          MS. SIEGMANN:  And we have a few minutes of redirect.

5          THE COURT:  And Delapena will be how long?

6          MR. CAPIN:  His direct will be approximately half an

7     hour.  I would imagine his cross will be longer.

8          THE COURT:  All right.

9          MR. CAPIN:  And, actually, I may be underestimating,

10    because we haven't actually reviewed -- I don't know how long

11    reviewing the confession itself will take, but we are going to

12    go through the confession line by line, and that will eat up a

13    few minutes.  That may be 40 minutes.

14         MS. SIEGMANN:  So, we might not get to Tazhayakov

15    today, your Honor, I guess.

16         THE COURT:  If we are within 15 minutes of 1:00, we

17    will get to Tazhayakov.  That is not a goal for you to try to

18    achieve or block that kick, but --

19         MS. SIEGMANN:  I'm sorry.  I didn't hear what you

20    said.

21         THE COURT:  If we get within 15 minutes of 1:00, I am

22    going to bring him in.

23         MS. SIEGMANN:  Okay.

24         MR. CAPIN:  We will take a break, so the Marshals can

25    do their thing?

40

1        THE COURT:  Yes.

2        MS. SIEGMANN:  Obviously, we want to move this along.

3        MR. CAPIN:  How much time?

4        THE COURT:  11:15.

5        THE CAPIN:  Thank you.

6        THE COURT:  I will be here.  I hope all of you are.

7                        (Laughter)

8    (END OF SIDEBAR CONFERENCE)

9        (The Honorable Court exited the courtroom at 11:00 p.m.)

10

11        THE CLERK:  All rise.

12    (The Honorable Court entered the courtroom at 11:20 a.m.)

13        THE CLERK:  This Honorable Court is now in session.

14    You may be seated.

15        MR. CAPIN:  Your Honor, we are having a discussion

16    among the parties whether witnesses who are on the stand may

17    remain in the room.

18        THE COURT:  Are they going to be called back?

19        MR. CAPIN:  The Government has no intention of calling

20    them back.

21        THE COURT:  So, that is the standard.

22        MR. DEMISSIE:  We have not made the decision, your

23    Honor.  That's why we said maybe by tomorrow I will have time

24    to think about it.

25        THE COURT:  Well, if there is a reasonable basis for

1  believing that the witness may be called back, then we will do

2  it.  I do not know why there would be, because I am permitting

3  beyond the scope, although not into matters that are

4  irrelevant.

5       MR. DEMISSIE:  This was just raised, and I indicated

6  to my brother that by tomorrow I would think about it, if

7  there's any possibility.  If not, then we will not have any

8  problem.  But at this point I am not sure.  They may be called

9  back.  That's the thing.

10       THE COURT:  All right.

11       MR. DEMISSIE:  They are under subpoena by us.

12       MS. SIEGMANN:  But he did agree that Special Agent

13  Walker, when he is completed, can come into the courtroom.

14       MR. DEMISSIE:  Yes.  Only because these two are

15  percipient, so that's why --

16       THE COURT:  So, let us bring the jury in.

17       THE CLERK:  All rise for the jury.

18       (The jury entered the courtroom at 11:22 a.m.)

19       THE CLERK:  You may be seated.

20       THE COURT:  You may continue, Mr. Demissie.

21       MR. DEMISSIE:  Thank you.

22  Q.   Earlier I asked you if you were receiving information as

23  the other federal agents who were conducting the interviews.

24  Isn't it fair to say that the agents were sending out emails

25  about the progress of the interviews?

42

1    A.    They may have been, but I don't recall having received a

2    single communication from them before I arrived at the

3    Barracks, with the exception of the 8:00 hour, when we had some

4    discussion of mechanics of consent and so forth.

5          MR. DEMISSIE:   I am going to show just for the

6    witness --

7          THE COURT:   Yes.

8          MR. DEMISSIE: -- a document.

9    Q.    Do you recognize this document?

10   A.    Yes.

11   Q.    You received an email from FBI Agent Farbod Azad around

12   7:48 p.m.?

