UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES,

v.

DZHOKHAR A. TSARNAEV,

Defendant.

)
)
)
)
)
)
)
)

CRIMINAL ACTION
NO. 1:13-cr-10200-GAO

## MOTION OF BOSTON GLOBE MEDIA PARTNERS, LLP TO MODIFY ORDER CONCERNING PRESS PRESENCE DURING JURY SELECTION

Boston Globe Media Partners, LLC, publisher of The Boston Globe newspaper (the "Globe") respectfully moves for a modification of the Court's current order limiting public attendance during jury selection. The Globe requests that the order be modified to (a) allow members of the press to be present during jury selection to the extent Courtroom 9 provides adequate space for appropriate seating; or (b) in the alternative, expand the pool to permit 18 members of the press to be present in the courtroom. As grounds for its motion, the Globe states as follows:

### RELEVANT FACTS

Individual jury *voir dire* began in this case on January 15, 2015. During the January 15 proceedings, Globe reporters, along with other members of the press, were permitted to observe jury selection from the designated overflow courtrooms using the live audio and video feed provided by the Court. *See* Docket # 955. Other than one sketch artist, no other members of the public or the press were permitted in Courtroom 9 during individual questioning on that day.

Before jury selection resumed on January 16, 2015, the Court modified its prior order to permit a pool arrangement allowing two members of the press to also be present in Courtroom 9. To the Globe's knowledge, the pooling arrangement did not interfere with the jury selection process.

During the two days of individual *voir dire* questioning to date, the audio and video feed have imposed the following limitations on persons excluded from Courtroom 9:

a.   The video feed does not permit members of the public or the press to see the jurors or to assess their demeanor, body language, non-verbal expressions, or interactions with trial counsel or the Court.

b.   In some instances, trial counsel apparently did not have the microphones close enough to allow their voices to be heard on the audio feed.

c.   Due to technical difficulties, there were some instances in which the audio feed temporarily failed.

## RELIEF REQUESTED

By this motion, the Globe does not seek to challenge or modify in any way the following aspects of the Court's jury selection procedures:

a.   Conducting *in camera* the type of individual questioning that ordinarily would be conducted at side bar.

b.   The prohibition against revealing jurors' names to the public or media in any fashion or form during the course of the proceedings and the requirement that any references to the jurors in public, including within the trial courtroom, be by juror number only. *See* Paragraph 6 of the Court's December 31, 2015 Decorum Order, ¶ 6 (a) (Docket # 879).

c.   The prohibition against any depictions or identification of individual jurors at any time during the course of the proceedings in any manner including, but not limited to, photographs, videos, or identifying artistic renderings by sketch artists or any other individuals. *Id.* ¶ 6 (b).

d.   The prohibition against any attempt to contact the jurors or to interact with the jurors in any way during the conduct of the trial, including conversations, interviews, and written communications with prospective jurors before the completion of voir dire or with selected jurors, including alternates, before the Court discharges the jury at the conclusion of the proceedings. *Id.* ¶ 6 (c).

Instead, the sole relief requested by the Globe's instant motion is that the Court's jury selection procedures be modified either to (a) allow members of the public and the press to be present during jury selection to the extent Courtroom 9 provides adequate space for appropriate

- 2 -

seating; or (b) in the alternative, expand the pool to permit 18 members of the press to be present
in the courtroom.

## REASONS RELIEF SHOULD BE GRANTED

### A.     The Public Has a First Amendment Right to be Present During Jury Selection.

The public's First Amendment right to attend jury *voir dire* first was recognized by the
Supreme Court in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"). *See also Presley v. Georgia*, 558 U.S. 209, 212 (2010). This "right to be
present" during jury selection exists "whether or not any party has asserted the right." *Presley,*
558 U.S. at 214. "In *Press-Enterprise I*, for instance, neither the defendant nor the prosecution
requested an open courtroom during juror *voir dire* proceedings; in fact, both specifically argued
in favor of keeping the transcript of the proceedings confidential. The Court, nonetheless, found
it was error to close the courtroom." *Id.* (citations omitted).

