UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   CRIMINAL NO. 13-10200-GAO |
| | ) |
| DZHOKHAR TSARNAEV | ) |

**MEMORANDUM IN SUPPORT OF**
**THIRD MOTION FOR CHANGE OF VENUE**

Questionnaires completed by the 1373 prospective jurors in this case show that an extraordinary 85 percent of the prospective jurors either believe Mr. Tsarnaev is guilty, or have some self-identified "connection" to the case, or both. Fully 68 percent of prospective jurors already believe that Mr. Tsarnaev is guilty, before hearing a single witness or examining a shred of evidence at trial. *See* Fig. 1. Even more striking, 69 percent of prospective jurors have a self-identified connection or expressed allegiance to the people, places, and/or events at issue in the case. *See* Fig. 2. Stronger support for a finding of presumed prejudice in Boston is difficult to imagine, and the existing record precludes a fair trial in Boston.




A change of venue is required if Mr. Tsarnaev is to receive the "fair trial by a panel of impartial, 'indifferent' jurors" guaranteed by the United States Constitution. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). As the First Circuit stated in *Sampson v. United States*, 724 F.3d 150, 163

(1st Cir. 2013), "[t]he right to an impartial jury is nowhere as precious as when a defendant is on trial for his life." Rooting out the overwhelming prejudice — even with the most thorough voir dire imaginable — is a quixotic undertaking that cannot overcome prospective jurors' powerful emotional connections to this extraordinary event. Those few jurors who survive the winnowing process of voir dire will not be representative of the community, the risk of seating biased jurors is too high, and in any event the appearance of impartiality cannot survive the endeavor.

Simply put, the presumption of prejudice precludes both actual and apparent impartiality and undermines public confidence in the proceedings. The presumption cannot be overcome or cured. If *this* case does not warrant a change of venue, the entire body of law on venue as it relates to the Constitutional rights to due process and a fair trial will be left a hollow shell.

## Argument

A change of venue is required on motion of the defendant if "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010). As *Skilling* reaffirmed, this entitlement is a "'basic requirement of due process.'" *Id.* (quoting *In re Murchison*, 249 U.S. 133, 136 (1955)). In addition, Fed. R. Crim. P. 21(a) obliges a trial court to transfer proceedings to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Courts have recognized that it is appropriate to renew a request for change of venue one or more times prior to trial and during voir dire as circumstances evolve. Indeed, this was the procedural posture in *Skilling*, the most recent Supreme Court decision on the merits of a venue change request. *See id.* at 370-73; *United States v. Abrahams*, 453 F.Supp. 749, 751-53 (D. Mass. 1978) (granting a renewed motion for change of venue notwithstanding an earlier denial

because defense counsel submitted a deficient factual record. Numerous courts concur that venue can and even must be revisited prior to trial. *See, e.g., United States v. Jeffreys*, 2013 WL 5503698, *3 (E.D. Wash. Oct. 3, 2013) ("The Court recognizes that inflammatory media coverage of [defendant] may increase as the trial date approaches. Therefore, [defendant] may renew his motion to change venue if appropriate."); *United States v. Agriprocessors, Inc.*, 2009 WL 1833598, *2 (N.D. Iowa Jun 18, 2009) (addressing renewed motion for change of venue on merits and noting that defendants again "may renew their request for a change of venue following voir dire."); *United States v. Dutton-Myrie*, 2008 WL 2914587, *3 (M.D. Pa. Jul. 24, 2008) (denying change of venue while noting it may be necessary to address a renewed motion during voir dire); *United States v. Johnson*, 403 F. Supp. 2d 721, 769-70 (N.D. Tex. 2005) (noting that venue challenge may be deemed waived if not renewed after voir dire); *United States v. Jamieson*, 264 F. Supp. 2d 603, 604 (N.D. Ohio 2003) (addressing merits of renewed and supplemental motion to change venue); *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-68 (2d Cir. 1990) (addressing merits of second venue motion brought to address changed circumstances).

