UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.        ) | Crim. No.13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV, ) | |
| Defendant   ) | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S THIRD MOTION FOR CHANGE OF VENUE

The only new information in Tsarnaev's third motion to change venue is a partial analysis of completed juror questionnaires, but that analysis does not bolster his arguments for a change of venue. On the contrary, it confirms that in a nationally-publicized case like this one, fair and impartial jurors are as likely to be found in the Eastern Division of Massachusetts as anywhere else, and that a thorough and searching voir dire is the appropriate way to identify them.[1]

Tsarnaev alleges that "[of] the 1,373 jurors filling out questionnaires, all but four said they had been exposed to publicity" about the case; but the same would undoubtedly be true of jurors in other federal districts as well. Tsarnaev's own telephone survey, commissioned in May 2014, revealed that nearly 100% of respondents in Springfield, New York City, and Washington, D.C. said they had been exposed to publicity about this case. (Dkt. 461-23, at 4). That is hardly surprising. The Marathon bombings were the largest mass-casualty terrorist attack on American soil since September 11, 2001. The attacks killed three, injured hundreds more, and interrupted an internationally famous sporting event. The bombings and their bloody aftermath were

---

[1] Although the government does not object to Tsarnaev's renewing his motion for a change of venue to the extent it is based on new information, the government does object to his renewed efforts to supplement the record with the declaration of Neil Vidmar and portions of the Smith declaration previously stricken by the Court. Those materials are not new information but rather belated attempts to bolster previous motions.

televised live and then rebroadcast innumerable times to the Nation and the world. They were also captured in videos and photographs that have been posted on the internet and collectively viewed millions of times by a worldwide audience.

Although Boston media outlets – notably the Boston Globe and Herald – have undoubtedly published more articles about the attacks than other papers, the Globe's entire circulation of approximately 225,000 amounts to less than 5% of the Eastern District's population of five million, and the Herald's amounts to only 2%, making it likely that only a small fraction of the local population has been exposed to those articles. The completed juror questionnaires bear that out. Given the nationwide interest in the bombings, a particular juror's news-consumption habits are likely to have a far greater impact on his or her exposure to pretrial publicity than the district in which he or she lives. In short, the nationwide notoriety of this case substantially diminishes the importance of its local notoriety as a factor in the venue calculus.

The same is true of potential jurors' opinions about Tsarnaev's guilt. According to Tsarnaev's motion, the completed jury questionnaires show that "[f]ully 68 percent of prospective jurors already believe that Mr. Tsarnaev is guilty." But according to Tsarnaev's May 2014 survey, the percentages in other districts who believe Tsarnaev is guilty are even greater: 84% in Springfield, 92% in New York City, and 86% in Washington, D.C. (Dkt. 461-23, at 5). Once again, the widespread belief in Tsarnaev's guilt is hardly surprising. As the Supreme Court first observed in 1879 and has repeated many times since, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." Reynolds v. United States, 98 U.S. 145, 155–156 (1879). Accord Irvin v. Dowd, 366 U.S. 717 (1961): Skilling v. United States,

561 U.S. 358, 381 (2010). It is safe to assume that everyone in the country has heard something about this case, and that potential jurors in other districts, no less than those who live here, have "some impression or some opinion in respect to its merits."

But that doesn't mean jurors cannot set aside their beliefs and apply the presumption of innocence. On the contrary, "it is a premise of [our] system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." Skilling, 561 U.S. at 398 n.34. Accord Irvin, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987) ("[Jurors] are presumed to be impartial . . . [and the] existence of a juror's preconceived notion as to the guilt of the accused will not by itself destroy the presumption of impartiality."). It is certainly possible that some prospective jurors in this case are already so convinced of Tsarnaev's guilt that they cannot be impartial; but according to Tsarnaev's own analysis, of the 68% of potential jurors in this case who have formed an opinion that Tsarnaev is guilty, fully 60% said they could set aside that opinion and decide the case solely on the evidence, meaning that three-quarters of the nearly 1,400 jurors who completed questionnaires have an open mind about the case.

The time-tested method for determining whether a juror can actually set aside his beliefs and apply the presumption of innocence is voir dire. See Patton v. Yount, 467 U.S. 1025, 1038 n.13 (1984) ("[V]oir dire has long been recognized as an effective method of rooting out . . . [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner.")

(internal quotation marks and citation omitted); Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003) ("The best way to ensure that jurors do not harbor biases for or against the parties is for the trial court to conduct a thorough voir dire examination. Assuming that venirepersons pass through this screen, the trial court thereafter may operate on the presumption that the chosen jurors will obey the judge's instructions to put extraneous matters aside and decide each case on its merits.") (citations omitted).

