UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**REDACTED FOR PUBLIC DOCKET**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                      )         CRIMINAL NO. 13-10200-GAO<br>)<br>DZHOKHAR TSARNAEV                     ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
<u>THIRD MOTION FOR CHANGE OF VENUE</u>**

The government devotes most of its opposition to arguing that the voir dire undertaken by the Court will remedy all of the ills caused by pervasive and intense pretrial publicity, by jurors' pre-existing opinions, and by jurors' personal connections to the case. *See* Opposition to Defendant's Third Motion for Change of Venue [DE 992] ("Opp.") Such confidence is misplaced. The record confirms a presumption of prejudice that requires a change of venue. Individual voir dire questioning of potential jurors by the Court has revealed still more evidence of the bias — explicit and implicit, conscious and unconscious — flowing from jurors' powerful emotional connections to the people, places, and events of the Boston Marathon bombing. The community ties from which the biases spring are visceral, lingering, and specific to the Eastern Division of the District of Massachusetts. It is unrealistic to expect that even the most sincere and scrupulous jurors can shield themselves from the biases and connections that inundate the communities in which they, themselves, live. And neither the Court nor the parties can be confident of identifying every juror who is either unable to recognize and acknowledge bias, or intentionally conceals it. As result, there cannot be a "fair trial by a panel of impartial,

'indifferent' jurors" guaranteed by the United States Constitution if the trial in held as scheduled in Boston. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Moreover, both the appearance of impartiality and public confidence in the fairness of the proceedings — two critical considerations that the government's Opposition ignores — are already damaged beyond repair. The Court should cease voir dire immediately and order a change of venue. *Id.*

## Argument

### I. PRESUMED PREJUDICE REQUIRES A CHANGE OF VENUE.

The government's attacks on the data that confirm a *presumption* of prejudice — pervasive publicity, overwhelming belief in guilt, and widespread personal connections to the case — are unconvincing. In the face of such presumed prejudice, the law requires a change of venue without resort to attempts, by voir dire, to cobble together a jury.

With regard to pretrial publicity, the government points out that this case has received nationwide media attention, notes the relatively limited local *print* edition circulation of the *Globe* and *Herald*, and concludes that "local notoriety" is therefore not an important "factor in the venue calculus." Opp. at 2. This argument does not withstand scrutiny. While the Marathon bombing itself and some major events in the case have indeed received national and even international media attention, the near-daily local coverage of community impact, documented across multiple defense filings, is unique to greater Boston. Although the print circulation of the *Globe* and *Herald* may be relatively small, the newspapers also have large on-line audiences and in any event were selected simply as representative bellwethers of local media saturation, which is fueled not only

by traditional press but also social media, and not as the exclusive sources of media exposure.

With regard to pre-existing opinions of guilt, the government compares juror questionnaire data to the defendant's May 2014 telephone survey data (which it derided as "unreliable and misleading" in an earlier filing, *see* DE 512 at 20-22), to imply that jurors in other potential venues may suffer from an even greater preconceived belief in the defendant's guilt.  Opp. at 2-3.  The government's comparison is misleading.  The questions posed in the questionnaire were different from those in the May 2014 survey.  In the questionnaire,  jurors were asked whether or not they had formed an opinion that Mr. Tsarnaev "is" guilty, or whether they are "unsure."  68 percent answered "yes" (that Mr. Tsarnaev "is" guilty), 25 percent responded "unsure" (expressing some uncertainty as to his guilt), but only 5% responded "no" (that they do not believe Mr. Tsarnaev is guilty).  The May 2014 survey inquired whether respondents believed that Mr. Tsarnaev was "definitely guilty" or "probably guilty" The survey data are not inconsistent with the juror questionnaires and confirm that Boston is the most biased venue with the most firmly-held opinions:

|  | % Def. Guilty | % Prob. Guilty |
|---|---|---|
| Boston: | 57.9 | 34.5 |
| Springfield: | 51.7 | 32.2 |
| S.D.N.Y. | 47.9 | 44.0 |
| D.C. | 37.4 | 48.7 |

