UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 13-10200-GAO |
| ) | |
| DZHOKHAR TSARNAEV ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
THIRD MOTION FOR CHANGE OF VENUE**

The government devotes most of its opposition to arguing that the voir dire undertaken by the Court will remedy all of the ills caused by pervasive and intense pretrial publicity, by jurors' pre-existing opinions, and by jurors' personal connections to the case. *See* Opposition to Defendant's Third Motion for Change of Venue [DE 992] ("Opp.") Such confidence is misplaced. The record confirms a presumption of prejudice that requires a change of venue. Individual voir dire questioning of potential jurors by the Court has revealed still more evidence of the bias — explicit and implicit, conscious and unconscious — flowing from jurors' powerful emotional connections to the people, places, and events of the Boston Marathon bombing. The community ties from which the biases spring are visceral, lingering, and specific to the Eastern Division of the District of Massachusetts. It is unrealistic to expect that even the most sincere and scrupulous jurors can shield themselves from the biases and connections that inundate the communities in which they, themselves, live. And neither the Court nor the parties can be confident of identifying every juror who is either unable to recognize and acknowledge bias, or intentionally conceals it. As result, there cannot be a "fair trial by a panel of impartial,

'indifferent' jurors" guaranteed by the United States Constitution if the trial in held as scheduled in Boston. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Moreover, both the appearance of impartiality and public confidence in the fairness of the proceedings — two critical considerations that the government's Opposition ignores — are already damaged beyond repair. The Court should cease voir dire immediately and order a change of venue. *Id.*

## Argument

### I.     PRESUMED PREJUDICE REQUIRES A CHANGE OF VENUE.

The government's attacks on the data that confirm a *presumption* of prejudice — pervasive publicity, overwhelming belief in guilt, and widespread personal connections to the case — are unconvincing.  In the face of such presumed prejudice, the law requires a change of venue without resort to attempts, by voir dire, to cobble together a jury.

With regard to pretrial publicity, the government points out that this case has received nationwide media attention, notes the relatively limited local *print* edition circulation of the *Globe* and *Herald*, and concludes that "local notoriety" is therefore not an important "factor in the venue calculus." Opp. at 2.  This argument does not withstand scrutiny.  While the Marathon bombing itself and some major events in the case have indeed received national and even international media attention, the near-daily local coverage of community impact, documented across multiple defense filings, is unique to greater Boston.  Although the print circulation of the *Globe* and *Herald* may be relatively small, the newspapers also have large on-line audiences and in any event were selected simply as representative bellwethers of local media saturation, which is fueled not only

by traditional press but also social media, and not as the exclusive sources of media exposure.

With regard to pre-existing opinions of guilt, the government compares juror questionnaire data to the defendant's May 2014 telephone survey data (which it derided as "unreliable and misleading" in an earlier filing, *see* DE 512 at 20-22), to imply that jurors in other potential venues may suffer from an even greater preconceived belief in the defendant's guilt. Opp. at 2-3. The government's comparison is misleading. The questions posed in the questionnaire were different from those in the May 2014 survey. In the questionnaire, jurors were asked whether or not they had formed an opinion that Mr. Tsarnaev "is" guilty, or whether they are "unsure." 68 percent answered "yes" (that Mr. Tsarnaev "is" guilty), 25 percent responded "unsure" (expressing some uncertainty as to his guilt), but only 5% responded "no" (that they do not believe Mr. Tsarnaev is guilty). The May 2014 survey inquired whether respondents believed that Mr. Tsarnaev was "definitely guilty" or "probably guilty" The survey data are not inconsistent with the juror questionnaires and confirm that Boston is the most biased venue with the most firmly-held opinions:

|              | % Def. Guilty | % Prob. Guilty |
|--------------|---------------|----------------|
| Boston:      | 57.9          | 34.5           |
| Springfield: | 51.7          | 32.2           |
| S.D.N.Y.     | 47.9          | 44.0           |
| D.C.         | 37.4          | 48.7           |

