UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 14-_____
_____

In re
DZHOKHAR TSARNAEV,
Petitioner
_____

REDACTED FOR PUBLIC DOCKET

**SECOND PETITION FOR WRIT OF MANDAMUS**

Dzhokhar Tsarnaev, by and through counsel, respectfully renews his request

that this Court issue a writ of mandamus ordering the district court to grant a

change of venue.

Since January 3, 2015, when this Court denied Mr. Tsarnaev's first

mandamus petition, 1,373 prospective jurors completed a lengthy questionnaire

and 114 prospective jurors were questioned individually.[1]  The questionnaires

reveal that an extraordinary 85 percent of the prospective jurors either believe Mr.

Tsarnaev is guilty, or have some self-identified "connection" to the case, or both.

Fully 68 percent of prospective jurors already believe that Mr. Tsarnaev is guilty,

_____

[1] Counsel are separately submitting under seal electronic copies of the
completed jury questionnaires as well as copies of other submissions that were
sealed in the district court.

before hearing a single witness or examining a shred of evidence at trial.  Even

more striking, 69 percent of prospective jurors have a self-identified connection or

expressed allegiance to the people, places, and/or events at issue in the case.

Individual voir dire questioning of potential jurors by the Court has revealed

still more evidence of the bias — explicit and implicit, conscious and unconscious

— flowing from jurors' powerful emotional connections to the people, places, and

events of the Boston Marathon bombing.  It is unrealistic to expect that even the

most sincere and scrupulous jurors can shield themselves from the biases and

connections that inundate the communities in which they, themselves, live.  And

the record also demonstrates that neither the district court nor the parties can be

confident of identifying every juror who is either unable to recognize and

acknowledge bias, or intentionally conceals it.   The conduct of jury selection to

date has damaged both the appearance of impartiality and public confidence in the

fairness of the proceedings beyond repair.

In denying the first mandamus petition (case no. 14-2362), the majority

stated:  "[W]e deny the petition and hold only that petitioner has not made the

extraordinary showing required to justify mandamus relief."  [Judgment,

document: 00116782091 at 1, filed 01/03/2015.]  The dissent found the time

between the filing of the petition and judgment insufficient to determine whether

the standard for mandamus had been satisfied, but noted that "Tsarnaev's argument that the entire city of Boston and its surrounding areas were victimized . . . is compelling.  At first glance, Tsarnaev makes a much stronger case for change of venue here than there was in *Skilling*, where a change of venue was found to be unwarranted, and *McVeigh*, where a change of venue was granted." [Judgment, document: 00116782091 at 3.]

The emergent evidence of actual bias among summonsed jurors is compelling and confirms the factors, set forth in the first mandamus petition, that support a finding of presumed prejudice:

- the perceived victimization of the greater Boston area and beyond by the Marathon bombings and related events;

- the actual impact of those events on potential jurors and the communities in which they live;

- the connections and linkages between potential jurors and people involved in the Marathon or directly and indirectly affected by the bombings and related events;

- the pretrial publicity engendered by those events and other events linked to them by the media.

In the totality of circumstances, a change of venue is required if Mr. Tsarnaev is to receive the "fair trial by a panel of impartial, 'indifferent' jurors" guaranteed by the United States Constitution. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This case is unique in the annals of this District. It calls for extraordinary relief.

## Relief Sought

Pursuant to 28 U.S.C. §1651 and Rule 21(a) of the Rules of this Court, Dzhokhar Tsarnaev petitions for a writ of mandamus ordering the district court to grant a change of venue in the case of *United States v. Tsarnaev*, No.13-CR-10200-GAO, pending in the United States District Court for the District of Massachusetts. He further requests that this Court stay the ongoing jury empanelment in the district court pending resolution of this petition, in the interests of judicial economy and public confidence in the fairness of the proceedings.[2] Alternatively, he requests that this Court order the district court to stay empanelment proceedings until that court rules on Mr. Tsarnaev's Third Motion for Change of Venue [D.E. 980], filed on January 22, 2015, hold this Petition until that ruling is entered, and, if the district court again denies a change of venue, continue the stay until this Court decides whether a change of venue should be

---

[2] Separate motions for stay are being filed contemporaneously with this petition in both this Court and the district court.

ordered.

## **Procedural History**

The procedural history of *United States v. Tsarnaev*, No.13-CR-10200-

GAO, in the United States District Court for the District of Massachusetts from

indictment on June 27, 2013, through the December 31, 2014, electronic order

denying Mr. Tsarnaev's Second Motion for Change of Venue was set out in the

petition filed in this Court in case number 14- 2362 and is incorporated in this

petition by reference.  The subsequent procedural history in the district court is set

out below.

The district court entered an Opinion and Order denying Mr. Tsarnaev's

Second Motion for Change of Venue and granting the government's motion to

strike exhibits to that motion on January 2, 2015 [D.E. 887].

