UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                              )
UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,           )
                              )  Criminal Action
v.                            )  No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,        )
                              )
         Defendant.           )
                              )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY FOUR**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, January 15, 2015
9:29 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            (The venire enters the courtroom at 9:29 a.m.)

 4            THE CLERK:  All rise for the Honorable Court.

 5            (The Court enters the courtroom at 9:29 a.m.)

 6            THE CLERK:  Be seated, please.

 7            THE COURT:  Good morning, everyone.

 8            MR. BRUCK:  Your Honor, please, we have a matter at

 9    sidebar concerning these preliminary instructions, if we may?

10            THE COURT:  Okay.  Can we just mitigate the numbers?

11            (Discussion at sidebar and out of the hearing of the

12    jury:)

13            MR. BRUCK:  My apologies.  We didn't realize the jury

14    would be in the box quite this quickly.

15            Page 3 at the top.

16            THE COURT:  Page 3?

17            MR. BRUCK:  Yes.  We would just ask that this first

18    sentence on that page be struck after the word "case."  We

19    don't think that there is any burden to show that the death

20    penalty would be --

21            THE COURT:  Fair enough.  I'll do that.

22            MR. BRUCK:  In addition, I think the Court

23    inadvertently omitted the burden to show statutory aggravating

24    factors.  You refer to threshold factors and then go straight

25    to weighing, and there's no reference to statutory aggravation.
```

```
 1            THE COURT:  Let me check the previous page.
 2            MR. BRUCK:  No, that's further on down on page 3.
 3            THE COURT:  No, on page 2.  I've already said it on
 4   page 2.
 5            MR. BRUCK:  Oh, well, that's true.  But it seems like
 6   you're summarizing the process.
 7            THE COURT:  I think that's okay.  But I'll strike it
 8   in the first sentence.
 9            MR. BRUCK:  Thank you.
10            (Pause.)
11            (In open court:)
12            THE COURT:  Technology really does help in the end,
13   you know.
14            So, again, good morning, everyone.
15            THE JURORS:  Good morning, your Honor.
16            THE COURT:  And thank you again for returning to the
17   Court for this important process.  You know we're continuing
18   the process of selecting a jury in the case of United States
19   versus Dzhokhar Tsarnaev.  And as you certainly know, he's
20   charged in connection with the bombing at the Boston Marathon
21   that resulted in three deaths, and is also charged with other
22   crimes, including the death of an MIT officer.
23            Some, but not all, of the crimes charged are, by
24   statute, potentially punishable by death.  You will recall from
25   my prior instructions that the trial jury will first consider
```

1    and decide whether the government has proved Mr. Tsarnaev's

2    guilt of any or all of the charges against him.  If he is

3    convicted of any of the capital crimes, that is, crimes

4    potentially punishable by death, the jury will then consider

5    and decide whether he will be sentenced to death for any such

6    crime or to life in prison without possibility of release.

7         Some of you may have wondered why the death penalty

8    would be a possibility in this case in view of the fact that

9    the laws of Massachusetts do not provide the death penalty for

10   murder or any other violation of Massachusetts law.  The reason

11   is because this is a federal case involving violation of the

12   laws of the United States rather than a state case involving

13   violations of the laws of Massachusetts.

14        If the jury convicts Mr. Tsarnaev of any one of the

15   capital crimes charged in the indictment, the same jury will

16   hear additional evidence and then decide whether to sentence

17   him to death or to life in prison without possibility of

18   release.  Because the jury that is selected to decide the

19   defendant's guilt or innocence will also decide his punishment

20   if convicted, it is necessary to question each of you about

21   your feelings and beliefs about the death penalty as part of

22   the process of picking the jury.

23        Let me explain briefly the procedure that must be

24   followed in a case in which the death penalty is or may be an

25   issue.  In any criminal trial, initially the government will

1    have the burden of proving a defendant is guilty, in fact, of

2    any crime with which he has been charged.  If Mr. Tsarnaev is

3    convicted by the jury of a crime for which the death penalty

4    may lawfully be imposed, there will be a second phase of the

5    trial.  That second phase is generally referred to, in

6    shorthand, as the penalty phase.

7            In that phase the government will introduce evidence

8    that seeks to prove beyond a reasonable doubt that, first,

9    Mr. Tsarnaev acted with sufficient intent to be subject to the

10   death penalty under the statutes; and, two, that aggravating

11   factors about the killings or about the defendant justify

12   sentencing him to death.  Aggravating factors are circumstances

13   that, if proven, make the crimes particularly serious or

14   blameworthy and, therefore, under the law may justify imposing

15   a more severe sentence on Mr. Tsarnaev compared to other

16   persons convicted of intentional murder or killing.

17           The government will bear the burden of proving

18   aggravating factors that it alleges beyond a reasonable doubt

19   to the jury unanimously, that is to say, the jury must

20   unanimously be convinced beyond a reasonable doubt that an

21   aggravating factor exists.

22           In turn, the defense will have the opportunity to

23   present evidence of what are called mitigating factors.

24   Mitigating factors are circumstances usually about the crime or

25   about the defendant's background or character that would

1    suggest that the death penalty is not an appropriate sentence

2    in the case, or that life imprisonment without possibility of

3    release is adequate to punish the defendant for the crime.

4         Unlike proof of aggravating factors which must be made

5    beyond a reasonable doubt to a unanimous jury, mitigating

6    factors must be proved only by the greater weight of the

7    evidence.  That is a less demanding standard of proof than

8    proof beyond a reasonable doubt.

9         Mitigating factors also do not have to be proven to

10   the satisfaction of all 12 jurors.  Any juror who finds or

11   determines a mitigating factor to have been proven by a greater

12   weight of the evidence may consider that factor in deciding on

13   an appropriate sentence in the case regardless of whether any

14   or all of the other jurors agree that that mitigating factor

15   has been proven.

16        After the parties have made their presentations of

17   evidence during the penalty phase, the jury will weigh all the

18   evidence.  Before a jury could vote to impose the death

19   penalty, every juror would have to be persuaded that certain

20   threshold factors make Mr. Tsarnaev potentially subject to the

21   death penalty and that those factors have been proven beyond a

22   reasonable doubt.

23        In addition, in order to impose the death penalty,

24   every juror would have to be persuaded that any proven

25   aggravating factors sufficiently outweigh any mitigating

1    factors found by any juror or jurors to justify a sentence of

2    death.  Even if the jury did not find any mitigating factors in

3    the case, it would still have to be unanimously persuaded that

4    any proven aggravating factors were themselves sufficient to

5    justify a death sentence.

6              You should understand that a jury is never required to

7    find that a sentence of death is justified.  The decision

8    whether the government has proven that a defendant should be

9    sentenced to death must ultimately be made by each juror

10   himself or herself.  If, however, every juror is persuaded that

11   the death penalty should be imposed, I would be required as the

12   judge to sentence the defendant to death.  In other words, I

13   could not change the jury's decision.  The jury, and not the

14   judge, is responsible for determining whether a defendant who

15   is convicted of a capital crime will live or die.

16             What I've just described is only an overview of the

17   law applicable to the consideration of the death penalty.  If

18   you are selected to serve on the jury and if you find the

19   defendant guilty of a crime or crimes punishable by death, I

20   will give you very detailed instructions concerning your duties

21   in deciding whether to impose a death penalty or penalty of

22   life imprisonment without possibility of release.  And the law,

23   as I give it to you at that point, will guide you and must be

24   followed in your decision.

25             As I told you before when you filled out your

 1    questionnaires, this morning as we ask you some additional

 2    questions there are no right or wrong answers to those

 3    questions.  We are asking them because both the government and

 4    Mr. Tsarnaev are entitled to a trial before a jury that does

 5    not have its mind firmly made up one way or the other before

 6    hearing the evidence and a detailed explanation of the law.

 7    That applies both to whether Mr. Tsarnaev is guilty or not

 8    guilty of the specific crimes charged in the indictment, and if

 9    he's convicted of a capital crime, whether he should be

10    sentenced to death or life in prison without possibility of

11    release.

12         So today I'm going to question each of you

13    individually about issues that are relevant to this process of

14    selecting a jury.  I'm going to call you back into the

15    courtroom -- we're going to excuse you as a group and then call

16    you back into the courtroom one by one to follow up on some

17    questions.

18         There will be a few people in the room in addition to

19    the lawyers and their staffs, and the proceedings are being

20    simultaneously transmitted by video and audio to overflow

21    courtrooms.  We will not identify you by name but rather by

22    your juror number, and you will be seated so that the video

23    camera will generally be behind you.

24         Your answers will be generally public because they're

25    being sent to the other courtrooms, but if you believe that a

1    truthful answer would require you to reveal sensitive personal

2    information, you will tell us that and we'll temporarily stop

3    the audio transmission to those courtrooms so that people

4    observing there will not hear that answer.

5           Again, we do not expect or want any particular answer

6    to any question; all we want and what the law expects is that

7    you provide accurate and truthful answers to the questions that

8    are asked.  If do that, you will be doing your duty as a

9    citizen and as a juror no matter what the answers may be.

10          I also want to take a moment to remind you about some

11   of my prior instructions.  As I told you before, a jury's

12   verdict must be based on the evidence produced at trial and be

13   free from outside influence; therefore, I remind you again that

14   it's extremely important that you do not discuss the case,

15   including this jury selection process, with your family,

16   friends or each other or any other person, until I either have

17   excused you or, if you're selected as a juror, until the case

18   has been concluded.

19          And, of course, again, you're not to conduct any

20   online research or otherwise read, watch or listen to reports

21   about the case in the media until either excused or, if you're

22   a juror, your task is completed.

23          You signed the questionnaires under the pains and

24   penalties of perjury.  Now, for this question -- follow-up

25   questions, we're going to ask you again to make it solemnly in

1    that way, and we will ask each of you to take an oath to answer

2    the questions today truthfully, completely, and to the best of

3    your ability.  The clerk will ask you to stand to do that now.

4           THE CLERK:  Will the jurors please rise and raise your

5    right hand.

6           (The venire is duly sworn.)

7           THE CLERK:  Thank you.

8           THE COURT:  Okay.  Thank you.

9           We'll now ask you to leave as a group and we'll begin

10   the process one by one.  We ask your patience.  For those who

11   may be at the end of the line, it's going to take a little

12   while, but it's something important to be done, and we'll get

13   to you in due course.  Thank you.

14          (The venire is excused and exits the courtroom at 9:45

15   a.m.)

16          (The juror enters the courtroom.)

17          THE COURT:  Good morning.

18          THE JUROR:  Good morning.

19          THE COURT:  We're going to be doing most of the

20   talking, you and I.  This is Juror No. 4.

21          And for your convenience, we have your questionnaire.

22   I may refer to some of the questions in it.

23          THE JUROR:  Sure.

24          THE COURT:  You'll recall when you were last here I

25   instructed everyone to avoid any discussion of the case or

1    any -- I repeated it this morning -- any investigation online

2    or otherwise, and I'd asked you to avoid any news stories and

3    so on.

4              Have you been able to do that?

5              THE JUROR:  I saw a news story about the Charlie Hebdo

6    thing and they wanted to move the case or something.

7              THE COURT:  Okay.  You didn't read it?

8              THE JUROR:  No.

9              THE COURT:  Okay.  So let's go through -- these are

10   really follow-up questions to the questions and answers that

11   you gave on the questionnaire, and mostly I'll be going in

12   sequence, really.

13             I want to start with the answer to Question No. 10,

14   and this concerns the difficulty you anticipate with respect to

15   your job.  And I wonder if you could just tell us a little bit

16   more clearly about that including, with some detail, what it is

17   you do.

18             THE JUROR:  Yeah, absolutely.

19             I work for a digital marketing company, so we run

20   advertising campaigns for --

21             THE COURT:  Can you move the mic just a little bit

22   closer?

23             THE JUROR:  We run advertising campaigns for brands

24   and agencies.  The reason I listed that hardship is

25   specifically because I was recently fortunate enough to be

1    promoted and have won two very large accounts with both

2    Mercedes-Benz and MasterCard.  It's a huge opportunity for me

3    and one that no one at my age, at least in my company, has ever

4    achieved.

5         And so in my opinion, just given how pivotal the

6    timing is for me, to have just gotten this promotion and having

7    just started working with these very, very large, important

8    accounts, not just for myself but for my company, it would take

9    all of that away from me.

10        THE COURT:  One of the reasons we scheduled the case

11   the way we did, so that people would have all day Friday

12   instead of every day having some piece of it taken, was to try

13   to mitigate the impact that people would have in their jobs,

14   that they could have a full day, at least, if not -- as well as

15   whatever else they might be able to do after hours otherwise.

16        Does that mitigate the impact at all?

17        THE JUROR:  Unfortunately, no.  Because as an account

18   manager, what I do is -- every single day I need to be

19   basically responsible for the delivery of the campaigns.  So by

20   "delivery," I mean they have a budget to spend for media that

21   we purchase on their behalf based on their plan.  If I'm not

22   there at all times during working hours, then -- even now I'm

23   sort of missing out on what could be, you know, very important

24   delivery issues for this company -- for both companies.

25        I don't think that one day a week will allow me to

1    retain my position as an account manager on either account.

2              THE COURT:  Have you talked about this with your

3    employer?

4              THE JUROR:  I have.

5              THE COURT:  And what have they said about it?

6              THE JUROR:  They said I won't lose my job but that I

7    will not be able to stay on the accounts.

8              THE COURT:  Let me turn to a couple of other

9    questions.  First, 29, which is about social media.

10             THE JUROR:  Yeah.

11             THE COURT:  29 and 30.  I guess -- given what you've

12   told us about your job, I guess you spend a good bit of time on

13   things like social media?

14             THE JUROR:  Yeah.

15             THE COURT:  You specifically said in 29 that you

16   comment or post on Reddit.

17             THE JUROR:  Yes.

18             THE COURT:  And I think later in the questionnaire you

19   said that you've actually commented there about this case.

20             Can you tell us a little bit about that?

21             THE JUROR:  I don't know if you recall, but Reddit was

22   somehow involved in trying to investigate after the bombings

23   had happened, trying to figure out who it was based on all of

24   the pictures.  They obviously were wrong about most of it.

25             But at the time -- I was home on the 19th, I think it

1    was, when everyone -- I lived in Weston at the time, and so I

2    was told not to leave my house -- I was posting on it I think

3    just with regards to being locked down.

4            But I did follow the sort of community crowd-sourced

5    investigation with quite a bit of interest.

6            THE COURT:  So that was while the events were

7    unfolding still?

8            THE JUROR:  That's correct.

9            THE COURT:  Since then, and particularly since the

10   charges have been made, have you commented on the case?

11           THE JUROR:  I haven't commented on the case in social

12   media, no.  At least Reddit, at least.

13           THE COURT:  On Number 30 you said you browse Facebook

14   occasionally?

15           THE JUROR:  Yeah, I use Facebook.

16           THE COURT:  Checking on friends and things?

17           THE JUROR:  Yeah, I'm not a very frequent poster, but

18   I browse.

19           THE COURT:  Any involvement with issues in the case on

20   Facebook?

21           THE JUROR:  No, not me specifically.

22           THE COURT:  I'd like you to look at Questions 43 and

23   46 which ask you about perhaps experience with or attitudes

24   towards law enforcement people.

25           THE JUROR:  Sure.

```
 1              THE COURT:  In 43 you talk about a cousin, I guess --
 2              THE JUROR:  Yeah.
 3              THE COURT:  -- who was -- is in an incident and you
 4    think the officer is not being truthful.
 5              THE JUROR:  That's what I was told.
 6              THE COURT:  And in 46, we asked if you had any
 7    strongly positive or negative views about law enforcement, and
 8    you said, "In general I do not."
 9              Can you amplify on those two answers?
10              THE JUROR:  Sure.  I think recently there's been,
11    obviously, a lot in the news regarding law enforcement.  I
12    think it's a small subset of the law enforcement community.
13    But I do think it's pretty clear that there are certain people
14    who taking advantage of their power in law enforcement.  So in
15    general, I think that we're looking at a group of people who
16    are good, but there's people who are not good mixed in.
17              THE COURT:  Would you be able to fairly assess the
18    reliability of testimony or evidence from law enforcement
19    people on an individualized basis, I guess, or would some
20    generalized views of how law enforcement people may behave --
21    would that influence you?
22              THE JUROR:  I think with regards to this case I should
23    be able to, you know, not be biased against law enforcement
24    testimony.
25              THE COURT:  In other words, we ask jurors to take
```

1    every witness as the witness appears and assess that witness

2    specifically and not applying preconceived ideas about anybody,

3    whether they're law enforcement or any other category.

4              Do you think as a juror you would be able to do that?

5              THE JUROR:  To witnesses?

6              THE COURT:  Yeah.

7              THE JUROR:  Yeah, I could be impartial to the

8    witnesses.

9              THE COURT:  Question 59 has an interesting answer.  It

10   says your mother's family was forced to leave Egypt?

11             THE JUROR:  Yes.

12             THE COURT:  Could you tell us about that.

13             THE JUROR:  This is paraphrasing the story as I've

14   been told it, but my grandfather was a Ph.D. in Egypt for --

15             THE COURT:  This would be your mother's father?

16             THE JUROR:  Yes.

17             -- geography.

18             They're Christian -- Coptic Orthodox Christians.

19             He wrote his thesis on the Fertile Crescent and

20   referred to Israel as Israel -- and this was in the late 1960s

21   when this was was not recognized by Egypt.  They took away his

22   Ph.D. and actually forced him to stay in Egypt as a punishment

23   so that he could not pursue his academic career.

24             He eventually was able to somehow sneak out or

25   something and went to Pennsylvania where he was able to get his

1    Ph.D. back and then teach at Edinboro University in

2    Pennsylvania.  But it was because Nasser was the head of the

3    Muslim regime at the time who took great exception to his

4    thesis.

5         THE COURT:  Would that family history have any impact

6    on your fair-mindedness in this case?

7         THE JUROR:  You know, my grandpa is still alive and I

8    grew up with him in the household.  He's a very biased person

9    as a result of all the things that happened to him.  So I did

10   grow up hearing quite a bit of that.  I don't think that the

11   religious aspect of things is -- well, frankly, it's kind of

12   hard for me to ignore that this extremism seems to happen

13   pretty regularly in that sect, and I think that I would have a

14   tough time disassociating the two things.

15        THE COURT:  A little further down on the same page you

16   answered that you think that the "war on terror" is overblown

17   or exaggerated.  Could you amplify on that?

18        THE JUROR:  I think by that I mean that at this point

19   in time I haven't really seen a whole lot of -- I don't think

20   it's accomplished anything tangible that I can point to.  So I

21   think that at a certain point it's just a huge drain on our

22   country.

23        THE COURT:  In Question 75 we asked about

24   conversations you may have had with others about your possible

25   jury service here, and one of the things you said was that you

1    were told how cool it was and that you get a chance to sentence

2    him to death.

3            Can you tell us what the circumstances were of that

4    conversation?

5            THE JUROR:  Yeah.  I live with several other males my

6    age, a very testosterone-driven household.  They think that

7    it's very cool and they very much want me to sentence him to

8    death.

9            THE COURT:  If you were a juror, would you do what

10   they wanted or would you make up your own mind?

11           THE JUROR:  Well, I would sentence him to death but

12   not because of them.

13           THE COURT:  Well, that gets us to some of the

14   questions about that.  You, first of all, in Question 77

15   answered that you had formed an opinion that he was guilty and

16   that he should receive the death penalty, and further indicated

17   that you didn't think you'd be able to set those conclusions

18   aside if you were a juror in the case.  You also told us later

19   that on a scale of 1 to 10, you're somewhere in the middle as

20   to the death penalty generally, and that you -- in the next

21   question, 90, that you could vote to impose it or vote to

22   impose a sentence of life imprisonment depending on the facts

23   of the case, right?

24           So I guess with all of those -- let me add that in

25   Question 95 and 96, specifically with respect to this

1   defendant, you said you could conscientiously vote for the

2   death penalty or you could conscientiously vote for life

3   imprisonment depending on the evidence.

4           Understanding that you've obviously heard things about

5   the case beforehand, is it your self-evaluation that you would

6   be unable to alter any ideas you have now if -- based on

7   evidence that was produced at the trial?  In other words, is

8   there no possibility that you could alter your assessment of

9   the matter based on what you heard at trial or --

10          THE JUROR:  I can't imagine any evidence that would

11  change how I feel about what happened and what I think happened

12  in that scenario, during the bombings, and afterwards, in fact.

13          THE COURT:  Do you feel committed to a position

14  because you've expressed it?

15          THE JUROR:  I feel committed to the position because

16  that's very genuinely how I feel about this case.

17          THE COURT:  Okay.  Thank you.  You may step down.

18          THE JUROR:  Should I leave this?

19          THE COURT:  Yes.  Leave that there.  Thank you.

20          (The juror is excused.)

21          THE COURT:  Good morning.

22          THE JUROR:  Good morning.

23          THE COURT:  Juror No. 6.

24          Have you been able to abide by the instruction I gave

25  the group last time, to avoid any discussion of the case or any

1  exposure to media accounts of the case?

2          THE JUROR:  Yup.

3          THE COURT:  Tell us a little bit about your job.

4  You're a project manager at John Hancock?

5          THE JUROR:  Yup, for John Hancock.  I manage their

6  real estate construction projects, construction for tenants in

7  their buildings; day-to-day operations:  interaction with all

8  the business units, security, cleaning, all that different

9  stuff.

10          THE COURT:  John Hancock, of course, was a sponsor of

11 the marathon.

12          THE JUROR:  Yup.

13          THE COURT:  Were you at -- where do you work?  Do you

14 work at the Prudential Center location?

15          THE JUROR:  200 Berkeley, right there.

16          THE COURT:  Yeah.  Were you there that day?

17          THE JUROR:  No.

18          THE COURT:  I think you told us later on in the

19 questionnaire, I think it was Question 80, that at least one

20 coworker was there on the occasion?

21          THE JUROR:  Yeah.

22          THE COURT:  Was he involved in some way?

23          THE JUROR:  Yeah.  One of my direct coworkers --

24 because part of real estate is security -- with John Hancock

25 being the major sponsor it's his responsibility at the security

1   at the finish line with all the John Hancock executives and

2   stuff at the finish line.

3            THE COURT:  Was he at the finish line?

4            THE JUROR:  He was, yes.

5            THE COURT:  Was he injured in any way?

6            THE JUROR:  No.

7            THE COURT:  Have you talked to him in detail about his

8   day?

9            THE JUROR:  No, he doesn't like to talk about it.

10           THE COURT:  If you were a juror in the case, would you

11  feel any pressure to be loyal to John Hancock in a way that

12  would cause you to have a biased view of the evidence?

13           THE JUROR:  I don't think so.

14           THE COURT:  How long have you been with the company?

15           THE JUROR:  Seven years.

16           THE COURT:  Just on a similar tack, I guess, I think

17  you told us in a couple of places, maybe at least one, that

18  your wife is a nurse at Mass General --

19           THE JUROR:  Uh-huh.

20           THE COURT:  -- and that she had some role in treating

21  victims?

22           THE JUROR:  She did.

23           THE COURT:  Could you give us an idea of what you

24  understand she was doing?  I mean, was she a surgical nurse?

25  Was she --

```
 1          THE JUROR:  ICU nurse.

 2          THE COURT:  ICU.  Is that her regular station?

 3          THE JUROR:  Yes, it is.  That's her regular floor, is

 4   an ICU floor.

 5          THE COURT:  Okay.  I imagine you've talked to her

 6   about it?

 7          THE JUROR:  Yup, she talked about it when she'd come

 8   home from work.

 9          THE COURT:  Would that have any effect on your

10   fairness and impartiality in a case like this -- in this case?

11   I shouldn't say "like this."  In this case.

12          THE JUROR:  It's tough because it hit my wife hard,

13   the stuff she had to do with the patients.

14          THE COURT:  Okay.  I know it's a little hard to assess

15   the impact of emotions.

16          THE JUROR:  Yeah.

17          THE COURT:  But -- so, the question is:  Would you be

18   able to put yourself in a frame of mind where you could commit

19   to evaluating the case on the evidence, or do you think, you

20   know, because you come home every night you would feel some

21   pull that would prevent you from doing that, I guess?  And this

22   is kind of a question that maybe nobody can answer, but you're

23   the best person to do it.

24          THE JUROR:  I possibly could, yes.

25          THE COURT:  All right.  You use Facebook a little bit?
```

```
 1            THE JUROR:  Yeah.

 2            THE COURT:  Could you look at Question 30?  We have

 3    your questionnaire in front of you.  I can't quite read what

 4    you wrote.  That's what I was going to ask you.

 5            THE JUROR:  That's fine.

 6            THE COURT:  It's on page 11.

 7            THE JUROR:  Question 30?

 8            THE COURT:  Yeah.  I can't read the first line.

 9            THE JUROR:  "Read frequently; comment rarely."

10            THE COURT:  I see.  Okay.  And when you do look at it,

11    what are the kinds of things you look at?

12            THE JUROR:  Mostly involving my hockey league.  That's

13    where they kind of post the schedule and everybody talks about

14    the games and stuff.  Just keeping up with friends' stuff and

15    their kids and stuff.

16            THE COURT:  Have you commented about this case on

17    Facebook?

18            THE JUROR:  Not that I can recall.

19            THE COURT:  Question 34 you told us you have a cousin

20    in the Tewksbury police.

21            THE JUROR:  I do.

22            THE COURT:  How long has he been a police officer?

23            THE JUROR:  He's been a police officer for about maybe

24    ten years or so, right about there.

