1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                      )
4    UNITED STATES OF AMERICA,         )
                                      )
5            Plaintiff,                )
                                      )   Criminal Action
6    v.                                )   No. 13-10200-GAO
                                      )
7    DZHOKHAR A. TSARNAEV, also        )
     known as Jahar Tsarni,            )
8                                      )
             Defendant.                )
9                                      )

10

11           BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE
12

13
                      **JURY TRIAL - DAY FIVE**
14

15
                John J. Moakley United States Courthouse
16                        Courtroom No. 9
                         One Courthouse Way
17                  Boston, Massachusetts  02210
                      Friday, January 16, 2015
18                           9:24 a.m.

19

20               Marcia G. Patrisso, RMR, CRR
                 Cheryl Dahlstrom, RMR, CRR
21                  Official Court Reporters
                John J. Moakley U.S. Courthouse
22              One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
23                      (617) 737-8728

24          Mechanical Steno - Computer-Aided Transcript

25

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
                By:  William D. Weinreb, Aloke Chakravarty and
 3                   Nadine Pellegrini, Assistant U.S. Attorneys
                John Joseph Moakley Federal Courthouse
 4              Suite 9200
                Boston, Massachusetts  02210
 5              On Behalf of the Government

 6         FEDERAL PUBLIC DEFENDER OFFICE
                By:  Miriam Conrad, and William Fick,
 7                   Federal Public Defenders
                51 Sleeper Street
 8              Fifth Floor
                Boston, Massachusetts  02210
 9              - and -
           CLARKE & RICE, APC
10              By:  Judy Clarke, Esq.
                1010 Second Avenue
11              Suite 1800
                San Diego, California  92101
12              - and -
           LAW OFFICE OF DAVID I. BRUCK
13              By:  David I. Bruck, Esq.
                220 Sydney Lewis Hall
14              Lexington, Virginia  24450
                On Behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2      (Attorney Fick not present.)

3              THE COURT:  Good morning.  Phil, this is sidebar.

4      (SIDEBAR CONFERENCE AS FOLLOWS:

5              THE COURT:  We have a new filing by the defense.  The

6      prosecution has seen it?

7              MR. BRUCK:  Yes, your Honor.  Before we do anything

8      today -- and this probably shouldn't be sidebar -- we have a

9      matter having to do with the public trial issue that we just --

00:00 10   really housekeeping, but we'd -- we're concerned about the --

11     if this could be not --

12             THE COURT:  I don't know what it is yet.

13             MR. BRUCK:  It's simply to express our concern about

14     the technical problems that have been occurring and to have

15     some system in place to ensure that if the -- if there's a

16     breakdown --

17             THE COURT:  We were just talking about that before we

18     came in.  And what we're going to ask is, if the -- there is a

19     problem with the transmission, either audio or video, you

00:01 20   signal us immediately, and we will recess to fix it.  We won't

21     continue in light of it.

22             MR. BRUCK:  Great.  Okay.  We'd like the press to be

23     informed that that system is in place.

24             THE COURT:  We can do that.

25             MR. BRUCK:  And that there was a focus on it.

1          THE COURT:  We'll do that.

2          MR. BRUCK:  Thank you.

3          MR. WEINREB:  Your Honor, the government also had

4     something on the public trial question, which is simply that

5     the defense, as the Court knows, waived its right to -- under

6     the Sixth Amendment to a public trial with respect to the voir

7     dire proceedings.  And we would just ask that that waiver be

8     renewed each morning so that we don't have any unclarity in the

9     record about whether the arrangements that are being made are

00:01 10     being made solely for First Amendment purposes rather than

11     Sixth Amendment purposes.

12          THE COURT:  Well, I'm aware -- I think I'm aware of

13     what you're talking about.  I didn't regard it as a formal

14     waiver, plus it isn't nonpublic because the defense is

15     permitted to have people here, as we talked last week.  So I

16     regard it, as to the defense and as to the prosecution as well,

17     that the permission to have certain limited number of people to

18     be in the courtroom who are members of the public, that's

19     there.  It's available.  And I understand the defendant has --

00:02 20     yesterday had nobody here.  The invitation still remains, and

21     it's open in that sense.  So I don't regard that a waiver is

22     necessary.

23          MR. WEINREB:  Well, we don't regard that a waiver is

24     necessary either, but it's our understanding the defendant, in

25     fact, did waive his right yesterday; and if he is prepared to

1    waive it, if that's his -- if that's his desire, his intent,

2    then we just ask that that be placed on the record each

3    morning.  We agree that the Court has taken sufficient

4    precautions to maintain this as a public proceeding, and this

5    is more in the -- more in the way of an excess of caution than

6    anything else, making the record so clear that it precludes any

7    need for any future litigation about it if the situation

8    arises.

9            THE COURT:  Does the defense want to respond to that

00:03 10   in any way?

11           MS. CLARKE:  Your Honor, our position is and has been

12   that this is a better arrangement for voir dire, and it

13   promotes the kind of voir dire that was going to be and

14   continues to be necessary in this venue.  And the defense is

15   satisfied that there should not be a courtroom filled with

16   people.

17           We are, however, concerned -- as I went into the room

18   to see what it's like over there, we are very concerned that

19   the technology is not permitting the press the appropriate

00:04 20   access.  And if that can be fixed, we're fine with it.

21           But as the Court knows, we like the arrangement of the

22   voir dire in this sort of more informal setting for the jurors

23   to promote truthful answers.  It may be that the Court should

24   let the press into the courtroom when the panel comes in to be

25   instructed and have the press leave when the panel leaves so

1    that there is some sense that this isn't, you know, a secret

2    proceeding.  They shouldn't be feeling that way already because

3    there are TVs and audio and video in that room.  But there's

4    been large numbers of complaints from them.  I'm sure that the

5    Court has heard about their ability -- they missed an entire

6    juror yesterday apparently because --

7          THE COURT:  Well, to the extent of technology

8    failures, we'll be sensitive to that and recess to get them

9    fixed.  To the extent you're addressing technology design, that

00:05 10    is, how we've set it up, what the camera can show, et cetera,

11    that's, I don't think, problematic.  And, you know, I have to

12    say informally, having read a couple of stories in the press

13    this morning, it seems that the press was rather well-informed

14    about what had happened yesterday and doesn't seem as serious

15    impairment of their ability to provide the public with

16    information about what's going on actively in the trial.  But

17    if they're interfered with because the technology fails, that's

18    a different matter, and we'll respond better than we responded

19    yesterday.

00:05 20          MS. CLARKE:  I think that was our point.

21          MR. WEINREB:  All I would ask in that is, your Honor,

22    that barring glitches in technology that the defense regards

23    this as a public proceeding under the Sixth Amendment as does

24    the Court and government so that there's no issue down the road

25    that there was any misunderstanding about it.

1         THE COURT:  Okay.  I think that's fair.  Do you have

2    any quarrel with that statement?

3         MR. BRUCK:  No, sir.

4         THE COURT:  Okay.  So defense has filed some

5    additional follow-up questions this morning.

6         MR. BRUCK:  Yes.

7         THE COURT:  I've looked at them.  A lot of them, I

8    think, are territory we covered yesterday.  I will say that I

9    have -- for example, Question No. 2, I don't know if it was

00:06 10    phrased in this way to every juror, but I know particularly as

11    to later prospective jurors, I began to phrase the Question 77

12    question in terms of the responsibility of the government to

13    prove beyond a reasonable doubt despite what people might have

14    thought and the defense has no burden and so on.  I'll continue

15    to do that.  I think that satisfies the issue on No. 2.

16         MS. CONRAD:  Your Honor, if I could on that point, the

17    proposed question asks about the presumption of innocence.  And

18    one issue that we have with the questioning yesterday,

19    particularly with the vast number of people who say that they

00:07 20    have formed an opinion about guilt, is your Honor's follow-up

21    to that was asking them about the burden of proof and

22    understanding the burden is on the government.  But your Honor

23    did not ask about and did not follow up about whether, despite

24    that preconceived belief in Mr. Tsarnaev's guilt, they could

25    presume him innocent.  And *Taylor v. Kentucky* says those are

1    two separate concepts, and it seems to me that that is a

2    crucial area of this inquiry where you -- especially where you

3    have so many people coming in with the belief that Mr. Tsarnaev

4    is guilty, is to ask them whether they can and will presume him

5    innocent.  It is insufficient, I would suggest, to simply say,

6    Do you understand that the burden of proof is on the

7    government?, because that suggests that they start at an equal

8    plane as opposed -- and then decide whether the evidence

9    amounts to proof beyond a reasonable doubt as opposed to

00:08 10   starting with the presumption of innocence.  I did a quick

11   search of the transcripts from yesterday, and your Honor did

12   not ask them about the presumption of innocence at all.  And I

13   would urge your Honor to do so certainly going forward.

14          In addition, a somewhat related but perhaps different

15   point -- and this maybe goes to Mr. Bruck's point -- with

16   respect to certain issues where the defense -- the juror,

17   excuse me, expressed a certain bias -- for example, I believe

18   -- was it the first juror questioned yesterday, had an

19   anti-Muslim bias, your Honor asked whether that would interfere

00:09 20   with their ability to fairly and impartially evaluate the

21   evidence in the case.  Well, that's fine for the guilt phase,

22   putting aside the issue about presumption of innocence, but I

23   would submit that it's not fine for the penalty phase because,

24   for the penalty phase, the question of bias is not just a fair

25   and impartial evaluation of the evidence.  It's whether they

1     can fairly weigh the aggravating and mitigating factors.  Many

2     of the jurors' responses are looking at this, Do I believe the

3     witnesses?  The facts are the facts.  But that's not at issue

4     in the penalty phase.  I think that needs to be addressed more

5     directly.

6              MR. BRUCK:  If I could finish with our request, what

7     we have done here, your Honor, is to boil down the earlier

8     series of requests.  We're not withdrawing any of the ones that

9     we made in writing in our prior filing, which were three sets

00:10 10   of requests:  one on publicity, one on *Morgan*, and one on

11    *Witherspoon*.  But I have combined them for efficiency sake into

12    a single follow-up request.  I'd like to say a couple of things

13    about some of the other ones that Miss Conrad didn't refer to.

14             The first one, as we noted, What stands out in your

15    mind?, is the question that was included in the *Skilling*

16    transcript at the defense request, and the Court cites that

17    with approval.  That question was excluded from the

18    questionnaire when we asked for it or any similar question

19    about content.  And the Court at that time -- it told us that

00:11 20   that would be covered in the oral voir dire.  So we think it's

21    -- to ask this *Skilling* question is, to say the least,

22    appropriate.

23             And then we've suggested some prompts for jurors who

24    say, Well, just what I read in the papers, or Nothing

25    particular.  Got to say that the investigation that we've done

1      tells us that jurors know an extraordinary amount of detail.

2      They know things about the welfare history of this family.

3      It's constantly being talked about on talk radio.  They know

4      things -- derogative information, much of it false, about the

5      defendant's sisters.  And that is the staple of talk radio.

6      But if there isn't a question posed, these people will be on

7      the jury, and none of us will be any the wiser.  We really --

8      if ever there was a case where some modest amounts of content

9      inquiry is necessary, this is the case.

00:12 10           Miss Conrad has talked about our second request.

11           Our third request, If you were the defendant on trial

12      in this case, would you want someone on your jury who thinks

13      about you the way you think about Mr. Tsarnaev?  That is taken

14      from *Irvin v. Dowd*.  The United States Supreme Court cited

15      almost exactly that question.  I put it into slightly more

16      modern wording.  It was a 1961 case.  But the Court noted with

17      great concern that many of the jurors in the *Irvin v. Dowd* case

18      answered no to that question or many of the members of the

19      venire.  So it's a proper question.  It does get close to the

00:12 20      juror, but that's what this is all about.  That's the point of

21      this process.  And so we think that that is a traditional,

22      well-established question with a very, very good pedigree, and

23      it should be asked.

24           Then we've -- we continue to feel that there has to be

25      questions about Paris, and we've asked for that again, very

1  short, succinct question.  But it's on people's minds, and I've

2  just seen a news account that there is -- two more hostages

3  have apparently been seized this morning in Paris.  They're not

4  sure if it's a terrorist attack or not, but this is what jurors

5  are hearing about when they're driving to the courthouse today.

6  And how could we not ask about it?

7         And then, No. 5, I don't think that this is

8  appropriate for every juror, but we have got jurors who want to

9  be on this jury.  I won't belabor this anymore.  We've made

00:13 10  this point.  This is a route to celebrity and to -- possibly to

11  financial profit for some people who are of a mind to look at

12  this opportunity in that way.  And this is the one question

13  that no one will be ready for who is of that mind.  What's the

14  right answer?  If you're someone with an agenda and the judge

15  says, Do you want to be on this jury?, what are you supposed to

16  say?  Yes, and you give it away?  No, and the judge might say,

17  Well, guess what?  I've got good news for you.  You're off.

18  What would be valuable is not so much the answer but the body

19  language, the reaction, the hesitation, the, Uh-oh, what am I

00:14 20  supposed to say now?  That will speak volumes but only if the

21  question is asked.  So we'd ask you to keep that in your

22  arsenal for inquiry and to use it as appropriate.

23         The *Morgan* question, the first No. 6 is the question

24  asked in *Morgan*.  It's not a particularly good question, but

25  it's the one that caused the United States Supreme Court to

1    reverse the death sentence in *Morgan v. Illinois*.  It goes far

2    beyond the quite-difficult-to-understand question that the

3    government proposed about, Would you meaningfully consider

4    aggravation and mitigation?, without any inkling of what the

5    point of that is.  The first juror that was asked that question

6    said, Can you repeat the question?  I don't understand it.  And

7    for good reason.  So this is the *Morgan* question.

8          And then No. 7, 8, and 9, we've tried to put that into

9    English in a form that's understandable just to be sure that

00:15 10   we're not getting jurors who are actually -- whose actual state

11   of opinion is, Sure, in a run-of-the-mill murder case, I could

12   consider both punishments but not in a terrorism case, not in a

13   case where a child was killed, not in a case involving weapons

14   of mass destruction.  I don't want to belabor this, but these

15   are not stakeout questions.  These are *Morgan* questions framed

16   in terms of the charge that the government has brought in this

17   case.

18          Finally, the *Witherspoon* questions are just -- speak

19   for themselves, and I think, by the end of the day, the Court

00:16 20   was asking fairly close to something like this, but we wanted

21   to put our request in writing.

22          Then as to the procedure, we think it's terribly

23   important that the Court give us an opportunity outside the

24   presence of the juror to ask for follow-up questions rather

25   than simply send the juror home after the Court's questioning

1    has concluded.  We'd prefer, and actually think it would be

2    faster, if the Court would, as was done in the *Skilling* case,

3    allow limited follow-up questioning by counsel.  If the Court

4    is unwilling to do that, then at a minimum, if you would excuse

5    the juror and hear from us so that we have an opportunity to

6    ask for specific follow-up questions, we'd appreciate that.

7         THE COURT:  Well, I think we're doing that at the end

8    of the day or actually in the middle of the day.

9         MS. CONRAD:  May I just add one thing to that?  With

00:17 10   respect to follow-up questions -- in our original submission,

11   Question 4, we asked, "How did you first learn about the

12   bombing of the Marathon?"  "Where were you?"  "What did you

13   do?"  "What was your reaction?"  "Did your feelings change?"

14   That was not included.

15        Instead, the questionnaire asks if you or anyone close

16   to you was personally affected.  If the person says no or even

17   if the person says a friend was there, but even if they say no,

18   we think all of the prospective jurors should be asked where

19   they were on the 15th of April 2013 and how they learned about

00:17 20   the Marathon bombing and where they were on April 19th because

21   many people -- even though the question asks whether the

22   effects include shelter in place, many people whom we know,

23   based on where they lived or worked, must have sheltered in

24   place, put down no.  I don't think we should simply accept the

25   no answer as covering everything.

1          Your Honor asked follow-up questions for people who

2     put down that they don't use social media.  Your Honor asked

3     them, Well, what kind -- you really don't use social media?

4     But it seems to me -- that's fine, but the crucial question

5     that we want to get at is not just whether they were affected

6     but how they were affected.  Someone who had a loved one or

7     even a friend or a neighbor at the Marathon in 2013, their

8     reaction would have been presumably, when they heard about the

9     bombing, you know, Is that person safe?  Try to call.  Not be

00:18 10  able to reach.  A sense of panic.  A sense of fear.  And we're

11    not getting that out because we're going straight from, you

12    know, the -- my friend or my whatever was at the Marathon to

13    would that affect your ability to be fair and impartial in this

14    case?  We need to find out what their reaction was, not just

15    how it relates to this case.

16          THE COURT:  Mr. Weinreb.

17          MR. WEINREB:  Your Honor, if I might, I'll respond in

18    reverse order.  With respect to that last request, the

19    government agrees that a searching and probing voir dire of the

00:19 20  jurors is appropriate in this case, but we also believe that

21    that is the process that has taken place.  And the parties

22    jointly negotiated over a 100-plus-question questionnaire, were

23    given an opportunity to review those, ask for follow-up on

24    specific questions.  The Court has asked follow-up on many of

25    the questions, asked follow-up on questions of his own.  It

1    will always be the case that one more question could be asked

2    or a hundred more questions could be asked if you had more and

3    more information.

4         The whole point of that process was to try and come up

5    with an approach that satisfied the objectives and the needs of

6    voir dire without making the process unduly cumbersome,

7    lengthy, and perhaps even counter-productive from having to

8    drag on too long.  We don't believe that there's any need for

9    these additional specific questions.  Many of the things that

00:20 10    the defense has asked about are subsumed in other questions

11    that are already on the questionnaire.  One of them, for

12    example, "Do you want to be on this jury?"  This was a question

13    on the questionnaire, "What was your reaction when you got the

14    summons in this case?"  And that fairly invited the -- an

15    answer to this same question, "Do you want to be on this jury?"

16    Was your reaction positive, negative, neutral?  Where did your

17    mind go?  In some ways, it's an even better question because it

18    does not force them -- it doesn't channel them into one just

19    particular answer but gives all the whole range of things that

00:21 20    might have been on their mind.

21         We don't think there's any need to ask whether they've

22    heard or read anything about the recent attacks in Paris.

23    There are terrorist attacks going on all over the world at

24    virtually all times.  Most of these jurors have been instructed

25    not to listen or hear about any news related to this case.

1    It's quite speculative to imagine they've drawn comparisons

2    between that case and this case.  I think it seems like, again,

3    an unnecessary additional question that is covered by so many

4    of the others that it would just be superfluous.

5         The question from *Irvin v. Dowd*, If you were the

6    defendant on trial in this case, would you want someone on the

7    jury who thinks about you the way you think about Mr.

8    Tsarnaev?, that doesn't imply that question was necessary to be

9    asked.  It just noted that it had been asked and that the

00:22 10   answer troubled the Court in that case.  But all the cases that

11   the Supreme Court has decided have emphasized over and over

12   again that there is no catechism for voir dire.  There is no

13   requirement that particular questions be asked or that they be

14   asked in a particular way except in very narrow exceptions,

15   which is the *Witherspoon* and *Morgan* questions.

16        The government's view is that the Court has formulated

17   -- the parties first together and now the Court has formulated

18   -- adequate ways of asking these questions.  And this

19   particular case could have been -- this particular question,

00:22 20   rather, could have been proposed to be included in the

21   questionnaire.  It wasn't.  There are only a limited number of

22   questions that we could include in that questionnaire.  The

23   defense evidently thought others would be better.  And so I

24   don't think now is the time to be amending it.

25        And then with respect to the *Morgan* question, I don't

1   want to belabor that because we've had so much discussion about

2   it.  But I just want to say that the idea that the defense --

3   that jurors need to be asked about the specific charges in the

4   case is a reimagining of what *Morgan* held.  I think that if the

5   Court looks at the language of the *Morgan* opinion carefully,

6   what the Court there said over and over and over again is that

7   it is necessary to screen out jurors who have made up their

8   minds to vote for the death penalty in a capital case before

9   they know anything about the particular case.  That's what it

00:23 10   says again and again.  A juror who will automatically vote for

11   the death penalty in every case will fail in good faith to

12   consider the evidence of aggravating and mitigating

13   circumstances because such a juror has already formed an

14   opinion before he knows anything about what the charges are in

15   this case other than it's a capital case.

16         Again, the very last sentence of the case, where the

17   Court is summarizing its holding, "Petitioner was entitled upon

18   his request to inquiry discerning those jurors who, even prior

19   to the state's case in chief, in other words, before they even

00:24 20   had any idea what the evidence was going to be in the case, had

21   predetermined the terminating issue of this trial," that being

22   whether to impose the death penalty.

23         I'm not going to read all the quotes, but I've

24   underlined ten more where the Court essentially says the exact

25   same thing, that is, that the holding in that case is limited

1    to determining -- to ferreting out jurors who are committed to

2    imposing the death penalty in every capital case, every one,

3    not just -- not necessarily limited to or potentially limited

4    to the ones where the charges in the case -- before the facts

5    in the case but before they know anything about the case.  And

6    so for that reason, again, we oppose these requests for

7    case-specific warning questions.

8              THE COURT:  Let me -- I don't want to prolong this by

9    again going through each of the questions and addressing it.  I

00:25 10    understand the arguments, and I think you will -- I think

11    largely we -- particularly as we got going and got further

12    experience with the jurors, we did most of this satisfactorily

13    yesterday.  I expect I might make some modest amendments, and

14    so you'll -- I understand your positions.  You'll see what they

15    are as they come up.

16              In other words, one of the difficulties here is being

17    too tied to a script.  Every juror is different.  Every juror

18    has to be sort of questioned in a way that is appropriate to

19    the juror's questionnaire answers and then to the preceding

00:26 20    voir dire answers and so on.  So to try to stick with a

21    repeatable formula is -- can be counter-productive actually

22    rather than helpful.  So I understand the points.

23              Let me raise a couple of procedural matters, I guess.

24    A couple of occasions the -- while I was looking at the juror,

25    the parties were looking at each other and agreeing that the

1          juror could be excused.  As a technique of doing that, it was a

2          little awkward.  Here's a suggestion:  If it gets to that

3          point, somebody could say, Excuse me, your Honor.  Could we

4          have a moment?  And we can then excuse the juror for the

5          moment, and it might turn into longer than that.  Would that be

6          satisfactory if --

7                    MR. BRUCK:  Yes.

8                    MS. CLARKE:  Yes.

9                    THE COURT:  Okay.  The other is to come back to the

00:27 10   press issue.  One possible accommodation -- I don't know

11         whether this is something we should do or not, but before I

12         thought even more about it, I wanted to see what the parties

13         thought about it -- is to have one or two pool representatives

14         in the room.

15                    MR. WEINREB:  So, your Honor, the government is in

16         favor of that proposal provided that it doesn't make doing

17         things essentially at sidebar under the husher so inconvenient

18         that it becomes impossible.

19                    THE COURT:  We might be able to ask them to step out

00:28 20   for that if the particular -- if there's only a couple of them.

21         It would be hard to ask two dozen people to step out, but I

22         think if there were only a couple --

23                    MR. WEINREB:  I think that's fine.  At least we could

24         begin trying it that way.

25                    MR. BRUCK:  We agree with that.

1          THE COURT:  I think we'll take a recess and see if we

2     can negotiate that on those terms; and when we've done that,

3     then we can come back.

4          MR. BRUCK:  Before we leave this, there were just two

5     very brief matters, and I also don't want to prolong this voir

6     dire discussion.  One is, though, is we cannot leave

7     unchallenged the suggestion that because of the questionnaire

8     we have in some way waived or defaulted all of the positions

9     we're taking or many of the positions we're taking now.  The

00:28 10    record will reflect that there was a negotiation over the

11    questionnaire, and then the Court ruled against us on many

12    points particularly about content voir dire and about

13    *Morgan*-type questions on the questionnaires.  So there has been

14    no waiver or agreement on the issues that we're talking about

15    in terms of the content of the questionnaire.

16          The second -- and this is a request.  We plan to go

17    through yesterday's transcript and today's and perhaps brief

18    this over the weekend.  But I think when we look at the

19    questionnaire -- at the transcript of the voir dire, we will

00:29 20    find times in which the juror was seeming to express a bias and

21    the Court responded with questions which I think have to be

22    considered somewhat leading, back in the direction of asserting

23    impartiality.

24          I know the Court didn't intend to lead the juror to

25    say something that they didn't really think, but it's just an

1    area of such sensitivity, and we would just like to

2    respectfully make the request that the jurors be encouraged to

3    really express what they think themselves.  Thank you.

4             THE COURT:  All right.

5             MR. CHAKRAVARTY:  Your Honor, one other housekeeping

6    matter.  Yesterday you learned some of our jurors have criminal

7    histories that are obviously going to be sensitive.  Today is

8    the first time I think that we're going to have a prospective

9    juror that actually has an active warrant which the juror may

00:30 10   not know about.  We don't want to do nothing and not discharge

11   our obligation.  We don't want to cause unnecessary

12   embarrassment.  But, also, we need to come up with some way, I

13   think, to notify the juror that he needs to take care of it.  I

14   don't know that we're the best equipped to do that.  We wanted

15   to alert your Honor just in terms of how to proceed in that --

16            MS. CLARKE:  It's a warrant for failure to appear for

17   jury service.

18            THE COURT:  Really?

19            MS. CLARKE:  Yes.

00:30 20   THE COURT:  Before we get to that issue, with respect

21   to the people who have records, it would be, I think, helpful

22   for me to know in advance that that's the case.  So any group

23   of 17 or whatever, there are people -- if perhaps before we

24   begin the process, I be alerted to what was coming and maybe

25   have a copy of the record.  So I'd like whatever papers you

1    have on this particular -- are there other people in this group

2    of 17 that there would be an issue?

3         MR. CHAKRAVARTY:  Your Honor, with criminal records,

4    there are, probably a handful.

5         THE COURT:  That were not disclosed?

6         MR. CHAKRAVARTY:  Some kind of criminal record.  I

7    have them.  I can provide them.

