UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )     Criminal Action
v.                            )     No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,        )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY ELEVEN**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, January 29, 2015
11:10 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3         Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6             By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
              By:  Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2  (The venire entered the room at 11:10 a.m.)

3        THE COURT:  Good morning, everyone.  Good morning,

4  ladies and gentlemen.  Thank you for being here on such a

5  terrible travel morning.  We appreciate the effort that you've

6  made to be here.

7        We're continuing with the process of selecting a jury

8  for the case of United States vs. Dzhokhar Tsarnaev.  As you

9  know, Mr. Tsarnaev is charged in connection with the bombing

02:16 10  that occurred near the finish line of the Boston Marathon on

11  April 15, 2013, that resulted in the deaths of three people.

12  He's also charged with the death of an MIT police officer and

13  other offenses occurring on April 18 and 19, 2013.

14        Some, but not all, of the crimes charged are, by

15  statute, potentially punishable by death.  You'll recall from

16  my prior instructions that the jury will first consider and

17  decide whether the government has proved Mr. Tsarnaev's guilt

18  of any or all of the charges against him.  If he is convicted

19  of any of the capital crimes, that is, crimes potentially

02:17 20  punishable by death, the jury will then consider and decide

21  whether he will be sentenced to death for any such crime or to

22  life in prison without possibility of release.

23        Some of you may have wondered why the death penalty

24  could be a possibility in this case in view of the fact that

25  the laws of Massachusetts do not provide the death penalty for

1    murder or any other violation of Massachusetts law.  The reason

2    is that this is a federal case involving alleged violations of

3    the laws of the United States rather than a state case

4    involving violations of the laws of Massachusetts.

5          If the jury convicts Mr. Tsarnaev of any of the

6    capital crimes charged in the Indictment, the same jury will

7    hear additional evidence after that verdict and decide on all

8    the evidence whether to sentence him to death or to life in

9    prison without the possibility of release.  So because the jury

02:18 10   that is selected to first decide whether the defendant is

11   guilty or not will also decide his punishment if he is

12   convicted, it is necessary to question you about your beliefs

13   or feelings about the death penalty as part of the selection

14   process.

15          Let me briefly explain the procedures that must be

16   followed in any case in which the death penalty is or may be an

17   issue.  As I said, as in any criminal trial, initially, the

18   government has the burden of proving that the defendant is, in

19   fact, guilty of any crime with which he is charged.  If he is

02:19 20   convicted of a crime for which the death penalty may lawfully

21   be imposed, there will be a second phase of the trial.  It's

22   sometimes referred in shorthand as the penalty phase.

23          In that phase, the government will introduce evidence

24   that seeks to prove beyond a reasonable doubt, first, that Mr.

25   Tsarnaev acted with sufficient intent to be subject to the

1    death penalty under the law; and, second, that aggravating

2    factors about the killings or about the defendant justify

3    sentencing him to death.  Aggravating factors are circumstances

4    that, if proven, make the crimes particularly serious or

5    blameworthy and, therefore, under the law may justify imposing

6    a more severe sentence on this defendant compared with other

7    persons who are convicted of intentional killing or murder.

8    The government will bear the burden of proving alleged

9    aggravating factors to every juror beyond a reasonable doubt.

02:20 10          The defense will have an opportunity to present

11   evidence of what it will argue are mitigating factors in the

12   case.  Mitigating factors are usually circumstances about the

13   crimes or the events or about the defendant's background or

14   character that would suggest that the death penalty is not the

15   appropriate sentence in the case or that life imprisonment

16   without the possibility of release is adequate as punishment

17   for the offenses.

18          Unlike the proof of aggravating factors, a mitigating

19   factor must be proved only by a greater weight of the evidence.

02:20 20   That is a less demanding standard of proof than proof beyond a

21   reasonable doubt.  Again, unlike the proof of aggravating

22   factors, mitigating factors do not have to be proven to the

23   satisfaction of all 12 jurors.  Any juror who finds or

24   determines that a mitigating factor has been proven by a

25   greater weight of the evidence may consider that factor in

1    deciding the appropriate sentence in the case regardless of

2    whether any or all of the other jurors agree that the

3    mitigating factor has been proven.

4            After the parties have made their presentations during

5    the penalty phase, the jury will weigh all the evidence.

6    Before a jury could vote to impose the death penalty, every

7    juror would have to be persuaded of certain threshold factors

8    that make the defendant potentially subject to the death

9    penalty.  They would have to be persuaded those factors have

02:21 10    been proven beyond a reasonable doubt, as I said.  In addition,

11    in order to impose the death penalty, every juror would have to

12    be persuaded that any proven aggravating factors sufficiently

13    outweigh any mitigating factors found by any juror or jurors so

14    that a sentence of death is justified.

15            Even if the jury does not find any mitigating factors,

16    it would still have to be unanimously persuaded that any proven

17    aggravating factors were sufficient to justify a death

18    sentence.  You should understand that a jury is never required

19    to find that a sentence of death is justified.

02:22 20            A decision whether the government has proved that a

21    defendant should be sentenced to death must ultimately be made

22    by each juror, himself or herself.  If, however, every juror is

23    persuaded that the death penalty should be imposed, I would be

24    required, as the trial judge, to sentence the defendant to

25    death.  In other words, I could not change the jury's decision.

1    The jury, and not the judge, is responsible for determining

2    whether a defendant who is convicted of a capital crime will

3    live or die.

4         What I've just described is only an overview of the

5    law applicable to a jury's consideration of the death penalty.

6    If you are selected to serve on this jury and if you find the

7    defendant guilty of a crime or crimes punishable by death, I

8    will give you very detailed instructions concerning your duties

9    in deciding whether to impose the death penalty or life

02:23 10   imprisonment without possibility of release and the law that

11   must be followed in making that decision.

12        As I mentioned when you filled out your questionnaires

13   a while ago, there are no right or wrong answers to any of the

14   questions that you have been asked or that you will be asked

15   today.  We're asking them because both the government and Mr.

16   Tsarnaev are entitled to a jury that does not have its mind

17   firmly made up one way or another before hearing the evidence

18   and a detailed explanation of the law.  That applies both to

19   whether the defendant is guilty or not guilty of the specific

02:24 20   crimes charged in the Indictment and, if he is convicted of a

21   capital crime, whether he should be sentenced to death or to

22   life in prison without possibility of release.

23        So today I'm going to follow up on the questionnaires

24   by questioning each of you individually regarding issues that

25   may be pertinent to the process of selecting a jury.  What

1   we're going to do is excuse you back to the room where you've

2   just been and ask you to come into the courtroom one by one to

3   ask those questions.  There will be some people in addition to

4   the lawyers and their staffs present in the courtroom during

5   the process, and these proceedings will also be simultaneously

6   transmitted by video and audio to overflow courtrooms where

7   there are other people watching and listening.

8           We will not identify you by name but rather by a

9   number, and you will be seated so that the video camera will be

02:24  10   behind you.  Your answers will generally be public, but if you

11   believe that a truthful answer would require you to reveal

12   sensitive personal information, we will temporarily stop the

13   audio feed to those courtrooms so that people observing there

14   will not be able to hear your answers.

15          Again, we do not expect or want any particular answer

16   to any questions.  All we want and what the law expects is that

17   you provide accurate and truthful answers to the questions

18   you're asked.  If you do that, you will be doing your duty as a

19   citizen and as a juror no matter what the answer may be.

02:25  20          Let me remind you about some of the prior

21   instructions.  As I told you before and emphasize again, a

22   jury's verdict must be based on the evidence produced at trial

23   and must be free from outside influence.  Therefore, I remind

24   you again it is extremely important that you do not discuss the

25   case, including the jury selection process, with your family,

1   friends, each other, or any other person until you've been

2   excused or, if selected as a juror, until the case concludes.

3          Again, of course, you're not to conduct any

4   independent research online or otherwise or to read, watch or

5   listen to reports about the case in the media that you are able

6   to avoid.

7          When you signed -- when you completed the

8   questionnaires, you signed after a statement that you were

9   making true answers to the questions in the questionnaire, you

02:26 10   made that affirmation under the pains and penalties of perjury.

11   You may recall that statement that preceded your signature.

12   Similarly, your answers here must be made under an oath or

13   affirmation that you will be answering truthfully, completely,

14   and to the best of your ability.

15          The clerk will now administer that oath to you so if

16   you'd all rise.

17   (Venire sworn.)

18          THE COURT:  Okay, jurors.  We'll ask you to withdraw

19   into the room, and we'll call you in one by one to continue the

02:27 20   process.

21   (The venire left the room at 11:20 a.m.)

22          THE COURT:  All set?  I guess we're on.

23          Good morning, everybody.  We had a slow start for

24   obvious reasons, I'm afraid.  Let's forge ahead.

25          THE CLERK:  Juror No. 204.

```
 1              THE JURY CLERK:  Juror 204.
 2              THE CLERK:  Ma'am, over here, please, if you would.
 3    Have a seat.
 4              THE COURT:  Good morning.
 5              THE JUROR:  Good morning.
 6              THE COURT:  I appreciate your patience.
 7              THE JUROR:  You're welcome.
 8              THE COURT:  I appreciate you being here on a lousy
 9    day.  Actually, the day is okay.  It's the travel that's lousy.
02:30 10         We're going to ask you some questions.  That's the
11    questionnaire that you filled out.  We'll ask you to follow
12    along with us on some of the questions.
13              Have you been able, since you were last here, to
14    follow my instructions and avoid my discussion of the case or
15    any exposure to media accounts?
16              THE JUROR:  Yes.
17              THE COURT:  We have a little personal family
18    information.  I see you have a brother who's in the Army at
19    Fort Hood, Texas.
02:30 20         THE JUROR:  Yes.
21              THE COURT:  How long has he been in the Army?
22              THE JUROR:  Three years.  He just signed on for
23    another three years, too.
24              THE COURT:  Does he have a specialty?
25              THE JUROR:  He is a sergeant.  He doesn't talk a lot
```

1    about it with me.  He's in the 238 Cav at West Fort Hood in

2    Texas.  He's at Fort Hood.

3              THE COURT:  Does he have any particular --

4              THE JUROR:  I'm not --

5              THE COURT:  -- assignment or anything that you're

6    familiar with?

7              THE JUROR:  Not that I know of.  He talks about it

8    with my mom but not to me.

9              THE COURT:  That's what I was going to ask.  Do you

02:31 10   text or tweet?

11             THE JUROR:  If I talk to him, it's usually about,

12   like, movies and stuff.  I don't really talk to him about what

13   he does.

14             THE COURT:  Okay.  And you're a medical secretary in a

15   medical office?

16             THE JUROR:  Yes, a urology office.

17             THE COURT:  We asked people about the use of social

18   media.

19             THE JUROR:  I put -- sorry, a lot.

02:31 20         THE COURT:  Yeah, you did.  Just tell us what you use.

21             THE JUROR:  Well, I have a friend in Brazil, so I use

22   Facebook just for communication.

23             THE COURT:  A friend where?

24             THE JUROR:  In Brazil, that I met at a concert.  So I

25   use Facebook, Twitter, but I don't go on it a lot.  I usually

```
 1    just follow a comedian, I think I put, too, on Twitter.  I just
 2    have accounts.  I don't -- Facebook, I sometimes go on but just
 3    to post pictures.  That's it.
 4             THE COURT:  And Twitter, you do -- you just follow
 5    somebody?
 6             THE JUROR:  Yeah, a comedian.  I follow a couple
 7    people, but I only really follow the comedian.
 8             THE COURT:  Actually, I see now in 32, your brother
 9    actually served in Afghanistan?
10    THE JUROR:  Yes.  I want to say it was a year or two
11    ago.  He was in Afghanistan for -- I want to says six months to
12    a year.
13             THE COURT:  You think he saw combat but aren't sure?
14             THE JUROR:  I believe he did.
15             THE COURT:  Okay.
16             THE JUROR:  I know he -- I know he got an award for --
17    a bomb went off, and he went and helped people.  He wasn't near
18    -- he was a football field away.  That's just what I heard from
19    my mom.  He doesn't talk to me about it.  My mom knows way more
20    than I do about -- I don't like to talk to him about that stuff
21    because it makes me nervous, so I kind of just talk to him
22    about normal stuff.
23             THE COURT:  It makes you nervous generally or it makes
24    you nervous because it's your bother?
25             THE JUROR:  Because he's my brother.
```

1           THE COURT:  He wasn't injured at all?

2           THE JUROR:  No, he wasn't injured at all.

3           THE COURT:  After that he was assigned as a

4    peacekeeper in Kosovo?

5           THE JUROR:  Yes.  He just got back in October, and now

6    he's back at Fort Hood.  So he should be there for at least as

7    long as he was in Kosovo, which was a year.

8           THE COURT:  Does he send you pictures or anything,

9    like, on Facebook or Instagram or anything?

02:33 10          THE JUROR:  He has a Facebook account so sometimes I

11   see pictures of him.  My mom looks at the 238 Cav Facebook

12   page, but I usually don't look at it.  Sometimes I'll see

13   pictures that mom shows me of him, like, in his uniform.  The

14   last picture I saw of him, he was at a ball for the military

15   and he --

16          THE COURT:  Dress uniform?

17          THE JUROR:  Yeah, dress uniform.

18          THE COURT:  I'm looking at Page 19, Question 70.  You

19   say you don't listen to radio much, but you rarely listen to

02:34 20   Kiss 108?

21          THE JUROR:  Yeah.  When there's a contest to win

22   concert tickets, I'll listen to the radio.  Normally, I just

23   listen to my iPod.  I don't like the radio.

24          THE COURT:  There's a particular show, I'm told, on

25   Kiss 108, Matty in the Morning.  Do you listen to that?

1          THE JUROR:  I've heard it once or twice, but I --

2     usually, on the way to work, I listen to my iPod.  The last

3     time I heard it was a couple months ago.  I don't listen to the

4     radio in the morning.

5          THE COURT:  Did you listen to it any time around the

6     time you filled out your questionnaire?

7          THE JUROR:  No, I haven't since.

8          THE COURT:  If you'd turn to Page 20, in Question 77,

9     we asked whether, based on things you'd seen or read in the

02:35 10    media or else-wise, you had formed any opinion about whether

11    the defendant is guilty or not and, if so, what punishment

12    might be appropriate.  We provided some choices, yes, no, and

13    unsure.  For each of those you checked "unsure."  Would you

14    tell us about that, why you checked that?

15         THE JUROR:  Yes.  I don't watch the news a lot, so I

16    don't really form opinions about stuff that's on the news.  The

17    only time I watch the news is if it's on when my parents -- in

18    the morning when I'm putting on my shoes.  So I wasn't sure

19    either way because I honestly don't watch the news.

02:36 20         THE COURT:  Did you watch news events around the time

21    of the events, the Boston Marathon itself; in other words, in

22    that week in April of 2013, were you tuned in?

23         THE JUROR:  Not tuned in.  I think I heard about it

24    when I was at work.  I think I saw, like, a little bit on TV,

25    but I didn't see enough that I'd -- you know, once I see

1    something on the news, I usually don't really follow it.

2         THE COURT:  Okay.  Well, if you're a juror in the

3    case, what we'll ask you to do is follow the principles that

4    govern in criminal prosecution, and that is, that any person

5    who is accused of a crime is presumed to be innocent of the

6    crime unless and until the government proves that he is guilty

7    by the evidence at trial and proves it beyond a reasonable

8    doubt.

9         So to the extent that people might have any

02:36 10   impressions beforehand, we ask them to set those aside and to

11   pay attention solely to the evidence produced at trial and to

12   concentrate on that and then decide the issues in the case

13   based on an evaluations of that evidence.

14        Would you be able to fulfill that duty faithfully if

15   you were a juror?

16        THE JUROR:  Yes, I believe so.

17        THE COURT:  There's nothing in your impressions or

18   mind that would interfere with that?

19        THE JUROR:  No.

02:37 20   THE COURT:  I'm now on Page 23.  Beginning with

21   Question 88, we asked a series of questions about attitudes

22   toward the death penalty in general and maybe more particularly

23   to this case.  So in Question 88 we asked the general question,

24   if you have any views, what are they.  And you said, "I believe

25   in the death penalty in certain circumstances, but it depends

1    on the crime and if guilty without doubt."  Of course, we only

2    get to the question of whether there's a death penalty if

3    someone has already been convicted beyond a reasonable doubt of

4    a crime for which the death penalty is possible, right?  You

5    understand that?

6              THE JUROR:  Yes.

7              THE COURT:  It's a given that the person has been

8    found guilty beyond a reasonable doubt in order to get to the

9    stage.

02:38 10         But when you said "depends on the crime," what were

11   you thinking of?

12             THE JUROR:  I wasn't really sure when I was answering

13   it because I believe in the death penalty, but I don't, like,

14   have certain circumstances that I would be able to -- at that

15   time I -- I'm not sure there are certain -- sorry.  It's really

16   bad.

17             THE COURT:  Relax.  Take a deep breath.

18             THE JUROR:  Okay.  So I think it all depends.  I'm not

19   sure if there's like -- if I'm one way or the other kind of

02:38 20   thing.  That's why I kind of --

21             THE COURT:  Let me -- is it something you've thought a

22   lot about or thought not very much about over the years?

23             THE JUROR:  Not very much about over the years.  When

24   I was -- when I was younger maybe because my great aunt was

25   murdered, so when I was younger, but not since then.

1          THE COURT:  Okay.  In the next question, 89, we asked

2     you to put yourself on a scale from 1 to 10, 1 being strongly

3     opposed, 10 being strongly in favor.  You selected 5.

4          THE JUROR:  Yeah, in the middle because I wasn't

5     either way.

6          THE COURT:  Okay.  On the next page, Question 90, we

7     asked you to -- rather than picking a number, to select a

8     statement that you thought came closest to describing your

9     feelings about the death penalty where someone has been proven

02:39 10     guilty of murder.  And you selected D.

11          THE JUROR:  The -- just, like, the middle one, I

12     think, again.

13          THE COURT:  It said you're not for or against it.  You

14     could vote to impose it or you could vote for life imprisonment

15     without possibility of release, whichever you thought was

16     called for by the facts and the law in that case.  Is that a

17     good summary of your --

18          THE JUROR:  Yes.

19          THE COURT:  And on Page 25, at the bottom, we asked,

02:40 20     if you found this defendant guilty and decided that the death

21     penalty was the appropriate punishment -- this is Question 95.

22          THE JUROR:  Okay.

23          THE COURT:  You found him guilty and you decided the

24     death penalty was the appropriate punishment, could you

25     conscientiously vote for the death penalty, and you put yes.

1          THE JUROR:  Yeah.  And I put yes for the second one,
2     too.
3          THE COURT:  The other side of it was, if you thought
4     that life imprisonment was the -- without possibility of
5     release was the appropriate punishment, could you
6     conscientiously vote for that, you said yes to that as well.
7          THE JUROR:  Yeah, because I was still on the unsure
8     part of it.
9          THE COURT:  Does that represent your frame of mind as
02:40 10    to the death penalty?
11          THE JUROR:  Yes, it does.
12          THE COURT:  Follow-up?
13          MR. WEINREB:  A few questions, your Honor.  Good
14     morning.
15          THE JUROR:  Morning.
16          MR. WEINREB:  My name is Bill Weinreb.  I'm one of the
17     prosecutors in the case.  If you don't mind, I wanted to follow
18     up on a few of the things in your questionnaire.
19          THE JUROR:  Sure.
02:41 20          MR. WEINREB:  You said earlier that you tend not to
21     watch the news or follow it unless it happens to be on.
22          THE JUROR:  Yeah.
23          MR. WEINREB:  Do you actively avoid the news?
24          THE JUROR:  I wouldn't say I -- well, I have a TV in
25     my room and it's a DVR, so everything I watch is usually

something that has been prerecorded.  The only time the news is

on in the living room is if my dad is watching it in the

morning and I'm putting on shoes.  But most of the time I'm in

my room or playing a game with my sister.  So I don't actively

avoid it.  I just don't tend to watch it.  Sorry.

