UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No.13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV, ) | UNDER SEAL |
| Defendant ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S STATUS REPORT AND NOTICE OF GUILT PHASE EVIDENTIARY ISSUES AND OBJECTIONS

Tsarnaev has filed a pleading entitled "Defendant's Status Report and Notice of Guilt Phase Evidentiary Issues and Objections" in which he moves pursuant to Federal Rule of Evidence 403(b) to exclude many of the first 40 exhibits that the government intends to offer at trial, as well as certain autopsy photos, the testimony of Officer Lauren Wood, a short videotape of a press conference, and victim-witness testimony about the long-term effects of injuries. This memorandum explains why Tsarnaev's motion to exclude those things should be denied in whole or part.

### INTRODUCTION

On April 15, 2013, at approximately 2:50 p.m., two bombs exploded on Boylston Street near the Boston Marathon finish line, killing three people and injuring hundreds more. The government's theory is that Tsarnaev and his brother detonated the bombs in order to influence American foreign policy by terrifying the public and killing, maiming, and disfiguring as many people as possible. The

indictment reflects this theory: Tsarnaev is charged with using a weapon of mass destruction resulting in death (and conspiring to do so), in violation of 18 U.S.C. § 2332a; bombing a place of public use resulting in death (and conspiring to do so), in violation of 18 U.S.C. § 2332f; destroying property with an explosive resulting in death (and conspiring to do so), in violation of 18 U.S.C. § 844(i) & (n); and multiple counts of using a destructive device resulting in death, in violation of 18 U.S.C. § 924(j).

The government will begin its case-in-chief by calling approximately 20 witnesses who will offer eyewitness testimony about the bombings and their aftermath, including testimony that the bombings caused panic and terror, that Tsarnaev succeeded in killing, maiming, and disfiguring many people, and that the crimes occurred in or affected interstate commerce  It will also offer testimony about the collection of evidence and the identification of Tsarnaev and his brother as suspects.

The government will offer a few photos and/or videos to illustrate each eyewitness's testimony. Generally speaking, those exhibits depict the witnesses at the crime scene, illustrating exactly where they were, what condition they were in, and what they were in a position to see and hear. In many cases, the exhibits also depict the actual events the witnesses will testify they saw and heard.

The government will offer approximately 40 such exhibits consisting of approximately 50 photos and videos during this segment of the trial. Each exhibit consists of a single photo or video, except for Exhibit 21, which consists of approximately 10 screen shots from Exhibit 23, the so-called Forum video. These photos and videos were chosen from among thousands of possible alternatives because they are particularly sharp, clear, revealing, and illustrate an important thing or event that a witness lived through and will describe. None of them merely duplicates another. As shown below, all are admissible under Rule 403(b).

The government also intends to offer testimony from the medical examiners who performed autopsies on the three bombing victims and to illustrate their testimony with three or four autopsy photos of each victim that show different full-length views of their bodies (e.g., front view, side view, back view). Like the crime scene photos, these autopsy photos helpfully illustrate the witnesses' testimony, illustrate the nature and cause of the victims' injuries, bolster the expert testimony regarding cause of death, and are not unduly gory or gruesome. They are admissible under rule 403(b) as well.

## ARGUMENT

Rule 403(b) exclusion is "an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." United States v. Mende, 43 F.3d 1298, 1302 (9th Cir. 1995) (internal quotation marks and citations omitted); United States v. DeParias, 805 F.2d 1447, 1454 (11th Cir. 1986) (same).  "[If] evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases," even if it is "revolting." United States v. Kapp, 419 F.3d 666, 677 (7th Cir. 2005) (internal quotation marks and citations omitted).  Although the Rule permits the exclusion of unnecessarily duplicative evidence, it "does not ban per se all duplicative evidence." United States v. Fields, 483 F.3d 313, 356 (5th Cir. 2007).  In particular, "it is not required that each piece of evidence admitted have an entirely unique theory of relevancy." Id.  Rather, "Rule 403 provides that courts should only exclude relevant evidence if the need to avoid cumulative presentation 'substantially' outweighs the probative value of the evidence." Id.

