UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                          )
UNITED STATES OF AMERICA,  )
                          )
        Plaintiff,         )
                          )   Criminal Action
v.                         )   No. 13-10200-GAO
                          )
DZHOKHAR A. TSARNAEV, also )
known as Jahar Tsarni,     )
                          )
        Defendant.         )
                          )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY FIFTEEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, February 6, 2015
10:19 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporters
Loretta Hennessey, RDR, CRR
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2          OFFICE OF THE UNITED STATES ATTORNEY
            By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
            John Joseph Moakley Federal Courthouse
 4          Suite 9200
            Boston, Massachusetts  02210
 5          - and -
            UNITED STATES DEPARTMENT OF JUSTICE
 6          By: Steven D. Mellin, Assistant U.S. Attorney
            Capital Case Section
 7          1331 F Street, N.W.
            Washington, D.C.  20530
 8          On Behalf of the Government

 9          FEDERAL PUBLIC DEFENDER OFFICE
            By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10              Federal Public Defenders
            51 Sleeper Street
11          Fifth Floor
            Boston, Massachusetts  02210
12          - and -
            CLARKE & RICE, APC
13          By: Judy Clarke, Esq.
            1010 Second Avenue
14          Suite 1800
            San Diego, California  92101
15          - and -
            LAW OFFICE OF DAVID I. BRUCK
16          By: David I. Bruck, Esq.
            220 Sydney Lewis Hall
17          Lexington, Virginia  24450
            On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2    (The jury enters the courtroom at 10:17 a.m.)
 3              THE CLERK:  All rise for the Honorable Court.
 4    (The Honorable Court entered the courtroom at 10:19 a.m.)
 5              THE CLERK:  Be seated.
 6              THE COURT:  Good morning, ladies and gentlemen.
 7              THE VENIRE:  Good morning.
 8              THE COURT:  Thank you for being here.
 9              As you know, we are continuing the process of
10    selecting a jury for the case of United States versus Dzhokhar
11    Tsarnaev.  Mr. Tsarnaev is charged in connection with bombing
12    that occurred near the finish line of the Boston Marathon on
13    April 15, 2013, that resulted in the death of three people.  He
14    is also charged with the death of an MIT police officer and
15    other crimes occurring on April 18 and 19, 2013.
16              Some, but not all, of the crimes charged are by
17    statute potentially punishable by death.  You will recall from
18    my prior instructions that the jury will first consider and
19    decide whether the government has proved Mr. Tsarnaev's guilt
20    of any or all of the charges against him.  If he is convicted
21    of any of the capital crimes, that is crimes potentially
22    punishable by death, the jury will then consider and decide
23    whether he will be sentenced to death for any such crime or to
24    life imprisonment without the possibility of release.
25              You may wonder why the death penalty could be a
```

1    possibility in this case in view of the fact that the laws of

2    Massachusetts do not provide the death penalty for murder or

3    for any other violation of Massachusetts law.  The reason is

4    that this is a federal case involving alleged violations of the

5    laws of the United States rather than a state case involving

6    the violation of the laws of Massachusetts.

7            If the jury convicts Mr. Tsarnaev of any of the

8    capital crimes charged in the indictment, the same jury will

9    hear additional evidence and then decide whether to sentence

10   him to death or to life in prison without the possibility of

11   release.  Because the jury that is selected to decide the

12   defendant's guilt or innocence will also decided his

13   punishment, if he is convicted, it is necessary to question

14   prospective jurors about your feelings and beliefs about the

15   death penalty as part of the process of picking a jury.

16           Let me explain briefly the procedures that must be

17   followed in a case in which the death penalty is or may be at

18   issue.

19           As in any criminal case, initially the government will

20   have the burden of proving that Mr. Tsarnaev is guilty of any

21   crime with which he is charged.  If he is convicted by the jury

22   of a crime for which the death penalty may lawfully be imposed,

23   then there will be a second phase of the trial, usually

24   referred to in shorthand as the penalty phase.  In the penalty

25   phase, the government will introduce evidence that seeks to

1    prove beyond a reasonable doubt first that Mr. Tsarnaev acted

2    with sufficient intent to be subject to the death penalty; and

3    second, that aggravating factors about the killings or about

4    the defendant justify sentencing him to death.  Aggravating

5    factors are circumstances that if proven make the crimes

6    particularly serious or blameworthy, and therefore under the

7    law may justify imposing a more severe sentence on Mr. Tsarnaev

8    than on other persons who are convicted of intentional killing

9    or murder.

10          The government will bear the burden of proving any

11   alleged aggravating factors to every juror beyond a reasonable

12   doubt.

13          The defense will have an opportunity in the penalty

14   phase to present evidence of what it will argue are mitigating

15   factors.  Mitigating factors are usually circumstances about

16   the crime or about the defendant's background or character that

17   would suggest that the death penalty is not the appropriate

18   sentence in the case or that life imprisonment without the

19   possibility of release is adequate to punish the defendant.

20          Unlike the proof of aggravating factors, a mitigating

21   factor must be only proven by the greater weight of the

22   evidence.  That is a less demanding standard of proof than

23   proof beyond a reasonable doubt.  Again, unlike the proof of

24   aggravating factors, mitigating factors also do not have to be

25   proved to the satisfaction of all 12 jurors.  Any juror who

1  finds or determines a mitigating factor to have been proven by

2  a greater weight of the evidence may consider that factor in

3  deciding the appropriate sentence in the case, regardless of

4  whether any or all of the other jurors agree that the

5  mitigating factor has been proven.

6        After the parties have made their respective

7  presentations during the penalty phase, the jury will weigh all

8  the evidence.  Before a jury could vote to impose the death

9  penalty, every juror would have to be persuaded that certain

10  threshold factors that make Mr. Tsarnaev potentially subject to

11  the death penalty have been proven beyond a reasonable doubt.

12  In addition, in order to impose the death penalty, every juror

13  would have to be persuaded that any proven aggravating factors

14  sufficiently outweigh any mitigating factors found by any juror

15  or jurors to justify a sentence of death.

16        Even if the jury did not find any mitigating factors,

17  it would still have to be unanimously persuaded that any proven

18  aggravating factors were themselves sufficient to justify a

19  death sentence.

20        You should understand that a jury is never required to

21  find that a sentence of death is justified.  The decision

22  whether the government has proven that a defendant should be

23  sentenced to death must ultimately be made by each juror

24  himself or herself.  If, however, every juror is persuaded that

25  the death penalty should be imposed, I would be required as the

1    trial judge to sentence the defendant to death.  In other

2    words, I could not change the jury's decision.  The jury and

3    not the judge is responsible for determining whether a

4    defendant who is convicted of a capital crime will live or die.

5         What I've just described is only an overview of the

6    law applicable to a jury's consideration of the death penalty.

7    If you are selected to serve on the jury and if you find the

8    defendant guilty of a crime or crimes punishable by death, I

9    will give you very detailed instructions concerning your duties

10   in deciding whether to impose the death penalty or life

11   imprisonment without the possibility of release and the law

12   that must be followed in making that decision.

13        As I told you when you, before you filled out your

14   questionnaires, there are no right or wrong answers to any of

15   the questions that you have been asked or that you will be

16   asked in this process.  We are asking them because both the

17   government and the defendant are entitled to a jury that does

18   not have its mind firmly made up one way or another before

19   hearing the evidence and a detailed explanation of the law.

20        That applies both to whether Mr. Tsarnaev is guilty or

21   not guilty of the specific crimes that are charged in the

22   indictment, and if he is convicted of a capital crime, whether

23   he should be sentenced to death or to life in prison without

24   the possibility of release.

25        We're going to follow up on your questionnaire answers

 1    by questioning each of you individually about some issues that

 2    are relevant to the selection process.  In just a moment we're

 3    going to ask you to go back to the room where you were

 4    assembling this morning and one by one we'll call you into the

 5    courtroom and interview you, ask you some additional questions.

 6    There will be people in the room in addition to the lawyers and

 7    their staffs and the proceedings will be simultaneously

 8    transmitted by video and audio to overflow courtrooms.

 9            We will not identify you by name but rather than juror

10    number.  And you will be seated so the video camera will be

11    behind you.  Your answers will generally be public, but if you

12    believe a truthful answer would require you to reveal sensitive

13    personal information, we will temporarily stop the audio

14    transmission to those courtrooms so that people observing there

15    will not hear your answer.  Again, we do not want or expect any

16    particular answers to any questions.  All we want and what the

17    law expects is that you provide accurate and truthful answers

18    to the questions you're asked.  If you do that, you will be

19    doing your duty as a citizen and as a juror, no matter what the

20    answers may be.

21            I'm going to take a moment to remind you of my prior

22    instructions about being free of outside influence.  A jury's

23    verdict must be based on the evidence produced at trial and not

24    by -- based on matters outside the evidence, and I therefore

25    remind you again it's extremely important to avoid any

 1   discussion of the case, including the selection process, with

 2   your family, friends, each other, or any other person until

 3   you've been excused, or if you serve as a juror, until the case

 4   has concluded.  Again, of course, you're not to conduct any

 5   independent research online or otherwise, or read or watch or

 6   listen to media reports about the case.

 7           When you filled out the questionnaire, at the end you

 8   signed under a statement that your answers were true and you

 9   were making an affirmation that they were made under the

10   penalty of perjury.  Similarly for this process, we will

11   administer an oath or affirmation to you that your answers will

12   be true, and the clerk will now do that.

13                   (The venire was sworn.)

14           THE COURT:  All right.  Jurors, if you now withdraw,

15   we'll see you again shortly one by one.

16           (The jury left the courtroom at 10:29 a.m.)

17           THE COURT:  I think we can do this on the record

18   before we go audio.  I just want -- one of the -- you may have

19   seen this.  One of the jurors, No. 356, had a blank page that

20   was not filled out.  It appeared to me that it was an

21   inadvertent turning of double pages, so we had her fill it out

22   and you've received the copies.

23           MS. CLARKE:  Yes, thank you.

24           MR. BRUCK:  At some point we filed some additional

25   material regarding Juror 318.

```
 1              THE COURT:  I'm aware of the fact of the filing.  I
 2     haven't looked at it.
 3              MR. BRUCK:  It's not self-explanatory, so at some
 4     point we'd like to be heard at the appropriate time.
 5              THE COURT:  Okay.
 6              (Discussion off the record.)
 7              MR. DOREAU:  We can go live with video and audio now.
 8              THE CLERK:  Juror No. 340.  340.
 9              (Juror 340 enters the courtroom.)
10              CLERK MAYNARD:  Juror No. 340.
11              THE CLERK:  Have a seat.  Speak into the mic and keep
12     your voice up so everybody around this table can hear you.
13     Okay?
14              THE JUROR:  Okay.
15              THE CLERK:  This is adjustable.
16              THE COURT:  Make yourself comfortable.  Good morning.
17              THE JUROR:  Good morning.
18              THE COURT:  Since you were here last to fill out the
19     questionnaire, have you been able to follow my instructions to
20     avoid any discussion of this case?
21              THE WITNESS:  Yes, I have.
22              THE COURT:  Also as much as possible to avoid any
23     media stories about the case?
24              THE JUROR:  Yes.
25              THE COURT:  Thank you.  So that's the questionnaire
```

1    you filled out.

2            THE JUROR:  Uh-huh.

3            THE COURT:  We'll be addressing some of the matters in

4    it.

5            THE JUROR:  Okay.

6            THE COURT:  So let me begin with actually Page 10, in

7    Question 26 we ask people about employment and so on.

8            THE JUROR:  Uh-huh.

9            THE COURT:  I wanted to clarify what your situation

10   is.  You have --

11           THE JUROR:  I take care of my dad during the day and

12   the night.  He's about 75 percent disabled.  I am also disabled

13   by CP, cerebral palsy, and because of that reason, I haven't

14   had a job since, or like before.

15           THE COURT:  Okay.

16           THE JUROR:  And I -- part of my college, I was an

17   intern at Cambridge Historical Society.

18           THE COURT:  Okay.  Good.  Thank you.

19           Do you use social media.

20           THE JUROR:  I quit using Facebook first year of

21   college, which was three years ago, and I rarely use Tumblr,

22   which is like blogs.

23           THE COURT:  What kinds of things -- I guess it says

24   literature and animal?

25           THE JUROR:  Yeah.  Like Japanese animation.  I mainly

1    V-blog those.

2         THE COURT:  Not animal -- all right.

3         So let me ask you to turn to Page 20.  And Question

4    77.

5         THE JUROR:  Yes.

6         THE COURT:  In this question we asked whether things

7    you saw or read in the news, whether you formed an opinion

8    about certain matters.  Particularly in A and B we asked

9    whether you formed an opinion that Mr. Tsarnaev is guilty or

10   that you formed an opinion that he was not guilty.  And then in

11   C and D we asked you about the possible penalty.  But let me

12   focus on A and B first.  You checked yes to both.

13        THE JUROR:  Yeah, I was unsure of that, like the

14   wording of it.

15        THE COURT:  The wording was a little awkward.

16        So can you tell us what -- have you formed an opinion

17   about his guilt or not?

18        THE JUROR:  Yes.  That he is guilty.

19        THE COURT:  Right.  So we then asked below, if you

20   answered yes, the question is would you be able or unable to

21   set aside that opinion and base your decision about guilt or

22   punishment solely on the evidence presented to you in court.

23   And you indicated "able."

24        THE JUROR:  Yes.

25        THE COURT:  Can you tell us about that.

1          THE JUROR:  My reason the death penalty are by case by

2     case.

3          THE COURT:  Before we get to the penalty, I'm talking

4     about guilt or innocence.

5          THE JUROR:  I mean, yeah, if I heard the evidence and

6     based on the evidence, my opinion changed, I would be able to

7     vote not guilty or guilty.

8          THE COURT:  Okay.  So you understand in the formal

9     criminal process, a person who is charged with a crime is

10    presumed to be innocent as a matter of law, and is convicted

11    only if the government presents its evidence at the trial that

12    is sufficient to convince the jury that the person is guilty

13    and the jury is convinced beyond a reasonable doubt.  So you

14    understand the burden of proof is always with the government to

15    prove somebody guilty by the evidence at trial?

16         THE JUROR:  Uh-huh.  Yes.

17         THE COURT:  You have to answer verbally because the

18    reporter will take it down.

19         So a defendant doesn't ever have any obligation to

20    prove he's not guilty; it's up to the government to prove

21    affirmatively that he is guilty at trial.  Do you understand

22    that?

23         THE JUROR:  Yes.

24         THE COURT:  Do you think you'd be able to faithfully

25    apply those principles if you were a juror in this case and

1    insist that the government prove to you by the evidence?

2              THE JUROR:  Yes, I would.

3              THE COURT:  Okay.  I want to come back to the penalty

4    questions, as to which you said you were unsure.

5              THE JUROR:  Yes.

6              THE COURT:  We're going to ask about that in a minute.

7    I just want to see.  You were living in Cambridge at the time

8    of the events?

9              THE JUROR:  Yes.  I was living in a dormitory for

10   Lesley University in like Porter Square.

11             THE COURT:  Okay.  And so you were in part of the

12   shelter in place?

13             THE JUROR:  Yes.

14             THE COURT:  And it looks, Question 82, you made a

15   donation to the One Fund?

16             THE JUROR:  Yes.  At the supermarket, yes.

17             THE COURT:  So if you go to Page 23, Question 88, we

18   begin a series of questions that address the death penalty.

19             THE JUROR:  Okay.

20             THE COURT:  And I want to run through those.  Question

21   88 itself asks if you have any views about the death penalty in

22   general, what are they.  And you said your views are determined

23   on a case-by-case basis.

24             THE JUROR:  Yes.

25             THE COURT:  I guess that means you don't have any

1    general views.

2              THE JUROR:  No.

3              THE COURT:  You would wait to decide each case.

4              THE JUROR:  Yes.

5              THE COURT:  In Question 89 we asked you to put

6    yourself on a scale of 1 to 10, one being strongly opposed and

7    10 thinking the death penalty should be imposed whenever a

8    defendant is convicted of intentional murder, you selected 8.

9    You're fairly strongly in favor.

10             THE JUROR:  Yes.  If the case is made that I find some

11   standing ground, and judged on the crime, I would be able -- I

12   would understand the death penalty might be -- might be --

13   might be awarded.  Blah.

14             THE COURT:  I get the idea.  Let me ask you to turn to

15   Page 24, the next question, 90.  Rather than numerical scale,

16   we ask you to select one of the statements if you thought it

17   reflected your views, and you picked D, which says, I'm not for

18   or against the death penalty, I could vote to impose it or I

19   could vote to impose a sentence of life imprisonment without

20   the possibility of release, whichever I believed was called for

21   by the facts and the law in the case.

22             THE JUROR:  Yes.

23             THE COURT:  Is that a fair summary?

24             THE JUROR:  That is automatic -- this is what my view

25   is all the time.

1          THE COURT:  Okay.  That's what you were telling us.

2          THE JUROR:  Yes.

3          THE COURT:  Now if you go to Question 95 at the bottom

4    of Page 25.  Now we're putting it in the context of this case.

5    If you found this defendant guilty and you found -- you decided

6    the death penalty was the appropriate punishment for him, could

7    you conscientiously vote for the death penalty?

8          THE JUROR:  Yes.  My answer remains the same.

9          THE COURT:  And the companion question to that is on

10   96 at the top, the very top, it just asks the other side of the

11   question.  If you found him guilty and you decided that life

12   imprisonment without the possibility of release was the

13   appropriate punishment for him, could you conscientiously vote

14   for life imprisonment without the possibility of release?  And

15   you said yes.

16         THE JUROR:  Yes.

17         THE COURT:  And that remains your view?

18         THE JUROR:  Yup.  Yes.

19         THE COURT:  Follow-up.

20         MR. CHAKRAVARTY:  Just very briefly.

21         Good morning.  My name is Aloke Chakravarty.  I'm one

22   of the prosecutors in the case.  Just a few follow-up

23   questions.  First, to get a better sense of how the trial will

24   bear on your personal life, in terms of your commitments to

25   your caretaking functions as well as -- I think you indicated

 1    you're taking some classes.

 2            THE JUROR:  Yes.  I'm currently taking a semester off

 3    to deal with some emotional issues, but the role of caretaker

 4    for my father is if, you know, once I wake up, I just get him

 5    his newspaper and his breakfast and then I'm out the door and

 6    he can take care of himself until I get home.

 7            MR. CHAKRAVARTY:  Either whatever you're going

 8    through, as well as with the family situation, would this --

 9            THE JUROR:  No.

10            MR. CHAKRAVARTY: -- impair that?

11            THE JUROR:  No.  My emotional problems don't factor

12    into this.

13            MR. CHAKRAVARTY:  There will be some graphic testimony

14    and evidence in the case.  Is that going to interfere?

15            THE JUROR:  No, no.

16            MR. CHAKRAVARTY:  The judge asked you some questions

17    about the death penalty, and there is a difference between

18    deciding that the death penalty is appropriate, as you've said

19    that you've been able to do, and then actually casting a vote

20    saying, I think that this person should receive the death

21    penalty.

22            THE JUROR:  Uh-huh.  When I got the call saying that I

23    was due to come in today, I thought about that for much of the

24    night, and I remain unsure about how I would feel afterwards if

25    that was the appropriate verdict, but I feel like I could be

```
 1    able to cope with it if that was the appropriate pathway to go.
 2            MR. CHAKRAVARTY:  Could you make the decision?
 3            THE JUROR:  Yes.
 4            MR. CHAKRAVARTY:  Is there some -- do you have
 5    confidence that you have the ability to do that?
 6            THE JUROR:  Yes.
 7            MR. CHAKRAVARTY:  Thank you.
 8            THE COURT:  Okay.
 9            MR. BRUCK:  Good morning.
10            THE COURT:  I remind you the mics are really for the
11    other rooms, not for here.
12            MR. BRUCK:  Okay.  I've got two of them.  That should
13    do the trick.
14            THE COURT:  You'll be in stereo.
15            MR. BRUCK:  My name is David Bruck.  I'm one of Jahar
16    Tsarnaev's lawyers.  I've listened carefully to your answers
17    and I don't have a lot more, but I have a couple of things.
18    Okay?
19            THE JUROR:  Okay.
20            MR. BRUCK:  You told the judge a little bit and you
21    wrote a little bit on your questionnaire about the death
22    penalty.  Everybody has different views, or many people have
23    different views.  Can you tell me a little more generally --
24    some people are against it, other people are strongly in favor
25    of it, some people think there ought not to be one, other
```

1    people think there should.  Can you fill out a little more what

2    your thinking is about it?

3              THE JUROR:  I think it's an important factor to have

4    based on the crimes that history has shown us, but I am

5    strongly -- I'm strongly behind the answer that I circled,

6    which is I'm neither for it nor against it, but I can, I can

7    put my basis behind one of the answers.

8              MR. BRUCK:  Okay.  Now, do you understand, and a lot

9    of people when they come to court have no reason to know this,

10   you've had some instruction from the judge, but not all the

11   details, do you understand that the death penalty never

12   automatically follows from a crime?  If a person is found

13   guilty of a capital crime, that only means the jury has a

14   choice to make.

15             THE JUROR:  Uh-huh.

16             MR. BRUCK:  And the jury can always decide, even if

17   the person is guilty, that life imprisonment without release is

18   the appropriate sentence.

19             THE JUROR:  Yes.  I watched a lot of crime shows back

20   when I was growing up.

21             MR. BRUCK:  A lot of what?

22             THE JUROR:  Crime shows, yeah.  So yes.

23             MR. BRUCK:  So you understand it's always up to the

24   jury.  And in the end, as Judge O'Toole told you, it's always

25   up to each individual juror.

```
 1              THE JUROR:  Yes.

 2              MR. BRUCK:  Not to a majority vote or anything like

 3     that.

 4              THE JUROR:  Yes.

 5              MR. BRUCK:  And in deciding whether or not to impose

 6     the death penalty, each juror can consider and should consider

 7     not only the crime and how bad the crime was, but also the

 8     person that committed it.  Does that seem -- does that make

 9     sense to you?

10              THE JUROR:  Yes.

11              MR. BRUCK:  Including the age of the person, if it's a

12     young person or an older person.

13              THE JUROR:  Yes.

14              MR. BRUCK:  What family situation, whether he was a

15     leader or a follower, all those sorts.

16              MR. CHAKRAVARTY:  Objection, your Honor, to the list.

17              THE COURT:  Yeah, I think it's getting a little

18     argumentative.

19              MR. BRUCK:  Okay.  So when you said that it would be

20     case by case based on the crime, that was just sort of a

21     shorthand way of putting it?

22              THE JUROR:  Based on the crime and the evidence

23     presented, yes.

24              MR. BRUCK:  By evidence, you mean everything in the

25     case?  All the evidence as presented.
```

```
 1              THE JUROR:  Yes.
 2              MR. BRUCK:  About the person as well as the about the
 3    crime?
 4              THE JUROR:  Yes, I would say yes to that.
 5              MR. BRUCK:  Okay.  Can you bear with me a second.
 6              That's all I have.  Thank you so much.
 7              THE COURT:  Let me remind you that depictions on crime
 8    shows aren't necessarily realistic.  Thank you.
 9              MR. BRUCK:  I should have pointed that out.
10              (The juror was excused.)
11              THE CLERK:  Juror No. 342.
12              (Juror 342 enters the courtroom.)
13              THE CLERK:  Do me a favor, speak into the mic so
14    everybody around this table can hear you.
15              THE COURT:  Good morning.
16              Since you were here to fill out the questionnaire,
17    have you been able to follow the instructions to avoid
18    discussion of the case with anyone.
19              THE JUROR:  Yup.
20              THE COURT:  Also as much as possible to avoid any
21    exposure to media stories about it?
22              THE JUROR:  Yes.  Yes.
23              THE COURT:  We're recording this by the stenographer
24    so you have to answer verbally too.
25              THE JUROR:  Sure.
```

```
 1            THE COURT:  Okay.  So you were born in Leningrad,
 2    Russia.
 3            THE JUROR:  Yes.
 4            THE COURT:  You lived there for about roughly 40 years
 5    or so?
 6            THE JUROR:  Yeah.  I move 1992.
 7            THE COURT:  Currently -- you can follow along in the
 8    questionnaire as we go ahead.  I'm going to be flipping through
 9    it.  You're employed at Tufts Medical Center as an electron
10    microscopist?
11            THE JUROR:  Yeah.
12            THE COURT:  You've been doing that for quite a while?
13            THE JUROR:  All my life.
14            THE COURT:  I think you told us elsewhere in the form
15    your husband is a physicist?
16            THE JUROR:  Yes.
17            THE COURT:  Where does he work?
18            THE JUROR:  MIT.
19            THE COURT:  How long has he been at MIT?
20            THE JUROR:  From 1992.
21            THE COURT:  Is he a professor teaching there or
22    researcher?
23            THE JUROR:  Researcher.
24            THE COURT:  Research?
25            THE JUROR:  Yeah.
```

1          THE COURT:  You know that one of the charges in the

2    case involves the murder of an MIT police officer.

3          THE JUROR:  Yeah.

4          THE COURT:  Have you and your husband talked about

5    that?

6          THE JUROR:  No.

7          THE COURT:  Do you know if he has any strong views

8    about that matter?

9          THE JUROR:  He been in MIT since day.

10         THE COURT:  I'm sorry?

11         THE JUROR:  He been in MIT this day, when this

12   happened.

13         THE COURT:  He was there?

14         THE JUROR:  Yes, he was locked in his lab.

15         THE COURT:  I'm sorry?

16         THE JUROR:  He was locked in his lab because he was

17   waiting for me.  I was I was in my work on this day.

18         THE COURT:  He was affected in that he had to stay in

19   while the events unfolded?

20         THE JUROR:  Yes.

21         THE COURT:  What I'm saying is because it was an MIT

22   officer who was killed, whether that had any special emotional

23   or other effect on him that he's communicated to you.

24         THE JUROR:  This day, he was emotional involved, yeah.

25   This day, yes.

1           THE COURT:  That day?

2           THE JUROR:  Yeah.

3           THE COURT:  You use Facebook a bit?

4           THE JUROR:  Yeah.

5           THE COURT:  Can you tell us how you use it?

6           THE JUROR:  I can talk with my son, my nephew, my

7    daughter-in-law.  That's mostly -- that's my -- contact with

8    young generation.

9           THE COURT:  Are they all here in the US?

10          THE JUROR:  Yes.

11          THE COURT:  Do you use Facebook or anything else to be

12   in touch with people in Russia?

13          THE JUROR:  I have some friends in Russia.

14          THE COURT:  Do you use Facebook or some other social

15   media to talk with them?

16          THE JUROR:  Yes.

17          THE COURT:  What's the Russian equivalent of Facebook?

18          MR. CHAKRAVARTY:  VKontakte.

19          THE COURT:  VKontakte.

20          THE JUROR:  I have no clue what it is.  Sorry.

21          THE COURT:  So let me ask you to turn to Page 20.

22          THE JUROR:  Yes.

23          THE COURT:  In Question 77, we asked whether based on

24   things you'd seen and read, media or otherwise, you had formed

25   an opinion.

1          THE JUROR:  Yes.

2          THE COURT:  That the defendant was guilty or not, and

3     if so, whether he should receive the death penalty or not.  And

4     you said yes, you had an opinion that he was guilty and you had

5     an opinion that he should not receive the death penalty.

6          THE JUROR:  Yes.

7          THE COURT:  We then asked, if you answered yes to any

8     of those questions, would you be able or unable to set aside

9     that opinion and base your decision about either guilt or

10    punishment based solely on the evidence presented in court.

11    And you selected the box that you said you would be able to do

12    that.

13         THE JUROR:  What the question?

14         THE COURT:  It's the second part of Question 77, where

15    it begins "if you answered yes," before Question 78.

16         THE JUROR:  77.  Maybe I'm confused.  My point is I'm

17    against death penalty in cases like this.

18         THE COURT:  Okay.  We'll come to that in a minute.

19         THE JUROR:  Yeah.

20         THE COURT:  I want to first ask whether, it's

21    understandable if people have impressions or understandings

22    that they have formed based on media coverage and so on, that

23    they would have an opinion about whether a defendant's guilty

24    or not.

25         THE JUROR:  Yes.

1          THE COURT:  The question is whether a juror in this

2     case who might have such an opinion could nevertheless focus

3     only on the evidence presented during the trial and make a

4     decision based only on that evidence without being influenced

5     by a prior opinion.  And I want to ask whether you think you

6     would be able to do that?

7          THE JUROR:  It's nothing to do with case.  My opinion

8     about death penalty is nothing to do with case.

9          THE COURT:  I'm not talking about the death penalty

10     right now; I'm talking about whether you think he's guilty of

11     any of the crimes or not.  If you look at Question 77, Part A.

12          THE JUROR:  Yes.

13          THE COURT:  We asked if you had an opinion that he was

14     guilty, and you checked the box yes.

15          THE JUROR:  Yes.

16          THE COURT:  So what I'm asking is, while it's

17     understandable you might have such an opinion, the question is

18     whether, if you were a juror, could you put that opinion to the

19     side, focus on the trial evidence, and make a judgment about

20     whether he's guilty or not based on the trial evidence.

21          THE JUROR:  It would be real difficult for me.  Yeah,

22     being in this city around the people, around me, all this, you

23     know, presentation, being inside city in hospital, I was in

24     hospital, working in hospital, we get patient in this day, it

25     will be difficult for me to forget this day and all this --

1    yeah.

2              THE COURT:  You were working at the hospital the day

3    of the event?

4              THE JUROR:  Yeah.

5              THE COURT:  And people were brought there.

6              THE JUROR:  Yeah.

7              THE COURT:  Thank you very much.

8              (The juror was excused.)

9              THE CLERK:  Juror No. 343.

10             (Juror 343 enters the courtroom.)

11             THE CLERK:  Sir, over here, please.  Have a seat, if

12   you would.  Do me a favor, keep your voice up, speak into the

13   mic so everyone around the table can hear you.  Okay.  Thanks.

14             THE COURT:  Good morning.

15             THE JUROR:  Good morning.

16             THE COURT:  Since you were last here, have you been

17   able to follow my instructions to avoid discussing the case

18   with anybody?

19             THE JUROR:  Yes.

20             THE COURT:  And as much as possible to avoid any media

21   exposure?

22             THE JUROR:  Yes.

23             THE COURT:  That's the questionnaire you filled out.

24   We're going to follow up on some of the things you told us in

25   it, and you can follow along if you want.

```
 1              Tell us what you do.  You work for Brown Brothers.

 2              THE JUROR:  It's a financial custodian, safekeeping

 3       bank right in Boston.

 4              THE COURT:  What do you could?

 5              THE JUROR:  I'm a client service manager.

 6              THE COURT:  What does that mean?

 7              THE JUROR:  So what I do is I have clients all in

 8       Boston and they come to me with issues of their investments,

 9       and I work internally within my department to ensure that their

10       investments are accurately funded in the right manner.  So it's

11       not all US, it's foreign relationships as well.

12              THE COURT:  Are you doing the investing?

13              THE JUROR:  No.

14              THE COURT:  You're not an investment advisor?

15              THE JUROR:  No.

16              THE COURT:  So I'm not clear.

17              THE JUROR:  It's a very hard concept.  So I have a

18       group of reports or employees that report up to me, and my

19       clients email or call my team, okay, and if there's an issue,

20       say they invested, you know, in federal bonds or something like

21       that, and they didn't basically settle in the sense of money

22       being moved, okay, we would work with that depository to make

23       sure that that money got to where it was.

24              THE COURT:  So are you facilitating transactions?

25              THE JUROR:  We don't facilitate.  We have a
```

1    transaction database that does that.  We just make sure that

2    database is working accordingly.  So we receive like an

3    automated trade instructions or fax in trading instructions and

4    we made sure those instructions are --

5              THE COURT:  You're just keeping an eye on things,

6    basically?

7              THE JUROR:  Monitor, right.

8              THE COURT:  And that's what the custodian does, take

9    custody.

10             THE JUROR:  Take custody.  Exactly.  I have that

11   problem trying to explain that to everybody.

12             THE COURT:  Okay.  Let me ask you to go back to Page 5

13   of Question 10.  You were concerned about whether this, if you

14   were called to serve on the jury, whether you would suffer

15   financial hardship.  Have you been able to get any information

16   about that since you filled out the questionnaire?

17             THE JUROR:  I have.  My company would.

18             THE COURT:  Would keep paying you?

19             THE JUROR:  Would keep paying me.

20             THE COURT:  So it would not be a financial hardship

21   for you to serve?

22             THE JUROR:  No.

23             THE COURT:  Page 11, Question 33.  Your wife works in

24   a law office.

25             THE JUROR:  Yes.

