UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                            )
UNITED STATES OF AMERICA,   )
                            )
        Plaintiff,          )
                            )   Criminal Action
v.                          )   No. 13-10200-GAO
                            )
DZHOKHAR A. TSARNAEV, also  )
known as Jahar Tsarni,      )
                            )
        Defendant.          )
                            )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>JURY TRIAL - DAY SIXTEEN</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, February 11, 2015
10:26 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (The venire enters the courtroom at 10:26 a.m.)

4          THE CLERK:  All rise for the Honorable Court.

5          (The Court enters the courtroom at 10:29 a.m.)

6          THE CLERK:  Please be seated.

7          THE COURT:  Good morning, ladies and gentlemen.

8          THE JURORS:  Good morning.

9          THE COURT:  I'm glad to see you all made it here

10   safely.

11          We are continuing the process of selecting a jury for

12   the case of United States versus Dzhokhar Tsarnaev.  As you

13   know, Mr. Tsarnaev is charged in connection with a bombing that

14   occurred near the finish of the Boston Marathon on April 15,

15   2013, that resulted in the death of three people.  He's also

16   charged in the death of an MIT police officer and other

17   offenses that occurred on April 18 and 19, 2013.

18          Some, but not all, of the crimes charged are, by

19   statute, potentially punishable by death.  You will recall from

20   my prior instructions that the trial jury will first consider

21   and decide whether the government has proved Mr. Tsarnaev's

22   guilt of any or all of the charges against him.  If he is

23   convicted of any of the capital crimes, that is, crimes

24   potentially punishable by death, the jury will then consider

25   and decide whether he will be sentenced to death for any such

1   crime or to life in prison without the possibility of release.

2        You may have wondered why the death penalty could be a

3   possibility in this case in view of the fact that Massachusetts

4   does not provide the death penalty for murder or any other

5   violation of Massachusetts law.  The reason is that this is a

6   federal case involving alleged violations of federal law rather

7   than a state case involving violations of Massachusetts law.

8        If the jury convicts Mr. Tsarnaev of any of the

9   capital crimes charged in the indictment, the same jury will

02:00 10   hear additional evidence and then decide whether to sentence

11   him to death or to life in prison without the possibility of

12   release.  Because the jury that is selected to decide the

13   defendant's guilt or innocence will also decide his punishment

14   if he is convicted, it is necessary to question prospective

15   jurors about your feelings and beliefs about the death penalty

16   as part of the process of selecting a jury.

17        Let me explain briefly the procedures that must be

18   followed in a case in which the death penalty is or may be an

19   issue.  As in any criminal trial, initially the government will

02:01 20   have the burden of proving that Mr. Tsarnaev is, in fact,

21   guilty of any crime with which he is charged.  If he is

22   convicted by the jury of a crime for which the death penalty

23   may lawfully be imposed, there will be a second phase of the

24   trial, referred to in shorthand generally as the penalty phase.

25        In the penalty phase, the government will introduce

1    evidence that seeks to prove beyond a reasonable doubt, first,

2    that Mr. Tsarnaev acted with sufficient intent to be subject to

3    the death penalty; and, second, that aggravating factors about

4    the killings or about the defendant justify sentencing him to

5    death.

6         Aggravating factors are circumstances that, if proven,

7    would make the crimes particularly serious or blameworthy and,

8    therefore, under the law, may justify imposing a more severe

9    sentence on this defendant compared to other persons convicted

02:02 10   of intentional killing or murder.  The government will bear the

11   burden of proving any alleged aggravating factors to every

12   juror beyond a reasonable doubt.

13        The defense will have an opportunity in the penalty

14   phase to present evidence of what it will argue are mitigating

15   factors.  Mitigating factors are usually circumstances about

16   the crime or crimes or about the defendant's background or

17   character that would suggest that the death penalty is not an

18   appropriate sentence in the case or that life imprisonment

19   without the possibility of release is adequate to punish the

02:02 20   defendant.

21        Unlike the proof of aggravating factors, a mitigating

22   factor need only be proven by the greater weight of the

23   evidence.  That is a less demanding standard of proof than

24   proof beyond a reasonable doubt.  Again, unlike proof of

25   aggravating factors, mitigating factors do not have to be

1    proven to the satisfaction of all 12 jurors.  Any juror who

2    finds or determines a mitigating factor to have been proved by

3    a greater weight of the evidence may consider that factor in

4    deciding an appropriate sentence in the case regardless of

5    whether any or all of the other jurors agree that the

6    mitigating factor has been proved.

7           After the parties have made their respective

8    presentations during the penalty phase, the jury will weigh all

9    the evidence.  Before a jury could vote to impose the death

02:03 10   penalty, every juror would have to be persuaded that certain

11   threshold factors that make the defendant potentially subject

12   to the death penalty have been proven beyond a reasonable

13   doubt.  In addition, in order to impose the death penalty,

14   every juror would have to be persuaded that any proven

15   aggravating factors sufficiently outweigh any mitigating

16   factors found by any juror or jurors to justify a sentence of

17   death.  Even if the jury did not find any mitigating factors in

18   the case, it would still have to be unanimously persuaded that

19   any proven aggravating factors were themselves sufficient to

02:04 20   justify a death sentence.

21          You should understand that a jury is never required to

22   find that a sentence of death is justified.  The decision

23   whether the government has proven that the defendant should be

24   sentenced to death must ultimately be made by each juror

25   himself or herself.  If, however, every juror is persuaded that

1   the death penalty should be imposed, I would be required as the

2   trial judge to sentence the defendant to death; in other words,

3   I could not change the jury's decision.  The jury, and not the

4   judge, is responsible for determining whether a defendant who

5   is convicted of a capital crime will live or die.

6          What I've just described is only an overview of the

7   law that is applicable to the jury's consideration of the death

8   penalty.  If you are selected to serve on the jury and if you

9   find the defendant guilty of a crime or crimes punishable by

02:05 10   death, I will give you very detailed instructions concerning

11   your duties in deciding whether to impose the death penalty or

12   life imprisonment without possibility of release and the law

13   that must be followed in making that decision.

14          As I told you when you filled out your questionnaires,

15   there are no right or wrong answers to any of the questions

16   that you have been asked or that you will be asked in this

17   process.  We ask them because both the government and

18   Mr. Tsarnaev are entitled to a jury that does not have its mind

19   firmly made up one way or another before hearing the evidence

02:05 20   and a detailed explanation of the law.  That applies both to

21   whether the defendant is guilty or not guilty of the specific

22   crimes that are charged in the indictment, and if he is

23   convicted of a capital crime, whether he should be sentenced to

24   death or to life in prison without the possibility of release.

25          So today I'm going to question each of you

1    individually about some issues that are relevant to the process

2    of selecting a jury.  In a moment we're going to excuse you

3    back to the room you were just assembled in, and one by one

4    you'll come into the courtroom and we'll follow up with some

5    questions.

6            There will be some people in the room in addition to

7    the lawyers and their staff, a few people, and the proceedings

8    are being transmitted simultaneously by video and audio to

9    overflow courtrooms where there may be other people watching.

02:06 10   We will not identify you by name, but rather by number, and

11   you'll be seated so that the video camera will be behind you.

12           Your answers will generally be public, but if you

13   believe a truthful answer would require you to reveal sensitive

14   personal information, we will temporarily stop the audio

15   transmission to those courtrooms so that people observing there

16   will not hear your answer.  We'll also excuse people not

17   affiliated with the case from the room for the duration of that

18   answer.

19           Again, we do not expect or want any particular answer

02:07 20   to any question.  All we want and what the law expects is that

21   you provide accurate and truthful answers to the questions that

22   are asked.  If you do that, then you will be doing your duty as

23   a citizen and as a juror no matter what your answers may be.

24           I want to remind you about something I instructed you

25   on before.  As I told you before, a jury's verdict must be

1   based on the evidence produced at trial and must be free from

2   outside influence; therefore, I remind you again that it is

3   extremely important that you do not discuss the case, including

4   the jury selection process, with your family and friends, each

5   other, or any other person until you've been excused or, if

6   selected as a juror, until the case has concluded.  And again,

7   of course, you're not to do any independent research online or

8   otherwise, or otherwise read, watch or listen to any reports

9   about the case in the media.

02:08  10        When you finished your questionnaires, you signed at

11   the last page where the statement above -- affirming that your

12   answers were true under the pains and penalty of perjury.

13   Similarly, your answers today must be given under a similar

14   affirmation or oath, and the clerk would now ask you to rise

15   and he will administer that to you.

16        (Venire duly sworn.)

17        THE COURT:  All right, jurors.  We'll ask you to

18   withdraw now, and we'll have you back one by one.  We

19   appreciate your patience as we get through this process.

02:08  20        (The venire exits the courtroom at 10:39 a.m.)

21        THE COURT:  Good morning.

22        COUNSEL IN UNISON:  Good morning.

23        (Pause.)

24        THE COURT:  All right.  Starting with Number 366.

25        THE CLERK:  I remind counsel and everybody to speak

1   into the mics, remember?

2           Juror No. 366.

3           MR. McALEAR:  Juror 366.

4           (The juror enters the courtroom.)

5           THE CLERK:  Sir, over here, if you would.  Have a seat

6   right here.

7           And if you could do me a favor, keep your voice up and

8   speak into the mic so everyone around the table can hear you,

9   okay?

02:12 10         THE JUROR:  Okay.

11          THE COURT:  You can adjust that and make it

12  comfortable for yourself.

13          Good morning.

14          THE JUROR:  Good morning.

15          THE COURT:  Since you were here last to fill out the

16  questionnaire, have you been able to follow the instructions to

17  avoid discussing the case with anyone in substance?

18          THE JUROR:  In substance, yes, sir.

19          THE COURT:  And also, as much as possible, to avoid

02:12 20  any media accounts of the case?

21          THE JUROR:  If I hear it, I turn it off.

22          THE COURT:  Thank you.  So we're going to follow

23  up -- that's the questionnaire you filled out.  We're going to

24  follow up on some of the things you told us about.

25          You work as a food service supervisor in a nursing

1   facility?

2              THE JUROR:  Yes, sir.

3              THE COURT:  And you've been there, I guess, quite a

4   while?

5              THE JUROR:  Yes, sir.  We just were sold this past

6   July from Kindred to a new company, Chestnut.  So it's actually

7   like starting from day one.

8              THE COURT:  In what sense?  New routine?

9              THE JUROR:  I lost all my time.  I lost my 25 years.

02:13 10        THE COURT:  Really?

11             THE JUROR:  Yes, sir.

12             THE COURT:  Well, are you a salaried employee?

13             THE JUROR:  No, sir.  I'm hourly.

14             THE COURT:  So if you had to serve two, three, four

15  months on this case, that would cost you your hourly wages?

16             THE JUROR:  I would not get paid, sir.  I have no

17  vacation time.  I have no holiday time.  I have not earned

18  anything till July 1st.

19             THE COURT:  Okay.  I think that's all we need to know.

02:13 20  Thank you.

21             THE CLERK:  Just leave that right here and I'll take

22  care of it.

23             (The juror is excused.)

24  ██████████████████████████████████████

25  ███████████████████████████████████

```
 1              MR. WEINREB:  I don't think so.

 2              THE COURT:  I think it's reported.

 3              MR. WEINREB:  Yes.

 4              THE CLERK:  Juror No. 369.

 5              THE JURY CLERK:  Juror 369.

 6              (The juror enters the courtroom.)

 7              THE CLERK:  Sir, over here, please.  Have a seat, if

 8      you would.

 9              Do me a favor, keep your voice up and speak into the

02:15 10    mic so everyone around here can hear you.

11              THE JUROR:  All right.

12              THE COURT:  Good morning.

13              THE JUROR:  Good morning.

14              THE COURT:  Have you been able, since you were last

15      here, to avoid discussion of the case in substance with anyone?

16              THE JUROR:  Yup.

17              THE COURT:  And as much as possible, to avoid seeing

18      media reports about the case?

19              THE JUROR:  Yup.

02:15 20        THE COURT:  Okay.  So that's the questionnaire you

21      filled out.  We're going to follow up on some of the things you

22      told us about.

23              I would like you to look at page 5.  Your answer --

24      what we have is Question 10, which is about the schedule in the

25      case and the length of the case and so on, and you told us
```

1    you're self-employed and would like to discuss with your family

2    and business partner whether you would be able to serve on a

3    three- to four-month case.

4           Have you had those discussions?

5           THE JUROR:  Yeah.

6           THE COURT:  And what do you think?

7           THE JUROR:  I mean, yeah, it's -- definitely it will

8    crush my business, no question about it, you know.

9           THE COURT:  Tell me about the business.  Is it a

02:16 10   two-person operation?

11          THE JUROR:  Yeah, I have a partner.  We do hardwood

12   floors.  And, you know, we pretty much just got our feet on the

13   ground within the last couple of years.  So, yeah, it will be

14   crushing financially but...

15          THE COURT:  Well, we certainly don't want you to be

16   crushed financially.  Let me just ask you about it.  How is

17   your compensation figured?  Do you --

18          THE JUROR:  It's half and half.

19          THE COURT:  Of what the joint enterprise does, is that

02:16 20   it?

21          THE JUROR:  Yeah, pretty much.

22          THE COURT:  Is it possible for the work to go on with

23   your partner supervising it?  You have people that work for

24   you?

25          THE JUROR:  On occasion, yeah.  We have a guy that

1    helps us, yeah.

2         THE COURT:  Here's what I'm getting at.  If other

3    people were able to do the work so the business kept getting

4    the money, would you still be able to split it with your

5    partner and you yourself get the money?

6         THE JUROR:  Yeah.

7         THE COURT:  Or some -- or alternatively, is some of

8    your compensation based on your own time that you put in, like

9    an hourly rate or something like that?

02:17 10         THE JUROR:  Well, there's just like certain things

11   that I can do and he can't and vice versa, so you know.

12        THE COURT:  You mean technically?

13        THE JUROR:  Technically, yeah.  There's certain, like,

14   customer-relation stuff that is not really his strong suit.

15        THE COURT:  I see.

16        THE JUROR:  And stuff like that.

17        THE COURT:  Well, would you be able, after hours and

18   on Fridays and weekends, to attend to those kinds of things?

19        THE JUROR:  I mean, I could hopefully.  But even

02:17 20   like -- I had something to do today.  I didn't know I was

21   supposed to be here until last night, and then I had to cancel.

22   So stuff like that is a pain in the neck, but...

23        THE COURT:  Okay.  All right.  Thanks.

24        THE JUROR:  All right?

25        (The juror exits the courtroom.)

         1              THE CLERK:  Juror No. 370.

         2              THE JURY CLERK:  Juror 370.

         3              (The juror enters the courtroom.)

         4              THE CLERK:  Ma'am, over here, if you would, please.

         5    Over here.  Thanks.  Have a seat.

         6              If you could do me a favor, keep your voice up and

         7    speak into the mic so everyone around the table can hear you.

         8    The mics are adjustable, so adjust it to your comfort.

         9              THE COURT:  Good morning.

02:19   10              THE JUROR:  Good morning.

        11              THE COURT:  Since you were last here have you been

        12    able to avoid discussion of the case with anyone as I had asked

        13    you to?

        14              THE JUROR:  I'm trying to.

        15              THE COURT:  And succeeding --

        16              THE JUROR:  Yeah.

        17              THE COURT:  -- by and large?

        18              THE JUROR:  By and large.

        19              THE COURT:  And avoiding any media about it?

02:19   20              THE JUROR:  Yes.

        21              THE COURT:  So that's the questionnaire you filled out

        22    in front of you.  We're going to ask you some follow-up

        23    questions about the information you put in.

        24              Let me start with what you do for employment.

        25              THE JUROR:  What page?

```
 1              THE COURT:  This is page 10.  Tell us about your
 2    employment.
 3              THE JUROR:  What's that?
 4              THE COURT:  Tell us about your employment.
 5              THE JUROR:  I work at an assisted-living facility with
 6    the elderly.
 7              THE COURT:  And what do you do?
 8              THE JUROR:  Serve the meals, do activity with them.
 9              THE COURT:  Is this a full-time job?
10              THE JUROR:  Yes.
11              THE COURT:  And you've been doing it for, it looks
12    like, about five years or so?
13              THE JUROR:  Five years, yeah.
14              THE COURT:  If you'd flip back to page 5, we asked you
15    there whether the schedule of the case, including the likely
16    duration of it, several months, would present a significant
17    hardship to you, and you said no.
18              THE JUROR:  Well, I'm not sure.  Does your employer
19    pay you?  I couldn't not get paid for four months.
20              THE COURT:  I guess that's the question we ask you.
21    What would the employer do?
22              THE JUROR:  Yeah, I don't know.  I didn't --
23              THE COURT:  Are you -- are you salaried or do you get
24    paid an hourly --
25              THE JUROR:  Hourly.
```

```
 1          THE COURT:  And you haven't discussed with the
 2    employer whether you would get paid if you were here?
 3          THE JUROR:  No.  I just actually thought you did.  I
 4    thought it was --
 5          THE COURT:  Oh, I see.  Okay.  No, it's not
 6    necessarily required for employers to do that.
 7          How big is the facility?
 8          THE JUROR:  It has places all over the country.  It's
 9    a big corporation.
02:21 10          THE COURT:  But, I mean, is it something you submit
11    time sheets for on a weekly basis or do you just have regular
12    hours and you get --
13          THE JUROR:  I have regular hours.  Regular.
14          THE COURT:  So you don't keep time; they just assume
15    you've worked whatever the number of hours required is?
16          THE JUROR:  Yeah.
17          THE COURT:  Okay.  I'm not sure you'd be able to
18    handle it, so, financially.
19          THE JUROR:  Okay.
02:22 20          THE COURT:  So thanks.
21          (The juror exits the courtroom.)
22          THE CLERK:  Juror No. 375.
23          THE JURY CLERK:  Juror 375.
24          (The juror enters the courtroom.)
25          THE CLERK:  Sir, over here, if you would.  Have a
```

1    seat.

2            Do me a favor, keep your voice up, speak into the mic

3    so everyone around here can hear you.

4            THE JUROR:  Okay.

5            THE CLERK:  This is adjustable.

6            THE COURT:  You don't have to get that close.

7            THE JUROR:  Okay.

8            THE COURT:  Good morning.

9            THE JUROR:  Good morning.

02:23 10         THE COURT:  Since you were here last have you been

11   able to avoid any discussion of the substance of the case?

12           THE JUROR:  Absolutely.

13           THE COURT:  And also as much as possible avoid any

14   media reports about the case?

15           THE JUROR:  Yes, indeed.

16           THE COURT:  Okay.  Thank you.  Tell us about your

17   employment.

18           THE JUROR:  I work at a local college, Suffolk

19   University, over near the Statehouse.

02:23 20         THE COURT:  What do you do?

21           THE JUROR:  I'm an academic advisor there.

22           THE COURT:  Tell me a little more.

23           THE JUROR:  I work with students.  I help them to stay

24   on track with their studies, advance toward their degree goals

25   in an efficient manner, some academic support counseling as

1    well.

2              THE COURT:  Are there other people who do the same

3    thing?

4              THE JUROR:  Yes; I'm in a large office.

5              THE COURT:  How many of you are there?

6              THE JUROR:  I think 11 at the moment.

7              THE COURT:  And how long have you been doing it?

8              THE JUROR:  I've been doing that particular job for

9    about two years now.

02:24 10         THE COURT:  And this is the undergraduate school --

11              THE JUROR:  That's correct.

12              THE COURT:  -- or both?

13              THE JUROR:  No, I primarily work with undergraduates.

14              THE COURT:  In your questionnaire you -- if you look

15    at page 5, Question 10, this was -- we set out the schedule in

16    the case, including the possibility it would last for several

17    months, and you wrote, "It would be no unusual hardship but

18    uncertain if I can still get paid by the employer."

19              Have you had any discussions about that?

02:24 20         THE JUROR:  You know, it's been so busy I haven't

21    really followed up with my human resources department.

22              THE COURT:  Are you a salaried employee?

23              THE JUROR:  Yes.

24              THE COURT:  We asked people about their social media

25    use.

```
 1              THE JUROR:  Sure.

 2              THE COURT:  You say you use Facebook and Instagram but

 3    very infrequently.  Is that a --

 4              THE JUROR:  That's correct.

 5              THE COURT:  Do you use any of those in your work or is

 6    this just social?

 7              THE JUROR:  Just social.

 8              THE COURT:  Do you typically both post and view other

 9    posts, or do you look at what other people have put up?

02:25 10              THE JUROR:  It's very rare for me to post.  I

11    occasionally will put vacation pictures on, things like that.

12              THE COURT:  Some of the -- I'm just looking at page

13    17, Question 58.  Some of the students you counsel are

14    international students?

15              THE JUROR:  Yes, we have a large international

16    population.

17              THE COURT:  And from all over?

18              THE JUROR:  All over.

19              THE COURT:  If you turn to the next page, 66 -- 65 and

02:26 20    66 -- I guess 65 is the better one -- there are some regions

21    there that are identified.  Do you know if you have any

22    students from those areas?

23              THE JUROR:  No.

24              THE COURT:  Any advisees, I guess is the way I should

25    put it?
```

1          THE JUROR:  Well, I can say that I have worked

2     recently with a student from Russia.

3          THE COURT:  Whereabouts, do you know?  From where in

4     Russia?

5          THE JUROR:  To be honest, I don't really know.  It

6     just wasn't pertinent to the conversation.

7          THE COURT:  Fine.

8          Let me ask you to turn to page 20 and Question 77.  In

9     this question we asked whether as a result of things you'd seen

02:26 10    or read in the news or otherwise had you formed an opinion

11    about whether the defendant was guilty or not, and if so,

12    whether he should receive the death penalty or not.  And it

13    appears that you may -- your original answer to A and B and

14    then changed it and so --

15         THE JUROR:  Yeah, it's a little scribbled.

16         THE COURT:  So you had, I guess, selected "yes" as

17    your answer to question Part A, and "no" to Part B, although

18    initially you thought maybe you would say you were unsure?

19         THE JUROR:  That's correct.

02:27 20        THE COURT:  Okay.  And then you said you were unsure

21    as to the other penalty questions?

22         THE JUROR:  Uh-huh.

23         THE COURT:  Below that we asked if you answered yes to

24    any of these questions, would you be able or unable to set

25    aside your opinion and base your decision on the evidence

```
 1   presented to you at court rather than things you'd seen before

 2   the trial, and you checked the box "able."

 3            THE JUROR:  That's correct.

 4            THE COURT:  You think even if you have an opinion at

 5   this point, you could set it aside and make a decision only

 6   based only on the evidence at trial?

 7            THE JUROR:  To be honest, your Honor, there wasn't an

 8   "unsure" policy, so I think on that day I was leaning more

 9   towards "able," but I think it would be, really, "unsure."

10            THE COURT:  So you understand, I'm sure, that in our

11   criminal justice system a person is accused of a crime, is

12   presumed to be innocent of that crime, unless and until the

13   government proves that he's guilty --

14            THE JUROR:  Absolutely.

15            THE COURT:  -- by the evidence at trial.

16            The government's burden is to prove the defendant's

17   guilt beyond a reasonable doubt by the evidence.

18            THE JUROR:  Certainly.

19            THE COURT:  So we ask jurors to put their mind in the

20   condition where they will listen to the evidence -- all the

21   evidence produced, and at the end decide whether the government

22   has met its burden to prove the defendant guilty of the charged

23   crime beyond a reasonable doubt, putting aside, of course,

24   things that are extraneous to the body of evidence.

25            Do you think if you were a juror in this case you
```

1    would be able to do that?

2             THE JUROR:  Yes.

3             THE COURT:  I think -- okay.  I'll just leave it at

4    that.

5             We asked in Question 81 on the next page if you or

6    someone close to you had been personally affected by the events

7    of the week of April 15th, and you said you didn't quite

8    understand the question.

9             THE JUROR:  Sure.

02:29 10          THE COURT:  It was intended to be a very general

11   question.  So if you thought you had detected any effect, that

12   you tell us about it.

13            THE JUROR:  Yeah.  No, the reason that I answered that

14   was based on my instructions that day from the jury

15   administrator.  I have a friend who works right near there.

16   He's a dentist, locally.  And I know he was affected by it.  He

17   was worried about it.  But he wasn't personally injured.  I

18   didn't know anyone who was directly injured by it.

19            But, you know, sure, I know a lot of people who were

02:30 20   affected by it.  I think everyone who lives -- I think everyone

21   in the country was affected by it in some way.  So that's why I

22   had difficulty expanding on that answer.  I hope that makes

23   sense.

24            THE COURT:  That's fine.  I mean, that's the kind of

25   thing we were looking for.

1          Were you in Boston on the 19th, the Friday of that

2     week?  What I'm getting at is did you have to remain

3     behind -- within the building and so on?

4          THE JUROR:  No.  No, I was not at work that day.

5          THE COURT:  You were home?

6          THE JUROR:  Yeah.

7          THE COURT:  And you did not have to shelter in place,

8     then?

9          THE JUROR:  No, I did not.

02:30 10          THE COURT:  Let's go to page 23 and Question 88.

11     Beginning with Question 88, we asked a series of questions to

12     try to understand whether the prospective jurors had views

13     about the death penalty and what they were.  And in 88 we asked

14     for a general view.  If you have any views on the death penalty

15     in general, what are they, and you said, "I'm not against the

16     death penalty but not for it either, case by case."

17          THE JUROR:  That's right.

18          THE COURT:  And the next question we asked if you

19     could place yourself on a scale from 1 to 10, where 1 was

02:31 20     someone strongly opposed, to believe the death penalty should

21     never be imposed, and 10 was someone strongly in favor who

22     believe it should be imposed whenever a defendant had been

23     convicted of intentional murder.

24          You put yourself at 5?

25          THE JUROR:  That's right.

 1                 THE COURT:  I guess that's consistent with 88?  Was

 2      that --

 3                 THE JUROR:  Yeah, I think it's -- if you want me to

 4      expound.

 5                 THE COURT:  Yeah, go ahead.

 6                 THE JUROR:  I think it's something that really does

 7      need to be looked at seriously in a case by case.  I don't

 8      think it's ever a deterrent, but I think it has the potential

 9      to provide justice for the victims if, you know, that's what

02:31 10      comes out in the trial.

11                 THE COURT:  Okay.  If you go to the next page,

12      Question 90, rather than having you put yourself on a numerical

13      scale, we asked you to look at a series of formulations and see

14      if there was one that came close to representing -- or did

15      represent your view, and you circled E, said, "I'm in favor of

16      the death penalty but I could vote for a sentence of life

17      imprisonment without the possibility of release if I believed

18      that sentence was called for by the facts and the law in the

19      case."

02:32 20                 THE JUROR:  That's correct.

21                 THE COURT:  And so you would reserve judgment, is that

22      it, until you heard in a particular case all the circumstances?

23                 THE JUROR:  I believe so, yes.

24                 THE COURT:  You heard me describe the penalty phase

25      this morning, whether it be evidence presumably from the

     1    government about things that made -- that aggravated the

     2    offense, made it particularly serious.

     3              THE JUROR:  That's right.

     4              THE COURT:  And there would be evidence from the

     5    defense of things that mitigated the offense, or mitigated the

     6    penalty that you might think was appropriate.  You'd be able to

     7    consider all those things and make a judgment based on your

     8    analysis of those things?

     9              THE JUROR:  Yes.

02:33 10              THE COURT:  In the next -- on the next page, Question

    11    95 at the bottom, we asked particularly about this case.  If

    12    you found this defendant guilty and you decided that the death

    13    penalty was an appropriate punishment for him, could you

    14    conscientiously vote for the death penalty, and you said "yes."

    15              THE JUROR:  Absolutely.

    16              THE COURT:  And the top of the next page is a related

    17    question.  If you found him guilty and you decided life in

    18    prison without the possibility of release was the appropriate

    19    punishment, could you conscientiously vote for life

02:33 20    imprisonment without the possibility of release, and you said

    21    "yes" there as well?

