```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )
```

```
         BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                UNITED STATES DISTRICT JUDGE
```

### JURY TRIAL - DAY SEVENTEEN

```
      John J. Moakley United States Courthouse
                 Courtroom No. 9
                One Courthouse Way
            Boston, Massachusetts  02210
            Thursday, February 12, 2015
                   11:15 a.m.




            Marcia G. Patrisso, RMR, CRR
               Official Court Reporter
           John J. Moakley U.S. Courthouse
           One Courthouse Way, Room 3510
            Boston, Massachusetts  02210
                 (617) 737-8728

      Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
            By: William D. Weinreb, Assistant U.S. Attorney
 3         John Joseph Moakley Federal Courthouse
            Suite 9200
 4         Boston, Massachusetts  02210
            - and -
 5         UNITED STATES DEPARTMENT OF JUSTICE
            By: Steven D. Mellin, Assistant U.S. Attorney
 6         Capital Case Section
            1331 F Street, N.W.
 7         Washington, D.C.  20530
            On Behalf of the Government
 8
            FEDERAL PUBLIC DEFENDER OFFICE
 9         By: Miriam Conrad, Federal Public Defender
            51 Sleeper Street
10         Fifth Floor
            Boston, Massachusetts  02210
11         - and -
            CLARKE & RICE, APC
12         By: Judy Clarke, Esq.
            1010 Second Avenue
13         Suite 1800
            San Diego, California  92101
14         - and -
            LAW OFFICE OF DAVID I. BRUCK
15         By: David I. Bruck, Esq.
            220 Sydney Lewis Hall
16         Lexington, Virginia  24450
            On Behalf of the Defendant
17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         THE CLERK:  All rise.
 3         (The venire enters the courtroom at 11:15 a.m.)
 4         THE CLERK:  All rise for the Honorable Court.
 5         (The Court enters the courtroom at 11:16 a.m.)
 6         THE CLERK:  Be seated.
 7         THE COURT:  Good morning.
 8         THE JURORS:  Good morning.
 9         THE COURT:  As you know, we are continuing the process
10    of selecting a jury for the trial of the case of United States
11    versus Dzhokhar Tsarnaev.  Mr. Tsarnaev is charged in
12    connection with a bombing that occurred near the finish line of
13    the Boston Marathon on April 15th, 2013, and that resulted in
14    the deaths of three people.  He's also charged in the death of
15    an MIT police officer and other crimes occurring on April 18
16    and 19, 2013.
17              Some, but not all, of the crimes charged are, by
18    statute, potentially punishable by death.  You'll recall from
19    my prior instructions that the trial jury will first consider
20    and decide whether the government has proved Mr. Tsarnaev's
21    guilt of any or all of the charges against him.  If he is
22    convicted of any of the capital crimes -- that is, crimes
23    potentially punishable by death -- the jury will then consider
24    and decide whether he will be sentenced to death for any such
25    crime or to life in prison without the possibility of release.
```

1              You may wonder why the death penalty could be a

2       possibility in this case in view of the fact that the laws of

3       Massachusetts do not provide the death penalty for murder or

4       any other violation of Massachusetts law.  The reason is that

5       this is a federal case involving alleged violations of the laws

6       of the United States rather than a state case involving

7       violations of Massachusetts law.

8              If the jury convicts Mr. Tsarnaev of any one of the

9       capital crimes charged in the indictment, then the same jury

10      will hear additional evidence and decide whether to sentence

11      him to death or to life in prison without the possibility of

12      release.  Because the jury that is selected to decide the

13      defendant's guilt or innocence will also decide his punishment

14      if he is convicted, it is necessary to question prospective

15      jurors about their feelings and beliefs about the death penalty

16      as part of the process of selecting a jury.

17             Let me explain briefly the procedures that must be

18      followed in a case in which the death penalty is or may be at

19      issue.  As in any criminal trial, initially the government will

20      have the burden of proving that Mr. Tsarnaev is, in fact,

21      guilty of any crime with which he is charged.  If he is

22      convicted by the jury of a crime for which the death penalty

23      may lawfully be imposed, there will be a second phase of the

24      trial, usually referred to in shorthand as the penalty phase.

25             In that phase, the government will introduce evidence

1    that seeks to establish and prove beyond a reasonable doubt,

2    first, that the defendant acted with sufficient intent to be

3    subject to the death penalty under the law; and, second, that

4    aggravating factors about the killings or about the defendant

5    justify sentencing him to death.

6          Aggravating factors are circumstances that, if proven,

7    make the crimes particularly serious or blameworthy and,

8    therefore, under the law may justify imposing a more severe

9    sentence on Mr. Tsarnaev compared to other persons who have

10   been convicted of intentional killing or murder.  The

11   government will bear the burden of proving any alleged

12   aggravating factors to every juror beyond a reasonable doubt.

13         The defense will have the opportunity in the penalty

14   phase to present evidence of what it will argue are mitigating

15   factors.  Mitigating factors are usually circumstances about

16   the crime or crimes or about the defendant's background or

17   character that would suggest that the death penalty is not the

18   appropriate sentence in the case or that life in prison without

19   the possibility of release is adequate to punish the defendant.

20   Unlike the proof of aggravating factors, a mitigating factor

21   must only be proven by the greater weight of the evidence.

22   That is a less demanding standard of proof than proof beyond a

23   reasonable doubt.

24         Again, unlike the proof of aggravating factors,

25   mitigating factors do not have to be proven to the satisfaction

1     of all 12 jurors.  Any juror who finds or determines that a

2     mitigating factor has been proven by a greater weight of the

3     evidence may consider that factor in deciding the appropriate

4     sentence in the case, regardless of whether any or all of the

5     other jurors agree that that mitigating factor has been proven.

6           After the parties have made their presentations during

7     the penalty phase, the jury will then weigh all the evidence.

8     Before a jury could vote to impose the death penalty, every

9     juror would have to be persuaded that certain threshold factors

10    that make the defendant potentially subject to the death

11    penalty had been proven beyond a reasonable doubt.

12          In addition, in order to impose the death penalty,

13    every juror would have to be persuaded that any proven

14    aggravating factors sufficiently outweigh any mitigating

15    factors found by any juror or jurors to justify a sentence of

16    death.  Even if the jury did not find any mitigating factors,

17    it would still have to be unanimously persuaded that any proven

18    aggravating factors were themselves sufficient to justify a

19    death sentence.

20          You should understand that a jury is never required to

21    find that a sentence of death is justified.  The decision

22    whether the government has proven that a defendant should be

23    sentenced to death must ultimately be made by each juror

24    himself or herself.  If, however, every juror is persuaded that

25    the death penalty should be imposed, I would be required as the

1    trial judge to sentence the defendant to death; in other words,

2    I could not change the jury's decision.  The jury, and not the

3    judge, is responsible for determining whether a defendant who

4    is convicted of a capital crime will live or die.

5           What I've just described is an overview of the law

6    applicable to the jury's consideration of the death penalty.

7    If you are selected to serve on this jury and if you find the

8    defendant guilty of a crime or crimes punishable by death, I

9    will then give you very detailed instructions concerning your

10   duties in deciding whether to impose the death penalty or life

11   imprisonment without the possibility of release and the law

12   that must be followed in making that decision.

13          When you filled out your questionnaires, we told you

14   that there are no right or wrong answers to any of the

15   questions you've been asked or that you will be asked in this

16   further process.  We're asking these questions because both the

17   government and Mr. Tsarnaev are entitled to have a jury that

18   does not have its mind firmly made up one way or another before

19   hearing the evidence and a detailed explanation of the law.

20   That applies both to whether Mr. Tsarnaev is guilty or not

21   guilty of the specific crimes charged in the indictment and, if

22   he's convicted of a capital crime, whether he should be

23   sentenced to death or to life in prison without the possibility

24   of release.

25          So we're going to continue the process today by

1    questioning you each individually about issues that are

2    relevant to selecting a jury.  In just a moment we're going to

3    ask you to go back into the room where you were just a few

4    moments ago.  We'll call you into the courtroom one by one to

5    ask you some questions.

6         There will be a few people in the courtroom in

7    addition to the lawyers and their staffs, and these proceedings

8    are being simultaneously transmitted by video and audio to

9    overflow courtrooms.  We will not identify you by name but

10   rather by juror number.  And you will be seated so that the

11   video camera transmitted to other courtrooms will be behind

12   you.

13        Your answers will be generally public, but if you

14   believe that a truthful answer would require you to reveal

15   sensitive personal information, we will temporarily stop the

16   audio transmission to those courtrooms so that people observing

17   there will not be able to hear your answer.

18        Again, we do not expect or want any particular answer

19   to any of the questions.  All we want, and what the law

20   expects, is that you provide accurate and truthful answers to

21   the questions you're asked.  If you do that, you will be doing

22   your duty as a citizen and as a juror, no matter what the

23   answers may be.

24        I remind you about some of my prior instructions.  As

25   I told you, a jury's verdict must be based on the evidence

1    produced at trial and must be free from outside influence;

2    therefore, I remind you again it is extremely important that

3    you do not discuss the case, including the selection process,

4    with your family, friends, each other, or any other person

5    until either you have been excused or, if selected as a juror,

6    until the case concludes.  And again, of course, you're not to

7    conduct any independent research, online or otherwise, about

8    the case or to read, watch, listen to reports about the case in

9    the media.

10          When you signed your juror questionnaire, you did so

11   under a statement that -- affirming that the statements in

12   the -- your answers in the questionnaire were true.  That was

13   under the pains and penalties of perjury.  Again, we'll ask you

14   to swear or affirm that your answers given today in this voir

15   dire process will be true, and the clerk will now administer

16   that oath or affirmation to you.

17          THE CLERK:  Will the jurors please rise and raise your

18   right hand.

19          (The venire is duly sworn.)

20          THE COURT:  All right.  Thank you, jurors.  We'll now

21   ask you to step out, and we'll have you back one by one to

22   continue the process.

23          (The venire exits the courtroom at 11:27 a.m.)

24          THE COURT:  We're going to do 418 first.

25          THE CLERK:  Juror No. 418.

```
 1              THE JURY CLERK:  Juror 418.

 2              (The juror enters the courtroom.)

 3              THE CLERK:  Sir, over here, please.  Have a seat.  And

 4   do me a favor, keep your voice up and speak into the mic so

 5   everyone at the table can hear you.  Okay?

 6              THE JUROR:  Okay.

 7              THE COURT:  Good morning.

 8              THE JUROR:  Good morning.

 9              THE COURT:  Since you were last here, have you been

10   able to follow the instructions to avoid discussing the

11   substance of the case with anyone?

12              THE JUROR:  The best I could.

13              THE COURT:  How was that?

14              THE JUROR:  Well, for example, in the dental chair,

15   they have flat-screen TVs, and I'm sitting there with things in

16   my mouth, and all of a sudden there's news about the case.

17              THE COURT:  All right.  Okay.

18              So that's the questionnaire, and we're going to follow

19   up on some of the answers you gave.  I guess we'll start with

20   the Question 10 where you had a fairly lengthy response.  We

21   would like you to tell us what you think would be the

22   difficulty for you.

23              THE JUROR:  Well, first of all, I understand the

24   importance of doing my civic duty, and I believe my situation

25   is -- goes beyond an inconvenience for me.  The company that I
```

1   work for, it's a small company.  There's no one above me,

2   there's no one below me that I can turn over my

3   responsibilities to.  So my being out of that office for four

4   months would have a devastating effect to the business.

5           THE COURT:  Give us some sense of size --

6           THE JUROR:  An example?

7           THE COURT:  No, give me an idea of the size of the

8   business.  How many employees, for example?

9           THE JUROR:  Well, as of right now, there's 120.  We're

10  a federal government contractor, Department of Defense, and

11  you're probably familiar with sequestration.  We just heard

12  yesterday we're having some major cuts to some of our programs,

13  so I'm a key individual to figure out where we need to make our

14  cuts in our overhead and G&A and things like that.

15          Also, because of the type of industry we're in, we

16  have to answer to the DCAA, the Defense Contract Audit Agency.

17  And I'm right now in the middle of giving them information for

18  2009, '10, '11, '12, and '13, and if I don't respond in a

19  timely manner, they have the ability to shut us down and we

20  can't even invoice the government for the work that we're

21  doing.  I can continue on and on of all the different things.

22          THE COURT:  Yeah.  One of the reasons we structure the

23  schedule the way we do, to concentrate on the four days rather

24  than five days a week, is to let people have some opportunity,

25  particularly in business settings, to be back in the office on

1    Fridays.  Obviously it's a different way of addressing the

2    duties, but you have Fridays, you have weekends, you have

3    evenings, which mitigates to some extent.

4            So let me -- you also -- you checked on the Question

5    26 that you supervise people.  We asked if you checked whether

6    you supervise people.  Can you tell me who and how many and so

7    on you supervise?

8            THE JUROR:  Well, in our company, we're spread out

9    around the country, but in this office that I'm in, it's

10   considered to be our headquarters, and we have a contracts

11   director, we have a security officer which is a person who

12   handles all the security clearances for our contracts, we have

13   our human resource manager, and then we have an accountant

14   assistant and an IT manager.  I believe that's everybody in

15   Sudbury.

16           THE COURT:  I gather you would not be financially

17   affected if you served on the jury.  In other words, you would

18   continue to get paid, I assume?

19           THE JUROR:  I haven't addressed that.  I believe so.

20   I would think so.

21           THE COURT:  I would think at your position in the

22   company, in any case.

23           THE JUROR:  Yeah, I would think so.

24           THE COURT:  Okay.  Let's go through some of the other

25   things we wanted to follow up on.  We have been asking people

1   about their use of social media.  You say you use Facebook

2   daily.  Check in daily, I think is what you said.

3            THE JUROR:  I check in daily, but I don't -- I don't

4   post anything.  It's basically to check in -- my daughters,

5   that's where I see the pictures and things like that.  I

6   don't -- it's not a form of communication with my friends or

7   anything like that.

8            THE COURT:  You have had occasion to serve on a

9   criminal jury once before, you said about 15 years ago in the

10  state?

11           THE JUROR:  Correct.

12           THE COURT:  Do you remember what court it was in?

13           THE JUROR:  It was in Dedham.  The Dedham District

14  Court.

15           THE COURT:  Was it a six-person jury or 12-person?  Do

16  you remember?

17           THE JUROR:  I believe it was 12.

18           THE COURT:  Okay.

19           So would you take a look at page 20, please?  Question

20  77 near the top, it's a multiple-part question.  We asked

21  whether, based on things you'd seen or heard in the media or

22  otherwise, you had formed different opinions; first, formed an

23  opinion that the defendant is guilty or that he's not guilty or

24  that he should receive the death penalty or not receive the

25  death penalty, and you checked a box in answer to each of those

1    answers.

2            With respect to the first, you checked "yes," that you

3    had formed and opinion that he's guilty; "no," that he -- you'd

4    not formed an opinion he was not guilty; and then "no," you had

5    formed an opinion that he should not -- you had not formed an

6    opinion that he should receive the death penalty; you had

7    formed an opinion that he should not receive the death penalty,

8    right?

9            THE JUROR:  Clearly I'm confused.

10           THE COURT:  Let's break it apart.  Let's talk about A

11   and B.  I think your answers are -- one is the reverse of the

12   other, and they're consistent.  So in A you said you'd formed

13   an opinion that the defendant is guilty.

14           THE JUROR:  Yes.

15           THE COURT:  Right?

16           And in B you said you had not formed an opinion that

17   he was not guilty.  That's because of A, I take it.

18           THE JUROR:  Right.  I checked the wrong box,

19   apparently.

20           THE COURT:  I'm not sure.  I think -- but let me just

21   ask, if you look below, later in the question it says, if you

22   answered "yes" to any of these questions, would you be able or

23   unable to set aside your opinion and base your opinion -- your

24   decision about guilt solely on the evidence presented to you in

25   court, and you said "able."

1        So would you tell us what you were thinking when you

2   made that choice?

3        THE JUROR:  Well, since January 5th, I've been

4   thinking a lot about this without reading anything, just my own

5   personal thoughts, and I'm thinking back at the time when it

6   all transpired and where I was and everything.  And I'm not

7   sure I'm able to change my mind.

8        My wife is -- was a marathon runner, not this

9   year -- I mean, not that year but in the past.  We're avid --

10  we always attend.  We were probably just lucky we weren't there

11  because in all the previous years when we were there, we would

12  stay right at the finish line.  So we were just lucky, for

13  whatever reason, we weren't there that year.  We were involved

14  in the town lockdowns.  My niece was a mile away from the

15  Watertown incident with the boat and everything.

16       So I just remember all those different things, and his

17  pictures are there in the media.  They have the video showing

18  him dropping off the backpack at the site, the MIT murder and

19  running over his brother.  I mean, why was he fleeing?  I mean,

20  I -- it's going to be difficult.

21       THE COURT:  Right.  The question isn't really getting

22  at whether you have seen reports about the case and therefore

23  have some ideas about what you might be asked.  It's more about

24  whether, in serving as a juror, you could focus on the task,

25  which is to pay attention to the evidence introduced in the

1     case and make a decision based on the evidence.

2          And you've had experience as a criminal juror, so I'm

3     sure you understand that, in our process, a person who's

4     accused of a crime is presumed innocent unless the government

5     proves that the person's guilty by the evidence produced at

6     trial and proves that beyond a reasonable doubt.  So what we

7     ask jurors to do is to set aside ideas they may have, focus on

8     the evidence that is in the case, and make a decision based on

9     that.

10          And do you think you'd be able to do that or not?

11          THE JUROR:  It's hard to say either way.  It's hard to

12     know.

13          THE COURT:  Okay.

14          THE JUROR:  If the evidence was compelling, perhaps I

15     would be able to change my mind.

16          THE COURT:  You understand that in a criminal case,

17     the burden of proof is always with the government.  The

18     defendant doesn't have an obligation to prove he's not guilty.

19          THE JUROR:  I understand.

20          THE COURT:  The default position is not guilty --

21          THE JUROR:  Right.

22          THE COURT:  -- unless the government persuades you

23     otherwise, right?

24          And the question is whether -- again, whether the

25     jurors can insist that the government satisfied them that it

1   has the evidence to convict the person or that, if it doesn't,

2   they would be bound to find the person not guilty.

3           You don't think you're able to do that?

4           THE JUROR:  I don't know, honestly.

5           THE COURT:  Okay.  We did also ask some

6   question -- and the latter part of the Question 77 is about the

7   death penalty, but let's turn to page 23 where we ask a series

8   of questions more specifically about it.

9           Beginning with Question 88, we ask if you have any

10  views about the death penalty in general, what are they, and

11  you said, "I'm against the death penalty.  I believe the

12  punishment is greater by having to live with it.  No

13  possibility of release."

14          Could you maybe amplify on that, what your views about

15  the death penalty in general are?  If you have ideas beyond

16  what you expressed.  And I know that people were asked this

17  sort of, perhaps, without warning.

18          THE JUROR:  Right.  I've been wrestling with it since

19  the 5th.  I have not come to a conclusion.  I just don't know.

