```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                   )
UNITED STATES OF AMERICA,          )
                                   )
         Plaintiff,                )
                                   )   Criminal Action
v.                                 )   No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
         Defendant.                )
                                   )



           BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE



                  JURY TRIAL - DAY EIGHTEEN



          John J. Moakley United States Courthouse
                      Courtroom No. 9
                    One Courthouse Way
                 Boston, Massachusetts  02210
                  Friday, February 13, 2015
                        10:54 a.m.



             Marcia G. Patrisso, RMR, CRR
              Cheryl Dahlstrom, RMR, CRR
                 Official Court Reporters
             John J. Moakley U.S. Courthouse
              One Courthouse Way, Room 3510
              Boston, Massachusetts  02210
                    (617) 737-8728

          Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
             By:  William D. Weinreb and Aloke Chakravarty,
3                 Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210

5
         FEDERAL PUBLIC DEFENDER OFFICE
6            By:  Miriam Conrad, Federal Public Defender
         51 Sleeper Street
7        Fifth Floor
         Boston, Massachusetts  02210
8        - and -
         CLARKE & RICE, APC
9            By:  Judy Clarke, Esq.
         1010 Second Avenue
10       Suite 1800
         San Diego, California  92101
11           - and -
         LAW OFFICE OF DAVID I. BRUCK
12           By:  David I. Bruck, Esq.
         220 Sydney Lewis Hall
13       Lexington, Virginia  24450
         On Behalf of the Defendant

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.  Thank you for

3   being here today.  We're continuing the process of selecting a

4   jury for the trial of the case of United States vs. Dzhokhar

5   Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection

6   with a bombing that occurred near the finish line of the Boston

7   Marathon on April 15, 2013, that resulted in the deaths of

8   three people.  He is also charged in the death of an MIT police

9   officer and other offenses occurring on April 18 and 19, 2013.

02:06 10   Some, but not all, of the crimes charged are, by statute,

11   potentially punishable by death.

12          You will recall from my prior instructions that the

13   trial jury will first consider and decide whether the

14   government has proved Mr. Tsarnaev's guilt of any or all of the

15   charges against him.  If he is convicted of any of the capital

16   crimes, that is crimes, potentially punishable by death, the

17   jury will then consider and decide whether he will be sentenced

18   to death or to life in prison without possibility of release.

19          You may wonder why the death penalty could be a

02:07 20   possibility in this case in view of the fact that the laws of

21   Massachusetts do not provide for the death penalty for murder

22   or any other violation of Massachusetts law.  The reason is

23   that this is a federal case involving alleged violations of the

24   laws of the United States rather than a state case involving

25   violations of Massachusetts law.

1            So if the jury convicts Mr. Tsarnaev of any of the

2    capital crimes charged in the Indictment, the same jury will

3    hear additional evidence and then decide whether to sentence

4    him to death or to life in prison without the possibility of

5    release.

6            Because the jury that is selected to decide the

7    defendant's guilt or innocence will also decide his punishment,

8    if he is convicted, it is necessary to question prospective

9    jurors about your feelings and beliefs about the death penalty

02:08 10   as part of this process of selecting the jury.

11           Let me explain briefly the procedures that must be

12   followed in a case in which the death penalty is or may be at

13   issue.  As in any criminal case, initially, the government will

14   have the burden of proving that Mr. Tsarnaev is, in fact,

15   guilty of any crime with which he is charged.  If he is

16   convicted by the jury of a crime for which the death penalty

17   may lawfully be imposed, then there will be a second phase of

18   the trial, usually referred to in shorthand as the "penalty

19   phase."  In the penalty phase, the government will introduce

02:08 20   evidence that seeks to prove beyond a reasonable doubt, first,

21   that the defendant acted with sufficient intent to be subject

22   to the death penalty; and second, that aggravating factors

23   about the killings or about the defendant justify sentencing

24   him to death.

25           Aggravating factors are circumstances that, if proven,

1   make the crimes particularly serious or blameworthy, therefore,

2   under the law, may justify imposing a more severe sentence on

3   Mr. Tsarnaev compared to other persons convicted of intentional

4   killing or murder.

5          The government will bear the burden of proving any

6   alleged aggravating factors to every juror beyond a reasonable

7   doubt.

8          The defense will have an opportunity to present

9   evidence in the penalty phase of what it will argue are

02:09 10   mitigating factors.  Mitigating factors are usually

11   circumstances about the crime or about the defendant's

12   background or character that would suggest the death penalty is

13   not the appropriate sentence in this case or that life

14   imprisonment without possibility of release is adequate to

15   punish the defendant.  Unlike the proof of aggravating factors,

16   a mitigating factor must only be proven by the greater weight

17   of the evidence.  That is a less standard of proof than proof

18   beyond a reasonable doubt.

19          Again, unlike the proof of aggravating factors,

02:10 20   mitigating factors do not have to be proven to the satisfaction

21   of all 12 jurors.  Any juror who finds or determines a

22   mitigating factor to be proven by the greater weight of the

23   evidence may consider that factor in deciding the appropriate

24   sentence in the case regardless of whether any or all of the

25   other jurors agree that the mitigating factor has been proven.

1          After the parties have made their preparations during

2     the penalty phase, the jury will weigh all the evidence.

3     Before a jury could vote to impose the death penalty, every

4     juror would have to be persuaded that certain threshold factors

5     that make Mr. Tsarnaev potentially subject to the death penalty

6     have been proven beyond a reasonable doubt.  In addition, in

7     order to impose the death penalty, every juror would have to be

8     persuaded that any proven aggravating factors sufficiently

9     outweigh any mitigating factors found by any juror or jurors to

02:11 10    justify a sentence of death.  Even if the jury did not find any

11    mitigating factors in the case, he would still have to be

12    unanimously persuaded that any proven aggravating factors were

13    themselves sufficient to justify a death penalty.

14          You should understand that a jury is never required to

15    sentence a defendant to death.  The decision whether the

16    government has proved that a defendant should be sentenced to

17    death must ultimately be made by each juror himself or herself.

18    If, however, every juror is persuaded that the death penalty

19    should be imposed, I would be required, as the trial judge, to

02:11 20    sentence the defendant to death.  In other words, I could not

21    change the jury's decision.  The jury, and not the judge, is

22    responsible for determining whether a defendant who is

23    convicted of a capital crime will live or die.

24          What I've just described is only an overview of the

25    law applicable to a jury's consideration of the death penalty.

1    If you are selected to serve on the jury, and if you find the

2    defendant guilty of a crime or crimes punishable by death, then

3    I will give you very detailed instructions concerning your

4    duties in deciding whether to impose the death penalty or life

5    imprisonment without possibility of release and the law that

6    must be followed in making that decision.

7         When you filled out your questionnaires, you will

8    recall that we told you that there are no right or wrong

9    answers to the questions you have been asked.  That's true of

02:12 10  those you will be asked further in this process.  We asked them

11   primarily because both the government and Mr. Tsarnaev are

12   entitled to a jury that does not have its mind firmly made up

13   one way or the other before hearing the evidence and a detailed

14   explanation of the law.  That applies both to whether Mr.

15   Tsarnaev is guilty or not guilty of the specific crimes that

16   are charged in the Indictment and, if he is convicted of a

17   capital crime, whether he should be sentenced to death or to

18   life in prison without the possibility of release.

19        So today I'm going to question each of you

02:13 20  individually about issues relevant to the selection of a jury.

21   We're going to have you go back into the room where you were

22   just awaiting your entry into the courtroom.  You'll wait

23   there, and we'll call you in one by one and ask you some

24   questions.  There will be a few people in the room in addition

25   to the lawyers and their staffs, and the proceedings will be

1    simultaneously transmitted by audio and video to overflow

2    courtrooms where there are other people attending.

3         We will not identify you by name but rather by number,

4    and you will seated so that the video camera will be behind

5    you.  Your answers will be generally public; but if you believe

6    that a truthful answer would require you to reveal sensitive,

7    personal information, we will temporarily stop the audio

8    transmission to those courtrooms so that the people observing

9    there will not hear your answer.

02:14 10         Again, we do not want or expect any particular answer

11   to the questions.  All we want and what the law expects is for

12   you to provide accurate and truthful answers to the questions

13   you're asked.  If you do that, you will be doing your duty as a

14   citizen and as a juror no matter what the answers may be.

15        I want to take a moment to remind you of some of my

16   prior instructions.  As I told you before, a jury's verdict

17   must be based on the evidence produced at trial and must be

18   free of outside influence.  Therefore, I remind you again it is

19   extremely important that you do not discuss the case, including

02:14 20   the selection process, with your family, friends, each other or

21   any other person until you have been excused or if you are

22   selected as a juror, until the case concludes.  Again, you are

23   to avoid any independent research on the case online or

24   otherwise and to avoid reading, watching, listening to media

25   reports about the case.

1            When you finished completing the questionnaires, we

2      asked you to sign the questionnaire under an affirmation that

3      the answers you had given were true.  There's a similar process

4      for this oral examination.  You are required to swear or affirm

5      that you will give true answers to the questions.  And the

6      clerk will now ask you to stand and administer that oath and

7      affirmation.

8      (Venire sworn.)

9            THE COURT:  All right, jurors.  Thank you.  We'll ask

02:15 10     you to step out, and we'll have you back one by one.

11     (The venire left the courtroom at 11:02 a.m.)

12            MR. WEINREB:  Your Honor, I don't think we had a

13     chance to give you these earlier.  They're nonissues.

14            THE COURT:  Nonissues?

15            MR. WEINREB:  Yeah, I think.  I don't know if you

16     agree.

17            MS. CONRAD:  I only looked at one of them.

18            THE COURT:  There's one.

19            MR. WEINREB:  412.

02:18 20            MS. CONRAD:  I think they both answered consistently.

21            MR. WEINREB:  I think the other was 440.

22            THE COURT:  440, yeah.

23            MS. CLARKE:  440 is gone.

24            THE COURT:  Yeah, right.  So this is just a very minor

25     -- so there's no -- there's agreement on 412, no issue?

       1              MS. CONRAD:  That's right, yeah.

       2              THE COURT:  Okay.

       3              THE CLERK:  Juror No. 412.

       4              THE JURY CLERK:  Juror 412.

       5              THE CLERK:  Sir, over here, please, if you would.

       6     Have a seat.

       7              THE COURT:  Good morning.

       8              THE JUROR:  Morning.

       9              THE COURT:  Have you been able to avoid any discussion

02:19 10     of the substance of the case since you were last here and media

      11     reports as well?

      12              THE JUROR:  I have, yes.

      13              THE COURT:  Okay.  So that's the questionnaire that

      14     you filled out when you were last here.

      15              THE JUROR:  Yes, looks like it.

      16              THE COURT:  I'm going to follow up on some of the

      17     questions -- some of the answers you gave us to the questions

      18     we asked, okay?

      19              I'd like to start with what you do for a living.

02:20 20              THE JUROR:  Self-employed contractor.  I grew up as a

      21     kid doing roofing, and that kind of -- once I built my own

      22     home, I expanded my skills off into other areas of construction

      23     so --

      24              THE COURT:  How long have you been doing it?

      25              THE JUROR:  Thirty-five, forty years.

1           THE COURT:  Do you have a work force that works with

2    you?

3           THE JUROR:  Actually, I used to have employees, but in

4    the last two and a half years, I have shrunk down to -- I've

5    taken on a partner, and I work solely with one partner.  He's

6    his own insured contractor himself.  We just work as a team.

7           THE COURT:  Okay.  You'll recall back on Page 5 of the

8    form, in Question 10, we outlined the schedule that we expect

9    to follow in the case.  It will be four days a week from 9 to

02:21 10   4, excluding Fridays.  On that schedule, it may last several

11   months.  Would that have an impact on your ability to earn a

12   living?

13          THE JUROR:  There would be a little bit of a strain,

14   financial strain.  I'm looking -- I was hoping that I had an

15   opportunity to take on some night work for a gentleman that I

16   had became an acquaintance with when I did a project, who's a

17   CEO of this company that does IT equipment in hospitals, and

18   it's all night work.  When that came about, I thought maybe it

19   would be very -- take a lot of stress off the family

02:21 20   financially.  If I was involved with any kind of jury service,

21   then I could work at night so --

22          THE COURT:  You're the one that can assess it.  I

23   raise the question because we don't want to impose a serious

24   hardship, including a financial hardship on you.  In other

25   words, if you can make arrangements to continue working and,

1    therefore, your income in the hours after the day or on Fridays

2    and weekends, then that's okay, too.  But you're really the

3    judge of that.  We can't --

4            THE JUROR:  It would be a strain on my income so --

5            THE COURT:  Is it a tolerable strain or an intolerable

6    strain, I guess is the question.

7            THE JUROR:  A tolerable strain.

8            THE COURT:  Okay.  So --

9            THE JUROR:  Uncomfortably tolerable.

02:22 10          THE COURT:  You're willing to take on the project if

11   we give it to you?

12          THE JUROR:  Yes, yes, sir.

13          THE COURT:  All right.  You said you just -- we asked

14   people about social media.  You said you're just learning to

15   use Facebook.  Do you use it just personally, socially, or do

16   you use it in the business at all?

17          THE JUROR:  Not in the business at all, no.  I'm

18   actually still trying to learn how to send email from the iPad

19   that I got for Christmas to my home computer so I can print out

02:22 20   information.  I'm kind of still old school, with a pencil and

21   paper.

22          THE COURT:  You have a brother who was a police

23   officer in New Hampshire for a number of years?

24          THE JUROR:  Yes, sir.

25          THE COURT:  Tell us about that.  Where was he?

1           THE JUROR:  He was 20 years as a sergeant with the New

2    Hampshire, Hudson, New Hampshire, Municipal Department.  He had

3    been in it probably --

4           THE COURT:  What's he doing now?

5           THE JUROR:  He's retired now.

6           THE COURT:  Let me ask you to turn to Page 20,

7    Question 77, near the top.  In this question we asked you

8    whether -- if you'd seen or read things in the media that had

9    led you to form an opinion about whether the defendant was

02:24 10    guilty or not guilty or should receive the death penalty or

11    not.  It's a multiple part question, and you had the option of

12    checking "yes," "no," or "unsure," and you checked "unsure."

13    Would you tell us why you made that selection?

14           THE JUROR:  Well, I made that selection due to the

15    fact that I have two brothers and three sisters.  And I was

16    wondering about, like, the design of the whole act, how -- what

17    had come about.  Was the young man following his brother's --

18    looking up to his brother as his -- you know, like a model to

19    follow?  And probably just making some really bad decisions due

02:25 20    to the fact that -- what I can relate to was, like, when I was

21    a kid -- I have an older brother; he likes to drink.  I thought

22    that was like a really great thing to do.  Because my older

23    brother liked to drink, so I drank.

24           It took a few years for me to, like, grow up and get

25    that out of my system.  And I realized I had lost a few years

1    due to the fact that someone that I looked up to led me in a

2    direction I probably, you know, would not have been -- gone in

3    that direction had I had a little more maturity or somebody

4    different to look up to.  So, I mean, I think about that, and

5    I'm, like, well, I'm unsure.  I'm unsure about that question

6    and that whole situation.

7         THE COURT:  So I'm sure you realize, in the criminal

8    process, that -- in our justice system, when somebody is

9    accused of a crime, they're presumed to be innocent, or not

02:26 10   guilty, unless the government proves that they're guilty of the

11   crime charged and does it by the evidence produced at the

12   trial.  And in order to obtain a verdict of guilty, the

13   government has to persuade the jury beyond a reasonable doubt

14   of the fact of the defendant's guilt.  Do you understand those

15   principles?

16         THE JUROR:  Yes.

17         THE COURT:  What we ask jurors to do is to pay

18   attention to the evidence at trial, to think about it, talk

19   about it with the other jurors, and then decide whether, on any

02:26 20   given charge, the government's satisfied its burden of proving

21   that charge beyond a reasonable doubt.  And the jurors are to

22   focus only on the evidence at trial and not on information they

23   might have from any other source.  Do you think you would be

24   able to do that in this case?

25         THE JUROR:  My heart tells me probably not.

1          THE COURT:  Why?

2          THE JUROR:  I have a five-year-old grandson at home,

3    and I think of the eight-year-old child losing his life.  And

4    it just kind of comes back to me that was a very selfish act of

5    some people to have robbed a child of their life like that.

6    And I personally don't think that -- I might hold some -- it

7    might have some leverage in making a bad decision because of

8    how I feel about that situation.

9          THE COURT:  Okay.

02:27 10          THE JUROR:  My grandchild lives with me, and I've

11    raised him, so I think that's why that -- my feelings towards

12    the child like that bothers me a little.

13          THE COURT:  Okay.

14          MR. WEINREB:  Your Honor, I think the parties --

15          THE COURT:  All right.  Thank you.  Appreciate that.

16    Just leave it there and we'll pick it up.  That's all.

17          THE JUROR:  Thank you.

18          THE CLERK:  Juror No. 435.

19          THE JURY CLERK:  Juror 435.

02:28 20          THE CLERK:  Sir, over here, if you would, please.

21    Have a seat.

22          THE COURT:  Good morning.

23          THE JUROR:  Morning.

24          THE COURT:  Since you were last here, have you been

25    able to avoid any discussion of the substance of the case with

1    anybody?

2             THE JUROR:  I have not discussed it, no.

3             THE COURT:  And, as much as possible, avoid any media

4    reporting about the case?

5             THE JUROR:  Correct.

6             THE COURT:  We're going to follow up on some of the

7    answers you gave us in the questionnaire.  I want to start with

8    what you do for a living.

9             THE JUROR:  I work at Harvard Pilgrim Health

02:29 10   Insurance.  I do accounting, accounts receivable.  So the money

11   coming in, I account for that.

12            THE COURT:  Okay.  We asked about use of social media,

13   and this is at the bottom of Page 10, Question 29, and 30, I

14   guess, on the next page.  You said you post messages on

15   Facebook, and you don't normally discuss serious -- you said

16   serious topics but more on sports.  And what's that?  Animal --

17   no comical subjects.

18            THE JUROR:  Uh-huh, yup.

19            THE COURT:  Okay.  You also use Instagram, I guess.

02:30 20   THE JUROR:  Correct.

21            THE COURT:  Do you use any of those in your work?

22            THE JUROR:  I do not, no.

23            THE COURT:  So it's just with friends and family kind

24   of thing?

25            THE JUROR:  Yup, yeah.

1          THE COURT:  Let me ask you to turn to Page 20,

2     Question 77, near the top.  If it's convenient to you, feel

3     free to take the clip off.

4          THE JUROR:  Okay.

5          THE COURT:  In this question we asked whether you

6     had -- on the basis of things you'd seen or read in the media

7     or from other sources whether you'd formed any particular

8     opinions in the case, including whether the defendant was

9     guilty or not or whether he should receive the death penalty or

02:31 10  not.  And you checked "no" to each of those, indicating that

11    you did not have any such opinion.  Can you tell us about that?

12         THE JUROR:  I mean, I've heard, obviously, about, you

13    know, through the news, but I don't really know any specifics

14    of exactly what happened.  You know, I would go in with, you

15    know, a clear conscience.  I wouldn't go in with a full guilty.

16    I didn't know anyone that was down there or anything like that.

17    So I haven't -- I guess I haven't really heard much about the

18    case, the specifics.

19         THE COURT:  I'm sure you know that, in our criminal

02:31 20  justice system, when somebody is accused of a crime, they're

21    presumed to be innocent of the crime they're charged with

22    unless the government proves them guilty by the evidence at

23    trial and proves it beyond a reasonable doubt.  You're familiar

24    with those concepts?

25         THE JUROR:  Correct.

1          THE COURT:  Do you think, if you were a juror in the

2     case, you could listen to the evidence in the case and decide

3     whether the government had proved its case or not based on your

4     evaluation of that evidence along with the other jurors?

5          THE JUROR:  Yes.

6          THE COURT:  If, on any given charge, you thought the

7     government's evidence had fallen short of convincing you beyond

8     a reasonable doubt, would you be able to vote not guilty?

9          THE JUROR:  Yes.

02:32 10          THE COURT:  Just to confirm, on Page 21, Questions 81

11    and 82, we asked about whether you had any -- whether you were

12    personally affected or had any involvement in support

13    activities, not just you but people close to you.

14          THE JUROR:  Uh-huh.

15          THE COURT:  You already said it, I guess, but you

16    didn't --

17          THE JUROR:  No, I did not know anyone.

18          THE COURT:  It didn't impact you personally in any

19    way?

02:32 20          THE JUROR:  It did not.

21          THE COURT:  Or anybody close to you?

22          THE JUROR:  No.

23          THE COURT:  Beginning on Page 23, at Question 88, we

24    asked a series of questions to gauge prospective jurors' views

25    about the death penalty.  Question 88 is itself a general

1    question.  If you have any views about it in general, what are

2    they?  And you said, "I believe that if the defendant is shown

3    through evidence to be guilty beyond a reasonable doubt, he

4    should be sentenced to death for this heinous crime."  Is there

5    anything you want to add or amend about that?

6         THE JUROR:  No.  Basically, I believe that if, you

7    know, someone was guilty of, you know, bombing innocent people,

8    I do believe that they should get the death penalty.

9         THE COURT:  Okay.  In Question 89, we asked you if you

02:33 10   could put yourself on a scale of 1 to 10, with 1 being strongly

11   opposed, thinking the death penalty should never be imposed,

12   and 10 being strongly in favor, thinking it should be imposed

13   whenever a defendant has been convicted of an intentional

14   murder, and you selected 9.  Can you tell us why you made that

15   choice?

16         THE JUROR:  I think, if you intentionally hurt other

17   people, especially in, you know in death, I think you, you

18   know, deserve, you know, an equal punishment.

19         THE COURT:  Yeah.  Okay.  Then in Question 90, we

02:34 20   asked if you could find one of the suggested statements that

21   best represented your views regarding a case where someone has

22   been proved guilty of murder.  You selected (e), "I'm in favor

23   of the death penalty, but I could vote for a sentence of life

24   imprisonment without the possibility of release if I believed

25   the sentence was called for by the facts and the law of the

1      case."  Does that represent your view?

2              THE JUROR:  Correct.

3              THE COURT:  That seems a little bit different from

4      what you said in answer to the other questions where you seemed

5      more -- thinking more of it, if the person has been guilty of

6      an intentional murder, that the death penalty might almost be

7      automatic afterwards.  This seems like you don't necessarily

8      think it's automatic.  I guess -- I wonder if you could explain

9      where you are on that.

02:35 10           THE JUROR:  Do you mind if I just read through it

11     again?

12             THE COURT:  Yes, please.  Take your time.

13             THE JUROR:  That one just fits my belief the most just

14     because it's basically saying that you're listening to the

15     facts and making a judgment on that.  If guilty, you know, like

16     I said, I would be for the death penalty.  If, you know, did

17     not a hundred percent, you know, I may not, you know, life

18     imprisonment may fit.

19             THE COURT:  Let me be sure you're following the

02:36 20     process we would take.  First of all, there would be two phases

21     to the trial.  The first phase would be whether the defendant

22     is guilty or not of any crime, including any of the charged

23     capital crimes.  In order for the government to prove him

24     guilty, as we were discussing, the government would have to

25     prove to the jury beyond a reasonable doubt that, as a matter

1      of fact, the defendant was guilty of the crime charged, okay?

2      So the jury would then decide that.

3            And if they found him guilty, then you would proceed

4      to the second phase, which is the penalty phase.  So everybody

5      who enters the penalty phase has already been found guilty of

6      an intentional murder by the jury.  So when the penalty

7      situation arises, it's dealing with a convicted intentional

8      murderer.

9            Then, as I said this morning to the group, in the

02:37 10    penalty phase, there would be additional evidence.  The

11      government would provide evidence of what it will call

12      aggravating factors or circumstances that made this a

13      particularly serious, blameworthy crime.  The defense would be

14      able to present evidence of what might be mitigating factors

15      that show that, in this case of murder for this crime, the

16      death penalty is not the appropriate punishment but life

17      imprisonment is instead.

18            And then the jurors would be asked to deliberate on

19      all that evidence and each of them come to an individual

02:37 20    assessment and decision about whether the death penalty was the

21      right punishment to vote for or life in prison, okay?  So

22      that's the process.

23            THE JUROR:  Okay.

24            THE COURT:  It seemed you might be mixing the guilt

25      phase and the penalty phase.

1             As you think about the penalty phase then, would you

2    be able, as statement (e) indicates, to make a decision after

3    considering all the facts, the aggravating circumstances, the

4    mitigating circumstances, and after all that, make a decision

5    without being committed one way or the other, or is your

6    tendency to favor the death penalty for what you've I think

7    referred to as a heinous crime?  Would that be -- really

8    exclude a serious consideration of the possibility of life

9    imprisonment?

02:38 10             THE JUROR:  If -- I wasn't aware that there was two

11   phases like that.  If found guilty, I would be for the death

12   penalty.

13             THE COURT:  Regardless of what you heard in the second

14   phase?

15             THE JUROR:  Correct, yeah.  If he were guilty of those

16   crimes, I would favor the death penalty.

17             THE COURT:  Let me just ask a little bit further.  If

18   you go to Page 25, at the bottom, Question 95, we asked, If you

19   found this defendant guilty and you decided the death penalty

02:39 20   was the appropriate punishment, could you conscientiously vote

21   for the death penalty?  And you said "yes," right?

22             THE JUROR:  Correct, yes.

23             THE COURT:  On the top of the next page, we asked, If

24   you found the defendant guilty and you decided life in prison

25   without the possibility of release was the appropriate

1    punishment, could you vote for life imprisonment without the

2    possibility of release?  And you said "yes" to that.

3         THE JUROR:  I wasn't aware of those two phases like

4    that.  I thought guilty there would be two -- I didn't realize

5    there would be two phases like that.  If guilty, I would favor

6    the death penalty.

7         THE COURT:  Okay.  So you would change the answer to

8    96?

9         THE JUROR:  I would, correct, after knowing that.

02:39 10      THE COURT:  Okay.

11        MR. WEINREB:  Your Honor, if I could inquire?

12        Good morning.  My name is Bill Weinreb.  I'm one of

13    the prosecutors.  I just want to make sure I understand one

14    thing about your answers clearly.

15        THE JUROR:  Okay.

16        MR. WEINREB:  Let's put this case aside for a minute.

17    Now we're just talking in general.

18        THE JUROR:  Okay.

19        MR. WEINREB:  Do you believe that all cases of

02:40 20    intentional, deliberate murder deserve the death penalty or

21    that some are -- some may be deserving of a lesser sentence

22    than the death penalty, depending on the evidence and the

23    circumstances?

24        THE JUROR:  For an intentional murder, I do believe

25    that the death penalty is the correct --

