UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
)
Plaintiff, )
) Criminal Action
v. ) No. 13-10200-GAO
)
DZHOKHAR A. TSARNAEV, also )
known as Jahar Tsarni, )
)
Defendant. )
)

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY TWENTY-THREE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, February 24, 2015
10:35 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2          OFFICE OF THE UNITED STATES ATTORNEY
            By: William D. Weinreb and Aloke Chakravarty,
 3              Assistant U.S. Attorneys
            John Joseph Moakley Federal Courthouse
 4          Suite 9200
            Boston, Massachusetts  02210
 5          On Behalf of the Government

 6          FEDERAL PUBLIC DEFENDER OFFICE
                By:  Miriam Conrad, Federal Public Defender
 7          51 Sleeper Street
            Fifth Floor
 8          Boston, Massachusetts  02210
            - and -
 9          CLARKE & RICE, APC
                By:  Judy Clarke, Esq.
10          1010 Second Avenue
            Suite 1800
11          San Diego, California  92101
                - and -
12          LAW OFFICE OF DAVID I. BRUCK
                By:  David I. Bruck, Esq.
13          220 Sydney Lewis Hall
            Lexington, Virginia  24450
14          On Behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2              THE COURT:  Good morning, everyone.  We are continuing

3       the process of selecting a jury for the case of the United

4       States vs. Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is

5       charged in connection with a bombing that occurred near the

6       finish line of the Boston Marathon on April 15, 2013, and that

7       resulted in the deaths of three people.  He's also charged in

8       the death of an MIT police officer and other crimes occurring

9       on April 18 and 19, 2013.  Some, but not all, of the crimes

01:40 10       charged are, by statute, potentially punishable by death.

11              You will recall from my prior instructions that the

12       trial jury will first consider and decide whether the

13       government has proved Mr. Tsarnaev's guilt of any or all of the

14       charges against him.  If he is convicted of any of the capital

15       crimes, that is, crimes potentially punishable by death, the

16       jury will then consider and decide whether he will be sentenced

17       to death for any such crime or to life in prison without the

18       possibility of release.

19              You may have wondered why the death penalty could be a

01:41 20       possibility in this case in view of the fact that the laws of

21       Massachusetts do not provide the death penalty for murder or

22       any other violation of Massachusetts law.  The reason is that

23       this is a federal case involving alleged violations of the laws

24       of the United States rather than a state case involving

25       violations of the laws of Massachusetts.

1          If the jury convicts Mr. Tsarnaev of any one of the

2     capital crimes charged in the Indictment, the same jury will

3     hear additional evidence and then decide whether to sentence

4     him to death or to life in prison without the possibility of

5     release.

6          Because the jury that is selected to decide the

7     defendant's guilt or innocence will also decide his punishment

8     if he's convicted of a capital crime, it is necessary to

9     question jurors about your feelings and beliefs about the death

01:42 10     penalty as part of the process of selecting the jury.

11          Let me explain briefly the procedures that must be

12     followed in a case in which the death penalty is or may be at

13     issue.  As in any criminal trial, initially the government will

14     have the burden of proving that Mr. Tsarnaev is, in fact,

15     guilty of any crime with which he is charged.  If he is

16     convicted by the jury of a crime for which the death penalty

17     may lawfully be imposed, there will be a second phase of the

18     trial, usually referred in shorthand -- referred to in

19     shorthand as the penalty phase.

01:42 20          In the penalty phase, the government will introduce

21     evidence that seeks to prove beyond a reasonable doubt that:

22     first, Mr. Tsarnaev acted with sufficient intent to be subject

23     to the death penalty; and, second, that aggravating factors

24     about the killings or about the defendant justify sentencing

25     him to death.  Aggravating factors are circumstances that, if

1    proven, make the crimes particularly serious or blameworthy

2    and, therefore, under the law, may justify imposing a more

3    severe sentence on Mr. Tsarnaev compared with other persons who

4    have been convicted of intentional killing or murder.  The

5    government will bear the burden of proving any alleged

6    aggravating factors to every juror beyond a reasonable doubt.

7           The defense will have the opportunity to present

8    evidence of what it will argue are mitigating factors.

9    Mitigating factors are usually circumstances about the crime or

01:43 10   crimes or about the defendant's background or character that

11   would suggest that the death penalty is not the appropriate

12   sentence in the case or that life imprisonment without the

13   possibility of release is adequate to punish the defendant.

14          Unlike the proof of aggravating factors, a mitigating

15   factor must only be proven by the greater weight of the

16   evidence.  That is a less demanding standard of proof than

17   proof beyond a reasonable doubt.  Again, unlike the proof of

18   aggravating factors, mitigating factors do not have to be

19   proven to the satisfaction of all 12 jurors.  Any juror who

01:44 20   finds or determines a mitigating factor to have been proven by

21   the greater weight of the evidence may consider that factor in

22   deciding the appropriate sentence in the case regardless of

23   whether any or all of the other jurors agree that a mitigating

24   factor has been proven.

25          After the parties have made their presentations during

1    the penalty phase, the jury will weigh all the evidence.

2    Before a jury could vote to impose the death penalty, every

3    juror would have to be persuaded that certain threshold factors

4    that make the defendant potentially subject to the death

5    penalty have been proved beyond a reasonable doubt.

6         In addition, in order to impose the death penalty,

7    every juror would have to be persuaded that any proven

8    aggravating factors outweigh any mitigating factors found by

9    any juror or jurors to justify a sentence of death.  Even if

01:45 10   the jury did not find any mitigating factors in the case, it

11   would still have to be unanimously persuaded that any proven

12   aggravating factors were themselves sufficient to justify a

13   death sentence.

14        You should understand that a jury is never required to

15   find that a sentence of death is justified.  The decision

16   whether the government has proven that a defendant should be

17   sentenced to death must ultimately be made by each juror

18   himself or herself.  If, however, every juror is persuaded that

19   the death penalty should be imposed, I would be required, as

01:46 20   the trial judge, to sentence the defendant to death.  In other

21   words, I could not change the jury's decision.  The jury, and

22   not the judge, is responsible for determining whether a

23   defendant who is convicted of a capital crime will live or die.

24        What I've just described is an overview of the law

25   applicable to a jury's consideration of the death penalty.  If

1    you are selected to serve on the jury and if you find the

2    defendant guilty of a crime or crimes punishable by death, I

3    will then give you very detailed instructions concerning your

4    duties in deciding whether to impose the death penalty or life

5    imprisonment without possibility of release and the law that

6    must be followed in making that decision.

7         As I told you before you filled out your

8    questionnaires in this case, there are no right or wrong

9    answers to any of the questions you have been asked or that you

01:47 10    will be asked today.  We ask them because both the defendant

11    and the government are entitled to a jury that does not have

12    its mind firmly made up one way or another before hearing the

13    evidence and a detailed explanation of the law.  That applies

14    both to whether the defendant is guilty or not guilty of the

15    specific crimes charged in the Indictment and, if he is

16    convicted of a capital crime, whether he should be sentenced to

17    death or to life in prison without possibility of release.

18         So today we're going to question each of you

19    individually about issues relevant to the selection process.

01:47 20    In a moment, we're going to ask you to return to the jury room

21    where you've just been assembling, and we'll call you into the

22    courtroom one by one to ask you some questions.

23         There will be a few people in addition to the lawyers

24    and their staffs present here in the courtroom during the

25    process, and the proceedings are being simultaneously

1    transmitted by video and audio to other courtrooms where there

2    are people observing.

3         We will not identify you by name but rather by number,

4    and you will be seated so that the video camera will be behind

5    you.  Your answers will generally be public; but if you believe

6    a truthful answer would require you to reveal sensitive,

7    personal information, we will temporarily stop the audio

8    transmission to the other courtrooms so that people observing

9    there will not hear your answer.

01:48 10        Again, we do not expect or want any particular answer

11   to any question.  All we want and what the law expects is that

12   you provide accurate and truthful answers to the questions

13   you're asked.  If you do that, you will be doing your duty as a

14   citizen and as a juror no matter what the answers may be.

15        I want to take a moment to remind you of some of my

16   prior instructions.  As I told you before, a jury's verdict

17   must be based on the evidence produced at trial and must be

18   free from outside influence.  Therefore, I remind you again

19   that it is extremely important that you do not discuss the

01:49 20   case, including the jury selection process, with your family,

21   friends, each other, or any other person until either you have

22   been excused or, if selected as a juror, until the case

23   concludes.  And, of course, you're not to conduct any

24   independent research about the case online or otherwise and are

25   to avoid reading, watching or listening to any reports in the

 1    media about the case.

 2          When you signed your questionnaires after you

 3    completed them, you signed under an affirmation or oath that

 4    you had made the statements -- that they were true and you were

 5    making them under the pains and penalties.  There's a similar

 6    oath or affirmation that will be administered to you now for

 7    the questioning that will occur hereafter.  And the clerk will

 8    ask you to rise so that he may administer that oath.

 9          THE CLERK:  Will the jurors please rise and raise your

01:49 10   right hand.

 11   (Venire sworn.)

 12          THE COURT:  All right, jurors.  Thank you.  Withdraw

 13   into the room, and we'll have you back one by one to ask you

 14   the questions.

 15   (The venire left the courtroom at 10:45 a.m.)

 16          THE CLERK:  Juror No. 612.

 17          THE JURY CLERK:  Juror No. 612.

 18          THE CLERK:  Sir, over here, please, if you would.

 19   Have a seat.

01:53 20          THE COURT:  Good morning.

 21          THE JUROR:  Good morning.

 22          THE COURT:  Since you were last here, have you been

 23   able to avoid discussing the merits of the case with anyone?

 24          THE JUROR:  No.  I mean, except my boss and, you

 25   know --

```
 1              THE COURT:  Let me ask -- listen to the question.
 2       Have you been able to avoid discussing the merits of the case?
 3              THE JUROR:  No -- yes -- no.  I mean, I had to discuss
 4       it with my boss.
 5              THE COURT:  I see.  The merits of the case, I'm not
 6       talking about the logistics.
 7              THE JUROR:  No, no.
 8              THE COURT:  The substance of the case, have you talked
 9       about that?
10              THE JUROR:  No, did not.
11              THE COURT:  Just about your having to be here.
12              THE JUROR:  Yes.
13              THE COURT:  That's understandable.  I told you at the
14       time that you can do that.
15              Have you also been able to avoid media accounts?
16              THE JUROR:  Yes.
17              THE COURT:  So that's the questionnaire that you had
18       when you were here and filled out.  We're going to follow up on
19       some of the information you gave us there.  Let me begin by
20       your employment.  You're a registered nurse.
21              THE JUROR:  Correct.
22              THE COURT:  At the Beth Israel Deaconess Medical
23       Center.
24              THE JUROR:  Yes.
25              THE COURT:  I guess my pages are slightly out of order
```

1    here.

2          Tell us generally what your duties are as a nurse at

3    that hospital.

4          THE JUROR:  I work on the Oncology Department, which

5    is on a -- located on the east campus.  And it's -- we call our

6    unit 11 Reisman, but it's pretty much oncology.

7          THE COURT:  Okay.  What do you do?

8          THE JUROR:  I'm a staff nurse.  I work 36 hours a

9    week.  Today was my scheduled day to work.  We had to make a

01:55 10   few switches and all of that.

11          THE COURT:  If you were called to be a juror on the

12   case, you know the schedule.  We pointed it out in Question 10

13   if you want to take a look.  It would be basically Monday

14   through Thursday, 9 to 4.

15          THE JUROR:  Correct.

16          THE COURT:  Is that something you could adjust your

17   schedule around?

18          THE JUROR:  It will be tough on the staff, but -- you

19   know, it will be very difficult because we do the schedule way

01:56 20   ahead.  Probably, like, the next three months the schedule is

21   already predone.

22          THE COURT:  I'm concerned about you individually, not

23   about how it might impact others.  Would you be able to have

24   your 36 hours a week, for example?

25          THE JUROR:  Not at work.  I will not be able to do

 1   every Friday, Saturday, Sunday.  I don't think I can do that.

 2            THE COURT:  Why?

 3            THE JUROR:  Just because, again, the schedule is

 4   predone, and there is people that will be there prefill the

 5   shifts.  I'm not the schedule coordinator, so I can't -- I

 6   don't have control of -- we don't pick and choose the shift.

 7   It's done -- you know, we make a request, but somebody else

 8   will oversee that.

 9            THE COURT:  Okay.  We asked jurors about their use of

01:57 10   social media.  You say you use Facebook a bit.

11            THE JUROR:  Yes, Facebook.

12            THE COURT:  For mostly personal reasons?

13            THE JUROR:  Personal, yeah, social media.

14            THE COURT:  Any professional-related use?

15            THE JUROR:  No, no, no, not at all.

16            THE COURT:  You had -- you've had experience in, I

17   guess, a state case as a juror, a criminal case?

18            THE JUROR:  Correct.

19            THE COURT:  When was that?

01:57 20            THE JUROR:  July of last year, I remember -- if I

21   remember right, yeah.

22            THE COURT:  This last July?

23            THE JUROR:  Yes.

24            THE COURT:  Where was it?  What county or --

25            THE JUROR:  Suffolk County.

1          THE COURT:  So right up at Government Center?

2          THE JUROR:  No.  It was Roxbury, the courthouse in

3      Roxbury.

4          THE COURT:  Okay.  All right.  Let me ask you to look

5      at Page 77 -- I'm sorry, Page 20, Question 77.  It's near the

6      top of the page.  It's a multiple part question in which we

7      asked jurors to tell us whether, based on things you'd seen or

8      read in the media or otherwise, you had formed an opinion about

9      whether the defendant was guilty or not or whether he should

01:58 10      receive the death penalty or not.  To each of those subparts of

11      the question, you answered you're not sure.  Could you tell us

12      about that?

13          THE JUROR:  I mean, the question, it's just pretty

14      much what you have read in the news media.  It looks like, you

15      know, it was one-way direction.  And maybe I would be -- you

16      know, it was just what the media was saying.

17          THE COURT:  Right.

18          THE JUROR:  But the evidence are pretty much very

19      strong.  And I guess I did not form my opinion just based on

01:59 20      that, but there is more evidence, of course.

21          THE COURT:  What other evidence than what you saw in

22      the media?

23          THE JUROR:  You know, maybe -- it was only one way,

24      the guilty, pretty much.  That's it.  That's what happened.

25          THE COURT:  So you have that impression from the

         1    media; is that what you're telling us?

         2           THE JUROR:  I guess so, yeah.  That's --

         3           THE COURT:  There was a second part to the question

         4    which you didn't answer because technically it called for only

         5    if you had answered yes.  But it did ask whether, if you had

         6    formed an opinion -- which I guess you're saying now you did.

         7    In other words, the not sure is not exactly --

         8           THE JUROR:  The way that the question was presented

         9    maybe I was not sure, you know.

02:00   10           THE COURT:  Will you answer it now that -- as to (a),

        11    for example, that you have an opinion that he is guilty?

        12           THE JUROR:  Yeah, I think he's guilty, yes.

        13           THE COURT:  So down in the second part of the

        14    question, it says, if you had answered yes to any of the

        15    questions, would you be able or unable to set aside your

        16    opinion and base your decision about guilt only on the evidence

        17    produced at trial.  You didn't answer that question, but I

        18    wonder if you could answer it now.

        19           THE JUROR:  Can I read the question again, the second

02:00   20    part?

        21           THE COURT:  Yeah, take your time.  Take your time.

        22           THE JUROR:  Not at this point anymore.  I don't think

        23    I could be able to do that.

        24           THE COURT:  You understand, in our criminal justice

        25    system, a person is accused of a crime is presumed to be

1    innocent unless the government proves at trial by the evidence

2    that the person is guilty and proves that beyond a reasonable

3    doubt?  Do you understand those principles?

4              THE JUROR:  I do.

5              THE COURT:  Actually, you probably applied them in the

6    criminal case.

7              THE JUROR:  Yes.

8              THE COURT:  The question would be, in this case,

9    whether you would be able to set aside any impressions you had

02:01 10    from the media or otherwise and listen to the evidence in the

11    case and base your decision about whether the defendant is

12    guilty or not based on that evidence in the case only?

13              THE JUROR:  I don't think I could.

14              THE COURT:  Okay.  Okay.  Thank you, sir.

15              THE CLERK:  Juror No. 617.

16              THE JURY CLERK:  Juror No. 617.

17              THE CLERK:  617, over here, ma'am.  Have a seat.

18              THE COURT:  Good morning.

19              THE JUROR:  Good morning.

02:03 20              THE COURT:  Since you were last here, have you been

21    able to avoid discussing the substance of the case with anyone?

22              THE JUROR:  Yup.

23              THE COURT:  And also avoid media accounts as much

24    as --

25              THE JUROR:  As much as I could, yeah.  It's kind of

1     hard sometimes.

2          THE COURT:  So that's the questionnaire that you

3     filled out.  We're going to follow up on some of the

4     information you gave us there.  I'd like to first start with

5     your employment.  You tell us that you're a self-employed copy

6     editor.

7          THE JUROR:  Yes.

8          THE COURT:  What does that mean?

9          THE JUROR:  That means I read really boring technical

02:03 10    manuals and make sure that everyone else can understand them,

11     you know, check spelling and --

12          THE COURT:  Are you -- is this a free-lance kind of

13     thing?

14          THE JUROR:  Yes, uh-huh.

15          THE COURT:  How do you get your work?

16          THE JUROR:  Luckily, I've got a couple of companies

17     that I've done enough work for that they hire me all the time.

18     So it's kind of full time, almost full time.

19          THE COURT:  How are you paid?  By the piece?  By the

02:03 20    time you spend on it?

21          THE JUROR:  By the job.  It's a flat rate by the job.

22          THE COURT:  We had asked -- we had set out earlier in

23     the questionnaire, on Page 5, Section 10 -- Question 10, the

24     schedule that we're going to follow, which will be basically a

25     weekly four-day-a-week, Monday through Thursday, 9 to 4 and so

1    on.  And we asked if, on that schedule, you thought you'd incur

2    a substantial hardship if you were called to serve on the case.

3    Given that you're self-employed, would that be an issue for

4    you?

5              THE JUROR:  Yeah, it would.

6              THE COURT:  Could you tell us how much of one?

7              THE JUROR:  I would be missing out on quite a bit of

8    money.

9              THE COURT:  What's your usual workweek like?

02:04 10              THE JUROR:  That's a good question.  Usually, I work,

11   like, five days a week if I have work.  Sometimes I don't have

12   work at all.  But in this case, I have work coming up in a

13   couple of weeks, and it's going to go for a good six to eight

14   weeks, the work itself.

15              THE COURT:  I guess we structured the schedule in part

16   to give people at least one full weekday and then time in the

17   -- later in the day after jury service, maybe in the evenings

18   work on things.  Would that help at all?

19              THE JUROR:  Yeah.  I could work in the evening and on

02:05 20   the weekend.

21              THE COURT:  Would you be able to keep up with your

22   work if you did that?

23              THE JUROR:  It would be really difficult.

24              THE COURT:  How come?  Tell us a little bit about

25   that.

1          THE JUROR:  Because the work comes in daily, and they

2     expect two sections done a day, so that's 14 sections in one

3     week.  And that's a good six hours of work on two pieces.  So I

4     would be getting home and working until, like, 11:00 at night

5     and then getting up and coming in here.

6          THE COURT:  Content?  Okay.  Thank you.

7          THE JUROR:  Oh, sure.

8          THE COURT:  That's it.

9          THE JUROR:  That's it?

02:05 10          THE COURT:  That's it.

11          THE JUROR:  Oh, thank you.  Have a nice day.  I'm

12     going home.

13          THE CLERK:  Juror No. 619.

14          THE JURY CLERK:  Juror No. 619.

15          THE CLERK:  Ma'am, over here, please, if you would.

16     Have a seat.

17          THE COURT:  Good morning.

18          THE JUROR:  Good morning.

19          THE COURT:  You don't have to get that close but that

02:07 20     was good.

21          Since you were here last, have you been able to avoid

22     discussing the merits of the case with anyone?

23          THE JUROR:  No, no.  My husband.  He's the only one

24     I've told.

25          THE COURT:  Told about your being here.  I'm talking

```
 1     about the substance of the case.

 2              THE JUROR:  Oh, no, no.

 3              THE COURT:  Just about your scheduling here?

 4              THE JUROR:  Yeah.  And just, like, my manager, too.  I

 5     said I had to go to court.

 6              THE COURT:  How about have you been able to avoid

 7     media reporting about the case?

 8              THE JUROR:  Pretty much so.

 9              THE COURT:  Yeah.  If you see anything, are you able

10     to put it away?

11              THE JUROR:  Yeah.  I'm not reading it, no.

12              THE COURT:  Tell us about your employment.

13              THE JUROR:  I work in Shaw's Supermarket.

14              THE COURT:  Yeah.

15              THE JUROR:  What I do?

16              THE COURT:  Yeah.

17              THE JUROR:  Produce clerk in Shaw's Supermarket.

18              THE COURT:  So what does that involve?

19              THE JUROR:  Cutting up fruit and doing all that stuff.

20     I don't know if you know.  We have new owners, and they're

21     just, like, ridiculous with all the stuff.  They cut the help,

22     and they want you to do this, that, and -- yeah.

23              THE COURT:  How are you paid?  On an hourly basis?

24              THE JUROR:  Yes.

25              THE COURT:  We set out the schedule earlier in the
```

1       form.  If you want to look at it, it's on Page 5 in Question

2       10.  In summary, we plan to be on a 9-to-4 schedule, Monday

3       through Thursday.  That will last for several months likely.

4       How would that affect you and your employment?

5               THE JUROR:  Financially, I couldn't do it, no, because

6       my work only pays three days.  They only pay me three days jury

7       duty and that's it.

8               THE COURT:  What's your usual weekly schedule like?

9               THE JUROR:  I usually work between 30 and 33 hours a

02:09 10    week.

11              THE COURT:  What days?

12              THE JUROR:  I have Thursdays and Saturdays off.  So

13      Sunday through -- yup.

14              THE COURT:  Okay.  Any issue?  Okay.  Thank you.

15      That's it.

16              THE JUROR:  That's it?

17              THE COURT:  Yup.

18              THE JUROR:  Okay.

19              THE CLERK:  Juror No. 621.

02:10 20        THE JURY CLERK:  Juror No. 621.

21              THE CLERK:  Sir, over here, please.  Have a seat.

22              THE COURT:  Good morning.

23              THE JUROR:  Your Honor.  How are you?

24              THE COURT:  Good.  Have you been able to avoid any

25      discussion of the merits of the case with anyone since you were

1    last here?

2                THE JUROR:  I have been, yeah.

3                THE COURT:  How about avoiding media reports about the

4    case?

5                THE JUROR:  Headlines, no; details, yes.

6                THE COURT:  Okay.  You've been able to ignore it if

7    you saw that it was about this case.

8                THE JUROR:  To the best of my knowledge of it, yes.

9                THE COURT:  Tell us about your work, what you do and

02:11 10    so on.

11                THE JUROR:  I'm an internal auditor for State Street.

12    I basically assess processes for risk and try to find the

13    controls that mitigate them and prove their existence or

14    effectiveness and report it to the board and senior management

15    of the company.

16                THE COURT:  You've been doing that for several years?

17                THE JUROR:  Three years, nine months.

18                THE COURT:  I think you told us -- this is later in

19    the questionnaire, on Page 26, Question 98 -- that you travel

02:11 20    extensively for work.  Can you tell us about that?

21                THE JUROR:  Correct, yes.  I do travel for work

22    because we are centralized out of Boston, and we do have

23    offices across the globe.  I was just in China.  I do have to

24    go to a conference in South Florida for anti-money laundering,

25    March 16th through the 18th.

1          THE COURT:  Any others that you can predict at this

2    point?

3          THE JUROR:  Potentially London in June.  That's still

4    to be determined.

5          THE COURT:  Okay.  We asked about Facebook or social

6    media use.  You post a little bit; you send happy birthday

7    wishes and things like that.

8          THE JUROR:  Happy birthday wishes and where I am,

9    that's about it.

02:12 10          THE COURT:  And some also, I guess rare, you say,

11   Twitter and Instagram.

12          THE JUROR:  Very seldom.

13          THE COURT:  Yeah, okay.  You told us that your father,

14   some time ago, was an assistant U.S. attorney?

