UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**SECOND MOTION TO DISMISS INDICTMENT AND STAY PROCEEDINGS PENDING RECONSTITUTING JURY WHEEL TO CONFORM WITH STATUTORY AND CONSTITUTIONAL REQUIREMENTS**

Defendant, Dzhokhar Tsarnaev, by and through counsel, moves pursuant to Fed. R. Crim. P. 6(b)(2) and 12(b)(3), and 28 U.S.C. §1867(e), that this Court dismiss the indictment returned in this case and/or stay further proceedings pending reconstitution of the jury wheel to conform with the Jury Selection and Service Act, 28 U.S.C §1861 et seq., the Jury Selection Plan for the District of Massachusetts, and the fair cross-section requirement of the United States Constitution.

The defendant previously filed a similar motion based upon the procedures used to select the grand jury that returned the indictment in this case. [DE 506.] The Court denied the motion. [DE 608.] This motion raises similar issues, plus one additional issue (violation of randomness requirement of Jury Plan) with regard to the procedures used to select the petit (trial) jury in this case. Defendant recognizes that the Court's rulings on the issues previously raised in his first Motion are likely dispositive of analogous issues in this motion, but he respectfully seeks to preserve those issues for appellate review with regard to the petit jury.

1

The defendant sought and the Court ordered production of records maintained by the District of Massachusetts which are used or relied upon by the Clerk of the Court, the jury commission, and Jury Commissioner for the Commonwealth of Massachusetts in connection with the selection process of the petit jury in this case. [DE 912, 1005.] Several violations – including substantial violations of the Jury Selection and Service Act and of the fair cross section requirement – surfaced during the review[1]:

1.     The District of Massachusetts Plan for Random Selection of Jurors ("Plan") has been violated by a re-ordering of jurors that undermined randomness. Section 5a of the Plan provides: "It is the policy of this Court that all citizens of this district shall have the opportunity to be considered for service on grand and petit juries and to ensure, to the greatest extent possible, that all grand and petit juries in the three divisions of the District of Massachusetts are drawn at random from source lists in the relevant division, that represent a fair cross-section of the community of that division."

Here, the original numbered random pool order list was modified when new, different numbers were assigned at the time jurors reported to complete written questionnaires. This re-ordering, apparently based on non-random factors such as arrival time, had systemic effects on the order. The re-ordering was not random and had non-neutral effects on cognizable groups.

On average, the re-ordering has caused potential African-American jurors to move back 43 positions while potential White jurors have remained essentially the same by moving 3 positions up in order. Potential jurors from Boston have moved back 25

---

[1] See Declaration of Jeffrey Martin, attached as Exhibit A.

positions. Potential jurors who are younger than 30 have moved back 13 positions. Comparing the re-ordering to the original ordering, in the first 94 qualified[2] jurors, there are zero potential African-American jurors in the re-ordering but there would have been 5 potential African-American jurors in the original ordering.

  2.  The Plan, as applied by the Clerk, violates the Constitutional fair cross section requirement by permitting the excuse, upon request, of any person over the age of 70 years. Here, 95.96% of persons age 70 and over summoned as potential Trial Jurors in this case chose to exercise their personal preference not to serve. Persons over the age of 70 make up 14.60% of the population, while persons over age 70 who choose to serve make up 0.93% of the Qualified Jury Wheel. This represents under representation of persons age 70 and over of 13.67% on an absolute disparity basis and 93.63% on a comparative disparity basis.[3]

  3.  The substantial under-representation of African Americans identified

---

[2] As used in this motion, "qualified" refers to that term as used in the Jury Plan (here, essentially, all eligible potential jurors who completed questionnaires) as distinguished from the much smaller group of jurors who have been "provisionally qualified" after completion of individual voir dire.

[3] There is also a substantial underrepresentation of young people – the Millenial generation – those born between 1981 and 2000, who constitute 25.59% of the population and 22.91% of the qualified jury wheel – an absolute disparity of 2.67% and a comparative disparity of 10.45%, meaning that a tenth of the group is missing. However, unlike the probability that the source lists are the direct cause of under-representation of African Americans, to date, we are unable to identify the cause of the under-representation of young people.

in 2005 in *United States v. Green*, 389 F.Supp.2d 29 (D. Mass. 2005), has not abated even in the face of the 2009 amendment to the Plan that appears to have been the District's attempt to address the under-representation. African Americans remain under-represented by approximately the same percentage as in 2005. African Americans make up 6.14% of the Eastern Division jury eligible population, but only 4.25% of the Qualified Jury Wheel. This is an absolute disparity of 1.89% and a comparative disparity of 30.73%, meaning that over a quarter of the group of African Americans in the jury-eligible population is missing from the Qualified Jury Wheel.

