UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>DZHOKHAR A. TSARNAEV,<br><br>Defendant. | CRIMINAL ACTION<br>NO. 1:13-cr-10200-GAO |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF AMERICAN BROADCASTING COMPANIES, INC.; CBS NEWS, A DIVISION OF CBS BROADCASTING INC.; CABLE NEWS NETWORK, INC.; AND NBCUNIVERSAL MEDIA, LLC TO INSPECT AND COPY TRIAL EXHIBITS**

American Broadcasting Companies, Inc., CBS News, a division of CBS Broadcasting Inc., Cable News Network, Inc., and NBCUniversal Media, LLC, submit this memorandum of law in support of their motion for leave to inspect and copy trial exhibits entered into evidence at the close of each trial day. More specifically, movants seek access at the close of each trial day to copies of videos admitted in evidence and shown to the jury. As shown below, the press and the public have a right of access to the exhibits under the common law and the First Amendment.

**ARGUMENT**

A.  **The Press and the Public Have a Common Law Right of Access to Copies of Trial Exhibits.**

"[R]elevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies." *Federal Trade Commission v. Standard Financial Management Corp.*, 830 F.2d 404, 409 (1st Cir. 1987) (recognizing common law right of access to judicial records relied on in adjudicatory proceedings). *See generally Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 599 (1978) (recognizing common law right of access to inspect and copy trial exhibits).

The public's common law right of access is "no paper tiger," *Standard Fin. Mgmt.*, 830 F.2d at 410. The party seeking to seal bears the burden of persuasion. *Id.* at 411; *Rushford v.*

*New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). "Only the most compelling reasons can justify non-disclosure of judicial records." *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983). Conclusory assertions of the need for closure are not accepted as surrogates for hard facts, and doubts are to be resolved in favor of public access. *Continental Illinois Securities Litigation*, 732 F.2d at 1313; *Standard Fin. Mgmt.*, 830 F.2d at 412; *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 10 (1st Cir. 1998). "The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Standard Fin. Mgmt.*, 830 F.2d at 410.

Even when a sufficiently compelling reason exists to overcome the public's common law right of access, the remedy is not a blanket sealing of entire judicial records. Instead, trial courts must "minimiz[e] the concomitant curtailment of the public's right of access to court filings" by redacting only those portions of the judicial record that warrant a sealing order, leaving the rest of the record open for public review. *Siedle*, 147 F.3d at 12 & n.16. *Cf. In re Providence Journal Co., Inc.*, 293 F.3d 1, 15 (1st Cir. 2002) (First Amendment right of access requires "consideration of the feasibility of redaction on a document-by-document basis").

Applying these principles, most federal court that have considered the issue have granted public access to recordings presented as evidence in criminal trials. *See, e.g., United States v. Criden*, 648 F.2d 814, 822 (3d Cir. 1981) ("[T]he public forum values emphasized in that case can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend the trial in person."); *Valley Broad. Co. v. United States Dist. Court*, 798 F.2d 1289, 1290, 1297 (9th Cir.1986) (abuse of discretion to deny media request to copy and broadcast audio and video tapes received in evidence). As the Second Circuit explained:

> Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of [the defendants], as well as [law enforcement officers]. And there is a significant public interest in affording that

- 2 -

> opportunity contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial.

*In re Application of National Broadcasting Co. (Myers)*, 635 F.2d 945, 952 (2d Cir. 1980). *See also Valley Broad.*, 798 F.2d at 1292 ("[b]ecause courtroom space is inherently limited, and because the public is dispersed, the media plays an indispensable representative role in gathering and disseminating to the public"); *United States v. Saunders*, 611 F. Supp. 45, 48 (S.D. Fla. 1985) ("[D]enying the media permission to broadcast the tape itself effectively denies the public of . . . the most accurate account of the conduct which led to the Defendants' arrest.").[1]

The exhibits at issue are directly relevant to the charges faced by the defendant. (Indeed, Exhibit 23 has been described as among the strongest pieces of evidence in the case.) The charges are a matter of great concern to people in Massachusetts, across the country, and beyond. The vast majority of those people cannot attend the trial to observe the evidence for themselves. Under these circumstances, the relief requested by the movants directly contributes to public understanding and acceptance of the outcome of this case, and promotes the legitimacy of the judicial process.

