UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                               )
                               )
       Plaintiff,     )
                               )  Criminal Action
v.                      )  No. 13-10200-GAO
                               )
DZHOKHAR A. TSARNAEV, also  )
known as Jahar Tsarni,    )
                               )
       Defendant.     )
                               )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**LOBBY CONFERENCE - SEALED**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, March 12, 2015
3:18 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb and Aloke Chakravarty,
3              Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2        (Lobby conference as follows:)

3        THE COURT:  First, the view.  I understand from

4  talking with the marshals earlier that they're going to try to

5  plan it for first thing Monday morning, which I think is

6  optimal.  It gives the weekend to make the arrangements.  We

7  can all just go there for the first hour of the day and then

8  show up here and begin the trial at ten or ten-thirty.  And I

9  think there will be no public commotion as a result of that

10  process.

11        The question arises of the defendant's presence.  Does

12  he waive his presence at the view?

13        MS. CLARKE:  We have not talked to him about it

14  because we didn't know the arrangements and how that would

15  work.  Would counsel be sitting at tables there as if the

16  parties would in court?

17        THE COURT:  I wouldn't expect so.  I would expect

18  we'll be walking around.  It actually presents -- if he doesn't

19  waive it -- and it's up to him to decide that -- it might make

20  it difficult to do it on this schedule because of the

21  arrangements that would have to be made.

22        MS. CLARKE:  We haven't talked to him about it because

23  we were trying to figure out --

24        THE COURT:  Let us know tomorrow because if he doesn't

25  waive it, we may have to revisit it.  And I say that not to put

 1    a thumb on the scale, but just because I don't know that we can

 2    make the arrangements by Monday morning.

 3            MS. CLARKE:  Could we ask the marshals to hold him

 4    here -- because they're going to ship him back -- so we could

 5    talk to him?

 6            THE COURT:  How soon do they do that, in your

 7    experience?

 8            MS. CLARKE:  They have to kill us if they tell us,

 9    so...

10            THE COURT:  Right.  Okay.  But it's later.  It's after

11    everybody's gone away.

12            MR. CHAKRAVARTY:  We broke early today.  I mean, is it

13    something you can talk to him about now?

14            THE COURT:  Can you talk to him today?

15            MS. CLARKE:  Right.  I was going to see if --

16            THE COURT:  Oh, hold him here?  I'm sorry.  I thought

17    you meant hold him --

18            MS. CONRAD:  He's been staying here during the week

19    and then going back.

20            THE COURT:  That's what I took it to mean, going back

21    to --

22            MS. CLARKE:  I'm sorry.  If we could hold him back.

23            THE COURT:  I'm sorry.  Yes.  Okay.  So you might get

24    an answer sooner rather than later.  That's a logistical issue,

25    basically, okay?  So that was the first thing.  If we can go

1    forward with it, we'll just -- everybody can make whatever

2    transportation they want when we find the exact location, and

3    we'll just all show up there.  The jurors will go from their

4    staging position directly to the warehouse or the hangar or

5    whatever it is, and then come directly here.  And it

6    won't -- it will minimize the moving around.

7            I don't know what the government has provided to the

8    defense by way of upcoming witnesses and exhibits.  We didn't

9    get a copy this time.  I would like to get the next addition of

10   that publication.  And when will it be, tomorrow, you'll be

11   able to sketch out next week?

12           MR. WEINREB:  We'll certainly have the order of

13   witnesses tomorrow, and I would assume we would have the bulk

14   of exhibits.  Sometimes we make last-minute adjustments.  As

15   we're talking to them, we realize we left something out.

16           THE COURT:  Right.  Sure.  I understand that.  I'm

17   more interested in the identity of the witnesses.

