UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                             )
        Plaintiff,       )
                             )  Criminal Action
v.                       )  No. 13-10200-GAO
                             )
DZHOKHAR A. TSARNAEV, also   )
known as Jahar Tsarni,      )
                             )
        Defendant.       )
                             )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY THIRTY-ONE
EXCERPT
<u>TESTIMONY OF CHAD FITZGERALD</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, March 11, 2015
9:51 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3             Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad and Timothy G. Watkins,
10        Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | |
| CHAD FITZGERALD | | | | |
| By Mr. Chakravarty | 4 | | 71 | |
| By Ms. Conrad | | 52 | | 79 |
| VOIR DIRE BY MS. CONRAD | 46 | | | |

E X H I B I T S

DEFENDANT'S

| EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 2 | T-Mobile Call Detail Record | | 60 |
| 3 | Phone extraction records for Tamerlan Tsarnaev | 78 | |
| 4 | AT&T records | 78 | |

P R O C E E D I N G S

\* \* \*

1
2
3    MR. CHAKRAVARTY:  The government calls Chad
4    Fitzgerald.
5                    CHAD FITZGERALD, duly sworn
6        THE CLERK:  Have a seat.  State your name, spell your
7    last name for the record and speak into the mic so everyone can
8    hear you.
9        THE WITNESS:  Okay.  Chad Fitzgerald,
10    F-I-T-Z-G-E-R-A-L-D.
11                    DIRECT EXAMINATION
12    BY MR. CHAKRAVARTY:
13    Q.   And can you tell the jury where you're employed?
14    A.   The Federal Bureau of Investigation, or the FBI, out of
15    Atlanta.
16    Q.   Are you a special agent there?
17    A.   I am.
18    Q.   How long have you been with the FBI?
19    A.   A little over 18 years.
20    Q.   And what is your current assignment?
21    A.   I'm assigned to the Cellular Analysis Survey Team, or
22    CAST.  Our responsibilities include interpreting and analyzing
23    cell phone data as it's received from the different service
24    providers like the AT&Ts and Verizons.  And we primarily work
25    on -- we were put in place for child abductions, so we do a lot

1    of -- kind of like a fly team for that, but we also, day to

2    day, do -- help out in local investigations and prosecutions

3    such as murders, robberies.  We do bank robberies with the FBI

4    too.

5    Q.   Now, how did you start working on this team?

6    A.   The team started kind of ad hoc several -- about -- I'd

7    say in the neighborhood of eight years ago, and then we became

8    an official unit about five years -- five, six years ago.  So

9    we were kind of born out of the fugitive and robbery

10   investigations.  A bunch of us were doing phone analysis.

11   Q.   Have you received any special training?

12   A.   I have, yes.

13   Q.   Would you describe that?

14   A.   Going back to school, I have a master's in electrical

15   engineering specializing in communication systems, and since

16   then, being part of this unit, we have been -- we go to

17   training and we meet quite frequently with the different

18   providers in the United States, you know, the Sprint, AT&T,

19   Verizon, Metro PCS and Cricket.  I'm sure I'm leaving one out

20   there.  But we meet with them, both subpoena compliance and the

21   engineering side, plus we go to specialized training for people

22   that work in that industry, different companies that provide

23   training to the cellular industry and others.

24   Q.   When you say "provide training," what types of aspects of

25   their businesses do you discuss with them?

1    A.   We do both how they maintain their records, but we're also

2    on the side of how their systems are designed -- how the

3    cellular systems are designed and meant to function, everything

4    from RF, radio frequency, to drive testing their networks and

5    how their network is maintaining the records and whatnot.

6    Q.   Before joining the FBI, did you have a technical

7    background at all?

8    A.   I did, yes.

9    Q.   What was that?

10   A.   My prior employment was Hughes Aircraft Company.  I worked

11   as an engineer there doing satellite -- we -- the unit I was

12   assigned to designed hardware for communication to satellite --

13   command to control of satellites, both commercial -- I mostly

14   worked on the commercial side, but we also had defense

15   satellites, and then I also, before that, have worked at IBM in

16   technical as well as in TV as an engineer.

17   Q.   And what's your education?

18   A.   I have a master's in electrical engineering.

19   Q.   Now, do you also perform trainings yourself?

20   A.   Yes, we -- part of our unit goes around the United States

21   training detectives, police departments, prosecutors.  We've

22   had -- we also go overseas and help train investigators

23   overseas just on techniques and methodologies they can use to

24   analyze phone records.  I think to date we've trained somewhere

25   in the neighborhood of 6,000.  I did about 100 about two weeks

1    ago myself.

2    Q.   And when you provide training, what kind of training do

3    you do?

4    A.   Just how we -- in our -- in the CAST unit how we -- what

5    we've done, how we've taken our practical experience as well as

6    our training with all the different providers and the cell

7    technology and we just kind of merge it into a fairly basic

8    two-day class where we teach people the methods we use and the

9    successes we've had using those methods.

10   Q.   And what's the ultimate point of this CAST -- the CAST is

11   the group that you -- the team that you're with.  Is that

12   right?

13   A.   Yes.

14   Q.   What is the ultimate addition to the arsenal of tools that

15   this offers to the FBI?

16   A.   It gives an interpretation for cell phone data.  So

17   somewhere in the neighborhood of more than -- it's 100 to 105

18   percent of the American population has a cell phone, so that's

19   a very strong tool to be able to exploit when you can receive

20   records.  And all the companies do it slightly different, and

21   we just help with that.  And it can be quite voluminous, so we

22   just help with techniques to analyze that information and

23   interpret it into, you know, where people can understand it and

24   see what's going on.

25   Q.   And is one of the functions of that kind of telephone

1    analysis to do what we call a cell site location?

2    A.   Yes.  So we do cell site analysis.  So the companies have

3    to know -- just by the nature of their business, they have to

4    know the general area of where their phone users are located to

5    deliver and allow them to make calls, and we can take that data

6    and determine the general geographic area of where a phone is

7    located.

8    Q.   Now, have you performed that type of analysis in many

9    other cases?

10   A.   Of course, yes.  All the time.  Every day.

11   Q.   About how many cases would you estimate you personally

12   have conducted that kind of analysis?

13   A.   I look at phone records every day.  I mean, it's

14   definitely in the thousands, I'm sure.

15   Q.   And do you use various technical tools to help you filter

16   through this volume of information?

17   A.   Yes.  So we have a couple of tools we've created on our

18   own with the help of computer programmers as well as just

19   basic, like Micro- -- that people would be familiar with,

20   Microsoft Excel, Google Maps or Google Earth.  We also use

21   Microsoft MapPoint, which is the mapping program.  So

22   everything from that on up to custom software that we've

23   developed.

24   Q.   Now, on occasion do you collaborate with other members of

25   this CAST team, the cell analysis team, in order to analyze

1  telephone data in a particular case?

2  A.   Yes.  So like I mentioned earlier, we're a pseudo fly

3  team.  So if there's a child abduction somewhere in the United

4  States that -- we get involved in quite a bit of those, we will

5  routinely fly either individually or a lot of times as a group

6  to provide coverage and work as a team on the -- you know,

7  there's a lot of records coming in in those, as well as like in

8  this case, we flew up here as soon as we got -- you know, as

9  soon as we knew that we were going to be needed up here.

10  Q.   When there's a large volume of data, do you separate roles

11  within the team and different people handle different types of

12  analysis?

13  A.   Yes.  So we have -- there will be different assignments

14  within the team to help get through all the data as well as

15  there's also kind of a peer-checking function too where we

16  might be working on the same thing but checking our work also

17  of each other.

18  Q.   And have you testified in various courts around the

19  country about this type of cell site analysis?

20  A.   Yes, this is the third time in the last week -- the

21  third -- about eight -- between last week and this week, this

22  is the third time in different states -- three different

23  states.

24  Q.   Is that fair to say that's a pretty regular pattern for

25  you?

1    A.    Not -- that's quite a bit, but it definitely -- we fly

2    around and testify a lot in state court, some federal court.

3    But definitely a lot of state court cases.  Yes, it's a

4    routine.  That's part of the nature of our assignments.

5    Q.    And so were you asked to conduct a cellular telephone

6    analysis in this case?

7    A.    I was, yes.

8    Q.    And were you involved with a portion of the investigation

9    back in April of 2013?

10   A.    I was.  I came here fairly quickly.

11   Q.    Okay.  And was the CAST team deployed to Boston to assist

12   in the investigation?

13   A.    Yes.  There were several members here -- both assigned

14   members and people that we have in training, both came here.

15   I'm not sure -- when I was here I think we had somewhere in the

16   neighborhood of five to six people on CAST, and then we got

17   relieved with another wave of people after about a week or so.

18   Q.    And particularly with regard to what your analysis was for

19   presentation to the jury, is that a small subset of all of the

20   analysis that was done over the last two years?

21   A.    Absolutely.  I mean, this is pared down to keep it -- try

22   to keep it somewhat simple.

23   Q.    In preparation for your testimony, did you prepare

24   any -- a presentation for the jury?

25   A.    I did, yes.

1        MR. CHAKRAVARTY:  Just for the witness, your Honor,

2    I'd call up Exhibit 1440.

3    Q.   Do you recognize this?

4    A.   Yes, that's the first page of my presentation I created.

5    Q.   And would this presentation assist you in presenting your

6    testimony to the jury?

7    A.   I hope.  That's the purpose of it.

8        MR. CHAKRAVARTY:  I'd move and publish Exhibit -- move

9    into evidence and publish Exhibit 1440.

10       MS. CONRAD:  There's multiple pages, your Honor.  I

11   don't have an objection to it being a chalk, but I think the

12   foundation for the individual --

13       THE COURT:  It seems more a chalk to me without

14   knowing what's in it.

15       MR. CHAKRAVARTY:  So --

16       THE COURT:  Will it illustrate his testimony?  Is that

17   what it does?

18       MR. CHAKRAVARTY:  It will illustrate his testimony.

19   The government would move it into evidence, but perhaps that

20   foundation can be made during his testimony.

21       THE COURT:  We'll defer on that, then.  So we can

22   expose it now, as he testifies, to the jury as a chalk?

23       MS. CONRAD:  Yes.  No objection to that, your Honor.

24       THE COURT:  All right.

25   BY MR. CHAKRAVARTY:

1    Q.    Mr. Fitzgerald, is that the symbol of your CAST team?

2    A.    Right.  That's our logo, I suppose.

3          MR. CHAKRAVARTY:  Page 2, please.

4    Q.    What are these?

5    A.    So this is just a photo that I took of a fairly standard

6    cell tower.  This is what your phone is ultimately

7    communicating with.  There's antennas mounted at the top

8    of -- can I draw on this?

9    Q.    Yes, that's a touch screen.  If you just push with the pad

10   of your finger.

11   A.    So there's antennas mounted at the top of these triangular

12   structures, are mounted to those triangular structures and

13   pointed in different directions.  And that's ultimately what

14   your phone is monitoring.  So as my phone sits in my pocket,

15   it's in idle mode, not necessarily doing anything.  It's just

16   monitoring the air to see what the strongest, clearest signal

17   is.  Typically, it can see multiple different towers, multiple

18   different sectors, which I'll get to.  But ultimately, they're

19   communicating with these antennas that are antennas that are

20   mounted at the top of this structure.

