```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Plaintiff,                )
                                  )  Criminal Action
v.                                )  No. 13-10200-GAO
                                  )
DZHOKHAR A. TSARNAEV, also        )
known as Jahar Tsarni,            )
                                  )
        Defendant.                )
                                  )


        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE
```

**JURY TRIAL - DAY THIRTY-FIVE
EXCERPT
<u>TESTIMONY OF STEPHANIE WAITE</u>**

```
   John J. Moakley United States Courthouse
              Courtroom No. 9
             One Courthouse Way
        Boston, Massachusetts  02210
          Wednesday, March 18, 2015
                  2:24 p.m.



        Marcia G. Patrisso, RMR, CRR
           Official Court Reporter
        John J. Moakley U.S. Courthouse
        One Courthouse Way, Room 3510
        Boston, Massachusetts  02210
                (617) 737-8728

   Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad and Timothy G. Watkins,
10            Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant
18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
 GOVERNMENT:

STEPHANIE WAITE

   By Mr. Weinreb        4
   By Mr. Watkins                    11

E X H I B I T S

GOVERNMENT'S

| EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 907 | Photograph |  | 7 |
| 908 | Photograph |  | 7 |
| 909 | Photograph |  | 7 |
| 910 | Photograph |  | 7 |

```
 1                    P R O C E E D I N G S
 2                            * * *
 3         MR. WEINREB:  The United States calls Stephanie Waite.
 4               STEPHANIE WAITE, duly sworn
 5         THE CLERK:  Have a seat.  State your name and spell
 6   your last name for the record, keep your voice up and speak
 7   into the mic.
 8         THE WITNESS:  Stephanie Waite, W-A-I-T-E.
 9                      DIRECT EXAMINATION
10   BY MR. WEINREB:
11   Q.   Good afternoon.
12   A.   Good afternoon.
13   Q.   Where do you work?
14   A.   Massachusetts State Police Crime Laboratory.
15   Q.   How long have you worked there?
16   A.   Almost seven years.
17   Q.   What are your job responsibilities?
18   A.   I'm a forensic scientist in the Crime Scene Response and
19   Criminalistics units.
20   Q.   Where did you go to school and what degrees have you
21   earned?
22   A.   I have an undergraduate at Lycoming College in
23   Pennsylvania, I have a master's of forensic science as well
24   from the University of New Haven, and in undergraduate, I have
25   biology and chemistry bachelor of science degrees.
```

1  Q.   Can you say a little more about what you do for a living?
2  A.   The Crime Scene Response Unit, I respond to crime scenes
3  to process items and the area for biological evidence and trace
4  materials.  Biological evidence would be things like blood,
5  semen, saliva, and then trace materials could be gunshot
6  residues and hairs and fibers.  And then in the lab I do mostly
7  the same thing with items that I have either collected from the
8  crime scene or that other agencies have collected and submitted
9  to the lab.
10 Q.   Do you have any specialized training in doing those things
11 you just described?
12 A.   In addition to the in-house training that I was under,
13 I've also taken courses in blood stain pattern analysis.
14 Q.   After getting trained, did you have to take an examination
15 to ensure that you knew how to do what you do properly?
16 A.   Yes.  During the training there were written and
17 competency tests, and then at the end there was a cumulative
18 written exam and a cumulative competency test.
19 Q.   Did you pass?
20 A.   Yes, I did.
21 Q.   Any additional training over the years?
22 A.   No.
23 Q.   I'm sorry.  Any additional tests over the years?
24 A.   Yes.  Every year I have what we call proficiency tests,
25 and it's just to make sure that I'm still able to perform all

1  of the testing as I should be.  I have one in crime scene, one
2  in trace, and one in biological fluid identification each year.
3  Q.   So in the course of your work, how many blood, semen,
4  other types of samples have you analyzed?
5  A.   I'm not sure because we don't count by sample; I count by
6  case, and I have been involved in over a thousand cases.
7  Q.   Did you participate in the Sean Collier murder
8  investigation?
9  A.   Yes, I did.
10 Q.   As part of that investigation, did you process items for
11 blood?
12 A.   Yes, I did.
13 Q.   How do you determine if there's blood on an item of
14 evidence?
