```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )



              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                   JURY TRIAL - DAY THIRTY-FOUR
                              EXCERPT
                   TESTIMONY OF STEPHEN SILVA


             John J. Moakley United States Courthouse
                        Courtroom No. 9
                        One Courthouse Way
                   Boston, Massachusetts  02210
                      Tuesday, March 17, 2015
                           10:15 a.m.



                  Marcia G. Patrisso, RMR, CRR
                   Cheryl Dahlstrom, RMR, CRR
                      Official Court Reporters
                  John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                         (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                              I N D E X

2                                    Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  STEPHEN SILVA

5      By Mr. Chakravarty              4                  78
       By Ms. Conrad                          57                    82
6

7                           E X H I B I T S

8
   GOVERNMENT'S
9    EXHIBIT      DESCRIPTION                  FOR ID        RECEIVED

10  926        Plea agreement                                6

11  1179       Photograph                                    8

12  930        Photograph                                    25

13  928        Handgun                                       26

14  1185-01    Photograph                                    35

15  1185-12    Photograph                                    35

16  1185-36    Photograph                                    35

17  1201       Photograph                                    35

18  820        Photograph                                    40

19  1341       Photograph                                    41

20  1178       Photograph                                    43

21

22

23

24

25

P R O C E E D I N G S

1  
2         MR. CHAKRAVARTY:  The government calls Stephen Silva.

3                  STEPHEN SILVA, duly sworn

4         THE CLERK:  State your name, spell your last name for

5    the record, keep your voice up and speak into the mic.

6         THE WITNESS:  My name is Stephen Silva, S-T-E-P-H-E-N,

7    S-I-L-V-A.

8                    DIRECT EXAMINATION

9    BY MR. CHAKRAVARTY:

10   Q.   Good morning.  Mr. Silva, how old are you?

11   A.   Twenty-one years of age.

12   Q.   Where were you born?

13   A.   Boston, Massachusetts.

14   Q.   Where did you grow up?

15   A.   Boston, Massachusetts, for about nine, ten years, then I

16   moved to Cambridge.

17   Q.   Do you have family here?

18   A.   Yes.

19   Q.   Who did you grow up with?

20   A.   My mother, my sister, my twin brother and my older

21   brother.

22   Q.   You say you have a twin brother?

23   A.   Yes.

24   Q.   What's his name?

25   A.   Steven Silva.

1    Q.    And is he an identical twin?

2    A.    Yes.

3    Q.    Where do you currently reside?

4    A.    I'm currently incarcerated.

5    Q.    For what?

6    A.    Gun possession and heroin charges, conspiracy,

7    distribution.

8    Q.    How long have you been incarcerated?

9    A.    About eight months.

10   Q.    And what is the status of your criminal case?

11   A.    Pending.

12   Q.    Have you pleaded guilty?

13   A.    Yes, I have.

14   Q.    Have you come to a plea agreement with the government?

15   A.    Yes, I have.

16   Q.    And you've come before a judge in this court and you've

17   pled guilty?

18   A.    Yes, I have.

19         MR. CHAKRAVARTY:  I'd call up Exhibit 926 for the

20   witness, please.

21   Q.    Do you recognize this?

22   A.    Yes, I do.

23   Q.    What is it?

24   A.    It's the plea agreement.

25         MR. CHAKRAVARTY:  And could we go to the last page,

1   Mr. Bruemmer.

2   Q.   Is this page 15 of that agreement?

3   A.   Yes, it is.

4   Q.   Do you see your signature on that?

5   A.   Yes, I do.

6           MR. CHAKRAVARTY:  I'd move into evidence Exhibit 926.

7           MS. CONRAD:  No objection.

8           THE COURT:  All right.

9           (Government Exhibit No. 926 received into evidence.)

10  BY MR. CHAKRAVARTY:

11  Q.   Mr. Silva, can you explain in a sentence what you

12  understand your obligation under this plea agreement to be?

13  A.   It is my understanding that if I cooperate and give

14  truthful testimony, I stand a better chance at sentencing.

15  Q.   Who makes the decision on whether you get a better

16  sentence?

17  A.   The judge and only the judge.

18  Q.   Now, after you were arrested for your criminal case, did

19  you agree to talk to the government?

20  A.   Yes, I did.

21  Q.   Have you met with the prosecutors several times?

22  A.   Yes, I have.

23  Q.   Have you talked about your testimony in this case?

24  A.   Yes, I have.

25          MS. CONRAD:  Objection to leading at this point, your

1    Honor.

2              THE COURT:  Go ahead.

3    BY MR. CHAKRAVARTY:

4    Q.   Do you know Jahar Tsarnaev?

5    A.   Yes, I do.

6    Q.   Do you see him in the courtroom today?

7    A.   Yes, I do.

8    Q.   How do you know him?

9    A.   I was close friends with him.  I recognize him.

10   Q.   Can you please point to him and identify him by something

11   he's wearing?

12   A.   He's wearing a black sports jacket.

13             MR. CHAKRAVARTY:  I'd ask the record reflect the

14   witness has identified the defendant.

15             THE COURT:  All right.

16   BY MR. CHAKRAVARTY:

17   Q.   You said you were friends with him.  Where did you first

18   meet him?

19   A.   Eighth grade.

20   Q.   Where was that?

21   A.   The Community Charter School of Cambridge.

22   Q.   And how often did you see him while you were in eighth

23   grade?

24   A.   Every day.

25   Q.   And did that continue through high school?

1    A.    Yes.

2    Q.    Did you graduate together?

3    A.    Yes.

4    Q.    When was that?

5    A.    June 2011.

6    Q.    All right.

7            MR. CHAKRAVARTY:  Can I call up Exhibit 1179?

8    Q.    What's that?

9    A.    That's a picture of me and Jahar before graduation.

10   Q.    That's how you appeared back in June of 2011?

11   A.    Yes.

12           MR. CHAKRAVARTY:  Move into evidence 1179.

13           MS. CONRAD:  No objection.

14           THE COURT:  All right.

15           (Government Exhibit No. 1179 received into evidence.)

16           MR. CHAKRAVARTY:  Ask to publish, your Honor.

17   BY MR. CHAKRAVARTY:

18   Q.    When you were in high school -- I'm sorry.  I'll give it a

19   second.

20         When you were in high school, how often would you interact

21   with the defendant?

22   A.    Every day usually.

23   Q.    And describe your relationship.

24   A.    We had a very close relationship.  He was the person who I

25   would consider, you know, one of my best friends back in the

1    day.

2    Q.    Did you know him by any other names?

3    A.    I called him "Jizz."

4    Q.    How often would you see him after graduating?

5    A.    Pretty often.

6    Q.    Did you graduate together in June 2011?

7    A.    Yes, we did.

8    Q.    What did you do after high school?

9    A.    After high school I went to college down in Tampa,

10   Florida.

11   Q.    And do you know where the defendant went to school?

12   A.    Yes.

13   Q.    Where did he go?

14   A.    UMass Dartmouth.

15   Q.    Did you stay in touch with him?

16   A.    Yes, I did.

17   Q.    How often?

18   A.    Pretty often.

19   Q.    How would you keep in touch with him?

20   A.    Text messages, phone calls, Facebook.

21   Q.    What kinds of things would you talk about with the

22   defendant?

23   A.    You know, how college, first semester -- you know, girls,

24   partying, you know, getting accustomed to being in college.

25   Q.    Where did your brother go to college?

1    A.    His first semester, freshman year he also attended UMass

2    Dartmouth.

3    Q.    Was your brother close with the defendant as well?

4    A.    Yes.

5    Q.    After you graduated high school, as you were going to

6    college, what did you do for money?

7    A.    I was lifeguarding.  I was also selling weed, marijuana.

8    Q.    When you say lifeguarding, was that at a pool?

9    A.    Yes.

10   Q.    Where was that?

11   A.    At one of the Harvard pools in Allston, Massachusetts.

12   Q.    And did the defendant at one point also do that?

13   A.    Yes, he did.

14   Q.    You said you were selling weed?

15   A.    Yes.

16   Q.    You mean marijuana?

17   A.    Yes.

18   Q.    When did you first start selling marijuana?

19   A.    About 16, 17, in high school.

20   Q.    How much marijuana were you selling after you graduated

21   high school?

22   A.    After I graduated high school, selling about quarter

23   pounds, half pounds.

24   Q.    Per week?

25   A.    Less than that.  Maybe every two weeks, three weeks

1    depending.

2    Q.    About how much money were you making from selling

3    marijuana after high school?

4    A.    It depends.  Anywhere between 500, a thousand dollars,

5    maybe a little less, maybe a little more.

6    Q.    When you went down to Florida, where would you get your

7    marijuana?

8    A.    I was getting it from local suppliers in the Tampa area.

9    Q.    At some point did you come back to Massachusetts?

10   A.    Yes, I did.

11   Q.    When was that?

12   A.    During the spring 2012, after my freshman year was over.

13   Q.    So in the spring of 2012, when you came back did you see

14   the defendant then?

15   A.    Yes, I did.

16   Q.    And what would you do?

17   A.    Same things we always did:  hung out.

18   Q.    Describe for the jury what would happen when you guys

19   would just hang out.

20   A.    He'd usually pick me up in his car, we'd hang out, smoke

21   weed, listen to music, talk, go to the pool, maybe.  Hang out.

22   Sometimes he would take me to this reservoir spot near

23   Swampscott, you know, jump off a cliff, hang out, drink.  You

24   know, normal teenager stuff.

25   Q.    Did you continue to sell drugs when you came back to

1    marijuana -- excuse me -- back to Massachusetts?

2    A.    Yes.

3    Q.    Why did you go down to Florida and leave Massachusetts to

4    go to college?

5    A.    I wanted to get out of Massachusetts for a little bit.  I

6    feel like I had spent my whole life in Mass., and I wanted to

7    you know, experience something a little different, something I

8    wasn't used to.

9    Q.    After your freshman year of college, did you go -- did you

10   decide to stay in Massachusetts?

11   A.    After my freshman year I decided to stay in Massachusetts

12   for a little bit.  Yes, I did.

13   Q.    And did you continue to sell drugs up here?

14   A.    Yes.

15   Q.    Now, near the end of 2012 did you go back to Florida?

16   A.    Yes, I did.

17   Q.    Were you enrolled as a student?

18   A.    No, not at that time.

19   Q.    Why did you go back?

20   A.    Some things had came up around Boston.  I just felt it

21   necessary to get out of Boston for a little.  So I thought I'd

22   just take a little vacation and go back down to Florida.

23   Q.    What came up in Boston?

24   A.    Supposedly my mother told me the police came to my house

25   looking for me, asking questions about something drug related.

