UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Criminal Action |
| v. | ) No. 13-10200-GAO |
|  | ) |
| DZHOKHAR A. TSARNAEV, also | ) |
| known as Jahar Tsarni, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY THIRTY-EIGHT**
**EXCERPT**
**TESTIMONY OF MATTHEW LEVITT, Ph.D.**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, March 24, 2015
9:10 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3             Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad and Timothy G. Watkins,
10            Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                                I N D E X

2                                       Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3     GOVERNMENT:

4  MATTHEW LEVITT, Ph.D.

5        By Mr. Chakravarty (Cont'd)  4                    36
         By Mr. Bruck                          9
6

7                           E X H I B I T S

8
                     (There were no exhibits marked)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2     THE CLERK:  All rise for the Court and the jury.

3     (The Court and jury enter the courtroom at 9:10 a.m.)

4     THE CLERK:  Be seated.

5     THE COURT:  Good morning, everyone.

6     THE JURORS:  Good morning, your Honor.

7     MR. CHAKRAVARTY:  May I proceed?

8     THE COURT:  Mr. Chakravarty.

9     MR. CHAKRAVARTY:  Thank you, your Honor.

00:03 10               MATTHEW LEVITT, Ph.D., resumed

11               DIRECT EXAMINATION CONTINUED

12  BY MR. CHAKRAVARTY:

13  Q.   Good morning, Dr. Levitt.  This is not Berlin but I hope

14  this did not disrupt your plans too much.  Thank you very much

15  for being with us.

16  A.   Berlin has nothing on Boston.

17  Q.   We were talking yesterday about some of the writing and

18  some of the documents that you had reviewed that comported to

19  some of the writing.  I'd like to call up before we get back to

00:04 20  that an additional exhibit which is in evidence, 1143-97.

21       Do you recognize this screen?  It's a paused screen of a

22  video?

23  A.   Yes.

24  Q.   And what is that?

25  A.   "25 Promises of Allah to the Believers."

1    Q.    And was that another Awlaki lecture?

2    A.    Yes.

3    Q.    Was that one of the popular ones that he had?

4    A.    Yes.

5          MR. CHAKRAVARTY:  Now, if we could go back to the

6    split screen, Mr. Bruemmer, 830 on the one side, page 3.

7    Q.    I think, Dr. Levitt, we were down to -- we had just done

8    "we were promised victory and we will surely get it."

9          Can you read the next line, please?

00:05 10    A.    "Now, I don't like killing innocent people.  It is

11    forbidden in Islam.  But due to said..." bullet hole "...it is

12    allowed."

13    Q.    Is this a concept that you're familiar with?

14    A.    It is.

15    Q.    And what's the significance of it?

16    A.    The significance is that as I believe we discussed

17    yesterday, this idea that normally killing innocent people

18    would be forbidden but under certain circumstances it becomes

19    permissible, even praiseworthy, even a personal obligation

00:05 20    because of certain events, because of taking revenge, for

21    example, for the acts of the West or the United States against

22    Muslims around the world as we discussed yesterday.

23    Q.    Now, in this sentence it says that "it is allowed."  What

24    is "it" in this sentence?

25    A.    Well, "it," in general, is -- referring back to the

1    beginning of the sentence -- killing innocent people.

2            MR. BRUCK:  If it please the Court, I am going to

3    object to the witness explaining plainly written statements in

4    which he has no more expertise than anybody else to

5    understand plain English.

6            THE COURT:  I think you're right as to this question

7    and answer.

8            MR. CHAKRAVARTY:  If we could call up on the other

9    screen 1142-88, page 3, please.

00:06 10    BY MR. CHAKRAVARTY:

11    Q.    This is another *Inspire* magazine?

12    A.    Yes.

13    Q.    Can you read starting from "however," the first full

14    sentence?

15    A.    "However, to bring down America, we do not need to strike

16    big.  In such an environment of security phobia that is

17    sweeping America, it is more feasible to stage smaller attacks

18    that involve less players and less time to launch, and thus we

19    may circumvent the security barriers America worked so hard to

00:08 20    erect.  This strategy of attacking the enemy with smaller, but

21    more frequent operations is what some may refer to as the

22    strategy of a thousand cuts.  The aim is to bleed the enemy to

23    death."

24    Q.    This notion of innocent people, does that have a special

25    connotation in the global jihad movement?

1    A.   Well, within Islam it is forbidden to kill innocent

2    people.  In the global jihad movement there is a redefinition

3    of who is and who is not innocent based on circumstances other

4    than whether or not they are actually involved in some other

5    action against you.  You can no longer be an innocent if you're

6    just walking down the street and are a citizen of, say, the

7    United States.

8    Q.   And why are those people not innocent anymore?

9    A.   Because by virtue of being a citizen of the United States,

00:09 10   by participating in the elections for American leaders who then

11   go on to approve actions which are perceived to be against

12   Islam, against the Islamic -- the Muslim ummah, the Muslim

13   nation, that Americans have some guilt for these actions.

14        MR. CHAKRAVARTY:  Now, on the left side of the screen,

15   Mr. Bruemmer, can we call up Exhibit 1451.

16   Q.   Now, this was also found in the boat.  Have you seen this

17   before?

18   A.   I have.

19   Q.   And can you read it?

00:09 20   A.   No.  Sorry.

