FILED
IN CLERK'S OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

APR 14 PM 2 07

U.S. DIST...
DIST...

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| v. ) | Crim. No. 13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV, ) | **UNDER SEAL** |
| Defendant ) | |

**GOVERNMENT'S MOTION IN LIMINE TO EXCLUDE
PENALTY-PHASE EXPERT TESTIMONY AND RELATED EXHBITS**

The United States of America, by and through its undersigned counsel, respectfully moves in limine to exclude expert testimony and related exhibits that Tsarnaev proposes to offer during the penalty phase.

    A.    <u>Professor Michael Reynolds</u>

    1.    <u>Expert testimony about the reasons Tamerlan Tsarnaev "expressed his apparent alienation from his adopted country so violently"</u>

The government moves in limine to exclude a portion of Professor Reynolds's testimony that calls for speculation and is outside his area of expertise. Professor Reynolds is a historian focusing on the Middle East, Russia, and Eurasia, including the Caucasus. He acknowledges that the reasons "Tamerlan expressed his apparent alienation from his adopted country so violently is beyond the scope" of his knowledge and expertise. (Deft. letter to Gov't dated 10/02/14 at 6-7) (copy attached). Yet, he still proposes to tell the jury that in answering that question

> it may be useful to consider (a) that one's self-identification as a Chechen is central to the self-concept of a young Chechen man, (b) that this self-identification carries with it special expectations and obligations of proper social relationships, behavior and comportment, but (c) circumstances both internal and external to the individual can make it impossible to maintain and live up to these demands of Chechen identity, particularly after emigrating to a new country and a new language as a teenager, and if one lacks effective parental or other role models. * * * *

The violent jihadist propaganda emanating from Chechnya and Dagestan that

> Tamerlan . . . watched on-line . . . was likely to have been especially seductive to a young man like Tamerlan to the extent that he felt himself to have failed both as a Chechen and as an American.

Mr. Reynolds, a history professor, should not be permitted to voice his own psychological theories about what might have prompted Tamerlan Tsarnaev to become a radical extremist, let alone about what prompted him to move from radical extremism to actual violence -- matters on which Mr. Reynolds has no expertise.

An expert is permitted to testify about a matter only where (1) his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Federal Rule of Evidence 702. Professor Reynolds's psychological theories about the reasons Tamerlan Tsarnaev became a radical extremist and then a violent extremist are the opposite of reliable; they are pure speculation. Although the government does not concede that testimony about the history and culture of a country the defendant left for good at age eight is relevant at all, at least it is within the area of Professor Reynolds's expertise. Professor Reynolds should not be permitted to testify as an armchair psychologist merely because he is an expert in some other field.

    2.      <u>Misleading and prejudicial PowerPoint presentation</u>

Professor Reynolds proposes to illustrate his own testimony with a 73-slide PowerPoint presentation that contains numerous lurid and provocative photographs. Absent evidence that the defendant saw these particular photographs before committing the Marathon bombings, they should be barred from use, even as a chalk, because they are unnecessary and are likely to confuse and mislead the jury.

The PowerPoint presentation begins with a dozen color slides showcasing the bucolic Chechen countryside and picturesque images of Chechen culture, then gives way to harsh black-and-white photos of Russian forces on the march, a grim-faced Josef Stalin, and disturbing photos of Chechen families being marched into exiled and transported in overcrowded cattle cars. Next come dozens of images of poorly clothed and ill-fed Chechens living in exile and crying women and children foraging for food in bombed-out ruins. These are followed by multiple images of Chechen exiles digging their own mass graves, or long rows of them lying dead in those graves, while Russian soldiers with machine guns blithely smoke cigarettes above them. The danger of unfair prejudice from these unnecessary and irrelevant images is obvious.

### B. Professor Bernard Haykel

According to Tsarnaev's disclosure, Professor Haykel is a professor of Near Eastern Studies with a focus on "Islamic law, Islamist political movements, including al-Qaeda and its affiliates, Salafi doctrine and ideology, as well as the history and politics of Saudi Arabia and Yemen."

#### 1. Comparisons between Tsarnaev and other murderers

The government moves to preclude Professor Haykel from comparing Tsarnaev to other violent offenders. Professor Haykel proposes to testify that the Tsarnaev brothers had no connection with any terrorist organization and that this "differentiated [them] . . . from Maj. Nidal Hassan, who is reported to have communicated with the US-Yemeni militant ideologue Anwar al-Awlaki before attacking soldiers at Ft. Hood, or Umar Farouk Abdulmutallab, the Detroit 'underwear bomber,' who is likewise alleged to have had direct communication with al-Awlaki and the Saudi bomb maker, Ibrahim al-Asiri, and taken direction from them, prior to the attack." (Deft. letter to Gov't dated 10/02/14 at 2). This testimony should be excluded because

it is irrelevant, likely to confuse and mislead the jury, and a waste of time.

As the defense itself has argued many times, the jury must sentence Tsarnaev based on an individualized assessment of his character and his crimes. Permitting an expert to compare Tsarnaev to other terrorists will confuse and mislead the jury about the nature of their task and lead to much evidence and testimony about other terrorists, all of which is irrelevant. The proposed testimony is not related to any disputed fact because government has never alleged, suggested, or argued that the Tsarnaev brothers had a connection to any terrorist organization. It should therefore be excluded.

