```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                   )
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )     Criminal Action
v.                                 )     No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
          Defendant.               )
                                   )



              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE


                               SEALED

                          MOTION HEARING



              John J. Moakley United States Courthouse
                          Courtroom No. 9
                         One Courthouse Way
                    Boston, Massachusetts  02210
                       Monday, April 13, 2015
                            10:04 a.m.



                   Marcia G. Patrisso, RMR, CRR
                      Official Court Reporter
                   John J. Moakley U.S. Courthouse
                    One Courthouse Way, Room 3510
                    Boston, Massachusetts  02210
                          (617) 737-8728

              Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: William W. Fick, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 10:04 a.m.)

4          THE CLERK:  For a motion hearing, United States versus

5     Dzhokhar Tsarnaev, 13-10200.  Will counsel identify yourselves

6     for the record, please.

7          MR. WEINREB:  Good morning, your Honor.  Bill Weinreb

8     for the United States.

9          MR. CHAKRAVARTY:  Aloke Chakravarty.

00:09 10         MS. PELLEGRINI:  Good morning, your Honor.  Nadine

11    Pellegrini.

12         MR. MELLIN:  Good morning, your Honor.  Steve Mellin.

13         MR. BRUCK:  Good morning, your Honor.  David Bruck for

14    the defendant with Judy Clarke and Bill Fick.

15         THE COURT:  Good morning.

16         All right.  So we're going to have argument on some of

17    the pending motions relating to evidence in the penalty phase.

18    Let's start with the government's motion regarding evidence of

19    the Waltham murders.

00:09 20         MR. WEINREB:  Your Honor, the defendant's opposition

21    to the motion makes clear that their argument is purely a --

22    essentially a 403(b) type of argument, that it's an argument

23    that Tamerlan Tsarnaev had a propensity to commit violent

24    crimes and to rope others into committing them with him, and

25    the jury should infer from that that he is the type of person

1    who does this and that he acted in conformity with that trait

2    or that character when he -- in this case as well.

3         Putting aside for a moment the relevance of that kind

4    of argument, which as the Court knows is quite suspect and

5    problematic under the law, a condition precedent to that kind

6    of evidence every time it's ever offered is that there is

7    enough evidence for the jury to believe that the prior bad act,

8    in this case Tamerlan Tsarnaev's committing of the murders in

9    Waltham, actually happened.  And that evidence is completely

00:11 10   lacking in this case.  The only thing that the defense has to

11   offer is the uncross-examined and uncross-examinable statement

12   of someone who was clearly somewhat unbalanced, if not deranged

13   at the time he made it, Abraham Todashev.  And I say that

14   because right after making it, as he was writing it down, he

15   attacked a Massachusetts state police officer with the intent

16   to kill him and, as the Court knows, was shot dead in the

17   course of doing that.

18        It's important to take a look at just how unreliable

19   that statement by Mr. Todashev is.  He was interviewed several

00:11 20   times about Tamerlan Tsarnaev after the marathon bombings.

21   Three or four at least.  In the first of those interviews he

22   never said anything about Tamerlan Tsarnaev being involved in

23   the Waltham triple homicides; in fact, he said that he and

24   Tamerlan Tsarnaev were never close, that they had had a

25   falling-out in 2010 after which they essentially stopped

1    talking.

2          It was not until agents asked Mr. Todashev about his

3    own potential involvement in the Waltham triple homicides that

4    he first implicated Tamerlan Tsarnaev in them and tried to

5    blame the whole thing on Tamerlan Tsarnaev.  He did that at a

6    time when he knew that Tamerlan Tsarnaev had been implicated as

7    a murderer in the Boston Marathon bombings and, therefore, it

8    was plausible to blame the whole thing on Tamerlan Tsarnaev,

9    but he did it when he also knew that Tamerlan Tsarnaev was dead

00:12 10   and therefore could not deny his involvement in the Waltham

11   triple homicides.  And before saying anything about Tamerlan

12   Tsarnaev at all, he first asked for a deal that would protect

13   him from his own liability in connection with those homicides.

14         The first time he told the story of what happened that

15   night in Waltham, he blamed the entire thing on Tamerlan

16   Tsarnaev.  He said that he personally wasn't even there, that

17   he was there beforehand and that he learned about the murders

18   the next day afterwards.  When the police confronted him with

19   evidence suggesting that they could prove differently, that he

00:13 20   himself, Todashev, had personally participated in the

21   homicides, he took back everything he had just said, admitted

22   that it was all a lie, and then admitted that he did, in fact,

23   participate in the homicides.  But he still tried to blame

24   everything on Tamerlan Tsarnaev, saying that Tamerlan had

25   masterminded it, Tamerlan had actually committed the murders,

1   that Todashev was actually, you know, a somewhat passive

2   participant who just went along.

3            Even then his story was internally inconsistent.  He

4   made statements during it which contradicted each other.  When

5   they were pointed out to him, he just took them back and said

6   other things.  He said things that seemed fairly, if not

7   wildly, implausible, such as that Tamerlan Tsarnaev proposed

8   the crime at a mosque during Ramadan despite the fact that

9   Tsarnaev had just become very religious.  He also said that

00:14 10   Tamerlan Tsarnaev had a gun, even though we know that during

11   the marathon bombings he had to use his brother's gun and was

12   very much in search of a gun, and all of the evidence points to

13   the fact that Tamerlan Tsarnaev did not own a gun.

14            But most importantly, because Mr. Todashev is dead, he

15   can't be cross-examined about any of this.  It's little

16   different than if the defense had just picked up a rumor that

17   Tamerlan Tsarnaev had participated in these murders and wanted

18   to put that in front of the jury and have them conclude on the

19   basis of all of that that Mr. Todashev actually committed

00:15 20   them -- I'm sorry -- that Tamerlan Tsarnaev committed them.

21            So the Court should exclude the evidence to begin with

22   on the grounds that even assuming that it was relevant and even

23   assuming it was not more prejudicial than probative, which I'll

24   address in a minute, that there simply is not enough evidence

25   that Tamerlan Tsarnaev actually committed these murders.  The

1    only evidence again that they offer to propose is this single

2    statement by a person who gave it under circumstances

3    indicating that he had every motive to lie, to implicate

4    somebody else, to cover up his own involvement in it, and he

5    made an accusation against someone he knew was a murderer but

6    who he also knew was dead and couldn't respond to it.  And he

7    then himself, immediately after giving it, engaged in an act of

8    violence that resulted in his own death and he can no longer be

9    cross-examined about it.  That is about as unreliable a basis

00:16 10   for the jury to conclude that this happened as it gets.

11           The government also moves to exclude it on the grounds

12    that it is -- this type of argument in general about propensity

13    and this particular argument is prone to confusing, misleading

14    and distracting this jury.  The first thing that will confuse,

15    distract and mislead them is the need for them to determine

16    whether Tamerlan Tsarnaev participated in the murders at all.

17    This is going to require them to consider in detail a great

18    deal of evidence about Mr. Todashev's credibility because if

19    the defense is permitted to put into evidence the statement of

00:16 20   Mr. Todashev, the government will be obliged to bring in all

21    the evidence it has to show that Mr. Todashev is not credible.

22    And there is a boatload of evidence.  And the jury will be

23    distracted into a sideshow of trying to figure out whether

24    somebody -- whether Tamerlan Tsarnaev is guilty of some other

25    crime entirely separate from the one that they are -- they just

1    decided.  They'll have to be debating or deciding the outcome

2    of a murder case that has nothing to do -- or almost nothing to

3    do with the sentencing of the defendant, which is the reason

4    they're here today.

5          And even if they conclude that based on Mr. Todashev's

6    statement there is reason to believe that Tamerlan Tsarnaev was

7    involved in the triple homicides, they're still going to have

8    to conclude that he was involved in it in the way that

9    Mr. Todashev says that he was because, for example, if

00:17 10   Mr. Todashev planned the robbery and just asked Tamerlan

11   Tsarnaev to participate and Tamerlan Tsarnaev was the one who

12   just went along and so on, then the information has zero

13   relevance.  There's no propensity argument that could even be

14   made on the basis of it.  And the government, therefore, will

15   be obligated to offer evidence to that effect, that there is

16   nothing to corroborate Mr. Todashev's account, at least as far

17   as the government knows, of the respective roles that he says

18   that he and Tamerlan Tsarnaev played in this.

19         So again, we will be having a mini trial on this that

00:18 20   will get involved in forensic evidence, the scope of the

21   investigation, what other witnesses have said about

22   Mr. Todashev, about Tamerlan Tsarnaev, about their relationship

23   with one another and so on.

24         Then even assuming we get past all of that, the jury

25   still has to decide what weight to give propensity of evidence.

1   And that's something they could also conceivably hear evidence

2   on.

3            And then the fourth thing they would have to do is

4   figure out what bearing all of this should have on the sentence

5   of Dzhokhar Tsarnaev, which is the reason they're here in the

6   first place.  The connection between Tamerlan Tsarnaev's

7   potential involvement in a murder, the circumstances of which

8   will forever be murky and perhaps unknowable because

9   Mr. Todashev, who was the one person who confessed to actually

00:19 10   being involved in it, is dead, that is going to become part of

11   the mix of this very difficult decision that the jurors have to

12   make -- an individualized decision about the culpability of

13   this defendant, Dzhokhar Tsarnaev, for these crimes.  And it's

14   simply too much of a distraction, it's too confusing, it has

15   too much of a risk of misleading them for the Court to admit it

16   given its very, very slim, if existent, probative value.

17            THE COURT:  Mr. Fick?

18            MR. FICK:  Thank you, your Honor.

19            On the question of reliability, I guess the first

00:20 20   thing I would say is all of the things that Mr. Weinreb just

21   said really go more to weight than to admissibility,

22   particularly in a capital sentencing proceeding where the rules

23   of evidence on this kind of thing are relaxed.  And the

24   government is, I think, overstating the extent to which the

25   confession is unreliable.  I mean, to hear everything the

1    government says, if those arguments could be employed, for

2    example, by a defendant whose admission is sought to be

3    admitted into evidence, then I would suspect there would be

4    many, many more excluded defendants' confessions in other cases

5    and verdicts of acquittal.  Essentially, all of these things

6    are issues for the jury to decide:  whether the confession is

7    reliable and why or why not.

8            The government is also, I think, overstating the

9    extent to which the confession is the only evidence of

00:20 10    Tamerlan's involvement in this murder.  First of all, you have

11    the computer file that apparently Tamerlan was reading within

12    weeks of the Todashev murder -- of the Waltham murders about

13    stealing or taking or seizing the property of infidels.  Within

14    a couple of weeks of that the Waltham murders happened.  It's

15    characterized as a drug rip-off.  And it would seem then that

16    Tamerlan has found the ideological basis for what he's about to

17    do and then goes about doing it with the assistance of his

18    friend Mr. Todashev.

19            THE COURT:  You have, I presume, thoroughly looked at

00:21 20    Tamerlan's computers and his files.  Is there any connection in

21    there -- any mention of Waltham?

22            MR. FICK:  Any mention of Waltham?

23            THE COURT:  Not necessarily by using the word

24    "Waltham," but anything to suggest he was writing about the

25    events that are suspected?

1          MR. FICK:  Not that I'm aware of, writing about the

2     events either before or after in any specific way.

3          THE COURT:  Are there references to Todashev?

4          MR. FICK:  There's extensive communication,

5     particularly by Skype, with Todashev.  Mr. Tamerlan sends back

6     and forth messages to Mr. Todashev including links to various

7     radical, one might say, jihadist images and videos on the

8     Internet, so they're certainly in communication in the years

9     surrounding all of these events about the views of radical

00:22 10    Islam, one might say.

11          THE COURT:  And anything that sounds like they're

12    talking about the Waltham events?

13          MR. FICK:  Not in any explicit way other than the

14    extent to which they're conferring with each other about

15    religiously motivated violence and why that may or may not be

16    justified.

17          THE COURT:  How about selling marijuana?

18          MR. FICK:  I don't have -- I'm not sure standing here

19    right now.  It's not something that I focused on.

00:22 20          I'd also note that the government sought a search

21    warrant or search warrants -- either the government or the

22    Massachusetts authorities.  I'd have to look at the warrant now

23    to recall exactly, but it was in the discovery -- for

24    Tamerlan's vehicle based on probable cause to believe he was

25    involved in the Waltham murders.  And so at least at some point

1   authorities believed there was probable cause to believe that

2   that occurred.

3         And the final thing is it's a very peculiar argument

4   the government is making because they have chosen taking their

5   representations at face value to insulate themselves from all

6   of the investigation that Middlesex has done about these

7   homicides, and saying essentially, We don't know, and we don't

8   want to know, and in conjunction with that, essentially block

9   the defendant from pursuing additional investigations.

00:23 10        So we have a situation where there is a confession, a

11   confession and implication of Tamerlan Tsarnaev.  The person

12   who made that confession was killed by the FBI in circumstances

