```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )


           BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE


              EXCERPT OF JURY TRIAL - DAY FORTY

                Testimony of Edward S. Knapp


            John J. Moakley United States Courthouse
                       Courtroom No. 9
                      One Courthouse Way
                  Boston, Massachusetts  02210
                  Thursday, March 26, 2015



                  Marcia G. Patrisso, RMR, CRR
                  Cheryl Dahlstrom, RMR, CRR
                    Official Court Reporters
                  John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3        Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6            By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G.
10        Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13            By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                            Direct   Cross   Redirect   Recross
  WITNESSES FOR THE
3    GOVERNMENT:

4  EDWARD S. KNAPP

5    By Mr. Chakravarty              4
     By Mr. Watkins                           97
6

7                        E X H I B I T S

8
  GOVERNMENT'S
9    EXHIBIT      DESCRIPTION              FOR ID      RECEIVED

10
     1573         Photograph of IED explosion            27
11
     1582         Photograph                             47
12
     957A         Photograph of Exhibit No. 957          52
13
     1122A        Photograph of Exhibit No. 1122         52
14
     949A         Photograph of Exhibit No. 949          55
15

16  DEFENDANT'S
     EXHIBIT
17

18   3093         Fragmented remains of cardboard        103

19

20

21

22

23

24

25

```
 1   (EXCERPT AS FOLLOWS:

 2          MR. CHAKRAVARTY:  The government calls Edward Knapp.

 3          THE CLERK:  Sir, want to step up here, please.  Step

 4   up to the box.  Remain standing.  Raise your right hand.

 5          EDWARD S. KNAPP, Sworn

 6          THE CLERK:  Have a seat.  State your name.  Spell your

 7   last name for the record.  Keep your voice up and speak into

 8   the mic so everyone can hear you.

 9          THE WITNESS:  Edward S. Knapp, K-n-a-p-p.

10   DIRECT EXAMINATION BY MR. CHAKRAVARTY:

11   Q.   Morning, Agent Knapp.  Are you a supervisory special agent

12   with the FBI?

13   A.   Yes, I am.

14   Q.   How long have you been with the FBI?

15   A.   Over 19 years.

16   Q.   Before the FBI, what did you do?

17   A.   I was in the United States Navy.

18   Q.   How long were you in the United States Navy?

19   A.   A little over eight years.

20   Q.   What unit were you in in the United States Navy?

21   A.   I was Naval Special Warfare, and that was -- basically

22   that's Navy SEAL.

