FILED
IN CLERKS OFFICE

2015 MAY 5  AM 10 05

U.S. DISTRICT COURT
DISTRICT OF MASS.

# EXHIBIT A

# TRANSCRIPT

*United States v. Briseno,*
*District of Indiana Criminal No. 2:11-CR-77.*

1        MR. HEGYI:  It was a penalty phase issue.  He was
2   photographed when he was arrested; those we felt were proper
3   for the guilt phase.  For the penalty phase it frankly occurred
4   only when we heard that he had this thing on his torso.
5        THE COURT:  That was, what, six weeks ago?  You
6   interviewed these guys in mid January?
7        MR. HEGYI:  It was.  Your Honor, but we filed it, our
8   motion, I think, two-and-a-half weeks ago.
9        THE COURT:  It was February 15th.
10       MR. HEGYI:  Okay.
11       THE COURT:  And they had to have time to respond to
12  it in the middle of a trial.
13       MR. HEGYI:  Yes, Your Honor.
14       THE COURT:  And then I had to have time to consider
15  it, and it's not as simple as you all think it is.  That's the
16  problem.  That's the problem.
17       So let's -- we got a jury waiting here.  We told them to
18  be here at 8:30.  I don't see us getting to them until -- for
19  another couple of hours.  I've got six or seven motions to
20  resolve.  So I want to hear from you all on each of these and
21  have argument and then I'm gonna give you rulings.
22       So let's just go through these one at a time.
23       All right.  The first one deals with -- the defendant has
24  filed a motion in limine, essentially three motions in limine,
25  dealing with their expert, Mr. Bezy.  You know, this was filed

```
 1   yesterday.  Of course the government hasn't had a chance to
 2   respond, so I want to give you that opportunity to respond.
 3        So there's essentially in two separate motions two issues
 4   relating to Mr. Bezy.  One is whether you can attack him with
 5   -- and confront him with specific instances of conduct that may
 6   or may not have occurred in various federal penitentiaries.
 7   You understand what I'm getting at?
 8             MR. HEGYI:  I do, Your Honor.  I know the motion.
 9             THE COURT:  That's one.  And then the other issue
10   deals with this cross-examination of him dealing with what
11   appears to have been some minor administrative employment or
12   personnel issue that he confronted a number of years ago down
13   in Terre Haute.  You know what I'm referencing?
14             MR. HEGYI:  I do.
15             THE COURT:  I'll hear from you on both of those
16   issues.
17             MR. HEGYI:  Thank you, Your Honor.
18        Let me take the second one first.  That issue is litigated
19   regularly when the defense calls Mr. Bezy.  I have -- though I
20   didn't have an opportunity to actually respond to it, I have my
21   response from the case in Puerto Rico.
22             THE COURT:  Just talk to me about it.  What happened
23   to him?  Why isn't this so minor as to be --
24             MR. HEGYI:  Yes, Your Honor.
25             THE COURT:  -- a fly speck?
```

1          **MR. HEGYI:**  Yes, Your Honor.

2          Here's what happened, and I have the OIG report here.  I
3   gave it to the defense so they know it.  What happened was he
4   was the warden at Terre Haute, and his deputy warden was a
5   woman.  There was a meeting that they were having, which they
6   had regularly, to discuss things about what's going on in the
7   prison, security matters in prison.  There was a presentation
8   being made about a new way they were -- prisoners were making
9   weapons.  And when the deputy warden asked a question about it,
10  he just went off.  And he started calling her a stupid bitch,
11  and he just wrote -- he went bazonkers on her, and then he
12  later turned around and said he had no recollection of ever
13  having done it.  So the OIG did an investigation, found that he
14  had, it was improper, and they were preparing to discipline him
15  for it.

