UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,       )
                              )
        Plaintiff,      )
                              )  Criminal Action
v.                       )  No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also  )
known as Jahar Tsarni,     )
                              )
        Defendant.      )
                              )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY FIFTY-SIX**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, May 6, 2015
9:11 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3        Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6            By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G.
10        Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13            By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                              Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    DEFENSE:

4   ELMIRZA KHOZHUGOV

5       By Ms. Clarke           15
        By Mr. Chakravarty               44
6
    JAY GIEDD, M.D.
7
        By Ms. Clarke           57
8       By Ms. Pellegrini                82

9   SONYA PETRI

10      By Mr. Bruck            96

11  JENNIFER CARR-CALLISON

12      By Ms. Conrad          105

13  ERIC TRAUB

14      By Ms. Clarke          117
        By Mr. Mellin                   127
15
    KEVIN MICHAEL ROCHE
16
        By Ms. Conrad          128
17      By Mr. Mellin                   137

18  MARK BEZY

19      By Mr. Bruck           143
        By Mr. Mellin                   168
20

21

22

23

24

25

1                          E X H I B I T S

2
      DEFENDANT'S
3       EXHIBIT      DESCRIPTION                 FOR ID        RECEIVED

4     3434      PowerPoint presentation on brain               63

5     3434A     Embedded slide                                 63

6     3509B     MGH records                                    97

7     3509C     Spaulding Rehabilitation records               97

8     3509D     MGH records                                    97

9     3509J     2005-2012 psychiatric records                  97

10    3523      Summary of medical records                     98

11    3507-068  Photograph                                     110

12    3246      Photograph                                     121

13    3247-3    Letter of recommendation                       123

14    3253      Photograph                                     154

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2          THE COURT:  Somebody said there was an issue before we

 3   brought the jury out.

 4          MS. CLARKE:  Yes.

 5          THE COURT:  All right.

 6   (SIDEBAR CONFERENCE AS FOLLOWS:

 7          MS. CLARKE:  Judge, this is regarding the first

 8   witness.  As you know from the pleadings and discussions about

 9   him coming to the United States, he was convicted of

10   misdemeanor assault; a protection order violation was

11   dismissed; and there have been some allegations, never

12   confirmed, to my knowledge, in any kind of a pleading or

13   writing or document or complaint, about parental kidnapping,

14   you know, sort of a concern about him keeping the child of

15   Ailina and him in Kazakhstan and not returning the child.

16          I've talked to Mr. Chakravarty, who's doing the

17   cross-examination of this witness, and he has acknowledged that

18   they will not seek to use it to impeach -- any of those

19   allegations to impeach the witness.  But Mr. Chakravarty

20   believes that it will be evidence of bias if the witness

21   testifies to the family being essentially crazy and

22   manipulative.  I guess you can probably speak to that.

23          MR. CHAKRAVARTY:  A disgruntled in-law who blames the

24   mother-in-law for breaking up his marriage and for a host of, I

25   guess, threatening and other types of behavior.
</pre>

1          MR. WEINREB:  I don't think that quite conveys it.  He

2     is part of the Ruslan branch of the family.  He's Ruslan's

3     brother-in-law.

4          THE COURT:  Meaning Ruslan's wife's brother?

5          MS. CLARKE:  Exactly.

6          MR. WEINREB:  Ruslan's wife's brother married Ailina

7     Tsarnaev.  She then believed that he was cheating on her.  She

8     accused him of it.  He hit her.  She divorced him.  Ruslan --

9     and there's a -- and Ruslan and that side of the family blamed

00:12 10    Ailina and particularly Zubeidat for false -- falsely accusing

11    him, the marriage, for besmirching his name.  And it created a

12    huge rift between Anzor and his relatives on the one hand and

13    Zubeidat and her relatives on the other.

14         He is going to talk about how Zubeidat and her

15    children or her side of the family are dysfunctional and are

16    crazy and so on.  They're going to have no idea why he might

17    feel so passionately.

18         MS. CLARKE:  Let me clarify this.  The purpose of his

19    testimony is not to talk about the dysfunction of the Tsarnaev

00:12 20    family.  He will talk about her -- Zubeidat with her son

21    Tamerlan, her relationship.  He observed it in the family home.

22    He's not going to drag in the nastiness of the divorce.  It's

23    not very relevant to the testimony.

24         MR. WEINREB:  Ruslan hated Zubeidat.  They think she's

25    a witch.  They think all -- everything that's gone wrong in the

 1   family is all Zubeidat's fault going back to the day she met

 2   Anzor.  And Tamerlan -- without making it relevant what the

 3   source of his extreme animus towards them might be.

 4          MS. CLARKE:  Well, this is not Ruslan.  This is

 5   Elmirza.

 6          MR. WEINREB:  His brother-in-law.  The rift occurred

 7   because of Elmirza.

 8          THE COURT:  I think some of it may well be in play.  I

 9   guess I'll have to hear what his direct is like.  But if it can

00:12 10   be shown that he harbors a possibly skewing bias, that's

11   something the jury should hear about.

12          MS. CLARKE:  The skewed bias will be against his wife,

13   not brother --

14          MR. WEINREB:  That's not true.  They all blame

15   Zubeidat.

16          MS. CLARKE:  Could we have a proffer as to what it is

17   that the prosecution would elicit?

18          THE COURT:  I think we did.

19          MR. WEINREB:  The whole story of how he came to blame

00:12 20   Zubeidat for the destruction of his marriage and for his --

21          MS. CLARKE:  He's not going to testify about that.

22          MR. WEINREB:  But he's going to testify about

23   Zubeidat.

24          MS. CLARKE:  He's going to testify about his

25   observations.

```
 1              MR. WEINREB:  And yet he blames Zubeidat for the
 2     destruction of his marriage.
 3              MS. CLARKE:  But he's not going --
 4              MR. WEINREB:  But he has a bias against her.
 5              THE COURT:  I think it may depend on where he goes on
 6     direct, but I can conceive of it being appropriate
 7     cross-examination to expose a bias, but --
 8              MS. CLARKE:  All right.  Then what I'm aware of is a
 9     misdemeanor assault conviction, a dismissed protection order,
10     and some sort of, in the ether, allegations of parental
11     kidnapping.  Now, if we could have a proffer as to the
12     underlying basis for that, that would be nice to know before I
13     go through this direct.
14              THE COURT:  Are you going to get into kidnapping?
15              MR. CHAKRAVARTY:  The fact that he was deprived of his
16     son by Zubeidat for years until, finally, with the assistance
17     of the defendant, the son was brought to Ruslan's family and
18     then ultimately brought over to Kazakhstan where now the son
19     has resided with the witness.  Ailina, the wife, mother of the
20     child, claimed to the FBI that he had essentially parentally
21     kidnapped --
22              THE COURT:  I'm not sure that --
23              MR. CHAKRAVARTY:  It goes both ways.  One, he blames
24     Zubeidat for keeping as essentially ransom his son from him for
25     a long time, further fomenting the dislike, the hatred, of the
```

1  Tsarnaev family.  And then after he then gets custody of his

2  son --

3        THE COURT:  We're talking about his bias, not other

4  people's bias towards him.

5        MR. CHAKRAVARTY:  Correct.  But it's his bias toward

6  the family.  It took everything in his power and his uncle's

7  power to be able to extract his son from the clutches of this

8  family.

9        MR. WEINREB:  He's biased against Zubeidat because he

00:12 10  sees her as having kept his child from him and evidence --

11        THE COURT:  But he has the child.

12        MR. WEINREB:  He has the child now but after years of

13  being deprived.

14        THE COURT:  Tell me about the keeping.

15        MR. WEINREB:  Well, the keeping is because he feels

16  that it was -- the child was unfairly kept from him.

17        THE COURT:  No.  That's what -- how was the child

18  unfairly kept from him?

19        MR. CHAKRAVARTY:  He wanted the child when he went

00:12 20  back to Kazakhstan.  Zubeidat gave him an ultimatum,

21  essentially saying, If you don't come back to the marriage and

22  stay married to my daughter, then you're not getting back this

23  child.

24        THE COURT:  Kidnapping is an inflammatory concept.  It

25  could be less inflammatory if it's a child custody dispute.

```
     1   And you can talk about it generally that there's a custody --
     2          MR. WEINREB:  We could avoid the term "kidnapping."
     3   That's not the point here.  We just want the jury to understand
     4   the story of the history.
     5          THE COURT:  If there's animus that he would testify to
     6   between him and Zubeidat or Ailina -- is it Ailina?
     7          MR. WEINREB:  Ailina.
     8          THE COURT:  -- the animosity could be shown, but it
     9   should be done in a non-inflammatory way.  Kidnapping is not a
00:12 10   way to talk about it.  A child custody dispute that might be
    11   going on may be fair game.
    12          MS. CLARKE:  The child was going to return to Boston,
    13   but the bombing occurred and the father, I think rather
    14   rightfully, held onto the child until things could --
    15          THE COURT:  Well --
    16          MR. CHAKRAVARTY:  There's another component which is
    17   best to flag now before we start, is after this -- the break-up
    18   between Ailina --
    19          THE COURT:  Which was when, by the way?
00:12 20          MR. CHAKRAVARTY:  It was 2008 that he went back to
    21   Kazakhstan.  He then returned in 2009 and then again in 2011 to
    22   see his son.
    23          MS. CLARKE:  He finished his education here, too.
    24          MR. CHAKRAVARTY:  He continued his education.  I don't
    25   know that he actually finished it.  He continued it.  He went
```

         1    back.  He was on an F1 visa.  But he maintained contact with

         2    Zubeidat during all of this time, and she continued to provide

         3    him information, continued often to lambast him when she would

         4    hear a rumor about all the things that he and his family were

         5    accusing -- typical bad break-up relationship -- accusing

         6    Ailina of besmirching his character, explaining the reasons for

         7    the break-up was something other than what the -- at least he

         8    would say it was -- and then threatened him and his family to

         9    say, If you continue doing this kind of talking about our

00:12   10    family like this, we'll scourge you to earth.  We will tar you

        11    on the internet.  We will send people out to harass you.  We

        12    will make -- the idea of this Hatfields and McCoys type of

        13    scenario.

        14          THE COURT:  I don't want to try a Hatfield and McCoy

        15    case here.

        16          MR. WEINREB:  But the jury is going to be asked.

        17          THE COURT:  The point can be made, but let's not

        18    overdo it.

        19          MS. CLARKE:  I also don't want the prosecution to

00:12   20    raise these issues that I'm not raising so that they can shoot

        21    them down.

        22          MR. WEINREB:  Your Honor, by asking him about

        23    Zubeidat, they're raised.  There's no other way around it.  He

        24    harbors tremendous animus for Zubeidat, as does his

        25    father-in-law.

```
 1              THE COURT:  Is he going to be testifying --
 2              MR. WEINREB:  He's going to be testifying about her
 3    and her dysfunction and her relationship with Tamerlan.  It's
 4    only being offered because the defense thinks it reflects
 5    poorly on --
 6              THE COURT:  Okay.
 7    .  .  .  END OF SIDEBAR CONFERENCE.)
 8              MS. CLARKE:  Your Honor, I believe that the video
 9    witness is the first witness, so do we need to adjust the
10    screens?
11              THE COURT:  When the jury is in the box, we'll do
12    that.
13              MR. WEINREB:  Your Honor, I just wanted to add one
14    last thing, which is, the Court has said that there would be an
15    instruction to the jury about the unusual circumstances in
16    which this --
17              THE COURT:  What did you want me to say?
18              MR. WEINREB:  That it's not under oath, for example.
19              THE COURT:  We will administer an oath.
20              MR. WEINREB:  But it's not an enforceable oath.
21              MS. CLARKE:  He's on U.S. -- he's at the consulate.
22    This is mostly of the making of the government that he's having
23    to come in by video.
24              MR. WEINREB:  Well, we would dispute that.
25              THE COURT:  But specifically?
```

00:12 (line 10)
00:13 (line 20)

1              MR. WEINREB:  We were under the understanding the
2    Court was going to instruct the jury that he's not under the
3    pains and penalties of perjury because he's not in this country
4    and can't be prosecuted for it if he perjures himself.  There's
5    no way to enforce the oath.  It's just a -- it's just a moral
6    suasion, but there's no legal --
7              THE COURT:  Well --
8              MR. WEINREB:  -- consequences for him.
9              MS. CLARKE:  We object to any admonition that would
00:14 10   diminish the quality of his testimony.
11             THE COURT:  I'm not going to do it at the beginning,
12   but I may do it at some point.
13             MR. WEINREB:  Very well.
14             MS. CLARKE:  Your Honor, would the Court give us an
15   opportunity to be heard before any instruction is given?
16             THE COURT:  All right.
17   (The jury entered the room at 9:25 a.m.)
18             THE COURT:  Good morning, jurors.  Jurors, we're going
19   to begin this morning with a witness who will be testifying via
00:15 20   remote connection.  The witness is in Almaty, Kazakhstan.  We
21   have a video connection.  And the examination of the witness
22   will be typical in many ways, but it will be by remote
23   connection.
24             You will actually see it on your own monitors.  If an
25   exhibit is shown, you will see the exhibit on your monitors;

|     |     |
| --- | --- |
| 1 | and when that happens, you won't see the witness for the time |
| 2 | being.  We can't do both.  But the witness will continue to be |
| 3 | on this monitor, and we're going to move that into position. |
| 4 | Phil will do it.  That's what we pay him for. |
| 5 | MS. CLARKE:  There you go. |
| 6 | THE COURT:  Can the jurors -- I remind you that the -- |
| 7 | you'll rarely have to do it because you'll have the video of |
| 8 | the witness on your monitors.  It's only when you have an |
| 9 | exhibit; and if you wanted to look and see the witness when |
| 00:17 10 | you're looking at the exhibit, that would be it.  I think |
| 11 | that's the best we can do. |
| 12 | THE CLERK:  Sir, will you please raise your right |
| 13 | hand.  Please raise your right hand.  Do you solemnly swear or |
| 14 | affirm under the pains and penalties of perjury that the |
| 15 | testimony that you're about to give the Court and jury in this |
| 16 | issue now on trial shall be the truth, the whole truth, and |
| 17 | nothing but the truth? |
| 18 | He's not hearing me. |
| 19 | THE WITNESS:  Can you hear me? |
| 00:18 20 | THE CLERK:  Yes.  Can you hear me?  Can you hear the |
| 21 | Court? |
| 22 | THE WITNESS:  Can you hear me now? |
| 23 | THE CLERK:  Yes.  Can you hear the Court? |
| 24 | THE WITNESS:  I heard what you said. |
| 25 | THE CLERK:  You want me to repeat it? |

```
 1              THE COURT:  Yes, repeat it.

 2              THE WITNESS:  Yes, please.

 3              THE CLERK:  Do you solemnly swear or affirm under the

 4      pains and penalties of perjury that the testimony you're about

 5      to give the Court and the jury in this issue now on trial shall

 6      be the truth, the whole truth, and nothing but the truth?

 7              THE WITNESS:  I swear.

 8              THE CLERK:  Please state your name and spell your

 9      first and last name for the record.

00:19 10          THE WITNESS:  My name is Elmirza Khozhugov.  It's

11      E-l-m-i-r-z-a.  Last name is K-h-o-z-h-u-g-o-v.

12      DIRECT EXAMINATION BY MS. CLARKE:

13      Q.   Good evening, Elmirza.  Can you see me?

14      A.   Hello.

15      Q.   Good evening.  It's about 7:30 p.m. over there?

16      A.   About that time, yes.

17      Q.   Where are you testifying from?

18      A.   I'm testifying from Almaty, Kazakhstan.

19      Q.   In what physical location are you?

00:20 20      A.   I'm in the U.S. Embassy in Almaty.

21      Q.   Do you live in Almaty?

22      A.   Yes, I do live in Almaty.

23      Q.   Were you raised in Almaty, or in Kazakhstan?

24      A.   I was raised in Almaty, Kazakhstan, yes.

25      Q.   Do you have employment?  Do you work there?
```

1    A.    Yes, I do work here now.

2    Q.    And do you have a family?

3    A.    I have family here, wife and four children.

4    Q.    What is it that you do for a living?

5    A.    I work in a construction company that belongs to my

6    father.

7    Q.    Can you tell us just a little bit about that?

8    A.    In our company, I'm responsible for supply chain

9    management and for construction materials.

00:21 10    Q.    And it's a family business?

11    A.    Yes, it is a family business.

12    Q.    I notice that you speak English very well.  How is that?

13    A.    Thank you.  I spent a lot of time studying in the United

14    States.

15    Q.    When did you first come to the United States?

16    A.    Can you repeat the question?

17    Q.    Yes.  When did you first come to the United States?  How

18    old were you?

19    A.    First time I went to the U.S., I was 14 years old, and I

00:21 20    spent five months in the U.S., in Maryland.

21    Q.    And then did you return to the United States for more

22    education?

23    A.    And then I went to college in the United States in 2004.

24    Q.    Where was that that you went to college?

25    A.    It's in Washington State, Western Washington University.

1    Q.   Thank you.  You have -- can you tell the jury your -- they

2    can see you on a screen in front of them.  Can you tell the

3    jury your connection to the Tsarnaev family?

4    A.   I am connected to the Tsarnaev family because I was

5    married to Ailina Tsarnaeva, the sister of Jahar.

6    Q.   Do you have other relationships --

7    A.   And also my elder sister is married to Ruslan Tsarni, who

8    is a cousin -- I'm sorry, who is an uncle on the father's side

9    for Jahar.

00:22  10   Q.   Do you and Ailina have a son together?

11   A.   Yes, we have a son together.  His name is Ziyaudi.

12   Q.   If you know, when did your sister marry Ruslan, Ruslan who

13   is Jahar's uncle?

14   A.   They got married in December of 1999.

15   Q.   And how old were you then?

16   A.   I was 13 years old.

17   Q.   When did you first meet members of the Tsarnaev family?

18   A.   One of the members, the mother of Jahar and Tamerlan, I

19   met on the wedding; and the rest of the family, I met about six

00:23  20   to nine months after the wedding.

21   Q.   I notice that you refer to Ruslan as Ruslan Tsarni, and

22   I'm referring to the Tsarnaev family.  Can you tell the jury

23   the difference between the name Tsarnaev and Tsarni?

24   A.   The difference is that Ruslan has decided to de-Russify

25   his last name, basically take out the two last letters of his

```
 1    last name to make it sound more Chechen rather than more
 2    Russian.
 3    Q.    So Tsarnaev is the Russian version of Tsarni?
 4    A.    Yes.
 5    Q.    In your --
 6    A.    That's right.
 7    Q.    In your younger years, you said you first met the rest of
 8    the Tsarnaev family after Ruslan and your sister got married.
 9    Did you know one member of the Tsarnaev family better than the
10    others in those years?
11    A.    Yes.  I knew Tamerlan Tsarnaev much better than the rest
12    of the family because he was my friend.
13    Q.    And why was it that you got to know Tamerlan better?
14    A.    When he first came to Almaty, Kazakhstan, he was
15    introduced to me by Ruslan Tsarni.  And we were the same age,
16    and we had a lot of interests, a lot of things that interested
17    both of us.  So we spent a lot of time together.  And I
18    introduced him to my friends and to my neighbors, my
19    classmates, and he has become friends with them as well.
20    Q.    Was there a time when Tamerlan stayed behind and lived
21    with your family, stayed in Kazakhstan?
22    A.    There was a time when Tamerlan stayed at Ruslan's place
23    for about one year.
24    Q.    And do you remember --
25    A.    Before he went to the United States.
```

1   Q.   Okay.  So he stayed there for about a year before he came

2   to the United States?

3   A.   Yes.

4   Q.   Were you aware of who came -- who in the family came to

5   the United States first?

6   A.   The mother, Zubeidat, and the father, Anzor, and the

7   younger son, Jahar, they came to the U.S. first.

8   Q.   And did the other three children stay in Almaty?

9   A.   The other -- the other three children at that time lived

00:26 10   with Ruslan Tsarni in Almaty, and they lived to the U.S. a year

11   after the parents and Jahar did.

12   Q.   So that year that you spent with Tamerlan, can you

13   describe him for the jury?

14   A.   Yes.  Tamerlan was an interesting young man, polite, and

15   good friend.  He was charismatic, friendly, goofy sometimes,

16   but, overall, he was just fun to be around with.

17   Q.   And how did your friends interact with him?

18   A.   My friends love him when he was around.  And there were

19   even times when I wasn't called to the party and he was.

00:27 20   Q.   After he left and came to the United States, I think that

21   was -- we've heard evidence that that was in about 2003.  Did

22   you come to the United States soon after that?

23   A.   I came to the U.S. in 2004, so about a year after -- a

24   year and a half after they moved.

25   Q.   When you came to the U.S., where did you live and who did

1    you live with?

2    A.   I lived in Ferndale, Washington, in the house that Ruslan

3    Tsarni has bought a little while before that.

4    Q.   When you were -- yes.  I'm sorry.

5    A.   And I lived there alone because --

6    Q.   You were going to school?

7    A.   I lived there alone.

8    Q.   While you went to school?

9    A.   Yes.  I went to school and live in their house.

00:28 10    Q.   When you lived in Washington State, attending school in

11    that first year, did you see the Tsarnaev family, any members

12    of the Tsarnaev family?

13    A.   In the first academic year that I went to college there,

14    the family did visit me and, actually, not just the elder

15    Tsarnaev family but also Ruslan Tsarni, along with my sister

16    and their children came over.  Maret Tsarnaev came over, who is

17    an aunt to Jahar.  And also Zubeidat, Bella, and Ailina

18    Tsarnaev came over.

19    Q.   It sounds like the women came with Ruslan to visit?

00:28 20    A.   They came separately but at the same time.

21    Q.   I'm going to show you a picture.  It's marked on your

22    stack 3507-60.  It should be the first one on your stack

23    depending on how they were provided.

24        THE COURT:  Let me just ask the government whether

25    you've seen the photographs.  Will there be any objection to

1   these photographs?

2           MR. CHAKRAVARTY:  All the photographs we were shown

3   last night, there is no objection.

4   Q.   You have the one -- it's marked on the side 3507-060.

5   It's with you sitting on a couch with -- have you got it?

6   A.   Yes, I do have it.

7           MS. CLARKE:  I'd like to pull up 3507-60, or I can

8   pull it up, I guess.

9   Q.   Elmirza, the jury is now seeing the photograph that you've

00:30 10   got in front of you.  Can you tell us who that is in that

11   photograph and when it was taken?

12   A.   On that picture, you can see myself hugging Zubeidat

13   Tsarnaeva, the mother of Jahar.  On the side there is Naina

14   Tsarni, the daughter of Ruslan -- the eldest daughter of

15   Ruslan.

16   Q.   The eldest daughter?

17   A.   Yeah.

18   Q.   Was this in that first visit that they made to Washington

19   State during your first year of school?

00:30 20   A.   Yes.  That's the first visit they made in the first year

21   of my school.

22   Q.   Had you met Zubeidat before then?  That was the first time

23   you met her?

24   A.   This isn't the first time I met her, but it's the first

25   time I met her in the United States.

1   Q.   Because you had met her at the wedding of your sister?

2   A.   I met her at the wedding, yes.

3            MS. CLARKE:  And I think it's clear --

4            THE COURT:  Tell me when you don't want the picture

5   anymore.

6            MS. CLARKE:  I think it's clear -- I'm going to -- I

7   think it's pretty clear we've got a child and two adults in the

8   picture, and one is Zubeidat and one is Elmirza and one is the

9   child.  So I think we can move on from that picture.

00:31 10   Q.   During that trip, did you get to know Ailina better?

11   A.   During that trip, we have all met again, I would say.  And

12   during that stay, I have become interested in Ailina, and we

13   started having sort of dates.

14   Q.   You would go out?

15   A.   Yes, we would go out.

16   Q.   I'm going to show you another picture around that time

17   frame, 3494.

18            MS. CLARKE:  I think there's no objection.

19   A.   3494.

00:32 20   Q.   That's the picture of the family together.  Can you see

21   where I'm talking about?

22   A.   Uh-huh.

23   Q.   Can you tell the jury who is in that picture from left to

24   right?

25   A.   On the far left, it's Hussein, the cousin of Jahar, and he

1    is son of Alvi Tsarnaev, the eldest son in the family.

2    Q.   I see there's --

3    A.   And second one is Tamerlan Tsarnaev, the elder brother of

4    Jahar.   Third on the left is Andy Tsarnaev and son of Alvi, the

5    cousin of Jahar.   When I said Hussein -- I meant Hussein is the

6    son of Molkan, the sister of Ruslan Tsarni.   Next on the

7    picture is Bella Tsarnaeva, the elder sister of Jahar.   Then it

8    goes the mother of Jahar, Zubeidat.   Then there's Jahar

9    himself.   And on the far right is Ailina Tsarnaeva, Jahar's

00:33 10   sister and my ex-wife.

11   Q.   Looking at the picture of Ailina and Zubeidat and Bella,

12   is that picture taken at around the same time of that visit to

13   your house in Washington?   It's not taken in Washington State?

14   A.   Judging by the clothing they're wearing, I can tell that

15   this picture was taken after they visited us in Washington

16   because some of the clothing that Ailina is wearing is the one

17   that she actually bought -- she actually got in Washington, and

18   I was there when she was buying it.

19   Q.   Thank you.

00:34 20        MS. CLARKE:   I think we can take the picture down.

21   Q.   Did anybody else from the Tsarnaev family come to visit

22   you in that first year of your college in Washington State?

23   A.   Yes.   After they left and I think about five to six months

24   passed -- so it was my second academic year -- that's when

25   Tamerlan visited me.

1    Q.    What was that visit like?

2    A.    Can you repeat the question?

3    Q.    Yes.  What was that visit like?  Can you tell us about

4    that visit?

5    A.    Oh, yes.  Tamerlan flew in because he had a break from

6    school, and I had a short break as well.  And we just spent

7    time together.  I showed him my college.  I showed him where I

8    lived.  I showed him the area, the lakes around, the mountains

9    around, and the -- I was trying to convince him to move to

00:35 10    Washington so that, first of all, we could be closer as a

11    family.  I was trying to convince him and the rest of the

12    family to move but him first.  And then as well I wanted him to

13    go to the same college as I did, so I was trying to convince

14    him that it's going to be a good idea to go.

15    Q.    What was Tamerlan's response to that?

16    A.    Tamerlan felt like it's a good idea.  He did consider it,

17    and he did say that he would discuss it with his parents when

18    he goes back.

19    Q.    And did Tamerlan end up moving to Washington State with

00:36 20    you?

21    A.    No, he did not.

22    Q.    Did you -- when Tamerlan was out there visiting with you,

23    did you talk to him about anything else that was important to

24    you?

