UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )



            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE



                       **LOBBY CONFERENCE**


              John J. Moakley United States Courthouse
                         Courtroom No. 9
                        One Courthouse Way
                   Boston, Massachusetts  02210
                      Friday, April 24, 2015
                          11:05 a.m.



                   Marcia G. Patrisso, RMR, CRR
                       Official Court Reporter
                  John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                          (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3             Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: William W. Fick and Timothy G. Watkins,
10            Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE LAW CLERK:  All rise.

3          (The Court enters the courtroom at 11:05 a.m.)

4          LAW CLERK:  You may be seated.

5          We're here for a conference in the case of United

6   States versus Tsarnaev, Criminal No. 13-10200.

7          Would counsel identify yourselves for the record.

8          MR. WEINREB:  Good morning, your Honor.  William

9   Weinreb for the United States.

00:03 10         MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your

11   Honor.

12          MS. PELLEGRINI:  Good morning, your Honor.  Nadine

13   Pellegrini.

14          MR. MELLIN:  Good morning.  Steve Mellin.

15          MS. CLARKE:  Judy Clarke, Bill Fick and Tim Watkins

16   for Mr. Tsarnaev.

17          THE COURT:  Okay.  Good morning.

18          COUNSEL IN UNISON:  Good morning.

19          THE COURT:  The first matter is, there are a couple of

00:04 20   ex parte motions by the defense, so I'd like to excuse the

21   government briefly.  My suggestion is that we kind of lock the

22   courtroom so that we don't have people coming in.  This is a

23   lobby conference.  There's a little side room I think you can

24   just wait in.  I don't think this will be long.

25          (Ex parte proceedings not transcribed and under

1    separate cover.)

2          THE COURT:  Okay.  There's -- actually, one of the ex

3    parte matters I've just ruled is not ex parte and so the

4    government should be included in it but you haven't seen it

5    yet, so I'll just tell you it exists and await an appropriate

6    response.  We won't deal with it now.

7          It's a motion for an order from me for materials from

8    the Massachusetts State Police, Middlesex District Attorney's

9    Office and Waltham Police regarding the Waltham murders.  The

00:10 10   defense seeks in camera review of those matters, so, yeah.  But

11   I won't expect an on-the-fly response to that.

12         MS. CLARKE:  But I could show that I'm handing a hard

13   copy --

14         THE COURT:  Yeah.  Okay.  Fine.

15         Let me just say that on the docket, the document

16   refers to an Exhibit 1 which apparently is a search warrant and

17   application, but it's not included in the filing.

18         Before we get to specific trial evidence issues, can

19   we talk a minute about trial management?  I'd like to have an

00:11 20   indication of who the first cadre of defense witnesses will be

21   and what exhibits they'll use, just as we've been doing with

22   the government's case.  A couple of days' worth.

23         MS. CLARKE:  We should be able to do that, I hope by

24   the end of the day but it looks like it might be tomorrow.  But

25   we'll certainly send it.  We've provided roughly in order of

1    our anticipated order already the witnesses.  And we've trimmed

2    some.  So we're trying to make some more cuts today before we

3    provide it to the government.  And we're trying to attach

4    exhibits.

5         THE COURT:  You know, there's always been some

6    variance here and there.  As long as it's within minor

7    toleration, that's okay.  The bulk of the information is useful

8    to have sooner rather than later.

9         MS. CLARKE:  Yes.

00:12 10         THE COURT:  Let me just ask on the cuts department,

11   have you revised at all your overall estimate for the case?

12   I'm just trying to think global planning here.  You had

13   originally said a couple of weeks.  Is that -- and that would

14   be, I guess, eight full days.  Is it still in that range?

15         MS. CLARKE:  We still think it could be six or seven.

16   It depends on cross-examination or lack thereof.

17         THE COURT:  Okay.  Again, I did some long-range

18   planning for this as well.  And actually, let me -- let me,

19   just, as long as I broached that subject -- again, this is

00:13 20   longer range, but at some point there will be a verdict, and it

21   will be one thing or another.  I would like to start giving

22   some thought to how we schedule subsequent events.  I mean, if

23   the penalty decision by the jury is life imprisonment without

24   parole, what does that mean for the other counts that have not

25   been considered, victim participation and so on; and similarly,

1    if the verdict is in the other direction, what steps occur

2    before the formal imposition of that sentence and so on.

3           So I'd just like to begin thinking -- I know, I looked

4    quickly at the *Sampson* case, and my recollection is that the

5    jury returned its verdict just before Christmas and he was

6    sentenced in February formally.  I don't know whether that's a

7    standard template, whether that's long or not, and so I would

8    just like some thoughts on that.

9           MR. WEINREB:  So, your Honor, I believe yesterday, or

00:14 10   if not yesterday, then perhaps today, an email went out to all

11   of the registered victims soliciting written victim impact

12   statements.  And I can't recall whether we gave a deadline.  I

13   think we did give a deadline of four weeks.  It's possible we

14   said six weeks.  But we also informed them that the Court had

15   not yet ruled on whether oral victim impact statements could be

16   given at a sentencing hearing, and we asked them to indicate

17   whether they would desire to give one or not.

18          We would very much like an opportunity for victims who

19   want to give an oral statement to have some opportunity to do

00:14 20   so.  It might make sense to wait and see what we hear back from

21   them to determine how much time might be needed, how much time

22   should be allocated for a sentencing hearing and that sort of

23   thing.  Of course, it depends on what the Court's inclination

24   is about -- I assume the Court will accept any written victim

25   impact statements, and if we could have some guidance on oral

1    victim impact statements, that might be helpful in coming up

2    with how much time we'll need.

