1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                      )
4     UNITED STATES OF AMERICA,       )
                                      )
5            Plaintiff,               )
                                      )  Criminal Action
6     v.                              )  No. 13-10200-GAO
                                      )
7     DZHOKHAR A. TSARNAEV, also      )
      known as Jahar Tsarni,          )
8                                     )
             Defendant.               )
9                                     )

10

11        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE
12

13
               **EXCERPT OF JURY TRIAL - DAY FORTY**
14
                  **Testimony of David McCollam**
15

16

17         John J. Moakley United States Courthouse
                      Courtroom No. 9
                     One Courthouse Way
18              Boston, Massachusetts  02210
                   Thursday, March 26, 2015
19                        9:13 a.m.

20

21             Cheryl Dahlstrom, RMR, CRR
                   Official Court Reporter
22             John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
23             Boston, Massachusetts  02210
                      (617) 737-8728
24
           Mechanical Steno - Computer-Aided Transcript
25

1    APPEARANCES:

2          OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
               John Joseph Moakley Federal Courthouse
4          Suite 9200
           Boston, Massachusetts  02210
5          - and -
           UNITED STATES DEPARTMENT OF JUSTICE
6              By:  Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
7          1331 F Street, N.W.
           Washington, D.C.  20530
8          On Behalf of the Government

9          FEDERAL PUBLIC DEFENDER OFFICE
               By:  Miriam Conrad, William W. Fick and Timothy G.
10             Watkins, Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13             By:  Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15             - and -
           LAW OFFICE OF DAVID I. BRUCK
16             By:  David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                          I N D E X

2                                Direct  Cross  Redirect  Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4

   DAVID McCOLLAM
5
     By Mr. Chakravarty              5                44
6
     By Mr. Watkins                       34
7

8

9

10                      E X H I B I T S

11
   GOVERNMENT'S
12   EXHIBIT      DESCRIPTION                     RECEIVED

13   1230-10      Photo contained in 2-D exhibit       34

14
   DEFENDANT'S
15   EXHIBIT

16   1387A        Complete text of Exhibit 1387          4

17   3102         Photograph of hobby                   41

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE COURT:  Morning, jurors. |
| 3 | THE JURY:  Good morning, your Honor. |
| 4 | THE COURT:  Just two matters before we continue with |
| 5 | the evidence.  There were two issues from yesterday.  After |
| 6 | review, I will admit the proffered 1387A, proffered by Mr. |
| 7 | Fick, which is the complete text from which selections were |
| 8 | made.  That will be admitted. |
| 9 | (Exhibit No. 1387A received into evidence.) |
| 09:15 10 | THE COURT:  There was a discussion of a couple of |
| 11 | photographs, and I will -- that I had expressed some concern |
| 12 | about.  Those may be used.  I'm satisfied that the reason -- |
| 13 | there is a value added for those that is not available from the |
| 14 | other evidence. |
| 15 | MR. CHAKRAVARTY:  Your Honor, just to clarify, 1387A, |
| 16 | that would be with the redactions that we had discussed? |
| 17 | THE COURT:  Yes.  You mean personal identifiers? |
| 18 | MR. CHAKRAVARTY:  Correct. |
| 19 | THE COURT:  Yes.  And I don't have a copy that has |
| 09:15 20 | that, but I'm sure one can be prepared.  All right. |
| 21 | MR. CHAKRAVARTY:  Your Honor, the government would |
| 22 | call David McCollam. |
| 23 | THE CLERK:  Sir, want to step up here, please, up to |
| 24 | the box, if you would.  Remain standing. |
| 25 | DAVID McCOLLAM, Sworn |

1          THE CLERK:  Have a seat.  State your name.  Spell your

2    last name for the record.  Keep your voice up and speak into

3    the mic.

4          THE WITNESS:  My name is David McCollam,

5    M-c-C-o-l-l-a-m.

6    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

7    Q.    Good morning, Mr. McCollam.

8    A.    Good morning.

9    Q.    Do you work at the FBI?

09:16 10    A.    Yes.

11    Q.    What do you do there?

12    A.    I'm a chemist forensic examiner assigned to the Explosives

13    Unit.

14    Q.    Are you a special agent?

15    A.    I am not.

16    Q.    What did you do before you joined the FBI?

17    A.    I was a tour guide at the FBI while I was in college; and

18    before that I was just a student majoring in chemistry at Old

19    Dominion University.

09:17 20    Q.    Is that your entire education?

21    A.    Yes.

22    Q.    After you graduated with your chemistry degree, when did

23    you join the FBI?

24    A.    I started off in the Chemistry Unit in August of 1995.

25    Q.    And can you describe your progress through the FBI

1    laboratory and the various roles that you've had there?

2    A.    In August of 1995, I was assigned in the Chemistry Unit to

3    a supervisory special agent who worked with explosives.  As his

4    chemist, I trained under him and other qualified examiners

5    learning the proper chemical techniques and instrumental

6    techniques that we utilize at the laboratory to identify

7    explosives or energetic materials.

8          A wide variety of training samples or practice samples

9    was part of my training.  At the end of that particular

09:18 10   training, I would take a series of batteries of competency

11   tests.  At the end those competency tests, I was then able to

12   work independently within the laboratory.  I've taken past

13   yearly proficiency tests.  And then in January of 2000, there

14   was a reorganization of the laboratory where we got shifted

15   over to the Explosives Unit.  And then in July of 2004, I

16   became a qualified forensic examiner.

17   Q.    What is a qualified forensic examiner?

18   A.    The extra training, aside from the bench chemistry that I

19   was trained in the Chemistry Unit, it's just a series of

09:18 20   writing reports, working with more samples, a series of oral

21   board evaluations on explosives, administrative functions

22   within the laboratory.

23   Q.    You mentioned something called bench work.  What's bench

24   work?

25   A.    Bench work is just analyzing evidence that's submitted to

1    the laboratory using different procedures, techniques, to get

2    those chemicals, residues or explosive material onto the

3    instruments that we utilize on a daily basis.

4    Q.   What is the purpose of forensic chemistry in explosives

5    investigation?

6    A.   With forensic chemistry, we're just using very scientific

7    principles to identify explosive compounds or compounds that

8    can be used to make explosives with a wide variety of analytic

9    techniques, scientific methods, to arrive at a conclusion.

09:19 10   Q.   What kind of explosives can you test for?

11   A.   Pretty much everything.  There's a wide variety of

12   different type explosives.  There are low explosives.  There

13   are high explosives.  There are hundreds of different types of

14   explosives that exist that we're able to analyze and identify.

15   Q.   Now, continuing with your background, as you progressed as

16   a chemist at the FBI lab, did you have an opportunity to

17   actually conduct forensic examinations on submissions,

18   evidentiary submissions, for testing for chemicals?

