1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5             Plaintiff,                )
                                        )   Criminal Action
6    v.                                 )   No. 13-10200-GAO
                                        )
7    DZHOKHAR A. TSARNAEV, also         )
     known as Jahar Tsarni,             )
8                                       )
              Defendant.                )
9                                       )

10

11          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE
12

13
            **EXCERPT OF JURY TRIAL - DAY FORTY-TWO**
14
                  **Testimony of Elena Graff**
15

16
            John J. Moakley United States Courthouse
17                      Courtroom No. 9
                      One Courthouse Way
18             Boston, Massachusetts  02210
                   Tuesday, March 31, 2015
19

20
              Cheryl Dahlstrom, RMR, CRR
21                Official Court Reporter
            John J. Moakley U.S. Courthouse
22           One Courthouse Way, Room 3510
             Boston, Massachusetts  02210
23                   (617) 737-8728

24       Mechanical Steno - Computer-Aided Transcript

25

```
1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3             Nadine Pellegrini, Assistant U.S. Attorneys
              John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6             By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
              By:  Miriam Conrad, William W. Fick and Timothy G.
10             Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13            By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15            - and -
          LAW OFFICE OF DAVID I. BRUCK
16            By:  David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          Direct   Cross   Redirect   Recross

3   WITNESSES FOR THE
      DEFENSE:

4

5   ELENA GRAFF

      By Mr. Watkins                  4                  34

6

7     By Mr. Weinreb                        28                 36

8

9                          E X H I B I T S

10

11                   DESCRIPTION                      RECEIVED
    DEFENDANT'S
12    EXHIBIT

13  3153        Photo of wires, instruction manual      10
                and soldering gun
14
    3154        Photo of group of tools                 12
15
    3156        Photo of packaging, Government's         14
16              Exhibit No. 1195

17

18

19

20

21

22

23

24

25

1    (EXCERPT AS FOLLOWS:

2         MR. WATKINS:  The defense calls Elena Graff.

3         THE CLERK:  Ma'am, would you step up here, please, up

4    to the box.  Remain standing.  Raise your right hand.

5         ELENA GRAFF, Sworn

6         THE CLERK:  Have a seat.  State your name.  Spell your

7    last name for the record.  Keep your voice up and speak into

8    the mic so everyone can hear you.

9         THE WITNESS:  My name is Elena Graff.  My last name is

11:32 10   spelled G-r-a-f-f.

11   DIRECT EXAMINATION BY MR. WATKINS:

12   Q.   Miss Graff, how are you employed?

13   A.   I work at the -- for the Federal Bureau of Investigation,

14   at their laboratory in Quantico.

15   Q.   What do you do for the Federal Bureau of Investigation at

16   Quantico?

17   A.   I'm a fingerprint latent examiner.

18   Q.   How long have you been a fingerprint -- latent fingerprint

19   examiner?

11:32 20   A.   Eight years.

21   Q.   Can you tell us briefly about your education?

22   A.   Yes.  I have a Bachelor of Arts in history from Utah State

23   University and a Master's in forensic science from Nebraska

24   Wesleyan University.

25   Q.   When and how did you learn the technique of identifying

1    fingerprints?

2    A.    I joined the Bureau in 2007, and after that I completed a

3    18-month training program in which I learned how to process

4    evidence and analyze and compare latent prints.

5    Q.    Have you testified at trial before about latent

6    fingerprint examination?

7    A.    I have.

8    Q.    How many times have you testified?

9    A.    I've testified four times.

11:33 10    Q.    Of any of those four times, were you ever called by the

11    defense to testify?

12    A.    I was not.

13    Q.    Miss Graff, have you and I met before today?

14    A.    No.

15    Q.    You were -- did a lot of work on this case, reviewed

16    thousands of items?

17    A.    That is correct.

18    Q.    You understood that you might be called to testify in this

19    case?

11:33 20    A.    Yes.  This is one of my duties.

21    Q.    In fact, a case agent has kept you updated about whether

22    or not you would be called to testify?

23    A.    That is correct.

24    Q.    And there was a point at which you understood you would

25    not have to testify?

1    A.   That is also correct.

2    Q.   And that changed yesterday?

3    A.   Yes.

4    Q.   And that's when you understood that you were going to be

5    coming up here to testify for the defense?

6    A.   Yes.

7    Q.   The examinations you did of evidence for the Dzhokhar

8    Tsarnaev case, that took place over the period of several

9    months?

11:34 10   A.   Yes.  In a case such as this, with this much evidence and

11   it needs to be turned around in a very quick manner, we

12   actually have a specialized team trained to work this kind of

13   investigation.  I was what's known as the examiner of record,

14   meaning I was in charge of that team.

15   Q.   And as -- and items kept coming in to be analyzed during

16   the course of the following year really?

17   A.   That is correct.

18   Q.   In your general career as a latent print examiner, how

19   many items have you examined trying to make comparisons of

11:34 20   fingerprints?

21   A.   Thousands.

22   Q.   In this case, how many items did you examine trying to

23   make fingerprint comparisons?

24   A.   I believe it was over 800.

25   Q.   While you were doing examinations of evidence in this case

1    for latent prints, you were also supplied known prints?

