UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|                                      |     |                   |
| ------------------------------------ | --- | ----------------- |
|                                      | )   |                   |
| UNITED STATES OF AMERICA,            | )   |                   |
|                                      | )   |                   |
|         Plaintiff,                   | )   |                   |
|                                      | )   | Criminal Action   |
| v.                                   | )   | No. 13-10200-GAO  |
|                                      | )   |                   |
| DZHOKHAR A. TSARNAEV, also           | )   |                   |
| known as Jahar Tsarni,               | )   |                   |
|                                      | )   |                   |
|         Defendant.                   | )   |                   |
|                                      | )   |                   |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY FIFTY-SEVEN**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, May 7, 2015
10:27 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2          OFFICE OF THE UNITED STATES ATTORNEY
            By: William D. Weinreb, Aloke Chakravarty and
 3               Nadine Pellegrini, Assistant U.S. Attorneys
            John Joseph Moakley Federal Courthouse
 4          Suite 9200
            Boston, Massachusetts  02210
 5          - and -
            UNITED STATES DEPARTMENT OF JUSTICE
 6          By: Steven D. Mellin, Assistant U.S. Attorney
            Capital Case Section
 7          1331 F Street, N.W.
            Washington, D.C.  20530
 8          On Behalf of the Government

 9          FEDERAL PUBLIC DEFENDER OFFICE
            By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10               Federal Public Defenders
            51 Sleeper Street
11          Fifth Floor
            Boston, Massachusetts  02210
12          - and -
            CLARKE & RICE, APC
13          By: Judy Clarke, Esq.
            1010 Second Avenue
14          Suite 1800
            San Diego, California  92101
15          - and -
            LAW OFFICE OF DAVID I. BRUCK
16          By: David I. Bruck, Esq.
            220 Sydney Lewis Hall
17          Lexington, Virginia  24450
            On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                               I N D E X

2                          Direct   Cross   Redirect   Recross

3    WITNESSES FOR THE
       DEFENSE:

4

     MARK BEZY, resumed
5
         By Mr. Mellin (cont'd)          4                    58
6        By Mr. Bruck                            52

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2       THE CLERK:  All rise for the Court and the jury.
3       (The Court and jury enter the courtroom at 10:27 a.m.)
4       THE CLERK:  Be seated.
5       THE COURT:  Good morning, jurors.
6       THE JURORS:  Good morning, your Honor.
7       THE COURT:  Again, we appreciate your patience.  The
8  lawyers and I had some things to discuss and we're ready now to
9  resume where we left off yesterday afternoon with the
10 examination of witnesses.
11                     MARK BEZY, resumed
12                  CONTINUED CROSS-EXAMINATION
13 BY MR. MELLIN:
14 Q.   Mr. Bezy, you retired from the BOP when?
15 A.   2006.
16 Q.   And since then you set up a company that deals with you
17 testifying in cases like this, correct?
18 A.   2008, yes.
19 Q.   Okay.  Since 2008.  So for the last seven years you have a
20 company in which you go around the United States testifying for
21 federal criminal defendants, correct?
22 A.   Correct.
23 Q.   You've never testified for the government, correct?
24 A.   Correct.  I've never been asked.
25 Q.   And how many times have you actually testified in federal

1   death penalty cases?

2   A.   I think it's approximately 14.

3   Q.   You were just hired recently to testify in the other

4   federal death penalty case here in Massachusetts, correct?

5   A.   Yes.

6   Q.   The Sampson case?

7   A.   Yes.

8   Q.   And would you agree that 95 percent of the income you

9   derive in your business is from testifying in capital cases?

00:01 10   A.   Correct.

11   Q.   Mr. Bezy, you said you were at the ADX in 2015 but you did

12   not go down the range, correct?

13   A.   Correct.

14   Q.   When was the last time you actually went down the range

15   and looked into a cell?

16   A.   At the ADX?

17   Q.   Yes.

18   A.   In which unit?

19   Q.   Well, I was going to ask you to clarify but go ahead.

00:02 20   Which units have you gone down and seen actual cells?

21   A.   The only unit that I have not been into is the H unit, and

22   that was because of the SAMs and we were not allowed to go down

23   to the ranges, talk to the inmates because they were under the

24   SAMs.  I've been in every other unit in the institution.

25   Q.   So you've never actually seen a cell in the H unit?

1    A.   Years ago I did, yes.

2    Q.   When did you see that?

3    A.   Probably 2005.

4    Q.   Since 2005, have you ever gone back to the H unit?

5    A.   No.

6    Q.   And you know there have been changes to the cells since

7    2005, correct?

8    A.   Yes.

9    Q.   Now, yesterday in response to a question, you said that --

00:03 10   and this is a quote from you.  "That's not what I was told

11   yesterday," meaning Tuesday.  Do you remember saying that?

12   A.   In reference to what?

13   Q.   To one of the questions about your understandings of if

14   there had been violations of the SAMs, you said that, "Well,

15   that's not what I was told yesterday."

16   A.   Yes.  We met with the female FBI agent who's in charge,

17   the national joint federal terrorism task force.

18   Q.   And so when you say "we met," who met?

19   A.   The defense -- part of the defense team.

00:03 20   Q.   And did you sit in on those meetings?

21   A.   On that meeting, yes.

22   Q.   And that person you're talking about is the unit chief

23   from the FBI that handles terrorism SAMs.  Is that right?

24   A.   Yes.

25   Q.   Micelle Nicolet?

```
 1   A.    I believe that's her name.
 2   Q.    You also sat in on a meeting with Warden John Oliver,
 3   correct?
 4   A.    Correct.
 5   Q.    And Warden Oliver is actually the current warden at ADX,
 6   right?
 7   A.    Yes.
 8   Q.    And you sat in on the meeting with BOP official David
 9   Schiavone, correct?
10   A.    Correct.
11   Q.    Now, when you sat in on those meetings, that's where you
12   learned this information that you talked about yesterday,
13   correct?
14   A.    On the SAMs?
15   Q.    Yes.
16   A.    No, I'd done other research.  I'd read the section in the
17   C.F.R.
18   Q.    Okay.  So -- and when you say "the C.F.R.," what is the
19   C.F.R.?
20   A.    It's 50 -- 28 C.F.R. 501.3.
21   Q.    And what does "C.F.R." stand for?
22   A.    It's a Code of Federal Regulations.
23   Q.    Right.  It's the federal regulations that deal with the
24   implementation of the SAMs, correct?
25   A.    Correct.
```

1   Q.   It's the federal regulations that talk about what has to
2   be proven and what has to be shown to even get a SAMs, right?
3   A.   Correct.
4   Q.   It doesn't -- the government can't just ask for a SAMs,
5   right?
6   A.   Correct.
7   Q.   You have to actually follow the regulations.  And when you
8   follow those regulations, then you can proceed to ask for a
9   SAMs, right?
00:05 10  A.   Yes.
11  Q.   And each year the government must justify the request for
12  the information that they're -- or justify the SAMs request
13  relying on information that they have, right?
14  A.   Yes, that they get from the FBI and the U.S. Attorney's
15  Office and other law enforcement.
16  Q.   Right.  And that information must be sufficient to satisfy
17  the Code of Federal Regulations before the request can even be
18  made, right?
19  A.   I believe so.
00:05 20  Q.   There's limitations on what the government can do in
21  seeking SAMs, correct?
22  A.   Yes.
23  Q.   And you understand that from listening to what Ms. Nicolet
24  had to say, the unit chief from the FBI, she talked about what
25  the procedures were that the FBI and then the U.S. Attorney's

1    Offices are required to go through in order to modify or renew

2    a SAMs that is existing, correct?

3    A.    Yes.

4    Q.    And specifically concerning terrorism cases, right?

5    A.    Correct.

6    Q.    And from sitting in on that interview with her, you

7    learned that the number of inmates who have been convicted of a

8    terrorism charge and who had a SAMs and were housed at the ADX

9    who had their SAMs removed or not renewed is nine, correct?

00:07 10          (Pause.)

11   A.    Yes.

12   Q.    And that's just since -- in the last five years, correct?

13   A.    Correct.

14   Q.    Okay.  So since 2009, there have been nine inmates

15   convicted of terrorism who had a SAMs housed at ADX who since

16   that time that SAM has been removed or not renewed, right?

17   A.    Yes.

18   Q.    Let me go back, then, to your time when you were employed

19   with BOP, so any time prior to 2006.  You never dealt with SAMs

00:08 20  at any time when you were actually employed by BOP, correct?

21   A.    No.

22   Q.    No, that's not correct or, no, you never did?

23   A.    No, I never did.

24   Q.    And of these federal death penalty cases in which you have

25   testified, you've never testified about SAMs at all, correct?

