Susan Bandes/Draft of December 4, 2013

Remorse and Demeanor in the Courtroom: Cognitive Science and the Evaluation of
Contrition

December 4, 2013

Susan A. Bandes
Centennial Distinguished Professor
DePaul University College of Law
25 E. Jackson Blvd.
Chicago, IL 60604
(312) 362 8452
sbandes@depaul.edu

Electronic copy available at: http://ssrn.com/abstract=2363326

Susan Bandes/Draft of December 4, 2013

Abstract

Although there is a rich legal literature on *whether* remorse should play a role in the criminal justice system, there is far less discussion of *how* remorse can be evaluated in the legal context— if indeed it can. There is ample evidence that perceptions of remorse play a powerful role in criminal cases. Whether a defendant is regarded as appropriately remorseful is often a determinative factor in criminal sentencing, including capital sentencing. And in capital cases, in which the defendant rarely testifies, the evaluation of remorse may be based entirely on the facial expression and body language of a defendant sitting silently in the courtroom. Yet the most basic questions about the evaluation of remorse have received little attention: what is it precisely that is being evaluated, and how adept are decision makers at evaluating it? What criteria are being applied and with what level of consistency and fairness?

There is evidence that the evaluation of remorse is particularly difficult across cultural, ethnic or racial lines, or where juvenile or mentally impaired defendants are being judged. But this troubling evidence leads to several larger questions. Is remorse (or the lack of remorse) something that can ever be accurately evaluated in a courtroom? If remorse is not susceptible to courtroom evaluation, is it feasible to bar decision-makers from considering it?  And if evaluation of remorse is a permanent feature of the criminal justice system, what can be done to improve upon an evaluative process that is demonstrably riddled with error and bias?

The article considers these questions in light of findings in three flourishing areas of cognitive science:  the field of interpretation of facial expressions and "micro" expressions (expressions difficult for the untrained eye to recognize), the study of the dynamics of empathy and empathic accuracy, and the study of implicit bias.

Electronic copy available at: http://ssrn.com/abstract=2363326

Susan Bandes/Draft of December 4, 2013

# Remorse and Demeanor in the Courtroom: Cognitive Science and the Evaluation of Contrition

Susan A. Bandes*

I.      Introduction

Though it occurred over a decade ago, the story of the first encounter between former U.S. President George W. Bush and Russian President Vladimir Putin still elicits amused derision. The former president famously said about Putin: "I looked the man in the eye. I found him to be very straightforward and trustworthy and we had a very good dialogue. I was able to get a sense of his soul."[1] The notion of looking into Putin's eyes and seeing his soul met with substantial scorn in part because of a widespread consensus that former President Bush had misread President Putin's soul,[2] but also because the entire soul-reading enterprise sounds mystical, irrational, and inappropriate for questions of governance. And so perhaps it is surprising how much stock the legal system places in the ability to resolve questions of deep

*Centennial Distinguished Professor, DePaul University College of Law. For their valuable comments on drafts of this article I am grateful to John Deigh, Jordan Steiker, and the other participants in the University of Texas Law and Philosophy Workshop, to Song Richardson and the other participants in the University of Iowa Faculty Workshop, to Gary Edmond, Simon Halliday, Jill Hunter, Mehera San Roque, Paul Roberts and the other participants in the "Conduct Unbecoming" workshop at the University of New South Wales Law School, to Neil Feigenson, to Carol Sanger, to Susannah Scheffer, and to the attendees at the law and emotion panel at the 2013 meeting of the International Society for Research on Emotion in Berkeley, CA. For excellent research assistance I thank Devin DiDominicus, Rachel Milos, Robin Wagner and DePaul Law Librarian Mark Giangrande.

[1] See Carla Ann Robbins, *Mr. Bush Gets another Look into Putin's Eyes*, NEW YORK TIMES, June 30, 2007 (recounting 2001 comment).
[2] See James Pinkerton, *Bush Looks into Putin's soul; Fails to See Tyrant*, NEW AMERICA FOUNDATION, November 11, 2003, available at http://www.newamerica.net/node/6336

Susan Bandes/Draft of December 4, 2013

character by looking into the eyes of litigants and witnesses, reading their body language, and evaluating other aspects of what the legal system calls "demeanor" and credibility."

Most common law systems[3] place tremendous faith in the importance of live witness testimony.[4] In the United States, the preference for live testimony, given in open court, is enshrined in the Sixth Amendment's Confrontation Clause and in the Federal Rules of Civil Procedure.[5] But the importance of confrontation and of the ability to assess the demeanor of witnesses is considered a central feature of the right to a fair trial in common law jurisdictions more generally.[6] Live testimony has, since its inception, been intimately tied to a belief in the importance of personal observation to the ability to evaluate demeanor.[7] Demeanor evidence is often described as an "elusive and incommunicable imponderable"[8] and as relying on "sense impressions."[9] It relies heavily on the interpretation of facial expression and body language.

This article will begin with a discussion of the concept of evaluating demeanor through facial expressions and body language. More specifically, it will argue that the notion of "demeanor" has long been too narrowly conceived. Demeanor evidence is portrayed as a means

---

[3] Although the preference for live testimony is less marked in inquisitorial systems, the U.S. system of justice, in line with common law adversarial tradition, exhibits a strong preference for oral as opposed to documentary evidence. Inquisitorial systems tend to exhibit a preference for documentary evidence, with the Dutch system often cited as one that most strongly favors documentary over oral, immediate evidence. See e.g. Martha L. Komter & Marijke Malsch, *The Language of Criminal Trials in an Inquisitorial System: The Case of the Netherlands*, at 408-409, in LAWRENCE SOLAN, THE OXFORD HANDBOOK OF LANGUAGE AND LAW (Oxford Univ. Press 2012).

[4] This preference has venerable roots. See James P. Timony, *Demeanor Credibility,*, 49 C. U. L. REV. 903, 916-918 (2000) discussing the history of live testimony and demeanor evidence dating back at least to early Roman legal practice.

[5] FRCivP 43 provides that "in every trial the testimony of witnesses shall be taken in open court."

[6] See e.g. *Police v. Razamjoo*, [2005] DCR 408; 2005 NZDCR LEXIS 3 (January 14, 2005); *The Queen and Anwer Shah Wafiq Sayed* (August 19, 2010, District Court of Western Australia); *Davis v. R.*, UKHL 36 (June 18, 2008).

[7] See e.g. *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (discussing the centuries-old belief that face to face encounter is essential to a fair trial). See also Olin Guy Wellborn III, *Demeanor*, 76 CORNELL L. REV. 1075, 1076-77 (1991) (citing sources tying the importance of demeanor as an indicator of credibility to the preference for in court testimony).

[8] Timony, *supra* note 4 at 921 (quoting Henry S. Sahm, *Demeanor Evidence; Elusive and Intangible Imponderables,* 47 ABA J. 580, 580 (1961)).

[9] *Id.* quoting Judge Learned Hand *in Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952).

Susan Bandes/Draft of December 4, 2013

of measuring candor and credibility, as if these qualities can be assessed in a vacuum. In fact, decision-makers evaluating demeanor assess a more complex amalgam of emotions, traits, attitudes and attributes—and do so through the lens of their own emotions, attitudes and biases.

The article will then turn to one particular use of demeanor evidence that assumes outsized importance in criminal cases: the evaluation of a defendant's remorse.  In the criminal justice context, crucially important decisions about life and liberty hinge on whether decision-makers find offenders to be appropriately remorseful.  Several studies have found that in capital cases the remorsefulness of the defendant is a crucial factor, and in a significant majority of cases, *the* crucial factor, in determining whether the defendant is sentenced to death.[10]  In capital cases, the defendant rarely takes the stand at either the guilt phase or the sentencing phase. In such cases, the defendant's facial expression and body language as he or she sits silently in court is one of the most influential factors in the jury's evaluation[11] of his level or remorse.

Remorse affects assessments of guilt and punishment in several other criminal justice contexts as well. [12] The lack of remorse is viewed as a primary indicator of a psychopathic personality or antisocial personality disorder.[13] The lack of remorse can lead to more punitive sentences, more restrictive prison conditions, and denial of parole or a pardon or clemency.[14] In the juvenile context, it can lead to transfer of an adolescent accused of a felony from juvenile

---

[10] See *infra* notes 70-74.

[11] In every current capital punishment jurisdiction, the sentencing decision is made by the jury, at least as an initial matter.

[12]  Expressions of remorse may also affect the conduct and resolution of civil suits.  See *e.g.* Day MV & Ross M., *The Value of Remorse: How Drivers' Responses to Police Predict Fines for Speeding,* 5 L. & HUM. BEHAV. 22 (2011). Brian H. Bornstein, Lahna Rung & Monica K. Miller, *The Effects of Defendant Remorse on Mock Juror Decisions in a Malpractice Case*, 20 BEHAV. SCI. & THE L. 393 (2002). See also Etienne & Robbennolt, *Apologies and Plea Bargaining*. 91MARQUETTE L. REV. 295 (2007).

[13] Richard Weisman, *Remorse and Psychopathy at the Penalty Phase of the Capital Trial: How Psychiatry's  View of "Moral Insanity' Hleps Build the Case for Death,* 41 STUD. IN LAW, POLITICS & SOC'Y 187 (2007).

