UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )
v.                             )   Criminal Action
                               )   No. 13-10200-GAO
                               )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                               )
        Defendant.             )
                               )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY FIFTY-NINE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, May 13, 2015
9:36 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                                    I N D E X

2

   CLOSING INSTRUCTIONS BY THE COURT..................PAGES 4, 172
3
   CLOSING ARGUMENT BY MR. MELLIN.....................PAGE 61
4
   CLOSING ARGUMENT BY MS. CLARKE....................PAGE 96
5
   REBUTTAL BY MR. WEINREB...........................PAGE 137
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2      THE CLERK:  All rise for the Court and the jury.
3      (The Court and jury enter the courtroom at 9:36 a.m.)
4      THE CLERK:  Be seated.
5      THE COURT:  Good morning, jurors.
6      THE JURORS:  Good morning, your Honor.
7      THE COURT:  Once again, I will ask you whether you
8  have all faithfully abided by my instructions to avoid any
9  discussion of the case with anyone, including yourselves.  Is
10  that true?
11      THE JURORS:  Yes.
12      THE COURT:  And, again, have you also insulated
13  yourself, as far as practicable, from any media accounts of the
14  case?
15      THE JURORS:  Yes.
16      THE COURT:  Yes?  All right.
17      Members of the jury, it is again my duty to instruct
18  you as to the law applicable to this sentencing phase of the
19  case.  The sole question before you is whether Dzhokhar
20  Tsarnaev should be sentenced for his capital offenses to either
21  the death penalty or to life imprisonment without the
22  possibility of release.
23      There is no parole in the federal system.  Life
24  without possibility of release means just that.
25      The choice between these very serious alternatives is

1    yours, and yours alone, to make.  If you determine on any

2    particular count that Mr. Tsarnaev should be sentenced to death

3    or that he should be sentenced to life imprisonment without the

4    possibility of release, the Court is required to impose

5    whatever sentence you choose as to that count.

6         Remember that you have previously found Mr. Tsarnaev

7    guilty of the following capital counts in the indictment:

8    Counts 1 through 10 and Counts 12 through 18.  Substantively,

9    those counts are conspiracy to use a weapon of mass destruction

10   resulting in death, use of a weapon of mass destruction

11   resulting in death, conspiracy to bomb a place of public use

12   resulting in death, bombing of a public place -- place of

13   public use resulting in death, malicious destruction of

14   property resulting in personal injury and death, and possession

15   and use of a firearm during and in relation to a crime of

16   violence resulting in death.

17        Even though there are a total of 17 capital counts at

18   issue here, you must still approach the sentencing decisions

19   before you separately as to each count.

20        I stress to you the importance of you giving careful

21   and thorough consideration to all of the evidence.  As I

22   previously said to you, you must follow the principles of law

23   given to you in these instructions, regardless of any other

24   thought or opinion you may have as to what the law may be or

25   should be.

1          The instructions I am giving you now are a complete

2     set of instructions on the law applicable to the sentencing

3     decision as to Mr. Tsarnaev.  During your deliberations, you

4     should, thus, rely on these instructions.

5          We've also prepared a special verdict form that you

6     must complete.  The form details the special findings you must

7     make, and it will aid you in properly performing your

8     deliberative duties.

9          Now, although Congress in the relevant statute has

10    left it wholly to you, the jury, to decide Mr. Tsarnaev's

11    proper punishment, it has narrowed and channeled your

12    discretion in specific ways by requiring you to consider and

13    weigh any aggravating and mitigating factors that are present

14    in this case.

15         As I explained previously, aggravating and mitigating

16    factors pertain to the circumstances of the crime or the

17    personal traits, character or background of Mr. Tsarnaev or

18    anything else relevant to the sentencing decision.

19         Aggravating factors are those that would tend to

20    support imposition of the death penalty.  By contrast,

21    mitigating factors are those that suggest life in prison

22    without the possibility of release is an appropriate sentence

23    in this case.

24         By requiring you to consider what aggravating factors

25    and mitigating factors are present in this case, the statute

 1    requires that you make a unique, individualized choice between

 2    the death penalty and life in prison without the possibility of

 3    release as to the appropriate sentence for the crimes

 4    Mr. Tsarnaev has been convicted of.

 5         The government at all times and as to each capital

 6    count has the burden of proving its sentencing allegations

 7    against the defendant beyond a reasonable doubt.  I have

 8    previously instructed you about proof beyond a reasonable

 9    doubt.  Let me remind you of those instructions.

10         The requirement of proof beyond a reasonable doubt is

11    a strict and heavy burden, but it is not an impossible one.  It

12    does not require the government to prove a necessary fact or

13    proposition beyond all possible, hypothetical or speculative

14    doubt.  There are probably very few, if any, things in human

15    affairs that can be proved to an absolute certainty.  The law

16    does not require that.  But the evidence must exclude, in your

17    minds, any reasonable doubt about the existence of the fact or

18    proposition in question.

19         A reasonable doubt may arise from the evidence

20    produced or from a lack of evidence.  If you conclude that the

21    evidence may reasonably permit alternate conclusions with

22    respect to the fact or proposition in question, then the

23    government has not proved that fact or proposition beyond a

24    reasonable doubt.

25         Reasonable doubt exists when, after you've considered,

1    compared and weighed all the evidence using your reason and

2    your common sense, you cannot say that you have a settled

3    conviction that the fact or proposition is true or correct.

4    Conversely, we say a fact is proved beyond a reasonable doubt

5    if, after careful consideration of all the evidence, you are

6    left with a settled conviction based on the evidence and your

7    reasoning about it that the fact or proposition is correct.

8          While the law does not require proof that overcomes

9    every conceivable or possible doubt, it is not enough for the

10   government to show that the fact or proposition it argues for

11   is probably true.  The government's burden is to convince you

12   that there is no reasonable doubt that the fact or proposition

13   it argues for is correct.

14         A defendant never has the burden of disproving the

15   existence of anything which the government must prove beyond a

16   reasonable doubt.  The burden is wholly upon the government.

17   The law does not at all require Mr. Tsarnaev to produce

18   evidence that a particular aggravating factor does not exist or

19   that death is not the appropriate sentence.

20         However, in this case, as he is entitled to do,

21   Mr. Tsarnaev asserts that there are mitigating factors that

22   should lead you to conclude that, all things considered, the

23   death penalty is not the appropriate punishment for his

24   offenses.  It is the defendant's burden to establish any

25   mitigating factor by a preponderance of the evidence.

1              Requiring something to be proved by a preponderance of

2       the evidence is a lesser standard of proof than proof beyond a

3       reasonable doubt.  To prove something by a preponderance of the

4       evidence is to prove that it is more likely true than not; that

5       it is supported by the greater weight of the reliable evidence.

6       If, however, the evidence is equally balanced as to a

7       mitigating fact or proposition, the defendant will not have

8       carried the burden of proving the fact or proposition by a

9       preponderance of the evidence.  The preponderance of the

10      evidence is not determined by the number of witnesses or the

11      volume of evidence, but by the quality and persuasiveness of

12      the relevant evidence.

13             In making the determinations you're required to make

14      at this stage, you must consider the information presented

15      during this penalty phase.  You may also consider the evidence

16      previously admitted in the prior liability phase.  Let me

17      provide some reminders about evidence and how to think about

18      the evidence that you will remember from the first phase of the

19      trial.

20             First I'll remind you what is not evidence.  The

21      lawyers' summaries of the evidence in their openings, when

22      they're telling you what they expect the evidence will be, and

23      now, today, in their closings, when they try to recall it for

24      you, are not part of the evidence.  The summaries are an

25      attempt to marshal the evidence for you, to try to persuade you

1   to understand it in a way that is consistent with their view of

2   the case.  But to the extent your collective appreciation of

3   the evidence differs in any way from the way the lawyers have

4   predicted it or argued it, it is your understanding and your

5   assessment of the evidence that controls.

6           What the lawyers say in their closing statements

7   cannot add or subtract -- add to or subtract from the evidence.

8   You have heard the evidence, and it is your judgment on that

9   evidence that matters.

10          I told you at the beginning, and you have seen, that

11  I'd be ruling on any questions of the admissibility of evidence

12  as they have arisen.  I remind you there is no significance,

13  for your purposes, to any of the rulings, either admitting or

14  excluding evidence.  Those considerations are wholly separate

15  from the kinds of decisions you'll have to make, and you should

16  give no consideration of significance to any of my evidence

17  rulings.

18          I remind you that evidence that is offered but not

19  admitted is not to be considered by you.  Similarly, questions

20  by the attorneys which are not answered by the witness produce

21  no evidence.

22          The indictment is not evidence.  Anything you may have

23  read in the press, seen on television, heard on the radio,

24  viewed online or heard from others outside the courtroom at any

25  point is, of course, not evidence.

1        You have repeatedly assured me that you have abided by

2   my instructions to avoid such information which is not part of

3   the evidence in the case.  To the extent you had any prior

4   impressions of the facts of this case from the time before you

5   were called to be jurors, you must completely set aside any

6   such impressions.  Again, in the jury selection process, you

7   assured me that you could do that; and, frankly, I had -- if I

8   had not trusted your answers in that respect, you would not be

9   sitting here today.  Your focus as you deliberate must be

10  entirely and exclusively on the body of evidence produced in

11  the course of the trial.  It would be unfair and a violation of

12  your jurors' oath to do otherwise.

13       Let me now address some of the things that are

14  information or evidence for you to evaluate in this stage of

15  the case.  You have a very large number of exhibits in the

16  case.  You'll have access to all the exhibits that have been

17  admitted in evidence in both phases of the trial, and you may

18  consider those exhibits and give them whatever weight, value or

19  significance you think they are fairly entitled to receive.

20  The judgment is entirely yours.

21       The digital exhibits, which is a technical matter, can

22  be put on the JERS system, which you used in your prior

23  deliberations; will again be available to you via the monitor

24  in the jury room.  Because of some certain technical

25  limitations, some other exhibits are available to you by means

of a laptop computer, which does not have any other programs or
capabilities, such as word-processing or the Internet --
Internet access.  And I remind you there's no significance
regarding which exhibits are on JERS and which are on the
laptop.

Many exhibits in the case have been physical exhibits
or actual items.  As before, those are available to you as
well.  If you would like to view any of the physical exhibits,
you shall simply write a note indicating what exhibit or
exhibits you would like to view and give it to the court
security office, and we'll arrange for you to view those
exhibits.

Remember that sometimes a particular item of evidence
is received for a limited purpose rather than for general
consideration.  For example, some of the exhibits were admitted
under a limitation that they could be considered as evidence
that a particular event occurred, for example, that somebody
said something on a particular occasion, but not as evidence
that any affirmative assertion contained in that evidence was
accurate or true.

Of course, in addition to the exhibits, you have the
testimony of the witnesses who appeared here in the courtroom
and one via videoconference from abroad, who answered questions
that were put to them.  You ought to give the testimony of each
witness whatever weight, value or significance in your judgment

1   it is fairly entitled to receive.  With respect to each

2   witness, you should think about the testimony and decide how

3   much value or meaning it ought to have to fair-minded people

4   like yourselves who are looking for the truth.

5          You may find, as you think about the evidence from any

6   particular witness, that you find credible, reliable or

7   meaningful just about everything that the witness has said,

8   perhaps just about nothing that the witness has said, and

9   perhaps something in between.  Maybe there are some things from

10  a particular witness you find credible and reliable and other

11  things from the same witness you're more skeptical of or

12  doubtful about.  There is no automatic rule.  You don't have to

13  accept any given witness's testimony in total or reject it in

14  total.  You should think about the testimony itself and accept

15  what is meaningful and reliable and reject what is not.

16         In deciding the credibility of a witness, you may

17  consider the witness's appearance or demeanor on the witness

18  stand as he or she testified, to the extent any such

19  observations may have any bearing on your assessment of the

20  reliability of that evidence.  The appearance or demeanor of

21  other people in the courtroom, including the defendant, the

22  lawyers for each side, spectators in the gallery or even me,

23  should not be taken by you as evidence for any proposition or

24  conclusion in the case.

25         You may also take into account any partiality or bias

1    that a witness might have toward one side or the other.  Does

2    the witness have any reason, motive or interest in the outcome

3    of the case or anything else that would lead the witness to

4    favor one side or the other in the testimony?  A tendency to

5    favor one side or the other might be deliberate, an intentional

6    effort to favor one side, or it might be unconscious, arising

7    out of some affiliation or affinity with one side or the other.

8    Again, such tendencies could affect the reliability of the

9    testimony, and you ought to consider whether there has been

10   such an effect with respect to the testimony you've heard.

11          Again, keep in mind in every case there are people who

12   have an association or connection with one side or the other,

13   and it is not automatic, of course, that people -- those people

14   must therefore be distrusted.  But potential bias or

15   partiality, conscious or unconscious, by a witness is a factor

16   that you can think about in evaluating the evidence.

17          You have heard testimony from witnesses described

18   generally as experts.  An expert witness is a witness who has

19   special knowledge or experience that allows the witness to

20   testify about matters within his or her expertise and to give

21   an opinion about the issues in the case based on his or her

22   knowledge and experience.  You should evaluate the testimony of

23   an expert witness with the same care that you employ in

24   evaluating the testimony of any other witness.  You may accept

25   or reject testimony of an expert witness as you judge is

1   appropriate.

2          In weighing expert testimony, you should consider the

3   factors that generally bear upon the credibility of witnesses

4   as well as the particular expert's qualifications, such as

5   education and experience, the soundness of the reasons given

6   for any opinion and any other evidence in the case that you

7   consider pertinent.  Remember that you alone decide how much of

8   a witness's testimony to believe and how much weight it should

9   be given.

10          You have heard the testimony of a number of law

11   enforcement officials.  The fact that a witness may be employed

12   as a law enforcement official does not mean that his or her

13   testimony is deserving of either more or less consideration or

14   greater or less weight than any other witness.  It is

15   legitimate for defense counsel to question the credibility or

16   reliability of a law enforcement witness on the ground that his

17   or her testimony may be colored by personal or professional

18   interest in the outcome of the case.  As with any witness, it

19   is up to you, after considering the matter, whether to accept

20   and rely on the testimony of a law enforcement witness, just as

21   with any other witness.

22          Consider the evidence as a whole.  You ought to

23   consider the evidence from each witness not only by itself, in

24   isolation, as if that witness were the only person to testify,

25   but also in the context of all the other evidence you have

heard.  For example, there might be a piece of evidence about

which you were originally skeptical, and then you might hear

other evidence that leads you to reexamine your initial

impression, and you being to trust the questioned evidence a

bit more.

          The opposite might happen, of course.  You might tend

to accept something that sounds pretty good at first.  Then you

consider other pieces of evidence; you might begin to doubt

what you had first accepted.  So, again, think of the evidence

sensibly as a whole as you make sound judgments about it.

          You may make inferences from the evidence.  An

inference is simply a conclusion that you might draw from the

available information that you have found to be reliable.  You

will recall I illustrated this point in my instructions at the

end of the first phase of the trial by pointing out that you

could draw an inference about how hot a stove burner is from

the observation of steam coming out of the teakettle on the

burner.  You must be careful that any inferences that you draw

are those that are genuinely supported by the information you

are relying on to make the inference.

          An inference, and consequently proof of a fact by

circumstantial evidence, cannot be an excuse for guessing or

speculating.  If there are alternate possible inferences from

the evidence, you can't just pick one you happen to like.  You

have to be persuaded that any inference that you make is

1  superior to other possible inferences based on the same

2  evidence and information.

3       And, of course, to the extent that you rely in a

4  criminal case on an inference by circumstantial evidence, in

5  the end, any conclusions accepting the government's

6  propositions must be those that convince you beyond a

7  reasonable doubt.

8       Finally, I remind you that you will have the notes

9  that you have taken in both phases of the trial.  As before, do

10  not assume that simply because something appears in somebody's

11  notes it necessarily took place in the courtroom.  Instead, it

12  is your collective memory with respect to the information

13  that -- evidence presented that must control.

14       As I have previously instructed you, a defendant has a

15  constitutional right not to testify.  There may be many reasons

16  why a defendant would choose to invoke and exercise that right.

17  You may not, under any circumstance, draw any inference or

18  presumption against a defendant from his decision to invoke

19  that right and to decline to testify.  Accordingly, it should

20  not be considered by you in any way or even discussed in

21  arriving at any aspect of your sentencing decision, including

22  the existence or nonexistence of an alleged aggravating or

23  mitigating factor.

24       You must deliberate and determine the appropriate

25  sentence for each of the capital counts individually.  Although

1    I will be discussing the capital counts as a group, your

2    findings as to Mr. Tsarnaev's age, the gateway factors,

3    aggravating factors and all the other issues pertaining to

4    those counts must address each of the counts individually.

5         It is possible that, although there may be parallels

6    or connections between some counts, you may also find

7    differences that would justify different sentences on different

8    counts.  You should understand, however, that if you impose the

9    death penalty as to any count or counts, the death sentence

10   will control, regardless of any life sentence or sentence that

11   might be -- sentences that might be imposed on other counts.

12        As you know, there are 17 counts concerning a total of

13   four homicides.  You should not attach any significance to the

14   fact that these four homicides have given rise to more than

15   four capital counts.  The government is entitled to bring

16   multiple charges with respect to each homicide, but the number

17   of counts does not by itself mean that the defendant's conduct

18   is more blameworthy or that he is deserving of greater

19   punishment.

20        The instructions that I am going to give you, as well

21   as the verdict form that you will be completing, will address

22   first -- will first address your findings, if any, with respect

23   to the defendant's age at the time of the offenses, the four

24   so-called gateway factors, and the statutory aggravating

25   factors identified by the government with respect to each

1    capital count.

2          The instructions on the verdict form thereafter

3    address your findings, if any, as to each capital count

4    regarding the existence of any non-statutory aggravating

5    factors and mitigating factors, as well as the weighing of

6    aggravating and mitigating factors.

7          So let me now discuss with you in summary form, first,

8    the deliberative steps that you must follow in considering the

9    issues before you as to each capital offense.  I will then

10   discuss in greater detail each of these steps.

11         First, you will consider whether the government has

12   proven beyond a reasonable doubt and to your unanimous

13   satisfaction that the defendant was at least 18 years old at

14   the time of the capital offenses for which you have found him

15   guilty.

16         Second, you will consider, as appropriate, whether the

17   government has proven beyond a reasonable doubt and to your

18   unanimous satisfaction one or more threshold intent factors or

19   gateway factors established by Congress as to each of the

20   capital offenses for which you have found the defendant was at

21   least 18 years old at the time of the capital offense.

22         Third, you will consider, as appropriate, whether the

23   government has proven beyond a reasonable doubt and to your

24   unanimous satisfaction at least one statutory aggravating

25   factor alleged as to each of the capital offenses for which you

1    have found the defendant was at least 18 years of age at the

2    time of the capital offense and have found the existence of at

3    least one gateway factor.

4         Fourth, you will consider, as appropriate, whether any

5    non-statutory aggravating factors identified by the government

6    have been proven beyond a reasonable doubt and to your

7    unanimous satisfaction as to each of the capital offenses for

8    which you have found the defendant was at least 18 years of age

9    at the time of the offense and have also found the existence of

10   at least one gateway factor and the existence of at least one

11   statutory aggravating factor.

12        Fifth, you will consider, as appropriate, whether any

13   of you individually or together with other jurors find that the

14   defendant has proved, by a preponderance of the evidence, any

15   mitigating factor or factors.

16        Sixth, if you have found the defendant was at least 18

17   years of age at the time of the particular offense under

18   consideration, and at least one gateway factor and at least one

19   statutory aggravating factor, you must then weigh the

20   aggravating factors, statutory and non-statutory, that you have

21   unanimously found to exist and any mitigating factors that you

22   personally have found to exist to determine the appropriate

23   sentence.

24        You must decide, in regard to that particular capital

25   offense, whether the aggravating factors that have been found

to exist sufficiently outweigh the mitigating factors found to
exist for that offense so as to justify imposing a sentence of
death on the defendant for that offense; or, if you do not find
any mitigating factors, whether the aggravating factors alone
are sufficient to justify imposing a sentence of death on the
defendant for that offense.

Now let me give you some greater detail.  Excuse me.
I'm fighting a spring cold here at an inopportune time.

Before you may consider the imposition of the death
penalty, you must first unanimously agree beyond a reasonable
doubt that Mr. Tsarnaev was 18 years of age or older at the
time of the offense.

I'm going to put on your monitors because we're going
to display for you the verdict slip that you will be filling
out because I think it may help you to track these instructions
as I go through them.

So in the event that you unanimously find beyond a
reasonable doubt that Mr. Tsarnaev was 18 years of age or older
at the time of the offenses as to all counts, you are to
indicate that finding on the appropriate line in Section I of
the verdict form.  And you'll see that's the top line, the
first one of the three.

In the event that you unanimously find beyond a
reasonable doubt that he was 18 years of age or older at the
time of the offenses as to some of the counts but not others,

1    you're to indicate that finding on the appropriate line in

2    Section I of the verdict form and also identify on the line

3    provided, by count number, those specific counts as to which

4    you find that he was at least 18.  And that, you will see, is

5    the third option.

6        If you do not unanimously find the government has

7    proven beyond a reasonable doubt that the defendant was 18

8    years of age or older as to any of the capital counts, then no

9    further deliberations will be necessary as to any such count.

10   And you see that's the second option:  "We find unanimously

11   that the age has not been proved as to any."  So you have the

12   three options to consider, and you'll indicate which represents

13   your decision.

14       Again, before you may consider the imposition of the

15   death penalty for any capital count, you must unanimously find

16   beyond a reasonable doubt the existence as to that count of one

17   of the so-called -- four so-called gateway factors, sometimes

18   also referred to as threshold intent factors, alleged by the

19   government.

20       The gateway factors alleged by the government are as

21   follows, and they're reproduced on the verdict form in

22   Section II:  First, that Mr. Tsarnaev intentionally killed the

23   victim or victims of that particular capital offense charged in

24   the respective count of the indictment; or, Number 2, that

25   Mr. Tsarnaev intentionally inflicted serious bodily injury that

1    resulted in the death of the victim or victims identified in

2    the particular offense charged in the respective count of the

3    indictment; or that Mr. Tsarnaev intentionally participated in

4    an act contemplating that the life of a person would be taken

5    or intending that lethal force would be used in connection with

6    a person other than one of the participants in the offense, and

7    the victim or victims of the particular capital offense charged

8    in the respective account of the indictment died as a direct

9    result of that act; and, fourth -- or, fourth, that

10   Mr. Tsarnaev intentionally and specifically engaged in an act

11   of violence, knowing that the act created a grave risk of death

12   to a person other than one of the participants in the offense

13   such that participation in the act constituted a reckless

14   disregard for human life, and the victim or victims of the

15   particular capital offense charged in the respective count of

16   the indictment died as a direct result of that act.

17          Your findings as to whether the government has proven

18   the existence beyond a reasonable doubt of a particular factor

19   from among those four gateway factors must be individual and

20   unanimous as to each capital count.

21          With regard to your findings, you may not rely solely

22   on your first-phase verdict of guilt or your factual

23   determinations in that phase.  Instead, you must now each

24   consider and decide the issue again for the purposes of this

25   trial.

1          Any finding that a gateway factor has been proven as

2    to a particular capital count must be based on Mr. Tsarnaev's

3    personal actions and intent and not on the actions or intent of

4    anyone else.  Intent or knowledge may be proved like anything

5    else.  You may consider any statements made or acts done by

6    Mr. Tsarnaev and all the facts and circumstances in evidence

7    which may aid in a determination of Mr. Tsarnaev's knowledge or

8    intent.  You may, but are not required to, infer that a person

9    intends the natural and probable consequences of acts knowingly

10   done or knowingly omitted.

11         In the event you unanimously find beyond a reasonable

12   doubt that a particular gateway factor exists as to all the

13   capital counts, you're to indicate that finding on the

14   appropriate line in Section II of the verdict form.  I think

15   you'll see, again, that is presented as the first of the

16   multiple choices.

17         In the event that you unanimously find beyond a

18   reasonable doubt that a particular gateway factor exists as to

19   some but not all of the capital counts, you're to indicate that

20   finding on the appropriate line in Section II and also identify

21   on the line provided, by the count number, the specific counts

22   as to which you find the gateway factor applies.  You'll see

23   that's the third choice presented again.

24         If you do not unanimously find a particular gateway

25   factor has been proved beyond a reasonable doubt and with

1    respect to any of the capital counts, you shall mark the

2    appropriate space in Section II, and that will be the second

3    option of the three.

4         I instruct you that any gateway factor found by you to

5    exist is not an aggravating factor -- that's a separate matter.

6    These are gateway factors -- and may not be considered by you

7    in the process of weighing any aggravating and mitigating

8    factors in ultimately deciding whether or not to impose a

9    sentence of death.

10        And for any capital count, if you do not unanimously

11   find that the government has proven beyond a reasonable doubt

12   the existence as to that count of any of the four gateway

13   factors, your deliberative task is -- as to that capital count

14   is over, and I will impose a mandatory sentence of life

15   imprisonment without the possibility of release.

16        Now let me turn to the statutory aggravating factors.

17   If you unanimously find the government has proven beyond a

18   reasonable doubt that at least one of the four gateway factors

19   exists as to a particular capital count and that the defendant

20   was 18 years or older at the time of the offense, you must then

21   proceed to determine whether the government has proven beyond a

22   reasonable doubt the existence of any of the following

23   statutory aggravating factors with respect to the same count.

24   You may consider only statutory aggravators alleged as to the

25   offenses for which you have found the defendant was 18 years

1    old and for which you have found at least one gateway factor.

2          The government alleges as a statutory aggravating

3    factor for each capital offense that the death or deaths

4    occurred during the commission of another crime or crimes.  The

5    government alleges as a statutory aggravating factor for each

6    capital offense, Counts 1 through 10 and 12 through 18, that

7    Mr. Tsarnaev knowingly created a grave risk of death to one or

8    more persons in addition to the victim of the offense in the

9    commission of the offense and in escaping apprehension for the

10   violation of the offense.

11         The government alleges, as to Counts 1 through 10 and

12   12 through 15, excluding those that exclusively charge the

13   death of Sean Collier, that Mr. Tsarnaev committed the offense

14   in an especially heinous, cruel and depraved manner and that it

15   involved serious physical abuse to the victim; that he

16   committed the offense after substantial planning and

17   premeditation to cause the death of a person and to commit an

18   act of terrorism; and that he intentionally killed and

19   attempted to kill more than one person in a single criminal

20   episode.

21         The government also alleges, as to Counts 1, 4, 5, 6,

22   9, 10, 14 and 15, those involving the death of Martin Richard,

23   that the defendant is responsible for the death of a victim,

24   Martin Richard, who was particularly vulnerable due to youth.

25         At this step, the law directs you to consider and

decide separately, as to each of the capital counts for which

you have unanimously found that the defendant was at least 18

at the time of the crime and the existence of at least one

gateway factor, whether the government has proved to you

unanimously and beyond a reasonable doubt the existence of any

one or more of the statutory aggravating factors that are

specifically alleged.

Any finding that one or more of these factors has been

proven must be based on Mr. Tsarnaev's personal actions and

intent.  In making your findings regarding the statutory

aggravating factor, you may not rely solely on your previous

verdict of guilt or your factual determinations therein.

Instead, you must now consider and decide the issues presented

in the present context.

In the event that you find unanimously beyond a

reasonable doubt that a particular statutory aggravating factor

exists as to all relevant capital counts for which you have

found the defendant was age 18 or older and the existence of at

least one gateway or threshold intent factor, you are to

indicate that finding on the appropriate line in Section III of

the verdict form.  And, again, you will see that is presented

as the first of the three options.

