1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                    )
4    UNITED STATES OF AMERICA,       )
                                    )
5           Plaintiff,               )
                                    )   Criminal Action
6    v.                              )   No. 13-10200-GAO
                                    )
7    DZHOKHAR A. TSARNAEV, also      )
     known as Jahar Tsarni,          )
8                                    )
            Defendant.               )
9                                    )

10

11          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE
12

13
                **EXCERPT OF DAY FORTY-TWO OF JURY TRIAL**
14
                   **Testimony of Mark Spencer**
15

16
             John J. Moakley United States Courthouse
17                        Courtroom No. 9
                         One Courthouse Way
18                 Boston, Massachusetts  02210
                     Tuesday, March 31, 2015
19

20
                   Cheryl Dahlstrom, RMR, CRR
21                    Official Court Reporter
               John J. Moakley U.S. Courthouse
22             One Courthouse Way, Room 3510
                 Boston, Massachusetts  02210
23                       (617) 737-8728

24       Mechanical Steno - Computer-Aided Transcript

25

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
               John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6              By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
               By:  Miriam Conrad, William W. Fick and Timothy G.
10             Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13             By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15             - and -
          LAW OFFICE OF DAVID I. BRUCK
16             By:  David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE DEFENSE: | | | | |
| MARK SPENCER | | | | |
| by Mr. Fick | 5 | | 70 | |
| by Mr. Chakravarty | | 45 | | 75 |

E X H I B I T S

DEFENDANTS:

No.      Description                                    In Evd.

1433     Tamerlan Tsarnaev travel record from .... 5
         Customs

3308     Spencer summary of three computers ...... 14
         analyzed

3303-    Spencer summary for Sony VAIO computer... 22
10

3301-    Summary of files and folders on 1W16..... 27
01

3310-1   Copies of files from Laurel Street hard . 32
and      drive
3310-2

3312-1   Summary of file and folder listings...... 37

3312-    Summary of events re Complete Inspire.... 40
02

3313-    Summary of Inspire files on Sony VAIO ... 43
03       computer

3302-    Chart re removal devices................. 56
04

3300-    Summary of MFT for 1W16.................. 57
07

3303-    Thirteen pages of Samsung history........ 73
06E

1    (EXCERPT AS FOLLOWS:

2        THE COURT:  Good morning, jurors.  Mr. Fick.

3        MR. FICK:  Good morning, your Honor.  The defense

4    calls Mark Spencer.

5        THE CLERK:  Sir, will you please rise and raise your

6    right hand.

7        MARK SPENCER, Sworn

8        THE CLERK:  Have a seat.  State your name.  Spell your

9    last name for the record.  Keep your voice up and speak into

09:16 10    the mic so everyone can hear you.

11        THE WITNESS:  Mark Spencer, M-a-r-k, S-p-e-n-c-e-r.

12    DIRECT EXAMINATION BY MR. FICK:

13    Q.   Good morning, Mr. Spencer.

14    A.   Good morning.

15        MR. FICK:  I'm going to ask to pause for a minute and

16    just do a housekeeping thing we talked about with the Court.  I

17    would move into evidence Government's Exhibit 1433, which is

18    the Tamerlan Tsarnaev certified travel record from Customs and

19    Border Protection.

09:16 20        THE COURT:  That may be admitted.

21    (Defendant's Exhibit No. 1433 received into evidence.)

22        MR. FICK:  May I just briefly publish it to the jury,

23    your Honor?

24        THE COURT:  From your computer?

25        MR. FICK:  From my computer, yes.  Thank you.  Turning

1    now to Page 2 of the document and highlighting the portion

2    reflecting Tamerlan Tsarnaev's departure from the United States

3    on January 21, 2012.

4         MR. CHAKRAVARTY:  Your Honor, the government doesn't

5    have an objection with using this exhibit with the witness, but

6    Mr. Fick shouldn't be testifying to it.

7         THE COURT:  Well, I think he was reading what it said

8    but fine.

9         MR. FICK:  Thank you, your Honor.  I will now commence

09:18 10   with my examination.

11        I'm going to display on the screen before I begin what

12   was used as a chalk with Mr. Swindon government's marked as

13   1557 if that's satisfactory.

14        THE COURT:  This is a chalk?

15        MR. FICK:  This is a chalk that was used -- shown to

16   everyone, though, with Mr. Swindon.  And I will --

17        THE COURT:  Does it have a number?

18        MR. FICK:  1557.  I'm going to actually take it off

19   the screen for the moment anyway.

09:18 20   Q.   Good morning again, Mr. Spencer.

21   A.   Good morning.

22   Q.   Could you please tell the jury where you work?

23   A.   I work for Arsenal Consulting in Chelsea, Massachusetts.

24   I'm the president.

25   Q.   What is Arsenal Consulting?

1    A.    Arsenal Consulting is a digital forensic company.  We

2    focus on digital forensics consulting and software development.

3    Q.    When you say "digital forensics consulting," what is that?

4    A.    Digital forensics involves the identification,

5    preservation, analysis and reporting on electronic evidence,

6    electronic data.

7    Q.    How long have you been the president of Arsenal

8    Consulting?

9    A.    Since mid-2009.

09:19 10   Q.    What is your educational background?

11   A.    I have a bachelor of arts from UMass Boston, which I

12   received in 2003.

13   Q.    Do you have training in digital forensics specifically

14   apart from your education, your formal university education?

15   A.    I do.  I have attended approximately 50 courses in

16   training events, courses from Guidance Software, AccessData,

17   SANS, Cytech.

18   Q.    And the companies you just mentioned, those are vendors of

19   digital forensic software, among other things?

09:20 20   A.    Or training providers, yes.

21   Q.    Do you have any certifications related to digital

22   forensics?

23   A.    I do.

24   Q.    Can you name a few of those?

25   A.    EnCase certified examiner; ProDiscover certified examiner;

1    digital forensics certified practitioner.

2    Q.    Are you familiar with an organization called the Digital

3    Forensics Certification Board?

4    A.    Yes.

5    Q.    What is that?

6    A.    That's the organization that sponsors the digital

7    forensics certified practitioner, an organization started by

8    the National Institute of Justice.

9    Q.    And so you are -- do you have a certification from that

09:20 10   board?

11   A.    Yes.

12   Q.    Do you lecture or teach on the subject of digital

13   forensics?

14   A.    I do.

15   Q.    How often?

16   A.    Frequently, approximately a hundred presentations and

17   courses between teaching for organizations at the college level

18   or at legal events, law enforcement events.

19   Q.    Have you given trainings or lectures for law enforcement?

09:21 20   A.    I have.

21   Q.    Can you give a few examples?

22   A.    RCMP.

23   Q.    RCMP, what is that?

24   A.    That's Canadian law enforcement.  Hong Kong Police

25   Department; Taiwan's MJIB.

1    Q.   What sorts of cases does Arsenal Consulting typically work

2    on?

3    A.   Typically civil cases, private sector matters,

4    intellectual property.  Theft is by far the most common type of

5    case we work on, both on behalf of defendants and plaintiffs,

6    depending on the case.

7    Q.   Have you also worked on criminal cases?

8    A.   Yes.

9    Q.   About how many cases do you work on in a given year?

09:21 10   A.   Approximately 50.

11   Q.   Can you give a ballpark estimate of how many digital

12   devices you've analyzed in the course of your career?

13   A.   Over a thousand.

14   Q.   Did you do computer forensic work prior to founding

15   Arsenal Consulting?

16   A.   I did.

17   Q.   Can you describe that history briefly?

18   A.   Yes.  Prior to founding Arsenal Consulting, I worked for

19   First Advantage Litigation Consulting from 2009 back to 2006.

09:22 20   Prior to 2006, I worked for Evident Data, from 2006 back to

21   2002, until Evident Data was acquired by First Advantage.

22   Prior to working in the private sector, I worked for the

23   Suffolk County District Attorney's Office in Boston.

24   Q.   Do you have employees at Arsenal Consulting who assist you

25   with your work?

1    A.    I do.

2    Q.    Do those employees also have relevant training and

3    certifications in digital forensics?

4    A.    Yes.

5    Q.    Does one of your employees speak a foreign language

6    relevant to work on this case?

7    A.    Yes.

8    Q.    What language is that?

9    A.    Russian.

09:22 10   Q.    Is she a native speaker of Russian?

11   A.    She is.

12   Q.    Have you previously given sworn testimony in legal

13   proceedings of various kinds?

14   A.    I have.

15   Q.    Have you previously testified in this court, before this

16   judge, about digital forensics?

17   A.    I have.

18   Q.    Does your firm have a standard billing rate that you

19   charge clients?

09:23 20   A.    We do.

21   Q.    What is that rate today?

22   A.    $425 an hour.

23   Q.    What is the rate at which you're being compensated for

24   this case?

25   A.    375.

```
 1    Q.    What is the institution or entity from which you receive
 2    payment in this case?
 3    A.    The federal court.
 4    Q.    Approximately how many hours has your firm billed to date
 5    for work on this case?
 6    A.    Approximately 400.
 7    Q.    So is that approximately --
 8    A.    Approximately 400 hours.
 9    Q.    Right.  Is that approximately $150,000 of fees?
10    A.    Yes.
11    Q.    What were you asked to do in this case?
12    A.    We were asked to review electronic evidence and reports
13    related to that evidence.
14    Q.    When you say "reports," whose reports?
15    A.    The FBI's.
16    Q.    When you say "electronic evidence," does that include
17    forensic images of various devices?
18    A.    Yes.
19    Q.    Can you remind the jury what a forensic image of a device
20    is?
21    A.    A forensic image is essentially a copy of a storage device
22    or volume which includes deleted space.  And a fairly important
23    matter is that at any time in the future, you can authenticate
24    that forensic image.  You can authenticate that it's good data.
25    Q.    Were you here last week when Agent Swindon of the FBI
```

1    testified?

2    A.   Yes.

3    Q.   I'm going to put up on the screen a chalk or a chart

4    listing a number of devices that he talked about in just a

5    moment.

