UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,       )
                                )
         Plaintiff,             )
                                )  Criminal Action
v.                              )  No. 13-10200-GAO
                                )
DZHOKHAR A. TSARNAEV, also      )
known as Jahar Tsarni,          )
                                )
         Defendant.             )
                                )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**SEALED**

**LOBBY CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, May 11, 2015
`8:45 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2        THE COURT:  So let's start with the Sister Helen

3    Prejean issue.  First of all, just to put it aside, I overrule

4    the government's objection to the timing.  So with respect to

5    the substance, it seems to me that the government acknowledges

6    that she could give a lay opinion on remorsefulness, and I

7    think that's then appropriate.  She may do that.  But it will

8    be a lay opinion.

9        MS. CONRAD:  Of course.

10        THE COURT:  And a consequence of that is that she

11    cannot vouch for it by reference to her particular experience

12    in talking with death row inmates.  To the extent there's an

13    appeal to experience, it seems to me it places at 702 rather

14    than 701, and that would be inappropriate.  So she may testify

15    to her lay opinion based on her observations of him as it

16    equates to perceptions in Rule 701 but not with reference to

17    experience with other death row inmates.

18        MS. CONRAD:  May I just be heard very briefly?  First

19    of all, to clarify, just so that isn't coming out of completely

20    left field, may she testify that she just -- by way of her

21    background and why she's meeting with him in the first place,

22    that she has a prison ministry and she has worked with

23    prisoners?

24        THE COURT:  Well, it will come out, I expect on

25    cross-examination.  I anticipate she has a policy viewpoint.

1          MS. CONRAD:  I don't plan to elicit that on direct.

2          THE COURT:  I expect the government will.  You will

3    tell me whether you will or not.  More precisely, the question

4    is if you will if I enforce the limitation that she can't refer

5    to it on direct.

6          MR. WEINREB:  The only thing that we intend to elicit

7    on cross is that she is a leading opponent of the death penalty

8    in the United States, not anything about her prison ministry or

9    her ministering to prisoners.  In other words we do not intend

10   to elicit at this point, assuming -- I should say this:  The

11   cross always depends on the direct.  The direct is going to

12   depend on the Court's ruling.  I'm not sure we've heard all of

13   it.

14         But assuming that the direct testimony is the portion

15   of the proffer that the government proposed would be part of a

16   proper lay opinion, not channeling of hearsay, not vouching for

17   her experience, then we would not be bringing out anything

18   about *Dead Man Walking* or about how that all got started,

19   simply the fact that she speaks, writes, lectures against the

20   death penalty.

21         THE COURT:  Right.  So I think it's best limited

22   because otherwise it gets close to experience and, therefore,

23   expertise.  She is entitled to put in some background, and I

24   think perhaps without getting -- I don't know if this goes over

25   the line or not, but she can say she has been in her order for

1    a long time and that includes spiritual counseling of people on

2    a one-on-one basis.

3          MS. CONRAD:  Including prisoners?

4          THE COURT:  I would allow including prisoners, but no

5    more than that.

6          MS. CONRAD:  May I just on this point of experience,

7    just point out that, for example, you know, experts rely on

8    things that are outside their personal experience.  Lay

9    witnesses rely in giving lay opinion on their personal

10   experience.  For example, Kevin Roche testified that his

11   interpretation of Mr. Tsarnaev's actions in the cell block were

12   informed by his experience in a full-blooded Irish household of

13   what that gesture means.  So, you know, which it seems to me

14   that experience comes into play in lay opinion.

15         THE COURT:  Well, it may -- yes, in some general sense

16   it does.  I don't think he gave the opinion that -- he got cut

17   off, in fact.  I was interested in where he was going with it

18   as a personal matter.

19         MS. CONRAD:  I don't think he got cut off.  He said it

20   was a defiant gesture based on his experience.

21         THE COURT:  Anyway, what distinguishes a lay opinion

22   giver from an expert opinion giver is that the lay opinion

23   giver is just the same as the jury and so, therefore, just as

24   the jury could tell whether someone is exhibiting anger or not,

25   the lay witness to events can do the same.  But to the extent

1    the witness is different from the jury because of experience,

2    then it crosses over into 702 as a general proposition, so...

3           MS. CONRAD:  Presumably, if the government asks about

4    her views on the death penalty, we can then inquire on direct

5    as to why -- how she formed those opinions?

6           THE COURT:  We'll cross, and then redirect depends on

7    what happens in the preceding --

8           MR. WEINREB:  So we have a request there, your Honor,

9    which we believe the government should be entitled to ask

10   questions to elicit her anti-death penalty -- the fact that she

11   is an opponent of the death penalty without opening the door to

12   her explaining the reasons why she is against the death

13   penalty.  The reasons why she is against the death penalty are

14   wholly irrelevant.  They have nothing to do with making her

15   more or less biased and they're improper for the jury to

16   consider.  The government can do -- there's a very simple way

17   in which the government can do that, is by simply asking

18   yes-or-no questions, and we would ask that either the judge

19   instruct the witness or the judge have counsel instruct the

20   witness that if she's asked a yes-or-no question, she should

21   give a yes-or-no answer.

22          THE COURT:  Well, you can do it too by prefacing it,

23   "I'd like you to answer this question yes or no, please."

24          MS. CONRAD:  It seems to me that opens the door.

25   That's a choice the government makes if they choose to ask

1  about it.

2          THE COURT:  No, I think a limited inquiry may be okay

3  to the extent that it may test a layperson's conceptual bias,

4  but it would have to be limited to avoid opening the door --

5          MS. CONRAD:  Doesn't that then --

6          THE COURT:  For example --

7          MS. CONRAD:  -- open the door to her experience even

8  if it's not her moral reasons for her opposition?

