```
            UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS



                                )
UNITED STATES OF AMERICA,        )
                                )
          Plaintiff,             )
                                )    Criminal Action
v.                               )    No. 13-10200-GAO
                                )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                )
          Defendant.             )
                                )



        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE


                        SEALED

                  LOBBY CONFERENCE


        John J. Moakley United States Courthouse
                   Courtroom No. 9
                   One Courthouse Way
              Boston, Massachusetts  02210
                 Tuesday, May 12, 2015
                      2:42 p.m.



              Marcia G. Patrisso, RMR, CRR
                  Official Court Reporter
              John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
                Boston, Massachusetts  02210
                      (617) 737-8728

         Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
 3           Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
 4       Suite 9200
         Boston, Massachusetts  02210
 5       On Behalf of the Government

 6       FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, Federal Public Defender
 7       51 Sleeper Street
         Fifth Floor
 8       Boston, Massachusetts  02210
         - and -
 9       LAW OFFICE OF DAVID I. BRUCK
         By: David I. Bruck, Esq.
10       220 Sydney Lewis Hall
         Lexington, Virginia  24450
11       On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1       THE CLERK:  All rise.

2       (The Court enters the courtroom at 2:42 p.m.)

3       THE CLERK:  For a lobby conference in United States
versus Tsarnaev, 13-10200.

4       Will counsel identify yourselves for the record.

5       MR. WEINREB:  Good afternoon.  Your Honor, William
Weinreb for the United States.

6       MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your
Honor.

7       MS. PELLEGRINI:  Nadine Pellegrini, your Honor.

8       MR. BRUCK:  Good afternoon, your Honor.  David Bruck
and Miriam Conrad for the defendant.

9       THE COURT:  You've received a draft of 31?

10      MR. BRUCK:  Yes.

11      THE COURT:  We'll try to get you a draft of
instructions hopefully by the end of the day as to progress.
Both of them may be fine-tuned a little bit, but I think you'll
get the general gist from them.

12      Let me just mention a couple of -- I don't want to go
through all the potential instruction issues.  If there are
any, I think we can deal with them.  So my proposal is we get
together at 8:30 in the morning to do any last-minute business
before the jury.  I'd rather not take too much time, even out
of the regular trial day.  It's going to be a long process

1    anyway, so I'd like to get an earlier start and resolve things

2    before we do that.

3              (Interruption in the proceedings.)

4              MR. BRUCK:  I guess this is why we have lobby

5    conferences in the lobby.

6              THE COURT:  All right.  I shut it off and I don't know

7    how to turn it on.  We're trying to solve the music problem,

8    the music dipping in volume, and the IT people were working on

9    it.  So just speak louder.  Sorry.

00:03 10         So 8:30 in the morning we can iron out any last-minute

11   issues.  Just to highlight a couple of those items, though,

12   that I think are perhaps more important, I am not going to

13   instruct on the effect of the lack of unanimity.  They will

14   have the option, obviously, to indicate they are not unanimous,

15   but I'm not going to tell them what the effect of that will be.

16             MR. BRUCK:  I recognize the Court has ruled, but could

17   we be heard on this issue?

18             THE COURT:  Well, you have.  I mean, I've read the

19   papers.  And I appreciate that a number of courts have done it.

00:04 20  I read Judge Wolf's explanation in *Sampson*.  I respectfully

21   disagree with it.  I think that the policy should encourage

22   unanimity, encourage it to the extent it is possible

23   conscientiously in each juror's sound judgment.  And I think to

24   suggest that this could be a truncated process by one juror

25   simply deciding that the decision was his or hers I think

1    undercuts what is the process anticipated by the statute, so...

2         MR. BRUCK:  Well, as a fallback position, your Honor,

3    Judge Sand proposes a -- not in the form that we submitted, but

4    in the form that is in his Instruction 9A-20 proposes an

5    instruction which says that if the jury -- well, I'll just read

6    it, because it both does not mislead the jury, or allow the

7    jury to be misled, and requires unanimous verdict as to either

8    verdict.  And he does it in this way:  He would tell the jury

9    "If, after engaging in the balancing process I have described

00:05 10   to you, all 12 members of the jury do not unanimously find

11   beyond a reasonable doubt that the defendant should be

12   sentenced to death, then you may not impose the death penalty,"

13   which of course is uncontroversial.

14        THE COURT:  Right.

15        MR. BRUCK:  "In that event, Congress has provided that

16   life imprisonment without any possibility of release is the

17   only alternative sentence available.  If the jury reaches this

18   result, you should do so by unanimous vote and indicate your

19   decision in Section..." so forth of the special verdict form.

00:06 20        So it preserves -- it follows the -- what's really

21   only a recommendation of *United States versus Jones*, but it

22   doesn't have the terrible vice which is more present in this

23   case than perhaps any other that has ever been tried under the

24   Federal Death Penalty Act of coercing the jury into unanimity

25   by causing the minority jurors to feel -- to assume, as they

 1    will, that if they don't go over to the majority, this entire

 2    traumatic process will have to be repeated, and the victims and

 3    the family members and the government and the law enforcement

 4    and the entire community will have to go through this again

 5    because one, two or three jurors did not surrender their vote

 6    and go with the majority.

 7          That's what the jury's going to think.  And there's

 8    pressure in any case, and the law doesn't necessarily condemn

 9    that, but in this case the coercive effect of that

00:07 10    misconception -- and it is a misconception -- is far more

11    powerful than any -- any erroneous deadlock instruction or

12    *Allen* charge that could ever be given in a normal criminal

13    case.  It will be overpowering.  No one will have the ability

14    to hold on to their conscientiously held belief in the face of

15    that misconception.  And of course it is a misconception.

16          So this proposal by Judge Sand is a middle ground, and

17    it simply tells the jury, just as the jurors were told in voir