13   A.    Around 7:48 p.m., yes.

14   Q.    And he was interviewing Azamat at that time?

15   A.    He had likely just begun around that time, yes.

16   Q.    And that's one of the ways the agents were communicating

17   with you and other agents, by email?

18   A.    Again, solely with regard to the mechanics of the

19   interview.   I asked Farbod to step out of the interview so that

20   he could communicate with another colleague, Special Agent

21   Christiana, about the mechanics of obtaining consent so that a

22   search could commence thereafter at the Carriage Drive

23   apartment.   I don't recall having received a single substantive

24   communication from anyone about the interview until I arrived

25   at the Barracks at about 12:30 a.m.

43

1    Q.   But emails were being sent by several agents to you, and

2    you received CCs, copies of those emails, as the investigation

3    was going on?

4    A.   Specifically with regard to those interviews?  No, I did

5    not.  I don't recall having received any email, with the

6    exception of that, perhaps another around 8:00 p.m., solely

7    with regard to that issue, and that was at the very outset of

8    my colleagues' contact with Mr. Tazhayakov at the Barracks.

9    Q.   I'm not referring to regarding the specific information

10   gained from the interview.  I am talking about updating each

11   other on what you were doing.

12   A.   To fairly characterize it, no, I was not being updated as

13   to the course and substance of their interview.  I was

14   conducting completely different work at a wholly different

15   location.

16   Q.   So, when you arrived at 12:30 is when you first received a

17   report from the agents?

18   A.   As I mentioned, I was witness to a communication of the

19   substance of their work to our colleagues in Boston.

20   Q.   What time?

21   A.   Sometime after 12:30 and continuing.  There was at least

22   one telephone conversation.  It was likely quarter to 1:00,

23   maybe, 1:00-ish, and that may have been their first

24   communication to Boston, but it was my first opportunity to

25   hear what my colleagues had obtained from those interviewees.

44

1    Q.    Okay.  On April 26th, Robel Phillipos was interrogated at

2    the FBI office?

3    A.    He was interviewed at the FBI office.

4    Q.    And he was there for several hours, correct?

5    A.    He was there for -- yes, three or four -- I'd consider

6    that several, yes, sir.

7    Q.    At the end of that interview a so-called confession was

8    shown to you, or you saw a statement signed by him?

9              MS. SIEGMANN:  Objection.  Beyond the scope.

10             THE COURT:  Yes, I really do think it is.

11   Q.    After you received a statement signed by Mr. Phillipos,

12   did you do anything in follow-up?

13   A.    Did I personally receive the statement?

14   Q.    Mm-hmm.

15   A.    I wasn't then assigned directly to matters involving

16   Mr. Phillipos.

17   Q.    Okay.

18   A.    I was in the office that day.  I was even unaware that he

19   was in our office that day.

20   Q.    That's fine.

21             You testified about a picture earlier today?

22   A.    Several, yes.

23   Q.    One, in particular, taken at Carriage Drive --

24   A.    Yes.

25   Q.    -- what you identified as Carriage Drive?

45

1    A.    Yes.

2    Q.    And you said it was in March 2013?

3    A.    It was.

4    Q.    Were you there?

5    A.    No.

6    Q.    And how did you determine that?

7    A.    The date?

8    Q.    Yes.

9    A.    Yes.  In two ways.  I first determined that one of the

10   persons depicted in the photograph arrived in the United States

11   for the first time on Saturday, March 9, 2013.

12              Secondly, I determined from the device of another

13   friend of these men when and where he took that photograph, and

14   I determined that he took it -- it was approximately 3:36 or

15   3:38 p.m. on Sunday, March 10, 2013.  The metadata also

16   associated with that photograph coincided geographically with

17   that location.

18   Q.    Is that device a cell phone?

19   A.    I think it was an iPhone, yes, sir.

20   Q.    An iPhone.  Now, were you able to determine if that phone

21   -- if that picture was sent to that iPhone, or was that picture

22   taken by that iPhone?