Although the limitations on public access to jury *voir dire* in this case presumably are
intended to protect the defendant's fair trial rights, "the primacy of the accused's right is difficult
to separate from the right of everyone in the community to attend the *voir dire* which promotes
fairness." *Press-Enterprise I*, 464 U.S. at 508.

> Criminal acts, especially violent crimes, often provoke public concern, even
> outrage and hostility; this in turn generates a community urge to retaliate and
> desire to have justice done. Whether this is viewed as retribution or otherwise is
> irrelevant. When the public is aware that the law is being enforced and the
> criminal justice system is functioning, an outlet is provided for these
> understandable reactions and emotions.  Proceedings held in secret would deny
> this outlet and frustrate the broad public interest; **by contrast, public
> proceedings vindicate the concerns of the victims and the community in
> knowing that offenders are being brought to account for their criminal
> conduct *by jurors fairly and openly selected*.**

*Id.* at 509 (citation omitted).

This case presents unique and compelling reasons to grant greater public access to the
jury selection process than is currently permitted. Empanelling a jury in a federal death penalty
case involves significant and complex legal issues, especially in a jurisdiction such as

- 3 -

A-76601363 2

Massachusetts that long has rejected the death penalty as a matter of state law. The jury selection process must address, among other things, the legal standards for excluding for cause jurors who either oppose or support the death penalty, and how to effectively assess prospective jurors' moral, religious and public policy views on the issue. *See generally Uttecht v. Brown*, 551 U.S. 1, 22 (2007). The task is even more difficult in cases such as this one involving a highly publicized crime that affected a broad community, and a defendant who has claimed that he cannot receive a fair trial in this venue.

Under these circumstances, it is not an overstatement to say that the fairness of the trial is dependent upon the conduct of the jury selection process. As this Court has stated:

> *[V]oir dire* has long been recognized as an "effective method for rooting out such [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." . . . It "is a singularly important means of safeguarding the right to an impartial jury. A probing *voir dire* examination is '[t]he best way to ensure that jurors do not harbor biases for or against the parties.'"

Opinion and Order on Defendant's Second Motion for Change of Venue (January 2, 2015) Docket # 887. *See generally Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007) (jury selection is a "crucial part of any criminal case" and is the "primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice ... or predisposition about the defendant's culpability....") (quoting *Gómez v. United States*, 490 U.S. 858, 873 (1989)).

The central role of *jury voir* dire in protecting the defendant's fair trial rights creates a commensurate interest on the part of the public in obtaining an independent, non-governmental verification of the effectiveness and impartiality of the jury selection process. Being present during *voir dire* allows the public to observe the responses of the prospective jurors, assess their demeanor, watch their interactions with trial counsel and the Court, and inform itself as to the demographic composition of the jury pool. *See, e.g., ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access—not, as the government describes, an incremental benefit."); *United States v. Antar*, 38 F.3d 1348,

- 4 -

1360 n.13 (3d Cir. 1994) ("a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript"); *Commonwealth v. Cohen*, 456 Mass. 94, 117, 921 N.E. 2d 906 (2010) (individual juror *voir dire* conducted at side bar is permissible if conducted in open court to "permi[t] members of the public to observe the judge, as well as the prospective jurors"). *See generally United States v. Mitchell*, No. 2:08-CR-125 DAK, 2010 WL 4386915, at *9 (D. Utah Oct. 29, 2010) (copy attached hereto as **Exhibit A**) (authorizing audio and video feed in overflow room with view of prospective jurors, but also allowing nine pool reporters and two sketch artists because the video was not sufficient to show the "specific expression" on the face of prospective jurors); *Morris Publ'g Grp., LLC v. State*, 136 So. 3d 770 (Fla. Dist. Ct. App. 2014) (limiting press access to overflow room with audio feed to the courtroom violated the First Amendment because it deprived press of the ability to see the judge, prospective jurors, and attorneys to evaluate their demeanor, body language, and other non-verbal expressions).