The core purpose of a venue inquiry is to assure "a fair and impartial trial," which is "a basic requirement of due process." *Skilling*, 561 U.S. at 378. *See also* Fed. R. Crim. P. 21(a). While the defense respectfully disagrees with the Court's prior rulings that certain arguments and authorities submitted in connection with prior venue motions were untimely [DE 887], this is not a motion for reconsideration of those prior rulings. Rather, this is a renewed motion that requires the Court to review *all* of the circumstances underlying a venue determination *de novo*. Therefore, all available information should be considered in connection with this renewed motion. In order to decide the motion, the Court of necessity must evaluate the *totality* of

circumstances. *See e.g.*, *Abrahams*, 466 F.Supp at 556-557 (considering publicity submitted in connection with motion for change of venue in separate case involving same defendant and underlying circumstances, together with more recent publicity, in evaluating need for change of venue). Collectively, the information submitted in connection with all three of the defendant's motions (including the declaration of Neil Vidmar and portions of the Smith declaration previously stricken by the Court) makes up the "totality" available for the Court to evaluate. While the new information marshalled in this third motion is alone a sufficient basis for a change of venue, the totality of the information and circumstances set forth in all of the submissions leaves no doubt of the necessity of the relief sought.

## I. JUROR QUESTIONNAIRES CONFIRM PRESUMED PREJUDICE IN THIS DISTRICT.

As noted in prior submissions concerning venue, unrelenting near-daily pretrial publicity in this case — including hundreds of articles in the Boston Globe and Boston Herald that have already been submitted, as well as a tidal wave of on-line and other media –– has cemented a narrative of guilt in the public consciousness that cannot help but be reflected in any pool of prospective jurors in this district. In addition, the Marathon attacks and their aftermath have been portrayed as victimizing and did, in fact, actually victimize the entire community in greater Boston. Of the 1,373 jurors filling out questionnaires, all but four said they had been exposed to publicity and 1,287, or 94% reported exposure to "moderate" or "a lot" of publicity. Recent events have compounded the prejudicial impact of this publicity.

The questionnaires completed by prospective jurors in this case mirror the narrative of guilt reported in the media and provide powerful data support for a finding of presumed prejudice in this district. The presumption cannot be overcome.

### A. Aggregate Survey Data and Sample Responses.

Analysis of the 1373 questionnaires completed by prospective jurors in this case reveals the following aggregate data:[1]

- In response to the question, "[H]ave you formed an opinion that Dzhokhar Tsarnaev is guilty?":

    - 934 prospective jurors or 68 percent of the total replied, "yes";
    - 345 or 25 percent replied, "unsure"; and
    - just 66 or 5 percent replied, "no."

    Notably, these responses came just minutes after prospective jurors had listened to admonitions in the Court's instructions on the presumption of innocence.[2]

- In response to the question, "[H]ave you formed an opinion that Dzhokhar Tsarnaev should receive the death penalty?":

    - 351 prospective jurors or 26 percent replied, "yes";
    - 299 or 22 percent replied, "no"; and
    - 638 or 46 percent replied, "unsure."

- In response to the question, "[W]ould you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that will be presented to you in court?":

    - 545 or 40 percent replied, "unable"; and
    - just 483 prospective jurors or 35 percent replied, "able."

- In response to a series of questions about whether jurors have some personal connection or allegiance to the people and events at issues in the case (questions 81-83), 951 prospective jurors or 69 percent, identified a connection.[3]

---

[1] Data are based on the "coding" of questionnaires that was commissioned by counsel and performed in haste in the time available between completion of the questionnaires and the deadline to file agreed-upon strikes for each "panel" of approximately 200 prospective jurors. While counsel believe the coding and resultant data to be substantially accurate, the raw numbers remain subject to possible revision.

[2] Twenty-eight prospective jurors (two percent of the total) did not answer this question on the questionnaire. We omit the "no answer provided" data point with regard to other questions where it is relatively insignificant statistically.

- Overall, 1162 prospective jurors or 85 percent either believe Mr. Tsarnaev is guilty, or have a self-identified connection, or both.

A stronger basis for presumed prejudice is difficult to conceive. A sampling of some of the narrative responses and comments by jurors on the questionnaire vividly illustrates the impact that this case has had on the Boston-area residents who have been called for jury duty:

- Juror #▮:
  
  o ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
  o ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
  o ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
- Juror #▮:
  o ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[3] Self-identified juror connections and allegiances to the case run the gamut from, *e.g.*, "Boston Strong" regalia and donations to the One Fund; to as a neighbor of the Boston FBI Special Agent in Charge at the time of the attacks; to friends and acquaintances of first responders, caregivers, victims, and survivors; to an ER doctor who personally treated the defendant and his brother after each was apprehended. In order to keep the questionnaire coding objective, we did not make any qualitative judgment about the significance or depth of the connection but rather recorded the fact that the juror attributed sufficient importance to the connection to mention it in the questionnaire.