The Court in this case has undertaken a thorough and probing voir dire of each potential juror and will no doubt continue to do so until a sufficient number are qualified. It has asked each juror follow-up questions about all pertinent answers in the juror's questionnaire and then has allowed the parties to ask their own follow-up questions. The Court has focused its queries on jurors' exposure to pretrial publicity (if any), personal connection to the events (if any), and preconceived views about Tsarnaev's guilt (if any), among other things. It has not hesitated to disqualify jurors who appear unable to be fair and impartial, even if they insist that they could be. When the Court *has* determined that a potential juror can be fair and impartial, it has made a credibility judgment based on the juror's words, tone of voice, demeanor, and body language, among other things. Those types of credibility judgments are entitled to "special deference" and may be reversed only for "manifest error." Yount, 467 U.S. at 1031-31, 1038.

Despite innumerable judicial decisions endorsing the effectiveness of voir dire, Tsarnaev claims it will be ineffective because "even the most thorough voir dire imaginable" could not "[root] out the overwhelming prejudice" against him in this district. (Deft. Mot. at 2). As usual, Tsarnaev attempts to bolster this claim with flights of rhetorical excess: he claims that an "unrelenting" "tidal wave" of media coverage has resulted in "extraordinary," "striking," "powerful," and "staggering" levels of local prejudice "unprecedented in modern venue

litigation," such that a stronger case for presumed prejudice is "difficult to imagine." (Deft. Mot., passim.). Local prejudice is so strong, in his view, that "[if] this case does not warrant a change of venue, the entire body of law on venue as it relates to the Constitutional rights to due process and a fair trial will be left a hollow shell." (Deft. Mot. at 2). But hyperbole is no substitute for a careful analysis of the facts and law. Tsarnaev cites only one case – Irvin v. Dowd -- in which a court held that adverse pretrial publicity created such a presumption of prejudice that jurors' claims that they could be impartial had to be disregarded. He contends that the facts of this case present a far stronger case for a change of venue than the facts of Irvin. But a careful examination of that case reveals that the opposite is true.[2]

The defendant in Irvin was convicted of committing one of a string of six murders and sentenced to death. See Irvin, 366 U.S. at 719. The trial took place in Gibson, Indiana, "a rural county of approximately 30,000 inhabitants." Id.. Four of the murders occurred in March 1955, and the defendant was arrested on April 8, 1955. Id. Shortly after his arrest, the prosecution and police "issued press releases, which were intensively publicized, stating that the petitioner had confessed to the six murders." Id. at 719-20. In addition,

> a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. . . . [T]he newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County. . . . [In] addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a

---

[2] To the extent Tsarnaev also relies on the district court's decision in United States v. McVeigh, 914 F.Supp 1467 (W.D. Okla. 1996), the government incorporates by reference its previous response to that argument in its opposition to Tsarnaev's first motion for change of venue. (Dkt. 405, at 8-10).

5

> lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence . . . and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). . . . [One story] characterized petitioner as remorseless and without conscience. . . . In many of the stories petitioner was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. . . . On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'

Id. at 725-26.

In contrast, local pretrial publicity concerning Tsarnaev has not been nearly so adverse. This district contains 5,000,000 people rather than 30,000, and the trial will take place nearly two years after Tsarnaev's arrest rather than just seven months later. The Supreme Court has repeatedly relied on those types of differences in distinguishing other cases involving claims of presumed prejudice from Irvin. See, e.g., United States v. Skilling, 561 U.S. 358, 382-83 (2010); Mu'Min v. Virginia, 500 U.S. 415, 429 (1991); Yount, 467 U.S. at 1032-34. The Globe and Herald, as noted earlier, are delivered regularly to less than 5% of the district's population rather than 95%. The articles in those papers, while not all kind to Tsarnaev, have largely been factual. To the extent the reports have touched on Tsarnaev's background, they have mostly been positive, emphasizing his popularity among his friends and his supportive role as the captain of his high-school wrestling team. There have been no reports of a criminal history, of an offer to plead guilty, of a confession to other crimes, or of damaging last-minute admissions. On the contrary, to the extent reporters have wondered in print about why Tsarnaev might have committed the bombings, they have mostly repeated the very same theory that Tsarnaev's attorneys have advanced in pleadings and in open court – that his brother made him do it. In short, here -- as in

all of the Supreme Court's post-Irvin presumed-prejudice cases – the record does not reveal a "barrage of inflammatory publicity immediately prior to trial amounting to a huge . . . wave of public passion that the Court found in Irvin."   Yount, 467 U.S. at 1033.