## II. VOIR DIRE CANNOT OVERCOME LOCAL PREJUDICE.

Even if there were no presumption of prejudice, the Court's repeated refusal to permit counsel to probe the specifics of jurors' exposure to pretrial publicity, coupled with experiences with multiple jurors, confirm the inefficacy of voir dire to seat an impartial jury in this unusual case.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court noted favorably that the trial court had permitted Skilling to include in a questionnaire "probing questions asking venire members to list the specific names of their media sources and to report on what stood out in their minds of all the things they had seen, heard or read about Enron." *Id*. at 371 (internal brackets and quotation marks omitted). During individual voir dire, the court also "asked about exposure to Enron-related news and the content of any stories that stood out in the prospective juror's mind." *Id*. at 374. Here, in contrast, the Court declined the defense request to include an open-ended question concerning the content of pretrial publicity to which jurors had been exposed, while stating that it would leave the issue to voir dire. ███████████████

███████████████ But during voir dire, the defense still has not been permitted to ask specific questions about what jurors recall concerning the large amounts of media coverage that almost all of them have seen. ███████████████

███████████████

███████████

The narrative of guilt that is cemented in the public consciousness, along with the reality that the entire community of greater Boston was victimized by the Marathon attacks and their aftermath, have been confirmed both by jurors' answers to questioning, and by jurors' failures to disclose biases.  The defendant, of course, is constitutionally entitled to *unbiased* jurors; that is the purpose of a thorough and searching voir dire.  But the task of the Court and the parties of discovering and evaluating potential bias is made impossible by prospective jurors' inability to recognize their own biases, and, at times, their failure to disclose them.  To be sure, some jurors can and will search within themselves and disclose with sufficient candor that their level of bias is too high to serve.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ But it is the jurors whose biases are *not* uncovered — either through the questionnaires or in-person questioning — who pose the greatest threat to the integrity of the proceedings.

Ten days of juror questioning make it apparent that individual voir dire is insufficient, as the defense can only capture the real impact and resulting bias on some potential jurors through chance or happenstance *outside of the voir dire process*.  Consider the following examples:

**Juror** ███ ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

**Juror** ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████. The Twitter feed featured a post on April 19, 2013 that celebrated defendant's capture with the exclamation, "WOOOOOHOOOOOO YOU GOT TAKEN ALIVE BITCH!!!!! DONT FUCK WITH BOSTON!!!!!." Review of the Twitter account also revealed that ██████ was following

- 8 -

a news reporter's Twitter feed of the trial ███████████████████████

███████████████ Screenshots of ████████ Twitter feed, previously submitted

to the Court ███████████████████████████████████████████████ are

attached hereto (under seal) as Exhibit A.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

     **Juror** ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ Facebook profile picture a photograph of the memorial at the Marathon

bombing site emblazoned with the words "Never Forget" and "#Boston Strong." Further,

on September 11, 2014, ███ switched ███ profile to a photograph of the New York World

Trade Center Towers. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

**Juror** ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████ ██████

████████████████████████████████

████████████████████████████ profile picture on Facebook prominently features a "We Are Boston Strong" jersey, and that ████████ Facebook account includes obscenity-laden posts about the defendant and unbridled joy at his arrest. Screenshots ████████████████████████████████ ████████████████████████████████ ████████████ are attached hereto (under seal) as Exhibit B.