## II. VOIR DIRE CANNOT OVERCOME LOCAL PREJUDICE.

Even if there were no presumption of prejudice, the Court's repeated refusal to permit counsel to probe the specifics of jurors' exposure to pretrial publicity, coupled with experiences with multiple jurors, confirm the inefficacy of voir dire to seat an impartial jury in this unusual case.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court noted favorably that the trial court had permitted Skilling to include in a questionnaire "probing questions asking venire members to list the specific names of their media sources and to report on what stood out in their minds of all the things they had seen, heard or read about Enron." *Id.* at 371 (internal brackets and quotation marks omitted). During individual voir dire, the court also "asked about exposure to Enron-related news and the content of any stories that stood out in the prospective juror's mind." *Id.* at 374. Here, in contrast, the Court declined the defense request to include an open-ended question concerning the content of pretrial publicity to which jurors had been exposed, while stating that it would leave the issue to voir dire. *See* 1-2-15 Tr. (sealed) at 7-8 ("We'll certainly talk with them about pretrial publicity. No question. Okay. So I think we're okay on that."). But during voir dire, the defense still has not been permitted to ask specific questions about what jurors recall concerning the large amounts of media coverage that almost all of them have seen. *See, e.g.*, Tr. 11-99 (sustaining government's objection to defense question: "And is there anything about that media coverage that stands out in your mind?").

The narrative of guilt that is cemented in the public consciousness, along with the reality that the entire community of greater Boston was victimized by the Marathon attacks and their aftermath, have been confirmed both by jurors' answers to questioning, and by jurors' failures to disclose biases. The defendant, of course, is constitutionally entitled to *unbiased* jurors; that is the purpose of a thorough and searching voir dire. But the task of the Court and the parties of discovering and evaluating potential bias is made impossible by prospective jurors' inability to recognize their own biases, and, at times, their failure to disclose them. To be sure, some jurors can and will search within themselves and disclose with sufficient candor that their level of bias is too high to serve. *See, e.g.,* Tr. 10-218 Re: Juror 186 (under seal) (juror who was otherwise "ideal" but showed eagerness to serve and was too "close to this race and event," particularly given her questionnaire disclosing comments by others — and, as she revealed during voir dire, comments that she had made herself — to the effect that "we should skip the trial, go right to sentencing."). But it is the jurors whose biases are *not* uncovered — either through the questionnaires or in-person questioning — who pose the greatest threat to the integrity of the proceedings.

Ten days of juror questioning make it apparent that individual voir dire is insufficient, as the defense can only capture the real impact and resulting bias on some potential jurors through chance or happenstance *outside of the voir dire process*. Consider the following examples:

**Juror 38.** He admitted in his questionnaire that he had followed this case and the cases of the defendant's friends from UMass Dartmouth with interest. In his

questionnaire and during voir dire, he disclosed that his friend, a Boston Police officer whom he did not name, was a first responder at the scene and that he had a cousin who handled triage in the medical tent at the finish line. He further disclosed that the Boston Police officer had been on the cover of *Time* magazine. Notwithstanding his admitted connections to and interest in the case, Juror 38 indicated in his questionnaire and during voir dire that he would be able to change his previously held opinion that the defendant was guilty and should receive the death penalty. It was only further defense investigation of Juror 38's reference to *Time* magazine, accomplished over a weekend recess that followed the conclusion of the juror's voir dire examination, that identified the *Time* Magazine cover to which the juror referred:



That iconic image of the Marathon bombing aftermath is a cropped version of Government's Exhibit 38, which the government proposes to introduce through Boston



Police Officer Tommy Barrett. But for the link fortuitously discovered by investigation independent of the voir dire process, the defense would not have identified his connection to a witness whose actions have been widely publicized.