Jury selection began on January 5, 2015 with approximately 400

summonsed jurors — approximately 200 in the morning and 200 in the afternoon

— appearing to fill out a twenty-eight-page, 100-question questionnaire.  The same

procedure was followed on January 6, 2015 and January 7, 2015.   A total of 1,373

prospective jurors in six panels (panels A-F) completed the questionnaire.  The

parties met with the district court on January 14, 2015 to discuss challenges for

cause based on the answers to the questionnaires provided by panels A and B.

Individual voir dire began on January 15, 2015 and is ongoing.  To date, 114 potential jurors have been questioned.[3]

On January 13, 2015, Mr. Tsarnaev moved to suspend jury selection for at least one month [D.E. 953] in light the terror attack in France at the *Charlie Hebdo* offices on January 7, 2015, and the extensive publicity linking and comparing that attack, committed by two brothers, to the Boston Marathon bombings.   The district court denied the motion.  *See* D.E. 954 ("No response from the government is necessary.  My detailed review of juror questionnaires in preparation for voir dire has so far confirmed, rather then [sic] undermined, my judgment that a fair and impartial jury can and will be chosen to determine the issues in this case.").[4]

Mr. Tsarnaev filed a Third Motion for Change of Venue and supporting memorandum in the district court on January 22, 2015 [D.E. 980, 981].   He asserted that, based on the totality of the circumstances, including responses from the questionnaires completed by the 1,373 prospective jurors, voir dire to date,

---

[3]  The district court has not publicly announced which or even how many of those questioned have been excused for cause.  On January 29, 2015, the *Boston Globe* filed a Motion for Public Access to Legal Rulings on Challenges for Cause. [D.E. 991.]  On February 3, 2015, CNN and WBUR filed a motion to join in the *Globe's* request.   [D.E. 1002.] The district court has not yet ruled on those motions.

[4]  The stated basis for the district court's ruling was puzzling because the *Charlie Hebdo* attacks occurred only after the questionnaires were created and

ongoing publicity, as well as the facts and circumstances set out in the first and second motions for change of venue, the court should find a presumption of prejudice requiring a change of venue and that Mr. Tsarnaev could not obtain a fair trial by an impartial jury in the district of Massachusetts.   Later that day, the district court impounded and sealed the entire supporting memorandum on the basis that the inclusion of quotations from completed juror questionnaires (identifying the jurors only by number) in a public filing was "improper."  [D.E. 983.]  On January 23, 2015, the defense filed a motion requesting that the district court amend its order to strike the finding that the defense filing had been "improper."  [D.E. 984.]  The government filed an unsealed Opposition to the Third Motion for Change of Venue on January 28, 2015 [D.E. 992].  Mr. Tsarnaev sought leave to file a reply on January 28, 2015 [D.E. 993] and, on January 30, 2015, moved for leave to file a reply under seal, submitting also a redacted version of the reply for the public docket [D.E. 996].  The district court has not acted on any of the venue-related motions filed on or after January 22, 2015.

---

after nearly all of the prospective jurors had completed them.

## Reasons Why the Writ Should be Issued

**I.    MANDAMUS IS AVAILABLE TO ORDER A CHANGE OF VENUE TO EFFECTUATE A DEFENDANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY.**

This Court should issue a writ of mandamus directing the district court to order a change of venue.  Alternatively, this Court should hold this petition, order a stay of jury empanelment in the district court, order the district court to rule on the pending motion for change of venue, and, if the district court denies relief, consider whether a change of venue is required before the stay of jury selection is lifted.

Mr. Tsarnaev incorporates his argument in support of the availability of mandamus relief from the petition filed in case no. 14-2362 at 16-18.  He also notes this Court's recognition that "[t]he right to an impartial jury is nowhere near as precious as when a defendant is on trial for his life." *Sampson v. United States*, 724 F.3d 150,163 ( 1st Cir. 2013).

**II.    RECENT DEVELOPMENTS CONFIRM THAT THE TOTALITY OF CIRCUMSTANCES REQUIRES A CHANGE OF VENUE.**

As circumstances evolve, a request for change of venue may be renewed both prior to trial and during voir dire.  *See, e.g., Skilling v. United States*, 561 U.S. 358, 370-73 (2010); *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-68 (2d Cir. 1990) (addressing merits of second venue motion brought to address

changed circumstances); *United States v. Abrahams*, 453 F.Supp. 749, 751-753 (D. Mass. 1978) (granting renewed motion for change of venue after earlier motion denied because defense counsel submitted a deficient factual record); *United States v. Dutton-Myrie*, 2008 WL 2914587, *3 (M.D. Pa. Jul. 24, 2008) (denying change of venue while noting it may be necessary to address a renewed motion during voir dire).

Based on new developments in this case over the last month, Mr. Tsarnaev asks this Court to evaluate the totality of the circumstances and to order the district court to grant a change of venue.