25            THE COURT:  Is he somebody you see frequently or --
```

1              THE JUROR:  Several times a year.

2              THE COURT:  Obviously there will be a lot of law

3     enforcement evidence, people, witnesses and so on.  Because you

4     have a relative in that line of work, would that have any

5     influence on your impartiality?  Would you tend to favor law

6     enforcement people?

7              THE JUROR:  No, I don't think so.

8              THE COURT:  You said in Question 46, I guess --

9     anytime you want to look -- I'll try to give you the numbers

10    and anytime you want to look at it, just feel free.  You said

11    you have a great deal of respect for police officers, putting

12    their lives at risk every day.

13             THE JUROR:  Yup.

14             THE COURT:  That's not a surprising feeling for

15    somebody to have.  Would it be something that would be of -- a

16    strength that would influence your assessment -- your critical

17    assessment of testimony from law enforcement people?

18             THE JUROR:  No.  I mean, facts are facts.

19             THE COURT:  If you'd look at Question 59, summarizing,

20    you say that -- what you call general Muslim followers should

21    speak out against extremism.

22             THE JUROR:  Yeah.

23             THE COURT:  Is that the gist of what you were getting

24    at?

25             THE JUROR:  Yeah.

 1          THE COURT:  Can you amplify on that?

 2          THE JUROR:  I just think that -- I don't think the

 3   Muslim religion in general is a bad religion; I just don't

 4   think the general population of the religion speak out enough

 5   against the extreme side.

 6          THE COURT:  Is that a view that would have some effect

 7   on your ability to fairly judge the evidence in this case?

 8          THE JUROR:  No.  Facts are facts.

 9          THE COURT:  I'd like you to look at Question 77.  And

10   that answer actually is a multiple-part question and it asks a

11   number of things.

12          THE JUROR:  Uh-huh.

13          THE COURT:  You said that you had formed an opinion

14   about the defendant's guilt but that you were unsure about the

15   penalty that he should get.  Let me ask you first about the

16   first part.

17          You have formed an opinion based on accounts, I

18   imagine, that you've seen in the media and elsewhere.

19          THE JUROR:  Yeah.

20          THE COURT:  The government has the burden, of course,

21   of proving each proposition at trial by evidence, and that

22   evidence is likely to be perhaps greater in volume and amount,

23   and you'll actually be sitting in the courtroom evaluating it.

24   Can you tell us whether you have a sense of your ability to

25   assess the trial evidence and possibly either revise or stick

1   with your position as it stands today?  In other words, is it a

2   position that you think you would firmly hold no matter what

3   was shown at trial, or would you be able to evaluate the trial

4   evidence, perhaps come to the same conclusion but perhaps alter

5   it if you thought that was called for by your evaluation of the

6   evidence?

7              THE JUROR:  Yeah.  No, I could -- I mean, with the

8   media it's very high-level; there's no detail.  I mean, until

9   you actually know the details you don't know everything.

10  That's just gut reaction from media and high level.

11             THE COURT:  And is that perhaps why you answered

12  "unsure" to the other penalty questions?

13             THE JUROR:  Yeah.  Yeah.

14             THE COURT:  We've asked about your general attitude

15  toward the death penalty, and you -- this is Question 88 -- and

16  you said, "I'm for the death penalty but only if," it looks

17  like, "100 percent no doubt of guilt."

18             THE JUROR:  Yeah.

19             THE COURT:  Can you maybe rearticulate that?

20             THE JUROR:  Yeah, I just think, you know, to put

21  somebody to death, it has to be 100 percent no doubt, rock

22  solid, concrete that the person's guilty.

23             THE COURT:  In Question 90 we gave you some options as

24  to what might express your view, and you said you're in favor

25  of the death penalty but could vote for a sentence of life

1    imprisonment if you thought that was called for by the law and

2    the facts of the case.

3            Is that an accurate statement of your position?

4            THE JUROR:  Yeah.

5            THE COURT:  So you've heard my instructions today.

6    You may hear things that might tend to -- we call them

7    aggravating factors -- might tend to weigh on the side of a

8    more serious penalty, and mitigating factors that might weigh

9    on the side of a lesser.  You think you'd be able to take

10   account of both aggravating and mitigating as you found them to

11   be -- as you and the other jurors found them to be and make a

12   judgment as to the appropriate penalty?

13           THE JUROR:  Yeah.

14           THE COURT:  And go either way depending on your

15   assessment?

16           THE JUROR:  Yeah.

17           THE COURT:  And that, I guess, is reflected -- if

18   you'd look at your answers to Questions 95 and 96, we asked if,

19   depending on your assessment, you could vote, A, for the death

20   penalty; or, B, for life in prison without release?

21           THE JUROR:  Yeah.

22           THE COURT:  And that's your view?

23           THE JUROR:  Correct.

24           THE COURT:  Okay.  Thank you.

25           THE JUROR:  Thank you.

1          (The juror is excused.)

2          MS. CLARKE:  Your Honor, is this an appropriate time

3    to ask the Court about follow-up with a juror like that?

4          THE COURT:  What would you like to do?

5          MS. CLARKE:  The concern that I have is that --

6    there's two:  One is on the question of guilt, presumption of

7    guilt.  And the Court had the juror essentially say, Well, I

8    would consider the evidence.  The question is really whether

9    there could be a presumption of innocence at this point in

10   time.

11         And the second thing is a *Morgan* question.  You know,

12   this is a juror in the abstract saying I can take aggravating

13   and mitigating, but it really is if you're 100 percent guilty

14   that you're going to get death in a case like this.  So it's

15   the case-specific *Morgan* questions that we've asked the Court

16   to ask.  Where there is proof beyond a reasonable doubt of

17   intentional murder, weapons of mass destruction, death of three

18   people, maiming of many others, the death of a child and the

19   death of a police officer, is there anything that would make

20   you sentence other than death?

21         THE COURT:  Well, I'm not going to ask those kinds of

22   specific -- case-specific questions.  You call them *Morgan*.  I

23   think they're stakeout questions, so...

24         And as to the other, I think the examination was

25   adequate.

1            MS. CLARKE:  Right.  The other area here was that
2   there was some conclusion as to guilt based on what he had
3   read, but we don't know what he read, what he knows, what he
4   has heard in specifics.  This was a question that was removed
5   from the questionnaire, with the Court -- with our
6   understanding that the Court intended to follow up with these
7   jurors on the content of publicity that they have read.
8            THE COURT:  I think we have adequate information from
9   him on that.
10           (Pause.)
11           (The juror enters the courtroom.)
12           THE COURT:  Good morning.
13           Juror No. 7.
14           THE JUROR:  Good morning.
15           THE COURT:  Tell us a little bit about what your
16   employment is.
17           THE JUROR:  Me and my fiancée run an Italian deli in
18   an area around here.  I cook mostly, do a lot of the prep work.
19   We work from about six-thirty in the morning to six-thirty at
20   night every night.
21           THE COURT:  But you think you'd be able to serve as a
22   juror on the schedule that I've described to you?
23           THE JUROR:  I don't believe so due to the fact that my
24   fiancée is now five and a half months pregnant, and to ask her
25   to be there by herself for those hours, it's just a hardship

1    that wouldn't -- after discussing everything with her, I don't

2    see it being feasible at this time.

3              THE COURT:  Is it possible to get other help?

4              THE JUROR:  For the time -- with the time slot -- I

5    mean, we constantly look for help, and it comes and goes, so I

6    don't know.

7              THE COURT:  We asked people whether they use social

8    media.  You said you don't but that you sometimes use

9    Instagram.

10             THE JUROR:  Yeah, occasionally on the Instagram.  As

11   far as Facebook, Twitter, all the other stuff, no.

12             THE COURT:  What do you do with Instagram?

13             THE JUROR:  Pictures of my children.  That's about it.

14             THE COURT:  You have a brother who is in active

15   service in the Marine Corps?

16             THE JUROR:  Yeah, San Diego.

17             THE COURT:  But he has not, as far as you know, been

18   in combat situations?

19             THE JUROR:  No.

20             THE COURT:  How long has he been in the Marines?

21             THE JUROR:  Ten years.  Nine, ten years now.

22             THE COURT:  So it's a career for him?

23             THE JUROR:  Yes.

24             THE COURT:  Okay.  Would his service have any effect

25   or impact on your ability to assess the facts of this case

1  fairly?

2         THE JUROR:  I don't speak to him, so no.

3         THE COURT:  We gave you the questionnaire there.  Let

4  me ask you to look at Question 77.  This was about whether you

5  had formed any opinions about this case either with respect to

6  the question of guilt or innocence or about the question of a

7  potential penalty, and you wrote "unsure" on each of those.

8         Can you tell us what you meant to convey by that?

9         THE JUROR:  I'm not really one to form an opinion on

10  anything until I know the facts.  That's just the general

11  nature I take on a lot of avenues in life.  So why people do

12  things at times or why people make the decisions they make, I'm

13  not one to form the opinion on anything until I actually see

14  the facts myself.

15         THE COURT:  So if you were a juror in the case, would

16  you be able to wait until you heard all the evidence that was

17  presented by the parties and make a decision based on that

18  evidence?

19         THE JUROR:  That's the general approach I like to

20  take.

21         THE COURT:  We asked the general question about

22  whether you had views on the death penalty, and you said you

23  didn't.  That's Question 88, if you want to look on.

24         In the next question we asked on a scale of 1 to 10

25  where you may place your attitude toward the death penalty and

1      you chose a 5.  And then on the next page, Question 90, you

2      selected Option D, which said you were not for or against it,

3      you could vote for it, either life imprisonment or the death

4      penalty, depending on what you thought were called for by the

5      case.

6                  Is that an accurate representation of your views?

7                  THE JUROR:  Yeah.  Just like that last question, when

8      I said, you know, my general views on things are the facts.  I

9      don't know what crime would commit that [*sic*], but once again,

10     the facts -- I would have to hear other facts before I could

11     make a decision on that.  I'm not strongly for the death

12     penalty; I'm not against the death penalty.  I really have no

13     opinion on it.

14                 THE COURT:  Let me ask you about Questions 95 and 96

15     because your answer there seems to be contrary to what you just

16     said.

17                 THE JUROR:  Uh-huh.

18                 THE COURT:  There it asks if you could

19     conscientiously, A, vote for the death penalty; or

20     conscientiously, B -- or B, conscientiously vote for life

21     imprisonment, you know, presenting the two options, and you

22     said no to both.  Could you explain that?

23                 THE JUROR:  I took the question as asking if hearing

24     the facts the death penalty was permitted in this case, would

25     it, you know, persuade me to go either way in the future.

1    That's the way I took it and that's why I answered that

2    question no.  So maybe I misunderstood the question.

3         THE COURT:  Okay.  So let me see if I -- I want to be

4    sure we understand.  Is it your view, of yourself, that having

5    considered all the evidence in the case and the instructions of

6    the law and so on, including consideration with respect to

7    guilt or innocence where the government has the burden, and

8    including the weighing of considerations for penalty including,

9    as you heard me say this morning, aggravating factors which the

10   government has to prove and any mitigating factors that might

11   be shown by the defense, taking all of that, would one possible

12   outcome be that you could conscientiously vote for the death

13   penalty?

14        THE JUROR:  Uh-huh.

15        THE COURT:  And would one possible outcome be that you

16   could conscientiously, based on your assessment, vote for life

17   in prison without parole instead of the death penalty?

18        THE JUROR:  Yes.

19        THE COURT:  Okay.  Thank you.

20        THE JUROR:  Thank you.

21        (The juror is excused.)

22        MR. BRUCK:  Before the next juror comes out --

23        THE COURT:  Is this --

24        MR. BRUCK:  About -- if I may, about the questioning,

25   about follow-up questioning, again, we have no idea what this

```
 1    juror knows or has read.  And we would ask the Defendant's 2
 2    follow up -- Number 2 on the general voir dire request be asked
 3    to really draw out what this juror knows and has heard about
 4    this case.  We would ask Number 3 be asked, Number 4.
 5            We would also -- I'm sorry.
 6            MS. CLARKE:  Your Honor --
 7            THE COURT:  She's got it.  Thank you.
 8            (Pause.)
 9            MR. BRUCK:  Again, we feel that -- we had hoped that
10    since none of these questions were put into the questionnaire
11    despite our requests, that this would be the time that we would
12    find out what jurors bring into the courtroom given the
13    unprecedented level of publicity and the unprecedented level of
14    direct talk, verbal communication and direct experience of the
15    marathon bombing in this division of the Massachusetts -- of
16    the District of Massachusetts.  So we would -- we really feel
17    that it's impossible to assess the impartiality of a juror like
18    this without getting to what he has heard or read.
19            In addition, it's -- this is a juror who believes the
20    defendant is -- I'm sorry.  This is a defendant [sic] who says
21    he's unsure whether he's guilty or not.  That covers an awful
22    lot of territory.  We think our Number 11 -- our 10 and 11,
23    which asks the juror to imagine that he was on the jury and the
24    government didn't prove its case and they acquitted
25    Mr. Tsarnaev and he went home, and then the juror is asked to
```

1    say, Well, how do you think people would react, how would you

2    react, how would you feel about that prospect, that gets at

3    whether or not jurors can put it aside; not the verbal

4    formulation of whether they could listen to the evidence and

5    come to their own conclusion.

6            But this is reality, and there may be jurors who say,

7    If the government didn't prove their case, sure, I could do

8    that.  But there are going to be a lot of jurors who will say,

9    Well, we all know he's guilty and people would be furious and

10   there would be an uproar.  But if we don't ask the question,

11   we'll never know.

12           So we think that these questions are really quite

13   critical.  In effect, we're asking can these jurors really

14   presume this man innocent or is it a situation where everybody

15   knows he's guilty and let's get on to the penalty phase, but,

16   sure, I could listen to the evidence and, you know, make it

17   look like I was a regular juror.

18           Secondly -- or maybe it's thirdly, as to the *Morgan*

19   question, we, of course, will stand on our legal position that

20   we're entitled to ask whether under the charges that have been

21   brought in this case the juror could still consider life

22   imprisonment.  We're not asking for all of the facts to be laid

23   out.

24           And then what we're asking for is for someone who has

25   been charged with a terrorist crime, that is, the use of a

1    weapon of mass destruction, that is the charge in the

2    indictment, could the juror ever impose life imprisonment

3    rather than the death penalty in that case?

4         The same is true of the statutory aggravating factors

5    which are found in the indictment.  They are alleged as special

6    findings.  And we think it's important to ask whether -- and we

7    only use a couple of examples, "especially vulnerable victim

8    due to childhood."  In other words, if the murder involved a

9    child, under *Ring v. Arizona* that has the legal equivalent of

10   the element of an offense.  Is the jurors' views on the death

11   penalty such that he could never impose the death penalty in

12   that -- life imprisonment, rather, in that situation?  Is he

13   talking about a completely different kind of case when he says

14   "I could go either way"?  It doesn't matter whether he could

15   impose life imprisonment in a completely different kind of

16   case.

17        This is not a murder charge; this is a charge of use

18   of a weapon of mass destruction where death results.  And

19   *Morgan* requires that you test the jurors' ability to impose

20   life imprisonment for the crime charged.  So we think we are

21   clearly entitled under *Morgan* to questioning on the -- on that

22   issue.

23        Finally, even if the Court were to rule against us on

24   that, it would -- we would -- we should nevertheless be allowed

25   to find out whether the juror would always impose the death

1    penalty on somebody where it was proven beyond a reasonable

2    doubt that he intentionally committed a murder or a killing

3    which, of course, has to be proven as a threshold finding.

4            Those are the only kinds of killings in which it's

5    what's alleged in this case and it's what's required.  It

6    doesn't matter whether the juror might vote for life for an

7    unintentional killing because that's not what we're dealing

8    with.  It's not what the government has charged.  It's not what

9    is on trial in this case.  It's purely academic.

10           It would be like saying for the government, Well, I

11   could never impose the death penalty for anyone under the age

12   of 25.  The government wouldn't say, Well, that's fine because

13   who knows what age the defendant will turn out to be.  That

14   would not be acceptable to the government and it's not

15   acceptable to us and it's not acceptable under the Eighth

16   Amendment and the due process clause of the Fifth Amendment to

17   be tried by a jury that would impose the death penalty -- or

18   even has a single member that would impose the death penalty

19   for every intentional murder.  This juror is a blank slate on

20   that.  We don't know because he hasn't been asked.

21           So those are the questions -- those are why we ask for

22   those follow-up questions, and we really don't think we're

23   going to have a fair jury unless they're asked.

24           MR. MELLIN:  Your Honor, may I respond to that?

25           THE COURT:  Go ahead.

1          MR. MELLIN:  As to the issue about the pretrial

2     publicity, I think the Court has been able to determine and

3     assess the credibility of witnesses based on their answers

4     concerning that.  If there was some concern that the Court had

5     about their truthfulness about whether or not something they

6     read or saw before they came into Court today, the Court would

7     be able to follow up on that.

8          Up to this point these jurors have been very clear

9     about the fact that they are not affected by what they have

10    read or seen prior to coming into court.  So I don't think

11    there's any need for what Mr. Bruck is asking for, which would

12    be to ask each of these jurors exactly what article did you

13    read or which news story did you see on television.  I think

14    that's completely unnecessary.  I think in a case-by-case basis

15    based on the answers that a juror gives, I'm sure the Court

16    will ask some follow-up questions, but I think it's unnecessary

17    at this time.

18         Concerning the *Morgan/Witt* questions, your Honor, we

19    completely disagree with what Mr. Bruck has said *Morgan/Witt*

20    requires.  He is asking for specific stakeout questions saying

21    in this case where you have an intentional killing and a weapon

22    of mass destruction and a child killed and all of these other

23    aggravating factors, would you be able to consider life

24    imprisonment?  That is only one half of the equation.

25         He is only advising or wanting the Court to advise

1     these jurors of all of the aggravating factors without even

2     talking about the mitigating factors and asking the jurors if

3     they could impose life imprisonment.  And that's an unfair

4     question to ask because that is assuming the juror has, in

5     fact, found all of the government's aggravating factors.

6          So if that is the case and this is the only evidence

7     they have at that time, each of these jurors would be entitled

8     to impose a sentence of death because they have found those

9     aggravating factors.  So I think that's completely unfair.

10         I would suggest maybe an alternative to what Mr. Bruck

11    says by asking these jurors if they understand that if we get

12    to the penalty phase, at that point you will have already found

13    the defendant guilty beyond a reasonable doubt of the actual

14    offenses.  When we are in the penalty phase would you be able

15    to meaningfully consider both the aggravating factors and the

16    mitigating factors before you came to a decision as to what the

17    appropriate sentence would be?  I think that would cover the

18    issues that Mr. Bruck is talking about without going into any

19    degree of trying to specify specific aggravating factors or

20    mitigating factors.

21         One last question the government would ask for, your

22    Honor, with some of these jurors, it's not clear when they

23    leave whether or not they would actually be able to impose the

24    death penalty themselves.  And so we would ask the Court with

25    those jurors, if the Court would ask them, If you got to the

1   final stage and you actually believed that the aggravating

2   factors substantially outweigh the mitigating factors, would

3   you be able to impose -- or vote to impose a sentence of death

4   against another human being.

5         THE COURT:  Well, again, these are follow-up questions

6   to a detailed questionnaire.  This goes to both points.  Just

7   taking the last one, we do ask them that in the questionnaire.

8   Questions 95 and 96 ask those questions.  I don't see any need

9   to repeat questions that they've answered in the questionnaire

10  straightforwardly or perhaps unambiguously.  To the extent

11  there is ambiguity -- and in this last case he apparently

12  misunderstood the direction of those questions, and so it was

13  necessary to follow up on that.  He answered on the

14  questionnaire, apparently from what he says here today, anyway,

15  opposite of what he meant to say.

16        As it goes for other matters, I make the same

17  observation about publicity questions.  We have detailed

18  answers in the questionnaire concerning what exposure to the

19  media about this is.  I don't think as a general matter we have

20  to repeat all of that and get -- there are multiple concerns

21  about that, one of which is committing the witness, the juror

22  witness, to positions that he'll feel he has said here and has

23  to stick with.  And so digging for details from someone who

24  hasn't prepared by spending time reflecting and recalling all

25  of that will not likely yield reliable answers and, again, it's

1    a matter I covered in the questionnaire.

2          With respect to the specificity of the questions about

3    aggravation/mitigation, I agree, essentially, with the

4    government.  I think that the kinds of categorical questions

5    are really questions about the case and fall into the category

6    of stakeout.  I think it has to be a more general level to be

7    consistent with the principles of those cases.  So -- and -- so

8    anyway, I think I will continue to use the more general level

9    with respect to those.

10         With respect to the -- one final one I guess was

11   raised was what will people think of you if you do this?

12   Again, it's Question 94 that we ask in the questionnaire and

13   people have answered it variously.  Some people say they think

14   they would be criticized for it; some people say they wouldn't.

15   So there's no reason to think that people who answered the

16   questionnaire weren't able to understand that and give us an

17   answer.

18         MR. BRUCK:  If I may, your Honor, Question 94 goes

19   only to the question of penalty.  Our request is not about

20   penalty; it is about guilt.  And that's where the rubber hits

21   the road, I think, in terms of prejudgment in this community.

22   It's the idea of being on a jury that acquits this man and lets

23   him go home, and then people themselves go home and face the

24   members of their family and the people they work with and their

25   neighbors.  And I mean, let's face it, we all know how that

1      would be received.

2            Now, the government may say, Well, it's not likely to

3      happen, and maybe it's not, but we're supposed to have a fair

4      trial.  And the trial is not supposed to be over already on the

5      issue of guilt or innocence.  I think there is such a pervasive

6      sense that "we know he did it" in this community that we're

7      sort of skipping over that.  And the truth of the matter is

8      that there would be such an explosion of outrage if that were

9      to happen.  We know that and these jurors know that.

10           And I think it is critical for the Court to ask them

11     to imagine that and then tell you what they would think

12     themselves, what other people would think of them, and then

13     whether they could really put aside what they've heard.  We're

14     not getting to find out what they've heard; let's at least find

15     out what effect whatever they've heard has had on them.

16           THE COURT:  Anything?

17           MR. WEINREB:  Yes.  Your Honor, we think that question

18     is unnecessary for several reasons:  First of all, it could

19     have been included in the questionnaire, and as far as I know

20     it wasn't even proposed.  I don't think it's appropriate to ask

21     it as a follow-up question in every case -- with every juror.

22           I also think that it's unnecessary to go down that

23     road with every juror, that one could keep asking questions

24     along that line indefinitely, trying to dig down deeper and

25     deeper into whether jurors have foreseen all the possibilities

1    of repercussions if they voted one way or another.  The

2    relevant question is simply whether they can -- sitting here

3    today, believe that they can decide the case on the evidence.

4          I think it's -- that is the question that is

5    traditionally asked, has been asked in voir dire, in my

6    experience in every case, and it seems to have sufficed to give

7    everybody a fair trial up until now, and I don't see this case

8    as being an exception.

9          And the third point I would make is that it's really

10   asking jurors to speculate about a hypothetical matter that

11   they're in no position to answer at this point.  For them to

12   find -- for them to go home and have to tell their friends and

13   family that they were on a jury that found the defendant not

14   guilty, they would have to imagine that the entire jury

15   unanimously found the defendant to be not guilty and that they

16   had discussed the -- they had heard the evidence together, the

17   12 of them had debated it together, had thoroughly gone through

18   it, and were unable to conclude at the end of that process that

19   the defendant was guilty.

20         And that can strongly fortify people in their belief

21   that they have done the right thing.  And I think that the

22   experience this court has had -- this courthouse has had

23   recently with very high-profile trials in which sentiment was

24   very strongly against the potential defendants -- or public

25   sentiment may well have been very strong against the potential

1  defendants, the jurors have shown no hesitation to find

2  defendants not guilty or to make findings in favor of

3  defendants where they have believed that that is the

4  appropriate thing no matter what the public might have

5  thought -- might think about their answer.

6         So I think for all those reasons it's an unnecessary

7  question and a question unlikely to yield reliable, meaningful

8  or useful answers.

9         MR. BRUCK:  If I may so the record is clear, we think

10  that question is most likely to get at the underlying issue,

11  which is whether the juror can presume the defendant guilty,

12  not say he does -- presume the defendant innocent, not to say

13  that he does but really presume -- accord the presumption of

14  innocence.  If that question would be explained and put to the

15  juror, we would be in much better shape, I think, than with the

16  question never being asked.

17         So we ask at least for questions getting at whether

18  the juror is capable of presuming this defendant innocent.

19         THE COURT:  Well, I share the concern that

20  hypothetical questions are troublesome because they do not

21  necessarily produce reliable answers.  What a juror predicts

22  about his behavior on some future occasion after the experience

23  of the full trial is asking for a very -- I think a very

24  speculative answer and it is one that I think

25  different -- people would react differently to and assess

1    according to criteria that we wouldn't be able to understand or

2    process.

3            There are multiple occasions when the jurors will be

4    reminded of the burden of proof and so on with respect to

5    guilt.  This -- to some extent this area is addressed by

6    Question 77 which asks for the jurors' current state of mind

7    and whether they are able or unable to vary that in their

8    sense.

9            Some people say "unable," and we will follow up on

10   that; others say -- at least as one of these have done, say

11   that they were able to.  And I think to ask for more than an

12   assessment of their anticipated openness or not to get a

13   specific answer about reaction to evidence that they haven't

14   heard would, I think, as I say, put us back into a range of

15   speculation that would not be reliable for judgment.

16           So I think the combination of questions concerning the

17   findings in 77, and then with respect to the penalty in the

18   later questions, I think the questionnaire, which was jointly

19   prepared, does a pretty good job of addressing those issues.

20   So I don't think it's necessary.

21           So I guess in summary, the place I do agree with you

22   is we have to look at an openness to someone who may be tending

23   towards a favorable view, death penalty in general, an openness

24   to the alternate conclusion based on the presentation at trial.

25   But I don't think going beyond a general inquiry in that area

1    to get to plug in specific attributes of specific crimes that

2    may be charged here is appropriate or even helpful.

3              MS. CLARKE:  Can we just have one second before we

4    raise a sidebar question?

5              THE COURT:  Is that about the next juror?

6              MS. CLARKE:  The last one.

7              MR. MELLIN:  Your Honor, can I also make one other

8    observation, or ask the Court to consider that when a juror

9    does come in and expresses some equivocation or hesitation in

10   their questionnaire about whether they can impose the death

11   penalty, we would ask the Court to consider asking the question

12   about would they be able to do that.  I think in my experience

13   with these cases, jurors are able to check a box on the

14   questionnaire, but once they've had a chance to go back and

15   think about it, a lot of times, even though they may have

16   philosophically believed in the death penalty and that may be

17   what drove their answer on the questionnaire, when you ask

18   jurors point blank, Would you really be able to go back and

19   vote to impose the death penalty, there are a lot of different

20   answers that jurors give to that type of question.  And that's

21   ultimately what the government is entitled to, which is a

22   death-qualified jury, and it's hard to ferret that out from the

23   questionnaire.

24             THE COURT:  Well, I think my answer is the same as in

25   the other direction.  I think the questionnaire does a good job

1    of that, actually, and we've had people who have said things

2    like that, "I could never do it myself.  I don't want to be

3    responsible for it."  So I don't think it's necessary to repeat

4    that.

5           Again, this is a very thorough questionnaire that was

6    prepared after considerable thought, and I think it's really in

7    areas of ambiguity that I think we should be directing our

8    attention for this process principally.

9           MS. CLARKE:  Your Honor, there is a question --

10   perhaps the government has information.  I think we got it from

11   them -- about this juror with a --

12          THE COURT:  Okay.  Can we --

13          MS. CLARKE:  Sidebar?

14          THE COURT:  Yeah.  Can we cut the audio?

15          (Discussion at sidebar and out of the hearing of the

16   public:)

17   ██████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   █████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████

24        ████████████████████████████████

25        ████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11     And I have another question that requires follow-up.

12     (Discussion off the record.)

13

14

15

16

17

18

19

20

21

22

23

24

25