8         THE COURT:  That were or were not disclosed?

9         MS. CONRAD:  Both.

00:31 10         MR. CHAKRAVARTY:  Both.

11         THE COURT:  Well, again, during the recess, if you

12    could make copies of those so I could see them.  Okay.  Thanks.

13    We'll take a short recess.

14         THE CLERK:  All rise for the Court.

15    (Recess taken at 9:55 a.m.)

16    (The venire entered the room at 10:43 a.m.)

17         THE COURT:  Good morning, ladies and gentlemen.  Thank

18    you for your patience.  We had some business we were attending

19    to and now we'll proceed.

01:19 20         I want to welcome you back to the District Court for

21    the District of Massachusetts.  As you know, we're in the

22    process of selecting a jury for the case of United States v.

23    Dzhokhar Tsarnaev.  As you also know, Mr. Tsarnaev is charged

24    in connection with the bombing that occurred near the finish

25    line of the Boston Marathon on April 15, 2013, that resulted in

1    the deaths of three people, and he's also charged in the death

2    of an MIT police officer and other crimes occurring on April 18

3    and 19, 2013.  Some, but not all, of the crimes charged by

4    statute are potentially punishable by death.

5         You will recall from my prior instructions that the

6    jury will first consider and decide whether the government has

7    proved Mr. Tsarnaev's guilt of any or all of the charges

8    against him.  If he is convicted of any of the capital crimes,

9    that is, crimes potentially punishable by death, the jury will

01:20 10   then consider and decide whether he will be sentenced to death

11   for any such crime or to life in prison without possibility of

12   release, which is the only alternative sentence permitted.

13        Some of you may have wondered why the death penalty

14   could be a possibility in this case in view of the fact that

15   the laws of Massachusetts do not provide the death penalty for

16   murder or for any other violation of Massachusetts law.  And

17   the reason is that this is a federal case involving violations

18   of the laws of the United States rather than a state case

19   involving violations of the laws of Massachusetts.

01:21 20        So as I think I indicated before, but tell you again,

21   if the jury were to convict Mr. Tsarnaev of any of the capital

22   crimes charged in the Indictment, then the same jury will hear

23   additional evidence and then decide whether to sentence him to

24   death or to life in prison without possibility of release.

25        Because the jury that is selected to first decide

1    whether the defendant is guilty or not of the crimes charged,

2    because that same jury will also decide punishment if he should

3    be convicted, then it is necessary to pursue with you and

4    question you about your feelings and beliefs about the death

5    penalty as part of the process of choosing a jury.

6         Let me explain briefly the procedure that must be

7    followed in a case in which the death penalty is or may be an

8    issue.  As in any criminal trial, initially, the government

9    will have the burden of proving Mr. Tsarnaev is, in fact,

01:22 10   guilty of any of the crimes with which he is charged.  If he is

11   convicted by the jury of a crime for which the death penalty

12   may lawfully be imposed, then there will be a second phase to

13   the trial.

14        The second phase is sometimes referred to in shorthand

15   as the penalty phase.  In that phase, the government will

16   introduce evidence that seeks to prove again beyond a

17   reasonable doubt, which is the government's burden, first, that

18   the defendant acted with an intent that is sufficient to make

19   him subject to the death penalty; and, secondly, if that's

01:23 20   true, then the government will seek to present evidence of what

21   are called aggravating factors about the crimes or about the

22   defendant that would justify sentencing him to death.

23        Aggravating factors are circumstances that, if proven,

24   would make the crimes particularly serious or blameworthy and,

25   therefore, under the law may justify imposing a more severe

1    sentence on this defendant compared to other persons who have

2    been convicted of intentional killing or murder.  And as I say,

3    the government will bear the burden of proving alleged

4    aggravating factors to every juror beyond a reasonable doubt.

5         The defense will have the opportunity to present

6    evidence of what it will argue are mitigating factors.

7    Mitigating factors are usually circumstances about the crime or

8    about Mr. Tsarnaev and his background or character that would

9    suggest that the death penalty is not the appropriate sentence

01:24 10    in this case or that life imprisonment without possibility of

11    release is adequate to punish the defendant for the crimes.

12         Unlike the government's burden in proving aggravating

13    factors, a mitigating factor must be proven only by the greater

14    weight of the evidence.  This is a less demanding standard of

15    proof than proof beyond a reasonable doubt.  Again, unlike the

16    proof of aggravating factors, mitigating factors do not have to

17    be proved to the satisfaction of all 12 jurors.  Any juror who

18    finds or determines a mitigating factor to have been proven by

19    a greater weight of the evidence may consider that factor in

01:25 20    deciding the appropriate sentence in the case regardless or

21    whether any or all of the other jurors agree that that

22    mitigating factor has been proven and should be considered.

23         After the parties have made their presentations during

24    the penalty phase, the jury will then weigh all the evidence.

25    Before a jury could vote to impose the death penalty, every

1    juror would have to be persuaded that the threshold factors

2    that make him -- make Mr. Tsarnaev potentially subject to the

3    death penalty have been proven beyond a reasonable doubt.  In

4    addition, in order to impose the death penalty, every juror

5    would have to be persuaded that any proven aggravating factors

6    sufficiently outweigh any mitigating factors found by any juror

7    or jurors so that a sentence of death is justified.  Even if

8    the jury did not find any mitigating factors, it would still

9    have to be unanimously persuaded that any proven aggravating

01:26 10    factors were themselves sufficient to justify a sentence of

11    death.

12          You should understand that a jury is never required to

13    find that a sentence of death is justified.  The decision

14    whether the government has proven that a defendant should be

15    sentenced to death must ultimately be made by each juror

16    himself or herself.  If, however, every juror is persuaded that

17    the death penalty should be imposed, I would be required, as

18    the judge, to sentence the defendant to death.  In other words,

19    I could not change the jury's decision.  The jury, and not the

01:26 20    judge, is responsible for determining whether a defendant

21    convicted of a capital crime will live or die.

22          What I have just described to you is only an overview

23    of the law applicable to the jury's consideration of the death

24    penalty.  If you are selected to serve and do serve on the jury

25    and if you find the defendant guilty of a crime punishable by

1    death, I will give you very detailed instructions concerning

2    your duties in deciding whether to impose the death penalty or

3    life imprisonment without possibility of release.  And you

4    will, in making that decision, be guided by that detailed

5    outline of the law that applies.

6            As I told you when you filled out your questionnaires,

7    there are no right or wrong answers to any of the questions

8    that you have been asked or that you will be asked in this

9    process.  We are asking them because both the government and

01:27 10   Mr. Tsarnaev are entitled to a jury that does not have its mind

11   firmly made up one way or the other before hearing the evidence

12   and the detailed explanation of the law.  That applies both to

13   whether Mr. Tsarnaev is guilty of the crimes charged in the

14   Indictment and also, if he is convicted of a capital crime,

15   whether he should be sentenced to death or to life in prison

16   without possibility of release.

17           So today I'm going to question each of you

18   individually about issues that are relevant to the process of

19   selecting a jury.  We're going to call you into the courtroom

01:28 20   one by one after this introduction and ask you each some

21   questions.  As you see, there are some people here, lawyers,

22   and their staff, and some others in the courtroom.  In

23   addition, these proceedings are being simultaneously

24   transmitted by video and audio to overflow courtrooms.  We will

25   not identify you by name but rather by your juror number, and

1    you will seated so generally the video camera will be behind

2    you as it broadcasts the proceedings.  Your answers will be

3    generally public in this way, but if you believe a truthful

4    answer to any of the questions would require you to reveal

5    sensitive personal information, we will temporarily stop the

6    audio transmission to the other courtrooms so that people

7    observing there will not hear your answer.  We will also excuse

8    from the courtroom anyone who is not part of the prosecution or

9    the defense team.

01:29 10        Again, we don't expect or want any particular answer

11   to any question.  All we want, and what the law expects, is

12   that you provide accurate and truthful answers to the

13   questions.  And if you do that, you will be doing your duty as

14   a citizen and as a juror no matter what your answers may be.

15        I want to take a moment to remind you of some of my

16   prior instructions.  As I told you before, a jury's verdict

17   ultimately must be based on the evidence produced at trial and

18   free of outside influence.  Therefore, I remind you again that

19   it is extremely important that you do not discuss this case,

01:30 20  including the selection process, with your family, friends,

21   each other or any other person until either you have been

22   excused or, if selected as a juror, until the case has

23   concluded.  I also instruct you to refrain from any online

24   research or other reading or watching of reports about this

25   case in the media until the process has been completed.

 1          You originally signed the questionnaires under the

 2     penalties of perjury to make sure that you solemnly were

 3     affirming that the answers were true.  You will -- now, for

 4     this process, we will ask you to take a similar oath or

 5     affirmation to answer the questions truthfully, completely, and

 6     to the best of your ability.  And the clerk will ask you now to

 7     stand and administer that oath to you.

 8          THE CLERK:  Will the jurors please rise and raise your

 9     right hand.

01:31 10    (Venire sworn.)

 11          THE COURT:  All right.  Jurors, we'll ask you now to

 12     withdraw, and one by one we'll have you in to pursue the

 13     questions.  This will take some time.  We appreciate your

 14     continued patience in the matter.

 15     (The venire left the courtroom.)

 16          THE CLERK:  Number 33.

 17          MR. McALEAR:  Juror 33.

 18          THE COURT:  Good morning.

 19          THE JUROR:  Good morning.

01:34 20          THE COURT:  I'll ask you to speak into the microphone.

 21     Just adjust it as you will.  Make yourself comfortable.

 22          THE JUROR:  Comfortable, okay.

 23          THE COURT:  When you filled out the questionnaires, as

 24     part of my instructions, I instructed everyone to refrain from

 25     any discussion of the matter and to avoid any discussion of it

1    in the media or else-wise.  Have you been able to follow that

2    instruction?

3         THE JUROR:  Yeah, mostly.  I mean, what about spouse

4    or -- yeah.  I'm not watching the media or --

5         THE COURT:  Have you talked to your spouse about it?

6         THE JUROR:  Well, it's kind of hard.  It's everywhere.

7         THE COURT:  Have you talked about the substance of the

8    case or just the fact of your service?

9         THE JUROR:  Just the fact of my service.

01:35 10         THE COURT:  I told you you could do that.

11         THE JUROR:  Yeah.

12         THE COURT:  Obviously, he needs to know where you're

13    going and --

14         THE JUROR:  Yes, he does.

15         THE COURT:  Speaking of your spouse, according to your

16    questionnaire, he works for the Massachusetts State Police.

17         THE JUROR:  Yes, he does.

18         THE COURT:  Can you tell us how long he's done that

19    and what his experience has been in the state police?

01:35 20         THE JUROR:  He's been in for 33 years, and he's a

21    trooper.  He's done many things with the state police.

22         THE COURT:  Say, for the last five years or so, what

23    have his assignments --

24         THE JUROR:  He's at Logan Airport and South Boston

25    area.  He has the Seaport area.  So he patrols there.  He does

1    Hanscom Field.  They have somebody there 24 hours a day.

2           THE COURT:  He's in a marked vehicle patrolling, is

3    that it?

4           THE JUROR:  Yeah, yeah.  They don't have their own

5    cruisers at home now.  Yes, he patrols the airport, patrols

6    over here at Seaport, does Hanscom Field.

7           THE COURT:  Okay.  Has he -- is this what you might

8    call general police work?  Has he had any special assignment,

9    any special task force or anything like that?

01:36 10        THE JUROR:  He was, for quite a few years at Logan,

11   lost and found and -- you know, lost and found.  He did that.

12   He's done everything.  He's done the motorcycles.  He's done,

13   you know, quite a few things.  He did the horses for a while.

14   But mainly he's been, you know --

15          THE COURT:  I guess what I was getting at, has he had

16   any special subject matter, for example, being on the Drug Task

17   Force, being on an Anti-Terrorism Task Force?

18          THE JUROR:  No, he hasn't done those.  He's done the

19   lost and found a contraband at the airport for about maybe four

01:36 20   or five years, until last year.  He's a trooper.  Patrols the

21   airport, patrols over here at the Seaport because that's part

22   of their area, the lower Seaport area.

23          THE COURT:  Do you think your husband's work as a

24   state trooper would have an effect on your ability to be an

25   impartial juror in a criminal prosecution?

1            THE JUROR:  Well, I think it might, yes.

2            THE COURT:  Tell us how you think it might affect you.

3            THE JUROR:  There was a police officer that was, you

4    know, killed through this.  I think -- yes.  I don't think I

5    can be impartial.  It's kind of hard to ask somebody, I think,

6    that -- when their husband is in that field of work and

7    somebody, you know --

8            THE COURT:  This isn't exactly related, but you have a

9    nephew who's a corrections officer as well?

01:37 10            THE JUROR:  Yes.

11            THE COURT:  Tell us a little about that, where he

12    works and so.

13            THE JUROR:  At Concord Prison.

14            THE COURT:  How long has he done that?

15            THE JUROR:  Probably about five or seven years, since

16    he graduated college in -- you know, I think it's at least five

17    years he's been over there or more.

18            THE COURT:  Can you give us some idea how close you

19    are to this nephew?  Do you see him regularly?  Do you see him

01:38 20    weekly?

21            THE JUROR:  No, not weekly.

22            THE COURT:  Major holidays?

23            THE JUROR:  Yeah, major holidays.  He's our godson.

24    My husband --

25            THE COURT:  He's your godson?

```
 1          THE JUROR:  Yeah.  My husband, he sees him.  We don't
 2   see him every holiday, family gatherings.
 3          THE COURT:  Would his employment have any affect on
 4   your service as a juror?
 5          THE JUROR:  I haven't real -- I don't talk -- I don't
 6   discuss his job with him that much because, like I say, I don't
 7   see him that much.
 8          THE COURT:  I think you also told us you have a
 9   brother who's an attorney.
10          THE JUROR:  Yes, I do.
11          THE COURT:  What kind of law does he practice, do you
12   know?
13          THE JUROR:  Real estate law.  He's not -- he doesn't
14   do much criminal, no, no, more real estate.
15          THE COURT:  You had a prior jury service in which you
16   served as the foreperson of the jury.
17          THE JUROR:  Yes.  It was a civil trial up in Lawrence.
18          THE COURT:  How long --
19          THE JUROR:  Civil -- probably five or six -- six or
20   seven years ago.  I don't remember the exact dates.  It's hard
21   to remember when, you know.
22          THE COURT:  In the questionnaire, you said the civil
23   trial was interesting.
24          THE JUROR:  Yes.
25          THE COURT:  And the criminal trial would be different.
```

1   What did you mean by that?

2          THE JUROR:  Because it's a whole different set of

3   circumstances.  Let's put it that way.  This was a man suing

4   his landlord that fell down the stairs at the house.  So it's a

5   lot different than a criminal trial.  I mean, I don't know

6   really how to explain.  I think you can tell.  There's

7   nobody --

8          THE COURT:  Would you be nervous about serving on a

9   criminal trial?

01:39 10        THE JUROR:  Yes, I think I would, yes.

11         THE COURT:  Why?

12         THE JUROR:  Well, just because of everything that goes

13  on.  You know, my husband is a trooper.  You hear things.  You

14  see things.  You talk about things.

15         THE COURT:  We asked you -- everybody in the

16  questionnaire a number of questions touching on what we might

17  call international kinds of issues, attitudes towards Islam,

18  the War on Terror and so on and so forth.  Since you filled out

19  the questionnaire --

01:40 20        MR. WEINREB:  Could we have a moment, your Honor?

21         THE COURT:  Okay.  Could you excuse us for just a

22  minute?

23         THE JUROR:  All right.  Thank you.  Me?  Me?

24  (The prospective juror left the courtroom.)

25         MS. CLARKE:  I think the parties have agreed we have

 1   sufficient --

 2           THE COURT:  Could we excuse the reporters for just a

 3   minute?

 4           MR. CHAKRAVARTY:  Your Honor, on the issues of when

 5   the reporters --

 6           MR. DOREAU:  Audio is off.

 7   (SIDEBAR CONFERENCE AS FOLLOWS:

 8           MR. CHAKRAVARTY:  I was just going to say that.  When

 9   the reporters leave, whether we keep the audio on or not, we

01:41 10   would prefer to keep it off because the microphones are more

11   sensitive than reporters.

12           THE COURT:  I can't hear you.

13           MR. CHAKRAVARTY:  Apparently not.  Whenever they

14   leave, it's just the audio is off.

15           THE COURT:  Yes.  And it's off now.  I have eye

16   contact with the producer there.

17           MS. CLARKE:  I think the parties agree.  If you want

18   us to just simply say the parties have agreed that we have

19   sufficient information from the question, then --

01:41 20           THE COURT:  I think it's okay to do it even more

21   opaquely, if I can.  That's fine.  So we'll just tell her that,

22   after conferring, we don't need to have any further questions

23   or -- is that all right?  So she can go along.

24           MR. WEINREB:  Yeah.

25           THE COURT:  I want to -- I looked at the -- as long as



1   ████████████████████████████████████

2       MS. CLARKE:  While we've taken that moment, could we

3   ask that the Court, on -- the proceedings this morning were on

4   the sidebar, and we didn't see any reason for that to be

5   non-public.  There was no privacy interest discussed, no juror

6   discussed, no --

7       THE COURT:  Well, I think we strayed -- the reason we

8   put it that way, because I wanted to talk about things like the

9   questioning to the jurors.  And we have done that at sidebar.

01:44 10   We did get into some other areas that arguably could have been

11   public but --

12       MS. CLARKE:  We just thought it should be as much as

13   it can be.

14       THE COURT:  Fine.

15       MR. WEINREB:  We have -- as long as we're on the

16   subject, we had one other request, which is simply that, when

17   the Court is in recess, that the audio be cut.

18       THE COURT:  Yes.  Is that --

19       THE CLERK:  It's being done.

01:44 20       THE COURT:  That should be done.

21       MR. WEINREB:  There was a proposal that it not be, and

22   we just object to that.  It was a proposal from the press that

23   it not be.

24       THE COURT:  No, because there are private

25   conversations going on, some of which are privileged,

 1    obviously, so I think it's best to protect against being

 2    broadcast.

 3            MR. WEINREB:  We don't mind the reporters being in the

 4    room because we can whisper, but these microphones can pick up

 5    the quietest whisper.

 6            THE COURT:  That's fair.

 7            I think we can invite the press back in.

 8    .  .  .  END OF SIDEBAR CONFERENCE.)

 9            MR. McALEAR:  Juror 35.

01:46 10        THE CLERK:  Juror No. 35, sit here, please.

11            THE COURT:  Good morning.

12            THE JUROR:  Good morning.

13            THE COURT:  I reminded everybody again today, but the

14    last time when you filled out the questionnaire, I asked people

15    to avoid discussion of the case or to avoid as well as you

16    could any exposure to media stories and things like that.  Have

17    you been able to abide by that?

18            THE JUROR:  Yes, I have.

19            THE COURT:  You did fill out the questionnaire before.

01:47 20   It's in front of you if you have need to refer to it, and I'm

21    going to be asking you some questions about particular answers

22    on the questionnaire.

23            THE JUROR:  Okay.

24            THE COURT:  Could you tell us a little bit about the

25    nature of your work employment?

1          THE JUROR:  Sure.  I work for the Massachusetts

2     Department of Energy Resources.  In that regard, my role is

3     looking at wholesale and retail electricity prices, wholesale

4     markets, wholesale operations, factors that may impact gas and

5     electricity prices, power plant operations, and the reliability

6     of electric grid.

7          THE COURT:  How long have you been in the field?

8          THE JUROR:  Since 1987.

9          THE COURT:  Okay.  In the questionnaire, we asked a

01:48 10     number of questions that could be generally characterized as

11     international affairs, attitudes towards Islam or Muslims,

12     attitudes toward the War on Terror and so on and so forth.

13     Since the filling out of the questionnaire, there have been

14     some incidents in Europe involving terrorist activity.  Would

15     any of those -- have you paid attention to any of those?

16          THE JUROR:  Just on, you know, high level, what was

17     reported, high level.

18          THE COURT:  You mean, by high level, you mean at sort

19     of a general level?

01:48 20          THE JUROR:  Yeah, just there was a situation in Paris.

21          THE COURT:  Have you read a lot about it, a little

22     about it?

23          THE JUROR:  No, I haven't read any.

24          THE COURT:  My question was going to be:  Does it

25     change any answers you gave in the questionnaire about those

1    matters, or does it bring up any other concern you would have

2    that could be pertinent to this case?

3         THE JUROR:  No.  As you instructed us, to look at all

4    the evidence that's presented in front of you, so that's what

5    my task would be in this regard.

6         THE COURT:  You did say in the questionnaire that you

7    thought that the -- this was Question 62, if you wanted to look

8    at it.  It's on Page 17.  -- that you thought the war -- we

9    asked whether you believe the War on Terror was overblown or

01:49 10   exaggerated, and you said yes.  Could you amplify on that?

11        THE JUROR:  Sure.  My thought process in answering

12   that question was in regard to the media coverage of all the

13   events globally and domestically.

14        THE COURT:  What specifically were you thinking about

15   that?

16        THE JUROR:  Just the situation over in -- where you

17   hear about, you know, our -- in Afghanistan and Iraq and all

18   over the world, those particular areas that they're covering

19   throughout the world, the media, so --

01:50 20   THE COURT:  I've forgotten the word you used exactly.

21   You think the media coverage has been overdone or something

22   like that?

23        THE JUROR:  Yes.

24        THE COURT:  In what sense?  Too much coverage or --

25        THE JUROR:  Yeah.  It's continuous coverage, if you

1    flick a channel on at some time, that it's there.  So --

2          THE COURT:  I guess, when you say "too much," it's

3    kind of a value judgment.  You think it's more coverage than

4    the events call for?  Is that a proper interpretation of what

5    you're saying?

6          THE JUROR:  I guess the duration of the -- the

7    duration of the coverage.

8          THE COURT:  In proportion to the importance of it or

9    -- I'm trying to get what you think is overdone.

01:51 10          THE JUROR:  Here's a story, cover it, and then there

11    seems to be, in my opinion, a lot of -- they get into so much.

12    We talked to this person, talked to that expert or this expert.

13    Just really dive in deep, deep, deep.

14          THE COURT:  Are you thinking -- sounds like you may be

15    thinking of TV shows.  Is that -- are you talking about news

16    reports or things like where there's panel discussions?

17          THE JUROR:  Yeah.

18          THE COURT:  I don't know if you watch, on Sunday, Meet

19    the Press and things like that.

01:51 20          THE JUROR:  No.

21          THE COURT:  Are those the kinds of things you're

22    talking about?

23          THE JUROR:  I don't watch Meet the Press.  Just in

24    some -- they have this panel, this expert, this expert on

25    federal government, former CIA, whatever.

1          THE COURT:  Just to come back to the general question

2     about the war on terror being overblown, your thoughts about

3     that are concerning media coverage of it rather than the

4     activity of the government?  Or do you think the government's

5     actions, so-called war on terror, are exaggerated or overblown?

6          THE JUROR:  I can only go by what's presented in the

7     media.  So if the media is covering that, that's what I would

8     be watching.  So I don't know what is the criteria, that I'm

9     just watching TV, the media coverage, so --

01:52  10          THE COURT:  Do you have any strong feelings, one way

11     or the other, about how the government is handling those

12     matters?

13          THE JUROR:  I have a feeling that the government needs

14     to obviously protect the citizenship of the United States and

15     its citizens.

16          THE COURT:  Okay.  Well, okay.

17          In Question 74, we asked you how you felt when you

18     received your summons for this case.  You said you would be

19     honored to be eligible to serve.  Is this a case that, because

01:53  20     of its subject matter particularly, intrigues you or --

21          THE JUROR:  No.

22          THE COURT:  Would that be an answer you would give for

23     any case?

24          THE JUROR:  It would be for any case.

25          THE COURT:  If you'd look at Page 20, Question 77, we

1    asked some questions about whether you had any opinion based on

2    what you'd read about this case, whether you had formed any

3    opinions from any source, including the media.  I just want to

4    go back to Question 73 for a minute, the previous page.  You

5    noted that you had read a lot or watched TV a lot about the

6    case.

7              THE JUROR:  Yes.

8              THE COURT:  So, now, going back to 77, we asked, Do

9    you have an opinion about whether the defendant is guilty or

01:54 10   not guilty, whether he should get the death penalty or not and

11   so and on forth.  You said "unsure" for each of those.  Can you

12   amplify on that?

13             THE JUROR:  I was really taking -- my interpretation

14   was taking your words and saying, Should I be drawing a

15   conclusion without all the evidence presented?  That's what my

16   thought process was to answer to that question.  I don't know

17   if I took it out of context or not.

18             THE COURT:  No.  I think you may have been right.  I

19   guess what you're saying is you were preparing your mind for

01:55 20   the condition it should be in if you were a juror in the case?

21             THE JUROR:  Right.  That's --

22             THE COURT:  You understand that a defendant has the

23   benefit of a presumption of innocence and the government has to

24   overcome that by proof, and you would be able to follow those

25   principles --

1          THE JUROR:  Right.

2          THE COURT:  -- if you were a juror in the case?

3          THE JUROR:  Correct, yeah.  That's the way I was

4     reading it.

5          THE COURT:  Okay.  We're going to get to the questions

6     of potential penalty in a minute.  But you noted on Question

7     82, on 21, that you had attended a OneFund event.

8          THE JUROR:  Yeah.

9          THE COURT:  What was the event?  What was your

01:55 10    participation in it and so on?

11          THE JUROR:  It was just -- it was a fund-raiser held

12     at the state room in Boston.  I don't know the exact date.

13          THE COURT:  Was it soon after the events or a couple

14     months later or when was it?

15          THE JUROR:  Yeah.  I think it was -- I don't know the

16     exact date.  It could have been maybe three to six months

17     perhaps afterwards.  I don't know the exact date.

18          THE COURT:  How did you come to go to that, do you

19     remember?