MR. WEINREB:  I guess what I'm getting at is, is it

just that it really doesn't interest you compared to other

things you could be doing with your time, or is it that there

are things you don't want to see and you just as soon not see

them or --

THE JUROR:  It probably doesn't interest me because I

just don't follow it.

MR. WEINREB:  One of the reasons I ask is because

Question 87, that asks whether graphic photographs or videos

showing severe injuries and so on would affect your ability to

serve as a juror, and you wrote no.

Just to flesh that question out a little, the

government expects that the evidence in this case will include

graphic pictures and videos of people who have lost limbs and

been injured in other ways.

THE JUROR:  Okay.

MR. WEINREB:  I was -- just wanted to make sure that

that -- you wouldn't have trouble looking at that evidence and

considering it as part of the case?

THE JUROR:  I don't believe so, no.  I've watched --

1    not a lot of news things but movies and TV shows that have

2    been, and I haven't been -- it hasn't bothered me really.

3         MR. WEINREB:  Turning back to your brother for a

4    minute, you said he served some time in Afghanistan.  Is it

5    possible he will be sent back there or to Iraq or to that part

6    of the world?

7         THE JUROR:  I don't know.  It may be possible.  Again,

8    I don't talk with him about what he does.  I know he was --

9    yeah, he was in Kosovo for peacekeeping and now he's back, and

02:43 10   he signed on for another three years.  But however long he was

11   in Kosovo, he can stay in the states.  So I'm not sure, in the

12   future, if he would go back.  So it's possible.

13        MR. WEINREB:  Again, there may be some evidence in

14   this case -- you may hear evidence that one of the motives for

15   the crime was to punish America for the actions of its soldiers

16   in places like Afghanistan and Iraq.

17        THE JUROR:  Okay.  I didn't --

18        MR. WEINREB:  No, you would have no reason to know

19   that.

02:44 20        THE JUROR:  Okay.

21        MR. WEINREB:  I'm just letting you know that because

22   we're trying to find out just ahead of time whether hearing any

23   certain evidence would create such a reaction in you that you

24   would no longer be able to be a fair and impartial juror.  So

25   that's really the question, is, if you heard that kind of

1   evidence, would that interfere with your ability to be fair and

2   impartial, do you think?

3           THE JUROR:  Sorry.  I'm not sure just because -- I

4   don't think so just because I don't know what my -- I just know

5   he's in the Army.  And I kind of don't think of what he does

6   when he's over places.  I don't think so unless it was, like,

7   directly related to him maybe, like if I knew it was directly

8   him.

9           MR. WEINREB:  And then one last thing.  With respect

02:44 10  to the death penalty, you said that you could conscientiously

11   vote both to impose a sentence of death and a sentence of life

12   imprisonment depending on what the evidence showed.

13           THE JUROR:  Yes.

14           MR. WEINREB:  And I just want to ask you one question

15   about that, which is, if you were in a -- on a case like this

16   one, involving a crime that carried the death penalty and the

17   defendant was convicted of it, and you had to vote for the

18   death penalty or against the death penalty, you understand, of

19   course, that that wouldn't just be an abstract kind of

02:45 20  decision?  That would be a real --

21           THE JUROR:  Yeah.

22           MR. WEINREB:  -- permanent decision.  It would mean

23   that you would be sentencing somebody to death, and you could

24   never change that decision.

25           THE JUROR:  Yes, yeah.

1          MR. WEINREB:  Do you believe that in a real-life

2    situation you could actually do it, sentence someone to death?

3          THE JUROR:  I am not sure.  I believe I could with all

4    the evidence and everything.  I'm not sure to that answer.  I'm

5    sorry.

6          MR. WEINREB:  Say more.  Why aren't you sure?  What's

7    the source of your doubts?

8          THE JUROR:  Just -- well, I'm nervous right now.  I

9    know it would be a hard decision, so that's why I'm unsure

02:46 10   right now because I know it's a really big decision.

11          MR. WEINREB:  I think for anybody it would be a hard

12   decision.

13          THE JUROR:  Yeah.

14          MR. WEINREB:  So that's understandable.  But let me

15   probe a little more because you say you're nervous now just

16   thinking about it.  When the time comes, if the time comes,

17   you'll actually -- can you -- do you think you might be so

18   nervous or so anxious about it that it would prevent you from

19   being able to do it the way you think you ought to be able to?

02:47 20         MS. CLARKE:  Your Honor, a juror never has to impose a

21   sentence of death, and it seems like that's what Mr. Weinreb is

22   trying to get this juror --

23          THE COURT:  Why don't you rephrase to avoid that

24   suggestion.

25          MR. WEINREB:  If you came to -- if it were a real-life

1    situation and the trial had ended and you'd heard all the

2    evidence, the defendant had been found guilty, and now there's

3    been a penalty phase and you've heard more evidence, and now

4    you're back deciding whether to sentence a defendant to life or

5    death, and you think the evidence justifies a sentence of

6    death, but you've actually got to do it, you've got to make --

7    you've got to -- could you do it, or do you think that, despite

8    feeling the evidence justified it, it would be so emotional a

9    thing, so big a thing, that you couldn't -- wouldn't be able to

02:47 10   do it?

11              MS. CLARKE:  Same objection, your Honor.

12              THE COURT:  No.  Go ahead.  You can answer that.

13              THE JUROR:  If I was really -- like, I thought it was

14   justified, then I believe I could.  If I really at the end

15   thought it was, then I could.  But it could go either one.  You

16   know, like -- I don't really know at this point.

17              MR. WEINREB:  Nobody --

18              THE JUROR:  Sorry.

19              MR. WEINREB:  I'm not asking you to predict how you

02:48 20   would vote in any case, let alone this case, just whether you

21   could actually do it.

22              MS. CLARKE:  I think she answered that.

23              THE COURT:  I think it's been answered.  Anything

24   else?

25              MR. WEINREB:  No.

```
 1              THE COURT:  Miss Clarke.
 2              MS. CLARKE:  Good morning.  I'm Judy Clarke.  I'm one
 3       of the lawyers for Mr. Tsarnaev.  I'm glad you made it in with
 4       the snow.
 5              THE JUROR:  Oh, yes.  Thank you.
 6              MS. CLARKE:  It sounds like your mom might be a source
 7       of information for you about your brother.
 8              THE JUROR:  Yes.
 9              MS. CLARKE:  Does she tell you all about his
02:48 10     activities overseas and his activities at Fort Hood?
11              THE JUROR:  No.  I know she knows more than I do.  She
12       doesn't usually tell me a lot about my brother.
13              MS. CLARKE:  Why is that?
14              THE JUROR:  I don't ask, I think is probably the
15       answer to that.  I don't dig into what's happening.  I just
16       kind of will talk to him about other stuff.  I don't like
17       thinking about it.
18              MS. CLARKE:  You don't like thinking about it because
19       why?
02:49 20             THE JUROR:  He's my little brother.  I'm nervous for
21       him.
22              MS. CLARKE:  Oh, okay.
23              THE JUROR:  Right now he's in Texas.  He's -- I just
24       get nervous about him just because he's my youngest brother --
25       younger brother.
```

           1              MS. CLARKE:  You mentioned several times today being
           2    nervous, and I'm sure --
           3              THE JUROR:  No.  Lots of people -- lots of people in
           4    one room kind of makes me really anxious.
           5              MS. CLARKE:  It does a lot of folks.  You mentioned in
           6    your questionnaire that -- if I can ask you to look at Question
           7    21.
           8              THE JUROR:  Question 21.
           9              MS. CLARKE:  On Page 8.  I'm sorry.  We've gotten used
02:50  10    to where all these questions are.
          11              THE JUROR:  Yes.
          12              MS. CLARKE:  Is there anything about the -- that
          13    condition that would cause you a problem sitting as a juror in
          14    the case?
          15              THE JUROR:  It's usually talking in front of a lot of
          16    people.  Like, at work, when I first started, I was, you know,
          17    quiet.  But even with the patients in the office, I usually am
          18    more out -- once I get comfortable, then it goes away.
          19              MS. CLARKE:  Then it's okay.
02:50  20              THE JUROR:  But right now it's really bad because so
          21    many people.  Sorry.
          22              MS. CLARKE:  Just wanted to make sure you felt at
          23    ease.
          24              THE JUROR:  Yeah.  It's usually the beginning of
          25    stuff, and then usually, after, it goes down.

1          MS. CLARKE:  And then you settle in?

2          THE JUROR:  Yes.

3          MS. CLARKE:  The judge asked you about how you got

4     your news about the Marathon bombing, and you mentioned that

5     you heard about it at work.

6          THE JUROR:  Yes.  One of the girls, on her phone,

7     heard about it.  We have a TV in the patient waiting area.

8          MS. CLARKE:  Okay.

9          THE JUROR:  I didn't watch it, but I heard from her

02:51 10   about it.

11         MS. CLARKE:  Did your mom talk to you about it?  Did

12    you get any information that way?

13         THE JUROR:  Not that I know of.  I know, like, after I

14    had seen a little bit on TV, because it was on the shows that I

15    usually watch, but I don't -- I don't think we discussed it

16    that much, I mean, what happened but not to the -- just about

17    what happened.  I don't -- see, I don't remember.  I'm sorry.

18    We didn't talk about it a lot.

19         MS. CLARKE:  Okay.  So you don't have many details?

02:51 20        THE JUROR:  No.

21         MS. CLARKE:  Could I just have one second?

22         THE JUROR:  Sure.

23         MS. CLARKE:  Did your parents say anything about you

24    being summonsed to come down to be on the jury?

25              THE JUROR:  No.  It was just that -- they knew I was

1    really nervous about going down by myself, so it was mostly

2    about nerves.  And then I have a state one, too, so I thought

3    it was weird that I was getting two of them.

4            MS. CLARKE:  You've gotten summonsed twice?

5            THE JUROR:  Yeah, because I moved the state one last

6    year to this April because I was nervous.  So, of course, then

7    I get another one.  So it was, like, of course, only me would

8    get two.

9            MS. CLARKE:  You're on a roll?

02:52 10         THE JUROR:  Yes.

11           MS. CLARKE:  Okay.  Could I have just one second?

12           THE JUROR:  Sure.

13           MS. CLARKE:  Thank you very much.

14           THE COURT:  Thank you.  Just leave the questionnaire

15   there.  Thanks.

16           THE CLERK:  Juror No. 205.

17           THE JURY CLERK:  Juror 205.

18           THE CLERK:  Sir, over here, please, if you would.

19   Please have a seat.

02:53 20         THE COURT:  Good morning.

21           THE JUROR:  Good morning.

22           THE COURT:  Thank you for being here on a tough travel

23   day.

24           That's the questionnaire that you filled out.  We're

25   going to follow up on some of the questions, so you may refer

1    to it as we do.

2         First of all, let me just ask if you've been able

3    since your last time here to follow my instructions to avoid

4    discussing the subject matter of the case and to avoid any

5    avoidable media accounts of anything that's going on.

6              THE JUROR:  Yes.

7              THE COURT:  Tell us about your work life.

8              THE JUROR:  Well, I'm an engineer.  I work here in

9    Cambridge, actually.  And I design computer control systems and

02:54 10   navigation systems, and I've been doing that kind of work for

11   over 30 years.

12             THE COURT:  With the same company?

13             THE JUROR:  I've been with the company I'm with now --

14   should I give you the name of the company?

15             THE COURT:  It's up to you.  We know what it is

16   because it's in your question --

17             THE JUROR:  Draper Labs.  I've been there for 25

18   years.  I've worked for a couple other aerospace companies

19   before that so --

02:54 20             THE COURT:  Okay.  I guess we asked you whether you'd

21   written -- whether you're a published or unpublished author.

22   You've written a number of technical papers.

23             THE JUROR:  That's correct.

24             THE COURT:  Otherwise, no publications?

25             THE JUROR:  No.

1          THE COURT:  Social media, you use Facebook a little

2    bit for social --

3          THE JUROR:  Yeah.  I use it to be able to look at my

4    niece's children's pictures and things like that, but I

5    actually don't post anything on any kind of social media.  In

6    fact, I'm sort of suggested that I don't do that for the kind

7    of work that I do.

8          THE COURT:  Okay.  So let me ask you to turn to Page

9    20.  In Question 77, we asked people to tell us whether they

02:56 10    thought they had formed an opinion based on things that they'd

11    seen in the news or otherwise seen or heard about whether the

12    defendant was guilty or not, and if so, what penalty might be

13    imposed and, if they had formed an opinion, whether they

14    thought they would be able to put that aside if they were

15    called to be a juror and judge the questions presented on the

16    evidence in the case and not on pretrial information.

17          So you indicated that you had formed an opinion about

18    guilt and were unsure about the penalty, but you thought you

19    would be able to set aside any preconceived opinions and decide

02:56 20    the case based on the evidence.

21          THE JUROR:  Yes.  I think I could do that, yes.

22          THE COURT:  You understand -- you've served as a juror

23    before, but I think it was in a civil case, correct?

24          THE JUROR:  Correct.  It was a medical malpractice.

25          THE COURT:  You haven't had experience as a juror in a

1    criminal prosecution?

2            THE JUROR:  No.

3            THE COURT:  You understand, I presume, that in a

4    criminal prosecution anybody accused of a crime is presumed to

5    be innocent unless the government proves that the person is

6    guilty of what's charged by the evidence at the trial and

7    proves that proposition beyond a reasonable doubt.  So the

8    burden is always with the government to prove guilt.  A

9    defendant never has any burden or responsibility to prove that

02:57 10   he's not guilty.  It's not a question of which side has

11   persuaded me.  It's has the government persuaded me that this

12   person is guilty.

13           Do you understand that those are the principles that

14   we apply in our criminal justice system?

15           THE JUROR:  Yes.

16           THE COURT:  Would you be in the frame of mind to

17   faithfully and properly apply those principles if you were a

18   juror in this case?

19           THE JUROR:  Yes.

02:57 20   THE COURT:  You did note in Question 78, if you take a

21   peek, that based on news reports you'd seen, you said it was

22   hard to imagine that he was completely innocent.

23           THE JUROR:  Yes.  I've been watching all the news, and

24   there was plenty of coverage.  There were certainly some facts

25   that seemed to be revealed that were pretty compelling.

```
 1              THE COURT:  Could you -- but you're telling us now
 2     that you think you could compartmentalize that somehow or put
 3     it away that you wouldn't --
 4              THE JUROR:  I think as well as anyone unless, you
 5     know, you had not had any exposure to this case at all.  I
 6     don't think there are very many people that are in that
 7     situation so --
 8              THE COURT:  Page 21, we asked a couple of questions
 9     about whether you were perhaps personally affected by events.
02:58 10     You said you knew some people at work who were asked to shelter
11     in place, but they weren't close friends.  Earlier you
12     indicated you work in Cambridge.  Were you asked to -- were you
13     there on that day when --
14              THE JUROR:  No, I was home.  I live in Middleboro,
15     Massachusetts, 50 miles away, and I -- let's see.  The shelter
16     in place was the next -- was a Friday.
17              THE COURT:  Friday, right.
18              THE JUROR:  No.  I was at work on the day of the
19     Marathon.  I came home early just to avoid some of the traffic
02:59 20     situations and so on.
21              THE COURT:  Before the --
22              THE JUROR:  No, no.  It was -- it was after.  I knew
23     that something had happened.  I didn't really know much about
24     it, but it was clear that there were going to be some problems
25     with -- I take the subway and the train and so on.  And we were
```

1   advised that that would possibly be disrupted, and a couple of

2   the stations on the red line were closed.  I went home.  And

3   then on the Friday with the shelter-in-place situation, I heard

4   that on the news and never went in to work that day.

5          THE COURT:  So, in other words, you -- having heard it

6   on the news, you decided not to go in?

7          THE JUROR:  I stayed home.

8          THE COURT:  I see.

9          THE JUROR:  I believe the MBTA was closed.

02:59 10        THE COURT:  With respect to the 15th, Patriots' Day

11   itself, you went home early?

12          THE JUROR:  Yup, yup.

13          THE COURT:  Because you heard of the event?  In other

14   words, you went home earlier than you would have because the

15   events occurred?

16          THE JUROR:  Yeah, not significantly, but I think I

17   took an hour early train that I normally take.  I was concerned

18   about traffic problems and T interruptions and so on.

19          THE COURT:  So at Page 23, we asked a series of

03:00 20   questions about attitudes toward the death penalty, beginning

21   with Question 88.  And that question asked about general views.

22   And you said you had no strong feelings either way.  Does that

23   accurately --

24          THE JUROR:  That is accurate.

25          THE COURT:  In the next question we asked you to put

1    yourself on a scale from 1 to 10, 1 being strongly opposed to

2    the death penalty, 10 being strongly in favor.  You selected 6.

3    Can you tell us why that was the right number for you?

4            THE JUROR:  Well, you know, I guess 5 would be right

5    in the middle, right?  And that would be completely neutral on

6    it.  So I'm just showing just a slight favoritism toward having

7    the death penalty.  But I do not have strong feelings about

8    this.  I guess I would say that there certainly has been a

9    national debate on the subject of the death penalty and

03:01 10  certainly there are a lot of people feel strongly that there

11   shouldn't be one and there are other people that feel that

12   there should be.  And I have not formed a strong opinion one

13   way or the other on the subject.

14           And I think I wrote in another part of the

15   questionnaire that in some ways I think, you know, life in

16   prison may be a more serious punishment than the death penalty.

17   It certainly would give an individual a very long period of

18   time to contemplate things and see the missed opportunities in

19   their life so --

03:02 20          THE COURT:  Okay.

21           THE JUROR:  Those are my thoughts.

22           THE COURT:  I think the question you are referring to

23   is on Page 25.  It's Question 93.  You may want to just --

24           THE JUROR:  25?

25           THE COURT:  Page 25, Question 93.

```
 1                THE JUROR:  Okay.

 2                THE COURT:  Just want you to review your answer there.

 3                THE JUROR:  Right.  Okay.

 4                THE COURT:  Beyond what you've already said, anything

 5      else you want to add to that answer?

 6                THE JUROR:  I think that covers my thoughts on it.

 7                THE COURT:  Let's go back a page, to 24.  And Question

 8      90, here, unlike 89 where we asked a numerical scale, we asked

 9      you to indicate which statement of a series of proposed

03:03 10      statements best described your feelings about the death penalty

11      in a case where someone had been convicted of murder.  You

12      selected D.  It says, "I'm not for or against the death

13      penalty.  I could vote to impose it or I could vote to impose a

14      sentence of life imprisonment without possibility of release,

15      whichever I believed was called for by the facts and the law in

16      the case."  Is that an accurate summary of your view?

17                THE JUROR:  That is accurate, yes.

18                THE COURT:  Then again to 25 and the bottom of the

19      page, Question 95, getting a little more particular, we asked

03:03 20      whether, if you found this defendant guilty and you considered

21      the death penalty was an appropriate punishment, could you

22      conscientiously vote for the death penalty?  And you wrote

23      "yes," or you checked the box "yes."

24                THE JUROR:  Right.

25                THE COURT:  The next question, on the next page, we
```

asked the reciprocal question basically.  If you found the

defendant guilty and you decided life imprisonment without the

possibility of release was the appropriate punishment for him,

could you conscientiously vote for that penalty?

THE JUROR:  Yes, I could.

THE COURT:  You said yes there, too, as well.

Finally, just because you have it here and we're

looking at it, Question 98, you indicated you have in the past

run the Boston Marathon once.

03:04 THE JUROR:  Yup.