The First Circuit has held that a trial court's determinations under Rule 403(b) will be overturned "[o]nly rarely – and in extraordinarily compelling circumstances." United States v. Rodriguez–Estrada, 877 F.2d 153, 155–56 (1st Cir.1989).

A.   The crime scene photographs

Crime scene photographs – including those that depict the victims of murder and violent crime -- are universally regarded as among the most helpful types of evidence; consequently, even "gruesome photos of the victim's body in a murder case" are admissible if they "have nontrivial probative value." Fields, 483 F.3d at 355. Accord United States v. Brady, 579 F.2d 1121, 1129 (9th Cir. 1978) (photographs of decedent's "battered, bloody, and bruised face" were properly admitted to show "cause of death"); United States v. Naranjo, 710 F.2d 1465, 1469 (10th Cir. 1983) (upholding admissibility of "disturbing" photo of victim's facial wound, which included "a great deal of blood on the pillow, bed sheets, and the victim's face," because photo had probative value and "gruesomeness alone does not make photographs inadmissible"); United States v. Analla, 975 F.2d 119, 125–26 (4th Cir.1992) (photographs depicting two gunshot wounds to a robbery victim's head and another photograph depicting an individual murdered during the robbery lying in a pool of blood were admissible to show that defendant committed "a crime of violence" as charged in the indictment); United States v. Brady, 595 F.2d 359, 361–62 (6th Cir.1979) (photos of dead victims lying in pools of their own blood were admissible even though they "were not absolutely necessary to prove" the fact for which they were offered).

5

In United States v. Salameh, 152 F.3d 88 (2nd Cir. 1998), a case much like this one, the Second Circuit held that Rule 404(b) did not bar the admission of disturbing descriptions and multiple crime scene photos of the victims of the first World Trade Center attack. It noted that "[d]uring the first four days of the trial, the government presented a number of witnesses to describe what happened before, during and after the bombing. In addition to describing their personal experiences as a result of the attack, several witnesses recounted observing the panic and suffering of other victims." Id. at 122. The government also introduced "graphic depictions of the corpses," including a photograph of a "clearly pregnant" victim's body lying on a stretcher. Id. Although the Second Circuit found "no doubt that the testimony and photographs of the victims were shocking, and a significant amount of such evidence was admitted," it also held that the evidence "was probative of the nature and location of the explosion that killed the victims . . . and provided corroboration for the expert witnesses' conclusions regarding the cause of the blast and the resulting casualties and damage." Id. at 122-23. Accord United States v. Sampson, 486 F.3d 13, 43 (1st Cir. 2007) (holding that crime scene photographs of two murders did not violate Rule 403(b) because they "corroborated and clarified testimony regarding the discovery of the bodies and the gathering of evidence").

As shown below, Tsarnaev's rule 403(b) challenges to particular crime-scene photographs and videos have no merit.

1. <u>Exhibits 38-39 (Jane Richard)</u>. These two photos depict Bill Richard carrying his daughter Jane away from the site of the second explosion. Tsarnaev claims they are inadmissible because they show Jane's "tattered" limb. (Deft. Mot. at 8). The government will offer only Exhibit 39 at trial. The photo is relevant because it illustrates and corroborates Bill Richard's account that his daughter was gravely injured at the second bomb site. It is not unduly prejudicial because its disturbing nature is a product of the crime itself rather than of any special features of this particular photograph.

2. <u>Exhibits 40-41 (Matt Patterson)</u>. Exhibit 40 is a color photograph that shows firefighter Matt Patterson carrying Jane Richard. Mr. Patterson will testify that he took Jane from Bill Richard and used a belt as a tourniquet to stanch the bleeding from her leg. This photo shows Mr. Patterson carrying Jane right after the hand-off. It also shows the tourniquet on her leg. It therefore does not merely duplicate Exhibit 39. Exhibit 41 is a black and white surveillance video taken from a distance that shows Mr. Patterson taking Jane from Bill Richard and applying the tourniquet. Because it is a video rather than a snapshot, it is not merely duplicative of Exhibit 40. The distance and black and white nature of the video significantly

diminish any risk of unfair prejudice.