```
 1            THE COURT:  But it looks like it's a real estate --
 2            THE JUROR:  Real estate attorney, yes.
 3            THE COURT:  Is she an attorney or is she --
 4            THE JUROR:  She is an attorney, yes.
 5            THE COURT:  Okay.  That's what she does, real estate?
 6            THE JUROR:  Yes.
 7            THE COURT:  The next page, you have a brother who is,
 8      I guess, in the Boston police?
 9            THE JUROR:  Yes.
10            THE COURT:  It looks like for about 20 years.
11            THE JUROR:  Yes.
12            THE COURT:  Does he have any special -- what's his
13      rank?
14            THE JUROR:  He's a patrolman.
15            THE COURT:  Does he have any special assignment
16      currently that you're aware of?
17            THE JUROR:  He actually just got promoted to
18      something, I don't know what it is, but he was working as a
19      patrolman in A 1 here in the North Station for about 20 years.
20      He just, over the last two years, he's in West Roxbury.
21            THE COURT:  Did he -- was he personally involved in
22      the events of the marathon?
23            THE JUROR:  I don't believe he was personally
24      involved.  I know he was ordered.  I don't know where he was
25      ordered.
```

1          My brother-in-law also was ordered as well.  He's a

2     patrolman as well.  I don't know if I put that on there.

3          THE COURT:  I don't think you did.  Tell us about him.

4          THE JUROR:  So my brother-in-law also is in Area 1.

5     He currently does the graveyard shift.  And again, he was

6     ordered.  I don't know what --

7          THE COURT:  Does that mean they were on duty?

8          THE JUROR:  On duty.

9          THE COURT:  But you don't know what they were doing?

10         THE JUROR:  Right.

11         THE COURT:  Just to get the relationship straight, is

12    your brother-in-law your wife's brother or your sister's

13    husband?

14         THE JUROR:  My sister's husband.

15         THE COURT:  Question 36, we asked whether you would

16    tend to give greater weight to people's testimony if they were

17    law enforcement officer as opposed to non-law-enforcement

18    officers.

19         THE JUROR:  Yes.  I mean, being in that position I

20    feel we have to trust our police and any law enforcement and

21    trust that they're acting in an honest way.

22         THE COURT:  I think many people would agree with that

23    as a general principle.  But the question is whether if you had

24    testimony from a witness who happened to be a member of law

25    enforcement, would you be inclined to accept that more readily

1    than you would accept the testimony from someone who was not

2    law enforcement?

3             THE JUROR:  Possibly.

4             THE COURT:  All right.

5             THE JUROR:  Just being a police officer, I would think

6    they are truthfully answering the questions, not to say that

7    the other witnesses wouldn't, but I think it would weigh a

8    little bit more.

9             THE COURT:  Let me ask you to go to Page 20.  In

10   Question 77 we asked whether on the basis of things you've

11   heard or read or seen in the media or otherwise, whether you

12   had an opinion about whether the defendant was guilty or not or

13   whether he should receive the death penalty or not, and you

14   answered yes, that you had an opinion that he was guilty by

15   checking the box A, and then also that he should receive the

16   death penalty by checking the box at C.

17            The question went on to ask, if you answered yes to

18   those questions, would you be able or unable to set aside your

19   opinion and base your decision about guilt and punishment

20   solely on the evidence presented to you in court, and you

21   checked the box saying you would be able to do that.  Can you

22   tell us about that?

23            THE JUROR:  Well, I mean, from seeing and seeing all

24   the evidence that was publicly available, you know, and the --

25   having all the casualty that occurred during that, yes, I feel

1    that he is guilty, and I think the punishment should be, you

2    know, death, because personally I think that this is something

3    that -- I feel takes a greater weight as 9/11, you know, where

4    there were so many lives affected, you know, with, you know,

5    legs or whatnot, you know, that they live every single day now.

6    And I know 9/11 is a bigger volume.  But these folks that were

7    at the finish line have to live every single day now with that,

8    knowing and waking up and not knowing, having limbs or whatever

9    happened to them, I feel is a guilty plea from my point.

10   Sorry.

11            MR. BRUCK:  We're satisfied.

12            THE COURT:  Okay.  All right.  Let me just ask, in

13   Question 80, your younger sister was at the finish line?

14            THE JUROR:  Yeah, so she was at a bar about two -- she

15   was very close to the finish line.  I actually talked to her,

16   when I found out what happened, I finally got in touch with her

17   and had to navigate her through Boston to get to a safe place.

18   She was hysterical.  She was running across the finish line and

19   had no idea what happened and trying to get in touch with my

20   brother, who had the day off during that day, trying to get in

21   touch with him.

22            THE COURT:  Yeah, okay.

23            THE JUROR:  So it was a very --

24            THE COURT:  Good.  Thank you.

25            (The juror was excused.)

```
 1              THE CLERK:  Juror No. 345.

 2              CLERK MAYNARD:  Juror No. 345.

 3              THE CLERK:  Ma'am, over here, please, if you would.

 4    Have a seat.  Do me a favor, keep your voice up, speak into the

 5    mic so everybody around the table can hear you.  And this is

 6    adjustable, so it can go up and down.  Make sure you keep your

 7    voice up.

 8              THE COURT:  Good morning.

 9              THE JUROR:  Good morning.

10              THE COURT:  Since you were here, have you been able

11    last to follow my instructions about avoiding discussion of the

12    case with anyone?

13              THE JUROR:  Yes.

14              THE COURT:  And also any exposure to media accounts?

15              THE JUROR:  Yes.

16              THE COURT:  Okay.  Thank you.  You're a radiology

17    tech?

18              THE JUROR:  I was.

19              THE COURT:  Was.  Change of circumstances?  It said

20    through 2015.

21              THE JUROR:  I work for a veterinary clinic now.  Well,

22    I do some x-rays for them, but I'm more of a vet tech now.

23              THE COURT:  Okay.  Tell us briefly what this is?  You

24    just assist the veterinarian?

25              THE JUROR:  Assist the veterinarian, yes.
```

```
 1              THE COURT:  We asked about social media.  You use
 2    Facebook daily, it says.
 3              THE JUROR:  Yup.
 4              THE COURT:  And you say you put opinions and pictures.
 5    What kinds of opinions do you post?
 6              THE JUROR:  Well, my last one was telling any friends
 7    of mine that don't vaccine their kids to defriend me.  I am
 8    opinionated.
 9              THE COURT:  Okay.  So a variety of issues, is that it?
10              THE JUROR:  Yup.
11              THE COURT:  Have you posted any issues about this case
12    or about the events?
13              THE JUROR:  Not recently.  I might have when it was
14    all going down, but I honestly don't remember.
15              THE COURT:  You mean as events were unfolding that
16    week?
17              THE JUROR:  Yes.
18              THE COURT:  Let me ask you to turn to Page 19.
19              THE JUROR:  Okay.
20              THE COURT:  You say you worked briefly with Dr.
21    Russell.
22              THE WITNESS:  Yes.
23              THE COURT:  Tell us a little about that.
24              THE JUROR:  I worked at the time when I was an x-ray
25    tech, I worked for Concentra medical centers and he was a
```

1    relief doctor and covered for our doctors.

2           THE COURT:  What was the time frame?

3           THE JUROR:  He'd come in maybe once, twice, three

4    times a month, occasionally I think there was a day he was

5    there for a couple of days or a week covering a vacation.

6           THE COURT:  No.  I meant what years was this?

7           THE JUROR:  Let's see.

8           THE COURT:  It doesn't have to be precise.  I'm trying

9    to get an idea.  Five years ago?  Ten years ago?

10          THE JUROR:  Probably five years ago because I left

11   Concentra about two, three years ago.  So about five years ago.

12          THE COURT:  So in the 2010 to '12 range?

13          THE JUROR:  Yeah.

14          THE COURT:  When did you leave?

15          THE JUROR:  I left in 2012.

16          THE COURT:  You might have told us in Question 26.

17   You say 2012.  You say you were there at 2008 to 2012.  So it

18   would be in that range someplace?

19          THE JUROR:  Yes.  More towards the end of it.

20          THE COURT:  And he was one of several doctors --

21          THE JUROR:  Yes.

22          THE COURT:  -- that you'd work with?

23          Let me ask you to turn to Page 20, Question 77.  In

24   that question we asked in multiple parts whether based on

25   things you'd seen or heard in the media or otherwise whether

1   you had an opinion that the defendant was guilty or not guilty

2   or should receive the death penalty or not receive the death

3   penalty.  You selected "unsure" by checking that box to each of

4   those, but added after A, about whether he was guilty, you said

5   "but leaning towards guilty."

6          We then asked below that series of questions in the

7   same Question 77, "if you answered yes," which you didn't quite

8   but you came close, "would you be able or unable to set aside

9   your opinion and base your decision solely on the evidence

10  presented in court?"  And you checked "able."

11               THE JUROR:  Yes.

12               THE COURT:  Can you tell us about that?

13               THE JUROR:  I have a very scientific mind and I go by

14  facts that are presented to me and not what the news likes to

15  say and hearsay.  I'd rather have it in front of me and I can

16  judge for myself.

17               THE COURT:  Okay.  I'm sure you understand that in our

18  criminal justice system when somebody is accused of a crime,

19  they're presumed to be innocent of the crime unless and until

20  the government proves that the person is guilty by proving it

21  at trial to the jury.  And the jury, if the jury is convinced

22  that the person is guilty and holds that conviction beyond a

23  reasonable doubt, then the jury is justified in finding the

24  person guilty.  But if the jury is not so convinced, it's the

25  jury's obligation to find the person not guilty.  Do you

1    understand that?

2              THE JUROR:  I do.

3              THE COURT:  Would you be able to judge the defendant's

4    guilt or innocence on the evidence at trial under on those

5    principles?

6              THE JUROR:  I think so.

7              THE COURT:  Let me ask you about Question 82.

8              THE JUROR:  Yes.

9              THE COURT:  Krystle is one of the victims who was

10   killed.

11             THE JUROR:  Correct.

12             THE COURT:  It talks about this.  You attended the

13   funeral to block Westboro Baptist from picketing.

14             THE JUROR:  They were supposed to have shown up to

15   picket and say how all bad things happen because of gays, and I

16   don't believe in the Westboro Baptist Church.  And I don't

17   believe that anybody -- if it was any funeral, I would have

18   liked to help stop them from disrupting something.

19             THE COURT:  Did you know Krystle?

20             THE JUROR:  I did not.

21             THE COURT:  So you were going because --

22             THE JUROR:  Because of Westboro Baptist.

23             THE COURT:  -- because of the Westboro Baptist issue?

24             THE JUROR:  Yes.

25             THE COURT:  So let's turn to Page 23.  Beginning there

1   with Question 88, we asked a series of questions about your

2   views concerning the death penalty.

3              THE JUROR:  Yup.

4              THE COURT:  In 88 we asked if you had general views

5   about the death penalty, what were they.  And you said, "I

6   think it is a valid punishment in cases that are 100 percent

7   proved."

8              THE JUROR:  Correct.

9              THE COURT:  Can you tell us what you meant by that.

10             THE JUROR:  As long as there's absolutely no doubt,

11  which there wouldn't be, because he was found guilty, but to me

12  it seems like there would need to be a stronger, 100 percent

13  everything points to he was found there, he was DNA,

14  fingerprints, all that stuff.  I would want to be extremely

15  sure before I put someone to death as opposed to life in jail.

16             THE COURT:  Question 89, we asked if you could put

17  yourself on a numerical scale from strongly opposed to strongly

18  in favor.  The way we asked the latter question was if the 10

19  on the scale reflected a belief that the death penalty should

20  be imposed whenever the defendant has been convicted of

21  intentional murder.

22             THE JUROR:  Yup.

23             THE COURT:  You selected 9.  Any further explanation

24  you want to give of that?

25             THE JUROR:  No, just if you purposely kill someone, I

1    don't see why shouldn't get the death penalty.

2            THE COURT:  Let's go to Question 90 on the next page.

3            THE JUROR:  Okay.

4            THE COURT:  Here, rather than asking you to pick a

5    number on a scale, we asked you to look at the various

6    statements and see if there was one that reflected your

7    feelings about the death penalty in a case where someone had

8    been proven guilty of murder.  And of course when we're talking

9    about the penalty we're always talking about a case when

10   someone has been convicted of intentional murder.  You don't

11   get to the penalty question unless you have somebody in that

12   condition, right?

13           THE JUROR:  Okay.

14           THE COURT:  So you selected E when you filled out the

15   questionnaire that said you were in favor of the death penalty,

16   but could vote for a sentence of life imprisonment without the

17   possibility of release if you believed that sentence was called

18   for by the facts and the law in the case.

19           THE JUROR:  Correct.

20           THE COURT:  Does that accurately represent your view?

21           THE JUROR:  Correct.

22           THE COURT:  You said that if you were a hundred

23   percent convinced the death penalty was appropriate, you would

24   think that it could be imposed, and then you said of course the

25   person's been convicted and so on.  Do you think that it should

1   be imposed in any case where the defendant has been convicted

2   of intentional murder?

3            THE JUROR:  Intentional, set out to do it?  Yes.

4            THE COURT:  Okay.  Let's look at Question 95 and 96 at

5   the bottom of Page 25.  This is now in reference to the present

6   case.  If you found this defendant guilty and you decided the

7   death penalty was the appropriate punishment for him, could you

8   conscientiously vote for the death penalty.  And you checked

9   yes.

10            THE JUROR:  Yes.

11            THE COURT:  And then in the next question you're asked

12   the companion question to that, really.  If you found the

13   defendant guilty and you decided life imprisonment without the

14   possibility of release was the appropriate punishment, could

15   you conscientiously vote for life imprisonment without the

16   possibility of release.

17            THE JUROR:  Yes.

18            THE COURT:  And you checked yes to that.

19            THE JUROR:  Yes.  I don't know the facts of the case

20   so I don't know which one will --

21            THE COURT:  Now in that case, the case proposed by

22   Question 96, the premise is still the same, that he has been

23   convicted of intentional murder, right?  So in the case of an

24   intentional murder and you decided the life imprisonment was

25   appropriate, you could conscientiously vote for life

 1   imprisonment?

 2          THE JUROR:  If the facts of the case warranted it, I

 3   would say yes.

 4          THE COURT:  Okay.  Thank you.

 5          MR. MELLIN:  Good morning, ma'am.  I'm Steve Mellin

 6   and I'm one of the prosecutors on the case.  I just wanted to

 7   follow up a little bit on those questions.

 8          THE JUROR:  Okay.

 9          MR. MELLIN:  When Judge O'Toole was asking you, you

10   said that if it's intentional and he set out to do it, that

11   that would be a case where you would vote to impose the death

12   penalty.  Is that right?

13          THE JUROR:  Yes.

14          MR. MELLIN:  Now, do you understand in a case like

15   this, before the jury would ever be deciding the punishment,

16   the jury would first have to find the defendant guilty of one

17   of these capital counts, do you understand that?  Right?

18          THE JUROR:  Yup.

19          MR. MELLIN:  Then the question is you've already found

20   him guilty of one of these capital counts that deals with

21   things like the killing of others in relation to the use of a

22   weapon of mass destruction or something like that.

23          THE JUROR:  Uh-huh.

24          MR. MELLIN:  Now we're going to get to the penalty

25   phase, and that's the phase where the government puts on

1    evidence about the aggravating factors and the defense has the

2    right to put on evidence about the mitigating factors.  Do you

3    understand that?

4              THE JUROR:  Yes.

5              MR. MELLIN:  At that point, because you've already

6    found him, the defendant guilty of this capital count, are you

7    going to go into that second phase with your mind already made

8    up and automatically impose the death penalty?

9              THE JUROR:  No.  I want to know the facts behind why

10   he did it.  I probably mis-- on these, it didn't say

11   intentionally murder when I was answering yes to both of them.

12   It just said he was found guilty of murder.  So I find that

13   there will be -- I want to know what influenced him.  I want to

14   know what caused him, if he is found guilty, I want to know

15   what caused him to do the actions, and if it's something that

16   was outside of his control that caused him to do it, then yeah,

17   there's definitely going to be more towards life imprisonment.

18   If it was just him saying I want to kill people, then I would

19   lean towards the death penalty, to be perfectly honest.

20             MR. MELLIN:  Maybe I was confused by your answer to

21   one of the judge's questions.  So are you saying you're going

22   to listen to all of that and carefully consider all of the

23   evidence before you decide what the appropriate punishment is?

24             THE JUROR:  I would hope so.

25             MR. MELLIN:  Does that include you could decide based

1    on the evidence to impose the death penalty as well as based on

2    the evidence decide to not impose the death penalty?

3              THE JUROR:  I would like to think so, yes.

4              MR. MELLIN:  Just to kind of wrap it up, if you got to

5    the point where you believe that the aggravating factors

6    sufficiently outweighed the mitigating factors to justify a

7    sentence of death, would you be able to impose and vote to

8    sentence someone to death?

9              THE JUROR:  Yes.

10             MR. MELLIN:  Let me jump back, if we can, to your

11   posts at the time of the event.  Do you recall what you posted

12   about the Boston bombing?

13             THE JUROR:  I wish I could say yes to that, but

14   honestly that was so long ago and I am -- I will admit I am a

15   Facebook addict.  I post a lot.  Anybody wants to look at my

16   Facebook, I'll be more than happy to let you go back and look

17   at it.

18             MR. MELLIN:  You may regret making that offer.

19             THE JUROR:  I said I'd let you'd look at it.  I'm not

20   giving you my password.

21             MR. MELLIN:  Is there anything you've posted since the

22   time of the events that has to do with the Boston bombing?

23             THE JUROR:  Again, I apologize.  I post so much, I

24   honestly don't remember.  I know I have not posted anything

25   since I was ordered not to, and I don't remember posting

1    anything in recent times that had anything to do with it.

2           MR. MELLIN:  So given your answers, is it fair to say

3    there's nothing about what you may have posted two years ago or

4    a year ago that would impact your decision making in this case?

5           THE JUROR:  I don't believe so.

6           MR. MELLIN:  So if you were on the jury, would you

7    keep an open mind and decide the case based on the evidence --

8           THE JUROR:  I'd like to think so, yes.

9           MR. MELLIN:  -- that you hear?

10          You mentioned that you had some interactions with Dr.

11   Russell.

12          THE JUROR:  Yes.

13          MR. MELLIN:  How did you know Dr. Russell's

14   connection, if at all, to this case.

15          THE JUROR:  I believe one of my co-workers from then

16   actually saw his picture on one of the news stations and texted

17   me that it was him, and we put it together that way.

18          MR. MELLIN:  Okay.  And when was that?  Because you

19   say that, in answer to Question 84 on Page 22, you write that

20   you briefly worked with Dr. Russell, and "I believe he is the

21   defendant's sister-in-law's father."

22          THE JUROR:  Correct.

23          MR. MELLIN:  How did you gain that information?

24          THE JUROR:  Like I said, one of my ex-co-workers

25   texted me and we looked at the news footage that would play

1    over and over again of his face and we put it together that way

2    that it was the same doctor that we worked with.

3            MR. MELLIN:  Do you recall when it was you were

4    putting that together?

5            THE JUROR:  Relatively after -- I believe he was

6    coming into one of the courts with his daughter.  It was during

7    that time when she was coming to the courts.  I don't remember

8    the exact dates, I do apologize.

9            MR. MELLIN:  Is there anything about learning that

10   information that might affect your ability to be fair and

11   impartial in this case?

12           THE JUROR:  I don't believe so.

13           MR. MELLIN:  And you talked about going to Krystle

14   Campbell's funeral.  Again, if you could just explain that, why

15   were you there?

16           THE JUROR:  Westboro Baptist Church had threatened to

17   picket the funeral.  I don't know if you know anything about

18   Westboro Baptist Church, but they're an evil organization that

19   basically blames everything bad in the world on gays, and I

20   have quite a few gay friends, so I despise them greatly and

21   will do anything I can from causing pain to other people.

22           MR. MELLIN:  Other than that event, you had no

23   connection to Krystle Campbell?

24           THE JUROR:  No.

25           MR. MELLIN:  Is there anything about attending that

1   event, her funeral, and kind of blocking off the picketers that

2   you believe might have any impact on your ability to be fair

3   and impartial in this case?

4          THE JUROR:  Not in this case, no.

5          MR. MELLIN:  Thank you, your Honor.

6          MS. CLARKE:  Good morning.  My name is Judy Clarke.

7   I'm one of Jahar Tsarnaev's lawyers.

8          THE JUROR:  Good morning.

9          MS. CLARKE:  I just had a couple of questions if I

10  could follow up on Dr. Russell first.  If Dr. Russell or a

11  member of his family actually testified, do you think that

12  would -- your knowledge of him would influence you in any way?

13         THE JUROR:  I know him to be a kind man, but other

14  than -- I liked working with him.  I don't know -- I don't

15  understand.

16         MS. CLARKE:  How much interaction did you have with

17  Dr. Russell?

18         THE JUROR:  I was the x-ray tech for him and I did

19  medical assisting for him.  So we'd interact with him, well,

20  whenever he was there, all day long basically.

21         MS. CLARKE:  Sure.  So you liked him.

22         THE JUROR:  I did.

23         MS. CLARKE:  He was friendly with you.

24         THE JUROR:  Yup.

25         MS. CLARKE:  And so if he testified, got called by the

1    defense, would that influence your judgment one way or the

2    other?

3              THE JUROR:  I guess it depends on what he said.

4              MS. CLARKE:  Would you tend to believe him?

5              THE JUROR:  Most likely.  Unless he was saying

6    something completely outrageous, I would assume that he would

7    be telling the truth like everybody else on the stand is

8    supposed to.

9              MS. CLARKE:  Did he ever talk with you about his

10   family?

11             THE JUROR:  He did.

12             MS. CLARKE:  And what kind of information did you get?

13   What did he tell you?

14             THE JUROR:  I did know that was estranged from his

15   daughter and that he wasn't a fan of his brother, but other

16   than that, there was no in-depth conversations.

17             MS. CLARKE:  How did those conversations take place?

18             THE JUROR:  He was aggravated one day that he, I guess

19   he had gotten into a tiff with his daughter over --

20             MS. CLARKE:  Over?

21             THE JUROR:  I don't even know what it was.  He was

22   just aggravated, so we were picking on him because he was being

23   grouchy and he basically said he had a tiff with the daughter

24   over the son-in-law and it made him grouchy.

25             MS. CLARKE:  How do you store that information?  Does

1    that influence you one way or the other?

2         THE JUROR:  Everybody has tiffs with their

3    son-in-laws, don't they?

4         MS. CLARKE:  I think that might be true.  But would

5    that influence you one way or the other if he testified?

6         THE JUROR:  I don't believe so.  I mean, unless --

7    again, I'd have to know what he was talking about and what he

8    was talking about in reference to.  I mean, I'm sure what he's

9    going to say is going to influence me because that's why he's

10   up there.

11        MS. CLARKE:  Sure.  And would you have any trouble

12   believing other members of his family based on what he talked

13   to you about, say, if his wife or his daughter testified?

14        THE JUROR:  Again, I would want to see what they were

15   testifying.  I don't know them.  I've never met anybody but

16   him.

17        MS. CLARKE:  Sure.  You can see what I'm getting at.

18        THE JUROR:  I understand.  But I don't -- if you're

19   putting them up there, they obviously know something you want

20   me to know.

21        MS. CLARKE:  Right.

22        THE JUROR:  So I would tend to probably believe what

23   they're saying.

24        MS. CLARKE:  Okay.

25        THE JUROR:  But if they put somebody up, I'd probably

1    tend to believe what they're saying, too, until everything --

2           MS. CLARKE:  Sure.  Until it all gets sorted out.

3           THE JUROR:  Exactly.

4           MS. CLARKE:  As you can see, not every juror knows a

5    potential witness or somebody connected to the case in the ways

6    that you know.

7           MR. MELLIN:  Objection.

8           MS. CLARKE:  So just inquiring about it.

9           THE JUROR:  Yeah.

10           MS. CLARKE:  Could I take you to the questions about

11    the death penalty.  And I really appreciate your helping us

12    sort of understand where your views come from.

13           It sounded like in answer to the judge's question that

14    you would impose the death penalty in any case where the

15    defendant was, and I'm just looking at my notes, "convicted of

16    intentional murder," and you said "yes, if he set out to do it,

17    yes."  That would mean you would impose the death penalty?

18           THE JUROR:  Most likely, yes.

19           MS. CLARKE:  So in a capital case, the defendant would

20    be convicted of an intentional, deliberate murder.  No

21    self-defense, no excuse.  Right?

22           THE JUROR:  Okay.

23           MS. CLARKE:  Intentional, deliberate murder.  And what

24    I'm hearing you say is the result for you would be the death

25    penalty?

1            THE JUROR:  I don't know how to answer that, because

2     if you're wording it that way, then yes, it would probably be

3     the death penalty.  But I want to know is why was it an

4     intentional, like what drove him to that.  Yes, he could be

5     convicted of that.  I don't want to say he's going to be, but

6     if he's convicted of that, he was convicted of intentional, but

7     to me there's intentional -- like if someone purposely drove

8     their car into a child with, that's what they're going to do,

9     and kill, I think they should get the death penalty.  If

10    someone purposely drove their child, drove their car into a

11    child because someone had their child hostage?  I want to know

12    what's the back story before I -- does that make sense?

13           MS. CLARKE:  Well, I guess it does.

14           THE JUROR:  Maybe I watch too much TV.

15           MS. CLARKE:  Part of -- we all do.  Part of the, part

16    of the dilemma is trying to put yourself in the frame of mind

17    that you have just, as a juror, convicted someone of a willful,

18    deliberate, intentional killing, multiple killings, with no

19    excuse.  And what I'm hearing you say is if there's an excuse,

20    you want to know about it.  But that might stop you from

21    convicting.  And so we're talking about a situation where

22    there's an actual conviction, where you've sat on the jury and

23    you are satisfied beyond a reasonable doubt that there was a

24    willful, intentional, deliberate murder.

25           MR. MELLIN:  Your Honor, objection.  These questions

1     are not fair, because they're embedding certain aggravators and

2     then asking the juror if you embed those aggravators, and you

3     have found those aggravators, would you impose the death

4     penalty, and the answer to that question could be yes without

5     discussing the rest of the evidence.

6          THE COURT:  I think it can be misleading, particularly

7     to laypeople.

8          Let me come back to what I said earlier today and to

9     remind you that in the penalty phase, again, take the fact that

10    the jury has found beyond reasonable doubt that the person is

11    guilty of murder which requires intent.  Okay?  So then the

12    question is what is the appropriate penalty between the choice

13    of two, the death penalty on the one hand, life imprisonment

14    without the possibility of release on the other hand.  You'll

15    hear evidence likely from the government what we call

16    aggravating factors, which make this case perhaps worse than

17    other cases of intentional murder.  You'll hear evidence from

18    the defense about mitigating factors, which might be about

19    events themselves or might be about the defendant and his

20    background, and, as you put it, what the back story was, in one

21    sense.

22         And the juror's job is to consider all that evidence,

23    decide if the government's proved the aggravating factors,

24    decide if any juror feels that a mitigating factor should be

25    taken into account, and then weigh all that.  You'll be pulled

1   in two different directions, one to aggravate the crime, one to

2   mitigate it.  And the question is, would you be able to have an

3   open mind through all of that and evaluate everything at the

4   end of that presentation without any precommitment to one

5   position or another based on the fact of his conviction of

6   murder, or would the fact that you found him guilty of

7   intentional murder end the question that you tend to go to the

8   death penalty because of it?

9          THE JUROR:  So in the second phase is basically when

10  you would tell us what caused him to have the intent, right?

11  Is that what I'm -- is that what aggravating circumstances,

12  caused the intent?

13         THE COURT:  That could go on either side of the

14  equation.

15         THE JUROR:  Which is why I could say that I would

16  think that I could go on either way.  I want to know what

17  caused the intent before I decide.  Does that -- I'm sorry.

18         MS. CLARKE:  Your Honor, the problem with that is

19  we're talking self defense, duress, some kind of...

20         THE COURT:  Good.  And that's the problem with the

21  line of questioning.  There are too many hypotheticals and it's

22  a mini instruction that is partial and it's difficult to get

23  first an understanding answer on the fly like this.

24         MS. CLARKE:  I understand.  If I could just sort of

25  get it clear.

1          Your feelings about the death penalty, you are a

2    strong proponent of it?

3          THE JUROR:  Yes.

4          MS. CLARKE:  And you would need someone to explain why

5    the actions took place.

6          THE JUROR:  Correct.

7          MS. CLARKE:  Before you could consider anything other

8    than the death penalty.

9          THE JUROR:  Before I could consider anything.

10          MS. CLARKE:  Other than the death penalty in an

11    intentional murder case.

12          THE JUROR:  I believe in the death penalty for an

13    intentional murder case, yes.  I would not vote for the death

14    penalty until I knew all the circumstances.  I'm not putting

15    someone to death myself unless I know in my head why it was

16    done.

17          MS. CLARKE:  Sure.  And if you heard no evidence of

18    why, and all you heard was evidence of mitigating factors such

19    as upbringing or learning disability or something like that.

20          THE JUROR:  To me that's --

21          MR. MELLIN:  Your Honor, I object, because that is not

22    what the evidence is going to be at that stage.

23          THE COURT:  Well, I don't know what the evidence is.

24          MR. MELLIN:  There's a gateway intent factor that the

25    government has to prove and the jury has to find before the

1     jury can even make that.  And right now Ms. Clarke's question

2     is carving out that portion, making this a misleading question.

3          MS. CLARKE:  It's not, your Honor, it's a mitigation

4     impairment question, and I think what we're hearing this juror

5     say, Ms. 345, is that the death penalty is her answer unless

6     there's an answer to the why question, which is not the

7     defendant's burden.

8          THE COURT:  All right.  That's why I come back to my

9     question, which was after you heard from both sides things that

10    tend to aggravate, things that might tend to aggravate, things

11    that might tend to mitigate, could you take all of that into

12    consideration before deciding --

13         Now, the other point is, I made this, but let me make

14    it a slightly different way.  Not only do you not get to the

15    question of the penalty until you found somebody guilty of

16    intentional murder, but when you get to the question of

17    penalty, that's the question.  Okay?  So what is the

18    appropriate penalty of the choice of the two.  Okay?  The jury

19    will be presented two options, the death penalty or if not

20    that, life imprisonment without the possibility of release.

21    And that's what the penalty phase evidence will be about.  One

22    side will be arguing presumably for the death penalty, the

23    other side will be arguing mitigation for life imprisonment.

24    And the question is, will you have an ability, having found him

25    guilty of intentional murder, to fairly consider the evidence

1    from both sides before deciding the question of penalty.

2    That's really the question that's getting asked.

3              THE JUROR:  I believe so.

4              THE COURT:  Or does your conviction of, if it happens,

5    of intentional murder, does that close the question for you

6    that it means --

7              THE JUROR:  No.

8              THE COURT:  -- it's the death penalty?

9              THE JUROR:  No.  It doesn't close the question.

10   Because I still haven't -- I'm still waiting for, I want to

11   know why the intention was there.

12             THE COURT:  Okay.

13             MS. CLARKE:  May I ask the mitigation impairment

14   question one more time.

15             THE COURT:  Go ahead.

16             MS. CLARKE:  In the penalty phase, and I think you had

17   enough of an explanation of what it takes to get there, in the

18   penalty phase, would you be able to consider in a meaningful

19   way mitigation that is like a learning disability or a

20   situation of childhood as opposed to why the person committed

21   the crime?

22             THE JUROR:  I think those things would be part of the

23   reason why, wouldn't they?

24             MS. CLARKE:  If you didn't --

25             THE JUROR:  So yes.