    22              THE JUROR:  Yes, indeed.

    23              THE COURT:  Any follow-up?

    24              MR. WEINREB:  Good morning, sir.

    25              THE JUROR:  Good morning.

```
 1              MR. WEINREB:  I have no questions, but thank you.
 2              MS. CONRAD:  Good morning, sir.  My name is Miriam
 3    Conrad.  I've one of the lawyers for Mr. Tsarnaev.
 4              I'd like to go back to the -- Question 81 about
 5    whether anyone you know was affected by the bombings or their
 6    aftermath.
 7              THE JUROR:  Okay.  Let me get to that.
 8              THE COURT:  It's page 21.
 9              THE JUROR:  Thank you.
10              MS. CONRAD:  Sorry.  Thank you.
11              And you told Judge O'Toole about a few people you knew
12    who were present.  Can you tell us a little bit more about
13    that?
14              THE JUROR:  Well, were they -- no, they weren't
15    present, but they were affected by it.  They had to evacuate,
16    and they had to keep away from that area of the city for some
17    time.
18              MS. CONRAD:  And so those are people you know who live
19    or work --
20              THE JUROR:  They work nearby that area.
21              MS. CONRAD:  When you say "that area," you mean --
22              THE JUROR:  On Boylston Street.
23              MS. CONRAD:  -- on Boylston Street?
24              Did they hear or see anything that day?
25              THE JUROR:  To my knowledge, no.  Thankfully, they
```

```
 1   weren't there.

 2           MS. CONRAD:  And when the bombings happened, where

 3   were you?

 4           THE JUROR:  I was at home.

 5           MS. CONRAD:  And did you have concerns about the

 6   people you knew in the area?

 7           THE JUROR:  I did.  And I actually gave them a call,

 8   and I found that they weren't in the office on that day,

 9   thankfully.  So everyone was safe.

10           MS. CONRAD:  Okay.  And how long did it take before

11   you found out that everyone was safe?

12           THE JUROR:  Not long.  About 10, 15 minutes or so.

13   Again, the reason I put "I don't understand" is the nature of

14   the word "affected."

15           MS. CONRAD:  Oh, sure.  I understand.  I'm just trying

16   to find out a little bit more about that.

17           THE JUROR:  Sure.

18           MS. CONRAD:  And you said, you know, that you felt

19   that everyone in Boston -- I think you said everyone in the

20   country was affected in some way.

21           THE JUROR:  Absolutely.

22           MS. CONRAD:  Can you tell us how you were affected by

23   those events?

24           MR. WEINREB:  Objection.

25           THE COURT:  Yeah, I don't think the question was
```

```
 1    asking for what he thinks about the events, if that's --
 2              MS. CONRAD:  That's not what I asked.
 3              THE COURT:  I know.  But I think he's already told
 4    us -- it didn't have any direct personal effect.
 5              THE JUROR:  No.
 6              THE COURT:  Yeah.  I think that's it.
 7              MS. CONRAD:  When you said you think everyone in the
 8    country was affected, can you tell us what you meant by that?
 9              MR. WEINREB:  Objection.
10              THE COURT:  Yeah.  You don't have to answer it.
11              MS. CONRAD:  You said that -- if I could turn to
12    Question 20 -- excuse me -- Question 77 on page 20.
13              THE JUROR:  Okay.
14              MS. CONRAD:  It looks like you gave this some thought,
15    which is a good thing.  As the judge said, we want people to
16    tell us how they feel about these questions.  But it also looks
17    like you changed your response from "unsure" to "yes" on guilt.
18              As you sit here today, what do you think is the
19    accurate answer to that question?
20              THE JUROR:  "Yes."
21              MS. CONRAD:  It's still "yes"?
22              THE JUROR:  Yes.
23              MS. CONRAD:  And can you tell us why you initially put
24    down "unsure"?
25              THE JUROR:  I was thinking about the circumstances of
```

1    the case that I knew, and I was also writing on my lap, so it

2    got a little bit jumbled in there.  But, no, I firmly believe A

3    would be "yes."

4         MS. CONRAD:  Okay.  And is the same thing true about

5    your response on B, about whether he's not guilty?

6         THE JUROR:  Yes, that's correct.

7         MS. CONRAD:  So you said that with respect to 77 as

8    far as whether you'd be able to put that aside, that you

9    would -- a more accurate answer would be "unsure."  I'm sorry.

02:37 10   Did I misunderstand that?

11         THE JUROR:  Forgive me.  I'm not sure I'm following

12   you.

13         MS. CONRAD:  All right.  So if you would go to the

14   bottom of 77, to that question, it asks whether you would be

15   able to set aside your opinion, and I thought you explained to

16   the judge that --

17         THE JUROR:  Yeah.  No, I don't think I understood the

18   way this question was framed.  I apologize.  What I meant to

19   say by that is that I would have to -- it's a case-by-case

02:38 20   basis, my feelings on the death penalty.

21         MS. CONRAD:  Okay.  But this is -- if I could just ask

22   you to take a look at that.  It's a different question.

23         THE JUROR:  That he should not receive?

24         THE COURT:  I don't think that's what she's asking.

25         MS. CONRAD:  No, no, no, the bottom part that starts,

1    "If you answered yes."

2         THE COURT:  Where you said you would be able to decide

3    on the evidence.

4         THE JUROR:  Okay.

5         I don't think I understood that question.  I

6    apologize.  I stand by the statement that I told you today.

7         MS. CONRAD:  But you had said that if the one option

8    had been "unsure," you would have selected that.  So I just

9    wanted to understand what you meant by that.

02:38 10        THE JUROR:  Okay.

11        I'm a little bit confused.

12        THE COURT:  Okay.

13        THE JUROR:  I'm sorry.

14        MS. CONRAD:  Maybe I misunderstood myself.  Maybe I

15   misheard.

16        I thought when the judge asked you about this part of

17   the question --

18        MR. WEINREB:  Your Honor, I object at this point, and

19   I would request that the question be open-ended rather than

02:39 20   trying to create what he said and --

21        MS. CONRAD:  It was going to be open-ended.  It was

22   going to be open-ended.

23        MR. WEINREB:  Yes, but it sounds like the premise of

24   the question is that he said something that he does not

25   remember saying.

1          THE COURT:  Let me ask you to take your time and read

2     that "If you answered yes" paragraph -- yes, right there -- and

3     tell us what today you think your answer to that question would

4     be.

5          (Pause.)

6          THE JUROR:  Okay.  Then I think yes, I could set that

7     aside.

8          MS. CONRAD:  And you're confident about that?

9          THE JUROR:  Yes.  Sorry for the mixup.

02:40 10        MS. CONRAD:  On Question 90 on page 24 you selected

11     the response E which indicates you're in favor of the death

12     penalty, correct?

13          THE JUROR:  You know what?  That was the closest I

14     thought to, you know, my true feelings on the subject.

15          MS. CONRAD:  Sure.  And that's all we're trying to

16     find out, is your true feelings.

17          So would you say you lean slightly more toward the

18     death penalty?

19          THE JUROR:  Possibly.

02:40 20        MS. CONRAD:  And you said that -- in response to

21     Question 93 on page 25 that one of the things it would depend

22     on, that is, whether the death penalty is more -- life without

23     parole is more severe, is the person's world view.  Can you

24     tell me a little bit more about that?

25          THE JUROR:  Well, I think just philosophically it's

1   tough to say what would be a worse punishment for someone.  A

2   person might view life imprisonment as worse than death, so

3   it's hard to say.

4        MS. CONRAD:  And if -- and when you say the "person,"

5   you mean the defendant or the --

6        THE JUROR:  Any defendant, yeah.

7        MS. CONRAD:  And if the person viewed that as worse,

8   would that change -- how would that affect your view of whether

9   the death penalty would be appropriate?

02:41 10        MR. WEINREB:  Objection.

11        THE COURT:  Yeah.  I don't think we need to have that

12   answer.

13        THE JUROR:  Okay.

14        MS. CONRAD:  I see here that you're a writer in your

15   spare time?

16        THE JUROR:  Sparingly, but yes.

17        MS. CONRAD:  Excuse me?

18        THE JUROR:  Sparingly, yes.

19        MS. CONRAD:  And what types of things do you write

02:42 20   about?

21        THE JUROR:  Nature, poems.

22        MS. CONRAD:  May I have a moment?

23        (Counsel confer off the record.)

24        MS. CONRAD:  Would you be able, in deciding whether to

25   vote for the death penalty in any given case, not necessarily

```
 1    this case, to give -- to consider things about not just the
 2    crime but about the defendant, such as his background and so
 3    forth?
 4              THE JUROR:  Yes.
 5              MS. CONRAD:  Would you tend to focus primarily,
 6    however, on the crime?
 7              MR. WEINREB:  Objection.
 8              THE COURT:  Sustained.
 9              MS. CONRAD:  If you were not to get paid by your
10    employer, would sitting on this jury be a hardship for you?
11              THE JUROR:  Absolutely.
12              MR. WEINREB:  Objection.
13              THE COURT:  No, you may answer it.
14              THE JUROR:  Absolutely.
15              MS. CONRAD:  And you simply don't have any information
16    about whether or not you would get paid?
17              THE JUROR:  I didn't look into the matter, no.  No, I
18    don't.
19              MS. CONRAD:  All right.  Thank you very much.
20              THE JUROR:  All right.
21              THE COURT:  Thank you, sir.
22              THE JUROR:  All right.
23              (The juror exits the courtroom.)
24              MS. CONRAD:  Your Honor, before he leaves, with a
25    juror like this, can we ask them to find out?  I don't think we
```

02:43 (line 10)
02:43 (line 20)

1    want to get them seated and then find out they aren't going to

2    get paid.

3              THE COURT:  I think -- yeah, I guess we can.

4              MR. WEINREB:  Your Honor, in the past when this has

5    come up, the Court's taken the view these things will --

6              THE COURT:  That tends to be my view, that if they

7    weren't, they would know about it.

8              MR. WEINREB:  And I don't think we should have one

9    rule for some jurors, ones the defense would like to get rid of

02:44 10    and not ones for the government.

11              MS. CONRAD:  I think we just did.  There was an

12    earlier juror who indicated she didn't know if she would get

13    paid.

14              MR. WEINREB:  No.

15              THE COURT:  No, she was an hourly --

16              MS. CONRAD:  But hourly doesn't --

17              THE COURT:  Anyway, he can go.

18              MS. CONRAD:  And, your Honor, may I just also be heard

19    on this last bit, the first questions I asked?  I frankly don't

02:44 20    understand why asking how someone, a prospective juror, was

21    affected by the bombings is not an appropriate question.

22              THE COURT:  Because I think he answered what the

23    question was getting at, which was a more direct kind of effect

24    than he had various thoughts about the matter.

25              MS. CONRAD:  But I --

```
 1              THE COURT:  So...
 2              MS. CONRAD:  It seems to me "how you were affected" is
 3    the fundamental question.
 4              THE COURT:  Okay.
 5              MS. CLARKE:  Your Honor, I think -- I'm sorry.
 6              THE COURT:  Before the --
 7    ████████████████████████████████████████
 8    ████████████████████████████████████████████████
 9    ████████████████████████████████████████████████
02:45 10          MS. CLARKE:  I just wanted to alert you to it.
11              THE COURT:  I appreciate that.
12              I don't know if you know, I was given a stack through
13    the clerk, so I've gone through them quickly.  And I'll ask him
14    about it.  It's fairly remote and small, but I'll ask him about
15    it.
16              THE CLERK:  Juror No. 376.
17              THE JURY CLERK:  Juror 376.
18              (The juror enters the courtroom.)
19              THE CLERK:  Sir, over here, if you would.  Have a
02:46 20   seat.
21              Do me a favor, keep your voice up and speak into the
22    mic.  It's adjustable so you can move it around, and make sure
23    everyone around the table can hear you, okay?
24              THE JUROR:  All right.
25              THE COURT:  Good morning.
```

             1              THE JUROR:  Good morning.

             2              THE COURT:  Since you were last here, have you been

             3    able to avoid discussion of the case with people?

             4              THE JUROR:  Yes.

             5              THE COURT:  And also as much as possible avoid any

             6    media exposure?

             7              THE JUROR:  Absolutely, yes.

             8              THE COURT:  So that's the questionnaire you filled

             9    out, and we're going to follow up on some of the questions you

    02:47  10    gave.  We've been asking everybody about their employment.  It

            11    says you are a delivery driver for Pepsi?

            12              THE JUROR:  Yes.

            13              THE COURT:  And you've been doing that for a good ten

            14    years or more?

            15              THE JUROR:  Yes, ten years.

            16              THE COURT:  We also asked -- if you want to look on

            17    page 5, we set forth the schedule of the case including the

            18    likely length of the case.  If you were to serve for three or

            19    four months, would that have an impact on your income or your

    02:47  20    ability --

            21              THE JUROR:  Oh, my income.  I wouldn't lose my job,

            22    but I wouldn't want to be out that long if I didn't have to be.

            23              THE COURT:  Well, what would the impact --

            24              THE JUROR:  I could work my schedule around it a

            25    little bit but...

 1          THE COURT:  You could?  Tell us how you could do that.

 2          THE JUROR:  I'm just typically Monday through Friday.

 3   I could -- I know Fridays they said they weren't going to be in

 4   court.

 5          THE COURT:  That's right.

 6          THE JUROR:  So I could probably work Friday, Saturday,

 7   Sunday if I had to to make up some of the time.

 8          THE COURT:  Well, you know, I want to be realistic

 9   about it.  We don't want to put you in a bind where you really

02:48 10   are making a huge sacrifice; on the other hand, if you think

11   you can do both, that's -- and not be, you know, so affected

12   that it would be really hurtful to you, so we kind of -- we

13   can't assess it as well as you can assess it, I guess.

14          THE JUROR:  Yeah.  I know you get somewhat compensated

15   too.

16          THE COURT:  Not very much, but you do.

17          THE JUROR:  My wife pays the mortgage mostly, so I

18   can't really...

19          THE COURT:  All right.

02:48 20          THE JUROR:  I mean, I don't know what to say.  She's

21   more the income-earner than I am, so...

22          THE COURT:  So are you -- do you have a regular route

23   that you deliver?

24          THE JUROR:  Yeah.  Yeah.

25          THE COURT:  So, for example, you have a convenience

     1    store or something you deliver things to?

     2                THE JUROR:  Yeah.

     3                THE COURT:  Do you go to the same store on a regular

     4    basis?

     5                THE JUROR:  Pretty much, see the same people on a

     6    regular basis.  Same route, same area.  I actually deliver down

     7    in New Bedford, Dartmouth area is my route, that area.

     8                THE COURT:  So you don't think it would be a problem

     9    for you.  Is that what you're telling me?

02:49 10                THE JUROR:  I have to work something out, yeah, I

    11    guess.  No, not 100 percent.

    12                THE COURT:  All right.  I guess here's why we ask the

    13    question up-front, and really up-front.  It's one of the first

    14    questions we ask.  We don't want it to become a problem later.

    15    If you're sitting and then all of a sudden you say, "I made a

    16    bad decision here," we'd rather not have that situation.  On

    17    the other hand, if you think it's the kind of thing you think

    18    you can stand, that's -- and are willing to do it.

    19                THE JUROR:  I thought you didn't have much choice.

02:50 20                (Laughter.)

    21                THE JUROR:  Then everybody could just say, "No, sure,

    22    I can't afford it," then you just -- I thought that was

    23    basically someone -- you don't have a choice.  You got to do

    24    what you got to do.  So, I mean, I don't know what else...

    25                THE COURT:  There are limits.  You don't have to do it

 1   in the circumstances that would make it a severe hardship.  And

 2   that's really the question.  If you think it would be a severe

 3   hardship and cost you earnings that, you know, would really be

 4   significant to you, then we won't ask you to do it.  On the

 5   other hand, if you think you can do it and also keep things

 6   running by an adjusted schedule, we'd be happy to have you.

 7            THE JUROR:  Yeah, it definitely would be hard.  But, I

 8   mean, I don't know.  It would be hard as far as schedule.  I

 9   mean, I take the kids to hockey and that kind of stuff, but,

02:51 10   you know, it's just...

11            THE COURT:  Yeah.  Okay.  Tell me about taking the

12   kids to hockey.  How often do you do that?

13            THE JUROR:  I got a six-year-old.  I take him twice a

14   week.

15            THE COURT:  When --

16            THE JUROR:  He goes Mondays and Wednesdays.  He goes

17   to swim on Saturdays.

18            THE COURT:  What time, after school?

19            THE JUROR:  Yeah, after school.  Five o'clock.  That

02:51 20   kind of stuff.

21            THE COURT:  Well, let's go on with the --

22            THE JUROR:  Sure.

23            THE COURT:  -- other questions.

24            THE JUROR:  I didn't write very much down.  I wasn't

25   expecting to be called back, honestly.

```
 1              THE COURT:  All right.  Sometimes it's difficult to
 2    read a juror's writing.
 3              THE JUROR:  Sure.
 4              THE COURT:  Page 6 we asked for your -- you know,
 5    whether you had -- whether you were married and, if so, what
 6    your spouse did.
 7              THE JUROR:  My wife's occupation?  Accountant.
 8              THE COURT:  Accountant?
 9              THE JUROR:  Yeah.
10              THE COURT:  Tell us about that, what --
11              THE JUROR:  Her background's in accounting.  She does
12    more finance now.
13              THE COURT:  Is she self-employed or work for somebody?
14              THE JUROR:  No, no, she works for -- it's a
15    London-based company, Inventus.  She actually just traveled to
16    France a week ago for work.  So she's more of a lead finance,
17    team financier.
18              THE COURT:  Okay.
19              Could we cut the audio for a minute?
20              MR. DOREAU:  Audio cut.
21              (Discussion at sidebar and out of the hearing of the
22    public:)
23    
24    
25    
```



1          ▮▮▮▮▮▮▮▮▮▮

2          THE CLERK:  Back on.

3          MR. DOREAU:  Audio and video on.

4          THE JUROR:  I didn't even realize that still showed

5     up.

6          (In open court:)

7          THE COURT:  Let me ask you to look at page 20 and

8     Question 77.

9          THE JUROR:  Yup.

02:54 10          THE COURT:  In that question we asked jurors whether

11    you'd seen or read anything in the news media that led you to

12    have an opinion now -- or when you filled out the questionnaire

13    and now -- that the defendant is guilty or not and, if so,

14    whether he should receive the death penalty or not, and you

15    checked "unsure" as to whether you had an opinion that he was

16    guilty and also "unsure" as to the penalty.  You checked "no"

17    as to whether you had an opinion that he was not guilty.

18          I wonder if you can tell us what you were thinking

19    when you made those answers.

02:55 20          THE JUROR:  As far as if -- on the first one, please

21    say again or --

22          THE COURT:  Yeah.  So in Part A it says based on

23    things you'd seen in the media or otherwise had you formed an

24    opinion that the defendant was guilty, and you checked

25    "unsure."

1        THE JUROR:  Yes.  If I was unsure he was guilty?  You

2   can't go just by what you see in the media; you have to go by

3   what you know -- knowing of the case.  I mean, I'm not

4   unsure of -- sure, you know, what the trial would be like.

5        THE COURT:  All right.  So you probably understand

6   that a person who's accused of a crime by the government is

7   presumed to be innocent, or not guilty, unless the government

8   proves the defendant guilty at trial by producing enough

9   evidence to convince the jury of that fact beyond a reasonable

02:56 10   doubt.

11        Do you understand that --

12        THE JUROR:  Yes.  Yes.

13        THE COURT:  -- basic principle?

14        THE JUROR:  Yeah.

15        THE COURT:  What the question is getting at is -- and

16   it may be understandable that people have things that they've

17   seen in the media that gives them some impression about what

18   happened, but the question is whether you'd be prepared to

19   reserve judgment and make your judgment based on the trial

02:56 20   evidence and not on other ideas or information you had from

21   other sources.

22        THE JUROR:  Absolutely.

23        THE COURT:  And so if you thought on any of the

24   various charges that it made -- if you thought the government

25   had failed to prove the defendant guilty by the evidence at

1    trial, would you be prepared to vote to find him not guilty?

2              THE JUROR:  Absolutely.

3              THE COURT:  Okay.  Now, as to the C and D, that asked

4    about the death penalty.  If you'd turn to page 23, we asked a

5    series of questions to see if we could get jurors' attitudes

6    about the death penalty.  In Question 88 we asked if you had

7    any views about the death penalty in general, what are they,

8    and you said, "I think it is fair."

9              Do you want to tell us a little bit more about that?

02:57 10             THE JUROR:  I think there are so many processes you

11   got to go through to get a death penalty sentence that I think

12   by that time -- I mean, it's not like 50 years ago, you didn't

13   have all the different -- I don't know, maybe all the different

14   DNA and all that different evidence that is presented now, that

15   I think it's more -- I don't know.  I think the outcome would

16   be more -- you know, I don't know what the word is I'm

17   searching for.  More, you know, reasonable to say if everyone

18   sees that that's the evidence then, yeah, maybe the evidence is

19   fair.

02:57 20             THE COURT:  Okay.  In the next question we asked you

21   to circle a number that you thought applied to you on a scale

22   from 1 to 10 where 1 reflects a belief that the death penalty

23   should never be imposed and 10 reflects a belief it should be

24   imposed whenever the defendant is convicted of a murder, and

25   you selected 6.  Can you tell us anything about why you

```
 1    selected 6?
 2            THE JUROR:  I don't know.  I think it depends on the
 3    person's background, if there was other reasoning behind why
 4    they committed a crime or, you know, other circumstances, you
 5    know, their upbringing.  Maybe something happened to them that
 6    maybe they just didn't have a fair shake either, you know, type
 7    of thing, you know, kind of getting a bad rap, you know, type
 8    of thing, they shouldn't have -- it's not always cut and dry, I
 9    don't think, you know?  There's a little bit of wiggle room in
02:58 10    everything, I guess.
11            THE COURT:  Okay.  Turn to the next page, 24, Question
12    90.  Question 90 sets forth a number of different positions
13    somebody might have on the death penalty and asks if there's
14    one that you thought would best describe your own view, and you
15    selected D.  It says, "I'm not for or against the death
16    penalty.  I could vote to impose it or I could vote to impose a
17    sentence of life imprisonment without possibility of release,
18    whichever I believed was called for by the facts and the law in
19    the case."
02:59 20            THE JUROR:  Yup.
21            THE COURT:  Do you think that represents your view of
22    the matter?
23            THE JUROR:  Yes.  I mean, my personal view is I
24    wouldn't want to be in jail for the rest of my life.  So if
25    that was the case, I would prefer to have the death penalty.
```

```
 1   If I was in those shoes, I would rather be -- than, you know,
 2   spend the rest of my life in jail.  So that's how I feel about
 3   it.
 4            THE COURT:  Well, let me just come back to statement
 5   D.
 6            THE JUROR:  Yup.
 7            THE COURT:  That indicates that you don't have a
 8   strong preconceived idea in either direction; that you're open
 9   to either --
10            THE JUROR:  I'm open to either/or.  I mean, I would
11   prefer -- type person to prefer not to spend the rest of my
12   life in jail, but if that's what the person would want, that's
13   what they would want.  I mean, I can't judge somebody else's
14   feeling.
15            THE COURT:  Okay.  Let me ask you to go to the next
16   page at the bottom, Question 95.  That asks about this
17   defendant.  If you found him guilty and you decided that the
18   death penalty was the appropriate punishment for him, could you
19   conscientiously vote for the death penalty, and you said "yes."
20            THE JUROR:  Yeah.
21            THE COURT:  Okay.  On top of the next page we asked
22   the related question.  If you found the defendant guilty and
23   decided instead that life imprisonment without the possibility
24   of release was the appropriate punishment, could you
25   conscientiously vote for life imprisonment?
```

```
 1              THE JUROR:  Yeah, absolutely.

 2              THE COURT:  Follow-up?

 3              MR. WEINREB:  Good morning.

 4              THE JUROR:  Good morning.

 5              MR. WEINREB:  My name's Bill Weinreb.  I'm one of the

 6    prosecutors.

 7              I wanted to follow up for a minute on your answer to

 8    Question 88, which is on page 23.

 9              THE JUROR:  Yup.

10              MR. WEINREB:  So if -- just so I'm clear, so if a

11    defendant were -- you heard the judge explain that there will

12    be two phases in this trial.  In the first phase it will just

13    be about whether the defendant is guilty or not guilty of any

14    of the crimes he's charged with, and at the end of that phase

15    if the jury finds him guilty of one of the charges that's a

16    capital crime, that carries a possible sentence of the death

17    penalty, then you have a whole second phase to determine if the

18    death penalty is the appropriate sentence.

19              Do you understand all that?

20              THE JUROR:  Yeah, absolutely.  Yeah.

21              MR. WEINREB:  So the question is:  Going into that

22    phase, that second phase, would you have an open mind -- not

23    necessarily in this case, but in any case -- would you have an

24    open mind about whether the person should get the death penalty

25    or not depending on what the evidence was?
```

```
 1            THE JUROR:  Absolutely, yeah.

 2            MR. WEINREB:  All right.  And the judge instructed you

 3    earlier that you'll hear evidence of aggravating factors.

 4    That's evidence that the government believes makes this a case

 5    where the death penalty is appropriate.  And then you'll also

 6    hear evidence of mitigating factors.  That's evidence that the

 7    defense believes is a case that makes life imprisonment the

 8    appropriate sentence, because those are the only two choices.

 9            And the question is:  Could you give meaningful

03:02 10    consideration to both the aggravating factors and the

11    mitigating factors and weigh them in determining ultimately

12    what you think is the appropriate sentence?

13            THE JUROR:  Yeah, I believe I could.  Yeah.  I

14    don't -- I don't see why not.  I think it's appropriate to hear

15    from both sides and kind of go from there what -- you know.

16            MR. WEINREB:  Okay.  Thanks very much.

17            THE JUROR:  Yeah, sure.

18            MS. CLARKE:  Good morning.

19            THE JUROR:  Good morning.

03:03 20            MS. CLARKE:  My name is Judy Clarke.  I'm one of the

21    lawyers for Mr. Tsarnaev.  And I just wanted to follow up on a

22    few questions.

23            THE JUROR:  Sure.

24            MS. CLARKE:  I guess I was a little concerned, and I

25    want to make sure you have your chance to tell us how much of a
```

1    hardship serving would be because, as I heard you, you have a

2    lot of -- you have care responsibilities for a child, a wife

3    that travels and a job.

4         THE JUROR:  Yeah.

5         MS. CLARKE:  And I think really what the judge was

6    trying to get at is:  Is that going to be a hardship on you to

7    be sitting in here for four months?

8         THE JUROR:  Yeah, it will be difficult.  Yeah.  I want

9    to say, yeah, obviously it will be difficult.  I mean, it's --

03:03 10   I mean, I wouldn't lose my house; I would lose my income, that

11   type of stuff.  But, yeah, I probably will have to make less

12   fishing trips in the summertime or a couple less vacations, not

13   go to Disney in the fall.  That kind of stuff, yeah.

14        MS. CLARKE:  So it doesn't sound like it's too much

15   for you to bear?

16        THE JUROR:  Yeah.  I mean...

17        MS. CLARKE:  Because it's your shot at telling us.

18        THE JUROR:  I mean, if I would have to lose work for

19   four months, I think I would probably survive, not that I -- it

03:04 20   would be tight.  It would be a struggle, but, yeah, financially

21   we could make it.

22        MS. CLARKE:  Okay.  Let me turn to Question 77 on page

23   20 again.

24        THE JUROR:  Yeah.

25        MS. CLARKE:  And you marked -- I think that you talked

|   | |
|---|---|
| 1 | about this a little bit, but you marked "unsure" on guilty and |
| 2 | "unsure" on the death penalty.  Have you ever had an opinion |
| 3 | about either one of those, Mr. Tsarnaev's guilt or whether or |
| 4 | not he should get the death penalty? |
| 5 | THE JUROR:  On him particularly?  No.  On other |
| 6 | people, yeah. |
| 7 | MS. CLARKE:  On other people in the news? |
| 8 | THE JUROR:  Well, yeah.  I mean like -- |
| 9 | MR. WEINREB:  Objection.  I don't think he needs to |
| 03:05 10 | tell us who he thought other -- |
| 11 | THE COURT:  Yeah, I think that's right.  I don't think |
| 12 | we need it. |
| 13 | MS. CLARKE:  So on Mr. Tsarnaev, you've never formed |
| 14 | an opinion, either before filling out the survey, the |
| 15 | questionnaire, or after? |
| 16 | THE JUROR:  Honestly?  Yeah.  I mean, you -- probably, |
| 17 | yeah, from what you seen in the news, yeah, I kind of -- I |
| 18 | wouldn't say formed an opinion, but from what you see in the |
| 19 | news at that time, you would think, yeah, he was the person |
| 03:05 20 | that was there, involved. |
| 21 | MS. CLARKE:  Okay.  Okay.  And regarding the death |
| 22 | penalty? |
| 23 | THE JUROR:  Oh, no, not at all. |
| 24 | MS. CLARKE:  Based on what you've seen or heard in the |
| 25 | news? |

```
 1                THE JUROR:  No, no, not on the death penalty.  As far

 2    as involved, yes.

 3                MS. CLARKE:  Okay.  You mentioned -- let me see if I

 4    can find it -- on page 19, Question 70, up at the top of page

 5    19 --

 6                THE JUROR:  Yeah.

 7                MS. CLARKE:  -- that you listen to the Howie Carr Show

 8    two or three times a week?

 9                THE JUROR:  Yeah.

03:06 10                MS. CLARKE:  Have there been any presentations on that

11    show about this case or about the Tsarnaev family?

12                THE JUROR:  No, no.  He's just -- not that I know of.

13    I read the Herald, you know, like his show.  Not that I know

14    of.

15                MS. CLARKE:  And have you heard him talk about or read

16    anything that he's written about the Tsarnaev family?

17                THE JUROR:  Yes.

18                MS. CLARKE:  And what is that?

19                THE JUROR:  What I've read about his family?

03:06 20                MS. CLARKE:  Yes.

21                THE JUROR:  Or what Howie's talked about his family?

22                MS. CLARKE:  Yes.

23                THE JUROR:  I think he's mentioned his parents'

24    background and stuff.

25                MS. CLARKE:  Can you tell us what you remember about
```

1     that?

2               THE JUROR:  I know something that he said his mother

3     went back to -- or got caught shoplifting or something at the

4     mall, or one of the family members.  So that's what I remember.

5               MS. CLARKE:  Does that influence you in any way?

6               THE JUROR:  No, not really.

7               MS. CLARKE:  What was your reaction when you heard

8     that?