20          THE COURT:  Okay.  In the next question, we tried to

21  get at it by asking you to put yourself on a scale from 1 to

22  10, where 1 was strongly opposed and it reflects a belief that

23  the death penalty should never be imposed, and 10 was strongly

24  favor and reflects a belief that the death penalty should be

25  imposed whenever a defendant has been convicted of an

1    intentional murder.  You placed yourself at 3, which is perhaps

2    moderately opposed.  Is that --

3         THE JUROR:  I would think moderately would be 5.

4         THE COURT:  All right.  A little more than moderately

5    opposed?

6         THE JUROR:  Yeah, I...

7         THE COURT:  Well, let's go to the next question

8    because we came at it a different way in the next question by

9    asking you to see if there's a statement that you could agree

10   with as representing your view, and you selected C --

11        THE JUROR:  Yeah.

12        THE COURT:  -- "I'm opposed to the death penalty but I

13   could vote to impose it if I believed that the facts and the

14   law in a particular case called for it."  That's what you chose

15   then.

16        Do you think that still represents your view?  And if

17   you want, take the time to review all of the possibilities.

18        (Pause.)

19        THE JUROR:  It's funny how things -- at the time,

20   obviously, on the 5th I felt C was appropriate, but after

21   wrestling with it since early January, I think I would change

22   that to B, as in "Bob."

23        THE COURT:  Which is that you're opposed and would

24   have a difficult time voting to impose it, even if the facts

25   supported it.  Is that --

```
 1              THE JUROR:  I think so.

 2              THE COURT:  Let's go to the next page, the bottom,

 3    Question 95.  We asked, now in reference to this particular

 4    case, if you found this defendant guilty and you decided that

 5    the death penalty was the appropriate punishment for him, could

 6    you conscientiously vote for the death penalty, and you said

 7    "not sure."

 8              And while you're thinking about that, let's go to the

 9    related question at the top of the next page, which says, "If

10    you found the defendant guilty and you decided that life

11    imprisonment without the possibility of release was the

12    appropriate punishment for him, could you conscientiously vote

13    for life imprisonment without the possibility of release?"  And

14    you said, "Yes."

15              THE JUROR:  Yes.

16              THE COURT:  So you were affirmative on that, but you

17    were not sure on 95?

18              THE JUROR:  Right.

19              THE COURT:  Can you tell us a little bit about that?

20              THE JUROR:  Well, this relates to the previous

21    question.  I'm just not sure.

22              THE COURT:  What is it that makes --

23              THE JUROR:  I'm not sure that I could be part of this

24    group to say death is appropriate.

25              THE COURT:  One of the things -- and I think you're
```

1    appreciating it.  One of the things the question is getting at

2    is you see one of the assumptions in the question is that you

3    have decided that the death penalty is an appropriate

4    punishment for him.  Having made that decision, can you

5    conscientiously vote to do it, is one of the things the

6    question is getting at.

7         THE JUROR:  I suppose if you follow all the rules and

8    everything meets the criteria it should be, I could see why you

9    could vote for the death penalty.  If I understand this

10   correctly, it's saying once you do that, can you actually

11   impose it.  Is that correct?

12        THE COURT:  Right.  The question is the difference

13   between sort of a rational, intellectual decision that the

14   death penalty is appropriate here, but whether you could

15   conscientiously follow through and vote to be responsible for

16   imposing it.  I think that's one of the things the question

17   gets at.

18        THE JUROR:  Right.  And I am not sure.

19        THE COURT:  And can you tell us why?

20        THE JUROR:  I feel that it's more appropriate to stay

21   in jail for life and think about the crimes that they did.

22        THE COURT:  Okay.  Any follow-up questions?

23        MR. WEINREB:  Yes, please.  Good morning.

24        THE JUROR:  Good morning.

25        MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

1    prosecutors.  I Just want to ask you a few more questions about

2    the death penalty question -- issue there.

3            So when you say that -- you said if you follow all the

4    rules, if everything meets the criteria, then the question is

5    could you impose it.  So I want to break that into two

6    different questions.

7            So the first thing is, you understand that if there

8    is -- if the defendant is found guilty -- or in any case, not

9    necessarily this one, but in a case where the death penalty is

10   a possibility, if the defendant's found guilty, then there's a

11   second phase of the trial, and that's a phase in which the

12   government offers evidence suggesting that the death penalty is

13   the appropriate sentence and the defense can offer evidence

14   that the death penalty is not an appropriate sentence.

15           And I guess the first question is:  Are you so

16   strongly opposed to the death penalty that you'd enter that

17   proceeding already pretty much made up in your mind that the

18   death penalty would not be the appropriate sentence?

19           THE JUROR:  Yes.

20           MR. WEINREB:  And then moving to the -- moving to the

21   second question, let's say that you were in the jury room and

22   you were viewing this just as an intellectual matter -- well, I

23   shouldn't say that.  Let's just say that you're in the jury

24   room, and you considered the evidence, and you're weighing it,

25   and you've reached the conclusion in your mind that the case is

1   an appropriate case for the death penalty.  But now comes the

2   time where you actually have to vote to sentence someone to

3   death.  And the question is:  Could you do that, in any case?

4          THE JUROR:  I -- I don't know.  I don't think so.

5          MR. WEINREB:  Thank you.

6          MS. CONRAD:  Good morning, sir.  My name is Miriam

7   Conrad.

8          You said that you thought life without parole was most

9   appropriate in this case.  But the question really is

10  whether -- understanding that a juror never is required to vote

11  for the death penalty, whether you could listen to the evidence

12  and listen to the arguments by both sides and consider both

13  options before deciding which penalty is most appropriate?

14         THE JUROR:  I believe I could do that.

15         MS. CONRAD:  And if there were a case -- not

16  necessarily this case -- but if there were a case where, after

17  listening to all the evidence, you decided, as a personal,

18  individual matter, that the death penalty was the most

19  appropriate penalty, could you vote for the death penalty?

20  Again, not in this case; in any case that...

21         THE JUROR:  I don't know.  I honestly don't know.

22  I've been wrestling with that for a month and a half now.  I

23  don't know.

24         MS. CONRAD:  And you said that you've been thinking

25  about this a lot since you filled out this form.  And can you

1    tell us a little bit more about how or why your thinking has

2    changed from what you put down on your form?

3              THE JUROR:  Well, the time when the questionnaire was

4    given to me, it was the first time I saw questions like that,

5    and you need to respond immediately without a lot of time to

6    think about it.  So since I've completed it, I've been thinking

7    about a lot of these questions.

8              MS. CONRAD:  So I guess what I'm wondering, though, is

9    what are some of the thoughts that you've had since then that

10   have caused you to change your answer?

11             THE JUROR:  Well, I've never been faced with having to

12   come to a conclusion, in my mind, whether I could, in fact,

13   impose -- agree to impose someone to death on actions that

14   they've done.  And I still have not come to a conclusion if

15   I -- even listening to all the facts, I just don't know.  If it

16   came down to it, I just don't know.

17             MS. CONRAD:  But you would be able to listen to all

18   the facts and to consider the views of the other jurors?

19             MR. WEINREB:  Objection.

20             THE COURT:  You may answer that.  It was leading, but

21   that's all right.  Go ahead.  You could answer it.

22             THE JUROR:  Could you repeat the question, please?

23             MS. CONRAD:  Sure.

24             THE COURT:  Why don't you rephrase it, since he's

25   asked you to...

```
 1              MS. CONRAD:  Sure.  Okay.

 2         Can you tell us whether you would be able to listen to

 3    all of the facts, the arguments of both parties, and discuss

 4    with your fellow jurors their views before reaching a

 5    conclusion?

 6              THE JUROR:  Maybe I'm a little confused.  I mean, I

 7    feel there's the --

 8              MS. CONRAD:  I'm not trying to confuse you, sir.  I'm

 9    sorry if I am.

10              THE JUROR:  Well, you know, I -- I can, you know,

11    listen to all the different sides and -- I believe, and can

12    understand that, based on those facts, you could make a

13    decision either way and say it comes out that the decision

14    should be that the evidence proves that the death penalty is

15    appropriate.  I just don't know if I would be able to go along

16    with imposing it.  Does that answer your question?

17              MS. CONRAD:  Yes, but let me just push that a little

18    bit further.  It would still be your decision whether the death

19    penalty was appropriate or not.  It's not a question of looking

20    at all the evidence and that dictates the answer.  The question

21    is whether you could consider all of those things before making

22    up your mind one way or the other.

23              THE JUROR:  I'm not sure.

24              MS. CONRAD:  Thank you very much.

25              THE COURT:  All right, sir.  Thank you.  That's it.
```

1   We'll put the form back together; just leave it.  Thanks.

2           THE JURY CLERK:  Right this way.

3           (The juror exits the courtroom.)

4           THE CLERK:  Juror No. 406.

5           THE JURY CLERK:  Juror 406.

6           (The juror enters the courtroom.)

7           THE CLERK:  Ma'am, over here, please.  Have a seat.

8           THE JUROR:  Thank you.

9           THE CLERK:  If you would do me a favor, keep your

10  voice up, speak into the mic so everyone around the table can

11  hear you, okay?

12          THE JUROR:  Sure.

13          THE CLERK:  Thank you.

14          THE COURT:  Good morning.

15          THE JUROR:  Good morning.

16          THE COURT:  Since you were here to fill out the

17  questionnaire, have you been able to follow the instructions to

18  avoid talking about the case with anybody and also to avoid

19  media coverage, if you could?

20          THE JUROR:  Yes.

21          THE COURT:  So we're going to follow up a little bit

22  on some of the things you told us in your answers to the

23  questionnaire.

24          THE JUROR:  Sure.

25          THE COURT:  Could you give us a little bit of an idea

1    what your work life is like.

2           THE JUROR:  I'm in pharmaceutical sales.  I work for a

3    contract company that's affiliated with a major pharmaceutical

4    company.  That was actually one of my concerns because I am a

5    contract employee.

6           THE COURT:  What does that mean?

7           THE JUROR:  Well, we're affiliated with one of the

8    major pharma companies, but I don't work for the manufacturer

9    directly.  So I work for -- I don't want to say the name

10   because I don't want to broadcast.

11          THE COURT:  Yeah.

12          THE JUROR:  But one of my concerns was I asked

13   regarding jury duty, you know, what are the ramifications, will

14   I get paid, will I hold my job.  They will pay me for 20 days,

15   and that's it.  So that was one of my concerns.

16          THE COURT:  How -- how are you normally paid?  Is it a

17   salary or is it --

18          THE JUROR:  Salary.

19          THE COURT:  -- commission-based or --

20          THE JUROR:  Salary and commission.  So I get paid

21   twice a month.

22          THE COURT:  How does that balance?

23          THE JUROR:  Monetarily?

24          THE COURT:  Yeah.  Yeah.  What percentage of your

25   gross would be salary versus commission or vice versa?

```
 1              THE JUROR:  I make a very -- a very good salary.
 2    Commission is nominal.
 3              THE COURT:  All right.
 4              THE JUROR:  It could be --
 5              THE COURT:  All right.
 6              THE JUROR:  I don't know what the percentage is.
 7              THE COURT:  I'm trying to get the balance.  Balanced
 8    heavily towards the salary?
 9              THE JUROR:  Yes.
10              THE COURT:  And the company has told you that --
11              THE JUROR:  Their policy, because I'm a contract
12    employee, would be to pay for 20 days, and then after that
13    there would be no pay.  So that's a concern.  I have a son in
14    college.
15              THE COURT:  All right.  I don't think we're going to
16    ask you to do that.
17              THE JUROR:  Okay.
18              THE COURT:  Thank you.
19              THE JUROR:  Thank you.
20              (The juror exits the courtroom.)
21              THE COURT:  412 is coming tomorrow.
22              THE CLERK:  Juror No. 413.
23              THE JURY CLERK:  Juror 413.
24              (The juror enters the courtroom.)
25              THE CLERK:  Sir, over here, please.  Have a seat.  And
```

1    do me a favor, keep your voice up and speak into the mic so

2    everyone around here can hear you.

3             THE JUROR:  Yes, sir.

4             THE COURT:  Good morning.

5             THE JUROR:  Good morning, sir.

6             THE COURT:  Have you been able to avoid discussing the

7    case with anyone since the last time you were here?

8             THE JUROR:  Yes, sir.

9             THE COURT:  And as well to avoid any media about the

10   case?

11            THE JUROR:  Yes, sir.

12            THE COURT:  Tell us a little bit about your work.

13            THE JUROR:  I'm an orthopedic physician's assistant.

14   I work for Harvard Vanguard.

15            THE COURT:  What does that mean?  What do you do?

16            THE JUROR:  Orthopedic PA.  Basically I manage --

17   largely the PA's job at Harvard Vanguard is taking care of sort

18   of the older, complicated cases that don't need surgery:

19   broken legs, ankles, wrist sprains, back pain, bursitis.

20            THE COURT:  You treat those conditions or --

21            THE JUROR:  Yes, sir.  Injections.  I also am an

22   operative PA, so I operate on Thursdays with one of the sports

23   medicine doctors.

24            THE COURT:  Okay.  You don't use social media, one of

25   the questions we asked.

1          THE JUROR:  Honest to God, I have never been on

2     Facebook.  I don't even know what it is.  Twitter, same deal.

3     I have an old teeny cell phone.  I never use that, though.

4          THE COURT:  Okay.  Let me ask you -- that's the

5     questionnaire you filled out.  And I'm going to ask you to

6     follow up on some things you told us in the questionnaire.

7          THE JUROR:  Yes, sir.

8          THE COURT:  If you look at page 20, Question 77 near

9     the top.

10          THE JUROR:  Uh-huh.

11          THE COURT:  Here we asked whether, when you filled out

12     the questionnaire, as a result of things you'd seen or read in

13     the media or elsewise, had you formed an opinion that the

14     defendant was guilty or that he should receive the death

15     penalty, and you answered Part A, yes, you thought -- you had

16     an opinion that he was guilty.

17          THE JUROR:  Yes, sir.

18          THE COURT:  And you didn't answer to B or C --

19          THE JUROR:  Sorry.

20          THE COURT:  -- but you answered D that you had an

21     opinion that he should not receive the death penalty?

22          THE JUROR:  I do not believe in the death penalty

23     under any circumstances, so I'd have to say that's a yes.

24          THE COURT:  Okay.  And you actually wrote that in

25     Question 78, you said that.

```
1              Let me turn to the -- we asked a series of questions
2     to gauge people's view of the death penalty.  If you go to page
3     23, we asked in Question 88 for your general view, and you
4     said, "I do not believe in the death penalty under any
5     circumstances."  I think that's almost exactly what you just
6     said --
7              THE JUROR:  Yes, sir.
8              THE COURT:  -- a minute or two ago.
9              In the next question, we asked if you could put
10    yourself on a scale of 1 to 10, with 1 being strongly opposed
11    and reflecting a belief that the death penalty should never be
12    imposed, as opposed to the other end of the spectrum, strongly
13    in favor, where it should be routinely imposed.
14             You selected 1?
15             THE JUROR:  That is correct.
16             THE COURT:  Okay.  And if you'd go to the next page,
17    and Question 90, here, rather than asking for a number, we
18    asked you to find a statement, if there was one, that you
19    thought represented your view as to the death penalty.
20             THE JUROR:  Yes, sir.
21             THE COURT:  And you selected A, "I'm opposed to the
22    death penalty and will never vote to impose it in any case, no
23    matter what the facts."
24             THE JUROR:  Yes, sir.
25             THE COURT:  That's your view?
```

1          THE JUROR:  Yes, sir.

2          THE COURT:  Go to page 25 at the bottom, Question 95.

3     We asked, now in reference to this case, if you found this

4     defendant guilty and you decided the death penalty was the

5     appropriate punishment for him, could you conscientiously vote

6     for the death penalty --

7          THE JUROR:  No, I could not.

8          THE COURT:  -- and you said no.  Right.

9          Okay.  Any follow-up?

10         MR. WEINREB:  No, your Honor.

11         MR. BRUCK:  Just very briefly, if I may.  My name is

12    David Bruck, and I'm one of Jahar Tsarnaev's attorneys.

13         And what I want to explore with you about the death

14    penalty is whether there is any distance between your own

15    firmly held belief, which I certainly appreciate, and your

16    ability to do your duty as a juror, because they could be two

17    different things.

18         This is my question:  Understanding that you oppose

19    the death penalty under all circumstances, would you be able to

20    serve on a jury and fairly consider both of the alternatives

21    that are available under the law as jurors on a jury are

22    required to do, the death penalty or life imprisonment,

23    assuming, of course, that the defendant was first convicted of

24    a capital crime?  Could you consider them both?

25         THE JUROR:  I'm a citizen of the United States.  If I

1    vote to put somebody to death, I'm essentially, by proxy,

2    putting that person to death.  I've spent my entire life trying

3    to make people better and healthy.  I could never do that under

4    any circumstances.

5              MR. BRUCK:  All right.  Thank you.

6              THE COURT:  Thank you, sir.

7              THE JUROR:  I'm done?

8              THE COURT:  Yes.  You have the questionnaire?  Just

9    leave it right there.  Thanks.

10             (The juror exits the courtroom.)

11             THE COURT:  414 we're skipping, so we'll go to 419.

12             THE CLERK:  Juror No. 419.

13   ████████████████████████████████████████████████████████████

14   ██████████

15   ██████████████████████████████████████

16   ████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████████

18   ████████████████

19   ██████████

20   ████████████████████████████████████████████████████████████

21   ██████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████

24   ████████████████████████████████████

25   ██████████████████████████████████████████████████



3    THE COURT:  I think we should briefly be sidebar.

4    Sidebar, please.

5    THE CLERK:  Cut it.

6    MR. DOREAU:  Cutting video and audio.

7    (Discussion at sidebar and out of the hearing of the

8    jury:)





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          THE COURT:  We're going to pass on Mr. 419.

22          MS. CLARKE:  Mr. 419.

23          THE CLERK:  Are we ready to go back on?

24          THE COURT:  Yeah.  Let me just get organized here.

25    421 we have passed, so we're up to 423.

 1             Yes, we'll go back on.

 2             THE CLERK:  Phil, back on.

 3             MR. DOREAU:  Audio back on.

 4             (In open court:)

 5             THE CLERK:  Next up is 423.

 6             THE JURY CLERK:  Juror No. 423.

 7             THE CLERK:  Sir, over here, please.  Have a seat.

 8             THE JUROR:  Thank you.

 9             THE CLERK:  If you could do me a favor, keep your

10    voice up, speak into the mic so everybody can hear you, okay?

11             THE JUROR:  Okay.

12             THE COURT:  Good afternoon.

13             THE JUROR:  Good afternoon, sir.

14             THE COURT:  Have you been able to follow my

15    instructions not to discuss the substance of the case with

16    anyone?

17             THE JUROR:  Yes, sir.

18             THE COURT:  And try to avoid media accounts as best

19    you could?

20             THE JUROR:  I've tried.

21             THE COURT:  I know they're everywhere, but you've put

22    them aside if you see them?