```
 1              MR. WEINREB:  In every case?

 2              THE JUROR:  If they're guilty of murder, correct, like

 3      intentional murder.

 4              MR. WEINREB:  Okay.

 5              THE COURT:  All right.  Thank you, sir.  Just leave

 6      the form there.  We'll take care of it.  Thanks.

 7              THE CLERK:  Juror No. 441.

 8              THE JURY CLERK:  Juror No. 441.

 9              THE CLERK:  Sir, over here, please, if you would.

02:41 10      Have a seat.

11              THE COURT:  Good morning.

12              THE JUROR:  Morning.

13              THE COURT:  Since you were last here, have you been

14      able to avoid any discussion of the case?

15              THE JUROR:  Yes.

16              THE COURT:  And, as much as possible, any media

17      accounts?

18              THE JUROR:  Uh-huh.

19              THE COURT:  Okay.  So that's the form you filled out

02:42 20      when you were here.  Let me just ask you about your employment.

21      What is it you do?

22              THE JUROR:  I'm an auditor but I got -- technically, I

23      got fired around January 20th for productivity.  So I'm

24      currently unemployed.

25              THE COURT:  Are you looking for work now?
```

 1          THE JUROR:  Yes.  I'm in the process of trying to

 2   collect unemployment and looking.

 3          THE COURT:  So, as you know, this case may be an

 4   extended case for three or four months.  Would that interfere

 5   with your ability to look for employment?

 6          THE JUROR:  No.  I mean, I don't know what I'm -- what

 7   I have access to, you know, to look for a job if I were to be

 8   in it, but other than that, I would be okay.

 9          THE COURT:  Okay.  Well, if a job came up and -- we

02:43 10   wouldn't want you to have to turn it down.

11          THE JUROR:  Yup.  I'm not -- I think I can get a

12   decent job with a little bit of looking for it relatively -- in

13   a reasonable amount of time.

14          THE COURT:  All right.  So you don't object to being

15   considered for the jury?

16          THE JUROR:  No, I don't object.

17          THE COURT:  Okay.  All right.  So I see you use

18   Facebook and Instagram about daily.  For just social purposes?

19          THE JUROR:  Yeah.  I don't post a lot on them.  I've

02:43 20   looked and just fishing through, you know, seeing what's going

21   on around.

22          THE COURT:  Are you using either in your job search?

23   Do you expect to use either?

24          THE JUROR:  Since I lost my job, it's been mainly

25   talking.  I got my auditing job through Indeed.  I'm going to

1    do that soon, but I kind of wanted to see where the

2    unemployment route was going to go first before I try to get

3    anything concrete.  I know I can lock into a job tomorrow if I

4    went back to CVS or anything like that.  I could go work for

5    retail.  I don't particularly want to do that again.

6            THE COURT:  So let me ask you to turn to Page 20,

7    Question 77 --

8            THE JUROR:  Yup.

9            THE COURT:  -- near the top, we asked whether, based

02:45 10    on things you'd seen or heard in the media or from other

11    sources you had formed an opinion that the defendant was guilty

12    or not guilty on that he should receive the death penalty or

13    not.  And you checked "no" to each of those boxes.  Could you

14    tell us about that?

15            THE JUROR:  More now looking back, as a not guilty.

16    Need to see more evidence, not that, yes, he's guilty or, no,

17    he's not guilty.

18            THE COURT:  Okay.  So I think you answered in one of

19    the earlier questions that you actually had service -- prior

02:45 20    jury service and it was a criminal case.

21            THE JUROR:  Yup.

22            THE COURT:  So you're familiar with the principles of

23    the presumption of innocence and the government's obligation to

24    prove crimes beyond a reasonable doubt by the evidence at

25    trial?

1          THE JUROR:  Correct.

2          THE COURT:  If you were a juror in this case, would

3     you be able to apply those principles faithfully to the

4     decision that you would have to make?

5          THE JUROR:  Yes.

6          THE COURT:  If the government failed in respect of any

7     of the charges to convince you beyond a reasonable doubt that

8     the defendant was guilty, would you be able to vote not guilty?

9          THE JUROR:  Yes.  I could vote not guilty.

02:46 10          THE COURT:  On Page 21, we asked about potential

11    impacts on you or close -- people close to you.  You said there

12    weren't any.

13          THE JUROR:  Yeah, nothing, nothing close, no friends,

14    relatives, really, friends of friends.

15          THE COURT:  Beginning on Page 23, at Question 88, we

16    asked a series of questions about the death penalty and your

17    attitudes about it.  88 itself is a question about general

18    views.  If you have any views about the death penalty in

19    general, what are they?  And you said you don't have any views

02:46 20    either way.

21          THE JUROR:  Yeah.  I mean, very, very neutral on it.

22    It can be used in certain circumstances or, you know, not used,

23    whatever.  I don't really have any concrete feeling on it.

24          THE COURT:  In Question 89, we asked you to give us an

25    idea of where you might place yourself on a scale from 1 to 10,

1    with 1 being strongly opposed, never impose the death penalty,

2    and 10 being strongly favor, impose the death penalty whenever

3    a defendant is convicted of an intentional murder.  You put

4    yourself at 7.  Can you explain that answer?

5         THE JUROR:  For certain circumstances I would

6    definitely vote for a death penalty, you know, not throwing it

7    around for any particular reason.  But 7 is the -- I would be

8    willing to go ahead with it.

9         THE COURT:  Okay.  On the next page, Question 90, we

02:47 10   asked it in a different way.

11        THE JUROR:  90?

12        THE COURT:  Page 24, Question 90.  If it's easier to

13   look at it -- to unclip it, why don't you take the clip off.

14        THE JUROR:  Yeah.  That would probably be easier.

15        THE COURT:  Here we asked -- instead of numbers on a

16   scale, we asked you to read a number of different possible

17   statements and see if there was one that represented what you

18   think about the matter.  And this is whether -- what your

19   feelings are when somebody has been convicted of murder.  You

02:48 20   selected (d).  "I'm not for or against the death penalty.  I

21   could vote to impose it, or I could vote to impose a sentence

22   of life imprisonment without possibility of release, whichever

23   I believe was called for by the facts and the law in the case."

24        THE JUROR:  Yes.

25        THE COURT:  Is that a fair summary of your views on

1    the matter?

2          THE JUROR:  Yes.  That would be a fair summary.

3          THE COURT:  So you would be prepared to make a call

4    depending on how you assessed the evidence?  You heard me talk

5    about the penalty phase.

6          THE JUROR:  I would have to see everything before I

7    would lean one way or another first.  Don't come to any

8    conclusions until everything is seen.

9          THE COURT:  Just a couple more questions.  On the next

02:49 10   page, the bottom of 25, Question 95, putting it in the context

11   of this case, If you found this defendant guilty and you

12   decided the death penalty was appropriate, could you

13   conscientiously vote for the death penalty?

14         THE JUROR:  Yes.

15         THE COURT:  And on the top of the next page, we asked

16   a similar question.  If you found him guilty and you decided

17   life imprisonment without the possibility of release was the

18   appropriate punishment, could you vote conscientiously for that

19   penalty?

02:49 20         THE JUROR:  Yes.

21         THE COURT:  And you said "yes."

22         THE JUROR:  Yup.

23         THE COURT:  So those represent your views?

24         THE JUROR:  Uh-huh.

25         THE COURT:  All right.

 1          MR. WEINREB:  Thank you, your Honor.  Good morning.

 2          THE JUROR:  Morning.

 3          MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

 4    prosecutors in the case.  I just wanted to follow up on a few

 5    of your answers.

 6          THE JUROR:  Okay.

 7          MR. WEINREB:  I may have heard you wrong, but did you

 8    say that you hadn't given a lot of thought to the issue of

 9    death penalty in the past?

02:49 10          THE JUROR:  Yeah.  I haven't fully looked into it.

11    It's nothing that I really have wanted to in the past or even

12    now.  I've thought about it, but I'm at that point where it

13    doesn't really matter to me.  I'm not super against it, you

14    know, don't do it, or super, you know, let's have the death

15    penalty.  I'm kind of neutral on that.

16          MR. WEINREB:  Have you thought since -- when did you

17    first learn that you were -- that this case was the one you had

18    been summoned for?

19          THE JUROR:  About a day or two before.  I heard a

02:50 20    couple of things that it might be for that.  I didn't think

21    really anything about it; and then in my heart, it could be

22    that case pretty much the night or two before.

23          MR. WEINREB:  Since that time, have you given thought

24    to the idea of you personally serving on a case where the death

25    penalty is a possibility?

1           THE JUROR:  I would have no issues.

2           MR. WEINREB:  I guess the question that I really

3      wanted to get at is if -- if you were on a jury, not in this

4      case necessarily, just in any case, any case, and the defendant

5      were convicted, and you moved to the penalty phase and you

6      heard evidence that convinced you that the death penalty was

7      the appropriate sentence for a defendant, would you personally

8      be able to sentence someone to death if you concluded that was

9      the right sentence?

02:51 10           THE JUROR:  Yes, absolutely.

11           MR. WEINREB:  Thank you.

12           MR. BRUCK:  Good morning.

13           THE JUROR:  Good morning.

14           MR. BRUCK:  My name is David Bruck, and I am one of

15      Jahar Tsarnaev's lawyers.  And I've just got a few more

16      questions for you if that's okay.

17           THE JUROR:  Go right ahead.

18           MR. BRUCK:  UMass Lowell?

19           THE JUROR:  UMass Lowell.

02:51 20           MR. BRUCK:  Did you ever take a course from a

21      professor named Horgan, John Horgan?

22           THE JUROR:  Not ringing a bell.

23           MR. BRUCK:  You told the judge a couple times that

24      your views on the death penalty are that it's appropriate in

25      certain circumstances or certain types of cases.  I think those

1    are pretty much the words you used.

2            THE JUROR:  Uh-huh.

3            MR. BRUCK:  Can you give us some examples, what kinds

4    of cases you're thinking about?

5            THE JUROR:  If the case has proven to be motivated or

6    something behind it or a severe evil act, something that a lot

7    of people would consider evil, you know.

8            MR. BRUCK:  Can you tell me more?

9            MR. WEINREB:  Well, your Honor, I don't think he

02:52 10   should be asked to precommit.

11           THE COURT:  I think that's right.  I think it's

12    getting close to that.

13           MR. BRUCK:  I'm trying to find out what the juror

14    meant when he said certain kinds of cases.

15           THE JUROR:  Very heinous act.

16           MR. WEINREB:  Objection, your Honor.  The question was

17    sustained.

18           THE COURT:  Yeah.  I think we should get to a

19    different question.

02:53 20    MR. BRUCK:  They're not objecting to you.  They're

21    objecting to me just so we're clear.

22           Okay.  Now that we've been talking about it, you've

23    been talking to the judge a little bit, I guess I want to be

24    sure about your feelings, if any, about the death penalty in

25    this case.  You know what case you've been called for?

1          THE JUROR:  Yes.

2          MR. BRUCK:  Do you have -- do you lean either way as

3     far as whether this case is one that is appropriate for the

4     death penalty?

5          THE JUROR:  I'd have to see everything before I would

6     know if it's going to lean one way or another.  I'm not leaning

7     anywhere right now, you know.  I don't know if -- you know,

8     guilty, not guilty.  I'm unsure until I see all the evidence.

9          MR. BRUCK:  Okay.  Where were you on April 15, 2013,

02:53 10     on the day of the bombing?

11          THE JUROR:  I don't know.  I was seeking employment at

12     that time.  I got hired the following June after that.

13          MR. BRUCK:  I guess what I'm really asking you:  Do

14     you remember where you were when you heard about it?

15          THE JUROR:  Maybe at my girlfriend at the time's

16     house.

17          MR. BRUCK:  Do you remember people talking about it

18     that day when the bombing first occurred?

19          THE JUROR:  A little bit, you know, what had happened.

02:54 20          MR. BRUCK:  How did you feel when you heard about it?

21          THE JUROR:  You know, that act occurred, you know.

22     That's not -- you know, not good.  I wasn't, you know, too into

23     it or not.  I wasn't angry or anything like that.  I was just

24     kind of disappointed.

25          MR. BRUCK:  Sure.  What about the following Friday,

1    the day that people sheltered in place during the manhunt.  Do

2    you remember that day?

3              THE JUROR:  Not in depth, no, but I'd get updates,

4    look at the TV once in a while.

5              MR. BRUCK:  Where were you living at the time?

6              THE JUROR:  The current house I'm in now, in Woburn,

7    Mass.  I was staying with a girlfriend in Stoneham back and

8    forth a little bit.

9              MR. BRUCK:  Did that -- the activities of -- the

02:55 10   police activities and everything that day and the

11   shelter-in-place order, did that affect your activities that

12   day?

13             THE JUROR:  No, no.

14             MR. BRUCK:  In any way at all?

15             THE JUROR:  No.

16             MR. BRUCK:  That's all I have.  Thank you.

17             THE JUROR:  Thank you.

18             THE COURT:  All right, sir.  Thank you.  Just leave

19   those there.  We'll pick them up.

02:56 20             THE CLERK:  Juror No. 444.

21             THE JURY CLERK:  Juror 444.

22             THE CLERK:  Ma'am, over here, please.  Have a seat

23   right here.

24             THE COURT:  Good morning.

25             THE JUROR:  Good morning.

```
 1              THE COURT:  Since you were last here to fill out the

 2      questionnaire, have you been able to avoid discussion of the

 3      substance of the case?

 4              THE JUROR:  Yeah.

 5              THE COURT:  And media reports about the case?

 6              THE JUROR:  No.

 7              THE COURT:  No, you haven't seen them?

 8              THE JUROR:  No, I haven't.  I haven't been paying

 9      attention.

02:57 10              THE COURT:  Yes, okay.  So when you filled out the

11      form anyway, you told us you were recently unemployed.  Is that

12      continuing?

13              THE JUROR:  Uh-huh.

14              THE COURT:  Are you -- you have to answer with a word

15      so that the reporter can write down yes or no.

16              THE JUROR:  Yes, yes.

17              THE COURT:  Okay.  Sorry.

18              Are you actively looking for work now or are you --

19              THE JUROR:  I've applied with a temp agency.

02:58 20              THE COURT:  I'm sorry?

21              THE JUROR:  I've applied with a temp agency.  I am

22      working part time.  I'm a free-lance reporter for the paper so

23      I write occasionally.

24              THE COURT:  Right.  I see you've done it for several

25      papers, it looks like, according to --
```

```
 1              THE JUROR:  Yes.

 2              THE COURT:  Are there any particular ones you're

 3    working with now?

 4              THE JUROR:  I write for the Boston Globe North

 5    section, so I'm doing that right now.  That's the only one I'm

 6    working for.

 7              THE COURT:  What kinds of stories do you write?

 8              THE JUROR:  I write arts and human interest stories

 9    mostly.

02:58 10              THE COURT:  You know what the plan is for the case,

11    how we plan to have our schedule, four days a week, 9 to 4, and

12    so on?

13              THE JUROR:  Yes.

14              THE COURT:  On that schedule, it may last three or

15    four months possibly.

16              THE JUROR:  Yes.

17              THE COURT:  Is that going to impact you in your work

18    life in a way that would cost you money?

19              THE JUROR:  Well, it will interfere with my job search

02:59 20    if I find an opportunity that would be, you know, a viable way

21    for me to make a living.

22              THE COURT:  Are you looking for something particular

23    in the search?  You recently were an English language teacher.