15          THE JUROR:  That's correct, in South Florida.

16          THE COURT:  South Florida.

17          THE JUROR:  Uh-huh.

18          THE COURT:  Do you know whether his concentration was

19   on criminal matters or civil matters?

02:12 20          THE JUROR:  Not a hundred percent sure.

21          THE COURT:  Okay.  We asked some interesting personal

22   data, and we see that your grandmother, you said, was Muslim.

23          THE JUROR:  Correct.

24          THE COURT:  It's put in the past tense.  Is she

25   deceased?

1          THE JUROR:  She's deceased.

2          THE COURT:  Did you know her?

3          THE JUROR:  Yeah, I knew her.

4          THE COURT:  I mean, sometimes -- one of my

5     grandmothers had passed before I was born.  That's why I asked.

6          How was your relationship with her?  Tell us about her

7     background.  Where was she from originally?

8          THE JUROR:  She was from Guyana originally.  At the

9     time it was a British colony.  Then they migrated up to North

02:13 10    America, and that's really about it.  I don't really know much

11    about her work experience or job responsibilities, but she was

12    a mother of ten.

13         THE COURT:  Your father's side or your mother's side?

14         THE JUROR:  Mother's side.

15         THE COURT:  Let me ask you to turn to Page 20 of your

16    questionnaire, Question 77, near the top.

17         THE JUROR:  Yup.

18         THE COURT:  In that question, we asked whether, based

19    on things you'd seen or read in the news or else -- from other

02:14 20    sources, you'd formed an opinion about certain matters, whether

21    the defendant was guilty or not, whether he should receive the

22    death penalty or not.  You checked "yes."  Let's just focus on

23    (a) and (b) for a minute.  You checked "yes," you had an

24    opinion that he was guilty; and, no, that you do not have an

25    opinion that he was not guilty.  You similarly answered (c) and

1    (d) about the penalty.  Below that, we asked, if you had

2    answered yes to any of the questions, as you did to (a) and

3    (c), would you be able or unable to set aside your opinion and

4    base your decision about the guilt and punishment solely on the

5    evidence presented in court?  And you checked the box "able."

6              THE JUROR:  I think I would be able to, but I do have

7    my prenotions.  I would require a severe amount of convincing.

8              THE COURT:  You understand, in our criminal justice

9    system, that a person accused of a crime is presumed to be

02:15 10   innocent of a crime.

11             THE JUROR:  Understand.

12             THE COURT:  Unless the government --

13             THE JUROR:  Proves guilty.

14             THE COURT:  -- proves the person guilty at trial by

15   the evidence produced at trial and proves that beyond a

16   reasonable doubt.  Do you think you would have difficulty

17   applying those principles in this case?

18             THE JUROR:  I think potentially, yes.

19             THE COURT:  You think you would require the defendant

02:15 20   to prove that he wasn't guilty?

21             THE JUROR:  Guilty of the crime?  That would require a

22   lot to prove not guilty.

23             THE COURT:  Okay.  Okay.  Thank you.

24             THE JUROR:  Thank you.

25             THE CLERK:  Juror No. 623.

```
 1              THE JURY CLERK:  Juror No. 623.

 2              THE CLERK:  Sir, over here, please.  Have a seat.

 3              THE COURT:  Good morning.

 4              THE JUROR:  Morning.

 5              THE COURT:  Since you were last here -- you can adjust

 6       it, sure.  Since you were last here, have you been able to

 7       avoid talking about the merits of the case with anyone?

 8              THE JUROR:  Yes.

 9              THE COURT:  And have you, as well as you could,

02:17 10       avoided media accounts of what's -- about the case or

11       proceedings here?

12              THE JUROR:  I think so, yes.

13              THE COURT:  Okay.  We have the questionnaire that you

14       filled out.  We're going to follow up on some of the

15       information you gave us there.  Why don't you tell us about

16       your employment.

17              THE JUROR:  I work at Boston Scientific.  I'm an

18       engineer.

19              THE COURT:  What -- tell us a little bit --

02:18 20              THE JUROR:  I work in the Equipment Maintenance Group,

21       and we support the research and development laboratories there.

22       I generate procedures to validate equipment so that the data

23       generator from that equipment can be used to support regulatory

24       findings for submissions for medical devices.

25              THE COURT:  You've -- we asked -- if you want to
```

1    follow along, this is on Page 10.  You said you have --

2    Question 28, we asked about whether you'd published, and you

3    said -- you put "scientific papers and patents."  Can you give

4    us a little information about that?

5             THE JUROR:  Well, from the time that I was in graduate

6    school, I've written a number of papers submitted to scientific

7    journals.  Mostly been biochemistry, describing immobilized

8    enzymes.  I've generated patents for similar things to be

9    applied to medical devices.  I've contributed technical work to

02:19 10   publications for enzyme -- or controlled delivery -- controlled

11   drug delivery devices.  There was a company in Cambridge called

12   Alchemy.  I did a lot of work where we developed a product that

13   was designed to treat children of short stature with human

14   growth hormones so that they could get an injection once a

15   month rather than every day or whatever the more frequent

16   protocols required.  There's patents that I've written --

17   that's a little bit of an overstatement maybe.  I have the

18   ideas, and then the company I work with now, Boston Scientific,

19   has a group, a legal group, that helps put those into a form

02:20 20   that can be submitted for a patent application.

21             THE COURT:  Are you listed as an inventor on patents?

22             THE JUROR:  Yes.

23             THE COURT:  How many?

24             THE JUROR:  Two at this point.  I have several

25   applications.

         1          THE COURT:  What are the subject matters?

         2          THE JUROR:  One of them is immobilized enzymes on the

         3   surface of a medical device in the -- the enzyme would be used

         4   to catalyze the reaction or treatment of some medical

         5   conditions.  So, for example, you could have an enzyme attached

         6   to a stent that would degrade cholesterol.  Someone that -- I

         7   mean, some of these things wouldn't actually work, but there

         8   are -- it would take quite a bit of development to actually get

         9   something like that to work.  That would be the sort of the

02:20   10   things that would be --

        11          THE COURT:  You have some pending as well?

        12          THE JUROR:  Yes.

        13          THE COURT:  Similar area?

        14          THE JUROR:  Similar, yeah, medical device and

        15   biochemistry --

        16          THE COURT:  Biochemical interface?

        17          THE JUROR:  Yes.

        18          THE COURT:  Okay.  Let me just -- before we go on

        19   about you, we asked a little family information.  You tell us

02:21   20   your wife is retired.  What field of work was she in?

        21          THE JUROR:  She was a medical transcriptionist for the

        22   State of Rhode Island, and then she worked for the Department

        23   of Environmental Management in Rhode Island for the

        24   Investigative Division.  So they would investigate the toxic

        25   waste dumps that people did in.

1          THE COURT:  Okay.  Back to you and back to Page 10.

2     At the bottom we asked about posting messages on websites or

3     blogs or things like that.  And I guess you say you use

4     Facebook for personal matters and LinkedIn for professional

5     matters as well, I guess.  Is that pretty much a summary?

6          THE JUROR:  Yeah.

7          THE COURT:  On Page 14 now, Question 43, we asked

8     whether you or family member or a close friend had ever been

9     treated unfairly by a law enforcement officer.  You wrote,

02:22 10  "Foster son harassed by police."  Can you tell us a little bit

11    about that?

12         THE JUROR:  I had a -- we had a foster son who stayed

13    with us for about five years.  He was Haitian.  He was placed

14    with us when he was a teenager, and he had had no real parental

15    involvement until that time, so he was kind of a challenge.

16    But, you know, he got older.  And then I know that we were in a

17    neighborhood where we were the only Caucasians.  So we were

18    kind -- we kind of stood out.  You just see things that happen

19    to people, sort of like what's in the news today.  You know, I

02:23 20  knew █████, and, you know, I knew the circumstances that he may

21    have been in at the time.  And, you know, the police would just

22    -- just picked them out and bother them just because they were

23    -- I don't know.  The term that people use now is "driving

24    while being black."

25         THE COURT:  Would any of those experiences or feelings

1    interfere with your ability to be a fair juror in a case where

2    the prosecution is presenting evidence through police officers?

3         THE JUROR:  I don't think so.  I mean, I don't think

4    -- that doesn't seem to be relevant to this.

5         THE COURT:  Okay.  Let me ask you to turn to Page 20,

6    Question 77, near the top.  It's a multiple part question.  We

7    asked whether, based on things you'd seen or read in the news

8    or learned from other sources, had you formed an opinion about

9    various matters, (a), whether the defendant was guilty, and you

02:24 10   said "yes"; and (c) and (d) about the death penalty.  Let me

11   ask you particularly about question Subpart (a).  If you see

12   down below, the question goes on.  "If you answered yes, to any

13   of these questions, would you be able or unable to set aside

14   your opinion and base your decision about guilt based solely on

15   the evidence presented to you in court?"  And you selected

16   "able."  Could you tell us about that?

17        THE JUROR:  Well, in reading that question, it seemed

18   to me that the question had to do with whether he was guilty or

19   not and not about the consequences of guilt.  And, you know,

02:25 20   I'm not sure -- so that's how I answered it.

21        THE COURT:  Right.  So the question is -- it's not

22   surprising that given the coverage of this -- these events that

23   people have ideas and impressions about what happened and who's

24   responsible.  The question is whether, if you were a juror in

25   the case, you would be able to put those to the side and decide

1    the issues in the case based on the evidence produced in the

2    course of the trial and not on preconceived ideas about guilt

3    or not or appropriateness of a particular punishment or not.

4    So I'm not sure --

5          THE JUROR:  I'm not sure.  I said I am guessing that I

6    can.  It's kind of -- after reading this and thinking about it

7    after that on that day, it seemed like kind of an intangible

8    thing.  There's no real measure of whether you can or not.  You

9    just say you can or -- I don't know.

02:26 10         THE COURT:  Right.  I think you told us -- these pages

11   are out of order.  Actually, I'm missing Page 15.

12         MR. WEINREB:  It's, I believe, later on.

13         THE COURT:  I see it.  Thanks.

14         You say you sat on a state jury case for a drug

15   dealer.  Do you remember when that was?

16         THE JUROR:  It was when I lived in Rhode Island,

17   probably it was 1989.

18         THE COURT:  Okay.  At any rate, I expect you

19   understand that in our criminal justice system a person accused

02:27 20   of a crime is presumed to be innocent unless and until the

21   government proves that he's guilty by the evidence at trial and

22   proves that beyond a reasonable doubt.  What we ask jurors to

23   do, even if they have an impression about guilt or innocence

24   going in, we ask them to put aside that -- those thoughts and

25   pay attention to the evidence produced at the trial and make a

1    decision based solely on that body of evidence.

2          The government has the burden of proof to prove that a

3    person is guilty.  A person accused of a crime never has any

4    burden to prove he's not guilty.  In other words, it's not a

5    question of which side has convinced me.  It's has the

6    government convinced me that he's guilty of what he's charged

7    with?  Do you think that, if you were a juror in this case, you

8    would be able to do that notwithstanding the fact that you have

9    some impressions from the media?

02:28 10          THE JUROR:  I think so, yeah.

11          THE COURT:  If, in particular, with respect to any of

12   the particular charges, if you thought, after considering all

13   the evidence that as to a particular charge you were not

14   convinced beyond a reasonable doubt that the defendant had

15   committed that offense, would you be able to find him not

16   guilty of that offense?

17          THE JUROR:  I think so.  I was -- had imagined that

18   some other events could be presented that hasn't been in the

19   news, and that might say that he wasn't guilty.

02:28 20          THE COURT:  Or --

21          THE JUROR:  So you would have to --

22          THE COURT:  My question is whether the government's

23   evidence might not just be convincing enough on any particular

24   charge.

25          THE JUROR:  It's possible.

```
 1              THE COURT:  If you were in that condition, would you
 2     be able to vote not guilty on that?
 3              THE JUROR:  I hadn't really thought about it in that
 4     way.  But if I say that I can set aside whatever I've heard to
 5     this point in time, then I would have to say yes to that
 6     question.
 7              THE COURT:  Okay.  We asked -- this is on 21.  Again,
 8     the pages got jumbled a little bit.  I don't know if it's in
 9     your copy.  It's Question 82, whether you had participated in
02:29 10     any of the post-event support activities that people had been
11     doing.  And you said you think you made a donation to the One
12     Fund.
13              THE JUROR:  Yeah.
14              THE COURT:  When was that?
15              THE JUROR:  Shortly after the event.  That had been
16     talked about a lot in the news.  And I didn't go back to look
17     and see if I did or not, but I'm pretty sure that I did.
18              THE COURT:  Question 85, you recognized a name on the
19     list, No. 314.  I have the list here if you want to look at it.
02:30 20              THE JUROR:  Yeah.  When I was looking over this
21     list -- I know a lot of athletes and a lot of people I know
22     that run.  I thought that maybe I would see someone's name in
23     there.  And I don't know if this person is a competitor but --
24     I don't know if it's the same person, but there's somebody from
25     work that has that same name.
```

```
 1              THE COURT:  Somebody who works at --

 2              THE JUROR:  He's not there now, but I worked with him.

 3              THE COURT:  Okay.  How closely do you know him?

 4              THE JUROR:  I knew him name, and we were on some

 5      groups together.  I didn't really ever have a lot of

 6      interaction with him other than at meetings.

 7              THE COURT:  Is it the kind of person you would give

 8      extra weight to his testimony over other witnesses just because

 9      you've had the past experience with him?

02:31 10              THE JUROR:  Probably, because I know -- if it's -- if

11      that was the person that came up, I know him, and I know his

12      work.

13              THE COURT:  You talked about running competitively.

14      Do you do that?

15              THE JUROR:  No.

16              THE COURT:  Or did you?

17              THE JUROR:  No.

18              THE COURT:  No.  How do you know people who do that?

19              THE JUROR:  Well, I do a lot of bike riding, and I

02:31 20      know a lot of other endurance athletes.  I know people who have

21      run the Marathon.

22              THE COURT:  But you haven't?

23              THE JUROR:  No.

24              THE COURT:  Beginning on Page 23, we asked a series of

25      questions to gauge potential jurors' ideas about the death
```

1    penalty.  In Question 88, we asked a general question.  Do you

2    have any general views about it?  And you said, "Against using

3    the death penalty."  Do you want to explain that a little bit?

4           THE JUROR:  Yes.  I've always -- well, as long as --

5    since I've read about it, I've been against it.  I don't think

6    it's -- you can't undo it.  That's just wrong, I think, for the

7    state to do it.  I don't know.  I don't really have a -- I've

8    never really had an opportunity to talk about it, and I'm not

9    sure if I have coherent thoughts about it.  But I just don't

02:32 10    think that it's right for the state to do the same thing to the

11    person found guilty as the person had done himself.

12           THE COURT:  Okay.  In the next question, 89, we asked

13    you to put yourself on a scale from 1 to 10 where 1 was

14    strongly opposed, reflecting a belief that the death penalty

15    should never be imposed; and 10, on the other hand, reflects a

16    belief it should be imposed whenever a defendant has been

17    convicted of an intentional murder.  You selected 2.  Can you

18    tell us what you thought as you did that?

19           THE JUROR:  I guess I'm thinking someone that's

02:33 20    strongly opposed that would be writing editorials to the

21    newspaper and conducting a campaign against it.

22           THE COURT:  Actually, it's a defined term.  If you

23    look above, it says --

24           THE JUROR:  Maybe I didn't read it carefully.

25           THE COURT:  It says, "1 reflects a belief that the

1    death penalty should never be imposed."  And I guess that means

2    under any circumstances.  And 10 represents the opposite, sort

3    of absolute, view that it should always be imposed when someone

4    has been convicted of murder.  So in light of that, could you

5    explain your thinking behind choosing No. 2?

6            THE JUROR:  So it might look like there are some

7    situations when I would find it acceptable?  Is that the --

8            THE COURT:  That's what I'm asking.  Do you think

9    that's the case or not?

02:34 10         THE JUROR:  I suppose there's maybe a case out there,

11   but I haven't seen it.  I mean, I haven't seen everything so --

12           THE COURT:  Let's look at the next page.  Here we

13   asked it not in numbers but in words.  There were a series of

14   statements proposed, and we asked if you could tell us if there

15   was one that represented your view.  Why don't you take a

16   minute to read through all of them, and then we'll talk about

17   --

18           THE JUROR:  Question 90?

19           THE COURT:  Question 90, yeah.  After you've read

02:34 20  through, we're going to ask about your selection.

21           THE JUROR:  I don't know.  I think (b) is still the

22   right answer.

23           THE COURT:  Okay, that you are opposed to it and would

24   have a difficult time voting to impose it even if the facts

25   supported it.

1          THE JUROR:  Yeah.

2          THE COURT:  In the next question, we asked if your

3     views had changed over ten years, and you wrote "more opposed."

4     Does that mean you grew more opposed to the death penalty over

5     the last ten years?

6          THE JUROR:  Yeah, I think so.

7          THE COURT:  Can you tell us why you think you --

8          THE JUROR:  I guess I can think of one example and it

9     was probably recently.  They are having a hard time actually

02:36 10    administering the death penalty.  The states can't find the

11    drug cocktails to actually do it.  And it seems like it's in

12    some ways it's a theoretical thing.  If they can't actually

13    kill somebody, how can you actually assign it?  What's the

14    point of assigning it if you can't execute it?

15         THE COURT:  Just to finish up, look at the bottom of

16    Page 25, Question 95.  We asked, if you found this defendant

17    guilty and you decided the death penalty was the appropriate

18    punishment for him, could you conscientiously vote for the

19    death penalty?  And you answered "no."

02:37 20         THE JUROR:  Yeah.  I mean --

21         THE COURT:  Let me -- before I ask you to explain

22    that, let me call your attention to Question 99, where you

23    wrote -- this was, "Did you have any problems reading or

24    understanding the questionnaire?"  And you wrote, "Question 95

25    seemed contradictory."  Do you remember what --

1      THE JUROR:  Yeah.  I remember writing that.  I'm not

2  sure if I was fatigued from answering all those questions.  Let

3  me read it again.

4      Yeah.  It seemed contradictory because, if you decide

5  the death penalty was the appropriate punishment, if it was the

6  right thing to do, then that's the same as voting for it.  You

7  can't vote for something that you think that is a wrong thing

8  to do.

9      THE COURT:  So -- right.  So you answered "no,"

02:38 10  though.  So --

11      THE JUROR:  All right.

12      THE COURT:  Were you rejecting the premise?  Is that

13  what --

14      THE JUROR:  Yeah.

15      THE COURT:  You didn't think you could find it was the

16  appropriate punishment; is that what you're saying?

17      THE JUROR:  I guess there's probably two ways you

18  could answer this.  Could I vote for the death penalty?  No.

19  And would I ever decide that this was the appropriate

02:38 20  punishment, would be no.

21      THE COURT:  All right.  Follow-up?

22      MR. WEINREB:  Good morning.

23      THE JUROR:  Good morning.

24      MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

25  prosecutors.

        1              So if you don't mind, I just want to follow up on a

        2    couple things you just said.

        3              THE JUROR:  Sure.

        4              MR. WEINREB:  So with respect to Question No. 95, did

        5    I understand you correctly that, regardless of which way you

        6    interpreted it, your answer to that would be no?

        7              THE JUROR:  Yes.

        8              MR. WEINREB:  Meaning that you couldn't find that it

        9    was the appropriate penalty, correct?

02:39  10              MS. CONRAD:  Objection.

       11              THE COURT:  No.  Go ahead.

       12              THE JUROR:  I don't think I would change what I said.

       13    I think the ways I looked at it are -- so the answer is no.

       14              MR. WEINREB:  No to Question 95?

       15              THE JUROR:  I'm not sure I understand your --

       16              MR. WEINREB:  Let me just ask the question right out.

       17    Could you conscientiously -- here we're talking about not as a

       18    theoretical possibility but as an actual reality.  Could you

       19    ever find that it was the right thing to do, to impose the

02:39  20    death penalty on another human being?

       21              THE JUROR:  No.

       22              MR. WEINREB:  And if, theoretically, intellectually,

       23    you decided it was appropriate, could you take the next step

       24    and actually vote to put someone to death?

       25              THE JUROR:  No.

1           MR. WEINREB:  I have nothing further.

2           MS. CONRAD:  No questions.  Thank you.

3           THE COURT:  Thank you very much, sir.  That's it.

4    Just leave the questionnaire there.

5           THE CLERK:  628.

6           THE JURY CLERK:  Juror No. 628.

7           THE CLERK:  Sir, over here, please.  Have a seat.

8           THE COURT:  Good morning.

9           THE JUROR:  Good morning.

02:41 10           THE COURT:  Since you were last here, have you been

11   able to avoid talking about the merits of the case with anyone?

12           THE JUROR:  Yes.

13           THE COURT:  And, as best as you could, have you been

14   able to put aside or avoid media reports about the case?

15           THE JUROR:  Yes.

16           THE COURT:  So we're going to ask you about some of

17   the things you wrote in the questionnaire just to follow up on

18   some of the answers you gave.

19           THE JUROR:  Okay.

02:42 20           THE COURT:  Actually, let's start with a short

21   sidebar, if we could.

22   (SIDEBAR CONFERENCE AS FOLLOWS:

23           THE COURT:  Are the other two --

24           MR. WEINREB:  These are members of the U.S. Attorney's

25   Office.



1

2

3

4

5

6

7       .   .   .   END OF SIDEBAR CONFERENCE.)

8

9

02:44 10

11

12

13

14

15

16

17

18

19

02:45 20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

02:47 10

11

12

13

14          THE COURT:  Right.  Okay.

15          THE CLERK:  Juror No. 634.

16          THE JURY CLERK:  Juror No. 634.

17          THE CLERK:  Ma'am, over here, please, if you would.

18     Have a seat.

19          THE COURT:  Good morning.

02:48 20          THE JUROR:  Good morning, Judge.

21          THE COURT:  Since you were last here, have you been

22     able to avoid talking about the merits or the substance of the

23     case with anyone?

24          THE JUROR:  Yes, I have.

25          THE COURT:  Have you been able to, as best you could,

1    to avoid media reporting about the case?

2              THE JUROR:  Yes, I have.

3              THE COURT:  All right.  Tell us about your work.

4              THE JUROR:  I work at -- when you say tell you about

5    my work, meaning?

6              THE COURT:  What do you do?

7              THE JUROR:  I'm a receptionist/administration.

8              THE COURT:  At a law firm?

9              THE JUROR:  Yes.

02:48 10              THE COURT:  You've been doing that for quite awhile?

11              THE JUROR:  Fifteen years.  And I was told to let you

12    know that when I spoke to you.

13              THE COURT:  Which?

14              THE JUROR:  To let you know that I work for a law

15    firm.

16              THE COURT:  Right.  We had that in the -- you told us

17    that in the form.  Does that indicate that the firm is

18    concerned about your serving as a juror?

19              THE JUROR:  Not at all.  The fact that I was told to

02:49 20    mention that I work for a law firm that is representing the

21    little boy's family.  And I did not know that because I'm in

22    administration.  I'm not --

23              THE COURT:  You're talking about Martin Richard?

24              THE JUROR:  The little boy, yes, sir.  And I was told

25    to let you know that.  That's not something I -- through

1    whispers, through the firm --

2              THE COURT:  That's an important thing for us to know.

3              THE JUROR:  It's very important.

4              THE COURT:  Thank you very much.  That's it.

5              THE JUROR:  Okay.

6              THE CLERK:  Juror No. 637.

7              THE JURY CLERK:  Juror No. 637.

8              THE CLERK:  Sir, over here, please.  Have a seat.

9              THE COURT:  Good morning.

02:51 10              THE JUROR:  Good morning, Judge.

11              THE COURT:  Since you were last here, have you been

12    able to avoid talking about the substance of the case with

13    anyone?

14              THE JUROR:  Yes, I have.  I've avoided it.

15              THE COURT:  And also avoid media reporting about the

16    case?

17              THE JUROR:  Yes, I have.  I've avoided it.

18              THE COURT:  Turn it to the side?

19              THE JUROR:  I turn it to the side, yes, sir.

02:51 20              THE COURT:  Okay, great.  We have the form that you

21    filled out.  We're going to follow up on some of the

22    information that you gave us there.