## MEMORANDUM IN SUPPORT

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010). Extra precautions must be taken to protect the defendant's right to an impartial and representative jury in a capital case because of "the broad discretion given the jury at the death-penalty hearing" and "the special seriousness of the risk of improper sentencing." *Turner v. Murray*, 476 U.S. 28, 37 (1986); *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013) ("The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life.")

The Supreme Court noted one of the rationales behind the constitutional fair cross section requirement in *Taylor v. Louisiana*, 419 U.S. 522 (1975) (quoting *Peters v. Kiff*, 407 U.S. 493, 502-504 (1972)):

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is

4

> unknown and perhaps unknowable.  It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Id*. at 532 n.12

The constitutionally mandated fair cross section requirement is incorporated into the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §1861 et seq. which provides, in §1861:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.  It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

The local Plan, promulgated pursuant to the JSSA must also further the right to a jury selected at random from a fair cross section of the community.

### A.  Substantial Violation of the Massachusetts Plan For Random Selection of Jurors

Section1867(a) of Title 28 provides, in pertinent part, that a defendant may move to dismiss an indictment "on the ground of substantial failure to comply with the provisions of this title in selecting the . . . petit jury."  The term "substantial failure" is not defined in the JSSA, but as explained in *United States v. Green*, 389 FD.Supp.2d 29 (D. Mass. 2005), it does not, as discussed in the legislative history, require a showing of prejudice.  It does require more than a mere technical violation.  *See id.* at 68-69 and

n.69. As set out below, the failure here is more than technical; it goes to the objective of obtaining a random fair cross section of the community.

The JSSA requires a district plan for the random selection of jurors designed to achieve the objective of, *inter alia*, selection at random from a fair cross section of the community. 28 U.S.C. §1863(a). The failure to comply with the provision of the Plan designed to ensure "random" selection has actual impact on cognizable groups and cannot be dismissed as a mere technicality.

### B. Constitutional and Statutory Fair Cross Section Violations

Evaluating whether there has been a violation of the fair cross section requirement is a three-step process. First, the court must determine whether the group allegedly excluded is a "distinctive group" in the community. The court must then determine whether the representation of that group in the venire is "not fair and reasonable" compared to its numbers in the community. Finally, the court must determine whether the under-representation is due to systematic exclusion of the group during the selection process. *See United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999); *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

#### (1) Distinctive Group

Neither the Supreme Court nor the JSSA mandates a particular test for defining a distinctive group for purposes of fair cross section analysis. It does not require showing that the group has suffered an historical experience of discrimination, as is the case in an equal protection analysis. *See, e.g., Commonwealth v. Bastarche*, 382 Mass. 86, 97, 414

N.E.2d 984, 992 (Mass. 1980) (comparing Supreme Court's discussions of requirements of equal protection clause and Sixth Amendment).

In *Taylor*, the Court stated that the purpose of the jury cannot be met "if the jury pool is made up of only special segments of the populace or if large distinctive groups are excluded from the pool." 419 U.S. at 530. It reiterated that "excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." *Id*. Moreover, "[c]ommunity participation in the administration of the criminal law…is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Id*. In concluding that women were a distinctive group the Court recognized that women may not act as a class and are influenced by the same factors that influence men, but, nonetheless, there was an "imponderable" difference requiring recognition of women as a distinctive group for fair cross section purposes. *Id*. at 531-532.

African-Americans, women, and Mexican-Americans have been recognized as distinctive groups by the Supreme Court. *See Berghuis v. Smith*, 130 S. Ct. 1382 (2010); *Taylor*, *supra*; *Castaneda v. Partida*, 430 U.S. 482 (1977) (equal protection claim). Here, Tsarnaev maintains that African-Americans are a distinctive group at issue.