### B.  First Circuit Precedent

Movants are aware of two cases in this Circuit that have addressed requests for public access to copies of recordings submitted in criminal trials. *See Providence Journal*, 293 F.3d 1;

---

[1] *See also In re Associated Press (Moussaoui),* 172 F. App'x 1, 4-7 (4th Cir. 2006) (reversing district court's refusal to allow access to trial exhibits including video); *Commonwealth v. Upshur*, 592 Pa. 273, 286, 924 A.2d 642, 650 (2007) ("[A]llowing public access to preliminary hearing exhibits, like the tape recording at issue, will serve to promote fairness from the outset of criminal proceedings and public confidence in the fairness and efficacy of the criminal justice system."); *In re NBC (Jenrette)*, 653 F.2d 609, 620-21 (D.C. Cir. 1981) (holding that trial court's denial of access to video admitted into evidence at trial was an abuse of discretion); *Dhiab v. Obama*, 2014 WL 4954458 (D.D.C. Oct. 3, 2014) (granting motion to unseal video evidence in habeas corpus proceeding); *United States v. Trofimoff*, 2001 WL 1644230, at *2-3 (M.D. Fla. June 12, 2001) (granting newspaper access to video admitted during criminal trial); *United States v. Mouzin*, 559 F. Supp. 463, 464 (C.D. Cal. 1983) (granting television network access to video admitted during criminal trial). *See generally* Levine, Lind et al., *Newsgathering and the Law* vol. 1 at 5-72 (4th ed. 2012) ("the expansive view of the common law right of access adopted in these cases reflects the majority position in the federal and state courts.").

*United States v. Sampson*, 297 F. Supp.3d 342 (D. Mass. 2003).  The relevance of each case is addressed below.

### 1. *United States v. Sampson*

In *Sampson* (one of the few death penalty prosecutions in Massachusetts), the trial court "provide[d] the media, during trial, [with] copies of the recordings played for the jury and admitted into evidence."  297 F. Supp.3d at 346.  To implement its order, the Court required written requests for the recordings at the end of each trial day.  The recordings were "duplicated by the staff of the District Court as quickly as their other important responsibilities permit[ted]," and were provided at a cost of $26.00 per disc.  *Id.* at 347-48.

The reasoning of the *Sampson* Court applies in full force here.  In that case, as here, there was a "strong and legitimate" public interest in one of the rare death penalty cases tried in Massachusetts, "a state which does not itself authorize execution as the punishment for any crime."  *Id.* at 346.  In both cases, "the public's interest in making informed decisions concerning the performance of the Department of Justice, the Court and, ultimately, the jury, is particularly strong."  *Id.*  Both also present a "'significant public interest' in affording citizens an opportunity to hear the recordings 'contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial.'"  *Id.* (quoting *Myers*, 635 F.2d at 952).  And, as *Sampson* held, the fact that the information at issue already was disclosed during trial is by no means a "complete substitute" for seeing and hearing what the jury saw and heard.  "Thus, the broadcast of those recordings during trial may make the jury's eventual verdict more understandable, and therefore more legitimate, to the public."  *Id.*

The *Sampson* Court also considered the potential effect on the jury of releasing copies of evidence to the public.  In that regard, the Court noted that the jury had been instructed not to read, watch or listen to news reports of the case, had consistently affirmed that they were following those instructions, and had, in any case, already heard the recordings, thus addressing any concern of juror prejudice.  *Id.* at 347.  The same is true here.

The defendant in *Sampson* objected to copies of the recordings being released on the grounds that disclosure might provoke members of the community to pressure jurors to sentence him to death. The Court overruled the objection, concluding that since the contents of the recordings had been played in open court, and since the identities of the jurors were protected until after the verdict, the defendant's concern did not overcome the public's right of access. *Id.* The same result is warranted here in light of the similar protections adopted by this Court for jurors.

In sum, for all of the reasons relied upon by the *Sampson* Court, the public has a common law right of access to inspect and copy the videos presented to the jury in this case.[2]

### 2. Providence Journal

In *Providence Journal*, the First Circuit addressed the unique circumstance in which the press sought a copy of a recording in a form in which it did not exist in the trial court. The evidence in *Providence Journal* included 71 videotapes and audiotapes of secretly recorded conversations with various government officials, including the defendants. 293 F.3d at 8. The prosecution transferred the contents of the 71 tapes into CD-ROMS which were loaded onto a computer hard drive. At trial, the government used the software program Sanctions to excerpt conversations for playback to the jury. *Id.*

The First Circuit readily concluded that, because the tapes the press sought to copy had been admitted into evidence, they were subject to the public's common law right of access. *Id.* at 16. It noted, however, that the case contained a "unique twist." *Id.* at 17. The government had not merely played individual tapes, but, rather, had used the Sanctions software to play "medleys