18           MR. WEINREB:  That we can do.

19           THE COURT:  And we may be getting to a point on our

20   two-week time frame where the defense would be on the

21   same -- under the same obligation to disclose who might be

22   their first witnesses as we get to that point.  I'm not sure

23   where --

24           THE CLERK:  He's still here.

25           MS. CLARKE:  Thank you, Paul.

1          MR. WEINREB:  We think at this pace we will very

2    likely finish our presentation not by the end of this coming

3    week but sometime the following week.  So we would very much --

4          THE COURT:  Before the end of the following week?

5          MR. WEINREB:  We believe so.  I mean, it could be --

6          MR. CHAKRAVARTY:  Right around then.

7          MR. WEINREB:  It could be right around then.

8    Wednesday, perhaps.

9          So we would very much like witness and exhibit lists.

10         THE COURT:  For that week?

11         MR. WEINREB:  For that week.

12         THE COURT:  For the week of the 23rd?

13         THE CLERK:  The 23rd, right.

14         MS. CLARKE:  We have updated the exhibit list the best

15   we can so far, and we'll do our best.  The government's been

16   about half a day ahead of us -- ahead of the trial schedule

17   right now, so we'll try to do better than that.

18         MS. CONRAD:  We're not getting two weeks' notice;

19   we're getting maybe 12 hours' notice.

20         THE COURT:  All right.  Well, I don't know.  At any

21   rate --

22         MR. WEINREB:  For the first days of trial there was

23   two weeks' notice, then things started zooming ahead.

24         THE COURT:  Things have gone fast.

25         MR. WEINREB:  So we'll take the first two days of the

1   defense case, you know, as soon as possible, and then if things

2   zoom ahead in the defense case, we would understand.

3          THE COURT:  And a realistic up-to-date exhibit list?

4          MS. CONRAD:  I thought Bill sent something out

5   yesterday.

6          THE COURT:  It doesn't include any of the ones that

7   are in, they've already marked.

8          THE CLERK:  Tim sent me the digital -- the ones

9   that -- I think it was heavy on the digital exhibits, like

10  hundreds and hundreds.  That's what I got yesterday -- or this

11  morning I saw it.  I emailed -- I forwarded it up to chambers.

12         MS. CONRAD:  And I brought over the list of what we've

13  either admitted or --

14         THE CLERK:  Right, those four.  That's right.  But

15  that's it.

16         MS. CONRAD:  And then Tim said he talked to you about

17  putting together a list.

18         THE CLERK:  He's going to start putting a list

19  together but I don't know when I'm getting it.  He said he's

20  going to put it together --

21         MS. CONRAD:  He'll -- he's very good.

22         THE CLERK:  He's very good.  No question.

23         THE COURT:  Well, I want, you know, what you actually

24  expect -- there's two things:  Your gross list which you have

25  to identify, and then some indication of what will actually be

1   offered.  The ones that have been marked are not on the list

2   that we got yesterday, which was -- I guess it was dated

3   December 29th, but we got it for the first time in that email

4   yesterday or this morning.

5           MS. CONRAD:  I think, but I'm not sure --

6           THE COURT:  So it's not on file.

7           MS. CONRAD:  Well, I think it was docketed as

8   government's exhibit list.  We sent it whatever the date was.

9   I think if you look at the docket, it was actually docketed.

10          MS. CLARKE:  I don't think we filed it.  I think we

11  emailed it to government counsel for notice and promised to

12  email it to chambers, and may have glitched on that.

13          MR. CHAKRAVARTY:  Yeah, I'm not sure I've seen it as a

14  list.

15          MS. CLARKE:  Oh, yeah, you got that email back in

16  December.

17          THE COURT:  This is what we got as an attachment to

18  the email that Tim sent, I guess, today (indicating).

19          MS. CONRAD:  I don't think that's a new document.

20  It's a December document.

21          THE COURT:  It is dated December.  We're seeing it for

22  the first time today.