21         Those antennas are attached or connected to equipment at

22   the base of this tower, and from there that equipment at the

23   base of the tower is then connected to a switch which is kind

24   of the brains behind the operation.  It connects to hundreds,

25   if not thousands, of towers and sectors, and from that switch

1  connected to the rest of the network, Verizon, AT&T network,

2  and then connected to the rest of the world.  So I can make and

3  receive a call through that general infrastructure.

4  Q.   Is that just a regular radio frequency signal that is

5  going through the --

6  A.   Right.  So each tower is putting out a signal.  And like

7  my phone is only programmed to speak to, you know, a certain

8  set of towers.  So my Verizon phone is -- it's no different

9  than a language -- is speaking the Verizon language and only

10  looking for Verizon towers; the AT&T phone is only going to

11  speak to AT&T towers.  So they're programmed for certain

12  languages.

13      So like in this instance this particular tower, which is

14  fairly standard, there's multiple layers of antenna on top of

15  it, and, you know, it can be just one company or it can be

16  multiple companies co-located on the same structure.

17  Q.   And so how does the cell phone communicate with these

18  towers?

19  A.   Well, so my phone will monitor the air and kind of rank

20  the strongest, clearest signal.  When I dial a number, hit the

21  green button or hit the send button, my phone will request

22  services from that strongest, clearest signal.  So a lot of

23  times I equate it to the teacher-student relationship in a

24  classroom.  If the tower is the teacher, and there's several

25  students in the classroom, would be the mobile phones, when my

1    phone wants to make a call, the student is going to raise -- or

2    ask a question, he's going to raise his hand, and when the

3    teacher is ready, the teacher will call on the student.  My

4    phone will ask for services saying it needs to make a call,

5    send a text.  The tower will then grant services to that

6    mobile, and that's when a record is generated, once those

7    services are granted.

8    Q.   Okay.  And once the tower gets the call, just for the

9    benefit of the jury, how does the call get to its ultimate

10   destination, just in summary?

11   A.   So like I said earlier, there's equipment attached to

12   those antenna at the top of the tower.  There's equipment at

13   the base of the tower typically, and that is connected to

14   switches.  The switch will then connect out to the rest of the

15   network and ultimately to the rest of the world when I dial a

16   number, or on the reverse, when a number is coming in -- a call

17   is coming in.

18   Q.   And do telephone companies keep records of when their cell

19   towers connect with cell phones?

20   A.   Yes.  So for every user on their network, they maintain a

21   record.  They have to for the nature of their business.  Like I

22   mentioned earlier, they have to know generally where you are to

23   deliver a call to you, and they have to know what piece of

24   equipment you're communicating through so that they cannot only

25   allow you to deliver -- you know, make a call, but also once

1    you're in that call, they need to know generally where you are

2    so they can keep your call connected as you're moving around,

3    you know, the city, the United States.  They have to hand off

4    from tower to tower, sector to sector.  They also -- what's

5    most important to them, they need to know how much you're

6    utilizing their services so they can bill you appropriately

7    each month.

8    Q.   And so how are cell towers designed?

9    A.   They're designed -- so every cell provider only has a --

10   set bands that it can operate in.  So the FCC, so the federal

11   government, you know, restricts them to a certain area that

12   they can operate in.  They have to be able to -- that's a very

13   specified area, so they have to make use of that as efficiently

14   as possible so that they can provide service to more people.

15        So a lot of times -- very common, you'll see that in very

16   densely populated areas, like the city of Boston, they'll put

17   towers very close to each other so that they can handle more

18   subscribers on each tower.  They will also further divide those

19   towers up into sectors.  So just think of if, you know, we

20   ordered a pizza -- there were three of us that ordered a pizza

21   and we wanted to cut it into three equal shares, or if we had a

22   pie or a cake and we wanted to have three equal shares, that's

23   the same thing they're doing with these towers.  They'll

24   sectorize it so they can support more subscribers.

25        I think that answers your question.

1   Q.   So typically they're sectored off in 120-degree pie

2   shapes?

3   A.   Right.  So if you -- the most common would be three

4   sectors.  And if you think of a 360-degree circle divided by

5   three, in theory you would have a 120-degree sector, you know,

6   on paper.

7            MR. CHAKRAVARTY:  If we could go to the next page.

8   Q.   What does this slide show?

9   A.   So like I was mentioning earlier, every phone is

10  programmed to speak a certain language, so -- and the towers

11  have different companies mounted on them.  So a lot of people,

12  when they see a tower across the street and they're wondering

13  why they're not getting service, it doesn't -- if I'm carrying

14  a Verizon phone and if Verizon doesn't have, you know, any

15  antenna on that tower that I see, it doesn't exist in my

16  phone's world.  So just because you see a tower doesn't mean

17  that's the one your phone is communicating with.

18       And I just put together a slide to show that just because

19  you don't see a tower doesn't mean that there isn't one nearby.

20  So they do try to disguise them occasionally depending on the

21  local ordinances or, you know, depending on where they're

22  trying to place their antenna.

23       So there could be one behind you, you know, instead of one

24  that you're communicating with in front of you.  So they're all

25  over the place.  So just because you do or don't see one

1    doesn't mean that your phone isn't communicating to the one

2    you're looking at or not.

3    Q.   So all the photos on this slide, do they have a cell tower

4    in each of the photos?

5    A.   Yes.

6         MR. CHAKRAVARTY:   Could we go to the next page?

7    Q.   All right.  And is this an example of some cell site

8    analysis that you do?

9    A.   Yes.  So every provider maintains a listing of where all

10   their towers are located.  Like I mentioned earlier, they have

11   to put towers -- they have to put them out to provide service.

12   So if the AT&Ts of the world could go to downtown Boston, on

13   the tallest building just put one antenna up, they'd be more

14   than happy to do that to maintain maintenance, you know, just

15   make it simple.  And if they could provide service to everyone,

16   that would make it simple.

17        But they obviously, like I spoke to earlier, have to put

18   multiple towers, thousands, hundreds of thousands across the

19   United States, out in the United States, and they maintain a

20   list of where all those towers are located.  And that list has

21   a unique number identifying every tower within their system and

22   sector.

23        So if you think of it like a fingerprint, there's only one

24   with that unique set of numbers.  And it provides a location of

25   where the tower is, the direction from the tower that that

1    sector's providing service to, and a couple of other pieces of

2    information.  So in this sample, this is -- I just took a tower

3    listing for the Boston area; I plotted it on a map to show with

4    the blue dots that are in the presentation -- in this page

5    where the towers are for this particular area.

6        And as I mentioned earlier, those towers are then further

7    divided out by sector.  So if I'd look at this one in the

8    middle, you can see I drew three 120-degree sectors, and I

9    included the numbers for -- that make that tower and sector

10   unique.  So if I was in this area and I wanted to make a call,

11   my phone would communicate with the strongest, clearest signal,

12   which would be this 40361.  A record would be generated when I

13   made that call that I started my call on that tower and sector.

14   So we know the general area that that tower is providing

15   service to.

16       And once my phone is connected, it's nothing more than a

17   beacon reporting the signal quality back to the switch or the

18   network.  And as I -- if I were to move around this tower, as I

19   got closer to a sector boundary, the signal levels, the quality

20   of signal would degrade on one and increase on this neighboring

21   sector.

22       And when I get to -- they're going to have some built-in

23   overlaps.  They can hand my call off from sector to sector.  If

24   there was no overlap, your call would just be dropped.  And as

25   I get close to that sector, at some point the network is going

1    to -- the switch will hand off that call to the next -- the

2    better signal quality.

3        And if I were just to continue around clockwise, my phone

4    call would just be handed off from sector to sector.  And if I

5    were to get on the highway and travel west, I would just be

6    handed off, you know, from sector to sector, tower to tower,

7    and I could -- in theory, if everything is designed out

8    appropriately, I could get on a highway in this area and

9    drive -- and start a call, drive for however long I want to,

10   and I would never know that my call is being handed off from

11   sector to sector, tower to tower; my call would just maintain

12   connectivity to the person on the other end of the line.

13   Q.   Apparently you've never driven under the Prudential

14   Center, right?

15   A.   Everybody's experienced dropped calls.

16        (Laughter.)

17   Q.   So the list of all the cell towers around the country, did

18   you rely on that list of cell towers for purposes of your

19   presentation today?

20   A.   Yes, we can pare it down to the Boston area.

21   Q.   And is that thousands of pages' worth of data?

22   A.   Yes, it's very -- if it was printed out it would be inches

23   thick.

24   Q.   Does the orientation of the cell tower matter to your

25   analysis?

A.   Yes.  So like I said, we know not only where the tower

structure is, but within that tower list we can then determine

what direction that sector is providing service to.  So if you

think of it -- if there was a man standing at the top of that

tower and he's got a big floodlight, we can tell which

direction that floodlight is pointing down towards the earth.

So if it was, you know, zero degree azimuth, that

floodlight would be pointing due north, you know, out from that

tower structure, providing light or service out to that -- in

that direction.

Q.   And just for the court reporter, is the word that you said

"azimuth," A-Z-I-M-U-T-H?

A.   Yes.

MR. CHAKRAVARTY:  All right.  Next page, please.

Q.   What is this?

A.   So it's kind of hard to see on the screen, but this is --

like I mentioned earlier, every provider keeps a record of use

that a subscriber is using on their network.  So it's in the

form of a call detail record, or a CDR.  So a lot of them, from

carrier to carrier, contain the same types of information.

They might name it a little bit differently.

So starting left to right, a lot of the information is

fairly self-explanatory.  So in the first two columns you have

date and time; you have length of time that it took to set up

the call; you have an originating and terminating number, so

1    that's just the from-to call.  So who the call came from and

2    who the call is going to.  So if it's an incoming call to me,

3    the "from" will be the caller ID that will display on my phone,

4    the "to" column would be my phone number.  If I was placing a

5    call out, my number would be in the "from," the person I was

6    dialing would be in the "to" column.  So just a from-to,

7    nothing more.

8    Q.   Now, that's -- originating is "from" and terminating is

9    "to"?

10   A.   Correct.

11   Q.   Please continue.

12   A.   Then the next column we have the elapsed time that the

13   call took, the amount of time in seconds and minutes that the

14   call took; we have the number that was dialed, very similar to

15   the -- you know, who I'm trying to connect to, the "to" column.

16   The next two columns are just equipment identifiers, so one is

17   the IMEI, which is the serial number of the phone.  So it's the

18   serial number burned into the phone equipment.  The next one is

19   an MZ, which is the SIM card that you place into the phone.  So

20   the MZ is what's tied to your account, what authenticates you

21   and gives you service.

22        Finally, the next two columns, the second-to-last one is

23   going to be the direction.  So that tells us if it's an

24   incoming or outgoing call, and the last column is what gives us

25   that location information.  So there would be information in

1    there that has the first little section on this left-hand side

2    is that unique fingerprint, that number -- that unique number

3    identifier.  It's a combination of numbers that is unique

4    anywhere in that AT&T network.

5        So if I took one of these number combinations and went to

6    the entire United States for the AT&T network, which would be

7    hundreds of thousands of towers and sectors, there's only going

8    to be one entry for that number combination.  And then they

9    actually provide a longitude/latitude and the azimuth for that

10   tower, if available.

11   Q.   So when in the life cycle of a telephone call, a cell

12   call, is a record made by the phone company?