15 A.   It's two separate tests.  The first one is a screening
16 test, and that can indicate that a stain either is or is not
17 blood, and that's called the Ouchterlony, or OT, test.  And
18 then if I get a positive result with that one, I will go on and
19 do a more confirmatory test -- it's the HemaTrace test -- and
20 that confirms that the sample is blood and indicates the
21 species origin is from a human.
22          MR. WEINREB:  Can I have Exhibit 907 for the witness,
23 please.
24 Q.   So looking at your screen, do you see Exhibit 907?
25 A.   Yes, I do.

1  Q.   And that's a photograph of a pair of gloves?
2  A.   Yes, it is.  Well, they're not a pair of gloves; it's two
3  separate gloves.
4  Q.   Fair enough.  But they're two gloves.  And at the bottom
5  of the picture are the initials SJW, correct?
6  A.   Yes.
7  Q.   Are those your initials?
8  A.   Yes, they are.
9  Q.   Now I'd like you to take a look at the Exhibit 908.
10      (Photograph displayed.)
11 Q.   And now 909.
12      (Photograph displayed.)
13 Q.   And now 910.
14      (Photograph displayed.)
15 Q.   Are those four photographs fair and accurate photographs
16 of what's depicted in them?
17 A.   Yes.
18          MR. WEINREB:  The government offers 907 to 910.
19          MR. WATKINS:  No objection.
20          THE COURT:  Okay.
21          (Government Exhibit Nos. 907, 908, 909 and 910
22 received into evidence.)
23          MR. WEINREB:  Let's start with 907.
24 BY MR. WEINREB:
25 Q.   So what are we looking at here?

1    A.    This is the exterior dorsal, or back side, of the gloves.
2    Q.    Did you take this photo?
3    A.    Yes, I did.
4    Q.    Where did you take it?
5    A.    At the crime laboratory.
6    Q.    Where did you first see these two gloves?
7    A.    When I was on-scene in Watertown on Laurel Street, there
8    was a Honda Civic parked in the middle of the street, and this
9    set of gloves was in there, in the front driver's side floor
10   area.
11   Q.    Who collected the gloves from the Honda?
12   A.    Kelly King.  She's another criminalist that works with me.
13   Q.    Do you know what she did with them?
14   A.    She collected them the next day and put them in a brown
15   paper bag and submitted them to the crime lab.
16   Q.    And then that's how you received them?
17   A.    Correct.
18   Q.    When you received them, were they packaged properly?
19   A.    Yes, they were.
20   Q.    Were they assigned a lab number?
21   A.    Yes, they were.
22   Q.    What number?
23   A.    13-08140.
24   Q.    Did they get an item number in addition to the -- that
25   number?

1  A.  Yes.  They're Item No. 12-9.
2  Q.  Did you test the outside of these gloves for blood?
3  A.  Yes, I did.
4  Q.  Did you collect -- well, let's just take a look.  So you
5  said we're looking at the backs of the gloves here?
6  A.  Correct.
7          MR. WEINREB:  Can we have 908, please.
8  Q.  And what's that a picture of?
9  A.  This is the exterior palmar side of the gloves.
10         MR. WEINREB:  909, please.
11 A.  That one is the interior palmar side.
12 Q.  Let's just focus on the outside of the gloves.  Did you
13 test the outside of the gloves for blood?
14         MR. WEINREB:  If you could go back to 908, please.
15 A.  Yes, I did.
16 Q.  What was the result of the test?
17 A.  I did confirm the presence of blood and indicated that it
18 was from a human.
19 Q.  Did you collect a sample of that blood for DNA testing?
20 A.  I collected four separate samples.
21 Q.  How did you do that?
22 A.  Once I had confirmed what stains were blood, I took a
23 sterile swab, I added some water to it and I just swabbed up
24 the stain.  And then once the swabs were dry, I packaged them
25 in a little tube and put it in a special storage area for DNA

1  testing.
2  Q.    Why four?
3  A.    I had wanted one from each side, so exterior palmar and
4  dorsal of left and right separately.
5  Q.    How were the samples labeled?
6  A.    Each tube has the case number, my initials, the date I
7  made the sample, and then the separate sample number of each
8  item.
9  Q.    Where did you actually put those samples after you took
10 them?
11 A.    Once I was done with them, we put them in a -- I put them
12 in a cold room, which is essentially a very large refrigerator
13 that is temperature and humidity controlled.