```
 1    So I just decided it was best for me to leave the area for a
 2    little bit.
 3    Q.   And what did you do when you got down to Florida?
 4    A.   When I got down to Florida I just hung out at a friend's
 5    house and continued selling weed.
 6    Q.   How long did you do that for?
 7    A.   From about the middle of August until the end of November.
 8    Q.   November 2012?
 9    A.   Yes.
10    Q.   And then did you come back to Massachusetts?
11    A.   Yes, I did.
12    Q.   Where did you go?
13    A.   At that time I came back from Florida, my brother and
14    friend had an apartment in Revere, Massachusetts.
15    Q.   And who is your friend?
16    A.   My friend Nicholas Silva.
17    Q.   So your brother Steven Silva and your friend Nicholas
18    Silva --
19    A.   Yes.
20    Q.   -- were in an apartment together?
21    A.   Yes.
22    Q.   Did you have a business relationship with them as well?
23    A.   Yes.
24    Q.   What was that business relationship?
25    A.   Just primarily selling marijuana.
```

1    Q.   Where were you getting your supply of marijuana from?

2    A.   A local supplier.

3    Q.   Did you repackage the marijuana?

4    A.   Yes.

5    Q.   About how much money were you making per week when you

6    came back?

7    A.   By the time I came back, I was selling more quantity, so

8    between a thousand and two thousand, give or take.  Less maybe.

9    Q.   Did the defendant come to your apartment?

10   A.   Yes.

11   Q.   How often?

12   A.   At least a few times a month.

13   Q.   How often would you communicate with the defendant around

14   this time?

15   A.   Pretty often.

16   Q.   What does "pretty often" mean?

17   A.   At least a couple of times a week.

18   Q.   Can I ask you whether any of your business partners had

19   ever been robbed?

20   A.   Yes.

21   Q.   Who?

22   A.   My twin brother.

23   Q.   Approximately when was that?

24   A.   About October 2012.  October.

25   Q.   Was he robbed of money?

1    A.    No.

2    Q.    What was he robbed of?

3    A.    Marijuana, product.

4    Q.    About how much?

5    A.    About two pounds.

6    Q.    How much was that worth if you broke it up?

7    A.    Anywhere between six, ten thousand dollars.

8    Q.    Was being robbed a concern of yours?

9    A.    Yes.

10   Q.    And did the three of you who lived together have that

11   concern?

12   A.    Yes.

13   Q.    Did you ever have discussions about obtaining a gun?

14   A.    Yes.

15   Q.    With who?

16   A.    My brother and my cousin, my friend Nick.

17   Q.    And what was that conversation?

18   A.    After my brother was robbed, we just started talking about

19   maybe obtaining a gun, you know, for protection.

20   Q.    And near the end of 2012 did an opportunity arise

21   to obtain --

22   A.    Yes.

23   Q.    Explain that opportunity.

24   A.    Well, like I said, me and my brother and my friend had

25   been talking about obtaining a gun, and around the same time a

1    friend of mine from my neighborhood, he had asked me if I could

2    do him a favor and hold down a firearm for him because he

3    needed to get it out of his house.

4    Q.   What was his name?

5    A.   Howie.

6    Q.   And did you agree to take the gun?

7    A.   Yes.

8    Q.   Did he get you the gun?

9    A.   Excuse me.  Repeat that?

10   Q.   Did he get you the gun?

11   A.   Yes.

12   Q.   What kind of gun was it?

13   A.   It was a P95 Ruger.

14   Q.   After you got the gun, what did you do with it?

15   A.   I put it -- I stored it away in my apartment, in a ceiling

16   panel.

17   Q.   Who else knew --

18        THE COURT REPORTER:  I'm sorry, in your apartment

19   in...

20        THE WITNESS:  In my apartment in Revere.

21        THE COURT:  In a ceiling panel.

22   BY MR. CHAKRAVARTY:

23   Q.   The court reporter is taking down everything you're

24   saying, so if you speak slowly, she'll get it.

25   A.   Okay.

1    Q.   The ceiling panel in your apartment in Revere, is that

2    where you put the gun?

3    A.   Yes.

4    Q.   Who else knew about the gun?

5    A.   My twin, my friend and a few close associates.

6    Q.   And did you tell people?

7    A.   Yes.

8    Q.   Some of those close associates?

9    A.   Yes.

10   Q.   Did you tell the defendant?

11   A.   Yes.

12   Q.   What was his reaction when you told him that you had a

13   gun?

14   A.   It wasn't much of a reaction.  He just acknowledged it.

15   Q.   When people -- some of your close associates came to the

16   house, did you show them the gun?

17   A.   Yes.

18   Q.   Did you ever take the gun out of the apartment?

19   A.   Yes.

20   Q.   What's the first time you remember taking the gun out of

21   the apartment?

22   A.   I took the gun out of the apartment sometime in December

23   to commit a robbery.

24   Q.   And who was with you?

25   A.   My friend Nicholas.

1    Q.    And how did you set up the robbery?

2    A.    Through a mutual friend.

3    Q.    And was this going to be a drug deal?

4    A.    Yes.

5    Q.    And where was the robbery going to occur?

6    A.    Cambridge.

7    Q.    And did you go to Cambridge?

8    A.    Yes.

9    Q.    Who did you go with?

10   A.    I went with my friend Nicholas.

11   Q.    Who had the gun?

12   A.    Me and Nicholas.

13   Q.    When you got there, did you meet with two individuals?

14   A.    Yes, I did.

15   Q.    Was it in their car?

16   A.    Yes.

17   Q.    Explain what happened.

18   A.    Me and Nicholas got into the car.  We were in the

19   backseat.  There were two individuals in the front passenger

20   seat.  We had talked very shortly, for a couple of minutes.  We

21   had asked to see the money; they had asked to see the

22   marijuana.  When the person in the passenger seat passed me the

23   money I put it in my pocket, and then Nicholas reached into a

24   bag, pulled out the gun, cocked back the slide, and then that

25   was pretty much it.

1    Q.   What was the reaction of the two individuals?

2    A.   They were in a state of panic and shock.

3    Q.   Did they leave?

4    A.   We left the car after we had the money and then they

5    eventually, I assume, drove back home.

6    Q.   Did you tell other people what happened?

7    A.   Yes.

8    Q.   And before that incident, had you ever handled a gun

9    before?

10   A.   A little bit, yes.

11   Q.   So had you handled a gun besides this gun?

12   A.   No.

13   Q.   Did you tell the defendant about the robbery?

14   A.   Yes.

15   Q.   What was his reaction?

16   A.   He laughed.

17   Q.   Did you take the gun out of your residence again?

18   A.   Yes, one more time.

19   Q.   When was that?

20   A.   New Year's Eve 2012.

21   Q.   And where did you take it?

22   A.   To a friend's apartment in Medford, Massachusetts.

23   Q.   What was happening there?

24   A.   Nothing.  We were just throwing a New Year's Eve party.

25   Q.   Why did you take it there?

1    A.    I was just being stupid.  I wanted to show it off.

2    Q.    And did you?

3    A.    Yes.

4    Q.    Did the defendant come to that house?

5    A.    Yes.

6    Q.    Did you bring it back ultimately to your apartment at some

7    point?

8    A.    Yes, I did.

9    Q.    You say you did.  Who else knew about the gun?

10   A.    Me, my twin brother, the defendant and a few close

11   associates.

12   Q.    And how about Nicholas?

13   A.    Yes.

14   Q.    Now, after that early January trip with the gun, did you

15   talk to the defendant again about the gun?

16   A.    Yes.

17   Q.    About when was that?

18   A.    Sometime in January.

19   Q.    How did you have that conversation?

20   A.    It started over the phone and then talked about it with

21   him in person.

22   Q.    When you talked to him about the gun, did he ask you for

23   anything?

24   A.    Yes.

25   Q.    What did he ask you for?

```
 1    A.    He asked me to potentially borrow the gun.

 2    Q.    Why did he ask you to borrow the gun?

 3              MS. CONRAD:  Objection to that in that form.

 4              THE COURT:  Sustained to the form of the question.

 5    BY MR. CHAKRAVARTY:

 6    Q.    For what purpose did he ask for the gun?

 7              MS. CONRAD:  Objection.  Same objection.

 8              THE COURT:  Yeah, rephrase it.

 9    BY MR. CHAKRAVARTY:

10    Q.    Did he tell you why he needed the gun?

11    A.    Yes.

12    Q.    What did he tell you?

13    A.    He said he wanted to rip some kids from URI.

14    Q.    When you say "rip," what does that mean?

15    A.    Rob.

16    Q.    Is that what you did with Nicholas a few months earlier?

17    A.    Yes.

18    Q.    Did he make arrangements to come by your apartment?

19    A.    Yes.

20    Q.    Approximately when did he come by your apartment?

21    A.    Within the next couple of weeks after we started talking

22    about the gun.

23    Q.    And was he regularly coming to your apartment around this

24    time?