21   Q.   Does it say "Stop killing our..." and then an arrow

22   "...innocent people and we will..." arrow "...stop"?

23   A.   Yes.

24   Q.   Now, was this proposal for a deal something that you're

25   familiar with?

A.    It is.

Q.    What is it?

A.    This is common within this literature that if only the West would stop killing innocent Muslims, then there would no longer be a need to carry out these reprisal attacks, to stand up in the defense of the defenseless Muslims who can't defend themselves against Western strikes, and that then these attacks would stop.

Q.    And is this also something that you saw in the literature that was relevant to this case?

A.    Yes.

         MR. CHAKRAVARTY:  Could we call up Exhibit 11 on the right side, 1142-91, page 15.

Q.    This is the first issue of *Inspire* magazine.  If you would read Question 5 here, and then I'll ask you to read the answer.

A.    So this is from *Inspire* magazine.  If memory serves, this is the question and answer that we referenced at one point yesterday.  Someone is interviewing one of the leaders of al-Qaeda in the Arabian Peninsula.

      This is Question 5.  "What does al-Qaeda want from the West for it to stop targeting it?

         "Answer:  What we want from the West is one thing:  To stop aggression and oppression against the Muslim nation and to withdraw out of its land.  This solution was given by all of our leaders and on more than one occasion.  The truce was

1    offered by the one who has real authority to take such a

2    decision on behalf of the Muslims, Sheikh Osama Bin Laden, may

3    Allah preserve him.  His offer was refused.  Whenever we offer

4    a sound plan, they escalate in their stubbornness so we are

5    left with no option but to defend ourselves and fight the

6    transgressors."

7    Q.   It concludes?

8    A.   "If the West refrains from attacking us and oppressing our

9    nation, we will refrain from them.  Otherwise, we will have

00:12 10   them drink from the same cup that they have the innocent from

11   our nation drink from."

12   Q.   And is this this concept of stop killing our innocent

13   people and we will stop?

14   A.   Yes.

15        MR. CHAKRAVARTY:  That's all I have.  Your Honor.

16        THE COURT:  Mr. Bruck?

17                      CROSS-EXAMINATION

18   BY MR. BRUCK:

19   Q.   Good morning, Dr. Levitt.

00:13 20   A.   Good morning, sir.

21   Q.   I'm David Bruck, representing Jahar Tsarnaev, and I've got

22   a few things I would like to go over with you, if I could.

23   A.   Absolutely.

24   Q.   Thank you.  You mentioned that you were a Deputy Assistant

25   Secretary of the Treasury but you didn't tell us when.  That

1    was during the Bush administration.  Is that correct?

2    A.    Yes, sir.

3    Q.    2005-2007?

4    A.    Yes, sir.

5    Q.    Okay.  And much of your academic and your government work

6    has -- and your work as a witness in criminal cases has

7    concerned the financing of terrorist activity.  Is that

8    correct?

9    A.    A lot of it has.  Not all of it by any stretch of the

00:14 10   imagination.  I do a lot of work on illicit finance including

11   terror finance; a tremendous amount of work now on counter

12   violent extremism or counter-radicalization, it's the same

13   thing, the flow of foreign fighters and a host of other issues.

14   Q.    Okay.  And the main focus of your work has been on the

15   Middle East --

16   A.    Yes.

17   Q.    -- throughout your career?

18   A.    Yes.

19   Q.    And the main language in the Middle East is Arabic?

00:14 20   A.    Correct.

21   Q.    Which is a language that you don't speak?

22   A.    Correct.

23   Q.    You mentioned another language that you didn't speak that

24   was relevant to this case but you didn't tell us which language

25   that was.

1    A.   There was at least one document that was provided to me

2    that was written in Cyrillic script, Russian, perhaps, but I

3    don't read it so I couldn't tell you.

4    Q.   Okay.  So at least one document that was written in what

5    you think was Russian?

6    A.   Correct.

7    Q.   Okay.  But you couldn't read that either?

8    A.   Correct.

9    Q.   And I take it you're not an expert in the history of

00:15 10   Russia or Chechnya or Dagestan, the North Caucasus, correct?

11   A.   I've done a lot of work on the Chechen conflict as it

12   relates to international jihad, but I'm not an expert in Russia

13   or its history, no.

14   Q.   Or in the culture and history of the North Caucasus except

15   to the extent that it relates to your field of terrorism,

16   correct?

17   A.   Correct.

18   Q.   And you've already told us that you're not an expert on

19   Islam?

00:15 20   A.   Correct.  I have studied Islam and I have studied a lot

21   about it, it's necessary for the work that I do, but I

22   certainly don't consider myself an expert on religion, or Islam

23   in particular.

24   Q.   All right.  You said that -- in talking about the process

25   by which someone becomes radicalized, in your term, and then

1   moves to violence, and I think I'm quoting you, that someone

2   has to kind of hold your hand and pull you across that dividing

3   line.  And then you said, "There is a radicalizer in every case

4   that we see," right?

5   A.   Yes.  And as we continue, that can be an individual --

6   Q.   Yes?

7   A.   -- an actual person; it can be virtual.  And increasingly

8   today it is virtual.  It's increasingly rare to have an actual

9   person face-to-face, two eyes into two eyes, radicalize an

00:17 10   individual, but it does still happen.