    2.    <u>Matters outside of Professor Haykel's expertise</u>

Professor Haykel should not be permitted to "comment on the risk of error associated with imputing all of the views of any given radical or extremist writer to any given person among the thousands or even millions of people who have downloaded or linked to their works by computer" (Deft. letter to Gov't dated 10/02/14 at 3), because that is a matter for argument, not a proper subject of expert opinion testimony. He likewise should not be permitted to opine that "the presence of hundreds or even thousands of pages of Salafi writings and recordings on the computer of an 19-year-old college student does not establish that he even read, watched or listened to most of them, much less that he understood them and guided his actions according to their contents." <u>Id.</u> That, once again, is a matter for argument, not a proper subject of expert opinion testimony. While Professor Haykel may be a learned professor Near East studies, he is not qualified to offer expert opinion testimony on the computer habits of 19-year-old college students.

### C. Jay Giedd, M.D.

#### 1. Testimony about Tsarnaev's prospects for rehabilitation

The government moves in limine to exclude Dr. Giedd's proposed testimony about Tsarnaev's prospects for rehabilitation as irrelevant and as likely to confuse and mislead the jury. According to Tsarnaev's disclosure, Dr. Giedd is a specialist in the area of "adolescent maturation and brain development" (Deft. letter to Gov't dated 11/24/14 at 4) (copy attached). Dr. Giedd does not, however, propose to tell the jury about his own (or anyone else's) examination of *Tsarnaev's* brain development; rather, he proposes to testify in general about "contemporary brain research focused on the development and maturation of the human brain from birth to adulthood, with specific attention to the period of adolescence and early adulthood." Id. The sole purpose of this testimony, according to Tsarnaev's disclosure letter, is to "assist the jury in weighing the significance of the defendant's age on the question of his prospects for rehabilitation, or, as the Supreme Court framed the question, 'his potential to attain a mature understanding of his own humanity.'" Id. (quoting Roper v. Simmons, 543 US 551, 574 (2005)).

Dr. Giedd's testimony should be excluded because it asks the jury to speculate about the likely course of Tsarnaev's moral development based not on an individualized assessment of Tsarnaev himself but rather on generalized observations about human nature. Tsarnaev does not need an expert to explain to the jury that an individual's moral development does not necessarily cease at age 19. But dressing up that commonsense observation as a medical and scientific conclusion risks misleading the jury into believing that Tsarnaev *necessarily will* in fact become more humane over time. As noted earlier, an expert is permitted to testify about a matter only where (1) his "scientific, technical, or other specialized knowledge will help the trier of fact to

5

understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Federal Rule of Evidence 702. Here, Dr. Giedd has no facts or data about Tsarnaev in particular -- as opposed to humanity as a whole -- that will assist the jury in determining whether Tsarnaev will ultimately "attain a mature understanding of his own humanity."

Roper offers no support for the admissibility of Dr. Giedd's testimony. On the contrary, the Court observed in Roper that while some juveniles do not reach an adult level of maturity when they turn 18, others "under 18 have already attained a level of maturity some adults will never reach." 543 U.S. at 574. This observation highlights the need for an individualized assessment of a given defendant's likelihood of rehabilitation. The Roper Court certainly did not suggest that expert testimony about human nature is admissible to assist the jury in determining a given defendant's "potential to attain a mature understanding of his own humanity.'" Id. It merely noted that executing a juvenile who has not yet attained a mature understanding of his own humanity will necessarily prevent him from ever doing so. See id.

2. Testimony about the "line" between adolescence and adulthood

In the event Dr. Giedd is permitted to testify at all, he should not be permitted to testify that "that there is not a clear line between adolescence and adulthood, and that the normal maturation process is by no means completed at age 19 or 20" (Deft. letter to Gov't dated 11/24/14 at 4). The Supreme Court in Roper drew the line between adolescence and adulthood at 18 years of age. For an expert to testify otherwise could easily mislead the jury into believing that a defendant whose "maturation process" is not complete by age 18 is not actually an adult and therefore should not be considered for the death penalty. For purposes of the death penalty,

6

"adult" and "18 years of age or older" are synonymous. The Court should not permit Dr. Giedd to risk confusing or misleading the jury on this subject, especially in light of the minimal probative value of his testimony.

      D.     <u>Professor Scott Atran</u>

According to Tsarnaev, Professor Atran "is an anthropologist whose work in recent years has largely focused on the study of global terrorism" (Deft. letter to Gov't dated 11/24/14 at 2). He proposes to testify about "the impact of imposing and carrying out the death penalty upon offenders as a punishment for violent jihadist offenses such as the Boston Marathon bombing." <u>Id.</u> Specifically, he proposes to testify that "capital punishment is likely to: reinforce the jihadist narrative of Muslim victimization and oppression throughout the world, glorify the defendant, and greatly increase the attention and emulation that the defendant will receive from young Muslims." <u>Id.</u> at 3.

The government moves to exclude this testimony on the grounds that it has no relation to the defendant's character, criminal history, or the circumstances of his crimes. It is simply a prediction about how the imposition of capital punishment on convicted terrorists like Tsarnaev will likely affect third parties. Even assuming the prediction is true, whether it constitutes sufficient reason to forego capital punishment of terrorists is a policy question for legislators, not jurors.

The remainder of Professor Atran's proposed testimony appears simply to lay the grounds work for his opinion that condemning Tsarnaev to death would ultimately do more harm than good. The government therefore moves to exclude the remainder of the testimony on the same grounds.

                        Respectfully submitted,

                        CARMEN M. ORTIZ
                        United States Attorney

                By:     /s/ William D. Weinreb
                        WILLIAM D. WEINREB
                        ALOKE S. CHAKRAVARTY
                        NADINE PELLEGRINI
                        Assistant U.S. Attorneys
                        STEVEN D. MELLIN
                        Trial Attorney
                        Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served by electronic mail on Dzhokhar Tsarnaev's attorney, Judy Clarke, Esq., on April 13, 2015.

                        /s/ William D. Weinreb
                        WILLIAM D. WEINREB