13   that are, shall we say, murky and not definitively resolved?

14   And so -- and at the same time the government has chosen not to

15   learn anything about other evidence that may bear on those

16   murders.  And so for all of those reasons, this is really,

17   again, a question of weight rather than admissibility.  The

18   jury is capable of sorting out evidence like this, they're

19   capable of deciding what, if any, importance it deserves, and

00:24 20   this is not a reason to exclude it.

21        It's particularly odd in the context of a capital

22   proceeding because in any normal case where, say, two brothers

23   were not coconspirators or co-committers of the underlying

24   crime, part of the family history in any normal capital

25   sentencing presentation would talk about instances of violence

1    or instances of bad conduct by other members of the family,

2    instances of mental health problems by other members of the

3    family.

4         And so this kind of evidence, even if there were no

5    connection to the underlying crimes which we have here, would

6    be sort of part and parcel of the overall family history

7    picture that gets painted in a capital proceeding.  And so to

8    exclude it here because it has particularly strong relevance

9    would be a peculiar result indeed.

00:24 10        And I think that essentially -- you know, what the

11   government says about the reasons why this particular species

12   of propensity evidence in general would create a sideshow, I

13   mean, any piece of evidence, depending on how the parties focus

14   on it, argue it and the importance the jury attributes to it,

15   could wind up taking on outside pieces of importance in their

16   deliberations or it may not.  But, again, these are things that

17   the parties are capable of arguing and the jury is capable of

18   deciding, whereas here we have a clear -- well, we have a

19   variety of types of evidence and types of personal history that

00:25 20   we expect to put in evidence about the nature of Tamerlan

21   Tsarnaev, the outside influence he had on his brother, the

22   kinds of interpersonal violence he exercised in a variety of

23   settings to essentially coercively control other people.  The

24   evidence that he committed a particularly gruesome crime by

25   sort of enlisting somebody who he had influence over is a very,

1    very -- it's an exceptionally strong piece of evidence that the

2    defense ought to be able to introduce.

3          THE COURT:  How would you present the evidence?  What

4    would it be?

5          MR. FICK:  Well, in the first instance, we have

6    Todashev's written confession itself, and then there are

7    various investigative materials from a Florida attorney general

8    investigation which we would submit are admissible under the

9    government -- official investigation against the government

00:26 10   hearsay exception.  I mean, so those would, at least in the

11   first instance, paint the picture of this is what Todashev

12   said, this is what the interaction was with law enforcement.

13          In addition to that, we have the evidence from the

14   computer about the relationship between Todashev and Tamerlan,

15   as well as the -- just weeks before this idealogical document,

16   so to speak, about seizing or stealing the property of

17   infidels.

18          Whether we're able to pursue more I guess would depend

19   on the Court's rule.  If the Court determines this is

00:27 20   admissible, we can certainly pursue initial third-party

21   discovery of this issue as well.  It seems to me that, again,

22   we don't know what Middlesex authority's position is sitting

23   here today, but given the passage of time, the likely -- sort

24   of the weighing of their law enforcement privilege, so to

25   speak, as that exists under the law versus the need for the

1    evidence and the potential importance it has in this case, I

2    think that weighing may be different than it was early on when

3    we were seeking discovery really at the beginning of the case.

4    So there may well be forensic and other evidence in the

5    possession of Middlesex authorities which we could obtain,

6    although obviously we do not have it right now.

7         THE COURT:  Okay.  Go ahead.

8         MR. WEINREB:  Your Honor, the government -- contrary

9    to what Mr. Fick said, the government is not questioning the

00:28 10   reliability of Mr. Todashev's confession to his own criminal

11   activity.  That is a statement against interests, and I believe

12   that that alone gives that portion of it some indicia of

13   reliability.  It's his attempt to shift blame onto a third

14   person that is the opposite of -- that's an indication of

15   unreliability, well acknowledged under the case law.  The

16   defense cites the hearsay exception for statements against

17   interest, but normally if somebody confesses but in the course

18   of confessing they essentially try to shift all of the

19   culpability onto somebody else, that part is redacted and is

00:28 20   excised out.  It's just their own confession that is admitted

21   in recognition of the fact that the blame-shifting part is the

22   opposite of reliable and it's only the self-implication part

23   that is normally deemed reliable.

24         It is not true that the government has chosen to

25   insulate itself from the Middlesex District Attorney's

investigation of the Waltham triple homicides.  The Middlesex
district attorney's office has decided to insulate us from
their investigation.  We made requests for that information.
They said no.  They said it's a confidential investigation by a
sovereign that is independent of their investigation of this
case, and they declined to allow us to view the file or to look
at the evidence in that case.  And that position, as far as I
know, has not changed.

          There is nothing murky about the circumstances under
which Mr. Todashev was shot dead after confessing.  It was
investigated thoroughly by three separate agencies who issued
very lengthy published reports.  No need for me to repeat
what's in them.  They speak for themselves.  But I think that
is yet another example of the kind of sideshow that we will see
if this information is put before the jury during the
sentencing phase and will just serve to further distract them
from the job that they have here, which is to make an
individualized assessment of the defendant's character and the
nature of his crimes, not the character and nature of other
people stretching from his brother all the way through Todashev
to the officers who were present in the room when Mr. Todashev
was shot.

          And then finally, this idea of coercive control,
that's just not even in the statement itself.  Even
Mr. Todashev did not go so far in trying to shift blame onto

1    Tamerlan Tsarnaev to say that Tamerlan Tsarnaev coercively

2    controlled him nor would that have been remotely plausible.

3    Mr. Todashev, as the Court is probably aware, was an extremely

4    experienced mixed martial arts expert.  He was a walking deadly

5    weapon.  Shortly before he attacked the agents in his

6    apartment, he engaged in an episode of what's commonly referred

7    to as road rage where he beat someone to a bloody pulp who just

8    got into a traffic altercation with him.  There's no evidence

9    that the defense can point to anywhere, including

00:31 10   Mr. Todashev's own statement, that Tamerlan Tsarnaev controlled

11   him in any way.

12              THE COURT:  Go ahead.

13              MR. FICK:  Just very briefly on the statement against

14   interests, again, we're, of course, operating not in a

15   strictly, you know, four corners of the rules of evidence.  And

16   certainly if Tamerlan Tsarnaev were on trial, Todashev's

17   statement against interests implicating Tamerlan might be

18   excludable in the sense that -- well, because the sort of due

19   process right of Tamerlan vis-à-vis the nature and reliability

00:31 20   of the statement, that weighing would be different.

21              But what we have here is a very different situation

22   where Todashev implicates himself.  And the only way that

23   implicating of himself makes any sense is to talk about what he

24   did together with Tamerlan.  I mean, these people who were

25   killed, Brendan Mess and the two others, these are Tamerlan's

1  friends.  There's no indication that Todashev had any

2  preexisting relationship with them.  So everything about

3  Todashev's self-implication only makes sense in the context of

4  it being part of what Tamerlan did.

5          THE COURT:  Let me ask about the computer information.

6  Again, with respect to the victims in Waltham, what, if

7  anything, do Tamerlan's computers have to say about that?  Do

8  they show a dealing relationship, for example?

9          MR. FICK:  You know, Tamerlan did not communicate a

00:32 10  lot on his computer except via Skype and so -- and that was

11  largely with either Mr. Todashev in Florida or here or people

12  up overseas.  His text messages and emails are really not on

13  the computer itself.  There were search warrant returns for

14  providers for those things, and you don't really see a lot of

15  interaction between him and Mr. Mess or others in the

16  electronic evidence that we have.

17          THE COURT:  So I guess what I'm looking for:  Is there

18  anything that you're aware of that would tend to be some kind

19  of objective corroboration for your theory about the

00:33 20  relationship of Todashev and Tamerlan?

21          MR. FICK:  Well, many, many civilian witnesses,

22  including Tamerlan's wife, although whether we would call her

23  or not is a question, but there's ample sort of lay witness

24  evidence to suggest that Brendan Mess, one of the three people

25  killed, was one of Tamerlan's best friends for years, they

1    spent time together, they smoked marijuana together.  There may

2    have been some sales relationship back and forth.  And

3    certainly there's evidence to suggest -- or there is civilians

4    who would suggest that Mess in particular and the others were

5    sort of large-scale marijuana dealers themselves.

6         You know, exactly how we could corroborate that in

7    terms of electronic evidence, I'm not certain.  That may not be

8    something that within the four corners of electronic evidence

9    is there.  But there's -- certainly lay witnesses would be able

00:33 10    to establish the basic bona fides of the relationship between

11    Tamerlan and the murder victims.

12         Oh, and the other peculiar piece of behavior was --

13    and this is something that civilians have talked about --

14    Tamerlan did not attend Brendan Mess's funeral, sort of stayed

15    away, even though for years they had been considered best

16    friends.  And that was something that people thought odd, that,

17    you know, there had been questions asked about why law

18    enforcement didn't think that odd and investigate Tamerlan

19    earlier.  But, again, for what it's worth, that's another piece

00:34 20    of civilian testimony -- or available civilian evidence that

21    would go to Tamerlan's peculiar behavior around these homicides

22    and his relationship with those individuals.

23         And Ms. Clarke reminds me, again, I would have to go

24    back and look exactly at the call history, but there may well

25    have been some telephone calls around the time of the homicide

1    either between Tamerlan and one or more of the victims and/or

2    between Tamerlan and Todashev.  But standing here right now, I

3    don't have that sort of lined up in my head.

4            THE COURT:  Okay.  All right.  I'll reserve on it.

5            I think the next -- actually, the next one in sequence

6    on the docket is the government's motion regarding plea

7    negotiations.  That's repeated in the omnibus motion.  I don't

8    know whether -- why don't we address that.

9            Mr. Mellin?

00:35 10         MR. MELLIN:  Thank you, your Honor.

11           Your Honor, as to that, there are actually three

12   circuits that have kind of decided and discussed this issue.

13   It's the Fourth, Sixth and Eighth Circuits have all come out

14   with either one circuit saying that this information should not

15   come in because it doesn't go to acceptance of responsibility,

16   or the Fourth Circuit went a little more restricted in saying

17   that the district court in the *Caro* case did not err in

18   restricting that information from coming in.

19           The basis of the argument is, your Honor, that under

00:35 20   Rule 410, plea negotiations are supposed to be kept private.  I

21   mean, that is the whole point of plea negotiations and that's

22   the point of Rule 410, that the information is not supposed to

23   be used by either side later on because that would tend to

24   discourage plea negotiations and not encourage plea

25   negotiations.

 1           The Sixth Circuit and Eighth Circuit went a little

 2   further and said in addition to that Rule 410 issue, there's

 3   the bigger issue which is that a conditional plea agreement is

 4   not, in fact, evidence of acceptance of responsibility; it's

 5   evidence of a defendant making a determination of whether or

 6   not he wishes to roll the dice and be -- find out if the death

 7   penalty is going to be imposed or whether or not he's just

 8   willing to take life imprisonment in return.  That does not go

 9   in any way towards whether or not the defendant accepts

00:36 10   responsibility; it goes to him making a conscious decision as

11   to whether or not he's willing to run the risk of the death

12   penalty being imposed.

13           Further, the cases also discuss the issue that a

14   conditional plea is not evidence of lack of remorse.  And,

15   again, it's also in line with the idea that a defendant who is

16   weighing the idea of serving life imprisonment versus being

17   exposed to the death penalty might decide to take the plea deal

18   concerning life imprisonment, but that in no way shows that the

19   defendant is accepting either responsibility or that there is

00:37 20   no -- that there is remorse by the defendant.

21           So based on those three cases, that's the basis for

22   our motion.

23           THE COURT:  Okay.  Mr. Bruck?

24           MR. BRUCK:  Whether an offer to plead guilty and to

25   accept a sentence of life without parole goes to remorse, we

believe is an issue for the jury.  The question of remorse is
raised by the government's aggravating factor of lack of
remorse, and it seems most unfair for the government to allege
the non-statutory aggravating factor that the defendant
demonstrated a lack of remorse and then keep out the fact that
he offered to plead guilty.  That is especially true because of
the danger of the jury drawing the inference that the
defendant's plea of not guilty was in some sense an act of
defiance, or an attempt to roll the dice, or that he did not
concur with his lawyer's concession of guilt.

There are any number of speculative interpretations so
that the jury would wrongly draw from the course of this trial,
like he did it because he wanted to put the victims through the
experience of testifying.  Of course we know that whether this
case had been tried purely on a sentencing -- on the issue of
sentence after a guilty plea, the victims would have been
called to testify in any event and it would not have relieved
them of the stress of these proceedings, but the jury doesn't
know that.

I should add that the guilty plea offer was not simply
an offer; it was in the course of the proceedings accompanied