23   Q.   Before that, what did you do?

24   A.   I went to college and graduated from the United States

25   Naval Academy.
```

1    Q.   As long as you've been an agent, have you had a variety of

2    different duties?

3    A.   Yes, I have.

4    Q.   And can you just give the jury an overview of your career?

5    A.   I was afforded regular basic FBI agent training.  Then I

6    went down to the Miami Field Division.  I investigated violent

7    crime, kidnapping, extortions.  At the same time, I got to go

8    to bomb technician school through the FBI in Huntsville,

9    Alabama, where all state and local bomb technicians are

10   trained.  And I was afforded that opportunity.  And I went back

11   to Miami.  Then I went and applied for a position up in the FBI

12   laboratory where I currently reside since the late 2003.

13   Q.   So let's -- at one point you were a -- I don't want to say

14   "regular" special agent because it doesn't make sense.  But you

15   were --

16   A.   Special agent.

17   Q.   You were a special agent.  Then you specialized in -- as

18   being a bomb tech, a special agent bomb tech?

19   A.   Yeah, that's correct.

20   Q.   So can you describe the process to become a special agent

21   bomb tech?

22   A.   Well, it was a course, a six-week course, basically how to

23   become a bomb tech, things of -- as far as explosives, handling

24   explosives, circuitry, what are bombs made up of, training

25   basic to render safe RSP bombs, how to deal with that.

1    Q.    RSP, does that stand --

2    A.    Render Safe Procedure, to neutralize an IED or a bomb.

3    Q.    Are there a variety of field divisions that have special

4    agent bomb techs?

5    A.    Yes.  All 56 field divisions have a bomb technician.

6    Q.    What are the duties of a special agent bomb technician?

7    A.    They basically coordinate.  They liaise state and local,

8    assist them at times for special events or if there's

9    call-outs.

10   Q.    What kind of activities do you do if there's a call-out?

11   A.    I might respond with that particular bomb unit to a call.

12   Things are reported back through them to our FBI headquarters

13   notifying that there's an incident going on.

14   Q.    And those incidents amount from, like, suspicious packages

15   all the way to an explosion, is that right?

16   A.    Correct.

17   Q.    And when you respond, do you do a variety of evidence

18   collection techniques?

19   A.    I imagine they do.  I mean, at this point that's up to --

20   in that field division, what's going on there at that time.

21   Q.    Just describing your -- when you were an SABT, did you go

22   out and respond to scenes?  And describe some of the things

23   that you did.

24   A.    If, yeah, there was a scene or go -- suspicious package or

25   there's some material that looks like maybe explosives or hand

1    grenade or might be explosive material, to assess if it's a

2    hoax or not.

3    Q.    And then did you also do render safe procedures?

4    A.    Practiced a lot.  But, I mean, I ended up leaving there

5    after a year or two to come up to the FBI laboratory.

6    Q.    You mentioned earlier that you attended the Huntsville

7    bomb tech training course.  Can you explain what that is?

8    A.    That's a six-week process.  You're familiar with

9    electrical and nonelectric fusing systems to detonate

10   explosives.  You handle explosives.  You look at render-safe

11   tools, tools that are used to disrupt IEDs, X-ray

12   interpretation, things like that.  And you have training and

13   then scenarios.  And you get qualified after that if you pass

14   tests and meet the standards.

15   Q.    And who is administering these tests and standards?

16   A.    That's the Hazards Device School, and it's run by the FBI.

17   And there's -- there was military bomb techs or retired

18   military bomb techs, you know, retired or public safety bomb

19   techs that are assigned as instructors down there in that

20   school.

21   Q.    And they evaluate you before they qualify you?

22   A.    Yeah.  There's practical application scenarios, getting in

23   the bomb suit, taking a disrupter, and neutralizing an IED.

24   Q.    As a result of that, do you get certified as a hazardous

25   device technician?

1  A.   No.

2  Q.   Okay.  How does that happen?

3  A.   That's a bomb technician.

4  Q.   Bomb technician, excuse me.  Is there a certification for

5  that?

6  A.   For?

7  Q.   For a bomb technician.

8  A.   That is the -- down in Huntsville, Alabama.

9  Q.   Is there ongoing training or a way to assess whether your

10  skills are up to date?

11  A.   There's periodic IED training with state and locals.  That

12  all depends, like I said, on the division where you're at and

13  the bomb techs with their state and local counterparts.

14  Q.   Have you continued to do that since this training?

15  A.   No.  I'm in the FBI laboratory, in the Explosives Unit.

16  Q.   I'm just trying to get a sense of, after your training,

17  how long you were in the field doing this work and then before

18  you came to the FBI lab.

19  A.   It was about a year and a half.

20  Q.   And during that time, did you investigate explosives

21  incidents?

22  A.   It's been awhile, but there's one or two, you know, and

23  then doing special events with the state and locals over down

24  in Florida where I was assigned.  But, you know, it's been

25  awhile but one or two times at some call-outs at night, but

1    other than that --

2    Q.    So the bulk of your experience has been at the FBI

3    laboratory?

4    A.    I had to be trained and certified, yes.

5    Q.    So please explain that.

6    A.    There's a process.  I'm a hazardous device examiner in the

7    FBI, and we fall under the TEDAC section under the FBI

8    laboratory.  And we have --

9    Q.    Let me pause there.  What is TEDAC?

10   A.    The acronym is Terrorist Explosive Device Analytical

11   Center.  But in the course of -- in the Explosives Unit,

12   there's training that basically I had to complete.  It takes

13   several years.  There's actually working cases, doing oral

14   examinations, explosives, the admin oral boards for as far as

15   the FBI laboratory protocols and procedures and how evidence is

16   handled and sent through our laboratory besides working cases

17   with a qualified examiner and then also outside training that

18   was afforded along with -- actually, they would test --

19   basically test us.  Basically we would -- you know, a case -- a

20   mock case would come in.  We would have to go from start to

21   finish.  Then we'd have to basically write reports and then

22   testify in a mock room setting.  You had to complete so many

23   cycles of that type of training.  And then once you completed

24   all that training, if you completed it, then you would be

25   certified as a hazardous device examiner.

1    Q.   So can you explain to the jury the difference between a

2    bomb tech and a hazardous device examiner?

3    A.   Well, we had additional training outside, going to

4    commercial explosive manufacturers, military manufacturers.  We

5    have liaison with those type industry reps.  We had basically a

6    little more extensive training as to be an examiner, you know.

7    Bomb tech, you know, they render safe some type of device and,

8    you know, it's sent to us.  And we're trying to put the pieces

9    back together and try to figure out the functionality of this.

10   Was it actually a device or was it not or what they call a hoax

11   device.

12   Q.   So you examine evidence that's submitted from the field?

13   A.   Yes.

14   Q.   I jumped the gun earlier to say -- when I asked whether

15   you had been certified to do that.  Have you been?

16   A.   Yes.

17   Q.   When -- for how long have you been a certified hazardous

18   device examiner?

19   A.   Since approximately 2007.

20   Q.   In the course of the last eight years, have you had

21   occasions to conduct not just the mock hazardous device exams

22   but actual real cases of hazardous device exams?

23   A.   Yes, I have.

24   Q.   About how many do you think you've participated in?

25   A.   Dozens.

1   Q.   And have you had training in this last eight years as well

2   after you have been certified?

3   A.   Yes.

4   Q.   Can you describe -- you described some of it.

5   A.   I mean, each year you have to go through a proficiency

6   testing to make sure you're still qualified, and you have to

7   pass those testing.

8   Q.   And is that administered by others in your field who are

9   also hazardous device --

10  A.   It's a requirement in the FBI laboratory under the -- as a

11  forensic laboratory under ASCLD.

12  Q.   And the process of conducting a forensic exam, is that a

13  collaborative process that you have -- you do with a team and

14  various disciplines?

15  A.   Well, as far as when the case comes to me, it's checked

16  in.  It comes to us.  There's a process of checking it in.  I

17  mean, I have a technician that is assigned to me.  And this is

18  checked in.  We then go to send the evidence out to other

19  forensic disciplines within the lab, DNA, latent fingerprints,

20  question documents, trace evidence, firearm toolmarks.  So this

21  evidence is then being sent to the other disciplines for them

22  to work on their discipline to find DNA or latent prints.  And

23  it would be transferred with the proper protocols through the

24  different disciplines, and it would come back to us.  But at

25  the end, at the end point, I'm looking and analyzing the

 1    material that had come in to me on a case and whatever field

 2    division in the FBI.

 3    Q.    Then you render your assessments about that evidence?

 4    A.    Well, whether it is an IED or a bomb, a homemade bomb, or

 5    it's not.  It could be a hoax bomb.  Yes.

 6    Q.    And in many of the cases that you've examined, have items

 7    been submitted to you that hadn't exploded?

 8    A.    Sometimes, yes.

 9    Q.    And in other cases, there are so-called post-blast

10    investigations; you get the remnants of materials?

11    A.    Yes, that's correct.

12    Q.    In addition to Improvised Explosive Devices, have you had

13    training in other types of explosive devices?

14    A.    I mean, when you talk about an Improvised Explosive

15    Device, it can be commercially available, military available

16    materials or commonly, readily available you can find and buy.

17    And it's just form fashion as the term is "improvised."

18    Sometimes we get an actual -- could be some military munitions,

19    and we have to deal with that, you know.  But normally they

20    come in and they're improvised somehow, not designed as they

21    were meant to be functioned.

22    Q.    Can you elaborate on that?  Improvised Explosive Device, I

23    think we understand what those words mean by themselves.  But

24    can you explain --

25    A.    In an Improvised Explosive Device, you have to have two

1     things.  You have to have a main charge, some type of

2     explosives, and some type of fusing system.  It could be an

3     electrical fusing system or nonelectrical fusing system.  Those

4     are the two main components.  And then sometimes how -- what

5     explosive you use, whether it's a high explosive, like a

6     military grade, or a low explosive, like a powder, you might

7     need a container to use in a low-explosive device.

8     Q.   Is that because the gases that build up is what causes the

9     explosion in a low-explosive explosion?

10    A.   Yeah.  You have to have some type of confinement.  And

11    basically the chemical reaction in it relieves it mechanically,

12    and there's an explosion in that container.

13    Q.   Okay.  So as a hazardous device examiner, how do you go

14    about conducting a post-blast evidence forensic examination?

15    A.   Well, when the material comes in, you know, it's just a

16    bunch of, you know, bits and pieces, and we're trying to

17    segregate out stuff that's -- you know, it's not part of the

18    bomb or what I'm looking for, an IED, and then trying to start

19    to recognize pieces of maybe parts of the bomb, whether the

20    fusing system, depending on what type it is, if there's a

21    container.  There might be a concealment container.  Then

22    you're basically trying to identify, I have a power source, or,

23    yes, here's a switch, all kinds of, you know, ways someone

24    could fashion a bomb so --

25         And then we're trying to determine the functionality of

1    the bomb.  And then sometimes there's also -- something might

2    have happened in one scene, and then there's a search at

3    another scene, and they might collect some evidence.  And then

4    they might ask -- this is the field division or the people

5    request an exam that maybe we compare items from a search scene

6    and from the bombing scene.

7    Q.   And so when you assemble the evidence and you're trying to

8    figure out what parts are what, how do you go about it?  Do you

9    take measurements?  Do you take pictures?  What are you looking

10   at?

11   A.   We're looking at roughly trying to separate, like I said

12   before, you know, electrical fusing system needs certain

13   components in it, and we're trying to look for those.  An

14   electrical fusing system, you can have some sort of power

15   source.  It could be varied type of battery.  You have to have

16   a conductor, some wire.  You would have to have some type of

17   switch or switches in combination.  And also, at the end, we

18   call a load or the -- where the detonator or refer to, like, a

19   blasting cap, or it could be an improvised detonator or

20   initiator.

21        So you're looking through all the material, and you're

22   trying to find if there is a viable fusing system in there and

23   also then separating out, if there was a container used, the

24   pieces that are coming together, all these little pieces.

25   There might have been sometimes fragmentation that was added,

1    you know, into a device or there's a container or it was

2    transported in a box or, you know, some other means.  Then

3    there might be little bits and pieces left at the scene there.

4    But you're going -- concentrating on that to figure out.  And

5    also, you know, things are being sent to our explosive chemist

6    for testing to try to see what type of explosive material was

7    used.

8    Q.   Okay.  You just mentioned several things there.  Are each

9    of those different systems, different components of an IED, a

10   fusing system, a container, and an explosive main charge?

11   A.   Yeah, that's correct.

12   Q.   Is an energy source also necessary for that?

13   A.   A power source.

14   Q.   A power source.  For an electrical system, it would be a

15   power source?

16   A.   Some type of power source.

17   Q.   For something like a pipe bomb, what would the energy be

18   from?

19   A.   It just depends on how it's made.  It could be a simple,

20   like, a firecracker fuse or those green -- that hobby fuse,

21   what we call, just lighting that with a match, or it could be

22   an improvised initiator and you're using a battery with some

23   type of switch to complete the circuit, and you could function

24   it that way.

25   Q.   Okay.  With regards to each of these components, the

1    energy source, the fusing system, a main charge or a container,

2    can you give some examples of each of those that you've seen

3    before or you've read about?

4    A.   Well, I mean, for an energy power source, nine-volt

5    batteries, six-volt lantern batteries, car batteries, things

6    like that.  I mean, I've seen regular commercial blasting caps,

7    commercial nonelectric blasting caps that were improvised to

8    make them electric blasting caps, blasting caps that were

9    improvised and made, initiators that were -- could be from an

10   SD rocket ignitor used as an initiator.

11   Q.   How about the various different vessels or containers that

12   you've seen?

13   A.   Pipes, pressure cookers, I've seen those; pipes; in a box;

14   PCV pipe.

15   Q.   Can you describe for the jury how these various components

16   interact together to create an IED?

17   A.   If we're talking in this -- in general or --

18   Q.   In general, and then we'll move to this case.

19   A.   In general, I mean, if you have that low explosive, you're

20   going to have to have a container.  And then it depends.  It's

21   as simple as putting a hobby fuse in it and lighting the hobby

22   fuse or, like I said before, you had some improvised initiator,

23   and you have to have a power source attached to it and then

24   some type of switch that will close that circuit and send a

25   current to that improvised initiator to ignite the low

1    explosive.

2    Q.   And then, because of the containment of the low explosive,

3    it will explode?

4    A.   If that's what the -- yeah, main charge was, yes.

5    Q.   Now, for purposes of this case, were you assigned to lead

6    the forensic examination of the explosives?

7    A.   Yes, for the Explosives Unit, yes.

8    Q.   So can you explain what you did early on in the

9    investigation?

10   A.   It started that next day.  Evidence started flowing into

11   the laboratory.  And as far as it was coming in, it was being

12   checked in, our process of checking it in, photographing it,

13   documentation, setting up an exam plan for all the other

14   disciplines.  And it just -- it kept coming in every about 12

15   hours.  There was a shipment at night, shipment in the morning.

16   And technicians were receiving the evidence in.  We were

17   looking -- looking at it.  Sometimes it was sent -- some of the

18   material was sent over maybe to DNA, if there was an issue,

19   they wanted to get DNA or latents.  But all these examiners,

20   material was going to them.  And then it was coming back to us

21   to -- to our unit but specifically me to analyze and start

22   looking through this.

23       I mean, there was over 1,300 submissions.  There might

24   have been 1,300 submissions, but it wasn't one single item.

25   We're talking hundreds.  So there was probably thousands of

1    little bits and pieces of trying to go look through this stuff,

2    all this material.  And you started separating and then started

3    recognizing, you know, what I talked before about, if there was

4    a piece of a battery, a piece of some type of switch.  Then you

5    started getting through the material that was just, you know,

6    collected up at that scene.

7        What I was specifically looking for, you know, what type

8    of -- if there was a container, if there was some type of

9    fusing system.  And what I started to find, that there was a

10   container or, like, a backpack.  Then there was pieces of

11   metal, larger pieces of metal that was the container, with the

12   bomb -- you know, it was contained, like, because then found

13   there was a low explosive in it.  Then we started seeing bits

14   of wire and pieces of electronic or RC model -- hobby model

15   components within and amongst the debris.  And that all started

16   coming in and started separating out, looking for what you need

17   for that electrical fusing system and started putting back the

18   pieces.  And then we went on to look at it and test the

19   functionality, if this would work.

20   Q.   Okay.  So once you get the pieces, you analyze them.  You

21   figure out how they interact with each other?

22   A.   We started to figure out what those pieces -- those

23   components were from.  You know, in our unit, we also will do

24   testing if we need.  Sometimes things come in and we'll test it

25   on the explosives range, but we'll try to re-create the actual

1   device.  We knew the type of receivers, the electronic -- there

2   was electronic speed controllers in there from model cars.  The

3   type of model RC car, we were purchasing some.  We started

4   seeing, like, bits of the container, the Fagor container, the

5   pressure cooker.

6       We started going out there and looking and purchasing for

7   exemplars because then we'd even take that, and we'd break

8   apart, say, the RC component because, in the explosive event,

9   it's not going to look the same.  Some of it, there was bits of

10  capacitors and bits of a circuit.  We actually had an exemplar.

11  We were taking a look because we'd find tiny pieces of wire,

12  tiny pieces of the connectors from the chaotic event, from that

13  explosion.  So we also did that for purchasing.

14      And then eventually it came down we put the functionality,

15  the fusing system together, and did some testing.  Then, of

16  course, on -- out there in the public domain, the internet and

17  the manuals for those particular type of RC transmitter, the

18  transmitters for the radio cars, also the receiver types for

19  their -- looking at those and seeing their compatibility and so

20  forth and doing some testing with that.

21  Q.   After you determined what the evidence submitted was, then

22  you went out and you tried to buy each of these things as

23  exemplars, intact things?

24  A.   Correct.

25  Q.   Then you'd use those to figure out exactly how they

1    interacted?

2    A.    That's correct.

3    Q.    Is that customary in your field, to try to purchase

4    exemplars and then create mock-ups?

5    A.    Yes, it is.  Even if there was a vehicle that was in an

6    explosion, to go take -- go to the manufacturer, look at the

7    vehicle, what type of wiring, what type of systems, if it was a

8    device that was blown up in a car.  But, yes.

9    Q.    Just before we move on to specifically how you

10   reconstructed those, did you arrive at a conclusion as to what

11   exploded on Boylston Street on April 15, 2013?

12   A.    Yeah.  There were two devices in pressure cookers, two

13   bombs that were carried in there in backpacks, and they were

14   pressure cookers.  They had electrical fusing system that was

15   an RC model hobby car components in it, and there was a low

16   explosive in it.  And they were placed on -- down in those

17   areas where they went off.

18   Q.    And a few days later, there were some explosions in

19   Watertown, on April 19th.  Did you arrive at conclusions as to

20   what exploded there?

21   A.    Yeah.  There was another pressure cooker, a smaller Fagor

22   pressure cooker.  It was -- they recovered, we talked before,

23   two pipe bombs.  There was an elbow and a pipe coupler.  But

24   they had internal end plugs, and they had what I talked before,

25   just simple hobby fuse.  And also there was some fragmentation

1    recovered that came in that were bits of pipe and end caps that

2    had exploded.

3    Q.   And in addition to the exploded materials, were there also

4    intact submissions that you saw?

5    A.   That's correct.  And there was also approximately three

6    pounds of a low explosive in a container with hobby fuse coming

7    out of it and also with this green hobby fuse inside the

8    container, too.

9    Q.   Was that also an IED?

10   A.   Yes, that is.

11   Q.   You may have mentioned that there were a couple of pipe

12   bombs that had been rendered safe.  Did you examine those as

13   well?

14   A.   Yes.  And they had some fragmentation on the inside of

15   them.

16   Q.   Now, are all these Improvised Explosive Devices or

17   destructive devices?

18   A.   Yes.  They're a bomb.

19   Q.   And so when bombs go off, do you do your own reenactments

20   of those devices?

21   A.   At times.  It depends for the explosive effect.  But there

22   was no need for that.  I mean, there was widely available that

23   two devices functioned.

24   Q.   So let's move on to some of the evidence collection and

25   some of the evidence that you looked at.

1           MR. CHAKRAVARTY:  If we could call up Exhibit 620.

2    This is the 2-D.  This is in evidence, your Honor.

3    Q.   Agent Knapp, have you seen this interactive exhibit

4    before?

5    A.   Yes.

6    Q.   So as far as -- sorry about that.  As far as your

7    analysis, what does this -- this is -- I've focused on Scene A.

8    What was significant to your analysis in terms of what evidence

9    that you were looking at?

10   A.   Well, I mean, this gives a pretty good description of

11   where the blast seat was and then where the pattern of some of

12   the materials radiated out from 360 degrees.

13   Q.   You said the word blast "seat."  Is that where the blast

14   originated essentially?

15   A.   Wherever that device was placed.  You can see where it --

16   it radiates out.  This is a good representation.

17   Q.   There's different colors.  Do each of these depict

18   different types of the systems that you had mentioned earlier,

19   like --

20   A.   Yeah, correct, you know, where some of the backpack, some

21   of the container, the actual pressure cooker, and then there

22   was also in the -- in this scene, there was copper -- there was

23   BBs for added fragmentation in there and also where the fusing

24   system -- you know, pieces happened to land at.

25   Q.   Okay.  You mentioned "fragmentation."

1    A.    Correct.

2    Q.    Can you explain what fragmentation is?

3    A.    In terms of -- fragmentation could be primary or secondary

4    fragmentation.  Primary fragmentation would be, like, in an

5    military ordinance, the casing.  When it explodes, that's

6    primary fragmentation.  You might have secondary, which

7    basically, depending on the violence and the pressures built

8    and as far as that pressure wave going, it picks up pieces in

9    the surrounding environment and hurls them out -- hurls them

10   out in all directions.  And secondary fragmentation can pick up

11   just from the scene or sometimes what they call shrapnel or

12   added fragmentation, where someone places something on a bomb

13   to try to cause more damage.  Usually, you see that, what they

14   call anti-personnel type devices, where you're trying to cause

15   as much damage or inflict, maim, kill, or injure personnel.

16   Q.    Now, in terms of how an Improvised Explosive Device works,

17   if there's no fragmentation, how does that -- how does a bomb

18   actually injure people?

19   A.    Well, there's always -- I mean, there's a bare charge,

20   but, normally, there's the overpressure and the extreme

21   pressures going out imparted on the surrounding area, you know,

22   picks up fragmentation from the surrounding.  But it's usually,

23   you know, overpressure from -- if there's no fragmentation,

24   it's really the overpressure that's coming to hit an individual

25   and can cause significant damage and death.

1    Q.   Is that like the shockwave that comes out of the

2    explosion?

3    A.   Yes.

4    Q.   Is there also heat sometimes generated?

5    A.   Well, there's the thermal effect.  If you're close enough

6    to the -- what particular material there is, you know, the

7    fragmentation, but is a big one, and then basically the

8    pressure, the overpressure, from -- imparted onto the

9    surrounding is a big one.

10   Q.   All right.  So back to the Scene A device, when you

11   started examining the evidence collected at Scene A, where did

12   you first start in order to try to reassemble what the

13   architecture of that device looked like?

14   A.   I mean, there was just evidence coming in.  It was not

15   like it all came in from Scene A.  There was stuff coming from

16   the Medical Examiner's Office, Scene A, Scene B.  And we

17   basically then started piecing it together and seeing -- I'd

18   see the power -- like I talked before, the fusing system of

19   this one particular on Scene A was a particular one.  And then

20   on Scene B, the fusing system, the power source was

21   particularly another -- another type.

22   Q.   I see.  For each scene there was a different -- your

23   examination started with a different component based on what

24   was either unique or the evidence that you found?

25   A.   It just came into the lab; and as it came into the lab, a

1    process of examining it.  It would come back to us.  And

2    basically I knew these particular items were from Scene A.

3    These particular items were from Scene B.  And then you started

4    analyzing those particular items, looking through the paint

5    cans with all the material in it, looking through the bags that

6    came in with numerous things and material inside those.  Then

7    you started -- what I talked about is start looking for the

8    particular components in the fusing system, the container, and

9    the bag.

10   Q.   So let's go to Scene A and explain what you found that was

11   significant about the device at Scene A.

12   A.   On this scene we found the power source.  We found the