16         It's relevant here for two reasons, one, because Mr. Bezy
17  will testify, as he has over and over again, how it is so
18  important to have free flow of information for the security of
19  the institution and what a great job he's always done in doing
20  that.  And this is a perfect example of if you berate your
21  deputy warden when she's asking questions about this new way
22  that they're making weapons and you shut her up so that she
23  won't ask any questions, how do the captains learn?  How do the
24  lieutenants learn?  How do the COs learn at the bottom?  So
25  this is a prime example of how there isn't free flow in his

```
 1   institution when he's running it.
 2          THE COURT:  So how is that relevant to this case?
 3          MR. HEGYI:  It's relevant because what he's gonna
 4   say, Your Honor, if he says what he says all the time when he
 5   testifies is, ladies and gentlemen, give me this defendant, and
 6   then you don't have to worry about him because we'll keep him
 7   safe.
 8          THE COURT:  And the fact that he's yelled at some
 9   underling -- how long ago was that?
10          MR. HEGYI:  This was 2000 and --
11          MR. MAKSIMOVICH:  2006.
12          THE COURT:  Nine years ago he yells at some underling
13   in a disrespectful way, I get that, that that somehow proves
14   what as it relates to the future dangerousness of Mr. Briseno?
15          MR. HEGYI:  It relates to how things happen in the
16   Bureau of Prisons and why there isn't always this free flow of
17   information.  It's also relevant to his bias because he ended
18   up resigning shortly after this.  He went on leave and then he
19   resigned from the Bureau of Prisons.
20          MR. MAKSIMOVICH:  That's a mischaracterization.  It
21   wasn't a result of that, Your Honor.
22          MR. HEGYI:  The timing is there.  He resigned two
23   years before his 30 years were in, and he did it --
24          THE COURT:  This is a collateral matter.  I don't see
25   this in any way, shape, or form having any relevance at all to
```

```
 1   the issue of future dangerousness.  You're attempting to say
 2   that the Bureau of Prisons somehow is an unsafe environment
 3   because on one occasion a warden yelled at a deputy warden in a
 4   disrespectful way.  That logical leap eludes me.
 5           MR. BEGYI:  That isn't quite what I'm saying.
 6           THE COURT:  Then maybe I am mischaracterizing it.
 7   What are you saying?
 8           MR. BEGYI:  It's more than that.  It's this witness
 9   who's gonna get up here and say, I am the Bureau of Prisons.  I
10   ran a flagship operation.  And what the point is, even in his
11   flagship operation, people have bad days.  Even in flagship
12   operations, there isn't this perfect flow of information, which
13   is what he's gonna try to tell the jury, that we get -- we can
14   keep everybody safe because -- he will call it the gold
15   standard.  We're the gold standard.  And here's an example of a
16   time that he -- this witness, when you say, all this
17   information flies, there's no bumps in the road, here's a bump
18   in the road that dealt with you.
19           THE COURT:  It's sustained.  I'm gonna exclude it.  I
20   find it has almost no probative value, if any at all.  And if
21   it does have any at all that whatever value it does have, it's
22   outweighed by the risk of confusing the issues with the jury, a
23   needless consumption of time, and a risk of unfair prejudice.
24   So that's sustained.  That motion is granted, and the
25   government will be prohibited from getting into those
```

```
 1    incidents.
 2         All right.  The next issue deals with cross-examination of
 3    Bezy relating to particular instances of violence in -- I guess
 4    I'm not sure.  I mean, what precisely do you anticipate getting
 5    into, Mr. Hegyi, as it relates to specific violence instances
 6    in other, you know, prison facilities?
 7         MR. HEGYI:  Yes, Your Honor.  Again, this is a motion
 8    that's regularly filed --
 9         THE COURT:  I don't care what other judges have done
10    on this unless it's the Seventh Circuit telling me what to do.
11    I'm aware of Johnson and what the Seventh Circuit said in
12    Johnson, but I just want to hear firsthand from you what your
13    position is.
14         MR. HEGYI:  What I anticipate being able to examine
15    him about are specific instances where -- that he's aware of,
16    some of which he was the investigator on, where the system that
17    he's telling this jury is the gold standard and can't break and
18    can't fail, it did fail.
19         THE COURT:  So what are those instances?  Can you
20    delineate them for me and for counsel?
21         MR. HEGYI:  Yes.
22         THE COURT:  Have you advised the defense what these
23    instances are?
24         MR. HEGYI:  I haven't -- I've given them --
25         THE COURT:  And what the factual basis is for them?
```