25    A.    Yes.  As I was driving him back to the airport when he was

          1    leaving, I asked him that -- I told him that I had feelings to
          2    his sister, and I asked him if he would mind if I was -- if I
          3    would have a relationship with her, to which he answered, as
          4    long as it has good intentions, he wouldn't mind it.
          5    Q.   So he gave his permission for you to go out with his
          6    sister?
          7    A.   Yes.
          8    Q.   Were you asking --
          9    A.   That is correct.
00:37   10    Q.   Were you thinking of marriage at that time?
         11    A.   Excuse me?
         12    Q.   Were you thinking of marriage at that time?
         13    A.   At that time exactly, probably not.  It was -- in
         14    perspective, yes, maybe, but for that, it was just talking
         15    relationship.
         16    Q.   Can you tell us what the age difference was between you
         17    and Ailina?
         18    A.   We were four years -- I'm four years older than her.
         19    Q.   So you were 19; she would have been 15, almost 16?
00:37   20    A.   She was 15, yes.
         21    Q.   Would you consider yourself close with Tamerlan during
         22    that period of time that you were in college in Washington
         23    State?
         24    A.   Do I consider myself what exactly?
         25    Q.   Did you consider you had a close relationship with

1    Tamerlan during that period of time?

2    A.    Oh, yes, yes.  Tamerlan was my only friend in the U.S. at

3    that time, and he was also my friend from my home country.  So

4    we shared a lot of things in common.

5          MS. CLARKE:  I'd like to pull up, your Honor, 3495.

6    Q.    Elmirza, you'll recognize it's you and Tamerlan.

7    A.    Yes.  On that picture, it's Tamerlan on the left and me on

8    the right.

9    Q.    How did that picture come about?

00:38 10    A.    Well, since we were communicating mostly through emails,

11    we were sending pictures of each other to each other.  And one

12    day I just felt like it would be a good thing to have a picture

13    together and since at that point in time we didn't meet yet.

14    So I took two photographs, and I added them to each other on my

15    computer, and I emailed it back to him.

16    Q.    Can you tell the jury what is written at the top of the

17    picture?

18    A.    On the top of that -- of this picture is mine and his

19    nicknames we had at that time.  For him, it goes "the

00:39 20    professor," and for me it's "the Chechenian."

21    Q.    How did --

22    A.    Given that -- huh?

23    Q.    I'm sorry.  Go ahead.

24    A.    Given our age, we were having -- we were giving ourselves

25    nicknames as what we would like to be identified with, what we

         1    would like to be called.  Tamerlan chose for himself the
         2    professor because that would make him sound smarter and wiser
         3    than others around him.  And my nickname is the Chechenian, and
         4    I chose that because I felt like our ethnicity, the name of our
         5    ethnicity, is usually mispronounced as Chechens.  So the right
         6    way would be Chechenian, so that's why I had the nickname.
         7    Q.   Did you and Ailina eventually get married?
         8         MS. CLARKE:  We're finished with that picture.
         9    Q.   Did you and Ailina eventually get married?
00:40   10    A.   Yes, we did, in July of 2006.
        11    Q.   Where did you get married?
        12    A.   We got married in Almaty, Kazakhstan.
        13    Q.   How old were you and how old was she?
        14    A.   I was 20 years old and she was 16 years old.
        15    Q.   I'm going to show you a photograph of the two of you,
        16    3507-059.  You see the one of you and --
        17    A.   Uh-huh.
        18         MS. CLARKE:  If we could bring that up.
        19    Q.   Can you tell the jury who is in that photo even though
00:41   20    I've already said it?
        21    A.   Well, it's me and Ailina.  And this picture was taken in
        22    Washington, in the Bellevue Square Mall in Washington, and at
        23    that point in time, we are already married.
        24    Q.   How did you -- how do you remember that you were already
        25    married with that picture?

```
 1   A.   I can tell because I am hugging her on that photograph.

 2   Q.   And you would not have been hugging her before that time?

 3   A.   And if I wasn't married to her, I wouldn't be hugging her,

 4   exactly.

 5   Q.   How long did --

 6   A.   Because that would be inappropriate thing to do before

 7   marriage.

 8   Q.   How long did the marriage last?

 9   A.   The marriage lasted for almost two years.

10   Q.   Was there -- did there come a time that there was a

11   problem in the marriage involving you striking Ailina?

12   A.   Yes, there has been that.

13   Q.   Can you tell the jury a little bit about what happened?

14        THE COURT:  You still want the exhibit up, or do you

15   want the witness?

16        MS. CLARKE:  The witness.

17   A.   Yes.  We had an argument considering some contacts that I

18   found in her Facebook account.  So because of that, I lost my

19   temper and basically put my hands on her.

20   Q.   And what happened as a result of that?

21   A.   As a result of that, I got arrested.

22   Q.   Who --

23   A.   And eventually we got divorced.  We got separated.

24   Q.   Separated.  Who came and bailed you out of jail?

25   A.   Her elder brother Tamerlan came over.  He bailed me out
```

        1   and flew in, and he stayed with us for about ten days, maybe

        2   two weeks.

        3   Q.   Did he seem to understand the problems that you guys had

        4   in your marriage?

        5   A.   He did talk to me during his stay, and he tried to advise

        6   me to be more patient, to stay calm, and to not pay too much

        7   attention if the young sister of his is behaving badly.  So he

        8   was trying to help, yes.  That's what I'm trying to say.

        9   Q.   Can you tell the jury why you think you had problems in

00:44  10   your marriage?  Was it your youth?  Was it not understanding

       11   marriage?  What was it?

       12   A.   Well, partially, it was because we both were young, and

       13   part of it was our family who got in between our relationship.

       14   Q.   Did you and Ailina have children together?

       15   A.   Yes, we had one child, a son.

       16   Q.   And his name is?

       17   A.   His name is Ziyaudi.

       18   Q.   Can you spell that for us?

       19   A.   Z-i-y-a-u-d-i.

00:44  20   Q.   And do you have --

       21   A.   Ziyaudi.

       22   Q.   And do you have a nickname for Ziyaudi?

       23   A.   We call him Zia.

       24   Q.   During the two years that you were married to Ailina,

       25   which I'm taking as 2006 to 2008, did you have -- you were in

1    Washington State?

2    A.    During 2006 and 2008?

3    Q.    Yes.

4    A.    Yes, we were in Washington State.

5    Q.    Did you visit the Tsarnaev home in Cambridge?

6    A.    Yes, every spring -- every break we had, spring break,

7    fall break, we would go there.  Either she would go up first

8    and then I would join or we would go there together.

9    Q.    So what do you think, six or eight times over the two-year

00:45 10    period of time you were in the Tsarnaev home in Boston -- or in

11    Cambridge?

12    A.    During these two years, I visit them for about four to six

13    times.

14    Q.    For how long a period of time?

15    A.    Every time it was about ten to fourteen days.

16    Q.    Can you describe the Tsarnaev home for the jury, the home

17    that you saw during that period of time?

18    A.    They lived in 410 Norfolk Street in Cambridge, and it's

19    basically -- it was basically a floor of a house, the third

00:46 20    floor of a house, very old house.  And they had two bedrooms

21    there, a kitchen, and a small living room.

22    Q.    How --

23    A.    And it was a small place to live in.  It was always

24    crowded.

25    Q.    Let me ask you about members of the family.  What did you

1    observe about the relationship between Anzor, Jahar's father,

2    and Zubeidat, Jahar's mother?

3    A.   The relationship between the parents wasn't an example

4    one, I would say.  It was obvious that neither of them wanted

5    to give in, so they had a lot of conflict.  They had a lot of

6    arguments and conflicts coming out of those arguments.  And for

7    the most part, I would say that the mother, Zubeidat, had more

8    authority in the family than the father did.

9    Q.   What about the relationship between Zubeidat and Tamerlan,

00:47 10   can you describe it to us?

11   A.   Zubeidat loved her son and she showed it, and she would

12   always praise him and encourage him to do things that he wanted

13   to do actually.  And in return, Tamerlan loved his mother very

14   much.  He respected her, and he would listen to her more than

15   to anyone else in the family or out of the family.

16           MS. CLARKE:  Let me pull up Photograph 3507-047.

17   Q.   That's a photograph you should have, 3507-047.  Can you

18   tell us who's in that photograph?

19   A.   It's Zubeidat on the left and Tamerlan on the right.

00:48 20   Q.   Now, how old do you think Tamerlan was then?

21   A.   He's probably around 13, 16 years.

22   Q.   Is that photograph --

23   A.   I'm not --

24   Q.   You don't know for sure?

25   A.   No, not for sure.

```
 1    Q.   Is that photograph reflective of the kind of close

 2    relationship they had when you knew them together?

 3    A.   Yes, it is reflective.  Tamerlan is hugging his mother on

 4    that picture, and he would hug her every day.  A few times he

 5    would just come up and hug his mother and tell her that he

 6    loves her, and he's showing that he defending her maybe.

 7    Q.   Now, when you were in the home, did you also see Jahar?

 8    A.   Yes, I have seen Jahar.

 9    Q.   So 2006 to 2008, Jahar would have been 13, 14, 15 years
```
00:50 10    old, in middle school.  Can you describe what he was like so
```
11    the jury can know?

12    A.   At the time when I was visiting the family, I would see

13    Jahar every time I was there.  So for the most time that he was

14    in the house, he would spend his time studying.  He would have

15    his textbooks out on the table.  He would be reading or

16    writing.  He wasn't very interested, I'd say, in the computer.

17    He was spending a lot of time with books.  And the mother would

18    put up his good grades, and she would put it on a magnet on the

19    fridge so the whole fridge was his successful grades and all
```
00:50 20    that stuff.
```
21    Q.   Was Jahar a quiet kid, a loud kid?  Was he the center of

22    attention or --

23    A.   He was really quiet, quiet and, again, polite, just as

24    Tamerlan was at that age.  And he was patient and he studied

25    well.  He spent -- he was responsible for whatever he did.  He
```

1    never -- I have never seen him or heard of him being in any

2    inappropriate situation, I would say.

3    Q.    When you were visiting the Tsarnaev home during this time

4    period, did you meet somebody there who was speaking to the

5    family about religion?

6    A.    The last -- one of the last visits that I made is when I

7    met a friend of Tamerlan or, like, a mentor.  His name was

8    Misha.  And he was an Armenian guy who converted to Islam, and

9    he was pretty much just preaching to Tamerlan about Islam.

00:52 10   Q.    What kind of things did you hear Misha -- I'm going to

11   spell that.  M-i-s-h-a, is that correct?

12   A.    Yes, that is correct.

13   Q.    What kinds of things did you hear Misha talking to

14   Tamerlan about?

15   A.    They would talk about politics; again, religion, and

16   concerning religion itself, they would discuss things like

17   hearing demons talk and talking to demons, and to jins, is what

18   they called in Islam.  Misha was telling in cases it was

19   possible to hear the jins and in which cases it was not

00:53 20   possible.

21   Q.    So he was giving him lessons in Islam, lessons --

22   A.    I wouldn't call it formally a lesson, but he was teaching

23   him and suggesting books to read, I guess, and just kind of

24   expressing his own views about that faith to Tamerlan.

25   Q.    Did anybody else in the family listen to or participate in

1    the conversations with Misha?

2    A.   No one actually participated in those conversations.  They

3    were usually left alone.  And even I, when I was a guest there,

4    I didn't spend much time with them because I didn't like these

5    conversations.  But Misha was welcome by the mother, by

6    Zubeidat, to come in any time to talk to Tamerlan.  And there

7    was even one situation when it was late night, and Misha and

8    Tamerlan were in the kitchen talking about religion again.

9         And at that late time, Anzor came home from work, and he

00:54 10   had to get to the shower.  And he -- to get to the shower, he

11   would have to go through the kitchen.  And Zubeidat stop him in

12   the hallway and said, Don't go in there.  You're going to

13   interrupt them talking.  And Anzor would say, Why is he so late

14   at night?  I think it was, like, 2 or 3 a.m.  Why is he so late

15   at night in my house?  Why are they not sleeping?  Why are they

16   talking?  She said, Don't bother them -- Misha is teaching your

17   son good things so don't interrupt it.  Just wait until they

18   leave, and then you can go take a shower.

19   Q.   You said you didn't participate in the conversations

00:55 20   because you didn't like them.  What didn't you like about those

21   conversations?

22   A.   Well, for me, these talks about religion are not

23   particularly interested when they intermix these talks with

24   politics and conspiracy theories and Satanism.  So I just

25   generally don't pay attention to people who talk much about

1    religion.

2    Q.   So --

3    A.   Because I believe faith is for one own, not for showing

4    off.

5    Q.   At some point did you begin to see changes in Tamerlan?

6    A.   Yes.  After this visit -- well, during that visit and

7    after I would talk with Tamerlan about who's this Misha?  Why

8    are you listening to him?  He would defend Misha as if he was a

9    good person, and he just converted to Islam so he has a lot of

00:56 10   background to learn from.  So after I left, I used to call

11   Tamerlan again and again.  And one call I ask him, So how is

12   your boxing?  How are you doing in boxing?  And he says, you

13   know, I quit boxing.  I ask him, Why would you quit boxing?

14   You love it.  This is the goal of your life to box, to become a

15   professional boxer.  Why would you stop?  His answer to me was,

16   Misha said to me, in Islam, hitting people in the head is not a

17   good thing to do so we shouldn't be doing it.  And that raised

18   concerns for me, of course.  So I talked to him more about it,

19   and I said to him he should do what he loves, but I guess he

00:57 20   didn't listen.

21        And then the other conversation I had with him is he

22   started -- he was taking some acting classes in some community

23   college, I believe.  And he would also do music with his

24   friends.  And when I ask him, So how is this thing going?  How

25   is your music?  He said, I quit music, too.  I go, Why would

1   you quit music?  You used to play the piano since you were a

2   kid.  Why would you quit it?  He says, again, Misha says that

3   music is not appropriate in Islam, so we shouldn't be playing

4   music or listening to music.  And the same thing pretty much

5   happened with his acting classes.  He also quit because he

6   didn't have time for it.  He needed more time to learn about

7   Islam.

8   Q.   Were there unusual beliefs, other than quitting boxing and

9   quitting music and the things that he loved, that Tamerlan

00:58 10   expressed to you?

11   A.   I didn't hear what you said in the beginning of the

12   question.  Could you repeat it?

13   Q.   Other than Tamerlan quitting boxing and quitting music and

14   the things that he loved, did he express any unusual beliefs to

15   you?

16   A.   Did he act unusually, did you say?

17   Q.   Did he tell you about unusual beliefs that he had

18   developed?

19   A.   He did talk to me a lot about religion itself in general

00:58 20   and particularly about conspiracy theory, and he was getting

21   into that a lot.  He showed me some videos on the internet

22   about that stuff.  He was hoping to find some books to read

23   about conspiracy theory.  It did seem interesting to him.  He

24   did seem like he had a goal to actually find out what is

25   happening around the world, how it is connected with politics

and how it is connected with big businesses and how -- what

place he has and religion has in between all of that.  He was

searching for this kind of stuff, yes.

Q.    During that time that you were visiting the family home,

did you get to see Tamerlan's relationship with Jahar?

A.    Yes, of course, I did.

Q.    And can you tell us what you observed about that?

A.    Well, Tamerlan loved his younger brother, absolutely

adored him.  And he always tried to show it, and he always

01:00   tried to put himself as a -- as well as with the mother, the

defender of Jahar.  His older brother is leader, I guess.

Tamerlan himself was very charismatic, and he was a leader

within himself.  And he was -- it was an easy thing for him to

be the elder brother.  He would -- every day he would talk to

Jahar about how he's doing in school and how he should be

doing.  And then they would spend time just by themselves,

like, you know, walking outside, talking.  And for most of the

time when I spoke to Tamerlan about Jahar, Tamerlan just

couldn't -- he couldn't find enough words to express his love

01:01   to his younger brother and to express how much he's ready to do

in order for Jahar to be successful in life, for Jahar to be

happy in his life.

Q.    So did the respect and admiration go the other way?  Did

it appear that the two of them were very close?

A.    Again, I can't hear you well.  I'm sorry.

Q.   You've told us how Tamerlan viewed Jahar.  How about how
Jahar viewed Tamerlan?
A.   Oh, well, Jahar, him being the younger brother, he -- of
course, he listened to Tamerlan.  He went along any time
Tamerlan would say let's go do this and that.  He would just go
along and always find time to actually go along.  He would be a
good younger brother, I would say, as he was supposed to be in
the Chechen family.
Q.   You mentioned the younger brother in a Chechen family.
You've told me a saying that comes to mind about the younger
and the older brother in a Chechen family.  Can you tell the
jury?
A.   There is a saying we have in Chechnya which goes like, it
is -- in a family with seven sons, it is better to be a dog
than the youngest son, meaning that the youngest of the boys is
obliged to do the things that the other boys tell him.  So he
had to obey every order that the elder brother say, any of
them, any of the six brothers.  So in a way it's better to be a
dog because then you wouldn't be able to do so many things
because you're a dog and not a human.
Q.   Your son Zia is also Anzor and Zubeidat's grandson.  Did
you maintain contact with them about your grandson after you
left the United States?
A.   Did I what?
Q.   Did you keep in touch with Anzor and Zubeidat regarding

 1  your grandson after you left the United States?  I mean their

 2  grandson.

 3  A.   My son stayed in the U.S. when I left for -- when we

 4  separated.  Yes, he stayed with them, with the Tsarnaev family.

 5  Is that --

 6  Q.   Yes.

 7  A.   -- what your question?  I didn't hear your question well

 8  actually.

 9  Q.   I'm sorry.  When you went back to Kazakhstan, Zia stayed

01:03 10  in the United States?

 11  A.   Uh-huh, yes.

 12  Q.   And at some point did he come back to Kazakhstan to be

 13  with you?

 14  A.   Oh, yes, yes, he did.  Zubeidat Tsarnaeva brought him on a

 15  flight from Boston to Almaty.  She brought him to stay with me

 16  for a few months, two months or three months, I believe.

 17  Q.   Do you remember when that was?

 18  A.   I do not remember the exact date, but Ziyaudi was about

 19  two and a half years old.

01:04 20  Q.   So Ziyaudi was born in what year?  2007?

 21  A.   April of 2007, yes.

 22  Q.   So maybe --

 23  A.   April 15, 2007.

 24  Q.   2009 or 2010 was when Zubeidat brought him to visit?

 25  A.   Maybe a little later, maybe a little later than that, 2010

1    -- 2010 probably.

2    Q.   When Zubeidat brought Ziyaudi to visit you, did you notice

3    any change in her?

4    A.   Yes.  When I met her in the airport, I was a little bit

5    surprised by her clothing because she had all of her body

6    covered with clothing.  Basically, she dressed up as a good

7    Muslim woman would.

8    Q.   Was she wearing the hijab?

9    A.   Something like a hijab, yes.  I can't say it was like the

01:05 10   Arab hijab itself, but it was close to that.

11   Q.   Did that surprise you?  What effect did that have on you?

12   A.   To be honest, it actually made me laugh more than be

13   surprised because, knowing that person, I know that wearing

14   these clothes isn't going to change her, the way that she is

15   actually.  So I just saw it as an attempt to cover up what she

16   has on her mind as if it could help.

17   Q.   During this period of time, did you notice changes in

18   Tamerlan?  Did you have an opportunity to see Tamerlan after

19   2010?

01:06 20   A.   I was finishing college in 2011.  And as I was about to

21   graduate, I have agreed with my ex-wife Ailina that on my way

22   back to Kazakhstan that I'm going to make a stop in Boston and

23   pick my son up and fly with him.  And when I stopped by, we

24   were supposed to meet at South Station in Boston.

25        And when I arrived, I spent, like, six hours waiting there

to see her to pick up my son.  But she never came, and I
couldn't get in touch with her by phone either because her
phone was either off or she didn't answer.  So I started trying
to call each member of the family.  So I called the father, the
mother, and the sister Bella, and then eventually I got through
to Tamerlan, and I briefly spoke to him.  I told him the
situation, that I'm here waiting for my son.  Do you know about
the whereabouts of Ailina and the boy?  And he said, No, I
don't know where they are, and I can't get in touch with them
either.

      So then I told him, Hey, I have a few hours here.  Would
you mind driving down to the South Station and talk to me about
things?  Life has moved on.  Maybe you have things to discuss
now.  And his answer to me was surprising, actually, that, you
know, I'm just getting out of my house, and I have to go to the
mosque.  I have to do some things at the mosque.  I have to
help out people.  So, no, I'm not going to meet you.
Q.   Was that surprising to you given your relationship with
Tamerlan?
A.   Yes, it was surprising to me because usually, even though
we have separated with his younger sister, we still kept a good
relationship between ourselves.  We didn't have a fight because
we didn't have a conflict because of it.  We still stayed -- I
can't say we stayed good friends, but we were still in -- in --
at least in respect to each other.

1    Q.    When did your son ultimately come to be with you in

2    Kazakhstan?

3    A.    In fall of 2012.

4    Q.    How did he arrive there?

5    A.    My younger brother was going to the same college as I was.

6    And as he was finishing up his English program in the end of

7    the summer, about that time, Zubeidat Tsarnaeva contacted my

8    mother and told her that, if we wanted to, we could take Zia

9    for a few months.  So since my brother was already there, I

01:09 10   told them that he's going to stop by in D.C. and take my son,

11   and I asked them to bring Ziyaudi to D.C., to the airport.  And

12   eventually Jahar was the one who brought Zia to D.C. and gave

13   him to my younger brother, and my younger brother flew with him

14   to Almaty, Kazakhstan.

15   Q.    You're aware that Zia had a relationship with Jahar as

16   well, right?

17   A.    Oh, yes.  Zia and Jahar, from the words of my son,

18   Ziyaudi, Jahar is his older brother, and he was always around

19   him when everyone would be either at work or somewhere else, at

01:10 20   school.  Jahar would be the one baby-sitting him.  And they

21   were like brothers.

22   Q.    I'm going to show you a final picture, 3507-066.  Do you

23   have it there?

24   A.    Yes, I have it, yes.

25   Q.    Can you tell the jury who that is in that picture?

1    A.   On this picture, you can see my son on the left, Zia, and

2    Jahar Tsarnaev on the right.

3    Q.   Is that reflective of your understanding of their

4    relationship?

5    A.   Yes.  I believe, on that picture, they are either on the

6    Skype talking to someone else in the family.  So probably Jahar

7    was starting up the computer to let Zia talk either with one of

8    my family members or maybe with me even.

9    Q.   Can you tell us by looking at your son about how old he

01:11 10   was at that time?

11   A.   He's about -- about he was four year old, I would say,

12   yes, about four years old in that picture.

13   Q.   In about 2011, before he came back to Kazakhstan?

14   A.   Yeah.  It was about 2011, maybe fall of 2011.

15        MS. CLARKE:  Thank you.  Give me just one moment,

16   Elmirza.  I'll be right back.

17   Q.   Elmirza, at some point, you've told us that Zia came to be

18   with you in the fall of 2012 and the plan was for a few months,

19   right?

01:12 20   A.   Yes.

21   Q.   And that he would then return to Ailina, right?

22   A.   After that he was supposed to return, yes.

23   Q.   And did he return?

24   A.   No, he did not return because later on we discussed it

25   with Ailina.  We decided that I might keep him for his

birthday, which is April 15th.  And, you know, on that date, on

that exact date, the Marathon bombings happened.  So a few days

after the bombings, we found out who are the suspects.  And

after that, I decided that it's not a good idea to send my son

over there at the moment.

          MS. CLARKE:  Thank you.  I have no further questions.

The prosecutor, Mr. Chakravarty, may have some questions for

you.

          THE WITNESS:  Thank you.

CROSS-EXAMINATION BY MR. CHAKRAVARTY:

Q.   Good morning, Mr. Khozhugov.  Excuse me, good evening for

you.

A.   Good evening.  Good morning, actually, for you.

Q.   Mr. Khozhugov, you just told us that your son Ziyaudi was

born on April 15th, is that correct?

A.   Yes, April 15th, 2007.

Q.   2007.  And he spent some substantial time in the apartment

at 410 Norfolk Street, the Tsarnaev family house?

A.   He spent a lot of time in there, yes, as I am aware.

Q.   And the defendant was close to him?

A.   Yes, the defendant was close to him.

Q.   And the defendant chose to bomb the Marathon on April

15th?

          MS. CLARKE:  Your Honor, I'd object.

          THE COURT:  Sustained.

```
 1    Q.   And he was -- your son was supposed to come back to the
 2    United States for his birthday, correct?
 3    A.   He was supposed to come back to the United States after
 4    his birthday party here in Almaty.
 5    Q.   I see.  So his birthday was going to be celebrated on
 6    April 15th in Almaty, and then he was going to return to the
 7    United States?
 8    A.   Uh-huh, yes.
 9    Q.   It was that day that the Marathon bombing happened, so you
01:15 10   were not able to bring him back, correct?
11    A.   Yes.
12    Q.   Now, Elmirza, you grew up in Kazakhstan, correct?
13    A.   I did grow up here, yes.
14    Q.   And you are also of Chechen extraction, is that right?
15    A.   Ethnicity?
16    Q.   Yes.
17    A.   Yes, I am Chechen.
18    Q.   Are both sides of your family Chechen?
19    A.   Yes.
01:16 20   Q.   And despite that you've grown up in Kazakhstan, but you
21    don't speak the Chechen language, correct?
22    A.   That is correct.  I do not speak the Chechen language.
23    Q.   And you don't consider yourself to be an expert on Chechen
24    culture, right?
25    A.   I do consider myself.
```

| | |
|---|---|
| 1 | Q.   You do consider yourself to be an expert on Chechen |
| 2 | culture? |
| 3 | A.   Fluent in the Chechen culture, absolutely. |
| 4 | Q.   Do you remember talking to the FBI back in 2013? |
| 5 | A.   Excuse me? |
| 6 | Q.   Do you remember talking to the FBI in 2013 after the |
| 7 | bombing? |
| 8 | A.   Yes, I do remember that. |
| 9 | Q.   And do you remember telling the FBI that you do not speak |
| 01:16 10 | Chechen, and you are not familiar with their culture or |
| 11 | traditions? |
| 12 | A.   I do not recall me saying these exact words, but I may |
| 13 | have said that, yes. |
| 14 | Q.   Regardless of -- Ruslan Tsarni, the defendant's uncle, he |
| 15 | was also in Kazakhstan for several years, correct? |
| 16 | A.   That is correct. |
| 17 | Q.   At one point -- I think you described on direct |
| 18 | examination that the Tsarnaev family came and lived with him in |
| 19 | Kazakhstan, is that right? |
| 01:17 20 | A.   The children came and lived with him. |
| 21 | Q.   And that includes Tamerlan, Bella, and Ailina? |
| 22 | A.   Tamerlan was there, and I believe Ailina and Bella were, |
| 23 | too. |
| 24 | Q.   And the defendant and his parents, however, they traveled |
| 25 | to the United States around that time, correct? |

1   A.   The defendant's parents were either on their way to the
2   United States or already in the United States.  I cannot say
3   for sure because at that age I was not aware of all of what was
4   happening in their family.
5   Q.   So I'm trying to establish that Ruslan Tsarni, your -- I
6   guess he's your brother-in-law, but he was the defendant's
7   uncle?
8   A.   Yes.
9   Q.   -- was very supportive of the rest of the Tsarnaev family;
01:18 10  is that fair?
11  A.   Can you repeat the beginning of your question, please?
12  Q.   Sure.  Ruslan Tsarni was very supportive of the Tsarnaev
13  family, correct?
14  A.   In what respect?
15  Q.   Well --
16  A.   I don't -- it's not a clear question.
17  Q.   Okay.  Thank you.  Did he financially support the children
18  when they lived with him in Kazakhstan?
19  A.   He was supportive of the children, yes.
01:19 20  Q.   And, in fact --
21  A.   He did pay for their school.
22  Q.   And, in fact, he helped put on your wedding, correct?
23  A.   He -- yes, he did help with the weddings for both of the
24  daughters of Anzor.
25  Q.   There were times when Tamerlan would come and stay with

1  you in Kazakhstan as you grew up -- as you were growing up,

2  back when he was in his teens, is that right?