3          THE COURT:  Well, it's not something I've given a lot

4    of thought to, which is why I raised it.  I mean, I guess I

5    don't want to speak extemporary on the subject, so we'll think

6    about -- but I guess the time frame that you suggested could

7    put their response sometime after we get a verdict in this

8    phase.  So we wouldn't have that -- and I guess that concerns

9    me a little bit because we would end with a verdict being

00:15 10    delivered and not know what to do next.

11          MR. WEINREB:  Well, we were initially just going to

12    ask for -- well, let me step that back for a moment.  So the

13    Federal Death Penalty Act says that if it's in a capital case,

14    there shall not be a pretrial -- or rather, a probation report.

15    But of course, there were 13 counts that aren't capital counts,

16    and under the federal rules normally there would be some kind

17    of presentencing report.  Normally it would take three months

18    to produce that.

19          I think given the degree to which every aspect of the

00:16 20    defendant's character and so on will be examined during the

21    penalty phase, there's probably no need for --

22          THE COURT:  Right.  It can be waived under Rule 32.

23          MR. WEINREB:  Exactly.  But nevertheless, in order to

24    fulfill our duties, and as we see it the Court's duties under

25    the Victim and Witness Rights Act, we'd need some time to

1    organize all the materials, make sure everyone's had an

2    opportunity to present them.  So we were going to just suggest

3    60 days from the date of the jury's verdict for a sentencing

4    hearing.

5            THE COURT:  And just run right through into the

6    imposition of sentence, then, after that?  In other words, I

7    think -- again, this is a bit from memory so it's -- I'm not

8    sure it's accurate, but I think in the *Sampson* case there was a

9    hearing in January and then the sentence was actually imposed

00:17 10    in February, but I don't know that there are any non-capital

11    counts in that case.  I just -- I don't know the answer to

12    that.

13            MR. WEINREB:  So I hadn't really given any thought to

14    whether there would be time between the conclusion of the

15    sentencing hearing and the imposition of sentence.  In a way,

16    that's really a matter for the Court, how much time the Court

17    needs to respond.

18            THE COURT:  Right.  I guess I mean any substantial

19    amount of time.

00:18 20            MR. WEINREB:  I don't think the government sees any

21    need for it.  The idea -- we envisioned perhaps a multi-day

22    sentencing hearing if there are quite a number of victims who

23    want to be heard, but at the end of it sentence could be

24    imposed from the government's point of view.

25            THE COURT:  Okay.  Ms. Clarke, any views?

1          MS. CLARKE:  Not right now.

2          THE COURT:  With either alternative.

3          MS. CLARKE:  Judge, my experience is that typically

4    the Court would -- having not experienced a death verdict, the

5    Court would typically order a presentence report on the

6    non-capital counts to make those sentencing judgments.  And the

7    Bureau of Prisons, my experience is, often wants some

8    background information to follow the inmate to wherever he

9    goes.  So we might have to consider those issues.  But I think

00:18 10    we'll be better prepared to address it having had the Court

11    raise the question later.

12          THE COURT:  Okay.  Good.

13          MR. MELLIN:  Your Honor, if I may, just from my own

14    experience in having two death verdicts that were returned, in

15    one the court immediately imposed sentence just after the

16    verdict was returned, and the other we waited until the next

17    business day for the court to actually announce the imposition

18    of sentence.  Those were done quickly.

19          I think this case certainly is a little different in

00:19 20    that you have the magnitude of the victims in this case that is

21    just unheard of compared to other cases.  So I do think there's

22    certainly time for the Court to entertain additional victim

23    impact evidence if the Court wishes to.

24          THE COURT:  Do those cases involve non-capital counts?

25          MR. MELLIN:  They did.  They did.  And the Court may

1    wish to reach out to Judge Surrick in the Eastern District of

2    Pennsylvania in the *Kaboni Savage* case.  That case did involve

3    additional counts, but like I said, Judge Surrick waited I

4    think until the next business day, which I think was a Monday,

5    to impose sentence.

6              MR. WEINREB:  I guess as long as we're discussing it,

7    I'll just add one other thing, which is to the extent there are

8    any 924(c) counts on which a sentence of death is not

9    recommended, there was conceivably room for dispute over what

00:20  10    the actual sentence -- whether there's a mandatory minimum

11    sentence of life imprisonment versus 30 years or so on for

12    those, I don't know whether the defense will dispute it or not

13    but it's just -- I'll preview that issue.  And then there are a

14    couple of counts for which a guidelines calculation would need

15    to be made.  There's no minimum mandatory at all.  So we would

16    want to leave some kind of room to do that.

17              MS. CLARKE:  And one final thought, just for the Court

18    to begin to think about is if there is a death sentence, I'm

19    sure there will be some analysis of post-trial motions, so

00:21  20    we'll need some time for the filing of those.  So that could

21    affect scheduling.

22              THE COURT:  Right.  Right.  Okay.

23              So to return to the motion we discussed last week,

24    which was the government's motion in limine regarding certain

25    expert testimony, I think some controversy seems to be

shrinking as to some of these matters.  And I guess my general

inclination is we'll have to see what actually gets offered and

deal with it that way.  And in particular, I'm thinking of

Professor Reynolds' collateral materials, if he has PowerPoint.

The defense response indicates it's been reduced rather

significantly, and as I understand, it tends to come from the

defendant's computer, so it's materials that have been

previously -- at least seen by the government.  So I don't know

what the final package would look like.  That will help define,

00:22 I imagine, what the scope of his testimony is going to look

like as well.

So I think for those we have to sort of wait and see

what the circumstances are when the witnesses arrive.