19   A.   Yes.

09:19 20   Q.   And approximately how many times have you conducted

21   forensic chemistry exams in explosives cases?

22   A.   Literally thousands of samples involving hundreds of

23   different cases.

24   Q.   Was your work peer-reviewed on a general level, and on

25   specific occasions did people verify your work?

1    A.   Whenever we -- or I write a report at the laboratory, the

2    data that I generate, the report that I've written, has to go

3    through a technical review process.  So there's another chemist

4    examiner who has the same qualifications, who's been through

5    the same training process that I have.  That individual would

6    review the report and the technical data with my conclusion;

7    and if he agrees with it, then he'll sign the report out.

8    There's also administrative review that's done as well in

9    conjunction with that.

09:20 10    Q.   And do you work with a team of various analysts, agents,

11    and examiners?

12    A.   Correct.

13    Q.   In the course of your work at the FBI, have you had an

14    opportunity to continue continued education or on-the-job

15    training?

16    A.   Yes.  The FBI mandates that we have to have approximately

17    eight hours of continuing education, so that can exist either

18    by taking classes which are sponsored by the instrument

19    manufacturers that I use at the laboratory to study the theory,

09:21 20    or I can take, you know, explosives classes that are offered.

21    There's a wide variety of those.  I can attend conferences on

22    explosives with the United States or overseas as well.

23    Q.   Have you continued to do that --

24    A.   Yes.

25    Q.   -- during your time, now almost 20 years at the FBI?

1    A.    Yes.

2    Q.    Now, as part of the Boston Marathon investigation, what

3    was your role?

4    A.    I stayed back at the laboratory, and then I started

5    receiving many submissions on April 16th centered around the

6    investigation.  So it was my job to coordinate the efforts in

7    the laboratory that evening.  Many samples were received from

8    the two devices at Boylston Street, the incident at Watertown,

9    and then in subsequent searches during the following weeks of

09:22 10    the investigation.

11    Q.    And, ultimately, did you analyze that evidence?

12    A.    Yes.  Myself and my team analyzed approximately 300 pieces

13    of evidence.

14    Q.    Did you draft a report?

15    A.    I did.

16    Q.    Did you prepare to come up here to testify in the case?

17    A.    I did, yes.

18    Q.    Have you testified in other cases?

19    A.    I have.

09:22 20    Q.    About how many times?

21    A.    This is my tenth time.

22    Q.    That's always in this capacity of talking about explosives

23    chemistry?

24    A.    Correct, yes.

25    Q.    What is an explosive?

A.    An explosive can be described as a pure substance or a
mixture of substances that's capable of producing explosion by
its own energy.  What they're designed to do is they're
designed to react very quickly, within thousandths of a second
or hundreds of thousandths of a second.  And all they're
designed to do is just release a tremendous amount of gas, and
that gas is generated.  It's designed to do work, to blow stuff
up in mining, engineering or, with military applications, just
to shatter and destroy things.

So since there's so many different types of explosives
and they react differently, they have to be classified into two
different categories.  We have low explosives and high
explosives.  And they're based on how quickly they react.  So a
low explosive, the material that's reacting is going at less
than the speed of sound.  A high explosive, on the other hand,
reacts faster than the speed of sound.  So examples of high
explosives you may have heard of would be TNT or C4, dynamite,
nitroglycerin.  Those are all military-type explosives that we
can see.

On the other hand, we have low explosives.  These are
commonly referred to as propellents.  They're mixtures of
different chemicals.  They're mixtures of oxidizers and fuels.
Now, in order to get that fuel to burn, it needs a chemical
source of oxygen.  It's like I stated earlier, they're designed
to work or react so quickly they can't take oxygen from the

1    air, can't diffuse that fast, so we have to bring in a chemical

2    source of oxygen called the oxidizer.  There are many different

3    types of oxidizers out there:  potassium nitrate, potassium

4    perchlorate, barium nitrate.  And all they do is supply that

5    oxygen to the fuel, which could be carbon or sulfur, aluminum

6    powder, magnesium as well.

7           Low explosives, pyrotechnics are low explosives, and

8    also propellents.  A propellent would be, like, black powder or

9    smokeless gunpowder, which is commonly found in ammunition.

09:24 10    And for pyrotechnics, that category, it's used by the military

11    for signaling, like, smoke grenades.  You can find them in

12    common household kitchen matches, road flares, signaling

13    flares, and also commercially available pyrotechnics or

14    fireworks.

15    Q.    So you talked about two different types of explosives:

16    high explosives and low explosives.

17    A.    Yes.

18    Q.    High explosives, I think you explained, are military grade

19    or they're commercially available for the specific purpose of

09:25 20    blowing things up essentially?

21    A.    Correct, yes.

22    Q.    And low explosives, can you describe some of the

23    nondestructive applications of low explosives?

24    A.    Again, low explosives are -- like I said, they're road

25    flares, kitchen matches.  There's pyrotechnic material that's

1    on there.  Black powder, people can go to, as a hobby, black

2    powder guns, Civil War reenactments, Revolutionary War

3    reenactments.  Those guns or canons use the black powder.  When

4    it burns, it reacts.  It generates that pressure very quickly,

5    and it's designed to propel something.  And then fireworks,

6    Fourth of July, stuff like that.  And then the smokeless

7    powder, that's the ammunition propellent.  People -- some

8    people are reloaders.  So they can go to, like, Dick's Sporting

9    Goods store or Wal-Mart, and they can buy pounds of smokeless

09:25 10   powder, and they can reload their own ammunition instead of

11   buying it.

12   Q.   So what is the difference between how high explosives

13   explode versus how low explosives explode?

14   A.   Low explosives are designed to deflagrate or burn, so

15   typically they're initiated with a match or some type of heat

16   source, whether it's a hot wire or a match.  And that gets the

17   reaction going.  It's very easy.  It's very simple to do.

18        On the other hand, most high explosives need to have

19   some type of shock initiation to them.  They're relatively

09:26 20   insensitive but they need a shockwave, typically in the form of

21   a detonator, to get them to go.  For example, TNT, if I had a

22   block of TNT for demonstration purposes and I took a match to

23   it, it would burn but it wouldn't detonate because there's not

24   enough energy to get those molecules to decompose to react to

25   achieve a shockwave.

1          So in the blasting industry or military operations,

2     they have commercially available blasting caps.  So there's

3     energy put into that blasting cap which starts the explosive

4     train, we call it.  There's a shockwave that's developed within

5     that blasting cap, and that blasting cap then propagates that

6     shockwave to the TNT to get it to go.