2    A.   That is correct.

3    Q.   And that is the standard procedure at the FBI --

4    A.   Yes.

5    Q.   -- right?

6         One can put prints into an automated fingerprint

7    identification system, but that's not what you were doing here,

8    right?

9    A.   No.   The prints -- the fingerprint cards were collected

11:35 10   and then brought to the lab.

11   Q.   In some examinations, you might have eight or nine

12   subjects that you are comparing to?

13   A.   That is correct.

14   Q.   Sometimes over a dozen that you are comparing to --

15   A.   Yes.

16   Q.   -- known subjects?

17        Constant amongst all those were the prints -- the

18   known prints of Dzhokhar Tsarnaev and Tamerlan Tsarnaev.   You

19   were always comparing to those two, right?

11:36 20   A.   That is correct.

21   Q.   And you generated reports over time about what your

22   findings were?

23   A.   Yes.

24   Q.   And multiple reports, over 20 reports?

25   A.   That is correct.

1    Q.   I'm going to take you to some specific pieces of evidence

2    that we've seen at trial and ask you if you analyzed them and

3    what the results are.  I'm putting on the screen first actually

4    two exhibits that have been admitted.

5            THE COURT:  That can be shown to everybody then?

6            MR. WATKINS:  I do believe.

7    Q.   On the left is Exhibit 853, and on the right is Exhibit

8    1122, both of which depict a Tupperware container with a hobby

9    fuse out of it.  Do you see that?

11:37 10  A.   I do.

11   Q.   The picture on the right, do you recognize where that had

12   been -- has been taken?

13   A.   Yes.  That was a picture taken at the laboratory.

14   Q.   Did you do analysis of that Tupperware container for

15   latent prints?

16   A.   Yes.  It was processed and latent prints were collected.

17   Q.   And when you compared those to Dzhokhar Tsarnaev and

18   Tamerlan Tsarnaev, first to Dzhokhar, you found his

19   fingerprints on there, is that correct?

11:37 20  A.   Yes, that's correct.

21   Q.   How many fingerprints of Dzhokhar Tsarnaev did you find?

22   A.   Two.

23   Q.   How many fingerprints of Tamerlan Tsarnaev did you find on

24   the Tupperware container that's depicted in 1122?

25   A.   Six.

1    Q.   Turning next to two exhibits that have been admitted, on

2    the left is 0948-532; on the right is Exhibit 0949.  Do you

3    recognize the photograph on the right?

4    A.   I do.

5    Q.   Where is that from?

6    A.   It's from the laboratory.

7    Q.   And can you tell from that picture whether that's before

8    or after latent print examination has been done?

9    A.   It is before latent prints.

11:38 10    Q.   So this would have been sent to you after this picture was

11    taken?

12    A.   That is correct.

13    Q.   Did you examine this item that's depicted in Exhibit 0949?

14    A.   This is the transmitter?

15    Q.   Yes.

16    A.   Yes, I did.

17    Q.   And what were the results of your analysis of 0949, the

18    transmitter, when you compared it to Dzhokhar Tsarnaev?

19    A.   The latent prints that we collected from this item were

11:38 20    not identified to Dzhokhar.

21    Q.   What did you find when you compared them to Tamerlan

22    Tsarnaev?

23    A.   They were identified to Tamerlan.

24    Q.   Putting before you Exhibit 974, which has been admitted

25    into evidence, and if I can get the Q number, can you see the Q

1    number on that item?

2    A.    I can.

3    Q.    This has been identified as a pressure cooker lid

4    recovered from Laurel Street in Watertown.  Were you able to do

5    latent -- were you able to find latent prints with sufficient

6    detail to be compared?

7    A.    I did, although I'd have to reference my report to

8    remember exactly how many.

9    Q.    If you wouldn't mind, that would be -- this is Q588.

11:40 10    A.    We collected one fingerprint.

11    Q.    Were you able to compare that to known fingerprint

12    exemplars?

13    A.    I did.

14    Q.    Whose fingerprint was that on that pressure cooker pot

15    lid?

16    A.    It belonged to Tamerlan Tsarnaev.

17    Q.    Keep that report in front of you because we're still going

18    here.  I'm showing you what has been admitted into evidence as

19    Exhibit 0975, a City of Cambridge Rindge and Latin diploma of

11:40 20    Tamerlan Tsarnaev.  Do you recognize that item?

21    A.    I do.

22    Q.    And did you -- were you able to find latent prints with

23    sufficient ridge detail to compare?

24    A.    Do you know the Q number?

25    Q.    589. -- well, 589.

1    A.   We did.  We developed five total latent impressions.

2    Q.   And those five latents, who did those come back to?

3    A.   We identified one of them with Tamerlan Tsarnaev.

4    Q.   And you also compared them to Dzhokhar Tsarnaev --

5    A.   Yes, we did.

6    Q.   -- correct?

7         Did any of those five come back to Dzhokhar Tsarnaev?

8    A.   They did not.

9    Q.   Showing you what's been admitted into evidence as Exhibit

11:41 10   0948-542, do you recognize this as an item that later you

11   examined at the laboratory?

12   A.   I do.

13   Q.   Were you able to find latent prints with sufficient ridge

14   detail to compare?