1    A.   Correct.

2    Q.   Not one of the 14 cases that you testified in prior to

3    this case have you once talked about SAMs, correct?

4    A.   Correct.

5    Q.   SAMs didn't even exist when you were at Marion, correct?

6    A.   I don't -- I don't believe so, but we had a number -- we

7    did have terrorists there at Marion.  We had a special unit.

8    In K unit in Marion we housed -- we housed American spies,

9    domestic terrorists and bombers.

00:09 10   Q.   Thank you.  That wasn't my question.  My question was:

11   You didn't have any SAMs inmates at Marion when you were there,

12   correct?

13   A.   Well, I don't know if Jonathan Pollard was under SAMs at

14   that time or not.  I'm not sure.

15   Q.   As you sit here today, can you tell us one inmate who was

16   at Marion when you were at Marion that was under SAMs?

17   A.   It's possible Pollard was and a Japanese national called

18   Kikumura.

19   Q.   It's possible?

00:09 20   A.   Possible, yes.

21   Q.   When you were at Terre Haute, there were zero inmates

22   under SAMs, correct?

23   A.   Correct.

24   Q.   And that was federal death row, correct?

25   A.   Yes.

1    Q.    So the time that you were at Terre Haute from -- I believe

2    it was 2004 to 2006 -- is that right?

3    A.    Yes.

4    Q.    -- you had no dealings whatsoever with SAMs, right?

5    A.    Correct.

6    Q.    You've never been involved in implementing any inmate

7    SAMs, correct?

8    A.    Correct.

9    Q.    You've never monitored any phone calls or communications

00:10 10   concerning SAMs, correct?

11    A.    Correct.

12    Q.    You've never even supervised anyone who did do that,

13    correct?

14    A.    Correct.

15    Q.    You never addressed or were concerned about any inmate's

16    administrative request to modify SAMs, correct?

17    A.    Correct.

18    Q.    You never were asked to give input about a modification of

19    a SAMs, correct?

00:10 20   A.    Correct.

21    Q.    You never talked to anyone at the FBI about a SAMs when

22    you were employed at BOP, correct?

23    A.    Correct.

24    Q.    You never talked to anyone from the U.S. Attorney's Office

25    about a SAMs when you were employed by BOP, correct?

1    A.    Correct.

2    Q.    You certainly didn't talk to anyone at main justice, or

3    the Department of Justice in Washington, D.C., about a SAMs,

4    correct?

5    A.    Correct.

6    Q.    Have you ever read an actual SAMs before getting involved

7    in this case?

8    A.    No.

9    Q.    Have you ever read the SAMs in this case?

00:11 10    A.    Yes, I have.

11    Q.    So given your entire career in BOP and now this career you

12    have testifying in capital cases, you have read one SAMs,

13    correct?

14    A.    Correct.

15    Q.    Now, the individuals that you met with on Tuesday, those

16    are the people that have actual involvement in the

17    implementation of SAMs, correct?

18    A.    Yes.

19    Q.    People like Ms. Nicolet, correct, or Agent Nicolet?

00:12 20    A.    Yes.

21    Q.    And Mr. Schiavone?

22    A.    Yes.

23    Q.    And Warden Oliver, correct?

24    A.    Yes.

25    Q.    Just so we're all clear, you were never employed at ADX,

1    correct?

2    A.    Correct.

3    Q.    Now, you told the jury yesterday that SAMs limit an

4    inmate's communications to immediate family members.  Is that

5    right?

6    A.    Correct.

7    Q.    And do you believe that to be true?

8    A.    That's what the SAMs says and that's what I was told.

9    Yes, I do believe it to be true.

00:12  10    Q.    Inmates can ask for friends or others to be added to their

11    SAMs, correct?

12    A.    They can ask but that doesn't mean it's approved, yes.

13    Q.    You know in this case that that has happened, correct?

14         MR. BRUCK:  Objection, your Honor.

15         THE COURT:  Overruled.

16         THE WITNESS:  No, I don't.

17    BY MR. MELLIN:

18    Q.    You don't know that the SAMs in this case has been

19    modified to allow other than just immediate family members to

00:13  20    meet with the defendant?

21         MR. BRUCK:  Objection, your Honor.  This is a pretrial

22    matter.  It is not comparable to the issue that we're talking

23    about for post trial.

24         THE COURT:  All right.  I understand.  The objection

25    is overruled.

1          THE WITNESS:  Can you repeat the question?

2    BY MR. MELLIN:

3    Q.    Sure.  You're not aware that the SAMs in this case was

4    modified to allow contact with the defendant by persons other

5    than his immediate family members?

6    A.    No.

7    Q.    You are aware that the SAMs that is in place carries over

8    from pretrial to post trial, correct?

9    A.    Correct.

00:13 10   Q.    I believe yesterday you said that you were unaware of any

11   SAMs violations that have occurred.  Is that right?

12   A.    In H unit, yes.

13   Q.    In H unit.  Are you aware of SAMs violations occurring

14   elsewhere?

15   A.    No, I'm not.

16   Q.    Do you know who Lynne Stewart is?

17          MR. BRUCK:  Objection, your Honor.

18          THE COURT:  Sustained.

19   BY MR. MELLIN:

00:14 20   Q.    Well, is it your testimony that you believe there -- that

21   you have no knowledge as you sit here today in 2015 of anyone

22   violating a SAMs?

23          MR. BRUCK:  This should be confined to H unit, is the

24   relevant issue here.  And we object to it, any broader than

25   that.

```
 1              MR. MELLIN:  Your Honor, I disagree.  I don't think it
 2    has to be confined to the H unit.  This is about the SAMs
 3    issue.
 4              THE COURT:  Yeah, you may have it.
 5              THE WITNESS:  Can you repeat it, please?
 6    BY MR. MELLIN:
 7    Q.   Sure.  Are you aware as you sit here today in 2015 of any
 8    SAMs violations that have occurred?
 9    A.   Since you brought the lawyer's name up, yes, I am familiar
10    with that case.  She violated the SAMs --
11              MR. BRUCK:  We object, your Honor.
12              THE COURT:  Sustained.  Sustained.
13    BY MR. MELLIN:
14    Q.   Without getting into the details of that case, so now you
15    are -- you have a recollection that, in fact, SAMs have been
16    violated in the past?
17    A.   In that one case, yes.
18    Q.   But that's the only case you can recall?
19    A.   Yes.
20    Q.   Now, do you remember sitting in with Ms. Nicolet when she
21    was discussing the number of SAMs violations that have occurred
22    over time?
23    A.   She described more of attempts than successful violations
24    in H unit.
25    Q.   And what was that number?
```

```
 1   A.   I don't recall.
 2   Q.   Do you recall it being over 80?
 3   A.   No.
 4   Q.   Was it over 70?
 5   A.   No.
 6   Q.   You don't recall the number?
 7   A.   No, I do not.
 8   Q.   And that number that you're referring to that -- you don't
 9   recall the number but you recall the topic coming up, correct?
10   A.   Yes.
11   Q.   And that topic was discussing attempts that are made to
12   violate SAMs, correct?
13   A.   Correct.
14   Q.   And that some of those attempts may or may not be
15   successful, correct?
16   A.   Well, if they're an attempt, they're not successful, yes.
17   Q.   Well, how would the FBI know if there was a successful
18   attempt to -- or a successful effort to circumvent a SAMs?
19   A.   Because if it's on the telephone, they're live monitoring;
20   if it's in written, they're reading it.  They copy it, they
21   analyze it.  They scrutinize all communication.  And if it's a
22   visitation, it's also -- like I say, it's live and it's
23   recorded.
24   Q.   Right.  So they scrutinize them looking for these attempts
25   to violate the SAMs, right?
```

```
 1   A.   Correct.
 2   Q.   That's the whole reason why there's this program set up,
 3   so that they can either live monitor the phone calls or look at
 4   the communications, right?
 5   A.   Correct.  But I was told that if it was live monitoring
 6   and if they're questioning anything, they just kill the
 7   conversation.
 8   Q.   Right.  And so as this is going on, the whole idea is the
 9   FBI agent on the case is trying to decode the messages that are
10   being sent, correct?
11   A.   Correct.
12   Q.   So if there's a successful use of a code, the agent
13   wouldn't even know about it, correct?  That's the whole point.
14   A.   Well, they're supposed to be trained.  I would assume
15   they're trained in the code, in the languages.  And that's one
16   of their primary duties, so I think they would be -- it just
17   wouldn't be a routine agent.
18   Q.   Well, you know it from your experience at BOP that not
19   every violation is caught, correct?
20   A.   Correct.
21   Q.   Yesterday you said that the defendant in this case under
22   his SAMs is entitled to only one 15-minute phone call?
23   A.   That's in the SAMs he's under right now, yes.
24   Q.   So he can only receive one 15-minute phone call?
25   A.   I believe if he requests more, it can be granted.  But the
```

1    SAMs, as it's written, is one 15-minute call.

2    Q.   Actually, the SAMs as it's written says he's entitled to

3    at least a minimum of one phone call per month, correct?