[14] Dawn T. Robinson, Lynn Smith-Lovin & Olga Tsoudis, *Heinous Crime or Unfortunate Accident? The Effects of Remorse on Responses to Mock Criminal Confessions,* 73 Social Forces 175, 176 (1994).

Susan Bandes/Draft of December 4, 2013

to adult court.[15] The demand for remorse has had an especially pernicious effect on the wrongly convicted, whose persistent refusal to admit to a crime can lengthen and worsen their sanctions.[16]

The available evidence makes it clear that there are no consistent criteria by which remorse is currently measured, that instead remorse is often in the eye of the beholder, and that when criteria are articulated, they are often based on inaccurate folk knowledge. This state of affairs—in which life or death decisions are based on folk knowledge that is at best unsubstantiated and at worst demonstrably wrong—ought to be regarded as untenable. It leads to several pressing questions. Is remorse (or the lack of remorse) something that can ever be accurately evaluated in a courtroom? If remorse is not susceptible to courtroom evaluation, is it feasible to bar decision-makers from considering it?  And if evaluation of remorse is a permanent feature of the criminal justice system, what can be done to improve upon an evaluative process that is demonstrably riddled with error and bias?

This article draws from three thriving fields of inquiry in the cognitive sciences that have the potential to illuminate these issues: the study of the interpretation of facial expressions and body language, the study of the dynamics of empathy, and the study of implicit bias.

II.     The Traditional Discourse on Demeanor

"Witness's demeanor has long been regarded as a primary method of ascertaining the truth and accuracy of their narratives."[17] Demeanor "includes a witness's dress, attitude, behavior, manner, tone of voice, grimaces, gestures, and appearance. In other words, demeanor

---

[15] Martha Grace Duncan, *So Young and So Untender: Remorseless Children and the Expectations of the Law*, 102 COLUMBIA L. REV. 1469 (2002)

[16] Richard Weisman, *Showing Remorse: Reflections on the Gap between Attribution and Expression in Cases of Wrongful Conviction*, 46 CANADIAN J. OF CRIMINOLOGY & CRIM. JUST. 121 (2004).

[17] Timony, *supra* note 4 at 919.

Susan Bandes/Draft of December 4, 2013

includes 'all matters which cold print does not preserve.'"[18] According to Black's Law

Dictionary, demeanor includes:

> The tone of voice in which a witness's statement is made, the hesitation or readiness with which his answers are given, the look of the witness, his carriage, his evidence of surprise, his gestures, his zeal, his bearing, his expression, his yawns, the use of his eyes, his furtive or meaning glances, or his shrugs, the pitch of his voice, his self-possession or embarrassment, his air of candor or seeming levity.[19]

Case law tends to discuss demeanor evidence as a window into credibility, and much of the

scholarship on demeanor evidence focuses on whether it leads to accurate assessments of

credibility and truthfulness as a general matter.[20] According to one of the major articles on

demeanor:

> The appearance and nonverbal behavior of a witness might bear upon the witness's credibility in two ways: first, as an indicator of sincerity—the willingness of the witness to tell the truth--and second, as evidence of the quality of the witness's perceptions and memory—his or her capacity to know the truth.[21]

But this formulation is unrealistic in two respects. First, it treats candor and credibility as if they

can be evaluated in a vacuum, and fails to address the dynamics of determining who to trust and

who to believe—a determination that is only partially cognitive. Second, it fails to reflect the fact

that candor and credibility are only part of what is being evaluated by legal decision makers. The

standard account makes no mention of the fact that decision- makers look to demeanor evidence

to evaluate other traits and attitudes as well. For example, in a criminal trial, decision-makers

examine the defendant's demeanor as a primary means of evaluating two crucially important

factors: his remorse and his future dangerousness.

---

[18] Timony, *supra* note 4 at 907, citing *Broadcast Music, Inc. v. Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 (2d. Cir. 1949).
[19] *Id.* at 919, citing Black's Law Dictionary 430 (6th ed. 1990)
[20] Olin Guy Wellborn III, *Demeanor*, 76 CORNELL L. REV. 1075 (1990), Jeremy A. Blumenthal, *A Wipe of the Hands, A Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility*, 72 Neb. L. Rev. 1157(1993).
[21] Wellborn, *id* at 1078.

Susan Bandes/Draft of December 4, 2013

The traditional discourse on evaluating demeanor is, in short, too narrowly focused. It approaches the evaluation of truth and accuracy as if it is solely a cognitive, rational task—one that requires no forays into the affective realm.  It treats this evaluative process as if it can be isolated from the process of evaluating the subject's behavior, attributes and character more broadly. It reads out not only the emotions being evaluated, but also the emotions of the evaluator. We need a richer and more realistic descriptive account of the dynamics of the evaluation, and of the impact of these dynamics on decision- making. This will enable a fuller normative discussion of what attributes ought to matter, and in turn, a more informed practical discussion of how to facilitate better decision-making.

Evaluating demeanor draws decision- makers into emotional appraisal and into assessing defendants, witnesses and others (judges, other jurors, even victims[22]) against preexisting emotional schemas.[23] These appraisals[24] engage a broad range of the decision-maker's attitudes and emotions, and assess a broad range of the evaluated party's characteristics. It would be comforting to think decision-makers could distinguish the legally relevant characteristics of these

---

[22] Scott D. Sundby, *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 CORNELL L. REV. 343 (2003) (finding the jurors feel more empathetic toward some victims than others, and that their degree of empathy can have a significant influence on their sentencing decisions). See also Salerno, J. M., Murphy, M. C., & Bottoms, B. L. *Give the Kid a Break—But Only if He's Straight: Retributive Motives Drive Biases against Gay Youth in Ambiguous Punishment Contexts.* (Forthcoming Publication.)

[23] See *e.g.* MARY L. SHUSTER & A.D. PROPEN, VICTIM ADVOCACY IN THE COURTROOM: PERSUASIVE PRACTICES IN DOMESTIC VIOLENCE AND CHILD PROTECTION CASES (N.E. 2011) on how judges expect rape victims and domestic violence victims to feel and display their feelings. See also Karl Ask & Sara Landstrom, *Why Emotions Matter: Expectancy Violation and Affective Response Mediate the Emotional Victim Effect*, 34 L. & HUM. BEHAV. 392 (2010) (discussing findings that emotionally agitated rape victims are found more credible because they conform to expectations of how a "real" rape victim acts, and reporting on their own findings supporting the alternative explanation that emotional rape victims are believed more readily because they elicit compassionate affective responses).

[24] See Robinson, Smith-Lovin & Tsoudis, *supra* note 14 discussing "affect control theory," which proposes that observers use information on emotion to help understand others' identities, predict their likely future behaviors, and determine what behaviors to direct toward them.

Susan Bandes/Draft of December 4, 2013

appraisals from the "extra-legal"[25] characteristics.  The difficulty is that in the decisional process, the legal and extra-legal factors cannot be so cleanly separated.[26]

Legally relevant inquiries—for example the defendant's truthfulness, his observational accuracy, his state of mind—require the fact-finder to exercise empathy: to seek to understand the intentions, motivations, and desires of another. As I will discuss below, empathy may be elicited by factors like similarity, familiarity[27] and sympathy. It may be triggered by all sorts of traits and characteristics, both legal and extra-legal. It may be influenced by pre-existing conceptions about how a blameworthy person or a trustworthy person acts, and how such a person appears. It is, therefore, likely to be influenced by attractiveness,[28] likeability, class, gender, ethnicity or race.[29]  We cannot hope to address these dynamics—to seek out ways to regulate against the use of pernicious or harmful factors—until we acknowledge and seek to understand them.

---

[25] See *e.g.* David T. Wasserman & J. Neil Robinson, *Extra-Legal Influences, Group Processes, and Jury Decision-making: A Psychological Perspective*, 12 N. C. CENT. L. J. 96, 99 and 101 (1980-81); Paul H. Robinson, Sean E. Jackowitz, and Daniel M. Bartels, *Extra -Legal Punishment Factors: A Study of Forgiveness, Hardship, Good Deeds, Apology, Remorse, and Other Such Discretionary Factors in Assessing Criminal Punishment*, 65 VANDERBILT L. REV. 737 (2012).

[26] See Wasserman & Robinson, *id.* at 106-110, considering various ways in which extra-legal factors influence legal factors in juror judgment.

[27] Douglas O. Linder, *Juror Empathy and Race*, 63 TENN. L. REV. 887, 897 (1995). See also Randall A. Gordon, *Attributions for Blue-Collar and White-Collar Crime: The Effects of Subject and Defendant Race on Simulated Juror Decision*, 20 J. Applied Soc. Psychol. 971, 194  (1990) (mock jury experiments indicate that jurors *always* view a black defendant a more likely to repeat a crime, regardless of the crime in question.)

[28] See *e.g.* David Landy & Elliot Aronson, *The Influence of the Character of the Criminal and His Victim on the Decisions of Simulated Jurors*, 5 J. EXPERIMENTAL SOC. PSYCHOL. 141, 151  (1969) (finding that mock jurors find it easier to imagine themselves in the defendant's situation when the defendant is attractive, and also perceive the crime as more serious--and the defendant as more unattractive--when the victim is attractive). But see DENNIS J. DEVINE, JURY DECISION MAKING: THE STATE OF THE SCIENCE at 93-94 (NYU Press 2012) citing a recent meta-analysis of the studies that finds that defendant attractiveness reduces sentence, but noting that most studies have involved mock jurors, and that retrospective analyses of actual juries have much more ambiguous results.