In the event you unanimously find beyond a reasonable

doubt that a particular statutory aggravating factor has been

proven as to some but not all of the relevant capital counts

1    for which you have found the evidence of at least one gateway

2    factor or threshold intent factor, you ought to indicate that

3    finding on the appropriate line in Section III of the verdict

4    form.  You're also to identify on the line provided, by count

5    number, those particular counts as to which you have found the

6    statutory aggravating factor applies.

7         If you do not unanimously find that a particular

8    statutory aggravating factor has been proved beyond a

9    reasonable doubt with respect to any of the relevant capital

10   counts that you're considering, you should mark that in the

11   appropriate space in Section III of the verdict form.

12        If you do not unanimously find that, as to any capital

13   count, the government has proved the existence of at least one

14   statutory aggravating factor, then your deliberative task on

15   that count will be over and I will impose a mandatory sentence

16   on that count of life imprisonment without the possibility of

17   release.

18        Let me now set forth for you in detail the specific

19   elements necessary for the government to prove any of the

20   alleged statutory aggravating factors.

21        The government alleges, as to all of the capital

22   counts, that death or injury resulting in death occurred during

23   the commission of or during the immediate flight from the

24   commission of another offense or offenses.  Specifically, the

25   government alleges that the death or deaths occurred during the

1   commission of a conspiracy to use a weapon of mass destruction

2   in violation of Title 18, United States Code, Section 2332(a)

3   or during the commission or immediate flight from the

4   commission of the use of a weapon of mass destruction, also a

5   violation of Title 18 of the United States Code,

6   Section 2332(a).

7          With regard to Counts 1 through 10 and 12 through 15,

8   that is the counts not addressed specifically to the death of

9   Sean Collier, the government alleges, in the alternative, that

10  the death occurred during the commission or during the

11  immediate flight from the commission of the destruction of

12  property affecting interstate commerce by explosive, a

13  violation of Title 18 of the United States Code,

14  Section 844(i).

15         Though you have already, in the prior phase, convicted

16  the defendant of those crimes, I will summarize for you again

17  the elements of those offenses so that you can determine

18  whether the deaths alleged occurred during the course of that

19  conduct.

20         The crime of conspiracy to use a weapon of mass

21  destruction has two elements:  First, that the defendant and

22  another agreed to use a weapon of mass distraction; and,

23  second, that the defendant knowingly and voluntarily joined in

24  the agreement, intending that the crime of using a weapon of

25  mass destruction be committed.

The crime of the use of a weapon of mass destruction has three elements:  first, that the defendant knowingly used a weapon of mass destruction; second, that it was knowingly used against a person or against personal property within the United States; and, third, that such property was used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce or, alternatively, that the offense or the results of the offense affected interstate or foreign commerce.

"A weapon of mass destruction" means a destructive device, which is defined by statute to include any explosive bomb.

"Knowingly" in this context means that the act was done voluntarily and intentionally and not because of mistake or accident.

The crime of destruction of property affecting interstate commerce by explosive has four elements:  first, that the defendant damaged or destroyed or attempted to damage or destroy, by means of fire or an explosive, any building, vehicle or other personal property; second, that the defendant did so maliciously; third, that he did so by means of fire or an explosive; and fourth, that the building, vehicle or other real or personal property was used in interstate or foreign commerce or in an activity affecting interstate or foreign commerce.

"Explosive" in this context means gunpowders, powders

1    used for blasting, blasting materials, fuses other than

2    electric circuit breakers, detonators and other detonating

3    agents, or a device that contains any oxidizing and combustible

4    units or other ingredients in such proportions, quantities or

5    packing that ignition by fire or detonation of the compound,

6    mixture or about device on the part -- or any part thereof may

7    cause an explosion.

8         To act maliciously means to act intentionally or with

9    deliberate disregard of the likelihood that damage or injury

10   will result.

11        "Use in interstate or foreign commerce or in any

12   activity affecting interstate or foreign commerce" means

13   current, active employment for commercial purposes and not

14   merely a passive, passing or past connection to commerce.

15   Property's function must affect interstate commerce.

16        As I instructed you during the liability phase, a

17   person may be found guilty of a non-conspiracy federal offense

18   if he aided or abetted another person in committing the

19   offense.  To aid or abet means intentionally to help someone

20   else commit an offense.

21        Aiding and abetting has two elements:  first, that

22   someone else committed the charged crime; and, second, that the

23   defendant consciously shared the other person's knowledge of

24   the underlying criminal act, intended to help him, and

25   willfully took some part in the criminal endeavor seeking to

1   help it succeed.  An act is done willfully if it is done

2   voluntarily and intelligently -- and intentionally.  I'm sorry.

3   Voluntarily and intentionally.

4          A person who aids and abets another to commit a crime

5   need not be present when the underlying criminal act is

6   performed or be aware of all the details of its commission to

7   be guilty of the crime by aiding and abetting, but a general

8   suspicion that a crime may -- an unlawful act or a crime may

9   occur or that something criminal is happening is not enough.

10  Mere presence at the scene of a crime and knowledge that the

11  crime is being committed are also not sufficient to establish

12  aiding and abetting.  To be guilty of a crime by aiding and

13  abetting, a person must act in some way to affirmatively assist

14  another person to commit that crime.

15         The government must prove beyond a reasonable doubt

16  that the death or deaths charged in a given count occurred

17  during at least one of the offenses identified in the alleged

18  aggravating factor.  Whereas here there are alternate ways of

19  proving the existence of the factor, you must be unanimous as

20  to which alternative or alternatives you find to have been

21  proved.

22         Your determination of which offense or offenses the

23  defendant was committing when he caused the charged death or

24  deaths must be unanimous.  Likewise, your determination as to

25  which death, if any, was caused by the given offense must be

1    unanimous.

2         Your finding as to this statutory aggravating factor

3    must be indicated in the appropriate space in Section III of

4    the verdict form.

5         The next statutory aggravating factor alleged by the

6    government with regard to all capital counts is that, in the

7    commission of the particular offenses and in escaping

8    apprehension for the offense, Mr. Tsarnaev knowingly created a

9    grave risk of death to one or more persons in addition to the

10   deceased victim or victims identified in the particular count.

11        To establish the existence of this aggravating factor,

12   the government must prove beyond a reasonable doubt that

13   Mr. Tsarnaev, in committing the offense described in the

14   capital count you're considering, knowingly created a grave

15   risk of death to one or more persons in addition to the

16   deceased victim or victims identified in a particular count.

17        "Knowingly" creating such a risk means that

18   Mr. Tsarnaev was conscious and aware that his conduct in the

19   course of committing the offense might realistically have this

20   result.  His conduct cannot merely have been the product of

21   ignorance, mistake or accident.  Knowledge, again, may be

22   proved, like anything else.  You may consider any statements

23   made or acts done by Mr. Tsarnaev and all the facts and

24   circumstances in the evidence which may aid in a determination

25   of Mr. Tsarnaev's knowledge.

1        "A grave risk of death" means a significant or

2   considerable possibility that another person might be killed.

3        In order to find that the government has proven this

4   factor beyond a reasonable doubt, you must unanimously agree on

5   the particular person or class of persons who were placed in

6   danger by Mr. Tsarnaev's actions.

7        Persons in addition to the victims include innocent

8   bystanders in the zone of danger created by the defendant's

9   acts but do not include other participants in the offense, such

10  as Tamerlan Tsarnaev.

11       Your finding as to this statutory aggravating factor

12  must be indicated in the appropriate space in Section III of

13  the form.

14       The next statutory aggravating factor alleged by the

15  government with regard to certain capital counts is that

16  Mr. Tsarnaev committed the offenses in an especially heinous,

17  cruel and depraved manner in that it involved serious physical

18  abuse to the victim.  The government alleges this factor with

19  respect to Counts 1 through 10 and 12 through 15 only, again,

20  omitting the counts specifically relating to Sean Collier.

21       "Heinous" means shockingly atrocious.  For the killing

22  to be heinous, it must involve such additional acts of serious

23  physical abuse of the victim as to set it apart from other

24  killings.

25       "Cruel" means the defendant intended to inflict a high

1    degree of pain by serious physical abuse of the victim in

2    addition to killing the victims.

3         "Depraved" means that the defendant relished the

4    killing or showed indifference to the suffering of the victim,

5    as evidenced by the serious physical abuse of the victim.

6         "Serious physical abuse" means a significant or

7    considerable amount of injury or damage to the victim's body,

8    which involves a substantial risk of death, unconsciousness,

9    extreme physical pain, substantial disfigurement or substantial

10   impairment of a function of a bodily member, organ or mental

11   faculty.  The defendant must have specifically intended the

12   abuse apart from the killing.

13        Pertinent factors in determining whether a killing was

14   especially heinous, cruel or depraved include infliction of

15   gratuitous violence upon the victim above and beyond that

16   necessary to commit the killing, needless mutilation of the

17   victim's body and helplessness of the victim.

18        For these purposes, the word "especially" should be

19   given its ordinary, everyday meaning of being highly or

20   unusually great, distinctive, peculiar, particular or

21   significant.

22        For each of the capital counts you are considering

23   with respect to this factor, in order to find that the

24   government has satisfied its burden of proof beyond a

25   reasonable doubt that Mr. Tsarnaev committed the offenses in an

1  especially heinous, cruel or depraved manner in that it

2  involved serious physical abuse to the victim, you may only

3  consider the acts of Mr. Tsarnaev.  You may not consider the

4  manner in which any accomplice or coconspirator committed the

5  offenses.

6          Again, your finding as to this statutory factor must

7  be indicated in the appropriate space in Section III of the

8  verdict form.

9          The next statutory aggravating factor alleged by the

10  government with regard to certain capital counts is that

11  Mr. Tsarnaev committed the offenses under the particular counts

12  after substantial planning and premeditation to cause the death

13  of a person and to commit an act of terrorism.  The government

14  alleges this factor in connection in Counts 1 through 10 and 12

15  through 15 only, again omitting the counts specific to Sean

16  Collier.

17          "Planning" means mentally formulating a method for

18  doing something or achieving some end.

19          "Premeditation" means thinking or deliberating about

20  something and deciding beforehand what to do about it and

21  whether to do it.

22          "Substantial planning and premeditation" means a

23  considerable or significant amount of time -- or amount of

24  planning or premeditation.

25          "An act of terrorism" for these purposes is an act

1    calculated to influence or affect the conduct of the United

2    States government by intimidation or coercion or to retaliate

3    against government conduct.

4         To find the defendant [*sic*] has satisfied its burden

5    of proving beyond a reasonable doubt that Mr. Tsarnaev engaged

6    in substantial planning and premeditation either to cause the

7    death of a person or to commit an act of terrorism, you must

8    unanimously agree on the particular object of the substantial

9    planning and premeditation, either to cause the death of a

10   person, to commit an act of terrorism or both.

11        Again, your finding as to this statutory aggravating

12   factor must be indicated in the appropriate space in

13   Section III of the verdict form.

14        I think it might be a good idea if everybody just

15   stood and stretched for a minute.

16        MR. WEINREB:  Does that include the lawyers?

17        THE COURT:  It includes the lawyers.  I don't think it

18   includes the gallery.

19        (Brief pause.)

20        THE COURT:  The next statutory aggravating factor

21   alleged by the government with regard to certain capital counts

22   is that Mr. Tsarnaev intentionally killed or -- and attempted

23   to kill more than one person in a single criminal episode.  The

24   government alleges this factor in connection with Counts 1

25   through 10 and 12 through 15 only, again excluding the counts

1   pertaining exclusively to the death of Sean Collier.

2           To establish the existence of this factor, the

3   government must prove beyond a reasonable doubt that

4   Mr. Tsarnaev intentionally killed or attempted to kill more

5   than one person in a single criminal episode.  You must

6   unanimously agree on the particular actual or intended victims

7   or class of intended victims in order to find that this factor

8   has been proved beyond a reasonable doubt.

9           "More than one person" means one or more other people

10  in addition to killing any single named homicide victim.

11          The government has named Krystle Campbell as a victim

12  in Counts 1, 2, 3, 6, 7, 8, 12 and 13.  It has named Lingzi Lu

13  and Martin Richard as victims in Counts 1, 4, 5, 6, 9, 10, 14

14  and 15.  It has named Sean Collier as a victim, in relevant

15  part, in Counts 1 and 6.

16          "Intentionally killing a person" means killing a

17  person on purpose; that is, willfully, deliberately or with a

18  conscious desire to cause a person's death, and not just

19  accidentally or involuntarily.

20          "Attempting to kill" means purposely doing some act

21  which constitutes a substantial step beyond mere preparation or

22  planning toward killing a person and doing so with an intent to

23  cause a person's death.

24          "A single criminal episode" is an act or series of

25  related criminal acts which occur within a relatively limited

1   time and place or are directed at the same person or persons or

2   are a part of a continuous course of conduct related in time,

3   place or purpose.

4        Again, you may, but are not required to, infer that a

5   person of sound mind intended the ordinary, natural and

6   probable consequences of his knowing and voluntary acts.  Thus,

7   you may infer from Mr. Tsarnaev's conduct that he intended to

8   kill a person if you find, first, that he was a person of sound

9   mind; second, that the victim's death was an ordinary, natural

10  and probable consequence of his acts, even if the death did not

11  actually result, in the case of an attempt; and, third, that

12  Mr. Tsarnaev committed these acts knowingly and voluntarily.

13  Once again, you're not required to make any such inference.

14       Your finding as to this statutory factor again must be

15  indicated in the appropriate place on Section III of the

16  verdict slip.

17       The final statutory aggravating factor alleged by the

18  government with regard to certain capital counts is that

19  Mr. Tsarnaev is responsible for the death of a victim, Martin

20  Richard, who was particularly vulnerable due to age.  The

21  government alleges this factor in connection with Counts 1, 4,

22  5, 6, 9, 10, 14 and 15 only.

23       The word "youth" should be given its ordinary,

24  everyday meaning.  "Youth" refers to a period when one is young

25  and has not yet reached adulthood.  A juvenile is a youth.

1              To find that the government has satisfied its burden

2    of proving beyond a reasonable doubt that Mr. Tsarnaev

3    committed the offenses on a victim who was particularly

4    vulnerable due to youth, you must unanimously agree that the

5    victim was vulnerable due to his youth and that there was a

6    connection between the victim's vulnerability and the offense

7    committed upon him.  A connection does not necessarily mean

8    that the defendant targeted the victim because of the

9    vulnerability; it means that once targeted, the victim was more

10   susceptible to death because of the vulnerability.

11             Again, your finding as to this statutory aggravating

12   factor must be indicated in the appropriate place on -- in

13   Section III of the verdict form.

14             Finally, let me reiterate that if, with respect to any

15   capital count, you do not unanimously find the government has

16   proven beyond a reasonable doubt at least one of the several

17   statutory aggravating factors, your deliberations as to that

18   count are concluded.

19             Let me turn now to non-statutory aggravating factors.

20   If you have unanimously found that the government has proven

21   beyond a reasonable doubt that the defendant was 18 years of

22   age or older at the time of the particular offense, has proved

23   the existence of a particular -- as to that particular count of

24   at least one gateway or threshold intent factor, and at least

25   one statutory aggravating factor alleged by the government, you

1    must then consider whether the government has proven the

2    existence of any alleged non-statutory aggravating factors with

3    regard to that same count.

4            You must agree unanimously and separately as to each

5    count that the government has proved beyond a reasonable doubt

6    the existence of any of the alleged non-statutory aggravating

7    factors before you may consider that statutory -- that

8    non-statutory aggravating factor in your deliberations.  Again,

9    any such finding must be based on Mr. Tsarnaev's actions and

10   intent.

11           The law permits you to consider and discuss only the

12   six non-statutory aggravating factors specifically claimed by

13   the government and listed below.  You're not free to consider

14   any other facts in aggravation that you may think of on your

15   own.

16           The non-statutory aggravating factors alleged by the

17   government with regard to the capital counts are as follows:

18   First, in conjunction with committing acts of violence and

19   terrorism, Mr. Tsarnaev made statements suggesting that others

20   would be justified in committing additional acts of violence

21   and terrorism against the United States.  The government

22   alleges this factor in connection with all of the capital

23   counts.

24           Second, the government alleges that Mr. Tsarnaev

25   caused injury, harm and loss to Krystle Marie Campbell and her

1  family and friends in Counts 1, 2, 3, 6, 7, 8, 12 and 13; to

2  Martin Richard and his family and friends, Counts 1, 4, 5, 6,

3  9, 10, 14, and 15; to Lingzi Lu and her family and friends,

4  Counts 1, 4, 5, 6, 9, 10, 14 and 15; and to Officer Sean

5  Collier and his family and friends, Counts 1, 6, 16, 17 and 18.

6          The third non-statutory aggravating factor alleged is

7  that Mr. Tsarnaev targeted the Boston Marathon, an iconic event

8  that draws large crowds of men, women and children to its final

9  stretch, making it especially susceptible to the act and

10 effects of terrorism.  The government alleges this factor in

11 connection with Counts 1 through 10 and Counts 12 through 15

12 only.

13         The government alleges that Mr. Tsarnaev demonstrated

14 a lack of remorse.  The government alleges this factor in

15 connection with all of the capital counts.

16         The government alleges that Mr. Tsarnaev murdered

17 Officer Sean Collier, a law enforcement officer who was engaged

18 in the performance of his official duties at the time of his

19 death.  The government alleges this factor in connection with

20 Counts 1, 6, 16, 17 and 18 only.

21         Finally, the government alleges that Mr. Tsarnaev

22 participated in additional uncharged crimes of violence,

23 including assault with a dangerous weapon, assault with intent

24 to maim, mayhem and attempted murder on April 15 in 2013 in

25 Boston, Massachusetts -- that's for Counts 1 through 10 and 12

 1    through 15 -- and on or about April 19, 2013, in Watertown,

 2    Massachusetts.  That relates to Counts 1 through 10 and 12

 3    through 18.  That is all the capital counts.

 4         These non-statutory aggravating factors are set forth

 5    in the verdict slip, and they are generally self-explanatory

 6    and do not require further amplification or instruction.  I do

 7    want to provide further instructions, however, regarding two of

 8    the non-statutory aggravating factors.

 9         The first non-statutory aggravating factor I would

10    like to address is the government's allegation that

11    Mr. Tsarnaev has, quote, demonstrated a lack of remorse.  In

12    determining whether the government has proven this fact beyond

13    a reasonable doubt, you may not consider the fact that the

14    defendant has not testified or made any statement here in

15    court.  I remind you the defendant has a constitutional right

16    not to testify or speak both at the first phase of the trial

17    and at his sentencing hearing.

18         Again, there may be many valid reasons why a defendant

19    would exercise his constitutional right not to testify.  You

20    must, therefore, not draw any conclusion against him as to any

21    issue from his failure to testify at this stage of the trial.

22         The second non-statutory factor on which I need to

23    provide some additional information is the allegation that

24    Mr. Tsarnaev participated in uncharged crimes of violence,

25    either directly or as an aider and abetter, as I've previously

1   defined that term.  To find the defendant committed -- and

2   you'll recall that I listed the ones that -- and you'll see it

3   in the verdict form, lists the other uncharged crimes the

4   government claims.

5        So to find the defendant committed an assault with a

6   dangerous weapon, the government would be required to prove

7   that the defendant forcibly assaulted another -- a person with

8   a deadly or dangerous weapon; and, secondly, the assault was

9   done voluntarily and intentionally.

10       To find the defendant the committed an assault with

11  the intent to maim, you would be required to unanimously and

12  beyond a reasonable doubt find that the defendant had forcibly

13  assaulted a person; that the assault was done voluntarily and

14  intentionally; and, third, that the defendant intended to cause

15  a permanent disability.

16       An assault is any intentional and voluntary attempt or

17  threat to do injury to the person of another.  When coupled

18  with the apparent present ability to do so sufficient to put

19  the person against whom the attempt is made in fear of

20  immediate bodily harm.

21       "Forcibly" means by the use of force.  Physical force

22  is sufficient, and actual physical contact is not required.

23       You may also find that a person who, in fact, has the

24  present ability to inflict bodily harm upon another and who

25  threatens or intends to inflict bodily harm upon such person

1   acts forcibly.  In such a case, the threat must be a present

2   one.

3          A deadly and dangerous weapon is an object used in a

4   manner likely to endanger life or inflict serious bodily harm.

5   A weapon intended to cause death or danger but fails to do so

6   because of a defective component is, nevertheless, a deadly or

7   dangerous weapon.

8          To find the defendant committed the uncharged crime of

9   mayhem, you must find beyond a reasonable doubt and unanimously

10  the defendant maliciously disabled or disfigured someone

11  permanently or deprived someone else of a limb, organ or part

12  of his or her body; second, that when the defendant acted, he

13  intended to permanently disable or disfigure the other person

14  or deprive the person of a limb, organ or part of his or her

15  body.

16         To act maliciously means to act with the intent or

17  with the willful -- to do that, or with willful disregard of

18  the likelihood that damage or injury would result.

19         To find the defendant committed the uncharged crime of

20  attempted murder, you must find unanimously and beyond a

21  reasonable doubt that the defendant intend to commit the crime

22  of murder; and, second, that the defendant engaged in a

23  purposeful act that, under the circumstances as he believed

24  them to be, amounted to a substantial step toward the

25  commission of that crime and strongly corroborated his criminal

1   intent.

2        "A substantial step" is an act in furtherance of the

3   criminal scheme.  It must be something more than mere

4   preparation but less than the last act necessary before the

5   substantive crime is completed.  The substantial step may

6   itself prove the intent to commit the crime but only if it

7   unequivocally demonstrates such an intent.

8        "Murder" is defined as the unlawful killing of a human

9   being with malice aforethought.

10        "Malice aforethought" means an intent at the time of

11   the killing willfully to take the life of a human being or an

12   intent willfully to act in a callous and wanton disregard of

13   the consequences of human life.  But malice aforethought does

14   not necessarily imply any ill will, spite or hatred towards the

15   individual killed.

16        In determining whether a victim was unlawfully killed

17   with malice aforethought, you should consider all the evidence

18   considering the facts and circumstances preceding, surrounding

19   and following the killing which tend to shed light upon the

20   question of intent.

21        Again, your findings regarding these non-statutory

22   aggravating factors must be separate as to each count and

23   unanimous.  You must also unanimously agree beyond a reasonable

24   doubt that the non-statutory aggravating factor alleged by the

25   government is, in fact, aggravating.  As I mentioned at the

1    beginning, an aggravating factor is a fact or circumstance that

2    would tend to support the imposition of the death penalty.

3         In the event that you unanimously find beyond a

4    reasonable doubt that a particular alleged non-statutory

5    aggravating factor applies to all of the relevant capital

6    counts for which you have found the defendant 18 years or older

7    and at least one gateway factor and at least one statutory

8    aggravating factor, then you are to indicate that finding on

9    the appropriate line in Section IV of the verdict form.  And

10   you'll see that again; that is presented as the first option.

11        In the event that you unanimously find a particular

12   non-statutory aggravating factor applies to some but not all of

13   the relevant counts, you're to indicate that finding on the

14   appropriate line in Section IV and also to identify on the line

15   provided by count number the particular counts to which you

16   find the non-statutory aggravating factor applies.

17        If you do not unanimously find that a non-statutory

18   aggravating factor has been proven beyond a reasonable doubt

19   with regard to any of the relevant capital crimes, you should

20   indicate that in Section IV of the form.

21        Now, unlike the rules relating to the gateway factors

22   or the statutory aggravating factors, you're not required to

23   find a non-statutory aggravating factor with regard to a

24   particular count before you may consider the death penalty as a

25   possible sentence for that count.  The law requires only that

1    before you may consider an alleged non-statutory aggravating

2    factor as to any particular capital count, you must first

3    unanimously agree that the government has proven beyond a

4    reasonable doubt the existence of that factor as to that count.

5            After you've completed your findings regarding the

6    existence or non-existence of non-statutory aggravating

7    factors, you should proceed to Section V of the verdict form to

8    consider whether any mitigating factors exist.  Again, remember

9    unless you're unanimous that the existence of a particular

10   statutory or non-statutory factor has been proven by the

11   government beyond a reasonable doubt, you may not give that

12   factor any consideration beyond -- in your deliberations.  That

13   is, as to any statutory or non-statutory factor you do not find

14   to be proved, you may not consider that in your deliberations.

15           Let me turn now to mitigating factors.  Before you may

16   consider the appropriate punishment for any one of the capital

17   counts for which you have unanimously found that Mr. Tsarnaev

18   was 18 years old or older and the existence of at least one

19   gateway factor and at least one statutory aggravating factor,

20   you must also consider whether Mr. Tsarnaev has proved the

21   existence of any mitigating factors pertinent to the question

22   of punishment for that particular count.

23           A mitigating factor is not offered to justify or

24   excuse Mr. Tsarnaev's conduct; instead, a mitigating factor is

25   a fact about Mr. Tsarnaev's life or character or about the

1    circumstances surrounding the particular capital offense or

2    anything else relevant that would suggest in fairness that life

3    in prison without possibility of release is a more appropriate

4    punishment than a sentence of death.

5           Unlike aggravating factors, which you must unanimously

6    find proved beyond a reasonable doubt in order for you to even

7    consider them in your deliberations, the law does not require

8    unanimity with respect to mitigating factors.  Any one juror

9    who's persuaded of the existence of a mitigating factor must

10   consider it in his or her sentencing decision.

11          Furthermore, as I've said, it is Mr. Tsarnaev's burden

12   to establish a mitigating factor only by a preponderance of the

13   evidence.  I've previously instructed you about that standard

14   of proof.

15          So Mr. Tsarnaev alleges or urges as mitigating factors

16   the following:  first, that he was 19 years old at the time of

17   the offenses; second, that he has had no prior history of

18   violent behavior; third, that he acted under the influence of

19   his older brother; fourth, whether because of Tamerlan's age,

20   size, aggressiveness, domineering personality, privileged

21   status in the family, traditional authority as the eldest

22   brother or other reasons, Dzhokhar Tsarnaev was particularly

23   susceptible to his older brother's influence; fifth, Dzhokhar

24   Tsarnaev's brother, Tamerlan, planned, led and directed the

25   marathon bombing; sixth, Dzhokhar Tsarnaev's brother, Tamerlan,

1   was the person who shot and killed Officer Sean Collier;

2   seventh, Dzhokhar Tsarnaev would not have committed the crimes

3   but for his older brother, Tamerlan;

4        Eighth, Dzhokhar Tsarnaev's teachers in elementary

5   school, middle school and high school knew him to be hard

6   working, respectful, kind and considerate; ninth, Dzhokhar

7   Tsarnaev's friends in high school and college knew him to be

8   thoughtful, caring and respectful of the rights and feelings of

9   others; tenth, Dzhokhar Tsarnaev's teachers and friends still

10  care for him; 11, Dzhokhar Tsarnaev's aunts and cousins love

11  and care for him;

12       12, mental illness and brain damage disabled Dzhokhar

13  Tsarnaev's father; 13, Dzhokhar Tsarnaev was deprived of needed

14  stability and guidance during his adolescence by his father's

15  mental illness and brain damage; 14, Dzhokhar Tsarnaev's

16  father's illness and disability made Tamerlan the dominant male

17  figure in Dzhokhar's life; 15, Dzhokhar Tsarnaev was deprived

18  of the stability and guidance he needed during his adolescence

19  due to his mother's emotional volatility and religious

20  extremism; 16, Dzhokhar Tsarnaev's mother facilitated his

21  brother, Tamerlan's radicalization;

22       17, Tamerlan Tsarnaev became radicalized first and

23  then encouraged his younger brother to follow him; 18, Dzhokhar

24  Tsarnaev's parents' return to Russia in 2012 made Tamerlan the

25  dominant adult male -- the adult in Dzhokhar's life; 19,

1    Dzhokhar Tsarnaev is likely -- is highly unlikely to commit,

2    incite or facilitate any acts of violence in the future while

3    serving a life-without-release sentence in federal custody; 20,

4    the government has the power to severely restrict Dzhokhar

5    Tsarnaev's communications with the outside world; 21, Dzhokhar

6    Tsarnaev has expressed sorrow and remorse for what he did and

7    for the suffering he caused.