6              Do you remember seeing that list last week?

7    A.   Yes.

8    Q.   Now, the items pulled out here, is that three computers

9    and four storage devices?

09:25 10    A.   Three computers, three thumb drives, and an external hard

11    drive.

12    Q.   Were those among the devices you analyzed in your work on

13    this case?

14    A.   Yes.

15    Q.   Did you analyze other devices in your work on this case?

16    A.   Yes.

17    Q.   Approximately how many?

18    A.   Approximately 30.

19    Q.   Across all of the devices you analyzed, can you give a

09:25 20    ballpark estimate of how many files existed on those devices,

21    discrete files?

22    A.   In terms of active files, over five million, five million

23    files and folders.  That does not include the contents of

24    containers, like zip files, or the contents of deleted space.

25    Q.   Now, when you begin work on a case, do you do some

1    background workup on devices or images that you're going to

2    analyze?

3    A.    We do.

4    Q.    What does that initial workup include?

5    A.    We refer to it as case initiation.  But even if our own

6    clients give us a laptop, for example, we determine what users

7    exist on that laptop, when Windows was installed on that

8    laptop.

9    Q.    Do you also investigate the manufacturing date of devices

09:26 10   if that information is available?

11   A.    In some cases, yes.

12   Q.    Why do you look for information or why do you compile the

13   information about the Windows installation and the

14   manufacturing date?

15   A.    We -- in general, it's because it helps us with

16   connections between computers, between files, between data,

17   events.  More specifically, in some cases, our clients will

18   give us a laptop and say, This is our employee's laptop.  When

19   we look at it closer, we'll realize it's only been the

09:26 20   employee's laptop for three months.  And we'll have to ask the

21   question, Well, where is the previous laptop?

22   Q.    Now, did you do a workup in this case for the three

23   computers we've been hearing a lot about:  the Samsung, the

24   Sony, and the Hewlett-Packard?

25   A.    Yes.

1          MR. FICK:  If I could get the screen, your Honor, just

2    for the witness?

3    Q.   Do you recognize the document that's on the screen, which

4    has been previously marked as Exhibit 3308?

5    A.   I do.

6    Q.   What is that?

7    A.   This is a summary of our findings related to the three

8    computers.

9    Q.   Is this a chart you created?

09:27 10  A.   Yes.

11   Q.   Does this gather together and compile information from a

12   variety of different forensic sources?

13   A.   It is.

14          MR. FICK:  Your Honor, I'd move into evidence 3308 and

15   ask to publish.

16          MR. CHAKRAVARTY:  The government's position is that

17   this should be a chalk.

18          THE COURT:  I'll admit it as a summary.

19          MR. FICK:  Thank you, your Honor.

09:27 20  (Defendant's Exhibit No. 3308 received into evidence.)

21   Q.   Now, the Samsung computer, you heard testimony last week,

22   didn't you, that it was recovered on Laurel Street in

23   Watertown, and the FBI called it Tamerlan's laptop?  Do you

24   recall that?

25   A.   Yes.

1    Q.   What was the Windows installation date on that computer?

2    A.   December 21, 2011.

3    Q.   And what is the principal user name on that computer?

4    A.   Umar.

5    Q.   And when was it manufactured?

6    A.   September 2011.

7    Q.   Now, the Hewlett-Packard, the second one there, HP 2R14,

8    you understand that was a computer seized from Norfolk Street

9    in Cambridge, correct?

09:28 10   A.   Yes.

11   Q.   What was the Windows installation date on that?

12   A.   September 22, 2011.

13   Q.   What was the principal user name on that computer?

14   A.   Umar.

15   Q.   Was that created on the same day?

16   A.   Yes.

17   Q.   And down at the bottom, the Sony 1R6, seized from an

18   apartment down south in the New Bedford area, what was the

19   Windows installation date on that computer?

09:28 20   A.   February 26, 2011.

21   Q.   And what is the principal user name on that computer?

22   A.   Anzor.

23   Q.   And that was created on the same day that Windows was

24   installed?

25   A.   That's correct.

1    Q.    Now, did you have occasion to extract the internet search

2    history on the Samsung computer, Tamerlan's laptop?

3    A.    Yes.

4    Q.    How did you go about doing that?

5    A.    We used a combination of two tools:  Internet Evidence

6    Finder and NetAnalysis.

7    Q.    Why do you use two tools?

8    A.    The tools aren't going to have the exact same criteria for

9    what constitutes a search, so we want to have as comprehensive

09:29 10    a set of potential searches as possible.

11    Q.    Are these tools tools that are widely accepted and used in

12    the digital forensics field?

13    A.    Yes.

14          MR. FICK:  If I could get the monitor now just for the

15    witness again, your Honor, please?

16    Q.    I'm going to show you a document on the monitor previously

17    marked as Exhibit 3303-6 and ask if you recognize it.

18    A.    I do.

19    Q.    What is it?

09:30 20    A.    This is a spreadsheet.  This is essentially output from

21    NetAnalysis and IEF related to searches.

22    Q.    For the Samsung?

23    A.    For the Samsung computer.

24    Q.    Is this a document that you created using the tools that

25    you described?

1   A.   Yes.

2   Q.   I want to draw your attention now to a particular search

3   in this document from March -- first of all, before I do that,

4   time on computers is measured or stated in different formats in

5   different instances; is that fair to say?

6   A.   Yes.

7   Q.   What is UTC time?

8   A.   UTC is Universal Time.  No one is going to like this

9   explanation.  Universal Time for forensic people, some

09:31 10   technical people, is the most accurate time.  Computers,

11   generally speaking, store time either in Universal Time or in

12   local time.  The problem with local time is that we may know

13   exactly when local time really was.  It might be Eastern.  It

14   might be Pacific.  It might be some other time zone.  There are

15   situations in which we won't know exactly what local time was,

16   and there's complications which include Daylight Savings and

17   Daylight Savings happening in different years, when it started,

18   when it stopped.  So, generally speaking, Universal Time is

19   just a much simpler time for us to stay in.

09:31 20   Q.   Is there a calculable relationship between UTC and Eastern

21   Time depending on whether we're in Daylight Savings or not?

22   A.   Yes.

23   Q.   What is that relationship?

24   A.   When we are not in Daylight Savings, you would subtract

25   five hours from UTC.

1     Q.    For Eastern?

2     A.    For Eastern Time.  When we are in Daylight Savings, you

3     would subtract four.

4     Q.    Okay.  Now I'm going to show you a portion of this search

5     history in just a moment if my computer will cooperate with me.

6            MR. FICK:  Your Honor, I would ask to publish what is

7     now on the screen, a portion of the document as we discussed,

8     identifying it as Exhibit 3303-6A.

9            THE COURT:  All right.

09:32 10    Q.   Is this --

11           MR. FICK:  I would ask to publish that to the jury, if

12    I could.

13           THE COURT:  They should have it.

14           MR. FICK:  Thank you.

15    Q.   Mr. Spencer, is this a sort of blow-up of a particular

16    line entry on your search history spreadsheet?

17    A.    Yes.

18    Q.    Is this the date and time that the search was conducted in

19    UTC that I just circled there on the screen?

09:33 20    A.    Yes.

21    Q.    Can you read the search term that's there?

22    A.    It says, "Ruger P95."

23    Q.    Now, I'm going to show you another portion of the

24    document.

25           MR. FICK:  If I could just get it for the witness

1    again, your Honor, briefly.

2    Q.   Is this a portion of the document showing search terms on

3    or about April 6 and 7 of 2013?

4    A.   Yes.

5    Q.   Are the search terms various versions of words including

6    "transmitter" and "receiver" and "oscilloscope"?

7    A.   Yes.

8         MR. FICK:  Your Honor, I'd ask to publish this exhibit

9    to the jury as 3303-6B.

09:34 10         THE COURT:  All right.

11   Q.   The highlighted portions that should be coming up on the

12   screen now, are these the searches and terms from Tamerlan's

13   Samsung that we just talked about on or about April 7 of 2013?

14   A.   Yes.

15        MR. FICK:  If I could get the screen just for the

16   witness again back, your Honor?

17   Q.   I'm going to page through the document for you, Mr.

18   Spencer, for a couple of other days on the screen here.  The

19   prior page, April 7th, are there terms on this screen that

09:35 20   include the terms "fireworks," "firing system," and

21   "detonator"?

22   A.   Yes.

23        MR. CHAKRAVARTY:  Your Honor, object to the leading

24   for each page.  I don't mind the signposts but just leading the

25   witness as to what to say.

 1              MR. FICK:  I can reframe and do it a different way.

 2              THE COURT:  Okay.

 3              MR. FICK:  I'd ask to publish this page to the jury,

 4    your Honor, as 3306-6C [sic], I think we're at.

 5    Q.   Does this reflect certain search terms that were used on

 6    Tamerlan's Samsung on April 7 of 2013?

 7    A.   Yes.

 8    Q.   Can you read the two search terms that are highlighted?

 9    A.   "Fireworks firing system" and "detonator."

09:36 10              MR. FICK:  If I could get the screen back again just

 11    for the witness, your Honor?

 12    Q.   Showing you a portion of the exhibit, does this page of

 13    the exhibit reflect certain search terms and -- from the

 14    Samsung computer on April 10 and 11 of 2013?

 15    A.   Yes.

 16              MR. FICK:  Your Honor, I'd ask to publish this page to

 17    the jury as 3303-6D.

 18              THE COURT:  Okay.

 19    Q.   If I could just ask you, Mr. Spencer, to read each of the

09:37 20    highlighted search terms on this page at least until you hit

 21    the foreign language at the bottom?

 22    A.   "Gun stores in N.H."; "gun stores in N.H., Salem"; "gun

 23    stores in N.H.," "Boston Marathon."

 24    Q.   What's the date of the search for the term "Boston

 25    Marathon"?

1    A.    April 10, 2013.

2    Q.    Now, did you also extract the web search history from the

3    Sony VAIO computer?

4    A.    Yes.

5    Q.    Did the search term "Ruger" appear anywhere in the search

6    history of the Sony VAIO computer?