9          THE COURT:  No, I don't think so.

10          MS. CONRAD:  Her experiential reasons for an

11  opposition?

12          THE COURT:  No, I don't think so.

13          MS. CONRAD:  Well, then, am I allowed to elicit on

14  direct that she is an opponent of the death penalty in order to

15  avoid --

16          THE COURT:  Lancing the boil?

17          MS. CONRAD:  Exactly.

18          THE COURT:  I don't see why not.

19          MR. WEINREB:  As long as --

20          THE COURT:  It's limited to that.

21          Yeah.  So just as a perception of a police officer as

22  to whether someone was intoxicated or not may be informed by

23  his point of view, I think point of view can influence a lay

24  opinion.  That's all I'm saying.

25          MS. CONRAD:  Of course.  It's also informed by his

1    experience.

2         THE COURT:  I think usually they're admitted as lay

3    opinions to the extent those kinds of things -- my point is

4    that your predisposition -- a layperson's predisposition to a

5    particular opinion might be something that a fact-finder would

6    evaluate in deciding on and considering an opinion.

7         MR. WEINREB:  Your Honor, if defense counsel does

8    intend to lance the boil, so to speak, on direct, all we'd ask

9    is they do it through leading questions so that we don't risk

10   getting into impermissible areas.

11        THE COURT:  Okay.  Now --

12        MR. WEINREB:  I had one request which is with respect

13   to the basis for her lay opinion that the defendant is

14   remorseful, it's one thing to say:  I've had conversations with

15   him, I have observed him, and based on those conversations and

16   observations I believe he's sincerely remorseful, it's another

17   thing to say:  We have discussed matters such as his regret or

18   such, as how he experiences the pain and suffering of the

19   victims, and channel his statements to get them in front of the

20   jury, essentially allowing him to testify through her, we would

21   ask that that be precluded, or in the alternative, that we then

22   have an opportunity to cross-examine him about his statements

23   to -- because she's obviously accepting them for the truth and

24   then repeating them to the jury.

25        MS. CONRAD:  That's just -- I mean, I know there's one

1    case in which the government requested to cross-examine the

2    defendant about out-of-court statements, actually, about an

3    unsworn allocation, which as I've noted -- and I won't belabor

4    the point.  In these cases it's not.  It's an out-of-court

5    statement.  It goes to state of mind, it affects her opinion

6    how he said it and what he said.

7          And the government wants, essentially, her to offer a

8    sanitized opinion so that then it has less credibility with the

9    jury.  And the whole point of this is for her to be able to

10   explain how and why she concluded that he was sincerely

11   remorseful.  The government wants this to be sanitized to the

12   point where they can simply say, "She's a death penalty

13   opponent.  Of course she's going to say he's sincerely

14   remorseful.  And what did he tell you that can help you decide

15   for yourself whether he's sincerely remorseful?"

16         They have to be able to evaluate the testimony based

17   on what she relays to the jury.

18         THE COURT:  If she were to say, for example, "I have

19   formed my opinion because I believed him when he said"

20   whatever --

21         MS. CONRAD:  Right.

22         THE COURT:  -- that puts the believability of the

23   statement in issue for the jury to evaluate.  If they found

24   that it was an unbelievable statement, then they would devalue

25   her opinion.  So it seems to me to raise legitimately

1  believability.  There are a couple of ways of proceeding from

2  that point:  One would be to sanction the cross-examination,

3  another would be to give a cautionary reliability instruction

4  as we did for 302s about the jury not having seen the statement

5  themselves or so on and so forth.  But I think that's hazardous

6  for the defense as well.

7          MS. CONRAD:  Well, the statement -- the only statement

8  that she would testify to is that he said "No one deserves such

9  suffering."  It's not a statement of fact; it's what he said.

10  It's --

11          THE COURT:  Whether she believed it or not?

12          MS. CONRAD:  It's not whether she believed -- she of

13  course believed that no one deserves such suffering.  We all

14  agree no one deserves such suffering.  It's not a factual

15  statement; it's a statement of his state of mind.

16          MR. WEINREB:  Your Honor, the point is that if you put

17  the statements in front of the jury, then they don't need an

18  expert to tell them whether it's sincere or remorseful or not.

19  That the jury can determine.  You don't need a lay opinion of

20  something that the jurors are in such a good position to decide

21  for themselves.  If you have a lay opinion and the jurors are

22  hearing something that they didn't experience for themselves,

23  they didn't get to hear, they don't know what it is.  That's

24  the first argument.

25          The second argument is that this is not like the

 1    ordinary case.  The defendant's own words about his state of

 2    mind could not possibly be of greater interest to the jury.

 3    And to give them a one-sided filtered presentation of solely

 4    what the defense wants them to hear coming through the mouth of

 5    a nun is entirely -- is so prejudicial and the -- that the

 6    likelihood that the jury will not take it for the truth of the

 7    matter asserted and will take it only to evaluate the opinion

 8    of this person is zero.

 9         They don't care what Sister Prejean thinks if they're

10    hearing what the defendant has to say; they care about what the

11    defendant said.  They can judge for themselves.  They've been

12    sitting through this trial since January, when she's just

13    stepping on this witness stand today.

14         THE COURT:  Is that the only statement?

15         MS. CONRAD:  Yes.  And can I just say --

16         THE COURT:  No.  You can have it.

17         MS. CONRAD:  Thank you.

18         THE COURT:  And the reason is that it's a verbal -- if

19    it only goes that far, it's like a verbal act, in a sense, and

20    it can form the basis for the opinion.