18    dire -- and as the government was careful to point out, to

19    jurors who were weak on the death penalty in voir dire -- that

00:08 20    if it's not unanimous, you know, there's no death penalty, it

21    says that.  And then it says that if that's where you come to

22    rest, then by unanimous vote indicate that the life sentence,

23    which is the other alternative, is the option you've reached.

24          There is no misconception.  It is accurate.  It, as

25    Judge Sand says in his comments, upholds the preference for

1   unanimous verdicts while at the same time not subjecting

2   holdout jurors to that tremendous pressure which, as I say,

3   will be exponentially greater in this case than in any other.

4        This is -- the case comes down to this instruction, I

5   think.  I mean, *Sampson* -- the *Sampson* case resulted in a death

6   verdict even with this instruction.  So it hardly makes, you

7   know, the government's burden all that heavier, but it makes

8   our burden extremely unfairly heavy because we have to overcome

9   the false belief that if this juror can't agree -- if this jury

00:09 10   can't agree, everything will have to start from the beginning

11   again with a new jury.

12        The sense of public failure, of failing to do their

13   job, of having been entrusted with this high responsibility for

14   this community and having failed to discharge it, will be

15   overpowering.  And it's all based on a false assumption, that

16   this case is like every other, when it's not.  It's different

17   from every other.  So we really implore the Court to consider

18   using Judge Sand's middle-ground instruction.

19        MS. CONRAD:  May I just confer with Mr. Bruck for one

00:09 20   second?

21        (Counsel confer off the record.)

22        MR. BRUCK:  Thank you.

23        THE COURT:  Anything from the government?  No?

24        Well, I think the concern is addressed more properly

25   at the -- with a very strong instruction about each individual

1   juror must give his or her own and not agree just to agree with

2   others.  I think that's the place where that danger can be

3   satisfied.

4          MR. BRUCK:  In that case --

5          THE COURT:  It's a balance.  I acknowledge.  I mean, I

6   understand the considerations, but I think they're

7   considerations in the direction that I've been persuaded to as

8   well, and so we'll...

9          MR. BRUCK:  In that connection, defense counsel has

00:10 10  planned to argue this point to the jury in argument.

11         THE COURT:  No.  That would be improper.  If I am

12  refraining from instructing on it, it's improper to argue on

13  it.

14         MR. BRUCK:  Well, if we may for the record have the

15  record reflect that in addition to all the arguments that we've

16  advanced in favor of the instruction, we also submit that

17  ordering defense counsel from -- to refrain from informing the

18  jury of the consequences of a deadlock has the further

19  constitutional harm of violating the defendant's Sixth

00:11 20  Amendment right under *Herring versus New York* to a full closing

21  argument and the assistance of counsel at the -- in summation.

22         THE COURT:  I don't think that could be true in the

23  light of *Jones*.

24         MR. BRUCK:  I must say that at oral argument one time

25  on one of these *Simmons* cases, I was berated by Justice Scalia

1    for not having raised that precise claim rather than the claim

2    I was actually raising.  So I've resolved that next time we're

3    going to raise it.

4          THE COURT:  Okay.

5          I think the next thing I'd like to address is the

6    government's -- which I think it's a recent -- second motion to

7    strike or modify certain mitigating factors.  I guess that was

8    filed today?

9          MR. WEINREB:  Yes, your Honor.

00:12 10        THE COURT:  Last night?  Today?

11          MR. WEINREB:  We received the mitigating factors

12    yesterday.

13          THE COURT:  Yesterday.  Okay.

14          MR. WEINREB:  So we filed this today.

15          THE COURT:  Though you have a response.

16          Let me say that I guess -- let me give you my

17    disposition before hearing from people, is that what is

18    identified as Mitigating Factor 19, which is this -- which is

19    the proposition that if he's not sentenced to death, the only

00:12 20    other punishment will be imprisonment for the rest of his life

21    without the possibility of release, I think we've talked about

22    it in the past.  I regard that as a proposition of law and not

23    a factor to be proved.  It is true, but I don't think it's

24    something the jury has to consider.  So I would be inclined to

25    strike that.

1          As to the others, I think that the general structure

2     and gist of the statute is to allow the defendant pretty much

3     to propose anything that might be found to be mitigating, and I

4     don't think there's -- should be much policing of those

5     propositions as long as they're matters of fact that could be

6     determined from the evidence.  So I would be inclined not to

7     strike anything else.  If you want to come back at any

8     particular one...

9          So the distinction I draw is between what is really

00:13 10   not a mitigating fact but a mitigating proposition of law, on

11    the one hand, which I think is not proper for consideration,

12    and mitigating possible facts that -- as to which there would

13    be dispute how mitigating they were if they were true, so...

14         MR. WEINREB:  Well, your Honor, with that guidance in

15    mind, although I think there's a very good argument that the

16    cases make clear that mitigation may be broad, but it's not an

17    empty vessel that you can just pour anything into.  It's not a

18    rubric for everything.  I'll focus my attention on a couple of

19    things, and that is the way that some of these are worded.

00:14 20        So we object to the way some of these are worded

21    because they essentially state several propositions.  They sort

22    of bundle two or three propositions into a single mitigating

23    factor, but they phrase one or two of them as if they're

24    already true and then ask you -- ask the jury to find if the

25    third is true.  And that's an improper way of essentially

1    requiring the jury to assume the truth of something that they

2    may not believe in.  And I think it's unnecessarily confusing

3    for the jury.

4         I think the best example is Number 12, which is on the

5    bottom of page 1, says "Mental illness and brain damage.

6    Disabled.  Dzhokhar Tsarnaev's father."  So that's a

7    proposition of fact that the jury can either decide is true or

8    not true.  Then the next one says, "Dzhokhar Tsarnaev was

9    deprived of needed stability and guidance during his

00:15  10   adolescence by his father's mental illness and brain damage."

11   So Number 10 assumes the truth of Number 9.  That seems to be

12   improper.  It's sort of saying to the jury, essentially, you