23   A.    It was taken by that iPhone.

24   Q.    Not sent to that iPhone?

25   A.    I didn't further inquire whether -- no, sir.  The camera

46

1    function of the iPhone was used, and that left on the phone
2    metadata that identified both the time when that device took
3    the photograph as well as where that device was physically
4    located when the image was snapped, and that longitude and
5    latitude happened to coincide within I would say a few meters
6    of 69A Carriage Drive.
7    Q.   And you have expertise to look at a cell phone and
8    decipher this information?
9    A.   No.
10   Q.   So, you, yourself, don't have that expertise?
11   A.   I have the expertise to read the results of analysis of
12   the phone, and that is the basis for my -- one basis for my
13   identifying the date.
14   Q.   So, it's based on that you are saying that picture was
15   taken in March?
16   A.   But, as I mentioned, I know that Adlet Tkishev, a
17   Kazakhstan national, arrived at Logan and was picked up by Dias
18   on the day before.  So, I knew that that photograph was taken
19   on or after March 9, 2013, and I know that it was taken
20   sometime before April 20th, 2013, when the FBI came in contact
21   with the phone that took the photograph.
22   Q.   Now, that picture just shows four or five individuals?
23   A.   Five, yes.
24   Q.   And they are just in a room, correct?
25   A.   They are sitting on the couch in the apartment.

47

1    Q.   And these are people who happen to be students at

2    UMass-Dartmouth, four of them, at least?

3    A.   Three or four, depending upon whether -- the status during

4    that semester of the men, yes.

5    Q.   And it's obvious that these were friends to begin with,

6    correct?

7              MS. SIEGMANN:  Objection.

8    Q.   What is the significance of the picture?

9              THE COURT:  Just a moment.

10             MS. SIEGMANN:  Objection.

11             THE COURT:  Just a moment.  I guess that is for the

12   jury to decide after argument by counsel.

13             MR. DEMISSIE:  I have no further questions, your

14   Honor.

15             THE COURT:  Ms. Siegmann.

16             MS. SIEGMANN:  Thank you, your Honor.

17                   REDIRECT EXAMINATION

18   BY MS. SIEGMANN:

19   Q.   Special Agent Walker, if you had learned at approximately

20   3:20 p.m. that Dzhokhar Tsarnaev was at Carriage Drive, that

21   Carriage Drive apartment, on the afternoon of April 18th, would

22   that have been important to you --

23             MR. DEMISSIE:  Objection.

24   Q.   -- on Friday, April 19th?

25             THE COURT:  You may answer that question.

48

1   A.   Very much so.

2   Q.   Why was that?

3   A.   It was the top priority of my agency worldwide to locate

4   and apprehend Mr. Tsarnaev.  Confirmation of his location at

5   that time would have confirmed the intelligence stream that I

6   referred to earlier.

7   Q.   Now, you were asked a number of questions about

8   information that you obtained from Dias Kadyrbayev, Azamat

9   Tazhayakov, and Bayan Kumiskali.  Do you remember that?

10  A.   I do, yes.  My colleagues obtained, yes, during interview.

11  Q.   Now, as a result of obtaining that information, did you

12  take any steps to have the defendant re-interviewed?

13  A.   I stand corrected.  Your reference is to when I spoke with

14  those men at or about 5:00 at Carriage Drive, and I did not

15  earlier testify, but I also spoke at around that time with

16  Ms. Kumiskali there.  Yes, my decision to initiate the

17  re-interview of Mr. Phillipos was informed by my investigation

18  outside that apartment.

19  Q.   And during cross-examination you were asked a number of

20  questions about when the interviews had concluded of Azamat

21  Tazhayakov, Dias Kadyrbayev, and Bayan Kumiskali.  Do you

22  remember those questions?

23  A.   Yes.

24  Q.   And that the interviews had concluded by 12:30 a.m.,

25  approximately?

49

1    A.    Yes.

2    Q.    And information obtained from those interviews pertained

3    to the backpack being removed from Dzhokhar Tsarnaev's dorm

4    room?