Public attendance at the *voir dire* also plays a positive role in the functioning of the jury selection process. In *Owens*, for example, the First Circuit held that a *voir dire* conducted out of the presence of the public "called into question the fundamental fairness" of a trial because "jurors might have been more forthcoming about biases and past experiences if they had *faced the public*" and trial counsel "might have picked a more impartial jury or asked different questions with *local citizenry watching*." 483 F.3d at 65 (emphasis added). *See also Press-Enterprise I*, 464 U.S. at 505 ("The process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980) (public presence "[gives] assurance that the proceedings were conducted fairly to all concerned, and [] discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality").

## B.   Modification is Warranted under the First Amendment.

The jury selection procedures adopted by the Court (including the Court's decision after completing the first day of individual *voir dire* to allow two pool reporters in the courtroom), clearly reflect an attempt to accommodate the First Amendment right of access to the jury selection process. For the reasons set forth below, however, the Globe respectfully submits that the First Amendment, as well as the results of the two days of individual *voir dire* conducted to date, warrant a further modification of the jury selection procedures.

The right to a public *voir dire* "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Presley*, 558 U.S. at 213 (quotations and citation omitted). "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.*

The presumption of an open jury *voir dire* ordinarily may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510. In the Sixth Amendment context, however, the First Circuit has applied a different standard when reviewing the constitutionality of partial closures of a criminal trial. *See United States v. DeLuca*, 137 F.3d 24, 33 (1st Cir.), *cert. denied*, 525 U.S. 874 (1998). *See also Woods v. Kuhlmann*, 977 F.2d 74, 76-77 (2d Cir. 1992). These cases have held that a "substantial reason"—rather than an "overriding interest"—may justify a partial closure. *See DeLuca*, 137 F.3d at 33-35 & n.11; *Woods*, 977 F.2d at 76-77.[1] Even in partial closure cases, however, the remaining *Press-Enterprise I* factors must be satisfied. *See DeLuca*, 137 F.3d at 34; *See also Woods*, 977 F.2d at 77; *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989); *Cohen*, 456 Mass. at 113, 921 N.E. 2d 906.

---

[1] *But see State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007) (declining to apply "different tests to complete versus partial closures"); *People v. Jones*, 96 N.Y.2d 213, 219 (2001) (because screening procedure raised "the same secrecy and fairness concerns that a total closure does,' nothing less than "overriding interest" satisfies constitutional scrutiny).

A 766013632

Assuming that the Court's current order is viewed as a partial closure of the jury *voir dire* subject to the "substantial reason" test, *DeLuca*, 137 F.3d at 33-35, modification of the current order limiting public attendance during jury selection still is warranted for the reasons discussed below.

### 1. The Order Is Not Required to Protect Juror Privacy or Security.

Allowing additional members of the press to be present during jury selection will not threaten juror privacy or security interests. The Court's December 31, 2014 Decorum Order (a) ensures that the names of the jurors will not be revealed to the public; (b) prohibits any conversations, interviews, or written communications with prospective jurors before completion of voir dire; and (c) prohibits contact with selected jurors, including alternates, before the jury is discharged. None of these protections will be undermined if additional members of the press are allowed to be present for jury *voir dire*. *See generally Owen*, 483 U.S. at 62 ("Once there was sufficient space in the courtroom, we see no state interest-compelling or otherwise-in not permitting [the defendant's] family, friends, or other members of the public to observe the proceedings.") (footnote omitted).

### 2. The Order Does Not Effectively Promote Candor on the Part of Prospective Jurors.

Limiting public access to the *voir dire* in an attempt to promote candor on the part of prospective jurors is not a substantial reason for partial closure in this case. *See generally Press-Enterprise I*, 464 U.S. at 503 (noting that State had opposed public access to *voir dire*, "arguing that if the press were present, juror responses would lack the candor necessary to assure a fair trial"); *Stewart*, 360 F.3d at 101-102 (rejecting argument that public attending jury *voir dire* would have chilled candor). As a general matter, the public's First Amendment right to attend jury selection is at least in part premised on the principle that open proceedings actually promote candor. *See Owens*, 483 F.3d at 65 ("jurors might have been more forthcoming about biases and past experiences if they had faced the public"). The assumption that excluding the public will

- 7 -

promote candor thus runs counter to the constitutional underpinnings of the public's First Amendment right to attend jury *voir dire*.