- Juror #▮:
  - ▮▮▮

- Juror #▮:
  - ▮▮▮
  - ▮▮▮
  - ▮▮▮

- Juror #▮:
  - ▮▮▮

- Juror #▮:
  - ▮▮▮
  - ▮▮▮

- Juror #▮:
  - ▮▮▮

- ▮▮▮
  Juror #▮:

---

[4] Juror ▮▮▮



- ○ ███
- ○ ███
- Juror #██:
  - ○ ███
- Juror #██:
  - ○ ███
  - ○ ███
- Juror #██:
  - ○ ███
  - ○ ███
- Juror #██:
  - ○ ███
- Juror #██:
  - ○ ███
- Juror #██:
  - ○ ███

- o ███████████████████████████████████
- o ███████████████████████████████████

The responses to questions concerning whether jurors had personal connections to or were personally affected by the bombings or their aftermath also demonstrate why prejudice must be presumed. As this Court recognized during voir dire, "it's a little hard to assess the impact of emotions," and whether a juror would feel "some pull" from a personal connection to the aftermath of the bombing "is kind of a question that maybe nobody can answer." January 15, 2015 (Trial Day 4) Tr. 4-23. And in the wake of the questionnaire answers by summoned jurors, there is now no doubt that these emotions are deep, that they linger, and that they are peculiar to and permeate the entire Eastern Division. We submit that the effect of the emotional impact of the types of personal connection or effect of the bombings and their aftermath on jurors, and the victimization of jurors that the questionnaires illustrate, preclude the impanelling of an impartial jury and require a change of venue.

As a general matter, a very high percentage of jurors revealed a second degree of separation from a participant who was actually present at the Boston Marathon attacks and their aftermath — that is, they identified a friend or loved one who was in the Boylston Street area at the time of the bombings, was connected with MIT, or was in Watertown during the shoot-out/lockdown/capture period. Not surprisingly, the close identification of jurors with victims, witnesses, and places has resulted in participation — either personally, financially, or both — in "Boston Strong" fundraising and solidarity events. Some responding jurors cited their pride at being a Bostonian or being "Boston Strong." This phenomenon of jurors' close association or identification with victims, witnesses, places, and Boston itself as a community under attack is

indisputably idiosyncratic to the Eastern District, and the permeation of the associations demonstrated in the jury questionnaires is a direct result of the Court's determination to hold the trial in Boston. Perhaps there is no better measure of the effect on jurors in the Eastern Division than the responses of Jurors #615 and #1061, who in response to Question #81 asking whether s/he had been personally affected by the Boston Marathon, the crimes charged, and the "shelter in place" directive, wrote:

[JUROR # 

[JUROR #

If the close association of the jury pool generally with the events were not enough to demonstrate the need to change venue, the depth and breadth of emotion voiced by summoned jurors in their questionnaires compels the conclusion that venue must be changed. A sampling of quoted responses follows:



- Juror #:
  o 
  o 
- Juror #:
  o 
- Juror #:
  o

- <u>Juror #</u>  ▮ :
  - ▮
- <u>Juror #</u> ▮
  - ▮
- <u>Juror #</u> ▮ :
  - ▮
- <u>Juror #</u> ▮ :
  - ▮
  - ▮
- <u>Juror #</u> ▮ :
  - ▮
  - ▮
- <u>Juror #</u> ▮ :
  - ▮
- <u>Juror #</u> ▮ :
  - ▮

- Juror # ▮:
  - ▮
- Juror # ▮:
  - ▮
  - ▮
- Juror # ▮:
  - ▮
  - ▮
- Juror # ▮:
  - ▮
  - ▮
- Juror # ▮:
  - ▮
- Juror # ▮:
  - ▮
  - ▮

- o █████████████

- Juror #██:
  - o █████████████
  - o █████████████

- Juror #██:
  - o █████████████
  - o █████████████
  - o █████████████

- Juror #██:
  - o █████████████

- Juror #██:
  - o █████████████
  - o █████████████

- Juror #██:
  - o █████████████

○ ███████████████████████████

The emotional connections reported by jurors are a singular phenomenon that will only be present where, as has happened with the trial set in Boston, potential jurors are drawn from the Eastern Division of the District of Massachusetts.[5] The nature of the emotional connections will inevitably carry with them a perceived obligation on the part of jurors, whether excused or empaneled, to convict and sentence the defendant to the most severe punishment available.