Tsarnaev argues that this case is special because many potential jurors have some kind of connection to someone else who has some kind of connection to the Marathon bombings or their aftermath (Deft. Mot. at 9), but that is not a basis for presuming prejudice on the part of the entire jury pool.   One of the chief purposes of voir dire is to identify potential jurors who have so strong a connection to the underlying events that they cannot be impartial.   The questionnaires and follow-up questions in this case have done that quite effectively.   It is no doubt true that moving trials to distant districts will nearly always reduce the number of potential jurors with a personal connection to the underlying events, but the Framers considered it more important to keep trials local.   "The Colonists believed in the concept that the community which had suffered injury should be allowed to judge those charged with the injury. . . . To this day, the interest of a community in trying those who violate its laws remains a central tenet of our judicial system." United States v. Dubon Otero, 76 F.Supp.2d 161, 164 (D.P.R. 1999) (internal quotation marks and citations omitted).   In 1791, when the Colonies decided that trials should take place in "the state and district wherein the crime shall have been committed," U.S. Const. Amend. VI, the entire population of the United States was only four million – one million fewer than the current population of the Eastern District of Massachusetts.   The challenge in this case of finding jurors sufficiently distant from the underlying events to be impartial is not significantly greater than that faced for centuries by courts trying cases in districts far smaller than this one.

In the final analysis, Tsarnaev offers little to support his claims of irremediable juror partiality beyond selected quotes from a few dozen juror questionnaires.   But Tsarnaev does not

claim, and could not truthfully claim, that those quotes were selected at random or are statistically representative of the entire panel's responses.  Experience has shown, moreover, that during follow-up questioning, jurors may reveal different opinions and sentiments than those they expressed in their questionnaires, or may have a more open mind that their written responses might have indicated.  The Supreme Court has repeatedly observed that when jurors are posed questions during voir dire -- particularly about unfamiliar legal concepts such as the burden of proof or presumption of innocence – they sometimes do not mean what they at first appear to say.  For example, the Court wrote in Yount::

> [T]he question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial. The testimony of each of the three challenged jurors is ambiguous and at times contradictory.  This is not unusual on voir dire examination, particularly in a highly publicized criminal case. . . .  Prospective jurors represent a cross section of the community, and their education and experience vary widely.  Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand.  Jurors thus cannot be expected invariably to express themselves carefully or even consistently.  Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.  The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

467 U.S. at 1038-39.  See also id. at 1038 n.14 ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying.  Any complicated voir dire calls upon lay persons to think and express themselves in unfamiliar terms, as a reading of any transcript of such a proceeding will reveal. Demeanor, inflection, the flow of the questions and answers can make confused and conflicting utterances comprehensible.").

What is true of voir dire is even more true of jury questionnaires.  As the Court has previously observed (and the voir dire in this case has borne out), jurors often exhibit a lay

8

understanding of questions that require some legal instruction in order to be answered accurately. For example, jurors who check a box on a questionnaire that they believe the defendant is "guilty" of the charges often treat that term as a synonym for the defendant's having been "present" or "involved" in the events giving rise to the charges. They do not use the term in the legal sense, nor could one expect them to, since no one has yet informed them of the actual crimes with which the defendant is charged, the elements of those crimes, the government's burden to prove each and every element beyond a reasonable doubt by evidence produced at the trial, the presumption of innocence, and other matters that bear on a determination of guilt.

Although Tsarnaev characterizes the Court's effort to identify impartial jurors through voir dire as a "quixotic undertaking" (Deft. Mot. at 2), that characterization is more aptly applied to his own repeated efforts to establish presumed prejudice. Courts, including the Supreme Court, routinely express great confidence in the efficacy of voir dire; but they virtually never find that the facts of any case warrant a finding of presumed prejudice. The Supreme Court itself has not done so in over 50 years, and it has never done so where the district's population even approaches the size of this one's. The First Circuit has never done so in any reported case. Numerous other courts have rejected venue motions in cases involving extraordinarily high-profile crimes with broad impact on the local population. See, e.g., United States v. Skilling, Case No. 04-25 (S.D. Tex.) (former CEO of Enron); Mikelonis et al. v. State Farm Fire and Cas. Co., Case No. 06-886 (S.D. Miss. Apr. 25, 2007) (insurer of homes destroyed by Hurricane Katrina); United States v. Salameh, No. S5-93-CR-0180 (S.D.N.Y. Sep. 15, 1993) (first World Trade Center bomber); People v. Charles Manson, Crim No. 21765 (Cal. Super. Ct. 1975) (leader of murderous cult); New York v. David Berkowitz, 93 Misc.2d 873, 879 (1978) ("Son of Sam" serial killer). To the government's knowledge, none of those decisions – nor any other decision to deny a change of

venue motion based on a claim of presumed prejudice -- has ever been reversed.

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's third motion for a change of venue.

> Respectfully submitted,
>
> CARMEN M. ORTIZ
> UNITED STATES ATTORNEY
>
> By:   /s/ William D. Weinreb
>       WILLIAM D. WEINREB
>       ALOKE S. CHAKRAVARTY
>       NADINE PELLEGRINI
>       STEVEN MELLIN
>       Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

> */s/ William D. Weinreb*
> WILLIAM D. WEINREB