These examples belie the government's confidence that three-quarters of the jurors who completed questionnaires have an open mind about the case. Gov't Opp. at 3. Perhaps on paper, and in response to the limited inquiry that has been afforded during

voir dire, they may appear that way. And perhaps, as is the case with ▇▇▇▇, jurors may well believe that they can be impartial given the "honor" that they perceive jury service *in this case* to be. But the question is not whether a juror can *appear* to be impartial or whether a juror is willing to profess, under questioning from the Court, a willingness to follow the Court's instructions; it is whether a juror truly is able to do so. The record of questionnaires and voir dire examination so far provides strong evidence that the jurors called from the Eastern Division cannot. The government argues that the voir dire procedure is actually working to root out jurors with prejudicial attitudes. Opp. at 4 ("[The Court] has not hesitated to disqualify jurors who appear unable to be fair and impartial, even if they insist that they could be."). But the fallacy in the government's argument is the assumption that the Court and the parties can and will always discover juror biases through the questionnaire and in-person questioning, especially when that questioning does not include probing questions regarding the details of exposure to pretrial publicity.

### III. TROUBLING INDICIA OF BIAS REMAIN AMONG JURORS WHO HAVE CLEARED VOIR DIRE.

The government acknowledges that when jurors are posed questions during voir dire, they sometimes do not mean what they at first appear to say. Opp. at 8. The government's acknowledgment is supported by the empirical research cited in defendant's previous submissions regarding the limitations of voir dire, as well as by the First Circuit:

> No doubt the district court conscientiously did all he could, both in questions he addressed to the jurors at the time of their selection and in

> cautionary remarks in his charge to the jury, to minimize the effect of this damaging publicity….But,[quoting Justice Jackson]… "The naïve assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."…One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.

*United States v. Delaney*, 199 F.2d 107, 112-113 (1st Cir. 1952); *see also Irvin*, 366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times admitted prejudice, such a statement of impartiality can be given little weight."). The danger of undisclosed conscious and unconscious bias that has been cited by the First Circuit and the Supreme Court is magnified by the untenable position in which the defendant will find himself at the end of the voir dire process.

The first group of ▇ jurors examined by the Court has produced ▇ "qualified" jurors, representing just over ▇ percent of the 64 jurors from which a jury will be selected. Analysis of the questionnaires completed by the ▇ qualified jurors reveals the following:

- ▇ %) admitted a connection to people, places, and things associated with the Boston Marathon Bombing and its aftermath;

- ▇ %) answered "yes" or "unsure" when asked in the questionnaire whether they thought the defendant was guilty;

- ▇ %) indicated in their questionnaire that the defendant should receive the death penalty;

- ▮▮▮▮▮%) stated in the questionnaire that s/he would be unable to set aside his/her opinion and base the guilt and punishment decision solely on the evidence present in trial.

The government is correct that the Eastern Division's five million residents are much more numerous than the approximately 30,000 inhabitants of rural Gibson, Indiana, the site of the trial in *Irvin v. Dowd*. But the government ignores the direct connection that residents of the Eastern Division feel to the bombings and their victims. The questionnaires and voir dire are irrefutable evidence of that connection, and a change of venue is required.

### IV.   THE APPEARANCE OF IMPARTIALITY AND PUBLIC CONFIDENCE IN THE PROCEEDINGS REQUIRE A CHANGE OF VENUE.

The government's opposition also ignores the imperative to preserve the appearance of impartiality and public confidence in the proceedings. Both continue to suffer as voir dire unfolds. For example:

> The prospective Trial of Dzhokhar Tsarnaev for his participation in the 2013 Boston Marathon bombing has descended into farce . . . . What this case needs is justice, reached in as cool and rational a manner as possible, and that is plainly impossible in Boston . . . . [T]he voir dire process itself in the Tsarnaev case has vividly demonstrated that the expressed concerns of the Oklahoma court [in McVeigh] were more than justified .