**Juror 140**. By her questionnaire, this juror appeared to be qualified, reporting middle-of-the-road views on the death penalty, that she is able to put aside her views on guilt and penalty until the presentation of evidence, and that she lacked any connections to people, places, and events associated with the bombings and their aftermath. She reported no use of social media to discuss the case. She left two questions regarding her public comments surrounding the event unanswered. Defense investigation, however, uncovered a Twitter social media account that the juror used. The Twitter feed featured a post on April 19, 2013 that celebrated defendant's capture with the exclamation, "WOOOOOHOOOOOO YOU GOT TAKEN ALIVE BITCH!!!!! DONT FUCK WITH BOSTON!!!!!." Review of the Twitter account also revealed that the juror was following a news reporter's Twitter feed of the trial in direct contravention of the Court's

instructions to the jurors. Screenshots of Juror 140's Twitter feed, previously submitted to the Court in connection with defendant's motion to strike Juror 140, *see* Tr. 9-61, are attached hereto (under seal) as Exhibit A.

Fortunately, the defense discovered the damning screenshots before voir dire questioning of this juror began and she was quickly dismissed by agreement. Tr. 9-140 (under seal). But it is clear that voir dire would have been, and is, ineffective at weeding out a juror who may be, as Juror 140 appeared to be, trying to get onto the jury to give effect in the jury room what she, like tens if not hundreds of thousands of people in greater Boston, expressed on the night the defendant was arrested.

**Juror 145.** This juror reported on her questionnaire that she was "honored to be possibly part of the proceedings" and had formed an opinion that the defendant is guilty and should receive the death penalty. She nevertheless indicated to the Court that she could put aside her belief that the defendant is guilty and should receive the death penalty and has been found qualified to serve. After the voir dire interview, however, investigation revealed that on the first anniversary of the bombing, the juror's spouse adopted as his Facebook profile picture a photograph of the memorial at the Marathon bombing site emblazoned with the words "Never Forget" and "#Boston Strong." Further, on September 11, 2014, he switched his profile to a photograph of the New York World Trade Center Towers. These actions reflect a strong (and understandable) identification with the victims in this case, and demonstrate an alliance that cannot help but color his wife's view of this case. Taken as a whole, they undermine her professions of neutrality. They also cause one to wonder whether the juror's husband will post a similar sentiment

on the second anniversary of the bombing, while the trial of this case is underway. The juror may very well believe that she can, or hope that she can serve impartially. Or she may be unduly eager to serve, given the "honor" that she perceives jury service *in this case* to be. But the question is whether she truly would be able to render an impartial verdict. The totality of the record provides insufficient assurance that she can.

**Juror 152.** This juror's questionnaire and voir dire questioning suggested on their face that he was a well-qualified juror. His views on the death penalty were middle-of-the-road, he was "unsure" of his views on both the defendant's guilt and on the penalty to be imposed, and he had no direct connection to people, places, and events associated with the bombings and their aftermath. He had been in the Middle East at the time of the events, and stated that had he not used social media to discuss the case. But further defense investigation of Juror 152's reference to a journalist sister, completed after the conclusion of his voir dire, uncovered that his profile picture on Facebook prominently features a "We Are Boston Strong" jersey, and that his sister's Facebook account includes obscenity-laden posts about the defendant and unbridled joy at his arrest. Screenshots of Juror 152's and sister's Facebook posting, previously submitted to the Court in connection with defendant's successful motion to strike Juror 152, *see* Tr. 9:191-200 (under seal), are attached hereto (under seal) as Exhibit B.

These examples belie the government's confidence that three-quarters of the jurors who completed questionnaires have an open mind about the case. Gov't Opp. at 3. Perhaps on paper, and in response to the limited inquiry that has been afforded during voir dire, they may appear that way. And perhaps, as is the case with Juror 145, jurors

may well believe that they can be impartial given the "honor" that they perceive jury service *in this case* to be. But the question is not whether a juror can *appear* to be impartial or whether a juror is willing to profess, under questioning from the Court, a willingness to follow the Court's instructions; it is whether a juror truly is able to do so. The record of questionnaires and voir dire examination so far provides strong evidence that the jurors called from the Eastern Division cannot. The government argues that the voir dire procedure is actually working to root out jurors with prejudicial attitudes. Opp. at 4 ("[The Court] has not hesitated to disqualify jurors who appear unable to be fair and impartial, even if they insist that they could be."). But the fallacy in the government's argument is the assumption that the Court and the parties can and will always discover juror biases through the questionnaire and in-person questioning, especially when that questioning does not include probing questions regarding the details of exposure to pretrial publicity.