### A. Completed Juror Questionnaires Confirm Pervasive Bias and/or Appearance of Bias.

#### 1. Aggregate Data.

Analysis of the 1,373 questionnaires completed by prospective jurors in this case reveals the following aggregate data:[5]

- In response to the question, "[H]ave you formed an opinion that Dzhokhar Tsarnaev is guilty?":

---

[5] Data are based on the "coding" of questionnaires commissioned by counsel and were performed in great haste in the time available between completion of the questionnaires and the district court deadline to file agreed-upon strikes for each "panel" of approximately 200 prospective jurors. While counsel believe the coding and resultant data to be substantially accurate, the raw numbers remain subject to possible revision.

- o 934 prospective jurors or sixty-eight percent (68%) of the total replied, "yes";
- o 345 or twenty-five percent (25%) replied, "not sure"; and
- o just 66 or five percent (5%) replied, "no."

Notably, these responses came just minutes after prospective jurors had listened to admonitions in the District Court's instructions on the presumption of innocence.  During individual voir dire, some jurors explained that they answered "unsure" because they knew they were supposed to presume the defendant "not guilty," but, when pressed, acknowledged that they had, in fact, formed an opinion that he was guilty.[6]

- In response to the question, "[H]ave you formed an opinion that Dzhokhar Tsarnaev should receive the death penalty?":

  - o 351 prospective jurors or twenty-six percent (26%) replied, "yes";
  - o 299 or twenty-two percent (22%) replied, "no"; and
  - o 638 or forty-six percent (46%) replied, "unsure."

- In response to the question, "[W]ould you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that will be presented to you in court?":

  - o 545 or forty percent (40%) replied, "unable";  and
  - o just 483 prospective jurors or thirty-five percent (35%) replied, "able."

- In response to a series of questions about whether jurors believe that they have some personal connection to the people and events at issues in the case (questions 81-83), 951 prospective jurors or sixty-nine percent (69%), identified a connection.[7]

---

[6] Twenty-eight (28) prospective jurors (two percent (2%) of the total) did not answer this question. on the questionnaire.  We omit the "no answer provided" data point with regard to other questions where it is relatively insignificant statistically.

[7] Self-identified juror "connections" to the case run the gamut from, *e.g.,* "Boston Strong" regalia and donations to the One Fund; to as a neighbor of the

- Overall, 1,162 prospective jurors or eighty-five percent (85%) either believe Mr. Tsarnaev is guilty, or have a self-identified "connection," or both.

A stronger basis for presumed prejudice is difficult to conceive.

In proceedings below, the government compared the juror questionnaire data to the defendant's May 2014 telephone survey data (which the government had derided as "unreliable and misleading" in an earlier filing, *see* D.E. 512 at 20-22), to imply that jurors in other potential venues may suffer from an even greater preconceived belief in the defendant's guilt.   *See* D.E. 992 at 2-3.  The government's comparison was misleading.  The questions posed in the questionnaire were different from those in the May 2014 survey.  In the questionnaire, jurors were asked whether or not they had formed an opinion that Mr. Tsarnaev "is" guilty, or whether they are "unsure."  68 percent answered "yes" (that Mr. Tsarnaev "is" guilty), 25 percent responded "unsure" (expressing some uncertainty as to his guilt), but only 5% responded "no" (that they do not believe Mr. Tsarnaev is guilty).  The May 2014 survey inquired whether respondents believed that Mr. Tsarnaev was "definitely guilty" or "probably guilty" The survey data are not inconsistent with the juror questionnaires and confirm that Boston is

---

Boston FBI Special Agent in Charge at the time of the attacks; to being friends and acquaintances of first responders, caregivers, victims, and survivors; to an ER doctor who personally treated the defendant and his brother after each was

the most biased venue with the most firmly-held opinions:

|              | % Def. Guilty | % Prob. Guilty |
|--------------|---------------|----------------|
| Boston:      | 57.8          | 34.5           |
| Springfield: | 51.7          | 32.2           |
| S.D.N.Y.     | 47.9          | 44.0           |
| D.C.         | 37.4          | 48.7           |

*See* D.E. 461.

### 2.  Sample Narrative Responses.

A sampling of some of the narrative responses and comments by jurors on the questionnaire vividly illustrate the impact that this case has had on the Boston-area residents who have been called for jury duty:



---

apprehended.



- █████████

  ◾ ████████████████████████████
    ████████████████████

  ◾ ████████████████████████████
    ████████████████████

◾ █████████

  ◾ ██████████████████████████████████

◾ █████████

  ◾ ██████████████████████████████
    ████████████

◾ █████████

  ◾ █████████████████████████████
    ██████████████████████████████

  ◾ ██████████████████████████████████
    ████████████████████████████
    ████████████████████

- █████████

  ◾ ██████████████████████████████████
    ████████████████████████████████
    ████████████████████████████

◾ █████████

  ◾ ██████████████████████████████
    ██████████████



The responses to questions concerning whether jurors had personal connections to or were personally affected by the bombings or their aftermath also illustrate why prejudice must be presumed. ████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████   And in the wake of the questionnaire answers by summoned jurors, there is now no doubt that these emotions are deep, that they linger, and that they are peculiar to and permeate the entire Eastern Division.  We submit that the effect of the emotional impact of the types of personal connection or effect of the bombings and their aftermath on jurors, and the victimization of jurors that the questionnaires illustrate,  preclude the impanelling of an impartial jury and require a change of venue.