```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15          (Discussion off the record.)
16          THE COURT:  He's gone.  Our process is that when
17     they're finished here, they're told to go along.
18          MS. CONRAD:  Well, so how should we in the future
19     handle follow-up questions, your Honor?
20          THE COURT:  Are there any other people in this
21     category?
22          MS. CONRAD:  Yes.
23          THE COURT:  Well, if you could tell us who they are in
24     advance, we'll ask them to pause for a moment while we consider
25     that.
```

1          MS. CONRAD:  But we won't also know which questions,

2     for example --

3          THE COURT:  No, but you'll know if there's an

4     inconsistency on the criminal history question.

5          MS. CONRAD:  Well, like on the shelter in place, we

6     don't know if your Honor is going to ask that question or not

7     ask that question.

8          THE COURT:  Well, I generally am not going to repeat

9     questions that are in the questionnaire.  And if it's a

10     relatively unambiguous answer, that's the answer.

11          MS. CONRAD:  I would respectfully request that your

12     Honor ask them where they were on April 15th and on April 19th,

13     2013, because that's going to give us the answers about whether

14     they would have sheltered in place or --

15          THE COURT:  I think it's -- again, you're amending and

16     extending the questionnaire which was jointly proposed and

17     thoroughly addressed all of these areas.  It is the primary

18     instrument of information, and we're following up to clarify

19     things, and that's the principal inquiry here.  It's not a

20     prelude to, you know, an open-ended interrogation of the

21     prospective jurors so --

22          MS. CONRAD:  I don't --

23          THE COURT:  This is not going to be attorney voir dire

24     by indirection.

25          MS. CONRAD:  But, your Honor, I, at least, didn't

1    understand that that was the case.

2             THE COURT:  Well --

3             MS. CONRAD:  I thought that the questionnaire was the

4    initial series of screening questions to determine whether

5    people could be excused for cause based on their questionnaire.

6    I thought based on what your Honor has previously said,

7    including about venue, that there would be a searching voir

8    dire, and a searching voir dire would include where they were

9    on April 19th, whether they sheltered in place, whether they

10   have -- you know, what they've been exposed to in the media.

11            And, for example, with ███████████ , when he says "My

12   wife had a tough time after treating victims in the ICU," what

13   exactly he means by that and how that affects him.  It seems to

14   me that those are appropriate follow-up questions.  And if we

15   can at least have the juror step out after being questioned by

16   your Honor, and at least at that point be asked if we have any

17   follow-up questions as opposed to forecasting before the

18   questions are asked what follow-up questions we might want in

19   response to the jurors' answers -- I think that puts us in an

20   impossible position.

21            And I would respectfully request that after your Honor

22   asks the questions the juror be asked to wait outside and we

23   have an opportunity to propose additional follow-up questions

24   suggested either by the questionnaire or by the answers.  But I

25   don't think we should --

```
 1            THE COURT:  Well, yes.  We will pause with the juror
 2    for that opportunity.  But I want to repeat that the -- again,
 3    much of this has been addressed and we have answers on many of
 4    these questions.  We have shelter-in-place answers in the
 5    questionnaires, and so on and so forth; we have answers about
 6    friends being involved, and so on and so forth.  So I think the
 7    questionnaire has adequately raised those issues and elicited
 8    responses in a general matter, so I don't think we have to
 9    reinvent the entire inquiry.
10            If there are particular ambiguities or if there's
11    potential inconsistencies as with respect to the last juror,
12    then fine.  That can be an appropriate area.  Or if an
13    ambiguity that hasn't appeared to me appears in one of the
14    answers, we can follow up on it.  But it's generally not an
15    opportunity, as I say, for attorney voir dire by indirection,
16    that's all.
17            So we'll proceed with the next one.
18            (In open court:)
19            THE COURT:  Good morning.  Juror No. 9.
20            I just want to follow up on some of the questions
21    you've given us on the questionnaire.  First of all, have you
22    followed the instructions I gave when you were last here to
23    avoid any discussion of the case or any exposure to the media
24    accounts since that time?
25            THE JUROR:  Yes, I did.  I never saw anything on the
```

```
 1   news.
 2          THE COURT:  You haven't talked with people about it?
 3          THE JUROR:  No.
 4          THE COURT:  You are employed as a custodian in a court
 5   facility?
 6          THE JUROR:  Chelsea.
 7          THE COURT:  Chelsea District Court?
 8          THE JUROR:  Yeah.
 9          THE COURT:  What are you duties?
10          THE JUROR:  Maintenance.  I maintain buildings, clean
11   outside, inside the buildings, change light bulbs, and snow
12   removal.
13          THE COURT:  You've done that for some years?
14          THE JUROR:  Almost ten, February 15th, 14th.
15          THE COURT:  You don't use social media?
16          THE JUROR:  No, I don't.  Like going on computers and
17   stuff?
18          THE COURT:  Yeah, Facebook.
19          THE JUROR:  No, no Facebook.
20          THE COURT:  Anything like that?
21          THE JUROR:  No.
22          THE COURT:  Twitter, anything like that?
23          THE JUROR:  No.
24          THE COURT:  Email?  Do you email people?
25          THE JUROR:  Actually, no.  I have email, but I don't
```

1   email anyone.

2          THE COURT:  With respect to the internet, do you use

3   the internet?

4          THE JUROR:  Yeah, I use the internet.  I use YouTube.

5   Mostly do -- I look up TV shows.

6          THE COURT:  I want you to look at Question 77 on Page

7   20.

8          THE JUROR:  All right.

9          THE COURT:  Okay.  This is a question that asked a

10  number of subquestions really about whether you have opinions

11  about things based on your -- pertaining to this case based on

12  your reading things or seeing things in the media or perhaps

13  talking with other people and so on and so forth about it.  You

14  have said that you have an opinion about the defendant's guilt

15  in the case.

16         THE JUROR:  Yeah.

17         THE COURT:  The government has the obligation to prove

18  a defendant guilty by evidence presented at the trial and prove

19  it beyond a reasonable doubt.  While you may have some

20  information about the matter, it will be necessary for you to

21  consider the evidence at trial and decide whether, on that

22  evidence, the defendant is guilty or not.  Would you be able to

23  do that honestly and fairly, or would you be, do you think,

24  perhaps, committed to sticking with an opinion you had on the

25  way in?

1              THE JUROR:  You know, I feel he's guilty, though,

2    because, you know, before this, all the news and everything,

3    before watching it for, like, a couple of days --

4              THE COURT:  Right.

5              THE JUROR:  Yeah.

6              THE COURT:  So you think, no matter what you heard at

7    trial, you would stick with that view?

8              THE JUROR:  Yes, guilty.

9              THE COURT:  Okay.  With respect to a possible penalty,

10   you said that you thought he should not get the death penalty?

11             THE JUROR:  Imprisonment.

12             THE COURT:  Again, is that something that you are

13   committed to on the basis of what you know now, and would you

14   be able to change it either way if you heard something at trial

15   that affected you?

16             THE JUROR:  More towards leaning towards being life

17   without the possibility of parole, though.  I'm more with that.

18             THE COURT:  Okay.  So you don't think that you would

19   be open to other considerations?  You would stick --

20             THE JUROR:  Death penalty?

21             THE COURT:  Death penalty, for example.

22             THE JUROR:  No, I don't think I could consider it.

23             THE COURT:  If you look at Question 90, we gave a

24   number of options as to what your views were.  And that said --

25   the one you selected -- it's on Page 24.

1           THE JUROR:  Do I have it?  Yup, okay.

2           THE COURT:  So there are a number of options.  You

3    circled Option B, which said, "I am opposed to the death

4    penalty and would have a difficult time voting to impose it

5    even if the facts supported it."  That's a little bit different

6    from what you just said.  You said that you would never do it.

7           So the question is:  Would you be open to the death

8    penalty as a possible punishment on the facts and overcome any

9    difficult time that you might have in doing that?  Or is it

10   your view that you're so firm in your view about the death

11   penalty that you would not be open to the possibility of

12   imposing it?

13          THE JUROR:  Yeah.

14          THE COURT:  Which?  Tell me --

15          THE JUROR:  I wouldn't -- without the possibility, I

16   suppose.  I probably -- I probably should have looked at it a

17   little bit better.  Sorry about that.

18          THE COURT:  Tell me again.  Tell me what your position

19   would be.  Would it be something that, even if you had a

20   difficult time doing it, you would be open to doing, or is it

21   that you are so committed against the death penalty that you

22   would not be able to do it?

23          THE JUROR:  Committed against it.  I should have wrote

24   that down.  I'm sorry about that.

25          THE COURT:  Okay.  Thank you.  I'll have you step out.

```
 1              THE JUROR:  Is that it?
 2              THE COURT:  I'll have you step out.
 3              Can we bring in the next juror?  Okay.
 4              Good morning.
 5              THE JUROR:  Good morning.
 6              THE COURT:  Juror No. 10.  So we have your
 7    questionnaire.  You have the original in front of you for
 8    reference, if necessary.
 9              THE JUROR:  Okay.  Thank you.
10              THE COURT:  Tell us about your experience in Taiwan.
11              THE JUROR:  I was there doing research on a Fulbright
12    scholarship, and I was learning Chinese and doing some further
13    research for my Ph.D.
14              THE COURT:  When was that?  When?
15              THE JUROR:  When?  2009 into 2010, nine months.
16              THE COURT:  Your wife is, you say, a research
17    scientist?
18              THE JUROR:  Yes.
19              THE COURT:  Can you give us some idea what her field
20    is?
21              THE JUROR:  She studies biomineralism at the Forsyth
22    Institute in Kendall Square.
23              THE COURT:  What is that?
24              THE JUROR:  How teeth grow.
25              THE COURT:  Okay.  You have a sister who is a judge?
```

```
 1            THE JUROR:  Yes.

 2            THE COURT:  What sort of court does she sit in?

 3            THE JUROR:  Utilities.  She makes decisions on

 4   utilities in Pennsylvania.

 5            THE COURT:  A regulatory --

 6            THE JUROR:  I believe so.

 7            THE COURT:  -- department?

 8            THE JUROR:  Yes.

 9            THE COURT:  When you say "utilities," you mean power

10   utilities, things like that?

11            THE JUROR:  Yes.

12            THE COURT:  And you're a professor of theology at

13   Saint Anselm?

14            THE JUROR:  Yes.

15            THE COURT:  Do you use social media?

16            THE JUROR:  Email.

17            THE COURT:  Only?

18            THE JUROR:  Yes.

19            THE COURT:  No Twitter or Facebook or anything like

20   that?

21            THE JUROR:  No.

22            THE COURT:  What is 350.org?

23            THE JUROR:  It's a concern about climate change.

24            THE COURT:  Are you active in the organization?

25            THE JUROR:  I went to a demonstration in Taiwan.
```

1          THE COURT:  When you were there?

2          THE JUROR:  When I was there, yes.

3          THE COURT:  Since then?

4          THE JUROR:  Since then, no.  My career keeps me quite

5     busy.

6          THE COURT:  We asked a number of questions about

7     attitudes towards various participants in a trial like that,

8     prosecutors, defense lawyers, law enforcement.  And in response

9     to the question about law enforcement officers, you said, "I

10    have witnessed small abuses of authority."  Can you tell us

11    what you had in mind?

12         THE JUROR:  Yes.  An officer throwing on his lights so

13    he can make a left-hand turn into a convenience store.

14         THE COURT:  Does that leave you with any attitudes or

15    feelings towards law enforcement officers generally that would

16    interfere with your ability to fairly judge testimony, for

17    example, from a law enforcement person here?

18         THE JUROR:  Well, since most of the law enforcement

19    officials are federal officials, and these days, in the news,

20    there's been a lot of criticism of how a lot of the evidence is

21    gathered.  So, yeah, I'm slightly suspicious of the Federal

22    Bureau of Investigation.

23         THE COURT:  Would that interfere with your ability to

24    fairly judge evidence from that source?

25         THE JUROR:  I think not.  I think, in terms of making

 1    judgments, the bigger question has to do with the death

 2    penalty.

 3              THE COURT:  We're coming to that.

 4              THE JUROR:  Okay.

 5              THE COURT:  Go ahead.  With respect to assessing the

 6    testimony of law -- we had a specific question actually which

 7    asked you that.  I raise it because of your answer to the other

 8    question.  Actually, if you want to look at it, it's Page 12.

 9    It's Question No. 36, which asked whether you would be able to

10    evaluate the testimony of a law enforcement officer the same as

11    you would any other witness or whether the person's status as a

12    -- or the fact of the employment as a law enforcement officer

13    would itself be a factor in your assessing credibility or

14    incredibility, either way?

15              THE JUROR:  No, I don't think we need to make a bigger

16    deal of this.  I would give a bias in favor of the testimony --

17    of the witness.

18              THE COURT:  You would or wouldn't?

19              THE JUROR:  Would.

20              THE COURT:  You would favor law enforcement testimony?

21              THE JUROR:  I'm saying I would assume that it would be

22    an officer in good standing who has -- I assume that you've

23    already vented -- or vetted the evidence as to how it was

24    gathered and that it's all legal evidence that he would be

25    commenting on.

1           THE COURT:  Well, witnesses come in, take the stand,

2    are asked questions and give answers.

3           THE JUROR:  Yes.

4           THE COURT:  The jurors ultimately will evaluate those

5    answers.  They'll find some true and reliable, and they might

6    find others maybe not true, maybe less reliable.  For every

7    witness, where there's a controverted fact, you may have to

8    make those kinds of judgments.

9           The question is:  Would you give categorical

10   consideration to the fact the person was, for example, an FBI

11   agent in deciding those issues, or would that -- you be able to

12   assess that evidence using the same tools of assessment that

13   you would use on any witness?  Would you treat them

14   differently, I guess, is the question.

15          THE JUROR:  I would not categorically discount an FBI

16   agent's testimony.

17          THE COURT:  Would you automatically credit it?

18          THE JUROR:  No.

19          THE COURT:  Would you look at Page 17 and Question

20   60 --

21          THE JUROR:  Uh-huh.

22          THE COURT:  -- which asks whether the government acts

23   unfairly towards Muslims here or in other parts of the world.

24   You gave a rather extended answer.

25          THE JUROR:  Yes.

 1          THE COURT:  How, if at all, do you think that your

 2     view in this respect would affect your evaluation of the

 3     evidence in this prosecution?  Would it affect it greatly, not

 4     at all, somewhere in the middle --

 5          THE JUROR:  I'm --

 6          THE COURT:  -- irrelevant?

 7          THE JUROR:  I'm going to be asking questions of the

 8     evidence, but my assumption is, is that the counselors will

 9     discuss whether -- and you will decide whether evidence is

10     admissible, whether it was rightfully gathered or if it was

11     illegally gathered and so forth.

12          THE COURT:  Is that your concern, about the abuse of

13     obtaining information essentially?

14          THE JUROR:  Yes.

15          THE COURT:  Look at Page 20 and Question 17.  This

16     asks about --

17          THE JUROR:  What question?

18          THE COURT:  77.  Did I say 17?  77.

19          THE JUROR:  Okay.

20          THE COURT:  This asks about whether you've formed an

21     opinion as to various matters:  whether the defendant was

22     guilty, whether he's not guilty, whether he should receive the

23     death penalty, whether he should receive -- should not receive

24     the death penalty.  And for all of those you said "unsure," and

25     you wrote questions in the margin.  "What are the charges?"

1    "What is the alternative?", and so on.  Can you tell us what

2    you were thinking when you answered the question?

3            THE JUROR:  Well, it's only until latter pages that I

4    realized that he's accused of 17 different charges.  In order

5    to answer these questions, I would have to know specifically

6    what those charges are and so forth.  So I can't answer a

7    question regarding his guilt or the decisions that come from

8    his guilt or innocence unless I know what the charges are.

9            THE COURT:  Okay.

10           THE JUROR:  Is he guilty?  What's the charge?  What if

11   he's not guilty?  What's the charge?

12           THE COURT:  To answer that question --

13           THE JUROR:  I want to know what the charges are.

14           THE COURT:  And the evidence, I presume, that is

15   presented with respect to that charge?

16           THE JUROR:  Yes.

17           THE COURT:  Do you understand the government has the

18   burden to prove any charge beyond a reasonable doubt by the

19   evidence?

20           THE JUROR:  Yes.

21           THE COURT:  You would be able to apply that standard?

22           THE JUROR:  Yes.

23           THE COURT:  Hold the government to that proof?

24           THE JUROR:  Yes.

25           THE COURT:  And with respect to the penalty

1    possibilities, which are C and D of that question --

2              THE JUROR:  Yes.

3              THE COURT:  -- again -- well, why don't you tell me.

4              THE JUROR:  At this point, my question is:  What's the

5    alternative?  At this point, and perhaps later in the

6    questionnaire, it was quite clear that the alternative is life

7    imprisonment without release.  I will not vote for the death

8    penalty with that option.

9              THE COURT:  Under any circumstance?

10             THE JUROR:  Under any circumstances.

11             THE COURT:  You've actually posited one circumstance,

12   but it's probably an unlikely one, that is, the failure of the

13   prison system.

14             THE JUROR:  Should the walls come down and we need to

15   protect innocent lives, then one could enforce the death

16   penalty.  But our prison system, I think, is generally

17   reliable, and I think the public will be safe from any further

18   harm from a potential killer.

19             THE COURT:  If you look at Page 23, the question -- so

20   Question 88 gave your kind of summary opinion which is similar

21   to what you just said, I guess?

22             THE JUROR:  Yes.

23             THE COURT:  Question 89, you circled -- on the scale

24   of 1 to 10, you circled No. 2.  One might have thought, given

25   your answer to 88, you might have circled No. 1.  Is there some

1    reason why you chose 2 instead of 1?

2          THE JUROR:  "Please circle one number that indicates

3    your opinion about the death penalty."  A "1" reflects a belief

4    that a death penalty should never be imposed.  I said, "My

5    opinion is not that it should never be imposed but should never

6    be imposed when a modern prison system is available."  That's

7    the "2."

8          THE COURT:  Okay.  All right.

9          THE JUROR:  I'm very suspicious of questions that use

10   "always," "never," "any," these sorts of things.

11         THE COURT:  Turn the page to the next question, 90.

12   You circled "E," which said you could vote for -- you're in

13   favor of the death penalty but could vote for life

14   imprisonment.  That seems inconsistent.

15         THE JUROR:  I'm in favor of the death penalty, but I

16   could vote for a sentence of life imprisonment without the

17   possibility of release if I believed that the sentence was

18   called for by the facts and the law in the case.

19         As I read that, as I said, that the death penalty is a

20   possibility but only if that -- there's some possibility of a

21   person not being contained.  I'm trying to use your answers

22   that you provide to your questions.  So I think by now my

23   position is pretty clear.

24         THE COURT:  When you say you're in favor of the death

25   penalty, you are to the limited extent you described, is that

1  it?

2          THE JUROR:  In theory, I'm open to it.  In practice --

3          THE COURT:  If there's a prison system that's

4  adequate, then you would not be; am I correctly understanding

5  you?

6          THE JUROR:  That's correct, yeah.

7          THE COURT:  But that is more or less absolute.

8  There's no --

9          THE JUROR:  That's what we're getting to.  There's no

10 way in modern America today and starting over the course of

11 this trial that I'm going to vote for the death penalty.  I

12 will not.

13         THE COURT:  Question 94, we asked about what -- how

14 people might react to your service.

15         THE JUROR:  Yes.

16         THE COURT:  You said you might be denied tenure.  Why

17 would you think that would happen?

18         THE JUROR:  Because --

19         THE COURT:  Somebody said something to you about that?

20         THE JUROR:  I'm a Catholic theologian.  The position

21 of the Catholic church, it's not dogma, but it's, as taught by

22 John Paul II, who's just been sainted, that the position is, as

23 I just described, that the innocent lives need to be protected

24 and that the death penalty should only be used in instances to

25 protect the innocent.  So if somehow my colleagues think that I

1   voted for the death penalty -- which my understanding is, you

2   need a full jury, correct, to get the death penalty?  Then they

3   would wonder what I know about Catholic social ethics.

4           Related to my profession -- again, I think I wrote

5   somewhere in here that, you know, there's no inconvenience to

6   me serving on a jury, and that's true.  But if I may plead for

7   my students, we're well into the semester, and I'm teaching

8   courses that only I can teach.  If I'm called to jury duty,

9   this would create a very difficult situation for a great many

10  people at my institution.

11          THE COURT:  Okay.  Thank you.  You may step out.

12          THE JUROR:  Thank you.

13          THE COURT:  Does anyone need a break?

14          MR. WEINREB:  That's five.

15          THE COURT:  Why don't we take a short break.

16          MR. WEINREB:  Uh-huh.

17  (Recess taken at 11:28 a.m.)

18  (The Court entered the room at 11:44 a.m.)

19  (SIDEBAR CONFERENCE AS FOLLOWS:

20          MR. WEINREB:  Your Honor, we were --

21          THE COURT:  Is the audio on or off?

22          MR. WEINREB:  It's off.  I believe he starts it when

23  you're ready, your Honor.

24          THE COURT:  Keep it off for a minute.

25          MR. WEINREB:  We were just going to propose that, for

1    doing the strikes, we keep it off as it's normally done.

2            THE COURT:  Right.  We had talked about talking about

3    it after each five.  I'm concerned about the time.  We have

4    another panel.  So I'm just wondering if we should reconsider

5    that.  Would it be adequate for everybody sort of take note of

6    their positions, and we can do it all at once once we've been

7    through all the jurors?

8            MR. WEINREB:  All today's jurors?

9            THE COURT:  All -- no, no, just -- even after the

10   first 20.

11           MR. WEINREB:  That's fine by the government.

12           THE COURT:  I think I'd like to just keep going.

13           MS. CLARKE:  We'll be going until 6:00 tonight if --

14   I'm not complaining.

15           MR. WEINREB:  That's fine.

16           THE COURT:  We'll proceed with the next juror.

17           MR. WEINREB:  Actually, your Honor, before we proceed

18   with the next juror -- this can be on the record.

19           THE COURT:  Okay.  Go ahead.

20   .  .  .  END OF SIDEBAR CONFERENCE.)

21           MR. WEINREB:  So we wanted to actually revisit for one

22   moment the issue of how the *Morgan* question should be asked

23   because I think that in the back and forth that the parties

24   engaged in over how it should be asked, there's a formulation

25   that the government had proposed that also didn't make it into

1    the questionnaire.  And although I think the Court has

2    effectively asked it in the way that it has questioned the

3    jurors so far, I think that in an excess of caution, to make

4    sure that the record is clear, that the defendants are being

5    asked the precise question that *Morgan* require it be asked, we

6    would ask that each juror be asked that, if the defendant is

7    found guilty of a capital crime and the case proceeds to a

8    penalty phase, would you be able to meaningfully consider both

9    aggravating and mitigating factors in reaching a penalty

10   decision?

11        "Meaningfully consider" is the phrase that *Morgan*

12   calls for.  It's the ability to meaningfully consider

13   mitigating factors that was the essence, the key question, at

14   issue in *Morgan*.  And we do believe the jurors should be asked

15   on the record if they will meaningfully consider mitigating

16   factors without further elaboration.

17        MR. BRUCK:  Well, we think there are two things

18   missing from that.  One is:  Found guilty of what?  A capital

19   crime doesn't tell the juror anything.  And the capital crimes

20   charged in this case include use of a weapon of mass

21   destruction.  If we conceal that from the juror in asking the

22   question, it doesn't tell us anything that is legally

23   significant under *Morgan*.

24        The second thing is that Mr. Weinreb's formulation

25   doesn't include the possibility that, after considering the

1    aggravation and mitigation, the juror could potentially vote

2    for a life sentence rather than the death penalty.  That's what

3    *Morgan* is all about.

4         The problem with not being able to consider a life

5    sentence is that the juror wouldn't consider mitigation, but

6    you can't substitute "would you meaningfully consider

7    mitigation" or "could you ever impose a life sentence on

8    someone that you convicted of using a weapon of mass

9    destruction resulting in death?"  That's the *Morgan* question.

10        MR. WEINREB:  If I could briefly respond, your Honor.

11   So I understand that that is Mr. Bruck's understanding or

12   theory of what *Morgan* holds, but I don't believe that is

13   literally what *Morgan* holds.  I believe that would be an

14   extension of *Morgan* beyond what the Supreme Court held; and,

15   therefore, there's no existing legal problem with the Court

16   asking the question the way that the Supreme Court in *Morgan*

17   said it needed to be asked.

18        And that's why -- and there is case law, as the Court

19   is aware and has cited, that disapproves of asking these kinds

20   of case specific questions because it asks the jurors to stake

21   out a position ahead of time.  And so we continue to oppose

22   that.

23        As for the issue that one must go beyond asking

24   whether the jurors could meaningfully consider mitigating

25   factors and ask them if they could, in addition, sentence the

1    defendant to life imprisonment without parole, that is subsumed

2    in the *Morgan* question.

3           So what was at issue in *Morgan* was that defendant's --

4    a juror's ability to follow the law as the Court gives it to

5    the jurors.  And the question in *Morgan* was -- the holding in

6    *Morgan* was that if jurors could not meaningfully consider

7    mitigating factors they effectively could not be fair and

8    impartial jurors because they were not following the law which

9    requires them to balance or weigh mitigating against

10   aggravating factors.

11          So if they say they can meaningfully consider

12   mitigating factors, that is what the law requires.  And that's

13   all that they, in the government's view, *Morgan* requires that

14   they be asked.

15          THE COURT:  Well, I think we -- I understand the

16   defendant's position.  I think we've talked about this a couple

17   of times.  I do think the additional specifics referencing the

18   specific -- drawing attention to specific circumstances, either

19   by the nature of the offense or by the identifying categories

20   of victims and so on, is more specific than is called for and

21   gets into the stakeout territory.

22          I would, I guess, add that the jurors know that this

23   is about a bombing, and they know that there are three people

24   who were killed in the bombing.  So in light of what we've also

25   heard about, what people understand from the media about the

1   case, is they have those specifics already in their minds as

2   they would answer the question about the ability to

3   meaningfully consider life imprisonment in this case.  In other

4   words, what they've -- even just as it's been framed in my

5   preliminary instructions, by telling them what the offenses

6   were in general, they have those specifics, and I think that's

7   sufficient under the circumstances.

8           Okay.  Let's proceed with No. 11.

9           THE JUROR:  Do I sit?

10          THE COURT:  Please.

11          THE JUROR:  Good afternoon.

12          THE COURT:  Good afternoon.  It's getting there.  I

13  appreciate your patience.

14          Have you been able to, since the last time you were

15  here, avoid any exposure to the case in the media or from

16  talking with anybody?

17          THE JUROR:  I don't talk to anybody, so, no, I don't

18  --

19          THE COURT:  Okay.  You have not talked about the case

20  with anybody?

21          THE JUROR:  No one's business.

22          THE COURT:  Tell me a little bit about your work.

23  You're a software engineer?

24          THE JUROR:  I am a contractor presently.  It's going

25  to present a little bit of a financial hardship if I'm going to

1    be here for three months.  That's probably a $20,000 hit I'm

2    going to have to take.

3            THE COURT:  How do you organize your business and

4    operate?  What do you do?

5            THE JUROR:  I work at home for a contracting position.

6    I work for a company here in Boston.  I do programming work.

7            THE COURT:  You do it at home?

8            THE JUROR:  Yes, I do.

9            THE COURT:  So you do it -- are you on a daily

10   business schedule, or do you kind of make your own schedule?

11   In other words, do you have to be available when somebody else

12   is in the office nine to five, or do you make your own

13   arrangements?

14           THE JUROR:  I have to be available during the day.

15           THE COURT:  Available remotely?

16           THE JUROR:  Available remotely, yes.  They contact me

17   via email or they call me on the phone.

18           THE COURT:  How are you -- how do you earn your

19   compensation?  Is it you -- you're a contractor.  You bill for

20   your hours or something?

21           THE JUROR:  I do.

22           THE COURT:  Is that it?

23           What kinds of programs do you work on?

24           THE JUROR:  I work for a financial institute right

25   now.  They do all sorts of information on their financial

1    business, mergers and so on.

2         THE COURT:  You told us in the questionnaire that you

3    and your wife have two patents.

4         THE JUROR:  Yes, we do.

5         THE COURT:  What are the subject matters of the

6    patents.

7         THE JUROR:  One is for a towel rack that -- it's a

8    towel that doesn't fall on the floor.  The other one is this

9    device for dieters and diabetics, for bariatrics people, to

10   measure their food.

11        THE COURT:  How measure?  By weight, by volume?

12        THE JUROR:  You can actually put the food in it if you

13   want to.  Most people just put it off to the side and realize

14   what they're supposed to eat and not supposed to eat.

15        THE COURT:  When do the patents date from?

16        THE JUROR:  The first one is from 2001.  The last one

17   is from 2011, I believe.

18        THE COURT:  With respect -- so with respect to social

19   media, you use them sometimes?

20        THE JUROR:  I use Facebook on occasion.

21        THE COURT:  Anything else?

22        THE JUROR:  No.

23        THE COURT:  Have you used it to comment about this

24   case at all?

25        THE JUROR:  (Shakes head.)

 1          THE COURT:  Or view comments about the case?

 2          THE JUROR:  I don't, no.  That's no one's business.

 3          THE COURT:  We asked some questions about religious

 4   practices or views.  One of them was whether you're familiar

 5   with the teachings of Islam.  And you checked the box that said

 6   -- and you can look at it if you want.  That's your

 7   questionnaire -- "not at all familiar."  Then you wrote

 8   underneath it, "And don't care to learn."  Could you tell us

 9   what prompted you to add that?

10          THE JUROR:  I'm a Christian, and I don't really want

11   to -- I don't really care to learn anybody else's religion.

12   That's my own personal choice.  I'm a lax Christian to start

13   with anyway.  Why should I learn somebody else's religion?  Why

14   is it important it me?

15          THE COURT:  So is it to other religions generally, or

16   is it to any religion, Islam --

17          THE JUROR:  Any religion.  I don't care about anybody

18   else's religion.  Practice what you please.  Don't throw it in

19   my face.

20          THE COURT:  So it wasn't particular to Islam?

21          THE JUROR:  No.

22          THE COURT:  I'd like you to use the questionnaire and

23   turn to Page 20 if you would.

24          THE JUROR:  Uh, oh.  Did I say something bad?

25          THE COURT:  No.  I just want to explore.  Question 77.

1             THE JUROR:  Yes.

2             THE COURT:  We asked about, as a result of what you've

3    seen or read in the media and maybe from other sources, whether

4    you'd formed an opinion about the defendant's guilt or not and

5    about what -- if he were guilty, what penalty might be imposed.

6             THE JUROR:  Okay.

7             THE COURT:  You checked "unsure" throughout.  Then you

8    wrote, "I am unsure at this stage."  Could you perhaps tell us

9    what you were thinking when you gave us those answers?

10            THE JUROR:  I'm unsure.  I don't know this guy over

11   here from Adam.  They arrested him.  I don't know anything

12   about it.  I wasn't really following the case.

13            THE COURT:  So if you were a juror and had to decide

14   those questions, whether he was proved guilty or not by the

15   government and, if so, what the penalty should be, what would

16   you -- what would you base your judgment on?

17            THE JUROR:  On evidence, what everyone said, what the

18   witnesses would say.

19            THE COURT:  Okay.

20            THE JUROR:  I don't get swayed by the media.  I don't

21   get swayed by anybody.

22            THE COURT:  We asked you -- I'm looking now at Page

23   23.

24            THE JUROR:  Uh, oh.

25            THE COURT:  We asked you, in Question No. 88 -- it was

1    noted that there are 17 counts in the Indictment that charge

2    Mr. Tsarnaev with a capital crime.  And if he's found guilty of

3    those, then the consideration will be what the penalty would

4    be.  And we asked for your general views on the death penalty.

5    What you wrote is, "Justice is justice."  Could you perhaps

6    expand on that and tell us what generally your view of the

7    death penalty is?

8            THE JUROR:  If you deserve it, you deserve to die.

9    You know the -- we live in a society, if you break the rules,

10   you don't deserve to live with the rest of us.  I don't think

11   that's really hard to understand.  I don't think wasting away

12   in prison does anybody any good.  It's not a deterrent.

13           THE COURT:  We asked on the next question for you to

14   kind of give us, on a scale of 1 to 10, what your opinion of

15   the death penalty was, with 10 being "strongly favor."  And you

16   circled 9.  Does that accurately represent --

17           THE JUROR:  Yes.

18           THE COURT:  So it's not 10, right?  You had some --

19   you stopped --

20           THE JUROR:  Oh.

21           THE COURT:  From the top of the scale.

22           THE JUROR:  Okay.

23           THE COURT:  Do you have some reservation about it in

24   some circumstances?

25           THE JUROR:  Only if you execute the wrong guy.  But if

1    you execute the right guy, I have no problem whatsoever.

2         THE COURT:  If you look at the next page, we asked

3    again a series of multiple choice, about how you would describe

4    your feelings.  The one you circled said that you're strongly

5    in favor of the death penalty, which you just said.

6         THE JUROR:  Yes.

7         THE COURT:  And you would have a difficult time voting

8    for life imprisonment, without the possibility of release,

9    regardless of the facts.  The next question said you would

10   never do it.  This said you would have some difficulty doing

11   it.  The question is:  If the defendant were convicted of a

12   capital offense and the jury proceeded to determine what the

13   appropriate penalty would be, could you meaningfully consider

14   both aggravating and mitigating circumstances in deciding on

15   whether the penalty should be death or life imprisonment

16   without release?  Could you give meaningful consideration to

17   both aspects?

18        THE JUROR:  I didn't understand the question.  I

19   apologize.

20        THE COURT:  Okay.  If the defendant's found guilty of

21   any offense that carries the possibility of a death penalty --

22   obviously, if he's not convicted of an offense that carries the

23   death penalty, the death penalty question goes away.  So it

24   arises if he's convicted of a crime that could potentially be

25   punished by death.

1              In that circumstance, the parties will present -- the
2    government will present aggravating circumstances that would
3    argue, perhaps, in favor of the higher penalty.  The defense
4    will suggest that there are mitigating circumstances that
5    should be taken into account that would point against the death
6    penalty and towards life imprisonment instead.
7              And the question is:  Could you give meaningful
8    consideration to all the evidence, including the evidence of
9    mitigating circumstances, in deciding whether, in this case,
10   the death penalty should be imposed or life --
11             THE JUROR:  You're asking if I can discern the
12   difference.  Yes, I can.
13             THE COURT:  You can?
14             THE JUROR:  Yes.
15             THE COURT:  Give meaningful consideration --
16             THE JUROR:  I will.
17             THE COURT:  -- to things that would point against the
18   death penalty?
19             THE JUROR:  I could.
20             THE COURT:  We asked you in sort of summary form in
21   Question 95 and 96 something similar, and that is, in 95, if
22   you thought, after hearing all the evidence, assuming a finding
23   of guilty, you could (a) in 95, conscientiously vote for the
24   death penalty; or (b), in 96, you also said you could
25   conscientiously vote for life imprisonment.  And I would gather

1    that is dependent on how you consider the evidence in the case,

2    is that --

3              THE JUROR:  That's correct.

4              THE COURT:  So is it -- while you tend to be strongly

5    in favor of the death penalty, you would not automatically

6    impose it?

7              THE JUROR:  That's correct.

8              THE COURT:  Okay.  Thank you.

9              THE JUROR:  Thank you, everyone.  Do I keep -- what do

10   I do?

11             THE CLERK:  Just follow the --

12             MS. CONRAD:  There's a matter that needs to be heard

13   at sidebar about the next juror.

14             THE COURT:  Before we see him?  Hold off for a second.

15   (SIDEBAR CONFERENCE AS FOLLOWS:

16   ██████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ███████████████████████████████████████████

20   ██████████████████████████

21   █████████████████████████████████████

22   ███████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████







15          MS. CONRAD:  Was your Honor planning to ask about his

16   brother who fought in Vietnam and received a Purple Heart?

17   That's -- I didn't see that --

18          THE COURT:  I can.

19          MS. CONRAD:  That's 31 and 32.

20          THE COURT:  A number of these people have had military

21   family members.  Generally, it seems incidental.  But somebody

22   wounded in combat, I think, might be a little bit different.

23   All right.  Why don't we have him come in.

24          MS. CLARKE:  Judge, I don't want to go backwards too

25   far, but if I could just ask you, for future purposes -- and

1    perhaps if that juror is still available -- he was a little

2    grumpy.  The last juror that we just had was a little grumpy

3    about his hardship, and it was really an economic problem for

4    him.  You know, I'm assuming he would probably be removed for

5    the hardship.  But if we could ask how distracting service

6    would be with that hardship if the parties -- if the Court

7    doesn't excuse.

8            And then the other thing, I think the Court

9    highlighted a lot of the inconsistency on his death penalty.

10   He's pretty consistent, that if you are convicted, if you break

11   society's rules, you're out.  And my concern is that he talked

12   in one question about life is only 20 years.  This is a guy

13   that tried to give the "I won't be automatically in favor of

14   the death penalty," but I don't think he understood what

15   capital crime was.  You just felt like he is an automatic death

16   penalty juror who was trying to give the socially appropriate

17   answer to the Court's question.

18            THE COURT:  Okay.

19            MS. CONRAD:  There was also a comment he made, I

20   think, on 8 -- 91 that wasn't asked about.

21            THE COURT:  We'll go back on audio and we'll bring in

22   -- we'll get to the relevant question in course.  There are a

23   few things I'm going to ask him before that, and then we'll cut

24   the audio again.

25   .  .  .  END OF SIDEBAR CONFERENCE.)