01:56 20          THE JUROR:  It was just through Boston.com or

21     something came up.  Somebody mentioned it or some -- so I

22     thought it would be a worth wild --

23          THE COURT:  This was an event that the interested

24     public could attend?

25          THE JUROR:  Yeah, yeah, absolutely.

         1          THE COURT:  You saw that and you --

         2          THE JUROR:  Yup.

         3          THE COURT:  Did it include a contribution?

         4          THE JUROR:  Yes, yes, it did.

         5          THE COURT:  A donation?

         6          THE JUROR:  Yes, yup.

         7          THE COURT:  Do you remember how much you donated?

         8          THE JUROR:  I think it was 75 or 50, 50 or 75,

         9  somewhere around there.

01:56  10          THE COURT:  Have you had -- since that event, had you

        11  had -- participated in any other fund-raising or expressions of

        12  support --

        13          THE JUROR:  No.

        14          THE COURT:  -- or sympathy or anything like that?

        15          THE JUROR:  No.  I only -- I have contributed to a

        16  specific fund called the Rett -- International Rett Syndrome

        17  Fund, which my daughter has Rett Syndrome.

        18          THE COURT:  Completely unrelated?

        19          THE JUROR:  Yeah, no.

01:57  20          THE COURT:  Now, we also asked a number of questions

        21  about your views about the possibility of a sentence of death

        22  versus the possibility of a sentence of life imprisonment.  So

        23  we start at Page 23, Paragraph 88 -- Question 88.  We ask, if

        24  you had any general views, what are they, and you said no.

        25  Can you --

1          THE JUROR:  Well, again, I was -- when you said to

2     take -- literally, I took your words to say don't make any

3     decisions until all the evidence is presented, so that's -- my

4     thought process was going through that.

5          THE COURT:  So that's about this case.

6          THE JUROR:  Right.

7          THE COURT:  Apart from this case, do you have any

8     general views about the death penalty, its appropriateness or

9     not?

01:58 10          THE JUROR:  Well, I would say that if it's considered

11     cruel or unusual punishment, but I don't know what the criteria

12     -- I don't know enough about what the criteria is that -- I

13     don't know if that answers your question.

14          THE COURT:  Okay.  Do you mean that in some cases you

15     think that might be true, or do you think that --

16          THE JUROR:  I guess --

17          THE COURT:  -- it will always be true?  I'm not sure

18     I'm following.

19          THE JUROR:  I don't know what is considered, like,

01:58 20     cruel and unusual punishment.  I'd have to learn more about

21     what is the criteria for that.

22          THE COURT:  Are you using that phrase in a way that

23     you think you understand it as a legal proposition as opposed

24     to a factual proposition?  In other words, do you think, in

25     fact, the death penalty is cruel or, in fact, it is unusual

1     kind of thing, or you know that phrase because it's in the

2     Eighth Amendment and you think you want to understand the legal

3     concept?  I guess I'm trying to understand whether you're

4     talking about it as a legal concept or as a human understanding

5     of events.

6                  THE JUROR:  Yes, yes, human.

7                  THE COURT:  Okay.

8            The next couple of questions, we tried to gauge what

9     you thought about the death penalty on 89.  Go back to the

01:59 10    previous page.

11                 THE JUROR:  Yup.

12                 THE COURT:  We asked you to circle on a scale of 1 to

13    10, 1 being strongly opposed, 10 being strongly in favor.  You

14    selected No. 5, which kind of puts you right in the middle.

15    Then in the next question we tried to scale it again in a

16    different way, this time by words rather than numbers.  You

17    said, "I am not for or against the death penalty.  I could vote

18    to impose it or I could vote for a sentence of life

19    imprisonment, whichever I thought was called for by the facts

02:00 20    and the law in the case."  Do those answers fairly represent

21    your views about the death penalty?

22                 THE JUROR:  Yes.

23                 THE COURT:  And in this case, would you be open to the

24    possibility of, on the one hand, the death penalty if you

25    thought the facts called for it and, on the other hand, open to

1       life imprisonment --

2               THE JUROR:  Yes.

3               THE COURT:  -- if you thought the facts called for

4       that?

5               THE JUROR:  Yes.

6               THE COURT:  So you're not committed -- I'm hearing

7       you -- you're not committed either way until you've heard all

8       the evidence?

9               THE JUROR:  Yes, correct.

02:00 10        THE COURT:  In Question 95, we asked if you could

11      conscientiously vote for the death penalty if you thought that

12      was the right punishment, and you said you weren't sure.  The

13      next question, you said that, if you thought life imprisonment

14      was the right one, could you conscientiously vote for that, you

15      said yes.  There's a slight difference between "I'm not sure"

16      and "yes."  Could you tell us why you answered those questions

17      the way you did?

18              THE JUROR:  Again, I was taking what you had

19      instructed us, to look at all the evidence, so how could I make

02:01 20   any decision on that particular sentence area until I knew more

21      about what is the criteria for that?

22              THE COURT:  Do you intend by that answer to indicate

23      in any way that you would not be prepared to vote for the

24      penalty of death in any circumstance?  Or do you intend to

25      convey that you will consider the circumstances before making

1    up your mind about that?

2          THE JUROR:  I have committed myself to make a decision

3    based on what you had said was all the evidence in the case.

4    So I --

5          THE COURT:  And just to be sure, if that evidence

6    persuaded you that a sentence of death was an appropriate

7    punishment, would you be able to vote for that?

8          THE JUROR:  Yes.

9          THE COURT:  And the same is true for life imprisonment

02:02 10   without release?

11         THE JUROR:  Yes.

12         THE COURT:  Any brief follow-up?

13         MR. BRUCK:  Could we confer just a moment?

14   (Discussion held off the record.)

15         MR. BRUCK:  No, sir.

16         THE COURT:  Thank you, ███████.

17         THE CLERK:  Number 37.

18         MR. McALEAR:  Juror 37.

19         THE COURT:  As I reminded everybody again this

02:05 20   morning, I've asked jurors to avoid any discussion of the case,

21   sort of exposure to media or other sources of information about

22   the case.  Have you been able to abide by that instruction?

23         THE JUROR:  Yes.

24         THE COURT:  So we have the questionnaire.  You have

25   yours in front of you if you want to refer to.  There may be

1    sometimes when I'll ask you to do that.  I'm going to follow up

2    on some of the questions.

3            I want to ask you first about the matter you raised in

4    Question 9, which is concerning your eye.  Is that something

5    you would rather not discuss in public?

6            THE JUROR:  No.  I'm fine with it.

7            THE COURT:  How serious of difficulty do you think it

8    will be?

9            THE JUROR:  Well, as you can see today, this is one of

02:05 10   the more mild episodes.  I do have a few photos to show you

11   when it's in its full-blown.  When it is, it's pretty

12   debilitating, unfortunately.

13           THE COURT:  In what sense debilitating?  Does it

14   impair your vision?

15           THE JUROR:  Yes.  May I show you --

16           In addition to impairing my vision, it -- I end up

17   with almost like a migraine-type headache.  It essentially --

18   it will take a day or --

19           THE COURT:  It's pronounced.

02:06 20         THE JUROR:  It is.  It's completely swollen shut.

21   It's an autoimmune disease.  It's an inflammatory disease.  I

22   have a tumor behind my eye.  So my immune system is

23   periodically sending stuff through it.  I'm taking chemotherapy

24   drugs for it, but it's not quite under control.

25           THE COURT:  Is it unpredictable?

1        THE JUROR:  It is.  I was here yesterday.  Everyone

2   could tell you there was nothing.  Today I woke up it's

3   swollen.  There is no rhyme or reason.  We have yet to figure

4   out what the cause is.  Today is not such a problem, but when I

5   have one of those, which happens periodically, I can't drive.

6   I can't see.  I have a very, very bad headache that makes it

7   very difficult for me to focus on anything.  It's,

8   unfortunately, just very distracting.

9        THE COURT:  Okay.  I think that's enough.  Thank you.

02:07 10        THE JUROR:  Sure.

11        THE CLERK:  Juror No. 38.

12        MR. McALEAR:  Juror 38.

13        THE COURT:  Good morning.

14        THE JUROR:  Good morning.

15        THE COURT:  I had asked people last time you were here

16   when you filled out the questionnaire to avoid any discussion

17   of the case or exposure to media accounts of the case or

18   talking about it or anything like that.  Have you been able to

19   do that?

02:08 20        THE JUROR:  Uh-huh.

21        THE COURT:  For the record, you have to answer

22   affirmatively.

23        THE JUROR:  Yes, yes.

24        THE COURT:  You're concerned about the burdensomeness

25   of service in light of your employment.  Can you tell us a

1    little bit about that?

2         THE JUROR:  Basically, what I do is I go to customers,

3    people that call -- it can be a company or an individual -- and

4    fix computers, phones.  So, basically, it's not for a company.

5    It's for myself.  I have a group of companies that I do that

6    for.

7         THE COURT:  You're sort of -- they're regular clients

8    of yours, put it that way?

9         THE JUROR:  Some of them are.

02:08 10         THE COURT:  You make arrangements with them or they

11   keep calling?

12         THE JUROR:  Yes, some are.  Some I go back monthly,

13   and then other times, it will be people will recommend me to

14   someone else, and I'll go and service their computers.

15         THE COURT:  The nature of your service is you have to

16   go there?

17         THE JUROR:  Yeah.

18         THE COURT:  It's not something you can do online or

19   over the line?

02:09 20         THE JUROR:  Sometimes I can do it remotely, usually

21   for the customers that I already have.  But sometimes I don't

22   have those customers every month, so --

23         THE COURT:  How do you get customers?

24         THE JUROR:  Referral.

25         THE COURT:  So, say, for the last week or so, what's

1      your activity been in the last week or so?

2              THE JUROR:  About 50 percent of the time, I'm out of

3      my house.  And then the rest of that time, I'm logging in and

4      working on research or stuff to get other jobs, you know --

5      say, you hire me to set up new computer systems or you want

6      cameras, I'll go research that, bring that back to you, and you

7      purchase it and I set it up.

8              THE COURT:  I noticed, just sort of background

9      information, that your father worked for the Department of

02:10 10   Defense.

11             THE JUROR:  Yup.

12             THE COURT:  Can you tell us what he did?

13             THE JUROR:  He started off as, like, computer analyst.

14     Then he was in communication.  He did base closures and

15     something with the tracking station.  I'm not exactly sure.

16             THE COURT:  Was he a civilian employee of the

17     Department?

18             THE JUROR:  Yeah.

19             THE COURT:  What were his professional training and

02:10 20   skills?  Was he an accountant?  Was he a software person?

21             THE JUROR:  Yeah, software and communications.  I know

22     that he dealt with telecommunications and software, but I don't

23     really know all the details.

24             THE COURT:  Okay.  Tell us about your own use of

25     social media, business or personal.

```
1              THE JUROR:  Facebook.

2              THE COURT:  How frequently and whether you post or

3       view or both or what?

4              THE JUROR:  Both.  That's kind of part of the work I

5       do, too.  I work with small companies to get them on Facebook

6       and to advertise and to help them with Google.  So I'm on there

7       a lot.  I'm on Facebook.  I kind of think it's a waste of time,

8       so I'm not on there a lot but a couple times a week.

9              THE COURT:  Have you posted anything about this case?

02:11 10       THE JUROR:  No.

11             THE COURT:  In Question -- again, it may help to refer

12      to Question 50 on Page 15.  Asked about what cases you might

13      have followed, criminal cases.  You said this case and the

14      trials related to his, I take it meaning the defendant's

15      friends, at UMass Dartmouth.

16             THE JUROR:  Yeah.

17             THE COURT:  Tell us to what level or degree of

18      interest you followed those cases, how thoroughly you followed

19      it and so on and so forth.

02:13 20       THE JUROR:  Well, the case is pretty much everywhere

21      if you're online, if you're on Facebook, it's on the news.  So

22      I've followed it that way.  And then, since I live near UMass

23      Dartmouth, I would see it in the paper or, again, online.  I've

24      just read some of the articles.  It's not like I'm looking for

25      information, but I've, you know, you see it often, so --
```

1          THE COURT:  With respect to the cases of the friends

2     from UMass Dartmouth, just because it was --

3          THE JUROR:  I've just read about it in the paper, so

4     -- no, I haven't particularly followed what's happened to the

5     -- to them, but I have read about it.

6          THE COURT:  Okay.  We asked a series of questions

7     about topics which could be grouped as sort of international

8     issues, attitudes towards Muslims, Islam, immigrants, what --

9     actions involving the war on terror and so on and so forth,

02:14 10     attitudes towards that.  You've answered it.  But since you did

11     fill out the questionnaire, there have been some incidents in

12     Europe and otherwise, things that could be classified as

13     terrorism.  Have you paid attention and, if so, how closely to

14     any of that reporting?

15          THE JUROR:  I've heard about it, but I actually

16     haven't really followed it.  I've been trying to stay away from

17     the news.

18          THE COURT:  I appreciate that.  Well done.

19          So what you do know, would it affect any of the

02:15 20     answers you gave previously?

21          THE JUROR:  No, I don't think so.  I mean, I don't

22     really know a lot about it.  I just know that there were some

23     bombs that went off in France, but --

24          THE COURT:  Would incidents like that -- I mean, who

25     knows -- and in the course of the case, maybe something else

1    will happen.  Would incidents like that, that are not directly

2    pertinent to this case, would they have any influence on you as

3    a juror in this, do you think, if you came to learn about them?

4          THE JUROR:  I don't think so, no.

5          THE COURT:  In Question 74 on Page 19, we asked sort

6    of for your reaction to realizing that you had been summonsed

7    and, I guess, realizing that it might have been for this case.

8          THE JUROR:  Yeah.

9          THE COURT:  First two things you said you felt was

02:16 10    stress and anger.

11          THE JUROR:  Yeah.  It's definitely stressful and I

12    just -- the whole -- I guess maybe my answer is not being

13    picked for -- it's about the case.  I mean, this is --

14          THE COURT:  Uh-huh.  So can you -- when you said

15    stress and anger, you --

16          THE JUROR:  So, I mean, you see so much on TV and you

17    -- I don't know.  I just -- that's --

18          THE COURT:  Do you -- as recently as the time you

19    received the summons, do you still experience anger about the

02:17 20    events in the case?

21          THE JUROR:  Yeah, I think so.

22          THE COURT:  Question 80 on Page 20, we asked if you or

23    a family member or close friend actually witnessed the events,

24    and you said a friend responded as a first responder at the

25    finish line.

```
 1              THE JUROR:  Yup.

 2              THE COURT:  He's a Boston officer.  And a cousin was

 3      at the Marathon medical tent.

 4              THE JUROR:  Yup.  My cousin was running the tent for,

 5      like, the cool-down.

 6              THE COURT:  That was where, in Copley Square?

 7              THE JUROR:  Yup, yup.  He was there during that.  And

 8      then a friend of mine was one of the first officers there at

 9      the finish line.  I think he was actually at the finish line

02:18 10     when it all happened.

11              THE COURT:  Have you talked to him about his

12      experience there, that is, well before this case?

13              THE JUROR:  Yeah.

14              THE COURT:  Or thereafter, too, but I meant around the

15      time.

16              THE JUROR:  A little bit.  More of it was he was on

17      the cover of Time Magazine, so it was talking about that.

18              THE COURT:  I guess what I'm wondering about is have

19      you -- has he been --

02:18 20              THE JUROR:  I haven't talked --

21              THE COURT:  -- a significant source of information

22      about the events to you as opposed to, for example, the media?

23              THE JUROR:  No, not to me.

24              THE COURT:  Now, I'm not clear on which person we're

25      talking about actually.
```

1          THE JUROR:  My friend that's the police officer.

2          THE COURT:  The police officer, okay.  That's what I

3    thought.

4          And the cousin, was he involved in responding in any

5    way after the event?

6          THE JUROR:  I think he was just there and coordinating

7    everything that was going on and kind of made a triage area.

8    But I haven't really -- we didn't really talk about it.

9          THE COURT:  Further up the page, in Question 77, we

02:19 10   asked whether, based on what you'd seen or read in the media or

11   otherwise from other sources, including people like we've just

12   been talking about, whether you had formed an opinion about

13   whether the defendant's guilty or not and about what punishment

14   he should get.  You indicated that you had formed an opinion

15   that he's guilty and, similarly, that you had formed an opinion

16   that he should get the death penalty.

17          As I think I instructed the last time, and I referred

18   to it again today a bit, a defendant is presumed to be innocent

19   of charges made against him in a criminal case unless and until

02:20 20   the government proves otherwise by proof at the trial.

21          THE JUROR:  Right.

22          THE COURT:  Would you be able -- notwithstanding that

23   you have some impressions and some opinions about this matter

24   from other sources, would you be able to apply those principles

25   faithfully and require that the government overcome the

1    presumption of innocence by proof beyond a reasonable doubt at

2    trial?  Would you be able to do that?

3            THE JUROR:  I think that I could.  These answers are

4    from everything that I've seen.  So, you know, they'll present

5    a case, and we all get to decide, I guess, one way or the

6    other.  I mean, I guess you'd try to keep an open mind.  Just

7    everything that's been on the news is -- I don't know.  I just

8    --

9            THE COURT:  Let me -- this is all hypothetical.  It's

02:21 10   hard to know what you would do in some future event, obviously.

11   But if you were to hear things that were different from what

12   you'd already heard in some way or additional in some

13   significant way, for example, would you be open to revising

14   your previously formed opinion?

15           THE JUROR:  Yes, uh-huh.

16           THE COURT:  Would that be true not only for the

17   determination of whether he's proved guilty or not?  Would that

18   apply as well to any opinion that you might have about the

19   appropriateness of the death penalty?

02:21 20           THE JUROR:  I think it depends on -- I don't know.  I

21   guess you would have to go through the case, I guess.  I don't

22   know.  What I -- maybe I would revise how I feel after hearing

23   and what the penalty should be.

24           THE COURT:  Page 23, we asked a series of, questions

25   beginning with Question 88, about trying to get to what your

1    views were about the death penalty in general.  And in 88, we

2    said, Do you have any general views?  And you said that you had

3    none.  But in 89, we asked you to do it on a scale, 1 to 10,

4    and you indicated "9."

5              THE JUROR:  Right.

6              THE COURT:  Specifically, the question was whether the

7    death penalty should be imposed whenever a defendant has been

8    convicted of an intentional murder.  And you circled "9" on

9    that.  It seems a little bit different from 88, but they were

02:23 10    asking slightly different things.  Let me just complete it as

11    you're thinking about it.  I can see you're thinking about it.

12              To add, the next page, Question 90, was another sort

13    of scaling question, which asks, in words, what represented

14    your view.  And you circled "F:  I am strongly in favor of the

15    death penalty, and I would have a difficult time voting for

16    life imprisonment without the possibility of release regardless

17    of the facts."

18              So refreshing your recollection with those answers,

19    can you give us a summary of how you would approach the

02:23 20    question on the premise that you have a defendant who has been

21    convicted of an intentional murder?

22              THE JUROR:  Right.

23              THE COURT:  On that premise, then, considering --

24    after you've heard from both sides aggravating factors,

25    mitigating factors and so on, what do you think your mental

         1   condition would be?  Would you be inclined automatically to

         2   vote for the death penalty?  Would you be inclined

         3   automatically the other way?  Would you be able to evaluate the

         4   aggravating and mitigating factors seriously and perhaps --

         5   perhaps in the end --

         6          THE JUROR:  If he was proven guilty of murder, how

         7   would I --

         8          THE COURT:  Right.

         9          THE JUROR:  -- would I process that?

02:24  10          THE COURT:  In other words, would it be your opinion

        11   or your point of view that a person who is guilty of an

        12   intentional murder -- take that as a premise -- such a person

        13   must always be sentenced to death or such a person may be

        14   sentenced to death in appropriate circumstances and may not be

        15   and be given life imprisonment in certain circumstances?

        16          THE JUROR:  Yeah.  Well, I don't know.  I have a hard

        17   time with that, I guess.  I think, if he's proven guilty of an

        18   intentional murder, then -- but I guess there's always facts.

        19   So, I mean, maybe I'm not understanding the question.

02:25  20          THE COURT:  We can't ask you to say what you would do

        21   because you don't have the facts.  It's really a question of

        22   whether you're committed sort of perhaps as a philosophical

        23   matter -- some people might have that view or maybe some other

        24   reason that you think you know things about the case that would

        25   lead you to do it, something about it so that you would --

1    really the question is:  Can you be confident yourself that you

2    could consider both mitigation and aggravation, balancing, and

3    make a decision as appropriate in the facts that you have, or

4    do you have some predisposition one way or the other that you

5    think would overtake that and control?

6              THE JUROR:  No.  I think I could weigh that and -- I

7    don't have any predisposition, but I read this as if, for

8    example, if he's -- that doesn't help me.

9              THE COURT:  You know what the case is about.  It's

02:26 10   about bombings in which three people died and in which a police

11   officer was shot.  So you have that general sense of it, right?

12             THE JUROR:  Uh-huh.

13             THE COURT:  If somebody is convicted of doing that

14   intentionally, would you have -- what would your approach be?

15   Would you think that under the circumstances it should

16   necessarily be the death penalty, or would you be able to give

17   consideration based on the evidence that you hear to either the

18   death penalty or life imprisonment?  That's really what I'm

19   getting at.

02:27 20             THE JUROR:  No.  I think it should be the death

21   penalty.

22             THE COURT:  Under those circumstances?

23             THE JUROR:  Yes.

24             THE COURT:  And so are you unable to consider in that

25   -- on those circumstances, the possibility of mitigating

1    circumstances that could reduce the appropriate punishment?

2              THE JUROR:  No.  I could consider other if --

3              THE COURT:  You would have to hear what it was?

4              THE JUROR:  Yeah.

5              THE COURT:  Well, I don't want to misunderstand your

6    position, but I'm trying to gauge the strength of the

7    predisposition.  Predisposition, as a human matter, can be

8    understandable, and it's hard to predict what you would do when

9    there's additional information.  I'm just trying to guess

02:28 10   whether it would be a dominant predisposition or whether you

11   could be open conscientiously to consider the possibility of a

12   different sentence than death.  Only you can tell us.

13             THE JUROR:  I mean, I think I can be open to that, but

14   I've seen so much that -- and when you go through this, I feel

15   like you're -- you know, like -- this No. 90 says, you know, if

16   he's proven guilty, how would you -- how would you respond or

17   react or what would you think?  So that's why I answered these

18   the way I did.  You know, it says if he was -- if this person

19   is proven guilty of murder, what would your -- I don't know if

02:29 20   that --

21             THE COURT:  Let me -- the question was asked in a

22   number of different ways because it's a complex question, and

23   we want to be sure we come at it in different ways.  If you

24   look at Questions 95 and 96, in each of those we asked, if you

25   found him guilty and you decided that, first, the death penalty

1    was appropriate, could you conscientiously vote for the death

2    penalty, and you said yes.  In the next question, we asked the

3    same thing but about life imprisonment, and you said yes as

4    well.  At the time you filled out the questionnaire, was that

5    your view, that you could consider either and conscientiously

6    choose either?

7           THE JUROR:  Yes, I could.  I see what you're saying.

8    Is it one or the other?  Is that what's confusing?  I feel like

9    if -- so I wouldn't be set on one, I guess, one decision or

02:30 10    outcome.  Is that what the confusion is?

11           THE COURT:  Okay.  I think we've explored it.  I just

12    -- lastly, I wanted to go back a little bit.  In the

13    questionnaire, in Question 81, which is on Page 21, you

14    commented that you and many of your friends sheltered in place

15    on that Friday, and you said you're not sure of any long-term

16    effects.  What did you have in mind when you said that?  What

17    kind of long-term effects were you thinking of?

18           THE JUROR:  So what was the question?  If --

19           THE COURT:  We're talking about how you personally

02:31 20    might have been affected about things.  That's what Question 81

21    was about.  You commented that you -- you said "many friends."

22           THE JUROR:  Yes, but I don't think they have any

23    long-term effects.

24           THE COURT:  It wasn't you, I guess.  It was your

25    friends.

1          THE JUROR:  They just experienced it, and I don't

2    think there was any long-term effects.

3          THE COURT:  You weren't affected by it personally?

4          THE JUROR:  No.  I stayed out of the city.

5          THE COURT:  You weren't in the city?

6          THE JUROR:  Yup.

7          THE COURT:  Any follow-up?

8          MR. WEINREB:  Yes, your Honor.

9          MS. CLARKE:  Yes, your Honor.

02:31 10          THE COURT:  Who wants to go first?

11          MR. WEINREB:  I will.  ███████.

12          THE COURT:  Just identify yourself for the juror.

13          MR. WEINREB:  I'm sorry.  You said that --

14          THE COURT:  This is Mr. Weinreb, one of the

15    prosecutors.  I just -- he should know who's asking the

16    question.

17          MR. WEINREB:  I'm sorry.  I'm Bill Weinreb.  I'm one

18    of the prosecutors in the case.  I'd just like to ask you a few

19    follow-up questions so I understand all your answers.

02:32 20          You explained the ways in which it would be a hardship

21    for you to serve because of the impact it would have on your

22    job.  One of the things -- I understand that, of course.  That

23    made sense.  But one of the things that was not entirely clear

24    to me is the degree to which it would be a financial hardship.

25    I notice that you're married, and your husband seems to have a

1    job and work.  Would that mitigate the financial hardship at

2    all?  Would that make it --

3             THE JUROR:  I mean, it does.  Things are tight now, so

4    it's -- it's still tough.

5             MR. WEINREB:  So I'm sure you're aware, as everybody

6    is, that serving on a jury is a sacrifice.  I guess one of the

7    things that we need to determine is how much of a sacrifice it

8    would be.  Is it just taking a hit in your income, or is it

9    going to be a catastrophe for you?

02:33 10          THE JUROR:  It takes both of us to be able to pay the

11   mortgage and the health and the bills, so it would be a pretty

12   big hit.  If I'm -- I don't know how much I would be able to

13   work.  There may be some remote stuff at night that I could do,

14   but I'm expecting it to be, if I was on the jury, to be pretty

15   tough.