THE COURT:  But it's been awhile.  Do you have any

particular feelings about the Marathon, affinity or anything,

that would interfere with your ability to be an impartial juror

in this particular case?

THE JUROR:  I don't think so, no.  I mean, I ran the

race, and I think it's a great race, but it's not -- wouldn't

influence any thinking on this case in any way.  I just -- I

only mentioned it because I think that it gives me maybe a

little bit more insight into what some of the runners were

03:05 faced with and so on at the time if that's at all relevant in

this case.  I don't know that it is, but I experienced the

race.

THE COURT:  Okay.

MR. WEINREB:  Good morning.

THE JUROR:  Good morning.

 1          MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

 2     prosecutors in the case.  I just wanted to follow up on one of

 3     your answers if I could.

 4          THE JUROR:  Okay.

 5          MR. WEINREB:  So one of the obligations of a juror

 6     when you step into a jury box in a criminal trial is to presume

 7     that the defendant is innocent.

 8          THE JUROR:  Yes.

 9          MR. WEINREB:  And to acquit him, to find him not

03:05 10     guilty, unless and until the government proves that he's guilty

11     beyond a reasonable doubt.

12          THE JUROR:  Yes.

13          MR. WEINREB:  Can you apply those principles?

14          THE JUROR:  Yes, of course.

15          MR. WEINREB:  You understand that that means that, if

16     the government doesn't offer enough evidence to prove him

17     guilty beyond a reasonable doubt, you can't fill in what you

18     heard in the courtroom with stuff you may have heard outside

19     the courtroom?

03:05 20          THE JUROR:  I do understand that.

21          MR. WEINREB:  Do you understand that?

22          THE JUROR:  Yes.

23          MR. WEINREB:  The case has to be decided just on the

24     evidence produced in court.  Are you able to do that?

25          THE JUROR:  Yes.  I remember from the other trial that

```
 1    I participated in, this medical malpractice, I believe the
 2    judge described it as a brick by brick establishing the case.
 3    And that's what I would expect that you would have to do in
 4    this case, lay out all the evidence in a very convincing
 5    fashion, and that would be the way the case is decided.
 6              MR. WEINREB:  Okay.  And no bricks can come from
 7    outside the courthouse.
 8              THE JUROR:  No.
 9              MR. WEINREB:  From what you've heard in the news or
10    anything like that, you understand that?
11              THE JUROR:  Right.  Right.
12              MR. WEINREB:  You understand the defense has no
13    obligation to put on any evidence or to do anything?  It's
14    totally on the prosecution to prove to you that he's guilty.
15              THE JUROR:  I do understand that.
16              MR. WEINREB:  Thank you.
17              THE COURT:  Mr. Bruck.
18              MR. BRUCK:  Good afternoon.
19              THE JUROR:  It is afternoon.
20              THE COURT:  It's changed while you've been here.
21              MR. BRUCK:  By one minute.  Time flies when you're
22    having fun.
23              I'm David Bruck.  I'm one of Jahar Tsarnaev's
24    attorneys.  I don't have a great deal to ask you, but I want to
25    follow up on a few things you were asked about.
```

```
 1              You checked the little box that said you're a
 2      supervisor or you have supervisory --
 3              THE JUROR:  Yeah.  We change projects all the time.  I
 4      worked various projects where I was responsible for running the
 5      project and assign people tasks and so on and monitor their
 6      progress.
 7              MR. BRUCK:  Of course, in a jury, you have 12 equal
 8      people even though some are much more educated and much more
 9      used to leadership than others.  I think maybe you can see
10      where my question is going.  Do you think you could respect the
11      ability of everybody else to have their say?
12              THE JUROR:  I would say, in my role as an engineering
13      supervisor, it's more a collaboration than a directing people,
14      fortunately or unfortunately, depending on how you want to look
15      at it.  I find you have to build consensus to do things.  It
16      isn't just a matter of asking people to do things your way and
17      they do it.  So I understand the jury would have to reach a
18      consensus by some sort of a process of deliberation where
19      everyone's opinion is considered.
20              MR. BRUCK:  And at the penalty phase, do you -- have
21      you pieced together from -- you haven't had full instructions,
22      but the judge has outlined how the system goes.  In the end, no
23      one is ever required to vote for the death penalty.  The vote
24      has to be unanimous if it's going to be imposed.  But so long
25      as the basic requirements have been met to consider the death
```

```
 1   penalty, it becomes a judgment of each individual juror.  In
 2   that sense, it's not really consensus.  Each juror has to make
 3   their own decision.  Could you do that?
 4           THE JUROR:  It's a unanimous decision that's required.
 5           MR. BRUCK:  It would need to be unanimous to impose
 6   the death penalty.
 7           THE JUROR:  Yup.
 8           MR. BRUCK:  And I guess that's really where I was
 9   going with the question.  Could you both do that yourself and
10   respect the --
11           MR. WEINREB:  I object, your Honor.  Part of what
12   happens in the jury box is jurors try to convince one another
13   of an outcome.  That's an appropriate thing to have happen.
14           THE COURT:  Right.  Why don't you start again.  Let's
15   back up.
16           MR. BRUCK:  Okay.  I guess, in the penalty phase of a
17   capital case, so long as some basic facts have been established
18   that allow the jury to consider the death penalty, then each
19   juror has to make their own decision.  It really -- it involves
20   not only facts but also rights -- a sense of right and wrong
21   and what's fair, which might well vary from one juror to the
22   next.  I guess my question is whether you would -- could make
23   that moral judgment for yourself?
24           THE JUROR:  Well, I certainly guess everything about
25   this has been -- I can only express my decision, my opinion,
```

 1    and I can certainly talk with other people and try to persuade

 2    them that if they think that -- differently, but I -- I

 3    certainly -- it doesn't sound like I have any choice in the

 4    matter but to accept the fact that it requires a unanimous

 5    decision, and that's the way it is.  I can live with that.

 6         MR. BRUCK:  Okay.  Staying with the death penalty for

 7    a minute, you may have noticed -- I don't want to hurt

 8    anybody's feelings here, but some of these questions are not

 9    very precise on the questionnaire.  And I want to look at one

03:10 10    of the important ones.  Question 77.

11         THE COURT:  It's on Page 20.

12         MR. BRUCK:  On Page 20, asked whether you had formed

13    an opinion, and you checked the box for "yes," guilty and not

14    guilty, "no"; and then C, you checked "unsure" and then

15    "unsure" for D.  When you checked "unsure" about the sentence,

16    did you mean to say that you were unsure whether you had an

17    opinion or unsure whether he should receive the death penalty?

18    You see the distinction?

19         THE JUROR:  No.

03:11 20         MR. BRUCK:  Well, the question was:  Have you formed

21    an opinion that he should receive the death penalty?  Yes, no,

22    unsure.

23         THE JUROR:  I have not formed an opinion on whether he

24    should receive the death penalty.

25         MR. BRUCK:  Okay.  So you're not really unsure that --

1    whether you'd formed an opinion.  You had not formed an

2    opinion.  You see what I mean?  The problem is in the question

3    and the way -- but I just want to make sure we're on the same

4    page.

5              THE JUROR:  Okay.  Still not sure that I'm on the same

6    page with you.

7              MR. BRUCK:  Well, I think you've answered what I was

8    looking for.

9              Have you thought about that question?

03:12 10              THE JUROR:  Well, first of all, like I said, we have

11    to establish guilt in this, and then we have to go through the

12    process of determining the appropriate sentence.  And I think

13    I've stated before that I do not have a strong opinion about

14    whether the death penalty is the -- is a reasonable thing to do

15    or not, and I don't -- I think it could be imposed, but I have

16    not spent enough time really soul-searching on the topic to

17    have come to a strong conclusion about how I feel about the

18    topic in general.  And in this case, I have no thoughts about

19    it at all.  I think that would be premature at this point to

03:13 20    try to figure out the sentencing.

21              MR. BRUCK:  Okay.  Do you see why I'm asking?  Some

22    people talk about it in the community, think about it, come

23    down one way or the other even though they don't know for sure,

24    but they know where they stand now.  I'm just wondering,

25    understanding that you haven't reached a final decision --

1          MR. WEINREB:  Your Honor, I object.  That was really

2    thoroughly asked and answered already.

3          THE COURT:  I think it has been.  I agree with that.

4          MR. BRUCK:  You mentioned your wife a couple points in

5    the questionnaire.  Has she talked to you about the --

6    expressed any opinion?

7          THE JUROR:  I don't think we have talked about my wife

8    yet, but the -- she hasn't expressed a strong opinion about it.

9    Obviously, she knows that I'm here today and what this is

03:13 10   about.  She hasn't done anything to try to influence me in any

11   way or say, Yeah, yeah, you've got to do this or you've got to

12   do that.  It's -- you know, she's neutral on it, I think.

13         MR. BRUCK:  Do you mind if I ask you whether she has

14   said how she feels without trying to influence you but just

15   saying where she stands?

16         MR. WEINREB:  I object.

17         THE COURT:  Yeah.  I think we'll limit it to the

18   juror.

19         MR. BRUCK:  Has anybody expressed their opinion to you

03:14 20   about either guilt or innocence or what punishment should be

21   inflicted that you can recall?

22         MR. WEINREB:  I object.  It's not a follow-up

23   question.

24         THE COURT:  I think so.  I agree.

25         MR. BRUCK:  Okay.  You see why I'm asking you these

```
 1   questions?

 2            MR. WEINREB:  Objection.  That's not a follow-up

 3   question.

 4            THE COURT:  It doesn't matter whether he does.

 5            MR. BRUCK:  I guess my last question is just:  Do you

 6   think there's anything -- this is our last chance, Judge

 7   O'Toole's last chance, to know what's inside.  And you're the

 8   only one who knows.

 9            THE JUROR:  Okay.

10            MR. BRUCK:  Is there anything else that the judge

11   ought to know, that we ought to know, about your feelings about

12   this case?

13            THE JUROR:  I feel like I've sort of stated my

14   position on this pretty clearly, and I'm not -- there's nothing

15   else that I can think of that I could say that would add to

16   that.

17            MR. BRUCK:  Very good.  Thank you so much.

18            THE COURT:  Okay.  Thanks.  Just leave the

19   questionnaire there.

20            THE CLERK:  Juror No. 208.

21            THE JURY CLERK:  Juror 208.

22            THE CLERK:  Sir, over here, please.  Have a seat if

23   you would.

24            THE COURT:  Good afternoon.

25            THE JUROR:  How you doing?
```

```
 1              THE COURT:  Thanks for being here on a tough day.
 2              Since you were here last, have you been able to follow
 3      my instructions to avoid any discussion of the substance of the
 4      case?
 5              THE JUROR:  Tried my best, yeah.
 6              THE COURT:  Avoid any avoidable news accounts or
 7      media?
 8              THE JUROR:  Yeah, definitely.
 9              THE COURT:  So we have -- that's the questionnaire
03:17 10     that you filled out.  We're going to follow up on some of the
11      questions.  I want to start actually on Page 4, Question 6.
12      You were born and raised in People's Republic of China.  We
13      asked for your citizenship and you said "PRC."  Are you a U.S.
14      citizen?
15              THE JUROR:  I might have answered that wrong.  But,
16      yes, my parents were naturalized when I was under 18.
17              THE COURT:  So you have derived citizenship through
18      your parents.
19              THE JUROR:  I was sworn in at Faneuil Hall.
03:17 20     THE COURT:  When was that, do you know?
21              THE JUROR:  Fourth grade so --
22              THE COURT:  That gives me an idea, awhile ago.  So
23      that was an error when you put citizenship PRC?
24              THE JUROR:  Yeah, sorry about that.
25              THE COURT:  Wanted to clear that up.
```

1          Can I ask you, on Page 7, your father is a physician.

2          THE JUROR:  Correct.

3          THE COURT:  Where does he practice?

4          THE JUROR:  Mass. General.

5          THE COURT:  How long has he been there?

6          THE JUROR:  He's been there since early 2000, since

7     his residency.

8          THE COURT:  Okay.  Was he -- some of the people

9     injured in the Marathon bombing were treated at Mass. General

03:18 10    after the event.  Was he involved in that at all?

11         THE JUROR:  Not to my knowledge, he was not.

12         THE COURT:  Do you know whether he was on duty that

13    that day or at the hospital?

14         THE JUROR:  He was working definitely, but I'm not

15    sure if he worked on any of the critical cases that came in

16    that day.

17         THE COURT:  Has he talked to you about that day, what

18    it was like at the hospital?

19         THE JUROR:  No.  I think he has cases that are

03:18 20    ordinarily scheduled, and he did what he had to do that day.

21         THE COURT:  Where is his sort of office practice?  Is

22    it part of the complex there?

23         THE JUROR:  His clinic or --

24         THE COURT:  Yeah, where he would see patients on a --

25         THE JUROR:  55 Fruit Street, the main campus of Mass.

```
 1   General.
 2          THE COURT:  One of the main buildings?
 3          THE JUROR:  Yeah, exactly.
 4          THE COURT:  Tell us a little about -- when you were an
 5   undergraduate, you took a course in Modern Trends in Islam?
 6          THE JUROR:  Oh, yeah.
 7          THE COURT:  Tell us a little bit about that.
 8          THE JUROR:  I went to Union College, which is a pretty
 9   typical northeastern liberal arts school, and I felt that, you
03:19 10  know, religious studies was a good way to get -- was a good
11   interdisciplinary, pretty solid liberal arts thing, a little
12   bit of English, philosophy, history, and all that.  So my
13   thesis was on Modern Trends in Islam.  Hit on some, like, stuff
14   that -- big topics, Islamaphobia in the U.S., Islamic finance.
15   I also had an econ minor.  It was pretty interesting to go
16   through that exercise.
17          THE COURT:  Since then have you continued an interest
18   in Islam?
19          THE JUROR:  Nothing more than like a cursory article
03:20 20  here or then but --
21          THE COURT:  For example?
22          THE JUROR:  Like, the news, not like -- for free
23   reading, I don't really delve into, like, textbooks.
24          THE COURT:  Did you study Islamic jurisprudence at
25   all?
```

1          THE JUROR:  A little bit, yeah, sharia law.  Most of

2     it was on Islamic finance, how they have profit-sharing

3     agreements, all that, instead of charging interest.

4          THE COURT:  Tell us about your day-to-day work.

5          THE JUROR:  I'm actually transitioning.  I work at

6     State Street Corporation, and I'm moving into a role in risk.

7     So I'm actually off for two weeks right now.

8          THE COURT:  What does the transition mean for you in

9     terms of --

03:21 10          THE JUROR:  I'm just hanging out, studying as much as

11     I can about my new role.

12          THE COURT:  No.  I mean, how much will your day-to-day

13     change?  Different subject matter, is that all?

14          THE JUROR:  Yeah, exactly, same company, different

15     group.

16          THE COURT:  Same place?  Different building?

17          THE JUROR:  Different building.  I'll at One Lincoln,

18     Street, the flagship building.

19          THE COURT:  If you were a juror on this case, would

03:21 20     that interfere with your transition?

21          THE JUROR:  No.  Might make my manager unhappy, but

22     other than that, I think we're fine.

23          THE COURT:  We ask -- this is on Page 11, top of the

24     page, 30, about your social media use.  Can you tell us a

25     little bit?  I take it that's Facebook and Instagram?

```
 1              THE JUROR:  Yeah.  Nothing more than just a cursory,
 2       like, scan through the news feed, wishing a friend happy
 3       birthday, maybe a strong acquaintance a happy birthday.  But I
 4       don't, like, run my own blog or anything or post long statuses
 5       every day.  A pretty casual user, I'd say.
 6              THE COURT:  So let me ask you to turn to Page 20.  I
 7       want to look at Question 77.
 8              THE JUROR:  Of course.
 9              THE COURT:  In this question we asked whether you had
10       as a -- because of something you'd seen or read in the
11       newspaper or otherwise learned, whether you'd formed an opinion
12       about whether the defendant was guilty or not.
13              THE JUROR:  Uh-huh.
14              THE COURT:  And also whether you had an opinion about
15       whether he should or should not receive the death penalty.  And
16       you -- we gave you the choice, yes, no or unsure.
17              THE JUROR:  Sorry.  That was pretty --
18              THE COURT:  Then we asked further that, if you
19       answered yes to any of the questions, would you be able or
20       unable to set aside your opinion and base your decision about
21       those matters based only on the evidence that might be
22       presented in court.  So you did indicate, I guess, yes, that
23       you had an opinion about whether he was guilty.
24              THE JUROR:  Yeah.
25              THE COURT:  It appears from the cross-out on the form
```

```
 1   that you originally picked "unsure" and then you changed it to
 2   "yes."
 3               THE JUROR:  Yeah.
 4               THE COURT:  As to all the other questions there you
 5   answered "no."
 6               THE JUROR:  Uh-huh.
 7               THE COURT:  Then down below, as I said, you checked
 8   the box saying "able."  You thought you would be able to put
 9   aside any opinion you had formed and decide the case on the
10   evidence at trial.
11               THE JUROR:  Uh-huh.
12               THE COURT:  So in a criminal prosecution, every person
13   accused of a crime is presumed to be innocent or not guilty.
14               THE JUROR:  Sure.
15               THE COURT:  Unless and until the government proves
16   that he's guilty beyond a reasonable doubt.
17               THE JUROR:  Of course.
18               THE COURT:  By the evidence at trial.  You say "of
19   course" because you've heard this before, is that right?
20               THE JUROR:  Perhaps, yeah.
21               THE COURT:  It's obviously a common principle because
22   it's one of the fundamental ones of our system.
23               THE JUROR:  Absolutely.
24               THE COURT:  A defendant who is accused of a crime
25   never has any obligation or duty or responsibility to prove
```

1     that he's not guilty.

2                THE JUROR:  Uh-huh.

3                THE COURT:  The question isn't:  Who is convincing me

4     here?  The question is:  Has the government convinced me by the

5     evidence at trial that he's guilty?

6                THE JUROR:  Yeah.

7                THE COURT:  To the extent you have any opinion, would

8     that opinion interfere with your ability to perform according

9     to those principles, or would you be able to compartmentalize

03:25 10     the opinion and set it aside and focus only on the evidence at

11     trial and make a decision based on that?

12                THE JUROR:  I'm not completely sure.  Yeah, sorry.  My

13     answers are all kind of all over the place on that.  I think,

14     in terms of the death penalty, my only reservation would be if

15     it was, like, a wrongful conviction, you can't take that back

16     once you've given that penalty.  But, personally, I believe

17     this case is no question for me.

18                THE COURT:  So even if the evidence at trial were not

19     convincing, you would remain convinced by what you heard before

03:25 20     the trial?

21                THE JUROR:  Potentially, yeah.  I'd say a strong

22     maybe.

23                THE COURT:  Let me just ask specifically about the

24     death penalty because we did ask some particular questions

25     about that.

```
 1              MR. WEINREB:  Your Honor, if we could interrupt at
 2    some point.
 3              THE COURT:  Okay.  I think I just want to run through
 4    these.
 5              MR. WEINREB:  Okay.
 6              THE COURT:  We will be -- I'm looking at Page 23.  We
 7    asked for some general views, your general views about the
 8    death penalty.
 9              THE JUROR:  Yeah.
10              THE COURT:  In Question 88, you said you didn't have
11    any really, I guess.
12              THE JUROR:  Yeah.
13              THE COURT:  89, you put yourself somewhere in the
14    middle as to being opposed or in favor.
15              THE JUROR:  Yeah.
16              THE COURT:  Is that accurate?
17              THE JUROR:  I'd say that definitely -- in terms of the
18    death penalty, definitely case-by-case basis.  But in something
19    as heinous as this incident, I think I would be more towards
20    the 10 side of the scale.
21              THE COURT:  Okay.  Any others, other questions?
22              MR. WEINREB:  No.
23              MS. CLARKE:  Thank you.
24              THE COURT:  Thank you, sir.
25              THE JUROR:  All right.  Have a great day, guys.
```



1      THE CLERK:  Juror No. 211.

2

3

4

5

6

7

8

9      THE CLERK:  Juror No. 211.

03:28 10      THE JURY CLERK:  Juror 211.