3. <u>Exhibits 25 and 26 (Roseann Sdoia)</u>. Exhibit 25 shows Roseann Sdoia in the seconds after the bombings, as a good Samaritan uses a belt as a tourniquet on her injured leg. Exhibit 26 shows her being carried away from the scene of the bombing and better illustrates the damage to her leg. Once again, these photos are not duplicative, and their disturbing nature is a product of the crime itself rather than of any special features of the photographs.

4. <u>Exhibit 32 (Leo Woolfenden)</u>. Exhibit 32 is a photograph of Officer Tommy Barrett carrying Leo Woolfenden away from the site of the second blast after rescuing him from a stroller. Tsarnaev's claim that Leo was uninjured is wrong; he suffered a perforated ear drum, burns, a skull fracture, and a gash to the side of his head that required stitches. This photograph is relevant because it illustrates and corroborates Officer Barrett's testimony. The photo is not gruesome or gratuitously bloody.

5. <u>Exhibits 11 (Colton Kilgore) and 14 (Sydney Corcoran)</u>. Colton Kilgore had a close-up view of the first explosion and its aftermath. He will testify, among other things, that the bombing and its aftermath were terrifying. Exhibit 11 is a video of the crime scene taken in the minutes after the explosion that illustrates the panic and chaos that reigned at the crime scene. It corroborates his testimony.

Sydney Corcoran was injured by the first bomb. She will testify about what she experienced and what she saw and heard going on around her. Exhibit 14 depicts her lying one the sidewalk, along with what was gong on around her. The exhibit therefore serves to illustrate and corroborate her testimony. Although the audio portion of Exhibit 11 contains a few stray comments made by passerby, those statements are admissible both as excited utterances and present sense impressions. In any event, none of them is being offered for the truth of the matter asserted.

      6.    <u>Exhibit 23 (Forum video) and 21 (Forum video screenshots)</u>. Exhibit 23 is a surveillance video from the Forum restaurant. It shows Tsarnaev place a bomb in front of Forum. It then shows the explosion and its immediate aftermath. The portion of the video that shows the explosion and its immediate aftermath contains a great deal of important information about the exact location, relative position, and actions of many people who were killed or injured in the blast or who helped treat the victims. It is impossible to follow and comprehend even a fraction of that information upon a single viewing. Nevertheless, the government currently intends to play that portion of the video only once in its case-in-chief. In lieu of repeated slow-motion viewings, the government will offer screen shots from the video to illustrate and corroborate the testimony of eyewitnesses to the events. Exhibit 21 consists of approximately 50 screen shots from the video. Of these, the

government intends to offer 12-15.

B.     The autopsy photographs

Federal courts routinely uphold the admission of autopsy photos offered to illustrate a pathologist's testimony. That is in part because "[a]utopsy photographs can have immense probative value" where, as here, "they confirm the prosecution's theory about the manner in which the crime was committed." United States v. Rezaq, 134 F.3d 1121, 1138 (D.C. Cir. 1998) (citing United States v. Cruz–Kuilan, 75 F.3d 59, 61 (1st Cir.1996)). The photos to which Tsarnaev objects show the location of each victim's wounds – both their absolute locations and their locations with respect to one another – as well as the nature of those wounds. They strongly support the government's theory that the victims bled out from shrapnel wounds caused by an improvised explosive device. The photos show the bodies cleansed of all excess blood and contain no gratuitous gore. They are not cumulative because they show each body from different angles and vantage points. See Soundingsides, 820 F.2d at 1243 (holding that autopsy photos were not "cumulative since, as the judge pointed out, they depict the body from different angles and vantage points . . . and thereby gave the jury a more complete understanding of the injuries").