```
 1            MS. CLARKE:  If you didn't hear why the crime was
 2     committed?
 3            THE JUROR:  Don't you have to hear why?
 4            MS. CLARKE:  If you didn't hear it.
 5            MR. MELLIN:  Your Honor, objection.
 6            THE COURT:  Yeah, I think this is unproductive.
 7            THE JUROR:  I'm sorry.
 8            THE COURT:  That's all right.  No, no.
 9            MS. CLARKE:  I don't know, did anybody ask you, would
10     there be a financial hardship for you if --
11            THE JUROR:  No.
12            MS. CLARKE:  If you're gone for three or four months,
13     you'll get paid?
14            THE JUROR:  I won't get paid, but there won't be a
15     financial hardship.
16            MS. CLARKE:  I want your life.
17            THE JUROR:  It's not going to be fun.  But I'm
18     fortunate enough that if I did not get paid I would still be
19     okay.
20            MS. CLARKE:  Okay.  Thank you.
21            THE COURT:  Okay.  Thank you very much.  Just leave
22     the questionnaire there.
23            (The juror was excused.)
24            MR. CHAKRAVARTY:  Can I make one point before the next
25     juror, your Honor.
```

```
 1              THE COURT:  Hold off just a moment.

 2              MR. CHAKRAVARTY:  Just a quick point, your Honor.  In

 3     questioning this last witness, Mr. Russell, who is the

 4     father-in-law, was mentioned several times, obviously for

 5     understandable reasons, whether there's any connection that

 6     this juror has with any of the events or facts in the case.

 7     But Ms. Clarke characterized Mr. Russell and other family

 8     members as potential witnesses.  They've never given us notice

 9     of any of these people as witnesses.  And going down a line of

10     questioning with surprise witnesses for jurors puts both us at

11     a disadvantage as well as defeats the purpose of having

12     exchanged witness lists.  Theoretically they could raise this

13     with every juror about some other witness that they anticipate

14     they have kept from us.  And so if -- it didn't affect her

15     testimony in terms of exploring whether she has any connections

16     to the case, but it's dangerous going forward, and I just

17     wanted to alert the Court and ask that if there are any other

18     such witnesses that you anticipate wanting to confront jurors

19     with, that we get notice of who those people are.

20              MS. CLARKE:  We'll be happy to.  We'll supplement our

21     witness list as we go along.  As the Court well knows, both

22     sides have an opportunity to do that.

23              MR. MELLIN:  Actually, that's not true, your Honor.

24     The government only has the opportunity to supplement with

25     potential rebuttal witnesses.
```



1

2

3

4

5

6

7      THE CLERK:  Juror No. 346.

8      (Juror 346 enters the courtroom.)

9      CLERK MAYNARD:  Juror 346.

10     THE CLERK:  Ma'am, over here, if you would.  Have a

11  seat.  Please sit here.  Speak into the mic so everybody can

12  hear you.

13     THE COURT:  Good morning.

14     THE JUROR:  Good morning.

15     THE COURT:  Since you were last here, have you been

16  able to abide by the instructions to avoid any discussion of

17  the case with anybody?

18     THE JUROR:  Yes.

19     THE COURT:  Except to tell people where you were

20  going?

21     Also as much as possible to avoid the media?

22     THE JUROR:  The media, yes.

23     THE COURT:  That's the questionnaire you filled out.

24  We're going to follow up on some of the questions you wrote in

25  it and maybe have some other questions for you as well.  Okay?

1          We asked people, first of all, I'm on Page 5, whether

2    because of the schedule in the case they might have some

3    difficulty that was a serious difficulty in serving.

4          You indicated that you would be able to fix your

5    schedule if that was the case.

6          THE JUROR:  Yes.

7          THE COURT:  You are a home care aid.

8          THE JUROR:  Yeah, I work with elderly people.

9          THE COURT:  Yeah.  And you would be able to continue

10   working on the schedule that accommodated serving on the

11   jury --

12         THE JUROR:  Yes.

13         THE COURT:  -- is that right?

14         How do you fix your hours?  In other words, do you

15   just set them yourself or do you have to go to somebody and say

16   this is the schedule I want to work next week?  How does it

17   work?

18         THE JUROR:  I set my hours.  I have 30 patients, and

19   on those patients, I go 8 to 3, I give them medications and I

20   give meal prep.  Sometime when I have to take vacation, I give

21   to my other home health aide and they accommodate me.  I don't

22   have like a schedule.  Sometimes I have five patients,

23   sometimes I have three.  It depends.  I make my own hours.

24         THE COURT:  Okay.  And if you're not working at that,

25   I presume you're not getting paid for it, right?

1          THE JUROR:  Yeah, I don't get paid.

2          THE COURT:  So does the fact that for four days from 9

3    a.m. to 4 p.m. you'd be here, would that be a financial burden

4    to you or not?

5          THE JUROR:  No.  I'd be able to see my patient on

6    Saturday and Sundays.  Yup.  I'd be able to do paper works on

7    those days.

8          THE COURT:  All right.

9          THE JUROR:  I do much of the work on the computer.

10         THE COURT:  I see.

11         THE JUROR:  Like I put what they need, if they need

12   laundry, shopping, anything, I put it in.  If they have

13   doctor's appointment, I make it out.

14         THE COURT:  Okay.  So that even on Monday through

15   Thursday, you could do some catch-up work like that in the

16   evenings, for example.

17         THE JUROR:  Yes.

18         THE COURT:  Okay.  All right.

19         How much do you use Facebook?

20         THE JUROR:  Not too much.  Just with my kids.

21         THE COURT:  You served on a jury in Massachusetts

22   once?

23         THE JUROR:  Yes.

24         THE COURT:  How long was that?

25         THE JUROR:  For three days.

1          THE COURT:  How long ago?

2          THE JUROR:  It was like five years ago.

3          THE COURT:  So let me ask you to turn to Page 20.  If

4     it's convenient, you want to take the clip off the top, you can

5     do that.

6          THE JUROR:  Yes.

7          THE COURT:  So in Question 77, near the top of the

8     page, we asked whether based on things you'd seen or read in

9     the media or otherwise, had you formed an opinion about some

10    matters, first whether the defendant was guilty or that he was

11    not guilty, that he should receive the death penalty or should

12    not receive the death penalty, and there were some boxes that

13    you could check to give your answers, right?

14         THE JUROR:  Uh-huh.

15         THE COURT:  You checked yes to the box that you had

16    formed an opinion that he was guilty.  And then you checked

17    "unsure" as to the rest.

18         THE JUROR:  Yup.

19         THE COURT:  Just below that, before Question 78, it

20    goes on to say, if you answered yes to any of these questions,

21    and you did, you answered yes to the question whether you

22    thought he was guilty, would you be able or unable to settle

23    aside your opinion and base your decision about guilt in this

24    case solely on the evidence that would be presented to you in

25    court, and you checked that you would be able to.

1          THE JUROR:  Yeah.

2          THE COURT:  Can you tell us about that?  Why do you

3    feel that you -- although you have formed an opinion, that you

4    would be able to set that aside and decide the questions

5    presented in the trial based solely on the trial evidence?  You

6    think you're able to do that?  And I guess I'd just like to

7    have you explain why you think you are able to do it.

8          THE JUROR:  Depend on the evidence, I could make sure

9    that I see if he's guilty or not, or he could go to the death

10   penalty.

11         THE COURT:  I want to separate the penalty first from

12   whether he was guilty or not.  Was the state trial you had a

13   criminal trial or a suit between private people?

14         THE JUROR:  Between private people, yeah.

15         THE COURT:  Okay.  In criminal trials, someone who is

16   accused of a crime is presumed to be innocent of the crime at

17   the beginning of the trial and throughout unless and until the

18   government proves that the person is guilty of what's been

19   charged and proves it by the evidence that is produced in the

20   course of the trial.

21         THE JUROR:  Yeah.

22         THE COURT:  Do you understand that?

23         THE JUROR:  Yes.

24         THE COURT:  And in order for a jury to return a

25   verdict of guilty, the jury must be convinced that the has

1    committed the crime charged and they must be convinced beyond a

2    reasonable doubt.  If they have a reasonable doubt about

3    whether a person is guilty or not, it is their obligation to

4    find him not guilty.

5              THE JUROR:  Yes.

6              THE COURT:  Do you understand those principles?

7              THE JUROR:  Yes.

8              THE COURT:  If you were a juror in that case would you

9    be able to judge the evidence in this case faithfully to those

10   principles?

11             THE JUROR:  Yes.  I do see the evidence to see if he's

12   guilty or not.

13             THE COURT:  And if to any of the counts you thought

14   that the government had not satisfactorily convinced you beyond

15   a reasonable doubt, could you vote not guilty as to that?

16             THE JUROR:  Yes.

17             THE COURT:  We asked some questions about the death

18   penalty beginning at Page 23, Question 88.  And we asked there

19   if you had views about the death penalty in general, what are

20   they.  I'm not sure, maybe you could tell us what you were

21   trying to convey when you answered that question.

22             THE JUROR:  I put if I -- if you are more than one

23   crime, like if you have more than one, you could be ended up

24   life imprisonment without the death penalty.

25             THE COURT:  I'm not sure I follow.

1          THE JUROR:  If you have more than one crime, you can

2     be facing life in prison, not the death penalty.

3          THE COURT:  Can you explain why you think that?  How

4     do you come to that thought?  What do you mean, "more than one

5     crime"?  You mean a criminal history, a criminal record from

6     prior cases?  Or do you mean more than one crime in a single

7     case?

8          THE JUROR:  More than one crime in a single case.

9          THE COURT:  Do you think that if there's more than one

10     crime, that's a reason for life imprisonment rather than the

11     death penalty?  Is that what you're saying?

12          THE JUROR:  Yes.

13          THE COURT:  Can you explain briefly why you think

14     that?

15          THE JUROR:  Because I don't -- like the death penalty

16     is not something with me.

17          THE COURT:  I see.  Okay.  If you go quickly to Page

18     25 at the bottom, we asked you if you found the defendant

19     guilty and thought the death penalty was an appropriate

20     punishment, could you conscientiously vote for it, and you said

21     you weren't sure.

22          THE JUROR:  Yeah.

23          THE COURT:  That's because of your attitude toward the

24     death penalty?

25          THE JUROR:  Yeah.

```
 1            THE COURT:  All right.

 2            MR. BRUCK:  We're satisfied.

 3            THE COURT:  Thank you.

 4            (The juror was excused.)

 5            THE CLERK:  Juror No. 348.

 6            THE COURT:  Hold off just a second.

 7            THE CLERK:  Hold off.

 8            THE COURT:  Could I direct everyone's attention to

 9   Question 85.

10            MS. CLARKE:  For the last juror?

11            MR. CHAKRAVARTY:  That's Jeff Bauman.

12            THE COURT:  Is that a reason?

13            MS. CLARKE:  Yes.

14            MR. CHAKRAVARTY:  He will be.

15            THE COURT:  He's a victim in the case, right?  He's

16   going to testify?

17            MR. CHAKRAVARTY:  Yes.  He will be a witness as well.

18            THE COURT:  I don't see any reason to go any further.

19            MS. CLARKE:  We agree.

20            THE COURT:  Okay.  We'll skip 348.

21            THE CLERK:  Can 348 go home?

22            THE COURT:  Yes.

23            THE CLERK:  With the same instructions?

24            THE COURT:  Yes.

25            THE CLERK:  Juror No. 349.
```

```
 1                    (Juror 349 enters the courtroom.)

 2             CLERK MAYNARD:  Juror 349.

 3             THE CLERK:  Ma'am, over here, please, if you would.

 4       Have a seat right here.  Thanks.  Speak into the mic so

 5       everybody around here can hear you.

 6             THE JUROR:  Okay.  Can I get my glasses?  I didn't

 7       realize I had to read.

 8             THE COURT:  Of course.

 9             THE JUROR:  Sorry.

10             THE COURT:  Good morning.

11             THE JUROR:  Good morning.

12             THE COURT:  Since you were here to fill out the

13       questionnaire, have you been able to follow the instructions to

14       avoid discussing the case with anyone?

15             THE JUROR:  Yeah.

16             THE COURT:  And as much as possible to avoid any

17       media?

18             THE JUROR:  That's a little harder.

19             THE COURT:  But when you've seen it, you've been able

20       to put it aside?

21             THE JUROR:  Yeah.

22             THE COURT:  So we put the questionnaire there because

23       we're going to follow up on some of the answers you've given

24       us.

25             THE JUROR:  Okay.
```

```
 1              THE COURT:  Feel free to take the clip off.
 2              Tell us what you do.
 3              THE JUROR:  Product development for women's clothing.
 4              THE COURT:  What does product development involve?
 5              THE JUROR:  Design of the garments, coloring the
 6    garments, putting it in to work with the factories, approving
 7    samples, fitting samples.
 8              THE COURT:  Something you've been doing for a while?
 9              THE JUROR:  Yes.
10              THE COURT:  I take it in your current position you've
11    been there only since mid December?
12              THE JUROR:  Yeah, it's a new company, start-up
13    company, so I've just started.
14              THE COURT:  I think you were, if I looked -- later on
15    you were wondering how the new job might -- people at the new
16    job might react --
17              THE JUROR:  Right.
18              THE COURT:  -- if you were called.  And this is on
19    Page 19, Question 74 if you want to look at.  And you said they
20    were okay.
21              THE JUROR:  Yeah.  I got the -- I think I might have
22    gotten the notification before I had started the job, so I
23    didn't know, you know.  And since it's a start-up, it's a
24    start-up company as well, I was a little bit nervous.  But they
25    are very -- you know, whatever happens, happens.  They're okay
```

1   with it.

2           THE COURT:  It's not going to be a financial hardship

3   to you.

4           THE JUROR:  No, they'll pay me.  I might have anxiety

5   in terms of my job, but, you know what I mean, because it's

6   new, but, yes, they're fine with it.

7           THE COURT:  Okay.  With respect to social media, do

8   you use it both personally and in connection with the job?

9           THE JUROR:  I don't use social media for work.  I use

10  it personally.

11          THE COURT:  Family and friends kind of thing?

12          THE JUROR:  Yup.  Yup.

13          THE COURT:  So nothing in the fashion design area, you

14  don't use it for that?

15          THE JUROR:  No.  I mean, I research, you know, like

16  what other companies are offering, things like that, online.

17  Do you mean that?

18          THE COURT:  You mean by going to their websites.

19          THE JUROR:  Yeah, I go to people's websites.

20          THE COURT:  I'm more interested in things you might be

21  posting.

22          THE JUROR:  Oh.  No.  No.

23          THE COURT:  So let me ask you to go to Page 20 and

24  Question 77 near the top of the page, a multipart question.  We

25  asked whether based on things you had seen or read in the media

1    or otherwise, had you formed an opinion about various matters,

2    and you indicated yes, you had formed an opinion that the

3    defendant was guilty.  And as to the other matters, you checked

4    you were unsure.

5              THE JUROR:  Uh-huh.

6              THE COURT:  Then below that we asked, if you answered

7    yes to any of the questions, as you did, would you able or

8    unable to set aside your opinion and base your decision about

9    guilt in this case solely on the evidence that will be

10   presented to you in court, and you selected the box that said

11   you would be able.  Can you tell us about that?

12             THE JUROR:  Yeah, I think when I first checked the

13   guilty, you know, if I felt that he was guilty box, I realized

14   after, I don't know what all the charges are, so I can't know

15   that he's guilty, because I don't know what the charges are or

16   what the evidence is and all of that.  But I think that there's

17   involvement.  There was so much media coverage, even just the

18   shootout in Watertown.  I watched it on TV.  And so I feel like

19   there's involvement there, like I think it's -- anybody would

20   think that.

21             THE COURT:  Yeah, it's understandable that, given the

22   coverage, that people have --

23             THE JUROR:  Right.

24             THE COURT:  -- formed impressions and perhaps even

25   conclusions.  The question of course is in the formal process

1    of a criminal trial, we ask jurors to put their minds in a

2    condition that they will focus on the evidence produced in the

3    trial and make their decisions that they have to make based on

4    that evidence and not on things they know independently or

5    from --

6                THE JUROR:  Right.

7                THE COURT:  -- some other source.  And the question is

8    would you be able to faithfully do that.

9                THE JUROR:  Yes, I would.

10               Can I ask you a question about the media thing?  Is

11   the live feed that's going on now, the media's in the other

12   room?

13               THE COURT:  Yes.  There's actually two members of the

14   media here.  And if we do a private, I told you you could have

15   a private answer, they'll leave the room too.

16               THE JUROR:  So for the trial, is that the same

17   situation?

18               THE COURT:  No.

19               THE JUROR:  Would media be allowed?

20               THE COURT:  Yes.  The media and the public will be in

21   the courtroom during that.  Okay?

22               THE JUROR:  Uh-huh.

23               THE COURT:  We've asked people about how they might

24   have been affected by events or how they may have reacted to

25   them.  In Question 82 we asked about whether you supported

1  various activities after the event.

2           THE JUROR:  Right.

3           THE COURT:  You said you bought a T shirt from Life is

4  Good.

5           THE JUROR:  Uh-huh.

6           THE COURT:  Is that the same or different from Boston

7  Strong?

8           THE JUROR:  Life is Good is a clothing T shirt

9  company.

10          THE COURT:  Right.

11          THE JUROR:  They made a T shirt.  I think it says "All

12  You Need is Love" on the back, maybe.  It just said Boston on

13  the front, not Boston Strong.  Then I think some of the

14  proceeds went to the One Fund.

15          THE COURT:  Okay.  Do you still have the shirt?

16          THE JUROR:  Yeah.

17          THE COURT:  Do you wear it?

18          THE JUROR:  Not really.  I wore it to the marathon

19  last year.

20          THE COURT:  Uh-huh.

21          THE JUROR:  But not really.

22          THE COURT:  You were there as a spectator last year?

23          THE JUROR:  Last year, I was.

24          THE COURT:  That is 2014.

25          THE JUROR:  Yeah, the most recent.  I was not there

 1    the year --

 2              THE COURT:  Have you gone, typically or commonly?

 3              THE JUROR:  No.  I went because a friend was running.

 4              THE COURT:  In 2014?

 5              THE JUROR:  Yeah.  I was not there the prior years.

 6              THE COURT:  Beginning on Page 23 at Question 88, we

 7    asked a series of questions about your attitudes towards the

 8    death penalty.

 9              THE JUROR:  Uh-huh.

10              THE COURT:  88 was if you had general views, what are

11    they.

12              THE JUROR:  Uh-huh.

13              THE COURT:  And you said you weren't sure, as I

14    interpret it, you weren't sure of the law concerning the death

15    penalty and would have to know that before you could --

16              THE JUROR:  Right.

17              THE COURT:  -- decide what your view was.

18              Is the subject something you've thought about, the

19    appropriateness of the death penalty in general as a policy

20    matter?  Is that something you've thought about?

21              THE JUROR:  I'm not opposed to the death penalty in

22    general.  I'm not -- I feel like I'm not for or against it.  I

23    would have to hear the evidence.

24              THE COURT:  In Question 89, we asked for you to put

25    yourself on a numerical scale from strongly opposed to strongly

 1    in favor and you put yourself sort of in the middle.

 2              THE JUROR:  Yeah.

 3              THE COURT:  Then in the next page, Question 90,

 4    instead of numbers we asked you to look at statements.

 5              THE JUROR:  Right.

 6              THE COURT:  And see if there was one that represented

 7    your feelings about the death penalty in the case of someone

 8    proven guilty of murder.

 9              THE JUROR:  Uh-huh.

10              THE COURT:  You selected D, which is I'm not for or

11    against the death penalty, I could vote to impose it or I could

12    vote to impose a sentence of life imprisonment without the

13    possibility of release, whichever I believe was called for by

14    the facts and the law in the case.

15              THE JUROR:  Right.

16              THE COURT:  Is that a fair representation --

17              THE JUROR:  Yeah, I think that's fair.

18              THE COURT:  -- of your attitude?

19              THE JUROR:  Uh-huh.

20              THE COURT:  You have to say yes or no.

21              THE JUROR:  Oh.  Yes.

22              THE COURT:  The reporter is taking down the --

23              THE JUROR:  Head nod, yes.

24              THE COURT:  But that fairly states your --

25              THE JUROR:  Yeah, yeah, uh-huh.

1          THE COURT:  If you go to Page 25, the bottom, Question
2     95.  Now, particular to this case, if you found this defendant
3     guilty and you decided the death penalty was the appropriate
4     punishment for him, could you conscientiously vote for the
5     death penalty, and you said yes.
6          THE JUROR:  That's true, yes.
7          THE COURT:  Then on the next, top of the next page we
8     asked the other side of that question.  If you found this
9     defendant guilty and you decided life imprisonment without the
10    possibility of release was the appropriate punishment for him,
11    could you conscientiously vote for life imprisonment without
12    the possibility of release, and again you checked yes.
13         THE JUROR:  Yes.
14         THE COURT:  So it's yes to both of those questions.
15         THE JUROR:  Uh-huh.  Yes.
16         THE COURT:  You're catching on.
17         MR. CHAKRAVARTY:  Just very briefly.  Good afternoon,
18    just barely.  My name is Aloke Chakravarty.  I'm one of the
19    prosecutors.  You had expressed a concern or the question about
20    the media arrangement.
21         THE JUROR:  Right.
22         MR. CHAKRAVARTY:  Is there some special concern you
23    have?
24         THE JUROR:  I think there's a lot, there were
25    questions and there's a lot of conversation, and if you were a

1     potential juror, you'd need to be avoiding the media, and it's

2     so front and center, it's difficult.  And, you know, just even

3     driving in the car, the news comes on, and, you know, I've

4     heard, you know, you try to switch it, but you hear things.  So

5     I just wondered, and I just would wonder that the jurors would

6     remain anonymous, you know, if you were put on the jury, that

7     it would stay anonymous and that it wouldn't be, you know, in

8     the media who you were.

9          THE COURT:  Yes.  You will remain unidentified except

10    by number until the case is over.  You will probably be

11    identified after the case is over.

12         THE JUROR:  Okay.  That was my question, I guess.

13         MR. CHAKRAVARTY:  Your attendance at the marathon this

14    past year, is that going to affect your ability to be fair and

15    impartial in this case?

16         THE JUROR:  No, no.

17         MR. CHAKRAVARTY:  I just wanted to touch on the last

18    series of questions that the judge had posed to you about the

19    death penalty.

20         THE JUROR:  Uh-huh.

21         MR. CHAKRAVARTY:  If, after you've, you and the rest

22    of the jury have decided guilty and you listen to all of the

23    evidence in the penalty phase, both the aggravating and

24    mitigating and you personally have come to the decision that

25    the death penalty is appropriate, what gives you the confidence

1    that you can say, "Yes, here's my vote, I vote to put this

2    person to death"?

3           THE JUROR:  Well, I think by all the evidence and by

4    the instruction from the judge, whatever the law is, I would go

5    with that.  And, you know, I think I'm a pretty fair and

6    equitable person, intelligent, and I would think it through.

7           MR. CHAKRAVARTY:  That's all I have.

8           MR. BRUCK:  Good afternoon.

9           THE JUROR:  Hi.

10           MR. BRUCK:  My name is David Bruck and I'm one of

11    Jahar Tsarnaev's lawyers, and I have a few more questions.  The

12    good news is I think I'm the last person who will ask you any.

13           THE JUROR:  Okay.

14           MR. BRUCK:  The judge has told you that when the trial

15    is over, the juror's names, you have to assume, would become

16    public.

17           THE JUROR:  Uh-huh.

18           MR. BRUCK:  Let me back up a little.  He asked you

19    about being able to consider the evidence in court, and if the

20    government proved their case, only consider the evidence that

21    was presented in the court to find the defendant guilty.

22           THE JUROR:  Uh-huh.

23           MR. BRUCK:  I'm going to ask it the other way.  If

24    you're on the jury, knowing everything or having seen

25    everything you've seen and heard everything you've heard and

```
 1   formed the opinion that you formed, and you're in the jury box
 2   and the government puts on their evidence but it leaves a
 3   reasonable doubt in your mind, probably guilty, maybe, but not
 4   beyond a reasonable doubt.  And this sound like an easy
 5   question, but it's intended to be a hard question.
 6             THE JUROR:  Okay.
 7             MR. BRUCK:  Could you find this defendant not guilty
 8   and let him go home?
 9             THE JUROR:  I would listen to all the evidence, and
10   what the law is.  So if that was the case, yeah.
11             MR. BRUCK:  Based on what the judge told you, that the
12   burden of proof is on the government, it's never on the
13   defendant.
14             THE JUROR:  Uh-huh.
15             MR. BRUCK:  But that's sometimes easier said than
16   done.
17             THE JUROR:  Right.
18             MR. BRUCK:  Based on everything you know, do you think
19   in the back of your mind you'd be expecting the defendant to
20   prove he was innocent?
21             THE JUROR:  So your question is would the defendant be
22   expected to prove his innocence versus --
23             MR. BRUCK:  To you.
24             THE JUROR:  To me?
25             MR. BRUCK:  Would you need, in this case, given
```

1    everything you've heard and the opinion you formed -- the judge

2    has told you what the rules are, but the point of this part of

3    the trial is to find out what's inside you.  And the law

4    doesn't ask people to do things that are superhuman or more

5    than a person can do.

6              THE JUROR:  Right.

7              MR. BRUCK:  So that's what I'm getting at.  Do you

8    think that what you have heard and the opinions you've formed

9    might cause you to feel that the defendant would have to prove

10   that he didn't do it in order for you to --

11             MR. CHAKRAVARTY:  Objection, your Honor.

12             MR. BRUCK:  -- find him not guilty?

13             THE COURT:  Go ahead and answer it, if you're able to.

14             THE JUROR:  I guess I'm kind of not clear on the

15   question.

16             THE COURT:  Maybe you don't understand it.

17             MR. BRUCK:  I can try to make it a little simpler.

18             THE COURT:  Make it a little shorter will help.

19             MR. BRUCK:  Shorter would be good.  Sorry.  It's my

20   fault, the way I asked the question.

21             I guess what it comes down to is knowing what you know

22   and having formed the opinion that you formed, do you think you

23   might need the defendant to bear a burden of proof and show

24   that he was innocent before you could actually render a verdict

25   of not guilty in the case?

```
 1            THE JUROR:  I think I would take whatever opinion I
 2    have and prior, and if I was on it and set it aside and listen
 3    to the evidence, and listen to the trial.  And I don't think
 4    whatever feeling I could have now would be that -- would affect
 5    it.
 6            MR. BRUCK:  Okay.  And knowing that the jurors
 7    wouldn't be anonymous forever, what would you feel like if the
 8    jury, all 12 members of the jury did find the defendant not
 9    guilty and you went back to your life out in the community?
10            MR. CHAKRAVARTY:  Objection, your Honor.
11            MR. BRUCK:  Could you do that?
12            THE COURT:  Well, let me ask the question a slightly
13    different way.  When people learn that you have been on the
14    case, if you and the other jurors had acquitted the defendant
15    of some or all of the charges, would you be concerned about
16    criticism from people about your decision?
17            THE JUROR:  I hadn't thought about it that way.
18            THE COURT:  And the second half of the question,
19    really, is if you were worried about that, how, if at all,
20    would that affect your service as a juror?
21            THE JUROR:  Right, right.  I think I would be okay
22    with it, with whatever the decision that we made, if I was on
23    the jury, I would stand by it and -- I guess I just kind of
24    worry during the trial, you know, I don't know if we're, if you
25    were on it, you were going back and forth from home and being,
```

1    you know, I don't know, media following you --

2            THE COURT:  No.

3            THE JUROR:  -- or something.  That's why I asked the

4    question.  I think once it was over, I would, if I was on it, I

5    hope I would just go back to my life.

6            THE COURT:  Okay.

7            MR. BRUCK:  You put in your questionnaire, if you turn

8    to Page 20 and look at 76, Question 76.

9            THE JUROR:  Okay.

10           MR. BRUCK:  Can you tell me what, if anything, you

11   remember about the New York Times article that you checked out

12   describing the start of the trial.

13           THE JUROR:  There was some information about the -- I

14   don't mean to point, but I don't know your name.

15           MS. CLARKE:  Me?  I'll remain anonymous.

16           THE JUROR:  Okay.

17           MS. CLARKE:  Judy Clarke.

18           THE JUROR:  Yeah.  There was some information about

19   her and some prior trials.

20           MR. BRUCK:  Do you remember, can you tell us what that

21   information was?

22           THE JUROR:  I think it was the Unabomber trial, maybe.

23           MR. BRUCK:  Anything else that you can recall, if you

24   think hard about it?

25           THE JUROR:  Unh-unh, not really.

```
 1          MR. BRUCK:  And what was the connection -- you said it
 2    was about Ms. Clarke and about the Unabomber.  Do you remember
 3    what it said?
 4          THE JUROR:  I think she was a defense lawyer for the
 5    Unabomber.
 6          MR. BRUCK:  A defense lawyer for the Unabomber.
 7          THE JUROR:  Yes.
 8          MR. BRUCK:  I mean, what was your reaction to that?
 9          THE JUROR:  I don't think I really had one.
10          MS. CLARKE:  It's okay.
11          THE JUROR:  What?
12          MS. CLARKE:  It's okay.
13          THE JUROR:  I don't know that I had a reaction.  I
14    just noted that she had, I guess.
15          MR. BRUCK:  You noted it.
16          THE JUROR:  That she's been involved with some big
17    trials, national media-type trials.
18          MR. BRUCK:  Okay.  And that article was after you came
19    to court to fill out the questionnaire --
20          THE JUROR:  Uh-huh.
21          MR. BRUCK:  -- that you saw that.
22          THE JUROR:  It was not after the questionnaire, it was
23    before.
24          MR. BRUCK:  It was before the questionnaire.
25          THE JUROR:  It says last week, it was before the
```

 1    questionnaire.  It was before I even came here.

 2             MR. BRUCK:  Okay, after receiving your summons but

 3    before that.

 4             THE JUROR:  Yeah.

 5             MR. BRUCK:  Okay.  I've gotcha.  Excuse me.

 6             I wanted to ask you a little bit about where you were

 7    on April 15, 2013, if you can remember.

 8             THE JUROR:  I was in New York City at Columbia

 9    Presbyterian hospital.  My brother had brain surgery.

10             MR. BRUCK:  Oh my goodness, is he okay?

11             THE JUROR:  Yeah.

12             MR. BRUCK:  Good.

13             And how did you find out about the marathon?

14             THE JUROR:  Later when I got home to his home, where I

15    was staying, it was on the news.

16             MR. BRUCK:  And did you go back to Boston that week?

17             THE JUROR:  Maybe a couple of days later.

18             MR. BRUCK:  Okay.  Where -- did you know anybody --

19    now that you've had more chance to think about it, anybody at

20    all that was down there around the --

21             THE JUROR:  (Juror shakes head.)

22             MR. BRUCK:  Where were you on the 18th and 19th, the

23    day of the search and the lockdown?

24             THE JUROR:  In Watertown?  I was at home.

25             MR. BRUCK:  In Scituate.

1            THE JUROR:  Yeah.

2            MR. BRUCK:  So you didn't shelter in place or you did?

3            THE JUROR:  No.  I had just stopped working, actually.

4     April 15 was my last day of work at a prior job, or the first

5     day that I wasn't -- excuse me -- working.  And so, yeah, I was

6     in Scituate, I wasn't working.  I don't remember if I went to

7     the gym, whatever.

8            MR. BRUCK:  Did the events of that day affect your

9     travel or where you went or what you did?

10           THE JUROR:  No.

11           MR. BRUCK:  Your friend that ran the marathon in 2014,

12    had she run the year before?

13           THE JUROR:  How did you know it was a she?

14           MR. BRUCK:  It was a lucky guess.

15           THE JUROR:  She had not, no.  It's my next-door

16    neighbor's daughter.

17           MR. BRUCK:  Okay.  And was there any discussion with

18    her about the --

19           MR. CHAKRAVARTY:  Objection, your Honor.

20           THE COURT:  Yeah.  And I think in the interest of

21    time, we should move on.

22           MR. BRUCK:  Okay.

23           THE COURT:  We have a long way to go today.

24           MR. BRUCK:  Sure.  I understand.

25           You said you were unsure about whether Mr. Tsarnaev

1   should receive the death penalty.  Unsure can cover a lot of

2   territory.  And I guess what I'd like to know is within that

3   unsure, do you lean one way or the other right now?

4         THE JUROR:  I don't.  I don't really know -- I don't

5   know what the law, how the law reads about the death penalty.

6   I am not for it or against it.  I would go by what the law was.

7         MR. BRUCK:  If I told you that the law in the end

8   leaves it up to the jury once certain basic facts are proven,

9   guilt beyond a reasonable doubt, intended to commit the crimes

10  that are charged in this case, that after that it's really up

11  to the jury, that law doesn't tell you what the answer is.

12        THE JUROR:  Okay.

13        MR. BRUCK:  That's what the judge meant when he said

14  the jury's never required to impose the death penalty.

15        THE JUROR:  Okay.

16        MR. BRUCK:  I'll ask the question again, knowing that

17  it really would be up to you, do you lean one way or the other

18  right now?

19        THE JUROR:  No.

20        MR. BRUCK:  Bear with me just a moment.

21        That's all I have.  Thanks so much

22        THE COURT:  All right.  Thank you.  Don't forget your

23  glasses.

24        THE JUROR:  Thank you.

25        (The juror was excused.)