9               THE JUROR:  More comical.

03:07 10          MS. CLARKE:  More comical?  Is that sort of what the

11    Howie Carr Show --

12              THE JUROR:  Yeah, absolutely.  If you're from Boston,

13    you know Howie Carr.

14              MS. CLARKE:  You know Howie Carr?

15              THE JUROR:  Absolutely.

16              MS. CLARKE:  Even if you're not from Boston I think

17    you know Howie Carr.

18              THE JUROR:  Okay.

19              MS. CLARKE:  Okay.  Let me ask you to turn to 88 again

03:07 20   at page 23.  I keep flipping you back and forth in the

21    questionnaire.  It's a test of dexterity.

22              THE JUROR:  Absolutely.

23              MS. CLARKE:  And when you talked to the judge about

24    what you meant by "I think it's fair," it sounded like you

25    thought it was fair because of the ability to be certain as to

```
 1   someone's guilt?  Am I hearing you right?
 2           THE JUROR:  Yeah, I don't think it's -- I think it's
 3   fair because of the ability now that you can prove it.  I mean,
 4   I think if you can prove something that's really -- the person,
 5   you know, absolutely did it and, you know, there's no, you
 6   know, 100 percent -- you can't say absolutely fair, then, yeah,
 7   I think it's somewhat fair, I guess.  I wouldn't want to be in
 8   jail for life, so...
 9           MS. CLARKE:  And how does -- you've said that a few
10   times, and I'm sure there are people that share that opinion.
11   How does that affect you sitting in a capital trial, your own
12   view that --
13           THE JUROR:  I don't really think it affects me in any
14   kind of way.  It's just a personal belief.  I think everybody
15   believes -- just like if you were sick and you were on -- you
16   want to take life support away, it's just the way you feel, you
17   wouldn't want to be -- I wouldn't want to be on life support
18   for the rest of my life.  You know, quality of life.  It's
19   basically quality of life is what I look at.
20           MS. CLARKE:  Sure.  You're just expressing your
21   personal opinion how it would affect you?
22           THE JUROR:  Yeah.
23           MS. CLARKE:  And the idea that the death penalty is
24   fair because we can be more certain nowadays, that kind of
25   makes it sound like you're more focused on the crime in making
```

1    your decision about the death penalty.  Did I get that wrong?

2          THE JUROR:  Focused on the crime?  More the crime than

3    the individual, I would say.  More -- I mean, I think

4    it's -- yeah, I guess you could focus more on the crime than on

5    the person.  That's my thought on it.

6          MS. CLARKE:  Well, in a capital trial where we don't

7    get to the penalty phase unless the person has been convicted

8    of a deliberate, intentional murder, no excuse, no

9    justification, right --

03:09 10          THE JUROR:  Okay.

11          MS. CLARKE:  -- so in that kind of situation, where

12    would you be on the death penalty?

13          MR. WEINREB:  Objection, your Honor, because I think

14    the no excuse/no justification tends to conflate questions of

15    the -- those are -- she's using them in the legal sense.  But

16    when it comes to the penalty phase, those will be argued as

17    being mitigating factors.

18          THE COURT:  Well, okay.  I think -- I don't know if I

19    agree with all of that, but I do think the question could be

03:10 20    confusing to a layperson.  Maybe you could ask it again.

21          MS. CLARKE:  I guess what I'm trying to figure out is,

22    you know, some people will say, "If it was self-defense, then I

23    wouldn't give the death penalty."  Of course if there was

24    self-defense it wouldn't be --

25          THE JUROR:  A death penalty case.  Understandable

1          MS. CLARKE:  Right.  It wouldn't be deliberate and

2     intentional murder, right?

3          THE JUROR:  Yes.

4          MS. CLARKE:  So the question is:  If there is a

5     conviction of a deliberate, intentional, premeditated murder,

6     where would you come out?

7          THE JUROR:  Honestly, I would come out if -- probably

8     for it if -- if -- if the person -- I would say if the person

9     wants it.  But you can't say you want or don't want the death

03:11 10    penalty.  But I would probably go for it.  Yeah, I would.

11          MS. CLARKE:  Based on the crime alone?

12          MR. WEINREB:  Objection.

13          THE COURT:  Yeah, I think that's too leading.

14     My --

15          MS. CLARKE:  I think I would let the Court --

16          THE COURT:  Earlier you heard me say that in the

17     penalty phase -- of course you have somebody who's already been

18     convicted, is found guilty by the jury of intentional murder,

19     right?  That's the premise.  You don't get to the penalty phase

03:11 20    unless you have a person convicted of that.

21          THE JUROR:  Absolutely.

22          THE COURT:  So then the question is:  What is the

23     appropriate punishment?  And as I said, there will be a

24     presentation by the government of things that aggravate the

25     offense and therefore call for maybe the more serious penalty,

1   and there will be a presentation by the defense -- did I say by

2   "the defense"?  By the government if I said that wrong --

3   aggravating by government, mitigating by the defense.

4           THE JUROR:  It's just hard to see how you would feel

5   about it at that point after you've gone through.  You don't

6   know.

7           THE COURT:  I think the question is:  If you're

8   considering all of that, are you thinking about the events of

9   the crime itself alone, or are you thinking about the

03:12 10   individual and what that person deserves or doesn't deserve

11   alone based on their characteristics, or are you thinking about

12   both things as balancing against each other, I guess?  Do you

13   understand what I'm saying?

14           THE JUROR:  Yeah, I understand.  It's just you can't

15   make that determination until you've kind of gone -- kind of

16   known more about what was behind, you know, the circumstances

17   of everything.  I mean, it's hard to say --

18           THE COURT:  Well, earlier I think you said something

19   about upbringing and things like that.  Is that a category of

03:12 20   things you might --

21           THE JUROR:  Yeah.  I mean, I wouldn't say

22   "upbringing."  I mean, yeah, I mean, if you was kind of beaten

23   24 hours a day and stuck in a closet for, you know, all your

24   life, that's kind of -- you're going to -- that's...

25           (Pause.)

```
 1              MS. CLARKE:  Thank you very much.

 2              THE JUROR:  That's fine.  Thank you.

 3              THE COURT:  All set?  All right.  Thank you.  Just

 4    leave the questionnaire there.

 5              (The juror exits the courtroom.)

 6              THE CLERK:  Juror No. 379.

 7              THE JURY CLERK:  Juror 379.

 8              (The juror enters the courtroom.)

 9              THE CLERK:  Ma'am, over here.  Have a seat.  And if

10    you could do me a favor and keep your voice up and speak into

11    the mic so everyone around here can hear you, okay?  The mic is

12    adjustable so you can move it around.

13              THE JUROR:  Okay.

14              THE COURT:  Good morning.

15              THE JUROR:  Good morning.

16              THE COURT:  Since you were last here, have you been

17    able to avoid any discussion of the case, substantively, with

18    anyone?

19              THE JUROR:  Uh-huh.

20              THE COURT:  You have to say yes or no for the court

21    reporter.

22              THE JUROR:  Yes.

23              THE COURT:  And have you also been able to avoid media

24    reporting about the case, largely?

25              THE JUROR:  Largely.
```

```
 1                THE COURT:  Yeah.  If you see it, you turn away from
 2      it?
 3                THE JUROR:  Pretty much.
 4                THE COURT:  Tell us about your employment.
 5                THE JUROR:  I'm a fitness instructor and a personal
 6      trainer.
 7                THE COURT:  At a health club in a hotel?
 8                THE JUROR:  Health club, yes.
 9                THE COURT:  And what's your schedule like?
03:15 10                THE JUROR:  I have private clients a few days a week
11      at another facility where I teach yoga, and I have two classes
12      a week in the evening.
13                Do you want the specific times or --
14                THE COURT:  Just a general idea of your schedule,
15      that's all.
16                THE JUROR:  And my other clients are just varied based
17      on when I have people for personal training.
18                THE COURT:  Do you have regular hours at the health
19      club where you --
03:16 20                THE JUROR:  Yes, I do.
21                THE COURT:  -- are a fitness instructor?
22                THE JUROR:  About ten hours a week.
23                THE COURT:  That, of course, is the questionnaire that
24      you filled out before.  And so we're following up on some of
25      the things -- I just want to ask you if you'd look at page 5,
```

1    Question 10.  In there we set out what we anticipate what the

2    schedule for the case would be.  And it would likely be a

3    lengthy case, may last several months.  We asked if it would be

4    a special hardship on you to serve on that schedule and you

5    said "no."

6         I'm just asking in light of what you told us about

7    your work and the hours and so on, would it be difficult for

8    you to maintain your work and serve on the case or could you

9    rearrange your hours and --

03:16 10        THE JUROR:  I don't know why I put "no."  I must have

11   been in a rush to get out.  It's a huge -- it would be very

12   difficult.  I have a lot of people that rely on me.  I also

13   volunteer through the Council on Aging and bring older people

14   to medical appointments, and they completely rely on me.  So it

15   would be very difficult.  And not to mention my husband owns

16   his own business, so we rely on this money that I would bring

17   in when I teach my classes and things, so I don't know why I

18   put "no."

19        THE COURT:  Okay.  All right.  Thank you.  That's it.

03:17 20        THE CLERK:  Just leave that right here, ma'am.

21   Thanks.

22        (The juror exits the courtroom.)

23        THE CLERK:  Juror No. 385.

24        THE JURY CLERK:  Juror No. 385.

25        (The juror enters the courtroom.)

1              THE CLERK:  Ma'am, over here, if you would.  Have a

2      seat.  Yeah, right over here.

3              And if you would do me a favor, keep your voice up,

4      speak into the mic so everyone around here can hear you, all

5      right?

6              THE JUROR:  Okay, I'll try.

7              THE COURT:  Good morning.

8              THE JUROR:  Good morning.

9              THE COURT:  Since you were last here, have you been

03:18 10   able to avoid any discussion of the case with other people?

11              THE JUROR:  Yes.

12              THE COURT:  And also as much as possible avoid reading

13     or hearing any media reports on the case?

14              THE JUROR:  Yes.

15              THE COURT:  So that's the questionnaire that you

16     filled out.  We all have copies, and we're going to follow up

17     on some of the answers you gave, all right?

18              You were born in Moscow, Russia?

19              THE JUROR:  Yes.

03:19 20         THE COURT:  And lived there until the early '90s, I

21     guess?

22              THE JUROR:  1990 we came here.  25 years ago.

23              THE COURT:  I assume you speak and understand Russian?

24              THE JUROR:  Oh, yeah.

25              THE COURT:  Let me ask you about your employment.

```
 1    Tell us what you do and for whom.

 2              THE JUROR:  I'm epidemiologist analyst.

 3              THE REPORTER:  I'm sorry?

 4              THE JUROR:  I'm epidemiologist analyst.  I do medical

 5    research.  My accent.  I'm sorry.

 6              And I do research for Veteran Affairs now, the

 7    government.

 8              THE COURT:  If you look at page 10 of the

 9    questionnaire --

03:20 10          THE JUROR:  Yes?

11              THE COURT:  -- that's where we -- in 26 at the top, we

12    ask you to list your employment.  And the VA, the Veterans

13    Administration, is the top one.  What's the next word?

14              THE JUROR:  "MAVERIC."  This is the name of the

15    research institute.  Massachusetts Veteran Research Institute.

16              THE COURT:  I see.  Okay.  And where's that located?

17    What town, what city?

18              THE JUROR:  Here in Boston.  In Jamaica Plain.

19              THE COURT:  Okay.  Oh, at the Jamaica VA?

03:20 20          THE JUROR:  Yes.  I work not far from there.

21              THE COURT:  And before that you worked -- is that a

22    private company?

23              THE JUROR:  Optima.  It's part of the -- it's also the

24    same thing, medical research, but Optima was a big insurance

25    company under the umbrella of United Care, I think.
```

```
 1              THE COURT:  Okay.  All right.  And then before that
 2   you were -- is it BWH?  Is that Brigham and Women's Hospital?
 3              THE JUROR:  Yes.
 4              THE COURT:  Doing similar work?
 5              THE JUROR:  Yes.
 6              THE COURT:  Let me go back to -- well, you don't
 7   necessarily have to look.  Page 6.  Your husband is also a
 8   statistical programmer?
 9              THE JUROR:  Yes.
10              THE COURT:  Where does he work?
11              THE JUROR:  Brigham and Women's.  About 20 years
12   there.
13              THE COURT:  And what kind of work does he do?
14              THE JUROR:  The same.
15              THE COURT:  Give us an idea, what is it?
16              THE JUROR:  This is medical research, what they do at
17   Brigham, and he is a leading programmer -- statistical
18   programmer.
19              THE COURT:  Does he work across departments, that is,
20   medical departments?  You said you were in epidemiology.
21              THE JUROR:  Yes.
22              THE COURT:  Is he in a particular --
23              THE JUROR:  He is in general medical -- I think a
24   general medical department, but they do research, medical
25   research.  He works with doctors, but he's not a doctor.  He's
```

 1    close, a statistician.

 2           THE COURT:  Okay.  We asked about -- and this is at

 3    the bottom of page 10 and the top of page 11 -- about the use

 4    of social media, like Facebook and stuff like that.  You don't

 5    use any of those things?

 6           THE JUROR:  I don't use Facebook.  But I do online,

 7    check news regularly.

 8           THE COURT:  Regular --

 9           THE JUROR:  Yeah.  I'm pretty aware of what happened

03:22 10    in the world.

11           THE COURT:  That just reminds me.  Do you still have

12    relatives living in Russia?

13           THE JUROR:  Not too much.  I mean, I have one, but

14    more friends than relatives.

15           THE COURT:  People you still stay in contact with?

16           THE JUROR:  Yes.  Not very close -- not very close,

17    but, yes, from time to time, friends.

18           THE COURT:  So how would you stay -- one thought I had

19    was people sometimes do that through Facebook, but you do it

03:23 20    other ways.  How do you do it?

21           THE JUROR:  Skype.

22           THE COURT:  Skype?

23           THE JUROR:  Skype, and we also call.  But I have my

24    brother living in Israel, and also communicate with him by

25    Skype and phone.

1          THE COURT:  Let me ask you about Question 77 on page

2     20.  In this question we asked whether you had, based on things

3     you had seen or read in the media or otherwise, formed an

4     opinion that this defendant is guilty or not guilty or that he

5     should be sentenced to death or not, and as to each of those we

6     gave you the choice of "yes," "no" and "unsure."  To each of

7     those you checked "unsure," okay?  You can --

8          THE JUROR:  Yes, I did.  But I certainly think that

9     he's probably guilty, but I'm not -- I cannot tell for sure.

03:24 10    About the death penalty?  I cannot make the decision, one or

11    another side right now.  Of course it's a very difficult one,

12    and I'm not sure what to say on that.

13         THE COURT:  Right.  I want to come back to that, but I

14    want to talk about first whether you have formed an opinion

15    that he's guilty or not, and you say that you think probably

16    that is the case.  Further down in the question, after the

17    multiple choice A, B, C, D, we asked if you answered "yes,"

18    which you didn't on the form, but I take what you're saying now

19    is equivalent to saying "yes" to Part A, that you think you do

03:25 20    have an opinion, to some degree, anyway.  Is that fair?

21         THE JUROR:  Yes, to some degree.  That's correct.

22         THE COURT:  Okay.  So then we ask if you had an

23    opinion, would you be able to set it aside and base your

24    decision on guilt based solely on the evidence presented in the

25    course of the trial here in the court, and you checked the box

1    and said "able."

2              THE JUROR:  Yes.

3              THE COURT:  Can you tell us about that?

4              THE JUROR:  Yeah, I can do it because I could look at

5    it -- like maybe change some opinion which I had before based

6    on some facts.  But I can also tell you that maybe I'm not a

7    good choice for this role because I take it very personal, all

8    what happened.  And I put it in question.  First of all, my

9    husband runs marathons, and he could be there.  I could be

03:26 10   waiting for him.  He could be a runner.

11             Also, it's very personal for me because, as you

12   already heard, I came here 25 years ago from Moscow as an

13   immigrant with two boys -- two young boys.  So everything here

14   is very, you know, disturbing for me, and I take it very

15   personal.  And also, my brother who's in Israel -- and I am

16   certainly very against the extremism, Muslim extremism, because

17   of that.  So I don't think I'm a good choice.

18             THE COURT:  How -- how long has your brother been in

19   Israel?

03:26 20             THE JUROR:  26 years.

21             THE COURT:  About the same time?  You all left --

22             THE JUROR:  Yeah, he left, like, one year before us.

23             THE COURT:  What is his employment or profession?

24             THE JUROR:  He's an artist.  He's also -- he's an

25   artist and he doesn't work.  He's like -- now he's 60- -- he

1    was 68 -- 69 years yesterday, so...

2           THE COURT:  So you think that because of the pattern

3    of your immigration with two young boys kind of matches what

4    you understand the family of Mr. Tsarnaev has?

5           THE JUROR:  Yes.  I think I take it very personally.

6    I know what brainwashing could be.  It's very disturbing, I can

7    tell you.

8           MR. WEINREB:  Okay.

9           THE COURT:  All right.  Thank you.  We appreciate

03:27 10   that.  Just leave that there.

11          THE CLERK:  Just leave that there.  We'll take care of

12   it.

13          THE JUROR:  Thank you.

14          (The juror exits the courtroom.)

15          THE CLERK:  Juror No. 386.

16          THE JURY CLERK:  Juror 386.

17          (The juror enters the courtroom.)

18          THE CLERK:  Sir, over here, if you would.  Have a

19   seat.  Do me a favor, keep your voice up, speak into the mic so

03:29 20   everyone around the table can hear you, okay?

21          THE JUROR:  Okay.

22          THE COURT:  Good afternoon.

23          THE JUROR:  Good afternoon.

24          THE COURT:  Since you were here last, have you been

25   able to avoid any discussion of the substance of the case with

1    anyone?

2         THE JUROR:  Yes.

3         THE COURT:  And also as much as possible to avoid any

4    media accounts or reporting?

5         THE JUROR:  Yes.

6         THE COURT:  Okay.  So that's the questionnaire that

7    you filled out.  We're going to follow up with some further

8    questions about some of your answers, okay?

9         THE JUROR:  Okay.

03:30 10         THE COURT:  Looking at -- on page 10, Question 26,

11    tell us a little bit about what your work is.  You work for

12    Central Boston Elder Services?

13         THE JUROR:  I'm sorry.  Page?

14         THE COURT:  Ten.

15         THE JUROR:  Yes, I work at Central Boston Elder

16    Services.

17         THE COURT:  Tell us what that organization is.

18         THE JUROR:  We provide services to elderly people.

19    Like we contract --

03:30 20         THE COURT:  Is it a private, nonprofit organization?

21         THE JUROR:  Yes.

22         THE COURT:  And you describe your position there as

23    case manager.  Tell us a little bit about what you do --

24         THE JUROR:  I visit --

25         THE COURT:  On, you know, a daily, weekly basis, what

           1    sorts of things you do.

           2              THE JUROR:  I usually visit elderly people, make sure

           3    they have everything they need.  If I see anything that I think

           4    they need, like a walker, cane, handheld shower, some things

           5    that they might need, I address that.

           6              THE COURT:  You visit them in their homes?

           7              THE JUROR:  In their homes.

           8              THE COURT:  What would your weekly schedule be like?

           9              THE JUROR:  Usually I do about eight visits weekly,

03:31 10    and on some days I visit, some days I do notes, progress notes.

          11              THE COURT:  And that's generally in the Boston area?

          12              THE JUROR:  Yes.

          13              THE COURT:  Your answer to Question 26 says that you

          14    had previously been a senior pastor?

          15              THE JUROR:  Senior pastor in Puerto Rico.

          16              THE COURT:  In Puerto Rico?  Can you tell us a little

          17    bit about that?

          18              THE JUROR:  Well, I used to be a pastor of a small

          19    church, about 35 people, and we used to work out in the street,

03:32 20    working with drug addicts, alcoholics, people, preaching the

          21    gospel, taking them to rehab centers.

          22              THE COURT:  And that -- so that was before you moved

          23    up to the Boston area?

          24              THE JUROR:  Before I moved to Boston, yeah.

          25              THE COURT:  When you came here, then you started

1    working for the Elder Services?

2            THE JUROR:  That's correct.  I've been here for five

3    years now.

4            THE COURT:  You'll see at the bottom of page 10 and

5    the top of the next page we asked about social media, and you

6    said you use Facebook to chat with family and friends in Puerto

7    Rico?

8            THE JUROR:  Uh-huh.

9            THE COURT:  And also daily thoughts.  Can you tell us

03:32 10   what you had in mind --

11           THE JUROR:  I just write some poems and things, and I

12   share with my family and friends.

13           THE COURT:  Okay.  Let me ask you to turn to page 20,

14   Question 77.  In this question we asked whether -- as a result

15   of things you'd seen or read in the media or from other

16   sources, whether you'd formed an opinion whether the defendant

17   is guilty or not and whether he should receive the death

18   penalty or not.  And you answered that you had an opinion that

19   he was guilty, and further down in D that you had an opinion

03:33 20   that he should not receive the death penalty.

21           We then asked further down in the question that if you

22   answered "yes" to any of the questions, would you be able or

23   unable to set aside that opinion.

24           THE JUROR:  Where was that?  I'm sorry.

25           THE COURT:  This part right here.

```
 1              THE JUROR:  79?

 2              THE COURT:  No, no, above 78.  Right above 78.  The

 3     second half of Question 77.

 4              THE JUROR:  Okay.

 5              THE COURT:  Do you see where it begins, "If you

 6     answered 'yes' to any of the questions"?  There's no number in

 7     front of it.

 8              THE JUROR:  Uh-huh.  Yes, sir.

 9              THE COURT:  Right.  And you'd answered "yes" to Part A

03:34 10    and Part D, right, above, in 77?

11              THE JUROR:  Uh-huh.

12              THE COURT:  Do you see you checked "yes" for A and D?

13              THE JUROR:  Uh-huh.  Yes.

14              THE COURT:  Okay?  So we asked then in the next

15     paragraph, if you answered "yes," would you be able or unable

16     to set aside the opinion you said you had and base a decision

17     of guilt or punishment based solely on the evidence presented

18     to you in court, and we gave you a choice between "able" and

19     "unable," and you said "able."

03:35 20             THE JUROR:  Yes.

21              THE COURT:  You would be able to do that.

22              THE JUROR:  Yes.

23              THE COURT:  Can you tell us about that?

24              THE JUROR:  Yes, it's just if I'm going to judge what

25     I saw, what they said on TV, I might think he's guilty.  But
```

1    after what I heard, the evidence and all that, I might change

2    my mind.  So that's when I say "yes."

3         And what was the other one?

4         THE COURT:  No, that was it.  That's what I wanted to

5    ask you about.  So let me just go a little further with that.

6    You understand that in our criminal justice system a person who

7    is accused of a crime is presumed to be not guilty, or

8    innocent, of the crime unless and until the government proves

9    he's guilty by the evidence produced at trial.

03:36 10        THE JUROR:  Correct.

11        THE COURT:  And proves that beyond a reasonable doubt.

12        You understand those principles?

13        THE JUROR:  Yeah.

14        THE COURT:  So what we ask jurors to do is -- even if

15   they have some ideas about the matter beforehand from publicity

16   and so on -- to focus their attention on the evidence at trial

17   and make a judgment limited to the evidence at trial and not by

18   other things.

19        THE JUROR:  Right.  Correct.

03:36 20        THE COURT:  And by your answer, you're indicating that

21   you think you're able to do that if you were a juror in this

22   case?

23        THE JUROR:  Yes, yes, I am.

24        THE COURT:  I get confused between questionnaires.

25   Have you had any experience as a juror either here or in Puerto

```
 1   Rico?

 2            THE JUROR:  No.  I was going to -- they called me when

 3   I first got here, but my English was limited, so I couldn't

 4   serve.

 5            THE COURT:  Well, it's not very limited now.

 6            THE JUROR:  Yes.

 7            (Laughter.)

 8            THE COURT:  So let me turn to the death penalty

 9   questions.  And beginning on page 23 at Paragraph 88 -- not

10   paragraph, Question 88.

11            THE JUROR:  Yes.

12            THE COURT:  We first asked if you have any views on

13   the death penalty in general, what are they, and you wrote, "I

14   believe it's too easy to a person to die or receive the death

15   penalty after committing a crime like this one."

16            THE JUROR:  Yes.  Because I think it's -- for me, you

17   know, a person who committed a crime like this should be

18   thinking about what they did the rest of their life instead of,

19   you know, kill them.  I think that's worse.

20            THE COURT:  Uh-huh.  In the next question we asked to

21   see if you could put yourself on a numerical scale from 1 to

22   10, where 1 represented a belief that the death penalty should

23   never be imposed and 10 to believe it should always be imposed

24   whenever a person is convicted of intentional murder, and you

25   selected 1, which as the question was phrased, would indicate
```

1    that you believe it should never be imposed.  Is that your view

2    or --

3              THE JUROR:  Yes, that's what I believe.

4              THE COURT:  If you go to the next page, Question 90,

5    we set out a series of possible statements and asked you to

6    choose one that best described your feelings about the death

7    penalty in a case where someone had been proved guilty of

8    murder, and you selected C, "I'm opposed to the death penalty

9    but I could vote to impose it if I believed that the facts and

03:39 10   the law in a particular case called for it."

11             THE JUROR:  Yes.  What I'm trying to say is if

12   the -- if I'm in a trial like, say, this one and everybody vote

13   that the person should receive the death penalty, well, I'll go

14   with it.  That's what I'm trying to --

15             THE COURT:  Well, it seems -- let me say -- I know the

16   questions are kind of formed differently, but in the previous

17   question you said you would never do it, and now in this

18   question you say you might do it.  And I guess that's what I'm

19   trying to --

03:39 20             THE JUROR:  Oh, maybe I misunderstood the question.

21   What I'm trying to say that I -- if the -- if the jurors

22   decided -- decided that the person should receive the death

23   penalty, I will have to agree with that.  That's what I'm

24   trying to --

25             THE COURT:  Well, you understand you'd be instructed

1    that your decision would be your own decision, not what other

2    people decide, and you would be not only free but required to

3    make your own decision about it and not necessarily vote with

4    the majority or even everybody else.  I mean, you could take

5    your own position even if it was different from all the other

6    jurors.  Do you understand that?

7              THE JUROR:  Okay.

8              THE COURT:  You don't have to agree with them.

9              So that's why we're asking you for your views, because

03:40 10   your views are important, as any juror's views are.  But you

11   don't have to defer to anybody.  What you do have to do, what

12   we expect you to do, is listen to all the evidence in the case,

13   including the evidence at the penalty phase, and make a

14   judgment based on your own assessment of that regardless of

15   what other jurors think.

16             Are you clear about that?

17             THE JUROR:  Yes, I think I misunderstood that.

18             THE COURT:  All right.  So now understanding that, you

19   are free to make your own decision even if all the other jurors

03:41 20   think otherwise, the question, I guess, is:  Would you change

21   your answer to Question 90 or would you --

22             THE JUROR:  Now that I understand better, let me see

23   which one is the one --

24             THE COURT:  Yeah, take your time.  Read through all of

25   them.

```
       1              (Pause.)

       2              THE JUROR:  I'll say A.

       3              THE COURT:  A, which is, "I'm opposed to the death

       4    penalty and will never vote to impose it in any case no matter

       5    what the facts"?

       6              THE JUROR:  Yeah, I would say that.

       7              THE COURT:  That's pretty -- okay.  Okay.  I'll...

       8              MR. WEINREB:  Good morning.  Or actually, good

       9    afternoon.

03:42 10              THE JUROR:  Good afternoon.

      11              MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

      12    prosecutors.

      13              I just wanted to also point your attention to on page

      14    25, Question 95 at the bottom.  If you could just reread that

      15    question.

      16              THE JUROR:  95?

      17              MR. WEINREB:  Yes, please.

      18              THE JUROR:  You want me to read out loud?

      19              MR. WEINREB:  No.  No, just to yourself.

03:43 20              (Pause.)

      21              THE JUROR:  Yes.

      22              MR. WEINREB:  Okay.  Is that still your answer today?

      23              THE JUROR:  That's my answer, yeah.

      24              MR. WEINREB:  Okay.  Thank you.

      25              MS. CLARKE:  Good afternoon.  My name is Judy Clarke.
```

```
 1    I'm one of Mr. Tsarnaev's lawyers, and I just had a few
 2    questions.  And I don't want it to be a tug-of-war; I just want
 3    to sort of get at where you are on the death penalty.
 4            The judge will give you, the jury, instructions that
 5    they're to deliberate and talk about and weigh the evidence in
 6    the penalty phase.
 7            Does that make sense to you?
 8            THE JUROR:  I'm sorry.  Can you do that again?
 9            MS. CLARKE:  The judge will tell you that as a juror
03:44 10   you have an obligation to talk with your fellow jurors about
11    the evidence.  Does that make sense?
12            THE JUROR:  Uh-huh.
13            MS. CLARKE:  Do you think you could do that?
14            THE JUROR:  Talk with the jurors about --
15            MS. CLARKE:  -- the evidence.
16            Maybe I'll take you back to Question 77, page 20.  You
17    got it?  Question 77A.
18            THE JUROR:  Okay.
19            MS. CLARKE:  And you remember talking to the judge
03:44 20   about that question, and he was --
21            THE JUROR:  Yes.
22            MS. CLARKE:  -- telling you that -- or asking you
23    whether you would be able to set aside that opinion, listen to
24    the evidence and talk to the rest of your juror friends, people
25    in the jury box with you, right --
```

         1              THE JUROR:  Uh-huh.

         2              MS. CLARKE:  -- and change your opinion?

         3              MR. WEINREB:  Objection.  That wasn't the question.

         4    The question was:  If you heard the evidence at trial, could

         5    you change your opinion?  I don't think it had anything to do

         6    with talking to the other jurors.