23             THE JUROR:  Yes.

24             THE COURT:  So we're going to follow up on some of the

25    things you told us in the questionnaire.

```
 1            THE JUROR:  Okay.

 2            THE COURT:  And so you have it there if you want to

 3   look.  Tell us a little -- you're now retired?

 4            THE JUROR:  Yes, I am.

 5            THE COURT:  And tell us what -- briefly what you did

 6   before you retired.

 7            THE JUROR:  I was a banker, commercial loan officer at

 8   the First National Bank of Boston for 20-plus years, and then

 9   continued that lending career with a small company that

10   financed equipment for venture-capital-backed companies.  So

11   I've been in finance all of my life.

12            THE COURT:  We asked about you or family or friends,

13   connections with the military, and you told us your son was in

14   the Marine Corps for about a dozen years, 2002 to 2014?

15            THE JUROR:  Yes.

16            THE COURT:  So he's out now, I gather?

17            THE JUROR:  Yes, he's just out.

18            THE COURT:  Okay.  And I think you told us he served

19   three tours in Iraq?

20            THE JUROR:  Yes, he had three combat tours in Iraq as

21   an infantry officer and fortunately returned intact, although a

22   lot of his friends did not.

23            THE COURT:  When was the last of those three tours, do

24   you remember?

25            THE JUROR:  I don't know -- I don't remember.
```

1        THE COURT:  In Question 34 we asked about relationship

2    with law enforcement agencies, and you said, "Son:  Police,

3    2014."  Is that the same son?

4        THE JUROR:  Yes.

5        THE COURT:  So --

6        THE JUROR:  Yes.  He was applying for jobs when he got

7    out of the Marine Corps, and one of them was -- he applied for

8    the police force in California.  He did not get that job and

9    has subsequently gone to work for a defense contractor in the

10   Washington, D.C., area.

11       THE COURT:  Okay.  We asked -- this is at page 14.  We

12   asked a series of questions about -- 44, 45, and 46, about

13   whether you had strongly positive or negative views about

14   prosecutors, defense attorneys, or law enforcement officers.

15   Do you remember that series?  You said "none" with respect to

16   defense attorneys or law enforcement officers, but with respect

17   to prosecutors, you said, "I believe some prosecutors have too

18   much power/discretion."

19            What were you thinking that led you to write that?

20       THE JUROR:  Well, I was thinking that I have learned,

21   and I can't cite specifics, that prosecutors have enormous

22   power to -- in our system, and occasionally I will read -- read

23   about folks that have gotten out of prison after being wrongly

24   convicted because of new DNA evidence or other evidence, and

25   sometimes it's because the prosecutors made mistakes.  And so I

1    think that's what I was thinking of.

2           THE COURT:  Okay.  Are these views that you developed

3    mainly through reading about cases in the media or --

4           THE JUROR:  Yes.

5           THE COURT:  Rather than personal experience?

6           THE JUROR:  I've had no personal experience.

7           THE COURT:  Okay.  You're an officer of the Trinity

8    Church in Boston?

9           THE JUROR:  Yes, sir.  I'm its treasurer.

10          THE COURT:  How long have you been an officer?

11          THE JUROR:  Since 2012.

12          THE COURT:  Okay.  That's obviously in Copley Square

13   and nearby the events.  Were you or the church affected in some

14   way by the events?

15          THE JUROR:  The church was closed down for several

16   days after the bombing.  I guess it was part of the crime

17   scene, so the church was unavailable.  And a number of friends

18   were spectators, some were runners, so it was an active

19   presence.  And I'm there quite frequently, so I'm in that area,

20   so I have -- I go by the bomb sites, you know, on -- on

21   Boylston.

22          THE COURT:  Let me ask you to turn to page 20,

23   Question 77, and near the top.

24          THE JUROR:  Okay.

25          THE COURT:  It's a multi-part question.  We asked

1    whether -- as a result of things you'd seen or heard from the

2    media or elsewhere, whether you had various opinions, and you

3    said, yes, you had an opinion that the defendant was guilty,

4    and then further down, yes, you had an opinion that he should

5    not receive the death penalty.

6         Let me ask you about the first one -- well, let me go

7    to the next -- right after that series of subparts, there's a

8    separate paragraph that says, "If you answered yes to any of

9    these questions, would you be able or unable to set aside your

10   opinion and base your decision about guilt or punishment solely

11   on the evidence that would be presented to you in court?"  And

12   you selected the box "unable."

13        Could you tell us about that?

14        THE JUROR:  I assume, like many people, I observed the

15   defendant on videotape carrying the backpack on Boylston Street

16   with his brother.  I saw at least the news clips of him either

17   in the boat or emerging from the boat.  So it's hard to -- it's

18   hard to believe that he wasn't responsible for these crimes.

19        THE COURT:  Uh-huh.  It's understandable under the

20   circumstances that people have ideas about what happened and so

21   on.  What we ask jurors in the criminal process to do is to

22   follow some principles of law, one of which is that the

23   defendant is presumed innocent or not guilty unless the

24   government proves that he's guilty by the evidence at trial.

25   And so therefore we ask jurors to focus on that body of

1    evidence that is in the trial and see what that proves or

2    doesn't prove.

3             THE JUROR:  Right.

4             THE COURT:  Would you be able to do that?

5             (Pause.)

6             THE JUROR:  Well, you're a persuasive fellow.

7             (Laughter.)

8             THE JUROR:  Having heard it stated the way you stated

9    it, I think I probably could.

10            THE COURT:  Okay.  Let me ask you about Question 80.

11   You have a friend who was in the stands and I guess right by

12   the --

13            THE JUROR:  Yes.

14            THE COURT:  -- that's where they were, right by the

15   finish line -- when the explosions happened.  I'm having a

16   little difficulty with the handwriting.

17            THE JUROR:  Yeah, it was -- after 20 pages, it was

18   beginning to go.

19            THE COURT:  That's all right.  We understand.  And we

20   know the conditions were not optimal as you filled it out.

21            But can you tell us about that, what your friend

22   experienced.

23            THE JUROR:  Yeah, I remember talking to her about it.

24   She was one of my Trinity friends who had -- was in the stands,

25   and she was -- heard the explosion.  Her daughter was with her,

1    and they were able to make their way out of the stands and out

2    of the area without any -- without any -- they didn't get hurt,

3    but it just scared the hell out of them.

4           THE COURT:  How old is her daughter?

5           THE JUROR:  She is now 12, I believe.

6           THE COURT:  On the next page, in 82, you told us you

7    bought some T-shirts with Boston Strong logos?

8           THE JUROR:  Yes.

9           THE COURT:  Lots, a few?

10          THE JUROR:  No, I think a couple of T-shirts.  I have

11   got two sons.  I think I sent them to the boys.

12          THE COURT:  We asked, beginning on page 23, at

13   Question 88, a series of questions about jurors' thoughts or

14   attitudes toward the death penalty.  And I want to turn to

15   those.

16          In Question 88 we asked if you had views about the

17   death penalty in general, what are they, and you said you do

18   not believe in the death penalty; that we are to follow "thou

19   shall not kill" and would have a more peaceful society if we

20   did.

21          Can you elaborate on that or let it stand as is?

22          THE JUROR:  Sure.  I have come to take my faith as a

23   Christian more and more seriously as I've gotten older, and

24   I -- I'm very grateful to Trinity Church for helping me do

25   that.  And what I wrote here, I firmly believe.

1          A second thing that informs this belief, Judge, is

2     that -- in a sense is my military experience or -- you know, I

3     served in the military for a couple of years during the Vietnam

4     era.  I didn't -- I wasn't in Vietnam, fortunately, but I knew

5     many people who were.  And as you know, tens of thousands of

6     people -- U.S. soldiers were killed in that effort, in my

7     opinion, for little good.  I watched my son volunteer to go in

8     the Marines and into Iraq, and while he is whole, many of his

9     friends have been -- were killed or maimed, in my belief, for

10    little purpose.

11          I think there's been too much killing during my

12    lifetime, and I'm not prepared to participate in any more,

13    particularly when, if this defendant is found guilty, there's

14    an alternative, which is life in prison without a chance of

15    release, as you've just told us.

16          So I am not going to participate in any process that

17    kills anybody if I can help it.

18          THE COURT:  Okay.  Any follow-up questions?

19          MR. WEINREB:  No, your Honor.

20          MS. CONRAD:  No, your Honor.

21          THE COURT:  Thank you very much.

22          THE JUROR:  Thank you.

23          THE COURT:  Just leave the paper there.  That's fine.

24          THE CLERK:  Thank you.

25          (The juror exits the courtroom.)

1           THE CLERK:  Juror No. 425.

2           THE JURY CLERK:  Juror No. 425.

3           (The juror enters the courtroom.)

4           THE CLERK:  Have a seat.

5           THE JUROR:  Hi.

6           THE COURT:  Hi.

7           THE CLERK:  And do me a favor, keep your voice up and

8    speak into the mic so everyone can hear you.

9           THE JUROR:  Yes.

10          THE COURT:  So since you were last here, have you been

11   able to avoid discussion of the substance of the case with

12   people?

13          THE JUROR:  Yes.

14          THE COURT:  And also, as much as possible, avoid any

15   media reporting on the case?

16          THE JUROR:  Yes.

17          THE COURT:  We have the questionnaire, copies, and

18   that's your original.  We just wanted to follow up on some of

19   the answers you've given us.

20          Tell us a little bit about your work.

21          THE JUROR:  I am a history teacher and a special

22   education teacher at Lexington High School.  I've been there

23   for six years now, and I've been teaching since I've been 21,

24   and I'm 47.

25          THE COURT:  Okay.  We asked jurors about social media.

1    You don't use it.

2         THE JUROR:  I don't do any social media whatsoever.

3         THE COURT:  We asked also whether you were a published

4    or unpublished author.  This is in Question 28 on page 10.

5         THE JUROR:  Yes.

6         THE COURT:  I can't quite read all the handwriting.

7         THE JUROR:  I wrote some short stories that were never

8    published, science fiction and an adventure one when I was

9    younger, sort of like an Indiana Jones thing, yeah.

10        THE COURT:  Let me ask you to look at page 20 and

11   Question 77.  In this multi-part question, we had asked whether

12   you had formed various opinions based on things you had seen or

13   read in the media or learned from other sources about whether

14   the defendant was guilty or not or should receive the death

15   penalty or not, and to each of the subparts you indicated your

16   answer was "unsure."

17        THE JUROR:  Correct.

18        THE COURT:  Could you tell us about that?

19        THE JUROR:  I'm unsure because I do not know all the

20   evidence or have all the information at my fingertips, and I

21   don't believe everything that's printed in the news or heard on

22   the radio.  So that's why -- and I -- as a teacher and a

23   history teacher, I firmly believe someone's innocent until

24   proven guilty and all the facts are before him or her as a

25   juror.  So that's why.

1          THE COURT:  So you're right.  That is the law, that a

2    person accused of a crime is presumed to be innocent and is

3    convicted only if the government persuades the jury by -- that

4    he is guilty beyond a reasonable doubt, by the evidence at

5    trial.

6          So you would be able to make your decision about

7    whether the defendant was guilty or not guilty of any

8    particular crime based on your assessment of the trial evidence

9    and --

10          THE JUROR:  Correct.

11          THE COURT:  -- nothing else?

12          THE JUROR:  Correct.

13          THE COURT:  We asked jurors a series of questions

14    about their attitudes towards the death penalty, both in

15    general and perhaps in this case as well.  That begins on page

16    23 at Question 88.  Question 88 itself asks for general views

17    about the death penalty, and you said "none."

18          THE JUROR:  I personally believe it's a case-by-case

19    basis.  I don't think it can be painted with a broad brush one

20    way or the other, and I do believe people are entitled to a

21    trial, and it depends on the evidence and whether or not the

22    state allows it or, if it's in a federal case, whether or not

23    it's warranted.  So that's my stance on it.  I really can't say

24    one way or another, yes, definitively, I think in all cases

25    people deserve it or not.  I think it has to go case by case.

```
 1              THE COURT:  Okay.  And if you look at your answer to

 2    Question 89, that's more or less what you indicated there?

 3              THE JUROR:  Yes.

 4              THE COURT:  And said you didn't think you could place

 5    yourself on the scale because it's --

 6              THE JUROR:  Correct.  And then on the next page, you

 7    had actually -- you had a more -- of a definitive scale, in

 8    between, so --

 9              THE COURT:  Right.  And that question, Number 90, it

10    shows option D of the various statements.

11              THE JUROR:  Yes.

12              THE COURT:  And that is that you're not for or against

13    the death penalty?

14              THE JUROR:  In the middle.

15              THE COURT:  You could vote to impose it or you could

16    vote to impose a sentence of life in prison instead --

17              THE JUROR:  Correct.

18              THE COURT:  -- whichever you thought was called for by

19    the facts in the case.

20              THE JUROR:  Correct.  That's absolutely right.

21              THE COURT:  That's a good statement of your views?

22              THE JUROR:  Yes, it mixed, what I wrote in my little

23    chicken scratch.

24              THE COURT:  Let me just ask you about Question 95 at

25    the bottom of 25.  There we put it in the context of this case
```

1   and said, if you found Mr. Tsarnaev guilty and you decided the

2   death penalty was the appropriate punishment for him, could you

3   conscientiously vote to impose the death penalty?

4        THE JUROR:  Yes.

5        THE COURT:  And similarly, the next page at the top,

6   we asked if you found Mr. Tsarnaev guilty and you decided that

7   life in prison without the possibility of release was the

8   appropriate punishment for him, could you conscientiously vote

9   for life in prison without the possibility of release?

10        THE JUROR:  Yes.

11        THE COURT:  And those remain your answers?

12        THE JUROR:  Yes.

13        THE COURT:  Follow-up?

14        MR. MELLIN:  Thank you, your Honor.

15        Good afternoon, sir.  I'm Steve Mellin.  I'm one of

16   the prosecutors on the case.

17        I want to try to drill down just a little bit on the

18   death penalty issues.  You've had a little bit of time since

19   filling out this questionnaire to think about it, I'm sure, and

20   as a history teacher, I would think that at some point it's

21   kind of been some topic for you, or not?

22        THE JUROR:  No, it hasn't been a topic because I teach

23   world history, and we teach U.S. history, and none of the stuff

24   we've covered has covered cases involving death penalties.

25        MR. MELLIN:  Okay.  As you sit here today, can you

1    elaborate a little bit on kind of where you come down on

2    whether or not we should have a death penalty, should not have

3    a death penalty?

4            THE JUROR:  I think it's a state-by-state issue, not a

5    federal one, in my opinion.  I think that's up to the states to

6    decide.  I know in the federal area it is.  But, again, I have

7    to go back to what I wrote.  It's on a case-by-case basis.  I

8    would have to look at the evidence and have to come to the very

9    strong conclusions beyond a reasonable doubt that it warrants

10   the death penalty.  There's been many cases that I've read

11   about that DNA has, you know, been wrong or other things, and

12   so you have to tread lightly on that.

13           MR. MELLIN:  Okay.  If you were a juror on this case

14   and the jury got to the point where the jury was deciding

15   between life and death and you believed that the evidence in

16   the case supported the death penalty, would you be able to vote

17   to sentence someone to death?

18           MS. CLARKE:  I object to "this case," your Honor.

19   That's a stakeout question.

20           THE COURT:  Yeah, yeah.

21           MR. MELLIN:  In any case.

22           THE COURT:  Make it a more general question.  Correct.

23   Why don't you start again.

24           MR. MELLIN:  I will.

25           If you were a juror on a case in which the death

 1    penalty was a consideration and the jury reached the point

 2    where the jury was deciding between life and death, if you

 3    heard all of that evidence and you believed that the death

 4    penalty was appropriate, would you be able to vote to sentence

 5    someone to death?

 6              THE JUROR:  Yes, I could.  So long as the other 11

 7    people I worked with came to the same conclusion, then yes.

 8              MR. MELLIN:  You understand from a little bit of the

 9    instructions this morning, though, that ultimately it's a

10    personal decision for each of the jurors.  You understand that?

11              THE JUROR:  Yes, to come to a consensus.

12              MR. MELLIN:  And so I take from what you're saying

13    that you would deliberate with the other jurors and --

14              THE JUROR:  Of course.

15              MR. MELLIN:  Okay.  But you believe that if you came

16    to that conclusion, you would be able to vote to impose the

17    death penalty?

18              THE JUROR:  Yes.

19              MR. MELLIN:  Thank you.

20              MS. CLARKE:  Good afternoon.

21              THE JUROR:  Good afternoon.

22              MS. CLARKE:  My name is Judy Clarke.  I'm one of --

23              THE JUROR:  Nice to meet you.

24              MS. CLARKE:  -- Mr. Tsarnaev's lawyers.

25              Good to meet you too.

1            If I could just spend a little time with you asking

2    you some questions.  On Question 77, which the judge pointed

3    you to on page --

4            THE JUROR:  Question 77 you're referring to?

5            MS. CONRAD:  Yes.  Page 20.

6            THE COURT:  Page 20.

7            MS. CONRAD:  And you marked "unsure," "unsure," and

8    understandably.  You don't have the evidence in front of you.

9    Have you ever had an opinion as to Mr. Tsarnaev's guilt?

10           THE JUROR:  No, I didn't pay much attention to it in

11   the media.  I heard about the bombing, I heard that they

12   arrested two individuals, and when it would come on the news, I

13   would usually turn it and wasn't that interested in hearing

14   much follow-up about it.  I figured the police would follow

15   through with what they need to do and...

16           MS. CLARKE:  I'm sorry?

17           THE JUROR:  That the police would follow through with

18   the case and take care of it, so I didn't pay much attention to

19   it after that.

20           MS. CLARKE:  What else do you recall hearing or

21   reading about the case in the media?

22           THE JUROR:  I would just see clips on TV.  I didn't

23   read anything about it in the papers.  I don't read the *Globe*

24   or the *Herald* or -- I would just hear sometimes stuff on the

25   radio and things like that, and on the news, just clips.

```
 1              MS. CLARKE:  Can you recall what that might have been?
 2              MR. WEINREB:  Objection.
 3              THE COURT:  Yeah, I don't think we have to go into it.
 4              MS. CLARKE:  There were a series of questions -- I
 5    think it started at the bottom of page 20, with 80, 81, 82, and
 6    it carried over into 83 about what sort of impact this -- the
 7    bombings and the events of that week might have had on people,
 8    and you marked "no."  But they were pretty specific to
 9    personally affected, witnessed the bombing.
10              Can you tell us if you were affected in any way by the
11    events of that week?
12              THE JUROR:  Not personally.  No immediate family, no
13    friends, no one that I knew was affected by the bombings.
14              MS. CLARKE:  Did you talk to anybody about the
15    bombings or the events of that week?
16              THE JUROR:  I talked to my cousin.  He's a fireman in
17    Everett, and asked him about it, and he just reaffirmed that,
18    yes, there's been a bombing, and I asked him if he was there,
19    and he said no, he wasn't there that day.
20              MS. CLARKE:  Did he participate in any of the
21    aftermath?
22              THE JUROR:  No, no.
23              MS. CONRAD:  Where were you on 15th of April, the day
24    of the bombing?
25              THE JUROR:  I was home.  Home in Littleton, Mass.
```

 1            MS. CLARKE:  Okay.  And how did you learn about the

 2    bombing?

 3            THE JUROR:  I think the TV, news.

 4            MS. CLARKE:  Just happened to see it on the news --

 5            THE JUROR:  Yeah.

 6            MS. CONRAD:  -- or followed it live?

 7            THE JUROR:  No, I didn't follow it.  I just saw it on

 8    the news.

 9            MS. CLARKE:  Have you ever had any connection to the

10    marathon?  Do you go to the event?

11            THE JUROR:  No, I try to avoid Boston on that day.  I

12    used to go to school at BU, so I...