24              THE JUROR:  Yes.

25              THE COURT:  Are you looking for something similar or
```

1    are you kind of casting the net widely to see what might be
2    there?
3             THE JUROR:  I'm focusing on international education
4    related fields, nonprofits, and the arts mostly in Boston.
5             THE COURT:  Okay.  Well, what do you feel about the
6    prospect of being a juror on the case for a few months?
7             THE JUROR:  To be honest, it's pretty nerve-racking,
8    the idea, but I don't know.  There's a part of me that is
9    intrigued by it as somebody who's a writer and, you know, and a
03:00 10    teacher, and who's worked with students similar to the person
11    here who we're talking about.
12             THE COURT:  So if you were ultimately selected to be a
13    juror on the case, your disposition would be that you would be
14    prepared to do it notwithstanding the other issues going on?
15    Is that what I'm hearing or not?  Tell me if that's not the
16    case.
17             THE JUROR:  I think I would -- yes, I would be
18    prepared to do it.
19             THE COURT:  We've been asking people about their use
03:00 20    of social media.  You say you use Facebook about once a week,
21    something like that.
22             THE JUROR:  Yeah.  I try to avoid it but it's there,
23    so I use it once in a while.
24             THE COURT:  Let me ask you to turn, if you would, to
25    Page 20, Question 77 at the top.  Here we asked whether, based

1      on things you'd seen or read in the media or that you had

2      learned from other sources, had you formed an opinion about

3      whether the defendant was guilty or not or should receive the

4      death penalty or not, and you answered "unsure" to each of

5      those subparts of the question.  Can you tell us about that?

6                  THE JUROR:  Well, I just -- I put that because I'm not

7      sure about his motivations and his psychological state and his

8      relationship with his brother.  I know what the media told me,

9      but I don't know the whole story really so --

03:02 10                  THE COURT:  Well, you know from this morning, as I

11      described it, the case, if it went the full distance, would

12      have two phases.  The first would be concerned with whether

13      he's guilty of the crimes he's charged with or not; and the

14      second phase, if he was guilty of a capital crime, whether the

15      penalty should be a death sentence or life in prison without

16      the possibility of release.

17                  So focusing on the first phase, it's not surprising

18      that people have learned things about these events from the

19      media coverage.  What we ask jurors in a criminal case to do

03:02 20      though is first to presume that the defendant is innocent and

21      require the government to prove to them by the evidence that

22      he's guilty.  The government's burden is to prove that beyond a

23      reasonable doubt.  So the burden is always on the government to

24      carry that burden in order to obtain a conviction.  You're

25      familiar with those principles, I presume?

1          THE JUROR:  Yes.

2          THE COURT:  Focusing on that first phase, would you be

3     able as a juror to perform those -- to perform your service in

4     accordance with those principles and require the government to

5     prove its case to you beyond a reasonable doubt?

6          THE JUROR:  Yes.

7          THE COURT:  Without presuming the defendant guilty of

8     anything?

9          THE JUROR:  Yes.

03:03 10          THE COURT:  And we're going -- we'll turn to the death

11     penalty questions in a minute because there's a series about

12     that.  But I want to ask you about your answer to Question 80

13     at the bottom of that page.

14          THE JUROR:  Uh-huh.

15          THE COURT:  This is about a former coworker.  Where

16     was she a coworker with you?  Was that in your teaching?

17          THE JUROR:  This was someone I worked with at

18     Montserrat College of Art.  I was doing a free-lance writing

19     position for them where I was going in part time.  And she told

03:03 20     me that she had this firsthand experience at the bombing.

21          THE COURT:  When did you talk with her about that?

22          THE JUROR:  It was last year around this time, I

23     guess.

24          THE COURT:  So it wasn't in the immediate aftermath?

25     It was sometime after that?

1          THE JUROR:  No.  It was after that.  It was because I

2     was working on a story for the college that involved a graphic

3     artist who designed T-shirts to -- like, a Boston Strong type

4     of T-shirt, and he was connected to the art school.  So it came

5     up.

6          THE COURT:  Is there anything more about this

7     conversation or what you know about her that you think we

8     should know?

9          THE JUROR:  No, I don't think -- I don't think

03:04 10    anything else.

11          THE COURT:  On the next page, we asked about you or

12     people close to you, whether you were affected -- that's

13     Question 81 -- whether you were personally affected in any way

14     by the events.  For example, some people had to stay in on the

15     -- you may recall the Friday.  I guess you said "not

16     applicable."  You weren't affected in any way?

17          THE JUROR:  I live on the North Shore, and I -- it

18     didn't affect me in the way that it affected people who were

19     living in Watertown or in the immediate area.

03:05 20          THE COURT:  You made a contribution to the One Fund,

21     the next question?

22          THE JUROR:  Yes, just one contribution, yeah.

23          THE COURT:  So at Page 23, beginning at Question 88,

24     we ask a series of questions to get an idea of your views about

25     the death penalty.  And Question 88 is a -- asks whether you

1    have any views on the death penalty in general, and you wrote,

2    "I am against the death penalty."

3           THE JUROR:  Right, yes, I am.

4           THE COURT:  In the next question, we asked you to see

5    if you could select a number on a scale that kind of gauged

6    where you were, with 1 strongly opposed would be a circumstance

7    where you believed that the death penalty should never be

8    imposed; and 10, at the other end, where you believed it should

9    be imposed whenever a defendant is convicted of murder.  You

03:06 10    selected 3.  You think that's --

11           THE JUROR:  Yes.

12           THE COURT:  Can you tell us why?

13           THE JUROR:  It's a difficult scale to work with

14    really.

15           THE COURT:  You're right about that.

16           THE JUROR:  There's, like, these shades of -- I'm

17    against it just because I'm a pacifist, and I'm somebody who

18    believes that everybody has the right to life.  I'm against

19    abortion for the same reasons.  It's -- I was raised in a

03:06 20    Christian household.  So it's just what I was -- it's part of

21    my background.

22           THE COURT:  If you look at Page 24, Question 90, this

23    is a little less clumsy than the previous numerical scale.

24    This asks you in words whether there was a statement that you

25    thought represented your views about the death penalty for

1    somebody convicted of murder.  You chose (b).  "I'm opposed to

2    the death penalty and would have a difficult time voting to

3    impose it even if the facts supported it."

4              THE JUROR:  Yes.

5              THE COURT:  I just want to see if there's a reason

6    why, given what you've just said, you didn't choose (a).

7              THE JUROR:  Well, I guess there's a shadow of a doubt

8    in my mind.  I've never been put in this position before where

9    I had to -- you know, to vote, like, on something like this.

03:07 10             THE COURT:  Right.

11             THE JUROR:  You know, it's not a black and white for

12   me.  There's a little bit of a shade of gray.

13             THE COURT:  So you heard me this morning describe what

14   would be the penalty phase if the defendant was convicted of a

15   capital crime, where the jury would be presented with evidence

16   that might tend to show it was a particularly serious and

17   blameworthy crime.  That would be the aggravating factors by

18   the government.  And on the other hand, there might be

19   mitigating factors about the defendant or other things about

03:08 20   the events that might tend to argue against the death penalty

21   and in favor of a life imprisonment.  Then we'd ask the jurors

22   to assess all that they had heard in the penalty phase and make

23   a choice based on that evidence about what was the right

24   punishment that each juror thought was appropriate.

25             Would you, in that process, be receptive to the

1   possibility that you could vote in either direction, or would

2   you be, because of your opposition to the death penalty, pretty

3   much disposed not to vote for the death penalty?

4        THE JUROR:  I really -- it's a really -- it's hard to

5   say.  I mean, I -- I think it would take a lot to change my

6   mind, frankly.

7        THE COURT:  To change your mind?

8        THE JUROR:  My conviction about the death penalty

9   being wrong for anybody.

03:09 10        THE COURT:  Okay.  Let me ask you to look at the

11   bottom of Page 25, Question 95.  There, putting it in the

12   context of this case, if you found this defendant guilty and

13   decided that the death penalty was an appropriate -- was the

14   appropriate punishment for him, could you conscientiously vote

15   for the death penalty?  And you wrote "not sure."

16        And if you want to look at the next question on the

17   next page, kind of the parallel question.  If you found him

18   guilty and you decided life imprisonment without possibility of

19   release was the appropriate punishment, could you

03:09 20   conscientiously vote for life imprisonment without the

21   possibility of release?  And you said "yes" to that.  So a

22   little contrast between "yes" to that and "not sure" to the

23   other.  I just want to -- do you want to talk about that

24   difference?

25        THE JUROR:  It just is more clear-cut in my mind that

1    I feel now that life imprisonment would be the best punishment

2    for him.  I mean, it would take a lot for me to change my mind

3    on that.

4          THE COURT:  Okay.  The lawyers will have some

5    follow-up questions.

6          MR. WEINREB:  Good morning.

7          THE JUROR:  Good morning.

8          MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

9    prosecutors in the case.  I just wanted to ask you a few

03:10 10    additional questions.  Turning back to Question 80, it's on

11    Page 20.

12          THE JUROR:  Okay.

13          MR. WEINREB:  You mentioned you were writing an

14    article at the time that your friend told you about her

15    experience.

16          THE JUROR:  It was a -- it was a blog posting on an

17    alum from this art school who had gone on to start a graphic

18    arts business and who had made T-shirts for -- to raise money

19    for the Marathon victims.

03:11 20          MR. WEINREB:  When you say it was a blog, is it --

21          THE JUROR:  A blog article.

22          MR. WEINREB:  A blog article.

23          THE JUROR:  Yeah, on the college website.

24          MR. WEINREB:  Did you do research for the article?

25          THE JUROR:  I interviewed the artist.  That was all I

1   did.  And I looked at his website and saw that he had raised

2   money for the Marathon victims.  That was it.

3   　　　　MR. WEINREB:  Did the article talk about the victims

4   themselves or what he had done for them or --

5   　　　　THE JUROR:  Nobody specifically.

6   　　　　MR. WEINREB:  What exactly was it about; can you tell

7   us?

8   　　　　THE JUROR:  My article?

9   　　　　MR. WEINREB:  Yes.

03:11 10   　　　　THE JUROR:  It was just a profile -- it was a success

11   story of somebody who graduated from this arts college and has

12   gone on to start a successful graphic arts business and focused

13   more on that.

14   　　　　MR. WEINREB:  Got you.

15   　　　　On this issue of the death penalty --

16   　　　　THE JUROR:  Uh-huh.

17   　　　　MR. WEINREB:  So turning to your answer to Question

18   88, how long has that been your view that you're against the

19   death penalty?

03:12 20   　　　　THE JUROR:  It's just sort of an engrained viewpoint

21   that I've held my whole life, I guess.  I haven't ever had to

22   think about it in such a -- you know, a relevant way before but

23   --

24   　　　　MR. WEINREB:  You mentioned that one reason you're

25   against it has to do with your religion.

1          THE JUROR:  Uh-huh.

2          MR. WEINREB:  Can you say more about that?

3          THE JUROR:  Well, I'm a Christian, and I believe that

4    life is a gift from God and that it's wrong for anybody to take

5    that away from somebody, whether it be murdering somebody, you

6    know, like in the Marathon bombing, or whether it be killing

7    somebody who committed the crime of the Marathon bombing.  I

8    think that killing somebody is wrong no matter what.

9          MR. WEINREB:  When you say "wrong," by that do you

03:13 10   mean, like, immoral?

11          THE JUROR:  Yes.

12          MR. WEINREB:  So -- and you extend that to taking --

13   basically to sentencing somebody to death?  That's taking

14   somebody's life in the same way that a murderer takes

15   somebody's life?

16          THE JUROR:  Yes.  I see them as one and the same, I

17   guess.  It just seems like it's punishing the crime with

18   another crime in my eyes.

19          MR. WEINREB:  So if I understand you right, believing

03:14 20   that it's immoral, as you say, and that it's essentially like

21   murder to sentence somebody to death, can you really envision

22   yourself ever sentencing somebody to death?

23          THE JUROR:  No, I really can't.  Sitting here right

24   now in front of you and thinking about it, I can't imagine that

25   I could do that.

 1              MR. WEINREB:  Okay.  So when you said earlier that you

 2      don't like to be black and white and that there's a sort of a

 3      shadow of a doubt, were you saying that you're wavering in your

 4      conviction as to whether the death penalty is immoral or not or

 5      just that nobody can ever know anything?  You can't be 100

 6      percent certain about anything?

 7              THE JUROR:  I guess I'm just -- I'm just thinking that

 8      I don't know the whole story, and there's a part of me that

 9      just -- maybe the journalist in me that just wants to hear --

03:15 10     before I make a judgment call, to hear the whole story.

 11             MR. WEINREB:  Fair enough.  So one of the things we're

 12     trying to figure out here though is whether -- whether your

 13     moral views against the death penalty, your belief that it's

 14     like murder to sentence someone to death, whether that would

 15     really impair your ability to realistically consider you

 16     personally putting somebody to death even if the evidence were

 17     strong in your mind.

 18             THE JUROR:  Right.

 19             MR. WEINREB:  Can you answer that for us?  Do you

03:15 20     think that it would impair you in the sense that in any

 21     case you would be --

 22             MR. BRUCK:  Objection.  I think -- impairment is a

 23     legal issue.

 24             THE COURT:  I'm not sure the juror understands it as a

 25     legal matter.  I think you can answer that in the plain English

1    sense of the word.  There is some legal gloss on it, but I

2    think you can have it as a plain English question.

3             MR. WEINREB:  In other words --

4             THE JUROR:  No.  I understand.  I'm just thinking.

5             MR. WEINREB:  Yeah.

6             THE JUROR:  I really -- I don't think -- I think any

7    conviction should be questioned.  I mean, I don't see myself as

8    a close-minded person, so that's why I didn't put the black or

9    white, one end of the scale or the other.  I mean, I don't

03:16 10    know.  I might change my mind about it.

11             MR. WEINREB:  Well, again, I realize we're talking

12    about things that are -- it's hard to predict how you would

13    feel about something in the future, but this is our one chance

14    to ask you and sort of get a sense of your best judgment on the

15    issue.  And that's why I'm pressing it a bit.

16             And what I'm really trying to get at, and my question

17    is, when you say you don't like to be black or white or you

18    don't want to be 100 percent one way or the other way, can you

19    really envision yourself giving up this -- or setting aside

03:17 20    this conviction that the death penalty is immoral and is like

21    murder and sentencing someone to death regardless of the

22    evidence that you heard?

23             THE JUROR:  I think it would take a lot.  That's all I

24    can say.  It would really -- it would take a lot to change my

25    mind.