23              THE JUROR:  Okay.

24              THE COURT:  We see that you're a teacher.

25              THE JUROR:  Yes, sir.

1        THE COURT:  And you indicated that -- in the question

2    about whether it would be a difficult thing for you to serve,

3    you indicated you would not have any hardship beyond the usual

4    in serving, is that correct?

5        THE JUROR:  This would not be a hardship for me.

6        THE COURT:  Your wife is a nurse?

7        THE JUROR:  Yes.

8        THE COURT:  Where does she practice her nursing?

9        THE JUROR:  She works at Rhode Island Hospital.

02:51 10        THE COURT:  Rhode Island Hospital.  Is that in

11    Providence, Pawtucket?

12        THE JUROR:  It is, yes.

13        THE COURT:  Providence?

14        THE JUROR:  Providence.  I'm sorry.

15        THE COURT:  How many years has she been there?

16        THE JUROR:  Over 20.  She's been there for a few.

17        THE COURT:  Any specialty?

18        MR. BRUCK:  She works on the neurosurgical floor so

19    brain aneurysms, anything dealing with the brain or the spine.

02:52 20        THE COURT:  As a staff nurse on the floor?

21        THE JUROR:  Yes, sir.

22        THE COURT:  You're a graduate of UMass Dartmouth?

23        THE JUROR:  Yes, sir.

24        THE COURT:  What year?

25        THE JUROR:  I have to stop and think because I took a

1    little extra time.  I believe 1991, 1992.

2              THE COURT:  You know that there's some involvement of

3    UMass Dartmouth and its personnel in the case?

4              THE JUROR:  Yes, I do.

5              THE COURT:  As an alumnus, would that cause you any

6    difficulty about being an impartial juror?

7              THE JUROR:  No, sir, it wouldn't.

8              THE COURT:  We've asked people about social media.

9    You seem to use Facebook but not very often.

02:52 10             THE JUROR:  That's correct.

11             THE COURT:  Any others?

12             THE JUROR:  I recently deleted my Twitter account

13   after it was made apparent that some of my students were going

14   on there to see my postings.  So I -- upon the request of my

15   principal, I deleted that account.  It was nothing bad, but I

16   just --

17             THE COURT:  When was that?

18             THE JUROR:  A couple of months ago.  But I normally --

19             THE COURT:  Prior to that, how did you use your

02:53 20   Twitter account?

21             THE JUROR:  Basically to look up information about

22   sports or entertainment or things like that.

23             THE COURT:  Okay.  Let me ask you to turn to Page 20,

24   Question No. 77, near the top.

25             THE JUROR:  Can I take that off?

 1            THE COURT:  Sure, absolutely.

 2            THE JUROR:  Which question?

 3            THE COURT:  Question 77 near the top.

 4            THE JUROR:  Okay.

 5            THE COURT:  It's a multipart question.  We asked,

 6    based on things you'd seen or heard in the media you'd formed

 7    an opinion about the various matters.

 8            THE JUROR:  Yes, sir.

 9            THE COURT:  Whether the defendant was guilty or not

02:54 10    and whether he should receive the death penalty or not.

11            THE JUROR:  Yes, sir.

12            THE COURT:  As to Part (a), you indicated that, yes,

13    you had formed an opinion about his guilt.

14            THE JUROR:  That's just the information I received

15    from the media.  That's what -- the opinion I formed, yes.

16            THE COURT:  As to the death penalty, you said

17    "unsure," "unsure," as to either alternative there.

18            THE JUROR:  Would you like me to speak on that?

19            THE COURT:  We'll come to that.  I want to focus on

02:54 20    the first one first.  You answered "yes" to Part (a).

21            THE JUROR:  Yes, sir.

22            THE COURT:  Further down we asked, "If you answered

23    yes to any of these questions, would you be able or unable to

24    set aside your opinion and base your decision about," in this

25    instance, "guilt solely on the evidence that would be presented

1        to you in court?"  And you checked "able."

2                THE JUROR:  Yes, I would.

3                THE COURT:  Can you tell us about that?

4                THE JUROR:  The information that I received from the

5        media is all that I had, and I never really took into account

6        that I would be asked to either use or not use that

7        information.  So just from what I received, that's what I

8        believed.

9                Upon being called upon for jury service, I realized

02:55 10       that there's more to the case, and I would have to see that in

11       order to really understand what's going on before I could

12       actually make a -- form an opinion on that.

13               THE COURT:  I'm sure you appreciate that in our

14       criminal justice system a person accused of a crime is presumed

15       to be innocent of the charged crime unless and until the

16       government proves the person guilty beyond a reasonable doubt

17       by the evidence at trial.  You're familiar with those

18       principles?

19               THE JUROR:  Yes, sir.  I'm familiar with them, yes.

02:56 20               THE COURT:  What we ask jurors to do, if they have

21       some idea before sitting as a juror, to put those ideas aside

22       and to face -- to concentrate only on the evidence produced in

23       the trial and make the judgments based on that body of

24       information and not on what they think they might have heard

25       from other places.

1          THE JUROR:  Yes, sir.

2          THE COURT:  Is that something you think you would be

3    able to do?

4          THE JUROR:  I do.

5          THE COURT:  You understand that a defendant never has

6    any burden to prove he's not guilty of what he's charged with.

7    The government always has the burden to prove guilt.  It's up

8    to the government to prove that.  If it does, it's entitled to

9    a verdict of guilty.  But if it doesn't prove guilt beyond a

02:56 10   reasonable doubt, the defendant is entitled to be acquitted.

11   If that were the case on any particular charges, that you

12   thought the government had not carried its burden of proof,

13   would you be able to find the defendant not guilty as to that

14   matter?

15         THE JUROR:  I believe I would, yes.

16         THE COURT:  In the next question, you said -- you

17   mentioned your wife.  You're against the death penalty but not

18   sure if you would still be, meaning in this case -- is that

19   with reference to this case or generally?

02:57 20        THE JUROR:  I believe that would be generally.  I --

21   personally, I don't feel that the death penalty is morally

22   right.  But, once again, I've never really been called upon to

23   demonstrate that or asked to support that.  So I don't really

24   know how I would vote in that situation or what the

25   circumstances would be.  I would hope that I would follow the

1    guidelines that I feel -- that I put down there, but I really

2    can't say until I see all the evidence.

3         THE COURT:  Let's go to Page 23.  Question 88,

4    beginning there, we asked a series of questions about the death

5    penalty.  In Question 88, we asked a general question.  If you

6    have general views about the death penalty, what are they?  You

7    said, "Ethically, I'm against the death penalty, but I don't

8    know how I would vote after this trial."  And I guess that's

9    somewhat ambiguous because it could mean you might change your

02:58 10   general views about the death penalty, or it could mean you

11   have some idea about how you might approach the question in

12   this trial specifically apart from your general views.  Could

13   you help us with what you were thinking?

14        THE JUROR:  Yeah.  As far as the death penalty goes,

15   I -- as I stated before, I feel that it's wrong.  But I really

16   don't know, after seeing the evidence of what's happened,

17   whether or not that will be tested.  Once again, I'd like to

18   hope that I will follow through on what I originally feel, but

19   I -- I cannot honestly say that I'm going to vote one way or

02:59 20   another.

21        THE COURT:  In the next question, 89, we asked you to

22   place yourself on a numerical scale where 1, strongly opposed,

23   represents a belief that the death penalty should never be

24   imposed under any circumstances; and 10, on the other hand,

25   would be a belief that it should be imposed whenever a

1   defendant is convicted of intentional murder.  You put yourself

2   at 3.  Can you explain that?  It's a little hard to explain a

3   numerical scale.

4        THE JUROR:  But I understand what you're saying.  If I

5   were to do this scale without these proceedings, I probably

6   would have gone a lot higher towards -- actually, I have to

7   stop and take a look.  I probably would have gone a lot lower

8   than 3.  With these proceedings, once again, I feel it's more

9   I'm going to be tested.  I hope, if the situation does come up,

03:00 10  that I will follow what I feel is right.  But I can't give you

11  a definite answer of, yes, I'll go one way or the other.

12       THE COURT:  Let's go to Page 24 and Question 90.  That

13  question set forth a series of possible views about the death

14  penalty and whether a person could support it or not.  We asked

15  -- why don't you take a minute to read through all of the

16  options.  We asked you to select one you thought applied to

17  you.  You made a selection.  After you've reviewed them all,

18  let's talk about that.

19       THE JUROR:  Okay.

03:01 20  THE COURT:  So you selected (c).  Do you think that

21  still represents your view the best of the options presented?

22       THE JUROR:  After reviewing the options and having

23  more time to contemplate this, I would probably today have

24  selected letter (b).

25       THE COURT:  So (b) is, "I'm opposed to the death

1    penalty and would have a difficult time voting to impose it

2    even if the facts supported it."

3              THE JUROR:  That's correct.

4              THE COURT:  That's different from what you selected,

5    which was, you thought you could vote for it if you believe the

6    facts and the law in the particular case called for it.  So you

7    think that is not fully representative of your thinking on the

8    matter?

9              THE JUROR:  I would go with (b).  I think it's -- it

03:01 10   would be a difficult decision either way.  And I really don't

11   feel that it would be fair for me to say I'm ruling out

12   anything.

13             THE COURT:  You're not choosing (a), which is the

14   never question?

15             THE JUROR:  That's correct.

16             THE COURT:  In no case.

17             So I guess the question is:  Are you realistically

18   open to voting to impose it, or are you sort of hypothetically

19   open to it or uncertain or -- I'm trying to gauge.  This is

03:02 20   fine grading, obviously, between (a), (b), and (c).  We're just

21   trying to understand where your thinking is.

22             THE JUROR:  Honestly, as an English teacher, I'm

23   afraid of the word "never."  I don't think that there's a

24   situation where the word "never" could really come into play as

25   an English teacher.  That just automatically -- I rule that out

1     automatically.  It is between (b) and (c).  Really it's a close

2     line.  After thinking about this -- and I have thought about

3     it -- I would probably lean more towards (b), that it would be

4     very difficult.  But, once again, I can't rule it out.

5            THE COURT:  Let me ask you to look at Page 25,

6     Question 95.

7            THE JUROR:  Okay.

8            THE COURT:  In that question, we said -- asked, if you

9     found the defendant guilty and if you thought the death penalty

03:03 10   was the appropriate punishment for him, could you

11    conscientiously vote for the death penalty?  And you wrote "not

12    sure."  Tell us a little bit about that.

13           THE JUROR:  I believe that answer still holds true.  I

14    really -- until I am faced -- until I face that road, I can't

15    honestly tell you which way I would go.  Once again, ethically,

16    I would hope that I would lean towards not implementing the

17    death penalty; but until I get to that point, I really can't

18    say.

19           THE COURT:  So you're an English teacher, so you'll

03:04 20   note that the question is a little awkward because one of the

21    premises is that you decided the death penalty was appropriate,

22    and then the question was could you conscientiously vote for it

23    under that circumstance.

24           THE JUROR:  Are you asking me to correct the grammar

25    or understand the question?

1          THE COURT:  It presents -- it sort of asks you to

2     accept that you've made a decision, and then asks whether you

3     can execute on it, I guess, is really what it's asking.

4          THE JUROR:  I see.  You're asking me if I could

5     consciously do that -- conscientiously do that.  I don't know.

6     I'm sorry.  I wish I had a better answer for you, but I don't

7     know.

8          MR. WEINREB:  Thank you, your Honor.  Good morning.

9          THE JUROR:  Good morning.

03:04 10          MR. WEINREB:  For another minute or two.  My name is

11    Bill Weinreb.  I'm one of the prosecutors in the case.

12          I just want to follow up on some of these questions

13    about the death penalty.  So turning back to Page 23, Question

14    88.

15          THE JUROR:  Okay.

16          MR. WEINREB:  So you essentially wrote there that you

17    believe the death penalty is unethical.

18          THE JUROR:  That's correct.  That's how I felt before

19    this happened.

03:05 20          MR. WEINREB:  And you no longer believe it's

21    unethical?

22          THE JUROR:  No.  I do.  I'm sorry.  I do believe that

23    it is unethical.

24          MR. WEINREB:  Then I thought I heard you say just now,

25    you would say ethically -- when the judge was asking you if you

1    could impose it, you said, Ethically, I hope I would not impose

2    it.

3              THE JUROR:  Right.

4              MR. WEINREB:  Would it be unethical to impose the

5    death penalty, is that --

6              MS. CONRAD:  Objection.

7              THE COURT:  No.  Go ahead.

8              THE JUROR:  I would have a very difficult time to

9    impose it.  It would be -- I don't really know how I would feel

03:06 10   afterwards.  And I have thought about this a lot.  One of my --

11   if I could kind of digress a little bit, one of my favorite

12   books is *To Kill a Mockingbird*.  I've been coming back to this

13   book a lot with Atticus Finch, whose moral dilemma -- I'm sure

14   you're all familiar with the story -- his moral dilemma of what

15   he feels he has to do for what's right.  He sticks to his guns.

16   I've always aspired to him, and I hope that I can still do

17   that.  But I can't -- I don't know if I could do that.

18             MR. WEINREB:  So what would -- what could cause you to

19   do something that, again, you think is unethical?

03:06 20            THE JUROR:  The evidence in the case and the -- the

21   evidence that's presented in the case.  I don't really know how

22   that will affect me, if that will change my feeling towards the

23   death penalty.

24             MR. WEINREB:  So you would need the evidence in the

25   case to change your feelings about the death penalty in order

1    to be able to vote for it?

2         THE JUROR:  That might be the case.  I don't -- I've

3    never had to take a decision like this, so I don't really know

4    how I'm going to respond.

5         MR. WEINREB:  Okay.  Thoughtful people give thoughtful

6    answers.  I understand that you're thinking a lot about this.

7    But what we're trying to ask you to do here really is to

8    determine if, realistically, in a death penalty case, you could

9    really consider voting for the death penalty and then imposing

03:07 10   it if you believe that it's unethical.  And that's the

11   question.

12        THE JUROR:  The question is I will consider it.  I

13   will consider both sides to it, absolutely.

14        MR. WEINREB:  All right.  And what -- let me ask you

15   again then.  So I'm a little -- I'm still a little unclear on

16   whether what you're saying is that you would have to be

17   convinced by evidence in the case to change your ethical

18   beliefs about the death penalty, go from believing that it's

19   unethical to believing that it's ethical in order to impose it.

03:08 20        THE JUROR:  I never thought I would be asked these

21   questions in my life, and so it -- I don't really know how to

22   answer that question.  I don't.  I would like to -- I think

23   that I could go either way on it, and that kind of troubles me

24   because I always thought a certain way.  But now that I'm in a

25   situation, I don't really know which way I would go.  Once

1       again, from previous years, I would have thought against the

2       death penalty, but I really can't say that now.

3                   MR. WEINREB:  Why is that?

4                   THE JUROR:  Because I don't really know the situation,

5       and I don't -- and I want to do what is right for the law and

6       for everyone.  So I'm having a hard -- struggling with that.

7                   MR. WEINREB:  You understand that the law never

8       requires anyone to vote for the death penalty.

9                   THE JUROR:  I understand that.

03:09 10                  MR. WEINREB:  So -- and the law doesn't require you to

11      change your ethics about something.

12                  THE JUROR:  I understand that, too.

13                  MR. WEINREB:  So -- but it does require you to be able

14      to consider the death penalty as a real possibility along with

15      life imprisonment without parole.

16                  THE JUROR:  Yes, sir.

17                  MR. WEINREB:  So, again, let me return to the question

18      that I asked before and ask you:  Would you have come to the --

19      would the evidence have to persuade you that the death penalty

03:09 20      was an ethical thing to do?

21                  MS. CONRAD:  Objection.

22                  THE COURT:  No.  Overruled.

23                  MS. CONRAD:  Well, the form, your Honor, and, also,

24      it's unclear whether it's this case or generally.

25                  MR. WEINREB:  Well, if you were to sit in a capital

1    case, not necessarily this one, any capital case, would you

2    have to hear evidence to persuade you that the death penalty

3    was ethical and not unethical in order to be able to really

4    consider it?

5         THE JUROR:  I think that this is bringing up whether

6    or not I actually believe that the death penalty is ethical or

7    not.  I think that's where this is going for me personally.

8    That's where it is.

9         MR. WEINREB:  You believe it's unethical?

03:10 10         THE JUROR:  I'd have to -- I'm considering it.  I'm --

11    everything that's coming up, I'm considering what my beliefs

12    are, and that's why I have a hard time saying I'm either for it

13    or against it right now.  That's why.

14         MR. WEINREB:  Can I just ask you about something else

15    for a minute?  Could you turn to Page 22?

16         THE JUROR:  22?

17         MR. WEINREB:  Yes, Question 85.

18         THE JUROR:  Okay.

19         MR. WEINREB:  Excuse me one second.

03:11 20    (Discussion held off the record.)

21         MR. WEINREB:  You mentioned that you know the witness

22    who was identified as No. 7.

23         THE JUROR:  Yes.  Actually, that was -- that was a

24    mistake.  I know another person who has a very close name to

25    that, and I was -- so I put down that -- I'm sorry, No. 7.

1          THE COURT:  Here's No. 7.

2          THE JUROR:  I'm sorry.  Yeah.  Actually, I don't know

3     that person.  There is another person in the area who has a

4     name similar to that, and I -- I was mistaken in that.

5          MR. WEINREB:  Okay.  No problem.

6          THE JUROR:  That's why I wrote the little --

7          MS. CONRAD:  Can I just clarify?  That's as to No. 7

8     or 272 or both?

9          THE JUROR:  Number 7, I don't know; No. 272, I am

03:12 10   familiar with.

11          MR. WEINREB:  Nothing further, your Honor.

12          THE COURT:  That's it.

13          MS. CONRAD:  I'm sorry.  Can I just pass something to

14    Mr. Chakravarty real quickly on that last point?

15          Good afternoon.  I'm sorry.  I'm Miriam Conrad.  I'm

16    one of Mr. Tsarnaev's lawyers.

17          THE JUROR:  Hello.

18          MS. CONRAD:  It sounds like -- and tell me if I'm

19    wrong -- let me back up.  Mr. Weinreb asked you some questions

03:13 20   about your views of the death penalty.

21          THE JUROR:  Yes.

22          MS. CONRAD:  Sounds like they're a little bit in flux

23    right now.  Is that fair to say?

24          THE JUROR:  I think that's fair to say.

25          MS. CONRAD:  And so, as you sit here today, would you

1    be able, as a juror, to listen to the evidence, to discuss the

2    evidence with the rest of the jury, and to come to your own

3    decision, understanding that you're never required to vote for

4    the death penalty, as to whether death or life without

5    possibility of release is the appropriate sentence?

6            THE JUROR:  I believe that I would.

7            MS. CONRAD:  So you would not go into this with your

8    mind already made up?

9            THE JUROR:  I would not.

03:14 10     MS. CONRAD:  Thank you very much.

11           THE COURT:  Okay, sir.  Thank you.  Thank you very

12   much.

13           THE JUROR:  Thank you.

14           THE COURT:  Let's take a short, ten-minute break.

15   (Recess taken at 12:08 p.m.)

16   (The Court entered the room at 12:21 p.m.)

17           THE COURT:  Give us just a minute so I can look at

18   this.

19   ████████████████████████████████████████████████

03:27 20  ████████████████████████████████████████

21   ████████████████████

22   ████████████████████████████████████████████

23  ██████████████████████████████

24   ████████████████████████████████████████████

25  █████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

03:28 10

11

12

13

14

15   .  .  .  END OF SIDEBAR CONFERENCE.)

16           THE CLERK:  Juror No. 638.

17           THE JURY CLERK:  Juror 638.

18           THE CLERK:  Ma'am, over here, please.  Have a seat.

19           THE COURT:  Good afternoon.

03:30 20           THE JUROR:  Good afternoon.

21           THE COURT:  Since you were last here, have you been

22 able to avoid talking about the substance of the case with

23 anyone?

24           THE JUROR:  Yes.

25           THE COURT:  Also, as much as you could, avoid media

```
 1    reporting about the case?

 2              THE JUROR:  Yes.

 3              THE COURT:  Putting aside things if you see them?

 4              THE JUROR:  I'm not a big media, so that's a yes.

 5              THE COURT:  Tell us about your employment.  You work

 6    for the Department of Developmental Services.  Tell us about

 7    the department first.  What's the scope of its

 8    responsibilities?

 9              THE JUROR:  I don't know if you're familiar, but it

10    recently had -- a few years ago it had a change.  It used to be

11    the Department of Mental Retardation.  Now it's the Department

12    of Developmental Services.  We try to teach people everyday

13    living skills, things like how to brush their teeth.  We do a

14    lot of direct care providing, like bathing and changing.

15              THE COURT:  Okay.

16              THE JUROR:  I'm a supervisor.

17              THE COURT:  You're a supervisor.  Do you spend most of

18    your time supervising, or do you do patient -- client attention

19    as well?

20              THE JUROR:  I do everything.

21              THE COURT:  All right.  You've indicated, in answer to

22    our question about the schedule in the case and so on, that

23    you're not concerned about it being a --

24              THE JUROR:  No.

25              THE COURT:  -- real burden for you?
```

```
 1              THE JUROR:  No.

 2              THE COURT:  And that includes financially?  You will

 3      be paid for being here?

 4              THE JUROR:  Yes.  As long as I get my mileage back,

 5      I'm good to go.

 6              THE COURT:  Don't worry about that.

 7              Tell us about your use of social media, I guess,

 8      Facebook, is that it?

 9              THE JUROR:  Yeah, Facebook.

10              THE COURT:  How do you use it?

11              THE JUROR:  I'm connected with families and friends on

12      it.  It's -- I like the funny little pictures and videos and

13      games.  And every morning I pop on, and I say "happy" whatever

14      day it is.

15              THE COURT:  Okay.  Could we have a brief sidebar?

16      (SIDEBAR CONFERENCE AS FOLLOWS:
```





15          THE COURT:  We'll go off or back on, I guess is what I

16    mean, off sidebar.

17    .   .   .   END OF SIDEBAR CONFERENCE.)

18          THE COURT:  Okay.  Let me ask you to look at Page 20,

19    Question 77, near the top.  In that question we asked jurors

20    whether, based on things you'd seen or read in the media or

21    from other sources, you had formed various opinions about

22    whether the defendant was guilty or not or whether he should

23    receive the death penalty or not.  To each of the four subparts

24    there you indicated "unsure."  Would you tell us about that?

25    Why did you answer that way?

1          THE JUROR:  Because I have not sat in the courtroom

2     and heard what the attorneys and the prosecutors have to offer.

3     I really don't follow the news media on anything.

4          THE COURT:  Okay.  So you understand, I'm sure, that

5     in a criminal justice system, a person who's accused of a crime

6     is presumed to be innocent, or not guilty, unless the

7     government proves the person guilty by the evidence at trial

8     and proves that to the jury so that they have no reasonable

9     doubt about the fact of guilt.  Do you understand those

03:35 10   principles?

11          THE JUROR:  Uh-huh.

12          THE COURT:  If you were a juror in this case, would

13    you be able to listen to the evidence presented in the case and

14    make your decision ultimately based on only the evidence

15    presented in the course of the case?

16          THE JUROR:  Yes.

17          THE COURT:  You understand that a defendant has no

18    obligation to prove he's not guilty, that the burden is always

19    with the government to prove that he is guilty.  And if the

03:36 20   government satisfies that burden, it's entitled to a verdict of

21    guilty.  But if the government fails to convince the jury

22    beyond a reasonable doubt as to any particular charge, that the

23    defendant is guilty of that offense, the jurors are obliged to

24    find the person not guilty?

25          THE JUROR:  I understand.

1          THE COURT:  If you thought the government, as to any

2     particular charge, had not sufficiently convinced you that the

3     defendant was guilty of that offense, would you be able to find

4     the defendant not guilty?

5          THE JUROR:  My comprehension is a little flustered

6     because this is a really big --

7          THE COURT:  Yes, it is.  It's an intimidating

8     circumstance.  Let me try to simplify it.  The government has

9     the burden of proof.

03:37 10          THE JUROR:  Yes.

11          THE COURT:  If it carries the burden of proof by

12     convincing the jury as to a particular charge that the

13     defendant is guilty, then it's entitled to a verdict of guilty.