Tsarnaev also submits that persons over 70 should be recognized as a distinctive group. While persons over 70 have been found not to be a distinctive group by some courts (s*ee, e.g., Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990)), the First Circuit has not

addressed that proposed classification.[4]   Although distinctive groups have not been defined as limited to those with immutable characteristics, distinctive groups recognized to date have been of that nature.  Being over age 70, like race, sex, and national origin, is an immutable characteristic – one cannot get younger – and exclusion on the basis of such a characteristic gives rise to the appearance of unfairness.

Congress has recognized the problematic nature of distinctions based on age in a variety of anti-discrimination legislation.  The Age Discrimination in Employment Act, 29 U.S.C. §621 et seq., was passed to, *inter alia*, "prohibit arbitrary age discrimination in employment."  29 U.S.C. §621(b).   The Congress found, *inter alia*, that "older workers find themselves disadvantaged in their efforts to retain employment,…"  §621(a)(1).  In the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq., Congress has also made it unlawful to for a creditor to discriminate against an applicant "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)."  15 U.S.C. §1691(a)(1).  That statute further provides that while an "empirically derived credit system which considers age" may, if "demonstrably and statistically sound", be used, "the age of an elderly person may not be assigned a negative factor or value" in such a system.  15 U.S.C. §1691(b)(3).  The purpose of the Age Discrimination Act of 1975, 42 U.S.C. §6101 et seq. is "to prohibit discrimination on the basis of age in programs or activities receiving Federal financial assistance."  42 U.S.C. §6101.

---

[4]  Courts, including the First Circuit, have rejected classification of young adults as a distinctive group for Sixth Amendment purposes.  *See, e.g., Barber v. Ponte*, 772 F.2d 982, 996, 1000 (1st Cir. 1995) (en banc) (people between the ages of 18 and 34).

The Silent Generation has been described as shaped by the Great Depression and World War II, factors not shaping later generations, and as sharing a complex of characteristics, lifestyles, and attitudes different from those of other generations. *See* Kaylene C. Williams and Robert A. Page, "Marketing to the Generations", 3 JOURNAL OF BEHAVIORAL STUDIES IN BUSINESS (Apr. 2011), *available at,* <www.aabri.com/manuscripts/10575.pdf>. Most members of the Silent Generation, people born before 1946, are age 70 and over (Martin declaration, par.22). Accordingly, Tsarnaev submits that persons over 70 are a definable group sharing experiences, characteristics, attitudes, and lifestyles different from other groups and that this Court should view persons over 70 as a distinctive group for purposes of fair cross section analysis.

**(2) Under-representation**

While neither the Supreme Court nor the JSSA has established a particular test to be used in determining whether a distinctive group is under-represented in a jury venire or whether any under-representation is significant (*see Berghuis v. Smith*, 130 S.Ct. 1382, 1393 (2010))[5], most courts, including the First Circuit, have utilized an absolute disparity standard in making those determinations. "Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel." *Royal*, 174 F.3d at 6-7.

---

[5] *Berghuis* noted that lower court have used at least three tests for measuring representation of groups in jury pools: absolute disparity, comparative disparity, and standard deviation. *See* 130 S. Ct. at 1393. The Court declined to adopt a particular test or measure.

In *Royal*, and *In re United States*, 426 F.3d 1 (1st Cir. 2005) the First Circuit recognized the under-representation of African-Americans in juries in the Eastern Division of the District of Massachusetts. The *Royal* court called the statistics presented at that time "disquieting" and the process, while not a violation of law, "a situation leaving much to be desired." *Royal*, 174 F.3d at 12. African-Americans were 4.86% of the 1990 census count for the population 18 and over in the Eastern Division, only 1.89% of the prospective jurors on the 1994 Master Jury Wheel, only 2.2% of prospective jurors not deemed exempt, disqualified or excused, and only 2.9% of jurors appearing for jury orientation. This produced an absolute disparity of 2.97% *See id.* at 10.

Six years later, the First Circuit again recognized that the issues of underrepresentation remained:

> Yet, there is asssuredly cause for concern, as this court said six years ago, *Royal*, 174 F.3d at 12, where…the proportion of blacks who return jury questionnaires is half the percentage to be expected from their presence in the division of the district concerned.