---

[2] The *Sampson* Court took a different approach with respect to "gruesome" photographs of victims murdered by the defendant. Rather than making those photographs available on request, the Court established a procedure whereby the press and the public were allowed to file a motion and supporting affidavit seeking such photographs, with the Court to decide whether to make the exhibit publicly available. *Id.* at 344 & n.1. To the extent some of the videos at issue here raise similar issues, redaction of those portions of the video—rather than a complete denial of access—is the appropriate remedy under the governing common law standard. *Siedle*, 147 F.3d at 12 & n.16.

of *sealed excerpts* from the universe of taped material stored on its laptop computer." *Id.* (emphasis added). "As a result, there is no electronic medium--no tape or CD-ROM--currently in existence that contains the precise medleys of taped excerpts that have been played in open court." *Id.* Because the case involved a media request for access to materials "that [did] not exist in readily reproducible form," the Court refused to disturb the district court's holding that the common law right of access "did not mandate the creation of something not already in existence (i.e., a tape or CD-ROM containing only those excerpts played in open court) and finding replication infeasible." *Id.*

In the thirteen years that have elapsed since *Providence Journal* was decided, the use of Sanctions (and other similar trial software) no longer is "cutting-edge," *id.*, but, rather, has become common-place. Moreover, the government amply has demonstrated its mastery of the process of editing, duplicating and presenting electronic evidence in this case. Because the formidable obstacles faced by the trial court in *Providence Journal* are not present here, the public's common law right of access—a right that "has been extended to accommodate technological advancements in document reproduction such as photography, photocopying, and the replication of videotapes and audiotapes"—applies in full force here to the movants' request to inspect and copy the videotapes played to the jury in this case. *Id.*

### C. The Public's First Amendment Right of Access

"This circuit, along with other circuits, has established a First Amendment right of access to records submitted in connection with criminal proceedings." *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 502 (1st Cir. 1989). Although movants respectfully submit that the First Amendment is an alternative ground on which their motion should be granted, they also recognize that the *Providence Journal* Court held that so long as members of the media were afforded ample opportunity to see and hear tapes as they were played at trial, the First Amendment right of access was satisfied. 293 F.3d at 16. One need not challenge that holding, however, to recognize, as have other courts, that "some of the same policy considerations" underlying the public's First Amendment access rights are appropriately considered when

considering a request to copy audio and video tapes presented to a jury in a criminal case. *See, e.g., United States v. Criden*, 648 F.2d 814, 820 (3d Cir. 1981). In both situations, "[t]he basis for this right is that without access to documents the public often would not have a 'full understanding' of the proceeding and therefore would not always be in a position to serve as an effective check on the system." *Pokaski*, 868 F.2d at 502.

The public interest in this trial, beginning with the jury selection process and continuing with the first days of evidence, underscores the truth of the statement made by the Supreme Court thirty-five years ago:

> When a shocking crime occurs, a community reaction of outrage and public protest often follows. . . . Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful 'self-help,' as indeed they did regularly in the activities of vigilante 'committees' on our frontiers. . . . To work effectively, it is important that society's criminal process satisfy the appearance of justice,' . . . and the appearance of justice can best be provided by allowing people to observe it.

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571-72 (1980) (citations omitted).

The work of this Court, and counsel for all parties, directly promotes these essential government interests. Granting movants' motion will further those interests, the very purpose of both the common law and First Amendment rights of access.

## CONCLUSION

For the foregoing reasons, movants request that the Court grant their motion for leave to inspect and copy trial exhibits entered into evidence at the close of each trial day.

Respectfully submitted,

**AMERICAN BROADCASTING COMPANIES, INC.; CBS NEWS, A DIVISION OF CBS BROADCASTING INC.; CABLE NEWS NETWORK, INC.; and NBCUNIVERSAL MEDIA, LLC**

By their attorneys,

/s/Jonathan M. Albano
Jonathan M. Albano BBO #013850
jonathan.albano@morganlewis.com
Emma D. Hall BBO #687947
emma.hall@morganlewis.com
**MORGAN, LEWIS & BOCKIUS, LLP**
One Federal Street
Boston, MA  02110-1726
Phone: 617-951-8000
Fax:     617-951-8736

Dated:  March 6, 2015

## CERTIFICATE OF SERVICE

I, Jonathan M. Albano, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 6, 2015.

/s/Jonathan M. Albano
Jonathan M. Albano