23          MS. CONRAD:  Right.  I got that, and that's our fault,

24  but we are intending to -- I thought someone was in the process

25  of updating that with what we've put in so far.

```
1            THE CLERK:  Tim is putting together an exhibit list

2    binder similar to what the government has been giving me to

3    keep it clear, and he said that was no problem, so...

4            MS. CONRAD:  We will get that out.

5            THE COURT:  A related question is for the upcoming

6    witnesses, whether there are pending motions that need to be

7    resolved with respect to their testimony.  We talked briefly

8    about the transmitter/receiver binding issue as one possible

9    witness.  I don't know if there are others.

10            MS. CONRAD:  There's Dr. King, there's --

11            THE COURT:  Right.

12            MS. CONRAD:  -- the 404(b).

13            MR. WEINREB:  Dr. King at this point is a penalty

14    phase witness.

15            MR. BRUCK:  Okay.

16            MR. WEINREB:  And the 404(b) that -- the government

17    does not intend to offer any of the information that was in the

18    404(b) notice intentionally.  I'm not sure exactly how to put

19    this.  Our main concern is that there are individuals who were

20    friends or associates of the defendant whose entire

21    relationship with him was -- revolved around smoking pot

22    together and sometimes selling pot together.  It's not clear to

23    me that any of them can coherently testify about their

24    relationship with the defendant without mentioning that.  We

25    can ask them to but it's hard -- it may be hard for them.
```

1    There will just be huge gaps in what they're discussing.  As

2    we've said, it's our view that it's not really 404(b) and it's

3    inextricably intertwined simply because the whole fabric of

4    their relationship was based on it.

5         But with respect to the other thing that was in the

6    404(b), which was Mr. Tsarnaev's reason for needing the weapon,

7    which was that he wanted to commit a robbery, we are not going

8    to elicit that unless the defense open that's door.

9         MR. CHAKRAVARTY:  There is a distinction between what

10   he said about what he was going to do and then what he said

11   had -- he had done, meaning actions that he was intending to

12   do, and that's the purpose for why he was acquiring the gun,

13   versus the potentially prejudicial aspect of him having

14   committed other crimes.

15        MS. CONRAD:  Well, I'm confused now because I thought

16   I heard Mr. Weinreb say they're not putting anything in about

17   him saying he wanted the guns to commit a robbery, and then I

18   heard Mr. Chakravarty hear they are.

19        MR. WEINREB:  Well, Mr. Weinreb may not know what he's

20   talking about so I'll defer to Mr. Chakravarty.

21        MS. CONRAD:  So I would like to know which it is

22   before --

23        THE COURT:  Yeah.  Yeah.  Well, go ahead on that.

24        MR. CHAKRAVARTY:  So as a proffer in broad strokes as

25   to what Mr. Silva would say about that is that Mr. Tsarnaev

1    asked for a gun, he gave a reason why he needed a gun.  Whether

2    that was true or not -- and, you know, the point is that he

3    imparted some knowledge to Mr. Silva that would convey why he

4    needed a gun.  It happened to be, he said, he wanted to do

5    essentially a robbery of some guys in a marijuana deal.

6    Whether that is true or not is irrelevant.  It does -- and

7    whatever that reflects on Mr. Tsarnaev is simply that he gave a

8    reason why he needed a gun.

9         The risk is that if we don't elicit that, is that it

10   seems like this was -- it was both purposeful and that

11   Mr. Silva somehow knew what he -- what Mr. Tsarnaev was

12   intending to do with the gun as opposed to this other reason.

13   After some time Mr. Tsarnaev allegedly reported back to

14   Mr. Silva that he had actually used a gun to engage in the rip,

15   and that's the information which we think both reflects on his

16   other bad conduct.

17              THE COURT:  When was that?

18              MR. CHAKRAVARTY:  That was in about February of 2013.

19              THE COURT:  Using some lingo, he used it in a robbery

20   of some customer or dealer --

21              MR. CHAKRAVARTY:  Correct.

22              THE COURT:  -- in February of 2013?

23         And he reported that to Silva when?  Shortly

24   thereafter?