13   A.   When the call comes in to the switch, so there will be a

14   record -- that's when the record gets started.  When the tower

15   information is populated, that initial tower is the tower that

16   I'm initially granted services on.  So the teacher called on

17   me, allowed me to ask my question and granted me resources.  So

18   it said:  Go make your call on this channel; go make your call

19   or your text, or send me your text.  And so when that initially

20   occurs, that's when that initial cell tower is recorded.

21       On some carriers, we can get a terminating tower where the

22   call ended.  And with AT&T, every now and again you may get

23   some intermediate handoff tower, but it's not very often in the

24   grand scheme of things.

25   Q.   How about if the user of a cell phone, especially today's

1   smartphones, is using text message or some other data function?

2   A.   Right.  So with some of the providers, we can get a tower

3   used for a text message.  On other providers, because of the

4   way it's routed, we will see that the text occurred but we

5   won't get the actual tower information.  And then on some

6   providers, they don't provide us that information at all.  And

7   then likewise with some providers, we get data connections.

8   You know, when the person is checking their Facebook or surfing

9   the Internet, we will get some of those too.

10  Q.   Today's phones also sometimes allow people to call using

11  Wi-Fi or just your home network.

12  A.   Right.

13  Q.   Are those recorded on these call detail records?

14  A.   Typically not.  If you're using some type of app on your

15  phone, like a Skype, that would recorded as a data connection.

16  But if you're strictly connecting your phone up to Wi-Fi and --

17  like some of the networks, like T-Mobile will allow you to make

18  texting -- or do texting and make calls over that connection,

19  that would generally not touch the network where we get the CDR

20  from.

21  Q.   Now, on this page, is this a sample of some records

22  provided by AT&T Wireless for the telephone number

23  (857) 247-5112?

24  A.   Yes.

25  Q.   And was that the phone associated by subscriber

1    information to Jahar Tsarnaev?

2    A.    Yes.  I think at the time, in April, it was -- the service

3    had been terminated for lack of payment, as I remember.

4    Q.    And meaning at the time of the marathon bombing?

5    A.    That's correct, yes.

6    Q.    And did you review records related to this phone number

7    for purposes of your presentation and testimony?

8    A.    I did, yes.

9    Q.    And, in fact, did you focus on two distinct time periods?

10   A.    I did.

11   Q.    And was that the week of the marathon bombing, April 15th,

12   2013, through April 19th, 2013, as well as a day or so back in

13   December, around Christmastime of 2012?

14   A.    I did, yes.

15              MR. CHAKRAVARTY:  Next slide, please.

16   Q.    Would you explain what this is?

17   A.    So this is just T-Mobile's version of the call detail

18   records, just giving an explanation of each of their columns.

19   Like I said, a lot of the columns all have the same

20   information.  In this case T-Mobile gives us a little bit more

21   information for everything.  And it's obviously very difficult

22   to read on this screen, but on the far left I had to break it

23   up into two different lines because it's -- the spreadsheet is

24   so long, but starting on the far left on the upper side is the

25   number that was --

1    Q.    Sorry.  It's all right.  Go ahead.

2    A.    So on the far left we have the number that was requested,

3    the target phone number that was requested that the records

4    pertain to; then you have some equipment identifiers, same

5    thing, the IMEI, the electronic serial number of the phone, as

6    well as the MZ or the SIM card that you put in the phone; you

7    have the type of connection, whether it's voice, SMS, a text;

8    you have the date and time for the call; direction of the call,

9    just incoming and outgoing; you just have the other phone

10   number that the phone -- that the call was connected to, so

11   whatever the other party's number was.  Then you have a couple

12   pieces of information about the status of the call, whether it

13   was roaming or not.  And then kind of over here on the top half

14   of the far right --

15   Q.    I think you can touch the screen.

16   A.    There.  Now I can.

17         -- you have the -- once again, those unique identifiers in

18   their system, that unique number combination, that is like the

19   fingerprint within the T-Mobile network for what tower and

20   sector was used.  And they also provide a location,

21   latitude/longitude.  And then continuing on down to the second

22   row, you have the last tower and latitude/longitude that was

23   used when the call terminated.  And then you have the market

24   the tower is located in, the switch that was handling the call.

25   And then you have over here just different versions of the

 1    duration or the amount of data that was used to send the text

 2    message.  So you have minutes, seconds of duration, and the

 3    data -- the amount of bytes.

 4    Q.   So how do the call detail records vary from company to

 5    company, just generally?

 6    A.   Like I mentioned earlier, they all have generally the same

 7    information.  They might word it a little bit differently, but

 8    a lot of the columns are the same.  They're not identical to

 9    each other, by no means, but a lot of the information is very

10    similar.

11    Q.   Now, for this case, for your presentation did you review

12    records provided by T-Mobile for the telephone number

13    (857) 928-4634?

14    A.   I did, yes.

15    Q.   And was that the cell phone that was subscribed to by

16    Tamerlan Tsarnaev?

17    A.   I did.  Yes, it is.

18    Q.   And again, did you cover the analysis for the same time

19    period of the week of the marathon bombing and then a brief

20    period of time back around Christmas of 2012?

21    A.   I don't think I look -- I think I only did the week around

22    the marathon bombing on this particular target number.

23              MR. CHAKRAVARTY:  Go to the next slide, please.

24    Q.   All right.  What is this?

25    A.   So this is just taking all that information, the call

1  detail records, the tower list or the base station list, and

2  marrying those two pieces of information up in relation to a

3  particular set of calls, and then displaying it graphically on

4  a map so it's more visual versus just lines on a piece

5  of -- you know, just numbers on a piece of paper.

6      So we have the telephone number that you mentioned

7  earlier, the 4634 number, the Tamerlan number.  I have a call

8  that was at 1449 and 8 seconds utilizing a tower and sector.

9  The tower is located right here, and the sector that was

10  utilized points off in this direction providing service, you

11  know, to that general area.

12      The kind of shaded area that I have on the map is not to

13  infer that that's the coverage.  That's just to give emphasis

14  which direction that sector is pointing and providing service

15  to.

16      And then I had another phone number, another T-Mobile

17  number that ends in 9151 that we analyzed, also a T-Mobile

18  number, and it also made a call at 1449, I think, and 6, I

19  think -- it's hard to see on this screen -- seconds utilizing

20  the same tower but a different sector that points off into the

21  opposite direction of the call.  And these two phones were

22  calling each other at that time during the call.  The 915

23  number actually dialed the Tamerlan number.

24      I was also provided addresses of the Forum restaurant and

25  Marathon Sports which I depicted on the map with red markers.

1    Q.   I neglected to ask --

2         MR. CHAKRAVARTY:  Mr. Bruemmer, if you could just go

3    back two slides to...

4    Q.   So when I asked you about this phone number, this was the

5    AT&T phone subscribed to Dzhokhar Tsarnaev, the 5112?

6    A.   Yes.

7    Q.   In addition to that phone, did you identify another phone

8    associated with Dzhokhar Tsarnaev?

9    A.   Yes, we eventually associated it with him.

10   Q.   And was that a phone that was a prepaid phone that was

11   subscribed to on April 14th of 2013?

12   A.   I don't remember the exact date, but I remember it was

13   very close to April 15th.  That sounds right.

14   Q.   Right.

15        MR. CHAKRAVARTY:  If we could call up 1170.  Page 2,

16   please.  Page 3.  Sorry.

17   Q.   Is this the subscriber information for that phone?

18   A.   Yes.  So you can see it's first name, Jahar; it

19   gives -- it's a prepaid phone so they can put whatever they

20   want on it; last name is T-S-A-R-N-I.  And it also shows the

21   date that it was activated, which was, like you said, April 14,

22   2013.

23   Q.   And so is that the phone that was being reflected in your

24   graphic, in Exhibit 1440?

25   A.   Yes.

```
 1            MR. CHAKRAVARTY:  Back to 1440, please.
 2    Q.   So that phone that we just were talking about, did you --
 3    like the other phone records, did you review the phone records
 4    for this phone?
 5    A.   I did.
 6    Q.   And did those phone records simply extend from April 14,
 7    2013, to April 19, 2013?
 8    A.   April 19th or 18th, somewhere in that -- one of those two
 9    days.
10    Q.   All right.  And is the first call between the two phones
11    that you just mentioned on that day at 1449?
12    A.   Yes, I believe it was the first call of the day.
13    Q.   And the fact that they're both reflecting off of one
14    tower, what does that tell you?
15    A.   They're both in the same general geographic area hitting
16    that one tower, but further they're hitting different sectors
17    pointing in opposite directions of each other.  So I believe
18    the user of one phone is on one side of the tower and the user
19    of the other phone is on the other side of the tower.
20    Q.   So with regards to the precision of your cell site
21    analysis, can you tell with, you know, precise -- within like a
22    GPS exactly where someone was within that sector?
23    A.   No, absolutely not.  I can't tell what street they're on,
24    what side of the street.  I can't tell that.  I can just tell
25    the general geographic area that that phone is located in.  And
```

1   as you can see on this map, I have other red dots of other

2   T-Mobile towers all in the downtown area near this site that

3   we're displaying that was used.

4   Q.   And so if the marathon -- Boston Marathon finish line was

5   in this area, the 4634 number was positioned closer to that

6   finish line area than the 9151 number?

7   A.   It was pointing -- yes, it was utilizing services off of a

8   sector that definitely points towards the finish line more than

9   the other phone.

10   Q.   And the other phone was in a direction of the Forum

11   restaurant.  Is that correct?

12   A.   That's correct, yes.

13        MR. CHAKRAVARTY:  Next slide, please.

14   Q.   What does this show?

15   A.   So this is just continuing chronologically.  We have the

16   9151 phone receiving a call at 1451, so 2:51 p.m., on the 15th,

17   and it's utilizing that tower and sector pointing in the same

18   direction that it was on the previous slide.  And then the

19   other phone, the Tamerlan phone, was actually placing a call to

20   that Jahar phone at the same time, just seconds before, and

21   utilizing the same tower structure but a sector that points

22   more towards the north.  So the service area would be up in

23   this direction versus the service area for this other tower and

24   sector being out to the west.  And then I've also left on the

25   map those same two reference points of the Marathon Sports and

1   the Forum restaurant.  Once again, they're calling each other.

2   Q.   So can your cell site analysis tell you how far away from

3   the tower either of these two callers were?

4   A.   No, we do not get that type of data with these providers.

5   Q.   All right.  But with regards to the 4634 number, you can

6   tell that that phone has been moving in the northerly

7   direction.  Is that fair?

8   A.   Well, it's utilizing a sector that's pointing more towards

9   the north.  I can't tell if it was actually moving from one

10  sector to the other or if it was just in that overlap area.

11  Like I mentioned earlier, there is a mutual boundary for those

12  two sectors and they could be right in that overlap area where

13  the signal quality is just as strong for both sectors.  So it's

14  going to be one or the other.

15  Q.   Okay.  And with regards to the 9151 number, can you

16  conclude that it's staying within the sector and maybe going

17  further away from the tower on the left-hand side?

18  A.   Right.  It's still in the same general area.  The service

19  is in the same general area.

20          MR. CHAKRAVARTY:  Next slide, please.

21  Q.   So that last call, was that about a minute and a half

22  after the first call at 1449?

23  A.   Right.  Yes.

24  Q.   And so what does this slide show?

25  A.   So this is showing -- and I can't -- if you could zoom in

1   on the one.

2        So this is both phones utilizing the same tower.  So the

3   tower's located here, the sector points to the north.  And

4   also, just kind of going chronologically a couple of minutes

5   later, at 2:53 p.m. -- and if you zoom back out -- so they're

6   both in -- I guess slightly to the north and east of the two

7   locations, the Marathon Sports and the Forum restaurant a

8   couple of minutes later.