14 Q.    And is that something that DNA analysts have access to so
15 they can get those materials when they need them?
16 A.    Yes, they do.
17 Q.    Now, the way that you processed the gloves, everything
18 you've said to us, is that the standard practice at the lab for
19 collecting and preserving blood samples for DNA testing?
20 A.    Yes, it is.
21 Q.    Did you also prepare a blood sample obtained from the
22 defendant, Jahar Tsarnaev, via search warrant for DNA testing?
23 A.    Yes, I did.
24        MR. WEINREB:  Exhibit 1519, please, which is already
25 in evidence.

1  Q.   Do you recognize this?
2  A.   Yes.  That's a biohazard bag that has a blood tube in
3  it -- or three blood tubes, rather.
4          MR. WEINREB:  And 1521, please.
5  A.   That is the same bag, just the other side of it.
6  Q.   And again, you took these pictures?
7  A.   Yes, I did.
8  Q.   These were assigned an identifying number?
9  A.   Yes.
10 Q.   What's the number?
11 A.   They're with Case No. 13-08091, and specifically, Item No.
12 12-1 within that case.
13 Q.   How did you prepare this known blood sample for DNA
14 testing?
15 A.   I took just a portion of the liquid blood from each tube
16 separately and put it on a special piece of paper that has
17 preservatives to preserve the DNA in there.  And once it dried,
18 I put it into an envelope and put it into that cold room area
19 again.
20 Q.   Thank you.
21         MR. WEINREB:  I have no further questions.
22                     CROSS-EXAMINATION
23 BY MR. WATKINS:
24 Q.   Good afternoon, Ms. Waite.
25 A.   Good afternoon.

1  Q.   Did you also process a sweatshirt?
2  A.   Yes, I did.
3  Q.   And was that an Adidas sweatshirt?
4  A.   Yes, it was.
5  Q.   Do you recognize this picture that's on the monitor now?
6  A.   Yes; that's the sweatshirt I processed.
7  Q.   And I'm showing you what's been admitted as Exhibit 3061.
8  Do you recognize that as --
9  A.   Yes, this is the packaging for the sweatshirt you see in
10 the photo.
11 Q.   Now, that's FBI packaging.  Is that correct?
12 A.   Yes.
13 Q.   And when -- do you know, after the Massachusetts State
14 Police were done with it, did it indeed go to the FBI?
15 A.   Yes; I transferred it to an FBI agent.
16 Q.   Before you transferred it to the FBI agent, did you
17 conduct the similar kinds of tests for blood and other fluids?
18 A.   I tested for blood, yes.
19 Q.   And did you find blood on this Adidas sweatshirt?
20 A.   Yes, I did.
21 Q.   You found blood on several different spots, right?
22 A.   Yes, I did.
23 Q.   And actually, seven different spots that you processed for
24 further testing, right?
25 A.   There were ten areas that I identified blood on.  Eight of

1  those were tested later on in DNA.
2  Q.   And you anticipated my next question.  You did indeed send
3  those samples on for DNA processing?
4  A.   That's correct.
5  Q.   Now, at the Massachusetts State Police Criminalistics,
6  there a lot of different kinds of tests that can be performed
7  and a lot of people who can perform them, correct?
8  A.   Yes.
9  Q.   So in addition to DNA, there's also gunshot residue that
10 can be tested for?
11 A.   Yes, it can.
12 Q.   Moving back to the gloves that the government introduced,
13 that was -- are -- those gloves were also sent for gunshot
14 residue testing?
15 A.   I took a sample from the gloves and sent that forward for
16 GSR, or gunshot residue, primer testing.
17 Q.   And that's not a test that you do; there's a specialist
18 who does that test?
19 A.   That's correct.
20 Q.   And that would be John Drugan?
21 A.   Yes.
22 Q.   Similarly, the sweatshirt that you see before you on the
23 screen, was that sent for gunshot residue testing?
24 A.   I did take another sample from the sweatshirt and I did
25 send that to John as well for gunshot residue testing.

1          MR. WATKINS:  That's all I have.  Thank you.
2          MR. WEINREB:  I have nothing further.
3          THE COURT:  All right.  Thank you.  You may step down.
4          (The witness is excused.)
5                            * * *

```
                        C E R T I F I C A T E
```

I, Marcia G. Patrisso, RMR, CRR, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

Date:  3/19/15