25    A.    Yes, about a few times a month when he could.
```

1   Q.   And did he actually come to talk about the gun?

2   A.   Yes.

3   Q.   Was he with anyone?

4   A.   Yes, he was.

5   Q.   Who was he with?

6   A.   Dias.  I can't pronounce his last name.

7   Q.   Is it Dias Kadyrbayev?

8   A.   Yes.

9   Q.   Was he a friend of the defendant's?

10  A.   Yes.

11  Q.   Did you know him as well?

12  A.   Yes, I did.

13  Q.   Where did you know him from?

14  A.   He was a good friend of my brother and the defendant's

15  from UMass Dartmouth.

16  Q.   Who else was there?

17  A.   Nicholas, my twin brother, and my friend Abdul.

18  Q.   And what did you guys do?

19  A.   We just hung out, chilled, smoked weed.  Same thing we

20  usually do.

21  Q.   At some point did the conversation turn to the gun?

22  A.   Yes.

23  Q.   What did you do?

24  A.   I took the gun out of the ceiling panel and showed it to

25  the defendant and Dias.

1    Q.    What was the gun stored in?

2    A.    It was stored in a sock.

3    Q.    Just a regular tube sock?

4    A.    Yes.

5    Q.    Did you hand the defendant the gun?

6    A.    Yes.

7    Q.    What did he do with it?

8    A.    Handled it, acknowledged it, tried to pass it to Dias.

9    Dias didn't want to touch it.  And he gave it back to me and I

10   put it away.

11   Q.    Did you talk about ammunition?

12   A.    Yes.

13   Q.    Did you have ammunition?

14   A.    Yes.

15   Q.    Where was that?

16   A.    It was in another sock inside the ceiling panel.

17   Q.    Did you show him that?

18   A.    Yes.

19   Q.    About how much ammunition did you have?

20   A.    About ten rounds.

21   Q.    Is ten rounds ten bullets?

22   A.    Yes.

23   Q.    Was there a magazine as well?

24   A.    Yes.

25   Q.    Did the defendant say anything when you handed him the gun

1   or the ammunition?

2   A.   He just took the gun, looked at it, acknowledged it,

3   didn't really say much.

4   Q.   Describe the gun.

5   A.   The gun's black.  It was kind of -- looked a little rusty.

6   The top slat part had kind of like a little reddish-orange hue

7   to it.  The serial number was obliterated on a silver panel.

8   And it said "P95" on the top slide, and it also says "Ruger" on

9   the side of the gun.

10  Q.   Now, do you know much about guns?

11  A.   No, not really.

12  Q.   You said the serial number was obliterated.  What does

13  that mean?

14  A.   Scratched off, or made to appear so that you can't read

15  it.

16  Q.   And have you pled guilty to possessing this gun with the

17  obliterated serial number?

18  A.   Yes, I have.

19        MR. CHAKRAVARTY:  Call up Exhibit 930 for the witness.

20  Q.   Do you recognize that?

21  A.   Yes.

22  Q.   What is it?

23  A.   That's the gun I possessed.

24  Q.   How do you recognize it?

25  A.   Because I've had it in my hands, I've seen it multiple

1    times, I've dealt with it.

2            MR. CHAKRAVARTY:  I'd ask that Exhibit 930 be

3    introduced.

4            MS. CONRAD:  No objection.

5            THE COURT:  All right.

6            (Government Exhibit No. 930 received into evidence.)

7            THE COURT:  Displayed?

8            MR. CHAKRAVARTY:  Please.

9            I'd like to approach in the meantime.

10   BY MR. CHAKRAVARTY:

11   Q.   Looking at this picture, Mr. Silva, can you describe some

12   of the features you mentioned earlier?  There's a screen

13   on that you can touch, and if you put your finger on it, then

14   it will put notes on the screen, so the jury can see what

15   you're talking about.

16   A.   The serial number is obliterated.  This is the silver

17   panel.  It says "Ruger" on the side of the gun.  It has the

18   reddish rust tint I referred to earlier.  As you can see from

19   the picture, it looks pretty rusty.  There's a lot of color to

20   the gun.  "P95" around there.  And that's about it.

21           MR. CHAKRAVARTY:  May I approach, your Honor?

22           THE COURT:  You may.

23           (Pause.)

24           MR. CHAKRAVARTY:  For the record, your Honor, I have

25   an item in my hand that has been rendered safe, and I want the

1    witness to know that before I hand it to him.

2    BY MR. CHAKRAVARTY:

3    Q.   Mr. Silva, do you recognize this item?

4    A.   Yes.

5    Q.   What do you recognize it to be?

6    A.   The gun I gave to the defendant.

7    Q.   How do you recognize it?

8    A.   From all the characteristics I've already explained, and

9    the Ruger, that obliterated serial number, the reddish hue

10   tint.

11   Q.   When did you give this gun to the defendant?

12   A.   About sometime in February 2012 -- 2013.

13           MR. CHAKRAVARTY:  I move into evidence Exhibit 928.

14           MS. CONRAD:  No objection.

15           THE COURT:  All right.  928 is admitted.

16           (Government Exhibit No. 928 received into evidence.)

17   BY MR. CHAKRAVARTY:

18   Q.   Mr. Silva, after you had your conversation with the

19   defendant and you showed him the gun, did he take it?

20   A.   Not at that specific time, no.

21   Q.   How long after you showed him the first time did he take

22   it?

23   A.   Within a few weeks.

24   Q.   Did he tell you that he was going to come over to pick it

25   up?

1  A.   Yes.

2  Q.   And why did he not pick it up on that day?  What did he

3  tell you about why he didn't pick it up on that day?

4  A.   Either he told me that he didn't want to drive back with

5  that -- with that type of, you know, things on him.  I think he

6  already had marijuana or something on him; he didn't want to

7  drive with all the hassle.

8  Q.   Were you expecting to get the gun back shortly after you

9  gave it to him?

10  A.   Yes, I was.

11  Q.   And how long after you had given him the gun did you

12  expect to get it back?

13  A.   Within a couple of weeks at most.

14  Q.   Let's talk a little bit more about the interaction where

15  he actually picked up the gun.  Did he come to your house?

16  A.   Yes.

17  Q.   And what happened?

18  A.   We hung out for a little bit, did the same things we

19  usually do.  At some point I gave the defendant the gun.

20  Q.   Did he ask for anything else?

21  A.   I gave him ammunition.

22  Q.   Did he use a particular phrase to ask for the ammunition?

23  A.   I remember him saying something like "food for the dog."

24  Q.   What did you take that to mean?

25  A.   Ammo, bullets.

1    Q.   How would you refer to the gun with the defendant?

2    A.   We would -- we wouldn't talk about it over the phone, you

3    know.  We wouldn't say "gun" or anything.  We would refer to it

4    in phrases that were less definite.

5    Q.   Was that just in case someone was listening?

6    A.   Yes.

7    Q.   When you gave him the gun, was he alone or with anyone?

8    A.   No, he was alone.

9    Q.   Do you remember what car he was driving?

10   A.   I think it was a black Camaro.

11   Q.   And did you recognize that car?

12   A.   Yes.

13   Q.   Whose was it?

14   A.   It was a friend of the defendant's, some Indian kid from

15   UMass Dartmouth.

16   Q.   Was that a car you had seen him driving before?

17   A.   Yes.

18   Q.   After you gave him the gun, when's the next time you

19   talked to him about the gun?

20   A.   Oh, a couple of weeks, three weeks after I gave it to him.

21   Q.   And why was that?

22   A.   Because I just wanted to ask him what happened with the

23   situation and if he was done using it because I wanted it back.

24   Q.   Why did you want the gun back?

25   A.   Around that time the person who gave it to me, Howie, he

1    kept calling me and asking me to return the gun.  So I wanted

2    to give him back, you know, the gun that he let me borrow.

3    Q.   Did Howie explain to you why he gave you the gun in the

4    first place?

5    A.   Yeah, he gave it to me because his mother had searched his

6    room and he needed to get it out of the house.

7    Q.   Did he tell you anything about the gun?

8    A.   He told me that it was, quote/unquote --

9              MS. CONRAD:  Objection.

10             THE COURT:  Sustained.

11   BY MR. CHAKRAVARTY:

12   Q.   Was -- when you received the gun, was the serial number

13   obliterated or not?

14   A.   Yes, it was obliterated.

15   Q.   Did you tell Howie why you couldn't give the gun back?

16   A.   No, I did not.

17   Q.   Did you continue to have contact with the defendant

18   through February and into April of 2013?

19   A.   Yes.

20   Q.   About how often?

21   A.   Same amount as usual.

22   Q.   About once a week?

23   A.   Yeah, around there.  Once a week, twice a week.

24   Q.   Did the defendant give you the gun back?

25   A.   No, he did not.

1    Q.   Did you continue to ask him for the gun?

2    A.   Yes, I did.

3    Q.   In addition to yourself asking, did other people ask him?

4    A.   Yes.

5    Q.   Who else asked him?

6    A.   Nicholas.

7    Q.   How did Nicholas ask him?

8    A.   He sent him a text via phone.

9    Q.   Did the defendant respond to Nicholas?

10   A.   No, he did not.

11   Q.   Did the defendant respond to you?

12   A.   Yes, he did.

13   Q.   What did the defendant tell you as to why he couldn't give

14   the gun back?

15   A.   He just kept coming up with excuses saying he -- when he

16   would come, he was in a rush, "I couldn't bring it," was just

17   beating around the bush, I'd say.

18   Q.   Did he mention he was doing anything with the gun at that

19   point?

20   A.   No.

21        MS. CONRAD:  Objection.  Objection.

22        THE COURT:  Overruled.

23   BY MR. CHAKRAVARTY:

24   Q.   Did he mention what he did on spring break?

25   A.   No, he did not.

1   Q.   Did he tell you -- strike that.

2        How were you communicating with the defendant during this

3   time?

4   A.   Cell phone usually.

5   Q.   Was that text as well as phone calls?

6   A.   Yes.

7   Q.   Do you still have the phone that you were using?

8   A.   No, I do not.

9   Q.   Where is it?

10  A.   No idea.  It was disposed of.

11  Q.   We'll get to that in a second.

12       Let's talk a little bit about the defendant.  How good of

13  a student was the defendant?

14  A.   The defendant was a very good student in high school.

15  Q.   What did he tell you about his grades?

16  A.   I know in high school he had a pretty high grade point

17  average, in the high 80s.

18  Q.   And how about in college?

19  A.   We didn't -- he told me his first semester he had kind of

20  struggled a little bit, but then his second semester he had

21  stopped messing around and improved his GPA highly.

22  Q.   Did you take classes with him in high school?

23  A.   Yes, I did.

24  Q.   And particularly in junior and senior year, did you take a

25  class with Mr. Matteo and Ms. Otty?

1    A.    Yes.

2    Q.    Were there ever conversations about terrorism in those

3    classes?

4    A.    In Ms. Otty's class, yes.

5    Q.    And did the defendant participate in one of those

6    conversations?

7    A.    Yes.

8    Q.    Describe it.

9    A.    Ms. Otty, she had raised the question about

10   whether -- whether we as students believed that terrorism is

11   ever justified and what is terrorism, why do people -- or why

12   do sometimes people resort to acts of terrorism to prove their

13   point, something along those lines.

14   Q.    And did the defendant answer?

15   A.    Yes.

16   Q.    What did he say?

17   A.    At this point in class I remember we were having a debate

18   about American foreign policy in the Middle East and what are

19   the sort of issues that America deals with in the Middle East.

20   And the defendant had raised a point that American

21   soldiers tend -- American foreign policy sometimes tends to be

22   a little hostile towards the Middle East, you know, persecuting

23   Muslims, going to war, trying to take over the people's

24   culture, you know, to tell them what to do, stuff like that.

25   Q.    And because of that, what?

A.   And because of that, you know, it's wrong.  Americans

shouldn't be allowed to just go wherever they want and try to

force people to believe in what they believe and not let them

live their own lives or believe their own things that they want

to believe in.

Q.   Did you ever visit the defendant at his residence in

Cambridge?

A.   Yes.

Q.   When?

A.   About the same time, in the summer of 2012.

Q.   So that's after you graduated, after you had already gone

to college, when you came back?

A.   Yes.

Q.   Why did you visit him that summer?

A.   I remember that specific night me and my mother had gotten

into an argument, and me and my twin brother left the house for

the night so we needed a place to stay.

Q.   So was it you and your brother went there?

A.   Yeah.

Q.   When you got to his house in Cambridge, had you been there

before?

A.   I had been around his house.  I think that was the first

time I had entered his home.

Q.   And was there anyone else at home when you got there?

A.   It was just me and my twin brother, Jahar, and I believe

1    his niece and brother's wife.

2    Q.    Brother's wife?

3    A.    Yes.

4    Q.    What did you guys do?

5    A.    We were inside his -- the defendant's bedroom.  I was on

6    the top bunk bed, and the defendant and my brother were

7    watching "The Walking Dead" on his computer.

8    Q.    The TV show?

9    A.    Yes.

10   Q.    Is that a TV show that he enjoyed?

11   A.    Yes.

12   Q.    I'm going to show you some pictures.

13         MR. CHAKRAVARTY:  Call up 1185-01.

14         This is for the witness, your Honor.

15   Q.    Do you recognize that?

16   A.    Yes.

17   Q.    What is it?

18   A.    The defendant's home.

19         MR. CHAKRAVARTY:  1185-12.

20   Q.    What's that?

21   A.    That's the defendant's bedroom.

22   Q.    And particularly, do you recognize the bed?

23   A.    Yes.  The top bed bunk [sic] is where I slept that night.

24         MR. CHAKRAVARTY:  1185-36.

25   Q.    Do you recognize that?

1    A.    Yes.

2    Q.    What is that?

3    A.    The defendant's desktop/laptop computer.

4    Q.    Is it a desktop or a laptop?

5    A.    It looks like a desktop.

6    Q.    And was that in that room?

7    A.    Yes.

8    Q.    The same room with the bed?

9    A.    Yes.

10   Q.    Was that the defendant's room?

11   A.    Yes.

12         MR. CHAKRAVARTY:  1201, please.

13   Q.    Do you recognize that?

14   A.    Yes.

15   Q.    What is that?

16   A.    That's a flag.

17   Q.    Was that in the bedroom?

18   A.    Yes.

19         MR. CHAKRAVARTY:  I'd move into evidence 1185-01,

20   1185-12, 1185-36 and 1201.

21         MS. CONRAD:  Objection to 1185-36, your Honor, because

22   I don't think it's been established that's what it looked like

23   at that time.

24         THE COURT:  I think it's sufficient.  I'll admit it.

25         (Government Exhibit Nos. 1185-01, 1185-12, 1185-36 and

1    1201 received into evidence.)

2              MR. CHAKRAVARTY:  Ask to publish, your Honor.

3              THE COURT:  Which one?

4              MR. CHAKRAVARTY:  I'm sorry.  1185-01 we'll start

5    with.

6    BY MR. CHAKRAVARTY:

7    Q.   Is this the structure in which the defendant lived?

8    A.   Yes.

9    Q.   Was it the third floor of this apartment?

10   A.   Yes.

11             MR. CHAKRAVARTY:  1185-12.

12   Q.   And is this the bed in his room?

13   A.   Yes.

14   Q.   It's a bunkbed?  In this picture, in which direction was

15   the computer?

16   A.   To the right side of the bed towards --

17   Q.   Over there?  Okay.

18             MR. CHAKRAVARTY:  1185-36.

19   Q.   And this is a computer?

20   A.   Yes.

21   Q.   And is this where they were watching "The Walking Dead"?

22   A.   Yes.

23   Q.   And where in relation to this was the flag?  Which

24   direction?

25   A.   I believe the flag was along the wall towards the middle

 1    of the room.
 2            MS. CONRAD:  Can we get some clarification on which
 3    flag we're talking about?  The flag that's depicted here or the
 4    other picture?
 5            MR. CHAKRAVARTY:  We could move on.
 6    BY MR. CHAKRAVARTY:
 7    Q.   The flag on the wall that I showed you earlier, was that
 8    on the wall to the right?
 9    A.   Yeah.
10            MR. CHAKRAVARTY:  Okay.  Can we go to that exhibit,
11    1201?
12    Q.   So is this flag facing the bed?
13    A.   Yes.
14    Q.   How long -- did you leave that morning?
15    A.   The next morning, yes.
16    Q.   Is that the only time you spent the night at the
17    defendant's house?
18    A.   Yes.
19    Q.   Has he come to your home?
20    A.   Yes, he'd come to my home before.
21    Q.   Where is your home?
22    A.   My mother has an apartment in Cambridge near the Charles
23    River.
24    Q.   Is that off of Memorial Drive?
25    A.   Yes.