11   Q.   You weren't asked to find out to determine, or were you,

12   who the radicalizer in this case was?

13   A.   No; I was asked to review the materials that were provided

14   to me, and that's what I did.

15   Q.   Okay.  And those materials were entirely from Jahar's

16   computer, correct?

17   A.   His computer and I believe some MP3 players.

18   Q.   And some MP3 files?

19   A.   Correct.

00:17 20   Q.   Okay.

21   A.   In other words, I don't know if all of those were

22   necessarily from his computer or from a -- I believe some of

23   them were downloaded to an actual MP3 player, an iPod or

24   something like that.

25   Q.   Okay.  About how many files in all did you look at?

1    A.    A few dozen.

2    Q.    I'm sorry.  Two dozen?

3    A.    A few dozen.

4    Q.    A few dozen?

5    A.    Yeah, two or three dozen, maybe four dozen, something like

6    that.

7    Q.    Somewhere between 24 and 48 files total?

8    A.    Yeah.

9    Q.    Okay.  And I think you said that it was not your job to

00:18 10   vet the information that you were given, correct?

11   A.    In other words, not to -- in some cases, you know, to be

12   able to vet whether this did, in fact, come from a person's

13   computer, I'm in no position to do that.  So in a case like

14   this, whether called by prosecution or defense, I have to rely

15   on what they've provided me, and it's up to the process, the

16   proceedings in court, to determine, in fact, where those

17   materials came from.

18   Q.    Okay.  And in the process of not vetting the materials,

19   you also didn't ask the prosecution for anything more than you

00:18 20   were given?

21   A.    I don't remember if I did or did not in this case.  I do

22   sometimes, if there's a need for it, if there's something that

23   stands out, you know, a specific *Inspire* magazine as opposed to

24   others.  I don't recall if I asked for more information in this

25   case.

1  Q.   Okay.  Do you think if you had asked for something more,

2  you might recall it?

3  A.   Honestly, no.  I do a lot of different work at a lot of

4  different times and I don't recall every conversation.

5  Q.   Okay.  You told us yesterday that your job is to provide

6  context to materials that you're given, whatever those are?

7  A.   Well, that was a job that was given to me, and my job now

8  is to -- whoever's asking me questions, to answer them as

9  truthfully and honestly to the best of my ability, to be able

00:19 10  to provide context.  That's what the expert is for.  I'm not a

11  fact witness.

12  Q.   And by "context," you meant the background in context to

13  the 24, 36, 48 files that you were given?

14  A.   That was part of the job that I was given.  I was also

15  given the task of explaining the context, the geopolitical

16  context, of what was going on at the time; what was going on at

17  earlier times, to be able to explain the context of some of

18  those documents; and then, yes, to provide context and

19  explanation of those documents of some of the individuals who

00:20 20  are either mentioned in or the authors of these documents or

21  lectures.

22  Q.   Okay.  Were you given any files from Tamerlan Tsarnaev's

23  computer?

24  A.   No.

25  Q.   Were you given any recordings from Tamerlan Tsarnaev's

1  computer, audio recordings about his discussions with --

2  concerning jihad in Russia that he conducted?

3  A.   No.

4  Q.   Did the government tell you anything about when the

5  materials that you've testified about appeared on each of the

6  various devices that were found by law enforcement in this

7  case?

8  A.   Not to that extent.  Not in -- not in each case to each

9  device.  There were -- I recall that there were certain

00:21 10  documents, and I can't remember which, that I remember being

11  told were accessed months, maybe a year, even, before the

12  events at the marathon, but in general, no.

13  Q.   Okay.  So if it were, in fact, the case that the vast

14  majority of the materials on Jahar's computer had actually been

15  dumped there by a thumb drive that originated with Tamerlan,

16  that's not your department?

17  A.   I could certainly comment on it if you're asking me to.

18  It wasn't what was asked of me by the prosecution.  Are you

19  asking me now?

00:21 20  Q.   No.  And the prosecution didn't give you any information

21  about that?

22  A.   That's not what I was asked to comment on.

23  Q.   My question is:  The prosecution didn't give you any

24  information about where all these files originated from in

25  terms of the various devices that were found?

A.   Again, there might have been one or two cases where that
came up, but that was not a focus and I don't remember getting
that for each and every instance.  The material that I was
given was presented to me as this is material that was on the
defendant's media.

Q.   Were you given any information about Tamerlan's overseas
travel to the Caucasus, to Dagestan and Chechnya in 2012 in
connection with your work in this case?

A.   Not by the prosecution.  Obviously, I had heard about it
beforehand, just as someone who follows these things
professionally.

Q.   But that was not something that you were asked to factor
into your analysis in this case by the prosecution?

A.   Correct.  And my understanding is that it was because I
was focused on the defendant and not the deceased.

Q.   Your understanding was that you were to focus on the
defendant and not on anyone else, correct?

A.   The defendant's the person on trial, yes.

Q.   Right.  Is it fair to say that to understand -- to draw
inferences from material that you find on someone's computer,
it would be helpful to know where those materials came from and
who provided them?

A.   Not necessarily.  The issue here is did the defendant
access and was the defendant affected by, radicalized by these
materials.  I think as we discussed earlier you can show direct

1    parallels between materials that were on those devices and the

2    defendant's own writings.