by a written statement of remorse by the defendant in which he
in just three or four or five lines made very clear that he
recognized what he had done was terribly, terribly wrong.  And
that was provided to the government.  So to say that a bare

1    offer of a guilty plea without more does not indicate remorse,

2    doesn't really have too much to do with the facts presented by

3    this case.

4           The government cites the *Fell* case, the only federal

5    capital case, I think, for the proposition that this is not

6    relevant information, but neglects the fact that in *Fell* the

7    offer to plead guilty was put before the jury, and all that was

8    kept out was an unconsummated plea agreement in which the

9    government had drafted an agreement -- or there was a drafted

00:40 10    agreement -- to which the local U.S. Attorney at one point had

11    agreed enumerating mitigating factors that the government took

12    into account.  That was not approved by the attorney general;

13    it was never consummated.  Nevertheless, Mr. Fell wanted to

14    introduce that.  And it was that that the Court said was too

15    far, went too far, and should not come in.

16           Rule 410, rules of evidence of course don't apply in a

17    sentencing hearing; the issue is whether the evidence outweighs

18    the prejudicial effect or the tendency to mislead or confuse

19    the issues outweighs the probative effect.  And I would note

00:40 20    for this argument and for a number of others that the Federal

21    Death Penalty Act is significant in its omission of the word

22    "substantially outweighs," which is found in Rule 403.  So

23    there is clearly a lower standard in the balancing that is

24    favorable to the defendant as far as the weighing process that

25    is supposed to occur in the -- under the Federal Death Penalty

1    Act.

2         In the situation where the government has

3    affirmatively raised the question of lack of remorse, we think

4    that the fact that the defendant was prepared to plead guilty

5    and that the only condition was that the government withdraw --

6    or rather, not seek the death penalty in the first instance, is

7    probative and relevant.  And should we choose to do so, we

8    think we have the right to introduce that fact to the jury.

9         THE COURT:  And, again, exactly what would you do?

00:41 10        MR. BRUCK:  We would introduce both the offer and the

11   statement.  That represents potentially separate issues and --

12        THE COURT:  That's why I asked.

13        MR. BRUCK:  -- of course, whether or not the statement

14   would come in might depend on what that would open the door to.

15   But at a minimum we think the offer itself should be admitted.

16        THE COURT:  And the offer was -- this is in the course

17   of the DOJ capital committee proceedings?

18        MR. BRUCK:  Yes.  Yes.  It was first made orally to

19   the government in October of 2013 at the meeting to discuss

00:42 20   authorization, and then it was then followed up in writing to

21   the government and presented to the attorney general in due

22   course before the decision to seek the death penalty was made.

23   It has been continually renewed in -- on a number of occasions,

24   even including during the progression of this trial.  It has

25   never been abandoned or withdrawn.

1          THE COURT:  And did the statement accompany the

2     written presentation or did that follow later?

3          MR. BRUCK:  I think the letter went first, and the

4     statement followed it by a few weeks.

5          MR. MELLIN:  And, your Honor, that's exactly why we

6     object to this, because they're trying to abuse and misuse plea

7     negotiations as a way to backdoor an unsworn allocution.  That

8     is the point of what Mr. Bruck is now getting to.  He wants to

9     bring out the plea negotiations, one, to say he was willing to

00:43 10    plead to life, but in addition, here's what he would say about

11    that.  And that's why it's completely inappropriate and that's

12    why we would ask the Court to exclude it.

13          What Mr. Bruck is overlooking is as part of those plea

14    negotiations in which the defendant offered to plead guilty to

15    life, the government turned right around and said, Well, before

16    we do that, we want a chance to have a proffer of the

17    defendant, and the defendant refused.  So that where there was

18    an offer to plead, we said before we do that, there's a

19    condition precedent to even going down this path, which is the

00:43 20    government having the chance to have a wide-open chance for

21    this proffer of the defendant, that did not occur.

22          So the whole point is that there is no reason to open

23    this Pandora's box.  There's no harm to the defendant in not

24    having this brought out because there are three cases that

25    stand for this, and Mr. Bruck says if you look at the *Fell*

1   case, it doesn't stand for that.  But there's the *Owens* case,

2   which is *Owens v. Guida* from the Sixth Circuit, which

3   specifically addresses this issue; there's the *Hall versus*

4   *Luebbers* case from the Eighth Circuit; and recently there's the

5   Fourth Circuit's opinion in *Caro* that talks about this specific

6   point.

7          There's a reason why these courts do not want this

8   information brought before a jury.  It's because it opens up

9   the entire Pandora's box of what goes on behind the scenes

00:44 10   regarding plea negotiations.  If they are going to bring out

11   that the defendant offered to plead guilty, then we would be

12   permitted to bring out the fact that before we even began that

13   process we asked for a proffer and the defendant refused.

14      MR. BRUCK:  I have to correct the record.  I know it

15   wasn't intentional, but I think Mr. Mellin has gotten all of

16   the facts and a number of different transactions mixed up, and

17   so I hadn't planned go into all of this but now clearly I must.

18          There are two separate things that have occurred

19   between the government and the defense.  One was a plea offer

00:45 20   that was made, as I say initially in October of 2013.  It was

21   followed up in writing to the attorney general.  It included,

22   in the course of the process, the furnishing of a handwritten

23   statement by the defendant expressing remorse.  That's the plea

24   offer.

25          In September of 2014, very shortly after we received a

1    Rule 16 expert notification about terrorism experts who at that

2    time intended, among other things, to testify about the

3    exploitation that had been made by the defendant -- by -- of

4    the defendant's actions, of the Boston Marathon bombing, by

5    al-Qaeda in the Arabian Peninsula, *Inspire* magazine and similar

6    AQAP publications extolling the Boston Marathon bombing and

7    urging other people to follow suit and take similar -- large,

8    similar attacks on the United States, and there was also

9    exhortations to attack Great Britain, the defense provided the

00:46 10   government with a handwritten statement in the defendant's

11   hand, from him, which did not have anything to do with the

12   guilty plea; it was rather a statement repudiating this

13   propaganda from AQAP, and it was addressed to whoever might be

14   out there saying, "Don't do this.  This is not -- I do not

15   agree with this.  Attacks of the sorts that are being urged

16   based on the Boston Marathon bombing would cause only more

17   suffering and pain and cannot be justified."

18        Our idea and our proposal to the government is that

19   the government ought to take advantage of this.  If they were

00:47 20   actually concerned -- and we had no reason to doubt that they

21   were -- about the possible repercussions of this AQAP

22   propaganda about the Boston Marathon bombing, then perhaps the

23   government would either wish to publicize this repudiation by

24   Mr. Tsarnaev or allow the defense to do so by making public

25   this or some similar statement.

1         Now, we could not do so because of the SAMs.  We are

2    not allowed to make public any statement on the part of the

3    defendant because of the terms of the special administrative

4    measures which the government imposed about four months after

5    his arrest.  So all we could do and what we did do was to make

6    this available to the government.

7         We received no response whatsoever for three or four

8    months, and finally we renewed the request and said, "If you're

9    not going to use this, will you allow us to make use of it?"

00:48 10   There was no connection to plea negotiations.  The government

11   responded finally -- we actually set a deadline.  We were

12   considering applying to the Court for authorization to release

13   this information ourselves, not respecting -- you know, despite

14   the SAMs, and felt obviously we had to have legal authority to

15   do that.

16        The government finally wrote back and said -- and so

17   we said, "Will you please respond by," you know, "three days

18   from now?"  And we did receive a letter back from the U.S.

19   Attorney which said, "We do not authorize you to release this,"

00:49 20   and set forth various reasons.

21        That -- at the same time the U.S. Attorney -- oh, I

22   should say that our original offer included -- or was followed

23   up by an offer for a clean team debrief of our client; in other

24   words, if the government would designate a walled-off person or

25   people to question our client about possible value that he

1     might be able to offer the government, to its counterterrorism

2     efforts, we would make him available to do that.  We just

3     wanted to make sure that we weren't going to furnish more

4     evidence and aggravation for the death penalty phase or for any

5     phase of his trial.  So we insisted that it be -- if this was

6     going to happen, it be done by a so-called clean team.

7          The government's response was that they would not

8     agree to a walled-off interrogation, that if there was to be

9     any interrogation of the defendant by the government, it had to

00:50 10   be done by the trial team and by the investigating agencies.

11    And the government's response made clear that the reason

12    that -- the focus the government had was on investigative

13    issues; in other words, who else might have been involved in

14    the marathon bombing and issues of that nature rather than the

15    questions -- the issues for which we had offered the defendant,

16    which was his potential value in counterterrorism efforts going

17    forward and countering the sort of jihadi propaganda that had

18    triggered this entire episode.

19         That is the disagreement to which I think Mr. Mellin

00:51 20   is referring.  And we are reasonably certain that there was no

21    other discussion of the sort to which he has referred having to

22    do with the plea negotiation process itself.  So I don't think

23    there is the danger of sort of litigating all of the various

24    other offers and counteroffers that were made because these

25    discussions did not concern the guilty pleas, were two separate

1    issues.

2            What possible relevance to the trial this second offer

3    of cooperation may have remains to be seen.  We haven't yet

4    reached a judgment about that.  But the guilty plea

5    effort -- the guilty plea offer is a separate quest.

6            MR. WEINREB:  Your Honor, I'm sorry.  If I might weigh

7    in because to the extent it's necessary to have a clear record

8    on this, things transpired before Mr. Bruck was appointed

9    counsel in this case, before Mr. Mellin joined the team.  The

00:52 10   initial discussions about a potential plea offer took place

11   between me and Ms. Conrad in Beth Israel Deaconess Medical

12   Center before the defendant even had his initial appearance.  I

13   asked if the defendant was willing to proffer and help the

14   government.  This was in the days immediately after the bombing

15   when there was enormous concern that there might be additional

16   bombs out there, there might be additional people out there who

17   might be involved in the bombing plot, there might be

18   additional components for building a bomb available.  There

19   were many, many, many things the government very badly wanted

00:53 20   to know.

21           Ms. Conrad immediately responded, "Will you take the

22   death penalty off the table?" and that began what has become a

23   series of ongoing plea negotiations, essentially, between the

24   government and the defense in which the defense has

25   persistently refused to allow the defendant to be proffered

except under conditions which in the government's view rendered
the proffer useless.  The government has refused to consider a
plea agreement in the absence of certain consideration from the
defendant including a complete, honest and open proffer of the
type that we demand from virtually every defendant who seeks a
benefit for cooperation.

As for this very lengthy account of this offered
statement repudiating what was in al-Qaeda -- in one of the
*Inspire* magazines, I think it's -- there have been two written
statements offered by the defendant over the course of time.
One was offered in conjunction with an offer to plead guilty,
and it is essentially a very carefully worded statement about
what he has and has not repudiated, in our view in any event.
That is the unallocuted -- the statement that the defense now
proposes to introduce as part of plea negotiations that we
believe is totally unfair because the defendant can't be
cross-examined about what he really meant about it and how far
it goes.  And that's something that is really -- has a great
danger of misleading and confusing the jury if they just hear
his carefully worded phrase without knowing exactly what it
meant.

This second thing, this offer to repudiate what was in
Al-Qaeda in the American Peninsula [*sic*] -- as we informed the
defense in a letter sent to them, we believe that it would not
in any way benefit the public safety for that to be out

there -- that experience had shown that when defendants who are

incarcerated issue statements of repudiating their terrorist

beliefs, that everybody in the terrorist community assumes that

they're being tortured or they're being coerced and it's not to

be believed, and it simply draws attention to them and to their

accomplishments and it helps them become a rallying point for

terrorists outside.  We informed the defense of that, and

that's why we did not use that statement.

Over time there have been other attempts to have some

kind of sort of very, very carefully hedged offers to have the

defendant be proffered.  We have come back and said we are not

going to agree to these conditional proffers where he's only

questioned by people who are not investigators in the case and

don't know the right questions to ask and don't -- are not in a

position to know whether he's telling the whole truth, part of

the truth, shading the truth, and they've never amounted to

anything because the defense refuses to accept the government's

offers and vice versa.

All of this will be brought before the jury if the

defendant is allowed to introduce evidence of his offer to

plead guilty.  We would argue certainly not his statements.

Those, I think, should very clearly be excluded.  And, in fact,

the defense has said that it's not going to seek to offer

statements of the defendant that is essentially an unsworn

allocation, which this plainly would be.