13   receiver, the electronic speed controller, also a little part

14   of the improvised initiator in there, the container.  There was

15   fragmentation and then the bag that was -- that it carried --

16   that it was carried in.

17   Q.   Now, before I go to the components, I just wanted to show

18   you a photograph.  With regard to the explosion -- you had just

19   described how an explosion works regardless of the

20   fragmentation.  You described the shock and you described the

21   fire.

22        MR. CHAKRAVARTY:  I'm putting up on the ELMO for the

23   witness, your Honor, what I'm going to mark now as Exhibit

24   1573.

25   Q.   You see the cloud of smoke and the flames off to the

1    right?

2    A.   Yes.

3    Q.   Is that an accurate description of what an explosion of an

4    IED would look like?

5         MR. WATKINS:  Your Honor, I'm going to object at this

6    point for a couple of reasons.  This exhibit was only provided

7    last night.  We actually thought it was coming in through a

8    different witness.  I don't know whether there's been a

9    foundation for this laid with this witness.

10         THE COURT:  All right.  Both objections are overruled.

11   He may answer the question.

12   A.   I mean, this is class -- like, in a detonation or

13   explosion, depending what type of explosive it is.  You see the

14   thermal effect usually close to the seat of the explosion, and

15   then pressures are radiating out and also fragmentation.  I

16   mean, we -- besides being an examiner, we instruct and teach

17   post-blast investigation.  And we show students the different

18   effects of explosives and what happens when they go off,

19   different type of explosives.  So this is just common.  That's

20   an explosion with the thermal effect, which is usually close to

21   the -- in the seat of the explosion.

22         MR. CHAKRAVARTY:  I know it's being published, your

23   Honor.  I don't know if I actually moved it in yet, but I do

24   move it in.

25         THE COURT:  What's the number?

1          MR. CHAKRAVARTY:  1573.

2     (Government's Exhibit No. 1573 received into evidence.)

3          MR. CHAKRAVARTY:  Go back to the computer, please.

4          THE COURT:  Actually, we're just about at 11:00.  Why

5     don't we take this opportunity to take the morning recess.

6          MR. CHAKRAVARTY:  Thank you.

7          THE CLERK:  All rise for the Court and jury.  The

8     Court will take the morning recess.

9     (Recess taken at 10:57 a.m.)

10          THE CLERK:  All rise for the Court and the jury.

11          (The Court and jury enter the courtroom at 11:26 a.m.)

12          THE CLERK:  Be seated.

13          THE COURT:  Proceed.

14          MR. CHAKRAVARTY:  Thank you, your Honor.

15     BY MR. CHAKRAVARTY:

16     Q.   Agent Knapp, when we broke we were just getting ready to

17     look at some of the evidence that was collected at Scene A.

18          Did you find some evidence related to the fusing system of

19     the device that exploded at Scene A?

20     A.   Yes.

21          MR. CHAKRAVARTY:  Calling up on 620.

22     Q.   Is this one of those items?

23     A.   Yeah, it's the remains of the electronic speed controller.

24     Q.   What is an electronic speed controller?

25     A.   In the model car, it basically sends the power to the

1   motor, whether it makes it go faster or slower or reverse or

2   forward, in the model car.

3   Q.   And so what function does that perform in an improvised

4   explosive device?

5   A.   It's just basically a switch in the fusing system.  And

6   you can see one of the outputs.  That hooks up -- the small

7   leads there hook up to the receiver, and that larger red, you

8   know, that hooks up to the power source battery, and then

9   there's -- there should be -- well, it's so damaged.  But in

10  the exemplar there's two leads that go to the output of the

11  motor, and that's where I found that the improvised detonator

12  was hooked up to those two outputs that would normally go into

13  the motor of the R/C car.

14  Q.   I'm sorry.  Just "R/C car," do you mean a

15  remote-controlled --

16  A.   Remote-controlled, the hobby car.

17  Q.   And the screen in front of you, Agent Knapp -- actually,

18  if you touch it, it will leave a mark.  So if you want to

19  circle something or show the jury what you're talking about,

20  you can just touch that area or draw a circle around it.

21       So, now, you described that in the piece of evidence that

22  you found, some of the components had been burned off or

23  otherwise destroyed, but in the exemplar, you're able to make

24  out further definition of what this particular item is?

25  A.   Yes.  This is damaged.  And in the exemplar, pristine

1    condition, you can see where the different connections to the

2    battery, to the receiver, and then to where the -- you would

3    hook it up to the motor of the hobby car.

4    Q.    And is this part of the circuit board to that electronic

5    speed controller?

6    A.    Yes.

7    Q.    Is this the lab photo?

8    A.    That's correct.

9    Q.    And what is this last photo?

10   A.    That's the photo of the two leads that come off that

11   electronic speed controller.

12   Q.    You mentioned that they come off and they go to the

13   detonator?

14   A.    Well, in normal configuration that goes to the motor, but

15   the two outputs that go to the motor would be connected with

16   the improvised initiator.

17   Q.    What's an initiator?

18   A.    Something to set off the main charge, like I talked

19   before, blasting cap, an improvised blasting cap, or some type

20   of improvised initiator that would set that main charge off.

21   Q.    And what was the initiator in the two devices on Boylston

22   Street?

23   A.    Well, on one, Scene A, there was just a small

24   fragmentation of a Christmas tree -- basically the green

25   Christmas tree lightbulbs that are strung out in like 50- or

1    200-strand for decoration purposes.  And the other scene

2    nothing was found, but that's not to be expected.

3         Because the violent nature, the reaction, sometimes you

4    just don't find it remaining or left.

5    Q.   Do you recognize what this is?

6    A.   Yeah, those are just -- like I said, it had a lot of that,

7    the fragmentation there, the bits and pieces.  And there's part

8    of a -- that circular thing was part of one of the batteries,

9    this area -- you know, part of that there was the, you know,

10   part of the Christmas tree bulb.

11   Q.   The Christmas tree lightbulb?

12   A.   Yes.

13   Q.   And does a Christmas tree lightbulb have enough power to

14   set off a low-explosive charge?

15   A.   Yes.

16   Q.   Did you find other items related to the energy or the

17   power for that fusing system?

18   A.   Yes.  The power source, they were Sub-C-size batteries,

19   but some of that was still connected to part of the leads of

20   the battery and other parts of the cells were disbursed amongst

21   the scene.

22   Q.   And I'm showing what's marked as Q208.  What's that?

23   A.   Yeah, I think that was the -- that's the casing of an

24   Exceed R/C battery.  That was 7.2 volts, and that, I think, was

25   1800-milliamp rated.

1   Q.   And so what was the -- explain how the battery interacted

2   with that --

3   A.   Well, the battery is the -- you know, it basically powers,

4   you know, the motor of an R/C car.  But the battery, that was

5   the power source to provide current to the improvised initiator

6   and also provided power to the electronic speed controller and

7   also the R -- the receiver, the small receiver, that was found

8   also at the scene.

9   Q.   Let's go to that.  I'm showing you what's marked Q178, a

10  photo of Q178.  What is that?

11  A.   That was the remains of the Flysky receiver.

12  Q.   When you say "Flysky," is that the name brand of the

13  receiver?

14  A.   245 was the model, yeah, the brand of the receiver.

15  Q.   So can you explain what a Flysky receiver is?

16  A.   A Flysky receiver basically receives a signal from the

17  transmitter.  In a normal R/C, the model hobby car, you'll have

18  a transmitter or controller, what you steer or drive the car

19  forward or reverse.  The receiver is in the model car.  You

20  have the electronic speed controller in there that deals with

21  the motor once you hook those leads up.  And then you plug

22  the -- plug the receiver into the electronic speed controller.

23  And obviously that battery, that Sub-C pack, is in there

24  providing power for the car in normal operation.

25       What has to happen is that receiver has to be connected to

1    that transmitter.  And then in the manufacturer -- in the

2    literature it's available, and then even in that particular

3    manual that transmitter has a code, an identifier, a number.

4    And basically, you have to bind that receiver to that

5    transmitter so they can talk to each other.

6        And once that's done, that function's performed, then the

7    receiver's bound to that transmitter, then you can use that

8    controller and turn the steering wheel or press the trigger to

9    that controller and the car will perform, you know, whatever

10   desired function you have in normal operation.

11       And this particular -- this particular type of this

12   manufacturer, Flysky, they use, in their literature,

13   frequency-hopping.  And basically, that's just one type of

14   system that's used for this particular transmitter/receiver.

15   And then other manufacturers use a different type of

16   technology -- or called "digital sequencing."

17       There's two different ways to run your R/C cars, but this

18   particular one, you have to make sure that you have the

19   compatible type of receiver/transmitter to perform driving an

20   R/C car or boat.

21   Q.   Okay.  So was that receiver connected to the electronic

22   speed controller which was connected to the initiator, the

23   Christmas tree bulb?

24   A.   It was.  But I mean, all that was all damaged.  But that

25   had to be connected up in that -- we talked a fusing system to

1    operate the improvised initiator in this particular scene.

2    Q.    Continuing on, did you find a toggle switch?

3    A.    Yeah.  Like I said before, testing the functionality and

4    seeing how these things were constructed, we noticed without

5    just putting the receiver, the electronic speed controller in

6    there with the battery and then hooking it up to an improvised

7    initiator, in this particular -- in this particular electronic

8    speed controller, when you hit the little slide switch and

9    power it up where it initializes and the receiver then receives

10   power, it's sent output signal to the two leads that were

11   connected to our improvised initiator, which we used as a

12   Christmas tree bulb, and it basically lit the bulb momentarily,

13   so...

14         And we also -- during the scene, through all that

15   material, we found the remnants of a heavily damaged -- what

16   was a toggle switch.  We couldn't identify it, but it was an

17   illuminated toggle switch.  And that was within the parts that

18   we looked at.  And for this particular device at Scene A, had a

19   toggle switch also which sometimes they're referred to as a

20   safe-and-arming switch, because if you turn that little slide

21   switch on the electronic speed controller on, and it's sent

22   that output to that Christmas tree bulb to light it up, it

23   would have detonated the bomb.

24         So to interrupt that circuit, a toggle switch, just like a

25   light on your on-and-off switch, it broke the circuit -- it

1    just needed to be done for a few seconds, and then the toggle

2    switch just needed to be flipped to the armed position.  And

3    then once you went and gave it the appropriate signal from the

4    transmitter, it would function the Christmas tree lightbulb.

5    Q.   So are you saying for that receiver to bind with the

6    transmitter without actually igniting the Christmas tree light,

7    you need to have this toggle switch on?

8    A.   No, the binding of the receiver and transmitter is already

9    complete.  It's basically -- the transmitter you can set aside.

10   You're not worried about -- we're not worried about the

11   transmitter.  It's the fusing system.  You needed a toggle

12   switch within -- between -- to break the continuity between the

13   electronic speed controller, the receiver battery, just had to

14   have a break in that continuity.  Because if you didn't, if you

15   didn't have that toggle switch in when the receiver, electronic

16   speed controller and battery are all put together, and we

17   tested it with a Christmas tree lightbulb on the outputs of

18   that electronic speed controller, when you slid and powered up

19   that electronic speed controller, it had enough output to send

20   current down to that Christmas tree lightbulb momentarily for a

21   second or two, but it would light up, so...

22        And we found in the evidence, like I said, that damaged

23   toggle switch.  And that toggle switch was used to break that

24   once you turned on the electronic speed controller, and then

25   they flipped it on to the -- or someone would flip it on to the

1    armed position then, and now it's armed and it's just waiting

2    for a signal from the transmitter.

3    Q.    So the toggle switch was necessary for the arming

4    procedure?

5    A.    Yes.  In that particular scene.

6    Q.    So for that scene, the pressure cooker pot, somebody would

7    have had to turn on the device before deploying it?

8    A.    In both of them.  But in this particular instance, just

9    the way that electronic speed controller sent a signal or

10   output to that -- where that Christmas tree -- improvised

11   Christmas tree bulb would have been, it would have set it off.

12   Q.    And this toggle switch -- was there a similar toggle

13   switch found in Scene B?

14   A.    No.

15   Q.    Now, in addition to this fusing mechanism, did you find an

16   alternative fusing mechanism for the device at Scene A?

17   A.    Yes, we did.  We found a very small piece of what we

18   talked before, hobby fuse, that green hobby fuse that's used in

19   fireworks.  There was two pieces taped up with electrical tape.

20   And they were at both scenes also.

21   Q.    I'm putting up on the screen Q192.  Is that the hobby fuse

22   that was recovered from the site of Scene A?

23   A.    Yes.

24   Q.    So can you explain why there would be hobby fuse in a

25   device that already had an electric fusing system?

A.   Well, there was two forms of initiation.  We talked
before, there's electrical and non-electrical.  The primary
means of initiation would be electrical by remote-control car,
but if somehow that failed, then all you would have to do is,
you know, light the hobby fuse and walk away, and that would be
sufficient to set off the low explosive.

     So, you know, when I saw that there, just that
small -- that small piece, it appeared that it was cut off --
once that violent reaction, that explosion, it was cut off, and
that was the small fragment that remained amongst the many
pieces of debris at each scene.

Q.   So when someone lights hobby fuse, describe what the
deflagration looks like.

A.   It's just you light it with a match or a lighter, and it
starts burning and it's giving off smoke.  It might smell like
a sulphur smell, but it's burning down.  And there would be
smoke around.

Q.   And does it take a little bit of time depending on how
long it is?

A.   Right.  Normally it's two seconds per inch, but it varies.
But it's just commonly available, manufactured hobby fuse.

Q.   In fact, for both of the scenes on Boylston Street, did
you find evidence of hobby fuse?

A.   Yes.

Q.   In addition, did you find components of a container?

1    A.    Yes, the Fagor container.

2    Q.    That's Q10.  What's that?

3    A.    That's the lid of the pressure cooker.

4    Q.    And did -- the deformities to this pressure cooker, what's

5    that evidence of?

6    A.    An explosive event.  And you could see it was crisscrossed

7    with tape.  The container had tape on it.  And it was

8    crisscrossed around the container also.

9    Q.    You're referring to the kind of clear marks here?

10   A.    That's correct.

11   Q.    And this particular lid was found some distance away?

12   A.    Yes, it was found some distance away.

13   Q.    So according to the interactive exhibit where I'm hovering

14   over here, does that sound right?  I know you weren't on the

15   scene --

16   A.    I wasn't at the scene but...

17   Q.    Were there also components of the backpack that was used

18   to conceal these devices?

19   A.    Yes.  It's identified as a Ful backpack.

20   Q.    Going to Q109, just quickly scroll through these, are

21   these the lab photos of that backpack?

22   A.    That's correct.

23   Q.    And I'm sorry.  This identified the brand as Ful?

24   A.    And then on the inside, in the liner of the material

25   there, it had the Ful brand in there.

1    Q.   All right.  Now let's move on to Scene B.  And as with

2    Scene A, did you find radio-controlled remote-control

3    components?

4    A.   Yes, we did.

5    Q.   Calling up Q41, what are these?

6    A.   That's a portion of another -- an electronic speed

7    controller, but that was -- there was two portions to that, and

8    that was a Duratrax Sprint electronic speed controller.

9    Q.   And the Duratrax speed controller, that's different from

10   the Accede that you found at Scene A?

11   A.   Yes; just a different type of electronic speed controller.

12   Q.   What does the speed controller do in a typical

13   remote-control car?

14   A.   I said it went and basically provided power to the motor,

15   if you wanted to go faster or slower, reverse or forward.  And

16   it would provide the input, and the current would go and engage

17   the motor.  And it would go forward, backwards or slower or

18   faster.

19   Q.   Thank you.  And so Q52, is this another portion of the

20   electronic speed controller?

21   A.   Yeah, that's a piece off that -- 52 and 51 is the board,

22   the electronic speed controller board.

23   Q.   Did you also find evidence of a receiver at --

24   A.   Yes.

25   Q.   A remote-control receiver?

1    A.    Yes, we did.

2    Q.    Q122:  Do you recognize that?

3    A.    Yes; that's a Spektrum receiver.

4    Q.    The company Spektrum?

5    A.    Yes.

6    Q.    "Spektrum" with a K?

7    A.    Yes.

8    Q.    It looks like there's -- the name is printed actually

9    here.  Is that right?

10   A.    That's correct.

11   Q.    Now, how does the Spektrum receiver differ from a Flysky

12   receiver?

13   A.    As we talked before, it's just how they communicate and

14   what technology that manufacturer had.  And that was direct

15   sequencing.  It's just a different way that it talks to the

16   receiver/transmitter.  But the same process of binding -- you

17   know, they have their receiver and transmitter.  The

18   transmitter has a unique ID, and basically it is bound.  Once

19   you bind that to the transmitter, they will talk, like

20   communicate.

21   Q.    Did you also find a power source at Scene B?

22   A.    Yes, we did.  A damaged Tenergy Sub-C pack.

23   Q.    Is that --

24   A.    That's the brand name, the Tenergy battery.

25   Q.    Another battery pack?

1   A.   Right.

2   Q.   Did you also find evidence of the hobby fuse?

3   A.   Yes, we did.

4   Q.   And then finally, did you find portions of the backpack

5   itself?

6   A.   The Fox backpack, yes.

7   Q.   This was different from the Ful backpack?

8   A.   Correct.

9   Q.   And finally, the -- did you find pieces of the container

10   as well?

11   A.   Yes.  The container again -- once again, it was a Fagor

12   pressure cooker.  And there was also, you know, we talked

13   before, fragmentation, some small nails and BBs in this scene,

14   and compared to just the BBs in Scene A.

15   Q.   Now, we've just looked at a sampling of some of the pieces

16   of evidence, but did you examine each piece of evidence and

17   come up with the configuration of how you surmised that these

18   devices were constructed?

19   A.   Well, yes, the configuration that these particular R/C

20   components had to be put into and how they would have

21   functioned the device.

22   Q.   And did you create mockups?

23   A.   Yes, we did.

24   Q.   And you described how you went out and bought components.

25   How did you configure the mockup devices?

1   A.   Based on the -- what was found at the scenes, the

2   particular type of transmitters/receivers, we purchased

3   the -- there was a -- we actually purchased several monster

4   rally trucks where the electronic speed controller, the power

5   source, everything was provided.  It was a full, intact one,

6   which was the same components found at the scenes.

7        And then we -- then I went and constructed the fusing

8   system, like I talked about, placing the receiver, binding it

9   with a transmitter, and then hooking up a -- in this

10  particular, just hooking up a Christmas tree bulb to it.

11  Q.   And for the device at Scene B, you described earlier that

12  there was no toggle switch found?

13  A.   Right.  We -- I said before we tested those -- that

14  Spektrum receiver with the Duratrax.  And when I talked before

15  about having to initialize and we have to turn on the

16  electronic speed controller in Scene A, power -- some output

17  went to those two leads that had the Christmas tree bulb.

18       When we tested it for the Duratrax electronic speed

19  controller hooked up, there was no output.  It didn't light up

20  the Christmas tree bulb, and there was no evidence of a toggle

21  switch remaining at the scene.  But it did not function it,

22  once you powered it, initialized it up, so the light did not

23  come on.

24  Q.   So unlike the device at Scene A, the device at Scene B

25  with that Spektrum receiver and the Duratrax electronic speed

 1    controller, when you armed it, it didn't set off the Christmas

 2    tree lightbulb?

 3    A.    That's correct.  The fusing system there, yes.

 4    Q.    But like the Scene A, did that device have to be armed

 5    before it was deployed?

 6    A.    You had to turn on that slide switch so it would power up,

 7    and then it's waiting for the signal from the transmitter.

 8    Q.    Let's talk a little bit before we move on about -- you

 9    described the components within the fusing system of the

10    pressure cooker.  What else would have been -- what else did

11    you find evidence of within the pressure cookers?

12    A.    Well, within the pressure cooker, the way they were

13    constructed, there was, I said -- in Scene A there were the

14    copper -- the BBs, and there was pink material, a red

15    rosin-type paper backing.  But some of the BBs, we found that

16    they had some adhesive -- sealant-type material -- they were

17    like embedded into the sealant-type material.

18         And also in Scene B, likewise, the same type of material

19    was found.  They had the BBs.  Or there was BBs and then there

20    was some small nails in it.  And also there was -- we started

21    seeing when all this evidence came in, there were pieces of

22    cardboard -- circular pieces of, like, fragmented cardboard

23    with duct tape taped around the edges of it.  And we started

24    noticing each scene had cardboard, and then there were some

25    tape associated with those.

1   Q.   And then you also described, I think, some tape on the

2   exterior of one of the --

3   A.   Well, and each device, basically it was crisscrossed with

4   tape around the pod.

5   Q.   So before deploying that device, someone would have had to

6   arm the device and then resealed it before deploying it?

7   A.   They would have had to go in and make sure the slide

8   switch on that electronic speed controller was on so it would

9   power up that fusing system, what we talked about, the

10  components of it.

11  Q.   And then resealed the container, the vessel?

12  A.   Yes.

13  Q.   And is that because the low explosive --

14          MR. WATKINS:   Objection to the leading nature, your

15  Honor.

16  BY MR. CHAKRAVARTY:

17  Q.   Why does a low explosive need to have a sealed container?

18  A.   Well, it builds up pressure.  But we've done tests

19  where -- I mean, low explosives, it just has to have enough

20  confinement and then it can, you know, explode, you know, and

21  the container can fragment.  But we've done tests where you

22  don't have, like, say on a pipe, two end caps.  One might be

23  off and it's still -- that's enough confinement to detonate

24  that pipe, so...

25          And even if you have enough material by itself, the weight

1    of that material can cause enough confinement to start a

2    violent reaction and explode.

3    Q.   When you say "material," you mean explosive material?

4    A.   Yeah, by itself the way that -- if you have enough.

5    Q.   And is there a correlation between how sealed -- how

6    confined something is with how violently it will explode?

7    A.   Of course if you have, you know, a heavier case, you know,

8    a thicker pipe -- you know, it just has to have enough

9    confinement in it.  But, you know, if it's a thicker pipe,

10   sealed better, time to build up more pressure, but it relieves

11   itself, but just enough confinement.  And in this case there's

12   enough confinement to explode these two containers.

13   Q.   In exploding a container, breaching the confinement, does

14   that in itself create fragmentation?

15   A.   That's -- the container itself is fragmentation along with

16   the added fragmentation.

17   Q.   And when it -- when an explosion breaches a containment

18   vessel, how does the physics work in terms of breaking the

19   containment?

20   A.   It just depends, you know, low explosives, how violently

21   they react.  You might have bigger pieces or smaller pieces

22   depending on the explosives that were used.

23   Q.   Okay.  So in addition to the gas being released, is that

24   also when the thermal effect occurs?

25   A.   Well, initially we talked before, the closer the thermal

1    effect is closer to, you know, the explosive or the seed, and

2    then the fragmentation and the pressure is radiating out.

3    Q.    Does it radiate out in any specific direction?

4    A.    It's just 360.  Just pressures are built up, and 360

5    degrees out, just imparting that onto the surrounding

6    environment or whatever else is in its way.

7    Q.    Let me show you a couple of photographs.

8          (Pause.)

9    Q.    Agent Knapp, I just wanted to show you a few photographs

10   to see if these are consistent with what the effect is of an

11   explosion on a containment vessel.

12         MR. CHAKRAVARTY:  Can we go to 2D, please?

13         THE COURT:  Is this something in evidence?

14         MR. CHAKRAVARTY:  I'm first going to go to the 2D

15   which is in evidence, your Honor.  Sorry.

16   BY MR. CHAKRAVARTY:

17   Q.    Agent Knapp, what does this show?

18   A.    That is the fragmented remains of a pressure cooker.

19   Q.    And the distortions of the ends and the discoloration, is

20   that all effects of the explosion?

21   A.    Could you repeat that?

22   Q.    The distortions at the ends -- the edges of the metal, is

23   that all the result of an explosion versus something else that

24   may have been done to it?

25   A.    It was ripped apart in the explosion.  It came apart, the

1    container.

2    Q.    And do you notice that there appear to be some

3    indentations here, almost as if stamped out of the metal?

4    A.    Right.

5             MR. CHAKRAVARTY:  Now, if I can have one moment.  I

6    wanted to see if -- rather than using the ELMO, see if we could

7    project it out electronically.

8             Just for the witness, your Honor.  It's not in

9    evidence.

10   Q.    Agent Knapp, showing you an exhibit marked 1582, do you

11   see the grates at the bottom of this photo?

12   A.    Yes.

13   Q.    Are those indentations on Q126 --

14            MR. WATKINS:  Objection, your Honor.  This is the

15   subject of expertise, and this is not an expert in that.

16            THE COURT:  All right.  Overruled.  I'll allow the

17   answer.

18   BY MR. CHAKRAVARTY:

19   Q.    Are the indentations that we just saw on Q126 consistent

20   with the pattern on the grate depicted in this 1582?

21   A.    When this device went off, it was placed close to the

22   ground and then the force was imparted on it and it just left

23   impressions in the metal on the container that was fragmented

24   from that grating.

25            MR. CHAKRAVARTY:  So I'd move in Exhibit 1582, your