3  A.   Yes.

4  Q.   And Ruslan would support Tamerlan when he would come out

5  to Kazakhstan as well?

6  A.   Ruslan was what?  Excuse me.

7  Q.   Would Ruslan support Tamerlan when he would come to

8  Kazakhstan as well?

9  A.   Yes, he did support him, of course.

01:19 10  Q.   Eventually, Ruslan came to the United States to live here,

11  correct?

12  A.   Yes.

13  Q.   And when he came here, he visited you in Washington, I

14  think you said?

15  A.   Well, since I was living in his house, yes, he visited.

16  Q.   So he actually purchased a house for you in Washington so

17  you could stay there and go to school, correct?

18  A.   He didn't buy the house for me.

19  Q.   Okay.

01:20 20  A.   He just bought a house.  And when it was time when I was

21  about to go to college, he told me, Hey, there's this nice

22  college right next to the place where I bought a house.  Do you

23  want to go there?  And I said sure.

24  Q.   Okay.  So you stayed in the house that he had purchased in

25  Washington?

1    A.    Yes.

2    Q.    So he was generally very supportive of his family, is that

3    right?

4    A.    He was very supportive, absolutely.

5    Q.    And he had the financial means, and he also had the

6    interest in supporting people in his family, correct?

7          MS. CLARKE:  Your Honor, I'm not sure --

8    A.    He had financial -- what did you say?

9    Q.    He had the financial means and had the interest --

01:21 10         THE COURT:  I think there may be an objection.

11         MS. CLARKE:  Your Honor, I'm just not sure the

12   relevance of going off on --

13         THE COURT:  Go ahead.

14         MR. CHAKRAVARTY:  It won't be much longer.

15   Q.    Ruslan Tsarni was supportive of the people in his family,

16   including you, including the Tsarnaevs, correct?

17   A.    Yes.

18   Q.    And is it fair to say that he was the youngest of the

19   Tsarnaev brothers, or the Tsarni brothers?

01:21 20   A.    Can you repeat the question, please?

21   Q.    Was your -- was your brother-in-law Ruslan --

22   A.    Can you just speak more slowly?  I can't catch the words

23   so fast right now.

24   Q.    Was Ruslan Tsarni the youngest of the Tsarnaev brothers?

25   A.    Yes, he was the youngest.

1   Q.   And it's not customary that the youngest brother would be

2   supportive -- would be the primary supporter of the other

3   family members, is that correct?

4   A.   It is not very common that the youngest brother is the, so

5   to speak, bread giver in the family.  It is very unusual.  And

6   in most of the family that I know, usually it's the older

7   brother who is supporting the younger children.  But in respect

8   to the Tsarnaev family, they just have a younger brother who

9   outsmarted the rest of the family.  And being that smart child

01:22 10   in the family, he acts as if he's the eldest one, and he is

11   trying to help the rest of the family.  And it doesn't stop

12   with his family.  It also includes myself and my younger sister

13   who is now living in his house and goes to college over there.

14   Q.   He lives in Maryland, is that correct?

15   A.   Yes.

16   Q.   And you describe being friends with -- strike that.

17        Before we leave Ruslan Tsarni, he acts as the --

18   essentially, he takes the role of the patriarch of the family,

19   as you describe, because he's the smartest in the family, is

01:23 20   that right?

21   A.   Smartest and most successful, I would say.

22   Q.   And he's actually supportive of Alvi's son Andy as well?

23   A.   Yes, he is.

24   Q.   Okay.  As well as -- I think you mentioned Hussein

25   earlier?

```
 1    A.    Hussein as well.
 2    Q.    Now, you described you were friends with Tamerlan back in
 3    Kazakhstan, correct?
 4    A.    Uh-huh, yes.
 5    Q.    And he was a very likable fellow?
 6    A.    He was very likable, yes.
 7    Q.    And he was goofy and he had friends?
 8    A.    Yes.
 9    Q.    And when he came to the United States, you also spent some
01:24 10   time with him with some of his friends here?
11    A.    I don't know -- he didn't have many friends in the U.S.
12    outside of the Chechen community in there.
13    Q.    Do you remember telling the FBI that on the weekends he
14    would meet with some of his friends, including one I think you
15    mentioned was Abu Bakr, and they would sit around and drink
16    beers?
17    A.    Again, please speak a little more slowly because the
18    outdoor here is a little bit noisy.  When you separate your
19    voice, I can hear it better.
01:24 20   Q.    Sorry about that.
21          Do you remember telling the FBI that you would spend some
22    time with Tamerlan and some of his friends here in the Boston
23    area?  One person you named was Abu Bakr.  And on weekends they
24    would spend some time and they would drink beer?
25    A.    Yes, that happened.
```

```
 1   Q.   And he was generally -- he was the same person that you
 2   knew back in Kazakhstan, correct?
 3   A.   He has become bigger at that point, yes, and still he was
 4   very friendly.  And I would say he would be the heart of the
 5   party or the center of attention again, yeah.
 6   Q.   And he continued to box in the United States?
 7   A.   Yes.
 8   Q.   And I think you mentioned on direct examination that you
 9   -- that he told you that he was told not to box by a person
10   named Misha, is that right?
11   A.   Yes, he told me that.
12   Q.   Do you remember telling the FBI in August of 2013 that it
13   was actually his parents that encouraged him not to box
14   anymore?
15   A.   His parents -- his father encouraged him to stop boxing.
16   He was encouraging him for a few years before he actually
17   stopped.
18   Q.   And then --
19   A.   But when I spoke to him on the phone, particularly he said
20   to me that Misha told him that it's not appropriate in Islam,
21   and that's why he stopped.
22   Q.   Do you remember also telling the FBI that you said he then
23   started boxing again?
24   A.   He started what?
25   Q.   Boxing again.
```

```
 1    A.    That -- yeah, that happened, and he was boxing, I mean,
 2    professional boxing, like in his high school, I mean, not
 3    exactly professionally but boxing for titles, and then he would
 4    quit and try something else.  He would work and not do as much
 5    boxing.  And then again he would attempt -- make an attempt to
 6    start boxing professionally again.  He would go to the gym,
 7    spend a lot of time there.  And eventually he just -- make sure
 8    you know the time patterns when you ask these questions
 9    actually.
```

01:27 10    Q.    So your last contact with Tamerlan was in 2010, is that
```
11    right?
12    A.    My what with Tamerlan was in 2010?
13    Q.    Your last contact with Tamerlan.
14    A.    Over the phone, it was in 2011, last contact.
15    Q.    Over the phone was in 2011.  But your last personal
16    contact was in 2010?
17    A.    Yes.
18    Q.    Okay.  And at that point, your relationship with Ailina
19    was pretty well broken, correct?
```
01:28 20    A.    We were separated by that time, yes.
```
21    Q.    And do you remember telling the FBI that in your culture
22    it's not allowable to maintain a friendship with the brother of
23    one's ex-wife?
24    A.    Yes, I did say that.
25    Q.    And so you weren't having a lot of contact with Tamerlan
```

```
 1    after that point, correct?

 2    A.   I did not have -- I was not supposed -- and I did not have

 3    a lot of contact with him as friends, but we were still family.

 4    And, yes, we did contact because we were family.

 5    Q.   So when, in 2011, you said that you were at South Station

 6    hoping to spend some time with him, you shouldn't have been

 7    surprised that he was not eager to spend time with you,

 8    correct?

 9    A.   No.   I was surprised because --
```
01:29 10    Q.   I understand you told us that you were surprised.
```
11    A.   The reason -- I understand your question is about the

12    reason why, because when I met him in 2010 and we were already

13    separated with his sister, when I saw him, he hugged me and we

14    did talk.   And it was the same situation.   I was picking up my

15    son to take him with me, instead this time I was staying in

16    D.C. with Ruslan.   But a little more than a year later, what I

17    get from him is, Hey, I'm busy with doing mosque things so, no,

18    I'm not going --

19    Q.   So is it fair to say, though, by that time, by 2011, your
```
01:30 20    relationship with the Tsarnaev family was based solely on their
```
21    custody of Ziyaudi?

22    A.   Yes, it is correct.

23    Q.   And you didn't do a lot of socializing, and you weren't

24    very communicative with them at that time, correct?

25    A.   We contacted mostly with a -- me and the mother Zubeidat,
```

1    we contacted a lot.

2    Q.   And she acted as a liaison between you and the family?

3    A.   She act as what?

4    Q.   As a liaison between you and her sons and daughters.

5    A.   We just contacted for discussions about my son primarily,

6    and then in between we would discuss how is every person in the

7    family doing at that point in time.

8    Q.   So from 2010, 2011, 2012, and into 2013, you did not have

9    a lot of a window into what was happening in the Tsarnaev

01:31 10  household, correct?

11   A.   I did not have much physical contact with -- I mean, I

12   didn't see them personally a lot.  I did not talk to them a lot

13   because it was not possible due to the distances.  But in any

14   way, they are my family and I am connected to them, not just

15   through my son but also my sister who is married to their

16   uncle.  So we always knew about what's happening in between us.

17   So it would be safe to say that we were informed of what was

18   happening in the family.

19   Q.   But the relationship between Ruslan, your brother-in-law,

01:32 20  and Anzor had also soured, and they were not talking to each

21   other?

22        MS. CLARKE:  Your Honor, the relationship --

23   A.   That is correct.

24        THE COURT:  Go ahead.

25   Q.   And you weren't getting that much information about what

1    was happening inside the Tsarnaev household, correct?

2    A.   I was getting information from the women in the family, I

3    mean, my own sister and my -- and the grandmother of Jahar and

4    Tamerlan, Liza and Zubeidat, too.  The women, of course, find

5    ways to talk to each other about what's happened.  But given

6    that Ruslan and Anzor didn't have the best relationship at this

7    point in time, I couldn't get information from Ruslan.  That's

8    true.

9    Q.   The only information you were getting was information that

01:32 10   Zubeidat wanted to get out, correct?

11   A.   That is possible, that we only heard what she wanted us to

12   hear.

13   Q.   You mentioned that you didn't have that much of a

14   relationship with Jahar when he came -- when you came to the

15   United States because he was always studying when you would

16   visit the home, is that fair?

17   A.   That is correct.  We -- I was friends with his older

18   brother, so I would spend more time with Tamerlan than with

19   Jahar, of course.

01:33 20        MR. CHAKRAVARTY:  Thank you, Mr. Khozhugov.

21        THE WITNESS:  Welcome.

22        MS. CLARKE:  Thank you.  I should probably -- Elmirza,

23   thank you very much.

24        THE WITNESS:  Okay.  Thank you.

25        THE COURT:  We'll terminate the witness' testimony,

```
 1   and we'll terminate the connection.
 2           Why don't we take a short break.  We're almost at the
 3   morning recess time.  We'll just take a short break early.
 4           THE CLERK:  All rise for the Court and the jury.  The
 5   court will take the morning recess.
 6   (Recess taken at 10:45 a.m.)
 7           THE CLERK:  All rise for the Court and the jury.
 8           (The Court and jury enter the courtroom at 11:14 a.m.)
 9           THE CLERK:  Be seated.
02:04 10         MS. CLARKE:  Your Honor, the defense would call
11   Dr. Jay Giedd.
12                      JAY GIEDD, duly sworn
13           THE CLERK:  Have a seat.
14           State your name, spell your first and last name for
15   the record, keep your voice up and speak into the mic so
16   everyone can hear you.
17           THE WITNESS:  Jay Giedd, first name J-A-Y, last name
18   G-I-E-D-D.
19                      DIRECT EXAMINATION
02:05 20   BY MS. CLARKE:
21   Q.   And I'm going to call you "Dr. Giedd."  You are an M.D.?
22   A.   Correct.
23   Q.   Dr. Giedd, where are you currently employed?
24   A.   At the University of California San Diego.
25   Q.   And how long have you been at UC San Diego?
```

1    A.    Since August of 2014, so eight months.

2    Q.    And where were you before that?

3    A.    Since 1991 I'd been at the National Institute of Health,

4    chief of brain imaging in the child psychiatry branch.

5    Q.    Since 1991?

6    A.    Yes.

7    Q.    Up until?

8    A.    Until August of 2014.

9    Q.    And why did you move to San Diego, other than for the

02:06 10   weather?

11    A.    It allowed me to expand the scope of my research into --

12    in addition to the institutes here in Boston, it's one of the

13    centers for people who study brain development; the people, the

14    technologies and support for my work to have a greater impact.

15    So I liked my years at NIH a lot, so it was a difficult

16    decision, but it turned out to be the right one for me.

17    Q.    And "NIH" is the National Institute of Health?

18    A.    Correct.  National Institutes of Health, and then a subset

19    of that is the National Institute of Mental Health.

02:07 20   Q.    Before we get into why you're here, can you tell us a

21    little bit about your educational background?

22    A.    I grew up in North Dakota and went to college and medical

23    school there.  My undergraduate degrees were in mathematics,

24    then philosophy, then the natural sciences, biology, chemistry,

25    physics.

1          After medical school, I did psychiatric training at the

2     Menninger Foundation in Topeka, Kansas, which was an old-school

3     psychoanalytic model; and then Barrow Neurologic Institute in

4     Arizona; and then I went to Duke University and did geriatric

5     and child and adolescent psychiatry training.

6     Q.    Both ends of the spectrum.

7     A.    Yeah.  It's a little unusual to be boarded in both

8     geriatric and child, but they have more in common than people

9     think, sort of the riddle of the Sphinx where people lock on

02:08 10    four and then two, then three.  So there's this idea of last

11    in, first out or a palindromic that a lot of the changes in

12    early brain development are undone in aging.  And so they're

13    not opposites; they're actually quite similar issues about how

14    the brain changes over time.

15    Q.    And so I take it that you specialized in both geriatric

16    and child and adolescents?

17    A.    Yes, but predominantly child and mostly adolescents, just

18    the nature of the studies.  We followed people from young ages

19    and had them come to my lab every two years.  We took a picture

02:08 20    of their brain.  We got their DNA from their blood or their

21    saliva or their skin.  And we ask questions how they're doing

22    at home, at school, at work.

23          And so many of the people in the study then matured

24    through the second decade of life, and that became key because

25    that's when most mental illnesses emerge.  Not all of them, not

1    Alzheimer's, not autism, ADHD, but schizophrenia, bipolar

2    disorder, eating disorder, substance abuse, panic attacks,

3    bipolar disorder.  So over half of all of the illnesses that

4    emerge, emerge during the second decade.

5    Q.   So your career has been in research?

6    A.   Yeah, I'm a practicing psychiatrist, but most of my time

7    is spent with research, and most of it related to brain

8    imaging, genetics and behavior.

9    Q.   And when you said you were boarded in both geriatrics and

02:09 10   child and adolescence psychiatry, what does that mean?

11   A.   Oh, just for medical certification, you can -- after

12   psychiatry, you can then develop a subspecialty with extra

13   training in different areas.  And one of the areas is

14   geriatric, and another one is child and adolescent psychiatry.

15   So it's doing additional training in those age groups.

16   Q.   Have you published in the area of child or adolescent

17   brain development?

18   A.   Yes.

19   Q.   A lot?

02:10 20   A.   Over 300 papers, but the type of work I do is team

21   science, so a lot of people contributed to those efforts, then

22   papers with over 500 people from 80 different institutions.  So

23   a lot of papers, but most of them as part of a team.

24   Q.   And when you were at NIH, was most of your research

25   focused on adolescent brain development?

A.    Toward the second decade of the research, since we started
young and then as people aged, a lot became that.  About half
is healthy children and youth, and the other half was for
illnesses such as schizophrenia, autism, ADHD, but 30 different
groups.  And both my work and my writing is almost exactly half
and half, half healthy and half illnesses.

Q.    All right.  So you publish in the area of the healthy
adolescent brain and the unhealthy adolescent brain?

A.    Yeah.  Some of the -- along the way then I became an
adjunct professor in the department of family and reproductive
medicine at Johns Hopkins.  And one of the themes there was
unwanted teen pregnancy.  So that's not an illness, but it
still has a huge impact on the lives of youth and their
families.

       And so much of what I did I realize wasn't technically an
illness, but it was still a huge impact, life decisions,
people's decisions about careers, relationships, education,
military service.  And so it's kind of an odd area that is not
technically an illness, it's not covered by medical insurance
plans, but for adolescents it still has a huge impact on their
lives.

Q.    Okay.  So we asked you today to come and talk with us and
with the jury and educate us a little on the science of brain
development.  Is that correct?

A.    Yes.

1    Q.   That was the specific task?

2    A.   Yes.

3    Q.   First, can you define for us "adolescence"?  What does

4    "adolescence" mean?

5    A.   So it is what I do a lot of, but it's a bit mushy to

6    define precisely.  It starts in biology with puberty, and it

7    ends in society in terms of being an adult role in society.  So

8    both the start and the end are imprecise because puberty can be

9    anywhere between nine and 15 and still normal, and when we

02:12 10   attain independent adult role in society, there's also a moving

11   target.  So people are waiting longer to get married, to start

12   families, to buy a house, to start families.

13        So it's a little bit imprecise in its onset and closure,

14   but the idea is when we become from child into an independent

15   functioning adult.

16   Q.   Have we learned -- "we," as a science -- learned a lot

17   about brain development in the last few decades?

18   A.   Yes, we have, largely because of technology like brain

19   imaging but also genetics and other areas.  One of the odd

02:13 20   parts about brain maturation -- so when you talk about

21   adolescents, sort of the brain being mature enough to not need

22   protection from that person's decisions, society's been -- has

23   reached almost no consensus.  So the age of reason in

24   Catholicism is eight when you can be held accountable, morally,

25   for your actions; to be -- a consent to sex is 13, depending on

       1   which state; to be married, 15; driving, 16; 18 to vote, to buy

       2   cigarettes or be drafted; 21 for a governor; 25 for House of

       3   Representatives; 30 for Senate; 35 for President.  It's all

       4   over the place in terms of the consensus of, you know, when is

       5   the brain, quote, "mature."

       6        And so a lot of the work has been trying to have

       7   neuroscience help inform this gray area.

       8   Q.   I would like to get you to talk to the jury a little bit

       9   about what you called the brain maturing, the maturation

02:14 10   process.  We have -- you provided some slides, PowerPoint

      11   slides.  Would those help illustrate your testimony?

      12   A.   Yes.  Yes.

      13   Q.   Let me pull up the first slide.

      14           MS. PELLEGRINI:  No objection, your Honor.

      15           THE COURT:  To any of them?

      16           MS. PELLEGRINI:  No.

      17           THE COURT:  Okay.

      18           MS. CLARKE:  I think the number is 3434, your Honor,

      19   and there's a small video embedded in one of the slides that

02:15 20   would be 3434A.

      21           (Defense Exhibit Nos. 3434 and 3434A received into

      22   evidence.)

      23   BY MS. CLARKE:

      24   Q.   Can you tell us, this first slide, Brain Maturation, can

      25   you tell us a little bit about this connection in

1    specialization?

2    A.   Well, when we started these studies, we kind of wondered,

3    should we follow people till 16 or 18, because I'm out of --

4    adolescent psychiatrist, by 16, people are already winning

5    medals in the Olympics; that they're quite smart and mature and

6    skilled.  And even concern that it was only because of the

7    Industrial Revolution that we've sort of stretched out this

8    whole adolescence.

9         So the first surprise was that it wasn't 16 or 18 but more

02:15 10   like 25 to 30 when the brain was still having very active,

11   dynamic changes.  And this just wasn't even on our radar

12   screen.  We looked more closely, and things like if you go to

13   the airport to rent a car, you have to be 25 or else the rates

14   are extraordinarily high.  And so with that -- this is the

15   trouble in neuroscience that Hertz has all the best

16   neuroscientists and we couldn't make progress.

17        But this later became called the paradox of adolescence.

18   So you should be at the top of your game, your resistance to

19   cancer, tolerance for heat and cold, agility, physical acuity,

02:16 20   so many things you measure you're absolutely at the top of your

21   game.

22        But morbidity and mortality go up 300 percent during this

23   time.  And so it was puzzling in terms of why, when we're so at

24   our peak physically, that we have all of these concerns related

25   to decision-making.  Predominantly motor-vehicle accidents is

1   the number one cause of death for teens; suicide or homicide

2   are two and three, depending on how people characterize the

3   events.  But all of the top 10 seem to be related to these kind

4   of brain maturation functions.

5   Q.   So the brain matures over a period of time.  In the teen

6   years, I think you have said that it doesn't grow by getting

7   bigger, but it grows how?

8   A.   That surprised us at first.  So by age six, the brain is

9   already 93 percent of adult size.  And at first, that was very

02:17 10   disappointing because we were going to watch how the brain grew

11   as we got smarter.  So it's this big, we can do arithmetic;

12   this big, algebra; this big, calculus.  And so when we realized

13   that the size of the brain was so close to its maximum so

14   young, it was a bit disappointing.

15       And that still remains the case.  The brain is as big as

16   it's going to get by about 12, and actually becomes smaller

17   after that.  So it's like Michelangelo's David emerging from

18   the granite, that we specialize the brain by actually making it

19   smaller.  We eliminate unused connections or connections that

02:18 20   lead to bad things.

21   Q.   Well, what do you mean by "becoming more connected"?

22   A.   So we used to think we'd point to a part of the brain, and

23   so this part of the brain does X, and this part of the brain is

24   for memory, and this part of the brain is for looking to the

25   future.  And that's been one of the changes.  So now we see

1   different parts of the brain are more like letters of the

2   alphabet.  And by about eight months, we have all of the

3   letters in place.

4       What happens as we go from child to teenager to adult

5   through life, those letters get formed into words, the words

6   into sentences, the sentences into paragraphs.  So that's how

7   the brain matures, but -- by becoming more connected within

8   itself, but not by growing larger.

9   Q.   So there's actually something happening in the brain to

02:18 10  make it more connected?

11  A.   Yes.  Yeah, there's a process called myelination, which is

12  where the nerves are wrapped in insulation, just like a copper

13  wire.  It's wrapped with that rubber coating to make the

14  information go faster.  And so throughout life into the fifth

15  decade for women and the fourth for men, we get more and more

16  of this insulation, which makes our brain move 100 times faster

17  than without the insulation, and it's ready to refire again 30

18  times faster.  So it's really responsible for what, you know,

19  makes human thoughts much better than other species.

02:19 20      So all throughout adolescence, we have this kind of

21  one-two process of connections that we use become stronger and

22  faster, and the connections that we don't use, they're not just

23  sort of like lying there idle.  They're physically removed from

24  the brain.

25      So growing up in North Dakota, it's a very good place to

1    drive or to be a pilot because, from the sky, everything is
2    like a checkerboard.  It's all quarter-mile grids.  You can get
3    to anyplace on the gravel roads by turning.  But as the roads
4    become more used, they become paved between the major grain
5    centers.  They might have become multi-lane highways.  So now
6    you can zoom down those lanes, but you can't turn off every
7    quarter of a mile anymore.  You have to wait for the exits.
8    Q.    Sure.  So, I mean, there's something physically that's
9    happening in the brain to make it more connected?
02:20 10   A.    Yeah.  As these changes happen, as you get this insulating
11   material that speeds everything up.  Then you pay a price for
12   that and that the brain is not as changeable anymore.  So it's
13   this balance of the brain staying changeable but also that we
14   get better and better at what we ask our brain to do.
15   Q.    And these connections, do we know how long that process,
16   on the average, takes?  You can't say on any given individual,
17   but on the average.
18   A.    So different parts of the brain reach adult status
19   different times.  The parts of the brain that keeps us alive,
02:21 20   like heart rate, breathing, that has to happen very early, even
21   in the womb.  And then our five senses of sight, sound, touch,
22   smell and taste, then those parts -- those connections get
23   formed.  And there's this sort of cascade, then, in terms of
24   during the teen years when we have the parts of our brain
25   involved in thinking about the future, making decisions,

1    long-range planning, social interactions.  They're the ones

2    that are still under construction.

3    Q.   So you also mentioned that, in addition to becoming more

4    connected, the brain becomes more specialized.  Can you help us

5    understand that?

6    A.   Yeah, it's really the key to humans in terms of -- the

7    biology creates a very broad range of possibilities.  And as we

8    go through the teen years, then our brains can become adapted

9    to live in the North Pole or the Equator, anywhere

02:22 10   between -- we can even live in outer space for a little while

11   with the technologies that our brains have developed.

12        And so this is the fundamental tradeoff.  Our brains stay

13   changeable way longer than any other species, and that's what

14   allowed us to survive.  Even compared to Neanderthals who we

15   coexisted with, their brains were 10 percent larger than ours,

16   but their brains matured earlier.  So by 12, Neanderthals were

17   already having their own children, were living with their

18   children in caves.

19        So what happened in humans was that everybody's ancestors

02:22 20   in this room had adolescence whose brains were very changeable.

21   And what predicts the big change in the brain wasn't how harsh

22   the climate was but how rapidly the climate changed.  And this

23   became the key to our survival as a species.

24   Q.   But when you specialize, what do you mean, the brain is

25   specializing?  Is it in an activity, is it -- what --

1   A.   Yeah, it can be an activity, a skill, music, a sport,

2   learning -- a knowledge about a certain area, almost anything

3   physical or mental that we can imagine, the more we do it, our

4   brain will become specialized and optimized to do that.

5   Q.   More focused on that?

6   A.   It will be able to do those tasks with less energy, with

7   less utilization of blood sugar and other energy sources.  It

8   becomes more streamlined.  We can accomplish those tasks faster

9   and more efficiently.  But the price we pay is then we can't

02:23 10  learn other tasks as easily.

11  Q.   As we become more specialized?

12  A.   Correct.

13  Q.   On this slide, why was it that you illustrated this point

14  with the two football players?

15  A.   It's -- you know, partly because this is a time -- in

16  terms of whether it's football or music or academics or other

17  things, this is a key time in developing these skills so

18  that -- even younger for certain things, between ages seven-11

19  is the key time to be doing piano, fine motor skills in terms

02:24 20  of certain sports and certain abilities.

21      But during the second decade, one of the key aspects is

22  social because the main task is to stay alive and to reproduce,

23  and so this is a time where there's a lot of social bonding,

24  team sports, learning new skills.

25  Q.   I take it that there are other major changes going on in

1    the brain through the teen years.  I'm going to pull up the

2    second slide somehow.  Can you talk to us a little bit about

3    the major changes in the development of the brain that are

4    going -- maybe in competition with each other or maybe, you

5    know, causing some issues that we call "teenage," going on

6    during the teen years?

7    A.   So the part shown here in green is the part --

8    Q.   You can touch the screen, Dr. Giedd, and circle -- you can

9    actually draw a circle around what you're talking about.

02:25 10   A.   (Witness complies.)

11   Q.   There you go.

12   A.   Okay.  So, yeah, this is the part of the brain -- it's

13   called the prefrontal cortex or the frontal part of the brain,

14   and it's what's most different between us and chimpanzees or

15   other genetic cousins.  And it's the part of the brain that is

16   for doing, in a sense, the hard stuff.  And so that we have to

17   wait longer for rewards, it controls impulses.  It's involved

18   in choosing the larger, later reward versus the sooner,

19   smaller.  And it's the part of the brain that allows us to do

02:26 20   time travel.