MR. WEINREB:  Your Honor, we'd just ask, though, that

there be a general understanding that Professor Reynolds is

here to testify about matters within his expertise as a

historian of Chechen -- of the Middle East -- or of the part of

the east that he's an expert in and not a psychologist.

THE COURT:  All of the experts will be expected to

00:22 testify only within their field of expertise.

MR. WEINREB:  And then Dr. Giedd is the main one that

I think we need a ruling on.

THE COURT:  Yeah, I guess we -- yes, all right.  So

with respect to Dr. Giedd, I mean, again, if his testimony is

as proffered, which is his generalized testimony about

1    adolescents as a class, then it may be given.  He can't stray

2    into evidence about a particular adolescent, if that is what he

3    is at age 19, and so...

4         MR. WEINREB:  Well, our argument was that generalized

5    testimony about adolescents should be excluded because it's not

6    individualized to the defendant.  If that objection is

7    overruled, then we would ask that the Court grant the

8    government's motion to obtain the defendant's CT films from

9    the --

00:23 10        THE COURT:  All right.  So that gets to the next one.

11         So, yes, I do -- I will permit the generalized

12   testimony about adolescents or young men in the defendant's

13   range as a general segment of the population and what that

14   means for brain development generally.

15         MR. WEINREB:  And then the other thing we'd ask is we

16   have an expert who would be testifying in rebuttal who would

17   like to be here for Dr. Giedd's testimony, and he's out of

18   state and will need several days' advance notice of when

19   Dr. Giedd will be testifying so that that person can make

00:24 20   arrangements.

21         THE COURT:  I'm assuming that won't be a problem?

22         MS. CLARKE:  We're anticipating right now May 5th.

23         THE COURT:  May 5th is a Tuesday, if I recall.

24         MS. CLARKE:  You know, all of this is subject -- we're

25   giving as much as we can.  Maybe it's May 4th, maybe it's May

```
 1   6th.
 2            THE COURT:  Okay.
 3            MR. WEINREB:  Actually, as long as I'm up here, the
 4   same thing would be true for Ms. Vogelsang's testimony.  We
 5   would like to have our expert here when she testifies, and so
 6   we need to know roughly, you know, within a day or two when
 7   she's going to be testifying.  That person also has to fly in
 8   from out of state.
 9            THE COURT:  Okay.  So why don't you address your
10   motion on the CT.  I don't know that it's been responded to
11   formally.
12            MS. CLARKE:  It hasn't.  Your Honor, our position on
13   the CT scans is they're not relevant to anything Dr. Giedd is
14   going to testify about so there's no need to produce them.  We
15   did produce, however, in discovery, Mr. Tsarnaev's medical
16   records from BI out of an anticipation that we --
17            THE COURT:  The original admission?
18            MS. CLARKE:  Yes.  The April admission, yes.
19            So they have those, and I guess that's why they're
20   asking for the CT scans.
21            MR. WEINREB:  So, your Honor, we actually
22   independently obtained from Beth Israel Deaconess Medical
23   Center all the defendant's medical records.  They were obtained
24   via a court order issued by the magistrate judge in this case
25   when the grand jury was examining the case.
```

1          But Beth Israel has taken the position that CT films

2     do not fall within the comprehensive scope of her order; that

3     they are protected health information and yet somehow they're

4     not medical records.  I'm not exactly sure how they came up

5     with that determination.

6          But they are perfectly willing to provide them so long

7     as they are essentially protected from any kind of attack under

8     HIPAA.

9          THE COURT:  Well, assuming that Dr. Giedd will not

00:26 10   give an individualized assessment of the defendant, why are

11    they relevant?

12         MR. WEINREB:  On that matter, with the Court's

13    permission, I'll defer that to Mr. Mellin.

14         MR. MELLIN:  Well, your Honor, it depends on what they

15    show and they don't show.  I mean, I don't think it's fair for

16    the defense to argue that generally an individual has this type

17    of development if Dr. Aguirre is able to look at that and say,

18    That's not appropriate in this case; in fact, in this case the

19    defendant has this development.

00:26 20        THE COURT:  That's your expert you're referring to?

21         MR. MELLIN:  Correct.

22         THE COURT:  Ms. Clarke?

23         MS. CLARKE:  Well, I think it's pretty well understood

24    that imaging at a given period of time is imaging at a given

25    period of time and it has nothing to do with the kind of

1  testimony Dr. Giedd will give about the maturation of the brain

2  and adolescence.  But, you know, if the Court orders the

3  production of the CT scans, we have a copy and would provide

4  it.  We don't think it's relevant.

5        THE COURT:  Well, I guess -- so let me see if I'm

6  hearing that correctly.  You have an objection to the perhaps

7  relevance as evidence -- it's an evidentiary question -- but

8  will not object to the discovery question about the looking at

9  it.

00:27 10        MS. CLARKE:  Yes.

11        THE COURT:  In other words, you would provide it

12  preserving your objection to its admission or use?

13        MS. CLARKE:  Well, we object to providing it and we

14  also preserve our objection to its admission.

15        THE COURT:  Okay.  I'll think about it.

16        MS. PELLEGRINI:  Your Honor, if I may, actually, I've

17  spoken to Dr. Aguirre, and while it's not yet clear that we

18  would admit it as -- what he feels in order to be fully

19  prepared to give his testimony is to review these records.  So

00:28 20  it's part of his preparation, in any event.

21        THE COURT:  Okay.  And who's the expert?

22        MS. PELLEGRINI:  Geoffrey Aguirre, A-G-U-I-R-R-E.

23        THE COURT:  And where is he?

24        MR. MELLIN:  University of Pennsylvania.

25        THE COURT:  Okay.  Then I think there are a couple of

1    motions that were very recently filed.  It looks like it was

2    Wednesday.  One relates to -- one is a motion to compel an

3    immigration parole for a witness.