7     Q.   And how does the low explosive work?

8     A.   Again, it could be a simple match, like a firework.

9     There's a fuse sticking out of it.  You light a match.  It's a

09:27 10     safety fuse, so you can light it and then get away in time, so

11     you could have some type of hot ember or hot -- it's just

12     energy.  That heat has to come from some form of energy.  It

13     could be a flame.  It could be a hot wire.  It could be

14     friction is generating energy just enough to get those

15     molecules within that low explosive to start decomposing to get

16     that energy going that it needs to sustain the reaction.

17     Q.   And so for low explosives to actually explode as opposed

18     to just burn, do they need to be contained?

19     A.   Yes.  If I -- for example, if I bought two cans of black

09:27 20     powder and we went outside and I demonstrated by taking one can

21     and pouring it on a surface, and I took a match and I lit that

22     black powder, you would feel the heat from the thermal

23     decomposition.  You would see smoke.  It would be white smoke.

24     You would smell the sulfur burning.  Black powder is potassium

25     nitrate, oxidizer, sulfur, and carbon as the fuels.  They're

burning in that oxidizer.  So you would see this reaction.  It wouldn't explode.  It's relatively harmless other than just, you know, the awe of it.  If I take that same amount of powder from the second can, which is a pound of it, and I put that in some type of container, now what's happening is that gas that I talked about earlier that's being generated, that pressure that has built up, it has to go somewhere.  It cannot stay within that container.  So that pressure, as it builds up over time very quickly within that container while the material is burning, that pressure is going to overcome that container in some fashion causing it to peel apart, bust open.  That's the explosion that you're hearing.  The black powder isn't exploding.  It's a chemical reaction.  It's causing a mechanical explosion which is the failure of the container which it's contained in.

Q.   And how quickly does that process happen?

A.   Low explosives are designed to function or react thousandths of a second.  In contrast, high explosives are designed to react one, one-hundred-thousandths of a second so several orders of magnitude quicker.  It's a relatively slow reaction, but on a chemical scale, it's pretty quick.  For us to interpret how fast it's reacting, we have a wide variety of instruments or engineers that study these compounds.  There's all these instruments they use to understand the reaction rate, the pressure that's generating, and how fast the reaction is

1    going.

2    Q.   When you see an explosion, are there signals from the

3    observations that you can make about the explosion that might

4    tell you whether it's likely a high-explosive or a

5    low-explosive explosion?

6    A.   When explosives react, you know, the energy that they

7    release is in the form of heat, light, and sound.  If you're

8    looking at an explosion going off, you're going to see the

9    light that's going off.  You're going to hear it as a loud

09:30 10   sound.  But there's another process or another -- not a flaw,

11   but what happens with some of the military-type explosives,

12   like TNT, if I initiate a pound of TNT, there's going to be a

13   black cloud that's associated with that because there's a lot

14   of extra carbon within TNT.  There's not enough oxygen to react

15   with that.  So that carbon soot goes away, and that's the cloud

16   that we see.

17          On the other hand, with low explosives, there is a lot

18   of oxidizer left over.  Some of the products that they're

19   forming, when they start off and they're burning, the products

09:30 20   that are left behind are a little bit different.  But when they

21   release their gas and energy, there is all these different

22   types of compounds, and they're typically white in color.

23   Q.   So one distinction is a white plume of smoke versus a

24   black plume of smoke?

25   A.   Correct.

1    Q.   Now, in addition to examining explosives when they're in

2    their bulk form or they're intact form, are you able to do

3    post-blast investigation?

4    A.   Yes.

5    Q.   And how do you do that?

6    A.   Post-blast, we're just looking for residues.  There may be

7    microscopic traces of material left behind.  So there's various

8    procedures that we go through, rinsing them with the material

9    that comes in with chemical solvents, water and then acetone.

09:31 10   It's a screening technique that we're achieving.  Based on the

11   results from those screening techniques will navigate as to

12   other instruments that we may use.

13   Q.   What is the purpose of doing that kind of a post-blast

14   forensic examination?

15   A.   Like I said earlier, there's going to be little bits of

16   residue left behind, so we're using these solvents to determine

17   what explosive may have been used to cause the explosion.

18   Q.   And can you determine using that process specifically what

19   brand of explosive was used, or what's the level of specificity

09:32 20   that you can arrive at?

21   A.   With low explosives, it's practically impossible.  It's

22   difficult to determine what brand it was or anything like that.

23   We don't try to determine, you know, the manufacturer or

24   anything like that.

25        For high explosives, it's a little bit easier.  For

1    example, TNT I talked about earlier.  If that material goes

2    off, there's microscopic traces of TNT residues left behind.  I

3    can state with confidence that the explosive contained TNT

4    within there.  Whereas, with low explosive, we can't determine,

5    like, a particular brand name or a manufacturer that made that

6    material.

7    Q.   Now, did you examine the evidence from the Boston Marathon

8    investigation?

9    A.   Yes.

09:32 10          MR. CHAKRAVARTY:  Mr. Bruemmer, if we could just call

11    up Exhibit 620.

12          THE COURT:  This is 620 which is in evidence?

13          MR. CHAKRAVARTY:  It is 620 in evidence, your Honor.

14    Q.   Now, Examiner McCollam, starting with Boylston Street, did

15    you examine evidence from a variety of the places where it was

16    collected on Boylston Street from the blast scene of Scene A?

17    A.   Yes.

18    Q.   Examining that evidence, did you arrive at a conclusion as

19    to what the nature was of the explosives involved?

09:33 20    A.   Yes.

21    Q.   What did you conclude?

22    A.   That the residues that were present from the specimens

23    that were submitted from Scene A, those residues are consistent

24    with the deflagration products of a pyrotechnic or

25    firework-type material.

1    Q.   And with regards to Scene B, again, did you examine the

2    evidence submitted that had chemical residues on it and

3    determine the nature of the explosive for Scene B?

4    A.   Yes, I did.  Again, the residues from Scene B are

5    consistent with the deflagration products of a low-explosive,

6    pyrotechnic-type material.

7    Q.   Did you also examine the evidence submitted from the

8    Watertown crime scene?

9    A.   Yes.

09:34 10   Q.   And that included both a pressure cooker device as well as

11   several pipe bombs?

12   A.   Yes.

13   Q.   Did you also examine the intact, rendered safe, pipe-bomb

14   material?

15   A.   Yes.

16   Q.   Did you also examine the bulk powder that was in a

17   Rubbermaid container that had not been ignited?

18   A.   Yes.

19   Q.   And did you conclude -- draw any conclusions about the

09:34 20   nature of those explosives?

21   A.   Yes.

22   Q.   What were those?

23   A.   The bulk material was definitely pyrotechnic

24   flash-powder-type material.