15   A.   Can you give me the Q number?

16   Q.   Yes.  It is 589.

17   A.   Yes, we did.

18   Q.   Were you able to compare those to known samples?

19   A.   We did.

11:41 20   Q.   And whose fingerprints were on this item?

21   A.   Tamerlan.

22   Q.   Now, just so the jury remembers, you and I have been

23   talking about Q numbers.  Again, that's the number that's

24   assigned when the item comes into the FBI laboratory, right?

25   A.   That is correct.

1    Q.    Used to be.  You've told me this morning that they've

2    actually now changed the system.

3    A.    Yes.  We've since moved to a digital paperwork system in

4    which evidence that comes in is received -- is given an item

5    number.  So instead of Q589, it would be Item 589.

6    Q.    When you talk about Q items, that's the way you identify

7    items?

8    A.    Right.  When these items came in, we were still on the

9    paper-based paperwork method.

11:42 10    Q.    I want to move over to an item that was recovered from a

11    car outside of 410 Norfolk.  I'm putting up what's been entered

12    into evidence as Exhibit 1431.  Again, this appears to be a

13    photograph from the FBI laboratory?

14    A.    That is correct.

15    Q.    And this receipt on the right here says RC Cars of Boston?

16    A.    Yes.

17    Q.    Were you able to develop latent prints with sufficient

18    ridge detail to be compared?

19    A.    Yes.  We developed three latent fingerprints.

11:43 20    Q.    When you compared those to the known samples that you had,

21    whose fingerprints were on this receipt?

22    A.    We ID'd them to Tamerlan Tsarnaev.

23    Q.    Moving now to what's been admitted into evidence as

24    Exhibit 1076, this is a photograph from the laboratory?

25    A.    It is.

13

1    Q.   And do you recognize that as an item that you lifted

2    latent prints from?

3    A.   Yes, although we don't lift the latent prints.   We

4    photograph them in place, but, yes, we collected a print from

5    this item.

6    Q.   When you collected a print from this item to compare to

7    known samples, were you able to determine a match?

8    A.   Yes.   It was identified to Tamerlan Tsarnaev.

9    Q.   In front of you is a Russian language -- appears to be in

11:44 10   Cyrillic writing here.   It's a two-page letter.   Did you

11   examine this item to determine whether there were latent prints

12   of sufficient quality to be compared?

13   A.   I'm sorry.   I can't make out the Q number on this one.

14   Can you tell me what it is?

15   Q.   See if I can get it this way.   The Q number is --

16   A.   Yes, we did.

17   Q.   What were you able to determine about the latent prints

18   that were on this item?

19   A.   We developed ten latent fingerprints and three latent palm

11:45 20   impressions.

21   Q.   Were you able to compare them to a known sample?

22   A.   Yes, and identified ten of them to Tamerlan Tsarnaev.

23   Q.   Showing you what's been admitted as Exhibit 3152, I'll

24   blow up the Q number there and tell you that that says 691 even

25   if you can't read it.   Did you examine this caulk gun for

1    latent prints?

2    A.   We did.

3    Q.   And were you able to develop latent prints of sufficient

4    quality to be compared?

5    A.   We developed one latent fingerprint on this item.

6    Q.   When you compared that to the known samples, who did it

7    match to?

8    A.   We identified it to Tamerlan Tsarnaev.

9    Q.   Showing you what's been admitted into evidence as Exhibit

11:46 10   1082, which is two rolls of tape, as part of Exhibit 1082, were

11   you able to examine these items for the presence of latent

12   prints?

13   A.   Yes.  We developed one latent fingerprint on these items.

14   Q.   Who did that compare to in the known samples?

15   A.   We identified it to Tamerlan Tsarnaev.

16   Q.   Again, you also compared it to the known fingerprints of

17   Dzhokhar Tsarnaev, right?

18   A.   Yes, I did.

19   Q.   And were there any prints on either of these items?

11:46 20   A.   No.  The only print we developed we identified to

21   Tamerlan.

22   Q.   Showing you what's been --

23          MR. WATKINS:  May I have just a moment?

24   Q.   Showing you a picture of what --

25          MR. WATKINS:  This should just go to the witness, your

1    Honor.  I'm sorry.

2    Q.   Miss Graff, I'm showing you a picture on the screen.  Do

3    you recognize that?

4    A.   Yes, I do.

5    Q.   Can you see the Q number?

6    A.   No.  Yes.

7    Q.   How is this item described in your report?

8    A.   When we originally received it, it's a case full of

9    contents.  We then take out each portion of that and give it

11:48 10   its own sub-numbers.  For example, Q69699 is the case, so then

11   699.1 is one part of the case.  Let me see if I can find it.

12   So Q699.1 is the instruction manual that was in the case.  And

13   Q699.2 was the soldering gun.

14   Q.   So this is a picture of a soldering gun, and that, indeed,

15   is what you analyzed for latent prints?

16   A.   Yes.

17   Q.   We've heard testimony of Exhibit 1198, the actual

18   soldering gun here.  This is a soldering gun that was received

19   at the Quantico lab, correct?

11:48 20   A.   Yes.

21            MR. WATKINS:  Your Honor, I'd move for admission of

22   3153.