4    A.   Okay.

5    Q.   Is that right?

6    A.   Yes.

7    Q.   So it's not that he only gets one, it's that he has to be

8    given at least one, right?

9    A.   He gets one call a month at minimum.

00:18 10  Q.   And right now the determination on how many phone calls he

11   gets while he's in his status here is up to the marshals,

12   correct?

13   A.   Yes.

14   Q.   He can receive or make more phone calls than just one a

15   month, right?

16   A.   It's possible, yes.

17   Q.   And then if he were, in fact, sent to ADX and if he were,

18   in fact, assigned to the H unit, how many phone calls would he

19   get there?

00:19 20  A.   In the first phase he would get two 15-minute calls.

21   Q.   Right.  Two 15-minute calls how often?

22   A.   Once a month.

23   Q.   So it's not that he only gets one call, correct?

24   A.   Well, he's in -- he's in H unit at that point, yes.

25   Q.   We discussed yesterday a little bit the phases and the

1    step-down processes, and I think there's some confusion.  There

2    are phases in the H unit, correct?

3    A.    Yes.

4    Q.    And there are how many phases?

5    A.    There's three.

6    Q.    And those phases allow an inmate to receive more

7    privileges as they go through the phases, correct?

8    A.    Correct.

9    Q.    So as you go from Phase 1 to Phase 2, you are getting more

00:20 10   phone calls, right?

11   A.    Yes, you get -- yes.

12   Q.    What do you get?

13   A.    You get one extra phone call.

14   Q.    How many more visits do you get?

15   A.    Visits the same:  Five.

16   Q.    What kind of rec time do you get?

17   A.    It's ten hours.

18   Q.    And as you -- at least a minimum of ten hours, correct?

19   A.    Yes.

00:20 20   Q.    Right.  So you can have more rec time than ten hours per

21   week, correct?

22   A.    It's possible, but it's normally -- if they say it's ten

23   hours, it's ten hours.

24   Q.    Well, when you say "if it's ten hours, it's ten hours,"

25   you've actually never been a warden at ADX, right?

1    A.    No, but at Marion we had the same operation where they

2    were given rec time and we didn't have the luxury of giving

3    them extra rec time.

4    Q.    Well, have you spoken to Warden Oliver and asked him that

5    specific question, if he's going to limit an inmate in H unit

6    to just ten hours?

7    A.    No.

8    Q.    So you don't have any personal knowledge to make that

9    statement, correct?

00:21 10    A.    No, I don't.

11    Q.    Now, we talked about the three phases in the H unit, but

12    there's also step down too, correct?

13    A.    Yeah.

14    Q.    Okay.  So if an inmate who is in the H unit on a SAMs has

15    that SAMs come down at some point in time -- you follow me so

16    far?

17    A.    Yes.  There's an approval process for each phase.

18    Q.    Right.  Right.  But if the SAMs comes down, that -- number

19    one, that inmate is not going to be in the H unit any longer,

00:21 20    correct?

21    A.    If he gets through Phase 3, no.  There's a J unit annex.

22    Q.    And what happens at the annex?

23    A.    They get more out-of-cell time.  They eat one meal out of

24    their cell.  There's small recreation groups.  That's in H

25    unit -- excuse me.  That's in H unit.  That's Phase 3.

1    Q.    Right.  So now the inmate who you said yesterday has no

2    contact with these individuals now has contact, correct?

3    A.    But it's got to be approved.  The institution has a

4    screening committee.  They meet, they review the

5    inmate's -- there's a criteria they look at.

6    Q.    Mr. Bezy, just for the record, can you tell me what you're

7    looking at?

8    A.    I'm looking at the supplement on H unit.

9          (Pause.)

00:23 10        The programming committee makes a determine [*sic*] on a

11   case-by-case basis.  There's no guarantee that an inmate's

12   going to move from Phase 1 to Phase 2 or Phase 2 to Phase 3.

13   It's a case-by-case basis.  And eligibility for consideration

14   does not equate to appropriateness for advancement to the next

15   phase.  They can meet every criteria that's required to move

16   from Phase 1 to Phase 2, but they don't have to move them.

17   Q.    That's fine.  And thank you for reading from that, but my

18   question was about when they're on Phase 3, this annex you're

19   talking about, the inmate would have contact with other

00:23 20   inmates, correct?

21   A.    In Phase 3, it's part of the unit.  They would have

22   contact, and that's part of the program, yes.

23   Q.    And then after Phase 3, they could actually move out of

24   that whole area, correct, and they would be in the step-down

25   process?

```
 1   A.    No, that's -- it is not up to the Bureau of Prisons for
 2   them to leave Phase 3, it's up to the FBI, the U.S. Attorney's
 3   Office and DOJ, and eventually it's up to the U.S. Attorney
 4   General.  The Bureau of Prisons does not have the authority to
 5   move a guy out of H unit just on their own.
 6   Q.    Right.  And let's be clear.  That's because there's a SAMs
 7   on that person, right?
 8   A.    Right.  Right.
 9   Q.    So if the SAMs is not renewed, right?
10   A.    Correct.
11   Q.    So there's no longer a SAMs, right?
12   A.    Correct.
13   Q.    And we're talking now five, ten, 12, 15 years out, right?
14   A.    Right.
15   Q.    With no SAMs, that inmate is no longer going to be in the
16   H unit, correct?
17   A.    Correct.
18   Q.    Okay.  So that inmate is now going to phase out of the H
19   unit and they're going to go someplace else, right?
20   A.    Yes.
21   Q.    And when they go to this someplace else, they then are
22   going to be in a step-down process, correct?
23   A.    Well, it would more than likely be the general population
24   program at the ADX.  And then there's a step-down program, but,
25   again, there's no guarantee that an inmate will move through
```

1    that program based upon his offense.  There's a number of

2    factors:  There's criminal history, the rationale why he was

3    designated to the ADX, and for safety and security needs of the

4    inmate.

5    Q.   Right.  Well, you're aware that there have been

6    terrorism-convicted inmates who were on SAMs.  When the SAMs

7    was taken down they're no longer even -- well, they're

8    certainly not in the H unit, correct?

9    A.   Right.

00:26 10   Q.   Some of them go into ADX general population, right?

11   A.   Correct.

12   Q.   And some of them have gone outside of the ADX altogether,

13   correct?

14   A.   Yes.

15   Q.   But you'd agree with me that if you're in the step-down

16   process, if you satisfy the first step and move on to the

17   second step, you are receiving more privileges?

18   A.   It's not so much that you satisfy the first step.  Like,

19   again, you can meet all the criteria that's required to be

00:26 20   evaluated for your appropriateness to move to the next step.

21   But if the committee does not feel it's appropriate, you will

22   stay at your current level.

23   Q.   The committee you're now talking about is the committee

24   actually at ADX, right?

25   A.   Correct.

1   Q.   So that committee is the one who's dealing with the

2   defendant -- or the inmate every day, right?

3   A.   Correct.

4   Q.   So they're seeing his progress every day, correct?

5   A.   Correct.

6   Q.   And there's an incentive in place to have him step down,

7   correct?

8   A.   There's an incentive, but all inmates will not step down

9   and leave the ADX.  Terry Nichols has not left the ADX since

00:27 10   1995.  And there's a number of inmates that were at Marion -- I

11   transferred from Marion to the ADX -- that are still there in

12   the general population in the first phase of that program

13   because he will never leave -- they'll never be stepped down.

14   Q.   That's fine.  But they're in ADX general population,

15   right?

16   A.   That's not a regular general -- it's a misnomer.  It's not

17   a regular general population of a United States penitentiary.

18   At a United States penitentiary, the inmates, we lock them in

19   their cells at ten o'clock at night, we unlock their cells at

00:27 20   six o'clock in the morning.  They have the opportunity to

21   shower, they have the opportunity to walk to a communal dining

22   room to eat.  They work, they recreate.

23        The general population at ADX is single-celled, single

24   recreation.  You come out of the cell, there's a minimum of two

25   staff there with batons.  You're in restraints, you're escorted

1    to a recreation cage which is probably 10 by 20, you're put in

2    there for your recreation or there's some indoor recreation.

3    But you are never unescorted anyplace you go.

4    Q.   They can be out of their cell from what time to what time?

5    A.   Which prison?

6    Q.   In what you were just discussing, in ADX general

7    population.