[29] *Id.* Sometimes these factors can be measured. See *McClesky v. Kemp*, 481 U.S. 279 (1987); David C. Baldus *et al.*, *Comparative Review of Death Sentences:  An Empirical Study of the Georgia Experience,* 74 J. CRIM. L. & C. 661 (1983); Raymond Paternoster *et al., Justice by Geography and Race:  The Administration of the Death Penalty in Maryland,* 1978-1999, 4 U. OF MD. L. J. OF RACE, RELIGION, GENDER & CLASS 1, 12-14 (2004) (studies demonstrating that race of victim has a significant influence on imposition of the death penalty).

Susan Bandes/Draft of December 4, 2013

III.  Evaluating Demeanor: The Dynamics of Empathy

The content of an emotion---here one imagines something like a picture. The human face might be called such a picture…[30]

Demeanor evidence is often described as an "elusive and incommunicable imponderable"[31] and as relying on "sense impressions."[32] Yet demeanor evidence isn't so imponderable after all. Acknowledging its emotional content opens up a rich vein of inquiry. For example, in a fascinating article, the neuropsychologist Jonathan Cole discusses the importance of the face for the ability to understand the inner states, motives and intentions of others.[33] The understanding that others possess inner states, motives and intentions different from our own is often called "theory of mind."[34] Theory of mind overlaps with the capacity for empathy.[35] Both require the recognition that others have thoughts, desires, motives and intentions different from one's own. Empathy also encompasses the ability to infer the internal states of others (the latter may also be called "empathic inference.")[36] It is an essential capacity for interpersonal relations. Cole observes that the way into the minds of others was not initially through the development of knowledge of another's cognitive states. Instead, as increasingly complex inner states evolved, they were revealed, expressed, and in part experienced through the body as an affective

---

[30] WITTGENSTEIN, CULTURE AND VALUE (1980), quoted in Jonathan Cole, *Empathy Needs a Face*, 8 J. OF CONSCIOUSNESS STUDIES 51, 55 (2001).

[31] Timony, *supra* note 4 at 921 (quoting Henry S. Sahm, *Demeanor Evidence; Elusive and Intangible Imponderables*, 47 ABA J. 580, 580 (1961)).

[32] *Id*, quoting Judge Learned Hand in *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952).

[33] Jonathan Cole, *Empathy Needs a Face*, 8 J. OF CONSCIOUSNESS STUDIES 51 (2001).

[34] See e.g. William D. Casebeer, *Moral Cognition and Its Neural Constituents*, 4 NATURE R./NEUROSCIENCE 841, 844 (2003). As with many of the terms used herein, theory of mind is a term whose meaning varies across disciplines.

[35] The term "empathy" has no one fixed meaning. See e.g. C. Daniel Batson, These Things Called Empathy: Eight Related but Distinct Phenomena, in DECETY AND ICKES, THE SOCIAL NEUROSCIENCE OF EMPATHY, 57 (The MIT Press 2011). Here I use the term to describe the ability to understand the internal state of another, including his thoughts and feelings. Batson id at 4.

[36] See e.g. William Ickes, *Empathic Accuracy: Its Links to Clinical, Cognitive, Developmental, Social, and Physiological Psychology, in* DECETY AND ICKES, THE SOCIAL NEUROSCIENCE OF EMPATHY, 57 (The MIT Press 2011).

Susan Bandes/Draft of December 4, 2013

domain.[37]  Similar findings have been made about the function of body language as a means of conveying subjective states such as motive and intention. "Recent research suggests a mechanism at the neural level that would enable such representations of others' actions, including facial expressions and bodily postures that may convey emotional states."[38]

Cole concludes that "the face…may have evolved not simply to display complex affective inner states but for those to influence the observer to feel the same."[39] "Empathy …is supported by, and requires, the embodied expression and communication that the face provides."[40] This is a powerful explanation for the value added by demeanor evidence and in-court testimony more generally. They elicit empathy. Empathy is a capacity that has been much studied in recent years. There is a growing store of knowledge that can be used to evaluate its dynamics, its limitations, and the conditions under which it best advances the goals of justice.[41]

Empathy has a significant effect on legal judgment.  For example the operation of empathy for defendants and victims influences decision making in criminal cases, as shown in cases involving both mock[42] and actual[43] juries. Thus it is a matter of concern to the legal system that not everyone possesses empathic capacity in equal measure. Some have more empathic accuracy than others.[44] Some are more aware of their empathic limitations than others.

---

[37] Cole *supra* note 30 at 51 (discussing the findings of Peter Hobson on theory of mind and autism).

[38] Suzanne Keen, *A Theory of Narrative Empathy*, 14 NARRATIVE 207, 212 (2006).

[39] Cole, *id* at 54 to 55.

[40] *Id* at 51.

[41] For example, there is evidence that when a witness or defendant appears via videoconferencing, fact-finders view him less favorably than when viewing live testimony. Viewers find live witnesses more attractive, intelligent, honest and trustworthy than remote witnesses. Ann Bowen Poulin, *Criminal Justice and Videoconferencing Technology: The Remote Defendant*, 78 TULANE L. REV. 1089, 1119 (2004).

[42] Olga Tsoudis, *The Influence of Empathy in Mock Jury Criminal Cases: Adding to the Affect Control Model*, 4 W. CRIMINOLOGY REV. 55 (2002).

[43] Linder, *supra* note 27.

[44] See e.g. Ickes*, supra* note 36.

Susan Bandes/Draft of December 4, 2013

It is a matter of particular concern that empathic inaccuracy is exacerbated by several factors that ought to be irrelevant to legal decision-making. Empathy is selective. It tends to flow most easily toward those like us, or toward those in whose shoes we can imagine ourselves.[45] People tend to impute their own internal states to those they perceive as similar, but "employ stereotypes to infer the internal states of those they view as dissimilar."[46] There is also evidence that "depth of processing;" (the willingness to draw inferences about others' subjective attributes) suffers when people are confronted with faces different from their own.[47] That is, empathy is negatively affected by difference.[48] This has been documented in regard to race,[49] ethnicity,[50] age,[51] and mental disability.[52]

---

[45] John R. Chambers & Mark H. Davis, *The Role of the Self in Perspective-Taking and Empathy: Ease of Self-Simulation as a Heuristic for Inferring Empathic Feelings*, 30 Soc. Cognition 153 (2012) (most theories of empathy argue that "the self is a template that observers apply to the target during perspective-taking," *id.* at 154 but in addition it is possible that observers will be more empathic if they can easily imagine themselves in the same situation.)

[46] *Id.* at 154.See also Jennifer L. Eberhardt, Paul G. Davies, Valier J. Purdie-Vaughs & Sheri Lynn Johnson, *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*, 17 Psychol. Sci. 383 (2006) (reporting that stereotypes, such as the belief that black people are more criminally inclined, can affect jurors' evaluation of credibility and blameworthiness).

[47] Ronald S. Everett & Barbara C. Nienstedt, *Race, Remorse, and Sentence Reduction: Is Saying You're Sorry Enough?* 16 Just. Q. 99, 118 (1999). See also L. Ducci, L. Arcuir, T.W. Georgis & T. Sineshaw, *Emotion recognition in Ethiopia: The Effect of Familiarity with Western Culture on Accuracy of Recognition*, 13 J. of Cross-Cultural Psychol. 340 (1982) (in a study of levels of emotional response among black and white students to facial expressions of fear and happiness, both groups responded most to the facial expressions of individuals of their own race).

[48] Recent work on implicit bias also sheds light on how negative stereotypes affect the evaluation of evidence. Levinson and Young, for example, describe the dynamics of "priming:" "the incidental activation of knowledge structures, such as trait concepts and stereotypes, by the current situational context." Justin D. Levinson & Danielle Young, *Different Shades of Bias: Skin Tone, Implicit Racial Bias, and Judgments of Ambiguous Evidence*, 112 W. Va. L. Rev. 307, 326 (2010).

[49] William J. Bowers, Benjamin D. Steiner & Marla Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. Pa. J. Const. L. 171, 257-58 (2001), Everett, *supra* note 47 at 102. See also Debi Roberson, Ljubica Damjanovic & Mariko Kikutani, *Show and Tell: The Role of Language in Categorizing Facial Expression of Emotion*, 3 Emotion Rev. 255 (2010) (citing findings that people respond most strongly to the facial expressions of individuals of their own race).

[50] See e.g. Deborah Franklin, *Disgust or Anger? Some Looks Don't Translate*, National Public Radio, August 14, 2009, available at www.npr.org/blogs/health/2009/08/to_spot_an_eastwest_difference.html   See also Everett *supra* note 56  at 117-118, discussing 'culturally defined inhibitions that preclude the open demonstration of certain emotional expressions."

[51] Duncan, *supra* note 15.