8            In Section V of the verdict form you will be -- after

9    each of the proposed mitigating factors, you are to indicate

10   the total number of jurors who individually find that that

11   particular mitigating factor has been established by the

12   defendant by a preponderance of the evidence.  As I say, that

13   can be any number because any number of jurors could make the

14   decision.  So it could be anywhere from zero to 12.

15           In addition to the mitigating factors specifically

16   raised by Mr. Tsarnaev, the law also permits each of you to

17   consider anything about the offense, the circumstances of the

18   offense or anything about Mr. Tsarnaev's background, record or

19   character or anything else relevant that you individually

20   believe should mitigate in favor of the imposition of life

21   imprisonment without the possibility of release instead of the

22   death penalty.

23           In other words, the law does not limit your

24   consideration of mitigating factors to those that have been

25   proposed or articulated by the defendant.  Accordingly, if

1    there are any mitigating factors not argued by the attorneys

2    for Mr. Tsarnaev by which any juror, on his or her own or with

3    others, finds to be established by a preponderance of the

4    evidence, the juror's free to consider such factor or factors

5    in his own determination as to the appropriate sentence.  And

6    you will see in Section V of the verdict form you're able to

7    identify any such additional mitigating factors that one or

8    more of you independently find to exist by a preponderance of

9    the evidence.

10            Please note the existence of a mitigating factor is a

11   distinct consideration from what weight, if any, should

12   ultimately be given to that factor in your deliberations.  For

13   example, any number of jurors might first find that a

14   particular mitigating factor exists, but those jurors as

15   individuals might later choose to give that same mitigating

16   factor differing levels of significance in the weighing

17   process.  With this distinction in mind, Section V of the

18   verdict form only asks you to report the total number of jurors

19   who individually find the existence of a particular mitigating

20   factor to be established by a preponderance of the evidence.

21            In addition, you should understand that the law does

22   not require that there be a connection between the mitigating

23   evidence and the crime committed, though you may conclude that

24   there is.  It is not necessary, for example, for the defense to

25   prove that adverse circumstances in the defendant's childhood

1    or family background caused him to commit the crime -- the

2    offense.  Whether any mitigating factor has a direct connection

3    to the crime does not affect its status as a -- mitigating

4    circumstances that you're required to consider in the weighing

5    process.

6            After you've completed your findings with respect to

7    the existence or nonexistence of mitigating factors, you should

8    then proceed to Section VI of the verdict form to weigh the

9    aggravating factors and the mitigating factors with regard to

10   each of the counts for which you have unanimously found that

11   the defendant was 18 years old at the time of the offense and

12   you found the existence of at least one gateway factor and at

13   least one statutory aggravating factor.

14           If you unanimously find beyond a reasonable doubt that

15   the government has proven that the defendant was 18 years or

16   older at the time of the offense and the existence of at least

17   one gateway or threshold intent factor and at least one

18   statutory aggravating factor with regard to any capital count;

19   and after you determine whether the government has proven

20   beyond a reasonable doubt the existence of any non-statutory

21   aggravating factors with regard to that count; and, further,

22   after you consider whether Mr. Tsarnaev has proven, by a

23   preponderance of the evidence, the existence of any mitigating

24   factors, then you must engage in a weighing process with regard

25   to that count.

1          You must consider whether you are unanimously

2     persuaded that the aggravating factors sufficiently outweigh

3     any mitigating factors or, in the absence of any mitigating

4     factors, that the aggravating factors are themselves sufficient

5     to call for a sentence of death on that particular count that

6     you are considering.

7          You are to conduct this weighing process separately

8     with respect to each of the capital counts for which you have

9     found the defendant was 18 years of age or older and you have

10    found at least one gateway or threshold intent factor and at

11    least one statutory aggravating factor.

12         Each juror must individually decide whether the facts

13    and circumstances in this case as to each count call for death

14    as the appropriate sentence.  In determining the appropriate

15    sentence for any particular capital count you're considering,

16    each of you must independently weigh the aggravating factor or

17    factors that you unanimously found to exist with regard to that

18    count, whether those aggravating factors are statutory or

19    non-statutory; and each of you must weigh any mitigating

20    factors that you individually or with others have found to

21    exist.

22         You're not to weigh, in the process, any of the

23    gateway or threshold intent factors.  In the weighing process

24    you must avoid any influence of passion, prejudice or any of

25    the arbitrary considerations.  Your deliberations must be based

```
 1    on your reasoned evaluation of the evidence as you have seen it

 2    and heard it and on the law which I am instructing you in.

 3           Now, you've heard evidence about the impact of the

 4    deaths of the deceased victims' -- deaths on the deceased

 5    victims' families -- family members and friends.  You may not

 6    consider that evidence in deciding whether any of the gateway

 7    or statutory aggravating factors have been proved.

 8           If you have found with respect to any particular count

 9    that Mr. Tsarnaev was 18 years old or older at the time of the

10    offense and have found the existence of a gateway factor and at

11    least one statutory aggravating factor, then you may consider

12    the victim impact evidence in deciding what the appropriate

13    punishment should be.

14           Again, I remind you that you are not to be influenced

15    by speculation concerning what sentence you think anyone else,

16    including victims' families, might wish to see imposed on the

17    defendant.  You have been selected to decide this case because

18    you committed to be fair and impartial in all respects, and you

19    made your oath or affirmation to that effect.  It is for you

20    alone, the fair-minded jurors, to decide the appropriate

21    punishment in this case based on your careful evaluation of the

22    evidence that you have heard and seen.

23           I also want to caution you again, as I did during the

24    trial, that you are not to consider any possible financial

25    costs to the government that may be involved in carrying out
```

1    either the death penalty or life imprisonment without the

2    possibility of release.  This is so for two reasons:  First,

3    whether one sentence may be more expensive than another is

4    simply not a proper basis upon which to decide a matter as

5    grave as this; and, second, even it were proper to impose

6    either the death penalty or life imprisonment to save money,

7    there's no evidence before you as to which sentence, if either,

8    is actually more expensive to carry out.  For both of these

9    reasons, it would be improper for you to base any part of your

10   decision on the notion that the government could save money by

11   imposing one sentence rather than another.  And that is, again,

12   a subject that should not even be discussed by you in the jury

13   room.

14        Again, whether or not the circumstances in this case

15   call for the sentence of death is a decision that the law

16   leaves entirely to you.  All 12 jurors must agree that death

17   is, in fact, the appropriate sentence in order for it to be

18   imposed.  And no juror is ever required to impose a sentence of

19   death.  The decision is yours, as individuals, to make.

20        The process of weighing aggravating and mitigating

21   factors against each other or weighing the aggravating factors

22   alone, if you find no mitigating factors, in order to determine

23   the proper punishment is by no means a mathematical or

24   mechanical process.  In other words, you should not simply

25   count the total number of aggravating and mitigating factors

1    and reach a decision based on which number is greater.  Rather,

2    you should consider the weight and significance of each factor.

3    As I've said, in carefully weighing these factors, you are

4    called upon to make a unique, individual judgment about the

5    sentence Mr. Tsarnaev should receive.

6         The law contemplates that different factors may be

7    given different weights or values by different jurors.  Thus,

8    you may find that one mitigating factor outweighs all

9    aggravating factors combined or that aggravating factors proved

10   do not, standing alone, justify the imposition of a sentence of

11   death.  Similarly, you may instead find that a single

12   aggravating factor sufficiently outweighs all mitigating

13   factors combined so as to justify a sentence of death.

14         Any one of you is free to decide that a death sentence

15   should not be imposed so long as, based on the evidence and

16   your sense of justice, you conclude that the proven aggravating

17   factors do not sufficiently outweigh the mitigating factors

18   such that the death penalty should be imposed.  Each juror is

19   to individually decide what weight or value is to be given to

20   any particular aggravating or mitigating factor in the

21   decision-making process.

22         Bear in mind, of course, that in order to find that a

23   sentence of death is appropriate for a particular count, the

24   jurors must be unanimous in their conclusion that the

25   aggravating factor or factors proven as to that count

1    sufficiently outweigh any mitigating factors found or, in the

2    absence of any mitigating factors, that the aggravating factors

3    alone are sufficient to call for a sentence of death.

4            In the event that you unanimously find as to all the

5    capital counts that the aggravating factor or factors found to

6    exist sufficiently outweigh the mitigating factor or factors

7    found to exist or, in the absence of any mitigating factors,

8    that the aggravating factor or factors alone are sufficient to

9    justify a sentence of death, then you will indicate that in

10   Section VI of the verdict form.

11           In the event you -- that you unanimously find that a

12   sentence of life in prison without the possibility of release

13   is the appropriate sentence for Mr. Tsarnaev for all of the

14   capital counts, then you would indicate that in Section VI,

15   which is the second option.

16           In the event that you unanimously find that some of

17   the capital counts -- for some of the capital counts that the

18   aggravating factor or factors found to exist sufficiently

19   outweigh the mitigating factor or factors found to exist or, in

20   the absence of mitigating factors, the aggravating factor or

21   factors are alone sufficient to justify death, with respect to

22   those counts, please indicate also in Section VI and then

23   identify those counts by number.

24           In the event that the jury is unable to reach a

25   unanimous verdict in favor of a death sentence or in favor of a

1　life sentence for any of the capital counts, please so indicate

2　in Section VI of the verdict form.  Before you reach any

3　conclusion based on a lack of unanimity on any count, you

4　should continue your discussions until you are fully satisfied

5　that no further discussion will lead to a unanimous decision.

6　　　　　After you have completed your sentence determination

7　in Section VI, regardless of what the decision determination

8　was, continue on to Section VII and complete the certificate

9　regarding the determination of sentence.

10　　　　　As I instructed you at the beginning of the penalty

11　phase, in your consideration whether the death sentence is

12　appropriate you must not consider the race, color, religious

13　beliefs, national origin or sex of either Mr. Tsarnaev or of

14　the victims.  You are not to return a sentence of death unless

15　you would return a sentence of death for the crime in question

16　without regard to the race, color, religious beliefs, national

17　origin or sex of either Mr. Tsarnaev or any victim.

18　　　　　To emphasize the importance of this consideration,

19　Section VIII of the verdict form contains a certification

20　statement.  Each juror should carefully read -- when you've

21　completed your deliberations, each juror should carefully read

22　the statement and sign your name in the appropriate place if

23　the statement accurately reflects the manner in which each of

24　you reached your individual decision.

25　　　　　So that is the conclusion of my instructions at this

 1    stage.  We'll have some further -- few thing to say later.  We

 2    will now turn to the closing statements by counsel.  And when

 3    they have finished, I will have some final issues to discuss

 4    with you.

 5            As we did before, the order of the closing arguments

 6    is the government will proceed first, followed by the

 7    defendant, followed by a brief rebuttal by the government.

 8    Again, at least we should -- I think perhaps we should actually

 9    take a short break.  Very short.

10            THE CLERK:  All rise for the Court and the jury.  The

11    Court will take a very short recess.

12            (The Court and jury exit the courtroom and there is a

13    recess in the proceedings at 11:05 a.m.)

14            THE CLERK:  All rise for the Court and the jury.

15            (The Court and jury enter the courtroom at 11:26 a.m.)

16            THE COURT:  All right.

17            THE CLERK:  Be seated.

18            THE COURT:  All right.  We're ready for the

19    government's main closing argument.

20            Mr. Mellin?

21            MR. MELLIN:  Thank you, your Honor.  Your Honor, may I

22    ask that the feed be shifted to the government so...

23            THE COURT:  Yes.  Tell me when you're ready.

24            MR. MELLIN:  Thank you.

25            THE COURT:  Go ahead.  I'm just waiting for you to get

1    away from your home screen.  That's all.  All right.

2         MR. MELLIN:  Thank you, your Honor.

3         Good morning.

4         THE JURORS:  Good morning.

5         MR. MELLIN:  There's a certain clarity that comes to

6    you when you are close to death.  Remember the testimony of

7    Jeff Bauman and Sydney Corcoran.  Even as they lay bleeding on

8    that sidewalk on Boylston Street, they made peace with death.

9         As the defendant lay bleeding in that boat, he too

10   made peace with death.  In his moment of clarity, he wrote what

11   he thought would be his lasting testament.  He wrote, "Now, I

12   don't like killing innocent people, but in this case it is

13   allowed because Americans need to be punished."  No remorse, no

14   apology.  Those are the words of a terrorist convinced that he

15   has done the right thing.  He felt justified in killing and

16   maiming and seriously injuring innocent men, women and

17   children.

18        I want to start back on Boylston Street, back where

19   the carnage began.  Picture the scene on Boylston just before

20   the first blast.  It's a beautiful, sunny Patriots' Day.  It's

21   2:45 p.m.  And the defendant walks up.  He walks up past the

22   Forum restaurant, sees how crowded it is, and decides that's

23   the place to put his bomb.  He placed it there because his goal

24   was to murder and mutilate.  He wanted to murder as many people

25   as possible.

1          When he looked up, what did he see?  He saw that he

2     had placed that bomb approximately four feet behind a row of

3     children.  Six-year-old Jane Richard, eight-year-old Martin

4     Richard, 11-year-old Aaron Hern, 12-year-old Henry Richard.  He

5     was right here.  The children were right there (indicating).

6          But seeing them didn't deter him.  He didn't pick up

7     that backpack, and he didn't move it.  He didn't care if he

8     killed them along with everyone else because he had already

9     decided that killing innocents was justified.  In fact, killing

10    innocents was the whole point.  It's the way you terrorize an

11    entire population.  The more vulnerable and unsuspecting the

12    victim, the more terrifying the murder.  The defendant picked

13    the Boston Marathon.  He picked the Forum restaurant.  And he

14    chose to remain there right by that tree because it was the

15    best way he could punish his perceived enemies.

16         The defendant put the backpack down behind those

17    children, and he waited.

18         (Pause.)

19         MR. MELLIN:  That was 20 seconds.  He waited almost 12

20    times that long before giving his brother the go-ahead and then

21    detonating his own bomb.  Remember what Alan Hern said, the

22    father of 11-year-old Aaron Hern.  He said he was helpless

23    trying to save Aaron.  Remember what Steve Woolfenden said.  He

24    was terrified and helpless as little Leo was carried away,

25    little Leo screaming for mommy and daddy, being handed off to

strangers.  Steve Woolfenden didn't know if he would live or
die, and he didn't know if he would live to ever see Leo again.
These fathers were helpless.  They were helpless in saving the
lives of their own children because of that defendant.

This is what terrorism looks like.  It's Martin
Richard bleeding on the ground in agony while his mother bends
over him, injured in one eye, and begs him to stay alive,
saying, "Please, Martin.  Please, Martin."

It's Lingzi Lu screaming in pain as she dies on that
street while her friend Danling tries to hold her abdominal
organs inside.

It's Krystle Campbell, burned all over her body,
filled with shrapnel, with smoke coming out of her mouth.

And it's Sean Collier, a loving son and dedicated
public servant, sitting in his cruiser with three bullet holes
in his head, dying as his own blood pools in that car seat.

And it's nearly 20 other people staring in shock at
their mangled and ruined limbs when just moments before they
were fine.

It's not just the dead and the wounded who were
injured by the defendant's crimes.  Others suffered unspeakable
pain and will do so for the rest of their lives.  Bill Richard
told you that he had to choose between saving Jane, who was
near certain death, or going back and seeing Martin in his last
moments of life.  Do you think that memory ever goes away? that

1    pain ever goes away?

2           The defense will ask you to value the defendant's

3    life, but he did not value the lives of his victims, not even

4    the lives of children.  He killed indiscriminately to make a

5    political statement, and he placed no value on the lives and

6    didn't care for a second what impact his actions and his

7    killings would have on so many other innocent family members

8    and friends.  His actions have earned him a sentence of death.

9           There is so much death and loss and devastation in

10   this case, it's hard to know where to begin.  The defendant

11   planted a bomb that led to painful eulogies and terrifying

12   memories.  Surviving family members were left to attend to

13   funerals and live lives with bittersweet memories of those lost

14   forever and painful reminders of what could have been.

15          You heard how Krystle Campbell was her dad's princess.

16   She was the light in his life.  He told you that she would call

17   him every day.  Now that light is out, and no phone call will

18   ever come.

19          Krystle's brother told you how the family got word

20   that Krystle was still alive and at the hospital.  Finally,

21   some good news on that awful day.  Only it turned out it was

22   Karen McWatters who was alive.  Krystle was dead.  You heard

23   that Krystle's dad fainted when he heard that news.  Two years

24   later, Bill still feels the loss, the loss of his sister, and

25   his son feels the loss of an amazing aunt.

1          Sean Collier was the moral compass in the family.  Now

2     he is gone forever.  His brother told you that Sean loved

3     helping people, and as Andrew said, there will always be a

4     cloud over family events, forever.  Or a cloud over the family

5     tailgates at the Patriots' games.  Joe Rogers will never be

6     able to go to another game with Sean.

7          This is Sean's graduation.  Mr. Rogers told you the

8     happiest day of Sean's life.  He was murdered while performing

9     that job.

10          Even to this date, the pain and suffering and loss is

11     too much to bear for that family.  Sean Collier's murder caused

12     his family a new world of pain.  Joe Rogers told you how his

13     wife can no longer go to work after seeing Sean murdered.  She

14     suffers from PTSD and could not even get out of bed for two

15     months after Sean's murder.

16          Sean's mother cried the entire weekend of the second

17     anniversary of his death, and Easter will never be the same for

18     that family.  If you remember, that was the last time the

19     family got together before April 18th, 2013.

20          Chief DiFava told you that one word described Sean

21     Collier:  character.  Now that character is gone.  And two

22     years later, the grief still remains.

23          Lingzi Lu's aunt, Aunt Helen, told you that her

24     parents were too devastated to come to the United States

25     initially when they got the news.  Lingzi was their only child,

1   their future.  That future ended on April 15th, 2013.  She was

2   her father's jolly elf.  She was the beautiful nerd.

3        Lingzi's father read a poem at her memorial service.

4   You heard it here in court:  "There will be no bombs or

5   terrorist attacks in its path.  In tears, we hear you say, the

6   forever young, 'Dear Mom and Dad, don't cry.  I love you.  If

7   there is an afterlife, I will be your daughter again.'"  Her

8   dad.

9        Her father said, "She's gone.  How can our living go

10  on?"  So unbelievably sad, and yet so true.  Their pain will

11  never go away.

12       Bill Richard knew immediately that there was no chance

13  for Martin.  He saw his little boy's severely damaged body.  He

14  embraced his son Henry for a moment and then told Henry, "You

15  have to help me find Jane."  After finding Jane, Bill Richard

16  made sure she got the help she needed.  Denise Richard was left

17  with Martin for the final moments of his life.  Martin's body

18  was ultimately covered by a tablecloth on Boylston Street.

19  Those are the lasting images Denise Richard has for the rest of

20  her life.

21       And think back to what Bill Richard said about telling

22  Jane about her brother's death.  Jane was still in surgery,

23  coming in and out of consciousness, and each time she was awake

24  she would ask, "How is Martin?"  And each time they had to tell

25  her Martin was dead.  That's another lasting memory for that

1   family.

2          Bill Richard did tell you that he can "still hear the

3   beautiful voices of my family."  Unfortunately, because of this

4   defendant, he will never hear Martin's voice again.  So much

5   loss and suffering for one family to bear.  It's too much.

6          Martin will never get to play high school sports or

7   attend college or form lifelong friendships.  Life for the

8   Richard parents and their children will never be the same.

9   Every race is an awful reminder that Martin is not running and

10  Martin is not there.

11         The defendant took all of that away from four lovely,

12  loving, caring, positive people.  This defendant blinded the

13  mother, maimed their six-year-old daughter, ripping off her

14  leg, and blew apart eight-year-old Martin right in front of

15  their son and the father.  There is no just punishment just for

16  that other than death.

17         All of this loss is overwhelming in scope and impact,

18  yet after causing all of this pain and suffering, this

19  defendant bought a half gallon of milk without shedding a tear

20  or expressing a care for the lives of the people that were

21  forever altered or destroyed.  He acted like it was any other

22  day.  He was stress free and remorse free.

23         He didn't care because the death and misery was what

24  he sought that day.  His actions destroyed so many families.

25  And he, and he alone, is responsible for his actions in causing

1    so much sadness, death and fear.

2         I want to turn briefly to the verdict form.  We just

3    went over it in detail.  Your decision in this case will be

4    assisted by kind of a record-keeping process.  As Judge O'Toole

5    has instructed you, the United States has to prove three

6    elements before you reach the larger task, which is an

7    assessment of a just punishment in this case.  It's a lengthy

8    form, but it will guide you through all of the steps.

9         And once you go through this form and this process and

10   the weighing of the factors, you will see how the aggravating

11   factors so clearly point to only one result:  a sentence of

12   death.

13        First, the government must prove the defendant was at

14   least 18 in April of 2013.  You know from his school records

15   and from his naturalization documents that he was born on July

16   22nd, 1993.  He was almost 20 years old in April 2013.

17        Second, we must prove at least one of the intent

18   factors.  As to the intent factors, the same evidence that

19   supported your finding of intent in the guilt phase is the same

20   evidence that will assist you in finding the intent in this

21   phase.

22        Remember also a passage from the *Inspire* magazine,

23   2010.  Page 33, it educates the defendant, right at the bottom,

24   "In one or two days, the bomb could be ready to kill at least

25   ten people.  In a month, you may make a bigger and more lethal

1    bomb that could kill tens of people."

2          The defendant knew what kind of hell was going to

3    happen and be unleashed, and he intended to kill people.  How

4    many did he think would die?  You have heard throughout this

5    case so much evidence of his intent, but just be mindful that

6    there are four intent factors in this phase.  You need only

7    find one applies, but you should consider all four.  And if you

8    find all four factors apply, you should indicate that.

9          Now, why do these murders deserve the death penalty

10   when other murders do not?  The aggravating factors are

11   circumstances that by law -- that the law says makes some

12   murders worse than others.  You need only find one statutory

13   aggravating factor to justify a sentence of death, but in this

14   case we have six.

15         First, the defendant didn't simply kill people; he

16   killed them using a weapon of mass destruction.  It's obvious

17   why the law considers murders committed in that way to be worse

18   than other murders.  A weapon of mass destruction is a tool of

19   terrorists.  Its purpose is not to kill a particular victim;

20   its purpose is to kill indiscriminately.  And not just kill,

21   but destroy.

22         Remember the massive fireball, the deafening

23   explosion, the acrid smoke, the searing heat, the broken glass

24   of the windows, the chaos and the noise, and the river of blood

25   running down that sidewalk?  All those things make weapons of

1    mass destruction terrifying and make the deaths that they cause

2    worse than others.

3          Second, the defendant killed multiple people in a

4    single criminal episode.  The number of deaths is seen by the

5    law, understandably, as a reason to distinguish between murder

6    cases.  A case involving multiple killings should carry a

7    greater punishment than a case involving a single killing.

8    It's clear the defendant killed more than one person by using a

9    weapon of mass destruction in this case.

10          Third, the defendant engaged in substantial planning

11    and premeditation.  The law punishes more harshly those like

12    the defendant who take considerable time to deliberate, plan

13    and carry out their murderous attacks.  Between the time this

14    whole conspiracy started and the time he finished carrying it

15    out, the defendant had plenty of time to reflect, to reconsider

16    and think better of this plan.

17          He didn't set out to commit acts of terrorism on an

18    impulse.  The whole plan was well thought out and a long time

19    in the making.  It began for him with reading terrorist

20    writings and listening to terrorist lectures, adopting the

21    beliefs that would enable him to kill without remorse.  He read

22    the *Inspire* article, "Make a bomb in the kitchen of your mom."

23    It's a recipe book for the bombs that were used in this case.

24    Little Christmas lights, pipe bombs like the ones used in this

25    case, and the pressure cookers.

1          The defendant acquired the 9-millimeter semiautomatic

2     weapon.  Remember the 9-millimeter gun?  That's an essential

3     ingredient in this plan as well.  He got that from Stephen

4     Silva in January or February 2013.  He bought ammunition and

5     practiced shooting the 9-millimeter at that firing range in

6     Manchester.  That was March 20th.  On the very same day, he

7     tweeted, "Evil triumphs when good men do nothing."  "Evil

8     triumphs."

9          On April 7th, the defendant tweeted, "If you have the

10    knowledge and the inspiration, all that's left is to take

11    action."  April 7th.  Within eight days they took action.

12         On April 14th, the day before, he purchased that SIM

13    card, the SIM card he used to call his brother to give him the

14    go-ahead to detonate the bomb.  And he waited to commit these

15    murders and these attacks on Patriots' Day, a school holiday

16    and the day of the marathon.  He did that so the bombings would

17    be as terrifying and devastating as possible.  And all of this

18    is proof of substantial planning and premeditation.

19         Also consider how the defendant and his brother killed

20    Officer Sean Collier.  That was not impulsive or reflexive; it

21    was an ambush.  You saw how they deliberately walked together

22    across the campus, and they went straight to the door of his

23    car.  They knew he was parked there.  And once they got there,

24    they did not hesitate because they knew exactly what they were

25    going to do.  They needed another gun, and they were going to

1  murder him and take his service weapon.

2      At any point along this long journey to committing

3  terrorism, the defendant could have reflected, reconsidered,

4  and stood down.  The fact that he marched resolutely on towards

5  his goal makes him more culpable and his crimes worse.

6      The fourth aggravating factor is that the defendant

7  knowingly created a grave risk of death to additional persons

8  other than the dead victims.  Judge O'Toole instructed you that

9  "a grave risk of death" means significant and considerable

10  possibility that another person might be killed.  In other

11  words, putting others at risk in addition to those who died.

12      The defendant killed and helped kill four people.  How

13  many others did he nearly kill?  Jim Hooley, the head of Boston

14  EMS, he told you that he and other EMS workers sorted the

15  wounded into three categories.  Thirty of the wounded were

16  given red tags -- 30 -- meaning that if they did not get to the

17  hospital within 60 minutes, there was a high likelihood that

18  they would die.  But 60 minutes would have been an eternity to

19  some who were wounded.

20      Sydney Corcoran told you that she felt her whole body

21  go cold as blood flowed from her severed femoral artery on that

22  sidewalk.  Celeste Corcoran told you she remembered every

23  detail of the blast.  She suffered excruciating pain as both of

24  her legs were destroyed.  She said she just wanted to die

25  because the pain was too much.  When she finally had enough

1   breath to breathe, she said she screamed in agony.  She was

2   left to try to recover in the same hospital room as her

3   daughter Sydney, another family blown apart by this defendant

4   and his brother.

5           Exhibit 20.  Look at all of the mayhem.  In the middle

6   sits Jeff Bauman.  Jeff Bauman described for you how he could

7   see his bone, and all he could say was, "This is really messed

8   up."  He told you to this day he doesn't know how he stayed

9   conscious throughout.  All he said -- or as he said, "I knew my

10  legs were gone.  I knew it instantly."