7    A.    No.

8    Q.    Did the search term "gun store" appear anywhere in the

9    history of the Sony VAIO computer?

09:38 10   A.    No.

11   Q.    Did the terms "transmitter," "receiver," "firework" or

12   "detonator" appear anywhere in the search history of the Sony

13   VAIO computer?

14   A.    No.

15   Q.    Was the search term "Boston Marathon" evident in the

16   search history of the Sony VAIO computer prior to the bombings

17   on April 15th of 2013?

18   A.    There were references to the Boston Marathon bombing on

19   the Sony.  There were no references to the Boston Marathon

09:38 20   without the context of the bombing.

21   Q.    In other words, there were no searches using the term

22   "Boston Marathon" prior to the bombing?

23   A.    Correct.

24         MR. FICK:  If I could get the screen, your Honor,

25   again just for the witness?

1    Q.   I'm going to show you, Mr. Spencer, what we've previously

2    identified as Exhibit 3303-10.  Do you recognize what this is?

3    A.   Yes.

4    Q.   What is it?

5    A.   This is an output from the tool I referred to earlier

6    called NetAnalysis.

7    Q.   What does it depict?

8    A.   This is a visual representation of hits, the number of

9    times a domain name exists in the internet history, the web

09:39 10   browser history.

11   Q.   How is it created?

12   A.   The tool basically will look at the total number of

13   occurrences of the domain name in the internet history.

14   Q.   Is this a tool that's widely used and accepted among

15   computer forensics examiners?

16   A.   Yes.

17          MR. FICK:  Your Honor, I'd move this exhibit into

18   evidence, 3303-10.

19          MR. CHAKRAVARTY:  Your Honor, same position.  I think

09:40 20   this should be a chalk.

21          THE COURT:  All right.  I'll admit it as an exhibit as

22   a summary.

23   (Defendant's Exhibit No. 3303-10 received into evidence.)

24          MR. FICK:  And if I can publish it, please?

25   Q.   What are the top two domains on this chart?

```
 1   A.    www.facebook.com and vk.com.

 2   Q.    Do you have an understanding of what vk.com is?

 3   A.    Yes.

 4   Q.    What is your understanding?

 5   A.    My understanding is it's a Russian social networking site.

 6   Q.    Kind of similar to Facebook?

 7   A.    As far as I know, yes.

 8   Q.    What is the total number of hits that the tool found for

 9   facebook.com?

10   A.    1,378.

11   Q.    And what's the total number of hits for vk.com?

12   A.    1,275.

13   Q.    Now, last week there was -- do you recall hearing

14   testimony about an external hard drive recovered at Laurel

15   Street in Watertown?

16   A.    Yes.

17   Q.    This is a device identified as 1W16 by the FBI, is that

18   right?

19   A.    Correct.

20   Q.    What is an external hard drive as compared to, say, a

21   thumb drive?

22   A.    Generally, an external hard drive is going to be a larger

23   device, both in terms of physical size and in terms of storage

24   capacity.

25   Q.    Does the file system on an external hard drive frequently
```

differ from the file system on a thumb drive?

A.   It many cases, yes.  A thumb drive normally will have an older type of file system known as FAT, or file allocation table.  External hard drives, being generally much larger devices, will have a more advanced file system on them, either NTFS or something known as HFS.

Q.   Can you glean more forensic information from a hard drive that has the NTFS file system on it?

A.   Yes.

Q.   What does it mean to format a hard drive, an external hard drive?

A.   From a laymen's perspective, format means to reset the hard drive, start fresh.  More specifically or more technically, you're creating a new file system on that device.

Q.   What is the consequence of that or an effect of that from an end user's perspective?

A.   A user who engages in a format isn't going to see the previous files and folders that were on that drive.

Q.   Is it possible to recover specific forensic information about what computer and what user on that computer formatted an external hard drive?

A.   It is.

Q.   How do you go about doing that?

A.   Based on the way NTFS works, the file system, you can identify the owner of files and folders that are on that drive,

1     including critical files and folders that allow the file system

2     to operate.  That file system information includes security

3     information about not only the computer that, by default, was

4     responsible but the user.

5     Q.    The user on that computer?

6     A.    Correct.

7     Q.    Can you also recover information about what computer

8     created individual files on an external hard drive?

9     A.    Yes.

09:44 10     Q.    Is that done in a similar manner to what you just

11     described for the format question?

12     A.    It is.

13     Q.    Now, you talked about security streams or security

14     identifiers, something like that.  What is a security

15     identifier?

16     A.    The actual information, the security information, stored

17     on the hard drive that contains the NTFS file system includes

18     things called security descriptors.  Basically, these are

19     things that tell the operating system what access various users

09:44 20     should have to the various device and what types of auditing

21     are correct on that device.  It's basically a big index, and it

22     says, This user can do this thing.  This user can do that

23     thing.  This user is the owner of a certain thing.

24     Q.    So when you talk about the security identifier, what is it

25     exactly?  What does it look like?  How is it depicted?

1    A.   It looks like a long string of numbers and letters.  It's

2    a globally unique identifier designed by Microsoft.  So it's a

3    long list.

4    Q.   Essentially a lengthy stream of letters and numbers?

5    A.   Yes.

6    Q.   Do any two computers or users in the world have the same

7    security identifier?

8    A.   Well, the intent of a global unique identifier is so that

9    they don't.  You could force a collision but in practice, no,

09:45 10   in our experience, no.

11   Q.   Did you make efforts to determine the security identifier

12   associated with various files on the 1W16 hard drive recovered

13   at Laurel Street in this case?

14   A.   Yes.

15   Q.   Were you able to associate the security identifiers on

16   that hard drive with another piece of evidence in this case?

17   A.   We were.

18   Q.   What association or relationship did you find?

19   A.   The security identifier for the files and folders on the

09:46 20   Laurel Street hard drive was related to the Samsung laptop and

21   the Umar user.

22   Q.   When you say "related to," what does that mean with

23   respect to the security identifier?

24   A.   Specifically, the owner of the files and folders was the

25   Umar user on the Samsung laptop.

1    Q.   Did you create a chart to summarize your review and the

2    results of the information that you took from various sources?

3    A.   Yes.

4         MR. FICK:   Your Honor, if I could get the screen for

5    the witness only?

6    Q.   Do you recognize the document I've put on the screen here?

7    A.   Yes.

8    Q.   What is it?

9    A.   This is a listing of the files and folders currently on

09:47 10   Laurel 1W16, the Laurel hard drive, which includes the SID

11   information, which user --

12   Q.   Let me stop you.   SID is?

13   A.   Security identifier.

14   Q.   Ownership information, which computer, which owner, is

15   associated with each file and folder in this list.   And do we

16   know what that SID is?   What does SID, security identifier,

17   relate to?

18        MR. FICK:   Your Honor, I'd ask to admit and publish

19   this Exhibit 3301-01 as a summary.

09:47 20        THE COURT:   Is this a single page?

21        MR. FICK:   It's actually got a few pages.   It's about

22   four or five pages.

23        MR. CHAKRAVARTY:   No objection, your Honor.

24   (Defendant's Exhibit No. 3301-01 received into evidence.)

25        THE COURT:   No.   Do they all look like this since I'm

1    only seeing the first one?

2               MR. FICK:  Yes.  But they're all similar to that.

3               THE COURT:  No objection?

4               MR. FICK:  If we could publish this.

5               THE COURT:  3301.

6               MR. FICK:  3301-0 1, that's correct.

7    Q.   What does the first column on the left here that I've

8    highlighted, what does that depict?

9    A.   Those are objects related to the file system itself that a

09:48 10   -- a normal user would not see these.

11   Q.   These are the names of files on the Laurel Street hard

12   drive?

13   A.   Essentially, yes.

14   Q.   Are there particular files that are associated with the

15   formatting of the hard drive?

16   A.   There are.

17   Q.   For example, what is -- I've just highlighted the file

18   name "$MFT."  What is that?

19   A.   That stands for master file table.  That's a critical

09:49 20   database that's used for the file system to function.  It

21   tracks the files and folders on that device.

22   Q.   What is the relationship of that file to the formatting

23   process of a hard disk?  In other words, is that a file that is

24   associated with the process of formatting a hard disk?

25   A.   Yes.

1    Q.    Can you describe what you mean by that?

2    A.    When you format a storage device, thumb drive or an

3    external hard drive, if you're using the NTFS file system,

4    there's going to be a suite of objects that have to be created

5    for it to function properly.  This $MFT is one of those objects

6    that is required for it to operate properly.

7    Q.    This second column, the long string of a letter and some

8    numbers here that I've just circled, what is that?

9    A.    That's the security identifier.

09:49 10   Q.    In this particular line, does this reflect the security

11   identifier for this file we were just talking about?

12   A.    Yes.

13   Q.    And then were you able to associate that security

14   identifier with a particular item of evidence?

15   A.    Yes.

16   Q.    Is that what's reflected here in the third column?

17   A.    It is.

18   Q.    So, in other words, the file here, the security ID owner

19   of that file is the user Umar on the Samsung computer?

09:50 20   A.    Correct.

21   Q.    Now, in addition to system files, you undertook similar

22   analysis for sort of ordinary user files that a user would see

23   on this hard drive, is that right?

24   A.    Yes.

25   Q.    I'm going to page ahead.  Up on the screen now from a

1    further page into this document, do you see file names on the

2    -- in the left column?

3    A.   Yes.

4    Q.   Are those various file names that have "Awlaki" in them?

5    A.   Not all of them; minus two.

6    Q.   Were you able to find the security identifier information

7    associated with those files?

8    A.   Yes.

9    Q.   Did that match another device in the case?

09:51 10   A.   It did.

11   Q.   Was that the Samsung?

12   A.   Yes.

13   Q.   And that's what's reflected here in the graph?

14        MR. CHAKRAVARTY:  Objection to the leading, your

15   Honor.

16        MR. FICK:  Just trying to be quick, but I'll refrain.

17        THE COURT:  Go ahead.

18        MR. FICK:  Thank you.

19   Q.   Moving ahead to another page just as a few more examples,

09:51 20   for those files listed on the left side, did you similarly --

21   did you reach a similar conclusion about what computer and user

22   was the owner of those files on this hard drive?