21         MR. WEINREB:  That's the only statement?

22         THE COURT:  That's what I've been told.

23         MR. WEINREB:  And we're not going to hear --

24         THE COURT:  And the statement was?

25         MS. CONRAD:  "No one deserves such suffering."

1           THE COURT:  So the witness will say, "I base my

2     opinion in part on the fact he said to me, 'No one deserves

3     such suffering'"?

4           MS. CONRAD:  Then his demeanor when he said it and so

5     forth.

6           THE COURT:  If those are just the observations, then

7     she may --

8           MR. MELLIN:  Your Honor, can we ask how often he said

9     this and when he said this, because the proffer --

10          MS. CONRAD:  You can cross.

11          MR. MELLIN:  Well, we were supposed to get a detailed

12    proffer.

13          MS. CONRAD:  I think it was a pretty detailed proffer.

14          MR. MELLIN:  It was two sentences.

15          THE COURT:  If it's limited to that and no other

16    statements of facts by him about things, then I think that's --

17          MS. CONRAD:  Correct.

18          THE COURT:  -- okay.  All right?

19          MS. CONRAD:  Thank you.

20          THE COURT:  Any other issues with her?

21          MR. WEINREB:  Yes.  So there were other things she was

22    proposing to say which seems completely unacceptable.  She

23    planned to give an opinion -- first of all, she planned to say

24    that the defense asked her to see him to help him continue to

25    process the pain and grief he has caused indicating that the

1  defense believed that he was already in the process

2  of -- already processing pain.

3          THE COURT:  Yeah.  I see the quote.  It's on page 5.

4  I would agree that that should not be -- that that's an

5  argumentative --

6          MS. CONRAD:  I'm sorry.  Page 5 of --

7          THE COURT:  Paragraph 2.

8          MS. CONRAD:  I'm sorry.  From the government's?  Not

9  mine?  I'm looking at mine.

10          THE COURT:  Yes, the government's.

11          MS. CONRAD:  I'm sorry.  Can I just clarify?  I mean,

12  she didn't just parachute in.  She was asked by the defense to

13  see him.

14          THE COURT:  To meet with him, not to continue his

15  remorseful process.  That's argumentative.

16          MR. WEINREB:  And then this Paragraph 6 or, no --

17  Paragraphs 9 and 10 which I believe are the second-to-last and

18  last paragraphs.

19          THE COURT:  The proffer?  Okay.

20          MR. WEINREB:  Of the proffer.

21          MS. CONRAD:  I'm sorry.  I'm still -- now I'm on the

22  government's.  I just want to make sure I'm in the right place.

23  So all right.  I just want to catch up.  Go ahead.

24          MR. WEINREB:  In fact, it might make sense to just go

25  through the proffer paragraph by paragraph because I think

1   that's the simplest way.

2           So we objected to Paragraph 3, which the Court already

3   ruled is inadmissible as part of the first experience

4   paragraph.

5           THE COURT:  Right.

6           MR. WEINREB:  Four, more experience; and 5, which is

7   more experience.  Then the next one is the one that has the

8   "continue to process the pain and grief."

9           THE COURT:  Right.  In the hope.  That would go out,

10  right.

11          MR. WEINREB:  Then --

12          MS. CONRAD:  Well, but the next you agreed to.  To see

13  if he would be open to working with her would be okay?

14          MR. WEINREB:  Yes, we don't object to that.

15          THE COURT:  Okay.  So the rest of that paragraph.

16  Yeah.

17          MR. WEINREB:  Then the next paragraph, we have gotten

18  the stipulation that that will be reduced to one sentence the

19  Court has approved.

20          MS. CONRAD:  I'm sorry.  Which paragraph are we on

21  now?

22          MR. WEINREB:  The top of page 3.

23          THE COURT:  What the discussion was?  About what the

24  discussion was?

25          MS. CONRAD:  So what's the proffer with that?

```
 1            THE COURT:  In other words, to the extent the
 2    discussion -- as I'm understanding it, to the extent discussion
 3    calls -- could call for evidence of what he said specifically.
 4            MS. CONRAD:  But these are just topics.
 5            THE COURT:  Right.
 6            MS. CONRAD:  The topics are okay?
 7            MR. WEINREB:  Well, I think if they -- if the topics
 8    are at this level of generality.
 9            MS. CONRAD:  They are.
10            MR. WEINREB:  They spoke about spirituality, religion,
11    and then, you know, but without regret indicates that he was
12    pressed for regret.  I think anything that gets -- that is a
13    feeling imputed to him.
14            MS. CONRAD:  Well, but we discussed just to say they
15    discussed religion and spirituality makes it sound like this
16    was a theology class.  They discussed what he did.
17            MR. WEINREB:  That's fine.  They discussed religion,
18    spirituality and the circumstances of the crimes.
19            MS. CONRAD:  Well, not the circumstances of the crime.
20    It's, you know, his feelings about the crime.
21            THE COURT:  Without giving content.
22            MS. CONRAD:  Right.  His feelings about the crime.
23            THE COURT:  Without giving content to his feelings
24    about the crime.
25            MR. MELLIN:  That's the problem, your Honor.  Sister
```

1    Prejean may --

2            MS. CONRAD:  I'll speak to her.

3            THE COURT:  I assume she'll be talked to.

4            MS. CONRAD:  And I'm sure the government will be --

5            THE COURT:  And the only other specific thing here

6    is -- no, I guess it comes to the next --

7            MR. WEINREB:  Right.  Then the next paragraph is fine.

8    Then in these two paragraphs that she sees in him an awareness

9    of the pain and anguish that he has caused, we would argue that

10   is not a helpful opinion based on rational observation but is

11   simply speculative and argumentative.