13   have to accept the premise that his father had mental illness

14   and brain damage and now you need to decide whether he was

15   deprived of needed stability and guidance.

16        And furthermore, frankly, the fact that he was an

17   adolescent in need of stability and guidance is itself a

18   proposition that the defense may or may not have proved.  I

19   mean, when these crimes occurred, he was 19 years old and, in

00:16  20   the years leading up to them, he was arguably no longer -- he

21   might not have been an adolescent in the jury's mind, or

22   certainly not one in need of stability and guidance.

23        And so we attach to our motion a red-line version of

24   these which proposes a way to basically re-list each of these

25   as propositions, each one of which the jury has to find to find

1   that the mitigator's been proved by a preponderance of the

2   evidence.  That seems both clearer and fairer.  Frankly, it

3   tells the jury exactly what they're supposed to do as opposed

4   to these which I think can be quite confusing to the jury as to

5   whether, you know, they have to take the premise as given and

6   just focus in on the ultimate conclusion or whether they're

7   also being asked to decide whether the subsumed premises are

8   true before they -- or in the course of deciding whether the

9   conclusion is true.

00:17 10         So we'd ask for those rewordings.  I think that's a

11   fair request.

12         THE COURT:  Well, okay.  I mean, I understand the

13   point.  I think of the two possibilities you just posited, that

14   I would rate it as the second; that is, the premise is put in

15   the question as well.  It's not given to the jury as a premise

16   but they -- if they find the premise, then they can think what

17   it means.  But again, I think it -- my disposition is to permit

18   the defendant to propose whatever factors he thinks might be

19   mitigating and then see if he can persuade the jury, or some of

00:17 20   them, to that conclusion.

21         In other words, the authorship, I think -- within

22   reason.  I mean, I think it can be exceeded under certain

23   circumstances, but I don't think that's the case here.

24         MR. WEINREB:  The other ones that we object

25   particularly to are 10 and 11, that his teachers and friends

1   still care for him and his aunts and cousins love and care for

2   him, in part because of the main argument that we have been

3   making, which is that it doesn't go to his character, his

4   history or the circumstances of the offense.  These are

5   propositions about these people, what they feel about him, not

6   about who he is or anything about him.

7          But more importantly, you know, these factors might as

8   well have been read:  His family and his teachers and friends

9   don't want him to get the death penalty.  They still see value

00:18 10   in him.  They want him to live.  And if not that, then at the

11   very least, that they will be impacted by his execution.  And

12   both of those are the types of arguments that courts routinely

13   hold are not appropriate to put in front of the jury.  In fact,

14   we filed a motion in limine to exclude execution impact

15   evidence.  The defense said it wasn't going to put on execution

16   impact evidence, and yet this is a way of trying to smuggle

17   those issues into this case.

18          The fact that his teachers and friends still care for

19   him today tell you that they're loving, compassionate people

00:19 20   and that they are forgiving people, and they don't want to --

21   you know, no matter what he did, just as if your own son had

22   done something, you might feel like no matter how bad it was, I

23   can't bear to see him go to the gallows.  And these people are

24   like that.  They were in loco parentis, or they are related to

25   him.

1          But their feelings should not become a proxy for what

2     the jury does.  They're supposed to be trying to distinguish

3     this murder and this murderer from others, and, you know,

4     making a reasoned individualized judgment about him based on

5     him, not based on what the impact's going to be on other people

6     or what other people happen to feel today.

7          THE COURT:  Do you want to address those two?

8          MR. BRUCK:  I mean, it is clearly the significance of

9     these that the unspoken part of these mitigating factors are

00:20 10     based on their knowledge of him, based on how they remember

11     him, based on what they know about him, they still care for

12     him, they love and care for him.  That does not have to be

13     spelled out.  That's obvious.  That goes without saying.  The

14     reason it is a mitigating factor is it reflects well on him.

15     And nobody is going to argue this, and I don't think any

16     reasonable juror would interpret this to mean that the jury

17     should weigh this as mitigating because of the effect on the

18     people who feel this way.  It's a way of talking about him.

19          We could rewrite these to make them extremely wooden

00:20 20     and awkward by spelling all of that out, but that's not the way

21     people talk, and I think we should just leave it the way it is.

22          THE COURT:  Okay.  I think we'll leave them in.  I

23     understand your -- essentially for the reasons that Mr. Bruck

24     just mentioned.

25          The defense has a motion to strike the aggravating

1  factor concerning victim impact of Martin Richard's death.  And

2  I guess now there's been a recent government response to that?

3         MS. PELLEGRINI:  There has, your Honor.

4         MR. BRUCK:  Well, as the Court will recall, no

5  evidence was presented other than some photographs of Martin

6  Richard at the penalty phase, at the victim impact phase of the

7  trial.  The government stoutly denied all through the guilt

8  phase that it was introducing victim impact testimony, and now

9  we discover that its entire victim impact case, or almost all

00:21 10  of it, or almost all that -- everything they point to regarding

11  Martin Richard was actually introduced at the guilt phase.

12         If it was admissible at the guilt phase, it wasn't

13  victim impact.  One could only treat the record concerning

14  Martin Richard as victim impact evidence if one takes the view

15  that every time there is a murder, the defendant -- which

16  obviously shows the impact on the victim, and inferentially on

17  the people around him, that that ipso facto satisfies the

18  evidentiary requirements for victim impact testimony under the

19  statute.  That's not what victim impact testimony is.

00:22 20         And for the government just to say that, Well, a

21  tragic murder has been shown and, therefore, the -- it has met

22  its burden to prove this factor beyond a reasonable doubt

23  doesn't wash.  They presumably had a case to present.  In the

24  end they, for whatever reason, did not call the witnesses and

25  did not present them.  And that's the end of the factor.