5    A.    I think it's fair to say that was among the most important

6    items that we learned that evening.

7    Q.    As a result of learning that Azamat Tazhayakov, Dias

8    Kadyrbayev and potentially somebody else -- did you ask that

9    Robel Phillipos be re-interviewed about the dorm room?

10   A.    Based on the interviews that occurred at the Barracks?

11   Q.    Yes.

12   A.    I don't recall whether I specifically, again, reinitiated

13   a third interview, and I --

14   Q.    Well, let me ask you a different question.

15   A.    Please, yes.

16   Q.    Did you provide that information to the Command Post, your

17   supervisors at the FBI?

18   A.    My colleague did, who sat next to me.  He put his

19   Blackberry on the -- and I asked him.  I said, "You have just

20   conducted these interviews.  Please convey to our superior --"

21            MR. DEMISSIE:  Objection.

22            THE COURT:  I permit the answer to stand as it is.

23   Q.    Sorry.

24   A.    It's simply that I thought it a better course that, since

25   I was arriving at the Barracks, my colleagues actually

1    conducted the interviews, that it would be best for them to

2    articulate to our superiors the substance of the interviews.  I

3    sat there and gleaned the same substance when I heard my

4    colleague speak to our Command Post.

5    Q.    What time, approximately, was that?

6    A.    It was after 12:30, and I think I mentioned earlier it was

7    probably around 12:45, perhaps pushing 1:00 when -- that was my

8    first order of business when I arrived at the Barracks, to say,

9    "We have to get this information up to our Command Post."

10   Q.    Was it before 4:00 a.m. on April 20th that that

11   information was provided to the Command Post?

12   A.    Oh, yes.

13   Q.    Now, you were asked, again, questions about this backpack

14   that was thrown in a dumpster.  Do you remember those

15   questions?

16   A.    I do.

17   Q.    Now, did you take any investigative steps to verify the

18   truth of that information?

19   A.    I did.

20   Q.    What did you do?

21   A.    I searched through the contents of the dumpster that had

22   been described by Tazhayakov and Kadyrbayev as the location

23   where the backpack was thrown, looking for a distinctive

24   plastic bag in which we suspected the backpack might be

25   located, and we went through the entire contents of that

51

1    dumpster.

2    Q.   Did you find it?

3    A.   We did not.

4    Q.   So, at that point what other steps did you take to figure

5    out if the information was accurate?

6    A.   Specifically with regard to the backpack?

7    Q.   Yes.

8         MR. DEMISSIE:  Beyond the scope, your Honor.

9         THE COURT:  Well, it is.  This I am counting as more

10   than one question.

11        MS. SIEGMANN:  Sorry.  It was a compound question?

12   I'll re-ask it.

13        THE COURT:  No.  I was told it was going to be one

14   question on redirect.

15        MS. SIEGMANN:  I said a "few questions," your Honor.

16        THE COURT:  I do not recall that, but, in any event, I

17   think I am going to exclude that.

18        MS. SIEGMANN:  I'm sorry?

19        THE COURT:  I am excluding the question.

20        MS. SIEGMANN:  One moment.

21                       (Pause)

22        MS. SIEGMANN:  No further questions.

23        THE COURT:  Mr. Demissie anything?

24        MR. DEMISSIE:  Nothing further.

25        THE COURT:  All right.  You may step down.

```
 1              THE WITNESS:  Thank you, your Honor.

 2                      (Witness stepped down)

 3

 4                   C E R T I F I C A T E

 5

 6

 7         I, Brenda K. Hancock, Official Court Reporter of the

 8   United States District Court, do hereby certify that the

 9   foregoing transcript constitutes, to the best of my skill and

10   ability, a true and accurate transcription of my stenotype

11   notes taken in the matter of United States v. Phillipos, No.

12   1:13-cr-10238-DPW-3.

13

14

15

16

17   Date: January 9, 2014          /s/ Brenda K. Hancock
                                     Brenda K. Hancock, RMR, CRR
18                                   Official Court Reporter

19

20

21

22

23

24

25
```