In this case, the Court's Decorum Order ensures that prospective jurors freely may answer questions with confidence that their identities are not public. *See Stewart*, 360 F.3d at 104 ("we do not see why simply concealing the identities of the prospective jurors would not have been sufficient to ensure juror candor"). There is no substantial reason to impose additional limitations on how many members of the public may be present in the room when anonymous prospective jurors answer *voir dire* questions.[2]

Limiting public attendance at the jury *voir dire* does not provide prospective jurors with any additional assurance of confidentiality. Their answers to individual questioning are immediately available to those able to listen in the overflow courtrooms, as well as to the press representatives and the sketch artist in the courtroom (and later will be available in the transcripts of the proceedings).

Under these circumstances, the purpose of the order appears to be limited to avoiding the potential incremental effect on juror candor that might be caused by the physical presence of additional persons in the courtroom. *See generally Globe v. Superior Court*, 457 U.S. 596, 607 n.19 (1982) (given public availability of transcript of witness's testimony, "the measure of the State's interest [in closing courtroom] lies not in the extent to which minor victims are injured by testifying, but rather in the incremental injury suffered by testifying *in the presence of the press and the general public*") (emphasis in original). But even if all members of the public were excluded from the courtroom, prospective jurors still would face questioning in the presence of a United States District Court Judge, teams of approximately five federal prosecutors and four defense lawyers, two support staff members, one consultant, the court stenographer, court

_____

[2] *Compare United States v. King*, 140 F.3d 76, 82 (2d Cir. 1998) (affirming press exclusion from jury *voir dire* in retrial where district court rejected use of juror numbers due to a concern that any press attendance would chill juror candor and "because, even more importantly, indicia of anonymity might well convey [to jurors] a sense of danger entirely inappropriate to the present case").

- 8 -

A/76601363.2

personnel, approximately five federal Marshals, and the defendant—hardly a confessional-like atmosphere. *See generally Stewart,* 360 F.3d at 101 ("We find it difficult to conceive of a potential juror who would be willing to reveal a bias against the defendants in their presence but not in the presence of reporters"). Under these circumstances, the "incremental injury" of having more than two members of the press sit quietly in the spectator section of the courtroom is far too speculative to be the type of "substantial reason" (or overriding interest) needed to overcome the public's First Amendment rights. *See generally Press-Enterprise I,* 464 U.S. at 510 (requiring "findings that closure is *essential* to preserve higher values and is narrowly tailored to serve that interest") (emphasis added).

### 3.    The Order Is Not Sufficiently Narrowly Tailored.

Even assuming that limiting public attendance is essential to preserving juror candor, the current order is not narrowly tailored to serve that interest. *Press-Enterprise I,* 464 U.S. at 510; *DeLuca,* 137 F.3d at 34. Not every *voir dire* question is so sensitive as to test the candor of the jury pool. "No benefit inure[s] from denying the media the right to be present when jurors answer[] routine background questions, put forth hardship requests, or recount[] other trivial details." *Stewart,* 360 F.3d at 105. When sensitive matters arise, they can be handled at side bar or, as the Court has done, in closed session.

A/76601363 2

## CONCLUSION

For the foregoing reason, movant respectfully requests that the Court's jury selection procedures be modified to (a) allow members of the public and the press to be present during jury selection to the extent Courtroom 9 provides adequate space for appropriate seating; or (b) in the alternative, expand the pool to permit 18 members of the press to be present in the courtroom.

Respectfully submitted,

**BOSTON GLOBE MEDIA PARTNERS, LLC**

By its attorneys,

/s/Emma D. Hall

Jonathan M. Albano BBO #013850
jonathan.albano@morganlewis.com
Emma D. Hall BBO #687947
**MORGAN, LEWIS & BOCKIUS, LLP**
One Federal Street
Boston, MA 02110-1726
Phone: 617-951-8000
Fax: 617-951-8736

Dated: January 20, 2015

## CERTIFICATE OF SERVICE

I, Emma D. Hall, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 5, 2015.

/s/Emma D. Hall
Emma D. Hall

- 10 -

A/76601363 2