### B. The Data Confirm a Presumption of Prejudice that Cannot Be Overcome.

The pervasive belief in guilt, the extraordinary litany of personal connections, and the heartfelt pain and anger reflected in the questionnaires completed by the prospective jurors from the District of Massachusetts's Eastern Division are unprecedented in modern venue litigation. In *Skilling*, for example, a "close" case decided by a divided Supreme Court, "only 12.3% of Houstonians named [Skilling] when asked to list Enron executives they believed guilty of

---

[5] Two significant events that occurred after the panels of prospective jurors completed the questionnaires compounded the prejudicial impact of pretrial publicity and are likely to have exacerbated, consciously or unconsciously, the visceral negative reactions reported by the jurors. On January 7, the third day of jury selection, terrorists killed 12 people at the *Charlie Hebdo* office in Paris. The perpetrators of the *Charlie Hebdo* attack were brothers. Press, politicians, and commentators drew parallels between the French attacks and the Boston Marathon bombing, including the fact that the suspects were brothers, that they reportedly were influenced by the lectures and writings of Anwar al-Awlaki, that they were "home-grown" terrorists, and that they attacked civilians in a Western city. *See, e.g.,* Kevin Johnson, *Paris and Boston attacks pose striking parallels*, USA Today (Jan. 9, 2015), *available at* <http://www.usatoday.com/story/news/nation/2015/01/08/paris-boston-attacks/21445461/>. On January 12, media outlets reported that Kharullozhon Matanov, a friend of the Tsarnaev brothers, had agreed to plead guilty to charges of making false statements in connection with the Marathon bombing investigation. *See, e.g.* Boston Globe, *Tsarnaev Friend Plans to Plead Guilty*, January 12, 2015, available at http://www.bostonglobe.com/metro/2015/01/12/tsarnaev-friend-matanov-planning-plead-guilty/k8LwmOs8D9XX0MDXa9CegJ/story.html; http://www.wcvb.com/news/tsarnaev-friend-changing-plea-to-guilty/30666840. The Paris events have reopened the traumatic wounds of Greater Boston while the imminent Matanov change-of-plea casts a pall of admitted guilt and punishment over the defendant here, who stands accused of crimes far more serious and faces the ultimate penalty of death if convicted.

crimes" in pretrial polling. 561 U.S. at 382 n.15. Indeed, "two thirds of respondents failed to say a single negative word" about Skilling. *Id.* "43 percent either had never heard of Skilling or stated that nothing came to mind when they heard his name and another 23 percent knew Skilling's name was associated with Enron but reported no opinion about him." *Id.* Here, in contrast, the pretrial polling in the Eastern Division showing that 57.9% of respondents believed the defendant was "definitely guilty" has been borne out by the actual juror questionnaires, which show that 68% of the venire believes Mr. Tsarnaev is guilty. Moreover, the questionnaires reveal ubiquitous personal connections that compound the prejudice, such that 85 percent of the actual prospective jurors either have a self-identified tie to the events at issue in the case and their aftermath or a pre-existing opinion that the defendant is guilty.

Given these staggering numbers, the only analogous cases that come close are Supreme Court's seminal opinion in *Dowd* and the district court's decision in *United States v. McVeigh*, 914 F.Supp 1467 (W.D. Okla. 1996). In *Dowd*, "adverse publicity caused a sustained excitement and fostered a strong prejudice among the people" of the venue. 366 U.S. at 726. On the first day of jury selection, "27 of the 35 prospective jurors were excused for holding biased pretrial opinions." *Id.* "[W]ith remarkable understatement, the headlines reported that 'impartial jurors are hard to find." *Id.* at 727. The "'pattern of deep and bitter prejudice shown to be present throughout the community'... was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box." *Id.* In *McVeigh,* a change of venue from Oklahoma to Colorado for a defendant charged with the bombing of the federal building in Oklahoma City was necessitated by the "strong emotional responses," "identification with those directly affected by the conduct at issue," and "identification with a community point of view" among potential jurors. *Id.* at 1473.

In *Skilling*, the Supreme Court expressly reserved the question of whether a presumption of prejudice can ever be overcome. *See* 561 U.S. at 385 n.18 ("Because we hold that no presumption arose, we need not and do not reach" the question of "whether a presumption of prejudice can be rebutted."). Controlling precedent indicates that in this case it cannot. For example, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court reversed the defendant's conviction based on inherently prejudicial circumstances "without pausing to examine . . . the voir dire examination of the members of the jury." *Id.* at 727. The Court held that a fair trial would require a change of venue. *See id.* As the Supreme Court noted in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), "When a petit jury…has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained" (interior quotes omitted). *Id.* at 149 n.4. *See also Dowd*, 366 U.S. at 727 ("The influence that lurks in an opinion [of guilt] once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.")