Charles P. Pierce, *The Prospective Prosecution of a Boston Marathon Bomber: Trial and Error*, ESQUIRE (Jan. 23, 2015): *available at* <http://www.esquire.com/blogs/politics/The_Mess_That_Is_The_Tsarnaev_Trial>; *see also* Masha Gessen, *Dzhokhar Tsarnaev and the Presumption of Innocence*, THE NEW YORKER (Jan. 22, 2015) ("If Dzhokhar Tsarnaev's defense team wanted to prove that

seating an impartial jury in Massachusetts was an impossible task, it could rest its case now . . . . [T]wo things are clear: the selection process is behind schedule, and the court may have to take a flexible approach to the standards of impartiality in order to seat a jury."), *available at* <http://www.newyorker.com/news/news-desk/dzhokhar-tsarnaev-presumption-innocence>; Peter Gelzinis, *Justice Will Previal in Tsarnaev Trial, in Washington or Boston*, THE BOSTON HERALD (Jan. 23, 2015) ("The pie charts, the numbers and the blunt answers to questions tend to reinforce what most of us already know deep in our collective gut. We can't separate out emotions when it comes to this guy. Let Dzhokhar Tsarnaev face justice in Washington."), *available at* <http://www.bostonherald.com/news_opinion/columnists/peter_gelzinis/2015/01/gelzinis_justice_will_prevail_in_tsarnaev_trial_in>.  Voir dire should cease and a change of venue should be ordered before further damage is done.

An event occurring within the past few days aptly symbolizes the unprecedented level of public feeling that still surrounds the Boston Marathon bombing, and that underlies the difficulties that have beset the jury selection process so far.  On Wednesday, January 28, all major Boston media outlets reported on a photograph depicting a "mystery shoveler" who cleared the Marathon finish line of snow during this week's blizzard.



The Boston Police Department appealed to the public on Twitter, with a "#BostonStrong" hashtag, for help identifying the "Good snow-maritan." *See* <https://twitter.com/bostonpolice/status/560489686133899265>. The Boston Athletic Association issued the following press release in response to the picture and story:

> We saw profound acts of courage and kindness following the bombings which occurred in the City of Boston in April 2013 near the Boston Marathon finish line. Since that time, we have continually witnessed an outpouring of support for this great event and the City, demonstrating just how unique and special this race really is and all for which it stands," B.A.A. Executive Director Tom Grilk said in a statement. "For someone to brave the winter blizzard to clear our finish line for us is yet another statement as to what our event means not only to runners but also to Americans. We, at the Boston Athletic Association are the organizers and are responsible for the management of the Boston Marathon, *but an act like we see depicted here proves that – in Boston – everyone owns the Marathon.*"

Owen Boss & O'Ryan Johnson, *Marathon finish line shoveler did it for love of the race*, THE BOSTON HERALD (January 28, 2015) (emphasis added). Meanwhile, compelling

stories of bombing victims continue to receive play and resonate in the Boston media market.  *See, e.g.,* Eric Moskowitz, *Her Decision, Their Life: Boston Marathon Survivor Debates Whether to Live with Pain or Become Double Amputee*, THE BOSTON GLOBE, (January 24, 2015) *, available at* <http://www.bostonglobe.com/metro/2015/01/24/her-decision-their-life-boston-marathon-survivor-debates-whether-live-with-pain-become-double-amputee/TMp4i6hRZHO9bDgvwxhGhK/story.html>; ; *Bombing Survivor Michele Mahoney Carries Onward as Trial Gets Underway,* BOSTON METRO (January 26, 2015), *available at* <http://www.metro.us/boston/bombing-survivor-michele-mahoney-carries-onward-as-trial-gets-underway/zsJoaz---YyIkttHuyb4Us/>.  Such stories, and the widespread reaction to them, underscore the impossible task of unmasking juror bias in the very community where "everyone owns the Marathon."

## Conclusion

For the foregoing reasons, as well as those set forth in prior filings incorporated herein by reference, the Court should halt voir dire in Boston immediately, order a change of venue, and convene a hearing to determine the appropriate venue of transfer.

> Respectfully submitted,
> DZHOKHAR TSARNAEV
> By his attorneys
>
> /s/ William W. Fick
>
> Judy Clarke, Esq. (CA Bar # 76071)
> CLARKE & RICE, APC
> 1010 Second Avenue, Suite 1800
> San Diego, CA 92101
> (619) 308-8484
> JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 30, 2015.

                */s/* William W. Fick