### III. TROUBLING INDICIA OF BIAS REMAIN AMONG JURORS WHO HAVE CLEARED VOIR DIRE.

The government acknowledges that when jurors are posed questions during voir dire, they sometimes do not mean what they at first appear to say. Opp. at 8. The government's acknowledgment is supported by the empirical research cited in defendant's previous submissions regarding the limitations of voir dire, as well as by the First Circuit:

> No doubt the district court conscientiously did all he could, both in questions he addressed to the jurors at the time of their selection and in cautionary remarks in his charge to the jury, to minimize the effect of this damaging publicity….But,[quoting Justice Jackson]… "The naïve

> assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."…One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.

*United States v. Delaney*, 199 F.2d 107, 112-113 (1st Cir. 1952); *see also Irvin*, 366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times admitted prejudice, such a statement of impartiality can be given little weight."). The danger of undisclosed conscious and unconscious bias that has been cited by the First Circuit and the Supreme Court is magnified by the untenable position in which the defendant will find himself at the end of the voir dire process.

The first group of 200 jurors examined by the Court has produced 26 "qualified" jurors, representing just over 40 percent of the 64 jurors from which a jury will be selected. Analysis of the questionnaires completed by the 26 qualified jurors reveals the following:

- 15 jurors (58%) admitted a connection to people, places, and things associated with the Boston Marathon Bombing and its aftermath;

- 20 jurors (77%) answered "yes" or "unsure" when asked in the questionnaire whether they thought the defendant was guilty;

- 3 jurors (12%) indicated in their questionnaire that the defendant should receive the death penalty;

- 1 juror (4%) stated in the questionnaire that s/he would be unable to set aside his/her opinion and base the guilt and punishment decision solely on the evidence present in trial.

The government is correct that the Eastern Division's five million residents are much more numerous than the approximately 30,000 inhabitants of rural Gibson, Indiana, the site of the trial in *Irvin v. Dowd*. But the government ignores the direct connection that residents of the Eastern Division feel to the bombings and their victims. The questionnaires and voir dire are irrefutable evidence of that connection, and a change of venue is required.

### IV. THE APPEARANCE OF IMPARTIALITY AND PUBLIC CONFIDENCE IN THE PROCEEDINGS REQUIRE A CHANGE OF VENUE.

The government's opposition also ignores the imperative to preserve the appearance of impartiality and public confidence in the proceedings. Both continue to suffer as voir dire unfolds. For example:

> The prospective Trial of Dzhokhar Tsarnaev for his participation in the 2013 Boston Marathon bombing has descended into farce . . . . What this case needs is justice, reached in as cool and rational a manner as possible, and that is plainly impossible in Boston . . . . [T]he voir dire process itself in the Tsarnaev case has vividly demonstrated that the expressed concerns of the Oklahoma court [in McVeigh] were more than justified .

Charles P. Pierce, *The Prospective Prosecution of a Boston Marathon Bomber: Trial and Error*, ESQUIRE (Jan. 23, 2015): *available at* <http://www.esquire.com/blogs/politics/The_Mess_That_Is_The_Tsarnaev_Trial>; *see also* Masha Gessen, *Dzhokhar Tsarnaev and the Presumption of Innocence*, THE NEW YORKER (Jan. 22, 2015) ("If Dzhokhar Tsarnaev's defense team wanted to prove that seating an impartial jury in Massachusetts was an impossible task, it could rest its case