As a general matter, a very high percentage of jurors identified a friend or loved one who was in the Boylston Street area at the time of the bombings, was connected with MIT, or was in Watertown during the shoot-out/lockdown/capture period.  Not surprisingly, the close link of jurors to victims and witnesses has resulted in participation — either personally, financially, or both —  in "Boston Strong" fundraising and solidarity events.  Many jurors cite their pride at being a

Bostonian or being "Boston Strong."  This phenomenon of jurors' close

association with victims, witnesses, places, and Boston itself as a community under

attack is indisputably idiosyncratic to the Eastern Division, and the permeation of

the associations demonstrated in the jury questionnaires is a direct result of the

Court's determination to hold the trial in Boston.  Perhaps there is no better

measure of the effect on jurors in the Eastern Division than the responses of Jurors



If the close association of the jury pool generally with the events were not

enough to demonstrate the need to change venue, the depth and breadth of emotion

voiced by summoned jurors in their questionnaires compels the conclusion that

venue must be changed.  A sampling of quoted responses follows:







- ███████

  ■ █████████████████████████
    ███████████████████████████
    ██████████

■ ███████

  ■ ████████████████

  ■ ████████████████████████████
    ████████████████████████████

■ ████████

  ■ █████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ██████████████

  ■ ████████████████████████████
    ████████████████████████████
    ██████████████

■ ████████

  ■ ████████████████████████████

  ■ ██████████████████████████
    ████████████████████████████
    ████████████████

■ ███████

  ■ ████████████████████████████
    ██████████████████████████





The emotional connections reported by jurors in the questionnaires are a singular phenomenon that will only be present to this extent where, as has happened with the trial set in Boston, potential jurors are drawn from the Eastern Division of the District of Massachusetts.  The nature of the emotional connections will inevitably carry with them a perceived obligation on the part of jurors to convict and sentence the defendant to the most severe punishment available.

### B.     Individual Voir Dire Questioning Confirms Extensive Bias.

The individual voir dire questioning  conducted to date provides additional evidence of the bias — explicit and implicit, conscious and unconscious — flowing from jurors' powerful emotional connections to the people, places, and events of the Boston Marathon bombing.  The community ties from which the biases spring are visceral, lingering, and specific to the Eastern Division of the District of Massachusetts.  It is unrealistic to expect that even the most sincere and scrupulous jurors can shield themselves from the biases and connections that inundate the communities in which they, themselves, live.  And neither the Court nor the parties can be confident of identifying every juror who is either unable to recognize and acknowledge bias, or intentionally conceals it. And it is the jurors whose biases are *not* uncovered, either through the questionnaires or voir dire questioning, who pose the greatest threat to the integrity of the proceedings.

The following examples, in which the defense fortuitously discovered the real impact on and resulting bias of some potential jurors through information learned outside the voir dire process, illustrate the inadequacy of voir dire in this case.

**Juror** ▮     ████████████████████████

████████████████████████████████████



██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████



███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

**Juror** ██████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

██████████████████████ The Twitter feed featured a post on April 19, 2013 that

celebrated defendant's capture with the exclamation, "WOOOOOHOOOOOO

YOU GOT TAKEN ALIVE BITCH!!!!! DONT FUCK WITH BOSTON!!!!!."

Review of the Twitter account also revealed that ████████ was following the U.S.

Attorney's Office Twitter feed as well as a news reporter's Twitter coverage of the

trial.████████████████████████████████████████

████████████████████████ feed were attached to the Reply filed under seal

in the District Court.

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**Juror** ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████ Facebook profile

picture a photograph of the memorial at the Marathon bombing site emblazoned

with the words "Never Forget" and "#Boston Strong." Further, on September 11,

2014, ██ switched ██ profile to a photograph of the New York World Trade Center

Towers. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████     ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

   **Juror** ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



profile picture on Facebook prominently features a "We Are

Boston Strong" jersey, and that ███████ Facebook account includes obscenity-

laden posts about the defendant and unbridled joy at his arrest.  Screenshots of

███████████████ Facebook posting, submitted to the district court ██

████████████████████████████████  ███████████

██ were attached to the Reply filed under seal in the district court.

These fortuitous discoveries may only be the tip of a large iceberg, the size

of which may not be determined until it is too late to correct course.