```
 1              THE CLERK:  14.

 2              THE COURT:  Good afternoon.

 3              THE JUROR:  Good afternoon, your Honor.

 4              THE COURT:  We asked you when you were last here and

 5   filling out the questionnaire to refrain from talking about the

 6   case with anybody.  Have you been able to abide by that

 7   instruction?

 8              THE JUROR:  Yes.

 9              THE COURT:  And to avoid any media accounts of the

10   case or anything relating to it?

11              THE JUROR:  Yes.

12              THE COURT:  So we have your questionnaire.  You have a

13   copy there.  I want to ask you some follow-up questions on some

14   of the things that have been in the questionnaire.

15              It appears that you don't have any particular

16   difficulty with the schedule in the case, is that correct?

17              THE JUROR:  No, no, your Honor.

18              THE COURT:  With regard to social media, you said in

19   Question 30 you use Facebook about once a day?

20              THE JUROR:  Yes.

21              THE COURT:  What do you do on Facebook?

22              THE JUROR:  I just communicate with friends and talk

23   to my children, see what they're up to.

24              THE COURT:  Have you talked about this case?

25              THE JUROR:  No, no, sir.
```

```
 1              THE COURT:  You had a brother who served in Vietnam
 2   and was wounded there?
 3              THE JUROR:  Yes.
 4              THE COURT:  Received a Purple Heart, I guess?
 5              THE JUROR:  Yes.
 6              THE COURT:  Does that have any ongoing effect on your
 7   view of public affairs or things like that?
 8              THE JUROR:  No.  He's quite a bit older, and I was
 9   pretty young at that time.
10              THE COURT:  So if you were a juror in this case
11   assessing things that may -- and we talked about it a little
12   later in the questionnaire -- may be seen as some part of war
13   on terror or something like that and military involvement,
14   would your brother's service and his having actually been
15   wounded have any effect on your evaluation and assessment of
16   that kind of evidence or those kinds of issues?
17              THE JUROR:  I don't think so.
18              THE COURT:  Let's cut the audio.
19   (SIDEBAR CONFERENCE AS FOLLOWS:
20   ███████████████████████████████████████████████████
21   ██████████████████████████████████████████████
22   ████████████████████████████████████████████████████
23   ███
24   █████████████████████
25   █████████████████████████████████████████████
```



1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████████

4  ███████████████████

5       █████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ██████████████████████████

9   .   .   .   END OF SIDEBAR CONFERENCE.)

10       THE COURT:  Okay.  You told us -- one of the questions

11  you answered -- if you want to look -- that's your

12  questionnaire.  You can follow through, and it might help

13  sometimes if you see what I'm looking at.  I'm looking at Page

14  15, Question No. 50, that says you have followed this case from

15  the start.

16       THE JUROR:  Yes, sir.

17       THE COURT:  Let's go back on the audio.  I'm sorry if

18  we didn't --

19       We back on?

20       MR. DOREAU:  It's not back on yet, no.

21       THE COURT:  Question 50.  You said you followed this

22  case from the start.  Could you tell us how you followed it and

23  perhaps why?

24       THE JUROR:  I watch Fox News probably almost every

25  night.  I listen to a lot of talk radio, the Howie Carr Show;

1   Michael Siegel, who's on now.  Almost every day on the way

2   home, I've been following the whole case.  I remember seeing it

3   from when it started on the television, when the defendant --

4   they found him in the boat, his brother being --

5           THE COURT:  Do you continue to listen to Fox News and

6   Howie Carr and so on?

7           THE JUROR:  Yes, sir, every day.

8           THE COURT:  Are they talking about this case?

9           THE JUROR:  They have been here and there, yes.

10          THE COURT:  Do you continue to listen when they do

11  that?

12          THE JUROR:  It's just -- yes.  It's part of my regular

13  routine.

14          THE COURT:  Let me look at No. 65.  You answered --

15  this is a question specifically about the defendant and his --

16          THE JUROR:  65, your Honor?

17          THE COURT:  Yes.  It's on Page 18.

18          THE JUROR:  18.

19          THE COURT:  It's about where the defendant was born

20  and so on and so forth.

21          THE JUROR:  Yeah.

22          THE COURT:  In response to that you said, "I feel the

23  defendant is guilty and have felt this way from the start."

24          THE JUROR:  That's correct.

25          THE COURT:  And in Question No. 74 and 75, you say a

1    variation of that.  "I feel biased and have made up my mind

2    already."

3              THE JUROR:  That's correct.

4              THE COURT:  So if you were a juror in this case, would

5    you be able or unable to come to a decision on the basis of

6    what's produced in the trial as evidence, or would you be so

7    convinced in advance that whatever the evidence was wouldn't

8    really affect you one way or the other?

9              THE JUROR:  I don't think I would be able to change my

10   opinion that I've felt, wouldn't be able to be biased.

11             THE COURT:  I think you mean unbiased.

12             THE JUROR:  I mean, I wouldn't be able to be

13   non-biased, is what I mean, yes.  I wouldn't be able to change

14   my feelings, to be honest with you.

15             THE COURT:  Now, is that about the question of whether

16   he is guilty of the offenses or whether he should get the death

17   penalty versus life imprisonment or both?

18             THE JUROR:  Probably both.  I feel that the death

19   penalty -- I feel like it applies to certain cases.  This one,

20   I particularly feel like it does apply.

21             THE COURT:  If the defendant is convicted of a crime

22   that carries the possibility of a death penalty, there will be,

23   as I've told you, a penalty phase, and there will be

24   considerations presented probably by both sides, some tending

25   to show the appropriateness of the death penalty, some perhaps

1  tending to show the appropriateness of life imprisonment as an

2  alternative.

3        After that presentation, would you be able to weigh

4  the evidence that might tend away from the death penalty as

5  well as the evidence that might support it and come to your own

6  new conclusion if that's -- if it would be a new one, or are

7  you so --in your mind, are you so convinced that the death

8  penalty is appropriate here that you would probably not change

9  your mind based on the evidence in a penalty phase?

10        THE JUROR:  That's how I feel, that I wouldn't be able

11  to change.

12        THE COURT:  The second?

13        THE JUROR:  Yes.

14        THE COURT:  Okay.  Thank you.  You may step out.

15        MR. BRUCK:  Your Honor, please, I think there might be

16  jurors for whom -- if the party favored by an expressed biased

17  is willing to sort of pull the plug, which I sensed the

18  government was willing to do quite some time ago for that

19  juror, at least a little while ago, it might be efficient if

20  the Court were simply to cast a glance over to one side or

21  another and say --

22        MR. CHAKRAVARTY:  Your Honor, I can agree with that.

23        THE COURT:  Maybe I can give you a red flag you can

24  put in your sock or something.

25        MR. WEINREB:  Your Honor, all joking aside, I do think

1   that would speed the process.

2           THE COURT:  I guess what I need is a mirror, but I'll

3   try to glance around, I guess.

4           MS. CLARKE:  (Indicating.)

5           MR. MELLIN:  Your Honor, if we speak up, if we could

6   have a moment or something like that?

7           THE COURT:  I guess I will probably recognize the

8   possibility and maybe that's when I can see if anybody wants to

9   continue.

10          MS. CLARKE:  On that note, are we on?

11          THE COURT:  Are we on -- cut it for a minute.

12  (SIDEBAR CONFERENCE AS FOLLOWS:

13          MS. CLARKE:  On the next one, the parties agree --

14          THE COURT:  I know, but I don't -- I don't want her to

15  know that or the others.

16          MS. CONRAD:  The one after that --

17          THE COURT:  This is going to be brief, but I

18  understand that this is an agreed excuse.  But rather than just

19  send her on her way, we're going to treat her like everybody

20  else but --

21          MS. CLARKE:  But she's gone?

22          THE COURT:  If the parties agree on it, she will be

23  excused.

24          Back on.

25  .  .  .  END OF SIDEBAR CONFERENCE.)

```
 1                THE CLERK:  15.

 2                THE COURT:  Good afternoon.

 3                THE JUROR:  Good afternoon.

 4                THE COURT:  I had previously instructed all the jurors

 5      to avoid any discussion of the case after that session and

 6      until now.  Have you been able to abide by that?

 7                THE JUROR:  Yes, sir.

 8                THE COURT:  Have you avoided any media about the case?

 9                THE JUROR:  Yes, sir.

10                THE COURT:  Tell me about your use of social media.

11                THE JUROR:  I use Facebook, Instagram and Pinterest,

12      but I do it based off of my job.  I am a makeup artist, so I

13      take pictures of myself and show them off and try to gain

14      business through that material.

15                THE COURT:  I just want to follow up on some of the

16      questions.  And you have the questionnaire there if you want to

17      look along.  Let me ask you to turn to Page 20, Question 77.

18      We asked about whether, based on things you'd seen in the media

19      or heard from other people, you had formed an opinion about,

20      first, whether the defendant was guilty or not and, second,

21      whether he should receive the death penalty.  And you answered,

22      yes, you had an opinion about his guilt and, yes, you had an

23      opinion about his -- that he should receive the death penalty.

24      Can you tell us what led you to make those conclusions?

25                THE JUROR:  I feel as if it was a capital punishment.
```

1   I believe in the death penalty in this particular situation.

2          THE COURT:  Is it the case that you, based on what you

3   understand anyway, given the nature of the crimes involved

4   here, that you would be firmly for the death penalty and unable

5   to consider the alternative of life imprisonment?

6          THE JUROR:  If it was a capital crime, I believe I

7   would still feel as firmly with the death penalty.

8          THE COURT:  A capital crime is any crime for which the

9   death penalty might be imposed.  So there's always the

10  question, even on conviction of a capital crime, whether it

11  should be imposed.  I guess that's the question.

12         THE JUROR:  I still have firm faith, yes, sir.

13         THE COURT:  Okay.  Thank you.  Why don't you step out.

14         THE COURT:  This is Question 40?

15         MS. CONRAD:  Question 40, yes, your Honor.  And the

16  document that I handed up indicates that this juror had an

17  arrest for assault and battery in 2012, and the charges were --

18         THE COURT:  I'll ask him about it.  I see it was...

19         Back on.

20         (In open court:)

21         MR. BRUCK:  Excuse me.  Before the juror comes in, if

22  we could, when you ask him -- when you ask him about it, could

23  the Court simply ask the juror if -- whether this is the answer

24  to the question rather than making it clear that you already

25  know there's something else, and see whether the juror still

```
 1    says, No, that's it.  It might be more revealing on the
 2    question of credibility.
 3             In other words, I guess if he learned about it, if
 4    someone is concealing something, you would be giving them a
 5    little more rope, and we might learn more if he still says, No,
 6    that's it, and then you'd say, Well, what about this, rather
 7    than making it clear from the beginning he's already
 8    backpedaling and say --
 9             THE COURT:  All right.  I can think of asking it that
10    way.  Okay.
11             (Pause.)
12             (The juror enters the courtroom.)
13             THE COURT:  This is Juror No. 16.
14             THE JUROR:  Good afternoon.
15             THE COURT:  Good afternoon.
16             Have you abided by the instruction I gave when you
17    were here last time to avoid any discussion of the case with
18    anyone or any exposure to media or other sources of information
19    about it?
20             THE JUROR:  Yes, your Honor.
21             THE COURT:  Okay.  I have a few questions to follow up
22    with you on the questionnaire, and there's -- it's in front of
23    you if you want to look at it at any time.
24             THE JUROR:  All right.
25             THE COURT:  I'd like you to look at Question 11 and --
```

```
 1              THE JUROR:  Yes.
 2              THE COURT:  Would that prevent -- present any issue
 3     of -- extended sitting in the courtroom or anything?
 4              THE JUROR:  No, I don't believe it would if --
 5              THE COURT:  So we usually sit, you know, roughly
 6     speaking, in two-hour blocks, two hours and then take a break
 7     and then --
 8              THE JUROR:  No.  I think if I was empaneled, I would
 9     watch my fluid intake and I would be fine.
10              THE COURT:  All right.  Let me ask you, you're
11     employed as a limo driver?
12              THE JUROR:  Yes, as an independent contractor.  Yes,
13     sir.
14              THE COURT:  Okay.  In Question 27 it says that you are
15     unemployed due to an auto accident.  Is that --
16              THE JUROR:  No, I'm unemployed due to a work injury.
17     Did I put auto accident?
18              THE COURT:  Yeah.
19              THE JUROR:  I recently had an auto accident, but the
20     unemployment -- the disability is due to a work injury that I
21     had.
22              THE COURT:  What kind?  You don't have to get too
23     specific.
24              THE JUROR:  Cervical.  I have cervical hardware in my
25     neck.  But it doesn't prevent me from --
```

1            THE COURT:  Was the accident before you started

2   driving as a limo driver?

3            THE JUROR:  What do you mean, my work injury?

4            THE COURT:  Yeah.

5            THE JUROR:  Yes, sir.  Yes.

6            THE COURT:  In other words, did you change your

7   employment and, you know, you were unemployed from what you

8   used to do because of the injury but you're able to be a limo

9   driver?  Is that --

10           THE JUROR:  Yes, your Honor.  I drive more as an

11  activity than an employment-type thing.  I just picked it up as

12  sort of an independent contractor for a limo company.

13           THE COURT:  I see.

14           Let's cut the audio for a second.

15           (Discussion at sidebar and out of the hearing of the

16  public:)

17  █████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ███████████████████████████████████

21  ██████████████

22  ████████████████████

23  ███████████████

24  ██████████████████████████████████████████████████

25  ██████████████████████████████████



19        THE COURT:  Okay.  I think we can go back on the

20   audio.

21        (In open court:)

22        THE COURT:  Number 62 on page 17, you -- I'll wait

23   until you get there -- you answered that you believe the war on

24   terror was overblown or exaggerated.

25        THE JUROR:  Number --

1              THE COURT:  62.

2              THE JUROR:  -- 62?  Yeah, I do believe that.

3              THE COURT:  Can you just briefly tell us what your

4     thoughts are on that.

5              THE JUROR:  What my thoughts are on that?  I believe

6     that the way the news -- the news grabs on it and tries to

7     inflame us.  That's how I feel as far as the exaggeration.  I

8     mean, I'm not trying to say that the war on terror is not

9     there -- it is there -- but I think that it's overblown.

10             THE COURT:  Have you followed over the time prior to

11    your appearance a couple of weeks ago, whenever it was, media

12    reports about this case?

13             THE JUROR:  No, sir.

14             THE COURT:  Even before you came in as a juror?

15             THE JUROR:  Even before.  The only time I followed was

16    when the initial thing happened.  Other than that, I don't

17    follow too much -- too much of the news.  Simply because of the

18    answer that I gave you about the war on terror and all of that,

19    I prefer to not have strong opinions about it.

20             THE COURT:  And if you'd look at page 20, Question 77,

21    in that question we asked a series of questions about whether

22    you had formed an opinion based on the media or other things

23    that the defendant here is guilty or not guilty or should or

24    should not receive the death penalty.

25             You checked the box "no" for each of those.

1            THE JUROR:  That's correct.

2            THE COURT:  Is that the condition of your mind, that

3    you have not formed an opinion about any of those things?

4            THE JUROR:  I have not formed an opinion of that in

5    any way.

6            THE COURT:  And that's including whether he is guilty

7    of any offenses?

8            THE JUROR:  Correct.

9            THE COURT:  And I guess in the next question you say

10   you haven't expressed an opinion to anybody else about those

11   matters?

12           THE JUROR:  No, I have not.

13           THE COURT:  If you turn to page 23, beginning with

14   Question 88, we asked a series of questions about your attitude

15   towards the death penalty or possible alternate punishment of

16   life imprisonment without release.  With respect to the death

17   penalty, you said you were neutral.  You had neutral feelings.

18   Maybe amplify that a little and tell us what you think about

19   the death penalty in general.

20           THE JUROR:  I don't think of the death penalty pro or

21   con; I'm neutral on it.  I don't know what -- how I would feel

22   about it.

23           THE COURT:  On the next page we had a series of

24   choices that you could pick that would indicate what was

25   closest to your opinion, and you picked D which says you're not

1  for or against the death penalty, you could vote to impose it

2  or you could vote to impose a sentence of life imprisonment,

3  whichever you believed was called for by the facts and the law

4  in the case.

5          THE JUROR:  That's correct.  I believe that.

6          THE COURT:  Is that true for this case?

7          THE JUROR:  Yes, sir.  I would depend -- I would

8  depend on the powers that be to convince me one way or the

9  other.

10         THE COURT:  What do you mean by "the powers that be"?

11         THE JUROR:  The case itself.  The case in general.

12         THE COURT:  So if -- first of all, of course the

13  defendant has to be proved guilty to be punished in any way.

14         THE JUROR:  Correct.  Correct.

15         THE COURT:  And the first phase of the case would be

16  for the government to prove that by the evidence.  So you are

17  telling me you don't have a preconceived notion of that because

18  you -- I guess for the reasons you said?

19         THE JUROR:  I wouldn't even consider it until the case

20  in general.

21         THE COURT:  All right.  If he were to be convicted of

22  a crime that carried capital punishment, would you then --

23  based on what I've called the penalty phase where the

24  government would offer evidence of things that might point

25  toward a serious -- more serious evaluation of the crime and