16            MR. WEINREB:  Okay.  Excuse me one second.

17            One last thing on the questions about your ability to

18   consider mitigating factors.  So you seem to be struggling with

19   the question of, if the defendant were convicted of the capital

02:34 20  offense and various things were proved that suggested that it

21   was a particularly bad offense, whether you would be able to

22   consider factors going the other way.  But nobody mentioned

23   what any of those might be, so you're left to just imagine for

24   yourself what they might be.  And so I just want to confirm

25   with you that if you -- that at a sentencing phase, if this

1    case has a sentencing phase, and you hear evidence about why

2    this case might be an appropriate one for the death penalty,

3    but you also hear evidence going the other way, evidence that

4    would tend to mitigate the crime, evidence about the nature of

5    the crime, and about the defendant's character or background,

6    that would suggest to you that maybe there are special

7    circumstances here that might point the other way.  Would you

8    be able to give meaningful consideration to those other

9    circumstances and consider whether they made it inappropriate

02:35 10    to impose the death penalty in this case?

11              THE JUROR:  Yes, I think -- yes.

12              MR. WEINREB:  That's all.  Thank you.

13              THE COURT:  Mr. Bruck.

14              MR. BRUCK:  Good afternoon.

15              THE JUROR:  Good afternoon.

16              MR. BRUCK:  Good afternoon by one minute.  I'm David

17    Bruck.  I'm one of Mr. Tsarnaev's attorneys, and I just have a

18    few things I'd like to follow up on.

19              They tell me I can't be heard.  Sorry.

02:35 20              Just a couple of things.  First, about your economic

21    situation, your job, it's -- I know it's hard to predict, but

22    this is the only chance you get to predict.  It will be too

23    late if you're on the jury and this becomes a source of real

24    stress and distraction for you that you are not able to pay the

25    bills.  Is that something that could happen and, if it did,

1    could it be a real interference with your ability to focus on a

2    case of this seriousness?

3            THE JUROR:  I guess -- I don't know.  It could be,

4    yeah.  I feel like you have to come up -- you have to figure

5    things out.  I don't know what I would do.  You know, I haven't

6    been in this situation before, but -- I work a lot so it's --

7            MR. BRUCK:  As you sit here now, is that a concern for

8    you?  Are you worried about it?

9            THE JUROR:  Yes, I am.

02:36 10           MR. BRUCK:  You said that you were -- you still have

11   feelings of anger.

12           THE JUROR:  Just the whole course of events kind of --

13   it's kind of needless.  It's like the stuff that happened

14   yesterday with the people blocking themselves on the road.

15   Just, you know, I don't get what any of this accomplishes.  I'm

16   not talking about coming to court and all this but the events.

17           MR. BRUCK:  I want to be sure, but when you filled out

18   the questionnaire, you felt that Mr. Tsarnaev is guilty of

19   these events.  That is your opinion now?

02:37 20           THE JUROR:  Yeah, just from everything that I've seen

21   on the news and, you know -- whatever that's worth.  There's,

22   you know --

23           MR. BRUCK:  Right.

24           THE JUROR:  I haven't heard anything else, so --

25           MR. BRUCK:  When you describe feelings of anger, who

1    are you -- please understand that there's nothing wrong with

2    having paid attention to what's going on.

3              THE JUROR:  It's just a feeling.  I mean, I don't -- I

4    guess it's towards the whole situation.  I don't necessarily

5    know if it's towards a particular person, but -- the whole

6    events and what you hear on TV.  I don't know if you can

7    believe everything you hear.

8              MR. BRUCK:  You told the judge and you told Mr.

9    Weinreb that you could hear other evidence that would change

02:38 10   your mind.  I guess my question is:  Would it take evidence

11   from the defense to change your mind from how you feel now?

12             THE JUROR:  I think it would.

13             MR. BRUCK:  So we would have to prove to you that he

14   is not guilty in order for you to feel that he is not guilty?

15             THE JUROR:  Yes, I think so.

16             MR. BRUCK:  And we would have to prove to you -- don't

17   let me put words in your mouth, but I'm trying to hear what

18   you're telling us.  We would have to prove to you that he does

19   not deserve the death penalty in order for you to not give him

02:39 20   the death penalty.

21             MR. WEINREB:  Objection, your Honor.

22             THE COURT:  I think this is a little too leading, both

23   of those questions.

24             MR. BRUCK:  I guess I can turn it around.

25             MR. WEINREB:  You're misrepresenting --

1          THE COURT:  I think it's ground we've been over.  I

2     understand the reason for the questions, but I think we've

3     gone --

4          Let me just come back -- since the family income now

5     has been put into issue, can you just tell us what your spouse

6     does?

7          THE JUROR:  He's an optometrist.

8          THE COURT:  It gives that he has an M.B.A.  Is that

9     just incidental?

02:39 10        THE JUROR:  Yeah.

11         THE COURT:  That doesn't affect his -- is he

12    self-employed?

13         THE JUROR:  Yes.

14         THE COURT:  In a -- what?  A vision store or something

15    like that?

16         THE JUROR:  Yeah, yeah.  Again, he works for himself.

17    That's how the -- yeah.

18         THE COURT:  Okay.  All right.  Thank you.

19         MR. WEINREB:  Your Honor, can I follow up on that

02:40 20    because I don't think that was a fair way to end the

21    questioning?

22         THE COURT:  Okay.  I don't want to -- I don't want

23    this to just be swatted back and forth across the net.

24         MR. WEINREB:  I understand.  Sir, I just want to make

25    sure we're clear on this question of the presumption of

1    innocence.  So if you are -- you will be instructed that the

2    defendant is entitled to a presumption of innocence, that you

3    need to presume that he's innocent and that he will remain

4    innocent unless and until the government proves him guilty

5    beyond a reasonable doubt.  Can you follow that instruction?

6              THE JUROR:  Yes.

7              MR. WEINREB:  That's all.

8              THE COURT:  I think that's enough.  Thank you.  Leave

9    the questionnaire there, if you would.

02:41 10              THE CLERK:  Number 40.

11              MR. McALEAR:  Juror No. 40.

12              THE CLERK:  Juror No. 40, right here, please.

13              THE COURT:  Good afternoon.

14              THE JUROR:  Hello.

15              THE COURT:  That's the questionnaire you filled out

16    before.  We're going to refer to it from time to time as I

17    follow up on some of the answers you've given in it.

18              THE JUROR:  Okay.

19              THE COURT:  When you were here last filling out the

02:42 20    questionnaire, I had instructed everybody to avoid any

21    discussion of the case and any exposure to media accounts of

22    this trial or anything else.  Have you been able to abide by

23    that?

24              THE JUROR:  I have.  I've turned down the radio,

25    turned it off, left the room.  I haven't looked at any

 1    articles.

 2              THE COURT:  I appreciate that.

 3              As I say, I'm going to follow up on some of the

 4    information just to get perhaps a little amplification of it.

 5    One of the interesting things is that you spent five years in

 6    Nepal.  Can you tell us about that?

 7              THE JUROR:  Yeah.  I was a Peace Corps volunteer

 8    there.  I served there for about two and a half years.  I got

 9    to do sort of a full-circle experience.  I got to go back and

02:42 10    train incoming Peace Corps volunteers.  I went to graduate

11    school.  I had to do a practicum.  I happen to speak Nepali.  I

12    got a practicum back in Nepal coordinating a women's literacy

13    program.

14              THE COURT:  So it wasn't a consecutive five years?

15    It's five years in total?

16              THE JUROR:  Kind of, yeah.  Two and a half years,

17    break for three months, couple months there, grad school, two

18    more years.  And then I actually ended up in Boston because I

19    worked with -- the company I worked for, the nonprofit I worked

02:43 20    for, is based here in Boston, and so I would travel on and off

21    to several countries, actually.

22              THE COURT:  When was the time in Nepal generally?

23    What decade?

24              THE JUROR:  Yeah.  Early '90s, Peace Corps; 1996,

25    work, to 2005.

1           THE COURT:  Tell us about your work and the

2     organization that you work for.

3           THE JUROR:  I run a nonprofit.  It's called Boston

4     Partners in Education.  We support kids in the Boston Public

5     Schools, Grades K through 12.  The way that we do that is by

6     getting people from the community to actually go into school.

7     They tutor, mentor kids.  They commit one hour a week mostly in

8     reading, writing, and math.  Any teacher in Boston can

9     request -- nominate their students and request volunteer help.

02:44 10    So if you know of anyone that wants to volunteer, I'm always

11    looking.

12          THE COURT:  How long have you been doing that?

13          THE JUROR:  This is my tenth year.

14          THE COURT:  And you're married, and your wife is an

15    attorney?

16          THE JUROR:  Yeah.  She's a hearing officer at the

17    Department of Public Utilities for a different state.

18          THE COURT:  Hearing regulatory matters?

19          THE JUROR:  Yes.

02:44 20    THE COURT:  Rating setting, things like that?

21          THE JUROR:  Yeah.  She works mostly on storm cases,

22    and cyber security is big right now.

23          THE COURT:  We asked about social media, and you said

24    you contribute to a blog, I think, but that it's a particularly

25    targeted blog.

1          THE JUROR:  Yeah.  It's for my work.  So I write a

2     couple of posts.  I help to edit all of our posts.  I -- it's

3     really about service and kids and supporting teachers in the

4     Boston Public Schools.

5          THE COURT:  Do you use social media for personal use?

6          THE JUROR:  I do.  I have a Twitter account.  I'm more

7     into Twitter than Facebook.  I'm kind of a stalker on Facebook.

8     I don't really do anything on Facebook.  I get tagged on things

9     there.  But with Twitter, I have a work -- I have my own Boston

02:45 10     Partners Ed Twitter account which I share information about

11     education, public education, what's going on in Boston with

12     education, stories, our blogs, that kind of stuff.  Then I have

13     another Twitter account, personal account, Sports Gal One, big

14     Red Sox fan.  You know, I post things about sports, LGBTQ

15     stuff, things that interest me personally.

16          THE COURT:  Have you done any posting about this case

17     or the circumstances?

18          THE JUROR:  I have not done any posting about this

19     case.

02:46 20          THE COURT:  Or the underlying circumstances?

21          THE JUROR:  I have not.

22          THE COURT:  Events?

23          THE JUROR:  No, no.  I was at the Westin Hotel on

24     Marathon Monday and maybe said something.  I can't recall.

25          THE COURT:  You have had some experience as a juror in

 1    a state civil case.

 2              THE JUROR:  Yes.

 3              THE COURT:  When was that?

 4              THE JUROR:  It was two jury services ago.  So I had

 5    one last summer, so it was the one before that, so probably

 6    four years ago, five years ago.

 7              THE COURT:  And you had one last summer?

 8              THE JUROR:  I got called to jury duty, but there were

 9    no cases.  I mean, I just spent --

02:47 10              THE COURT:  You reported but you were discharged?

 11              THE JUROR:  I reported but was dismissed.

 12              THE COURT:  We asked some series of questions in the

 13    questionnaire about what might generally be called

 14    international affairs, some questions about attitudes towards

 15    Islam and Muslims, for example, attitudes towards the -- what's

 16    called the war on terror and so on and so forth.  Since the

 17    filling out of the questionnaire, there have been some events

 18    in Europe involving what could fairly be described as

 19    terrorism.

02:47 20              THE JUROR:  Uh-huh.

 21              THE COURT:  Have you followed those reports?

 22              THE JUROR:  I have followed those.

 23              THE COURT:  How closely?  Casually?  Could you

 24    quantify it a little bit?

 25              THE JUROR:  I'm not out protesting.  I think that

1    those kinds of things are something to be concerned about, when

2    you can't go to work or can't go to a public place and you have

3    to be worried about -- not that I worry about that stuff, but

4    that something could happen.

5            THE COURT:  Would you take just a minute to look at, I

6    guess, Page 17.  Just scan the series of questions there.  And

7    the question at the end is:  Would any of those answers change

8    as a result of anything recent since the questionnaire was

9    filled out?

02:48 10         THE JUROR:  No, none of those things would change.

11           THE COURT:  Question 72 on Page 19, we asked about

12   whether you'd ever called a talk show, written a letter to the

13   editor, et cetera, posted websites.  Your answer is, yes, in

14   regards to education, mentoring and volunteerism.  That sounds

15   like what you've already told us about.  Your blog, is that

16   what you're talking about, or is this something in addition to

17   that?

18           THE JUROR:  No.  I mean, a couple of letters I've

19   written to the Globe.  I think one was published in the Herald

02:49 20  a few years ago, mostly around community service, education

21   issues.  I can't remember exactly.  One was about mentoring.

22           THE COURT:  Sort of adjunct to your professional life?

23           THE JUROR:  Yeah.  I want my voice to be heard, yeah.

24           THE COURT:  Questions 74 and 75, we asked about what

25   happened when you learned you might be called in for this case.

1   74, you said you were surprised, a little disbelief since I

2   felt personally affected.  Can you tell us what you meant by

3   that?

4            THE JUROR:  Well, I live in Dorchester.  You know, I

5   know the Richard family personally, but -- you know, I did,

6   like, a clean-up day and I usually met Martin.  You know, I --

7   it was just, you know, walking by a memorial for him, all that

8   stuff.  So I just was a -- I was sort of surprised and the fact

9   that I -- my organization has runners in the Marathon, so I was

02:50 10   down there.  I had to look for my runners, their families.  I

11   had given passes to the finish line.

12            MR. WEINREB:  Can we pause for a minute?

13            THE JUROR:  It was a long couple days.

14            THE COURT:  Yes.  There's a request for consultation

15   with the lawyers.  If you'd excuse us for a minute.

16            THE JUROR:  Okay.

17   (The juror left the courtroom.)

18            THE COURT:  We can proceed to another.

19            MR. BRUCK:  We can.

02:51 20   (SIDEBAR CONFERENCE AS FOLLOWS:

21            THE COURT:  Could you excuse us?

22            MS. CLARKE:  I don't think he's going to say

23   anything --

24            THE COURT:  Somebody else might.

25            MR. WEINREB:  Let's excuse them and figure it out.

1          MS. CLARKE:  Somebody else might.

2          MR. BRUCK:  Are we ready?  I think the parties can

3     agree that that juror should be excused.  I just wanted the

4     record to reflect, which it otherwise would not, that the juror

5     was crying during the last minute or two of the --

6          THE COURT:  Fair enough.

7          MS. CLARKE:  That was okay, right?

8          THE COURT:  That was okay.

9          MR. WEINREB:  Actually, in future, perhaps we could

02:52 10   just say on the record, We can move on, and it will be

11    understood that that's --

12         MS. CLARKE:  I suggested that awhile ago.

13         MR. WEINREB:  That that's an agreed strike?

14         THE COURT:  I like this way better.

15         MR. WEINREB:  Where we actually send the reporters out

16    of the room?

17         THE COURT:  If we're going to have a discussion.  No,

18    I meant, the interruption.

19         MR. WEINREB:  I just meant that instead of sending

02:52 20   them out of the room so that we can say this is an agreed

21    strike, we can just follow the Court's lead.  If the Court can

22    ask, Can we proceed to the next juror, and we all assent, that

23    would be a way of --

24         THE COURT:  The only reason we did -- I didn't know

25    what was coming with the comment.  That's the only reason.

 1          MR. WEINREB:  So that will be --

 2          THE COURT:  They didn't have to be excused for the

 3     reason that the juror is finished with us.  Yes, we'll --

 4          MR. BRUCK:  I'll try not to be an unguided missile.

 5          THE COURT:  If somebody can get them back in.

 6     .  .  .  END OF SIDEBAR CONFERENCE.)

 7          THE CLERK:  Juror No. 41.

 8          MR. McALEAR:  Juror 41.

 9          THE COURT:  Good afternoon.

02:54 10          THE JUROR:  Good afternoon.

11          THE COURT:  We have put the questionnaire you filled

12     out previously in front of you, and we may be referring to it

13     from time to time.

14          When you were here to fill out the questionnaire, I

15     instructed jurors to avoid talking about the case in substance

16     with anybody or -- and tried to avoid any media or other

17     information, sources about the case.  Have you been able to do

18     that?

19          THE JUROR:  Yes.

02:54 20          THE COURT:  Let me start with you telling us a little

21     bit about your employment.  What do you do, and how long have

22     you done it?

23          THE JUROR:  I work for EMC Corporation.  I'm a senior

24     executive assistant.

25          THE COURT:  That's -- what is that?  Assistant to a

1    senior executive or a senior assistant?

2          THE JUROR:  No.  That's my title.  Senior executive

3    assistant.

4          THE COURT:  I'm just getting to the "senior" applies

5    to you and not to somebody else.

6          THE JUROR:  Well, they're both seniors, too.  I

7    support a senior vice president and a chief risk officer.

8    She's one and the same.  And I also support a senior vice

9    president.  He's chief officer of public affairs and government

02:55 10   policies.

11          THE COURT:  Okay.  And you've done that for a while?

12          THE JUROR:  I've been there since 2005.

13          THE COURT:  You tell us in the form that you have a

14    couple of friends who are -- one is in, I guess, the

15    correctional -- a correction officer of some kind, and the

16    other is a sheriff.  Can you tell us a little bit about those

17    people?

18          THE JUROR:  I have one girlfriend who did work for the

19    corrections department for many years, and she has recently

02:56 20   just gone to work for the Worcester sheriff's office.  And then

21    my husband --

22          THE COURT:  What does she do?

23          THE JUROR:  She's in HR.  She does something with

24    human resources.

25          THE COURT:  Okay.  All right.

1          THE JUROR:  My husband and I, who is also her husband,

2    are friends with him, and he works for the Norfolk prison.  And

3    he's not really a correction officer.  I think he is.  I don't

4    know.  But he mainly drives the inmates, like, to their

5    doctors' appointments or the hospital or stuff like that.

6    That's what he does.

7          And then I have another girlfriend who works at the

8    Framingham women's prison.  She does, like, computer stuff.  I

9    think she's like their IT person.

02:56 10          THE COURT:  You had the honor of serving on two juries

11    before?

12          THE JUROR:  Yes.

13          THE COURT:  When were they, just approximately?

14          THE JUROR:  The last one I did was just April 1st of

15    2014.

16          THE COURT:  Really?

17          THE JUROR:  I got picked as the alternate, so --

18          THE COURT:  Oh.  When was the other one?

19          THE JUROR:  Years ago.

02:57 20          THE COURT:  The other one was a civil -- first was a

21    civil case and then a criminal case?  You want to refresh that?

22    I'm looking at Page 15.

23          THE JUROR:  The first one, I don't know what you call

24    it, criminal or civil.  The first one I remember, it was

25    someone who walked across the street, and she got hit outside

1    of a crosswalk or something.  The one that I just did in April

2    was drunk driving.

3            THE COURT:  We asked a series of questions in the

4    questionnaire about things that could generally be put under

5    the umbrella of international events or issues such as matters

6    relating to Islam or Muslims, the war on terror and things like

7    that.  You answered them in the questionnaire.  Since you

8    filled out the questionnaire, there have been events in Europe

9    that are getting some reporting here about terrorism acts in

02:58 10   Paris and so on and so forth.  Have you followed any of those

11   reports?

12           THE JUROR:  I don't watch the news really a lot.  If I

13   hear it a lot, I usually hear it at work around the water

14   bubbler.

15           THE COURT:  Have you heard about the events in Paris?

16   Do you know what I'm talking about?

17           THE JUROR:  Kind of.  I know that -- was it Kerry was

18   going over there to do some talking or peace talks or -- that's

19   probably about all I know.

02:58 20           THE COURT:  Okay.  What I was leading up to was

21   whether any -- what you've heard about any of that would affect

22   any of the answers that you previously gave.  Doesn't sound

23   like it would.  There doesn't seem like there's much there.

24           THE JUROR:  Probably not because I don't really know

25   about it.

1          THE COURT:  Now, I'd like you to look at Page 20,

2     Question 77.  In that question we asked a multipart question

3     about whether you had -- based on the media or anything else,

4     you'd formed an opinion about whether the defendant was guilty

5     or not guilty or should be sentenced to death or not, and you

6     answered to each of those questions that you had not formed an

7     opinion.  Am I reading that right?

8          THE JUROR:  Uh-huh.

9          THE COURT:  Can you amplify on that?  Is that the

03:00 10   case?  You don't have an opinion one way or the other?

11          THE JUROR:  I don't really have an opinion.

12     Obviously, I know what happened on that day.  I have seen some

13     of it in the media, but I don't really follow it.  Sometimes I

14     try not to listen to the news because it's too depressing.

15          THE COURT:  When it comes to trial, as you've heard,

16     there will be two phases.  The first phase will be to determine

17     whether the defendant is guilty of the crimes he's charged with

18     or not.  At that stage of the case, at the beginning -- before

19     the presentation of any evidence and throughout the case, until

03:00 20   the jury gives us its answer, the defendant is presumed to be

21     innocent of the charges and is guilty only when the jury says

22     so because they've been convinced by the evidence at trial that

23     the government has persuaded them that he is guilty of the

24     offenses beyond a reasonable doubt.  Do you think you would

25     have any difficulty in accepting and applying the principles of

1    presumption of innocence and proof beyond a reasonable doubt by

2    the government?

3               THE JUROR:  No, not at all.

4               THE COURT:  Then if the defendant is guilty -- found

5    guilty by the jury at that point of a capital crime, one for

6    which the death penalty is possible, the jury would then have

7    to consider whether that sentence should be imposed or a

8    different sentence, life without release.  And this answer says

9    you have no opinion about that as well.  Is that a fair

03:01 10   understanding of your condition at this stage?  That's where

11   your --

12               THE JUROR:  Uh-huh.

13               THE COURT:  You have to use a word.

14               THE JUROR:  Yes.

15               THE COURT:  Nodding doesn't help.

16               Then it might help you to follow this, too, Page 23,

17   Question 88.  We asked, in summary, for your general views on

18   the death penalty, if you had some.  And you said you didn't

19   have any general views, and it would depend on the evidence and

03:02 20   the crime.  Is that an accurate summary of your general view?

21               THE JUROR:  Yes.

22               THE COURT:  Next question, we asked you to scale --

23   put it on the scale what you thought about the death penalty,

24   whether you were strongly opposed to it or strongly in favor of

25   it, and you selected something right in the middle.

1          THE JUROR:  Yes, I did.

2          THE COURT:  Similarly, on the next page, we asked for

3    that sort of -- sort of that same kind of assessment of where

4    you are on the scale of things but in words this time.  And you

5    selected "D."  Would you just read that for a minute and tell

6    me whether that represents your view?

7          THE JUROR:  Uh-huh, yes.

8          THE COURT:  Assuming that the defendant is convicted

9    of a capital crime -- so take that as a premise of the

03:03 10    question, he is convicted -- and you proceed to a penalty

11    phase, would you be prepared by mental attitude and your

12    general disposition to the manner to vote for penalty of death

13    if you thought that was warranted under the circumstances; and

14    on the other hand, would you similarly be prepared to vote for

15    a penalty of life imprisonment without parole instead of the

16    death penalty if you thought that was warranted?

17          THE JUROR:  Yes, I would.

18          THE COURT:  Either way, you would be prepared.

19          THE JUROR:  Either/or.

03:03 20          THE COURT:  Depending on the circumstances that you

21    heard them in the course of the trial?

22          THE JUROR:  Yes.

23          THE COURT:  So you heard me talk about certain things

24    the government must prove in the penalty phase.  They must

25    prove there was a certain level of criminal intention involved

1    in the commission of the acts and that there were circumstances

2    that were aggravating that might call for a higher penalty than

3    the average intentional murder and there would be evidence

4    about mitigating factors that might say that's not the right

5    penalty, that there should be life imprisonment.  You hear all

6    that, and you're open to going either way, depending on how you

7    assess all that evidence?  Is that a fair summary of what --

8            THE JUROR:  Yes, it is.

9            THE COURT:  Have I got anything wrong?

03:04 10         THE JUROR:  No.

11           THE COURT:  If you look at Question 95, we ask

12   whether, if he was guilty and you decided that it was

13   appropriate, could you conscientiously vote for the death

14   penalty, and you expressed some uncertainty there.  You said

15   you were unsure.

16           THE JUROR:  Yes, I did.

17           THE COURT:  Is that -- today you've kind of been a

18   little firmer about it.  I'm just wondering which is really --

19           THE JUROR:  Because, when I'm answering that question,

03:05 20   I don't know any -- I don't know anything about the case.  I

21   don't know any evidence.  And where I'm not one way for death

22   penalty or one way not for death penalty, to me, I would have

23   to hear -- I would have to hear the circumstances and the

24   evidence and --

25           THE COURT:  Any follow-up?

1           MR. WEINREB:  No.

2           MR. BRUCK:  No, sir.

3           THE COURT:  All right.  Thank you.  Step out.  Leave

4      the questionnaire right there.

5           (The juror is excused.)

6           MR. WEINREB:  I just want to point out that Number 42

7      didn't sign --

8           THE COURT:  I know.  It's the first thing he's going

9      to do.

03:08 10           THE CLERK:  Juror No. 42.

11           MR. McALEAR:  Juror No. 42.

12           THE CLERK:  Right here, sir.

13           THE COURT:  Hello.

14           THE JUROR:  Hi.

15           THE COURT:  We are going to follow up on some of the

16      answers that you've given in the questionnaire, so I've put in

17      front of you.  But before we get any further, we noticed that

18      you hadn't signed it.

19           THE JUROR:  Oh, I apologize.

03:09 20           THE COURT:  So we would like you to did that, if you

21      would.  And you should read the statement before -- you can use

22      my pen -- affirming that the answers are made under the

23      penalties of perjury and that they are true and complete.

24           (The juror complies.)

25           THE COURT:  Thank you.

1          THE JUROR:  Sure.

2          THE COURT:  So tell us about your professional career.

3          THE JUROR:  It's -- I've been quite a few places.

4    I've worked in municipal and state government for a number of

5    years.  I've spent about a dozen years working in the

6    correctional field, either with or on behalf of correctional

7    agencies, New York City and Massachusetts.