11      THE CLERK:  Right up here, ma'am.  Have a seat if you

12  would.

13      THE COURT:  Good morning.  No, I'm too late.  Good

14  afternoon.

15      THE JUROR:  Good afternoon.

16      THE COURT:  Thank you for being here.

17      THE JUROR:  You're welcome.

18      THE COURT:  Have you been able to follow my

19  instructions from the last time to avoid any discussion of this

03:28 20  case or process with anybody?

21      THE JUROR:  Yes.

22      THE COURT:  As much as you could, to avoid any media

23  accounts of the process?

24      THE JUROR:  Yes.

25      THE COURT:  Of the case?

1          Tell me about your employment.

2          THE JUROR:  I work for the City of Lynn School

3    Department.  I am work in the Special Ed Department.

4          THE COURT:  Okay.  As a teacher's aide?

5          THE JUROR:  I'm paraprofessional.  I'm getting my

6    teacher's license so -- I already passed all the tests so --

7          THE COURT:  Okay.  And you have some use of social

8    media, Facebook, but mostly --

9          THE JUROR:  A little bit.  I just play video games,

03:29 10   and, you know, I talk to relatives that live out of the

11   country.

12         THE COURT:  Where do they live?

13         THE JUROR:  Ireland, Australia, Germany.

14         THE COURT:  Could we cut the audio?

15   (SIDEBAR CONFERENCE AS FOLLOWS:

16   ███████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ██████████████████████████████

19         █████████████████

03:30 20   ████████████████████████████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████████████████████████

24   ██████████████████████████████████████████

25   ██████████████████████████████████████████████████





```
 1  ████████████████████████████████████████
 2  ████████████████████████████████████████████
 3  ████████████████████████
```

 4         THE COURT:  Okay.  All right.  We can go back on.

 5  .  .  .  END OF SIDEBAR CONFERENCE.)

 6         THE COURT:  If you'd turn to Page 20, Question 77, up

 7  near the top, we asked whether, as a result of things you'd

 8  seen or read or learned from any source, had you formed an

 9  opinion about whether the defendant was guilty or not and

03:34 10  whether he should receive the death penalty or not.  Of the

11  available boxes, you checked in each case "unsure."  Can you

12  tell us a little bit about that answer?  Why did you select

13  "unsure" about the three options?

14         THE JUROR:  I really -- I mean, I knew about the case,

15  but I haven't really been following it.  I'm just unsure about

16  the death penalty.

17         THE COURT:  Okay.  Let's take the first part, (a) and

18  (b) first, where you say you're unsure about that as well.

19         THE JUROR:  I just -- I -- I mean, I've seen it on TV,

03:35 20  in the news and all that, but I was just -- I don't know.  I

21  just put I was uncertain about it when I wrote it and I said

22  "unsure."

23         THE COURT:  Okay.  You understand that in our criminal

24  justice system anybody who's accused of a crime is presumed to

25  be innocent unless the government proves the person guilty by

1    the evidence at trial and proves that beyond a reasonable

2    doubt.  The burden of proof -- of proving somebody guilty or

3    convicting somebody of a crime, the burden of proof is always

4    with the government alone.  The government has the

5    responsibility to prove somebody guilty.  One of the tasks, if

6    not the central task, of a juror is to listen to the evidence

7    in the case, based on the evidence presented in the course of

8    the case, decide whether the government has done that or not,

9    whether it's succeeded in proving the person guilty beyond a

03:36 10   reasonable doubt.

11         The defendant doesn't have any burden to prove that

12   he's not guilty or to explain anything.  It's up to the

13   government entirely to prove the proposition that it advances,

14   and that is, that he's guilty.  Do you understand that?

15         THE JUROR:  Yes.

16         THE COURT:  If you were a juror in this case, would

17   you be able to act faithfully and properly apply those

18   principles in deciding the issues in the case?

19         THE JUROR:  Yes.

03:36 20       THE COURT:  If the government had failed to convince

21   you of any of the charges beyond a reasonable doubt, would you

22   have any hesitation in concluding that the government's proof

23   had failed and that the defendant was, therefore, not guilty of

24   that offense?

25         THE JUROR:  Could you just explain that one more time,

1     the last sentence?

2          THE COURT:  Let me -- I combined a couple of things

3     there.  The burden of proof being placed on the government

4     means, as I've said, that the responsibility of proving its

5     proposition that it has advanced by the accusation, the

6     government proposes by its accusation that the defendant is

7     guilty of an offense.  The government has to prove that.  The

8     defendant doesn't have to prove the opposite.  He doesn't have

9     to prove he's not guilty.

03:37 10          The question is never which side has convinced me

11     about this case.  The question is:  Has the government

12     convinced me that the defendant is guilty, okay?  Do you

13     understand that?

14          THE JUROR:  Yes.

15          THE COURT:  If the government has -- with respect to

16     any of the particular charges, the evidence is not sufficient,

17     in your judgment, that you're convinced beyond a reasonable

18     doubt that the defendant is guilty of that offense, would you

19     be able in that circumstance to make your verdict not guilty

03:38 20     because the government had not proved its case?

21          THE JUROR:  I'm not sure.  I understand what you're

22     saying, but I don't -- I'm not certain what I can -- what my

23     answer is.

24          THE COURT:  What's troubling you?

25          THE JUROR:  So you want me to -- if the government

1    doesn't present enough evidence, you want me to say that I

2    think he's guilty or not guilty?  Is that what it is?

3         THE COURT:  Not quite.  Under the law, if a jury

4    concludes and an individual juror concludes that the government

5    has not presented evidence that proves guilt beyond a

6    reasonable doubt, under that circumstance the juror's duty is

7    to return a verdict of not guilty because the government has

8    failed in its proof.  Do you understand that?

9         THE JUROR:  Yes.

03:39 10         THE COURT:  The question is if, at the trial, your

11    conclusion as to any one of the charges or all of them that the

12    government had failed to produce what needed to be produced to

13    convince you beyond a reasonable doubt, if that happened, would

14    you be able to return a verdict of not guilty?

15         THE JUROR:  Yes.

16         THE COURT:  Are you -- you sure you understand my

17    question?  You look a little uncertain.  That's why I ask.

18         THE JUROR:  I just -- I'm not sure because you want me

19    to say either guilty or not guilty, right?

03:39 20         THE COURT:  What other option might there be?

21         THE JUROR:  I understand that, but it's just --

22         THE COURT:  I'm not asking you to tell us how you

23    would decide this case.

24         THE JUROR:  Okay.

25         THE COURT:  I'm not asking that.  I'm asking whether

1    you could faithfully apply the principle of law that says, if

2    you're not convinced beyond a reasonable doubt as to any of the

3    counts, then your vote is not guilty?

4              THE JUROR:  Okay.  Yes.

5              THE COURT:  Okay?  Are we together now?

6              THE JUROR:  Yes.  This is just, like, a question.

7    It's not against -- it's not about this case.  It's just a

8    question in general.

9              THE COURT:  No.  It's about -- it is in general, but I

03:40 10  want to tie it to this case.  If you're a juror in this case,

11   would there be any difference in your ability to apply that

12   principle?

13             THE JUROR:  No.

14             THE COURT:  Okay.  Let me ask you to turn to Page 23.

15   Beginning at Question 88, we asked a series of questions about

16   the people's attitude towards the death penalty.  88 was that

17   very general question, If you have any views, what are they?

18   And you said "uncertain."  Can you tell us anything --

19             THE JUROR:  This is the first time that I ever really

03:41 20  had to think about the death penalty, and I just -- I'm really

21   undecided about it.

22             MR. WEINREB:  Is it time to interrupt and --

23             THE COURT:  Okay.  No further --

24             MR. WEINREB:  No.

25             THE COURT:  Thank you.

```
 1              MR. WEINREB:  Thank you.

 2              THE CLERK:  Juror No. 215.

 3              THE JURY CLERK:  Juror 215.

 4              THE CLERK:  Ma'am, over here, please.  Have a seat.

 5              THE COURT:  Thanks for your patience.  Since you were

 6    last here, have you been able to follow my instructions to

 7    avoid any discussion of the substance of the case?

 8              THE JUROR:  Uh-huh.

 9              THE COURT:  Or the process?

03:43 10              THE JUROR:  Uh-huh.

11              THE COURT:  And also to avoid, as you could, any news

12    media accounts of this case or what's going on?

13              THE JUROR:  Yes.

14              THE COURT:  Okay.  That's the questionnaire you filled

15    out.  So we're going to ask you some follow-up questions about

16    it.  Tell us a little bit about your employment.

17              THE JUROR:  Right now I'm working part time as a

18    bookkeeper for a small company.

19              THE COURT:  I see you're pursuing accounting studies

03:43 20    still?

21              THE JUROR:  Yes, yes.

22              THE COURT:  Can you give us an idea of what the part

23    time is?  How much -- how much time is part time?

24              THE JUROR:  About 17 hours a week.  I usually work

25    Monday afternoons, Wednesday and Friday all day.
```

```
 1              THE COURT:  Okay.  In Question 33, on Page 11, you
 2    said that -- I guess one of your brothers is a public defender.
 3              THE JUROR:  Yes.
 4              THE COURT:  Where does he work?
 5              THE JUROR:  Salem, Mass.
 6              THE COURT:  Committee for Public Counsel Services,
 7    does that sound familiar?
 8              THE JUROR:  I don't know.
 9              THE COURT:  You don't know?
03:44 10              THE JUROR:  I'm not really too close to him.  He's a
11    half-brother.
12              THE COURT:  I see.  How long has he been a public
13    defender as far as you know?
14              THE JUROR:  Ten years.
15              THE COURT:  Is that the entire time he's been a
16    lawyer, or did he do something as a lawyer before that?
17              THE JUROR:  You know, I think he -- you know what?  I
18    don't think he's been a public defender for ten years.  He's
19    been a lawyer for ten years so possibly five years.  And I
03:44 20    think he was in private practice -- tried to do private
21    practice before that.  I'm really not sure.
22              THE COURT:  Apparently, he's not somebody you're
23    particularly close to?
24              THE JUROR:  I'm not very close to him.  He's a
25    half-brother.  He's younger than I am.
```

1           THE COURT:  You've had -- I'm on Page 15, Question 47.

2           THE JUROR:  Oh, yes.

3           THE COURT:  You have had jury service before.

4           THE JUROR:  Yes.

5           THE COURT:  Did both cases go all the way to verdict?

6           THE JUROR:  Yes.

7           THE COURT:  One was criminal; one was civil?

8           THE JUROR:  Yes.

9           THE COURT:  When were they, just as a --

03:45 10          THE JUROR:  The civil was probably 16 years ago, and

11  the criminal was -- and I'm just estimating.  I don't remember

12  what year it was.  Possibly five or six years ago.

13          THE COURT:  Where was --

14          THE JUROR:  They were both in Salem.

15          THE COURT:  Salem District Court or the Superior

16  Court, do you remember?

17          THE JUROR:  One was in Superior, I believe, and one

18  was in District.

19          THE COURT:  Do you remember which was which?

03:46 20          THE JUROR:  I believe the criminal was in superior and

21  the civil was in district.

22          THE COURT:  If you'd turn to Page 20, Paragraph -- I'm

23  sorry, Question No. 77, we asked whether, as a result of things

24  you'd read or seen in the news or learned from otherwise, had

25  you formed an opinion about -- or that the defendant was guilty

1    or that he was not guilty or that he should receive the death

2    penalty or that he should not receive the death penalty.  And

3    to the we gave you three selections:  yes, no, and unsure.  To

4    each of those you indicated "unsure."  Can you tell us a little

5    bit about why you selected that answer for each of those

6    questions?  Let's start first with (a) and (b).

7            THE JUROR:  Okay.  To be honest, I really didn't

8    follow the case.  I didn't watch a lot of TV.  I knew a little

9    bit about it, just -- I would be unsure because I don't know

03:47 10   enough to make an opinion about something like that.

11           THE COURT:  Okay.  I was focusing on (a) and (b).

12   Does that apply to (c) and (d)?

13           THE JUROR:  Yeah.  I think (c) and (d), I would need

14   to learn a lot more before I could make a decision about

15   something like that.

16           THE COURT:  So you've served on a criminal jury, so I

17   think you appreciate the principles that apply, but let me just

18   remind you of them.  Any person who's accused of a crime is

19   presumed to be innocent of the crime unless the government

03:48 20   proves that he's guilty by the evidence at trial and proves it

21   beyond a reasonable doubt.  So the government always has the

22   burden of proving its proposition that the defendant is guilty.

23   The defendant doesn't have any responsibility or burden to

24   prove that he's not guilty or to explain anything.  That's

25   always -- the burden always rests with the government.

1          And so that if a juror considering a particular charge

2    made against someone is not convinced beyond a reasonable doubt

3    that the government's proof -- by the government's proof that

4    the person is guilty, the juror's responsibility is to declare

5    the verdict not guilty.  Do you understand that?

6          THE JUROR:  Not unsure but not guilty.

7          THE COURT:  Right.  But the point is not -- well,

8    jurors can be unsure during the course of the trial, of course,

9    and then at the end they begin to think about it and talk about

03:48 10   it with each other.  What I'm getting at is there's never any

11   responsibility on a defendant to prove himself not guilty or

12   innocent.  He's presumed to be innocent.  The government has to

13   in a sense change the jury's mind about that by proof.

14         THE JUROR:  Right.

15         THE COURT:  Would you have any difficulty in applying

16   those principles properly in a case -- in this case if you were

17   a juror?

18         THE JUROR:  No.

19         THE COURT:  Okay.  You understand --

03:49 20   THE JUROR:  Yes, I do understand.

21         THE COURT:  Okay.  Let me -- so let me ask you to turn

22   to Page 23.  Beginning with Question 88, we asked jurors about

23   some -- about the death penalty and what their views might be

24   in Question 88.  We asked, if you had general views about the

25   death penalty, to say what they were.

1           THE JUROR:  Uh-huh.

2           THE COURT:  You left it blank.

3           THE JUROR:  Uh-huh.

4           THE COURT:  Is it proper to interpret that that you

5   don't have any general views about it, proper or improper?

6           THE JUROR:  You know, honestly, I really -- I've never

7   been put in a position where I've had to think hard about the

8   death penalty, and I -- you know, I don't have -- I really

9   didn't have anything that I could add down there.

03:50 10         THE COURT:  Nothing wrong with that.  We just want to

11  make sure that we're understanding your answer properly.

12          THE JUROR:  I should have put N/A or --

13          THE COURT:  That's all right.

14          In the next question, we asked you to place yourself

15  on a scale from strongly opposed to strongly favor.  And,

16  again, you didn't circle anything but said you could not answer

17  without having all the information about this case.

18          THE JUROR:  Right.  That's just how I feel.

19          THE COURT:  I think we were asking not about this case

03:50 20  but about the death --

21          THE JUROR:  In general.

22          THE COURT:  In general, for this question.  Do you

23  have any -- could you put yourself anywhere on that scale, as a

24  general matter, about the death penalty, from strongly opposed

25  to strongly favor?  If you're unsure, that's fine, too.

1          THE JUROR:  I can't answer that.

2          THE COURT:  As I said earlier when we had the group of

3    you, there are no right or wrong answers.  We just want your

4    answers.

5          THE JUROR:  I don't have a strong opinion about that,

6    I guess.

7          THE COURT:  Page 24, the next page, Question 90, here

8    we asked you to look at the series of possible statements and

9    select one that you thought was closest to your view about the

03:51 10   death penalty.  You selected (d), and you said, "I'm not for or

11   against the death penalty.  I could vote to impose it or I

12   could vote to impose a sentence of life imprisonment without

13   the possibility of release, whichever I believed were called

14   for by the facts and the law in the case."

15          So here, I guess, you thought you could signal that

16   that represented your view, whereas you were a little bit

17   hesitant on the previous two questions.

18          THE JUROR:  Still seems to me answering that way I'm

19   still a little -- that I could -- it's just that I'm unsure

03:51 20   about that.

21          THE COURT:  Right.  You haven't thought things

22   through?

23          THE JUROR:  Right.

24          THE COURT:  Well, let me ask it the other way.

25   Apparently, if you don't have strong views so that you could

 1    say I could go -- I could vote for it, I could vote for life

 2    imprisonment, I take it then that you're not of the view that

 3    you favor one of them over the other as a general proposition?

 4            THE JUROR:  No.

 5            THE COURT:  Is that --

 6            THE JUROR:  Yes.  You can take that.

 7            THE COURT:  You have to -- you really are in suspended

 8    judgment until you have heard a particular case; is that what

 9    you're saying?

03:52 10          THE JUROR:  I think that that's how I feel, yes.

11            THE COURT:  Okay.  In Questions 95 and 96 -- and 95 is

12    at the bottom of 25 -- we asked two sides of a question.  If

13    you found this defendant guilty -- you understand, by the way,

14    that the question of what the penalty is only arises if a

15    person is convicted of a crime that carries the potential of a

16    death penalty?  So the premise is, if you're considering the

17    death penalty, you've already convicted somebody of a serious

18    murder, right?

19            THE JUROR:  Right.

03:53 20          THE COURT:  So 95 says, If you found the defendant

21    guilty and you decided the death penalty was the appropriate

22    punishment, could you conscientiously vote for the death

23    penalty?  And you checked "yes."

24            THE JUROR:  I know I did.  That was, like, the last

25    checkbox that I checked.

```
 1              THE COURT:  Well, not quite.  If you go to the top of
 2    the next page --
 3              THE JUROR:  No.  I went back to it.
 4              THE COURT:  I see.  Fair enough.  You left that blank
 5    and went past it and then went back.  Okay.
 6              Let's look at 96.  96 asks the other side of that
 7    question in a sense.  That is, if you found the defendant
 8    guilty and you decided life imprisonment without the
 9    possibility of release was the appropriate punishment, could
03:53 10   you conscientiously vote for life imprisonment without the
11    possibility of release?  And you checked that box "yes."
12              THE JUROR:  I probably should have checked "I'm not
13    sure" to both of them.  Those were really hard questions for
14    me.  I just -- I know --
15              THE COURT:  Right.  We're not asking you to predict
16    what your decision would be in this case because that's -- you
17    don't have -- obviously, you haven't heard the case.  Again,
18    we're trying to gauge whether you're in any -- whether there
19    are any reservations you have about either that we ought to
03:54 20   know about or whether you're simply in the position where you
21    can't commit to anything until you've heard -- if you're a
22    juror, would ultimately hear.
23              THE JUROR:  I think that's how I feel.  I really feel
24    that I can't -- I should have probably answered I was not sure
25    to those two questions.  I don't know why I answered "yes," but
```

1    I guess I felt that if I heard what I needed to hear to vote

2    that way, then I would be able to consciously vote that way in

3    both those questions.

4              THE COURT:  Okay.  All right.  Follow-up?

5              MR. WEINREB:  Good afternoon.  My name is Bill

6    Weinreb.  I'm one of the prosecutors in the case.  If I could,

7    I'd just like to pick up where the Court left off just now.

8              So you said, if you heard what you needed to hear.  So

9    I think, as the judge explained, if the defendant's found

03:55 10   guilty by the jury of a crime that carries a sentence of death,

11   a potential sentence of death, then there will be a second

12   phase of the trial, and the parties will -- the prosecution and

13   the defense will each offer evidence suggesting what the

14   appropriate penalty should be.

15             And the real question is:  Could you listen to all

16   that evidence with an open mind and, at the end of it,

17   depending on whether it convinced you one way or the other,

18   vote for a death sentence or for a sentence of life

19   imprisonment without release?