Tsarnaev cannot cite a single case in which photographs meeting these criteria were excluded under Rule 403; but cases upholding the admission of far less

10

probative and more gruesome autopsy photos abound.  See, e.g., Rezaq, 134 F.3d at 1138 (autopsy photo showing removal of bullet from victim's head was admissible even though photo was only probative of fact that the victim was shot in the head, a "point [that] did not especially need elucidation," because "[t]he photograph did have some probative value, and its prejudicial effect, although significant, was not extreme"); Soundingsides, 820 F.2d at 1242-43 (upholding admission of "undeniably gruesome" autopsy photographs because they "were a substantial aid in illustrating the testimony of the pathologist . . . and they had considerable probative value . . . in proving the nature of Valerie's injuries and the cause of her death") (internal quotation marks and citations omitted); Fields, 483 F.3d at 355-56 (holding that court properly admitted 32 photographs of murder victim's decomposing body, both at the site where it was discovered and during the autopsy, in part because the photos "helped the jury understand the medical examiner's testimony" and supported the government's theory on the cause of death); Kuntzelman v. Black, 774 F.2d 291, 292 (8th Cir. 1985).

   Tsarnaev argues that the photos may be excluded because "[t]he cause of the deaths of the three bombing victims is not in dispute" and Tsarnaev is willing to stipulate to cause of death (Deft. Mot. at 9), but that kind of argument has been soundly rejected by the courts.  It is well-settled that "a defendant's Rule 403

objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." Old Chief v. United States, 519 U.S. 172, 183 (1997).  Accord United States v. Collins, 368 Fed.Appx. 517, 519 (5th Cir. 2010) (that pathologist's testimony "was largely uncontested does not rob it of its relevancy or its importance to the Government's case"); United States v. Boyd, 640 F.3d 657, 668-69 (6th Cir. 2011) (holding that the government's right "to prove its case free from any defendant's option to stipulate the evidence away . . . remains applicable to the prosecutor's introduction of sensitive or gruesome evidence to prove elements of an offense.") (internal quotation marks and citations omitted); United States v. Mellies, 329 Fed.Appx. 592, 599 (6th Cir. 2009) ("[E]ven in the sensitive arena of child pornography cases, a defendant's offer to stipulate does not deprive the government of its right to reject the offer and present its evidence, particularly because the government bears the burden of proving the accused guilty beyond a reasonable doubt" and is entitled to do so "by evidence of its own choice"); United States v. Morales-Aldahondo, 524 F.3d 115, 199-20 (1st Cir. 2008) (district court properly admitted 12 photos and 10 video clips of child pornography despite defendant's offer to stipulate that the material met the legal definition of child pornography).

The Supreme Court explained in Old Chief why testimony and reports, let

alone stipulations or concessions, are no substitute for photographs. It wrote:

> This persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them. Jury duty is usually unsought and sometimes resisted, and it may be as difficult for one juror suddenly to face the findings that can send another human being to prison, as it is for another to hold out conscientiously for acquittal. When a juror's duty does seem hard, the evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment. Thus, the prosecution may fairly seek to place its evidence before the jurors . . . to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.

519 U.S. at 187-88. In addition, "there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be." Id. at 188. See also Fields, 483 F.3d at 356 (noting that some points are made "more effectively with images than" with testimony).

These considerations apply with special force in this case. The government will ask the jurors in this case to find Tsarnaev guilty of 17 capital crimes. Both the crime scene and autopsy photos, which illustrate how the victims died, can be expected to help convince the jurors "that a guilty verdict would be morally reasonable." Old Chief, 519 U.S. at 188. They also will satisfy the jurors' expectations about "what proper proof should be" in a case as serious, and as carefully investigated, as this one.