```
 1                (Discussion off the record.)

 2                THE CLERK:  Are we ready, Judge?

 3                THE COURT:  Yes.

 4                THE CLERK:  Juror 350.

 5                CLERK COPPOLA:  Juror 350.

 6                (Juror 350 enters the courtroom.)

 7                THE CLERK:  Sir, over here, if you would, please.

 8    Have a seat.  Keep your voice up, speak into the mic so

 9    everybody around here can hear you.

10                THE COURT:  Good afternoon.

11                THE JUROR:  Good afternoon.

12                THE COURT:  Let me ask since you were last here to

13    fill out the questionnaire, have you been able to follow the

14    instructions to avoid discussing the case with anyone?

15                THE JUROR:  Yes.  The best I could.

16                THE COURT:  Yeah.  And as well to avoid media reports

17    about the case?  I know that's a little difficult but have you

18    been able to put those --

19                THE JUROR:  Yes, yes.

20                THE COURT:  So that's the questionnaire you filled

21    out.

22                THE JUROR:  Yup.

23                THE COURT:  We just have a few, maybe more than a few,

24    follow-up questions.

25                Let me start with your employment.  Can you tell us
```

1    what you do.

2         THE JUROR:  I do extermination for Ehrlich, Watch

3    All/Ehrlich.  I've been doing that for 12 years with the same

4    company.

5         THE COURT:  So you go, what do you do, go out to a

6    site.

7         THE JUROR:  I go to different address, clients,

8    throughout Massachusetts, Rhode Island, Connecticut, and we

9    provide pest control service for all type of properties.

10        THE COURT:  All types of properties?

11        THE JUROR:  Yes.

12        THE COURT:  All types of pests?

13        THE JUROR:  All types of pests.  All types of

14   buildings, property, hospitals, university, everything.

15        THE COURT:  We're concerned with people whether the

16   schedule would cause them any financial hardship if they had to

17   be here on a four-day-a-week schedule for three or four months.

18   Would it be okay for you?

19        THE JUROR:  It would be a financial hardship.  I'm not

20   sure how my company deal with the jury duty.  I believe they do

21   pay for some amount of time that I'm on it, but I'm not sure

22   about it.  It hasn't really got all the information about it.

23        THE COURT:  You haven't talked to the people about it?

24        THE JUROR:  About my, if my work paid?  No, I hadn't.

25        THE COURT:  Are you paid on an hourly basis or a

```
 1   salary?

 2          THE JUROR:  Hourly.  Hourly.

 3          THE COURT:  So if you don't put in the hours, would

 4   they pay you?

 5          THE JUROR:  No.  No.

 6          THE COURT:  So, just to -- we describe it at Page 5 of

 7   Question 10, but once the trial gets started, it would be, the

 8   jury would be here Monday through Thursday between 9 and 4.

 9          THE JUROR:  Uh-huh.

10          THE COURT:  If you were otherwise normally working

11   that time, you wouldn't be working obviously and you wouldn't

12   be earning the money.

13          THE JUROR:  Yeah.

14          THE COURT:  I mean, is that something that you can

15   handle?

16          THE JUROR:  I believe so.

17          THE COURT:  You can?

18          THE JUROR:  I believe so.  I'm not saying it's going

19   to be easy, but I believe so.

20          THE COURT:  It's up to you.

21          THE JUROR:  Yup.

22          THE COURT:  Tell me about your use of social media.

23          THE JUROR:  Social media I use mainly to forecast for

24   work, driving, traffic.  I like to go out surfing, so I first

25   catalog the water.
```

1          News, not that much.  Mostly sports when I'm working.

2     I can be working.  Like more to family.  And everybody got TVs,

3     so we're going apartment to apartment and that kind of thing.

4          I'm not a Facebooker or Tweeter.  I don't have a

5     Twitter account or none of that.

6          THE COURT:  You said you used -- on Page 11 on the

7     questionnaire you said you use Facebook approximately two or

8     three times a week?  Is that what --

9          THE JUROR:  Yeah, to put pictures of my son so my mom

10    can see him in Puerto Rico.  Most like family, you know.

11         THE COURT:  Just on that subject, you were born and

12    raised in Puerto Rico?

13         THE JUROR:  Yes.

14         THE COURT:  You live here now, and I think you said

15    you've been in your current location for eight years.  Is that

16    when you moved to the mainland?

17         THE JUROR:  No, I moved here in August 9, 2001, and I

18    came directly to the South End in Boston.

19         THE COURT:  So let me ask you to turn to Page 20.  And

20    direct your attention to Question 77.

21         THE JUROR:  Yeah.

22         THE COURT:  And there we asked whether as a result of

23    things you'd seen or read in the news or otherwise had learned,

24    had you formed any opinion about whether the defendant was

25    guilty or not or whether he should get the death penalty or not

1    if he was guilty.  And you indicated unsure to each of those.

2              THE JUROR:  Uh-huh.

3              THE COURT:  Can you tell us why you selected that

4    answer.

5              THE JUROR:  I'm aware the media's crazy, it happen

6    when I follow the storms, like the snowstorms, they go out of

7    their way, so I believe they do that with everything.  So isn't

8    sure, in my opinion that's the reason why you guys are here, if

9    he's guilty or not.  By the media, he already is, but I'm not

10   that attached to media or what they said.  Lately you see

11   reports about journalists just lying to get some credit and

12   stuff like that.  So...

13             THE COURT:  So in a criminal trial, as I'm sure you

14   know, a person is accused of a crime is under the law presumed

15   to be innocent of the crime unless and until the government

16   proves that he's guilty and proves it by evidence at the trial

17   that convinces the jury beyond a reasonable doubt that the

18   person is guilty.  Do you understand those principles of the

19   criminal law?

20             THE JUROR:  Yup.

21             THE COURT:  So what we ask jurors to do is keep an

22   open mind during the presentation of the case, listen to all of

23   the evidence.  At the end of the case, when they're

24   deliberating, think about that evidence and see what they have

25   been persuaded about and what perhaps they've not been

1    persuaded about.  And if they're convinced beyond a reasonable

2    doubt that the person is guilty, they should find them guilty.

3    And if they're not convinced beyond a reasonable doubt, they

4    should find him not guilty.  Do you understand generally --

5            THE JUROR:  In Puerto Rico, we're run by the same

6    system.

7            THE COURT:  Right.  So would you be able to do that if

8    you were a juror?

9            THE JUROR:  I believe so, yes.

10           THE COURT:  Make a decision either way, depending how

11   you assess the evidence?

12           THE JUROR:  Yes.

13           THE COURT:  If the government failed to convince you

14   beyond a reasonable doubt on any of the charges, would you be

15   able to find the defendant not guilty of that charge?

16           THE JUROR:  Yes.

17           THE COURT:  You mentioned principles in Puerto Rico.

18   Have you served on a jury in Puerto Rico?

19           THE JUROR:  No.

20           THE COURT:  We asked you that about here but we didn't

21   ask you about...

22           The next page, 21, you indicated you donated some

23   money to the One Fund after the events.

24           THE JUROR:  Yes, I did.  Via text message, one time.

25           THE COURT:  That was fairly close to the events.

1          THE JUROR:  Within the first month.  Within the first

2     month.

3          THE COURT:  Beginning on Page 23 at Line 88 we have a

4     series of questions about your attitude towards the death

5     penalty.

6          THE JUROR:  23?  Okay.

7          THE COURT:  See Question 88.  We asked if you have any

8     views on the death penalty in general, what are they?  And you

9     said you're pro-death penalty in general.

10         THE JUROR:  Yes.

11         THE COURT:  Do you want to say any more about that?

12         THE JUROR:  When I grew up in Puerto Rico, right now

13    is tear upside down by violence and crime, and the death

14    penalty is a topic that come up very often when these are very

15    high profile case in Puerto Rico.  Since I was young, I'm not

16    saying everybody deserve the one to fix society, but there is

17    some cases, either to show, send a message or how awful those

18    cases are, they do deserve the death penalty.

19         THE COURT:  Okay.  And the next question, we asked you

20    to place yourself on a numerical scale from 1 to 10, strongly

21    opposed to strongly in favor.  And you suggested 7 was

22    appropriate for you.

23         THE JUROR:  Uh-huh.  Is because every case have to be

24    -- not every case should go to death penalty.  It's got to be,

25    you know, some specific situation that will -- I won't believe

1    that I will believe that everybody who's guilty deserve the

2    death penalty.  That's what I mean with 7.

3           THE COURT:  So let's go to the next page, Question 90.

4    Here, rather than asking you about a number, we asked you to

5    see if there was a statement among the several that were set

6    out there that you thought reflected your view, and you picked

7    statement E.  And that says that I'm in favor of the death

8    penalty, but could vote for a sentence of life imprisonment

9    without the possibility of release if I believed that sentence

10   was called for by the facts and the law of the case.

11          Is that an accurate statement of your --

12          THE JUROR:  That's an accurate statement.

13          THE COURT:  So even though in general terms for some

14   cases you favor the death penalty, you would be able to

15   consider and perhaps vote for a sentence of life imprisonment

16   if you thought that was the right sentence for the particular

17   case?

18          THE JUROR:  That's correct.

19          THE COURT:  Let's go to the next page at the bottom,

20   Question 95.  Now we're getting particular about the case.

21   This and the next question are both about this case.  If you

22   found Mr. Tsarnaev guilty and you decided that the death

23   penalty was the appropriate punishment for him, could you

24   conscientiously vote for the death penalty?

25          THE JUROR:  Yes.

1           THE COURT:  And you said yes?

2           THE JUROR:  Yes.

3           THE COURT:  And then the next question is the other

4    side of that, in a sense.  If you found Mr. Tsarnaev guilty and

5    you decided that life imprisonment without the possibility of

6    release was the appropriate punishment, could you

7    conscientiously vote for that?

8           THE JUROR:  Yes.

9           THE COURT:  And you said yes?

10          So you are prepared to go in either direction

11   depending on how you evaluate everything at the end of the

12   case?

13          THE JUROR:  Yes.

14          MR. MELLIN:  Thank you, your Honor.

15          Good afternoon, sir.  I'm Steve Mellin, one of the

16   prosecutors on the case.  Just a few questions about the death

17   penalty.  You indicated that, I think you said that not every

18   case deserved the death penalty.  Is that right?

19          THE JUROR:  That's right.

20          MR. MELLIN:  So you've heard the judge's instructions

21   this morning.  Do you understand that for the jury to even get

22   to the point where the jury is deciding whether it's life or

23   death, the jury would have found the defendant already guilty.

24   Do you understand that?

25          THE JUROR:  Yes.

1          MR. MELLIN:  And so the jury would find the defendant

2     guilty and we'd go on to this next stage.  And would you, in

3     going to that next stage, would you be able to keep an open

4     mind and carefully consider all of the evidence before you

5     decided what the appropriate punishment would be?

6          THE JUROR:  This is what I understand.  I understand

7     it would be like two type of trial, the trial to see for he's

8     guilty of the cases, and then it would be another trial about

9     the death penalty and each one -- this is my understanding.  I

10    might be wrong.

11         MR. MELLIN:  No, you're absolutely right.

12         THE JUROR:  And each one of those would bring their

13    own evidence and counterparts.  So it's like the decision from

14    the guilty doesn't have nothing to do with the decision about

15    the death penalty.

16         MR. MELLIN:  Right.  And that's what I was getting at.

17    Just because you found him guilty, would you automatically

18    impose the death penalty, or would you make that decision after

19    you hear all of the evidence?

20         THE JUROR:  I will make the decision after I hear all

21    of the evidence.

22         MR. MELLIN:  Okay.  Finally, when you get -- if the

23    jury were to get to this stage where the jury's deciding life

24    or death, and you believe that the evidence sufficiently out --

25    or the aggravating evidence sufficiently outweighed the

```
 1    mitigating evidence, so you thought the death penalty was
 2    appropriate, would you be able to vote to sentence someone to
 3    death?
 4              THE JUROR:  Yes.
 5              MR. MELLIN:  All right.  Thanks a lot.
 6              MR. BRUCK:  Good afternoon.
 7              THE JUROR:  Good afternoon.
 8              MR. BRUCK:  My name is David Bruck, and I'm a lawyer
 9    and I'm one of Jahar Tsarnaev's attorneys, and I've got a few
10    questions I'd like to ask you too, if that's okay.
11              THE JUROR:  Sure.
12              (Ms. Conrad enters courtroom.)
13              MR. BRUCK:  I want to -- I listened carefully what you
14    told Judge O'Toole about your job, but I want to be sure that
15    we're all on the same page.  This case could last all through
16    the month of April -- February, March, April, May.  I mean, the
17    judge said three to four months, and we haven't even started
18    yet.
19              If you were on the jury 9 to 4 four days a week and
20    weren't getting paid, could you really make do with that and
21    survive.
22              THE JUROR:  We talked -- my wife is a little concerned
23    about it too.  My wife is a little concerned.  And we're just
24    going to take it day by day.  I won't consider that my job is
25    an obstacle.  I believe I can go by and find a way.  If not, we
```

1    try to reach out to all of you.

2              MR. BRUCK:  You'll try to what?

3              THE JUROR:  To reach out to you all to discuss it.

4    But right now it hasn't been a problem, and we'll see.

5              THE COURT:  Well, let me just interject.  If you're

6    in, you're in.

7              THE JUROR:  All right.

8              THE COURT:  Okay?  There won't be a -- it's not a

9    trial period.  Well, it is a trial.  That's a bad choice of

10   words.  It won't be a test period to see if it's okay for you,

11   and if it isn't, then you can opt out.  If we impanel you and

12   you're actually sworn to be a juror, then you would be expected

13   to be here for the duration.

14             THE JUROR:  I understand.

15             THE COURT:  There isn't a second look-back.

16             THE JUROR:  I understand.

17             MR. BRUCK:  With that information that you can't take

18   this day by day --

19             THE JUROR:  Everybody will have inconvenience to be a

20   juror.  It would be family, work, bills.  Everybody would have

21   any kind of inconvenience.

22             In my case, if I can go by, I believe so.  I have been

23   out of work because of accidents and stuff before, and I have

24   been able to get by.  Yes, I would say yes.

25             MR. BRUCK:  Okay.  You were being asked, I think it

 1    was by the judge, about the death penalty, and you mentioned

 2    that Puerto Rico has been turned upside down by violent crime.

 3              THE JUROR:  Yes, it is.

 4              MR. BRUCK:  And there were cases, I take it, in which

 5    you thought the death penalty was appropriate?

 6              MR. MELLIN:  Objection.

 7              MR. BRUCK:  I haven't even asked the question yet.

 8              THE COURT:  Well, okay, go ahead.

 9              MR. BRUCK:  That you said that that affected your

10    thinking about the death penalty?

11              THE JUROR:  Uh-huh.

12              MR. BRUCK:  And those weren't cases on which you were

13    a juror, those were cases that you read about?

14              THE JUROR:  Yes.  I never have been a juror in Puerto

15    Rico.

16              MR. BRUCK:  Okay.  So you sometimes have formed

17    opinions about whether somebody deserves the death penalty just

18    based on the news media and what you've heard --

19              THE JUROR:  We're talking in Puerto Rico, right?

20              MR. BRUCK:  Yeah.

21              THE JUROR:  It's 15 years ago.  I mean, I've been 15

22    years in Boston.

23              MR. BRUCK:  Right.  I understand.

24              THE JUROR:  Back then when I was in Puerto Rico, yes,

25    by the type of crime.  Sometimes the criminals confess.

1           MR. BRUCK:  Right.

2           THE JUROR:  And, yeah, that would be when is a lot of,

3    you know, stuff that, wow, how did that happen.  Yeah, that

4    would be a good case for the death penalty.  And usually the

5    topic just came up in a really controversial way in Puerto

6    Rico.

7           MR. BRUCK:  Okay.  Well, a lot of people form opinions

8    about things where they're not on juries.  They just hear about

9    them in the press.  And what I'm getting at, what I want to ask

10   you about is just in this case, based on understanding that you

11   haven't heard the evidence and you don't know every detail, but

12   just based on what you have heard and what you have read, did

13   you form an opinion about whether this is a case that deserves

14   the death penalty?

15          THE JUROR:  Since the beginning when this started,

16   since the beginning when this has happened, I'm really don't

17   have the time to really follow cases or the case and stuff like

18   that.  But if they guilty, yes, this case, this case I would

19   believe, you know, they deserve it.

20          MR. BRUCK:  And why do you say that?

21          THE JUROR:  Well, because how it happen, how was

22   carried out, innocent people involve, no regard for life.

23   Probably to send a strong message out there.

24          Right now we are in a really scary time.

25          MR. BRUCK:  I'm sorry?

```
 1          THE JUROR:  We are really scary -- times they are

 2   scare, and this type of situation are happening more often and

 3   often.  And I do believe so.

 4          MR. BRUCK:  Okay.  So of course you haven't heard the

 5   evidence.  The defendant hasn't been found guilty.

 6          THE JUROR:  No.

 7          MR. BRUCK:  But my question is:  If he was found

 8   guilty, if you were on the jury and found him guilty, as you

 9   sit here today, you feel that this is a case where it's

10   important to send a message and impose the death penalty?

11          THE JUROR:  Uh-huh.

12          MR. BRUCK:  And that's your opinion?

13          THE JUROR:  I'm sorry, I didn't get it.

14          MR. MELLIN:  Your Honor, objection.  It's compound and

15   also confusing.  But he's saying "if you're on the jury," but

16   then "as you sit here today."

17          MR. BRUCK:  Okay.  I'll break it down.  If you're on

18   the jury and you found the defendant guilty of committing the

19   crimes that are charged, do you feel now that that's a case

20   that you -- do you favor the death penalty in this case?

21          MR. MELLIN:  Objection, your Honor.  Complete

22   stake-out.

23          THE COURT:  Yeah, it is a stake-out.

24          MR. BRUCK:  Okay.  Well, I think I've asked -- the

25   question's been answered really.
```

1          Would the -- you said you have an opinion about, that

2     this is a case where there's a need to send a message if the

3     defendant was guilty.

4          THE JUROR:  If he's guilty, and how I was explain

5     before, like kind of two type of trial, right.

6          MR. BRUCK:  Right.

7          THE JUROR:  Like to find him guilty, then we should --

8     got to be found guilty first before we go to the other step.

9          MR. BRUCK:  That's right.  Okay.  And picture now that

10    you're on the jury and you've gotten to the second part of the

11    trial, he's been found guilty --

12         THE JUROR:  Uh-huh.

13         MR. BRUCK:  -- you and the rest of the jury, and it's

14    the second trial.

15         THE JUROR:  Uh-huh.

16         MR. BRUCK:  Now the only choice is the death penalty

17    or life imprisonment.  Do you have an opinion about which it

18    should be?

19         THE JUROR:  I can't -- I can't draw an opinion right

20    now.

21         MR. BRUCK:  And why is that?

22         THE JUROR:  I don't have everything in front of me.

23         MR. BRUCK:  Okay.  But as you sit here today, you've

24    said you do have the opinion that he should -- that this case

25    should receive the death penalty.

```
 1              MR. MELLIN:  Objection.  Asked and answered.

 2              THE COURT:  Yup, sustained.  I think --

 3              MR. BRUCK:  Bear with me just a moment.

 4              THE COURT:  Yup.

 5              (Discussion off the record.)

 6              MR. BRUCK:  What do you mean by "send a message"?

 7              THE JUROR:  What I mean by "send a message"?

 8              MR. BRUCK:  Uh-huh.

 9         THE JUROR:  We are the United States, and really we do

10   not tolerate this type of behavior.  I've been here 15 years,

11   and I have not even one complaint about United States.  It has

12   been very good to me.  And if there is people out there that

13   want to come here just to harms --

14              MR. BRUCK:  That want to?

15              THE JUROR:  Harm people.

16              MR. BRUCK:  Harm people.

17              THE JUROR:  I'm sorry, my English is not --

18              MR. BRUCK:  No, it's very good.  I'm hard of hearing.

19         THE JUROR:  So if these people like that out there,

20   yes, we should send a message that we have a strong -- I'm

21   looking for the word in my mind -- judicial system.

22              MR. BRUCK:  Uh-huh.

23              THE JUROR:  And that we know how to handle this.

24              MR. BRUCK:  And by knowing how to handling this, you

25   mean what?
```

```
 1              THE JUROR:  Criminal cases like this.  Criminal cases
 2      where they are confused -- highly publicized, we still can be,
 3      you know, fair enough to do a trial.
 4              MR. BRUCK:  And to impose the death penalty?
 5              THE JUROR:  I'm sorry?
 6              MR. BRUCK:  And to impose the death penalty?
 7              THE JUROR:  If necessary.
 8              MR. BRUCK:  Thank you.
 9              THE COURT:  All right.  Thank you, sir.  Just leave
10      the questionnaire, we'll put it back together.
11              THE CLERK:  Just follow that gentleman right out
12      there.
13              (The juror was excused.)
14              THE CLERK:  Juror No. 351.
15              (Juror 351 enters the courtroom.)
16              CLERK COPPOLA:  Juror 351.
17              THE CLERK:  Ma'am, over here, please, if you would.
18      Have a seat.  Do me a favor, keep your voice up, speak into the
19      mic so everybody around you can hear you, and this is
20      adjustable so you can move it around if you need to.
21              THE JUROR:  Thank you.
22              THE COURT:  Good afternoon.
23              THE JUROR:  Good afternoon.
24              THE COURT:  Since you were last here, have you been
25      able to follow my instructions and avoid discussing the merits
```

1    of the case with anyone?

2          THE JUROR:  Yes, I have.

3          THE COURT:  And also as much as possible to avoid

4    media accounts?

5          THE JUROR:  Yes.

6          THE COURT:  They're everywhere, but you can turn away

7    from them if you see them.

8          THE JUROR:  Minimize them.

9          THE COURT:  Okay.  Thank you.

10          So that's the questionnaire.  We're going to follow up

11    on some of the information you gave us.

12          You're a high school teacher?

13          THE JUROR:  Yes, I am.  I'm sorry, I have a little

14    sore throat.

15          THE COURT:  A little croaky?

16          But you think -- I think you told us when we asked

17    about whether it would be a hardship on the schedule, you said

18    you thought you could arrange -- with some planning, you could

19    serve, I think is the way you put it.

20          THE JUROR:  Of course a long trial would be a hardship

21    for anybody.  I could make arrangements at school.

22          It would be somewhat challenging for my family.  I

23    have two teenage boys.  But I could make arrangements.

24          It would be a hardship in terms of, you know,

25    colleagues having to cover the school, but it would be possible

1  for me if I had to.

2          THE COURT:  And you understand, I mean, it's kind of a

3  regular business day.

4          THE JUROR:  Yes.

5          THE COURT:  It's 9 to 4.  So in terms of your kids or

6  whatever, I mean you'd be -- in the morning you'd be there.

7          THE JUROR:  We could work around that.  You know,

8  everybody has conflicts.  With school vacations coming up, we

9  had plans to go on college visits with my son, but, you know,

10  could figure it out if I had to.

11          THE COURT:  Okay.  So we're interested in what people

12  might be writing about or posting.  You've written some

13  educational articles.  I'm looking here at Page 10.

14          THE JUROR:  And those were some time ago through my

15  work and some professional development things.  But the kinds

16  of things that I've published or posted online, they're all --

17  you know, one was about President Lincoln.  They're very -- not

18  related to current events.  They're more related to my field of

19  history that I teach.

20          THE COURT:  And in terms of social media, you do

21  Facebook a little bit.  And I guess it says you have a Twitter

22  account, but you don't use it?

23          THE JUROR:  Yeah.  I really am not on Twitter at all

24  on any regular basis.  I'm on Facebook.  I go online, read some

25  online articles.  But I'm not on Twitter or any other

1    platforms.

2              THE COURT:  Okay.  So let me ask you to turn to Page

3    20 --

4              THE JUROR:  Sure.

5              THE COURT:  -- and Question 77.  And in this we asked

6    whether on the basis of things you had seen or heard in the

7    media or otherwise, whether you had formed an opinion about

8    various matters, including A, that the defendant was guilty.

9    And today you said you had formed an opinion based on what you

10   had seen.  And as to the questions about a penalty, which are C

11   and D, you said you were unsure.

12             THE JUROR:  Uh-huh.

13             THE COURT:  Then below that we asked:  If you answered

14   yes to any of these questions, as you did, would you be able or

15   unable to set aside that opinion and base your decision about

16   guilt or punishment based solely on the evidence presented to

17   you in the court, and you said you thought you would be able

18   to.

19             THE JUROR:  Yes.

20             THE COURT:  Can you tell us about that?

21             THE JUROR:  Yes.  Just as a history teacher, I teach

22   about the constitution, and I do think it's important that a

23   case is decided based upon the evidence that's presented in

24   court.  So I'm very comfortable with that.

25             On the other ones that you asked me about --

 1          THE COURT:  Let's just stick with that one for a

 2     minute.

 3          THE JUROR:  Sure.

 4          THE COURT:  Because you did say you had an opinion

 5     about it, so the question is --

 6          THE JUROR:  Yes.

 7          THE COURT:  -- setting that aside, so

 8     compartmentalizing, if you will, as a history teacher, and you

 9     mentioned the constitution, you know that any criminal

10     defendant is presumed innocent unless the government proves the

11     person guilty of the charge made by sufficient evidence at the

12     trial that the jury is convinced by that evidence beyond a

13     reasonable doubt.  You're familiar with those principles?

14          THE JUROR:  Yes, absolutely.

15          THE COURT:  So what we ask of jurors is that they pay

16     attention to the evidence presented and the law instructions,

17     of course, and use those sources to make their conclusions in

18     the case.  And then if they're convinced beyond a reasonable

19     doubt, they should find the person guilty.  But if they're not

20     convinced beyond a reasonable doubt as to any charge, their

21     obligation is to find the person not guilty.

22          THE JUROR:  Yes.

23          THE COURT:  So I guess that's the question we ask of

24     jurors:  If you were in that position of having to make the

25     decision and you are not convinced beyond a reasonable doubt on

1  any of the charges, would you be able to find the defendant not

2  guilty?

3          THE JUROR:  Based on the evidence presented, yes, I

4  could.

5          THE COURT:  So we're going to come to the penalty

6  questions in a minute.

7          THE JUROR:  Yes.

8          THE COURT:  I just wanted to ask you, on Page 21, we

9  ask a couple of questions of how you may have been affected by

10 the events as they unfolded.

11         THE JUROR:  Yes.

12         THE COURT:  Your husband's a dentist?

13         THE JUROR:  He's a dentist in Watertown.

14         THE COURT:  And you said his office was closed that --

15 you said for a day.  Was it just a day or more than a day?

16         THE JUROR:  I honestly, I don't remember how many days

17 it was because I was away, I was out of the country, but he was

18 here.  So I think it was probably for at least one, probably

19 two days.  I could check on that.  I don't remember.  But his

20 office was closed for a day.

21         THE COURT:  Was he there?  In other words, was he

22 closed within the office, or did he not get there?

23         THE JUROR:  He did not get there.

24         THE COURT:  Were there other people in the office?

25         THE JUROR:  I believe the office didn't open after the

 1    shelter-in-place order was happening.

 2          THE COURT:  Okay.  Tell me about the answer to 82.

 3    You made some contributions to victims funds?

 4          THE JUROR:  Yes, I did.  I made a contribution to the

 5    One Fund.  And there was also -- I didn't write it down, but

 6    there was a fundraiser at the gym that I participate in,

 7    Fitness Unlimited in Milton.  They had a fundraiser because the

 8    mother, Mrs. Richards, the mother of one of the victims was a

 9    member of the gym.  I don't know her personally.  But I made a

10    contribution to the fundraiser at the gym.

11          THE COURT:  And your husband has a "Watertown Strong"

12    bumper sticker?

13          THE JUROR:  Yes.  He grew up in Watertown.  His

14    business is Watertown.  So because of that we have a couple of

15    bumper stickers and things like that.

16          THE COURT:  Does he still have it on his car?

17          THE JUROR:  I believe he has it on his car.  I don't

18    have it on my car.  We have one hanging in our house on a

19    bulletin board.

20          THE COURT:  So beginning on Page 23 at question 88, we

21    asked a series of questions to try to get at your views about

22    the death penalty in general and perhaps in particular.

23          THE JUROR:  Uh-huh.

24          THE COURT:  88 is a general question:  If you had

25    general views, what are they?  And you said basically that you

1   used to be opposed to it in all cases, but you think now there

2   might be cases that it is appropriate.  Is that -- but it

3   should not be given easily I think is --

4          THE JUROR:  Yes.  That's what I wrote.  And that

5   represents certainly my thinking when we were filling this out.

6   I have struggled with it both just on a moral basis, I'm

7   Catholic; and I think even apart from my religions beliefs,

8   I've been opposed to it.  And as a historian of sorts, I've

9   seen it misused historically, so there's a lot of suspicion

10  around that.

11         So think I've believed for a long time that it's

12  unjust and you shouldn't do it.  And then when -- apart from

13  this particular case, when other terrible cases come up, I can

14  understand the argument in favor of it.  So I really do

15  struggle with it morally.

16         I understand the other perspective.  I don't always

17  agree with it.  And thinking more recently, with the

18  possibility of serving on the case, I don't know if I could

19  personally make a decision that was responsible for the death

20  of another person, even if they had committed a horrible crime.

21  So that's the nature of my struggle

22         THE COURT:  Okay.  Okay.  Yup.  So let me just -- I

23  think we're going to explore that a little bit.  I just want to

24  note, then, in Question 89 where we asked you to put the number

25  on a scale where you thought you were, you were on the, sort of

1    on the opposed side, but not quite at the extreme.

2             THE JUROR:  Yeah.  I mean, the closer you get I think

3    to serving, the more you have to think more deeply about it.

4             THE COURT:  Would you adjust that?  Would you change

5    that?

6             THE JUROR:  Yes.  I would go, I think, to maybe 2.  I

7    mean, it's just my honest answer.  I'd go to 2, possibly 1.  I

8    think my struggle is with the law versus my personally having

9    to make that decision --

10            THE COURT:  Right.  Right.

11            THE JUROR:  -- is what I find challenging.

12            THE COURT:  So if you look at the next question.

13            THE JUROR:  On the next page?

14            THE COURT:  Yeah.  Question 90.  Here we asked if you

15   would look at a number of possible statements, and if there was

16   one that described your feelings, if you could select it.  And

17   at the time, anyway, you selected "I'm opposed to the death

18   penalty, but I could vote to impose it if I believed that the

19   facts and the law in a particular case called for it."

20            THE JUROR:  I think I would have to go to B or A on

21   that now, really, thinking on a personal level of being faced

22   with that decision, it would be even harder than I thought on

23   that day.

24            THE COURT:  Well, the difference between B and A is A

25   is more absolute, it says "never," and B says "difficult."

1    Would you be "never" or would you be "difficult"?  Or is it

2    just not a question you can answer?

3            THE JUROR:  It's difficult.  I think I would say A at

4    this point, having really thought about my personal moral

5    responsibility, and in the context of my faith, I just think of

6    myself as being a person of peace, and I have difficulty making

7    a decision for death for another human being.

8            THE COURT:  So could you -- one way we ask the

9    question is if you could meaningful consider your voting for

10   the death penalty in an appropriate case?

11           THE JUROR:  I could consider it.  I can't say how I

12   would decided it ultimately.  I'm sorry.

13           THE COURT:  Okay.

14           MR. CHAKRAVARTY:  Just a little more.  Good morning --

15   good afternoon, excuse me.  I'm Aloke Chakravarty, I'm one of

16   the prosecutors.

17           THE JUROR:  Yes.

18           MR. CHAKRAVARTY:  I think you've been pretty clear on

19   the reservations --

20           THE JUROR:  Yes.

21           MR. CHAKRAVARTY:  -- on opposing the death penalty on

22   a personal level.  Unfortunately for you, I'm going to ask you

23   a few more questions just to plumb that a little bit more.

24           THE JUROR:  Sure.

25           MR. CHAKRAVARTY:  Is it the challenge of coming to a

1   decision under the facts and the law that the death penalty is

2   the appropriate punishment that is the reservation for you, or

3   is it the personal implementation of it?

4          THE JUROR:  I think it's the personal implementation

5   of it.

6          MR. CHAKRAVARTY:  So at the end of the trial, assuming

7   there was a conviction and then the penalty phase where you

8   hear all of the evidence, can you envision a circumstance in

9   which you would say "I vote to put a person to death"?

10         MS. CLARKE:  Objection.  Calls for speculation.

11         THE COURT:  Yeah, I think it's a little too pointed.

12         MR. CHAKRAVARTY:  I'm trying to get at whether there's

13  any theoretical possibility.  It sounds like there's not even a

14  theoretical possibility that you would put somebody to death,

15  but I don't want to put words in your mouth.

16         But what we're trying to find out is whether there's a

17  realty possibility that you could actually say "I vote for

18  death."

19         THE JUROR:  It's a difficult question, and I've never

20  been faced with it.

21         I think not.  I think not.

22         MR. CHAKRAVARTY:  Thank you.

23         MS. CLARKE:  Could I just ask, because it's a hard,

24  hard setting to be in, and I'm sure -- I don't know, do you

25  teach about the constitution and your history class?

1          THE JUROR:  Uh-huh.

2          MS. CLARKE:  You teach about the jury system, right?

3          THE JUROR:  Yes.

4          MS. CLARKE:  I'm sorry, my name is Judy Clarke.  I'm

5     just a voice coming from the end of the table.  I'm one of Mr.

6     Tsarnaev's lawyers.

7          THE JUROR:  Yes.

8          MS. CLARKE:  And I guess what the question really

9     comes down to is this, because it sounds like you've really

10    sort of struggled with the question of the death penalty.  What

11    it really comes down to is 12 jurors have a responsibility of

12    deliberation, right?

13         THE JUROR:  Yes.

14         MS. CLARKE:  And I guess you'd agree with me that they

15    have a responsibility -- that we have a responsibility in

16    ensuring a fair and impartial jury that a variety of views are

17    represented on the jury.  Right?

18         THE JUROR:  Yes.

19         MS. CLARKE:  So it would be important, I guess, or you

20    tell me if it's important to you, that on the 12-person jury,

21    there be people that are both for and against the death penalty

22    in a capital case?

23         THE JUROR:  Not being an attorney, I'm not sure.

24         MS. CLARKE:  Just as a citizen.

25         THE JUROR:  I mean, if you know there's people who

 1     absolutely won't ever vote for the death penalty on a case --
 2     this is what you're struggling with?  So I don't want to tell
 3     you.
 4          MS. CLARKE:  That's what we're struggling with.
 5     Really what the law requires the jurors to do is listen to the
 6     evidence --
 7          THE JUROR:  Yes.
 8          MS. CLARKE:  -- evaluate the evidence; and in the case
 9     of a capital case, weigh the aggravating evidence against the
10     mitigating evidence, and come to a determination of whether
11     individually -- it's not a collective decision -- individually,
12     your conscience tells you that the death penalty is the
13     appropriate sentence, or that the life imprisonment is the
14     appropriate sentence.  That's what it all comes down to.
15          And no juror ever has to vote to impose a sentence of
16     death.  Right?
17          THE JUROR:  That's correct.
18          MS. CLARKE:  What a juror has to agree to be willing
19     to do is to consider in a meaningful way both options.  And
20     what I hear you say is that as a policy matter, as a
21     legislature, or somebody implementing, you know, designing the
22     law, you would say "I don't want to have a death penalty."
23          THE JUROR:  I think that's the case.  I guess what I'm
24     struggling with is I understand all the legal breakdown and
25     logic and division of that, but then ultimately each individual

1    has their moral beliefs and their own conscience, and they have

2    to live with their decision afterwards --

3              MS. CLARKE:  That's right.

4              THE JUROR:  -- and their values.

5              And so on a -- speaking for myself, I would find it

6    extraordinarily difficult to be the agent of that sentence of

7    death.

8              MS. CLARKE:  Okay.  Thank you very much.

9              THE COURT:  Thank you very much.

10             (The juror was excused.)

11             THE COURT:  I think it's an appropriate time to take a

12   break.  We'll come back at 2.

13             (Luncheon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (The Court enters the courtroom at 2:05 p.m.)
 2           THE COURT:  I think we're ready to roll.
 3           THE CLERK:  Juror No. 352.
 4           THE JURY CLERK:  Juror No. 352.
 5           (The juror enters the courtroom.)
 6           THE CLERK:  Hi, ma'am.  Have a seat over here, please.
 7           Do me a favor, if you could, please.  Speak into the
 8      mic so everyone can hear you.  This is adjustable.
 9           THE COURT:  Good afternoon.
10           THE JUROR:  Hi.
11           THE COURT:  Since you were here to fill out the
12      questionnaire, have you been able to follow the instructions to
13      avoid discussion of the case with anybody?
14           THE JUROR:  Yes.
15           THE COURT:  And also to avoid, as much as you could,
16      contact with media reporting about the case?
17           THE JUROR:  Yes.
18           THE COURT:  Thank you.  We're going to follow up on
19      some of the information you gave us in the questionnaire, and I
20      just wanted to ask you -- this is on page 4, the basic bio
21      information.  You spent five years living in Turkey?
22           THE JUROR:  Yes.
23           THE COURT:  Can you tell us about that.
24           THE JUROR:  Yup.  My husband at the time was working
25      in Turkey, so I moved there.  And I went to school there, did a
```