         7              MS. CLARKE:  All right.  I'll try to get it right.

         8              THE COURT:  I put that in later.

         9              (Laughter.)

03:45  10              MS. CLARKE:  I thought you had "friends" in there

        11    somewhere.

        12              You told the judge that you could listen to the

        13    evidence at the trial and change your opinion, right?

        14              THE JUROR:  I definitely said yes.

        15              MS. CLARKE:  So that's sort of the same question on

        16    the death penalty.  Would you be able to listen to the evidence

        17    presented by both sides and fairly consider both sides?

        18              THE JUROR:  Of course.

        19              MS. CLARKE:  So in sitting with the jury, would you be

03:45  20    able to consider the government's position that the death

        21    penalty should be imposed?

        22              THE JUROR:  Well, my opinion is that, you know, what I

        23    believe, it shouldn't be imposed, but if the government -- if

        24    the government decided to do that, I cannot oppose that, if

        25    they're going to --

1          MS. CLARKE:  Well, that's not really the question.  I

2    mean, I think we all understand that you're opposed to the

3    death penalty yourself personally, and that, if given a choice,

4    you wouldn't have a death penalty in this country.

5          THE JUROR:  Uh-huh.

6          MS. CLARKE:  But that's not the question.  The

7    question is whether or not you can fairly consider the

8    arguments for the death penalty as well as the arguments

9    against the death penalty in a case.

03:46 10          THE JUROR:  Oh, yes.

11          MS. CLARKE:  You can --

12          THE JUROR:  I got to hear all the evidence, and after

13    that I can make my mind about -- if he's guilty or not or --

14    you know, if he's guilty or not, but not about the death

15    penalty.  Do you know what I mean?  I believe there's two

16    things -- two different things.

17          MS. CLARKE:  Two different questions.  One is whether

18    he's guilty or not, and that's a decision that the jury makes.

19          THE JUROR:  Right.

03:46 20          MS. CLARKE:  And then the second decision the jury

21    makes if they find him guilty is whether or not to impose life

22    imprisonment without the possibility of release or the death

23    penalty, right?

24          THE JUROR:  Yes.

25          MS. CLARKE:  And the question is whether or not your

1    views against the death penalty would allow you to still

2    consider the arguments for the death penalty as well as the

3    arguments against the death penalty.

4         THE JUROR:  I believe that I can hear all the evidence

5    and then decide if he's guilty or not --

6         MS. CLARKE:  And --

7         THE JUROR:  -- until there.

8         MS. CLARKE:  And then the second question is whether

9    or not you can, in the second phase of the trial, consider the

03:47 10   evidence for the death penalty and the evidence against the

11   death penalty.

12        MR. WEINREB:  Objection, your Honor.  The question's

13   now been asked several times.

14        THE JUROR:  Yes, I already answered the question.

15        THE COURT:  Go ahead and answer it if you can.

16        THE JUROR:  Yes, I don't believe in the death penalty.

17        MS. CLARKE:  Okay.  Thank you very much.

18        THE COURT:  Thank you very much, sir.  Just leave the

19   form there.

03:47 20        THE JUROR:  Thank you so much.

21        (The juror exits the courtroom.)

22        THE CLERK:  Juror No. 390.

23        THE JURY CLERK:  Juror 390.

24        (The juror enters the courtroom.)

25        THE CLERK:  Ma'am, over here, please, if you would.

1    Have a seat.  Do me a favor and keep your voice up and speak

2    into the mic so everyone around the table can hear you, okay?

3              THE JUROR:  Okay.

4              THE CLERK:  Thanks.

5              THE COURT:  Good afternoon.

6              THE JUROR:  Good afternoon.

7              THE COURT:  Since you were last here have you been

8    able to avoid discussing the substance of the case with

9    anybody?

03:49 10             THE JUROR:  Yes.

11             THE COURT:  And also as much as possible avoid the

12   media reporting and accounts about the case?

13             THE JUROR:  Yes.

14             THE COURT:  Thanks.  So that's the questionnaire that

15   you filled out.  We're going to follow up with some questions

16   about some of the answers you've given.

17             I want to start with what you do for a living.  I'm

18   looking at page 10, Question 26.  This says that you are a

19   medical assistant at Mass. General Hospital?

03:49 20             THE JUROR:  Yes.

21             THE COURT:  You began in 2013?

22             THE JUROR:  Yes.

23             THE COURT:  Do you remember what month?

24             THE JUROR:  October 1st.

25             THE COURT:  2013?

 1          THE JUROR:  Yes.

 2          THE COURT:  So you were not there in April 2013 when

 3     the marathon events happened?

 4          THE JUROR:  No; I was in school.

 5          THE COURT:  And school was Bunker Hill?

 6          THE JUROR:  Yes.

 7          THE COURT:  Do you remember what you -- during that

 8     week when things were happening were you at school or were you

 9     home?

03:50 10          THE JUROR:  No, I was home.

11          THE COURT:  Was school off that week?  I know for

12     grade schools it is but --

13          THE JUROR:  Yes.

14          THE COURT:  -- it was for community college as well?

15          THE JUROR:  Yes.

16          THE COURT:  Okay.  So tell me about your work as a

17     medical assistant.

18          THE JUROR:  I work in the cancer center at MGH.  I do

19     vital signs, assist with bone marrow biopsies, thyroid

03:50 20     biopsies, and lobotomy.

21          THE COURT:  Let me ask you to turn back to page 5 and

22     Question 10.  In this question we outlined the schedule the

23     case would take and also pointed out it's likely to be a long

24     case, and the estimate there was three to four months.  That is

25     an estimate, but it's very possible.  We then asked if that

 1    schedule would cause you any special hardship that would make

 2    it difficult for you to serve in the case.

 3            I'm just wondering how it would impact your employment

 4    if you were on a case on that schedule that would last three or

 5    four months.

 6            THE JUROR:  Well, I spoke to my supervisor about it

 7    just saying I was a potential juror, and they were okay with

 8    it.

 9            THE COURT:  You'll continue to get paid?

03:51 10        THE JUROR:  Yes.

 11            THE COURT:  We asked -- this is -- if you want to look

 12   at it, it's page 11, Question 30.  We asked about use of social

 13   media.  You said Instagram every day.

 14            THE JUROR:  Yes.

 15            THE COURT:  Are you both a sender and a receiver?

 16            THE JUROR:  Yes.

 17            THE COURT:  Some people look more than they post.

 18            THE JUROR:  No, I do both.

 19            THE COURT:  Social things?  Just friends and family

03:52 20   kinds of things?

 21            THE JUROR:  Yes.

 22            THE COURT:  You don't use it for work or anything?

 23            THE JUROR:  No.

 24            THE COURT:  Your sister served as a Marine?

 25            THE JUROR:  Yes, she's currently still a Marine.

1          THE COURT:  She is?

2          THE JUROR:  Uh-huh.

3          THE COURT:  What have her assignments been, do you

4    know, or deployments?  Has she been over in Iraq and

5    Afghanistan?

6          THE JUROR:  Yes, from 2012 to 2013.

7          THE COURT:  Where?

8          THE JUROR:  Afghanistan.

9          THE COURT:  And she's back now?

03:52 10          THE JUROR:  Yes.

11          THE COURT:  Where is she stationed?

12          THE JUROR:  San Diego.

13          THE COURT:  Did she see combat, do you know, when she

14    was over there?

15          THE JUROR:  I'm not sure.

16          THE COURT:  Have you talked to her about it?

17          THE JUROR:  She doesn't talk much about it.

18          THE COURT:  And you don't press?

19          THE JUROR:  No.

03:52 20          THE COURT:  Let me ask you to look at page 20 and

21    Question 77.  In this question we asked jurors whether as a

22    result of things they'd seen or read in the media or elsewhere,

23    whether they formed any opinion about whether the defendant was

24    guilty or not and whether he should receive the death penalty

25    or not, and we gave you a choice of "yes," "no" or "unsure,"

1    and you checked "unsure" as to each of those.

2            Can you tell us why you made that decision?

3            THE JUROR:  I don't like to base it off of what other

4    people have said.

5            THE COURT:  Excuse me?

6            THE JUROR:  I don't like to base it off of what other

7    people have said, so I'm unsure.

8            THE COURT:  Okay.  So if you were -- let me back up.

9            You understand that in the criminal process that if a

03:54 10   person is accused of a crime, a person is presumed innocent, or

11   not guilty, of the crime unless and until the government proves

12   a person guilty by the evidence at trial and proves it beyond a

13   reasonable doubt to the satisfaction of the jury.

14           You understand those principles?

15           THE JUROR:  Yes.

16           THE COURT:  And so what we ask jurors to do is to

17   focus on the evidence produced at trial and consider that and

18   make judgments about it, and if they're convinced by the

19   government -- by the government's evidence or all the evidence

03:54 20   in the case that the person is guilty and they're convinced

21   beyond a reasonable doubt, then they're justified in returning

22   a verdict of guilty, but if they're not convinced beyond a

23   reasonable doubt that the person is guilty of what crime is

24   accused -- the person is accused of, it's the obligation of the

25   jury then to vote not guilty.

1              Do you understand those principles?

2              THE JUROR:  Yes.

3              THE COURT:  Would you -- if you on any particular

4    charge were not convinced the government had satisfied you

5    beyond a reasonable doubt, would you be able to vote not

6    guilty?

7              THE JUROR:  If I wasn't convinced?

8              THE COURT:  Yeah.

9              THE JUROR:  No.

03:55 10            THE COURT:  Would you be able to vote not guilty?

11             THE JUROR:  Not guilty.

12             THE COURT:  Yeah.  We asked some questions about the

13   death penalty beginning on page 23 at Question 88, and the

14   first one, 88, was a question whether you had any views on the

15   death penalty in general, and if so, what they were, and you

16   said "none."

17             THE JUROR:  No.

18             THE COURT:  No general views pro or con?

19             THE JUROR:  No.

03:55 20            THE COURT:  But then in the next question we asked,

21   pick a number on the scale from 1 to 10, where 1 is a belief

22   that the death penalty should never be imposed and 10 reflects

23   a belief that the death penalty should be imposed whenever a

24   defendant's been convicted of intentional murder, and you

25   picked 10.

1          THE JUROR:  Right.  Like I don't have any strong

2     beliefs against the death penalty, but there are consequences.

3     So if you do commit a murder, then you should be held

4     responsible for that.  But I'm just saying that, like, I have

5     nothing against the death penalty.

6          THE COURT:  So you thought Question 88 was asking

7     whether you had any negative opinions about the death penalty?

8          THE JUROR:  Yeah.

9          THE COURT:  Okay.  I think we meant to ask either way.

03:56 10          In -- well, let me ask you to go to the next page.

11     Here, rather than asking you to select a number on the scale,

12     we asked you to select a statement if you thought it best

13     described your feelings about the death penalty in a case where

14     someone has been proved guilty of murder.  And you understand

15     that we don't reach the question of a penalty unless somebody's

16     been convicted of a murder, right?  I mean, that's the premise

17     to get to the penalty question, right?

18          So here on this question you selected statement D

19     which was, "I'm not for or against the death penalty.  I could

03:57 20     vote to impose it or I could vote for a sentence of life

21     imprisonment without possibility of release, whichever I

22     believed was called for by the facts and the law in the case."

23          That sort of indicates you could go either way.

24          THE JUROR:  Right.

25          THE COURT:  Let me go back to Question 89 because if

1    you look at 89 where you said "strongly favor" -- do you see

2    that, you circled 10?

3        THE JUROR:  Uh-huh.

4        THE COURT:  If you look right above it, it says "A 10

5    reflects a belief that the death penalty should be imposed

6    whenever the defendant has been convicted of intentional

7    murder."  That means more or less always.  And that's a little

8    different from D.  So maybe -- the questions aren't perfect and

9    it could be subject to interpretation, so tell us -- reconcile

03:58 10    for us, I guess, what seems to be a difference between 89 and

11    90.

12        THE JUROR:  Well, my thing is, it's just I guess I can

13    go either way depending on if he was guilty or not depending on

14    what evidence was brought against him.

15        THE COURT:  We're not talking about guilt now; we're

16    talking a person who has been convicted of murder, okay?  So

17    now we've moved on to the second phase, which is the penalty

18    phase, what punishment should be imposed on this person who is

19    guilty of murder.

03:58 20        THE JUROR:  Yeah, if he's guilty, I would impose the

21    death penalty.

22        THE COURT:  Okay.

23        THE JUROR:  If that makes any sense.

24        THE COURT:  Okay.  So you heard me this morning talk

25    about the penalty phase where there would be an opportunity for

1    both sides to present evidence about what the appropriate

2    punishment should be, the death penalty or life imprisonment,

3    and that the government would present evidence -- aggravating

4    factors that it would argue justify the death penalty and the

5    defense would have the opportunity to present evidence of

6    mitigating factors that would suggest the death penalty is not

7    the right punishment and life imprisonment is.

8            Do you remember those instructions?

9            THE JUROR:  Yes.

03:59 10           THE COURT:  And as I said, after hearing all that, the

11   jurors would be asked to decide what is the right penalty for

12   this case for a person who has been convicted of this crime.

13   Are you saying that you would or would not be able to consider

14   both mitigating and aggravating factors?

15           THE JUROR:  No, I would be able to consider both.

16           THE COURT:  What I'm trying to get at is whether you

17   think you would automatically go in one direction or another

18   without considering the evidence or whether you'd consider --

19           THE JUROR:  No, I would consider the evidence.

03:59 20           THE COURT:  The reason I'm pressing you a little bit

21   on this is because you -- I want to be sure we understand what

22   you're telling us because earlier I think you said that if the

23   person was guilty of murder, you would impose the death

24   penalty.  Do you see the possible conflict between those

25   positions?

```
 1                THE JUROR:  Uh-huh.

 2                THE COURT:  Can you tell us where you really are?

 3                THE JUROR:  It's just really in the middle, like

 4       it's -- I guess it all depends on the evidence brought against

 5       him.  I mean, that's all I can really say.

 6                THE COURT:  Let me ask you to turn to page 25 at the

 7       bottom, Question 95.  There we asked if you found this

 8       defendant guilty and you decided the death penalty was the

 9       appropriate punishment, could you conscientiously vote for it.

10       And you said "yes," right?

11                THE JUROR:  Yes.

12                THE COURT:  And that is your answer to that question?

13                THE JUROR:  Yes.

14                THE COURT:  And then on the top of the next page, if

15       you found him guilty and you decided that life imprisonment

16       without the possibility of release was the appropriate

17       punishment, could you conscientiously vote for life

18       imprisonment without the possibility of release.  You said

19       "yes" to that?

20                THE JUROR:  Yes.

21                THE COURT:  And is that still your answer?

22                THE JUROR:  Yes.

23                MR. WEINREB:  Thank you, your Honor.

24                Good afternoon.

25                THE JUROR:  Hi.
```

```
 1              MR. WEINREB:  Hi.  My name is Bill Weinreb.  I'm one
 2    of the prosecutors in the case.  If I could, I would just like
 3    to follow up on a few of your answers.
 4              So the goal here, as the judge explained, is to
 5    determine whether someone can be fair and impartial in sitting
 6    as a juror, meaning judge the case on the evidence and not on
 7    things that you hear outside of the courtroom or that sort of
 8    thing.  And I notice one of the things that you mentioned on
 9    your questionnaire is that you have a seven-year-old boy.
04:01 10              THE JUROR:  Yes.
11              MR. WEINREB:  Yeah.  So you may hear evidence in this
12    case -- in fact, you will hear evidence that one of the victims
13    of the marathon bombings was an eight-year-old boy.
14              Would the fact that you have a seven-year-old boy
15    prevent you from being a fair and impartial juror in this case?
16              THE JUROR:  It might make it difficult.
17              MR. WEINREB:  Okay.  So that's understandable.  And
18    what we're trying to get at here is whether you can judge the
19    case based on the evidence, and the judge -- and basically on
04:02 20    the facts and the law.  So the judge will explain -- you'll
21    hear facts in the courtroom; the judge will explain the law to
22    you.  Jurors aren't expected to not have personal lives, not
23    have a background, but they are expected to compartmentalize to
24    some degree and sort of put aside --
25              MR. BRUCK:  I want to object to the long explanation.
```

     1   He should ask the question.

     2         THE COURT:  Yeah, yeah, I think you should ask the

     3   question.

     4         MR. WEINREB:  Okay.  So the question is simply:  Will

     5   you be able to follow the law as the judge gives it to you and

     6   judge the case on the facts?

     7         THE JUROR:  Yes.

     8         MR. WEINREB:  Okay.  Now let me ask the same question

     9   about your relatives who have had Army service.  So, again, you

04:03 10   may hear evidence in this case that one of the motives for the

    11   marathon bombing was to essentially punish America for its

    12   actions in places like Afghanistan and Iraq and to advance the

    13   cause of terrorists.

    14         And the question is, again, you know, you'll hear

    15   evidence about that and you may believe it and you may not

    16   believe it, you may believe some of it or not believe some of

    17   it, but the question is:  Will you be able to decide the case

    18   based, again, on the evidence that you hear in the courtroom

    19   despite the fact that you've had siblings who have served?

04:04 20         THE JUROR:  Yes.

    21         MR. WEINREB:  So now I want to follow up just a bit on

    22   what you said about the death penalty.  And trust me, you're

    23   not alone in finding the process a little confusing, but...

    24         So at the risk of repeating what's been said before,

    25   I'll say it again.  So this trial may have two phases.  So the

1     first phase is just like any other trial; it's to determine if

2     the defendant's guilty or innocent, or guilty or not guilty.

3     And at the end of that process, the jurors will vote.  And if

4     they find the defendant guilty of a capital crime, meaning a

5     crime that carries a potential sentence of death, then there

6     will be a second phase of the trial, but if they find the

7     defendant guilty, that means that the jury will have found the

8     defendant guilty of a deliberate, intentional, premeditated

9     murder, and the question then becomes -- so then during the

04:05 10   second phase the question is:  What should the penalty be for

11    that murder?  Should the penalty be life imprisonment or should

12    it be the death penalty?  We're not talking about this case

13    now; I'm talking about any death penalty case.

14            And in the second phase you hear evidence about that.

15    Again, the government puts on evidence that it believes shows

16    that this is the kind of crime, or the kind of defendant, who

17    should deserve the death penalty, and the defense puts on

18    evidence that it thinks shows that this is the kind of crime or

19    the kind of defendant that should not -- does not deserve the

04:05 20   death penalty, should get life imprisonment without release

21    instead.

22            Do you understand all that?

23            THE JUROR:  Yes.

24            MR. WEINREB:  All right.  So the question is:  Would

25    you go into that second phase with your mind already made up

```
 1    about what the penalty should be or could you hear the evidence

 2    and meaningfully consider all of it and weigh it before

 3    determining what the penalty should be?

 4              THE JUROR:  I would want to hear both evidence to see

 5    what my decision would be.

 6              THE COURT:  Would you just say it a little louder?  I

 7    think some of us had a problem --

 8              THE JUROR:  I would listen to both evidence in order

 9    to determine what my decision would be.

10              MR. WEINREB:  Thanks very much.

11              THE JUROR:  You're welcome.

12              MR. BRUCK:  Good afternoon.

13              THE COURT:  Not quite finished.  Not quite finished.

14              MR. BRUCK:  One more person wants to ask you some

15    questions, and that's me.  My name is David Bruck, and I'm one

16    of Jahar Tsarnaev's lawyers.  Is it okay if I ask you a few

17    more questions?

18              THE JUROR:  Sure.

19              MR. BRUCK:  I know you've already been through the

20    mill.  Thank you.

21              You now work at Mass. General?

22              THE JUROR:  Yes.

23              MR. BRUCK:  You weren't working there at the time?

24              THE JUROR:  No.

25              MR. BRUCK:  At the time of the bombing?
```

```
 1              THE JUROR:  Correct.

 2              MR. BRUCK:  Can you tell me what you were doing on

 3      April 15th, 2013?  You said you were a student.  Can you tell

 4      me how you heard about the bombing?

 5              THE JUROR:  I remember being at home and seeing it on

 6      the news, and from there just watching it.

 7              MR. BRUCK:  And did you have any concerns about people

 8      that you thought might be there?

 9              THE JUROR:  No.

04:07 10        MR. BRUCK:  You didn't know anyone?

11              THE JUROR:  No.

12              MR. BRUCK:  Have you since learned that there were

13      people that you knew that were along the route of the marathon

14      or --

15              THE JUROR:  No.

16              MR. BRUCK:  -- witnessing it?

17              How about on the -- on April 19th, the day where there

18      was the manhunt.  Do you remember that?

19              THE JUROR:  Yes.

04:07 20        MR. BRUCK:  Where were you that day?

21              THE JUROR:  I was home because they said everybody was

22      supposed to stay home.  I was home because on the news it said

23      that everyone should be home.  So I was watching the whole

24      thing at home.

25              MR. BRUCK:  So you had to stay at home that day
```

1    because of the manhunt?

2              THE JUROR:  Yes.

3              MR. BRUCK:  Okay.  The -- and with your child?

4              THE JUROR:  Yes.

5              MR. BRUCK:  Your child was home that day too?

6              THE JUROR:  Yes.

7              MR. BRUCK:  Did you find that you had to explain to

8    him what this was all about, what's going on?

9              THE JUROR:  Yes.

04:08 10         MR. BRUCK:  Was he frightened?

11             MR. WEINREB:  Objection.

12             THE COURT:  No, go ahead.  You could have it.

13             MR. BRUCK:  Was he alarmed?

14             THE JUROR:  I think he was more confused.  He didn't

15   really understand.

16             MR. BRUCK:  Did you find it hard to explain what was

17   happening?

18             THE JUROR:  Yes.

19             MR. BRUCK:  Like any parent?

04:08 20         THE JUROR:  Yes.

21             MR. BRUCK:  Is it something that he has talked about

22   since then?

23             THE JUROR:  No.

24             MR. BRUCK:  You've been asked now already about

25   evidence that the motive for the bombing may have been

```
 1   retribution for what our troops have been doing in the wars in
 2   Afghanistan and Iraq, and you told us about your sister.  Now
 3   that you've had a little bit of chance to think about it, do
 4   you think that your sister's time over there, the risks that
 5   anyone takes when they're in harm's way in Afghanistan, that
 6   that might affect the way you look at this case at all?
 7             THE JUROR:  No.
 8             MR. BRUCK:  Are you sure?
 9             THE JUROR:  Yes.
10             MR. BRUCK:  Okay.  And I want to ask you again -- and
11   what I'm talking about now -- you told the judge originally --
12   and you filled out part of the form to suggest that if you're
13   sure that someone was guilty of intentional murder that you
14   would always favor the death penalty as the punishment so long
15   as it was clear, you were satisfied that they really committed
16   an intentional murder.  And there's been some back-and-forth
17   about that.
18             Is that how you feel?
19             THE JUROR:  Yes.
20             MR. BRUCK:  Now, you've heard us explain, the judge
21   explain, Mr. Weinreb explain, that it's a two-part trial, and
22   the first part is to see whether or not the person's really
23   guilty, and if they are guilty, then there's a second hearing
24   which is to decide whether the person should get the death
25   penalty or life imprisonment.  And of course people bring their
```

1    own views and feelings into that, and the point of all these

2    questions is just to find out what your views and feelings are

3    rather than to tell you what you should think.  So that's what

4    I'm trying to do.

5           If you were a juror in the second part and there would

6    be evidence presented by both sides in favor of the death

7    penalty or against it, but we want to know what you think, if

8    you were convinced that a person had committed an intentional,

9    deliberate murder, no doubt in your mind, and you had to decide

04:10 10   after hearing all the evidence at the second part of the trial

11   whether to impose the death penalty or whether to impose life

12   imprisonment, would you always vote for the death penalty?

13          THE JUROR:  Yes.

14          MR. BRUCK:  That's how you really feel when we've been

15   through all of this understanding that there would be evidence

16   presented going both ways?

17          MR. WEINREB:  Objection.  That's a leading question.

18          MR. BRUCK:  I think we're pretty much done.  Thank

19   you.

04:11 20        THE COURT:  Finished?  All right.  Thank you.

21          (The juror exits the courtroom.)

22          THE CLERK:  Juror No. 391.

23          THE JURY CLERK:  Juror 391.

24          (The juror enters the courtroom.)

25          THE CLERK:  Sir, over here, if you would, please.

1    Have a seat.  And do me a favor and keep your voice up and

2    speak into the mic so everyone around the table can hear you.

3         THE JUROR:  All right.

4         THE COURT:  Good afternoon.

5         THE JUROR:  Good afternoon.

6         THE COURT:  Since you were last here, have you been

7    able to follow my instructions to avoid discussing the

8    substance of the case with anyone?

9         THE JUROR:  I've avoided the substance of the case.

04:12 10   People have talked about --

11        THE COURT:  Knowing that you're --

12        THE JUROR:  Right.  Right.

13        THE COURT:  -- here but --

14        THE JUROR:  Right.  But we haven't talked about the

15   substance.

16        THE COURT:  And as much as possible to avoid any media

17   reporting of the case?

18        THE JUROR:  Yes.

19        THE COURT:  So that's the questionnaire that you

04:12 20   filled out.  We're going to follow up on some of the answers

21   that you gave us there, and you can follow along, I guess.

22        Let me start with your employment.  This is page 10,

23   Paragraph -- I mean Question 26.

24        THE JUROR:  Okay.  Yup?

25        THE COURT:  And you're a -- you manage customer

```
 1  support for a medical imaging company?

 2          THE JUROR:  Correct.

 3          THE COURT:  Tell us what that involves.  Your job, I

 4  mean.

 5          THE JUROR:  Oh, I have a team of support engineers.

 6  We have servers in about 100 hospitals around the country that

 7  manage transfer of medical images between hospitals.  And so I

 8  have a five-person team and we -- you know, whenever there's a

 9  problem with it, we're upgrading, fixing, configuring servers

10  and that sort of thing.  So it's IT basically.

11          THE COURT:  Okay.  Earlier on on page 5 we had given

12  jurors an outline of the schedule we anticipate and the

13  projection that the case could take three or four months --

14          THE JUROR:  Uh-huh.

15          THE COURT:  -- and asked if it presented a special

16  hardship, and you answered it does not impose any special

17  hardship.

18          THE JUROR:  Yeah.  I mean, I am the sole income for my

19  house, I guess.  I don't know what my employer would do in

20  terms of -- you know, in terms of three or four months.

21  But -- and my wife is sick.  That's why she's not working.  But

22  I'd assume my employer would be fine, but I don't know that,

23  actually.  So my hardship is basically --

24          THE COURT:  Have you raised it?

25          THE JUROR:  I think they'll be fine, but I don't know
```

1    that.

2           THE COURT:  You're a salaried employee?

3           THE JUROR:  I am a salaried employee, yes.  So I need

4    to be sure I'm employed and I have health insurance for my wife

5    and things like that.

6           THE COURT:  I understand she's currently unemployed.

7    The implication was that she had worked in the past.  What kind

8    of work did she do?

9           THE JUROR:  She worked for her parents selling

04:15 10   handbags.  And right now she has a heart condition, so she's

11   sort of unable to work right now.

12          THE COURT:  I was just getting at the field.  She was

13   in retail sales?

14          THE JUROR:  Retail sales, yeah.

15          THE COURT:  Let me ask you to look at the bottom of

16   page -- go back to page 10, and the last question we asked if

17   you logged or posted messages or opinions.  You said you don't

18   really post anymore?

19          THE JUROR:  Oh, no, no.  I mean, I didn't post to

04:15 20   websites or anything like that.  I was at one point a

21   journalist and did writing and stuff like that, but I haven't

22   done that for ten years or so.  *New York Media*.

23          THE COURT:  What --

24          THE JUROR:  They're all technical publications, so I

25   would be writing about technical things usually.

 1          THE COURT:  You speak a little Russian or understand a

 2     little Russian?

 3          THE JUROR:  I took Russian in college.  I mean, I can

 4     kind of read Cyrillic from time to time and occasionally pick

 5     out words and phrases and stuff, so...

 6          THE COURT:  Nothing you currently use?

 7          THE JUROR:  Nothing I currently use, no.  Basically

 8     college, and I'd been to Russia way back in high school.

 9          THE COURT:  Where did you go?

04:17 10          THE JUROR:  I went to St. Petersburg and I went to

11     Moscow.

12          THE COURT:  Let me ask you to turn to page 20,

13     Question 77.  Here we asked jurors whether -- based on things

14     they'd seen or read in the media or elsewise, whether they had

15     formed an opinion that the defendant was guilty or that he was

16     not guilty, and then whether the juror had found -- formed an

17     opinion about the death penalty.

18          You checked the box "yes" for that you had formed an

19     opinion that he was guilty, and "no" the corresponding --

04:17 20     reciprocal answer, I guess.