13            MS. CLARKE:  So you know what it's like.

14            THE JUROR:  Yeah, I don't want to be in here.

15            MS. CLARKE:  And where were you on the 19th of April?

16    And you know what the significance of that day is, that's the

17    shelter-in-place day and -- and the day of the --

18            THE JUROR:  I know I wasn't near Boston.  I know that.

19    I can't recall.  But I was probably home, or if it was a

20    workday, I was at -- oh, was that vacation week?

21            THE COURT:  Yeah.

22            MS. CLARKE:  I think it might have been.

23            THE JUROR:  I was home, then, with my daughters.

24            MS. CLARKE:  And your kids are how old?

25            THE JUROR:  I have two 13-year-olds, a 14-year-old,

1    and a 12-year-old.  Four girls.

2              MS. CLARKE:  Congratulations.

3              THE JUROR:  Thank you.

4              MS. CLARKE:  Good luck.

5              THE JUROR:  Yeah.  Very busy.

6              MS. CLARKE:  It's interesting on your views about the

7    death penalty.  It sounds like maybe January 5th was the first

8    time you really gave that issue much thought?

9              THE JUROR:  Uh-huh.

10             MS. CLARKE:  Is that right?

11             THE JUROR:  Yeah, I don't think about the case, you

12   know.  It's not of interest to me, so I didn't -- the case

13   itself is not something of interest where I would hear it on

14   the radio and stop and listen or do something or on the TV.

15   So, yes, when the questionnaire came out, and I had to fill

16   this out...

17             MS. CLARKE:  Right.  Not so much the case but the

18   death penalty as a social issue, a political issue.

19             THE JUROR:  Oh, as a social issue?  No, I don't give

20   too much thought about it.

21             MS. CLARKE:  So January 5th was really the first time

22   you had been asked what are your views about --

23             THE JUROR:  Directly asked, yes.  Like, what do you,

24   ██████████████, feel about this?  What would you do in this

25   case?  Yeah.

1          MS. CLARKE:  Well, you live in Massachusetts, which is

2     a state that does not have --

3          THE JUROR:  -- have the death penalty.  Correct.

4          MS. CLARKE:  And how do you feel about that?

5          THE JUROR:  That's what the people want, that's what

6     the legislators vote for, so that's the law.  I'm not upset

7     about it, or it doesn't bother me one way or the other.

8          MS. CLARKE:  One way or another.  Since January 5th,

9     and I think Mr. Mellin alluded to it, have you given more

10    thought to your position on the death penalty?  Not with regard

11    to the case, but your position about the death penalty, period.

12         THE JUROR:  No.  It's right where -- the neutral area

13    where I am.  It just depends on the evidence.  I could go one

14    way or the other depending on the evidence on any case, so long

15    as the evidence warrants one way or the other.

16         MS. CLARKE:  And I guess you realize that it's an

17    individual sort of reasoned moral judgment --

18         THE JUROR:  Correct.

19         MS. CLARKE:  -- that each individual gets to make.

20    And I guess what we're all sort of trying to get at is, are you

21    able to make the decision one way or the other?

22         THE JUROR:  Yes.

23         MS. CLARKE:  Without hesitation?

24         THE JUROR:  Without hesitation, yes.

25         MS. CLARKE:  Your kids are all school age?

1          THE JUROR:  Correct.

2          MS. CLARKE:  And did you talk to them about the

3    bombing and what that meant?

4          THE JUROR:  No.  No.

5          MS. CLARKE:  Did they come home and say, "Dad, what is

6    that all about?"

7          MR. MELLIN:  Objection.

8          THE COURT:  Yeah, I think the answer is sufficient.

9          MS. CLARKE:  Did it get discussed in your class?

10         THE JUROR:  God, I can't remember.  Did it?  Not that

11   I recall because it was over vacation; we came back.  I

12   don't -- I mean, there was talk of it in the teachers', of

13   course, lounge, but I don't remember it being addressed in any

14   of the classes that I co-teach in.

15         MS. CLARKE:  Not a topic that the teachers would bring

16   up and sort of address?

17         THE JUROR:  No.  No, we didn't talk about it.

18         MS. CLARKE:  In your world history, do you cover any

19   Russia, Chechnya, Kyrgyzstan, Kazakhstan, that sort of area of

20   the world?

21         THE JUROR:  World History 2, no.  World History 2 --

22   we might in World History 2, when we get into World War I and

23   World War II.

24         MS. CLARKE:  Any of the Chechen wars?

25         THE JUROR:  No.

```
 1              MS. CLARKE:  That's just not a topic that's --
 2              THE JUROR:  -- popular in our curriculum?  No, it's
 3     not in there.
 4              MS. CLARKE:  Can I have just one moment, Judge?
 5              (Counsel confer off the record.)
 6              MS. CLARKE:  I guess I have one more follow-up
 7     question, if I can.
 8              THE JUROR:  Sure.
 9              MS. CONRAD:  It's my understanding that most of the
10     schools had events supporting the One Fund or doing something
11     with regard to the marathon.  Did your kids' schools do that or
12     your -- the school where you teach?
13              THE JUROR:  Not -- I don't think we did it at
14     Lexington.  I can't recall them doing that or seeing any of the
15     students or going around in homeroom with any of that.  And the
16     only thing my kids had at their school in Littleton is UNICEF
17     that they do drives for.
18              MS. CLARKE:  But nothing --
19              THE JUROR:  I don't remember anything with the One
20     Fund or anything like that.
21              MS. CLARKE:  Thank you.
22              THE JUROR:  You're welcome.
23              THE COURT:  All right, sir.  Thank you very much.
24              THE JUROR:  Oh, thank you.
25              (The juror exits the courtroom.)
```

1          MR. WEINREB:  Before we call the next witness, can I

2     raise one quick thing?  It's not sidebar.

3          THE COURT:  Okay.

4          MR. WEINREB:  I just want to point out the

5     objection -- Mr. Mellin asked a question to which there was an

6     objection by Ms. Clarke that it was a stakeout question because

7     it asked about this case in particular, but I believe the

8     question he asked was nearly verbatim Question No. 95.  And

9     regardless of how we may characterize it now, 95 and 96 were

10    agreed-upon questions by the parties.  And I think, at least to

11    those two questions, any objection should be deemed waived or

12    we can't follow up on them.

13         THE COURT:  Okay.  I don't remember the phrasing of

14    the question, but --

15         MS. CLARKE:  That's not how I heard it.

16         THE COURT:  -- we have been asking 95 and 96

17    consistently.  Any question that was tracking that would be

18    okay.

19         427.

20         THE CLERK:  Juror No. 427.

21         THE COURT:  Can I just have a minute before --

22         THE CLERK:  Hold on.

23         THE COURT:  I guess let's make this a quick sidebar, I

24    think.

25         MR. DOREAU:  Audio off.

```
 1              (Discussion at sidebar and out of the hearing of the

 2    jury:)

 3              THE COURT:  This was one that was proposed jointly, I

 4    think, by the parties this morning, and I took a look at it.

 5    The reason that it was suggested to me for the parties' view,

 6    which may or may not be right, was that in Question 85 the

 7    juror recognized somebody on the witness list.

 8              If that was the reason, I just wanted to discuss that

 9    a little.  It seems to me that it's not necessarily a binary

10    yes-or-no question.  It may well depend on who the witness is,

11    how likely the witness is to testify, how close the

12    relationship is and so on.  So I think it deserves examination

13    when that's the only one.  We had a second one, I think it was

14    428, who knew a witness but also had a hardship, and I thought

15    the hardship was sufficient.

16              But -- so going forward, I would like to maybe, mostly

17    from the government, know the likelihood of such a person

18    actually being a witness in the trial, and then we can explore

19    how close the relationship is and whether it would have an

20    effect and so on and so forth.  So I just wanted to make that

21    comment before we go.

22              MR. WEINREB:  Yes.

23              MS. CLARKE:  For this one, Bill, 895 is ███████████.

24              THE COURT:  A Boston police officer?

25              MR. MELLIN:  I don't believe he's going to be a
```

1    witness.

2              MR. WEINREB:  I'm not sure.

3              THE COURT:  So if that was --

4              MS. CLARKE:  We should come together more often.

5              THE COURT:  We can whittle down the witness list.

6              MR. WEINREB:  I also agree that whether an affirmative

7    answer to Question 85 should -- disqualifies a juror or not

8    should depend on the factors the Court articulated.

9              THE COURT:  Right.  I wanted to, I guess, provide that

10   guidance.  That's my view.  And if that -- we haven't really

11   seen very many who recognize people on the witness list.  I

12   would say half a dozen at most.  So it's not going to be a big

13   problem, but I just wanted to explain why I wanted this held in

14   the --

15             MS. CLARKE:  We have got another one coming up at the

16   end of the day.

17             THE COURT:  Oh, we do?  Well, we'll get --

18             MS. CONRAD:  They know a victim.

19             MS. CLARKE:  No, 437 knows a pretty major witness.

20             THE COURT:  Okay.  Well, I'll look at that.

21             Okay.  We're ready to go back on live.

22             THE CLERK:  Back on, Phil.

23             MR. DOREAU:  Audio on.

24             (In open court:)

25             THE CLERK:  427.

```
 1              THE JURY CLERK:  Juror No. 427.

 2              (The juror enters the courtroom.)

 3              THE CLERK:  Ma'am, over here, please, if you would.

 4     Have a seat.  Keep your voice up and speak into the mic, okay?

 5              THE JUROR:  Sure.

 6              THE COURT:  Good afternoon.

 7              THE JUROR:  Good afternoon.

 8              THE COURT:  Since you were last here, have you been

 9     able to follow the instructions to avoid talking about the

10     substance of the case with anyone?

11              THE JUROR:  Absolutely.

12              THE COURT:  And as much as possible to turn away from

13     any media reports that you get exposed to?

14              THE JUROR:  Yes.  My husband's been very good about

15     changing it.

16              THE COURT:  Okay.  Good.

17              So that's the questionnaire.  We're just going to

18     follow up on some of the things you told us.

19              First, you're a special ed assistant?

20              THE JUROR:  Right.

21              THE COURT:  Is that a distinction from a teacher?

22     You're an assistant teacher or --

23              THE JUROR:  Well, I call myself a teacher, but I'm

24     basically a one-to-one aide for special needs students.

25              THE COURT:  And in the public schools in Amesbury?
```

```
 1              THE JUROR:  Yes.
 2              THE COURT:  We asked about use of social media.
 3              THE JUROR:  Right.
 4              THE COURT:  If you want to look on -- this is at page
 5    10, at the bottom.
 6              THE JUROR:  Yup.
 7              THE COURT:  You use Facebook --
 8              THE JUROR:  Right.
 9              THE COURT:  -- on a weekly basis, I guess, and you
10    said you mostly post about your children, and then inspiration
11    messages.  I just wanted you to explain what you're talking
12    about.
13              THE JUROR:  You know, things like you find a picture
14    of some -- like a butterfly and it talks about, you know,
15    happiness is this or that, you know, those kinds of things.
16              THE COURT:  You've had prior -- actually, fairly
17    recent jury experience --
18              THE JUROR:  Yes.
19              THE COURT:  -- as a juror.
20              And it was a civil case?
21              THE JUROR:  Right.  And I think I said I -- I said I
22    think it was 2012, but it was 2013, so it was two years ago,
23    February.
24              THE COURT:  And that was in Lawrence Superior Court?
25              THE JUROR:  Right.
```

```
 1              THE COURT:  You said -- this is in Question 48 on page
 2    15.  You said it was a great experience --
 3              THE JUROR:  Uh-huh.
 4              THE COURT:  -- which we're happy to hear.
 5              You said you weren't the foreperson, but you did help
 6    decipher through the evidence.
 7              Could you tell us what you meant by that?
 8              THE JUROR:  Basically, we had trouble coming to a
 9    conclusion, so we went home, we had come back, you know, the
10    next day, and I just led -- led it as, you know, let's hear
11    from everybody why you're saying no, why you're saying yes.
12    And as they would go, you know, I went through my notes, went
13    through what we had, was able to say, "But look at" -- you
14    know, "Look at it this way," or, you know, "Look at what they
15    said," you know, those kinds of things.
16              THE COURT:  Okay.
17              THE JUROR:  I was involved in that.  And maybe
18    probably about four others might have been more heavily
19    involved in that way.
20              THE COURT:  This is a 12-person jury?
21              THE JUROR:  Yes.
22              THE COURT:  Let me ask you to turn to page 20.  In
23    Question 77, near the top, we asked a series of questions about
24    whether you had formed any opinions based on things you'd seen
25    in the news or from other sources.
```

1                THE JUROR:  Right.

2                THE COURT:  And in Part A we asked if you had formed

3     an opinion that the defendant was guilty, and you checked

4     "yes."  And then on C and D regarding the possibility of the

5     death penalty, you said you were unsure in those boxes.

6                Down below that, we then said, if you answered "yes"

7     to any of these questions, would you be able or unable to set

8     aside your opinion and base your decision about guilt in this

9     case -- that's the one you checked "yes" for -- would you be

10    able to base your decision about guilt based solely on the

11    evidence presented to you in court, and you checked "able."

12               THE JUROR:  Right.

13               THE COURT:  Can you tell us why you made that

14    selection?

15               THE JUROR:  You know, basically, my feeling is, yes,

16    that he's guilty, from what I know of the media, from what I

17    saw on TV, but I am the type of person that -- well, most of

18    the time there's three sides to a story, you know, his, hers,

19    and the truth kind of a thing.  But I believe that we don't

20    know everything, so I'm not going to say -- I don't come right

21    away and say, absolutely, you can't tell me anything that's

22    going to change my mind, you know.  I am just that way.  I

23    respect this process enough that -- that I would -- I would be

24    able to listen to all sides.

25               THE COURT:  So you've had jury experience, but it

1    wasn't a criminal case?

2              THE JUROR:  No.

3              THE COURT:  I'm sure you know that in a criminal case

4    when someone's accused of a crime the person is presumed to be

5    innocent of the crime charged unless and until the government

6    proves that the person is guilty by the evidence at trial and

7    proves that beyond a reasonable doubt.

8              THE JUROR:  True.

9              THE COURT:  You're familiar with those concepts?

10             THE JUROR:  Right.  Right.

11             THE COURT:  A defendant never has any burden to prove

12   he's not guilty; the burden is always with the government to

13   prove that he is guilty.

14             THE JUROR:  Okay.

15             THE COURT:  You understand that?

16             THE JUROR:  Uh-huh.

17             THE COURT:  So what we ask a jury to do, the members

18   of the jury, in a criminal case is to set the default position

19   at not guilty and then listen to the evidence and consider

20   whether, at the end, considering everything that's been

21   produced, whether the government has satisfied its burden of

22   proof by showing by the evidence the person is, in fact, guilty

23   beyond a reasonable doubt.

24             Do you think you would be able to follow those

25   principles if you were a juror in this case --

```
 1              THE JUROR:  So...

 2              THE COURT:  -- notwithstanding any prior opinions?

 3              THE JUROR:  Right.  I see what you're saying.  Because

 4       obviously the question I answered truthfully --

 5              THE COURT:  Right.

 6              THE JUROR:  -- you know.

 7              But what you're saying now is would I be able to come

 8       in and say he's not guilty and -- by our law, he's not guilty

 9       until everybody kind of says what they need to say?  I feel I

10       could do that but want to be up-front that from what I've seen

11       on the TV at the time that it was happening, there still is

12       that, in the back of my mind, sort of feeling of guilt.  But

13       I'm not saying that I wouldn't -- because I respect the

14       process, I'm not saying that I wouldn't be able to cast aside

15       those.  I'm saying I would be able to and listen to both sides.

16              THE COURT:  Okay.  Let me ask you about Question 80 at

17       the bottom of the page.

18              THE JUROR:  Uh-huh.

19              THE COURT:  You had a friend who was near the site of

20       the explosions, I gather?

21              THE JUROR:  Right.

22              THE COURT:  And she and her ten-year-old son had to

23       run away and you said hide out in a college student's room?

24       Can you tell me about that?

25              THE JUROR:  She was there with her family, with her
```

```
 1   husband as well.  Her husband had to go a different way and
 2   help someone else.  But she ran with her son down the street,
 3   and a college student had come out and said, "Come up here.
 4   Come up and hide up here."  So she stayed in a --
 5            THE COURT:  Where was that, do you know?
 6            THE JUROR:  I don't know the exact location.
 7            THE COURT:  Are you familiar with downtown Boston?
 8            THE JUROR:  Not really.
 9            THE COURT:  You said her husband had to help someone
10   else?
11            THE JUROR:  Yes.  They went as a group of
12   other -- other friends that they were with, and he had to -- I
13   don't know which way, but he had to go find -- make sure those
14   people were okay too, so he went -- and they were like, "Meet
15   us down here," and, you know, that kind of thing.
16            THE COURT:  So when you say "help somebody," you mean
17   they were trying to locate everybody and make sure they were --
18            THE JUROR:  Just locate them and -- yeah.  I mean, it
19   could have been --
20            THE COURT:  As opposed to --
21            THE JUROR:  -- ten feet away.  I don't know.
22            THE COURT:  Right.  As opposed to helping someone who
23   had been injured?
24            THE JUROR:  Right.  Right.  It wasn't anybody that was
25   injured.  It was just --
```

```
 1            THE COURT:  Account for everybody?

 2            THE JUROR:  Right.

 3            THE COURT:  Okay.  Now, has that -- does that leave

 4   you with some impressions that might affect you as a juror in

 5   this case?

 6            THE JUROR:  I mean, she's a very good friend of mine,

 7   and at that time it was obviously devastating for her and her

 8   son, so I would say yes, there is some emotional feeling that I

 9   have toward it -- about it.

10            THE COURT:  Would it -- would it affect your judgment

11   in the case?

12            THE JUROR:  I can't say yes or no, really.  You know,

13   I just want to be honest that, I mean, I guess -- I guess as

14   the trial could go along, the emotions could, you know, come up

15   in such a way that maybe it would.

16            THE COURT:  Okay.  Let me ask you to turn to page 22,

17   Question 85.

18            THE JUROR:  Uh-huh.

19            THE COURT:  You said that -- I'm going to show you the

20   list here.  You said that you recognized one of the --

21            THE JUROR:  Yes.

22            THE COURT:  -- witnesses?

23            Could you tell us a little bit about how you know that

24   person?

25            THE JUROR:  Yep.  It's actually my best
```

1    friend's -- her sister -- so it's her niece's husband.  It's

2    her niece's husband, which -- actually, ex, I should say.  I've

3    only met him once at a graduation party.  "Hi, how are you?

4    Nice to meet you," and that's it.

5            THE COURT:  Okay.  So you know who he is?

6            THE JUROR:  I know who he is.

7            THE COURT:  But you --

8            THE JUROR:  Do I know any circumstances of him within

9    the case?  Maybe the only thing I remember my friend maybe

10   saying was, you know, "Oh, he was driving around, and it was

11   hard and" -- you know, whatever, something on that idea.  I

12   don't really remember anything specific.

13           THE COURT:  When was the graduation party you're

14   referring to?

15           THE JUROR:  Oh, gosh.  Her daughter is 21, so it was a

16   high school graduation.

17           THE COURT:  So about three years ago?

18           THE JUROR:  Three, maybe a little bit more.  It would

19   have been a June of whatever year.  Well, all right.  18, 19,

20   20, 21.  Yeah, I would say three.