```
 1            MR. WEINREB:  And what -- can you envision --
 2            THE JUROR:  I don't know.  I really don't know what
 3    this case is about.
 4            MR. WEINREB:  I'm not talking about this case.  I'm
 5    just talking about any case.  Can you envision circumstances
 6    that would change your mind?
 7            THE JUROR:  I already answered.  I don't -- I really
 8    -- I don't know.  Maybe --
 9            MR. WEINREB:  I'm asking --
03:18 10         THE JUROR:  Yes, maybe.  Maybe I could envision
11    something that would make me change my mind.
12            MR. WEINREB:  What would you envision that could
13    change your mind?
14            THE JUROR:  The idea of spending your life in prison
15    isn't that much more fulfilling than being killed in a way.  I
16    mean, I don't know.
17            MR. WEINREB:  I mean, you can take a moment and think
18    about it.
19            THE JUROR:  Is he going to be up for parole at all?
03:18 20   Is there a chance that he might get out of prison and have a
21    life for himself?  Are we talking about, like, he's going into
22    prison for the rest of his life with no chance for parole?
23            MR. WEINREB:  The latter.
24            THE JUROR:  That's it.  There's no room.
25            MR. WEINREB:  No room.  Those are the two options:
```

1    death or the life without any possibility of release.

2         THE JUROR:  Then, in my mind, there's more room for

3    the death penalty because it almost changes my viewpoint.

4         MR. WEINREB:  Okay.  But what I'm asking here is a

5    slightly different question, which is, can you envision a crime

6    that would be so bad or circumstances about a murder that would

7    be so bad that it would justify murdering somebody else, the

8    defendant?

9         MR. BRUCK:  Objection to "murdering somebody else."

03:19 10        MR. WEINREB:  Just using the defendant -- the juror's

11   own words.

12        THE JUROR:  I think you're just asking me the same

13   question over and over again.

14        MR. WEINREB:  I'm trying to actually get you to tell

15   use what the circumstances would be that would -- what would be

16   a heinous enough crime in your mind, if any?

17        THE JUROR:  If I believed that he -- well, for

18   example, right now, just looking at the case as I've seen in

19   the media, I see it as something where he's a young -- he's a

03:19 20   younger brother and that he was influenced by his older brother

21   and that -- as I'm looking at it now, I'm seeing it as that the

22   older brother was more of the mastermind.  But in the course of

23   the trial, something swayed me and changed my mind and I, you

24   know, I learned that he was more of the mastermind in the

25   trial, perhaps there would be more of a sense that he deserves

1    something like that.  As things stand now, I would not vote for

2    the death penalty, and I would -- I don't know.  I mean, it's

3    sad to me even that there's not a chance of parole for him but

4    -- but I -- that's --

5         MR. WEINREB:  You know you're here for this case, and

6    so you keep answering about this case, and that's perfectly

7    understandable.  There's nothing wrong with that.

8         I'd like to ask you though a slightly different

9    question which has to do with any case, not this case.  Putting

03:20 10   aside this case, can you imagine circumstances under which

11   somebody who had committed a murder should be sentenced to

12   death?

13        MR. BRUCK:  I think that's been asked and answered.

14        THE JUROR:  I've already told you.

15        THE COURT:  I think we've been over it.

16        MR. WEINREB:  Excuse me one second.

17        THE COURT:  Yeah.

18   (Discussion held off the record.)

19        MR. WEINREB:  Okay.  Thanks very much.

03:21 20   THE COURT:  Go ahead.

21        MR. BRUCK:  When we started, it would have been good

22   morning, but it's now good afternoon.

23        THE JUROR:  Good afternoon.

24        MR. BRUCK:  I'm David Bruck, and I'm one of Jahar

25   Tsarnaev's lawyers.

1          I know you've been asked a lot of questions about

2     this, but I just want to see if we can get some clarity at the

3     end.  You said that the journalist in you has a response to the

4     situation of curiosity.  What I think we're really asking is

5     whether there's a juror in you by which the law means someone

6     who can put their personal views, no matter how strong, to one

7     side, not forget about them or change them but just put them to

8     one side and be guided by the evidence in the case.

9          That's what this is about, and that's what I want to

03:22 10   ask you.  On the issue of the death penalty, understanding your

11     strongly held views, could you put your views to one side and

12     serve as an impartial juror that -- by which we mean paying

13     attention to the evidence in favor of the death penalty, the

14     evidence against the death penalty, and make your decision

15     based on the evidence in the case.

16          THE JUROR:  No, I don't -- I don't think I could.  I

17     think that my viewpoint is too much of a conviction for me.

18          MR. BRUCK:  Just to be clear about one last thing --

19     and I won't belabor this -- but a juror never has to vote for

03:23 20   the death penalty.  It's not as though there are some facts,

21     once proven, the judge will say, All right.  That's it, jury.

22     Go out and come back with the death penalty.  In the end, the

23     jurors always have to make and get to make their own decision

24     one at a time, individually.  So -- and if your decision was

25     that the death penalty was not the right thing to do, you would

1    always be legally allowed to do it.  So I don't want you to --

2            MR. WEINREB:  Objection, your Honor.

3            THE COURT:  Yeah.  I think we need a question.

4            MR. BRUCK:  The question is:  Understanding that you

5    could always vote one way or the other based on the evidence --

6    that was really what I was asking -- could you go for the death

7    penalty or against the death penalty based on the evidence in

8    the case?

9            THE JUROR:  Yes.

03:23 10         MR. BRUCK:  Okay.  There was a difference between the

11   answer you gave me and the one --

12           THE JUROR:  Well, the question seemed different to me.

13           MR. BRUCK:  Tell me.

14           THE JUROR:  You're saying that I could still vote for

15   the death penalty if I felt like it was the right choice.

16           MR. BRUCK:  Right, or for life if you thought that was

17   the right choice.

18           THE JUROR:  Right.  How does it work if -- if one

19   person votes against the death penalty in the jury, then what

03:24 20   happens?

21           MR. BRUCK:  It has to be unanimous for the death

22   penalty or there's no death penalty.

23           THE JUROR:  Right, okay.  So my answer --

24           MR. BRUCK:  Is?

25           THE JUROR:  -- stands that I -- if I could still keep

1    my conviction -- I honestly don't know if anything would change

2    my mind or not.  But as things stand now, I feel that the death

3    penalty is wrong, but there's a chance that I might change my

4    mind.

5              MR. BRUCK:  You'd change your mind based on what?  On

6    the evidence in the case?

7              THE JUROR:  Uh-huh.

8              MR. WEINREB:  Objection, your Honor.

9              THE COURT:  All right.

03:25 10              THE JUROR:  Sorry.  I don't know if I was clear on

11   this.

12              MR. BRUCK:  No.  I appreciate it.

13              THE COURT:  Thank you very much.  You're all set.

14   Thanks.

15              THE CLERK:  Juror No. 447.

16              THE JURY CLERK:  Juror 447.

17              THE CLERK:  Ma'am, over here, please, if you would.

18   Have a seat.

19              THE COURT:  Good afternoon.

03:26 20              THE JUROR:  Good afternoon.

21              THE COURT:  Since you were here last to fill out the

22   questionnaire, have you been able to avoid any discussion of

23   the case?

24              THE JUROR:  Yes, I have.

25              THE COURT:  And, as much as possible, any media

 1    reports about it?

 2              THE JUROR:  Yes.

 3              THE COURT:  So we're just going to follow up on some

 4    of the answers you gave us.  Let's start by talking about your

 5    work.  You are, it looks like, an office --

 6              THE JUROR:  Administrative assistant for the

 7    Department of Executive Office of Work Force Development.

 8              THE COURT:  Okay.  The usual office-type work?

 9              THE JUROR:  Phone calls, answering the phones, faxing,

03:27 10    anything else that needs to be done.

11              THE COURT:  Okay.  You've been doing that for?

12              THE JUROR:  Fourteen years.

13              THE COURT:  Yeah, quite awhile.  You would have no

14    difficulty if you were asked to serve on a lengthy case like

15    this?

16              THE JUROR:  The only difficulty I would have is my

17    kids.  I'm a single parent to two girls.  So there would be

18    some difficulty there, but other than that --

19              THE COURT:  Is it manageable or is it something --

03:27 20              THE JUROR:  My parents help me out.

21              THE COURT:  Are they local?

22              THE JUROR:  They are, yes.

23              THE COURT:  You know that the normal trial day would

24    be 9 to 4.  It wouldn't be an unusual --

25              THE JUROR:  Yup, that would be reasonable.

1           THE COURT:  Okay.  I don't know how significant it is,

2    but we've been asking people about their use of social media.

3    You use Facebook --

4           THE JUROR:  I do.

5           THE COURT:  -- on a daily basis almost?

6           THE JUROR:  I do, yes.

7           THE COURT:  Family and friends kind of things?

8           THE JUROR:  Yes.

9           THE COURT:  Any other use?

03:28 10           THE JUROR:  No.

11           THE COURT:  Let me ask you to look at Page 20.  If

12    it's easier for you to deal with it, you can take the clip off

13    and separate the -- Question 77, near the top of the page,

14    there we asked whether, based on things you'd seen or read in

15    the media or learned from other sources, had you formed an

16    opinion that the defendant was guilty or not or that he should

17    receive the death penalty or not.  And to Part (a) you answered

18    "no."  And to the other parts you answered "unsure."  Could you

19    tell us about your answers?

03:29 20           THE JUROR:  I think -- I think that every case is

21    different, and I think that, unless you hear all the

22    information and you need to hear everything in the case before

23    you can make a decision if someone is guilty or if they're

24    innocent.  Not every case is black and white.  There's a lot of

25    things that go on.

          1          THE COURT:  So you understand, I'm sure, that in our

          2    criminal justice system, if a person is accused of a crime, the

          3    person is presumed innocent of that crime --

          4          THE JUROR:  Yes.

          5          THE COURT:  -- unless and until the government proves

          6    otherwise -- proves him guilty at the trial by the evidence at

          7    trial and proves it beyond a reasonable doubt.  Those are

          8    familiar concepts to you?

          9          THE JUROR:  Uh-huh.

03:30    10          THE COURT:  It's not surprising people have heard

         11    about things -- about the events that underlie this case and

         12    have some impressions about it.  What we ask jurors to do is to

         13    set those ideas aside and pay attention to the body of evidence

         14    that's produced in the course of the trial and make judgments

         15    about that.  Would you be able to do that?

         16          THE JUROR:  Yes.

         17          THE COURT:  If the government, on any given charge,

         18    failed to satisfy you beyond a reasonable doubt that the

         19    defendant was guilty of that charge, would you be able to vote

03:30    20    not guilty?

         21          THE JUROR:  Yes.

         22          THE COURT:  On Page 21, we asked a couple of questions

         23    about whether you or anybody close to you were personally

         24    affected by the events of the Marathon bombings.  You said

         25    "none."  No personal impact on you?

1          THE JUROR:  No, uh-umm.

2          THE COURT:  You didn't participate in any of the

3     after-the-fact support activities, One Fund, Boston Strong or

4     anything like that?

5          THE JUROR:  Nope.

6          THE COURT:  So beginning at Page 23, Question 88, we

7     asked a series of questions about jurors' attitudes about the

8     death penalty, so I want to run through those.  88 was itself a

9     general question.  If you had general views, what were they?

03:31 10    You wrote that each criminal has different circumstances, and

11    this case should, I guess, look at all the evidence.

12         THE JUROR:  Yeah.

13         THE COURT:  Tell me -- wait a minute.

14         THE JUROR:  Sorry.

15         THE COURT:  There were a couple of crossouts.  Why

16    don't you read it for us.

17         THE JUROR:  "Each criminal is different circumstances

18    and that this case should have -- look at all the evidence

19    before the sentence of death came up.  And before I made a

03:31 20    decision, I would have to look at everything and listen to

21    everything."

22         THE COURT:  Let's step away from what you wrote.  Tell

23    us what your general views about the death penalty are.

24         THE JUROR:  The same thing, that each case is

25    different, that each criminal is different, and that, you know,

1    depending on what the evidence shows, that's how I would base

2    my decision on, not on what I've heard or what I've seen or

3    anything else.

4         THE COURT:  Okay.  In the next question, we asked if

5    you could put yourself on a scale, this is -- no, Question

6    89 -- from 1 to 10, with 1 being strongly opposed, would never

7    vote to impose the death penalty; and, strongly favor, would

8    always vote to impose the death penalty when someone was

9    convicted of murder.  You put yourself somewhere in the middle.

03:32 10        THE JUROR:  Because I'm not really sure where I stand

11   on that.  I'm not going to say that I think it should be.  I'm

12   not going to say I'm strongly opposed to it.  I'm in the middle

13   of it.

14        THE COURT:  Now, let's go to the next page, Question

15   90.  There we ask a little differently by giving you a number

16   of statements you might agree or disagree with and asked if one

17   of those represented fairly your own views about the imposition

18   of the death penalty in a case where someone has been guilty of

19   murder.  You chose (d).  It says, "I'm not for or against the

03:33 20   death penalty.  I could impose it or I could vote to impose a

21   sentence of life imprisonment without the possibility of

22   release, whichever I believed was called for by the facts and

23   the law in the case.

24        THE JUROR:  Yes.

25        THE COURT:  Does that represent your view?

1          THE JUROR:  Yes.

2          THE COURT:  If you go to the next page, 25, at the

3    bottom, Question 95, we put it in the context of this case now.

4    If you found this defendant guilty and you decided that the

5    death penalty was the appropriate punishment for him, could you

6    conscientiously vote for the death penalty?  You said "not

7    sure."

8          THE JUROR:  I honestly don't know if I can do that.

9    That's somebody's life that you're playing with.  I don't

03:33 10   really know if I could honestly put him to death.

11         THE COURT:  Notice that the question says that -- the

12   assumption in the question is that you've decided that the

13   death penalty is appropriate for him.

14         THE JUROR:  I'm still very unsure.

15         THE COURT:  I just wanted to call that to your

16   attention.

17         Now, if you go to the next question, it's kind of a

18   parallel question.  If you found the defendant guilty and you

19   decided that life imprisonment without the possibility of

03:34 20   release was the appropriate punishment, could you

21   conscientiously vote for that?  You said "not sure" to that as

22   well.

23         THE JUROR:  Yeah.  Honestly, on both of those, I do

24   not know if I could --

25         THE COURT:  When you say you don't know, you don't

1    know whether you would -- could do it in good conscience, or

2    you don't know whether you could make up your mind about which

3    was the better choice?

4           THE JUROR:  Yes, which -- at the time.  I'm not --

5           THE COURT:  I explained this morning in brief terms

6    the process.  If there were a conviction of a capital crime,

7    that we'd proceed to the penalty phase, and there would be

8    evidence of what we call aggravating factors, and there would

9    be evidence of mitigating factors, and they would have to be

03:35 10    balanced.  Could you make a judgment about which penalty was

11    appropriate, if you were at that stage, based on an evaluation

12    of that evidence?

13           THE JUROR:  Would have to, yes.

14           MR. WEINREB:  Thank you, your Honor.  Good afternoon.

15           THE JUROR:  Hi.

16           MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

17    prosecutors in the case.

18           I'm not sure I understood all of your answers at the

19    end about the death penalty questions.  So if you don't mind,

03:35 20    I'd like to ask you a few more to clear it up.

21           THE JUROR:  Sure.

22           MR. WEINREB:  So if -- at the very end you said that

23    -- in your answers to the final two questions that you --

24    you're unsure about which way you would go.  But I want to put

25    aside this case entirely and just ask you in general about

1    serving on a jury where a defendant is potentially subject to

2    the death sentence.  So we're not talking about this defendant.

3    And the question there is:  If you -- can you envision cases

4    where the circumstances could convince you that the death

5    penalty was an appropriate sentence for an intentional murder?

6              THE JUROR:  If there was such a case and the evidence

7    shown proved beyond a reasonable doubt that he -- that the

8    death penalty was the way to go, then, yes, I would vote for

9    that particular way to go.

03:36 10             MR. WEINREB:  Okay.  What about the other?  If the

11   evidence showed --

12             THE JUROR:  If it showed that life imprisonment was

13   the way to go, then I would be voting for life imprisonment.

14             MR. WEINREB:  Okay.  Just to make sure that we're on

15   the same page, you understand that the way that it works in the

16   federal system is that, if a defendant is found guilty of an

17   intentional murder, there's no automatic penalty one way or the

18   other at that point.  There's a whole second phase of the

19   trial.

03:37 20             THE JUROR:  I understand that.

21             MR. WEINREB:  At that trial you'd hear evidence, and

22   the government would try -- would offer evidence that it

23   believes made the death sentence the appropriate sentence.  The

24   defense would offer evidence that it believes made life

25   imprisonment the appropriate sentence.  And there's no formula

1    for figuring out which is the right way to go.  You, as a

2    juror, are personally called upon to weigh all the evidence,

3    consider it all together, and make a judgment at the end about

4    what you believe is the right sentence.

5         THE COURT:  You're doing a little bit about what

6    you've criticized Mr. Bruck for doing.

7         MR. WEINREB:  Here I'm not trying to lead to any

8    particular answer.  Generally just trying to ask --

9         THE COURT:  Let's get to the question.

03:38 10        MR. WEINREB:  -- whether you could do that.

11        THE JUROR:  Yes, I could.

12        MR. WEINREB:  If you determined that the death

13   sentence was the appropriate sentence, could you actually do

14   it, sentence someone to death, knowing that it was a decision

15   you could never take back?

16        THE JUROR:  Knowing that was the decision that I could

17   never take back, again, that's somebody's life we're playing

18   with.  Even though he's been found guilty and the person has

19   been sentenced to death, I -- that, I have -- you know, I'm

03:38 20   unsure of because it's somebody's life.

21        MR. WEINREB:  Okay.  So you've never been in that

22   situation before.

23        THE JUROR:  No, I haven't.

24        MR. WEINREB:  It's impossible to know from experience.

25   So we're just -- we're left to ask you what your prediction is

1    of your ability.

2         MR. BRUCK:  I think he's asked, and we have the

3    answer.

4         THE COURT:  He can have it.  This is the last one.  Go

5    ahead.  Answer the question.

6         THE JUROR:  I would have to really weigh everything

7    and really think about it before I would be able to make that

8    decision.  Again, it's somebody's life we're playing with

9    regardless of the fact that they've been found guilty.

03:39 10         MR. WEINREB:  Okay.  And if you weighed it and made

11   the decision and you came to the decision that a death sentence

12   was the appropriate sentence, could you take the next step and

13   actually give the sentence?

14         MS. CLARKE:  I think that's been --

15         THE JUROR:  I'm undecided on that.  I'm sorry.  I'm

16   very undecided on that.

17         THE COURT:  We'll leave it at that.  That's the answer

18   you're going to get, I think.  Is that it?

19         MR. WEINREB:  Yes.  Thank you, your Honor.  Thank you.

03:39 20         MS. CLARKE:  My name is Judy Clarke.  I'm one of the

21   lawyers for Mr. Tsarnaev.  Good afternoon.

22         THE JUROR:  Good afternoon.

23         MS. CLARKE:  If you'll bear with me just for a few

24   questions.

25         THE JUROR:  Sure.

1          MS. CLARKE:  The jury is expected to do a couple of

2     things in a capital case.  After finding the accused guilty of

3     the crime beyond a reasonable doubt, there's a penalty phase.

4     And all the law requires of a juror is to fairly consider all

5     of the evidence presented and to listen to it and deliberate

6     about it.  Can you do those things?

7          THE JUROR:  Yes, I can.

8          MS. CLARKE:  And recognizing in a capital case that no

9     juror is ever required to vote for a death sentence but what a

03:40 10    juror is required to do is give fair consideration to both

11    options:  life in prison without parole or death.  Could you do

12    that?

13         THE JUROR:  I could, yes.

14         MS. CLARKE:  And then the third thing that the juror

15    has to do, be able to do, is to assure Judge that once that

16    juror makes up his or her mind that they could follow through

17    on their conscience.  If their conscience said that a sentence

18    of life in prison without parole was the right way to go,

19    that's what they would vote for.

03:41 20         THE JUROR:  Yes.

21         MS. CLARKE:  You could do that?

22         THE JUROR:  Yes.

23         MS. CLARKE:  If their conscience said that the right

24    way to go in that particular case was a death sentence, could

25    you follow through on that third obligation as a juror?

1          THE JUROR:  Again, I'm very unsure on that.  I would

2     have to weigh everything in my conscience and really take a

3     look at my conscience and really think about that.

4          MS. CLARKE:  Well, I think why we're spending just a

5     little extra time allowing you to think fast about that

6     because, obviously, since January the -- whatever day you came

7     in, the 5th, I guess -- you've probably given it some

8     consideration, right?

9          THE JUROR:  I have, but, you know, again, my stance

03:41 10    has been it's somebody's life, and I just don't know if I could

11    make that conscious decision to put them to death.  I honestly

12    -- even though he's been found guilty and that's what they gave

13    him, I honestly don't know if I could do that.

14         MS. CLARKE:  Thank you.

15         THE JUROR:  You're welcome.

16         THE COURT:  All right.  That's it.  Thank you.

17         THE JUROR:  Thank you very much.

18         THE CLERK:  Juror No. 448.

19         THE JURY CLERK:  Juror 448.

03:44 20    THE CLERK:  Ma'am, over here, please.  Have a seat.

21         THE COURT:  Good afternoon.

22         THE JUROR:  Good afternoon.

23         THE COURT:  Have you been able to avoid talking about

24    the case since we were last here?

25         THE JUROR:  I have been.  I didn't talk to anybody.  I

1    mean, if it happened to be on television, I kind of walked out

2    of the room.

3              THE COURT:  Right.  So we're going to follow up on

4    some of the answers you gave in the questionnaire.

5              THE JUROR:  Okay.

6              THE COURT:  I want to start with, on Page 10, Question

7    26, where we asked for your employment.  You said you are an

8    estate manager.  Can you tell us what that is?

9              THE JUROR:  Yes.  This was for a private residence.  I

03:44 10   took care of this man and his wife for about 20 years.  And

11   when she passed away, she asked me to continue taking care of

12   him, whatever he needed, and --

13             THE COURT:  So you managed the household?  Is that

14   what you do?

15             THE JUROR:  He had quite a lot of property.  He had a

16   big ranch in Colorado.  He had a lot of stocks.  I mean, I had

17   a staff of, like, ten to twelve people.  Whatever he needed,

18   basically, that was -- but I was working at a hospital, at the

19   Winchester Hospital.

03:45 20             THE COURT:  Right, right.

21             THE JUROR:  Then they asked me to leave that job to do

22   this.

23             THE COURT:  You've been putting it in the past tense.

24   Are you still doing it?

25             THE JUROR:  No.  I retired in October.

1          THE COURT:  All right.  Okay.  Congratulations.

2          THE JUROR:  Thanks.

3          THE COURT:  When you were doing it, were you -- he was

4    based here, but he had properties elsewhere, is that it?

5          THE JUROR:  He did.

6          THE COURT:  So you would travel around?

7          THE JUROR:  I did not have to travel, but if I had to

8    I would have.

9          THE COURT:  All right.  So now you're a woman of

03:46 10   leisure, is that it?

11          THE JUROR:  I was.  I was heading for Florida in

12    January, but -- that's okay.

13          THE COURT:  Well, you've got to enjoy all the snow.

14          THE JUROR:  Oh, yeah, my first year out.  I won't

15    forget it.

16          THE COURT:  Okay.  I just want to turn to Question 77

17    on Page 10 -- 10?  20, Page 20.  In Question 77, we asked

18    whether, based on things you'd seen or heard in the media or

19    from other sources, you had formed an opinion about whether the

03:46 20   defendant was guilty or not and what the penalty should be.

21    You indicated by checking the boxes that you had an opinion

22    formed that he was guilty but that you were unsure of the

23    penalty, correct?

24          THE JUROR:  Right.

25          THE COURT:  In the second part of the question, if you

1    look at it, we asked, If you answered yes to any of those

2    questions -- and you answered yes to Part (a) -- would you be

3    able or unable to set aside your opinion and base your decision

4    about guilt based solely on the evidence presented in court?

5    And you checked "able."

6            THE JUROR:  Yes.

7            THE COURT:  Can you tell us about that?

8            THE JUROR:  I believe that people have to -- you have

9    to prove that he's innocent or guilty.  Everybody has a fair

03:47 10   chance.  Nobody was born -- come into this world being bad.  I

11   just think everybody should have a fair chance.

12           THE COURT:  Okay.  As I'm sure you know, in a criminal

13   prosecution, a person accused of a crime is presumed to be

14   innocent of the crime unless the government proves that he's

15   guilty by the evidence at trial and proves it to the jury

16   beyond a reasonable doubt.

17           THE JUROR:  Yes.

18           THE COURT:  You're familiar with those concepts?

19           THE JUROR:  Yes.

03:48 20          THE COURT:  What we'd ask a juror to do in a criminal

21   case is pay attention to the evidence in the case and make

22   judgments about the various charges that may be made based on

23   that evidence and not based on ideas that they might have from

24   other sources.

25           THE JUROR:  Yes.

1              THE COURT:  If you were a juror in this case, would

2    you be able to do that?

3              THE JUROR:  Yes, I would.

4              THE COURT:  And the burden of proof, of course, is

5    always on the government to prove a person guilty.  A defendant

6    in a criminal case never has a burden to prove that he's not

7    guilty.  It's up to the government to prove its proposition in

8    a sense.

9              THE JUROR:  Uh-huh.

03:48 10             THE COURT:  If, on any of the charges, you thought

11   that the government had not fulfilled that -- had not carried

12   that burden and had failed to convince you beyond a reasonable

13   doubt that the defendant was guilty of that particular charge,

14   would you be able to vote not guilty under those circumstances?

15             THE JUROR:  Yes.

16             THE COURT:  Let me just ask you to go to the next

17   page.

18             THE JUROR:  21?

19             THE COURT:  We asked about whether you had personally

03:49 20   been affected -- that's Question 81 -- by the Marathon events.

21   You said "no."

22             THE JUROR:  No.

23             THE COURT:  And in the next one -- there were various

24   support activities after the events:  the One Fund and Boston

25   Strong and so on and so forth.

1                THE JUROR:  Yes.

2                THE COURT:  You said you purchased a shirt and a

3      Boston Strong magnet.  Can you just tell us --

4                THE JUROR:  I'm a Red Sox ticket holder, so I go to

5      many Red Sox games.  I just happened to not go to that game

6      that day.  So I did go to one a few times later, and they were

7      selling the shirts and --

8                THE COURT:  What shirts were they?

9                THE JUROR:  It says "Boston Strong" on them.

03:49 10              THE COURT:  They weren't Red Sox shirts?  That's what

11     I was getting at.

12               THE JUROR:  No.  They were Boston Strong shirts, but I

13     bought them at the Red Sox game and the little magnets that go

14     in your car.

15               THE COURT:  That was a short time after the events?

16               THE JUROR:  I --

17               THE COURT:  Later in April maybe?

18               THE JUROR:  Well, I know that when I took the train in

19     that the crime scene tape was still up, so we couldn't go near

03:50 20    there.  So it was in that time frame.

21               THE COURT:  You know that the equipment truck has left

22     for Florida?

23               THE JUROR:  I know.  I saw it yesterday.  I wasn't on

24     it.

25               THE COURT:  On Page 23, beginning at Question 88, we

1    asked a series of questions about jurors' attitudes towards the

2    death penalty.  88 itself was a -- asked, if you had any

3    general views, what were they.  And you said, "I believe the

4    death penalty should be used depending on the crime, example,

5    serial killer or rapist."  Is that what that says?

6              THE JUROR:  Yes.

7              THE COURT:  "Anyone who would like to relive the

8    crimes."

9              THE JUROR:  Right.

03:51 10             THE COURT:  "All of the crimes depends on the

11   circumstances."

12             THE JUROR:  Correct.

13             THE COURT:  Okay.  Do you want to amplify on that at

14   all?

15             THE JUROR:  Well, somebody like -- well, I put down a

16   serial killer or a rapist.  Somebody who would enjoy reliving

17   that crime I think should then spend the rest of their life in

18   jail -- should not, should get the death penalty so they would

19   not enjoy reliving it.  Somebody who, let's say, killed a

03:51 20   police officer or somebody didn't plan it or -- I think life

21   imprisonment.  So it depends on the case.

22             THE COURT:  Uh-huh.  In the next question, we asked if

23   you could think about putting a number on a scale to match your

24   views.  You chose No. 10, which, as the question says,

25   "reflects the belief that the death penalty should be imposed

```
 1    whenever the defendant has been convicted of intentional

 2    murder."

 3             THE JUROR:  Maybe I just didn't understand.

 4             THE COURT:  That seems a little more --

 5             THE JUROR:  Right.  I'm not very good at taking tests.

 6    This was like a test.

 7             THE COURT:  Let's go to the next question, which,

 8    rather than using numbers, puts it in words.

 9             THE JUROR:  Okay.

03:52 10         THE COURT:  There was a series of propositions.  We

11    asked if you could find one that reflected your feelings about

12    the death penalty when somebody has been convicted of murder.

13    You actually selected two.

14             THE JUROR:  Okay.

15             THE COURT:  (d) and (e).  Is that because you

16    weren't --

17             THE JUROR:  Let me see what it says.

18             THE COURT:  Go ahead.  Read it.

19             THE JUROR:  (d) is the -- actually the answer to the

03:53 20    previous question, the other page when I said depending on the

21    type of crime it was.

22             THE COURT:  Okay.

23             THE JUROR:  Let me see.  (e), again, same thing.

24             THE COURT:  Okay.  So now correct me if I'm wrong.  I

25    don't want to put words in your mouth.
```

1              THE JUROR:  Okay.

2              THE COURT:  Is it your position then, based on those

3      answers, that you would make up your mind, if you were in the

4      penalty phase of a case, which -- whether the death penalty or

5      life imprisonment without possibility of release was the right

6      punishment, would you make your mind up after you had

7      considered all the --

8              THE JUROR:  Yes.

9              THE COURT:  -- penalty phase information that you had

03:53 10      gotten in the course of that?

11              THE JUROR:  Yes, I would.

12              THE COURT:  Without any necessary predisposition to

13      one view or the other?

14              THE JUROR:  No.

15              THE COURT:  Let me ask you to go to the next page,

16      bottom of the page, Question 95.  We put it in the context of

17      this case.  If you found the defendant guilty and you decided

18      that the death penalty was the appropriate punishment for him,

19      could you conscientiously vote for the death penalty?  And you

03:54 20      said "yes."

21              THE JUROR:  Yes.

22              THE COURT:  Then if you go to the top of the next, we

23      asked a similar question.  If you found him guilty and you

24      decided life in prison without the possibility of release was

25      the appropriate punishment for him, could you conscientiously

1      vote for that sentence?  And you said "yes."

2                THE JUROR:  Yes.

3                THE COURT:  So, okay.  I'll just leave it at that.

4                THE JUROR:  Whatever the jury decided would be a --

5                THE COURT:  You understand you don't have to do what

6      the other jurors do?

7                THE JUROR:  I understand, yes.  But I would put my

8      feelings forth.

9                THE COURT:  You would be open to either?

03:54 10                THE JUROR:  Either/or.

11                MR. WEINREB:  I have nothing, your Honor.  Thank you.

12                MS. CONRAD:  Good afternoon, ma'am.  My name is Miriam

13      Conrad.  I'm one of Mr. Tsarnaev's lawyers.

14                How long have you been a Red Sox season ticket holder?

15                THE JUROR:  About 15 years.

16                MS. CONRAD:  So the game that you went to after the

17      Marathon bombing, was there a ceremony or any events honoring

18      the Marathon bombing victims?

19                THE JUROR:  I was not at that game.  You mean when

03:55 20      they brought in the victims?

21                MS. CONRAD:  Well, was there any acknowledgment --

22                THE JUROR:  I don't remember.

23                MS. CONRAD:  Was it the game where David Ortiz made

24      his famous statement that I can't repeat?

25                THE JUROR:  No.  Wait a minute.  Maybe.  It could have

 1    been.  You know, if I'm not at the game, I'm watching it on TV.

 2         MS. CONRAD:  Sure.

 3         THE JUROR:  So I could say yes and then I could be

 4    wrong so --

 5         MS. CONRAD:  But there was a lot of emotion.

 6         THE JUROR:  Oh, yes, there was.

 7         MS. CONRAD:  And how did that affect you?

 8         THE JUROR:  I cried.

 9         MS. CONRAD:  On the anniversary, I think it was -- I

03:56 10   don't remember if it was Opening Day of 2014 when the --

11         MR. WEINREB:  Objection, your Honor.

12         MS. CONRAD:  I'm getting to the question.

13         MR. WEINREB:  A question would be more appropriate

14    than --

15         MS. CONRAD:  Were you present when the World Series

16    rings were presented --

17         THE JUROR:  No.

18         MS. CONRAD:  -- by Marathon bombing victims?

19         THE JUROR:  No.

03:56 20   MS. CONRAD:  Did you watch that on TV?

21         THE JUROR:  I could have, but I could have also been

22    in Florida.  I don't remember.

23         MS. CONRAD:  Okay.  Let me just ask generally.  On how

24    many occasions that you either watched a Red Sox game or

25    attended a Red Sox game was there some acknowledgement of the

1    Marathon bombing events?

2            THE JUROR:  Well, last year I only went to four, and I

3    get 13.  So I'd say maybe -- out of the four, maybe one or two.

4            MS. CONRAD:  Do you remember anything about what those

5    events were?

6            MR. WEINREB:  Objection.

7            THE COURT:  Yeah.  I think -- I don't think we --

8            MS. CONRAD:  Well, let me ask this question:  You said

9    that you didn't go to the game on April 15, 2013, the Patriots'

03:57 10   Day game.

11           THE JUROR:  No, I did not.

12           MS. CONRAD:  Did you know anybody who did?

13           THE JUROR:  Probably the other owners of those

14   tickets.

15           MS. CONRAD:  Did you speak with them about what their

16   experience was like that day?

17           THE JUROR:  No, I did not because I don't see these

18   people again till the following year at draft.

19           MS. CONRAD:  Did you have any concerns about their

03:57 20   safety that day?

21           THE JUROR:  I did not.

22           MS. CONRAD:  Do you remember where you were that day?

23           THE JUROR:  Actually, I was taking care of my boss at

24   the time.

25           MS. CONRAD:  I'm sorry?