14          THE JUROR:  Yes.

15          THE COURT:  If it doesn't convince the jury beyond a

16     reasonable doubt as to a particular charge, if the government's

17     evidence fails to convince the jury beyond a reasonable doubt

18     that the person has committed the particular crime charged,

19     then the defendant is entitled to be and should be -- must be

03:37 20     acquitted.  And the question is:  Would you be able -- if you

21     were not convinced on any particular charge that the government

22     had proved that charge beyond a reasonable doubt, would you be

23     able to find the defendant not guilty?

24          THE JUROR:  Yes.

25          THE COURT:  Okay.  Do you understand the question?

1    You're scowling a little.  That's why I'm asking.

2                THE JUROR:  Uhm.

3                THE COURT:  Let me try it another way.  You understand

4    the burden of proof is always with the government and not with

5    the defendant.  The defendant has no obligation to prove he's

6    not guilty.

7                THE JUROR:  Yes.  It's the prosecutor's job to prove

8    guilt.

9                THE COURT:  Right, right.  The question never is which

03:38 10   side has convinced me.

11               THE JUROR:  Correct.

12               THE COURT:  The question is has the government

13   convinced me beyond a reasonable doubt that the defendant, any

14   defendant, is guilty of the crime charged in this particular

15   case -- in the particular count of a case.  Do you understand

16   that?

17               THE JUROR:  Yes.

18               THE COURT:  So the question is:  If you, after

19   listening to all the evidence, had a doubt about whether the

03:38 20   defendant was guilty of that offense or not, would you be able

21   to vote for not guilty on that count?

22               THE JUROR:  Yes.

23               THE COURT:  Okay.

24               THE JUROR:  I gotcha.

25               THE COURT:  Are you following me now?

1          THE JUROR:  I'm sorry.  I'm so sorry.

2          THE COURT:  It's a lot of legal terminology.

3          THE JUROR:  I'm nervous.

4          THE COURT:  Understandable.  You're clear now?

5          THE JUROR:  I follow you.  I clearly follow you this

6    time.

7          THE COURT:  Okay.  Thank you.  We asked a series of

8    questions about attitudes toward the death penalty beginning on

9    Page 23.  At Question 88, that was a question whether you had

03:39 10   any general views about the death penalty.  That is, as a

11   general proposition, are you for or against the death penalty

12   in general?  And you said you have no views.

13         THE JUROR:  I have no views.

14         THE COURT:  Is it something you've spent any time

15   thinking about?

16         THE JUROR:  No.

17         THE COURT:  Okay.

18         THE JUROR:  I think that's why I have no views.

19         THE COURT:  Question 89, we asked you to see if you

03:39 20   could tell us, on a scale from 1 to 10, where you might be,

21   where 1 is opposed to the death penalty so that you could --

22   you think that it should never be imposed, 10 being strongly in

23   favor so that you think it should be imposed whenever a

24   defendant is convicted of intentional murder.  And you chose 9.

25   Can you recall what you were thinking when you chose 9?

1          THE JUROR:  I think if enough -- I think if enough

2     evidence is presented that it was absolutely horrific, then

3     something could qualify for the death penalty.  But other

4     situations might not.

5          THE COURT:  Okay.  Let's turn to the next page.  Here

6     we set forth a number of different propositions that you might

7     or might not agree with, and we asked you to choose one you

8     thought came closest to your view.  Would you take a minute and

9     read through all of them, and then we'll talk about the

03:41 10    selection you made.

11          Okay.  So you selected (d).  "I'm not for or against

12    the death penalty.  I could vote for it or I could vote to

13    impose life imprisonment without possibility of release,

14    whichever I believe was called for by the facts and the law in

15    the case."  Does that accurately represent your thinking about

16    this?

17          THE JUROR:  Yes.

18          THE COURT:  So that, in a given case, after -- you

19    heard me describe the penalty phase.

03:42 20          THE JUROR:  Uh-huh.

21          THE COURT:  So you start now -- the penalty phase only

22    occurs if somebody has been convicted of a crime that qualifies

23    for the death penalty.

24          THE JUROR:  Yes.

25          THE COURT:  Right?  So you have a guilty person,

1    right?  Then there's evidence about aggravating factors that

2    might tend to show this was a crime worse than others and,

3    therefore, deserving of a worse penalty than others.  And you

4    would have mitigating factors shown perhaps that would tend to

5    show this is not a case for the death penalty.  This is a case

6    for life imprisonment instead.  You'd weigh all that.  Would

7    you be able, after weighing all that and talking about it with

8    your fellow jurors, be open to either possibility?

9              THE JUROR:  Yes.

03:42 10              THE COURT:  Depending on the facts as you heard them?

11              THE JUROR:  Yes.

12              THE COURT:  Let's go to the next page, 25, at the

13    bottom, 95, at the very bottom.  Coming at it again at a

14    different way, if you found the defendant guilty and decided

15    the death penalty was the appropriate punishment, could you

16    conscientiously vote for the death penalty?

17              THE JUROR:  Yes.

18              THE COURT:  And you said "yes."

19              THE JUROR:  Yes.

03:43 20              THE COURT:  And at the top of the next page, If you

21    found the defendant guilty and you decided that life in prison

22    without the possibility of release was the appropriate

23    punishment for him, could you conscientiously vote for that

24    sentence?

25              THE JUROR:  Yes.

1          THE COURT:  Okay.  And that represents your

2    disposition going in?

3          THE JUROR:  Yes.

4          THE COURT:  You could go in either direction?

5          THE JUROR:  Yes.

6          THE COURT:  All right.

7          MR. WEINREB:  No questions.

8          THE COURT:  No questions.

9          MS. CLARKE:  Yes.  Hi.  My name is Judy Clarke.  I

03:43 10   already got to ask you one question.  But I'm one of Mr.

11   Tsarnaev's lawyers.  I just had some follow-up if I might, is

12   that okay?

13          THE JUROR:  Yes.

14          MS. CLARKE:  You mentioned to the judge on Question 77

15   -- that's Page 20 --

16          THE JUROR:  Okay.

17          MS. CLARKE:  -- that you marked "unsure" essentially

18   because you haven't sat in court and listened to any evidence,

19   right?

03:44 20          THE JUROR:  Correct.

21          MS. CLARKE:  Question 73, I think, asked you -- I

22   think that's the page before -- how would you describe the

23   amount of media that you've seen about this case.  And you said

24   "a moderate amount."  Right?

25          THE JUROR:  Yes.

1          MS. CLARKE:  Can you help us understand what it is

2     that you recall reading or hearing about the case?

3          THE JUROR:  I took the word "seen" very literally.

4     I've seen flashes of clip -- flashes of news stuff on the TV.

5     Where I work, there's a TV on every single dorm.  News is on

6     all the time.  I'm more into what I'm doing for work, so I'm

7     not hearing it.  I'm not just really listening to it.  I'm not

8     really even seeing it.  I see the news and I see names and

9     stuff, but I'm not following it.

03:45 10          MS. CLARKE:  Sure.  Can you tell us, though, what

11     stands out that you've heard or seen?

12          MR. WEINREB:  Objection in light of the previous

13     answer.  It's irrelevant.

14          THE COURT:  No.  Go ahead.  You can answer that.

15          THE JUROR:  Like, what I remember hearing?

16          MS. CLARKE:  Sure.

17          THE JUROR:  On TV?

18          MS. CLARKE:  Yeah.

19          THE JUROR:  I know there was a bombing at the

03:45 20     Marathon.  I know they were looking for people.  And they found

21     someone in a boat.  That's about it.

22          MS. CLARKE:  Did you draw any opinions, conclusions,

23     impressions, based on that information?

24          THE JUROR:  No.

25          MS. CLARKE:  Okay.  Do you ever go to the Marathon or

1    know anything about the Marathon or follow the Marathon event?

2            THE JUROR:  No.

3            MS. CLARKE:  No.  Do you have -- do you remember where

4    you were on April 15, 2013, the day of the Marathon?

5            THE JUROR:  Do you know what day of the week it was?

6            MS. CLARKE:  It was a Monday.  It was Patriots' Day.

7            THE JUROR:  I was working.

8            MS. CLARKE:  So it was a Monday; you were working?

9            THE JUROR:  Yes.

03:46 10         MS. CLARKE:  Do you remember how you heard about the

11   Marathon bombing?

12           THE JUROR:  I don't remember.  I don't know if it's

13   something I saw or something I heard.

14           MS. CLARKE:  From a coworker or a friend?

15           THE JUROR:  Pretty much.  I mean, I know that when it

16   happened it was everywhere.  I don't know how much I'm allowed

17   to talk either.

18           MS. CLARKE:  Sure.  You're allowed to talk.

19           THE JUROR:  I'm allowed to talk.  I apologize to the

03:46 20  news media, but I just -- I don't believe anything that they

21   put on TV.  I'm more of a -- I'm better if I can read

22   something.  I don't like the newspapers.  I don't like the news

23   media I see on TV.  I don't like the news clippings I see on

24   the whole Facebook.  I'm just -- I'm kind of introverted, too,

25   so I don't get a lot of social experience, which is why this is

1       so -- my face is probably really red.

2               MS. CLARKE:  You're doing fine.

3               THE JUROR:  Sorry.

4               MS. CLARKE:  The end of that week, do you remember

5       where you were that day, the day of the shelter in place?

6               THE JUROR:  No.

7               MS. CLARKE:  Did you have to shelter in place?

8               THE JUROR:  Shelter?

9               MS. CLARKE:  You know what I'm talking about?  On the

03:47 10     -- at the end of that week when the governor asked everyone to

11      stay home?

12              THE JUROR:  (Shakes head.)

13              MS. CLARKE:  You don't remember that?

14              THE JUROR:  I am essential staff.  It wouldn't affect

15      me.

16              MS. CLARKE:  It was a Friday.

17              THE JUROR:  It was a Friday?

18              MS. CLARKE:  Yes.

19              THE JUROR:  I was home.

03:47 20             MS. CLARKE:  You can get it by the days of the week.

21              Could I take you to Question 50?  It's at Page 15.

22      You talked a little bit about a case that you took some

23      interest in, the Schiavo case out of Florida, and your feelings

24      about that case.  Can you help us understand how your feelings

25      about life in that case relate to your feelings about the death

1   penalty?

2           MR. WEINREB:  Objection.  If at all.

3           MS. CLARKE:  If at all.

4           THE COURT:  Yeah.

5           MS. CLARKE:  You know what I mean?

6           THE COURT:  The views that led you to be interested in

7   that case -- I guess you were interested in whether -- you said

8   your interest was, hopefully, they would let her live, which

9   they would keep her sustained on life support, so on and so

03:49 10   forth.  Does that -- do your views about that relate in any way

11   to your views about the appropriateness of the death penalty in

12   general or in any particular case?

13           THE JUROR:  I took an interest in her because she was

14   receiving all her nutrients through her G tube.  The people

15   that I take care of -- I'm trying not to cross any HIPPA lines

16   either because --

17           THE COURT:  You can talk generally.

18           THE JUROR:  The people that I take care of, a lot of

19   those people are on feeding tubes.  They communicate via facial

03:49 20   expressions and eye gazes and stuff.  When I had heard some

21   things that -- I think it was her husband was saying that she

22   was a vegetable and there was just nothing there, but her

23   mother was pleading, saying that she could carry a conversation

24   with her or get yes-or-no answers from her eye gaze or facial

25   expressions.  I'm familiar with that, and I wanted to see where

1    they were going to go with that because, to me, it would be

2    like taking one of the individuals I care for and just deciding

3    I'm done caring for this person.  We're going to unplug them

4    and go about our business.

5              MS. CLARKE:  That makes sense.  Thank you.  So they

6    don't really connect to your views on the death penalty at all?

7              THE JUROR:  No, no.  It had more to do with what I do

8    for work.

9              MS. CLARKE:  More for who you care for now.

03:50 10            THE JUROR:  Yeah.

11             MS. CLARKE:  I think that's got it.  Thank you very

12   much.

13             THE COURT:  All right.  Thank you.  Just leave the

14   questionnaire there.  Thanks.

15             THE JUROR:  Thank you.

16             THE COURT:  Hold up just a minute.  Let me assess

17   this.

18   ██████████████████████████

19   ██████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████

23   ██████████████████████████████

24   ████████████████████

25   ███████████████████████

1

2

3

4

5

6       THE CLERK:  Juror 645.

7       THE JURY CLERK:  Juror 645.

8       THE CLERK:  Sir, over here, please, if you would.

9       THE COURT:  Good afternoon.

03:53 10       THE JUROR:  Good afternoon.

11       THE COURT:  Since you were here to fill out the

12  questionnaire, have you been able to avoid talking about the

13  merits or substance of the case with anyone?

14       THE JUROR:  I have.

15       THE COURT:  And, as much as you've been able, to put

16  aside any media reporting you see about the case?

17       THE JUROR:  Yes.

18       THE COURT:  Okay.  So we're going to follow up on some

19  of the things you told us in the questionnaire.  Let's start

03:53 20  with your employment.  You're the owner of a meat processing

21  facility.

22       THE JUROR:  Yes.

23       THE COURT:  Can you tell us a little bit about the

24  business.

25       THE JUROR:  We manufacture ground beef and ground beef

1    patties and supply to various distributors in New England area.

2              THE COURT:  How big an operation is it?

3              THE JUROR:  We do -- there's only eight employees.

4              THE COURT:  How many?

5              THE JUROR:  Eight.  And we do probably 4 million in

6    sales a year.

7              THE COURT:  Okay.  And you're the president and owner?

8              THE JUROR:  Yes.

9              THE COURT:  You are aware of the schedule that we'll

03:54 10   follow on the case?

11             THE JUROR:  Yes, I am.

12             THE COURT:  Monday through Thursday, 9 to 4.

13             THE JUROR:  Yeah.

14             THE COURT:  Fridays off.  So will you be able to sort

15   of remotely manage the business?

16             THE JUROR:  It's kind of tough because I oversee all

17   the day-to-day purchasing and accounting of the business.  So

18   for me to not be there -- I would have to actually come, do my

19   service, try and purchase for the company to keep all my guys

03:54 20   going.  The downfall is I'm also -- we're such a small

21   operation, I am the repair guy for all the machinery as well.

22   So if something goes down while I'm not there, even today, they

23   would have to shut down until I actually showed back up to

24   repair the unit.

25             THE COURT:  Do you count yourself as one of the eight,

         1    eight employees?

         2            THE JUROR:  I do, yes.

         3            THE COURT:  Among the other seven, are there any other

         4    people who are sort of front office type people or are they

         5    just line people?

         6            THE JUROR:  My son works for me, and he could probably

         7    step in, but he doesn't know how to repair any of the machinery

         8    yet.  He's just out of college so he just stepped into the

         9    business with me.

03:55   10            THE COURT:  So give us an idea of what the hazard is

        11    for repairs?  How often does that occur?

        12            THE JUROR:  It could happen, you know, usually there's

        13    something that happens once a week, sometimes minor, sometimes

        14    major.  Like a bearing or a gear will -- thing.  If the guys

        15    set up the machine wrong, one of my employees, it becomes major

        16    because it will actually tear the machine apart.  Normally, I

        17    have a back-up machine in place but not at this time.

        18            THE COURT:  Okay.  We'll continue?

        19            Tell me about use of social media.  You say you have a

03:56   20    Facebook listing.

        21            THE JUROR:  Yeah, but I've only been on it -- somebody

        22    else set it up for me, but I don't know.  I try to keep private

        23    what's private.

        24            THE COURT:  Can we do a sidebar, please?

        25    (SIDEBAR CONFERENCE AS FOLLOWS:





1

2

3

4

5

6          THE COURT:  Okay.  All right.  Okay.  Thank you.

7    We'll go back on.

8    .  .  .  END OF SIDEBAR CONFERENCE.)

9          THE COURT:  So I'd like you to look at Page 20.

03:59 10          THE JUROR:  Okay.

11          THE COURT:  Question 77, near the top.  We asked here,

12    in some subparts of the question, whether you had formed an

13    opinion about various matters based on things you'd seen in the

14    news or heard from other sources.  And (a) was whether you had

15    formed an opinion the defendant was guilty.  You checked "yes."

16          THE JUROR:  Yeah.

17          THE COURT:  Then, (c), that he should receive the

18    death penalty, and you checked "yes" there as well.

19          THE JUROR:  Right.

04:00 20          THE COURT:  The question went on to say, "If you

21    answered yes to any of these questions, would you be able to or

22    unable to set aside your opinion and base your decision about

23    guilt and punishment solely on the evidence that will be

24    presented in court?"  You checked "able."

25          THE JUROR:  Right.

1          THE COURT:  Would you tell us about that?

2          THE JUROR:  Even though you've seen what's happened in

3     the media -- I mean, it was broadcast everywhere -- could you

4     actually say it was him, you know?  There was actually -- it's

5     all hearsay by the media pretty much.  To be objective, you

6     have to answer yes.  You have to get all the evidence and then

7     form your opinion.

8          THE COURT:  Okay.  So --

9          THE JUROR:  I mean, answering yes to the "Do you think

04:01 10   he's guilty?", just from what you hear, yeah, probably.

11          THE COURT:  I'm sure you appreciate that in our

12     criminal justice system a person who is accused of a crime is

13     presumed to be innocent or not guilty.

14          THE JUROR:  Until --

15          THE COURT:  Unless and until the government proves

16     that he's guilty by the evidence at the trial and proves it

17     beyond a reasonable doubt.  You're familiar with those

18     principles?

19          THE JUROR:  Yes.

04:01 20        THE COURT:  For any juror in this case, it's not

21     surprising if they've seen things about the case in the media

22     and have formed some impressions as a result of that.

23          THE JUROR:  Right.

24          THE COURT:  What we'd ask jurors to do is, if they sat

25     on the case, to pay attention to the evidence actually produced

1    in the course of the trial and focus only on that and not on

2    information they had from any other source including prior news

3    reports.

4              THE JUROR:  Right.

5              THE COURT:  Do you think you would be able to do that

6    if you were a juror in the case?

7              THE JUROR:  Yes.

8              THE COURT:  And make your decision only on the trial

9    evidence?

04:01 10          THE JUROR:  Absolutely.

11             THE COURT:  Do you understand the burden is always on

12   the government to prove a person guilty of an offense that's

13   charged?

14             THE JUROR:  Correct.

15             THE COURT:  A person charged never has any obligation

16   to prove he's not guilty.

17             THE JUROR:  Correct.

18             THE COURT:  It's always a question of has the

19   government convinced me by the evidence that this person has

04:02 20   committed the crime that he's charged with.

21             THE JUROR:  Yes.

22             THE COURT:  If you thought on any particular charge

23   that the government had not shown enough evidence to convince

24   you beyond a reasonable doubt that the defendant had committed

25   that crime would you be able to find him not guilty?

```
 1              THE JUROR:  Absolutely.

 2              THE COURT:  On the next page, 21, we asked about

 3    whether you or people close to you had -- this is in Question

 4    82 -- participated in various support activities and so on.

 5    You say you didn't personally, but you have two sisters-in-law

 6    who have Boston Strong merchandise.

 7              THE JUROR:  I mean, they're marathoners and were there

 8    at the time.

 9              THE COURT:  Okay.  Tell us about that.

04:02 10         THE JUROR:  They were just in that general area being

11    support people.

12              THE COURT:  Were they running in that Marathon?

13              THE JUROR:  No.

14              THE COURT:  They've run in others, is that it?

15              THE JUROR:  Yes.

16              THE COURT:  And so they were -- were they at the

17    finish line?

18              THE JUROR:  They were at the finish line.

19              THE COURT:  Were they at the finish line when the

04:03 20    explosions occurred?

21              THE JUROR:  No, they weren't.

22              THE COURT:  So they had left?

23              THE JUROR:  They had left, yeah.

24              THE COURT:  Beginning on Page 23, beginning at Page --

25    I'm sorry, at Question 88, we asked a series of questions about
```

 1        -- are you on 23?

 2               THE JUROR:  Oh, sorry.

 3               THE COURT:  -- series of questions about the attitudes

 4     towards the death penalty.  And 88 itself is a question.  If

 5     you have any general views about the death penalty, what are

 6     they?  And you said "no opinion."  Can you tell us about that?

 7               THE JUROR:  Well, I mean, I'm all for the death

 8     penalty if it warrants it, but I could go either way.  It's

 9     solely based on everything that's presented.

04:04 10               THE COURT:  Okay.

11               THE JUROR:  I mean, so it's kind of either/or.

12               THE COURT:  Is this something you've thought much

13     about or a little about?

14               THE JUROR:  The death penalty?

15               THE COURT:  Or a great deal about it?

16               THE JUROR:  This?

17               THE COURT:  The death penalty in general, as a policy

18     matter.

19               THE JUROR:  Not in great detail.  You just hear things

04:04 20     that happen in certain cases, other cases in the past, and, you

21     know, have -- you know, do people deserve it?  Yes, if -- you

22     know, if it warrants it, you know.

23               THE COURT:  Let's turn to Page 24, Question 90.

24     Question 90 sets forth a series of various positions that

25     somebody might have on the death penalty, and we asked you to

1    read through them and select one that came close to you.  Would

2    you just review that?  Take a minute now and read through all

3    of them, and then we'll talk about the choice you indicated.

4             THE JUROR:  Okay.

5             THE COURT:  All right.  And you selected (e).

6             THE JUROR:  Yes.

7             THE COURT:  Which is, "I'm in favor of the death

8    penalty, but I could vote for a sentence of life imprisonment

9    without the possibility of release if I believed that sentence

04:05 10   was called for by the facts and the law in the case."  Is that

11   accurate?

12            THE JUROR:  Right, yes.

13            THE COURT:  Let me ask you for a minute to go back to

14   the previous page, Question 89.  There we asked you to put

15   yourself on a scale from 1 to 10 about the death penalty, where

16   1 is strongly opposed.  If you read in the preamble, "strongly

17   opposed so that the death penalty should never be imposed."

18   See that?  1 reflects a belief that the death penalty should

19   never be imposed.  And as the question puts it, a 10 reflects a

04:06 20   belief that the death penalty should be imposed whenever the

21   defendant has been convicted of intentional murder.  That seems

22   a bit inconsistent with the (e) answer on the next page.  Could

23   you reconcile those things for us?

24            THE JUROR:  Well, let me just read through the other

25   ones, so I'll breeze through those again here.

1          I mean, by saying I'm strongly for it on the previous

2     question, even though (e) is -- you know, it's almost like a --

3     even though, like, you're going from being a death penalty to

4     life imprisonment, that's basically -- you know, it's almost

5     the same as the death sentence because you're never going to

6     leave prison, ever, you know.  I mean, that's kind of the way I

7     see it.  Either way, it's one -- it's either death or you're

8     going to be incarcerated for the rest of your life.  Is life

9     really worth living if you're going to be behind bars for the

04:07 10    rest of your life?

11          THE COURT:  This morning I gave you an overview about

12     what we call the penalty phase in a case like this.

13          THE JUROR:  Yes.

14          THE COURT:  So that occurs only after the jury has

15     convicted somebody of a crime --

16          THE JUROR:  Right.

17          THE COURT:  -- for which the death penalty is a

18     possibility, right?  So you start the penalty phase with the

19     person you have just found guilty of a qualifying crime.

04:07 20         THE JUROR:  Right.

21          THE COURT:  Okay.  The question then is, after

22     considering the evidence, what should the penalty be for this

23     person, for this crime, okay?

24          THE JUROR:  Right.  But all the facts will, hopefully,

25     give you the sense to either -- go either way with it.

          1              THE COURT:  That's my question.

          2              THE JUROR:  There's a lot more facts that are unknown

          3     to us at this point in time.

          4              THE COURT:  But that's my question.

          5              THE JUROR:  So that would have to make your -- your

          6     judgment sway either way.

          7              THE COURT:  Right.  That's what I'm asking you.  You

          8     tend to be, I hear you, in favor of the death penalty in an

          9     appropriate case.

04:08    10              THE JUROR:  Exactly.

         11              THE COURT:  Okay.  Would you be open to a decision in

         12     either direction, either for the death penalty or for life

         13     imprisonment, based on your evaluation of the evidence you

         14     heard in the penalty phase?

         15              THE JUROR:  Yes.

         16              THE COURT:  In other words, you wouldn't be

         17     precommitted --

         18              THE JUROR:  Right, exactly.

         19              THE COURT:  -- to one or the other?

04:08    20              THE JUROR:  Right.

         21              THE COURT:  You'd be open to either?

         22              THE JUROR:  You would have to go in with an open mind.

         23              THE COURT:  Even understanding that the person has

         24     been guilty of a capital crime?