*In re United States*, 426 U.S. at 9. In that case the district court had found that African-Americans were over 6% of the Eastern Division population in the several preceding years but only just over 3% of those who returned questionnaires and identified race. The average absolute disparity for 2001-2003 was 3.66% *See id.* at 3.[6]

---

[6] In *Green*, the court noted that the JSSA had been amended in 1992 to provide for the use of resident lists rather than voter lists in Massachusetts "because of serious concerns about the racial composition of jury pools drawn from voter lists." 389 F.Supp.2d at 42.

In both cases the First Circuit applied an absolute disparity test to the data and found the disparity insufficient to establish constitutionally meaningful under-representation.

Tsarnaev recognizes that the absolute disparity of 1.89% derived from the petit jury data analyzed here will not be deemed sufficient to establish constitutionally meaningful under-representation in this case under current First Circuit law and raises the following to preserve the issue of whether the under-representation of African-Americans in the jury wheel violates the constitutional and statutory fair cross section requirements for appellate review. He submits that absolute disparity is an analysis that will never be found sufficient where the population of the group alleged to be underrepresented is small, and should not be the analysis used to determine whether African-Americans are under-represented in the qualified jury wheel. As the Martin declaration explains (par. 25), since absolute disparity is simply the arithmetic difference between the percentage of a group on the jury list and the percentage of the same group in the population, where the population of a group is under 10% all of that group could be excluded and no unconstitutional under-representation would be found if the standard for unconstitutional under-representation is 10%. Given the limitations of an absolute disparity analysis for evaluating small populations, Tsarnaev suggests that a comparative disparity analysis should be used. This analysis measures the rate at which a distinctive group is represented (Martin declaration, par.27). Comparative disparity analysis shows a 30.73% under-representation of African-Americans on the jury list or that "over a quarter of the African-Americans are missing from the Qualified Jury Wheel." (Martin declaration

11

par.10). This under-representation, he submits, is constitutionally significant. Analyzing the under-representation of African-Americans using standard deviation analysis, impact analysis and disparity of risk analysis confirms the significance of the under-representation of African-Americans (*see* Martin declaration, pars. 30-37).

Applying absolute disparity analysis to the representation of persons over the age of 70 in the jury wheel shows an under-representation of 13.67%. Applying comparative disparity analysis shows under-representation of 93.63% (Martin declaration, par.11). Tsarnaev submits that this under-representation of older persons is constitutionally meaningful.

**(3) Systematic Exclusion**

The systematic exclusion required to establish a violation of the fair cross section requirement under the Sixth Amendment and the JSSA does not require proof of discrimination or intent. Rather, the disparity must be caused by some sort of official action or inaction. In *Taylor* the practice of excluding women unless they chose to register (an opt-in system) was held to constitute systematic exclusion. In *Duren*, the practice of giving women the option for an automatic exemption upon request (an opt-out system) was held to constitute systematic exclusion. *See Duren*, 439 U.S. at 366-367.

As in *Duren*, the Plan for the District of Massachusetts provides an opt-out system for persons over the age of 70 (section 9c). As in *Duren,* this constitutes systematic exclusion.

As explained in the prior motion, the largest number of African-Americans among the cities and towns of the Eastern Division resides in Boston and 22.49% of Boston's

population is African-American (the third highest percentage of African-Americans in the Eastern Division and well above the Division's overall percentage of 6.14%). However, Boston is under-represented in the municipal resident lists used to create the master jury wheel. This under-representation in municipal resident lists is attributable to some form of official action or inaction in the jury selection process and is, therefore systemic exclusion.  *See e.g. United States v. Jackman*, 46 F.3d 1240 (2nd Cir. 1995).  This systematic exclusion is a contributing factor to the under-representation of African-Americans in the jury wheel.

## CONCLUSION

For the foregoing reasons, it is requested that the Court dismiss the indictment returned in this case, and stay further proceedings pending reconstitution of the jury wheel to conform with the Jury Selection and Service Act, 28 U.S.C §1861 et seq. and the Jury Selection Plan for the District of Massachusetts and the fair cross-section requirement of the United States Constitution.

                Respectfully Submitted,

                DZHOKHAR TSARNAEV
                By his attorneys

                      */s/ William Fick*

                Judy Clarke, Esq. (CA Bar# 76071)
                CLARKE & RICE, APC
                1010 Second Avenue, Suite 1800
                San Diego, CA 92101

(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq. (SC Bar # 967)
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 458-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 26, 2015.

*/s/ William Fick*