25              MR. CHAKRAVARTY:  Shortly thereafter.

1          MS. CONRAD:  May I address this?

2          THE COURT:  Yeah.

3          MS. CONRAD:  So first of all, it's 404(b) and it's

4     certainly 403, but more importantly, there's absolutely no

5     corroboration of this.  And Mr. Chakravarty obviously

6     recognizes that when he says "whether it's true or not."

7          Now, I understand if I open the door to this by

8     saying, "Well, did he tell you that he was going to use it for

9     the Boston Marathon bombing?" then maybe then it comes in, but

10    it's certainly not my intention to do that.  And if

11    Mr. Chakravarty wants to lead on that by saying he didn't say

12    he was going to -- anything about the Boston Marathon bombing,

13    I'm fine with that.  But to put in this totally

14    uncorroborated -- you know, "I want the gun for -- to do a drug

15    robbery," it seems to me is 403.

16         THE COURT:  Wouldn't you rather have the jury think

17    that than that he wanted it for the marathon events?

18         MS. CONRAD:  Well, your Honor, quite frankly, not

19    to --

20         THE COURT:  If there's no information about it, that's

21    what they're going to think.

22         MS. CONRAD:  Well, our theory is that that's what

23    happened, he did it at the direction of his brother.  So, yeah,

24    I guess -- you know, we don't think that he told Silva, you

25    know, I'm going to go do this -- and I'm certainly not going to

1    suggest, "Oh, he asked for a gun?  Why didn't you go running to

2    the police and say he was going to do the marathon bombing?"

3    And if the government is trying to counteract that -- so the

4    short answer to your question, your Honor, is no.

5             THE COURT:  Yeah.  Well, I guess it's your risk.  I

6    mean, if there's nothing about another purpose and he goes to

7    somebody to get a gun two months before the marathon, the jury

8    is going to think that's why he got the gun.

9             MS. CONRAD:  It's not about why he got the gun, it's

10   about what he told him about why he got the gun, and I think

11   that's irrelevant.

12            MR. WEINREB:  Your Honor, I think it's also fair to

13   say that the reason that he gave for needing the gun, the

14   reason he gave to Mr. Silva, says something about their

15   relationship with one another that is important for the jury to

16   know.  So it's independently relevant.  It has nothing to

17   do -- we're not saying he's a robber of drug dealers, and,

18   therefore, he's guilty of the marathon bombings; we're saying

19   he asked Mr. Silva for a gun and he gave a reason that was

20   sufficient for Mr. Silva to get him a gun.

21            This is a story that is going to depend on the jury

22   believing Mr. Silva.  And for them to believe it, they have to

23   believe that this is something that plausibly could have

24   happened.  And the reason he gave was something very plausible

25   to Mr. Silva, that's why he gave him the reason.  If we just

1   don't mention any reason, it may seem preposterous to them,

2   so...

3           THE COURT:  Go ahead.

4           MS. CONRAD:  There certainly would be evidence, and we

5   would need to confer, but, you know, I think in terms of

6   evidence that Mr. Tsarnaev smoked pot, you know, we don't have

7   any issue with that coming in and we think it is going to come

8   in.  I think there's even going to be evidence -- or, you know,

9   I think the issue with respect to whether he sold pot, in fact,

10  sold pot with Stephen Silva and his brother, don't have a

11  problem with that.  And my colleagues and co-counsel can tell

12  me later that -- or even right now that they disagree with me

13  on that.

14          But I don't think it's credible, frankly, that he told

15  Silva that he wanted it to commit robberies.  Silva much after

16  the fact admitted to the government that he himself had

17  committed robberies.  There's no independent evidence that

18  Jahar ever committed robberies.  So in terms of the aspect of

19  403 about confusion, waste of time and so forth -- I mean, you

20  want to talk about credibility, I think it raises more

21  questions about Mr. Silva's credibility if he testifies -- and

22  we'll leave, frankly, for further cross-examination on that

23  point -- if he testifies that "he told me he wanted it for a

24  drug robbery."