9   Q.   And so this shows both of the phones in the same sector.

10  Is that correct?

11  A.   That's correct, yes.

12  Q.   So you don't know where in proximity, whether it's over

13  here by where the tower is or whether it's out here by the end

14  of the range of that tower -- you don't know where in that

15  sector they are?

16  A.   Right.  I can't say that they're standing right next to

17  each other or, you know, a block away from each other, but

18  they're utilizing -- they're in the same coverage area, that

19  same tower and sector.

20  Q.   And again, compared to the previous call, this call is

21  about a minute and a half later?  A little bit more than a

22  minute and a half?

23  A.   Right.  And it's the 9151 number, the Jahar phone, calling

24  the Tamerlan phone.

25            MR. CHAKRAVARTY:  Next slide.

1    Q.   Now, does this reflect calls from about 20 and about 40

2    minutes later?  I'm sorry, 35 minutes later?

3    A.   So at 3:14, and then I think it's 3:38 -- 3:36 two calls

4    from the -- on the Tamerlan phone utilizing two different

5    towers and sectors, one just to the north of the other one.

6    And I also depicted on the map a Whole Foods which came into

7    play when we were conducting the investigation.

8    Q.   Okay.  So just to orient the jury, is this the city of

9    Cambridge --

10   A.   Yes.

11   Q.   -- reflected on this chart?

12        And so the marathon -- and Boylston Street is on the other

13   side of the Charles River, to the south?

14   A.   It is, yes.

15   Q.   And let's focus in on, first, this call.  What does this

16   tell you?

17   A.   This is the Tamerlan number, has a call that was at 3:14

18   p.m. on April 15th.  So just kind of continuing on

19   chronologically.

20   Q.   And then a few minutes later is there another call?

21   A.   Yes, at 3:30 p.m.  So the next call that was recorded --

22   or the next phone activity that was recorded was at 3:30 and 32

23   seconds.

24   Q.   And again, the direction of the cell tower, the sector,

25   could be anywhere on this area up to any of these other

1  sectors -- other cell towers?

2  A.   Right.  So the coverage area will be generally in that

3  fashion.  Same with down here, it would be -- that's the

4  general service area for that phone -- for that sector.

5  Q.   Now, did that information become of investigative interest

6  during the investigation?

7  A.   Yes.  So when I was here at the time the investigation was

8  occurring, we had received information, I believe, from a

9  witness that the people involved stopped at a Whole Foods.

10         MS. CONRAD:  Objection.

11         THE COURT:  No, go ahead.

12         THE WITNESS:  I used that information.  Looking at the

13  phones, once we identified the phone numbers, I told the

14  investigative team that they probably want to go to the Whole

15  Foods and look at the video in between these two times, so

16  between the 3:15 and 3:30 time period, review the video to see

17  if that statement is true, that they might have been caught on

18  video.  And I was told the next day that when they --

19         MS. CONRAD:  Objection.

20         THE COURT:  No, overruled.

21         THE WITNESS:  When they returned, they were able to

22  locate video stills of the two suspects, or at least one of the

23  suspects at the Whole Foods in that time period that I provided

24  to them.

25         MR. CHAKRAVARTY:  Next slide, please.

BY MR. CHAKRAVARTY:

Q.   And what does this next slide show?

A.   So this is just continuing on with the Tamerlan phone,
just showing the tower and sector utilized from roughly 8:30 to
8:47.  And then I have another tower and sector depicted on the
map that shows kind of further into the night.  I believe it
was a little after ten o'clock.  And I also referenced the
address of 410 Norfolk Street, showing where it is in relation
to that 1028 call.

Q.   And 410 Norfolk Street you know to be the Tsarnaev family
residence?

A.   Yes.

Q.   And is that off of Prospect Street?  There's a cell tower
here near Prospect Street?

A.   Yes.

        MR. CHAKRAVARTY:  Next slide, please.

Q.   Now, this is the next day.  Can you explain what this
slide shows?

A.   Yes.  So I was asked to look at the numbers just kind of
as they -- where they were generally being used on April 16th.
And if you zoom to the top half, please.

        So this is just showing on the 16th both the Tamerlan
phone and the 5112 phone during -- from 3:30 the 5112 phone is
located in the Boston area.  The Tamerlan phone is also in
the -- utilizing towers in the Boston area at 5:23 -- around

1    5:23.

2         And then if you zoom to the other towers kind of down at

3    the bottom, it shows that later in the day the 5112 phone

4    traveled down to and utilized towers around 9:47 and 10:25 in

5    the New Bedford/Dartmouth area.

6    Q.   So in the afternoon there was phone activity from that

7    AT&T phone subscribed to Jahar Tsarnaev in the Cambridge area,

8    and then in the evening it was down in the New Bedford area?

9    A.   That's correct, yes.

10   Q.   And are you familiar with the UMass Dartmouth campus,

11   where that is?

12   A.   I am, yes.

13   Q.   Is that in the vicinity of these cell towers?

14   A.   As I remember, it was very close.

15        MR. CHAKRAVARTY:  Next slide, please.

16   Q.   What does this show?

17   A.   Kind of more of the same, just showing where the phones

18   are -- the towers that the phones are utilizing on the 17th.

19   So once again, if you wouldn't mind zooming in to the top half.

20        It's just showing the Tamerlan phone on the 17th as

21   utilizing towers all in the Boston area starting at 12:29 p.m.

22   and going all the way through 9:46 p.m.

23        And if you could zoom to the bottom.

24   Q.   Sure.  So this shows the Tamerlan phone, the 4634, in the

25   Boston area for the entire day, essentially?

1    A.   That's correct.

2    Q.   And what does this show?

3    A.   It's the records for the 5112 number, show the phone

4    utilizing towers once again in the New Bedford/Dartmouth area

5    in the eight o'clock hour, so 8:08 through 8:48 -- and 8:48.

6    Q.   So did you -- do you recall whether you had telephone

7    activity from the 5112, the phone subscribed to Jahar Tsarnaev,

8    in the morning on April 17th?

9    A.   No, I plotted the activity that was available.

10        MR. CHAKRAVARTY:  Next slide, please.

11   Q.   Now, is this a slide of April 18th, 2013, the Thursday

12   after the marathon bombing?

13   A.   It is.

14   Q.   And what does this show?

15   A.   So it's showing both the 9151 phone, the Jahar phone,

16   utilizing a tower kind of over in this side of the map and a

17   sector pointing to the south at 8:17.  And I also depicted the

18   two towers and sectors -- or three, actually, that were being

19   utilized by the Tamerlan phone starting at 5:34 and ending at

20   7:30 p.m.  So there's this tower and then two sectors pointing

21   in that direction.  And I also put where -- I kept on the map

22   410 Norfolk Street.

23   Q.   And so this shows that 9151 phone number subscribed to

24   Jahar Tsarni, the phone that was activated on the Sunday before

25   the marathon bombing, that was back in Cambridge,

1    Massachusetts, on Thursday at about 8:17 p.m.?

2    A.   I can't say it was back in.  It started being used on the

3    18th again in the Cambridge area.

4    Q.   And you hadn't seen any activity prior to that -- on that

5    phone before -- after April 15th?

6    A.   Right.  So the slides I spoke to earlier showing that

7    phone activity, that was it on the 15th, and then it doesn't

8    get used again until the 18th.

9    Q.   And just if we could go back quickly to --

10             MR. CHAKRAVARTY:  Go to Exhibit 1172.

11   Q.   So these are the phone records associated with that 9151

12   number.  On April 17th in between was there an SMS text that

13   apparently was coming in to that phone?

14   A.   Right.  So there's a text, but like I mentioned earlier,

15   we don't get data -- or tower information on texts for

16   T-Mobile.  And I'd also like to note also that with T-Mobile,

17   texting is in Pacific time.  So to add further confusion to the

18   whole thing, instead of 9:06 a.m. Eastern time, that text

19   actually occurred at a little after noon.  So you have to add

20   three hours for texts in T-Mobile.

21   Q.   And this originating number, 7777, what significance does

22   that have?

23   A.   That's typically a network message of some sort, like

24   maybe something about their bill or voicemail or something to

25   that effect, some kind of text network-generated, is typically

1    what I see.

2              MR. CHAKRAVARTY:  Back to 1440.

3    Q.   All right.  And what does this slide show?

4    A.   So this is just showing the night of the 18th.  There's a

5    call between the two phones, the Tamerlan phone as well as the

6    9151 phone a little after 11 p.m., and utilizing two different

7    towers and sectors, which I've depicted on the map, so you

8    have, you know, the general coverage area for the one and then

9    general coverage area for the other, and just showing they're

10   calling each other.  The Tamerlan phone is calling the Jahar

11   phone, and just showing the general area of where that service

12   is being provided.

13   Q.   So this is the Thursday night at about 11 p.m., correct?

14   A.   Correct.

15   Q.   So it's about three hours after the earlier call that was

16   reflected on the 9151, Jahar Tsarni phone?

17   A.   Yes.

18   Q.   And separating the calls -- or the towers from which these

19   phones used is the Charles River, so one person, Tsarni, is in

20   Cambridge, and the Tamerlan Tsarnaev phone is in Boston.  Or I

21   should say the tower off of which the Tamerlan Tsarnaev phone

22   uses --

23   A.   The towers are located there.  It doesn't mean --

24   obviously, you don't plug into the base of the tower.  So the

25   service is provided in the directions that I've depicted on the

1    map.  So they could definitely be -- the furthest south tower

2    I'm sure has service on both sides of that river.

3    Q.   Now, does a cell phone always use the nearest tower?

4    A.   No.  There could be something physically blocking it.

5    Like if I'm off standing on the other side of the mountain and

6    the tower is physically closer to me but it's getting blocked

7    from that topology, the actual earth, my phone won't be able to

8    see it.  So there are situations where the towers get blocked

9    either by, you know, solid structures, the mountains, hills.

10   But obviously the network engineers know the area and they

11   place the towers to provide service in the most appropriate

12   area, immediately around that tower and sector.

13   Q.   Now, testing your Boston area geography a little bit, is

14   this the direction of Watertown and this the direction of

15   Cambridge?

16   A.   Being from Atlanta I have no idea, but I'll take your word

17   for it.

18            (Laughter.)

19   Q.   Fair enough.

20            MR. CHAKRAVARTY:  Next slide, please.

21   Q.   Now, in addition to -- is that the last call activity

22   between the two phones the week of the marathon bombing?

23   A.   It is.  And I've also depicted on the map the address of

24   45 Laurel Street and where it is in relation to that last call

25   between them.

1    Q.   And you prepared this exhibit for testimony today from the

2    records that you had reviewed from each of these phone

3    companies and the cell towers?

4    A.   Correct.  The phone records as well as the tower lists.

5    Q.   All right.

6         MR. CHAKRAVARTY:  Your Honor, I would move to

7    introduce this into evidence.

8         MS. CONRAD:  I'm sorry.  I don't even -- can I just

9    see what it is because I don't even have -- just this one page

10   or the whole thing?

11        MR. CHAKRAVARTY:  All of 1440.

12        MS. CONRAD:  Then I would like to be heard.

13        THE COURT:  Yeah, we'll talk about it.

14        MS. CONRAD:  Thank you.

15        MR. CHAKRAVARTY:  Just for the witness, can I show

16   1485, please?