```
 1            MR. CHAKRAVARTY:  I'd ask to show Exhibit 742.  This
 2    is in evidence, your Honor.
 3            THE COURT:  This is in evidence?
 4            MR. CHAKRAVARTY:  It is in evidence.
 5    BY MR. CHAKRAVARTY:
 6    Q.   Do you recognize this intersection?
 7    A.   Yes, I do.
 8    Q.   And does it show where your mother lives?
 9    A.   Yes, it does.
10    Q.   Can you just circle that area?
11    A.   (Witness complies.)
12    Q.   All right.  So you just --
13    A.   Sorry.
14    Q.   That's all right.  So let me just orient you a little bit.
15    Are there two gas stations in that intersection?
16    A.   Yes.
17    Q.   And there's a Shell Gas Station and a Mobil Gas Station?
18    A.   Yes.
19    Q.   And next to the Mobil Gas Station where you just circled,
20    is there an apartment tower?
21    A.   Yes.
22    Q.   Okay.  And is that where you grew up?
23    A.   Yes.
24    Q.   One of the places you grew up?
25    A.   Yes.
```

1   Q.   How much would the defendant visit you there?

2   A.   During high school, a lot.

3   Q.   What's "a lot" mean?

4   A.   A few times a week.

5           MR. CHAKRAVARTY:  Exhibit 743.

6   Q.   Is this the Shell Gas Station from across the street?

7   A.   Yes, it is.

8   Q.   How often would you go there?

9   A.   Every day.

10  Q.   Would you go there with the defendant?

11  A.   Multiple times I've gone there with the defendant, yes.

12  Q.   Why would you go there with the defendant?

13  A.   Cop snacks, water, Gatorade, blunts to roll marijuana in.

14  Q.   It sounds like you hung out with the defendant a fair

15  amount up through high school?

16  A.   Yes.

17  Q.   And then even afterwards, in college.  Is that right?

18  A.   Yes.

19  Q.   Did you ever know him to wear a knit hat, like in the

20  winter?

21  A.   Yes.

22  Q.   I show you Exhibit 820.

23          MR. CHAKRAVARTY:  Just for the witness, your Honor.

24  Q.   Do you recognize that?

25  A.   Yes.

1    Q.   What do you recognize it to be?

2    A.   The defendant's Boston Red Sox winter hat.

3    Q.   And you had seen him wearing this?

4    A.   Yes.

5              MR. CHAKRAVARTY:  I'd move into evidence Exhibit 820.

6              MS. CONRAD:  No objection.

7              THE COURT:  All right.

8              (Government Exhibit No. 820 received into evidence.)

9              MR. CHAKRAVARTY:  Exhibit 1341 just for the witness.

10   I'm not sure whether this is in.  Strike that.  1349.

11             Go back to 1341, please.

12   BY MR. CHAKRAVARTY:

13   Q.   Do you recognize this picture?

14   A.   Yes.

15   Q.   What do you recognize it to be?

16   A.   The defendant in his bedroom, it seems.

17   Q.   And how do you know that it's the defendant in his

18   bedroom?

19   A.   The flag on the wall.

20   Q.   The same flag you just were talking about a little while

21   ago?

22   A.   Yes.

23   Q.   Do you recognize the chair?

24   A.   Yes.

25   Q.   Do you recognize the computer table?

1    A.    Yes.

2    Q.    And was this in substantially the same condition of his

3    room when you were there?

4    A.    Yes.

5              MR. CHAKRAVARTY:  I'd move into evidence Exhibit 1341.

6              MS. CONRAD:  No objection to the photograph, your

7    Honor, but I can't even see what the writing is, and I don't

8    think there's any foundation on that.

9              MR. CHAKRAVARTY:  We can redact that at this point,

10   and it will --

11             MS. CONRAD:  You should redact it before it's

12   published, then.

13             THE COURT:  Well, it's illegible.

14             MS. CONRAD:  My eyes are pretty bad.  The jury's

15   vision might be a little better than mine.

16             THE COURT:  I think we can --

17             MR. CHAKRAVARTY:  I can zoom in, your Honor.

18             THE COURT:  That's a better...

19             All right.  And the rest will be redacted.

20             MR. CHAKRAVARTY:  Yes, your Honor.

21             THE COURT:  Okay.

22             MR. CHAKRAVARTY:  Or another witness will lay the

23   foundation.

24             THE COURT:  All right.  Fine.

25             (Government Exhibit No. 1341 received into evidence.)

1    BY MR. CHAKRAVARTY:

2    Q.    Did you ever go to the apartment of Dias Kadyrbayev?

3    A.    Yes, one time.

4    Q.    Where was that?

5    A.    New Bedford, Massachusetts.

6    Q.    And who did he live with?

7    A.    He lived with Aza and a couple of other Kazakhstans.

8    Q.    Who is Aza?

9    A.    Azamat -- I don't know how to pronounce his last name.

10   He's a friend of the defendant's.

11   Q.    Is it Tazhayakov?

12   A.    Yes.

13   Q.    And were they students at UMass Dartmouth?

14   A.    Yes.

15   Q.    How often would you go there?

16   A.    Repeat that?

17   Q.    How often would you go to their apartment?

18   A.    I just went to their apartment one time.

19   Q.    When was that?

20   A.    Sometime the spring of 2013.

21   Q.    And who else was there when you got there?

22   A.    Me and the defendant, Aza, Dias, a couple of Kazakhstans

23   that I don't know the names of, a girl named Pamela, and

24   another black student.  I don't remember his name.

25   Q.    I'm going to show you a photograph.

 1              MR. CHAKRAVARTY:  1178 just for the witness, your

 2   Honor.

 3   Q.   Do you recognize these people?

 4   A.   Yes.

 5   Q.   Who do you recognize them to be?

 6   A.   I recognize Aza, Dias and the defendant.

 7   Q.   Do you know the two people at the ends?

 8   A.   I don't.  I don't remember them.

 9   Q.   Do you know when this photograph was taken?

10   A.   I believe in November.

11   Q.   Were you present?

12   A.   No.

13   Q.   But you've seen this photograph before?

14   A.   Yes.

15   Q.   All right.  And does it fairly and accurately depict the

16   defendant, Aza and Dias?

17   A.   Yes.

18              MR. CHAKRAVARTY:  I'd move into evidence 1178.

19              MS. CONRAD:  No objection.

20              (Government Exhibit No. 1178 received into evidence.)

21              MR. CHAKRAVARTY:  Thank you, your Honor.

22   BY MR. CHAKRAVARTY:

23   Q.   For the jury, can you just circle Aza and Dias again?

24   A.   This is Aza, Dias.

25   Q.   Do you know how often the defendant would go to New York?

1  A.   No, I do not.  I know he went there a few times.

2  Q.   Did you ever go with him?

3  A.   No.

4  Q.   Do you know whether he went with his Kazakh friends aside

5  from this occasion?

6           MS. CONRAD:  Object, your Honor.  Foundation.

7           MR. CHAKRAVARTY:  I'll ask another question, your

8  Honor.

9  BY MR. CHAKRAVARTY:

10  Q.   Do you know whether he went in February of 2013?

11  A.   No, I do not.

12  Q.   When's the last time you saw the defendant?

13  A.   About a day or two after my 20th birthday.

14  Q.   When was that?

15  A.   April 2013.

16  Q.   Was it early April?

17  A.   Yes.

18  Q.   And where did you see him?

19  A.   I met with him inside the parking lot of my mother's

20  apartment complex.

21           MR. CHAKRAVARTY:  Go to Exhibit 743, please.

22           I think this is in evidence, your Honor.

23           I'm sorry.  744.

24           Your Honor, I believe this is in evidence.  I don't

25  know if it's been published.

 1              THE COURT:  It is.

 2              MR. CHAKRAVARTY:  Thank you.

 3    BY MR. CHAKRAVARTY:

 4    Q.   So do you recognize this intersection?

 5    A.   Yes, I do.

 6    Q.   Is this the intersection where the Shell Gas Station is on

 7    one side and the Mobil Gas Station is on the other?

 8    A.   Yes, it is.

 9    Q.   And where on this picture is your mother's apartment?

10    A.   (Witness indicates.)

11    Q.   That building?  And that's a tower?

12         And where is the parking lot in which you met the

13    defendant?

14    A.   (Witness indicates.)

15    Q.   Okay.  You've circled what appears to be a parking

16    structure.  That's the second main building on the right?

17    A.   Yes.

18    Q.   Why were you meeting with the defendant after your

19    birthday?

20    A.   He was meeting with me to purchase some marijuana.

21    Q.   And was he with anyone?

22    A.   Yes.

23    Q.   Who?

24    A.   Dias.

25    Q.   What happened when you guys met?

1   A.   He was in -- I believe that day he was in Dias's BMW.  I

2   went downstairs; I met up with him inside the car.  I was with

3   my twin brother, Steven.

4        I got in the car.  The defendant was driving; Dias was in

5   the passenger seat.  We had talked very shortly.  The defendant

6   handed me some money, and then I left the car to go grab the

7   marijuana.

8   Q.   And you went to somebody else's car to do that?

9   A.   Yes.

10  Q.   Did you get the marijuana?

11  A.   Yes.

12  Q.   Did you come back?

13  A.   Yes.

14  Q.   What happened?

15  A.   Can you repeat that?

16  Q.   What happened when you got back?

17  A.   When I got back I put the marijuana in the -- Dias' car's

18  trunk, and then I talked to the defendant very shortly.

19  He -- I don't know.  He wasn't really talking to me much.  I

20  was trying to get into a deeper conversation with him but he

21  said he was in a rush.  And I asked him about the gun and he

22  gave me another excuse on why he couldn't -- why he didn't

23  bring it that day.

24       And then I remember Dias saying, "Oh, we're in a rush.

25  We're in a rush."  So I only talked to him for a little bit,

1   told the defendant, you know, I loved him, and then I got out

2   of the car.

3   Q.   Did he say specifically why he didn't bring the gun?

4   A.   He just came up with an excuse, said he was in a rush, he

5   had to -- he was driving fast; he didn't want to be speeding.

6   Q.   Do you believe that?  Did you believe that was the reason?

7   A.   I just took it as another excuse, so I don't know.

8   Q.   Did you continue to communicate with him into the weekend

9   before the marathon?

10  A.   Yes.

11  Q.   How?

12  A.   The defendant's cell phone had been turned off so I

13  reached out to him on Twitter.

14  Q.   So you communicated with him through Twitter?

15  A.   Social media.

16  Q.   And where were you during the 2013 marathon?

17  A.   I was at my friend's grandmother's house.

18  Q.   Had you ever spoken with the defendant before about the

19  marathon?

20  A.   Yes.

21  Q.   When?

22  A.   Sometime before the marathon.  I know that the defendant

23  and my brother went to the marathon in 2012, I believe.

24  Q.   Do you remember what conversation you had with the

25  defendant about it?

1   A.   No, I don't remember the conversation in the detail.  No.

2   Q.   When did you first see pictures of the defendant after the

3   2013 marathon?

4   A.   That Thursday night, April 18th, I believe.

5   Q.   Do you remember what photos they were?

6   A.   Yeah.  They were photos of him at the Shell Gas Station.

7          MR. CHAKRAVARTY:  Ask to pull up Exhibit 750.

8   Q.   Do you recognize --

9          MR. CHAKRAVARTY:  I think this is in evidence, your

10  Honor.

11  Q.   Do you recognize this photo with the exception of the

12  circle?

13  A.   Yes.

14  Q.   And who do you recognize in the photo?

15  A.   The defendant.

16  Q.   Now, the person who's circled, did you ever meet that

17  person before?

18  A.   No, I have not.

19  Q.   Did you ever speak with that person before?

20  A.   No, I have not.

21  Q.   The sweatshirt that the defendant is wearing, had you seen

22  him wearing that sweatshirt before?

23  A.   Yes, I have.

24          MR. CHAKRAVARTY:  Go to Exhibit 751.  Sorry.

25  Q.   Is that the Mobil station?