3        You can get these things directly off the Internet, you

4    can be handed them from somebody else.  At a certain point it

5    almost doesn't make a difference where you got them from if you

6    got them and then internalized them and were motivated and

7    operationalized by them.

8    Q.   Let me ask you this:  If someone else got these materials

9    first and internalized them and provided them to the defendant

00:24 10   and also talked to the defendant, and harangued him and

11   instructed him, would there be any way to tell whether the

12   defendant's views and feelings had come from being talked to or

13   had come from the materials on his computer?

14   A.   We are all products of our -- the totality of our

15   experience, so I can't get into the defendant's head.  All I

16   can tell you is that there are direct parallels between his

17   statement and the statements of the materials that were on his

18   devices.  Could other people have hit these points too, maybe

19   in that same verbatim language?  Possibly.  Could that have

00:25 20   contributed to the radicalization?  It could have.

21       How much -- you know, as we discussed yesterday, how much

22   can you parse out how much was a person affected by one

23   particular issue or input than another is really difficult to

24   say.  At the end of the day, if a person is radicalized but --

25   by whatever inputs to the point -- to the extreme of carrying

1    out violence against civilians, you've checked that box of

2    radicalization no matter how it happened.

3    Q.   Okay.  So of course in weighing that and analyzing that,

4    it's pretty much a given that if you only look at the materials

5    in isolation on one person's computer, you're not going to be

6    able to make any assessment of what the history of this process

7    was; you can only describe the end product, correct?

8    A.   Well, in part the end product describes what happened.

9    The end product is the defining moment of it all that makes it

00:26 10   something beyond radical ideas which are protected and violence

11   against civilians which is not.

12       I don't know if there were other materials that if they

13   had been provided to me could have given me more insight into

14   the history of his radicalization, but I also could not have

15   been a fly on the wall in the brothers' personal conversations.

16   At the end of the day, what we do know for a given is what

17   actually happened, the attack that took place, the defendant's

18   statement, and the direct parallels between that statement and

19   these materials.

00:26 20   Q.   Okay.  Some of these 24, 48, 36 files were very long,

21   weren't they?

22   A.   They were.

23   Q.   He had a book called the *Book of the End*.  Do you know

24   what that is?

25   A.   Not offhand, no.  There was lots of material.  And when it

1   came to books, I did not read every book that was -- the copies

2   of which, or the covers -- copies of covers of which were

3   provided to me.

4   Q.   Okay.  The *Book of the End*, you are not aware that is a

5   classic work of Islamic scholarship written in 17th-18th

6   century, which is the edition he had in English on his

7   computer, 748 pages long?

8   A.   I'm familiar with the book.  I may even have it on my

9   shelf.  But I did not review it for purpose of this case.

00:27 10   Q.   Okay.  Even though it was one of the files -- was it one

11   of the files you were provided, or do you know?

12   A.   I was not provided this file, to the best of my

13   recollection.  There were -- I believe there were pictures of

14   the covers of certain books, and this may or may not have been

15   one of them.

16   Q.   Now, when I say "book," I mean a PDF, a computer file.  It

17   doesn't ring a bell?

18   A.   As I said, the name rings a bell.  I don't think I was

19   given this file.  I'm quite certain I was not given this file.

00:28 20   Q.   Okay.  Were you shown "The Slicing Sword"?

21   A.   Possibly.

22   Q.   You don't remember?

23   A.   No.

24   Q.   Do you have a list with you of the 24 or 36 or 48 files

25   you were given?

1    A.   I don't.  I don't.

2    Q.   Okay.  Do you remember that you -- that they included

3    various issues of *Inspire* magazine?

4    A.   They did.

5    Q.   And other than that, your memory is hazy?

6    A.   I believe you have a copy of my report which gets through

7    some of them, and I'm sure the prosecution could provide you

8    with a list of things I was provided.  But, A, over the course

9    of the time of my preparation I reviewed many, many things,

00:29 10    including many things that did not make it into the report,

11    which I was not commenting on or not asked to comment on, and

12    because I cover these types of issues professionally outside of

13    this case and the vast majority of my time is not on this case,

14    it's very difficult sometimes to remember did you see this

15    particular document in this context or in another context.

16    Q.   Now, a lot of the materials on this computer concerns

17    concepts of the end times, correct?

18    A.   Correct, from the materials that I saw.

19    Q.   And this is the idea that Quranic prophecy predicts signs,

00:29 20    in fact, Awlaki has devoted many lectures that were on the

21    computer to interpreting historical events and recent events as

22    showing that the end times are near?

23    A.   Correct.

24    Q.   And this will lead up to huge conflagration and really the

25    end of the world and leading up to the day of judgment,

1    correct?

2    A.    Right.

3    Q.    And people who internalize this, these theological

4    concepts, really think that we've come very close to the end of

5    the world?

6    A.    I'm not in a position to comment on what they or you or

7    the defendant really truly do believe or not.  There is a delta

8    between how these things are interpreted by, for lack of a good

9    term, kind of mainstream Muslim thought and the radicals.  That

00:30 10    I can tell you.  But I can't tell you what any particular

11    individual actually is thinking.

12    Q.    You talked about the "Hereafter Series" which you said on

13    its face, at least, is not jihadi; it is Awlaki's discussion of

14    what happens after death, essentially, in his view of Islam?