```
 1              But the whole history of attempts to proffer the
 2     defendant, of his offer to plead guilty only in exchange for
 3     certain consideration that the government was not prepared to
 4     give and our request for certain things from him that he was
 5     not prepared to give, all of this will come out in front of the
 6     jury, and we submit that in the absence of a legal requirement
 7     that it be put before the jury, it is more prejudicial than
 8     probative in this case.  It's not relevant and it has more of a
 9     likelihood of confusing and misleading the jury, distracting
10     them and wasting time than it does of helping them decide any
11     fact that is actually at issue in the case.
12              THE COURT:  All right.  I'll reserve that as well.
13              MR. WEINREB:  I'm sorry, your Honor.  I'm sorry to
14     interrupt.  But before we move completely away from the
15     Todashev motion, that was a motion not just to exclude evidence
16     of the Waltham triple homicides but evidence of other prior bad
17     acts by Tamerlan Tsarnaev.
18              And the point there is the jury is going to be asked
19     to determine -- to look at the relative culpability of these
20     two defendants -- I shouldn't say "two defendants" -- of the
21     defendant and his brother for the crimes that were committed in
22     this case.  But that is different from asking them either
23     explicitly or implicitly to draw a comparison between Tamerlan
24     Tsarnaev's character and the defendant's character, which is
25     not something that is appropriate for them to do in picking a
```

1    sentence for the defendant.

2          We are aware of certain other acts that would

3    be -- fall into the category of prior bad acts by Tamerlan

4    Tsarnaev, specifically, allegations that as far as I know were

5    never proved anywhere, that he engaged in acts of domestic

6    violence both against a former girlfriend who did, in fact,

7    file a complaint which she later dropped and did, in fact,

8    obtain a restraining order, as well as alleged acts of

9    diametric violences against his ex -- his widow, Katherine

00:58 10   Russell -- or Katherine Tsarnaev, nee Russell -- that Katherine

11   Russell herself has always consistently denied ever occurred

12   and are simply based on hearsay or rumor.  They're based on

13   beliefs or the statements of girlfriends of hers who never

14   liked Tamerlan in the first place, and no charges there were

15   ever brought; there are no sworn statements about it, no

16   eyewitnesses to it, nothing like that.

17          We believe that that evidence should be excluded both

18   because it's irrelevant and because clearly the risk of it

19   misleading and confusing the jury and distracting them from the

00:59 20   task at hand outweighs any probative value that it might have.

21   And it's really hard to imagine what probative value it could

22   possibly have.  It's not a propensity to do anything that's

23   relevant in this case; it's not something that the defense has

24   ever offered any evidence or even proffered that the defendant

25   knew about, and even if he did, they haven't proffered that it

1    had some effect on him like he thought he might be the victim

2    of violence by his brother or anything like that.

3              There may be other bad acts by the defendant that the

4    defense intends to offer that we don't even know about.  We

5    would ask that before they be offered, that we be given notice

6    of them so that we have an opportunity to move ahead of time,

7    before they pop out of some witness's mouth on the witness

8    stand, to evaluate whether we believe they should be excluded

9    under the appropriate part of the FDPA.

01:00  10             MR. FICK:  There is a wide variety of evidence that

11   Tamerlan Tsarnaev exercised coercive control over other people

12   by violence and intimidation both directly and by reputation.

13   It's hard to imagine something that could be more probative in

14   a situation where a key part of the defense is to say that

15   Tamerlan was the dominant person in the sibling relationship;

16   Tamerlan over many years exercised coercive control over his

17   brother both by violence and other means.  And whether or not

18   Jahar knew about any particular instance of domestic violence

19   or other kinds of violence that Tamerlan committed, all of

01:00  20   those things tend to make the overall suggestion that Tamerlan

21   exercised coercive control over other people by violence and by

22   other forms of coercion are more likely to be true.  So that's

23   sort of one category of information that's clearly central to

24   the familial relationships that are at issue here.

25             The second sort of category that -- I don't know if

1    the government considers these to be bad acts but I think are

2    particularly relevant here are various kinds of outbursts that

3    Tamerlan had in various settings, including at the mosque and

4    other places of a religious nature, of a radical jihadist

5    nature, outbursts expressing extremely -- well, outbursts

6    expressing extreme views or having extreme reactions to things

7    that an ordinary person would not react in an extreme way to.

8    All of that is probative of the nature, extent and timing of

9    Tamerlan's radicalization.  He was an extraordinarily

01:01 10   opinionated, I guess one would say, person, and he sought to

11   impose his views and his views of proper behavior and his views

12   of Islam on the world, on other people in a variety of ways.

13   And to understand the relationship between Tamerlan and Jahar,

14   it's really critical for the jury to see the full picture of

15   how Tamerlan behaved in various aspects of his life.

16          MR. WEINREB:  Your Honor, we believe those outbursts

17   in the mosque are essentially irrelevant, but we don't think

18   they rise to the level of being so misleading or distracting

19   that they need to be excluded, so we don't object to those.

01:02 20          THE COURT:  Okay.  All right.  So let's move on to

21   the -- this is a defense motion regarding Dr. King's testimony.

22   Now, let me just observe that the motion was filed when it was

23   possible he was going to testify in the guilt phase as well

24   so --

25          MR. BRUCK:  Yes.

1          THE COURT:  -- the papers are a little bit skewed

2     towards that rather than the penalty phase.

3          MR. BRUCK:  Yes.  I don't think the fundamental issues

4     really are very much different.

5          There are a number of questions here.  I provided the

6     background about Dr. King -- somewhat jumped the gun on this

7     motion a few days ago when we were discussing what was

8     pending -- and I won't go back over his background except to

9     remind the Court that Dr. King is an especially attractive and

01:03 10   I could even say sort of heroic figure in the history of the

11    Boston Marathon, and this is all very much intermingled with

12    his record as a United States Army airborne trauma surgeon in

13    both Iraq and Afghanistan.

14         And the government proposes to intermix those -- the

15    story of his activity and views and opinions about the injuries

16    of the Boston Marathon with his career as a trauma surgeon in

17    Iraq and Afghanistan.  And we think this is bringing back the

18    betrayal-of-the-United-States factor in another form.  It is an

19    attempt to sort of ramp up the patriotic them-versus-us theme

01:04 20   which -- to which this defendant is especially vulnerable as a

21    Muslim immigrant, and we think that simply the prejudicial

22    effect of all of that -- those aspects of Dr. King's testimony

23    far outweigh whatever added probative value he can bring.

24         Now, there are some legal issues here too.  Most of

25    Dr. King's testimony is offered as relevant to the question of

grave risk of death, which is a statutory aggravating factor.

That factor almost invariably in the past has been proven by

evidence that people who were not hurt were in the zone of

danger.  And all the case law are cases like that, where even

though the person wasn't injured, they could have been

seriously injured or killed.  A shot is fired and there are

several people around and there were people that were not hit

but could have been.  That's what this -- that is the core

conduct.

The aggravating factor, as I pointed out a few days

ago when we started to talk about some of these issues,

is -- focuses on the defendant's intent, his intent to cause a

grave risk of death or his intentional action that caused a

grave risk of death to others rather than the effect of the

action.  And what the government has really done here is to

create a new aggravating factor which is not grave risk of

death.

Let me be more precise about that.  The aggravating

factor alleged is, and I quote -- this is Number 4 from the

Notice of Intent to Seek the Death Penalty.  "Dzhokhar Tsarnaev

intentionally and specifically engaged in acts of violence

knowing that the acts created a grave risk of death to a person

or persons other than one of the participants in the events

such that the participation in the acts constituted a reckless

disregard for human life and that the murder victims died as a

1    result."  The focus is on his reckless disregard, "and the

2    deaths of the murder victims," not on the injuries that were

3    committed to the other victims.

4         And so this cuts fairly widely for Dr. King to -- and

5    for some of the other evidence that the government wants to

6    introduce at the penalty phase from people who were grievously

7    injured but not killed, and to justify it all as

8    grave-risk-of-death evidence does not speak to the actual

9    aggravating factor that's been alleged.

01:07 10      Now, I don't know and have had no occasion to research

11   whether or not the government could have alleged as a

12   non-statutory aggravating factor that had these -- you know,

13   that the capital crime charged -- not other crimes but the

14   capital crimes charged -- also caused grievous injuries to

15   other -- to other people who did not die.  But they didn't

16   allege that.  And the government is strictly bound by the

17   notice that they have filed.  They can't amend it without good

18   cause, and they certainly can't amend it now.

19        So to justify Dr. King's very -- what we expect to

01:07 20   be -- we don't have a report, but we expect his testimony to be

21   extremely graphic testimony linking IED damage that he saw

22   overseas treating American troops to the damage to the

23   victims -- the injuries to the victims of the Boston Marathon

24   bombing.  To try to get that into evidence on the grounds that

25   it proves the grave-risk-of-death aggravating factor is both

1   legally meritless and risks really inflaming the jury past the

2   point that they already have been in this case.  And simply

3   laying on more pain and more horror and more sense of

4   identification -- completely understandable identification with

5   the surviving victims in this case as a reason to impose the

6   death penalty, underlying all of this -- and this is the thing

7   of which we must never lose sight, is that the jury does not

8   sentence for the non-capital injuries.  Those are crimes, had

9   they been separately charged, that the Court would sentence

01:09 10   for.

11          But to put these injuries before the jury both in the

12   form of one victim after another, and of Dr. King describing in

13   graphic -- what I assume to be the most graphic detail what the

14   non-fatal injuries looked like, is to push the jury's ability

15   to keep clear what they have sentencing authority for and what

16   they don't way past the breaking point.  And it guarantees in

17   my view, in our view, that the jury will impose sentence partly

18   for the injuries that were done to the people who lost limbs

19   and who received other terrible injuries.

01:09 20          These people have a right to be heard and the injuries

21   that they suffered have a right to be considered, but the time

22   for that is the sentencing before the Court, not before the

23   jury whose sentencing authority is limited to the four

24   homicides that, of course, are charged various ways.  But

25   that's it.  That's what the jury does.  And I think it's

1    terribly important that the -- both with respect to Dr. King

2    and across the board the Court segregate that issue out so that

3    the jury isn't overwhelmed with this highly emotional evidence.

4         So we have a whole mix of factors regarding Dr. King.

5    There are some very specific things that the government intends

6    to get from Dr. King, such as that Martin Richard was

7    especially vulnerable.  That's already in.

8         Dr. King did not see any of the homicide victims,

9    including Martin Richard.  He treated victims who survived and

01:11 10   went to Mass. General.  He was not involved in any of the

11   autopsies; he didn't see any of the autopsies.  The doctors who

12   actually conducted the autopsies have already testified.

13        If the forensic pathologist who has already testified

14   regarding the Richard child -- if the government feels that he

15   did not make clear enough that Martin Richard was especially

16   vulnerable, of course he could be re-called.  He testified

17   about the loss of blood, that a small child would lose his

18   blood more rapidly.  And the evidence of particular

19   vulnerability is already there.

01:11 20        It is not necessary to call this veteran of Iraq and

21   Afghanistan to describe what IED wounds do, to bring all of

22   those powerful but extraneous emotional issues into this case

23   simply to have him say what any doctor could, is that a child

24   is more likely to be hit by more shrapnel because he's closer

25   to the ground, that he has less blood in his body.  That

1   is -- I think that is a sort of make wait reason, additional

2   reason, for calling Dr. King when that's not any part of the

3   actual reason.

4          I said at the beginning that we remain extremely

5   concerned about the potential -- about what is becoming -- what

6   we think is almost the impossibility of the jury abiding by the

7   non-discrimination requirement of the Federal Death Penalty

8   Act.  And when Mr. Chakravarty's closing argument ended with

9   the juxtaposition of this nasheed over a fast photo -- a photo

01:13 10   montage of the carnage on Boylston Street, we really had a

11  moment in which the uttering of this defendant, the emphasis on

12  his foreignness, on the strangeness of his religion and of his

13  religious beliefs, in addition to everything else in evidence,

14  had really gone too far.

15         And now to add this, to bring in the United States

16  Army, a man who also, while he was at it, ran the marathon that

17  day before going to his post as a trauma surgeon at Mass.

18  General, and just to try to present this idea of this is the

19  heroism of the American military.  Here is a man who saw the

01:13 20   way our soldiers have been afflicted -- the government actually

21  went so far in their papers as to say the one thing he can do

22  is to say that these injuries -- that this defendant had made

23  statements, the boat writing which extolled the actions, the