```
 1   Honor.
 2              MR. WATKINS:  Objection.
 3              THE COURT:  Overruled.  I'll admit it.
 4              (Government Exhibit No. 1582 received into evidence.)
 5   BY MR. CHAKRAVARTY:
 6   Q.   Again, was the grating that you're talking about this type
 7   of grating?
 8   A.   Yes.
 9              MR. CHAKRAVARTY:  Mr. Bruemmer, if we can go back to
10   the 2D and call up...
11   Q.   And this is what I had identified earlier as that kind of
12   stamp?
13   A.   Correct.
14   Q.   Now, going to -- moving on to the Watertown crime scene,
15   did you use a similar methodology to examine the evidence at
16   Watertown as you did for the Boylston Street explosions?
17   A.   Yes.
18   Q.   And did you identify -- let's first talk about the
19   pressure cooker device there.  Did you identify the vessel that
20   was used?
21   A.   It was a smaller Fagor pressure cooker.
22   Q.   So for the Watertown scene, Agent Knapp, I think I'm just
23   going to show you the physical items because I don't have the
24   exhibit numbers -- excuse me -- the photo numbers handy.
25              So there was a Fagor pressure cooker device that was
```

1    smaller, I think you said earlier?

2    A.    Just a little smaller in size, yes.

3    Q.    And the fact that it was smaller, what significance did

4    that have to you as an explosives analyst?

5    A.    Nothing.

6    Q.    And does it matter how large a vessel it is for purposes

7    of determining an explosion analysis?

8    A.    No.

9    Q.    Why is that?

10   A.    Obviously the -- I mean, obviously if it's bigger, you can

11   put more explosives in it.  But, I mean, it's just a

12   containment vessel and it just happened to be that size.

13   Q.    And so how much -- the fact that it's a smaller vessel

14   means that it can hold less items.  Is that fair to say?

15   A.    Material.

16   Q.    Material?

17   A.    Possibly.

18   Q.    So were you able to estimate how much explosive material

19   was in these devices?

20   A.    In the Scene A and Scene B?

21   Q.    Start with wherever you want.

22   A.    You know, for the -- I mean, they were -- the same size

23   pressure cookers in Scene A and Scene B, and they were like

24   six-liter-size pressure cookers, and roughly -- it could be

25   anywhere from eight pounds to 16 pounds in those pressure

1    cookers.  And obviously, the other one was a four-liter,

2    four-quart size.  And obviously, that would be a smaller, you

3    know, eight pounds in there, so forth, approximating.

4    Q.   And you're approximating.  That's estimating if it was

5    half full of explosive material?

6    A.   Half full to full.

7    Q.   So that's the range that you described?

8         MR. WATKINS:  Objection to the leading, your Honor.

9         THE COURT:  Overruled to that question.

10   BY MR. CHAKRAVARTY:

11   Q.   Now, for the Watertown scene, in addition to the Fagor

12   pressure cooker, which we've seen photos of the lid and the

13   vessel, what other components of significance were there?

14   A.   In the pressure cooker itself, obviously when that went

15   off, they did find wire, a 9-volt battery and a toggle switch

16   at the scene.  And then they also had collected two intact pipe

17   bombs.  One was an elbow and one was a straight coupler.  And

18   they had internal end plugs.  And then they also collected

19   fragmentation, or bits and pieces, of pipe at that scene.  And

20   they also collected a container with material in it with green

21   hobby fuse coming out of the lid.

22   Q.   So you said a few moments earlier that it doesn't really

23   matter how sealed something is or -- in terms of whether it

24   will explode.  Would the device that was made out of plastic

25   that had powder in it and hobby fuse, would that have exploded

1    like an IED?

2    A.   There's confinement there, and that just happens to be

3    plastic.  But there's confinement, and that right there was a

4    device also because it had all the components, the

5    non-electrical fusing system, the main charge and the

6    container.

7            MR. CHAKRAVARTY:  Can we call up Image 951, please?

8    I'm sorry.  957.

9    Q.   This is a Q photo of 582.  Do you recognize that?

10   A.   That's a toggle switch that was found at Watertown.

11   Q.   And what significance did that have to the device?

12   A.   Well, there was -- it was connected.  They had a

13   9-snap-volt battery connector.  There was a 9-volt battery

14   found.  That toggle switch with a length of wire, that right

15   there -- obviously there was no initiator on the end of the

16   wires, but that was found at some distance away from the

17   pressure cooker.  And as far as in my course of investigation,

18   being overseas, you have a toggle switch, and basically it's

19   just an on-and-off switch, you have a power source, and you'd

20   have some type of initiator at the end of that.  And all you do

21   was to close the circuit, just flip the toggle switch.  And if

22   that was in an explosive, it would detonate and explode.

23   Q.   So this was another way to trigger an explosive device?

24   A.   Well, in --

25           MR. WATKINS:  I'm going to object, your Honor.  That

1    wasn't his testimony.

2           THE COURT:  Yeah, sustained to that.

3    BY MR. CHAKRAVARTY:

4    Q.   So let's just clarify a few things.  You mentioned that in

5    the course of the investigation you have come to learn this.

6    Do you mean in the course of your training and experience as an

7    investigator?

8    A.   In dealing with material coming in, or overseas, bombing

9    investigations, seeing the type of fusing systems out there.

10   And this is a particularly used -- what we normally have is --

11   a dead-man's switch or a suicide bomber would have this type of

12   configuration.

13          MR. WATKINS:  I'm going to object, your Honor.

14          THE COURT:  No, overruled.  That may stand.

15   BY MR. CHAKRAVARTY:

16   Q.   And in addition to this system, was there

17   another -- evidence of another fusing system found on Laurel

18   Street?

19   A.   Well, there was the hobby fuse.  It's non-electric.

20   Basically, the burning of the green hobby fuse.  They had it in

21   the pipes; they had it in the container, the plastic container.

22          MR. CHAKRAVARTY:  One moment, your Honor.  I believe

23   Exhibit 957 is in evidence, but I'm not sure whether it's the

24   image or the physical piece of evidence.  I'm just confirming

25   that.

1          (Pause.)

2          MR. CHAKRAVARTY:  So, your Honor, I believe 957 is the

3    physical piece of evidence.  If I could offer this exhibit as

4    957A, which is a photo of that.

5          MR. WATKINS:  No objection.

6          THE COURT:  Okay.

7          (Government Exhibit No. 957A received into evidence.)

8    BY MR. CHAKRAVARTY:

9    Q.   This is that switch that you just described that was found

10   in Watertown?

11   A.   Yes, it was.

12          MR. CHAKRAVARTY:  I'd call up Exhibit 1122.

13          THE COURT:  Is this in or not?

14          MR. CHAKRAVARTY:  Again, it is in, your Honor.  I

15   just, again, don't know if it's physical or --

16          (Pause.)

17          MR. CHAKRAVARTY:  Your Honor, similarly, if not, I'd

18   make clear that this is 1122A, which is a photograph of --

19          THE COURT:  All right.

20          MR. CHAKRAVARTY:  Q71.

21          (Government Exhibit No. 1122A received into evidence.)

22   BY MR. CHAKRAVARTY:

23   Q.   And so this is the lid that you were mentioning earlier?

24   A.   Of the container?  Yes.

25   Q.   So there's hobby fuse on here that we can see.  Is that

 1    fair to say?

 2    A.    Yes.  It was coming out of the lid of the container.

 3    Q.    So in addition to this hobby fuse, was there other hobby

 4    fuse found in Laurel -- at the Watertown scene?

 5    A.    There was a bit of hobby fuse inside the container, so

 6    with the powder that was in there.

 7    Q.    And so the pressure cooker device that was exploded, was

 8    there any hobby fuse associated with that, or how did you

 9    determine that?

10    A.    You couldn't determine -- I mean, usually, hobby fuse

11    burns.  That explosion happened, and the hobby fuse usually is

12    no longer there.

13               MR. CHAKRAVARTY:  May we go to Exhibit 848.

14               I'm not sure whether this is in evidence.

15    Q.    Do you see this area over here?

16    A.    Yes.

17    Q.    Is that significant to you?

18    A.    It looks like a darker spot in the ground.

19    Q.    What happens when an IED explodes on asphalt?

20    A.    It can leave a cratering pattern or it could leave some

21    residue near there.

22               MR. CHAKRAVARTY:  If we could go to Exhibit 852.

23               This is in evidence, your Honor.

24    Q.    Is this that collection of hobby fuse that you were

25    talking about?

1    A.    Yes.

2              MR. CHAKRAVARTY:  Go to Exhibit 853.

3    Q.    This is another angle.

4              MR. CHAKRAVARTY:  Could we go to Exhibit 833, please.

5    834.

6              I don't think that's in evidence, your Honor.

7              THE CLERK:  834 is in.

8              MR. CHAKRAVARTY:  834 is in, yes.

9              THE COURT:  Is or isn't?

10             MR. CHAKRAVARTY:  834 is.  My apologies, your Honor.

11   BY MR. CHAKRAVARTY:

12   Q.    Is this one of those rendered-safe pipe bombs that were

13   found in Watertown?

14   A.    Correct.

15   Q.    Could you describe the configuration of this?

16   A.    That was an elbow pipe, two-inch diameter with internal

17   end plugs, it had some Teflon tapes on the threads, and then on

18   the inside it had, once again, BBs inside, encased inside, and

19   there was a green hobby fuse coming out of a hole that was in

20   the elbows.

21             MR. CHAKRAVARTY:  Could we do 842, which is also in

22   evidence.

23   A.    That shows you a picture of the inside, but the same

24   thing.  That's just a straight coupler with the internal end

25   plugs and hobby fuse coming out of it.

1    Q.   And like the other mockup devices that you made, did you

2    make mockup devices of each of these devices:  the pipe bombs,

3    the plastic container containing hobby fuse and explosive

4    material, as well as the pressure cooker that was found in

5    Watertown?

6    A.   Yes.

7    Q.   In addition to the explosives, the exploded IEDs -- the

8    remnants of the exploded IEDs as well as the rendered-safe, did

9    you also find a transmitter in Watertown?

10   A.   Yes, there was a transmitter that was submitted with this

11   evidence.

12        MR. CHAKRAVARTY:  And if we could call up Exhibit 949,

13   which I would move into evidence 949A as a photo of this.

14        MR. WATKINS:  No objection.

15        THE COURT:  Okay.

16        (Government Exhibit No. 949A received into evidence.)

17   BY MR. CHAKRAVARTY:

18   Q.   And what is that?

19   A.   That's the modified Flysky transmitter, or basically the

20   R/C hobby controller.

21   Q.   So you said it's a modified Flysky.  Is "Flysky" the name

22   brand?

23   A.   Yes, of the transmitter, the controller.

24   Q.   And so it's the same name brand as the receiver that was

25   found at Scene A?

1    A.    That's correct.

2    Q.    And you said it was modified.  How was it modified?

3    A.    Well, normally if you had an intact one, there's the

4    battery pack on the bottom, and it has like a pistol grip where

5    you can hold it, and on the top it has the -- that -- that's

6    the electronic display.  And there's usually buttons up there.

7    And then on one side there's a little steering wheel, and it

8    has -- on the grip there's like a little trigger for operating,

9    you know, the forward and reverse of your car and the steering

10   wheel to turn your R/C car.

11   Q.    Now, as part of the investigation, did the FBI obtain

12   various receipts or other records to see whether there were

13   other radio-controlled/remote-controlled components involved in

14   the case?

15   A.    Yeah, other receipts had come in of purchases.

16   Q.    Right.

17         MR. CHAKRAVARTY:  If we could call up Exhibit 1160,

18   please, which I believe is in evidence.  Page 2.

19   Q.    Is this one of the receipts that you reviewed?

20   A.    This is one of them that had come in.

21   Q.    And could you describe the items on this receipt?

22   A.    Up on the top you see the "Accede R/C electric rally

23   Monster Off-Road Rally Truck, stripe blue."  That was a whole

24   intact package of an actual R/C car.  We purchased several of

25   those for our exemplars.

1    Q.   Did you find any evidence related to that vehicle, like --

2    A.   On that one, the electronic speed controller and the --

3    the electronic speed controller, the receiver and the battery

4    were found at Scene A.

5    Q.   Okay.  Please continue.

6    A.   And then there's a -- it looks like there's a transmitter

7    and receiver, and then another receiver, a Flysky receiver, in

8    that list.

9    Q.   And is there also some batteries?

10   A.   Right.

11   Q.   So this transmitter and receiver, does the "FS" stand for

12   Flysky?

13   A.   Yeah.  That's the model number, Flysky model.

14   Q.   All right.  And so this entry is for a combination package

15   of both the transmitter and the receiver that are compatible

16   with each other?

17   A.   Yes.

18   Q.   And the last entry is for an extra receiver.  That's also

19   compatible with those?

20   A.   Correct.

21        MR. CHAKRAVARTY:  Can we call up Exhibit 1431, please,

22   also in evidence.

23   Q.   Did you also have an opportunity to learn more about what

24   this was a receipt for?

25   A.   That was a receipt for a transmitter -- what we talked

1    about before, the Spektrum transmitter -- controller and a

2    receiver.

3    Q.   And so was the receiver consistent with the receiver, the

4    remnants of which were found at Scene B?

5    A.   Yes.

6    Q.   Did you ever find in the investigation the Spektrum

7    controller?

8    A.   No.

9    Q.   In fact, were there any other controllers found in the

10   investigation aside from the one we just saw from Watertown?

11   A.   No.

12   Q.   Was the Spektrum receiver that was found in Scene B -- was

13   that compatible with the Flysky receiver that we were just

14   looking at?

15   A.   We talked about -- earlier about the two different ways

16   they communicate those two different manufacturers have, the

17   frequency hopping and then the direct sequencing.  That's not

18   compatible with -- the Spektrum receiver with the Flysky

19   transmitter.

20            MR. CHAKRAVARTY:  Back to 949A.

21   Q.   Did you determine whether this transmitter bound with the

22   receiver that was found on Scene A?

23   A.   Did I --

24            MR. WATKINS:  Objection, your Honor.

25            THE WITNESS:  Basically --

1          MR. WATKINS:  Objection.

2          THE WITNESS:  Basically --

3          THE COURT:  Wait.  Hold on a moment.

4          Is it related to disclosure?

5          MR. WATKINS:  No.

6          THE COURT:  Let me just see you briefly.

7          (Discussion at sidebar and out of the hearing of the

8     jury:)

9          MR. WATKINS:  So this relates to the so-called binding

10    testimony.  I had filed a motion in limine.  The Court's never

11    ruled on that.  It's actually not this witness that did any of

12    the work.

13          We've agreed, I thought up until now, that we would

14    allow a certain amount of testimony by Agent Knapp here that

15    included work done by other people for him.  I specifically --

16    when we were talking about this carved-out -- that binding code

17    issue, I had understood up until this minute that he would not

18    seek to admit that through Agent Knapp.  I believe it's

19    complete hearsay as to this agent.  He didn't run any of the

20    tests that would result in that conclusion.  I don't even think

21    the other one had, ran a test.

22          So I'm asking that that be excluded.

23          MR. CHAKRAVARTY:  The intention is not to elicit that

24    the binding code is the same on each.  He didn't do a test to

25    figure out what the binding code was.  But he can say -- he's

1   going to say -- what I wanted to elicit -- and I can ask

2   another question to elicit that -- is was the Flysky receiver

3   that was found compatible with the Flysky receiver that was

4   found in Watertown.  The transmitter pair -- were they

5   compatible with each other.  And if they determined that they

6   actually were -- worked together, I guess is the correct --

7          MR. WATKINS:  That is not the question you asked.  You

8   said "bind."  If you want to ask are they compatible, that's

9   good.

10          THE COURT:  What does "compatible" mean?

11          MR. CHAKRAVARTY:  That they can talk to each other as

12   opposed to --

13          THE COURT:  Right.  And how is that different from

14   binding?

15          MR. CHAKRAVARTY:  So binding is the more precise idea

16   that there was a specific code on one that matched the code on

17   the other.  And my point is I want to be more general but still

18   show that these two can talk to each other, and they can't talk

19   to the device on Scene B.

20          THE COURT:  Well, I think he's already said the

21   latter.  I don't think --

22          MR. CHAKRAVARTY:  Yes.

23          THE COURT:  Okay.

24          MR. WEINREB:  I'm sorry, your Honor.  Before we

25   leave --

1          THE COURT:  Yeah.

2          MS. CLARKE:  While I've got you.

3          (Laughter.)

4          MR. WEINREB:  Can I just add that -- I'd assume that

5     the binding code like -- the reasoning -- the defense is not

6     going to be permitted to inquire of this witness about binding

7     codes, or specifically to ask questions intending to

8     elicit -- if he is going to ask questions intending to suggest

9     to the jury that Tamerlan Tsarnaev might have detonated at the

10    scene two bombs, that would be trying to -- asking the jury to

11    assume facts not in evidence in bad faith because the defense

12    knows that Jahar Tsarnaev in fact did detonate the second bomb.

13    And to ask questions to elicit otherwise would not be

14    good-faith cross-examination.

15          THE COURT:  Okay.  Is there an issue?

16          MR. WATKINS:  There is an issue, your Honor.  It's a

17    longer issue.  I understand the Court is going to break at

18    12:45.  I don't know how much Mr. Chakravarty has left.  I'm

19    not sure that that won't --

20          MR. CHAKRAVARTY:  There's not much more other than

21    he's going to explain the mockups that he created, we're going

22    to do a demonstration, and then we're going to talk about the

23    *Inspire* magazine.  I think if we're breaking early for lunch

24    today, it would take us at least to that.

25          MR. WATKINS:  So I will consider what Mr. Weinreb has

 1    talked about, and we will come to some kind of agreement on

 2    that, or agree to disagree.

 3            THE COURT:  Well, okay.  I'll leave it at that for

 4    now.

 5            MR. CHAKRAVARTY:  One other point that might implicate

 6    this again is before we do the mockup and the demonstration,

 7    he's going to -- he had created a device, and he was going to

 8    actually activate the device.  In order to do that, he has to

 9    bind the transmitter with the receiver, so -- which he's

10    already explained there is a binding process, and now he's

11    bound to that.