21   Q.   What do you mean?

22   A.   Mental time travel.  So we don't have to just consider

23   what's happening at the very present moment, like most animals;

24   we can consider all of our memories, all of the experiences

25   that we've had in our life, all of the input coming in through

1    our eyes and our skin and our nose and our mouth but also our

2    hopes and dreams for the future and to tie it all together.

3         So going back to the letter metaphor, this would be where

4    the paragraphs are formed, and it's the part of the brain that

5    is latest to mature.  So not --

6    Q.   So the part of the brain that is the latest to mature is

7    what allows us to control impulses and to plan and to

8    understand consequences?

9    A.   Yes, and to get along with each other socially and to run

02:26 10   these different scenarios in our mind instead of the real

11   world, so we can imagine different consequences and different

12   actions instead of having to physically put ourself in harm's

13   way.

14        Again, this sort of long development is not necessarily a

15   bad thing.  It also then allows us to specialize in these

16   different areas.  But as opposed to the, you know, 25 or so

17   parts of the brain, the purple parts, the limbic system --

18   Q.   Can you show us where --

19   A.   Yes.  So these areas here, which are a collection of

02:27 20   structures, they have a lot of hormone receptors.  And so at

21   puberty, there's drastic changes, not just in the size or the

22   shape of them, but in the receptors and the density of

23   different types of molecules.

24        And there's an explosion, then, in the passions, in terms

25   of sex drive kicks in, aggression, but also fundamentally

1    rewards and punishments.  So this -- puberty, if it happens

2    around 12, that leaves a decade or more so in terms of balance

3    that's changing.

4        They're not really at odds with each other.  The whole

5    thinking was that the limbic system was sort of primitive and

6    had to be overridden by the civilized, frontal lobe.  Now it's

7    seen much more as a dance between them.  The limbic system

8    tells us what our goals should be.  It tells us our

9    motivations.  And the frontal part helps us achieve those

02:28 10   goals.  But inherently they're sort of at odds in terms of

11   "Right now I see it, I want to do it, just let it happen,"

12   versus having the kind of stepping back and saying, "Let's

13   think this through," what might be the longer-term

14   consequences.  And that balance shifts during the teen years.

15   Q.   Then the limbic system could be the emotional drive?

16   A.   Yeah, it's emotional, but it's also -- it tells us what's

17   important.  So it's basically to stay alive and to reproduce,

18   are the big ones, but also involved in even sleep, hunger, all

19   of the drives that motivate us to do or not do things are

02:29 20   related to the limbic system.

21   Q.   And there's a slide I think you have next that we

22   have -- you have captioned "Brain Maturation, Age 4-22."

23   You've already drawn a circle around it --

24   A.   Yeah, just to sort of -- so this is actually a movie, if

25   it works as a movie, and it will loop around and around, but

1   just to sort of focus on, again, this is that same area that I

2   was mentioning, the prefrontal cortex, involved in controlling

3   impulses, long-range planning, mental time travel, doing the

4   hard stuff of what makes humans, humans.

5        And what we'll see, if the movie runs, is when it turns

6   blue, that's when it's reaching the adult levels, when it's

7   maturing.  And so this part of the brain is amongst the latest

8   to reach adult levels.

9   Q.   So what should -- assuming the movie works, what should we

02:30 10  watch for?

11  A.   So if I was accurate with the circle, you can kind of see

12  it's sort of like the blue will sort of circle the wagons.  It

13  will circle around and sort of close in on this area,

14  indicating that it's very late to reach adult levels.  It's not

15  broken or absent in teens; it's just that it's not as good as

16  it's going to get.

17  Q.   Let me get you to draw that again.  I had to clear the

18  other --

19  A.   Okay.  Okay.

02:30 20  Q.   That's roughly where the prefrontal cortex text is?

21  A.   Yeah, and, again, this is on average.  So this is an

22  average of 52 brain scans averaged across this age.  So for a

23  given person, they, you know, may be earlier or later on this

24  process.

25  Q.   Let's make that clear.  You're not talking about any

1    individual brain here; you're talking about what the studies

2    collectively would --

3    A.   Yeah, that's actually a really important point because

4    when these studies -- when we say, you know, on average

5    people -- there's so many exceptions to the rule, and so we

6    have 14-year-old girls who are very future thinking and are not

7    impulsive and long-range planning and 54-year-old men who

8    never, you know, get to those stages.  And so --

9    Q.   You're not talking about yourself?

02:31 10         (Laughter.)

11   A.   I'm under oath, so I'll say yes.  Yeah.

12         (Laughter.)

13   A.   And there's just a huge variation.  That's been one of the

14   biggest challenges of why we can't do very much with a single,

15   individual scan.  So everything I'm saying relates more to

16   child adolescence and adulthood in general.  There's many

17   exceptions to the rules.

18   Q.   Well, let me click on the movie.  And it will repeat

19   itself, I think.

02:32 20   A.   The circle moves, so let me see if I can.

21   Q.   Here, let me clear that and you can --

22   A.   (Indicating.)

23         And so, again, it's not that before this age that it's

24   defective or damaged or nonexistent.  But it's just that it's

25   not as good as it's going to get.  It's still under

1    construction.  But in general, that's a good thing.  It allows

2    the brain to keep options open.  So during these times we can

3    specialize in all kinds of different things.  It's a great time

4    for learning.  It's a great time for interventions.  So I don't

5    want to paint this as a bad thing or a pathology.  It's a

6    healthy part of humans.

7    Q.    It's the way it works?

8    A.    It worked, yeah.  I guess that's a better way to say it,

9    that it's both the blessing and curse of much of my work in

02:33 10   terms of this plasticity creates the vulnerabilities to the

11   illnesses, but it also creates the positives.  And it's a

12   double-edged sword.

13   Q.    Doctor, I just stopped the film here at an arbitrary

14   place.  And can you explain what the blue versus the green is?

15   A.    Yes.  So the blue would be areas that are already at the

16   adult level at these young ages.  So here is -- this is called

17   the sensory and motor strip in terms of this is basic sense of

18   touch and of movement.  At quite young ages, that's already at

19   adult levels, visual centers, auditory also, you know, quite

02:33 20   early.

21        This part of the brain is involved in social interactions,

22   in assessing what other people are thinking or feeling,

23   affected in things like autism.  But this is the key area

24   involved in the things that make us most human in terms of our

25   individuality.

1   Q.   You've told us that the limbic system --

2        MS. CLARKE:   If I can now get out of the movie and go to

3   the next slide.

4   Q.   You've told us that the limbic system is maturing faster

5   than the prefrontal cortex, essentially?

6   A.   It's maturing throughout -- you know, throughout life we

7   always have a reward system, but at puberty it really gets

8   intensified, and so -- and it's literally puberty.  So the

9   frontal lobe, whether -- it's more your age, whether you're pre

02:35 10  puberty or post puberty, the hormones don't affect the frontal

11  part as much.

12       But the limbic system is very hormonally sensitive, and so

13  when that's activated, it changes our motivations; it changes

14  our passions, again, for both -- you know, for good and ill;

15  whereas the prefrontal cortex is sort of plugging along at its

16  own -- at its own pace.

17  Q.   When do they catch up to each other?

18  A.   Somewhere between 25 and 30.  And, again, for a given

19  person, it might be quite -- quite different than that.  The

02:35 20  brain never stops changing from conception, you know, through

21  death.  So sometimes we ask -- we're asked when does the brain

22  stop maturing, when does it stop changing, and it's a difficult

23  thing to answer, but in this context we're saying the brain

24  increases -- more cells, more connections than can possibly

25  survive, and then it prunes down based on our experience, and

1    then it sort of levels off.  And so what I'm talking about is

2    this kind of leveling-off process, where things sort of slow

3    down, and that's between 25 and 30.

4    Q.   So what does this difference in the balance between the

5    limbic system and the prefrontal cortex mean to us?

6    A.   Well, teens are more likely to choose the smaller, sooner

7    rewards, less worried about longer-term consequences, you know,

8    20 years down the road.  Again, it may be a reasonable thing

9    for, you know, teens to think that way.  It's a time when they

02:36 10   have greater reward seeking -- and this isn't even just humans.

11        All mammals, all social mammals, have these huge changes

12   in sensation seeking, reward sensitivity and a move away from

13   parents to peers.  And so this -- these changes are triggered

14   by these limbic changes.  And we're not going to make them go

15   away.  They're sort of part of our human condition.  They're

16   part of like even other species.

17        And so the idea is to keep these non-lethal, in terms

18   of -- car accidents is one example, but substances of abuse,

19   things we didn't have when our brains were evolving, but now

02:37 20   it's kind of a Stone Age brain with modern Computer Age

21   temptations.  But these changes affect and suggest a lot of

22   decisions that teens make, many of which are quite rational,

23   you know, in terms of for where the teens are at that moment in

24   their life.

25   Q.   So if the prefrontal and the limbic system are trying to

1    catch up to each other, you say they catch up probably by age

2    25.  Is that helping us define adolescence?

3    A.   It's tricky in terms of at some, you know, point we have

4    to draw the line and we have to realize that for a given person

5    that number is quite different.  So I think in terms of 25,

6    maybe, you know, being as good as it's going to get or close to

7    that, but at earlier ages it might, you know, be good enough.

8    It's a tricky line to draw, especially given that it's so

9    different from person to person.

02:38 10      But for certain decisions, in terms of financial planning

11   and things like that, where there is a right answer, it's not

12   even 25.  People actually make better decisions well into their

13   50s in certain types of decisions.

14   Q.   Where is this -- on the average in the studies that you've

15   done, where is this prefrontal limbic balance at around age 19

16   and 20?

17   A.   Well, on average, puberty 12, and then the end point 25,

18   so it's sort of about halfway, actually.  Yeah.

19   Q.   Well, you've got a scale here.  You're saying that the

02:38 20   scale is trying to average by 25 and it's on its way from 12?

21   A.   Yes.  Yes, on average.

22   Q.   There must be some influences on brain development that

23   affect development.  What would they be?

24   A.   Yeah, so that's a big part of the research.  The first,

25   really, 13 years of my research was just creating the maps,

1    what is the path of brain development.  And then in 2002, we

2    started looking at what matters, what helps it, what hurts it

3    in terms of what are the influences that sports or music,

4    bacteria, viruses, diet, schools, second languages, video

5    games -- all these different choices.

6         And so one of the ways to address this is to look at

7    twins, identical twins versus non-identical twins.  And what

8    was striking was how big the impact of the environment is.  And

9    so the environment is not just sort of the pollutants in the

02:40 10   air but family, friends, the media, all the non-genetic

11   influences.

12        And one way to think about it is that the genes are like

13   the lightbulbs on a scoreboard, a huge scoreboard with a

14   billion lights.  So we're born -- we might have slightly

15   different numbers of lightbulbs or slightly different

16   arrangements, but what really matters is which lightbulbs are

17   turned on and at what time.  That spells out the letters; that

18   spells out, you know, the numbers.

19        And so the genetics really just sort of creates a very

02:40 20   broad playing field, but it's the environment, then, that

21   determines which of the genes are turned on in which sequences,

22   and so we become, you know, much more impressed, I guess, with

23   the potential for the environment to change the brain.

24   Q.   Some environmental influences, how would you relate

25   parental influence or sibling influence on the developing

 1    brain?

 2    A.   Well, different environments have different impacts at

 3    different ages in different parts of the brain.  But

 4    particularly during the -- after puberty and before adulthood,

 5    the big thing is social, that we stay alive by being part of a

 6    team, by being part of a group.  We're not the biggest,

 7    strongest, or fastest.  So it's really -- it's not algebra;

 8    it's not the things you learn in school.  It's social, you

 9    know, fitting into social groups.

02:41 10       And the way that the brain does that is through modeling,

 11   you know, not modeling kind of stuff but learning, and learning

 12   by example.  So reading's only about 5,000 years old.  Through

 13   most of humanity, nobody read a single word.  Our brains learn

 14   by example, from our parents or family when we're younger, from

 15   peers when we're older, you know, or media.  But the brain is

 16   really good at learning by example.

 17       And, you know, family is the proximate example.  And

 18   sometimes I'm asked sort of what do I do different as a parent

 19   based on the brain science, and it's hard because it's not a

02:42 20   long list.  But one of the aspects is that we're always on.

 21   We're teaching our children about how to deal with emotions,

 22   about time management, about goals and values, not when we're

 23   having these big-day talks and, you know, sitting down.  It's

 24   everyday moments, what we say about them when they're in the

 25   back of the car to other people.

1       And so the idea, you know, in terms of this is when their

2   brain -- because it's specializing, because it's eliminating

3   connections and not, this is when we become who we are in terms

4   of our values, identity, you know, what makes us unique

5   individuals.

6   Q.   Is there -- in the -- from what we're learning in research

7   and -- your decades of research and others', is there an age

8   range that we can now say is adolescence, or are we still not

9   able to do that?

02:43 10   A.   Yeah, at the end of the day, we, you know, kind of go

11   around and around and talk about when you become independent

12   adults.  And, pragmatically, we often kind of then come back to

13   the second decade, you know, ten to 20, but more so because

14   of -- like, it depends on the question being asked.

15       But the data is available for the United States, Germany

16   and Japan.  Even since the 1970s, we're getting married five

17   years later.  We're starting families five years later.  We're

18   leaving home, you know, later.  30 percent of college graduates

19   live back at home for at least a year.  Not that that's

02:43 20   inherently a bad thing, but biology hasn't changed in 40, 50

21   years.

22       And so the whole notion of adolescence is -- always comes

23   back to for what -- you know, it depends, and for what reason

24   do you want to refine it.  It's really hard to deal with the

25   individual variation in terms of how different people are on

1    this scale of maturation.

2    Q.   Is there a take-home message on brain development in

3    the -- from, say, puberty through 25 or 30, or 20?

4    A.   It's hard to pick one, but I think that one of them is

5    just that itself, how -- how protracted it is, how stretched

6    out the ability of the brain to change.  And the second is the

7    changeability, that even, you know, all the other -- for

8    instance, we're kind of amazed at how changeable the brain is,

9    how good it is at adapting to the challenge of the environment.

02:45 10        And it used to be thought at a pretty young age, you know,

11   five or six, these things -- you know, give me a top age five,

12   I can make him -- pre-scholar kinds of things, and that's just

13   biologically wrong, which is very optimistic for people in my

14   business, that from the biology standpoint, the brain is very

15   changeable, you know, through, you know, much of a life,

16   certainly the first three decades.

17   Q.   And so I take it at age 19, the brain is still a work in

18   progress?

19   A.   Yes.  I think a work in progress but not a damaged or

02:45 20   defective brain.

21        MS. CLARKE:  Thank you, Dr. Giedd.  Ms. Pellegrini may

22   have some questions.

23        MS. PELLEGRINI:  I may.

24                    CROSS-EXAMINATION

25   BY MS. PELLEGRINI:

1    Q.    Good morning, Dr. Giedd.

2    A.    Good morning.

3    Q.    My name is Nadine Pellegrini.

4          Dr. Giedd, when you first started to explain what your

5    position was and what your job experience was to Ms. Clarke,

6    you mentioned that you were a child psychiatrist, correct?

7    A.    Yes.

8    Q.    And you also said something about -- I don't know if you

9    said "specialization," but you said "brain imaging and

02:46 10   behavior."

11   A.    Yes.

12   Q.    All right.  So would it be fair to say that, with respect

13   to the science of brain imaging, one needs to look at behavior

14   as well?

15   A.    Not only "as well"; predominantly, I think.

16   Q.    So metaphorically speaking, you can no more separate the

17   brain from the person than you can separate a brain imaging

18   from behavior of the person, correct?

19   A.    Yes.  But the behavior is the more direct observation.

02:47 20   Q.    All right.  So that if you don't have, for example, the

21   measurements that you were talking about when looking at a

22   brain scan and development, the best way of determining

23   maturation would be behavior?

24   A.    Even with -- even with the metrics, yes.

25   Q.    Yes.  And so, for example, when you were asked by

1   Ms. Clarke, you know, what have we learned about brain

2   development, we've learned a lot in the last decade, two

3   decades or so.  I think that was your answer, correct?

4   A.   Yeah, 20, 25 years.

5   Q.   And it's changed a lot; but what you have also seen, have

6   you not, is the fact that sometimes trying to put an overlay of

7   science into another form, such as law or a courtroom, isn't

8   always a perfect fit, correct?

9   A.   Correct.

02:48 10   Q.   And even in, for example -- no offense, folks -- but

11   popular media -- you know, for example, awhile back there was a

12   whole trend toward, you know, playing Mozart to the baby while

13   it's still in utero.  And that came from where the science was

14   looking at that particular point in time with respect to

15   influences upon the development of the child, correct?

16   A.   Correct.  Which turned out not to hold up, but --

17   Q.   Right.  So all those Mozart playing was for naught.

18        But, also, would you also agree with me that with respect

19   to what you're learning in your field, with respect to brain

02:48 20   imaging and what people know about behavior, I mean, in

21   people's lives, they already can, under many circumstances,

22   judge and look at behavior themselves, correct?

23   A.   Correct.

24   Q.   So that, for example, when people say things like, "Oh,

25   you know, she was born an old soul," or, "There's an old head

 1    on young shoulders," that's because they're seeing something in

 2    that person's behavior that relates to what seems like a mature

 3    decision-making?

 4            MS. CLARKE:  That may call for speculation, unless the

 5    doctor knows.

 6            THE COURT:  You may answer it if you're able to.

 7            THE WITNESS:  I'm not sure I understand the question.

 8    BY MS. PELLEGRINI:

 9    Q.   I guess what I'm asking you is if, in fact, you need

02:49 10    behavior to look at the whole picture of a person and brain

11    imaging won't tell you the whole story, people who are not in

12    your field can also look at others' behaviors, and they can

13    make a determination for themselves whether they're mature or

14    immature, another person that they're looking at is mature or

15    immature?

16    A.   Yes.

17    Q.   And that, again, will be based upon the behavior that they

18    would have seen?

19    A.   Correct.

02:50 20    Q.   All right.  And you yourself have done that, correct?

21    A.   Correct.

22    Q.   All right.  For example, in one of your many articles that

23    you talked about, you indicated that sometimes you're asked to

24    look at whether or not -- taking a brain scan and looking at

25    somebody's prior behaviors.  And I think the example was a

1    young person jumping into a car and driving off with it.  Do

2    you remember that?

3    A.   Yes.  Yes.

4    Q.   All right.  And your view was it's looking backwards?

5    A.   Exactly.  Yeah.

6    Q.   Because the behavior has already occurred?

7    A.   Yes.

8    Q.   But also because you can look at that behavior, and

9    without a brain scan you can say, "Okay.  That's impulsive

02:50 10   behavior."

11   A.   Yes.  Just to elaborate on that a bit, so the question

12   was, "Is this 12-year-old impulsive?  Can you do a brain scan

13   to prove it?"  And I said, "Well, he just, you know, jumped in

14   a police car and took off.  He's impulsive."  That's the thing.

15   The brain scan would, you know, not be any more certain than

16   that.  It would be more colorful and, you know, more aesthetic,

17   probably.  But to me it's backwards, that the brain images are

18   only a loose indication of possible behaviors, but the behavior

19   itself is --

02:51 20   Q.   Is key?

21   A.   -- is the key, correct.

22   Q.   As a matter of fact, speaking of aesthetically colorful --

23           MS. PELLEGRINI:  May we have 3434 up again for

24   everyone, your Honor?

25           THE COURT:  Your feed?

```
 1            MR. BRUEMMER:  Yes, your Honor.
 2    BY MS. PELLEGRINI:
 3    Q.    Is that in front of you, Dr. Giedd?
 4    A.    Yes.
 5    Q.    So this is a very colorful picture, correct?
 6    A.    Yes.
 7    Q.    And, in fact, you also said at one point colorful brain
 8    scans introduced in courts can be almost irrationally
 9    persuasive?
02:52 10   A.    Correct.
11    Q.    And you went on to say that --
12    A.    And out of court.
13    Q.    And out of court.
14         And you went on to say that it's very seductive to have an
15    aesthetically beautiful brain scan -- by the way, beauty being
16    in the eye of the beholder -- that brings a sense of certainty
17    to something that really isn't certain.
18         Those are your words?
19    A.    I stand by them, yes.
02:52 20   Q.    Okay.  And, in fact, what you went on to say was, in
21    trying to explain how these -- behavior and imaging work
22    together, that human behavior is much more nuanced and complex
23    than what some of these images are showing.
24    A.    Correct.
25    Q.    And, in fact -- so taking that, that -- the nuanced and
```

1    complex aspect of human behavior, and linking that with what

2    you said several times was an average when you're doing your

3    studies, it's fair to say that within this range and spectrum

4    of, say, four to 22, you really don't know where any particular

5    individual might be at any one point in time?

6    A.    Correct.

7    Q.    All right.  And, in fact, it's not only that the brain

8    imaging shows highly variable changes between -- for people,

9    but also, I believe this is something else that you might have

02:53 10   said -- and, by the way, this would have been at a symposium

11   called "The Brain on Trial"?

12   A.    Ah, yes.  Yes.

13   Q.    Okay.  And do you recall indicating that "What's difficult

14   is applying this" -- "this" being the adolescent brain

15   maturity -- "is that there are so many exceptions to the

16   rule -- there are many mature teens and, likewise, immature

17   people in their 20s and 30s -- so the real challenge is going

18   from group averages to individual prediction or

19   characterization"?

02:54 20   A.    And we haven't, you know, met that challenge.

21   Q.    Okay.  All right.  And that's just the nature of research

22   and science at this particular point in time?

23   A.    Yes.  I think that being able to get to the individual

24   level is one of the big -- the big goals, but I think we're

25   farther away from it than people realize.  So one of the

1    examples is to say that men are taller than women, so

2    statistically that's true.  If you take 100 men on average, 100

3    women on average, the men will be taller.

4        The effect of that size is about twice as big as the

5    brain-imaging differences.  And so if you were to just look

6    around the room and say -- if we went into a high school and

7    said, "Everybody above five six, this locker room; everybody

8    below, this other locker room," well, that's ridiculous.  Why?

9    Well, there's -- there's too many exceptions to the rule, just

02:54 10   looking at it.  And so that's twice the difference of the brain

11   imaging.

12       So I think that's, you know, a key point to make in terms

13   of it would be very hard to go from a brain scan of a person

14   and predict how mature, impulsive.  So it's only with group

15   averages that, even if the 14-year-old is mature, they're going

16   to get even more mature, you know, as that individual goes

17   through life.  That's -- that's pretty strong in terms of that

18   people get better and better at choosing the larger, later

19   reward as -- as they mature.  But it only holds at this group

02:55 20   level.  To say, like in 25-year-olds, as a group, we'll make

21   decisions differently than 16-year-olds as a group, but that

22   would be as far as I could push the science.

23   Q.   So that, at the end of the day -- and I hate to sound like

24   a commercial, but age might be just a number when we're talking

25   about the level of maturity of an individual?

1    A.   Yes.  I mean, there's many aspects of maturity and huge

2    individual variation.  If that's what you mean, I agree.

3    Q.   And so, therefore, also -- you were saying a few times

4    that it's not necessarily that things are broken or absent when

5    you're talking about the connections in the brain?

6    A.   Correct.

7    Q.   But that they're going to work better, maybe, later on.

8    There's no guarantee of anything, correct?

9    A.   Correct.  But on average, people, you know, will get more

02:56 10   life experiences, they'll make better decisions, they'll be

11   able to control impulses better.  Like you said, you know, not

12   everybody, but that's a pretty strong direction as well, like

13   most people, you know, will move in that direction unless they

14   have, you know, damage to their brain or other things.

15   Illnesses --

16   Q.   But conversely -- I'm sorry.  I didn't mean to cut you

17   off.

18   A.   I'm sorry.  Or -- or people may develop an illness, such

19   as schizophrenia or bipolar disorder, that might, you know,

02:57 20   affect decision-making and such.  But in health, that most

21   people will progress on that dimension.

22   Q.   So in answer to one of Ms. Clarke's questions about the

23   maturation of the brain, she asked you about a person's ability

24   to plan and to understand consequences.  But am I right in

25   saying that the age of a person and the brain maturation does

1   not present a barrier?  A person can, in fact -- an individual

2   within this larger group -- can plan, can premeditate, and can

3   understand consequences of his or her actions?

4   A.   Correct.  Even -- even younger, I would say, as well.

5   Q.   Younger -- I'm sorry.  Younger than --

6   A.   Even younger than -- than 19 years.

7   Q.   Than 19, right?  Because there are, you mentioned,

8   14-year-old girls who understand, who are mature?

9   A.   But even younger, below age ten, in the right settings,

02:58 10   they can, you know, do quite well with planning and

11   consequences.

12   Q.   And one of the other things that you talked about with

13   Ms. Clarke was the possible influences upon the maturation or

14   development of the brain, correct?

15   A.   Yes.

16   Q.   And there was a time that you were asked -- and I think it

17   might have been the same conference, if you would just give me

18   a minute -- about the fact that within the time period from,

19   say -- I think it might have been 2001 to 2011 -- all of the --

02:58 20   all of the statistics relating to risky behavior for juveniles

21   declined, whether it was unprotected sex, teenage pregnancies,

22   crime, things like that?

23   A.   Yeah, the context for that was the Internet, and that the

24   amount of time spent with violent video games from 2002 to that

25   time went up four-fold, but the degree of violence is only

1    limited by, you know, our imagination.  Coming across sexual

2    content, it's almost impossible not to, just in the ads and

3    such.  So one would have anticipated, you know, this would be

4    unraveling the moral fabric of our nation and such.  But all of

5    the statistics -- unwanted teen pregnancies, sexually

6    transmitted disease, all the indices, 49-year low.  Real world,

7    you know, violence, 47-year lows.  It was more of a puzzlement

8    to us because if it had been the opposite, we would have been

9    all over the cause.

02:59 10    Q.    That's what I'm getting at.  So I think the question that

11    might have been -- this would have been -- again, this was a

12    talking point with Sarah MacDonald in September of 2012 at the

13    University of New South Wales symposium.

14    A.    Uh-huh.  I remember.

15    Q.    All right.  And I believe you were a guest speaker at that

16    point.  And one of the questions was about the explosion of

17    social media and the challenges of modern society changing,

18    apparently, the way the brain functions.  You had mentioned,

19    for example, that reading may not have as great an effect, and

03:00 20    it seemed to be that reading wasn't a natural activity in that

21    regard.  Is that correct?

22    A.    It pains me to say that as an educator, but yes.

23    Q.    And that -- I believe this is something else that you

24    mentioned at that time.  Ironically, or not ironically, the

25    data for the last 47 years, since they've been keeping score,

1    unwanted teen pregnancies are at an all-time low; abortion is

2    at an all-time low; sexually transmitted disease, all-time low;

3    murders and other violent crime among adolescents, all-time

4    low.  It's gone in exactly the opposite direction.  And the

5    moderator said, "Well, so it's safe to play on the Internet,"

6    and your response was, "I am baffled."

7         So there are things that, even as someone with all of your

8    experience and what science can tell you, remains a mystery.

9    A.   Well, I mean, brain science is a very humbling business in

03:01 10   terms of -- had it since I can remember, and, yeah, I think

11   we're just scratching the surface.

12   Q.   And I just had one final question.  In going back to the

13   brain, the measurements that would be taken with respect to

14   getting an image like it's on our screen right now, that within

15   one of your papers -- and if you'd give me a moment -- and I

16   confess, it's not something I subscribe to -- but *Neuron*

17   *Review*, the article was "Structural MRI of Pediatric Brain

18   Development:  What We've Learned and Where We Are Going."

19   A.   Durston or --

03:01 20   Q.   It was you and Judith Rapoport.