4             Mr. Fick?

5             MR. FICK:  That's correct.  And we filed a supplement

6    to that this morning as well.

7             THE COURT:  Yes.

8             MR. FICK:  So this individual is the -- is the

9    former -- the estranged husband of the defendant's sister and

00:29 10   the brother-in-law of the defendant's uncle.  He lived for an

11   extended period of time in the Cambridge home at the time he

12   was still with the defendant's sister.  He is the same age as

13   Tamerlan Tsarnaev, and he really has a wealth of information to

14   provide about the family, the dynamics, the chaos and that sort

15   of thing.

16             Interestingly, the government, either yesterday or the

17   day before, produced an FBI 302 from August of 2013 about

18   Mr. Khozhugov which conveys much, although not all, of this

19   kind of information that he could provide.  It's a bit puzzling

00:30 20   about why that disclosure came so late since we would view much

21   of the content as mitigating and exculpatory.  The government

22   said something to the effect that it was overlooked and it

23   hadn't been classified for some time which is sort of puzzling

24   in its own way given the kind of pedestrian contents in the

25   scheme of security classification and the fact that the

1        government repeatedly earlier in the case indicated there were

2        no CIPA or FISA issues that would arise.

3              In any event, the bottom line is this is an extremely

4        important witness.  His parole was denied.  It was sort of

5        informally conveyed by one of the agents to one of our

6        investigators that the reason was a concern on the FBI's part

7        that there would be some kind of an incident or a conflict

8        between this individual and the defendant's sister.

9              We explained in some detail about the motion and sent

00:30 10       an email response asking for reconsideration, why that was sort

11       of an unfounded concern especially in light of the

12       extraordinarily stringent security conditions that are being

13       placed on the parolees.

14             And then yesterday there was an additional very

15       peculiar addition to the story which is that parallel to the

16       parole process, Mr. Khozhugov had applied in Kazakhstan for an

17       ordinary U.S. visitor's visa.  That was issued to him, we are

18       informed, yesterday morning and then was promptly rescinded

19       later that day when the State Department learned that the

00:31 20       separate parole request had been denied.

21             The bottom line is we really cannot comprehend why

22       this person is not being allowed to come.  We think he's an

23       extremely important witness in the case.

24             THE COURT:  And what is my authority to order some

25       executive department to do something they have determined they

1    should not do?

2        MR. FICK:  Well, the statute and the regulations sort

3    of provide for parole as a way to get in witnesses.  It seems

4    to me there's a Fifth and Sixth Amendment right for us to be

5    able to call witnesses who are important to the case.  And so

6    to the extent the Court has any -- typically has authority over

7    an executive department to make sure that the rights of a

8    defendant are vindicated, or are protected, I think that same

9    authority would apply here.

00:32 10        I would point to the *Filippi* case which indicated it

11   would be a due process violation or a Fifth Amendment and Sixth

12   Amendment violation for the government not to assist in

13   obtaining parole for a witness.

14        THE COURT:  But I think that order was directed to the

15   prosecution team, not to some unrelated department, or formally

16   unrelated, anyway.

17        MR. FICK:  I'm not sure the order in that case -- I'm

18   not sure the underlying order in that case -- to whom it was

19   directed, but I think the bottom line was ultimately the

00:32 20   executive in whatever department that controls access to the

21   United States, and to the extent the executive, which is also

22   the prosecuting -- well, it's the branch of government which is

23   prosecuting this case is preventing us from calling an

24   important witness who is willing and able to testify, that is a

25   due process of Fifth and Sixth Amendment violation.

1    THE COURT:  Mr. Weinreb?

2    MR. WEINREB:  Your Honor, much of what Mr. Fick has

3    said is factually incorrect.  I'll say in particular it's our

4    understanding that he was not granted a visa.  That's just

5    misinformation.  And the reasons given for why the FBI would

6    not request to DHS that he be paroled is that he was charged

7    with a felony crime of violence, which was an assault on his

8    now ex-wife.  He pled guilty to a misdemeanor, yet it was still

9    a crime of violence, and then he was found to have violated a

00:33 10   stay-away order.

11    Under those circumstances, the FBI has deemed him a

12   risk to public safety if he's paroled into the country.  And I

13   don't think the point is well taken that because he will be

14   kept at a hotel and there will be FBI agents stationed there,

15   that the threat to public safety, indeed, the threat to

16   themselves, should be discounted.

17    A hotel is not a jail and the FBI are not jailers.

18   It's unfair to put that responsibility on the FBI to

19   essentially be jailers, to hold somebody in circumstances

00:34 20   tantamount to custody when the experts in custody, such as BOP,

21   would never dream of keeping somebody in a jail or simply

22   having two people stationed in a hallway or in another room or

23   something to protect the safety of them.

24    I don't think the *Filippi* case is on point for a

25   couple of reasons.  First of all, in the *Filippi* case, it seems

1    to me, there was no countervailing reason for not granting

2    parole.  You know, the indication in that case was simply that

3    the government ignored all the requests to parole the

4    defendant, and then finally said they only had two days' notice

5    and that it was too late.  That's obviously not the situation

6    here.