25   Q.   Now, can you explain to the jury what a pyrotechnic

1    flash-powder-type material is?

2    A.    Pyrotechnics are designed for our amusement.  They're

3    Fourth of July-type events.  They're made here in the United

4    States, but the bulk of fireworks are made in Asia.  They're

5    brought over.  And, again, it's just a combination of

6    oxidizers.  There's chemical sources of oxygen mixed with the

7    various types of fuel.  And the fuel specifically, they're

8    highly reactive fuels such as aluminum or magnesium.  That

9    flash that you see, that bright flash is aluminum or magnesium

09:35 10    burning.

11    Q.   Are there combinations of commercially available

12    pyrotechnics, are they consistent in terms of what elements are

13    contained within those?

14    A.   It's a very complex process how they make them, and it

15    depends on the customer who's ordering the fireworks, what they

16    want.  All these different chemical oxidizers that go in there

17    have a various function.  Not only are they designed to supply

18    the oxygen during the reaction but the element that's

19    associated with them as well.  For example, barium nitrate,

09:36 20    they add barium nitrate to fireworks because that burns green.

21    So when you're watching fireworks burn, if you see green, it's

22    because the oxidizer barium nitrate is in there.  If you see

23    red, that means that the oxidizer strontium nitrate is in

24    there.  If you see blue, then you have copper salts or copper

25    nitrate, various compounds that are in there.  So the engineers

1    and the people that make this stuff understand the different

2    colors that these chemicals produce, so they can design these

3    fireworks.  So when they're burning in the sky, those materials

4    that you see burning are because of the different elements and

5    the different oxidizers that are associated with them.

6    Q.    All right.  And so when you conducted your analysis of

7    each of those various crime scenes and pieces of evidence, can

8    you explain to the jury how you did that?

9    A.    So when the evidence came in, there were many, many pieces

09:37 10    that came in.  Both from the Scenes A and B were big pieces of

11    metal fragment.  In observing those pieces of metal, I could

12    see black-colored material, discoloration on there, residue

13    that was left behind.  There was also swabs from the scene.  We

14    swab surfaces that can capture residue.  And also vacuum

15    samples were submitted as well both from Scene A and B and then

16    the Watertown incident as well.

17          So what myself and my team did is that we -- if the

18    piece of metal had black residue or discoloration on there, if

19    we were able to scrape that off, we would set that aside for

09:37 20    further analyses but decided to focus our analyses -- since

21    there were so many items, to focus our analyses on a technique

22    called ion chromatography.  What I'm doing with that is there's

23    a water wash that I'm using, so I rinse the items with water.

24    I filter that water.  And then what it's designed to do is

25    these organic -- sorry, inorganic compounds, those oxidizers

1    I'm talking about, are soluble in water.  So they're going to

2    be trapped within the water.  It's kind of like a chemical

3    soup.  So this material goes on the ion chromatograph system.

4    We call that IC.  That IC system separates out all those

5    individual components based on how much time they want to spend

6    in the system.  So I can get -- say, for example, if I had

7    eight compounds, I could separate out those eight compounds.

8    These are called anions.  They have a negative charge to them.

9    So I can determine if there's chloride, if there's nitrate, if

09:38 10   there's sulfate, if there's perchlorate, all these different

11   ions that are associated with that.  It's just a piece of the

12   puzzle.

13         Next step would be to analyze that black residue

14   material that we scraped off.  We'll grind that up in a mortar.

15   That's going to go on a system called an X-Ray Diffractometer.

16   We call that XRD.  What that XRD system does is its sample is

17   sitting in an instrument, and X-rays are focused on that

18   sample.  And what the sample does is it rotates through

19   predetermined degrees.  It goes from approximately 5 to 75

09:39 20   degree angle.  And those X-rays that are focused on the

21   instrument -- or, sorry, the sample will diffract at certain

22   angles because of the crystal lattice structure of the sample

23   that's in there.  No two chemicals have the same crystal

24   lattice.  We can only do this for solid material.  We can't do

25   it for liquids or gels or anything like that.  It's only for

1    solid material.  So it develops what we call a diffraction

2    pattern which is unique to those specific chemicals or crystal

3    structures.  If there's a mixture in there, it can easily

4    separate the mixtures out and give me a diffraction pattern.

5    And that diffraction pattern is searched against a known

6    library of materials that's associated with the instrument.

7        Finally, that black material is then going to be

8    analyzed by an instrument called Scanning Electron Microscopy

9    with Energy Dispersive X-Ray Spectroscopy.  That's a mouthful,

09:40 10   so we'll just call that SEM.  So what the SEM does, well,

11   there's a detector called the EDS detector.  What that detector

12   does is it determines the elemental composition of the material

13   that's in there.  It doesn't determine structure or anything

14   like that.  It just determines what elements are present.  So a

15   lot of these samples contain carbon.  They contain oxygen,

16   silicon, sulfur, barium, potassium, chlorine, aluminum,

17   magnesium, all chemicals that are commonly found in pyrotechnic

18   material.

19   Q.   Similarly, are those elements not commonly found on

09:40 20   Boylston Street and on Laurel Street in Watertown?

21   A.   No.

22   Q.   Now, once you have identified a number of the different

23   chemicals, how do you conclude -- what can you do with that

24   combination of the various chemicals that you have?  How do you

25   use that information?

A.   Well, then we just -- once all the data has been
collected, we sit down and I start going through all the data,
all the notes.  And that's when I start arriving at the
conclusion that these materials present are consistent with the
deflagration of pyrotechnic materials.  I've analyzed cases
from fireworks before, people making flash powders.  We've seen
it many times before.  I've burn them myself; I've analyzed
them myself.  So I arrive at that conclusion, and that's when
the report process starts to be written.

09:41  Q.   You drafted a report.  I suspect that's the report in
front of you, is that right?

A.   Yes.

Q.   The analysis you described can tell you what kinds of
materials were used.  Can you tell how much of that material
was used?

A.   You can.  There's a technique called quantitation,
determining how much of something you have.  The Explosives
Unit on the chemistry side, we don't quantitate anything.
We're just trying to determine what's present.  Is there an
09:42  explosive there or not.  So I did not determine how much of
anything was present.

Q.   Now, a pyrotechnic mixture comes from fireworks, right?

A.   They can.  Like I said earlier, there's pyrotechnics for
road flares, kitchen matches; the military uses it for various
applications.  It not just fireworks, but that's a common

1    source of it.

2    Q.   For a civilian who doesn't work in those other industries

3    which use fireworks -- excuse me, which use pyrotechnics, how

4    would one extract from a firework the pyrotechnic mixture that

5    would be the explosive that you described?