23            THE COURT:  Which is the photograph?

24            MR. WEINREB:  No objection.

25            THE COURT:  Okay.

1          MR. WATKINS:  May that go to the jury?

2     (Exhibit No. 3153 received into evidence.)

3     Q.   So you've anticipated my questions.  This was actually

4     three separate items that you analyzed for fingerprints?

5     A.   Yes.

6     Q.   What were those three items contained here?

7     A.   The case with the random wires and then the instruction

8     manual and the soldering gun itself.

9     Q.   In your -- were you able to develop latent fingerprints

11:49 10     off of any of those three items?

11     A.   Yes.  We developed two latent fingerprints on the case

12     itself.  We developed ten latent fingerprints on the

13     instruction manual and two latent fingerprints on the soldering

14     gun.

15     Q.   Did you compare those latent prints to the known samples

16     of Dzhokhar Tsarnaev?

17     A.   Yes, we did.

18     Q.   And were any of those latent prints his?

19     A.   They were not.

11:50 20     Q.   Were any of the latent prints Tamerlan Tsarnaev's?

21     A.   We -- yes.  We identified looks like five latent

22     fingerprints across those three items to Tamerlan.

23     Q.   In your report, there's a notation derived from the

24     evidence about where that item was found.  What does your

25     report indicate about where this item was recovered from?

1    A.    It says, "Items from residence 410 Norfolk Street,

2    Apartment 3, Cambridge, Massachusetts."

3    Q.    Also from 410 Norfolk Street, I'm showing you on the left

4    Exhibit 3066 and on the right Exhibit 1099.  Do you recognize

5    both of those as pictures of items when they come into the

6    Quantico laboratory?

7    A.    I do.

8    Q.    I'm going to first to blow up the Q number here.  Oh, that

9    worked.  Do you recognize this as 725, a group of tools that

11:51 10    came into the Quantico laboratory?

11    A.    I do.

12    Q.    There are a number of items within this drawer -- I'm

13    sorry, within this collection of items?

14    A.    Yes, that is correct.

15    Q.    Now, in such a case, would the laboratory assign sub-items

16    to them?

17    A.    Yes, we would.

18    Q.    So, for example, 1099 on the right, what is the sub-item

19    it's been given there?

11:52 20    A.    It has been given Q725.4.

21    Q.    And we see a similar roll within 3066, correct?

22    A.    Correct.

23    Q.    Now, with this item that's depicted in 1099, did you

24    conduct latent print examination of that roll of plumber's

25    tape?

18

1   A.   We did, and we developed one latent fingerprint.

2   Q.   I'm sorry?

3   A.   One latent fingerprint was developed on that roll of tape.

4   Q.   Who did that latent print compare to?

5   A.   It was identified to Tamerlan Tsarnaev.

6   Q.   Much the same manner, there was also a roll of tape

7   included in that drawer.  You see it here, and you can see the

8   discoloration there and here in this picture.  That was also

9   assigned a sub-number?

11:53 10   A.   Yes, although I can't read it right now.

11   Q.   Q725.5 may be how it's denoted in your report?

12   A.   Yes.

13   Q.   Were you able to get fingerprints off that roll of duct

14   tape?

15   A.   Yes.  We developed 12 latent fingerprints off that roll.

16   Q.   And were any of those latent fingerprints Dzhokhar

17   Tsarnaev's?

18   A.   No.

19   Q.   And how many of them were Tamerlan Tsarnaev's?

11:53 20   A.   They were all identified to Tamerlan Tsarnaev.

21   Q.   I'm showing you what's been -- hold on.

22        This has been admitted.  I'm showing you what's been

23   previously admitted as 3066.

24        MR. WATKINS:  Just one moment, your Honor.

25        I do believe this has been admitted, but I'm going to

1     have to defer, 3154.

2          THE CLERK:  I don't know.  I have 3153, the photo of

3     the soldering gun.  Then you talked about 3066.

4          MR. WATKINS:  Perhaps just for the witness then at

5     this point to be on the safe side.

6     Q.   I'm showing you Defendant's Exhibit 3154.  Do you

7     recognize this from its Q number?

8     A.   I do.

9     Q.   What is depicted in that picture?

11:55 10    A.   It's a group of --

11          MR. WEINREB:  Objection, your Honor.  This is a

12    fingerprint examiner, not someone with personal knowledge of

13    what was seized where.  To allow her to testify as to that

14    would be pure hearsay.

15          THE COURT:  I'm not sure that's what the question was

16    calling for.  I think it was just a description of the items

17    that appear.  If she examined them, then I think that would be

18    all right.

19          MR. WEINREB:  Well, without any testimony as to where

11:55 20    they came from, anywhere in the world.

21          THE COURT:  Without any, yes.

22    Q.   Generally, what is this?  Can you describe what's in this

23    picture?

24    A.   It's a group of tools.

25    Q.   Would it be the FBI's policy back in the time to separate

1    these into sub-numbers?

2    A.    Yes, it would.

3    Q.    In this case, did that seem to have been done?

4    A.    No, that was not done in this case.

5    Q.    But from this set of tools, was there a particular item

6    that you examined for latent prints?