8    A.   In a regular USP, and the ADX --

9    Q.   If you'd hold that.  I was talking about what you were

00:28 10   just discussing.  I think you were just discussing the general

11   population at ADX, correct?

12   A.   Right.

13   Q.   Okay.  Even at ADX, in general population an inmate is

14   allowed out of their cell from what time to what time?

15   A.   They're not.  They're allowed out of their cell for ten

16   hours a week.

17   Q.   Okay.  But what are they doing during the day?

18   A.   They're sitting in their cells.

19   Q.   Or they're holding a job, right?

00:29 20   A.   They don't work.  There's only one or two inmates in a

21   unit at the ADX who work, and they're called -- they're

22   orderlies.  Those are the only two people out of the 60 in that

23   unit that we would offer a job.  It would be approved by the

24   captain.  They sit in their cells, locked in their cells every

25   day.

1    Q.   They're locked in their cells at night.  But during the

2    day they have --

3    A.   No, you're confusing a standard USP with the ADX.  Each

4    one has a general population, but it's apples and oranges,

5    okay?  The general population is a program at the ADX.  There's

6    the general population program, there's the control unit

7    program, and then there's the special security program.  Those

8    are the three main and only programs at the ADX.

9         At the ADX, the inmates are locked in their cells unless

00:30 10   they come out for recreation or they have a medical appointment

11   or they need to be seen by a doctor or they get their ten hours

12   of rec a week.  Their showers are in their cells.  They shower

13   in their cells.  If they come out, there's a slot in the door,

14   they back up to the door, they put their hands through, they're

15   handcuffed and then they're put in leg irons, and then they're

16   escorted by two staff to wherever they're going.  And it can be

17   more.  It can be a lieutenant hold, it can be a three-man hold.

18   It depends on the inmate.  That's the only time they come out

19   of their cells in the general population at the ADX.

00:30 20        It's a whole different world than a regular USP like I ran

21   at Terre Haute.  That's an open population penitentiary.  This

22   is a -- it's a whole different game.  You're mixing apples and

23   oranges.

24   Q.   The general population at ADX, you say they will be in

25   their cells, right?

1   A.   Correct.

2   Q.   What is in their cell?

3   A.   They have a shower.

4   Q.   Okay.  They have their own individual shower, right?

5   A.   Correct.

6   Q.   They have their own individual cell, right?

7        MR. BRUCK:  Counsel has opened the door this far but

8   we're objecting to going further.

9        THE COURT:  Well, I think it's the witness that opened

00:31 10   the door.  The objection is overruled.

11   BY MR. MELLIN:

12   Q.   In their cell they have their own shower, right?

13   A.   Correct.

14   Q.   So that's even different than the H unit, correct?

15   A.   Correct.

16   Q.   In the H unit, this more secure facility, the inmate

17   doesn't even have their own shower in their own cell, right?

18   A.   Correct.

19   Q.   Here they do have a cell with a shower.  They also have a

00:31 20   bed, right?

21   A.   A concrete bed.

22   Q.   Well, a concrete bed.  That's -- they have a mattress on

23   top of the concrete bed, right?

24   A.   Yes.

25   Q.   Yes?

1    A.    Yes.

2    Q.    They have blankets, right?

3    A.    Yes.

4    Q.    Okay.  They have a TV in their cell, right?

5              MR. BRUCK:  Objection, your Honor.

6              THE COURT:  Yeah, I think we've had enough of...

7    BY MR. MELLIN:

8    Q.    They have heating in their cell, correct?

9              THE COURT:  You may have that.

00:32 10             THE WITNESS:  Correct.

11             MR. BRUCK:  Objection, your Honor.

12             THE COURT:  No, that may stand.

13   BY MR. MELLIN:

14   Q.    They have air-conditioning in their cell, correct?

15   A.    It's -- I don't know if it's called air-conditioning.

16   It's a cool water/cool air system, but it keeps the

17   climate -- yes.

18   Q.    Okay.  So, but it's temperature-controlled, right?

19   A.    Yes.

00:32 20   Q.    Now, actually, while we're talking about this, why don't

21   we pull up Exhibit 1595, I think.  I don't know if that's the

22   right number.  The photo?

23             (Counsel confer off the record.)

24             MR. BRUCK:  For the witness only, your Honor?

25             MR. MELLIN:  No, no, no, published, your Honor.  This

```
 1    is the photo Mr. Bruck showed him yesterday.
 2              MR. WATKINS:  5253?
 3              MR. MELLIN:  It's in color.
 4              THE COURT:  Do you know the number?
 5              MR. MELLIN:  I'm told it's Exhibit 3253.
 6              THE COURT:  Is that the one you want?
 7              MR. MELLIN:  Yes, your Honor.  Thank you.
 8    BY MR. MELLIN:
 9    Q.   Mr. Bezy, you were shown this photo yesterday, right?
10    A.   Yes.
11    Q.   And where exactly is this photo from?
12    A.   That's the federal correctional complex in Florence,
13    Colorado.
14    Q.   Right.  And so Florence is a city in Colorado, right?
15    A.   Yes.
16    Q.   What you see in the photo, though, it's very white
17    everywhere, right?
18    A.   Yes.
19    Q.   So there was a recent snowfall in the foothills of
20    Colorado?
21    A.   I don't know if it was recent.  There's snow on the
22    ground.
23    Q.   Well, when did you go out to ADX, in April?
24    A.   April.
25    Q.   How did it look?
```

1    A.    It was high desert brown.

2    Q.    Right.  It's typically just high desert out there, right?

3    A.    No, you get snow.

4    Q.    Well, you get snow two or three times a year, right?

5    A.    I've never been assigned there.  I've been out there when

6    there has been a lot of snow, though, too.

7    Q.    Just so we're all clear just exactly where we are, as you

8    look at this photograph, in the -- behind the ADX, or behind

9    USP Florence, is the beginning of the foothills into the

00:34 10   Rockies, right?

11   A.    You're talking about up here?

12   Q.    No, I would think those are the Rockies.  I was talking

13   about right here, correct?  Those are the foothills?

14   A.    I'm not from Colorado.  I wouldn't -- it's possible.

15   Q.    All right.  These are the Rockies, correct?

16   A.    Correct.

17   Q.    The Rocky Mountains, right?  Yes?

18   A.    Yes.

19   Q.    Okay.  Florence is located just south of Colorado Springs,

00:35 20   right?

21   A.    I believe so.

22   Q.    You're not sure where Florence is located?

23   A.    I don't -- when I go there, I stay in Canyon City.  I

24   don't go to Colorado Springs.  But you go through Colorado

25   Springs to get to Florence, yes.

```
 1    Q.   And just so everyone knows, Colorado Springs is south of
 2    Denver, correct?
 3    A.   Yes.
 4    Q.   And as you go south of Florence, you're actually into the
 5    high plain deserts, correct?
 6    A.   Correct.
 7    Q.   And so in that area, there's very little snowfall
 8    year-round, correct?
 9    A.   I don't live there.  I don't know.
10    Q.   Now, when you go to ADX, you can fly right into Colorado
11    Springs, right?
12    A.   No, I fly into Denver and drive.
13    Q.   Well, is that because it's cheaper to fly into Denver than
14    it is to fly into Colorado Springs?
15    A.    It's when you're flying on the government dime, you can
16    only fly certain places.
17    Q.   All right.  Well, how far is it from Denver to Colorado
18    Springs, then?  At least you'll know that.
19    A.   It's about a two-and-a-half-hour drive.
20    Q.   Yeah?  And Colorado Springs to Florence is about how far?
21    A.   I mean, it's about a two-and-a-half-hour drive from Denver
22    all the way to Canyon City.
23    Q.   Right.  And that drive is through the metropolitan Denver
24    area, correct?  You start there, right?
25    A.   I don't go through the -- I go the south loop, the new,
```

00:35 (line 10)
00:36 (line 20)

1    and then --

2    Q.   I25?

3    A.   Yes.

4    Q.   So you fly into -- I didn't know we were going to get into

5    all of this, but you fly into -- or is it DIA?  You fly into

6    the Denver Airport, right?

7         MR. BRUCK:  I don't think we should be getting into

8    all of this.  We object on relevance.

9         THE COURT:  No, overruled.  Go ahead.

00:36 10   BY MR. MELLIN:

11   Q.   You fly into the Denver Airport and you have to go for

12   quite a distance around the metropolitan Denver area, right?

13   A.   I plug it into my Garmin and follow my Garmin.

14   Q.   Right.  And then your Garmin leads you right down I25,

15   right?

16   A.   Correct.

17   Q.   And you go right down I25 from Denver to Colorado Springs,

18   right?