Susan Bandes/Draft of December 4, 2013

## IV.  Remorse

Remorse is a prominent example of an emotion (or trait, or attitude) that is not acknowledged in the traditional discourse on demeanor, though it plays a significant role in the evaluation of demeanor. There is substantial evidence that perceptions of a defendant's remorse have a causal effect on judgment: that jurors,[53] judges,[54] parole boards,[55] probation officers[56] and other decision makers treat remorse as one of the determinative factors in their decisions.[57] In some of these venues, the decision maker has access to the subject's own description of his emotions and attitudes (for example through in-court testimony, forensic interviews, or pre-sentence reports). In some situations, evidence of the defendant's behavior during or after the incident in question may bear on remorse. But in many cases the defendant's in-court demeanor is the major determinant of whether he is adjudged appropriately remorseful. This reliance on in-court demeanor is most prominent in capital cases, since in most capital cases the defendant does not testify at trial or sentencing. Indeed, the United States Supreme Court explicitly recognized the

---

[52] Georgina Stobbs & Mark Rhys Kebbell, *Jurors' Perception of Witnesses with Intellectual Disabilities and the Influence of Expert Evidence*, 16 J. APPLIED RES. INTELL. DISABILITIES 107 (2003) (finding that mock jurors found such witnesses to be honest but not reliable and that expert testimony can help ameliorate prejudicial assumptions).

[53] Scott E. Sundby, *The Capital Jury and Absolution*, 83 Cornell L. Rev. 1557 (1998), Haney, Sontag & Costanza, *supra* note 22, Eisenberg *et al*, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 CORNELL L. REV. 1599, 1604-07 (1998), William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 AM. J. CRIM. L 1, 16-17 (1987-1988). See also M. Kimberly MacLin, Conn Downs, Otto H. HacLin, & Kather M. Caspers, *The Effect of Defendant Facial Expression on Mock Juror Decision-making: The Power of Remorse*, 11 N. AM. J. OF PSYCHOL. 323 (2009) (finding that mock jurors are significantly more likely to reach a lenient verdict when a defendant's facial expression is remorseful).

[54] Zhong, Baranoski, Feigenson *et al*, *So You're Sorry? The Role of Remorse in Criminal Law* 36 (Pending Publication on File at J. OF THE AM. ACAD. OF PSYCHIATRY & THE L.) (qualitative study based on interviews with sitting judges), Everett *supra* note 47, at 102.

[55] Richard Weisman, *Problems and Consequences of How Canadian Parole Boards Decide Who is Remorseful and Who is Not,* THE L. & SOC'Y. ASS'N., (2013).

[56] Everett, *supra* note 47, at 103.

[57] Although lack of remorse is linked to detrimental outcomes in almost every context, there is some evidence that when a defendant shows remorse before culpability has been established, his remorse may be taken as an indicator of guilt. Wasserman, *supra* note 25 at 96; Brian H. Bornstein, Lahna Rung and Monica K. Miller, *The Effects of Defendant Remorse on Mock Juror Decisions in a Malpractice Case*, 20 BEHAV. SCI. & THE L. 393 (2002).

Susan Bandes/Draft of December 4, 2013

importance of remorse and of facial expressions as a means of demonstrating remorse in capital cases, observing that "serious prejudice could result if medication inhibits the defendant's capacity…to demonstrate remorse or compassion…In [capital cases] assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the defendant lives or dies."[58]

As I will discuss, there is a growing body of evidence about what can go wrong with the process of evaluating remorse. Conversely, there is little or no evidence that remorse can be accurately evaluated based on demeanor or body language.[59] The most basic questions about the evaluation of remorse have received little attention: what is it precisely that is being evaluated, and how adept are decision makers at evaluating it? What criteria are being applied and with what level of consistency and fairness?  Unfortunately, even when remorse is referenced in judicial or legislative contexts, it is not defined.[60] It is necessary to turn to sources like interviews with judges and jurors to understand what decision makers mean by the term "remorse."  Or more precisely, to understand  "what expectations [] these decision-makers have for the *display and communication* of remorse[61]

A comparison between apology and remorse places the difficulty of evaluating remorse in sharp relief. An apology is an outward manifestation, generally verbal in nature. Its existence is externally ascertainable. An apology might be sincere or insincere, and these underlying motivations are far less ascertainable. However, whether an apology is sincere may not matter. For example, legal scholar Brent White has argued that in some situations, for example the

---

[58] *Riggins v. Nevada*, 504 U.S. 127, 143-44 (1992) (Kennedy, J., concurring).
[59] The topic is ripe for research by affective scientists and social scientists.
[60] See *e.g. U. S. Sentencing Guidelines*, *infra* note 100, and *Riggins v. Nevada,* 504 U.S. 127 (1992).
[61] Richard Weisman, *Being and Doing: The Judicial Use of Remorse to Construct Character and Community*, 18 Soc. & Legal Stud. 47-69 (2009).

Susan Bandes/Draft of December 4, 2013

situation of a court-mandated apology by a public entity or official for a violation of civil rights, it is primarily the content and public nature of the apology that matter to the litigant. Whether the apology rests on sincere emotion may be entirely irrelevant to the goals of the litigation.[62]

Remorse, on the other hand, is an internal state and therefore is far less susceptible to measurement. Professor Weisman provides an articulate description:

> While an apology may *refer* to the anguish and pain that the offender feels at having broken the norms of community, an expression of remorse *shows* or *demonstrates* this pain by making the suffering visible. Conventional usage in law and psychiatry describes expressions of remorse as "signs," "symptoms," "manifestations," or "demonstrations." What this suggests is that remorse is communicated through gestures, displays of affect, and other paralinguistic devices. Both the apology and the expression of remorse can be communicated through simple linguistic formulae such as "I am sorry." With the former, we are likely to attend to the words. With the latter, we focus on how the words are expressed, the feelings that accompany the words; expressions of remorse are shown rather than stated.[63]

Jeffrie Murphy succinctly identifies the problem—to evaluate remorsefulness is to claim to be able to evaluate one's "deep character'[64] or one's soul. As Justice Kennedy observed in his opinion in *Riggins v. Nevada* (in which the Court ordered a retrial where the defendant was so heavily medicated he was unable to show remorse), sentencers must attempt to "know the heart and mind of the offender."[65] The evaluation of deep character requires some fine distinctions. Most prominently, the remorse the offender displays must be remorse for the harm caused by the crime; not remorse for getting caught or having to suffer the consequences.[66]  Indeed, this leads to one of the "central paradoxes"[67] of factoring remorse into the punishment calculus: the

---

[62] Brent White, *Say You're Sorry: Court-Ordered Apologies as a Civil Rights Remedy,* 91 CORNELL L. REV. 1261 (2006).  See also Janet Ainsworth, *The Social Meaning of Apology, in* Paul Robinson, Stephen Garvey, & Kimberly Ferzan., *eds*. In CRIMINAL LAW CONVERSATIONS, (Oxford Univ. Press 2012).
[63] Weisman, *Wrongful Conviction*, *supra* note 16 at 125.
[64] Jeffrie G. Murphy, *Remorse, Apology, and Mercy*, 4 OHIO ST. J. OF CRIM. L. 423, 437 (2007).
[65] *Riggins, supra* note 70 at 144.
[66] Weisman, *Being and Doing, supra* note 61 at 58.
[67] *Id* at 53.

Susan Bandes/Draft of December 4, 2013

remorseful offender suffers for the harm he caused and wishes to atone for it—and so we reduce his punishment.

At bottom, the function of remorse is to separate the act from the offender; to identify those situations in which the act is a deviation from the offender's character rather than an expression of it.[68] The expression of suffering for the wrong one has done to others must be regarded as sincere rather than instrumental. This presents an obvious challenge in legal settings, in which a defendant has every incentive to appear remorseful. Facial expression and body language are regarded as spontaneous, "natural," and un-manipulable, and thus as windows into true feelings of remorse.


V.      The Theater of Contrition

"Make eye contact with the jury, but not homicidal maniac eye contact."[69]

How, then, is remorse to be ascertained? Can it be ascertained from viewing demeanor? The question urgently requires an answer because decision makers (as well as the media, which shape public perception about crime and punishment) believe demeanor can be ascertained in this manner, and, as discussed, serious legal consequences flow from this belief.  For this section, I will put to one side the questions of whether remorse is something that can be evaluated in a legal setting, and if so, whether it is germane to legal decision making. Whether or not it is possible to discern *actual* remorse, the available evidence makes it clear that there are no consistent criteria by which remorse is currently measured, that instead remorse is often in the eye of the beholder, and that when criteria are articulated, they are often based on inaccurate folk

---

[68] *Id*.
[69] Gahan Wilson, *Defense Attorney Instructing His Client*, THE NEW YORKER, August 13, 2007.

Susan Bandes/Draft of December 4, 2013

knowledge. These problems are not confined to juries: they extend to judges, parole officers, and other legal actors as well. There is also ample evidence that evaluation of remorse is heavily influenced by factors such as race, ethnicity, mental disability and age.