11          You saw video of Marc Fucarile lying on the street on

12  fire with a severed leg gushing blood.  There's Marc Fucarile

13  in the middle (indicating).  Marc Fucarile had to endure more

14  than 60 operations in the months after the bombings.  Over 60.

15  As Dr. King told you, every surgery is dangerous and can itself

16  be life threatening.

17          And after all of those surgeries, Marc Fucarile still

18  isn't out of the woods.  His body is still filled with

19  shrapnel.  It's too dangerous to remove.  And one of those

20  pieces of shrapnel is lodged in his heart.  At any time that

21  could travel to his lungs, and he might die.

22          It's a miracle that Marc Fucarile, Jeff Bauman, Sydney

23  Corcoran, Celeste Corcoran or so many others survived.

24          And none of this was by accident.  Just the opposite.

25  Remember what *Inspire* magazine says?  Page 40 of the same

```
 1   volume.  It recommends using a pressure cooker and placing it
 2   in a crowded area.  In fact, what it says is, "With that said,
 3   here are some important steps to take for an effective
 4   explosive device:  One, place the device in a crowded area;
 5   two, camouflage the device with something that would not hinder
 6   the shrapnel, such as cardboard."
 7          You place it in a crowded area because that pressure
 8   cooker will be more effective in that crowded area.  The grave
 9   risk of death to others is part of the reason why a pressure
10   cooker bomb is so effective.
11          The fifth statutory aggravating factor is the cruel,
12   heinous and depraved manner of committing the offense in that
13   it involved serious physical abuse to the victims.  Judge
14   O'Toole just instructed you that "serious physical abuse" means
15   a considerable amount of injury and damage to the body.
16   "Cruel" means the defendant intended to inflict the high degree
17   of pain by physical abuse to the victim in addition to just
18   killing them.
19          The evidence that the defendant caused injury and
20   damage to the victims' bodies could not be clearer.  You saw
21   the autopsy photos of Martin Richard, Krystle Campbell and
22   Lingzi Lu.  The bombs burned their skin, shattered their bones
23   and ripped their flesh.  It disfigured their bodies, twisted
24   their limbs and punched gaping holes into their legs and
25   torsos.
```

1           And none of that was accidental.  It's what the

2      defendant intended to do to them.  That's the entire reason for

3      filling the bombs with little nails and BBs and other tiny

4      pieces of shrapnel, because merely killing a person isn't

5      nearly as terrifying as shredding them apart.

6           Remember what was said in the *Inspire* magazine, again

7      on page 40:  "However, in order to fill, for example, a

8      pressure cooker with a substance from matches, it may take a

9      lot of matches to do so, and therefore you may want to use

10     gunpowder or the powder from fireworks."  Sound familiar?

11          It goes on to say, "You need to also include shrapnel.

12     The best shrapnel are the spherical-shaped ones.  As you can

13     see in the figures below, you need to glue them to the surface

14     of your canister.  (If steel pellets are not available, you may

15     use nails instead.)"

16          That's exactly what the defendant did.  You recall the

17     testimony of those victims outside the Forum?  They were full

18     of nails and BBs.

19          The defendant wasn't out just to kill innocents in

20     order to punish America.  He wanted to torment them to make a

21     political statement.  He knew these bombs would make people

22     suffer because murders are more terrifying and they make a

23     better political statement this way.  It's a better political

24     statement if you force the victims to suffer, suffer

25     excruciating pain in front of their parents and their friends.

1    That's what the defendant did to Martin Richard.

2           Dr. King told you that Martin did not die right away

3    and that the shattering of his arm and the twisting of his

4    internal organs were excruciatingly painful.

5           Dr. Jennifer Hammers told you the same thing about

6    Krystle's broken leg.  You know that Krystle lived to

7    experience that excruciating pain because you can see her here

8    screaming on the sidewalk before she dies.  And this, this is

9    how Karen McWatters, her best friend, will have to remember

10   her.

11          The same, of course, is true for Lingzi Lu.  You saw

12   the photos of her screaming as she lay dying, and you heard

13   Danling tell you how it pained her that she couldn't help her,

14   that she was of no use to her friend at that time.

15          The sixth statutory aggravating factor is the

16   vulnerability of Martin Richard due to his youth.  No one

17   deserves to be killed by a terrorist bomb, but some people are

18   more vulnerable, more vulnerable to the harm done.  Can there

19   be anyone more vulnerable than a little boy next to a weapon of

20   mass destruction?  In this case, an eight-year-old boy named

21   Martin Richard.  There isn't a part of his body that was not

22   affected.

23          Both the chief medical examiner and Dr. King explained

24   to you that Martin was more vulnerable because he was a little

25   boy and his abdomen and key organs were closer to the ground.

1     The defendant placed that bomb on the ground, so the smaller

2     the victims were, the more exposed they were to the shrapnel.

3     Martin, he was 53 inches, just over four feet tall, and he

4     weighed 69 pounds.

5            Where the shrapnel from that bomb ripped apart the top

6     of Lingzi Lu's legs, that same shrapnel headed right for the

7     middle of Martin's midsection.  Also because of Martin's youth,

8     his body would not be able to sustain those injuries as long as

9     an adult.  The evidence shows you that there can be no doubt

10    that Martin Richard was a vulnerable victim.

11           There are five other aggravating factors in this case.

12    One is the impact of these crimes on the victims and their

13    surviving family members.  I already talked a little bit about

14    the impact of the crimes on the families, and I won't say more

15    at this point because I suspect you remember quite well what

16    those family members had to say.

17           Another aggravating factor is the selection of the

18    Boston Marathon as a targeted site for terrorism.  Committing

19    murder during an act of terrorism is enough by itself to make

20    that murder worse than others, but choosing the Boston Marathon

21    as the site for the terrorist attack makes it even worse.

22           That's in part because the Boston Marathon is a family

23    event.  It takes place on a school holiday.  As Stephen Silva

24    had told you, the defendant had gone to the marathon the year

25    before, 2012.  He knew that the marathon attracted families and

1    that people go there with their friends, so he knew that his

2    bomb was likely to kill and mutilate parents in front of their

3    children or children in front of their parents or both.

4         He also knew that the last stretch down Boylston

5    Street, all the way to the finish line, drew huge crowds.  He

6    knew that by placing his bomb there, he had a good chance of

7    killing and injuring hundreds of people, which is exactly what

8    happened.

9         He knew that the marathon draws an international crowd

10   so that the news of his bombing would be of interest in every

11   corner of the world.  And he knew that the marathon is

12   televised.  His bombing would be played and replayed over and

13   over again, allowing him to terrorize people not just in

14   Boston, but all over the country and all over the world.

15        And of course the marathon takes place on Patriots'

16   Day, a day when we celebrate an important milestone in the

17   birth of American independence.  It's hard to think of a better

18   place to murder people than the Boston Marathon if you want to

19   make a political statement, if you want to make Americans -- or

20   if you believe Americans are in need of punishment.

21        Another aggravating factor is that the defendant and

22   his brother chose to murder Sean Collier precisely because he

23   was a police officer, a police officer with a gun.  Police

24   officers carry guns because it is their job to protect us, and

25   they put their lives at risk doing so.  To kill a police

1    officer makes all of us more vulnerable.

2         Sean Collier was a compassionate soul, a dedicated

3    young man who had devoted himself to protecting everyone on

4    that MIT campus, from the students to the homeless men who

5    wandered onto campus.  He was everything a police officer

6    should be.  The fact that the defendant and his brother

7    targeted him because he was a police officer is another

8    aggravating factor for you to consider.

9         Another factor is the defendant's participation in

10   additional uncharged crimes of violence, like Judge O'Toole

11   just talked about, like assault with a deadly weapon, or

12   attempted murder on others.  You heard plenty of evidence about

13   how the defendant attempted to murder as many people as

14   possible on Boylston Street and how close he came to murdering

15   dozens.

16        I want to talk for just a minute about how hard he

17   tried to kill other police officers, the officers in Watertown.

18   Officer Reynolds told you that after he learned the police were

19   looking for the Mercedes SUV, he saw it.  He saw the defendant

20   and his brother driving down in his direction.  The defendant

21   was in front.

22        When he passed them and made a U-turn to follow, the

23   defendant turned down Laurel Street and his brother followed.

24   And the defendant stopped in the middle of Laurel Street and

25   his brother stopped behind him.  Both got out.

1          What was the defendant planning when he stopped his

2     car in the middle of Laurel Street and got out?  You know what

3     he was planning because you know what he did next.  While his

4     brother provided cover and shot at the officers, the defendant

5     lit bombs, the pipe bombs, and a pressure cooker bomb, and

6     hurdled them at the officers.  His goal was to kill them.

7          His brother was also trying to kill them, and the

8     defendant shared in that goal.  You know that was exactly what

9     he was trying to do because when his brother was on the ground

10    and the officers were trying to arrest him, the defendant made

11    one last attempt to kill police officers.  He got back into

12    that Mercedes, and instead of driving away from the officers

13    where he had a clear route of escape, he turned around that SUV

14    and drove it at top speed right at them.  He didn't care that

15    his brother was on the ground.  He saw an opportunity to

16    inflict even more pain, even more punishment on America, and he

17    wasn't going to pass it up.  Once again, he nearly succeeded.

18         Sergeant Pugliese rolled out of the way just in time,

19    or he, like Tamerlan Tsarnaev, would likely have been run over

20    and killed.

21         The last aggravator I want to discuss is the

22    defendant's demonstrated and disturbing lack of remorse, his

23    lack of remorse during the commission of the crime and on the

24    date of the arraignment.

25         20 minutes -- 20 minutes -- after exploding his bomb,

1    while his victims lay dead and dying and bleeding -- 20

2    minutes -- that's a lot less than 60 minutes that some of them

3    had -- 20 minutes later, there's the defendant.  He strolled

4    into Whole Foods like it was an ordinary day and shopped for

5    milk.

6            That same evening, at 8 p.m., he got on the Internet

7    and tweeted to his friends, "Ain't no love in the heart of the

8    city."  "Ain't no love in the heart of the city."

9            Hours after he fled the carnage that he had unleashed

10   in Boston, he had the gall to tweet, "Ain't no love in the

11   heart of the city."  As to that, he couldn't have been more

12   wrong.  As the defendant sat at home drinking his milk and

13   tweeting his glib commentary, the heartbreaking love of a

14   mother comforting her dying child played out in the heart of

15   Boston.  Also on display were the bravery, the strength, the

16   efforts of strangers trying to help those who had been injured,

17   injured by the bomb planted by this defendant.  He failed

18   miserably in trying to blow apart the fabric of society.  Make

19   no mistake:  Love prevailed in the heart of Boston on April

20   15th.  But his true character was on display that night.  It

21   was on display in his words, in his callousness in that tweet.

22           The next day, April 16th, while victims awoke in cold,

23   antiseptic hospitals to the new reality that they were

24   amputees, the defendant went to the gym and worked out.  An

25   hour later, he tweeted this:  "I'm a stress-free kind of guy."

1    He's stress free, April 16th.

2            Then on April 18th, while Dun Meng, terrified, sits in

3    the SUV with Tamerlan Tsarnaev, the defendant walks into that

4    ATM and coolly withdraws money from Meng's account like it's

5    any other day.  Later at the gas station, he slowly takes his

6    time buying snacks for that trip to New York where he wants to

7    unleash even more havoc.

8            And then finally, on July 10th, 2013, three months

9    after the bombings, the defendant comes into court to be

10   formally charged with murdering a little boy, murdering two

11   women and a police officer.  He has had months to reflect on

12   the pain and suffering that he has caused.  But when he's put

13   in that holding cell, you cannot see a trace of remorse on his

14   face.  He paces, he fluffs his hair, and he makes obscene

15   gestures at the marshals watching over him and watching over

16   the surveillance cameras.

17           Who is capable of being so stress free after

18   committing the crimes he committed?  Who is capable of showing

19   so little remorse?  Only a terrorist, someone who had no reason

20   for remorse because he believed that he had done something

21   brave and something good.  Someone who had set out to make a

22   political statement, to commit a political crime and then

23   firmly believed in the righteousness of what he had done.

24           Alone, and certainly together, these aggravating

25   factors sufficiently outweigh any mitigating factors to justify

1    your imposition of a sentence of death.  Frankly, it's not even

2    close.  The magnitude and the gravity of the aggravating

3    factors overwhelmingly tilt the scales of justice in only one

4    direction.

5           The defense has proposed a number of mitigating

6    factors.  A number of them are unsurprisingly focused on the

7    defendant's family life and his age.  I want to discuss a few

8    of those factors very briefly right now, and Mr. Weinreb will

9    discuss them in greater detail during the government's

10   rebuttal.

11          Many of these mitigating factors concern issues we all

12   deal with in our daily lives every single day.  These factors

13   are deserving of little weight in your analysis.  None of the

14   factors about the defendant's age or childhood meaningfully

15   mitigate the terrorist attacks in this case.

16          His age:  The defendant was almost 20 years old when

17   he committed these crimes, old enough to know right from wrong.

18   At 18, young men and women leave home.  They join the military,

19   start families, and they can vote.  The law states that a

20   defendant must be at least 18 before a sentence of death may be

21   imposed.  Because when you are 18 or older, you are responsible

22   for your actions.  Dr. Giedd's observations regarding the

23   development of the brain are in line with the law, and the law

24   was informed by these understandings.

25          Now, you heard an enormous amount of evidence in this

case about Tamerlan Tsarnaev, but Tamerlan Tsarnaev was not the
defendant's master.  They were partners in crime and brothers
in arms.  Each had a role to play, and each played it.  Both
came to believe in the teachings of Anwar al-Awlaki and the
other terrorists.  Both decided that they wanted to punish
America in a way that would win them glory and win them a place
in paradise.

The defendant would like to focus all of your
attention on something you can never know, namely, what
influence, if any, did Tamerlan Tsarnaev have on the
defendant's decision to commit these crimes?  You can't know it
because there's no evidence of it in this case.  What you do
know from the evidence is what things the defendant actually
did and what he wrote.  Those are the things that really matter
in deciding what his punishment should be.

The defendant independently got the gun used to murder
Officer Sean Collier.  He independently chose the Forum
restaurant as a bombing site, and he stayed there in spite of
the children.  He called his brother to initiate the attack.
And because of his actions and role in this conspiracy, he
maimed Jeff Bauman, Erika Brannock, Celeste Corcoran, Mery
Daniel, Rebekah Gregory, Patrick Downes, Jessica Kensky, Karen
McWatters, William White, Heather Abbott, Roseann Sdoia, Marc
Fucarile, Paul Norden, JP Norden, Adrianne Haslet-Davis, Steve
Woolfenden, and little Jane Richard, whose leg looked like it

1    went through a meat grinder, as Matt Patterson described it.

2         The defendant murdered Krystle Campbell, Martin

3    Richard and Lingzi Lu.  He returned to UMass Dartmouth in

4    secret triumph and posted tweets that reflected his

5    satisfaction with his own work.  Not once in those tweets does

6    he say, "Tamerlan made me do it."

7         He independently returned to Cambridge when he saw his

8    face on the news to rejoin his brother for their final acts of

9    terror.  He murdered Sean Collier.  He tried to steal his gun.

10   He robbed Dun Meng.  He loaded bombs in the Mercedes.  He went

11   to buy the Red Bull and snacks for the trip to New York.  And

12   when the police caught up with him, he led the way to the site

13   of the last stand.  He tried to kill the officers, first with

14   bombs and then with an SUV, without any help from his brother

15   or anyone else.  He wrote a manifesto that explained their

16   actions and took credit for what they had done.

17        As the defendant so clearly wrote, "I can't stand to

18   see such evil go unpunished."  That's what he wrote.  "I can't

19   stand."  "I," not "we."  Not "my brother."  Nowhere in that

20   manifesto does he write, "My brother made me do it."

21        What deserves more weight:  the things the defendant

22   did in his written confession of guilt or the speculation about

23   what Tamerlan might have said?  You heard that the defendant

24   learned the value of love and caring and support from his

25   family and friends, yet he made a conscious decision to destroy

1    loving and caring families without any regard for the

2    consequences.  In total, the mitigating factors are essentially

3    weightless when compared to the gravity of the terror,

4    devastation and murder perpetrated by the defendant.

5           Now, some of you expressed the opinion during voir

6    dire that a life sentence may be worse than death.  You now

7    know, after hearing from Warden John Oliver, the warden at ADX,

8    his life will not be worse than death.  He won't be put in a

9    dungeon.  He won't be in a black hole.  He'll have his own cell

10   with a window.  He'll take separate showers.  He'll have a

11   toilet and a sink.  He can view prison programming in his cell.

12   He can take courses and get a college degree.  He can write a

13   book.  He can exercise inside and outside of his cell.  He'll

14   be able to talk to other inmates and to the staff.  And he

15   won't need to deal with the fear of others hurting him because

16   the staff will be there.

17          He will be able to visit with family and approved

18   contacts.  He gets to see them in person, speak with them on

19   the phone and exchange an unlimited number of letters.

20   Unlimited.  He can ultimately step down and have more

21   privileges.

22          He is a young man in good health.  As you've heard,

23   SAMs restrictions are not permanent.  They must be renewed

24   yearly.  And they can only be renewed if they meet the

25   requirements.  If those restrictions are lifted, he will be

1    allowed more privileges and more contacts.  Times change.  No

2    one can predict the future.  But his life will not be worse

3    than death, especially if he steps down during that process.

4         This defendant does not want to die.  You know that

5    because he had many opportunities to die on the streets of

6    Boston and Watertown.  But unlike his brother, he made a

7    different choice.  In the manifesto he wrote in the boat, he

8    praises his brother for dying a martyr, but he did everything

9    in his power to avoid becoming one himself.  He didn't take on

10   the officers after he ran out of pipe bombs.  The defendant

11   managed to escape.  He escaped in Dun Meng's SUV down Laurel

12   Street, and then he hid -- he ran, and then he hid in the boat.

13        A death sentence is not giving him what he wants.  It

14   is giving him what he deserves.

15        This is a solemn day.  Nothing is ever going to bring

16   back Krystle Campbell, Lingzi Lu, Martin Richard or Officer

17   Sean Collier.  No one will ever be able to put the amputees

18   back in the position they were to run on their own two legs

19   again.  We understand this is a weighty decision, and we

20   appreciate the need to be circumspect and thoughtful in making

21   that decision, but you all said in the right case, if the

22   government proved it was an extreme case, a heinous case, that

23   you could vote to impose a sentence of death.  This is that

24   case.

25        Don't be swayed by the many cute photos you saw of the

1    defendant as a child.  All murderers start out as cute

2    children, but sometimes cute children grow up to be bad people.

3    When the defendant became an adult, he changed into someone

4    else.  He found terrorist writings, he found terrorist

5    lectures, and read and listened to them.  He found them

6    compelling and convincing, so much so that he became one of the

7    extremely few people in the world who acted on those.  He acted

8    on the beliefs and the writings and the lectures, and he acted

9    on it to carry out a terrorist attack.

10         He was an adult.  He made an adult decision and the

11   damage will last forever.  Now he has to face the consequences.

12   He struck at what citizens hold dear to cause the greatest

13   amount of pain, fear and panic.  He went after the core values

14   of society:  children, family, neighborhoods, public safety.

15         After all of the carnage and fear and terror that he

16   has caused, the right decision is clear.  It is your job to

17   determine a just sentence.  The only sentence that will do

18   justice in this case is a sentence of death.

19         Thank you.

20         THE COURT:  I think, because of the time, we'll take

21   the lunch recess at this point and have the -- but I propose to

22   make it a little shorter than an hour.  We'll come back at

23   1:15.  All right, jurors?  I'm told that lunch is available for

24   you.

25         Please, no discussion of any of this -- these issues,

1    until we've concluded all our process.

2           MS. CONRAD:  Your Honor, we would like to be heard at

3    sidebar before the break, after the jurors are excused.

4           THE COURT:  After the jurors are excused.  All right.

5    Okay.

6           Let's excuse the jury.

7           THE CLERK:  All rise for the jury.

8           (The jury exits the courtroom at 12:27 p.m.)

9           (Discussion at sidebar and out of the hearing of the

10   jury:)

11          THE CLERK:  Marcia is over there so you have to speak

12   directly into here so she can hear you.

13          MS. CONRAD:  I don't know that we couldn't do it in

14   open court.

15          THE COURT:  You said "sidebar."

16          MS. CONRAD:  Well, I know that.

17          MR. BRUCK:  Should we go back to --

18          THE COURT:  What's the issue?

19          MS. CONRAD:  Well, I've got several objections to

20   Mr. Mellin's closing.  I think Mr. Bruck has some as well.

21          THE COURT:  That's typically done at sidebar.

22          MS. CONRAD:  Okay.  So, first of all, when Mr. Mellin

23   said --

24          THE COURT:  You have to talk into the mic.  Seriously.

25          MS. CONRAD:  Sorry.  This is awkward.

1          When Mr. Mellin said that there was no evidence that

2    Tamerlan influenced Mr. Tsarnaev in his -- in the crime, that

3    it's a direct comment on the defendant's failure to testify,

4    and the First Circuit has repeatedly held that when a

5    prosecutor comments that there's no evidence of something that

6    only the defendant could provide evidence of, that is a comment

7    on the failure to testify.  There certainly was plenty of

8    evidence in this case about Tamerlan's influence overall, but

9    when Mr. Mellin points specifically to this offense, it's a

10   comment on the failure to testify.

11         His discussion, although he didn't name the case of

12   *Roper v. Simmons*, and the reason why the law requires that one

13   must be over 18 in order to have the death penalty imposed was

14   inaccurate and misleading, and I would ask for the opportunity

15   to submit a curative instruction.

16         *Roper* does not just say that someone over

17   18 -- someone must be over 18 to get the death penalty because

18   they are responsible.  It also talks about the capacity for

19   change of younger people.  And it also talks about the fact

20   that 18 is a bright line that they must set.  And for

21   Mr. Mellin to mislead the jury about what the law -- why the

22   law requires someone be over 18 I think is a serious error that

23   the Court should correct.

24         Third, Mr. Mellin, despite the Court's very clear

25   position yesterday, again stepped over the line with respect to

1   conditions at ADX by saying that he can, quote, view prison

2   programming.  Again, trying to highlight his improper

3   cross-examination -- rather, his improper examination in which

4   he said, despite the Court's clear ruling, that the defendant

5   could watch prison programming.  I think Mr. Bruck --

6           MR. BRUCK:  We also object to the representation that

7   the rebuttal of mitigating factors will be held back, the

8   government -- for the government's reply.  The government has

9   notice of the case of mitigation.  They've had, generally

10  speaking, notice for months, and they've had the mitigating

11  factors for several days.  And it just isn't fair to say,

12  "Well, Mr. Weinreb is going to handle most of the response to

13  that after -- as the last word."

14          If Ms. Clarke says something that wasn't anticipated

15  and he wants to respond to that, that's what reply argument is

16  for.  It is not an opportunity to have an unrebutted crack at

17  the defendant's case.  And so we think that that is improper.

18          MS. CONRAD:  I think Mr. Fick may have a couple more.

19          THE COURT:  Is there a line?

20          MS. CONRAD:  Yes.

21          MR. FICK:  A few additional objections to the

22  argument.

23          One, that there was a characterization of the verdict

24  form as being sort of a mere record-keeping process which sort

25  of denigrates the process -- or the importance of the process

1    involved in filling out the form.

2         And there were several comments that sort of -- I

3    would suggest cross the line in terms of denigrating of the

4    consideration of mitigating factors.  For example, near the

5    beginning, with regard to the Richard family suffering, there

6    was a comment that there is no just punishment for that other

7    than death, which invites the jury to ignore mitigating

8    factors.

9         There were other comments that sort of crossed the

10   line of counsel commenting on evidence, like "it's not even

11   close," with regard to the weight of mitigating factors, and

12   the comment that none of the mitigating factors meaningfully

13   mitigate.  That is injecting the opinions of counsel rather

14   than an actual argument about the evidence.

15        MR. WEINREB:  Your Honor, if I may, we don't plan on

16   responding to any of those except I just want to make a

17   representation, which is that the statement he will have the

18   opportunity to view programming in his cell was my -- I take

19   responsibility for that.  It was my understanding that that was

20   what the Court had authorized, that the objection was to

21   "watch" and that the Court said that "view" was not

22   objectionable because "view" embraced written materials as well

23   as other things and didn't carry the necessary implication that

24   there would be television or something else like that.

25        So I just want to make sure that Mr. Mellin isn't

1    charged with anything like that.

2             THE COURT:  Have you checked the transcript with

3    respect to that or is this your memory?

4             MR. WEINREB:  This is the conversation we just had, as

5    I recall, the other day, that --

6             THE COURT:  Yeah.  I just didn't know whether you

7    had -- it was yesterday, right?

8             MR. WEINREB:  I believe it was yesterday.

9             THE COURT:  I just didn't know whether you had looked

10   at the transcript of that, to see whether the word was "view"

11   or not.

12            MR. WEINREB:  No.  No, no, no.  In other words, he

13   said "watch" the first time, and you had said that "view" would

14   have been okay but "watch" not.  And this time he said --

15            THE COURT:  Right.  I'm not sure that's exactly what I

16   said.  But I don't think it's as offensive as "watch" was.

17   So I don't -- the objections are noted.  I don't propose to

18   take any action.

19            (In open court:)

20            THE COURT:  We'll be in recess until 1:15.

21            THE CLERK:  All rise for the Court.

22            (The Court exits the courtroom at 12:34 p.m.)

23            THE CLERK:  Court will resume at 1:15.

24            (There is a recess in the proceedings at 12:34 p.m.)

25            THE CLERK:  All rise for the Court and the jury.

```
 1                (The Court and jury enter the courtroom at 1:27 p.m.)

 2           THE CLERK:  Be seated.

 3           MS. CONRAD:  Your Honor, may we just approach for one

 4  brief moment, please?

 5           THE COURT:  I'm sorry?

 6           MS. CONRAD:  May we approach for a moment, please?

 7                (Discussion at sidebar and out of the hearing of the

 8  jury:)

 9           MS. CONRAD:  So I just -- with respect to the

10  objections previously raised to Mr. Mellin's closing argument,

11  we just would be, first of all, asking for a mistrial; and,

12  second of all, if that is not allowed, we would ask that the

13  jury be told that the argument regarding viewing prison

14  programming was improper argument, as was the argument that

15  there is no evidence regarding Tamerlan's influence.

16           THE COURT:  All right.  I thought that was the prior

17  request.

18           MS. CONRAD:  I just wanted to make sure that --

19           MR. BRUCK:  There was a request for relief.

20           THE COURT:  Yeah.  The first point was not made, and

21  that motion is denied.

22           MR. BRUCK:  And to the extent -- subject to that, we

23  would ask for a curative instruction as to each of the issues

24  raised.

25           THE COURT:  Fine.
```

```
 1          MR. BRUCK:  The last thing -- thank you.

 2          The last thing is that to the extent that

 3   Mr. Weinreb's response on mitigation exceeds what the proper

 4   role would apply, that is, if it turns out as we fear, as

 5   Mr. Mellin forecasts, that the government has reserved its

 6   response to our cases in mitigation to its reply, we'll request

 7   surreply argument in order to respond in a way that Ms. Clarke

 8   should have had the opportunity to do.

 9          THE COURT:  Can we see what the conditions on the

10   ground are at that point?

11          MR. BRUCK:  Yes.

12          MS. CONRAD:  I had a note with respect to that that

13   yesterday in the lobby conference Mr. Weinreb stated that the

14   rebuttal would be very brief, and it sounds like that's not

15   going to be the case.

16          MR. WEINREB:  Actually, what I said was it would be

17   general in reply.  We received the full list of mitigating

18   factors less than 48 hours ago, and I still haven't heard what

19   Ms. Clarke is going to say about them.  I think that responding

20   to the mitigating factors is a reply.

21          THE COURT:  All right.

22          (In open court:)

23          THE COURT:  All right.  We're now ready for the

24   defense closing.

25          Ms. Clarke?
```

1          MS. CLARKE:  Thank you, your Honor.

2          May we have the screen?

3          Hello.

4          THE JURORS:  Hello.

5          MS. CLARKE:  Ten weeks ago, you took your oath as

6    jurors in this trial, *United States versus Dzhokhar Tsarnaev*,

7    and now the time's come for you to decide what to do with

8    Dzhokhar.

9          It's -- I'm sure it was clear from the beginning of

10   the case that the prosecution would come to you and ask you to

11   impose a sentence of death.  That came as no surprise.  And I'm

12   sure it's no surprise to you that I come before you on behalf

13   of all of his attorneys and ask you to choose life.