23   A.   Yes, the same conclusion.

24   Q.   Were there any files on this hard drive that were not

25   owned by the security identifier associated with the Samsung?

1    A.   Other than system files, which do not have traditional

2    security identifiers like this, no.

3    Q.   Now, I'm going to show you a government exhibit already in

4    evidence, Exhibit 1475-02A, which is -- one moment.

5         Do you recognize this as being the blowup of the

6    government's exhibit which listed all the files on the Laurel

7    Street hard drive?

8    A.   I really can't see much of that other than what you've

9    blown up, but it looks similar.

09:53 10  Q.   The two file names highlighted there in Cyrillic letters,

11   did you have occasion to verify whether those two files, in

12   fact, exist on the Laurel Street hard drive?

13   A.   Yes.

14   Q.   Do those files exist on the Laurel Street hard drive?

15   A.   They do.

16   Q.   And the documents, were you able to verify that the

17   documents previously marked as Exhibits 3310-1 and 3310-2 are

18   correct copies of those two files?

19   A.   Could you say that again?

09:53 20  Q.   Did you verify whether the exhibits previously marked as

21   3310-1 and 3310-2 are true and accurate copies of those two

22   files off the Laurel Street hard drive?

23   A.   Yes.  We compared the actual files to make sure that the

24   content was the same.

25        MR. FICK:  Your Honor, I would move into evidence

1    3310-1 and 3310-2 as well as the translations which I believe

2    are agreed upon.

3               THE COURT:  Okay.

4               MR. CHAKRAVARTY:  No objection, your Honor.

5               THE COURT:  All right.

6    (Defendant's Exhibit Nos. 3310-1 and 3310-2 received into

7    evidence.)

8    Q.    Now, first of all, as a general matter, do you have an

9    understanding of what the English meaning of those two file

09:54 10   names are from your employee's assistance?

11   A.    I do.

12              MR. CHAKRAVARTY:  Objection, your Honor.

13              THE COURT:  Well, we have the translation, don't we?

14              MR. CHAKRAVARTY:  We do have the files.  I'm not sure

15   that the file names are also translated.  It sounds like he's

16   getting it from his employee.

17              MR. FICK:  I believe the government witness did the

18   same thing.

19              THE COURT:  My point -- you're right, strictly

09:54 20   speaking.  But is it inevitable that we're going to get it

21   anyway?  The objection is sustained.  Go ahead.

22   Q.    I'm going to pull up on the screen what's now in evidence

23   two different items.  On the left side of the screen is Exhibit

24   3310-01, a document in a foreign language; and on the right

25   side of the screen is 1475-21, a copy of *Complete Inspire*, a

1    particular page.  Do you see that on the screen in front of

2    you?

3    A.   I do.

4         MR. FICK:  Oops.  It's not the -- here we go.

5         MR. CHAKRAVARTY:  Your Honor, the government doesn't

6    object to the authenticity of either of these documents, but

7    this witness is not -- it's not in his expertise to be

8    testifying about comparing those documents.

9         THE COURT:  That seems to be right.

09:55 10         MR. FICK:  I just want to show a few contents next to

11   each other, your Honor, on the screen.  I'm not going to ask

12   him to analyze them.

13        MR. CHAKRAVARTY:  This seems argumentative, your

14   Honor.

15        THE COURT:  The exhibits are in evidence.  Okay.  Go

16   ahead.  I guess what can be absorbed is the pictures, is that

17   it?

18        MR. FICK:  For this particular purpose, yes, on the

19   screen.

09:56 20        THE COURT:  Okay.

21        MR. FICK:  And I'll move on.

22   Q.   I'll now put up on the screen the translation of 3310-01A,

23   which is the translation of the first of those two files.

24        Can you just read this paragraph of the translation

25   that I highlighted there, the full paragraph?

1    A.    "Your task is to make use of this material which is

2    translated into Russian from *Inspire*, the mujahideen magazine

3    of the Arabian Peninsula.  The text was translated into Russian

4    so that our Russian brothers and sisters could make use of it.

5    And let Allah help you.  Amen."

6              MR. FICK:  I'm now going to put up on the screen the

7    translation, 3310-02A, the other of those two files.  I'll move

8    ahead a page.

9    Q.    Can I just ask you to read the first couple sentences of

10   this paragraph?  You can skip, I guess, the foreign language in

11   the first clause if you'd like.  "Good article."

12   A.    "As-salaam aleikum Ali Abu (ph).  Good article but novices

13   will not be able to understand.  They were somewhere around

14   video lessons in three parts on how to make a bomb."

15   Q.    Can you continue a little bit?

16   A.    "And the refrigerator temperature should be between 3 and

17   5 degrees to make the powder."

18   Q.    And one more sentence.

19   A.    "And also, when you are making the bomb, get rid of all

20   metal things as they might detonate the powder.  Work only with

21   wooden and plastic things."

22   Q.    Now, did you have occasion to investigate whether -- first

23   of all, what kind of files were these original files, the two

24   that we just talked about and were entered into evidence, not

25   the translations but the originals?

1       A.   These files were in Word document format.

2       Q.   Did you have occasion to determine whether those files

3   were ever opened in Microsoft Word on any of the computers

4   available in evidence in this case?

5       A.   We did.

6       Q.   What did you find?

7       A.   We found event log records.  Windows event logs are

8   diagnostic logs kept by Microsoft in some applications.  In

9   this particular case, Microsoft Office recorded some alerts

09:59 10  related to when files were saved, these files in particular.

11      Q.   On what computer did you find those artifacts?

12      A.   On the Samsung.

13      Q.   The Samsung from Laurel Street identified as Tamerlan's?

14      A.   Yes.

15      Q.   Did you find any such artifacts on the Sony?

16      A.   No.

17      Q.   Now, I'm going to put up on the screen a couple of pages

18   of what is in evidence as 1475-21, which is a PDF document

19   called *Complete Inspire*.  Do you recall seeing this PDF and

10:00 20  hearing testimony about it last week when you were observing

21   Mr. Swindon?

22      A.   Yes.

23      Q.   Did you undertake any analysis across the forensic devices

24   or the images available to you to trace the history and origin

25   of this file across those devices?

```
 1   A.   Yes.

 2   Q.   What did you do exactly?  Can you describe a little bit

 3   what you did?

 4   A.   At the most basic level, we looked to see where this

 5   document existed, when it was created.

 6   Q.   Okay.  And did you create a couple of charts to summarize

 7   your findings?

 8   A.   Yes.

 9        MR. FICK:  If I could get the screen just for the

10   witness, your Honor?

11   Q.   Mr. Spencer, do you recognize this chart?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a summary of our findings related to the created

15   date and times of this document.

16   Q.   Is it a summary of information taken from a variety of

17   different forensic sources across the images you had in your

18   possession?

19   A.   Yes, essentially file and folder listings.

20        MR. FICK:  Your Honor, I'd move this document into

21   evidence and ask to publish.

22        MR. CHAKRAVARTY:  Same objection, your Honor.

23        THE COURT:  Okay.  All right.  I'll admit it as an

24   exhibit.

25        MR. FICK:  Thank you, your Honor.
```

10:00 (line 10)
10:01 (line 20)

1          THE COURT:  The number?

2          MR. FICK:  It's 3312-1.

3  (Defendant's Exhibit No. 3312-1 received into evidence.)

4  Q.   So can you just describe briefly for the jury what the

5  different columns of this chart represent?

6  A.   The first column represents the piece of evidence we were

7  referring to it.  The second column, if the value is not in

8  italics, that's the Universal Time for the created date, for

9  that item.  If it's in italics, then it's in local time.

10 Q.   What is the -- what is the created date of a file on a

11 device?  What does it mean?  What's its significance?

12 A.   The created date normally refers to when a file was

13 originally created in its current location.  So that could mean

14 copied there.  It could also mean originally created there, or

15 it could refer to when a file was moved there.  The reference

16 would be to its creation time in its original location if it

17 was moved there.

18 Q.   Now, some of these entries are in italic, which meant you

19 left them in local time.  Why did you do that?

20 A.   Again, that's because the local time in these cases, it's

21 -- that is how the value was stored by the operating system, by

22 the file system.  In many cases we can assume that we're

23 referring to Eastern Time, and we can simply -- if we wanted to

24 go back to Universal Time, we could add hours.  If we wanted to

25 come back from Universal Time, we would subtract them.  But the

1    Eastern Time is an assumption.  We know that laptops can

2    travel.  Time zones can change.  We may not know exactly when a

3    time zone was set one way versus another way.

4    Q.   In other words, where your data was in local time, you

5    left it in local time?  Is that essentially what you're saying?

6    A.   If the data was originally stored by the file system or

7    the operating system in local time, we left it that way here,

8    yes.

9    Q.   So across all the evidence you had available to you, did

10:03 10   you find any sign of or reference -- any evidence of the

11   *Complete Inspire* PDF being created prior to the circled date

12   here, December 21, 2011?

13   A.   Creation time, no.

14   Q.   And on the Samsung, Tamerlan's Samsung, documents TC, what

15   does that stand for?

16   A.   That refers to an encrypted container, a TrueCrypt

17   container on the Samsung laptop.

18   Q.   Was the name of the TrueCrypt container "documents"?

19   That's why that's in quotes?

10:04 20   A.   Yes.

21   Q.   And so that's among all -- across all of the evidence you

22   had available, that is the -- was that the first reference to

23   creation of *Complete Inspire* that you could find?

24   A.   Yes.

25   Q.   Now, the second reference here, this Patriot VSN, what is

1    that device?

2    A.    That's a Patriot thumb drive.  We do not have a forensic

3    image for it, so we refer to it with its known volume serial

4    number.

5    Q.    Do you recall testimony from Agent Swindon where he also

6    referred to it or agreed with me referring to it as the missing

7    Patriot thumb drive?

8    A.    Yes.

9    Q.    And so the second reference -- so how do -- where did you

10:05 10   come up with the reference to the file being created on the

11   Patriot thumb drive on that date, the thumb drive itself?

12   A.    This particular entry came from target information of a

13   jump list.  A jump list is similar to a shortcut that you've

14   heard about before.  It's data that points somewhere else.