12           MS. CONRAD:  May I respond?  I mean, that's part of

13   why she thinks it's sincere.  To basically say "He said these

14   words, I believe he's sincerely remorseful," and not be able to

15   say, you know, what it is she sees in him that makes her

16   believe he's sincerely remorseful.

17           THE COURT:  To the extent -- and this is hard to place

18   on one side of the line or not.  To the extent it is

19   perceptions, yes; to the extent it is evaluation, no, so...

20           MS. CONRAD:  Well, evaluation is lay opinion.

21           THE COURT:  So processing herself and her -- maybe

22   goes too far into expressing her own opinion about things, you

23   know.  As an overlay her opinion is about his remorse, which

24   she can say, and she can say -- I mean, again, she can -- for

25   example, she could say he looked pained or something like that.

1   That's a physical observation.

2           MS. CONRAD:  Also an awareness of the pain and

3   anguish.

4           THE COURT:  I guess to the extent her observation may

5   include a moral component --

6           MS. CONRAD:  Right.

7           THE COURT:  -- that would go too far.

8           MS. CONRAD:  Correct.  And certainly she wouldn't be

9   saying "I believe he's sincere because I believe all people,

10  you know, come to realize" -- you know, it's not a generality;

11  it's what she saw in him.

12          THE COURT:  Physically saw in him.

13          MS. CONRAD:  Well, saw on him.  And also based on

14  their relationship, which is a big part of it, that they met a

15  number of times, they established a rapport, they established a

16  level of honesty.  That all goes into how you evaluate what

17  someone says to you and you know --

18          THE COURT:  Fine.  To some extent, yes.  I guess a lot

19  of this is going to depend on how it actually comes out, but I

20  think she could probably say "In my opinion we developed a

21  level of trust" or something like that.

22          MR. WEINREB:  See, your Honor --

23          MS. CONRAD:  It's not a moral judgment; it's --

24          MR. WEINREB:  -- one of the problems here is who they

25  picked to be this witness.  "See" is a very freighted term when

1    it comes out of the mouth of a religious figure.  Catholics, as

2    well as those in adherence of other religions, are told that

3    God sees in us, God's representatives on earth can see in us.

4    When she says she sees in him, that can be taken as you may not

5    see it, but I see it.  I can see something in him that the

6    ordinary person cannot see.

7        So to say that he looked pained is -- I think conveys

8    something quite different from I see something in him that you

9    should believe is there.  "I'm a nun.  I know."

10        MS. CONRAD:  This is not a script.  This is not

11   verbatim.  These are -- you know, I think we provided what the

12   Court asked for and, you know, if we're going to start

13   nitpicking every word because it might be spun this way or that

14   way, you know, I think we're never going to get through this

15   direct, for one thing.

16        THE COURT:  Yeah, I don't -- I think that's

17   fine-tuning it a little too much.  But I do want to emphasize

18   the next sentence, we talked about the second part of it.  But

19   that he regrets his actions you think is an affirmative

20   statement.  That's a cross-examination problem.

21        MS. CONRAD:  And I think actually the words she's most

22   likely to use is "no one deserves to suffer like that."  I

23   think that's his quotes -- comes as close to a direct quote as

24   it's going to be, which is probably less offensive to the

25   government, that no one deserves the suffering that he realizes

1    he caused.

2        MR. WEINREB:  We don't object to her saying she

3    believes that he's sincerely remorseful, but we object to that

4    that he will painfully remember his actions and the harm he

5    caused for the rest of his life.  That is just speculative.

6        THE COURT:  I think that goes too far.

7        MR. WEINREB:  And then in the final paragraph, we also

8    believe -- object to she "sees in him a very good man with a

9    potential to grow and mature and to continue to grasp and face

10   up to the harm he caused."  That is not a lay opinion.

11       THE COURT:  I agree.  The potential is not a lay

12   opinion.

13       MS. CONRAD:  What about the next sentence?

14       MR. WEINREB:  And then if she is allowed to she will

15   visit him in the years to come and will accompany him along his

16   way.  That has nothing to do with a lay opinion.  It is also

17   entirely speculative and misleading.  The reality is this is a

18   76-year-old woman.  What does it even mean to say she'll visit

19   him.  What, once?  100 times?  What does it mean to accompany

20   him on his way?  Is he going somewhere?  She's implying there's

21   a spiritual journey, he'll get somewhere.  "I'll accompany him

22   as far as I can."  All of that is complete -- it's

23   argumentative.  It's not a lay opinion.

24       MS. CONRAD:  Your Honor --

25       MR. WEINREB:  It's not something the jurors themselves

1    could come up with.

2           MS. CONRAD:  If I may, the government having alleged

3    as an aggravator that the defendant demonstrated, past tense,

4    lack of remorse, and then in its opening squarely put their

5    feet down on was and is unrepentant, untouched, uncaring, and

6    unchanged at one point, the government essentially opened the

7    door to saying not only that he is unchanged but that he is

8    incapable of change.  The government did not have to argue it

9    that way but they chose to do so.

10          THE COURT:  That goes beyond a lay opinion.

11          MS. CONRAD:  Well, how about "would be willing to work

12   with him in the future"?

13          THE COURT:  I think it's irrelevant.  So I would agree

14   with the government.  So I think the last paragraph does not

15   have --

16          MR. WEINREB:  Your Honor, without belaboring things, I

17   would like to clarify the record in one respect.  The

18   government does not -- although I know the Court has ruled that

19   the late notice issue is gone, so we're not arguing it, but I

20   want the record to be clear that the government does not

21   concede that it opened the door to anything.  When

22   Ms. Pellegrini said in her opening statement "is unrepentant,

23   unchanged" and so on, she was pointing at the picture of him in

24   the lockup, and that was what she was suggesting.