```
 1           MR. WEINREB:  Your Honor, evidence introduced during

 2    the guilt phase can serve more than one purpose.  Evidence in

 3    the guilt phase is admissible in the penalty phase.  Many of

 4    the aggravating factors we're going to prove in the penalty

 5    phase were already proved in the guilt phase.  Mr. Bruck has

 6    made that point innumerable times in trying to block us from

 7    putting in evidence at the penalty phase.

 8           As for whether there was actual evidence of impact on

 9    the Richard family, it would be one thing if -- sometimes a

10    decedent could have no survivors.  It could be an anonymous

11    person found in a ditch.  Sometimes a decedent -- it may be

12    that all the family members of a decedent find it too painful

13    to testify for one reason or another.  That's not the end of

14    the story.

15           In this case the jury heard from the defendant's

16    father and --

17           MS. CONRAD:  Victim's.

18           MR. WEINREB:  I'm sorry?  Heard from the decedent's

19    father.

20           And they saw images of the decedent, they heard about

21    the suffering that the decedent himself went through.  There

22    was plenty of evidence from which the jury could conclude that

23    this had a profound impact on Martin Richard and on his family

24    and friends.  It doesn't have to be the kind of presentation

25    for one witness that it is for another witness.
```

1          THE COURT:  Well, okay.  I essentially agree with the

2    proposition that evidence can serve multiple purposes, and

3    there is evidence in the record which the jury is entitled to

4    consider which would support a conclusion about the impact of

5    Martin Richard's death on his family properly.

6          I would propose to send the same redacted indictment

7    to the jury room just for their reference purposes.  Is there

8    any objection to that?

9          MR. WEINREB:  No.

00:24 10          MR. BRUCK:  No, sir.

11          THE COURT:  I do not propose to send the government's

12    notice of intent which outlines the aggravating factors.  The

13    aggravating factors will be first summarized by me.  They will

14    again get a copy of my oral instructions.  They are extensive

15    and it will be important for them to be able to go back and

16    review them.  And in addition, the verdict slip will have

17    relevant aggravating factors set out, so I don't think there's

18    any reason for the notice of intent.

19          MS. CONRAD:  May I have one moment, your Honor, to

00:25 20    confer with Mr. Bruck?

21          (Counsel confer off the record.)

22          MR. BRUCK:  I assume that the wording of the

23    aggravating factors, statutory and non-statutory, will be

24    exactly the same as they were in the notice?  The -- I mean,

25    the government is bound by the notice that they gave and --

1          THE COURT:  I'd have to check.  I mean, I think in

2     preparing the verdict slip we relied principally on -- or

3     substantially, I guess I should say, on the defense proposal

4     and Judge Sand, and we copied the language from those sources

5     without checking it against the notice of intent.  I don't know

6     how much substantial difference there is in the formulations.

7          MR. BRUCK:  I'm actually referring to the non- --

8          THE COURT:  Oh, non-statutory?

9          MR. BRUCK:  The non-statutory factors.  And the slip I

00:26 10  think tracks them exactly, and we're just assuming that that

11    will continue to be true.

12         THE COURT:  I think so but I'd have to check.

13         MR. BRUCK:  Sure.

14         THE COURT:  But it's the statutory -- sometimes it's

15    the statute's language, sometimes it's a slight modification of

16    the statute's language, so...

17         MR. BRUCK:  Sure.

18         THE COURT:  I understand you've been working to

19    harmonize exhibits, et cetera, and that the physical exhibits

00:27 20  have been made available for the jury and have been reviewed?

21         With respect to closing arguments:  First, if you

22    haven't, I hope you will exchange whatever demonstratives you

23    intend to use just so if there's any issue, we can deal with it

24    before it's shown to the jury.  I mean, it has to be something

25    in evidence so I doubt it will be a problem, but I just mention

1    that.

2         MR. BRUCK:  We did have a couple of issues

3    respecting -- of course we have filed a motion respecting

4    improper forms of argument and we trust that none of those will

5    be made.  I had inquired of Mr. Mellin yesterday whether he

6    still intends to do that which he said he was going to do,

7    which is to display the clothes that young Martin Richard was

8    wearing.  He did not respond to my email.  That was an attempt

9    to determine whether or not there was a need for a motion.

00:28 10        On the assumption that silence is not consent, we do

11   wish to move that the Court bar the government from displaying

12   those clothes.  You've seen them displayed already.  You know

13   what I'm talking about.  I know the evidence is in evidence,

14   but there is an inflammatory effect from these particular items

15   of evidence which is difficult for words to convey.  It's been

16   done once, and we just think that in closing argument in a case

17   of this nature, the waving -- literally waving the bloody shirt

18   is inappropriate, inflammatory, and the Court should not allow

19   it.

00:29 20        Now, it could be that Mr. Mellin doesn't plan to do

21   it, but since I didn't get an answer, I don't know.  So I

22   wanted to make the motion.

23        MR. WEINREB:  Your Honor, it's my understanding

24   Mr. Mellin does intend to do it.  And I think there's no merit

25   whatsoever to that argument.  The clothes are in evidence.  It

would be odd, indeed, if the government could put something
into evidence and then was precluded from showing it or
highlighting it to the jury.  That's the whole purpose of
closing argument, is to distill for the jury what the
government believes is the most important pieces of evidence in
the case and to weave them together into a narrative that
helped to bring all of the evidence together.

It would be one thing if the government intended to
display them in some kind of misleading way.  I could see a
motion in limine to prevent the government from blowing them up
on a giant screen or from enhancing them in some way or
anything like that, but the bare evidence itself is by
definition a proper matter for the jury's consideration.  And
the jury may well be inhibited from handling these things
because they're -- you know, they're biohazard to some degree,
you need to wear gloves to handle them.  And it's perfectly
appropriate for the government to display them.

And furthermore, they've been displayed before.  One
could easily take the opposite instinct that Mr. Bruck voices
may also be true, that the impact of these kinds of things
diminish with repetition.  So I don't think it's self-evident
that showing them to the jury will somehow magnify any kind of
impact that it previously had.  They've seen them before.

But it is an important part because one of the main
arguments that the government -- many of the aggravating

1    factors in this case depend on the government proving that this

2    was not just any old murder.  This was a murder done in an

3    especially cruel, heinous and depraved fashion.  This was a

4    murder committed with a device that can permanently disfigure

5    people.  This was a murder done with a device that has a

6    grave -- poses a grave risk of death to other people because of

7    the manner in which it kills.

8         All of those things are the very things that we have

9    to prove in this phase.  And so a vivid piece of evidence that

00:31 10   helps to compactly make some of those points is precisely the

11   kind of thing we should be allowed to show the jury.

12        THE COURT:  Okay.  Okay.  I don't think it should be

13   used.  I agree with Mr. Bruck's argument.  It is in evidence.

14   It can be examined if the jury wants to.  I don't think there's

15   anything wrong with Mr. Mellin referring to or describing the

16   evidence, but I do think that the emotional content so

17   outweighs the rational value added that it is -- there's too

18   strong a possibility of inflaming the emotions of the jury at a

19   critical time in the case with very little intellectual content

00:32 20   that cannot be easily otherwise used and displayed.

21        MR. WEINREB:  As an alternative, could we use the

22   photograph of it?  That's less impactful, it's --

23        THE COURT:  I'll look at the photograph, I guess.  I

24   think I'm inclined to say yes.

25        MR. WEINREB:  I think there is a photograph.