The Court must also remain vigilant to preserve the appearance of impartiality and public confidence in the proceedings. "[J]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, (1954); *cf. In re Bulger*, 710 F.3d 42, 47 (1st Cir. 2013) (recognizing, in recusal context, the "need to secure public confidence through *proceedings that appear impartial*") (emphasis added). These concerns also militate in favor of changing venue in this case. Press coverage from the first two days of voir dire illustrates the damage already caused by continuing efforts to seat a jury in this district. *See, e.g.,* Emily Rooney, *A Week at the Tsarnaev Trial: Jury Selection -- A Close Up*, WGBH News (Jan. 16, 2015) (", *available at* <http://wgbhnews.org/post/week-tsarnaev-trial-jury-selection-close>:

> The other thing that became perfectly clear, finding a totally impartial jury maybe harder than the judge and the prosecution have led everyone to believe. Almost

- 16 -

> everyone had some tangential association with the marathon bombings of 2013. Some were forced to shelter in place, one man's wife treated trauma victims at MGH, one man worked for marathon sponsor John Hancock, one had ties to MIT officer Sean Collier who was shot and killed that day. Further, virtually everyone had made up their minds about guilt or innocence -- make that guilt.

*See also,* David Boeri, *Screening Prospective Jurors In Tsarnaev Trial Proves Challenging*, WBUR (Jan. 16, 2014), *available at* <http://www.wbur.org/2015/01/16/screening-jurors-tsarnaev-trial-challenging>; Mike Hayes, *A Possible Juror Got Choked Up During Questioning At The Tsarnaev Trial*, Buzzfeed (Jan. 16, 2015) ("With the entire pool of potential jurors living a maximum two hours from Boylston Street, the judge and attorneys selecting the jury may have to settle with candidates who think they can put their connections aside, but aren't 100% sure."), *available at* <http://www.buzzfeed.com/mikehayes/tsarnaev-juror-break-down>.

## II. VOIR DIRE CANNOT EFFECTIVELY PREVENT ACTUAL PREJUDICE.

Given the extent of prejudice and personal connections to the events at issue in the case and their aftermath among members of the jury pool, the Court cannot rely on voir dire to produce a jury that is both actually impartial and preserves the appearance of impartiality. In theory, it will always be possible to fill the box with 12 or 18 jurors who swear that they can be impartial if enough prospective jurors are summoned. But that is not the test. Where, as here, prejudice and personal connections are so pervasive, the remnants from which a jury can be cobbled together are not representative of the community in any sense and the risk of seating jurors who want to be selected to pursue their own personal goals of conviction and punishment (and perhaps to bask in the glow of public adulation following the verdict) is simply too high.

As noted in prior submissions, empirical research has demonstrated limitations of voir dire, and the First Circuit has never revised *United States v. Delaney*, 199 F.2d 107 (1st Cir. 1952), in the decades since it was decided.

> No doubt the district court conscientiously did all he could, both in questions he addressed to the jurors at the time of their selection and in cautionary remarks in his charge to the jury, to minimize the effect of this damaging publicity....But,[quoting Justice Jackson]... "The naïve assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."...One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.

*Id.* at 112-113; *see also Skilling*, 561 U.S. at 358 ("The danger is not merely that some prospective jurors will deliberately hide their prejudices but also that as a 'part of a community deeply hostile to the accused,' "they may unwittingly [be] influenced by the fervor that surrounds them") (quoting *Murphy v. Florida*, 421 U.S. 794, 803) (Sotomayor J., dissenting); *Irvin*, 366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times admitted prejudice, such a statement of impartiality can be given little weight.").

No other case in this district where voir dire may have proven effective is remotely analogous. While the *Phillipos* and *Tazhayakov* prosecutions arose from the after-the-fact investigation of the Boston Marathon bombings, few prospective jurors even knew the defendants' names and certainly could not have formed an opinion as to guilt or punishment.

## Conclusion

For the foregoing reasons, as well as the reasons set forth in prior filings incorporated herein by reference, the Court should halt voir dire in Boston immediately, order a change of venue, and convene a hearing to determine the appropriate venue of transfer.

Respectfully submitted,
DZHOKHAR TSARNAEV
By his attorneys

/s/ Timothy G. Watkins

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 22, 2015.

/s/ Timothy G. Watkins