now . . . . [T]wo things are clear: the selection process is behind schedule, and the court may have to take a flexible approach to the standards of impartiality in order to seat a jury."), *available at* <http://www.newyorker.com/news/news-desk/dzhokhar-tsarnaev-presumption-innocence>; Peter Gelzinis, *Justice Will Previal in Tsarnaev Trial, in Washington or Boston*, THE BOSTON HERALD (Jan. 23, 2015) ("The pie charts, the numbers and the blunt answers to questions tend to reinforce what most of us already know deep in our collective gut. We can't separate out emotions when it comes to this guy. Let Dzhokhar Tsarnaev face justice in Washington."), *available at* <http://www.bostonherald.com/news_opinion/columnists/peter_gelzinis/2015/01/gelzinis_justice_will_prevail_in_tsarnaev_trial_in>.  Voir dire should cease and a change of venue should be ordered before further damage is done.

An event occurring within the past few days aptly symbolizes the unprecedented level of public feeling that still surrounds the Boston Marathon bombing, and that underlies the difficulties that have beset the jury selection process so far.  On Wednesday, January 28, all major Boston media outlets reported on a photograph depicting a "mystery shoveler" who cleared the Marathon finish line of snow during this week's blizzard.



The Boston Police Department appealed to the public on Twitter, with a "#BostonStrong" hashtag, for help identifying the "Good snow-maritan." *See* <https://twitter.com/bostonpolice/status/560489686133899265>. The Boston Athletic Association issued the following press release in response to the picture and story:

> We saw profound acts of courage and kindness following the bombings which occurred in the City of Boston in April 2013 near the Boston Marathon finish line. Since that time, we have continually witnessed an outpouring of support for this great event and the City, demonstrating just how unique and special this race really is and all for which it stands," B.A.A. Executive Director Tom Grilk said in a statement. "For someone to brave the winter blizzard to clear our finish line for us is yet another statement as to what our event means not only to runners but also to Americans. We, at the Boston Athletic Association are the organizers and are responsible for the management of the Boston Marathon, *but an act like we see depicted here proves that – in Boston – everyone owns the Marathon.*"

Owen Boss & O'Ryan Johnson, *Marathon finish line shoveler did it for love of the race*, THE BOSTON HERALD (January 28, 2015) (emphasis added). Meanwhile, compelling

stories of bombing victims continue to receive play and resonate in the Boston media market. *See, e.g.,* Eric Moskowitz, *Her Decision, Their Life: Boston Marathon Survivor Debates Whether to Live with Pain or Become Double Amputee*, THE BOSTON GLOBE, (January 24, 2015), *available at* <http://www.bostonglobe.com/metro/2015/01/24/her-decision-their-life-boston-marathon-survivor-debates-whether-live-with-pain-become-double-amputee/TMp4i6hRZHO9bDgvwxhGhK/story.html>; ; *Bombing Survivor Michele Mahoney Carries Onward as Trial Gets Underway,* BOSTON METRO (January 26, 2015), *available at* <http://www.metro.us/boston/bombing-survivor-michele-mahoney-carries-onward-as-trial-gets-underway/zsJoaz---YyIkttHuyb4Us/>.  Such stories, and the widespread reaction to them, underscore the impossible task of unmasking juror bias in the very community where "everyone owns the Marathon."

## Conclusion

For the foregoing reasons, as well as those set forth in prior filings incorporated herein by reference, the Court should halt voir dire in Boston immediately, order a change of venue, and convene a hearing to determine the appropriate venue of transfer.

> Respectfully submitted,
> DZHOKHAR TSARNAEV
> By his attorneys
>
> /s/
>
> Judy Clarke, Esq. (CA Bar # 76071)
> CLARKE & RICE, APC
> 1010 Second Avenue, Suite 1800
> San Diego, CA 92101
> (619) 308-8484
> JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

I hereby certify that a copy of this document was served on government counsel of record by hand on January 30, 2015.

/s/ Robert F. Rieske