### C.   The Totality of Circumstances Demonstrate a Presumption of Prejudice.

Mr. Tsarnaev incorporates his discussion of the ongoing community impact

of the Marathon bombing and its aftermath, and the extensive prejudicial and

emotional publicity that this sequence of crimes generated, from his petition in

case no. 14-2362 at 18-25.  The scope and extent of victimization in this case

(described in the petition in case no.14-2362 at 3-4, 19-22), which take it outside

the realm of other high-profile cases with extensive pretrial publicity, is

unprecedented in this district.    Combined with the jury questionnaire data and the

experience of voir dire to date, stronger support for a finding of presumed

prejudice in Boston is difficult to imagine.

   In addition, the flow of pretrial publicity continues unabated.   The extensive

pretrial publicity and its potential impact were outlined in the petition in case

no.14-2362 at 22-25 and in the change of venue motions filed in the district court.

Juror questionnaire responses showed that of the 1,373 potential jurors all but four

said they had been exposed to publicity, and 1,287  (94%) reported exposure to

"moderate" or "a lot" of publicity.

   Recent events, including the unique resonance of the *Charlie Hebdo* terrorist

attacks in Boston and the imminent guilty plea to "false statements" charges by a

friend of the Tsarnaev brothers here in Boston compound the prejudicial impact of

this publicity and eliminate any possible salutary effect of passing time.  *See* D.E.

981 (sealed), at 14, n.5 (collecting media citations).

   Meanwhile, compelling stories of bombing victims continue to receive play

and resonate in the Boston media market.  *See, e.g.*, Eric Moskowitz, *Her*

*Decision, Their Life: Boston Marathon Survivor Debates Whether to Live with*

*Pain or Become Double Amputee*, THE BOSTON GLOBE (January 24, 2015) ,

available at <http://www.bostonglobe.com/metro/2015/01/24/her-decision-their-

life-boston-marathon-survivor-debates-whether-live-with-pain-become-double-

amputee/TMp4i6hRZHO9bDgvwxhGhK/story.html>; *Bombing Survivor Michele*

*Mahoney Carries Onward as Trial Gets Underway*, BOSTON METRO (January 26,

2015), available at  <http://www.metro.us/boston/bombing-survivor-michele-

mahoney-carries-onward-as-trial-gets-underway/zsJoaz---YyIkttHuyb4Us/>.

An event occurring within the past few days aptly symbolizes the

unprecedented level of public feeling that still surrounds the Boston Marathon

bombing, and that underlies the difficulties that have beset the jury selection

process so far.  On Wednesday, January 28, all major Boston media outlets

reported on a photograph depicting a "mystery shoveler" who cleared the

Marathon finish line of snow during this week's blizzard.



The Boston Police Department appealed to the public on Twitter, with a

"#BostonStrong" hashtag, for help identifying the "Good snow-maritan."   *See*

<https://twitter.com/bostonpolice/status/560489686133899265>.  The Boston

Athletic Association issued the following press release in response to the picture

and story:

> We saw profound acts of courage and kindness following the
> bombings which occurred in the City of Boston in April 2013 near the
> Boston Marathon finish line. Since that time, we have continually
> witnessed an outpouring of support for this great event and the City,
> demonstrating just how unique and special this race really is and all
> for which it stands," B.A.A. Executive Director Tom Grilk said in a
> statement. "For someone to brave the winter blizzard to clear our
> finish line for us is yet another statement as to what our event means
> not only to runners but also to Americans. We, at the Boston Athletic
> Association are the organizers and are responsible for the
> management of the Boston Marathon, *but an act like we see depicted
> here proves that – in Boston – everyone owns the Marathon.*"

Owen Boss & O'Ryan Johnson, *Marathon finish line shoveler did it for love of the race*, THE BOSTON HERALD (January 28, 2015) (emphasis added), *available at* <http://www.bostonherald.com/news_opinion/local_coverage/2015/01/marathon_finish_line_shoveler_did_it_for_love_of_the_race> .

Such remarkable and enduring displays of public solidarity in the wake of the Marathon bombings are laudable.  But jurors drawn from the community where "everyone owns the Marathon" cannot be dispassionate and impartial.

### D.     Presumed Prejudice Requires a Change of Venue.

The presumption of prejudice produced by the combination of the pervasive belief in guilt, the unparalleled litany of personal connections, and the heartfelt pain and anger reflected in the questionnaires completed by the prospective jurors from the District of Massachusetts's Eastern Division cannot be remedied by voir dire.  In *Skilling*, for example, a "close" case decided by a divided Supreme Court, "only 12.3% of Houstonians named [Skilling] when asked to list Enron executives they believed guilty of crimes" in pretrial polling. 561 U.S. at 382 n.15. Indeed, "two thirds of respondents failed to say a single negative word" about Skilling. *Id*. "43 percent either had never heard of Skilling or stated that nothing came to mind when they heard his name and another 23 percent knew Skilling's name was associated with Enron but reported no opinion about him." *Id*. Here, in contrast, the

actual juror questionnaires show that 68% of the venire believes Mr. Tsarnaev is guilty.  The prejudice is compounded by the network of personal connections revealed by the questionnaires.  Eighty-five percent (85%) of the prospective jurors either have a self-identified tie to the events at issue in the case and their aftermath or a pre-existing opinion that the defendant is guilty.