```
 1   therefore support the death penalty, and at the same time
 2   consider what might be presented by the defense as something
 3   that might mitigate against that and point in the other
 4   direction, towards life imprisonment rather than the death
 5   penalty -- would you be able to give consideration to either of
 6   those alternatives without preconception?
 7              THE JUROR:  Absolutely.
 8              THE COURT:  Okay.  Thank you.  You may step out.
 9              THE JUROR:  Thank you.
10          (The juror is excused.)
11              THE COURT:  The live feed is apparently not working.
12              MR. DOREAU:  The audio has been going constantly.
13              THE COURT:  But the video has not?
14              MR. DOREAU:  The video has been cutting in and out.
15   If I can have one second, I can try a new cable.
16              THE COURT:  I'm thinking we may break for lunch at
17   this point.  We're going to have to do it anyway.  Can we make
18   it about a half-hour, so maybe 1:15?
19              MS. CLARKE:  Can we leave our stuff?
20              THE COURT:  Yes.  The courtroom will be secured.  Yes.
21          (There is a recess in the proceedings from 12:48 p.m.
22   to 1:25 p.m.)
23              THE COURT:  Before we bring in the next juror, this
24   has obviously been a little more time-consuming than perhaps we
25   anticipated.  In light of the fact it's almost 1:30 and we
```

1    still have half this panel, I think we're considering sending

2    the second panel home to come back tomorrow morning and we'll

3    not schedule what we had planned for for Friday.  We'll use

4    tomorrow's -- if the pace picks up, which I think it may as we

5    all get a little more accustomed to it, we'll make the

6    adjustment.

7         MR. BRUCK:  We'll just have the second 20 for all-day

8    Friday?

9         THE COURT:  That's right.  Okay?  I just wanted to get

10   assent to that.

11        MR. WEINREB:  Sure.

12        THE COURT:  So the jury clerk will send the

13   panel -- just for your information, the first panel we provided

14   lunch for.  They didn't have to go downstairs.  They've eaten.

15        (The juror enters the courtroom.)

16        THE COURT:  Good afternoon.

17        THE JUROR:  Good afternoon.

18        THE COURT:  When you were here before I asked

19   everybody to avoid any discussion about the case with anybody

20   after this process had begun.  Have you been able to comply

21   with that?

22        THE JUROR:  To the best of my ability.  We had spoken,

23   you know, a tiny bit, but nothing --

24        THE COURT:  Who's "we"?

25        THE JUROR:  I mean, I told my wife that, you know, I'm

1   on the trial, but nothing big, though.  I purposely tell them,

2   "Let's not talk about this."

3            THE COURT:  Okay.  Well, I told you you could

4   obviously discuss with your family that you might be on the

5   trial because it involves scheduling and so on, but what I

6   intended you to avoid was any discussion of the substance of

7   the case, the merits or --

8            THE JUROR:  No.  No, I have not.

9            THE COURT:  You have not?  Okay.

10           So we have your questionnaire.  You have the original

11   right there, actually, if you want to refer to it.

12           THE JUROR:  I remembered a few mistakes on this.

13           THE COURT:  Well, are there some things you want to

14   mention?  It might be useful at the beginning.

15           THE JUROR:  Yeah.  In my house, we -- I found a Red

16   Sox Boston Strong towel.  Somebody took us to a game.  So I

17   have that and I said I didn't.

18           THE COURT:  Okay.

19           THE JUROR:  I also -- what else did I -- things have

20   changed since that day, since I filled that out, so I don't

21   know if that matters, or just on the day?

22           THE COURT:  Yeah, okay.  We'll come to that.

23           THE JUROR:  Okay.

24           THE COURT:  Anything else that occurs to you?  Anyway,

25   if it does, bring it up.  But I have some things that I want to

1   address and it actually, I think, is what you're thinking of.

2           And if we could cut the audio just briefly for this.

3           (Discussion at sidebar and out of the hearing of the

4   public:)



1

2

3

4

5        THE COURT:  Yeah.  Okay.  I thought that was what you

6   were referring to when you said something had changed that day.

7        THE JUROR:  No, no, that isn't it.

8        THE COURT:  Okay.  What does it relate to?

9        THE JUROR:  My views.

10       THE COURT:  Okay.  We'll go back on the audio.

11       (In open court:)

12       THE COURT:  Tell us a little bit about what you work

13  as.

14       THE JUROR:  I'm an engineer.

15       THE COURT:  What do you do?

16       THE JUROR:  Write software.  I test software.  Most of

17  my career has been testing software, but they've allowed me to

18  write software.  I managed a test group for a while and then I

19  changed to a developer.

20       THE COURT:  Okay.  Tell us about your use of social

21  media.

22       THE JUROR:  I have LinkedIn, but I try never to use

23  it.  I'd use it for a while.  I don't use anything else really.

24       THE COURT:  Your sister-in-law is a paralegal

25  someplace?

 1            THE JUROR:  Yeah, I just don't have any details on it.

 2            THE COURT:  You don't know where?

 3            THE JUROR:  No.

 4            THE COURT:  Is she somebody you see on a regular

 5    basis?

 6            THE JUROR:  Yes.

 7            THE COURT:  But you don't know what kind of office she

 8    works in?

 9            THE JUROR:  Sometimes I get fuzzy on details.  I don't

10    know exactly.  I know she's a paralegal, and I know she's

11    bounced in jobs just like most people do, so it's hard to keep

12    track of your own.

13            THE COURT:  Okay.  I think you said in the past you

14    applied to the FBI?

15            THE JUROR:  Yeah, I was in college.  I remember doing

16    that.  It was -- I think it was the FBI.  I remember it on the

17    wall.  Back then you -- jobs were listed on the wall and you

18    put your name in for it.  I didn't get it.

19            THE COURT:  Any spillover to this case from that --

20            THE JUROR:  No.

21            THE COURT:  -- either way?

22            THE JUROR:  No.

23            THE COURT:  And if you want to turn to it, on page 17,

24    a couple of questions about world affairs, in a sense.  In 60

25    we asked whether you think the U.S. government acts unfairly

 1    towards Muslims in this country or other parts of the world,

 2    and you checked yes.  And then the next question is do you

 3    think the war on terror unfairly targets Muslims.  Are you --

 4    can you amplify those views?

 5            THE JUROR:  Yes.  I do not believe in this country

 6    that Muslims are treated unfairly.  In other parts of the

 7    world, I don't know.  I'm not -- I can only go by what I see.

 8            THE COURT:  Do you remember why you checked "yes"?

 9            THE JUROR:  No, I don't.  It's stressful, these

10    things.  I don't remember.  Maybe it was because, "If yes,

11    please explain"?  I don't know.  And then you asked about 61

12    and 62.  Is that correct?

13            THE COURT:  Yeah.  They're similar questions in a

14    slightly different...

15            THE JUROR:  My issue with war on terror, it's based on

16    what I see in the news, who's in -- what -- the POWs I saw on

17    TV are Muslims.  So if that's your war on terror, that's why I

18    said that.  In fact, I just think the term "terror" -- I don't

19    know.  They're just criminals, that's all.

20            THE COURT:  Okay.  Page 20, Question No. 77, we asked

21    in this question whether you had already formed an opinion

22    about whether the defendant was guilty or not and whether he

23    should, if so, be punished with the death penalty or not, and

24    you said you had an opinion about whether he was guilty.

25            THE JUROR:  Yes.

```
 1              THE COURT:  You're unsure of the penalty.

 2              THE JUROR:  That's what changed over the period of

 3    time that you gave us to think about it.

 4              THE COURT:  Okay.

 5              THE JUROR:  I just believe it's completely wrong to

 6    kill another man.

 7              THE COURT:  Okay.  Let's take the first question.  In

 8    a criminal trial the government is required to prove a

 9    defendant guilty of what he's charged with beyond a reasonable

10    doubt.  Does the fact that you have an opinion mean that you

11    would not hold the government to that burden of proof, or are

12    you simply saying you're tending towards that view but you

13    could evaluate the evidence and apply the appropriate standard?

14              THE JUROR:  Yeah.  I mean, the problem is, I'm

15    so -- I've seen so much on it, right?  I mean, it was all over

16    TV.  How can you not be slanted toward certain --

17              THE COURT:  The question is:  If you're sitting as a

18    juror and the process requires holding the government to its

19    proof and requiring it to be proved in the trial, not by word

20    of mouth or media or something like that, would you be able to

21    assess the evidence and basically vote for a verdict of guilty

22    only if you were convinced of the guilt by the evidence in the

23    trial beyond a reasonable doubt?  Would you be able to do that?

24              THE JUROR:  It seems like a tall order.  Yeah, it

25    would have to -- the evidence would have to be so overwhelming,
```

1    that's the problem.  But I could, you know...

2            THE COURT:  In other words, do you have any tendency

3    to, in effect, shift the burden to the defendant to show why he

4    wasn't guilty or would you make the government prove that he

5    was?

6            THE JUROR:  So following the rules, innocent till

7    proven guilty.  I could follow the rules if that's what you're

8    asking.

9            THE COURT:  Yes, that's what I'm asking.

10           THE JUROR:  Yeah, I could follow the rules.

11           THE COURT:  Now, with respect to the penalty, we asked

12   a few pages later in Question 88 your general views about the

13   death penalty, and you wrote, "Most cases should never go to

14   the death penalty."  And then in the next question we asked you

15   to sort of rate it on a scale of 1 to 10, your level of

16   opposition or approval of the death penalty.

17           And by the way, looking through the questionnaire, if

18   you want to take a minute to look at it to refresh your

19   recollection, that's fine with me.  I don't want to put you at

20   any disadvantage if you think you want to refresh your

21   recollection about something you'd you written.

22           Anyway, those two answers suggest you're in general

23   opposition to the death penalty.

24           THE JUROR:  I'm opposed to it.

25           THE COURT:  The next question, on page 24, we asked

1    for you to circle which was the thing that was -- the statement

2    that was closest to your beliefs.  And the one you said --

3    again, you're opposed to the death penalty but could vote to

4    impose it if you believed that the facts and the law in a

5    particular case called for it.

6              THE JUROR:  Yeah, that's why I -- because you gave us

7    so much time to think about it.  And that's another thing that

8    may have changed.  I may become more -- I wrote that I wasn't

9    religious.  I gave it a "none."  And I am religious.  Really,

10   this thing -- this whole process made me more religious.  I

11   just can't agree with the death penalty.

12             THE COURT:  So you can't think of any circumstance in

13   the evidence that would lead you to think that the death

14   penalty was a more appropriate punishment for a crime than life

15   imprisonment?

16             THE JUROR:  No, I think life imprisonment is awful.

17   And I just think -- I just think killing another man is wrong.

18   And I feel like I'd be the one that -- one of the members that

19   would be doing it.  I just can't kill another person.

20             THE COURT:  Okay.  Thank you.

21             (The juror is excused.)

22             (Pause.)

23             (The juror enters the courtroom.)

24             THE COURT:  Good morning.

25             THE JUROR:  Hello.

1          THE COURT:  Since you were last here have you followed
2     my instructions not to discuss the case with anybody --
3          THE JUROR:  Yes.
4          THE COURT:  -- or expose yourself to any media
5     accounts or anything?
6          THE JUROR:  Just one.  When they were talking about
7     some jurors were let go or something like that, I heard.
8          THE COURT:  Okay.  Tell me about your job.
9          THE JUROR:  My job?
10         THE COURT:  What do you do?
11         THE JUROR:  I work in a manufacturing plant.  I work
12    in the office.  So I take the calls and I take the orders,
13    process the orders, follow up on the orders, talk to the
14    customers, bill -- did the billing and various --
15         THE COURT:  About how big a company is it?
16         THE JUROR:  There's about 15 -- 15 people.
17         THE COURT:  Employees?
18         THE JUROR:  Yes.
19         THE COURT:  You had indicated in Question 10 that you
20    thought you would not be paid if you served on the jury.  Have
21    you talked with your employer about that since?
22         THE JUROR:  I don't have to.  I know the answer to
23    that.
24         THE COURT:  What is it?
25         THE JUROR:  No.  It's a definite no.

 1              THE COURT:  Your husband served as a member of the
 2    Lowell police force?
 3              THE JUROR:  Yes.
 4              THE COURT:  And I think you said it was from 1970 to
 5    1982?  You can look --
 6              THE JUROR:  Yeah, it was about approximately 12 years
 7    or so.
 8              THE COURT:  It's page 12.
 9              THE JUROR:  Approximately, yeah.
10              THE COURT:  What has he done since then?
11              THE JUROR:  Well, he left because he was injured, so
12    he went back to school and became a teacher.  And he ended up
13    leaving there because there was a lot of conflict with the
14    police as far as him making money after he had already been
15    injured.
16              THE COURT:  Because of his disability payments?
17              THE JUROR:  Yes.  Yeah.
18              THE COURT:  So is he working now?
19              THE JUROR:  No.
20              THE COURT:  And you have a son who is a part-time
21    police officer?
22              THE JUROR:  Yeah.  Yup.
23              THE COURT:  Where?
24              THE JUROR:  Hampton, New Hampshire.
25              THE COURT:  Okay.  What is part time?

```
 1            THE JUROR:  He works there in the summers.  He's a
 2   vice principal all year, and then in the summer he works at the
 3   police department.  He's been doing that for about 12 -- well,
 4   what, 14 years?
 5            THE COURT:  As a result of your having a husband and a
 6   son who were employed as police officers, would you have any
 7   partiality or tendency to favor police evidence or non-police
 8   evidence in a case like this?
 9            THE JUROR:  Probably.
10            THE COURT:  You think you would?
11            THE JUROR:  Uh-huh.
12            THE COURT:  I think you told us you worked in a legal
13   services office a while ago?
14            THE JUROR:  Uh-huh.
15            THE COURT:  What was that for?
16            THE JUROR:  That was my first job out of high school.
17   Legal Services of the Merrimack Valley.
18            THE COURT:  For people who couldn't afford lawyers, is
19   that what it was?
20            THE JUROR:  Yeah, it was a federal government job.
21            THE COURT:  Okay.  And you did that for only about
22   five years?
23            THE JUROR:  Uh-huh.
24            MR. BRUCK:  Your Honor, I think we have a consensus.
25            MR. WEINREB:  We have enough.
```

```
 1              THE COURT:  Okay.  Thank you.

 2              (The juror is excused.)

 3              THE COURT:  Thanks.

 4              THE JUROR:  Okay.

 5              THE COURT:  Are we on?  Yeah?  Stay on.  We'll have to

 6   figure this out.  Maybe you can signal Jane and she can signal

 7   me.

 8              LAW CLERK:  They did; I just didn't know what they

 9   wanted.

10              THE COURT:  Tap me on the shoulder.  Right shoulder,

11   keep going; left shoulder, stop.

12              (The juror enters the courtroom.)

13              THE COURT:  Hi.

14              THE JUROR:  Hi.

15              THE COURT:  You're Number 21?

16              THE JUROR:  Yes.

17              THE COURT:  Have you followed my instruction from last

18   time to avoid any discussion of the merits of the case with

19   anybody?

20              THE JUROR:  Yes.

21              THE COURT:  And avoid exposure to media stories about

22   it?

23              THE JUROR:  Yes, sir.

24              THE COURT:  Okay.  Let me ask you a little bit about

25   employment.
```

1              By the way, your questionnaire is right there if you

2       want to look at it and refresh your memory as to what it asked

3       you about and what you answered.

4              Let me just talk a little bit about employment.

5       First, your wife is a teacher?

6              THE JUROR:  Yes, sir.

7              THE COURT:  Where does she teach?

8              THE JUROR:  She teaches preschool in Millis.

9              THE COURT:  Millis?

10             THE JUROR:  Yes.

11             THE COURT:  How long has she done that?

12             THE JUROR:  She's been a full-time teacher there for

13      about 18 years, 16 years.

14             THE COURT:  Okay.  And how about yourself?

15             THE JUROR:  I'm a software engineer for a medical care

16      company.

17             THE COURT:  How long have you done that?

18             THE JUROR:  I've been a software engineer for 20

19      years, 25 years.  I've been at this particular company for two

20      years.

21             THE COURT:  Okay.  Is service on this case a problem

22      for your employment?

23             THE JUROR:  No.  It might be a financial, you know,

24      burden, but I would expect to have my job when I got back.

25             THE COURT:  It's a big-enough company that it could

 1    absorb the --

 2             THE JUROR:  Yeah, I think they could live without me.

 3             THE COURT:  I didn't mean it that way.

 4             THE JUROR:  No.

 5             THE COURT:  Social media:  Do you use it?

 6             THE JUROR:  I use LinkedIn.

 7             THE COURT:  That's the only thing?  No Facebook, no

 8    Twitter?

 9             THE JUROR:  I have accounts, but I don't use them.

10             THE COURT:  You had a couple of relatives who worked

11    in probation offices?

12             THE JUROR:  Yes, I had an aunt that worked at the

13    Barnstable District Court.  She worked in Quincy as well.  But

14    she's retired now.  And my sister-in-law is an assistant

15    probation officer in Falmouth.

16             THE COURT:  Okay.  Do either of those circumstances

17    have any effect on your fair-mindedness as a juror?

18             THE JUROR:  No.

19             THE COURT:  We asked some questions about affiliations

20    you might have.  You said you're a contributing member of the

21    ACLU?

22             THE JUROR:  That's correct.

23             THE COURT:  American Civil Liberties Union?

24             THE JUROR:  That's correct.  My membership is expired.

25    It was an automatic withdrawal every month.  My credit card

1    number changed, so I haven't renewed it yet.  I'm too busy.

2              THE COURT:  You told them now.

3              THE JUROR:  Yeah.

4              (Laughter.)

5              THE COURT:  So we asked a question on the

6    questionnaire that was about whether you had formed opinions

7    about, first of all, whether the defendant was guilty or not or

8    whether he should be punished by the death penalty or not.

9    That's Question 77 if you want to take a look at it.

10             And to each of those possibilities, the four

11   possibilities, you said you're unsure.

12             THE JUROR:  Yes.

13             THE COURT:  Could you maybe just amplify that a little

14   bit?

15             THE JUROR:  Well, I mean, I saw what everybody saw on

16   the media, but I do know that media jumps to conclusions and we

17   don't always have all of the facts.  There was the -- the

18   Olympic bombing in Atlanta where everybody rushed to judgment

19   on this fellow and it turns out he wasn't involved, and there

20   was the case of the anthrax person that was -- everybody

21   suspected him.  He was an employee of the government.  And it

22   turns out he wasn't involved.  So I don't know all the facts

23   that -- as they exist.  I know what I see in the media, but I'm

24   skeptical at times.

25             THE COURT:  Okay.  As to guilt or not, the government

1    always has the burden to prove guilt by the evidence at trial,

2    it's never presumed, and the defendant doesn't have any burden

3    to prove he's not guilty.  Are you comfortable accepting and

4    applying those principles?

5              THE JUROR:  Yes, I am.

6              THE COURT:  If you turn to page 23, we ask a series of

7    questions about your attitude or beliefs about the death

8    penalty both in general and at the end in particular.  And as

9    to Question 88, you said in general you do not support the

10   death penalty.

11             THE JUROR:  That's correct.

12             THE COURT:  Okay.  We asked you in the next question

13   to put it on a scale of 1 to 10, your level of opposition.  And

14   from -- with 1 being strongly opposed, you said you were at

15   about a 3.  Is that fair?

16             THE JUROR:  Yes.

17             THE COURT:  The next question, we again asked you to

18   select which of a number of possibilities might reflect your

19   view most closely, and you said you were opposed, as the

20   previous question sort of indicated, but you could vote to

21   impose it if you believe that the facts and the law in the

22   particular case called for it.

23             So let me just ask it a different way.  If

24   you -- having -- assuming, of course, the defendant would be

25   convicted because you'd never get to the question if he

1    weren't, you would -- notwithstanding your general opposition,

2    if there were circumstances in the case that were shown to you

3    to be reliable and you accept it as relevant and important,

4    that you would not rule out as a matter of course the death

5    penalty?

6              THE JUROR:  That is correct.

7              THE COURT:  You could, under some circumstances,

8    decide to impose it?

9              THE JUROR:  As long as it followed the law.  And

10   that's the way...

11             THE COURT:  And if you would just look at Questions 95

12   and 96.  In turn they asked would you be prepared if you

13   thought it was the right thing to do to conscientiously vote

14   either for the death penalty, in 95, or for life imprisonment

15   in 96, and you said yes to both of those possibilities?

16             THE JUROR:  Yes.

17             THE COURT:  Okay.  Thank you.

18             THE JUROR:  Thank you.

19             (The juror is excused.)

20             (Pause.)

21             (The juror enters the courtroom.)

22             THE COURT:  Hello.

23             THE JUROR:  Hi.

24             THE COURT:  So that's your questionnaire for your

25   reference if you find it convenient.

1          THE JUROR:  Okay.

2          THE COURT:  I just want to follow up on some of the

3     answers that you've given in the questionnaire.  You're a

4     psychotherapist?

5          THE JUROR:  Right.

6          THE COURT:  You've written in the answer to Question

7     10 rather extensively about the impact this would have.  And I

8     guess my question -- I understand what you've put there -- are

9     there any arrangements or accommodations that reasonably could

10    be made that would mitigate that difficulty, both for you and

11    for the people you counsel?

12         THE JUROR:  Well, no.  In fact, I brought you a letter

13    from my supervisor which sort of indicates pretty much what I

14    said here.  It really doesn't feel like so much of a hardship

15    for me but it's more for my clientele.  I just feel like it's

16    kind of a lengthy period not only for my clientele, but for

17    Boston University since they would not be able to replace my

18    services, so...

19         THE COURT:  We'll keep that.  Is that all right?

20         THE JUROR:  Yeah, please.  It would be something like

21    20 clinical hours a week which would be lost as far as I could

22    tell, so...

23         THE COURT:  When do you usually see clients?  In other

24    words, one thought that occurred to me as I was reading it is

25    would it be possible to do something in the evenings?

1              THE JUROR:  No.  I mean, our hours are -- well, we

2    do -- sometimes I work until 6:30 -- 6:30, I guess.  So, yeah,

3    it would be possible to see a few, but generally we only do

4    that once a week.  So -- and most of the students don't come in

5    at night, to be honest with you.  So I could do a few of them,

6    but it really wouldn't -- I don't think it would make a big

7    difference.

8              THE COURT:  Okay.  That was really what I was

9    interested in, so thank you.

10             THE JUROR:  Okay.  Is that it?

11             (The juror is excused.)

12             (Pause.)

13             (The juror enters the courtroom.)

14             THE COURT:  Hi.

15             THE JUROR:  Hi.

16             THE COURT:  Make yourself comfortable.  I'm going to

17   follow up on some of the questionnaire questions.

18             THE JUROR:  Glasses.

19             THE COURT:  Fair enough.

20             So you have the questionnaire?

21             THE JUROR:  Correct.

22             THE COURT:  When you were here before for the large

23   part when you filled out the questionnaire, I instructed people

24   to avoid any discussion of the case thereafter.

25             THE JUROR:  Correct.