8          I've been -- in 2006 I became a professor of criminal

9    justice at -- all of this stuff is all --

03:10 10          THE COURT:  Yeah.

11          THE JUROR:  So I became a professor of criminal

12   justice beginning in 2006, spent the last 15 months or so -- I

13   have been in an academic administration position, although I'm

14   still an active criminal justice researcher.

15          THE COURT:  Okay.  From your educational history

16   that's in the form, it looks like you started out sort of in

17   the field of psychology/sociology?

18          THE JUROR:  That was my undergraduate major.  I have a

19   master's in public administration and a master's in public

03:10 20   policy.

21          THE COURT:  That's what I was going to say.  So you

22   kind of migrated to public policy?

23          THE JUROR:  Yeah.  I was already at that point working

24   in corrections at that time.

25          THE COURT:  Would it be fair to just -- if you want to

1    put a sort of overall label on your career, criminal justice,

2    is that --

3                THE JUROR:  Mostly.  I would say the majority of my

4    professional career and my current academic career, my research

5    is in that area.

6                THE COURT:  Now, so we asked some questions about the

7    use of social media, and you apparently have some professional

8    postings and things that you do.  Is that --

9                THE JUROR:  Well, yeah.  I have a Twitter account that

03:11 10   I post, you know, various -- usually not a lot of commentary,

11   just kind of articles, things that come to my attention that

12   people might be interested in.

13               THE COURT:  Within the field that you're --

14               THE JUROR:  Mostly in my field, but I occasionally

15   post some music because I'm a music fan.  But aside from that

16   --

17               THE COURT:  That's what I was going to get at.  Do you

18   use it --

19               THE JUROR:  Yeah, it's mostly professional with a

03:11 20   little twinge of personal stuff.

21               THE COURT:  And is it mostly Twitter or is there

22   other -- Facebook, for example?

23               THE JUROR:  I occasionally will weigh in on blogs in

24   terms of commentary on issues.  But again, most of my social

25   media use is professional.  I rarely use it for personal

 1    things.

 2           THE COURT:  We asked a series of questions in the

 3    questionnaire that could be grouped under the general topic

 4    international affairs or international issues and so on.  Do

 5    you remember them?  Some were about attitudes towards Islam or

 6    Muslims and attitudes towards the war on terror and so on and

 7    so forth.

 8           THE JUROR:  Yeah.

 9           THE COURT:  Since you filled out the questionnaire --

03:13 10       THE JUROR:  Yup.

11           THE COURT:  -- there have been some events in Europe,

12    Paris, in particular --

13           THE JUROR:  Yeah.

14           THE COURT:  -- that could be characterized as

15    terrorism.

16           Have you followed that at all?

17           THE JUROR:  Yes, I have.

18           THE COURT:  Closely or casually or --

19           THE JUROR:  Like I follow most other things in the

03:13 20    news.  I'd say fairly closely, yeah.

21           THE COURT:  Does your awareness of those events lead

22    you to want to change or revise any of the questions?  You can

23    review it if you want to.  It's on page 15 if you want to start

24    looking at it.  Actually, it's not 15.  It's -- wait a minute.

25    I'm in the wrong place.  It's 17, I think.

1          THE JUROR:  Page 17?  No, I don't think so.

2          THE COURT:  Have you -- in any way relevant to this

3     case have you been influenced by those events?

4          THE JUROR:  I don't think so.

5          THE COURT:  You did say when you filled out the

6     questionnaire to one of the questions -- which was whether you

7     believed the war on terror is overblown or exaggerated, you

8     answered affirmatively.  Can you tell us what you had in mind

9     when --

03:14 10          THE JUROR:  Well, I'm looking at the question now and

11     trying to interpret -- you know, it could be interpreted a

12     number of different ways.  I think that from a policy

13     standpoint -- I think certainly it's overblown and exaggerated

14     in the media possibly, but from a policy standpoint it didn't

15     strike me as overly exaggerated.  It's a real challenge that

16     faces our society.  And -- I mean, I'm not crazy about the

17     terminology, but -- the terminology of "war on terror," you

18     know, it's just kind of a little hypie to me, but...

19          But as a thing, I mean, it's obviously something that

03:15 20     over the last -- particularly over the last, you know, 14 years

21     it has become a major issue for us.

22          THE COURT:  So I agree with you the question is

23     ambiguous.  It could be asking about the media or it could be

24     asking about public policy and so on and so forth.

25          So I gather your affirmative was more on the media

1   side than the public policy side.  Is that fair?

2        THE JUROR:  Yeah, I would say -- well, I said yes, I

3   think it's overblown and exaggerated.  Yes, I probably thought

4   it was a media thing more than anything else.

5        THE COURT:  Perhaps it's unsurprising given your

6   profession and career, but Question 76, you said you had read

7   through the indictment and related court documents including

8   motions and rulings.

9        THE JUROR:  Yeah.  The night before I came here I was

03:16 10   very curious, and so I actually went out and I read through

11   some stuff that was posted online.

12        THE COURT:  That was prompted by the fact you were

13   coming here?

14        THE JUROR:  That was prompted by the fact I was coming

15   here, yes.

16        THE COURT:  Is it something you probably wouldn't have

17   done if you hadn't been called here?

18        THE JUROR:  Yeah, I guess I was kind of curious about

19   what was --

03:16 20        THE COURT:  But would you --

21        THE JUROR:  I probably wouldn't have read through the

22   entire indictment but, you know, I find it interesting and, you

23   know.

24        THE COURT:  Okay.  So in the next question, 77, we are

25   asking about whether people have formed opinions based on what

```
 1    they've seen or read.  We intended the question to apply to

 2    things like media reports and so on and not to the indictment.

 3    I don't know whether --

 4              THE JUROR:  Right.

 5              THE COURT:  -- having read the indictment influenced

 6    you.

 7              THE JUROR:  Actually, even without having read it, I

 8    probably would have said that I had formed some kind of an

 9    opinion about it.

10              THE COURT:  So as you answered that question, you were

11    sort of thinking about what you had learned --

12              THE JUROR:  I was thinking about what I already --

13              THE COURT:  -- through the media, on TV and so on?

14              THE JUROR:  Right.

15              THE COURT:  Okay.  All right.

16              And in that question, then, we asked, you know, had

17    you formed an opinion about guilt or not guilty, and then about

18    the penalties that could be imposed, the death penalty

19    particularly.

20              With respect to the first stage of this proposition, a

21    defendant, this defendant, of course, is presumed to be

22    innocent of the charges against him unless and until the

23    government proves otherwise at trial by the evidence and proves

24    it to the jury beyond a reasonable doubt.

25              Do you have any difficulty in faithfully applying
```

1     those principles of the presumption of innocence and proof

2     beyond a reasonable doubt?

3           THE JUROR:  That I do not feel like I would have any

4     problem applying.

5           THE COURT:  Even if you have an opinion before the

6     trial begins?

7           THE JUROR:  I'm a researcher, a social scientist.  I

8     look at the evidence, you know, that's in front of me.  I'm not

9     afraid to kind of take a step back and question my assumptions

03:18 10    about -- so in terms of looking at facts and evidence, that's

11    not necessarily something that --

12          THE COURT:  So if at trial you thought on any of the

13    counts the government had failed to satisfactorily prove that

14    count, you could --

15          THE JUROR:  Yeah.

16          THE COURT:  -- you could vote for -- you know, in

17    favor of not guilty?

18          THE JUROR:  Yes.

19          THE COURT:  You could?

03:18 20    THE JUROR:  Uh-huh.

21          THE COURT:  Okay.  Now, with respect to the third and

22    fourth parts of that question --

23          THE JUROR:  Yeah.

24          THE COURT:  -- should he receive the death penalty,

25    no; should he not receive it, yes, I guess I'd ask a similar

1    question:  Are those firm views or would you similarly be

2    receptive to the evidence --

3         THE JUROR:  The death penalty question is a different

4    one because there's other pieces that end up being implicated.

5    It's not simply a matter of looking at the facts.  There are

6    value judgments that implicitly have to take place.  You had

7    mentioned the aggravated and mitigating circumstances, how

8    those things are weighted.  Those things are weighted very

9    individually.  I don't necessarily think that -- it's not a

03:19 10   matter of looking at the beyond-a-reasonable-doubt question in

11   my mind, so...  It's more complicated.

12        THE COURT:  So if you'd turn to page 23, we asked a

13   series of questions to try to determine your views concerning

14   the death penalty in general.  And particularly, Question 88

15   asks about your views in general.

16        And in it you -- I'm having a little trouble reading

17   the writing, I have confess.  Perhaps you could read it.

18        THE JUROR:  Let me just summarize -- it says "I

19   have" -- I know my handwriting is not good.  I have

03:20 20   reservations about the death penalty as a matter of -- as a

21   matter of public policy, I have reservations about it.  When I

22   just kind of look at the evidence around why we would have it,

23   I don't necessarily think that it is something that has a lot

24   of imperialistic justification behind it.

25        Stepping back from that, I also think that the -- in

1    this particular case -- we talk about mitigating

2    circumstances -- the age of the defendant actually has some

3    weight in my mind, and that's an unassailable fact of the case,

4    okay?  No matter what's presented, the defendant was, as I

5    understand, 19 years old at the time that the crime was

6    committed, and I look at that as a mitigating circumstance.  So

7    that's what I wrote here.

8             THE COURT:  The next two questions try to sort of take

9    the temperature of your views on the death penalty.  89 on the

03:21 10   previous page, if you go back a page --

11            THE JUROR:  Yeah.

12            THE COURT:  -- would put it on a scale of 1 to 10,

13   from strongly opposed to strongly in favor, and you selected

14   Number 2 --

15            THE JUROR:  Uh-huh.

16            THE COURT:  -- indicating you're sort of on the

17   opposed side of that.

18            Then on the next page we asked it a little

19   differently, using words instead of numbers, and you said that

03:22 20   you're opposed to it and would have a difficult time voting to

21   impose it even if the facts supported it.

22            Is that an accurate statement of your views?

23            THE JUROR:  Yeah, I think because I have -- I have

24   certain reservations about it, generally speaking, and I think

25   that -- I stop short of saying A.

1          THE COURT:  Right.

2          THE JUROR:  But I felt B was an approach.

3          THE COURT:  What do you think the difference is

4    between A and B as it affects your answer?

5          THE JUROR:  Because I don't like -- any absolutist

6    kind of thing makes me very uncomfortable, which is why I

7    circled 2.  The idea of just -- it's not like I have this

8    absolutely kind of unshakeable, purely kind of moralistic

9    position about the death penalty.  That's not what it's about.

03:22 10   It's about a whole lot of other things that I think about.

11          THE COURT:  And I guess what I'm interested in is --

12    these weren't your words --

13          THE JUROR:  Right.

14          THE COURT:  -- so we didn't ask you to say it, so

15    we're asking you to agree with somebody else's formulation.

16    But the formulation is that you would have a difficult time

17    doing it even if the facts supported it.

18          THE JUROR:  Right.

19          THE COURT:  And so that could mean -- that could come

03:23 20   close to meaning never.

21          THE JUROR:  Yeah.  Yeah.  And again, this goes back to

22    one mitigating position that I pointed out before which is

23    there's one fact that I know about the case --

24          THE COURT:  Right.

25          THE JUROR:  -- that is in my mind material, so...

1          And again, I may not -- this is -- I think when I was

2    answering this I was maybe -- I'm not sure if I was thinking

3    about the current case or generally speaking but...

4          THE COURT:  Well, okay.  Yeah.

5          THE JUROR:  It actually asks in general.

6          THE COURT:  Obviously.  And, you know, as I say, it's

7    a form and it has the defects of forms.

8          The premise is you never get to the question of what

9    the penalty is unless the defendant has been convicted of an

03:24 10   intentional killing or murder, okay?  So you take that as the

11   premise.  You have somebody convicted of that offense.

12         THE JUROR:  Right.

13         THE COURT:  Right?  As you've referred to, in the

14   penalty phase there will be on one side suggestions of things

15   that should aggravate your evaluation of the culpability which

16   would tend towards the death penalty.  You've identified

17   already yourself something that might mitigate against that and

18   call instead for life.  The question is:  Could you assess all

19   that evidence and be open to the possibility of a conscientious

03:24 20   vote for either the death penalty or life in prison on that

21   body of evidence, or do you think your disposition against the

22   death penalty is so strong that you doubt that would be the

23   case?  I guess -- change my words.  You don't have to accept

24   that formulation either.  I'm just trying to get --

25         THE JUROR:  Here's -- I'll certainly -- during the

1    course of the trial there will obviously be evidence presented

2    that will present more information than what I know, okay?

3    This was a horrendous crime, okay?  You know, hundreds, if not

4    thousands, of people's lives have been altered.  And clearly,

5    you know, the magnitude of this thing is pretty significant.

6            At the same time I also have -- I do have reservations

7    about the death penalty as a matter of policy, and I can't -- I

8    can't really say for sure that my feelings about the death

9    penalty wouldn't creep in somewhere, all right?

03:25 10           THE COURT:  All right.

11           THE JUROR:  I mean, I would obviously do my best to

12   apply the facts.

13           THE COURT:  Let's try another question.  The next

14   page, Question 95.

15           THE JUROR:  Yeah.

16           THE COURT:  If you found Mr. Tsarnaev guilty and

17   decided the death penalty was an appropriate punishment, could

18   you conscientiously vote for it, and you said no.  That

19   question could be criticized in its form.

03:26 20           THE JUROR:  Yeah.  Yeah.

21           THE COURT:  It's imperfect.

22           THE JUROR:  Right.

23           THE COURT:  But I guess what I'm getting at is the

24   negative answer as opposed to perhaps a more equivocal "I'm not

25   sure" answer.

1          THE JUROR:  Yeah.  Yeah.  There's no -- these are not

2     easy.  There's probably a lot of inconsistencies in here.

3     These are not easy questions to answer.

4          THE COURT:  Right.

5          THE JUROR:  You know, without actually being in the

6     situation, it would be very difficult for me to absolutely say

7     positively that I could or couldn't do something.  I really

8     can't be sure.  So maybe "I'm not sure" might have been a

9     better response to that.

03:26 10          THE COURT:  I think the last thing I have, and then I

11     don't know if the lawyers want to follow up on anything, you

12     told us that you've run in 12 marathons, including the Boston

13     Marathon four times.  Does that have any impact on your views

14     and ability to --

15          THE JUROR:  You know, like a lot of other people, you

16     know, I've looked at -- when this crime was committed, I looked

17     at it as a real kind of -- a real violation of something that I

18     kind of held very dear.  I live very close to the starting line

19     of the marathon.  When I moved my family to Hopkinton, this

03:27 20     area, in 1998, the marathon was actually part of our decision

21     about what town we were going to live in.

22          There was a time in my life where I lived and breathed

23     it.  I'm older and slower and my back hurts so I don't do it

24     anymore, but it's a very important thing for me.  And so

25     I -- you know, I would like to think that I could put it aside.

1    I can't say 100 percent that I could.

2             THE COURT:  When was the last time you ran it?

3             THE JUROR:  2005.

4             THE COURT:  Follow-up?

5             MR. WEINREB:  Just briefly.

6             THE COURT:  Identify yourself.

7             MR. WEINREB:  I'm sorry.  Good afternoon.  I'm Bill

8    Weinreb.  I'm one of the prosecutors in the case.

9             Question 90, if you would just turn back to that for a

03:28 10   second?

11            THE JUROR:  Yeah.

12            MR. WEINREB:  So you wrote you were opposed to the

13   death penalty and would have a difficult time voting to impose

14   it even if the facts supported it.  And the question really is

15   simply:  How difficult do you think it would be?  I understand

16   that you said that you don't like to say anything absolutist

17   because --

18            THE JUROR:  Yeah.

19            MR. WEINREB:  -- and I understand where that comes

03:28 20   from, but what we're really trying to get at here is can you

21   genuinely envision yourself voting for the death penalty in any

22   case given how strongly you feel or not?  In other words, not

23   as a theoretical matter but as a real matter, something that

24   you could actually do.

25            THE JUROR:  I think that the statement here that I

 1   would have a difficult time is accurate.

 2           MR. WEINREB:  But could you elaborate?

 3           THE JUROR:  Let's put it this way:  It would go

 4   against my judgment about whether the death penalty is a good

 5   idea for society.  And so that's -- you know -- and so I'd be

 6   kind of -- I was struggling with trying to apply the law

 7   against kind of these convictions that I have that are built --

 8   you know -- built on this -- on my personal belief that the

 9   death penalty serves no constructive purpose.  Do you see what

03:29 10   I'm saying?

 11           MR. WEINREB:  Yes.

 12           THE JUROR:  Yeah.

 13           MR. WEINREB:  And so really that is the question,

 14   which is:  You have -- you say you have a judgment or belief

 15   that the death penalty serves no useful purpose but you also

 16   say that your understanding is that the law is different.  And

 17   my question is:  Are you actually capable of putting aside your

 18   judgment and your beliefs and following the law or not?  And

 19   not just are you capable of it theoretically, but as a

03:30 20   practical matter --

 21           THE JUROR:  Could I vote for the death penalty?

 22           MR. WEINREB:  -- could you really do it in a real

 23   case, you personally --

 24           THE JUROR:  You know, it depends on the -- I think

 25   talking in the abstract, a real case or this case, okay, those

1        are two different things.

2                MR. WEINREB:  This case you haven't heard any evidence

3        in.

4                THE JUROR:  I haven't heard any evidence but I know

5        certain things about it that are factual, okay?  And I

6        mentioned again before in my mind the age of the defendant is a

7        material issue here, okay?  Based on what we know about brain

8        development, okay?  And that becomes a factor that is -- you

9        know, it would take a lot to kind of override that for me, all

03:30 10       right, when we're talking about the facts in the case.

11                And you're saying that if you were to demonstrate, for

12       example, that the aggravating circumstances were so far beyond

13       that, they would outweigh that, could I apply --

14                MR. WEINREB:  I'm not asking you to make a decision

15       now because you can't.  You haven't heard the evidence.  All

16       I'm asking is for you to -- and this is very hard to do.  It's

17       hard to project yourself into a situation, and it's even harder

18       when you haven't actually heard the evidence.  So all we can do

19       is rely on your best estimate of your own situation.

03:31 20                And so really what I'm asking you to look deep inside

21       and tell us the answer to is:  In an actual case where you were

22       deliberating in a jury room and you were trying to decide

23       whether you could put aside your judgments and other things and

24       vote for the death penalty in a particular case where

25       you -- are there circumstances where you could see yourself

1    actually doing it?

2          THE JUROR:  Are there certain -- there could be.  I

3    don't know what the circumstances would be.  You know, I --

4          MR. WEINREB:  Does it seem only theoretical to you --

5          THE JUROR:  It is theoretical to me because I haven't

6    been put in that situation.  I'm trying to wrap my mind around

7    what it takes to move from the theoretical to the practical,

8    and until you're there it's very difficult for me to make that

9    assessment, you know?

03:32 10          I lean towards answering no to your question.  That's

11    my inclination.

12          MR. WEINREB:  Okay.  Thank you.

13          MR. BRUCK:  If I could very briefly, I'm David Bruck.

14    I'm one of Mr. Tsarnaev's lawyers.

15          And I just want to clarify, stepping away from this

16    case, you appreciate that the system requires jurors to

17    consider aggravating factors and mitigating factors.  No one's

18    ever required to impose the death penalty; you're simply

19    required, if you're on a jury, to fairly weigh the evidence and

03:32 20    then make a -- what is a moral judgment about what's fair and

21    what the person deserves.

22          Imagine now that you are confronted with a case in

23    which there is very, very strong aggravating factors, such as a

24    very cruel or sadistic way the murder was committed, and a lot

25    of evidence that the person would recidivate, perhaps even in

 1    prison.  Dangerous.

 2              MR. WEINREB:  Your Honor, I'm going to object.

 3              MR. BRUCK:  I just want to discuss what the

 4    aggravating factors are.

 5              THE COURT:  Go ahead.

 6              MR. BRUCK:  If those were the facts, understanding

 7    that your inclination is to be highly skeptical of the death

 8    penalty, could you vote for the death penalty if those were

 9    your conclusions?

03:33 10              THE JUROR:  If -- well, you're presenting a scenario

11    where society is at risk, okay, and the only way to mitigate

12    that risk would be to vote for the death penalty.  Is that what

13    you're asking?

14              MR. BRUCK:  Well, if that was your conclusion, yes, if

15    there was unacceptable risk.

16              MR. WEINREB:  Again, I object to this.

17              THE COURT:  No, go ahead.  You can answer it.

18              THE JUROR:  If there was unacceptable societal risk,

19    okay, I would say possibly, you know.

03:34 20              MR. BRUCK:  You would require a lot of evidence to

21    justify --

22              THE JUROR:  It would just have to be -- it would have

23    to be very compelling.

24              MR. BRUCK:  Understanding you wouldn't want to, if it

25    was there, could you do it?

 1            MR. WEINREB:  Your Honor, this is very leading.

 2            THE COURT:  I think this is a little too far, this

 3     one.  That's getting a little argumentative.

 4            Okay.  I think that's it.  Thank you.  I appreciate

 5     your...

 6            THE JUROR:  One other piece of information just

 7     to -- just it may be material; it may not be.  I do receive

 8     significant amount of research funding from the U.S. Department

 9     of Justice.  I just wanted that to be on the record, okay?

03:34 10     So...

11            THE COURT:  Okay.  Does it go directly to you or does

12     it flow through --

13            THE JUROR:  Yes, it funds my research.  It flows

14     through the university.

15            THE COURT:  It flows through the university?  Okay.

16            (The juror is excused.)

17            THE COURT:  We're at about one o'clock.  I think we'll

18     take about a half-hour recess for everyone.

19            (There is a luncheon recess in the proceedings from

03:35 20     12:59 p.m. to 1:45 p.m.)

21            (Federal Defender William Fick joins the proceedings.)

22            THE CLERK:  Juror No. 43.

23            MR. McALEAR:  Juror 43.  Take a seat right over there.

24            THE COURT:  Good afternoon.

25            THE JUROR:  Good afternoon.

```
 1              THE COURT:  How was lunch?

 2              THE JUROR:  Passable.

 3              THE COURT:  Passable will do.

 4              THE JUROR:  Appreciated.

 5              THE COURT:  Have you been able to abide by the

 6     instructions I gave you last time to avoid any discussion of

 7     the case with anyone or exposure to any media articles about

 8     the case?

 9              THE JUROR:  Yes.

10              THE COURT:  Okay.  The questionnaire you filled out

11     last time is in front of you, and I will be referring to it as

12     I follow up on some of the answers that you gave to the

13     questions in the questionnaire.

14              THE JUROR:  Okay.

15              THE COURT:  Just tell us a little bit about your

16     employment, your career and so on.

17              THE JUROR:  I work in the pharmaceutical industry.

18     I'm a biologist.

19              THE COURT:  Done that for some years?

20              THE JUROR:  Yeah, I've done that for about ten years.

21              THE COURT:  Okay.  Use of social media?

22              THE JUROR:  I have a Facebook account, Instagram.  I

23     don't use it all that much.

24              THE COURT:  What's "all that much"?

25              THE JUROR:  You know, I've used it in the past.  Now I
```

1    would say maybe a couple of times a month I might check in on

2    it.

3           THE COURT:  Any -- are you putting any material out or

4    are you viewing any that relates to the case?

5           THE JUROR:  No.

6           THE COURT:  We asked about prior jury service, and you

7    had a trial -- a criminal trial in New Hampshire, I guess?

8           THE JUROR:  Yes.

9           THE COURT:  When was that, roughly?

04:26 10           THE JUROR:  I would say early 2000s.

11           THE COURT:  So a decade or so ago?

12           THE JUROR:  Yeah.

13           THE COURT:  We asked a series of questions in the

14    questionnaire about what might generally be grouped as

15    international affairs or things like that, attitudes towards

16    Islam or Muslim people or the war on terror, so-called, and so

17    on and so forth, and you answered those.  Since you've answered

18    those questions there's been some other international news

19    about incidents in Paris and so on and so forth.

04:27 20           Are you aware of those?

21           THE JUROR:  I am.

22           THE COURT:  How closely have you followed those?

23           THE JUROR:  I haven't really followed them closely

24    myself.  I work with a man who is French Canadian, so he had

25    some interest in what's happening, I guess, in French culture

1      and has mentioned it.  So I know about it peripherally.

2              THE COURT:  If you'd turn to page 17 and just quickly

3      review that series of questions on that next page.  And my

4      question is:  Does anything you've learned about that European

5      incident lead you to change any of the answers you've given?

6              THE JUROR:  No.

7              THE COURT:  One of the answers you did give was, in

8      Question 62, that you thought the war on terror was overblown

9      or exaggerated.  Can you amplify on what you had in mind when

04:27 10    you answered that?

11             THE JUROR:  It's just kind of my perception that

12     people like to war monger.  It's, I guess, good for a lot of

13     different industries and businesses.  So that's really my

14     thinking about that.

15             THE COURT:  Okay.  So if you would turn to page 20, I

16     want to ask you a little bit about Question 77.  In that

17     question we tried to determine what prospective jurors might

18     think about -- already think about this case in terms of having

19     formed an opinion about whether the defendant is guilty or not

04:28 20    and whether he should be sentenced to death or not, and you

21     answered all the possibilities there, well, differently, so

22     "unsure" as to guilt or not guilty; "no" as to the death

23     penalty; and "yes" as to not receiving the death penalty.

24             Let me take the guilt questions first --

25             THE JUROR:  Okay.

1          THE COURT:  -- as to which you said you were unsure.

2          THE JUROR:  Okay.

3          THE COURT:  Tell us what you had in mind when you

4    chose that option.