03:56 20             And before you answer, the thing I want to make clear

21   is the parties aren't going to be debating whether there should

22   be a death penalty or not or whether a crime should be

23   punishable potentially by death or not.  That's just the law

24   that the judge will instruct you on, that certain crimes are

25   and that there is a death penalty.  The question will just be

1    whether it's the appropriate sentence or not.

2         And so the real thing that I think both sides are

3    trying to get at is could you -- are you able to consider all

4    that evidence, decide which one -- which sentence you think is

5    appropriate, and vote for it?  Could you do that?

6         THE JUROR:  Yes, I believe so.

7         MR. WEINREB:  Okay.  And so -- and just to break that

8    down, if you -- not necessarily -- not in this case but just in

9    general, if you were on a case where you heard evidence that

03:57 10   convinced you that a death sentence was appropriate in this

11   case, even though it might not be in other cases, could you

12   actually do it, meaning could you vote to sentence someone to

13   death knowing that your vote would be part of what meant that

14   they would get the death penalty and you could never take that

15   back?  Is that something you would actually be able to do, do

16   you think?

17        THE JUROR:  I don't know.

18        MR. WEINREB:  This is our only chance to find out

19   whether you could do it or not.  So let me ask you to think

03:57 20   about it.  Is that the best you can do at this point, you

21   think?  You just don't know?

22        THE JUROR:  I think so, yeah.

23        MR. WEINREB:  So there's a possibility you would not

24   be able to no matter -- even if the evidence showed it was an

25   appropriate sentence?

1          MR. BRUCK:  Objection.  It's not the evidence that

2    shows.  It's the juror deciding.

3          THE COURT:  Sustained.  I agree with you.  Sustained.

4          MR. WEINREB:  If at the end of the trial you heard all

5    the evidence and you decided that the death sentence was an

6    appropriate one for this particular case rather than -- even if

7    it wouldn't be in others, you're not sure that you could

8    actually do it?  You could actually sentence someone to death?

9          MR. BRUCK:  Object to leading.

03:58 10          THE COURT:  Go ahead.  You can answer it, I guess.

11          THE JUROR:  I don't know right now.

12          MR. WEINREB:  Thank you.

13          MR. BRUCK:  Good afternoon, ma'am.

14          THE JUROR:  Hi.

15          MR. BRUCK:  My name is David Bruck, and I'm one of

16    Jahar Tsarnaev's attorneys, and I just want to follow up on a

17    few things.

18          Mr. Weinreb -- I want to be sure we're on the same

19    page or talking about apples and apples with the question that

03:58 20    Mr. Weinreb just asked you.  I think the question wasn't

21    whether you will -- whether you would impose the death penalty

22    in this case.  You wrote you don't know the facts, right?

23          So you said you were undecided.  And you would want to

24    hear the facts before you made up your mind?  Is that where you

25    stand?

1           THE JUROR:  Yes, yup.

2           MR. BRUCK:  Okay.  You haven't decided the case

3     already?

4           MR. WEINREB:  Objection, your Honor.  These are all

5     leading questions.

6           THE COURT:  Yeah, they are.

7           MR. BRUCK:  The question that I think Mr. Weinreb

8     meant to ask you is, if you heard all the evidence, you first

9     convicted -- you and the rest of the jury convicted the

03:59 10     defendant, any defendant, of a case -- of a crime that could

11     carry the death penalty, then there would be a second phase,

12     and the government would present evidence that made this an

13     especially bad case or that made this person an especially bad

14     murderer and the defense presented evidence that said that

15     maybe life imprisonment was adequate, and you heard it all and

16     decided that this particular case, based on all the facts you

17     had heard, that this was an appropriate case for the death

18     penalty, and that was your opinion, that's the question.  If it

19     was your opinion that the death penalty was the right thing to

04:00 20     do, could you do it?

21           THE JUROR:  I think, if it was my opinion that that

22     was the appropriate punishment, then I wouldn't consider it if

23     it wasn't my -- yes, I think -- I guess the answer would be

24     yes.

25           MR. BRUCK:  Right.  You see what the questioning is.

```
     1    Some people might not have the courage of their convictions.

     2    And the question we're asking you is, if your conviction was

     3    the death penalty was the right thing to do -- we're not saying

     4    it will be.

     5              THE JUROR:  Right.

     6              MR. BRUCK:  But if it was, could you vote to impose it

     7    understanding nobody wants to but could you?

     8              MR. WEINREB:  Objection, your Honor.

     9              THE COURT:  Yeah.  Let's let her answer the question

04:01 10    if you're able to.

    11              THE JUROR:  I want to say yes, but part of me still

    12    says I'm unsure.

    13              THE COURT:  Why is that?  Let me just --

    14              THE JUROR:  I don't know.  I feel like, if I made that

    15    decision that that was -- if I made that decision, that that

    16    was my -- inside me, that I decided that that was what was

    17    right and that was -- I would want to say, yes, I could vote

    18    for it.  But there's a little piece of me inside of me that

    19    says that I'm not sure that, you know, that --

04:02 20              THE COURT:  Okay.

    21              MR. BRUCK:  Is that -- are you telling us that's

    22    something that you could never -- are you feeling that no one

    23    can ever say that until they are in the situation?

    24              THE JUROR:  I think --

    25              MR. WEINREB:  Objection, your Honor.  Whether that's
```

1   the case or not, that's not the question here.

2           THE COURT:  I think we have the picture here.

3           MR. BRUCK:  Thank you.

4           THE COURT:  Okay.  Thanks.

5           The next one that was on our list, 219, you probably

6   know has been postponed.  So that leaves three.  I would be

7   inclined --

8   (Discussion held off the record.)

9           THE COURT:  There would be three left.

04:03 10        MR. BRUCK:  Want to take a short break?

11          THE COURT:  Why don't we do 1:30.  How's that?  That

12  will help the jurors get on their way.

13  (Recess taken at 12:55 p.m.)

14          (After the recess:)

15          (The Court enters the courtroom at 1:40 p.m.)

16          MR. WEINREB:  Before we call out the next juror, can I

17  be heard for a minute?  It can be on the record.

18          THE COURT:  Okay.

19          MR. WEINREB:  Your Honor, I would like to renew the

04:47 20  motion I made several days ago that Mr. Bruck in particular,

21  but nobody, instruct jurors on the appropriate way to

22  deliberate in the jury room.  That strikes me as wholly

23  inappropriate.  And in particular, the instruction that seems

24  to be being given, even if it is phrased in terms of a

25  question, is that no juror attempt to change another juror's

1   subjective view as to whether the death penalty is appropriate

2   in a given case.  And the result -- or seemingly the intended

3   effect of that instruction to these jurors about how to

4   deliberate and not deliberate is to encourage the possibility

5   of a hung jury; in other words, to say to jurors who might

6   naturally be leaders on the jury and help to persuade others to

7   reach a unanimous verdict, that they should not do that.  That

8   just as it's their personal subjective decision as to whether

9   to impose the death penalty, they should respect others'

04:48 10  subjective opinions and not try to change them.

11        That is not the law.  In the *Jones* case in the Supreme

12   Court, the court wrote about the importance of unanimous

13   decisions by jurors, and in death penalty cases in particular,

14   just as it's an important consideration in all cases, and it's

15   perfectly appropriate for jurors to try to change the minds of

16   others.  And it's undoubtedly a common situation on juries that

17   leaders emerge who try to convince the other jurors and help to

18   achieve a unanimous verdict, and that should be encouraged and

19   not discouraged.

04:49 20       This juror candidate in particular seemed to be in no

21   need of any instruction on that score.  When first asked about

22   it, he said that he understood as a manager that it's important

23   to listen to others, and nevertheless, Mr. Bruck persisted in

24   making sure that he understood that he should let others have

25   their opinions even if they differ from his.

1        And it's that kind of pushing the jurors in a

2    particular direction about a matter that has nothing to do with

3    voir dire and everything to do with trying to affect what

4    happens in the jury box later on that the government thinks is

5    inappropriate and should be prohibited.

6        MR. BRUCK:  This has come up with a grand total of two

7    jurors who were both engineers in supervisory capacities.  And

8    this was a juror who had talked about reaching consensus in a

9    way that raised the question of whether or not he understood

04:50 10    that in the end jurors had to make individual -- I think the

11    Supreme Court's language is "reasoned moral responses to the

12    evidence," which is not the same as an engineering problem or a

13    pile of bricks.

14        And I think it was appropriate in -- for that

15    particular juror to simply ask whether or not he would respect

16    or could respect other -- the fact that other jurors might

17    reach different moral views, and that was the end of the

18    inquiry.

19        THE COURT:  Well, okay.  I think the purpose here is

04:51 20    to discover disqualifying bias or other issues.  That's the

21    principal purpose, and we have to remain focused on that.

22    There's no single script that we could follow as we do that.

23        I agree with the general proposition that this is not

24    an occasion for argument or instruction, so -- it's obviously

25    difficult for jurors who are not used to this process, who are

1    not used to thinking the way we think about cases, to process

2    questions about "what would you do if."  It's just very hard.

3    And for them to be uncertain about that, to express

4    reservations about their ability to do something in the future

5    on some hypothetical set of -- or unknown set of data, really

6    has questionable utility in this process.

7            I mean, there's some people you can get a sense that

8    they have a disability of some kind with respect to being able

9    to handle their responsibility as jurors, but you'll have very

04:52 10   qualified jurors who think, because they're being asked the

11   questions, that they should doubt what they don't doubt, and

12   that's one of the problems we have here.

13           I think that was a ruling.  I'm not sure.

14           (Laughter.)

15           THE COURT:  All right.  223?

16           THE CLERK:  Juror No. 223.

17           MR. McALEAR:  Juror No. 223.

18           (Juror No. 223 enters the courtroom.)

19           THE CLERK:  Ma'am, over here, please.

04:53 20   Have a seat.

21           THE JUROR:  Thank you.

22           THE CLERK:  Speak into the mic and make sure you speak

23   loud enough so everyone can hear you.

24           THE COURT:  Good afternoon.

25           THE JUROR:  Good afternoon.

```
 1              THE COURT:  Since you were here last have you been
 2       able to follow my instructions to avoid any discussion of the
 3       case and --
 4              THE JUROR:  Kind of.
 5              THE COURT:  I'm sorry?
 6              THE JUROR:  Kind of.
 7              THE COURT:  What's the qualification?
 8              THE JUROR:  What's a "qualification"?
 9              THE COURT:  What do you mean "kind of"?
10              THE JUROR:  Oh, yes, yes, yes.  No, I think I got it.
11              THE COURT:  Okay.  And avoid any news media reports on
12       the case?
13              THE JUROR:  Yes, yes, yes.
14              THE COURT:  Okay.  So that's the questionnaire you
15       filled out.  We're going to follow up on it with some of the
16       answers you gave.
17              THE JUROR:  Okay.
18              THE COURT:  Let me ask you to tell us about your work
19       position.
20              THE JUROR:  Oh, I'm a financial analyst.
21              THE COURT:  What does that involve?  What do you --
22              THE JUROR:  It's like a lot of financial information.
23       It's kind of an explanation for the company and then do a lot
24       of financial reporting, do the budgeting, forecasting for the
25       company, those stuff.
```

1           THE COURT:  Is it -- this is a fairly large company.

2    Is it company-wide or are you a division?

3           THE JUROR:  I'm in a division.  I'm in the Quincy

4    division, is my current job, yeah.

5           THE COURT:  Okay.

6           THE JUROR:  The headquarter in Marlborough, so...  I'm

7    in Quincy.

8           THE COURT:  So you're in Quincy?

9           THE JUROR:  Yes.

04:54 10          THE COURT:  If you'd look on page 5 of the

11   questionnaire, under Question 10 you express some concern about

12   whether your job would be in jeopardy.

13          THE JUROR:  Yes.

14          THE COURT:  Have you explored that further since this

15   questionnaire was filled out?

16          THE JUROR:  Yes, I think it's going to impact my life,

17   basically, my job.  I have a very demanding full-time job.  I

18   have children.  And then it's -- because it's if I -- it seems

19   like two work -- I mean, pretty much two jobs, if I come here

04:55 20   and then go home, still have work.  Like, for example, last

21   night I received a phone call to come here to the jury duty,

22   and then worked until, like, 10:30 last night.

23          I guess it's kind of an impact on my job since I would

24   have two full-time jobs.

25          THE COURT:  Has anybody at work told you that, that if

```
 1   you were serving they would continue to expect you to be

 2   working full time or --

 3            THE JUROR:  No.

 4            THE COURT:  -- or that it would somehow cost you your

 5   job?

 6            Have you discussed it with anybody at work?

 7            THE JUROR:  No, not yet.  Not that far yet.

 8            THE COURT:  Okay.

 9            And with respect to the children, it looks like

10   they're mid-teenagers?

11            THE JUROR:  Yeah, yeah, my daughter will be applying

12   for college this year.  So we would plan for the school visit

13   in the spring.

14            THE COURT:  She's a junior?

15            THE JUROR:  Yes, she's a junior.

16            THE COURT:  Okay.  Thank you.

17            THE JUROR:  Thank you.

18            (The juror is excused.)

19            MR. McALEAR:  Right this way, ma'am.

20            THE CLERK:  Juror No. 229.

21            MR. McALEAR:  Juror No. 229.

22            (Juror No. 229 enters the courtroom.)

23            THE CLERK:  Ma'am, over here, if you would, please.

24   Have a seat.

25            Speak into the mic so everybody around here can hear
```

```
 1   you, okay?
 2            THE JUROR:  Okay.
 3            THE CLERK:  Okay.  Thanks.
 4            THE COURT:  Good afternoon.
 5            THE JUROR:  Good afternoon.
 6            THE COURT:  Have you been able, since the last time
 7   you were here, to abide by my instructions to avoid any
 8   discussion of the substance of the case with anybody or the
 9   process or anything like that?
10            THE JUROR:  Uh-huh.
11            THE COURT:  And have you also, to the extent you've
12   been able, avoid media reports about the case or the process?
13            THE JUROR:  Yes.
14            THE COURT:  So that's the questionnaire you filled
15   out, and we're going to follow up on some of the questions.
16            THE JUROR:  Can I open it?
17            THE COURT:  You can.  I'm going to start on page 6.
18   And the question is a quick one.  It gives a little information
19   about your husband and his work.  You say he's a financial
20   advisor?
21            THE JUROR:  Yes.
22            THE COURT:  Can you tell -- put that in a little more
23   context, what it is he does?
24            THE JUROR:  Sure.  He works in a family business for
25   RBC.  It's called the McCarthy Group.  And he's a financial
```

```
 1    advisor, just as far as long-term planning.
 2              THE COURT:  I see.
 3              THE JUROR:  Investments.
 4              THE COURT:  Personal wealth, is that what you're
 5    talking about?
 6              THE JUROR:  Yeah, exactly.
 7              THE COURT:  How long has he done that?
 8              THE JUROR:  Oh, let's see.  I'm going to go with --
 9    God, I think going on 21 years.
04:59 10              THE COURT:  Okay.  And your own work?
11              THE JUROR:  Well, I don't know what I want to be when
12    I grow up, but I do do a little bit of everything.  I run
13    events right now, I was a social worker, and I do volunteer for
14    HAWC.  I think that's on here.
15              THE COURT:  Yeah, I was going to ask you what that
16    acronym means.
17              THE JUROR:  So it was a haven for domestic violence.
18    And basically what we do is --
19              THE COURT:  What do the letters mean?
04:59 20              THE JUROR:  Well, they just changed it.  Now I'm
21    nervous.  What is it?  It's Haven for Wellness and Change
22    [sic], so...  And it's out of Salem.
23              THE COURT:  Okay.
24              THE JUROR:  And basically what we do, I'm on call for
25    people who suffer from domestic violence.
```

1                THE COURT:  Do you counsel or --

2                THE JUROR:  It's just a hotline.  So basically what I

3     do is I make a plan with them to be referred to -- you know,

4     make sure they're in a safe situation, and I refer them to the

5     best situation.

6                THE COURT:  Okay.  I'm looking at Question 26 on page

7     10 where you talk about your event planning and so on.

8                THE JUROR:  Okay.

9                THE COURT:  Did I say page 26?

05:00 10             THE JUROR:  You did.

11               THE COURT:  Page 10, Question 26.  Sorry.

12               THE JUROR:  Okay.

13               THE COURT:  Just from the dates, homemaking prior to

14    the event planning, but there's an overlap there.  So is it you

15    were doing both at the same time?

16               THE JUROR:  I was.

17               THE COURT:  Is the event planning a full time, part

18    time?

19               THE JUROR:  No, I do contract work for them.  So they

05:00 20    call me when they want me to work, and I can say yes or no.

21               THE COURT:  When they get a particular event?

22               THE JUROR:  Yes.  Right.  Exactly.  I mean, they would

23    like me to work a lot more, but because I have the children I

24    just kind of get to pick and choose.

25               THE COURT:  I see.

1          Next page, page 11, Question 33, you have a friend who

2     is a Homeland Security lawyer?

3          THE JUROR:  Yes.

4          THE COURT:  Tell us about that.  Do you know what this

5     person does?

6          THE JUROR:  Right now she works in immigration.  She

7     just moved up here.  Her parents were sick.  So she was down in

8     Miami, and now she works out of Hartford.  So she does a lot of

9     the Homeland Security with people who are in immigration, are

05:01 10    illegal status.

11          THE COURT:  And is this somebody you're close to or is

12    this just somebody who's an acquaintance?  Can you give us --

13          THE JUROR:  Sure.  She was my roommate in college, and

14    we've been friends ever since, so over 20 years.

15          THE COURT:  But you're not neighbors --

16          THE JUROR:  No.

17          THE COURT:  -- because she's long distance.

18          THE JUROR:  No, no.  She lived in Miami, but she had

19    to move back because, unfortunately, both her parents are ill,

05:02 20    so she takes care of them.

21          THE COURT:  So how do you stay in touch?

22          THE JUROR:  By phone.  She's actually back in Miami

23    selling her house.

24          THE COURT:  Also on page 11 at the top we asked about

25    social media.

1              THE JUROR:  Uh-huh.

2              THE COURT:  You said Facebook infrequently?

3              THE JUROR:  Yeah, just to kind of spy on my kids.

4              THE COURT:  Page 14, Question 42, you've been a

5       witness, I guess, probably when you were a social worker?

6              THE JUROR:  Yeah, a long time ago.  Yup.

7              THE COURT:  And then also personal family matter, I

8       guess?

9              THE JUROR:  Oh, yeah.  I took care of my uncle who

05:02 10      passed away last year, and his ex-girlfriend's daughter was

11      suing him for rent even though they lived together.  I just

12      felt like I had to stand up for him.

13             THE COURT:  So that was fairly recent?

14             THE JUROR:  Within the last two years.

15             THE COURT:  How about the other one?

16             THE JUROR:  Oh, God.  That was a long time ago.  That

17      was probably -- had to be in the '90s.

18             THE COURT:  All right.  So now turn to page 20, if you

19      would, please.

05:03 20             THE JUROR:  Sure.

21             THE COURT:  Question 77.

22             THE JUROR:  Okay.

23             THE COURT:  In that question we ask a multiple-choice

24      sort of question with available boxes for you to check about

25      whether you'd formed an opinion about whether the defendant was

1   guilty or not or if he should receive the death penalty or not

2   based on things you'd seen in the news or learned about

3   otherwise.  And you -- for the available choices, yes, no or

4   unsure, for each of those you checked "unsure."

5          THE JUROR:  Uh-huh.

6          THE COURT:  Would you just tell us about that, why you

7   chose that box?