      C.    <u>Testimony of Officer Lauren Woods</u>.  Officer Lauren Woods provided first aid to Lingzi Lu, who died at the scene despite Officer Woods's efforts.  The testimony is relevant because it shows that Lingzi Lu was wounded by shrapnel from the second bomb and bled to death at the scene.  Tsarnaev's argument that there is "minimal probative value" (Deft. Mot. at 12) in eyewitness testimony from the person who tended to Ms. Lu in her last minutes of life is plainly lacking in merit.

      D.    <u>Video of April 18, 2013 law enforcement press conference</u>.  On April 18, 2013, at approximately 5:00 p.m., law enforcement officers held an eight-minute press conference during which they released photos and videos of the bombing suspects and pleaded with the public for help in identifying the suspects.  The government intends to offer a videotape of the press conference at trial.  It is needed not simply to show how the Tsarnaev brothers were publicly identified as suspects in the Marathon bombings, but also to advance the government's theory that the press conference drove the Tsarnaev brothers to resume the terrorist campaign of bombing and murder that they had begun three days earlier.  Tsarnaev's highly speculative claims of unfair prejudice do not "substantially outweigh" the evidence's probative weight as required for exclusion under Rule 403.

      E.    <u>Victim-impact testimony from bombing survivors</u>.  In <u>United States v. McVeigh</u>, 153 F.3d 1166 (10th Cir. 1998), the Tenth Circuit explained the

appropriate limits of victim-witness testimony from the survivors of a bombing in the guilt phase of a capital case. It held, among other things, that "reasonable background information about a witness is always admissible, precisely because it allows the jury to make better informed judgments about the credibility of a witness and the reliability of that witness' observations," id. at 1201; that testimony about witnesses' pre-explosion activities is admissible because it "places the witnesses at the scene of the crime, demonstrates how they knew the deceased victims, and sets a foundation for their testimony describing the explosion, identifying the specific location of deceased victims . . . and explaining why individual victims were present," id. at 1201-02; and that evidence about a bombing's immediate effects on the witnesses themselves and on others is admissible to show "the magnitude of the destruction" and to identify "the victims and the cause of death," id. at 1202-03. It is also "legitimately part of the res gestae of the crime." Id. at 1203.

The Tenth Circuit expressly noted that, in McVeigh, "[t]he description of the destruction and carnage following the explosion [was] the most emotionally powerful of the evidence presented during the guilt phase. Hunt's and Garrett's descriptions of the dead children from the day care center [were] particularly powerful." Id. at 1203. Nevertheless, it held, "even graphic depictions of a murder are relevant to support other evidence about how the crime occurred . . . even

15

when the element is uncontested — indeed, even when the defendant offers to admit to the element." Id. (internal quotation marks, brackets, and citation omitted). It also held that "the government has no obligation to minimize the emotional impact of testimony . . . . [because] Rule 403 is designed to insure only that the prejudicial effects of emotional testimony do not overwhelm the jury." Id. at 1202 n.25.

Although the government does not intend to offer victim-impact testimony from bombing survivors during the guilt phase, not all testimony about the bombings' long-term effects on victim-witnesses is victim-impact testimony. Put another way, some testimony about those long-term effects has relevance independent of its bearing on the seriousness of the capital crimes. Many of the counts in the indictment allege (either directly or by reference) that the Marathon bombings "maimed, burned, and wounded scores" of individuals or "resulted in personal injury to many persons." The government is entitled to prove these allegations through victim testimony. In addition, the long-term effects of the bombings on victim-witnesses may help explain why certain witnesses cannot remember certain events – or why they remember them with particular sharpness and certainty. It also may corroborate witnesses' accounts of things they saw or felt at the scene. Under the circumstances, objections to testimony on this ground are better made on a question-by-question basis rather than in a motion in limine.

16

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's motion to exclude evidence in limine pursuant to Fed. R. Evid. 403.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By: /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
Assistant U.S. Attorneys
STEVEN MELLIN
Trial Attorney, U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that this document was served by electronic mail on Dzhokhar Tsarnaev's attorney, Judy Clarke, Esq., on February 4, 2015.

*/s/ William D. Weinreb*
WILLIAM D. WEINREB