1   master's degree.

2          THE COURT:  What university?

3          THE JUROR:  Bogazici University in Istanbul.

4          THE COURT:  Can you spell it?

5          THE JUROR:  B- -- it's Bosphorus University in

6   English.

7          THE COURT:  Thank you.  All right.  In English.

8          Do you speak Turkic?

9          THE JUROR:  Turkish?  Now it's not so good, but then

10  it was better.

11         THE COURT:  Uh-huh.  And tell us what you do for

12  employment.

13         THE JUROR:  I work at an insurance company.  I'm the

14  vice president of a group that does quantitative analysis and

15  database systems management.

16         THE COURT:  Okay.  And you've done that for, according

17  to this, at least ten years?

18         THE JUROR:  Yup.

19         THE COURT:  It says that you supervise -- I guess I

20  see it in Question 27.  You manage a team of six people?

21         THE JUROR:  Yes.

22         THE COURT:  At the bottom of page 10 and over to the

23  top of 11 we asked about social media that you might use.  On

24  Question 29 at the bottom of page 10 you said you occasionally

25  post about events happening in Boston?

1          THE JUROR:  Yup.

2          THE COURT:  Did you post about the marathon events?

3          THE JUROR:  No, just stuff pertaining with the

4     environment.

5          THE COURT:  Oh, I should have read on.  "Pertaining to

6     environmental and sustainability."  Is that -- so it's a

7     topical area that you post on?

8          THE JUROR:  Yes.

9          THE COURT:  And Facebook for personal use?

10          THE JUROR:  Yes.

11          THE COURT:  Do you use it professionally at all?

12          THE JUROR:  No.

13          THE COURT:  We asked about various relationships you

14     might have with certain categories of people including police.

15     You said you have a friend who's a police officer?

16          THE JUROR:  Yes.

17          THE COURT:  What police force?

18          THE JUROR:  It's a town in New Hampshire.

19          THE COURT:  Okay.  Would that have any effect on your

20     impartiality as a juror?

21          THE JUROR:  No.

22          THE COURT:  I see you've served on a couple of state

23     juries?

24          THE JUROR:  Yes.

25          THE COURT:  One civil, one criminal?

1              THE JUROR:  Yes.

2              THE COURT:  And in each case the case didn't proceed

3    through to a full verdict.  Is that right?

4              THE JUROR:  Correct.

5              THE COURT:  So let me ask you to turn to page 20,

6    Question 77.

7              THE JUROR:  Uh-huh.

8              THE COURT:  In this question we asked whether, based

9    on things you'd seen or heard in the media or otherwise, you'd

10   formed an opinion about whether the defendant was guilty or not

11   guilty or should receive the death penalty or should not

12   receive the death penalty, and to each of those questions you

13   checked the box "no."

14             THE JUROR:  Uh-huh.

15             THE COURT:  Could you tell us about that, why you made

16   that choice?

17             THE JUROR:  I really haven't followed the case.  I

18   didn't pay much attention to it at the time it happened, so I

19   don't really know that much more than the basics of the little

20   blurb description that was on the front page of this.  Maybe a

21   few details here and there, but otherwise I just haven't heard

22   much.

23             THE COURT:  You've had experience in trials before.

24   You know that what we ask of jurors is to make their decision

25   based on the evidence presented in the course of the case and

1  not on evidence from other sources outside the evidence.

2          THE JUROR:  Right.

3          THE COURT:  You didn't get to quite apply that in the

4  other cases because I guess you didn't get to deliberate to a

5  verdict.

6          THE JUROR:  Correct.

7          THE COURT:  Can you give us your assessment about

8  whether you would be able to do that, make a judgment based

9  solely on the facts as they're presented to you as you

10 understand them in the course of the case?

11         THE JUROR:  Yes.

12         THE COURT:  You understand that a criminal defendant

13 is presumed innocent unless the government proves that he's

14 guilty by the evidence, and proves that to the satisfaction of

15 the jury that they have no reasonable doubt about that fact?

16         THE JUROR:  Yes.

17         THE COURT:  And that the burden is always with the

18 government?

19         THE JUROR:  Yes.

20         THE COURT:  The defendant never has a burden to prove

21 he's not guilty; the government has to prove he is guilty?

22         THE JUROR:  Yes.

23         THE COURT:  You understand that?

24         And you could, in your judgment, fairly and faithfully

25 apply those principles?

1          THE JUROR:  Uh-huh.  Yes.

2          THE COURT:  You have to say "yes" for the reporter.

3          THE JUROR:  Sorry.

4          THE COURT:  What city or town is your office in?

5          THE JUROR:  Boston.

6          THE COURT:  Were you here during the week of the

7    marathon events?  Were you in your office?

8          THE JUROR:  Yes.

9          THE COURT:  Were you affected by the sheltering in

10   place that occurred at the end of the week when the hunt was

11   going on?

12         THE JUROR:  Yup, I was here.  But I had just come back

13   from a business trip.  So my plane got in very late and I slept

14   most of the day, actually.

15         THE COURT:  So you weren't in the office the day that

16   everybody was closed in; you were home?

17         THE JUROR:  Yeah, I got in at like three in the

18   morning, and then I had already determined I wasn't going to go

19   in.  And when I woke up I saw it was closed.

20         THE COURT:  Well, you slept most of the day, so I

21   guess it doesn't matter, but you were in your house for the

22   full day?

23         THE JUROR:  Yes.

24         THE COURT:  Let me ask you to turn to page 23.

25   Beginning with Question 88, we ask some questions about

1    attitudes towards the death penalty.

2          THE JUROR:  Uh-huh.

3          THE COURT:  88 is a general question:  If you have any

4    views about the death penalty in general, what are they, and

5    you said, "It's not something to be applied in every case, if

6    ever, that has to do with murder."

7          Is there anything more you want to add to that or

8    qualify it or anything?

9          THE JUROR:  Nope.

10          THE COURT:  Okay.  We then ask in the next question to

11    circle a number that indicates your opinion, 1 reflecting a

12    belief that the death penalty should never be imposed and a 10

13    reflecting that it should be imposed whenever the defendant has

14    been convicted of an intentional murder.  You chose 1.

15          And then on the next page we asked if you could find a

16    phrase or a clause that expressed your views, and you chose A

17    that said you're opposed to the death penalty and will never

18    vote to impose it in any case no matter what the facts.

19          THE JUROR:  Uh-huh.

20          THE COURT:  Is that your position, your view?

21          THE JUROR:  It is.  Since doing this questionnaire I

22    have tried to think could there ever be a circumstance where I

23    would, and I can come up with things, but they're very remote,

24    I suppose.

25          THE COURT:  Like what?

1          THE JUROR:  Like if someone was convicted of a crime

2     that involved the loss of life and they could somehow outwit

3     the prison system and escape and be considered dangerous, or

4     they were considered a danger to their fellow inmates or prison

5     guards or something.

6          THE COURT:  I see.  Okay.  Let me ask you to look at

7     the bottom of page 25, Question 95.  There we ask if you found

8     Mr. Tsarnaev guilty and you decided that the death penalty was

9     the appropriate punishment for him, could you conscientiously

10    vote for the death penalty, and you said yes.

11         THE JUROR:  Uh-huh.

12         THE COURT:  That seems to be inconsistent with what

13    you've just told us.

14         THE JUROR:  Uh-huh.

15         THE COURT:  Can you explain?

16         THE JUROR:  So my interpretation of that question is

17    despite my opposition to the death penalty, generally speaking,

18    if I were to be convinced that it was the right thing to do, I

19    wouldn't be wishy-washy about then going forward.  If that's

20    the right thing to do, it's the right thing to do.

21         THE COURT:  Okay.  And how do you reconcile that with

22    the other answers that you would never do it?

23         THE JUROR:  I can hardly come up with a circumstance

24    where someone would convince me it was the right thing to do.

25         THE COURT:  All right.  So you think the condition

1    that's posited in the question is so remote that you don't find

2    it to be really inconsistent with what your other views are?

3              THE JUROR:  Yes.

4              THE COURT:  Is that a fair understanding?

5              THE JUROR:  Yes.

6              THE COURT:  Okay.

7              MR. CHAKRAVARTY:  Yes, your Honor.  Thank you.

8              Good afternoon.  My name is Aloke Chakravarty.  I'm

9    one of the prosecutors in the case.

10             Let's deal with the death penalty issue first, I

11   guess, and then there are some other questions that I wanted to

12   ask you.

13             THE JUROR:  Okay.

14             MR. CHAKRAVARTY:  So the theoretical possibility that

15   you would be convinced that the death penalty is appropriate,

16   it sounds like that -- the fact that you had come to that

17   conclusion you think is a remote possibility.

18             THE JUROR:  Uh-huh.  Yes.

19             MR. CHAKRAVARTY:  So the -- you said that you're

20   opposed to it and you can't conceive of -- at the time you

21   filled out the questionnaire you couldn't conceive of the

22   circumstances, but if one of these possibilities that you've

23   suggested -- if the case is not one of those types of cases,

24   could you consider aggravating factors and mitigating factors

25   in some other type of case?

1          THE JUROR:  I guess the way I view it is it's

2     the -- if you get to the penalty phase of the trial and it's a

3     life-versus-death decision, as far as I understand it, life is

4     the minimum, so by default you start there, then it's the

5     prosecution's job then, or task, to argue that it should be a

6     step up, it should be more.  It should be more severe.

7          So can I listen to that?  Could my mind be changed?

8     It's hard for me to consider it, but like I said, in a month I

9     sat and tried to consider circumstances that -- you know, could

10    I really say never?  No, I could come up with something.  So I

11    can't 100 percent discount it, but I could -- I can't say it's

12    not possible.

13         MR. CHAKRAVARTY:  So at the time you filled this out

14    you hadn't yet gone through that process, so you reacted by

15    saying that you couldn't do it.  Can you explain to us the

16    process of why you went back to consider circumstances in which

17    you might be able to do it?

18         THE JUROR:  I guess it's -- well, it's just one of

19    those questions that you don't dwell on very much.  If people

20    ask you, you kind of give a gut reaction, and then the idea

21    that you have to come back and potentially be questioned just

22    triggers thoughts, I guess.  So I suppose challenging myself,

23    is this what I really think?  Could I not come up with a

24    situation?  So...

25         MR. CHAKRAVARTY:  So moving now from the theoretical

1    to the real, if you had come to that conclusion that you had,

2    in your words, I think been persuaded that it is the right

3    decision, you would then have to, of your own volition,

4    regardless of what the rest of the jurors do, cast a vote in

5    order to take the life of somebody.

6              THE JUROR:  Uh-huh.

7              MR. CHAKRAVARTY:  Do you think at that point you would

8    be able to cast the vote?

9              THE JUROR:  Yes, if I'm convinced it's the right thing

10   to do, I'm 100 percent sure I would stand by that.

11             (Pause.)

12             MR. CHAKRAVARTY:  Sorry.  I just wanted to confer with

13   my colleague.

14             So without trying to get a litany of all the

15   situations in which you could be persuaded, is it fair to say

16   that there are only limited circumstances in which you have --

17   even in the last month that you've been thinking about it, that

18   you could even contemplate that it would be within your realm

19   to be thinking that it would be appropriate?

20             THE JUROR:  Correct.

21             MR. CHAKRAVARTY:  Okay.  Moving on to what you know

22   about the case, and you'd indicated that you have no opinion

23   about the defendant's guilt or -- as to whether the death

24   penalty's appropriate in this case -- is that right?  I'm

25   trying to get a sense of -- in your words, about having

1    somebody who's a Bostonian living in the city for the last two

2    years, having been exposed to some media, you're obviously in a

3    professional field, how you've insulated yourself from that

4    media attention in order to be able to have no opinion one way

5    or the other.

6              THE JUROR:  Yup.  I assume a lot of the media coverage

7    must have been right after the incident, so, like, spring of

8    2013, summer of 2013.  At the time I honestly was -- I was

9    taking a night class.  I was apartment hunting.  I was very

10   overwhelmed with a lot of other stuff.  I just didn't watch the

11   news.  I never watch local news.  I pretty much only watch

12   political commentary-type things.  So since then just nothing I

13   watched -- I mean, I've seen -- you log on and you see a

14   headline pop up.  I've seen, like, you know, headlines and

15   things said, but I just never read the articles.  I just never

16   did.

17             MR. CHAKRAVARTY:  Okay.  You had -- there were some

18   answers on the questionnaire that you had just left blank, it

19   seems like you probably had no positive response to.

20             THE JUROR:  Yeah.

21             MR. CHAKRAVARTY:  One of them is particularly

22   important, Question 10 on page 5, as to whether being a juror

23   on this trial would present any kind of a hardship for you.

24   And it just basically lays out the schedule in the case.  On

25   page 75 -- excuse me -- Question 75 which is on page 19, you

1    say that when you received the summons and you had said that

2    the likelihood of serving was so small you weren't going to

3    worry about the length of the trial and any accommodations you

4    had to make at work until there was a real need.

5         So we're trying to forecast that now because if you do

6    sit, then -- you know, you're either on or you're not.  You

7    won't have a chance to kind of see how things play out.

8         Can you tell us a little bit about what your personal

9    situation is at work or otherwise and whether you feel

10   confident that this would not present a hardship to you?

11        THE JUROR:  Yes.  As long as my nights and my weekends

12   are free, I can, with effort, keep up at work.  I don't have

13   any dependents or anything like that that I'm worried about,

14   so...

15        MR. CHAKRAVARTY:  Okay.  Thank you.

16        MR. BRUCK:  Good afternoon.  My name is David Bruck.

17   I'm one of Jahar Tsarnaev's attorneys, and I've just got a few

18   questions for you, if that's okay.

19        THE JUROR:  Uh-huh.

20        MR. BRUCK:  I'd like to bring the conversation back,

21   I'm afraid, to the death penalty, which you've already been

22   asked about a lot.  You said you've been able to think of

23   situations involving a defendant who was dangerous as an

24   example of a case where, whether you'd want to or not, you

25   could vote for the death penalty.  You could imagine that.

1          I think you appreciate that jurors don't have to have

2     any one set of opinions in order to sit on a jury -- we're

3     supposed to have a cross-section -- but it is necessary that

4     the jurors have an open mind, by which we mean that you not

5     have made up your mind before you get in the jury box.

6          Now I'd like you to imagine we're in the second phase

7     of the trial, you're on the jury, the defendant has been found

8     guilty.  Can you keep an open mind until you've heard the

9     evidence from both sides, the government's evidence favoring

10    the death penalty, the defense evidence that might favor life

11    imprisonment, and then make your decision fairly weighing both

12    positions?

13          THE JUROR:  Yeah, I would like to think that I most

14    certainly would listen to the arguments.

15          MR. BRUCK:  Okay.

16          THE JUROR:  I certainly, just naturally, lean towards

17    being quite opposed to the death penalty.

18          MR. BRUCK:  Okay.  But the question is whether you

19    could open your mind and be fair-minded to both sides and give

20    the government a fair trial and the defense a fair trial on the

21    issue of the punishment.  Could you do that?

22          THE JUROR:  Yes, listen to the arguments that would

23    argue there are aggravating factors and whatever their

24    reasoning is, why the death penalty would be the correct...

25          MR. BRUCK:  Now, you've listed a couple of examples

1   where you believe the death penalty to be appropriate after

2   spending some time thinking about it.  Could there be others

3   that you haven't thought of that could be suggested by the

4   evidence that you would be open to?

5          THE JUROR:  I can't say that there couldn't be, but

6   it's really, really difficult for me to imagine that.

7          MR. BRUCK:  To imagine now.  I guess by definition you

8   can't say what something is if you haven't thought about it.  I

9   guess my question is:  Are you open-minded to hearing all of

10  the evidence and seeing whether there could be additional

11  reasons to impose the death penalty that made sense to you?

12         THE JUROR:  I think -- I think I can be, yes.

13         MR. BRUCK:  Okay.  And if the evidence convinced you

14  that it was the appropriate thing to do -- I understand it

15  would not be comfortable or easy -- but you could do it?

16         THE JUROR:  Yes.

17         MR. BRUCK:  And you could return that verdict along

18  with the rest of the jury if that was the decision?

19         THE JUROR:  Yes.

20         MR. BRUCK:  All right.  Thank you.

21         MR. CHAKRAVARTY:  Your Honor, just one brief

22  follow-up?

23         THE COURT:  No, I think we've explored it.  Thank you.

24         (The juror is excused.)

25         THE COURT:  Just give me a minute on the next one.  I

 1    just have something I have to read.

 2              (Pause.)

 3              THE COURT:  Okay.  I think we're ready.

 4              THE CLERK:  Okay.

 5              Juror No. 353.

 6              THE COURT:  I think I'm going to start directly with

 7    the 88 series with this fella.

 8              THE JURY CLERK:  Juror No. 353.

 9              THE CLERK:  Sir, over here, if you would.

10              (The juror enters the courtroom.)

11              THE CLERK:  Have a seat.  Keep your voice up and speak

12    into the mic.

13              THE JUROR:  Sure.

14              THE COURT:  Good afternoon.

15              THE JUROR:  Good afternoon.

16              THE COURT:  Since you were here last, have you been

17    able to follow the instructions to avoid talking about the case

18    with anyone?

19              THE JUROR:  Yeah.  A lot of people know I'm here.

20              THE COURT:  Of course people know where you are.  But

21    in terms of the substance of the case, you haven't talked about

22    the merits --

23              THE JUROR:  No.

24              THE COURT:  And have you been able, as best you can,

25    to avoid media coverage of the case?

1          THE JUROR:  Oh, absolutely.

2          THE COURT:  Eagerly?

3          That's the questionnaire you filled out right before

4     you when you were here.  I'm going to ask you about some of the

5     questions -- some of the answers you gave to some of the

6     questions.

7          THE JUROR:  Yes, sir.

8          THE COURT:  So would you open it and look at page 23?

9     You can take the clip off if it's easier for you.

10         THE JUROR:  Okay.  I don't have glasses with me, so...

11         THE COURT:  Do you have them in the other room?

12         THE JUROR:  Nope.

13         MS. CLARKE:  Do you want to borrow some?

14         THE JUROR:  Please.

15         THE COURT:  They go with your hair.

16         All right.  So beginning with Question 88, there's a

17    series of questions about attitude towards the death penalty

18    that we wanted to follow up with you about.  Question 88 asked

19    if you had any views on the death penalty in general, what are

20    they, and you said, "Against death penalty"?

21         THE JUROR:  Correct.

22         THE COURT:  Do you want to amplify on that in any way?

23         THE JUROR:  I'm just absolutely against the death

24    penalty.  I don't think -- let's see.  How can I say this and

25    be totally honest?  All right.  I don't know how many thousands

1   of rounds were shot at that boat.  You couldn't kill the man;

2   I'm not going to kill him.

3            THE COURT:  Okay.  Let's go to the next question where

4   we ask you to put yourself on a scale of 1 to 10 where 1 was

5   reflects a belief that the death penalty should never be

6   imposed and 10 reflects a belief that it should be imposed

7   whenever a defendant is convicted of intentional murder, and

8   you selected 1.

9            THE JUROR:  Correct.

10           THE COURT:  Were you intending to indicate that you

11  think it should never be imposed?

12           THE JUROR:  I think it should never be imposed.

13           THE COURT:  Question 90 on the next page, here, rather

14  than ask you to put in numbers, we asked you to look at a

15  number of different statements and see if there was one that

16  expressed your views towards the death penalty in a case of

17  somebody convicted of a murder.  And I believe you selected A,

18  which is, "I'm opposed to the death penalty and will never vote

19  to impose it in any case no matter what the facts."

20           THE JUROR:  That's the fact.

21           THE COURT:  That's your view?

22           THE JUROR:  Yes.

23           THE COURT:  So it's a rather -- I say this for

24  information and not because I'm being critical.  I just want to

25  know.  It's a rather inflexible position.  Is that it?

```
 1            THE JUROR:  Absolutely.

 2            THE COURT:  Do I need to go any further?

 3            MS. CLARKE:  I don't think so, your Honor.  Thank you.

 4            THE COURT:  All right.  Thank you.

 5            (The juror is excused.)

 6            THE CLERK:  Juror No. 354.

 7            THE JURY CLERK:  Juror No. 354.

 8            (The juror enters the courtroom.)

 9            THE CLERK:  Sir, over here, please.

10            THE JUROR:  I need my glasses.

11            THE COURT:  Perhaps we could advise them before they

12     come into the courtroom?  Perhaps Jim can advise them if they

13     need glasses, they should bring them in.

14            THE CLERK:  Keep your voice up, speak into the mic so

15     everyone around the table can hear you.  This is adjustable, so

16     adjust it accordingly.

17            THE COURT:  Good afternoon.

18            THE JUROR:  Good afternoon.

19            THE COURT:  Thank you for your patience.

20            MS. CLARKE:  Don't go there.

21            THE JUROR:  Yeah.

22            THE COURT:  You did get a free lunch.

23            Anyway...

24            THE JUROR:  If you call that free.

25            (Laughter.)
```

 1          THE COURT:  Since you were here last, have you been

 2     able to follow the instruction not to discuss the case except

 3     that you have to report here?

 4          THE JUROR:  Yes.

 5          THE COURT:  You have to answer verbally so the

 6     reporter can take down your words.  Okay?

 7          THE JUROR:  Shakes head.

 8          THE COURT:  And also try to avoid any media reporting

 9     of --

10          THE JUROR:  Yeah, I don't watch the news.  There's

11     nothing good.

12          THE COURT:  So that's the questionnaire that you

13     filled out.  We're going to follow up on some of the answers by

14     having a few more questions for you.

15          Let's start with your employment.  What do you do?

16          THE JUROR:  I'm a production associate for EMC.  We do

17     data storage up in Franklin.

18          THE COURT:  Franklin?  And what's a production

19     associate do?

20          THE JUROR:  Okay.  My job -- I work for the

21     non-standard organization.  And you know what a data storage

22     unit looks like, like the size of a refrigerator.  It's full of

23     drives.  And my department -- when a customer wants to upgrade

24     from a 146 drive to a 300-gig drive or a terabyte or something

25     like that, we buy the old drives back, transfer all their

1    information onto the new drives, and then we erase all their

2    information off the old drives so that we can resell them.  If

3    the drive decides to become -- if we can break it down and use

4    the raw to build a different-size drive, that's what we do so

5    we're not constantly buying new material.  We're recycling, so

6    to speak, so...

7              THE COURT:  So to put it in --

8              THE JUROR:  Layman's terms?

9              THE COURT:  -- simple terms, you're dealing with the

10   hardware rather than the software --

11             THE JUROR:  Correct.

12             THE COURT:  -- in a computer?

13             THE JUROR:  Yes.

14             THE COURT:  Are you a manufacturing facility or --

15             THE JUROR:  Yes.

16             THE COURT:  Okay.

17             THE JUROR:  Yeah.

18             THE COURT:  On page 5 in Question 10 we asked people

19   whether serving on this case on the schedule that we outlined,

20   which is basically Monday through Thursday, nine to four, would

21   be a serious hardship.  It's a difficulty for everybody to

22   arrange things, but one of the things we sometimes hear is that

23   people would have difficulty financially because of the impact

24   on their job and everything.  Would that have an --

25             THE JUROR:  On our timesheets we have "jury time," so

1   my boss knows.  When I first got the letter I showed it to him

2   and everything and I said, "I don't know what's going on.  I

3   don't know what case it is," what have you, because I hadn't

4   had regular jury duty in over 20 years, and then, bam.  So I

5   showed him that.

6           So I assume as long as it's a federal or state thing,

7   they're going to let me and pay me for as long as I go.  I live

8   alone, so...

9           THE COURT:  Okay.  But you think based on that

10  conversation that you're okay in terms of their continuing to

11  pay you while you're --

12          THE JUROR:  Yeah, either that or I don't know if they

13  would put me on long-term or short-term disability -- well, not

14  call it "disability," but...

15          THE COURT:  Right.  Right.

16          You don't use social media?

17          THE JUROR:  Nope.  No Facebook.  I have a phone, but I

18  use it Internet-wise, you know, navigation.  No Facebook, no

19  Myspace, no Match.com, no nothing.

20          THE COURT:  You seem to know all the names.

21          THE JUROR:  Well, on my phone.

22          THE COURT:  Okay.

23          THE JUROR:  I know what they are, but...

24          THE COURT:  So we asked about relationships you might

25  have with various kinds of -- categories of -- like police

1    officers.

2            THE JUROR:  Yeah.

3            THE COURT:  And you have a cousin, an uncle --

4            THE JUROR:  And my father.

5            THE COURT:  -- and your father.

6            I guess your father is retired.  Is that right?

7            THE JUROR:  Yeah, my father was a special on the

8    Easton Police Department.  He's retired.  He was also on the

9    MBTA.  And then my uncle Gibby, my father's brother, was on the

10   drug unit, retired, Boston P.D., and my cousin Kevin is

11   currently on the K-9 bomb squad.

12           THE COURT:  Let's talk about the two retired ones.

13           THE JUROR:  They don't know anything about this right

14   now.

15           THE COURT:  Right.  Your uncle and your father are

16   both retired.  Your uncle -- are they brothers?

17           THE JUROR:  Yes.

18           THE COURT:  Your uncle was with the Boston --

19           THE JUROR:  Yes.

20           THE COURT:  -- drug unit?

21           THE JUROR:  Yup.

22           THE COURT:  When did he retire, do you know?

23           THE JUROR:  Maybe '96.

24           THE COURT:  Oh, it's been quite a while.

25           THE JUROR:  Yes.  Oh, yeah, yeah.

 1          THE COURT:  And your father, he was a special officer?

 2          THE JUROR:  Yeah.  Auxiliary police, Easton.

 3          THE COURT:  He had another job?

 4          THE JUROR:  Yeah, he was a bus driver for the MBTA.

 5          THE COURT:  Okay.  All right.  And what period of time

 6  was he a special officer in Easton?

 7          THE JUROR:  From a minimum 1977 to sometime in the

 8  '90s.

 9          THE COURT:  Okay.  Now, your cousin -- your first

10  cousin --

11          THE JUROR:  Kevin.  Yes, Gibby's -- Gil's son.

12          THE COURT:  Right.  So he is currently a Boston police

13  officer?  And how long has he been on the Boston --

14          THE JUROR:  He started in the housing authority at 18

15  and he is now 53.

16          THE COURT:  So he was a housing --

17          THE JUROR:  He went from the housing authority --

18          THE COURT:  Police.

19          THE JUROR:  Yup.  And then --

20          THE COURT:  He moved --

21          THE JUROR:  -- he moved into patrolman, and then he

22  was in -- I think he may have been in the computer police or

23  whatever, cyber whatever, and then he got the option to go on

24  K-9 bomb squad.

25          THE COURT:  How long has he been doing that?

 1          THE JUROR:  I want to say five years maybe.

 2          THE COURT:  Since he was on the K-9 bomb squad, was he

 3   involved in the marathon events?

 4          THE JUROR:  I honestly don't know, but I think he was

 5   there the next year when the next marathon happened.

 6          THE COURT:  2014?

 7          THE JUROR:  Yes.

 8          THE COURT:  As just part of the security precaution?

 9          THE JUROR:  Correct, yeah.

10          THE COURT:  But you don't know if he was involved in

11   2013?