21          THE JUROR:  Right.  Right.  Right.

22          THE COURT:  And then "unsure" about the death penalty.

23          Then below that we asked, "If you answered yes to any

24     of the questions," and you did answer "yes" to A, "would you be

25     able or unable to set aside your opinion and base your decision

1     about guilt solely on the evidence that would be presented in
2     court," and you checked the box "able."
3              THE JUROR:  Yeah.  I guess my point there was I do
4     come in essentially, based on news media and that sort of
5     thing, feeling that he's guilty, but I could be persuaded, I
6     guess, is the -- I guess the question ultimately is could
7     you -- I'm starting from guilt instead of sort of presumed
8     innocence towards guilt -- you know -- I'm not starting with
9     presumed innocence; I am starting with presumed guilt, but I
04:18 10   could be kind of persuaded towards innocence, I guess, which I
11    realize is not the point of the --
12             THE COURT:  Right.  It's backwards.
13             THE JUROR:  It's backwards, but it is how I kind of
14    feel at this point, so...
15             THE COURT:  You think that you would effectively shift
16    the burden of proof to the defendant to prove that he wasn't
17    guilty?
18             THE JUROR:  I think so, yes, so -- which I realize is
19    not the answer, but that's -- I think that's what I would have
04:19 20   to kind of -- but I feel I could if someone made a case, so...
21             MR. WEINREB:  Your Honor, I think the parties are
22    content.
23             THE COURT:  Okay.  You also -- let me just ask this:
24    You were very close to the events that day, the day of -- the
25    end of the week.

```
 1              THE JUROR:  Yes.

 2              THE COURT:  The manhunt.

 3              THE JUROR:  Correct.

 4              THE COURT:  I think you even said you were awakened by

 5     shooting?

 6              THE JUROR:  Yes.

 7              THE COURT:  Okay.  Thank you.

 8              THE JUROR:  Okay.  Thanks.

 9              (The juror exits the courtroom.)

04:20 10         THE COURT:  Hold on just a minute.  393?

11              MS. CLARKE:  Yes.

12              MR. BRUCK:  Yes.  I guess I was looking at my watch.

13              THE COURT:  Well, I'm looking at a couple of things.

14     You haven't talked about her.  I mean, look at Question 26 and

15     Question 98.

16              MR. WEINREB:  We've proposed her.

17              THE COURT:  I'll talk to her if you want but...

18              (Counsel confer off the record.)

19              THE COURT:  You know, if there's any doubt...

04:21 20         MR. BRUCK:  I think we should explore hardship, if

21     that's the issue.

22              THE COURT:  Have her come in?  She's here.  We might

23     as well do it, but I have a suspicion.

24              MS. CLARKE:  Yes.

25              THE CLERK:  Juror No. 393.
```

```
 1              THE JURY CLERK:  Juror 393.

 2              (The juror enters the courtroom.)

 3              THE CLERK:  Ma'am, over here, please, if you would.

 4    Have a seat.

 5              THE JUROR:  Yes.

 6              THE CLERK:  And do me a favor, keep your voice up and

 7    speak into the mic so everyone can hear you, all right?

 8              THE JUROR:  Yes.

 9              THE COURT:  Good afternoon.

04:22 10              THE JUROR:  Good afternoon.

11              THE COURT:  Since you were here last, have you been

12    able to avoid talking about the substance of the case with

13    other people?

14              THE JUROR:  Yes.

15              THE COURT:  And as much as possible to avoid exposure

16    to media reporting?

17              THE JUROR:  Yes.  Yes.

18              THE COURT:  So that's the questionnaire that you

19    filled out.

04:23 20              THE JUROR:  Yes.

21              THE COURT:  And we're going to follow up on some of

22    the answers you gave there.

23              THE JUROR:  Okay.

24              THE COURT:  I'm first looking at page 10 and Question

25    26 where we ask you about your current employment.
```

```
 1              THE JUROR:  I'm retired.

 2              THE COURT:  Oh, you're retired?

 3              THE JUROR:  Yes.  It will be a year this April.  I

 4    don't work anymore.

 5              THE COURT:  And you had written in you were at

 6    Countryside Nursing Home, and it carried through to 2015, so...

 7              THE JUROR:  No, that's wrong.  I'm sorry.

 8              THE COURT:  So you retired last year sometime?

 9              THE JUROR:  Yes, it was a year ago this April.  So

10    2014.

11              THE COURT:  Okay.  Okay.  So we also asked jurors

12    about whether you used any social media like Facebook or

13    Instagram or anything.

14              THE JUROR:  No.

15              THE COURT:  You don't?

16              You served on a jury in the state court a couple of

17    years ago?

18              THE JUROR:  In Framingham, yes.

19              THE COURT:  And that was a criminal case?

20              THE JUROR:  Yes.

21              THE COURT:  Your husband has passed away?

22              THE JUROR:  Yes.

23              THE COURT:  What kind of work did he do before he

24    passed away?

25              THE JUROR:  He was a postal worker before he passed
```

```
 1    away.
 2              THE COURT:  I'd like you to look in the form -- in the
 3    questionnaire to page 20, Question 77 near the top.
 4              THE JUROR:  Yes.
 5              THE COURT:  There we asked whether as a result of
 6    things you'd seen in the news or learned about the -- things
 7    about this case from any source had you formed an opinion about
 8    whether the defendant was guilty or not and whether he should
 9    receive the death penalty or not.  As to the first two
10    questions, A and B, which are had you formed an opinion that he
11    was guilty or that he was not guilty, you checked the box
12    "unsure."
13              THE JUROR:  And I am.
14              THE COURT:  Can you tell us about that?
15              THE JUROR:  I am unsure.  I don't know much about this
16    case.  I never really got into it.  I don't know much about it
17    at all.
18              THE COURT:  Okay.  You know from your prior juror
19    service, I assume, that in a criminal case a defendant is
20    presumed innocent, or not guilty, unless the government proves
21    the person guilty of the crime charged beyond a reasonable
22    doubt by the evidence at the trial?
23              THE JUROR:  Yes.
24              THE COURT:  And a juror would be asked to listen to
25    the evidence produced in the case and at the end, in
```

1    deliberation with fellow jurors, decide whether the government

2    had carried its burden of proof, in which case the person could

3    be found guilty, or had failed to carry its burden of proof, in

4    which case the jury will be obliged to find the person not

5    guilty.

6              THE JUROR:  Yes.

7              THE COURT:  You understand those principles?

8              THE JUROR:  Yes.

9              THE COURT:  Would you have any difficulty in applying

04:26 10   those principles faithfully if you were a juror in this case?

11             THE JUROR:  Yes.

12             THE COURT:  Would you have any difficulty doing that?

13             THE JUROR:  No, I don't think so.  No.

14             THE COURT:  In other words, could you listen to the

15   evidence and reserve judgment whether the government had

16   satisfied its burden of proof or not until you had heard all

17   the evidence and discussed it with your fellow jurors?

18             THE JUROR:  Yes.

19             THE COURT:  I'm going to come to the death penalty

04:26 20   questions in a minute.  Actually, right now.

21             I want to turn to page 23.  We asked a series of

22   questions beginning on page 23 about juror attitudes about the

23   death penalty.

24             THE JUROR:  Yes.

25             THE COURT:  Question 88 was if you had any general

1  views about the death penalty, what are they.  You wrote, "It's

2  not right to kill."

3         THE JUROR:  Yes.

4         THE COURT:  Could you expand on that?  Could you tell

5  us what you had in mind when you wrote that?

6         THE JUROR:  Well, maybe it's because I'm Catholic and

7  thou shall not kill.  I don't believe --

8         THE COURT:  I just want to be clear.  You're talking

9  about the jury or the government doing the killing rather than

04:27 10  a defendant?  In other words, it's not right to kill.  Somebody

11  might say that about a defendant charged with murder.

12         THE JUROR:  Right.  Yes.

13         THE COURT:  Or someone might say the government should

14  not -- as a matter of moral position, the government should not

15  have the right to kill people.  I'm not sure which you're

16  talking about.

17         THE JUROR:  Let me just -- I see what you're saying,

18  though.  I see what you're saying about that.  Well --

19         THE COURT:  In other words --

04:28 20         THE JUROR:  That's just my -- my -- that's just what I

21  believe.  I don't believe in killing anybody.

22         THE COURT:  Right.  So do you think the government

23  does not have the right to put somebody to death?

24         THE JUROR:  I don't know about the government.

25         THE COURT:  Well, that's what the death penalty would

```
 1   be, the government putting somebody to death.

 2           THE JUROR:  Right.

 3           THE COURT:  And the process of law, but it still would

 4   be the authority of the government to put somebody to death.

 5           THE JUROR:  Yes.

 6           THE COURT:  Is that what you're talking about when you

 7   said it's not right to kill?

 8           THE JUROR:  Yes.

 9           THE COURT:  If you look at the next question, 89, we
```
04:28 10   asked you to circle a number that indicated your opinion, and 1
```
11   reflected a belief that the death penalty should never be

12   imposed and 10 reflected the belief that it should be imposed

13   whenever a person has been convicted of willful murder, okay?

14   That's what the question asked.

15           THE JUROR:  Yes.

16           THE COURT:  You selected 1, it should never be

17   imposed?

18           THE JUROR:  Yes.

19           THE COURT:  If you'd look at the next page, Question
```
04:29 20   90 asked if you could find among the selections presented a
```
21   statement that best described your feeling about the death

22   penalty in a case where someone had been proven guilty of

23   murder.  You didn't select anything.  So I wondered if I could

24   ask you to just take a minute and read through those.

25           THE JUROR:  Excuse me.  What page again?
```

```
 1              THE COURT:  This is page 24.  Two at a time.
 2         Would you read through Question 90, and when you're
 3    finished let us know, and then we'll ask you if you think
 4    there's a statement there that represents your view.  Question
 5    90.
 6              THE JUROR:  I'm reading it.  91.  I'm sorry.
 7              THE COURT:  It starts at the top.
 8              (Pause.)
 9              THE JUROR:  Most of this I don't remember from when I
10    was here last month.
11              THE COURT:  Take your time because it's kind of an
12    involved question and we want to be sure we get a good answer.
13              (Pause.)
14              THE JUROR:  I just don't know what to say.
15              THE COURT:  Okay.  Let me ask you to go to page 25.
16    At the bottom of page 25, Question 95, we asked if the
17    defendant was found guilty and you decided that the death
18    penalty was an appropriate punishment for him, could you
19    conscientiously vote for the death penalty, and you said "no."
20              THE JUROR:  No.
21              THE COURT:  Can you tell us why you chose that answer?
22              THE JUROR:  To be honest, I just don't know.  I just
23    think it's wrong.
24              THE COURT:  Would you ever be open to the possibility
25    of imposing the death penalty in a case, or are you kind of
```

1    absolutely against it?

2         THE JUROR:  I don't know if I would be against it if

3    it -- you know, I'd have to see.  You know, I'd have to --

4         THE COURT:  Well, you heard me this morning describe

5    if a person was convicted of a crime for which the death

6    penalty was a possibility, we would proceed to a second phase.

7         THE JUROR:  Okay.  I understand.  Yes.

8         THE COURT:  Right?  And in that phase the

9    government -- certain principles of law apply to when a death

04:32 10    penalty may be imposed by a jury.  The government would try to

11    show that this was one of those cases because, among other

12    things, there were particularly aggravating factors that made

13    it a worse crime than other murders might be.

14         THE JUROR:  Yes.

15         THE COURT:  Okay?  In the same phase of the trial the

16    defense would likely present evidence that there were features

17    about this crime or about the defendant himself personally that

18    made the death penalty an inappropriate punishment and that

19    life imprisonment was the proper punishment.  So you'd have

04:33 20    aggravating factors and mitigating factors.

21         The jurors would be asked to consider all of that

22    evidence and then each individual juror would be asked to

23    decide whether she thought that the death penalty was the

24    appropriate punishment or life in prison without possibility of

25    release was the appropriate punishment.

1          Would you be able to listen to the evidence, consider

2     it and reserve judgment about which penalty is imposed until

3     you're finished?

4          THE JUROR:  Yes.  Yes.

5          THE COURT:  And if you thought that the death penalty

6     was the right penalty, could you vote to impose it?

7          THE JUROR:  Yes.

8          THE COURT:  Go ahead.

9          MR. WEINREB:  Good afternoon.

04:33 10          THE COURT:  Can I just ask one thing before -- we can

11     come back -- the last question.  You indicated on page 26 in

12     Question 98 that you were concerned about transportation?

13          THE JUROR:  I don't drive yet.  I hope to get a

14     license this summer.

15          THE COURT:  Well, that will be too late for the case.

16          THE JUROR:  Right.

17          THE COURT:  How did you get here today?

18          THE JUROR:  My son-in-law took me.

19          THE COURT:  I think there's probably public

04:34 20     transportation from Framingham.

21          THE JUROR:  Yes.

22          THE COURT:  Have you explored that?  I think there's

23     both buses and maybe trains.

24          THE JUROR:  Yes, there is.

25          THE COURT:  Would that satisfy --

```
 1              THE JUROR:  Yes.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. WEINREB:  Good afternoon.

 4              THE JUROR:  Good afternoon.

 5              MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

 6    prosecutors in the case.  I'd just like to ask you a few

 7    follow-up questions.

 8              THE JUROR:  Okay.

 9              MR. WEINREB:  So I'd just like to review some of these

04:34 10   questions relating to the death penalty to make sure I

11    understand what your views are.

12              So with respect to Question 88, if you'd take a look

13    at that.  It's on page 23.  That's the one where you wrote

14    "It's not right to kill."

15              THE JUROR:  Yes.

16              MR. WEINREB:  And then 89 you wrote that on a scale of

17    1 to 10, about your feelings about the death penalty, that you

18    strongly oppose it.

19              THE JUROR:  Yes.

04:35 20          MR. WEINREB:  So nobody's asking you to -- you're

21    entitled to your views.  Here the questions aren't -- it seemed

22    earlier when you were asked about some of these things you were

23    having a little trouble figuring out the reasons.

24              THE JUROR:  Yes.

25              MR. WEINREB:  And you're entitled to your views about
```

1    the death penalty.  You don't have to give any reasons for

2    them.  Your views are yours.  What we're trying to figure out

3    here is whether -- if you were a juror in a death penalty case,

4    whether your feelings are so strong that they would cause you

5    to vote against the death penalty in every case.  In other

6    words, if you're a juror in a death penalty case, at the end of

7    the whole case you personally have to make a decision about

8    whether to vote to impose the death penalty on somebody.

9              THE JUROR:  Yes.

04:36 10            MR. WEINREB:  Given your strong feelings that you're

11    opposed to it, that it's not right to kill, could you still

12    vote, if you believed it was the appropriate sentence, to send

13    someone to death?

14             THE JUROR:  Yes.

15             MR. WEINREB:  Okay.  And can you give us an example of

16    what would be -- something that would be --

17             MR. BRUCK:  I object to this.  That's not required.

18             THE COURT:  Yes, sustained.

19             MR. WEINREB:  Can you imagine cases in which you would

04:36 20    find the death penalty to be appropriate enough that you could

21    vote to send -- give someone the death penalty?

22             THE JUROR:  Yes.  If I knew what was going on, if they

23    explained everything to me, you know, why he should be put to

24    death.  What I'm saying is I don't know anything about this

25    case.  I don't know much about it at all.

1           MR. WEINREB:  Of course.  And nobody's asking about

2    this case or whether this defendant should get the death

3    penalty.  This is a different question.

4           THE JUROR:  Yes.

5           MR. WEINREB:  Which is when you say you could do it, I

6    guess what I'm trying to get at here is:  Is it just a

7    theoretical possibility or can you imagine cases on -- can you

8    imagine that there would be a case --

9           MR. BRUCK:  Asked and answered.

04:37 10           MR. WEINREB:  -- in which you heard all the evidence

11   and at the end of it you decided that it was appropriate

12   to -- for you to vote for the death penalty?

13           THE JUROR:  Yes.

14           MR. WEINREB:  Okay.

15           (Counsel confer off the record.)

16           MR. WEINREB:  Let me direct your attention to Question

17   95 now on page 25.  So that question -- I thought maybe you

18   were struggling to read it before.

19           THE JUROR:  Which one?

04:38 20           MR. WEINREB:  Question 95 at the bottom of page 25.

21           THE JUROR:  Yes.

22           MR. WEINREB:  I'll just read it out loud.  So the

23   question is, "If you found Mr. Tsarnaev guilty" -- so now we're

24   talking about this case.  "If you found Mr. Tsarnaev guilty and

25   you decided that the death penalty was the appropriate

```
 1    punishment for Mr. Tsarnaev, could you conscientiously vote for
 2    the death penalty," and you wrote "no."
 3              THE JUROR:  Right.
 4              MR. WEINREB:  Is that true?
 5              THE JUROR:  Yes.
 6              MR. WEINREB:  You could not vote for it?
 7              THE JUROR:  No.
 8              MR. BRUCK:  May I?
 9              THE COURT:  Yeah, in a minute.
04:38 10             So I understand your answer to that.  You answered
11    that before.  But you've also answered that you could.  And so
12    we know that it's hard to speculate.  You haven't heard the
13    evidence that you ultimately will hear.  We're not asking you
14    to commit to one position or another.
15              THE JUROR:  Right.
16              THE COURT:  This is really kind of an assessment of
17    whether your beliefs are such that you envision the possibility
18    that if you found the right facts to be the case, that you
19    could decide to vote affirmatively in favor of the death
04:39 20   penalty and, therefore, support the imposition of the death
21    penalty.  Could you do that?  That's the question.
22              THE JUROR:  No.  I'm sorry.
23              THE COURT:  Okay.  Mr. Bruck?
24              MR. BRUCK:  Thank you.  Good afternoon.  You've never,
25    I'm sure -- my name is David Bruck.  I'm one of Mr. Tsarnaev's
```

1    attorneys.  And I've just got a few more questions so that

2    we're all completely sure we understand your feelings about

3    this.

4             You've served on a jury before?

5             THE JUROR:  Yes.

6             MR. BRUCK:  So you know that jurors, if they possibly

7    can, have to have an open mind?

8             THE JUROR:  Yes.

9             MR. BRUCK:  And that's what all of this is about.

04:40 10   That's what all of these questions about the death penalty are

11   about.

12            Could you have an open mind about the death penalty on

13   the one hand or life in prison on the other?

14            THE JUROR:  Yes.

15            MR. BRUCK:  Okay.  The last question that Mr. Weinreb

16   was asking you, and I know the judge was asking you, was if you

17   approached the sentencing part of the trial with an open mind

18   and you decided that the death penalty was the right punishment

19   to impose after hearing all the evidence in the case, could you

04:40 20   vote for that verdict if -- do you see what I'm asking?

21            THE JUROR:  Yes.

22            MR. BRUCK:  Could you vote for it?

23            THE JUROR:  Yes, I could.

24            MR. BRUCK:  And on the other hand, if you found that

25   life imprisonment was the right thing after you considered all

 1    the evidence --

 2              THE JUROR:  Yes.

 3              MR. BRUCK:  -- could you vote for life imprisonment if

 4    that was what the evidence told you the right thing was?

 5              THE JUROR:  Yes.

 6              MR. BRUCK:  So would your vote depend on the evidence

 7    in the case?

 8              THE JUROR:  Yes, it would.

 9              MR. BRUCK:  Okay.  And your beliefs about the death

04:41 10    penalty, would that stop you from voting the way the evidence

11    convinced you you should vote?

12              THE JUROR:  No.

13              MR. BRUCK:  Okay.  You'd be guided by the evidence?

14              THE JUROR:  Yes.

15              MR. WEINREB:  Objection.

16              THE COURT:  Yeah, that's leading.

17              MR. BRUCK:  And that's all I have.  Thank you.

18              MR. WEINREB:  Your Honor, can we --

19              THE COURT:  No, I think we've been over it.

04:41 20              Thank you very much.

21              THE JUROR:  Thank you.

22              THE COURT:  We'll talk about...

23              (The juror exits the courtroom.)

24              THE COURT:  I think we'll take a break at this point.

25    Two o'clock okay?

```
 1              MR. BRUCK:  Sure.

 2              THE COURT:  About 45 minutes?

 3              MS. CLARKE:  Yes, no, yes, no.

 4              THE COURT:  Are you sure?

 5              (Laughter.)

 6              MS. CLARKE:  I'm unsure.

 7              MR. BRUCK:  May I follow up?

 8              THE COURT:  We're off.

 9              (The Court exits the courtroom and there is a recess

04:42 10   in the proceedings at 1:13 p.m.)

11              (After the recess:)

12   (The Court entered the courtroom at 2:10 p.m.)

13              THE CLERK:  Juror 394.

14              THE JURY CLERK:  Juror No. 394.

15              THE CLERK:  Ma'am, over here, please, if you would.

16   Have a seat right here.

17              THE COURT:  Good afternoon.

18              THE JUROR:  Good afternoon.

19              THE COURT:  Since you were last here, have you been

05:42 20   able to avoid any discussion of the substance of the case?

21              THE JUROR:  I have done my best to do so.

22              THE COURT:  How good was that?

23              THE JUROR:  Pretty good.

24              THE COURT:  And also avoid any media coverage?

25              THE JUROR:  That's correct.
```

1        THE COURT:  Thank you.  So we're just following up on

2   some of the answers you gave us.  Tell us a little bit about

3   your work as a teacher.

4        THE JUROR:  I'm a preschool teacher.  I teach children

5   ages between three and five.

6        THE COURT:  And we asked about social media.  You seem

7   not to be a user of social media.

8        THE JUROR:  I am not.

9        THE COURT:  Question 31 on Page 11, you indicated that

05:43 10   the daughter of your best friend is in the Army Reserves and

11   served in Afghanistan for ten months.

12        THE JUROR:  That's correct.

13        THE COURT:  How recently was that, do you know?

14        THE JUROR:  Two years ago.

15        THE COURT:  Did she see -- I guess you said it in the

16   next question.  She didn't see combat.  She was in a noncombat

17   role?

18        THE JUROR:  That's correct.

19        THE COURT:  On the next page, in Question 35, you say

05:43 20   you have a friend who works in a state prison.

21        THE JUROR:  That's correct.

22        THE COURT:  Massachusetts?

23        THE JUROR:  Yes.

24        THE COURT:  In what capacity?

25        THE JUROR:  It's the Plymouth --

```
 1                THE COURT:  What's the friend do?
 2                THE JUROR:  They work in the agricultural area, the
 3       farm.  They were in the control room before that.
 4                THE COURT:  Okay.  What do they do in the agricultural
 5       unit?
 6                THE JUROR:  The prisoners come and they --
 7                THE COURT:  They supervise --
 8                THE JUROR:  They supervise the prisoners.
 9                THE COURT:  He or she --
05:44 10                THE JUROR:  He.
11                THE COURT:  -- supervises prisoners doing agricultural
12       things?
13                THE JUROR:  That's correct.
14                THE COURT:  The next question, we asked whether you
15       would have a tendency to give greater or lesser weight to
16       testimony from somebody who's a law enforcement officer.  You
17       said you thought you would.
18                THE JUROR:  Yes.
19                THE COURT:  Can you tell us about that?
05:44 20                THE JUROR:  I believe just growing up it's the
21       authority and believing in those who are entitled -- those who
22       are law enforcement officers and believing in that they're
23       there to protect us, and we do as we're told.
24                THE COURT:  Well, in a trial, of course, you're
25       evaluating evidence given by any number of people in a wide
```

1    range of occupations and so on.  You think you would not be

2    able to be a critical judge of law enforcement testimony the

3    way you would be of other professions?

4              THE JUROR:  Most likely.

5              THE COURT:  You would not be able?

6              THE JUROR:  I would not be able to.

7              THE COURT:  Let me ask you to turn to Page 19,

8    Question 75.  We asked whether you had said things to people

9    when you learned that you might have service on this case.  And

05:45 10   you wrote that, "I have said that the defendant is guilty.  I

11   could not be impartial."

12             THE JUROR:  That's correct.

13             THE COURT:  Is that your frame of mind?

14             THE JUROR:  Yes, it is.

15             THE COURT:  You don't think that could be changed?

16             THE JUROR:  No.

17             THE COURT:  Okay.  Thank you.

18             THE JUROR:  Thank you.

19             THE CLERK:  Juror No. 395.

05:46 20   THE JURY CLERK:  Juror 395.

21             THE CLERK:  Ma'am, over here, please.  Have a seat if

22   you would.

23             THE JUROR:  Thank you.

24             THE COURT:  Good afternoon.

25             THE JUROR:  Good afternoon.

1          THE COURT:  Since you were last here, have you been

2     able to avoid talking about the substance of the case with

3     other people?

4          THE JUROR:  Pretty much, yes.

5          THE COURT:  Tell me how much "pretty much" is?

6          THE JUROR:  I've been in situations but have gotten up

7     and excused myself.

8          THE COURT:  Good.  And similarly with media reports

9     about the case, have you been able to turn away if you've run

05:47 10   across one?

11         THE JUROR:  Yes.

12         THE COURT:  You're employed as a legal executive

13    assistant for a law firm in Boston.

14         THE JUROR:  That's correct.

15         THE COURT:  Looks like you've been doing it for quite

16    awhile.

17         THE JUROR:  Yes, I have.

18         THE COURT:  So you now support actually the managing

19    director.  Is that what they call the partner in charge?

05:47 20        THE JUROR:  Yes, yes, in the corporate division.

21         THE COURT:  I see.  Managing of the corporate?

22         THE JUROR:  Yes.

23         THE COURT:  Have you been supporting people in the

24    corporate side mostly in your career, or have you gone in

25    other --

1          THE JUROR:  Prior to this, I worked for 30 years for

2      an attorney that did, first, commercial real estate and leasing

3      and then went into estate planning and probate.  And then the

4      last four years has been with the corporate department.

5          THE COURT:  But not litigators?

6          THE JUROR:  No, never a litigator.

7          THE COURT:  We asked about social media.  You say you

8      use Facebook intermittently to very rarely.

9          THE JUROR:  Correct.

05:48 10          THE COURT:  Give us a little bit of an idea of that.

11          THE JUROR:  I don't really know how to post anything.

12      So I can read what is posted, but I've never posted anything

13      myself.

14          THE COURT:  Okay.  Let me ask you to turn to Page 20.

15          THE JUROR:  I don't have Page --

16          THE COURT:  It might be out of order.

17          THE JUROR:  Okay.  Here it is.

18          THE COURT:  It's actually -- in my copy, it's between

19      18 and 19.

05:49 20          Question 77, there we asked whether, as a result of

21      what you'd seen or read in the news media or elsewhere, had you

22      formed an opinion about various matters including, (a), that

23      the defendant was guilty or (b), he was not and then about the

24      penalty.  And you indicated, yes, you had formed an opinion

25      that he was guilty.

1           We then down below, in the second part of the

2     question, asked, If you answered yes to any of these questions,

3     would you be able or unable to set aside your opinion and base

4     your decision about guilt solely on the evidence that will be

5     presented to you in court?  And you selected the box that said

6     "able."

7           THE JUROR:  Yes.

8           THE COURT:  Can you tell us about that?

9           THE JUROR:  I believe that -- I have formed an opinion

05:50 10    up until this point based on what I did read and had seen in

11    the media, but I realize that that's not all the information

12    that would be available to me.  So once more -- once I had more

13    information, I believe that, you know, I could change my mind

14    based on what I had read at the time.

15          THE COURT:  Yeah.  It's understandable, given the

16    amount of coverage that there has been, that people have formed

17    impressions about things.  What we ask jurors to do, if they're

18    serving in a case, is to focus their attention on the evidence

19    that is actually produced in the trial and make their decision

05:51 20    based on that body of evidence without importing into it other

21    ideas from other sources.

22          THE JUROR:  Correct.

23          THE COURT:  You think you would be able to observe

24    that discipline if you were a juror in the case?

25          THE JUROR:  I do.

```
 1              THE COURT:  I'm sure you know that in our criminal
 2   process a person who's accused of a crime is presumed innocent
 3   unless the government proves that he's guilty by the body of
 4   evidence at the trial and proves it beyond a reasonable doubt.
 5   Do you think you would have any difficulty in faithfully
 6   applying those principles of the presumption of innocence and
 7   proof beyond a reasonable doubt?
 8              THE JUROR:  No, I don't.
 9              THE COURT:  Let me ask you to look at Question 78.
10   You said you don't talk about this with your husband because
11   the conversations can become too heated.  Is it only he who has
12   strong views, or do you have them, too?
13              THE JUROR:  Actually, it's not -- my husband and I
14   wouldn't discuss this just one on one.  It would be more in a
15   social setting.
16              THE COURT:  And other people would be there?
17              THE JUROR:  And other people, right, and --
18              THE COURT:  I was thinking you might have meant one on
19   one.  Then I was going to ask really whether you thought, if
20   your husband had strong views and they were different than
21   yours, whether that would affect your service.
22              THE JUROR:  No, I do not.
23              THE COURT:  Just going back to Question 77, as to the
24   (c) and (d) parts of the question, about the death penalty, you
25   indicated "unsure."
```

1          THE JUROR:  Uh-huh.

2          THE COURT:  You don't have any present opinion about

3    that.