21           THE COURT:  Okay.  On page 23, beginning at Question

22   88, we asked a series of questions to gauge what jurors might

23   think about the death penalty in general and perhaps related to

24   this matter as well.  Question 88 itself was a general

25   question, if you have any general views, what are they, and you

 1    said that you believe it, the death penalty, should be used for

 2    certain crimes, usually the more heinous crimes.

 3            THE JUROR:  Yeah.

 4            THE COURT:  Anything you want to add to that?

 5            THE JUROR:  When I think of it, you know, I'll be

 6    honest, it's more like child murderers, pedophiles would be my

 7    strongest criminals that I would not have a problem...

 8            THE COURT:  Okay.  In Question 89 we asked you to try

 9    to place yourself on a 10-level scale, strongly opposed at

10    number 1 to strongly favor at number 10, number 10 being a

11    belief that it -- the death penalty should be imposed whenever

12    the defendant had been convicted of intentional murder.  You

13    selected 8, which is not in the middle.  It's halfway up the

14    high end of the scale.

15            THE JUROR:  Yeah.

16            THE COURT:  Tell us what you were thinking about that.

17            THE JUROR:  Well, I tend to, on any scale, not, you

18    know, go right to the end or right to the beginning of things,

19    and I probably -- in there, because most crimes that include

20    the death of someone if found guilty is, you know, pretty bad

21    to me, so I would think that I believe in it more than I don't

22    believe in it.

23            THE COURT:  Okay.  If you'd go to the next page,

24    Question 90, we asked you, rather than picking a number on a

25    scale, if you could find a formulation of your opinion among

1    the several options that were presented there, and you selected

2    E as the option, which was, "I'm in favor of the death penalty,

3    but I could vote for a sentence of life imprisonment without

4    the possibility of release if I believed that sentence was

5    called for by the facts and the law of the case."

6                THE JUROR:  Right.

7                THE COURT:  Does that continue to represent your --

8                THE JUROR:  Yes.

9                THE COURT:  -- point of view on this matter?

10               THE JUROR:  Yes.  Even though -- you know, and I have

11   thoughts about life imprisonment as well, and I know it's in

12   there.  But I could give you, like, an example if you want.

13               THE COURT:  An example of?

14               THE JUROR:  Of like cases that I would -- either death

15   penalty or --

16               THE COURT:  All right.

17               THE JUROR:  So cases that, you know, I may know of,

18   like someone like Andrea Yates who drowned her five children in

19   Texas, I think it was, for someone like her, very sick,

20   postpartum, you know -- from what I know, someone like her, I

21   probably would do life in prison.

22               Someone like Susan Smith who killed her two boys,

23   pushing the car into the river over the fact that she wanted to

24   be with a certain lover, whoever, someone like her, I feel

25   that's more heinous, and I would be okay with death penalty for

1    her.

2              THE COURT:  You seem a little familiar with those

3    cases.

4              THE JUROR:  Yeah.  I mean --

5              (Laughter.)

6              THE JUROR:  Well, honestly, I used to watch court TV a

7    long time ago, a long time ago when, you know, I was home,

8    so...

9              But those are the -- you know, I want to -- that's

10   where I would -- those are the kind of cases that I would weigh

11   like if -- if there's a mental illness or something on that

12   idea that's proven, you know, I might -- I would go more toward

13   the life in prison.

14             THE COURT:  Okay.  Let me ask you to look at the

15   bottom of page 25, Question 95.  We asked, in the context of

16   this case, if you found Mr. Tsarnaev guilty and you decided

17   that the death penalty was the appropriate punishment for him,

18   could you conscientiously vote for the death penalty, and you

19   indicated "yes"?

20             THE JUROR:  Right.

21             THE COURT:  Does that represent your view?

22             THE JUROR:  Yup.

23             THE COURT:  And at the top of the next page we asked

24   if you found Mr. Tsarnaev guilty and you decided life

25   imprisonment without the possibility of release was the

1    appropriate punishment for him, could you conscientiously vote

2    for that penalty?

3              THE JUROR:  Yes.

4              THE COURT:  And you said "yes."

5              THE JUROR:  Yes.

6              THE COURT:  And that continues to be your view?

7              THE JUROR:  Right.

8              THE COURT:  Follow-up?

9              MR. WEINREB:  Thank you, your Honor.

10             Good afternoon.

11             THE JUROR:  Good afternoon.

12             MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

13   prosecutors in the case.  I just wanted to follow up on a few

14   of your answers.

15             THE JUROR:  Sure.

16             MR. WEINREB:  So -- I'm sorry.  I just want to find --

17   with respect to your friend who was at the marathon.

18             THE JUROR:  Right.

19             MR. WEINREB:  I think you were asked a question by the

20   judge about whether anything about that experience would affect

21   your ability to be a juror in this case, and I want to phrase

22   the question a little bit differently, which is to ask this:

23   So as a juror, your duty is to listen to the law as the judge

24   gives it to you and apply it and to decide the case on the

25   facts that are -- the evidence that's presented in court, not

 1    on things that happened outside.

 2              THE JUROR:  Right.

 3              MR. WEINREB:  And the question really is:  Is there

 4    anything about that experience that you believe would prevent

 5    you from fulfilling that duty?

 6              THE JUROR:  No.  I see, you know, where you're going.

 7    In, like -- I'll say it again:  Because I respect this process

 8    so much, that that experience I could put aside.

 9              MR. WEINREB:  And then I have the same question about

10    the question of the defendant's guilt or innocence.  So as you

11    correctly put it, when you walk into the courtroom, the

12    defendant's not guilty, and he remains that way all throughout

13    the trial, unless and until --

14              MR. BRUCK:  I'm going to object to the whole long

15    buildup.  I think the government should ask a question.

16              THE COURT:  Well, no.  Go ahead.  Go ahead.

17              MR. WEINREB:  -- unless and until the government

18    proves him guilty beyond a reasonable doubt.  And if the

19    government doesn't present evidence, you can't fill it in with

20    stuff you've heard outside of the courtroom.

21              Are you able to abide by those rules?

22              THE JUROR:  Absolutely.

23              MR. WEINREB:  On the question of the death penalty, as

24    the judge explained earlier, if the defendant in a capital

25    case, the case where the death penalty's a possibility, is

1    found guilty of a capital crime, there's a second phase of the

2    trial.  So now he's already been found guilty of an intentional

3    murder.

4            THE JUROR:  Right.

5            MR. WEINREB:  And now the question is, what's the

6    appropriate penalty?  And the government will present evidence

7    of aggravating factors, factors that the government believes

8    warrant a sentence of death.  And the defense will present

9    evidence of mitigating factors, factors about the crime or

10   about the defendant that they believe make this a case where

11   death is not appropriate.

12           The question is:  Could you weigh the aggravating

13   factors and the mitigating factors in making a decision, and

14   are you open to the possibility of either decision, meaning

15   that you could be persuaded one way; you could be persuaded the

16   other way?

17           THE JUROR:  Yes.

18           MR. WEINREB:  Okay.  And is there anything about this

19   case where you feel that your answer would be different, that

20   you couldn't do it in this case?

21           THE JUROR:  That I couldn't do what?

22           MR. WEINREB:  You couldn't weigh aggravating factors

23   and mitigating factors and give both meaningful consideration

24   and make a decision accordingly?

25           THE JUROR:  Maybe just the emotion behind it would be

1    hard to get around, you know, the death of the people, the

2    emotional part of it.

3            MR. WEINREB:  Okay.  So let me ask you more about

4    that.  So in any case where the death penalty is a possibility,

5    there are dead people --

6            THE JUROR:  Right.

7            MR. WEINREB:  -- at least one dead person, because

8    it's only murder where you have the capital punishment.  And so

9    are you saying there's something different about an

10   ordinary -- another case you might sit on, not any particular

11   one -- but I guess what I'm getting at is, is are you capable

12   of fulfilling the duties of a juror in this case, meaning

13   capable of weighing aggravating factors and mitigating factors

14   and giving both of them meaningful consideration.  I'm not

15   asking you --

16           THE JUROR:  Meaningful consideration?  I mean, I

17   believe I would be, absolutely.  But I just, you know, in

18   general, this is going to be an emotional case, so I...

19           MR. WEINREB:  Fair enough.

20           THE JUROR:  But, yes, I see what you're saying, yes.

21           MR. WEINREB:  Okay.  So cases can be emotional, and

22   you can be emotional, and that's not against the rules.  But

23   the rules do require that you not let your emotions control how

24   you decide a case.

25           THE JUROR:  Right.

1              MR. WEINREB:  Can you do that?  Can you --

2              THE JUROR:  I believe I could, yes.

3              MR. WEINREB:  Okay.  Not decide the case

4     unemotionally, but keep your emotions enough in check so that

5     you're giving meaningful consideration to the evidence and

6     deciding the case on the evidence?

7              THE JUROR:  Right.  Yes.

8              MR. WEINREB:  So I guess the real question is:  If

9     you're selected as a juror and the jury finds the defendant

10    guilty in any case, and the case enters a penalty phase, do you

11    go into the penalty phase with your mind already made up just

12    because it's a murder case, or do you have an open mind about

13    the penalty?

14             THE JUROR:  Well, I would say I have an open mind

15    because I clearly state I could go either way.

16             MR. WEINREB:  Right.  Thanks very much.

17             THE JUROR:  You're welcome.

18             MR. BRUCK:  Good afternoon.

19             THE JUROR:  Hello.

20             MR. BRUCK:  Hi.

21             THE JUROR:  Good afternoon.

22             MR. BRUCK:  My name is David Bruck, and I'm one of the

23    lawyers for Jahar Tsarnaev.  And if it's okay, I would like to

24    ask you some questions.

25             THE JUROR:  Sure.

1          MR. BRUCK:  You're a special ed -- your field is

2     special ed; you work with kids?  Do you get paid if you're on

3     the jury?

4          THE JUROR:  I think it's three days.  I have a

5     contract that says jury duty, three days.

6          MR. BRUCK:  So if this trial was three or four

7     months --

8          THE JUROR:  Right.  I would not.

9          MR. BRUCK:  Okay.  Would that pose a hardship for you?

10          THE JUROR:  Well, of course.  And I would have to pay

11     for my health insurance.

12          MR. BRUCK:  Well, this is the last chance you get --

13          THE JUROR:  Right.

14          MR. BRUCK:  -- to say whether or not serving on the

15     jury is going to pose an undue hardship for you, so we really

16     need to hear from you.

17          THE JUROR:  Yeah.  I mean, I'll be honest.  The amount

18     of money that I make is not completely detrimental to my

19     household.  My husband does well.  So I'm not that freaked out

20     about that, if I could say it that way.

21          MR. BRUCK:  Sure.

22          THE JUROR:  I mean, it's a hardship generally.  You

23     know, I have bills to pay.  I have credit cards to pay.  I have

24     one in college, you know, one child in college, that kind of

25     thing.  But it's not like I'm making 50-, 60-, 70-, $100,000,

1   so...

2           MR. BRUCK:  Okay.  The reason I'm asking you now is

3   that once you're on the jury, it's too late to say, "Whoa, this

4   is proving to be hard" --

5           THE JUROR:  I understand.

6           MR. BRUCK:  -- "I need to get off."

7           THE JUROR:  Right.  Yeah.  No, I understand.

8           MR. BRUCK:  And what about the kids you work with?  Do

9   you have a concern about who will work with them when you're

10  gone if you were to serve three or four months?

11          THE JUROR:  I mean, my school system, you know, does a

12  great job at replacing people when they need to.  You know, and

13  the kids are essentially resilient to that kind of thing,

14  so -- changes like that.

15          MR. BRUCK:  Okay.  Now, you remember Judge O'Toole

16  this morning said that all he is asking for, all the system is

17  asking for during this questioning, is how you really and truly

18  feel.

19          THE JUROR:  Right.

20          MR. BRUCK:  And if you answer the truth, no matter

21  what your answers are, you're doing your duty as a citizen and

22  as a juror.  So in that spirit, I appreciate what you've told

23  him.  I could see that you were struggling with some of the

24  answers, and I want to pursue that a little bit.

25          THE JUROR:  Okay.

1          MS. CLARKE:  Go as deep as we can.

2          MR. WEINREB:  Your Honor, I object to this,

3    instructing the juror how she's feeling about the questions.

4          THE COURT:  All right.  So let's get to the questions.

5          MR. BRUCK:  All right.

6          I want to go back to before you got your jury summons.

7    In other words, before you thought about being a juror, you

8    were just a resident of this state, area.

9          THE JUROR:  Okay.

10          MR. BRUCK:  And of course had heard about -- quite a

11    bit about the Boston Marathon bombing.  And you say you had an

12    opinion that the defendant -- you had formed an opinion, based

13    on that everything you heard, that the defendant was guilty.

14          THE JUROR:  Right.

15          MR. BRUCK:  Did you also form an opinion about whether

16    he should receive the death penalty before you got your

17    summons?

18          THE JUROR:  I'm kind of not like that.  I mean, people

19    around me have.  I'm not -- I wasn't strong and vocal with that

20    kind of a thing.  So, no, I really didn't.

21          MR. BRUCK:  The people around you, tell me a little

22    bit more about that.  And who --

23          THE JUROR:  People around me --

24          MR. WEINREB:  Objection.

25          THE COURT:  I think you have to target it a little bit

1    better.

2            MR. BRUCK:  Well, I mean, were these -- people around

3    you were expressing an opinion about the death penalty?

4            THE JUROR:  Not at the time that it happened.

5            MR. BRUCK:  Right.

6            THE JUROR:  More so after receiving the jury summons

7    and I had to tell my workplace, so I would say the majority of

8    the people at my workplace have no problem telling me, you

9    know...

10           MR. BRUCK:  And what did they say?

11           THE JUROR:  They basically said --

12           MR. WEINREB:  Objection, your Honor.

13           THE COURT:  Go ahead.

14           THE JUROR:  They basically said, "Fry him."

15           MR. BRUCK:  "Fry him."  These are people you work with

16   that --

17           THE JUROR:  Yes.

18           MR. BRUCK:  How many people said things to that

19   effect?

20           MR. WEINREB:  Objection.

21           THE COURT:  Go ahead.

22           THE JUROR:  Maybe a handful.

23           MR. BRUCK:  Okay.  These are coworkers, people you see

24   every day.

25           THE JUROR:  Right, right.

1          MR. BRUCK:  And you'll see again if you --

2          THE JUROR:  Yes.

3          MR. WEINREB:  Objection.

4          THE COURT:  Yeah, I think a little less directive

5     questioning.

6          MR. BRUCK:  Oh, sure.

7          Now, you -- sometimes when we say "opinion," people

8     think, well, that needs to be a really firm idea.  What I'm

9     really asking you for is, did you lean either way before you

10    thought about being a juror, before you had any reason to think

11    about being a juror?

12         THE JUROR:  Lean about death penalty?

13         MR. BRUCK:  Uh-huh.

14         THE JUROR:  No.

15         MR. BRUCK:  In this case.

16         THE JUROR:  No.

17         MR. BRUCK:  Did you think about it at all?

18         THE JUROR:  No, I...

19         MR. BRUCK:  The people who you -- who expressed an

20    opinion at work, are any of them people who supervise you?

21         THE JUROR:  No, colleagues.  Just my colleagues.

22         MR. BRUCK:  Okay.  Now, you told us a little bit about

23    the sorts of cases in which you think the death penalty would

24    be or wouldn't be appropriate.  And you may have noticed on the

25    jury form, and you may know from listening about the case --

1          MR. WEINREB:  Your Honor, I object.  This is going to

2     be asking about the facts of this case.

3          THE COURT:  Yeah, it sounds like it.

4          MR. BRUCK:  No.  I guess the question is:  Mr. Weinreb

5     asked you whether -- well, let me back up a little bit.

6          You know from all the information, including the jury

7     form --

8          MR. WEINREB:  Objection.  That's the same thing.

9          MR. BRUCK:  I haven't asked the question yet.

10         THE COURT:  No, but it does sound like you want to put

11    the facts of the case to her, and that's not right.

12         MR. BRUCK:  The question is:  This case includes --

13         MR. WEINREB:  Objection, your Honor.  That is the

14    exact thing.

15         MR. BRUCK:  I'm not asking about the death penalty.

16    I'm really -- I think I should just be allowed to ask the

17    question before there's an objection.

18         THE COURT:  Well, if it's going to posit the facts of

19    the case, then I think it's out, to the extent it asks for an

20    opinion about those facts.

21         MR. BRUCK:  Well, no, it doesn't.

22         The question I want to ask you is whether any

23    of -- whether it would be hard for you to be completely fair

24    and impartial in a case involving, as you know, the murder of

25    an eight-year-old.

1          MR. WEINREB:  Objection, your Honor.  That is exactly

2    the question that has not been permitted under the Court's many

3    prior rulings.

4          MR. BRUCK:  That's not so.

5          THE COURT:  Well, no, I think the juror -- prospective

6    juror, did talk about the potential emotional component to the

7    case, so you can explore that.

8          MR. BRUCK:  Thank you.

9          I can ask the question again.

10         THE JUROR:  You need to, yes.

11         (Laughter.)

12         MR. BRUCK:  There were some interruptions.

13         The question -- what we're concerned about is whether

14   this is a case in which you are confident that you could remain

15   objective and fair and impartial.  And one of the facts of this

16   case is that it involves --

17         MR. WEINREB:  Objection, your Honor.  That's --

18         THE COURT:  No, go ahead.

19         MR. BRUCK:  -- that it involves the murder of an

20   eight-year-old child.

21         THE JUROR:  Uh-huh.

22         MR. BRUCK:  You know yourself.  You know your own

23   feelings and your responses.  And so my question is:  Is that a

24   fact that would prevent you or affect your ability -- affect

25   your ability to be a fair and impartial juror?

1          THE JUROR:  It wouldn't affect my ability.

2          MR. BRUCK:  Yes.

3          THE JUROR:  I feel that I can come in with the notion

4    of not guilty, listen to all sides, and weigh it then.

5          MR. BRUCK:  Okay.  Now --

6          THE JUROR:  Because of the strong feeling that I feel

7    about this process, I feel that that outweighs a lot for me in

8    most cases.

9          MR. BRUCK:  I'm sorry.  You feel that what outweighs a

10   lot for you?

11         THE JUROR:  The fact that I believe in this process so

12   much that I'm not going to come in and not be able to look at

13   both sides.  I wouldn't be able to sit there if I had the

14   notion of that:  "I'm not even going to bother listening to

15   that side."  I will not do that.  I...

16         MR. BRUCK:  Right.  Okay.

17         Now, that -- your answer, quite properly, concerned

18   guilt or innocence, the process of deciding whether the person

19   did or did not.