```
 1              THE JUROR:  I was taking care of my boss at the time.

 2              MS. CONRAD:  Do you remember how you found out about

 3      the bombing?

 4              THE JUROR:  On television.

 5              MS. CONRAD:  What do you remember about that?

 6              THE JUROR:  Just that there had been an explosion at

 7      the finish line, and then it was just constant TV about it.

 8              MS. CONRAD:  How did you feel?

 9              THE JUROR:  It's hard to say.  You feel numb.  You

03:58 10     don't know -- believe it or not, the one feeling I did have was

11      I felt guilty.

12              MS. CONRAD:  Why?

13              THE JUROR:  I wasn't there.

14              MS. CONRAD:  Can you tell me more about that?

15              MR. WEINREB:  Objection, your Honor.  This isn't

16      follow-up on any --

17              THE COURT:  Yeah.  Let's stick with the main event

18      here.

19              MS. CONRAD:  Well, I think, respectfully, your Honor,

03:58 20     this is.

21              THE COURT:  No.

22              MS. CONRAD:  Were you affected by the shelter in place

23      on April 19th?

24              THE JUROR:  Was I affected by what?

25              MS. CONRAD:  The shelter in place on April 19th.
```

 1         THE JUROR:  No, I was not.

 2         MS. CONRAD:  Now, you selected on your questionnaire,

 3   on Page 23, Question 89, No. 10 -- if you'd just take a moment

 4   to read the introduction.

 5         THE JUROR:  Page 23?

 6         THE COURT:  Yes, 23, Question 89.

 7         MS. CONRAD:  Where all the numbers are.

 8         THE JUROR:  Oh, yes.

 9         MS. CONRAD:  If you take a look at the introduction to

03:59 10   that, it says that 10 reflects a belief that the death penalty

11   should be imposed whenever the defendant has been convicted of

12   intentional murder.  So is that how you feel?

13         THE JUROR:  No.  It shouldn't be in every murder case.

14         MS. CONRAD:  Okay.  But you selected 10.

15         THE JUROR:  I know, because I'm not very good, like I

16   said -- maybe I read through to it too fast.

17         MS. CONRAD:  Sure.  You said something -- when the

18   judge was asking you questions about your opinions about when

19   the death penalty would be appropriate, you said something

04:00 20   about if a police officer is killed.

21         THE JUROR:  Right.  That wasn't a premeditated.  That

22   was something that happened in the -- the person that commits

23   the crime is not going to sit back in his cell thinking, oh --

24   reliving it, how wonderful it was.

25         MS. CONRAD:  But what if it were premeditated?

 1           MR. WEINREB:  Objection.  That's a precommitment

 2      question.

 3           THE COURT:  Yes.  The examples are sort of

 4      spontaneous.  I don't think you can place too much weight on

 5      them.

 6           MS. CONRAD:  My question is -- let me ask a different

 7      question.  Do you believe that anyone who commits a

 8      premeditated murder of a police officer should receive the

 9      death penalty?

04:00 10           MR. WEINREB:  Objection.

 11           THE COURT:  Well, again, I think -- you know, we've

 12      had this discussion.  They're often using terms that have legal

 13      freight in ways that they may not be clear.  It will produce

 14      ambiguity that is --

 15           MS. CONRAD:  May I then --

 16           MR. WEINREB:  Your Honor, I have an additional ground

 17      as well, which is, offering one aggravating circumstance

 18      without any of the mitigating circumstances is a case-specific

 19      *Morgan*-type question that we've decided long ago is not

04:01 20      appropriate.

 21           THE COURT:  I agree with that.

 22           MS. CONRAD:  Can I ask, ma'am, what you mean by

 23      premeditated?

 24           MR. WEINREB:  Objection.

 25           THE COURT:  No.

1          MS. CONRAD:  Do you -- if someone were charged --

2     strike that.

3          If someone were found guilty beyond a reasonable doubt

4     of a preplanned murder, would you be willing or able to take

5     into account facts about the defendant before -- such as his

6     background, before deciding whether the death penalty was

7     appropriate?

8          THE JUROR:  No.

9          MS. CONRAD:  Thank you.

04:02 10          THE COURT:  Is that it?

11          Okay, ma'am.  Thank you.  You may step out.

12          THE JUROR:  Thank you.

13          THE COURT:  I think we have time for one more.

14          THE CLERK:  Juror No. 452.

15          THE JURY CLERK:  Juror No. 452.

16          THE CLERK:  Sir, over here, please.  Have a seat.

17          THE COURT:  Good afternoon.

18          THE JUROR:  Good afternoon.  Hi, Judge.

19          THE COURT:  Have you been able to avoid discussing the

04:03 20     merits of the case with anyone?

21          THE JUROR:  Absolutely.

22          THE COURT:  And, as much as possible, avoid media

23     coverage of the case?

24          THE JUROR:  Yes.  I don't follow it, you know.

25          THE COURT:  That'S the questionnaire that you filled

```
 1    out.  We're going to follow up on some of the answers you gave

 2    to get some more information.

 3           I'm interested -- this is on Page 4, the beginning.

 4    You spent a total of four years in Africa?

 5           THE JUROR:  Yes, I have.

 6           THE COURT:  Can you tell us about that?

 7           THE JUROR:  Well, my parents were divorced.  My mother

 8    was a librarian.  I was a youth.  I was, like, eight and nine

 9    and then 12 and 13 so two different periods of times for two

10    years in two different places.

11           THE COURT:  Currently, you're a staff nurse at the

12    McLean Hospital.

13           THE JUROR:  That's right.

14           THE COURT:  You've been doing that for quite awhile?

15           THE JUROR:  Thirty-eight years in March.

16           THE COURT:  Looking at Page 11, we asked about some

17    affiliations of you or other family members.  You said your

18    father was a criminal defense lawyer for about 30 years.