         25              THE JUROR:  Right.

```
 1              THE COURT:  Okay.

 2              MR. WEINREB:  Good afternoon.

 3              THE JUROR:  Good afternoon.

 4              MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

 5      prosecutors in the case.

 6              THE JUROR:  Yes.

 7              MR. WEINREB:  I just wanted to follow up a little bit

 8      on your -- what you were saying about your job.

 9              THE JUROR:  Yeah.

04:09 10              MR. WEINREB:  So I notice that -- I think you listed

11      here that from 1981 to 2004 you were the general manager.

12              THE JUROR:  Yes.

13              MR. WEINREB:  And then you took over?

14              THE JUROR:  It was my father and his partner's

15      company.  And then they wanted to retire, and I bought the

16      business from the both of them.

17              MR. WEINREB:  Got you.  Now your son is there, too.

18              THE JUROR:  My son.  He just graduated college a

19      couple years ago, and now he's -- the job market isn't so good.

04:09 20              MR. WEINREB:  Is he essentially the manager?

21              THE JUROR:  Yeah.  He's the general manager, yeah.

22              MR. WEINREB:  So he doesn't have your repair skills?

23              THE JUROR:  No, no, no.  I'm just -- I'm basically

24      breaking him in.  As something happens, him and I will work

25      together in conjunction.  I want him to learn because I want
```

1   to -- I don't want to stay in the business, like my father did,

2   until 79.  I want to retire a little early.

3            MR. WEINREB:  I understand.  If you were selected to

4   be on the jury and a machine broke, is it possible that your

5   son could get a repairman to come in and fix it?

6            THE JUROR:  You know, the guys that used to do it are

7   a dying breed.  It used to be you could pick up the phone and

8   call any one of a half a dozen.  These guys are all gone and

9   retired.  You're pretty much on your own.  Unless you call a

04:10 10   manufacturer, but he's in Chicago.  Then you would have to fly

11   him out and get him to repair the machine.  Is it practical?

12   No.

13            MR. WEINREB:  Okay.

14            THE JUROR:  Because then you'd lose a whole day's

15   worth of production.

16            MR. WEINREB:  Speaking of that, so if the machine

17   broke and it was a complicated repair, the kind you had to do

18   yourself, could it be done at the end of the day when you were

19   done or on a Friday?

04:11 20            THE JUROR:  Oh, yeah.  I could do it at the end of the

21   day if I had to go in and get it done and then go home, along

22   with doing all the regular book work, payroll, and such.

23            MR. WEINREB:  The book work and the payroll, is that

24   something somebody else could potentially do?

25            THE JUROR:  Yeah, yeah.  I mean, I could talk them

         1      through it.

         2              MR. WEINREB:  Okay.  Thanks.

         3              THE JUROR:  You're welcome.

         4              MS. CONRAD:  Good afternoon.  My name is Miriam

         5      Conrad, and I'm one of Mr. Tsarnaev's lawyers.

         6              Just to follow up a little bit on the impact on your

         7      business.

         8              THE JUROR:  Yes.

         9              MS. CONRAD:  So if one of these machines broke in the

04:11   10      morning --

        11              THE JUROR:  Yup.

        12              MS. CONRAD:  -- and you couldn't fix it till after you

        13      got done here -- where is it actually located?

        14              THE JUROR:  New Market Square, about ten minutes.

        15              MS. CONRAD:  So close by.

        16              THE JUROR:  It's close by.

        17              MS. CONRAD:  What would be the financial impact of

        18      that?

        19              THE JUROR:  You lose a day's production.  And the

04:12   20      business that we're in, if you don't supply somebody with

        21      something and then they go to a competitor to buy it, then

        22      there's always that potential that that customer liked his

        23      product more than yours, so you could potentially lose a

        24      customer.  That's why, I mean -- my father's motto is never let

        25      your customers go away to somebody else, so you always made

```
 1    sure you had stuff on hand.
 2         MS. CONRAD:  How many regular customers do you have?
 3         THE JUROR:  I probably have maybe -- regular
 4    customers, a weekly basis, maybe 250.
 5         MS. CONRAD:  Would that be a concern to you, a
 6    distraction, if you were picked for this jury?
 7         THE JUROR:  It would be on my mind all day long, make
 8    sure that things were operating correctly and sufficient.  My
 9    son has a good handle on it.  He's a bright kid.  And, you
10    know, he's coming along pretty well.  Some of the minor
11    repairs, he's, you know, been able to take care of.  Some of
12    the major ones, no.
13         MS. CONRAD:  Can you give us an idea, over the course
14    of three or four months, you know, how often --
15         THE JUROR:  How often?
16         MS. CONRAD:  Yeah.
17         THE JUROR:  Maybe ten repairs, twelve, at best.
18         MS. CONRAD:  So that could represent up to ten lost
19    days of production?
20         MR. WEINREB:  Objection, your Honor.  We don't need --
21         THE COURT:  That's a little leading.
22         MS. CONRAD:  What would that translate into in terms
23    of lost production?
24         MR. WEINREB:  Objection.
25         THE COURT:  Yeah.  I think we have that.
```

1        MS. CONRAD:  Okay.  You also -- you gave an answer on

2   Question 74 I couldn't quite make out, Page 19, that related to

3   this, I think.

4        THE JUROR:  74?

5        MS. CONRAD:  Can you just read that out loud for us,

6   please?

7        THE JUROR:  "As much as I would like to be on any

8   trial for the experience and duty, I feel it would be a burden

9   to me for the proper running of my U.S.D.A. meat processing

04:14 10   plant."

11        MS. CONRAD:  Do you still feel that way?

12        THE JUROR:  I do.

13        MS. CONRAD:  You also mentioned something about

14   purchasing.  What would be the impact --

15        THE JUROR:  I purchase meat to manufacture on a daily

16   basis.  My son has -- actually, I've been training him, you

17   know, over the last couple years.  So, yes, he could fill in

18   and do it for me.

19        MS. CONRAD:  Okay.  You mentioned that -- I think it

04:14 20   was your two sisters-in-law that were at the Marathon that day.

21        THE JUROR:  Yes.

22        MS. CONRAD:  Are those your wife's sisters?

23        THE JUROR:  My wife's sisters.

24        MS. CONRAD:  Can you tell me a little bit more about

25   that?  Do you know how long before the bombings they left?

```
 1              THE JUROR:  No, I'm not sure.  I just know they were
 2     there.
 3              MS. CONRAD:  I'm sorry?
 4              THE JUROR:  I just knew that they were there.
 5              MS. CONRAD:  Did you know that beforehand or you found
 6     that out --
 7              THE JUROR:  I knew it afterwards.
 8              MS. CONRAD:  Did your wife know beforehand that they
 9     were there?
04:15 10         THE JUROR:  Yes.
11              MS. CONRAD:  Was she concerned about them when she
12     heard about the bombings?
13              THE JUROR:  Yes, she was.
14              MS. CONRAD:  Can you tell me a little bit about that?
15     How long?
16              THE JUROR:  I didn't really get into too much of the
17     conversation with her.  I just knew that she was concerned that
18     they were in the area.  And then after she found out that they
19     weren't anywhere near it, at the time it had already left, that
04:15 20    everything was okay.  Close-knit family.
21              MS. CONRAD:  Do you know how long it was between when
22     she heard about the bombings and when she found out they were
23     okay?
24              THE JUROR:  I don't know.  I was in the office.
25              MS. CONRAD:  Did you -- I'm sorry.  Did you shelter in
```

1    place on the 19th of April?

2              THE JUROR:  Did I -- excuse me?

3              MS. CONRAD:  Shelter in place during the manhunt on

4    April 19th, that Friday, when people were told to stay home.

5    Did that affect you?

6              THE JUROR:  No.  I was heading to the Cape.

7              MS. CONRAD:  Okay.

8              THE JUROR:  I had a ferry to catch.

9              MS. CONRAD:  Sorry?

04:16 10             THE JUROR:  I have a house on Martha's Vineyard so --

11             MS. CONRAD:  You mentioned your son.  I think you put

12   down on Question 7 that you also have nine- and ten-year-old

13   sons.

14             THE JUROR:  I do.

15             MS. CONRAD:  I'm sure you're aware that one of the

16   victims in the bombings was an eight-year-old boy.  How do you

17   think the fact that you have sons close to that age, or

18   actually who were that age at that time, would affect you in

19   listening to the evidence in this case?

04:17 20             THE JUROR:  I don't think it would affect me one way

21   or the other.  It's just -- the case is based on all the

22   evidence.  And even in other cases that you see in the media, I

23   mean, it's unfortunate, but, you know, that's just part of the

24   whole grand scheme of what's happened.

25             MS. CONRAD:  You put down on Question -- on Page 20,

1    Question 77, the judge asked you about Part (a), but I'd like

2    to ask you about Part (c).

3           THE JUROR:  Yup.

4           MS. CONRAD:  So you said that you had formed an

5    opinion that Mr. Tsarnaev should receive the death penalty.

6           THE JUROR:  Right.  That was basically based on, you

7    know, what you hear in the media and stuff like that.  So I

8    answered yes to that question because of what I've heard so

9    far.

04:18 10        MS. CONRAD:  Now, you understand there's two parts to

11   the trial, right?

12          THE JUROR:  I do.

13          MS. CONRAD:  And so when you talk about things you've

14   heard in the media, I assume you're talking about things about

15   the crime itself?

16          THE JUROR:  Absolutely.

17          MS. CONRAD:  And so based on what you've heard about

18   the crime itself --

19          THE JUROR:  That's --

04:18 20        MS. CONRAD:  -- you formed an opinion --

21          THE JUROR:  That's why I answered --

22          MS. CONRAD:  -- that he should receive the death

23   penalty?

24          So during -- if at the end of the guilt part of the

25   trial you and the other jurors found or believed that the

1    government had proved beyond a reasonable doubt that Mr.

2    Tsarnaev had committed these crimes, would you then still

3    believe that he should receive the death penalty?

4              THE JUROR:  Could I answer that?

5              MR. WEINREB:  Objection, your Honor.  That's asking

6    him to --

7              THE COURT:  That's a little too case specific.

8              MS. CONRAD:  But that's 95, your Honor.

9              THE COURT:  You can ask it in a different way.  Let me

04:19 10   try, actually.

11             You said you formed an opinion that he should receive

12   the death penalty.  That's Question 77(c).

13             THE JUROR:  Right.

14             THE COURT:  The question is:  You've also told us

15   that -- at least in a general way, that your understanding of

16   the penalty phase is that you consider both aggravating and

17   mitigating circumstances.

18             THE JUROR:  Right.

19             THE COURT:  The question is:  Would you be able to put

04:19 20   aside any present opinion you have about the penalty that's

21   appropriate for this defendant and pay attention to the

22   evidence in the penalty phase and be open to either option --

23             THE JUROR:  Yes.

24             THE COURT:  -- for this defendant notwithstanding the

25   opinion you have?

1          THE JUROR:  Right.

2          THE COURT:  Or -- let me finish the other side of the

3    question.  Or is your opinion fixed enough that it would

4    interfere with your ability to truly make a considered judgment

5    on the evidence in the penalty phase and be open to either

6    side?  Would it interfere with your -- would your existing

7    opinion interfere with your ability to truly fairly evaluate

8    both options in the penalty phase?

9          THE JUROR:  No.  I could -- basically, I'm going to

04:20 10   wait until all the evidence -- if I am a juror, you wait.  And

11   then you can make a decision then.

12         MS. CONRAD:  You seem like you wanted to say something

13   before when I was asking the question.  I don't know if the

14   judge will let you say what you wanted to say.  You said

15   something like, Let me explain.  I would like to let you

16   explain.

17         MR. WEINREB:  Your Honor, there was an objection that

18   was sustained.

19         THE COURT:  Yeah.  I think --

04:20 20   MS. CONRAD:  On Question 89 on Page 23, you selected

21   10, which is -- in the question it says that that reflects a

22   belief that the death penalty should be imposed whenever the

23   defendant has been convicted of intentional murder.  Is that

24   correct?

25         THE JUROR:  Yes.

1          MS. CONRAD:  That's your view?

2          THE JUROR:  Yes.

3          MS. CONRAD:  So if the evidence proves in any death

4    penalty case beyond a reasonable doubt that the defendant

5    convicted -- excuse me, committed an intentional murder, it

6    would be your belief that the death penalty should be imposed?

7          THE JUROR:  Could I vote -- you're asking could I vote

8    for the death penalty?

9          MS. CONRAD:  No.  I'm asking whether it would be your

04:21 10   belief, if a defendant is convicted of intentional murder, not

11   an accident, not self-defense --

12         THE JUROR:  Right.

13         MS. CONRAD:  -- not insanity but an intentional

14   murder --

15         THE JUROR:  Right.

16         MS. CONRAD:  -- whether it would be your belief that

17   in that case the death penalty should always be imposed?

18         THE JUROR:  Could I -- yes.  I could answer yes to

19   that question.

04:22 20        MS. CONRAD:  I'm sorry?

21         THE JUROR:  Yes, I could answer.  That's yes.

22         MS. CONRAD:  I'm not asking whether you could impose

23   the death penalty.  I'm asking whether you would automatically

24   vote for the death penalty in any case.

25         THE JUROR:  That all comes down to the evidence that's

1    been presented.

2          MS. CONRAD:  Okay.

3          THE JUROR:  You're saying there's a verdict of guilty,

4    intentional murder.  Yes, I could.  The answer would be yes.

5          MS. CONRAD:  I'm sorry.  You keep saying, "Yes, I

6    could."  I feel like we're talking past each other a little

7    bit, and that's my fault.  I apologize.

8          I'm not asking whether you could.  I'm asking whether

9    you would always vote for the death penalty in a case where the

04:22 10   defendant was convicted of intentional murder.

11          THE JUROR:  Yes.

12          MS. CONRAD:  So -- may I have one moment, please?

13    (Discussion held off the record. )

14          MS. CONRAD:  So if a defendant were convicted of

15    intentional murder, would you be willing to consider facts

16    about the defendant, such as his background, his criminal

17    record, or would you automatically vote for the death penalty?

18          THE JUROR:  Well, wasn't that going to be presented

19    prior to?

04:23 20         MS. CONRAD:  No.  So there's two parts to the trial.

21          THE JUROR:  Oh, the second part.

22          MS. CONRAD:  Right.  So the first part you would hear

23    evidence about the crime.

24          THE JUROR:  Right.

25          MS. CONRAD:  The second, if the jury found the

1    defendant guilty -- and I'm talking about any death penalty

2    case now, not this one -- then the jury would decide whether

3    the government had proved the case beyond a reasonable doubt,

4    meaning proved intentional murder, not accident, not

5    self-defense, not insanity, beyond a reasonable doubt.  And

6    then after that, the jury would hear additional evidence about

7    the defendant and about the crime and then would be asked to

8    decide whether, based on their own individual judgment, the

9    penalty should be death or life without possibility of release.

04:24 10         So my question is:  Based on your answer to Question

11   89, whether having already heard the evidence that convinced

12   you beyond a reasonable doubt that the defendant in this

13   hypothetical case, in this example, let's say, was guilty of

14   intentional murder, would you automatically vote for the death

15   penalty?

16         MR. WEINREB:  Objection.

17         THE COURT:  That's all right.  You can answer.

18         THE JUROR:  No.

19         THE COURT:  The answer may stand.

04:25 20         MS. CONRAD:  Can you explain to me why you picked 10

21   on 89?

22         MR. WEINREB:  Your Honor, I think that's been asked

23   and answered a couple times now.

24         MS. CONRAD:  I think there's been different answers.

25         THE COURT:  There has been.

1          MS. CONRAD:  I'm just trying to clarify it.

2          THE COURT:  Let me try to clarify it.  I've heard you

3     say at different occasions two different things.  They do seem

4     inconsistent.  Question 10 is kind of -- Question 89, the

5     answer 10, if you look at it.

6          THE JUROR:  Right.

7          THE COURT:  It was defined in the paragraph that

8     appears above the scale.  10 is should be imposed whenever a

9     defendant has been convicted of intentional murder.  That means

04:25 10   there are no exceptions.  It should be imposed if the -- it

11    follows from the conviction that he should get the death

12    penalty, okay.

13         In the next page, with Question 90 -- and we've talked

14    about this in some of our dialogue -- you picked (e) that said,

15    while you are generally in favor of the death penalty, you

16    could also vote for a life imprisonment sentence depending on

17    the facts and the law in the case.  We talked about the penalty

18    phase and assessing that.

19         THE JUROR:  Right.

04:26 20   THE COURT:  You told us there that you thought you

21    could wait and hear all that evidence and then make a decision

22    and not automatically choose the death penalty as the

23    punishment for someone guilty of the capital crime.

24         THE JUROR:  Right.

25         THE COURT:  Those two things are a little bit

1    consistent.  Remember I told you there are no right or wrong

2    answers.  We just want to know what your condition of mind is.

3    Would you tend to vote for it automatically on conviction of a

4    capital crime, the example being intentional murder; or after

5    convicting somebody of a capital crime, such as intentional

6    murder, would you wait to hear and decide, on the basis of your

7    balancing of the pros and cons, the aggravating and the

8    mitigating?  Again, there's no right or wrong answer.  We just

9    want to know which you think would be your disposition if you

04:27 10   were a juror in the case.

11         THE JUROR:  Right, okay.  Well, I mean, I'm all for

12   the death penalty, but, like I said -- I think I said it

13   before.  But based on the facts, I feel life imprisonment is

14   just as bad as the death penalty, you know.  Obviously, there

15   will be other information in the case that will bring out which

16   way you would want to sway, you know, keeping him in jail or

17   putting him to death.

18         THE COURT:  So what's your bottom line?

19         THE JUROR:  So -- well, I could go either way.  It's

04:27 20   just basically you've got to listen to all the facts, I guess.

21   It's kind -- I can't say whether I'm going to do it all the

22   time or whether I'm not going to do it all the time.  You have

23   to hear all the evidence in order to say one way or the other.

24         MS. CONRAD:  I'd like to ask two questions not on that

25   subject if I may.  I think we've covered that subject pretty

1    thoroughly.  Actually, one of those is somewhat related.

2         But on Question 93, if I could, on Page 25, you said

3    you didn't have an opinion about life -- whether life without

4    possibility of release is more or less severe than the death

5    penalty.  Today I heard you say something a little different.

6    So I'm wondering if maybe you've given it some additional

7    thought.

8         THE JUROR:  Given it additional thought.

9         MS. CONRAD:  Can you tell me about that?

04:28 10        THE JUROR:  When you're sitting out there in the jury

11   room, you have to think about what's going on.

12        MS. CONRAD:  Sure.

13        THE JUROR:  Then earlier in the thing talking about

14   the death penalty and stuff like that.  At the time I wasn't

15   really sure which way even though I stated I'm all for the

16   death penalty if it warrants it.  But, you know, and then --

17   because none of us are really tied to the legal system, so we

18   don't know how all of this works.

19        MS. CONRAD:  Of course.

04:29 20        THE JUROR:  As you sit in there or you're talking with

21   other people and how things go with the legal system, you kind

22   of have to think about which way you would want to go and what

23   you'd want to do if you were sitting in that box, you know, so

24   -- I didn't have an opinion, and I'm -- you really could go

25   either way.  It's all -- like you saw, it's going to come down

         1   to the information you presented.

         2            MS. CONRAD:  Sure.  I'm just wondering, as to that

         3   question, now that you've had more time to think about it,

         4   whether you would answer it differently today.

         5            THE JUROR:  Probably.

         6            MS. CONRAD:  And what would your answer be?

         7            THE JUROR:  On this answer?

         8            MS. CONRAD:  Yes.

         9            THE JUROR:  I would base it on just -- I'm going to

04:30   10   stick with the -- I'm just going to go with whatever evidence

        11   is presented --

        12            MS. CONRAD:  Okay.

        13            THE JUROR:  -- to sway which way I'm going to go,

        14   either way.

        15            MS. CONRAD:  I may have misunderstood, but is this

        16   something -- these questions about the death penalty that,

        17   since you filled out this form, you've discussed with other

        18   people?

        19            MR. WEINREB:  Objection, your Honor.  Seems like we're

04:30   20   just fishing.

        21            THE COURT:  No.  Go ahead.  You can answer that.

        22            THE JUROR:  No.  It's basically my own personal --

        23            MS. CONRAD:  Sure.

        24            THE JUROR:  Just thinking about it in general.

        25            MS. CONRAD:  But you mentioned sitting in the jury

1      room.  Was that sort of an internal dialogue?

2            THE JUROR:  This was when the judge was up there

3      talking about, if you had to basically vote for the death

4      penalty, then you have to think about that, then talk about the

5      evidence and stuff like that.  You basically have to -- you're

6      thinking about it and you're, like, one minute I'm saying --

7      you get hostile, and you're all for the death penalty.  And

8      then you come here and you sit in front of all the legal teams

9      and the judge, and you have to think, okay, maybe I -- I got

04:31 10     off on the wrong track.  I should really hear all the evidence

11     before I, you know, just shout out, yeah, I want the death

12     penalty.

13           MS. CONRAD:  Have you spoken -- this is a slightly

14     different subject, a very different subject.  Have you spoken

15     to your sisters-in-law about what they experienced on the day

16     of the Marathon?

17           THE JUROR:  No.

18           MS. CONRAD:  You said it's a close-knit family.

19           THE JUROR:  My wife and them.  They're together all

04:31 20     the time.  I'm always working.

21           MS. CONRAD:  I got the impression.  Do you have any

22     sense of their feelings about the events?

23           MR. WEINREB:  Objection, your Honor.  This has been

24     already gone over.

25           THE COURT:  I think we've had enough.

```
 1              MS. CONRAD:  Thank you very much.

 2              THE COURT:  I think that's enough.  Thank you very

 3       much, sir.

 4              Okay.  We'll take a lunch break, I think, until 2:30.

 5       (Luncheon recess taken at 1:27 p.m.)

 6              (After the recess:)

 7              (The Court enters the courtroom at 2:33 p.m.)

 8              THE CLERK:  Juror No. 646.

 9              THE COURT:  I think I'm going to go right to Question

05:38 10      85, if that's okay.

11              MR. WEINREB:  That's a good idea.

12              THE JURY CLERK:  Juror No. 646.

13              (The juror enters the courtroom.)

14              THE CLERK:  Sir, over here, if you would.  Have a

15       seat.

16              THE JUROR:  Thank you.

17              THE CLERK:  And make sure you keep your voice up and

18       speak into the mic.

19              THE COURT:  Good afternoon.

05:39 20       THE JUROR:  Good afternoon, Judge.

21              THE COURT:  Since you were here last, have you been

22       able to avoid talking about the substance or merits of the case

23       with anyone?

24              THE JUROR:  Yes.

25              THE COURT:  And avoiding media accounts of the case?
```

1          THE JUROR:  Yes.

2          THE COURT:  That's the questionnaire that you filled

3     out when you were last here, and we're going to follow up on

4     some of the information.  Actually, I'd like to go right to

5     page 22, if you would.

6          So actually, let me just go back for a minute.  You

7     are a construction superintendent for Aggregate?

8          THE JUROR:  Yes, I am.

9          THE COURT:  Okay.  And you've done that for a long

05:40 10   time, 20 years or so?

11          THE JUROR:  With Aggregate, 20 years; with Middlesex

12     an additional 22 -- I've been in construction for 45 years.

13          THE COURT:  Okay.  So now let's go to Question 85.

14     You know a fellow named Bob Joyce who is Jeff Bauman's uncle?

15          THE JUROR:  Yes, I do.

16          THE COURT:  You know that Jeff Bauman is a victim of

17     the bombings?

18          THE JUROR:  Yes, I do.

19          THE COURT:  So tell us about your relationship with

05:40 20   Bob Joyce.

21          THE JUROR:  Bob Joyce actually worked for me when I

22     had my own paving crew with Middlesex probably about 25, 30

23     years ago.  He was a laborer.  And that's when I first met him.

24     And -- but he only worked for a short period of time.  He left

25     and he started his own business.  And he does have his own

1    business right now.  It's called Allied Paving.  And Allied

2    Paving does some paving for Aggregate, which means I have to

3    associate myself with him.