25          The fact that they were both selling drugs at various

1  times here makes it plausible that he might ask for a gun

2  without the explanation about robberies, which he's never told

3  him about committing in the past.

4        THE COURT:  Okay.  My initial question is what has to

5  be resolved before next week, and now I think I know.  But let

6  me just say:  This doesn't sound like 404(b) at all; it sounds

7  like 403, pure and simple.  Either it's prejudicial because

8  it's irrelevant -- it's not plan preparation, knowledge, all

9  those -- the string of things in 404(b), it's not offered

10 for --

11       MS. CONRAD:  It doesn't have any special relevance.

12       THE COURT:  But it's relevant as part of the story, if

13 it is relevant.  That's all I'm saying.  402, 403, I don't

14 think -- I'm just isolating it --

15       MR. WEINREB:  It's not a prior bad act.

16       THE COURT:  Right.  You're not offering it under a

17 special relevance aspect of 404(b).

18       MS. CONRAD:  Unless the government seeks to put in, as

19 I believe they had previously, his after -- allegedly

20 after-the-fact statement that he had actually committed

21 robberies, in which case it would be 404(b), pure and simple.

22       THE COURT:  No, I don't -- no, it's not.  It doesn't

23 mean they have to put it in, I'm just saying it's not a 404(b)

24 situation.

25       MS. CONRAD:  Can we at least be clear that they are

 1    not going to attempt to put that in no matter what your Honor

 2    rules about the first part of it?  They're not going to put in

 3    evidence that Mr. Tsarnaev told Silva that he, in fact, had --

 4              THE COURT:  No, I haven't decided that yet.

 5              MS. CONRAD:  I thought Mr. Chakravarty said he wasn't

 6    going to put that in.

 7              MR. CHAKRAVARTY:  It's our present intention not to

 8    put that in but, you know, things change over time.  We don't

 9    know how you're going to ultimately deal with your

10    cross-examination --

11              MS. CONRAD:  If I don't open the door, is the

12    question.

13              MR. WEINREB:  We don't want to pre-commit given what

14    we're hearing here.

15              THE COURT:  Okay.

16              MR. WEINREB:  There is one other thing that we would

17    very much like to have resolved, and that is the issue of the

18    DNA evidence.  And the reason for that is that we have an

19    expert, Jen Montgomery, who is a state police expert.  She's

20    the one who did the initial test.  She's the one who will offer

21    the evidence that Sean Collier's blood was found on the outside

22    of the glove.

23              But the expert who did the further analysis of the

24    mixture of DNA that was on the inside of the glove is a doctor

25    named -- a scientist named Mark Perlin.  He is an out-of-state

1     paid expert who we would have to, you know, give advance notice

2     to get him here at the appropriate time, we'd have to pay him.

3     If there's a *Daubert* hearing, he'd have to be here in time for

4     that, then he would also have to be here to testify and so on.

5           My understanding of the Court's ruling was that the

6     government was precluded from putting him on about the Jahar

7     Tsarnaev DNA in the glove because it wasn't sufficiently

8     probative, so when we asked if that same logic would preclude

9     evidence about the Tamerlan Tsarnaev DNA on the inside of the

10    glove, it seemed like the Court was sort of reserving on that

11    or wasn't sure.

12          THE COURT:  No, I didn't know whether it was going to

13    be offered, that's all.  I would think it would be the same.

14          MR. WEINREB:  It would be the same?

15          THE COURT:  It would have the same linkage problem.

16    Without a temporal connection, you couldn't tell that Tamerlan

17    deposited his DNA the night of the murder or whatever either.

18    I think it goes both ways.  To the extent I was reserving, it

19    was because I wasn't clear that there was going to be a

20    suggestion that somebody would try to put that in.

21          MS. CLARKE:  There was a question of opening the door.

22    That's how it was left.

23          THE COURT:  Right.  Right.  So I see it as I guess you

24    say you do, which is if it didn't prove one, it doesn't prove

25    the other.  I think it has the same problem on both sides

 1    without some additional evidence that would put a temporal

 2    connection to it, that's all.