17   BY MR. CHAKRAVARTY:

18   Q.   Do you recognize what this is?

19   A.   Yes.

20   Q.   What is that?

21   A.   This is a slide I was asked to put together just showing

22   the activity on December 25th and December 26th to just show

23   the area that was being used for the AT&T phone, the

24   5112 -- the Jahar -- I'm sorry.  I don't know which name you

25   said -- what you're calling that phone, but the AT&T 5112

1    number.

2    Q.   The Jahar Tsarnaev phone.

3    A.   Sorry.

4    Q.   So is this, like the other slides you showed, a fair and

5    accurate depiction of your plotting of the cell site location

6    for that use of that phone in that 24-hour period?

7    A.   Yes.  So I just -- I took that entire day's worth of

8    activity and just kind of put it all on one map showing all the

9    different towers and sectors to show where that phone, you

10   know, was -- the towers and sectors that phone was utilizing

11   for that two-day period, and I also depicted the 410 Norfolk

12   Street address.

13            MR. CHAKRAVARTY:  I would move into evidence Exhibit

14   1485 which for all intents and purposes is just another page to

15   the presentation that he had just done.

16            MS. CONRAD:  Your Honor --

17            THE COURT:  The same situation?

18            MS. CONRAD:  Well, yes, and also the underlying data.

19            THE COURT:  Yeah.  That objection's overruled.

20            This was so far -- you may use it -- we're deferring

21   the exhibit/chalk question, but it may be used as a chalk and

22   I'll expose it now to the jury.

23            MR. CHAKRAVARTY:  Thank you, your Honor.

24   BY MR. CHAKRAVARTY:

25   Q.   Agent Fitzgerald, is this also, as with the phone records

1    that you described, about the phone activity on the Tsarnaev

2    brothers' phones the week of the marathon bombing -- does this

3    show the use of the Jahar Tsarnaev AT&T phone on December 25th

4    and 26th of 2012?

5    A.    Yes.

6    Q.    And can you go through and explain what the phone activity

7    shows you?

8    A.    So there were several text messages -- mostly text

9    messaging, if not all -- utilizing, what -- one, two, three,

10   four -- five different sectors in the Cambridge area over that

11   time period.

12   Q.    And, again, as with some of the previous plots, you showed

13   where the Tsarnaev family residence was at 410 Norfolk Street?

14   A.    Yes.

15   Q.    And this was that Prospect Street cell tower that you were

16   talking about -- or actually, this is an AT&T cell tower also

17   in the vicinity of Prospect Street?

18   A.    Right.  It might be at the same location.  I don't recall.

19   Like I say, sometimes they co-locate on the same structure, the

20   same building, and sometimes they are just nearby each other.

21   I can't remember if exactly -- if this was in the same exact

22   location, but it's definitely near that.

23   Q.    And does this show that this phone, the one that ends in

24   5112, was using cell towers in the Cambridge area from December

25   25th in through December 26th, at least through 12:35 of that

1  day?

2  A.   Right.  I believe that -- I think this one over here might

3  be 12 -- yeah, 12:31.  So, yeah, through 12:35, noon.  And it

4  starts as early as a little after -- well, there's actually --

5  on 12:26 there's another one up here, 5:55.  So all the way

6  through 5:55.  And then it starts as early as -- let's see, a

7  little after noon on Christmas Day.

8  Q.   So if that's when Christmas break was for -- or the

9  holiday break, I should say, for UMass Dartmouth, then it's

10 possible that the phone was being used back at home on Norfolk

11 Street?

12 A.   I mean, my kids were on break those same two days.  I

13 mean, as far as the university, I assume that they're also on

14 break Christmastime.  But, yes, the phone was being utilized in

15 Cambridge, and it definitely could have been 410 Norfolk

16 Street.  In that area for sure.  That tower and sector to the

17 north is providing service to that address.

18           MR. CHAKRAVARTY:  Just a moment, your Honor.

19           (Counsel confer off the record.)

20           MR. CHAKRAVARTY:  No further questions.

21           MS. CONRAD:  Your Honor, I do have cross-examination,

22 but there's a discovery issue that I would like to discuss with

23 your Honor, and perhaps if we could take a break and discuss

24 that.

25           THE COURT:  All right.  A different one, I presume?

1          MS. CONRAD:  I'm sorry?

2          THE COURT:  A different one?

3          MS. CONRAD:  Yes.

4          THE COURT:  All right.  We'll take the morning recess.

5          THE CLERK:  All rise for the Court and the jury.  And

6     we'll take the morning recess.

7          (The Court and jury exit the courtroom at there is a

8     recess at 10:57 a.m.)

9          THE CLERK:  All rise for the Court.

10         (The Court enters the courtroom at 11:21 a.m.)

11         THE CLERK:  Be seated.

12         MS. CONRAD:  Do you want me back at counsel table,

13    your Honor, or can I be --

14         THE COURT:  That's fine.

15         MS. CONRAD:  Okay.  Your Honor, just a couple of

16    matters.  First of all, I think we've resolved the chalk, I'll

17    call it for now, that Mr. Chakravarty was using, had a page

18    that was not in the one that we had been provided in discovery.

19    So he gave me a hard copy of his, and I now have it.  But that

20    was the discovery issue.

21         THE COURT:  Okay.  So that's solved?

22         MS. CONRAD:  That's solved.

23         I do have some issues about *Jencks* material.  I could

24    ask, if the Court would allow me, Agent Fitzgerald, outside the

25    presence of the jury, about *Jencks* material.  We have been

1    provided no reports, no memoranda, no emails, nothing other

2    than this chalk and the summary expert witness disclosure.  No

3    worksheets.

4            MR. CHAKRAVARTY:  I've inquired of him, and there's no

5    *Jencks* material that the government is aware of.  If Ms. Conrad

6    wants to ask Mr. Fitzgerald that question in lieu of asking in

7    front of the jury, then the government has no objection to it.

8            THE COURT:  All right.  Right now.

9            MS. CONRAD:  Thank you.

10                    VOIR DIRE EXAMINATION

11   BY MS. CONRAD:

12   Q.   Good morning, sir.  I'm Miriam Conrad.  I'm one of

13   Mr. Tsarnaev's lawyers.

14   A.   Hi.

15   Q.   In preparing what the jury has now seen, the

16   multiple-page, I think 14-page document, did you take any notes

17   in preparation of that?

18   A.   No.  It's all just done on the computer utilizing the

19   records and the tower list and the mapping and so forth.

20   Q.   And do you create spreadsheets as you're doing that?

21   A.   They're just derivative of the original spreadsheet.  So

22   they might be pared down to, like in this case, the April 15th

23   through the 18th, but there's no -- I don't create an original

24   spreadsheet, no.

25   Q.   And did you provide copies of those documents to the

1    government?

2    A.   The call detail record?

3           MR. CHAKRAVARTY:  Objection, your Honor.

4           THE COURT:  It's not clear what documents you mean.

5    BY MS. CONRAD:

6    Q.   Well, you created documents that were essentially a

7    summary of what you reviewed, the records you reviewed.  Is

8    that right?

9    A.   I utilize the records, the original call detail records,

10   and then I can filter it out -- or filter it down to the calls

11   I'm interested in versus having the thousands of calls.

12   Q.   I see.  All right.  And did you write any reports or

13   memoranda regarding what you found?

14   A.   No.  I mean, I've emailed back and forth like the drafts

15   and stuff like that for peer review or to the prosecutors.

16   Q.   So when you say "drafts," drafts for what?

17   A.   The presentation.

18   Q.   Okay.

19          MS. CONRAD:  And I'd ask to be provided with those.

20          MR. CHAKRAVARTY:  Ms. Conrad just complained that she

21   had the draft of the presentation that we sent her.

22          MS. CONRAD:  Okay.  Let me ask a different question.

23   BY MS. CONRAD:

24   Q.   How many drafts did you prepare?

25   A.   I only sent one draft up to Al.  I mean, that's the draft.

1    I mean, that was the draft, and that draft becomes a final.

2    Q.   And you said there were emails back and forth?

3    A.   Right.  To the person who is doing the peer review, asking

4    them to do the peer review, as well as to Al, showing him that

5    the draft was done and to contact me after he reviewed it.

6    Q.   And was there any substance in those emails?

7    A.   No, it was all logistics.

8    Q.   Okay.  Thank you.

9         THE COURT:  All right?

10        MS. CONRAD:  Yes.

11        THE COURT:  Just while we have the jury out of the

12   room, after this witness?

13        MR. CHAKRAVARTY:  We have a brief witness who's going

14   to describe the press conference and introduce some photos from

15   the press conference that we've agreed upon, and then we'll

16   move to MIT.

17        THE COURT:  Okay.  And there was a controversy about

18   one of the pictures?

19        MR. BRUCK:  Yes, your Honor.

20        THE COURT:  Let me see the numbers.  So I'm told

21   they're 676, 677 and 678.  Do you know which one it is

22   you're --

23        MS. CONRAD:  The picture we object to is the

24   graduation photo in which Officer Collier is back by the flag,

25   and we just think that's -- 77.

1          MS. CLARKE:  677.

2          MR. BRUCK:  677.

3          THE COURT:  I guess my question is:  Why do we need

4    three photographs?

5          MS. PELLEGRINI:  Well, your Honor, having Chief DiFava

6    explain how Sean Collier was hired by MIT and his experience

7    before he joined the MIT police force, we were asking him about

8    what path Sean took, and one of them was that he attended the

9    police academy.  I asked him about what uniform he was in at

10   that time.  He said Somerville, and he explained why it was

11   Somerville and not MIT, and that he recognized this as being

12   his graduation photo.  So that was part of his story of how

13   Sean joined the force.

14         And then the other picture is of him in his MIT

15   uniform which, as the Court can see, is different.  And the

16   explanation for that is that is that uniform, and that was also

17   his identification card.

18         THE COURT:  Well, I think it's cumulative.  I don't

19   believe you need more than one, frankly.

20         MS. PELLEGRINI:  Well, can I use --

21         THE COURT:  You can have the narrative of what his

22   career path was but --

23         MS. PELLEGRINI:  Can I use the one they're not

24   complaining of, then, the general one and the other?

25         THE COURT:  Fine.  You can use the civilian one as

1    well.

2           MR. CHAKRAVARTY:  Your Honor, since the jury is not

3    here, if Ms. Conrad intends to attempt to introduce phone

4    records that the government objects to, introducing defense

5    evidence in the government case, perhaps we should deal with

6    that now as opposed to wasting the jury's time when they come

7    out.

8           THE COURT:  I think I've already ruled on that.

9           MR. CHAKRAVARTY:  Okay.

10          MS. CONRAD:  Well, your Honor, I am planning to ask

11   Agent Fitzgerald questions about his review of phone records,

12   and I assume that that is permissible.  And I also -- to the

13   extent there are excerpts from phone records that are in the

14   government's chalk, I intend to show the phone records from

15   which those were drawn.

16          THE COURT:  Well, we'll see how it goes.  I don't

17   think the records themselves -- the volume of records

18   themselves should be admitted.  So something else?

19          MR. MELLIN:  Yes.  While the jury is out of the room,

20   it may surprise you we're actually in agreement on the point

21   I'm about to raise, and that concerns the autopsy photos of

22   Officer Sean Collier.

23          There are three photos that we intend to use.  I don't

24   think there's any objection to those three photos.  What we

25   would like to do, though, is not have those photos broadcast,

1    that those photos just be shown to your Honor and to the jury,

2    to the witness, but not put on the big screens.