```
 1   A.   Yes.
 2        MR. CHAKRAVARTY:  749, please.
 3   Q.   And again, is this -- I'm circling this person.  Is that
 4   the defendant?
 5   A.   Yes.
 6   Q.   Do you see what he's carrying?
 7   A.   It looks like Red Bull.
 8   Q.   Red Bull the energy drink?
 9   A.   Yes.
10   Q.   What was your reaction after you saw him on TV?
11   A.   I was in a state of huge shock, disbelief, paranoia.
12   Q.   What did you do?
13   A.   I did nothing.  I just disposed of my phone.  I was pretty
14   shocked.  I didn't really want to talk to people.  I didn't
15   really want to go outside.  I stopped selling.
16   Q.   So you described getting rid of your phone and stopped
17   selling.  Do you mean stopped selling drugs?
18   A.   Yes.
19   Q.   Marijuana?
20   A.   Yes.
21   Q.   At some point later in 2013 did you start selling again?
22   A.   Yes.
23   Q.   When?
24   A.   About the fall 2013.
25   Q.   And what kinds of drugs did you sell at that point?
```

1   A.   I started selling some cocaine, some Molly, prescription

2   pills.

3   Q.   Why did you expand your repertoire?

4   A.   That's just what my clientele had been asking for, so I

5   had to accommodate my clientele.

6   Q.   You said cocaine?

7   A.   Yes.

8   Q.   Molly.  What is Molly?

9   A.   A form of Ecstasy.

10  Q.   Ecstasy is the street name of MDMA?

11  A.   Yes.

12  Q.   And prescription pills you said as well?

13  A.   Yes.

14  Q.   And did something happen to you in November of 2013?

15  A.   Yes.  I was arrested at JFK UMass train station.

16  Q.   For what?

17  A.   For possession of marijuana with intent to distribute.

18  Q.   What's the status of that case?

19  A.   Pending.

20  Q.   Did you post bond in that case?

21  A.   Yes, I did.

22  Q.   After you got out, did you continue to sell?

23  A.   Yes, I did.

24  Q.   What kinds of stuff?

25  A.   Same.  Weed.  Same other drugs I was selling.

1    Q.    In 2014, just last year, did you sell heroin?

2    A.    Yes, I did.

3    Q.    To whom?

4    A.    A confidential informant.

5    Q.    When you say "confidential informant," what do you mean?

6    A.    A person who was working with the government.

7    Q.    And how many times did you sell drugs to that person?

8    A.    About eight to ten times.

9    Q.    Of heroin?

10   A.    Yes.

11   Q.    Do you know about how much heroin you sold him?

12   A.    I don't know, about two, three hundred grams.

13   Q.    Do you know how much money that was worth?

14   A.    Not exactly, but it was worth thousands of dollars.

15   Q.    After selling that person the heroin over that period of

16   time, did you get arrested?

17   A.    Yes, I did.

18   Q.    What were you charged with?

19   A.    Conspiracy to distribute heroin and gun possession.

20   Q.    And is it the same gun that's up on the table?

21   A.    Yes, it is.

22   Q.    Now, as part of your plea agreement, does it spell out

23   what the maximum sentences are and the minimum sentences are in

24   your case?

25   A.    Yes.

1    Q.   What is your understanding of what the maximum sentence is

2    in your case?

3    A.   Twenty years max for each count, and I believe it's about

4    eight counts, so 160 years, somewhere around there.

5    Q.   And that's a statutory maximum?

6    A.   Yes.

7    Q.   Are you familiar with the sentencing guidelines?

8    A.   Yes.

9    Q.   And what are those?

10   A.   Sentencing guidelines are the guidelines, depending on how

11   much points you have of criminal history is what the judge

12   usually does when he's deciding sentencing.

13   Q.   And what is your idea of how much time you're looking at

14   under the sentencing guidelines?

15   A.   Between five and seven years.

16   Q.   And is there a minimum mandatory sentence for you?

17   A.   Yes.

18   Q.   And what is that?

19   A.   Five years.

20   Q.   How can you get out from that five-year sentence?

21   A.   By cooperating with the government.

22   Q.   After you were arrested, did the government show you video

23   recordings of those transactions you made with the confidential

24   informant?

25   A.   Yes, they did.

1    Q.   Did you tell that person about the gun that you had given

2    to the defendant?

3    A.   Yes.

4    Q.   Why?

5    A.   I was just being stupid, trying to show off.

6    Q.   After you were arrested, did you, in fact, cooperate?

7    A.   Yes.

8    Q.   And have you told the government about your drug-dealing

9    activities?

10   A.   Yes, I have.

11   Q.   Did you tell the government about some of your suppliers?

12   A.   Yes.

13   Q.   Did you tell the government about who you got the gun

14   from?

15           MS. CONRAD:   Objection.   Leading.

16           THE COURT:   Overruled.

17   BY MR. CHAKRAVARTY:

18   Q.   Did you tell the government about who you got the gun

19   from?

20   A.   Yes.

21   Q.   Are there any promises that you've received as a result of

22   your testimony here today?

23   A.   I've received no promises.   I've just been told if I

24   cooperate, give truthful testimony, the government will file a

25   5K1 motion.

1    Q.   Now, with the confidential informant, did you also propose

2    an additional business transaction?

3    A.   Yes.

4    Q.   What was that?

5    A.   I discussed the possibility of whacking somebody, harming

6    somebody.

7    Q.   When you say "whacking somebody," what did you mean?

8    A.   Getting someone potentially hurt or shot.

9    Q.   And why?

10   A.   At the time I was -- I had been robbed by a former friend.

11   I was very angry.  I was saying things out of anger.

12   Q.   And did you propose to actually pay to have the informant

13   do that?

14   A.   Yes.

15           MR. CHAKRAVARTY:  Excuse me.

16           (Counsel confer off the record.)

17           MR. CHAKRAVARTY:  Your Honor, it is 11:10.  I don't

18   have much more, but I probably have at least five minutes.  I

19   mean, there may be more, but at least that much.

20           THE COURT:  All right.  We'll take the morning recess

21   at this point.

22           THE CLERK:  All rise for the Court and the jury.  The

23   Court will take the morning recess.

24           (The Court and jury exit the courtroom and there is a

25   recess in the proceedings at 11:12 a.m.)

1   (The Court and the jury entered the courtroom at 11:44 a.m.)

2   Q.   Just a few more questions, Mr. Silva, if you'd please just

3   keep your voice up.

4        Mr. Silva, when we broke, I was asking you about your

5   conversation with what you called informant about hurting

6   somebody.  Have you had conversations with other people about

7   potentially hurting somebody?

8   A.   No, not really.

9   Q.   With regards to this -- the conversation you had with the

10  informant, did you follow through?

11  A.   Of course not.

12  Q.   Did you pay him any money to do anything?

13  A.   I did not.

14  Q.   After you were arrested, did you have conversations with

15  some friends about what should happen to the person who

16  introduced you to this informant?

17  A.   Yes.

18  Q.   What did you say?

19  A.   I said -- I remember saying someone should smack her, spit

20  in her face, something along these lines.

21  Q.   Did you say anything about the prosecutor who was

22  prosecuting you?

23  A.   Yes.

24  Q.   What did you say?

25  A.   I said, He's not -- at the time I said, He's an asshole.

1    Someone should spit in his face.

2    Q.   Why did you say these things about those people?

3    A.   I was just very angry at the time.  When you're angry, you

4    say stupid things.

5    Q.   Have you ever seen the defendant get angry?

6    A.   Not much but a couple times.

7    Q.   What were those times?

8    A.   Times where -- I used to joke around with the defendant,

9    call him a Russian refugee.  That kind of ticked him off

10   because he's very proud of his Chechen nationality.

11   Q.   What was his reaction?

12   A.   He'd get upset.  He'd get angry, tell me shut up.  I'm not

13   Russian.

14   Q.   Did he ever call you any names?

15   A.   Yeah, a couple times.

16   Q.   What kind of names would he call you?

17             MS. CONRAD:  Objection.

18             THE COURT:  Overruled.

19   Q.   What kind of names did he call you?

20   A.   This one time he called me a kafir.

21   Q.   Kafir.  What is a kafir to you?

22   A.   I believe it's -- it means, like, nonbeliever, something

23   along those lines, like, infidel, something along those lines.

24   Q.   Were there any other occasions that you can remember?

25   A.   Besides a joking manner, no.

1    Q.   Last time you saw the defendant before today was back in

2    April of 2013?

3    A.   Yes, it was.

4    Q.   Was it a couple weeks before the Marathon?

5    A.   Yes, it was.

6         MR. CHAKRAVARTY:   That's all I have, your Honor.

7    CROSS-EXAMINATION BY MS. CONRAD:

8    Q.   Good morning, Mr. Silva.