15    A.    In the context of there are Awlaki lectures that are about

16    Islam, there are Awlaki lectures that are about -- explicitly

17    about jihad.  And this is one that I put in the former

18    category.

19    Q.    Okay.  Okay.  And there were -- the "Hereafter Series"

00:31 20    includes about 24 or 22 audio files.  They're each somewhere

21    around an hour long?

22    A.    That sounds right.

23    Q.    Okay.  And those were found on the defendant's computer?

24    A.    As I understand it.

25    Q.    All right.  And those are essentially religious lectures?

1    A.   Again, they are religious lectures but there is a real

2    consensus among practitioners, both within government and

3    within -- among Islamic leaders about concern that these

4    earlier series that don't explicitly call for violence do

5    contribute to putting some on the path of violence.  It was one

6    of his former co-imams at a mosque here in the United States

7    who explained this specifically.

8    Q.   Sort of a gateway drug?

9    A.   Yes, a gateway or a conveyor belt, that someone, you know,

00:32 10    listens to these early lectures, as we discussed yesterday by

11    someone who is not shrill, he's professorial, and becomes

12    someone who's following this person's lecture series, then

13    continues to follow that person's lectures as they get more

14    explicitly violent.

15    Q.   And the "Hereafter Series" goes into tremendous detail

16    about the nature of paradise --

17    A.   Yes.

18    Q.   -- correct, and the nature of hell?

19    A.   Yes.

00:33 20    Q.   And the physical torments that await people in hell?

21    A.   Yes.

22    Q.   The -- and makes the point over and over again that if

23    someone understood what was awaiting them in hell, everyone

24    would be a good Muslim and do what they should do?

25    A.   I think that's the general theme.

1    Q.    You described Awlaki as a very effective propagandist --

2    A.    Yes.

3    Q.    -- whose lectures had great allure for many, many

4    listeners?

5    A.    Correct.

6    Q.    For many vulnerable listeners.  Let me rephrase that.

7          For someone who did not have a strong background or

8    education in Islam and was searching for Islamic ideas, to

9    learn more about their faith online, Awlaki would be a very,

00:34 10   very seductive source of information, would he not?

11   A.    Well, of course it's important to note it's not like

12   Awlaki owns the Internet.  He's not the only voice out there.

13   But, yes, Awlaki proved to be a seductive voice for all kinds

14   of individuals, at risk and otherwise.

15   Q.    And on the Internet when you find somebody like that, you

16   can get a very distorted picture of how representative that

17   person is?

18   A.    You could, but I'd argue much more in the early years

19   about Awlaki's sermonizing.  By the time in question that we're

00:34 20   discussing here today, news of who Awlaki was was commonplace.

21   So a person who was just then choosing to listen to the Awlaki

22   series almost certainly was not stumbling innocently into an

23   exploration of Islam and happened to fall into an Awlaki

24   lecture series, this is someone who's all over the news, the

25   focus of U.S. government action.  Quite popular in the popular

1    media, that is.

2    Q.    Okay.  Hundreds of thousands, millions of people have

3    downloaded his material?

4    A.    Many people.  I don't know the number.

5    Q.    Now, you said yesterday that -- you were describing the

6    many different types of categories of people who are -- have

7    shown -- proving to be vulnerable to the radical jihadi

8    message.  And you listed one group as young Muslims responding

9    to a -- who feel excluded from their own societies, trapped in

00:36 10   poverty or hopelessness and authoritarian regimes.  That's one

11   group, right?

12   A.    I think that's from my report.  Maybe not from yesterday,

13   but yes.

14   Q.    Right.  But there were words to that effect yesterday.

15   Maybe not -- as one example.  Well, I'll go on.

16        Another -- you mentioned another group, well off and well

17   educated who live in Western democracies but struggle with

18   issues of belonging and identity and feel -- find that the

19   extremist message resonates?

00:36 20   A.    Correct.

21   Q.    And then you didn't mention this yesterday but it is in

22   your report, you wrote "Some either immigrants themselves or

23   descendants of immigrants from countries suffering from war,

24   natural disasters, political and/or economic oppression, war,

25   et cetera, are drawn to this radical and violent narrative

based on national and/or religious affinity for their ancestral

lands and empathy for the suffering of family, friends or

fellow nationals still suffering there"?

A.   That's right.

Q.   You went through the boat writing yesterday line by line

with Mr. Chakravarty.  Before I get to that, you looked

at -- with him at Exhibit 1280, a tweet from 2012.  "They will

spend their money and they will regret it and they will be

defeated."  That was a line that was in Mr. Tsarnaev's Twitter

00:37 feed, correct?

A.   Correct.

Q.   And you compared that to a somewhat similar statement by

Awlaki?

A.   I think it was a very similar statement, yes.

Q.   Where does that line come from originally?  I don't mean

word for word, but do you know?

A.   It has scriptural sources.  I don't remember where.

Q.   You don't remember where it's from.  Is that right?

A.   Correct, beyond the radical literature of the type we went

00:38 through yesterday and the way -- the issue is not so much

whether it has other antecedents but how within the radical

ideological moue, how it is used.

Q.   Would it surprise you to know that is a quote from the

Qur'an?