24  attacks by Muslim extremists on our troops, or words to that

25  effect, and here is a witness who can say that these are the

1    sorts of injuries inflicted by Muslim extremists in Iraq.

2         Now, there was nothing in the boat specifically about

3    Iraq.  It's the government's conclusion that that is what he

4    was referring to when the writings referred to "killing our

5    innocent civilians" and so forth, but the government's papers

6    really close this circle and make it very, very clear that

7    there is simply no way to avoid the conclusion that bringing

8    Dr. King into this mix where there's no need for his testimony

9    on any issue pointing towards -- for the most part toward a

01:15 10   statutory factor that doesn't fit is really simply an effort to

11   inject prejudice and bias into the sentencing proceeding.

12        We think it would violate the Eighth Amendment to go

13   down this road, but much more immediately, I think it is a

14   clear example of where the Court should exercise its

15   gatekeeping function under the Federal Death Penalty Act

16   because this evidence has far more prejudicial effect than

17   probative value.

18        MS. PELLEGRINI:  Your Honor, if I may, I think we

19   should start off first by correcting the record with respect to

01:15 20   the government's notice.  The factor that Mr. Bruck was

21   concentrating on, Number 4, is an intent threshold factor.  And

22   the government specifically quoted the statute at 18 U.S.C.

23   3591(a)(2)(D).  That includes the language that we put in

24   there, that it created a grave risk of death to a person or

25   persons.  Yes, it focuses on intent, and specifically engaged,

1    because that is an intentional factor, and then adds the part

2    about the acts constituted a reckless disregard for human life.

3         The statutory aggravator that the government is

4    relying upon under 18 U.S.C. 3592(c)(5) is actually the correct

5    one and sets forth the specific parameters of what will be

6    Dr. King's testimony, that the defendant knowingly created a

7    grave risk of death to one or more persons in addition -- in

8    addition -- to the victim of the offense in the commission of

9    the offense.  So it obviously contemplates that there were

01:16 10   persons other than the victims, and that has always been the

11   government's stance on that.

12        To the extent that Dr. King's testimony will provide

13   information about the grave risk of death, the fact of the

14   matter is his military experience simply isn't just intertwined

15   with his testimony; it actually forms the basis for his

16   knowledge and his being able to give the opinion.  Unlike a

17   medical examiner, although they are extraordinarily well

18   trained and experienced in what they do, their field is

19   forensic pathology.  In Dr. King's case, as a trauma surgeon,

01:17 20   it was his responsibility and job, and continues to be so, that

21   he is treating the person while still alive and continues that

22   treatment throughout the course of their recuperation and

23   rehabilitation, so that he is acutely aware of all of the

24   factors that, in fact, form a grave risk of death:  the risk of

25   going under anesthesia for multiple operations, the risk of

1    infection, all the things that he has already opined upon.

2    Whether or not there's an airway blockage or thoracic injury,

3    whether there's blunt, abdominal trauma, whether there's

4    penetrating chest trauma, what one does for massive

5    gastrointestinal bleeding.  These are all to keep people alive,

6    so he understands the response of the human body to the

7    injuries that have occurred by the use of an IED.

8            If you'll recall, your Honor, Jessica Kensky took the

9    stand and indicated that one of the problems and one of the

01:18 10   reasons that she was now being treated at Walter Reed Hospital

11   was that there weren't very many people in the medical

12   profession here in the Boston area who understood the nature of

13   her injuries and what she needed in order to recuperate.

14           That is true.  But Dr. King is one of the few who has

15   that experience.  He has -- unlike a regular, if there is such

16   a thing, emergency-room trauma surgeon, seen one or two victims

17   who may have been involved in a blast injury or in a fire so

18   that there are thermal injuries, he has literally seen

19   thousands.  And he has spoken to these people before he has

01:18 20   treated them; he has spoken to them while he's treating them.

21   So he not only understands the nature of the grave risk of

22   death to their bodies, but he also understands the level of

23   pain which relates to the cruel, heinous and depraved

24   aggravating factor that the government also intends to put in

25   through Dr. King because of his familiarity with what is needed

1      in order to have the person be released from that pain.

2              He is able, as only one could do with a live person,

3      to gauge the level -- and he would say that it would be a

4      profound level -- of medication in order to relieve the pain,

5      and he also understands because of his work, where the pain is

6      felt, how it is felt, and what medical steps can be taken to

7      alleviate that.

8              With respect to Martin Richard, the government does

9      expect to be able to call Dr. King with relation to the

01:19 10    particularly vulnerable aspect of Martin.  Yes, we did not

11     enlarge upon it because the medical examiner's testimony was

12     just that.  What did he see in the course of the autopsy.

13     However, Dr. King, again because of his particularized

14     evidence -- and we can't help it, your Honor.  He's a

15     40-year-old man who's an athlete and currently a lieutenant

16     colonel in the United States Army.  This is his background, and

17     this is who he is.  He would be the last person to tell you

18     that he was a hero, because in his view he was simply doing his

19     job that day.

01:20 20            But with respect to Martin Richard -- going back to

21     that, he is particularly able to tell the jury about how death

22     occurs or how it could occur particularly with these types of

23     injuries because he's seen it, he's stopped it, and in some

24     cases he hasn't been able to stop it, but he's able to say why

25     the injury occurred in the manner that it occurred, what

1    occurred as a result of that, and the fact that Martin was of

2    small stature and how the blood loss -- but also be able to

3    talk about how a person's body reacts to that sort of stress

4    and what happens when a person is, in fact, in the throes of

5    dying.

6         So for all of those reasons, his testimony is

7    extraordinarily relevant and very important to the government.

8    It's limited to those aggravating factors that we have noticed.

9    His CV has been provided.  And it has nothing to do with where

01:21  10   the defendant comes from or his national origin or anything of

11   that nature.  It just happens to be that that's where IEDs are

12   exploded most often, and that's where Dr. King's knowledge base

13   comes from.

14        MR. BRUCK:  I do stand corrected.  I had read the

15   wrong aggravator, but the argument is identical.  The grave

16   risk of death statutory eligibility factor, which is

17   3592(c)(5), is materially exactly the same as the threshold

18   factor that I read to you, which was that the defendant

19   knowingly created a grave risk of death to one or more person

01:21  20   in addition to the victims of the offense.  The focus, again,

21   is the knowing creation of a grave risk of death; not on the

22   consequences.

23        The government has established in spades that

24   exploding a bomb, which actually killed two people in one

25   instance and another one in the other, in a crowd establishes a

1    grave risk of death to other people.  That is not something

2    which has to be proven over and over again by exploring the

3    actual sequelae for each of the people that was injured.  As I

4    say, that proves another aggravating factor and one that the

5    government has failed to allege.

6         The government now says, Well, okay.  So it proves the

7    heinous, atrocious -- the heinous, cruel and depraved manner of

8    committing the offense, but the problem with that argument is

9    that it does not comport with the terms of the statutory

01:23 10    aggravating factor, which is that the defendant committed the

11    offense in a especially heinous, cruel and depraved manner in

12    that it involved serious physical abuse to the victim.  And

13    what is meant by "victim" is the victim of the capital count,

14    that is to say, the decedent.  That is the focus.

15         This has been the most constitutionally problematic

16    statutory aggravating factor in all of death penalty law for

17    the last 35 years because of its inherent vagueness and

18    susceptibility to being applied to every murder case.  And

19    there are a number of U.S. Supreme Court decisions reversing

01:23 20    death sentences where the jury could have used this aggravating

21    factor to sentence anybody to death for any murder.

22         The way that the Federal Death Penalty Act controls

23    that is by specifying very specific facts that must be proven

24    as a predicate for a finding of this aggravating factor, and it

25    is in this case limited to serious physical abuse and it is

limited to the victim.  The victim of the murder.  So it simply

doesn't help the government to say that there's that other

aggravating factor that they can hang all of this very, very

emotionally overwhelmingly powerful evidence on because it's

not relevant to that factor either.

For all those reasons, we think that Dr. King's

testimony should be excluded and that the government's proof

concerning non-homicidal offenses generally -- non-homicide

injuries generally should be limited accordingly.

01:24    MS. PELLEGRINI:  Your Honor, if I just may briefly

respond to that.  Directing the Court to Sand's on the federal

jury instructions, and specifically Instruction 9A-10 on the

grave risk of death relating to the definition provided therein

about the significant and considerable possibility that another

person might be killed.  So obviously, it could not include the

victims.

With respect to the heinous, cruel and depraved, the

government's testimony with respect to Dr. King will relate to

the victims.  He has, in fact, reviewed all of the autopsy

01:25  reports.

THE COURT:  All right.  Let's move to the omnibus

motion.  Let's take the issues one at a time, I guess.

So I think the defense in the response took some of

them off the table, explicitly the reasonable doubt standard

for the weighing.  I think the defendant preserves his point of

1    view but acknowledges that the law of the circuit is otherwise.

2    I'm just tracking through the response to get the issues, I

3    guess.  So the evidence about -- or argument about the

4    Massachusetts lack of a death penalty is a state law matter.

5        MR. MELLIN:  I think that one is still in play, your

6    Honor.  And we would rely on the cases we cite, and in

7    particular, the Sixth Circuit's en banc decision in *Gabrion*

8    which lays out that there is a reason why this is not an

9    appropriate mitigating factor.  It's because it has nothing to

01:26 10   do with the defendant's character, the defendant's history or

11   the circumstances of the offense.

12        Whether it's the Commonwealth of Massachusetts or the

13   State of Maryland or the country of France, it doesn't matter

14   in the cases that *Gabrion* talks about what the actual

15   diplomatic or political decision was made by that governing

16   body; what's important is the evidence about whether or not the

17   defendant has put on mitigating factors that deal with his

18   background, his character or the circumstances of the offense.

19   So I think it's very clear, especially in the most recent

01:27 20   opinion of the Sixth Circuit.

21        MR. BRUCK:  I think we can rest on our papers on this

22   issue.  The Court has already advised the jury that

23   Massachusetts law does not provide the death penalty, so this

24   is not a secret.  This was done during your introductory

25   instructions, as the Court recalls, to each panel during voir

1    dire.

2            We are not asking to introduce evidence on the issue.

3    The issue is already known to the jury.  We do think that

4    whether or not the requirements of justice in this particular

5    case, given the harm to this particular community, which I know

6    the government is going to probably have things to say during

7    argument from its side, can take into account the fact that

8    this punishment is not something which the people of

9    Massachusetts are used to, feel that it's part of their arsenal

01:28 10  against -- or something which historically has felt to be

11   necessary in this Commonwealth.  And looking to, in a holistic

12   manner, as to what is fair and just and necessary in this case,

13   I think that is something that can't be off limits.  But as I

14   say, we have authority in our brief that we've cited and we

15   rest on that.

16           THE COURT:  All right.  We've dealt with the plea

17   issue.  The next is the -- I guess it's the -- this is the last

18   one, Number 7, on the -- in the notice letter of December 12th

19   which is the circumstances -- under the circumstances executing

01:29 20  the defendant would increase rather than reduce the danger of

21   future terrorist attacks.

22           MR. BRUCK:  I might be able to clarify this issue just

23   a little bit.

24           THE COURT:  Okay.

25           MR. BRUCK:  That statement about the -- sort of the

1    actual prediction that there would be more murders rather than

2    fewer murders came at the end of Dr. Scott Atran's Rule 16

3    expert disclosure.  It was a way of expressing conclusions that

4    could be drawn from opinions that Dr. Atran will give which are

5    largely responsive to those of Dr. Levitt.  And really, this is

6    an expert who has tremendous one-on-one firsthand face-to-face

7    experience interviewing, evaluating, actually administering

8    psychological testing to terrorists, to people who have been

9    involved in religiously motivated acts of violence all around

01:30 10    the world.  And he is one of the foremost researchers on the

11    whole question of radicalization and what actually moves people

12    who hold radical views to take violent action.  And contrary to

13    Dr. Levitt, he will talk about the role of interpersonal

14    relationships, and in a more general way will discuss what it

15    is that moves people to action.

16         It will be inferential -- it could be inferred from

17    his testimony that -- and indeed it's inferrible from just

18    plain old common sense that the death penalty is a problematic

19    response to a very specific form of crime which happens to be

01:31 20    involved in this case, which is religiously motivated violence

21    by people who seek martyrdom, who seek death, who are actually

22    members of what one could describe as a death cult.  And there

23    will be evidence presented from Tamerlan Tsarnaev's computer

24    that that describes him to a tee.

25         The government has introduced evidence claiming that