12            THE COURT:  Is it in his disclosure that he's going to

13    do that?

14            MR. WATKINS:  We're getting into larger issues here.

15    We spoke on Sunday about some of the -- Mr. Chakravarty, I

16    think, is going to introduce some mockups of each of these

17    individual items and do some demonstrations.  That was one of

18    them that I identified that we would object to, that -- using

19    that mockup, because that essentially gets them to the same

20    place where their expert that they did not call would try to

21    get them.

22            THE COURT:  Isn't that part of the instructions that

23    comes with the car?

24            MR. CHAKRAVARTY:  It is.  That's the only way these

25    cars would work.

1          THE COURT:  I don't know if that's expert.  That's

2     just sort of -- it's the way some 12-year-old gets the car to

3     run.

4          MR. WATKINS:  That is true as a general matter, but

5     what they are trying to prove is that this specific one bound

6     with that specific receiver down there, and that is the subject

7     of expert testimony.  It could have, but for them to say that

8     it absolutely did...

9          THE COURT:  Well, that it could be the subject of

10    expert testimony doesn't necessarily mean that it is; in other

11    words, it might be an inference from other non-expert evidence.

12    I don't know.  It depends on how it's presented.  But it sounds

13    elementary, that you have to punch in the code that you have to

14    use in order to identify the car to the transmitter.

15         MR. WATKINS:  That part of it is true, that they would

16    identify -- that the two of them -- whether this particular

17    transmitter identified with this particular receiver -- it's

18    not functioning anymore.  They can't do it.  They're unable to

19    do it, so they do it in a roundabout way.

20         MR. CHAKRAVARTY:  That's a separate question.  In the

21    actual piece of evidence versus in the exemplar, which he has

22    to say that's what he did in order to get the thing to work.

23         MR. WATKINS:  And that's why I think it's

24    objectionable.  It doesn't come in because of that exact

25    reason.

1           THE COURT:  No, I think he can say that's what he did.

2   He's not offering an opinion about these two other devices, so

3   he could go there.

4           MR. WATKINS:  Okay.  As long as -- because we're up

5   here and we're talking about the mockups, there's also a mockup

6   of the so-called Tupperware bomb.  I don't think that comes in

7   at all because they don't have the same Tupperware container.

8           MR. CHAKRAVARTY:  We're going to use the amount of

9   powder in the Tupperware.  There's an inert material that

10  they're using as an example of that.  That I wanted to put into

11  the actual piece of evidence so that the jury can see how heavy

12  this thing is.  So we wouldn't be moving the Rubbermaid in, but

13  we would be moving the material inside of the bag.

14          MR. WATKINS:  So as I understand it, they're mixing

15  exemplar material with an actual exhibit.  I would object on

16  that ground because they're moving those two things in --

17          MR. CHAKRAVARTY:  The exemplar would be the

18  separate -- would be a new exhibit number, and we would put

19  that new exhibit number in an existing exhibit number for

20  demonstrative purposes.  It wouldn't itself --

21          THE COURT:  Why can't you just have a similar

22  container?

23          MR. CHAKRAVARTY:  We have a similar one.  That's what

24  Mr. Watkins is objecting to.

25          MR. WATKINS:  They bought the wrong darn container.  I

1   mean, it's the wrong size; it's the wrong color.

2          MR. WEINREB:  We have the actual container.  We can't

3   put real explosive powder in it, so we're proposing to put

4   substitute explosive powder.

5          THE COURT:  As long as it doesn't alter the exhibit.

6          MR. CHAKRAVARTY:  It won't alter the exhibit.  I'll

7   see if they can do it.

8          MR. WATKINS:  And then finally, the government is

9   seeking to admit all of these.  I understand that they're

10  mockups, they're exemplars, but they do not get into evidence

11  as a general matter, any of these mockups.

12         MR. CHAKRAVARTY:  So we think it's important that they

13  do because, first, you can't appreciate the intricacies of the

14  fusing system unless you're handling it.  It's one thing to

15  pass it around; it's another thing to actually feel how heavy

16  this thing is.  It's important to see how the charges are

17  separated from each other.  I think based on his foundation,

18  him saying, "This is how I assembled it," it goes to weight,

19  literally and figuratively.

20         THE COURT:  I'll have to think about that.

21         MR. WATKINS:  One more:  the kill switch.  In

22  Watertown -- I object to -- the mockup they have actually has

23  the kill switch being inside of the pressure cooker itself, or

24  at least as I viewed it.  That's pure speculation.  The kill

25  switch shows no signs of burning.  There was nothing to

1    indicate it was on the inside.

2           As he has testified, there is no evidence of the

3    Christmas tree light that would be responsible, exploded or

4    unexploded.  Both the battery and this kill switch quite

5    obviously were separate.  Maybe they were going to do something

6    with that -- maybe Tamerlan was going to do something with

7    that, but there was -- they were completely separate.  It's

8    pure speculation as to this mockup, certainly in his testimony,

9    generally to say that there was a kill switch mechanism.

10          THE COURT:  I think it's a matter for

11   cross-examination, that point.  You can expose that on

12   cross-examination.

13          MR. WATKINS:  Yeah.

14          THE COURT:  Okay?

15          (In open court:)

16   BY MR. CHAKRAVARTY:

17   Q.   Agent Knapp, based on this evidence that you -- was

18   submitted to you, 949 and 949A, did you create a modified

19   version of an exemplar transmitter that would be comparable to

20   the one that was seized in this case?

21   A.   Yes.

22   Q.   And how did you make the modifications to the version of

23   the device that you bought off the shelf?

24   A.   Removed the trigger and the cutback on the throttle, put

25   the battery pack up beneath where the LCD or the circuit board

1    was.  This stuff was -- like I said, we have all kinds of

2    examiners in the FBI in our operational technology division.

3    They have examiners there also.  So evidence went over to them,

4    besides in our laboratory, to determine examinations on

5    particular items, whether they're with computers or like this

6    transmitter here that had gone over to them also.

7        But the modifications we made were like the modifications

8    of that transmitter.  And that transmitter basically was

9    modified in such a way that when you turn on the power button,

10   it's going to send a full output to that electronic speed

11   controller which then is going to, you know, send the

12   current -- all the current, to those where we talked about,

13   those two outputs to the motor.  And where that would have

14   been, that's where the initiator -- the improvised initiator

15   would have been, and it would have -- you know, it would light

16   up.

17   Q.   So instead of having to turn the throttle or to pull a

18   trigger, just turning the transmitter on would send a full

19   signal?

20   A.   The power button on that Flysky, yes.  When you turn that

21   on, it would send a full output to the electronic speed

22   controller because what it was seeing was a full reverse --

23   like you were running the car full reverse.

24   Q.   So, Agent Knapp, how sophisticated would you have to be in

25   order to create the improvised explosive device you described?

1          MR. WATKINS:  I'm going to object, your Honor.

2          THE COURT:  Go ahead.  You can answer.

3          THE WITNESS:  You have knowledge of hobby cars, the

4    components.  You might do a little bit of a testing to make

5    sure you, you know, get the right hookups.  But commonly

6    available out there in the Internet, how to modify.  There's

7    other Internet sites out there.  It's not that too

8    sophisticated.  I mean, if you know you have the components of

9    the hobby car, once you use your transmitter, press a button,

10   and you can get it to the output of the electronic speed

11   controller, it's not too difficult of a system to build.

12   BY MR. CHAKRAVARTY:

13   Q.   And you mentioned information is available on the Internet

14   about that?

15   A.   Right.  Widely available on just R/C models and

16   transmitters, different receivers, how to increase power to

17   your cars.  All these hobbyists out there that go around and

18   fly planes or race cars.

19   Q.   And so that's all with regards to the R/C component, the

20   radio-controlled, remote-control component to this?

21   A.   Right.

22   Q.   How about the assembly of improvised explosive devices?

23   A.   There's many sites out there available on the website.

24   Some give you step-by-step instructions on how to build an IED

25   or bomb.

1   Q.   And have you seen pipe bombs many times in your career?

2   A.   Yes.

3   Q.   And the principles behind building a pipe bomb, are those

4   pretty widely available as well?

5   A.   Correct.

6   Q.   Now, have you had a chance to review the *Inspire* magazine

7   which details the instructions they propose to build an

8   improvised explosive device?

9   A.   Yes.

10        MR. CHAKRAVARTY:  If we could call up 1142-91, page 3.

11  Sorry.  Next page, please.

12  Q.   Agent Knapp, does this first section of the "how to"

13  portion of this article say that there are two types of

14  explosions?  The first is a chemical explosion.  "This

15  explosive causes great pressure that would kill living beings

16  within a certain radius.  Examples are all the military-grade

17  explosions such as TNT, CR and RDX."  Did I read that first

18  section properly?

19  A.   Yes, just the chemical explosion and you have mechanical

20  explosions.

21  Q.   And so the type of IED that you've described on Boylston

22  Street in Watertown, those are not chemical explosions, right?

23  A.    Well, there was a chemical reaction for the low explosive,

24  and then the container relieved and mechanically separated with

25  the pressure being built up from the explosives.

1    Q.   Okay.  So does this article next go on to read, "The

2    mechanical explosion:  This results from the burning of an

3    inflammable material within a confined space.  An example is

4    putting gunpowder inside an iron pipe with a small opening

5    enough only for a fuse.  When the gunpowder is ignited, great

6    pressure results from the gunpowder turning into gases, and

7    which result in the exploding of the iron pipe, turning it into

8    shrapnel flying at a high speed."

9         Did I read that properly?

10   A.   Correct.

11   Q.   And is that the type of explosion that you were describing

12   earlier?

13   A.   Yeah.  I mean, it relieves the container, it relieves --

14   just like any buildup of pressure, whatever that comes from,

15   there's a buildup of pressure and it relieves the vessel or

16   container.

17   Q.   And does the *Inspire* magazine also suggest an elbow pipe,

18   some flammable material which I think *Inspire* calls

19   "inflammable substance," and then what appears to be a

20   Christmas tree light?

21   A.   Yes.

22   Q.   Section B gives instructions on how to extract the

23   inflammable substance.  And does it say that -- does it propose

24   to strike the head of the match softly?

25             MR. WATKINS:  Your Honor, I'm going to object to

1    Mr. Chakravarty continuing to read all of this.  If he wants

2    the witness to read...

3    BY MR. CHAKRAVARTY:

4    Q.   Agent Knapp, if you wouldn't mind reading --

5    A.   "Grind the substance and filter to obtain a fine powder.

6    In the picture you will see the fine powder and you will add

7    sugar equivalent to one-quarter its quantity.  Mix the two

8    substances until they become uniform in color."

9    Q.   What's the purpose of these instructions?

10   A.   Basically to get a low explosion composition, harvest it

11   off of matches, and stick a fuel in there and mix it up and you

12   have a low explosive.

13        MR. CHAKRAVARTY:  Next page, please.

14   Q.   Preparation of the decoration lamp?

15   A.   Yeah, this basically is telling you, you know, be careful

16   how you open up a little Christmas tree bulb.  Be careful of

17   the filament, because if you break the continuity of that,

18   you're not going to have an initiator.  There's a little

19   filament in there, and they say to carefully place it inside

20   your low explosive.  Just an improvised initiator using a

21   Christmas tree bulb.

22   Q.   And is that a process that takes some experience in doing

23   effectively?

24   A.   It's -- sometimes it can be tricky when you break that

25   glass bulb and then you ruin the inside filament, but it just

1  takes, you know, just a little bit of ability to crack the

2  glass just right.  But nothing too sophisticated about that.

3  Q.   This next section talks about preparation of the iron pipe

4  and it suggests drilling a hole in the pipe.  Is that right?

5  A.   Right.  I mean, you have to insert your initiator somehow,

6  whether it was a Christmas tree light as they're talking this

7  way, or just a piece of that green hobby fuse into your pipe.

8          MR. CHAKRAVARTY:  Next page, please.

9  Q.   It says the final preparation.  Can you read this, please?

10 A.   "Pour some inflammable substance into the lamp.  Do so

11 gently in order not to tear the filament, which is very

12 sensitive.  The device will not explode if the filament is

13 torn.

14    "Insert the lamp into the pipe with the wires sticking

15 out.

16    "Fill the pipe with the inflammable substance.  Avoid

17 having any of the substance on the threads of the pipe so that

18 it won't ignite when closing the pipe.

19    "Wrap tape around the pipe to close the hole which was

20 drilled into the pipe only leaving the wires sticking out.  The

21 tape will surround the wires, closing any gaps in the pipe and

22 will not wrap around them."

23 Q.   It continues down here.

24 A.   "You may substitute the inflammable substance extracted

25 from the matches by gunpowder used in cartridges but you may

1    also use powder from fireworks instead.  Note:  You do not have

2    to use one substance.  You may mix together the substance from

3    matches, gunpowder or fireworks, but in doing so, you'll need

4    to mix them well," and it goes on to talk about electricity

5    source.

6    Q.    So just on the flammable substance they're talking about,

7    those are all low explosives that they describe there?

8    A.    Yeah, that's low explosive.

9    Q.    Okay.  Please continue with the electricity source.

10   A.    "The importance of the electricity source in the explosive

11   device is that it is the key in igniting the device.  The

12   electricity that is sufficient to turn on a small lamp is

13   sufficient to cause an explosion.  This electrical current may

14   reach to the lamp directly through a battery, by a time circuit

15   or by a remote-controlled circuit."

16   Q.    And is the hobby car fusing system that you described

17   earlier -- is that a remote-controlled circuit?

18   A.    That's correct.

19          MR. CHAKRAVARTY:  Next page.

20   Q.    Now, did they give an example of the timed circuit here?

21   A.    Yeah, they have chosen for you a timed circuit as it is

22   simple.  "We set up the circuit which is composed of a 9-volt

23   battery, a wire connected to the plus of the battery and a

24   nail, the red wire, a wire connected to the negative of the

25   battery, and a test lamp, the black wire.

1        "Note:  You may use any small lamp here.  Take notice that

2    this is not a lamp we filled before with the inflammable

3    substance.  We connect from the other pole of the lamp a green

4    wire.  When this wire touches the nail, the circuit is closed

5    and the lamp should light."

6        This is simply a very basic -- you got a power source.

7    The switch they have is the nail touching the other side of the

8    wire, and the power source is hooked up and you have a little

9    light and it will come on.

10   Q.   So far with the exception of the typos, are the

11   instructions they've been giving consistent with how you

12   understand an IED would work?

13   A.   Consistent with a fusing system, a simple fusing system,

14   yes; that you could use in an IED, yes.

15            MR. CHAKRAVARTY:  Next page, please.

16   Q.   And then this page, it describes the --

17   A.   Modifying a mechanical clock in using two contacts.  Once

18   they touch, it's a switch.  Just like in the previous, they use

19   the nail to the wire.  They're just using the hands of the

20   clock with a wire.  And once -- they're talking about using one

21   of the hands, and once it comes and touches a nail, it

22   completes the circuit, a simple circuit.

23            MR. CHAKRAVARTY:  Next page, please.

24   Q.   This middle section, is it more details about that timed

25   explosive?

1    A.    Yeah, correct, using the timer to function up in the top,

2    the light or how you could set it up to function that pipe

3    bomb.

4    Q.    I want to focus in on this bottom section which talks

5    about fragmentation.  Can you read that?

6    A.    Yeah.  "It is important to put a quantity of small nails

7    on the surface of the iron pipe from the inside.  You do that

8    by sticking them to the wall of the pipe by using glue.  The

9    pipe used here is a 2-inch one.  The inflammable substance used

10   to fill it was extracted from 80 match heads.  The explosion

11   that results from this device is a mechanical one.  It results

12   from the pressure caused by the gases and, therefore, it only

13   works if contained in a high-pressure environment.  So you may

14   use iron pipes, pressure cookers, fire extinguishers or empty

15   propane canisters.  The point is that the inflammable substance

16   needs to be" --

17            MR. CHAKRAVARTY:  Next page, please.

18   A.    -- "contained in a strong container that would allow the

19   pressure to build up and thus cause a damaging explosion."

20   Q.    All right.  If I could ask you to stop there?

21            MR. CHAKRAVARTY:  Your Honor, I think we were going to

22   break a little early?

23            THE COURT:  How much more do you have on this topic?

24            MR. CHAKRAVARTY:  This topic, just to the end of this

25   article.  So just a couple more minutes?

1          THE COURT:  Yeah, go ahead.

2   BY MR. CHAKRAVARTY:

3   Q.    Now, they mention fragmentation such as small nails?

4   A.    Right.

5   Q.    Which of the devices in this investigation had small nails

6   as an apparent secondary fragmentation?

7   A.    That was at Scene B.

8   Q.    And that's the blast in front of the Forum restaurant?

9   A.    That's correct.

10  Q.    Would you please continue reading?

11  A.    "However, in order to fill, for example, a pressurized

12  cooker with the substance from matches, it would take a lot of

13  matches to do so; therefore, you may want to use gunpowder or

14  powder from fireworks.

15       "You need to also include shrapnel.  The best shrapnel are

16  the spherical-shaped ones.  As you can see in the figures