21   A.   Oh, me and -- okay.

22   Q.   All right?  And one of the striking things was, if you

23   recall, that all of the data presented regarding brain

24   measurement must be interpreted in light of the strikingly high

25   variability of brain-size measurements across the individuals.

1    And in that, you add -- your co-author cited another earlier

2    study, so it was known even earlier, that there was a

3    strikingly high variability even within the group that you are

4    taking the averages from.  Correct?

5    A.   As a concrete example, so we have two ten-year-old,

6    totally healthy, doing-great boys in the study whose brains

7    are -- twice -- one's twice as big as the other, and both

8    doing -- doing fine.

9    Q.   And then, finally, one of the conclusions you came to in

10   the paper -- or, actually, I think one of the sort of

11   parameters was that going from group-average differences to

12   individual use is one of the preeminent challenges of

13   neuroimaging.  You agree with that?

14   A.   So one of the goals when I started was to be able to do a

15   brain scan to see if somebody had autism or ADHD or

16   schizophrenia, and 25 years later, no.  So that, as you

17   indicated, we go to the behavior.  That's the -- the gold

18   standard in terms of these things.  And so we're not -- we're

19   not close, frankly.  We're not right around the corner; you

20   know, that it's going to be hard for a while.  We'll have to

21   actually talk to people.  We'll actually have to understand

22   behaviors.

23       The, I guess, utility of it has been sort of these trends

24   that, you know, in aggregate, the brain is incredibly

25   changeable during the second decade, and it -- the development,

        1    the way we usually think of it, is protracted, in that the

        2    brain stays that way, you know, longer than any of us, I think,

        3    thought at the beginning.

        4    Q.   But it does constantly change until we die?

        5    A.   You know, I guess ready for prime time in the sense of --

        6    so as a -- as a psychiatrist, if someone comes to see me, do I

        7    get a brain scan?  No.  I listen to them.  I hear their family,

        8    their story.  And I'd be the first in line if that, you know,

        9    wasn't the case.  And, yeah, I think that we have to be careful

03:04  10    about the colors in terms of --

       11    Q.   Literally.

       12    A.   Yeah.

       13         MS. PELLEGRINI:  Thank you very much.  I have no

       14    further questions.

       15         THE COURT:  Ms. Clarke?

       16         MS. CLARKE:  Thank you, Dr. Giedd.

       17         THE COURT:  All right.  Dr. Giedd, thank you.  You my

       18    step down.

       19         (The witness is excused.)

03:04  20         MR. BRUCK:  We'll call Sonya Petri.

       21         THE COURT:  May I see counsel briefly?

       22         MR. BRUCK:  Yes.

       23         (Discussion at sidebar and out of the hearing of the

       24    jury:)

       25         THE COURT:  I don't think it's on the witness/exhibit

```
 1    list, but I think I've been advised that one of the issues

 2    might be the Zubeidat emails.

 3              MR. BRUCK:  Exactly.

 4              THE COURT:  Those will be excluded, okay?  I think

 5    they're cumulative.  I think the witness is not unavailable.

 6              MR. WEINREB:  Your Honor, we just wanted to put on the

 7    record that in light of the relative blandness of his

 8    testimony, we're withdrawing our request for an instruction

 9    about the lack of the enforceability of the oath or --

10              THE COURT:  Okay.  Thank you.  That makes it easy for

11    me.

12              (In open court:)

13              MR. BRUCK:  Sonya Petri.

14              THE COURT:  Good afternoon.

15              (Pause.)

16                     SONYA PETRI, previously sworn

17                          DIRECT EXAMINATION

18    BY MR. BRUCK:

19    Q.   Good afternoon, Ms. Petri.

20    A.   Good afternoon.

21    Q.   You have been previously sworn; you're a paralegal with

22    the Federal Defender's Office?

23    A.   Correct.

24    Q.   And you have read documents to the jury before in this

25    trial, and you're here again to do that now?
```

A.    Correct.

         MR. BRUCK:  If it would please the Court, we would
like to move into evidence the remainder -- and I understand
there is no objection from the government -- the remainder of
the medical records of Anzor Tsarnaev, those being Exhibits
3509B, which are Mass. General records; 3509C, which are from
Spaulding rehabilitation; 3509D, which are also Mass. General
records; and 3509J, which are the remainder of Mr. Tsarnaev's
psychiatric and neurological records from 2005 until 2012.
That is, this completes the records that were partially
introduced yesterday when Dr. Niss testified.

         THE COURT:  All right.  And there is no objection to
those being entered?

         MR. CHAKRAVARTY:  No objection.

         THE COURT:  All right.

         (Defense Exhibit Nos. 3509B, 3509C, 3509D, and 3509J
received into evidence.)

         MR. BRUCK:  These are extremely voluminous, and rather
than go through the records themselves, we would move in at
this time Exhibit 3522, which is Ms. Petri's summary, extracts
from the records.

         MR. CHAKRAVARTY:  Your Honor, I don't know if it's
changed since when I saw it, I think, a couple of days ago, but
if it's that version, I have no objection.

         THE COURT:  Okay.  In principle, there's no objection;

```
 1    it's just a --

 2              MR. CHAKRAVARTY:  Correct.

 3              THE COURT:  Okay.

 4              (Defense Exhibit No. 3522 received into evidence.)

 5              MR. BRUCK:  And if we could have 3522 displayed to the

 6    jury, your Honor.  Thank you.

 7    BY MR. BRUCK:

 8    Q.   Ms. Petri, you have in front of you Exhibit 3522 on the

 9    screen?

10    A.   Yes, it appears so.

11    Q.   And can you tell us what -- this is a document of about

12    how many pages?

13    A.   I believe it's four pages.

14    Q.   I'm sorry.  3522.  Oh, I'm terribly sorry.

15              THE COURT:  This looks like a document used with

16    Dr. Niss.

17              MR. BRUCK:  No, it should have been 3523.  My

18    apologies.

19              MS. CLARKE:  Your Honor, I believe 3522 went into

20    evidence yesterday.

21              MR. CHAKRAVARTY:  No, actually, that relates to --

22              MR. BRUCK:  No, no, I don't think so.

23              The -- I had the number -- I had -- that's the exhibit

24    we wanted.  23.  My apology.  I had the numbers reversed.

25              THE COURT:  So you want 23?
```

1          MR. BRUCK:  Yes.  Yes, please.  22 is not coming into

2    evidence.  We are not offering it.

3          THE COURT:  Is the document that's on the screen --

4          MR. BRUCK:  This is the correct document, and this is

5    23.

6          THE COURT:  Okay.

7          MR. BRUCK:  Thank you.

8          (Defense Exhibit No. 3523 received into evidence in

9    lieu of Exhibit No. 3522.)

03:11 10    BY MR. BRUCK:

11    Q.   Ms. Petri, can you tell us what Exhibit 3523 is?

12    A.   Yes.  It's a summary of treatment records for Anzor

13    Tsarnaev.

14    Q.   And did you prepare this summary?

15    A.   I did.

16    Q.   And is this based on his medical records that have just

17    been moved into evidence?

18    A.   It is.

19    Q.   What I would like to do, we're not going to read the

03:11 20    entire document.  The jury will have it.  But I would like to

21    call up a few items and ask you to read them for us, please,

22    with the date and the notes, diagnosis.

23          I should ask you:  In preparing this summary, did you go

24    through the records and extract the complaint -- that is to

25    say, what Mr. Tsarnaev told the physicians at each of these

1    medical appointments -- the diagnosis that was given at the

2    conclusion of the interaction, and the medications that were

3    prescribed?

4    A.    Yes, I did.

5    Q.    And that's what this summary actually is?

6    A.    Yes, it is.

7    Q.    Okay.  Let me get this a little better.

8    A.    I can read it that way.

9    Q.    You can -- okay.  Go ahead.

03:12 10   A.    So on May 15th, 2006, Dr. Martirosyan notes that patient

11   returns to treatment after stopping all medications.  Symptoms

12   returned about a month ago, and include panic attacks,

13   insomnia, nightmares, memory problems and concentration,

14   unstable mood.  Feels differently at different times of the

15   day.  Thinks he hears someone calling his name and feels

16   presence next to him.  The diagnosis was PTSD, panic attacks

17   with agoraphobia.  And the medications prescribed were Lexapro

18   and Trazodone.

19   Q.    Thank you.

03:13 20         All right.  And the next page?

21   A.    This is March 12th, 2007.  Provider is Dr. Martirosyan.

22   Notes:  The patient and wife are at the appointment.  Patient

23   reports feeling very anxious.  Unable to control himself and

24   wants to cry.  Has frequent awakenings at night with

25   flashbacks.  Wife confirms his complaints and seems very

1    supportive and caring.  The diagnosis is PTSD and in moderate

2    distress.  Medications prescribed is Zyprexa, Lexapro, Ativan

3    and Ambien.

4    Q.    Thank you.  The next page, please?

5    A.    On January 13, 2009, Dr. Mashkovich -- that's

6    M-A-S-H-K-O-V-I-C-H -- notes that patient reports having

7    auditory hallucinations (voices screaming his name or

8    whispering) and some visual hallucinations (little lizard-like

9    creatures) for past two to -- sorry, part three to four weeks.

03:14 10   Says they are more intrusive than before.  Inpatient admission

11   advised, but patient wants to see if medication can help.

12   Believes being in own home more beneficial mentally.  The

13   diagnosis is psychosis NOS, and the medications is Trilafon.

14   Q.    Thank you.  Next page?

15   A.    On August 8th, 2009, at around 10 p.m., Anzor is assaulted

16   and battered at Arbat Restaurant.  On August 9th, 2009, at 2:45

17   a.m., Anzor arrives by ambulance to the Cambridge Hospital

18   where his condition deteriorates and he is intubated.  On

19   August 9th, 2009, at 5:30 a.m., a CT scan shows acute left

03:15 20   parietal skull fracture depressed about eight millimeters

21   associated with subarachnoid hemorrhage, pneumocephalus

22   involving posterior parietal lobe and extending to left

23   posterior convexity, mild cerebral edema and mild

24   intervertebral disk space narrowing noted at C5-C6.  And the

25   diagnosis is subarachnoid hemorrhage, depressed skull fracture,

1   and pneumocephalus.

2   Q.   Next page?  Oh, I'm sorry.  Further on down?

3   A.   On August 11th, 2009, Anzor has surgery for the repair of

4   his skull fracture at 7:10 p.m.  And on August 12th, 2009,

5   Anzor observed to have alternated motor function, decreased

6   recall, altered gait pattern -- there's a spelling error there;

7   it should be G-A-I-T -- impaired mental and cognitive function,

8   and impaired visual and sensory function.

9   Q.   Thank you.  Next page?

03:16 10   A.   On August -- I'm sorry -- October 15th, 2009, the provider

11   is Dr. Eydelman who notes:  The patient reports unsteady gait,

12   visual changes, tremor, auditory hallucinations, multiple

13   voices screaming his name, and visual hallucinations (animal

14   faces).  "I am scared."

15        Depressed, anergastic, irritable, angry, and talkative.

16   And the diagnosis is psychosis NOS.  Medications prescribed are

17   Cogentin, Risperdal and Ambien.

18   Q.   Next page, please?

19   A.   On May 6th, 2010, the provider is Dr. Eydelman who notes:

03:17 20   The patient reports headaches, decreased vision, hearing

21   problems, nosebleeds, depressed mood, flashbacks, confusion at

22   times.  Continues to experience auditory and visual

23   hallucinations (multiple voices) and paranoid ideations.  The

24   diagnosis is psychosis NOS and organic delusional disorder NOS.

25   Medications:  Cogentin, Risperdal, Ambien and Neurontin.

1    Q.    Thank you.  Next page?

2    A.    On October 25th, 2010, Dr. Fridman of neurology notes:

3    New patient intake.  General symptoms include pain in left side

4    of head, hearing loss, numbness in face, decreased vision

5    lasting 30 minutes with gradual disappearance (several times a

6    week).  Neurological symptoms include headaches, syncopal

7    episodes, tremors, migraines, vertigo, tingling, numbness,

8    seizures, loss of feeling/power, loss of consciousness,

9    confusion, weakness, insomnia, visual changes, dizziness,

03:19 10   memory loss, gait abnormality, sleep problems, headache.  No

11   fainting spells.  No sciatica.  The diagnosis is chronic

12   posttraumatic headache, depression with anxiety, and

13   hyperlipidemia.  The medications are Cogentin, Risperdal,

14   Neurontin and Ambien.

15   Q.    Two pages further on, please?

16   A.    On February 17th, 2011, the provider is Dr. Smurawska, who

17   notes:  Anzor Tsarnaev reports feeling quite overwhelmed.

18   Appears depressed, tearful, having difficulty functioning,

19   upset with minor things.  "If I am not getting better, my wife

03:20 20   would divorce me."  Agreed that meeting together with wife next

21   week would be good idea.  Feeling weak physically, refused

22   inpatient stay.  Diagnosis is psychosis NOS, PTSD, organic

23   delusional disorder NOS.  Medications are Zyprexa, Risperdal,

24   Cogentin, Ativan and amitriptyline.

25   Q.    Next page, please?

1    A.   On September 23rd, 2011, the provider is Dr. Smurawska who

2    notes:  The patient came in -- sorry -- patient came for

3    following up -- or follow-up with wife.  Pleasant and

4    cooperative.  Feels better but easily overwhelmed and

5    fluctuating.  The diagnosis is psychosis NOS, PTSD, organic

6    delusional disorder NOS, R/O mood disorder secondary to brain

7    injury.  Medications are amitriptyline and Ativan.

8    Q.   And the last page?

9    A.   On April 3rd, 2012, a letter from Dr. Smurawska from the

03:21 10   St. Elizabeth's Medical Center addressed to whom it may

11   concern.  It says:  Patient suffering from mental illness.  Not

12   able to work.  Needs constant supervision and support.

13        And a visit note from April 3rd, 2012.  Dr. Smurawska

14   notes:  Patient stopped coming to clinic six months ago.

15   Divorced his wife.  Stopped taking all meds.  Psychotic.  Will

16   start Haldol and Depakote today.  Very close follow-up.  And

17   diagnosis is psychosis NOS, PTSD, organic delusional disorder

18   NOS, R/O mood disorder secondary to brain injury.  Medications

19   are Haldol, Cogentin and Depakote.

03:22 20        MR. BRUCK:  Thank you, Ms. Petri.

21        That's all we have.

22        THE COURT:  That's all?  Thank you.

23        THE WITNESS:  Thank you.

24        (The witness is excused.)

25        MS. CONRAD:  The defense calls Jennifer Carr-Callison.

1           JENNIFER CARR-CALLISON, duly sworn

2           THE CLERK:  Have a seat.  State your name, spell your

3    first and last name for the record, keep your voice up and

4    speak into the mic.

5           THE WITNESS:  Okay.  My name is Jennifer Callison.

6    It's J-E-N-N-I-F-E-R, C-A-L-L-I-S-O-N.

7                       DIRECT EXAMINATION

8    BY MS. CONRAD:

9    Q.   Good afternoon, Ms. Callison.

03:23 10   A.   Good afternoon.

11   Q.   What kind of work do you do?

12   A.   I am the transition specialist for the office of special

13   education in the Winchester Public Schools.

14   Q.   And what is a transitional specialist?

15   A.   My job kind of is to help students who have disabilities

16   transition from high school to adult life.

17   Q.   And how long have you been with the Winchester school

18   system?

19   A.   This is my first school year with them.

03:24 20   Q.   Where did you work before there?

21   A.   The Cambridge Public Schools.

22   Q.   And before -- where did you go to school?

23   A.   I went to school at the University of Massachusetts Boston

24   and to Norwich University.

25   Q.   And are you currently -- in addition to working for the

1   Winchester school system, are you also currently going to

2   school yourself?

3   A.   I am.

4   Q.   And what are you studying?

5   A.   I'm studying for my Ph.D. in leadership in urban schools

6   through the University of Massachusetts at Boston.

7   Q.   And before you went into the field of education, what kind

8   of work did you do?

9   A.   I was the director of marketing and promotions for

03:24 10   multiple major market radio stations in both Massachusetts and

11   California.

12   Q.   And which radio station did you work for in Boston?

13   A.   WBCN and then formerly WBOS.

14   Q.   And were you ever a disk jockey?

15   A.   I was.

16   Q.   Turning to the Cambridge school system, during what years

17   did you work in the Cambridge school system?

18   A.   I started working there in 2007 and finished working there

19   in June of 2014.

03:25 20   Q.   And in the school year 2010 to 2011, what was your

21   position in the Cambridge school system?

22   A.   I was the transition coordinator for the district.

23   Q.   And where specifically did you work?  What was your place

24   of work?

25   A.   I worked at the high school, at Cambridge Rindge and Latin

1    school.

2    Q.   And at that time, was your last name the same?

3    A.   No, it was not.

4    Q.   What was it at that time?

5    A.   It was Garcia.

6    Q.   So tell us a little bit more about what your

7    responsibilities were when you were working at -- in the

8    Cambridge system, specifically, in the 2010-to-2011 school

9    year.

03:25 10   A.   I was the transition specialist for the district, so I

11   worked in the office of special education.  I worked with

12   students who were 14 to 22 who had a variety of disabilities to

13   help them plan for the transition from adult -- from high

14   school to adult life, so really looking towards employment

15   opportunities, education and social and community relations,

16   connecting students to state agencies, also connecting students

17   and families to day programs and other supports that may be

18   useful to them when they leave school.

19   Q.   Can I ask you just to slow down just a little bit for the

03:26 20   court reporter.

21   A.   Sorry.  Of course.

22   Q.   When -- in that position, did you also serve as

23   advisor -- faculty advisor to a student group?

24   A.   Yes, I was the faculty advisor to the CRLS chapter of Best

25   Buddies.

```
 1    Q.    What is Best Buddies?
 2    A.    Best Buddies is an international organization, they have
 3    chapters at high schools, elementary schools, middle schools
 4    and colleges as well as other programs they run.  The program
 5    that I supervised specifically was a social club at the high
 6    school level, which was a chapter of Best Buddies that ran for
 7    students with and without intellectual and developmental
 8    disabilities.
 9    Q.    And what role -- what relationship did the Best Buddies
10    program have to your responsibilities as -- in the transitional
11    assistance?
12    A.    They weren't interconnected necessarily, but as part of my
13    role, I was the faculty advisor, and many of my students who I
14    was transitioning out also participated in Best Buddies.
15    Q.    What do you mean by "transitioning out"?
16    A.    Students that were preparing to leave high school and go
17    into adult life to kind of help gain social skills, they would
18    join Best Buddies to make new friendships, participate in
19    social activities both on and off campus, and I would oversee
20    that club.
21    Q.    So what were some of the activities of Best Buddies?
22    A.    We would alternate activities on campus and off campus.
23    So around Christmastime we did an annual gingerbread
24    house-making competition on campus for students.  Then off
25    campus we would go out to lunch, go out to dinner.  We went to
```

1    the Best Buddies prom.  We had a year-end banquet.  We had

2    different events that were designed to foster social skills and

3    development and create friendships for students with and

4    without disabilities in one setting.

5    Q.   And in the 2000 -- and do you know Jahar Tsarnaev?

6    A.   I do.

7    Q.   And how do you know him?

8    A.   He was a member of our club.

9    Q.   In what year?

03:27 10   A.   2010 to 2011.

11   Q.   And is this -- by the way, for students who participate,

12   students like Jahar, is this an activity that they get academic

13   or school credit for?

14   A.   No, they do not.

15   Q.   And, in fact, do they -- did Cambridge at the time have a

16   community service requirement?

17   A.   We did.

18   Q.   And would this fulfill the community service requirement?

19   A.   It would not.

03:28 20   Q.   And I take it it's purely voluntary?

21   A.   Yes.

22   Q.   And what types of students -- I'm talking about students

23   who did not have developmental challenges.  What types of

24   students generally would participate in the Best Buddies

25   program at Cambridge Rindge and Latin?

```
 1    A.   Overall, the students that participated were typically
 2    students that were involved in other sports, students that were
 3    doing well academically, students that wanted to make more
 4    friends, students that wanted to be part of a club that was
 5    inclusive and that was designed to have fun and be social.
 6    Q.   I'm going to show you what's been marked for
 7    identification -- I don't know if the government has an
 8    objection -- as 3507-068.
 9         MS. PELLEGRINI:  May we see that on the screen,
10    please?
11         No objection, your Honor.
12         MS. CONRAD:  We'd offer that.
13         THE COURT:  Admitted.
14         MS. CONRAD:  Thank you.
15         (Defense Exhibit No. 3507-068 received into evidence.)
16    BY MS. CONRAD:
17    Q.   Do you see that photograph on the screen?
18    A.   I do.
19    Q.   And can you tell us if you recognize what -- when and
20    where that photograph was taken?
21    A.   That was our -- I believe our end-of-the-year banquet at
22    Ryles jazz club in Cambridge.
23    Q.   And do you see Jahar in that picture?
24    A.   I do.
25    Q.   And you just -- you can just touch the screen and draw a
```

1    circle around it with your finger.

2    A.   (Witness complies.)

3    Q.   And where was that held?

4    A.   That was at the Ryles jazz club.

5    Q.   Now, was that the only -- I'm sorry.  Do you see Jahar in

6    the courtroom today?

7    A.   Yes, I do.

8    Q.   Was that the only event that Jahar attended?

9    A.   No.

03:30 10   Q.   Can you tell us what some of the other events were that he

11   attended?

12   A.   The Best Buddies prom at Babson College, which was held by

13   Best Buddies, which our chapter went to.  I believe there were

14   other on-campus events and off-campus events that Jahar did

15   attend.

16   Q.   And, in fact, are there events that are held on a regular

17   basis, say once a month or once a week?

18   A.   The events that we had were once a month, third Friday of

19   the month, typically from 6 to 8 p.m.; and we also had a weekly

03:30 20   lunch event where students could meet during their lunchtime

21   and sit together and have lunch, and that was typically on

22   Wednesdays.

23   Q.   And you mentioned the prom.  Can you tell us about the

24   prom?

25   A.   The Best Buddies prom was held at Babson College.  It was

1    run by Best Buddies International.  They had the prom for any

2    student chapter in Massachusetts who wanted to attend.  For a

3    fee we could buy tickets and take students to the Best Buddies

4    prom.

5    Q.   And what would happen at the prom?

6    A.   It was a typical dance.  Students got dressed up.  They

7    went -- they had a dee-jay.  They had pizza.  They had music.

8    They did different kind of activities, just they crowned a king

9    and queen group of different peer buddies and buddies who were

03:31 10   together.  So it was more of just kind of a fun social event

11   where kids danced, and it was a really good time.

12   Q.   What was that like for the kids?

13   A.   Wonderful.  I mean, it was the kind of event where, for

14   many of the students who I worked with who had developmental

15   disabilities, they might not get the chance to go to a prom, so

16   this was an opportunity to go and have a great time with your

17   friends from school, celebrate and, you know, really just

18   participate in a great social event.

19   Q.   What are the expectations for the students -- the students

03:31 20   without disabilities who participate?  I mean, do they just go

21   and eat the free pizza and hang out with their friends and

22   leave?

23   A.   No, the expectation of all members of the club is that

24   you're there to help create an inclusive environment for

25   students with developmental disabilities.  The idea is that

1    you're there to participate in the social event, behave

2    respectfully, be part of the team of the Cambridge Rindge and

3    Latin Best Buddies.  Students are expected to have a good time

4    and be respectful.

5    Q.   Other than seeing him in this picture, do you remember

6    Jahar?

7    A.   I do.

8    Q.   What do you remember about him?

9    A.   Like all students in the club, he was kind.  He was

03:32 10   respectful.  He came to the events.  He was nice to every

11   student that he encountered.  He was a good member of the club.

12   Q.   And do you remember anything about how he was interacting

13   with the students who had intellectual challenges?

14   A.   Yeah, he was very nice to them.

15   Q.   Did he ask you for college recommendation?

16   A.   He did not.

17   Q.   Is that something that some of the students do?

18   A.   Yes.

19   Q.   And as far as attending the events, who pays for the

03:32 20   students to attend?

21   A.   It was funded by students.  Typically they would pay for

22   tickets.  We also had a grant that we got to pay for some of

23   the events, and the school funded the bus that took us to the

24   Best Buddies prom.

25   Q.   Is there anything -- at some point you learned that Jahar

1    was involved in the marathon bombing, correct?

2    A.   Yes.

3    Q.   And was the Jahar -- was that consistent with the Jahar

4    that you knew?

5              MS. PELLEGRINI:  Objection.

6              THE COURT:  Overruled.

7              You may answer.  You may answer.

8              THE WITNESS:  I don't believe that it was.  The

9    student that I worked with in my club is the student that I am

03:33 10   speaking on today.

11   BY MS. CONRAD:

12   Q.   And could you imagine that person --

13             MS. PELLEGRINI:  Objection.

14             THE COURT:  No, go ahead.

15             You can follow up.

16   BY MS. CONRAD:

17   Q.   Could you imagine that person committing the marathon

18   bombing when you knew him in 2011?

19   A.   No.

03:33 20             MS. CONRAD:  I have nothing further.

21             MS. PELLEGRINI:  Just a second, your Honor.

22             (Pause.)

23             MS. PELLEGRINI:  Nothing, your Honor.

24             THE COURT:  All right, Ms. Callison.  Thank you.  You

25   may step down.

```
 1                    (The witness is excused.)

 2               MS. CLARKE:  Your Honor, I wonder if we should take

 3      the lunch break early.

 4               THE COURT:  Let me just see you briefly.

 5               (Discussion at sidebar and out of the hearing of the

 6      jury:)

 7               THE COURT:  General --

 8               MS. CLARKE:  A test?

 9               THE COURT:  No, just general orientation.

10               MS. CLARKE:  Yes.  Next would be Eric Traub and then

11      Kevin Roche and then the ADX.

12               THE COURT:  How long do you think Bezy will be?

13               MR. BRUCK:  Not terribly long, maybe 45 minutes.  But

14      we have a legal matter.  There's a motion respecting this

15      business of whether or not putting in the SAMs opens the door

16      to ESPN.

17               THE COURT:  Okay.

18               MR. BRUCK:  So we'll take that up.

19               MR. WEINREB:  Your Honor, for the record, it's not a

20      matter of putting in the SAMs that opens up the door to ESPN,

21      since these are now all being published.  I think it's

22      important that the record reflect that the argument that if the

23      defense wants to put on a portrayal of what life in ADX will be

24      like, then the government is entitled to make sure it's not a

25      one-sided misleading portrayal.
```

```
 1              THE COURT:  All right.  I don't want to --
 2              MS. CLARKE:  I was just asking for an early lunch
 3       break.
 4              THE COURT:  I just want to know what's coming.  So
 5       he'll be on and off today?
 6              MR. WEINREB:  Yes.
 7              THE COURT:  Because I assume he's remote, and he'll go
 8       back to wherever he's come from.
 9              And then?
10              MS. CLARKE:  That's all we had planned for today.
11              THE COURT:  You won't get to these others?
12              MS. CLARKE:  That's what I call the ADX.
13              MR. BRUCK:  We're not exactly sure what our planning
14       is for the rest of them.  We're going to see how Mr. Bezy --
15              MS. CLARKE:  These four.
16              THE COURT:  I see.  Okay.  All right.
17              MS. CLARKE:  Thanks.
18              THE COURT:  And then for tomorrow?  Just to get a
19       preview.  Is there a tomorrow?
20              MS. CLARKE:  Yes, there's a tomorrow, and it will
21       probably be debated with the Court, but there's -- tomorrow we
22       have two witnesses -- potential witnesses left tomorrow, and
23       that would be Vogelsang and Prejean.
24              MR. WEINREB:  So we'll be filing a motion in limine
25       after court today to exclude the testimony of Sister Helen
```

 1    Prejean.

 2            THE COURT:  Okay.  All right.  So -- fine.  We can

 3    break for lunch.