7         Secondly, that case was decided in, I believe, back in

8    the early 1990s before the technology was readily available to

9    have individuals questioned over a closed-circuit television

00:35 10    live in the courtroom.  And if you look at probably the more

11    applicable case, which is *United States versus*

12    *Valenzuela-Bernal*, a Supreme Court case, the Court in that case

13    talks about the executive's different functions, different

14    roles, and the need for the executive to balance them.  One is

15    to protect the -- keep the country safe from aliens who live

16    outside its borders, and that that has to be balanced with its

17    other duties under the Constitution, and against -- that also

18    was a case involving Fifth and Sixth Amendment rights.  And,

19    for example, the court there held that it was okay for the

00:36 20    United States to deport aliens who might have exculpatory

21    information absent some showing of bad faith or some other

22    kinds of showings.  So it's clear that the rights and the

23    interests can be balanced.

24         We think that an appropriate balance to strike here

25    would be to permit this individual to testify over

closed-circuit television provided that he agrees to certain

conditions that seem reasonable under the circumstances.  One

is that he swear to tell the truth the way every ordinary

witness would even though that oath cannot be enforced by the

Court; secondly, that the jury be informed that he's not

subject to the pains and penalties of perjury the way other

witnesses are; and, third, that he understand and agree that in

addition to answering questions on direct examination, he has

to answer all questions that are asked of him on

cross-examination truthfully or he may not testify in the first

place.

So I think that that is a solution that would be fair

under the circumstances regardless of what the surrounding

legal picture is, what the law is, which I think is not

entirely clear, at least not from the cases that were cited in

the defense motion, and maybe not even from -- based on a more

thorough analysis, and it would avoid having to make a lot

of -- do a lot of difficult legal research and make a lot of

legal decisions, if a practical solution like that were done.

MR. FICK:  Very briefly:  The domestic incident we're

talking about was in 2008 when both this individual and Ms.

Tsarnaev were extremely young.  It resolved as a misdemeanor.

Our understanding is that in subsequent years after the

incident, Mr. Khozhugov applied for, obtained a U.S. visa,

visited the United States without incident, went back again.

1    And the chief issue that he's had since is that there's a

2    custody dispute between he and Ms. Tsarnaev about where their

3    son should live, which they've been working out.

4         To suggest that this person had a misdemeanor -- a

5    domestic violence conviction years ago and has subsequently

6    been in the United States without incident, to suggest that

7    he's a threat to public safety is simply -- it doesn't make any

8    sense.

9         You know, at this point in the case, having expected

00:38 10    that he was going to come and now that he is not, our ability

11    within the time we have to present our case, to get somebody to

12    Kazakhstan to make the arrangements to do a closed-circuit

13    presentation, I'm just not sure we can even make that happen

14    still at this point.  And the conditions the government wants

15    to put on that, frankly, are uncalled for.

16         Individuals have testified, simply taken the oath over

17    the closed-circuit television in other cases in this court.  To

18    the extent there is a basis for a perjury prosecution, it seems

19    extraordinarily remote here, that such an indictment can be

00:39 20    handed down whether somebody is here or not even if they can't

21    be arrested immediately.  But the bottom line is to call

22    particular attention to this person and his testimony over

23    hypothetically a closed-circuit connection, to suggest that

24    there's something inherently less trustworthy about it simply

25    devalues for the defense the potential impact of that testimony

1      even more than the fact that we can't get him here in person

2      already does devalue it.

3             So for all of those reasons that is not an appropriate

4      substitute, and really, just the basis for keeping him out,

5      especially given the conditions, especially given the

6      surrounding circumstances of the original incident, simply

7      don't hold water.

8             THE COURT:  Where does he live?

9             MR. FICK:  He lives in Almaty, Kazakhstan.

00:39 10           THE COURT:  So that's a place where you were making

11      arrangements with our IT people to have a connection?

12             MR. FICK:  Well, we had talked about the possibility

13      of doing that and some other places.  And in talking with the

14      IT people about the technical requirements, the kind of

15      computer we need to buy and the software and that sort of

16      thing, but we had not gotten down to the brass tacks of finding

17      a physical place in Kazakhstan to do it because we sort of

18      decided to cut the other individuals we had thought about

19      bringing in to Moakley, and we had a reason to think that

00:40 20      Mr. Khozhugov would be able to attend in person.

21             MR. WEINREB:  Your Honor, just to complete the record

22      in case there's an appeal later on, there were additional

23      factors that went into the FBI's decision.  The defendant's

24      sister, who is the witness's ex-wife, initially made a claim of

25      parental kidnapping because the witness took their child out of

the country, she claimed, without her permission, against her

will.  And the defendant may have actually, not wittingly,

perhaps, but played a part in that by actually delivering the

child to Ruslan Tsarni's house in Maryland, which I believe is

the place from where the child had been taken away.

         And the FBI also has reasons to believe that there's a

border security issue here.  The witness has indicated a desire

to come back to the United States and to remain here, and there

is -- any time somebody is in the country, even if they're not

admitted, even if they're just paroled in, there always is an

increased risk they will try to find some way to stay in the

country.  And that's always a concern in these types of

situations.  So that and other information which...

         (Counsel confer off the record.)

         MR. WEINREB:  I think I mentioned earlier there was a

restraining order which he violated indicating that he is

not -- he's either unwilling or unable to abide by judicial

restraints on his conduct.  And we don't know his willingness

or ability to abide by law enforcement restraints on his --

         THE COURT:  All right.  I'll reserve on it.  The

motion was filed on Wednesday and a supplement filed this

morning.  Is the government content to rest on your

presentation here or do you want to file something?

         MR. WEINREB:  No, we're content.

         THE COURT:  Okay.  I'll reserve on it.

1          Then there's a motion to compel production of grand

2     jury testimony or recorded statements of defense witnesses that

3     may be in the government's possession or control, again, filed

4     Wednesday, I guess, to which no written response has been made

5     yet, I think, right?