6    A.   Someone would have to mechanically go into the pyrotechnic

7    device to get the filler or the explosive material out of

8    there.  For example, a small firecracker, the small, little

9    cylindrical objects you see, by law, they can only have 50

09:42 10   milligrams of material inside of that.  But yet there are other

11   commercially available fireworks that are sold that can contain

12   up to hundreds of grams of pyrotechnic material, all legal,

13   depending on what state you live in and how the laws are set up

14   where you can buy them.

15        But somebody would have to actually go in, cut through

16   the cardboard.  Those cardboard tubes and some of those

17   materials are relatively thick.  Again, that thickness of the

18   cardboard is to contain the pressure so that the firework could

19   be projected vertically.  So there's a lot of effort that will

09:43 20   go into separating out the pyrotechnic or firework explosive.

21   Q.   What would happen if you have pyrotechnic mixture from a

22   variety of different low-explosive sources so, like, black

23   powder as well as firework flash powder as well as other types

24   of things?

25   A.   They all burn pretty much the same.  Flash powder burns or

1   fireworks burn a little bit hotter than just regular black

2   powder.  But they will function -- if they're mixed together,

3   they pretty much function the same.

4   Q.   And to extract from fireworks a pound of explosive --

5   low-explosive material, about how many fireworks would that

6   require?

7   A.   Again, it depends on what has been purchased.  Some of the

8   products -- like I said, the firecracker would be not worth

9   your time because there's only 50 milligrams.  There's 454

09:44 10   grams in a pound, so that wouldn't be a good way of doing it.

11   But there are mortars that you can buy.  Certain states sell

12   mortars.  They can contain up to maybe 30 grams or more of

13   explosive material within them.  So if you're looking for a

14   pound, 30 grams, 454 grams in a pound, you would need dozens of

15   those mortars just to create a pound of explosive material.

16        MR. CHAKRAVARTY:  Can we call up Exhibit 1230-10?  I

17   believe this is in evidence.

18   Q.   Do you recognize that?

19   A.   I've seen the picture before, but I don't know if I've --

09:45 20   I believe I analyzed it in the lab in a different form.  When

21   it came into the laboratory, it had already been dismantled or

22   taken apart.

23   Q.   All right.  Can I show you Exhibit 1256-04?

24        MR. CHAKRAVARTY:  Which is also in evidence, I

25   believe.

1    Q.   Do you recognize that?

2    A.   Yes.

3    Q.   Does that appear to be a disassembled version of the

4    earlier photo?

5    A.   Yes.

6    Q.   And what did you analyze that to be?

7    A.   So I mechanically removed some of the powder that you can

8    see from the different firework-type material, and the powder

9    that was contained within is pyrotechnic, low-explosive

09:45 10   material.

11   Q.   If you can estimate, without precision but just as a

12   ballpark, how many of these you would need to extract a pound

13   of explosives?

14   A.   It would be quite a lot, hundreds, I would guesstimate.

15   It's really inaccurate, but it would be hundreds because

16   there's not a lot of material.  There's three different kinds.

17   You can see there's a Roman-candle-type product up at the top.

18   I didn't analyze that.  But then you can see those from, I

19   guess, south to north, you can see finger-type or long

09:46 20   cylindrical-type materials.  There's a couple milligrams or a

21   gram or so of material within each of those.  And then off to

22   your left at about 9:00 or 10:00, there's more cylinders that

23   are chained together with a fuse.  I opened up one of those.

24   There's approximately a half a gram to a gram of material

25   within each one of those.

1    Q.   Did you have various receipts and other exemplars of other

2    fireworks that were purchased as part of this investigation

3    that you analyzed?

4    A.   Yes.  One sample was sent down to us.

5    Q.   Was there a lock-and-load mortar kit that you examined?

6    A.   Yes.

7    Q.   Was that the largest firework that you examined?

8    A.   Yes.

9    Q.   And how many of those would you need to create a pound of

09:47 10   explosive material?

11   A.   If I recollect correctly, the lock and load, one of those

12   mortars contained a little bit more than 30 grams, about 35

13   grams of material.  So, again, you would need a couple dozen of

14   those to get up to a pound.

15   Q.   In order to extract explosives from firework materials,

16   can you describe how clean or dirty that process is?

17   A.   In my experience, it's a pretty dirty process.  Again,

18   because -- when I've talked about the low explosives, oxidizers

19   and the fuel, the most common fuel used is aluminum powder

09:47 20   because it's cheap and it's very reactive.  So that's pretty

21   much the go-to fuel for a lot of these firework manufacturers.

22   But when you work with this material, it appears -- since it's

23   mixed so well commercially, it appears to just look silver in

24   color.  You almost can't discern any heterogeneous compounds

25   within there, like a mixture of different things, until you put

1    it under a microscope and start looking at it.  And then you

2    can see the many different things that go in there.  But

3    working with that, we definitely use gloves, but it's almost

4    impossible not to get the material coating on your hands, the

5    silver powder, which is aluminum powder or magnesium powder

6    which may be in there as well.

7    Q.   And if you were to use black powder as if from a

8    propellent or as a -- or just in bulk form, how clean or dirty

9    is that to extract and to make into a low-explosive device?

09:48 10   A.   Black powder is pretty unique because it literally looks

11   like very small pieces of coal.  It comes in various grain

12   sizes depending on what application the -- the people that use

13   it for hunting or black-powder rifles.  It has four different

14   sizes.  But they're very highly polished, little, irregularly

15   shaped lumps of powder material.  So if I handle that, I'll get

16   a little bit of chemical residue on me, but it's not going to

17   really notice -- or be able to see on my hands, yes, I just

18   handled black powder because my hands are all black now.  It

19   doesn't work that way.  It's coated with graphite to keep the

09:49 20   friction down, so if you're pouring it, it doesn't generate

21   friction which could set it off.

22   Q.   Now, as part of this investigation, you said that you had

23   analyzed a number of bulk materials submitted as well as

24   post-blast materials --

25   A.   Yes.

1    Q.    -- correct?

2         With regard to the bulk materials submitted, for

3    example, in that plastic container in Watertown, was there

4    several pounds of explosives in that container?

5    A.    I didn't weigh out the material.  It was presented to me

6    in smaller, couple grams of material to analyze.

7    Q.    But to create that bulk material, would you expect to see

8    residues of that bulk material wherever it was created?

9    A.    In that volume and that mass that was produced, yes.

09:50 10   Q.    And if there was the same type of powder in the pressure

11   cooker devices and the pipe bombs, then you would expect that

12   there would be even more bulk material that would have had to

13   have been prepared before they could have been used in those

14   devices?

15   A.    Yes.

16   Q.    Again, did you, in your investigation, see traces or

17   evidence that was consistent with a -- the volume of particles

18   of residue that would indicate where specifically these devices

19   were assembled?