7    A.    We examined them all for latent prints.  We developed two

8    latent fingerprints on what I believe is the pliers.

9            MR. WATKINS:  Your Honor, I move to admit Exhibit

11:56 10    3154.

11            MR. WEINREB:  Your Honor, I object on relevance

12    grounds because it hasn't been established it has any

13    connection -- relevance in relation to this case.

14            THE COURT:  Overruled.  I'll admit it.

15    (Exhibit No. 3154 received into evidence.)

16    Q.    It will be coming up in a moment.

17            Are you able to here identify which of these tools it

18    was that you took a latent -- you were able to develop a latent

19    print from?

11:57 20    A.    No.  I'd have to reference my photos.

21    Q.    I'm sorry?

22    A.    Not without referencing my photos, I don't recall.

23    Q.    Your own photographs?

24    A.    Correct.

25    Q.    But one of these tools you developed a latent print off

1    of?

2    A.    Yes.

3    Q.    And that latent print that you developed, who did it

4    compare to?

5    A.    The two latent fingerprints that were developed were

6    identified with Tamerlan Tsarnaev.

7              MR. WATKINS:   This is just for the witness, your

8    Honor.

9    Q.    Do you recognize what's depicted in this photograph?

11:58 10   A.    I do.

11   Q.    What is it?

12   A.    It is a group of books.

13   Q.    And is there a Q number associated with that?

14   A.    Yes.   The Q number is Q708.

15   Q.    We have heard testimony of notebooks being introduced

16   physically as Exhibit 3065.   Does this picture comport with the

17   notebooks that came into the Quantico laboratory?

18   A.    It does.

19   Q.    Now, did you go through all of these notebooks?

11:58 20   A.    Yes.   Each cover and page was individually sub-numbered

21   out.   However, by the time we were processing, I believe our

22   instructions at that time were the covers and first five and

23   last five pages of each book.

24   Q.    Nevertheless, there was a lot of fingerprint examination

25   first for latent prints that might be present there and then

1    for comparison?

2    A.    That is correct.

3    Q.    Just as a general matter, how many fingerprints were you

4    able to develop off of those notebooks?

5    A.    I don't have an exact number, but it was a lot.  Dozens.

6    Q.    Dozens.  And of those fingerprints, were any of them able

7    to be compared to Dzhokhar Tsarnaev?

8    A.    They were all compared to Dzhokhar.

9    Q.    Were there any positive matches for Dzhokhar Tsarnaev?

11:59 10    A.    There were not.

11    Q.    Were there positive matches to Tamerlan Tsarnaev?

12    A.    Yes.

13    Q.    And how many of those were there in this general

14    collection of notebooks?

15    A.    Most of them were identified to Tamerlan.

16    Q.    When you say "most of them," it would be dozens?

17    A.    Yes.

18    Q.    Are you able to say, was there at least one fingerprint of

19    Tamerlan Tsarnaev in each of these items?

12:00 20    A.    Yes, that is correct.

21    Q.    Showing you now what's been admitted -- it has been

22    admitted.

23            THE COURT:  Well, I don't know whether it's been

24    admitted or not but not under the number that you have it

25    indexed as.  I know some of these look familiar.  But I don't

1    believe we're in this range of 31-- this is 3156 by your

2    numbering.

3           MR. WATKINS:  This is 3156.  I believe the actual

4    exhibit is 1195, the physical item, and this is a picture of

5    that.

6           THE COURT:  Okay.  That doesn't appear from this.  The

7    correlation doesn't appear.  That's what I'm getting at.

8           Is 1195 in evidence, Paul?

9           MR. WATKINS:  I believe the physical exhibit is --

12:01 10        THE COURT:  I understand.  The connection wasn't being

11   made.

12          MR. WATKINS:  I'm sorry?

13          THE COURT:  The connection wasn't being made, the

14   correlation to a physical exhibit.  That's the point.

15   Q.   Showing you what's marked for -- as Defendant's 3156, do

16   you recognize this?

17   A.   I do.  Can you bring up the Q number, please?  Yes.

18   Q.   Do you see that?

19   A.   I do.

12:01 20   Q.   And this is previously -- the physical item has previously

21   been admitted as 1195.  Now, were you able to develop latent

22   prints off of this item?

23   A.   We did.  We developed three latent fingerprints.

24   Q.   Who were those able to be compared to?

25   A.   We compared them to all the named suspects in this case.

1    They were identified with Tamerlan Tsarnaev.

2    Q.    In this particular item, there were latent fingerprints

3    obtained both from the outside of this package and also on the

4    inside, an item on the inside of the packaging?

5    A.    That is correct.  Two of the latent fingerprints were from

6    the outside box, and one of them was developed on a plastic bag

7    inside.

8    Q.    Again, all of those were matched to Tamerlan Tsarnaev?

9    A.    That is correct.

12:03 10         MR. WATKINS:  If I have not already, may I move into

11   admission 3156?

12               THE COURT:  Okay.

13               MR. WEINREB:  No objection.

14   (Exhibit No. 3156 received into evidence.)

15   Q.    Again, I'm not going to make you repeat your testimony.

16   There were prints found both on the outside packaging that we

17   see here and on an item inside of this packaging?