19   A.   Correct.

00:37 20   Q.   And as you're driving down that drive, it's a pretty drive

21   as you're going south.  The Rockies are on your right, you have

22   the plains on your left, right?

23   A.   Okay.

24   Q.   Is that right?

25   A.   I'll take your word for it.

```
 1   Q.   All right.  And you're going through cities on the way
 2   down there, correct?
 3   A.   Yes.
 4   Q.   And you get to Colorado Springs.  It was where the Air
 5   Force Academy is at, correct?
 6            MR. BRUCK:  I object to relevance.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  Yes.
 9   BY MR. MELLIN:
10   Q.   Okay.  And that conveniently, though, is not shown on this
11   photograph, is it, any of Colorado Springs?
12            MR. BRUCK:  I object to the characterization of
13   convenience.
14            MR. MELLIN:  I will rephrase.
15            THE COURT:  Okay.
16   BY MR. MELLIN:
17   Q.   Is Colorado Springs shown on this photograph?
18   A.   No, it's too far away.
19   Q.   Well, how far away is the southern portion of Colorado
20   Springs from Florence?
21   A.   An hour plus.
22   Q.   You believe it's an hour plus?
23   A.   Yeah.
24   Q.   Okay.  And then as you go south of Colorado Springs,
25   there's actually a fort there, right?
```

1    A.    Yes.

2    Q.    Fort Carson?

3    A.    Yes.

4    Q.    A very big Army installation, right?

5    A.    Yes.

6    Q.    How far is Fort Carson from USP Florence?

7    A.    45 minutes to an hour, I believe.  I've never timed it.

8    Q.    Okay.  The ADX, when we were talking about it having

9    heating, it's a very modern facility, right?

00:38 10   A.    It's 20 years old, yes.

11   Q.    In the lifetime of BOP, that's a pretty modern facility,

12   though, right?

13   A.    Yes.

14   Q.    Okay.  I mean, it's one of the newer facilities, correct?

15   A.    No, it's not one of the newer ones.  There's a lot more

16   newer ones.  But it's been activated for 20 years.

17   Q.    And it's got all of the latest upgrades when it comes to

18   heating and cooling, right?

19   A.    I've never checked into that, but --

00:39 20   Q.    Well, an inmate at ADX is not going to be necessarily hot

21   or cold; they're going to monitor the temperature, right?

22   A.    Right.  There's a facility department there that takes

23   care of the heating and the...

24   Q.    An inmate at ADX is permitted visitors, right?

25   A.    Correct.

```
 1   Q.    Even an inmate in the H unit is permitted visitors, right?

 2   A.    Yes.  They're all noncontact visits at the ADX.

 3   Q.    How many visits is an inmate in the H unit permitted per

 4   month?

 5   A.    I believe it's five.

 6   Q.    Those are five social visits, right?

 7   A.    Correct.

 8   Q.    How many legal visits is an inmate in the H unit

 9   permitted?
```

00:39 10         MR. BRUCK:  I object to this, your Honor.  That's not

```
11   relevant to any of the topics we discussed.
```

```
12         MR. MELLIN:  Your Honor, I believe it goes straight

13   to --
```

```
14         THE COURT:  Overruled.  You may have it.  It goes to

15   the conditions of the SAMs.
```

```
16         THE WITNESS:  I'm not sure but they have to request

17   them and there's only certain days of the week that they -- H

18   unit inmates are allowed in the visitation room.  So if it's

19   available and the room's available, they'll grant the visit.
```

00:40 20   BY MR. MELLIN:

```
21   Q.    Right.  There's an unlimited number of meetings that an

22   inmate can have, legal meetings, correct?

23   A.    Right.  But there's only certain days that they do H unit

24   visits at the ADX.

25   Q.    Right.  The social visits that an inmate can have, the
```

1   five visits per month, those include family members, right?

2   A.   Spouses, parents, siblings.  Who's approved by the SAMs,

3   yes.

4   Q.   Right.  So whoever's on the SAMs list can go see the

5   inmate at ADX, correct?

6   A.   Right.

7   Q.   An inmate can ask for and get a SAMs modified to have

8   other individuals on the SAMs list, right?

9   A.   He can ask for it.  It's up to the FBI and the U.S.

00:41 10   Attorney's Office to amend the SAMs.

11   Q.   Right.  But if there is no objection to it and there's no

12   basis under the Code of Federal Regulations to exclude it, then

13   that will be permitted, right?

14   A.   It's possible, yes.

15   Q.   And so an inmate can ask that a new person be added to the

16   list, right?

17   A.   They can request but they have to be approved.

18   Q.   And so if this defendant with his SAMs currently that he

19   has goes to ADX H unit, he immediately is going to be permitted

00:42 20   five social visits a month with people on his approved list,

21   correct?

22   A.   Correct.

23   Q.   He'll be able to meet with family or whoever's on that

24   list, right?

25   A.   Yes.

1  Q.   When an inmate is at ADX, if they meet someone new, they

2  can add that person, or make a request to add that person as

3  well, right?

4  A.   What do you mean if they meet someone new?

5  Q.   If they meet a new person?

6  A.   No; there has to be a prior relationship before

7  incarceration.

8  Q.   Is it your testimony that you cannot modify a SAMs to

9  allow for a new person that you did not know prior to the

00:43 10  institution of the SAMs to be added to the list?

11  A.   I was giving you the BOP policy.  The BOP policy is there

12  must be a prior relationship to incarceration.  And again, I'm

13  sure the FBI and U.S. Attorney's Office -- because as the

14  warden says, there's a great partnership there -- they would

15  ask what -- you know, they would ask the warden, because they

16  get input from the ADX staff too, and it may not be approved.

17  Q.   Right.  But it may be approved, right?

18  A.   It's up to the U.S. Attorney's Office and the FBI.

19  Q.   And you're aware, though, that at times modifications have

00:43 20  been made to allow new girlfriends or boyfriends or whatever to

21  be added to a list, right?

22  A.   I'm not aware of any, no.

23  Q.   Are you aware that an inmate is allowed to write an

24  unlimited number of letters?

25  A.   Correct.

1    Q.    He can receive an unlimited number of letters, correct?

2    A.    If they're on the approved list, he can write to them and

3    he can receive from them.  If not, it's rejected

4    correspondence.

5    Q.    Right.  But if there is a new person added, they can write

6    to that person and receive communications from that person with

7    an unlimited basis each month, correct?

8    A.    Right.  If it's approved by the FBI and the U.S.

9    Attorney's Office, yes.

00:44  10    Q.    So if this defendant were sent to ADX, to the H unit, even

11    under the SAMs as it exists today, he can write an unlimited

12    number of letters to people on his family and friend list,

13    correct?

14    A.    On the approved list, yes.

15    Q.    And he can receive an unlimited number back from them,

16    correct?

17    A.    On the approved list, yes.

18    Q.    In addition to that, he can write an unlimited number of

19    letters to -- or what's called legal mail, right?

00:45  20    A.    To the attorney of record, yes.

21    Q.    Okay.  And that legal mail is not monitored.  Is that

22    right?

23              MR. BRUCK:  I'm going to object to this.

24              THE COURT:  No, your may have it.

25              THE WITNESS:  It's -- when it comes in, it's opened,

1   it's screened for contraband, and then it's delivered to the

2   inmate.  But on certain circumstances the court can grant

3   access to review legal material.

4   BY MR. MELLIN:

5   Q.   But in the normal course, if an inmate writes legal mail

6   on some piece of correspondence, no one is allowed to open that

7   up and look at it, correct?

8   A.   No, we open it in front of the inmate, we search it, we do

9   a -- we look at it, we search the pages, we make sure there's

00:46 10   nothing concealed in it as far as contraband that we could see

11   between the pages, pages stuck together, something behind a

12   stamp, something behind -- we can look at it very closely.  And

13   everything's x-rayed to begin with, so it's opened in front of

14   the inmate and then it's given to the inmate.

15   Q.   Right.  But no one can read it, correct?

16   A.   If the court authorizes it, it can be read.

17   Q.   Right.  But that's the exception to the general rule.

18   Isn't that right?

19   A.   Right.

00:46 20   Q.   So the general rule is if an inmate writes on

21   correspondence, "legal mail," and it is sent out, no one from

22   BOP is opening that letter, correct?

23   A.   I think he may have to seal it in front of -- it may have

24   to be sealed in front of the inmate [sic] or --

25           MR. BRUCK:  Your Honor, I object to this line of

1    questioning because it does not include that the limitation is

2    to counsel of record; not just any lawyer.

3              MR. WEINREB:  Objection, your Honor.

4              THE COURT:  No, I think that was referred to.  But

5    anyway, go ahead.