Studies of jury decision-making consistently show that a defendant's showing of remorse is correlated with a jury's willingness to grant mercy; his lack of remorse is often cited as justification for condemning him to death.  Craig Haney, in his study of California capital jurors, reported that one of the major factors in their decision was "whether or not the defendant expressed remorse (based only on in-court observations of the defendant)." In the opinion of most of the jurors, capital defendants simply did not express appropriate emotion during the penalty-phase proceedings."[70] Defendants cannot simply opt out of this evaluative process. Consider author Beverley Lowry's description of Karla Faye Tucker's attempt to follow her lawyer's instructions during her murder trial:

> [her lawyer] had told her to try to look dignified and calm and so she was trying to look unmoved by the proceedings and when she did they said she was cold and when she looked out into the courtroom and smiled at [her father] Larry Tucker, the press reported that she had smiled at someone else, and so she never looked out in the courtroom again.[71]

The prevailing assumption is that "what is not shown is also not felt."[72] Trial transcripts are rife with juror statements along the lines of "I was waiting for the defendant to express remorse for what he had done. I did not hear any of that remorse."[73]  Scott Peterson's murder conviction is a recent example of the effect of the failure to look remorseful; as the New York

---

[70] Haney, *et al, Deciding to Take a Life, supra* note 28 at 163. See also Michael E. Antonio, *Arbitrariness and the Death Penalty: How the Defendant's Appearance During Trial Influences Capital Jurors' Punishment Decision,* 24 BEHAV. SCI. & THE LAW 215, 223 (2006) (finding that when jurors viewed the defendant in the courtroom as emotional involved, sorry and sincere they were much more likely to favor a life sentence than when they viewed the defendant in the courtroom as emotionally uninvolved and bored.).

[71] BEVERLY LOWRY, CROSSED OVER: A MURDER, A MEMOIR, 171 (Vintage 2002).

[72] Weisman, *Remorse and Psychopathy supra* note 13 at 203.

[73] *Id*.

Susan Bandes/Draft of December 4, 2013

Times reported, "the prosecution had portrayed his unflinching behavior [at trial] as the cool

calculation of a killer."[74] As Scott Sundby reports,

> Jurors scrutinize defendants through the trial and are quick to recall details about
> demeanor, ranging from attire to facial expressions... Mostly jurors deduced
> remorselessness from the defendant's general demeanor---mainly his lack of emotion
> during the trial as the prosecution introduced horrific evidence. The defendant's
> perceived boredom or indifference made jurors angry. Some saw them as cocky and
> arrogant, indicating they lacked human compassion.[75]

People are far less adept at evaluating demeanor than they believe, and than the legal

system assumes them to be.[76] This problem is greatly exacerbated by empathic divides in

situations where demeanor must be evaluated across cultural,[77] ethnic[78] or racial lines,[79] or where

juvenile[80] or mentally impaired[81] defendants are being judged. Bill Bowers, Marla Sandys and

Ben Steiner found, for example, that:

> Observing the same defendant and interpreting the same mitigating evidence,
> black jurors saw a disadvantaged upbringing, remorse, and sincerity, while white
> jurors saw incorrigibility, a lack of emotion, and deceptive behavior. They
> discovered that "where a white juror sees black witnesses as faking or putting on,
> a black juror sees them as sincere. Where a white female juror interprets the black
> defendant's demeanor as hard and cold, a black male juror sees him as sorry.
> Even when a white female juror sympathizes with the anguish of the black
> defendant's mother, she blames the defendant for it and rationalizes that his
> execution will be in his mother's best interest."[82]

---

[74] Dean E. Murphy, *At Peterson Sentencing, a Family's Anger*, N. Y. TIMES A20 (Mar. 17, 2005).

[75] Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1563 (1998).

[76] See *e.g.* Blumenthal, *supra* note 20; Wellborn, *supra* note 20.

[77] Duncan, *supra* note 15 at 1499 (discussing problems of judging demeanor of juveniles in homicide cases).

[78] See Everett, *supra* note 47 at 102 (finding that both race and ethnicity affected evaluations of expressions of remorse).

[79] See generally Sheri Lynn Johnson, *The Color of Truth: Race and the Assessment of Credibility*, 1 MICH. J. OF RACE & L. 261 (1996); Joseph W. Rand, *The Demeanor Gap: Race, Lie Detection, and the Jury,* 33 CONN. L. REV. 1 (2000). Jurors are also ill-equipped to judge the credibility of defendants with mental disabilities, Stobbs, *supra* note 52.

[80] Duncan, *supra* note 15, generally.

[81] Zhong, Baranoski, Feigenson, *supra* note 54 at 31

[82] Bowers, *et. al.*, *Death Sentencing in Black and White*, *supra* note 49 at 244-52.

Susan Bandes/Draft of December 4, 2013

The empathic divide between the white juror and the black defendant is deep, pervasive and tenacious. The study by Bowers and his coauthors shows that a related set of dynamics plays out in the jury room. Black and white jurors evaluate the evidence differently. In addition black and white jurors need to evaluate one another in order to deliberate, and here, too, they do so through the sharply differing lens of their own prior cultural perceptions.[83]

The problems with evaluating remorse—lack of articulable or consistent criteria, reliance on inaccurate folk knowledge, and the influence of irrelevant or pernicious variables--are not confined to the jury. A recent ethnographic study, consisting of interviews with 23 sitting judges, found the judges in substantial disagreement about the indicators of remorse. "Behaviors that suggested remorsefulness to some judges suggested remorselessness to others."[84] Moreover, some were confident in their ability to perceive remorse, while others believed that true remorse is difficult to ascertain.  Some judges placed great weight on demeanor or body language, but interpreted specific indicators quite differently. For example, "Some judges believed that putting one's head down or hanging one's head was a sign of respect. Others said that it indicated an absence of remorse. Similarly, eye contact or lack thereof could be construed as either respectful or disrespectful."[85]

Another study focused on the operation of the Federal Sentencing Guidelines, and specifically on the question of whether the incidence of downward departures based on the defendant's "acceptance of responsibility"[86] differs by race or ethnicity of the offender. The researchers found a pronounced difference in sentencing outcome based on race and ethnicity.

---

[83] *Id.*
[84] Zhong, Baranoski, Feigenson et al, supra note 54 at 36.
[85] *Id.*at 25.
[86] USSG Sec. 3E1.1(b). Although "acceptance of responsibility" is not defined, the second application note mentions remorse as a relevant consideration in applying the guideline. Everett, *supra* note 47 at 101 n2.

Susan Bandes/Draft of December 4, 2013

Although the information available to the decision- makers in these cases went well beyond demeanor evidence, it was clear that court actors responsible for sentencing, including prosecutors, judges and probation officers, placed significant emphasis on demeanor. The authors posited that cultural differences might affect the court officials' ability to perceive genuine remorse when it is expressed differently than in their own culture. They also observed that some "culturally defined inhibitions [may] preclude the open demonstration of certain emotional expressions."[87]

> For example, a judge in a region with a large Hispanic population commented on Hispanic males' difficulty in openly and publicly admitting guilt, 'to look you in the eye and see they're sorry.' Cultural values inculcated in certain racial/ethnic minorities may prohibit such required displays of remorse, just as a judge's cultural values may preclude him or her from perceiving a valid expression of remorse from a member of a different racial/ethnic group.[88]

Cultural and social norms and display rules also create a problem for those evaluating the remorse of adolescents accused of serious crimes.[89] As Martha Grace Duncan explains, remorse becomes a factor at a very early and significant stage in juvenile proceedings—the decision whether to try the accused as a juvenile or as an adult. Since remorse is viewed as a sign that rehabilitation may be possible, it is also viewed as consistent with the "Juvenile Court's historical mission of rehabilitation."[90] And remorse plays a similarly significant role at trial and sentencing. Unfortunately, the folk knowledge view of what remorse looks like fails to account for several aspects of adolescent development. For one, comprehension of the nature and gravity

---

[87] *Id* at 117.
[88] *Id* at 117-118.
[89] Norms and display rules about remorse are also problematic for adolescents in other contexts. Carol Sanger, in an article about the judicial bypass hearings some states require before permitting minors to receive abortions, explains that judges evaluating maturity often want to hear some indication of the minor's remorse for the pregnancy and/or the abortion and " . . . that she considers abortion to have moral implications that she has taken seriously." Carol Sanger, *Decisional Dignity*, 18 COLUMBIA JOURNAL OF GENDER AND LAW at 467-68 (2009).
[90] Duncan *supra* note 15 at 1476.

Susan Bandes/Draft of December 4, 2013

of the crime may be long delayed, appearing well after the commission of the crime[91] and also well after trial and sentencing. For another, facial expression is likely to be a very poor measure of remorse. Duncan describes a case in which the judge at the juvenile transfer hearing relied heavily on his own perception of the demeanor of a 14 year old boy accused of murder to conclude that the boy was remorseless (noting "the lack of any expression of emotion or remorse," characterizing his face as "impassive" and concluding that he was "amoral.")[92] Yet as one child psychiatrist put it "Fourteen-year-olds do not appear remorseful, almost categorically. They feel relatively powerless within the system and react by rebelliousness, which feels authentic to them."[93]  An indifferent or tough front may be a protective shell. In many adolescent circles, youth may "be required to be tough, alien, and mean," qualities "diametrically opposed to the qualities needed for remorse."[94]

Mental disability poses an additional set of problems for the evaluation of remorse. As the Supreme Court has noted, psychotropic drugs may affect demeanor and interfere with a defendant's ability to exhibit appropriate remorse.[95] Mental illness or disability may itself render the defendant's facial expression or body language an unreliable indicator of his level of remorse. More to the point, the trier of fact, whether judge or jury, may not be cognizant of the effects of mental illness or medication on demeanor and body language generally, or on the ability to display what is considered appropriate remorse. [96]

---

[91] Rachel Aviv, *No Remorse*, THE NEW YORKER p. 55 at p. 63, January 2, 2012. This is problematic when investigative, mental health or legal personnel interpret the lack of "same day contrition" as evidence of remorselessness. Duncan *supra* note 14 at 1491.
[92] Duncan, *supra* note 15 at 1499.
[93] *Id*.
[94] *Id*.
[95] *Riggins, supra* note 70.
[96] Zhong, Baranoski, Feigenson, *supra* note 54 at 31.