14         And now you have the unenviable task, each of you --

15   each of you individually have the unenviable task of

16   considering everything you've heard in court, considering all

17   of the instructions from Judge O'Toole, considering your life

18   experiences, considering your wisdom, and considering your

19   moral sense in deciding the answer to that question.

20         Miriam, David, Tim, Bill and I have stood with

21   Dzhokhar Tsarnaev for many months.  We've tried to bring you

22   information to help you do your job.  We've told you when we

23   agreed with the evidence of the prosecution, and we've told you

24   when we've disagreed about their theories and about why.

25         We brought witnesses to tell you about Dzhokhar's

1  background, his life, his life experience as a child, as a

2  teenager, and now.  And I need to talk with you about Dzhokhar.

3         But before I do, I want to make one thing very, very,

4  very clear.  The story of the Boston Marathon bombing is not

5  about Tamerlan and Dzhokhar Tsarnaev.  The story of the Boston

6  Marathon bombing is one of tragedy of their making, but it is

7  more than that.  Family members of those who lost their loved

8  ones came into this courtroom, either in the first phase or

9  this phase, and testified from the depth of their grief and

10 with great dignity and spoke to you about their heartbreaking

11 loss.  Those who were hurt beyond imagination came into this

12 courtroom and testified about their pain and anguish.  But

13 every person -- in each person, you saw a will and a

14 determination to survive and thrive.

15        First responders told us about their -- what can only

16 be described as brave and heroic acts.  They came in here and

17 told us about their efforts to comfort the injured, to save the

18 seriously injured and to protect others.  The story of the

19 Boston Marathon bombing is about resilience and the strength of

20 the spirit of those so deeply affected by these senseless and

21 catastrophic acts.

22        But I'm going to spend some time talking with you

23 about Dzhokhar and his life because he's the person you've got

24 to sentence.  He's the person you've got to make your

25 individual decisions about.  You're not just making a decision

1    about the horrific nature of the crimes.  You did that in

2    returning your verdict of guilty on every count in this

3    indictment.  You did that.  You've done that.  You're now to

4    make a decision about who he is, who he was and who he might

5    become.

6             I'm not asking you to excuse him.  There are no

7    excuses.  I'm not asking you for sympathy.  Our sympathies lie

8    with those who were harmed and killed and their families.

9             What I am asking you to do when I talk with you about

10   Dzhokhar is to listen.  And I'm asking you to hold open your

11   minds, as you promised that you would do, and I'm asking you to

12   try to understand -- it's a mighty big task for all of us to

13   do -- try to understand how the unimaginable occurred.

14            You heard from the witness stand a little bit about

15   Dzhokhar's parents, very -- sort of very young and very rocky

16   beginning.  Neither thought they should marry.  One was a

17   Chechen, one was an Avar, and they shouldn't marry.

18            You heard a little bit about Zubeidat.  You heard the

19   name pronounced a couple of times, Zubeidat or Zubeida,

20   Dzhokhar's mom, and you heard about how she was fashionable and

21   flashy and loud, and Anzor was a hard-working, quiet man.  They

22   moved a lot, often thousands of miles.

23            And from Kyrgyzstan -- I think we've got a map.  I

24   think you saw this chalk during the testimony.  And you heard

25   about how they moved from Kyrgyzstan to Kazakhstan to Chechnya

1    to Dagestan, often thousands of miles, and required the help of

2    Zubeidat's sisters and their children to help the family make

3    it.  Zubeidat and Anzor had four kids in seven years.  They

4    often landed with relatives thousands of miles from where they

5    had been living, uprooting the kids.

6         Now, the prosecution tried to make it sound like they

7    were summering on the Caspian Sea.  We know that's not true.

8    We heard from the women that came here from Russia that that

9    wasn't true.  There was a two-bedroom apartment where they

10    crammed in with several other relatives and stayed for months.

11    Even the women that came here to talk with you from Russia told

12    you how unsettling all of those moves were for that family.

13         The women who came here, two sisters of Zubeidat, and

14    the cousins of Dzhokhar didn't even know until coming here

15    where Tamerlan had been born.  They didn't know that Dzhokhar's

16    birth certificate showed that he was born in Kyrgyzstan and

17    were somewhat surprised to learn that because some of them were

18    there when he was born in Dagestan, 2,000 miles away.

19         While most folks described Anzor as a quiet,

20    hard-working dad, there were mixed reviews on Dzhokhar's mom.

21    She ranged from fashionable and flashy and loud.  Her family

22    was stunned, shocked when she began covering in dark.  Her

23    somewhat skeptical son-in-law, who we -- former son-in-law who

24    we saw coming to Boston by way of video from Kazakhstan, talked

25    of her -- about her as controlling and didn't believe the

1    reasons for her covering up.

2            You heard her described as intense and intimidating

3    and attending a baby shower and acting like the queen bee.  A

4    wide range of descriptions for Zubeida.  The one thing we

5    really got out of that is she was a force in the family.

6            So when -- in 2002, when Dzhokhar -- eight-year-old

7    Dzhokhar came with his mom and dad to the United States, they

8    came over here with one child, leaving 15- or 16-year-old

9    Tamerlan in Kazakhstan with his two sisters, with family, and

10   they tried to make their way in the United States.  A year

11   later, the whole family joined up in Cambridge and set on hopes

12   and dreams and unrealistic expectations for Tamerlan.

13           Tamerlan would go on to do great things.  Tamerlan

14   would be a famous musician.  Tamerlan would be an Olympic

15   boxer.  Tamerlan would be the savior of the family.  Where was

16   Dzhokhar in this entire time and this entire discussion?  He

17   was the quiet kid who kept his head down and did his homework.

18   He was the shy, quiet, respectful, hard-working kid that the

19   teachers and friends came in here and told you about.

20           Katie Charner-Laird, the third-grade teacher -- she

21   came in and said, "Look, he came in speaking Russian.  He

22   learned English.  He learned it well.  He worked hard.  He

23   wanted to do everything right."

24           Tracey Gordon told you about the fifth-grader who

25   enjoyed the farm club.  He was hard-working.  She recalled his

1    enthusiasm when he went to the farm school.  We saw several

2    pictures of that.  She recalls him dancing in the classroom.

3    She met his parents, and his parents wanted him to skip a grade

4    and go ahead.  And that happened.

5         Becki Norris taught Dzhokhar in middle school.  You

6    may remember Ms. Norris when she came in.  She loved that kid.

7    She spoke Russian.  She became his advisor.  She got to know

8    him very well.  Her husband got to know him.  They saw great

9    promise in this kid.  Her husband was a soccer coach.  They

10   cared deeply for Dzhokhar then, and they care deeply for him

11   now.

12        Becki Norris remembered Dzhokhar coming to school one

13   day in the wrong color pants.  Do you remember that testimony?

14   And he got sent back home.  And when he came back, he said his

15   mother was pulling him out of school, and Becki Norris was

16   devastated.  She even remembers that feeling today.  She was

17   devastated by that and said, "I'll call your mom."

18        What did Dzhokhar say?  "Don't.  It won't do any

19   good."

20        You heard Dzhokhar followed his big brother around the

21   boxing gym, followed Tamerlan around the boxing gym like a

22   puppy.  So Dzhokhar was at the boxing gym, but unlike with

23   Tamerlan -- and I don't want to miss the picture that made

24   Becki Norris almost tear up on us.  She was pregnant the year

25   she taught Dzhokhar, and one of the children that she was able

1   to let hold her infant was Dzhokhar.  She still holds that

2   memory.

3           But where was Dzhokhar's dad when he's taking pictures

4   with Tamerlan?  Where are the pictures of Dzhokhar?  He was the

5   invisible kid.  But, you know, Dzhokhar tried.  He still tried

6   hard.

7           Eric Traub, remember him?  He lives in Washington,

8   D.C., now.  He taught Dzhokhar in the ninth and the twelfth

9   grade.  And he remembers him very, very well and wrote a letter

10  of recommendation in December 2010.

11          And I asked him to look at it, and he read it out loud

12  to you, and I said to him, "Did you believe it then?"

13          "Yes.

14          "Do you believe it now?

15          "Yes."

16          "Dzhokhar is a good student.  He quickly absorbs new

17  ideas.  He's amiable with peers and adults.  His good nature

18  and positive spirit have made Dzhokhar a pleasure to know over

19  the last four years.  He's polite and respectful and enters

20  class with a warm greeting."

21          This was a man that fondly remembers Dzhokhar and

22  remembers stepping into a photo -- I think he called it a photo

23  bomb.  He stepped into the photo with Dzhokhar and another

24  student.

25          Dzhokhar did the Model U.N. club.  He did Best

1    Buddies.  He was good with disabled kids.  He seemed to do high

2    school on his own, though.  Even his wrestling coach, Roy

3    Howard -- remember the man who came in, and he was the

4    volunteer wrestling coach.  And he -- because he had another

5    job.  And he came in and he said, "Yeah.  I always liked to

6    talk to the parents about the nutrition and all of the demands

7    of wrestling.  Wrestling has some of the most demanding, you

8    know, practices to it and -- you know, because the weight has

9    to be managed and all of that.  And I like to talk to the

10   parents about the demands on the kids, and I like to talk to

11   them about nutrition."

12          Did he ever meet Dzhokhar's parents?  No.  They didn't

13   show up for senior day, the big day for the wrestlers when the

14   wrestlers get their rose.

15          We now know that something was going on at home.

16   Dzhokhar's dad was becoming more disabled.  His mother and

17   older brother began to listen to an Armenian man named Misha

18   who brought his own special version of Islam into the home and

19   began to teach them about it.  We know that Tamerlan began to

20   have ideas and obsessions about conspiracy theories and about

21   religious extremism.

22          We know that by 2010 Zubeidat, Dzhokhar's mom, had

23   changed in many ways.  Zubeida, who had been a flashy dresser,

24   described by many people that way, and who enjoyed a good

25   party, and whose parenting skills were probably learned in the

1    chaotic shuttling that she went through as a young child in the

2    villages of Dagestan -- we know that she had changed to

3    conservative dress and conservative religious views and was not

4    a safe harbor for Dzhokhar.

5         You heard from Zubeida's own family, her sisters and

6    her nieces.  What a shock it was, how scary it was to them to

7    see her covered in dark.  What did they say to you?  "That is

8    not how our family was raised."

9         And you know from the government's own intelligence

10   committee report that Zubeida was radicalizing.  Two years

11   before the Boston Marathon bombings, Tamerlan and Zubeida came

12   to the attention of the FBI based on information received from

13   the Russian Federal Security Service.  In March 2011, the FBI

14   received information from the FSB alleging that Tamerlan and

15   Zubeidat were adherents of radical Islam and that Tamerlan was

16   preparing to travel to Russia to join unspecified underground

17   groups in Dagestan and Chechnya.

18        So that's what was happening to Dzhokhar's mom and

19   Dzhokhar's older brother.  And what was going on with his dad?

20   Anzor was becoming more and more disabled.  And you heard from

21   Dr. Niss that when Anzor came to the United States, he came

22   with a series of mental health problems.  He began getting

23   treatment when Dr. Niss was here in 2003, 2004 and 2005.  And

24   they only increased in intensity over time, and then he

25   suffered that remarkably damaging head injury.

1           You heard about the medical records.  And we read some

2    of the records to you.  They're in evidence.  You can see the

3    entirety of the records.  In 2007, "Patient complains of

4    attacks with flashbacks and out-of-body visions, of having some

5    auditory hallucinations and his name being called, difficulty

6    falling and staying asleep.  And will go on for days without

7    being asleep."

8           "Patient reports having auditory hallucinations" --

9    later in 2009 -- "voices screaming his name or whispering and

10   some visual hallucinations, little lizard-like creatures, for

11   the past three to four weeks."

12          "Anzor reports severe frontal and left side headaches

13   with decreased sensation on left side of face.  Patient reports

14   unsteady gait, visual changes, tremor, auditory hallucinations,

15   multiple voices screaming his name."  This was Dzhokhar's dad.

16          2011, "Anzor reports feeling quite overwhelmed,

17   appears depressed, tearful, having difficulty functioning,

18   upset with minor things.  'If I'm not getting better, my wife

19   would divorce me.'"

20          2014, shortly before he leaves the United States and

21   returns to Russia for good, "To whom it may concern:  Patient

22   suffering from mental illness.  Not able to work.  Needs

23   constant supervision and support."

24          Sam Lipson came before you.  He's known the family for

25   a long time.  His mom was the landlady.  Sam Lipson came and

1  told you about the changes in Anzor and changes in his friend.

2  He viewed Anzor as his friend.  He saw him losing weight.  He

3  saw him feeling burdened and unhappy.  We know there were

4  serious problems in the home.

5       But Dzhokhar still had friends.  They didn't know much

6  about his family.  They hadn't been to his house.  But they

7  cared for him.  You could see that when they came before you.

8  He was loyal.  He was laid back.  He was funny.  He was quiet.

9  He was shy.

10      Rosa Booth, a young woman, came in and described him

11  as sweet, shy and goofy.  And she had a crush on him, but she

12  was so shy she wouldn't accept his invitation to go to the

13  prom.

14      Bett Zamparelli knew him in Best Buddies.  He made her

15  laugh and feel good.  He was respectful to the other girls.  He

16  treated them with respect.  And when Bett saw the pictures of

17  the Boston Marathon bombers, one looked like Dzhokhar, but she

18  very quickly set that thought aside.

19      Dzhokhar had a bond with his wrestling buddies.

20  Remember Henry Alvarez came in.  He was kind of funny about

21  comparing the various sports.  He said that Dzhokhar was kind

22  and funny and would dance to a song to break the tension in a

23  room.  He asked Dzhokhar to come to his senior night and to be

24  there when he got his rose.  He couldn't imagine that Dzhokhar

25  could do something like he did.

1          Coach Howard, who chose Dzhokhar to be co-captain of

2     the wrestling team, described him as a quiet, hard worker and

3     dedicated.  He was a good wrestler.

4          One thing that was consistent in all of the family

5     chaos and craziness was Dzhokhar remained the invisible child.

6     His parents weren't there for his wrestling match.  His parents

7     never met his teachers in high school.

8          In the fall of 2011, Dzhokhar went off to UMass

9     Dartmouth.  On the surface, his college years started out sort

10    of ordinary.  He did okay in school.  He had friends.  He

11    drank, although he was too young.  He smoked and sold some pot.

12    He was with his friends the first year.  Remember Tiarrah

13    Dottin describing the bro nights that they had, and she

14    recalled that very fondly.  She even recalled very fondly the

15    selfie when they clearly are -- having been done something that

16    they shouldn't have been doing, but she remembered it, and she

17    teared up over the memory of her good friend, Dzhokhar.

18         Alexa Guevara came before you and she described

19    Dzhokhar as approachable, kind and accepting.  He was more

20    respectful than the others.  Remember when she said, We played

21    Ruzzle together, the Internet Scrabble game.  Dzhokhar

22    encouraged her to go to art school.  She cried when she told

23    you she misses the guy she knew.

24         Even with his friends, 2012 was a fairly unsettling --

25    "fairly" is a light word -- a remarkably unsettling year for

1    Dzhokhar.  His dad left the United States for Russia and never

2    returned.  His brother Tamerlan, who had changed dramatically,

3    becoming very radical, left for Russia on a trip we now know

4    was to wage jihad, to take up the fight in the mountains -- or

5    to take up the fight.

6         When Tamerlan returned from his unsuccessful join-up

7    with the jihadi movement, he was frustrated and determined to

8    find a new war to express his rage.  Dzhokhar's mom left and

9    went to Russia for good.  She wasn't available, even with her

10   limited parenting skills, to help this kid, to be there to

11   provide any guidance or support that a parent does.  Many of us

12   have seen kids go off to college.  They graduate from high

13   school, and they go off to college.  They're not done.  They

14   need a tremendous amount of support from their parents.  They

15   still need guidance from their parents.  And what little

16   parental guidance and support Dzhokhar had by September of 2012

17   was gone.

18        And perhaps more significant than that was who he was

19   left with.  His sole source of family, of support, of strength

20   by the fall of 2012 was his older brother, Tamerlan.  Tamerlan

21   had charisma.  Tamerlan was bigger than him.  Tamerlan was

22   older than him.  It's not uncommon, in any of our experiences,

23   whether you're Chechen or Avar or -- or us -- it's not uncommon

24   in any experience that a younger brother will revere and adore

25   an older brother and not really understand the logic of why.

1          But it's particularly significant in the culture of

2    the Chechens and on both sides of Dzhokhar's family tree.  You

3    heard about the Avar -- the women that came in from Russia:

4    "Yes, it's very important.  Our fathers and our older brothers

5    make decisions for us."  In the Chechen culture, it goes back

6    thousands of years.

7          But what Elmirza, who came in from Kazakhstan by

8    video -- I point over there because that's where I saw him.

9    What did Elmirza tell us?  He had a very interesting little

10   quote that he said.  And remember, Elmirza is in the picture as

11   the Chechenian.  But Elmirza came in and he said, "We have a

12   funny quote in our culture.  It's better to be a dog than the

13   youngest of seven brothers."  And he explained that because you

14   owe allegiance to so many people above you.

15         So we need to talk about Tamerlan.  The government,

16   from the attorney box to the witness stand, continue to try to

17   minimize any interest in Tamerlan and has complained that we

18   have focused on Tamerlan.  Today for the first time we hear,

19   "Well, Tamerlan didn't influence Dzhokhar."  At least they're

20   recognizing that Tamerlan was there.

21         Tamerlan did influence Dzhokhar, and we need to talk

22   about Tamerlan.  Somebody needs to talk about Tamerlan.  The

23   story of Dzhokhar cannot be told without knowing the story of

24   Tamerlan.  The horrific events of the Boston Marathon bombing

25   cannot be told or understood in any degree of reality without

1    talking about Tamerlan.

2         We know that Dzhokhar respected and loved his older

3    brother.  We know that his older brother was a major influence

4    in his life.  We can see it in the pictures from very young

5    what these kids meant to each other.  We can see it in the size

6    difference, in the age difference and just how they interacted.

7    We can see it in this photo with the older brother and the much

8    smaller younger brother.

9         He seemed deferential to his older brother.  One

10   witness came in and said he followed Tamerlan around like a

11   puppy.  Vishkan Vakhabov, who did not come before you but whose

12   FBI 302 was read to you, talked about Dzhokhar being like a

13   little boy.  We know from a lot of evidence and witnesses that

14   Tamerlan was charming.  He was charismatic.  He was a flashy

15   dresser.

16        He thought of himself as the professor.  Again,

17   Elmirza made this -- Elmirza, the Chechenian, Tamerlan, the

18   professor.  He was a skilled boxer.  The boxers came in, and

19   they said he was a skilled boxer, but he would listen to no

20   one.

21        And something happened to Tamerlan.  He tried, and he

22   failed.  He couldn't stay in school.  He couldn't get a job.

23   He couldn't stick with boxing.  He couldn't go to the Olympics.

24   Something happened.

25        And Misha turned up at the house, and Tamerlan began

1   to learn more about Islam, an unusual form of Islam,

2   discussions of demons.  And he got obsessions, and he got into

3   conspiracy theories, and he got into politics, and he changed.

4          Elmirza saw the change in his friend and

5   brother-in-law.  Robbie Barnes, who came in and testified, saw

6   the change in his dress and how he interacted with people.

7   Roger Franca, who used to smoke pot and drink and party and

8   club with Tamerlan, saw the dramatic change in him, the man

9   dressed in white and wearing the beard.

10          You may recall the chance meeting that Roger Franca

11   said he had with Tamerlan walking down the street.  I think

12   Boylston Street.  And Katherine stepped back behind as they

13   greeted each other and would only nod and shake her head in

14   greeting.

15          You recall the testimony of Mr. Assaf, the imam at the

16   mosque where Tamerlan attended, where Tamerlan disrupted the

17   mosque twice, the sermon.  It's unheard of.  It's

18   inappropriate.  It violates the prayer.  It's not done.  And

19   Tamerlan did that twice.  He told his friend, Vishkan Vakhabov,

20   who, again, you heard from the 302, that extremist violent

21   jihad was the proper path.

22          Tamerlan's power over those who he encountered is seen

23   no better than in his relationship with Katherine.  Katherine

24   Russell, a beautiful, young college student, falls in love with

25   Tamerlan.  She was an attractive young woman.  She enjoyed fun

1    with her friends.  And she changed dramatically under

2    Tamerlan's influence.

3           Judith Russell, her mom, you saw her.  She came in.

4    It's a difficult thing for her to do, to come in and talk to

5    you.  And she told you about her concerns with Tamerlan.  She

6    told you how she tried to work with her daughter about it.  And

7    she told you how she tried to be gentle so that she could keep

8    her daughter and her granddaughter in her life.  But her

9    daughter changed.

10          Gina Crawford, Katherine's best friend from fifth

11   grade on, saw the changes in her best friend and chose to be

12   non-judgmental about it so that she could keep the friendship.

13   Amanda Ranson, the former roommate of Katherine, came in and

14   told you that she feared for Katherine, she feared Tamerlan,

15   and she was so afraid from a fight that they had that she moved

16   out.

17          Yes, this strong-willed, independent, young college

18   student, daughter of a doctor and a nurse from Rhode Island,

19   fell to Tamerlan's sway.  Judith Russell showed you the

20   picture.  He left her and he left her young daughter with her

21   when he went to Russia in 2012.  And this isn't just our

22   guesswork about why he went.  You heard about it from the

23   Homeland Security report.  It's in evidence.  And you heard

24   about it from the Intelligence Committee report.

25          And you heard about it through the -- again, through

1    the 302 of a guy named Magomed Kartashov, who was a relative of

2    Zubeida, and living in Dagestan in jail.  And what he said to

3    the FBI was:  Tamerlan was under the impression there was jihad

4    in the streets.  Tamerlan's expectations of how it was going to

5    be when he got to Dagestan came from Internet sites like Kavkaz

6    Center.  Tamerlan came to Russia with the intent to fight jihad

7    in the forest.  Kartashov told him to stop talking like that or

8    he wouldn't make it to the next tree.  Tamerlan told Kartashov,

9    "I came here to get involved in jihad."  Eventually Tamerlan

10   told Kartashov, "You have convinced my head but my heart still

11   wants to do something."

12          Tamerlan's decision to pursue jihad was not a decision

13   he made yesterday.  Tamerlan was on the radar.  He was on the

14   terrorist watch list.  You saw pictures of him there.  You

15   heard about recordings on his computer where he is talking to

16   other people involved in the movement, and he talked about the

17   rage he had and his call to action.

18          To say that Tamerlan did not influence Dzhokhar defies

19   the reality of the series of email exchanges with Tamerlan and

20   Dzhokhar when Tamerlan was over in Russia.  Tamerlan was

21   consistently sending materials, jihadi kinds of materials,

22   radical extremism materials, to Dzhokhar.

23          And in a telling exchange of emails while Dzhokhar was

24   over there [*sic*] -- well, this slide sort of popped up on me.

25   But do you know what happened?  Before he went, you can see

1     part of the purpose of his departure -- Katherine was worried

2     about it.  These are searches on Katherine Russell's computer:

3     "If your husband becomes a shahid, what are the rewards for

4     you?"  "Can women become shahid?"  "Wife of the mujahidin.

5     Rewards for the wife."  Katherine was worried about what

6     Tamerlan was doing.

7           You know from Tamerlan's computer that he gave the

8     radical materials to Dzhokhar.  We looked at this in the first

9     phase, and I'll go through it quickly in this phase.  But this

10    was the complete *Inspire*.  Remember the missing Patriot thumb

11    drive?  The missing Patriot thumb drive attaches on the day

12    that Tamerlan leaves for Russia, attaches into the Samsung,

13    Tamerlan's computer, and then the file is created, the complete

14    *Inspire* file is created, and then it is attached into the Sony,

15    Dzhokhar's computer.

16          The other *Inspire* magazines follow a similar path.

17    The vast majority of the materials that you heard about all

18    throughout this trial that landed on -- and that Mr. Mellin

19    talked about in closing, that landed on Dzhokhar's computer,

20    landed there from Tamerlan.  Tamerlan spent a lot of his time

21    focused on radical websites and radical ideas.  And his

22    desktop, you know, the background on his computer, the screen

23    that you stare at when you don't have a document up, here it

24    is.  This is what Tamerlan looked at every day when he looked

25    at his computer.

1           And the sticky notes -- here's one of the

2     translations.  There's another translation for the other note

3     in evidence -- is jihad.

4           "If Allah had so willed, he would have taken revenge

5     himself, but he wanted to test some of you by means of others."

6           "And if they turn him away, it's enough for me to have

7     Allah.  There's no god.  I trust in him.  He is the lord of the

8     great throne."

9           "Truth has arrived and falsehood perished, for

10    falsehood is bound to perish."

11          "Allah says in the Qur'an fighting may be imposed on

12    you, even though you dislike it.  You may dislike something

13    which is good for you, and you may like something which is bad

14    for you.  Allah knows what you do not know."

15          This is what Tamerlan looked at every day.  This is

16    what he wrote.  This is the sticky note on his computer.

17          Other notes were found in the Norfolk Street

18    apartment.  You may remember there were these composition

19    notebooks, and his fingerprints were all over them.  We brought

20    you the translations of the notes.  It's a similar kind of

21    writing.  He was consumed with radical extreme ideas, and he

22    pushed and pushed.  Remember the little video of his daughter,

23    Zahara, at the park, and she's climbing on the contraption

24    there, and he's saying, "Al Akhbar, Al Akhbar."  And she starts

25    to repeat it back to him:  "Al Akhbar."  I mean, here's a

1   toddler playing in the park.

2          Naida, his cousin from Russia, was so undone by his

3   radical change and radical extremism when she saw him in Russia

4   in 2012 that she did not want her son to spend any time with

5   him.

6          So that's Tamerlan.

7          What was going on with Dzhokhar while Tamerlan was in

8   Russia?  While he was in Russia, Dzhokhar was going to bro

9   nights.  He was posting on Instagram.  He was posting on

10  Facebook.  He was hanging out with his friends.  He was doing a

11  little underaged drinking.  He was spoking pot with his

12  friends.  He was missing some classes.  He was flunking out of

13  school.  He was not engaged in radical jihad.

14         In a very telling set of emails, though, when Tamerlan

15  kept sending stuff to Dzhokhar, Dzhokhar writes back,

16  "Tamerlan, I miss you.  I hope everything's all right.  I can't

17  get through to you, no matter how many times I try to call.

18  Thanks for the video.  Take care of yourself.  I'll call today.

19  Inshallah."

20         The only other response while Tamerlan was in Russia

21  from Dzhokhar, when Tamerlan is sending him materials, is to

22  send back to Tamerlan what Professor Reynolds told you about

23  was a -- sort of an anti-jihad site.  It was a

24  government-sponsored site with a text from a 13th century

25  mystic.  But the jihadis reject it.  So this wasn't Dzhokhar

1    weighing in and supporting and liking or encouraging Tamerlan.