15   This jump list data will contain specific information about the

16   thing it points at including the thing it points at, its

17   created time, its last access time, its last modified time.

18          In this case, a jump list on one of the computers

19   pointed at *Complete Inspire*, on this Patriot thumb drive, and

10:05 20   recorded at that time that its created date was as you see,

21   January 21, 2012.

22   Q.    Again, that's the created date on the Patriot itself,

23   correct?

24   A.    Correct.

25   Q.    Did you undertake further analysis of exactly what may

1    have happened to *Complete Inspire* on January 21 of 2012?

2    A.   Yes.

3         MR. FICK:  If I could get the screen just for the

4    witness, your Honor?

5    Q.   I'm going to put up on the screen what's previously been

6    marked as 3312-02.  Do you recognize this document?

7    A.   Yes.

8    Q.   What is it?

9    A.   This is a summary of events that are in some way related

10:06 10   to *Complete Inspire* on this particular day.

11   Q.   Where is the information taken from that is put into this

12   summary?

13   A.   This information comes from three sources:  the jump list

14   information I mentioned, file system information; the file and

15   folder listings; and Windows registry information.

16   Q.   Those are all -- fair to say those are all sort of sources

17   of forensic digital information in the various images you

18   looked at?

19   A.   Yes.  All of this information exists within the forensic

10:07 20   images.

21        MR. FICK:  Your Honor, I'd move this into evidence as

22   3312-02.

23        THE COURT:  All right.  On the same basis, I will

24   allow it.

25   (Defendant's Exhibit No. 3312-02 received into evidence.)

1          MR. FICK:  If we could publish that?

2     Q.    Can you just explain for the jury what this slide depicts

3     and sort of go through step by step the events that are listed

4     here?

5     A.    The first line indicates that we see an attachment event

6     of this Patriot, this particular Patriot, January 21, 2012,

7     6:22 a.m.

8     Q.    I'm sorry.  To what was the Patriot attached at that time?

9     A.    The Samsung laptop.

10:08 10   Q.    How do you know that?  Where did that information come

11    from?

12    A.    Windows registry information.

13    Q.    Inside the Samsung?

14    A.    That's correct.

15    Q.    Now, the second line, January 21, 2012, about two seconds

16    or so later, explain what that is.

17    A.    Two minutes later.

18    Q.    I'm sorry, two minutes later.  I apologize.

19    A.    That is information from a jump list, which pointed at the

10:08 20   Patriot, actually pointed at completeinspire.pdf on the

21    Patriot, which indicates that that file was created in that

22    location, on that device, on January 21, 2012, 6:24:18.

23    Q.    And then the next event, what is that?

24    A.    That's an attachment event, which shows the attachment of

25    this Patriot to the Sony laptop.

42

1    Q.   And that's about two minutes -- less than a minute later,

2    also on January 21 of 2012?

3    A.   Correct, less than a minute later.

4    Q.   And then the last line, what does that depict?

5    A.   That's the file creation time on the Sony of

6    completeinspire.pdf.

7    Q.   What, if anything, can you infer from this data about how

8    Complete Inspire wound up on the Sony?

9    A.   The window is very, very tight here in terms of the

10:09 10   attachment of this device onto which we know this particular

11   file was copied and then its creation onto another device.  So

12   this would appear to indicate that completeinspire.pdf was

13   copied from the Samsung laptop and then copied to the Sony

14   laptop.  There's also the issue of evidence which does not

15   reflect anything else occurring.  There was very, very little

16   activity around these times on either of these computers.

17   Q.   So to put that another way, did you find, for example, any

18   indication whatsoever that Complete Inspire came off the

19   internet at this time?

10:10 20       MR. CHAKRAVARTY:  Objection, your Honor.  It's

21   argumentative.

22       THE COURT:  No, overruled.  You may answer that.

23   A.   No.

24   Q.   Did you find any information to suggest that Complete

25   Inspire was created at this time from any other source?

43

1    A.    No.

2    Q.    Now, did you have occasion to investigate whether other

3    copies of *Inspire* -- when they were created on the Sony, other

4    copies of *Inspire Magazine*?

5    A.    Yes.

6          MR. FICK:  If I could get the screen just for the

7    witness, your Honor?

8    Q.    Showing to the witness what's been premarked as 3313-03,

9    what does this chart depict?

10:11 10   A.    This chart is a little bit more general than the last one

11   in terms of file creation.  This is the creation -- essentially

12   shows the creation of all issues of *Inspire* on the Sony on

13   January 21, 2012.

14   Q.    Is it a summary compiled from other sources in the

15   forensic data you looked at?

16   A.    Multiple sources from the forensic images, yes.

17         MR. FICK:  Your Honor, I'd move this into evidence as

18   3313-03.

19         THE COURT:  All right.  Admitted.

10:11 20   (Defendant's Exhibit No. 3313-03 received into evidence.)

21         MR. FICK:  And if we could publish that?

22   Q.    Can you describe for the jury what this chart depicts?

23   A.    The first line shows an attachment event on the Samsung

24   laptop of the Patriot that we've been discussing.  The second

25   line shows a file creation of completeinspire.pdf on that

1    Patriot device.  Third line shows an attachment of that Patriot

2    thumb drive to the Sony laptop.  Then the next four lines

3    depict file creation date and times for multiple issues of

4    *Inspire* on the Sony laptop.

5    Q.   What's the time window in which all those events occurred,

6    roughly speaking?

7    A.   This was between 6:22:31, again, Universal Time, and

8    6:26:10.

9    Q.   All within a couple of minutes?

10:13 10   A.   A few minutes.

11   Q.   Do you understand the date of January 21, 2012, to have

12   other significance in the case?

13          MR. CHAKRAVARTY:  Objection, your Honor.

14          MR. FICK:  Well --

15          THE COURT:  Sustained.

16   Q.   Do you recall at the beginning, right before I started

17   asking you questions, we put up a travel document showing

18   Tamerlan's departure from the United States on January 21,

19   2012?

10:13 20          MR. CHAKRAVARTY:  Objection, your Honor.

21          THE COURT:  Sustained.

22   Q.   After January 21, 2012, is there any evidence across any

23   of the forensic images at your disposal to suggest or to show

24   the Patriot, the missing Patriot, ever being attached to a

25   device again that we're aware of?

1   A.   No.

2   Q.   So what was the last date in all the evidence that you

3   have available to you where we see indicia of the Patriot being

4   attached to something?

5   A.   Later in the day on January 21, 2012.

6        MR. FICK:  I have nothing further.

7   CROSS-EXAMINATION BY MR. CHAKRAVARTY:

8   Q.   Good morning, Mr. Spencer.

9   A.   Good morning.

10:15 10  Q.   We've met before?

11  A.   Yes.

12  Q.   That other case that you testified in, I had the privilege

13  of cross-examining you in that case, correct?

14  A.   Yes.

15  Q.   That was another case where you testified for the defense,

16  right?

17  A.   That's correct.

18  Q.   Now, you said that you had spent about 400 hours so far on

19  this case?

10:15 20  A.   That's correct.

21  Q.   Is that how much you've billed for or how much your firm

22  has spent on the case?

23  A.   That's how much we've billed for in this case.

24  Q.   You still have another bill, I hope, to submit?

25  A.   That's correct.

1    Q.   About how much do you expect to be billing for it?

2            MR. FICK:  Objection.

3            THE COURT:  Overruled.  You may answer.

4    A.   I do not know, but I believe it will be higher than the

5    monthly bills prior because of the amount of time that we spent

6    this month.

7    Q.   And that's getting ready for trial.  And you digging into

8    each of these materials that Mr. Fick asked you about takes a

9    lot of time, right?

10:15 10   A.   Yes.

11   Q.   And that's both your time as well as the other people in

12   your firm?

13   A.   Correct.

14   Q.   Do you think it's going to be more than 400 hours

15   additional?

16           MR. FICK:  Objection.

17           THE COURT:  Overruled.

18   A.   No.

19   Q.   So just in terms of the limitations of your science, you

10:16 20   can't tell who is actually using a computer at any given time;

21   is that fair to say?

22   A.   I think, generally speaking, that's fair to say.

23   Q.   Unless you have a video camera or some other way to have

24   some extrinsic evidence saying that Mark Spencer is using a

25   computer, then you just have to infer it from the activity on

1    the computer, right?

2    A.    Correct.

3    Q.    And one of the ways that you do that is you check to see

4    if the person is logging into his email account, for example?

5    A.    Yes.

6    Q.    Or his Twitter account, that kind of thing, right?

7    A.    (Nodding.)

8    Q.    Having looked at the computers, you recognize that the

9    Sony VAIO computer, the 1R6, was the defendant's computer,

10:17 10   Dzhokhar Tsarnaev's, right?

11   A.    Correct, yes.

12   Q.    So the fact that the user account name was called Anzor

13   was simply what the user of the computer decided to name his

14   computer, correct?

15   A.    Correct.  That's arbitrary, yes.

16   Q.    In fact, the full name on the Windows information was that

17   it was -- Jahar was the full name of the user?

18   A.    Correct.

19   Q.    Through similar analysis, you gleaned that the Samsung

10:17 20   computer that was found in Watertown, what was called the 1W3

21   today, that was Tamerlan's computer, correct?

22   A.    That would be a portion of the analysis, yes.

23   Q.    And some of the other devices, it's less clear, right?

24   A.    Correct.

25   Q.    Because those are not complete computer operating systems

1    in which one person was the exclusive user.  There were

2    actually -- if it was a removable media, it was put into many

3    different devices?

4    A.   Correct, right.  Many of them are meant to be mobile

5    devices.

6    Q.   And I think some of the exhibits you pointed to today

7    actually showed that there were migrating files between

8    devices, right?

9    A.   Correct.

10:18 10   Q.   And, in addition, there was a desktop computer found at

11   the 410 Norfolk Street residence in the defendant's room that

12   was used by a lot of different people, right?