25          The aggravating factor in this case is the defendant

 1    demonstrated a lack of remorse, and we have only argued to the

 2    jury and will only argue to the jury that he demonstrated a

 3    lack of remorse in the days after the marathon bombings and the

 4    murder of Sean Collier and when he was in the lockup.  We don't

 5    dispute that the defense can put on character evidence of the

 6    defendant's remorsefulness independent of the government having

 7    opened the door to it.  The government doesn't have to open the

 8    door to it.  His character is at issue.  But we don't believe

 9    that this whole open-the-door argument is productive and I

10    don't want the record to be left with the impression that we do

11    agree to it.  The defense --

12            MS. CONRAD:  I want to be clear that the transcripts

13    show that the statements that I quoted in my motion -- or my

14    reply, opposition, as the government put it, all came before

15    the jury saw that photograph.  When Ms. Pellegrini says he was

16    and is indifferent, it was before that moment.  The record

17    speaks for itself.  That's what the transcript says.

18            THE COURT:  I think we've had a little bit of this on

19    both sides in terms of the openings being a little exaggerated,

20    perhaps.

21            But anyway, so after the testimony of Sister Helen,

22    the defense will rest?

23            MS. CLARKE:  That's correct.

24            THE COURT:  Any cleanup matters we need of any kind?

25            MS. CLARKE:  I think everything has been denied by

1    now.

2           (Laughter.)

3           THE COURT:  That just -- this is not germane really to

4    the present business, but it's soon to be future business.  As

5    we look at the verdict slip and so on, is there any dispute or,

6    contrary, is there a stipulation that the defendant was 18 at

7    the time of the events or will that be an element that the

8    jury -- we should instruct the jury on --

9           MR. MELLIN:  Your Honor, I think we have to.

10          THE COURT:  -- because I noticed in, I think it was

11   the form, verdict form, that the defense suggested it was not

12   in there.  It is in some of the ones, other models we've looked

13   at.

14          You don't have to answer right now but tell us whether

15   you want the jury to answer that question or not or whether

16   they can be told --

17          MR. WEINREB:  I think whether stipulated or not, I

18   think they have to find it.

19          MR. MELLIN:  Agreed.

20          THE COURT:  You want it in there no matter what?

21          MR. WEINREB:  Stipulating means it's not in dispute

22   and they can accept it as true, but I think they have to find

23   it, and we would be concerned if they didn't.

24          MS. CLARKE:  I think there was a question, and maybe

25   we can talk about this when we talk instructions, but I think

1   there was a question when the victim impact regarding Martin

2   Richard goes to the jury because victim impact was not put on

3   as to him.

4            THE COURT:  Okay.

5            MR. BRUCK:  We will have the final list of mitigating

6   factors to provide to the Court today.  We're going to have one

7   more request in the charge with a memo we'll also get to you at

8   some point in the day.

9            THE COURT:  Okay.  So the defense will conclude.  So

10  let's turn to the rebuttal witnesses.  As a general matter I

11  don't think the government needs to refrain from rebuttal

12  evidence of its own even if a point has been made on

13  cross-examination of a defense witness.  In other words, I

14  think the government is entitled to an authoritative witness of

15  its own on rebuttal.  It can get redundant and cumulative in

16  the sense of wasting time because it's saying things that

17  they've already heard, but I do think in a sense the

18  government's entitled to get it from the mouth of a government

19  person.  But that's not license to go on at great length.

20          And I think it should be particular to the structural

21  operation of the SAMs.  I think it -- to get into other cases

22  specifically I think diverts attention from the issues here.

23  And you have issues of comparability and so on and so forth,

24  and I don't think other cases ought to be discussed.  That

25  includes the nine down to three or whatever the numbers are.

 1           MR. MELLIN:  The government does not want the numbers

 2      out --

 3           THE COURT:  Right.

 4           MR. MELLIN:  -- because I think Mr. Bezy --

 5           THE COURT:  I want to focus on the structure.  The

 6      SAMs permit relief, I guess is the government's point of view,

 7      under certain circumstances, and it is available when the

 8      circumstances are satisfactory to the people making the

 9      decision, that even people convicted of terrorism crimes can

10      get relief.  Whether this defendant will or whether others did

11      on whatever conditions, there's just no way of comparing the

12      prospect of --

13           MR. WEINREB:  Mr. Bezy was allowed to testify --

14           MR. MELLIN:  Your Honor, we should be able to rebut

15      that.  I do think Mr. Bezy left a very misleading if not false

16      impression that there have been numerous SAMs violations, and

17      he said he was unaware of any.  And the examinations will be

18      very truncated and very focused.

19           THE COURT:  I think you could say in general terms

20      that relief has been given, but to then be specific as to the

21      criteria by which it was given -- because, I mean that's simply

22      saying the availability -- for example, I think it's legitimate

23      to say the availability of relief under the SAMs is not just

24      theoretical in the language of the SAMs, it has and actually

25      has occurred.  But to go any further and to try to

1    compare -- to suggest that there's a ratio, and therefore a

2    probability, I think goes too far.  So if you say of the

3    original whoever was in 2002, three --

4            MR. MELLIN:  Seven down to three, right.

5            THE COURT:  I think that suggests a probability which

6    is speculative and unreliable.  So the numbers I think have to

7    stay out of it.