```
 1            THE COURT:  It's the physical --

 2            MR. WEINREB:  Yeah.

 3            THE COURT:  I mean, the problem is you imagine the

 4    boy's body in the clothing in a way that is just too emotional,

 5    I think.

 6            MR. BRUCK:  Mr. Weinreb's argument brought me to the

 7    second part of this motion which was when he said, "Well, we're

 8    not blowing it up," that reminded me of the display of Martin

 9    Richard's autopsy photographs where they did blow up the

10    severed arm and the tendons and the shredded muscle and

11    magnified it.

12            MS. PELLEGRINI:  We only magnified it on the screen.

13            MR. BRUCK:  On the screen.

14            And we have the same objection to autopsy photos, any

15    of the victims being displayed in closing argument as we did to

16    the clothes of the young Richard boy, and for the same reasons.

17    And in particular, the autopsy photos of Martin Richard.

18            MR. WEINREB:  So we don't intend, either Mr. Mellin or

19    I, to use any of the autopsy photos except one which is the

20    photo of Sean Collier.  He -- I think even in the defense's

21    initial motion to exclude autopsy photos in general, the

22    motion -- there was no motion to exclude the Collier autopsy

23    photos because it was not a full-body photo and it didn't show

24    what the defense described as unusually gruesome damage.  It's

25    bullets wounds which is something a little more common that
```

00:32 (line 10)
00:33 (line 20)

1    people see.

2            So we would ask leave for that one photo which also is

3    in evidence.  It's not blown up and it's a clean -- it's a

4    bloodless photo.

5            THE COURT:  All right.  I think that's fine.

6            So the defense has filed the motion yesterday, I

7    guess, regarding a series of topics -- possible topics that

8    might be included in closing argument.  I guess my inclination

9    would be to ask the government to review that and those topics

00:34 10   and tell me if there is any intent to use any of those matters

11   in any way that we need to address; otherwise, I'll take

12   silence as indicating that they're not going to be proffered

13   and we don't need to address it.

14           MR. BRUCK:  We do have one more to add to the list,

15   your Honor, which I should have included but I think is very

16   likely to be heard if nothing is said about it, and that is the

17   argument:  If not in this case, when, which is an argument

18   which is improper for a number of reasons --

19           MR. WEINREB:  We won't be making that argument.

00:35 20         MR. BRUCK:  Okay.  Well, then that takes care of that.

21           MR. WEINREB:  May we have a moment, your Honor?

22           THE COURT:  To look at those?

23           MR. WEINREB:  Yes, if you don't mind.

24           (Pause.)

25           MR. WEINREB:  So with respect to many of these, I'll

just say -- first of all, we oppose in general a motion in

advance to preclude the government from engaging in

prosecutorial misconduct.  That's a specious kind of motion and

it's dangerous because we're not flyspecking the exact words of

every one of these things.  I mean, these things are always

subject to interpretation.  It also would seem to excuse the

defense from making contemporaneous objections to anything it

finds objectionable, and they should not be permitted to do

that for reasons we said before.  The Court can't correct

something, sustain an objection, give a limiting instruction or

anything like that without a contemporaneous objection.

So we -- for all those reasons we would ask that the

motion not simply be handled in this way but it be denied

without prejudice with instructions to the defense to raise any

objections in the moment that they might have...

With respect to some of these things, like urging the

jury to ignore or disregard legitimate mitigating evidence,

suggesting that mitigating evidence requires a nexus to the

crime or the defendant's culpability, we understand that if the

Court deems something to be a legitimate mitigating factor,

it's not for us to tell the jury it's not potentially -- it's

not a legitimate mitigating factor if they find it, by if it's

proved.  But the government does intend to argue that some of

these mitigating factors deserve no weight.  That's a different

story from saying it's not a mitigating factor.  I just want to

make that clear.  And I think it is proper to argue that a

mitigating factor with no nexus to the crime deserves less

weight than one that has a nexus to the crime, for example.

(Pause.)

MR. WEINREB:  Well, suggesting additional evidence

beyond that adduced at trial, that's a routine argument that

lawyers sometimes make during closing arguments that there's no

evidence of that.  And courts almost always instruct the jury

that it's their memory of the evidence that controls, and the

00:37 argument will just fall flat if the jurors find that there is

no evidence of it.  So we would object to that one

specifically.

The denigrating defense counsel -- or the defense,

that's another one where lawyers very often call into question

whether the other side has actually proved something or that

sort of thing.  We object to that one in particular.  That's

the kind of thing which is very subject to interpretation, and

there's room for argument over what would count as unfair or

impermissible denigration.  We're all experienced attorneys

00:38 here.  I think we know how not to cross that line.

And then commenting on the alleged costs or alleged

comforts of life imprisonment, obviously, we won't be

commenting on the alleged costs, but the alleged comforts is

another matter because I believe the defense has introduced as

a mitigating factor something we object to, which is that the

 1    government has the power to severely restrict Dzhokhar

 2    Tsarnaev's communications with the outside world.  That's his

 3    proposed Mitigating Factor No. 21.

 4         We've taken the position from the outset that

 5    arguments about what the Bureau of Prisons can or can't do are

 6    not individualized to this defendant.  They're true for every

 7    murderer; and, therefore, they do not provide a rational basis

 8    to assist the jury in reaching a non-arbitrary, non-capricious

 9    sentencing judgment.  Whatever they say -- whatever they

00:39 10    -- this would be true for every murderer in every case and,

11    therefore, doesn't really help them.  Furthermore, it has

12    nothing to do with his character, his history and so on.

13         The Court, however, has let in a lot of evidence.

14    Having done that, and now having allowed the defense to list it

15    as a mitigating factor, I assume we're going to hear argument

16    about it from the defense.  Many of the things that the jury

17    heard about in the course of that back-and-forth could be

18    described as comforts for the defense.  Having communications

19    with family, with friends, with being able to write a book,

00:40 20    being able to educate himself so that he can write a better