The only analogous cases that come close in impact are the Supreme Court's seminal opinion in *Dowd* and the district court's decision in *United States v. McVeigh*, 914 F.Supp 1467 (W.D. Okla. 1996).  In *Dowd*, "adverse publicity caused a sustained excitement and fostered a strong prejudice among the people" of the venue. 366 U.S. at 726. On the first day of jury selection, "27 of the 35 prospective jurors were excused for holding biased pretrial opinions." *Id*. "[W]ith remarkable understatement, the headlines reported that 'impartial jurors are hard to find." *Id*. at 727. The "'pattern of deep and bitter prejudice shown to be present throughout the community'… was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box." *Id*. In *McVeigh*, a change of venue from Oklahoma to Colorado for a defendant charged with the bombing of the federal building in Oklahoma City was necessitated by the "strong emotional responses," "identification with those directly affected by the

conduct at issue," and "identification with a community point of view" among

potential jurors. *Id.* at 1473.

In *Skilling*, the Supreme Court expressly reserved the question of whether a

presumption of prejudice can ever be overcome. *See* 561 U.S. at 385 n.18

("Because we hold that no presumption arose, we need not and do not reach" the

question of "whether a presumption of prejudice can be rebutted.").  Controlling

precedent indicates that in this case it cannot.  For example, in *Rideau v.*

*Louisiana*, 373 U.S. 723 (1963), the Court reversed the defendant's conviction

based on inherently prejudicial circumstances "without pausing to examine . . . the

voir dire examination of the members of the jury." *Id*. at 727.  The Court held that

a fair trial would require a change of venue. *See id.*  As the Supreme Court noted

in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), "When a petit jury…has

been exposed to prejudicial publicity, we have required reversal of the conviction

because the effect of the violation cannot be ascertained" (internal quotation marks

omitted). *Id.* at 149 n.4; *see also Dowd*, 366 U.S. at 727 ("The influence that lurks

in an opinion [of guilt] once formed is so persistent that it unconsciously fights

detachment from the mental processes of the average man.").

Simply put, the presumption of prejudice precludes both actual and apparent impartiality and undermines public confidence in the proceedings.  The presumption cannot be overcome or cured.

### E.      Jury Voir Dire Cannot Substitute for a Change of Venue.

In denying both the first and second motions for change of venue, the district court stated that voir dire will be adequate to identify prejudice during jury selection.  *See* D.E. 577 at 6; D.E.887 at 9-11.   Mr. Tsarnaev addressed the adequacy of voir dire in this case at pages 29-32 of his petition in case no. 14-2362 and in the pleadings submitted in support of his Third Motion to Change venue. [D.E. 981 (sealed); D.E. ___ (sealed Reply)]  Extensive social science research and this Court's controlling precedent confirm that voir dire cannot cure the ills of community bias.

> No doubt the district court conscientiously did all he could, both in questions he addressed to the jurors at the time of their selection and in cautionary remarks in his charge to the jury, to minimize the effect of this damaging publicity….But,[quoting Justice Jackson]… "The naïve assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."…One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.

*United States v. Delaney*, 199 F.2d 107, 112-113 (1st Cir. 1952); *see also Irvin*,

366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be

fair and impartial to petitioner, but psychological impact requiring such a

declaration before one's fellows is often its father.  Where so many, so many times

admitted prejudice, such a statement of impartiality can be given little weight.").

In addition, the questionnaire responses and examples drawn from the

empanelment proceedings to date discussed herein, *supra*, support Mr. Tsarnaev's

contention that the court cannot rely on voir dire to produce a jury that is both

actually impartial and preserves the appearance of impartiality.

In theory, if enough prospective jurors are summoned it will always be

possible to fill the box with 12 or 18 jurors who swear they can be impartial.  But

that is not the test.  Where, as here, prejudice and personal connections are so

pervasive, the remnants from which a jury can be cobbled together are not

representative of the community in any sense and the risk of seating jurors who

want to be selected to pursue personal goals of conviction and punishment is

simply too high.  It is unrealistic to expect that even the most sincere and

scrupulous jurors can shield themselves from the biases and connections that

inundate the communities in which they, themselves, live. And neither the Court

nor the parties can be confident of identifying every juror who is either unable to recognize and acknowledge bias, or intentionally conceals it.

No other case in this district where voir dire may have proven effective is remotely analogous. While the *Phillipos* and *Tazhayakov* prosecutions arose from the after-the-fact investigation of the Bsoton Marathon bombings, few prospective jurors even knew the defendants' names and certainly could not have formed an opinion as to guilt or punishment. The crimes charged in *Bulger* had far narrower community impact and many years had passed by the time of trial.