```
 1              THE COURT:  Have you been able to abide by that
 2    instruction?
 3              THE JUROR:  Yes.
 4              THE COURT:  And to avoid any contact with media
 5    stories about the case?
 6              THE JUROR:  If I pass through the living room, I mean,
 7    maybe 45 seconds, you know.
 8              THE COURT:  But you've made an effort --
 9              THE JUROR:  I don't sit down and watch anything.
10              THE COURT:  You're concerned about health coverage if
11    you serve on the case?
12              THE JUROR:  Right.
13              THE COURT:  Can you tell us about that?
14              THE JUROR:  Yeah, my manager took me aside yesterday.
15    And I'm an hourly-paid person who works 32 hours at my
16    position, which lets me have benefits.  They told me that my
17    job would cover my benefits should I be on a jury but I would
18    have to pay that back.  So I'm not getting paid.
19              THE COURT:  Pay what back, pay the insurance premiums?
20              THE JUROR:  Correct.  Back to the company for fronting
21    me.  And I was like, well, for me doing my civic duty I owe
22    thousands of dollars back when I'm done?  That doesn't make
23    sense.  But that's what she told me.  And she did check on it.
24    So that would be a hardship for my family definitely.
25              THE COURT:  Do you know the details of your coverage;
```

1    that is, who the --

2         THE JUROR:  I have Blue Cross Blue Shield, and it is

3    for health insurance, for dental and eye.  And I have two

4    children that have lifelong problems that they get tested for

5    and medication for every six months.

6         THE COURT:  But it is employer-provided healthcare;

7    it's not through Mass. Health or anything like that?

8         THE JUROR:  No, employer-provided that I sign up for

9    and pay for through my pay.

10        THE COURT:  Okay.  Do you use social media at all?

11   Social media:  Facebook, Twitter, anything like that?

12        THE JUROR:  I do not, no.  As little as possible.

13   Just my phone.

14        THE COURT:  Okay.  Do you have -- what kind of phone

15   do you have?

16        THE JUROR:  I have a Samsung phone.  That's what I can

17   tell you.  If I break down, I can use it.  I do text.  I like

18   texting to my sister.

19        THE COURT:  Okay.  Your daughter's boyfriend is a

20   Marine and he has served in Afghanistan?

21        THE JUROR:  Correct.

22        THE COURT:  Is he still there?

23        THE JUROR:  He is.  He just came home on a leave for

24   two weeks for Christmas, and he doesn't have to go back to

25   Afghanistan.  We were real happy, real pleased.  We're real

1    proud of him.

2            THE COURT:  Does his service there and your

3    appreciation of it have any possible impact on your point of

4    view if you were a juror in a case like this?

5            THE JUROR:  No.  No, I don't think it would.

6            THE COURT:  Can we cut the audio for a minute.

7            (Discussion at sidebar and out of the hearing of the

8    public:)



1

2

3

4

5          THE COURT:  Just a sort of maybe related question, 46,

6   which is on page 15, you said you have some negative views

7   about law enforcement officers who have attitudes of

8   superiority.  Is that a reference to this?

9          THE JUROR:  Oh, no.  That's in general.  I work at a

10  public place where people --

11         THE COURT:  Wait a minute.  Excuse me.

12         We can go back on audio since this is unrelated to the

13  other questions.

14         (In open court:)

15         THE JUROR:  I think that was a generalization.  You

16  can tell by body language and attitude from a lot of people

17  that just come into a place that they frequent how they speak,

18  and because they wear a uniform they -- some people, I'm just

19  saying, that I come across on a daily basis at my job can have

20  an attitude.

21         THE COURT:  Okay.

22         THE JUROR:  Not all.  Absolutely not.  My daughter's

23  boyfriend's father -- stepfather is a policeman and highly

24  respected, and we think much of him.

25         THE COURT:  So in this case obviously there will be

1    testimony and so on from police officers of various categories

2    and so on.  Am I hearing you correctly that you don't have sort

3    of a predisposition to --

4              THE JUROR:  Oh, no, no, to anybody in a uniform or a

5    police officer?

6              THE COURT:  Yeah, law enforcement.

7              THE JUROR:  No.  No.

8              THE COURT:  Okay.  This is a little bit out of order,

9    but let me jump to Question 74.  You said that your son was

10   upset because of what you called a SWAT team --

11             THE JUROR:  Yes.

12             THE COURT:  -- at the university and probably related

13   to this general course of events that may be involved here.

14             THE JUROR:  Uh-huh.

15             THE COURT:  Does that incident give you any concern

16   about how you might feel about the defendant having, you know,

17   sort of indirectly causing the SWAT team to --

18             THE JUROR:  No, it just said when I got the jury

19   summons how did I feel when I received it, I was like, Oh, my

20   gosh, this is an incident that my son had -- not an

21   opportunity, but he was in a position where he had to witness,

22   you know, some tragic things on campus that affected him.  That

23   was my only comment.

24             THE COURT:  And my question is:  Does that affect you,

25   that he had that experience?

1          THE JUROR:  No.  No.

2          THE COURT:  And just to confirm, I think you also told

3     us that your son actually refereed a soccer team that the

4     defendant may have played on?

5          THE JUROR:  Correct.  He didn't coach it; he ref'd it.

6     My son is very active in soccer.

7          THE COURT:  Did I say "coach"?  I meant ref'd.

8          So do you know of any relationship or contact between

9     your son and the defendant?

10         THE JUROR:  No, I think I wrote in there that he does

11     not know the defendant personally at all.

12         THE COURT:  Okay.  Whether you wrote it or not, that's

13     what you understand the case to be?

14         THE JUROR:  Correct.  Absolutely.

15         THE COURT:  Let me ask you to look at page 20,

16     Question 77.  This asks a number of questions, sub-questions,

17     about whether you formed an opinion about whether the defendant

18     is guilty and, if so, what penalty might be imposed.  You

19     indicated in responding on the questionnaire that you had

20     formed an opinion that he was guilty but you were unsure about

21     the penalty to be imposed.

22         Let me ask you this:  In a criminal trial the burden

23     is always on the government to prove the defendant guilty by

24     the evidence beyond a reasonable doubt.  The burden never

25     shifts to the defendant to prove he's not guilty.  If somebody

 1    has a -- as you say you may have -- a pre-trial opinion --

 2            THE JUROR:  Right.

 3            THE COURT:  -- would you still be able to insist by

 4    your verdict that the government by the evidence prove him

 5    guilty or would you have some tendency to shift in your mind

 6    the burden to the defendant to prove that he wasn't guilty as

 7    you may have thought he was?  In other words, would you be able

 8    to follow the instructions on the law as to how to analyze the

 9    evidence and resolve the issue presented, or would your

10    preconceived idea dominate and prevent you from doing that?

11    That's really the question I have.

12            THE JUROR:  I see what you're saying.  Yes, I do think

13    that what happened he is guilty of, so...  But would I look at

14    what is placed or put in front of me or, you know, for my ears

15    only?  Would I be able to listen to that?  Yes.  But to what

16    extent of guilt?

17            THE COURT:  I'm going to come to the penalty in a

18    minute, okay?

19            THE JUROR:  Okay.  That's --

20            THE COURT:  The guilt -- there are a number of

21    separate offenses charged, and you'll be instructed as to what

22    the government must prove to establish that each of those

23    charged offenses was committed.  And if you have doubt whether

24    that proof was there, then you'd be instructed you should find

25    the defendant not guilty of that charge.

1          So right now I'm just only talking about the

2   government's responsibility to prove guilt at trial and whether

3   you would evaluate the evidence to see whether the government

4   had done that, and if you thought they had not, whether you'd

5   be able to return a verdict of not guilty because you thought

6   the government had failed in its proof?  What do you think you

7   would be able to do under those circumstances?

8          THE JUROR:  Can I answer I'm not sure, I would have to

9   hear the evidence?  That's my answer.

10          THE COURT:  And that's because you don't know what the

11   evidence is?

12          THE JUROR:  Right.

13          THE COURT:  And until you do know what it is, you

14   won't be able to say what you would think about it?

15          THE JUROR:  Right, and how I would feel.

16          THE COURT:  Now, let's turn to the penalty.  You said

17   you were unsure about -- this is in Question 77 -- whether he

18   should receive the death penalty or whether he should not.  You

19   checked the box "unsure," C and D to that question, right?

20          THE JUROR:  Right.  I'm unsure about that.  But can I

21   answer -- I, myself, personally would never, ever be able to

22   say I think anybody -- I'm against the death penalty.

23          THE COURT:  So --

24          THE JUROR:  So.

25          THE COURT:  So let me move along in the questionnaire

1    a little bit to get to some of those issues.  On page 23,

2    Question 88.

3              THE JUROR:  Right.

4              THE COURT:  Do you see your answer there?

5              THE JUROR:  Yes.

6              THE COURT:  The next question we asked your general

7    attitude toward the death penalty on a scale from strongly

8    opposed at 1 to strongly favor at 10, and you selected 5.  Was

9    that accurate?

10             THE JUROR:  I did that --

11             THE COURT:  Let me actually -- because I think it

12   involves the same considerations.  On the next page --

13             THE JUROR:  Okay.

14             THE COURT:  -- if you look at Question 90, there was

15   other -- again, other options, and you selected D, "I am not

16   for or against the death penalty.  I could vote to impose it or

17   I could vote to impose a sentence of life imprisonment,

18   whichever was" --

19             THE JUROR:  Right.  I would rather do the life

20   imprisonment.

21             THE COURT:  Right.  But I guess I'm getting at the

22   form seems to indicate one thing and you seem to be saying

23   something different today.  So I just wanted to kind of find

24   out where it is.

25             THE JUROR:  Yes.

 1            THE COURT:  Which --

 2            THE JUROR:  I'm against the death penalty.

 3            THE COURT:  So the answers you gave on the

 4    questionnaire in 89 and 90, for example, you say do not

 5    properly reflect your view.  Is that correct?

 6            THE JUROR:  Correct.

 7            THE COURT:  Do you know why you indicated that?

 8            THE JUROR:  Well, maybe I misread the question, didn't

 9    know quite how to answer it.  And I know maybe I should have at

10    that time put "unsure of how to answer it," but I did what I

11    did then.

12            THE COURT:  So is it your point of view that you would

13    never vote to impose the death penalty, or is it your point of

14    view that it would take a lot to get you to impose the death

15    penalty or that you'd have to be shown something particularly

16    serious in order to vote for the death penalty?

17            THE JUROR:  How I look at --

18            THE COURT:  One of those voices are --

19            THE JUROR:  How I look at the question is I could not

20    say, Yes, I think he should be put to death, give him a lethal

21    injection.  But should someone kill my child?  That might be a

22    different story for me emotionally at that time.  I might -- if

23    someone was really, really guilty.

24            THE COURT:  Okay.  Let me ask you this, then:  If you

25    knew more about the crime than simply that there was -- someone

1    was convicted of murder, for example, intentional murder, if

2    you knew just that fact, what would your attitude be without

3    knowing more?

4            THE JUROR:  It would have to be as personal as my

5    child.  Anybody else, I can't -- I can't pass on the death

6    penalty.  I couldn't do it.

7            THE COURT:  Okay.  How about somebody else's child?

8            THE JUROR:  I wouldn't want to do it.

9            THE COURT:  Okay.  Thank you.

10           THE JUROR:  Okay.

11           (The juror is excused.)

12           THE COURT:  Do you want to hold her for a minute?

13           MR. BRUCK:  Yeah.  I think we should probably say for

14    the record that we think that more follow-up from that last

15    question was required.  When a juror says "I wouldn't want to

16    do it," that actually comes from *Witherspoon*.  I realize this

17    juror has a lot of trouble with the death penalty but so do a

18    lot of jurors who cannot be disqualified under *Witherspoon*.

19           We would like the Court to follow up -- or to have

20    followed up with that juror to say, Well, understanding that

21    you wouldn't want to do it, could you do it if the facts were

22    bad enough and if the defendant deserved it and if the crime

23    was horrible enough?  That's the *Witherspoon* question.

24           MR. MELLIN:  Actually, your Honor, I disagree.  This

25    juror is clearly substantially impaired.  What -- the

1    clarification that the Court was driving at was, was she just

2    prevented in addition to being substantially impaired?  Under

3    either of those standards we would move that she be struck for

4    cause.

5            THE COURT:  I don't think there's any need for further

6    questioning on her.

7            (The juror enters the courtroom.)

8            THE CLERK:  26.

9            THE COURT:  Hi.

10           THE JUROR:  Hello.

11           THE COURT:  We're going to be following up on some of

12   the answers you gave in the questionnaire that you filled out

13   when you were here before.

14           THE JUROR:  Sure.

15           THE COURT:  So it's there if you want to look at it.

16           One of the things I asked jurors -- or instructed them

17   when we were here before was to avoid any contact with media

18   stories about the case and to avoid any discussion of it with

19   anybody.  Have you been able to abide by those instructions?

20           THE JUROR:  Sure.

21           THE COURT:  Tell me about your job.

22           THE JUROR:  My job?

23           THE COURT:  Yeah.

24           THE JUROR:  I'm an auto damage appraiser.  So, like, I

25   crash cars for a body shop [*sic*].  People come in looking to

1   get estimates, I give them estimates on the car.  Very, very

2   busy, very long hours.

3          THE COURT:  You expressed at the end of the

4   questionnaire some concern about whether you'd lose your job if

5   you served on the case.  Is that a real concern?

6          THE JUROR:  Not that I'd lose my job, but I'd lose my

7   income, and I have a house that I'm behind on some payments on.

8          THE COURT:  So is your income dependent on, for

9   example, the number of estimates you do or something like that?

10  Tell me how that would --

11         THE JUROR:  Well, I mean, if I'm on trial for a few

12  months, I wouldn't be at work.

13         THE COURT:  You wouldn't be paid by your employer?

14         THE JUROR:  Correct.

15         THE COURT:  How are you paid?  Are you on salary or --

16         THE JUROR:  Commission.

17         THE COURT:  Commission.

18         THE JUROR:  That's my biggest concern.

19         THE COURT:  Tell me about -- whether and how much you

20  use social media.

21         THE JUROR:  I have a Facebook account that I check,

22  but I never really post much.  We're talking about maybe look

23  at it once a week.  But I certainly don't blog, I don't -- I

24  don't spend a lot of time online.  I'm very, very busy at work

25  for the most part.

1           THE COURT:  All right.  Thank you.

2           THE JUROR:  That's it?

3           THE COURT:  That's it.

4           THE JUROR:  Do I take this, leave it?

5           THE COURT:  Leave it.

6           (The juror is excused.)

7           THE COURT:  There are a couple here who might, on the

8    papers, satisfy you in the same way.  This one might be one.

9           MR. MELLIN:  I believe 31 is another one.

10          THE COURT:  And 31 is the other one.  31 I think we

11   talked about yesterday.

12          MR. MELLIN:  We did.

13          MR. CHAKRAVARTY:  I thought we agreed on that one.

14          MS. CLARKE:  I think we would like to hear ███████.

15   Yeah, the student I think we agreed on, which would be Number

16   31.

17          THE COURT:  Could you cut the audio for a moment?

18          (Discussion at sidebar and out of the hearing of the

19   public:)

20          THE COURT:  We have tried not to signal to people who

21   might be excused without being examined that they could infer

22   the outcome.  And so we had one earlier today, this morning,

23   brought in for a few questions just so it would appear that she

24   was being examined like everyone else.  So even with respect to

25   31, I think we may do that.

1          MS. CLARKE:  Right.

2          THE COURT:  But I understand that the parties are

3    agreed on that.

4          And I guess I'm -- we can go back on the record, on

5    the audio.

6          (In open court:)

7          THE COURT:  With respect to this one, I guess if

8    you -- we'll have her in.

9          (The juror enters the courtroom.)

10          THE CLERK:  27.

11          THE COURT:  Hi.

12          THE JUROR:  Good afternoon, your Honor.

13          THE COURT:  I'm going to follow up on some of the

14    answers you gave us in the questionnaire.

15          THE JUROR:  Okay.

16          THE COURT:  And let me just ask:  When we were last

17    here I instructed everybody to avoid any discussion of the case

18    with anybody.  Have you been able to abide by that?

19          THE JUROR:  Yes, your Honor.

20          THE COURT:  And also to avoid any exposure to media

21    stories?

22          THE JUROR:  Yes, your Honor.

23          THE COURT:  Okay.

24          Now, tell me about your professional employment.

25          THE JUROR:  I'm self-employed, and I've been

1   self-employed pretty much for the last 20 years, since

2   graduating law school.  At this time mostly I do postconviction

3   work for the Committee for Public Counsel Services as a private

4   bar advocate.

5           THE COURT:  Okay.  Appellate work.  Is that what you

6   said?

7           THE JUROR:  Yes, your Honor.

8           THE COURT:  In state courts, federal courts?

9           THE JUROR:  State courts.

10          THE COURT:  Are you a sole practitioner or --

11          THE JUROR:  My law partner is my husband.

12          THE COURT:  Okay.  Just the two of you?

13          THE JUROR:  Just the two of us.

14          THE COURT:  And what is his area of practice?

15          THE JUROR:  He does that and he also does -- he does

16  postconviction work and he also does landlord-tenant stuff in

17  the Boston Housing Court.

18          THE COURT:  Okay.  You expressed a concern in the

19  questionnaire about the length of time this case might take and

20  the impact on your practice, I guess.

21          THE JUROR:  Yes.

22          THE COURT:  Is there anything more you want to add to

23  that or has your thinking about that changed at all?

24          THE JUROR:  No, it's pretty consistent with this.

25  It's just the two of us at home so...  We have four children

1    and we kind of juggle work and the kids and the practice.  So

2    it would impact that.

3                    THE COURT:  I guess it's a matter of degree.

4                    THE JUROR:  It is a matter of degree.

5                    THE COURT:  So can you tell us how much of a burden it

6    would be?  Would it be possible for you to live with it for the

7    duration --

8                    THE JUROR:  I would have to work in the evenings

9    because I don't think it would be financially possible for us

10   to sustain -- you know, to pay our mortgage if we weren't both

11   working, so...

12                   THE COURT:  Yeah.  Is that feasible, keeping in mind,

13   again, that we sort of reserve Fridays for people to have a

14   chance to be in the office and catch up on some things.  I know

15   that's -- one day is not equal to five days, but a couple of

16   months of evening work, is that a possibility?

17                   THE JUROR:  Yes, your Honor.  I believe so.  It would

18   be difficult but I think it would be possible.

19                   THE COURT:  Tell me about your -- the other thing I

20   wanted to ask you about in that question was you have a trip

21   planned in February?

22                   THE JUROR:  It's a school field trip of sorts.  We're

23   going to the United Nations.  My children are active in a group

24   through school and there's going to be a field trip there.  If

25   court wasn't in session I would have -- I suppose I could join

```
 1    them in Manhattan that Friday if I...
 2              THE COURT:  Is it a weekend trip?
 3              THE JUROR:  No, it starts on Wednesday.  It's a
 4    Wednesday, Thursday, Friday trip, returning late Friday night.
 5    So the kids will be excused from school.
 6              THE COURT:  Oh, I see.
 7              THE JUROR:  They're working with Ambassador Chowdhury
 8    on a project.
 9              THE COURT:  How much do you use social media, if at
10    all?
11              THE JUROR:  Not very much.  I try to follow my kids
12    somewhat.  They...
13              THE COURT:  Do they have Facebook accounts?
14              THE JUROR:  Facebook isn't cool anymore.
15              THE COURT:  Neither am I.
16              (Laughter.)
17              THE JUROR:  I have a Facebook account which I don't
18    really use.  They use Instagram a lot posting pictures.
19              THE COURT:  Okay.
20              THE JUROR:  I don't use them too terribly much.  I
21    don't post terribly much but...
22              THE COURT:  Okay.  Twitter?
23              THE JUROR:  I've never tweeted.  Every once in a while
24    I find that my high-schooler is getting some tweets on in
25    school, which he should be working in school and not tweeting.
```

1          THE COURT:  So on page 20, in Question 77, we asked

2    prospective jurors about whether they had formed an opinion

3    about this case both as to whether the defendant was guilty or

4    not and, if so, whether -- what penalty might be imposed on

5    him.

6          And so if you look at Question 77, the four subparts,

7    and you answered "unsure" to each of them.

8          THE JUROR:  Uh-huh.

9          THE COURT:  Could you amplify on that, what your

10   thinking was as you answered that question?

11         THE JUROR:  I just think the government should be held

12   to its burden of persuasion with respect to this case, with

13   respect to every aspect of this case.

14         THE COURT:  This is an area of the law you're quite

15   familiar with, I gather?

16         THE JUROR:  Yes, your Honor.

17         THE COURT:  And you don't have any trouble -- even if

18   you have some impressions from media accounts or anything, you

19   don't have any trouble with making sure the government is put

20   to its proof?

21         THE JUROR:  I think the government should be put

22   through its paces, yes.

23         THE COURT:  With respect to the penalty, if the

24   defendant is convicted of a capital offense --

25         THE JUROR:  Yes, your Honor.

1          THE COURT:  -- you said you were unsure in Question

2     77, and later on we asked some questions about your attitudes

3     toward the death penalty.  In Question 88 you said you were

4     against it?

5          THE JUROR:  Yes, your Honor.

6          THE COURT:  And on the scale we gave you in 89, 1

7     through 10, you put yourself at the low end of the numbers,

8     which was on the strongly opposed end of the spectrum, sort of,

9     but you didn't put down 1, so I guess it leaves some

10    reservation there.  And then the last one I want to direct your

11    attention to is the next page, page 90, where you chose B and

12    said "I'm opposed to the death penalty and would have a

13    difficult time voting for it even if the facts supported it,"

14    but you didn't say, which might be a more absolutist opinion,

15    you could never under any circumstances do it.

16         So I want to know where you are on that end of the

17    spectrum.  Could you conceive of factual circumstances in a

18    case that would lead you to conclude that contrary to your

19    general drift or attitude that the particular case for certain

20    reasons calls for an exception to your general opposition and

21    would support your -- would have your support for a death

22    penalty under those circumstances?

23         THE JUROR:  I could.

24         THE COURT:  You could?

25         THE JUROR:  I could.

 1              THE COURT:  Could you give an example of something

 2      like that?

 3              THE JUROR:  If my children were involved.

 4              THE COURT:  Okay.  Would it have to be something

 5      personal to you?

 6              THE JUROR:  I don't know.

 7              THE COURT:  So what we ask any juror, obviously, is to

 8      evaluate the particular evidence in the case and make a

 9      conscientious decision about that, the issues in that case.  We

10      ask sort of that question in 95 and 96.  And 95 asked whether

11      if you thought -- if he was found guilty, could you

12      conscientiously vote for the death penalty, and we asked the

13      other side of that question in 96 on the next page, if you

14      found he was guilty could you conscientiously consider voting

15      for life imprisonment.

16              As to the second one you said yes, as to the first one

17      you said you're not sure, probably not.

18              THE JUROR:  Probably not.

19              THE COURT:  Okay.

20              THE JUROR:  I would be disinclined to.

21              THE COURT:  Okay.  But nonetheless, there could be

22      circumstances that would lead you to do it.  Is that what

23      you're telling me?

24              THE JUROR:  I would leave myself open to persuasion

25      but I would be disinclined to.

```
 1                THE COURT:  Okay.  Thank you.

 2                THE JUROR:  Thank you.

 3                (The juror is excused.)

 4                (Pause.)

 5                (The juror entered the courtroom.)

 6                THE COURT:  Hi.

 7                THE JUROR:  Hi.  How are you?

 8                THE COURT:  Good.  Thank you for being patient.

 9                THE JUROR:  Anytime.

10                THE COURT:  First, just as a preliminary, we -- when

11     you were last here we instructed the potential jurors to avoid

12     any discussion of the merits of the case or -- and to avoid any

13     media exposure about the case.  Have you been able to abide by

14     those?

15                THE JUROR:  I have, your Honor.

16                THE COURT:  Okay.  You are, yourself, an attorney?

17                THE JUROR:  I am.

18                THE COURT:  But not practicing right now.  Is that it?

19                THE JUROR:  Correct.

20                THE COURT:  Tell us about what your practice was and

21     what you're doing now.

22                THE JUROR:  Okay.  So when I got out of law school, I

23     actually served as a law clerk for the superior court.  So that

24     year I was a law clerk to Judge Doerfer and Judge Larkin.

25                THE COURT:  Was that here in Suffolk?
```

```
 1              THE JUROR:  Superior court, yup.

 2              THE COURT:  I was on the superior court at the time.

 3              THE JUROR:  Yeah, I think you might have been in the

 4    program where you had your own law clerk.

 5              So then what I did was I went to Hanify & King for

 6    four years -- what was Hanify & King -- and then I went to

 7    Gadsby Hannah where I became a partner.  During that time I was

 8    in a business litigation role essentially.  Then I went to

 9    Tufts Health Plan approximately 2003 and my role was associate

10    general counsel.

11              About four years ago I transitioned out of the legal

12    position to a business role.  So for about a year and a half I

13    worked for our chief operating officer doing business analysis

14    and now I'm actually directing our client services department.

15              THE COURT:  Okay.  So have you ever practiced criminal

16    law?

17              THE JUROR:  So I never practiced it.  I did have an

18    internship my second year of law school working for the JAG

19    Corps, and I did work with a defense attorney but never

20    practiced criminal law.

21              THE COURT:  You had -- prior to your current marriage

22    you were married to someone who's a lawyer?

23              THE JUROR:  Yes.

24              THE COURT:  And did he have a criminal practice?

25              THE JUROR:  No.
```

```
 1            THE COURT:  You're concerned about the length of the
 2   trial.  Can you tell us about that a little bit?
 3            THE JUROR:  Yeah.  I mean, not from a professional
 4   standpoint, but my concern -- and I don't know whether this
 5   constitutes a hardship.  But I have two boys, ages 10 and 11,
 6   and, you know, typically I spend February and April vacation
 7   with them.  And we do have a trip planned for April.  But, you
 8   know, I understand the importance of this obligation.
 9            THE COURT:  Tell us about whether and how much you use
10   social media.
11            THE JUROR:  So the only social media that I belong to,
12   if that's even the right word, is Facebook, and I probably
13   check it a few times a day.  I rarely post.  I'm not a social
14   media person really.
15            THE COURT:  Your father was a Milton police officer?
16            THE JUROR:  Correct.
17            THE COURT:  And he's been retired for some years?
18            THE JUROR:  Yes; 17 years now.
19            THE COURT:  Yeah.  Obviously in a criminal case there
20   are law enforcement witnesses and so on.  Would you have any
21   partiality toward them because of your father's career?
22            THE JUROR:  I don't think so, your Honor.
23            THE COURT:  I'd like you to turn to page 20 in the
24   questionnaire and look at Question 77.  In that question we
25   asked prospective jurors about whether they had formed any
```

1    opinions about, first, whether the defendant was guilty or not;

2    and, secondly, if so, what the penalty might be.  You answered

3    to each of the four subparts that you were unsure.

4           Could you elaborate on that?

5           THE JUROR:  Oh, so I probably -- if -- the question is

6    "have you formed an opinion."  I don't have an opinion one way

7    or the other.

8           THE COURT:  Okay.  So notwithstanding what you may

9    have seen in the media coverage and so on, you have reserved

10   judgment.  Is that a fair summary of what your position is?

11          THE JUROR:  That's a fair summary.

12          THE COURT:  As a lawyer you understand, of course,

13   that the government has to prove a defendant guilty beyond a

14   reasonable doubt at trial, and would you --

15          THE JUROR:  I do.

16          THE COURT:  -- follow instructions to that effect and

17   be sure that if you eventually were to vote for guilty it was

18   because you were convinced by the trial evidence beyond a

19   reasonable doubt?

20          THE JUROR:  Yes.

21          THE COURT:  Tell us about the other -- the C and D

22   parts.  Well, actually, let me do this and turn to page 23.  We

23   asked there a series of questions about the death penalty and

24   attitudes toward it.  Question 88 we asked about your general

25   views of the death penalty, and you said "neutral."  And I

1    guess you reflected that in the next question where we ask you

2    to put it on a scale from "strongly opposed" to "strongly in

3    favor," and you picked 5, which is in the middle of the scale.

4            So do those questions fairly represent your view

5    about --

6            THE JUROR:  They do.

7            THE COURT:  And then if you'd turn to the next page,

8    you chose among -- again, a scale of options, letter D, which

9    says you're not for or against it; you could vote for it or you

10   could vote for life in prison instead, whichever you thought

11   was called for?

12           THE JUROR:  Correct.  I continue to believe in that.

13           THE COURT:  So you would consider the evidence in the

14   case, and if there was a penalty phase and you considered the

15   aggravating factors and any mitigating factors, you would take

16   all that into account and make some conclusion, and it could be

17   in favor of the death penalty and it could be in favor of life

18   in prison?

19           THE JUROR:  I would, your Honor.

20           THE COURT:  Is that fair?

21           THE JUROR:  That's fair.

22           THE COURT:  Okay.  Thank you.

23           THE JUROR:  Thank you.

24           (The juror is excused.)

25           MS. CLARKE:  One follow-up.  And there are a handful

1    that listen to Matty in the Morning on the radio station, and

2    the guy on that radio station has been -- his son was in the

3    pool.  I don't know whether he was excused.

4            MR. WEINREB:  It wasn't Matty in the Morning himself.

5            MS. CONRAD:  It's actually Matty in the Morning has

6    ████████████████████████████████████████████████████████████

7    ████████████████████████.

8            MR. WEINREB:  He was excused.

9            MS. CONRAD:  He was excused?

10           Well, at any rate, this is relevant to what they

11   listen to.  There was a lot of discussion if ████████████

12   should try to get on the jury so that he could make the second

13   cut and get close to the defendant and go after the defendant,

14   and we actually have a recording of this discussion which

15   included them saying things like, Well, gee, maybe we shouldn't

16   be saying this on the radio, maybe we'll get in trouble.

17           THE COURT:  So you want me to ask her about her

18   listening to Matty in the Morning.  Is that it?

19           MS. CONRAD:  If she's heard any discussion on that

20   show about this jury selection.

21           THE COURT:  Okay.

22           MR. BRUCK:  In fairness, I should say, this was done

23   in a humorous way --

24           THE COURT:  Right.  Right.  It sounds like --

25           MR. BRUCK:  -- but it was not funny.