5          THE JUROR:  I mean, I'm open to hearing the evidence.

6    You know, I think I'm a pretty objective person.  So, you know,

7    I'm willing to hear evidence for both sides.  I haven't -- I

8    would say I'm open to forming an opinion based on that

9    evidence.

04:29 10          THE COURT:  What we ask jurors in a criminal case to

11   do is to, at the outset, presume -- in a sense, the default

12   position is that the defendant is not guilty, presumed

13   innocent -- unless and until the government proves otherwise,

14   and proves that he is guilty by the evidence at trial, and

15   proves it beyond a reasonable doubt.

16          Do you have any difficulty in accepting and applying

17   those principles faithfully in the case?

18          THE JUROR:  No.  No.

19          THE COURT:  And was my re-summary essentially what you

04:29 20   had in mind?

21          THE JUROR:  Exactly, yes.

22          THE COURT:  Now, as to the death penalty cases, we're

23   going to turn to a different part of the questionnaire.  It's

24   page 23.  And it's a series of questions beginning with 88.

25          We asked for general views about the death penalty,

1      and you said, "I don't believe in the death penalty."

2                  THE JUROR:  Correct.

3                  THE COURT:  We then asked you to scale your -- the

4      strength of your view on a 1-to-10 scale with 1 being strongly

5      opposed, and that's the selection you made.

6                  THE JUROR:  Correct.

7                  THE COURT:  And then on the next page we asked you to

8      choose which of a series of statements might come the closest

9      to your views about this matter, the death penalty, and you

04:30 10      said you were opposed and would have a difficult time imposing

11     it even if the facts supported it.

12                 Is this, for lack of a better term, an absolute

13     position?  In other words, is there no circumstance under which

14     you would be persuaded that the death penalty was an

15     appropriate sentence, or could you -- if the circumstances

16     seemed to you to warrant it, could you conscientiously vote in

17     favor of a death penalty because of the circumstances?

18                 THE JUROR:  I wouldn't say that it's an absolute

19     position.  Again, I think that I'm fairly open-minded.  I do

04:31 20     question the death penalty and whether or not it's the right

21     way to approach punishment.  I could conceive of a situation in

22     which I could be persuaded to go along with it, but that

23     situation would have to be extreme.

24                 THE COURT:  Okay.  In Question 95 we asked sort of

25     straightforwardedly now, not so much as a general matter but

1    more with reference to the case, if you found Mr. Tsarnaev

2    guilty of a death-eligible crime and you thought that the death

3    penalty was the appropriate punishment, could you

4    conscientiously vote for it in that circumstance.  You said

5    "not sure" on the form.

6              THE JUROR:  Yeah.  You know, I think it's something

7    that I would struggle with.  I'm not sure if I have the

8    personal constitution to contribute to somebody else's death,

9    but, again, I -- I don't tend to deal in absolutes, so I think

10   I'm open-minded and willing to be convinced.

11             I'm not sure how I would -- how I would respond were I

12   in that position.

13             THE COURT:  Okay.  Any follow-up by anybody?

14             MR. WEINREB:  Yes, your Honor.  Just briefly.

15             Good afternoon.

16             THE JUROR:  Good afternoon.

17             MR. WEINREB:  I'm Bill Weinreb.  I'm one of the

18   prosecutors in the case.

19             THE JUROR:  Okay.

20             MR. WEINREB:  You said that you felt you could impose

21   the death penalty only in an extreme situation.  And my

22   question is:  When you say that, do you have a particular

23   extreme situation in mind that is the only one in which you

24   could impose it or are you saying that in a more general,

25   abstract way?

1          THE JUROR:  I would say it was more of a general

2     statement.  I don't have, I guess, a particular situation in

3     mind.

4          MR. WEINREB:  Okay.  And then you said, "I'm not sure

5     I have the personal constitution to impose it but I'm

6     open-minded and willing to consider it."  And I just wanted to

7     ask you if you could elaborate a little bit on that.  And in

8     particular, right now I imagine you're thinking about it more

9     as a -- because the trial hasn't begun, you haven't heard any

04:34 10    evidence, you're thinking about it in a more general, abstract

11    way.

12         THE JUROR:  Correct.

13         MR. WEINREB:  But what we need to know is if you were

14    sitting in a jury deliberating with other jurors and you came

15    to the conclusion that the death penalty was the appropriate

16    punishment in the case, could you personally vote to impose it

17    knowing that that meant a person would go to their death based

18    on your vote?  In other words --

19         THE JUROR:  Yeah, I understand.

04:35 20    MR. WEINREB:  Yeah.

21         THE JUROR:  Honestly, I don't -- I don't know the

22    answer to that question.  It's something that, again, I would

23    struggle with.  I don't know.  I don't know if -- I don't know

24    if I could live with that, but...

25         MR. WEINREB:  Well, that's fair.  It's very hard to

1    know things that you've never experienced before, but now is

2    the only time we're going to get to --

3              THE JUROR:  No, I understand.  I understand.

4              MR. WEINREB:  If I could push you a little further.

5              THE JUROR:  Sure.

6              MR. WEINREB:  I don't want to push you further than

7    you could go, but if you could just help us understand any

8    better.

9              THE JUROR:  As I said, I'm open-minded.  I'm willing

04:35 10   to be -- to hear an argument in favor of that position.

11             MR. WEINREB:  Not that -- I'm not talking now about

12   the abstract idea; I'm talking about the other part, the actual

13   idea of being able to do it, you personally.

14             THE JUROR:  Right.

15             MR. WEINREB:  Help us with that.

16             THE JUROR:  You know, it's something that, again, I

17   would struggle with.  If I really felt that it was warranted,

18   again, I think I could be convinced of that position, but I

19   would personally struggle with that decision.

04:36 20            MR. WEINREB:  Okay.  Thanks.

21             MR. BRUCK:  Just a couple of things.  Would you think

22   that any conscientious person would struggle with that

23   decision?

24             MR. WEINREB:  Objection, your Honor.  That's not a --

25             THE COURT:  I think it's not about -- yeah, I would

1     agree with that.  It's speculating about other people.

2          You can ask the juror about it -- about his own views,

3     but not about others'.

4          MR. BRUCK:  Okay.

5          By the way, I'm David Bruck.  I'm Dzhokhar Tsarnaev's

6     lawyer, one of them.

7          THE JUROR:  Nice to meet you.

8          MR. BRUCK:  Just to clarify some of the questions you

9     were being asked about a moment ago, you appreciate that you

04:37 10    were being asked about a decision where you had listened to all

11    of the evidence and come to the conclusion that -- probably

12    with some reluctance, but you had come to the conclusion that

13    the facts really warranted, justified the death penalty.  Is

14    that -- that's how you understood the questions from --

15         THE JUROR:  No, I understand.  Again, that's the law.

16    I'm willing to consider the law and to work within the law.  I

17    don't -- I don't know that I think that that's the right law,

18    but, again, I'm willing to be convinced.

19         MR. BRUCK:  And I don't know how well this has been

04:38 20    explained -- I think it has been -- but the law never requires

21    a jury to impose a death penalty, but it requires that you

22    fairly consider everything --

23         THE JUROR:  Sure.

24         MR. BRUCK:  -- and then come to a conclusion.

25         And if your conclusion is that it's not warranted, you

         1    don't vote for it.  And you're only asked to vote for it if you

         2    decide it's the right thing to do.  Are we together on that?

         3              THE JUROR:  Okay.  Yeah.

         4              MR. BRUCK:  That's how it works.

         5              THE JUROR:  Okay.

         6              MR. WEINREB:  Your Honor, this isn't a question.  I

         7    object.

         8              MR. BRUCK:  I'm getting to it.

         9              THE COURT:  All right.  Let's have the question.

04:38   10              MR. BRUCK:  The question is just if you were convinced

        11    that it was the right thing to do, knowing you wouldn't want

        12    to, could you do it?

        13              THE JUROR:  I don't know that I think that it is the

        14    right thing to do.

        15              MR. BRUCK:  You haven't heard the evidence yet.

        16              THE JUROR:  I don't know that the death penalty is an

        17    appropriate punishment for a capital crime.

        18              MR. BRUCK:  Until you've heard the case.

        19              MR. WEINREB:  Objection.

04:38   20              THE COURT:  Yeah.  To that -- yes, I sustain the

        21    objection to that.  You don't have to answer that.

        22              If there's nothing else, I think we can move on.

        23              MR. BRUCK:  Yeah.

        24              THE COURT:  Thank you.  Why don't you leave the

        25    questionnaire there and you can be excused.

 1              THE JUROR:  Thank you.

 2              (The juror is excused.)

 3              (Discussion at sidebar and out of the hearing of the

 4      public:)

 5              THE COURT:  The questions are a little argumentative.

 6      We're really looking for information.

 7              MR. BRUCK:  I understand.

 8              THE COURT:  I think it's a phenomenon I've detected a

 9      little on each side.

04:40 10              MR. BRUCK:  I could do better.

11              THE COURT:  So this is really to get the information

12      from the juror and not to make an argument.  And I say that as

13      the factfinder.

14              MR. BRUCK:  I understand.

15              THE COURT:  Okay.  Back on.

16              (In open court:)

17              THE COURT:  Number 45 is not here because we postponed

18      that, so we'll see 46 now.

19              THE CLERK:  Next is Juror No. 46.

04:40 20              MR. McALEAR:  Juror No. 46, you can have a seat right

21      there.

22              THE CLERK:  Have a seat right here, sir.

23              THE COURT:  Good afternoon.

24              THE JUROR:  Good afternoon.

25              THE COURT:  That's the questionnaire you filled out

1    when you were here before.

2            THE JUROR:  Uh-huh.

3            THE COURT:  We may refer to it from time to time.

4            THE JUROR:  Okay.

5            THE COURT:  Since the time of that when I asked people

6    to avoid talking about the case or reading things -- seeing

7    things about it, have you been able to abide by those

8    instructions?

9            THE JUROR:  I tried to.

04:41 10            THE COURT:  Did you succeed?

11            THE JUROR:  Well, there was a thing about

12    a -- scrolled across the TV about a delay or something when I

13    was watching something.

14            THE COURT:  Yeah.  Well, with respect --

15            THE JUROR:  I mean, I wasn't deliberating looking for

16    this.

17            THE COURT:  I mean, if you see a crawl on the TV

18    screen or you see the headline of a paper that's at a newsstand

19    or something, you might have to recognize that it's about the

04:41 20    case in order to avoid it.  But other than that, have you read

21    any stories or watched any reports significantly about the

22    case?

23            THE JUROR:  No, not really.

24            THE COURT:  Not really?

25            THE JUROR:  No.  No, I haven't read any reports.

1          THE COURT:  You told us about some medication you're

2     taking and so on.  Would that substantially affect you if you

3     were sitting as a juror?

4          THE JUROR:  Well --

5          THE COURT:  If you want -- if this is private, we can

6     cut --

7          THE JUROR:  To be honest --

8          THE COURT:  Do you want this --

9          THE JUROR:  No, this is fine.  When I am in a

04:42 10    situation like this and I have to sit in a room where I know I

11    can't leave -- even when I was filling out the questionnaire

12    before they said "You can't leave," it kind of freaks me out

13    that I can't just -- you know, it's hard to focus sitting like

14    that for any amount of time.  It's kind of like an anxiety-type

15    thing.

16         THE COURT:  Okay.  I understand what you're saying,

17    and that's something to be considered.

18         I was actually asking about -- you said you're taking

19    medication that makes you dizzy.  Is that a serious issue or is

04:43 20    it just --

21         THE JUROR:  I take 40 milligrams of lisinopril for

22    high blood pressure and sometimes it makes me dizzy.  I did

23    black out one time on a plane.

24         THE COURT:  Okay.  It's the "sometimes" I guess I'm

25    wondering about.  How commonly does this occur, or how

1    frequently?

2              THE JUROR:  If I get up quick or something, or if I'm

3    bent over and come up, I might get a little light-headed and a

4    dizzy spell.

5              THE COURT:  So your employment is for the town and you

6    maintain the athletic fields for the town?

7              THE JUROR:  Yes.

8              THE COURT:  And you've done that for some years, I

9    guess?

04:43 10              THE JUROR:  Yes.

11              THE COURT:  It looks like about 20 years?

12              THE JUROR:  Yeah.

13              THE COURT:  The condition you were just talking about,

14    the dizziness or anxiety, do they affect you in your work at

15    all?

16              THE JUROR:  No, because I'm on the field in a

17    wide-open space.  But if I do get bent over and come up quick,

18    like I'm painting a field, you know, stripes, I get a little

19    light-headed and dizzy.

04:44 20              THE COURT:  Does it pass?  I mean --

21              THE JUROR:  Yeah, it passes.

22              THE COURT:  Do you use Facebook a little bit?

23              THE JUROR:  Not really.  Sometimes my wife will show

24    me some pictures somebody posted.  I'm not a big fan.

25              THE COURT:  You have a friend who's in the police

1    department?

2            THE JUROR:  I have -- working for the town, I know

3    most of the cops that are my age or a little bit younger.

4            THE COURT:  Uh-huh.

5            THE JUROR:  I just listed one.  I actually used to

6    work with that one.

7            THE COURT:  Right.

8            MS. CLARKE:  Your Honor, I think that the parties

9    would be interested in Question 80, and then perhaps --

04:45 10         THE COURT:  Question 80?

11           Would you look -- it's on page 20 of the form.  Your

12   son apparently was in the --

13           THE JUROR:  Yeah.

14           THE COURT:  -- nearby the marathon finish line and he

15   was, I guess --

16           THE JUROR:  Those are chicken scratches because I was

17   shaking.

18           THE COURT:  He was going to go to the finish line.  Is

19   that it?

04:45 20         THE JUROR:  Earlier that day he went down that way for

21   lunch and he went back, and then he was going to go to the

22   finish line previous, and then both explosions occurred.

23   Because he called me and told me bombs were going off.  But he

24   planned on going down there.

25           THE COURT:  And what's your reaction to that?  I mean,

1    how do you --

2             THE JUROR:  Well, I'm glad he didn't get there, you

3    know.

4             THE COURT:  Naturally.  That's a natural feeling, of

5    course.

6             Is that something you think might come back to you if

7    you were a juror and were listening to the case?  Would you be

8    thinking about your son's near miss?

9             THE JUROR:  Yeah, I think about that little boy, that

04:46 10   eight-year-old.  They lost their son.

11            MR. WEINREB:  All right.

12            THE COURT:  All right.  Thank you very much.

13            (The juror is excused.)

14            THE CLERK:  Juror No. 47.

15            MR. McALEAR:  Juror No. 47, have a seat right in front

16   of the judge.

17            THE CLERK:  Right here, sir.

18            THE COURT:  Good afternoon.

19            THE JUROR:  Good afternoon.

04:47 20          THE COURT:  I'm sorry?

21            THE JUROR:  Good afternoon.

22            THE COURT:  Oh, thank you.

23            When you were last here to fill out the questionnaire,

24   which is before you, I asked people to avoid discussing the

25   case or reading about it or watching TV.  Do you remember that?

1              THE JUROR:  Yes, sir.

2              THE COURT:  And were you able to follow those

3      instructions?

4              THE JUROR:  Yes.

5              THE COURT:  Okay.  Do you want to take a minute to

6      refresh your -- I would be happy to give you a chance to leaf

7      through it; otherwise, I'm going to go through and ask some of

8      the questions, and I'll point to the ones --

9              THE JUROR:  Sure.

04:48 10              THE COURT:  Actually, I want to go back to page 4.

11      You expressed some concern about your facility in English and

12      the ability to follow if things got going fast and so on.

13              Give us your assessment of that.  How difficult do you

14      think that would be?  English is not your first language.

15              THE JUROR:  It is my second language.

16              THE COURT:  Right.

17              THE JUROR:  And I could read okay, but sometimes I

18      cannot understand some of the words.  Like it's not -- it's

19      just some of them, like, I don't know the meanings

04:48 20      or -- because my work is more into computer, and I'm not really

21      much talk to people.

22              THE COURT:  So, for example, you've heard me at length

23      a couple of times.  One was the last time when you had the

24      occasion to fill out the questionnaire, and then this morning I

25      spoke for ten or 15 minutes or so.  Did you have difficulty

 1   following that or not?

 2          THE JUROR:  I had some problems like with the death

 3   penalty and some of the rules, and like I'm not getting all the

 4   words.

 5          MR. WEINREB:  Your Honor, I'm sorry to interrupt.

 6   This might be a good place to pause.

 7          THE COURT:  Okay.  Do you agree?

 8          MR. BRUCK:  Yes, I do.

 9          THE COURT:  The lawyers and I are going to caucus for

04:49 10   a moment.  Would you excuse us?  Just go this way for a minute.

 11          (The juror is excused.)

 12          THE COURT:  Number 48.

 13          MS. CLARKE:  Is Tuesday.

 14          THE COURT:  Oh, that's right.  We postponed it.

 15   You're right.  48 is not here because he had an appointment

 16   this morning, so we're going to come back to him.

 17          49 is the next one.

 18          THE CLERK:  Juror No. 49.

 19          THE COURT:  Good afternoon.

04:51 20          THE JUROR:  Good afternoon.

 21          THE COURT:  When you -- we put the questionnaire you

 22   filled out when you were last here in front of you.  We're

 23   going to refer to it because I'm basically following up on some

 24   of the answers to the questionnaire.  You'll remember at that

 25   time I asked you to avoid any discussion about the case or any

 1  exposure to the media accounts and so on.  Have you been able

 2  to follow that pretty much?

 3           THE JUROR:  Yes.  Yes.

 4           THE COURT:  So I think you have told us you are

 5  currently retired?

 6           THE JUROR:  That's right.

 7           THE COURT:  And it looks like you had brief employment

 8  in 2013-'14, but most of your employment was prior, in --

 9           THE JUROR:  2012.

04:52 10          THE COURT:  And you're a technologist in CAT-scanning?

11           THE JUROR:  That's right.

12           THE COURT:  But no employment now.  Full retirement?

13           THE JUROR:  I think so.

14           THE COURT:  How is it?

15           THE JUROR:  It's good so far.

16           THE COURT:  Good.

17           We asked a series of questions about what might be

18  called international events and so on, attitudes towards

19  Muslims and Islam, for example, attitudes towards the war on

04:53 20  terror, so-called, and so on and so forth.

21           Since you filled out the questionnaire and gave the

22  answers you gave, there has been an incident in Paris that

23  could be called terrorism.  Are you aware of that and have you

24  followed it to any degree?

25           THE JUROR:  Yeah, I've been following it.

1          THE COURT:  How closely or not closely?  How would you

2     characterize that level?

3          THE JUROR:  I'm pretty much a news junkie.

4          THE COURT:  Oh, you are?  How do you pursue that?

5          THE JUROR:  I watch TV mostly.

6          THE COURT:  TV mostly?

7          THE JUROR:  Mostly.  And online.

8          THE COURT:  What kind of news sources do you see

9     online?  You probably told us already.

04:53 10          THE JUROR:  CNN a lot, sometimes Fox.

11          THE COURT:  Does the Paris incident -- would that lead

12     you to change any of the questions -- answers you gave to any

13     of the questions about --

14          THE JUROR:  No.  No.

15          THE COURT:  We asked at one point what you -- how you

16     reacted when you received the jury summons and thought it might

17     be this case.  And if you want to look at it, I'm looking at

18     page 19, at Question 74 and 75.  And you said your reaction to

19     the summons was nervousness, which is certainly understandable.

04:54 20          THE JUROR:  Yeah.

21          THE COURT:  And then we asked what did you say to

22     others or others say to you about that, and you wrote,

23     "Discussed possibility of being dismissed since I don't believe

24     in the death penalty."

25          Tell us about that discussion, if there was one, and

1    who it was with and so on.

2         THE JUROR:  I guess I told a couple of friends,

3    probably, that I had read that that was true.  I heard it on

4    TV, that you wouldn't be considered, and that since that's what

5    I believed, I thought I would be dismissed.

6         THE COURT:  Well, let's turn to that, if we could.

7    This is Question 88.  We asked in Question 88 -- you could take

8    the clip off of there if it's more convenient for you.

9         THE JUROR:  That's okay.

04:55 10        THE COURT:  We asked for your general views about the

11   death penalty, and you indicated you were against it.  And then

12   in the next question we asked you to gauge the strength of that

13   belief, and you put it at the strongest level.

14        THE JUROR:  Hmm.

15        THE COURT:  And then in the next page we presented a

16   series of possible views and asked you to select the one that

17   was closest to yours.

18        THE JUROR:  Right.

19        THE COURT:  And it looks like you made one selection

04:55 20   and then put an X through it and made a second selection.

21        THE JUROR:  I think I just made a mistake the first

22   time.

23        THE COURT:  Okay.

24        THE JUROR:  Yeah.

25        THE COURT:  So the question -- the answers you gave to

1    that question indicated that you would -- you were opposed to

2    the death penalty and you would never impose it in any case, no

3    matter what the facts.

4              THE JUROR:  Right.

5              THE COURT:  Is that correct?

6              THE JUROR:  That's correct.

7              THE COURT:  You can't conceive of any circumstance in

8    which the facts of the case were so disturbing, perhaps, or

9    morally repugnant that you could not, even in that

04:56 10    circumstance, vote in favor of the death penalty?

11              THE JUROR:  I'm pretty sure no.

12              THE COURT:  Anybody?

13              MR. WEINREB:  Nothing further.

14              THE COURT:  Anything further?

15              MS. CLARKE:  No.

16              THE COURT:  Thank you.

17              THE JUROR:  You're welcome.

18              (The juror is excused.)

19              THE COURT:  Can we have a moment and cut the audio?

04:57 20              MR. DOREAU:  Audio cut.

21              (Discussion at sidebar and out of the hearing of the

22    public:)

23              THE COURT:  This is for Juror 50.

24              The reporters, would you excuse us for a couple of

25    minutes?

1            I'm trying to find it.  These things are annoying to

2    read.

3            (Pause.)



1          MR. BRUCK:   Before we have a -- I have a quick

2     request --

3     ████████████████████████████████████████████████

4     ██████████████████████████████████████████████████

5     ████████████████████████████████████████

6          MR. McALEAR:   Okay.

7          THE COURT:   While he's doing that, now you can --

8          MR. BRUCK:   Thank you.

9          Your Honor, we really do appreciate your asking the

05:04 10   Paris question.  My request is just that it be phrased a little

11    more broadly.  It could be relevant to more than just the

12    answers about feelings about Muslims.  There's been a great

13    deal of press coverage linking Paris to this offense.  So

14    generally -- in other words, the supposed parallel:  two

15    brothers, similarly motivated, connections to Anwar al-Awlaki

16    and so on, there has been a lot in the press.  We filed a lot

17    of clippings just from the Boston press with the Court to make

18    that very point.

19         And so I think a more broad question would just be:

05:05 20   Is there anything about what you have read or learned that

21    affects your feelings in any way about this case or this

22    defendant or that would affect your answers?

23         THE COURT:   Okay.

24         MR. WEINREB:   No objection.

25         THE COURT:   By the time the jurors are considering

1      this case, they won't remember Paris.

2                THE CLERK:  51.

3                MR. DOREAU:  Audio?

4                THE COURT:  Audio back, yes.

5                (In open court:)

6                THE CLERK:  Juror No. 51.

7                Have a seat, ma'am.

8                THE COURT:  Good afternoon.

9                THE JUROR:  Good afternoon.

05:06 10          THE COURT:  You have to speak into the mic, so be sure

11     that -- you can adjust it as you feel comfortable, all right?

12                We put before you your questionnaire that you filled

13     out when you were last here.  We may refer to it as we talk

14     about some of these things.  This is principally to follow up

15     on the answers you've given in the questionnaire.

16                Since doing that, have you abided by my instructions

17     to avoid discussion of the case with anybody and tried to avoid

18     any media or other reports about this case?

19                THE JUROR:  Yes.

05:07 20          THE COURT:  Thank you.  Tell us about your employment

21     and the kind of work you do.

22                THE JUROR:  The actual company name?

23                THE COURT:  Not necessary.  We have it in the -- if

24     you'd rather not, it's in the file.  We know what it is.  We

25     just want to know what kind of work you do.

 1              THE JUROR:  I'm a software engineer.  I work on disk

 2      RAID management software.

 3              THE COURT:  What's that?

 4              THE JUROR:  You know, where all your data is stored,

 5      those refrigerator-type boxes.  I write the software to manage

 6      them.

 7              THE COURT:  And you've been doing that for some time,

 8      I guess?

 9              THE JUROR:  Yes.  I've been a software engineer for 28

05:08 10     years.

11              THE COURT:  Do you spend much time on social media

12      yourself?

13              THE JUROR:  No.

14              THE COURT:  At all?

15              THE JUROR:  Just LinkedIn.  No Facebook, no Instagram.

16              THE COURT:  LinkedIn is for professional connections

17      and so on?

18              THE JUROR:  Yes.

19              THE COURT:  You -- we asked you if anybody had -- you

05:08 20     know, that you knew anybody, a family member, close friend who

21      had ever worked for various agencies, including the FBI?

22              THE JUROR:  Yes.

23              THE COURT:  And you indicated that a neighbor was a

24      Boston FBI agent and left in 2013 after this case, and then in

25      question 75 you seem to refer to Rick Deloria.

1          THE JUROR:  Yes.

2          THE COURT:  Is that the neighbor you're talking about?

3          THE JUROR:  Yes.

4          THE COURT:  And how close were you to Mr. Deloria?

5          THE JUROR:  We've been neighbors since 1999.  Three

6   houses.

7          THE COURT:  You see him --

8          THE JUROR:  Not too much.

9          THE COURT:  During that time did you see him commonly,

05:09 10  during the time -- the entire time that you've been neighbors?

11  I mean, there are neighbors and there are neighbors, I guess --

12         THE JUROR:  Mostly I see him out running, and we chat

13  when we're out.

14         THE COURT:  You know that he was the special agent in

15  charge here for awhile?

16         THE JUROR:  Yes.

17         THE COURT:  Did you have any conversations with him

18  about the case?