8          THE JUROR:  I would have to say because of a lot of --

9   when it happened -- was through the media that I heard about

05:04 10  it.  And, you know, I just think I'm a little bit jaded with

11  the media, and I just thought with our legal system I should

12  keep an open mind.  You know, through my education and, you

13  know, I just know what the media tells us, there's always more.

14  So I felt like, you know, you're innocent before proven guilty,

15  that I should have that open mind.  So I had to answer that

16  fairly.

17         THE COURT:  And would you be able to, if you were a

18  juror in the case, follow that principle, that a person accused

19  of a crime is innocent until proven guilty by the evidence at

05:04 20  trial?

21         THE JUROR:  Yes.

22         THE COURT:  In your capacity as a social worker or in

23  your volunteer capacity, have you had any connection with or

24  association with criminal prosecutions?

25         THE JUROR:  Well, what I do right now as far as with

1    HAWC is we have to stay very non-judgmental.  And the advice

2    that we give people has to be one of just support and

3    empowerment and not what -- you know, we can't persuade them

4    either way.

5           And when I was a social worker, what I did mainly was

6    crisis work.  And, again, that was where I would go in and make

7    a plan for the person's safety but I couldn't tell them what to

8    do and I couldn't judge the situation or what was going on.

9           THE COURT:  So would you be able, in this case,

05:05 10   although it has some notoriety, to listen to the evidence, hold

11   the government to its burden of proof, which is to prove the

12   defendant guilty of any of the crimes that he's charged with

13   beyond a reasonable doubt by the evidence at trial, and if you

14   thought the government had not sustained its burden on any of

15   the counts, would you be able to find the defendant not guilty

16   as to that count?

17          THE JUROR:  Yes, I think so.

18          THE COURT:  Any hesitation?

19          THE JUROR:  Well, I mean, it's a weighty question, but

05:06 20   I want to believe that, yes, I would, because I feel like, you

21   know, as we learned today with the videos and everything I've

22   been thinking about is that, you know, if it was myself or

23   someone I knew who was in this situation, that I would want

24   that fair trial.

25          THE COURT:  Okay.  Beginning on page 23 we asked a

```
 1    series of questions about jurors' thoughts or attitudes about
 2    the death penalty, and that begins with Question 88 on 23.
 3              THE JUROR:  Sure.
 4              THE COURT:  88 is a general question:  Do you have any
 5    views about the death penalty in general? and you said none.
 6    Is that accurate?
 7              THE JUROR:  Yeah, I think that -- well, maybe as far
 8    as like -- what do you mean "in general"?
 9              THE COURT:  I guess as a policy matter should there be
10    a death penalty or not or are there occasions when it is
11    appropriate and occasions when it's not?  I mean, people could
12    have various thoughts about it, that's all.  We're really
13    trying to get you to tell us whatever occurred to you in
14    response to that, so...
15              THE JUROR:  Right.  So I think on 91 I explained that
16    I feel that it is case to case in my mind.  So I don't know if
17    "none" is an appropriate answer to that one.  So, I mean, I
18    feel it's case by case.
19              THE COURT:  Okay.  We'll get there.  We'll work
20    through them.
21              THE JUROR:  Sorry.
22              THE COURT:  In 89 we asked you to see if you could
23    position yourself on a scale of 1 to 10 in terms of being
24    strongly opposed or strongly in favor, and you chose -- I guess
25    you chose 6 first and then changed it to 5.
```

1        THE JUROR:  I feel like it should be the middle

2   because, again, I feel it's case by case.

3        THE COURT:  Okay.  And then the next page, Question

4   90, we set forth a series of statements that people could

5   possibly agree with or disagree with, and asked you to select

6   one that you thought best described your feelings about the

7   death penalty for someone who has been proven guilty of murder,

8   and you selected D saying you're not for or against the death

9   penalty.  "I could vote to impose it or I could vote to impose

05:08 10   a life imprisonment without the possibility of release,

11   whichever I believe was called for by the facts and the law in

12   the case."

13        Does that fairly represent your view?

14        THE JUROR:  Yes.

15        THE COURT:  And when you were referring to 91, you're

16   kind of saying the same thing?

17        THE JUROR:  Right.  Right.

18        THE COURT:  Is this something that -- it's

19   understandable if jurors, when they came in in early January,

05:09 20   hadn't thought a lot about the death penalty at that point and

21   when we asked you to fill out these questionnaires.  Have you

22   thought about it more since then at all?

23        THE JUROR:  Oh, absolutely.  Since I left, you know,

24   having to answer that question, of course.  But has it changed?

25   No.  I mean --

             1          THE COURT:  That was going to be my next question.

             2   Have you changed your view in any way?

             3          THE JUROR:  No.

             4          THE COURT:  The bottom of 25, Question 95, we asked,

             5   "If you found this defendant guilty and you decided the death

             6   penalty was appropriate, could you conscientiously vote to

             7   impose the death penalty?" and you said "yes."

             8          THE JUROR:  Uh-huh.

             9          THE COURT:  The next question is the reciprocal of

    05:09   10   that.  "If you found the defendant guilty and you decided that

            11   life imprisonment without the possibility of release was the

            12   appropriate punishment, could you conscientiously vote for that

            13   penalty?" and you said "yes."

            14          THE JUROR:  Do you feel like that's a contradiction?

            15          THE COURT:  No, I don't necessarily.  Do you?

            16          THE JUROR:  No, I don't.  I think it's depending on

            17   what the facts are.

            18          THE COURT:  Okay.  Follow-up?

            19          MR. MELLIN:  Your Honor, may I ask a few questions?

    05:10   20          THE COURT:  Okay.

            21          MR. MELLIN:  Good afternoon.  I'm Steve Mellin.  I'm

            22   one of the prosecutors on the case.  I'd like to jump back to

            23   where Judge O'Toole started, which was a little bit of

            24   discussion kind of about your master's of social work.

            25          Your undergraduate degree, it looks like, was in

1    psychology.  Is that right?

2           THE JUROR:  Yes.

3           MR. MELLIN:  What types of courses did you take for

4    that?  I didn't mean that to be a trick question.

5           THE JUROR:  I know.  It was just a thousand years ago.

6    So behavioral psych.  I did concentrate more in adolescent at

7    the time, so adolescent psych, family and children.

8           MR. MELLIN:  And "adolescent" to you means what?  What

9    age are you talking about?

05:10 10          THE JUROR:  Well, adolescent -- well, some theories it

11    could be 13 to 26.

12          MR. MELLIN:  Okay.

13          THE JUROR:  You know, depending on, you know, what

14    school of thought you came from, so...

15          But when I did work with children, for adolescents it

16    was considered 13 to probably 18.

17          MR. MELLIN:  And what type of work did you do with the

18    children?

19          THE JUROR:  Well, I've had many jobs in social work,

05:11 20    so I'm trying to think.  To start off with, I did work at a

21    group home, Harbor Schools, and I was the lead social worker

22    there.  So they were residents that were placed there.  And so

23    I did a lot of case work, a lot of individual, and then a lot

24    of groups.  And then overseeing the staff.

25          MR. MELLIN:  How did the children end up at the home?

 1          THE JUROR:  Some of -- I would say most of them were

 2    probably placed by the state at the time.  They -- you know, if

 3    they weren't able to be integrated into the community at their

 4    homes, or if their homes weren't a place where they were being

 5    able to kind of abide by laws and different things like that,

 6    this was a place where they could be under supervision and get

 7    an education as well.

 8          MR. MELLIN:  Okay.  You mentioned earlier that you did

 9    some work in kind of a crisis setting.  Is this the crisis

05:12 10    setting or is that something else?

 11          THE JUROR:  No, no, I worked for Greater Lynn -- not

 12    Greater Lynn.  I'm sorry.  I worked in Lynn at a crisis center,

 13    so it was on-call.  And I also worked in the crisis agency.  So

 14    if, say -- a lot through Lynn Union Hospital, if they had

 15    people who came in who were, perhaps, suicidal and different

 16    things like that, I was the initial person who did the

 17    evaluation before the psychiatrist came onsite.

 18          So I did the evaluation to see if the person should go

 19    to the next step or if they could go home or if they could go

05:12 20    into outpatient therapy or if they needed to be in inpatient.

 21          MR. MELLIN:  Any interactions with law enforcement in

 22    any of that where -- if the crisis was some type of domestic

 23    abuse or anything like that where you would call the police?

 24          THE JUROR:  They would call me.  So I was -- like the

 25    police usually were the ones who brought them to the hospital.

```
 1    Not all the time.  I'm sorry.  But that's how that happened.
 2            Would I have to call the police?  At my office
 3    sometimes, you know, if somebody was -- you know, had a
 4    psychotic break or something like that, or was getting violent,
 5    then we did have to call for police assistance.
 6            MR. MELLIN:  And in the time you were working in
 7    social work, did you do any psychological testing on any of the
 8    people you were dealing with, anything like that?
 9            THE JUROR:  No, that wasn't my job.  That was
10    done -- they were referred to me after that.
11            MR. MELLIN:  Have you ever done any?
12            THE JUROR:  Probably as, like -- you know, in graduate
13    school as part of a practicum, but it wasn't what I studied or
14    specialized in.
15            MR. MELLIN:  Okay.  So in this case if you were to
16    hear from psychologists, would you be able to decide the weight
17    to give that testimony based on hearing the testimony here in
18    court as opposed to maybe what you learned back a few years
19    ago?
20            THE JUROR:  Honestly, you know, I don't know.  I mean,
21    it was so long ago, it kind of seems like a lifetime ago.  It
22    might trigger some things that I had in my education, but I
23    don't think I would consider myself like a professional in
24    that.
25            MR. MELLIN:  Fair enough.  Okay.
```

1        And then turning to the death penalty questions, you

2    kind of put yourself in the middle of the road on this.  You

3    said that you have thought about it a little bit since we

4    handed you this little text to fill out.

5        What have you thought about the death penalty since

6    you filled out this questionnaire?

7        THE JUROR:  Probably how my position has changed on

8    it, you know, as far as, like, you see me as a social worker, I

9    probably started out young probably being more liberal, and

05:14 10   then probably becoming -- as I became older and worked more a

11   little bit more open to, you know, that it's not very black and

12   white; that there's different things that come into play for me

13   as far as that decision.

14       MR. MELLIN:  Okay.  And you mentioned that you believe

15   that it's a case-by-case analysis, right?

16       THE JUROR:  Uh-huh.

17       MR. MELLIN:  If you did believe this was a case where

18   you thought the death penalty was appropriate, would you be

19   able to vote to impose the death penalty?

05:14 20   THE JUROR:  Yes.

21       MR. MELLIN:  Thank you.

22       MS. CONRAD:  Good afternoon.  My name is Miriam

23   Conrad.  I'm one of Mr. Tsarnaev's lawyers.

24       Can you tell me a little bit more about some of the

25   things in your life experiences that caused you to change your

1    view about the death penalty?

2         THE JUROR:  Probably having children myself and seeing

3    things -- you know, and as far as just things that -- cases

4    maybe I've come across or things I've seen in the news as far

5    as things happening.

6         MS. CONRAD:  Can you be more specific?  Any particular

7    cases that come to mind?

8         THE JUROR:  No.  I think just probably, you know, if

9    you had asked me this question 20 years ago, I would have said

05:15 10  absolutely not, and now I just think -- I'm just not as naive

11   and I just have to, you know, look at things from both sides.

12        MS. CONRAD:  When was it exactly that you did do

13   social work?  You said the '90s?

14        THE JUROR:  Yes.  And I still always -- like I said, I

15   always try to keep myself involved in some way, you know, as

16   far as like volunteering or something like that.

17        MS. CONRAD:  So was it a conscious decision to leave

18   that field or was it more just change in circumstances?

19        THE JUROR:  I'd say change in circumstances because I

05:16 20  made no money and my husband did, and so I didn't want to pay

21   someone to raise my kids.

22        MS. CONRAD:  I understand.  You said, I think in

23   answer to Mr. Mellin's question, about, you know, if the

24   circumstances called for it.  Can you tell us a little bit more

25   about what kind of circumstances would be relevant to that in

1    your mind?

2           THE JUROR:  Well, I just think -- like an example just

3    that would come to me -- I don't know.  If the evidence just

4    was, like, just completely that this was just a malicious act

5    and this is the intention, then I guess that -- you know, if

6    there was no way around it, you know, but I think -- just the

7    facts would have to be there that I would really have to, you

8    know, think about it.  I couldn't just say no right away; I

9    couldn't just say yes right away.

05:17 10           MS. CONRAD:  I'm sorry.  You could or could not say

11   yes right away?

12           THE JUROR:  I think that I would have to have more

13   information either way.  I don't think it's a decision -- like

14   I'm not somebody who's just going to say right at a cocktail

15   party that, yes, somebody should be put to death or, no, they

16   shouldn't.  I need more information.  I'm not going to just

17   jump to that.

18           MS. CONRAD:  And would you be able to consider facts

19   regarding the defendant's background as well as facts regarding

05:17 20   the crime in making that determination?

21           THE JUROR:  Yeah, absolutely.  I think that's probably

22   where my thought process would be.

23           MS. CONRAD:  Now, you said something about having

24   children changing your view.  Can you talk a little bit more

25   about that?

1      THE JUROR:  Well, I just think that as far as probably

2  not being as naive and just thinking that -- you know, that

3  sometimes bad things happen out there and there needs to be

4  more consequence, whereas when I was younger and it was just

5  myself, I probably didn't have that point of view.

6      MS. CONRAD:  Would a case that involved the death of a

7  child make it more difficult for you --

8      MR. MELLIN:  Objection.

9      THE COURT:  Sustained.

05:18 10      MS. CONRAD:  You told us that -- well, you said on

11  your form that you were unsure whether you'd formed -- the way

12  the question is framed is a little bit difficult.  If you'd

13  look at page 20, Question 77.  So it's a little confusing, but

14  the way the question is actually written is it asks whether

15  you'd formed an opinion about whether Mr. Tsarnaev is guilty,

16  and your answer to that is "unsure."

17      THE JUROR:  Uh-huh.

18      MS. CONRAD:  So are you saying there that you're

19  unsure whether he's guilty or you're unsure whether you formed

05:19 20  an opinion?

21      THE JUROR:  Well, I think they're one and the same

22  because I don't have that information, you know, as far as if I

23  just watched the television that day, then, you know, that

24  wouldn't be -- I don't know.  That's just not where I would

25  come from, you know?  I just don't feel like -- I am unsure as

1    far as, like, what you're asking.  Like I'm not someone who's

2    going to say "guilty" or not "guilty."

3            MS. CONRAD:  Sure.  And I appreciate that and I really

4    appreciate -- first of all, I want you to understand that we're

5    really trying to find out how you feel.  There are no right or

6    wrong answers here, which is really the most important thing,

7    is that you tell us as honestly as you can.  And sometimes it's

8    hard to know yourself how you feel about something.

9            And of course, we appreciate that you understand the

05:20 10   legal concepts, but before you ever got your jury summons, did

11   you have an opinion about whether Mr. Tsarnaev was guilty?

12           THE JUROR:  From what I saw on TV?

13           MS. CONRAD:  Yes.

14           THE JUROR:  I guess, yes, I suppose that we knew that

15   he was involved.

16           MS. CONRAD:  And what was that based on?

17           THE JUROR:  From the media.  And like I started off,

18   it's just -- you know, I don't always believe everything that

19   I, you know, hear or see from the media, but it was from what

05:20 20   the media coverage was telling us.

21           MS. CONRAD:  And is there anything about that media

22   coverage that stands out in your mind?

23           MR. WEINREB:  Objection.

24           THE COURT:  Yeah, I think so.

25           MS. CONRAD:  Again, focusing on your state of mind, if

```
 1   you will, before you got your jury summons did you have an

 2   opinion about whether or not Mr. Tsarnaev should receive the

 3   death penalty?

 4           MR. WEINREB:  That was just asked and answered.

 5           MS. CONRAD:  No, I asked about guilt; now I'm asking

 6   about the penalty.

 7           THE COURT:  This is about the death penalty.

 8           MR. WEINREB:  I withdraw that.

 9           THE COURT:  The C and D part is the question.

10           THE JUROR:  I'm sorry.  So what was your question?

11           MS. CONRAD:  So my question is just before you got the

12   jury summons did you have an opinion one way or the other about

13   whether Mr. Tsarnaev should receive the death penalty?

14           THE JUROR:  Honestly, I don't think I thought about

15   it.

16           MS. CONRAD:  And did you think about it after you

17   received the summons?

18           THE JUROR:  Yeah, I think so.  I think that's because

19   it was out there for -- you know, everybody obviously knew what

20   this trial was going to be about.

21           MS. CONRAD:  And when you thought about it at that

22   point, did you form an opinion or did you have an opinion?  And

23   I'm not, again, asking whether you could put that opinion

24   aside; I'm just asking whether you had an opinion.

25           THE JUROR:  An opinion of?
```

```
 1              MS. CONRAD:  Whether he should receive the death

 2       penalty.

 3              THE JUROR:  No, I did not.

 4              MS. CONRAD:  You said in answer to Question 76, which

 5       is also on page 20, that you read news articles regarding the

 6       venue appeal?

 7              THE JUROR:  Uh-huh.

 8              MS. CONRAD:  And can you tell us a little bit about

 9       what you read?

05:22 10              MR. MELLIN:  Objection.

11              THE COURT:  No, go ahead.  You can answer that.

12              THE JUROR:  So I'm sorry.  I don't have my glasses.

13       So the question is?

14              MS. CONRAD:  Do you want to borrow mine?

15              THE JUROR:  They made me leave me stuff outside.

16              So you want to know what I read specifically?

17              MS. CONRAD:  Yes.

18              THE JUROR:  Just that his lawyers were trying to

19       change the venue because, obviously, you know, you were

05:22 20       concerned about people on the North Shore and, you know, just

21       us being probably more prejudice to the situation.

22              MS. CONRAD:  Why do you mention the North Shore in

23       particular?

24              THE JUROR:  That's where I live.  It wasn't in the

25       article.
```

```
 1              MS. CONRAD:  And you read this after you got the
 2    summons?
 3              THE JUROR:  Oh, gee.  I don't -- after I got the
 4    summons?  Honestly, I probably wasn't conscious of the fact
 5    that that was even about this.  I think as of January 5th I
 6    didn't even put two and two together, so I think I did.  I
 7    think when I would just open, you know, my computer, it was
 8    there.
 9              MS. CONRAD:  Sure.
05:23 10              THE JUROR:  To be honest, did I read the whole
11    article?  No.
12              MS. CONRAD:  So you didn't realize -- am I
13    understanding you correctly that you didn't realize that your
14    jury summons was for this case until you came in on January
15    5th?
16              THE JUROR:  Absolutely.  Right.
17              MS. CONRAD:  And so how did you feel about that?
18              MR. MELLIN:  Objection.
19              THE COURT:  Sustained.  We asked it in the
05:23 20    questionnaire.
21              MS. CONRAD:  Yes.  But your -- let me go back, then,
22    your Honor.
23              So your answer to Question 74 was not your reaction to
24    being a juror in this case but just getting a jury summons in
25    general.
```

```
 1              THE JUROR:  74?  "What did you think of..."   Yeah.
 2      That's...
 3              MS. CONRAD:  So my question is:  When you realized it
 4      was for this case, how did you feel?
 5              THE JUROR:  On January 5th?
 6              MS. CONRAD:  Yes.
 7              THE JUROR:  Probably a little stupid that I didn't
 8      realize it was that case because I think everybody else did.
 9              MS. CONRAD:  Not necessarily.
10              THE JUROR:  Okay.
11              MS. CONRAD:  But how did you feel about the
12      possibility of being a juror in this case? I guess is what I'm
13      asking.
14              THE JUROR:  It probably gave me pause.  I mean, I
15      don't know if it -- you know, what the emotions that I had.  I
16      was just like, wow.
17              MS. CONRAD:  And since then have you given that more
18      thought?
19              THE JUROR:  Honestly?  Yeah.  I'm supposed to go to
20      Aruba in a couple of months.  I was thinking, wow, you know,
21      this is going to be a long -- the judge said that you could be
22      here for a long time, so I thought, wow, it's a big commitment.
23              MS. CONRAD:  Do you already have tickets for that?
24              THE JUROR:  I do.
25              MS. CONRAD:  You do?
```

05:24 (line 10)
05:24 (line 20)

                    1            THE JUROR:  Yeah.

                    2            MS. CONRAD:  And they're already paid for?

                    3            THE JUROR:  No, it's a company -- for my husband,

                    4    so...