12          THE JUROR:  I honestly don't know.  I couldn't tell

13   you.

14          THE COURT:  Okay.  How often do you see him?

15          THE JUROR:  Maybe once a year at family functions or

16   something.  I see my uncle when I go up to Maine twice a year,

17   maybe.

18          THE COURT:  He lives up in Maine?

19          THE JUROR:  He lives in West Roxbury, but they have a

20   camp up in Maine, so...

21          THE COURT:  So let me ask you to turn to page 20,

22   Paragraph -- I'm sorry, Question 77 at the top.  In this

23   question we asked based on things that you'd seen or read in

24   the media or otherwise came to you from any other source, had

25   you formed an opinion whether -- that the defendant was guilty

1    or not guilty or that he should receive the death penalty or

2    not, and to each of those you selected the box "unsure."

3            Could you tell us about that?

4            THE JUROR:  I only know what was on the media from

5    what little media I did see.  You know, like when Boston was

6    closed down and the hunt went on and everything like that.  And

7    I know that if I'm on this, I have to go by what the evidence

8    is, not by what hearsay there is through the media.  Is that --

9            THE COURT:  So you feel that if you were a juror in

10   the case, you could pay attention to the evidence that's

11   presented in the course of the case and focus your attention on

12   that and make any decision you had to make based only on what

13   you heard in the course of the case?

14           THE JUROR:  That's what I have to do.

15           THE COURT:  The question is:  Can you do it?

16           THE JUROR:  Yeah, I assume I can because that's what I

17   have to do.

18           THE COURT:  Okay.  You understand that in any criminal

19   prosecution the person accused is presumed to be innocent of

20   what he's charged with --

21           THE JUROR:  Right, until proven guilty.

22           THE COURT:  -- unless the government proves him guilty

23   by the evidence at trial and proves it beyond a reasonable

24   doubt.  So that the burden is always on the government to prove

25   that a person is guilty beyond a reasonable doubt.  A defendant

```
 1    doesn't have any burden to prove he's not guilty.  The burden
 2    is always with the government alone.
 3            Do you understand that?
 4            THE JUROR:  Uh-huh.
 5            THE COURT:  Okay.  Do you have any difficulty in -- if
 6    you were a juror -- listening to the evidence, and if you
 7    concluded the government hadn't proved its case on any of the
 8    counts, would you be able to find the defendant not guilty?
 9            THE JUROR:  I would assume so.  Yes.
10            THE COURT:  Why?  Why do you assume so?
11            THE JUROR:  Well, if you don't -- if you can't prove
12    it, then he's innocent.  If you can prove it, then he's guilty.
13            THE COURT:  Okay.  And you think you could faithfully
14    and fairly apply those principles?
15            THE JUROR:  To the best of my ability.
16            THE COURT:  Okay.  Do you remember the events -- do
17    you remember paying attention to the events when they happened?
18            THE JUROR:  I'm not -- all I know is like when it
19    happened -- like my company sponsors a lot of the marathon
20    stuff because it starts in Hopkinton, and that's where our
21    corporate is.
22            THE COURT:  Right.
23            THE JUROR:  Other than that, you know, I know they
24    close down corporate for the race.  And then there was the
25    explosion and the guy that was the hero with the cowboy hat.
```

1    And that's about -- like I said, I don't really watch the news

2    because there's nothing -- if I watch the news, it's for the

3    weather.

4              THE COURT:  Okay.  You mentioned that the company

5    sponsored some marathon-related events.  Did you participate in

6    any of those?

7              THE JUROR:  Nothing.  I'm not a big sports person.

8              THE COURT:  If you'd turn to 23, page 23.  Beginning

9    with Question 88 we asked a series of questions about attitudes

10   towards the death penalty, and 88 itself is a general question,

11   do you have any general views, and you said "none."  Is that

12   accurate?  Do you have any general views about --

13             THE JUROR:  Yeah.  I mean, I'm not against it; I'm not

14   for it.  But, you know, if the crime fits the penalty, if

15   that's what it is, then that's what it is.

16             THE COURT:  In the next question we asked you to put

17   yourself on a scale from 1 to 10 where 1 reflected a belief

18   that the death penalty should never be imposed and 10 reflected

19   a belief it should be imposed whenever the defendant's been

20   convicted of intentional murder.  And you selected 9, which is

21   fairly high up the scale.

22             Can you tell us what you were thinking when you made

23   that choice?

24             THE JUROR:  If he's been convicted on -- like if he

25   committed murder on purpose and the crime is the death penalty,

1    then...

2              THE COURT:  These are matters that will be explained

3    in much greater detail if you're a juror in the case, but you

4    should take it for the present purposes that a person can't be

5    convicted of murder without proof beyond a reasonable doubt

6    that he has acted intentionally, okay?

7              THE JUROR:  Right.

8              THE COURT:  Okay.  That's an element of the offense of

9    murder.  So if you've been convicted of murder, it's an

10   intentional murder, okay?

11             THE JUROR:  Okay.

12             THE COURT:  Necessarily, all right?

13             So when we ask the death penalty, or any penalty

14   question, we've already established as a premise that somebody

15   is guilty -- is eligible for it because he is guilty of an

16   intentional murder, okay?

17             THE JUROR:  Okay.

18             THE COURT:  And then the question is for such a person

19   is the death penalty appropriate or is life without the

20   possibility of release appropriate.  That will be the question

21   this jury will face, okay?  You may not have understood that

22   before because there's no reason for you to have known that,

23   but I want you to take that as a given.  He's been convicted of

24   an intentional murder if you're talking about what penalty to

25   impose, okay?

1          THE JUROR:  Okay.

2          THE COURT:  I don't know whether that affects the

3     answers you gave on 88 or 89.

4          THE JUROR:  No.

5          THE COURT:  Do you think it would change?

6          THE JUROR:  I don't think so.

7          THE COURT:  Okay.  Keeping that still in mind, look at

8     page 24 and Question 90.  There, rather than asking you to pick

9     a number on a scale, we asked you to see if one of the

10    statements listed below described your feelings in a case where

11    someone had been proved guilty of murder, and you selected D,

12    "I'm not for or against the death penalty.  I could vote to

13    impose it or I could vote to impose a sentence of life

14    imprisonment without the possibility of release, whichever I

15    believed was called for by the facts and the law in the case."

16          That was your selection then?

17          THE JUROR:  Right.  Yup.

18          THE COURT:  Do you think -- is that what best

19    describes your view of the appropriateness of a death penalty

20    or not?

21          THE JUROR:  I don't know.

22          THE COURT:  If you want to take your time to read

23    through the whole question.

24          THE JUROR:  Because I know there was one question that

25    I had a hard time dealing with because they all sounded like

1    the same thing.

2             THE COURT:  All right.  Why don't you take your time

3    and just read through it for a minute.

4             (The juror complies.)

5             THE JUROR:  I think I should have picked C.

6             THE COURT:  C?  Okay.  C says, "I'm opposed to the

7    death penalty" --

8             THE JUROR:  Wait a minute.  Okay.  Sorry, go ahead.

9             THE COURT:  Is that the one?  The one right above what

10   you circled?

11            (Pause.)

12            THE JUROR:  No, I think I'll stick with D.  Yeah.

13            THE COURT:  Okay?  You've reviewed all of them again,

14   all the way down to G and H?

15            (Pause.)

16            THE JUROR:  I'll stick with D.

17            THE COURT:  All right.  Let's go to the next page.

18   Question 95 at the bottom we asked, "If you found this

19   defendant guilty and you decided that the death penalty was the

20   appropriate punishment for him, could you conscientiously vote

21   for the death penalty?" and you said "yes."  Is that your view?

22            THE JUROR:  Yeah, I could.

23            THE COURT:  Do you have some hesitancy about it?

24            THE JUROR:  If he was guilty -- now, when you say

25   "you" --

```
1              THE COURT:  You.

2              THE JUROR:  Oh, myself; not the jury?

3              THE COURT:  This is about you personally.  If you

4    listen to the evidence and at the end of the evidence, having

5    found him guilty, of course, and then after the penalty phase

6    as I described it to you, you considered it and you thought the

7    death penalty was the appropriate punishment for him, could you

8    conscientiously vote for the death penalty?

9              THE JUROR:  I believe so.

10             THE COURT:  Okay.  But you say that with some

11   reservation, or am I reading you wrong?

12             THE JUROR:  I feel like there's a wrong answer, but I

13   don't --

14             THE COURT:  There is no right or wrong answer.  Don't

15   try to second-guess the system here.  We just want what you

16   think.  That's the right answer.

17             THE JUROR:  I think I could.

18             THE COURT:  Okay.  But -- and so as I say, you say it

19   with some tone of voice that suggested maybe you have a

20   reservation, and all I want to know is if you do, what is it?

21   What is the reservation?

22             THE JUROR:  I don't know.  I don't know what the

23   reservation is, if there is one.

24             THE COURT:  Is it that you simply can't predict how

25   you'll feel under some future circumstance, or is it that you
```

 1    really aren't that big a fan of the death penalty?

 2         THE JUROR:  It's not that I'm not a fan of the death

 3    penalty; it's I would have to see how everything lays out

 4    evidence-wise and what have you.

 5         THE COURT:  Okay.  Let's go to the top of the next

 6    page, Question 96.  "If you found the defendant guilty and you

 7    decided that life imprisonment without the possibility of

 8    release was the appropriate punishment, could you

 9    conscientiously vote for life imprisonment without the

10    possibility of release?" and you checked "yes" there as well.

11         Is that your --

12         THE JUROR:  Yup.

13         THE COURT:  Do you have any reservation about that?

14         THE JUROR:  If that's what has been decided, then

15    that's what it is.

16         THE COURT:  Well, it's what you would decide, is what

17    we're asking.  If you -- well, if you -- as you see in the

18    first line, if you decided that life imprisonment without the

19    possibility of release was the appropriate punishment, that

20    means you, if you had decided that, would you be able to

21    conscientiously vote for it?

22         THE JUROR:  Yes.

23         MR. CHAKRAVARTY:  Just a brief follow-up?

24         Trying to figure out what your views are on the death

25    penalty is the reason we ask these questions so many ways,

 1    obviously.  So -- excuse me one minute.  I'm sorry.  My

 2    colleague reminded me to introduce myself.

 3              THE JUROR:  Oh.

 4              MR. CHAKRAVARTY:  I'm Aloke Chakravarty, one of the

 5    prosecutors.

 6              So on 89 there's a spectrum.  The judge asked you if

 7    you thought that the 9 on that spectrum accurately reflected

 8    your view, and that seems a little bit at odds with -- I think

 9    you were wavering between C and D, which is you're opposed to

10    the death penalty, or just kind of neutral, 5.

11              What did you mean when you circled 9?  Like, what were

12    you trying to convey to us?

13              THE JUROR:  I don't know.  I just thought it was a

14    little less stronger than 10, you know?  I don't know how to

15    explain it.

16              MR. CHAKRAVARTY:  So -- but you don't have any

17    opposition to the death penalty?

18              THE JUROR:  Uh-uh.

19              MR. CHAKRAVARTY:  And you're not for it?

20              THE JUROR:  Correct.

21              MR. CHAKRAVARTY:  But you will impose it if you think

22    it is warranted by the facts and the law?

23              THE JUROR:  Yes.

24              MR. CHAKRAVARTY:  And if it came down to you making

25    the decision as to "Can I" -- every juror has to make their own

1    choice as to whether the death penalty is appropriate, and then

2    getting to that stage in the trial you would have to sign the

3    vote slip saying, "Yes, I support this," you have confidence

4    you can do that?

5              THE JUROR:  If the evidence proves it.

6              MR. CHAKRAVARTY:  Okay.  And you would consider both

7    the aggravating factors and the mitigating factors in deciding

8    that?

9              THE JUROR:  Okay.  How did --

10             MR. CHAKRAVARTY:  Let me break that down for you.

11             THE JUROR:  Thank you.

12             MR. CHAKRAVARTY:  So as the judge suggested, at this

13   phase of the trial the defendant would already have been found

14   guilty, and then there's a proceeding on showing factors that

15   show why the death penalty might be appropriate in a case, and

16   then mitigating factors, if the defense chooses to put those

17   on, as to why it's not appropriate in a specific case.  And

18   then you would have to weigh those.  You would have to decide

19   which ones apply and then weigh whether one outweighs the

20   other.  And if you decided that the factors weighing in favor

21   of the death penalty were appropriate, that's the only time

22   that you would have to vote for the death penalty.  You never

23   have to vote for the death penalty.

24             THE JUROR:  Okay.

25             MR. CHAKRAVARTY:  But you evidenced some hesitation in

1    some of these questions before, so I'm trying to get a sense of

2    why you're confident that you would be able to vote for the

3    death penalty.

4              THE JUROR:  I don't know.  It just -- that's just how

5    I feel.

6              MR. CHAKRAVARTY:  Okay.  A quick question about your

7    family that's on the police force.

8              THE JUROR:  Yup.

9              MR. CHAKRAVARTY:  So there's going to be police

10   officers in this case who testify.  Are you going to favor

11   their testimony over other people's testimony?

12             THE JUROR:  I have to go by what the evidence shows,

13   so no.

14             MR. CHAKRAVARTY:  Okay.  And I think that's how you

15   answered on the questionnaire.  There was a question as to

16   whether you would give more weight to one or the other.  Would

17   the fact that police officers would be testifying -- would that

18   affect your ability to be fair and impartial in this case?

19             THE JUROR:  No.

20             MR. CHAKRAVARTY:  The fact that there was a police

21   officer who was killed as part of this case, does that impact

22   your ability to assess the evidence?

23             THE JUROR:  No.

24             MR. CHAKRAVARTY:  Thank you.

25             MS. CONRAD:  Good afternoon, sir.  My name is Miriam

1    Conrad.  I'm one of Mr. Tsarnaev's lawyers.

2            THE JUROR:  How you doing?

3            MS. CONRAD:  I appreciate your understanding of the

4    concepts of needing to be impartial, but part of what we're

5    trying to do here is to find out what's in your mind and what's

6    in your heart.  And let me ask you this:  Before you ever knew

7    you might be a juror in this case, did you have any opinion one

8    way or another about whether Mr. Tsarnaev was guilty?

9            THE JUROR:  No, I just know what I saw on TV.

10           MS. CONRAD:  Okay.  And what did you see on TV?

11           THE JUROR:  Just the hunting down of -- you know, when

12   they come up -- him being in the boat, and then you hear about

13   the MIT officer and some other shootout when his brother was

14   killed.

15           MS. CONRAD:  So when you saw that on TV, did you draw

16   from that that he was guilty?

17           THE JUROR:  No, I just -- I don't know what he was,

18   you know.

19           MS. CONRAD:  Well, did you think it wasn't true?

20           THE JUROR:  No.

21           MS. CONRAD:  Did you think it was true?

22           THE JUROR:  I didn't know.

23           MS. CONRAD:  Did you ever discuss it with anybody?

24           THE JUROR:  Nope.

25           MS. CONRAD:  And where were you on the day of the

1  bombing?  I'm sorry if the judge already asked you that.  I

2  apologize.

3           THE JUROR:  I believe I was at work.

4           MS. CONRAD:  And you said that EMC, the headquarters

5  in Hopkinton, shuts down, right?

6           THE JUROR:  Yes.

7           MS. CONRAD:  So your office doesn't shut down too?

8           THE JUROR:  No, I'm in manufacturing.  I'm in a

9  totally different building.  I'm in Franklin.

10          MS. CONRAD:  Okay.  But I'm still asking whether --

11  because the headquarters shuts down, whether your office shuts

12  down.

13          THE JUROR:  No.

14          MS. CONRAD:  Do you remember when and how you learned

15  about the bombing?

16          THE JUROR:  I think it was near the end of the day,

17  someone on their phone said that there was a -- excuse me -- a

18  bombing at the marathon.

19          MS. CONRAD:  And did you watch any of the TV footage

20  that day?

21          THE JUROR:  Just when I'm going through and, you know,

22  the news came on with the quick blips and stuff like that.

23          MS. CONRAD:  So you don't recall watching the TV news

24  that evening about --

25          THE JUROR:  No.  Like I said, I really don't watch the

1    news.

2           MS. CONRAD:  And what about during the manhunt

3    on -- you mentioned something about finding him in the boat.

4    Do you remember where you were when you found out about that?

5           THE JUROR:  I don't recall where I was, but I know I

6    was supposed to go up to Wellesley on a -- that Friday, but I

7    couldn't go because the town was closed up.

8           MR. CHAKRAVARTY:  Your Honor, we're satisfied.

9           MS. CONRAD:  I think we have an agreement.

10          THE COURT:  All right.  Thank you.  That's it.  Thank

11   you.

12          (The juror is excused.)

13          MS. CONRAD:  Your Honor, before he's excused, can we

14   raise something at sidebar?  Before he leaves.

15          THE COURT:  Sidebar mode.

16          MR. DOREAU:  All right.  Audio and video cut.

17          (Discussion at sidebar and out of the hearing of the

18   public:)

19          MS. CONRAD:  So I just wanted to check with the Court,

20   we had reached an agreement on this juror, but since I know

21   your Honor actually doesn't, of course, need to accept our

22   agreement --

23          THE COURT:  No.  No, if we interrupt like that, that's

24   a sign that it's accepted.

25          MS. CONRAD:  Okay.  I just wanted to make sure that we

1    didn't --

2              THE COURT:  No.  No.  No.

3              MS. CONRAD:  Thank you.

4              THE COURT:  That applied principally to the overnights

5    where I wanted to look at things.  I'd been given a string of

6    numbers --

7              MS. CONRAD:  Sure.

8              THE COURT:  -- I just wanted to check --

9              MS. CONRAD:  I just wanted to make sure there weren't

10   things that I didn't develop.

11             THE COURT:  No.  No.

12             MS. CONRAD:  Okay.  Good.  I wanted to make sure we're

13   all on the same page, as it were.

14             While we're at sidebar mode, this next person --

15             MS. CLARKE:  Is the next one 351?

16             MS. CONRAD:  Yes, it's the next one.

17             MS. CLARKE:  Do you want me to --

18             MS. CONRAD:  Go ahead.  You go ahead and then I'll

19   tell you if you're wrong.

20             (Laughter.)

21             MS. CLARKE:  Your Honor, 355 is a lawyer, and we don't

22   think it's disqualifying, but we want to give the Court a

23   heads-up that he at some point applied for a job with the FPD

24   office.  Just wanted the Court to know that.

25             THE COURT:  What's the "some time"?

```
 1              MS. CLARKE:  Ms. Conrad wasn't quite clear about that.
 2              MS. CONRAD:  So he applied most recently in 2014 for a
 3      most-recent opening.  I did not interview him.  And I
 4      believe -- I know he has applied in the past, but I don't know
 5      the precise dates.  I did email my secretary and ask her to
 6      check.  And I do not recall whether I interviewed him on those
 7      occasions.  And that's what I asked her to --
 8              MS. CLARKE:  I thought it was worth the Court
 9      inquiring.
10              THE COURT:  You would know him if you saw him?
11              MS. CONRAD:  I have no mental image of what he looks
12      like and --
13              THE COURT:  No, but I mean, if he came in, that
14      might --
15              MS. CONRAD:  I hope so.  But at my advanced age,
16      maybe, maybe not.
17              THE COURT:  Okay.
18              MS. CONRAD:  I just -- if you want to just hold on a
19      second I'll tell you --
20              THE COURT:  I think he said in his form that he knew
21      federal people.
22              MS. CLARKE:  We just wanted you to know that he
23      applied for a job so you could inquire.
24              THE COURT:  Fine.  I appreciate it.
25              So we could go ahead?
```

1          MS. CONRAD:  Can I tell you one more thing?  There's a

2    different juror coming up we have social media on and your

3    Honor wanted to be alerted to that.

4          THE COURT:  What number?

5          MS. CONRAD:  The number is 359.  I mean, I can do it

6    now, I can do it later, but since we're in sidebar mode now I

7    thought I would seize the moment.

8          THE COURT:  Could you give me a brief summary of it?

9          MS. CONRAD:  Yes.  So this would be very -- believe it

10   or not this will be very brief.  So, first of all, she mentions

11   on her questionnaire that she had written a blog post the day

12   after the marathon bombing.  We have that blog post in which

13   she describes having attended the marathon, I think since she

14   was six years old, and talks about being angry and furious and

15   devastated by the events.  I have a copy of that.

16         She also pretty much live tweeted on her Twitter feed

17   throughout the events of the marathon and also pretty much

18   minute by minute during the manhunt and the events in

19   Watertown.  And I have copies of just those select portions.

20   Just an example, on the day of the bombing, "Hurting for my

21   city on what should be a day of celebration.  Thank you first

22   responders and those who are helping."

23         So I can pass these up.  I have copies for the Court.

24         THE COURT:  So what do you propose?  She said in

25   question -- this wasn't concealed.  She said --

1           MS. CONRAD:  Right.  But I'm planning --

2           THE COURT:  So I mean, she can be asked to confirm it,

3    but I don't know how much that adds.  Do you intend to ask her

4    about the content of it?

5           MS. CONRAD:  I -- I don't know if I'm the one -- yes,

6    is the short answer.  I mean, the content of it expresses her

7    emotions about it, and it's highly relevant.

8           THE COURT:  But the document may speak for itself, is

9    what I'm getting at.  I guess the question would be:  "You were

10   very emotional then."

11          MS. CONRAD:  Right.

12          THE COURT:  "Has it subsided to the point where you

13   could be fair-minded or is it still affecting you?"

14          MS. CONRAD:  I'm not sure I would ask it that way,

15   but yes.

16          THE COURT:  I'm sure you wouldn't, actually.

17          (Laughter.)

18          THE COURT:  But in other words, just in the interest

19   of time, I don't want to spend a lot of time having her read

20   from the document.

21          MS. CONRAD:  No, no, I'm not going to do that.  But I

22   do want to point out she didn't say anything about the Twitter

23   posts, and the Twitter posts may be different, just in terms of

24   more reflecting that she was glued to the TV.

25          THE COURT:  The germane point is if she remains in a

1    condition she cannot be fair-minded.  That is the germane

2    point.

3            MS. CONRAD:  So do you want me to --

4            THE COURT:  Yeah.  So if you want to hand it to me now

5    we'll get to it.  But I just want to make sure we get efficient

6    in your questioning.

7            MS. CONRAD:  I'm not going to read everything.

8            THE COURT:  We still have a ways to go.

9            I guess we're ready for Juror No. 355.

10           MR. DOREAU:  Audio and video on.

11           (In open court:)

12           THE CLERK:  Juror No. 355.

13           THE JURY CLERK:  Juror 355.

14           (The juror enters the courtroom.)

15           THE CLERK:  Sir, if you would, over here, please.

16   Speak into the mic so everyone around the table can hear you.

17   And this is adjustable, so if you need to move it.

18           THE COURT:  Good afternoon.

19           THE JUROR:  Good afternoon, your Honor.

20           THE COURT:  Since you were last here have you been

21   able to follow the instructions not to discuss the case on the

22   merits or --

23           THE JUROR:  I have.

24           THE COURT:  And also to try to avoid any exposure to

25   media accounts?

1              THE JUROR:  The best I can.

2              THE COURT:  They're there, but you have to put them

3      aside.

4              So we're going to follow up on some of the areas

5      touched on by the questionnaire, and of course we'll start with

6      your occupation, which is attorney.  And you work for the

7      Committee for Public Counsel Services?

8              THE JUROR:  Correct.

9              THE COURT:  And you've been doing that for a while?

10             THE JUROR:  For a while, yes.

11             THE COURT:  A little over ten years, maybe?

12             THE JUROR:  At the committee, yes.  I started actually

13     at New Hampshire back in 1992.  So I've been a criminal defense

14     lawyer for over 22 years.

15             THE COURT:  When you were in private practice, your

16     practice was criminal defense?

17             THE JUROR:  Yes, as --

18             THE COURT:  Has it changed in any way?

19             THE JUROR:  Yeah, 99.9 percent, and I was still taking

20     mostly court-appointed.

21             THE COURT:  Do you have any feeling that that would

22     make it difficult for you to be an impartial juror in a

23     criminal case?

24             THE JUROR:  I don't think so.  I actually think it

25     makes it a little bit easier because I look at every case about

1    what can be proved in court, what are the facts.

2         THE COURT:  Have you had any particular concentration

3    in your practice in, I guess, what courts you practice in or

4    anything like that?

5         THE JUROR:  District and superior courts in

6    Massachusetts and in New Hampshire back when I was up there,

7    but...

8         THE COURT:  Are you a member of the bar of this court?

9    Have you practiced --

10        THE JUROR:  No, I've never practiced in federal court.

11        THE COURT:  Just working through the -- well, wait a

12   minute.  Let me just see if -- just working through, somewhat

13   in order, and you can follow if you want -- this is the bottom

14   of page 10 and top of page 11 -- in Questions 29 and 30 we

15   asked you about blogging or social media.  You said you blogged

16   last year when you were training to run the 2014 Boston

17   Marathon and to fund-raise for charity.  What was the charity?

18        THE JUROR:  It was a Framingham charity, the Boys and

19   Girls Club.

20        THE COURT:  It wasn't a marathon-related charity?

21        THE JUROR:  No, it was a part of --

22        THE COURT:  The One Fund or anything like that?

23        THE JUROR:  No, what -- the way I got my bib is that

24   the Town of Framingham had, I think, 20 bibs given to them by

25   the Boston Marathon, and basically picked numbers out of a hat.

1    And what you had to do was raise charity [*sic*] for a local

2    Framingham charity.  And they had a list of six and they -- we

3    got to choose which one.

4         THE COURT:  And what were you blogging; what kinds of

5    things?

6         THE JUROR:  My ups and downs of trying to go from

7    running five miles at top to trying to finish a marathon.

8    Nothing political.

9         THE COURT:  Facebook?

10        THE JUROR:  I have my own Facebook.

11        THE COURT:  How do you use it?

12        THE JUROR:  Mostly to keep track of my friends' kids

13   and whatnot.  I post very infrequently, and if I do, it's

14   usually a picture of my kids or about a disastrous running.

15        THE COURT:  It looks like you served as a juror in

16   Middlesex?

17        THE JUROR:  I did.

18        THE COURT:  That was a civil workers' comp case?

19        THE JUROR:  Yes.

20        THE COURT:  When was that?

21        THE JUROR:  Four years ago now?  Four and a half

22   maybe?  It was a two-week-long case.

23        THE COURT:  So if you'd turn to page 20, I'd like you

24   to look at Question 77, and that's a question where we ask if

25   you'd seen or read things in the news media or else-wise, had

1    you formed an opinion prior to filling out the questionnaire

2    that the defendant was guilty or not guilty or should receive

3    the death penalty or should not, and to each of those you

4    selected the option "unsure."  Can you tell us about that?

5         THE JUROR:  Sure.  I mean, it's mostly based upon my

6    training and experience.  I think, like everybody in the

7    courtroom here, I know what I see in the papers and in the

8    media isn't necessarily entirely accurate.  And while it

9    certainly was constant for a time, I know and I can wait until

10   I see what the actual facts are before making up my mind.  I

11   mean, I do that in my own cases.  I mean, reading a police

12   report isn't necessarily what makes me decide how I feel about

13   the case.

14        THE COURT:  And I guess it was unnecessary, I guess in

15   the way you answered the first question, but in the second part

16   of that question it said if you'd answered yes, which you

17   hadn't done, would you be able or unable to set aside any

18   opinion and base your decision on the -- based solely on the

19   evidence in the case.  You checked "able."

20        THE JUROR:  I thought it was a good expression of how

21   I felt about everything.

22        THE COURT:  The next page, Question 82, we asked if

23   people had participated in any what we might call support

24   activities after the fact, and you might have bought some

25   merchandise or something, maybe Boston Strong kinds of things?

1          THE JUROR:  Yeah, I'm sure.  There was another
2    marathon I did in October that I think there might be a Boston
3    Strong logo on the shirt they gave out.
4          THE COURT:  October 2014?
5          THE JUROR:  Yes.
6          THE COURT:  Question 84, you know some of the federal
7    defenders, including Ms. Conrad who's seated at the table?
8          THE JUROR:  I've met Ms. Conrad once, I think at a
9    function, like a talk or something.  I know one of their recent
10   employees who just recently left the office, Mr. Mirhashem.
11         THE COURT:  And you also include Tim Watkins?
12         THE JUROR:  Yes.
13         THE COURT:  How do you know Tim?
14         THE JUROR:  Again, I met him at a function or two.
15         THE COURT:  Met, not --
16         THE JUROR:  Met.
17         THE COURT:  -- socialize with or --
18         THE JUROR:  I would not call it that.
19         THE COURT:  I'm working my way through --
20         THE JUROR:  Sure.  My handwriting is atrocious.  I can
21   interpret it if you want.
22         THE COURT:  No, that's okay.
23         So beginning at page 23, Question 88, we asked
24   questions related to your views about the death penalty.  So
25   let's -- I'd like to run through those.

```
 1            THE JUROR:  Sure.

 2            THE COURT:  Question 88 is if you have any views on

 3    the death penalty in general, what are they.  You said, "It

 4    should be the rarest of punishments.  It is much too prevalent

 5    in the country."  And you preface that by saying, "Since it is

 6    legal."  I guess you're accepting as a proposition that it's

 7    legal?

 8            THE JUROR:  Yes.

 9            THE COURT:  Although you might have some view that it

10    shouldn't be?

11            THE JUROR:  I mean, if I was asked to vote on it, I

12    would probably vote against it because of my belief that it is

13    overused.

14            THE COURT:  Well, as to the opinion that -- or the

15    view that it should be the rarest and is too prevalent, do you

16    want to amplify on that at all?

17            THE JUROR:  I think we are -- we hear quite often

18    about people who are on death row who are later exonerated and

19    just how some states have higher death penalty conviction rates

20    than others; and additionally, the racial and economic

21    disparity on who gets the death penalty.  And for a lot of

22    those reasons, I just think it's overused.

23            THE COURT:  Have you ever been personally involved as

24    a lawyer in a death penalty case?

25            THE JUROR:  I haven't.
```

1          THE COURT:  Question 89 we asked you to put yourself

2     on a scale from 1 to 10, 1 being it should never be imposed and

3     10 being it should be imposed whenever someone's convicted of

4     murder.  You selected 2.  Do you want to amplify on that?

5          THE JUROR:  Sure.  I did a -- when I found out I was

6     going to be in this pool, I did a lot of soul-searching, and I

7     came to the conclusion that because I believe it should be in

8     the most rarest of situations, that's why I'm down at that end,

9     but I could foresee situations where I might consider it

10    appropriate.

11         THE COURT:  Okay.  Next page, Question 90, we set

12    forth a series of statements of different attitudes towards the

13    death penalty and we asked you if you thought there was one

14    that represented your views.  You selected C.  It says you're

15    opposed to the death penalty but could vote to impose it if you

16    believed that the facts and the law in a particular case called

17    for it.

18          Is that an accurate statement of your --

19         THE JUROR:  I think that's an accurate statement.

20         THE COURT:  So you can envision there could be a case

21    where you could vote in favor of the death penalty?

22         THE JUROR:  After a lot of thought and soul-searching,

23    I think I could.

24         THE COURT:  Let's go down to the bottom of page 25.

25    Question 95 we asked kind of focusing on this case if you found

1    this defendant guilty and you decided that the death penalty

2    was the appropriate punishment, could you conscientiously vote

3    for the death penalty.  You selected "I'm not sure," and added

4    in your own words, "I cannot possibility prejudge his guilt or

5    potential punishment at this stage."  And you gave essentially

6    the same answer for the reciprocal question on the next page

7    about whether you could conscientiously vote for life

8    imprisonment.

9           Do you want to tell us why you answered those

10   questions that way?

11          THE JUROR:  Sure.  Without having the facts in front

12   of me or, frankly, the instructions from the Court, I find it

13   very difficult to make that far of a prediction.

14          THE COURT:  In part, the question may have been

15   getting at whether in Question 95, for example, if you had

16   intellectually concluded the death penalty was appropriate,

17   could you actually vote for it; in other words, would you have

18   any moral or other scruple about voting for it even if you were

19   convinced intellectually that there was a case for it to be

20   made?

21          THE JUROR:  I find it very difficult to answer that

22   without hearing everything.

23          THE COURT:  Okay.

24          MR. MELLIN:  Thank you, your Honor.

25          Good afternoon, sir.  I'm Steve Mellin.  I'm one of

1    the prosecutors.