4          THE JUROR:  I do not.

5          THE COURT:  Okay.  So we asked a series of questions

6    about the death penalty to get jurors' attitudes.  That begins

7    on Page 23, at Question 88.  Question 88 itself asks, If you

8    have any views on the death penalty, in general, what are they?

9    And you said, "I would need to hear and know all the facts

05:53 10   before committing either for or against the death penalty.

11   I've always thought I was against it, but when you really have

12   to think about it, things change."  Can you amplify on that a

13   little bit?

14         THE JUROR:  I think it's easy to have what you feel

15   are strong opinions about something; but then once you're in a

16   situation that it actually could be a possibility and you think

17   about it from that perspective, it kind of opens up a whole

18   different dialogue within yourself.

19         THE COURT:  In the next question, we asked you to

05:53 20   locate where you think you would be on a spectrum from 1 to 10,

21   where 1 was someone who is strongly opposed and believed that

22   the death penalty should never be imposed; and 10 reflected

23   somebody who's strongly in favor and believed it should be

24   imposed whenever a defendant is convicted of intentional

25   murder.  You chose 5, to indicate you were somewhere in the

1     middle of all that, is that correct?

2              THE JUROR:  That is correct.

3              THE COURT:  Turn the page to the next page, 90.  Here

4     we asked you to select from a series of statements which one

5     you thought best described your feelings about the death

6     penalty for someone convicted of murder.  You selected (d).

7     "I'm not for or against the death penalty.  I could vote to

8     impose it, or I could vote for a sentence of life imprisonment

9     without the possibility of release, whichever I believed was

05:54 10    called for by the facts and the law of the case."  Do you think

11    that best sums up your state of mind?

12             THE JUROR:  I do.

13             THE COURT:  And then in the bottom of Page 25, at

14    Question 95, we asked -- focusing perhaps on this case a bit

15    more particularly than those other questions did -- If you

16    found this defendant guilty and you decided that the death

17    penalty was the appropriate punishment for him, could you

18    conscientiously vote for the death penalty?  And you said, "I'm

19    not sure."  Go to the top of 96.  There we ask a similar

05:55 20    question.  If you found the defendant guilty and you decided

21    life imprisonment without the possibility of release was the

22    appropriate punishment, could you conscientiously vote for that

23    sentence?  And you said "yes" to that.  So there's a little bit

24    of a difference between your answers to the two questions.

25             THE JUROR:  I think that -- I think that, when I was

1  filling these questions out and thinking about it, I -- in my

2  mind I was thinking that, for me, there are different degrees

3  of guilt.  And I don't know what -- where this falls without

4  knowing all of the information.  So my thought process was just

5  that, for me, I believe there are different degrees of guilt.

6        THE COURT:  Well, you heard this morning that I

7  described in brief the process after a person has been

8  convicted of murder.  And that would be the predicate.  You

9  don't get to the penalty, obviously, until the jury has already

05:56 10  found the person guilty of intentional murder, right?

11        THE JUROR:  Uh-huh.

12        THE COURT:  And at that point, as I said, you'd hear

13  aggravating factors that might make the case more serious or

14  more blameworthy.  And you might hear other mitigating factors

15  that might explain why the death penalty was inappropriate and

16  life imprisonment was an appropriate and sufficient sentence.

17        THE JUROR:  Uh-huh.

18        THE COURT:  And on the basis of all that, the jurors

19  would be asked to decide whether they thought the death penalty

05:56 20  should be imposed or life imprisonment without the possibility

21  of release.  So, obviously, it's difficult to predict what you

22  would do in the future on an unknown --

23        THE JUROR:  Right.

24        THE COURT:  -- base of information.

25        THE JUROR:  Yes.

```
 1              THE COURT:  But can you tell us whether you think you
 2    would be prepared to listen to that evidence and be open to
 3    being persuaded in either direction?
 4              THE JUROR:  I would be, yes.
 5              THE COURT:  Okay.
 6              MR. WEINREB:  Good afternoon.
 7              THE JUROR:  Hi.
 8              MR. WEINREB:  My name it Bill Weinreb.  I'm one of the
 9    prosecutors in the indicates.
05:57 10        THE JUROR:  Hello, Mr. Weinreb.
11              MR. WEINREB:  I just want to follow up on one thing
12    here on that Question 95 just to make sure I understand.  So
13    Question 95 assumes that the penalty phase is over.  You've
14    heard evidence from the government suggesting that the death
15    penalty is the appropriate sentence, and you've heard evidence
16    from the defense suggesting that it's not the appropriate
17    sentence.  And now you've come to the decision in your mind
18    that you believe it is the appropriate sentence.  This is just
19    the assumption.
05:57 20        THE JUROR:  Uh-huh.
21              MR. WEINREB:  The question is:  Having come to that
22    belief in your mind, would you actually be able to do it, to
23    vote to send somebody to death?
24              THE JUROR:  If I came to that decision based on the
25    facts that were presented to me, yes.
```

1            MR. WEINREB:  Thanks very much.

2            THE JUROR:  Sure.

3            MS. CLARKE:  Hi.  Good afternoon.  My name is Judy

4    Clarke.  I'm one of Mr. Tsarnaev's lawyers.

5            THE JUROR:  Hi, Miss Clarke.

6            MS. CLARKE:  I just wanted to ask you a few things if

7    I could.  You mentioned in 77, and you talked to the Judge --

8    and you're right.  Your questionnaire goes from Page 18 to 20

9    and then 19.  There you go.

05:58 10          You mentioned that the conversations become too

11   heated.  What do they get heated about?

12            THE JUROR:  Just people -- various people's opinions

13   as to what happened, what should happen, where -- you know,

14   where things went wrong, what -- you know, just basic

15   communications over the days that followed.

16            MS. CLARKE:  So what happened to the community and to

17   -- on Boylston and what should happen in the future?

18            THE JUROR:  Not so much the future but just what the

19   -- the events that had just happened and how -- why it

05:59 20   happened.  Everyone, you know, had an opinion as to why it

21   happened and how it happened.  And so -- and if you tend not to

22   agree with some people, they get upset.

23            MS. CLARKE:  So you do what?

24            THE JUROR:  I'm sorry?

25            MS. CLARKE:  You do what?  Avoid the conversation?

1          THE JUROR:  Well, I think that I try to steer the

2     conversation away from that.  In a social setting, you know,

3     let's not discuss politics or religion.

4          MS. CLARKE:  Probably a good --

5          THE JUROR:  That's kind of where we try to put things.

6          MS. CLARKE:  If you're -- have you served on a jury

7     before?  I can't remember.

8          THE JUROR:  I have not.

9          MS. CLARKE:  If you're in a -- on a jury, it could get

05:59 10    heated.  The debate could get heated.  How do you think you

11     would deal with that?  Just tell everybody to quiet down?

12          THE JUROR:  Everyone is entitled to their opinion; and

13     in a jury setting, it's much different than a social setting.

14          MS. CLARKE:  Sure.

15          THE JUROR:  And people have much more of the facts

16     than they do in a social setting.  So I think that the

17     conversation would be much more knowledgeable of the people

18     involved.

19          MS. CLARKE:  At least a little more informed?

06:00 20    THE JUROR:  Yes.

21          MS. CLARKE:  Have the people who have had these heated

22     conversations involving you, I guess --

23          THE JUROR:  Involving this situation.

24          MS. CLARKE:  You just happen to be there?

25          THE JUROR:  Yes.

```
 1              MS. CLARKE:  Participating in the conversation?
 2              THE JUROR:  Well, yes, with friends.
 3              MS. CLARKE:  Have there been opinions expressed about
 4      the death penalty in this case?
 5              MR. WEINREB:  Objection.
 6              THE COURT:  Sustained.
 7              MS. CLARKE:  Have there been any opinions expressed
 8      that influence you one way or the other?
 9              THE JUROR:  No.
06:00 10        MS. CLARKE:  It was interesting, in 88, which is Page
11      23, where you wrote, "I always thought I was against it," the
12      death penalty, "but when you really have to think about it,
13      things change."  What prompted that thinking?
14              THE JUROR:  I don't think that I was in a -- that I'm
15      in a position, without hearing all of the facts, to say that I
16      am either for it or against it at this point.  It's easy for me
17      to say, yes, I believe that a person should have -- should have
18      the death penalty; but when you're faced with that may be a
19      real possibility that I would have to decide, then -- and you
06:01 20  start -- and I start thinking about it in those terms, then
21      it's difficult for me to say.
22              MS. CLARKE:  Sure.  And I guess, when you filled this
23      out, you were beginning to think about --
24              THE JUROR:  Correct.
25              MS. CLARKE:  -- the death penalty.  In this case or
```

```
 1    just generally?
 2           THE JUROR:  I would have to say, when I filled this
 3    out, it was in this case.
 4           MS. CLARKE:  Okay.  Your work at the law firm, I don't
 5    think anybody asked you.  Is that a hardship for you if you
 6    were sitting for three or four months here with the rest of us?
 7           THE JUROR:  I mean, I've discussed it with my
 8    employer, and they're aware of it.  I don't think -- I think
 9    that, for every juror, it would be a hardship to be on a case
10    such -- such a lengthy case.
11           MS. CLARKE:  Would you --
12           THE JUROR:  But they have said that it would be fine.
13           MS. CLARKE:  And you would be paid?
14           THE JUROR:  Correct.
15           MS. CLARKE:  So there's not a financial crunch for
16    you?
17           THE JUROR:  Yes.
18           MS. CLARKE:  Okay.  Could I just -- one moment, your
19    Honor?
20    (Discussion held off the record.)
21           MS. CLARKE:  If I can go back to 88 and just to sort
22    of make clear in our minds, your position before this case on
23    the death penalty, did you have one abstractly, as a matter of
24    policy or as a matter of law?
25           THE JUROR:  I would say that I would probably lean
```

 1    towards being against it, but I can't say that I was set in

 2    that.

 3              MS. CLARKE:  You were open to both?

 4              THE JUROR:  Correct.

 5              MS. CLARKE:  Life imprisonment or the death penalty

 6    outside of this case?

 7              THE JUROR:  Correct.

 8              MS. CLARKE:  And remain open to both inside of this

 9    case?

06:03 10          THE JUROR:  That is correct.

11              MS. CLARKE:  Thank you very much.

12              THE COURT:  All right.  Thanks.  Just leave it there.

13    We'll put it back together.

14              THE JUROR:  Thank you.

15              THE CLERK:  Juror No. 396.

16              THE JURY CLERK:  Juror No. 396.

17              THE CLERK:  Ma'am, over here, please.  Have a seat.

18              THE COURT:  Good afternoon.

19              THE JUROR:  Hi.

06:05 20          THE COURT:  Since you were last here, have you been

21    able to avoid talking with people about the substance of the

22    case?

23              THE JUROR:  Yes.

24              THE COURT:  And also, as much as possible, any media

25    reporting on the case?

```
 1              THE JUROR:  Yes.
 2              THE COURT:  So we're following up with information we
 3     got from the questionnaire just to learn a few things more.  We
 4     see you're a senior business analyst for an insurance company.
 5              THE JUROR:  Yes.
 6              THE COURT:  And you've been doing that for quite
 7     awhile, I guess.
 8              THE JUROR:  Yes.
 9              THE COURT:  Tell us what the job involves in general
06:05 10       terms.
11              THE JUROR:  Software, I do software testing and write
12     requirements for new software.
13              THE COURT:  Okay.  For use in the business?
14              THE JUROR:  Yes.
15              THE COURT:  So adapting --
16              THE JUROR:  Claim systems, claim and reserving
17     systems.
18              THE COURT:  I see, okay.  All right.  Pretty much the
19     same thing over your time with the company?
06:06 20             THE JUROR:  Yeah.
21              THE COURT:  We asked about social media use.  You said
22     you sometimes, but rarely, use Facebook.
23              THE JUROR:  Yeah, very rarely.  I have like --
24              THE COURT:  Sounds like you don't like it.
25              THE JUROR:  I have 30 friends, and I will look at
```

1    their posts for ten minutes at night.  That's it.  I work on a

2    computer, all day so I'm not on the computer at night.

3            THE COURT:  Fair enough.  You brother served as a Navy

4    pilot.

5            THE JUROR:  Yes.

6            THE COURT:  When, approximately?

7            THE JUROR:  I don't --

8            THE COURT:  You said for ten years so --

9            THE JUROR:  Out of college.  He went to military

06:06 10   college and then into the Navy.

11           THE COURT:  Okay.  Was he ever in combat?

12           THE JUROR:  No.

13           THE COURT:  Let me ask you to turn to Page 19.  At the

14   bottom, Questions 74 and 75, we asked a little bit about what

15   you thought and what people may have said when you -- or you

16   may have said when you learned that you might be a prospective

17   juror in this case.  In 74, you said you were interested in the

18   case, also how disruptive it would be.

19           And then in the next question about what kinds of

06:07 20   things you said to others or others said to you, you had some

21   other concerns about work and, I guess, a course you're taking.

22           THE JUROR:  Yup.

23           THE COURT:  We had asked earlier in the questionnaire

24   -- if you want to go back to Page 5, Question 10, we set out

25   this -- what we thought the schedule would be, and it still

1    would follow this pattern.  And then on that schedule, the

2    trial could last three or four months possibly.  We asked if

3    this would be a substantial or special hardship on you as

4    opposed to the necessary hardship any juror would feel.  I'm

5    just -- you said "no" to that question.

6              THE JUROR:  I think I understood "special hardship" as

7    something else.

8              THE COURT:  Tell us about what you were referring to

9    in 74 and 75 and how much of an impact it would be on you.

06:08 10         THE JUROR:  You know, I have two kids at home and one

11   away at college, and I have doctors' appointments and sports

12   appointments and college applications, and I work 80 hours a

13   week, and I'm training new staff.  So I think the general

14   hardship for anybody.

15             THE COURT:  Would it be a financial cost to you?

16             THE JUROR:  No.

17             THE COURT:  In other words, would you stop getting

18   paid?

19             THE JUROR:  No.

06:09 20         THE COURT:  Is it in the nature of one more thing to

21   juggle?  Is that the kind of thing?

22             THE JUROR:  Yeah, in the middle of juggling, like, a

23   million things.

24             THE COURT:  Tell me about the class.

25             THE JUROR:  I'm taking an advanced networking class so

1    I waited -- I was waiting to see before I registered, and I

2    couldn't wait any longer.

3              THE COURT:  Tell me about it.

4              THE JUROR:  So I take a class at Bentley College.

5    It's a networking computer class.

6              THE COURT:  When is it?  When do you take it?

7              THE JUROR:  Thursday nights.

8              THE COURT:  What time?

9              THE JUROR:  7:30 to 10:30.  And it's my last class.

06:09 10         THE COURT:  Then you get a certificate or degree?

11             THE JUROR:  Degree.

12             THE COURT:  Bachelor's degree?

13             THE JUROR:  Yeah.

14             THE COURT:  Let me ask you to turn to Page 20.

15             THE JUROR:  Uh-huh.

16             THE COURT:  Question 77, near the top.  In this

17   question we asked whether -- based on things you'd seen or read

18   in the news or learned from other sources, whether you had

19   formed an opinion in Subpart (a) that the defendant was guilty

06:10 20  and then (b), or not guilty, and then some questions about

21   potential penalty in (c) and (d).  You checked -- to Part (a),

22   you said "yes," you had formed an opinion that he was guilty.

23             THE JUROR:  Based on what I've seen.

24             THE COURT:  Right.  Then down below we asked, in the

25   second part of the question, If you answered yes to any of

1    these questions, would you able or unable to set aside your

2    opinion and base your decision about guilty solely on the

3    evidence that would be presented to you in court, and you said

4    "able."

5         THE JUROR:  Where is that?

6         THE COURT:  Right above 78, the second part of 77.

7         THE JUROR:  Yes, that's true.

8         THE COURT:  So could you tell us what led you to

9    answer the question the way you did?

06:11 10         THE JUROR:  Which question?

11         THE COURT:  The second part there, the "able."

12         THE JUROR:  I think I can listen to, you know, the

13    evidence of the case and just consider that despite what I've

14    seen.

15         THE COURT:  Okay.  You, I'm sure, understand that a

16    defendant in a criminal case is presumed innocent, or not

17    guilty, until the government proves that he's guilty by the

18    evidence at the trial.

19         THE JUROR:  Yup.

06:11 20         THE COURT:  And proves it beyond a reasonable doubt.

21    That's what we ask jurors to do, to pay attention to that body

22    of evidence and decide whether on that evidence the government

23    has proved the person guilty of what he's charged with or not,

24    right?

25         THE JUROR:  Yeah.

          1              THE COURT:  You think you would be able to follow

          2    those principles?

          3              THE JUROR:  I think I would, yes.

          4              THE COURT:  Let me ask you about your answer to

          5    Question 80, at the bottom of the page.  Your brother was in

          6    the Copley Square area about the time that the bombs --

          7              THE JUROR:  Uh-huh.

          8              THE COURT:  -- were exploded?

          9              THE JUROR:  Yup.

06:12    10              THE COURT:  And he's told you about it a little bit?

         11              THE JUROR:  Yeah.

         12              THE COURT:  You said he described it?

         13              THE JUROR:  Yeah.

         14              THE COURT:  Would the fact that he was nearby the

         15    incident, would that have any effect on your impartiality as a

         16    juror?

         17              THE JUROR:  No.  He was okay and his family running

         18    the race -- everybody was okay.

         19              THE COURT:  You had people in the race?

06:12    20              THE JUROR:  Yes.  My sister-in-law's brother had

         21    already crossed the finish line.

         22              THE COURT:  Okay.  On the next page, you sheltered in

         23    place?

         24              THE JUROR:  Yes.

         25              THE COURT:  On that -- at the end of that week?

```
 1                THE JUROR:  Uh-huh.
 2                THE COURT:  Then you or others in your family have
 3     engaged in various support activities.  Can you tell us a
 4     little bit about that, what you did yourself or what others
 5     did?
 6                THE JUROR:  Yeah.  I took my kids into the memorial in
 7     Copley Square.  We bought T-shirts, wrist bands, hats --
 8                THE COURT:  When did you do that?
 9                THE JUROR:  -- all Boston Strong.  Shortly after -- I
10     don't remember the dates but --
11                THE COURT:  Not the exact day.
12                THE JUROR:  Within the year following.
13                THE COURT:  Was it right after?  Was it a couple
14     months after?
15                THE JUROR:  Some of it was right after.  Some -- I
16     think a bakery in Somerville did a fund-raiser for Sean
17     Collier, so we went there and bought -- so it's ongoing.  As
18     things come up, we may or may not go to them today.
19                THE COURT:  Do you keep an eye out for things like
20     that to go to, or they just get your attention and you decide
21     to go?
22                THE JUROR:  Yeah.  No.  I don't keep an eye out for
23     them.
24                THE COURT:  Have you organized any responses like
25     that?
```

1          THE JUROR:  No.

2          THE COURT:  Just kind of contributed and participated

3    that way?

4          THE JUROR:  (Nodding.)

5          THE COURT:  Let me ask you to look at Page 23.

6    Beginning with Question 88, we asked a series of questions to

7    gauge jurors' attitudes about the death penalty both in general

8    and perhaps in this case.  Question 88 is about your views in

9    general, and it asks, If you have them, would you summarize

06:14 10   them?  You said, "In general, I believe in the death penalty.

11   I'm not sure I personally could impose it."  Could you tell us

12   about that?

13         THE JUROR:  Well, I actually never really thought

14   about me personally having to sentence someone to death before

15   this.

16         THE COURT:  Right.

17         THE JUROR:  So I've always been a general supporter

18   that, if necessary, the death penalty is a valid tool, I guess,

19   for law enforcement or the courts.  But, you know, I don't

06:15 20   know.  I don't know.  I'm a Catholic.  I'm not sure it's up to

21   me personally to decide who lives or dies.  Again, I thought

22   just two days ago, if this were one of my kids that was killed

23   in this bombing, I could have a whole -- I just don't know.

24   I'm not sure how I would decide that.

25         THE COURT:  So in the next question, we asked you to

1    put yourself on a scale from 1 to 10, where 1 is strongly

2    opposed and reflects a belief that the death penalty should

3    never be imposed; 10, strongly in favor and reflects a view

4    that the death penalty should be imposed whenever a defendant

5    has been convicted of an intentional murder.  And you selected

6    8, a little bit towards the favor side.

7         THE JUROR:  Yeah.  I mean, I favor it.  I'm just not

8    sure I can do it.

9         THE COURT:  You wrote in "must be of a heinous

06:15 10   nature."

11        THE JUROR:  Yeah.  This said "should be imposed

12   whenever the defendant has been convicted of an intentional

13   murder."

14        THE COURT:  So did you mean to qualify that by saying

15   not just any intentional murder; it has to be a heinous one?

16   Is that what you meant?

17        THE JUROR:  Yes, that's what I meant.

18        THE COURT:  Then Question 90, we asked to you look at

19   a series of possible statements and see if there was one that

06:16 20   adequately described your feelings about the death penalty.

21   And you didn't find one that you could agree with, I guess.

22   You said, "None of the statements above really describes my

23   feelings."  Then, again, you wrote in, "I'm in favor of the

24   death penalty but not sure I could impose it."  That's what

25   you've already told us, right?

1          THE JUROR:  Yup.

2          THE COURT:  Then if you would go to the next page,

3     Question 95, at the bottom, focusing now more particularly on

4     this case, the question asks, If you found this defendant

5     guilty and decided that the death penalty was the appropriate

6     punishment for him, could you conscientiously vote for the

7     death penalty?  And you wrote, "I'm not sure."  Right?

8          THE JUROR:  Right.

9          THE COURT:  That's, I guess, what you've been telling

06:17 10    us.

11          THE JUROR:  I'm still not sure.

12          THE COURT:  Just to finish the questionnaire for a

13    minute, Question 96, we asked you, If you found this defendant

14    guilty and decided life imprisonment without the possibility of

15    release was appropriate, could you conscientiously vote for

16    that punishment?  And you said "yes."

17          THE JUROR:  Right.

18          THE COURT:  You heard me this morning describe in

19    general terms the process of a penalty phase after someone's

06:17 20    been convicted.  You don't get to the penalty, of course, until

21    the person has been convicted, right?

22          THE JUROR:  Right.

23          THE COURT:  And that there would be evidence that the

24    government would offer of what we call aggravating factors that

25    made this crime seem worse than many and perhaps particularly

1    blameworthy, and the government would argue that.  You would

2    have evidence from the defense that, for various reasons, there

3    are mitigating circumstances about the events, about the person

4    of the defendant himself and so on.  And we asked the jury then

5    to consider all of that and decide, between the two options

6    that is are presented:  the death penalty and life

7    imprisonment.  Do you think you could deliberate upon that

8    evidence with an open mind to returning a verdict in either

9    direction or not?

06:18 10          THE JUROR:  I don't know if I could return a death

11   sentence verdict.  I don't know that I can do that.

12          THE COURT:  And that's -- I don't want to put words in

13   your mouth.  But is it because of your views of morality and

14   what's proper or views about --

15          THE JUROR:  You know, I don't know.  That's how I

16   thought of it at first, that it's really not up to me to decide

17   who lives or dies.  But as I thought more about my own

18   children, I think I would have a different view.  So I'm just

19   -- I think in my own heart I'm conflicted about --

06:19 20          THE COURT:  You remember -- and we talked about it in

21   Question 89 -- I think it was 89 -- you added the qualification

22   that not only the defendant was convicted of murder but it must

23   be of a heinous nature.  If you thought that the evidence

24   showed a crime of a heinous nature, do you think you would be

25   able to vote for the death penalty in that circumstance?

```
 1              THE JUROR:  I don't know.

 2              THE COURT:  Okay.

 3              MR. WEINREB:  Good afternoon.

 4              THE JUROR:  Hi.

 5              MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

 6      prosecutors in the case.  I think you've been pretty clear in

 7      your answers, and so I don't want to just belabor it by asking

 8      the same questions over and over.  But maybe by asking slightly

 9      different ones we can get a better sense of your assessment of

06:19 10     your own abilities in this area.

11              So a couple times you've said that you have kids and

12      that, if it were one of your children, maybe you could vote to

13      impose the death penalty.  Forgive me if I'm wrong, but you

14      seem to get a little emotional even thinking about it.

15              THE JUROR:  I do.

16              MR. WEINREB:  You're emotional right now thinking

17      about it.

18              THE JUROR:  Right.

19              MR. WEINREB:  But when it comes time to make a

06:20 20     decision in this case, you will be asked to do it not based on

21      emotion but based on --

22              THE JUROR:  The evidence.

23              MR. BRUCK:  I object to that.  I mean, you can't

24      banish emotion from this.  I mean --

25              THE COURT:  Well, get to the point of the question, I
```

1     think, will be the best thing.

2          MR. WEINREB:  So far, I guess what you've said -- what

3     you seem to be saying -- you correct me if I'm wrong -- is

4     that, if your emotions were impacted as deeply as if it were

5     one of your own kids, then you think you could potentially do

6     it?

7          THE JUROR:  No.  What I meant to say was, if it were

8     one of my own kids, not if my emotions were like if it were one

9     of my own kids.

06:21 10          MR. WEINREB:  Okay.  So other than if it were one of

11     your own kids, can you imagine actually doing it, sentencing

12     someone to death?

13          THE JUROR:  No.  But that's why the conflict is

14     because I never would have imagined being able to do it, and

15     then I find myself thinking I could if it was one of my

16     children.  So I don't know.  I don't know if, after hearing

17     everything, I have -- you know, I change my mind.  But I won't

18     know that, you know -- I can't say right now.

19          MR. WEINREB:  I appreciate that, but, thank goodness,

06:21 20     you're not going to hear that it was one of your own kids.  So

21     we know that we can rule out that possibility.

22          THE JUROR:  Right, yeah.  That was just to explain how

23     it changed a little bit from what I initially thought, that I

24     could never do that.

25          MR. WEINREB:  Right.  I understand.  But that's a very

 1   personal kind of impact.  In this case, it's not going to be

 2   personal.

 3           THE JUROR:  Right.

 4           MR. WEINREB:  It's going to be about other people.

 5   And so, again --

 6           MR. BRUCK:  I think now we're staking out this

 7   individual.

 8           THE COURT:  I think we're getting close.  I agree.

 9           MR. WEINREB:  In imagining any case in which you're

06:22 10   sitting, not this case in particular but any case where it's

11   not personal, it's -- didn't affect your family, anyone who you

12   knew personally, can you imagine yourself actually -- despite

13   your moral objections to it and your feelings about it,

14   actually sentencing someone to death?

15           THE JUROR:  I don't know.  No matter how you ask that

16   question, I don't know if I can do that.

17           MR. WEINREB:  Okay.  I think that's a pretty

18   definitive answer.  Thank you.

19           MR. BRUCK:  Good afternoon.

06:22 20           THE JUROR:  Hi.

21           MR. BRUCK:  I'm David Bruck.  I'm one of Jahar

22   Tsarnaev's lawyers.  I just want to be sure that we're all on

23   the same page.  I think, when the judge was asking you

24   questions before, the bottom line of all of his questions are,

25   can you put your opinions or publicity aside and base your

1    decision based on the evidence?

2         MR. WEINREB:  Objection.  I don't believe that's what

3    all the questions were about, including the --

4         THE COURT:  Some of them were.  You can have it.  Go

5    ahead.

6         MR. BRUCK:  That's what I really want to get to,

7    understanding that you have opinions about the death penalty.

8    A lot of people do.  The real question is:  Can you -- could

9    you base a decision on the death penalty based on the evidence

06:23 10   in the case?  If the case was heinous enough, could you vote

11   for it?  I'm not talking about this case.  I just mean --

12        THE JUROR:  I don't know the answer to that.

13        MR. BRUCK:  You don't know the answer to that why?

14        THE JUROR:  Because I have never considered whether or

15   not -- I just don't -- I'm conflicted, just conflicted about

16   whether or not I could sentence someone to death.

17        MR. BRUCK:  Does that have anything to do with not

18   having heard the evidence yet?

19        THE JUROR:  No.

06:24 20   MR. BRUCK:  Thank you.

21        THE COURT:  Okay.  All right.  Thank you.

22        THE JUROR:  Am I done?

23        THE COURT:  You're done.  Just leave that there.

24        THE JUROR:  Thank you.

25        THE CLERK:  Juror No. 399.

1        MR. BRUCK:  Before the juror comes in, I'd like to

2   move, in the future, that the counsel for the government not

3   make comments after the juror has finished with their

4   examination but immediately before ours about -- such as, I

5   think that's pretty definitive, or, I think you've been clear.

6   In a way, it's sort of trying to nail down the answers so that

7   it won't change or to keep it from being affected by the rest

8   of the voir dire.  I don't think it's really fair.

9        THE COURT:  Okay.  I think we should avoid commenting

06:25 10   on the quality of the answers.  Questioning is fine.