20         THE JUROR:  Okay.

21         MR. BRUCK:  I would like to move on from there.

22         THE JUROR:  Okay.

23         MR. BRUCK:  Let's assume, for purposes of my question,

24   the jury found that he did it, and now the question is the

25   death penalty.  That's not either/or.  That involves a lot of

```
 1  considerations, right?
 2          THE JUROR:  Right.  And I -- actually, ask the
 3  question that you want to ask me about that.
 4          MR. BRUCK:  Well --
 5          THE JUROR:  About what --
 6          MR. BRUCK:  I want to come back to whether or not your
 7  ability to fairly consider all factors weighing -- the factors
 8  weighing against the death penalty might be impaired by the
 9  fact that this involves the murder, among other people, of a
10  child.
11          THE JUROR:  Right.  I see what you're saying.  And
12  like I said, there was certain cases where they did include
13  children, but, you know, the situation of maybe one case, the
14  evidence or what had happened with the criminal, say, were
15  different in each of the cases that -- where I would form an
16  opinion of death penalty or life.
17          So, like, I don't know all of the facts yet, so I
18  would say that I can go into the next phase saying which side,
19  whether it's mitigating or whatever the other one was saying,
20  would prove that it should be death penalty or life.  So
21  without knowing even the full side on this side or any, really,
22  of what's going on on this side, I -- without knowing that -- I
23  would have to know those facts and all the information that
24  would need to come, but I'm -- so what I'm saying is, no, I --
25  I would have the ability to look at all of that.
```

1             THE COURT:  I think we should try to wrap up, if we

2        can.

3             MR. BRUCK:  Yes.  I think that's all.

4             THE COURT:  All right.

5             MS. CONRAD:  Excuse me, your Honor.  May I ask

6        something?  It has to do with a question --

7             THE COURT:  No, you can speak to Mr. Bruck.

8             MS. CONRAD:  Well, can I speak with Mr. Bruck for a

9        minute, then?

10            (Counsel confer off the record.)

11            MR. BRUCK:  Just very briefly, when did your friend

12       tell you about her very frightening experience at the marathon?

13            THE JUROR:  Pretty much immediately right after

14       because I -- it was like maybe the day after.  Actually,

15       because that was on April vacation, we're all -- all the

16       teachers are off, and I was having people over my house on

17       Tuesday for a lunch, and she had come over.  So I knew the

18       night before, actually, because, you know, I was making sure

19       everybody was coming.  So I knew basically immediately.  And

20       then she came over, and we all -- everybody that was there

21       heard about it, and...

22            MR. BRUCK:  And was that a pretty emotional

23       discussion?

24            THE JUROR:  Yeah.  You know, we were like, "Oh, my

25       gosh, I can't believe you were there" and, you know, that kind

```
 1    of thing.
 2              MR. BRUCK:  Were there tears in her description?
 3              MR. WEINREB:  Objection.  I don't think we need to be
 4    getting into that kind of --
 5              THE COURT:  Yeah, I don't think we need the details.
 6    I think that's enough.
 7              Thank you.
 8              MR. BRUCK:  Thank you very much.
 9              THE JUROR:  You're welcome.
10              (The juror exits the courtroom.)
11              THE COURT:  So we have six more.  I think we should do
12    two o'clock.
13              So I think we'll break.  It looks like we have I think
14    six more, so we should probably do two o'clock and
15    get -- continue.
16              MR. BRUCK:  Two o'clock?
17              MS. CLARKE:  Six more or --
18              MR. WEINREB:  Four more.
19              MS. CLARKE:  Four more.
20              THE COURT:  Oh, I didn't cull mine.  I'm sorry.  Let
21    me just look.
22              MS. CLARKE:  429, -31, -34, and 37.  Two are coming in
23    tomorrow.
24              THE COURT:  Right.  Right.  Okay.  Sorry.
25              So do you want a little more time?  Do you want to
```

1    make it 2:15?

2              MS. CLARKE:  Sure.

3              MR. WEINREB:  Actually, that would be appreciated.

4              (The Court exits the courtroom at 1:20 p.m.)

5              (There is a recess in the proceedings at 1:20 p.m.)

6              (The Court enters the courtroom at 2:33 p.m.)

7              THE CLERK:  429.

8              THE JURY CLERK:  Juror 429.

9              (The juror enters the courtroom.)

10             THE CLERK:  Sir, over here, please.  Have a seat.

11             THE JUROR:  Hi.

12             THE CLERK:  Keep your voice up and speak into the mic.

13             THE COURT:  Good afternoon.

14             THE JUROR:  Hi, how are you?

15             THE COURT:  Thank you for your patience.

16        Have you been able to follow my instruction to avoid

17   talking about the case since you were here in January?

18             THE JUROR:  Yes.

19             THE COURT:  And also as much as possible to avoid

20   media stories about the case?

21             THE JUROR:  Yeah.

22             THE COURT:  Okay.  Thanks.  So that's the

23   questionnaire you filled out, and we're going to follow up on

24   some of the questions and answers.

25             In terms of your employment, you're in the banking

1  business?

2          THE JUROR:  Correct.

3          THE COURT:  Have been for some time?

4          THE JUROR:  Yes.

5          THE COURT:  I gather that notwithstanding the

6  anticipated schedule in the case, you're able to devote the

7  time to spend on the case if you're asked to do that?

8          THE JUROR:  Yeah, I would do that.

9          THE COURT:  We asked jurors about whether they use

10  social media of any sort, and you said you don't?

11          THE JUROR:  I don't.  Although it did occur to me

12  afterwards that I actually have a LinkedIn account.  But that's

13  for professional; that's not social.

14          THE COURT:  Okay.  So I think the question I'd like to

15  turn to is Question 77 on page 20.  And in that question we

16  asked jurors whether, based on things they'd seen or read in

17  the media or elsewise, they had formed an opinion about whether

18  the defendant was guilty or not or should receive the death

19  penalty or not, and you answered each of the parts of that

20  question by saying "unsure," and then you had an asterisk

21  that -- and you wrote in "not sure what all the charges are."

22          THE JUROR:  Correct.

23          THE COURT:  I just want you to tell us a little bit

24  more about why you answered the way you did.

25          THE JUROR:  Sure.  I know there are a number of

1    charges.  I don't know exactly what those charges are.  And in

2    terms of guilty or not, the defendant hasn't had due process

3    yet, and that's really the only way to determine guilt.

4         THE COURT:  We asked jurors -- I guess you've not had

5    formal jury service before?

6         THE JUROR:  Correct.

7         THE COURT:  But you're, I guess, familiar with the

8    tenets of our judicial system?

9         THE JUROR:  Yes.

10        THE COURT:  And you understand that a defendant who is

11   accused of a crime is presumed innocent unless the government

12   proves that the person's guilty by the evidence produced at

13   trial, and proves that beyond a reasonable doubt?

14        THE JUROR:  Correct.

15        THE COURT:  You're familiar with those principles?

16        THE JUROR:  Yes.

17        THE COURT:  Would you have any difficulty in

18   faithfully applying those principles?

19        THE JUROR:  No, I don't think so.

20        THE COURT:  And if in a given charge, for example,

21   given count of the indictment, if you thought the government's

22   evidence was insufficient to convince you beyond a reasonable

23   doubt that the defendant was guilty, would you be able to vote

24   not guilty under those circumstances?

25        THE JUROR:  Yes, that would be correct.

1          THE COURT:  In your banking career, have you
2     personally been involved as a participant in litigation?  I'm
3     sure you've seen litigation going on.
4          THE JUROR:  I've seen litigation.
5          THE COURT:  Have you testified or participated or
6     anything like that?
7          THE JUROR:  No, not that I can recall.  It's been 30
8     years of banking, so -- but not that I can recall.  I mean, the
9     only court proceeding I would have been involved in would have
10    been speeding tickets.
11         THE COURT:  Okay.  30 years ago?
12         THE JUROR:  A long time ago.
13         THE COURT:  Let me ask you to look at page 21.  We
14    asked about whether people were personally affected or involved
15    in the events.  And in 81 you said you closed branches for the
16    day -- "the day" being the marathon day itself?
17         THE JUROR:  Correct.
18         THE COURT:  -- due to lack of or reduced police
19    presence in communities served.
20         How long was the branch closed?
21         THE JUROR:  I believe it was the day.  During the
22    shelter-in-place order.
23         THE COURT:  The end of the week?  Not Patriots' Day
24    itself?
25         THE JUROR:  I think it was Friday.  During the

1    shelter-in-place order there were an inordinate number of

2    police departments that helped the police in Boston, and as a

3    result, there was a reduced police presence out in the suburbs.

4    So we felt it was unsafe to have the branches open.

5              THE COURT:  How many branches?

6              THE JUROR:  I believe at the time we had six branches.

7              THE COURT:  Okay.  And in that next question we asked

8    about participation of various support activities that followed

9    the events, and you said that your employer purchased a table

10   at a fund-raising dinner, I guess?

11             THE JUROR:  That's correct.

12             THE COURT:  To honor first responders?

13             THE JUROR:  That's correct.

14             THE COURT:  And you --

15             THE JUROR:  I did attend the dinner.

16             THE COURT:  -- did attend it?

17             Tell us about that in relation to the events.  When

18   was that, a few months after, a year after?

19             THE JUROR:  A few months after.

20             THE COURT:  Where was it?

21             THE JUROR:  I don't recall which hotel, but it was at

22   one of the hotels in Boston.  We go to a number of events at a

23   number of different venues, so unfortunately I can't tell you

24   which one it was.

25             THE COURT:  Is that the extent of your participation

1    in support of activities?

2              THE JUROR:  Yeah.

3              THE COURT:  Beginning on page 23 at Question 88 we

4    asked a series of questions about attitudes towards the death

5    penalty, both in general and perhaps as related to this case.

6    Question 88 itself is the general question, if you have any

7    views about the death penalty in general, what are they, and

8    you said, "The death penalty has its place and requires special

9    circumstances in" -- I guess it says "in states that use it."

10             THE JUROR:  In certain states that use it, yes.  I was

11   born and raised in a state that is a death penalty state.

12             THE COURT:  Which state is that?

13             THE JUROR:  California.  And as a result of that, when

14   death penalties applied it didn't happen just because you

15   committed a murder; it required special circumstances.

16             THE COURT:  How long -- when were you last in

17   California?

18             THE JUROR:  When was I last in California?

19             THE COURT:  I mean when did you live there?

20             THE JUROR:  I lived there up until the end of 2000.

21             THE COURT:  It just struck me that you're rather

22   familiar with the death penalty laws --

23             THE JUROR:  It was rather big in California.  The

24   Supreme Court actually went through the process of overturning

25   death penalty cases repeatedly.  And in California the justices

1    came up on the ballot, and actually three of them were voted

2    out as a result of that.

3            THE COURT:  So it was a public issue?

4            THE JUROR:  It was a public issue.  Yeah, it was

5    actually quite well advertised in the media.  And if I'm not

6    mistaken, Charles Manson may have been a byproduct of that.  I

7    don't recall, but he may have been a death penalty case that

8    was overturned and commuted to life.

9            THE COURT:  In Question 89 we asked you to place

10   yourself on a scale from 1 to 10, 1 being strongly opposed and

11   believing that the death penalty should never be imposed, to 10

12   strongly in favor and believing it should be imposed whenever a

13   defendant is convicted of a willful murder, and you put

14   yourself at 3.  Can you explain that?

15           THE JUROR:  Correct.  I think it's an important

16   decision.  It has its place but it's not something that can

17   randomly or willy-nilly be thrown around.  It's an important

18   decision.

19           THE COURT:  On the next page we asked the question a

20   little bit differently, this time not with numbers but words,

21   and asked you to look at a number of different positions that

22   someone might have and select one that might represent your

23   feelings about the death penalty with respect to someone proved

24   guilty of intentional murder.  You selected C, which is that

25   you are opposed to the death penalty "but could vote to impose

1    it if I believed that the facts and the law in the particular

2    case called for it"?

3              THE JUROR:  Correct.

4              THE COURT:  Is that a fair summary of --

5              THE JUROR:  That's a pretty fair statement, yes.

6              THE COURT:  On page 25, at the bottom, Question 95, we

7    put it in the context of this case, said if you found

8    Mr. Tsarnaev guilty and decided that the death penalty was

9    appropriate punishment for him, could you conscientiously vote

10   for the death penalty, and you said "yes"?

11             THE JUROR:  Yes.

12             THE COURT:  And the other side of that question is 96,

13   the next page.  If you found Mr. Tsarnaev guilty and decided

14   life imprisonment without the possibility of release was the

15   appropriate punishment for him, could you conscientiously vote

16   for that penalty?

17             THE JUROR:  Absolutely.  I think it's based on the

18   merits of what's presented in court.

19             THE COURT:  Okay.  Any follow-up?  Mr. Mellin?

20             MR. MELLIN:  Thank you, your Honor.

21             Good afternoon, sir.  I'm Steve Mellin.  I'm one of

22   the prosecutors in the case.  I want to follow up on some of

23   the death penalty answers you had where you talked about

24   California and special circumstances.

25             Are there particular circumstances that you remember

1    or recall as being a basis for the death penalty?

2        THE JUROR:  No.  Yes, because I wasn't ever involved

3    in a trial like that.  I just remember it had got quite a bit

4    of media play and it was due to the fact that the Supreme Court

5    took it upon itself to start overturning death penalty cases

6    repeatedly.

7        MR. MELLIN:  Did you have a feeling about that or an

8    opinion about that?

9        THE JUROR:  I did.  I actually felt that when the

10   death penalty was warranted, that it shouldn't be overturned

11   just because a justice decides that he or she doesn't like the

12   death penalty.

13       MR. MELLIN:  You heard a little bit this morning about

14   how this process works.  And I think, you know, you would find

15   that the special circumstances you're referring to in

16   California are somewhat like the aggravating factors you would

17   be hearing about if you were a juror in this case.

18       Do you understand that?

19       THE JUROR:  Yes.

20       MR. MELLIN:  And assuming we -- you were a juror in a

21   case and it got to the point where the jury was deciding

22   between life imprisonment on the one hand and death penalty on

23   the other, would you be able to -- if you believed the facts

24   supported it, would you be able to actually vote to impose the

25   death penalty on another human being?

```
 1              THE JUROR:  Yes, I would.

 2              MR. MELLIN:  Thank you.

 3         Thank you, your Honor.

 4              THE COURT:  Mr. Bruck?

 5              MR. BRUCK:  Good afternoon.

 6              THE JUROR:  Hi.

 7              MR. BRUCK:  I'm David Bruck, and I'm one of

 8    Mr. Tsarnaev's attorneys.  And I would like to follow up a

 9    little bit.

10              THE JUROR:  Sure.

11              MR. BRUCK:  I also would like to go back to California

12    for a minute.  I take it that if, you know, there was a ballot

13    issue recently in California, you would not have voted to

14    support getting rid of the death penalty in California if you

15    were still living there.  Is that correct?

16              THE JUROR:  That's probably accurate because I believe

17    it has a place.  However, if it would have passed and no longer

18    be the law there, I wouldn't support it.  From my perspective,

19    if that's what the law calls for, then that's what you do.

20              MR. BRUCK:  You expressed your feeling about the

21    record of the California Supreme Court.  Of course we're in

22    federal court now.

23              THE JUROR:  Correct.

24              MR. BRUCK:  The U.S. Supreme Court makes the rules.

25    If you were on a jury in this case, would you have any
```

1    lingering suspicion that anything that was done here would just

2    be reversed or that the courts wouldn't really carry through on

3    the jury's verdict?

4         MR. MELLIN:  Objection.

5         THE JUROR:  No, I don't think so.

6         THE COURT:  No, we'll take the answer.

7         THE JUROR:  No, I don't think so.

8         MR. BRUCK:  You understand this is for real?

9         THE JUROR:  Yes, I do.  That's why I put in here that

10   I think it's probably the most important decision a human being

11   can make.

12        MS. CLARKE:  Now, I understand that -- I heard your

13   answers that you haven't formed an opinion because you haven't

14   heard the evidence, but, of course, people that lived in Boston

15   heard a lot, and that's why I want to bring you back to before

16   you knew you were going to be a juror.

17        THE JUROR:  Sure.

18        MR. BRUCK:  You weren't approaching this, of course,

19   as a potential juror.  Did you have a sense of whether -- any

20   sort of opinion at all about whether this young man was

21   probably guilty or probably innocent?

22        THE JUROR:  Did I see videos of, say, the defendant

23   and -- allegedly the defendant and his brother with the

24   backpacks on walking under a store camera on a sidewalk?  Of

25   course I saw that because it was in the media repeatedly.

1          MR. BRUCK:  Sure.

2          THE JUROR:  Did I see the video of the defendant in

3     the boat the night after the shootout in Watertown?  Of course,

4     because it was all over the media.  So, yeah.

5          Now, do I recall specifically what the defendant did

6     in terms of -- for example, the judge this morning mentioned

7     that -- the police officer that was shot at MIT.  Do I know

8     what occurred there?  I don't know who did what there.  Do I

9     know who planted which backpack where?  I have no idea.

10          MR. BRUCK:  Got it.

11          THE JUROR:  So I don't know those components.

12          And, again, I would look at it in the context of,

13     well, I saw those particular video clips just as probably sort

14     of anybody did.  Again, it's about what gets presented in court

15     as opposed to those components that you saw.

16          MR. BRUCK:  Okay.  I guess I want to ask something of

17     a similar question but this time not about guilt or

18     innocence --

19          THE JUROR:  Sure.

20          MR. BRUCK:  -- but about the death penalty.

21          Back before you were a juror --

22          THE JUROR:  Sure.

23          MR. BRUCK:  -- and believed the death penalty can be

24     appropriate in some situations.

25          THE JUROR:  Correct.

1          MR. BRUCK:  Based on what you knew or had read or seen

2     on TV, did you have an opinion about whether the death penalty

3     was appropriate in this case?

4          THE JUROR:  Believe it or not, at the time because

5     Massachusetts is a no-death-penalty state, my assumption was

6     that that applied in this particular case.  At the time I

7     wasn't aware that it was federal and it would be a death

8     penalty case based on federal.

9          MR. BRUCK:  And did you ever learn that it was a

10    federal case and could be a death penalty case before you

11    became a juror -- a potential juror?

12         THE JUROR:  Possibly.  I don't recall.  I just

13    remember at the time thinking that it was not due to the fact

14    that we were in Massachusetts, and I just assumed that that

15    prevailed.

16         MR. BRUCK:  Okay.  And understanding that, did you

17    have any feelings about whether the death penalty would have

18    been appropriate in this case?

19         THE JUROR:  Again, I would probably have to -- I'd

20    have to see what the evidence was to know if it was

21    appropriate.  I still don't know that today.

22         MR. BRUCK:  Sure.  Can you tell me how you -- where

23    you were and how you first found out about the Boston Marathon

24    bombing?

25         THE JUROR:  You bet.  I believe I was at the office

1  when it actually occurred.

2          MR. BRUCK:  Which is where?  I don't mean --

3          THE JUROR:  My office is in Norwood, Massachusetts.

4          MR. BRUCK:  In?

5          THE JUROR:  Norwood.

6          MR. BRUCK:  Okay.

7          THE JUROR:  Yes.  So I'm outside the 128 belt.

8          MR. BRUCK:  Okay.  And you found out how?

9          THE JUROR:  I believe it was -- gosh, you know, I

10  don't recall.  It's just too long ago.  Too much water has gone

11  under that bridge.

12          MR. BRUCK:  When you first heard the news, were there

13  any particular people that you were concerned about that you

14  knew might be there?

15          THE JUROR:  No, I actually didn't know any of the

16  runners.

17          MR. BRUCK:  Or anyone you thought might be attending

18  the marathon?