19           THE JUROR:  That's right.

20           THE COURT:  Where did he practice?

21           THE JUROR:  In Florida, in Key West, in Miami,

22    Florida, and -- in the south, in Florida primarily.

23           THE COURT:  Okay.  Now, I think you said your parents

24    were divorced.  Were you living with him when he was --

25           THE JUROR:  No.  I was living with my mother.  I'd
```

1    visit him.  I'd go down for spring breaks or whatever in

2    college and so on, yeah.

3          THE COURT:  Your father-in-law was also a -- no.  He

4    was just private practice, not necessarily criminal defense

5    practice, is that it?

6          THE JUROR:  Not criminal at all.

7          THE COURT:  So let me ask you to turn to Page 20.  And

8    if it's more convenient, you can take the clip off the page.

9          THE JUROR:  Okay.

04:06 10          THE COURT:  Question 77, in that question we asked

11    whether, based on things you'd seen or read in the media or

12    from other sources, you had formed various opinions.  And you

13    indicated that, yes, you had formed an opinion the defendant

14    was guilty.  And as to the penalty questions, in Part (c) and

15    (d), you said you were unsure.

16          THE JUROR:  Right.

17          THE COURT:  Then down just below that, we said, If you

18    answered yes to any of the questions, would you be able or

19    unable to set aside your opinion and base your decision about

04:06 20    guilt solely on the evidence presented to you in court?  And

21    you checked "able."

22          THE JUROR:  Yes.

23          THE COURT:  Would you tell us about that?

24          THE JUROR:  As to the guilty or the penalty phase or

25    which?  Just the guilty?

1          THE COURT:  Let's concentrate on the "yes" to guilty

2    and "able" to set aside.

3          THE JUROR:  Okay.  So, in general, I have an opinion

4    that the -- Mr. Tsarnaev is guilty.  However, I don't know the

5    charges.  I don't know the evidence.  I don't know anything

6    about it aside from, you know, what was, like, visibly

7    displayed everywhere.  I would have to be --

8          THE COURT:  I'm sure you know that in our criminal

9    justice system a person is presumed innocent of any charge

04:07 10   against him unless and until the government proves that he's

11   guilty by evidence at the trial and that the government's proof

12   must be convincing enough that the jurors have no reasonable

13   doubt about the fact of the person's guilt.  You're familiar

14   with those principles?

15         THE JUROR:  I am.

16         THE COURT:  What we ask jurors to do is just set aside

17   ideas they might have from other sources about the issues in

18   the case and decide those issues based only on what they hear

19   in the course of the trial.  You think you would be able to do

04:07 20   that?

21         THE JUROR:  Yeah.  I mean, I -- I would go into that,

22   you know, believing that and so I -- that is a fundamental

23   right and so on.  I agree with that principle.

24         THE COURT:  If, on any of the particular charges, you

25   thought that the government's proof had not convinced you

1    beyond a reasonable doubt that the defendant was guilty, would

2    you be able to vote for not guilty?

3           THE JUROR:  Absolutely.  I mean, sure.

4           THE COURT:  In your work, do you have any intersection

5    with the criminal justice system?

6           THE JUROR:  Not really.  I mean, someone may call 911

7    and say, I'm being held here against my will, and the Belmont

8    Police will show up at their door.  That is the extent of it.

9    Or we might have a forensic consult on a patient, that kind of

04:08 10    thing.  In general, no.  It's not Bridgewater.  It's McLean.

11           THE COURT:  Beginning on Page 23, at Question 88, we

12    asked a series of questions about jurors' attitudes regarding

13    the death penalty.  88 was a question about views in general,

14    if you had any views about the death penalty in general.  And

15    you said, "Generally opposed, possible exceptions."

16           THE JUROR:  Right.

17           THE COURT:  Can you explain that a little?

18           THE JUROR:  Sure.  I'm generally opposed.  You know,

19    probably 30 years ago I would have been for.  But then, you

04:09 20    know, the DNA evidence and the questions that have come up

21    about it, I've become more generally opposed.  Possible

22    exceptions would be, you know, war crimes, the Nuremberg Trial

23    or terrorism, I think, and serial killers.  There are some

24    things that probably I would lean more towards being in favor

25    of it.

 1          THE COURT:  So in 89 we asked you to place yourself on

 2     a scale of 1 to 10, where 1 is strongly opposed and would never

 3     vote to impose; 10 being the opposite of that, strongly in

 4     favor and virtually always would vote to.  You placed yourself

 5     as No. 2.  Anything you want to say about that?

 6          THE JUROR:  Well, I just probably, you know,

 7     statistically thinking that the vast majority of crimes don't

 8     fall into those exceptions of mine; and so, therefore, I would

 9     be more towards the strongly opposed than not.

04:10 10          THE COURT:  On the next page, in Question 90, we asked

11     it not with numbers but with words and asked if you found a

12     statement among the several you had to choose from that

13     expressed your view the best.  You chose (c).  "I'm opposed to

14     the death penalty, but I could vote to impose it if I believed

15     that the facts and the law in the particular case called for

16     it."  Is that a --

17          THE JUROR:  Right.  I think that's accurate.  I

18     haven't had time to look over these others.

19          THE COURT:  Take your time.

04:10 20          THE JUROR:  Okay, sure, absolutely.

21          Okay.  So (c) or (d).  I'd have to look and break

22     those down.  "I'm not for or against the death penalty."  "I'm

23     more against it."  "I could vote to impose it or I could vote

24     to impose a sentence" -- either (c) or (d).  They seem to be

25     pretty close.

1          THE COURT:  Well, one of the differences between (c)

2     and (d) is (c) begins by saying you're opposed to the death

3     penalty.  The other says you're neither for or against.

4          THE JUROR:  Right.  Then I am not for or against,

5     although, as I've said, you know, in 90 percent or more, I'm

6     more against but I'm not -- to me, being against something

7     means more like (a) so --

8          THE COURT:  You read for or against "always," one way

9     or the other; is that what you're saying?

04:12 10          THE JUROR:  Right.

11          THE COURT:  Because you're not an always, in your

12     view, in either direction, you're somewhere in the middle?

13          THE JUROR:  Yeah, exactly, more towards --

14          THE COURT:  Let's look at the bottom of Page 25,

15     Question 95.  And that question puts it in the context of this

16     case.  If you found Mr. Tsarnaev guilty and you decided that

17     the death penalty was the appropriate punishment for him, could

18     you conscientiously vote for the death penalty?  And you

19     checked "yes."

04:12 20          THE JUROR:  Yeah.  So it's presumed that I found him

21     guilty and decided that it was the appropriate punishment.  If

22     I did that, I would not for some other reason say no, you know,

23     so, I mean, if I reached those conclusions.

24          THE COURT:  Right.  And then at the top of the next

25     page, 96, we asked the parallel question.  If you found him

1    guilty and decided that life imprisonment without the

2    possibility of release was the appropriate punishment, could

3    you conscientiously vote for life imprisonment without the

4    possibility of release?  And you checked "yes" there.

5         THE JUROR:  Right.  So, yeah, I think it's kind of the

6    same thing in a way.  It doesn't really have the death penalty

7    involved in this question, so I would be --

8         THE COURT:  This is the alternate.

9         THE JUROR:  Yeah.  If I thought that it was life

04:13 10   imprisonment and that was the appropriate, then I would

11   absolutely certify that if that's what I thought.

12        THE COURT:  Okay.  All right.  Follow-up?

13        MR. WEINREB:  Thank you, your Honor.  Good afternoon.

14        THE JUROR:  Hi.

15        MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

16   prosecutors in the case.

17        THE JUROR:  Okay.

18        MR. WEINREB:  I just want to follow up on one thing,

19   which is the nature of your work at McLean.

04:13 20        THE JUROR:  Sure.

21        MR. WEINREB:  What kind of care do you provide to the

22   patients?

23        THE JUROR:  The very best.

24   (Laughter.)

25        MR. WEINREB:  That's really all I needed to know.

1          THE JUROR:  So it's a 28-bed psychotic disorders unit.

2     Schizophrenia and bipolar are the main diagnoses.  So it's

3     fairly short term.  When I started at McLean, the average stay

4     was 381 days.  Now it's down to about 12.  So it's just direct

5     clinical care of the patient.  I'm a member of the rounds

6     teams.  I administer medications.  I speak with the patients

7     individually and so on.

8          MR. WEINREB:  Do you -- I assume you don't do

9     diagnostic tests?

04:14 10          THE JUROR:  I don't, no.  I'm a nurse.

11          MR. WEINREB:  Do you do therapy with them though of

12     any kind?

13          THE JUROR:  No, just what we call staff talks, just

14     sort of checking in with the person, just trying to reassure

15     them or help them along in the process.

16          MR. WEINREB:  Are you part of discussions with the

17     doctors and the staff about what the problems are?

18          THE JUROR:  Absolutely.  It's a very democratic place.

19     I don't know if you know anything about McLean.  That's one of

04:14 20     the best things I've felt about it in all my time there.  So,

21     absolutely.  Nurses and mental health workers and everybody has

22     a lot of input into what's going on.  I may know something that

23     the doctor hasn't come across and/or -- you know, I'm not going

24     to say, I think this person is bipolar.  I'm not going to go

25     over those boundaries, but I'm going to give information and

1    communicate, you know, what I've observed and assessed.

2              MR. WEINREB:  Okay.  Thanks very much.

3              THE COURT:  Sure, absolutely.

4              MS. CONRAD:  Good afternoon, sir.  My name is Miriam

5    Conrad.  I'm one of Mr. Tsarnaev's lawyers.

6              THE JUROR:  Hi.

7              MS. CONRAD:  You mentioned that there were certain

8    exceptions where you thought the death penalty was appropriate,

9    and you mentioned a few of those.  In those exceptions, would

04:15 10   you automatically vote for the death penalty?

11             MR. WEINREB:  Objection.  That's not --

12             THE COURT:  No.  Go ahead.  You can answer that.

13             THE JUROR:  I don't -- no.  I don't have a checklist

14   necessarily.  You know what I mean?  I think each case is

15   individual.  So I wouldn't say, Okay, you know, Goring should

16   be killed but Hitler should be left off.  I don't know.  I

17   don't have a hard-and-fast rule about --

18             MS. CONRAD:  You would be able to listen to the

19   evidence during the penalty phase and consider both facts about

04:16 20   the crime and facts about the defendant himself before deciding

21   what the appropriate punishment is?

22             THE JUROR:  Oh, absolutely.

23             MS. CONRAD:  Thank you.

24             THE COURT:  Okay, sir.  Thank you very much.

25             THE JUROR:  Thank you.

         1            THE COURT:  We'll take a lunch break.  2:00.

         2    (Luncheon recess taken at 1:03 p.m.)

         3            (The Court enters the courtroom at 2:08 p.m.)

         4            THE COURT:  Okay.  Ready?

         5            THE CLERK:  Juror No. 453.

         6            THE JURY CLERK:  Juror No. 453.

         7            (The juror enters the courtroom.)

         8            THE CLERK:  Sir, over here, if you would.  Take a

         9    seat.

05:21   10            Keep your voice up and speak into the mic, okay?

        11            THE JUROR:  Okay.

        12            THE COURT:  Good afternoon.

        13            THE JUROR:  Good afternoon.

        14            THE COURT:  Have you been able to avoid discussion of

        15    the merits of the case since we were last here?

        16            THE JUROR:  Yes.

        17            THE COURT:  And also as much as possible avoid media

        18    accounts?

        19            THE JUROR:  I haven't talked to anyone.

05:21   20            THE COURT:  But I'm talking about the media too.

        21            THE JUROR:  Yeah, the media too.  Definitely not the

        22    media.

        23            THE COURT:  Thank you.

        24            So I'm going to follow up on some of the answers you

        25    gave to some of the questions.

1          THE JUROR:  Okay.

2          THE COURT:  You're currently an assistant professor in

3     political science?

4          THE JUROR:  Yup.

5          THE COURT:  Any special concentration?

6          THE JUROR:  Political science.  Oh, I'm sorry.

7     Comparative politics.  I do immigration politics, Latin

8     America, development, international relations.  Is that what

9     you meant?

05:22 10          THE COURT:  Yeah.

11          THE JUROR:  Yeah.

12          THE COURT:  Yeah.  Both undergraduate and graduate?

13          THE JUROR:  Well, UMass -- oh, I'm not supposed to

14     say.

15          THE COURT:  You can.  That's all right.

16          THE JUROR:  Well, the school I teach at there's mostly

17     undergrads.  So I have taught some graduate courses but -- in

18     development, but most of the time I teach undergrads.

19          THE COURT:  Okay.  You're working on a book?

05:22 20          THE JUROR:  I just finished it, actually.

21          THE COURT:  Oh, you did.  What is the topic?  Just

22     generally.

23          THE JUROR:  Remittances.  Remittances.  Money that

24     migrants send back to their home countries.

25          THE COURT:  Okay.  You write on a blog at the

1    University of Pittsburgh?

2         THE JUROR:  Yeah.  It's, you know, sort of a political

3    scientist talking about current events.  It's all about Latin

4    America, though.  Nothing about the U.S.  Well, that's not

5    true.  I have written about U.S.-related issues with the war on

6    drugs and that sort of thing, but nothing domestic.

7         THE COURT:  And in terms of Facebook and Twitter, you

8    use them --

9         THE JUROR:  I do use Facebook very often, yes.

05:23 10         THE COURT:  For --

11         THE JUROR:  Twit- --

12         THE COURT:  -- personal matters?

13         THE JUROR:  Personal matters, yes.  I don't have any

14    page -- I do express political opinions from time to time, but

15    it's personal.  And Twitter, I actually just joined recently,

16    but I haven't -- I tweeted one thing, so that's it.

17         THE COURT:  Okay.  I see -- this is on page 11 at

18    Question 31 -- that you had a cousin who was killed in Iraq in

19    2006?

05:24 20         THE JUROR:  Yes.

21         THE COURT:  Can you tell us about that?

22         THE JUROR:  Yeah.  My cousin, he was a medic.  We were

23    fairly close, actually.  Sorry.  And he -- he joined Iraq

24    and -- actually, I feel very strongly about it because I didn't

25    agree with the war in the first place.  I thought that it was a

1    mistake that he joined the Army.  He did it because he wanted

2    to go to college and couldn't pay for it.  And he thought,

3    "I'll join the military."  The kid -- yeah.  Wasted life, you

4    know.

5              Anyway, yeah.  Sorry.

6              THE COURT:  Yeah, I understand.  So similar to you in

7    age?  Were you growing up together or --

8              THE JUROR:  Oh, in age?  He was a little younger than

9    me, about three years younger than me.

05:24 10             THE COURT:  Yeah.

11             THE JUROR:  Also an immigrant who had come here soon

12   after -- yeah, soon after.  Soon after I came.

13             THE COURT:  Yeah.

14             THE JUROR:  Yeah.

15             THE COURT:  Did you grow up in the same area?

16             THE JUROR:  No, no.  Well, I mean, up until -- I came

17   here when I was 12, and before that we grew up together in the

18   same city.  Then I came to Arizona and he went to California,

19   and we saw each other a few times.  And, yeah, it -- we were

05:25 20   planning to go to a game before he went in the -- yeah.

21             THE COURT:  Yeah, I can see it affects you.

22             THE JUROR:  Yeah.

23             THE COURT:  Do you know the circumstances of --

24             THE JUROR:  He was in a Humvee in Iraq.  They were

25   driving.  I don't know where they were going or what they were

1    doing.  But he was in a Humvee and there was an -- what do you

2    call it, an explosive on the side of the road.  Some, you

3    know -- I don't know, the rebels or whatever put something on

4    the side and then -- yeah.  Okay.

5              THE JUROR:  Yeah.  Yeah.

6              THE COURT:  We asked various questions about

7    organizations or causes that you might have been affiliated

8    with or supported.  On Question 39 on page 13 --

9              THE JUROR:  Yeah.

05:26 10             THE COURT:  -- you noted two, I guess.

11             One was immigration law reform as you've already

12   adverted to, and also death penalty laws reform.  Can you tell

13   us a little bit about that?

14             THE JUROR:  Yeah.  So both?  In the case of --

15             THE COURT:  Yeah, okay.  Both.  Sure.  I was more

16   interested in the death penalty --

17             THE JUROR:  Yeah, obviously, I would think.

18             Immigration law, I just went on a rally in D.C. about

19   support for comprehensive immigration reform.  Death penalty

05:26 20   law reform I was at a meeting where people were talking about

21   reforming the death penalty.  My wife works for a foundation

22   that supports abolishing the death penalty, and so those were

23   the people that I --

24             THE COURT:  Do you know the name of the foundation?

25             THE JUROR:  Proteus, P-R-O-T-E-U-S.

1          THE COURT:  Okay.  In Question 72, this is now on page

2     19, we asked if you'd called a talk show, written a letter to

3     an editor, posted a comment and so on about issues, and you

4     said, "Yes.  Immigration, Latin American politics and U.S.

5     invasion of Iraq."

6          THE JUROR:  Expanding:  Invasion of Iraq, I was asked

7     to talk about it with a Hawaiian on TV.  They were asking me

8     about veterans -- what was happening was we were leaving Iraq,

9     or Obama said that the war was over, we're bringing troops

05:28 10     back, and they asked me to comment on it, so I did.

11          THE COURT:  Who asked?

12          THE JUROR:  It was a Hawaiian talk show.  So, you

13     know, like a politics sort of general show.  And, yeah.  That's

14     what you --

15          THE COURT:  When was that?

16          THE JUROR:  When did Obama -- whenever that was.

17     2010, 20- -- yeah, 2010.

18          THE COURT:  On page 20 --

19          THE JUROR:  Yeah.

05:28 20          THE COURT:  -- if you'd look at Question 77.

21          THE JUROR:  Yup.

22          THE COURT:  In this question we've asked whether,

23     based on things you'd seen or heard, you'd formed an opinion

24     that the defendant was guilty and if you had an opinion about

25     the penalty that should be imposed and so on.

         1              THE JUROR:  Yeah.

         2              THE COURT:  You answered yes, you had an opinion that

         3    he was guilty, and as to the penalty you were unsure.

         4              THE JUROR:  Yeah.

         5              THE COURT:  Then we asked below that, "If you answered

         6    yes to any of these questions, would you be able or unable to

         7    set aside your opinion and base your decision about guilt

         8    solely on the evidence that will be presented to you in court,"

         9    and you said, "I do not know."

05:29   10              Can you tell us about that?

        11              THE JUROR:  Well, I don't think -- I feel pretty

        12    strongly about the death penalty, but in the case -- in this

        13    particular case.

        14              THE COURT:  Before we get to the death penalty, I want

        15    to focus on Part A where you said you had an opinion that he

        16    was guilty.

        17              THE JUROR:  So prior to this case -- I'm not

        18    originally from Boston.  I didn't know anything about really

        19    the Boston Marathon.  And so when it happened, it was pretty

05:29   20    shocking, the whole thing.  So I read extensively about it.  I

        21    mean, I teach politics, so of course I was interested in the

        22    particular case.  I read about lots of articles on *Slate*.  I

        23    read them on *Boston Globe* and a bunch of other places.

        24              And so at least from what I read, it seemed pretty

        25    clear that he was guilty, guilty in the sense that he had been

1   part of this and he had committed -- you know, that he had been

2   part of the killing of the MIT officer, that he had been

3   setting the bombs in the Boston Marathon.  Yeah, so to me that

4   seems pretty clear that he's guilty.

5          And then what do you want me to say, or what did you

6   want me to answer?  So should he receive the death penalty?

7          THE COURT:  No.  No, not yet.

8          THE JUROR:  Sorry, sorry, sorry.

9          THE COURT:  In our criminal justice system a person

05:30 10   who is accused of a crime is presumed to be innocent, or not

11   guilty --

12          THE JUROR:  Right.

13          THE COURT:  -- unless the government proves that he's

14   guilty by the evidence at trial.  And we ask trial jurors to

15   evaluate the evidence and tell us whether the government has

16   proved that or not.

17          THE JUROR:  Right.

18          THE COURT:  And if they're satisfied beyond a

19   reasonable doubt that the government has proved the fact of

05:30 20   guilt, then they may return a verdict of guilty, but if they're

21   not convinced of that, it's the obligation of the jury to find

22   the person not guilty.

23          THE JUROR:  Right.

24          THE COURT:  It's understandable that people have

25   impressions about what happened in this case and that they

1    would approach the jury service having that in some degree.

2    And the question -- the second part of the question asked would

3    you be -- to the extent you had such opinions, would you be

4    able to set them aside and to concentrate on the trial evidence

5    and make a judgment based on that body of evidence alone

6    regardless of what other impressions you had from those reports

7    or otherwise?

8              THE JUROR:  Right.

9              THE COURT:  So that's really the self-assessment

05:31 10   question.  Do you think you would be able to do that?

11             THE JUROR:  I think it would be very difficult to.  I

12   can't say for sure that I wouldn't, but I think it would be

13   very, very difficult for me to get rid of impressions I have.

14             THE COURT:  Okay.  Let's now turn for a minute to the

15   death penalty questions.

16             THE JUROR:  Okay.

17             THE COURT:  And that's on 23.

18             THE JUROR:  Yeah.

19             THE COURT:  Beginning at Question 88.

05:32 20             THE JUROR:  Yup.

21             THE COURT:  88 is a question whether you had views

22   about the death penalty in general, what are they.  And you

23   wrote, "I believe the death penalty should be abolished.  As

24   much as I believe Tsarnaev is guilty, I do not think he should

25   be executed."

1          THE JUROR:  That's correct.

2          THE COURT:  Okay.  Do you want to amplify on that at

3     all or...

4          THE JUROR:  So I believe very strongly -- or fairly

5     strongly -- that the death penalty should not be -- should not

6     exist here or anywhere.  Although I think -- and the reason why

7     I think that's the case is because it's very difficult, I

8     think, to have an impartial reading of cases.  In this

9     particular case it might be clear, say.  There are

05:32 10    cases -- there are many cases that have been -- death penalty

11    has been imparted.  In Texas, for instance, in Florida, in

12    Alabama, which I think the -- okay.  My impression is that it

13    was wrong, and people have written about this.  And so because

14    I think there's always a possibility that it could be wrong, I

15    think that the death penalty should be abolished because

16    there's always a possibility that people are innocent and that

17    they get killed.  So that's what I think generally about the

18    death penalty.

19          In Mexico, which is where I was from, does not have

05:33 20    the death penalty, and so maybe that's where I get this from.

21    But -- so, yeah.  So I think generally as it is, it should be

22    abolished, and if I had the power to do that, I would do it

23    today.

24          Nonetheless, even though I believe that the death

25    penalty should be abolished, there are cases I think, for

1    instance, in the case of the Aurora shooter or the Newtown

2    situation, where the crimes are so horrendous that I can

3    understand why the death penalty exists, let's say, people feel

4    whatever.

5        And so I don't think personally I would be able to

6    execute -- or to decide for the execution of anyone.  And even

7    though I think -- my impression is that Tsarnaev is guilty, I

8    don't think that I would be able to say that he should be

9    executed.

05:34 10      THE COURT:  Okay.  And I just want to, I guess -- you

11   indicated that generally by the next question --

12       THE JUROR:  The 2?

13       THE COURT:  -- the 2, and then again on the next page,

14   Question 90, where you chose as close to your views Statement

15   B, which is you're opposed to the death penalty, would have a

16   difficult time voting to impose it?

17       THE JUROR:  Yeah.  So the reason I put a 2, for

18   instance, is because I can imagine a possibility where, I

19   suppose -- like Hitler, for instance, or somebody like that --

05:35 20   where they commit genocide or something so horrendous that I

21   suppose I could have -- I would vote in that instance.  But in

22   this case I don't think -- I don't think the -- at least -- and

23   I don't know in the previous question -- I don't foresee myself

24   as being able to do that, but I suppose there's a possibility

25   that I could be okay.  I don't know.

1          But I think even if the facts -- even if the facts

2     were clear -- as I said before, even if he was guilty, it would

3     be very difficult for me to say we should execute him.

4          THE COURT:  Okay.  Finally, for me, anyway -- and the

5     lawyers will have a chance to ask you things if they want -- on

6     page 26.

7          THE JUROR:  Yeah.

8          THE COURT:  The Question 97.

9          THE JUROR:  Yeah.

05:35 10        THE COURT:  You say, "I teach international relations,

11    so I'm familiar with Tsarnaev's claims about Russian and

12    American terrorism."

13         THE JUROR:  Yeah.

14         THE COURT:  What are those claims?

15         THE JUROR:  Well, claims about Putin in particular;

16    about the oppression from the Russian state on Chechnya and on

17    the neighboring states; claims about abuses and people getting

18    killed; police brutality, et cetera.  And I'm also familiar

19    with -- or claims about the United States being unfair to

05:36 20    Muslims, about the invasion of Iraq and all of these things

21    related to the Muslim world.  I don't necessarily agree, but I

22    am familiar.

23         THE COURT:  I understand.

24         You put it in terms of "the defendant's claims."  How

25    do you know what the defendant's claims are?

1          THE JUROR:  Well, from the reading -- from what I

2     was -- from what I had read prior to the -- my impressions,

3     anyway, of --

4          THE COURT:  From the sources you were talking about?

5          THE JUROR:  Yes, from *Slate*, from the *Boston Globe*,

6     from magazines, et cetera, yeah.

7          THE COURT:  Okay.  Questions?

8          MR. CHAKRAVARTY:  Yes.  Good afternoon.  My name is

9     Aloke Chakravarty.  I'm one of the prosecutors in the case.

05:37 10          THE JUROR:  Yeah.

11          MR. CHAKRAVARTY:  Some follow-up questions.  Let me

12     just start with that last issue that the judge raised about

13     what you may have read about the defendant's claims.

14          Do you mean statements the defendant made?

15          THE JUROR:  No.  I don't -- I don't -- to be honest,

16     this was a year ago, right?  So it was April of 2013.  So, you

17     know, there was a lot of attention about it.  And I read, for

18     instance -- I think it was on *Slate*.  I don't remember all the

19     sources.  But I remember reading about his family and how they

05:37 20     had lived in different parts of Russia and they had come to the

21     United States and what their life was like and some of

22     the -- the older brother's -- I do remember the older brother's

23     claims about hatred against Muslims and how the United States

24     had been oppressive and that sort of thing.  I don't remember

25     his particular claims, if he -- I mean, reading whether he

         1    specifically made these claims or not.  But that's my

         2    impression, that he at least supported them to some extent.

         3             MR. CHAKRAVARTY:  So this period that you were

         4    actively learning about this case.

         5             THE JUROR:  Yeah?

         6             MR. CHAKRAVARTY:  What time period would you say that

         7    you were doing that?

         8             THE JUROR:  Right after the marathon -- the stories

         9    that came out, there was a lot of interest on, you know, what

05:38   10    could have possibly led people to do this, how did it

        11    come -- and I was interested also because they're immigrants

        12    and they're white -- or at least perceived as white.  And

        13    so -- because I teach immigrant politics, there's a lot of talk

        14    about, you know, Mexicans being criminals and the

        15    criminalization of immigrants, so I was very interested in how

        16    the media would portray these people.

        17             And so I was interested in that, and that's why -- so

        18    I don't remember the exact timeline, but the months after

        19    whatever was written I probably read it, between May 2013 and,

05:39   20    I don't know, August 2013, roughly, those months that came

        21    after?

        22             MR. CHAKRAVARTY:  And so your courses that you teach

        23    are in immigrant policies?

        24             THE JUROR:  Immigration politics.

        25             MR. CHAKRAVARTY:  Politics?  Excuse me.

1        THE JUROR:  Which is -- right now I'm teaching it,

2   actually.  And it's about what states do in response to

3   immigrants coming.  So I go through all of the different

4   countries, the United States -- not all of the different

5   countries, but the main countries -- in Europe, France, Spain,

6   England, Sweden, Italy, so on.  I don't do Russia.  Maybe I

7   should.  Japan, Korea and so on.  But I also -- and in my other

8   class, international relations, I talk about migrant flows and

9   things like that.

05:39 10        MR. CHAKRAVARTY:  And do you talk about the asylum

11   process in your --

12        THE JUROR:  I do talk about the asylum process, yeah.

13   That is not a main focus of it, but I do talk about it.  Mostly

14   Cubans, though.

15        MR. CHAKRAVARTY:  I don't think we asked you what your

16   course schedule is like this semester.

17        THE JUROR:  I'm teaching two classes.  Immigration

18   politics is one; the other is Latin America politics, Tuesday

19   and Thursday.

05:40 20        MR. CHAKRAVARTY:  What time?

21        THE JUROR:  9:30 to 10:45 and 12:30 to 1:45.

22        MR. CHAKRAVARTY:  Okay.  And so if you're seated on

23   this case, those times would have to change.  Is that something

24   that --

25        THE JUROR:  Well, actually, I don't know that they

1    would -- I couldn't teach them.  Somebody would have

2    to -- actually, I have no idea what that would mean.

3    Obviously, right, I couldn't teach.

4         MR. CHAKRAVARTY:  That's a question for you.

5         THE JUROR:  I don't know.  I don't know the answer to

6    that.  Presumably the school would have to get somebody or they

7    would have to cancel the classes.

8         MR. CHAKRAVARTY:  Okay.  You're an assistant

9    professor?  I'm just trying to get a sense of your tenure

05:40 10   track.

11        THE JUROR:  Yeah.

12        MR. CHAKRAVARTY:  How does that --

13        THE JUROR:  Well, I submitted the book, so hopefully

14   they'll publish it, and I should hear within two months.  And I

15   have a few articles and -- a few articles that are out, so

16   hopefully -- you know, I'm moving along.

17        MR. CHAKRAVARTY:  So the classes issue should not

18   hamper your career?

19        THE JUROR:  No, the class issue should not -- no, it's

05:41 20   the research.

21        MR. CHAKRAVARTY:  So the question on the class issue

22   is:  Is it a hardship either to you or, you know, in the

23   interest of your students if you --

24        THE JUROR:  Yeah, I don't know the answer to that.  It

25   would be a hardship, but I have no idea what the school would

1    do.  Like, can they teach -- can somebody teach immigration

2    politics?  I don't know.  I don't know if they can get

3    somebody.  So presumably they would have to cancel the class,

4    in which case that wouldn't be a hardship for me; it would be a

5    hardship for 80 students:  40 students on immigration politics

6    and 40 students on Latin America politics.

7              MR. CHAKRAVARTY:  And you already started teaching?

8              THE JUROR:  Yeah.  We're a little bit behind, just

9    like you are, with the snow.  Just a little bit.  But, yeah.

05:41 10             MR. CHAKRAVARTY:  One more point on your study.  This

11   book that you wrote, remittances.

12             THE JUROR:  Yeah?

13             MR. CHAKRAVARTY:  Do you write about terrorism

14   financing?

15             THE JUROR:  No, nothing about terrorism.  I am not a

16   special- -- that is not my specialty.  I have, I would say, a

17   fairly positive view of immigrants in the book, even though I

18   consider the possibility of -- I'll tell you about it if you

19   really want to know.  It's about social remittances, and it's

05:42 20   the idea that immigrants can change the politics of their home

21   country through connections and through social networks.  And

22   so it's a fairly positive thing, even though I consider the

23   possibility that, quote/unquote, bad ideas can be transferred

24   back.  But it's a positive view.

25             MR. CHAKRAVARTY:  That was my thesis in undergrad, so

1   I commend you for writing something scholarly.

2            THE JUROR:  Very good.

3            MR. CHAKRAVARTY:  All right.  So I want to ask you a

4   little bit about your wife's work.

5            THE JUROR:  Yup.

6            MR. CHAKRAVARTY:  The Proteus Foundation, is it?

7            THE JUROR:  Yeah.

8            MR. CHAKRAVARTY:  The death penalty is one of their

9   causes.

05:43 10           You indicated that you've spoken about the death

11   penalty with her.  Ostensibly you've even --

12            THE JUROR:  I attend it, yeah.

13            MR. CHAKRAVARTY:  Yeah.  So would you be able to

14   consider -- just at the threshold stage are you -- would you be

15   able to hold aside any of her convictions and your discussions

16   with her, anything she may have said to you and what her

17   response might be based on your actions in this case, would

18   that not -- could you shield that from your decision-making?

19            THE JUROR:  I could -- yes, I could hold my -- like

05:43 20   talking about it or, you know, my conversations with her,

21   whatever, but it would be hard to -- my own convictions about

22   it because, like I said, if I could, I would abolish the death

23   penalty today, right now.

24            MR. CHAKRAVARTY:  And that's your independent --

25            THE JUROR:  That's mine, yeah.  That's mine.

1         She -- actually, I don't know if she feels stronger

2    than me or not.  I think she's probably exactly where I am.

3    But, yeah, I could -- that's a good question.  I don't know.

4    I'll have to find out at some point.  But -- yeah.  Anyway...

5         MR. CHAKRAVARTY:  And so it's fair to say you grew up

6    generally opposing the death penalty based on just --

7         THE JUROR:  Yeah.

8         MR. CHAKRAVARTY:  I mean, you said you lived in

9    Mexico.

05:44 10         THE JUROR:  Yeah.

11         MR. CHAKRAVARTY:  But had you actually contemplated

12    the death penalty and your position on it when you were there?

13         THE JUROR:  I was 12 when I came to the United States,

14    so, no, I probably didn't think about the death penalty very

15    often.  And I indicated that I guess my position has softened

16    over the years because, I don't know, you get older and wiser,

17    I suppose.  I don't know.  But, you know, there are cases I

18    suppose that could happen.  But, yeah, I don't know -- I don't

19    think I -- I don't think I thought about it very carefully

05:44 20    before I came to the United States, but the change in coming

21    from Mexico to the U.S. I think had something to do with my

22    idea about it, if that makes any sense.

23         MR. CHAKRAVARTY:  I think so.  You just finished

24    talking about the death penalty, and there are a couple of

25    other points I wanted to make.

1          If you'd look at the questionnaire.

2          THE JUROR:  Yeah.

3          MR. CHAKRAVARTY:  I think you've been very clear in

4    terms of where you are on the death penalty.

5          THE JUROR:  Yup.

6          MR. CHAKRAVARTY:  Question 95 asks whether you can

7    impose it and --

8          THE JUROR:  For the what?

9          MR. CHAKRAVARTY:  I'm sorry.  Page 25, Question 95.

05:45 10          THE JUROR:  Yeah.

11          MR. CHAKRAVARTY:  Reading that anew, is that still

12    your answer?

13          THE JUROR:  Yeah.

14          MR. CHAKRAVARTY:  Okay.  So it's in the middle; it's

15    not a "no"?

16          THE JUROR:  I don't know.  I mean -- I don't know.  I

17    mean, the more I think about it, the more -- I don't know.  The

18    thing is, I think he's guilty.  And so I suppose I could say

19    yes, but I feel very strongly about the death penalty.  So it

05:46 20    would be a real dilemma for me.  It would be a real moral

21    dilemma.  So, I don't know.  If I had to say if I was leaning

22    toward one or the other, I would say no.

23          MR. CHAKRAVARTY:  So what this question's trying to

24    capture is a distinction between the cognitive decision of

25    whether it actually applies versus whether you could impose it,

1   but --

2          THE JUROR:  Oh, I see what you're saying.  So you're

3   asking --

4          MR. CHAKRAVARTY:  Hold on one moment while I just

5   think about it.

6          Your Honor, I think we've heard -- we're satisfied

7   that we've gotten the information, so instead of asking these

8   questions, I'll just withdraw it.

9          THE COURT:  All right.

05:46 10          MR. CHAKRAVARTY:  Thank you very much.

11          THE JUROR:  Okay.

12          THE COURT:  That's it.  Thank you.

13          THE JUROR:  Thank you.

14          THE COURT:  Just leave that.

15          THE CLERK:  Just leave that.  Thanks a lot.

16          THE JUROR:  Good luck.

17          (The juror exits the courtroom.)

18          THE CLERK:  Juror No. 454.

19          THE JURY CLERK:  Juror No. 454.

05:47 20          (The juror enters the courtroom.)

21          THE CLERK:  Sir, over here, if you would.  Have a

22   seat.  Keep your voice up and speak into the mic.

23          THE JUROR:  Okay.

24          THE COURT:  Good afternoon.

25          THE JUROR:  Good afternoon, your Honor.

         1              THE COURT:  Have you been able to avoid talking about
         2    the case or viewing media accounts about the case?
         3              THE JUROR:  I have.
         4              THE COURT:  Yeah?  So we're going to follow up on some
         5    of the answers you gave us in the questionnaire when you filled
         6    it out.
         7              THE JUROR:  Okay.
         8              THE COURT:  And it's there for you if you want to
         9    follow along with us.
05:48   10              So you tell us in the questionnaire -- we had a
        11    question about employment, and you said you're disabled?
        12              THE JUROR:  Yes.
        13              THE COURT:  Can you tell us the nature of the
        14    disability?
        15              THE JUROR:  I have a back problem.
        16              THE COURT:  A back problem?
        17              THE JUROR:  Yes.
        18              THE COURT:  Is it something that you regularly take
        19    medication for?
05:48   20              THE JUROR:  I don't anymore.  I just had surgery
        21    recently and had it corrected.
        22              THE COURT:  So is it corrected so that you can stop
        23    being disabled or --
        24              THE JUROR:  Yes.
        25              THE COURT:  -- just to ameliorate it?

1            THE JUROR:  No, it's eliminated.

2            THE COURT:  Are you expecting to go back to work?

3            THE JUROR:  I am starting to look for work now, yes.

4            THE COURT:  Okay.  And I think you were in the

5      construction business somehow?

6            THE JUROR:  Yes.

7            THE COURT:  Can you tell us what you did before the

8      disability?  What kind of work did you do?

9            THE JUROR:  Well, I started doing security work

05:49 10     because of the back problem.

11            THE COURT:  Right.  That's fine.  Tell us about that.

12            THE JUROR:  I did that for a few years.

13            THE COURT:  When was the last time you were able to

14     work at any job?  Approximately.

15            THE JUROR:  It goes back many, many years.

16            THE COURT:  Okay.  And the only reason I asked about

17     construction was I see you went to Wentworth.

18            THE JUROR:  I did.

19            THE COURT:  And did you enter that field at all?

05:49 20            THE JUROR:  I didn't graduate.  I was there for a year

21     and a half, I believe.

22            THE COURT:  Oh, I see.  All right.  So the last time

23     you were employed you were in the security field?

24            THE JUROR:  Yes.

25            THE COURT:  That's, what, building security?  Is that

1     what you mean?  What kind of things were you doing?

2          THE JUROR:  No, security in a building, protecting the

3     building and the property.

4          THE COURT:  Right.  Right.  Were you working for a

5     security company or did you work for a particular manufacturing

6     or institution or anything else like that and were on their own

7     security force?

8          THE JUROR:  A business.  Filene's Basement.

9          THE COURT:  Okay.  So I think we started to ask about

05:51 10    it.  You're beginning to think about going back to work?  Have

11    you started actively looking for a job?

12         THE JUROR:  I haven't yet, but I fully intend to.

13         THE COURT:  Okay.  You know, I guess from what we told

14    you in the form, if you were to be a juror on this case it

15    could be several months.

16         THE JUROR:  Uh-huh.

17         THE COURT:  That would probably interfere with your

18    ability to find work.  Would that be a problem for you?

19         THE JUROR:  It would interfere, yes, but I'm prepared

05:51 20    to serve if I need to.

21         THE COURT:  Yeah?  In a sense -- it would interfere in

22    the sense that it might postpone the time when you might go

23    back to work?

24         THE JUROR:  Right.

25         THE COURT:  Any other way?

1          THE JUROR:  No.

2          THE COURT:  So I guess the question is:  Is it

3     unreasonable to ask you to postpone going back to work on our

4     part?

5          THE JUROR:  I've been ready to serve if need be.

6          THE COURT:  All right.  As long as you have thought

7     about it.

8          Let me ask you to go to page 20, Question 77.  In this

9     question we asked whether, based on things you'd seen or read

05:52 10     in the media, you had learned -- or you had learned from other

11     sources, had you formed an opinion that the defendant was

12     guilty, and you checked "yes," Part A of the question.  Do you

13     see that?

14          THE JUROR:  Yes.

15          THE COURT:  And the second half, C and D, is whether

16     he should receive the death penalty or not, and you said "yes"

17     to Part C, right?

18          THE JUROR:  Yes.

19          THE COURT:  Just below that, then, we asked, "If you

05:53 20     answered yes to any of these questions, would you be able or

21     unable to set aside your present opinion and base your decision

22     about guilt and punishment solely based on the evidence that

23     would be presented to you in court?"  And you checked "able" --

24          THE JUROR:  Yes.

25          THE COURT:  -- saying you'd be able to do that.

1          Can you tell us about that?

2          THE JUROR:  I feel I would -- listen to the evidence

3     and decide after that.

4          THE COURT:  I presume you know that in a criminal

5     prosecution the person who's accused of a crime is presumed to

6     be innocent, or not guilty, unless the government proves him

7     guilty beyond a reasonable doubt by the evidence at trial.

8          Are you familiar with those principles?

9          THE JUROR:  Yes.

05:54 10        THE COURT:  So what we ask jurors to do, even if they

11    have some ideas from other sources, to make their judgment in

12    the case based on what they have heard in the courtroom or seen

13    in the courtroom and not on matters from elsewhere.

14         THE JUROR:  Uh-huh.

15         THE COURT:  Would you be able to assess the evidence

16    alone and put aside any ideas you may have from other sources

17    in thinking about whether the government has proved the

18    defendant guilty of any charge or not?

19         THE JUROR:  I feel I would be able to.

05:54 20        THE COURT:  We asked a series of questions about the

21    death penalty and attitudes toward it beginning on page 23,

22    Question 88.  88 asked if you had any views about the death

23    penalty in general, and you said, "I do favor the death

24    penalty."

25         THE JUROR:  Yes.

1          THE COURT:  Anything you want to add to that?

2          THE JUROR:  If it's appropriate, I believe in the

3   death penalty.

4          THE COURT:  Okay.  In the next question we asked you

5   to circle a number that indicated where you were on the scale

6   from 1 to 10 where 1 was strongly opposed and 10 was strongly

7   in favor, but if you look at the question, it was defined as --

8   10 reflects a belief that the death penalty should be imposed

9   whenever the defendant has been convicted of an intentional

05:55 10   murder.

11          THE JUROR:  Yes.

12          THE COURT:  Let's go to the next question, Question

13   90.  And this asks you if there was a statement that you agreed

14   with to indicate that.  You selected E which says, "I am in

15   favor of the death penalty, but I could vote for a sentence of

16   life imprisonment without the possibility of release if I

17   believed that sentence was called for by the facts and the

18   law."

19          Does that represent your view?

05:56 20          THE JUROR:  It does, yes.

21          THE COURT:  Well, that's a little bit different from

22   circling 10, because 10 was whenever someone was convicted of

23   murder, and this seems to be that you'd decide based on the

24   facts and the law of the case.  Or maybe you don't think it's

25   inconsistent.

1          THE JUROR:  Can I reread this?

2          THE COURT:  Yeah, go ahead.  Take your time.

3          (Pause.)

4          THE COURT:  And if you want, take a minute or two to

5     read all of Question 90 and see if there might be some

6     different statement you might choose as representing your

7     views.  Take a moment.

8          (Pause.)

9          THE JUROR:  I'm still confused.

05:57 10          THE COURT:  Well, forget the questions.  Tell us

11    whether you would be in favor of the death penalty anytime

12    someone was convicted of a -- let me back up for a minute.

13          You understand that you're considering the question of

14    what the penalty should be, death penalty/life imprisonment,

15    only if the jury has convicted somebody of a capital crime such

16    as intentional murder.

17          THE JUROR:  Uh-huh.

18          THE COURT:  So first you've already -- the jury's

19    already agreed that the person is guilty, okay?  So the

05:58 20    question is what sentence is appropriate for this guilty

21    person, right?  And then the question is -- you heard me this

22    morning talk about the so-called penalty phase where the

23    government would try to produce evidence to convince the jury

24    that there were certain aggravating factors about the case that

25    made it worse than other crimes of murder and the defense would

1    try to present evidence of things about the defendant or about

2    the circumstances that would suggest that the death penalty was

3    not the right penalty but life imprisonment was a better

4    choice.

5         Do you remember me describing that this morning?

6         THE JUROR:  Yes.

7         THE COURT:  So the question is:  If you were a juror

8    considering all that, would you tend, in a case where there was

9    an intentional murder, to think that the death penalty is the

05:59 10   right punishment regardless of other considerations, or would

11   you evaluate the case based on the aggravating and mitigating

12   circumstances and perhaps be open to either the death penalty

13   or life imprisonment?

14        THE JUROR:  I would evaluate the case.

15        THE COURT:  And make a choice in either direction or

16   gravitate toward the death penalty?

17        THE JUROR:  Either.

18        THE COURT:  Okay.

19        MR. WEINREB:  Good afternoon, sir.

05:59 20        THE JUROR:  Good afternoon.

21        MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

22   prosecutors in the case.  I just wanted to follow up on a few

23   of your answers in the questionnaire.

24        THE JUROR:  Okay.

25        MR. WEINREB:  So on page 8 of the questionnaire -- I'm

1    not going to ask about that -- Question 19 we asked whether any

2    of your siblings has had a major positive or negative influence

3    on your life, and you said your sister's been very helpful in

4    every way.  Can you tell us a little bit about that?  What led

5    you to give that answer?

6              THE JUROR:  We've been close all our lives.  If I ever

7    needed anything -- if I need anything, I know she would be

8    there for me or --

9              MR. WEINREB:  She lives in the same town as you?

06:00 10             THE JUROR:  Yes.

11             MR. WEINREB:  Your back problem that you've had, has

12   that prevented you from getting around or taking care of

13   yourself in the sense of, you know, getting your groceries,

14   cooking your meals and so on, or was it more the kind of thing

15   that you just couldn't strain it?

16             THE JUROR:  No, it was a very -- just a constant

17   problem, night and day.

18             MR. WEINREB:  And are there any lingering effects of

19   it that would make it difficult for you to sit in a jury box

06:01 20   day after day?

21             THE JUROR:  No, after having surgery, that's

22   completely corrected.

23             MR. WEINREB:  Turning to -- you don't need to turn to

24   your questionnaire if you don't want to, but in answer to

25   Question 31, you mention that your father had served in the