4             THE COURT:  Give us a sense of the strength of the

5    association.  How frequently, how --

6             THE JUROR:  Oh, maybe -- well, I deal mostly -- a lot

7    with his superintendents, but I do acquaint myself with Bob

8    Joyce himself probably maybe once every three weeks, possibly?

9             THE COURT:  Okay.  Do you know Jeff Bauman himself?

05:41 10          THE JUROR:  No, I do not.  My son -- my youngest son

11   played Little League ball with him in Cambridge -- in

12   Chelmsford probably about 15 years ago.  But I personally do

13   not know Jeff.

14            THE COURT:  Knowing that Bob Joyce's nephew is a

15   victim in these events, would that give you any concern about

16   your impartiality as a juror in the case?

17            THE JUROR:  Honestly, no.

18            THE COURT:  Can you expand on that a little?

19            THE JUROR:  I mean, I know Bob Joyce as a -- basically

05:42 20   as a work associate.  He's -- I mean, that's as far as our

21   relationship goes.

22            THE COURT:  You don't socialize with him?

23            THE JUROR:  No, I do not.  No.

24            THE COURT:  All right.  Let me ask you to go to page

25   20.

1          THE JUROR:  Yes.  Oh, I'm sorry.  It didn't look

2     right, did it?

3          THE COURT:  No, it didn't.

4          THE JUROR:  Okay.

5          THE COURT:  Okay?

6          THE JUROR:  Yes.

7          THE COURT:  Question 77 near the top.

8          THE JUROR:  Yes.

9          THE COURT:  We asked in that question whether based on

05:43 10    things you'd seen or read in the media or from other sources

11    you'd formed various opinions about whether the defendant was

12    guilty or not or should receive the death penalty or not, and

13    to each of those subparts to the question you answered

14    "unsure."

15          Do you see that?

16          THE JUROR:  Yes, I do.

17          THE COURT:  Can you tell us why you chose that answer?

18          THE JUROR:  Because I am unsure.  I believe -- I'm a

19    true believer that in any case like this you'd better be damned

05:43 20    sure one way or the other.  And just up until January, when I

21    was told to come in here, all I knew of the case is what was on

22    TV, what was in the papers.  And even the papers, I didn't

23    really -- the job position I have in the company, I don't even

24    read -- hardly ever read a newspaper because I'm up and out of

25    the house by four-thirty, five o'clock in the morning, and

1    sometimes I don't get home until seven.  I have very little

2    time to read the newspaper.

3            So honestly, it would be what you see on TV or what

4    you hear from word of mouth of what happened.  And of course,

5    for the first month or two after the -- what did happen, it was

6    all over the place anyway.  So I wrote down "unsure."  And

7    guilty is -- I'm unsure.  I guess I could say yes, I could say

8    no, but I'm unsure.

9            THE COURT:  Okay.  So I'm sure you know these

05:44 10   principles but let me just set them out for you.  You know that

11   in our criminal justice system, a person who is accused of a

12   crime is presumed to be not guilty, or innocent, of that

13   crime --

14           THE JUROR:  Yes.

15           THE COURT:  -- unless the government proves that the

16   person is guilty based on the evidence presented at trial and

17   proves that beyond a reasonable doubt.

18           You understand those principles?

19           THE JUROR:  Yes.

05:45 20   THE COURT:  It's not surprising that people have some

21   information and, therefore, some ideas about what happened in

22   the case from the news reporting.

23           THE JUROR:  Uh-huh.

24           THE COURT:  What we would ask jurors in this case is

25   whether they could put aside any preexisting ideas that you

1    might have about the case one way or the other and judge the

2    issues presented based only on the evidence presented in the

3    course of the trial.

4            Do you think you'd be able to do that?

5            THE JUROR:  That's tough.  That's tough.  To be

6    totally honest, it would be tough to --

7            THE COURT:  Could you expand on that?

8            THE JUROR:  I would imagine because the -- there's

9    nobody else that's ever been talked about that could have done

05:46 10   this.  And it's not as if it's still up in the air whether or

11   not -- you know, maybe somebody else possibly could have done

12   this and that -- so it's very difficult for me to say that he

13   could be innocent.

14           THE COURT:  Okay.

15           THE JUROR:  I honestly think so, yeah.

16           (Counsel confer off the record.)

17           MR. WEINREB:  Okay.

18           THE COURT:  Yeah?  All right.  Thank you very much,

19   sir.

05:46 20          (The juror exits the courtroom.)

21           MR. BRUCK:  Before the next juror comes in, I just

22   wanted to bring this to the Court's attention.  I don't think

23   we have to go off.

24           This is a Facebook feed that includes two messages

25   from the juror's son on April 19th that are on this juror's

1    Facebook page.  The pages speak for themselves also.  It's the

2    second one in the middle of the page and then the last one.

3              MR. WEINREB:  Do you have copies for us?

4              MR. BRUCK:  I'm sorry, I don't.

5              (Pause.)

6              THE COURT:  So when you say the second one --

7              MR. BRUCK:  No, it's the second from the top -- from

8    the top of that group.

9              THE COURT:  Oh, I see.  I see.

05:48 10              MR. BRUCK:  About "A mind = blown."

11              THE COURT:  Okay.

12              MR. BRUCK:  And then at the bottom of the same series,

13   another reference to "kicking his" blank.

14              THE COURT:  The first one -- the second one has a time

15   of day on it; the first one doesn't.

16              MR. BRUCK:  Maybe I should just --

17              THE COURT:  I mean, it's the same day but I couldn't

18   tell which came before which.

19              MR. BRUCK:  They both have times of day.  One says --

05:49 20              THE COURT:  One was in the morning.

21              MR. BRUCK:  I'm sorry.  It's at the top.  Right, one

22   of them has -- the second one does not have a time of day.

23   "That bombing SOB went to my high school.  Mind = blown" from

24   the juror's son.  And then the last one is 9:20 a.m.  "I know,

25   Cam.  I saw your street on the news.  Tell your mom to kick

 1    his..."

 2            THE COURT:  Right.  So I couldn't -- since the first

 3    one didn't have a timestamp --

 4            MR. BRUCK:  It did not have a timestamp.

 5            THE COURT:  -- is there a way you can tell from the

 6    sequencing?

 7            MS. CONRAD:  Yes.  So the first one would be the

 8    actual post by the person whose Facebook it is, and then what

 9    follows are the comments that come afterwards in chronological

05:49 10    order.  So the first one -- it runs in chronological order.

11            THE COURT:  So that the first one would have to be

12    before the comments?

13            MS. CONRAD:  Exactly.

14            MR. BRUCK:  Just before 9:19 a.m. on the 19th, which

15    is after the --

16            MS. CONRAD:  I think it's got the date on it, the

17    first one.

18            MR. BRUCK:  Yes, it does.

19            MS. CONRAD:  It's got the date.  But those are all

05:50 20    comments on --

21            THE COURT:  That's after the overnight but before the

22    arrest?

23            MR. BRUCK:  Exactly.

24            MS. CONRAD:  Right.

25            MR. BRUCK:  The juror indicates he's active on

1    Facebook, and I just thought --

2              MS. CONRAD:  And he's also friends with his son.

3              MR. BRUCK:  And he's friends with his son.

4              THE COURT:  I'll let you ask about it.  You're

5    probably more adept at it than I am.

6              Oh, did you want to see it?

7              MR. WEINREB:  Yes.

8              THE COURT:  Sorry.

9              (Pause.)

05:51 10             THE COURT:  Are we all set?

11             MS. CLARKE:  Yes.

12             THE CLERK:  Juror No. 649.

13             THE JURY CLERK:  Juror 649.

14             (The juror enters the courtroom.)

15             THE CLERK:  Sir, over here, please.  Have a seat.

16   Make sure you keep your voice up and speak into the mic, okay,

17   so everyone can hear you.

18             THE JUROR:  Okay.

19             THE COURT:  Good afternoon.

05:52 20             THE JUROR:  Good afternoon.

21             THE COURT:  Since you were here last, have you been

22   able to avoid talking about the substance or merits of the case

23   with anyone?

24             THE JUROR:  Yes.

25             THE COURT:  And also as much as you could possibly do,

1    avoid the media?  There's a lot of it, but have you been able

2    to turn away from it if you've seen it?

3              THE JUROR:  Yes.

4              THE COURT:  So we have the questionnaire you filled

5    out.  We're going to follow up on some of the information you

6    gave us there.

7              And I want to turn to page 10 first where you describe

8    your employment --

9              THE JUROR:  Okay.

05:52 10            THE COURT:  -- and talk a little bit about that.

11             Tell us what you do.

12             THE JUROR:  Okay.  All right.  Well, I work at an

13   after-school program with kids.  I'm a counselor.  And I do,

14   like, dodgeball with them, hockey, crafts.

15             THE COURT:  What age are the kids?

16             THE JUROR:  The kids range from around six years old

17   to ten.

18             THE COURT:  Okay.  So they're grade school?

19             THE JUROR:  Grade school, yes.

05:53 20            THE COURT:  In the public schools?

21             THE JUROR:  Yes.

22             THE COURT:  So what are your hours?

23             THE JUROR:  Three to six.

24             And then I, after that -- actually, I clean a room

25   after that.  A preschool room.  And that goes to about seven

 1   o'clock or so.

 2          THE COURT:  Okay.  If we -- if you were on this jury,

 3   we would ask you to be here between nine and four on Monday

 4   through Thursday, and off on Fridays, and of course the

 5   weekend.  Is that going to be a problem for you given your

 6   employment?

 7          THE JUROR:  No, I don't think so.

 8          THE COURT:  Why not, since there's an overlap?  In

 9   other words --

05:54 10          THE JUROR:  Right.

11          THE COURT:  -- you said three to six and we've got

12   nine to four.

13          THE JUROR:  But my boss is a really good boss, and I'm

14   also friends with her and stuff, and she's really lenient about

15   it, so...

16          THE COURT:  Would you plan to go there after finishing

17   up here or would you just be excused for the first four days of

18   the week and go on Fridays?

19          THE JUROR:  I could do either/or.  I could go there

05:54 20   and get a couple of hours in and then definitely clean the room

21   and --

22          THE COURT:  You would still do the cleaning later on?

23          THE JUROR:  At six o'clock, yes.

24          THE COURT:  And it wouldn't have a substantial impact

25   on your earning ability?

1           THE JUROR:  It might have a little impact but I think

2     it will be all right, yeah.

3           THE COURT:  We ask people about their social media

4     use, Facebook.

5           THE JUROR:  Yeah.

6           THE COURT:  You say you use it one to two hours a day?

7           THE JUROR:  Not really.  I mainly play games on it.

8     You know, I don't really --

9           THE COURT:  Do you exchange posts with family members

05:55 10     and things like that?

11           THE JUROR:  No, not really.  I pretty much pay my

12     bills and stuff online and stuff like that with it, and that's

13     pretty much it.

14           THE COURT:  Are you aware that other family members

15     use it?

16           THE JUROR:  Use --

17           THE COURT:  Members of your family, do they use it?

18           THE JUROR:  Yes, they do.

19           THE COURT:  But you don't?

05:55 20           THE JUROR:  Not that much, no.

21           THE COURT:  Let me ask you to turn to page 20,

22     Question 77 near the top.

23           THE JUROR:  Yeah.

24           THE COURT:  Do you see that?

25           THE JUROR:  Yes.

1          THE COURT:  That's a question where we asked based on

2     things you'd seen or heard in the news media or maybe from

3     other sources, had you formed an opinion about whether the

4     defendant was guilty or not or whether he should receive the

5     death penalty or not, and there were four subparts to that.

6     You answered yes to Part A, that you had formed an opinion that

7     he was guilty.

8          Do you see that?

9          THE JUROR:  Yes.  Yes.

05:56 10          THE COURT:  Okay.  And then down below after the four

11     subparts, the question goes on to say if you'd answered yes to

12     any of these questions, would you be able or unable to set

13     aside your opinion and base your decision about guilt and

14     punishment solely on the evidence that would be presented to

15     you in court, and you checked "able."

16          THE JUROR:  Yes.

17          THE COURT:  Would you explain that?

18          THE JUROR:  Well, from what I saw at the time in the

19     media, it seemed like from all the evidence that he was guilty.

05:57 20     But if I go to the trial and I hear all the -- you know, all

21     the evidence here, I could change my mind either way, I mean,

22     depending on what I hear at court.

23          THE COURT:  Given the amount of publicity in this

24     case, the events received, it's not surprising people have

25     impressions about what happened.

 1              THE JUROR:  Right.

 2              THE COURT:  What we would ask any juror to do would be

 3      to put aside those impressions and focus entirely and only on

 4      the evidence produced in the course of the trial and make any

 5      decision required based on that evidence and not on

 6      preconceived ideas from other sources.

 7              Do you think you'd be able to do that?

 8              THE JUROR:  I think I would be able to do that, yes.

 9              THE COURT:  Okay.  You understand that in our criminal

05:57 10      justice system a defendant who is accused of a crime is

 11      presumed to be not guilty, or innocent of the crime --

 12              THE JUROR:  Yes.

 13              THE COURT:  -- unless the government proves otherwise

 14      by proving him guilty at trial by the evidence, and proving

 15      that beyond a reasonable doubt.

 16              You recognize those principles?

 17              THE JUROR:  Yes, I do.

 18              THE COURT:  Do you think you would have any difficulty

 19      adhering to those principles if you were a juror in this case?

05:58 20              THE JUROR:  No.  No, I don't think I would have

 21      difficulty.

 22              THE COURT:  In particular, the government's burden of

 23      proof beyond a reasonable doubt means that a defendant never

 24      has any burden to prove he's not guilty; the burden is always

 25      with the government to prove that he is guilty, right?

1          THE JUROR:  Yes.

2          THE COURT:  You understand that?

3          THE JUROR:  Yes.

4          THE COURT:  So the question is never which side has

5    convinced me about this, but has the government convinced me by

6    its evidence that this person is guilty of what we've charged

7    him with.

8          If the answer to that is "yes," the jury thinks, yes,

9    the government has persuaded them beyond a reasonable doubt

05:58 10   about that, then the government is entitled to your verdict of

11   guilty.  But if you're not convinced beyond a reasonable doubt

12   on any of the charges that are made, the defendant is entitled

13   to be acquitted of those charges.

14         Would you be able to find this defendant not guilty if

15   you thought the government had failed in its burden of proof on

16   any of the particular charges?

17         THE JUROR:  I think I would be able to, yes.

18         THE COURT:  On the next page, Questions 81 and 82, we

19   asked whether you were affected by the bombings or other

05:59 20   events, including that Friday when people had to stay in

21   because of the hunt that was going on, and then the next

22   question is about your support activities, "Boston Strong"

23   merchandise and so on and so forth.  We asked whether you or

24   anybody in your family fell into either of those circumstances,

25   and you said, "I don't know."

1          Let me ask, just, is that -- the "I don't know," I

2      assume, is about other people?

3          THE JUROR:  Right.

4          THE COURT:  You do know about yourself, I presume?

5          THE JUROR:  Yes, I do know about myself.

6          THE COURT:  What's the answer about yourself?

7          THE JUROR:  About myself?  I was in the house with my

8      two children.

9          THE COURT:  On that Friday, you mean?

06:00 10          THE JUROR:  Yes, when the -- yeah.  And, you know, we

11      watched it on TV and everything.  But as -- affected as someone

12      in my family was hurt or -- physically hurt or anything, they

13      were not, no.

14          THE COURT:  And your children, you say, are in their

15      20s?

16          THE JUROR:  Yes.  Yes, 25 and 23.

17          THE COURT:  Now?

18          THE JUROR:  Now.

19          THE COURT:  A couple of years ago they were a couple

06:00 20      of years younger?

21          THE JUROR:  Yes.

22          THE COURT:  Okay.

23          If you'd go to page 23.  Beginning with Question 88,

24      we asked a series of questions to learn about jurors' views

25      about the death penalty.  Question 88 asked if you had any

```
 1   general views about the death penalty, what are they, and you
 2   put "not applicable."
 3          Can you tell us about that?
 4          THE JUROR:  I think I'd have a hard time with the
 5   death penalty.  I'd have to be really convinced that it would
 6   be worthy of it.  But I never -- you know, I never really gave
 7   it much thought.
 8          THE COURT:  But are you saying that as a general
 9   proposition, that in any case in which the death penalty might
10   be at issue, you might have a problem with it?  Is that what
11   you're saying?
12          THE JUROR:  I'm saying --
13          THE COURT:  Or are you talking about this case?
14          THE JUROR:  No, with any I'd have a hard time thinking
15   about -- you know, taking somebody's life, you know, part of
16   that.
17          THE COURT:  Okay.  In the next question we asked you
18   to circle a number that indicates where you might be on a scale
19   of 1 to 10 where 1 -- one side is strongly opposed so that you
20   would never vote for the death penalty and a 10 on the other
21   hand was so strongly in favor that you would vote to impose it
22   whenever a person was convicted of murder.
23          You put yourself in the middle, at 5.
24          THE JUROR:  Right.  I would have to, I mean, hear all
25   the evidence about it, I think, to make a decision on it.  I
```

1    mean, I'd have a time about it [*sic*].  But if the evidence

2    proves it, I would -- I mean, I could vote for it, yes.

3            THE COURT:  All right.  Let's go to the next page, and

4    Question 90.  In this question, rather than trying to put you

5    on a numerical scale, we asked you to look at a number of

6    different propositions and see if there was one you thought

7    represented your views accurately.  Take a minute to read

8    through all of them right now and then we'll ask you about the

9    one you selected.

06:02 10         (Pause.)

11           THE JUROR:  Uh-huh.

12           THE COURT:  So you selected D.

13           THE JUROR:  Yes.

14           THE COURT:  In reviewing that again now, do you think

15   that's still the best choice for you?

16           THE JUROR:  Yes.  Like I said, I mean, if the evidence

17   proves it, then I could.

18           THE COURT:  So D is -- it says you're not for or

19   against it.  You kind of indicated here that you tend to be

06:03 20   against it, I guess.  Is that fair or not?

21           THE JUROR:  I don't know.

22           THE COURT:  No?  You still think D is --

23           THE JUROR:  I still think so.  I mean --

24           THE COURT:  Okay.

25           THE JUROR:  -- like I said, I would have a hard time

         1    with it, but I would -- if it merits it, I would.

         2         THE COURT:  Okay.  You heard me this morning explain

         3    the so-called penalty phase.  That of course presumes that the

         4    jury has already concluded that the defendant's guilty of a

         5    crime for which the death penalty is possible, right?  So you

         6    start with the proposition you're dealing with a person who's

         7    been convicted and then you decide what's the right penalty.

         8         And you've heard the evidence that tends to show it's

         9    a serious enough crime that it should be punished by the death

06:04   10    penalty or it's a crime that can be adequately punished by life

        11    in prison instead of the death penalty, right?

        12         THE JUROR:  Yes.

        13         THE COURT:  And the jury will weigh all that, and each

        14    individual juror would make his or her own judgment about that

        15    balance and how it tilts, right?

        16         THE JUROR:  Yes.

        17         THE COURT:  Are you telling us that you would be

        18    prepared -- based on how you evaluated all of that evidence,

        19    you would be open to either possibility and committing yourself

06:05   20    to either possibility at the end of your deliberations?

        21         THE JUROR:  Yes.

        22         THE COURT:  Not going into it committed one way or the

        23    other?

        24         THE JUROR:  I don't think so.

        25         THE COURT:  Let me ask you to look at the bottom of

1   page 25, Question 95.  We asked if you found the defendant

2   guilty and decided that the death penalty was the appropriate

3   punishment for him, could you conscientiously vote for the

4   death penalty, and you picked "not sure," between yes and no.

5            THE JUROR:  Yes.

6            THE COURT:  Can you amplify on that at all?

7            THE JUROR:  I think I go back to depending on what the

8   evidence was against him, how strong it is against him if I do

9   vote for it or not.

06:06 10        THE COURT:  All right.  So again, are you saying that

11   you'd make that decision based on what you've heard and you

12   wouldn't have a preconceived idea?  Is that what you're telling

13   me?

14           THE JUROR:  Yes.

15           THE COURT:  Okay.

16           MR. WEINREB:  Thank you.

17           Good afternoon.

18           THE JUROR:  Hi.

19           MR. WEINREB:  My name is Bill Weinreb.  I'm one of the

06:06 20  prosecutors.

21           I just wanted to ask you a few follow-up questions.

22           THE JUROR:  Uh-huh.

23           MR. WEINREB:  You said a couple of times that you

24   think you would have a hard time with the death penalty.  Could

25   you just explain what you mean by that?

1          THE JUROR:  Well, like I said, I mean, it's -- you're

2   taking someone's life, so I would really have to think about

3   it, I mean, really hard and hear the evidence against him.

4          MR. WEINREB:  And is that because you just want to be

5   sure you're doing the right thing or because you have some

6   moral reservation about whether the death penalty's ever

7   appropriate for anybody?

8          THE JUROR:  Probably a little of both, I would think.

9          MR. WEINREB:  Have you spent a lot of time thinking

06:07 10   about the death penalty before you got your juror summons in

11   this case?

12          THE JUROR:  No.

13          MR. WEINREB:  Since you got it, have you thought about

14   it?

15          THE JUROR:  A little bit, yeah.

16          MR. WEINREB:  And can -- well, what's your thinking

17   been?

18          THE JUROR:  That it's -- it would be a big decision to

19   make if it came down to it, to, you know -- you know, take

06:07 20   someone's life.

21          MR. WEINREB:  Do you have any moral or philosophical

22   or -- views about the death penalty?

23          THE JUROR:  Like I said, I never really thought about

24   it before, you know, I was picked to be on the jury -- I mean,

25   to be here.

1          MR. WEINREB:  So can you imagine -- not this case, but

2     can you imagine being on a capital case and hearing evidence

3     that would convince you that the death penalty's an appropriate

4     sentence for somebody?

5          THE JUROR:  If the evidence is there?  I don't...

6          MR. WEINREB:  Well, let me put it another way.  So the

7     law never requires anybody to impose the death penalty.  It's

8     not like you'll be given a checklist of things and if you check

9     them all off, then that means that person deserves the death

06:08 10   penalty.  That's always going to be a decision for you to make,

11    each juror individually.

12         THE JUROR:  Right.

13         MR. WEINREB:  You will hear evidence from both sides,

14    evidence that may lead you to think it's the right sentence and

15    evidence that may lead you to think it's not the right

16    sentence.  The question is:  Would you go into that process

17    with an open mind and can you imagine situations where you

18    could hear evidence that would convince you that it's

19    appropriate or do you think that you'd -- that could never

06:09 20   really happen?

21         THE JUROR:  I could probably hear evidence that would

22    make me think it would be appropriate.  I think so.

23         MR. WEINREB:  And if you got to that point, if you

24    heard evidence that convinced you that a particular case was

25    the right one for the death penalty, could you then take the

1     next step and actually vote to put someone to death?

2              THE JUROR:  It would be really hard.

3              MR. WEINREB:  What do you think?

4              THE JUROR:  I'm not sure.

5              MR. WEINREB:  Okay.  Nobody's been in that situation

6     before typically, so it's hard to know.  This is our one chance

7     to get a sense from you.

8              THE JUROR:  Right.

9              MR. WEINREB:  Can you give us a better sense or...

06:10 10         THE JUROR:  I don't know.  No, I'm not sure.  I'm not

11    sure.

12             MR. WEINREB:  Are you having more thoughts about it

13    or --

14             THE JUROR:  Yeah, now, here.

15             MR. WEINREB:  Could you share your thoughts so that we

16    have some sense of what's going on inside your head when you're

17    thinking about this?

18             THE JUROR:  I'm just thinking, like I stated before,

19    it's just that, you know, it's someone's life you're taking,

06:10 20   you know.  So a lot of thought would have to go into it and

21    there would have to be a lot of evidence to prove that, that

22    it's worth it.

23             MR. WEINREB:  Okay.  I hear that.  And if the

24    evidence, though -- if you heard a lot of evidence and it did

25    prove it, could you take the next step to actually do it, to

           1    actually vote to send someone to death?

           2           THE JUROR:  I don't know that I can now.  I don't

           3    know.

           4           MR. WEINREB:  Are your thoughts or feelings changing

           5    about it even as you're talking about it right now?

           6           THE JUROR:  It is, yes.

           7           MR. WEINREB:  And what are you thinking and feeling?

           8           THE JUROR:  I'm just thinking the same thing.  You

           9    know, it's someone's life.