 3           MR. WEINREB:  So with that understanding, we're not

 4    going to have Mr. Perlin here.

 5           THE COURT:  Okay.

 6           MS. CONRAD:  May I just inquire, your Honor, about the

 7    procedure for the view?  Because having done them both in state

 8    court and federal court and also having seen the boat, I think

 9    we all have -- you know, usually in a view you walk around and

10    you say, "Look at this," "look at this," "look at this."

11           THE COURT:  Right.

12           MS. CONRAD:  Each juror is going to be going up,

13    presumably, individually on a lift?

14           THE COURT:  Either individually or in small groups.

15    It depends on how big the lift is.  When I looked at it, there

16    were three of us that went up in the lift.

17           MS. CONRAD:  And then I'm not sure how we're going to

18    be pointing things out in that scenario unless we have some

19    kind of presentation beforehand or something or maybe -- I

20    don't know.

21           MR. WEINREB:  Well, your Honor, I think that raises

22    the question in part of what the purpose of this view is.  I

23    mean, the Court could easily direct the jurors' attention to

24    where the writing is.  My understanding was the purpose of the

25    view was to give context for this writing.  You know, there's

1    another part of the boat that I'm sure is -- the defense is

2    interested in pointing the jurors' attention to which is all

3    the bullet holes in the boat.

4            THE COURT:  That's what I assumed.

5            MR. WEINREB:  Those all came in long after that

6    writing was in place and it doesn't give any context to the

7    writing because it happened, you know, well before -- he

8    couldn't have been where the writing was or he wouldn't be

9    alive today, so it is quite clear that he wasn't there.

10           THE COURT:  This occurred to me on the spot so I don't

11   know how good a thought it is, but perhaps you could each, if

12   you wanted, specify particular features of the boat that should

13   be directed to their attention and I could do that.  I could

14   say, "As you look at the boat you may want to pay attention to

15   the bow, you might want to pay attention to how wide the boat

16   is," and so on.  You could have a list of some things.  And

17   then counsel would say nothing, basically, having given me the

18   list, something like that.

19           If we did that in advance of anybody going up on a

20   lift or anything like that, they would all have it in mind.  I

21   anticipate they would have their notebooks with them if they

22   wanted to jot a note about something.

23           MS. CLARKE:  They'll hear testimony later, so...

24           MR. CHAKRAVARTY:  So the issue that raises, whatever

25   the Court is directing them to is essentially an imprimatur of

1    the relevance of whatever that is.

2         THE COURT:  No, I don't think so.  I could say "the

3    parties have requested that you pay attention to the following

4    items."  I mean, it's inherent in any view, you know.  You

5    know, I direct the jurors' attention to the angle from the

6    second floor window down to the street, you know, that suggests

7    the relevance of that angle.  But that's why you take a view.

8    So I don't think it gives any stamp of approval, particularly

9    if it's a joint list.

10        MS. CLARKE:  May I ask if the wood with the

11   scratched-out writings is back in the boat?

12        MR. CHAKRAVARTY:  It's not in the boat.  It's been

13   taken out of the boat.

14        MS. CLARKE:  So it probably should be replaced into

15   the boat.  There is a piece of wood where there was

16   scratched-out words.

17        MR. CHAKRAVARTY:  Then we'll be putting all the

18   evidence back into the boat.

19        MR. WEINREB:  I don't think we should be putting the

20   evidence back into the boat.  They won't be in exactly the same

21   place they were in when they were seized.  Something that was

22   removed from the boat, I think that's --

23        MS. CLARKE:  It's just a writing, that's all.

24        THE COURT:  What is it?

25        MR. WEINREB:  Part of the writing that was in the

1    boat, most of it's on the inside wall of the boat, but there

2    were also wooden slats in which the defendant essentially

3    carved a writing.  And it's the one that says, "Stop killing

4    our innocent civilians and we will stop."  Those sections were

5    physically cut out of the boat two years ago and taken down to

6    the FBI lab in Quantico.  There's no problem with us

7    bringing -- we're happy to bring them into court if the jurors

8    want to see them, but to try and put them back in where they

9    were --

10              THE COURT:  Yeah, I think that's sufficient.  If

11   they're an issue, they can be seen here, okay?