3              THE COURT:  Well, somebody, I don't know who, gave me

4    a set of --

5              MR. MELLIN:  I gave you --

6              THE COURT:  -- autopsy photos.

7              MR. MELLIN:  -- the PowerPoint that was put together

8    by Dr. Robinson.

9              And if you look at the first photo of the head of

10   Officer Collier, we will use that photograph.  As you turn the

11   page, the next photo of the side, and then a picture --

12             THE COURT:  I think this is -- we've had some

13   discussion about autopsy photographs in general, and I think

14   the consensus is that they need not -- because of the nature of

15   them, they need not be displayed publicly beyond the jury out

16   of respect for the victims and their families.

17             I think perhaps the most feasible way would be the

18   old-fashioned way and let the jury see paper copies.  The

19   electronics are a little more complex because of the way the

20   system is configured.

21             MR. MELLIN:  That's fine, your Honor.  Over lunch hour

22   we'll make 18 copies -- or 19 copies, one for the Court.

23             THE COURT:  Any disagreement with that approach?

24             MS. CLARKE:  No, that's fine.  My understanding is

25   that the big screens can be unplugged, and it works that way.

1          THE COURT:  Yes, but it's more disruptive, I think,

2     than using the paper.  Anyway -- okay.  Let's get the jury.

3          (Pause.)

4          THE CLERK:  All rise for the jury.

5          (The jury enters the courtroom at 11:32 a.m.)

6          THE CLERK:  Be seated.

7          MS. CONRAD:  Thank you, your Honor.

8                    CROSS-EXAMINATION

9     BY MS. CONRAD:

10    Q.   Good morning, Mr. Fitzgerald.  My name is Miriam Conrad.

11    I'm one of Mr. Tsarnaev's lawyers.

12    A.   Hi.

13    Q.   I would like to ask you a few questions about the work you

14    did regarding the location of the two phones being used by

15    Jahar and Tamerlan Tsarnaev on April 15th.

16         Now, those were both T-Mobile phones, correct?

17    A.   Right.  There was one -- well, on April 15th, yes, they

18    were both T-Mobile.

19         MS. CONRAD:  And, Mr. Bruemmer, if you would be kind

20    enough to turn to -- I think it's Slide 7, page -- no, this

21    one.  Thank you.

22    Q.   So that one shows a phone call approximately 2:49 p.m.

23    from Jahar Tsarnaev to Tamerlan Tsarnaev, correct?

24    A.   That's correct, yes.

25    Q.   And the work that you did -- I know you can't pinpoint

1    exactly, but it shows that the -- their locations at that time

2    were consistent, or the information you found was consistent

3    with Jahar Tsarnaev being in the vicinity of the Forum

4    restaurant and Tamerlan Tsarnaev being in the vicinity of

5    Marathon Sports, correct?

6    A.    Right.  That's fair to say, yes.

7    Q.    In the vicinity, right?

8    A.    Yes.

9    Q.    And turning to the next slide, which reflects the phone

10   call made from Tamerlan Tsarnaev to Jahar Tsarnaev at

11   approximately 2:51 p.m., that also is consistent with Tamerlan

12   Tsarnaev being in the vicinity of Marathon Sports and Jahar

13   Tsarnaev being in the vicinity of the Forum restaurant.  Is

14   that correct?

15   A.    Right.  It's all the same area, yes.

16   Q.    Now, you extracted this information from T-Mobile records,

17   correct?

18   A.    That's correct, yes.

19   Q.    And those T-Mobile records, I think they're shown for

20   April 10th, anyway, on the previous slide?

21        MS. CONRAD:  Is that right, Mr. Bruemmer?  I'm sorry.

22   Two back.  Well, let's start with that since it's on the

23   screen.

24   Q.    That's the AT&T Wireless call detail, correct?

25   A.    Correct.  The call detail records, yes.  Just a small

1    sampling of what we received.

2    Q.   And by the way, that record was drawn from a much larger

3    portion -- excuse me -- from a much larger set of records you

4    got from AT&T, correct?

5    A.   That's correct, or the government got from AT&T.

6         MS. CONRAD:  And if I could just for the witness now

7    display on the screen -- could we have the -- thank you.  Just

8    for the witness, please.

9    BY MS. CONRAD:

10   Q.   So that's the record that Mr. Bruemmer just had up on the

11   screen, right?

12   A.   It's only part of the screen; it's not --

13   Q.   I just want to show you now the record that you took that

14   information from.  If you'd just bear with me for a second.

15        While Mr. Watkins is trying to figure that out, let me ask

16   a different question.  Going back to the record that

17   Mr. Bruemmer had up on the screen.

18        THE COURT:  Do you want to go back to the computer?

19        MS. CONRAD:  Yeah, the AT&T, the portion.  Thank you.

20   BY MS. CONRAD:

21   Q.   Do you see where it says "seizure time"?

22   A.   Yes.

23   Q.   And can you explain what that means?

24   A.   Typically, it's the amount of time it took to set up the

25   call.

Q.   And that varied, at least on April 10th, from anywhere
from four seconds to 21 seconds?

A.   Correct.

Q.   And just to use your analogy earlier of when someone makes
a call, it's sort of like a kid in the classroom raising their
hand, right, and asking to be called on, right?

A.   Right.  That's what I used, yes.

Q.   From the time someone dials a number and then hits send,
it takes some time before the call actually goes through,
right?

A.   It can.

Q.   And it can be anywhere from four seconds to 21 seconds,
right?

A.   It can be any amount of time.

Q.   So, for example, if you make a telephone call, sometimes
you'll dial the number and you press "send" on your cell phone,
and you don't necessarily even hear ringing right away, right?

A.   Right.  It would be like call blocking, yes.

Q.   Well, sometimes that's the time when your phone is trying
to communicate with the most available tower, correct?

A.   I mean, that's one instance, yes.

Q.   So without the seizure time, you don't know how long an
actual -- or even with the seizure time, for that matter,
because you don't know how long it took someone to answer the
phone -- you don't know how long the actual conversation was.

1    Is that correct?

2    A.   That would be under the elapsed time of the call --

3    Q.   So for --

4    A.   -- for AT&T.

5    Q.   So for this record, for AT&T it would show the elapsed

6    time, correct?

7    A.   That's correct.

8    Q.   And you're saying that would be the length of the actual

9    conversation?

10   A.   Yes; that's what AT&T tells us.

11   Q.   And is that from the time the person receiving the call

12   actually answers the phone?

13   A.   Well, when I say it's the length of the call, the

14   channel's being used, so I don't know -- you mentioned that's

15   when that person answered the phone.  It's not

16   necessarily -- the person doesn't have to physically pick up

17   the phone; it's just that's what they're billing you under.

18   That's going to be how long you used up that channel.

19   Q.   Sure.  But my question is whether you can tell from

20   looking at that how long the actual conversation was.

21   A.   I don't even know that a person picked up the phone.  I

22   don't know what the content of the call was.  No, I do not know

23   if the call was physically connected person to person.

24   Q.   And with respect to the T-Mobile records --

25              MS. CONRAD:  If we could just go to that next slide,

1    please, Mr. Bruemmer.

2    Q.   -- there's no column -- I know this is actually two sets

3    of columns that are cut into two pieces to fit on the page,

4    right?

5    A.   Correct.

6    Q.   So there's a lot of columns here?

7    A.   Right.

8    Q.   Is that fair to say?

9    A.   Absolutely.

10   Q.   And in a second I'm going to show you the columns -- or at

11   least some of the columns for April 15th.  Is it fair to say

12   that T-Mobile does not give you the seizure time?

13   A.   Right.  So their system is just set up differently, and

14   then they give us the duration of the call.

15   Q.   And the duration includes the time it takes to connect,

16   right?

17   A.   I believe the time starts when you start utilizing

18   resources on the tower.  So that would be once you get

19   that -- those resources granted from the tower, that's when the

20   timestamp occurs and that's when your duration starts with

21   T-Mobile.  So your call would be -- you would be in a, like,

22   call mode, if you will.

23   Q.   So just to make sure I understand this correctly, so I

24   pick up my phone, I dial the number, I press "send," a signal

25   goes out to a tower, right?

1    A.    Right.  You request services.

2    Q.    They make sure that I've paid my bill, right?

3    A.    Hopefully -- you usually register before that part.

4    Q.    All right.  And at that point the signal starts searching

5    for the person being called, right?

6    A.    No, because you have to get resources from the tower.

7    Q.    Right.  Once you get resources from the tower, which would

8    be when this record shows the call, the time starts running on

9    that call, correct?

10   A.    Right.  Once those resources are granted from the tower,

11   that's when the duration and the timestamp occurs.

12   Q.    Okay.  But the call does -- is not necessarily received by

13   the person whom I'm calling at that moment?

14   A.    Right.  When your resources are granted, you still have to

15   then navigate through the rest of the system and through

16   whoever you're contacting's system, back down to the mobile,

17   the page has to occur, all that.

18   Q.    And so the person that I'm calling -- if I'm calling

19   Mr. Chakravarty, he doesn't know yet that I'm trying to call

20   him, right?

21   A.    Right.  I mean, when you dial the phone, your phone

22   requests services, you're granted those services, and

23   everything starts getting routed out to whatever his service

24   provider is.

25   Q.    Okay.  So showing you --

1   A.   But the time has already started on your end.

2   Q.   Now, sir --

3        MS. CONRAD:  Maybe this is just for the witness unless

4   Mr. Chakravarty doesn't have an objection.

5        MR. CHAKRAVARTY:  I don't know what it is.

6        MS. CONRAD:  Could we just get that on -- I'm going to

7   plug this in -- or try to.

8        It's a page from the call detail from T-Mobile.  It's

9   on the screen.

10       MR. CHAKRAVARTY:  Can you zoom in, please?

11       MS. CONRAD:  I'm sorry?

12       MR. CHAKRAVARTY:  Can you zoom in, please?

13       MS. CONRAD:  Yes.

14       MR. CHAKRAVARTY:  I think this is an exhibit.

15       MS. CONRAD:  I'm sorry?

16       MR. CHAKRAVARTY:  This is an exhibit.

17       MS. CONRAD:  I think a portion of it is.  But if it's

18  an exhibit -- if it is, it's 1172.  I'm just asking if you have

19  any objection if I show it to --

20       MR. CHAKRAVARTY:  The witness?

21       MS. CONRAD:  -- the witness and the jury.

22       I'll ask the witness first.

23  BY MS. CONRAD:

24  Q.   Mr. Fitzgerald, do you recognize what's on your screen?

25  A.   Yes.

1   Q.   Okay.  And that's a portion of the T-Mobile records,

2   correct?

3   A.   It appears to be, yes.

4   Q.   And let me just slide it over a little bit more and then

5   slide it up so you can see the top column, right?

6   A.   Yes.

7   Q.   And that says "duration seconds," right?

8   A.   Yes.

9   Q.   And again, that is the time from when the caller started

10  using the resources, as you put it, of the phone -- cell tower,

11  correct, to when the call ended?

12  A.   Well, assuming it's an outgoing call, yes.

13  Q.   Okay.  All right.  Well, let's go back --

14  A.   In reference to that call.

15        MS. CONRAD:  Your Honor, if it's not in evidence, I'd

16  offer it at this time.