9    A.   Good morning.

10   Q.   My name is Miriam Conrad.   I'm one of Mr. Tsarnaev's --

11   Jahar's lawyers.

12        Mr. Chakravarty just asked you something where you said

13   that one time Jahar called you a kafir?

14   A.   Yes.

15   Q.   When was that?

16   A.   This was a long time ago, sometime in January, 2013.

17   Q.   Now -- but you -- he never talked to you about religion,

18   did he?

19   A.   We talked about religion a few times, not much.

20   Q.   Didn't you tell the government, when you first spoke to

21   them, that he didn't really talk much about religion?

22   A.   Yes, I did.

23   Q.   And that was true, right?

24   A.   We'd talk about religion, not in depth, not all the time,

25   no.

1    Q.    You also told the *Rolling Stone* that he never talked about

2    religion?

3    A.    Yes.

4    Q.    You were interviewed by *Rolling Stone Magazine*, right?

5    A.    Yes.

6    Q.    And but you used a different name, right?

7    A.    Yes.

8    Q.    That name is Sam?

9    A.    Yes.

10   Q.    Mr. Chakravarty asked you how you reacted to news of the

11   -- of seeing pictures of Jahar after the Boston Marathon

12   bombing.  You said you were shocked, right?

13   A.    Yes, I was.

14   Q.    You were shocked because you had not seen anything in

15   Jahar that would make you believe that he could or would do

16   something like that, right?

17   A.    At the time, yes.

18   Q.    And you even posted on your Facebook pages that it must

19   have been his brother who got him into it?

20         MR. CHAKRAVARTY:  Objection, your Honor.

21         THE COURT:  Overruled.  You may answer it.

22   A.    Can you -- I have --

23   Q.    You can answer it.  Do you want me to ask the question

24   again?

25   A.    Can you ask the question again?

1    Q.   Yeah, sure.  You even said at the time that it must have

2    been his brother who got him into it?

3    A.   At the time, that's what I felt, yes.

4    Q.   And you were interviewed by the FBI on April 20, 2013,

5    right?

6    A.   Yes, I was.

7    Q.   Right after this happened?

8    A.   Yes, I was.

9    Q.   And you told them that at the time, right?

10            MR. CHAKRAVARTY:  Objection, your Honor.

11            THE COURT:  No.  Overruled.

12   A.   Yes.  That's what I told them at the time.

13   Q.   And during -- in fact, what you told them was that you

14   felt 150 percent that Tamerlan influenced Jahar to do the

15   bombing?

16            MR. CHAKRAVARTY:  Objection, your Honor.

17            THE COURT:  Sustained to that.

18   Q.   You also told them -- well, strike that.

19       And you thought that it must have been Tamerlan who built

20   the bombs, right?

21            MR. CHAKRAVARTY:  Objection, your Honor.

22            THE COURT:  Sustained.

23   Q.   Now, you were friends with Jahar since eighth grade,

24   right?

25   A.   Yes.

1    Q.   Close friends?

2    A.   Yes, very close friends.

3    Q.   Spent almost every day together?

4    A.   Yes.

5    Q.   And he was even -- in fact, I think you said on direct

6    that he was one of your closest friends?

7    A.   I considered him a best friend.

8    Q.   And he was well-liked, right?

9    A.   Yes, he was.

10   Q.   Popular?

11   A.   Yes, he was.

12   Q.   And one of the realest and coolest kids that you knew?

13   A.   Yes, that's what I felt.

14   Q.   And you felt that way still even after you started

15   cooperating, as you put it, with the prosecution in this case,

16   right?

17   A.   Yes.

18   Q.   In fact, you told them on October 28th that he was one of

19   the realest and coolest kids you'd ever met?

20   A.   Yes.

21   Q.   And he wasn't violent, right?

22   A.   No.  I've never seen him violent.

23   Q.   And he never picked on anybody?

24   A.   No.

25   Q.   He was kindhearted?

1   A.   Yes, he was.

2   Q.   And he -- even though he was -- he had training as a boxer

3   and as a wrestler, you never saw him fight with anybody?

4   A.   No, I did not.

5   Q.   And he was humble?

6   A.   Yes, he was.

7   Q.   And the only examples you could come up with -- or example

8   you could come up with of him getting annoyed or angry was when

9   someone referred to him as a Russian refugee, right?

10  A.   Yes.

11  Q.   That was because he was proud of his culture, right?

12  A.   Yes.

13  Q.   But you never heard him say anything that showed that he

14  had any resentment to the United States of America, did you?

15  A.   No.

16  Q.   In fact, even in November of 2012, he posted on his

17  Twitter page about celebrating Obama being reelected?

18            MR. CHAKRAVARTY:  Objection, your Honor.

19  A.   Yes.

20            THE COURT:  Sustained.

21  Q.   Well, you were on his Twitter page, right?

22  A.   Yes.

23  Q.   You communicated with him through his Twitter page?

24  A.   Sometimes, yes.

25  Q.   In fact, he posted birthday greetings to you and your twin

1    brother on your birthday?  Was that April 1 of 2013?

2    A.    Yes.

3    Q.    He said, "Happy 20th to the twins"?

4    A.    Yes.

5    Q.    Do you remember that?

6    A.    I do.

7    Q.    And do you remember him posting about Obama being

8    reelected?

9            MR. CHAKRAVARTY:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.    And you talked a little bit about how you and he smoked

12   weed together, right?

13   A.    Yeah.

14   Q.    And that was one of the things that you did together,

15   right?

16   A.    Yup.

17   Q.    But there were other things you did together, too, right?

18   A.    Yes.

19   Q.    For example, you said you went up to Swampscott and jumped

20   off cliffs?

21   A.    Yes.

22   Q.    Was that, like, a swimming hole or something?

23   A.    A lake, reservoir.

24   Q.    And you played basketball?

25   A.    Yes.

1    Q.   And you went to the pool?

2    A.   Yes.

3    Q.   Chased girls?

4    A.   Yes.

5    Q.   And sort of typical teenage things, right?

6    A.   Yeah.

7    Q.   In fact, it was you who introduced him to smoking

8    marijuana, right?

9    A.   I guess you could say that, but I don't think I smoked

10   with him his first time.

11   Q.   You didn't tell the government that you used peer pressure

12   to get him to try marijuana?

13        MR. CHAKRAVARTY:  Objection to the relevance of this,

14   marijuana smoking.

15        THE COURT:  Overruled.

16   A.   I can't recall.

17        MS. CONRAD:  One moment.

18   Q.   So you knew he was easy to influence, right?

19        MR. CHAKRAVARTY:  Objection, your Honor.

20        THE COURT:  Sustained.

21        MS. CONRAD:  Well, I'll move on since I can't find it

22   at the moment.

23   Q.   Didn't you post on your Facebook page on April 24th that

24   you knew how easy it was to corrupt him?

25        MR. CHAKRAVARTY:  Objection, your Honor.  It's being

1   offered for the truth.

2           THE COURT:  Sustained.

3           MS. CONRAD:  It's impeachment.

4           THE COURT:  Sustained.

5   Q.   Did you think that he was someone who could be easily

6   corrupted?

7           MR. CHAKRAVARTY:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q.   Now, you were really good friends with him, but I think

10  you said it was summer -- no, I'm sorry.  When was it that you

11  went to his apartment?

12  A.   Summer of 2012, I believe.

13  Q.   That was between freshman and sophomore years of college?

14  A.   Yes.

15  Q.   And you had been friends with him at that point for,

16  what?, six, seven years, at least, eighth grade?

17  A.   Yeah, give or take.

18  Q.   Okay.  And in all that time you both lived in Cambridge,

19  right?

20  A.   Yes.

21  Q.   Saw each other almost every day?

22  A.   Yes.

23  Q.   And you had never been to his apartment?

24  A.   I can't remember going to his apartment besides that one

25  time.

1    Q.   He came to your apartment a lot, right?

2    A.   Yeah.

3    Q.   But did you ever ask him about that?

4    A.   Not really, no.

5    Q.   Did you ever wonder why he didn't want you to come to his

6    apartment?

7              MR. CHAKRAVARTY:  Objection, your Honor.

8              THE COURT:  Sustained.

9    Q.   Did he -- you said you never met his brother Tamerlan,

10   right?

11   A.   No, I never met his brother.

12   Q.   And did he tell you, You don't want to meet my brother?

13             MR. CHAKRAVARTY:  Objection, your Honor.

14             THE COURT:  Overruled.  You may answer that.

15   A.   Yes, he did.

16   Q.   What did you think that meant?

17             MR. CHAKRAVARTY:  Objection, your Honor.

18             THE COURT:  Sustained.

19   Q.   Did you ask him what that meant?

20             MR. CHAKRAVARTY:  Objection, your Honor.

21             THE COURT:  No.  You may answer that.

22   A.   Can you repeat the question?

23             MS. CONRAD:  If I could remember it, I could.

24   Q.   Did you ask him what he meant by that?

25   A.   Yes, I did.