A.   No, I think I just told you it's from scripture.

1    Q.    Scripture?  Okay.

2          Looking at the boat writing, can you tell us which

3    passages are passages from the Qur'an or from the Hadith, from

4    Islamic scripture?

5    A.    Certainly not without it up here, but probably only one or

6    two.  As I said, and as you asked and answered, I don't

7    consider myself a scholar in Islam or in the Qur'an.

8    Q.    Well, "There is no God but Allah and Mohammed is his

9    prophet."  Is that something that Mr. Tsarnaev got from *Inspire*

00:39 10   magazine?

11   A.    No.  Of course, as we said yesterday, this is the

12   Shahadah.  This is the statement of faith.  It is common to

13   restate it in times of stress, especially when one thinks one

14   is about to die.  But this is -- as I think I said explicitly

15   yesterday, there is nothing inherently extremist about the core

16   statement of belief of the world's Muslims.

17   Q.    When one is about to die, the profession of faith, the

18   Shahadah, is something that a Muslim is likely to say or write,

19   correct?  Is that what you just told us?

00:40 20   A.    Yes.  I can say it again if you want.

21   Q.    No.  I just wanted to be sure.

22         You told us about the term "innocent" -- there was a

23   discussion a moment ago with Mr. Chakravarty about innocent

24   civilians -- or innocent people -- excuse me -- and you

25   explained some of the doctrine about why Americans would not be

1  viewed as innocent.  The writing in the boat actually used the

2  phrase "innocent people," correct?  "I don't like killing

3  innocent people"?

4  A.   I believe that's right.  I haven't memorized it and it's

5  not up on the screen, so I'll take your word for it.

6  Q.   Okay.  Have you -- you read all the *Inspire* magazines?

7  A.   Unfortunately.

8  Q.   Can you think of a single place in *Inspire* magazine where

9  Americans were described as innocent people?

00:41 10  A.   Well, I said I've read them all; I haven't said I've

11  memorized them all.  And they are long and so I can't -- I

12  can't answer that question.

13  Q.   Have you ever in any al-Qaeda propaganda seen Americans

14  referred to as "innocent people"?

15  A.   I can't recall.  And it's not impossible, as we saw in the

16  literature that we were looking at just a few minutes ago,

17  where there is this idea quite common --

18  Q.   Let me interrupt you.  I'm not asking about the idea; I'm

19  asking about the phrase "innocent people."

00:41 20  A.   Then asked and answered.

21  Q.   I'm sorry?

22  A.   Then asked and answered.

23  Q.   You don't remember?

24  A.   I don't.

25  Q.   Okay.  You said yesterday that you thought the writing in

1  the boat was addressed to the American public?

2  A.   I'm sorry.  Could you restate?

3  Q.   I'm sorry.

4  A.   That's okay.

5  Q.   You said yesterday you thought the writing in the boat was

6  addressed to the American public?

7  A.   Correct.

8  Q.   When someone recites the Shahadah, do you think that was

9  addressed to the American public?

00:42 10  A.   Well, in this context I think yes.  I think this was a

11  restatement of a self-identity.  And again, putting in context,

12  and I think as you said in an objection at one point, you don't

13  actually need a whole lot of expertise if you understand some

14  basic English grammar to be able to see what the note is trying

15  to accomplish.

16  Q.   As a matter of fact, these -- how long would it

17  take -- I'm not asking for your opinion about the person who

18  wrote this, I just have a simple question, which is:  The

19  statements -- the religious statements on the boat writing and

00:43 20  the political statements, if you will, how long would it take

21  someone to learn those slogans and those religious statements?

22  A.   One could learn them quite quickly.

23  Q.   Right.

24  A.   I think as we showed yesterday and this morning, it would

25  take some time to be able to go through all the literature that

1   you can draw parallels from.  But even that, you're talking

2   potentially, you know, hours and days, not necessarily months

3   and years, which gets to the issue we discussed yesterday:  The

4   radicalization has no one model and can happen very, very

5   quickly.

6   Q.   So the slogans and the religious statements that were

7   found on the boat, one would not have to have read an enormous

8   amount of material, let alone the 24, 36 or 48 files that you

9   reviewed, in order to be able to write that on the boat?

00:44 10   A.   I don't know how much or how little scientifically we

11   could say you would have needed to have internalized.  I don't

12   know that this statement in the boat could have been written by

13   someone who was not exposed to any of these ideas.  There are

14   clear parallels to these ideas.  But having read through some

15   of these materials, having listened -- or watched some of these

16   materials, one could have then written this statement, yes.

17   Q.   If -- and you've said before that a lot of this material

18   could have come from being -- from conversation, from being

19   talked to as well as from reading materials on the computer.

00:45 20   A.   Well, it's impossible to say, of course.  It would

21   have -- I think it would have been remarkable, if at all

22   possible, for it to have only come from conversations given the

23   very strong direct parallel to the text.  It's uncommon for

24   people in colloquial conversation to speak in the way that

25   we've seen this text, whether it's *Inspire* magazine or some of

          1    these audio or video files.  So you might have gotten some of

          2    the general ideas, but what was in part telling to me was how

          3    strong the parallels were to these specific texts.

          4    Q.   But they were parallels; they weren't quotes for the most

          5    part, correct?

          6    A.   That's what happens when you paraphrase.

          7    Q.   Right.  You can paraphrase something you've read,

          8    something you've been told, either one?