 1     in effect it also describes the defendant.  I envy my brother.

 2     There is no getting out of this case the logical proposition

 3     that one would wonder about the utility of threatening or

 4     punishing with death people who commit a crime in order to die.

 5     So there's no way of disentangling that from the case.  The

 6     government has joined the issue in various ways.

 7           In closing argument, the government made the point

 8     about how the defendant was doing what terrorists do.  He

 9     wanted his acts to stand for more than what people might think.

01:32 10     There was a long discussion of messaging, of the effect on

 11     other people that the defendant wanted to have.  There is just

 12     no way of unscrambling the egg.

 13           And so we're not asking -- and I think maybe the

 14     government was responding to something which maybe is not

 15     really an issue in the case which is why I asked to speak out

 16     of turn here.  We are not actually making an empirical

 17     prediction that there will be more terrorist attacks rather

 18     than fewer if the defendant is sentenced to death and executed;

 19     rather, it is -- Dr. Atran's testimony will simply deal with an

01:32 20     area in which this question arises, as it already has arisen

 21     and must inevitably arise, from all of the evidence that the

 22     government has introduced in the case.

 23           And all we're saying in responding to their motion --

 24     and maybe we don't have to say it -- is that there is no way to

 25     elide this question from the evidence, from the jury's

consideration or from closing argument.  It is part and parcel

of every case of this nature, and it would be very unfair and

illogical for the government, in effect, to get a free pass on

what is an issue that will be on everybody's minds, and should

be, because it arises from the individual facts of this case.

     This is not a categorical argument that the death

penalty should never be imposed for terrorism.  It has to do

with the facts that have been introduced primarily by the

government, so far, in this case, and that will also be

explored by us, particularly when we look finally at the

motivations of Tamerlan Tsarnaev.  And so that's what this is

all about, and I'm not sure that there's really a live

controversy.

     MR. MELLIN:  Well, your Honor, there's a live

controversy if the defense is asking for this mitigator.  I'm

not exactly sure what Mr. Bruck is saying right now, but if

they are asking that this mitigator be put before this jury, we

would ask that it be excluded.  It's not appropriate.

Mr. Bruck's argument to the Court is about some legislative

impact or legislative concerns that may go on in deciding

whether or not a political body wishes to have the death

penalty, but that's not an issue for this jury.

     The issue for this jury is to look at all of the

evidence that deals with the defendant's character, his history

and the circumstances of the offense, and decide what is the

1   appropriate punishment in this case, not what some hypothetical

2   third party may do or may not do.

3        Mr. Bruck just said that he would not be able to put

4   on empirical evidence that there would be an increase in

5   attacks.  That takes care of this mitigator.  They don't have a

6   basis to claim this mitigator.  Just because Dr. Atran at the

7   end of some disclosure says this doesn't make it appropriate.

8   We would move to exclude it.  If they are going to call

9   Dr. Atran to testify, we would move to exclude that statement

01:35 10   from his testimony because there's no basis for it and it's not

11   appropriate for him to make it.  It's completely speculative

12   and has nothing to do with the defendant's sentencing.

13        And just one other point, your Honor, concerning

14   Dr. Levitt's testimony.  At no point did Dr. Levitt say

15   anything about the impact that sentencing the defendant to

16   death would have on the actions of others.  That is not at all

17   what Dr. Levitt said.  We will have no evidence that will claim

18   that in our case-in-chief.  And the actual aggravating factor

19   that we have alleged says, "In conjunction with committing acts

01:35 20   of violence and terrorism, the defendant made statements

21   suggesting that others would be justified in committing

22   additional acts of violence."

23        That has to do with the defendant's statements in the

24   boat.  What he wrote in the boat.  That is what that is

25   referring to, his actions in this case, and also his statements

1   in the boat.  That is it.  We're not talking about anything

2   anyone else is saying.  We're talking about what the defendant

3   intended and what the defendant wrote; not anything at all

4   about actions of third parties not involved in this case.

5          MR. BRUCK:  I should just say that the government's

6   motion to which we were responding was to bar evidence and

7   argument; it was not a motion to strike the mitigating factor.

8   If there is a way of redrafting the mitigating factor to make

9   it more responsive to what we intend to prove we can certainly

01:36 10   do that, but we're not prepared to argue the striking of the

11   mitigating factor in response to an argument which was actually

12   addressed at evidence and argument, not at the factor itself.

13          THE COURT:  Well, that conveniently brings me to

14   another topic, and that is when we might have a final statement

15   of mitigation factors and aggravating factors in the form that

16   they would be put to the jury in the verdict slip.  I think we

17   should have that before openings.  So to the extent that these

18   do or do not match that criterion, I would like to include that

19   in whatever is proposed from the parties regarding what should

01:37 20   be said to the jury in the opening statements so it's clear

21   from the outset what the template is and there's no argument

22   later about things coming in that weren't identified to the

23   jury at the outset.

24          Which brings me to my other question from everybody,

25   is when we might have witness and exhibit lists sufficient to

1   be advised prior to the instruction -- the preliminary

2   instructions.  And for that I would suggest I don't think

3   there's any reason to stagger it.  I would say both sides by

4   the end of the -- by the close of business on Thursday, if I

5   could have an expected witness and exhibit list for this phase.

6            And if possible, because I invariably referred to it

7   in terms of the aggravating and mitigating factors that will be

8   put to them, I don't know if you have prepared a proposed

9   verdict slip, but that would be useful.  That can be adjusted,

01:38 10   I think, as we go along, depending on what happens in the

11   course of the case.  But I am particularly interested in the

12   statement of those propositions, aggravating and mitigating,

13   that will be the focus of the jury's attention when they

14   finally deliberate.

15            So I guess we could make the same deadline, the end of

16   the day Thursday, for that.

17            MR. WEINREB:  Your Honor, that's fine by the

18   government.

19            I'd just like to add, we intend to file a motion in

01:39 20   limine by close of business today related to some of the expert

21   testimony that the defense proposes to introduce in the penalty

22   phase with one exception -- or two exceptions, I should say,

23   and that's with respect to Mr. Spencer, who is the computer

24   expert, and Mr. Grant, the cell phone extraction expert.

25            The defense has provided the government as evidence

1    that it intends to offer at trial 18 gigabytes of information

2    from Tamerlan Tsarnaev's computer and 16 devices, mostly cell

3    phones.  And as far as -- it has really not been narrowed down

4    beyond that, so that we have no idea which of these items the

5    defense actually intends to put in.  And we're assuming, unless

6    we hear to the contrary, all of them.

7         That is, in our view, on its face an offer of evidence

8    that is both irrelevant and more prejudicial than probative in

9    the sense that just a cursory glance at some of this material

01:40 10    makes clear that it has little or nothing to do with this case.

11    Innumerable photographs of the Tamerlan Tsarnaev with other

12    people who have never been identified and probably never will

13    be, photos of things that appear to have absolutely nothing to

14    do with this case, thousands and thousands of files that have

15    nothing to do with this case, Katherine Tsarnaev's entire

16    Internet search history with tens of thousands of entries in

17    it, I mean, just all sorts of things that are plainly on their

18    face irrelevant and likely to mislead and distract the jury.

19    The same thing with all of these devices.

01:40 20         The defendant, as the proponent of this evidence, has

21    the burden of showing that it is relevant and noncumulative.

22    We assume that when it comes down to it, the defense is only

23    going to be offering a small portion of this evidence.  But

24    until we see each item, item by item, we can't say whether it's

25    relevant; whether we believe that it's more prejudicial than

1    probative; we can't assess whether it has been altered, meaning

2    stripped, for example, of metadata that could help put it in

3    context for the jury by informing us and them when it was

4    created on particular devices; and whether it was deleted, in

5    other words, whether it comes from someplace in the file

6    structure or whether it comes from so-called CART space or it

7    may have been deleted for days, weeks, even years.  We have

8    reason to believe that some of the images that they have all

9    sort of noticed as potential exhibits are images that were

01:41 10   converted into PDF files for purposes of presentation.  That

11   strips them of their metadata.

12        So before we can craft a motion in limine with respect

13   to any of those items, we need an itemization of them.  And it

14   sounds like we potentially will get one on Thursday.  We will

15   then quickly endeavor to review them and file something.  But I

16   just want the Court to know that there's no possible way we

17   could do it before Thursday -- or really before having that

18   list and taking some time to review it.

19        THE COURT:  Well, let me just note on our schedule the

01:42 20   defense case will begin the 27th, so there will be some time to

21   assess those things.

22        MR. WEINREB:  And then in addition, we know, as the

23   Court does too, that the defense intends to call various

24   witnesses from the Bureau of Prisons as well as potentially an

25   expert, a former employee of the Bureau of Prisons, to talk

about, it appears, the capacity of the Bureau of Prisons to
incapacitate defendants of all nature to the point where they
are not capable of doing harm to others within the institution
or outside of the institution.

As the Court may be aware, there is a great deal of
case law that rejects that as relevant mitigating evidence
because, again, it doesn't have to do with the character of the
defendant or the nature of this crime; it simply has to do with
essentially a policy matter of whether the death penalty is
needed at all given the capacity of the Bureau of Prisons to
incapacitate people.  It's true with respect to every
defendant.  There's nothing individualized about it with
respect to this defendant.

Whether or not we seek to exclude that evidence as
being essentially categorical evidence, not individualized to
this defendant, depends in part on whether the defense, by
offering it, is -- it's proposing to open the door to a robust
examination of what it really means to spend your life in
prison.  We're not actually opposed to that.  We're not opposed
to it in part because the jury seems to have exhibited a lot of
curiosity about it during voir dire, and we understand why the
defense might want the jury to feel secure that the defendant,
if he is incarcerated for the rest of his life, will not pose a
threat or a danger to others.  But by the same token, the jury
should not be given a one-sided presentation; in other words,

1    they should not be fooled into thinking that prison is one

2    thing when it's really another thing.  They should have the

3    whole picture.

4         And so I guess what I'm asking here is really for the

5    Court to inquire of the defense whether that is what they are

6    proposing, is a sort of complete examination of what it will

7    mean for this defendant if he is sentenced to life

8    imprisonment, or whether they intend to try to narrowly put on

9    evidence solely of something that they think will make the jury

01:45 10   believe that life imprisonment is one thing when the

11   government, through cross-examination and rebuttal testimony,

12   could offer what we believe to be a complete picture of what

13   that will be.  And that will determine for us whether we seek

14   to exclude this evidence as being impermissible categorical

15   evidence or not.

16        MR. BRUCK:  Well, we're a little bit hamstrung by the

17   fact that although we subpoenaed a government witness to

18   describe conditions -- or at least the security circumstances

19   surrounding where the defendant will be housed if he receives a

01:45 20   life sentence back in January, we just in the last few days

21   have been told that we are going to have substitute witnesses

22   from the government provided instead of the witness we seek,

23   and we now have a conference call with the substitute witnesses

24   arranged for Wednesday with the government counsel

25   participating.

1          So what our evidence is, given that sequence of

2     events, is a little bit difficult to predict, but I can inform

3     the Court that all we seek to do is to show what measures are

4     in effect to keep the defendant from communicating or for -- or

5     from posing a risk of violence or of threatening national

6     security while serving a life sentence.

7          We are not seeking a thorough-going exploration of

8     every condition or circumstance under which he will be held for

9     the rest of his life.  We want to show what the cells look like

01:46 10     that he'll be held in, we want to show what the day-to-day

11     security arrangements are, and above all, the restrictions on

12     communication.  And we also want to show that the authority to

13     leave those conditions in place rest with the government, with

14     the Department of Justice, including the United States

15     Attorney's Office for the District of Massachusetts, so the

16     government [*sic*] will not think that the defendant goes into a

17     bureaucracy and none of these folks have anything to do with

18     restrictions that he will be under in the future.

19          That's fairly limited and that's what we want to

01:47 20     prove.  Whether there are higher levels of violence or whether

21     there are different sorts of conditions in prisons where he

22     will never go because of the classification that he is

23     extremely likely to be held under for the foreseeable future or

24     possibly even forever is not relevant and should not come in,

25     but we are narrowly focused on the ways that the government