17  below, you need to glue them to the surface of your canister.

18  If steel pellets are not available, you may use nails instead.

19  Above is a 2-inch iron pipe with nails inside it.  You fill the

20  inflammable substance afterwards."

21  Q.    Please continue.

22  A.    "The next three points illustrated by the previous images

23  are for shrapnel used with a gas canister.  The shape of nails:

24  You may place the nails in a mold or pour glue over them, and

25  when dry you remove them from the mold, wrap the molded nails

1    around the canister.  After wrapping the shrapnel around the

2    canister, empty the canister from the gas and open the valve

3    and then fill it with the inflammable substance.  Insert the

4    lamp with the wires sticking out just as you did earlier with

5    the iron pipe.

6        "With that said, here are some important steps to take for

7    an effective explosive device:  Place the device in a crowded

8    area.  Camouflage the device with something that would not

9    hinder the shrapnel, such as cardboard."

10   Q.   When it's talking about gas canister in this article, do

11   you understand that to mean like a propane-gas-type canister

12   or --

13   A.   Any type of -- yeah, fire extinguisher, propane canister.

14   Q.   And in this investigation did you recover materials such

15   as cardboard --

16   A.   Yes, we did.

17   Q.   -- from each of the scenes, on Scenes A and B?

18   A.   Correct.

19   Q.   Read the iron pipe method.

20   A.   "The iron pipe method is effective if more than one is

21   used simultaneously.  To do so, bundle one wire from each pipe

22   together and then bundle the remaining wires together as you

23   may see in the illustration to the bottom right.  One bundle

24   would represent the green wire which connects to the clock's

25   hour arm.  The other bundle connects to the...on the battery."

1    The negative of the battery.

2    Q.   The negative terminal of the battery?

3         All right.  Read this section, please.

4    A.   "The pressurized cooker is the most effective method.

5    Glue the shrapnel to the inside of the pressurized cooker, then

6    fill in the cooker with inflammable material.  Insert the

7    prepared lamp into the inflammable material gently in order not

8    to break the filament of the lamp.  Then have the wires

9    sticking out of the hole in the lid of the cooker.  Wrap some

10   tape around the hole to seal any openings and connect the wires

11   to the electric source in the same way we did with the iron

12   pipe."

13   Q.   With regards to the non-electrical fusing system that you

14   found from the Boylston Street devices, are these instructions

15   consistent with what you uncovered in your investigation?

16   A.   Right.  They add the fragmentation, the shrapnel.  They

17   had the BBs in Scene A embedded with a sealant, and they had

18   the fragmentation with the BBs and the small nails inside the

19   pressure cooker in Scene B, in a sealant.

20   Q.   And then you described earlier the nuance with getting the

21   Christmas tree light done right?

22   A.   That's correct.

23   Q.   I'll conclude with this.  Read the safety precautions.

24   A.   "The following are a few safety precautions:  Put your

25   trust in Allah and pray for the success of your operation.

1    This is the most important rule:  To wear gloves throughout the

2    preparation of the explosive to avoid leaving behind

3    fingerprints.  Three, this is an explosive device so take care

4    during preparation and handling.  In the article we covered one

5    of the many ideas for a lone mujahideen.  We ask Allah to

6    assist our brothers in targeting his enemies and we ask Allah

7    to grant us victory."

8              MR. CHAKRAVARTY:  This is a good place to break, your

9    Honor.

10             THE COURT:  All right.  We'll take the recess at this

11   point.

12             THE CLERK:  All rise for the Court and the jury.  The

13   Court will take the lunch recess.

14             (The Court and jury exit the courtroom and there is a

15   recess in the proceedings at 12:53 p.m.)

16             THE CLERK:  All rise for the Court and the jury.

17             (The Court and jury enter the courtroom at 2:13 p.m.)

18             THE CLERK:  Be seated.

19   BY MR. CHAKRAVARTY:

20   Q.   Agent Knapp, you described earlier that some mockup

21   devices were made, and you said that you had constructed the

22   configuration of these mockup devices to comport to the devices

23   that you've spoken about that were -- evidence of which was

24   found in this case.  Is that right?

25   A.   Yes, that's correct.

1    Q.    Did you bring those into court with you today?

2    A.    Yes.

3    Q.    And so do you have a mockup device for the Scene A

4    pressure cooker bomb?

5    A.    Correct.

6    Q.    And that we'll call 1568.  And for the Scene B pressure

7    cooker bomb, is that 1569?

8    A.    Correct.

9    Q.    And then for the materials that -- the inert explosive

10   materials that were in the Rubbermaid container that was found

11   in Watertown, did you bring an inert facsimile of that

12   substance?

13   A.    Yes.

14   Q.    Okay.  And for the facsimile of that substance, we're

15   going to mark that as 1570.  And for the pressure cooker bomb

16   at Watertown, is that 1571?

17   A.    Am I supposed to be seeing something on the screen?

18   Q.    You don't know the number.  Okay.  I'll show you.

19        Did you bring the mockup for the Watertown pressure cooker

20   bomb?

21   A.    Yes.

22   Q.    And did you also bring the mockups for the two pipe bombs

23   that were rendered safe in Watertown and you had mockups made?

24   A.    That's correct.

25   Q.    And are all of these helpful to explaining your testimony

1    about how each of these devices worked?

2    A.    For the fusing systems, yes.

3    Q.    And can you explain how you approximated how much

4    explosive material to put in?

5    A.    Before the -- we said the volume of those Fagor pressure

6    cookers, half to full, estimated that it was about eight pounds

7    if it was full to 16 pounds, and then of course the smaller one

8    would have had less than the larger ones.

9    Q.    And about -- for the pipe bombs, you actually were able to

10   collect the unexploded material from the Watertown devices.   Is

11   that fair to say?

12   A.    Well, they were -- like I said, they were rendered safe

13   and the powder was taken out of them before they came down to

14   us.

15   Q.    And did you approximate that -- sorry.   In the mockups

16   that you made there is no powder, correct?

17   A.    There is no powder.

18         MR. CHAKRAVARTY:   Your Honor, at this point I would

19   ask permission to have SSA Knapp approach the podium with each

20   of those exhibits and demonstrate -- or to show that -- each of

21   the components of those exhibits to the jury.

22         THE COURT:   That's fine.   It's ahead of the -- I'm not

23   sure if you've worked out the lines of sight for counsel.

24         MR. WATKINS:   I'll move around if the Court doesn't

25   mind.

1          THE COURT:  Move around or move to a spot?

2          (Laughter.)

3          MR. WATKINS:  I will move to one spot and try my best

4    to stay still.

5          THE COURT:  Okay.  Go ahead.  Proceed.

6    BY MR. CHAKRAVARTY:

7    Q.   Agent Knapp, if you'll come to the podium here again.

8    A.   (Witness complies.)

9    Q.   Agent Knapp, just keep your voice up so everyone can hear

10   what you're saying.

11   A.   This was the pressure cookers from the mockup from Scene

12   A, a hobby fuse coming out of it.  Inside was the fusing system

13   we talked about earlier.  Now, we found fragments of cardboard

14   taped up around, and then the inside -- I mean, the

15   fragmentation was on the inside and it was with a sealant, and

16   these were where the BBs were encased inside.  We found this

17   pink-like rosin paper encasing just on the outside.  Those

18   would have been placed in here.

19        And this was the -- what we talked about before,

20   electronic speed controller.  We have the Flysky receiver here.

21   Here was the toggle switch, the power source.  And off the

22   electronic speed controller where the two outputs would go to

23   the motor and an improvised initiator was connected in.  And

24   we're representing this as the lightbulb right here.  But the

25   improvised lightbulb would have been into the main charge, the

1  low explosive.

2  Q.  So when you say it would be into the main charge, meaning

3  that --

4  A.  Yeah, this is just represented in the bag because it would

5  be pretty messy in here otherwise.

6      But anyway, this was placed inside the pot.  You know,

7  there was -- the tape was crossed over, you saw, in some of

8  those pictures there, and then it was placed in the backpack.

9  Into a backpack.

10     You know, this was found at Watertown, and this is the

11  mockup of what was found there out of a bag.  But this is

12  actually what the controller would look like.

13  Q.  For the record -- one moment.  Just for the record, you're

14  holding up two transmitters.  One appears to be a modified

15  Flysky transmitter and one is an intact Flysky --

16  A.  Yeah, this is what it would have looked like where the

17  pistol grip, the trigger control and the wheel for steering the

18  car.  That's the battery pack where it was cut off and placed

19  underneath, and all these buttons here are gone, but the dials

20  are still underneath it.  So this was how that was found.

21  Q.  Now, just to clarify, the modified device you just held

22  up, that's a mockup, not the original evidence that we saw --

23  A.  Yes, this is the mockup of the Flysky, what we found at

24  the scene.

25  Q.  Agent Knapp, could you put the pressure cooker into the

1    backpack?

2    A.    I mean, it is pretty heavy.

3              MR. CHAKRAVARTY:  Your Honor, I would ask for

4    permission -- first, with regard to all of these, I'll move

5    them in -- or make a motion to move them into evidence, but if

6    I may ask to publish them in the backpack so that the jury

7    can -- actually, maybe take it out of the backpack -- excuse

8    me -- so the jury can actually see it close up.

9              MR. WATKINS:  I object to actually admitting them.

10   Passing them around, no problem.

11             THE COURT:  I'll reserve on the admission, as we've

12   discussed, but you may exhibit them.

13   BY MR. CHAKRAVARTY:

14   Q.    Agent Knapp, if you would be so kind to pass around this

15   device.

16   A.    You want the lid --

17   Q.    Take the lid off.

18             (The exhibit is published to the jury.)

19   Q.    Agent Knapp, while the jury's looking at that, just to

20   clarify, all of the powder that you have in these exemplars is

21   inert and poses no danger from any of these devices?

22   A.    That's correct.

23             (The exhibit is published to the jurors.)

24   Q.    Agent Knapp, the configuration of the various components

25   that are in the mockup, how did you arrive at that architecture

1    given the fact that the devices that were used were actually

2    exploded and you didn't have the original to model it after?

3    A.   Well, like I said before, at the scene all the evidence

4    that was collected, the damaged electronic speed controller,

5    the Flysky, the battery parts and that really damaged toggle

6    switch, to have this operate, it has to be plugged up in such a

7    way that leads -- the power source goes to the electronic speed

8    controller in this fashion, the toggle switch was wired up

9    coming off one of the -- we found the inputs into the

10   electronic speed controller so it would basically break the

11   signal when there was an output to this improvised Christmas

12   tree.

13        So when you turn it on, where there's a slide switch here

14   that initialized what we talked about, then it doesn't send an

15   output to that light and it will trigger that light, it will

16   flash.  So there was an interruption, so a toggle switch was

17   used to break that circuit momentarily until this initialized.

18   And then this is in the off position right now as it stands,

19   and they just have to go and turn it on so it will complete the

20   circuit.

21   Q.   Okay.  Thank you.  With regard to the transmitter that was

22   modified, with the absence of the throttle and the trigger like

23   you demonstrated, what would happen when you turned that on?

24   A.   As I talked about before, the modification -- when they

25   modified it from here, what would happen is when you turn this

1    on, it would be like you were pressing this trigger full speed

2    backwards, so there would be an output as soon as you turn

3    on -- here's the power button, usually on the back.  When you

4    turn that on, it would send that output directly to the

5    receiver, which then the electronic speed controller would

6    interpret it and send it to the output where the improvised

7    initiator was going to be.

8    Q.    And this is a Flysky transmitter and a Flysky receiver in

9    this setup, correct?

10   A.    Yes, that's correct.

11   Q.    Thank you.  Can we move on to Exhibit 1569, which is the

12   Scene B exemplar?  Or I should ask:  Is there anything else

13   about this that you haven't described?

14   A.    Everything that was from the scene that we gathered up is

15   represented here in this mockup.

16   Q.    Thank you.  Can we move on, then, to the Scene B exemplar?

17   A.    Once again, there was a backpack that was concealing the

18   device.  Same-type pot, the Fagor.  It had hobby fuse going

19   into it as a second form of initiation if the R/C fusing system

20   didn't work.

21        Like we talked about, at the scene what was collected,

22   there was a power source which is basically just another Sub-C

23   pack power source for a hobby car.  This was the electronic

24   speed controller and this would be the receiver.  And this

25   electronic speed controller, you know, the slide switch to

1   initialize in this position here.  There were -- the two

2   outputs that would normally go to the motor is going to the

3   improvised initiator, same type.

4        And the only difference is, you know, there was -- besides

5   the BBs, there were these small steel nails that was embedded

6   into the -- with the BBs.

7   Q.   But the fragmentation sleeve, that's in the sealant

8   against the interior walls of the pressure cooker?

9   A.   Right.  And we saw that with the red rosin paper again and

10  the fragmentation, and then it was also -- had tape on it again

11  consistent with Scene A.

12  Q.   Thank you.

13       MR. CHAKRAVARTY:  Again, your Honor, I would ask to

14  publish 1569, the Scene B exemplar.

15       THE COURT:  All right.

16       THE WITNESS:  And as far as demonstration purposes,

17  there was a transmitter that, you know, we purchased off of

18  those receipts that we talked about, the transmitter, receiver,

19  and I have an unmodified transmitter here today.

20  BY MR. CHAKRAVARTY:

21  Q.   That's because the transmitter for the Scene B device was

22  not actually located, correct?

23  A.   That is correct.

24  Q.   So you bought one that was -- married the receipt that we

25  saw earlier?

1   A.   Yes.

2   Q.   Please publish the -- this device.  If you can hand it to

3   Juror No. 1.

4            (The exhibit is published to the jurors.)

5   Q.   Now, significantly, Agent Knapp, there's no toggle switch

6   on this device.  Is that correct?

7   A.   Yeah.  Like we talked about earlier, that once you

8   initialized it, it didn't have enough output, or there was no

9   current going to that improvised initiator, so there was none

10  needed.

11  Q.   Thank you, Agent Knapp.

12       If we could move on to Exhibit 1570.  This is the

13  Watertown evidence -- sorry -- Watertown mockups.

14       Agent Knapp, let's first start with the pressure cooker

15  device, Exhibit 1571.  Can you explain the architecture of that

16  mockup?

17  A.   Yeah, it was a Fagor.  There was cardboard -- circular

18  cardboard found, that was burnt and charred, at the scene also.

19  There was a toggle switch with wire found, basically a 9-volt

20  battery.  Like I said before, there was no improvised initiator

21  attached to this, but there was a length of wire with just a

22  simple flip up on-and-off toggle switch.

23  Q.   None of the circuitry that we saw in the other two devices

24  existed in the Watertown pressure cooker?

25  A.   No.  And there was the same type of construction with the

1    BBs, pink/red -- the pink rosin paper was found at the scene

2    with the fragmentation.

3    Q.   And was there also an alternate fusing system?

4    A.   Well, there were holes poked through here, through the

5    cardboard which was damaged and burnt.  And basically, hobby

6    fuse, when it burns, it's going to go away.  So the primary

7    means of initiation would have been this hobby fuse, and you

8    have that as a secondary type of initiation.

9    Q.   Okay.  And how does this device compare in relative weight

10   to the other two devices that the jury just saw?

11   A.   Half the weight.

12   Q.   Fair enough.  Thank you.

13        Let's move on to the two pipe bomb exemplars, 1572.

14        Agent Knapp, just one more question on that Watertown

15   device as you're opening that bag.  The pieces of the Watertown

16   pressure cooker were more intact than those on Boylston Street.

17   How would you attribute that?  How would you explain that?

18   A.   That is correct.  I mean, pretty much the whole base of

19   that pot was just crumbled and crushed.  But as far as -- an

20   explosion happened, but that could have been due to

21   confinement.  That was more than likely thrown and the lid

22   probably was -- came un- -- I mean, we found no evidence of any

23   tape around it.  So if the lid did come unseated, you know,

24   it's still intact and it's almost acting like a projectile.

25   And it just basically violently flew in one direction, and I

1    believe that was found embedded --

2            MR. WATKINS:  I'm going to object, your Honor.

3            THE WITNESS:  -- in pictures --

4            THE COURT:  That's all right.  Overruled.  Go ahead.

5    You can continue.

6            THE WITNESS:  -- into a car.

7    BY MR. CHAKRAVARTY:

8    Q.   Thank you.  Please move on to the pipe bombs.

9    A.   It's simple.  Your loads are Home Depot 2-inch-diameter

10   pipes.  You can put any powder in, but basically it was

11   fragmentation.  And in some of the ones that did go off, you

12   can see the circular impressions in some of the pieces that

13   they also had fragmentation in the pipe.  It was just a simple

14   hobby fuse lighted and you throw it.

15   Q.   Now, there's some tape on the threads of the end caps.  Is

16   that --

17   A.   Right.  I mean, usually -- yeah, we -- in our training

18   we'll make what -- we use Vaseline basically so you cause no

19   friction.  A possible low explosive can ignite it.  Like we

20   read in that manual before, that *Inspire*, about be careful, you

21   know, threads.  So Teflon just to ease so there's no friction

22   buildup between the threads.

23   Q.   And just speaking of tape, were there various tapes

24   submitted as evidence in this investigation?

25   A.   Yeah, there was numerous types of tape:  black electrical

1  tape, this Teflon tape, duct tape, clear packing tape.  Just