 4            MS. CLARKE:  Thank you.

 5            (In open court:)

 6            THE COURT:  All right.  We will take the lunch recess

 7    at this point.

 8            THE CLERK:  All rise for the Court and the jury.  The

 9    Court will take the lunch recess.

03:37 10        (The Court and jury exit the courtroom and there is a

11    recess in the proceedings at 12:47 p.m.)

12            THE CLERK:  All rise for the Court and jury.

13            (The Court and jury enter the courtroom at 2:22 p.m.)

14            THE CLERK:  Be seated.

15            MS. CLARKE:  Your Honor, the defense would call Eric

16    Traub.

17                        ERIC TRAUB, duly sworn

18            THE CLERK:  State your name, and spell your first and

19    last name for the record.  Keep your voice up, and speak into

05:13 20    the mic so everyone can hear you.

21            THE WITNESS:  Eric Traub, E-R-I-C, T-R-A-U-B.

22                        DIRECT EXAMINATION

23    BY MS. CLARKE:

24    Q.   Mr. Traub, where do you live?

25    A.   I live in Washington, D.C.

```
 1   Q.   Are you married?  Do you have a family there?

 2   A.   I'm married, and I have a daughter.

 3   Q.   What do you do for a living?

 4   A.   I am a software engineer.  I work at a small company.

 5   Q.   In the Washington, D.C., area?

 6   A.   Yes.

 7   Q.   Where did you go to college?

 8   A.   I went to MIT.

 9   Q.   When did you go there?

05:14 10   A.   From 1995 to 1999.

11   Q.   Did you have another career before you became a software

12   engineer in D.C.?

13   A.   Yes, I did.  I was a teacher.

14   Q.   And where were you teaching?

15   A.   I taught at several schools.  I taught at the Commonwealth

16   School in Boston as well as City on a Hill in Boston and

17   Cambridge Rindge and Latin in Cambridge.

18   Q.   And is there some intersection between your interest in

19   software and your interest in teaching?

05:14 20   A.   Yeah.  I originally -- well, software is mostly composed

21   of mathematics; and for several of the years that I was a

22   teacher, I was also a computer science teacher, so I taught

23   both math and computer science and was very interested in the

24   intersection between those two.

25   Q.   And your degree at MIT was in?
```

1  A.  I have a bachelor's of science in computer science and

2  engineering.

3  Q.  And you told us that you taught at Cambridge Rindge and

4  Latin School.  Do you recall the years?

5  A.  Yeah.  I started there in 2007, and I finished in 2011.

6  Q.  Do you know Jahar Tsarnaev?

7  A.  Yes, I do.

8  Q.  Do you see him here in the courtroom?

9  A.  I do.

05:15 10  Q.  And when did you -- did you teach Jahar?

11  A.  He was my student in 2007, in the fall, and in the fall of

12  2010.

13  Q.  So you had him for two -- two semesters or two full years?

14  A.  Two semesters.

15  Q.  And what did you teach?

16  A.  I was his math teacher, so I taught him in Algebra I and a

17  class called Honors Advanced Math Topics, which is a course for

18  seniors in which we look at a variety of topics, like

19  probabilities, statistics, and discrete math.

05:15 20  Q.  So you taught him at the beginning of his high school

21  years and at the end of his high school years?

22  A.  That's correct.

23  Q.  How would you describe Jahar for the jury?

24  A.  Jahar was a kind student.  He got along great with his

25  peers.  I really liked having him in the classroom because he

1    participated.  He brought kind of a fun energy to the

2    classroom.

3    Q.    Was he outspoken?  Quiet?  How would you describe him?

4    A.    He wasn't outspoken in the sense of being disruptive in

5    the classroom.  He was quiet, but he was always, you know,

6    willing to engage in conversation.

7    Q.    And did he have a particular group of friends or -- were

8    you aware?

9    A.    I didn't know of any particular clique that he hung out

05:16 10   with.  In my classroom he seemed to get along -- seeing him in

11   my classroom, he seemed to get along with all the students.

12   Freshman year was a bigger class, and he kept to himself a

13   little bit more as a freshman.  There were a few students I

14   know that he hung out with.  I know the Silva brothers were in

15   that class, and he was friends with them.

16   Q.    I'm going to pull up a photograph.

17            MS. CLARKE:  I don't think there's any objection, your

18   Honor.  3246?

19            MR. MELLIN:  That's fine, your Honor.

05:17 20            THE COURT:  Okay.

21            MS. CLARKE:  I'd like to make sure that goes into

22   evidence.

23            (Defense Exhibit No. 3246 received into evidence.)

24   BY MS. CLARKE:

25   Q.    Do you recognize that photograph?

```
 1   A.   I do.

 2   Q.   And can you tell the -- you can actually touch the screen

 3   and point to people.  Can you tell the jury who that is?

 4   A.   Sure.  This is Jahar; this is one of the Silva brothers,

 5   one of the twins; and that's me.

 6   Q.   That's probably not a picture that you want to send around

 7   the world.

 8   A.   No.

 9        (Laughter.)

10   Q.   Can you tell us, do you recall the occasion?

11   A.   Sure.  We were -- I can tell what was happening.  I don't

12   remember the specific day.

13        You can see in the background there's some students

14   leaving the classroom, so this is probably after school, class

15   has just ended, and -- I don't remember if I was invited into

16   this photo or if I decided just to jump in and photobomb them,

17   but I was just goofing off and blowing off some steam after

18   school.

19   Q.   But you had a good relationship, I take it, with Jahar?

20   A.   Yeah.  We had a good relationship.

21   Q.   Did you know anything about Jahar's ethnic or religious

22   background?

23   A.   I didn't know much about his ethnic background.  I knew he

24   spoke Russian, and I knew he was Muslim.

25   Q.   How did you know that?
```

05:17 (line 10)
05:18 (line 20)

A.   He and some of the other students occasionally prayed in a
classroom near mine.

Q.   Did you ever hear Jahar talk about American policies
overseas or politics?

A.   No.

Q.   Did you ever meet his parents?

A.   No.

Q.   Were there opportunities at Cambridge Rindge for teachers
to meet parents?

A.   Yeah.  There were two things that happened.  These were
both freshman year and senior year.  It hadn't changed.

      There's an open house at the start of each semester in
which parents can go through the students' classes, and then
there's a parent-teacher night where parents can schedule
one-on-one sessions to talk with the teachers.

Q.   And they never came to those?

A.   They never came to the one-on-one meetings.  It's possible
they came to one of the open houses but -- the open houses you
have all the parents there, and it's not a one-on-one
interaction.  You kind of explain the classroom and what
happens there, so...

Q.   Did you know that Jahar had siblings?

A.   I did not.

Q.   At some point did Jahar ask you to write a letter of
recommendation for him to go to college?

     1   A.   He did.

     2   Q.   And what was your reaction when he asked you to do that?

     3   A.   I was happy to write it for him.  I was excited about

     4   writing a letter for a student that I had had in my -- like,

     5   seeing him as he started school and seeing him at the end of

     6   his school is -- it's fun to write a letter like that.  It's

     7   fun to -- for a student that you get to see both as they enter

     8   and finish school.

     9   Q.   So I'm going to pull that up.  It's Exhibit 3247-3.

05:19 10            THE COURT:  Is there any objection to this?

    11            MR. MELLIN:  No, your Honor.

    12            THE COURT:  Okay.

    13            (Defense Exhibit No. 3247-3 received into evidence.)

    14   BY MS. CLARKE:

    15   Q.   Do you recognize this letter?

    16   A.   I do.

    17   Q.   And is it the letter of recommendation that you wrote?

    18   A.   Yes.

    19   Q.   I'm going to ask you to read it to the jury.

05:20 20            I think that might make it large enough.

    21   A.   Thank you.

    22   Q.   Can you see that okay?

    23   A.   Yeah.  I can read that.

    24   Q.   Would you read it to the jury?

    25   A.   Sure.

1          "Dear Admissions Officer:

2          "I write with enthusiasm to you in recommendation of

3     Dzhokhar Tsarnaev.  I have known Dzhokhar since the start of

4     his freshman year in high school when I was his Algebra I

5     teacher.  This fall he has been a student in Honors Advanced

6     Math Topics, an elective which explores a variety of topics in

7     discrete math with a focus on their application in the real

8     world.  Dzhokhar is a smart, energetic and friendly student.

9          "Dzhokhar is a good student.  He quickly absorbs new ideas

05:21 10   and has a close-to-perfect homework record.  He brings a

11    healthy, energetic, competitive spirit to the class.  He

12    motivates himself in class with academic competitions of his

13    own devising (such as racing to write down notes or completing

14    a calculation).  His tongue-in-cheek contests are taken in good

15    spirit and have a beneficial effect on the attention of not

16    only himself but the classmates he is competing against.

17         "Dzhokhar is amiable with his peers and adults.  His good

18    nature and positive spirit have made Dzhokhar a pleasure to

19    know over the past four years.  He is always polite and

05:21 20   respectful and enters the classroom with a warm greeting.  He

21    is well regarded by his peers and gets along well with everyone

22    in the class.  I can rely on him to contribute positively to

23    any permutation of students with whom he is grouped.

24         "Dzhokhar is a strong student with a positive attitude.  I

25    enjoy teaching him both as a freshman and as a senior because

1    of his competitive academic drive and positive disposition.  It

2    has been a pleasure to have him at our school, and I strongly

3    recommend him to you."

4    Q.    You wrote that in December 2010, right?

5    A.    That's correct.

6    Q.    Were you sincere about everything that you said in that

7    letter of recommendation?

8    A.    Absolutely.

9    Q.    And do you mean those things even as you sit here today?

05:22 10   A.    I do.

11   Q.    Where were you when you heard about the Boston Marathon

12   bombing?

13   A.    I was in South Africa visiting my brother.

14   Q.    And did you have -- can you tell us what your thoughts

15   were when you learned that Jahar Tsarnaev was suspected of

16   being involved in the bombing?

17            MR. MELLIN:  Objection.

18            THE COURT:  Sustained in that form.

19   BY MS. CLARKE:

05:22 20   Q.    What you heard -- when you learned that Jahar Tsarnaev was

21   involved in the bombing, was that consistent with the Jahar

22   Tsarnaev that you knew?

23   A.    Not at all.  I was shocked when I saw his picture on TV,

24   and then his name was there.  In fact, I didn't even believe it

25   was him at first because it just didn't make sense to me, and

1    it took me a while to absorb that it was him and that, you

2    know, I wasn't misunderstanding.

3    Q.   Well, now that you know that it was him, what are your

4    thoughts about it?

5              MR. MELLIN:  Objection.

6              THE COURT:  Sustained.

7    BY MS. CLARKE:

8    Q.   Do you have any reflections on --

9              MR. MELLIN:  Objection.

05:23 10   BY MS. CLARKE:

11   Q.   -- on the fact that you taught Jahar and you now know that

12   he was involved in the bombing?

13             MR. MELLIN:  Objection.

14             THE COURT:  Sustained.

15   BY MS. CLARKE:

16   Q.   Do you think that Jahar had you fooled in high school?

17             MR. MELLIN:  Objection.

18             THE WITNESS:  No, I don't.

19             MR. MELLIN:  Never mind.  I'll withdraw it, your

05:23 20   Honor.

21             (Laughter.)

22             MS. CLARKE:  And I thank you.

23             THE COURT:  The answer can stand.

24             MS. CLARKE:  Thank you very much.  The prosecutor may

25   have some questions.

```
 1                        CROSS-EXAMINATION

 2    BY MR. MELLIN:

 3    Q.   Mr. Traub, you would agree that the defendant was

 4    self-motivated, correct?

 5    A.   As a student?

 6    Q.   Yes.

 7    A.   Yes.

 8    Q.   From your -- you're testifying about your experiences with

 9    him, right?

 10   A.   Yeah.

 11   Q.   And you wrote that he motivates himself, right?

 12   A.   Yes.

 13   Q.   So he's self-motivated, correct?

 14   A.   He was self-motivated in the classroom.

 15   Q.   Good.  He was mature?

 16   A.   Yeah, he was mature for a high school kid.

 17   Q.   And he was smart, correct?

 18   A.   He was smart.

 19   Q.   Thank you.

 20             THE COURT:  Anything else?

 21             All right.  Mr. Traub, thank you.  You may step down.

 22             (The witness is excused.)

 23             MS. CONRAD:  Defense calls Kevin Roche.

 24                      KEVIN ROCHE, duly sworn

 25             THE CLERK:  State your name.  Spell your first and
```

1    last name for the record, keep your voice up, and speak into

2    the mic, if you would.

3              THE WITNESS:  My name is Kevin Michael Roche.  Last

4    name is R-O-C-H-E.

5                        DIRECT EXAMINATION

6    BY MS. CONRAD:

7    Q.   Good afternoon, Mr. Roche.

8    A.   Good afternoon, Counselor.

9    Q.   Mr. Roche, where do you work?

05:25 10   A.   For the United States Marshal Service.

11   Q.   What's your position?

12   A.   I'm a deputy U.S. marshal.

13   Q.   And how long have you worked for the Marshal's Service?

14   A.   For 17 years.

15   Q.   And has that always been in Boston?

16   A.   Yes, ma'am.

17   Q.   And is that your current assignment?

18   A.   Yes.

19   Q.   And were you working as a U.S. marshal back on April 19th,

05:26 20   2013, when Jahar Tsarnaev was arrested?

21        April 20th.  Excuse me.

22   A.   What was the date again?

23   Q.   April 20th, 2013.

24   A.   That was the Friday?

25   Q.   Friday was the 19th.  20th was Saturday.

         1    A.   I was not working Saturday, no.

         2    Q.   Okay.  Did you encounter Mr. Tsarnaev shortly after he was

         3    taken into federal custody?

         4    A.   Yes, ma'am.

         5    Q.   And where did that occur?

         6    A.   At the Beth Israel Hospital on Sunday.  I think that was

         7    the 21st.

         8    Q.   And do you see Mr. Tsarnaev in the courtroom?

         9    A.   I do.

05:26   10    Q.   From the time of his arrest to, let's say, the date of his

        11    first appearance in this courthouse on July 10, 2013, how many

        12    times did you personally interact with Mr. Tsarnaev?

        13    A.   Prior to the arraignment?  I would say half dozen

        14    probably.

        15    Q.   And tell us what your role was and how you came to

        16    interact with him.

        17    A.   On the Sunday after his apprehension, the clerk

        18    magistrate -- I mean the judge magistrate, Marianne Bowler,

        19    came to the hospital to give him his initial appearance in the

05:27   20    hospital.  And from that point on, he became a Marshal's

        21    Service in-custody detainee.  He remained at the hospital that

        22    day, and we had a detail on him while he was at the hospital

        23    until the time of his discharge.

        24    Q.   And could you explain what you mean by "a detail"?

        25    A.   There were maybe six of us that were inside the actual

1    wing that he was being treated in, and then there was other law

2    enforcement throughout the hospital for security purposes.  But

3    we stayed with him the entire time he was in the hospital.

4    Q.    And you were part of that detail?

5    A.    Yes, ma'am.

6    Q.    And was Deputy U.S. Marshal Gary Oliveira also part of

7    that detail?

8    A.    Not the day that I was there.  I did a 12-hour shift from

9    the Sunday that he was -- he had his initial appearance until

05:28 10    Monday morning.  I'm sure that he did.  I think everyone in the

11    district did at some point.

12    Q.    At some point was Mr. Tsarnaev transferred to the Federal

13    Medical Center at Devens?

14    A.    He was.

15    Q.    And that was -- again, he was still in federal custody?

16    A.    Correct.

17    Q.    And after his transfer out of Beth Israel, did you have

18    interaction with him as part of your duties as a U.S. marshal?

19            MR. MELLIN:  Your Honor, objection to this line as

05:28 20    irrelevant.

21            MS. CONRAD:  It's foundation, your Honor.

22            MR. MELLIN:  There's no question about the foundation.

23            MS. CONRAD:  Well, I'll make a proffer at sidebar,

24    your Honor, but --

25            THE COURT:  Well -- yeah.  Let me see you.

1          (Discussion at sidebar and out of the hearing of the

2     jury:)

3          THE COURT:  You seem to be taking a while to get to

4     the point.

5          MS. CONRAD:  Well, no.  The point is that, in his

6     interactions with him, he was never defiant, hostile or

7     uncooperative.  And that's exactly the point.  The July 10th

8     event is what the government wants to focus on --

9          MR. WEINREB:  Your Honor, two days when he lay in the

05:29 10    bed in Beth Israel, he wrote one defiant note after another.

11    He couldn't be defiant physically.  He was physically --

12         MS. CONRAD:  I was getting to after he went to Devens.

13    I just had to establish when he first went there.  Now we're

14    talking --

15         MR. MELLIN:  They're trying to draw these fine lines

16    and --

17         MS. CONRAD:  I'm done with Beth Israel.

18         THE COURT:  No, no.  But it's fair game for them to

19    point out that he was defiant on other occasions.

05:29 20         MS. CONRAD:  I'm talking about this --

21         MS. CLARKE:  He's not been defiant.

22         MS. CONRAD:  He has not been defiant.

23         THE COURT:  He just said -- I don't know what the

24    evidence is.

25         MS. CONRAD:  He's talking about the interrogation by

```
 1    the FBI the government said they're not offering.  I'm talking

 2    about his interaction.

 3              MR. WEINREB:  We're not offering it in our

 4    case-in-chief but to cross-examine him to rebut a claim.  The

 5    defense isn't entitled to put on a one-sided presentation and

 6    then keep out evidence that contradicts it.  The jury's being

 7    misled.

 8              MS. CONRAD:  First of all --

 9              THE COURT:  I think it opens the door to evidence of

05:30 10    defiance if they have it.  I don't know what it is.

11              MS. CONRAD:  I don't know what it is either.

12              THE COURT:  But be warned, it opens --

13              MS. CONRAD:  Even if it's during the course of an

14    un-Mirandized interrogation, which I think is what they're

15    talking about --

16              THE COURT:  I don't know.  I'll have to hear what it

17    is.

18              MS. CONRAD:  Well, if it's statements by the

19    defendant, we have not been given discovery under Rule

05:30 20    16(a)(1)(A)--

21              MR. WEINREB:  They have all the statements.

22              THE COURT:  I'm just -- okay.  I think you may have to

23    be careful because I think it may open the door to something

24    you don't want.  I'm sorry.

25              MS. CONRAD:  It would help if the government would
```

1    tell me what they're talking about because I'm not aware of

2    what they're talking about.

3              MR. WEINREB:  We don't need to preview our

4    cross-examination.  All the statements the defendant made at

5    Beth Israel were produced to the defense.  It's up to the jury

6    to decide if they were defiant statements or not.  We happen to

7    believe that many of them were.

8              MS. CONRAD:  I do not want to ask whether he was

9    defiant at Beth Israel; I just want to establish when he first

05:31 10   met him and under what circumstances.

11             MR. WEINREB:  The question is, was he defiant?

12             MS. CONRAD:  That wasn't the question.  I'm

13   focusing --

14             THE COURT:  If you focus on a particular quality, like

15   defiance, they can meet with a particular quality.  A more

16   general focused quality of what his demeanor was might not --

17             MS. CONRAD:  Okay.

18             (In open court:)

19   BY MS. CONRAD:

05:32 20   Q.   Were there occasions when you escorted Mr. Tsarnaev to

21   medical appointments from Devens?

22   A.   Yes.  I believe on at least two occasions.

23   Q.   And on those occasions, what was his demeanor in his

24   interaction with you?

25   A.   On the first time that we took him to a hospital, I

```
 1    believe he was still pretty lethargic.  It seemed like he

 2    was -- he was pretty fresh from his discharge, and he may have

 3    still been medicated.

 4    Q.   And when you say "fresh from his discharge," did you

 5    actually observe physical injuries?

 6    A.   Yes.

 7    Q.   And, specifically, did you observe physical injuries to

 8    his face?

 9    A.   I did.

10    Q.   What did you observe?

11    A.   He had a wound that appeared to have been sutured, and his

12    head was deformed.  I believe it was his left side of his --

13    his head seemed swollen.

14    Q.   And did you notice anything about his mouth?

15    A.   Not to my recollection, no.

16    Q.   Were you aware that he had been shot in the face?

17    A.   Yes.

18         I take that back.  I'm sorry.  I knew he had an upper body

19    wound and a hand wound and a leg wound.  I don't know -- I

20    mean, other than the obvious suture, that was my first

21    indication.

22    Q.   And when you escorted him to medical appointments, did you

23    give him instructions?

24    A.   I did.

25    Q.   And did he follow those instructions?
```

           1    A.    He did.

           2    Q.    And I want to turn your attention to July 10th, 2013.    And

           3    that was the day that Mr. Tsarnaev first came to this

           4    courthouse for his arraignment, correct?

           5    A.    Yes, ma'am.

           6    Q.    And did you -- have you seen the video of a gesture he

           7    made to the camera in the cellblock?

           8    A.    I have.

           9    Q.    Now, you're familiar with the cellblock?

    05:34  10    A.    Yes.

          11    Q.    And are you familiar with the camera in the cellblock?

          12    A.    Yes.

          13    Q.    And by the way, what was your assignment that day on July

          14    10, 2013?

          15    A.    I was part of the team that moved him from the facility

          16    here on that morning, and then -- I don't recall if I actually

          17    escorted him to court that day.    I believe I did.

          18    Q.    At some point did you go with a supervisor to speak to him

          19    after becoming aware of a gesture that he made to the camera?

    05:35  20    A.    Yes, ma'am.

          21    Q.    And what did -- and when you spoke to him -- or your

          22    supervisor spoke to him on that occasion, how would you

          23    describe his demeanor?

          24    A.    It was very brief, that discussion we had with him, and

          25    his demeanor was -- he basically listened to what we had to

```
 1   say, and he didn't have much to offer.

 2   Q.   Did he apologize?

 3   A.   He did.

 4   Q.   Have you seen other detainees use the housing on that

 5   camera as sort of a reflection or a mirror?

 6   A.   Yes.

 7            MR. MELLIN:  Objection to "others."

 8            THE COURT:  No.  Overruled.  That may stand.

 9   BY MS. CONRAD:

05:36 10   Q.   And after you spoke with him that day, did you receive any

11   report -- strike that.

12        Was he given any instructions at that time?

13   A.   Was he given instructions?

14   Q.   Yes.  In your presence.

15   A.   He was.

16   Q.   And did he follow those instructions?

17   A.   Well, let me just clarify that.

18        I don't know if we gave him instructions, but we addressed

19   what we had observed and informed him that that was not going

05:36 20   to be tolerated here in this house, and it was going to be

21   dealt with if it continued and asked him if he had any plans to

22   continue that behavior.

23   Q.   And what did he say?

24   A.   And he had said, "No.  I'm done.  I'm sorry."

25   Q.   And did he engage in any other behavior like that that day
```

1    in the cellblock?

2    A.    Not that day, no.

3    Q.    In your experience, what types of things have inmates done

4    in the cellblock?

5    A.    You name it.  We've seen attempted suicides in our

6    cellblock, inmate-on-inmate assaults.  They flood the toilets.

7    You know, they act out verbally, physically to each other.

8    Q.    Do they ever act out verbally to you?

9    A.    Anyone or him?

05:37 10    Q.    Other detainees.

11    A.    Yes.

12    Q.    And have you ever -- strike that.

13          In terms of the hand gesture, would that normally result

14    in writing up an incident report?

15    A.    I would -- it would depend on the detainee.  Different

16    inmates rise to a different level of attention from the

17    Marshal's Service in what's considered, you know, important or

18    significant.  I can say, in my experience, I've never written a

19    report about a hand gesture.

05:38 20          MS. CONRAD:  May I have a moment, please?

21          (Counsel confer off the record.)

22          MS. CONRAD:  Thank you very much, Mr. Roche.  I don't

23    have any further questions for you at this time.

24                       CROSS-EXAMINATION

25    BY MR. MELLIN:

```
 1   Q.    Mr. Roche, by the time the defendant came to court in
 2   July, he was healing, correct?
 3   A.    Yes.
 4   Q.    His face was no longer swollen like you talked about,
 5   correct?
 6   A.    In July?
 7   Q.    Yes.
 8   A.    I believe it was still in July.
 9   Q.    Okay.  Did you see his hand gestures that day?
05:39 10   A.    Yes, sir.
11   Q.    Now, Ms. Conrad just asked you about your experience and
12   what types of things are done, in your experience.
13         Did you ever see him make a peace sign that day?
14   A.    In my opinion, no.
15   Q.    Did he ever once put his hands up like this during that
16   video and make a peace sign like this?
17         MS. CONRAD:  Objection, your Honor.  The video speaks
18   for itself.
19         THE COURT:  I agree.  The video speaks for itself.
05:39 20   BY MR. MELLIN:
21   Q.    Did you see that sign?
22         MS. CONRAD:  Objection.
23         THE COURT:  Sustained.
24   BY MR. MELLIN:
25   Q.    What gestures did you see the defendant make, and what
```

           1   gestures were the reasons for why he was talked to that day?

           2           THE COURT:  That's a multiple question.  You can

           3   answer the second part of it.

           4           THE WITNESS:  Can you repeat that?  I'm sorry.

           5   BY MR. MELLIN:

           6   Q.   Sure.  What gestures were made that required someone -- in

           7   this case, you -- to go talk to the defendant?

           8   A.   I saw a two-fingered sideways gesture and then a middle

           9   finger straight up.

05:40    10   Q.   In your experience, what did you take the two-finger

          11   sideways gesture to mean?

          12           MS. CONRAD:  Objection.

          13           THE COURT:  A little foundation.

          14   BY MR. MELLIN:

          15   Q.   Have you seen that gesture before, in your experience?

          16           MS. CONRAD:  Objection.

          17           THE COURT:  Overruled.

          18           THE WITNESS:  Yes.

          19   BY MR. MELLIN:

05:40    20   Q.   And putting -- considering the context of the time -- the

          21   context of what happened after you saw that gesture, what did

          22   you take that gesture to mean?

          23           MS. CONRAD:  Objection.

          24           THE COURT:  Overruled.

          25           THE WITNESS:  If I could elaborate?

BY MR. MELLIN:

Q.   Yes.

A.   I'm purebred Irish, and all four of my grandparents

emigrated here from Ireland, so that --

          MS. CONRAD:  Objection.

          THE COURT:  I don't know --

          MS. CONRAD:  I don't think there's any evidence that

the defendant is Irish.

          THE COURT:  I'm not sure what this --

05:41     MS. CONRAD:  May we approach?

          THE COURT:  There's got to be deeper background

than --

          MR. MELLIN:  Let me rephrase it.