6          MR. WEINREB:  No, your Honor.  We did file a witness

7     response.  We emailed a copy --

8          THE COURT:  Oh, you did?  Oh, I haven't seen it.

9          MR. WEINREB:  -- and filed it formally yesterday.

00:44 10          (Pause.)

11          THE COURT:  Okay.  I've read the government's response

12     now.

13          MR. FICK:  So, I mean, the legal authority for this is

14     something that's not yet settled in the First Circuit.  It's

15     debatable in the reach in allowing *McMahon* -- I think Judge

16     Wolf subsequently recognized in *Salemme* that there's an open

17     question whether there is an obligation to produce these

18     statements of defense witnesses in the government's possession.

19          I think our position is simply as a matter of trial

00:45 20     management and as a matter of simple fairness to be able to

21     deal with possible cross-examination or refreshing the

22     recollection of a witness, that the production of those

23     statements is warranted and within the Court's authority to

24     order them.  And beyond that, I think we'd rest on the papers.

25          MR. WEINREB:  Your Honor, we'll rest on our papers.

1        THE COURT:  Okay.  I think at the very least for grand

2    jury materials, in particular, there has to be a particularized

3    need, which is absent.  If there is one that develops, then we

4    can reconsider that.  And I think otherwise, the motion is

5    denied.

6        I think that's it on my agenda.  Anything else?

7        MR. WATKINS:  Your Honor, there are a couple of

8    lingering issues.  We've all been on trial, of course.  I sent

9    a letter to the government concerning a particular BOP witness,

00:46 10    Tony O'Garro.  The government has not yet responded to that.

11    It's concerning specific discovery requests as to him.

12        I don't know whether they intend to respond or they're

13    going to object to that.  We're trying to sort out the trial

14    management issues.

15        MR. MELLIN:  Your Honor, I believe we just received

16    that yesterday.

17        MR. WATKINS:  Wednesday -- Tuesday or Wednesday, I

18    believe.

19        MR. MELLIN:  We'll have a response.

00:46 20        MR. WATKINS:  I know it was recently, but it's a

21    fairly simple question.

22        THE COURT:  All right.  You've reminded them.

23        MR. WATKINS:  Very good.

24        THE COURT:  Anything else?

25        MS. CLARKE:  And there's another request pending, I

1    think Miss Conrad sent a letter asking for the names of the FBI

2    agents who interviewed the family on April 2011.

3            MR. WEINREB:  So, your Honor, we're going to have a

4    motion in limine to exclude all evidence respecting that which

5    we would like a ruling on before we respond.  And in addition,

6    any request for the testimony of FBI agents about anything done

7    within their duties needs to be accompanied by a *Touhy* request,

8    and none has been filed in this case.

9            Speaking of motions in limine, we were hoping to get a

00:47 10    pared-down witness and exhibit list earlier so that we would be

11    in a position to file a motion in limine -- we wouldn't waste

12    our time moving in limine to exclude things the defense has

13    decided to cut anyway.  But since we're so close to the

14    beginning of trial, we're planning on filing one by the end of

15    today.

16            THE COURT:  All right.

17            MR. WEINREB:  We'll be moving to exclude a number of

18    defense exhibits.  If I could just preview that for the most

19    part to the extent that the exhibits and witnesses relate to

00:48 20    firsthand knowledge of the defendant, his family members, his

21    life growing up and that sort of thing, we are not going to

22    object for the most part.  To the extent, however, that the

23    defense is seeking to introduce things like congressional

24    reports with multilevel hearsay in them and basically using a

25    congressman's name on a report to try to give greater weight to

1    the jury and that sort of thing, we are going to object.

2         We're also going to object to the defense seeking to

3    offer 302s or written witness statements, of witnesses who they

4    could call to the witness stand, especially if, as in the case

5    of Mr. Matanov, he is a convicted liar, convicted of giving

6    false statements about the very subject matter of that 302.

7    And it would be essential for the government to have an

8    opportunity to cross-examine him and bring out all the many,

9    many inconsistencies and contradictions in his numerous

00:49 10   statements about these matters over time as well as his prior

11   conviction, his admission that he lied about it and so on, for

12   the jury to decide how much weight to assign that kind of

13   testimony.

14        And then in some ways, the most vexing problem for the

15   government at this point in terms of motions in limine is the

16   digital evidence.  So there is to some -- we have gotten a list

17   from the defense of digital evidence that they intend to offer,

18   but that list includes a number of exhibits that are really one

19   exhibit number attached to hundreds and hundreds and hundreds

00:49 20   of files, primarily from Tamerlan's computer, you know,

21   numerous ones of which are obviously, it seems, irrelevant,

22   like, you know, movies about -- I can't remember -- the Mark

23   Wahlberg movie where his best friend is a talking Teddy bear

24   and that sort of thing.

25        And it's very hard -- I mean, it seems to me the

1    burden is on the proponent of the evidence to demonstrate its

2    relevance.  It shouldn't be on the government to have to go

3    through every single one of these hundreds of exhibits, guess

4    what its relevance might be, and then explain why it's not

5    relevant.  So I don't think it's appropriate for the defense to

6    simply offer wholesale hundreds and hundreds of files, and that

7    appears to be what they're intending to do here.

8              Similarly, there are several items from Katherine

9    Russell's computer, including her entire Internet search

00:50 10   history, thousands of pages long, and various other things

11   without any seeming foundation for saying that it's not really

12   her, for example, it's Tamerlan who made all those searches.

13   We're in a difficult position here.

14             So we intend to simply move in limine to exclude it

15   all and put the burden on the defense to explain why it

16   shouldn't be, but we don't want to appear to be playing games.