09:50 20   A.    No.

21            MR. WATKINS:  I'm going to object.  Very confusing.

22            THE COURT:  Well, in light of the answer, I'll let it

23   stand.

24   Q.    Did you also receive in the lab for analysis trace filters

25   from various vacuum samples?

1    A.    Yes.

2    Q.    And did you see -- receive those from various search

3    locations in the investigation?

4    A.    Yes.

5    Q.    Was there any one set of trace filters that you received

6    that indicated that there was a large volume of traces of

7    either black powder or low-explosive, pyrotechnic mixture?

8    A.    I'm going to have to refer to my report.  Is that okay?

9    Q.    Please, to refresh your recollection.

09:52 10    A.    So there are going to be specimens Q933, that whole

11    sequence from -- let's see here -- 410 Norfolk Street,

12    Apartment No. 3.  So the residues -- so some of the filters

13    that I analyzed did contain residues of pyrotechnic material.

14    Q.    So how much residue was there?

15    A.    They contained -- again, we don't quantitate.  I don't

16    know how much residue was there.  But there's the perchlorate

17    ion.  There's the nitrate -- elevated nitrates, sulfates,

18    materials like that.

19    Q.    So you don't -- you don't measure from the quantity of

09:53 20    these materials when you do the analysis?  You just measure

21    whether those materials actually exist?

22    A.    Correct, if they're present.

23    Q.    Aside from Norfolk Street, were there any other locations

24    where you tested for residue?  I guess the question is whether

25    you tested for residue in other places.

1    A.    There were some gloves that were -- some latex or some

2    type of disposable gloves from a vehicle that contained

3    residues as well.

4    Q.    Was that a Honda CR-V that was parked outside of 410

5    Norfolk?

6    A.    Correct.

7    Q.    Again, was that pyrotechnic mixture on the fingertips of

8    those gloves?

9    A.    Yes, consistent with pyrotechnic material.

09:53 10   Q.    Aside from that, was there anything else?

11   A.    Some of the samples from 410 Norfolk Street.  There were

12   four samples that contained small grains of black powder as

13   well, not just the residues of the ions, the oxidizers that we

14   were detecting, but actual physical black powder grains were

15   identified.

16   Q.    Now, in a case involving as much explosives as you --

17              MR. WATKINS:  I'm going to object, your Honor.

18              MR. CHAKRAVARTY:  I'll ask a new question.

19   Q.    In this case, would you expect to have seen more residue?

09:54 20             MR. WATKINS:  I object.

21              THE COURT:  Sustained, sustained, without foundation.

22   Q.    Do you expect to see residue -- residues of the creation

23   of IEDs or, Improvised Explosive Devices, when they are created

24   in the course of --

25   A.    Correct.  In this type of operation, if material is being

1   extracted from fireworks and then ground up somehow, it's hard

2   to keep a clean surface.  It's hard to not contaminate or

3   spread this material around to the surfaces or areas you're

4   working in or getting it on your person, yourself, within your

5   clothes and then tracking it to other areas.  It's very

6   difficult.

7   Q.   So is it fair to say that there was at least a large --

8            MR. WATKINS:  Objection, your Honor.  Leading.

9            THE COURT:  No.  Overruled.  Go ahead.

09:55 10  Q.   -- an unquantifiable but a substantial amount of explosive

11  powder that was necessary to create the devices on Boylston

12  Street and in Watertown?

13  A.   Yes.

14  Q.   And did you find the residues that were commensurate with

15  that volume --

16           MR. WATKINS:  I'm going to object, your Honor.  Can we

17  be seen at sidebar?

18           THE COURT:  Okay.

19  (SIDEBAR CONFERENCE AS FOLLOWS:

09:55 20          MR. WATKINS:  He's trying to get into an opinion that

21  hasn't been noticed.  I'm not exactly sure where he's going in

22  the long term of the guilt phase here, trying to suggest that

23  the bombs weren't built in Norfolk or built somewhere else.  I

24  don't know what that has to do really with anything in the

25  guilt phase.  So I'm wondering about relevance on that.

1    I was not noticed about this particular aspect of the

2    testimony where he's really speculating about where -- what Mr.

3    Chakravarty is trying to do is get a conclusion that the bombs

4    were not built at Norfolk Street through a series of questions,

5    "wouldn't you expect."  I don't know that he's going to ask

6    that, but that certainly suggests to the jury.  And on that

7    aspect, really what he's trying to do is elicit an expert

8    conclusion without soliciting an expert conclusion.

9         MR. CHAKRAVARTY:  I'm not trying to elicit an expert

09:56 10   conclusion.  I'm doing two things:  one is preempting what I

11   anticipate to be a line of questioning from the defense.  So

12   I'm simply exposing what his analysis was about those trace

13   explosives and other things that Mr. Watkins raised yesterday.

14   So he's exposing that.  And in order to provide the context of

15   what those -- that analysis means, I'm eliciting from him the

16   fact of the residues that he found there was a relatively small

17   amount of residue versus the amount of explosives that he had

18   -- the amount of explosives that appeared to have been

19   involved.  That's precisely the question I'm asking for.

09:57 20   There's no line of questioning.

21        THE COURT:  What about the notice issue?  Was this in

22   his report?

23        MR. CHAKRAVARTY:  What's in his report is that there

24   are trace amounts of the explosives and the residues, and it's

25   -- what's not in his report is an opinion as to whether the

1    trace amount would be proportional to the amount of explosives

2    that may have been involved in the case because, frankly, at

3    the time he did the report, he didn't know what the trace

4    amount was.  I'm not sure that that's an expert opinion.

5              THE COURT:  I think it is so I'd exclude it.

6              MR. CHAKRAVARTY:  Okay.

7    .  .  .  END OF SIDEBAR CONFERENCE.)

8              MR. CHAKRAVARTY:  Your Honor, a moment ago I showed

9    Mr. McCollam Exhibit 1230-10, and that's part of the 2-D

09:58 10   exhibit and it's in evidence, but it's not separately marked as

11   such.  So I would move that into evidence.

12             MR. WATKINS:  Are we talking about the photograph?

13             MR. CHAKRAVARTY:  The photograph.

14             MR. WATKINS:  Then no objection.

15   (Government's Exhibit No. 1230-10 received into evidence.)

16             THE COURT:  Okay.

17             MR. CHAKRAVARTY:  Thank you, Mr. McCollam.

18   CROSS-EXAMINATION BY MR. WATKINS:

19   Q.   Good morning, Mr. McCollam.

10:00 20   A.   Good morning.

21   Q.   Mr. Chakravarty was asking you a series of questions about

22   other items that you tested in the laboratory for explosive

23   residues?