18   A.    That is correct.

19   Q.    All of those went to Tamerlan Tsarnaev?

12:04 20   A.    That is correct.

21               MR. WATKINS:  One final item just for the witness.

22   Q.    Showing you a picture of -- a laboratory picture of Q --

23   well, it's Q716, *The Sovereign* newspaper.

24   A.    Yes.

25   Q.    Did you develop latent prints off of that item?

1    A.    I did.

2    Q.    How many latent prints were you able to develop?

3    A.    One moment.  Looks like nine latent prints were developed.

4    Q.    I'm sorry.  How many?

5    A.    Nine.

6    Q.    Were any -- nine were developed.  And who did they match

7    to?

8    A.    Tamerlan Tsarnaev.

9    Q.    Did any of the fingerprints that you were able to develop

12:05 10  there match to Dzhokhar Tsarnaev?

11   A.    No.

12        MR. WATKINS:  This next one has been admitted,

13   Defendant's Exhibit 3151.

14   Q.    Do you see that before you on the screen?

15   A.    I do.

16   Q.    This is an item that does not have a Q number, now has an

17   item number, right?

18   A.    That is correct.  This item came under our new digital

19   system.

12:05 20  Q.    But do you recognize that now as Item 3 in a particular

21   report?

22   A.    I do.

23   Q.    Were you able to develop latent fingerprints off of this

24   particular item?

25   A.    Yes.  We developed three latent fingerprints and one

1    latent palm print.

2    Q.   Were they all -- well, who did they match up to?

3    A.   They were all identified with Tamerlan Tsarnaev.

4         MR. WATKINS:   Almost done.   This next item has been

5    admitted.

6    Q.   Before we get to this particular item, I'm now going to

7    the Boylston Street location, which is the scene of two blasts,

8    Scene A and Scene B.   You're familiar with those denominations?

9    A.   I am.

12:07 10    Q.   How many items altogether did you examine from the

11    Boylston Street area looking for latent prints?

12    A.   Over 500.

13    Q.   How many were you -- how many latent prints were you able

14    to develop sufficient ridge detail for comparison?

15    A.   We developed three latent fingerprints and three latent

16    palm prints.

17    Q.   First I'm talking about all together in all the scenes

18    there on Boylston Street.   Are you able to estimate how many

19    latent prints you were able to develop?

12:08 20    A.   Just from the Boylston Street scenes, correct?

21    Q.   Yes.

22    A.   Yes.   There were six.

23    Q.   Of the -- let me back up.   You analyzed a total of about

24    170 items that were submitted actually for fingerprint

25    examination from Scene A, correct, or was it more than that?

1    A.   You just want to know the ones from Scene A?

2    Q.   Yes, how many altogether from Scene A?

3    A.   I believe it's four.

4    Q.   Well, directing you now to Item 1 -- Defendant's Exhibit

5    3093, which is Q199, we've been told cardboard collected from

6    the vicinity of the Scene A blast.

7    A.   Yes, that is correct.

8    Q.   This cardboard is in pieces when it came into the lab?

9    A.   Yes.

12:09 10    Q.   Because it was in pieces, was it assigned sub-numbers?

11    A.   Yes.  Each individual piece was assigned its own number.

12    Q.   Were you able to develop prints on some of these

13    sub-items?

14    A.   Yes.  We developed one latent fingerprint on Q199.26 and

15    one latent palm print on Q199.27.

16    Q.   And those would be two of these pieces that we see

17    depicted here in this picture?

18    A.   That is correct.

19    Q.   When you compared those latent prints to the known samples

12:09 20    you have, who did they come back to?

21    A.   They were identified with Tamerlan Tsarnaev.

22    Q.   Were any of the prints that you were able to develop at

23    Scene A come back to Dzhokhar Tsarnaev?

24    A.   No, they did not.

25    Q.   Showing you two pictures here, both of which have been

28

```
1    admitted -- one is 3090; the other one is 3091 -- do you
2    recognize these?
3    A.   I do.
4    Q.   These are denoted as the remains of a backpack and a piece
5    of paper within it?
6    A.   That is correct.
7    Q.   And the piece of paper within it is denoted by the
8    sub-number Q11.1?
9    A.   That is correct.
```
12:10 10  Q.   Were you able to develop a latent print from Q11.1, the
```
11   piece of paper that was in the destroyed backpack?
12   A.   We developed two latent palm prints.
13   Q.   And when you compared them against the known samples, who
14   did they compare to?
15   A.   They were identified with Tamerlan Tsarnaev.
16   Q.   At Scene B, the site of the Forum blast, were you able to
17   develop any prints and match them to Dzhokhar Tsarnaev?
18   A.   No, I did not.
19        MR. WATKINS:  That's all I have, your Honor.
```
12:11 20  CROSS-EXAMINATION BY MR. WEINREB:
```
21   Q.   Good afternoon.
22   A.   Good afternoon.
23   Q.   So let's start with Scene A and Scene B, Boylston Street.
24   How many items did you say on Boylston Street were tested for
25   fingerprints?
```

1    A.    Over 500.

2    Q.    Specifically, they were all tested for Dzhokhar Tsarnaev's

3    fingerprints and Tamerlan Tsarnaev's fingerprints?