6              MR. WEINREB:  Your Honor, he's testifying.

7              MR. MELLIN:  I'll be happy to just say that.

8    BY MR. MELLIN:

9    Q.    The defendant -- or excuse me.  The inmate decides that he

00:47 10    is going to send out something and he writes "legal mail" on

11    it, correct?

12   A.    Correct.

13   Q.    The inmate has to write down the address of approved

14   counsel, right?

15   A.    There is a disclaimer that has to be put on the envelope

16   by the inmate.  If it's not put on, then it's not considered

17   legal mail coming in or going back out.

18   Q.    Right.

19   A.    So there is an official disclaimer put on it, and it has

00:47 20   to be the specific BOP disclaimer for legal mail.

21   Q.    Right.  The disclaimer is on the envelope.  The inmate

22   writes "legal mail."  The address of the attorney is on that

23   envelope.  Once that happens, BOP is not opening that mail,

24   correct?

25   A.    Well, they can check to see if there is an attorney at

that address.  Yes, the SIS office would monitor that.  And in
certain cases, in conjunction with an FBI court order, they
could open it.

Q.    In general, does BOP open legal mail?

A.    Coming in or going out?

Q.    Going out, let's start with.

A.    Going out it's sealed in front of staff and it's given to
staff and then it's sent out.

Q.    So the answer to that is no, they don't open it, correct?

A.    It's not -- they seal it -- it's sealed in front of staff
and then it's sent out.

Q.    Who seals it?

A.    Staff or the inmate can seal it.

Q.    Does BOP go through the pages of whatever is in that
document?

A.    Yes, they'll do a cursory search.

Q.    Do they read it?

A.    No.

Q.    Right.  They don't have any right to read it, correct?

A.    Correct.

Q.    Again, legal mail is unlimited, correct?

A.    Yes.

Q.    Legal mail coming in is unlimited, correct?

A.    Yes.

Q.    You're aware that inmates have abused that process,

1    correct?

2           MR. BRUCK:  Objection to this.

3           THE COURT:  Yeah, I think we've gone far enough on

4    this, Mr. Mellin.

5    BY MR. MELLIN:

6    Q.   Concerning contacts or communications, you're aware that

7    inmates can file lawsuits, right?

8    A.   Yes.

9    Q.   You know that from your experience as the warden, right?

00:49 10   A.   Right.

11   Q.   Your name would be put on pleading after pleading, right?

12   The inmate versus the warden and the Department of Justice?

13   A.   They have to go through the administrative remedy process.

14   They have to exhaust that first before they can go into civil

15   court, yes.

16           MR. BRUCK:  Beyond the scope, your Honor.

17           THE COURT:  Well, we'll wait until the next question.

18   BY MR. MELLIN:

19   Q.   And inmates can sue to change the conditions of

00:49 20   confinement, correct?

21           MR. BRUCK:  Same objection.

22           MR. MELLIN:  Your Honor, this goes directly to the

23   SAMs and what limitations would be on --

24           THE COURT:  All right.  Okay.

25   BY MR. MELLIN:

1    Q.    Inmates can sue to change the conditions of confinement,

2    correct?

3    A.    Yes.

4    Q.    You know that because, in fact, you're involved in a

5    lawsuit just along those lines, right?

6    A.    Excuse me?

7    Q.    You're involved in a lawsuit regarding the changing of

8    conditions of confinement?

9    A.    I am?

00:50 10    Q.    Are you?  You're not?

11    A.    In which case?

12    Q.    Is there a case that you're involved with in Colorado

13    concerning the conditions of ADX?

14    A.    Yes.

15    Q.    You're aware that a defendant can -- or excuse me -- an

16    inmate can write a book, right?

17    A.    There's a process they go through for manuscripts, yes.

18    Q.    They can write a book even if they're on SAMs at the H

19    unit, right?

00:51 20         MR. BRUCK:  Objection.  This is a misleading question.

21    They can write whatever they want.

22         MR. WEINREB:  Your Honor, if Mr. Bruck is testifying,

23    it's not appropriate.

24         THE COURT:  Well, you can point it out on redirect.

25    BY MR. MELLIN:

```
 1    Q.    An inmate on the H unit can write a book, correct?

 2    A.    I believe so.

 3    Q.    Inmates on death row write books, correct?

 4    A.    Yes.

 5    Q.    You know that from your own experience, correct?

 6    A.    Yes.

 7    Q.    Mr. Hammer wrote a book, right?

 8          MR. BRUCK:  Objection to --

 9          THE COURT:  Yes.

10          MR. BRUCK:  -- particular inmates.

11          THE COURT:  Yes, I think the other answers were

12    sufficient.  We don't need specific instances.

13    BY MR. MELLIN:

14    Q.    Assuming an inmate has no SAMs restrictions, or the SAMs

15    that were in place at one time now are no longer in place, that

16    book -- if an inmate writes a book, that book can be sent to

17    anyone, correct?

18    A.    I don't think it can be sent to staff, but it can be sent

19    to outside people, yes.

20    Q.    Right.  It can be sent to anyone in the outside world,

21    right?

22    A.    Yes.

23    Q.    You would agree that inmates in USPs or ADX communicate

24    with each other almost every day, correct?

25    A.    Yes, because their rec cages are side by side.
```

1    Q.   And it's not only that their rec cages are side by side,

2    but they can communicate through their cells, correct?

3    A.   Yes, they can use the vent -- some of the toilets, yes.

4    Q.   Right.   The inmates get somewhat ingenious with this

5    method of communication, right?

6    A.   Yes.

7    Q.   So what they do, they clear the water out of their toilets

8    or out of their sinks and they communicate through the plumbing

9    to each other, right?

00:53 10    A.   Yes.

11    Q.   And that happens repeatedly every day, right?

12    A.   It happens, yes.

13    Q.   They send out things called kites, correct?

14    A.   Yes.

15    Q.   Do you know what a kite is?

16    A.   Yes.

17    Q.   What is a kite?

18    A.   It's a written message, a letter.

19    Q.   And how is it --

00:53 20         MR. BRUCK:   Objection.   The question is conflating H

21    unit with ADX generally, and it's -- we would object to

22    conflating these two different institution units.

23         THE COURT:   Yeah, I think where there are possible

24    differences, you should be clear which you're addressing.

25         MR. MELLIN:   That's fine.

 1    BY MR. MELLIN:

 2    Q.   Well, I'm not sure, Mr. Bezy, if you have experience on

 3    the H unit, but do you have experience on the H unit enough to

 4    comment on whether or not kites are being sent between inmates

 5    on the H unit?

 6    A.   No, I don't.

 7    Q.   But you are aware, though, that kites are sent in general

 8    population, correct?

 9    A.   Correct.

00:54 10    Q.   They are even sent in general population at ADX, right?

11    A.   I believe so, yes.

12    Q.   And these messages are sent by what's called fishing,

13    correct?

14    A.   Yes.

15    Q.   And what is fishing?

16    A.   You take thread out of a T-shirt, underwear, you wrap it

17    around your kite, and from underneath your door you can sling

18    it down the range.  But then you can also modify the doors to

19    prevent that from occurring too.

00:54 20    Q.   You're aware that inmates play chess with each other,

21    right?

22             MR. BRUCK:  I object to the scope, your Honor.

23             MR. MELLIN:  Your Honor, it goes directly to

24    communications.

25             THE COURT:  Well, I think it's getting cumulative.

1    The objection is sustained.

2         THE WITNESS:  At some institutions, yes.

3         THE COURT:  Mr. Bezy, wait for the next question.

4    BY MR. MELLIN:

5    Q.   One thing I failed to ask you about is if an inmate sends

6    a letter out to someone -- in fact, even on a SAMs, if an

7    inmate sends something out to someone who's approved on his

8    SAMs list, BOP cannot keep that person from posting whatever

9    that information was on the Internet, correct?

00:55 10    A.   I believe there is some conditions that they comply --

11   because when the -- on the phone, you know, they'll read the

12   SAMs to the caller, and there may even be something written

13   that they have to sign about written correspondence.  I know

14   there is.  And on some units there are -- you have to sign that

15   you won't post anything.

16   Q.   Right.  So you sign that you won't post anything to get

17   onto the list, right?

18   A.   Right.

19   Q.   But once you're on the list, if you receive something, you

00:56 20   can still post it, right?

21   A.   Yes.  And then as a warden, I'd ban you from any type of

22   correspondence or contact with that inmate for the rest of your

23   life.

24   Q.   Correct.  But yet it's too late.  It's now been posted,

25   correct?

1    A.    Correct.  You'd never post it again, though.

2    Q.    All right.  But if that message wants to be sent and an

3    inmate wants to send that message, they can use someone on

4    their approved list to post that message on the Internet and

5    there's nothing BOP can do to stop that at that moment?