Susan Bandes/Draft of December 4, 2013

VI.     A Window into the Soul

Decision makers evaluate a defendant's performance of emotion as a window into not just intention and motivation, but character more broadly. And a primary site for this evaluation is facial expression and body language. As one commentator summarizes, nonverbal cues such as facial expressions serve a number of functions, including "expressing our identity (e.g. culture, personality, gender, values, etc.);" communicating attitudes and feelings, creating first impressions, assisting others to comprehend our speech, and "allowing us to engage in deception and to send 'mixed' messages."[97] The U.S. judicial system, in line with a deeply rooted common law tradition, regards the ability of the witness to express these non-verbal cues and the ability of the fact-finder to observe them as crucial to the right of confrontation.[98] A victim who testifies from behind a barrier so that her facial expressions cannot be seen[99] deprives the defendant of his right of confrontation. A defendant who, because of psychotropic drugs, is unable to communicate facial expressions, behavior, manner, and emotional responses such as compassion and remorse [100] has been deprived of the right of confrontation.[101] Likewise, the ability of the fact-finder at the trial level to observe these non-verbal cues is one of the primary reasons for appellate court deference to the findings of the trial court. The appellate court is confined to the

---

[97] Aaron J. Williams, *The Veiled Truth: Can the Credibility of Testimony Given by a Niqab-Wearing Witness be Judged Without the Assistance of Facial Expressions?* 85 U. OF DETROIT MERCY L. REV. 273, 281-82 (2008).

[98] See *e.g*. *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (holding confrontation clause violated when witness testifies from behind a screen). The right is, nevertheless, not absolute. See *Maryland v. Craig*, 497 U.S. 836 (1990) (holding confrontation clause not violated when witness testified via closed circuit television).

[99] *Coy, supra* note 7.

[100] *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring).

[101] The use of testimony via videoconferencing raises interesting issues in this regard. Although it arguably permits the expression and evaluation of demeanor, there is evidence that remoteness affects evaluation of the witness adversely. Moreover, videoconferencing, like other visual evidence, involves choices in framing, close-ups, angle and other aspects of filming that may affect his presentation to the trier of fact. Ann Bowen Poulin, *Criminal Justice and Videoconferencing Technology: The Remote Defendant*, 78 TULANE L. REV. 1089, 1119 (2004).

Susan Bandes/Draft of December 4, 2013

"cold record," but the trial court can observe facial expression, attitude, body language and other such cues at close range.[102]

As discussed above, for a criminal defendant, much rides on an appropriate showing of remorse. However, exhibiting appropriate remorse through facial expression poses a challenge. Facial expression may be an essential indicator of intent, motivation and other inner states. But it is unsurprising that it is often a deeply flawed indicator. So much of what is being "read" in facial expression and body language is highly ambiguous and cannot be interpreted without reference to pre-existing schemas and assumptions.

For example Alex Kotlowitz, in an account of capital jury deliberations, described how growing understanding and empathy toward a defendant can transform a jury's interpretation of demeanor. A jury of men and women who strongly favored the death penalty came to spare the life of Jeremy Gross, a capital defendant whom they had convicted of a brutal murder.[103] Kotlowitz recounts how the jury, learning about Gross's own brutal childhood, gradually came to understand him and even to empathize with various aspects of his life. At first, jurors could not look him in the eye, and they adjudged him to be cold and indifferent. As they got to know more about him, they began to view what they initially thought was indifference as shame. This rereading of his demeanor was crucial to their eventual decision to spare him.[104]

---

[102] See e.g. *Goodwin v. MTD Products, Inc.* 232 F.3d 600, 606-07 (7th Cir. 2000) ("While this court's review is confined to the "cold pages" of an appellate transcript, the jury had an opportunity to observe the verbal and non-verbal behavior of the witnesses, including the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements.")

[103] Note that in this case both jurors and defendant were white. Email from Alex Kotlowitz, Journalist, to Susan Bandes, (September 12, 2003 (on file with author). Thus the aforementioned problem of an empathic divide based on race is absent.

[104]    Alex Kotlowitz, *In the Face of Death*. The N. Y. Times Magazine, July 6, 2003, at 32.

Susan Bandes/Draft of December 4, 2013

The problems of evaluating remorse from facial expression point back to a basic antecedent questions. Are there any external observable indicia that can be said to reflect "actual remorse?" In the cognitive sciences, there is a thriving field focusing on the interpretation of facial expressions and "micro" expressions (expressions difficult for the untrained eye to recognize). It is controversial whether internal emotions are ever precisely identifiable by physical indicia like expression, body language, or physiological signals like flushing or blushing, and whether these indicia remain constant across cultures and contexts for any group of emotions.[105] Paul Ekman and others have argued that some emotions, such as anger, fear, pride or shame,[106] do have physiological correlates. Others argue, to the contrary, that all emotions are cultural and social constructs, rather than "natural kinds." [107]  But even among those who believe in the existence of basic, cross cultural, physiologically identifiable emotions, there is disagreement about how many such basic emotions exist.[108] That is, it may be possible to identify positive or negative expressions generally, or even basic expressions such as happiness, anger, fear, surprise, disgust and sadness, but other emotions may be too individualized or

---

[105] The field encompasses two prominent approaches to measuring facial expression; the component approach, which involves objective description and measurement of changes in facial behavior (see e.g. Ekman, Friesen & Ancoli, *Facial signs of emotional experience*, 39 J. OF PERSONALITY & SOC. PSYCHOL. 1125 (1980)) and the judgment approach, which builds on Darwin's work (see *e.g.* CHARLES DARWIN, THE EXPRESSION OF EMOTIONS IN MAN AND ANIMALS, John Murray (1872)) and which explores the assumption that facial expressions for certain emotions are innate and universal (see *e.g.* Ekman, *Argument for Basic Emotions*, 6 COGNITION & EMOTION 169 (1992).

[106] See *e.g.* Tracy, J. L., Shariff, A. F., Zhao, W., & Henrich, J. *Cross-cultural Evidence That the Pride Expression is a Universal Automatic Status Signal*, 142 J. OF EXPERIMENTAL PSYCHOL.: General 163 (2013), Tracy, J. L., & Matsumoto, D. , *The Spontaneous Expression of Pride and Shame: Evidence for Biologically Innate Nonverbal Displays*, 105 PROC. OF THE NATL. ACAD. OF SCI. 33, 11655-11660 (2008).

[107] Lisa Feldman Barrett wrote a seminal and much debated article in which she argued that emotions are not "natural kinds." That is, they cannot be reliably correlated with physiological criteria. They are variable constructs, shaped by cultural and social context. Lisa Feldman Barrett, *Are Emotions Natural Kinds?*, 1 PERSPECTIVES ON PSYCHOL. SCI. 28, 28-58 (2007).

[108] The Western idea of basic emotions finds an equivalent in the Indian conception of "bhavas" and "rasas," which holds that there are "nine fundamental emotions in ordinary life, called bhavas," each accompanied by a literary emotion, or "rasa." The bhavas are sexual delight, laughter, sorrow, anger, perseverance, fear, disgust, wonder and serenity. KEITH OATLEY, THE PASSIONATE MUSE: EXPLORING EMOTION IN STORIES at 34-35 (Oxford Univ. Press 2012). In this

Susan Bandes/Draft of December 4, 2013

culturally influenced to be universally identifiable.[109] There is as yet no evidence about the facial expressions, body language, or other physiological markers of remorse.[110]

Indeed, one study investigated the ability to distinguish embarrassment, shame and guilt. Embarrassment was defined as a reaction to transgression of social norms; shame as a reaction to the failure to live up to central personal expectations; and guilt as a reaction to violation of obligatory moral standards. Thus guilt is the closest of these emotions to remorse. The study found that while embarrassment and shame may have distinct facial displays, there was no evidence that there is an identifiable facial display of guilt as a discrete emotion.[111]

To complicate matters, recall that even if guilt or remorse could be identified as a discrete emotion correlated with identifiable facial expressions, the legal system demands still more from the display. The defendant must display remorse that is attributable to his distress at the crime and the harm caused by the crime, and not to his distress at facing the criminal justice system.[112] It is difficult to imagine a scenario in which facial expression could be reliably correlated with such a fine- grained moral judgment about internal attitude. And this objection contains the seeds of a larger objection to the legal uses of remorse. Remorse appears to be more than simply an

---

context, too, remorse is not regarded as a basic emotion. I thank Kathleen Higgins, UT Austin Department of Philosophy, for this insight.

[109] *Roberson et al, supra* note 49 at 254.

[110] But see John M. Grohot, *Can you Fake Feeling Remorse?* Psychcentral.com/blog/archives/2011/02/10 (last visited Nov. 3, 2013) reporting on a Canadian study that found certain indicators of fake remorse, including a greater range of emotional expressions, swinging from one emotion to another quickly, and speaking with hesitation.

[111] Dacher Keltner & Branda N. Buswell, *Evidence for the Distinctness of Embarrassment, Shame, and Guilt: A Study of Recalled Antecedents and Facial Expressions of Emotion*, 10 COGNITION & EMOTION 155 (1996).