2           Dzhokhar's other -- and they're in evidence.  His

3    other emails to Tamerlan were about cars.  That's who that kid

4    was.  Tamerlan left the United States wanting to wage war.  He

5    was rejected as a warrior.  He left the United States for

6    Russia as a jihadi wannabe.  He couldn't make it.  He came back

7    to the United States as a jihadi wannabe.  He couldn't fit into

8    any movement.  So he created his own.

9           It was not Dzhokhar at this point in his sophomore

10   year in college that was like that.  You know it; I know it; we

11   all know it.  And to say that Dzhokhar was a jihadi in

12   his -- the beginning of his sophomore year in college is just

13   wrong.

14          After he came back to the United States, Tamerlan went

15   on his search through the Internet.  He found these extremist

16   articles.  He looked at violent YouTube sites.  You saw some of

17   the clips from YouTube sites, and you saw that chart that

18   showed how much time you spent on YouTube.  And Professor

19   Reynolds told you he went in and looked at the kinds of

20   YouTubes that Tamerlan was looking at, and they were either

21   preaching about religious extremism or teaching or somehow

22   encouraging that movement.

23          He also looked for a P95 Ruger.  He looked for

24   bomb-making parts.  He ordered the materials that he built the

25   bombs with.  And as we talked about and showed you in the first

1  phase of this case, his fingerprints were all over the

2  materials; not Dzhokhar's.

3         We've told you that Dzhokhar followed his brother down

4  Boylston because that is the tragic truth.  But if not for

5  Tamerlan, this wouldn't have happened.  Dzhokhar would never

6  have done this but for Tamerlan.  The tragedy would never have

7  occurred but for Tamerlan.  None of it.

8         Dzhokhar became convinced of the fallacy of the cause

9  of his brother's passion and became a participant.  He carried

10  a backpack, and he put it down in a crowd of people, believing

11  that it would be detonated and people would be hurt and killed.

12         To replay for you today, after you've made your

13  decisions in the first phase, the picture of Dzhokhar standing

14  by the tree and to replay with the mockup of the grill, is

15  misleading.  We do not deny, and we have never denied, and we

16  came to you at the very beginning of this case and acknowledged

17  that Dzhokhar put that backpack down.  But you saw the films,

18  and we don't need to see them again, the Forum video films with

19  the crowds going back and forth.  And to take a clip and to

20  show Dzhokhar standing behind the tree and to argue that there

21  was nothing between him and the children makes more of

22  something that was already horrible enough.  Let's not make it

23  worse.

24         He was foolish enough to get a gun for his brother.

25  He was foolish enough to go with his brother.  Do you really

1  think that he used that gun?  Do you really think he got it for

2  anybody other than his brother?  The evidence would really tell

3  us that that's who he got it for.

4        Tamerlan -- at Watertown, who had the gun?  Who was

5  shooting at the police?  Who shot Collier with the gun?  Whose

6  fingerprints are on the magazine inside that gun?  Tamerlan's.

7  Who had the BB gun and the fingerprints on the BB gun?

8  Dzhokhar.

9        Tamerlan was determined to die in a blaze of gunfire,

10 and Tamerlan -- and Dzhokhar panicked and got into the car and

11 escaped.  Hundreds of bullets went into that Mercedes and

12 didn't kill this young man.  He ran -- how it didn't kill him,

13 I don't know.  He ran, and he hid in a boat, and he wrote.  And

14 you know what he wrote, words that had been introduced to him

15 by his brother; words that he had listened to, that were sent

16 to him by his brother; words that he had read that were sent to

17 him by his brother until at least -- he could at least recite

18 them.  But we're not sure with how much certainty he could

19 recite them.

20        Remember he also wrote, "I am jealous of my brother

21 who has gone to paradise"?  What's the first thing he asked the

22 EMTs when he was being taken to the hospital?  "Where's my

23 brother?"

24        The differences in Dzhokhar and Tamerlan can be seen

25 in other ways, from how they reacted when they knew the police

1    had them.  Tamerlan shoots straight at them, walks into the

2    blaze of gunfire and throws the gun at them and resists, fights

3    and yells and screams when the EMTs are trying to give him aid.

4         When Dzhokhar was spotted in the boat with no weapon

5    and ordered out, he came out of the boat.  You saw the boat.

6    We all went out and saw the boat.  You saw the hundreds of

7    bullet holes in the boat.  He wasn't, again, killed, but he was

8    shot.  He was hit in the head and the face, the hand.  You see

9    him coming out of the boat.  And what did he do?  He followed

10   the directions of the EMTs.  He answered their questions, he

11   accepted treatment, and he asked about his brother.

12        So how does all of this happen?  How does this good

13   kid, this youngster, this young man who was described as gentle

14   by friends and family and teachers -- how does he do it?  How

15   did this happen?  If there were an easy -- if only there were

16   an easy and succinct answer to that question, that will haunt

17   many of us for years to come, I would give it to you.

18        Sometimes star-crossed lovers whose families don't

19   want them to marry, marry anyway, and their marriages work out.

20   Sometimes people who have serious mental illnesses and get help

21   can function.  That didn't happen for Dzhokhar's parents.

22        Sometimes refugee families can come from difficult

23   circumstances in war-torn countries and come to the United

24   States and embody the American dream, despite their past.  That

25   didn't happen for the Tsarnaev family.

1          Sometimes children who are forgotten or neglected or

2     raised in chaos and craziness are able to recognize that they

3     don't have to protect their families and they can ask for help

4     and get it and their hollowness does not get filled up by the

5     darkness of the most dominant person in their lives, who they

6     happen to love beyond their understanding.  Not so with

7     Dzhokhar.

8          If you're looking to me for a simple and clean answer

9     as to why this young man, who had never been arrested, who had

10    never sassed a teacher, who spent his free time in school

11    working with disabled kids -- if you ask me -- if you expect me

12    to have an answer, a simple, clean answer as to how this could

13    happen, I don't have it.  I don't have it.

14         I can tell you this, and we've shown you, that

15    Dzhokhar Tsarnaev is not the worst of the worst.  And that's

16    what the death penalty is reserved for, is the worst of the

17    worst.

18         The prosecutors want you to believe that Dzhokhar is a

19    bad seed, and they had everyone fooled, every teacher, every

20    friend, every person who came before you and risked public

21    exposure coming to you to testify -- every one of those people

22    were fooled.  He committed a heinous crime and must be

23    executed.  That is the prosecution's theory.

24         The crime is heinous; that much is true.  But you

25    promised us when you took your oath as jurors that when the

1    time came for sentencing, you would look beyond -- you would

2    look beyond the crime, you would look at the person, and you

3    would look at all of the reasons that the law allows you to

4    consider life without the possibility of release could be the

5    appropriate sentence.

6            And when you deliberate -- when you get the case, when

7    you deliberate, you'll have the aggravating and mitigating

8    factors that the judge has gone through and the prosecutor has

9    gone through and hear the aggravating -- and you'll get to

10   consider them and hear the aggravating factors are primarily

11   focused on the crime.  There are no aggravating factors that

12   the government alleges that focus on Dzhokhar being a danger,

13   Dzhokhar leading a life of crime and violence, or that he will

14   continue to be some lawless, violent person, unable to be

15   housed in prison.  The aggravating factors in this case you

16   pretty much have already decided by your verdict in the first

17   phase.

18           The mitigating factors are going to ask you to look to

19   Dzhokhar's past as well as who he is now and his future.  They

20   look to his background.  They look to the circumstances of the

21   crime, his role in the crime, and his future.  Is his a life

22   worth saving?  Is there hope for him?  Is there hope for

23   redemption?

24           The law recognizes that all people convicted of the

25   same crime don't get the same sentence.  Whether it's murder or

murder by weapon of mass destruction, you've got to the look at

the person.  So in a minute I'm going to talk to you about a

couple of things in the verdict form that I want you to sort of

untangle or figure out, but first let me talk a little bit

about the categories of mitigation that you'll see.  You've

seen the list.  The judge read you the list.  You saw the list

come down on your screens.

There will be factors that you consider about his

family, about Dzhokhar's background, about the lack of parental

support that he had.  There are mitigating factors having to do

with his role in the crimes.  We brought you evidence that

although both Tsarnaev brothers are responsible, they had very

different roles.  Those are things you need to consider.

What was Dzhokhar like in the life that he led before

these crimes?  Something to be considered.  You know from his

teachers, from his friends that he was a kind and gentle boy,

that he cared for people and he sought to help others.

You know that in high school, just two years before

the bombing, he took pride in his schoolwork and in his

athletic ability, and he was motivated to help other disabled

schoolmates.  He was in the Model U.N.  He was in Best Buddies.

He was a wrestler.  He was well liked and well loved.

You've also heard that he's young.  He was 19 at the

time.  Dr. Giedd came before you, Jay Giedd.  You may remember

his testimony.  And Dr. Giedd has spent some decades studying

1    brain development, and he's been studying primarily the

2    adolescent brain development.

3         And his bottom line of his testimony was something

4    that we all know, if you've ever been a teenager, had a

5    teenager, known a teenager.  We all know it's not a finished

6    product.  And Dr. Giedd was able to show you from brain studies

7    the reason why teenagers are the -- the way they are, why that

8    time in life is so topsy-turvy, why you can make some good

9    decisions and make some bad decision.  It's what's going on.

10        There's a biological reason that we have teenagers,

11   and he's spent his life studying it.  Sure, there are averages.

12   Sure, you don't know from any brain scan how mature any

13   individual was.  Could you imagine that, as a parent?  You'd

14   like to have that.

15        There are categories of mitigation that look at who

16   Dzhokhar was in the past.  There are categories of mitigation

17   that look at who he is now and who he's likely to be.  There's

18   nothing in the evidence, nothing at all, to suggest that

19   Dzhokhar is likely to be difficult to supervise or manage or

20   house in a prison.  He's never tried to influence anybody about

21   his beliefs.  He's never tried to break the rules or disobey

22   the law.  And he's been incarcerated for two years.

23        And what does the government bring to you after over

24   two years of incarceration?  A video -- not even a video, a

25   picture, an instant, the one second of Dzhokhar shooting the

1    finger at the camera.  Now, most -- that's probably a first.  I

2    doubt anybody has ever been written up for shooting a finger at

3    the camera.  It's the kind of scrutiny this kid is under.  And

4    if there were more, believe me, you would have been hearing

5    about it.

6         What surprises me the most about the government's

7    attempt to persuade you based on that evidence is that they

8    took the instant clip and took it entirely out of context.

9    Didn't show you the sort of childish, silliness about it,

10   stupidity about it.  And what's more important is what they

11   didn't tell you when he was called on it.  What did he say?

12   "I'm sorry."  He apologized.

13        Finally, we think that we have shown you that it's not

14   only possible but probable that Dzhokhar has potential for

15   redemption.  Sister Helen Prejean testified and told you about

16   her visits with Dzhokhar.  She's spent five visits with him.

17   She shared her insight into him and his potential for

18   redemption.  As you know, she's a nun, and she runs a -- part

19   of her ministry is to work with prisoners who have committed

20   horrible crimes.

21        She met Dzhokhar.  They discussed religious beliefs.

22   This young Muslim guy and this older Catholic nun discussed

23   their religious beliefs.  He was open.  He was respectful.  And

24   what was the first thing she noticed about him?  So young.  And

25   then what did she tell you?  He's genuinely sorry for what he's

1    done.  "When I asked him about the crimes, he lowered his head,

2    he lowered his voice, and he said, 'No one deserves to suffer

3    like they did.'"

4         That just does not sound like the same boy who wrote

5    in the boat, "I don't like killing innocents unless it's

6    necessary."  "It's necessary."  That is growth.  That is

7    maturity.  Most of us hope that we have a chance to mature more

8    from age 19 to age 21.  And what Sister Helen gave you the

9    opportunity to see is that this kid is on that path of growth

10   and remorse.

11        The young man that Sister Helen sat with is not the

12   angry, vengeful, uncaring, unrepentant, unchanged, untouched

13   young man that the prosecution has described to you.  What

14   unrepentant, unchanged, untouched jihadi is going to meet with

15   a Catholic nun, connect with her, talk with her and have her

16   enjoy the conversation with him?  What unrepentant, uncaring,

17   untouched young jihadi is going to reveal his regret for the

18   suffering that he caused?

19        I suppose the government's going to argue that this

20   young man pulled the wool over Sister Helen's eyes.  That is

21   simply not going to happen.  She's been at this work since

22   1957.

23        THE COURT:  Be careful of experience.

24        MS. CLARKE:  She works -- she is experienced.  She may

25   be against the death penalty, and that was the

cross-examination.  Many religious figures are against the

death penalty.  She's against the death penalty, but she's not

going to come in here and lie to you about her observations of

this young man.  And what unrepentant, hate-filled jihadi would

even bother to try to get her to be fooled?

We ask you to reflect on her testimony.  It was short.

It was direct.  It was to the point.  And it shows the

potential -- the great potential for redemption.

The verdict form.  The judge went through it.  It's 23

or 24 pages long.  It begins with the threshold intent factors.

Those are factors that you have to find -- you've already found

them in the first phase of this case.  Those are factors that

you have to find to make the case eligible for the death

penalty.  It is eligible for the death penalty.  You can check

them off.

The statutory aggravating factors are a similar

narrowing so that you can have the decision about whether to

impose death or life.  You can check them off.  You have found

them in the first phase of this case.  You have already

discussed the facts that give rise to those statutory

aggravating factors.

There are non-statutory aggravating factors that the

prosecutor went over with you.  You can check them off.

There are two, though, I would like for you to look at

and think about because they just may not apply.  "Dzhokhar

1    Tsarnaev demonstrated a lack of remorse."  Now, the prosecution

2    has come to you and said what that means is what he wrote in

3    the boat and the fact that he was not remorseful during the

4    time of the crime.

5          Well, that calls on a little bit much.  The crime

6    charged is conspiracy that lasted up through the 19th of April.

7    And you don't know many people who are remorseful during the

8    commission of the crime.  It's okay if you make that finding.

9    The critical thing is that Dzhokhar is remorseful today.  He's

10   grown in the last two years.  He is sorry, and he is

11   remorseful.

12         The other one that raised some concern is the -- and

13   that is on page 14.  It's Number 4.  The next one is the

14   allegation that Dzhokhar murdered Officer Collier.  Now, we

15   know that you have found him legally responsible.  He was

16   charged as an aider and abetter.  You found him legally

17   responsible for the death of Officer Collier.

18         He didn't pull the trigger.  He may be responsible for

19   the death of Officer Collier, but in a sense of weighing that

20   for punishment, consider who killed Officer Collier, who pulled

21   the trigger.  We talked long and hard during the guilt phase

22   about that -- that evidence.  It didn't matter because of the

23   legal responsibility that the aiding and abetting charge

24   carries.

25         The verdict form also contains the list of mitigating

1    factors that the judge went over, and it includes blanks if

2    those aren't all of the factors.  The only thing I want to

3    caution you about the mitigating factors, and the judge's

4    instruction covers it, that if you find by a preponderance of

5    the evidence, by 51 percent of the evidence, that the factor

6    was proven, then you note that.

7              So if you find that Dzhokhar was 19 years old at the

8    time of the offenses, which he was, you write in 12.  If you

9    find that Dzhokhar had no prior history of violent behavior,

10   which is true, you write in 12.

11             Now, the 12 doesn't necessarily tell you what kind of

12   weight you're going to give to that factor, but this is the

13   factual finding that you write in.

14             Tamerlan -- Dzhokhar acted under the influence of his

15   brother, which is true.  12.  And I believe you can go down the

16   line of all the mitigating factors --

17             MR. WEINREB:  Your Honor, I think this is --

18             THE COURT:  No.  Go ahead.

19             MS. CLARKE:  -- and make your finding.

20             And in the end, there are several blanks for other

21   mitigating factors that any of you might find appropriate.  In

22   other words, it's not a finite list.  If there are other

23   reasons that you believe weigh in favor of a life sentence, you

24   can write them in.

25             Then the last section, Section VI, is really where

1   your work is.  Because I think you can check off these

2   threshold factors, check off these statutory aggravating

3   factors, check off most of the non-statutory aggravating

4   factors, discuss and check off the mitigating factors.  But

5   where your work comes in is in the determination of the

6   sentence.

7           The law that Judge O'Toole has given you and will

8   finish up with tells you to make findings about aggravating and

9   mitigating factors.  You make the finding that they exist.  And

10  then it's not a numbers game.  It isn't, "There are six factors

11  here and 17 factors there."  It isn't a numbers game.  It isn't

12  list and list and then the longest list wins.  You don't make a

13  list and look at the columns.  You can find that one mitigating

14  factor outweighs all the aggravating factors.  You can find

15  that there are no mitigating factors and that the aggravating

16  factors do not justify the sentence of death.

17          Whether a sentence of death is justified is your own

18  individual decision.  The judge's instructions tell you that.

19  And I know during voir dire we talked a lot about, you know,

20  "Well, I'll follow the law, and I can follow the law and do

21  what the law requires me to do."  Well, the law requires you to

22  make these findings.  The law requires you to make findings as

23  to aggravation, findings as to mitigation, to weigh them, and

24  then the law leaves it entirely up to you.

25          There is no law that ever requires that a sentence of

1    death be imposed.  That is an individual decision for each of

2    you to make.  It is an individual reasoned judgment that you

3    make.  You have a duty to deliberate with each other.  You have

4    an obligation to discuss with each other.  You have an

5    obligation to hear each other's views.  But the law values

6    life, and you have no obligation to vote for death.

7         Each one of you individually, each one of you, is a

8    safeguard against the death penalty.  Each individual.

9         You've been through a lot together.  We've all been

10   through a lot together.  But you've been through a lot together

11   sitting here for the last ten weeks, and I'm sure you want to

12   support each other.  But that is not your job in this phase.

13   You have a job to deliberate, listen, discuss and respect.

14   Everyone respects everyone else's views.  No one of you ever,

15   ever has to vote for the death penalty.

16        A sentence of death is only imposed if it is

17   unanimous.  The questions on Section IV guide you through this.

18        "We, the jury, unanimously find all of the capital

19   counts and that aggravation significantly outweighs

20   mitigation."  If you make that unanimous finding, it is death.

21        "We, the jury, unanimously find that a sentence of

22   life in prison without the possibility of release for all of

23   the counts."  If you make that decision, it is life.

24        "We, the jury, unanimously find for some of the

25   capital counts."  If you make a finding as to any of the

1    capital counts that -- unanimously that death is appropriate,

2    that is the sentence.  It will override any life sentence.

3          The judge, in the instructions -- and it's really

4    important to listen to this.  You should understand that if you

5    impose the death penalty as to any count or counts, the death

6    sentence will control, regardless of any life sentences that

7    may be imposed on other counts.  A single count with a death

8    sentence is death.

9          The judge also cautions you in the instructions, "The

10   government was entitled to bring multiple charges with respect

11   to each homicide, but the number of counts does not by itself

12   mean that the defendant's conduct is more blameworthy or he is

13   worthy of greater punishment."

14         A death sentence will not be imposed unless each one

15   of you decides that it should be.

16         A sentence of life in prison without the possibility

17   of release sends Dzhokhar Tsarnaev to ADX.  Now, we use those

18   initials rather freely, like we know what it is.

19   Administrative maximum prison in Florence, Colorado.  We flung

20   those initials around, but that's what ADX -- it's the

21   administration maximum prison in Florence, Colorado.  There was

22   no dispute about that, that that's where he's going.  And he

23   will be under the SAM.  He's under -- "the SAM," special

24   administrative measures -- he will be under them.  He's under

25   them now.

1          Warden Bezy and the prosecutor sort of scuffled over

2    how long Dzhokhar may stay under the SAM and whether he'll get

3    to write or receive letters.  And the prosecution spent a long

4    time telling you that it doesn't snow that much in Colorado and

5    that there will be heat control in the rooms.

6          There's a concrete bed with a mattress on it and heat

7    control and a pillow.  And for some reason, there was great

8    discussion about this being at the foothills of the Rocky

9    Mountains.  It doesn't much matter because Dzhokhar Tsarnaev's

10   not going to see the Rocky Mountains.  He won't have a room

11   with a view, and they know it.

12         Let's get real.  This isn't a club.  This isn't a

13   resort.  This is the most rigid, punitive prison in America.

14   It's a place where 29 men -- you heard the testimony about

15   it -- 29 men vie for the privilege of cleaning the showers, and

16   two get the job.

17         The same government that asked you to sentence

18   Dzhokhar Tsarnaev to death has the power to cut him off from

19   the world.  The FBI and the U.S. Attorney in Boston will never

20   be out of that loop.  He is under the SAM.  What is clear is

21   that the FBI and the U.S. Attorney in Boston, the offices of

22   the people sitting at this table, will decide how long he'll

23   stay under SAM.  I'm baffled by their argument.

24         Are they telling you that they -- you shouldn't trust

25   them to provide protection and security, but you should trust

1     them when they say that the justice that is required in this

2     case is a sentence of death and execution?

3            No one's going to give you 100 percent guarantee that

4     Dzhokhar will remain in the H unit at ADX forever.  What is

5     guaranteed is that the decision-makers, the offices of the

6     folks sitting at this table, will be involved, and they are

7     hardly softies on convicted terrorists.  They know what they

8     need to do.  They know what's necessary to do.  And they're in

9     a position to know what's necessary to do.

10           And if, for some reason, Dzhokhar Tsarnaev gets off of

11    H unit, the SAM unit, he's still going to be in isolation for

12    the rest of his life.  His mail, his phones, any visits that he

13    may have will be strictly controlled and monitored.  There will

14    be no book.  There will be no coded messages.  There will be

15    nothing.

16           There's no disputing that both punishment options in

17    this that are before you are harsh and severe.  With either of

18    the options Dzhokhar Tsarnaev dies in prison.  The question is

19    when and how.  We're asking you to choose life.  Yes, even for

20    the Boston Marathon bomber.

21           You might say, how can I do that?  How can I ask you

22    to choose life after all of the pain that he's caused?  If this

23    crime doesn't require the death penalty, what crime does?  The

24    question could be, why should he have the opportunity to live

25    when he didn't give it to others?  Why shouldn't he suffer as

1    his victims did.  Mercy?  He didn't offer any mercy to his

2    victims and to the people whose lives were ripped apart.

3           And all of those thoughts and those questions that I

4    just ran through are completely understandable.  They're driven

5    by anger, emotion, disgust, fear, pain.  Some of them might

6    sound like they are based in vengeance.  But really what

7    they're based in is the search for fairness and justice.

8           There's nothing wrong with having those questions and

9    searching in that way, but there is something wrong with

10   thinking that the answer will be found in imposing the sentence

11   of death.  There's no punishment -- there's no punishment, not

12   even a death sentence -- that could balance the scales.

13   There's no punishment, even a death sentence, that could equal

14   the impact on these families.  And as David Bruck said to you

15   in the opening of our part of the penalty phase, there's no

16   even-ing of the scales.  It can't be done.

17          A sentence of life in prison without the possibility

18   of release is not a lesser sentences than death; it is an other

19   sentence than death.  It ensures that Dzhokhar Tsarnaev will be

20   locked away in a bleak environment, in bleak conditions.  He

21   will have no fame, no notoriety.  He will have no media

22   attention.  And if there are those that wish to make him so,

23   he'll have no glory and stature that martyrdom could bring.

24   His name will fade from the headlines.  It will fade from the

25   front page.  It will fade from the inside page.  It will fade

1    from the news altogether.  And those who so desperately no

2    longer want to be reminded of him won't be.

3            A sentence of life in prison doesn't dishonor the

4    victims in this case.  It does not in any way minimize what

5    happened and what was caused by his crimes.

6            In closing argument in the first phase of this case,

7    the prosecutor stood in front of Dzhokhar and pointed at him

8    and said, and asserted to you, "What motivated his actions was

9    an eye for an eye.  You kill us; we kill you."

10           Even if you believe that that's who Dzhokhar was, even

11   if you believe that that's who Dzhokhar is, that is not who we

12   are.  We can think and reason and decide what is best for all

13   involved, not just what fulfills the need for vengeance and

14   retribution.

15           Finally, a sentence of life in prison without the

16   possibility of release allows for hope.  If allows for the

17   possibility of redemption and a greater opportunity for healing

18   for everyone involved.  It's a sentence that reflects justice

19   and mercy.  Mercy's never earned; it's bestowed.  And the law

20   allows you to choose justice and mercy.

21           I ask you to make a decision of strength, a choice

22   that demonstrates the resilience of this community.  We ask you

23   to choose life and impose a sentence of life in prison without

24   the possibility of release.

25           Thank you.

1          THE COURT:  Jurors, why don't we take another break.

2     Everybody, if you want, stand and stretch and relax for a

3     minute.

4          (Discussion off the record.)

5          THE COURT:  Why don't we just take a five-minute break

6     so everyone can use the restroom.

7          THE CLERK:  The Court will take a five-minute recess.

8          (The Court and jury exit the courtroom and there is a

9     recess in the proceedings at 2:48 p.m.)

10         THE CLERK:  All rise for the Court and the jury.

11         (The Court and jury enter the courtroom at 2:56 p.m.)

12         THE CLERK:  Be seated.

13         THE COURT:  The government has an opportunity for a

14    rebuttal argument.

15         Mr. Weinreb?

16         MR. WEINREB:  Good afternoon.

17         THE JURORS:  Good afternoon.

18         MR. WEINREB:  As you can see from the list of

19    mitigating factors in this case, the bulk of the mitigation

20    case comes down to a single proposition:  "His brother made him

21    do it."

22         There are other mitigating factors, of course, related

23    to his family and his upbringing.  But as Ms. Clarke's argument

24    just made clear to you, they are there largely to explain to

25    you how his brother made him do it.  The defense may phrase it

1    in different ways, but that's the basic idea, and that's the

2    idea they've been trying to sell you on since day one in this

3    case.  That was the defense in the guilt phase, and now it's

4    the heart of the mitigation case.

5           No matter how many times they say that the defendant

6    takes responsibilities for his actions, they actually keep

7    trying to pin the blame on his older brother.  Our response is

8    just as easily stated:  It's not true.  His brother did not

9    make him do it.  And in any event, it doesn't matter what his

10   brother did.  He's the one on trial, not his brother.  You need

11   to sentence him for his actions.

12          When you consider the mitigation case, keep in mind

13   that the defense bears the burden of proof.  They have to

14   convince you that these things are true.  An argument isn't

15   evidence.  Things aren't true just because Ms. Clarke says they

16   are.  There has to be evidence that proves them to be true.

17   It's up to you to decide whether that evidence exists and, if

18   it does, whether it's enough to convince you.

19          Also keep in mind that even if a mitigating factor is

20   proved, that doesn't mean you have to give it any weight.  It's

21   easy to phrase mitigating factors in a way that can be proved.

22   Take the very first one on their list.  The defendant was 19

23   years old when he committed these offenses.  That's pretty easy

24   to prove.  But it's entirely up to you to decide if it makes a

25   difference in this case.  Some 19-year-olds act like they're

14.  Some 14-year-olds can be more mature than adults.  Their

own expert told you that.  It's entirely up to you to decide

whether the defendant deserves credit for his age or for any

other mitigating factor.

Now, I agree with Ms. Clarke that the weighing of

aggravating and mitigating factors is not a numbers game.  You

can't just total them both up and compare.  You have to decide

how weighty each one is.