13        MR. FICK:  Objection to the characterization of the

14   room, which he has no knowledge of certainly.

15        THE COURT:  Go ahead.  You may answer it.

16   A.   Multiple users, yes.

17   Q.   There were some children's shows on that as well as some

18   jihad-related materials as well as innocuous materials,

19   correct?

10:18 20        MR. FICK:  Objection to the generalizations.

21        THE COURT:  Overruled.

22   A.   I would agree that there was all kinds of material on that

23   computer, yes.

24   Q.   Now, both the defendant's computer and his brother's

25   computer had searches for the Boston Marathon explosions after

1    the Boston Marathon, correct?

2    A.   Correct.

3    Q.   And both of them had the *Inspire* magazines, some of the

4    collection which you pointed out today as well as some

5    additional issues, correct?

6    A.   Yes.

7    Q.   Both of them had other radical Islamist extremist material

8    as well, correct?

9         MR. FICK:  Again, objection to this witness'

10:19 10   foundation of what that means.

11        THE COURT:  Overruled.

12   A.   Material that I understand to be jihadi-related, yes.

13   Q.   You pointed out that there was a search on Tamerlan's

14   computer in March of 2013 for a Ruger P95; do you remember

15   that?

16   A.   Yes.

17   Q.   And that was -- from the internet history, you saw that

18   somebody plugged into Google or something "Ruger P95," right?

19   A.   Correct.

10:19 20   Q.   And so do you also know that that is after the defendant

21   had already obtained the P95?

22        MR. FICK:  Objection.

23        THE COURT:  Sustained.

24   Q.   Were there searches for other guns on Tamerlan's computer?

25   A.   I do not recall.  If you show me the internet history, I

1    can look through it.

2    Q.    And the -- you also were shown a search on Tamerlan's

3    computer on April 7, 2013 -- this is about a week before the

4    Marathon -- for "fireworks" and "detonation" -- or "detonator,"

5    is that right?

6    A.    Sounds correct.

7    Q.    So that was only a week before the Marathon is when the

8    "detonator" and "fireworks" were sought, according to your

9    analysis?

10:20 10    A.    That search term, correct.

11    Q.    And do you know that the defendant had actually returned

12    to Cambridge the week before the Marathon?

13          MR. FICK:  Objection.

14          THE COURT:  Sustained.

15    Q.    Now, on the Sony VAIO computer, the defendant's computer,

16    there were also some additional searches of interest; is that

17    fair to say?  You looked at some of the searches on the Sony

18    VAIO computer?

19    A.    Yes, yeah, many searches.

10:21 20          MR. CHAKRAVARTY:  Mr. Bruemmer.

21          MR. FICK:  I'm going to object to the scope grounds.

22          MR. CHAKRAVARTY:  Your Honor, the witness was asked if

23    he had searched -- had found evidence --

24          THE COURT:  Go ahead.

25          MR. CHAKRAVARTY:  -- on all the things he looked at.

1          THE COURT:  Go ahead.

2    Q.   Now, Mr. Spencer, is it true that the defendant made some

3    searches just before the Boston Marathon, on April 11, 2013,

4    for the -- under the search term "the call of jihad"?  Do you

5    remember that?

6    A.   I see that, yes.

7    Q.   And this is a -- I'm pulling up 3303-02, which is a parsed

8    web search from the Sony VAIO computer that you had created,

9    correct?

10:22 10   A.   Correct.

11         MR. CHAKRAVARTY:  Your Honor, if I could ask to

12   publish just that search entry, just this page?

13         THE COURT:  All right.  The whole page or the file?

14         MR. CHAKRAVARTY:  I think just the file area.  I'll

15   zoom in as much as I can.

16         MR. FICK:  Again, note the objection on scope.

17   Frankly, if we're going -- I'd rather the whole page be in if

18   we're going to be -- to show --

19         MR. CHAKRAVARTY:  I don't have objection to that.

10:23 20        THE COURT:  All right.  Okay.  Are you set with it now

21   so I can --

22         MR. CHAKRAVARTY:  Yes, please, your Honor.

23   Q.   So this entry shows that the user of this device, the

24   weekend before the Boston Marathon bombing, searches for "the

25   call of jihad," correct?

1    A.    Correct.

2          MR. CHAKRAVARTY:  Your Honor, just for the witness

3    again, please.

4    Q.    Again, sometime before the Marathon, back in February of

5    2013, the user of this device also searched for "Jannah al

6    Firdaus," is that accurate?

7    A.    February 2, 2013?

8    Q.    February 2.

9    A.    Yes.

10:24 10        MR. CHAKRAVARTY:  Again, your Honor, I would ask to

11   publish Page 29 of this exhibit.

12         THE COURT:  All right.

13   Q.    That's this entry here that I'm just circling.

14   A.    Yes.

15   Q.    And do you know what "Jannah al Firdaus" means?

16   A.    I've seen the phrase.  I don't recall.

17         MR. CHAKRAVARTY:  Again, just for the witness, your

18   Honor.

19   Q.    This is some of the internet search history for -- that

10:25 20  include references to the Boston Marathon explosions at the

21   finish line, is that accurate?

22   A.    Yes.

23   Q.    And there are a few different pages related to the

24   searches of the Boston Marathon, correct?

25   A.    There's multiple entries related to searches of that type,

53

1    yes.

2    Q.   And there are multiple entries related to searches related

3    to jihad as well, correct?  We saw one of them.  I'm just

4    asking are there others in addition to the "call of jihad"

5    search.

6    A.   I believe so.

7    Q.   Now, if we could turn to the 1W16, this was the hard drive

8    that was found on the street in Watertown.  You had examined

9    that hard drive and recognized that there were a number of

10:26 10   files that were in what we call the unallocated space of that

11   hard drive; is that fair to say?

12   A.   Yes.

13   Q.   And so that means that there were -- I think there were

14   mostly MP3-type audio files, maybe somebody's song collection?

15   A.   Yes.

16   Q.   And amongst the maybe thousands of songs that had been on

17   that hard drive, there were also some files related to some

18   homework or school work of somebody named Giovanni, correct?

19   A.   Correct.

10:26 20   Q.   And all of that stuff was deleted, and it was replaced

21   with some of the files that Mr. Fick asked you about today,

22   right?

23   A.   Correct.

24   Q.   So the *Inspire* magazines, the Awlaki lectures, all that

25   stuff replaced this hard drive that had a lot of MP3 songs on

54

1      it and some homework assignments, correct?

2      A.    Correct.

3      Q.    And so the homework assignments, did you recognize were in

4      2012 for a UMass Dartmouth student?

5            MR. FICK:  Objection.

6            THE COURT:  Overruled.  You may answer it.

7      A.    I don't think I took note of the content.

8      Q.    In any event, those were still -- you could still see

9      traces of those files on the computer.  That's how you know it

10:27 10   was all on there?

11     A.    Yes.

12     Q.    And after the -- those files were placed on that hard

13     drive, that hard drive was then plugged into the defendant's

14     Sony laptop, right?

15     A.    That's correct.

16           MR. FICK:  Objection as to the temporal -- I'm not

17     sure I understood the temporal --

18           THE COURT:  Maybe you could make that clear.

19     Q.    So you said that the external hard drive was plugged into

10:28 20   Tamerlan's computer, I think, back in January of 2013, correct?

21           MR. FICK:  I'm not sure there's any testimony about

22     when.

23     A.    If you could show me a list of attachment dates.

24     Q.    Sure.  Let me go to some of your exhibits.  You recognize

25     this?  This is 3302-04.

1    A.    Yes.

2    Q.    And this is a list of various removable storage devices

3    that were plugged -- that the external hard drive that we're

4    talking about was plugged into various devices, right?

5    A.    Computers that it was plugged into, yes.

6    Q.    Sorry, plugged into various computers.  In fact, there's

7    two computers it was plugged into, according to this chart:

8    Tamerlan's computer and the defendant's computer, right?

9    A.    Yes.

10:29 10   Q.    According to this chart, on January 21, 2013, there was a

11   file called setupapi.dev.log.  That's a file that simply tells

12   you that this device is plugged into a computer, correct?

13   A.    Basically, yeah.  You can determine the first attachment

14   time.

15   Q.    So this is the first time that this device was plugged

16   into the -- Tamerlan's computer?

17   A.    Correct.

18   Q.    So on January 21, 2013, it was first plugged in.

19         By the way, for the benefit of the jury, is this chart

10:29 20   helpful to explain what this -- the removable storage

21   attachment sequence was?

22   A.    Yes.

23         MR. CHAKRAVARTY:  Your Honor, I would move in evidence

24   3302-04.

25         MR. FICK:  No objection.

1           THE COURT:  Okay.

2   (Exhibit No. 3302-04 received into evidence.)

3           MR. CHAKRAVARTY:  And ask to publish.

4   Q.   So this shows that on January 21, 2013, this device, which

5   is the laptop -- excuse me, the external hard drive, was

6   plugged into Tamerlan's computer, the Samsung 1W3, right?

7   A.   Right.

8   Q.   And then this chart shows that in March, again, of 2013,

9   about a month before the Marathon, it was plugged in for the

10:30 10  first time, it looks like, into the Sony 1R6, which is the

11  defendant's computer, right?

12  A.   Correct.

13  Q.   And then a few minutes later, it goes back into Tamerlan's

14  computer, right?

15  A.   Right.

16  Q.   And then later, the next morning, it goes back into the

17  defendant's computer, right?

18  A.   Right.

19  Q.   And then it gets plugged in two more times, both times

10:31 20  into the defendant's computer, right?

21  A.   Correct.

22  Q.   In fact, the last time it goes in is about a week and a

23  half before the Marathon, correct?

24  A.   Correct.

25  Q.   And, in fact, the defendant's computer, the Sony 1R6,

1    actually accessed this Samsung -- excuse me, the 1W16, the

2    external hard drive, on March 18th.  It watched some videos.

3    It did some other activity on that day, correct?

4    A.   That sounds correct.  In terms of exactly what it

5    accessed, I'd need to see the -- the shortcut or jump list

6    activity.