8            MR. WEINREB:  What if we avoid any specific numbers

9    and say a number have so that --

10           THE COURT:  It has happened, okay?

11           MR. MELLIN:  Yes.

12           MR. BRUCK:  Now, when we're talking about relief,

13   we're talking about the government withdrawing the SAMs.  There

14   was an implication raised, The courts could do this, and no

15   court has ever ordered a SAMs withdrawn.  There's been -- and

16   no court has ever granted -- has never issued an order even

17   altering or requiring the government to make the slightest

18   variation in a SAMs but, yes, there has been back and forth,

19   there's been negotiation, there have been compromises, but that

20   gets us into a world of comparison that would keep us here for

21   the rest of the week.

22           So the subject of court review should not be

23   mentioned.  It's so unfair and it is so impossible to respond

24   to and it appeals to this popular idea that there are liberal

25   judges who just can't wait to let people loose and undermine

1    national security and so forth.  We don't know what the

2    political views of jurors are going to be on these areas.  If

3    there was any factual basis to it, that would be one thing, but

4    there isn't.  It's nothing but an appeal to bias and suspicion.

5    So it's --

6              THE COURT:  Well, let me ask you this:  No court has

7    ever ordered it.  Has there been litigation over it?

8              MR. BRUCK:  Of course there has been.

9              THE COURT:  Maybe that's a way of saying it.

10             MR. BRUCK:  But that implies -- if there's been

11   litigation that has run into essentially a brick wall in terms

12   of getting a court to order relief, that opens the door and

13   doesn't allow us to close it.  And they're calling witnesses

14   who will say, Oh, well, I mean, why should courts -- the fact

15   that -- prisoners can sue over anything, and do as you well

16   know, as every federal judge knows.

17             To inject that when this is an area to which courts

18   defer to the executive branch -- this Court deferred to the

19   executive branch when we asked the SAMs to be removed.  It

20   just -- it is enough that the government -- that the SAMs are

21   imposed and they are sometimes allowed to lapse, or at least

22   they are sometimes withdrawn by the government.  That tells the

23   jury everything they need to know:  That they don't stay in

24   effect forever in every case.  End of story.  Beyond that,

25   there's simply no way to have a fair airing of this.

1          And the fact that the defendants are allowed to send,

2     you know, handwritten pleadings to the Court saying, "Please do

3     something" that no court has ever done and no court probably

4     ever will, does illuminate the facts for the jury as to what's

5     going to happen to this uniquely spotlighted defendant who's

6     likely to stay under the SAMs for years and years, and

7     presumably for decades, and will stay at ADX even if it

8     doesn't.  Ramzi Yousef went there in 1998 and he's never

9     leaving, and our kid is in the same --

10          MR. MELLIN:  Your Honor, that's not correct.  Walker

11     Lindh went there in 2002 and he's no longer there.  It's unfair

12     for them to try to leave this impression which they've left

13     which is incorrect.  I don't need to get into the names or say

14     the names like Walker Lindh or anything like that, but it's

15     wrong to leave the impression someone who is convicted of a

16     terrorism charge, who is on SAMs, who is sent to ADX will

17     always be at ADX.

18          MR. BRUCK:  Walker Lindh was serving a 20-year

19     sentence.  There is no possible way to compare that case to

20     this case.  And that's the problem.  And that is why this is a

21     brier patch that, you know, we just should stay out of.  It is

22     enough that the SAMs are not necessarily permanent.  They can

23     be lifted.  They have been lifted.  End of story.

24          MR. WEINREB:  Your Honor, if I may make a few points.

25     One is that the reality is that litigation is not always

1    resolved with a court order one way or another.  People often

2    settle litigation, and that happens with respect to the SAMs

3    all the time.  And it happens often with the courts signaling

4    to one party or the other that it will -- it is expecting

5    relief or seeking a negotiated modification of the SAMs in

6    order to avoid a court order.  That is exactly what happened in

7    this case.

8              Secondly, to say that the government is trying to open

9    a can of worms here really rings hollow because it is the

10   defense and only the defense who brought this up, introduced

11   this entire topic.  They basically -- Mr. Bruck said to the

12   jury in his opening statement and tried to establish through

13   Mr. Bezy two propositions that cannot, in fact, be proved

14   because they are not true.  One is that the SAMs will always be

15   in place on this defendant and the second is that he will never

16   be stepped down.  That is not only not true but it's not

17   likely.

18             And it's one thing to say that it's a difficult issue

19   for the jury to understand, it requires, you know -- that

20   reasonable limits have to be placed on the testimony -- that's

21   something the Court's equipped to do -- but it's another thing

22   to say that the defense has put on its one-sided story from

23   which they're completing the picture.  That would be unfair and

24   it's something they opened the door to, not us.

25             MR. BRUCK:  Well, I mean, I think the Court's initial

1  ruling seems to --

2          THE COURT:  I think it is fair and probably -- not

3  probably, I guess it is accurate at a level of generality to

4  say that -- I think -- "there has sometimes been litigation

5  over the extent of the SAMs and it has sometimes resulted in

6  modification."  That's a true statement?

7          MR. BRUCK:  It has sometimes resulted in the

8  government deciding --

9          THE COURT:  "It maybe resulted" is conclusory.

10         MR. BRUCK:  And the government has sometimes --

11         MR. WEINREB:  Your Honor, that's a matter for

12  cross-examination.

13         THE COURT:  I mean, it is true that litigation that

14  doesn't proceed to judgment can have real effects changing the

15  prior relationship of the parties.  I don't think there's any

16  question about that.