21    book, I mean, all of these things can fall under that rubric.

22         So we won't refer to anything not in evidence, but I

23    think everything that is in evidence should be considered fair

24    and that's why it was allowed into evidence in the first place.

25         MR. BRUCK:  If I may, we had something rather specific

1   in mind.  The Court, for example, ruled in no uncertain terms

2   at sidebar that the government was not to introduce evidence

3   concerning television, and that the way the issue -- the

4   closest the government was permitted to do, and I think I'm

5   quoting the Court verbatim, was that it would be permissible to

6   say that the defendant -- that the defendant had

7   available -- could have prison -- could have prison programming

8   in his cell.  And when the question was put by Mr. Mellin, it

9   had changed into, "Can he view prison programming in his cell?"

00:41 10           THE COURT:  "Watch" I believe was the word.

11           MR. BRUCK:  Or watch?

12           It was -- and this was after the particular question

13   had been asked of the Court, "Well, can we mention the TV?" and

14   you said no.  So it got in anyway.

15           So we're trying to be a little careful.  We think that

16   the argument is likely, given the track record, to strain

17   against the Court's rulings exactly as the examination of the

18   witness did.  And that's what we're talking about.  We don't

19   think that the Court's ruling should be flouted and we think

00:41 20   the Court should enforce its ruling.

21           MR. WEINREB:  So, your Honor, there was no mention of

22   television in the question or in the answer.  But "programming"

23   is not a thing.  In fact, I don't even know if the jury has any

24   idea what "programming" means.  It's a term of art.

25           THE COURT:  I think they heard a little bit about it

    1    from Mr. Bezy.

    2           MR. WEINREB:  Well, perhaps.  But in any event, the

    3    only way for them to have any conception of what it means to

    4    "have programming in your cell" as if it were a thing that they

    5    can sort of pass you through the door, it sits in the corner,

    6    is if they understand that having programming in your cell

    7    means watching programming.  I can see why Mr. Mellin asked the

    8    question that way.  It's almost -- it makes no sense to ask it

    9    in any other way.

00:42 10           THE COURT:  Well, I think he went too far, frankly, on

    11   it.  I think he went over the line.  Actually, "viewing" would

    12   have been less offensive because that could have been a book or

    13   papers or something like that.  But "watching," I think, was a

    14   deliberate, I have to say, suggestion of television, which I

    15   think was inappropriate.

    16          Now, so let me just say more broadly, we're obviously

    17   at a critical stage of the case and it will be vigorously

    18   argued by both sides but we have to stay within the lines, both

    19   sides.  We've come too far in this case to have something

00:43 20   happen that does make what Mr. Bruck feels is unthinkable, and

    21   that is a retrial.  I just urge everybody to keep that in mind.

    22          MR. WEINREB:  Well, your Honor, I'll bring that

    23   message back to Mr. Mellin who will be making the argument.  I

    24   hope the message applies equally to the defense and

    25   particularly about this issue that they feel so passionate, a

1    deadlocked jury.

2         THE COURT:  It does.  Anyway, so I think that may be

3    it for today unless there's something.

4         MR. BRUCK:  We've got a couple more things.  We could

5    do it in the morning but I think --

6         THE COURT:  We can actually dispose of it now.

7         MR. BRUCK:  -- if the Court has more -- will bear with

8    me, we made a motion way back last year to strike the selection

9    of the marathon non-statutory aggravating factor as duplicative

00:44 10   of or encompassed within the substantial planning statutory

11   aggravating factor.  We -- the Court did not grant that motion

12   at that time.  We don't see this -- I realize the Court has

13   told us to put our Rule 29 type motions in writing, and we

14   still can do that, but I didn't really see this as a Rule 29

15   motion; it's a question of whether, sort of as the government

16   has just done, whether there is -- the factors to be submitted

17   to the jury in some way overlap or encompass one another.

18        And we really think that that non-statutory

19   aggravating factor is -- relies entirely on facts which are

00:44 20   also there to prove the substantial planning to cause the death

21   of another person or -- and to cause an act of terrorism.  It's

22   a two-part aggravating factor.  The government has alleged both

23   parts here.  And the way that was done was to attack the

24   marathon according to the non-statutory aggravating factor.

25        Of course there are many ancillary facts involved with

1    the marathon, but those are the facts which make this,

2    according to the government, an act of terrorism.  And that is

3    the statutory factor.  So there really isn't any daylight

4    between the two factors.  It allows double counting.

5         And for the reasons that we briefed in the motion to

6    strike, we think that now the evidence is in, the Court should

7    only allow one or the other of those factors.

8         THE COURT:  Okay.  I think they're distinct factors.

9         MR. BRUCK:  We have just drafted, and I'd like to hand

00:46 10   to counsel and pass up to the Court, a very short curative

11   instruction dealing with this problem of the modification of

12   the SAMs by the Court.  So if I may.

13         (Curative instruction handed up to the Court.)

14         MR. BRUCK:  As the Court will notice, the focus at

15   sidebar was whether the statement was accurate or not, and the

16   Court concluded after consulting the clerk's notes that you

17   felt that it was.  We accepted that ruling.  But the focus here

18   is not on whether it was accurate but whether it had any

19   relevance to any issue in the case because of the fact that the

00:47 20   entire subject matter of the controversy about the SAMs or

21   the -- the only part that had any traction at all was having to

22   do with the ability of defense counsel to prepare their case

23   with the assistance of the defendant.

24         And that becomes moot.  We're talking about

25   postconviction.  And we're talking about postconviction when he

1   receives a life sentence where there will truly be little or no

2   future litigation ever, and certainly none that will implicate

3   these issues.  So we think it is only fair for the jury to know

4   that's water under the bridge and -- whatever happened, and

5   that it shouldn't be taken as some indication that the Court is

6   going to issue rulings or exercise continuing jurisdiction over

7   whatever SAMs may be renewed or imposed if this young man is

8   sent to prison for life.

9           MR. WEINREB:  So, your Honor, the defense decided to