Finally, troubling indicia of bias remain among jurors who have "cleared" voir dire. The first group of 200 jurors examined by the district court has produced ■ "qualified" jurors, representing just over ▬▬▬▬▬%) of the 64 jurors from whom a jury will be selected. Analysis of the questionnaires completed by the ■ qualified jurors reveals the following:

- ▬▬▬▬%) admitted a connection to people, places, and things associated with the Boston Marathon Bombing and its aftermath;

- ▬▬▬▬%) answered "yes" or "unsure" when asked in the questionnaire whether they thought the defendant was guilty;

- ▬▬▬%) indicated in their questionnaire that the defendant should receive the death penalty;

- ▬▬%) stated in the questionnaire that s/he would be unable to set aside his/her opinion and base the guilt and punishment decision solely on the evidence present in trial.

### F.     The Balance of Equities Supports A Change of Venue.

Finally, Mr. Tsarnaev submits that the balance of equities supports

mandamus relief and a change of venue in this case.  The victimization and

community impacts stemming from the events at issue here and their aftermath, as

reflected in the juror questionnaire responses, is wide-spread.  Coupled with the

unrelenting publicity not only about the offenses charged but the responses of

affected persons and communities, the totality of the extraordinary circumstances

of this case precludes empanelment of a jury in this District that can be, and will be

perceived as being, fair and impartial as required by the Sixth Amendment.

Mr. Tsarnaev's constitutional rights must be balanced against the public

right of access to judicial proceedings and the defense is mindful of that right,

including the right of victims to see the proceedings.  However, even if the trial

remains in Boston, many of those seeing the trial will be doing so remotely, as

courtroom space is limited.  Currently, the proceedings are being broadcast from

the courtroom for viewing in a separate room.  Broadcast of trial proceedings from

a district of transfer to courtroom(s) in the Boston courthouse would allow

members of the public, including survivors, to see the proceedings while

safeguarding Mr. Tsarnaev's Sixth Amendment rights.  A change of venue will

enhance, rather than undermine, the integrity of the judicial system.

### III.   A WRIT OF MANDAMUS ORDERING A CHANGE OF VENUE IS NEEDED TO PREVENT IRREPARABLE HARM.

If, as Mr. Tsarnaev maintains, he is clearly entitled to a change of venue, relegating him to post-trial appellate review in the event of a conviction will cause irreparable harm.  In addition to the reasons set out in his petition in case no. 14-2362 at 32-33, reaction to the jury empanelment proceedings conducted to date shows that maintaining the appearance of impartiality and public confidence in the proceedings, and maintaining the integrity of the judicial system, requires a change of venue.   "[J]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, (1954); *cf. In re Bulger*, 710 F.3d 42, 47 (1st Cir. 2013) (recognizing, in recusal context, the "need to secure public confidence through *proceedings that appear impartial*") (emphasis added).

Press coverage from the voir dire process illustrates the damage already caused by continuing efforts to seat a jury in this district.   As one commentator noted:

> The other thing that became perfectly clear, finding a totally impartial jury maybe [sic] harder than the judge and the prosecution have led everyone to believe. Almost everyone had some tangential association with the marathon bombings of 2013. Some were forced to shelter in place, one man's wife treated trauma victims at MGH, one man worked for marathon sponsor John Hancock, one had ties to MIT officer Sean Collier who was shot and killed that day. Further,

> virtually everyone had made up their minds about guilt or innocence –
> make that guilt.

Emily Rooney, *A Week at the Tsarnaev Trial: Jury Selection -- A Close Up*,

WGBH News (Jan. 16, 2015),  *available at*  <http://wgbhnews.org/post/week-

tsarnaev-trial-jury-selection-close>;

*see also,* David Boeri, *Screening Prospective Jurors In Tsarnaev Trial Proves*

*Challenging*, WBUR (Jan. 16, 2014), *available at*

<http://www/wbur.org/2015/01/16/screening-jurors-tsarnaev-trial-challenging> ;

Mike Hayes, *A Possible Juror Got Choked Up During Questioning At The*

*Tsarnaev Trial*, Buzzfeed (Jan. 16, 2015) ("With the entire pool of potential jurors

living a maximum two hours from Boylston Street, the judge and attorneys

selecting the jury may have to settle with candidates who think they can put their

connections aside, but aren't 100% sure."), *available at*

<http://www.buzzfeed.com/mikehayes/tsarnaev-juror-break-down>.

    As voir dire has continued, public confidence in the fairness of the

proceedings and integrity of the judicial system has continued to erode.  For

example, one commentator noted:

> The prospective Trial of Dzhokhar Tsarnaev for his participation in
> the 2013 Boston Marathon bombing has descended into farce . . . .
> What this case needs is justice, reached in as cool and rational a
> manner as possible, and that is plainly impossible in Boston . . . .
> [T]he voir dire process itself in the Tsarnaev case has vividly

demonstrated that the expressed concerns of the Oklahoma court [in McVeigh] were more than justified.