```
 1              THE COURT:  I mean, I'm just hearing the description
 2    of -- I understand that too.
 3              MS. CONRAD:  Attempted at humor.
 4              THE COURT:  It sounds like a wiseguy crack.
 5              MR. BRUCK:  It was a whole extended spiel.
 6              THE COURT:  Yeah.
 7              (The juror returns to the courtroom.)
 8              THE COURT:  One follow-up.  We asked about what radio
 9    or -- shows or things, internet shows you might listen to.  You
10    said you listen to Matty in the Morning on the weekday commute.
11              THE JUROR:  Yes.
12              THE COURT:  Apparently I don't, okay?  I'm hearing it
13    from somebody else.  But there had been some comments on that
14    program about this case.  Did you hear any of them?
15              THE JUROR:  No, I haven't been listening to it since
16    your Honor gave me the order.
17              THE COURT:  All right.  Thank you.  That's all we
18    wanted to know.
19              (The juror is excused.)
20              MS. CONRAD:  The discussion occurred first before the
21    questionnaires were filled out when that juror got summonsed
22    and then after, so depending on it could have been either --
23              (The juror enters the courtroom.)
24              THE COURT:  Hi.
25              THE JUROR:  How are you doing?
```

```
 1            THE COURT:  Thank you for your patience.
 2            THE JUROR:  No problem.
 3            THE COURT:  When you were last here I instructed all
 4     the jurors to avoid any discussion of the case or any exposure
 5     to media about it.
 6            THE JUROR:  Yeah.
 7            THE COURT:  Have you been able to follow that
 8     instruction?
 9            THE JUROR:  I have.
10            THE COURT:  We're following up on some of the
11     questions -- answers that you gave in the questionnaire, so it
12     may be helpful to refer to it from time to time.  That's your
13     questionnaire right there.
14            My first questions are about whether you have
15     any -- you would have any difficulties participating as a
16     juror, and I want to look first at Question 9.  It says you
17     sometimes have some hearing difficulty?
18            THE JUROR:  Yeah.
19            THE COURT:  Is it serious enough that you would have
20     any difficulty --
21            THE JUROR:  Well, I mean, I don't think so.  When you
22     were talking earlier it was kind of hard for me to --
23            THE COURT:  When I was on the bench giving you the
24     instructions?
25            THE JUROR:  Yeah.
```

1          THE COURT:  Is it assisted at all?  Do you have a

2    hearing aid?

3          THE JUROR:  I don't have an assistant, no.

4          THE COURT:  Is it something that's intermittent and

5    maybe depends on how loud somebody is talking?

6          THE JUROR:  Yes.

7          THE COURT:  And whether they're talking into the

8    microphone and so on and so forth?

9          THE JUROR:  Exactly.

10          THE COURT:  So if you were a juror and you were having

11    some trouble and you signaled to us, we would make sure the

12    person spoke up, would that cure the problem?

13          THE JUROR:  Well, I think that would help, definitely.

14          THE COURT:  In Question 11, you take some medication

15    that sometimes makes you drowsy?

16          THE JUROR:  Oh, yeah, lisinopril.  I take it in the

17    morning every day.

18          THE COURT:  Would your level of drowsiness be a

19    problem to sit as a juror?

20          THE JUROR:  I don't know.  You know, I kind of learned

21    how to, you know, operate with it, so...  I've been taking it

22    for a while, so...

23          THE COURT:  I gather you probably go through your

24    workday having taken it?

25          THE JUROR:  Yeah.

1          THE COURT:  Does it affect you then?

2          THE JUROR:  No, not really.  I think I've been okay

3    with it.

4          THE COURT:  And speaking of your workday, why don't

5    you tell us a little bit about what your workday is like.

6          THE JUROR:  What my workday is like?  Pretty much I'm

7    a general manager for Tedeschi's convenience store, so it can

8    be challenging.  The store is really based on the GM being

9    there.  You know how the convenience stores work.  I'm there, I

10   do a 50-hour week, and it's, you know, just a pretty busy

11   store.

12         THE COURT:  How many employees?

13         THE JUROR:  Well, right now --

14         THE COURT:  Let me ask it differently because some of

15   them may be part time.  How many full-time-equivalent

16   employees?

17         THE JUROR:  Equivalent?  Okay.  Well, I have an

18   assistant manager full time; a specialist who's full time; and

19   then we have a deli, and they have a deli manager and an

20   assistant manager.  Everyone else is part time.

21         THE COURT:  And if you added all the part times

22   together, how many full-time equivalents would that be?

23         THE JUROR:  Added all the...

24         THE COURT:  Roughly.

25         THE JUROR:  Three, four.

```
 1              THE COURT:  Is it a seven-day operation?

 2              THE JUROR:  Oh, yeah.  Yup.  Yup.  Six in the morning

 3    till eleven at night.  It would be difficult if I had to leave

 4    for three to four months.

 5              THE COURT:  I see in -- there was a question about

 6    whether anybody in your family had worked for a law office,

 7    basically a prosecutor, public defender, and so on and so

 8    forth.  And you said your niece's husband?

 9              THE JUROR:  Yeah, ██████

10              THE COURT:  And he has his own --

11              THE JUROR:  Yeah.

12              THE COURT:  I noticed the ██████ name appeared later in

13    Question 83.

14              THE JUROR:  Right.  His brother ██████

15              THE COURT:  ██████████ is an officer for MIT.

16              THE JUROR:  Right.

17              THE COURT:  How well do you know the ██████

18              THE JUROR:  Well, I know ██████ obviously more than I

19    know ██████.  I've known ██████ since he was dating my niece.

20    I can't really remember.  It's got to be at least 10, 15 years.

21              THE COURT:  And he's an attorney?

22              THE JUROR:  He's an attorney.

23              THE COURT:  And what's his practice, do you know?

24              THE JUROR:  He's changed recently so I'm not 100

25    percent sure on his practice.  I think it's accidents and --
```

1           THE COURT:  Civil as opposed to criminal?

2           THE JUROR:  Yes, exactly.

3           THE COURT:  Okay.  Now, how well do you know or

4    interact -- how often do you interact with ███████████?

5           THE JUROR:  Just at, like, family events.

6           THE COURT:  Why would he be at family events?  Is he

7    related to?

8           THE JUROR:  Well, say he's -- he's --

9           THE COURT:  He would be there because he's ██████████

10   brother?

11          THE JUROR:  Exactly.  So just at, like, you know,

12   birthday parties for the kids and stuff like that, and

13   different parties that the families might have.

14          THE COURT:  One of the persons who was killed in the

15   events that is about this trial was a police officer for MIT.

16   Do you know if ████████ had any relationship with him?

17          THE JUROR:  I can't say that I know offhand if he

18   actually did or not, to be honest with you.  I think he -- he

19   obviously might have known him but I don't -- I don't recall

20   having --

21          THE COURT:  Do you think you would be affected in your

22   judging the evidence, at least particularly about the murder of

23   Sean Collier, the police officer, because of your relationship

24   with an MIT police officer?  Would that affect you in any way?

25   Would you be able to -- put another way, would you be able to

```
 1    be as critical a judge of the evidence in that case as you

 2    might be with other cases that you didn't have any connection

 3    with?

 4              THE JUROR:  I don't know.  I don't think so.  That's

 5    kind of a tough one.  I don't think I could...

 6              THE COURT:  Do you yourself have any connection with

 7    the MIT police generally?

 8              THE JUROR:  I don't.

 9              THE COURT:  Could you give us an idea of how many

10    times a month, a year -- you could pick the time frame -- you

11    might be in contact with ███████████?

12              THE JUROR:  ███████?

13              THE COURT:  Yeah.

14              THE JUROR:  Two to three times a year.

15              THE COURT:  And how about ███████?

16              THE JUROR:  ███████ was a little bit more -- more

17    frequent.  Four to five, depending on what's going on with the

18    family.

19              THE COURT:  Where does your niece and ███████ -- where

20    do they live?  What town?

21              THE JUROR:  Newburyport.

22              THE COURT:  I would like you to look at Question 74,

23    which is on page 19.  It asks what your reaction was when you

24    got the jury summons, and you said, "When I realized what case

25    it was I felt there's no way I could be impartial."
```

1           THE JUROR:  Hmm.

2           THE COURT:  Tell us your thinking behind that answer.

3           THE JUROR:  My thinking behind that?  Pretty much

4    just, you know, following the case right from the get-go,

5    following, you know, the marathon and the bombings and all the

6    different news reports and things that I've -- I've read and

7    I've seen, I kind of felt that -- I just didn't think I could

8    put that aside and be partial [*sic*], frankly.

9           THE COURT:  On the next page, Question 77, there's a

10   four-part question to ask whether people had formed opinions

11   based on what they'd seen and so on, and you answered to A that

12   you had formed an opinion that he was guilty and you had formed

13   an opinion that he should receive the death penalty.

14          THE JUROR:  Yes.

15          THE COURT:  In a criminal trial the government is

16   required to present evidence that is sufficient to prove to the

17   impartial jury that the defendant has committed the offense

18   charged, and the government's burden is to prove that beyond a

19   reasonable doubt.  Notwithstanding that you have some views

20   that would precede the trial, would you be able to assess the

21   trial evidence under that standard and be sure that if there

22   were a guilty finding it was only because the government had

23   proved it beyond a reasonable doubt or do you think you would

24   effectively lower the burden for the government or even reverse

25   it and put it on the defendant to show that he was not guilty?

```
 1            THE JUROR:  Good question.  Frankly, I feel like I've
 2   formed an opinion already.
 3            THE COURT:  So you wouldn't be able to --
 4            THE JUROR:  I don't.
 5            THE COURT:  -- be as rigorous as maybe the law
 6   requires.  Is that what you're saying?
 7            THE JUROR:  That's -- yup, that's what I'm saying.
 8            THE COURT:  Okay.  Thank you.
 9            THE JUROR:  Okay.
10            (The juror is excused.)
11            THE COURT:  It is suggested that I remind people to
12   avoid using the jurors' names.  I know it's -- I have to
13   suppress the impulse myself because I'm looking at the name,
14   but try to avoid it.  There have been a couple of slips.
15            (The juror enters the courtroom.)
16            THE COURT:  Juror No. 31.
17            THE JUROR:  Yes.
18            THE COURT:  Thank you for your patience.
19            Tell me about your status as a student.
20            THE JUROR:  Okay.  I'm currently a full-time student,
21   so I'm set to return next week.  I'm a pharmacy student.  This
22   would be my last semester in school, and then I have rotations
23   starting in May, I believe, so...
24            THE COURT:  So your semester begins --
25            THE JUROR:  Next Wednesday.
```

1          THE COURT:  And continues till when?

2          THE JUROR:  I believe classes end the first week of

3   May, and then it's like two weeks of finals.

4          THE COURT:  Okay.  Let me just ask you a couple of

5   questions about your attitude towards the death penalty.

6          THE JUROR:  Uh-huh.

7          THE COURT:  You seem to say in your questionnaire that

8   you are more or less firmly opposed to it?

9          THE JUROR:  Yes.

10          THE COURT:  And would be unable, no matter what the

11   circumstances, to vote to impose it?

12          THE JUROR:  That is correct.

13          THE COURT:  Would that be correct?

14          THE JUROR:  Yeah.

15          THE COURT:  Okay.  Thank you.

16          THE JUROR:  Thank you.

17          (The juror is excused.)

18          (Pause.)

19          (The juror enters the courtroom.)

20          THE CLERK:  32.

21          THE COURT:  Hi.

22          THE JUROR:  Hello.

23          THE COURT:  Last but not least.

24          THE JUROR:  Yes.

25          THE COURT:  Have you been able to abide by my

 1    instructions given the last time to avoid any discussion of the

 2    case --

 3          THE JUROR:  Yes.

 4          THE COURT:  -- or any exposure to media accounts about

 5    the case?

 6          THE JUROR:  Yes.

 7          THE COURT:  Tell me a little bit about the work you

 8    do.  I guess you said -- what I'm interested in, I guess, is

 9    you said you're on a leave of absence?

10          THE JUROR:  Yes.  I work for Home Depot.  I'm going

11    back -- plan on going back the 26th.

12          THE COURT:  Of January?

13          THE JUROR:  Yes.  Yeah.  But I am on a medical leave

14    of absence.  I've had trouble with insomnia.  I've been seeking

15    treatment for it, but I'm definitely making progress.  So if

16    I'm not called for service I will be going back.

17          THE COURT:  If you were called, you could postpone

18    your return to the company?

19          THE JUROR:  Absolutely.  Absolutely.

20          THE COURT:  Do you use Facebook?

21          THE JUROR:  Yes, occasionally.

22          THE COURT:  Well, you said every day in the form.  Is

23    that accurate?

24          THE JUROR:  Well, I don't go -- I look at Facebook to

25    see who's tweeting me, but I don't actually use it myself to

 1    send out...

 2              THE COURT:  Has anybody been sending you anything

 3    about the case?

 4              THE JUROR:  No, not at all.

 5              THE COURT:  This is picky, maybe, but if you'd look at

 6    page 14, beginning with Number 44 and through Number 46 on the

 7    next page, we say, Do you have any strongly positive or

 8    negative views about various categories, prosecutors, defense

 9    lawyers, and so on.  And you say "no negative views."

10              THE JUROR:  Yeah.

11              THE COURT:  I just wanted to be sure that you weren't

12    implying anything about whether you had positive views.

13              THE JUROR:  No, both sides have a job to do.  I

14    recognize that.  So I don't have any positive or negative

15    views.

16              THE COURT:  Do you have strongly positive or strongly

17    negative views about any of the categories in those --

18              THE JUROR:  No.

19              THE COURT:  Turn to page 20, if you would, Question

20    77.  In this question we ask people whether they have formed an

21    opinion based on media accounts or otherwise about whether the

22    defendant was guilty of the crimes he's charged with, and if

23    so, what -- whether he should be sentenced to death or not.  To

24    each of the four options there you indicated that you were

25    unsure.

1          THE JUROR:  Yes.

2          THE COURT:  Could you just tell us a little bit about

3    your answer, why you answered it that way.

4          THE JUROR:  I really haven't been following the case

5    at all.  Even though, you know, I'm sure there's been a lot of

6    coverage, it's just been too close to home, I guess.  And I

7    didn't know anybody that was involved, so I didn't have the

8    same interest as somebody who maybe did know somebody that was

9    affected somehow, so...

10          THE COURT:  Well, with respect to the question of

11    guilt or not, at trial the government would be required to

12    present evidence sufficient to convince the jury that the

13    defendant had committed the offense charged, and the evidence

14    would have to be so convincing that the jurors would have no

15    reasonable doubt about it.  That's always the burden on the

16    government.

17          Do you have any difficulty applying those principles

18    and making sure if you're a juror in the case, in order to

19    prove the defendant guilty of any of these crimes, the

20    government would have to do that, prove it beyond reasonable

21    doubt to you?  Do you have any difficulty with that?

22          THE JUROR:  Yeah, they would have to prove it beyond a

23    reasonable doubt definitely.  Especially if, God forbid, the

24    death penalty is called for.

25          THE COURT:  Okay.  You did say in answer to Question

1   78 that if he is found guilty you could support the death

2   penalty?

3           THE JUROR:  Yes.

4           THE COURT:  If you turn over to page 23, you said the

5   same thing in answer to Question 88 where we ask for your

6   general attitudes about the death penalty.  You basically used

7   the same words, I guess.  So the word I focus on is you could

8   support it.  I take that to be something different from you

9   automatically would support it.  Is that correct?

10          THE JUROR:  I'm not for the death penalty, per se.

11  But if somebody did something that called for that, I wouldn't

12  have a problem.

13          THE COURT:  Could you make that judgment only after

14  you had heard all the evidence in what we call the penalty

15  phase, where evidence is presented as to things that might

16  support the death penalty and evidence will be presented about

17  things that would call for, instead of the death penalty, a

18  sentence of life imprisonment?  So if you had that body of

19  evidence in the penalty phase, would you be able to reserve

20  decision about whether the death penalty should be applied

21  until you heard and considered all that evidence?

22          THE JUROR:  Whatever the instructions were to the

23  jury, that's what I would do.

24          THE COURT:  In Question 89 you said you're relatively

25  strongly in favor of the death penalty.  You're a 9 out of 10.

1    I don't know if that -- sometimes it's hard to gauge that, but

2    that's what you put there.  If you look at the next page, you

3    circled letter E, which is one of the many choices we gave you.

4    You said you were in favor of the death penalty but you could

5    vote for a sentence of life imprisonment without possible

6    release if you believed that that sentence was the appropriate

7    one on the facts.

8              THE JUROR:  Right.

9              THE COURT:  Does that truly represent your view?

10             THE JUROR:  Yes, it does.  Yes, it does.

11             THE COURT:  So you're not automatically in favor of or

12   against the death penalty in this case because you haven't

13   reached that point of deciding.

14             THE JUROR:  It would depend upon what was shown in

15   court and what your instructions were.

16             THE COURT:  Okay.  I think that's all I have.  Thank

17   you.

18             THE JUROR:  You're welcome.

19             (The juror is excused.)

20             THE COURT:  So do you want to hold him?

21             MS. CLARKE:  One follow-up, your Honor, on the

22   insomnia question.  He's suffering from insomnia but he didn't

23   get good treatment for it so he's just going to go back to

24   work?  I don't know how that might affect his ability to sit.

25   Did the Court maybe want to inquire a little bit more about how

 1    disabling that is?

 2              MR. WEINREB:  My recollection is that he said that it

 3    had been improving.

 4              THE COURT:  Yeah, I think he thought it was.

 5              MS. CLARKE:  I couldn't hear.

 6              THE COURT:  I thought he said he was going back to

 7    work next week or in two weeks.

 8              MR. WEINREB:  Right, if he wasn't selected to serve he

 9    would be going back to work because he was well enough.

10              MS. CLARKE:  I couldn't hear him well enough so I

11    thought he said, "I'm giving up so going back to work."

12              MS. PELLEGRINI:  No.

13              MS. CLARKE:  It just seems like insomnia is something

14    that --

15              THE COURT:  I think we'll leave it as it is.

16              So I think we'll take a break.  Among other things,

17    the reporter needs a break.  As we had discussed, I think we'll

18    reconvene and go over the people we've examined and perhaps

19    hear some argument and make some conclusions about it.

20              I intend to hear the argument openly, but in order to

21    protect the integrity of the process, I may or may not announce

22    conclusions on the basis of the argument.  And if you have

23    views on that, I'll entertain those as well.  That's my

24    inclination.

25              MR. BRUCK:  I think that hearing the argument openly

1   has the same effect as making the rulings openly.  We don't

2   really think that -- if the intention is to keep the criteria

3   and the issues for disqualification from being in the public --

4           THE COURT:  So you think we should do both off the

5   record or off the public record?

6           MR. BRUCK:  That's, in effect, at sidebar.

7           THE COURT:  Let me think about that.

8           MR. WEINREB:  Your Honor, we --

9           THE COURT:  You may be right about that.  So let me --

10          MR. WEINREB:  With the caveat that it would eventually

11  become public.

12          THE COURT:  Yes, of course.  Absolutely.

13          Just for those who are listening, we are concerned

14  about protecting -- this is going to be an extended process and

15  we're concerned about people being coached by outcomes.  We

16  want honest answers to the questions.  So we'll take a recess

17  and -- I presume people will want to confer among themselves

18  before we get back together, so what would you say, about a

19  half-hour?  Is that enough?  Do you want a little more than

20  that, a little less?

21          MS. CLARKE:  That sounds good.

22          MR. WEINREB:  That's a good amount of time.

23          THE COURT:  Okay.  So about 20 minutes of four.

24          (There is a recess in the proceedings at 3:09 p.m.)

25  (The Court entered the room at 4:03 p.m.)

```
 1              THE COURT:  Okay.  I would imagine you've agreed on

 2     some.

 3              MR. WEINREB:  We have, your Honor.

 4              THE COURT:  Can we just run through those?

 5              MR. WEINREB:  So Number 4.

 6              MS. CLARKE:  Number 9.

 7              THE COURT:  I'm sorry?

 8              MR. WEINREB:  Number 9.  Number 14.

 9              THE COURT:  We already --

10              MR. WEINREB:  And Number 19.

11              THE COURT:  Which one?

12              MR. WEINREB:  19.

13              MS. CLARKE:  15 was already off.

14              THE COURT:  Let's just include for this purpose the

15     list of ones that we already have -- was No. 20 one of those?

16              MR. WEINREB:  Yes, your Honor.

17              MS. CLARKE:  Number 22 was one of those.  26 was one

18     of those.

19              THE COURT:  Right.

20              MS. CLARKE:  30 was one of those.  31 was one of

21     those.

22              THE COURT:  Any others?  Is that the list, I think?

23              MR. WEINREB:  That's it.

24              THE COURT:  So that's nine.  Okay.  So the first then

25     as to which there's no agreement would be No. 6.  Is there
```

1    any --

2            MS. CLARKE:  Number 6, we move to strike for cause.

3    This was the juror, your Honor, that -- whose wife treated

4    victims at the hospital.  He said -- when asked, Could you set

5    that aside -- she had a tough time.  It was hard on her.  When

6    asked whether you could set that aside, he said, Well,

7    possibly, but it's tough.  And my wife had a tough time.  Your

8    question was:  Could you be fair?  And he said, It's tough.  We

9    don't see how he stays as a juror.

10           He also had a coworker at John Hancock that was there

11   that day.  He works for John Hancock.  So he has connections,

12   close connections, to the Marathon events.

13           MR. WEINREB:  So the government objects.  The working

14   at John Hancock, he said, would not affect him.  And he said

15   his coworker, although was at the finish line, they had had no

16   detail talk about it.  The only issue would be that his wife

17   was a nurse at MGH and treated some of the victims, but that is

18   once removed from him.  He was not someone who dealt with the

19   victims or treated them.  And although he did say that it hit

20   her hard, he did not say he could not be fair and impartial.

21   And then he followed up -- when the Court followed up on it, he

22   said, The facts are the facts, indicating that in the end it

23   would be the evidence that would persuade him and not his

24   wife's experience.

25           We do, however, think that he should be brought back

 1   for a different purpose, which is that he was questioned before

 2   we had our colloquy about how to phrase the *Morgan* question,

 3   and we would like him brought back just for the purpose of just

 4   asking him that question.

 5        THE COURT:  Okay.  I think I'm going to strike him at

 6   the defense request.  It's the combination of his wife's

 7   experience and his affiliation with John Hancock, who is not

 8   just any business in the Back Bay.  It's the sponsor of the

 9   Marathon.  I think, as much as he may be sincere in his

10   intentions, going home every night, particularly when some of

11   the victim evidence is produced, I think will be too much of a

12   -- potentially too much of an influence on him, and I don't

13   think we should take that risk.  So I'll excuse him for that

14   reason.  It won't be necessary to bring him back.

15        MR. BRUCK:  The next is 7, ██████████

16        THE COURT:  On the use of the name, I don't know that

17   it matters -- is anybody going to get daily copy other than you

18   lawyers?  When it's broadcast -- that's why I don't want the

19   names used because it's being broadcast to the public.  If you

20   want to stay with the numbers, that's fine here, too.

21        Let me just say that -- keep in mind that there may be

22   some other identifying -- piece of information that will easily

23   identify someone.  For example, I thought of and rejected the

24   idea of asking the Tedeschi's supervisor where his store was

25   because it would be easy for somebody to go to Braintree and

 1    find the store if that's where it is.  I don't know where it

 2    is.  Keep in mind that there are other facts that could

 3    identify someone for somebody who was interested in tracking

 4    them down.  So -- all right.  7.

 5          MR. BRUCK:  Number 7 seems like a pretty clear

 6    hardship combined with he and his wife run a small deli.  She

 7    is five-and-a-half-months pregnant.  That leaves three and a

 8    half months if she goes full term.  And they're running this

 9    business together.  So you've got two problems.  You've got the

10    economic problem of how she's going to do this by herself, and

11    he's going to be worried about it.  And then she's going to

12    have a baby during the period in which we are projecting this

13    case could still be lasting.  I can't imagine how the Court or

14    anybody is going to want to deal with that problem.  And so it

15    just seems pretty clear to us that that is a real hardship, on

16    top of which we have the problem with his rap sheet, and he

17    would need to come back.  But we don't think he needs to come

18    back because we think it's clear that he really isn't -- it

19    isn't fair to ask him to serve, not in the next three and a

20    half months.

21          MR. WEINREB:  Your Honor, we would prefer to bring him

22    back for several reasons.  With respect to the hardship, he

23    may, in fact, have a genuine hardship claim, but he wrote on

24    his questionnaire that he didn't.  Then when he came in, he did

25    explain about his job as a cook.  But my recollection is that,

 1    after saying that his fiance was five-and-a-half-months

 2    pregnant, he said that the hours he would be gone would be --

 3    typical for her would be five hours a day.  It was a quite

 4    confusing answer that I think could -- we could benefit from

 5    asking him a little more detail about it.

 6           He also said, I'm not one to form an opinion until I

 7    hear the facts for myself, which recommends him as a juror.

 8    And if he's not got a disqualifying hardship, then there's no

 9    other basis for excusing him.  And we think he's entitled to

10    his chance to serve and if he's willing --

11           THE COURT:  He didn't bring it up at the beginning,

12    but I do think it is a genuine hardship.  He seems to me to be

13    in the self-employed category.  And regardless of what

14    attention he may have to devote to his wife and new child or

15    child to be, I think his not being able to attend the business

16    is a bigger hardship.  I tend to -- I think everybody does --

17    tend him -- I put him in the same category, I guess, as the

18    commission fellow who's working as the damage estimator.  I

19    think they're pretty similar.  So I think I will excuse him.

20           You know, it is a little unexplained why he didn't say

21    it in the first place.  Maybe it was optimism.  I don't know.

22    But I think it's -- I think -- another way of saying it, I

23    think we're going to have trouble with him later if we try to

24    force the issue on him.

25           9 you've agreed on.  10.

1          MR. BRUCK:  Number 10 is the Bidlack -- okay.  Go

2     ahead.

3          MR. WEINREB:  Your Honor, the government moves to

4     strike No. 10.  Number 10 made clear that he is categorically

5     opposed to the death penalty except under one circumstance that

6     will never come to pass, which is that the walls of all the

7     prisons fall down.  He said that he would be denied tenure if

8     he voted for the death penalty.  And he said that it would be a

9     hardship for his students because he's irreplaceable.

10          If he is not disqualified under *Witherspoon* as being

11     unable to impose the death penalty, then he is surely

12     substantially impaired in his ability to do so.

13          MR. BRUCK:  Number 10, we feel that the government's

14     case may very well satisfy his criteria, that the government

15     proposes -- forecasts evidence about -- that the prison system

16     could not adequately protect innocent life from this defendant

17     in several ways, one having to do with terrorism generally and

18     the other having to do with actual conditions in prison.  I

19     think this is a juror who has a very high standard for what it

20     would take to impose the death penalty, but that is not

21     disqualifying under *Witherspoon* and *Witt*.  And so we don't

22     think that he should be excused on that ground.

23          MR. WEINREB:  Your Honor, if I may respond just to

24     clarify, the government has not alleged as an aggravating

25     factor in this case that the defendant presents a risk of

1    future dangerousness.  We did, however, notice to the

2    defendant, if the defense asserts as a mitigating factor that

3    the defendant poses no risk of future harm, then the government

4    would seek to offer rebuttal evidence.  So it remains unclear

5    what the jury will be hearing if there is a penalty phase on

6    that subject.

7         THE COURT:  I think he should be excused.  His views

8    are, I think, very seriously and -- very seriously considered

9    in an academically sophisticated way.  But I think he is -- as

10   a practical matter, the condition that he sets for being able

11   to vote for it is so remote and if not impossible that I think

12   it may satisfy his philosophical understanding of the

13   appropriateness of the death penalty.  But as a practical

14   matter, I think it's a signal that he would be unable to

15   conscientiously consider it and at least be substantially

16   impaired in that respect.

17         11.

18         MS. CLARKE:  Number 11 is a defense motion to strike.

19   This was the man that I would refer to as grumpy, but you could

20   call him -- that I would refer to as grumpy.  You could call

21   him angry.  He has a hardship that's pretty substantial.  He

22   would stand to lose $20,000 by not being able to be at work.  I

23   think the Court asked him, Can you do this off hours?  And he

24   said, No, I need to be available during the day.  Is that the

25   right guy?  Yes.

 1            And on top of his hardship, which seemed fairly
 2    substantial, he appears to be, to us, to be substantially
 3    impaired with regard to the penalty decisions.  He was fairly
 4    straightforward and harsh in his answers, Justice is justice.
 5    A small percentage of the population needs to be put down.
 6    Life is only equal to 20 years.  We break the rules, we can't
 7    -- you can't be allowed to live with the rest of us.  He was --
 8    appeared substantially impaired in the death penalty, and that
 9    combination seems to us to remove him.
10            MR. WEINREB:  We object, your Honor.  He said that he
11    was a software engineer contractor who worked at home and,
12    therefore, could do his job at times other than 9 to 5.
13    Although he said he needed to be available during the day, he
14    said he could be available remotely via email or phone, and he
15    will have breaks during the day and a lunch hour, plus times
16    before and after the trial -- the trial will end at 4 -- when
17    he can be in touch with the people who may need to get in touch
18    with him.  In that sense, he's not unlike many other people.
19    Presumably during the day, in his normal days, there are times
20    when he has other things that he needs to do, and he stays in
21    touch via these ways that he mentioned.
22            The fact that he will lose money if he serves on the
23    jury is not in itself a hardship unless he says that it is
24    going to be -- he said he would take a financial hit, and, of
25    course, that's a hardship for anybody.  But to be a hardship in

```
 1    the legal sense, I think it has to be more than the kind of

 2    sacrifice that everyone makes when they serve on a jury.