19         THE JUROR:  No.

05:09 20         THE COURT:  Ever?

21         THE JUROR:  No.

22         THE COURT:  You have a second cousin who's a state

23  trooper in Massachusetts?

24         THE JUROR:  Yes.

25         THE COURT:  Do you see that person regularly or

1   intermittently?

2           THE JUROR:  No.

3           THE COURT:  Or at all.

4           THE JUROR:  Once in the last year, or twice, tops.

5           THE COURT:  Male or female?

6           THE JUROR:  Male.

7           THE COURT:  And do you know what his general work

8   assignments are or what he does for the state police?  I mean,

9   does he ride in a cruiser or --

05:10 10           THE JUROR:  Yes.

11           THE COURT:  You're not aware if he has any special

12   field of focus or anything like that?

13           THE JUROR:  No.

14           THE COURT:  And his status as a relative of yours

15   being employed by the police, would that have any effect on

16   your ability to be a fair-minded juror in a criminal case?

17           THE JUROR:  No.

18           THE COURT:  In the questionnaire we'd asked a number

19   of questions that could come under the general topic of

05:11 20   international events or affairs or attitudes and things like

21   that; I mean, for example, experience with or opinions about

22   Islam or Muslims, the war on terror, for example, and other

23   things.  Do you remember those series of questions?

24           Since you filled out the questionnaire and answered

25   those questions, there's been an incident in Paris involving a

 1    terrorist attack.  Are you familiar with that?

 2              THE JUROR:  Yes.

 3              THE COURT:  Have you followed it closely, not closely?

 4              THE JUROR:  Yes.  I have relatives in Belgium.

 5              THE COURT:  There was an incident in Belgium as well,

 6    wasn't there?

 7              THE JUROR:  Yes.

 8              THE COURT:  Were they affected by that at all?

 9              THE JUROR:  No.

05:11 10              THE COURT:  So you've paid attention to the European

 11    events?

 12              THE JUROR:  Yes.

 13              THE COURT:  Why don't you just take a look at page

 14    17 -- page 17 and 18, basically, and just review the answers to

 15    those questions.  And my question at the end is going to be:

 16    As a result of what's happened in Europe, would you answer

 17    these questions any differently than you answered them on the

 18    questionnaire?

 19              THE JUROR:  It's still the same.

05:12 20              THE COURT:  It's still the same?

 21              THE JUROR:  Yeah.

 22              THE COURT:  Thinking about the possibility you might

 23    be a juror in this case, do you think the European events,

 24    including Belgium as well as Paris -- do you think that would

 25    have any impact on your ability to be a fair judge of the

1    evidence in this case?  Would your assessment of the issues in

2    this case be affected by what's happened in your -- or what

3    similar -- if there are future events, what effect they might

4    have?  Would you be able to keep focus on the issues here and

5    not be affected by it, I guess?

6              THE JUROR:  I mean, it's always difficult.  You know,

7    the world is changing and it's dangerous, and I do have family

8    in different places, but I think I could be able to separate it

9    from this case.

05:13 10          THE COURT:  How much in contact are you with the folks

11   in Belgium?

12             THE JUROR:  We travel to see them, visit them once a

13   year, and they travel to visit us once a year and we Skype.

14   The kids Skype.  I have a niece and nephew there and a

15   brother-in-law and sister-in-law.  Other than that, it's mostly

16   just a phone call maybe once every two months, Skype maybe once

17   a month -- once every -- you know, the other month.

18             THE COURT:  So these are a brother or sister of --

19             THE JUROR:  This is my husband's brother.

05:14 20          THE COURT:  And his wife and children?

21             THE JUROR:  Yes.

22             THE COURT:  So they're Americans living in Belgium?

23             THE JUROR:  No.  My brother-in-law is American and my

24   sister-in-law is French.

25             THE COURT:  All right.  Are the children -- how old

1     are they?

2                THE JUROR:  They are -- sorry -- nine and 11.

3                THE COURT:  Were they born in Belgium or --

4                THE JUROR:  Yes.  They're French citizens.

5                THE COURT:  They're French citizens?

6                THE JUROR:  Well, French.  I don't think they've

7     chosen their citizenship, but they're half American, half

8     French.

9                THE COURT:  Did they live in France for awhile before

05:14 10    they --

11               THE JUROR:  No.  But my understanding on this is a

12    little vague, but you don't become a Belgium citizen just

13    because you're born in Belgium.

14               THE COURT:  I don't think we have to delve too much

15    more into that.  It's very interesting.  I'll look it up

16    someday.

17               I'm just trying to get to how close they are to you.

18    It sounds like they're fairly close to you?

19               THE JUROR:  Yes, my children and their children are

05:15 20    very good friends.

21                THE COURT:  All right.

22               Now, I'd like you to look at page 20 of the

23    questionnaire, and Question No. 77.  This question we've asked

24    whether, based on what you've heard in the news or other

25    places, you have formed an opinion about certain matters.  And

1    the first was whether you formed an opinion about whether the

2    defendant was guilty or not guilty, and then we asked also

3    whether you had formed an opinion about whether he should

4    receive the death penalty or not.

5         And as to the first two, guilty or not guilty, you

6    indicated that you had formed an opinion that he was guilty

7    based on news reports of what you've heard and read about the

8    marathon events.  Is that fair?

9         THE JUROR:  Yes.

05:16 10         THE COURT:  So the task of a jury, of course, is to

11   judge the evidence that's presented in the course of the trial.

12   And at the outset of the case any defendant, including this

13   defendant, is presumed to be innocent of what he's charged with

14   unless and until the government proves otherwise, proves that

15   he's guilty of what he's charged with, and does that by proof

16   that's convincing enough that the jury has no reasonable doubt

17   about it.

18         Would you be able to control whatever impression you

19   have in the beginning and follow those principles of law; that

05:16 20   is, accept the presumption of innocence and the obligation and

21   burden on the government to prove otherwise by the evidence

22   beyond a reasonable doubt?  Would you be able to apply those

23   principles?

24         THE JUROR:  Yes.

25         THE COURT:  So the question as to whether he should

1    receive the death penalty or not, you answered you were unsure.

2    Can you tell us a little bit about -- so I guess literally the

3    question was have you formed an opinion.  Your opinion is that

4    you're unsure, is that -- or are you unsure whether you have an

5    opinion?  I guess that's --

6             THE JUROR:  No, I have an opinion.  I guess I don't

7    object to the death penalty in itself, but I could never decide

8    somebody's fate like that.

9             THE COURT:  Let's turn to page 23 and Question No. 88.

05:17 10   This is asking for your general views about the death penalty.

11   And what you wrote down is that you didn't know if you could be

12   responsible for making that decision.

13            Can you maybe amplify on that a little bit?

14            THE JUROR:  Again, I'm not in favor of the death

15   penalty but I'm not fully opposed to it either, but I don't

16   feel that it's up to me to make that decision to take somebody

17   else's life.

18            THE COURT:  In the next -- on the next page -- well,

19   you reflected that you're sort of ambivalent about it as a

05:18 20   general matter in Question 89.

21            THE JUROR:  Okay.

22            THE COURT:  Is that fair?  I mean, you chose somewhere

23   in the middle of the range.  On the opposed side but not

24   strongly opposed, is what you said.

25            THE JUROR:  I mean, I don't feel any objections to

1    other people if, you know, they listen to the trial and they

2    decide that, but it would be very difficult for me to live with

3    the fact that I've made a decision like that.  It would bother

4    me.  And I'm not even sure I could -- I'm not even sure I

5    could.

6                    THE COURT:  That's the question we wanted to get to on

7    the next page, Question 90, where we asked you to try to select

8    which of the possible expressions of point of view was closest

9    to your own, and you said that you were opposed to the death

05:19 10    penalty and would have a difficult time voting to impose it

11    even if the facts supported it.

12                    THE JUROR:  Yeah.  I had trouble with this question.

13    Again, I don't really think -- I don't really think we need the

14    death penalty, but if other people in other trials -- I don't

15    feel ill-will towards anybody that's sat on a jury that's, you

16    know, voted for the death penalty.  But for me that's a huge

17    decision.

18                    MR. WEINREB:  Your Honor, can we pause at this point?

19                    THE COURT:  Okay.  All right.  I think we're just

05:19 20    about finished anyway, so...  I think that's fine.

21                    Thank you.  I appreciate your answers to the

22    questions.  Just leave that.  Thank you.

23                    THE JUROR:  Thank you very much.

24                    (The juror is excused.)

25                    THE COURT:  52 has also been postponed.  So the next

 1   is 54?

 2              MS. CLARKE:  Yes.  52 and 53 were postponed.

 3              THE COURT:  We're skipping 52 and 53.

 4              THE CLERK:  54.

 5              THE COURT:  Could you kill it for a minute?

 6              (Discussion off the record.)

 7              THE COURT:  All right, Phil.  Back on.

 8              MR. McALEAR:  54.  You can go to the first seat.

 9              THE CLERK:  Juror 54, please.  Sir, right here.

05:22 10              THE COURT:  Good afternoon.

11              THE JUROR:  Good afternoon.

12              THE COURT:  That's the questionnaire you filled out

13   before.  We're going to probably refer to it as I ask some

14   follow-up questions about it, so that's why we give it to you

15   so it would be handy to you.

16              THE JUROR:  Thank you.

17              THE COURT:  When you were here last and left, I

18   instructed people not to -- prospective jurors not to talk

19   about the case and so on, and not to be exposed to any media

05:22 20   accounts or anything else about the case.  Have you been able

21   to live up to that?

22              THE JUROR:  Yes.

23              THE COURT:  Tell us a little bit about your job and

24   what you do in general terms.

25              THE JUROR:  I'm a data management consultant who works

1    with the pharmaceutical industry.  Basically, we help companies

2    go paperless.  I have a detailed science background which helps

3    me basically bridge the gap between our software people and the

4    scientists on the lab bench.

5              THE COURT:  You work for a company that employs you --

6              THE JUROR:  Yes.

7              THE COURT:  -- and the company contracts with the

8    pharmaceutical companies?

9              THE JUROR:  Yes.

05:23 10              THE COURT:  Tell me about your own either professional

11    or personal use of social media.  How often, what do you use,

12    how do you use it?

13              THE JUROR:  I have a LinkedIn account that I've

14    probably had access to nine months; I have a Facebook account

15    that I think my wife has the password to.  I honestly don't do

16    much with social media.

17              THE COURT:  Okay.  You noted -- we asked about what

18    other family members might be doing in case they had any

19    connection with things that might come up with the case.  You

05:24 20    said your father is a Maine judicial marshal?

21              THE JUROR:  My father-in-law.

22              THE COURT:  Your father-in-law.  Do you know what a

23    judicial marshal is?  Is that like a court officer of some

24    kind?

25              THE JUROR:  He handles court security for the State of

1    Maine.

2              THE COURT:  In the court system?

3              THE JUROR:  Yes.

4              THE COURT:  But it's -- is he located in a courthouse?

5    Is that what he does?

6              THE JUROR:  Yes.

7              THE COURT:  Okay.  You've probably seen them around

8    here with -- they wear blue coats --

9              THE JUROR:  Yes.

05:24 10              THE COURT:  -- and something like that.

11              THE JUROR:  Yeah.  He's in a management position; he's

12    not --

13              THE COURT:  We have one right here, a court security

14    officer.  He does something like that?

15              THE JUROR:  Yes.

16              THE COURT:  Okay.  Exhibit A.

17              (Laughter.)

18              THE COURT:  If you would turn in the questionnaire to

19    page 20, I want to direct your attention to Question 77.  In

05:25 20    that question we asked whether -- based on things you had read

21    or seen in the news media or otherwise, whether you had formed

22    an opinion about various matters including whether the

23    defendant was guilty or not guilty, whether he should receive

24    the death penalty or not, and you checked boxes indicating your

25    answers.

1          Let's talk about the first two which are concerned

2     with the question of guilt or not.  And you said that -- you

3     checked the box that said you had not formed an opinion about

4     that.

5          THE JUROR:  That's correct.

6          THE COURT:  Is that the case?

7          THE JUROR:  (Nonverbal response.)

8          THE COURT:  As I think I instructed the last time and

9     remind you, in our criminal justice system anybody accused of a

05:26 10    crime is presumed to be innocent unless and until the

11    government proves otherwise at trial by the evidence, and

12    proves it beyond a reasonable doubt.  So the burden of proof is

13    always on the government and the defendant doesn't have a

14    burden to prove he's not guilty.

15          You understand those principles?

16          THE JUROR:  I do.

17          THE COURT:  Do you have any difficulty applying them

18    in this case?

19          THE JUROR:  I do not.

05:26 20          THE COURT:  I think for the -- with respect to the

21    next two, you've said you thought he should not receive the

22    death penalty, and that sort of brings us to some other

23    questions further on.  I want to turn to page 23, Question 88.

24    And we asked for your general views on the death penalty and

25    then we asked you to kind of indicate the strength of those

1       views by circling one of the numbers on the scale.

2               As we talk about this I want to bring you back for a

3       second to Question 78 where you said you had discussed your

4       reservations about the death penalty with your wife.  So it's

5       been a matter -- since you thought you might be considered for

6       this jury, you've had some discussions about that with your

7       wife?

8               THE JUROR:  No, we've had discussions about it prior

9       to knowing about this case.

05:27 10        THE COURT:  Oh, I see.  Okay.  Extensive?  I mean, is

11      it something -- it just came up because life is life and topics

12      come up, or was there some particular reason why you were

13      talking about it?

14              THE JUROR:  I believe the topic came up based on a

15      news report about another trial a while ago.

16              THE COURT:  Okay.  So you had kind of an extended

17      answer to the Question 88.  Maybe you can summarize it.  What

18      is your view in general -- not now specific to this case, but

19      in general what is your view about the death penalty?

05:28 20        THE JUROR:  My general view of the death penalty is

21      that it's not a logical punishment for any crime in general.

22      It costs the state more than other punishments; it carries the

23      burden of being irreversible if found -- if the person is found

24      to be not guilty afterwards; and it's been proven not to be a

25      deterrent.  And based on those grounds, it doesn't seem to be a

1    logical punishment.

2          THE COURT:  If you'd turn to page 24, Question 90,

3    instead of a numerical scale 1 to 10, this asks you to agree

4    with -- or to indicate which of the various possible statements

5    was closest to your view, and you chose C, which was that you

6    are opposed to the death penalty but you could vote to impose

7    it if you believe that the facts and the law in a particular

8    case call for it.  Is that accurate?

9          THE JUROR:  If a particular case was proven to

05:29 10   override my previous opinions about the death penalty, then,

11   yes, I could find to give it to someone.

12          THE COURT:  Can you tell us what would lead you to

13   think that your prior views were overridden?  What kind of fact

14   about the case would lead you to that position?

15          THE JUROR:  I honestly don't know what would override

16   my previous opinions, but I frankly do believe in general that

17   I can -- that I have the ability to evaluate and change my

18   opinions if given cause to do so.

19          THE COURT:  Okay.  So that if, as the question says,

05:30 20   the facts and the law in a particular case called for the

21   imposition of the death penalty, then you could conscientiously

22   vote to impose it.  Is that correct?

23          THE JUROR:  I think it would be difficult for me, but

24   honestly I think I could.

25          THE COURT:  Would you look at the bottom of page 25

1    and over the top of page 26.  We asked sort of parallel

2    questions on both sides of the issue.  First, if you found this

3    defendant guilty and decided that the death penalty was an

4    appropriate punishment, could you conscientiously vote for the

5    death penalty, you answered yes.  That's pretty much what

6    you've just told us.  Is that --

7              THE JUROR:  Yes.

8              THE COURT:  -- fair?

9              And then on the next question we ask the opposite of

05:31 10    that:  If you found him guilty and found that life in prison

11    without the possibility of release was the appropriate

12    punishment, then you could conscientiously vote for that as

13    well?

14              THE JUROR:  Yes.

15              MR. WEINREB:  I just would like to clarify -- good

16    afternoon.  I'm Bill Weinreb.  I'm one of the prosecutors in

17    the case.

18              I just want to clarify something you said.  It may

19    just be that I didn't understand the way you put it.

05:32 20              You told us that as sort of a reasoned matter you're

21    against the death penalty and you think it's illogical, and the

22    way you put it here is, you think it's just state-sponsored

23    vengeance?  I'm just reading off your questionnaire.

24              THE JUROR:  As I have been exposed to it in the past,

25    that's what it seems like.

1          THE COURT:  So you said just now that you can't think

2     of any facts -- you said that you're opposed to the death

3     penalty "but I could vote to impose it in certain cases."  And

4     then when the judge asked you to elaborate, you said if you

5     could -- what kind of case, you said, "I can't think of any

6     case that would override my previous opinions."

7          And I guess my question for you is:  Are you saying

8     that you could only impose it if something convinced you to

9     abandon your view -- your views about the death penalty, in

05:33 10    other words, to change your mind and to think that it was a

11    logical punishment and not just state-sponsored vengeance?

12    Would that be the point of your --

13         THE JUROR:  Could you repeat that question?

14         MR. WEINREB:  Okay.  I'm sorry.  It wasn't a good

15    question.

16         You have a general view, general belief against the

17    death penalty.  You don't believe it makes sense as a

18    punishment?

19         THE JUROR:  That's correct.

05:33 20    MR. WEINREB:  All right.  But you are aware that under

21    the law the death penalty is available in certain cases?

22         THE JUROR:  I understand that, yes.

23         MR. WEINREB:  And so the question is:  Are you saying

24    that you could only impose it if something convinced you -- if

25    you heard evidence about whether the death penalty is a good

1    idea, whether it's a good thing to have in our society, whether

2    it really does make sense?  Is that what you're saying?

3              THE JUROR:  Yes.

4              MS. CLARKE:  Your Honor, I think that's staking out

5    certain evidence.

6              THE COURT:  No, I don't think so.

7              MS. CLARKE:  Okay.

8              MR. WEINREB:  Okay.  So you're saying -- so

9    just -- I'm just trying to understand what you're saying.  If

05:34 10   the evidence did not convince you that the death penalty as a

11   general matter was a good idea, was something that society

12   should have, or simply that it was something that was a logical

13   thing, something that made sense, if you weren't convinced of

14   that, would you be able to impose it in a particular case?

15             THE JUROR:  I think if -- in the context of a

16   particular case, I would need to be convinced that that

17   particular case warranted it over my objections.

18             MR. WEINREB:  And what kind of -- could you try again

19   and tell us what kind of thing could convince you of that?

05:34 20            THE JUROR:  I honestly don't know what could convince

21   me of that.

22             MR. WEINREB:  Well, so is it just a hypothetical

23   possibility or do you think there's a practical -- as a

24   practical reality could anything convince you?

25             MS. CLARKE:  Your Honor, I think we're pushing the

1    stakeout by this hypothetical.

2        THE COURT:  No, I think it's still a general question.

3        THE JUROR:  I have always felt like -- I've always

4    felt personally that nothing is immutable, and if given cause,

5    my opinion should change to accept new ideas.  In this case I

6    do not know what could cause them to change, but I feel like I

7    have to be open to the possibility that they could.

8        MR. WEINREB:  Okay.  So would it be necessary for the

9    government to convince you that as a general matter that -- let

05:35 10   me put it another way:  If there were a referendum on the death

11   penalty, whether we should have it in society or not, you would

12   vote no?

13       THE JUROR:  That is correct.

14       MR. WEINREB:  Would the government have to convince

15   you that you should vote yes, that it would be -- as a public

16   policy matter it would be a good idea to have it for you to

17   impose it in a particular case?

18       THE JUROR:  As I understand it, the burden of proof

19   would be on the government to prove that.  I guess I'm not --

05:36 20       THE COURT:  I'm not sure you're on the same

21   wavelength.  Try again.

22       MR. WEINREB:  I'm still trying to get at it.

23       Could you -- can you imagine circumstances where, even

24   believing that the death penalty, as you put it, is not

25   logical, doesn't deter crime, is really nothing more than

1    state-sponsored vengeance, notwithstanding all those beliefs

2    you could still impose it in a particular case?

3            MS. CLARKE:  Your Honor, that's an imaginary question.

4            THE COURT:  No, go ahead.  Answer that.

5            THE JUROR:  I'm sorry?

6            THE COURT:  You may answer that.

7            THE JUROR:  I believe it would be difficult, but I'm

8    forced to answer that, yes, I think I could.

9            MR. WEINREB:  Why are you forced to?

05:37 10         THE JUROR:  Again, I feel I do have reservations on

11   the death penalty, but I think, with difficulty, I could

12   overcome them if it was proven for a specific case.

13           MR. WEINREB:  I have nothing further, your Honor.

14           THE COURT:  No?  Nothing?  Okay.  Thank you, sir.

15   Step out.  Leave the questionnaire right there.

16           (The juror is excused.)

17           THE COURT:  55 was removed from the pile, right?  55

18   was removed?  Okay.  I think this is the last one, right?

19           MR. WEINREB:  Yes, it is.

05:38 20         THE COURT:  Actually, hold off with 57 for a minute.

21   And could you cut the audio?  And, gentlemen.

22           (Discussion at sidebar and out of the hearing of the

23   public:)

24           THE COURT:  I've only read -- tried to read this

25   report quickly.  It -- I'm not sure it's -- I'm not sure what

 1    it gives us.  It seems consistent rather than inconsistent with

 2    the answers she gave to Question 40 and carried over.  It's

 3    approached from a different point of view, but the time frame

 4    and the charges seem to be like, so I'm not sure this is a case

 5    of failure to report.

 6         Does anybody have a different view?  I think they seem

 7    to be consistent.

 8         MR. CHAKRAVARTY:  That's the government's position,

 9    your Honor.

05:39 10       MS. CLARKE:  Yes, we agree.

 11        THE COURT:  All right.  We won't bring it up, then.

 12   Apart from our getting the report, if someone wants to ask

 13   about that question, but I don't see any reason to wave the

 14   report around.

 15        MS. CLARKE:  We agree.

 16        THE COURT:  Okay.

 17        THE CLERK:  Okay.

 18        THE COURT:  Yes, they can come back on.

 19        THE CLERK:  Phil, turn it back on.

05:40 20       MR. DOREAU:  Back online.

 21        (In open court:)

 22        THE CLERK:  Number 57.

 23        THE COURT:  Good afternoon.

 24        THE JUROR:  Good afternoon.  How are you?

 25        THE COURT:  Good, thank you.

1            We've placed the questionnaire that you filled out

2    before in front of you.  We may refer to it as I follow up on

3    some of the questions that you gave.

4            THE JUROR:  Okay.

5            THE COURT:  Tell us just a little bit about your

6    employment and what you do.

7            THE JUROR:  I work at Pentucket Bank.  It's a small

8    community bank.  And I work as a customer-service --

9            THE COURT:  In Middlesex County, generally?

05:41 10            THE JUROR:  Yes.  As a customer-service

11    representative.

12            THE COURT:  And you've done that for a while?

13            THE JUROR:  I've done that for seven years.

14            THE COURT:  Tell us the extent to which you may use

15    various social media, Facebook, Instagram, Twitter, anything

16    like that.

17            THE JUROR:  I have an account with Facebook.  I

18    normally go in it once or twice a week.  Sometimes months go by

19    without using it.  It all depends.

05:42 20            THE COURT:  And are you posting as well as reading

21    other -- going down people's posts?

22            THE JUROR:  Mostly reading.  I have family outside of

23    the United States that I keep in touch with.

24            THE COURT:  And that's one of the ways you stay in

25    touch?

1          THE JUROR:  Exactly.

2          THE COURT:  Any posting about this case or anything

3     related to it?

4          THE JUROR:  Not at all.  Not at all.

5          THE COURT:  Let me ask you, in the questionnaire if

6     you'd turn to page 20, and I want you to look at Question 77

7     near the top where we ask some questions about whether you had

8     formed some opinions about this case, particularly whether the

9     defendant was guilty or not, and whether he should receive the

05:43 10    death penalty if he was guilty.  And you indicated to -- in the

11    first part of the question that you thought he was guilty, but

12    it looks like you had changed your answer from "unsure."  So I

13    just wanted to see what your thinking was on that.

14         THE JUROR:  Yes.  My first response was "unsure."  I'm

15    not that familiar to 100 percent of the case.  Once I continued

16    going -- I went back to reread the question and I said, "Do you

17    know what?  I've heard some things through the media."  And I

18    said, "Well, my mind is more towards the answer that you do see

19    there, but I'm always willing to hear and see what the case is

05:43 20    all about."

21         And as you know by reading this, you find out I'm a

22    Christian woman, so I'm not a person who likes to judge anyone.

23    I like to hear and go from there.

24         THE COURT:  Just on that last point, some people

25    believe firmly that they should not sit in judgment of other

1    people --

2           THE JUROR:  Right.

3           THE COURT:  -- and therefore can't be a juror in any

4    case -- a criminal case, that is, I guess -- no matter what the

5    charges are, even if they're not capital charges.  Are you of

6    that belief or were you speaking a little more generally about

7    not judging people in --

8           THE JUROR:  In general.

9           THE COURT:  To convey that you're patient about

05:44 10   assessing a matter before you jump to a conclusion?

11          THE JUROR:  Yes.  Exactly.  In general.

12          THE COURT:  All right.  That's what I thought, but I

13   wanted to be sure.

14          Now, you do understand that in any criminal case,

15   again, the defendant's presumed to be innocent at the outset

16   and is determined to be guilty only if the government proves

17   that he's guilty at the trial on the evidence and proves it

18   beyond a reasonable doubt.

19          THE JUROR:  Yes.

05:44 20        THE COURT:  And you are -- if you were a juror in this

21   case, could you conscientiously apply those principles?

22          THE JUROR:  Absolutely.

23          THE COURT:  Okay.  So let's turn to the question of

24   the penalty.  If you'd turn to page 23, and in answer to

25   Question 88 you said that you do not agree with the death

 1    penalty and only God can have the right to end a life.

 2              THE JUROR:  Yes.

 3              THE COURT:  And then right below that in the next

 4    question we asked how -- you to gauge how strong your

 5    opposition to the death penalty was, and you circled 1,

 6    indicating strongly, right?