                    5            But that's probably the most thought I gave it.

                    6            MS. CONRAD:  Your answer to Question 74, "Grateful to

                    7    have a legal system in place"?

                    8            THE JUROR:  Yes.

                    9            MS. CONRAD:  Can you tell me a little bit more about?

    05:25     10            MR. MELLIN:  Your Honor, objection.  We've already

                  11    gone over this.

                  12            THE COURT:  Yes, I think that's plain enough,

                  13    actually.

                  14            MS. CONRAD:  May I just have a moment, your Honor?

                  15            (Pause.)

                  16            MS. CONRAD:  On Question 89 -- and I'm sorry if you

                  17    already answered this, I had a little trouble hearing -- but it

                  18    looks like you crossed out 6 and changed it to 5?

                  19            THE JUROR:  Okay.  I'm sorry.

    05:25     20            MS. CONRAD:  It's on page 23.  I'm sorry.

                  21            THE JUROR:  Page 23?  Page 23?

                  22            MS. CONRAD:  Yes.

                  23            THE JUROR:  Okay.

                  24            MR. WEINREB:  Your Honor, if that's a question, I

                  25    object.  That was asked and answered at length.

```
  1              MS. CONRAD:  I'm sorry.  I just didn't hear the answer
  2    if it was.
  3              MR. WEINREB:  Well, it will be in the transcript.
  4              THE COURT:  I think it shows that there was a -- the
  5    juror originally put 6 and changed it to 5.  I'm not sure how
  6    much of a gradient change that is.  They're both right in the
  7    middle.
  8              MS. CONRAD:  Well, one's -- they're two different
  9    answers.
10    05:26      THE COURT:  Anyway, I think we can leave it as-is at
11    this particular point.
12              MS. CONRAD:  When you read about the venue, did you
13    have any opinion about it?
14              MR. MELLIN:  Objection.
15              THE COURT:  Sustained.
16              MS. CONRAD:  In working with law enforcement and your
17    experience with law enforcement, would anything about that
18    experience affect how you would view testimony by a law
19    enforcement officer?
20    05:26      THE JUROR:  No.
21              MS. CONRAD:  Would you tend to give more -- more
22    readily believe a law enforcement witness than a non-law
23    enforcement witness?
24              MR. MELLIN:  Objection.  Asked and answered.
25              THE COURT:  Yeah.  You know, I don't think we have to
```

```
 1    follow up on questions that were unambiguously answered in the
 2    questionnaire.
 3              MS. CONRAD:  Well, your Honor, respectfully,
 4    Mr. Mellin asked a number questions about work with law
 5    enforcement.  I'm following up on those.
 6              THE COURT:  Well, that was about experience.  But the
 7    question about crediting or discrediting law enforcement
 8    testimony because of its source was plainly in the
 9    questionnaire.  We have an answer to that.
05:27 10              MS. CONRAD:  Thank you very much.
11              THE JUROR:  Okay.
12              THE COURT:  Okay.  Thank you.
13              THE JUROR:  Thank you.
14              (The juror is excused.)
15              MS. CONRAD:  Your Honor, may I just raise one issue on
16    that last point?  I feel like I've read this questionnaire
17    pretty thoroughly, and the way the question is framed is,
18    Question 36, is "Do you have any concerns about your ability to
19    follow that instruction," which is not quite the same thing.
05:27 20    And if Mr. Mellin is allowed to ask questions about details
21    about interactions with law enforcement, it seems to me it's
22    fair follow-up to ask how that would affect your view of a
23    witness.
24              THE COURT:  You were just asking the same question.
25              MS. CONRAD:  No, I'm not asking "Do you have any
```

1    concerns"; I'm asking whether it would cause her to view it

2    differently.  It's not whether she has concerns.

3              THE COURT:  I think it's substantially the same

4    question.

5              Anyway, let me just point out on the ambiguity -- by

6    the way, I think most of these questions were as a result of a

7    shared proposal.

8              MS. CONRAD:  Well, excuse me, your Honor.  That's not

9    quite true.

05:28 10            THE COURT:  Well, I don't know all the history.  I

11   know that I didn't write it, so I know -- let me go to another

12   potentially ambiguous -- I don't think 77 is as ambiguous as

13   has been suggested.  The question is:  "Have you formed an

14   opinion," and then if you continue on, "that the defendant is

15   guilty?"  It's not whether the defendant is guilty, which would

16   be a question about the existence of an opinion.  This presents

17   the opinion and says, "Have you formed this opinion?"

18             MS. CONRAD:  But then what is --

19             THE COURT:  So I'm not sure the ambiguity is as.

05:28 20            MS. CONRAD:  But then what does "unsure" mean in that

21   context?

22             THE COURT:  I don't know.  That's a fair question.

23             MS. CONRAD:  That was my question.

24             THE COURT:  But -- no.  The suggestion was, and I

25   think it happened the other day too, and I hadn't focused on it

1    myself until that time, that if the question was "Have you

2    formed an opinion whether he's guilty or not," then you could

3    arguably be asking whether the mental event had occurred and

4    that there was an opinion rather than asking for what the

5    opinion was.

6            This posits the opinion in each of the subsections and

7    says, "Have you formed an opinion that he is guilty?  Yes, no

8    or unsure?"  "Have you formed an opinion that he's not guilty?

9    Yes, no or unsure."  So it's not whether you have an opinion;

05:29 10   it's about whether you have the specific opinion.

11           MS. CONRAD:  But I think the problem is that for

12   people who answer "unsure," it is more plausible -- or

13   certainly is plausible that they are unsure whether he's guilty

14   or not as opposed to they're unsure whether they have an

15   opinion, which frankly doesn't make any sense.

16           THE COURT:  Well, okay.  I think I made my point.  I

17   think we could move on.

18           MR. WEINREB:  Your Honor, could we go to sidebar mode

19   for a minute?

05:29 20           THE COURT:  All right.

21           THE CLERK:  Cut it.

22           MR. DOREAU:  Audio and video off.

23           (Discussion at sidebar and out of the hearing of the

24   public:)

25           MR. WEINREB:  So over the break the parties took

1    another look at 238, and I think we've reached an agreement.

2              MS. CONRAD:  I'm sorry.  I can't hear a word

3    Mr. Weinreb is saying.

4              THE COURT:  That's the next one?

5              MR. WEINREB:  Yeah.  A combination of hardship -- it's

6    apparently a single mother of a middle-school child who she

7    says has depression -- and then there are other factors.

8              THE COURT:  Okay.  I think I had the hardship issue in

9    my mind when I reviewed this.

05:30 10             MS. CLARKE:  There are also substantial connections.

11             MR. BRUCK:  That was the basis on which we agreed.

12             THE COURT:  Where is that?

13             MR. MELLIN:  80 through 82, your Honor.

14             MR. BRUCK:  Connections to the event.

15             THE COURT:  I don't know if they are but...

16             MR. WEINREB:  That's not the basis on which we agreed,

17    but I understand that's a concern of the defense.

18             THE COURT:  It does seem to be a concern.  We might

19    have to explore that to find out -- although I think 80 is

05:31 20    concerning, I'm not sure 81 and 82 is so concerning.  But 80.

21    I think my reaction when I read the circumstances of the

22    hardship, that that was likely to be recognized.

23             So I guess we can just skip that.

24             Okay.  So we'll take a break.  And I have another

25    matter that I have to deal with.  It shouldn't take too long.

1    It's a conference in another criminal case.  I think we're

2    going to do a telephone conference at about 2:30.  So three

3    o'clock okay for everybody --

4              COUNSEL IN UNISON:  Sure.

5              THE COURT:  -- just to have a round number?

6              MS. CLARKE:  We think the Court should be able to

7    reassign its other cases.

8              (Laughter.)

9              THE COURT:  Night court.

05:32 10              (Laughter.)

11              THE COURT:  Before everybody wanders, we have a

12    list -- this should be on the record but it's in sidebar mode.

13    So stay cut.

14              MR. DOREAU:  We're still off.

15              THE COURT:  We're still off.

16              So we prepared a list of my suggested excusals for

17    tomorrow, and if you're agreeable to those and if you have any

18    others that you want to propose, we can deal with them and then

19    we'll backfill.  We have, then, a much more extensive list for

05:33 20    what is basically the rest of Panel B that I would like to have

21    resolved by Friday afternoon, if we could, so that we could

22    prepare all of next week without these people.  I think we're

23    about to get to the point where we'll stop dragging in people

24    that we immediately send home, which is troubling, frankly,

25    but...

1            So if you'd each --

2            MS. CLARKE:  So, Judge, this long list is --

3            THE COURT:  Is for next week.

4            MS. CLARKE:  -- out of the rest of B?

5            THE COURT:  Yes.  It covers a couple hundred people, I

6    think.  And let me just tell you, my criterion is that it's

7    virtually certain by the -- what we've already been doing in

8    two areas in particular -- well, I guess principally hardship

9    is what it is.  Principally hardship.  And there are different

05:33 10    kinds of hardship:  There's, perhaps, family matters; there's,

11    perhaps, trips that are planned; there's, perhaps, student

12    status and something.

13            But I have not tried to cut it finely, so that if

14    somebody looks like they're an hourly worker but they have

15    answered Question 10 "no," I haven't proposed them to be

16    excused.  I haven't made the judgment that they can't handle it

17    even though I suspect that might be the case.

18            So these are intended to be pretty clear people.  And

19    so there will still be some people that will have hardships

05:34 20    that we'll recognize, but these are ones that are palpable on

21    the face of it.

22            MS. CLARKE:  Judge, what does this list go through

23    tomorrow, 279?

24            THE COURT:  We had the number.

25            LAW CLERK:  It's at the bottom.

1          THE COURT:  Oh, yeah, it's at the bottom.  Whatever it

2     says in the footnote.

3          MS. CLARKE:  Through 276.  We've already agreed on

4     242, I think.

5          THE COURT:  Well, anyway, take a look at this, and

6     this afternoon let us know about tomorrow's, and then by, you

7     know, early afternoon tomorrow, so Jim can work on it for next

8     week, if you could let us know about the rest of the list.

9     There's about 30 or so of them, I think.

05:35 10          MR. MELLIN:  Your Honor, if we -- if the parties have

11     a perhaps slightly more liberal criteria of hardship and we can

12     come to agreements that exceed what your Honor has suggested,

13     should we propose those or not?

14          THE COURT:  Yeah, you can propose them.  I would want

15     to look at them.  So okay.  Thanks.  We'll see you about three.

16          (The Court exits the courtrooms and there is a recess

17     in the proceedings at 2:28 p.m.)

18          (The Court enters the courtroom at 3:08 p.m.)

19          THE COURT:  Okay.  No broadcasting, right?

06:15 20          So we'll consider the jurors who we interviewed today

21     starting with Number 204.

22          MR. CHAKRAVARTY:  Your Honor, the government has a

23     motion.  This was -- I think maybe a first amongst the

24     jurors -- the prospective jurors that we've seen in that it was

25     not a particular response to any of the material questions in

```
 1    the questionnaire that gives pause to the government, but it's
 2    how she responded.  She clearly had some anxiety.  She was open
 3    and candid about that in the paper.  When she sat down she was
 4    visibly extremely anxious.  I think even the Court reminded
 5    her -- caused her to relax a little bit.  But then as the
 6    questioning went on, time and time again she manifested both by
 7    delays and pauses in how she answered some of the questions,
 8    the anxiety that she was open with us that she had.
 9            In this case where a lot of the evidence is going to
10    be very disturbing and for a person who, you know, in her
11    words, she doesn't like to think about those things -- another
12    thing she said was it makes her nervous to even think about the
13    things that happened to her brother in the context of -- it's
14    somebody who's avoided that kind of assessment of some of the
15    hideous issues that anybody will ever have to do strikes me
16    that this is not the case that we should have this young woman,
17    who might grow to have the confidence to be able to deliberate
18    with a jury with at least 12 people in another case maybe down
19    the line.
20            At this stage in her life the government doesn't feel
21    confident that she would be able to do so in a constructive way
22    that regardless of how she comes out and regardless of her
23    feelings on the death penalty or guilt or innocence, it's just
24    not constructive to the process that we're here for.  So that's
25    the reason for the cause.
```

06:16  (line 10)

06:17  (line 20)

1          MR. BRUCK:  We disagree.  Do you need to hear argument

2     from us?

3          THE COURT:  Sure.

4          MR. BRUCK:  Well, I mean, people come in all, you

5     know, different types.  And she described her anxiety as

6     something that tends to dispel when she gets used to the

7     situation, which she did visibly.  She's a young person who

8     took very seriously some of the questions about the death

9     penalty.  She does -- I don't think it's disqualifying that

06:17 10  somebody doesn't listen to the news.  In this case it's a

11    little bit of a relief, assuming that it's true, and I think it

12    did seem to be true for her.

13          There's just -- I mean, she's a somewhat shy person,

14    but I think the government's real objection was that she became

15    very solemn when asked about the death penalty and expressed an

16    appropriate degree of seriousness about -- that that would be a

17    hard decision.  And I think the government feels like, well,

18    she's not a good juror for them so we'll move to disqualify her

19    on the grounds that she's anxious.

06:18 20          But I just don't think that's warranted, and I think

21    it's somewhat clear what the government really doesn't like

22    about her, is that she's not a strong death penalty juror.

23          MS. CONRAD:  May I just add one thing to that?  What

24    she said she was anxious about was speaking in front of other

25    people like this.

```
 1              THE COURT:  I won't strike her for cause.  I actually
 2      thought she did pretty well.  Given her self-report about
 3      anxiety, I thought she did pretty well.  I think some of our
 4      more sophisticated jurors today displayed nervousness as well.
 5      I mean, this is an unusual thing for people to be confronted
 6      with and in a forum they're not accustomed to.  And it's kind
 7      of intimidating with all you people staring at them.  I
 8      actually thought she did pretty well.
 9              So I don't see her anxiety or her deportment here as a
10      cause for excuse for cause.  So we'll leave her in.
11              205?
12              MR. WEINREB:  No motion.
13              MR. BRUCK:  No motion except in the -- as against the
14      background of our venue motion, our position of implied
15      prejudice applies to -- you know, when we say we have no motion
16      with respect to a juror, that obviously doesn't negate the fact
17      that we think there is implied prejudice as to all jurors in
18      this venue, so...
19              And I think this is a juror to which that would
20      apply --
21              THE COURT:  Okay.
22              MR. BRUCK:  -- in particular.  We don't think there's
23      anything particular about him that is -- allows us to make a
24      particularized motion.
25              THE COURT:  I guess I'm not following this.  You
```

1     object to everybody.

2              MR. BRUCK:  We do.

3              THE COURT:  Okay.  I understand that part.  That's all

4     you're reserving?

5              MR. BRUCK:  Thank you.

6              THE COURT:  Okay.  All right.  He's in.

7              I think Number 208 we've already assessed, as 211.

8              That brings us to 215.

9              MR. WEINREB:  So, your Honor, the government moves to

06:20  10     strike 215 as being prevented or substantially impaired from

11     imposing a death sentence.  The government's entitled to jurors

12     who can, in fact, impose a sentence of death if the juror

13     determines that it's the appropriate sentence, and there are

14     numerous cases which hold that a -- if a juror is unable to

15     unequivocally state that he or she can do so, that it is

16     appropriate to strike them for cause.

17              This juror could not even once unequivocally state

18     that she could do so.  And, in fact, even in situations where a

19     juror states unequivocally that he or she can do so but then

06:21  20     seems to back away from that or contradict it, even that, the

21     cases have held, is sufficient grounds for excluding them.

22     *Uttecht* and many other cases from the courts of appeals from

23     all of the circuits have held that.

24              So this juror under the, you know, well-settled

25     prevailing standard is substantially impaired in her ability to

1   impose the death penalty.  When asked if she could actually do

2   it having concluded that it was the appropriate sentence, the

3   most she could ever muster is, "I'm not sure.  I don't know.  I

4   want to say yes," but she could never actually say yes.

5          And, in fact, the very last time she was asked the

6   question, which was by Mr. Bruck, I'm sure the Court recalls

7   she hesitated for a very long time and really seemed to be

8   searching her soul as to whether she could do it.  And at the

9   end she said, "I want to say yes but I don't know" or "I'm not

06:22 10   sure."

11          And that's not a fair juror for the government.

12   That's not a juror who can necessarily follow the law which is

13   that she would be able to actually impose the death sentence.

14   And although I understand, as the Court said earlier, that it

15   puts jurors in a difficult spot to be asked to predict what

16   they could or could not do in an unfamiliar situation, that's

17   the whole nature of this process.  Being on a jury where you

18   have to impose a sentence of death on somebody is a possibility

19   that is going to be unfamiliar to every juror.  And so we have

06:22 20   to be able to rely on their prediction of their own ability to

21   do so or not.  And this juror simply was not sure; she could

22   not say yes.

23          THE COURT:  The cases you refer to -- I'm guessing, I

24   guess -- say it was not error to have excused a juror under

25   those circumstances rather than saying a juror who answers

1     thusly must be excused.

2          MR. WEINREB:  Well, yes.  But I would add the caveat

3     that since the government can't appeal under those

4     circumstances, it's logical that you are never going to see a

5     circumstance saying that the Court erred by failing to grant a

6     government's strike.  But I do think that the -- although the

7     Court is absolutely correct about that, that the cases -- if

8     you -- the cases from *Witherspoon* and *Witt* on make it clear

9     that the government is entitled -- and that's the word that the

06:23 10   courts use, including the Supreme Court -- entitled to jurors

11    who are not prevented or substantially impaired from imposing

12    the death penalty.

13          So although a court will never be found to have erred

14    by granting a defense strike, because it's impossible for the

15    government to appeal that, I think that it is clear that it is

16    not -- it is contrary to the law to seat a juror who is, in

17    fact, unable to state equivocally that they can give

18    consideration to it.  Not actually do it in this particular

19    case, but that if they determine that it was the appropriate

06:24 20   sentence, actually impose a death sentence.

21          MR. BRUCK:  Your Honor, when you were entertaining

22    Mr. Weinreb's objection to one of my questions, you described

23    the difficulty of a juror projecting into the future what he or

24    she may or may not do in response to various eventualities, and

25    I really thought you were talking about this juror, because

1   this is exactly what happened.  This juror was being more

2   thoughtful, perhaps, than many others about the awesome nature

3   of this decision and one about which she had never thought

4   before.  And she said many times over that she could make the

5   decision that the death penalty was appropriate, but then the

6   best that she or indeed anybody who's really being honest can

7   say about, "Well, can you actually do it?" is, "Well, I don't

8   know."

9           But she felt like she could, that she should.  She

06:25 10  went as far as she possibly could.  And it just didn't seem at

11  the time that we were -- we had an impaired juror; it seemed

12  like this was a juror who was simply struggling with a

13  hypothetical situation that she had never encountered before.

14          The test shouldn't be jurors who take this question

15  seriously and struggle with it are ineligible to serve, and

16  only the jurors who say, "Yeah, sure.  No problem.  I would do

17  that," are the ones who exclusively sit on juries.  That

18  would -- is the sort of jury that *Witherspoon* forbids.