2        Let me just kind of go right where Judge O'Toole just

3    cut off, which was -- the question was if you found

4    Mr. Tsarnaev guilty and you decided that the death penalty was

5    the appropriate punishment, could you conscientiously vote for

6    the death penalty.  So it says -- the question is assuming --

7    and you're a lawyer.  The question is assuming that he's guilty

8    and that you found that the death penalty was appropriate.

9        THE JUROR:  I guess part of my problem is that I'm

10   disturbed that I have to assume his guilt at this stage without

11   hearing anything and to prejudge the particular case I'm asked

12   to come and judge.  I don't know that I really want to exercise

13   that fantasy.  And I'm sorry if I'm being difficult about it.

14       MR. MELLIN:  Well, we're all here today.  It's really

15   not a fantasy, though.  I mean, we're getting down to if you

16   found him guilty, which means the jury's now deciding life

17   versus death, and if you believed that death was appropriate,

18   could you ever vote to sentence someone to death?

19       MS. CLARKE:  That's mixing this case with "could you

20   ever vote someone."  I mean, I think we -- the juror's problem

21   is prejudging this case.

22       THE COURT:  Yeah, I think as I was hearing it, your

23   answer, the difficulty was that the question was phrased in

24   terms of this case.  Let's generalize it.

25       THE JUROR:  You want me to step back?

1          THE COURT:  If you were sitting on a death penalty

2     case where the defendant -- that is, when I say that, a capital

3     case, and the defendant is found guilty of a capital crime, and

4     you concluded that for that defendant and for that crime the

5     death penalty was an appropriate punishment, could you

6     conscientiously vote to impose it in that case?  And --

7          THE JUROR:  If, after hearing the Court's

8     instructions, and if I believed it was one of those -- it fit

9     into one of those rare cases where I believed the death penalty

10    should be imposed, having understood the law as given to me,

11    then, yes, I could vote to impose the death penalty.

12         THE COURT:  Do you have a collection of the category

13    of cases you're thinking of?  Do you have some examples?

14         THE JUROR:  I don't really.

15         MR. MELLIN:  Well, can you imagine any case that you

16    would think is appropriate for the death penalty?

17         THE JUROR:  Yes.

18         MR. MELLIN:  What?

19         THE JUROR:  I think Slobodan Milosevic was close, if

20    not a prime example.  Again, I didn't do that trial.

21         MR. MELLIN:  So genocide?

22         THE JUROR:  Genocide's a good starting point.

23         MR. MELLIN:  Okay.  Anything other than genocide?

24         THE JUROR:  I mean, I think -- I cannot say that I

25    have sat and thought about a list of particular crimes or

```
 1    severity of crimes where I would have a checklist of what I
 2    thought was appropriate for the death penalty or not.  And
 3    having never worked on a death penalty case, I've never even
 4    read an instruction about what, at least legally, is considered
 5    for the death penalty or not.
 6            I mean, everybody uses the example if somebody hurts
 7    your child, you know, a child, that's sort of a prime example
 8    of where people can go.  But I like to think that we all take a
 9    step back and that's why we have juries decide rather than
10    letting our emotions take over.
11            Without -- I guess that's my answer.  I have not come
12    up with a list of cases where I think it would be appropriate.
13    I mean, I'd have to listen to the Court's instructions, I would
14    have to judge the facts in front of me and determine whether or
15    not that satisfied me.
16            MR. MELLIN:  But you've known since January 5th that
17    you were going to be coming back in here, because you're a
18    lawyer, you understand how this works, right?
19            THE JUROR:  Uh-huh.
20            MR. MELLIN:  In fact -- you just have to say "yes" or
21    "no."
22            THE JUROR:  Yes.
23            MR. MELLIN:  In fact, you're a criminal defense
24    attorney, right?
25            MS. CLARKE:  Your Honor, this is not
```

1    cross-examination.

2          THE COURT:  Yes, this sounds a little bit too much

3    like cross-examination.

4          MR. MELLIN:  Well, I think in answer to one of the

5    questions, you said you'd been a criminal defense attorney for

6    how long?

7          THE JUROR:  A little over 22 years.

8          MR. MELLIN:  Since 1992?

9          THE JUROR:  Yes.

10          MR. MELLIN:  And in answer to Question 92 which you

11    filled out on January 5th, you said, "Killing people,

12    especially government-sponsored killing, is generally wrong.

13    While I can imagine a scenario where facts and law call for it,

14    it is an exceedingly rare case."

15          So you wrote that as your answer to 92, right?

16          THE JUROR:  Yes.

17          MR. MELLIN:  And there what were you referring to as

18    you can imagine a scenario where facts and law call for it?

19          THE JUROR:  The Milosevic example is usually the one I

20    rest on when I say I can immediately come up with a scenario.

21    Whether or not there are other scenarios, again, without

22    knowing specifics, I find it difficult to answer the question.

23          MR. MELLIN:  Okay.  So since January the 5th, though,

24    you haven't been able to come up with any other scenario, and

25    as you sit here today the only scenario you can come up with is

1    the genocide scenario?

2          MS. CLARKE:  Your Honor, I think that's an unfair

3    question.  He hasn't been asked to come up with other

4    scenarios.

5          THE COURT:  I think we can move along anyway.  I think

6    I'm understanding the witness -- the juror's position.

7          MR. MELLIN:  All right.  The judge asked you earlier a

8    little bit about your concentration in your type of work that

9    you've been doing.  What do you concentrate in?

10         THE JUROR:  Right now I'm one of the supervising

11   attorneys in the district court office in Worcester.  So I do a

12   lot of supervising of the lawyers in that office.  I am -- I --

13   directly over six lawyers.  I still do maintain a caseload of

14   my own in both district and superior court in Worcester.

15         MR. MELLIN:  All right.  And just for the record, you

16   didn't really indicate if that was for the prosecution or for

17   public defender service or who that is for.  Who is that for?

18         THE JUROR:  It's for the public defender service, the

19   Committee for Public Counsel Services.

20         MR. MELLIN:  Okay.  And you actually worked for the

21   New Hampshire public defender at some point.  Is that correct?

22         THE JUROR:  Yes.

23         MR. MELLIN:  Have you ever worked for the prosecutors?

24         THE JUROR:  No.  I have worked with the prosecutors.

25         MR. MELLIN:  On cases, correct?

1              THE JUROR:  Well, on cases.  And we're

2    very -- Worcester is actually a very collegial area.  Just last

3    night, for example, I coordinate with members of the D.A.'s

4    office and the court and Bar Advocate Program in advanced trial

5    skills training.  And so we do work collaboratively on some

6    issues.

7              MR. MELLIN:  But in your actual job you've never

8    prosecuted a case, right?

9              THE JUROR:  Right.

10             MR. MELLIN:  Now, you mentioned in answer to Question

11   76, and it's on page 20, that you read the First Circuit's

12   decision rejecting the delay of trial and change of venue.

13             THE JUROR:  Yes.

14             MR. MELLIN:  When did that occur, that you read that?

15             THE JUROR:  I don't remember the day.  I heard on the

16   radio there had been a motion and it was, I think, several days

17   before we were to come on that Monday.  And I wanted to see

18   what the court's decision was to find out if I was actually

19   going to be arriving in court.  So that's why I sought it out.

20             MR. MELLIN:  Okay.  You said that you've met two of

21   the public defenders on this case before, correct?

22             THE JUROR:  Yes.

23             MR. MELLIN:  And when did you meet Ms. Conrad?

24             THE JUROR:  I couldn't tell you when.  It was years

25   ago.

1        MR. MELLIN:  Do you remember what function it was at?

2        THE JUROR:  I'm not entirely sure.  It might have

3    been -- it might have been a MACDL event, a Massachusetts

4    Association of Criminal Defense Lawyers event.  I'm really not

5    100 percent sure.

6        MR. MELLIN:  And what about Mr. Watkins?

7        THE JUROR:  I want to say it's a similar-type event.

8        MR. MELLIN:  And I think you told the judge you've

9    never worked on a death penalty case on behalf of a defendant,

10   correct?

11       THE JUROR:  Correct.

12       MR. MELLIN:  Well, do you know what the Innocence

13   Project is?

14       THE JUROR:  I do.

15       MR. MELLIN:  What is that?

16       THE JUROR:  We have -- at CPCS there is a lawyer --

17   there may be more than one lawyer in that unit -- who do work

18   on sort of Innocence Project-type cases.

19       MR. MELLIN:  Okay.  And what is the Innocence Project?

20       THE JUROR:  My understanding is the Innocence Project

21   looks at old cases, determines whether or not they

22   require -- usually -- sometimes in death penalty cases, but I

23   don't think it's exclusive, and determine whether or not there

24   was some error in trial and/or actual innocence of the

25   defendant, and they begin to file -- whether it's discovery

1    pleadings or motions for a new trial, depending on new

2    evidence.

3            MR. MELLIN:  Do you know if they advocate on behalf of

4    people on death row?

5            THE JUROR:  I'm certain they do.

6            MR. MELLIN:  Now, the one person that you're talking

7    about in your office who deals with that, who is that person?

8            THE JUROR:  ███████████.

9            MR. MELLIN:  Is she under your control?

10           THE JUROR:  No, she's not even in Worcester.

11           MR. MELLIN:  Have you ever gone to any functions or

12   training concerning Innocence Project?

13           THE JUROR:  No.

14           MR. MELLIN:  Do you have any affiliation with it?

15           THE JUROR:  I don't.

16           MR. MELLIN:  Do you --

17           THE JUROR:  Other than there's somebody in my office

18   who's affiliated with it.

19           MR. MELLIN:  Have you anything on a website that would

20   indicate that you have any affiliation or connection to the

21   Innocence Project?

22           THE JUROR:  No.

23           MR. MELLIN:  Your Honor, may I ask the juror about the

24   issue that was raised previously?

25           THE COURT:  I don't think it's necessary.

 1              MR. MELLIN:  All right.  All right.  Thank you.

 2              MS. CLARKE:  May I?  Just a couple of questions

 3    about --

 4              THE COURT:  Just a couple would be perfect.

 5              MS. CLARKE:  It might have some subparts.

 6              THE COURT:  You might set a good example for somebody

 7    else.

 8              MS. CLARKE:  You know, we don't typically see genocide

 9    cases in the courts in the United States.  And really, this

10    just is sort of a question to flush out whether your views

11    against the death penalty are such that you could never

12    consider it or you could in a given set of circumstances.

13              My name is Judy Clarke.  I'll really sorry.  I'm one

14    of the lawyers for Mr. Tsarnaev, but I was feeling pressured to

15    go fast.

16              THE COURT:  I'm glad.  I just want to make that clear

17    to everybody.

18              MS. CLARKE:  I'm not feeling singled out.

19              THE COURT:  You're not singled out at all.

20              MS. CLARKE:  What the judge will instruct a jury

21    that's just convicted a defendant of a capital crime is that

22    they have an obligation to consider the aggravating factors

23    presented by the government, the mitigating factors presented

24    by the defense, deliberate about them, weigh them, and come to

25    their own individual judgments about whether that justifies a

1   sentence of death.

2          And then -- and I assume from what I'm hearing about

3   you is that you would be able to do that, go through that

4   process of listening to your fellow jurors and weighing

5   aggravation and mitigation.  Is that right?

6          THE JUROR:  I think that's a fair statement.

7          MS. CLARKE:  And that you would then be able to

8   deliberate and debate the pros and cons of imposing a sentence

9   of death or life.  Is that right?

10          THE JUROR:  That's right.

11          MS. CLARKE:  And if in your conscience, your

12  individual conscience, you decided that the death penalty was

13  an appropriate sentence for that given set of facts, the

14  question is could you then actually vote to impose it?

15          THE JUROR:  I think I could.

16          MS. CLARKE:  Are you pretty confident of that answer?

17          THE JUROR:  Yes.

18          MS. CLARKE:  One question -- one area about -- there's

19  been some suggestion that you're a criminal defense lawyer so

20  you're biased toward one side or the other.  As I read your

21  answers to Questions 44 through 46, that was if you have

22  positive feelings one way or the other about defense,

23  prosecutors and law enforcement, you sort of cut across the

24  board:  "I've got friends that are prosecutors; I've got

25  friends that are police officers; I've got friends that are

1  defense lawyers."  Is that a fair assessment?

2          THE JUROR:  That's a fair assessment.  Everybody --

3  having worked in the system for as long as I have, I mean,

4  there are lawyers I think are stellar whether they're

5  prosecutors or defense attorneys.  There are police officers I

6  think are stellar; there are police officers I don't.  But it's

7  really an individual determination on the person's work.

8          MS. CLARKE:  So just given your role as a criminal

9  defense lawyer and the fact that you know people in the FPD's

10 office, would that bias you one way or the other for or against

11 the defense?

12         THE JUROR:  I don't think it would one way or the

13 other.  Again, I think based on the training and experience

14 I've had, I look at what's in front of me and I make a decision

15 based upon what I see.

16         MS. CLARKE:  Okay.  Thank you very much.

17         THE COURT:  Thank you.

18         (The juror is excused.)

19         THE CLERK:  Juror No. 356.

20         THE JURY CLERK:  Juror 356.

21         (The juror enters the courtroom.)

22         THE CLERK:  Ma'am, over here if you would, please.

23 Have a seat.

24         THE JUROR:  Thank you.

25         THE CLERK:  Do me a favor and keep your voice up,

1    speak into the mic so everybody around this table can hear you.

2    And this is adjustable, so you can just move it however you

3    like it.

4              THE COURT:  Good afternoon.

5              THE JUROR:  Good afternoon.

6              THE COURT:  Thanks for your patience.

7              THE JUROR:  Not a problem.

8              THE COURT:  Since you were last here, have you been

9    able to follow the instructions to avoid talking about the

10   substance of the case?

11             THE JUROR:  I would say for the most part.  You know,

12   people asking me, "Are you going?"  And I'd say, "Have to call

13   tomorrow night.  I have to call tomorrow night."

14             THE COURT:  Fair enough.

15             And also avoiding media stories about the case, to the

16   extent you're able to?

17             THE JUROR:  Yes.

18             THE COURT:  If you see them you put them away.

19             THE JUROR:  I walk away.

20             THE COURT:  So that is the questionnaire that you

21   filled out.  We're going to follow up on some of the answers

22   you gave.

23             THE JUROR:  Okay.

24             THE COURT:  Ask you some questions.

25             So first of all, tell us about your employment.

```
 1          THE JUROR:  I work for the Town of Wareham in the

 2   capacity of a secretary for the special education department,

 3   student services.  And I basically do IEPs, do record-keeping,

 4   you know, all the clerical portion.  Keep the records for

 5   state-mandated programs.

 6          THE COURT:  When you filled out the questionnaire, --

 7   this is on page 5, Question 10 -- you indicated that you were

 8   in the middle of a state coordinator review and you had a lot

 9   of responsibility for that and you were concerned about how

10   that might affect -- how this case might affect that.

11          Has that review been completed?

12          THE JUROR:  No, it -- the actual -- they actually are

13   coming in May to the building, but we're getting all the

14   records ready.

15          THE COURT:  I see.  Is that a particular problem for

16   you, if you were on the case?

17          THE JUROR:  Well, I'm one of the people if they call

18   for a certain record, I have to put it all together, probably

19   similar to what your people do here.

20          THE COURT:  Are there other people who could do that

21   if you were absent?

22          THE JUROR:  Right now I'm the only one that does my

23   job, and another girl does her portion of the job.  We have a

24   large population.  Over 20 percent of special ed of our

25   students, so that we would --
```

```
1              THE COURT:  What would that be in real numbers?
2              THE JUROR:  I have 150 kids that I coordinate the
3      paperwork for.
4              THE COURT:  Okay.  When the state does a review like
5      this, what's involved?  I know you're gathering the records.
6              THE JUROR:  I'm gathering the records and making
7      sure --
8              THE COURT:  Someone comes down and reads them.  Is
9      that --
10             THE JUROR:  Yes, over a certain period of time in May.
11     We're getting all the files and everything ready for them for
12     when they come in May.
13             THE COURT:  Can a school district adjust the review
14     date for special circumstances?
15             THE JUROR:  I am not aware of that, no.
16             THE COURT:  So it might affect the performance of
17     those duties, but would it affect you personally in any way?
18     Would you --
19             THE JUROR:  I feel like I have an obligation because
20     it's my files.
21             THE COURT:  What I mean is, would you suffer any loss
22     of pay or anything like that?
23             THE JUROR:  No, sir, I would not.
24             THE COURT:  We asked at the bottom of page 10 and top
25     of page 11 whether you blogged or posted opinions and so on or
```

```
 1    whether you use social media.  I'm looking at 29 on page 10.
 2    You said that you apparently post opinions for retail items or
 3    hotels?
 4              THE JUROR:  Yeah.
 5              THE COURT:  Is that where you're kind of rating --
 6              THE JUROR:  Survey.
 7              THE COURT:  -- a service?
 8              THE JUROR:  Yeah.
 9              THE COURT:  Any other kinds of postings that you do?
10              THE JUROR:  I mean, just posting on other
11    people's -- their posts.  Nothing, you know -- really nothing
12    political or anything.
13              THE COURT:  Nothing about public affairs or anything
14    like that?
15              THE JUROR:  Not that I remember.
16              THE COURT:  Okay.  And in Question 30 you say you use
17    Facebook regularly?
18              THE JUROR:  Yes.
19              THE COURT:  And Instagram and Twitter on occasion?
20              THE JUROR:  Right.
21              THE COURT:  Tell us about the "on occasion."
22              THE JUROR:  I can't tell you the last time I
23    twitted -- tweeted, rather.  Obviously, since I don't know the
24    correct word.  The other, Instagram, you know, just when my
25    kids post pictures, you know, I'll look on that.  But other
```

 1    than that, I don't post pictures on Instagram.

 2           THE COURT:  Okay.  On page 12 we asked about your

 3    relationship with people in various categories of employment.

 4    You had a cousin who was an FBI agent but is now retired, I

 5    guess?

 6           THE JUROR:  He was.

 7           THE COURT:  Where did he work, do you know?

 8           THE JUROR:  He worked in Washington and he was a

 9    supervisor.

10           THE COURT:  Okay.  Was he a first cousin?

11           THE JUROR:  Yes.

12           THE COURT:  And did he have any special area of

13    assignment or anything that you know of, subject matter, drugs,

14    mail fraud?

15           THE JUROR:  I really don't know.  He's much older than

16    I am, so...

17           THE COURT:  Okay.  And I'm looking at page 15,

18    Question 47.  You've served on three juries, it looks like?

19           THE JUROR:  I've been called for four and served on

20    three.

21           THE COURT:  Okay.  One, a civil case settled, I guess,

22    but the two criminal cases went to verdict.  Is that right?

23           THE JUROR:  Yes.

24           THE COURT:  And can you tell us roughly when those

25    were?

```
 1          THE JUROR:  Wareham was probably -- it was March of
 2   2014, so it was probably -- it was 2011.  It was a -- an OUI on
 3   a woman that was stopped by a police officer and --
 4          THE COURT:  But the jury trial was in 2014?  That's
 5   what I'm getting at.  When was the jury trial?
 6          THE JUROR:  In -- you're talking about the second one,
 7   the one that -- in Wareham?
 8          THE COURT:  Yeah, the DUI.  That was in -- you used
 9   two different dates and I wasn't sure which was the trial.
10          THE JUROR:  In 2014 was when I did the Brockton trial.
11          THE COURT:  I see.
12          THE JUROR:  2011 was when I did the Wareham OUI.
13          THE COURT:  How about the Suffolk?
14          THE JUROR:  I want to say the 1980s.
15          THE COURT:  Okay.  So let me ask you to turn to page
16   20.  Actually, you filled this out this morning, right?
17          THE JUROR:  I did.
18          THE COURT:  Because you had a mishap in filling it
19   out, apparently turned two pages at the same time?
20          THE JUROR:  I would think so.
21          THE COURT:  Yeah.  So in Question 77 we asked you
22   whether as a result of things you'd seen or read in the news
23   media or from any other source you formed an opinion that the
24   defendant was guilty, that he was not guilty, that he should
25   receive the death penalty, that he should not receive the death
```

1    penalty, and to each of those you selected the choice "unsure."

2    Can you tell us what you were thinking when you made that

3    choice?

4            THE JUROR:  I think that I -- I don't like to be

5    biased.  I don't have all the facts.  I saw things on TV, but I

6    don't have all the facts, so I have to say I can't form an

7    opinion yes or no.

8            THE COURT:  Okay.  You've been on criminal jury

9    trials.  You understand that anybody who's accused of a crime

10   is presumed to be innocent unless and until the government

11   proves them guilty beyond a reasonable doubt by the proof at

12   trial, right?

13           THE JUROR:  Correct.

14           THE COURT:  And that the task of the jury is to focus

15   on the evidence at trial and make a judgment about the issues

16   based on that and not on ideas from outside the trial?

17           THE JUROR:  Correct.

18           THE COURT:  Are you confident you'd be able to do that

19   in this case?

20           THE JUROR:  I would honestly hope so.

21           THE COURT:  Do you have any reservation or doubt about

22   your ability to do it?

23           THE JUROR:  No.  I feel I'm always fair in life and

24   equitable.

25           THE COURT:  On the next page, 21, you say you bought

1    some Boston Strong items and contributed to victims' funds?

2            THE JUROR:  I did.

3            THE COURT:  Can you tell us what the items were?

4            THE JUROR:  I bought a shirt which the money went

5    -- was contributed to the fund.

6            THE COURT:  So those are the same thing?

7            THE JUROR:  Yes.

8            THE COURT:  In other words, buying the shirt was the

9    contribution?

10            THE JUROR:  Yes.

11            THE COURT:  Was the shirt for yourself?

12            THE JUROR:  Yes.

13            THE COURT:  Do you still have it?

14            THE JUROR:  I do.

15            THE COURT:  Do you wear it?

16            THE JUROR:  No; it's too big.

17            THE COURT:  Question 83 you have a friend whose

18    daughter had a connection through a dance studio, I guess, with

19    Martin Richard's sister?

20            THE JUROR:  Yes.

21            THE COURT:  How do you know about that?  I mean, your

22    friend told you or --

23            THE JUROR:  Yeah.  Well, actually, my cousin works for

24    this woman and she's also a friend, and it was just said in

25    passing back when all this was happening.

```
 1            THE COURT:  Would that have any effect on your ability
 2   to be a fair-minded juror in this case?
 3            THE JUROR:  Honestly, I don't think so.
 4            THE COURT:  Let's turn to page 23.  There's a series
 5   of questions that we ask beginning there about your attitude
 6   towards the death penalty.
 7            THE JUROR:  I'm sorry.  What --
 8            THE COURT:  Page 23.
 9            THE JUROR:  Okay.
10            THE COURT:  And it begins with Question 88 which asks
11   if you have any views on the death penalty in general, what are
12   they, and you said "not sure."
13            THE JUROR:  I have mixed emotions about it.  I'm
14   not -- I don't -- I think that certain cases might need that,
15   other cases might not.  I don't -- I'm not sure on what I feel
16   until I would be posed with the question.
17            THE COURT:  Okay.  Question 89, right below it, we
18   asked you to place yourself on a scale in attitude towards the
19   death penalty from strongly opposed at 1 to strongly favor at
20   10, and you picked 5.  Does that sort of --
21            THE JUROR:  Sums up --
22            THE COURT:  What you just told us?
23            THE JUROR:  Yes.
24            THE COURT:  So let's go to the next page.  Question
25   90.  Here, rather than numbers we ask you to select which of
```

1    the several possible statements you might think was the closest

2    to your views about the death penalty --

3              THE JUROR:  Uh-huh.

4              THE COURT:  -- for someone who was guilty of murder,

5    and you selected C, which is, "I'm opposed to the death penalty

6    but could vote to impose it if I believed that the facts and

7    the law in a particular case called for it."

8              THE JUROR:  Which is basically without the facts I

9    can't make a decision.

10             THE COURT:  Uh-huh.  So you tend to be opposed?

11             THE JUROR:  I suppose it's my Catholic upbringing,

12   would be, but I don't follow all the rules of the faith.

13             THE COURT:  Okay.  You don't have to go into that.

14             (Laughter.)

15             THE COURT:  But what I'm interpreting from the answer

16   is you're opposed to it.  You're not severely opposed to it.

17   So in B, for example, you'd have a difficult time and you're

18   not as ambivalent as perhaps D where you're not for or against.

19   You tend to be opposed, but you could vote for the death

20   penalty if you believed in a particular case the facts and the

21   law supported that decision.  Is that correct?

22             THE JUROR:  Yes, sir.  That's correct.

23             THE COURT:  Okay.  Then on the bottom of page 25,

24   Question 95, asking about if you found this defendant guilty

25   and you decided that the death penalty was the appropriate

1    punishment for him, could you conscientiously vote for the

2    death penalty, and you said you weren't sure.

3            THE JUROR:  Again, until I would -- I mean, it's a

4    supposition.  I can't really say what I'd do until I hear

5    everything.  I honestly -- I don't know what more I can tell

6    you, but that's how I feel.  I don't know.  I'm not sure if I

7    could or I couldn't until that time.

8            THE COURT:  One of the things I think the question is

9    getting at is even if you believed that the death penalty was

10   the right punishment, could you decide to vote for it?  I think

11   that's one of the things it may be asking.

12           THE JUROR:  If I believed it was, yes.

13           THE COURT:  And, of course, the parallel question on

14   the next page at the top was if you found the defendant guilty

15   and decided life imprisonment without the possibility of

16   release was the right punishment, could you conscientiously

17   vote for that penalty.

18           THE JUROR:  Yes.

19           MS. PELLEGRINI:  Good afternoon, ma'am.

20           THE JUROR:  Hi.

21           MS. PELLEGRINI:  My name's Nadine Pellegrini -- and my

22   microphone is turned off.  Now it's turned on.  And I'm a

23   member of the prosecution team.  I just want to follow up on a

24   couple of questions.

25           THE JUROR:  Certainly.

```
 1          MS. PELLEGRINI:  So I might have missed this.  When
 2     the judge was asking you about your job, you indicated that,
 3     you know, you thought -- you had an obligation to do your job,
 4     when you were talking about the review.  Okay.
 5          So I just want to make sure I'm getting this correct.
 6     So when you said in response to one of the questions, I think
 7     it was when you got your summons, that you -- yeah, it's
 8     Question No. 75, the end of it, "How long it would go in order
 9     to prepare people for how long I would possibly be out of
10     work."  So that's possibly be out of work just for that period
11     of time, not out of work totally?
12          THE JUROR:  Right.
13          MS. PELLEGRINI:  Right?
14          THE JUROR:  Correct.
15          MS. PELLEGRINI:  So my question is, you know, when
16     you're a juror, what we ask of jurors is that they give their
17     full attention to what's going on in the courtroom, and other
18     things, just basically, there's not room or time for them.  So
19     would that be a problem for you?  Would you be thinking about,
20     Oh, my God, are they doing it the right way, are they doing it
21     the way I would do it?
22          THE JUROR:  I probably -- I'm a dedicated employee, so
23     probably what will happen when I leave here at night, I will
24     pick up work to work at home and then drop it off at a friend's
25     house on my way to have it brought back.
```

1          MS. PELLEGRINI:  Would you do that every day?

2          THE JUROR:  Almost every day.  And on Fridays I would

3     be at work.

4          MS. PELLEGRINI:  All right.  You're dedicated.

5          So just a couple of other questions.  And maybe it was

6     the judge's questioning of you, right at the end here when we

7     were talking about the Question No. 95 where you had marked

8     that you were not sure and you said "I don't know, I'm not sure

9     I could," and then the judge explained a couple of things to

10    you, and then you said, "If I believed it, I think I could,"

11    what was the change?

12         THE JUROR:  Maybe when I was filling this out -- I

13    really can't tell you.  I think that it -- depending on the

14    facts of everything, I always try to be honest and equitable.

15    And by saying "unsure," I am being honest that I think that I

16    really truly believe that I can do what is necessary.  I'm not

17    going to say that it wouldn't be stressful either way, but I

18    think that's what I'm trying to say, that I can honestly -- I

19    think I can honestly do the job.  I think at the point I wasn't

20    sure.  Am I?  I mean, when you're coming into jury duty -- it's

21    nerve-racking to come, and I have experience.  And so I think

22    that that's probably -- answering this questionnaire was

23    stressful too.

24         MS. PELLEGRINI:  Okay.  So, again, when you get to be

25    a juror, as you know, you -- one of the things you're called

```
 1   upon to do is deliberate with your fellow jurors.  Would you
 2   find that stressful if you were at the point where you're all
 3   talking about the penalty?
 4           THE JUROR:  I would have to give the penalty
 5   the -- after the instructions from the judge, I would follow
 6   the instructions from the judge and then do the -- you know, my
 7   opinion of what I believe at that point.
 8           MS. PELLEGRINI:  Right.  Perhaps --
 9           THE JUROR:  And, yes, I would think that I could -- if
10   I believe that that's from his instructions what I need to do,
11   that would be what I would need to do.
12           MS. PELLEGRINI:  I guess what I'm getting at a little
13   bit more is could you -- would you feel comfortable discussing
14   how you feel with your fellow jurors?  You have to deliberate.
15   Would that be stressful for you or do you feel you could also
16   do that?  I know you've done it, but now we're talking about,
17   you know, the possibility of --
18           MR. BRUCK:  Objection.  We've already covered this.
19           THE COURT:  Yeah, I think we've covered it.  I think
20   we can move on.
21           MS. PELLEGRINI:  Thank you, ma'am.
22           THE COURT:  That's it?
23           Mr. Bruck?
24           MR. BRUCK:  Good afternoon, ma'am.  I'm David Bruck.
25   I'm one of Jahar Tsarnaev's attorneys.  And you have answered
```



1    all of our questions.  I don't have any more for you.

2              THE JUROR:  Thank you very much.

3              THE COURT:  Thank you.





16    (The juror is excused.)

17    THE COURT:  We can go back on.

18    THE CLERK:  Audio on.

19    MR. DOREAU:  Audio on.

20    (In open court:)

21    THE COURT:  We're ready.

22    THE CLERK:  358.

```
 1  ████████████████████████████████████████

 2  ████████████████████████████████████████████

 3  ███

 4          THE CLERK:  Juror 358.

 5          THE JURY CLERK:  Juror 358.

 6          (The juror enters the courtroom.)

 7          THE CLERK:  Sir, over here, if you would.  Have a

 8  seat.

 9          THE JUROR:  Thank you.

10          THE CLERK:  Thank you.  And do me a favor, keep your

11  voice up, speak into the mic so everyone can hear you, okay?

12          THE JUROR:  Close to the mic?

13          THE CLERK:  Yes.

14          THE COURT:  Good afternoon.

15          THE JUROR:  Good afternoon.

16          THE COURT:  Since you were here last, have you been

17  able to follow the instructions not to discuss the substance of

18  the case with anyone?

19          THE JUROR:  Yes, sir.

20          THE COURT:  And also, as much as possible to avoid

21  media about the case?

22          THE JUROR:  Yes, sir.

23          THE COURT:  So that's the questionnaire you filled out

24  in front of you.  We'll make reference to it.

25          I want to first start with you had a fairly long
```

 1   answer to the question about the schedule in the case.  If you

 2   would turn to page 5 and Question 10, if that would refresh

 3   your recollection as to what you wrote.

 4        THE JUROR:  May I also add to this that I booked my

 5   trip to the Philippines to meet my future in-laws in March?  I

 6   would have written it down, but I hadn't booked that flight yet

 7   when I showed up for the questionnaire, if I can add this to

 8   the information.

 9        THE COURT:  Let's talk about the --

10        THE JUROR:  Okay.

11        THE COURT:  What you have there.  Tell us what you

12   think the workplace issue is; what your work issue is.

13        THE JUROR:  I'm in a situation in my career that a lot

14   of things are happening.  And I'm an analyst.  I'm a senior

15   analyst, and I'm involved in very important projects.  And I'm

16   helping out senior management, so being away for three to five

17   months would be a very big disruption at this point in my

18   career because senior management, they want to get things done.

19   And me being away from it, it's sort of being away from the

20   action and not being on the front line itself of what's going

21   on.  I do risk management at a major financial institution in

22   Boston.  So that's really what the situation is.

23        THE COURT:  We tried to structure the schedule nine to

24   four, Monday to Thursday, to afford people late in the day or

25   perhaps Fridays to get back to the office and do things, catch

1    up.  It wouldn't be 100 percent, but it might ameliorate the

2    difficulty to some degree.  Would that help?