25    .   .   .   END OF SIDEBAR CONFERENCE.)

```
 1              THE CLERK:  Juror No. 399.

 2              THE JURY CLERK:  Juror 399.

 3              THE JUROR:  Sir, over here, please.  Have a seat right

 4     here.

 5              THE COURT:  Good afternoon.

 6              THE JUROR:  Good afternoon, sir.

 7              THE COURT:  Since you were last here, have you been

 8     able to avoid discussing the substance of the case with anyone?

 9              THE JUROR:  Certainly.

06:30 10          THE COURT:  And to the extent possible, put aside any

11     media stories that you may have come across?

12              THE JUROR:  No problem.

13              THE COURT:  Thank you.  That's the questionnaire that

14     you filled out when you were here last.  We're going to ask you

15     a little bit about some of the answers, follow-up on some of

16     them, okay?

17              THE JUROR:  Sure.

18              THE COURT:  I'm looking at Question 26 on Page 10

19     where you tell us in brief what your employment is.  You're a

06:30 20    manager of a home medical equipment company.

21              THE JUROR:  That is correct.

22              THE COURT:  Can you tell us a little bit about what

23     that works involves for you?

24              THE JUROR:  We provide home medical equipment such as

25     wheelchairs, hospital beds, oxygen, to people in their homes,
```

```
 1    up in the -- primarily in the Merrimack Valley area.
 2              THE COURT:  Is this a national company?
 3              THE JUROR:  No, no.  It's a locally owned company.
 4    They've been in business about 20 years.  I just work there.
 5    I'm not an owner.
 6              THE COURT:  And you've been there?
 7              THE JUROR:  Going on ten years.
 8              THE COURT:  You owned your own business before that?
 9              THE JUROR:  Yes, sir, I did own a business for a few
10    years in Philadelphia.
11              THE COURT:  So you've been in Massachusetts since
12    about the time you went to work for the -- your current
13    employer, is that --
14              THE JUROR:  That's correct, yes.
15              THE COURT:  Mid --
16              THE JUROR:  About ten years ago, yup.  Years prior to
17    that, I lived here, then moved away, and then moved back.
18              THE COURT:  So what does your work involve?  What do
19    you do?
20              THE JUROR:  Well, I'm what's called an ATP, assistive
21    technology professional.  That is a certification that is
22    required by Medicare and the insurance companies to prescribe a
23    complex power wheelchair or other complex rehab equipment.  So
24    most of my day is spent measuring butts.
25              THE COURT:  That's direct enough, I guess.
```

```
 1              THE JUROR:  Well.

 2              THE COURT:  Let me ask you to go back to Page 5,

 3    Question 10.

 4              THE JUROR:  Page 5?

 5              THE COURT:  Yeah.  In that question we outlined the

 6    general plan for the conduct of the trial of the case in terms

 7    of weekly basis and included the projection that it may go

 8    three or four months possibly.  And we asked, recognizing that

 9    there's some imposition on every juror who sits, whether this

10    would cause a substantial hardship to you, and you answered

11    "no."  Is that accurate?

12              THE JUROR:  It certainly is a hardship.  I'm not sure

13    what you would consider substantial.

14              THE COURT:  One thing is there's a possibility of

15    financial.  Would you continue to get paid?

16              THE JUROR:  I would certainly hope so, yes.

17              THE COURT:  Have you talked about that with your boss?

18              THE JUROR:  They would certainly prefer I not be

19    chosen to serve.

20              THE COURT:  Right.  But if you were, do you think they

21    -- are you salaried?

22              THE JUROR:  Yes, I am, yes.

23              THE COURT:  Do you think they would continue to pay

24    your salary?

25              THE JUROR:  I do think so, yes.
```

1          THE COURT:  In terms of the impact on you -- it might

2     impact their conduct of the business, but in terms of the

3     impact on you, it would not --

4          THE JUROR:  I probably would be doing a little more

5     work nights and weekends and days off but --

6          THE COURT:  You may have already said this, and I may

7     have missed it, but back at Question 26, we asked you to check

8     a box if you supervised others, and you did.  How many people

9     do you supervise?

06:34 10          THE JUROR:  Four.

11          THE COURT:  Are they doing similar things to what you

12     do?

13          THE JUROR:  Yes, yes, yes.

14          THE COURT:  We asked about use of social media in

15     Questions 29 and 30.  You answered 30 that you do Facebook

16     every few weeks, I think is what you said.  That's on Page 11.

17          THE JUROR:  Yes.

18          THE COURT:  Tell us a little bit about how you use

19     Facebook.

06:34 20          THE JUROR:  I'm not a fan of Facebook.  I do, every

21     few weeks, go in to look at our company Facebook pages.  And,

22     oddly enough, my grade school has a Facebook page that I do

23     check in on.  But other than that, I'm a very infrequent user

24     of Facebook.

25          THE COURT:  Do you post at all?

1          THE JUROR:  I do to my private grade school group

2     sometimes, but that's about it.

3          THE COURT:  Let me ask you about -- I'm on Page 15.

4     Actually, go back a page, to 14.  You can take the clip off

5     there if it's easier to navigate.  You don't have to keep it

6     clipped.

7          So beginning at Question 44, 45, and 46, we asked

8     whether you had strongly positive or negative views about

9     prosecutors, defense attorneys, and then on the top of the next

06:36 10   page, law enforcement officers.  And you said "no" to the

11    prosecutors and defense attorneys; but with respect to law

12    enforcement officers, you said you had "negative views about

13    the job they do.  It's gone to their heads."

14         THE JUROR:  My personal opinion is, years ago when I

15    was a kid, the police officers had some -- typically some

16    different ideas than they do today.  I think, along with the

17    television show Miami Vice, a lot of what -- a lot of them get

18    carried away with their attitudes of self-importance.

19         I think they have one of the safest jobs that a person

06:37 20   can have.  Where else are you fully trained, fully armed, in

21    full communications for whatever comes up?  Certainly, it's a

22    tragedy when one is injured or killed on duty.  Absolutely,

23    it's a tragedy.  But it's also a tragedy when a truck driver

24    trying to get our groceries to the store for us gets killed,

25    too.

 1          So I just -- I just don't see them as elevated above

 2     the rest of people.  And I think sometimes, because of the

 3     media and Hollywood, that it gets carried away a little bit.

 4          THE COURT:  Go back to Page 14 for a minute and,

 5     actually, the question before the series that I asked you

 6     about.  And this is related to what you have just been saying.

 7     Question 43 asked whether you or someone close to you had ever

 8     been treated unfairly by a law enforcement officer and so on.

 9     I'm just wondering if your view that their authority has gone

06:38 10     to their heads has led to a personal experience that you've had

11     or somebody close to you has had.

12          THE JUROR:  My ex-wife was a police officer in

13     Philadelphia.

14          THE COURT:  I'm not sure we can tease out the sources

15     of the difficulty.

16          Apart from her, have you had a personal experience

17     where you thought a law enforcement officer was treating you

18     unfairly?

19          THE JUROR:  I haven't had a personal encounter with

06:38 20     any, no.  Sometimes I hear it on TV.  And like I said, I think

21     they certainly have a difficult job to do, and I appreciate the

22     job they do.  I also appreciate the jobs a lot of other people

23     do.

24          THE COURT:  So now let's go back to Page 12, and in

25     Question 36 we asked -- we noted that jurors will be instructed

1   that the testimony of law enforcement officers is to be treated

2   as the testimony of other witnesses, and it's not to have

3   either greater or lesser weight simply because of the witness'

4   status as a law enforcement officer.  We asked if you had any

5   concerns about your ability to follow that instruction, and you

6   said "no."  Is that correct?

7         THE JUROR:  That's correct, yes, absolutely.

8         THE COURT:  That's taking into account your views that

9   you expressed in Question 46?

06:39 10         THE JUROR:  I think Question 46 actually supports my

11   answer on Page 36 because I don't elevate -- see them as having

12   super status.  I see them as having the same status anybody

13   else would.

14         THE COURT:  Could we do a brief sidebar, please?

15   (SIDEBAR CONFERENCE AS FOLLOWS:

16

17

18

19

06:40 20

21

22

23

24

25





```
 1            THE JUROR:  Thank you for doing that.

 2    .  .  .  END OF SIDEBAR CONFERENCE.)

 3            THE COURT:  Let me ask you to look at Page 20 of the

 4    form, Question 77, near the top.  It's a multiple part

 5    question.  And we asked you there whether, as a result of

 6    things you've seen or heard in the media or from other sources,

 7    you had formed certain opinions, including the opinion that

 8    this defendant is guilty or not guilty or that he should

 9    receive the death penalty or not receive the death penalty.

06:43 10    And you had some boxes.  You could check "yes," "no" or

11    "unsure."  And as to each of those answers you checked

12    "unsure."  Could you tell us what your reasoning was in

13    selecting "unsure"?

14            THE JUROR:  I know that bad things happen in the

15    world.  I also know that -- I've come to realize in my life

16    that what I give my attention to is my choice.  And I -- I

17    choose very carefully what I look at and what I let into my

18    life personally.  And I choose not to listen to the news, for

19    example.  I know there's stuff out there that goes on, but you

06:44 20    know what?  It doesn't need my attention.  And to be -- at the

21    risk of sounding totally selfish, if it doesn't involve me -- I

22    won't say I don't care, but I don't need to be involved.

23            So as far as whether or not -- the answer to any of

24    these questions is really "unsure" is not correct.  "I haven't

25    thought about it" would be more correct.  I just haven't given
```

1    it any thought.  It's none of my business.  I heard things

2    happened.  I think things happen all the time, but I don't pay

3    much attention.  Honestly, the only time I turn on the news is

4    to check the weather over the last few weeks.  But other than

5    that -- yeah, stuff goes on, but I don't need to know about it.

6    I really don't.  And so I don't have -- I would choose not to

7    have an opinion about this.  It's really none of my business.

8         Now, if for some reason I was on a jury or something,

9    then it would be my business, and I would have to form an

06:45 10    opinion.  But I'll be perfectly honest with you.  I don't want

11    to say I don't care because it's not that I'm not a caring

12    person, but this doesn't affect me, so I have no -- I have no

13    business.  I don't know.

14         THE COURT:  As you say, if you were a juror on this

15    case, then you would be involved, and you would have to pay

16    attention to it.  So let me just ask you a few things about

17    that.  I'm sure you realize that in a criminal prosecution if a

18    person is accused of a crime, the person is presumed innocent,

19    or not guilty, unless the government proves that he's guilty by

06:46 20    the evidence at trial and proves it beyond a reasonable doubt.

21         THE JUROR:  Certainly, absolutely.

22         THE COURT:  Do you have any difficulty in faithfully

23    applying those principles if you were a juror in this case?

24         THE JUROR:  None whatsoever.

25         THE COURT:  And if, for example, in listening to the

1    evidence on any particular charge, you concluded that the

2    government had failed to satisfy its burden of proving the

3    defendant guilty beyond a reasonable doubt, would you be able

4    to vote to find him not guilty of that charge?

5           THE JUROR:  Absolutely, if I -- I would have to look

6    at the facts and weigh the case.  It's either this or that.

7    Yes, absolutely.

8           THE COURT:  Let me ask you to go to Page 23.  Question

9    88 and the following questions ask about your views, if any,

06:47 10   about the death penalty, both in general and perhaps in

11   relation to the circumstances here.  Question 88 is the general

12   question.  If you have any views on the death penalty in

13   general, what are they?  And you wrote, "I'm not sure I support

14   the death penalty."

15          THE JUROR:  I have no views on the death penalty for

16   the same reason I have no opinion on the gentleman's guilt or

17   not guilty.  I've never been confronted with it.  I've never

18   been in a position to have to make that decision.  Frankly, I

19   would hope that I never am in the position to have to make that

06:47 20   decision or weigh in on it.  But if I did have to make the

21   decision, I would hope that I would be able to defer to the law

22   for my decision because I can't say what I would -- what my

23   opinion would be.  I don't know.  I really don't know.

24          It's easy for someone to sit around the house and go,

25   I'd do that and I'd do that.  Until you're really faced with

1    it, I don't think -- I don't know what my answer -- I haven't

2    seen the evidence.  I don't know.

3         THE COURT:  In the next question, we asked if you

4    could locate yourself on a sliding scale from 1 to 10, where 1

5    was strongly opposed because you believe the death penalty

6    should never be imposed; and 10, in the opposite pole, you

7    think it should be imposed whenever a defendant is convicted of

8    intentional murder.  You placed yourself at a 5 between

9    those --

06:48 10        THE JUROR:  Because I don't know.  I honestly don't

11   know.  We can cite another case somewhere where a person got

12   the death penalty; and, frankly, I didn't hear the evidence.

13   And so I would have to say that whatever those people decided

14   that was the best decision because I wasn't there.  I mean, I'm

15   speaking about myself.  I can't -- I'm not second-guessing

16   anybody on the death penalty issue.

17        THE COURT:  So let's look at the next question, No.

18   90, on Page 24.  There we asked, if you could find from the

19   selections offered, whether there was a statement that best

06:49 20   described your feelings about the death penalty in a case

21   involving someone guilty of murder.  And you chose (d), which

22   is, "I am not for or against the death penalty.  I could vote

23   to impose it or I could vote to impose a sentence of life

24   imprisonment without the possibility of release, whichever I

25   believe was called for by the facts and the law in the case."

1      Is that a fair --

2             THE JUROR:  I think that's a accurate statement, yes,

3      sir.

4             THE COURT:  You heard me this morning talk a little

5      bit about what the penalty phase would be like if the defendant

6      was convicted for a crime that qualified for the death penalty.

7      You would hear predictably some evidence of what the government

8      would claim are aggravating factors that made this a more

9      blameworthy murder than other murders.  You would hear

06:50 10     mitigating factors about the crime or about the defendant that

11     the defense would argue should lead you to think that the death

12     penalty is not the right punishment, that life imprisonment is.

13     Would you be able to listen to all that evidence, weigh it,

14     consider it, and then decide which of the two alternatives you

15     would be prepared to support?

16            THE JUROR:  I think it would be my obligation to do

17     so.

18            THE COURT:  I'm asking:  Could you be able to do it?

19            THE JUROR:  Yes, yes.

06:50 20            THE COURT:  And if you look at the bottom of Page 25,

21     Question 95, now getting more particular to this case, If you

22     found this defendant guilty and you decided -- this is after

23     the penalty phase -- and you decided that the death penalty was

24     the appropriate punishment for him, could you conscientiously

25     vote for the death penalty?  And you checked the box, "I'm not

1    sure."

2          THE JUROR:  Well, I think what I really meant here is

3    I wasn't that sure about -- the question seems a little

4    ambiguous to me, your Honor.  It says, if I decided the death

5    penalty was the appropriate punishment, could I conscientiously

6    vote for it?  Well, if I decided the death penalty is the

7    appropriate punishment, then, obviously, I would vote for it.

8          THE COURT:  Well, I'm not sure --

9          THE JUROR:  I'm not sure --

06:51 10          THE COURT:  That's your interpretation, and that's a

11    reasonable interpretation of the question.  And you're right.

12    It is a little ambiguous.  I think one of the things the

13    question was getting at was:  If you intellectually decided

14    that this is the case where the death penalty would be

15    appropriate, could you yourself actually vote to impose that?

16    In other words, could you act on your intellectual judgment, or

17    would you be inhibited by your personal feelings or moral

18    objections or anything of that sort?

19          THE JUROR:  I don't feel I have a particular moral

06:51 20    objection to it, no.  I think if --

21          THE COURT:  If you thought that was the right penalty,

22    could you vote to impose it knowing that somebody would be put

23    to death?

24          THE JUROR:  If that's what I felt was the appropriate

25    punishment, again, I would feel obligated to do that, to vote

```
  1    for that.
  2            THE COURT:  We ask the other side of that question on
  3    the next page, at the top; that is, if you found this defendant
  4    guilty and you decided that life imprisonment without the
  5    possibility of release was the appropriate punishment for him,
  6    could you conscientiously vote for that punishment?  And you
  7    said "yes."
  8            THE JUROR:  I think it would be an easier call to vote
  9    for the life imprisonment than the death penalty, yes.  So
06:52 10    that's why I answered "yes" as opposed to "unsure" on the --
 11            THE COURT:  Easier in what sense?
 12            THE JUROR:  The death penalty is a pretty final
 13    decision.  Life imprisonment is not quite so final.
 14            THE COURT:  Follow-up?
 15            MR. WEINREB:  No, sir.
 16            MR. BRUCK:  Not from us either.  Thank you.  You've
 17    answered our questions.
 18            THE COURT:  Thank you, sir.
 19            THE CLERK:  Juror No. 400.
06:53 20            THE JURY CLERK:  Juror No. 400.
 21            THE CLERK:  Sir, over here, please.  Have a seat,
 22    please.
 23            THE COURT:  Good afternoon.
 24            THE JUROR:  Good afternoon.
 25            THE COURT:  Thanks for your patience.
```

1          THE JUROR:  Yeah.  No problem.

2          THE COURT:  Have you been able to avoid discussing any

3    of the substance of the case with people since you were last

4    here?

5          THE JUROR:  Yes.

6          THE COURT:  And, as much as possible, avoiding news

7    accounts touching on the subject?

8          THE JUROR:  Yeah, definitely.

9          THE COURT:  We just want to follow up on some of the

06:54 10   answers you gave us in the questionnaire.  Let's start with

11   your job.  What do you do?

12         THE JUROR:  I work in, like, tech support, application

13   support, for computers.

14         THE COURT:  In what kind of a company?

15         THE JUROR:  It's a company based out of the U.K.  It's

16   financial software.

17         THE COURT:  So what do you do on a daily or weekly

18   basis?

19         THE JUROR:  On a daily basis, I come in.  I generally

06:54 20   work on projects.  I set up software on customer servers

21   usually in different countries.

22         THE COURT:  Remotely?

23         THE JUROR:  Remotely, yes.  And also take in any

24   support calls and stuff like that.  I handle that too and then

25   also handle the IT in the entire office.

1          THE COURT:  How big is the work force where you are?

2          THE JUROR:  Well, the Massachusetts office is nine

3     people.  The -- we're in the U.K., Australia.  The U.K. is the

4     biggest office.  It has about 110 people.

5          THE COURT:  We asked earlier in the questionnaire --

6     this is on Page 5, Question 10, if you want to look.  We

7     outlined what we thought the course of the case would be, and

8     that included the prediction that it might last for three or

9     four months.  We asked if it would be an unusual hardship for

06:55 10   you to serve on the case, and you said "no."  Is that accurate?

11          THE JUROR:  It is.  I don't -- I mean, the only

12    hardship would be me getting here every day.  I don't have --

13          THE COURT:  But in terms of your employment, you'd

14    still get paid?

15          THE JUROR:  Yeah, as long as I'd still get paid, that

16    would be -- I'm pretty sure, yeah.

17          THE COURT:  We asked about social media.  You say you

18    look at Facebook once a week or so.

19          THE JUROR:  Maybe, maybe not even that much.  I'm not

06:55 20   big into that.

21          THE COURT:  For social things?

22          THE JUROR:  That's it, actually.  I don't really do

23    any social media stuff, Twitter or anything like that.

24          THE COURT:  No.  I mean, the use of Facebook is for

25    family and friends?

```
 1              THE JUROR:  Yeah.
 2              THE COURT:  It's not business related at all?
 3              THE JUROR:  No, not at all.
 4              THE COURT:  We asked a little bit about people you
 5    knew who were perhaps involved in law enforcement and other
 6    particular lines of work.  This is on Page 12, Question 34.
 7    You say you have a friend who is or was a Mass. state trooper.
 8              THE JUROR:  He is a Mass. state trooper, yeah.
 9              THE COURT:  You're not sure how long he's done that?
10              THE JUROR:  Maybe ten years, around there.
11              THE COURT:  Give us an idea of how close a friend he
12    is.
13              THE JUROR:  I grew up with him, high school, knew him
14    in college.  Still good friends with him now, but he lives
15    farther away.  He lives on the south side of Boston.  I live on
16    the north.
17              THE COURT:  How often do you catch up with him?
18              THE JUROR:  Maybe every three or four months.  I talk
19    to him maybe a couple times a month but see him, like, once
20    every three or four months.
21              THE COURT:  Would that have any effect on your
22    impartiality as a juror in a criminal prosecution?
23              THE JUROR:  No.
24              THE COURT:  Do you know if he has any particular
25    assignment or area of --
```

1          THE JUROR:  What he does?

2          THE COURT:  Yeah.

3          THE JUROR:  He's a detective.  I think he's in

4    insurance fraud.

5          THE COURT:  Could we do a brief sidebar?

6    (SIDEBAR CONFERENCE AS FOLLOWS:





```
 1              THE COURT:  Okay.  We'll go off sidebar mode.
 2    .  .  .  END OF SIDEBAR CONFERENCE.)
 3              THE COURT:  If you go to Page 20, in Question 77,
 4    which is near the top of the page, we asked whether, on the
 5    basis of things you'd seen or read in the media or from other
 6    sources, you formed various opinions, that the defendant was
 7    guilty, that he was not guilty, that he should receive the
 8    death penalty, that he should not receive the death penalty.
 9    We had it set out that there would be a response after each of
10    the subsections (a), (b), (c), and (d).  It may be, as I look
11    at this, you thought maybe the bottom was answering all of
12    them.
13              THE JUROR:  Yeah.
14              THE COURT:  You checked "unsure" as to those matters.
15    Can you tell us what you were thinking as you did that?
16              THE JUROR:  Well, at the time, when I actually read
17    that, I was thinking more -- I was unsure because I would need
18    to see the facts in general.  I don't know what really happened
19    so --
20              THE COURT:  You've seen some media coverage of the
21    events?
22              THE JUROR:  Right, obviously, yeah.
23              THE COURT:  Who hasn't, I guess?
24              THE JUROR:  Right, exactly.
25              THE COURT:  But that hasn't led you to form any
```

1 conclusions?

2    THE JUROR:  No, no.

3    THE COURT:  I'm sure you realize that in a criminal

4 prosecution a person is presumed not guilty, or innocent,

5 unless the government proves him guilty by the evidence at

6 trial and proves that beyond a reasonable doubt.  You're

7 familiar with those principles?

8    THE JUROR:  Yes.

9    THE COURT:  Do you have any reservations about your

07:01 10 ability to faithfully apply those principles if you were a

11 juror in this case?

12    THE JUROR:  Not at all.

13    THE COURT:  On any particular charge you thought the

14 government had fallen short and not had enough evidence to

15 convince you beyond a reasonable doubt that the defendant was

16 guilty of that charge, would you be able to vote not guilty for

17 him on that charge?

18    THE JUROR:  Yes.

19    THE COURT:  We asked about your views about the death

07:01 20 penalty in a series of questions beginning on Page 23, at

21 Question 88.  And that was a general question.  If you have any

22 views about the death penalty in general, what are they?  You

23 said, "I don't have any issues," I guess is --

24    THE JUROR:  I don't have any issues with it.

25    THE COURT:  Could you amplify that a little?

1           THE JUROR:  Sure.  If the person is found guilty and I

2     believe they deserve the death penalty and they're up for the

3     death penalty, I could sentence them to death, saying so.  If

4     there wasn't enough evidence, I basically could look -- I would

5     say definitely not.  I would have to be swayed one way or the

6     other.  In other words, I don't have any issues choosing one

7     way or the other.  Put it that way.

8           THE COURT:  Okay.  In the next question, we asked if

9     you could place yourself on a scale of 1 to 10, with 1 being

07:02 10   strongly opposed because you believe the death penalty should

11    never be imposed, 10 being strongly in favor because you had

12    the belief that a death penalty should be imposed whenever the

13    defendant has been convicted of intentional murder.  You

14    selected 7.

15          THE JUROR:  Yes.

16          THE COURT:  Can you give us your thinking there?

17          THE JUROR:  Sure.  That's fine.  I'm trying to think

18    of my frame of mind when I said that.  But 10, obviously, if

19    you're strongly in favor, you're going to give -- you're going

07:02 20   to look for the death penalty every time basically.  I'm not

21    looking for it every time, but I think it should be used when

22    it's necessary versus not being used at all.  Put it that way.

23          THE COURT:  Okay.  Go to the next page.  We came at

24    this in a slightly different direction this time, in Question

25    90, by asking if there was a statement among the ones that were

1   offered that best described your feelings about the death

2   penalty when someone has been proved guilty of murder.  And you

3   selected (c), which is, I'm opposed to the death penalty but

4   vote to impose it if I believe the facts and the law in the

5   particular case called for it.

6            THE JUROR:  That doesn't make sense to me because I'm

7   not --

8            THE COURT:  I was going to say that's a little

9   inconsistent about what you said.  Take a minute to read

07:03 10   through all the options to see if there's a better expression

11   of your views.

12            THE JUROR:  (e).

13            THE COURT:  (e), which is you're in favor of the death

14   penalty but could vote for a sentence of life imprisonment

15   without the possibility of release if you believed that

16   sentence was called for by the facts and the law in the case.

17            THE JUROR:  Yeah.

18            THE COURT:  You heard me this morning tell you as a

19   group that -- what the features of a penalty phase would be.

07:04 20            THE JUROR:  Yes.

21            THE COURT:  And, of course, you realize that you don't

22   get to the penalty phase unless the jury has already convicted

23   the person of willful murder.

24            THE JUROR:  Right.

25            THE COURT:  And that there would be a presentation of

1   what the government would characterize as aggravating factors

2   that would tend to support a conclusion perhaps that the death

3   penalty was appropriate.  The defense would present evidence

4   concerning mitigating factors or circumstances that would

5   perhaps militate against the death penalty and in favor of life

6   imprisonment as an appropriate punishment.  Then the jurors

7   would think about all that and make their own individual

8   decision about which they thought was the appropriate penalty.

9              THE JUROR:  Okay.

07:05 10              THE COURT:  Would you be able to do that and be open

11   to either death penalty or life imprisonment depending on how

12   you assessed all those factors?

13              THE JUROR:  Yes.

14              THE COURT:  If you'd look at the bottom of Page 25,

15   Question 95, in this we asked, If you found this defendant

16   guilty and you decided that the death penalty was the

17   appropriate punishment for him, could you conscientiously vote

18   to impose the death penalty?  You said "yes."  Is that

19   accurate?

07:05 20              THE JUROR:  Yes.

21              THE COURT:  Next question on the top of the next page

22   is a similar but different question; that is, If you found this

23   defendant guilty and you decided that life imprisonment without

24   the possibility of release was the appropriate punishment for

25   him, could you conscientiously vote for life imprisonment

```
 1   without the possibility of release?

 2            THE JUROR:  Yes.

 3            THE COURT:  That, again, represents your view?

 4            THE JUROR:  It does.

 5            MR. WEINREB:  I have no questions.  Thank you.

 6            MS. CONRAD:  Good afternoon.  I'm sorry.  One moment.

 7   (Discussion held off the record.)

 8            MS. CONRAD:  Thank you very much.  We don't have any

 9   questions.

07:06 10            THE COURT:  Thank you.  Just leave that there.

11            MR. CHAKRAVARTY:  Your Honor, on the last juror, I'm

12   not going to go into it.  It may make sense, before we go and

13   retire, recess for the discussion, to have a sidebar with

14   regard to what the parties' perception is of that.

15            MS. CLARKE:  I think we can probably talk about it and

16   come back and advise the Court.  I think we don't have an

17   objection to the --

18            MR. CHAKRAVARTY:  Right.  At least we should be

19   prepared to argue the merits.

07:07 20            MS. CLARKE:  No.

21            THE COURT:  We'll follow the usual course.

22            MR. CHAKRAVARTY:  Fair enough.

23            THE COURT:  So about 4:00.

24   (Recess taken at 3:38 p.m.)

25   (The Court entered the courtroom at 4:08 p.m.)
```

1    (SIDEBAR CONFERENCE AS FOLLOWS:

2         THE COURT:  I think the first three, I guess, we

3    suspended on early.  That's 366, 369, and 370.  So the first

4    one for discussion, if there is any, is 375.

5         MS. CONRAD:  That would be a defense motion, your

6    Honor.

7         Your Honor, first of all -- well, the main point here

8    is that he did not put down, in response to Question, I think,

9    80, 81, 82, that anyone was affected but he expressed -- I

07:39 10    think he wrote something like he wasn't sure what the question

11    meant.  And he clearly interpreted that as whether anybody was

12    physically injured.

13         However, he then volunteered that he knew a lot of

14    people who worked in the area and a lot of people who were

15    affected.  And he said, Everyone in Boston was affected.

16    Everyone in the country was affected.  And I tried to follow up

17    on that, and I was not permitted to.  And I think that that is

18    a crucial comment because it's not a question of an empirical

19    fact, simply an empirical fact, of whether someone was

07:39 20    affected.  It is the juror's subjective view of the impact of

21    these events on this person.  Just as Juror 385 said, you know,

22    although she didn't know anyone who was there, but her husband

23    had run the Marathon before.  She could have been there.  So

24    the idea of it personally affected her.  And the problem here

25    is we don't know how he feels about these events except that he

1    feels that all of Boston and potentially all of the country was

2    affected.

3           To the extent, as we've said in previous settings and

4    previous pleadings, that this is an event, a crime, that has

5    been perceived as an attack on Boston, it seems to me this is

6    an indication that this juror believes it was an attack on

7    Boston, an attack on his community, an attack on him.  And

8    that's what we don't know, what was behind those comments.  And

9    taking his comments at face value, I think, given the lack of

07:41 10    follow-up that was permitted, I think that he should be

11    disqualified.

12           I also would note that, with respect to Question 77,

13    he said that, as far as being able to put aside his views on

14    guilt, he said, Well, really, if there was an option for

15    "unsure," I would have selected "unsure."  When I tried to

16    follow up on that, again, I was cut off.  And he sort of

17    reverted back to, having been asked questions by your Honor and

18    I think the government, although I can't remember, Oh, yes, of

19    course, I would presume him innocent.