19          THE JUROR:  No.  I remember thinking it was tragic,

20  obviously, and it was rather compelling in terms of, you know,

21  people being injured, but it's been a long time since I've been

22  a runner.

23          MR. BRUCK:  Okay.  And how about on the 19th?  When

24  did you -- can you tell me -- you said -- you told the judge

25  you shut six branches of your bank?

1          THE JUROR:  Correct.  The shelter-in-place order came

2     out.  I believe I was attending a meeting right up on the belt

3     at the -- what was it?  The Newton Marriott, I believe it was.

4     The shelter-in-place order went into place.  We decided to

5     leave the meeting, go back to the office.

6          On the way back to the office, we saw busload after

7     busload of police heading in to Boston.  It became very

8     apparent that the police presence in the suburbs was

9     diminished, and that's what led us to shut the branches down.

10         MR. BRUCK:  After you shut the branches down, did you

11    go home?

12         THE JUROR:  Yeah, I think I went home probably

13    midafternoon, like one o'clock, one-thirty in the afternoon.

14         MR. BRUCK:  Okay.  Can you bear with me just a moment?

15    I think that's it, but I need to check.

16         THE JUROR:  Sure.

17         (Counsel confer off the record.)

18         MR. BRUCK:  Oh, yeah.  Question 94, you were asked

19    whether anyone close to you would be critical of you or

20    disappointed in you if you voted for the death penalty in this

21    case, if you voted for life imprisonment, and you stated it was

22    possible.  "The responsibility is mine, however."

23         Were you thinking of anyone in particular when you

24    said it is possible?

25         THE JUROR:  You know, I have friends that are natives

1  of Massachusetts that the death penalty is very foreign to

2  them.  I have friends that are very Catholic that the death

3  penalty would be very foreign to them.  So in that context,

4  yes, it is possible that I could have either coworker,

5  colleague, friend that would take a dim view of that.

6          MR. BRUCK:  Okay.  Of voting for the death penalty?

7          THE JUROR:  Correct.

8          MR. BRUCK:  Okay.  Anybody you were thinking of that

9  might go the other way, might be critical of you for not voting

10  for it?

11          THE JUROR:  You know, I think that the risk is in a

12  situation like this, it's such a serious issue, that it

13  potentially can become emotionally charged in one direction or

14  another.  So, yeah, it's possible.  Just from my perspective,

15  that would be my decision, not theirs.

16          MR. BRUCK:  Okay.  Thank you, sir.

17          THE JUROR:  Sure.

18          THE COURT:  All right, sir.  Thank you very much.

19  Just leave that there.

20          THE CLERK:  Just leave the questionnaire there.

21          THE JUROR:  Thanks.

22          (The juror exits the courtroom.)

23          THE CLERK:  Juror No. 431.

24          THE JURY CLERK:  Juror 431.

25          (The juror enters the courtroom.)

```
 1              THE CLERK:  Sir, come over here, please.  Have a seat,
 2      if you would.
 3              THE JUROR:  Thank you.
 4              THE CLERK:  Just keep your voice up and speak into the
 5      mic so everyone can hear you.
 6              THE COURT:  Good afternoon.
 7              THE JUROR:  Good afternoon.
 8              THE COURT:  Since you were last here when you filled
 9      out the questionnaire, have you been able to avoid talking
10      about the case, in substance, with anybody?
11              THE JUROR:  Yes.
12              THE COURT:  And avoid media reports about the case?
13              THE JUROR:  Yes.
14              THE COURT:  So that's the questionnaire you filled
15      out.  We're going to follow up on some of the things you wrote
16      there.
17              I want to start on page 5 with Question 10, which we
18      set out there what the schedule of the case might be and how
19      long it might take and so on, and we asked whether -- if you
20      were asked to be a juror in the case would it present any
21      special hardship to you.  And there are a couple of things in
22      your answer that I want to explore with you.
23              THE JUROR:  Okay.
24              THE COURT:  You said you don't have a license to
25      drive?
```

1          THE JUROR:  No.  It was suspended because I have back

2     child support.  So they suspended my license, and my bank

3     account is levied right now.

4          THE COURT:  When did those events happen?

5          THE JUROR:  About -- I want to say two months ago?

6          THE COURT:  Fairly recently?

7          THE JUROR:  Yeah.

8          THE COURT:  And how did you come up today?

9          THE JUROR:  My mother, actually, took me, which is

10    also a hardship because she's handicapped.  She has Charcot's

11    foot and neuropathy in her foot, and she walks with a cane.  So

12    she would be my only transportation.  And even today she was in

13    pain, today, driving up here.

14         THE COURT:  Yeah, okay.  Have you explored public

15    transportation at all?

16         THE JUROR:  I've explored it, but, again, I have no

17    work, I have no job, I have no money to even --

18         THE COURT:  You would be reimbursed for the travel

19    expense by the court, but I didn't know whether you'd looked

20    into the -- what you might call the logistics of getting

21    transportation.

22         THE JUROR:  Yeah.  Like I said, I have no bus fare.

23         THE COURT:  So you're living with your mother now?

24         THE JUROR:  Yes.

25         THE COURT:  And tell me what assistance you are to her

1    sort of on a daily basis.

2            THE JUROR:  Well, she's also a diabetic and sometimes

3    her sugar will go low.  And I'm the only one that's living

4    there with her.  Well, me and my son.  I have a child that was

5    recently born in November.  So I take care of her, whatever she

6    needs.  I go with her, say, for groceries.  I help her with the

7    bags while she goes upstairs.  And that's really it.

8            THE COURT:  You told us in the form that you are

9    currently unemployed?

10           THE JUROR:  Yes.

11           THE COURT:  I'm looking now at page 10.  It looks like

12   the last time you worked was sometime last year, in 2014?

13           THE JUROR:  Yes, Talbot's was my last job.

14           THE COURT:  Do you remember what month you finished

15   there?

16           THE JUROR:  November 28th.

17           THE COURT:  Are you currently actively looking for

18   work?

19           THE JUROR:  Yes, I am, like I said.

20           MR. MELLIN:  Your Honor, I think the parties have an

21   agreement.

22           THE COURT:  Yeah, okay.

23           Okay.  We're going to let you get on with your life.

24           THE JUROR:  All right.

25           THE COURT:  Thank you.

```
 1              (The juror exits the courtroom.)

 2              THE CLERK:  Juror No. 434.

 3              THE JURY CLERK:  Juror 434.

 4              (The juror enters the courtroom.)

 5              THE CLERK:  Ma'am, over here, please.  Just have a

 6     seat, if you would.

 7              THE JUROR:  Hi.

 8              THE CLERK:  Do me a favor.  Keep your voice up and

 9     speak into the mic so everyone around here can hear you, okay?

10              THE JUROR:  Okay.

11              THE COURT:  Hi.

12              THE JUROR:  Hi.

13              THE COURT:  Since you were last here, have you been

14     able to avoid discussing the substance of the case with anyone?

15              THE JUROR:  Yeah.

16              THE COURT:  And also as much as possible avoid media

17     reports of the case?

18              THE JUROR:  Uh-huh.  Yes.

19              THE COURT:  So we're going to follow up on some of the

20     things that you wrote in the questionnaire.  And it's there for

21     you to follow.

22              THE JUROR:  For reference?  Okay.

23              THE COURT:  Let me start with page 5, Question 10.

24     Here we set out the schedule of the case and how long we

25     thought it would take and so on, and asked if you thought it
```

 1    would be a special burden or a hardship for you.

 2              THE JUROR:  Right.

 3              THE COURT:  And you wrote that you thought it would.

 4    Can you tell us a little bit more about that?

 5              THE JUROR:  Well, I'm the manager of my salon and I'm

 6    responsible for maintaining revenues.  And it's constant daily

 7    managing of what's coming in and how do we augment the business

 8    that we have at hand.  It's also managing schedules and

 9    internal disputes or client complaints, things like that.  So

10    I'm mostly -- I'm pretty much the sole person who's doing that

11    at the moment.

12              THE COURT:  This is a hair salon?

13              THE JUROR:  Correct.

14              THE COURT:  And about how many employees are there?

15              THE JUROR:  I want to say 26 including myself.

16              THE COURT:  Are they all full time, some full time,

17    some part time?

18              THE JUROR:  The majority are full time.

19              THE COURT:  What's your weekly schedule like?

20              THE JUROR:  I'm there Tuesday through Saturday, and it

21    varies.  I can be there at -- usually their earliest time would

22    probably be 8 a.m. and the latest time would be, like, 8 p.m.

23              THE COURT:  What are the hours the salon is open?

24              THE JUROR:  The salon is open 9:15 -- it varies on the

25    day.

1           THE COURT:  Sure.

2           THE JUROR:  So an early start could be -- we could be

3     there at eight to start getting money out and getting

4     everything done, to -- it depends on if people run behind.

5     It's very difficult to say.  I guess I would say like

6     seven-thirty, eight the latest, if everything is going

7     accordingly.  But, again, the schedule varies.  So start times

8     are earlier, but it depends on who's opening and who's closing.

9           THE COURT:  If you had to be here instead of there, in

10    addition to the disruption of the work -- I understand that --

11    would you also have any economic -- would it have an economic

12    impact on you or would you continue to get paid, do you know?

13          THE JUROR:  I would probably lose some income because

14    I'd lose my clients.

15          THE COURT:  So you actually have clients as well as

16    management duties?

17          THE JUROR:  Yes.  Yes.

18          THE COURT:  About how many a week, would you say,

19    clients?

20          THE JUROR:  How many clients do I do personally?  I

21    should know that answer.  It depends.  The salon does roughly

22    400 people a week, so I'm doing a fraction of those.  So I

23    guess we could say --

24          THE COURT:  Twenty?

25          THE JUROR:  Probably more than that.

1          THE COURT:  Okay.  You told us later on in the -- as

2    long as we're talking about the salon --

3          THE JUROR:  Sure.

4          THE COURT:  -- later on in the form that the business

5    of the salon -- first of all, the salon is located on Boylston

6    Street in Boston?

7          THE JUROR:  Correct.

8          THE COURT:  This is -- if you want to look, this

9    is -- it's on page 21, I think.  20 and 21.

10         THE JUROR:  Uh-huh.

11         THE COURT:  And Questions 80 and 81, principally.

12         THE JUROR:  Yup.

13         THE COURT:  Tell us how the events affected the salon

14   itself, because that's what you were writing about in --

15         THE JUROR:  Yes.  We were closed the day of the

16   bombing, but the Tuesday we were also closed down because they

17   weren't sure if that was also part of the crime scene.  We did

18   reopen.  We had, at the beginning of Berkeley, starting all the

19   way down Boylston Street, sort of where they had the grate up

20   and people were leaving memorial things, flowers, toys, there

21   was a large --

22         THE COURT:  When you say at Berkeley, down Boylston

23   Street --

24         THE JUROR:  Yeah.

25         THE COURT:  Away from the harbor, I guess is one way

1    of putting it.  I don't know if that's west on Boylston Street.

2           THE JUROR:  Sure, west.  I think that would be

3    correct.

4           THE COURT:  I just want to get the directions correct.

5           THE JUROR:  So we had a large military presence near

6    us.  There were the people in the white suits who were

7    gathering evidence off the street; you had people in uniforms;

8    you had vehicles, military vehicles all around us.  It was a

9    very intense scene.

10           THE COURT:  How long did that last?  How many days?

11           THE JUROR:  It was a substantial time.  It was however

12    long they were rebuilding things.  And they were looking for

13    evidence for quite some time, I believe.  So I don't want to

14    say an exact number, but it was substantial.

15           THE COURT:  So do you remember later that week, the

16    Friday, there was a shelter in place?

17           THE JUROR:  Yes.

18           THE COURT:  Were you working then or --

19           THE JUROR:  No, I had to -- so we reopened that

20    Wednesday, Thursday.  A lot of stuff felt very uncomfortable

21    coming back, but we did reopen.

22           Friday was the shelter in place.  Is that correct?

23           THE COURT:  Yeah.

24           THE JUROR:  So I did -- after receiving some text

25    messages early that morning from people seeing the news and

1  then waking up and watching the news, we closed.  I live in

2  Cambridge, not too far from -- East Cambridge.

3           THE COURT:  Were you home on that Friday?

4           THE JUROR:  All day.  And I had other people who lived

5  in Watertown who were also -- everyone was locked in.

6           THE COURT:  When you say "other people," you mean

7  other people from the salon?

8           THE JUROR:  Other coworkers.  Other coworkers.

9           THE COURT:  Yeah.

10          THE JUROR:  Yeah, so we had like -- I was home.  There

11 was SWAT going down the street.

12          MR. BRUCK:  We're satisfied, your Honor.

13          THE COURT:  Okay.  Thank you.

14          THE JUROR:  Thank you.

15          THE CLERK:  Just leave that there.

16          (The juror exits the courtroom.)

17  ██████████████████████████████████

18 █████████████████████████████████████

19  ██████████████████████████████████

20  █████

21  ██████████████

22  ████████████████████

23  ██████████████████████

24  ████████████████████████████

25  █████████████████████████████████████

```
 1  ████████████████████
 2  ██████████████████████████████
 3  ████████████████████████████████████████
 4  ██████████████████████████
 5  ████████████████
 6  ██████████████
```

 7              MR. WEINREB:  I'm sorry, your Honor.  One other thing.

 8  You asked us to alert you.  On Question 85, this juror says he

 9  knows a witness.

10              THE COURT:  Yeah, right.

11              MR. WEINREB:  And that one will be a witness in the

12  case.

13              THE COURT:  Will be?

14              MR. WEINREB:  Yes.

15              THE COURT:  An active participant in the Watertown

16  events?

17              MR. WEINREB:  Yes.  Is it Sergeant MacLellan?  So he's

18  one of the Watertown officers who participated in the shootout.

19              THE COURT:  Let's go.

20              MS. CLARKE:  I think he just got honored, too.

21              THE COURT:  At the White House --

22              MR. WEINREB:  Yes.

23              THE COURT:  -- or wherever it was?

24              MS. CLARKE:  At the White House.

25              THE COURT:  Was that yesterday?  I read --

```
 1              MR. WEINREB:  I believe it was.

 2              THE COURT:  -- it this morning, but this morning seems

 3      so far away.

 4              (Laughter.)

 5              THE CLERK:  Juror No. 437.

 6              THE JURY CLERK:  Juror 437.

 7              (The juror enters the courtroom.)

 8              THE CLERK:  Sir, over here, please.  Have a seat.

 9              THE COURT:  Good afternoon.

10              THE JUROR:  Good afternoon.

11              THE COURT:  Thanks for being patient.

12              THE JUROR:  No problem.

13              THE COURT:  Since you were last here, have you been

14      able to avoid discussing the substance of the case?

15              THE JUROR:  Yes.

16              THE COURT:  And also as much as possible to avoid

17      media reports about the case?

18              THE JUROR:  Uh-huh.

19              THE COURT:  You have to answer "yes" or "no" for the

20      reporter.

21              THE JUROR:  Yes.

22              THE COURT:  I understand, but her machine doesn't.

23              THE JUROR:  No problem.

24              THE COURT:  So that's the questionnaire you filled out

25      when you were here.  We're going to follow up on some of the
```

1     things you told us in answer to some of the questions, okay?

2          THE JUROR:  Okay.

3          THE COURT:  Let's start by having you tell us a little

4     bit about your current employment.  You're a

5     construction -- senior project manager, I guess you say?

6          THE JUROR:  Yes.

7          THE COURT:  For a construction company?

8          THE JUROR:  Yeah.  We do hospital construction.

9          THE COURT:  Hospital construction?

10         THE JUROR:  Uh-huh.

11         THE COURT:  Can you give us an idea of the size of the

12    company?

13         THE JUROR:  It's about a $50 million company.  They do

14    hospital construction, retail construction.  Cell phone towers

15    is the other half of the company.  But my involvement is

16    strictly on healthcare.

17         THE COURT:  Is it regional, national?

18         THE JUROR:  Regional.

19         THE COURT:  We ask people about social media use, and

20    I guess you use LinkedIn for professional reasons?

21         THE JUROR:  Uh-huh.  For business.

22         THE COURT:  Any social media, Facebook or anything

23    like that?

24         THE JUROR:  No.  No, I had an account years ago, and I

25    don't think I even open it anymore.

1        THE COURT:  Let's do a sidebar briefly.

2        THE CLERK:  Audio off.

3        MR. MacELHINEY:  Audio off.

4        (Discussion at sidebar and out of the hearing of the

5    public:)

1   ██████████████████

2   THE COURT:  Okay.  All right.  End of the sidebar.

3   THE CLERK:  Back on.

4   (In open court:)

5   THE COURT:  If you'd turn to page 20.

6   THE JUROR:  Uh-huh.

7   THE COURT:  And Question 77 near the top.

8   THE JUROR:  Yes.

9   THE COURT:  In that question we asked jurors whether

10  they had seen or read anything in the news and as a result had

11  an opinion about certain things in the case.  There are four

12  parts to it.  Whether you had an opinion based on things you'd

13  seen that the defendant was guilty or not guilty and whether he

14  should receive the death penalty or not.

15  You said "yes" to the question whether you had an

16  opinion that he was guilty, and as to the others you said

17  "unsure."

18  THE JUROR:  Uh-huh.

19  THE COURT:  Okay?  Then below that we asked if you

20  answered "yes" to any of the questions, would you be able or

21  unable to set aside your opinion and base your decision about

22  guilt and punishment solely on the evidence that would be

23  presented in court, and you checked the box "able."

24  THE JUROR:  Uh-huh.

25  THE COURT:  Can you tell us about that?

 1           THE JUROR:  Yeah, I'd be able to listen to things in

 2    court.  Live in Watertown, so I was exposed to a lot of things

 3    that happened on those two days.  I'm friends with a few of the

 4    police officers.  The first officer at the scene, John

 5    MacLellan, coached my son in hockey, coached him in sports.

 6    Everything was shut down for the two days.  My 13-year-old

 7    daughter had friends that had SWAT teams at their house in the

 8    neighborhood.  So a lot of influence there, I feel.

 9           THE COURT:  Do you think all of that would affect your

10    ability to be an impartial juror in this case?

11           THE JUROR:  I said "able," you know, to be able to

12    listen to it fairly, but I've heard so much of it, you know, so

13    I really don't know.

14           THE COURT:  Okay.  I think you may be too close to the

15    situation.

16           THE JUROR:  Pretty close.

17           THE COURT:  Thanks.

18           THE JUROR:  Okay.  Thank you.

19           (The juror exits the courtroom.)

20           THE COURT:  All right.  So 3:30 okay?

21           MR. WEINREB:  That's fine.

22           MS. CLARKE:  Yes.

23           (The Court exits the courtroom and there is a recess

24    in the proceedings at 3:14 p.m.)

25           (The Court enters the courtroom at 3:37 p.m.)

 1              (Discussion at sidebar and out of the hearing of the

 2      public:)

 3              THE COURT:  Okay.  So I think the first person we saw

 4      was 418.

 5              MR. WEINREB:  Your Honor, the government moves to

 6      strike 418.

 7              MR. BRUCK:  No argument.

 8              THE COURT:  No argument?  Is that what you said?

 9              MR. BRUCK:  Is this correct?

10              Yes, that's correct.  No argument.  Yes, we have no

11      bananas.

12              MS. CLARKE:  You can always deny the motion.

13              (Laughter.)