```
 1        Army.  Was he -- did he serve in a war, do you know?
 2                THE JUROR:  World War II, yes.
 3                MR. WEINREB:  Which theater was he -- did he go
 4        overseas?
 5                THE JUROR:  He was in the Philippines.
 6                MR. WEINREB:  Do you know if he saw combat?
 7                THE JUROR:  He did not.
 8                MR. WEINREB:  What was his position in the Army?
 9                THE JUROR:  Private.
10                MR. WEINREB:  And did he talk to you about his
11        experience there?
12                THE JUROR:  He told a few stories.
13                MR. WEINREB:  Were they combat related at all?
14                THE JUROR:  No, personal.  Really funny, funny
15        stories.
16                MR. WEINREB:  Okay.  And then in answer to Questions
17        47 and 48, you talked about your previous jury experience in
18        Cambridge, and you'd mentioned it was a good experience?
19                THE JUROR:  Yes.
20                MR. WEINREB:  What made it a good experience in your
21        view?
22                THE JUROR:  How?
23                MR. WEINREB:  How was it good?
24                THE JUROR:  Just I think the process is interesting.
25                MR. WEINREB:  Did the jury deliberate a long time in
```

1    that case, do you know?

2              THE JUROR:  They ended up settling out of court.

3              MR. WEINREB:  So the jury never actually had to

4    deliberate?

5              THE JUROR:  No.

6              MR. WEINREB:  In answer to Question 74 when you were

7    asked what did you think or feel when you received your jury

8    summons for this case, you wrote, "Mixed feelings."  Could you

9    say what your feelings were and why you had mixed feelings?

06:03 10         THE JUROR:  I'm sorry.  The question again?

11             MR. WEINREB:  If you want, it's on page 19.  So it's

12   Question 74.

13             THE JUROR:  Mixed feelings?  Because of my personal

14   situation where I'm between working and just having surgery

15   and -- I guess I hadn't decided whether I would be able to sort

16   of -- since then I fully realize it's -- I lost my train of

17   thought.

18             MR. WEINREB:  Well, we can come back to that.

19             In answer to Question 75 at the bottom of the page you

06:05 20   said -- you were asked what kinds of things you said to others

21   or they said to you, and just that it would most likely be a

22   long trial.  Was that all there was that you could recall that

23   anyone said or you said?

24             THE JUROR:  Yes, that's mostly what people were

25   saying.

1          MR. WEINREB:  So did you have mixed feelings about

2     serving on the jury -- did those result from anything other

3     than that you just finally got your back problem fixed and

4     you're looking for work again and this was unexpected?  Is

5     there anything about the case itself that gave you mixed

6     feelings?

7          THE JUROR:  Possibly.

8          MR. WEINREB:  Could you tell us about that?

9          THE JUROR:  It's a very tough case.  I knew it would

06:06 10     be a long case, trial.

11          MR. WEINREB:  Is there anything else that makes it

12     tough?

13          THE JUROR:  No.

14          MR. WEINREB:  Okay.  Thanks very much.

15          MR. BRUCK:  Your Honor, I think we need to go to

16     sidebar, but I wonder if we could possibly excuse the juror for

17     a moment.  I know it's not how we usually do it.

18          THE COURT:  Okay.  We'll have a sidebar with just

19     counsel.  If you could step out for a minute.

06:06 20          MR. WILSON:  Audio off.

21          (The juror is excused.)

22          (Discussion at sidebar and out of the hearing of the

23     public:)

24          MR. WEINREB:  Your Honor, I don't think we can draw

25     any conclusions about this juror's mental state based on his

1   affect, but he does seem quite uncomfortable about being

2   here --

3          THE COURT:  Yeah.

4          MR. WEINREB:  -- and I just don't want to put him

5   through a four-month ordeal that might be very unpleasant for

6   him.

7          THE COURT:  I have the same --

8          MR. BRUCK:  We agree.  I didn't want to put him

9   through ten minutes of the ordeal about his --

06:07 10          THE COURT:  Right.  I don't know what the explanation

11   is.  I mean --

12          MR. WEINREB:  I was just hoping maybe we could get him

13   to open up.

14          MR. BRUCK:  He's been disabled for 23 years.  It's not

15   just his back.

16          THE COURT:  Yeah.  I think we can --

17          MR. WEINREB:  I think we can excuse him.

18          THE CLERK:  Can I tell him?

19          THE COURT:  Yeah, you can tell him he doesn't have to

06:08 20   come back in.

21          So we'll go off the sidebar.

22          MR. WILSON:  Video and audio back on.

23          (In open court:)

24          THE COURT:  We're back live, just so you know.

25          MS. CLARKE:  Thank you.

 1          THE CLERK:  Juror No. 464.

 2          THE JURY CLERK:  Juror 464.

 3          (The juror enters the courtroom.)

 4          THE CLERK:  Sir, over here, if you would, please.

 5   Have a seat.  Make sure you speak into the mic, okay?

 6          THE JUROR:  Yup.

 7          THE COURT:  Good afternoon.

 8          THE JUROR:  Good afternoon.

 9          THE COURT:  Thanks for your patience.

06:09 10          THE JUROR:  Absolutely.

 11          THE COURT:  So since you were last here, have you been

 12   able to avoid talking about the case or as much as possible

 13   avoid media reports about it?

 14          THE JUROR:  Yeah.  Sure, yeah.

 15          THE COURT:  So we're going to follow up on some of the

 16   questions you gave us in the questionnaire.  I want to start

 17   with your work.

 18          THE JUROR:  Uh-huh.

 19          THE COURT:  You're an account manager for a tech

06:09 20   company of some kind?

 21          THE JUROR:  Yes.

 22          THE COURT:  What's the nature of the equipment?  You

 23   say you sell technology equipment?

 24          THE JUROR:  Yeah.  So it's Internet security

 25   equipment.

1          THE COURT:  Hardware?

2          THE JUROR:  And software, yes.

3          THE COURT:  Both?

4          THE JUROR:  Yup.

5          THE COURT:  You understand the schedule of the case

6     that we've outlined?

7          THE JUROR:  Yup.

8          THE COURT:  And that's not going to be a problem for

9     you?

06:10 10          THE JUROR:  No.

11          THE COURT:  Out of the ordinary?  I mean, it's a

12     problem for anybody.

13          THE JUROR:  Yeah.

14          THE COURT:  But it's not an unusual burden for you?

15          THE JUROR:  Well, I'm a commissioned employee, so it

16     would be a little burdensome, obviously.

17          THE COURT:  You do have -- you know, we tried to

18     structure it so people had some ability to keep up with work.

19          THE JUROR:  Uh-huh.

06:10 20          THE COURT:  One day a week anyway, and then evenings

21     and so on.  Does that help at all?

22          THE JUROR:  Yeah.  I mean, it's burdensome for anybody

23     who's going to be on a jury.  I understand that.

24          THE COURT:  So it's something you're okay with?

25          THE JUROR:  Yeah.