  06:11  10           MR. WEINREB:  Okay.  Thank you.

          11           MR. BRUCK:  Good afternoon.

          12           THE JUROR:  Hi.

          13           MR. BRUCK:  Hi.  My name is David Bruck.

          14           THE JUROR:  Hi, David.

          15           MR. BRUCK:  Hi.  I'm one of Jahar Tsarnaev's lawyers,

          16    and I've got a few more questions for you, if that's okay.  The

          17    good news is that I think I'm the last person to ask you

          18    anything.

          19           THE JUROR:  That will be good.

  06:12  20           (Laughter.)

          21           MR. BRUCK:  I thought that might be good news.

          22           THE JUROR:  Yeah.

          23           MR. BRUCK:  Can you tell me if either of your children

          24    went to -- knew anything about either of the Tsarnaev brothers

          25    from school or --

```
  1              THE JUROR:  No.  My son -- my son went to school at

  2    the same time but didn't know him.

  3              MR. BRUCK:  Didn't know either one of them?

  4              THE JUROR:  No.

  5              MR. BRUCK:  And the school that you -- the

  6    after-school program that you're a counselor in, what part of

  7    Cambridge is that in?

  8              THE JUROR:  North Cambridge.

  9              MR. BRUCK:  North Cambridge?

06:12 10         THE JUROR:  Yes.

 11              MR. BRUCK:  I just want to try to clear up what we've

 12    been talking about concerning the death penalty.  I understand

 13    this is something that weighs heavily on you, like it does on a

 14    lot of people.  I think the question we're all trying to get at

 15    is you told the judge that it would take a lot of evidence, but

 16    that if the evidence was there you think the death penalty

 17    could be appropriate in some cases?

 18              THE JUROR:  I think it could be appropriate in some

 19    cases, yes.

06:13 20         MR. BRUCK:  Right.  Depending on the facts?

 21              THE JUROR:  Yes.

 22              MR. BRUCK:  Okay.  And would you be able to listen to

 23    the facts as a juror if the defendant was already found guilty

 24    of -- beyond a reasonable doubt of these capital crimes or in

 25    any case, not -- let's not talk about this case.  If you were
```

1    on a jury in any case that involved the death penalty, could

2    involve the death penalty, and guilt was proven beyond a

3    reasonable doubt -- are you with me?

4            THE JUROR:  Yes.

5            MR. BRUCK:  That's the first stage of the trial.

6            THE JUROR:  Yes.

7            MR. BRUCK:  And then there's a second stage which is

8    devoted to should the death penalty be imposed or should life

9    imprisonment without release be imposed.  Only two choices,

06:13 10   right?

11           THE JUROR:  Yes.

12           MR. BRUCK:  And the judge told you about that.

13           THE JUROR:  Yes.

14           MR. BRUCK:  Could you listen to the evidence from both

15   sides with an open mind at that stage of the trial?

16           THE JUROR:  Yes, I could.

17           MR. BRUCK:  And decide, based on the evidence, whether

18   this was one of the cases where life imprisonment was

19   appropriate --

06:14 20          THE JUROR:  Yes.

21           MR. BRUCK:  -- or whether the death penalty was

22   appropriate?

23           THE JUROR:  Yes.

24           MR. BRUCK:  Okay.  And you -- the law never says that

25   a juror is supposed to vote for the death penalty unless they

1    think it's appropriate, unless the juror himself or herself

2    looks at it that way.

3              THE JUROR:  Yes.

4              MR. BRUCK:  So let's suppose that -- again, not this

5    case but a really terrible set of facts, all the evidence was

6    proven to your satisfaction.

7              THE JUROR:  Yes.

8              MR. BRUCK:  The case -- that you concluded that the

9    death penalty was the right way to go.  I know you've never

06:14 10   been in this situation, very few people have, but I think what

11   we're getting at is if you decided it was the right thing to

12   do, would you be able to follow through and say so in court --

13   or not in court, but in the jury room in deciding on a verdict?

14             THE JUROR:  Yes.

15             MR. BRUCK:  That was a yes?

16             THE JUROR:  Yes.

17             MR. BRUCK:  Okay.  And I understand you wouldn't want

18   to.

19             THE JUROR:  No, I wouldn't want to.  No.

06:15 20           MR. BRUCK:  But if you decided it was the right thing

21   to do, you could?

22             THE JUROR:  Yes.

23             MR. BRUCK:  Okay.  Thanks so much.

24             THE COURT:  Okay.  Thank you, sir.

25             THE JUROR:  Thank you.

```
 1              THE COURT:  Just leave that there.

 2              (The juror exits the courtroom.)

 3              THE CLERK:  Juror No. 650.

 4              THE JURY CLERK:  Juror 650.

 5              (The juror enters the courtroom.)

 6              THE CLERK:  Ma'am, over here, please, if you would.

 7     Have a seat.  Be sure you keep your voice up and speak into the

 8     mic so everyone can hear you, okay?

 9              THE JUROR:  Okay.

10              THE COURT:  Good afternoon.

11              THE JUROR:  How are you?

12              THE COURT:  Thanks for your patience.

13              Since you were last here, have you been able to avoid

14     talking about the substance or the merits of the case with

15     anyone?

16              THE JUROR:  Yes.

17              THE COURT:  Answer good and loud so everyone --

18              THE JUROR:  Yes.

19              THE COURT:  And also avoid, as much as you could, any

20     media reports about the case?

21              THE JUROR:  Yes.

22              THE COURT:  Tell us a little bit about your current

23     employment.

24              THE JUROR:  I work at Tufts Medical Center in

25     Chinatown in Boston.
```

```
 1              THE COURT:  And what do you do?

 2              THE JUROR:  I'm a supervisor for patient financial

 3     services.

 4              THE COURT:  What does that involve?

 5              THE JUROR:  I supervise eight people, and I deal with

 6     insurance companies and getting the claims out the door to the

 7     insurance companies.

 8              THE COURT:  Who are covering the individual patients,

 9     is that it?

06:17 10          THE JUROR:  Yeah.

11              THE COURT:  Now, we asked in the questionnaire -- you

12     have the questionnaire there.  As I say, we're following up on

13     some of the answers you gave us there.

14              THE JUROR:  Okay.

15              THE COURT:  If you'd look at page 5, Question 10, we

16     outlined the schedule we planned to follow in the case.

17              THE JUROR:  Uh-huh.

18              THE COURT:  Monday through Thursday, nine to four, and

19     then Friday off so the jurors could have the day to themselves

06:17 20     to do other things, and that that would probably -- on that

21     schedule we would probably be going for three or four months

22     perhaps.

23              THE JUROR:  Uh-huh.

24              THE COURT:  You indicated in Question 10 that that

25     would not be a significant hardship for you.
```

```
 1              THE JUROR:  No.

 2              THE COURT:  But I want to swing over to page, I think

 3      it's 19, Question 75 at the bottom.

 4              THE JUROR:  Uh-huh.

 5              THE COURT:  We asked -- this was after you got your

 6      summons and were concerned about things, this is what kind of

 7      things did you say to others or others say to you, I guess,

 8      about your possible service, and you said, "Worried/financial

 9      hardship."

10              THE JUROR:  That was from my mother.

11              THE COURT:  She was worried.

12              (Laughter.)

13              THE COURT:  She's a good mother.

14              THE JUROR:  Yeah.

15              No, but my work, actually, told me that I would be

16      paid for the time.

17              THE COURT:  I just wanted to make sure we understood

18      your situation.

19              So we asked everybody about social media use, and

20      you've said you use Instagram every day?

21              THE JUROR:  Uh-huh.

22              THE COURT:  Is that generally social?

23              THE JUROR:  Pictures and stuff.

24              THE COURT:  Personal family kinds of things and so on?

25              THE JUROR:  Yeah, friends and family.
```

1          THE COURT:  You don't use it in your business at all?

2          THE JUROR:  No.

3          THE COURT:  Do you use it to make comments about

4     public affairs or anything like that?

5          THE JUROR:  Jokingly sometimes, yes.

6          THE COURT:  To the same group of people or --

7          THE JUROR:  Yeah.

8          THE COURT:  So let me ask you to turn to page 20, and

9     Question 77.  This question we asked based on thing you'd seen

06:19 10     or heard in the media or from other sources, whether you'd

11     formed various opinions about whether the defendant was guilty

12     or not and whether he should receive the death penalty or not.

13     And you answered "yes" as to A, that you thought -- you had an

14     opinion that he was guilty, and as to D you answered "yes" that

15     he should not receive the death penalty, okay?

16          We then asked in the next paragraph of that question,

17     If you answered yes to any of the questions, would you be able

18     or unable to set aside your opinion and base your decision on

19     guilt or punishment solely on the evidence presented to you in

06:20 20     court, and you checked "able."

21          Would you tell us about that?

22          THE JUROR:  Well, basically from what I've seen or

23     what I've heard of, I think he's guilty.  I don't feel like I

24     could put someone to death unless I really know the facts, so

25     that's where my answer of "able" would be, once everything's

 1    presented to me that I don't know about.

 2          THE COURT:  Let me ask you about the first opinion,

 3    whether he's guilty or not.  It's not surprising given the

 4    amount of coverage the events got that people have impressions

 5    about what happened and who's involved and so on and so forth.

 6    You understand that in our criminal justice system a person who

 7    is accused of a crime is presumed not to be guilty, to be

 8    innocent, unless and until the government proves the person

 9    guilty by the evidence at trial and proves that beyond a

06:21 10   reasonable doubt.

 11          You're familiar with those principles?

 12          THE JUROR:  Yes.

 13          THE COURT:  We would ask any juror in this case

 14    notwithstanding any prior opinions they might have to pay

 15    attention to the evidence in the case and to make their

 16    decision based only on that evidence and not on, say, news

 17    reports they'd seen earlier.

 18          Do you think you'd have any difficulty in doing that?

 19          THE JUROR:  I don't think I would.

06:21 20         THE COURT:  You don't think you would have difficulty?

 21    That was a bad question on my part.

 22          THE JUROR:  Yeah, I don't think I would have any

 23    difficulty in forming my own opinions on what's presented to

 24    me.

 25          THE COURT:  In the trial?

1          THE JUROR:  In the trial.

2          THE COURT:  Excluding things you might have thought

3     beforehand?

4          THE JUROR:  Right.  Because I know with news media

5     coverage and stuff like that, it's not always 100 percent.  You

6     don't know the whole story, so...

7          THE COURT:  Right.  As we've said, the government has

8     the burden of proof in a criminal case, and it's always the

9     government's burden, and the defendant doesn't have a burden or

06:22 10   responsibility to show he's not guilty.  It's up to the

11    government to prove to the jury that he is, right?

12         THE JUROR:  Right.

13         THE COURT:  So you never shift the burden to the

14    defendant to prove himself not guilty.

15         THE JUROR:  Right.

16         THE COURT:  Okay?

17         As to any of the particular counts in the indictment,

18    the government would be required to produce evidence that

19    convinced each juror beyond a reasonable doubt that the

06:22 20   defendant was guilty of that offense.  If the jurors agreed

21    that they were convinced beyond a reasonable doubt to a

22    particular offense, then the government would be entitled to

23    their verdict of guilty.  On the other hand, if the jurors were

24    not convinced as to a particular count that the government had

25    convinced them beyond a reasonable doubt, the defendant would

       1    be entitled to be acquitted of that count.

       2           Would you, under those circumstances, be able to find

       3    him not guilty of that particular offense?

       4           THE JUROR:  As long it was presented to me and I

       5    agreed with it, then yes.

       6           THE COURT:  In Question 78 you noted that family and

       7    friends know that you feel he's guilty?

       8           THE JUROR:  Uh-huh.

       9           THE COURT:  Does that alter what you've just told us

06:23 10    in any way about your --

      11           THE JUROR:  No, a lot of it has to do with -- not only

      12    just family, but even where I work.  We were kind of a

      13    high-level area where we were seeing a lot of people come in.

      14           THE COURT:  I was going to say, were people brought --

      15    victims were brought there.  Were you involved in that at all?

      16           THE JUROR:  No, but I saw a lot.

      17           THE COURT:  Were you at work on April 15th?

      18           THE JUROR:  Yes.

      19           THE COURT:  So tell us what you saw.

06:23 20           THE JUROR:  Well, just the news started coming in, and

      21    then they had set up in the emergency department and

      22    everything.  And I saw people -- you know, just a lot of people

      23    covered in blood and stuff like that.

      24           THE COURT:  Where is your office or quarters relative

      25    to the emergency room?

```
 1              THE JUROR:  It's right in Chinatown.

 2              THE COURT:  No, but relative to the emergency room.

 3              THE JUROR:  It's right outside.

 4              THE COURT:  In other words, your space and the

 5    emergency --

 6              THE JUROR:  The office building is right outside the

 7    atrium, which is right where the emergency room is.

 8              THE COURT:  So what floor are you on?

 9              THE JUROR:  I'm on the second floor.

10              THE COURT:  Okay.  So you were able to see people

11    coming in?

12              THE JUROR:  Well, we went out and into the main area,

13    and that's where we saw people coming in.  And they had the

14    SWAT teams running around.

15              THE COURT:  So you left the office to go down to see,

16    what was going on?

17              THE JUROR:  Well, we were leaving, so that was part of

18    it.  So as we were on our way out, we had the SWAT teams coming

19    around.  They had people coming in and out and all kind of

20    craziness was going on.

21              THE COURT:  How long did you stay?

22              THE JUROR:  Probably about half an hour.

23              THE COURT:  I'm just guessing, is this like a

24    seven-to-three shift and you were leaving around three?

25              THE JUROR:  I work eight to four-thirty.
```

1          THE COURT:  Okay.  So it was around four-thirty-ish?

2     Four, four-thirty?

3          THE JUROR:  I want to say we left a little early that

4     day, so about four.

5          THE COURT:  Okay.  Having sort of been an eyewitness

6     to those events, do you think that would have any effect on

7     your impartiality as a juror in the case?

8          THE JUROR:  I don't believe it would.

9          THE COURT:  Why not?

06:25 10          THE JUROR:  Like I said, there's a lot of things I

11     know I don't know about this case.  So in trying to form a

12     general opinion on the whole thing, I only see what I saw and

13     can make a statement that point.  But until I hear other

14     things, I think I'm a pretty fair person and can make my own

15     judgment.

16          THE COURT:  All right.  On page 23, beginning at

17     Question 88, we asked a series of questions to gauge what

18     jurors might think about the death penalty.  88 asks in general

19     if you have views about them, what are they, and you said

06:25 20     "none."

21          Can you explain that a little?

22          THE JUROR:  I've never really actually, I guess,

23     thought about the death penalty unless it's -- to me the death

24     penalty is something that if you're 100 percent sure that

25     somebody has done something wrong, then that would be it.  So

1     I'm kind of -- it's got to be 100 percent or nothing.

2               THE COURT:  Well --

3               MR. WEINREB:  Your Honor, I think the parties --

4               THE COURT:  Okay.  All right.  I think they've heard

5     enough.  Thank you.  That's it.

6               THE JUROR:  All right.  Thank you.

7               (The juror exits the courtroom.)

8               THE COURT:  Quarter of?  Is that all right?

9               MR. BRUCK:  Thank you.

06:26 10          (The Court exits the courtroom and there is a recess

11     in the proceedings at 3:21 p.m.)

12               (The Court enters the courtroom at 3:49 p.m.)

13               (Discussion at sidebar and out of the hearing of the

14     public:)

15               THE COURT:  Okay.  I think we only have a few to

16     discuss.  So we passed 612 and 617 and 619 and 621?

17               MS. CLARKE:  That's correct.

18               MR. WEINREB:  That's right.

19               THE COURT:  I don't remember whether 623 -- was that

06:55 20     resolved?

21               MR. WEINREB:  We have -- the government has a motion.

22               MS. CLARKE:  And we have no response.

23               THE COURT:  I guess that was the impression I had.  So

24     we didn't actually do it but it was headed that way, right?

25               MS. CLARKE:  That's right.

1          THE COURT:  The motion is granted.

2          628 we passed, as well as 634.

3          So that brings us to 637, I think is the first.

4          MR. WEINREB:  So, your Honor, the government moves to

5     excuse 637 as being substantially impaired.  This juror wrote

6     in answer to Question 78 that he doesn't feel the death penalty

7     is morally right; 88, both in his written answer and then the

8     follow-up answers, he said, "Ethically I'm against the death

9     penalty; I think it's wrong," and repeatedly that he hopes that

06:55 10    he would follow through on his ethical feeling, that he would

11    be proud of himself if he stuck to his guns.

12          And he seemed to indicate that the only thing that

13    could cause him to overcome that moral and ethical opposition

14    to the death penalty would either be evidence that convinced

15    him that it wasn't an immoral and unethical punishment, which

16    is not something the trial is about, or should be about, or

17    perhaps something where his emotions would overcome his

18    emotions -- his ethics and morals, in which case he seems to

19    indicate he wouldn't be proud of himself.

06:56 20          I think the most telling line that he gave us in

21    trying to explain why he came out where he did was he said in

22    answer to Question 90 that thinking about it now, he would

23    change his answer to a B and that the only reason it wouldn't

24    be an A is that "as an English teacher, I'm afraid of the word

25    never," one of these things we've heard before, which is

1    somebody -- a thoughtful, well-educated person who doesn't want

2    to ever say "never" to anything because they don't want to be

3    absolutist, but as a practical matter, is somebody who is not

4    ever going to be able to impose the death penalty.

5        He seemed to be somebody who wanted to be on the jury,

6    seemed to -- like he thought it would be an interesting

7    experience, seemed very eager to give an answer that was one

8    that he appeared to know was the answer that was called for,

9    but it's clear that he -- you know, it's only because of his

06:57 10   torturous thinking about it that he's even able to say that he

11   would be able to consider it.

12       And in response to Question No. 95 where even if

13   hypothetically he concluded that he could impose -- it was the

14   right thing to do, he said he was not sure he could ever impose

15   it, and he repeatedly gave that answer to the Court.

16       That's just not somebody who is qualified to sit on

17   this jury, especially when we've encountered so many other

18   people who, despite feeling strongly about it or struggling

19   with it, made it clear that they could.

06:58 20       MR. BRUCK:  Well, we oppose the motion.  I'm not

21   entirely sure we were listening to the same juror from that

22   description.  I realize that it was Mr. Weinreb's objective to

23   hope that this juror would say that he could never impose it or

24   that he was really an A, but he never went there.  He kept

25   coming back again and again to "it would depend on the

1    evidence."

2         And, in fact, he said that his -- he would have put

3    himself further on the scale, towards a 1, except for this

4    case, which is a perfect expression of the fact that he is open

5    to being persuaded by the evidence and this case provided an

6    illustration.  To be honest with you, he gave us a little bit

7    of concern when we saw that in the questionnaire.

8         But in the end, it just -- this is exactly the sort of

9    death-scrupled juror who you would expect to have -- to be

06:59 10   experiencing the tension between his beliefs about the death

11   penalty in the abstract and his recognition that his duty as a

12   citizen is to follow the law and be fair.  And that's what he

13   said.

14        His bottom line was, "I want to do right by the law

15   and every" -- "I want to be fair" -- let me think.  The exact

16   words were something -- "I want to be fair to" -- or "do right

17   by the law and by everybody," which I don't think could be any

18   clearer a description of the duty of a juror.

19        I don't see any reason to doubt this juror's

07:00 20   sincerity.  He just is a very thoughtful, smart, educated

21   person.  If the only thing he had said was, "I'm an English

22   teacher so I never say never," then, you know, there may be

23   some merit to what Mr. Weinreb is saying, but clearly this

24   juror is qualified.

25        THE COURT:  I agree.  My impression of him was that he

1    was confronting the possibility that his prior ethical

2    assessment needed to be adjusted and he was open to adjusting

3    it, perhaps, in this case.  And so in summary, I mean, without

4    belaboring it, I think it was consistent with his obvious

5    intelligence and seriousness, but you could almost see

6    him -- it dawning on him that, Maybe I'm wrong.  Maybe there is

7    a case that I would do this in and it might be this one.

8            So I think he's fine.

9            638?

07:00 10         MR. WEINREB:  We have no motion.

11           MR. BRUCK:  We have a motion on this juror, and I do

12   this with some hesitation because, God bless her, I mean, she

13   is doing the Lord's work and I am so grateful for people like

14   her, but she does not seem to have what is required of a juror.

15           She was so undone by this most straightforward

16   question that has not concerned any other juror on Question 77,

17   about her ability to put her opinion aside and -- she said she

18   was unsure.  And, just, you asked her to explain it and she

19   started laughing, and it seemed like was on the verge of tears

07:01 20   at the same time, became completely flustered.

21           Putting this lady on the jury would be like having an

22   11-member jury.  I just don't think she has the independence,

23   the ability, the life experience in a way to fulfill the duties

24   of a juror, so -- and, you know, maybe in a less complicated

25   case it may not be true, but we just don't think it would be

1    fair to include her on this jury.  I don't think it would be

2    fair to her or to the defendant, so we move to disqualify her.

3         MR. WEINREB:  Your Honor, we oppose that motion.  That

4    Question 77, on the contrary, I think, has bedeviled many

5    people the way that it's phrased.  And I think that the manner

6    in which the -- this juror was exhibiting some nervousness

7    about being at a table like this, being confronted by, you

8    know, a tableful of suits, as many jurors have said.  I think

9    she was just flustered by the experience of being here and

07:02 10   being put on the spot.  So that accounts for much of what we

11   heard in response to her answer.

12        When the Court sort of tried to formulate the question

13   a few times in a way that would put it more plainly, and when

14   the question was put plainly enough to her, she had no trouble

15   understanding it and answering it.  And I think to disqualify

16   her just because she might not have as much education as

17   another juror just would be completely unfair.

18        THE COURT:  I think she's okay.  She was completely

19   nervous, and I think she settled a little bit as she talked a

07:03 20   little bit more and I think we got there.

21        I was actually quite impressed by her response on the

22   Question 50 about the Mary Schiavo [*sic*] case.  When she got

23   into her wheelhouse she settled down and she seemed like a very

24   composed and thoughtful person.  And I think she'll be okay.

25        645?

1        MR. BRUCK:  We have a cause challenge on this juror,

2   your Honor.  This, of course, is the owner of the meat-packing

3   company.  And I'd like to -- primarily on the grounds of --

4   there are a number of issues but I think hardship takes care of

5   it, and I would just like to address that unless the Court

6   wishes me to go further.

7        This is a juror -- although he did not request a

8   hardship, he wrote in answer to 74 as -- this is clearly a

9   juror who would like to serve, would like to do his duty.  That

07:04 10   was impressive about him.  But he wrote, "As much as I would

11   like to take on any trial for the experience and duty, I feel

12   it would be a burden to me for the proper running of my USDA

13   meat-processing plant" -- and that was fully substantiated by

14   his examination here today.

15        The bottom line for him was he said -- "Would you be

16   distracted by all the problems?"  He talked about the concerns

17   of the equipment breaking down that only he can get going

18   again, and his words were, "It would be on my mind all day

19   long."  All day long for four months.

07:05 20        That -- you know, we have excused -- the Court has

21   excused people because they had a cruise at the end of May.

22   This is a juror we're really asking too much.  Even though he

23   is not an hourly paid worker, this is a tiny, little company,

24   he described the competitive pressures, the line is down and,

25   boom, your customers go somewhere else and never come back.

1      That is what is going to be on his mind.  When an expert

2      witness is going on and on, he's going to be thinking, "Oh,

3      come on.  I've got to get out of here.  I've got to see what's

4      happening at the business."  We know that's true.

5             So we just don't think it's fair to this juror and we

6      don't think it's fair to the defendant.

7             THE COURT:  I wouldn't excuse him on hardship grounds.

8      I think it's tolerable.  It is a hardship but it's not the kind

9      of hardship that I think is so impossible, nor do I think in

07:06 10   this case it is a danger that jurors' minds will wander,

11     frankly.

12            MR. BRUCK:  Well, I hope you're right.

13            As to the other issues, the Court has -- I understand

14     the juror gave the correct responses in the end -- well, in

15     response to questioning about his ability to put his opinions

16     aside.  But I think there is -- if I'm not mistaken, out of all

17     60-something jurors who have been qualified, maybe only one has

18     said that they had an opinion both that the defendant was

19     guilty and that he should receive the death penalty.  This

07:06 20   juror is in that category.  Like I say, I understand that

21     that's not where it ended, that's just where it started, but I

22     think that creates a rather heavy burden to ask ourselves, you

23     know, do we need to include this juror in the pool.