12              MS. CONRAD:  There is one final issue, your Honor.

13   The other day when the government put in the Whole Foods video,

14   it hadn't occurred to me that -- until I think it was Agent

15   Fitzgerald was asked, you know, "Did you receive information

16   that the defendant Tsarnaev had gone to Whole Foods" and he

17   said "yes," that was something that was Mr. Tsarnaev's hospital

18   statement, that he'd gone to Whole Foods.

19              The government said it would not put the statements in

20   during its case-in-chief.  I haven't had a chance to go back

21   and look at this again, my memory's a little dim in terms of

22   what the law is on fruits, but the issue of voluntariness of

23   those statements was never resolved.

24              Now, Mr. Chakravarty in response to an inquiry I had

25   today told me that the source of the information for

1     the -- that they had gone to the Whole Foods was not

2     Mr. Tsarnaev, even though the timing -- the chronology lines up

3     that way, but some independent tip which I'm not aware of.  We

4     probably have it on our database of tips but hasn't been

5     pointed out to me.

6            My point is simply this:  Because the issue of

7     voluntariness has not been resolved, the issue of fruits

8     remains potentially a live one unless the government can show

9     inevitable discovery, independent source and the like.  We

10    don't necessarily know as evidence is coming in what the source

11    of that evidence is.  We had assumed, based on the fact that

12    the search warrants were issued before the hospital

13    statements -- or the bulk of the search warrants were issued on

14    April 19th before the hospital statements were taken, that they

15    were not fruits.  But this Whole Foods business gives us pause.

16            And I asked Mr. Chakravarty, and I want to put on the

17    record, that to the extent the government is offering evidence

18    that was derived from information provided by Mr. Tsarnaev, the

19    issue of voluntariness may be joined and should be, we think,

20    addressed before that evidence is intro- -- admitted.  The only

21    point of this is to simply ask that some notice be provided so

22    to give us an opportunity to raise the issue before the cow is

23    out of the barn -- horse is out of the barn, whatever the

24    expression is.

25            THE COURT:  Chickens, maybe.

1              (Laughter.)

2              MS. CONRAD:  You notice I looked at Mr. Bruck to see

3      if I got that right.  I'm not so big on farm analogies.

4              MR. BRUCK:  I'm apparently the font of farm wisdom.

5              MR. CHAKRAVARTY:  So first, in preparation with

6      Mr. Fitzgerald when he told me about this tip, he made it clear

7      that it was somebody else entirely.  My understanding is he

8      doesn't even know about what was said in the hospital

9      statement.  And his communications with the investigator is --

10     when it happened was based on what this other evidence, or this

11     tipster, what information that person had.

12             THE COURT:  As long as that person didn't have it from

13     the statement.

14             MR. CHAKRAVARTY:  And that person -- he named a

15     civilian witness who was not involved in the investigation, so

16     in this case it's a nonissue entirely.  But it raises the

17     broader issue of the defense raising post fact, either now or

18     on appeal, by mining the defendant's hospital statement and

19     trying to find anything that overlaps with evidence that the

20     government has presented as somehow creating some obligation

21     for the government to identify pre-presentation of evidence of

22     something that -- for which they could preserve better.  That's

23     not our job, that's theirs, and they should do that at or near

24     the time of the admission of evidence.

25             MS. CONRAD:  But we don't know what the source is

1   especially on the -- I did not -- I was taken aback.  I hadn't

2   really thought about how -- how the FBI got to the Whole Foods

3   video in the first place until he said, "I got information."