17        MR. CHAKRAVARTY:  No objections.  I'm sorry.

18        THE COURT:  Okay.

19        MS. CONRAD:  I guess that would be Defendant's 2.

20        THE COURT:  Do you want to give it Defense 2?

21        MS. CONRAD:  Unless we changed over.  Did we change

22  over to 3,000 to --

23        THE COURT:  We'll fix that later.

24        MS. CONRAD:  Okay.

25        (Defense Exhibit No. 2 received into evidence.)

BY MS. CONRAD:

Q.   And that shows that the phone call from 9151 -- which
would be Jahar's phone, right?

A.   Yes.

Q.   -- at 2:49 p.m., outgoing call, it lists it as 19 seconds,
correct?

A.   That's correct.

Q.   But that's not the length of the conversation?

A.   That's the length that that phone was using utilizing
T-Mobile resources.

Q.   So presumably the length of the conversation was shorter
than that?

A.   It's absolutely possible, yes.  If there was a
conversation at all.  I don't even know if there was a
conversation.

Q.   But if there was a conversation, it was certainly shorter
than this, right?

A.   Well, the phone on the other end does have to ring and
that is included in this phone duration.

Q.   And looking at the next phone call, which is a phone call
from Tamerlan to Jahar at 2:51, that's listed as 30 seconds,
right?

A.   That's correct.

Q.   And again, it would be -- that's not the length of the
time that they were actually talking on the phone, if they did

 1    talk on the phone?

 2    A.    That's correct.

 3    Q.    Now, did you, by any chance, review the extraction from

 4    Tamerlan's phone?

 5    A.    It probably came into our area where we were working in

 6    the original investigation, so it's very possible that I saw

 7    it.  But we didn't rely on it for any of our maps or anything.

 8         MS. CONRAD:  Okay.  If I can just have the camera for

 9    the witness only, please.

10    A.    And can I clarify it?

11    Q.    Oh, sure.  Please do.

12    A.    On that extraction, we might have used contacts.  Like so

13    if a contact was listed as a certain person associated with a

14    phone number, that's how we would have used that extraction.

15    Q.    Okay.  All right.  I'm not sure I understood what you just

16    said, but it may help me if I'm looking at something --

17    A.    To marry up a name to a phone number is what we use it

18    for.

19    Q.    Okay.

20         MS. CONRAD:  Again, just for the witness.

21    Q.    Do you see an entry for 4:15 -- let me go back down,

22    actually -- no, let me stay there.  4:15 --

23         MR. CHAKRAVARTY:  Your Honor, I'm sorry.  I'm just not

24    clear why is the witness being impeached, or what is the

25    question?

```
 1              MS. CONRAD:  No, I'm eliciting information.  I thought
 2      that's what --
 3              THE COURT:  Go ahead.
 4      BY MS. CONRAD:
 5      Q.   Thank you.  4/15/2013, and it says 6:51, but then it says
 6      UTC.  Do you know what "UTC" is?
 7      A.   The GMT about this time of year, it would be four hours'
 8      difference.
 9      Q.   Is "GMT" Greenwich Mean Time?
10      A.   Yes.
11      Q.   So that actually would be the 2:51 call?
12      A.   Yes.
13      Q.   And do you see what the length of that phone call is?
14      A.   Yes.
15      Q.   And that's 18 seconds?
16      A.   According to the phone, yes.
17      Q.   And that's an extraction, meaning that's information taken
18      from the phone physically itself?
19      A.   Right, it's a forensic report generated from the actual
20      hardware -- the actual phone -- mobile phone itself.
21      Q.   So that's -- instead of 30 seconds that you got from the
22      cell tower records, it's 18 seconds for the 2:51 call, right?
23      A.   I thought it was 18 or 19 -- oh, 2:51?  Yes.
24      Q.   2:51, not 2:49.
25      A.   Yes, that's a different time.
```

1    Q.   And these are records for Tamerlan Tsarnaev's, correct?

2         MR. CHAKRAVARTY:  Objection, your Honor.  There's no

3    foundation that this witness has even seen this.

4         THE COURT:  Use the phone number.

5         MS. CONRAD:  Well, it's an extraction.  The

6    government, I hope, would be aware of this.  It's an extraction

7    from Tamerlan's phone.  I don't have the phone number.  It's

8    not toll records; it's an extraction done by the government.

9         THE COURT:  Go ahead.  Proceed.

10        MR. CHAKRAVARTY:  Just, your Honor, this witness has

11   analyzed phone records, not data extracted from a phone.

12        THE COURT:  I understand.

13        Go ahead.

14   BY MS. CONRAD:

15   Q.   So that was the 2:51 call, right?

16   A.   Right.

17   Q.   And that was outgoing, right?  Just, I could scroll back

18   up if you want to look at it again.

19   A.   Yeah, according to whatever system they used here,

20   Cellebrite or whatever extraction they used.

21   Q.   And there's an earlier call, 6:49 UTC, which would be

22   2:49 p.m. Boston time, right?

23   A.   That's correct, yes.

24   Q.   And that's shown as incoming, right?

25   A.   Right, yes.

1    Q.    From 9151 -- excuse me.  From 9151, correct?

2    A.    That's correct, yes.

3    Q.    And that would be Jahar's phone, right?

4    A.    Yes.

5    Q.    And that shows a duration of eight seconds?

6    A.    That's correct, yes.

7    Q.    And so we've got an eight-second call at 2:49 -- or

8    eight-second conversation, I guess, right, at 2:49?

9    A.    I don't know how Cellebrite or whatever forensic utility

10   was used.  I don't know how they determine the duration, if

11   it's the actual -- if the call's connected, if it's the

12   conversation or if it's when the call comes in.  I don't know

13   how this system works or the extraction software works.

14   Q.    But just to clarify, it's not inconsistent that the phone

15   would reflect an eight-second call when the cell tower data

16   reflects a 19-second call?

17              MR. CHAKRAVARTY:  Objection, your Honor.

18              THE COURT:  Overruled.

19              You may answer it.

20              THE WITNESS:  Like I said, I don't know much about

21   Cellebrite other than how to operate it.  I don't know the

22   detail ins and outs that it pulls from the call logs.  I mean,

23   this is like from a call log versus network resources that are

24   used in the network.  So you're kind of comparing -- although

25   it's talking about the same information, you're kind of

 1   comparing two different entities or two different things.

 2   BY MS. CONRAD:

 3   Q.   I guess really I'm just asking, the fact that one shows a

 4   shorter time period does not -- it's not inconsistent with the

 5   fact that the cell tower reflects a longer time because it

 6   includes the connection time, right?

 7   A.   I don't think that's unusual.  But, like, once again, I

 8   don't know how it determines this duration or time.  I assume

 9   it's the call.  It's like when the -- you know, the actual call

10   is occurring.  But what happens when a call's missed, I don't

11   know the answer to that.  So whether you say it's inconsistent

12   or consistent, I don't know the answer to that because I'm not

13   familiar enough with what they're extracting out of the actual

14   mobile phone itself.  I deal with more the networks.

15   Q.   I understand.  Thank you.

16        But the -- showing you the slide that I think is Number 9

17   which is the -- well, let's go to Number 8 -- which is the 2:49

18   call, I think, right?

19        MS. CONRAD:  And could we have that on the screen,

20   please?

21   Q.   That shows -- I'm sorry.  It's the 2:51 call, but let's

22   just stay there for a second.

23        It shows for one -- that's just one phone call even though

24   there's two times shown, right?

25   A.   Two diff- -- yes, they're calling each other, so it's in

 1    respect to two different phones.  So we received call detail

 2    records for one phone number and call details for another phone

 3    number.  I'm showing them both on the screen in respect to each

 4    of those call detail records, but, yes, the two phones are

 5    calling each other.

 6    Q.   And the 2:51 call we know was a call from Tamerlan to

 7    Jahar, right?

 8    A.   Yes.

 9    Q.   And one of them says 14:51:18.  The other one shows

10    14:51:19.  Is that because the cell data for each of them would

11    be different?

12    A.   Well, yeah, it's in respect to that phone itself.

13    Q.   Right.  But again, the 14:51:19 is not the time that in

14    this instance Jahar picked up the phone and started talking?

15    A.   Well, it's the instant in which his phone responded to the

16    page.  So when a phone's incoming, like I said, the network has

17    to generally -- or know the general area where you are.  So if

18    I have an incoming call, the area where I am, a page signal

19    would go out.  When that page signal goes out, it's kind of

20    like going back to the teacher-student relationship.  The

21    teacher's calling my name.  As the mobile I raise my hand; the

22    teacher calls on me and says:  Hey, you have a call.  Go over

23    here and you can complete your call.  That's when -- when those

24    resources are granted, that's when the record is generated and

25    that timestamp is generated.

1    Q.    Okay.  But not when the conversation necessarily began?

2    A.    Right, not when I hit the green button.  But like I'm

3    getting caller ID, my phone is ringing, that's typically when

4    you're starting to look for those resources.  And right before

5    I hit the green button, that's when, you know, I'm going to

6    actually connect and we can communicate with each other.

7    Q.    And the records or the -- excuse me -- the maps and

8    diagrams that you showed us for days after April 15th were not

9    necessarily calls between the brothers.  Is that right?

10   A.    Right.  There are some that are between them, but I think

11   the majority of them, or the bulk of the calls that are

12   displayed, are not between the two.

13   Q.    So the purpose of that was just to show where each phone

14   was located at those particular times, right?

15   A.    The general area, yes.

16   Q.    And in order to put that information together, you

17   reviewed in this case AT&T records going back from April

18   2014 -- excuse me -- April 2013 going back to -- into December

19   of 2012, right?

20   A.    They continued on beyond that.

21   Q.    Okay.  But you reviewed all of them.  Is that right?

22   A.    I had them on my system.  Like there were

23   several calls -- yes.  I mean, when we were in the

24   investigation, we were trying to come up with leads, yes, we

25   did review in bulk, like, who they're contacting, what phone

1    numbers they're contacting.  But for the purposes of this

2    presentation, I only looked at the dates and times that I have

3    displayed.

4    Q.   But you are generally familiar with those underlying

5    records.  Is that correct?

6    A.   Absolutely, yes.

7              MS. CONRAD:  May I have a moment, please?

8              (Counsel confer off the record.)

9              MS. CONRAD:  Okay.  We're going to give this another

10   try with Mr. Watkins.  Again, just for the witness, please.

11   Q.   So what you see on the screen now is your presentation,

12   right?

13   A.   That's correct, yes.

14   Q.   A portion of the AT&T records from April 10th, 2013?

15             (Pause.)

16             MS. CONRAD:  Thank you.  If I could just have my

17   laptop this time for the witness.

18   Q.   Is that the record from which you took that?  I can make

19   it bigger.  Sorry.

20   A.   Yeah, it looks on the surface like it is.  Yes.

21   Q.   Well, that's April 10, 2013, right?

22   A.   Yes.

23   Q.   And those are the records that you put into the

24   presentation, right?

25   A.   Yeah, I just grabbed a screen shot of a couple of lines.

1          MS. CONRAD:  And could I have this --

2    Q.   And those are records that were received by the government

3    from AT&T for Jahar Tsarnaev's AT&T cell phone, correct?

4    A.   Right, I think they received a couple different -- you

5    know, like they got a certain time period, then they wanted to

6    extend that time period.  So which set I used, you know,

7    between the two time periods that were obtained, because one

8    was much longer than the other, I don't recall off the top of

9    my head.