```
 1   Q.   What did he say?
 2            MR. CHAKRAVARTY:  Objection, your Honor.
 3            THE COURT:  Overruled.
 4   A.   From my perspective and options from the conversation, he
 5   said his brother was very strict.  He was very opinionated and
 6   that since I wasn't a Muslim, you know, he might give me a
 7   little shit for that.
 8   Q.   Do you remember when that conversation was, or was it on
 9   more than one occasion?
10   A.   I remember on more than one occasion.
11   Q.   When was the last time?
12   A.   I can't recall.
13   Q.   Did there come a time in -- over Christmas of 2012 when he
14   complained that his brother was keeping him on a short leash?
15   A.   Yes.
16            MR. CHAKRAVARTY:  Objection, your Honor.
17            THE COURT:  Sustained.  I'll strike the answer.
18   Q.   Did you ever observe, when you were out with him, how he
19   would react if his brother would call him?
20   A.   Yes.
21   Q.   Tell us about that.
22            MR. CHAKRAVARTY:  Objection, your Honor.
23            THE COURT:  Sustained.
24   Q.   Did he ever express concern about making sure his car
25   didn't smell of weed because his brother would be angry?
```

 1          MR. CHAKRAVARTY:  Objection, your Honor.

 2          THE COURT:  Sustained.

 3          MS. CONRAD:  State of mind, your Honor.

 4   Q.   Were you aware of his brother's reputation?

 5          MR. CHAKRAVARTY:  Objection, your Honor.

 6          THE COURT:  Let me see you.

 7   (SIDEBAR CONFERENCE AS FOLLOWS:

 8          THE COURT:  That's as much as you're going to get.

 9          MS. CONRAD:  Well, your Honor, I do think the

10   government went through his entire relationship with him, and I

11   think this is part of it, what he told him about his family.

12          THE COURT:  No.

13          MR. CHAKRAVARTY:  That's the whole point of doing

14   motions in limine so --

15          THE COURT:  Okay.  New topic.

16   .  .  .  END OF SIDEBAR CONFERENCE.)

17          MS. CONRAD:  Your Honor, I just need a -- I'm getting

18   a little assistance here.  Let me go back to something for a

19   minute now that Mr. Watkins has assisted me.  If I could have

20   the presentation camera, please, just for the witness.

21   Q.   Okay.  Mr. Silva, if you would look at the screen in front

22   of you, if I could just draw your attention to the last

23   sentence on that page and just ask you to read it silently.

24   A.   From the top, at the beginning?

25   Q.   Right here next to my finger, where it starts out, "While

1    at Rindge."

2    A.    "While at Rindge" --

3    Q.    No, no, to yourself.

4    A.    (Witness complies).

5          Okay.

6    Q.    Looking at the top, that was an interview you gave on --

7              MR. CHAKRAVARTY:  Objection, your Honor.

8    Q.    -- on August 4th?

9              MR. CHAKRAVARTY:  First --

10             MS. CONRAD:  It's impeachment.

11             MR. CHAKRAVARTY:  It's -- it's not clear whether it's

12   a prior statement being used to refresh his recollection.

13             MS. CONRAD:  It's not being used to refresh -- it's

14   impeachment.  I'll ask the question I asked before again.

15   Q.    Did you use peer pressure on Mr. Tsarnaev to get him to

16   try marijuana?

17             MR. CHAKRAVARTY:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.    I smoked weed with him.  I wouldn't say I used peer

20   pressure.

21   Q.    But that's what you told the prosecution --

22             MR. CHAKRAVARTY:  Objection, your Honor.

23             THE COURT:  Overruled.

24   Q.    That's what you told the prosecution on August 4th of last

25   year, right?

1   A.   That's what I said, but I stated it wrong.

2   Q.   You stated it wrong?

3   A.   Yeah.  I didn't mean peer pressure, and it's -- in

4   retrospect, if I -- like, as if I forced him to smoke weed.  I

5   didn't force him to smoke it.  We were smoking weed together,

6   and he chose to smoke with me.

7   Q.   Didn't you say, Hey, come on, try it?

8   A.   I can't -- I don't remember.

9   Q.   What did you mean when you said "peer pressure" to the

10  prosecution on August 4th?

11  A.   I don't -- back then, I don't think I used the correct

12  term.

13  Q.   So -- but you would agree with me that the report says

14  that "Silva and his friends" --

15           MR. CHAKRAVARTY:  Objection.

16           THE COURT:  Overruled.

17  Q.   -- "had to use peer pressure to get Tsarnaev to smoke

18  marijuana"?

19  A.   Yes.  That's what the report says.

20  Q.   Now, when Mr. Chakravarty showed you some photographs of

21  the apartment on Norfolk Street, there were some items in the

22  picture of his bedroom, right?

23  A.   Yes.

24  Q.   And that was the only time you had been there, right?

25  A.   The only time I remember, yes.

1    Q.   And at that time, Mr. Tsarnaev was a college student,

2    right?

3    A.   Yes.

4    Q.   So he was just home for Christmas break; is that when this

5    was?  Summer break?

6    A.   Yes.

7    Q.   And you don't know who used the items in that room when he

8    was gone, do you?

9    A.   No, I do not.

10   Q.   You don't know, for example, who else might have used that

11   computer?

12           MR. CHAKRAVARTY:  Objection, your Honor.  Asked and

13   answered.  He said he didn't know.

14           THE COURT:  No.  Go ahead.  You can have a little bit

15   of it.

16   Q.   You don't know who else would have used that computer,

17   right?

18   A.   No, I do not.

19   Q.   You don't know who put the items that you saw in those

20   pictures in that room, right?

21   A.   No, I do not.

22   Q.   Now, Mr. Chakravarty asked you some questions about the

23   gun, the Ruger, right?

24   A.   Yes.

25   Q.   Now, let me make sure I've got the sequence of events

1    straight because I'm a little bit confused.

2         So you got the gun, and you told -- you and Nick and your

3    brother got the gun to protect your business, right?

4    A.    Yes.

5    Q.    And you told Jahar about the gun, right?

6    A.    Yes.

7    Q.    And then -- and that was what?, over the phone or over

8    Twitter?

9    A.    I can't recall.  It was either over the phone or in

10   person.

11   Q.    When you told him about it -- I'm sorry.  The first time

12   you talked to him about it in person, you showed him the gun,

13   right?

14   A.    I can't recall the exact situation.

15   Q.    So you don't remember whether you showed him -- told him

16   about the gun over the phone or something before you actually

17   showed it to him?

18   A.    Yes.  I don't remember.

19   Q.    But, at any rate, you showed it to him before he asked you

20   to borrow it, right?

21   A.    Yes.

22   Q.    So the -- and that conversation about borrowing it wasn't

23   until February, is that right?

24   A.    Sometime in January or February.

25   Q.    And you don't remember exactly, right?