          9    A.   Therefore, when the paraphrase is particularly close to

00:46    10    the text, that is a statement in and of itself.

         11    Q.   And you found these paraphrases to be particularly close

         12    to the text?

         13    A.   I do.

         14    Q.   Okay.  Bear with me just a moment.

         15    A.   Of course.

         16    Q.   You described yourself yesterday as a hired expert?

         17    A.   I don't know if I did but I have been hired, yes.

         18    Q.   Okay.  And at what rate?

         19    A.   $450 an hour.

00:47    20    Q.   Okay.  Do you know how many hours you've put in?

         21    A.   Total, no, but -- and I bill in stages, so.  But I imagine

         22    that, you know, yesterday and today will end up being probably

         23    about somewhere around 20 hours.  Traveling here Sunday,

         24    yesterday, today traveling.

         25    Q.   Okay.  But the 450 hours [*sic*] was for all of the work you

1    did on the case, not only the two days that you've been in

2    court?

3    A.    Correct.  It will be several thousand dollars.

4    Q.    Okay.  And now, have you talked about your testimony with

5    anybody after you -- court was finished yesterday?

6    A.    No, other than to kind of tell my wife that I testified

7    and I'm not going to Berlin and will be coming home early.  No.

8    Q.    But you listed your publications with Mr. Chakravarty.

9    You didn't include that you were a rather prolific user of

00:48 10   Twitter?

11   A.    I am.

12   Q.    And, in fact, you tweeted -- re-tweeted *Boston Globe* news

13   accounts of your own testimony within an hour or two after

14   getting off the witness stand yesterday?

15   A.    I did.  I re-tweeted three or four things, then thought

16   better of it.  I testify a lot.  It's not often in the press.

17   I obviously have not tweeted any of my own thoughts or even my

18   own commentary, but I don't have a problem in tweeting media.

19        My Twitter feed is all about the news in the world of

00:48 20   terrorism.  It's very common for me to tweet about cases.  I've

21   been very, very careful not to tweet about this one.  And then

22   after, whatever it was, two or three or four tweets, I thought

23   better of it and stopped.

24   Q.    You actually had been tweeting about this case, or

25   re-tweeting some of the news coverage before yesterday,

1    correct?

2    A.   It's possible one off here or there, but normally in a

3    case like this I would be tweeting a lot and would also be

4    providing opinion, and that I have not been doing.

5    Q.   Okay.  You've just been re-tweeting to your 7,000 Twitter

6    followers news articles about your own testimony here today?

7    A.   Two or three articles yesterday, then thought better of

8    it.  And probably, you know, I don't know, a very small handful

9    of articles in the whole period that this trial has been going

00:49 10   on, whereas I would normally have been doing much more.

11   Q.   Okay.  One last thing.  I wanted to ask you about one of

12   the intellectual figures in the world jihadi movement as you

13   described it.  And before I get to that, you said to begin with

14   that when you used the term "world jihadi movement" you're not

15   actually referring to a movement that issues commands to

16   followers, correct?  Or at least in a case like this that's not

17   what you meant?

18   A.   Well, I'll tell you what I meant.  I think the way I put

19   it is there's no office, there's no address.

00:50 20   Q.   Right.

21   A.   I think the way I put it yesterday is there's no command

22   in control.  But it certainly is the case that commands or

23   instruction are put out there.  That's the nature of the

24   impersonal communication, including some that we went through

25   yesterday.

1   Q.   And then whoever responds to it, responds?

2   A.   I'm sorry.  I couldn't hear you.

3   Q.   That's okay.  I think you've answered my question.

4        And you mentioned that one of the perhaps -- I don't know

5   if you used the phrase the sort of intellectual grandfather of

6   jihadi radicalism is a man named Sayyid Qutb?

7   A.   I think I used that phrase more to describe Sheikh

8   Abdullah Azzam.  Sayyid Qutb we discussed yesterday as well,

9   one of the founders of the Muslim brotherhood and one of the

00:51 10   original proponents of the idea of near-term jihad, that is to

11   say, the need to carry out jihad now as opposed to doing

12   things, proselytizing, trying to bring Muslims back to good or

13   traditional religious practice first and only then engaging in

14   jihad.  Sayyid Qutb's innovation was the idea that jihad should

15   come in parallel, at the same time, and it would have a

16   self-fueling cycle, whereby virtue of engaging in jihad, that

17   would help to bring people back to proper observance.

18   Q.   By the way, before I get back to Qutb, Azzam wrote "Join

19   the Caravan" in the late 1980s.  Isn't that correct?

00:51 20   A.   That's right.

21   Q.   And at that time you might say that he was with the Afghan

22   mujahidin, or with the mujahidin in Afghanistan?

23   A.   He was.

24   Q.   Fighting against the Russians?

25   A.   Correct.

1    Q.   And in that sense, he was allied with us?

2    A.   I would not say that.  I think that's a very common

3    misperception.

4    Q.   Let me put it differently.  The United States was

5    supporting the Afghan mujahidin, and so was he.  Would that be

6    a fairer way to put it?

7    A.   Yes.

8    Q.   Okay.  Qutb:  He was an Egyptian?

9    A.   He was.

00:52 10    Q.   Who wrote several books?