```
 1    will be able to ensure public safety and to protect national

 2    security even if he is allowed to live in the Federal Bureau of

 3    Prisons.

 4            And that's it.  And I don't think that this -- we do

 5    not intend to try everything about the Federal Bureau of

 6    Prisons from soup to nuts, and I don't think the government

 7    should be allowed to show that they also have minimum security

 8    camps where people have all sorts of privileges that

 9    Mr. Tsarnaev will never come within a country mile of should he

10    be sentenced to life in prison.

11            I think we can and should cabin this quite narrowly.

12    But it is an important issue.  The jury is right to worry about

13    it given the havoc that this crime undeniably caused.

14            MR. WEINREB:  So, your Honor, obviously we don't

15    intend to put on evidence all about the entire Bureau of

16    Prisons, including statements that don't have any potential

17    relationship to the defendant in this case, but we would intend

18    to offer evidence of things that do potentially relate to the

19    defendant's likely course of incarceration through his lifetime

20    in the Bureau of Prisons.  And for everything that we seek to

21    offer, we'll have some kind of foundational evidentiary basis

22    for it.

23            There will be an expert, or someone from the Bureau of

24    Prisons or somebody, who will -- obviously we're not going to

25    put on evidence about a minimum-security work camp somewhere if
```

1    nobody's going to say there's any realistic possibility the

2    defendant will be there, but there may be something other than

3    an entire lifetime spent in the highest level of super max in

4    Florence, Colorado, that the defendant can look forward to.

5          In addition, the SAMs process, which is what the

6    defense is referring to when they talk about control over the

7    defendant's communications, it would of course be inaccurate to

8    suggest to the jury that that is simply something that the

9    government, including the U.S. Attorney's Office, manipulates

01:50 10   at will and can keep in place for somebody's entire lifetime.

11   As the Court I'm sure is aware, the government cannot do that.

12   There's judicial review of it.  SAMs have been removed over

13   time.  The government sometimes loses SAMs litigation.  And all

14   of that is something that the jury should be aware of.

15         So I know that the defense naturally would like to

16   focus very narrowly on all the restrictions that will be on the

17   defendant.  My whole point is that those normally would be

18   excluded as being evidence not relevant to his character or to

19   the nature of the crime or to his criminal history.  They are

01:51 20   about the ability of the Bureau of Prisons as a whole to manage

21   its population.  We would only not be objecting to it, not

22   seeking to exclude it, if the jury is given a complete, full

23   picture of just how restrictive the defendant's incarceration

24   is likely to be realistically over the history of his time

25   there and what the conditions of that confinement will be like.

1           So I think because we're talking about it somewhat in

2     the abstract, I'm not sure it's possible to be clearer than

3     that, but I believe the parties' positions are clear.  We will,

4     I guess, make the motion to exclude it, and in the alternative,

5     if the Court does not exclude it, seek permission to put on

6     a -- to robustly cross-examine and rebut testimony in the

7     nature -- in the manner that I have stated, and we'll leave it

8     at that.  If the defense wants to oppose our right to do that,

9     then I think they should make clear exactly what limits they're

01:52 10    seeking to put other than irrelevant material, which is all

11    that I heard Mr. Bruck say just now.

12          THE COURT:  Well, to the extent that it's the

13    alternative outcome and there would be rebuttal evidence, I

14    think I heard you say you might have an expert.  That would

15    raise the question again of timing of disclosure.  So if that's

16    something -- I just say we should resolve this so that it

17    permits time for expert disclosure, if that's what is required.

18          MR. MELLIN:  Your Honor, that disclosure's already

19    occurred.

01:52 20          THE COURT:  Oh, it has?  All to the good.

21          I think that's what I had for this morning.

22          MR. WEINREB:  Well, I guess there's one other thing.

23    Mr. Bruck sent us a letter the other day asking for proffers as

24    to what government witnesses would be testifying about with

25    respect to lack of remorse -- or what evidence the government

 1    intends to put on with respect to lack of remorse and what

 2    evidence it intends to put on with respect to risk of

 3    severe -- bodily harm to others as opposed to the victims, the

 4    matter we argued about earlier.

 5          The government, likewise, is in a position of not

 6    knowing what many of the defense witnesses are going to say.

 7    In particular, there are a number of the foreign witnesses who

 8    are being brought over who we don't have the slightest idea of

 9    what they're going to talk about.  For example, there are four

01:53 10    of Zubeidat Tsarnaeva's sisters.  We don't know whether they're

 11    going to be talking about the defendant, we don't know if

 12    they're going to be talking about the defendant's grandparents,

 13    we don't know if they're all going to be saying different

 14    things or if they're all going to be saying the same thing.

 15    And so we have no way in advance of seeking to challenge their

 16    testimony, if that's an appropriate thing to do.  They also

 17    noticed any number of domestic witnesses where we don't know

 18    what they intend to seek from these witnesses.

 19          I think that both sides are entitled to some kind of

01:54 20    notice of where the other -- where it's not self-evident, what

 21    witnesses intend to say.  And I would ask that that be part of

 22    the disclosures that are required to be made along with the

 23    witness list and the exhibit list themselves.  They don't

 24    necessarily need to be made to the Court unless the Court wants

 25    them.  I think they can be exchanged between the parties.  They

1    don't obviously need to be scripts of what every witness is

2    going to say, but I think that, you know, as experienced

3    counsel, we have some sense of how to give the other side

4    enough notice to potentially object if an objection is

5    warranted.

6            MR. BRUCK:  With respect to the -- I mean, this is the

7    first time we've been -- had a request or demand from the

8    government for summaries of each of our lay witness's

9    testimony, and I don't know that we're in a position to do that

01:55 10   on top of everything else that we're faced with in the next few

11   days.  I specifically -- we specifically requested

12   specification of the so-called no-remorse, or lacks-remorse

13   evidence, because this is evidence which potentially -- not

14   necessarily, but potentially has great Fifth Amendment

15   significance and can involve a whole rats' nest of very, very

16   difficult constitutional issues.  And we had to know ahead of

17   time whether this is the sort of evidence that they intend to

18   offer on the issue of remorse or whether or not this -- they

19   have some relatively unproblematic evidence.

01:56 20         So there was a particularized reason for wanting to

21   know what that evidence was, and we're going to have a problem

22   if we -- it's going to be rather hard to sort out if we don't

23   get some advance notice.

24         So that was -- I think there's a special reason that

25   it's really essential for the government to say what evidence

they intend to present on the question -- and what exhibits on

the question of failure to demonstrate remorse.  Obviously, a

defendant who fails to demonstrate remorse after being charged

and in the face of accusation is likely exercising his Fifth

Amendment right against self-incrimination, and that can never

be used against him at sentencing, at guilt.  And that's the

core of the constitutional problem that caused us to ask for

the government's evidence and exhibits on that issue.  And we

still need it.

01:57          We've also got a few other issues that aren't ready to

be resolved but I wanted to flag for the Court.

THE COURT:  Well, let's just stay on this for a

minute.  I do think just from a trial management point of view

it would be helpful to the jury and others for the parties to

be well prepared for the examinations and not to have to react

on the spot, which may require some interruptions and perhaps

delays and so on, which I would like to try to avoid.

So it would seem to me it could be mutually beneficial

and aid that interest as well if the parties could indicate

01:57 relatively briefly the subject matter and substance of what the

witnesses will be talking about, just to give some notice to

each other as to what to prepare for from witnesses who might

otherwise be undefined, I guess is one way of putting it.  And,

you know, I'm not talking about a couple of paragraphs; I mean,

a couple of sentences or something like that that could

1    accompany the witness list would be very helpful.  It would be

2    helpful to me to see that as well.  So it could be one list, I

3    guess, for each side.

4         You had some other --

5         MR. BRUCK:  Yes, very briefly.  We have filed and

6    furnished to the Court a suggested instruction for tomorrow

7    about avoiding the marathon.  I'm sure the Court has its own

8    that --

9         THE COURT:  I was going to mention that.  I mean,

01:58 10   tomorrow really is going to be relatively brief.  It is simply

11   to impress on the jury the importance of their being faithful

12   to their responsibilities over the next week.  And I saw it.  I

13   haven't read it yet.  I haven't prepared my own yet, but I

14   will.  If the government has something, I'll be happy to

15   receive that as well.  But I expect to really just touch on

16   what we know now about the scheduling going forward once the

17   case resumes, and then, again, as I say, just continuing to

18   impress on them the responsibility that they have an as active