2  commonly available items seen over the years of being put in a

3  device, like I'm taping up the hobby fuse or taping up wires

4  together, but it's just available material used to construct a

5  device.

6  Q.   And in addition to that tape, there's some electrical

7  tape, it looks like, on both of these devices?

8  A.   When it came in, there was electrical tape on the

9  initial -- or the actual devices, yes.

10 Q.   And each of these mockups represents a rendered-safe

11 intact device?

12 A.   That is correct.

13 Q.   So we don't know exactly what the other pipe bombs that

14 exploded may have looked like?

15 A.   Right.  They were just fragmentation, pieces of the pipe.

16 Q.   And is the elbow, 90-degree elbow pipe, similar in terms

17 of construction?

18 A.   Yeah, just they -- a 90-degree pipe.

19        MR. CHAKRAVARTY:  Your Honor, I would ask to publish

20 1572.

21        THE COURT:  Okay.

22 BY MR. CHAKRAVARTY:

23 Q.   I'm sorry.  "Publish" means to give it to the jury.

24 A.   The pot too?

25 Q.   No, just those two -- the pipes; not the pot.

1          (The exhibit is published to the jurors.)

2    Q.   While they're doing that, let's set up the next one.

3    Exhibit 1570 is the plastic bag of powder that you just placed

4    on counsel table.  If you wouldn't mind retrieving a piece of

5    evidence in the Rubbermaid container.

6    A.   (Witness complies.)

7    Q.   You just picked up Exhibit 854 which was the -- well, what

8    is it?

9    A.   This is the container that approximately three pounds of

10   low explosives were recovered in, and it had -- in the lid it

11   had a hole in it and it had three pieces of hobby fuse coming

12   out of it.

13   Q.   All right.  And if you wouldn't mind just placing the --

14   1570, the bag, into the container and holding it up?

15   A.   (Witness complies.)

16   Q.   Agent Knapp, if you would hold up Exhibit 854 containing

17   Item 1570.  Would you take off the lid just so the jury can get

18   a sense of how much of that Rubbermaid container was filled.

19   A.   And of course, there was all the hobby fuse that was

20   packed in here amongst the powder.

21   Q.   And was the hobby fuse lying on top of the powder?

22   A.   Yes.

23   Q.   And the hobby fuse itself has some explosive material in

24   it.  Is that correct?

25   A.   That's correct.

1    Q.   And was the strand of hobby fuse sticking out through the

2    top of that lid?

3    A.   Yeah, there was three pieces.

4    Q.   Thank you.  And, Agent Knapp, we're done showing

5    the -- these exhibits to the jury.  I just wanted to ask you to

6    put that away, and then we'll do a demonstration of the exhibit

7    1568 and 1569, with the Court's permission.

8         MR. CHAKRAVARTY:  I'm seeking the Court's permission

9    to do that demonstration.

10        THE COURT:  Okay.

11        MR. CHAKRAVARTY:  Thank you.

12        THE COURT:  I don't know what the demonstration

13   entails.  It's kind of a blank check.

14        (Laughter.)

15   BY MR. CHAKRAVARTY:

16   Q.   So, Agent Knapp, if you would take the remote control

17   transmitter for each of those mockups and perhaps resume the

18   witness stand.  And you place each of these devices either on

19   the podium or I can hold one.

20        (Pause.)

21   A.   Like I said before --

22        THE COURT:  Why don't we have a question.

23        MR. CHAKRAVARTY:  Yeah, thank you.

24   BY MR. CHAKRAVARTY:

25   Q.   Thank you.  Agent Knapp, first of all, you've taken off

1    the lid of Exhibits 1568 and 1569, correct?

2    A.   Yes, correct.

3    Q.   And each of the -- each of those receivers for each of

4    those radio-controlled devices has been bound to the respective

5    transmitters.  Is that accurate?

6    A.   Yes, that's correct.

7    Q.   And how did you learn to do that?

8    A.   Basically, R/C hobby model cars, there's instructions out

9    there widely available, there's manual -- instruction manuals

10   that come.  And based on the evidence collected, as I said

11   before, I put it into the appropriate configuration as the

12   fusing system would have been in Scene A.

13   Q.   Do the instruction manuals for each of those devices also

14   have the binding procedures?

15   A.   It's a simple process where you bind the receiver to the

16   transmitter, you turn on the power on the receiver, and then

17   there's a bind -- there's this little bind button up here that

18   you press in and then you turn the power on, and then there's a

19   blinking light.  And then once it's bound, it stays solid.  And

20   then you remove the little binding plug and you put the plugs

21   into the appropriate channel in the receiver and get ready

22   to -- you know, if you had a hobby car, you would get ready to

23   drive, steer it, move it.

24   Q.   And is the Flysky receiver bound to the Flysky transmitter

25   that you brought?

1    A.    The modified, yes.

2    Q.    The modified transmitter?  And the Spektrum receiver is

3    bound to the Spektrum exemplar that you had purchased as well?

4    A.    That is correct.

5    Q.    In your experience in making these mockups and testing

6    them, was one transmitter capable of activating the other

7    receiver?

8    A.    As I said, they use two different forms to communicate.

9    Spektrum uses a digital sequencing and the Flysky uses

10   sequencing hopping.  So the transmitter and the receiver have

11   to have that type of technology so they can communicate with

12   each other.  That has the digital sequencing and the Flysky has

13   the frequency hopping.

14   Q.    So they don't communicate?

15   A.    No.

16   Q.    You described an arming procedure that's required for each

17   of the receivers, for the receiver-electronic speed controller

18   combination.

19   A.    But you have to initialize each one.  Basically there's a

20   little slide switch from the electronic speed control you turn

21   on and it powers it up, and then it goes through its little

22   sequence, and then it's waiting for the signal from the

23   transmitter to receive an input.

24   Q.    And so can you position the Christmas tree light for each

25   of these devices in a way that the jury can see whether the

1  light turns on.

2  A.   (Witness complies.)

3  Q.   Now, in the improvised explosive device, that Christmas

4  tree light filament would be embedded in the explosive

5  material.  Is that right?

6  A.   Yes.

7  Q.   So now, if you can arm each of the devices and then resume

8  the witness stand with the respective transmitters?

9  A.   Okay.

10  Q.   I'm sorry.  Is there anything else that you need to

11  describe about what you're doing?

12  A.   No.  Basically, it's turned on.  You can see there's power

13  coming to it.  And right now it's in the safe-arm position.  So

14  when you turn it on, it wouldn't get a little blink on the

15  light.  And if it was on -- do you see that blink -- that would

16  cause the power to detonate it.

17  Q.   Agent Knapp, you're going to have to get back to a

18  microphone.

19  A.   So I'm going to go to the safe arm -- I'm going to take it

20  off the safe arm -- I'm going to put it on safe.  It's

21  initializing, and in a couple of seconds, and then I'm turning

22  it on.  Now all I have to do is press this button to turn the

23  receiver on.

24  Q.   Okay.  And you've pressed the modified Flysky transmitter

25  and it's activated, the device, 1568, the Scene A mockup?

1    A.   Correct.

2    Q.   Now, please go on to 1569, the Scene B mockup.

3    A.   Once again, there's a slide switch here.  But we didn't

4    know the configuration of this transmitter, the controller.

5    But the slide switch is on and it's armed.  And then you just

6    have to put an input from this transmitter to it.

7    Q.   And you've depressed the transmitter in the exemplar,

8    Spektrum transmitter, and it has activated the Christmas tree

9    light on the 1569, Scene B mockup.  Is that right?

10   A.   Correct.

11   Q.   Now, you obviously did that here at close range.  And you

12   don't know the exact range of each of these devices.  Is that

13   right?

14   A.   That's correct.

15   Q.   When you activated one of the transmitters, it did not

16   activate the Christmas tree light on the other receiver.  Is

17   that correct?

18   A.   That's correct.

19        MR. CHAKRAVARTY:  That's all I have, your Honor.

20        THE COURT:  Mr. Watkins, do you want the witness there

21   or on the stand?

22        MR. WATKINS:  I would like to start off there.

23        THE COURT:  Okay.  Fine.

24                    CROSS-EXAMINATION

25   BY MR. WATKINS:

1    Q.    Good afternoon, Agent Knapp.

2    A.    Good afternoon.

3    Q.    1568 is this one, correct, from Scene A?

4          I'm going to move this over to counsel table.

5               THE COURT:  Mr. Watkins, you stay near the microphone

6    too, please.

7               MR. WATKINS:  I will.  I know I have a soft voice.

8               THE COURT:  It's not just for the room; it's for

9    transmission to other rooms as well.

10   BY MR. WATKINS:

11   Q.   Now, Agent Knapp, as I understand it, it's -- the two

12   switches on here, right, this one has to be turned on.  The

13   problem is when this one turns on, this immediately does a

14   little cycle that would light up the Christmas tree light and

15   that would ignite, right?

16   A.    Correct.

17   Q.    And that's why it needed this added feature of this arming

18   switch, right?

19   A.    That's a safe-and-arm toggle switch.

20   Q.    Safe-and-arm toggle switch.  Because then it runs its

21   cycle, you can put that switch on, and then it's ready to go,

22   right?

23   A.    It's waiting for input from the transmitter.

24   Q.    From the transmitter.

25          Now, this battery pack here, this doesn't last forever.

1  Like any other battery pack, you have to recharge it.  It will

2  lose power over time, correct?

3  A.   That's correct.

4  Q.   And not only will it lose power, but if it's on all the

5  time, it will drain the battery.  The battery will go dead,

6  right?

7  A.   Well, if you're not putting an input and you're running

8  the motor and the battery is then being drained because you're

9  speeding around on your hobby car.

10  Q.   Correct.  Or it's just the electronic speed controller

11  takes a certain amount of energy itself, right?

12  A.   There's a little bit of energy.  But not like taking it

13  and driving the car on the motor.

14  Q.   Of course.  So in order for this to work, this has to be

15  charged up.  It has to have a charge in it, right?

16  A.   That's correct.

17  Q.   And then it would go into this pressure cooker pot.

18       Now, I saw -- I think the jury saw there are actually two

19  pieces of cardboard in each of these pressure cooker bombs,

20  right?

21  A.   Right.

22  Q.   And that is consistent with what you found on the street

23  at each scene, there were two kind of -- I mean, there were

24  shards but you could identify two of these, right?

25  A.   There was -- yes, there was two.  Well, there was

1    cardboard, very fragmented, with duct tape around it of a

2    circular nature, yes.

3    Q.    And two pieces at each site, right?

4    A.    Well, and then Watertown, I think there was three without

5    duct tape on it.

6    Q.    So you put both of these in.  But you don't know what the

7    order, for example, of these pieces of cardboard were in there,

8    right?

9    A.    No.

10   Q.    And indeed, this one could be on top and -- where did our

11   lid go?  There it is.  Go on top like that?

12   A.    Sure.

13   Q.    So going back, then, to this arming switch, you could turn

14   this on, but at some point when you're getting to use it, this

15   safe arm switch is the last thing that's going to happen to

16   make it operational, correct?

17   A.    Yes.

18   Q.    Okay.  So one would flip the switch and put it back in

19   here and then put this down on here and close it up, and then

20   all we could do is wait for the signal from the transmitter,

21   right?

22   A.    If it was on, yes.

23   Q.    So again, the last thing that actually went inside when I

24   just did that was this piece of cardboard, right?

25   A.    Yes.

1   Q.   I think I'm done here.  If you could go back to the stand,

2   I'll go back to my usual spot.

3        MR. WATKINS:  I'm actually not getting any screens at

4   this point.

5        THE COURT:  No, you're not.  What do you want, the

6   computer?

7        MR. WATKINS:  Yes, please.  There we are.

8   BY MR. WATKINS:

9   Q.   You talked a little bit about what your role became once

10  the bombing happened on April 15th.  You stayed down in

11  Quantico, and part of what you did was intake evidence there,

12  right?

13  A.   Yeah.  I was down in Quantico, in the explosives unit, and

14  the evidence started coming down to the laboratory.

15  Q.   And so when that came in, you would identify -- or you

16  would help identify it as maybe part of an explosive item that

17  would be within your purview?  In other words, items would come

18  down, this might be involved with an explosive device, it goes

19  to Agent Knapp -- or you would decide it goes to Agent Knapp in

20  the explosives unit?

21  A.   That was decided at -- once an explosive event or

22  explosive case, it would come through our unit, and an examiner

23  was assigned.  And I was the examiner that was assigned to this

24  case.

25  Q.   And because there were -- I think you said really

1    thousands of items of evidence that were tied to the explosive

2    device, right?

3    A.   Yes, there was over 1300 individual submissions of items

4    that came in.

5    Q.   And some of those had sub-items that went to hundreds of

6    items, right?

7    A.   There was a lot, yes.

8    Q.   I'm showing you --

9         MR. WATKINS:  I think this is in evidence, your Honor,

10   but perhaps it should just go to the witness to make sure.

11   Q.   Do you recognize what is depicted on the screen?

12   A.   Fragmented remains of cardboard.

13   Q.   And that's identified as Q199?

14   A.   That's correct.

15   Q.   And was that one of the items that you listed in your

16   report as being associated with the bombs?

17   A.   Correct; it was listed in my report.

18   Q.   And now, I do believe this is in evidence as part of 623

19   because I think I've seen it there, but we don't have sub

20   numbers for that.  I'm going to ask my colleagues if they could

21   determine.  Otherwise, I'll admit it separately.

22        THE COURT:  It doesn't hurt to admit it separately.

23        MR. WATKINS:  Then I would move for admission of

24   Defendant's Exhibit 3093.

25        MR. CHAKRAVARTY:  No objection, your Honor.

1          (Defense Exhibit No. 3093 received into evidence.)

2          MR. WATKINS:  While that's being shown on the screen,

3    may I approach, please?

4    BY MR. WATKINS:

5    Q.   You, in your report, identified this as fragments of

6    cardboard collected at Scene A.  Is that correct?

7          THE COURT:  Are you getting the picture?

8          THE JURORS:  No.

9          MR. WATKINS:  Oh, I'm sorry.

10         THE COURT:  Now?  Okay.  Sometimes there's a delay.

11   BY MR. WATKINS:

12   Q.   Is that right, you identified a number of items?

13   A.   I've identified a lot of items, but I don't have my report

14   available, so...

15   Q.   Your report is 108 pages long?

16   A.   That's correct.

17   Q.   Did you -- I thought you told Mr. Chakravarty that you

18   looked over your report before you came in today?

19   A.   I looked over the report previously.

20   Q.   I'm sorry?

21   A.   I had looked over it previously, but not this morning or

22   today.

23   Q.   But just sitting here now, you know that cardboard came

24   in, and that was analyzed and found to be part of one of the

25   bombs?

1    A.    Correct.

2    Q.    And you talked about the multidiscipline -- the different

3    disciplinary areas within the FBI laboratory, right?  You

4    talked about fingerprint identification, you talked about

5    chemistry, you talked about -- what else, firearms

6    identification, I think, DNA?  There's all kinds of different

7    disciplines within the lab, right?

8    A.    Correct.  There are multiple disciplines within the

9    laboratory.

10    Q.    And part of what you do when you see something come in for

11    analysis is to also help to determine where that should go

12    next, in other words, whether it should go to another

13    discipline either after you've seen it or after you've done

14    your full analysis?

15    A.    Yes.  There's what we call an examination report where the

16    evidence is flowing through the laboratory, what disciplines

17    get certain particular pieces of items which will then

18    eventually -- once those examiners do their examinations, then

19    the evidence will be coming back over to the explosive unit, to

20    myself, to analyze the bits and pieces of the parts.

21    Q.    In the early stages of the Boston Marathon bombing case,

22    all of the disciplines communicated with each other.  There

23    were daily meetings about the evidence, right?

24    A.    Basically there was an exam plan started.  And depending

25    on what it was, it went to those examiners, and then it went to

1    the next examiner, whatever discipline that was, and -- but

2    there was other communication going on.

3    Q.   And there were, indeed, daily meetings about the evidence

4    and the -- what should be analyzed and how far people had

5    gotten with their analysis on the Boston Marathon bombing case,

6    right?

7    A.   Right.  That was a bigger picture -- I mean, the lab was

8    doing its part, but then there was these daily meetings with

9    our FBI headquarters and other FBI entities involved in this

10   case.

11   Q.   Ms. Clarke has helped me out.  Can I refresh you with your

12   report about Q199 came from?

13   A.   Sure.

14   Q.   It's on the computer here.  So you could see the heading

15   from your report.  Don't read it, but I want to point out where

16   you are.  And you recognize that as something you would do on

17   your report?

18   A.   Yeah, the various Q items, right.

19   Q.   Right.  And then if you scroll down to the next page,

20   we're looking for Q199.  Yeah, there we go.

21   A.   Right.

22   Q.   So does that refresh your recollection where Q199 came

23   from?

24   A.   From Scene A.

25   Q.   And when you're talking about Scene A, that's the Boston

1    Marathon bombing Scene A?

2    A.    Correct.

3    Q.    So to get back to Q199, these shreds, they were sent to

4    other disciplines for analysis also, right?

5    A.    Yes, that's correct.

6    Q.    The shreds from Q199 which was found at Scene A was sent

7    for fingerprint analysis.  Is that correct?

8            MR. CHAKRAVARTY:  Objection, your Honor, to this line.

9    Not to this question but to the --

10           THE COURT:  Well, you can have this question.

11   BY MR. WATKINS:

12   Q.    Did it get sent for analysis?

13   A.    Yes.

14   Q.    Do you know whether positive results of a fingerprint

15   analysis were done?

16           MR. CHAKRAVARTY:  Objection, your Honor.

17           THE COURT:  Sustained.

18   BY MR. WATKINS:

19   Q.    Showing you the remains of the backpack that were found at

20   Scene B, Boylston, marathon bombing, do you recognize that and

21   do you recognize the Q number?  It's hard to read, but I think

22   Mr. Chakravarty put this up for you just before.

23   A.    That looks like Q51?

24   Q.    This would be Q11.

25   A.    Q11.