BY MR. MELLIN:

Q.   The two-finger sideways, did you take that to be a sign of

disdain by the defendant, or how did you perceive that gesture?

          MS. CONRAD:  Objection.

          THE COURT:  Again, you can have the second part of the

question.  How did you perceive it?

05:41     THE WITNESS:  I perceived it as defiance.  The way

that I understood it growing up around my family and circle of

people, that was it.  That was a disrespectful sign.

BY MR. MELLIN:

Q.   And after -- immediately after the defendant uses the

two-finger sideways, does he then use the middle finger to send

1  another hand gesture?

2          MS. CONRAD:  Objection.  The video speaks for itself.

3          THE COURT:  Go ahead.  You can answer it.

4          THE WITNESS:  To me they were one and the same.  I

5  mean, they were similar.  They meant the same to me.

6  BY MR. MELLIN:

7  Q.   After that is when you went to speak to the defendant,

8  correct?

9  A.   I did not see him make the sign when he initially made it.

05:42 10  It was told to me from the deputy in charge that he was making

11  obscene gestures in the camera, so at the time that I went in

12  to discuss that with him, I don't even know if I knew what the

13  sign was.  I just knew that my colleagues identified them as

14  obscene gestures, and it didn't matter to me what it was.

15          MR. MELLIN:  I asked an imprecise question.  I --

16          MS. CONRAD:  Your Honor, in light of -- if I may.  In

17  light of that answer, your Honor, I move to strike the previous

18  testimony about how he interpreted it when he saw it, which

19  wasn't until after the fact.

05:42 20          THE COURT:  The motion is denied.

21  BY MR. MELLIN:

22  Q.   I asked an imprecise question.  I was only trying to

23  indicate that you went to see the defendant after that incident

24  happened, correct?

25  A.   That is correct.

1   Q.   And at the time that you went to see the defendant, he

2   admitted, in fact, that he had done that, correct?

3   A.   He acknowledged -- my reading in his mannerisms, he

4   acknowledged that he -- he knew we were there for a reason, and

5   he did it to a camera, so clearly we saw it, and he apologized

6   for it.

7   Q.   And what is it that he said?

8   A.   He said -- we asked him if he was going to continue to be

9   a problem, or if he was going to be a problem for the rest of

05:43 10   the day, and he said, "No.  I'm done.  I'm sorry."

11   Q.   And that was -- he said that just after he was confronted

12   and not any time before that, correct?

13        MS. CONRAD:  Objection, your Honor.

14        THE COURT:  Sustained.

15   BY MR. MELLIN:

16   Q.   Did he make that statement voluntarily or when you were

17   questioning him about what happened?

18        MS. CONRAD:  Objection, your Honor.

19        THE COURT:  Sustained.  I think we have the

05:43 20   circumstances.

21        MR. MELLIN:  All right.  Thank you, your Honor.

22        MS. CONRAD:  Nothing further.  Thank you.

23        THE COURT:  All right, Deputy.  Thank you.  You may

24   step down.

25        THE WITNESS:  Thank you.

1          (The witness is excused.)

2          MR. BRUCK:  I call Mark Bezy.

3                    MARK BEZY, duly sworn

4          THE CLERK:  Please state your name, your first and

5     last name, and spell both for the record, if you would, and

6     keep your voice up.

7          THE WITNESS:  My name is Mark Bezy, B-E-Z-Y.

8                    DIRECT EXAMINATION

9     BY MR. BRUCK:

05:45 10   Q.   Good afternoon, Mr. Bezy.

11    A.   Good afternoon.

12    Q.   Where do you live?

13    A.   I live in San Tan Valley, Arizona.

14    Q.   What sort of work have you done for most of your career?

15    A.   Corrections.

16    Q.   Are you retired as a career employee from the Federal

17    Bureau of Prisons?

18    A.   Yes, I am.

19    Q.   And what is the Federal Bureau of Prisons?

05:46 20   A.   It's the agency that houses offenders that have been

21    convicted in federal courts and sentenced to periods of times

22    of incarceration.

23    Q.   How long did you work for the Federal Bureau of Prisons?

24    A.   28 and a half years.

25    Q.   From what year to what year?

1   A.    Started in 1978, and I retired in 2006.

2   Q.    2006?

3   A.    Correct.

4   Q.    And what, briefly, do you do now?

5   A.    I own a correctional consulting company.

6   Q.    And between the time of your retirement and the present

7   day, have you also worked for a private prison corporation?

8   A.    Yes.  Before I retired, I was recruited by a private

9   correctional company out of Boca Raton, Florida.  They hired me

05:46 10   to activate and run a thousand-bed sex offender unit in the

11   state of Arizona; in Florence, Arizona.  So I retired and went

12   to work for them, activated it, worked it for a couple of

13   years.

14   Q.    In the course of your long career with the Bureau of

15   Prisons and with the consulting work that you have done since,

16   are you familiar with the programs, policies, operation of the

17   Federal Bureau of Prisons?

18   A.    Yes, I am.

19   Q.    Did we ask you to assist us by providing the Court with

05:47 20   information concerning restrictions on communications by

21   certain federal prisoners?

22   A.    Yes.

23   Q.    Now, I'd like to ask you a little bit more about your

24   career before we get started.

25         Where did you -- what is your educational background?

1   A.   I have a bachelor of science in criminal justice from the
2   University of Nebraska in 1974.
3   Q.   And I think you said you started at the BOP, Bureau of
4   Prisons, in 1978?
5   A.   Correct.
6   Q.   I'm not going to ask you about each of your institutional
7   assignments.  There were a great many of them, weren't there?
8   A.   Yes.
9   Q.   And that's the way careers progress in the Bureau of
05:48 10   Prisons, from -- people who advance go from institution to
11   institution?
12   A.   Yes.
13   Q.   Acquiring more and more responsibility as they go?
14   A.   Correct.
15   Q.   And that was the pattern of your career?
16   A.   Yes.
17   Q.   All right.  What types of institutions did you serve at as
18   you advanced through the Bureau of Prisons?
19   A.   I started in 1978 at the Federal Correctional Institution in
05:48 20   Oxford, Wisconsin.  It was a medium-security adult male
21   facility.
22   Q.   And briefly speaking, did you work at a variety of
23   different institutions at different levels of security over the
24   course of your career?
25   A.   Yes.  I've worked at camps, I worked at low, I worked at

1    mediums, I worked at United States penitentiaries, and I've

2    worked at federal medical centers.

3    Q.    And have you also had occasion to work at various

4    headquarters for the Bureau of Prisons in different parts of

5    the country?

6    A.    I worked in two regional offices, yes.

7    Q.    Okay.  Which administer prisons for large swathes of the

8    country?

9    A.    Yes.  For the institutions within that region, we manage

10   them.

11   Q.    Would you tell us what the last three or four assignments

12   that you had during the course of your career were?

13   A.    Last three or four?

14   Q.    Yeah.

15   A.    It would have been -- I was appointed to the captain of

16   the United States Penitentiary in Marion, Illinois -- if I can

17   look at my dates, that's...

18   Q.    Sure.

19   A.    -- in 1992 to 1995, and at that time Marion was the most

20   restricted facility and most controlled facility in the Bureau

21   of Prisons.

22         From there I went to the --

23   Q.    Let me stop you there.

24   A.    Excuse me.

25   Q.    How many captains were there at Marion at this

1    high-security prison?

2    A.    There's only one captain at every facility.

3    Q.    And you were it?

4    A.    Yes.

5    Q.    And the captain's job is what, in lay terms?

6    A.    Well, all the correctional officers report to you; the

7    lieutenants report to you.  You have GS-9 lieutenants and GS-11

8    lieutenants, you have a security officer, an armorer, and

9    investigative staff, which is known as the SIS office --

05:50 10    special investigative supervisors -- report to you.

11    Q.    Very well.

12          And you say that Marion was at that time the most -- sort

13    of the super max for the entire country?

14    A.    Yes.

15    Q.    Okay.  Where did you go after that?

16    A.    After that I was promoted to the correctional service

17    administrator in the North Central Regional Office in Kansas

18    City.

19    Q.    And during the time you were at Marion and during that

05:50 20    next assignment, did a new maximum-security facility come

21    online for the Bureau of Prisons nationwide?

22    A.    Yes.  In 1994 the bureau had been building, but they

23    opened the -- what they call the administrative maximum

24    facility at the Florence Correctional Complex in Florence,

25    Colorado.

1 Q. And that's known, for short, as ADX?

2 A. ADX.

3 Q. Did you have any role in selecting the inmates who were

4 transferred from Marion to ADX when it opened?

5 A. Yes.  We moved probably 90 percent of our population from

6 Marion to the ADX in small groups.  We picked which groups

7 would go first, second, third and fourth.

8 Q. Thank you.

9  And just to move this along, did you also stay involved at

05:51 10 ADX -- in matters involving ADX when you went to the regional

11 headquarters after you left Marion?

12 A. Yes.

13 Q. Okay.  And you had responsibilities for helping

14 Marion -- ADX get underway?

15 A. Correct.

16 Q. All right.  And what was the next assignment you had?

17 A. I was promoted to the associate warden at the United

18 States Penitentiary in Leavenworth, Kansas.

19 Q. After that?

05:52 20 A. I was promoted to warden at the Federal Correctional

21 Institution at Elton, Ohio.

22 Q. And after that?

23 A. I was promoted to warden at the United States Penitentiary

24 in Terre Haute, Indiana.

25 Q. And was that your final assignment before you retired?

1   A.   Yes.

2   Q.   Did your -- was there any unusual feature of the

3   institution -- of the Terre Haute institution for which you

4   were responsible as warden?

5   A.   Terre Haute already had an existing penitentiary on our

6   property.  It was a 70-year-old facility.  It was becoming

7   outdated.  They were building and had built a brand-new

8   state-of-the-art penitentiary on the compound, so when I

9   arrived -- the current warden finished out his time as running

05:53 10   the old penitentiary.  He retired.  Then I became the complex

11   warden where I was over the new federal penitentiary, the

12   federal correctional institution, and the federal prison camp.

13   Q.   Is Terre Haute also the location -- or was it when you

14   were there -- is it still today the location for the federal

15   death row?

16   A.   Yes.

17   Q.   So you were the warden for death row as well as for the

18   larger penitentiary?

19   A.   Yes.

05:53 20   Q.   Is there a specific procedure in the federal regulations

21   that govern the Bureau of Prisons for ensuring the control,

22   limitation or restriction on prisoners whom the government

23   believes present a threat through inciting or communicating

24   with other persons?

25   A.   Yes, there is.

1    Q.   Do you know offhand what the name of that regulation is?

2    A.   It's special administrative measures.  It's called --

3    commonly known as SAMs.

4    Q.   Okay.  And I don't know if it's that important, but do you

5    know the citation for it?

6    A.   It's 28 C.F.R. 501.3.

7    Q.   Okay.  That's Volume 28 of the Code of Federal

8    Regulations, Chapter 501.3?

9    A.   Correct.

05:54 10   Q.   And that concerns something called special administrative

11   measures?

12   A.   Yes.

13   Q.   And just to summarize -- we'll get into the details in a

14   moment, but just to summarize, what are special administrative

15   measures?

16   A.   It's a mechanism to cut off an inmate's communication with

17   the outside world, but there are few exceptions which are

18   limited, restricted and approved by the FBI, the U.S.

19   Attorney's Office.

05:55 20   Q.   Is this procedure, the special administrative measures, or

21   SAMs, frequently used for prisoners who are convicted of

22   terrorist offenses?

23   A.   Yes.

24   Q.   Is it used for prisoners pretrial as well as after

25   conviction?

1    A.    Yes.

2    Q.    And was the process of applying special administrative

3    measures invoked in this case for Jahar Tsarnaev?

4    A.    Yes, they were.

5    Q.    Is he currently under special administrative measures?

6    A.    Yes.

7    Q.    Now, in summary, what does it mean so far as ensuring the

8    prisoner's communication with the outside world is restricted

9    or limited?  What sorts of communications are we talking about?

05:55 10   A.    We're talking about his written communication, his

11   visitation, his correspondence, contact with the media, and

12   contact with other inmates.

13   Q.    Now, before we get into the details of that, can you

14   describe, generally speaking, the procedure for deciding who --

15   when an inmate is subject to these restrictions under the SAMs?

16   Who decides?

17   A.    It's the FBI -- the U.S. Attorney's Office make a

18   recommendation to the attorney general of the United States,

19   and he's the approving official.

05:56 20   Q.    All right.  And I assume that there are several levels up

21   the bureaucracy that this recommendation travels through.  Is

22   that correct?

23   A.    Correct.

24   Q.    Without going into all of that, when you say "the FBI,"

25   you mean the investigating agency on a given case?

```
 1   A.   Yes.

 2   Q.   Which in this case would be the FBI here in Boston?

 3   A.   Correct.

 4   Q.   And you referred to the U.S. Attorney's Office?

 5   A.   Yes.

 6   Q.   You mean by that the prosecuting agency in the case?

 7   A.   Yes.

 8   Q.   By which you mean the U.S. Attorney right here in Boston?

 9   A.   Correct.

10   Q.   And those agencies make a recommendation which has to be

11   approved by the attorney general?

12   A.   Yes.

13   Q.   And if it is, what happens?

14   A.   If it is, then he's not allowed to have contact with the

15   media or from the media; he's not allowed to have contact with

16   any other inmates; his visitations are limited to immediate

17   family, which consists of --

18   Q.   We'll be getting into the details of that, but I guess my

19   question was:  The attorney general approves that SAMs are

20   invoked, correct?

21   A.   Correct.

22   Q.   And when a -- now, the attorney general is the head of

23   what agency?

24   A.   Department of Justice.

25   Q.   And what agency is the Bureau of Prisons a part of?
```

1    A.   The Department of Justice.

2    Q.   And what agency is the U.S. Attorney's Office part of?

3    A.   The Department of Justice.

4    Q.   And the FBI?

5    A.   Department of Justice.

6    Q.   Okay.  So this whole procedure is internal to the

7    prosecution, the FBI, the Justice Department?

8    A.   Yes, it is.

9    Q.   All right.  When the SAMs is invoked, when an inmate is

05:58 10   subject to the special administrative measures, how long does

11   this order last, maximum?

12   A.   They're good for one year, and then they're up for

13   renewal.

14   Q.   Is there any -- and -- so the SAMs can be renewed after

15   one year?

16   A.   Yes.

17   Q.   And in this case involving Jahar Tsarnaev, have the SAMs

18   already been renewed?

19   A.   Yes, it has.

05:58 20   Q.   All right.  Is there any limitation to the number of years

21   that this special administrative measures procedure can be

22   renewed?

23   A.   No, there's not.

24   Q.   Now, when the special administrative measures are invoked

25   and a prisoner is tried and convicted and sentenced to the

1    Bureau of Prisons, does the bureau have a particular

2    institution designed to house such prisoners and to implement

3    these procedures?

4    A.   Yes.  It's the administrative maximum, the ADX in

5    Colorado.

6    Q.   The institution to which you referred a moment ago?

7            MR. BRUCK:  Can we bring up 3253, please?

8            And we offer this.

9            THE COURT:  Any objection?

05:59 10   BY MR. BRUCK:

11   Q.   Do you see that photograph on the screen?

12   A.   Yes, I do.

13   Q.   Is that a photograph of the --

14           THE COURT:  Just a minute, Mr. Bruck.

15           I take it there's no objection because I think we

16   dealt with this earlier.

17           MR. MELLIN:  No objection, your Honor.

18           THE COURT:  Okay.

19           (Defense Exhibit No. 3253 received into evidence.)

06:00 20   BY MR. BRUCK:

21   Q.   And is this a picture of the Florence, Colorado, prison

22   complex?

23   A.   Yes, it is.

24   Q.   And is ADX, the administrative maximum, one of these

25   prisons?

```
  1    A.    Yes.

  2    Q.    I'm going to enlarge this area.

  3          Is that ADX?

  4    A.    Yes, it is.

  5    Q.    And a view from the other side --

  6          MR. BRUCK:   3254, please.

  7    BY MR. BRUCK:

  8    Q.    Is that an aerial view from the other side of ADX?

  9    A.    Yes, it is.

06:01 10    Q.    All right.  That's what it looks like today?

 11    A.    Yes.

 12    Q.    By the way, when was the last time you visited ADX?

 13    A.    I was out there on the 7th of last month.

 14    Q.    Okay.  You've been there recently?

 15    A.    Yes.

 16    Q.    You know what it looks like?

 17    A.    Yes.

 18    Q.    Now, are prisoners under SAMs -- do you know whether -- I

 19    think you've said that prisoners under -- that this institution

06:01 20    is designed to accommodate prisoners who are under the SAMs.

 21          Why are prisoners that are under special administrative

 22    measures assigned to ADX rather than some other institution in

 23    the Bureau of Prisons?

 24    A.    It's been deemed as the most appropriate institution to

 25    house inmates under SAMs.
```

1    Q.    Is there a particular unit or cellblock at ADX that is

2    used to house these types of prisoners?

3    A.    Yes.  It's called H unit.  It's a special security unit.

4    Q.    Special security unit?

5    A.    Yes.

6    Q.    Or H?

7    A.    H unit, yes.

8    Q.    H unit?  All right.  And why would the bureau need a

9    special institution in a specific location for this group of

06:02 10   inmates?

11   A.    Well, all these inmates are under SAMs.  It's been

12   activated since, I believe, 2002.  The policies and procedures

13   there are effective, and it works.

14   Q.    All right.  I'd like to go through the various types of

15   communication or potential for communication that you listed

16   and get you just to describe what the limitations are that

17   are -- that result from the SAMs in each instance.

18         Are there restrictions on inmates' use of the telephone?

19   A.    Yes, there are.

06:03 20   Q.    What are those restrictions?

21   A.    Inmates will get one 15-minute phone call.  It's got to be

22   to -- what they call a member of the immediate family, which

23   has been defined as parent, sibling, spouse or children, and

24   they all have to be further approved by the FBI.

25   Q.    The people with whom they're allowed to speak have to be

        1    approved?

        2    A.    By the FBI too.

        3    Q.    When a phone call is made, what restrictions or what

        4    precautions are taken to ensure that nothing untoward is -- no

        5    information that is untoward is passed in either direction?

        6    A.    The call is recorded, and it's live-monitored by both an

        7    agent from the FBI and somebody from the Federal Bureau of

        8    Prisons.

        9    Q.    Is there an absolute right to make phone calls to members

06:04 10    of your immediate family?

       11    A.    No.

       12    Q.    Can a member of the immediate family be -- can an inmate

       13    be refused the right, if it is deemed appropriate, to speak

       14    with any member of their family?

       15    A.    Yes.

       16    Q.    Now, you say phone calls last 15 minutes?

       17    A.    Correct.

       18    Q.    And do you know what the maximum number of phone calls a

       19    month that can be allowed is under the SAMs?

06:04 20    A.    Under the SAMs, if they're in H unit, it's two.  Here it's

       21    one.

       22    Q.    And can that number be increased greater than two

       23    depending on the level that someone is in?

       24    A.    Yeah.  That's Phase Level 1.  Phase Level 2, it would be

       25    3; and then Phase Level -- or -- excuse me -- 2 is three, and

1    Phase Level 3 is four.

2    Q.   Very well.

3         Are there also restrictions on physical visits?

4    A.   Yes.

5    Q.   Can you tell us, generally speaking, what those

6    restrictions are?

7         First of all, who is allowed to visit an inmate?

8    A.   It's immediate family.

9    Q.   "Immediate family" means who?

06:05 10  A.   Parents, siblings, children and spouses.

11   Q.   So if an inmate is unmarried --

12   A.   They don't, yes.

13   Q.   -- and has no children, then it would be siblings and

14   parents?

15   A.   Correct.

16   Q.   What about friends?

17   A.   No.

18   Q.   If a person had friends who wanted to visit him from the

19   outside, that's not included?

06:05 20  A.   No.

21   Q.   What are the conditions under which the physical

22   visitation occurs for inmates at H unit?

23   A.   They're noncontact visits.

24   Q.   What's that mean?

25   A.   There's a physical barrier between the visitor and the

```
 1    inmate.  It's usually security glass.  The inmate is locked
 2    into a booth on one side.  On the other side, the visitor would
 3    sit.  Each one would have a phone.  They would pick up the
 4    phone, and they would do -- they would conduct the visit that
 5    way.
 6    Q.    And how many visitors can be in the booth at a time?
 7    A.    One.
 8    Q.    The -- what contact is allowed with the news media for an
 9    inmate who is under a SAMs?
10    A.    None.
11    Q.    None?
12    A.    None.
13    Q.    What contact is allowed with the news media who wishes to
14    speak to an inmate who is under a SAMs?
15    A.    None.
16    Q.    What about mail?  Are inmates under SAMs allowed to
17    correspond, and if so, with whom and under what conditions?
18    A.    Again, it's to immediate family.  All outgoing mail is
19    photocopied.  It's read by the FBI, Bureau of Prisons.  If it's
20    deemed appropriate, then it's sealed and mailed.  Incoming
21    is -- again, it's opened, checked for contraband.  It's read by
22    FBI Bureau of Prisons, it's analyzed, and then, if there's no
23    issues, then it will be delivered to the inmate.
24    Q.    Who is allowed to correspond with the inmate?
25    A.    Immediate family.
```

1    Q.    Same restrictions as with visitation?

2    A.    Yes.

3    Q.    And with telephone?

4    A.    Yes.

5    Q.    And as with telephone and visitation, is there any legal

6    requirement that any particular immediate family member be

7    allowed to communicate by mail with the inmate?

8    A.    No.

9    Q.    So someone could be disapproved even though they are

06:08 10   immediate family?

11   A.    Correct.

12   Q.    Finally, are there -- you've described H unit.  This is

13   a -- is this a self-contained cell block within ADX?

14   A.    Yes, it is.

15   Q.    Is an inmate -- how are inmates housed within the cell

16   block?  Is it multiple cells or single cells?

17   A.    It's single cells.  Each inmate is assigned to a single

18   cell.

19   Q.    And are inmates permitted to mingle or communicate with

06:08 20   other inmates outside of H unit?

21   A.    No.

22   Q.    Do you know whether there are recording facilities or

23   capabilities to monitor anything that is said by an inmate

24   inside of H unit?

25   A.    Yes, there are, but it's law enforcement privilege, I'd

 1    like to add to that.  But yes, there are.

 2    Q.    Okay.  Without going into the details of how that's

 3    done --

 4    A.    Yes.  I -- yeah, I'd prefer to not go into specifics, but

 5    there are.

 6    Q.    I understand.

 7         And that monitoring also permits recording of any

 8    conversations that inmates may have or attempt to have with

 9    each other within the unit?

06:09 10    A.    Yes.

11    Q.    Do you know how many inmates under SAMs are currently on

12    H unit today?

13    A.    As of the 7th of last month, there were 20 -- 27.

14    Q.    All right.  And do you know how many cells are in the

15    unit?

16    A.    There's 34 in the unit.  Thirty-four cells.

17    Q.    So there are empty cells there now?

18    A.    Yes.

19    Q.    Now, you've told us that these procedures, the SAMs, can

06:10 20    be renewed annually?

21    A.    Yes.

22    Q.    Are there some prisoners who may spend many years under

23    these procedures?

24    A.    Yes.

25    Q.    Are there prisoners still in H unit who have been there

1    since it was created to house SAMs inmates back in 2002?

2    A.   Yes, there are.

3    Q.   Now, if an inmate is well-behaved, does the Federal Bureau

4    of Prisons have the authority to remove these communications

5    restrictions on its own authority?

6    A.   No, they do not.

7    Q.   Who has the authority -- sole authority to do that?

8    A.   It would be the FBI and the U.S. Attorney's Office.

9    Q.   Or --

06:10 10   A.   Or attorney general.

11   Q.   The attorney general?

12   A.   Yeah.

13   Q.   Acting on the recommendation?

14   A.   Right.

15   Q.   And I suppose that leads me to the next question:  Does

16   the U.S. Attorney's office and the FBI, who investigate or

17   prosecute a case, have any role in the decision to renew the

18   SAMs?

19   A.   Yes, they do.

06:11 20   Q.   And that role is what?

21   A.   Well, they're asked for recommendations, and then there's

22   a report compiled, and it's sent up to OEO and then up to the

23   attorney general.

24   Q.   If the Bureau of Prisons, the FBI or the U.S. Attorney

25   suspect that a prisoner's attempting to defeat the

1    restrictions, to communicate in some way despite these

2    restrictions on communications, what sorts of measures are

3    available to deal with that?

4    A.   Well, they can totally take away his telephone privilege,

5    his correspondence privilege and his visitation privilege.

6    Q.   When a prisoner is sent to the H unit on ADX under a SAMs,

7    can that -- does the Bureau of Prisons have the power to send

8    him to another institution that would not -- where he would not

9    be subject to the special administrative measures on its own

06:12 10   say-so?

11   A.   No, they would not.

12   Q.   Do you know how many -- since 2002 -- and that is the time

13   when this procedure was created; is that correct?

14   A.   Correct.

15   Q.   -- how many life-sentenced terrorist -- offenders

16   convicted of terrorist offenses under the SAMs, excluding

17   prisoners with medical issues, were either designated directly

18   to ADX or ended up there?

19   A.   All but one.

06:13 20   Q.   And how big a group are we talking about?

21   A.   There were 34 total, and 33 went there -- went to the

22   G -- or to the H unit, and one went to a medical center.

23   Q.   And one went to a medical center?

24   A.   Correct.

25   Q.   Presumably because he needed to be there?

1    A.    Yes.

2    Q.    Do the -- can you give us some examples of -- without

3    naming any names, some of the types of offenses of people who

4    have ended up --

5              MR. MELLIN:  Your Honor, objection.

6              THE COURT:  Overruled.

7              You may have it.

8    BY MR. BRUCK:

9    Q.    Can you list some of the offenses for which people are

06:13 10   convicted and are serving their time under SAMs at H unit?

11             MR. MELLIN:  Your Honor, may we approach on that?

12             THE COURT:  All right.

13             MR. BRUCK:  I'll rephrase the question, your Honor.

14             THE COURT:  All right.

15   BY MR. BRUCK:

16   Q.    Without naming the specific crimes or the specific

17   offenders, can you give us some sense of the types of offenses

18   for which people have --

19             MR. MELLIN:  Objection.

06:14 20        THE COURT:  I think I have to see you.

21             (Discussion at sidebar and out of the hearing of the

22   jury:)

23             MR. BRUCK:  I'm just trying to bring out these are

24   serious terrorist offenses, and maybe it goes without saying.

25             THE COURT:  Well, just so I understand the

1    controversy, let me know what touched the nerve.

2          MR. MELLIN:  The attempt to try to do some comparative

3    analysis to bring out the fact that there is people that --

4          MR. WEINREB:  In addition, your Honor, I just want to

5    also say that the suggestion may be -- without being

6    intentionally made, may be received by the jury that this is an

7    indication that people who commit these kinds of crimes don't

8    generally get the death penalty.

9          MR. MELLIN:  Correct.  And, your Honor, while we're

06:15 10   here, Mr. Bruck has now shown the photo of ADX from the sky,

11   trying to make it look like it's on the moon.  He has now

12   zoomed in on ADX, and he's talked about the defendant will be

13   in a single cell.  I think we have every right to talk about

14   all of the issues we discussed previously.  He's trying to --

15          THE COURT:  You have got plenty of room on what he has

16   done by sticking to my ruling.