17   I mean, we don't want to move to exclude items of evidence that

18   are relevant and that are admissible and that are

19   non-cumulative.  We just have no way of knowing because the

00:51 20   defense won't tell us which ones -- or what their theory of

21   relevance is or which ones they actually intend to offer.

22             There's also categories of evidence which are pictures

23   of family members, not the defendant, not Tamerlan Tsarnaev,

24   but numerous cute pictures of Dzhokhar Tsarnaev's niece.  It's

25   unclear why 10, 20 pictures of the niece would be relevant and

admissible.  There are videos -- many videos, primarily from
the defendant's phone, of him playing with his niece.  And
there's audio, so the defendant is essentially talking to the
jury through these videos.  And again, you know, we don't know
what the relevance or significance of them is or why there need
to be so many.

         And so, you know, again, we don't want to appear to be
playing games.  We know that the defense is opening on Monday
and that they are entitled to have some idea as to what
exhibits they're actually going to be permitted to put into
evidence and talk about in their opening statement; on the
other hand, we haven't been given any notice of what the
relevance of this is and what the particular ones are that they
actually intend to offer, and now it's Friday.

         So we'll file it by the end of the day, and we'll do
our best.

         THE COURT:  Well, you touched on a point I was going
to raise, and that is the opening.  I think it's critical that
everybody know what exhibits, or other evidence, I guess even
testimony, would be referred to in the opening so that if there
is an issue like this, we can address it before that happens.

         MR. FICK:  I think -- my understanding is it makes
sense to do that.  Just with regard to the digital evidence, I
think what the government's sort of depiction here is rather
overstated.  For example, with regard to Tamerlan Tsarnaev's

1    computer -- well, first of all, let me just preface this by

2    saying what the government essentially did in its presentation

3    was, for example, from Dzhokhar Tsarnaev's computer, introduced

4    a CD with hundreds of files taken off the computer, some of

5    which we were trying to sort out the night before exactly which

6    ones they were.  There was no individualized showing as to

7    which individual file was relevant, the idea was they put

8    together a collection of things from the computer that were

9    consistent with their story, they put it in, and over various

00:53 10    objections that was admitted.

11         With Tamerlan Tsarnaev's computer, we have also

12    collected a segment of files mostly from the encrypted folders

13    he had on his computer, and it's largely a collection of jihadi

14    videos, various kinds of pictures of death and destruction that

15    really show what the man's obsessions were.  And again, to the

16    extent part of our attack on the government's case of guilt was

17    to say they were really cherry-picking from the defendant's

18    computer, you know, only the things they thought were bad and

19    not giving the whole picture, we're trying to be a little bit

00:54 20    more inclusive without going overboard and saying, Look, you

21    know, these folders don't show the whole picture.  Yes, there

22    may be a few innocuous items in them, but looking at the whole

23    is really what helps you to understand what this man's

24    obsessions were.  And so for that reason, the files that are

25    being offered as -- the files in their format were collected

1      and are being offered in that way.

2             As to things like Katherine Tsarnaev's search history,

3      the search history that the expert generated is available to

4      the government.  And, you know, I don't, frankly, see any

5      problem with putting the whole thing in.  Of course, we are

6      only going to focus on a couple, a couple of searches that

7      Katherine made right around the time that Tamerlan left for

8      Russia.  I believe those were culled out and sub-identified as

9      exhibits in the earlier production.  If they weren't, they will

00:55 10      be cleaned up and put in the production we're doing today.

11             Again, we're trying to avoid a cherry-picking

12      accusation against ourselves and say, This is the whole.  We're

13      going to focus on a couple of parts here.  But to the extent

14      you want to have a broader picture and think there's something

15      else that's available for the jury, we do.  And so that's sort

16      of been our approach with the digital files.

17             Similarly, in terms of the pictures of the defendant

18      and his niece, if you look at the collection of photographs on

19      the defendant's computer and the collection of photographs on

00:55 20      Tamerlan's computer, yeah, the defendant largely has

21      collections of selfies and photographs of his niece.  The

22      equivalent space on Tamerlan's computer is a couple of

23      family-type photographs and then image after image after image

24      of death and destruction in Syria and other places in the

25      world.  It's that contrast to the extent that here the computer

1   is really a window into the soul.  It's the contrast that we're

2   looking to depict, and I think that's the purpose for which

3   it's being offered.

4          And I guess I would leave it at that.  To the extent

5   there are specific issues, I guess we can litigate it.

6          MR. WEINREB:  I guess I would respond that to the

7   extent that the defense wishes to draw a contrast that the

8   Court rules on relevant and otherwise admissible, the way

9   that -- normally, I think, the appropriate way of doing that,

00:56 10  the typical way of doing that is one has testimony accompanied

11  by perhaps a few examples, so that it illustrates it for the

12  jury.  And in the way that a picture is worth a thousand words,

13  they can see a few pictures and they get the sense of it

14  through their own senses.  But there's no need for the actual

15  hundreds and hundreds of pictures to come in.  It's cumulative,

16  it's prejudicial.  It's more work for the jury, frankly, if

17  they want to do a thorough job than is really appropriate to

18  give them.  And it's a normal way of, I think -- a normal kind

19  of 403 balancing to...

00:57 20      MR. FICK:  Yes, but we have the collections of

21  hundreds the government put in from the defendant's computer.

22  We're trying in some way to establish the contrast by making a

23  similar submission of our own.