24   A.   Yes.

25   Q.   And there was really a whole lot of items that you

          1    analyzed?  You were a very busy man in this case; is that fair

          2    to say?

          3    A.    Yes.

          4    Q.    And your report is quite lengthy and goes on to identify a

          5    whole host of items that you examined and/or tested for

          6    explosive residues, right?

          7    A.    That's correct.

          8    Q.    Showing you what's been admitted as Exhibit 3099 -- I'm

          9    waiting for it to come up.

10:01    10          You mentioned in your report a Q number.  Exhibit 3099

         11    is Q667.  Do you see that in your report?

         12    A.    I do.

         13    Q.    What was the -- your analysis of exactly what was found on

         14    those gloves in Q667?

         15    A.    Within some of those gloves there was black smudging on

         16    some of the fingertips.  So that smudging in that fingertip

         17    area, I couldn't scrape off any residue, per se, like I could

         18    with the metal fragments that were from the explosions.  So I

         19    prepared an SEM slide, or an SEM stub is what it's called.  So

10:02    20    I just take the sample holder that's utilizing the SEM

         21    instrument, and I dabbed it on the fingertip of that glove to

         22    get any residue that's off.  That specimen was analyzed on the

         23    SEM.  Then I did a water wash of that -- those black-tipped

         24    from the particular gloves that were within Specimen 667 and

         25    668, actually.

36

1    Q.    You told us about ions and anions that you look for when

2    you're doing your analysis?

3    A.    Correct.

4    Q.    You found those on these -- this set of gloves, right?

5    A.    I found some anions, yes.

6    Q.    Residues detected carbon, oxygen, iron magnesium.  You

7    explained to us already that those are items that are included

8    in low explosives?

9    A.    They're included in some pyrotechnic formulations.  They

10:02 10    can be in some low explosives, but they're commonly found --

11    those, in particular, were common for firework material.

12    Q.    Actually, those things can be found everywhere in nature,

13    but the combination starts to suggest fireworks and pyrotechnic

14    formulations?

15    A.    Correct.

16    Q.    Going on, silicone, sulfur, calcium, chlorine, potassium,

17    barium and zinc, those are things also found when you analyzed

18    these gloves that were found in the Honda CR-V?

19    A.    Yes.

10:03 20    Q.    Again, you analyzed many, many things, and for many of

21    them you concluded there was no explosive residue, right, on

22    many of the items that came into your laboratory?

23    A.    Correct.

24    Q.    But these certainly were of note because of that

25    particular collection of elements indicated pyrotechnic

1    formulations, right?

2    A.   Yes.

3    Q.   And you mentioned -- you anticipated already 668, the same

4    thing, another latex glove found in the CR-V.  You found the

5    same kinds of ions and anions on that glove also, correct?

6    A.   Yes.

7    Q.   And, again, you've analyzed a lot of different things.

8    And if there were no collection of those elements, you wouldn't

9    report a finding or you'd report no finding.  But certainly

10:04 10   this was of interest given those collection of elements on the

11   glove, right?

12   A.   Yes.

13   Q.   Also, 671, another latex glove found in the CR-V, it was

14   notable because it had --

15        MR. CHAKRAVARTY:  Objection, your Honor.  I think this

16   is the same photo from the -- same glove from a different

17   angle.

18        MR. WATKINS:  Is it?  I'm sorry.  This is Q671.  Maybe

19   I hit the wrong one before.

10:05 20   Q.   These are different, aren't they?

21        MR. CHAKRAVARTY:  I stand corrected.

22   Q.   668 and 671?

23   A.   Correct, yes.

24   Q.   So they're two different gloves.  They look very much the

25   same, right?

1    A.   They do, but they have different numbers, Q numbers.

2    Q.   Which means they're different items?

3    A.   Yes.

4    Q.   But there was explosive powder found on each of them?  I'm

5    sorry.  "Explosive" is the wrong word.  There were elements on

6    those gloves consistent with pyrotechnic formulations?

7    A.   On 667 and 668 but not on 671, that second picture you

8    showed.

9    Q.   Right.  671 found chloride nitrate and sulfate items,

10:06 10  right, according to your report?

11   A.   Yes.

12   Q.   That's here, 671.  Not as many elements as those other

13   items but still enough to warrant a finding in your report or

14   at least a mention in your report, right?

15   A.   Yes.  I listed chloride, nitrate, and sulfate on those

16   items.

17   Q.   Because those are also consistent with pyrotechnic

18   formulations and low explosives?

19   A.   They can be, yes.

10:06 20  Q.   In addition to actual items, you received vacuum

21   filters --

22   A.   Yes.

23   Q.   -- to analyze, right?

24   A.   Yes.

25   Q.   And vacuum filters come from vacuum sweeping?  There are

1    forensic vacuums that the FBI has for this purpose?

2    A.   Yes, they're special filters.

3    Q.   Special vacuums and special filters and actually written

4    procedures about how one goes about vacuum-sweeping an area,

5    right?

6    A.   Those -- I'm not aware of those procedures.  I'm not an

7    ERT member, so I didn't collect any of these samples.

8    Q.   But you do get those trace filters back to the lab and

9    that's what you analyze?

10:07 10   A.   Yes.

11   Q.   There's no picture for it because it's, you know, trace

12   filter.  But Q669 is also a vacuum filter from the Honda CR-V

13   at 410 Norfolk.  Do you see that in your report?

14   A.   Yes.

15   Q.   Again, you identified that as having residues of chloride,

16   nitrate, and sulfate, right?

17   A.   Yes.

18   Q.   Again, consistent with pyrotechnic formulations,

19   low-explosive residue?

10:08 20   A.   Some, yes.

21   Q.   Finally, Q732 was a vacuum filter from a sweep of a Honda

22   Odyssey at 410 Norfolk, the same for that contained residues of

23   chloride, nitrate, and sulfite, right?

24   A.   That's sulfate.

25   Q.   Sorry, sulfate.

1    A.   Yes.

2    Q.   In addition to the items found -- Q667, just to go through

3    and make it clear for the record, I showed you Exhibit 3099,

4    which was Q667.  I showed you Exhibit 3100, which is Q668.  Is

5    that correct?

6    A.   Yes.

7    Q.   And then Exhibit 3101, this is a second picture -- not a

8    second picture -- a picture of a second glove, which was Q671,

9    is that correct?

10:09 10   A.   Yes.

11   Q.   Have you also analyzed a set of tools and other items that

12   were denoted Q725?  It was a box of tools and other things that

13   was admitted yesterday as Exhibit 1094.

14   A.   Yes.  Q725 I analyzed.

15   Q.   I'm sorry?

16   A.   Yes.  I analyzed Q725.

17   Q.   What that involves is a lot of different items that were

18   found in a drawer at 410 Norfolk?