4    A.    That is correct.

5    Q.    And those items included many, many pieces of the bomb

6    that exploded at Scene A, correct?

7    A.    That is correct.

8    Q.    And many pieces of the components that was in that bomb?

9    A.    That is correct.

12:12 10    Q.    It included pieces of the backpack that the bomb was

11    carried in?

12    A.    That is correct.

13    Q.    Yet, you found usable prints from Tamerlan Tsarnaev or the

14    defendant on only a single item, a piece of cardboard that was

15    in many pieces?

16    A.    Two pieces of cardboard.

17    Q.    Two pieces of cardboard that were all stuck together and

18    you separated them?

19    A.    By the time they got to my unit, they were pretty much

12:12 20    already in separate pieces.

21    Q.    And hundreds of items from Scene B were also examined for

22    fingerprints, correct?

23    A.    That is correct.

24    Q.    And those were also tested for Tamerlan Tsarnaev's and

25    Dzhokhar Tsarnaev's fingerprints?

1    A.    Yes.

2    Q.    And those, again, included many, many pieces of the bomb

3    that exploded in front of the Forum restaurant?

4    A.    Yes.

5    Q.    And components that was inside -- were inside that bomb?

6    A.    That is correct.

7    Q.    And the backpack that the bomb was carried in?

8    A.    That is correct.

9    Q.    And, yet, once again, you only found a single fingerprint

12:13 10    from Tamerlan Tsarnaev or Dzhokhar Tsarnaev on only a single

11    item, which was a piece of paper inside the shreds of the

12    backpack?

13    A.    There were two palm prints, but, yes.

14    Q.    But it was just on that single item?

15    A.    That is correct.

16    Q.    Now, the bombs didn't build themselves, did they?

17    A.    I would assume not.

18    Q.    The backpacks didn't carry themselves onto the scene?

19          MR. WATKINS:  I object, your Honor.

12:13 20          THE COURT:  Sustained.  It's argumentative.

21    Q.    So what could explain the absence of Tamerlan Tsarnaev's

22    and Dzhokhar Tsarnaev's fingerprints on more of these items?

23          MR. WATKINS:  I'm going to object, your Honor.

24          THE COURT:  Overruled.  You may answer that.

25    A.    Because latent prints are usually left in sweat or the oil

1    that covers your fingerprints, they're very fragile especially

2    if they're on a nonporous item such as a metal or plastic.  So,

3    for example, if I touch this coffee pot right here, the

4    impression left behind by my latent prints rests on the top of

5    the surface.  Therefore, they can be easily wiped off or

6    smudged or, because they're made of sweat, they can evaporate.

7    Due to the extreme temperatures and force in an explosion, it

8    is not unusual to not find fingerprints on items.

9    Q.   So the bottom line is that the presence of a person's

12:14 10    fingerprints on an item tell you that at some time that person

11    touched the item?

12    A.   That is correct.

13    Q.   But the absence of a person's fingerprints on an item

14    doesn't tell you that that person never touched the item?

15    A.   That is also correct.

16    Q.   For example, the person might have touched it but might

17    have been wearing gloves?

18    A.   Yes.

19    Q.   And, in fact, as you said, the person might have touched

12:14 20    it but -- and left a fingerprint but the fingerprint vaporized?

21    A.   Yes.

22    Q.   Or got rubbed off by somebody else's fingerprints?

23    A.   Yes.

24    Q.   Or if the person touched it but didn't have sweaty fingers

25    at the time, they just might not have left a fingerprint?

1   A.   That is correct.  If there's not enough matrix on the

2   ridges, it won't always transfer.

3   Q.   In fact, it's even true that some people, just by nature

4   of their own biology, are more prone to leaving fingerprints on

5   things than other people?

6   A.   Yes, if your fingers are more sweaty, yes.

7   Q.   You were asked about many items, all of which, except for

8   a bunch of tools, were identified as coming from 410 Norfolk

9   Street, correct?

12:15 10   A.   Yes.

11   Q.   Nearly 150 items from 410 Norfolk Street were tested for

12   fingerprints, correct?

13   A.   Yes.

14   Q.   And you found numerous fingerprints of Tamerlan Tsarnaev

15   from his apartment on 410 Norfolk Street?

16   A.   That is correct.

17   Q.   Would you expect to find a person's fingerprints all over

18   the residence where he lives full time with his wife and

19   daughter?

12:16 20   A.   Yes, I would expect that.

21   Q.   In fact, if a person just, let's say, picked up a glass

22   jar and moved it from one shelf to another shelf, you might

23   leave fingerprints on it?

24   A.   Yes, that is true.

25   Q.   If you picked up a magazine or some notebooks to put them

1   aside so that the floor could be cleaned, he might leave

2   fingerprints on them, correct?

3   A.   Yes.

4   Q.   But if a person who once lived full time in an apartment

5   became an adult, moved out, and only went back there on

6   vacations or in the summer, would you necessarily expect to

7   find their fingerprints all over the apartment?

8           MR. WATKINS:  Objection.

9           THE COURT:  Sustained.

12:16 10   Q.   If a person did not live full time in a residence, would

11   you necessarily expect to find their fingerprints on things?