6    A.    Well, if it -- well, I mean, like I said, everything is

7    read by the FBI and the BOP.  It's scanned, it's recorded.  If

8    there's any indication that that would happen, they would not

9    let that letter out.  It would be rejected.

00:56 10    Q.    It could be anything, though, right?  It could just be,

11    "Hi, mom.  Here's what I'm up to," right?

12    A.    Yes.

13    Q.    And that could be posted immediately on the Internet,

14    correct?

15    A.    Correct.

16    Q.    It could also be a coded message that the agent doesn't

17    understand is a coded message, right?

18              MR. BRUCK:  Objection.

19              THE COURT:  Sustained.

00:57 20              THE WITNESS:  I would hope they --

21              MR. MELLIN:  You don't have to answer that, Mr. Bezy.

22    BY MR. MELLIN:

23    Q.    Is it fair to say that there's no way for BOP to guarantee

24    that no word from an inmate could ever be posted on the

25    Internet?

```
 1              MR. BRUCK:  This has been asked and answered several

 2       times.

 3              THE COURT:  Sustained.  Sustained.

 4       BY MR. MELLIN:

 5       Q.   You mentioned earlier that there could be communication

 6       when an inmate is on rec time.  Is that right?

 7       A.   Yes.

 8       Q.   And the rec time we're talking about is the ten

 9       hours -- at least ten hours a week that an inmate is allowed to
00:58 10 go out and recreate, right?

11       A.   Are we talking H?

12       Q.   We'll start with H.

13       A.   Okay.  Yes.

14       Q.   Yes?  And if we -- H is going to have ten hours a week.

15       If you're out of H, how many hours do you get a week?

16       A.    If they're in H, like I said earlier, it's -- the place

17       has got -- it's got video cameras and it's got microphones.

18       And if they want to overhear -- if law enforcement wants to

19       overhear, they will overhear.
00:58 20 Q.   Right.  But that happens day in and day out, correct?

21       A.   Right.

22       Q.   There's communications between inmates day in and day out

23       that BOP overhears, right?

24       A.   Right.

25       Q.   So if an inmate, starting with the H unit, is outside
```

1   doing recreation, there can be another inmate outside at the

2   same time, correct?

3   A.   Right.  But if there's a question, there's also indoor

4   recreation areas that are separate from the outdoor recreation

5   areas.  So you can segregate.  You can put one inmate outside,

6   you can put one inmate inside if you have any questions.

7   Q.   My point is two inmates can be outside recreating at the

8   same time, correct?

9   A.   Correct.

00:59 10   Q.   Even on the H unit?

11   A.   Right.  There's over-hearings going.

12   Q.   Right.  And those two inmates can talk back and forth to

13   each other, correct?

14   A.   That's what ADX staff say, yes.

15   Q.   Now, if the SAMs comes down and an inmate is no longer on

16   the H unit, they have more ability to communicate during rec

17   time, correct?

18   A.   Correct.

19   Q.   And especially they have more opportunity if they move on

00:59 20   to a USP at some point, correct?

21   A.   Correct.

22   Q.   Because at a USP, they're going to have the availability

23   to play sports and do all types of other activities, correct?

24           MR. BRUCK:  Objection to going on to a USP.

25           THE COURT:  Yeah, sustained.  Sustained.  Let's stay

         1    with the ADX.

         2    BY MR. MELLIN:

         3    Q.   Well, if an inmate has their SAMs removed, they at some

         4    point can get into the stepped-down process, right?

         5    A.   Yes.

         6    Q.   And if they succeed in the stepped-down process --

         7         MR. BRUCK:  This has all been asked and answered and

         8    he's doing the same thing.

         9         THE COURT:  I think it's cumulative.

01:00   10         MR. MELLIN:  I was just trying to link it to the

        11    recreation, your Honor.

        12         THE COURT:  Let's move along.

        13    BY MR. MELLIN:

        14    Q.   Do you know the number of people -- the number, not the

        15    names -- the number of people that are on the defendant's

        16    approved list in this case?

        17    A.   No, I do --

        18         MR. BRUCK:  Objection, your Honor.

        19         THE COURT:  Sustained.

01:01   20         MR. MELLIN:  With the Court's indulgence.

        21         (Pause.)

        22    BY MR. MELLIN:

        23    Q.   Would you agree that the more people that are on an

        24    approved list, there is a greater risk that there could be a

        25    violation?

```
 1            MR. BRUCK:  Objection.
 2            THE COURT:  Sustained.
 3            MR. MELLIN:  Thank you.
 4                    REDIRECT EXAMINATION
 5    BY MR. BRUCK:
 6    Q.   Mr. Bezy, starting back to the SAMs process again, you
 7    were asked yesterday about the SAMs being allowed to expire at
 8    the end of the year?
 9    A.   Correct.
10    Q.   Are you aware whether or not there is an automatic process
11    to trigger the renewal process within the Department of
12    Justice --
13    A.   Yes.
14    Q.   -- by the FBI?
15    A.   Yes.  It's tracked, and I believe it's -- about three to
16    four months out they start the renewal process.
17    Q.   All right.  And so the people involved are notified that
18    the process is ready for renewal and needs to be proceeded
19    with?
20    A.   Correct.
21    Q.   Are you aware of any SAMs inmate convicted of a terrorist
22    offense who had their SAMs discontinued just because the
23    government forgot to renew the SAMs?
24    A.   No.
25    Q.   I believe the government provided us and you with the
```

01:02 (line 10)
01:03 (line 20)

1    total number of SAMs inmates who have been convicted of

2    terrorism-related offenses and assigned to ADX since it opened

3    in 1994.  Do you have that -- do you have that statistic?

4    A.    Yes, I do.

5    Q.    And what -- how many SAMs inmates convicted of

6    terrorism-related offenses have been assigned to ADX since it

7    opened in 1994?

8    A.    Thirty-four.

9    Q.    Thank you.

01:04 10        There was some discussion about being transferred out of

11   ADX.  Based on everything you know about the regulations,

12   procedures, policies of the Federal Bureau of Prisons in which

13   you spent a 28-year career, is there any likelihood that

14   Mr. Tsarnaev will be transferred out of ADX no matter what the

15   result of his conduct, step-down programs or anything else?

16         MR. MELLIN:  Objection.

17         THE COURT:  Sustained.

18   BY MR. BRUCK:

19   Q.    Now, you were questioned a moment ago about the

01:04 20   three -- about the phase-down program at -- on H unit for

21   inmates who have SAMs?

22   A.    Correct.

23   Q.    Am I correct in thinking that in order -- and you said

24   that the -- the Phase 1 to Phase 2 basically involves one more

25   phone call a month?

1    A.    Yes.

2    Q.    And a couple of other minor changes in the way people walk

3    to the showers?

4    A.    Yeah, they get unescorted to the shower and they may

5    get a -- yes.

6    Q.    Okay.  And then for -- and that does not affect the amount

7    of contact -- or whether the person is allowed contact with

8    other inmates on the unit.  Is that correct?

9    A.    Correct.

01:05 10    Q.    Phase 3 does allow some greater interaction with other

11    SAMs inmates on H unit, correct?

12    A.    Correct.

13    Q.    And for that reason, in order to advance to Phase 3, the

14    SAMs actually has to be modified, correct?

15    A.    Correct.

16    Q.    And that modification is up to the Department of Justice,

17    not the Bureau of Prisons?

18    A.    Correct.

19    Q.    All right.  Are there inmates at H unit now who have spent

01:06 20    many years on H unit without ever being approved to go to Phase

21    3 and have a little bit of contact with other inmates?

22              MR. MELLIN:  Objection.

23              THE COURT:  Overruled.

24              You may answer.

25              THE WITNESS:  Yes.

```
 1    BY MR. BRUCK:
 2    Q.    Okay.  By contrast, you also talked about the step-down
 3    program, correct?
 4    A.    Right.
 5    Q.    And that is for people who are not on H unit?
 6    A.    Correct.
 7    Q.    But are at ADX?
 8    A.    Correct.
 9    Q.    And for most inmates, that is designed to eventually get
10    people transferred out of ADX?
11    A.    Yes.
12    Q.    But so long as someone stays at ADX, you've described the
13    conditions there, right?
14    A.    Correct.
15    Q.    And is it your testimony that Mr. Tsarnaev belongs to two
16    categories of inmates that would require him to stay at ADX?
17    A.    It would have impact, yes, and it's -- his CIM of special
18    supervision --
19    Q.    Excuse me.  CIM stands for what?
20    A.    Central Inmate Monitoring.  Special supervision and broad
21    publicity.
22    Q.    Okay.  I'm sorry.  Special supervision --
23    A.    Special supervision and broad publicity.
24    Q.    Okay.  So special supervision is one categorization of an
25    inmate?
```

1    A.    Yes.  It's based upon the nature of his offense.

2    Q.    Based on the nature of the offense?

3    A.    Correct.

4    Q.    Which is not something that he can change?

5    A.    No.

6    Q.    Or that will ever change?

7    A.    No.

8    Q.    And that is a factor that would require him, in your

9    opinion, to stay at ADX?