[112] John Deigh, in his influential work on remorse, considers guilt a response to violation of a moral rule or duty, and remorse a response to violation of an ethic of care for others. That is, guilt is oriented to the violation of rules or standards; remorse to the violation of values. JOHN DEIGH, LOVE, GUILT, AND THE SENSE OF JUSTICE, IN THE SOURCES OF MORAL AGENCY: ESSAYS IN MORAL PSYCHOLOGY AND FREUDIAN THEORY 42-46 (Cambridge Univ. Press 1996). Thus feelings of guilt may indicate what the legal system needs to know—that the wrongdoer recognizes he has violated rules that are worthy of respect. Remorse, on the other hand, has no similar "juridical" implications. *Id.*

Susan Bandes/Draft of December 4, 2013

emotion. If it is an emotion, it is not a transient one. We might describe a defendant as appearing angry or cold or sad as he sits in the courtroom. Our description might or might not be accurate, but it is plausible that we can discern these emotional states from observation. Perhaps even regret or shame can plausibly be discerned by observing demeanor. The term remorse, on the other hand, implies a less transient emotion or attitude (and even if fleeting remorse is possible, it hardly seems to be an attitude that should prompt leniency). Remorse is a state of mind. The term implies a painful process leading to acceptance of personal responsibility for the harm one has caused; a desire to atone or to make restitution; or even a desire to transform oneself. Thus it is a complex and unfolding state consisting of reflection on one's past acts, an abiding sense of distress, and a desire to take future actions. It does not seem plausible that this complex and unfolding state can be discerned from demeanor at a single point in time.

Note that this is not a point about fakery or sincerity. Fakery is always possible in the courtroom; the problem of insincere performance (often abetted by coaching) is hardly confined to remorse. The point, rather, is that even assuming genuine, sincere remorse, it is simply not something that can be conveyed solely by facial expression and body language. This objection to reading remorse from demeanor shares some common ground with some of the powerful arguments Jeffrie Murphy has made against the legal uses of remorse. With typical dry wit, Murphy observes:

> Issues of deep character are matters about which the state is probably incompetent to judge—it cannot even deliver the mail very efficiently, after all—and which, for that reason and others, might well be regarded as simply none of the state's business.[113]

---

[113] Murphy, *supra* note 64 at 437.

Susan Bandes/Draft of December 4, 2013

Murphy's objections, both normative and practical, are premised on the notion that remorse is an aspect of deep character. One of these objections concerns the invasion of dignity and autonomy: the law may ask us to conform our behavior to certain norms, but it should have no dominion over our internal thoughts, desires and souls. The related practical objection is more germane to this article: even if it were permissible for the state to pass judgment on deep character, it has no viable means of discerning that character.

Murphy and I part company on the question of what ought to follow from these powerful objections. He has argued that for these reasons and others, remorse should simply be declared off-limits as a factor in evaluating guilt and punishment.[114]  Granting his point about the difficulties of evaluation, there is the separate question of whether remorse *can* be kept off-limits. I doubt it is possible for the criminal justice system to simply put questions of remorse aside when assessing guilt and punishment. Remorse is too deeply ingrained in the fabric of judgments of criminal culpability and sentencing. Remorse is regarded as a measure of whether the defendant's act is consistent with his general character or a deviation from it. Remorse suggests that a defendant will strive to avoid such behavior in the future rather than pose a continuing danger to society. It has expressive value: it signals to the victim and to society that although there has been an injury to the social fabric, there has also been an acceptance of responsibility and even repentance.[115] Feelings of remorse are often difficult to separate from other emotions an offender is expected to feel if he is to be treated with respect or leniency, such

---

[114] *Id.*

[115] Stephen Garvey, following Jean Hampton, speaks of the "annulment" theory, which "sees punishment as the institutional means by which the organized community condemns wrongdoing and vindicates the value of those members whom other members have wronged."  Stephen P. Garvey, *Punishment as Atonement*, 46 UCLA L. REV. 1801, 1837 (1999).

Susan Bandes/Draft of December 4, 2013

as empathy or compassion toward the victim or his family, shame at the act, or a desire to learn and change (i.e. to begin work on his rehabilitation).[116]

Or to frame the point more critically, evaluating remorse may be a flawed proxy for more relevant inquiries. We may believe the remorseful defendant is less likely to recidivate,[117] but this is an empirical question. Does remorse in fact correlate with changed behavior? As Murphy points out, even for the genuinely remorseful, there is a very real danger of backsliding.[118] Likewise, we may believe the remorseful defendant poses less danger to society. This too is an empirical question. Although I know of no studies on the correlation between remorse and future dangerousness, there is ample evidence of the difficulty of predicting dangerousness,[119] and of the pernicious impact of racial stereotypes (including "stereotypical racial appearance") on predictions of dangerousness.[120]

Ultimately, the appropriate role of remorse in assessing punishment cannot be disentangled from the question of why we punish[121]—a question that is unlikely to be definitively resolved.[122] A defendant who has acted "out of character" may be deemed less dangerous (less in need of

---

[116] Richard Weisman, *Remorse and Psychopathy*, *supra* note 13 at 204.

[117] At least one set of studies supports the conclusion that the importance accorded to remorse is based in large part on the assumption that the remorseful defendant is less likely to repeat the offending behavior.  Gregg J. Gold & Bernard Weiner, *Remorse, Confession, Group Identity, and Expectancies About Repeating a Transgression*, 22 BASIC & APPLIED SOC. PSYCHOL. 291 (2000).

[118] *Murphy*, *supra* note 64, at 439.

[119]  See *e.g.* Thomas Grisso & Paul S. Appelbaum, *Is it Unethical to Offer Predictions of Future Violence?* 16 L. & HUM. BEHAV. 621 (1992).

[120] See *e.g.* Eberhardt *et al*, *supra* note 46 and Bowers *et al*, *supra* note 49. See also Michael E. Antonio, *If Looks Could Kill: Identifying Trial Outcomes of Murder Cases Based on the Appearances of Capital Offenders Shown in Black-and-White Photographs*, *in* PSYCHOLOGY OF DECISION MAKING, 123-140 (Gloria R, Burthold Ed., Nova Sci. 2007)

[121] There is a rich legal literature on the normative question of whether remorse ought to play a role in assessing blame and punishment. See *e.g.* Murphy, *supra* note 76, Stephen P. Garvey, *Punishment as Atonement*, 46 UCLA L. REV. 1801 (1999); Stephanos Bibas & Richard A. Bierschbach, *Integrating Remorse and Apology into Criminal Procedure*, 114 YALE L.J. 85, 114-115 (2004).

[122] See Danielle Allen, Democratic Dis-ease: *Of Nature and the Troubling Nature of Punishment* 191, 206, *in* SUSAN BANDES, THE PASSIONS OF LAW (NYU Press, 2000) discussing the deep-seated difficulties in arriving at a consistent theory of punishment.

Susan Bandes/Draft of December 4, 2013

incapacitation or specific deterrence) or more amenable to rehabilitation. Under expressive

theories of punishment, the unrepentant offender may necessitate a more emphatic expression of

community opprobrium than a remorseful one. Victim-centered theories of punishment may

emphasize the effects of a defendant's remorse on the wellbeing of victims or survivors.[123]

Under certain retributive theories (e.g. character retributivism) a remorseful offender may be

regarded as less blameworthy, though the notion of keying punishment to character raises a host

of concerns.[124]  Does the remorseful defendant "deserve" less punishment as a matter of just

desert? This question plunges us into a retributive debate that is beyond the scope of this article.

My point is a narrower one. None of these issues is likely to be resolved or even illuminated by

observing the facial expressions and body language of a defendant sitting silently in a

courtroom.[125]

## VII.      Solutions

I have argued in response to Murphy that evaluation of remorse, in some form, is likely

impossible to forbid, and that we should therefore concentrate on guiding decision- makers on

---

[123] See Stephanos Bibas & Richard A. Bierschbach, *Integrating Remorse and Apology into Criminal Procedure*, 114 YALE L.J. 85, 114-115 (2004) (arguing for the importance of face- to- face interaction as a means of conveying the victim's remorse and other emotions to the offender).

[124] For retributivism keyed to the harm caused by the crime (grievance retributivism), remorse appears irrelevant to the calculus. For retributivism keyed in part to the character of the offender (character retributivism), remorse might be relevant. However, this would seem to require the decision maker to take into account the offender's behavior and attitude post-sentencing (for example Karla Faye Tucker's turn to remorse during her years on death row). Murphy, *supra* note 76 at 443-445.

[125] Stephanos Bibas and others who would like to integrate remorse and apology into the criminal justice system have argued for the importance of face- to face –apologies to crime victims, in part because they permit the communication of facial expression and body language. See Stephanos Bibas & Richard A. Bierschbach, *supra* note 121 at 114-115. Their argument contemplates verbal apologies, in which the defendant's facial expression and body language are one component of sincere communication and of the effort to put the offender's crime in context.

Susan Bandes/Draft of December 4, 2013

how to improve their evaluative abilities and understand their limitations.[126] I will return to the question of how the legal system might address these issues below.