For example, you might decide that a particular

aggravating factor, say that Martin Richard was especially

vulnerable to the effects of a shrapnel bomb because he was a

little boy, is more important than a mitigating factor, say

that the defendant's teachers had a high opinion of him when he

was in elementary school.

You may even decide that a few aggravating factors,

say that the defendant committed multiple murders in a heinous,

cruel and depraved manner during an act of terrorism, outweigh

all of the mitigating factors combined.  That's entirely up to

you.

You heard an awful lot about Tamerlan Tsarnaev during

the mitigation case, and you heard Ms. Clarke refer to Tamerlan

Tsarnaev or to the older brother well over 100 times just now.

You also heard a lot about Chechnya.  What did all that really

tell you?  At times it might have seemed to you as if Tamerlan

Tsarnaev were the one on trial or the Chechens.

1              But since it's the defendant who's on trial, consider

2     for a minute what all that evidence told you about the

3     defendant.  He was born in central Asia, not the mountains of

4     Chechnya.  He was born in the same area where his father and

5     all of his paternal aunts and uncles had been born.  He spent

6     his early years in the bosom of a warm, extended family that

7     included his parents, grandparents, aunts, uncles, a brother

8     and two sisters.  They loved him, supported him and doted on

9     him.

10             He lived either in central Asia with -- in Dagestan

11    with his mother's family or with his cousins in a house near

12    the Caspian Sea.  He has never --

13             MR. BRUCK:  Objection, your Honor.

14             THE COURT:  No.  Overruled.

15             MR. WEINREB:  He has never set foot in Chechnya in his

16    life.

17             When he was eight, he moved with his parents from one

18    of the poorest parts of the world to the wealthiest.  They were

19    looking for a better life, and they found it.  They got an

20    apartment in Cambridge that was walking distance to Harvard

21    Square.  Anyone who knows Cambridge knows how a desirable place

22    it is to live.  The apartment was snug, but it was adequate.

23    It had a bedroom for the parents, a separate bedroom for the

24    girls, another bedroom for the boys, a kitchen and a living

25    room with a TV.

1           Anzor and Zubeida were not well off, but they provided

2    what kids need to thrive.  The defendant and his siblings had

3    food, clothing, school supplies and a warm home to share, and

4    they also had a lot of the extras American kids have come to

5    take for granted in their lives:  cars, television, computers,

6    iPods, cell phones.  The children had medical care and a free

7    public education at excellent schools.  They may not have been

8    well off, but they were rich in many things that a lot of kids

9    lack.

10          MS. CONRAD:  Objection, your Honor.  This is not

11   rebuttal.

12          THE COURT:  Overruled.

13          MR. WEINREB:  Let's talk a minute about school because

14   quite a number of the defense witnesses were people who knew

15   the defendant through school.  What did you learn from those

16   witnesses?

17          One thing you learned is that the defendant was

18   extremely lucky when it came to school.  He had devoted

19   teachers who got to know him, appreciated him and helped him

20   succeed.  He had dedicated coaches and mentors who promoted

21   him.  He was well liked.  In short, everything you heard tells

22   you that the defendant had everything he needed to grow into a

23   strong, independent, mature, resilient adult.

24          And the evidence shows that is just what happened.

25   Several of his teachers, coaches and mentors noted that he was

1    unusually mature.  He was the only boy in elementary school who

2    held the baby.  He learned English so quickly, he skipped

3    fourth grade.  His high school friends made him captain of the

4    wrestling team.  His friend Tiarrah Dottin told you that he was

5    not easily pushed around.  He liked to say yes, but he knew how

6    to say no.  He was not a follower.  He was able to make up his

7    own mind.  He knew his own mind.  He understood the difference

8    between right and wrong.

9           Tamerlan, you heard, grew up in the same large family

10   as the defendant.  He was also loved, supported and doted on.

11   He had the same advantages the defendant had when he came to

12   the United States to live in Cambridge, and he also had a lot

13   of strengths and successes.  He wasn't as good in school as the

14   defendant, but he was a skilled boxer.  Elmirza, the

15   defendant's brother-in-law, who testified via video link, told

16   you that Tamerlan was handsome and could be charming, albeit it

17   in a goofy kind of way.

18          Of course Tamerlan and the defendant had very

19   different personalities.  Tamerlan was loud, flashy, in your

20   face.  The defendant was quiet, polite and laid back.  Tamerlan

21   couldn't stop talking about his beliefs.  The defendant kept

22   his beliefs to himself.  Tamerlan sometimes lost his temper.

23   The defendant knew how to keep his cool.

24          But despite their differences, they were from the same

25   stock, they grew up in the same family, in the same household,

1    and in many ways, they were very much alike.  They were both

2    physically strong, one a boxer, one a wrester, capable of

3    defeating much larger opponents.  They were both emotionally

4    strong.  They took care of themselves and didn't need anyone's

5    shoulder to cry on.  And they were both men of action.  When it

6    was time to make a bomb, Tamerlan shopped for pressure cookers

7    and got on the Internet and ordered the parts he needed.  When

8    the defendant decided that he needed a gun, he got one from his

9    friend Stephen Silva by telling him he planned to rob some drug

10   dealers in Providence.  Stephen Silva was surprised by that.

11   He didn't bat an eye.

12        Despite what Ms. Clarke just told you, there's no

13   evidence that Tamerlan told the defendant to get a gun.  None.

14   That's just something the defense wants you to believe.

15   Tamerlan didn't search for "P95 Ruger" on the Internet until

16   well after the defendant got the gun.  Don't be misled by that

17   argument.

18        Of course you know the defendant's strength of will,

19   his presence of mind in many other ways.  You know that even

20   after his brother had been captured by police, he had the grit

21   to get back into that SUV, make a three-point turn and try to

22   run over three police officers, even if it meant driving

23   through a hail of bullets and running over his own brother.

24   How many people do you know who could pull off something like

25   that?

1           (There is an interruption in the proceedings.)

2           MR. WEINREB:  And after ditching the Mercedes, while

3    whole police forces were searching for the defendant, he

4    managed to pick his way through Watertown, blood dripping from

5    his gunshot wounds, find a hiding place, smash his cell phones

6    and pen a very coherent and powerful message on the inside of a

7    boat while nearly evading capture altogether.  That's the kind

8    of person he is:  strong and strong-willed, just like his

9    brother, Tamerlan.

10          When you think back over all the evidence you heard

11   during the mitigation case, ask yourself this:  Did you hear

12   any evidence that convinces you that Tamerlan Tsarnaev actually

13   made Dzhokhar Tsarnaev commit these crimes?  Not "made him" in

14   the sense of put a gun to his head.  Even the defense doesn't

15   claim that.  But "made him" in the sense that the defendant was

16   coerced or controlled.  "Made him" in the sense that he was so

17   vulnerable to Tamerlan's influence and so influenced by

18   Tamerlan that he should be excused from bearing moral

19   responsibility for what he did.

20          Let's look at some of the evidence.  One of the main

21   arguments the defense makes is that when the defendant's

22   parents returned to Russia in the fall of 2012, they left him

23   in Tamerlan's hands; that the defendant was already 19 years

24   old in the fall of 2012.  He hadn't lived at home for over a

25   year.  He lived at UMass Dartmouth, and he spent his days down

1    there hanging out with his friends, smoking pot and playing

2    video games.  He wasn't financially dependent on Tamerlan, and

3    he wasn't -- he was making ample pocket money selling drugs.

4    And he wasn't emotionally dependent on him.  He had plenty of

5    his own friends.

6         Tamerlan, meanwhile, had become a scold.  He condemned

7    drinking, smoking, doing drugs.  It wasn't much fun to be

8    around him, so the defendant simply stayed away.  He spent his

9    weekends at UMass Dartmouth instead of bringing friends home to

10   the house at 410 Norfolk.  He visited Tamerlan only now and

11   then on the occasional weekend or holiday.  They seldom saw

12   each other or even spoke.  That's what the phone records show.

13        What about the period before the parents left for

14   Russia in the fall of 2012?  Well, for the entire first part of

15   that year, from January of 2012 to August 2012, Tamerlan

16   himself was in Russia.  For those six months, the defendant

17   never saw Tamerlan at all.  Tamerlan emailed the defendant only

18   six times during those entire six months.  That's what the

19   evidence shows.  When he did, he sent him some jihadi videos.

20        But what was the defendant's response?  "Thanks.

21   That's interesting."  That's it.  Where is the evidence of

22   brainwashing, of mind control?  Where is the evidence that the

23   defendant was under his brother's spell?  You haven't heard it

24   from the mouth of any witness in this case.  You've only heard

25   it from the mouths of defense attorneys.

1          What about the year before Tamerlan went to Russia?

2    The defendant spent half that year finishing high school and

3    half that year in college.  Again, you've heard no evidence

4    that Tamerlan exercised dominion or control over the defendant

5    during that year.

6          You heard evidence that Tamerlan may have given the

7    defendant jihadi materials to look at before he went to Russia,

8    but then Tamerlan went off to Russia, looking for an

9    opportunity to do jihad on his own.  He didn't try and take the

10   defendant with him.  On the contrary, he left his little

11   brother behind, quite possibly intending never to return.  And

12   as I just mentioned, he barely wrote to him while he was away.

13         You did hear testimony that Tamerlan was bossy.  He

14   had become abstinent himself, and he didn't want the defendant

15   to smoke, drink or do drugs.  He wanted him to pray and go to

16   the mosque more often.  But that's the way a lot of older

17   siblings are with their younger siblings, isn't it?  They

18   admonish them to stay on the straight and narrow.  And a lot of

19   younger siblings, like the defendant, pretend to take that

20   advice, even though they go back to doing whatever they want

21   once they're out of their older sibling's sight.  That is a far

22   cry from coercion or control.

23         The defense argues that even before the defendant's

24   parents left in the fall of 2012 to go back to Russia, they

25   were effectively absent anyway because Anzor's illnesses and

1    Zubeida's religious conversion left them unable to parent him.

2    Is that what it looked like to you?  Of course Anzor and

3    Zubeida had their issues.  All parents do.  But parents can go

4    through a lot and still have a lot left over for their

5    children.

6            You saw the photos of the defendant in drum class,

7    dance class and at farm camp.  As he gets older, you see him

8    with soccer trophies, winning wrestling matches, playing pool

9    with his friends.  Those aren't the photos of a child who was

10   neglected or overlooked with parents too crippled with problems

11   to parent him.  On the contrary, the evidence is that both his

12   parents were devoted to him.

13           And despite their problems, they stayed together and

14   maintained a family home until all of their children had grown

15   up, become adults and left home to begin leading independent

16   lives.  Only then, once all their kids had become adults and

17   left the nest, did they return to their families of origin from

18   whom they had been away for so long.

19           Moreover, we're not just raised by our parents.  Our

20   lives are shaped by uncles, aunts, teachers, friends,

21   neighbors, coaches, mentors.  You heard evidence that the

22   defendant was surrounded, supported and guided by some of the

23   best.  If his parents were ever unable to support him or guide

24   him, others were there to step in:  his teachers; his wrestling

25   coach; his Model U.N. advisor; his kindly neighbor and

1    landlady, Joanna Herlihy; his uncle Ruslan, who lived only a

2    bus ride away.  That is considerably more support and guidance

3    than a lot of adolescents have.

4         The last thing the defense falls back on to prove that

5    there must have been coercion and control is the defendant's

6    Chechen heritage.  It's a tradition in Chechnya going back

7    thousands of years that elders control the family.  But

8    traditions can change as times change.  Even Professor

9    Reynolds, the defense expert on Chechnya, told you that.  It

10   happened in Chechnya itself in the 1990s right around the time

11   the defendant was born.

12        Can I have the screen, your Honor?

13        THE COURT:  I don't see an image.  I don't have a

14   feed.  There it is.  Okay.

15        MR. BRUCK:  We have to renew the objection.  This is

16   far beyond any rebuttal.  We already --

17        THE COURT:  Overruled.

18        MR. WEINREB:  Here's what Professor Reynolds wrote

19   back in May 2013.

20        MS. CONRAD:  Objection, your Honor.  That's not in

21   evidence.  It was not shown to the jury.  It should not be on

22   the screen.

23        MR. WEINREB:  It's a chalk, your Honor.

24        MS. CONRAD:  It's not a chalk.

25        THE COURT:  I think it was shown during the trial.

```
 1              MS. CONRAD:  No, it was not.

 2              MR. WEINREB:  It was handed to the witness, and I

 3    reviewed it with the --

 4              MS. CONRAD:  It was not shown.

 5              May we be heard, your Honor?

 6              THE COURT:  Put it up again.

 7              MR. WEINREB:  That's all right.  I don't need to keep

 8    it there.

 9              THE COURT:  Okay.

10              MR. WEINREB:  But the next one is just a clip.

11              THE COURT:  All right.  You may use that as a chalk.

12              MR. WEINREB:  I can't see it.  There we go.  Okay.

13              MS. CONRAD:  This was not shown to the jury, your

14    Honor.  I would like to be heard at sidebar.

15              THE COURT:  This is used as a chalk.

16              Go ahead.

17              MR. WEINREB:  Your Honor, I cleared this with

18    Mr. Bruck before --

19              THE COURT:  All right.  Go ahead.

20              MS. CONRAD:  Your Honor, this was impeachment.

21              THE COURT:  Overruled.

22              MR. WEINREB:  This is what Professor Reynolds wrote

23    back in May of 2013 before the defense hired him and explained

24    to him what they were trying to prove in the mitigation phase.

25    He wrote, "The experience of Chechnya in the 1990s profoundly
```

1     affected Chechen cultural norms.  For example, the cult of the

2     elders by which Chechens, like most North Caucasians, would

3     routinely accept the opinions of the older males as law,

4     declined precipitously."  Went down.  "The masculine ideal of

5     the Chechen as an irrepressible warrior remained, but much of

6     the culture that had nourished that ideal and bounded it with

7     obligation to others, that part had withered away."

8          And, in fact, you know that the defendant's family

9     isn't actually from Chechnya.  His father and his father's

10    siblings were born in Kazakhstan, and his mother and all her

11    siblings were born in Dagestan.  And the defendant and his

12    siblings certainly weren't born or raised in Chechnya.

13         Again, this is what Professor Reynolds wrote back in

14    May 2013 before he became a defense expert.  He wrote,

15    "Tamerlan and Dzhokhar Tsarnaev were hardly typical of

16    Chechens, and one might justifiably question whether they could

17    even be properly described as Chechen.  Their mother, Zubeida,

18    was an ethic Avar.  Both brothers were born outside of

19    Chechnya.  Both brothers grew up outside of Chechnya.  And both

20    brothers --

21         MS. CONRAD:  Your Honor, I renew my objection.

22         THE COURT:  Over- --

23         MS. CONRAD:  This is being confused.  This is a prior

24    inconsistent statement.

25         THE COURT:  No, the witness was examined on it at the

1    time.

2           MS. CONRAD:  And we don't have an opportunity to

3    respond to --

4           THE COURT:  The objection is overruled.

5           MR. WEINREB:  And both brothers spent little or no

6    time in Chechnya.

7           No matter what things might be like for actual Chechen

8    families that actually live in Chechnya, you know from the

9    evidence in this case that there was no tradition of obeying

10   elders in the defendant's family.  Anzor Tsarnaev defied his

11   own father by marrying Zubeidat, an Avar, and an immodest

12   dresser.  Tamerlan, in turn, defied Anzor by marrying Katherine

13   Russell, a Christian.  Ruslan Tsarnaev, the defendant's uncle,

14   defied tradition by assuming leadership of the whole extended

15   family, even though he was the youngest of Anzor's two

16   brothers.

17          And the defendant's sister, who was married to

18   Ruslan's nephew, Elmirza, defied both Ruslan and her husband by

19   calling the police on Elmirza and divorcing him.  In fact,

20   Elmirza -- remember, he's the -- he's Ruslan's son-in-law, the

21   defendant's ex-brother-in-law.  He's the one who testified over

22   the video link.  He told you something very telling.  He said

23   that Ruslan, the youngest brother, became the leader of the

24   family because he was the smartest and the most successful,

25   even though he was the youngest.  That's a typical American

1   story.  Who was the smartest and most successful in the

2   defendant's immediate family?  It wasn't Tamerlan Tsarnaev.

3         What was modeled for the defendant his entire life

4   were family members making up their own minds and making their

5   own independent life choices, regardless of what their elders

6   wanted them to do.

7         If the defense wanted to prove to you that Tamerlan

8   Tsarnaev played a dominant role in the defendant's household

9   and that his younger sibling was under his sway, they had a

10  funny way of going about it.  You didn't hear testimony from

11  his patients, his sisters or his uncles.  You didn't hear

12  testimony from any of Tamerlan's best friends or from any of

13  the defendant's best friends.

14        For the most part, the only witnesses the defense

15  subpoenaed to talk about Tamerlan were people who happened to

16  be present on an occasion when he lost his temper or acted

17  inappropriately.  What about the people who spent time with him

18  every day?

19        As for the defendant, you heard mainly from Russian

20  aunts and uncles who haven't seen him for over a decade,

21  schoolteachers and coaches from years past.  But none of those

22  people can tell you what things were like in the Tsarnaev

23  household.  Isn't that what really matters?

24        You also heard from a number of young women who were

25  sweet on the defendant.  They took the witness stand and got

1    teary seeing him in court.  But none of them had even been to

2    his house.  They hadn't even met his brother or anyone else in

3    his family.  One last saw him at a barbecue in the summer of

4    2012.  One was only friends with him during his freshman year

5    in college.  And one had just met him in college and only hung

6    out with him for a few months.  How well did they actually know

7    him?  Obviously not very well since none of them had any idea

8    that he was reading *Inspire* magazine, listening to Anwar

9    al-Awlaki lectures, or listening to jihadi nasheeds on his iPod

10   or in his car.  And he didn't care enough about them to warn

11   them away from Boylston Street on the day of the marathon.

12        The defense wants you to believe that Tamerlan

13   coerced, dominated and controlled the defendant; that he had

14   such a great influence over the defendant that it lessened his

15   moral culpability for these crimes.  That is the centerpiece of

16   their mitigation case.  They have the burden of proving it.

17   Did they meet that burden?

18        Why did they spend days calling witnesses with so

19   little connection to Tamerlan and his brother?  Why didn't they

20   call anyone with actual insight into their relationship with

21   one another?  Ask yourselves those questions when you go back

22   to deliberate and when you decide whether they have met their

23   burden of proof.

24        What the whole claim of influence, dominance and

25   coercive control really boils down to in the end is the

1    proposition that Tamerlan supplied the defendant with most of

2    the jihadi files on his computer and sent him a handful of

3    jihadi links from Russia.  Now, the computer evidence, as you

4    heard at very great length during the trial, is open to

5    interpretation, and I don't intend to rehash all of that here.

6            Instead, I urge you to ask yourself this question:  So

7    what?  Even if it's true, so what?  Does it matter whether you

8    get your jihadi files from your brother, a distant cousin, a

9    quick search of the Internet or Anwar al-Awlaki himself?

10           Tamerlan didn't turn the defendant into a murderer by

11   giving him some magazines and lectures and then disappearing to

12   Russia for six months.  The defendant had to become a believer,

13   and that is something he did entirely by himself.

14           He became so much of a believer that he began to tweet

15   what he had learned to others.  He became so much of a believer

16   that he could summarize the teachings on the inside wall of a

17   boat when he didn't have any books or lectures to crib from.

18           As Professor Levitt told you during the guilt phase, a

19   million people look at those materials.  Only a handful of

20   people find the materials convincing.  And of that handful,

21   only a tiny fraction consider them so convincing that they're

22   willing to shred people alive in front of their family members

23   and friends in order to advance a political agenda.  The

24   defendant is one of that tiny fraction.  His actions are the

25   best guide to the depths of his beliefs.

1           If you want to know why the defendant committed these
2    crimes, that's the question Ms. Clarke just told you is
3    unanswerable.  If you want to know -- if you want an
4    explanation of how he became this person, of what made him do
5    it?  What better place to look for the answer than in his own
6    handwritten explanation of his actions.
7           He wrote in the boat, "I'm jealous of my brother who
8    has received the reward of martyrdom, but God has a plan for
9    each person.  Mine was to hide in this boat and shed some light
10   on our actions."  "God has a plan for each person."  That's who
11   he believed he was doing this for.  His god, not Tamerlan
12   Tsarnaev.
13          He wrote, "He who Allah guides, no one can misguide."
14   Again, that's who he believed was guiding him, Allah, not his
15   brother.
16          He wrote, "The U.S. government is killing our
17   civilians.  As a Muslim, I can't stand to see such evil go
18   unpunished."  He's talking about himself.  He doesn't even
19   mention his brother.
20          He also wrote, "Now, I don't like killing innocent
21   people.  It is forbidden in Islam, but in this case it is
22   allowed."  Again, "I don't like killing innocent people."  He's
23   talking about himself.
24          His tweets are the same.  They give the reasons --
25   they give his reasons for believing in violent jihad.  Those

1    tweets never even mentioned his brother.

2          In the end, the best evidence you have of the nature

3    of the defendant's relationship with his brother, Tamerlan, is

4    the evidence of how they actually committed these crimes.  They

5    committed them together as partners.  Each one had an essential

6    role to play.

7          Tamerlan was ready to commit violent jihad as early as

8    January 2012 when he left for Russia, but the defendant wasn't

9    ready yet.  He was reading terrorist writings and listening to

10   terrorist lectures, but he wasn't yet convinced.  So Tamerlan

11   left for Russia, hoping to find a partner there.  He came back

12   when he didn't succeed.

13         But by then, the defendant had steeped himself in the

14   writings of *Inspire* and Anwar al-Awlaki, and he had become

15   inspired himself.  He decided he was ready to partner up.  It

16   was only then, when the defendant made the decision to become a

17   terrorist, that Tamerlan was able to go into action.  The

18   defendant obtained a gun and ammunition, a crucial ingredient

19   in their plans.  He arranged for them to go to the range in

20   Manchester to practice firing it.

21         When Marathon Monday arrived, he let Tamerlan go on

22   ahead to the finish line, and then he chose on his own where to

23   place his bomb for maximum effect.  Then he called Tamerlan to

24   give him the go-ahead.

25         Again, contrary to what Ms. Clarke just told you,

1    later, on April 18th, both of them executed Sean Collier.

2    There's no evidence of who pulled the trigger.  You know that

3    Sean Collier's blood was found on the defendant's keychain and

4    on the gloves that were on the floor of the car by his feet,

5    but the video doesn't show who pulled the trigger.  Don't

6    mistake argument for fact.

7         It was a full-on partnership, a partnership of equals.

8    They did not do the exact same things, but they were both

9    terrorists engaged in a joint effort.  They bear the same moral

10   culpability for what they did together.

11        The very first mitigating factor on the defense list

12   is that the defendant was 19 years old when he committed these

13   crimes.  In fact, he was just shy of 20.  What about that fact?

14   And what about the fact that some of the time he still acted

15   like a teenager doing teenage things?  Is that a mitigating

16   factor that deserves any weight?

17        It might deserve some weight if these were youthful

18   crimes.  For example, if the defendant and his brother had

19   robbed a liquor store and shot the clerk in a moment of panic.

20   But these weren't youthful crimes.  There was nothing immature

21   or impulsive about them.

22        These were political crimes, designed to harm the

23   United States, to punish Americans for our military actions

24   overseas by killing and mutilating innocent civilians on U.S.

25   soil.  They were acts of terrorism planned over a period of

1    months and carried out over days.  They were acts of terrorism

2    so successful that they not only killed four people and maimed

3    17 others, but stopped the Boston Marathon, closed Logan

4    Airport and shut down the entire city of Boston for nearly a

5    day.

6            The murders on Boylston Street were not a youthful

7    indiscretion.  The cold-blooded execution of Sean Collier, a

8    police officer, was not a rash or impulsive act.  The defendant

9    was old enough to understand right from wrong.  He wrote in the

10   boat, "I don't like killing innocent people, but in this case

11   it is allowed."  He decided that the cause of his people, the

12   ummah, justified the murders of a small child, two young women

13   and a police officer.  Does being nearly 20 years old mitigate

14   any of that?

15           Ms. Clarke said at the beginning of her closing that

16   these crimes were senseless and unimaginable, but they made

17   perfect sense to the defendant, and he was perfectly able to

18   imagine the harm his actions would cause.  He was certainly old

19   enough for that.

20           Mr. Mellin already talked at length about ADX and the

21   SAMs.  I'm not going to repeat what he said.  I just want to

22   emphasize one point that every witness who testified agreed

23   upon:  There is no guarantee that the defendant will spend the

24   rest of his life in H unit or even in ADX.  In fact, the

25   opposite is true.  BOP tries to step down inmates whenever

1    possible.  And BOP's desires are taken into consideration

2    whenever SAMs are up for renewal.

3           Even if everyone in the government wanted the

4    defendant to stay on SAMs, there are legal requirements for

5    keeping them in place.  If those requirements are not met, the

6    SAMs can't be renewed.  There has been litigation over SAMs.

7    Will the defendant spend the rest of his life on H unit or even

8    in ADX?  He has not proved that to you because he can't.

9           Let's talk for a minute about Sister Helen.  Why did

10   the defense choose her over all other clergy who could have

11   been invited to spend time with the defendant and then testify

12   about it in court?  Why not call an imam from the mosque here

13   in Cambridge, like Loay Assaf, who testified here in court?

14   Why bring in someone from Louisiana?  Do you think it has

15   anything to do with the fact that Sister Helen is one of the

16   leading death penalty opponents in the United States?

17          Did Sister Helen's testimony really give you much

18   insight into what the defendant truly thinks and believes?  Put

19   aside for a moment that, as a nun, she undoubtedly tries to see

20   the good in everyone.  And put aside that, as a committed

21   opponent of the death penalty, she undoubtedly wants to help

22   the defendant avoid it.  Focus instead on what she told you the

23   defendant actually said to her.  What do those words really

24   mean in the end?  They're open to a lot of interpretation.  And

25   because of that, they really don't tell you anything at all.

1    In the end, can you be confident that you really know more

2    about the defendant now than before Sister Helen testified?

3           According to Sister Helen, the defendant said, "No one

4    should have to suffer like that."

5           MR. BRUCK:  Objection.

6           MS. CONRAD:  Objection.

7           MR. BRUCK:  Under the circumstances, we object.  Given

8    the limitations on her testimony, this is not fair.

9           MS. CONRAD:  And also that misstates the evidence.

10   That's not what she said.

11          THE COURT:  Go ahead.  The objections are overruled.

12          MR. WEINREB:  But he expressed pretty much the same

13   sentiment in the manifesto he wrote in the boat.  He wrote, "I

14   don't like having to kill people," but he went on to say that

15   sometimes it is necessary to kill people to advance the cause

16   of the Muslim people.  That's a core terrorist belief.  The

17   fact that now, while he's on trial for his life, the defendant

18   is willing to go so far as to say that no one should have to

19   suffer like that doesn't tell you much about his core beliefs.

20   When you stack that up against his actions in this case, does

21   it really make a difference to your decision?

22          Sister Helen said that the defendant seemed young to

23   her, and Ms. Clarke tries to spin that into a guarantee that

24   the defendant will become remorseful over time, but there's no

25   evidence of that, no reason for you --

1          MS. CONRAD:  Your Honor, same objection.

2          MR. WEINREB:  -- to believe that it's true.

3          MS. CONRAD:  We were not allowed to elicit that

4     testimony.

5          THE COURT:  Overruled.

6          MR. WEINREB:  Sister Helen is 76, and the defendant is

7     21.  Of course he seems young to her.