7    Q.   Okay.  So let's go to --

8         MR. CHAKRAVARTY:  Thank you, your Honor.

9    Q.   -- 3300.  Now, I've just put up for you what you've

10:32 10   labeled as the live MFT record, Laurel 1W16.  And that is the

11   master file table drawn from Windows for that device, correct?

12   A.   Correct.

13   Q.   And so this is a six-page document?

14   A.   Yes.

15   Q.   Again, is this an extraction that you had from the

16   external hard drive that was found on Laurel Street?

17   A.   Yes.

18        MR. CHAKRAVARTY:  I would move into evidence 3300-07,

19   your Honor.

10:32 20        MR. FICK:  No objection.

21        THE COURT:  All right.

22   (Exhibit No. 3300-07 received into evidence.)

23   Q.   So this shows some of the files that were on that device,

24   correct?

25   A.   Yes.  This should be a complete listing of all the files

1    and folders on that -- currently on that device.

2    Q.   And so we were just talking about the March 18, 2013, day

3    that this device was plugged into the Sony VAIO; do you

4    remember that?

5    A.   Yes.

6    Q.   And so this first column, is this the first -- this is the

7    name of the file, and then this is the creation date, correct?

8    A.   Correct.

9    Q.   So this entry -- let's use, for example, Entry 67 -- shows

10:33 10   that that file was created on this device on March 18, 2013,

11   right?

12   A.   Correct.

13   Q.   And it was accessed on April 6, 2013, correct?

14   A.   Correct.

15   Q.   And, again, we just looked at the earlier exhibit, which

16   showed that that access, April 18th and April 6th, were both on

17   the Sony VAIO, correct?

18           MR. FICK:   Objection.   That's not the only 18th.

19           THE COURT:   The chart is --

10:34 20           MR. CHAKRAVARTY:   The chart speaks for itself.

21           THE COURT:   -- is plain, I think.

22   Q.   This also shows that some of those files that you had

23   talked about before, the *Inspire* magazines, over in this

24   section, correct?

25   A.   Correct.

1    Q.   And, specifically, it shows -- I'll zoom in here -- the

2    *Complete Inspire* magazine that Mr. Fick asked you about, that

3    you heard a lot about when Agent Swindon testified, that's this

4    entry, Exhibit 38, right?

5    A.   Yes.

6    Q.   Now, you said that this device was first plugged into

7    Tamerlan's computer on January 21, 2013, is that right?

8    A.   Correct.

9    Q.   And so there's a creation date of December 27, 2012, on

10:35 10   this file list, right?

11   A.   Right.

12   Q.   And that means that on this computer this file existed on

13   December 27, 2012, is that accurate?

14   A.   No, that is not accurate.

15   Q.   So then why is this date, which predates the date that the

16   computer was plugged in -- the device was plugged into

17   Tamerlan's computer, how else can you explain this December 27,

18   2012?

19   A.   Files and folders that are moved to a location as opposed

10:36 20   to having been copied or originally created in that location,

21   will retain the created date and time of the former location.

22   Q.   So you're suggesting then that that's the date that it

23   existed on Tamerlan's computer or however the file got to this

24   hard drive, right?  That date preexisted the existence --

25   creation date on this hard drive?

1    A.    Correct.

2    Q.    So that's inconsistent with what you described as the

3    creation date, right?

4    A.    The creation date of?

5    Q.    The creation date you said that was on this hard drive.

6    You described the creation date as -- you told Mr. Fick that it

7    was the date that the file was either created in a specific

8    location or it was moved to a specific location, right?

9    A.    If the file or folder is moved to a location as opposed to

10:37 10   copied or originally created there, the date and time is from

11    its previous location, not its current location.

12    Q.    Okay.  So for all of these other files, January 25, 2013,

13    all of the other *Inspire* magazines were January 25, 2013,

14    right?

15    A.    January 25, 2013?

16    Q.    Yup.  And all of these other files on the next page,

17    including the Awlaki lectures, were sometime in March of 2013,

18    right?

19    A.    Right.

10:37 20   Q.    In fact, there's no other entry for 2012 except for that

21    one entry, right?  That's the only entry that shows a creation

22    date of 2012, correct?

23    A.    Right.

24    Q.    And so you analyzed all of the devices in this case, but

25    you only presented some charts from -- for some of those

 1    devices, correct?

 2            MR. FICK:  Objection, especially given the limitations

 3    on the scope.

 4            THE COURT:  Sustained.

 5    Q.    If this hard drive actually were not plugged into

 6    Tamerlan's computer but was plugged into the Norfolk desktop

 7    that also accessed *Complete Inspire* around that same time, then

 8    you would expect to see a setup API log file on the desktop,

 9    correct?

10:38 10    A.    Correct.  We would expect to see this device in that log.

11    Q.    Right.  And you didn't put that into your chart, did you?

12            MR. FICK:  Objection.  The absence of a direction.

13            MR. CHAKRAVARTY:  It's the lack of completeness of the

14    chart that the defendant --

15            THE COURT:  The objection is sustained.

16    Q.    So this file could have come from any computer in which

17    the creation date that existed was December 27, 2012, correct?

18    A.    No, that's not correct.

19    Q.    So there's something on this file that tells you that it

10:39 20    had to have come from the Samsung?

21    A.    This file, completeinspire.pdf, on the Laurel external

22    hard drive --

23    Q.    Yes.

24    A.    -- the owner SID relates specifically to the Samsung

25    computer and the Umar account on that computer.

1    Q.   Which means that at some time that file, the origination

2    of that file, was on the Samsung computer, correct?

3    A.   Correct.

4    Q.   And then however -- wherever that files goes, that SID

5    follows it?

6    A.   No.

7    Q.   So if it goes then to the Norfolk computer, then the

8    Norfolk computer SID would be imparted into it?

9    A.   On the Norfolk computer.

10:39 10    Q.   On the Norfolk computer.

11    A.   Correct.

12    Q.   So you did recognize -- you do recognize that the Norfolk

13    computer did access on an external drive around the same time

14    the *Complete Inspire* magazine?

15    A.   A time other than January 21st?

16    Q.   On December 23rd and December 26th of 2012.

17    A.   We have a -- that could be correct.  We have a spreadsheet

18    which tracks the attachments of this device.

19    Q.   You were here for Agent Swindon's testimony, right?

10:40 20    A.   Yes.

21    Q.   You were seated here at counsel table.

22          You saw some of the charts that showed that that file

23    was accessed on an external drive on the Norfolk Street

24    computer.  You have no reason to question that, right?

25    A.   No.

1    Q.   Now, going back to -- I guess staying on this, there were

2    some other files on this external hard drive that included

3    appeared to be some movies.  One of them was a *Django*

4    *Unchained*, right?

5    A.   Are you --

6    Q.   I'm sorry.  I'm looking -- I'll move it up here a little

7    bit.  Entry 74 and 75 and 76 appear to be records of the movie

8    *Django Unchained*.  It appears from -- in a folder called --

9    that ends with -- not in a folder, excuse me -- that has a text

10:41 10   file that goes along with it called "torrent downloaded from

11   extratorrent.com," correct?

12   A.   Correct.

13   Q.   Is that all an indication that these are movies that were

14   downloaded through peer-to-peer network, some kind of torrent

15   program?

16   A.   That's what it looks like, yes.

17   Q.   Somebody downloaded those files onto this external hard

18   drive, right?

19   A.   The word "downloaded" infers that it came directly from

10:42 20   the internet.  But the files were created in a vacuum from this

21   spreadsheet.  We know that the files were created on the drive

22   at that time.

23   Q.   So they were created on the drive.  They weren't created

24   on the 1W3?

25   A.   We're looking at the spreadsheet related to Laurel 1W16.

64

1    These files were created on Laurel 1W16.

2    Q.   Okay.  So these were created -- I'm not following what you

3    mean in terms of whether a file was created on 1W16 or

4    transferred to 1W16 from another device.  I thought you just

5    said that the *Inspire* magazines were transferred from

6    Tamerlan's computer.

7         MR. FICK:  Objection.  I don't think that's what --

8    A.   I'll clarify.  The device was plugged into the Samsung.

9    That's how the owner information is populated.

10:43 10   Q.   But you don't know then whether it was downloaded from the

11   internet or downloaded from Tamerlan's computer?

12   A.   I'm confused.  It would come from -- the drive would be

13   connected to Tamerlan's computer either way.

14   Q.   I understand that the drive was connected to the computer.

15   The drive was connected to Tamerlan's computer and to the

16   defendant's computer.  I'm trying to figure out how these files

17   got onto this computer, onto this hard drive.  I'm simply

18   asking you that -- there's a creation date for *Django Unchained*

19   on March 18th.  It's fair to say that those were downloaded

10:43 20   from some source, either the internet or some computer,

21   correct?

22   A.   Right.  It came from somewhere via the computer that it

23   was attached to.

24   Q.   And that's the same date as these Anwar Awlaki lectures,

25   right?

1    A.   Correct.

2    Q.   And so you can't say with any more specificity where any

3    of that stuff was downloaded from?  All you can say is that

4    that's the date that they were created on this hard drive?

5    A.   From this spreadsheet, that's correct.

6    Q.   And then the use of that hard drive later was all on April

7    6th or on April 19th -- or March 19th, correct?

8    A.   You can infer some type of use.

9    Q.   But since this hard drive was not plugged into Tamerlan's

10:44 10   computer after March 18, 2013, it's a fair inference that any

11   access that postdates April -- March 18 of 2013 was done on the

12   defendant's computer?

13        MR. FICK:  Objection.

14        THE COURT:  You may answer it.

15   A.   It's a -- you're asking me if it's a fair inference to say

16   that any activity post a certain date was related to the

17   defendant's computer?

18   Q.   You showed us 3302-04, which shows the dates that this

19   device was plugged into the various computers, the two

10:45 20   computers particularly.  It does not include the Norfolk drive.

21   It just includes the Sony laptop and the Samsung laptop, right?

22   A.   Correct.

23   Q.   And so these are the dates that those files -- that that

24   device was accessed on -- after March 18th, correct?