17         MR. WEINREB:  That certainly happened in the case of

18  Richard Reid.  There was excessive litigation over the SAMs in

19  that case, and ultimately the government would --

20         MS. CONRAD:  You're talking about pretrial litigation?

21         THE COURT:  Is it still at a very high level without

22  no --

23         MS. CONRAD:  Was that -- I want to be clear.  When you

24  say Richard Reid, our office didn't litigate the trial.

25         MR. WEINREB:  Judge Young kept continuing supervision

1     over the SAMs even after the defendant was put in BOP.  For

2     example, Judge Young ordered that the defendant could not be

3     interviewed unless it was videotaped and he had an opportunity

4     to review it and various other things.  I'm not sure which of

5     these are under seal or not.

6            MS. CONRAD:  I don't think any of that --

7            MR. WEINREB:  So I don't want to put things on the

8     open record.  But in any event, it is the reality that judges

9     do exercise a degree of supervision over SAMs, and either by

10    indicating what a ruling will be, if not making an actual

11    ruling, affects the modifications.

12           THE COURT:  Would either of these witnesses have been

13    in a position to affect or execute the government's policy in

14    litigation; that is, to approve an amendment to the SAMs?

15    Participate in the process?  In other words, could they testify

16    about that process?

17           MR. MELLIN:  Yes, and as a matter of fact, that's what

18    Agent Nicolet would be talking about.  She is the unit chief in

19    Washington, D.C., for the FBI who is in charge of overseeing

20    the request for terrorism SAMs.  So she can discuss that.

21           THE COURT:  In other words -- I guess I'll refine my

22    question -- would she have personal knowledge of a -- of the

23    fact, if it is a fact, that litigation brought has resulted

24    in --

25           MR. MELLIN:  Modifications.

1           THE COURT:  -- modifications by the government?

2           MR. MELLIN:  Yes.  Yes.  She is a lawyer and she's

3    also an FBI agent.

4           THE COURT:  Well, I think testimony at that level of

5    generality is okay without any specific cases.

6           MR. WEINREB:  One other thing we'd like to revisit

7    here is our request that the government be able to put in some

8    limited testimony about what, in fact, the conditions of the

9    defendant's confinement within his cell would be.  He was asked

10   about -- Mr. Bezy was able to testify that he has to back up to

11   a slot in the wall and have handcuffs undone and various other

12   things.  Mr. Bruck again made a very big point in his opening

13   statement and tried his best to develop through Mr. Bezy's

14   testimony a picture of life in ADX.  And we believe that it is

15   an entirely fair response to that to offer some limited

16   testimony about what it would be like, and in particular, that

17   there is some programming for defendants who are there, that

18   they have television and that they have access to education

19   like to be able to take online courses or whatever it is, video

20   courses and so on.

21          MR. MELLIN:  True.

22          MR. WEINREB:  And it seems as if that's a pretty minor

23   thing that the government is asking permission to do.  It is

24   responsive to what was said both in the opening statement and

25   in Mr. Bezy's testimony, and I don't think that there's

 1   something, you know, incredibly prejudicial about it to

 2   outweigh its probative value because it's something that has

 3   been raised as an issue in the case and something the jurors

 4   are no doubt interested in.

 5        MR. BRUCK:  I mean, we went into the issue with

 6   Mr. Bezy of restrictions on communication.  He accurately

 7   described that there are three levels and that there is more

 8   communication at the third level if a defendant -- if the SAMs

 9   are modified to allow a defendant to reach the third level in

10   the SAMs structure.  He did not testify one way or the other

11   about conditions.  We avoided that.  We didn't put in the

12   pictures.  We stayed away from the whole area.  And now to say,

13   Well, that opens the door to cable television and ESPN and all

14   these inflammatory details, the government is pushing so hard

15   not because they think it's modest but because they think it's

16   huge.  They've been pushing on this since day one.  We did not

17   open the door to it, we did not create a miscommunication

18   whether he'll be allowed to.

19        Mr. Bezy's testimony was accurate on that.  It wasn't

20   spun perhaps the way the government would like it but that

21   isn't -- that doesn't mean that they're entitled to go into new

22   areas, and that's what they want to do.  This is -- you know,

23   this is just -- this is inflammatory and it should not be

24   allowed.  The Court ruled at the beginning of this that we were

25   going to stick to the SAMs and that's the correct ruling.

1          MR. WEINREB:  Your Honor, for the defense -- for

2     Mr. Bruck to say in his opening statement the Rockies are right

3     there but the defendant won't be able to see them because he'll

4     only have a tiny slit in his wall and that's all he could see

5     out of, for him to say in his opening statement the defendant

6     will spend the rest of his days doing nothing but thinking

7     about what he did to these victims, implying he'll have nothing

8     else to do in his cell other than that because all he'll have

9     is four walls to stare at, is what opened the door or invites

10    the -- creates the necessity for some limited evidence to

11    provide a more complete picture of what the defendant will be

12    able to see while he is sitting in his cell.

13          He will not be blocked from view of the outside world

14    because it will be piped into his cell through a screen.  So

15    the fact that there's just a slit in the window that doesn't

16    even let him see the Rockies does not in any way convey what

17    the -- the visual, you know, distraction the defendant will

18    have from having to think about his crimes for the rest of his

19    life while he's sitting in that cell.

20          THE COURT:  So what are the specifics that you would

21    want to put in?

22          MR. MELLIN:  Just what is in the cell, your Honor.

23    The fact that there is a desk, so he can write on his desk, the

24    fact that there is a TV in there with cable television.

25          THE COURT:  Who controls it?

1          MR. MELLIN:  The defendant -- or the inmate controls

2     it.  There are 50 channels of DirecTV that's piped into their

3     room along with music as well, so the inmate controls all of

4     that.  They can watch whatever television stations they want.