00:48 10  open the door to a discussion by witnesses on the witness stand

11  about a process that is largely a legal process but also it's a

12  process that occurs behind closed doors in the Department of

13  Justice involving communications among various branches, not

14  something easily explained to the jury from the witness stand.

15  But he decided to do it.

16          And then he called to the witness stand Mr. Bezy, a

17  witness who really did not know what he was talking about, gave

18  testimony that I think was obvious to everybody in the

19  courtroom was based on virtually nothing more than a

00:49 20  conversation he had had two days earlier with Ms. Nicolet who

21  actually does know what she's talking about, and then

22  regurgitated as much of it as he could or that he knew.

23          Then when the knowledgeable person was on the witness

24  stand, the defense asked her on cross-examination the question

25  that elicited the answer to which he now wants a curative

1    instruction to be given, an answer that as far as the witness

2    was concerned was an absolutely true answer and that the Court

3    acknowledged up on the stand that she had a good-faith reason

4    for believing was a true answer.

5         Now what he wants to do is he wants to single -- the

6    Court said up at the witness stand -- I'm sorry.  The Court

7    said at sidebar that the back-and-forth among the witnesses on

8    this issue had been somewhat illuminating and perhaps somewhat

9    confusing, but that in the matter of the way things often

00:49 10    unfold in court, the jury had gotten a mix of input and was in

11    a -- things had been sort of left in equilibrium, and it was in

12    a good situation to draw its own conclusions.

13         What the defense wants to do now is single out a

14    particular fact that he considers bad for him and have the

15    Court instruct the jury so that it's no longer even up to them

16    to make these judgments, what matters and what should matter to

17    them, what's true and what isn't true.  That's just not fair.

18    If we had known this was coming, we would have had our own

19    curative instruction that emphasized the points that we think

00:50 20    are favorable to us.  It's just not how these things should be

21    handled, back and forth like this, with asking the Court to

22    tell the jury what they should believe and shouldn't believe

23    and so on.

24         Personally, I believe this is misleading.  The

25    defendant could have plenty of litigation.  People who are

1   sitting in life in prison often have nothing to do, as the

2   Court well knows, but file 2255 motions.  And he may well have

3   plenty of legal representation in prison and there may be

4   plenty of issues involving modifications of the SAM.

5        This Court could get involved again if there's a

6   retrial or an appeal or any number of reasons.  It's simply not

7   a fair or appropriate thing to do.

8        MR. BRUCK:  If I could just -- the missing fact,

9   without agreeing with any of Mr. Weinreb's characterizations,

00:51 10   the important fact he left out is when Mr. Watkins interviewed

11   Ms. Nicolet two days before, he got the opposite answer, that

12   she never heard of a modification of a SAMs ordered by a court.

13   That's the only reason he asked the question.

14        So I don't think it's really fair to say that we

15   invited this.  Well, that's what happened.

16        THE COURT:  Well, I'm inclined not to do it.  You just

17   proposed it.  I haven't thought about it for very long.  I will

18   think about it a little more, but my current inclination is not

19   to use it.

00:51 20        MR. WEINREB:  There were two other defense requests

21   for instructions.

22        MR. BRUCK:  Oh, well -- Mr. Weinreb points out that we

23   had a total of five --

24        THE COURT:  Right.

25        MR. BRUCK:  -- supplemental requests.

1        I took the Court to be saying that we'll get the

2   answer on that shortly.

3        THE COURT:  You're right.

4        MR. WEINREB:  Okay.

5        THE COURT:  I think most of those I have done

6   something with and they're in there and you'll see what I have

7   done.

8        MR. WEINREB:  Very well.

9        MR. CHAKRAVARTY:  Your Honor, one thing I should have

00:52 10   raised when you asked whether the parties had exchanged

11   exhibits.  We have.  We think we're in a pretty good place.

12   Just one issue that we're going to have time tomorrow to

13   resolve expeditiously, so I wanted to get ahead of it is that

14   with regard to some of the computer exhibits that the defendant

15   introduced, some of them are not JERS compliant so they're

16   going on to the stand-alone computer, like the government

17   exhibits and all of that is worked out.  However, some of them

18   appear to not be on the stand-alone computer, so it looks like

19   they're kind of bifurcated.  So some are on JERS and some are

00:53 20   on the stand-alone computer.

21        The government doesn't think that's ideal.  The

22   government thinks they should be in one place.  The other risk

23   it creates is one of double-counting, like there might be

24   exhibits in both places, which we want to avoid.  Mr. Fick, I

25   think, is the most knowledgeable on this.  And I don't know

          1    what the status is currently but I know that's a concern which

          2    I'm alerting the Court because if the Court has a preference

          3    one way or the other, then it's best to tell the parties now.

          4         THE COURT:  No.  My concern is if the jurors want to

          5    see a particular exhibit, they know where to go to get it.

          6    That's my concern.  I don't really care if those of a feather

          7    flock together or not.  But my interest is in assisting the

          8    jury in their job.  And if there's an impediment to that, then

          9    I'm concerned about it.  If it's just a quirk of indexing or

    00:53 10    something, then -- but doesn't substantially interfere with

         11    their ability to find what they want, then I am less concerned

         12    about it.  It would be nice -- perfection is nice but -- you

         13    know, we've had the problem both with respect to compatibility

         14    with the system and volume in this case that is maybe a new

         15    experience for jurors and its custodians.  And so they're doing

         16    the best they can.

         17         But I believe that I have been assured the jurors will

         18    have a master list of the exhibits and they will know where to

         19    look if they're looking for something.

    00:54 20         MR. CHAKRAVARTY:  Okay.  Thank you.

         21         MR. BRUCK:  I have one -- go ahead.

         22         MR. WEINREB:  I just had a very brief thing.

         23    Inquiring minds are again asking me whether the Court's given

         24    any more thought to when the sentencing hearing will be

         25    regardless of whether we have a death verdict or a life