Charles P. Pierce, *The Prospective Prosecution of a Boston Marathon Bomber: Trial and Error*, ESQUIRE (Jan. 23, 2015): *available at* <http://www.esquire.com/blogs/politics/The_Mess_That_Is_The_Tsarnaev_Trial>; *see also* Masha Gessen, *Dzhokhar Tsarnaev and the Presumption of Innocence*, THE NEW YORKER (Jan. 22, 2015) ("If Dzhokhar Tsarnaev's defense team wanted to prove that seating an impartial jury in Massachusetts was an impossible task, it could rest its case now . . . . [T]wo things are clear: the selection process is behind schedule, and the court may have to take a flexible approach to the standards of impartiality in order to seat a jury."), *available at* http://www.newyorker.com/news/news-desk/dzhokhar-tsarnaev-presumption-innocenc>; Peter Gelzinis, *Justice Will Previal in Tsarnaev Trial, in Washington or Boston*, THE BOSTON HERALD (Jan. 23, 2015) ("The pie charts, the numbers and the blunt answers to questions tend to reinforce what most of us already know deep in our collective gut. We can't separate out emotions when it comes to this guy. Let Dzhokhar Tsarnaev face justice in Washington."), *available at* <http://www.bostonherald.com/news_opinion/columnists/peter_gelzinis/2015/01/g elzinis_justice_will_prevail_in_tsarnaev_trial_in>.

Most recently, *Boston Globe* columnist Kevin Cullen summed up the public

perception of jury selection to date:

> There's a case of "I told you so" unfolding in Courtroom 9 of the
> federal courthouse in Boston . . . . It has proven much harder than
> O'Toole envisioned, with so many prospective jurors expressing bias
> against the defendant . . . . This is exactly the scenario Tsarnaev's
> defense team warned against when repeatedly asking O'Toole to
> move the trial out of Boston. The obvious bias of so many prospective
> jurors is also playing out in a sort of six degrees of separation, in
> which a not insignificant number of them have connections with the
> assorted players in the case.

Kevin Cullen, *Desperately Seeking Jurors*, THE MARSHALL PROJECT (Feb. 2,

2015), *available at*

<https://www.themarshallproject.org/2015/02/02/desperately-seeking-

jurors?ref=hp-3-111>.

Maintaining the trial in this District in the face of the ongoing

questioning of the impartiality and fairness of the jury selection can only

further erode any appearance of impartiality in these proceedings and cause

irreparable harm to public confidence in the integrity of the judicial system.

Voir dire should cease and a change of venue should be ordered before

further damage is done.

**IV.    IN THE ALTERNATIVE, THIS COURT SHOULD HOLD THIS PETITION, REMAND FOR A RULING ON DEFENDANT'S THIRD MOTION FOR CHANGE OF VENUE, ORDER A STAY OF JURY EMPANELMENT PENDING THAT RULING AND, SHOULD THE MOTION BE DENIED, CONTINUE THE STAY PENDING THIS COURT'S CONSIDERATION OF THIS PETITION .**

As detailed in the procedural history and in the pleadings filed in the district court, Mr. Tsarnaev has presented his analysis of the jury questionnaires and the efficacy of the voir dire process to date in selecting a fair and impartial jury in a Third Motion for Change of Venue.  That motion was filed on January 22, 2015. Mr. Tsarnaev sought leave to file a reply to the government's opposition on January 28, 2015 and leave to file the proposed reply under seal on January 30, 2015.  The district court has not acted on any of those requests.  Continuing the empanelment process without acting on those motions may be viewed as a *de facto* denial of the motion for change of venue.  However, if this Court feels that the views of the district court would assist its evaluation of the need for a change of venue, it should, alternatively, stay the empanelment proceedings pending the district court's ruling and, should the motion be denied, continue a stay pending this Court's consideration and resolution of this petition.

## Conclusion

For the foregoing reasons, this Court should grant the writ.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys,

/s/ Judith Mizner
Judith Mizner (1st Cir. No. 11056 )
William W. Fick (1st Cir. No. 82686)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
JUDITH_MIZNER@FD.ORG
WILLIAM_FICK@FD.ORG

## CERTIFICATE OF SERVICE

I, William Fick, hereby certify that I have caused this document to be served by e-mail PDF upon the trial judge, Hon. George A. O'Toole, and upon counsel of record for the United States, William Weinreb (william.weinreb@usdoj.gov), Aloke Chakravarty (aloke.chakravarty@usdoj.gov), Nadine Pellegrini (nadine.pellegrini@usdoj.gov), and Steve Mellin (steve.mellin2@usdoj.gov) on this 3rd day of February, 2015.

/s/ William W. Fick