 3         With respect to being substantially impaired, he

 4    clearly was and is -- he is a person who firmly supports the

 5    death penalty and is unafraid and unhesitant to say so.  But

 6    that's different from saying that he could not meaningfully

 7    consider mitigating factors and impose a sentence of life

 8    without parole if the facts justified them.  When he was asked

 9    those questions pointblank, he unhesitatingly said that he

10    could.  And that is not evidence of substantial impairment.

11    It's evidence of the opposite.

12         THE COURT:  Well, again, I think I'm going to excuse

13    him as well.  I do think he's probably in the self-employed

14    category.  The fact that somebody, particularly software

15    people, work remotely doesn't necessarily mean they work out of

16    normal work hours because of -- not because of their own work

17    habits but because of the people they're dealing with.  So I

18    think he's that.

19         I also have to say that some of the way he phrased

20    things in the questionnaire and his demeanor here today

21    suggested a kind of oppositional attitude that I think would be

22    problematic in unknown ways.  And I think that we're better off

23    not having that issue.

24         Number 14, we've already dealt with.

25         Next would be No. 15.  We've already dealt, I think,
```

1    with her as well, right?

2           THE CLERK:  Yup.

3           MR. WEINREB:  Yes.

4           THE COURT:  She didn't get mentioned on the list

5    there.

6           Number 16.

7           MR. WEINREB:  Your Honor, the government moves to

8    strike No. 16.  We have a serious concern about his candor,

9    particularly with respect to his work situation.  He wrote on

10   his questionnaire that his employment is that he's a limo

11   driver.  But when he came into court, he clarified that he is

12   unemployed -- he clarified that because he suffered a work

13   injury, he's on disability and, therefore, considers himself

14   unemployed.  And so his limo driving, which pays him money, he

15   described as an avocation, something that he just does -- how

16   did he put it?  Almost like a hobby.  And that seems to be an

17   interesting spin on the fact, if not an outright

18   misrepresentation of it.



1

2

3

4

5

6

7

8

9

10

11       I think we have a different view of the limo driver

12  question.  He was pretty upfront with that, too.  If you look

13  at Question 26, he says, "Limo driver."  And then 27,

14  "Unemployed due to auto accident," ending in 2014 -- 2013 to

15  2014.

16          So his credibility didn't seem to us to be at issue.

17  We did not see anything in his answers on the questionnaire or

18  the questioning the Court did that would give rise to a cause

19  challenge.

20          THE COURT:  Well, I guess -- I think it's a bit of a

21  close question.  I guess I am a little troubled, like the

22  government, with his candor.  The question is pretty easy to

23  read.  And I think, when he started to read it, he realized it

24

25

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 █████████████████████████████████████████

4 █████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████

7 █████████████████████████

8          And there is the question of his candor with respect

9   to his driving and whether he's skating close to the edge with

10  his working when maybe he shouldn't be kind of thing.  So it's

11  -- it's a close question, but I think I'll excuse him.

12          19 is already done.  20 is done.  21.  No?

13          MR. WEINREB:  No.

14          THE COURT:  He wins the prize.  22 is excused.  23.

15          MR. WEINREB:  Your Honor, the government moves to

16  strike 23.  She unequivocally stated her opposition to the

17  death penalty and said she could not impose it in any case.

18  And, in addition, she has a genuine hardship.

19          THE COURT:  For the defense?

20          MR. BRUCK:  Her opposition to the death penalty, I

21  thought, the Court really cleared up.  At one point she said,

22  Well, if it was my children, and you followed up with what

23  about other children, at which point she said it would be hard,

24  which is where she started.

25          THE COURT:  I don't think that's this -- that was

1    another juror.  This is Juror 23.

2              MR. BRUCK:  It is.

3              THE COURT:  I think the person who answered that way

4    was Juror 27.

5              MR. BRUCK:  No.  They both discussed children.

6              MS. CLARKE:  23, I think, was the one that was not

7    asked the follow-up question.

8              MR. WEINREB:  Juror 23 said, I could not say yes, he

9    could get the death penalty.  I myself personally would never,

10   ever be able to say that with anybody.  I'm against the death

11   penalty.  It would have to be as personal as my child.

12             THE COURT:  Okay.  She mentioned the child.

13             MS. CLARKE:  Maybe we should look at the transcript?

14             MR. WEINREB:  I'm confident that the one who said --

15             MS. CLARKE:  The one that corrected was 27, not 23?

16             MR. WEINREB:  Correct.

17             THE COURT:  I actually thought on the basis -- when I

18   reviewed her questionnaire, I thought she was in the zone, and

19   I was struck by her retreat from that today.  So I think I'm in

20   agreement with the government on this.  She became more adamant

21   about her opposition than I expected her to be from the way she

22   had answered the questions on the questionnaire.

23             MR. BRUCK:  Just so the record is clear as to our

24   position -- it took me awhile to find my notes.  But when you

25   asked, How about somebody else's child? she said, I wouldn't

1    want to do it.  That's where it was left.  And that is, we

2    think, not disqualifying.

3         THE COURT:  That is consistent with her answer to

4    Question 88 where she said, I couldn't emotionally handle

5    having that judgment be in part by me.  But I saw that when I

6    looked at the questionnaire, but then I also saw that she was

7    in the middle of the range and that she -- on both 89 and 90,

8    and I thought maybe that put her back in the zone.  But I think

9    she reaffirmed her inability to do it on Question 88.

10        It's not brought up, I guess, but she also has the

11   hardship issue of possibly losing her health benefits, which is

12   a significant hardship.  I don't understand that, I have to

13   say.  She said she talked with the employer about it.  She has

14   at least a major controversy on her hands even if three years

15   from now she could win a lawsuit.  So I think that's a separate

16   reason.  She does -- as I recall, her husband was a contractor,

17   probably doesn't carry insurance because it's expensive for

18   them, and she's getting it through her employer.  I think

19   that's something that shouldn't be risked.  So I'll excuse No.

20   23.

21        MS. CLARKE:  26, we had agreed to.

22        THE COURT:  27.

23        MS. CLARKE:  27, no motion.

24        MR. WEINREB:  Your Honor, the government moves to

25   strike No. 27 primarily on the grounds that she is

 1    substantially impaired in her ability to impose the death

 2    penalty.  She is against the death penalty and said on her

 3    questionnaire that she probably -- when asked if she could

 4    impose it, she said probably not.

 5           When the Court probed and sought to try to uncover

 6    circumstances in which she could impose it, the only example

 7    she could come up with was only if her own children had been

 8    victims.  And I think it's quite telling that, in saying that,

 9    it was obvious, looking at her, that she almost began to cry.

10    She became very emotional.  And it suggests that, when applying

11    her reason, she finds she could not impose the death penalty.

12    It's equivalent to saying, The only way I could impose it is if

13    I did it on an emotional basis, as an emotional basis and not

14    one based on consideration of aggravating and mitigating

15    factors.

16           Also, I think it's quite significant that she does

17    post-conviction criminal cases.  That's her whole career, is

18    advocating on behalf of criminal defendants and looking for

19    ways to spare them from whatever penalty they may have

20    received.  Her husband does the same thing in addition to other

21    things.  And it is -- given those combination of factors, it

22    is, I think, clear -- given those combination of factors and

23    based on her demeanor, the way that she answered the questions

24    in court, I think it's clear that she -- even if she does not

25    fall into the category of somebody who could not under any

1   circumstances impose a death penalty that she falls into the

2   definition of substantial impairment that is discussed in the

3   cases, mainly someone who is not categorically opposed to the

4   death penalty but states that they could only impose it under

5   very special or unusual circumstances such as -- I could name

6   all the examples that the Supreme Court has given, but they're

7   cited in papers we previously submitted.

8        MR. BRUCK:  We thought, by the end of your

9   examination, that it was clear that she is qualified.  She is

10  somebody that does not support the death penalty, and she

11  regards it with a tremendous seriousness.  That is not

12  disqualifying in any way, shape or form.  Because she's a

13  lawyer, she knows how real this is, and it's not abstract.  But

14  that's not disqualifying either and neither is the fact that

15  she advocates for individuals who have been convicted.

16       We think that she is clearly -- the words she used is

17  that she is open to persuasion.  That is exactly the frame of

18  mind that a juror should have.  And we think that she is

19  qualified.

20       THE COURT:  She does -- putting aside the death

21  penalty issue, her career is something that I'm wondering

22  about, and that is, I would think that perhaps a plausible

23  cause for excuse might be cited by the defense if there was an

24  assistant district attorney who prosecuted murder cases who was

25  on the list.  I mean, she does have a professional commitment

1    to one side of the criminal prosecution.  Nothing at all wrong

2    with that.  But it might have a kind of inherent bias that's

3    hard to detect particularly with someone who is composed as she

4    is and familiar with the standards that apply.  So I think

5    that's what troubles me more than the death penalty question.

6    I think it's her career orientation that would be skewing, I

7    think, even if she thought she was not.  So I think it's a

8    concern.  It's kind of having a partisan for one side of the

9    criminal case generally conceived.  So I think, for that

10   reason, I'll strike her.

11         28.

12         MS. CLARKE:  One moment.  If you give us -- didn't we

13   agree on 28?

14         MR. WEINREB:  Yes, we did.

15         THE COURT:  To strike 28?

16         MR. WEINREB:  Yeah.

17         THE COURT:  That's it, I think.

18         MR. WEINREB:  No.

19         THE COURT:  I'm sorry.  32.

20         MR. BRUCK:  Yes.  The defense has a motion to

21   disqualify ███████.  If I can just get to my notes.  First,

22   there was a rather confusing health picture.  He is going back

23   to work after what sounded like unsuccessful treatment for or

24   not entirely successful attempt to recover from insomnia, which

25   is a right serious health problem for a juror in a three- or

1    four-month trial.  He -- I have to say he did seem

2    exceptionally eager to serve.  This is a juror who we would

3    have liked to have been asked that question flat out, which is

4    one of our requested voir dire questions:  Do you want to be on

5    this jury?  We have expressed all along in this process our

6    concern about people who really want to be on this jury for

7    reasons having to do with an agenda.  I'm not accusing him of

8    that.  The point is that the -- one of the goals of this

9    process, which we think may have not succeeded in this

10   instance, is to identify those people when they're there.

11          We also think that he is effectively, in all

12   likelihood, a juror who will not consider mitigation.  His --

13   and will automatically impose the death penalty.  His responses

14   were very unilluminating, and we don't think that the *Morgan*

15   inquiry was sufficient to determine whether or not, in a case

16   of intentional murder, where there was no self-defense and no

17   insanity and no heat of passion and all the sorts of irrelevant

18   factors that jurors sometimes think are -- would be sentencing

19   considerations at the penalty phase -- we know they're not but

20   the jurors don't know that.  And it very well, given the

21   questions that were asked and weren't asked, if found guilty, I

22   could support the death penalty, is his questionnaire answer.

23          We really think that this is a juror who would not

24   consider mitigation, would not meaningfully consider imposing a

25   life sentence.  And at a minimum, we can't say from his answers

1    whether I'm right or wrong about that.  We just -- his answer

2    was basically, I would go with your instructions.  Well, your

3    instructions aren't going to tell him what to do, but he

4    doesn't know that.  And that's why we just don't think he's

5    qualified.  He's too far on the death side of the scale, and

6    there's too much mystery about his actual views still after

7    voir dire.

8         MR. WEINREB:  Your Honor, we object.  What Mr. Bruck

9    has cited is pure speculation, speculation about his potential

10   impairment from insomnia, which he claims he no longer had.  He

11   said he had gotten better and is ready to go back to work.  If

12   he's not selected for this jury, that's what he's going to do.

13   He gave no indication whatsoever that he was unable to consider

14   a life sentence or substantially impaired in any way, just pure

15   seemingly hunch on Mr. Bruck's part.

16        He seemed, in his answers to the Court, to be candid,

17   open.  He bore all the characteristics that jurors are told in

18   trials to pay attention to when evaluating somebody's

19   credibility.  He didn't hesitate.  He didn't duck any of the

20   questions.  There's nothing inconsistent about them, nothing

21   inconsistent about what he said in court and what was on his

22   questionnaire.  He was quite firm that he had not made up his

23   mind, that he would listen to the evidence, that that was the

24   most important thing, were the facts in the case, and that he

25   would decide it based on the evidence and on the instructions

1      the Court gave him.

2              There's simply -- Mr. Bruck seems to be saying that

3      those answers themselves somehow create a suspicion that he's

4      unable or unwilling to do the very things that he's sworn under

5      oath that he's able to.  That can't be a fair inference.

6              THE COURT:  Yeah.  I would deny this strike request.

7      I think his answers were satisfactory.  I didn't detect

8      anything in the manner of his answering that led me to think he

9      was being insincere.  You can't always tell, obviously.  He

10     seemed rather ingenuous as opposed to disingenuous.  And I

11     found his answers credible.  So I would not excuse him for

12     cause.

13             MS. CLARKE:  Your Honor, could I take the Court back

14     to ███████████       just for one moment?  That's the government

15     strike that was just granted, the lawyer.  We have no basis in

16     this record that she handles murder cases.  I don't know

17     whether that would influence one way or the other.

18             THE COURT:  I used that as an example, perhaps illy

19     chosen, of the opposite side just to kind of make the point.  I

20     wouldn't -- the point is a larger one of affiliation with

21     prosecution and defense rather than specifically about the

22     nature of the crime charged.

23             MS. CLARKE:  I personally have a very good friend who

24     hung a jury, 11 votes for not guilty, and this person held out

25     for guilty and hung a -- that's criminal defense lawyer friend.

1   So I'm not sure that either side should be tarred and feathered

2   with what their practice is.  It brings experiences, but it

3   doesn't necessarily bring a bias towards guilt or innocence or

4   a penalty or not.  I would get struck because of my death

5   penalty views, but she should not.

6           THE COURT:  Okay.  I think it will stand.

7           We have -- Jim McAlear is here to perhaps explain this

8   a little bit.  We had a couple of, I guess, calls from two

9   jurors who were scheduled to be here this afternoon and then

10  got told to come tomorrow morning.  They both have schedule

11  issues because they thought they would be free tomorrow

12  morning.  They're both at 11 a.m.  The first is -- I presume

13  you've reviewed the questionnaires.  The first is a radiologist

14  from Children's Hospital.  He has surgery on a patient tomorrow

15  at 11.

16          MS. CLARKE:  Which number is that?

17          THE COURT:  He's 52.  I believe -- did you talk to him

18  directly or --

19          MR. McALEAR:  One of my staff members said that he's

20  completely willing to come if he could be first on the list.

21  It would be, like, 9 a.m.

22          MR. WEINREB:  We have no objection.

23          THE COURT:  We get to him after -- assuming we can

24  start at 9:00, which we were delayed for a couple of reasons

25  today.  But we'd get to him around 9:20 or so.  If he's able to

1    go back to the hospital and participate, if there's no

2    objection, we'll take him first.

3         The other is No. 48, who has a -- as far as the note

4    is concerned, an unspecified doctor's appointment.  He is the

5    patient.

6         THE CLERK:  He claims -- I don't have a copy of the

7    questionnaires anymore, but he claims he wrote it on his

8    questionnaire that he had health issues, and this is one of the

9    things that --

10        THE COURT:  We could simply take him off the list for

11   tomorrow, and at some point, like the woman we talked about the

12   other day -- No. 15, was it, I think -- alter -- just plug them

13   in at some point where we can make that arrangement with some

14   other panel.

15        MR. WEINREB:  We have no objection.

16        THE COURT:  They would be out of sequence at some

17   point.

18        MS. CLARKE:  If you want to give us a couple minutes

19   to look at the questionnaire, maybe we could talk about that.

20        MR. WEINREB:  Based on health problems, maybe.

21        THE COURT:  I didn't bring mine with me.  If you have

22   yours there -- if you're doing that, look at both of them.

23        MS. CLARKE:  Both?  Not the doctor?

24        THE COURT:  Yes.  Look at the doctor.

25        MR. CHAKRAVARTY:  Your Honor, as long as Mr. McAlear

1    is here, if the parties continue to discuss potential

2    agreed-upon strikes, when is the latest that we can make that

3    information known to the Court such that those jurors --

4    prospective jurors would not have to come in, or would your

5    Honor just prefer they come in and we do what we did today?

6              THE COURT:  They can get called off the night before,

7    can't they?

8              MR. McALEAR:  Yes.

9              THE COURT:  If it's a business day?

10             MR. McALEAR:  Yes.

11             THE COURT:  You answer the question.

12             MR. McALEAR:  With records to --

13             THE COURT:  Maybe you can be more specific.  What's --

14   what would be the objective?

15             MR. CHAKRAVARTY:  When the parties have more time and

16   tonight when we go back through the questionnaires, for

17   example, for tomorrow or maybe for Tuesday, there may be some

18   more that we can agree upon, having some visibility into how

19   the process is going from today's experience, such that we

20   might be able to add additional ones even as early as tomorrow

21   but, more realistically, for two days hence.

22             THE COURT:  Let's talk about Tuesday.  We'll see again

23   tomorrow how things go.  I think -- you know, this was the

24   first panel that we did.  There was some start-up -- getting

25   used to the process and so on.  I expect the pace will more or

1     less pick up.  And if we get started at 9, my hope is that our

2     experience tomorrow will confirm that we could put two panels

3     on again on Tuesday.  We'll see.  But -- anyway.  If we can't,

4     we won't.  But I think maybe that's a possibility if things

5     move tomorrow.

6             MR. WEINREB:  I guess the question is, if the jurors

7     are scheduled for the following day, if we inform Mr. McAlear

8     by close of business the day before?

9             THE COURT:  So the Tuesday is a problem -- I guess we

10    could do it anyway.  Could we post it -- even though Monday is

11    a holiday, could we post it Monday evening?

12            MR. McALEAR:  Yeah.

13            THE COURT:  There's a question of whether we want to

14    do that.

15            MR. McALEAR:  That's what I --

16            THE COURT:  Our procedure to this point has been to be

17    opaque about who is getting excused partly because of a literal

18    reading of the decorum order makes them, if excused, free to

19    talk to the press.  And so I think we wanted to keep everybody

20    unexcused, even the most obviously excusable, until we were

21    ready to announce the jury.

22            MR. WEINREB:  We agree with that approach.

23            THE COURT:  So that counsels for bringing them in so

24    people don't figure out that they've been excused.

25            MR. WEINREB:  Very well.

1            MS. CLARKE:  Your Honor, we'll agree on --

2            THE COURT:  We can do the same thing, and that is,

3    with respect to those, we can sort of abbreviate some of the

4    inquiry.  But we can conduct enough so that they will feel that

5    they're being treated exactly the same as those as to whom

6    there is no agreement.

7            MR. BRUCK:  As for No. 52, we're prepared to agree to

8    his being excused.  I think the government will also agree.

9    And under the circumstances, given that he is a surgeon with

10   surgeries scheduled, I think we probably should make an

11   exception.

12           THE COURT:  We can tell him that we will reschedule

13   him and not tell him that he's been excused, and he'll just

14   never get rescheduled.  If you want to do that with the other

15   one too -- I don't know what the situation is with the other

16   one.

17           MS. CLARKE:  No, not on the other one.

18           THE COURT:  Okay.

19           MS. CLARKE:  At least not this week.

20           THE COURT:  We'll plug him in someplace where we

21   can --

22           MS. CLARKE:  If we could.  Maybe just tell him to come

23   on Tuesday.

24           THE COURT:  We could do that.  You want to do that?

25           MR. WEINREB:  That's fine.

1        THE COURT:  We'll tell him to come on Tuesday.

2        MS. CLARKE:  So what do we have tomorrow?

3        THE COURT:  I'm sorry?

4        MS. CLARKE:  What do we have tomorrow?

5        THE COURT:  The next 20 that we were planning to do

6   this afternoon.

7        MR. BRUCK:  Nineteen now.

8        MS. CLARKE:  Eighteen.

9        MR. McALEAR:  You want me to add two?

10        THE COURT:  No.  Let's just leave it as is.  We'll

11   regroup and get the lists back on their regular track next

12   week.

13        I don't know if -- we had some trouble with the

14   transmission to the other room today.  I hope that's fixed.  So

15   the media was upset about that because they couldn't see

16   things.  They're also upset that they can't be here.

17        MR. BRUCK:  If they were here, they'd feel

18   differently.

19        THE COURT:  We've had both verbal and emailed

20   complaints about that.  My own view is that, where the

21   proceedings are made available for their coverage audially and

22   videoly (ph), that there is no First Amendment denial of access

23   by not being physically in the room.  This is the First

24   Amendment version of the Sixth Amendment problem.

25        So -- and I think, where there is an interest, a

1    legitimate administration-of-justice interest in trying to

2    protect the jury selection process, I think an accommodation

3    which gives them information access without physical access --

4    so they don't see everything.  They're complaining they can't

5    see all the participants, including the jurors, and so on and

6    so forth.

7         But I -- this is my unstudied opinion that reasonable

8    accommodations can be made to protect the process so long as

9    the press has some ability to cover it and can report to the

10   public generally what's going on.  Press probably has a

11   different view of that.  I'd rather not get into litigation

12   over it.

13        One proposal was made that they have a pool reporter

14   in the room so there wouldn't be a crowd, but there would be an

15   individual.  So I mention that to you.  Why don't you think

16   about that overnight.  We can have one or two people.  It might

17   take the issue off the table if we did something like that.

18   You can consider what harm it would do.

19        MR. WEINREB:  Your Honor, we actually proposed a pool

20   reporter in our submission to the Court.  However, I think at

21   the time that we submitted that we weren't aware yet that this

22   would be the arrangement with the tables in the middle and that

23   there would be no opportunity to have a husher or anything

24   going during the times when we needed to make the proceedings

25   more private.  So I don't know if there is --

 1          THE COURT:  Yeah.  It's a logistical problem.  We

 2    could do it with some difficulty, everybody moving around and

 3    so on.  So that is a bit of an issue.  So that might counsel

 4    against it, so -- we can discuss it again in the morning.

 5          MS. CLARKE:  Judge, there are two things pending to

 6    file follow-up questions for jurors -- what?  41 through 80.

 7          THE COURT:  I think --

 8          MS. CLARKE:  81 through 120.

 9          THE COURT:  Wait a minute.

10          MS. CLARKE:  We've only submitted through --

11          MR. CHAKRAVARTY:  We submitted two.

12          THE COURT:  We have, from last night, what would have

13    been tomorrow's two panels, right?

14          MS. CLARKE:  So could we submit on Tuesday the 81

15    through 120 as opposed to --

16          THE COURT:  I don't see why not if that's okay.  We

17    won't get -- yeah, I think that's okay.

18          MS. CLARKE:  And the other thing is we have agreed to,

19    based on the questionnaire, on Panel C and D, due on Tuesday.

20          MR. WEINREB:  That's correct.

21          MS. CLARKE:  Should we still --

22          THE COURT:  When do we exhaust Panel --

23          MR. WEINREB:  We won't exhaust A and B --

24          THE COURT:  For awhile.

25          MR. WEINREB:  A and B is almost 400-plus.

 1          THE COURT:  Grossly, it was.  It's 320 something, I
 2   think.
 3          MR. WEINREB:  320.  I'm trying to think --
 4          THE COURT:  What were you saying about C and D?
 5          MS. CLARKE:  Right now we're on schedule to agree to
 6   them on Tuesday by noon.
 7          THE COURT:  No.  I don't think you would have to do
 8   that.  We'll set a date at some point, but let's get deeper
 9   into Panel A and B.
10          MS. CLARKE:  So you'll set a date on 81 through 120,
11   and you'll set a date on the rest.
12          MR. CHAKRAVARTY:  Tuesday.
13          MR. WEINREB:  Tuesday, close of business.
14          MS. CLARKE:  Perfect.  Perfect, your Honor.
15          MS. CONRAD:  One more thing, as far as the
16   transcripts, we're getting daily parts on the voir dire, parts
17   where the audio is turned off, I don't know if it was
18   considered sealed.
19          THE COURT:  It will be considered a sidebar.
20          MS. CONRAD:  We can still get a transcript of that as
21   far as the daily?
22          THE COURT:  I believe so.  It's the equivalent of a
23   sidebar if we were in the open court setting.  The parties will
24   still have access to it.
25          Okay.  Thank you all.  See you tomorrow.

1           One last thing, I just see lying on the table here --

2    this is Juror No. 22's letter from his boss saying it would be

3    trouble.  Does anybody care what I do with it?

4           MS. CLARKE:  We agreed to a strike on him.

5           THE COURT:  That's what I mean.

6           MR. WEINREB:  The government has no --

7           THE COURT:  Dispose of it?

8           MS. CLARKE:  Mail it back to the boss.

9    (Whereupon, at 4:56 p.m. the trial recessed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4    Dahlstrom, RMR, CRR, Official Reporters of the United States

 5    District Court, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skill and ability, a true and

 7    accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 13-10200-GAO, United States of

 9    America v. Dzhokhar A. Tsarnaev.

10

11    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13

14    /s/ Cheryl Dahlstrom
      CHERYL DAHLSTROM, RMR, CRR
15    Official Court Reporter

16

17    Date:  January 15, 2015

18

19

20

21

22

23

24

25
```