 7              THE JUROR:  Yes, that's correct.

 8              THE COURT:  Turn to the next page, and we asked you

 9    to -- which of the following describes your feelings.  And you,

05:45 10    I guess, thought that you should indicate that there were two

11    possible expressions of your views on this:  One was that

12    you're opposed to the death penalty and would never impose it

13    no matter what the facts; and, secondly, that you're opposed to

14    the death penalty and would have a difficult time voting to

15    impose it even if the facts supported it.

16              THE JUROR:  Exactly.

17              THE COURT:  First of all, did you intend to highlight

18    both of those?

19              THE JUROR:  I could have misunderstood it.  What I did

05:46 20    mean by it is I'm completely opposed to it and there is -- by

21    having a difficult time, I thought it was more towards my

22    person and how I feel, but definitely I do not support it.

23              THE COURT:  Is your opposition such that you could

24    not -- you feel you could not vote to impose the death penalty

25    in any circumstance?

1           THE JUROR:  Exactly.

2           THE COURT:  Is it that strong?

3           THE JUROR:  That strong.

4           THE COURT:  You can't think anything about a case that

5     could be so horrendous or shocking that would lead you to

6     change your mind on that?

7           THE JUROR:  No, I wouldn't change my mind on that.

8           THE COURT:  Anything else?

9           MR. WEINREB:  No.

05:47 10           THE COURT:  No?  Thank you.

11           THE JUROR:  Thank you.

12           THE COURT:  You may step out.

13           (The juror is excused.)

14           MR. McALEAR:  Right this way.

15           THE COURT:  We'll take a recess and then we'll come

16     back in a sidebar and there will be further discussion.

17           MR. WEINREB:  What time?

18           THE COURT:  What do you want?  Half an hour?

19           MS. CLARKE:  Can you give us a half-hour?

05:47 20           THE COURT:  Half-hour?

21           (There is a recess in the proceedings at 3:12 p.m.)

22     (The Court entered the room at 3:54 p.m.)

23           THE COURT:  Okay.  Some -- are there further agreed-on

24     matters?

25           MR. WEINREB:  No, your Honor.

 1          THE COURT:  So we've dealt with those.  I think the

 2     first then non-agreed would be No. 35.

 3          MR. WEINREB:  That's correct.  We have no motion.

 4          MS. CLARKE:  There is no motion.

 5          THE COURT:  35 is in.

 6          Number 37 was excused.  Next, 38.

 7          MS. CLARKE:  It's a defense motion.

 8          MR. BRUCK:  It is a defense motion.  We move that he

 9     be disqualified on two different grounds, and it may save time

06:31 10     to take them up one at a time.  Observing the Court's general

 11     practice so far, he seems to clearly come under the hardship.

 12     He is a self-employed computer person.  He said on his

 13     questionnaire he would have no income.  He would not be able to

 14     pay his bills.  And on -- when questioned more about that, he

 15     said it would be distracting or could well be distracting

 16     during the course of the trial.  He said it would be tough no

 17     matter how he was able to juggle his time.  I just don't see

 18     any way to distinguish him from other self-employed jurors who

 19     depend on their hourly or income by the job.

06:32 20          There's a great deal else to be said about this juror,

 21     but I don't think there's any need to say it.  It's the Court's

 22     preference whether you'd like to take that up.

 23          THE COURT:  You want to --

 24          MR. WEINREB:  Sure.  I'm happy to do it that way.

 25          Your Honor, I disagree that he can't be distinguished

1   from others.  I do think he has a genuine hardship, but I don't

2   believe it's a disqualifying hardship.  And I base that on a

3   couple of things.  The most important one is he seemed to be a

4   very earnest and honest person who struggled hard to say what

5   he believed to honestly be true accurately.  And he was given

6   many opportunities to say that this would be a disqualifying

7   hardship for him, but he simply couldn't do it.  But every time

8   he was asked, he kept stopping short of that.  He said it would

9   be a financial hit, that it would be difficult.  But he didn't

06:33 10   say that it would be the kind of hardship that he couldn't

11   bear.

12         And, in fact, he did point out -- or he did

13   acknowledge that he has a husband who also has an income, and

14   you can -- he contributes to the household expenses.  And he

15   said that there was -- there was some work he could do on the

16   Fridays and after hours and so on that would continue with some

17   income, plus he gets the daily stipend.

18         So although I do acknowledge that -- he certainly made

19   it clear that this would be a financial hit, he did also

06:33 20   acknowledge that juror service is a sacrifice for everybody and

21   that he did not go so far as to say that it was too much of a

22   sacrifice.

23         THE COURT:  Okay.  With respect to this juror, I think

24   I'm going to actually reserve and read the transcript again.

25   So I think you should make all your points, and I'll let you

1    know at the beginning of the week on him.  I think it's a close

2    -- I think I know what your argument is going to be, and I

3    think it may be a close call on both.  I just would like to be

4    sure I'm seeing what he actually said as opposed to what my

5    faulty memory may be about that.

6            MR. BRUCK:  Okay.

7            THE COURT:  Yeah.  Go ahead.  That's all I'll say

8    about that.

9            MR. BRUCK:  I suppose the other alternative would be

06:34 10    to argue the case when we all have the transcript on Tuesday.

11            THE COURT:  Yeah?

12            MR. BRUCK:  Not that --

13            THE COURT:  If you want to do it that way, that's

14    fine.  In other words, that might be an approach for close

15    cases, which I think this is a close case, frankly.  I don't

16    know which way.  I want to look at it.  I say that principally

17    because I had the same impression of him personally that Mr.

18    Weinreb just referred to; and that is, he struck me as a very

19    conscientious witness, very careful about what he was saying

06:35 20    and wanting to be sure he was telling us things accurately and

21    so on.  He seemed to be struggling sometimes with that, but the

22    very fact that he was struggling indicated his earnestness to

23    me.  I found that appealing.  That doesn't necessarily answer

24    the other questions, which I think are very close questions.

25    And that's why I'd like to look at the transcript.  If you want

1    to have that opportunity, we can come back to him the beginning

2    of the week.

3            I think what I'd like to do, under those conditions,

4    is take it up at 8:30 so we can actually get started at 9:00.

5            MR. WEINREB:  Sure.  Fine.

6            THE COURT:  Without logistical issues.

7            MS. CLARKE:  You're awfully demanding.

8            MR. CHAKRAVARTY:  Your Honor, just on that point,

9    obviously, if everybody is inclined to think that that's going

06:35 10  to be more helpful, then that makes sense.  But our collective

11   memory of him and his demeanor and the other observations that

12   will factor into your decision are best closest in time to

13   those observations.  I'm just suggesting that if the parties

14   made the arguments now, then you would be fully equipped, both

15   based on our arguments as well as your own observations and

16   then having the transcript, to be able to make an assessment as

17   opposed to us arguing from the black and white divorced from

18   the actual voir dire process that we actually had here where we

19   were -- the impressions that were made in front of us are going

06:36 20  to be pronounced.

21           MR. WEINREB:  I actually second that.  I think that if

22   we start arguing from transcripts, the argument time is going

23   to begin to overwhelm the voir dire time.

24           THE COURT:  Well, I don't want that to happen.

25           MR. BRUCK:  My memory is also faulty.

1          THE COURT:  We'll just -- we'll just make sure it

2    doesn't get out of control.  I don't know that this will be a

3    common thing to do, so I think let's -- we'll -- I don't think

4    it's that far away from the event Tuesday that we won't have a

5    memory of his persona as he sat here.

6          40 was excused.  Brings us to 41.

7          MS. CLARKE:  There's no motion.

8          MR. WEINREB:  No motion.

9          THE COURT:  Okay.  So she's in.  42.

06:37 10        MR. WEINREB:  The government moves to excuse 42 for

11   cause.  We would submit that he is the very definition of

12   somebody who's substantially impaired in his ability to

13   consider the death penalty and impose it.  He clearly is

14   philosophically opposed to it in every way, and the only reason

15   that he stopped short of saying that he couldn't do it was

16   simply his statement that, Any absolutist thing makes me

17   uncomfortable.  And, yet, when he was asked repeatedly whether

18   there were any circumstances under which he could impose it, he

19   couldn't think of them.

06:38 20        And, in addition, he -- at the end when the parties

21   were asking him questions, Mr. Bruck asked him to imagine a

22   situation in which the facts were especially egregious and

23   heinous and asked him, even under those circumstances, even the

24   most egregious or heinous kind of case, could you impose it.

25   And the best he could muster was possibly.

1          I am certain that if the Court asked him if he could

2     apply the presumption of doubt -- the presumption of innocence

3     or apply the reasonable doubt standard and the best he could do

4     is say possibly, that that juror would not survive voir dire.

5     And that is *Witherspoon* and *Witt*, essentially give the

6     government a corresponding right to somebody who is fully able

7     to consider actually imposing the death penalty despite their

8     personal views.  And he did not say that he could do it.  In

9     fact, he indicated in every way that he could not do it.

06:39 10          The other objection we have is that he is a professor

11     of criminal justice; and putting someone like that in the jury

12     box is like putting an expert witness in the jury box, somebody

13     who is particularly liable to exert such a disproportionate

14     influence on the jurors based on his knowledge of things

15     outside of the courtroom, not just based on ordinary life

16     experience but on specialized training that he's had for years

17     and years of pursuing this career and doing research in it and

18     being a published author, that it would interfere with the

19     process of deliberation that jurors are expected to undertake

06:40 20     with one another.

21          MR. BRUCK:  If I may, to take that in reverse order, I

22     don't know that he is in any different posture than a doctor or

23     a lawyer who aren't disqualified.  There were no questions.

24     The government didn't pursue the question of whether he would,

25     in effect, behave as an expert witness in the jury room.  And I

1   just don't think there's any basis for that at all.

2          As opposed -- as for his death penalty views, the

3   problem, if there is one, is simply that he speaks like a

4   social scientist, with a sense of precision.  And if something

5   is possible, he describes it as possible, not that, yes, it

6   will happen.  There are many contingencies, and he's holding

7   them all in his mind in a very analytically precise way.

8          He is the juror of whom the Supreme Court wrote in

9   *Witherspoon v. Illinois* that it is possible for a juror to be

06:41 10   opposed to the death penalty and irrevocably committed to its

11   abolition and still adhere to the -- carry out his

12   responsibilities as required by the laws of the state.  And

13   that's what this juror -- that's who this juror is.  And I

14   don't think people ought to be disqualified from service

15   because of the precision with which they express themselves.

16          He was -- on the one hand, he was listing valid

17   mitigating factors that he is aware are present in this case,

18   or at least one, age, which is, as a matter of Eighth Amendment

19   constitutional law a weighty mitigating factor.  So there's

06:41 20   nothing wrong with the fact that he takes that heavily into

21   account.  It would be unconstitutional if a jury did not.  And

22   the amount of weight is for the jury.  It's not disqualifying.

23          As far as the general proposition, looking generally

24   at the run of cases, he clearly is on the end of the scale

25   where he would require a great deal of proof.  And that can't

1    be disqualifying under *Witherspoon*.  And when that becomes

2    disqualifying, even as to a single juror, we have reversible

3    error.

4         So I'm not going to say this is not -- there's not an

5    argument to be made, but when you look at the totality of the

6    circumstances, he, we think, may not be disqualified under

7    *Witherspoon* and *Wainwright v. Witt*.

8         THE COURT:  No.  I'll allow the strike.  It seems to

9    me that the standard, whether anti-death penalty views prevent

06:42 10   or substantially impair the performance of the duty, has to be

11   understood in practical terms rather than theoretical or

12   hypothetical terms.  And I think a good bit of what might have

13   looked like an ability to do it was in the latter zone of

14   hypothesis and theory, and I did not sense that it had a

15   practical significance in his case.  I just saw -- I think he

16   is -- he would not practically be able, so I think he fits

17   within the substantially impaired -- or his views would

18   substantially impair his ability to exercise that in this case.

19   So I think he --

06:43 20        I have to say I was a little concerned as well about

21   his eagerness about the case, signaled by his reading the

22   docket.  It's an intrusion of his -- I understand that somebody

23   in his field would do that, but -- and that may even relate a

24   little bit to the second point the government made, that this

25   is an occasion for some professional interest in the workings

1       of a case like this.  I don't know.  It's just -- I don't rely

2       on that.  I just noted that it was -- the flavor of eagerness.

3       We're worried a little bit about eagerness and that there's a

4       little sense of that in this case as well.

5               Number 43.

6               MR. WEINREB:  Your Honor, the government moves to

7       strike No. 43 as well.  Number 43, I believe, is the

8       quintessential example of somebody whose strong anti-death

9       penalty views, combined with quite inconsistent answers about

06:44 10    his ability to impose it, especially in light of his demeanor

11      and the way that he spoke, demonstrate that he is substantially

12      impaired in his ability to consider the death penalty.

13              He said that repeatedly, I don't think that I -- I

14      don't know that I think it's the right thing to do.  I don't

15      know that I believe in the death penalty.  I don't think that's

16      the right law.  But beyond that, he said that I'm not sure I

17      have the personal constitution to impose it.  And he said, I

18      don't know if I could live with myself if I did.

19              And that's something beyond -- that's exactly what

06:45 20    *Witherspoon* was getting at, although I agree with Mr. Bruck

21      that it is possible under the law to be opposed to the death

22      penalty on religious, philosophical, and moral grounds and

23      still be qualified as a juror if you can bring yourself to put

24      all of that aside and follow the law and actually impose it.

25              This is somebody who made it clear that he did not

1    believe he could do it or at the very least was quite unsure he

2    could do it.  And he -- he said -- he said that he could impose

3    it only in an extreme situation.  But, again, when pressed

4    repeatedly to name an extreme situation in which he could

5    impose it, he simply couldn't come up with one.

6           Again, it seemed like he was the kind of person who

7    was reluctant to state an absolutist position because people

8    don't like to believe that they are not open-minded people.

9    And yet the definite impression that he gave was of somebody

06:47 10   who believed that he -- in the abstract or theoretically he

11   could do it, but when it came down to whether he personally

12   could actually do it despite his strong beliefs against it,

13   that he couldn't or at least was so unsure that he amounts to

14   substantial impairment.

15          MR. BRUCK:  Well, in this instance, this juror said

16   over and over again, If I really felt it was warranted, I could

17   be convinced of it.  I could be convinced of that position.  It

18   was -- he would say, I would not say it is an absolute

19   position.  It is something I would struggle with.  Open-minded

06:47 20   and willing to be convinced.  I don't know how I would respond

21   if I were in that position.  This is someone who has the

22   self-knowledge to know that for many, many people, most people,

23   this decision is somewhat traumatic, and no one knows what it's

24   going to be like and how they're going to respond until they're

25   in the position.  And he is able to forecast that, unlike some

1    people who don't really think about it until they get in the

2    jury room.  That shouldn't be disqualifying.

3         And he has a full sense of the enormity of the

4    decision and of the effect of the decision on the person making

5    it.  That can't be disqualifying; and if it is, then we really

6    have, you know, the problem that *Witherspoon* identified of the

7    hanging jury, composed of only people who are required to say

8    they're sure of how they would respond in that life-changing

9    moment of decision.  That's really the most that one can say

06:48 10   against him, and that's not very much, and it's certainly not

11   enough under *Wainwright v. Witt*.

12        THE COURT:  No.  Again, I think he falls in the zone

13   of substantially impaired.  You know, if you look at -- again,

14   at the answers on the questionnaire as well as the answers here

15   today, there really is held out as a -- again, hypothetical

16   possibility that isn't fleshed out at all.  It's sort of like

17   an X variable in a formula.  It's possible that it could be

18   some value there that would lead to an outcome and so on.  But

19   if it's just the possibility without some practical

06:49 20   illustration of it, it comes, I think, too close to being an

21   absolute position and not enough openness.

22        In contrast, you know, there are people who have

23   answered this questionnaire who -- not at the 1 and 2 level.

24   They may be at the 3 or 4 on the scale.  They're opposed.

25   They're not quite as dogmatic about it and who say, I'm

1   generally opposed to it.  It would have to be a special case,

2   but I could do it in that case.  So I think that's the

3   distinction that the cases are getting at, I think.  So I would

4   allow this one as well.

5           And 45, we'll see on Wednesday.  46 was excused.

6   Number 47 was excused.  Number 48, we'll see on Tuesday.  49 is

7   excused.

8           MS. CLARKE:  49 is a government --

9           MR. WEINREB:  We excused 49.

06:50 10          MS. CLARKE:  I think that's a government motion.

11          MR. WEINREB:  That's a government motion, I think.

12          THE COURT:  Oh, I'm sorry.

13          MR. WEINREB:  The government moves to strike No. 49.

14   Both in her questionnaire and in her questioning, she said that

15   she was unalterably opposed to the death penalty and could not

16   retreat from that position in the slightest, express any

17   ambiguity about it.

18          MR. BRUCK:  We have no argument on that.

19          THE COURT:  I think that's true.  Maybe that's why I

06:51 20   thought she was excused.  It seemed fairly clear.  She was

21   pretty adamant about it.

22          Number 50, we regarded as not qualified.

23          Number 51.

24          MR. WEINREB:  That was an agreement.

25          THE COURT:  This was agreed, okay.

1          Number 52 has been deferred.

2          MS. CLARKE:  No.  Agreed.

3          MR. WEINREB:  Agreed.

4          THE COURT:  I was being euphemistic.

5          MS. CLARKE:  A redo.

6          THE COURT:  Fine, yes.  But he won't know it.

7          MR. WEINREB:  Right.

8          THE COURT:  He'll know that he's deferred.

9          And I think there was an agreement as to 53 as well.

06:51 10          MS. CLARKE:  That's correct.

11          THE COURT:  That brings us to 54.

12          MR. WEINREB:  Your Honor, the government moves to

13   excuse No. 54, again, on the ground that he is substantially

14   impaired in his ability to consider the death penalty.  And I

15   want to -- I'm sure the Court is quite familiar, since he was

16   the last one there, with what he said.  I want to highlight a

17   couple of things.  First, just his -- first of all, he again

18   seemed like the kind of person who was speaking very much in

19   terms of abstract belief when he talked about his potential

06:52 20   willingness to consider the death penalty and not in terms of

21   something that, as a practical matter, he actually could do.

22          Although he said that his -- he was opposed to the

23   death penalty, that he could impose it in a particular case if

24   the facts justified it.  He then said he couldn't think of any

25   fact that would, in fact, justify it.  He also said in his

1    questionnaire that he considered the death penalty to be

2    nothing more than state-sponsored vengeance, and yet he seemed

3    to -- and in saying that he could impose it if the government

4    somehow proved to him that his views were wrong, he seemed to

5    be indicating that -- the logical inference to draw from that

6    is that, only if the government could prove to him that the

7    death penalty was something other than state-sponsored

8    vengeance, meaning that as matter of public policy or logic, as

9    he put it, of utility, that the death penalty's benefit

06:53 10    actually outweighed what he obviously sees to be its downside.

11        And, yet, again, he was someone who was utterly

12    incapable, could not give any example, any circumstances that

13    would lead him to that belief.  He said that at one point the

14    government would have to prove that the law was just for him to

15    do it, which obviously is not a burden the government bears and

16    should not have to bear.  And it's not an idea that ought to be

17    injected into the jury room where people may, in fact, be in

18    the category of people who believe the death penalty is unjust

19    and yet are willing to say, despite my personal belief, I'm not

06:54 20    the lawmaker, and I'm willing to put that aside and follow the

21    law as it's given to me by the Court.  He didn't say he would

22    follow the law as given to him by the Court.  He seemed to

23    indicate that the government would have to prove to him what

24    the law should be.

25        I also want to draw attention to his demeanor as he

1   was sitting there.  In contrast to some of the other jurors

2   we've discussed, he was not somebody who seemed to be coming

3   across as extremely earnest and struggling to give an honest

4   opinion.  He seemed to be somebody who was trying to give a

5   right answer, an answer that he considered to be correct in

6   some way, according to some metric.  And that is not a reliable

7   juror or a -- and it means -- it calls into question the

8   reliability of his answers but, on top of that, does not

9   recommend him as a juror in general.

06:55 10        MR. BRUCK:  Well, Mr. Weinreb identified an ambiguity

11   in his answers and went hard for it and cleared it up but not

12   in the way the government suggests.  He tried to get this juror

13   explored whether this juror really meant that the government

14   would have to change his policy views, and the answer he got

15   was that, I could vote for it in a specific case or in a --

16   based on the facts of the specific case.

17        The fact that he can't offer hypotheticals about what

18   the case would look like, we haven't been allowed to ask for

19   hypotheticals on the other end of the spectrum, about what

06:56 20   sorts of terrorist bombings would cause a juror to vote for

21   life.  And the fact that he wasn't able to do that to the

22   government's liking is absolutely -- it not only is not a

23   grounds for disqualification, but it will be very unfair to

24   allow that to count as evidence in favor of the government's

25   motion and not us -- not allow us to ask the question of jurors

1    at the other end of the scale.

2           This was a juror in the -- at the end of the day who

3    got the distinction between having to change policy and having

4    -- on the one hand and having the government simply having to

5    show that the -- on the facts of the case the death penalty was

6    warranted, and he said he could be persuaded, which is where he

7    began with -- he classified himself as a "C" on Question 90 on

8    Page 24.  And he's a bright enough guy to understand what that

9    means.  And he's opposed to, but he could impose it if the

06:57 10   facts and the law in a particular case called for it.  That's

11   where we started with him, and that's where we ended up.

12          Like a lot of jurors, his mannerisms are not the same

13   as everybody else's.  He's a computer nerd and kind of talks

14   that way, but that should not be disqualifying either.  And we

15   think that he's clearly qualified and that it would be

16   *Witherspoon* error to rule otherwise.

17          THE COURT:  I think I'm going to review his transcript

18   as well because I do think the questioning got a little -- it

19   sounded a little bit like ships passing in the night sometimes,

06:57 20   and I just want to clarify that as I look at that.  So I want

21   to look at that.

22          And then Juror No. 55 was an agreed excuse, I believe.

23          MS. CLARKE:  And 57.

24          THE COURT:  And 57, after her examination, I think it

25   was agreed.

1          MS. CLARKE:  Judge, how many do you plan to call in on

2     --

3          THE COURT:  We're only going to do 20.  The pace is

4     such that -- I'm hoping that at some point it may accelerate

5     the more experienced everybody gets at this, but I don't think

6     it's realistic to have any more than 20 for Tuesday.  We'll

7     always be looking to increase the number as available.

8          MS. CLARKE:  I'm just asking.

9          THE COURT:  I think for Tuesday we're going to be

06:58 10    cautious.

11          MR. BRUCK:  Should we stagger when they come in?

12          THE COURT:  We thought about that.  I think that just

13    adds another administrative -- people get called in for jury

14    duty for a day, they can come and they get a free lunch.

15          MR. BRUCK:  For which there is no such thing.

16          MS. CLARKE:  For which they're appreciative but not

17    happy.

18          Judge, before you leave, could we re-raise the jury

19    data motion?

06:59 20          THE COURT:  It's something I have to talk to Jim

21    about.  Neither of us has had the time to do it.

22          MS. CLARKE:  I don't understand what you've been

23    doing.

24          THE COURT:  I'm aware that it's there.  We'll get to

25    it.

1          MS. CONRAD:  Judge.

2          MR. WEINREB:  You can go ahead.

3          MS. CONRAD:  I just wanted to make this part of the

4    record.  This is the CD we provided to the government.  It's of

5    the Matty in the Morning Show, the discussion of ████████

6    getting on the jury because we have asked that there will be

7    questions of those prospective jurors who listen to this show.

8          MR. WEINREB:  Your Honor, we would object to that

9    being made part of the record until some juror actually says

06:59 10   they listen to Matty in the Morning.

11          MS. CONRAD:  I think the Court should be aware of

12    what's in it so that we understand why we're asking questions

13    about them listening to Matty in the Morning.

14          THE COURT:  I'll listen to it.  I don't know what the

15    difference -- you want me to listen to it.  I don't know if

16    that makes it part of the record.

17          MR. WEINREB:  That, I have no objection to.

18          THE COURT:  I don't know what "part of the record"

19    means, what the implications are.

07:00 20         MS. CONRAD:  Fine, whatever.  Thank you.

21          MR. WEINREB:  Before the Court recesses for the day,

22    can we have one moment to confer with counsel?

23          THE COURT:  Yes.  Is there anything else

24    administratively we're going to talk about?  I think -- people

25    can correct me if I'm wrong, but I think our pool approach has

 1    quelled a rebellion.

 2              MS. CLARKE:  Right.

 3              THE COURT:  I think they're satisfied.

 4              MR. WEINREB:  Actually, another question we have is

 5    how many jurors are going to be brought in on Tuesday?

 6              MS. CLARKE:  Twenty.

 7              THE COURT:  Twenty.

 8              MR. WEINREB:  I'm sorry.  If we could just have one

 9    moment?

07:03 10    (Discussion held off the record.)

11              THE COURT:  The stenographer is wondering whether she

12    needs to stay here.  We're all done?

13              MR. WEINREB:  We're all done.

14              MS. CLARKE:  We're done.  Thank you very much.

15    (Whereupon, at 4:27 p.m. the trial recessed.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3              We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4       Dahlstrom, RMR, CRR, Official Reporters of the United States

5       District Court, do hereby certify that the foregoing transcript

6       constitutes, to the best of our skill and ability, a true and

7       accurate transcription of our stenotype notes taken in the

8       matter of Criminal Action No. 13-10200-GAO, United States of

9       America v. Dzhokhar A. Tsarnaev.

10

11      /s/ Marcia G. Patrisso
        MARCIA G. PATRISSO, RMR, CRR
12      Official Court Reporter

13

14      /s/ Cheryl Dahlstrom
        CHERYL DAHLSTROM, RMR, CRR
15

16
        Date:  January 16, 2015
17

18

19

20

21

22

23

24

25