19          If this juror did not strike your Honor as

06:25 20  substantially impaired, that ends the issue.  The cases that

21  Mr. Weinreb is referring to are the ones where the court is

22  convinced that a juror is impaired, and then the question

23  becomes does the record support the exercise of discretion?

24  But if she did not strike you as an impaired juror, then

25  there's nothing -- there's nothing really further to be

1    concerned about.  And I don't think she should have.

2         We had a Juror No. 60, we revisited her

3    disqualification.  The best she could say about whether she

4    would put aside her opinion of guilt was that she thought so,

5    and that was ruled to be sufficient.  And this is similar.

6    This is a juror who simply takes the decision very seriously.

7    It's a new issue.  She was struggling in front of our eyes to

8    imagine herself sentencing somebody to death.  It's the kind of

9    juror that we ought to have in a capital case.  And we don't

06:26 10   think there's any basis for finding her substantially impaired.

11   There is certainly no basis for requiring her disqualification.

12         THE COURT:  Yeah, I'm going to deny the strike on this

13   as well.  I think that she was a very thoughtful juror.  One of

14   the issues, I probably said this already, is some jurors are so

15   scrupulous about their answers that they over-doubt their own

16   ability.  I mean, I've found that as long as I've been trying

17   cases.  And I think this is a juror in that category.  I think

18   there's a difference between intellectually being unable to

19   vote for the death penalty and not being sure here that at some

06:27 20   future occasion on some body of evidence emotionally she will

21   be able or unable to do it.  I just think that's a very

22   difficult question to assess.

23         And so I looked at other criteria or indicators, and I

24   think her general intelligence, apparent intelligence and

25   thoughtfulness, are the marks of a good juror.  And the

1    substantive answers she gave as well.  I mean, her position was

2    essentially, "I've got to hear everything before I tell you

3    what I think."  So I think she would be a good juror.

4             Number 223 we talked about.

5             That brings us to 229.

6             MR. MELLIN:  No motion.

7             THE COURT:  And we talked about 238.

8             So passed on to the next level would be 204, 205, 215,

9    229.  Let me sum up -- this may already be in the record --

06:28 10  people who we may have either passed on beyond because -- I

11   guess these are all people we haven't seen, is that right -- on

12   the papers and determined no further voir dire was necessary.

13   Let me just read the list so it's in the record in case it's

14   otherwise ambiguous.  That's for this -- I guess for --

15            MS. CLARKE:  Where are you starting?

16            THE COURT:  201.  I don't remember.  Was that today or

17   yesterday?

18            LAW CLERK:  This is all today.

19            THE COURT:  This is all today.  So 201, 202, 203, 206,

06:29 20  207, 209, 210, 212, 213, 214, 217, 218, 220, 221, 222, 224,

21   225, 226, 227, 231, 232, 233, 235 -- and with respect to 235, I

22   add that we also have a doctor's letter with respect to that

23   particular juror -- 236 and 242.

24            MS. CLARKE:  And I'm not sure what it was the Court

25   was reading off because there were others that were excused

1    that --

2          THE COURT:  These are the ones that we didn't

3    interview, I believe, that we were removed from the interview

4    process.  There are others in -- yes, there are others that we

5    have seen that we've dealt with.  I just wanted to record those

6    people we did not actually interrogate.

7          Okay.  So we look -- yeah.  Did you have something?

8          MR. WEINREB:  I was just wondering if we're going to

9    move on now to the proposed agreed strikes.

06:30 10       THE COURT:  If you're ready to do that, yeah.

11         MR. WEINREB:  We're ready.

12         THE COURT:  Okay.  So where's my list?  I don't know

13   if I brought it in.  I may have left it in the other room.  I

14   think I maybe did.

15         Did you add any?

16         MS. CLARKE:  Yes.  188, your Honor, was a carryover.

17         THE COURT:  What's the -- can you just highlight

18   the --

19         MS. CLARKE:  He's -- I think it was hardship that we

06:31 20  agreed on.  I don't have the thing in front of me.  I just keep

21   carrying that number forward until he's coming back.

22         Do you have it?

23         THE COURT:  Yeah, well, I see his Question 10 was his

24   concern about discontinuation of health insurance.

25         MS. CLARKE:  Yes.

```
 1              THE COURT:  Yeah.  No, I don't have any issue with
 2     that.
 3              MS. CLARKE:  And of the list that the Court provided,
 4     I think we're all in agreement except for 244.
 5              THE COURT:  All right.  I don't think I have it here.
 6     I'll look at it.
 7              Who thinks it should be and who thinks it shouldn't
 8     be?
 9              MR. WEINREB:  We would agree to strike 244.
10              MS. CLARKE:  We thought we should ask a little more
11     about the hardship.
12              MR. BRUCK:  This is the homesteader with chickens.
13              THE COURT:  Well, if I recall, she said she had to
14     feed the chickens three times a day.
15              MR. WEINREB:  Yes.
16              THE COURT:  That's what caught my eye.
17              MR. BRUCK:  Having raised chickens, I can tell you
18     they don't need that level of attention.
19              THE COURT:  You had neglected chickens, I guess.
20              (Laughter.)
21              MR. WEINREB:  I was looking to a very entertaining
22     voir dire.
23              MR. BRUCK:  If you can keep it under 20 minutes of
24     back-and-forth questions about chickens --
25              MS. CLARKE:  Your Honor, her husband is a senior
```

 1    marketing executive, and we just thought it would be worth

 2    inquiring.

 3            THE COURT:  I'll look at it.

 4            MR. WEINREB:  We would also add 219 as a proposed

 5    strike for tomorrow on the grounds of hardship.

 6            MS. CLARKE:  219's gone.

 7            THE COURT:  We passed 219.

 8            Oh, I remember her.  Yeah, she was supposed to be here

 9    today and didn't, and she has --

06:33 10            MS. CLARKE:  Is she the carryover?

 11            MR. WEINREB:  She's the single mother with three kids.

 12            THE COURT:  No, there was something else that I saw

 13    about her.

 14            MS. CLARKE:  Oh, do you know what?

 15            MR. WEINREB:  She said she was unable to set aside her

 16    opinions about the defendant's guilt.

 17            MS. CLARKE:  Yeah, I thought 219 was gone but...

 18            MR. WEINREB:  She's possibly unemployed at this point.

 19            MS. CLARKE:  We don't see a hardship.  There was a

06:34 20    hearing loss on the right side.

 21            THE COURT:  I know I had her.  I think I left it in my

 22    office because I was expecting her tomorrow.  I think I put it

 23    up there.  So where are we?  There's not an agreement on her?

 24            MS. CLARKE:  Right.

 25            MR. WEINREB:  Right.

1          THE COURT:  Then we'll bring her in.

2          Okay.  So in addition to --

3          MR. WEINREB:  I'm sorry, your Honor.  We propose one

4    other, which is 249.

5          THE COURT:  Okay.

6          MS. CLARKE:  249 is gone.

7          MR. McALEAR:  She has been excused.

8          MR. WEINREB:  249 has been excused?  Okay.  Okay.  So

9    we're prepared to move ahead and consider who -- the proposed

06:35 10   agreed strikes to the backfilled jurors as well, if the defense

11   is ready and the Court is ready.  If you want to wait until

12   Friday afternoon.

13         THE COURT:  Let me get tomorrow first.

14         MR. WEINREB:  Okay.

15         THE COURT:  So we have the numbers, then, on the sheet

16   that we prepared, which are two, four, seven, and then there's

17   a question about one of them, 244, which I will look at.

18         MS. CLARKE:  Okay.

19         THE COURT:  So in addition to those seven --

06:36 20   MR. WEINREB:  Perhaps Mr. McAlear can tell us how many

21   are left at this point.

22         THE COURT:  Yeah, okay.

23         Well, did you have somebody in addition to the ones I

24   suggested?  I know you wanted one out, which is 244, but did

25   you have any additional?

1          MS. CLARKE:  One in.

2          MR. BRUCK:  One off the list.

3          THE COURT:  Yeah, I'm sorry.  It's a two-way street

4     and we're going in opposite directions.

5          MS. CLARKE:  I feel it.

6          (Laughter.)

7          THE COURT:  Are there additional proposed excuses from

8     tomorrow's group?

9          MS. CLARKE:  Not that we had a chance to --

06:36 10          THE COURT:  All right.  So the range of decision for

11     this is these seven or six of these seven.  Is that right?

12     Excluding 244?

13          MS. CLARKE:  Right.

14          MR. WEINREB:  That's right.

15          THE COURT:  All right.  So we'll resolve that.

16          MS. CLARKE:  We reserve the right, of course, to

17     change our minds -- no, only kidding.

18          THE COURT:  It's a judicial privilege.

19          (Laughter.)

06:36 20          THE COURT:  So then -- this basically, the long list

21     that you see here, basically exhausts Panel B; that is, we've

22     gone through to the end of Panel B for these people and propose

23     these.  So if you have a response now, that would be great.  I

24     mean, we could start assembling next week because it would help

25     us to the extent we have to backfill for Monday, we could begin

```
 1    do that.
 2            MS. CLARKE:  We've only had a chance, really, to look
 3    through 387, but we can tell you on those.  And we can do the
 4    others, you know --
 5            THE COURT:  Okay.  So that will give us a start
 6    anyway.  So through 387.
 7            MS. CLARKE:  Right.  We thought that the Court should
 8    still look at 311 and 358 -- or bring them in, 311 and 358.
 9    The others we were in agreement through 387.
06:37 10            THE COURT:  311, 358?
11            MS. CLARKE:  Right.  And we just haven't looked at the
12    remainder, Judge.
13            MR. WEINREB:  We agree with all of them.
14            THE COURT:  All right.  I'll look at 311 and 358.
15            MR. WEINREB:  I'm sorry.  Except for 414.
16            THE COURT:  We weren't going beyond 387 for that one,
17    but I could get the government's answer if you've done them all
18    the way down to the bottom.
19            MR. WEINREB:  We have.  And we would agree with all of
06:38 20    them except for 414, I believe just said with respect to
21    hardship, children and financial issues.
22            THE COURT:  414?
23            MR. WEINREB:  Yeah.  So it was a little unclear what
24    that meant.
25            THE COURT:  All right.  So you can tell us either late
```

1    today or tomorrow morning about the rest.

2         So the --

3         MR. WEINREB:  I'm sorry, Judge.  Before we move on,

4    would you like our proposals for additional strikes within the

5    range that the Court's considering, 280 to 387, because we

6    identified two others that seem to fit the Court's criteria for

7    hardship strikes.

8         THE COURT:  Oh, okay.  Yes.  Okay.

9         MR. WEINREB:  So we believe 283 is a full-time

06:39 10   student, wasn't on the Court's list.

11        THE COURT:  Is that the one we had a question about?

12   I don't know.

13        LAW CLERK:  I'm not sure.

14        THE COURT:  Do you know -- there was one, it was

15   ambiguous.  He didn't tell us he was a student in Question 26;

16   he said it in Question 27.  I don't know if that's the one

17   you're talking about.  Anyway, I'll just take the numbers.

18        MR. WEINREB:  He identified himself as a computer

19   science grad student at MIT.

06:39 20        THE COURT:  Okay.  All right.

21        MR. WEINREB:  And then the other one was 290 who said

22   that -- the juror said had ride problems.

23        THE COURT:  Is that the cook from the Cape?

24        MR. WEINREB:  Yes, the cook from the Cape.

25        MS. CLARKE:  Good, I'll remember.

```
 1              MR. WEINREB:  I think for a three- or four-month trial

 2    having to come up from the Cape is different from a one-week

 3    trial.

 4              THE COURT:  I'm not going to agree to that general

 5    proposition but --

 6              MR. WEINREB:  Okay.

 7              THE COURT:  -- I'll look at it.

 8              I think I toyed with taking him out.  I thought we

 9    should talk to him.  I think that was my reaction.  That's why

10    I know who you're talking about.  So I may be inclined to leave

11    him in.

12              MR. BRUCK:  Is that 283 or 290?

13              THE COURT:  That was 290.

14              MR. WEINREB:  290.

15              THE COURT:  So does the defense have any -- we talked

16    about some of mine that you thought should not be excused.  Do

17    you have additional ones --

18              MS. CLARKE:  We haven't looked at it for that.

19              THE COURT:  Okay.  But they would -- those would only

20    be joint ones anyway.

21              MS. CLARKE:  Right.

22              THE COURT:  Right.  So I'm not interested in those at

23    this point.  Okay.

24              MS. CLARKE:  So who would we have tomorrow?

25              MR. WEINREB:  Only Jim can tell us that.
```

```
 1              THE COURT:  What was our last number today?
 2              MS. CLARKE:  We struck 242.
 3              THE COURT:  The next number after 242, whatever it is,
 4    that hasn't been excused.  I don't know.  And it would go --
 5              MR. McALEAR:  Yeah.
 6              THE COURT:  -- I don't know that we have the last --
 7    do you have the last number?
 8              LAW CLERK:  We start at 243.
 9              MR. McALEAR:  If we go to 276, it's more than 20.  So
10    I just want to know how many you wanted me to bring in.
11              MS. CLARKE:  Because we start with 219.
12              MR. McALEAR:  219 is number one; 242 would be number
13    two.
14              THE COURT:  Why would you -- and you're assuming
15    these, excused?
16              MR. McALEAR:  Yes.  Yes.
17              THE COURT:  Okay.  And that would get -- 20 would
18    bring us to where?
19              MR. McALEAR:  Twenty would get us to 274.
20              THE COURT:  Okay.  Let's do that.  274 of --
21              But we agreed on 188, who was going to come tomorrow,
22    he'll not come?  Okay.
23              MR. McALEAR:  That's right.
24              THE COURT:  I don't know what the weather is going to
25    be tomorrow.  There's talk about a storm.
```

1          MR. WEINREB:  A few inches of snow, they said.

2          THE COURT:  It comes in the morning when people will

3     be driving?

4          MR. WEINREB:  Yes.  It starts after midnight.

5          MS. CLARKE:  Is the CDA going to vote to stay home?

6          MR. WEINREB:  Boston is safe.  What's a few inches of

7     snow?

8          MS. CLARKE:  I know.  Ms. Conrad said it's a dusting,

9     but I think she's learned --

06:43 10          MR. WEINREB:  Unfortunately, there's another storm

11     brewing for Sunday night.

12          THE COURT:  I guess I'm inclined to soldier on because

13     this is going to happen every week but -- we can't go by the

14     court's generic rule of the Boston Public Schools.  It's too

15     imprecise for our purposes, I think.  We have a manageable

16     number of jurors that can be contacted even individually, if

17     they had to be, to say don't come.

18          MS. CLARKE:  Should we start later?

19          THE COURT:  We probably will inevitably, but -- I

06:43 20     guess what it does raise is whether we should try to have as

21     many as 20.  Maybe we should reduce it to 15 or so.

22          MS. CLARKE:  Right.

23          MR. WEINREB:  Well, it might make more sense to go the

24     other way, assume that some aren't going to make it, or some

25     aren't going to make it until the afternoon, and start in the

1    morning.

2          THE COURT:  Do you have the towns that the people

3    would be coming from?

4          MR. McALEAR:  I do.

5          THE COURT:  You do?

6          MR. McALEAR:  219 is New Bedford.  She had problems

7    coming in today.  That does not include any snow on the ground,

8    as far as I know.  243, Stoughton; Pepperell; Lawrence;

9    Stoneham; Everett; Boston; Fairhaven.

06:44 10          THE COURT:  Okay.  I get the idea.

11          (Laughter.)

12          MS. CLARKE:  Let's bring in ten and start at noon.

13          MR. WEINREB:  What random distant towns.

14          THE COURT:  I don't know.  What are your views?

15          MR. BRUCK:  Bring in ten and start at ten or

16    ten-thirty?

17          MR. McALEAR:  Whatever you guys decide here, I'm still

18    telling the jurors eight o'clock.  I'm down there; we're down

19    there.  We have jurors who wander in at eight-thirty.  You

06:45 20    know, what I experienced as far as traffic out front this

21    morning, jurors had a hard time coming in later; for example,

22    of the two jurors that we were waiting on, they got here 30

23    minutes before they actually walked through the door, but the

24    parking and the traffic change from what they were --

25    experienced on the 5th just -- they didn't know where to go.

```
 1              THE COURT:  Do you know from paying parking tickets --
 2    do you pay their parking expenses on a daily basis for them?
 3    How do they get reimbursed for parking?
 4              MR. McALEAR:  We reimburse them --
 5              THE COURT:  Here's what I'm getting at:  Do you know
 6    where they're parking?
 7              MR. McALEAR:  Yes.
 8              THE COURT:  Do you know where they're parking?
 9              MR. McALEAR:  Vertex, for the most part, jurors who
10    are coming in, this group, because there's only 20 of them, and
11    there's plenty of parking.
12              THE COURT:  There's enough room there?  Okay.
13              MR. McALEAR:  The first three days they were all over
14    the place.
15              MR. WEINREB:  I don't know if this would be a welcome
16    decision or not, but having driven in this morning and having
17    gone in the same traffic, the two lots that are on the street
18    when you get off the exit from the Pike for Seaport
19    Boulevard -- you pass two lots on your way to Northern Avenue.
20    That -- it was right there at that intersection that you have
21    to sit for 20 minutes before you could take that left turn.
22              If people park in those lots, they could shave 20
23    minutes off their commute because then they just walk to the
24    lot around the corner to the courthouse.
25              MR. McALEAR:  Correct.
```

1          MR. WEINREB:  I don't know if that's something that

2     makes sense to propose to the jurors.  I was tempted to do it

3     and I have a spot in the Vertex lot.

4          MR. McALEAR:  We've done it a couple of times and told

5     them to park down there, and what happens is we tell the wrong

6     person and then they get lost and -- a lot of these people

7     don't come in to Boston at all, so they follow the directions

8     that are on their thing to the law, and that takes them right

9     to the Vertex building and they're right next door, and most of

06:47 10   our jurors feel comfortable with that.

11          I understand your suggestion.  The problem is it's not

12     the easiest walk from that parking lot if you don't know where

13     you're going because you have to cut in through the Gather

14     walkway, and if you don't know where that is, you're --

15          MR. WEINREB:  Right.  Would it make sense to summon in

16     all 20 and then whoever gets here by a certain amount of time

17     or -- swear them and --

18          MS. CLARKE:  That's unfair.

19          THE COURT:  Yeah, I don't want to engineer absences.

06:48 20   That's my problem with that.

21          MR. WEINREB:  I'm not saying exclude the next till the

22     next day, just till later in the day.

23          MS. CLARKE:  Maybe we're just safe to go with ten and

24     see where we end up.

25          I mean, for those people way out, is this even cleared

1    up enough, what we've already got on the ground?

2            THE COURT:  That's going to vary by locality, I think.

3            MR. WEINREB:  Having driven the roads this morning, I

4    don't think that's the issue.

5            THE COURT:  Certainly not the main roads.  Being a

6    Bostonian, it's the side roads that are the real problem.

7            Why don't we do a dozen and just see what happens.

8    And they'll come in when they're -- you know, they'll be told

9    to come in at the usual time, and some will, some won't, and

06:49 10   we'll just get them here.

11           MR. McALEAR:  Okay.

12           THE COURT:  All right?  Okay.  Thanks.

13           MS. CLARKE:  Thank you, Judge.

14           (The Court exits the courtroom and the proceedings

15   adjourned at 3:42 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4   Dahlstrom, RMR, CRR, Official Reporters of the United States

 5   District Court, do hereby certify that the foregoing transcript

 6   constitutes, to the best of our skill and ability, a true and

 7   accurate transcription of our stenotype notes taken in the

 8   matter of Criminal Action No. 13-10200-GAO, United States of

 9   America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14

15   Date:  1/29/15

16

17

18

19

20

21

22

23

24

25
```