3              THE JUROR:  Honestly, sir, it wouldn't.  I'm perfectly

4    honest.  It wouldn't because we are putting out fires on a

5    daily basis.  The regulatory environment right now is enhanced,

6    and we have a lot of work to do.  And that's the situation.

7              THE COURT:  So tell me about the trip.

8              THE JUROR:  I'm going to the Philippines to meet my

9    future in-laws.  I'm flying out on the 26th of March.  My

10   future fiancée.  I haven't proposed to her yet, but we've

11   talked about it.

12             MS. CLARKE:  Oh, let's talk about that.

13             THE JUROR:  She's going to be there first.  She's

14   flying there first, she's going there, and then I'm going two

15   weeks later to meet her family.  We've only Skyped with her

16   family so far.

17             MS. CLARKE:  I think the parties would wish him well

18   and good luck.

19             THE JUROR:  Thank you.

20             THE COURT:  I hope she says yes.

21             MS. CLARKE:  Yes.

22             THE JUROR:  I hope so too.

23             THE CLERK:  Thank you.

24             (The juror is excused.)

25             THE COURT:  All right.  So hold on one minute.

1           THE CLERK:  Hold off on 359.

2           THE COURT:  Is there anything more before we bring her

3   in?  This is the social media.

4           MR. CHAKRAVARTY:  Social media.

5           THE COURT:  Let me just take a peek.

6           MS. CONRAD:  Can I just -- I don't know if the

7   government already had this, but if they have anything other

8   than -- I'm getting mixed answers over here, actually, about

9   that.  Whether -- but if they have something that we don't

10  have, I would ask that we be provided with that.

11          MR. CHAKRAVARTY:  No.

12          (Pause.)

13          THE COURT:  So I've looked at it very quickly because

14  there's a lot of things here.  It does seem to be in the time

15  period of April 15th through the 19th.

16          MS. CONRAD:  She also posted on Twitter in April 2014

17  on the occasion of the opening day for the Red Sox season.  I

18  sort of -- you know, Boston Strong heroes of Boston and so

19  forth.  I think, you know, given her expression, she should

20  be --

21          MS. CLARKE:  I think we.

22          MS. CONRAD:  -- disqualified.

23          MR. MELLIN:  Your Honor, I think we agree.  Without

24  establishing a trend, we'll agree as to this particular juror

25  that she should be excused.

```
 1              THE COURT:  Okay.
 2              We'll proceed to 360.
 3              THE CLERK:  Juror No. 360.
 4              THE JURY CLERK:  Juror 360.
 5              (The juror enters the courtroom.)
 6              THE CLERK:  Ma'am, over here, please.  Have a seat.
 7    And do me a favor and keep your voice up and speak into the mic
 8    so everyone at the table can hear you.
 9              THE JUROR:  All right.
10              THE COURT:  Good afternoon.
11              THE JUROR:  Good afternoon.
12              THE COURT:  Since you were here to fill out the
13    questionnaire, have you been able to follow the instruction to
14    avoid talking about the substance of the case with anybody?
15              THE JUROR:  Yeah, I haven't talked about anything in
16    particular, but people do know that I'm --
17              THE COURT:  Sure.  Right.  They know where you are.
18    You have to tell people where you're going, obviously, but the
19    substance and the merits of the case you haven't talked about?
20              THE JUROR:  Yeah, no.
21              THE COURT:  And also, as best you could, avoid media
22    stories about the case?
23              THE JUROR:  Yeah, I'm pretty good about that.
24              THE COURT:  So let's talk about your employment.  You
25    are an art teacher.  Is that a full-time position?
```

1          THE JUROR:  No.  So I am a part-time art teacher and

2     then I go to an after-school job.  So I have two jobs.

3          THE COURT:  What does "part time" mean in terms of the

4     art teacher?  The first job --

5          THE JUROR:  I'm a .2, so it means I go in in the

6     morning.  So I'll go there first thing in the morning and then

7     I have a break, and then I go in for about five hours to my

8     second job.

9          THE COURT:  Okay.  I want to isolate the two.  I want

10    to understand the day.  So for the school job in the morning,

11    the part where you said it was a part-time art teacher job --

12         THE JUROR:  Yes.

13         THE COURT:  -- what is your schedule for that on a

14    weekly basis?

15         THE JUROR:  I work there from about like the start of

16    school till about nine, nine-thirty every day, Monday through

17    Friday.

18         THE COURT:  All right.  And then after that you go to

19    the other school, the after-school program?

20         THE JUROR:  Yes.

21         THE COURT:  And when does that begin?

22         THE JUROR:  That starts at one.

23         THE COURT:  And goes till, what, six?

24         THE JUROR:  Six, yes.  Generally.  Sometimes it's a

25    little bit different, but...

1           THE COURT:  Right.  Now, how are you compensated for

2   each of these positions?

3           THE JUROR:  Well, for my art teacher job I'm salary,

4   and for my after-school job I'm hourly.

5           THE COURT:  Okay.  And you do this Monday through

6   Friday?

7           THE JUROR:  Yes.

8           THE COURT:  So it sounds like -- I guess -- I may be

9   wrong about this, but it sounds like you may get more

10  compensation from your afternoon job than from the morning job?

11          THE JUROR:  Yeah, a little bit more.  Yeah.

12          THE COURT:  And it's that job that if you didn't work,

13  you wouldn't get paid?

14          THE JUROR:  Probably not.  I'm guessing that I

15  wouldn't get paid for that job.

16          THE COURT:  Well, if you weren't -- if you're on a

17  case and your normal time would be one to six, say, you

18  wouldn't -- you know, you were here until four, I mean, that

19  would be, I imagine, a problem.  So four days a week, would

20  that be four days out of your earned income for that week?

21          THE JUROR:  If it was Monday through Thursday, it

22  would be four days.  If it was five days, I work there five

23  days a week.

24          THE COURT:  No, I understand.

25          THE JUROR:  Okay.

1          THE COURT:  Having Friday off doesn't help you that

2     much.  Is that right?

3          THE JUROR:  Working one day a week, no, they would

4     probably need to find somebody else.

5          THE COURT:  Okay.  I don't think we're going to ask

6     you to do this.

7          THE JUROR:  Oh, great.  Thanks.

8          THE COURT:  Just leave it there.

9          THE CLERK:  Just follow that gentleman over there,

10    please.

11          (The juror is excused.)

12    

13    

14    

15    

16    

17    

18    

19    

20    

21    

22    

23    

24    

25

1 

2 

3 

4 

5          THE CLERK:  Ready?

6          THE COURT:  Yeah.

7          THE CLERK:  Juror No. 361.

8          THE JURY CLERK:  Juror 361.

9          MS. CLARKE:  Can I just have one moment?

10         THE CLERK:  Sir, come on here, please.

11         THE COURT:  Hold up for just one second.

12         THE CLERK:  I'm sorry.  Can you just go back there for

13   one second, sir?

14         (Pause.)

15         MS. CLARKE:  Your Honor, I think the parties are fine

16   with agreements on the last two, and I can --

17         THE COURT:  Hardships or a variety of things?

18         MS. CLARKE:  A variety of things.

19         THE COURT:  Okay.

20         MS. CLARKE:  I can explain it a little bit more.

21         THE COURT:  No, I don't -- I think -- I saw a hardship

22   issue with both that might need exploration.  I thought we

23   might need to explore that, but if you have other reasons that

24   you can concur on, I'll accept that.

25         THE CLERK:  So they're both gone?

1        THE COURT:  Yeah.

2        Okay.  So we will take pause.  Is 4:30 okay --

3        MS. CLARKE:  That would be great.

4        THE COURT:  -- to come back?  Thank you.

5        (The Court exits the courtroom and there is a recess

6    in the proceedings at 4:08 p.m.)

7        (The Court enters the courtroom at 4:38 p.m.)

8        (Discussion at sidebar and out of the hearing of the

9    public:)

10        THE COURT:  Okay.  So today's business.  Number 340?

11        MR. CHAKRAVARTY:  No motion, your Honor.

12        MS. CLARKE:  No motion.

13        THE COURT:  342 we excused -- you know, designated for

14    excuse, as 343.

15        MS. CLARKE:  Yes.

16        THE COURT:  Which brings us to 345.

17        MS. CLARKE:  There's a defense motion to strike, your

18    Honor.  The Court probably remembers pretty well there's sort

19    of an overall package plus individual reasons to excuse her for

20    cause.  This was the woman that said 9/E on the death penalty

21    views and wrote in her questionnaire that she was looking for

22    100 percent proof, but once she got the 100 percent proof, she

23    was pretty much at automatic death penalty on intentional

24    murder.

25        She went sort of round with us about, "Well, if you

1   can explain the back story" -- sort of she was seeking for an

2   explanation of the intent, it seemed to me, as she was trying

3   to talk to us.  You know, "If I know" -- you know, she talked

4   about driving the car into the child, but if you were doing it

5   because you'd been taken hostage -- you know, she's looking to

6   mitigate the intent; not looking broader at mitigation.  And

7   that's essentially a *Lockett* violation.  *Tennard v. Dretke,* the

8   Supreme Court said, Look, it's unconstitutional to require a

9   link between mitigation and the offense.

10          It seemed very clear:  "I would want to know what

11   caused the intent; I would need to know why he did what he did;

12   I would want to know the intention," which is where she was

13   really fixated.  And she did acknowledge a very strong bias in

14   favor of the death penalty.  And so we think she should go on

15   her substantially impaired -- on that issue.

16          She also has connections and had talked about the

17   defendant's family with Dr. Russell.  And Dr. Russell is the

18   father of Kathryn Russell who is the widow now of Tamerlan.

19   And so they had actually had conversations about -- it sounds

20   like, about Tamerlan.  How that cuts, who knows.  But the thing

21   is it's a juror who has talked about and has connections to a

22   relative of the guy on trial which seems too close -- way too

23   close for comfort.

24          She also went to the funeral for one of the victims.

25   I know she explained it was the Westboro Baptist Church folks,

 1    but -- and she said she didn't know anything about Krystle

 2    Campbell, but -- and we haven't had a chance to really dig deep

 3    enough, but it looks like that she liked Facebook friends who

 4    wrote about how close they were to Krystle Campbell, and

 5    Krystle Campbell and her family, and talking about what a

 6    beautiful woman she was.  And it just sounds like there's a

 7    little closer connection and knowledge of Krystle Campbell than

 8    the juror acknowledged.

 9         So sort of that whole package, we think that she needs

10    to go for cause.

11         MR. CHAKRAVARTY:  The government opposes the motion,

12    your Honor.  On the death penalty question, it's clear that she

13    doesn't know what the law is around the death penalty.  She

14    hasn't been instructed; she doesn't know the calculus.  In her

15    understanding, if somebody has been convicted of intentional

16    murder and the law calls for the death penalty, it was her

17    understanding, as she completed the questionnaire and as she

18    first sat down, that meant that, okay, that means now that my

19    duty is to give the death penalty.

20         When it was made clear to her that that isn't, in

21    fact, the law, and that at that second stage there would be a

22    weighing of aggravating and mitigating factors, she couldn't be

23    more clear that it doesn't close the question as just whether

24    somebody had committed the crime.  She was one of those jurors

25    who made it seem like it was an automatic consequence of being

1    convicted.

2          She said she wanted to know all the circumstances.

3    It's true she couched it in the terms of intent because that is

4    the only thing that she was aware of.  She's not -- she hasn't

5    been instructed on other types of mitigation that may go to

6    something else aside from intent.  And although Ms. Clarke was

7    very careful to avoid explaining some of those other factors,

8    the one thing that came out clear when she understood that was,

9    "I would" -- "I would not vote for the death penalty" unless

10   she was sure of all the circumstances, and that it does not

11   close the question "I would want to know the circumstances."

12         I think from her body language, from her clear and

13   logical evolution over time as we were questioning her on this

14   point, the reason it went as long as it did, I would suggest,

15   is not because she didn't understand what we were asking her;

16   it was because each side was trying to bring out a different

17   aspect of it, including, in some respects, when Ms. Clarke

18   would finish some of her answers to suggest what the next

19   question would be.

20         When she had a chance to answer for herself, she said,

21   "I would want to see everything."  And I'd suggest to you

22   that's not suggestive of mitigation impairment.  She just

23   hasn't been presented with either what a mitigation factor is

24   nor the types of information that could validly be considered

25   as mitigation.

1        With regard to the Warren Russell connection, this, I

2   submit, is a red herring.  First, he's not a witness in the

3   case.  His credibility -- and the series of questions are all

4   based on his credibility and whether that would influence her

5   assessment of the evidence in the case.  And he's not

6   presenting evidence in the case.

7        She made clear that her relationship with him was

8   peripheral at best.  Occasionally he would come and work at the

9   clinic that she worked in, and it was years before the events

10  in question.  I'd suggest there's nothing to suggest that she

11  would be somehow disposed to adopt any theory of the case.  And

12  if there was any, then it would favor the defense, not to the

13  government.  But I submit to you there's no evidence that she

14  would be influenced at all one way or the other.

15       The final point is on the -- Krystle Campbell's

16  funeral.  Her answer as to why she was even there could not be

17  more clear and disconnected from the facts in the case.  She is

18  adamantly opposed to the Westboro Baptist Church, which is an

19  activist church with a number of issues which are often very

20  controversial, and she was not allowing that group to destroy

21  the sanctity of, in her words, any funeral.  It was wherever

22  she can oppose the evil that they -- of that evil organization,

23  she will try to do it.  It's completely unconnected to the

24  case.

25       This constellation of factors related to this very

1    opinionated and outspoken, I submit, credible juror candidate

2    doesn't make it -- her any closer to this case than any of

3    these other jurors that we've seen.

4         THE COURT:  I was satisfied with her answers on the

5    death penalty questions.  I think that she was confused,

6    understandably.  She was being asked, probably by everybody,

7    including me, to understand legal concepts she was hearing for

8    the first time.  And so her confusion over 100 percent and

9    whether that made it automatic was a product of her being

10   unfamiliar with the concepts.  And I'm comfortable with it.

11        My general impression of her was of a very sort of

12   self-possessed person who knew who she was and knew how she

13   thought about things, definitely more inclined to the death

14   penalty than otherwise.  But I think in the end, her answers

15   were satisfactory that she could meaningfully consider life

16   imprisonment as an alternative depending on the facts.

17        I mean, she dwelled a good bit on the -- her

18   speculation about what might be mitigating factors.  They

19   didn't match perhaps exactly what she was being asked about,

20   and it's not clear that Ms. Clarke and she were on the same

21   wavelength as to what was a "why" question or not.  I think

22   they had different definitions for that.  But I think she could

23   conscientiously do that.

24        I guess what troubles me is the Russell connection.

25   She does have outside-the-jury knowledge of the family in some

1    respect, and I think that without trying to make too much of

2    it, it's just a point of contact that I think is unnecessary.

3    So I think I would excuse her for that basis.

4              346, 348 were resolved.

5              349?

6              MS. CLARKE:  No motion.

7              MR. CHAKRAVARTY:  No motion.

8              THE COURT:  350?

9              MR. BRUCK:  Oh, I'm sorry.  349 -- oh, excuse me.  350

10   is a defense motion.  This is on two grounds.  One is hardship.

11   This was the juror -- the exterminator who called and said,

12   "We'll take it day by day."  I think by then he was a little

13   too dug in to back out, but he never explained how he and his

14   family were going to survive for four months without his

15   income.

16              And before that -- we got to that point, I mean, he

17   sort of said, "Well, we'll manage," but I think applying the

18   general rule that this Court has applied in similarly situated

19   jurors, this is -- it's just not going to work for him, whether

20   he's willing to suck it up for now and take it day by day, as

21   he said, or not.  So I think he should be treated consistently

22   with other jurors that the Court has excused who were favored

23   by one side or the other.

24              In addition, I realize this juror gave qualifying

25   answers about the death penalty, but for a long time he

 1    suggested that he had no opinion whatsoever about the death

 2    penalty in this case.  And eventually, with a lot of probing,

 3    it turned out that he had a humdinger of an opinion about the

 4    death penalty in this case, which is that this is the sort of

 5    case for which it should be imposed.  It was like cases in

 6    Puerto Rico in the '90s, which he said Puerto Rico was turned

 7    upside-down by violent crime.  I think many of us know what he

 8    was referring to.  And there were cases there that deserved it,

 9    and this was like that.  And then he rattled off a series of

10    attributes about this case that made it the sort of case

11    where -- and really the critical language was -- "where you

12    have to send a message."

13         Now, "sending a message" is a consideration that is

14    divorced from the facts of the case, or certainly divorced from

15    mitigation.  Because no matter what the mitigating factors are,

16    if the aggravating factors are as he described them -- the loss

17    of innocent lives, a total disregard for innocent life, and he

18    listed several others that the Court will recall -- and your

19    objective is to send a message, then you go ahead and send it

20    and mitigation really doesn't matter.  You're using the

21    defendant as a billboard.

22         Now, in the end he backed up in a very mechanical

23    fashion and said, "Well, but of course I would have to hear the

24    evidence."  But he really tipped his hand.  And I think it was

25    especially revealing that until that probe, you wouldn't guess

1    that he had any opinion about the case at all, and then it came

2    gushing out.  And it was very strong.

3           Now, when you take both of these factors together --

4    he seems like a great guy.  I mean, I don't want to speak about

5    him in a way that's disrespectful.  He's very impressive in a

6    lot of respects.  But that isn't what qualifying someone for

7    jury service is about.  And it seems quite clear that between

8    these two factors, this is a juror that the Court ought not

9    find to be qualified.

10           MR. MELLIN:  Your Honor, we disagree.  He expressed no

11    hardship.  He was asked repeatedly about that.  He told

12    Mr. Bruck that the job is not an obstacle.  And he said it

13    would be inconvenient but he could get by.  And then he made

14    reference to another time in his life when he was out of work

15    and was able to get by.  So he didn't express a hardship or say

16    it was a financial hardship that will create a problem for his

17    family.

18           Regarding the death penalty questions, just on the

19    form itself he said -- his answers to Questions 95 and 96, he

20    said yes to both, that he could conscientiously vote for the

21    death penalty, he could also conscientiously vote for life

22    imprisonment.  He said very clearly that the death penalty is

23    not appropriate or not something he would impose in every case,

24    and he said not everyone who is guilty should get the death

25    penalty.

1          When he was pressed repeatedly for an opinion, he gave

2     an opinion that was completely appropriate for a layperson to

3     give.  Counsel's asking a layperson for a lay opinion about the

4     death penalty, and he goes and lists a number of factors,

5     frankly, that are aggravating factors that would come into play

6     in this case.  So there was nothing inappropriate about his

7     answers concerning about the death penalty.  He followed that

8     up by saying that in this case, though, he has no opinion and

9     will wait to hear the evidence before he forms his opinion.

10          I believe he's a perfectly acceptable juror.

11          THE COURT:  I agree.  I think he's -- you know, on a

12     hardship, we pushed him a little bit and he didn't claim the

13     hardship.  In the end the juror has to be the temperature gauge

14     on this.  I think it's appropriate to test it and push him a

15     little bit, but he didn't seem fazed.  If he wants to, you

16     know, accept that burden, whatever it is, it's hard to tell.

17     He knows the stakes.  So, you know, I'll contrast it with

18     somebody later on when we did bring it up, she took the

19     opportunity to express why it was a hardship for her.  That's

20     the art teacher, for example.  So there's a difference in the

21     way people respond.

22          So -- and as to the death penalty, I thought he was

23     satisfactory.  You know, in this questioning they get pulled

24     over to this side of the ring and then they go back to the

25     other side of the ring.  But I think in the end, he appears to

1    me to be a very thoughtful man, may have strong views about

2    various things, but I think one of his views was that he would

3    make the decision he thought he should make after he heard all

4    the evidence, and I think that's satisfactory.

5              Number 351 was --

6              MS. CLARKE:  That's a --

7              MR. MELLIN:  Government-challenged without opposition.

8              THE COURT:  Yeah, I think that was fairly obvious.

9              352?

10             MS. PELLEGRINI:  352, your Honor, is a government

11   motion.  Once again, you know, if this process has taught us

12   anything, it's that the last answer to the last question is not

13   what controls.  From the very beginning with this juror's

14   questionnaire, starting with Question 88, her inability to

15   consider -- substantially consider the death penalty is quite

16   clear.  Her answer to 88 was it's something to be applied in

17   every case, if ever, that has to do with murder.

18             In 89 she circled 1.  And what I find interesting

19   about 89 is in listening to the various questions and answers

20   that have gone on prior to this, you know, when a person is

21   somewhere in the middle, 3, 4 and 5 the Court sometimes

22   explains a little bit where it is on the spectrum.  But 1 says

23   right here in the question, "Reflects a belief that the death

24   penalty should never be imposed," and that's what she circled.

25   In 90 she circled A.  "I'm opposed to the death penalty and

 1   will never vote to impose it in any case no matter what the

 2   facts."

 3          Unprompted, her views on the death penalty in

 4   circumstances in which she might consider it, she said, "I

 5   tried to think of could there ever be a circumstance where I

 6   would?  I can come up with things but they're very remote" --

 7   "remote" being a term she used several times -- "someone

 8   convicted and could escape, considered a danger to their fellow

 9   inmates and prison guards."

10          She continued with that and she said, "I could hardly

11   come up with a circumstance that I could do it, it's so remote.

12   And it's a remote possibility.  It's hard for me to consider."

13   When Mr. Bruck asked her whether she could remain open-minded,

14   it's not exactly the same as whether you can substantially

15   consider the aggravating and mitigating factors.

16          No one likes to think of themselves as being unable to

17   be open-minded, and she did answer yes, but I think that it's

18   clear that she's open-minded within a very limited ability that

19   she has set for herself, and she is, in fact, substantially

20   impaired.  And that's our motion.

21          MR. BRUCK:  Well, we certainly don't agree with that.

22   This was -- the Court has qualified jurors at the other end of

23   the spectrum who were unable to think of a single concrete

24   example of when they would not impose the death penalty, as I

25   recall.  And that by itself isn't disqualifying provided the

1    juror can say that they would be open-minded and listen to all

2    the evidence and make their decision.  This juror is at the

3    skeptical or anti-death penalty end of the spectrum but well

4    within the range that *Witherspoon* says is protected from

5    disqualification by the Constitution.

6         She gave two examples of the kinds of facts in which

7    she thought it was warranted.  And the critical thing, I think

8    she was asked, "And could there be things you haven't thought

9    of?" and she said "yes."  "And would you keep an open mind and

10   see if those or other situations were established in the

11   evidence?"  And she said "yes."

12        She's very firm that if she found the death penalty to

13   be warranted, she would sign.  There was not any hesitation.

14   She would vote for it.  That's not the issue.  The issue is

15   that the -- apparently that the government feels --

16        She also said she -- she gave this thought -- she

17   thought about it more, as I recall, after she filled out the

18   form, like a lot of jurors have.  And they've gone in both

19   directions.  But this is a juror who clearly is very thoughtful

20   about it and is open to having the government demonstrate that

21   this is an appropriate case.

22        She will be guided by the evidence and she will vote

23   either way.  And I just don't think there's any merit to the

24   notion that she is substantially impaired.  And we think that

25   it would violate *Wainwright v. Witt* to so rule.

1        THE COURT:  I don't think she should be struck.  I

2   think she should be in the pool.  She is clearly at one end of

3   the spectrum, but I was influenced in part by her answer that

4   she had a couple of examples and was open to more if you can

5   present any.  But I was also just sort of evaluating her by how

6   she presented herself.  And she's obviously a very intelligent,

7   very thoughtful person.  She seems kind of disciplined.  And,

8   of course, that's one of the qualities that this project calls

9   upon, is discipline in jurors.

10       So I think she can be thoughtful about it.  She'd

11  be -- will take some persuasion, obviously, but I think she

12  fits within the range of acceptable jurors.

13       353, 354 were agreed, I believe.

14       And now we have 355.

15       MR. MELLIN:  And, your Honor, the government moves to

16  strike this juror for two reasons, for his bias and also for

17  his death penalty answers.  He is a person who admitted that

18  he's been a criminal defense attorney since 1992.  So for 22

19  years his concentration of work has been representing criminal

20  defendants.  He admitted that he remembered meeting Ms. Conrad

21  and Mr. Watkins.  I think just on its face that is a sufficient

22  bias that no one would be able to overcome given 22 years of

23  work.

24       In addition, I asked him about the Innocence Project.

25  And I have a piece of paper that I think that Mr. Chakravarty

1    has but he has not handed it over.

2              MR. CHAKRAVARTY:  Sorry.

3              MR. MELLIN:  And I asked him about the Innocence

4    Project, and he indicated -- or tried to claim kind of no real

5    connection to it, but even on his LinkedIn page he has a group

6    that is the Innocence Project.  And if the Court goes on to the

7    next page, which is just a short synopsis of what the Innocence

8    Project is, it says, "The Innocence Project supports a

9    moratorium on capital punishment while the causes of wrongful

10   convictions are fully identified and remedied.  This has been

11   the Innocence Project's position since our inception in 1992,

12   and it is the same position that the American Bar Association

13   adopted more than a decade ago."

14             THE COURT:  So I'm trying to navigate what you've

15   given me.  I see.  Is that what you're talking about?

16             MR. MELLIN:  On the second page.  Yes, your Honor.

17             THE COURT:  And that takes you to the single page?

18             MR. MELLIN:  That takes you to the Innocence Project's

19   page.

20             MS. CONRAD:  Well, I'm sorry --

21             MS. PELLEGRINI:  We're not done yet.

22             THE COURT:  Let him finish.  Let him finish.

23             MR. MELLIN:  That's the issue of bias, your Honor.  I

24   don't even think the Court, frankly, needs this information.  I

25   think that someone who is a criminal defense attorney for over

1    22 years, they're biased in a case like this.

2         Then I've gone on to discuss his position on the death

3    penalty where he said that even having a substantial amount of

4    time to think about it -- he is a criminal defense attorney.

5    He knows what the process is.  He understood at the time that

6    he fills out this jury questionnaire that he's going to be

7    brought back and asked questions about his questionnaire.  And

8    as he sat here today the only time that he said he could think

9    that he could impose the death penalty would be in a case of

10   genocide.

11        There are cases that say that that -- in and of itself

12   if that is the only position that you're espousing, that that

13   is the only time that you can think of the use of the death

14   penalty, that that is a reason to excuse a juror.  I cite

15   specifically to the *Antwine v. Delo*.  That's an Eighth Circuit

16   opinion, 54 F.3d 1357.  There the juror talked about Adolf

17   Hitler, that the only time the juror could see imposing the

18   death penalty was Adolf Hitler.

19        There's another opinion from the Ninth Circuit, *United

20   States versus Mitchell*, 502 F.3d 931.  That is a case where the

21   juror said that the death penalty is only appropriate for

22   murderers like Charles Manson or Ted Bundy.  This man is even

23   well beyond Ted Bundy or Charles Manson.  He is saying there

24   has to be genocide.

25        So I think given his answers in court today, that he

1    is substantially impaired.

2          MS. CLARKE:  I know Miss Conrad is going to run over

3    me.  I might as well --

4          MS. CONRAD:  Can I just make a couple of points and

5    then let her make a couple of points?  I just want to address

6    this professional aspect.

7          THE COURT:  All right.  Go ahead.

8          MS. CONRAD:  I don't remember meeting the man.  He has

9    a look that's vaguely familiar.  I mean, these Massachusetts

10   Association of Criminal Defense Lawyers -- I've been a member

11   over 20 years.  They're big, twice-yearly dinners, meetings.

12   Somebody's having a conversation.  I walk up; they say, "Do you

13   know so-and-so?"  They introduce us.  We walk away.  That's it.

14   I don't see how that, which occurred sometime in the last 22

15   years, means that he's biased.

16         And I just want to say, I am trying desperately, since

17   the government didn't see fit to bring this up about the

18   LinkedIn page before, to bring up his LinkedIn page.  I can't.

19   It looks like they didn't go to his actual profile.  So I just

20   want to correct what I think is a misimpression that somehow

21   this link on his page, if it is a link to the Innocence

22   Project, takes you to this page on the death penalty.  I assume

23   that it does not take you to this page on the death penalty; it

24   takes you to the home page, presumably, for the Innocence

25   Project.  And of course the Innocence Project is primarily an

1    organization that tries to make sure that people are not

2    wrongfully convicted.

3           That's all I have to say, and I'll let Ms. Clarke deal

4    with the death penalty issue which I'm not really that

5    qualified to do.

6           MS. CLARKE:  Well, you know, I think █████████

7    tried to tell us that he was not comfortable with the death

8    penalty but he could impose it.  He was hit with the question

9    of, "Well, tell us a time that you could," and he said, "Well,

10   genocide is a time," but then when he stepped back and talked

11   about whether he could weigh aggravation and mitigation and

12   come to a conclusion with other jurors and make a decision in a

13   given set of facts, he said he could do it.

14          He's friends with prosecutors.  He's friends with law

15   enforcement officers.  He's friends with defense lawyers.  He's

16   been a defense lawyer.  It's a little bit strange to listen to

17   the prosecution talking about admitting to being a criminal

18   defense lawyer.  I never sort of had that as something to deal

19   with.  But at any rate, I think he's across the board as fair

20   as they can come.

21          I know that the Court has ruled previously with regard

22   to a criminal defense lawyer, that you were concerned about the

23   life imprisonment with one side or the other, but he

24   essentially sounds aligned with all the sides.  He's been

25   working as a criminal defense lawyer.  His death penalty views

1    seem to fit right within what we're looking for.

2         THE COURT:  So this really is not -- I don't approach

3    this at all on a categorical way.  Everybody is different, and

4    the value of this process is you can sit here five feet away

5    and you can sense the being.  And I -- my sense of him is

6    different from my sense of the last juror that we just

7    qualified who I thought is open to the possibility of the death

8    penalty in a way that I do not think that ██████████ is.

9         I agree that his -- the zone of possibility is so

10   narrow, I think you would have to regard it as substantially

11   impaired, this is the genocide issue, in contrast to her -- the

12   other juror's examples were more possible, I guess, in the

13   world that we'll be operating in.  So I think he's not

14   qualified under the death penalty question.

15        I would not exclude him just because of his criminal

16   justice -- criminal defense work.  Again, there was a juror

17   where that figured in.  It was more in that case, as I recall

18   it, that she -- her career was postconviction -- finding

19   problems with trials.  And I was, among other things, concerned

20   she might be spending her time finding trouble in the law along

21   the way.  But his career as a criminal defense lawyer wouldn't

22   by itself be a factor.  I think it may explain where his

23   alignment is on these issues, but ultimately, it was his

24   answers to the questions and my sense of it.

25        He was a learned witness, in a sense.  He knew what we

1    were talking about whereas others don't necessarily, and I

2    guess that could go in either direction.  But in the end, it

3    was not convincing to me that he was going to be truly open in

4    the way that would be necessary.

5            356?

6            MR. CHAKRAVARTY:  No motion.

7            MR. BRUCK:  No motion.

8            MS. CLARKE:  No motion.

9            THE COURT:  And I think we run the table after this.

10           MR. BRUCK:  Yes.

11           THE COURT:  So the ones that have passed are, to

12   summarize, 340, 349, 350, 352, 356.

13           Okay?  All right.

14           MR. CHAKRAVARTY:  Thank you, your Honor.

15           MS. CONRAD:  Judge, I just want to raise the Juror 318

16   from yesterday.

17           THE COURT:  Yeah, I know you filed something.  I

18   haven't looked at it.

19           MS. CONRAD:  It kind of --

20           THE COURT:  I will look at it.

21           MS. CONRAD:  It leads you through how we get to that

22   being her husband, basically.

23           THE COURT:  All right.  I'll take a look at it.

24           MS. CONRAD:  Thanks.

25           (The Court exits the courtroom and the proceedings

1    adjourned at 5:08 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           We, Marcia G. Patrisso, RMR, CRR, (pages 117 - 226)

4    Official Reporter of the United States District Court, and

5    Loretta Hennessey, RDR, CRR, (pages 1 - 116) do hereby certify

6    that the foregoing transcript constitutes, to the best of our

7    skill and ability, a true and accurate transcription of our

8    stenotype notes taken in the matter of Criminal Action No.

9    13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Loretta Hennessey
14   LORETTA HENNESSEY, RDR, CRR

15
     Date:  2/6/15
16

17

18

19

20

21

22

23

24

25