07:41 20           But I think the fact that his first reaction, using

21    his own words, was, Well, I'm unsure if I could put my opinion

22    aside.  And his own reaction, in his own words, was, A lot of

23    people I know were affected.  Boston was affected.  I think

24    that that is someone who is not impartial.

25           MR. WEINREB:  Your Honor, the government opposes the

1    motion.  Unlike the other juror who talked about her husband

2    having run the Marathon twice, this juror gave no indication

3    whatsoever, through his emotions, body language, and really not

4    through his literal answers, that he believed he personally had

5    been affected in a way that would interfere with his ability to

6    be fair and impartial.

7           I interpreted his saying, talking about this whole

8    city of Boston, indeed the whole country, was affected that he

9    personally had been no more affected than anybody had been --

07:42 10           MS. CONRAD:  But -- go ahead.

11           MR. WEINREB:  -- in Boston and in the country.

12           In any event, the question is always not whether a

13   particular thing happened.  It's whether it would interfere

14   with the juror's ability to judge the case on the evidence, to

15   judge it fairly.  And he gave every indication that he would be

16   able to and that none of these other -- these things that he

17   didn't even consider to be strong enough impacts to warrant

18   listing in the answer to the question on the questionnaire

19   would interfere.

07:43 20           MS. CONRAD:  May I just respond to that briefly?  Mr.

21   Weinreb, having objected successfully to those follow-up

22   questions, now says, Well, he didn't say how it emotionally

23   affected him because he wasn't asked.  So we're inferring from

24   the lack of an answer, not for lack of trying to ask the

25   question, that there's nothing there.  And that's what we can't

1    do.

2         THE COURT:  Well, I'll deny the motion.  On that

3    topic, it seemed to me that his answer, on its face, was a --

4    he was using the word "affected" in the broadest possible way

5    and not in the way that would affect his judgment in the case

6    in the sense that everybody is aware of it and has some idea.

7    So --

8         MS. CONRAD:  But --

9         THE COURT:  It in a sense devalued the word so it

07:44 10   didn't particularly mean what we were trying to get at, which

11   is a much more closer personal connection.  And that's

12   influenced, I think, by his persona.  He's obviously a pretty

13   confident fellow.  He seems very bright.  If he were affected

14   in a substantial way, it would have showed differently from the

15   way he appeared in answering the questions, and I just don't

16   think that's right.

17        I think his answers were satisfactory.  As I say, he

18   appears as an intelligent, thoughtful person, who's cognisant

19   of his abilities to do what he's asked to do.  And I think he's

07:44 20   fine.

21        MS. CONRAD:  The only one thing I just want to add,

22   because it may impact future questioning, is it seems to me, if

23   that was going to be the response, Well, I was no more affected

24   than anyone else, then that would have been his response.  And

25   I don't know why we aren't willing to let him say that in

1    response to the question.

2            THE COURT:  Well, jurors don't always give the best

3    response they could.  We judge them on what they've said.

4    Anyway, my assessment is that he's a qualified juror.

5            Next is 376.

6            MS. CLARKE:  No motion.

7            MR. WEINREB:  No motion.

8            THE COURT:  379, I think, was terminated early, as was

9    385.

07:45 10         386, I don't remember whether there was anything on

11   that or not.

12           MR. WEINREB:  Well, the government moves to strike

13   386.

14           THE COURT:  Go ahead.

15           MR. BRUCK:  There will be no argument from the

16   defense.

17           THE COURT:  Okay.

18           MR. BRUCK:  390 is a motion from the defense.

19           THE COURT:  Okay.

07:45 20         MR. BRUCK:  And I'm not sure.  Does the government

21   oppose?

22           MR. WEINREB:  We do.

23           THE COURT:  Let's hear the motion then.

24           MR. BRUCK:  As your Honor will recall, this is the

25   young woman who now works at Mass. General, who initially put

1    herself down as a 10 on her death penalty views, expressed the

2    view that she would always impose the death penalty for anyone

3    convicted of an intentional murder.  She also put herself down

4    as a (d).

5         But her own words -- I mean, in the end, I asked

6    clarifying questions, and she went right back to saying that,

7    if the person was convicted beyond a reasonable doubt, if he

8    was guilty beyond a reasonable doubt, she would always impose

9    the death penalty.  And there was no longer any ambiguity.  In

07:46 10   fact, the original answer she gave was the last answer she gave

11   despite some valiant efforts to rehabilitate by the government.

12        In addition, this is a juror with -- who describes --

13   describing to her very young son, who is now seven, what had

14   happened and his confusion.  She has a sister who has been

15   eight years in the Marines, served in Afghanistan.  She now

16   works at Mass. General, which, of course, is one of the centers

17   for treatment, although she was not there at the time.  There

18   were a lot of issues with this juror, but I don't think there's

19   any doubt that she is a *Morgan* juror.  If there is -- at a

07:47 20   minimum, she is substantially impaired.

21        To the extent that there was what appeared to be

22   vacillation, it all makes sense when one interprets, as I think

23   we must, her answers as saying that it would depend on the

24   evidence of guilt, how certain she was of guilt, whether or not

25   she would always support the death penalty or not.  But if

1    there was no issue of guilt, she never -- once that was clearly

2    established, she could listen to the evidence in the penalty

3    phase; but in the end, if there was no issue of guilt, she

4    would never -- she would always impose the death penalty.  This

5    is a *Morgan*-impaired juror, and we think she should be

6    excluded.

7          MR. WEINREB:  So I didn't interpret her answers that

8    way.  She -- just as the Supreme Court has said, that there are

9    jurors who can be morally opposed to the death penalty but can

07:48 10   still decide cases on a case-by-case basis and impose it where

11   it is appropriate, this juror struck me as someone who was sort

12   of the mirror image of that, someone who believes very strongly

13   that there should be a death penalty and that it is appropriate

14   in cases but not necessarily in every case.

15         If you look at all of her answers on the

16   questionnaire, it's true that she put a 10 for 89.  And

17   although Mr. Bruck correctly reads the literal language of the

18   question, I think our experience has uniformly been, in

19   questioning these jurors, that they just see this as being do

07:48 20   you oppose or favor the death penalty as a general matter

21   without paying attention to the specifics and the two-phase

22   nature of a capital case.

23         So she strongly is in favor of having a death penalty.

24   But every time she was asked whether she could vote to impose

25   it or a life sentence in the alternative, she said she could do

1    both.  When it came to 90, she answered (d).  When it came to

2    Question 96 and she was asked -- and here I'll quote the

3    literal language -- "If you found him guilty and you decided

4    life imprisonment without the possibility of release was the

5    appropriate punishment, could you conscientiously vote for it?"

6    She said "yes."  She didn't even say unsure.

7          I think that she actually was pretty consistent

8    throughout her answers here, that she had very strong feelings

9    about the death penalty, no question about it, and she is

07:49 10  strongly in favor of it.  But I don't think that Mr. Bruck's

11   final question, which was the attempt to sort of get her to say

12   that she would automatically impose it was a fair question

13   because that question used her own language of feelings, and it

14   focused on the question of whether -- he, in fact, said to her,

15   What we're after here is your feeling, what your feelings would

16   be.  And that's not the relevant question.  The question is

17   whether, despite her feelings, that it's an appropriate and

18   important punishment, that she could decide, go either way.

19   And, in addition, when Mr. Bruck asked that question, he didn't

07:50 20  mention the possibility of mitigating evidence or mitigating

21   factors.

22          So I think every time that the process was explained

23   to her, how the system -- how the system works and what her

24   duties would be, she was -- she said that she could impose a

25   sentence of -- meaningfully consider mitigation and impose a

1    sentence of life imprisonment.

2         MR. BRUCK:  Do you need to hear anything further?

3         Her actual words in response to the Court, when you

4    asked her about 10, about her response circling 10, she said,

5    If he is guilty, I would be imposing the death penalty.  And

6    beyond that, any contrary answer she gave always had the

7    ambiguity of where you're talking about guilt.

8         The other thing that I forgot to mention about her

9    son, Mr. Weinreb sort of preemptively, knowing we would ask

07:51 10   about it, asked her about the effect of having a son we all

11   know is almost the same age as Martin Richard, and her response

12   was -- there was a long pause, and then she said that that

13   might make it difficult.  Of course, you asked follow-up

14   questions and she said, you know, she could put that aside or

15   whatever she said.  But that was the raw, unvarnished truth.

16   And it's very understandable.

17        This juror has too much on her.  There is way too

18   much, at best, ambiguity.  If you look at the actual words she

19   used, both in response to the Court and in response at the end,

07:51 20   after everything had been laid out for her, we cannot say that

21   she would ever impose life imprisonment if she found beyond a

22   reasonable doubt that this young man was guilty.

23        THE COURT:  I was going to ask you to comment on that.

24   That's the child.

25        MR. WEINREB:  Yes.

1       THE COURT:  She's apparently the single mother of a

2  boy about Martin Richard's age.

3       MR. WEINREB:  Yes.  So, again, I think that her

4  response to that was to give it some real thought.  It seemed

5  to me that she hadn't given it some real thought up to that

6  point, and so she really did focus hard on it.  I think, in

7  saying that it would be difficult, that that was a tribute to

8  her desire to think -- to be honest about it.  And when she

9  said -- her initial reaction was it would be hard.  When she

07:52 10  was asked again just how hard would it be, would it really

11  interfere?  She thought about it some more, and she said no.

12       Many of the people we're seeing have teenagers -- who

13  have children who are teenagers, the same age as the defendant,

14  and yet we're not taking it as a ground to strike people that

15  they might have, you know -- it would be like sentencing to

16  death someone who could have been their own son having

17  committed the crime.  I don't think that is a disqualifying

18  factor in and of itself unless the juror really indicates that

19  it's not something that they could set aside.  And this one

07:53 20  seemed to, after giving it some thought, that she could.

21       And, frankly, I think that her hesitation is also

22  further confirmation that she doesn't believe the death penalty

23  is the automatic sentence in every case, or it wouldn't have

24  been a problem to answer that question.  She would have just

25  said, of course, he should get the death penalty.  That was

1    never her answer to any of these questions.  In fact, the only

2    time it was ever the answer was at the end when Mr. Bruck led

3    her into saying it, and it was very inconsistent with

4    everything that had gone before.

5         THE COURT:  Okay.  I don't think I'm going to excuse

6    her.  I think that -- I was impressed by her persona, I guess.

7    She seemed very composed, thoughtful, intelligent.  I did think

8    she was -- had some perhaps inadequate understanding of the

9    processes.  For example, I don't remember if it was with her or

07:54 10   with one of the other jurors, but it happened perhaps in both

11   cases anyway, that when the juror was talking about guilt, I

12   took the meaning to be culpability in the context rather than

13   the way we would use it as a first-stage proposition.  And I

14   think, understood that way, it does refer to the penalty phase

15   and not to the guilt or innocence phase.  In other words, it's

16   a way of actually, you know, processing perhaps the instruction

17   about particularly blameworthy case if you talk about how -- in

18   other words, we think of guilt as binary.  There will be a

19   verdict that says he's guilty, or there will be a verdict that

07:55 20   says he's not guilty.  Jurors may think of it as a continuum.

21   Some people are more guilty than others.  That's a different

22   way of using the word.  I think it's not surprising that

23   laypeople use the word that way.

24        It seemed to me throughout she was not necessarily

25   fully understanding the difference between the guilt and the

1    penalty phase and was getting confused about which phase she

2    was being asked about perhaps for the reason I just mentioned,

3    that people using the word "guilt," she may have been

4    translating that in her head.

5         I think, in not excusing her, I really rely on my

6    overall impression of her rather than on any specific answers.

7    She did say things on both sides of the question.  There's no

8    question about that.  She said them flatly sometimes.  I don't

9    know that -- first of all, we're assessing her as a whole and

07:56 10   not on any given answer or series of answers.  And I have to

11   say that my judgment about her is that she can be prepared to

12   hear the evidence in a penalty phase and potentially go both

13   ways.

14        MR. BRUCK:  So the record is complete, I also probably

15   should have mentioned again, although I don't know that I

16   needed to, but she also said she sheltered in place with her

17   young child as a consequence --

18        THE COURT:  That wouldn't alter my --

19        MR. BRUCK:  And we would add that.

07:56 20        THE COURT:  Fair enough.  I would pass her at this

21   point.

22        Let me just add, I don't think there's anything in the

23   MGH association that is worrisome particularly at this stage.

24   Not only was she not there.  She works in a department that is

25   not the E.R.  She's not working with the same people.  She's in

1    a cancer testing center basically doing --

2              MR. BRUCK:  I must say I would have gone on had I not

3    been pretty sure that she was disqualified under *Morgan*.  We

4    get back to this problem with Doctor David King and the

5    government's use of an MGH trauma surgeon at both guilt and

6    penalty phase with the IEDs.  And this links back into thinking

7    about her sister in Afghanistan.  Her connection to MGH may be

8    -- may end up being a little more problematic than we thought.

9              THE COURT:  Well, okay.  It didn't appear so today.

07:57 10             I think next is 391.

11             MR. WEINREB:  That was agreed.

12             THE COURT:  393.

13             MR. WEINREB:  393 is a government motion.  Your Honor,

14   the government would argue that this juror is substantially

15   impaired in many ways.  She -- for one thing, she really didn't

16   seem to understand the questions that she was being asked very

17   well, and the chief indication of that was that she seemed to

18   be a juror who wanted very much to be a good juror, say the

19   right thing.  She was very agreeable.  And as a result, she

07:58 20   essentially answered yes to whatever anybody asked her about

21   anything so that -- I asked a series of questions.  She

22   answered yes to all of them.  The Court did; Mr. Bruck did.

23   They were all contradictory in her answers.  But I think that

24   if you try to sort through all of that -- first of all, we'd

25   argue that that alone substantially impairs her.

1        But, in addition, if you look at what she wrote on her

2    questionnaire, before anybody was asking her questions, she

3    indicated quite plainly that she is unable to impose the death

4    penalty or unwilling to do so, that she's against it, and that

5    she personally couldn't do it.  In response to Question 90, she

6    couldn't even give the Court an answer.

7        There's just no -- it's impossible to conclude from

8    the -- she didn't answer it on the questionnaire.  And when the

9    Court asked her to read through all the possibilities and then

07:59 10  pick one, she still couldn't do it.  I think that there's no

11   way to have confidence either that this person would be able to

12   give fair consideration to aggravating factors and impose a

13   death penalty but, moreover, that she would be a good juror in

14   general, that she would be able to follow legal instructions.

15   This is a case with 30 offenses.  Many of them have -- the

16   924(c) counts, among others, are going to be very complicated

17   in terms of how they need to be decided because of all the

18   disagreements among the courts about what the unitive

19   prosecution is under those statutes.  There are conspiracy

08:00 20  charges.  There are other counts, like bombing a place of

21   public use with numerous elements, not all of which are very

22   straightforward.

23       And it's hard to believe that this is a juror who

24   could deliberate well with other jurors since she doesn't seem

25   to know her own mind, isn't able to articulate what's on her

1    mind, can't seem to even answer questions when they're written

2    down for her and she's given the opportunity to do a multiple

3    choice.  So there's -- we would argue that she is simply not

4    the right juror for this case.

5         MR. BRUCK:  Well, we think there's a little

6    inconsistency here between this and the juror that -- whose

7    qualification the state just supported.  I don't mean to

8    suggest that they are identical in every respect.  There are

9    obviously differences between them, but in the critical respect

08:01 10   they're the same.  They gave inconsistent responses at times.

11   But the bottom line for this juror, while she would have a hard

12   time predicting what she would do, which is something the Court

13   has addressed many times over and not find to be disqualifying,

14   she clearly stated that, if she was convinced that the death

15   penalty was appropriate, she could vote for it; and if she

16   wasn't, she wouldn't.  That's the test.

17         And beyond that, this is the domain of the -- that's

18   what the 20 peremptory challenges are for.  If the government

19   doesn't trust her to be a good juror, they know what to do.

08:01 20   But to qualify the juror we just discussed a moment ago and

21   then to say that this juror, who is so similar in the material

22   respects, is unqualified, I think would be inconsistent and

23   really quite unfair.

24         THE COURT:  I agree that they are, on the record, that

25   taken as a record, they are similar in many respects.  They

1    gave similar answers and vacillated similarly.  I think they

2    are completely different in the overall appreciation of them.

3         I really don't know what this juror thinks, whereas I

4    think I have a sound judgment about what the other juror

5    thinks.  She seems like a very lovely lady, but -- and I think

6    I would agree that she's trying to do the right thing.  She

7    wanted to in some extent give an answer that was the right

8    answer to give.  But I just don't know that she was giving us

9    answers that we could rely on.

08:02 10        It did appear a couple of times that she was kind of

11   puzzled about the question, but then she went ahead and

12   answered it.  I don't know whether to rely on the answer she

13   gave in the questionnaire when she said she was a 1, and she

14   answered 95 "no."  Those could be right, but I'm not sure of

15   that either.

16        I just -- she is just someone who I don't think has

17   given us a basis for thinking that she can be a reliable juror

18   to follow instructions.  So I will excuse her.  I recognize

19   that it's -- it looks fishy given the cold record, but I rely

08:03 20   on the different sense of them as they answered the questions.

21   So I would excuse her.

22        394.

23        MR. WEINREB:  She was excused.

24        THE COURT:  She left, right?

25        MR. WEINREB:  Yes.  We agreed on her.

1            THE COURT:  I remember her now.  I had a blank for a

2    minute there.

3            395.

4            MR. WEINREB:  No motion.

5            THE COURT:  Legal assistant -- legal executive

6    assistant.

7            396.

8            MR. WEINREB:  So, your Honor, the government has a

9    motion on 396.  I won't belabor this one because I think that,

08:04 10    now that we've had some experience with jurors, we've seen two

11    kinds of jurors who steadfastly say that they are not sure that

12    they could impose the death penalty even in a case where they

13    intellectually believed it was the right sentence to give.

14            There are jurors who simply say that because they're

15    projecting themselves into an unfamiliar situation, and maybe

16    nobody can say whether they could actually do it under those

17    circumstances.  And then there are jurors who are genuinely

18    unsure because they have scruples against the death penalty

19    that are so strong that they're really not sure they could ever

08:04 20    overcome them in any case.

21            That's this juror.  She made it perfectly clear that

22    that was her outlook, that she is -- that she is a -- although

23    she believes intellectually or in theory that the death penalty

24    is an appropriate punishment and doesn't fault other jurors for

25    imposing it in other cases, that because of her Catholic

1    beliefs and other moral beliefs that she is genuinely unsure if

2    she could ever impose it in any case.

3         And I think it was quite telling that the only case

4    that she talked about in which she could potentially impose it

5    is one in which her own children were the victims, were killed.

6    And even then she was not able to say I could do it if it were

7    my own kids.  All she was able to say was, I'd think about it.

8    Maybe if it was my own kids, I'd be able to think about it.

9         That is the -- so that, I think, is one definition of

08:05 10    a juror who is substantially impaired in her ability to

11    consider aggravating factors and impose the death penalty.

12    Basically, she has to -- at a minimum, to be qualified to sit

13    on the jury, she has to be able to follow the law, which is

14    that she can meaningfully consider imposing the death penalty

15    if in her intellect tells her that -- and she can't say that.

16    All she can say is that she's skeptical of her ability to do it

17    highlighted by the fact that it would have to be her own kids

18    for her to even be able to say maybe.

19         And then on top of that, she got very emotional when

08:06 20    she said that.  And when she was pressed again about the

21    possibility of giving it in a case where -- even where it was

22    her own kids, she not only seemed emotional in the sense of

23    tearing up, but she almost seemed angry just thinking about the

24    whole issue.  And I think that that is just the tip of the

25    iceberg for her, that the prospect of personally having to

1    impose the death penalty -- maybe it's -- I'm sure it's an

2    emotional experience for anybody.  But there can come a point

3    when it can become too emotional and your emotions overcome

4    you, and you're not making a decision according to the

5    standards that you should be applying.  And she is someone who

6    I think it is reasonable to anticipate would fall into that

7    category.

8              MR. BRUCK:  Well, I think Question 95 has gradually

9    led us into doing that which the Court has not allowed the

08:07 10    parties to do, which is to, in effect, get the jurors to commit

11    imposing the death penalty in this case because that is the way

12    it is worded.  And I think that's where we tripped up.  This is

13    another example of a juror who, looking ahead, hypothetically,

14    right in the presence of this defendant, talking about this

15    case, ran into this obstacle.  But I think that imposes an

16    additional hurdle that *Witherspoon* does not, so we'd leave it

17    to the Court on that basis.

18              THE COURT:  It would be interesting what -- I

19    appreciate those issues -- but what either of you think about

08:08 20    her life schedule, if I could put it that way?  She said she

21    worked 80 hours a week.  She's taking a course at night.

22              MR. BRUCK:  One night a week when we leave, Thursday,

23    which is the end of the court week.  80 hours a week.

24              THE COURT:  She looks like a person who can handle a

25    lot.

1        MR. BRUCK:  She does.

2        MR. WEINREB:  I didn't think the course -- I agreed

3    with Mr. Bruck that the timing of the course didn't seem

4    like --

5        THE COURT:  It wasn't so much the timing.  That was

6    fine.  It was the question of an additional burden, and I don't

7    know -- the 80 hours is probably an exaggeration but --

8        MR. WEINREB:  Right.

9        THE COURT:  -- obviously a busy person.  Neither of

08:08 10   you think that's an issue?

11        MR. WEINREB:  I don't know that I would say that it's

12   an issue in and of itself.  But I think, for somebody who is

13   already being put under, I think, is likely to be put under

14   vast emotional stress by the decision making, it's not going to

15   help that, on top of everything else, her busy work life, her

16   busy home life, and her schooling, that she's now got an

17   additional 35-hour-a-week job here in the courtroom, plus the

18   commute, and that -- I just think we've got 1,350 jurors to

19   choose from.  We're finding plenty who are, you know, genuinely

08:09 20   fair and impartial jurors who say that they could go either way

21   on the death penalty, who do not have a hardship, who are

22   otherwise qualified in every way.  It just seems unfair to the

23   government, in my view, and I think unfair to her, as the Court

24   may be suggesting, to subject her to this process when she

25   really doesn't seem to be qualified for it in the first place.

1          MR. BRUCK:  I would just point out that she is one of

2     the few jurors who or relatively few jurors who flat out said

3     she's getting paid.  So she doesn't have a hardship.  Everybody

4     is busy.  I point out that she is an 8, 8(h), on her

5     questionnaire.

6          MR. WEINREB:  Then, your Honor, I'd also point out

7     that -- in contrast to what Mr. Bruck said about that this was

8     a question about whether she could impose the death penalty in

9     this case, his last question to her was:  And is the reason

08:10 10    that you can't say beyond "I'm not sure" because you haven't

11    heard the evidence?  And she said, No, it has nothing to do

12    with not hearing the evidence.  It purely has to do with her

13    scruples against the death penalty and her inability to say

14    that she could do it in any case regardless of the evidence.

15         THE COURT:  I think I have to regard her as

16    substantially impaired.  She really stuck to not sure.  And I

17    think -- I'm not sure that every "not sure" is disqualifying.

18    It was -- in context, I think she wasn't able to tell us that

19    she affirmatively would be open to that as a realistic

08:11 20    possibility.  I think in -- sometimes the neutral ground, the

21    middle ground, isn't enough to be open to meaningful

22    consideration, and so I think I have to conclude that she's

23    substantially impaired.

24         399.

25         MR. CHAKRAVARTY:  Your Honor, on 399, the government











1

2

3

4

5

6

7

8

9

08:18 10

11

12

13

14

15

16

17

18

19

08:18 20

21

22

23

24          Okay.  Just to record a couple -- there's some -- I'm

25     told there's some question whether we formally put on the

1    record that No. 332 would be put in the excuse category.  You

2    can look that up.  I don't even know who it is.  I just have

3    the number.

4         MS. CLARKE:  332 I show as excuse.

5         THE COURT:  We didn't know if we put it on the record.

6    I think everybody regards it as having been done.  So it's now

7    on the record.

8         318 that we suspended judgment on, I will also not

9    qualify.  That's the person whose husband worked at City Hall.

08:19 10   Sorry Miss Conrad wasn't here to hear me say that.

11        MS. CLARKE:  We'll tell her.

12        THE COURT:  Just also for the record, earlier today we

13   did -- I think we did it at the beginning.  I'm pretty sure we

14   did.  276, 357, 392, 397, 398.

15        I think you had previously, last week, I guess, given

16   us through the series tomorrow, so we already have what your

17   joint proposals were on that.  We are about to dip into Panel

18   C.  Originally, we had asked everybody to do -- you know, look

19   at A and B and give us the things you jointly agreed on and we

08:20 20   can just scrub that.  I think -- unless you've already done

21   it -- that's a step we can skip this time because we're now in

22   the process of identifying, say, the next hundred in the

23   sequence.  And we have been, in fact, getting from you things

24   you look as the next day, the next day out after that.  So I

25   don't think we need a separate master list for Panel C.  We've

1    just adopted in practice what we had done on that.

2         MR. WEINREB:  So the clerk will be giving us proposed

3    hardship strikes from Panel C?

4         THE COURT:  We have somebody going through them right

5    now.

6         MR. WEINREB:  Okay.

7         MS. CLARKE:  Judge, we had early on exchanged Panel C

8    once, and then we were -- both sides were looking at the

9    return.  And so we were very --

08:21 10        THE COURT:  If you're halfway there and you don't mind

11   going the rest, that will be fine.  I don't want to impose the

12   additional burden when we're sort of doing the same thing at

13   this stage.  If you could reduce it by any number --

14        MS. CLARKE:  I think we are close to being ready.

15        THE COURT:  Okay, because it may be -- maybe as soon

16   as -- maybe as soon as Friday, I think, and, if not, certainly

17   Tuesday that we would be in Panel C.

18        MS. CLARKE:  Right.  How far is -- how far does the

19   Court intend to go in terms of qualifying?  To 70?

08:22 20        THE COURT:  That's the number we've been using.  I

21   know there is some sort of back strikes going on, which I

22   haven't considered.  It may depend on the outcome, you know,

23   because we need a margin not only for that.  That was one of

24   the reasons for the margin, but for other events in people's

25   lives that can happen.

```
 1              It's late.  Let me just raise this for your thought.
 2      You don't even have to -- when we get to the peremptory stage,
 3      it has occurred to me -- and I don't know whether you've talked
 4      about it -- as a method, we don't necessarily need the bodies
 5      here.  It could all be conceivably done on a chart.  So I don't
 6      know that there's any reason why we couldn't do that.
 7              In a more ordinary case, particularly with much more
 8      limited voir dire here in Massachusetts, you would want to see
 9      the person again.  But you have all these things, and you have
08:23 10     your notes and everything like that.  It may be efficient to do
11      it without them and just call in the panel having been reduced
12      by the peremptories.
13              MS. CLARKE:  Has the Court considered how we'll do the
14      strikes?
15              THE COURT:  Only to think that I would follow the
16      procedure I usually do, but I don't know if anybody wants to
17      address that.
18              MS. CLARKE:  Which would be?
19              THE COURT:  No back strikes.  So both sides, my
08:23 20     typical case, you have jurors and alternates in the box.  The
21      time would come for peremptories.  Counsel would come to the
22      side.  The government will go first, strike anybody in the box,
23      two, three, four, five, however many they wanted.  The defense
24      then would strike from anybody remaining.  The empty seats
25      would be filled.  Only the empty seats would be candidates for
```

1   future strikes.  The second round the defense would go first,

2   followed by the government, and then we keep flipping back, and

3   each round potentially would get narrower and so on until the

4   process was finished.

5           It does raise the question about designating

6   alternates.  My usual practice, I tell lawyers -- we had a

7   12-person-plus-two-alternate jury.  Fourteen is what we

8   typically do.  I would tell the lawyers that the alternates

9   would be the last two seated so that they knew when they got to

08:24 10   the last two -- say, you had -- well, they could know that

11   those people would be designated alternates no matter where

12   they were in the box.  In other words, we don't physically

13   separate them.  It could be the juror in Seat No. 3 and the

14   juror in Seat No. 9 could be the alternates, and they wouldn't

15   know it.  They'd just know they got seated.

16           MR. BRUCK:  So under that system, jurors who were the

17   last qualified could be regular jurors.  We would not have a

18   panel for the main jury and then a separate panel for the

19   alternates?

08:25 20           THE COURT:  Correct, that's right.

21           MR. BRUCK:  Okay.

22           THE COURT:  That's right.  You wouldn't concentrate on

23   12 and then concentrate on six.

24           MR. BRUCK:  Right.  Okay.

25           THE COURT:  The reason for that, from my point of

1    view, is it doesn't tell the alternates who they are, that they

2    know that they're alternates.  I think that's to be avoided if

3    we can.  So anyway --

4              MS. CLARKE:  Thank you.

5              THE COURT:  Okay.  Thank you.

6    (Whereupon, at 4:56 p.m. the trial recessed.)

1                   C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso_____
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13

14   /s/ Cheryl Dahlstrom_____
     CHERYL DAHLSTROM, RMR, CRR
15   Official Court Reporter

16
     Date:  February 11, 2015
17

18

19

20

21

22

23

24

25