14              THE COURT:  Okay.  I always forget who we --

15              MR. WEINREB:  406 is next.

16              MS. CLARKE:  413 is the same motion.

17              MR. WEINREB:  Do we want to go in order?  Why don't we

18      go in order?

19              THE COURT:  Yeah, 406 is next.

20              MR. WEINREB:  406 was excused.

21              THE COURT:  Yeah.

22              MR. WEINREB:  413 the government moves to strike.

23              MR. BRUCK:  There's no argument on that juror.

24      ███████████████████████████████████████

25              MR. WEINREB:  Was disqualified.

1          THE COURT:  421 was one we skipped by agreement, as

2     was 414 and 404 and 428, just for the record.

3          MR. WEINREB:  Right.

4          THE COURT:  So that brings us to 423.

5          MR. WEINREB:  That's a government motion.

6          MR. BRUCK:  No argument on that.

7          THE COURT:  Okay.

8     425?

9          MR. BRUCK:  Oh, no motion.

10          MR. WEINREB:  No motion.

11          THE COURT:  Okay.  425 is okay, then.

12     427?

13          MR. BRUCK:  The defense has a motion on this juror.

14     This is based on the cumulative amount of indications of

15     potential bias.  I want to begin by saying this is a juror who

16     was eager to serve and wanted to be a good juror and was with

17     the program as far as what one needs to do or needs to feel,

18     and I think she seems sincere in wanting to be a good juror,

19     but there's just too much.

20          To begin with, she formed an opinion of guilt, which

21     she candidly acknowledged both in her form and in her

22     questioning, from the TV.  When she spoke in her own words, she

23     was clearly someone who had to be convinced otherwise by the

24     defense.  She said, "I'm not saying you can't tell me anything

25     that will change my mind.  I respect the process enough to

1    listen to all sides, but there still is that back-of-my-mind

2    sort of feeling that he is guilty."  That's the juror, you

3    know, unprompted.

4           She said that -- of course she has a good friend who

5    was at the bombing who went through what sounds like a very

6    nightmarish experience with her ten-year-old son.  This juror

7    found out about it that very night, or that day, very quickly,

8    and then the next day they were all together and she got the

9    whole story.  She described the experience as devastating for

10   her and for her son.  She described her, as I said, a very good

11   friend.

12          Now, this juror -- the jury is going to learn all

13   about Martin Richard, an eight-year-old boy, two years

14   different than this little boy, complete with quite dreadful

15   autopsy photos.  We just have to be realistic about how this

16   juror is going to be thinking about her friend and her friend's

17   child.

18          And she was somewhat candid about that.  She said, "I

19   would say yes, there are some emotional feelings" -- this was

20   in response to will this affect the way you sit in this case;

21   would it affect your judgment?  "I want to be honest" -- this,

22   again, is how the juror is talking when she's not being, you

23   know, encouraged to give any particular answer -- "I mean, I

24   guess as the trial goes on the emotion could come up in such a

25   way that maybe it could," that is, affect her judgment.  "Maybe

1   the emotion behind it would be hard to get around."  That's
2   another direct quote from this juror.
3         So there's all of that.  And that's pretty intense,
4   and it goes to the kind of crime that she gave as an example,
5   unbidden, of a death penalty case, that is a crime against a
6   child, she was talking about sex abuse and so on.  That's where
7   she goes when she's thinking about a capital case.  And this is
8   very personal and very intense, and I think you could see that.
9         Then she had friends at work, colleagues say, "Fry
10  him."  That is when they knew she got her jury summons; this
11  isn't back at the time or the year and a half since then.  So
12  there is that setting.
13        There is the in-law, the police officer witness.  The
14  government says, Well, we're not going to call him, which is
15  the more jurors we talk to, the shorter the witness list is
16  going to be.  I hope there's someone left.  But this witness --
17        THE COURT:  That's part of my objective.
18        MR. MELLIN:  You're succeeding, your Honor.
19        (Laughter.)
20        MR. BRUCK:  It's succeeding beyond your wildest
21  imagination.
22        Be that as it may, the question here isn't what she
23  thinks about the witness, but she's already heard his
24  testimony.  She told us the succinctly breathless description
25  secondhand from this witness, how he was driving around and it

1  was scary.  So it's a little late.  And granted, we don't know

2  exactly what she's heard or exactly what effect it had, but

3  it's -- you know, it's a witness to the case, if not a witness

4  who will be called for her to -- in a way, it almost might be

5  better if he is called because at least then she will hear the

6  real testimony rather than the secondhand version.

7          And then there's something which is a little odd.  I

8  mean, it's not odd, but it's only come up with this one juror,

9  and that is that she volunteered -- she gave an example of a

10  case where she would impose the death penalty and a case where

11  she wouldn't.  The case in which she wouldn't was a little

12  disturbing because it was the Andrea Yates case, which was a

13  woman who was profoundly mentally ill and in the end was

14  acquitted by reason of insanity after being retried.  And

15  that's someone she saw as a candidate for life imprisonment.

16  Her candidate for the death penalty was Susan Smith, who I

17  think, as the Court is aware, was represented by Ms. Clarke and

18  by me.

19          THE COURT:  I wasn't aware of it, but I'm not

20  surprised, given your evidence.

21          MR. BRUCK:  The difficulty is that this case -- she

22  said "Court TV."  I think she's probably talking about a

23  Justice File documentary, an hour-long documentary which has

24  been replaying for the last 15 years about that case.  It's on

25  all the time.  And anyone who watches it or, you know, anyone

1    who remembers the details, like who the lawyers are, will know

2    that it was me and Ms. Clarke.

3              MS. CLARKE:  We looked younger.

4              MR. BRUCK:  As a matter of fact, we were younger.  But

5    be it all as it may, if that was the only problem with this

6    juror, then it would be something to worry about.  We don't

7    think it would be disqualifying all by itself, but it is

8    something to worry about.

9              The other thing, and there's no reason to get into the

10   weeds of that case, but she parroted the media story of the

11   Susan Smith case and why Susan Smith murdered her children,

12   which absolutely fell apart at trial, was not proven, were not

13   the real facts.  But 20 years later, as a juror who said she

14   would not form an opinion in this case based on the media, is

15   still reciting the erroneous media version of the Susan Smith

16   case.  Now, that's not to malign her in any way.  It's simply

17   to reflect on the realities of the effect of media coverage.

18   And we're a lot closer to the Boston Marathon bombing and this

19   witness's exposure to the Boston Marathon bombing than to the

20   Susan Smith case.

21             Mr. Weinreb said yesterday we have 1350 jurors, why on

22   earth would we take a chance on this one?  There's no need to

23   do it.  We just think there's too much there.

24             THE COURT:  Okay.

25             MR. WEINREB:  So, your Honor, the government opposes

1    the motion.  I do agree with Mr. Bruck if you just were to look

2    at the record of various things that he elicited from her

3    during his examination of her, and elsewhere from the

4    questionnaire and so on, she might be the victim of a death

5    from a thousand cuts, but I think that completely ignores who

6    she appeared to be as a person when she was sitting in that

7    chair.

8         I think she came across as one of the most candid,

9    thoughtful jurors we have seen, someone who seemed to have a

10   lot of insight, someone who unhesitatingly talked about her

11   inner process, talked about it articulately, insightfully.  And

12   I think that that's one of the reasons why there's so much

13   fodder for Mr. Bruck to draw upon on trying to excuse her.

14        I think that, you know, there are some jurors who

15   state with absolute confidence, "I could do this, I could do

16   that, emotion would not affect me," and so on, and I'm sure

17   when they say that, they're sincere and believe it, but I think

18   there are other jurors who are more, let's say, emotionally

19   attuned to their own inner process and maybe to human nature in

20   general, who acknowledge that emotional -- that cases like this

21   one, like all capital cases, are likely to be emotional and

22   that those emotions might affect them.

23        And to acknowledge -- to only favor jurors who state

24   categorically that it would not affect them and exclude those

25   who have the insight and candor to say it might affect them

1   would be to disqualify from jury service many people who are

2   very qualified to serve.

3           With respect to just a few of the things that were

4   just raised, when -- in answer to Question 77, Mr. Bruck had

5   said when she was giving her candid answers, by which I assume

6   he meant answers when the Court was asking the questions rather

7   than when I was asking the questions --

8           MR. BRUCK:  That would be correct.

9           (Laughter.)

10          MR. WEINREB:  -- she -- one of the things I wrote down

11  that she said is that, "We don't know everything."  The Court

12  asked, "Would you be able to set aside what you heard outside

13  the courtroom?"  She said, "I feel I could do that.  I respect

14  the process.  I would be able to."  I think she also expressed

15  some concern about her ability to.  And again, to me that's a

16  mark of a very thoughtful juror who is not simply saying the

17  thing that she knows is the right answer because she's an

18  intelligent person, but she's saying something that would be

19  true of virtually every juror who is qualified to serve on a

20  jury.

21          With respect to her friend who was at the Boston

22  Marathon, she said that she heard that story two years ago,

23  practically.  It was emotional at the time.  But the way that

24  she described it, she didn't seem to be emotional about it.  It

25  was emotional for the friend and for the friend's child.  And

1    of course she, being an empathic person made an empathic

2    response at the time and repeated it today, but there was no

3    evidence looking at her that she felt emotional about it or

4    that it affected her, and she was quite confident that it would

5    not affect her.

6         With respect to the examples that she gave of cases in

7    which she thought the death penalty might be appropriate or

8    would not be appropriate, I don't think that any insidious

9    inferences can be drawn from that.  I'm obviously no expert on

10   the Susan Smith trial the way the two attorneys who tried it

11   are, but my recollection of that case is that the theory that

12   she spoke of as being the reason why Susan Smith committed that

13   murder was the government's theory in that case.

14        MS. CLARKE:  It was the media's theory.

15        MR. WEINREB:  When I say I don't have the same

16   familiarity as you, I would say I read every word of the

17   transcript in preparation for this case.

18        MR. BRUCK:  It was the government's theory at the

19   beginning of the trial.

20        MR. WEINREB:  It seemed to me in reading the opening

21   and closing statements that that was the government's argument.

22   And I believe that there is, you know, plenty of belief -- no

23   one can know why jurors decide what they do, but I believe

24   there is plenty of belief that people may have believed that

25   theory but also believed that any woman who kills her own

1    daughters [*sic*] must have some sort of mental -- mitigating

2    mental issue.

3           So, again, I only say that because I don't want the

4    record to stand with those as being facts on the record.  But I

5    think the bottom line about this juror is that she is exactly

6    the kind of person one would want on a jury.  Mr. Bruck said

7    given 1350 people to choose from, why her?  Because you are

8    looking for people who have all the qualities that this juror

9    has, that's why.

10          THE COURT:  I'm going to allow the strike in this case

11   for a combination of reasons.  I do think she would be a fine

12   juror in very many cases.  I do not think that -- and I

13   appreciate her earnestness here.  I am concerned about her

14   personal connection with people who were affected.

15          I take note that she's a teacher of special ed kids,

16   and I think that would surface at some point in the course of

17   the case within her somehow perhaps.  Her own kids are a little

18   older than this now, but I just think she's -- I agree.  She's

19   probably an empathic person, and I just think this is probably

20   not a good fit for this case.

21          That brings us to 429.

22          MR. BRUCK:  The defense has a motion on this juror on

23   two grounds:  One is, of course, he was a bank manager who

24   found it necessary to close all six branches of which he has

25   authority on the day of the shelter in place as well as staying

1    at home all of that day, and also that his bank organized a

2    dinner that he attended for first responders, I'm assume many

3    of whom will be witnesses in this case.

4        You know, this is the sort of connection that if it

5    were not this case and a juror came forward with these two

6    connections, I don't think anyone would think twice about

7    thinking he was too connected to the offense to serve as a

8    juror, and the only reason why he would be seriously considered

9    is there's so many other people with greater connections.  But

10   the facts are what they are, and we think that his life has

11   been too impacted professionally and he's been too exposed by

12   people who are likely to be -- and he's already taken part in

13   honoring people who are likely to be prosecution witnesses,

14   although he couldn't have been expected to know their names.

15       So for those two reasons, we think he should be

16   disqualified.

17       MR. WEINREB:  Your Honor, the government opposes the

18   motion.

19       With respect to the attending of the fund-raiser, he

20   couldn't remember where it was, who it was, what it was.  It

21   was obviously an extremely minor, insignificant event in his

22   life, certainly not one that he remembers two years later, so

23   he might not have been paying too much attention.  Who was

24   there seems to have not made an impression on him.

25       As for closing the bank branches, it wasn't that he

1    was personally affected in any way; he said he simply closed

2    them because the number of officers who were drawn off to some

3    other part of the city to do some other thing made him believe

4    that there might be insufficient police presence to guard the

5    banks where he was.  Again, not the kind of -- not evidence at

6    all of a personal connection to the event; simply, you know, an

7    event out of the ordinary for that day, but nothing that seemed

8    to have any particular impact on him.

9             Frankly, you know, it was quite scrupulous of him to

10    mention it on his questionnaire.  I think a lot of jurors

11    wouldn't have even thought it was worth mentioning.  That's

12    all.

13             THE COURT:  Okay.  No, I think he's fine.  I don't

14    think his answers to Questions 81 and 82 indicate an inability

15    to perform the obligations of jury service in this case.

16    Otherwise, he seemed to be, you know, very obviously

17    intelligent and aware of the serious responsibility.  He said

18    that a couple of times in his form and here, so I think he's

19    fine.

20             431 we excused, 434 and 437.

21             So I think for today it's 425 and 429 that are in the

22    pool.

23             Other business.  We have, I think you have --

24             Did you hand this out yet?

25             LAW CLERK:  Not yet.

1          THE COURT:  So I've gone through -- so we have the

2     remainder of Panel A, which I think after having some

3     reductions -- first of all, we have a couple -- we have two or

4     three people from today because of car problems and so on --

5     who are coming in tomorrow.  Then we have the remainder of

6     Panel A, which is a little bit short of the 20 when you put

7     those two things together.  I forget what the count is,

8     17 -- 16, 17.

9          MS. CLARKE:  Panel B.

10          MR. WEINREB:  That would be these.

11          THE COURT:  Panel B.  I'm sorry.

12          Now looking forward to Panel C.

13          MR. WEINREB:  Right.

14          THE COURT:  So this picks up at the end of whatever

15     range we have already had for -- through Panel B.  And so I

16     went through the beginning, I don't know, roughly 100 maybe,

17     and these would be my suggestions.  I think most of them are

18     pretty clear, a good number of hardships, various other things,

19     students, one semester, things like that.  So I would like you

20     to look at them and see if there's any issue with that.  Again,

21     I would like to squeeze the guaranteed excuses out of the pool

22     so we could have real candidates when we begin next week.

23          I think we would probably -- at the very beginning may

24     want to fill in -- I'm not sure of the number, whether it's

25     three or five -- to get up to a rough 20 for tomorrow,

1    including the postponements we made.  It would only take a few.

2    So if you could at least look at the first array of ten or so,

3    and see if you can do that so we can pick -- so that's that.

4         MR. WEINREB:  I'm sorry, your Honor.  So a little

5    earlier the parties gave Mr. McAlear a list of excused -- of

6    agreed strikes for Panel C.

7         THE COURT:  I haven't seen that yet.  So we'll compare

8    those lists.  There may be some --

9         MR. WEINREB:  There may be an overlap.

10        THE COURT:  I'll look at that as well.

11        So to the extent -- if my numbers and your numbers

12   match, we'll take them out.  If there are differences, we can

13   talk about it, or just leave them in, whichever.  That's one

14   thing.

15        One of the jurors who didn't come today and was -- is

16   currently scheduled to come tomorrow, I just wanted to raise

17   it.  432.  She is a -- she works at the Massachusetts Parole

18   Board as an institutional parole officer, and she works in the

19   Victims' Unit of the parole board.

20        MS. CLARKE:  Right.

21        MR. BRUCK:  Right.

22        THE COURT:  It struck me that if she might be somebody

23   you agreed on, we won't have to have her come in tomorrow.

24        MS. CLARKE:  We'll agree with that.

25        MR. WEINREB:  We'll take a quick look at her, but it

1    sounds like somebody we could agree to.

2           THE COURT:  Jim could call her tonight, then, and tell

3    her she doesn't have to come in, if that's the case.

4           I guess that's it for today.

5           MR. McALEAR:  I do have one.  Juror 401.  She was our

6    juror that was on a trip.  She was planning on coming in

7    tonight.  She's getting word that her plane may be delayed.

8           THE COURT:  Monday.

9           MR. McALEAR:  Tuesday, unless we're coming in Monday.

10   I haven't been told yet.

11          MS. CLARKE:  So we'll put her off till Tuesday?

12          THE COURT:  Okay.  So that's it.

13          MR. McALEAR:  That's the only one I got.

14          MS. CLARKE:  So maybe 432 not at all?

15          MR. WEINREB:  Right.

16          THE COURT:  So as I presume you all know, the Court of

17   Appeals has scheduled an oral argument next Thursday morning.

18   We may well still be in this process, although I think in the

19   very last stages of it.  I didn't know whether -- what the

20   sentiment of the attorneys might be about whether we would sit

21   on Thursday morning or not, or whether you want it to be in the

22   Court of Appeals.  I don't know who's arguing, I guess is my

23   point.  For instance, I saw Ms. Meissner's name on the notice,

24   and she does a lot of appellate argument.  And if you don't

25   know it now, I don't need to know now, but we have time to

1    plan.

2          MR. WEINREB:  I think we would be inclined to suspend

3    it for the morning.

4          THE COURT:  I think it's ten o'clock or something like

5    that, and it's 20 minutes per side, so it's over by eleven

6    o'clock anyway.

7          MR. WEINREB:  Right.

8          THE COURT:  We often get a late start.  We could start

9    at 11:30 or something like that.

10          MR. WEINREB:  That would be fine.

11          MR. McALEAR:  The only thing I would like to raise is

12    we tried to have for another matter regarding our folder

13    inserter machine -- and our folder inserter gentleman showed up

14    at eleven o'clock, and there's no parking anywhere.

15          THE COURT:  When you get here in the late morning?

16          MR. McALEAR:  The Vertex building has been full.

17          THE COURT:  Couldn't we have the jurors come in early

18    and just serve them milk and cookies?

19          (Laughter.)

20          MR. WEINREB:  By the time they get settled, see the

21    video and so on...

22          MR. McALEAR:  That's fine.

23          THE COURT:  When I was saying 11:30, I was thinking

24    they would actually --

25          MR. McALEAR:  I'll have the jurors here.

1          THE COURT:  -- maybe be here, but 11:30.

2          Okay?

3          COUNSEL IN UNISON:  Thank you.

4          THE COURT:  That's everything.

5          MS. CLARKE:  Jim is going to tell us the list.

6          (The Court exits the courtroom and the proceedings

7    adjourned at 4:02 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4      the United States District Court, do hereby certify that the

 5      foregoing transcript constitutes, to the best of my skill and

 6      ability, a true and accurate transcription of my stenotype

 7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8      United States of America v. Dzhokhar A. Tsarnaev.

 9

10      /s/ Marcia G. Patrisso
        MARCIA G. PATRISSO, RMR, CRR
11      Official Court Reporter

12

13      Date:  2/12/15

14

15

16

17

18

19

20

21

22

23

24

25
```