```
 1              THE COURT:  Okay.  You told us that you had a couple
 2    of close friends who served in Iraq and one also in
 3    Afghanistan.  Can you tell us about them?  Take each one.
 4              THE JUROR:  Sure.  So my next-door neighbor growing up
 5    served in both Iraq and Afghanistan, and one of my good friends
 6    from high school served in both Iraq and Afghanistan as well.
 7              THE COURT:  They were both in both places?
 8              THE JUROR:  Yeah.
 9              THE COURT:  And you said they both experienced combat
10    while there?
11              THE JUROR:  Yeah.
12              THE COURT:  Was either of them injured?
13              THE JUROR:  No.
14              THE COURT:  Have you talked with them in detail about
15    their experiences?
16              THE JUROR:  Some level of detail, yeah.
17              THE COURT:  Yeah?
18              You also -- I'm now on page 12.  You also have some
19    friends with the Arlington police?
20              THE JUROR:  Uh-huh.
21              THE COURT:  Your best friend, you say?
22              THE JUROR:  Yes.
23              THE COURT:  And tell us about them, those --
24              THE JUROR:  So my best friend is an Arlington police
25    officer for the past two or three years.  He was called into
```

1   action in Watertown on the night -- a couple of nights after

2   the marathon bombing.  And so he was in there overnight, as

3   well as a few of the guys he worked with.

4          THE COURT:  Do you know what he was tasked with doing

5   that night or what his activities were?

6          THE JUROR:  I think they were all sort of just given a

7   sector to monitor until they found --

8          THE COURT:  Was he involved in the shootout?

9          THE JUROR:  No, he wasn't.  He was called in after the

06:12 10   shootout.

11          THE COURT:  Okay.  And how about -- you have two other

12   friends also on the Arlington police?

13          THE JUROR:  Yeah, so I have a few friends who are on

14   the -- I mean, a bunch of friends were on the Arlington police

15   force:  my best friend, and then a few other friends that I

16   play softball with who were also called into action that night.

17          THE COURT:  And have you talked with them about what

18   they experienced and saw and so on that night?

19          THE JUROR:  Yeah.

06:12 20          THE COURT:  Why don't you take a look at page 12,

21   Question 36.

22          THE JUROR:  Sure.

23          THE COURT:  You know, we typically instruct jurors

24   they're to evaluate all the testimony by the same criteria, and

25   that means not giving any special treatment one way or the

1      other to people because of their employment or background and

2      so on.

3                THE JUROR:  Sure.

4                THE COURT:  And so we asked that particularly about

5      law enforcement officers.  You said that you might tend to give

6      greater weight to the testimony of law enforcement officers

7      than other witnesses?

8                THE JUROR:  My answer is, I would say, yes.

9                THE COURT:  Now, let me ask you to look at Question

06:14 10     77.

11               THE JUROR:  What page is that?

12               THE COURT:  That's on page 20.

13               Here we asked whether -- based on things you'd seen or

14     heard either from the media or perhaps other places, whether

15     you had formed opinions about whether the defendant was guilty

16     or not and whether he should receive the death penalty or not.

17               THE JUROR:  Uh-huh.

18               THE COURT:  With respect to Parts A and B, you

19     answered that you had formed an opinion that he was guilty.

06:14 20     Below that we asked if you answered yes to any of the

21     questions, would you be able or unable to set aside your

22     opinion and base your decision about guilt solely on the

23     evidence that would be presented to you in court, and you said

24     "unable."  Can you explain that?

25               THE JUROR:  Yeah, I think just from what I'd read and

1    heard and seen, you know, prior to being called in as a juror,

2    I think I'd formed a pretty strong opinion, and I think it

3    would be difficult for me to go back on sort of some of the

4    beliefs I have about what transpired during the marathon

5    bombing.

6            MR. BRUCK:  We're satisfied, your Honor.

7            THE COURT:  Okay.  Thank you.

8            THE JUROR:  Thank you.

9            (The juror exits the courtroom.)

06:15 10          THE COURT:  So that's it for the questioning.  Why

11    don't we come back about 3:30.

12            MS. CLARKE:  Great.

13            THE COURT:  Okay?

14            MR. WILSON:  Audio and video is off.

15            (The Court exits the courtroom at 3:03 p.m.)

16            (There is a recess in the proceedings at 3:03 p.m.)

17            (The Court enters the courtroom at 3:45 p.m.)

18            (Discussion at sidebar and out of the hearing of the

19    public:)

06:58 20          THE COURT:  So I think 412 and 435 were dealt with as

21    we went along.  I think that brings us to 441.

22            MS. CLARKE:  No motion.

23            MR. WEINREB:  No motion.

24            MR. BRUCK:  That was no motion.

25            THE COURT:  No motion?

1              444.

2              MR. WEINREB:  Your Honor, that's a government motion.

3              MR. BRUCK:  There's no argument.

4              MS. CLARKE:  Without argument.

5              THE COURT:  447?

6              MR. WEINREB:  Same thing, government motion.

7              MS. CLARKE:  Same thing.

8              THE COURT:  All right.  448?

9              MS. CLARKE:  That's a defense motion, your Honor.

06:59 10   That's the Red Sox fan who --

11              THE COURT:  Yes.  The estate manager.

12              MS. CLARKE:  There's three areas of concern that we

13   wanted to express to the Court.  First, I think she seemed like

14   a very good person.  I actually liked her, seemed very honest.

15   But there are three sorts of impairments that we think

16   disqualify her.

17              First, there's the level of emotion that she attaches

18   to the events.  She said, "I cried."  "I felt numb."  "I felt

19   guilty."  "Why did you feel guilty?"  "I wasn't there."  Now,

07:00 20   Ms. Conrad was doing the questioning and was not allowed by the

21   Court to follow up on what that actually meant and how she was

22   actually affected, but there was, beyond most of the people

23   that have qualified, a lot of somehow emotional reaction to the

24   events.  And particularly when she said, "I felt guilty that I

25   wasn't there.  I cried and I felt numb," that caused us a great

1        deal of concern about her level of attachment or reaction.

2              The second thing that is of concern is really not

3        being allowed to get into her death penalty views.  I know

4        there was a lot of discussion about whether she was for or

5        against the death penalty, and when we got into the -- she

6        talked about, "Yes, I don't want somebody who is reliving the

7        crime" -- "I think they should get the death penalty and I

8        don't think others should."  It was very confusing.  And when

9        Ms. Conrad tried to pin her down on "Are you talking about

07:00 10  premeditated, intentional murder?" there was an objection about

11        that, and whether or not that had a legal meaning or a

12        practical meaning, and Ms. Conrad said something about, "Well,

13        a planned murder" and that got stopped.  So we were never

14        really allowed to get into what she was thinking about her view

15        on the death penalty.

16              But the third and final real problem was the final

17        question by Ms. Conrad, was the mitigation impairment question.

18        And she said, "No, I can't consider the defendant's background,

19        character, other things about the defendant's life."  And

07:01 20  nobody followed up on that.  That was just simply a, "No, I

21        can't consider those things."  So the combination, seems to us,

22        disqualifies her.

23              MR. WEINREB:  Your Honor, the government opposes the

24        motion.  With respect to her level of emotion, I mean, the

25        Court was able to see her, and I don't think that she showed a

1      level of emotion that was particularly striking.  What she said

2      was that -- she was asked how she felt when she first heard

3      about what had happened, and she said that initially she felt

4      numb and that at a later point, thinking back on it, she cried.

5           But I mean, this was a shocking event to many people.

6      And to initially -- to have your initial reaction to feel numb

7      and to shed some tears over the death of some people is nothing

8      that disqualifies somebody from jury service and, indeed, I

9      think recommends them for jury service.  It shows that they're

07:02 10    human and they have the capacity for empathy.

11          There was nothing particularly about this event versus

12     any murder that one might hear about on the news, like what

13     happened in Newtown or anywhere else, that this juror might

14     have had the same reaction to, so I don't see how that

15     disqualifies her as a juror.

16          I disagree with Ms. Clarke about her assessment that

17     the Court blocked thorough questioning about her views on the

18     death penalty.  I thought that that was explored pretty well

19     with her.  I mean, she may not have been the most articulate or

07:03 20    precise in making distinctions about things, but through

21     examples that she herself offered and through follow-up

22     questions, she freely gave examples of aggravating factors that

23     would influence her and others where she felt other factors

24     would be mitigating factors.  She at one point talked about

25     lack of a motive as being a mitigating factor, she talked about

1    certain kinds of things as being aggravating factors, and

2    almost unwittingly gave examples of exactly what jurors in

3    death penalty cases are supposed to do, which was consider all

4    the different factors.  And that was the theme of her

5    discussion about it.

6         And then finally, I dispute this -- the claim that she

7    said that she could not consider any mitigating factors.  That

8    is not at all what Ms. Conrad asked at the end.  What she asked

9    specifically was in the case of a premeditated murder, could

07:04 10    you take account of the defendant's background.  And

11    "background" is a very broad term.  It embraces not only some

12    things that might be legitimate mitigating factors but things

13    that may be specifically excluded as mitigating -- as factors,

14    like the defendant's race, his religion, his ethnicity and

15    other things that also fall in the category of background.  And

16    nobody blocked any follow-up on that.  Ms. Conrad thought that

17    she had nailed this juror and that that was going to disqualify

18    her, and she immediately said, "No further questions," and the

19    juror was excused.

07:04 20         That one answer, I think especially to a very broad

21    and ambiguous question, I do not think can undo or negate all

22    the very clear answers she gave previous to that, that she is

23    somebody who could weigh aggravating and mitigating factors and

24    decide each case on its facts.

25         MS. CLARKE:  If I might, just a couple of points.  On

1    the question of getting under premeditated or planned, I think

2    it was the juror who used the word "premeditated."  What

3    Ms. Conrad was trying to do was find out what she meant by

4    "premeditated."  And we got kind of off -- and I understand --

5    is there a legal definition or a human definition.

6         The other thing, on the last question, my recollection

7    of what Ms. Conrad asked was, "Would you be able to consider

8    things about the defendant himself, like his background?"  And

9    she said, "No."  So the record's pretty unambiguous on the

07:05 10    mitigation impairment of this juror.

11         THE COURT:  Just on that last point, the record might

12    or might not be unambiguous, but it's unconvincing as well.  We

13    are constantly running into the phenomenon of laypeople who

14    have not thought very deeply about these matters necessarily at

15    all being asked to give rather precise answers, sometimes being

16    asked in terms that we understand in a way that they may or may

17    not understand it the same way.  And I think to try to be too

18    literal in the interpretation of the jurors' answers is a

19    mistake.  I mean, this is an assessment of whether a juror can

07:06 20    be open as necessary to -- in the penalty phase either

21    possibility, and my overall assessment of her is that she can

22    be.

23         She seems like a very self-confident, experienced

24    person if she ran the estate that she described, and, you know,

25    supervising a staff and so on and so forth.  She seemed to me

1   to be the kind of person that can do what she's tasked to do.

2   And of course when we get to things like terms of art, she will

3   have very specific instructions about what that means under the

4   circumstances.  And a word like "background," for example,

5   would be explained in much greater specificity as to what can

6   be considered and not considered.  And of course that will be

7   done in the light of what has been produced in the course of

8   the trial that can be characterized as aggravating or

9   mitigating, and the instructions will make a great deal more

07:07 10  sense.

11          So what I'm looking for is somebody who I expect will

12  respond correctly to those kinds of instructions on that body

13  of evidence, and I think she can do that.  So I would deny the

14  strike.

15          452?

16          MR. BRUCK:  No motion.

17          MR. WEINREB:  No motion.

18          THE COURT:  No motion?  Okay.  The afternoon was not

19  productive, I think.

07:08 20      (Laughter.)

21          MS. CLARKE:  It's all agreed, I think.

22          THE COURT:  Anybody disagree with that?

23          MS. CLARKE:  Well, productive.

24          THE COURT:  It was interesting.  We met some nice

25  people, but...

1         MS. CLARKE:  Okay.

2         THE COURT:  So I think we have -- let's see.  That's

3    one, two, three?

4         MS. CLARKE:  That's right.

5         THE COURT:  Now, everybody's doing their best, but,

6    again, we shrank down to a smaller number.  And I don't

7    discourage you from agreeing on the eliminations; I just would

8    like to maybe make a little more progress.  So I'm thinking of

9    increasing the number to 25 for our pool for Tuesday.  It will

07:08 10   shrink to 15 and we'll be able to handle it, is my --

11        MS. CLARKE:  That's the first time we won't be able to

12   screen --

13        THE COURT:  Well, I don't know.

14        Let me just call your attention to two -- I'm told

15   there are two -- I had proposed some and I know the parties had

16   agreed on some, and there were a couple of ones that I guess

17   the parties do not agree with my proposal.  And I just urge you

18   to take a second look at it.  489 and 501.  Actually, I think I

19   left my note upstairs.  I believe one is a -- it looks like a

07:09 20   production-line laborer, if I'm thinking of the right one, and

21   the other, I think, was an auto mechanic.  I mean, they kind of

22   fit in what we've been doing.  There might be other issues; I

23   don't remember.  But just take another look at 489 and 501.

24        MS. CLARKE:  501 was a union member, so we didn't know

25   whether he got paid or not.

             1          THE COURT:  Oh, because he was a tile guy, a

             2   bricklayer.

             3          MR. McALEAR:  Tile finisher.

             4          THE COURT:  Yeah, it was the bricklayers union.  I

             5   know that because my grandfather was in the bricklayers union.

             6          MS. CLARKE:  Do they pay?

             7          THE COURT:  Not in those days.

             8          (Laughter.)

             9          MR. WEINREB:  Sometimes the confusion with these

07:10  10   arises because there's no claim of hardship.

            11          THE COURT:  Yeah.  Yes, I was thinking about that.

            12   Although it's sort of appearing to me over the time that was

            13   our original marker, was that if they claimed it and it

            14   appeared to be valid in 26, it was an easy way to do it.  I

            15   have developed a sense that people early on, being good

            16   citizens, said "no" to 10, and then as things got on, they got

            17   more accustomed -- I've seen a couple of them, I'm sure you did

            18   too, that we see the comment in the 70 series, 74 we'll see a

            19   comment, or in the 98 range they'll add it, but they won't go

07:10  20   back and amend Question 10.  So I'm not sure 10 is as reliable

            21   a marker as we may have thought.

            22          So anyway --

            23          MR. WEINREB:  We'll take another look.

            24          THE COURT:  -- take another look at those two.

            25          MS. CLARKE:  Didn't we have another labor member or

1    two that did get paid?

2         THE COURT:  I remember the thought occurring to me

3    with a teacher -- I think she was excused anyway -- when she

4    said her contract provided something.  And it occurred to me it

5    was at a collective-bargaining agreement or an individual

6    contract.  But I don't think we ever answered that question.  I

7    think there are -- there are laborers who kind of work through

8    the union.

9         MS. CLARKE:  Right, and they get paid.

07:11 10         THE COURT:  The carpenters, for example, have that

11   kind of arrangement.  But anyway...

12         MR. WEINREB:  So, your Honor, before you came in, so

13   Mr. McAlear gave us the next 20 and then the next 10 after

14   that.  And we will get together over the weekend and see if we

15   can agree on any more.  And it would be useful if you could

16   also review them --

17         THE COURT:  I will.

18         MR. WEINREB:  -- over the weekend.

19         And then Mr. McAlear said if we get him the results by

07:11 20   Monday, he can backfill.

21         THE COURT:  We can adjust accordingly.  That's fine.

22         MR. WEINREB:  So should we email -- how should we

23   communicate?  Should we email them to Jim or --

24         THE COURT:  Yeah, we'll go through Jim.  That's the

25   easiest way.

1        MS. CLARKE:  Right now that would take us through 504

2   if we're calling in 25 to look at?

3        MR. McALEAR:  Yup.

4        MS. CLARKE:  And that's including 501 and 489, so...

5        THE COURT:  Right.  So that's adjustable too.

6        Let me also comment that the last fellow had multiple

7   issues.

8        MR. WEINREB:  We've discussed that he should have

9   been -- he slipped through the cracks.

07:12 10        THE COURT:  Yeah, that was a waste of time.

11        MR. WEINREB:  That was a waste of time.  We all agree

12   with that.  We'll take the hit for that.

13        MS. CLARKE:  They're taking it.  Sometimes we do.

14        THE COURT:  The people on the sensitive issues, the

15   77- and the 88-plus series, that's fine.  We'll talk to all

16   those people.  But if there's somebody who has a cousin who was

17   killed in Iraq and was affected by it or whatever, that's

18   something that maybe we can...

19        A couple of just-while-I-have-you items.  In addition

07:13 20   to the *Globe*'s motion to alter the arrangements, which we were

21   about to -- I think we haven't filed it yet.  We're about to

22   file it, a disposition.  They also filed a motion for access to

23   the legal rulings on the things that we're doing here.

24        The time has passed for any response from the parties.

25   I gather there is no response from the parties.  We'll act on

1    that.  I just wanted to confirm that, that we don't have to

2    wait for anything on that?

3            MR. WEINREB:  No.

4            THE COURT:  Okay.  We're getting close, I think, to

5    completing this.  If we don't get any more winter storms, we

6    should be in pretty good shape.

7            MS. CLARKE:  That's a big "if" right now.

8            THE COURT:  I know.  Well, fortunately this one is

9    well-placed.  It's right in the middle of the weekend.  But

07:14 10   there is talk of something perhaps later in the week.  But I

11   think we're getting pretty close.

12           So the time has come to start thinking beyond that,

13   and one thing -- and I'm not asking for answers now.  I just

14   want to -- what I'm beginning to think about is once we have

15   finished the jury empanelment, which can include the peremptory

16   process, whatever we decide on that, whether it will be

17   necessary to take some time to address any motions in limine

18   that need to be resolved before openings and the beginning of

19   evidence, and if we do, how much time we have to do for that.

07:14 20           We're getting inquiries from the press regularly.

21   Most people are not as interested in this process as they will

22   be in the actual beginning of the case.  And there are people

23   who will travel to get here.  And so we're constantly -- we're

24   not -- but the people downstairs are constantly getting

25   inquiries.  And so partly out of just good relations we would

1     like to keep them up to speed a little bit without -- we won't

2     tell them what we can't tell them.

3          So I just am interested in what you may be thinking

4     about that.  My thought is we might be able to -- once we

5     figure out -- we'll still have to finish this because we have

6     to know when the time breaks.  But when we've done that, we may

7     be able to pick a date and tell them this is the date we will

8     swear the jury in, begin the case.  So that's something to

9     think of.

07:15 10          MS. CLARKE:  Judge, we filed a while back a -- sort of

11    in the -- it looked like a status report/in limine evidentiary

12    issues, and we tried to set forth in that the ones we thought

13    needed to be ruled on before openings.

14         THE COURT:  Okay.  If that needs updating --

15         MS. CLARKE:  We can look at that again.  And I think

16    the government just responded to that.

17         MR. WEINREB:  I think it may have been overtaken by

18    events, and there are now more things to add to it, so...

19         MS. CLARKE:  We should look at that.

07:16 20          MR. WEINREB:  Yeah.  Maybe the parties also can

21    exchange lists of what we think are sort of the critical ones

22    to be addressed before opening statements.

23         THE COURT:  Well, that's it.  I mean, stepping back

24    from this case, every time we begin a case we get motions in

25    limine.  And I may think that it's -- about 20 percent of them

 1   are worth ruling on before the case begins.  A lot of them you

 2   have to wait and see how things are developing in the case.

 3   They're often contingent on developments in the case.  Some

 4   clearly have to be done because somebody wants to say something

 5   about it in the opening.

 6          So I'm interested in that group more than the ongoing

 7   group.  We can deal with those as we need to.

 8          MR. WEINREB:  Sure.

 9          THE COURT:  So I don't know whether -- again, at some

07:16 10   point we should consider once the jury empanelment process is

 11   over what sealed matters might be opened.  We've had a lot of

 12   sealed things just to protect the process.  There will be some

 13   things that I think will have to remain under seal until the

 14   conclusion of the case so they don't affect the trial, but

 15   there may be other things not in that category and we could

 16   deal with that.

 17          For example, I would think that the transcripts of the

 18   voir dire would remain sealed through the trial because I think

 19   the cases say -- the First Amendment cases I think permit that.

07:17 20   But I don't think it would be wise to have the voir dire

 21   transcript of a sitting juror available for publication.  I

 22   think it will be an invitation to mischief, personal matters,

 23   things like that.

 24          And finally on that -- thinking forward, I know that

 25   for the preliminary instructions both back in January and now

         1    what I'm doing today you got together and made some proposals.

         2    I don't know if you're going to have similar proposals for

         3    opening instructions of the case itself.  My practice in a

         4    run-of-the-mill case is not to give substantive instructions at

         5    the beginning of the case; it's really an outline of how we'll

         6    proceed and a little bit about the rules of evidence and why

         7    they'll see people objecting and me ruling and things like

         8    that.  I mean, you've probably heard me do it.  But I don't

         9    know if you have anything more specific about that.

07:18   10         It is the case in a run-of-the-mill case that I would

        11    read the relevant language of the indictment at the beginning

        12    of the case, you know, the man's charged with being a felon in

        13    possession of a handgun or something like that.

        14         MS. CLARKE:  We might have to add a day to the start,

        15    then.

        16         THE COURT:  But I don't intend to read this

        17    indictment.  And I don't know whether you can think of an

        18    appropriate substitute that you would like to propose, that's

        19    all.

07:19   20         I guess for purposes of the record -- is this the list

        21    I'm supposed to read?  I have to ask the boss.

        22         (Laughter.)

        23         THE COURT:  Is this it?

        24         LAW CLERK:  That's one of them, yeah.

        25         THE COURT:  Do I have another one?  Oh, this one?

1    This too?  Yeah, okay.  Just so it's on the record as to ones

2    that have not been qualified for service, we'll start with

3    today's -- well, other than -- I think we'll do it -- it

4    doesn't include what we have here, right?  What we just did

5    this afternoon.  I think we'll --

6                MS. CLARKE:  Write it up?

7                THE COURT:  -- write it up.  I just want to be sure.

8                MS. CLARKE:  Judge, I have one thing while we're here

9    too.  The Court indicated that there would -- its common

07:20 10    practice is no back-strikes.  Could the Court just again tell

11    us what your plan is for striking?

12                THE COURT:  So you fill --

13                MS. CLARKE:  Except they won't be here.

14                THE COURT:  Well, whatever.

15                MS. CLARKE:  Yes.  You fill a piece of paper or you

16    fill a box.

17                THE COURT:  Right.  So there's -- let's just talk

18    about 12 first, because then we can talk separately about the

19    alternates.

07:20 20                MS. CLARKE:  Sure.

21                THE COURT:  You have 12 jurors.  It comes peremptory

22    time, both parties would come up.  The government would go

23    first and say, 2, 4, 6, 8.

24                MR. BRUCK:  And the 12 jurors are the first 12

25    qualified in order?

 1          THE COURT:  Yes, in order.  Correct.  We don't

 2   rejumble them once -- so I guess they'll follow this

 3   numerically.  So consider them Seats 1 through 12, 2, 4, 6, 8.

 4   And then the defense goes 3, 5, 7, 9.  All those people are

 5   excused, those seats are refilled in order.

 6          MS. CLARKE:  The seats aren't refilled until both

 7   parties have struck?

 8          THE COURT:  Correct.  Right.

 9          And so that was eight seats.  So eight new people come

07:21 10   into the box in those seats.  The four who were not struck are

11   done.  They're on the jury.  The eight new seats are subject to

12   further strikes.

13          The second round the defense goes first, picks theirs,

14   followed by government.

15          MS. CLARKE:  Out of the eight?

16          THE COURT:  Out of the eight.

17          So if seven are excused, seven new people come in.  It

18   goes back, first the government, then the defense.  Now you've

19   got three people left.  And it keeps narrowing like that.

07:21 20          MS. CONRAD:  Any limitation on the number of strikes?

21          THE COURT:  No.

22          MS. CONRAD:  Not two, two, two?

23          THE COURT:  No, no, just do them all at once.

24          MS. CLARKE:  Out of the 12?

25          THE COURT:  And do as many as you want.  You can

1    strike all 12 if you wanted.

2         Now, that brings up the question of how to deal with

3    alternates in this case.  In a run-of-the-mill case we would

4    have 12 and two alternates, and it's easy to track the

5    alternates.  And as I said, my practice is just to advise

6    everybody they will be the last two people seated and they

7    could be in seats 3 and 11.  We don't put them off to the side

8    or anything like that.  And a principal reason for that is they

9    don't know who they are.  There would be a few more here.

07:22 10        I was thinking about it in terms of what's allowed,

11   which is 20 for the 12, plus three for the six alternates for

12   each side, and that's 23.  You could interpret that as meaning

13   you get 20 to use on the first 12 and you only have three to

14   use on the other six.  That's a little -- I think more

15   cumbersome, and if the parties don't object I'd just give you

16   23 and you use them however you want.

17        I think there's some advantage to the parties in that

18   latter approach because you can front-end a little bit more if

19   you have to import one of the alternate ones to get somebody in

07:23 20   the original 12 before we've gotten to the last six.  You may,

21   you know, be better off.  You may get 21 for them rather than

22   20 if you don't -- if you do the accounting that way.  So

23   maybe -- but I think it would be easier to do it that way.

24        But if you think we have to count separately, I guess

25   we can do that.  We can say, Okay.  We haven't gotten to the

1   last six jurors yet.  You only have 20, you're done, or

2   something like that.  I don't know.  You can think about that.

3   I don't know that there's any rule that affects that, but we

4   could adjust it.

5           MR. WEINREB:  So --

6           Did you have something?

7           MS. CLARKE:  No, I was just trying to understand the

8   process.

9           MR. WEINREB:  So, your Honor, unless the Court is

07:23 10   wedded to that particular system, we would like to propose a

11   different system largely because that system does not seem to

12   be well adapted to this particular situation where each side

13   has so many strikes, 23 strikes.  You only have 12 people in

14   the box.  And it also seems to have -- frankly, from our point

15   of view, waste a lot of the work that the parties have put into

16   trying to identify who we think would be the best jurors in the

17   case because it puts a tremendous amount of emphasis on the

18   people who are numbered 1, 2, 3, 4 versus people who may be

19   more suitable as jurors further back in the pool.

07:24 20           And we propose a system where the parties just take

21   turns striking two people from the pool at a time until we're

22   all done with our peremptories, and that way --

23           THE COURT:  You mean just on the master list?

24           MR. WEINREB:  Just on the list of the 70 or however

25   many are qualified.  Right, and then they'll --

1          THE COURT:  Starting at the beginning?

2          MR. WEINREB:  No, just anywhere in the pool.  Because

3    the -- at this point we're going to know who they all are.

4    We'll be able to identify them by number very easily.

5          THE COURT:  So your first strike could be Number 70?

6          MR. WEINREB:  Exactly.  Well, except Number 70 would

7    have no chance of being sat if --

8          THE COURT:  All right.  Number 64.

9          Well, I'm not so sure of that.  That's why we have

07:25 10   Number 70 --

11         MR. WEINREB:  But at some point we'll have the pool.

12         THE COURT:  Right.

13         MR. WEINREB:  And that way it also seems fairer,

14   frankly, because otherwise the -- again, the government's in

15   the position of having to go first and potentially strike any

16   number of people who we don't particularly object to just

17   because we don't know -- without -- normally you know you're

18   going to get to use up all your peremptories because you don't

19   have very many to begin with.  Here you would be risking

07:26 20   forfeiting a lot of --

21         THE COURT:  I think that's right.  I think there's a

22   possibility, if we did it the way I've outlined it, that

23   neither side would use all their peremptories.

24         MR. WEINREB:  But the parties are allocated this

25   number of peremptories for a reason, and I assume the reason is

1  that when it comes to a case like this, there was the belief

2  that the parities are entitled to have more say in who they

3  think the jurors ought to be and have more chance to strike

4  people who they believe really don't fit the qualifications of

5  a juror in a death penalty case.

6         And so we're not really going to have as much of an

7  opportunity to get the benefit of what Congress gave if we have

8  to do it this way versus the other way.

9         THE COURT:  Well --

07:26  10         MR. BRUCK:  We think we're fine with the Court's

11  proposal, but we would like to think about it over the weekend.

12         THE COURT:  Yeah, think about it.  It's new to me too.

13  I don't know.  I can't react to it.  Will I entertain it?  Yes.

14  Will I do it?  I don't know.

15         (Laughter.)

16         THE COURT:  I'm not sure.

17         MS. CLARKE:  Unsure.  Maybe.  Ask me tomorrow.

18         MR. BRUCK:  The question is:  Will you ever be able to

19  say?

07:27  20         MS. CLARKE:  Thank you very much.

21         THE COURT:  Okay.  Thanks.

22         (The Court exits the courtroom and the proceedings

23  adjourned at 4:15 p.m.)

24

25

1                        C E R T I F I C A T E

2

3              We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14

15   Date:  2/13/15

16

17

18

19

20

21

22

23

24

25