24     ████████████████████████████████████████████████

25     ████████████████████████████████████████████████████████



9          Then there was the -- he had -- does have some family

07:07 10   connection to the events.  His two -- his wife's two sisters

11    were there.  He said of course that would not affect him

12    either, but it's something to weigh in the mix.

13          And then there were the very complicated

14    inconsistencies.  He was a 10 on the scale and told the Court

15    that he would consider everything and could go either way, but

16    then went back in talking to Ms. Conrad -- and I don't think

17    she was leading him.  She was really just asking him the

18    question to cause him to say he was a 10 again, and he endorsed

19    it again.

07:08 20         I think when all is said and done, there is -- and I

21    can't prove this, but it is a reasonable likelihood that the

22    way his various statements on the death penalty are reconciled,

23    is that the weight of the evidence of guilt would determine he

24    could go either way on penalty depending on the aggravation,

25    depending on the proof of guilt.  But whether this is really a

1    juror who could consider mitigation, whether he even understood

2    the concept after all the back-and-forth, just remains an

3    unknown.

4         Put all of that together, including, you know, the

5    concern about hardship which the Court feels it's not enough,

6    but -- you know, we both at various times said, you know, we

7    have hundreds of jurors to choose from, this one, there's just

8    too much.

9         MR. WEINREB:  Your Honor, the government opposes that

07:09 10   motion.  This strikes me as an effort at death by a thousand

11   cuts, which is really more like death by a thousand scratches,

12   and virtually nothing that Mr. Bruck has mentioned is remotely

13   close to being a disqualifying fact.

14        The shoplifting conviction, he said that he didn't

15   report it because -- and he used the word "minor."  And it was

16   a little unclear to me whether he was saying it was because it

17   was a minor conviction or because he was a minor when he got

18   the conviction.

19        He's a man in his 50s.  If he was a minor, then -- and

07:09 20   it was sealed, which it has been, one could easily understand

21   how he might think that it was not something that he was called

22   upon to report, nor, I think, do we need to have any concern

23   that this is somebody who is concealing things in general or is

24   a deceptive person.  He came across as a very honest person.

25        You know, in fact, when he was talking about his

1    hardship, I think he just gave us the facts honestly.  He

2    didn't claim a hardship he didn't feel.  He told us exactly how

3    he felt about it without embellishing, without trying to make

4    it seem was more than it was or less than it was.  And I think

5    we can assume that's true for his answers about pretty much

6    everything.

7           With respect to the death penalty, it's obvious that

8    the defense wants to get rid of him because he's a pro death

9    penalty juror.  And I think there's no question that he is.

07:10 10   But he seemed to have no problem when answering open-ended

11   questions and when answering on the questionnaire, indicating

12   that he would be willing to consider both sentences and would,

13   as he kept saying over and over and over again, even as he was

14   being badgered with a lot of questions, that he would look at

15   all of the evidence in making his decision.  That was

16   his -- his bottom line.  And he was being -- everybody was

17   coming at him in all these different ways, and I think he

18   eventually retreated to that because he wasn't sure exactly

19   what everybody was trying to get at with all of these questions

07:11 20   when he had already given that answer.

21          At one point he did talk about -- with respect to

22   putting a 10 for Question 88 he talked about, you know, if he

23   was found guilty.  But I think he indicated through his

24   answers, and we had heard other jurors make this same use of

25   the word, that guilty means you're convinced that the death

1   penalty is the appropriate sentence; in other words, If I found

2   him to be guilty in that sense, that all the evidence has come

3   in, all the evidence I'm ever going to hear, and I make the

4   determination that this is the appropriate thing, yes, then I'm

5   in favor of the death penalty.

6        But at no point did he ever say in a way that

7   contradicted his earlier answers that he would automatically

8   give the death penalty to everybody convicted of an intentional

9   murder or that he would be unable to consider mitigating

07:12 10   evidence.  That's just not a fair characterization of what he

11   said during a very lengthy questioning.

12        THE COURT:  Well, as with other jurors, he got tangled

13   up a little bit in some of the legal concepts, I think.  I

14   think my assessment is that he is open to both sides and --

15   we've said this about somebody else, I think -- is

16   instructable.  I think that this kind of abbreviated sort of

17   instruction sometimes can be unhelpful and they get backed into

18   corners.

19        I mean, you know, there's -- Question 89 has been a

07:12 20   troubled question throughout, I think.  And so -- I think in

21   the end he indicated that he could be open-minded in a general

22   way, without getting too specific about what those duties would

23   be.  And of course we have to think about the environment.

24   When he gets to that point he will have been through the guilt

25   phase and he'll have fellow jurors and he'll have the

1    instructions and so on.  Under those conditions, I think he

2    will -- from my assessment of him here, he will be open to

3    being receptive to either argument depending on the evidence.

4         So I would overrule the objection to him.

5         646 I think we dealt with.  649?

6         MR. WEINREB:  Your Honor, the government has a motion

7    on 649.  This is a juror who I don't think we would argue that

8    he -- he would not -- it's not our argument that he would walk

9    into the jury box automatically in his mind that I am going to

07:14 10    vote for life imprisonment no matter what.  He said that he

11    could be open -- he could listen to all the evidence.  And in

12    response to Mr. Bruck's question at the end, he even said that

13    he could say, if he believed -- if he came to the conclusion

14    that the death penalty was the appropriate sentence, he could

15    say it to the other jurors, but that's a totally different

16    question as whether if he could vote to sentence somebody to

17    death.  That's also a necessary feature of death qualification,

18    somebody who could not only really consider it but could really

19    do it if that were their conclusion.  And this was a juror who

07:14 20    clearly, the more he thought about it, the less confident he

21    became that he could do it.

22         He candidly admitted that he hadn't thought much about

23    it.  And as we focused him on the question and asked him to

24    really think about it, he was obviously very, very upset about

25    the whole thought of it.  You could see him getting emotional.

1    And, you know, there were long hesitations in his answers.  He

2    looked -- his body language, his expression signaled his

3    discomfort and his reluctance.

4         Now, that's not to say it's not a weighty decision and

5    that everybody would feel some kind of emotion in rendering it,

6    but there's a difference between the kind of emotion that maybe

7    even a person who was pro death penalty and confident of their

8    ability to do it might feel and the kind of emotion of somebody

9    who's confronting for the first time that they might actually

07:15 10    have to do it and really profoundly -- has profound concerns

11    about their ability to do it.

12         The government is entitled to death-qualified jurors,

13    somebody who can do it to the degree of certainty that anyone

14    can have who's never been in that situation before.  We've had

15    those people before who have said, You never know until you get

16    there but I'm pretty confident I could do it.  This is not that

17    juror; this is somebody who is quite unconfident that he can do

18    it, and became more and more unconfident, and as it becomes

19    realer and realer, may go more and more in that direction.

07:16 20         And we don't believe it's fair to qualify a juror of

21    that sort.

22         MR. BRUCK:  We oppose the strike.  We have to go by

23    what the jurors say in the first instance, "Like I said, I

24    would have a hard time, but if it merits it.  I'm not committed

25    one way or the other."  When Mr. Weinreb was examining the

1   juror, he said a lot of thought would have to go into it.  He

2   said he could vote for the death penalty if he thought it was

3   the right thing to do.  And then when I was questioning him, he

4   said the same thing and he said it repeatedly.

5         Of course he's like a lot of jurors who have never

6   been confronted with this before.  The solemnity of it is

7   weighing on him for the first time.  It is emotional.  It

8   should be emotional.  But he is indistinguishable from many of

9   the jurors the Court has required.

07:17 10   THE COURT:  Well, he is a 95-not-sure juror.  We've

11   had a number of them, and they've gone both ways.  So it's not

12   simply the -- necessarily the form of words that gets used;

13   it's really an assessment about the person as a whole.  And I

14   guess I'm inclined to allow the strike.

15         I think he really, really hesitated at the idea that

16   he might be called upon to do it.  As Mr. Weinreb points out, I

17   was struck by the long pauses, the very thoughtful pauses as he

18   was kind of saying, What can I do?  What can I do here?  And he

19   did almost tear up at one point when he was thinking of that.

07:17 20   He mentioned a couple of times -- the decision to take

21   someone's life, showed how deep it was to him.  Under those

22   circumstances, I think I have to conclude he's impaired in

23   respect to the death penalty.

24         MR. BRUCK:  Well, of course we would note that

25   exception under the *Witherspoon* line of cases.

1          THE COURT:  Okay.  Okay.

2          And then 650 was resolved, I think.

3          So I believe we have three.

4          THE CLERK:  Three, Judge.

5          THE COURT:  637, '38 and '45.

6          THE CLERK:  Right.

7          MR. BRUCK:  The iron law of three.

8          THE COURT:  Apparently.

9          MR. WEINREB:  Three and a half, actually.  We average

07:18 10   three and a half.

11          THE COURT:  Anyway, so we'll maybe get another three

12   tomorrow or something.  We'll do this I think just one more

13   day.  I don't think we're going to need to go beyond tomorrow.

14   I think the count is at 71.  So if we get three, we're at 74;

15   if we get four, we're at 75.  I think that will be fine.

16          The question is:  What number do you think we should

17   bring in to do that?  I mean, what have we been doing, starting

18   with some high number and getting down?

19          MR. McALEAR:  Twenty.

07:19 20   THE COURT:  I mean, what did we have -- I don't know

21   how many we did today, 12 or 13?

22          MS. CLARKE:  We started with 21.

23          THE COURT:  No, I mean a net.

24          MS. CLARKE:  It was 13.

25          THE COURT:  Thirteen?  Yeah, so we could go for 20,

1    21, something like that.  Actually --

2           MR. McALEAR:  I just want to let you know we have 17

3    left on Panel C.

4           THE COURT:  Seventeen?

5           MR. McALEAR:  Yes.

6           THE COURT:  So we have 606 coming in tomorrow, that we

7    kept skipping?

8           MR. McALEAR:  Yes.  And 647 would not be able to come

9    in until the 26th, which would be Thursday.

07:19 10           THE COURT:  Who is 647?  Can I see 647?

11           MR. McALEAR:  647 is ███████████.

12           THE COURT:  Oh, all right.  Okay.  So this is up to

13    700?  Is that --

14           MR. McALEAR:  It's up to 682.

15           THE COURT:  Okay.  And that was how many again?

16           MR. McALEAR:  Seventeen.

17           THE COURT:  Seventeen plus one?

18           MR. McALEAR:  Seventeen plus one, which would be that

19    647, so, which would be that Thursday.

07:20 20           THE COURT:  I haven't looked at the group so I don't

21    know how many vulnerable to, you know, joint discharges there

22    are for hardship or various other reasons.  Maybe Jim and I can

23    propose it a little later, what the range is.

24           MR. WEINREB:  That's fine.

25           THE COURT:  Does anybody mind if we go in to the next

1    panel?

2              MR. WEINREB:  No.

3              THE COURT:  I mean, it would only be the beginning of

4    it, so...

5              MR. WEINREB:  No, there's no problem going into Panel

6    D.

7              THE COURT:  So I think maybe we can do that.  So we'll

8    come up with a list.  I haven't looked at it yet.

9              Some housekeeping matters on things getting served and

07:20 10   not served.  Could we have the defendant's oppositions to the

11   government's motions in limine served to us through the law

12   clerk by Saturday?

13             MS. CLARKE:  To all four?

14             THE COURT:  Yeah.  Well --

15             MR. WEINREB:  Actually, your Honor, the Katherine

16   Porterfield one is a purely sentencing phase.

17             THE COURT:  That's right.

18             MR. WEINREB:  I'm sorry.  Penalty phase.

19             So I don't think there's any need for response to that

07:21 20   anytime before the trial begins.

21             THE COURT:  I think that's right.  I think that's

22   right.

23             And there's an old one for Vogelsang, I think --

24             MR. WEINREB:  That is still pending.

25             THE COURT:  -- that is pending but has been briefed, I

1    think.  So that's not -- so, yeah, whatever's there.

2         Here's what I want to know, is what do we have to

3    resolve before openings?  And I'd like to be able to do that.

4         So let me just sketch out where I think we may go

5    schedule-wise.  Assuming we do tomorrow and are satisfied at

6    the end of the day that we can stop the voir dire process -- I

7    know I've said this to people in chambers and I've said it to

8    myself.  I don't remember whether I've said it to you.  I think

9    I did -- but I want to skip over a few days before we do the

07:22 10   peremptories.  I want to do that right before we empanel the

11   jury officially.  I don't want 18 selected people hanging out

12   there for days before they get sworn.  It just invites trouble.

13        So my thought is to set aside some days to resolve

14   these legal issues, and then perhaps Monday have argument on

15   any motions in limine and any other motions we need to resolve,

16   and resolve them Monday.  Have argument in the morning and have

17   a decision either right then or by the afternoon or something

18   like that.  It would be relatively summary, obviously, without

19   a lot of explanation, but we could resolve them.  Tuesday have

07:23 20   the 70-whatever jurors in to do the peremptories.

21        Backing up a minute, I guess before that we would

22   resolve any pending issues with respect to jurors as to which

23   there are some issues, okay?  So there won't be necessarily 70,

24   maybe there will be the high 60s or whatever the outcome of

25   that is.

1         But have them in on Tuesday, complete the peremptory,

2    plan then to have the 18 -- 12 jurors and 18 -- and six

3    alternates in Wednesday morning, swear them, and begin the

4    case, okay?  So that's my broad outline.  And it will fit in

5    with -- so it might be then that we would have no -- well, I

6    won't say no, but no significant courtroom proceedings on

7    Thursday and Friday, but Monday, and proceed that way, okay, as

8    we tidy up some of these things?

9         I think there are a couple of ex parte matters I need

07:24 10   to discuss with the defense, and I don't know whether any with

11   the government, so we might try to do those on Thursday and

12   Friday somehow.

13        MS. CLARKE:  Okay.

14        THE COURT:  So that's the general outline.  Any

15   comments?

16        MS. CLARKE:  No.  We brought with us to discuss with

17   the government our list of motions that we think are

18   outstanding, so perhaps we can do that.

19        MR. WEINREB:  We're happy to stay behind and try to

07:24 20   get that to you this afternoon.

21        THE COURT:  Okay.  So anyway, Saturday any oppositions

22   emailed to us.

23        MS. CLARKE:  If it needs to be resolved before --

24        THE COURT:  If it needs to be resolved before opening.

25   Yes, of course if it's --

            1           MS. CLARKE:  If it's a penalty-phase motion --

            2           THE COURT:  Absolutely.  And even if it's a guilt

            3    phase but --

            4           MS. CLARKE:  Not opening.

            5           THE COURT:  -- can be omitted in the opening, skipped

            6    over, that's fine too.  I mean, in an ordinary case my

            7    experience is very few motions in limine are resolvable before

            8    trial.  You always want to see what the conditions are when the

            9    issue arises.

07:25   10           That just sparks one of the -- you know, I think it's

           11    maybe in the status report and the government's response and so

           12    on -- the mockup.  Has the defense seen the mockup, the

           13    Boylston Street mockup?  I'd like that to happen as soon as can

           14    be so that we can resolve that -- any problem there, if there

           15    is one.

           16           MR. WEINREB:  So we actually currently do not intend

           17    to use the mockup other than we've been using it for witness

           18    preparation.  But we're actually -- I'll discuss with the

           19    others --

07:25   20           THE COURT:  Okay.  Well, if you're not going to going

           21    to use it, that makes it easy.  I just don't want a last-minute

           22    problem with the carpentry department.

           23           MR. WEINREB:  Of course.

           24           So the government has a couple of motions that are

           25    pending that don't, strictly speaking, have to be resolved

1    before opening statements or have to do with the admission of

2    evidence but are things that are urgent for other reasons.  For

3    example, the motion to take the section of the boat that has

4    the note on it so that it can be brought into court, certain

5    things that just require some lead time.

6              There's also an issue with respect to overseas

7    witnesses that to the extent that they need visas and they need

8    government assistance in getting in, that's not something that

9    can just happen overnight.  So there are certain things that --

07:26 10   we'll flag them --

11             THE COURT:  Okay.

12             MR. WEINREB:  -- what we consider to be sort of urgent

13   motions even though they're not motions in limine, per se,

14   pertaining to opening statements.

15             THE COURT:  Okay.  Does the defense plan to open at

16   the beginning of the case or reserve?

17             MS. CLARKE:  Open.

18             THE COURT:  Okay.  So just on that subject, can you

19   give me an idea of the time required for combined openings?

07:27 20             MR. WEINREB:  The government estimates an hour.

21             MS. CLARKE:  Far less than that.

22             MR. WEINREB:  Hopefully it will be less.

23             THE COURT:  Okay.  And so Wednesday morning we would

24   expect to get the first witness?

25             MR. WEINREB:  Yes.

1          THE COURT:  Because we'll have selected the jury the

2     day before; in other words, reduced it to the 18, they'll just

3     report, and we won't swear them until that morning, just for

4     obvious reasons, I guess, and then -- okay.  Okay.

5          MS. CLARKE:  Has the Court decided how strikes will

6     go?

7          THE COURT:  No.  And I'm open to the suggestion.  I

8     don't know whether you've discussed it any further than that.

9     I'm indifferent.  I don't want to -- I'll entertain any --

07:28 10          MS. CLARKE:  Drawing numbers out of a hat?

11          THE COURT:  Any ideas.

12          No, we'll take them in sequence, but whether you want

13     to do it the way I've described is my normal practice or

14     whether you want to take a look at the whole panels and work

15     out something else.  I haven't thought that through myself but

16     I was kind of waiting to -- the government put it out there and

17     I was kind of waiting for the defense's reaction to that.

18          MS. CLARKE:  I think we were inclined to go with your

19     normal approach.

07:28 20          THE COURT:  Well, okay.  Maybe that's something we can

21     spend some time on if you want to debate that out.  I don't

22     know that there are any rules about it.  I think it's -- I

23     guess the only thought I had -- question I had about the

24     government's suggestion was in my method, the alternates become

25     the last six seated, so you know when you're in alternate

 1    territory.  I'm not sure how that would work.

 2              MR. WEINREB:  That would still be the case.  We would

 3    exercise the 20 and the 20.

 4              THE COURT:  You'd get down to the last -- the three

 5    and three?

 6              MR. WEINREB:  Exactly.

 7              THE COURT:  Well, that actually raises a separate

 8    issue, and that is in my normal practice I don't worry about

 9    whether the alternate strike is -- well, whether -- so the

07:29 10    government gets six plus two for the alternates, right?

11              MR. WEINREB:  In the normal case, yes.

12              THE COURT:  In the normal case.

13              Or one for the alternate or two for the alternate,

14    depending on how many alternates.  I never worried about

15    whether seven were used for the original 12 and one for the

16    next.  I mean, I don't know whether anybody parses it that

17    precisely.  I just deal with it as a total number.  And I would

18    be inclined to do that here with the 23, not worry about who's

19    susceptible to 20 and who's susceptible to three.  It's just an

07:30 20    accounting problem I'm not sure we need.  So you can think

21    about that.

22              In other words, the three extra which are allocated

23    for the alternates, may they only be used on alternates or can

24    you exhaust your 23 before you even get to the alternates, if

25    that's the issue?

1          MS. CLARKE:  We think that they can only be used on

2     the alternates.

3          MS. CONRAD:  The rule says that.  24 says that.

4          MS. CLARKE:  Twenty each and then --

5          THE COURT:  That's the number but --

6          MS. CONRAD:  Rule 24, I think it's (c), says that all

7     the peremptories for the -- that are assigned for the

8     alternates can only be used for the alternates.

9          THE COURT:  Oh, it does say that?

07:30 10          MS. CONRAD:  Yeah.

11          THE COURT:  Specifically?

12          MS. CONRAD:  Yeah.

13          THE COURT:  Okay.  Well, that answers my question.

14     Okay.  So we'll have to pay attention to that boundary, then.

15     That might be easier to do in the practice additional method

16     than in yours, but I haven't thought that out.

17          A number of oppositions by the government to defense

18     motions apparently were actually served but have never been

19     filed.  Those include opposition to the defendant's motion to

07:31 20     limit disclosure of foreign defense witnesses.  A copy was

21     apparently served but we don't have it formally on the docket.

22     It includes an opposition to the defendant's motion in limine

23     regarding the testimony of terrorism experts and Dr. King.  I

24     think none of those oppositions have actually made it to the

25     docket.

1          MS. CLARKE:  And we're wondering whether any of it

2    that made it to the docket actually didn't get served on us.

3          THE COURT:  Right.  And -- well, now, I thought that

4    was happening.  I thought that had happened by now.

5          MR. WEINREB:  That did happen.

6          MS. CLARKE:  Well, we got three on Saturday, Judge,

7    and when we were digging back through to figure out whether we

8    actually picked them up from the Court, we found one that the

9    government still hasn't served but was in there.  You know, we

07:31 10   haven't been comparing so we don't know whether we've been

11   served with everything the government has filed or not.  That

12   gave us some -- sort of a sense of queasiness.

13         THE COURT:  Well, we've had the same experience.

14         (Laughter.)

15         THE COURT:  So feel a little bit less queasy.

16         But can we get some representatives of each party to

17   straighten all this out?

18         MR. WEINREB:  Yes.

19         THE COURT:  Because the docket -- this has been a

07:32 20   complicated docket, and the snow days have not helped because

21   on our part we've had subs sometimes taking over because our

22   personnel weren't here.  So we've had some docketing done by

23   people who weren't used to the way we were docketing these

24   things.  So we've just got to straighten kind of straighten it

25   all out.

1          The opposition to the defendant's position on the

2     video that we've been showing, we got a courtesy copy mailed to

3     us but there was never a filing in the clerk's office.  That

4     was back in early February.

5          On the defense side, the memo in support of the third

6     motion for change of venue, we asked that a couple of juror

7     numbers be redacted in that redacted copy then filed; in other

8     words, the redactions of quotations, but I think we

9     also -- this is Docket -- E-Order 1020 striking a couple of the

07:33 10     juror numbers.  It was a minor change but --

11          MS. CONRAD:  There was some confusion about that, I

12     think, because there was a page reference in the Court's order

13     and a page of the memorandum.

14          THE COURT:  Yeah.

15          MS. CONRAD:  And we looked at it and we did not see.

16          THE COURT:  Was it off a page?

17          MS. CONRAD:  It might have been.  I don't know.

18          THE COURT:  I mean, it could have been an artifact --

19          MS. CONRAD:  There was not a juror number on that page

07:33 20     so we weren't quite sure what to do with that.

21          THE COURT:  Well, there are juror numbers, I guess

22     wherever they are.

23          MS. CONRAD:  We'll take another look.

24          THE COURT:  Okay.  And then that -- the

25     redacted -- with that redaction, that can be filed.

1          And the reply to the government's opposition to the

2     defendant's motion to quote materials in the public filings, I

3     denied the main motion but I granted the motion to file, and

4     the reply hasn't been formally filed.  This is just neatening

5     up the docket, that's all.

6          MS. CLARKE:  In other words, bring the hard copy over?

7          THE COURT:  Is it under seal?

8          MS. CLARKE:  Everything is.

9          THE COURT:  The reply is?  Yeah, I guess so.  Then

07:34 10    bring the hard copy over and the clerk will put it on.

11          And I think that's where a lot of these things happen.

12     People are emailing them and serving them and things, but the

13     process requires hard copies of sealed documents be given to

14     the clerk and uploaded and so on and so forth.  So we're trying

15     to catch up on some of this.

16          Something to think about, we have a little bit of time

17     on it, we mentioned from -- my preliminary instructions to the

18     jury when they've been empaneled, what I may say about the

19     indictment, whether a summary of the indictment can be perhaps

07:35 20    jointly agreed to, that could be shown to the jury or read to

21     the jury or whatever.  Give some thought to that.  I mean, we

22     don't want to obviously present the whole complicated

23     indictment to them, but maybe a summary of the charges.

24          So I think that's it for now.

25          MS. CLARKE:  Thank you.

1        THE COURT:  We'll get you the numbers for tomorrow as

2   soon as we can.

3            (The Court exits the courtroom and the proceedings

4   adjourned at 4:31 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14

15
     Date:  February 24, 2015
16

17

18

19

20

21

22

23

24

25