4   When you say "from a civilian witness," you know, it sounded to

5   me more like he got information from another FBI agent who

6   could have gotten it either from a civilian witness or from the

7   defendant.  And we can't just sit there and look at every piece

8   of evidence and try to guess.  And if we did that, if we

9   followed Mr. Chakravarty's preferred procedure, that means

10  before any piece of evidence conceivably is introduced, we have

11  to stand up, go to sidebar and object because it might be a

12  fruit of the defendant's statement.  And I don't think unless

13  it was obtained before the defendant's statement was made, I

14  don't think that that's a very efficient or sensible solution.

15          MR. CHAKRAVARTY:  Well, here it wasn't even being

16  offered for the truth; it was just being offered to say why he

17  did this analysis.

18          THE COURT:  I think you just have to be -- in light of

19  this, particularly sensitive to the source of that kind of

20  information, that it does not trace back to those statements.

21          MR. CHAKRAVARTY:  We have been diligent throughout.

22  But as Ms. Conrad suggests, for example, that search warrants

23  were all done on the 19th, before those statements were made,

24  that's actually not true.  There were dozens of search

25  warrants, many of which went into May and beyond, and we have

1    evidence derived from those, in none of those search warrants

2    did we ever put information that was derived from those -- the

3    hospital statements.  But this is my point, that some of the

4    subsequent law enforcement actions that were not derived or

5    dependent upon those statements still might be prone to this

6    kind of opportunistic attack.

7            MS. CONRAD:  That was not my point.  My point was that

8    we looked at the search warrants and confirmed that they were

9    not based on the statement.  I am excluding the search warrants

10   because those documents -- the bases and the sources for the

11   information.  I was not saying we need to go back to the search

12   warrants.  So I'm sorry that it --

13           THE COURT:  This sounds like it may be a hypothetical

14   problem.

15           MS. CONRAD:  It would be helpful if the government

16   could provide some documentation of the tip that was -- even

17   redacted that was underlying the Whole Foods.

18           THE COURT:  I don't think that's necessary under the

19   present circumstances.

20           Let me go over two other matters.  With respect to the

21   12.2(b) issue, I would like as part of a determination whether

22   good cause exists to permit a late filing a rather detailed ex

23   parte proffer of the probative value of the medical evidence so

24   I can assess whether this is something strong or weak, I guess

25   is the best way to put it.  That may affect my decision on

```
 1    whether to allow a late filing.  So sooner rather than later,

 2    but I don't know how unreasonable any possible time period

 3    would be.

 4              How -- early next week?

 5              MS. CLARKE:  Sure.

 6              THE COURT:  What's early next week?

 7              MS. CLARKE:  Well, we'll just do it -- we've been

 8    pretty good on meeting your deadlines, contrary to what we are

 9    constantly accused of, but we'll shoot for Monday or Tuesday if

10    we can.  Is that all right?

11              THE COURT:  Yes.  By Tuesday at the latest, and then

12    we can move on that and decide.

13              Trivial -- well, not trivial, but minor, I guess,

14    rather than trivial.  The lease that was just put into

15    evidence, I think should be redacted.  It has some personal

16    information, it occurs to me.

17              MR. CHAKRAVARTY:  Thank you.  We'll do that.

18              MS. CONRAD:  I also thought the bank account number.

19              THE COURT:  Yeah, and the bank account number.  He

20    probably doesn't have that bank account anymore.

21              MS. CLARKE:  Or perhaps not made public.

22              THE COURT:  But in any event, you should review his

23    info.  Some of that was pretty identifying.

24              MS. CONRAD:  I wasn't sure if that was his residential

25    address or his work address.
```

1          THE COURT:  It looked like a residential address.

2          MS. CONRAD:  It did, but then it said Kendall Square,

3     and maybe he lives near his workplace.

4          THE COURT:  Anyway.  Okay?

5          MR. WEINREB:  All right.

6          THE COURT:  Thank you.

7          (The proceedings adjourned at 3:50 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  3/13/15
13

14

15

16

17

18

19

20

21

22

23

24

25
```