10   Q.   But you reviewed records for that phone going back, at

11   least, until December 2012, which is how you prepared your

12   other presentation --

13   A.   Yes.  Yes.

14   Q.   -- correct?

15        To December 11, 2012, correct?

16   A.   Like I said, for this phone, I only went back to -- you

17   know, as I testified to earlier, I only went and did December

18   25th and 26th.

19        MS. CONRAD:  Your Honor, I'd ask that these be

20   marked -- this be marked for identification.

21        THE COURT:  All right.

22        MR. CHAKRAVARTY:  No objection to identification; not

23   as an exhibit, though.

24        THE COURT:  I'm sorry?

25        MR. CHAKRAVARTY:  No objection as to identification,

1    not as an exhibit.

2              THE COURT:  Yes.

3    BY MS. CONRAD:

4    Q.   In reviewing those records, you told us about Jahar's

5    location on December 25th and 26th, correct?

6    A.   That's correct, yes.

7    Q.   And you know he was a student at UMass Dartmouth during

8    that time, correct?

9    A.   Yes.

10   Q.   And I think you testified about that being the Christmas

11   break?

12   A.   Correct, yes.

13   Q.   And in the records that you reviewed, did you note that

14   Mr. Tsarnaev, Jahar Tsarnaev, spent much of his time in the

15   Dartmouth area based on his cell phone data usage?

16   A.   Yeah.  As I remember, it definitely went down there, even

17   the week of April 15th.

18   Q.   Thank you.

19             MS. CONRAD:  I don't have any further questions.

20             THE COURT:  Anything else?

21             MR. CHAKRAVARTY:  I do have some brief follow-up.

22                          REDIRECT EXAMINATION

23   BY MR. CHAKRAVARTY:

24   Q.   Agent Fitzgerald, you were asked several questions about

25   these calls that occurred on the 15th, the date of the marathon

1    bombing, at about 1449.  Is that 2:49 for those of us who

2    haven't been in the military?

3    A.    Yes.

4    Q.    So at 2:49, is that the first call contact between the two

5    phones, the one -- the new T-Mobile phone that was subscribed

6    to by Jahar Tsarni and the T-Mobile phone that was subscribed

7    to by Tamerlan Tsarnaev?

8    A.    Right.  I believe it was the first -- if I remember

9    correctly, it was the first call of the day, even.  But, yes,

10   it was definitely the first call between them.

11              MR. CHAKRAVARTY:  Can we call up 1172?

12   Q.    And this reflects those calls?

13   A.    Yes.  So as you can see, the first call of the day on the

14   15th is the 2:49 call you were asking about.

15   Q.    And is that a call of 19-second duration outgoing from

16   Jahar's phone to Tamerlan's phone?

17   A.    It is.

18   Q.    Now, Ms. Conrad asked you a number of questions about what

19   the call duration means.  The 19 seconds that appear here, what

20   can you definitively say that means in terms of the phone

21   contact of the 9151 phone?

22   A.    That's how long that phone utilized resources on the

23   T-Mobile network.

24   Q.    And did you also review Tamerlan's phone records around

25   that -- for that same call?

1    A.    Yes.

2    Q.    And did that, in fact, show that there was a call on the

3    same date and time for 17 seconds?

4    A.    Right.  I think it might be off by a second, but, yes,

5    it's relatively the same time.

6    Q.    And that seizure period, or the handshake period where the

7    phone is talking to the cell tower, can that be just a matter

8    of less than a second up to maybe several seconds?

9    A.    Right.  I think several people have experienced both ends

10   of that, where you dial the number, hit "send" and your call

11   starts connecting, or sometimes, like the defense mentioned,

12   you'd dial your number, hit "send," and it might take a little

13   while before your phone call actually gets connected.

14   Q.    Do you know whether this call was made before or after the

15   marathon bombing?

16   A.    I believe it was --

17              MS. CONRAD:  Objection.  Foundation, your Honor.

18              THE COURT:  Yes, sustained.

19   BY MR. CHAKRAVARTY:

20   Q.    How do you know when this call was made vis-à-vis the

21   marathon bombing?

22              MS. CONRAD:  Objection.

23              THE COURT:  Sustained.  It's also not proper redirect.

24   BY MR. CHAKRAVARTY:

25   Q.    So Ms. Conrad asked you about a call at 1451, which is the

1   very next call.  Do you remember that?

2   A.   Yes.

3   Q.   And she highlighted that there was a slight discrepancy

4   between Jahar's phone records and Tamerlan's phone records of

5   one second.  I think one was at 20:51:18 and one was at

6   20:51:19.  Do you remember that?

7   A.   Yes.

8   Q.   And can you explain the discrepancy?

9   A.   Well, once again, it's the person making the call, it's

10  just how long each call was using resources.  The person

11  dialing the phone, you know, logically, that call, when you're

12  dialing and hitting the green button, it's going to happen

13  sooner than the person receiving the call.

14         MR. CHAKRAVARTY:  Can we call up Exhibit 1440?  I

15  believe it's page 8.

16  Q.   Does this reflect that call?

17  A.   Yes.

18  Q.   And so this reflects that if there's a school over here,

19  that the 4634 number was in the vicinity -- or was in the

20  sector assigned to that school?

21         MS. CONRAD:  Objection, your Honor.

22         THE COURT:  Sustained.

23  BY MR. CHAKRAVARTY:

24  Q.   Ms. Conrad asked you some questions about phone

25  extraction.  Can you explain to the jury why data collected

1   from a handset or of a phone is different from the data

2   collected from the phone company that provides the tower log

3   records?

4   A.   Right.  So the phone company pulls that information from

5   the switch that -- like I mentioned earlier on direct, it's

6   pretty much the brains behind the operation; it's the one

7   controlling all the handoffs.  That's where the phone detail

8   records occur.  The phone extraction software, like I testified

9   to, I don't know where it's grabbing the information from, how

10  it's grabbing the information, or even from provider -- or from

11  manufacturer to manufacturer, an iPhone versus an S5, even a

12  Samsung versus an HTC, I don't know how that phone software

13  maintains those logs, but that's what the phone extraction, or

14  the forensic tool, is relying on to obtain those records that

15  were brought up by the defense.

16  Q.   And does a cell phone capture all of the same data that is

17  captured by the cell phone network?

18  A.   No.  For a perfect example, the phone extraction is not

19  going to be able to tell you what tower and sector was being

20  utilized versus the switch knows what tower and sector was

21  being utilized.

22  Q.   Now, on this graphic, does this show, then, that the call

23  by Tamerlan was made in the sector -- this sector over here?

24  A.   Yes.

25          MR. CHAKRAVARTY:  Can we go to --

```
 1            THE WITNESS:  This is a little wider -- I mean, it
 2    goes out to this edge right here.
 3            MR. CHAKRAVARTY:  Can we go to the previous page?
 4    Q.   And the call at 1449 it shows in this sector?
 5    A.   The phone, yeah.
 6    Q.   The phone?
 7    A.   Yes.
 8    Q.   Does that suggest movement in your business?
 9            MS. CONRAD:  Objection, your Honor.
10            THE COURT:  Sustained.
11    BY MR. CHAKRAVARTY:
12    Q.   Ms. Conrad asked you some questions about connectivity, I
13    mean, calls between these two cell phones, the 9151 T-Mobile
14    phone, the prepaid T-Mobile phone, and Tamerlan's phone, 8634.
15    Aside from the contact on April 15th and then again later in
16    the week on the 18th, did -- was the principal phone that was
17    subscribed to by Jahar Tsarnaev, the AT&T phone, the one that
18    communicated with Tamerlan Tsarnaev?
19            MS. CONRAD:  Objection.  Scope.
20            THE COURT:  No, but I'm not sure the question is
21    clear.  Why don't you replay it.
22            MR. CHAKRAVARTY:  I'll ask another question.
23            Mr. Bruemmer, can you fast-forward about four slides?
24    One more, please.
25    BY MR. CHAKRAVARTY:
```

 1   Q.   So this is the next day.  At this time it's not the 9151

 2   phone that was being used -- the Jahar Tsarni phone that was

 3   being used to communicate with Tamerlan Tsarnaev; it was the

 4   AT&T phone?

 5           MS. CONRAD:  Objection.

 6           THE COURT:  Overruled.

 7           You may answer it.  Go ahead.

 8           MS. CONRAD:  It's the assumption in the question,

 9   "being used to communicate with Tamerlan Tsarnaev."

10           THE COURT:  Right.  That's enough.

11           Go ahead.

12           THE WITNESS:  I don't remember how many calls there

13   were, if any, during this time period between 4634 and 5112.

14   And as I remember, the service had been disconnected on the

15   5112.  But kind of a side product, they don't eliminate

16   texting.  So the user could still use it for texting, and I

17   believe that's what was -- if my memory serves correctly, I

18   believe that's what was being used on the 5112 number at this

19   time period.

20   BY MR. CHAKRAVARTY:

21   Q.   And that 5112, if it hadn't paid for its service, could

22   also use the wireless signals, the Wi-Fi signals?

23   A.   Right.  It could connect via Wi-Fi or do the texting even

24   though it would have been shut off.

25   Q.   Does Apple have an iMessage communications means?

1           MS. CONRAD:  Objection, your Honor.

2           THE COURT:  Sustained.

3           MR. CHAKRAVARTY:  That is all I have, your Honor.

4           MS. CONRAD:  Your Honor, I neglected to ask that the

5     phone extraction for Tamerlan's phone be marked for

6     identification, so I would ask that that be marked as Exhibit 3

7     for identification, and then the AT&T records be marked for

8     identification as Exhibit 4.

9           THE COURT:  All right.

10          MS. CONRAD:  And I would actually ask that -- given

11    the redirect examination, I would ask that the AT&T records for

12    April 15th, 16th, 17th and 18th, at least, be admitted at this

13    time, or those -- excuse me -- that were reviewed.

14    Mr. Chakravarty just asked a series of questions about what

15    those records showed.

16          MR. CHAKRAVARTY:  I would object to that, your Honor.

17          THE COURT:  No.  You may have them all marked for

18    identification.

19          (Defense Exhibit Nos. 3 and 4 marked for

20    identification.)

21          MS. CONRAD:  May I ask just a couple of questions on

22    redirect, please?

23          THE COURT:  Recross.

24          MS. CONRAD:  Recross.  Thank you.

25          THE COURT:  Only as to that matter.

1           MS. CONRAD:  Yes.  Absolutely.

2                    RECROSS-EXAMINATION

3    BY MS. CONRAD:

4    Q.   Sir, Mr. Chakravarty just asked you some questions about

5    being able to make calls wirelessly, correct?

6    A.   Yes.

7    Q.   Those wouldn't be reflected on cell tower data, would

8    they?

9    A.   No.  Well --

10   Q.   And --

11          MS. CONRAD:  May I just have a moment?

12   A.   -- they would be reflected in the data connection part,

13   but we didn't rely on any of those.

14   Q.   Right.  That's not what you were referring to in these

15   charts?

16   A.   Right.  Right.

17          MS. CONRAD:  May I just have one moment, please?

18          (Counsel confer off the record.)

19          MS. CONRAD:  Thank you very much, sir.

20          THE COURT:  All right.  Thank you, sir.  You may step

21   down.

22          THE WITNESS:  Thank you.

23          (The witness is excused.)

24                               *  *  *

25

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200,

8    United States v. Dzhokhar Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  3/17/15
13

14

15

16

17

18

19

20

21

22

23

24

25