```
1    A.    I don't remember the exact date, no.

2    Q.    And at the time he asked you for it, you had already told

3    him about the robbery that you and Nick Silva had done

4    together, right?

5    A.    Yes.

6    Q.    So -- and you had already described to him that robbery,

7    right?

8    A.    Yes.

9    Q.    And after you loaned Jahar the gun, you kept asking for

10   him to give it back, right?

11   A.    Yes, I did.

12   Q.    And he never did, right?

13   A.    No, he did not.

14   Q.    So when you're charged, for example, in your Indictment,

15   you're charged with possessing the gun before you gave it to

16   Jahar, right?

17   A.    Yes.

18   Q.    It's not like you got it back later and then were arrested

19   with it, right?

20   A.    You're right.

21   Q.    And so when you kept asking him to give it back, you said

22   he kept giving you excuses, right?

23   A.    Yes.

24   Q.    And you didn't believe those excuses, did you?

25   A.    No.  I just felt like he was BS'ing me.
```

1   Q.   Did it ever occur to you that he didn't have the gun

2   anymore?

3            MR. CHAKRAVARTY:  Objection, your Honor.

4            THE COURT:  Sustained.

5   Q.   Did you ask him if he still had the gun?

6   A.   I did.

7   Q.   And what did he say?

8   A.   He told me he still had it.

9   Q.   Did you believe him?

10  A.   Yes, because he did not give it back to me, so where else

11  would it have been?

12  Q.   Well, what if he gave it to somebody else?

13           MR. CHAKRAVARTY:  Objection, your Honor.

14           THE COURT:  Sustained.

15  Q.   He wouldn't be able to give it back to you if he didn't

16  have it any longer, would he?

17           MR. CHAKRAVARTY:  Objection, your Honor.

18           THE COURT:  Sustained.

19  Q.   Would you have loaned him the gun if he told you it was

20  for his brother?

21           MR. CHAKRAVARTY:  Objection, your Honor.

22           THE COURT:  You may answer that.

23  Q.   Would you have loaned him the gun if he told you it was

24  for his brother?

25  A.   No.

1   Q.   Now, this robbery that you told us about, you -- that you

2   did?

3   A.   Yes.

4   Q.   You didn't tell the Feds about that the first, second,

5   third or even fourth time that you sat down with them, did you?

6   A.   Initially, no, I did not.

7   Q.   In fact, what you told them was that you didn't believe in

8   sticking people up?

9   A.   Yes, I did.

10  Q.   And, in fact, you told them that you had never discussed a

11  robbery with anyone before Jahar asked to borrow the gun,

12  right?

13  A.   Yes.

14  Q.   And both of those were lies, right?

15  A.   Yes.

16  Q.   And you lied to them because you wanted to make yourself

17  look good?

18  A.   Yes.

19  Q.   And because you wanted to get your deal?

20  A.   No.

21  Q.   But you knew you were looking at a five-year minimum

22  mandatory sentence, right?

23  A.   Yes.

24  Q.   I think you made a reference -- Mr. Chakravarty asked you

25  something about a 5K1?

1  A.   Yes.

2  Q.   And a 5K1 is a motion that the prosecutor can file in your

3  case to get your sentence below the sentencing guidelines,

4  right?

5  A.   Yes.

6  Q.   And it could also get the sentence below a minimum

7  mandatory sentence, right?

8  A.   Yes.

9  Q.   And you know that the judge doesn't have to go with the

10  guidelines, but the judge has to go with a minimum mandatory,

11  right?

12  A.   Yes.

13  Q.   And until the prosecutor files that motion, the judge has

14  to give you five years?

15  A.   Yeah, something along those lines.

16  Q.   So when Mr. Chakravarty asked you, well, it's not -- who's

17  it up to what your sentence is and you said the judge, that's

18  not actually completely true, is it?

19       MR. CHAKRAVARTY:  Objection, your Honor.

20       THE COURT:  Overruled.  You may answer it.

21       MS. CONRAD:  I'm sorry?

22       THE COURT:  He may answer it.

23  A.   To my knowledge, it's only up to the judge.

24  Q.   It's only up to the judge if the prosecutor files the

25  motion, right?

1  A.  Yes.

2  Q.  Without that motion, you're getting five years, right?

3  A.  Yes.

4  Q.  And, in fact, you're hoping to get -- you're hoping to get

5  time served out of this case, aren't you?

6  A.  I'm hoping to get the best deal I can possibly get.

7  Q.  Your original sentencing date was for today, right?

8  A.  Yes, it was.

9  Q.  And it got moved, right?

10 A.  Yes, it has been.

11 Q.  Because you didn't want to get sentenced until after

12 you've had a chance to fill your end of the deal for the

13 government, right?

14 A.  Yes.

15 Q.  And they didn't want you to get sentenced until after you

16 testified in this case?

17          MR. CHAKRAVARTY:  Objection, your Honor.

18          THE COURT:  Sustained.

19 Q.  I just want to show you your plea agreement for a second.

20          MS. CONRAD:  This is just -- actually, no.  It's in

21 evidence so I guess the jury can see this, too.

22 Q.  You recognize this as part of your plea agreement?

23          MS. CONRAD:  Why is it not on?  Thank you.

24 Q.  You recognize that language there, Part B, "substantial

25 assistance motion"?

1    A.    Yes.

2         MS. CONRAD:  And I forget what exhibit number this is.

3    Maybe the government can assist me on that.

4         926.  Mr. Mellin is nodding yes.

5         MR. MELLIN:  Yes, it is.

6         MS. CONRAD:  Thank you very much.

7    Q.    Just drawing your attention down to that last paragraph,

8    "The determination whether defendant has provided substantial

9    assistance rests solely in the discretion of the U.S.

10   Attorney."  Did you read that part?

11   A.    Can you repeat that question?

12   Q.    Yeah.  I'm just asking you to read that sentence, the last

13   full paragraph on Page 9.  "The determination whether defendant

14   has provided substantial assistance rests solely in the

15   discretion of the U.S. Attorney."

16   A.    Yes, I read it.

17   Q.    And that means it's up to the prosecutor to decide whether

18   you get that 5K motion, right?

19   A.    Yes, it is up to the prosecutor.

20        MS. CONRAD:  May I have a moment, please?

21        I don't have anything further for you, Mr. Silva.

22   Thank you very much.

23        MR. CHAKRAVARTY:  A brief redirect, your Honor.

24        Can we call up that exhibit again, 926?  Can we go to

25   Page 10 -- 9, please?

1    REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

2    Q.   Mr. Silva, this is the page of the agreement that Miss

3    Conrad showed you, is that right?

4    A.   Yes.

5             MR. CHAKRAVARTY:  Can we turn the page to Page 10?

6    Q.   All of this pertains to the conditions under which the

7    government will file this 5K motion, correct?

8    A.   Yes.

9    Q.   Let me go first to this provision marked D, letter

10   immunity.  Does this provision say, "In return for the

11   defendant's full and truthful cooperation, the U.S. Attorney

12   agrees not to use any information provided by the defendant

13   pursuant to this agreement or pursuant to the proffer letter

14   dated July 23, 2014, or any information directly or indirectly

15   derived therefrom against defendant in any criminal case except

16   in a prosecution for:  1), for perjury or obstruction of

17   justice, or for making a false statement after the date of this

18   agreement; or, 2), for an act of physical violence against the

19   person of another or conspiracy to commit any such act of

20   violence"?

21   A.   Yes.

22   Q.   And what do you understand that to mean?

23   A.   That for -- whatever I say in my testimony won't be used

24   against me unless it's an act of violence.

25   Q.   And what about the first provision, what do you understand

1    perjury and obstruction to justice mean?

2    A.    Perjury means lying; obstruction of justice, hiding the

3    truth.   That's what I understand that to mean.

4    Q.    What do you understand happens to you if you lie or you

5    obstruct justice?

6    A.    I will not get my 5K1 motion.

7    Q.    And what else does this particular provision regarding

8    immunity mean?

9    A.    It means I won't be subject to getting immunity.  I could

10   get prosecuted.

11   Q.    So you could both be prosecuted as well as -- for the lies

12   as well as you wouldn't get the benefit of your 5K1 motion,

13   right?

14   A.    Yes.

15         MR. CHAKRAVARTY:   Can we go to Page 11?

16   Q.    What does this say?

17   A.    Would you like me to read it?

18   Q.    Can you read the title?

19   A.    "Court not bound by agreement."

20   Q.    What do you understand that to mean?

21   A.    That the Court, if they don't -- if they -- they're not

22   bound to go with the motion if they don't feel that -- they

23   don't feel that I -- my testimony was truthful or not.

24   Q.    The part that I'm highlighting here, does this say,

25   "Within the minimum maximum sentence the defendant faces under

 1    the applicable law, the sentence to be imposed is within the

 2    sole discretion of the Court"?

 3    A.   Yes.

 4    Q.   So who do you understand controls your sentence?

 5    A.   The Court.

 6             MR. CHAKRAVARTY:  Go to Page 12, please.  And Page 13.

 7    Q.   Does Paragraph 14 describe what happens if there's a

 8    breach of the agreement?

 9    A.   Yes.

10    Q.   And that includes whether the government breaches the

11    agreement or whether the defendant breaches the agreement,

12    right?

13    A.   Yes.

14    Q.   And what happens if you breach the agreement?

15    A.   Then I won't get the 5K1.

16    Q.   And you -- what could happen to you in terms of what you

17    have told the government?

18    A.   It can be used against me.

19    Q.   What is the agreement, to your understanding?

20    A.   The agreement, to my understanding, is, if I give a

21    truthful testimony, I stand my best chance at sentencing.

22             MR. CHAKRAVARTY:  Can we go to Page 2, please?  Sorry.

23    Page 3.  Page 4.

24    Q.   As we page through this plea agreement, does this

25    carefully lay out the details of what the agreement is with the

1    government?

2    A.   Yes.

3          MR. CHAKRAVARTY:   Page 5.

4    Q.   Is this where it says what the sentencing recommendation

5    might be?

6    A.   Yes.

7    Q.   Does it say it will be within the guidelines?

8    A.   Yes.

9    Q.   When Miss Conrad asked you some questions, something she

10   put up on the screen, was that something that you had written?

11   She asked you to read something that was put up on the screen

12   aside from the plea agreement.

13   A.   Yes.

14   Q.   Was the item that was put up on the screen something that

15   you wrote yourself?

16   A.   Yes.

17   Q.   What was it?

18   A.   It was the report.

19   Q.   Did you write the report?

20   A.   I didn't write the report, no.   It wasn't written by me.

21   Q.   So some agent wrote the report?

22   A.   Yes.

23   Q.   Had you seen that report before?

24   A.   Yes.

25   Q.   The statements that were being read to you, was that

```
 1   refreshing your memory as to what you told the police?
 2   A.   Yes.
 3           MR. CHAKRAVARTY:  That's all I have, your Honor.
 4           MS. CONRAD:  Some questions.
 5   RECROSS-EXAMINATION BY MS. CONRAD:
 6   Q.   Mr. Silva, so it's your understanding under your plea
 7   agreement that if you do one of the things that's listed in
 8   there and the government doesn't like it, they can cancel your
 9   plea agreement, right?
10           MR. CHAKRAVARTY:  Objection, your Honor.
11           THE COURT:  Sustained.
12   Q.   It's your understanding of the plea agreement that, if you
13   lie or commit a crime, they won't file a 5K for you, right?
14   A.   Yes.
15   Q.   And that portion about sentence recommendation that Mr.
16   Chakravarty showed you, by the way, that says, "If the
17   government doesn't file a 5K motion, it will recommend a
18   sentence within the guidelines," right?
19   A.   Yes.
20   Q.   And you have, in fact, lied to them, right?
21   A.   Yes.
22   Q.   You lied to them about the robbery, right?
23   A.   Yes.
24   Q.   Oh, and by the way, you said that you saw the defendant's
25   sister-in-law when you were at the Norfolk Street apartment?
```

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Sustained.  Scope.

3    Q.   And the plea agreement says very clearly that if you do

4    not -- well, strike that.

5          And you also -- since you've been down at the jail, you've

6    done a few things that are certainly illegal, right?

7          MR. CHAKRAVARTY:  Objection, your Honor.

8          THE COURT:  Sustained.

9          MS. CONRAD:  Well, it has to do with violating the

10   plea agreement, your Honor.

11   Q.   Well, okay.  Have you -- in fact, you have violated the

12   terms of the plea agreement?

13         MR. CHAKRAVARTY:  Objection.  Argumentative.

14         THE COURT:  Again, the objection is sustained.

15   Q.   Has the government informed you that it is going to cancel

16   your plea agreement?

17   A.   No.

18   Q.   Has the government told you that, because you've lied,

19   they're not interested in filing a 5K?

20         MR. CHAKRAVARTY:  Objection, your Honor.

21         THE COURT:  You may answer.

22   A.   No.

23   Q.   Has the government told you that, because you discussed

24   having friends use fake IDs to come visit you, they're

25   canceling the 5K?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Sustained.

3    Q.   Has the government told you that, because you have been

4    making homemade alcohol --

5          MR. CHAKRAVARTY:  Objection, your Honor.

6          THE COURT:  Sustained.

7    Q.   And your plea agreement says that, unless the government

8    files a motion, the judge has no choice but to give you five

9    years minimum?

10         MR. CHAKRAVARTY:  Objection.

11         THE COURT:  You may answer that.

12   Q.   Right?

13   A.   Yes.

14         MS. CONRAD:  I don't have anything further.  Thank

15   you, Mr. Silva.

16         THE COURT:  All right.  Mr. Silva, you're excused.

17                            * * *

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13

14   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
15   Official Court Reporter

16

17   Date:  March 24, 2015

18

19

20

21

22

23

24

25