11    A.   Yes.

12    Q.   And had the ideas that you've described about jihad -- his

13    ideas had great impact upon subsequent thinking of radical

14    Islam.  Is that a fair statement?

15    A.   Within the radical community, yes.

16    Q.   And he continues to this day to be a very influential and

17    revered figure?

18    A.   He's influential within this, frankly, let's be honest,

19    very, very small subset of the world, small subset of the

00:53 20    Muslim community, this radical element within it, and far less

21    so with the vast majority of Muslims around the world.

22    Q.   Sure.  When I say "revered" I mean within the group of

23    jihadists about whom you've been testifying?

24    A.   Correct.

25    Q.   And who have, as in your description, posed this grave

1    challenge to peace and security, correct --

2    A.    Correct.

3    Q.    -- in other countries?

4    A.    And here.

5    Q.    Qutb died in 1966.  Is that correct?

6    A.    Yes.

7    Q.    Was he more famous before he died or after?

8    A.    I think it's hard to say.  He was famous when he lived and

9    was imprisoned, and then he was killed by the regime and was

00:53 10    famous then too, and maybe some might argue more so.  I think

11    it's safe to say that after he died he became more famous not

12    necessarily because of his life or death but because his

13    material book *Milestones*, in particular, was quoted and cited

14    over and over and over and given much more prominence by being

15    cited and referenced over and over.

16    Q.    And Qutb's name and his work have lived on through the

17    1970s, the 1980s, the 1990s, 2000 and to today?

18    A.    Books have staying power.

19    Q.    And when you say he was killed by the regime, he was

00:54 20    sentenced to death and hanged by the government of Egypt,

21    correct?

22    A.    That's right.

23    Q.    In 1966?

24    A.    In 1966, I believe, yes.

25            MR. BRUCK:  Thank you, your Honor.

1           MR. CHAKRAVARTY:  Briefly, your Honor.

2                    REDIRECT EXAMINATION

3    MR. CHAKRAVARTY:

4    Q.   Dr. Levitt, Mr. Bruck asked you several questions about

5    people who are introduced to Anwar Awlaki.  Is everyone who is

6    introduced to Anwar Awlaki's material -- does everyone become

7    radicalized?

8    A.   Absolutely not.

9    Q.   And does everyone who becomes radicalized by Anwar

00:55 10   Awlaki's material actually engage in an act of violence?

11   A.   No.  As counsel noted many, many people have accessed

12   Mr. Awlaki's sermons, both the earlier ones about the history

13   of Islam and the later ones particular to jihad, and thankfully

14   the vast majority of them have not, or have not yet, carried

15   out acts of violence.

16   Q.   Is there a continuum between the thought, the radical

17   thought, versus the action that is actually violent?

18   A.   There's not a necessary continuum, that is to say, it is

19   not an if-then statement, that if you are exposed to radical

00:55 20   ideas, you will then necessarily, because of that motivation,

21   be operationalized.  I do believe that there is a necessity

22   that it's -- I don't see how someone gets to the point of

23   carrying out an act without having had gone through some point

24   of the motivation.  But many, many people are exposed to these

25   ideas and do not carry out acts of violence for a whole host of

1    different reasons.

2    Q.   Mr. Bruck asked you several questions about some tweets

3    that the media had put out that you simply re-tweeted?

4    A.   That's right.

5    Q.   Did that happen last night?

6         Is there something secret about your testimony here today?

7    A.   I hope not.

8    Q.   In fact, the whole world is watching the Twitter feed

9    about your testimony.  Is that fair to say?

00:56 10   A.   Yes.  And this was my -- this is my line of thought:

11   Normally I would be providing commentary.  I was wise enough

12   not to do that; apparently not wise enough to say wait another

13   couple of days before tweeting anything.  I guess it's part of

14   the live and learn that we all go through with news social

15   media.

16   Q.   Fair enough.  Now, Mr. Bruck asked you some questions

17   about could someone learn the material that was written in the

18   boat very quickly.

19        MR. CHAKRAVARTY:  Speaking of tweets, can I ask

00:56 20   Mr. Bruemmer to call up Exhibit 1280, please?

21   Q.   Now, this tweet that we talked about a little yesterday,

22   this was a paraphrase from an Awlaki note.  Is that right?

23   A.   That's right.

24   Q.   And is the date of this tweet April 16th, 2012?

25   A.   It is.

```
 1   Q.   It's about a year before the Boston Marathon bombing?

 2   A.   Yes.

 3            MR. CHAKRAVARTY:  Thank you.

 4            THE COURT:  Mr. Bruck, anything else?

 5            MR. BRUCK:  No, sir.

 6            THE COURT:  All right.  Dr. Levitt, thank you.  You

 7   may step down.

 8            THE WITNESS:  Thank you, sir.

 9            (The witness is excused.)

10                          *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4      the United States District Court, do hereby certify that the

 5      foregoing transcript constitutes, to the best of my skill and

 6      ability, a true and accurate transcription of my stenotype

 7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8      United States of America v. Dzhokhar A. Tsarnaev.

 9

10      /s/ Marcia G. Patrisso
        MARCIA G. PATRISSO, RMR, CRR
11      Official Court Reporter

12
        Date:  3/25/15
13

14

15

16

17

18

19

20

21

22

23

24

25
```