19   jury.  So I expect it will take 15 minutes at the most, if

01:59 20   that.

21        MR. BRUCK:  We have also filed -- requested

22   supplemental preliminary instructions on two issues, victim

23   impact and non-discrimination certificate, which we are asking

24   that the Court incorporate into your preliminary instructions

25   next Tuesday.

1          There are a number of issues that we wanted to flag.

2     We've been advised that the government intends to repeat the

3     exhibition of Martin Richard's clothing in open court, and

4     that's all we know about what they were going to do.  We object

5     to it.  We, on reflection, think we should have objected to the

6     display of the clothing, or the admission of the clothing when

7     it came in at the guilt phase.  We found that to be an

8     extremely inflammatory part of the presentation of evidence

9     without corresponding -- or without sufficient corresponding

02:00 10     probative value.  We don't see any need to be waving the boy's

11     clothes around anymore.  And we wanted to put that on the

12     record.  Maybe the government isn't going to do it, but we were

13     told it was.

14          We've been notified the government intends to use an

15     elegy to Lingzi Lu given by her father.  For the most part we

16     do not object to that but think it should be given in a written

17     form rather than a videotape of a massive memorial service

18     conducted at Boston University, which is the form in which it

19     was given to us, and we also intend to discuss with the

02:01 20     government a few proposed redactions.

21          We received by email yesterday some extremely gruesome

22     photographs of injuries to the victim Mark Fucarile.  And the

23     government hasn't yet told us whether they were simply

24     furnishing those to us or whether they intend to offer them,

25     but that's a potential problem that will have to be resolved if

1     the government wants to introduce those.

2            Last week the government furnished us with

3     X-ray -- with two medical articles including X-ray photographs

4     of metal objects lodged in the bodies of victims.  We had never

5     seen any of these before.  We don't think they're relevant to

6     any statutory aggravating factor.  We made copies to pass up to

7     the Court.

8            Again, since we don't actually know what the

9     government intends to offer, it's perhaps premature, but we

02:02 10    think it would be wise to flag these issues now rather than be

11    surprised at the last minute.  So when we're done, I would like

12    to pass these articles that we were furnished last week to the

13    Court --

14            THE COURT:  All right.

15            MR. BRUCK:  -- so that the Court will have some basis

16    if the issue arises.

17            I've mentioned the issue of lack of remorse and I

18    think -- if you'd bear with me.

19            (Counsel confer off the record.)

02:02 20    MR. BRUCK:  Oh, yes.  The government suggested, but

21    I'm not sure entirely made, an objection to videotaped remote

22    testimony from witnesses.

23            MS. CLARKE:  Not taped.

24            MR. BRUCK:  I'm sorry.  Not taped.  Video testimony --

25    a live video link to witnesses in Kazakhstan and Kyrgyzstan and

1    possibly Turkey who cannot travel for one reason or the other

2    to the United States.  I don't know, again, whether this is a

3    live issue or whether the government has now come around to the

4    view that that is proper.  But if it is a live issue, we're

5    going to need to resolve it before we go through the, you know,

6    very elaborate preparations that have to be made to actually

7    secure this remote live testimony from our witnesses overseas.

8         And I think that is everything we see on the horizon

9    at this time.

02:03 10         MR. CHAKRAVARTY:  On that last point, Mr. Bruck raised

11    it because I was going to before.  We can't make decisions on

12    whether we can agree to that until we know who they are and

13    what they're going to say, and I assume that Thursday we'll get

14    better visibility of that.  But attendant to that is the

15    logistics, what is the proposed logistics kind of solution that

16    the defense is offering to make their witnesses available.

17         We don't want to make categorical statements unless we

18    know what the context is, what the type of testimony is that

19    the witness is going to offer, whether it will be controversial

02:04 20    and whether it will be cumulative, and whether the very grave

21    concerns that the government has about remote testimony from

22    somebody who's not going to be subject to perjury

23    accountability, somebody who's not going to have the other

24    indicia of a liability that you have in court, to be able to

25    weigh that process.

1            So we ask on Thursday if they could also provide that

2      type of information, and that would be useful.

3            THE COURT:  I would agree and add to it for this

4      special category of witness, perhaps much greater detail would

5      have to be supplied so that trade-offs could be evaluated.  Not

6      only who they are but what the substance would be.

7            MR. FICK:  And we're --

8            THE COURT:  Frankly, I have an institutional concern

9      about the absence of an oath -- an enforceable oath.  I'll just

02:05 10   tell you that.  It could be -- it could perhaps be overridden

11     by safeguard conditions, but I'd like to -- so I'd like to know

12     rather specifically what you propose, and that also will relate

13     to the probative value and the --

14           MR. FICK:  There's a bit of a moving-part element to

15     it as well because there's a question of -- a couple of these

16     people, we hope they might get parole, but the government has

17     indicated they're still in review, so that's sort of a

18     question.

19           THE COURT:  Right.

02:05 20   MR. CHAKRAVARTY:  Your Honor, one other point.  First,

21     a simple explanation for Mr. Bruck's exhibit that he's going to

22     show to the Court.  There is some medical review kind of

23     journal articles which depict images of various scans, MRI, CAT

24     scans, PET scans.  Some of those involve some of our victims

25     who are going to be testifying, and it goes to the grave risk

 1    of death to those particular victims.  It's not the article

 2    that would be offered; it would simply be the images.  So

 3    that's the explanation for that.

 4         One other point which I hesitate to raise simply

 5    because it seems so trivial, but it's been raised a few times

 6    by Mr. Bruck, with regard to the sense of a

 7    nondiscrimination -- the closing, and in particular, a nasheed

 8    that was played.  Before the government's closing, we provided

 9    a list of exhibits that the government would be using.  The

02:06 10    defense, of course, made no objection.  I want to make that

11    clear for the record.

12         The second point is there were files in evidence

13    before the closing that came in without particularized

14    objection by the defense that depict both that nasheed, which

15    was a nasheed which was converted into an MP3 audio file from a

16    video.  That video file, which is the nasheed playing over

17    jihadi images, subtitled further as "Ghuraba,"

18    suggesting -- explicitly saying that the people who this video

19    was produced by and for were different than others.

02:07 20         These were not necessarily religious connotations;

21    these were terrorist connotations.  And the evidence in this

22    case is replete with motivation for terrorism and terrorism

23    connotations.  There is no intention -- and certainly if the

24    evidence points towards a particular ethnic group or religious

25    group that has -- that's because that's where the evidence

1    points, not because that's an argument the government is making

2    nor is it trying to inflame the passions of the jury on that

3    point.  We haven't thus far; we won't going forward.

4         It seems to be the defense has -- as I say, its past

5    prologue has teed that up as a theme they want to convey in the

6    penalty phase.  And it's equally inappropriate in the penalty

7    phase for the defense to be arguing that our theory of

8    prosecution is somehow implicating the defendant because he is

9    an immigrant or because of his national origin or his religion,

02:08 10   just as it would be if we were to do it.

11        MR. MELLIN:  Your Honor, if I could respond to

12   Mr. Bruck's concern about Martin Richard's clothing.  We do

13   intend in the closing in the death penalty phase to show the

14   jury this clothing.  It goes to two of the aggravating factors

15   in this case:  one, the vulnerability of Martin Richard, how

16   little he was, how short he was, where the tearing would occur;

17   secondly, it goes to the cruel, heinous nature of it, how his

18   clothing is ripped apart, how his shorts are essentially

19   burned.  That is direct evidence of two of the important

02:08 20   aggravating factors.

21        THE COURT:  All right.

22        MR. BRUCK:  Very briefly with respect to the last

23   point by Mr. Chakravarty, we have been attempting to secure

24   from the government a -- so that we can make it part of the

25   record, the actual video clip that was played.  We think that

1    rather than argue about what it meant, the record should

2    clearly include the material itself.  So if the government

3    would help us with that, we would be --

4              THE COURT:  Yes, we talked about that at the time.

5              MR. CHAKRAVARTY:  Right.  And we provided that to the

6    Court, and at the Court's direction I can make a copy

7    for the --

8              THE COURT:  Oh, I see.  Fine.  Yes.

9              MR. CHAKRAVARTY:  And for the record, the video file

02:09 10   which the government just alluded to, again, is, I think,

11   1143-88.

12             THE COURT:  Okay.  All right.  Very good.  We'll see

13   you tomorrow morning.

14             THE CLERK:  All rise for the Court.  Court will be in

15   recess.

16             (The Court exits the courtroom and the proceedings

17   adjourned at 12:05 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12

13   Date:  4/16/15

14

15

16

17

18

19

20

21

22

23

24

25