```
1    Q.   Do you know what --

2    A.   Remains of a backpack.

3    Q.   And inside of that backpack were remnants of pieces of

4    paper?

5    A.   Yeah, correct.

6    Q.   Do you know whether that was sent for fingerprint

7    analysis?

8    A.   Yes, that was sent for analysis.

9    Q.   And do you know whether there were results obtained?

10        MR. CHAKRAVARTY:  Objection, your Honor.

11        THE COURT:  Sustained.

12   BY MR. WATKINS:

13   Q.   Showing you a picture of Exhibit 974, do you recognize

14   that as the lid recovered in Watertown that came to you for

15   analysis?

16   A.   Yes.

17   Q.   And that's the pressure cooker lid?

18   A.   Correct.

19   Q.   Do you know whether that item was sent for fingerprint

20   analysis?

21   A.   A lot of these items basically were sent out to the

22   various disciplines.  That one would have been sent out also

23   looking for fingerprints.

24   Q.   And the reason to send something out from an explosives

25   point of view, a metal surface like this can capture
```

```
 1   fingerprints pretty easily, correct?

 2              MR. CHAKRAVARTY:  Objection, your Honor.

 3              THE COURT:  Sustained.

 4   BY MR. WATKINS:

 5   Q.   The FBI has a protocol about what order things are to be

 6   analyzed in, a general protocol?

 7   A.   If they're looking for trace, possibly DNA or latent

 8   fingerprints, that would -- depending on what we're looking

 9   for, a combination, it could go to latents first for visuals;

10   come back if they're looking for trace evidence, hair or other

11   things; or it might end up going to DNA to take a swab and a

12   sample.  It just all depends what's the evidence, what piece

13   of -- what it is and then where it's going to go first.

14   Q.   And those were the kinds of decisions that were being made

15   at Quantico as each of these pieces of evidence came in?

16   A.   As it came into the lab and then examined, a plan was

17   established.  And evidence just kept coming in, and the various

18   disciplines and examiners were getting this evidence and doing

19   their examinations on it.

20   Q.   Now, I want to move to the transmitters that you talked

21   about as the fusing system.  There was a lot of testing done on

22   these particular transmitters, and you talked about people

23   buying exemplars and things of that nature?

24   A.   We -- the explosion unit, we ended up purchasing these

25   products, yes.
```

1   Q.   That's what I'm getting at.  It was a "we."  It was a

2   group effort; it wasn't you doing all of these particular

3   things, right?

4   A.   There were other examiners in our unit purchasing, and

5   some individuals going out, looking for the type of pots that

6   were used, yes.

7   Q.   Now -- but they also did independent testing of the

8   circuits and tried to make sure that -- well, they came to the

9   conclusion that you reported here about these transmitters

10  binding to these receivers, right?

11          MR. CHAKRAVARTY:  Objection, your Honor.  Objection.

12          THE COURT:  Sustained.

13  BY MR. WATKINS:

14  Q.   And they issued a report, right, of their own about the

15  transmitters and receivers?

16          MR. CHAKRAVARTY:  Objection.

17          THE COURT:  Let me see you at the side.

18          (Discussion at sidebar and out of the hearing of the

19  jury:)

20          MR. CHAKRAVARTY:  The government was restricted from

21  incorporating the very same type of testimony that the defense

22  is now attempting to elicit, but this is something beyond his

23  expertise.  He just simply looked at results of other -- the

24  other disciplines, and in some cases he incorporated reference

25  to the fact that other people had done their own independent

1    tests in his report.  But he didn't adopt the findings of all

2    of those in order to make his assessment.

3            I mean, that would pull the sting out of whatever

4    Mr. Watkins was going to do, had he been transparent about the

5    strategy of first bringing it out on cross.

6            MR. WATKINS:  No, I did it in a very evenhanded way.

7    He testified on direct that he didn't know what the distance

8    that each one of them could go on was.  The report actually

9    says, quite specifically, what the distance of each of the

10   transmitter receiver pairs was.

11           That's all I was doing, was gearing up to do a kind of

12   refresh recollection with him with these reports.  And that's

13   why I was asking about the reports.  That's the one and only

14   question.

15           THE COURT:  He didn't testify to it.

16           MR. WATKINS:  No.  Mr. Chakravarty asked him "Do you

17   know what the distance is" --

18           THE COURT:  And he said no.

19           MR. WATKINS:  He said, "I don't know," but he knows

20   this report and he does know.  There were a lot of things he

21   did not know until he prepared for testimony today using those

22   kinds of reports.

23           THE COURT:  It looks like you're trying to

24   cross-examine your own evidence.  I mean, you want to get it in

25   so you can criticize it.

1           MR. WATKINS:  No.

2           THE COURT:  I'm not following this.

3           MR. WATKINS:  All I want to get in is the distance

4     that -- one of the transmitters had a distance of 572 feet; the

5     other one had 1100 feet.  The evidence is that our client kind

6     of raced away from the one scene, and it goes to his

7     sophistication concerning, you know, what he knew about the

8     particular item and its attributes.

9           MR. CHAKRAVARTY:  Any information about the range was

10    not from this witness; it was from this other expert who was

11    doing his own independent analysis.  He didn't incorporate that

12    into his findings and he didn't do it.

13          MR. WATKINS:  That's not true.  It is in his report.

14    It is in his report.

15          MR. WEINREB:  We have good reason to exclude it under

16    403 grounds because the purpose of this examination is to

17    suggest that Tamerlan Tsarnaev could have detonated that second

18    bomb, which the defense has no good-faith basis for suggesting

19    because they know that it's not --

20          THE COURT:  I don't know because he's already -- well,

21    anyway.

22          MR. WATKINS:  Your Honor, I just want to correct one

23    thing.  It is absolutely in his report.  He does adopt the

24    distances.  It's in there.

25          MR. CHAKRAVARTY:  Here's the report.  It very well may

1  be.  It's 108 pages.  If you want to find that.

2      THE COURT:  The fact that it's in the report isn't a

3  basis for admitting it, necessarily.  You need something more

4  than that.  He testified on the subject and said that he

5  doesn't know.

6      MR. WATKINS:  And so I can refresh his recollection.

7      THE COURT:  You could try to refresh his recollection,

8  but that's not what you started to do.  If you want to put the

9  report in front of him and see if that refreshes his

10 recollection --

11     MR. MELLIN:  But, your Honor, the problem with this is

12 there's no good-faith basis for what -- they're trying to argue

13 that Tamerlan had both receivers -- or both transmitters, and

14 that is the only reason they're raising this issue.  They don't

15 have a good-faith basis and they can't argue that.

16     MR. WEINREB:  And this will just mislead and confuse

17 the jury and it should be excluded under 403 grounds.  It is a

18 critical issue in the case.  The defense knows it's not true.

19 They have no good-faith basis for suggesting it.  Introducing

20 it will mislead and confuse the issues and, therefore, it

21 should --

22     MS. CONRAD:  Judge --

23     MR. WEINREB:  -- be excluded on 403 grounds.

24     MS. CONRAD:  -- if two prosecutors can speak, can two

25 defense attorneys speak?

 1            THE COURT:  Go ahead.

 2            MS. CONRAD:  Thank you.  First of all, the government

 3    -- and the Court has allowed the government to introduce in

 4    terms of whether it's his finding or not his finding, and

 5    experts rely on others' testing.  And they've been allowed to

 6    introduce what he's learned from others, so it seems to me that

 7    that's fair ground.

 8            Second of all, it's either impeachment or refresh your

 9    recollection.

10            Third of all, it seems to me whether or not we can

11    address an issue that was specifically addressed on direct

12    examination, which is the range of these -- it seems to me

13    that's a no-brainer.  We can.  And what we're going to argue

14    from it or not argue from it is for another day.  I don't think

15    the government can just put us off from addressing something

16    that's relevant.

17            THE COURT:  No, I think it's a fair Rule 403 question,

18    but I don't know the answer.  So give me something more about

19    why there's no good-faith basis.  I mean, somebody knows

20    something to the opposite?

21            MR. WEINREB:  Yes; the defendant.

22            MS. CONRAD:  That's ridiculous.  I mean, to say the

23    defense can --

24            THE COURT:  Keep your voice down.

25            MS. CONRAD:  To say that -- I don't think we're there

1    yet, first of all.  But second of all, to say that the defense

2    can't argue something that -- to which there exists -- as to

3    which there is contrary evidence is ridiculous because, first

4    of all, that's like saying that in an identification case if

5    your client told you he was guilty, you can't argue mistaken

6    identification.  That's Defense 101.  This also goes to the

7    issue that the government claims that was Jahar's apartment.

8             THE COURT:  Okay.  I will exclude it on the 403

9    grounds.

10            MS. CONRAD:  May I just have a clarification?  403 --

11            THE COURT:  For the reasons argued by Mr. Weinreb.

12            MS. CONRAD:  I don't understand.

13            (In open court:)

14   BY MR. WATKINS:

15   Q.   I'm showing you what's been identified as Exhibit 1160-02.

16   That is the receipt Mr. Chakravarty showed you for an order.

17   Do you recall that?

18   A.   Correct.

19   Q.   What is the date on that particular order?  Oh, I'm sorry.

20   This is not -- this is already in evidence?  There.  What is

21   the date on that receipt?

22   A.   February 8th of 2013.

23   Q.   And whose name is on the receipt for that R/C car that you

24   have the exemplars from?

25   A.   Tamerlan Tsarnaev.

1    Q.    Showing you 1431 --

2            THE COURT:  These are all in, right?

3            MR. WATKINS:  Yes.

4    BY MR. WATKINS:

5    Q.    -- which Mr. Chakravarty showed you on direct.  Let me see

6    if I can find the date on this one.  Can you -- what is the

7    date on that purchase?

8    A.    It's 4/8/13.

9    Q.    And that is seven days before the Boston Marathon bombing?

10   A.    April 8th.

11   Q.    And these are for parts that were related to the second

12   Boston Marathon bombing, Scene 2?

13   A.    This was the Spektrum products, I believe.

14   Q.    And I think you testified the Spektrum was related to

15   Scene B, the second Boston Marathon bombing?

16   A.    That's correct.

17   Q.    Mr. Chakravarty showed you *Inspire* magazine and the alarm

18   clock pages from that.  Do you recall that?

19   A.    Yes.

20   Q.    And there's no mention in *Inspire* magazine about

21   radio-controlled cars as a fusing system.  Is that right?

22   A.    The portion I read at, no.

23   Q.    And what I think you've told us is that this is something

24   that can be easily found out on the Internet by searches?

25   A.    Correct.

1    Q.   Were you aware that Tamerlan Tsarnaev searched the

2    Internet for radio-controlled cars in the months leading up to

3    the Boston Marathon bombing?

4              MR. CHAKRAVARTY:  Objection, your Honor.

5              THE COURT:  Sustained.  Sustained.

6              And I remind the jury that unanswered questions

7    produce no evidence.

8              MR. WATKINS:  That's all I have, your Honor.

9              MR. CHAKRAVARTY:  Nothing further.

10             THE COURT:  Agent, thank you.  You may step down.

11             (The witness is excused.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date:  4/28/15
16

17

18

19

20

21

22

23

24

25