17          (In open court:)

18   BY MR. BRUCK:

19   Q.   If the government for some reason decided not to renew the

06:16 20   SAMs as to Mr. Tsarnaev and he were sent to ADX -- or let's say

21   he were sent to ADX, and then at some point in the future the

22   government did not -- chose not to renew the special

23   administrative measures that is currently in effect to restrict

24   his communications, is it likely that he would nevertheless

25   remain at ADX?

1    A.    In my opinion, he would remain at the ADX.

2    Q.    And why do you say that, based on your knowledge of the

3    rules and regulations of the Federal Bureau of Prisons?

4    A.    Well, the Bureau of Prisons has what's called the central

5    inmate monitoring system, which designates inmates in certain

6    categories.  Say there's a fight between two inmates, they make

7    them separatees.  They can never be in the same institution at

8    the same time.  There's also one called special supervision,

9    and that's based upon the nature of the offense that the inmate

06:17 10   is sentenced under.  And then there's -- broad publicity is a

11   separate category, and that's because of the inmate's offenses

12   received such wide publicity, basically everybody knows who he

13   is.

14   Q.    And so two of those categories would apply in this case?

15   A.    He carries those -- he carries those assignments now.

16   Q.    Very well.  All right.  That's all I have to ask you about

17   ADX.

18        I do want to ask you one other thing:  Did you review

19   Mr. Tsarnaev's Bureau of Prisons records from the two years

06:17 20   that he has spent in pretrial confinement at the Federal

21   Medical Center at Devens, Massachusetts?

22             MR. MELLIN:  Your Honor, objection.  May we approach

23   on this point?

24             THE COURT:  All right.

25             (Discussion at sidebar and out of the hearing of the

jury:)

MR. MELLIN:  Your Honor, we have zero notice that they were using Mr. Bezy to get into his records for the two years he's been at Devens.  In fact, we have zero notice of what Mr. Bezy was going to say, but Mr. Bruck represented to me that he was only going to be talking about his experience in working at BOP, not his former records.

MR. BRUCK:  We had a very informal conversation in which I asked whether the government needed a written Rule 16 summary, and Mr. Mellin told me if it's the usual thing that Bezy does, which invariably involves reviewing his records -- all we're going to ask is the following question:  How many disciplinary violations did you find on his Bureau of Prisons institutional record over the two-year period since his arrest on April 19th?  And we anticipate the answer would be none. That is the extent of the testimony, simply that he has a clean record of disciplinary violations.  It's not a point of contention.  Those are the facts.  And after Mr. Mellin told me that we didn't need to provide anything, I'm a little taken aback to be told that we didn't provide enough.

MR. MELLIN:  No, your Honor.  There's two separate issues altogether, and Mr. Bruck should know that.  It's one thing to call an expert who has worked at BOP to talk about what the BOP does and the procedures the BOP follows.  It's another thing altogether to have someone come in and talk about

1    reviewing records.

2        If we had been told there would be a review of

3    records, we would be able to look at them now, go through them

4    and make sure his answer is correct.  I know for a fact that

5    the answer is not correct for at least one instance that

6    Marshal Roche could talk about in which he acted out on a

7    transport from Devens to this courthouse.  So I don't believe

8    that is a correct answer.

9        MR. BRUCK:  Well, there is no institutional

06:19 10   infractions, but how we --

11        THE COURT:  Well, I don't think -- I don't think it's

12   a serious notice problem necessarily.  I am concerned about the

13   accuracy of the information, but --

14        MR. BRUCK:  We'll leave it alone.

15        THE COURT:  Yeah.  Okay.

16        (In open court:)

17        MR. BRUCK:  Thank you, Mr. Bezy.  Please answer any

18   questions the government may have for you.

19                          CROSS-EXAMINATION

06:20 20   BY MR. MELLIN:

21   Q.   Mr. Bezy, good afternoon.

22   A.   Good afternoon.

23   Q.   Mr. Bezy, you never actually worked at ADX, correct?

24   A.   Correct.

25   Q.   The only times you've been to ADX has just been as a

1    walk-through, correct?

2    A.    No, I've done a staff assist of the correctional services

3    department as a pre-audit, pre-program review.  I've been part

4    of a regional office team that went in and did -- spent a week

5    there doing an institutional character profile of the entire

6    complex.  Every time I go out to the -- to the complex and do a

7    staff assist visit to the -- to any of the facility there,

8    we're always required to go visit all of the -- the

9    institutions.  As a warden, I did an after-action review of a

06:21 10    -- of a serious incident that occurred at the ADX.

11        So I've been there quite a few times.  And, actually, I

12    flew in with the last load of high-security inmates when we

13    shut down Marion.  I took them -- I was on the plane with them

14    from Marion to the ADX.  I'm quite familiar with the ADX.

15    Q.    Right.  And when was that that you did this fly-in from

16    Marion into ADX?

17    A.    2005.

18    Q.    Okay.  Now, there's been changes at the ADX.  Wait.  That

19    was 2005?

06:22 20    A.    I mean -- excuse me -- 1995.

21    Q.    Right.  There have been changes to the ADX since, using

22    your first number, 2005, correct?

23    A.    Correct.

24    Q.    Okay.  There were changes made certainly since 1995,

25    correct?

```
 1    A.    Correct.

 2    Q.    How many times have you been on the H unit?

 3    A.    Probably -- the last time I was on it was in, I think,

 4    2005.

 5    Q.    Right.  So you haven't been there in ten years, correct?

 6    A.    I was there just last month.

 7    Q.    To the H unit?

 8    A.    H unit, yes.

 9    Q.    I thought you said the last time you were there was 2005.

06:22 10   A.    I toured it last month, on the 7th; I was in the unit.

11    Q.    Did you go in and see the cells?

12    A.    No, they wouldn't let us go down range because of

13    sensitivity of the unit.

14    Q.    Right.  So when you say you went into the H unit, what did

15    you go into?

16    A.    We went into the entrance.  We went into the -- you can

17    stand and see down the ranges.  We went outside, saw the

18    recreation yards, and basically that --

19    Q.    Right.  You were at the control booth in the middle,

06:23 20   correct?

21    A.    We went beyond the control booth.

22    Q.    And when you say you're looking down the range, that means

23    you're looking down the hallway, but the cells are actually off

24    on the sides, correct?

25    A.    Correct.
```

1    Q.   So you couldn't see into any of the cells, correct?

2    A.   Correct.

3    Q.   You couldn't see who was in what cell or anything like

4    that, right?

5    A.   Right.  They didn't want us to know that.

6    Q.   Now, you talked about the SAMs issues, yet you've never

7    worked at ADX, and I think you just testified that it's your

8    understanding that most of the individuals on SAMs go to the

9    ADX.  Is that what you're saying?

06:23 10   A.   Under this provision, yes.

11   Q.   Right.  So then you would not have had any type of work

12   experience in that situation because you were never at ADX,

13   correct?

14   A.   Correct.

15   Q.   Now, let's talk about the SAMs.  You understand, of

16   course, that the SAMs is an established procedure that DOJ must

17   follow, correct?

18   A.   Yes.

19   Q.   And if it's not followed every single year, it just

06:24 20   lapsed, correct?

21   A.   Yes.

22   Q.   There are a number of individuals who have been in ADX

23   where their SAMs have lapsed and they are now either in another

24   part of ADX, not in the H unit, or other facilities, correct?

25   A.   Correct.  But that's not up to the BOP.  It's up to the

1    FBI and the U.S. Attorney's Office.

2    Q.   Well, then if it's not up to the FBI or the U.S.

3    Attorney's Office, who makes the call on that?

4    A.   Whether they're -- they're not renewed?

5    Q.   Yes.

6    A.   It's not the Bureau of Prisons, no.

7    Q.   It's not the local U.S. Attorney's Office either, is it,

8    Mr. Bezy?

9    A.   Well, that's -- we were told that differently yesterday.

06:24 10   Q.   You believe, as you sit here right now, that the

11   U.S. Attorney's Office makes the call as to whether or not the

12   SAMs will be in place?

13   A.   There's a recommendation -- there's a group in Washington

14   that calls down here and talks to the local FBI field office.

15   They talk to the U.S. Attorney's Office.  They get -- they get

16   a recommendation.  They compile the report.  The report, then,

17   is routed through DOJ.  It's up to OEO, and then it's sent up

18   to the attorney general.

19   Q.   Right.  So you know the call's not made by this local

06:25 20   U.S. Attorney's Office, correct?

21   A.   The final call, no.  But you have input in it, yes.

22   Q.   Right.  And this U.S. Attorney's Office may think they

23   want to have a SAMs in place, but the Department of Justice

24   overall may make a call and say no, correct?

25   A.   It's possible.

1    Q.    That's happened repeatedly, correct?

2    A.    It's very possible.

3    Q.    You agree that if the SAMs is not renewed, it lapses in a

4    year, correct?

5    A.    Yes.

6    Q.    You would also agree that prisoners file lawsuits

7    attacking their SAMs all the time, correct?

8              MR. BRUCK:  Objection to "all the time."

9              THE WITNESS:  Correct.

06:26 10              THE COURT:  Well, it's a little vague, but that --

11   I'll allow it.

12   BY MR. MELLIN:

13   Q.    SAMs can be modified, correct?

14   A.    Yes.  Not by the -- not by a court, no.

15   Q.    Not by a court?

16   A.    You're right.

17   Q.    What happens?

18   A.    The court can make a recommendation, but the -- the court

19   cannot stop -- change a SAMs or end a SAMs.

06:26 20   Q.    Right.  And the court makes a recommendation to whom?

21   A.    To DOJ.

22   Q.    Right.  So you have the judicial branch making a

23   recommendation to the executive branch, correct?

24   A.    Correct.

25   Q.    And generally, that is the judicial branch that's

1    overseeing the case making a recommendation to the executive

2    branch that is prosecuting that case, correct?

3    A.   Correct.

4    Q.   You know in this case there has been a modification of the

5    SAMs already, correct?

6    A.   I'm not familiar with that, no.

7    Q.   You're not?

8    A.   No.

9    Q.   Are you familiar whether or not this defendant's attorneys

06:27 10   have already asked to modify the SAMs in this case?

11              MR. BRUCK:  Objection.

12              THE COURT:  Overruled.

13              You may answer it.

14              THE WITNESS:  No.

15   BY MR. MELLIN:

16   Q.   You're not aware of that?

17   A.   No.

18   Q.   And just so the jury is clear, the SAMs program -- what

19   does "SAMs" stand for again?

06:27 20   A.   Special administrative measures.

21   Q.   Right.  That program has been in existence for how long?

22   A.   Probably 1993, I believe.

23   Q.   Or maybe 1995?

24   A.   Possible, yes.

25   Q.   So just at 20 years right now, correct?

```
 1    A.    Yes.
 2    Q.    So prior to that, there was no SAMs program that existed,
 3    right?
 4    A.    Correct.
 5    Q.    And as you sit here today, you can't predict how long
 6    there's going to be a SAMs program that exists in the future,
 7    correct?
 8              MR. BRUCK:  Objection.
 9              THE COURT:  Overruled.
10              Go ahead.  You may answer.
11              THE WITNESS:  I'd say it's going to be there for a
12    while, yes.
13    BY MR. MELLIN:
14    Q.    And you're not aware that the defense moved to vacate the
15    SAMs in this case?
16    A.    No.
17    Q.    In spite of the existence of these SAMs or these special
18    measures that are put in place, there have been numbers of
19    violations of the SAMs that are in place, correct?
20    A.    I'm not aware of any, no.
21    Q.    You're not aware of any SAMs violations?
22    A.    No.
23    Q.    Were you not a consultant, if not someone who testified in
24    the Philadelphia case involving Kaboni Savage?
25    A.    No, I did not testify in that case.
```

1   Q.   Were you hired as an expert in that case?

2   A.   Not in that case, no, I was not.

3          MR. BRUCK:  Objection to -- we're going very far

4   afield.  And in addition, the question should focus on the

5   H unit about which the witness the has testified.

6          THE COURT:  It's still -- still addressing the SAMs.

7   I think that's appropriate.

8   BY MR. MELLIN:

9   Q.   Is it your testimony that -- as you sit here today, that

06:28 10   you're unaware that SAMs have been violated?

11   A.   I'm unaware of any situations where it has been violated,

12   correct.

13   Q.   Are you aware that every year inmates come off SAMs?

14   A.   It's possible, yes.

15   Q.   Is that a yes or a no?  Are you aware of that?

16   A.   Every year?  I can't say yes or no.  I said it's very

17   possible, though.

18   Q.   Are you not aware of the information in this case

19   regarding the request concerning SAMs discovery?

06:29 20   A.   Yes.

21   Q.   Well, then you're aware that there's at least half a dozen

22   every year that come off of SAMs, correct?

23   A.   Correct.

24   Q.   You would agree that when the SAMs come down, someone

25   who's on the H unit is transferred out, correct?

1    A.    When they're removed?

2    Q.    Yes.

3    A.    Yes.

4    Q.    So an inmate who might have been in the H unit because of

5    restrictions on communications, when those come down, they're

6    going to go someplace else, right?

7    A.    Yes.

8    Q.    And you're aware that there have been times where

9    terrorist inmates who are on SAMs are no longer on SAMs,

06:30 10   correct?

11   A.    Correct.

12   Q.    And they have been moved out of the H unit, correct?

13   A.    Correct.

14   Q.    Some have moved into general population at ADX, correct?

15   A.    Correct.

16   Q.    And just so we're all clear there, that means ADX isn't

17   just this special security unit H unit, but it's a regular

18   penitentiary, correct?

19   A.    No, it's not a regular penitentiary.

06:30 20   Q.    Well, how would you describe it?

21   A.    It's the most restrictive penitentiary in the Bureau of

22   Prisons.  It's -- they're single cells.  Inmate comes out of

23   his cell, he's in restraints.  There's two to three officers

24   escorting him every place he goes.  He's single rec'd and

25   single celled, and he's there for a period of time.

```
 1    Q.   He's single rec'd at all times when he's at ADX?

 2    A.   Yes.

 3    Q.   Even when he's stepping down, he's single rec'd?

 4    A.   Oh, not -- not in step-down program, no.  But in the -- in

 5    the first initial phase, he is.

 6    Q.   I'm talking about -- I thought we were talking about when

 7    the SAMs come down and an inmate is now going to be in general

 8    population at ADX, they're not going to be single celled

 9    necessarily, are they?

10    A.   Yes, if they're going to go to Phase 1 of the ADX program.

11    They're not going to the step-down unit initially.  They're

12    going to have to work their way through the program.  And

13    there's no guarantee that they'll work their way through.

14    There's a provision in the ADX mission statement that if the

15    inmate has a high notoriety and if his life, his security would

16    be a threat at a less-security -- a less-secure institution,

17    he'll remain at the ADX.

18    Q.   And that deals with the security of the inmate, correct?

19    A.   Correct.

20    Q.   BOP is stepping in to protect the inmate, correct?

21    A.   Correct.

22    Q.   I'm talking about in situations where someone has been at

23    ADX -- immediately when someone goes to ADX, they're going to

24    get involved in a step-down process; isn't that right?

25    A.   No.
```

```
 1   Q.   No?

 2   A.   No.

 3   Q.   There's no step-down process in the H unit?

 4   A.   There's a step -- in H unit, yes.

 5   Q.   And there's not a step-down process outside of the H unit?

 6   A.   Yes, but they have to -- they have to work -- there's

 7   Phase 1, Phase 2 and Phase 3.  They have to work through the

 8   phases.

 9   Q.   Right.

10   A.   And just because they've worked through the phases and

11   their behavior has been exemplary, that doesn't mean that

12   they're going to move to the next level.  Each case is based on

13   individual case, and it's based upon factors involving that

14   inmate.

15   Q.   Right.  And I'm asking you generally the inmates, what can

16   go from Phase 1 to Phase 2, correct?

17   A.   If the -- if the committee deems it appropriate, yes.

18   It's not guaranteed.

19   Q.   Of course it's not guaranteed, but the whole idea of this

20   is that you want to have these individuals step down to less

21   restrictive situations, correct?

22   A.   Correct.  That's the goal, but the goal is not always met.

23   There are inmates that have been there since 1994, and they

24   will -- they'll be there forever.

25   Q.   That have been at ADX since 1994?
```

```
 1    A.    Yes.
 2    Q.    When did you move the inmates from Marion to --
 3    A.    I mean in 1994 -- they've been there since 1994.
 4    Q.    Okay.  I'm asking you about a step-down process that
 5    you're well aware of, correct?
 6    A.    Correct.
 7    Q.    You were at Marion at the time, correct?
 8    A.    Correct.
 9    Q.    You were the one who thought it was a good idea to have
10    the step-down process go at Marion, right?
11    A.    I was the captain.  That's all I was.  That's a higher pay
12    grade than I was that made the step-down.  But there's inmates
13    that came for review -- I was part of that -- that step-down
14    review program -- that came up for review that we never moved
15    beyond Phase 1.
16    Q.    That's fine.  I'm asking you about the program.  The
17    program was something you knew about at Marion, correct?
18    A.    Correct.
19    Q.    You were the warden, I thought, at Marion?
20    A.    No, I was captain.
21    Q.    Just the captain.  Where were you the -- no, I'm sorry.
22    You were the warden at Terre Haute, right?
23    A.    And Elkton, yes.
24    Q.    Okay.  And at that time, when you were at Marion, you knew
25    that it was a three-phase step-down process, right?
```

     1    A.    Yes.

     2    Q.    And the reason why you have that is because you want to

     3    try to get to a situation where you have less restrictions on

     4    these inmates, right?

     5    A.    Correct.

     6    Q.    Because it's incredibly costly for the Department of

     7    Justice or for BOP to have their individual employees --

     8              MR. BRUCK:  Objection.

     9              THE COURT:  No, you may have it.

06:34 10    BY MR. MELLIN:

    11    Q.    I'll rephrase it.

    12    A.    Please.

    13    Q.    What's the purpose of a step-down process?

    14    A.    It's to work the inmates into a more -- into a less

    15    restrictive environment.

    16    Q.    And why?

    17    A.    With the eventual goal of them working their way out of,

    18    at that time, Marion.

    19    Q.    And why?

06:35 20    A.    Because it's -- it was the goal that some inmates met and

    21    some inmates didn't meet.

    22    Q.    You do it because it requires a higher number of staff to

    23    monitor these people that are in --

    24              MR. BRUCK:  Objection.

    25              THE COURT:  Sustained.  Sustained.  That's -- I think

1    the point has been made.

2    BY MR. MELLIN:

3    Q.   You put incentives into the program to encourage inmates

4    to step down, correct?

5    A.   Correct.

6    Q.   You talked about the -- that at one point there were a

7    number of inmates who were on SAMs who had some type of

8    terrorism connection who, even today, are still at the H unit,

9    correct?

06:36 10  A.   Correct.

11   Q.   H unit was created when?

12   A.   2002.

13   Q.   All right.  So we're talking about for over 13 years,

14   right?

15   A.   Correct.

16   Q.   Okay.  But the majority of those inmates who were at the

17   H unit in 2002 are no longer on those SAMs restrictions or even

18   at the H unit, correct?

19   A.   There's a number that have been moved out, yes.

06:36 20  Q.   Right.  The majority, correct?

21   A.   It's possible, but there's a number that have been moved

22   out.

23   Q.   Now, you were the warden at Terre Haute from 2004 to 2006,

24   right?

25   A.   Correct.

1    Q.   You oversaw the federal death row, right?

2    A.   Yes.

3    Q.   You're aware that there are violent acts that happen every

4    day at U.S.P., correct?

5    A.   Yes.

6              MR. BRUCK:  Objection.

7              THE COURT:  Sustained.  Scope.

8    BY MR. MELLIN:

9    Q.   Well, are you aware that inmates communicate with other

06:37 10   inmates?

11   A.   In a U.S.P.?

12   Q.   Yes.

13   A.   Yes, it's an open -- it's an open penitentiary.  They work

14   together.  We open the cells at six o'clock in the morning; we

15   lock them back down at ten o'clock.  From six to ten, they

16   work, they program, they eat in the dining room together, and

17   they recreate, and they watch TV; they play cards.  Yes, they

18   communicate.

19   Q.   They communicate even at ADX, correct?

06:38 20   A.   Yes.

21   Q.   Sometimes appropriately; sometimes not appropriately,

22   correct?

23   A.   Yes.

24   Q.   And some of those communications involve trying to carry

25   out a hit on somebody else, correct?

```
 1              MR. BRUCK:  Objection, your Honor.  There's no
 2      evidence --
 3              THE COURT:  Yeah, sustained.
 4              MR. BRUCK:  -- relative to this at all.
 5      BY MR. MELLIN:
 6      Q.   These communications involve violent acts, correct?
 7              MR. BRUCK:  Same objection.
 8              THE COURT:  Sustained.
 9      BY MR. MELLIN:
06:38 10 Q.   You're aware that inmates, even at ADX, have access to
11      books and magazines, correct?
12      A.   Yes.
13              MR. BRUCK:  Objection.
14      BY MR. MELLIN:
15      Q.   They can receive communications, correct?
16              THE COURT:  Well, let me just see you.
17              (Discussion at sidebar and out of the hearing of the
18      jury:)
19              MR. BRUCK:  Is that as far as you were going with --
06:39 20         THE COURT:  I want to -- this is going to stay tight
21      to the SAMs, so if -- the content of the SAMs regulations has
22      been put in issue.  If the content -- if the SAMs regulations
23      have a provision regarding this, then I guess it's fair.
24              MR. MELLIN:  Well, your Honor, but that's not --
25              THE COURT:  I don't want to go to general -- the point
```

1   is not just general conditions, but we're still -- we're still

2   following the track of the SAMs.

3          MR. MELLIN:  But the problem with that is, your Honor,

4   we're only looking at one little part of the process because we

5   had him admit that SAMs are a yearly review.  The SAMs might

6   come down.  We have every right to ask when it comes down.

7          THE COURT:  You can show -- right.  You can have

8   evidence of what is opened up, I guess, what

9   possibilities -- what the restrictions of the SAMs are, and if

06:40 10   the restriction isn't there, I guess what is possible.  But

11   it's got to be tied to the present terms that are in the SAMs.

12          MR. MELLIN:  But that's what I was doing.  In the

13   absence of the SAMs, I was asking what --

14          THE COURT:  I wasn't --

15          MR. MELLIN:  I'm not sure -- I'm not sure I understand

16   the Court's ruling concerning the violent acts, where there are

17   communications between inmates --

18          THE COURT:  Well, no.  I don't think we have the -- I

19   don't think it's fair game to address the philosophy of the

06:40 20   SAMs or the objectives.  We're dealing with the mechanics of

21   the SAMs, and what they preclude and what in their absence is

22   not precluded, that is a -- I guess an otherwise available

23   feature of prison life.

24          MR. WEINREB:  It's also their effectiveness, though.

25   I mean, Mr. Bruck's argument is that the defendant will not

1    pose a danger to others going forward because the SAMs will

2    prevent him from communicating in a way that could provoke or

3    encourage or facilitate violence.  If the SAMs are in effect to

4    do that, that's something the jurors ought to be aware of.

5    And, in fact, the SAMs are not foolproof.  They've been

6    violated, and they have led to violence.

7        MR. BRUCK:  We have a list of every documented

8    instance -- we asked for every documented instance of violence

9    on the H unit involving SAMs inmates.  We were told we could

06:41 10   only have the last five years.  We were given the last five

11    years.  They are the most trivial incidents.  There are six

12    incidents involving five inmates, and the worst of them

13    involves somebody who is fighting against being force fed.  I

14    mean, this is -- if we're going to go there, it's not going to

15    be pretty for the government.

16        MR. MELLIN:  No, your Honor.  It doesn't need to be

17    pretty for anyone.  The point is it needs to be fair, and it's

18    not fair to draw these very fine lines and say, "I'm going to

19    talk about this little thing" when that little thing is

06:42 20   probably going to be gone in five years.  And when that little

21    thing is gone in five years, the situation is going to be

22    completely different.

23        THE COURT:  I think you've made your point with

24    respect to what happens about the SAMs.

25        MR. WEINREB:  Your Honor, we would ask the Court to

1    take judicial notice of the fact that a motion was filed in

2    this case --

3              THE COURT:  We can deal with that at some point.

4              MR. WEINREB:  -- to vacate the sentence.

5              THE COURT:  The document's been published.

6              MR. WEINREB:  Yeah.  But it's not really what you

7    would normally put a witness on for, so I think --

8              THE COURT:  No, no.  No, I think -- I think notice can

9    be taken of that.

06:42 10         MR. BRUCK:  But it was also denied, and it was -- it

11   was a pretrial SAMs, and --

12             THE COURT:  Yeah, we can put the disposition.

13             Mr. Mellin.  Time?

14             MR. MELLIN:  Quite a bit.  More than five minutes.

15   Probably a good time to break.  Probably 20 or 30 minutes,

16   maybe.

17             MR. BRUCK:  I'd like to let this witness go.  I

18   suggest we keep going for another 15 minutes.

19             THE COURT:  If that would do it, I'll do that.

06:43 20         MR. MELLIN:  I don't believe it's going to do it.

21   That's the problem.

22             THE COURT:  I don't know how much more you could have.

23             MR. MELLIN:  Well, I have pretty much more about

24   visitation, about communications, about family members,

25   about --

1          MR. WEINREB:  This is a very important issue.  The

2     jury cares a lot about this.  We're not talking about something

3     trivial or collateral.  We're talking about maybe the most

4     important thing for them.

5          MR. BRUCK:  Well, it looks like Mr. Mellin plans to go

6     into a series of non-SAMs-related incidents at other

7     institutions involving other inmates.  Maybe I should make the

8     motion now and you could rule that out rather than spend 20

9     minutes or so on this inmate at Terre Haute or that inmate at

06:43 10    Leavenworth.  It's not relevant.  We have gone into the SAMs.

11    They've established the SAMs can be withdrawn.  That's not open

12    carte blanche to every single incident involving every

13    non-comparable inmate everywhere in the department -- in the

14    Bureau of Prisons.

15         MR. MELLIN:  I don't disagree, necessarily, with that,

16    your Honor, but the impression that's being left is that if

17    someone is on the SAMs, no one is going to have contact, and

18    that the world is safe, and that's just not true.

19         MR. WEINREB:  Let's deal with the issue of timing for

06:44 20    a minute.  The defense chose to put on this very critical

21    witness at the very end of the day to try to examine him to the

22    point where we would have a very limited amount of time to

23    cross-examine him.  It had to be done by the end of today.

24    That's just not fair.  We had many witnesses today who were not

25    very important.  This one's a critical witness.

1          THE COURT:  All right.  We'll break for the day.

2          (In open court:)

3          THE COURT:  Jurors, we're just about at four o'clock.

4    We're going to take the recess for the day and resume tomorrow

5    with the evidence.

6          Again, I caution you against any discussion of the

7    case with yourselves or anybody else, and avoid any news media

8    accounts of the case.  Enjoy the rest of the day.  We'll see

9    you tomorrow morning.

06:45 10          THE CLERK:  All rise for the Court and the jury.  The

11   Court will be in recess.

12          (The Court and jury exit the courtroom and the

13   proceedings adjourned at 3:56 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           We, Marcia G. Patrisso, RMR, CRR, Cheryl Dahlstrom,

4    RMR, CRR, Official Reporters of the United States District

5    Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date: 5/6/15
16

17

18

19

20

21

22

23

24

25