24          THE COURT:  All right.  We'll see.  But again, it

25  sounds like you'll work on being specific as to the opening.

```
 1    And if there's an issue about materials or witnesses for the
 2    opening, we'll be able to address it before that happens.
 3              Ms. Clarke, are you doing the opening?
 4              MS. CLARKE:  Mr. Bruck.
 5              THE COURT:  Mr. Bruck?  Okay.
 6              MR. WEINREB:  Your Honor, I'd just make an oral motion
 7    at this point, if that's acceptable, to strike certain of the
 8    mitigating factors.
 9              THE COURT:  I don't know that I have an up-to-date
10    list.  Was there a new one or is it the one that we had about a
11    week ago?
12              MR. WEINREB:  As far as I know, it's the same one we
13    had --
14              THE COURT:  It went to 15 or something?  I don't have
15    it in front of me.
16              MR. WEINREB:  There were exactly 15.
17              (Pause.)
18              THE COURT:  It's part of Document 1300.  And I guess
19    this is uncontroversial that the -- if looks like Attachment 2
20    to 1300 supersedes the prior December list.  Is that fair to
21    say?
22              MS. CLARKE:  That's correct.  I don't have the
23    document with me.  And the government, I think a week or so
24    ago, said they were going to file something on this, and we've
25    been waiting for that.  It would be more appropriate for them
```

00:57  (line 10)
00:58  (line 20)

1    to file it so we could respond.

2            MR. WEINREB:  It's up to the Court.  I mean --

3            MS. CLARKE:  I'm only saying because Mr. Weinreb

4    represented that he was going to file it by the close of

5    business one day, and we would -- when we were here for an

6    earlier lobby conference.  I think it would just be appropriate

7    to do that.

8            THE COURT:  Yeah, I think that's a better way to do

9    it.  Promptly, obviously, because we would have to decide that

00:59 10   before, I presume, the opening.  Maybe not.  I mean, maybe

11   there's a way of doing the opening without doing that, but it

12   might be a problem.

13           MR. WEINREB:  In addition, the Court ordered that by

14   April 27th -- that before April 27th the parties confer on,

15   among other things, a verdict slip and file it by April 27th.

16   The verdict slip normally has all the aggravating and

17   mitigating factors listed.  We've prepared one with the

18   aggravating factors, we assume the defense has prepared one

19   with the mitigating factors, and we'll exchange them and see if

00:59 20   we could file something joint.  But again, that will require

21   some ruling on what the permissible mitigating factors are.

22           MS. CLARKE:  Maybe the Court should extend that

23   deadline just a couple of days so we could deal with these

24   mitigating factors and --

25           THE COURT:  Well, I agree that we'd have to decide

```
 1    what can be included before you can finalize it.

 2              MS. CLARKE:  True.

 3              THE COURT:  But since that's a -- what you're

 4    submitting is a proposed verdict slip; it's not a final form

 5    anyway.  I don't think it really matters whether that comes

 6    with or without the contested ones.  If they're stricken, it

 7    just gets revised to strike them, that's all.

 8              MS. CLARKE:  I think that's correct.  I just realized

 9    that it's Friday.  A lot of things have happened over the past

01:00 10  24 hours that I didn't expect to have happen.  And if we could

11    just have a couple more days to try to work with the

12    government.

13              THE COURT:  Well, the verdict slip, I think, is more

14    important than the instructions.  So I'll give you a break on

15    the instructions.

16              MS. CLARKE:  Okay.

17              THE COURT:  But the verdict slip really does set the

18    template for the jury's thinking about this, and so I think we

19    should be clear at least as to what the aggravating and

01:01 20  mitigating factors are that will be in play.  That will be a

21    guide to evidence admission decisions.

22              MS. CLARKE:  Sure.  On that note, Judge, I suppose we

23    could do it at sidebar on Monday morning, but we should make

24    our Rule 29 motion as to each and all of the statutory and

25    non-statutory aggravating factors, failure to prove.  I want to
```

1    get that on the record before too much time passes.

2            THE COURT:  Okay.

3            MS. CLARKE:  And renew, as well, if the Court would

4    look at our motion to strike the duplicative factors.  It was

5    Docket 289.  We can discuss that with the Court on the record

6    further on Monday, or if this is sufficient.

7            THE COURT:  Let me think about it.

8            MR. WEINREB:  Your Honor, with respect to this motion

9    about the Waltham triple homicides, I assume given the timing

01:01 10    of it that the defense will not be mentioning them in opening

11    statement on Monday.  We're probably not going to have a ruling

12    on it by then.

13            THE COURT:  I guess it depends on when you get your

14    response in.  But if it isn't ruled on and there's a pending

15    issue, then it can't be referred to.  I think that's standard

16    practice.

17            MS. CLARKE:  That's correct.

18            MR. FICK:  One other housekeeping matter.  We had

19    received from the government their closing argument

01:02 20    presentation with the montage of audio and video.  We wanted to

21    get that marked for the record just so it's...

22            THE COURT:  This is the one that Ms. Conrad has been

23    worried about?

24            MR. FICK:  Right.  We did get it but now we want to

25    get it marked, so.  And I don't know if there's a number we

1    could assign to it or what the Court's --

2              MS. CLARKE:  Should we do that on Monday?

3              THE COURT:  Yeah, why don't we do that on Monday.  The

4    clerk has his method.

5              MS. CLARKE:  We did that out of deference to your law

6    clerk.

7              THE COURT:  Thank you.  I defer to the clerk on those

8    matters.

9              LAW CLERK:  All rise.  The Court is now in recess.

01:02 10              (The proceedings adjourned at 12:04 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4    the United States District Court, do hereby certify that the

 5    foregoing transcript constitutes, to the best of my skill and

 6    ability, a true and accurate transcription of my stenotype

 7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8    United States of America v. Dzhokhar A. Tsarnaev.

 9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12

13    Date:  5/7/15

14

15

16

17

18

19

20

21

22

23

24

25
```