19   A.   Yes.

10:10 20   Q.   There were two items on that that also included evidence

21   of low explosives?

22   A.   Yes.

23        MR. WATKINS:  Your Honor, I don't think this is in

24   evidence, so perhaps we can go just to the witness.

25   Q.   Showing you a picture of 725.11, is that one of the items

 1    that you analyzed?

 2    A.    Yes.

 3    Q.    That is a picture -- do you recognize that as a picture

 4    that you looked at because it was taken in the Quantico

 5    laboratory?

 6    A.    Yes.

 7              MR. WATKINS:  I'd seek to admit Exhibit 3102.

 8              MR. CHAKRAVARTY:  No objection, your Honor.  I think

 9    it may also have a government exhibit number.

10:11 10    (Defendant's Exhibit No. 3102 received into evidence.)

11              MR. WATKINS:  Is it?  There you have it.  May we

12    publish that?

13              THE COURT:  Yup.

14    Q.    And that -- it's a hobby fuse, right?

15    A.    That's one of the names -- common names for it, yes.

16    Q.    And there are traces of potassium perchlorate and carbon

17    on the hobby fuse?

18    A.    Not traces.  There's actual bulk explosive --

19    low-explosive material that is contained within the core of

10:12 20    that.  You can't see it on the outside, but it's contained with

21    the inside of it.

22    Q.    I want to direct your attention to Q725.24.  Now, there's

23    not a separate picture of that item, but that would be --

24              THE COURT:  Is this in evidence?  It's all part of the

25    interactive anyway, I think.  It was shown in that.  I don't

42

1   know that it was separately marked.  Any problem showing it to

2   the jury?

3           MR. CHAKRAVARTY:  No, your Honor.

4           THE COURT:  Okay.

5           MR. WATKINS:  May I have just a moment?

6   Q.   Anyway, this picture that's up before you with a red

7   circle around a lid, did you analyze that black lid?

8   A.   I analyzed the lid, yes.

9   Q.   I'm sorry.  Analyzed the lid with the black residue on it?

10:13 10   A.   Yes, sir, I did.

11  Q.   And that was notable for high explosives, nitroglycerin,

12  on it, right?

13  A.   Correct.  Nitroglycerin is a high explosive.

14  Q.   You told us about smokeless powder.  These items were

15  consistent with smokeless powder?

16  A.   Right.  The residues that I detected on that can lid

17  contained nitroglycerin and another chemical called ethyl

18  centralite.  Those two chemicals are commonly found in some

19  smokeless powder formulations.  It will be a double-based

10:14 20   smokeless powder.

21  Q.   Again, I'm told this picture was introduced as Exhibit

22  3066 yesterday.  This picture is in evidence.  And it is a

23  collection of items that you understand through your notes was

24  collected at 410 Norfolk, in a drawer, right?

25  A.   Correct.

1    Q.    You received vacuum filters for analysis sometime in July

2    or August of 2013?  I would be referring to Q1283 through 1293.

3    A.    Yes.

4    Q.    When did you receive those items?

5    A.    I don't recall the exact date that I received them, but

6    they came into the laboratory -- because when evidence comes

7    into the laboratory, it's assigned a unique identifying number.

8    It appears that those came in August 16, 2013.

9    Q.    And these were more vacuum filters, right, for analysis?

10:15  10    A.    Q1283 through Q1291 were vacuum filters.  Q1292 was a vent

11   filter.  And then I believe you said 1293 -- you said Q1293

12   were swabs.

13   Q.    In your report, you have those identified with particular

14   locations where they were from, that they had been collected

15   from?

16   A.    When the evidence is inventoried within the laboratory,

17   they just have a disclaimer stating where these items were

18   collected from.  I don't know where they're collected from

19   other than what somebody tells me.

10:16  20    Q.    Right.  What were you told that -- where they were

21   collected from?

22           MR. CHAKRAVARTY:  Objection, your Honor.

23           THE COURT:  Overruled.

24           MR. WATKINS:  Sorry?

25           THE COURT:  Overruled.  You may have it.

1    A.    The following items were recovered from UMass Dartmouth,

2    Pine Dale Hall, Room 7341, North Dartmouth, Massachusetts, by

3    FBI Boston.

4    Q.   So, again, these are vacuum filter traces consistent with

5    the kinds of evidence you would get if somebody had vacuumed up

6    an area and sent it to you for analysis?

7    A.    Yes.

8    Q.   And you analyzed all of those vacuum filters?

9    A.    Yes.

10:17 10   Q.   Did you find any of the traces that you talked about with

11   the jury as being indicative of pyrotechnics?

12   A.    No.   The screening technique showed that they were

13   negative for any typical explosive residue traces that we

14   screen for.

15           MR. WATKINS:   That's all I have, your Honor.

16           MR. CHAKRAVARTY:   Very briefly, your Honor.

17   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

18   Q.   Mr. McCollam, you testified that there may have been

19   pounds of low explosives that were used in this case?

10:18 20   A.    Correct.

21   Q.   And you testified that it's an extremely messy process to

22   create those low explosives?

23   A.    Yes.

24   Q.   And as far as you know, with regards to the trace amounts

25   of low explosives that Mr. Watkins asked you about, you found

1    them on some gloves, and you found some in some vacuum filters

2    from 410 Norfolk Street?

3    A.   Yes.

4    Q.   And that's the only trace amounts that you found in this

5    case; is that fair to say?

6    A.   Yes.

7    Q.   And unlike trace amounts of explosive product, there was

8    actually intact fireworks found in the dorm room in Pine Dale

9    Hall, isn't that right?

10:18 10   A.   If it was submitted to the laboratory coming from there, I

11   analyzed it, so, yes, there were.

12   Q.   And in the landfill, there was a bag containing intact

13   amounts of low-explosive, pyrotechnic mixture?

14   A.   Yes.

15   Q.   Did you ever find a location, a single location, where

16   there was a production facility for these IEDs?

17             MR. WATKINS:  Objection, your Honor.

18             THE COURT:  Sustained.

19             MR. CHAKRAVARTY:  That's all I have, your Honor.

10:19 20             THE COURT:  Anything else?

21             All right, sir.  Thank you.  You may step down.

22   .  .  .  END OF EXCERPT.)

23

24

25

1                        C E R T I F I C A T E

2

3

4            I certify that the foregoing is a correct transcript

5      of the record of proceedings in the above-entitled matter to

6      the best of my skill and ability.

7

8

9

10

11

12      /s/Cheryl Dahlstrom            April 28, 2015

13      Cheryl Dahlstrom, RMR, CRR         Dated

14      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25