12   A.   No, I would not.

13   Q.   Now, among the items in 410 Norfolk Street that you found

14   Tamerlan Tsarnaev's fingerprints on were a nail clipper,

15   Q680.2?

16   A.   I believe so, yes.

17   Q.   And a bag of curtain rod brackets, for example?

18   A.   Yes.

19   Q.   A letter?  That would be Q685.1.

12:17 20   A.   Probably.  Yes, that is correct.

21   Q.   A fan, Q97.3?

22   A.   97.3?

23   Q.   Yes.

24   A.   I don't have that.

25   Q.   Let's try a brush, Q712.3.

1    A.   Q712.3?

2    Q.   Yes.

3    A.   I didn't develop latent fingerprints on that either.

4    Q.   So -- but as a practical matter, you only found Tamerlan's

5    fingerprints all over the objects in his own apartment?

6    A.   For the most part, yes.

7    Q.   But --

8         MR. WEINREB:  Can we have Exhibit 852, please?  This

9    is in evidence, your Honor.

12:18 10   Q.   But when it came to the bomb that was found in the back of

11   the Mercedes abandoned on Laurel Street in Watertown, on that

12   one you found both Dzhokhar Tsarnaev's and Tamerlan Tsarnaev's

13   fingerprints?

14   A.   That is correct.

15        MR. WEINREB:  I have no further questions.

16        MR. WATKINS:  Just one.

17   REDIRECT EXAMINATION BY MR. WATKINS:

18   Q.   Referring back to Q199, which is the pieces of

19   cardboard --

12:18 20        MR. WEINREB:  Your Honor, I object to this.  Can we be

21   scene at sidebar?

22        THE COURT:  Okay.

23   (SIDEBAR CONFERENCE AS FOLLOWS:

24        MR. WEINREB:  I believe that Mr. Watkins is about to

25   show this witness a component from the bomb and ask her to

1    essentially speculate on whether she believes that it's the

2    same or consistent with the piece of cardboard that she saw in

3    the lab.  She's not a bomb expert.  She's a fingerprint expert.

4    It might have been appropriate to ask Ed Knapp that question.

5    He's somebody who tests bombs, sees them explode, know what

6    things look like after they've exploded.  She's not an

7    appropriate witness to ask.

8            MR. WATKINS:  The two things I'm going to do with this

9    is hold up a piece of cardboard where Mr. Weinreb talked about

12:19 10    the kinds of surfaces where fingerprints can be found and not

11    found.  I think it's appropriate to say that they can be found

12    on cardboard.

13            The second aspect of it is he mentioned -- the witness

14    mentioned -- he elicited from the witness about high

15    temperatures perhaps evaporating fingerprints.  Clearly, that

16    did not happen in this case.  I think I'm allowed to rebut that

17    particular part of the testimony.

18            MR. WEINREB:  I think holding up the cardboard is an

19    example of the surface.  There's no --

12:20 20            THE COURT:  I think you can ask the questions without

21    holding the cardboard.  It's a testimonial gesture.

22    .  .  .  END OF SIDEBAR CONFERENCE.)

23    Q.   You testified -- when Mr. Weinreb was asking about

24    surfaces that retain fingerprints and the fragility of some

25    surfaces and fingerprints, in regard to 199, that was several

1    pieces of cardboard, correct?

2    A.    That is correct.

3    Q.    And that is a surface that will retain fingerprints,

4    right?

5    A.    Right.  Cardboard and paper are what we call a porous

6    item, and what happens there is, when you touch it, the sweat

7    from your fingers is actually absorbed into the paper which

8    helps preserve them.

9    Q.    Also, if a piece of cardboard is encased in something

12:21 10   else, it's less likely that the fingerprint is going to get

11   accidentally or just disappear in some way?

12   A.    That is correct.

13   Q.    You talked about the high temperatures affecting

14   fingerprints in some cases?

15   A.    Yes.

16   Q.    199, you developed Tamerlan Tsarnaev's fingerprints off of

17   the pieces of cardboard that were collected on Boylston Street

18   after the blast, correct?

19   A.    That is correct.

12:21 20           MR. WATKINS:  I have nothing further.

21           MR. WEINREB:  I do, your Honor, just on that one

22   point.

23           THE COURT:  All right.

24   RECROSS-EXAMINATION BY MR. WEINREB:

25   Q.    So because things like pieces of cardboard and paper

1   absorb sweat, fingerprints last on them better and longer than

2   on other items?

3   A.    That is correct.

4   Q.    So, for example, the pieces of cardboard and the pieces of

5   paper from Scene A and Scene B that you testified about, the

6   fingerprints on those items could have been there for months or

7   even years?

8   A.    That is also true.  I can only tell if someone touched an

9   item.  I can't tell when that contact happened.

12:22 10         MR. WEINREB:  No further questions.

11          THE COURT:  All right.  Thank you, Miss Graff.  You

12   may step down.

13   .  .  .  END OF EXCERPT.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4              I certify that the foregoing is a correct transcript

 5       of the record of proceedings in the above-entitled matter to

 6       the best of my skill and ability.

 7

 8

 9

10

11

12       /s/Cheryl Dahlstrom              April 28, 2015

13       Cheryl Dahlstrom, RMR, CRR       Dated

14       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```