01:08 10    A.    Yes.

11   Q.    And, in fact, there are inmates who have been convicted of

12   similar offenses who have been at ADX for 20 years or more?

13            MR. MELLIN:  Objection.

14            THE COURT:  Overruled.

15            You may answer it.

16            THE WITNESS:  Yes, Terry Nichols is there.

17   BY MR. BRUCK:

18   Q.    Who is the --

19   A.    He was the --

01:08 20            MR. MELLIN:  Objection, your Honor.

21            THE COURT:  Sustained.

22   BY MR. BRUCK:

23   Q.    And in addition, you mentioned another classification that

24   would separately require him to stay at ADX?

25   A.    Broad publicity.  Where everybody -- basically, there's so

1    much press about him, that everybody -- everybody would know

2    who he is.

3    Q.   All right.  And the reason that that would require him to

4    stay at ADX rather than be transferred to another institution

5    is what?

6    A.   In my opinion, there would be other inmates in different

7    populations that would want to do great bodily harm to him.

8    Q.   Okay.  He could not be safely transferred out of ADX?

9    A.   No.

01:08 10   Q.   Mr. Mellin asked about challenges to the SAMs restrictions

11   in court?

12   A.   Yes.

13   Q.   To your knowledge, has any court, any court --

14              MR. MELLIN:  Objection.

15              THE COURT:  I haven't heard the question.

16              MR. BRUCK:  May I finish the question?

17              THE COURT:  Yes, go ahead.

18   BY MR. BRUCK:

19   Q.   Has any court ever removed a SAMs classification from an

01:09 20   inmate?

21   A.   No.

22              MR. MELLIN:  Your Honor, objection.  He doesn't have a

23   basis of knowledge for that.

24              THE COURT:  The answer may stand.

25              MR. BRUCK:  If you would bear with me just one moment,

1    your Honor.

2              (Counsel confer off the record.)

3              MR. BRUCK:  That's all we have.  Thank you very much.

4              MR. MELLIN:  Your Honor, very briefly?

5              THE COURT:  Okay.

6                        RECROSS-EXAMINATION

7    BY MR. MELLIN:

8    Q.   Mr. Bezy, how many legal cases have you read to -- that

9    form the basis of your last statement that no court has ever

01:10  10   done something?

11   A.   It came from your FBI female agent that's over the

12   national counterterrorism task force.

13   Q.   You're aware that courts have, and the parties have agreed

14   based on courts' decisions, to modify SAMs, correct?

15              MR. BRUCK:  Objection, your Honor.  This is a legal

16   conclusion --

17              THE COURT:  Well, no.  Go ahead.  You may answer it.

18              MR. BRUCK:  -- regarding a Court's decision.

19              THE COURT:  You may have it.

01:10  20              THE WITNESS:  I'm going by what the FBI subject matter

21   expert told us the other day in a meeting.

22   BY MR. MELLIN:

23   Q.   Okay.  So you're basing your entire testimony here in this

24   court --

25              MR. BRUCK:  Objection to his entire testimony.

```
 1              MR. MELLIN:  No -- on this point.

 2              THE COURT:  Start the question again.

 3    BY MR. MELLIN:

 4    Q.   You're basing your testimony on that point in this court

 5    based on a conversation that you had on Tuesday.  Is that

 6    right?

 7    A.   She's the leader of the national joint terrorism task

 8    force who you would think would know it.  And I took her word

 9    for it, yes.

10    Q.   You were asked about two factors that Mr. Bruck said would

11    have an impact on the defendant's transfer out of ADX, right?

12    A.   Correct.

13    Q.   How many total factors are there?

14    A.   There's a number of them, yes.

15    Q.   Right.  How many?

16    A.   Offhand, I don't know.  Well --

17              MR. BRUCK:  Relevance.

18              THE COURT:  Overruled.

19              MR. BRUCK:  It's also misleading, your Honor.  We

20    think it implies that more than one is required to keep someone

21    at ADX.

22              MR. MELLIN:  Your Honor, I object to that comment.

23              THE COURT:  No, you may have the question.

24              THE WITNESS:  I don't know.  There's a number of them.

25    BY MR. MELLIN:
```

Q.    Right.  As you sit here today, you don't even know the
answer to that question, do you?
A.    I have a policy right here.  If I need to know it, I can
look up the policy.
Q.    I'm asking you, as you sit here today, you don't even know
the number of factors the BOP would have to consider to
determine whether or not the defendant will be transferred out
of ADX?
A.    I made the initial recommendation --
Q.    Sir, if you could please just answer my question.
A.    Okay.  Could you repeat it?
Q.    As you sit here right now, you don't even know the number
of factors that are involved in the determination of deciding
if the defendant would be sent out of ADX, correct?
A.    It can be one factor, correct.
Q.    You don't know the number, correct?
A.    The total number, no.  But I know the numbers that are on
him, and it doesn't take all the factors to be applicable.
Q.    And you're testifying as an expert in this field, correct?
A.    Correct.
Q.    Yet you don't even know the other factors that are
involved, correct?
A.    There are a number of them.  There's escape risk, sex
offenders, drug dealers, sentence length.  I mean, you can go
on and on and on if you want to.

```
 1    Q.   Right.  There's a very long list and you cherry-picked two

 2    out of it?

 3    A.   I didn't cherry-pick.  That's what --

 4         MR. BRUCK:  Objection to the characterization of

 5    cherry-picking.

 6         THE COURT:  Well, the witness has contradicted it, so

 7    we'll just let it stand.

 8    BY MR. MELLIN:

 9    Q.   There's a very long list and you just talked about two,

10    correct?

11    A.   No, that's what the Bureau of Prisons in their

12    professional judgment put on him as two assignments necessary

13    to provide adequate security for him.

14    Q.   Right.  And all I'm asking, those other factors could

15    override the one or two factors you've talked about, correct?

16    A.   It's possible but not likely.

17    Q.   And it's -- that decision is not made by Mr. Bezy, it's

18    made by the people at ADX, correct?

19    A.   No, it's made by -- this was made by a case manager, can

20    make a recommendation; the institution can be; the region can

21    approve it; the central office can do it.  It's made by the

22    professionals in the Bureau of Prisons.

23    Q.   It's not made by you, correct?

24    A.   Correct.

25         MR. MELLIN:  Thank you.
```

1          THE COURT:  All right, Mr. Bezy.  Thank you.  You may

2     step down.

3               (The witness is excused.)

4          THE COURT:  Jurors, let me just mention one thing.  I

5     believe it was yesterday there was some reference in the

6     testimony to costs of running a prison and so on.  Any possible

7     cost to the government from any method of punishment is not an

8     appropriate subject for you to be considering at all, and there

9     are principally two reasons for that:  First of all, it's just

01:14 10     improper to consider cost in making the serious judgment you'll

11     have to make.  That's completely irrelevant to your decision

12     and you're not to make it.  The second is, of course, you don't

13     have any information about that, what the cost of relative or

14     possible punishments might be, so there's no way to make a

15     rational judgment about it not having that information.

16               So there was some reference to it, but it's not a

17     proper subject for you to consider, all right?

18               We'll take a short -- well, I don't know how long.

19     We'll take a recess.

01:15 20          THE CLERK:  All rise for the Court and the jury.  The

21     Court will take a recess.

22               (The Court and jury exit the courtroom and there is a

23     recess in the proceedings at 11:42 a.m.)

24               (The Court and jury entered the courtroom at 1:02

25     p.m.)

1          THE COURT:  Jurors, again, we appreciate your

2     patience.  There are some issues we've been working on.

3     Actually, we need a little bit more time.  We're going to

4     actually end the day today here and the week and ask you to

5     come back on Monday.  I think this approach will make it

6     smoother on Monday when we actually get going.  All right.

7          So, once again, I caution you to avoid any discussion

8     of the case.  Don't make up your mind about any of the issues

9     in the case, of course, and, as much as you can, as you've told

02:36 10    me you have been able to do, avoid any accounts of the media in

11    the case.

12         Have a good weekend.  It looks like the weather is

13    going to be delightful for a change.  And we'll see you on

14    Monday morning.  We'll be in recess.

15         THE CLERK:  All rise for the Court and the jury.  The

16    court will be in recess.

17    (Whereupon, at 1:04 p.m. the trial recessed.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  May 7, 2015

17

18

19

20

21

22

23

24

25