Although it may not be possible to take remorse off the table entirely, it is important to note that criminal justice systems have many choices about how much weight to accord to remorse. To take an exceptionally clear example, statutes such as the Federal Sentencing Guidelines in the U.S.[127] and the Canadian Criminal Code[128] offer a sentence reduction for a showing of remorse, and many U.S. state courts have explicitly found the absence of remorse to be an appropriate aggravating factor when calculating criminal punishment.[129] The failure to display remorse and therefore accept responsibility for one's crime and its consequences is often an explicit reason for more severe probation recommendations, denial of parole,[130] or other decisions penalizing defendants and prisoners. Indeed, as Weisman has documented, one of many hurdles for the wrongfully convicted is their inability to satisfy the persistent demand that they accept responsibility for their crimes. He notes "A long list can be compiled from among the annals of the wrongfully convicted in Canada, in which parole was denied or temporary absences refused because of a continued assertion of innocence."[131] Even when denial of parole is not expressly justified by lack of remorse, it may be based on the failure to participate in therapeutic or rehabilitative programs that will accept only those inmates who accept

---

[126] Susan Bandes, *Evaluation of Remorse is Here to Stay: We Should Focus on Improving its Dynamics*, *in* Paul H. Robinson and Stephen Garvey, eds., Criminal Law Conversations at 198 (Oxford Univ. Press, 2011), in response to Jeffrie Murphy, *Remorse, Apology, and Mercy*, *id* at 185.

[127] See Michael M. O'Hear, *Remorse, Cooperation, and "Acceptance of Responsibility": The Structure, Implementation, and Reform of Section 3E1/1 of the Federal Sentencing Guidelines*, 91 Nw. U. L. Rev. 1507 (1997).

[128] Richard Weisman, *Detecting Remorse and its Absence in the Criminal Justice System*, 19 Stud. in L., Pol. & Soc'y. 121, 123 (1999) citing Sec. 721(3)(a) of the Criminal Code, which prescribes "willingness to make amends" be included in the report, a phrase which "has been interpreted as tantamount to requiring an evaluation of whether or not the offender shows remorse."

[129] Bryan H. Ward, *Sentencing without Remorse*, 38 Loyola U. Chi. L. J. 131 at 131 (2006).

[130] Robinson et al, *supra* note 14, *id***.**

[131] *Id* at 128.

Susan Bandes/Draft of December 4, 2013

responsibility for their crimes, thereby barring those who continue to assert their innocence because they will not express remorse.[132]

Less explicitly, regimes that emphasize restorative justice place a premium on acceptance of responsibility, remorse and apology.  As Weisman demonstrates, in a restorative as opposed to a retributive regime, "expressions of remorse play a role in whether to impose conditional sentences."[133] But even in a more traditional retributive setting, prosecutors are generally permitted to comment on the defendant's lack of remorse, despite the fact that such comments may be in significant tension with the defendant's right not to testify.[134] These are just some illustrations of a larger point: whether or not remorse can be rendered irrelevant, legal systems have numerous opportunities to enhance or downplay its role in conviction, sentencing, and other decisions affecting life and liberty.[135]

Other reforms should be examined. One possibility is jury instructions. The Supreme Court has upheld the "anti-sympathy" instruction, which commanded capital juries in California

---

[132] *Id.*

[133] Weisman, *supra* note 16 at 123.

[134] See Jules Epstein, *Silence: Insolubly Ambiguous and Deadly: The Constitutional, Evidentiary and Moral Reasons for Excluding "Lack of Remorse" Testimony and Argument in Capital Sentencing Proceedings*, 14 TEMPLE POL. & CIV. RTS. L. REV. 45 (2004).

[135] Capital defendants are entitled to a jury instruction during the guilt phase explaining that failure to testify should not lead to an inference of guilt (*Carter v. Kentucky*, 450 U.S. 288 (1981)). In a later case arising in the context of a federal drug prosecution, the Court held that a negative inference could not be drawn at the sentencing phase from the defendant's failure to testify at trial and subsequent failure at the sentencing hearing to provide an account or explanation of her conduct (*Mitchell v. United States*, 526 U.S. 314 (1999)). The Court noted that the question of whether silence bears upon a "determination of a lack of remorse, or upon acceptance of responsibility" was not before it. The Court granted certiorari in the capital case of *White v. Woodall*, an appeal from a grant of federal habeas relief by the Sixth Circuit. The defendant had pled guilty, had not testified at the sentencing phase, and had requested that the jury be instructed not to draw adverse inferences from his failure to testify at sentencing. The trial judge refused to give the instruction, stating that he would not tell the jury "you can go out and rape, murder and kidnap and admit it and then offer no testimony, no explanation, no asking for forgiveness, no remorse, and the jury can't consider that." *TE 1591, JA 71* cited in respondent's reply to the petition for *certiorari*. The question on *certiorari* is whether the right to such an instruction in these circumstances was clearly established by prior precedent. The state characterizes the defendant's claim as one about the relevance of remorse, whereas the defense argues that it is about more than just remorse: it is about the trier of fact's expectation that the defendant will provide testimony and an explanation in his own defense, in violation of the Fifth Amendment.

Susan Bandes/Draft of December 4, 2013

to put their sympathy aside when determining the defendant's sentence.[136] Where appropriate, juries can be similarly instructed not to consider the defendant's remorse or lack thereof.[137] One critique of the anti-sympathy instruction is that it fails to define sympathy;[138] an instruction on remorse could address this deficit. An instruction on the limits of demeanor evidence is another possibility. Expert testimony might also be helpful on several issues. It could address the limits of demeanor evidence generally. More specifically, it could address the problems of assessing remorse from facial expression overall or in specific contexts such as assessment of juveniles[139] or the mentally disabled,[140] or assessment across racial lines. Yet another reform that would help address some of the problems of assessing remorse across racial, ethnic and cultural divides is to work toward impaneling more diverse juries. And finally, it is important to remember that it is not just juries, but also judges, parole officers, probation boards and other decision- makers who often take an "I know it when I see it" approach to remorse. In some cases discretion can be guided (or better guided) through the provision of more specific statutory or administrative criteria. In addition, training decision-makers about the psychological and sociological research on these issues is a viable option.

Conclusion

This article comes to three conclusions that are in some tension. The first is that in the legal realm, serious consequences, including loss of life or liberty, hinge on whether a defendant

---

[136] *California v. Brown,* 479 U.S. 538 (1987).

[137] Or to construe his failure to testify at sentencing, as well as at trial, as a lack of remorse. See supra note 135.

[138] Bandes, *Repellent Crimes and Rational Deliberation: Emotion and the Death Penalty.* 33 Vт. L. Rеv. 3 (2009). Another is that it singled out a single emotion as off-limits, implying that all other emotions elicited by the testimony may appropriately guide the penalty-phase jury's decision. *Id*.

[139] See Duncan, *supra* note 15 at 1517-18. Duncan cautions that though experts can be helpful they are no panacea, in part because they may well disagree.

[140] Everett*, supra* note 47 (discussing contribution of mental health experts to process of judicial evaluation of remorse displayed by mentally ill offenders); Stobbs *et al, supra* note 52.

Susan Bandes/Draft of December 4, 2013

displays [what is regarded as appropriate] remorse through facial expression and body language. The second is that there is no good evidence that remorse can be evaluated through facial expression and body language, and significant evidence that evaluation of remorse is influenced by racial, ethnic and cultural divides, among other extra- legal or flat-out illegal factors. The third is that as long as we adhere to the longstanding traditions of open courtrooms in which demeanor is evaluated, it will be difficult to entirely remove evaluation of a defendant's remorse from the process of assessing guilt and assigning punishment.

Nevertheless, several steps need to be taken both by the legal system and by cognitive scientists and social scientists. Emotion researchers, particularly those working in the burgeoning field of facial expression, ought to make the study of remorse and related emotions a priority. The disconnect between legal claims and underlying scientific and social scientific evidence in this field is a poster child for the importance of interdisciplinary research. The legal system is operating on unsupported folk knowledge. The influence of this folk knowledge about remorse on legal decision- makers has been convincingly shown. It is time to thoroughly investigate its accuracy in light of findings from other disciplines. Is remorse something that can be identified or evaluated in a courtroom? When decision-makers say they are evaluating remorse, what do they actually mean? Is there any correlation between remorse and future behavior? The answers to these and other empirical questions can help inform the debate about the role of remorse. Ultimately, however, the legal system must consider what role remorse is meant to serve in the criminal justice system. The answer to this question will depend on the particular legal context (e.g. parole hearing, clemency hearing, capital sentencing hearing) and on our notions of what ends punishment is meant to serve.

Susan Bandes/Draft of December 4, 2013

As I argued above, the legal system has many choices about when to demand showings of remorse or penalize the lack of remorse. The available evidence establishes that evaluating remorse from facial expression and body language is imprecise if it is possible at all, and that it permits or even encourages selective empathy based on race, mental disability and other pernicious factors. In light of this evidence, the legal system ought to take every opportunity to minimize the occasions on which consequences hinge on such an evaluation. To the extent this cannot be done, for example where defendants are in an open courtroom and human nature leads decision makers to evaluate their remorse, there are a number of ameliorative steps the legal system may take, including jury instructions, judicial training, and use of expert testimony. A more radical solution would be to screen the defendant from the decision maker. This solution is unlikely to be adopted, but it does place in sharp relief the more basic antecedent issue: what do we expect to learn from demeanor evidence generally, why do we place so much faith in it, and how well is it meeting our expectations?