8          What did their brain development expert, Dr. Giedd,

9     tell you?  He testified that in determining a person's level of

10    maturity, the single most important thing to look at is his

11    behavior.  He told you that some people are more mature at age

12    19 or even age 14 than some adults will ever be.  And he told

13    you that there is absolutely no guarantee that a 19-year-old

14    will get any more mature or reflective just because his brain

15    will continue to grow over time.

16         Ms. Clarke criticizes the government for showing you

17    the image of the defendant in the holding cell giving the

18    camera the finger rather than showing you the whole video, but

19    the whole video is even worse.  It shows just how remorseless

20    the defendant was when he came into court to answer for his

21    crimes three months after committing them.

22         Mr. Bruck said in his opening that if you sentence the

23    defendant to life, he'll spend the rest of his life thinking

24    about his crimes.  But that's not true just because the defense

25    says it is.  Where's the evidence of that?

1          If the defendant goes to prison for life, he won't be

2     free to come and go, but he will be safe, well fed and have

3     excellent medical care.  Will he spend his days thinking about

4     the victims, or will he spend the rest of his life thinking

5     about himself, his family, his friends, his pen pals, his next

6     workout, his next visit, his next phone call, his next meal?

7          Will he stare at the wall all day thinking about the

8     pain and suffering he has caused, or will he do many of the

9     very same things that people do every day to enjoy life:  read

10    books and magazines; talk on the telephone to his parents, his

11    sisters and his friends; eat; pray; sleep; exercise?  Maybe

12    he'll even write a book.

13         You saw from the evidence what kind of a person he is.

14    Maybe he'll leave behind his memories of Martin Richard,

15    Krystle and Lingzi Lu in the same way he left them dying on the

16    street when he went shopping at Whole Foods.  Maybe he'll leave

17    behind his memories of Sean Collier, the same way he left him

18    bleeding to death in his patrol car as he drove into Boston to

19    look for another gun.

20         The callousness and indifference that allows you to

21    destroy people's lives, to ignore their pain, to shrug off

22    their heartbreak, that doesn't go away just because you're

23    locked up in a prison cell.  It's what enables you to be a

24    terrorist, and it's what insulates you from feelings of

25    remorse.

1          In the end, did you hear any testimony from any

2     witness that speaks louder about the appropriate punishment in

3     this case than the defendant's own actions on Boylston Street

4     or at Whole Foods or at MIT or on Laurel Street?  The defendant

5     deserves the death penalty, not because he's inhuman, but

6     because he's inhumane.  Because of his willingness to destroy

7     other people's lives for an idea.

8          Most people can't even imagine standing for four

9     minutes behind a row of children, sometimes only feet away from

10    them, and leaving behind a bomb that you know will cause them

11    excruciating pain and a lingering death on the sidewalk.  But

12    that's what it is to be a terrorist.

13         If you want to know who the defendant was, you have

14    the testimony of his relatives, his teachers and his friends.

15    But if you want to know who he turned into, look at his

16    actions.  They tell you all you need to know about the kind of

17    person he became.  His actions on Boylston Street, afterwards

18    at Whole Foods, at MIT and in Watertown and in this courthouse

19    on the day of his arraignment, they are the best evidence you

20    have about who the defendant became.

21         Ms. Clarke urged you to just go through the intent

22    factors and the aggravating factors in the verdict form and

23    just check them off.  I urge you to take your time with each

24    one and give it the consideration it deserves.

25         As for the mitigators, she urged you to go through

 1    them one by one and just fill in 12.  But you only write in 12

 2    if all 12 of you find a mitigator to be proved.

 3              One final thought before I sit down:  If you sentence

 4    the defendant to life imprisonment, you will be giving him the

 5    minimum punishment authorized by law for these crimes.

 6    Contrary to what Ms. Clarke said, it is a lesser punishment

 7    than death.  Does he deserve the minimum punishment or do these

 8    crimes, these four deaths, demand something more?  Please ask

 9    yourself that question when you go back to deliberate.

10              Thank you.

11              THE COURT:  I'll see you at the side.

12              (Discussion at sidebar and out of the hearing of the

13    jury:)

14              MS. CONRAD:  Your Honor, first of all, as we had

15    previously objected, that this -- that the government should be

16    limited to rebuttal, that was 45 minutes of pre-prepared,

17    typewritten rebuttal.  I watched Mr. Weinreb during

18    Ms. Clarke's closing.  He made three -- he wrote down three

19    words or three sentences on a piece of paper.  He didn't refer

20    to those at all.  He had a canned presentation that was not

21    proper rebuttal.

22              We did -- the reference to Professor Reynolds'

23    statements, those statements were impeachment as prior

24    inconsistent statements that are not to be considered for the

25    truth of the matter.  Mr. Weinreb argued them as if they were

1   being offered -- essentially as they were the truth of the

2   matter.

3            MR. BRUCK:  I should also clarify when Mr. Weinreb

4   said that he cleared this with me, what he said was that if we

5   went into Chechnya, he was going to use Professor

6   Reynolds' -- he was going to post Professor Reynolds.  I didn't

7   give it a moment's thought because we didn't go into that.

8            But this wasn't rebuttal.  I had no conception of what

9   it was they had in mind.  This sort of sandbagging was so far

10  from my mind when he caught me about that -- or mentioned it to

11  me that there was no opportunity to respond to this.

12           MS. CONRAD:  Should I keep going or do you want the

13  government to respond?

14           THE COURT:  Are you moving to a different point?

15           MS. CONRAD:  Yes.  One more point about Professor

16  Reynolds.  That was not displayed to the jury during the

17  cross-examination by Mr. Weinreb.  That was not put into

18  evidence.  We were not allowed to display the 302s when we

19  offered them.  It would be the same thing if Ms. Clarke had put

20  the 302s up on the screen, except one difference is those were

21  offered for the truth of the matter and these statements

22  weren't.

23           It was also misleading because the line about -- that

24  one could ask whether they were truly Chechen was explained by

25  Professor Reynolds during the cross-examination.  But the

1    government, by essentially making this argument during its

2    rebuttal when we have no opportunity to respond, is misleading

3    the jury.  This was basically a second closing.

4          I have other points I'd like to make.

5          THE COURT:  All right.

6          MR. WEINREB:  All right.  So with respect to Professor

7    Reynolds, my recollection of what I said to Mr. Bruck is that

8    if Ms. Clarke goes into Chechnya in any way at all, then I

9    intend to use a couple of quotes from his article.  And my

10    recollection is that when I confronted him with these prior

11    statements, he adopted them.  So they then become evidence.

12          In addition, just so the record's clear, not that I

13    think it really matters at all, I dispute the characterization

14    that the government only wrote down three sentences and I

15    didn't refer to them.  Absolutely not true.  But I think it

16    hardly matters.

17          MS. CONRAD:  Which part?

18          MR. WEINREB:  If one party is skilled at guessing what

19    the closing is going to be and manages to make substantial

20    notes ahead of time, that's not -- you still have to wait and

21    make sure that it's actually said before you can actually get

22    up there and rebut it.

23          THE COURT:  Yeah.  My judgment is that it was proper

24    rebuttal, even if it was more extensive than commonly, but it

25    touched on the same topics that were addressed in the closing

1   by the defense.  It seems to me that's what -- the measure of

2   rebuttal, whether it responds to arguments made by the defense,

3   and it did.

4        Now, again, it's possible to anticipate that,

5   particularly where there is an aspect of the case as to which

6   the defense has the affirmative burden.  It's obviously

7   possible to anticipate that those would be in the closing

8   statement.

9        MS. CONRAD:  Chechnya was barely mentioned.

10        THE COURT:  Well --

11        MS. CONRAD:  But the other thing is, this discussion

12   of Sister Helen's testimony was entirely out of bounds.  For

13   the government to say she didn't explain what else -- what he

14   said, she didn't give any insight, she didn't say that he had,

15   you know, a promise of change in the future -- all of those

16   things were things that we were prohibited from asking her and

17   that the government objected to repeatedly.  So for the

18   government to stand up and say, "Well, she didn't tell you

19   this, and she didn't tell you that," when they were the ones

20   who blocked us from doing it, is entirely improper and

21   extremely prejudicial.  And I think that part of the argument

22   should be struck.

23        THE COURT:  All right.

24        MR. WEINREB:  Your Honor, the Court asked the defense

25   for a very detailed proffer of what Sister Helen said.  We went

1    into the back, and the government objected to certain parts of

2    it.  Primarily what the government objected to were things

3    about her experience, which I didn't touch on.  Other than

4    that, with respect to the sentence that was in the proffer that

5    he spoke to her, that the government moved vigorously to keep

6    out and the defense moved vigorously keep in, it stayed in.

7    And so I think it was appropriate to refer to that.

8            I don't think it's a fair characterization of the

9    argument that I said that Sister Helen failed to provide

10   greater insight into -- I said that the testimony didn't

11   provide --

12           MS. CONRAD:  Well, the testimony should be barred.

13   And one of the things the government objected to and the Court

14   prohibited us from asking her about was her ability to work

15   with him in the future, which went to the point that the

16   government said that it's only Ms. Clarke's statement that he

17   could change in the future, that we didn't introduce any

18   evidence of it.  We didn't introduce evidence of it because we

19   weren't permitted to introduce any evidence of it.

20           And, in addition, as far as the experience, her

21   experience is what informs her insight, so the government is

22   saying, "Well, she didn't really explain why it is that she

23   thinks he's remorseful."  Because the government wouldn't let

24   us, and the Court sustained those objections.

25           THE COURT:  Well, yes.  And we explained that on the

1    record at the time.

2            What would you ask as a curative instruction?

3            MS. CONRAD:  Disregard the government's argument

4    regarding what testimony Sister Prejean -- Sister Helen Prejean

5    did not provide, that she did not explain certain things or

6    that we didn't offer certain evidence of certain things, and

7    tell them that that is because the government objected to it.

8            MR. WEINREB:  Your Honor, I think if you were to

9    review the transcript of the argument I just gave, you will see

10   that I made absolutely no reference to what Sister Prejean did

11   not say.

12           MS. CONRAD:  We did not present any evidence is what

13   you said.  The only person we could have --

14           THE COURT:  Go ahead.

15           MR. WEINREB:  What I argued is that what value is the

16   testimony that she actually gave you -- what is its value?

17   What insight does it give you really into the defendant's

18   beliefs?  That was all that the government asked.  And I said

19   that there's no evidence that he will, in fact, be remorseful

20   in the future because, frankly, there can be no evidence.  That

21   is an unknown.  It's speculative either way.

22           And so the point the government was making is that,

23   despite what Sister Prejean said, they really haven't learned

24   much, if anything, of value to them in weighing the

25   remorsefulness.

1           THE COURT:  Okay.  Let's -- are there other points?

2           MR. FICK:  One thing.  The government made repeated

3    arguments that the defense did not elicit evidence about

4    certain witnesses, for example, the defendant's friends.  Well,

5    as the government well knows, the defendant's principal friends

6    are being prosecuted by the government, have the Fifth

7    Amendment privilege, and there was no realistic possibility we

8    could have called them.

9           And so it's improper to suggest that there's something

10   wrong with the defense approach for failing to do something we

11   could not have done because of the government's prosecution of

12   those people.

13          MR. WEINREB:  And I will proffer on the record that

14   there were several people who were, in fact, the defendant's

15   very best friends growing up.  I can give their names.  It's

16   Vakhabov, others, who the defense could have called, in fact,

17   had on their witness list, for whom we are aware of no Fifth

18   Amendment privilege and no reason to believe that they would

19   have asserted a Fifth Amendment privilege.

20          THE COURT:  Okay.

21          MS. CONRAD:  I want to also note that the government

22   misstated the evidence or argued facts not in evidence.  For

23   example, Mr. Weinreb said that he earned plenty of pocket money

24   selling drugs at UMass Dartmouth.  I believe there was no

25   direct evidence of him selling drugs, much less how much money

1    he made.  I think there was some cross on Alexa Guevara and

2    Tiarrah Dottin about, you know, whether he had money.  You

3    know, the fact that he had money to buy Domino's pizza I don't

4    think shows that he earned plenty of pocket money -- change

5    selling drugs.

6            The argument that there were others there to step in,

7    like Uncle Ruslan, talking about in the 2012 time period, I

8    don't think there's any evidence --

9            THE COURT:  Well, you know, I think this has gone from

10   objection into reply, actually.

11           MS. CONRAD:  Well, I would like an opportunity to

12   reply.  We would like an opportunity to reply.

13           THE COURT:  No, I don't think there was enough of it.

14           So I want to move to a different topic, which is, I

15   think we -- I do have to give you the opportunity to preserve

16   any objections to the substantive instructions --

17           MS. CONRAD:  Does that mean your Honor is rejecting a

18   request for a curative instruction as to Sister Helen?

19           THE COURT:  Yes.

20           MS. CONRAD:  Can I just note that I wrote down, "Did

21   she give you any insight?"  That was the quote.

22           MS. CLARKE:  Can we do that after you discharge the

23   jury?

24           MS. CONRAD:  No, you can't discharge the jury.

25           MS. CLARKE:  I mean after you send them back for the

1   night.

2            MS. CONRAD:  You can't do that.

3            MS. CLARKE:  Can we get our notes?

4            THE COURT:  This is the time it's usually done while

5   it's still possible to correct any misstatement.

6            (Discussion off the record.)

7            MS. CONRAD:  Are you going to have them begin

8   deliberating?

9            THE COURT:  Yeah.  They'll have a half an hour, 45

10  minutes, just so they -- really to make the point of beginning.

11           MR. BRUCK:  Part of this is to object to the

12  instructions you're about to give.  So is this the time for

13  that too?

14           MS. CONRAD:  No, we'll have to come back.

15           THE COURT:  I think I have to give it first.  So if

16  you want me to do that and then we'll do everything.

17           MR. BRUCK:  Then we'll do everything.  Let's do that.

18           THE COURT:  All right.

19           (In open court:)

20           THE COURT:  Jurors, I'm going to just complete my

21  instructions with a few relatively brief remarks.

22           I've outlined for you the rules of law applicable to

23  your consideration of the death penalty and the process by

24  which you should determine the facts and weigh the evidence.

25  And in a few moments, you'll retire to the jury room.

1          The importance of your deliberations should be

2     obvious.  I remind you that you can return a decision

3     sentencing Mr. Tsarnaev to death only if all 12 of you are

4     unanimously persuaded that the death penalty is, in fact,

5     appropriate.  And, again, I remind you that no juror is ever

6     required by law to impose a death sentence.

7          When you're in the jury room, please discuss all

8     aspects of these sentencing issues among yourselves with candor

9     and frankness, but also with a due regard and respect for the

10    opinions of one another.  This has been a long case, and you

11    have spent a lot of time together as jurors.  Regardless of any

12    personal regard you may have for each other, you must each

13    decide this case for yourself.  No juror should surrender his

14    or her own conscientious conclusion merely because other jurors

15    might feel otherwise or simply to get to a unanimous decision.

16         Remember that the parties and the Court are relying on

17    you to give full, considered and mature consideration to the

18    question of sentencing.  By so doing, you carry out, to the

19    fullest, your oath as jurors, that you will well and truly try

20    the issues of this case and render a just verdict.

21         As with the prior phase, if it becomes necessary

22    during your deliberations to communicate with me for any

23    reason, simply send a note signed by the foreman of the jury.

24    If you send a note, do not indicate any decision-making on any

25    of the issues that are before you or provide any details about

1   your progress.  And additionally, do not attempt to communicate

2   with the Court or any other court personnel, except the court

3   security officer by telling him that you have the need for him

4   to convey it, other than in writing, a signed writing.  There

5   will be no oral communications.  Any questions you have, you

6   should present in writing.

7          When you have reached a decision, send me a note

8   signed by the foreman that you have reached a decision.  Do not

9   indicate on the note what the decision is.  And in no

10  communication with the Court prior to a verdict should you ever

11  give a numerical count of where the jury stands in its

12  deliberations on any issue.

13         Whichever decision you reach, the foreman must also

14  sign and fill out the verdict form accordingly, according to

15  the verdict, and be prepared to report to the Court your

16  findings as to the issues in the verdict form, the defendant's

17  age, the gateway, aggravating and mitigating factors and your

18  sentencing decision.

19         As we did in the prior phase, you will have an

20  envelope in the room that at the end of the day, each day, as

21  you deliberate, you will put the verdict slip inside the

22  envelope and seal it, and it will remain sealed and be returned

23  to you in a sealed condition the following day and you will

24  remove it from the envelope yourselves.

25         I note for the record that you will not have your

1    cellular phones, PDAs or other electronic devices during the

2    deliberations.  I understand they have already been collected

3    from you and will not be returned to you until the court

4    recesses each day.

5         Of course, as I previously said, it would be improper

6    and a violation of your oath as a juror to conduct any outside

7    research or investigation on the Internet or otherwise to -- or

8    otherwise, or to communicate with anyone, including your fellow

9    jurors, outside the deliberations conducted by the jury as a

10   whole in the jury room.

11        As in the first phase, only 12 jurors will be

12   deliberate.  The alternates remain important because you may be

13   called to serve in the event that a deliberating juror is no

14   longer able to participate in the deliberations.  But as

15   before, the alternate jurors will be separated from the

16   deliberating jurors during the deliberations.

17        And among the alternate jurors, you're not to discuss

18   anything about the case or the penalty among each other.  In

19   other words, you're not to act as if you were also a

20   deliberating jury.

21        When the court is in session, you will return to the

22   courtroom as well so that you may hear any responses to jury

23   questions and any other remarks that are necessary from me.

24        Let me conclude by reminding you again that nothing I

25   have said in my instructions and nothing I've done or said

 1    during the course of the trial has been said or done to suggest

 2    to you what I think the outcome should be.  What the sentencing

 3    decision should be is your exclusive duty and responsibility.

 4              Let me see counsel again at the side, please.

 5              (Discussion at sidebar and out of the hearing of the

 6    jury:)

 7              MR. BRUCK:  Well, the first objection we'd like to

 8    make is the Court's refusal of our Instruction No. 3, which is

 9    the instruction that -- concerning the consequences of a

10    deadlock.

11              THE COURT:  Okay.  All right.

12              MR. BRUCK:  And I understand that the rule may require

13    me to spell that out unless --

14              THE COURT:  I don't think so.

15              MS. CONRAD:  The First Circuit does.  You can't just

16    refer to it by the number.  You actually have to state what was

17    requested and what's not --

18              MR. BRUCK:  No, that's not the one.

19              THE COURT:  I think that's stating a summary.

20              MR. BRUCK:  Maybe I should read it to be sure.

21              MS. CONRAD:  The First Circuit says -- it's very

22    short.  The First Circuit says you have to read it.

23              MR. BRUCK:  The request --

24              THE COURT:  Well, I'm concerned about the jury hearing

25    it.

1          MS. CONRAD:  Well, your Honor, I'm telling you the

2     First -- that our appeals chief is in the courtroom.  If you

3     want to bring her up to sidebar, she'll tell you.  She'll be

4     all over me if we don't read it.

5          THE COURT:  Well, I'll tell you what, we can excuse

6     the jury without commissioning them to begin deliberating.

7          MR. BRUCK:  That would be great.

8          (In open court:)

9          THE COURT:  Jurors, we have to do this outside your

10    hearing, and because the music is dipping on us, we are afraid

11    that you might be able to hear it.  So we're going to actually

12    ask you to step out of the room, not to begin deliberating.

13    We're going to have you back in before you do that.  But just

14    step out so that we can have a conversation, frankly, without

15    having to worry about whether you're hearing things you

16    shouldn't hear.

17         THE CLERK:  All rise for the jury.

18         (The jury exits the courtroom at 3:56 p.m.)

19         THE COURT:  Okay.  You may be seated.

20         I don't think there's any need to be at sidebar,

21    particularly since everybody can hear anyway.

22         MR. BRUCK:  If I may?

23         THE COURT:  Please.

24         MR. BRUCK:  If it please the Court, we would first

25    like to object to the Court's refusal to include in its

1    instructions and the verdict slip our Request No. 3, which is

2    an instruction regarding the effect of the jury's inability to

3    reach a unanimous decision.

4         The instruction as requested and as refused by the

5    Court is as follows:  "If the jury is unable to reach a

6    unanimous decision in favor of either a death sentence or a

7    life sentence, I will impose a sentence of life imprisonment

8    without possibility of release upon the defendant.  That will

9    conclude the case.  At the sentencing stage of the case, the

10   inability of the jury to agree on the sentence to be imposed

11   does not require that any part of the case be retried.  It also

12   does not affect the guilty verdicts that you have previously

13   rendered."

14        We argued this issue yesterday.  As the Court is

15   aware, I simply want to note at this time that, notwithstanding

16   the authority of the *United States versus Jones*, we think that

17   under the extraordinary circumstances of this case, any

18   misapprehension, which is very likely, that the jury will labor

19   under that a non-unanimous -- or failure to achieve unanimity

20   would require a mistrial, and a retrial would be

21   extraordinarily prejudicial because of the nature of this

22   particular case and what it would signify to put the victims

23   and the survivors and the entire community through this entire

24   case again.

25        Of course, everybody but the jury now knows that

1    that's not what happens, and we think that this is a situation

2    which is fraught with the risk of coercion.  So understanding

3    that there is a -- that there is, at this time, authority

4    supporting the Court's decision, we note that it is a practice

5    which is very commonly -- the practice of informing the jury,

6    of telling them the truth about the results of a failure to

7    agree, is extremely widespread in the federal courts, even

8    under cases where the necessity, we believe -- or where the

9    reasons for giving a full and complete and accurate instruction

10   are nowhere near so compelling as here.

11          THE COURT:  All right.  As to that, I've made my

12   reasons clear on the lobby conference record.  I don't think

13   it's necessary to repeat them.  I adhere to those views.

14          MR. BRUCK:  Very well.

15          In the alternative, and reserving our rights under

16   that request, we would request that the Court give the

17   instruction contained in Sand's *Modern Federal Jury*

18   *Instructions*, Instruction No. 9A-20, which, in pertinent

19   part -- I've handed the entire instruction up to the Court

20   yesterday at the lobby conference, but the pertinent part for

21   purposes of the record reads as follows:  "If, after engaging

22   in the balancing process I have described to you, all 12

23   members of the jury do not unanimously find beyond a reasonable

24   doubt that the defendant should be sentenced to death, then you

25   may not impose the death penalty.  In that event, Congress has

1    provided that life imprisonment without any possibility of

2    release is the only alternative sentence available.  If the

3    jury reaches this result, you should do so by unanimous vote

4    and indicate your decision in Section" blank "of the special

5    verdict form."

6           So we, as a follow-up, reserving our rights under

7    Request No. 3, make that request as well and object to the

8    Court's having declined to give it at the lobby conference

9    yesterday and today.

10          THE COURT:  Okay.  Again, my reasons were stated on

11   the record yesterday, and I adhere to them.

12          MR. BRUCK:  Next, we submitted a proposed instruction

13   following the language from Sand's *Modern Jury Instructions*

14   that on the issue of the appropriateness of the death penalty,

15   the reasonable doubt standard should apply.  That is to say

16   that the jury should only impose the death penalty if it found

17   beyond reasonable doubt that the aggravating circumstances

18   outweigh the mitigating circumstances sufficiently so as to

19   justify the death penalty.  That is the language from Judge

20   Sand.  That was the language of our request.  The Court removed

21   the requirement of beyond a reasonable doubt from that

22   instruction, and we wish to preserve our objection to having

23   done so.

24          THE COURT:  As you know, the ruling was consistent

25   with circuit law.

1          MR. BRUCK:  We also except to the Court's refusal to

2     include as a mitigating factor that the defendant would be

3     sentenced to a sentence of life imprisonment without

4     possibility of release, if the death penalty is not imposed, we

5     understand that the jury has been informed of that fact, but we

6     think that that is a mitigating factor or a circumstance

7     weighing against imposition of the death penalty.  Mitigating

8     factor within the meaning of the Federal Death Penalty Act and

9     the Eighth Amendment, which should have been included on the

10    list of mitigating factors.

11         THE COURT:  Okay.

12         MR. BRUCK:  I went to check with counsel to make sure

13    I haven't missed anything.

14         (Counsel confer off the record.)

15         MR. BRUCK:  That's it.  Thank you.

16         THE COURT:  Okay.  Does the government have anything?

17         MR. WEINREB:  No, your Honor.

18         THE COURT:  All right.  Let's get the jury back in.

19         (Pause.)

20         THE CLERK:  All rise for --

21         MR. BRUCK:  Oh, before the jury is summoned -- I'm

22    sorry -- just to be absolutely clear, we are requesting not

23    only the instruction but also a spot on the verdict slip for

24    the jury -- where the jury would be informed of the

25    consequences of a failure to agree.

```
1                  Thank you.

2                  THE COURT:  All right.  Noted.

3                  (Pause.)

4                  THE CLERK:  All rise for the jury.

5                  (The jury enters the courtroom at 4:04 p.m.)

6                  THE COURT:  Okay.  Thank you, jurors.

7                  THE CLERK:  Be seated.

8                  THE COURT:  So we're ready to have you commence your

9       deliberations, jurors.  We know it's late in the day.  It has

10      been a long day.  We would like you to just perhaps get

11      started, do a little organizing if you wish.  We won't go too

12      long today.  We know you've had, as I say, a long day, and we

13      don't expect you to work overtime today.

14                  So I will ask the first 12 jurors who deliberated in

15      the guilt phase, again, to withdraw to deliberate upon the

16      evidence and, when you have reached a verdict, to notify us of

17      that fact, and we will receive your verdict.

18                  With respect to the six alternates, you will again be

19      separated but kept available in case there may be need to call

20      one of you into service if something should prevent a

21      deliberating juror from continuing with the deliberations.

22                  So if the clerk will now lead the 12 into the jury

23      room, and the other six alternates will be led to a separate

24      room.

25                  We will be in recess.
```

1              THE CLERK:  All rise for the Court and the jury.

2              (The Court and jury exit the courtroom at 4:06 p.m.)

3              THE CLERK:  We will be in recess.

4              (There is a recess in the proceedings at 4:06 p.m.)

5              THE CLERK:  All rise for the Court and is the jury.

6              (The Court and jury enter the courtroom at 4:53 p.m.)

7              THE COURT:  All right, jurors.  So this is as far as

8    we'll go today.  We did want you to just, you know, begin the

9    process.  Obviously you have a long way to go.

10             You've been through this overnight adjournment before.

11   I just want to emphasize some things again.  Of course it is

12   very important now that you abide fully with all my

13   instructions about avoiding any discussions of the case with

14   anyone, any communications about the subject matter of the case

15   at all, and of course avoid any investigation or peeking at

16   things on the Internet or otherwise and, again, maintain your

17   ability to put aside and avoid any media coverage of the case,

18   of which there will be considerable, as you can imagine.

19             Same goes for the alternates.  Because you still are

20   in the bullpen as a potential deliberating juror, you should

21   abide by the same instructions.

22             To remind you of our procedure, as of now, you

23   finished deliberating for the day.  No further discussion.

24   Tomorrow as you assemble, no discussion until you've been

25   brought into the courtroom, and we will record that you've

1    returned and are ready to continue deliberating.  At that

2    point, when you go back in, you can resume discussing the case.

3    All right?  But until that time, just social chat before then.

4    Okay?

5            So have a restful evening, and we'll look forward to

6    seeing you tomorrow as you continue your work.  We'll be in

7    recess.

8            THE CLERK:  All rise for the Court and the jury.

9    Court will be in recess.

10           (The Court and jury exit the courtroom and the

11   proceedings adjourned at 4:56 p.m.)

```
 1                  C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8     United States of America v. Dzhokhar A. Tsarnaev.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  5/13/15
13

14

15

16

17

18

19

20

21

22

23

24

25
```