25   A.   This chart shows you when this device, the Laurel Street

1    hard drive, was connected to different computers that we have,

2    that we have access to, forensic images.

3    Q.   So on April 6, March 21, and March 19 of 2013, this device

4    was only plugged into the defendant's laptop?

5    A.   As it relates to the forensic images that we have access

6    to.  This information comes --

7    Q.   Let me ask you a question.

8            MR. FICK:  Let the witness finish, please.

9            MR. CHAKRAVARTY:  I think he had answered my question.

10:46 10         THE COURT:  I think he had answered it.

11   Q.   So these accesses -- this was the simple question that I

12   was trying to get to you.  These accesses correlate to the

13   accesses on the defendant's Sony laptop, correct?

14   A.   Similar time frame.  This is not normally how forensic

15   examiners will determine document or file activity.

16   Q.   Right.  But those are the dates that this file was

17   manipulated on this hard drive?

18   A.   That's correct, some type of interaction, yes.

19   Q.   And, in fact, there is a link file -- you're aware of what

10:47 20   a link file is?

21   A.   Yes.

22   Q.   And you heard Agent Swindon talk about link files?

23   A.   Yes.

24   Q.   And they show that some user uses an application to

25   actually access a file?

1    A.    Yes.

2    Q.    In fact, the *Django Unchained* video was watched on the

3    defendant's computer on March 19, 2013, as well as on another

4    date, a couple days later?

5    A.    Yes.  That's normally how we would look at file access.

6    Q.    And that file was not accessed on Tamerlan's computer, the

7    Samsung?  There was no such link file, right?

8    A.    Not that I know of.

9    Q.    Now, let's just get quickly to the idea of Tamerlan's

10:47 10   computer, the 1W3.  Now, you said that you don't know whether

11   -- you can't make conclusions about what somebody is thinking

12   or who the person is that's actually accessing a particular

13   file, correct?

14   A.    We can't say with specificity who is at that keyboard.

15   Q.    So no matter what computer files are on somebody's

16   computer, you can't say, Oh, this person must have been

17   thinking something, right?  That's beyond what a computer

18   forensic scientist can do?

19   A.    Correct.

10:48 20   Q.    So the 1W3, what you say is Tamerlan's computer, in fact,

21   other people used that computer as well, right?

22   A.    My understanding is that that is correct, yes.

23   Q.    In fact, the defendant used Tamerlan's computer, correct?

24   A.    Yes.

25   Q.    In fact, he logged onto his email on Tamerlan's computer?

A.    I believe we know of one instance if you have the internet

history.

Q.    All right.  And I think right around the time that this --

several of these files -- I think you described January 21,

2013, being the date that the external hard drive was set up on

Tamerlan's computer, is that right?  Let's go back to your

chart.  January 21, 2013, is the date that --

A.    Correct.

Q.    -- the hard drive was set up?

           This is the hard drive that had the homework

assignments on it.  It was cleaned, and the new jihadi material

was put on it, right?

A.    Correct.

Q.    And so a few days before that, during Christmas break of

2013, the defendant was checking his email on Tamerlan's

computer, is that right?

           MR. FICK:  Objection to the time frame vagueness.

           THE COURT:  Overruled.

A.    I don't know the exact date and time.  If you can pull it

up, I will.

Q.    Okay.  The exact date and time, I think, is less important

than the fact that the defendant was actually using the

defendant's -- Tamerlan's computer.

           MR. FICK:  Objection to the commentary.

           THE COURT:  Overruled.  You may answer it.

1  Q.   The defendant was actually using Tamerlan's computer near

2  the time that this hard drive was set up?

3         MR. FICK:  Objection.

4         THE COURT:  Overruled.

5  A.   We don't know that with the same certainty that we

6  discussed before, who's sitting in that chair, but that would

7  be consistent with another user.

8  Q.   You don't know who made the decision to download these

9  files or where they got these files from, right?

10:50  10  A.   Which files?

11  Q.   Let's start with the *Complete Inspire* magazine.  You don't

12  know -- all you know is that that first appears on the Tsarnaev

13  brothers echo system on January 21, 2012?

14         MR. FICK:  Objection.

15  Q.   Excuse me, 2011.

16         THE COURT:  Overruled.

17  Q.   December of 2011.

18  A.   Correct, on the removable storage device.

19  Q.   And that means that it could have been plugged into

10:51  20  another computer that nobody has ever found, right?

21  A.   That's correct.

22  Q.   In fact, do you know that the defendant purchased a

23  computer that nobody ever found?

24         MR. FICK:  Objection.

25         THE COURT:  Sustained.

1          MR. CHAKRAVARTY:  I think that's all, your Honor.

2          MR. FICK:  If I may have one moment briefly?

3          Can we actually take the break, your Honor?  I may

4    have a little bit or I might not, but I'd -- I think we're

5    almost at 11:00.

6          THE COURT:  All right.  We'll take the morning recess.

7    (Recess taken at 10:51 a.m.)

8    (The Court and jury entered the courtroom at 11:24 a.m.)

9          MR. FICK:  Very briefly, your Honor.

11:25 10          THE COURT:  Okay.

11   REDIRECT EXAMINATION BY MR. FICK:

12   Q.   Good morning again, Mr. Spencer.

13   A.   Good morning.

14   Q.   Mr. Chakravarty took you through a couple of entries from

15   Exhibit 3303-02, not in evidence but published them.  That's

16   the search history from the Sony computer.  Do you remember him

17   doing that with you?

18   A.   Yes.

19          MR. FICK:  Your Honor, if I could do the same, just to

11:25 20   publish without putting in evidence, the same sections that Mr.

21   Chakravarty talked about with the Court's permission?

22          THE COURT:  What is it you wanted?

23          MR. FICK:  I just want the screen.  I want to put up

24   the same sections of this exhibit that are not moved into

25   evidence but that Mr. Chakravarty talked about in the jury's

1    presence.

2              THE COURT:  You have them?

3              MR. CHAKRAVARTY:  No objection.

4              MR. FICK:  I have them up here.  I'm going on the

5    screen right now.

6    Q.   So, Mr. Spencer, do you remember Mr. Chakravarty showing

7    you some of these?  These are like entries from the Sony search

8    entries?

9    A.   Yes.

11:26 10   Q.   Referring to the Boston Marathon.

11              Why are there no dates for those artifacts?

12   A.   Web history remnants or artifacts may not have dates, one,

13   because they were never stored in the first place, by design,

14   depending on the browser and the particular action in question

15   or the date and time may no longer be available.

16   Q.   While this information is captured by a search history

17   tool, does it actually mean that somebody sat at a keyboard and

18   typed all that in as their search?

19   A.   No, that's not necessarily what that means.

11:27 20   Q.   So is it fair to say that some of these tools will gather

21   as search history some information that's not actually a

22   search?  That's just that the tool happens to gather it that

23   way?

24              MR. CHAKRAVARTY:  Objection, your Honor.

25              THE COURT:  Overruled.  You may have it.

1    A.    That's correct.  The tools aren't perfect in terms of

2    extracting out what they feel represent search criteria.

3    Q.    Now, if I could now put on the screen -- actually, I'll

4    just -- Exhibit 3303-006, which is the Samsung search history,

5    I would just request the Court's permission to publish a small

6    portion of it in the same manner if that's okay.

7              THE COURT:  Okay.

8    Q.    Do you recognize what this document is?

9    A.    Yes.

11:28 10  Q.    What is it?

11   A.    This is a list of the web searches for the Samsung laptop.

12   Q.    And just the top one here, I mean, does this actually

13   reflect the typing in of a search in Google with that term?

14   A.    Yes.  Well, you can plainly see the search question mark Q

15   equals, which is related to a Google search.

16   Q.    What does that tell you about whoever was at the keyboard

17   of the Samsung actually typed in?

18   A.    They're searching for this phrase.

19   Q.    And I'm going to page through now.  Is it fair to say that

11:28 20  there are multiple pages -- on the Samsung, multiple pages of

21   such searches over the course of several days and times?

22   A.    There's multiple terms that are used that are similar.

23   Q.    So we're on Page 11 now of the exhibit, 12, 13.

24             MR. FICK:  If I may have one moment, your Honor?

25             I would just offer into evidence those 13 pages of

 1    Exhibit 3303-06 as 3303-6 -- I think we're at E or F.

 2              MR. CHAKRAVARTY:  Object to that, your Honor.  This is

 3    beyond the scope of what -- certainly what the cross was.  I

 4    didn't refer to this history.

 5              THE COURT:  Overruled.  You may admit it.

 6              MR. FICK:  Mr. Lyness, can you tell me what letter

 7    that is?  It's 3303-6.

 8              THE CLERK:  I believe the next one should be E.

 9              MR. FICK:  Okay.  I will name it that then, 3303-6E.

11:29 10    (Defendant's Exhibit No. 3303-06E received into evidence.)

11              MR. FICK:  With that, I have nothing further.

12              MR. CHAKRAVARTY:  Just on that point.

13    RECROSS-EXAMINATION BY MR. CHAKRAVARTY:

14    Q.   Mr. Spencer, the exhibit that Mr. Fick just showed you,

15    there were several searches on April 15 and April 16, 2013,

16    correct, for the Boston Marathon explosion?

17    A.    That spreadsheet is related to the output from the tools,

18    would show that's their web search output, web-search-related

19    output.

11:30 20    Q.   On those two dates, April 15 and April 16, the day of the

21    Marathon and the day after?

22    A.   Correct.

23    Q.   Those are dates where you don't know who the actual

24    searcher was for that information?

25    A.   Correct.

1    Q.   If the defendant and Tamerlan were together, you wouldn't

2    be able to tell which one of them made those searches?

3    A.   Correct.

4              MR. CHAKRAVARTY:  That's all I have.

5              THE COURT:  All right, sir.  You may step down.

6    .  .  .  END OF EXCERPT.)

1

## C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of my skill and ability.

7

8

9

10

11

12    /s/Cheryl Dahlstrom

13    Cheryl Dahlstrom, RMR, CRR          Dated

14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25