5     They can watch educational training, they can watch videos that

6     are -- to workouts like yoga or something like that.  The

7     individual inmate controls all of that.

8          Also, just in response to what Mr. Weinreb was saying,

9     Mr. Bezy testified and left the impression that the defendant

10    or an inmate will be left in his prison cell for 23 hours a day

11    with nothing to do, and this is -- these are the things they

12    can do:  They can watch television the entire time.

13         THE COURT:  What else.  That's it?  Just television?

14         MR. BRUCK:  Nothing --

15         MR. MELLIN:  They can watch television, education.

16         MR. BRUCK:  The "nothing to do" is supplied by

17    Mr. Mellin.  That isn't what Mr. Bezy said.  I point out most

18    of what the government is complaining about they elicited on

19    cross.  It was not about H unit; it was about ADX generally.

20    And it came out because Mr. Mellin elicited it.  It did not go

21    beyond what the government is saying, and we opened it up and

22    didn't like the answer, and now we're entitled to open it up

23    even further.  This is completely barred.  It does not go to

24    the SAMs.

25         THE COURT:  Let me think about this.  We have a little

1    bit of time before the witness testifies so let me think about

2    it.

3           Let me complete the government's proffer for rebuttal.

4    Dr. Francis:  Let me set the table by saying it sounded like he

5    was an expert rebuttal witness, and if the testimony is lay

6    opinion, it sounds like he would not be necessary.

7           MR. WEINREB:  That's correct.  If the testimony that

8    Sister -- can I ask you a question?  Is it Sister Helen or

9    Sister Prejean?

10          MS. CONRAD:  Sister Helen.

11          THE COURT:  Presumably nuns use their first name.

12          MR. WEINREB:  So if the testimony that Sister Helen

13    gives is limited in the way the Court directed, there will be

14    no need for Dr. Francis.

15          MS. CONRAD:  Well, then I don't need to address his

16    opinion about the boat writings.

17          MR. BRUCK:  If I could get back to the SAMs

18    limitation, I trust that the testimony will not involve

19    pretrial litigation in this case which is --

20          THE COURT:  That raises the notice question.  I'm

21    inclined against it because I think there is a difference

22    between -- the purposes of the pretrial -- the purposes of the

23    accommodations in pretrial which had to do with the Fifth and

24    Sixth Amendment implication, I think I said it at the time that

25    I was not sitting on this as a judge drawing the Civil Rights

1    case but only as it impacted the fair trial right of this

2    defendant in this case and I didn't want to make any judgments

3    beyond that.  So I think there can be a substantial difference

4    in the judicial prospective on pretrial addressing SAMs in the

5    context of a criminal prosecution as opposed to judicial

6    attention to the conditions of confinement postconviction.

7              MR. WEINREB:  Well, and yet --

8              THE COURT:  And we can't get into that with the jury,

9    that distinction.

10             MR. WEINREB:  But there's no guarantee, and, in fact,

11   we all know that, in fact, there will be litigation wherever

12   he's sent, and if he's sent to -- that there will be additional

13   litigation, he will continue to have a right to counsel and --

14             THE COURT:  And we've said you can -- I think at the

15   level of generality, that can be put in.  But to compare it to

16   what happened in this case I think is too gross a comparison, I

17   guess is what I would say, and the considerations certainly

18   that I was thinking of as we were considering these things is

19   how much does this interfere with the right to access to

20   counsel and those kinds of things for the criminal prosecution

21   where he is presumed innocent.  All that changes with

22   conviction and the other circumstances.  So I think it could be

23   an apples and oranges situation.

24             MR. MELLIN:  The concern, your Honor, is that the

25   modifications in place now are going to roll over to ADX.

1          THE COURT:  They will for a while anyway.

2          MR. MELLIN:  So those changes in the immediate family

3    members.

4          MR. FICK:  Even the modifications in place were all

5    about the members of the defense team and the defendant's

6    sister-in-law.  All of the postconviction incidents that I was

7    able to find that nibbled at the edges of SAM were ultimately

8    about the exercise-of-counsel duties.  And the government is

9    suggesting in their cross of Mr. Bezy, he's going to get

10   unlimited fan mail and he's going to write a book.  And that is

11   way, way outside of the realm of possibility and unlikely.

12         THE COURT:  You won the point.

13         (Laughter.)

14         MR. BRUCK:  This other thing about TV, there is a

15   prisoner's composition we provided detailing the

16   psychologically debilitating effects for him of confinement in

17   H unit.  We would like to enter that portion of that testimony

18   if the defendant -- if the government is going to be able to

19   show that he gets cable TV.  This is a man describing going out

20   of his mind in that cell, becoming paranoid and having all

21   sorts of degrading conditions psychologically, with cable

22   television.  And so it is just terribly unfair -- I realize the

23   Court hasn't ruled on this, but that's part of a mix that I

24   hope the Court will keep in mind.

25         THE COURT:  Okay.

1           MR. WEINREB:  We would object for the reasons --

2           MS. CONRAD:  With respect to Sister Helen, I would

3    like a little leeway on leading on some of these points.

4           THE COURT:  Yes.  To stay within bounds?  Yes.

5           MS. CONRAD:  Thank you.

6           MR. WEINREB:  No objection.

7           THE COURT:  And you'll take a couple of minutes with

8    her to explain the limitations?

9           MS. CONRAD:  Of course.

10          (The proceedings adjourned at 9:33 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  5/20/15
13

14

15

16

17

18

19

20

21

22

23

24

25