```
 1  verdict.
 2          THE COURT:  No, other than what we talked about.  I
 3  mean, and -- well --
 4          MR. WEINREB:  We're still hoping for somewhere in the
 5  order of 30 to 60 days.
 6          THE COURT:  Yeah, I've been having in my mind July.
 7  Mid-July.
 8          MR. WEINREB:  I'm sorry?  Mid-July?
 9          THE COURT:  Mid-July.
00:55 10         By the way, I have jury duty on July 14th at Suffolk
11  Superior Court, so it won't be that day.
12          MR. WEINREB:  The only concern we have is the
13  scheduling of -- whether victims can be here or not.  Can we
14  take a moment to -- I mean, not a moment, but -- well, why
15  don't we vet that --
16          THE COURT:  What's your concern, summer vacation?
17          MR. WEINREB:  Exactly.
18          THE COURT:  Well, you know, it's not a perfect world
19  and --
00:55 20         MR. WEINREB:  I understand.
21          THE COURT:  -- I don't know that you can -- the
22  alternative would be to put it off until September.
23          MR. WEINREB:  No.  No, we would be thinking June.
24  Late June, for example.
25          THE COURT:  Well, it depends.  I mean, I'm not sure I
```

```
 1    should be doing this speculating on the record, but if there
 2    were a death penalty verdict, for example, I would expect that
 3    we would probably see a motion for a new trial or something of
 4    that sort, okay?  That will take some time to resolve,
 5    presumably, and so the sentencing would have to await that and
 6    whether -- and that might be an uncertain schedule, okay?
 7            On the other hand, if the judgment is in the other
 8    direction and a life sentence, I expect there will not be a
 9    motion for a new trial and things can be scheduled sooner
10    rather than later.  So we're really operating in a range.  So I
11    guess the possible range is maybe mid-June to late July, is the
12    target window.
13            MR. WEINREB:  We'll stick with that.  We just need to
14    say something to the victims who are inquiring.
15            THE COURT:  Mr. Bruck?
16            MR. BRUCK:  If you'd bear with me just a moment.
17            (Counsel confer off the record.)
18            MR. BRUCK:  I had one procedural question.  We've been
19    filing requests to charge, memoranda, exhibits, informally with
20    the Court.  I can't say for many of these I could come up with
21    a justification for sealing, and I would propose to go ahead
22    and file them all on the public docket, but if the Court would
23    prefer we not do that, then we won't.
24            THE COURT:  No.  No.  No, I think for proposed verdict
25    slips, proposed instructions, those are all matters for the
```

00:56 (line 10)
00:56 (line 20)

 1   public record, it seems to me.

 2            MR. BRUCK:  Very well.  We'll go ahead and just file

 3   them.

 4            THE COURT:  Okay.  Thank you.

 5            THE CLERK:  All rise for the Court.

 6            (The Court exits the courtroom at 3:38 p.m.)

 7            THE CLERK:  The Court will be in recess.

 8            (The proceedings adjourned at 3:38 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4    the United States District Court, do hereby certify that the

 5    foregoing transcript constitutes, to the best of my skill and

 6    ability, a true and accurate transcription of my stenotype

 7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8    United States of America v. Dzhokhar A. Tsarnaev.

 9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12

13    Date:  5/22/15

14

15

16

17

18

19

20

21

22

23

24

25
```