UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Criminal Action |
|  | ) No. 13-10200-GAO |
| DZHOKHAR A. TSARNAEV, also | ) |
| known as Jahar Tsarni, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**EXCERPT OF JURY TRIAL - DAY THIRTY-THREE**

**TESTIMONY OF JEFFREY PUGLIESE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 16, 2015
12:13 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

<pre>
1                          I N D E X

2                          Direct   Cross   Redirect   Recross
    WITNESSES FOR THE
3     GOVERNMENT:

4   JEFFREY PUGLIESE

5       By Mr. Chakravarty       4                36
        By Mr. Watkins                    31
6

7                        E X H I B I T S

8
    DEFENDANT'S
9     EXHIBIT      DESCRIPTION           FOR ID       RECEIVED

10
    3006          Photograph of two suspects            32
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

P R O C E E D I N G S

* * *

JEFFREY PUGLIESE, duly sworn

THE CLERK:  State your name and spell your last name
for the record and speak into the mic.

THE WITNESS:  My name is Jeffrey Pugliese; last name
is spelled P-U-G-L-I-E-S-E.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. CHAKRAVARTY:

Q.   Good afternoon.

Sergeant Pugliese, are you with the Watertown Police
Department?

A.   Yes, I am.

Q.   And what's your rank?

A.   Sergeant.

Q.   How long have you been with the Watertown Police
Department?

A.   35 years.

Q.   And are you from Watertown?

A.   Yes, I am.

Q.   Grew up there?

A.   Yes.

Q.   Before you became a police officer in Watertown, what did
you do?

1   A.   I was in the U.S. Army.

2   Q.   And what was your role there?

3   A.   I was a military police officer.

4   Q.   And when did you become a sergeant?

5   A.   1993, I believe.

6   Q.   And in addition to your role as a sergeant, do you have

7   collateral duties on the Watertown P.D.?

8   A.   Yes, I do.

9   Q.   What are they?

10  A.   I'm a firearms instructor.

11  Q.   Back in April of 2013, what was your assignment as a

12  sergeant?

13  A.   I was assigned to the night patrol division, patrol

14  supervisor, uniform.

15  Q.   And what does that entail?

16  A.   You're out driving around the town, supervising, making

17  sure the officers are doing what they need to do, or you're

18  available to assist the officers in any critical incidents.

19  Q.   And about how many other police officers do you supervise

20  when you're on shift?

21  A.   It varies depending on the night of the week.  It can be

22  upwards of ten, it could be a minimum of four.

23  Q.   Do you recall the week of the Marathon bombings, April 15,

24  2013?

25  A.   Yes, I do.

1   Q.   During the day, what were you doing that week?

2   A.   That particular day of the bombings?

3   Q.   On the day of the bombings.

4   A.   Yes. I was actually in Lowell, Massachusetts, at our

5   annual in-service training.

6   Q.   And how did you hear about the bombing?

7   A.   The class had let out somewhere around two o'clock. I was

8   getting in my vehicle, and I turned on the radio, WBZ radio,

9   and I heard that there was just an explosion at the Boston

10   Marathon finish line.

11   Q.   Do you listen to a lot of news when you're in your

12   cruiser?

13   A.   Yes, I do.

14   Q.   Later that week, did you continue to attend that

15   in-service up in Lowell?

16   A.   Yes. It's a Monday through Thursday, four-day class. And

17   so I was going Monday, Tuesday, Wednesday, Thursday that week.

18   Q.   Now, on Thursday, April 18th of that week, were you

19   scheduled to work after your in-service?

20   A.   Yes, I was.

21   Q.   And what was your shift that night?

22   A.   Three-thirty to midnight.

23   Q.   And did you head back to the Watertown area from Lowell

24   that afternoon?

25   A.   Yes, I did.

1   Q.   And did you go along with your shift duties without

2   incident until the evening?

3   A.   Yes.

4   Q.   What happened around 10 p.m. that evening?

5   A.   I was in the police station writing a report on an

6   incident that had occurred at a licensed establishment in town,

7   and I heard on my portable radio that Cambridge -- or an MIT

8   police officer had been shot.

9   Q.   And so what did you do after you heard that?

10  A.   I continued to finish my report.  I was actually in the

11  police station until just about the end of my shift.  About

12  11:30, 11:35, I finished the report and sent it off to the

13  lieutenant for approval -- or his review and approval.  And

14  then I went out, took my cruiser over to my personal vehicle,

15  put my gear in the back and went back into the building.

16  Q.   So you were transitioning from your cruiser to your

17  personal vehicle?

18  A.   Yes.

19  Q.   And when you went back into the station, was there any

20  further conversation?

21  A.   Yes.  The lieutenant was looking for me.  He had told me

22  that he thought he had inadvertently deleted the report that I

23  had written, asked me if I could see if I could pull it back

24  up.  And I subsequently spent about, I don't know, 40, 45

25  minutes or so trying to find the report, to no avail.

1    Q.    While all that was happening, did a call come in?

2    A.    Yes.

3    Q.    Explain that.

4    A.    Well, let me just back up just a -- not while that was

5    going on.  I had left the building at this point, figured I

6    would let the computer people try to figure that report out in

7    the morning.  And I was actually out in my own vehicle when I

8    learned about a carjacking.

9    Q.    Okay.  So you gave up on the report issue and went back

10   out to your car?

11   A.    Yes.  Yes.

12   Q.    Okay.  So, now, were you still in uniform?

13   A.    Yes, I was.

14   Q.    And you were sitting in your car?

15   A.    Yes, I was.

16   Q.    But did you still have your police radio?

17   A.    Yes, I did.

18   Q.    All right.  So what did you hear?

19   A.    I heard that there was a vehicle that had been carjacked

20   in Cambridge and that it was being -- I believe our dispatcher

21   said the cell phone was being pinged, but it ultimately -- I

22   believe turned out to be the GPS system on the vehicle.  But

23   that it was being pinged, and it was on Dexter Avenue in

24   Watertown.

25   Q.    And you were at the Watertown police headquarters?

1   A.   Yes.

2   Q.   Which is on Main Street?

3   A.   Yes, it is.

4   Q.   So how far is that from Dexter Avenue?

5   A.   Mile and a half to two miles.

6   Q.   So what did you do after you got that?

7   A.   So I was sitting, listening to the radio, and the vehicle

8   was being pinged in Watertown.  And I then heard Officer

9   Reynolds say that he had located the vehicle.  And at that

10  point -- I knew that there had been four officers working the

11  midnight shift plus the patrol supervisor -- I decided that I

12  would take a ride in that direction in case there was a vehicle

13  pursuit, and if anybody driving the vehicle bailed out of the

14  car and there would be a foot pursuit, I figured in my own

15  vehicle I would be an extra set of eyes.

16  Q.   And at the time you were heading over towards Dexter

17  Street -- Dexter Ave. -- excuse me -- did you know who the

18  suspects were?

19  A.   No.

20  Q.   Okay.  Incidentally, you mentioned earlier that the

21  Watertown P.D. is on Main Street?

22  A.   Yes.

23  Q.   Is there a Bank of America very close by, right across the

24  street?

25  A.   It's probably -- maybe a half mile away down in the

1    Watertown Square area.

2    Q.    And that's also on Main Street?

3    A.    Yes, it is.

4    Q.    So did you head towards Dexter Ave.?

5    A.    Yes, I did.

6    Q.    Was this your personal vehicle or in the cruiser?

7    A.    My personal vehicle.

8    Q.    How long did it take you to get there?

9    A.    Initially I was probably doing the speed limit, you know,

10   driving along, and then eventually I heard the radio broadcast

11   from the officers on-scene that they're being fired upon,

12   they're taking gunshots at them.  And at that point I was

13   probably anywhere between Main and Waverley Avenue and Main and

14   Whites Ave.  And from there to the scene, it probably took me a

15   minute, if that.  I was doing probably 70, 80 miles an hour

16   up -- down through Watertown Square, up Arsenal Street.

17   Traffic was very light at that time.

18   Q.    And could you tell who was talking through the microphone

19   that they said that shots were being fired?

20   A.    Yes; it was Officer Reynolds and Sergeant MacLellan.

21   Q.    And was Sergeant MacLellan the shift supervisor who took

22   over for you?

23   A.    Yes.  Yes.

24   Q.    What was their tone when they were saying that?

25   A.    A little bit excited.

1   Q.   Did you get down there pretty quickly?

2   A.   Pardon me?

3   Q.   Did you get down to the scene pretty quickly?

4   A.   Very, very quickly.

5   Q.   And where did you park your car?

6   A.   I parked my vehicle on Dexter Avenue just prior to Laurel.

7   Yeah, just prior to Laurel.

8   Q.   And what did you do when you got there?

9   A.   I opened the -- I drive a Chrysler minivan.  I opened the

10  sliding door, put my vest back on because I had taken it off at

11  the end of my shift, and I started approaching Dexter Avenue to

12  where the gunshots were coming from.

13  Q.   Okay.  And when you say "vest," you mean a bulletproof

14  vest?

15  A.   Yes.

16  Q.   That's a standard issue that when you're on duty you wear?

17  A.   Yes.  Yes.

18       MR. CHAKRAVARTY:  Can we call up Exhibit 775, which is

19  in evidence.

20  Q.   Do you recognize this diagram, Sergeant Pugliese?  I can

21  zoom in.

22  A.   Yes, I do.

23  Q.   Okay.  And is this Dexter Street -- Dexter Ave. over here?

24  A.   That would be Dexter Avenue, yes.

25  Q.   And then this is Laurel Street?

1    A.    Yes.

2    Q.    And on this diagram, can you just make a notation -- or

3    just touch the screen in the general vicinity of where you

4    parked your car?

5    A.    Okay.

6    Q.    And you've motioned close -- right in front of 144 Dexter

7    Ave.  Is that right?

8    A.    I don't know what the number is, but that is the location.

9    As a matter of fact, I was just about in front of that

10   residence's driveway.

11   Q.    Okay.  And was this cruiser there already?

12   A.    I don't believe so.  I don't recall that cruiser being

13   there.

14   Q.    Okay.  So could that be your cruiser?

15   A.    Pardon me?

16   Q.    No, you weren't in your cruiser.

17   A.    No, I was in my personal vehicle.

18   Q.    Okay.  And where did you go on this diagram?

19   A.    I -- do you want me to touch and --

20   Q.    If you can.

21   A.    I exited my vehicle about here, I walked along this hedge

22   line here, along the sidewalk.  And then when I was about where

23   my finger is stopped right now, I could hear the gunshots, and

24   I heard an explosion at this point.  I continued on, and I cut

25   into this walkway here leading into this residence, and I saw

1    two officers.  And I recognized one as Officer Reynolds.  The

2    other one I didn't recognize immediately, which turned out to

3    be ultimately one of our Watertown officers, Officer Miguel

4    Colon.

5        As I stepped in behind them, they turned around to me and

6    said, "Sarge, Sarge, get down.  They're shooting at us."  I

7    took a position of cover.  We had the vehicles -- if you look

8    there, in the driveways there were vehicles.  We were able to

9    use those for cover.

10   Q.   And then did you assess the situation from there?

11   A.   Yes, I did.  I kind of looked around, and I saw Sergeant

12   MacLellan behind a tree down on my left, and he was returning

13   fire to the suspects and verbalizing to them, "Give it up.

14   Give it up," you know, among other things.  I don't really -- I

15   just remember, "Give it up.  Give it up."

16   Q.   And there's only one tree on that side of the street?

17   A.   That would have been this tree there, yes.

18   Q.   Where could you tell that the -- could you tell from which

19   direction the gunfire was coming?

20   A.   The gunfire was coming from the east end of Laurel Street.

21   Q.   Okay.  Is that in this direction?

22   A.   Correct.

23   Q.   So -- sorry.  They were shooting at you?

24   A.   Right.  Right.  But it was coming from -- correct.

25   Q.   Could you see anything from where the gunfire was coming?

1   A.   Yeah, there was -- I could actually see a couple of

2   vehicles down in the street.  One of them was a police cruiser

3   off to the left; another one was a black, you know, SUV; and

4   there was another vehicle in front of that.  And I could see

5   what I thought to be -- I could hear the gunshots and I saw

6   muzzle flashes -- what I thought to be muzzle flashes coming

7   from both sides of the vehicle.

8   Q.   When you say "the vehicle," is it the black SUV?

9   A.   Yes.

10  Q.   Was this where Sergeant MacLellan's cruiser ultimately

11  came to rest?

12  A.   Yes.

13  Q.   And was it there when you first came upon the scene?

14  A.   Yes.

15  Q.   Where was the black SUV in relation to that cruiser, if

16  you could just touch the screen?

17  A.   Right about there (indicating).  Did it take?

18  Q.   It didn't take.  If you could use the pad of your finger?

19  A.   Yes, I am.  Right about --

20  Q.   I'm sorry.  Do it again.

21  A.   Right about -- right in this area here.

22  Q.   After you assessed where the gunfire was coming from, what

23  did you do?

24  A.   I made a determination that Sergeant MacLellan, Officer

25  Reynolds and Officer Colon were pinned down, and so I decided

1   that I was going to try to work my way through some backyards

2   and try to flank the individuals that were firing at the other

3   officers.

4   Q.   Why did you decide to flank the individuals?

5   A.   It was -- I wanted to protect the other officers on the

6   scene.  I wanted to help save their lives in case they were

7   going to get shot.

8   Q.   Could you see a direct route?

9   A.   If I had gone directly straight down the street I would

10  have been exposing myself to the gunfire, so I decided to cut

11  through backyards and flank them that way.

12  Q.   Okay.  So again, using your finger, if you could just

13  trace, as you did earlier, your path?

14  A.   Okay.  I was in this front yard here.  I went up alongside

15  of this house like this.  I went over a chain-link fence there,

16  through this backyard, over another fence here (indicating).

17  Q.   Let me stop you there.  Right where you had -- your

18  path -- you stopped, did you see -- notice anything happen

19  behind the houses?

20  A.   Yes.  That second house that I was going behind, after I

21  went over the fence I was kind of watching my feet to see where

22  I landed.  It was dark out.  I focused my attention to get

23  ahead of me and I saw an individual at the bottom of the set of

24  stairs there and he started to flee, I guess that would be

25  southerly, towards Cypress Street.

1   Q.   So can you describe the individual?

2   A.   Yeah, it was a white male.  He had dark hair and he was

3   wearing a white T-shirt.

4   Q.   Did you know whether he was one of the suspects?

5   A.   At that time I did not.

6   Q.   What did you do?

7   A.   I aimed my pistol at him, I ordered him to stop.  He

8   didn't stop; he just kept going.  He went over a chain-link

9   fence in the backyard.  And what I did then is I radioed into

10  Watertown Control, our dispatch, that there was an individual

11  that was fleeing from the area, gave a description, and advised

12  that I didn't know if he was a suspect or a resident just

13  fleeing for his own safety, and told them to keep an eye out

14  for him, any other units responding.

15  Q.   Did you later learn who he was?

16  A.   Yes, I did.  He was a resident of that house right there

17  where I saw him at the back -- the bottom of the stairs.

18  Q.   Why didn't you chase him?

19  A.   He was fleeing and I did not think he was a threat to the

20  officers that were on-scene because there was still gunshots

21  going off.  And I figured if he's running, you know, he's not

22  going to hurt the officers, he's going to be gone, and we could

23  always try to hunt him down later.

24  Q.   What did you do?

25  A.   Then I continued through the backyards.

1    Q.    Please continue to describe your path, if you can.

2    A.    I continued through here.  And I was cutting through the

3    backyards here, I believe it is.  And when I got about to this

4    point here, I heard a loud explosion (indicating).  I saw a big

5    flash, huge, huge plume of smoke.  Something actually came by

6    and hit me in the cheek -- fortunately, I didn't get any

7    injuries -- and then stuff started raining down on me.  It kind

8    of stunned me for a moment, you know.  I kind of stopped for a

9    moment, kind of gathered my wits again and continued up to

10   about this point here.  And I was looking to my right and I

11   could see the black SUV and I could see a couple of individuals

12   in front of it.

13        The headlights to the vehicle were on, and it was casting

14   the light onto the two individuals that were in front of the

15   vehicle, illuminating their bodies to a certain degree.  And I

16   could see activity going back and forth.  I could see muzzle

17   flashes once again and hear gunshots.

18             MR. CHAKRAVARTY:  Mr. Bruemmer, can I call up Exhibit

19   1522, please.

20   Q.    Sergeant Pugliese, is this the SUV with the headlights

21   facing easterly on Laurel Street?

22   A.    Yes.

23   Q.    And is that the position of the two individuals that you

24   saw in front of the SUV?

25   A.    For the most part, yes.

1    Q.   Now, in relation to this photograph -- in relation to

2    those individuals in this photograph, approximately where were

3    you?

4    A.   This house here -- is that going to touch -- this house

5    here, a little bit beyond that doorway there, there's a

6    driveway to the right of that house, then there's -- there were

7    two vehicles in that driveway, then there's a chain-link fence.

8    And I was on the other side of that chain-link fence.  So I was

9    probably maybe 25 feet from that location roughly.

10   Q.   Okay.  And were the individuals who were in front of the

11   car which I just circled, were they stationary or were they

12   moving?

13   A.   They were moving around back and forth.  I don't know

14   exactly what they were doing back there, but there was

15   movement.

16   Q.   So what did you do?

17   A.   I saw the muzzle flashes -- I could still hear Sergeant

18   MacLellan tell them to give it up, give it up, they don't have

19   a chance, and they continued to fire.  And what I did is I drew

20   my service pistol, I took aim at the one individual -- I guess

21   I'll call him Suspect 1.  If you want, I can identify who it

22   ultimately turned out to be.

23   Q.   Is it somebody you later had a personal encounter with?

24   A.   Yes.

25   Q.   And who was that?

1    A.    That was Tamerlan Tsarnaev.

2    Q.    Okay.  And did you see him when you were behind that

3    chain-link fence?

4    A.    Yes, I did.

5    Q.    Okay.  So explain what happened.

6    A.    I drew my pistol, I took careful aim, and I fired three or

7    four shots at the individual.  I thought I was hitting him but

8    I didn't know whether or not I did.  I just -- you know, I

9    wasn't rushing my shots so I thought I was probably, you know,

10   hitting my target, but it didn't seem to be having any effect.

11   Q.    So what happened next?

12   A.    Then I decided -- I could see their feet and ankles from

13   underneath the vehicle.  As I said, if you look at the picture,

14   you can see how the headlights have illuminated their bodies.

15   So that light was being cast down off of their bodies, kind of

16   like reflecting it downward, and I could see their ankles and

17   their feet.

18        And what I decided to do was take a few skip shots, and

19   that's you aim at the ground in front of your target and you

20   kind of bounce the bullets -- the trajectory of the bullets,

21   you'll come down, and the bullets will hit the ground and then

22   bounce up and they'll reach a plane of about six to eight

23   inches and then continue on on that plane.  They don't come

24   down like on this angle and bounce back up again like many

25   people think they would; they kind of just pick up and get that

1    trajectory.

2        And I thought if I could, once again, take my time, aim,

3    and get these bullets to count, maybe I could take their ankles

4    out and get them to, you know, stop with the aggressive

5    behavior they were doing.

6    Q.   So that skip shot, the ricochet shot, is that a special

7    shot that you learned --

8    A.   I've learned -- I've learned it -- I've been a firearms

9    instructor for the department for probably 30 years of my 35

10   years on the job.  And I know somewhere in those 30 years that

11   I've been trained in that at one of the firearms instructor

12   schools, whether it be one or two classes over the years or

13   several, but I know I've been trained in that.

14   Q.   And what effect did that have after you shot --

15   A.   When I was doing that, that's when Suspect 1 noticed where

16   I was.  I saw him kind of look at me.  And he came charging up

17   the street firing his firearm at me, and I returned fire as he

18   was approaching.

19   Q.   So you made eye contact with him?

20   A.   Yes.  Yes.

21   Q.   Did you see what the other person was doing?

22   A.   At this point now -- I now focused on the one that was

23   charging me and shooting at me.

24   Q.   Was he shooting at you as he was coming at you?

25   A.   Yes, he was.

1    Q.    All right.  How many times do you think he shot at you?

2    A.    I'm guessing four to six.  Somewhere in there.  I don't

3    know.  I wasn't really counting.

4    Q.    Did he get to that driveway that you described earlier?

5    A.    Yes, he did.

6    Q.    And what did he do?

7    A.    There was about a three-foot gap between the chain-link

8    fence and one of the vehicles that was parked there.  He ran up

9    that driveway about five feet or so and continued to fire at

10   me.

11   Q.    Okay.  On this diagram, can you just draw the general path

12   in which he took to get to you?

13   A.    Just right up the sidewalk.  And the picture stops shy of

14   where his destination was there.

15            MR. CHAKRAVARTY:  Mr. Bruemmer, if we could go back to

16   755, please?  I'm sorry.  Did I read that wrong?  775.  Excuse

17   me.  Thank you.

18   Q.    So, Sergeant Pugliese, I think you earlier indicated that

19   the Mercedes was in this area and that you were in this area.

20   Is that right?

21   A.    Correct.

22   Q.    Okay.  And so on this diagram, can you draw where Tamerlan

23   Tsarnaev was shooting at you?

24   A.    As I say, he left his position of cover here, ran up the

25   sidewalk here, and came in -- there's a chain-link fence.  I

1    don't see it depicted on this map.  But he stopped about there,

2    and once again, I was right about there (indicating).

3    Q.    So you're -- right face-to-face with each other?

4    A.    We're about six feet, maybe eight feet at the most apart

5    from each other.

6    Q.    And did you continue to shoot at him?

7    A.    As he was advancing towards me and firing, I was returning

8    fire, yes.

9    Q.    How many times do you think you shot at him?

10   A.    I'm guessing five or six only because magazines hold 13

11   rounds of ammunition.  I had one in the chamber of my pistol,

12   gave me 14 rounds, and I had run out of ammunition at a certain

13   point there.  So I'm guessing while he was standing there and I

14   was standing there, he was continuing to fire.  My pistol ran

15   out of ammunition and I had to reload in the middle of this

16   battle.

17   Q.    And did you do that?  You dropped your magazine?

18   A.    Yes, I did.  I reloaded, dropped the magazine right by my

19   feet, threw another magazine into the pistol, and continued to

20   exchange fire with him.

21   Q.    And what did he do?

22   A.    He continued to fire at me.  Ultimately, he had a problem

23   with his pistol.  I don't know if it jammed or he ran out of

24   ammunition.  He kind of just looked at his gun, he looked at

25   me, we looked at each other, and I think out of frustration he

1    threw his gun at me.  It hit me in my left bicep and the gun

2    fell.  And then he turned -- do you want me to --

3    Q.   Yes, please.  What did he do after that?

4    A.   After he threw the firearm at me, he turned, ran down the

5    sidewalk -- the driveway, out into the street, turned left, and

6    started running in this direction here.  I, in turn -- there

7    was a picket fence along this property line here, there was a

8    gate right here (indicating).  I holstered up and I started

9    chasing after him myself, and I tackled him right about in this

10   area here.

11   Q.   When you went to go chase down Tamerlan Tsarnaev, do you

12   know what the other person was doing?

13   A.   I really don't know what he was doing at that time.  My

14   focus was on the older brother, or Tamerlan.

15   Q.   Did you catch up with him?

16   A.   Yes, I did.

17   Q.   And what happened?

18   A.   I tackled him, brought him to the ground.

19   Q.   When you brought him to the ground, was he wounded?

20   A.   Yes, he was.

21   Q.   What kind of wounds, in your estimation?

22   A.   He was bleeding.  I don't know exactly what the extent of

23   the wounds were at that point.  I didn't know.  But I did know

24   that he was bleeding.

25   Q.   Okay.  And so what happened when you brought him down?

1    A.   He was continuing to resist Sergeant MacLellan.  He was

2    still in this position, under cover over here by this tree.  He

3    came out, came over to assist.  Officer Reynolds, I don't know

4    if he was still in that front yard or not or if he had advanced

5    forward, but he came down and he was trying to assist, and the

6    three of us were trying to get handcuffs on Tamerlan.

7    Q.   So there were three of you in this area right here?

8    A.   Yes.

9    Q.   And was -- were you able to handcuff Tamerlan at that

10   point?

11   A.   No.  He was face down.  We were able to get his right hand

12   behind his back, and his left hand -- at one point he had it

13   underneath him, then it was flailing around a little bit, and

14   then he got it underneath him again, and we were trying to get

15   him.  I know my own personal thought is I didn't want him to

16   roll over because we didn't know what he had on him, so we

17   wanted to keep him face down.  That was my thought.

18        And while we're trying to get control of his arms, Officer

19   Reynolds said, "Sarge, Sarge, look out.  The other guy's in the

20   car.  He's coming at us."

21   Q.   So, now, were you paying attention to what was happening

22   behind you?

23   A.   At that point, no, I was still focused.  I gave a quick

24   glance to my right and I saw some headlights down the road and

25   then I turned my attention back to Tamerlan.

1    Q.    And what did Sergeant MacLellan and Officer Reynolds do?

2    A.    They withdrew from that position.  Officer Reynolds

3    disappeared to my left, which would have been -- he headed to a

4    westerly position, and Sergeant MacLellan withdrew back to the

5    safety of the tree area there.

6    Q.    Okay.  Did you look behind you at that point?

7    A.    I looked to my right, and I could hear an engine racing,

8    and I saw the headlights moving towards me from the SUV.

9    Q.    Okay.  On the diagram, could you just in your best

10   estimation mark where you first saw the SUV coming towards you?

11   A.    I would venture to say right about here maybe

12   (indicating).

13   Q.    And so when you first came on the scene, the headlights

14   were facing away from you?

15   A.    Correct.

16   Q.    Is that fair to say?

17   A.    Yes.

18   Q.    And now they're facing towards you?

19   A.    Yes, they were.

20   Q.    Now, you had described when you came on the scene that

21   there were cruisers at this end of Laurel Ave. [*sic*].  Is that

22   right?

23   A.    Correct.

24   Q.    Were there any police cars down at this end?

25   A.    None that I can recall.

1  Q.   And you were one of the first people on-scene.  Is that
2  fair to say?
3  A.   Yeah, I think I was probably the fourth officer on-scene.
4  As I said -- yeah, fourth officer on-scene.  There was Sergeant
5  MacLellan, Officer Reynolds, Officer Colon, and then myself.
6  Q.   And these roads all connect.  And does this go back
7  towards Arsenal Street?
8  A.   Yes, that would -- Cypress Street?  Let me think.
9  Q.   I can zoom in on it for you.
10 A.   I believe that's -- yeah, Cypress Street.  Cypress Street,
11 it will actually come down and it hooks around to the right,
12 brings you back out to Dexter Avenue.  And then if you take a
13 left, it would bring you back to School Street, or if you went
14 straight, it would take you to School Street.
15 Q.   Now, when the SUV was coming in your direction, were you
16 closer to the southerly side of Laurel Ave. or the northerly
17 side?
18 A.   I was close to the sidewalk on the southerly side of the
19 roadway.
20 Q.   And was there anything in the middle of the road that
21 would prevent travel?
22 A.   No, not in that area.
23        MR. CHAKRAVARTY:  Can we go to Exhibit 1525, which is
24 in evidence.
25 Q.   Do you recognize that picture?

A.   Yes, I do.

Q.   What is that?

A.   That's a picture of Laurel Street looking westbound.  And
it looks like it may be the Mercedes SUV going up the roadway,
and it looks like it may actually -- the picture's a little
fuzzy, but I'm guessing that may be me standing in the middle
of the road there, or on the side of the road.

Q.   We'll zoom in now.  And can you just circle the mass that
you think may include you?

A.   (Witness complies.)

Q.   How quickly did that car come up on you?

A.   Very, very rapidly.  It was accelerating at a very high
rate of speed.

Q.   And so once Officer Reynolds and Sergeant MacLellan
withdrew, what did you do?

A.   I saw that the vehicle was on the wrong side of the road
heading directly at me, and Tamerlan -- what I did is I reached
down and I grabbed Tamerlan by the back of the belt, and I was
trying to drag him out of the street to prevent him from
getting struck.

Q.   Was the car coming straight at you?

A.   Yes, it was.

Q.   Were you successful in dragging him off?

A.   I was able to pull him about a foot towards the sidewalk,
and then the black SUV just -- it was right in my face.  Like I

1    kind of looked to the right, and the headlight was just like

2    almost there, and I kind of rolled back onto my back.  And as I

3    did so, I could feel the breeze of the vehicle go by my face.

4    I looked down and I saw Tamerlan -- the front wheels were over

5    Tamerlan.  He kind of bounced up and underneath the

6    undercarriage a couple times.  He got hung up in the rear

7    wheels of the vehicle.  The vehicle dragged him about 25 or 30

8    feet, and it struck one of our police cars that was off to the

9    left side of the roadway there on the south side of the street.

10            MR. CHAKRAVARTY:  With the Court's permission, I would

11   like to ask the witness to get off the stand and demonstrate

12   how he rolled off of Tamerlan.

13            THE COURT:  All right.

14            (The witness steps off the witness stand.)

15   BY MR. CHAKRAVARTY:

16   Q.   Sergeant Pugliese, if you wouldn't mind demonstrating in

17   the well.

18   A.   Where would you like me to go?

19   Q.   In the well of the court.

20   A.   Right here?

21   Q.   Yes.

22        So can you just -- if you wouldn't mind, get in a position

23   that you were over Tamerlan Tsarnaev as you were trying to pull

24   him to safety.

25   A.   Yeah, I was in a position like this.  I grabbed him by the

1    back of the belt, and I was trying to pull him towards the

2    sidewalk, which the southerly side would have been behind me

3    here.

4    Q.   And then when the SUV was right upon you, can you

5    demonstrate how you got out of the way?

6    A.   Well, like I said, I kind of looked like this.  I saw the

7    headlights.  They were like right here in front of --

8    approaching my face, and I just kind of rolled back like that,

9    and I was watching the SUV go by me.

10            (Demonstrating.)

11   Q.   How close -- please.  Thank you.  Resume the stand.

12            (The witness resumes the witness stand.)

13   Q.   How close did the wheels come of the SUV to you?

14   A.   Oh, they were within inches of my feet as it went by me.

15   Q.   And what happened to the vehicle when it ran over

16   Tamerlan?

17   A.   It continued to travel for, like I said, 25 or 30 feet.

18   Tamerlan was hung up in the rear wheels.  And it crashed into

19   our car 465, which was parked on the south side of Laurel

20   Street.

21   Q.   And did the -- did the SUV ultimately get loose of that

22   vehicle?

23   A.   Yes, it did.

24   Q.   And did it continue down Laurel Street?

25   A.   Yes, it did.  It continued down Laurel Street across

1    Dexter Ave.  And again, continuing down Laurel Street, that's

2    the last time I saw the taillights.  I got back up and

3    refocused my attention back on to Tamerlan.  Officer Reynolds

4    came back down.  We got him handcuffed.  He was still moving

5    around.  Once again, we didn't know if he had any other

6    explosive devices on him or anything else, so what I did is I

7    literally stood up and put my foot in the small of his back and

8    held him down, got on the radio and called for an ambulance.

9    Q.   As you were doing that, did you check to see if you were

10   injured?

11   A.   No, I was focused on keeping Tamerlan from rolling over.

12   Like I said, I didn't know if he had any explosive devices or

13   anything else on him.

14   Q.   And were you able to get him handcuffed?

15   A.   Yes, with Officer Reynolds' handcuffs.  He handed them to

16   me, and the two of us got him handcuffed.

17   Q.   And did an ambulance come?

18   A.   Yes, it did.

19   Q.   And did you get him into the ambulance?

20   A.   Yes.  He was -- Boston EMS arrived.  They cut his clothes

21   off him.  And as they were cutting his clothes off, rolled him

22   over a little bit at a time, saw that there were no other

23   devices with him or anything like that, put him on a stretcher,

24   put him in the back of an ambulance, and I believe off to Beth

25   Israel Hospital.  I may be mistaken on the hospital they took

1    him to.

2              (Counsel confer off the record.)

3    Q.    Sergeant MacLellan, I --

4              MR. CHAKRAVARTY:  Excuse me.  Can we have 775 again?

5    Q.    I asked you those questions about Cypress Street and

6    getting back on to Dexter Ave. and then off to Arsenal.  To the

7    best of your knowledge, as long as you were on-scene, was there

8    anything from preventing the Mercedes from continuing in this

9    direction?

10   A.    No, there was nothing -- no police cars were down there.

11   And the two vehicles, the green -- I believe it's a Honda,

12   which was in front of the black SUV was more over to the south

13   side of the street.  And I believe the SUV did a three-point

14   turn when he turned to come back in our direction.  He could

15   have just as easily gone around the Honda.

16             MR. CHAKRAVARTY:  That's all I have, your Honor.

17                       CROSS-EXAMINATION

18   BY MR. WATKINS:

19   Q.    Good afternoon, Sergeant Pugliese.

20             MR. WATKINS:  May I have the screen just for the

21   witness?

22   Q.    The government showed you Exhibit 1522.  And you

23   identified the two suspects there?

24   A.    Yes.

25   Q.    Do you recall that?

1          I want to show you what I'm marking for identification,

2     Defendant's Exhibit 3006 from that same series.  Is that the

3     same two suspects there?

4     A.   It appears to be.

5     Q.   And is that a fair and accurate representation of what was

6     going on that night?

7     A.   I would say yes.

8               MR. WATKINS:  I would move into evidence Defense

9     Exhibit 3006.

10              MR. CHAKRAVARTY:  No objection.

11              THE COURT:  All right.

12              (Defense Exhibit No. 3006 received into evidence.)

13    BY MR. WATKINS:

14    Q.   Now I'm going to blow up a portion of that.  And you can

15    see two figures?

16    A.   Yes, sir.

17    Q.   There is one to the left in darker clothing?

18    A.   Yes.

19    Q.   Do you recognize that as Tamerlan Tsarnaev?

20    A.   No, I don't.

21    Q.   There's a person to the right in what appears to be

22    lighter or illuminated clothing.  Do you recognize that as

23    Tamerlan Tsarnaev?

24    A.   I believe that one was Tamerlan.

25    Q.   And what makes you believe that that is Tamerlan rather

1   than Jahar?

2   A.    Tamerlan was wearing light-colored clothing when he

3   advanced towards me.

4   Q.    He was wearing a jacket that night?

5   A.    I don't recall if he had a jacket on or not.

6   Q.    A dark blue or even black jacket?  You don't recall?

7   A.    I don't.  I thought it was light clothing he was wearing.

8   Q.    I'm showing you now what's been marked as Government's

9   Exhibit 1525.

10  A.    Yes.

11  Q.    We talked about that portion of it where I've blown it up.

12  A.    Uh-huh.

13  Q.    Now, here one can see two headlights on the left side and

14  two headlights on the right side?

15  A.    That's what it appears to be, yes.

16  Q.    And I think you also already testified this is the

17  Mercedes as it was coming towards you?

18  A.    That's what I believe it is, yes.

19  Q.    I'm going to show you Exhibit 775, which is in evidence,

20  and also, if I can, Exhibit 1525.  Now I'll do 775.

21        So looking at these two maps -- I'll blow that up again --

22  it appears to be two pairs of headlights pointed down towards

23  the Mercedes in that picture?

24  A.    Yeah, I guess it does appear to be.

25  Q.    And were those -- the set of headlights closer to us, it

1    looks like you're right next to that in this picture?

2    A.    Yeah, that's what it looks like.

3    Q.    I think you've told us that that was a fair and accurate

4    representation of the Mercedes going towards you?

5    A.    Yup.

6    Q.    So it's fair to say from what you've seen there, there

7    actually is another car parked there next to where you are

8    tackling Tamerlan?

9    A.    I would say yes.

10   Q.    It sounds like you're a truly excellent marksman to be

11   able to do those skip shots and hit Tamerlan Tsarnaev.

12   A.    I'm a fairly good shot, yes.

13   Q.    And Tamerlan Tsarnaev, with a gun, started walking towards

14   you, where you were?

15   A.    Running towards me.

16   Q.    Running towards you?

17   A.    Yes.

18   Q.    And the two of you exchanging shots?

19   A.    Yes.

20   Q.    You hit him; fair to say?

21   A.    I would think I was hitting him.  I don't know if I was.

22   Q.    When you saw him down -- when you tackled him, he was

23   injured at that point, correct?

24   A.    Yes.

25   Q.    You could see the visible wounds that he had on him?

1    A.    Not at that point, I could not.  He had clothing on.  I

2    could see blood on him.

3    Q.    Right.  And you are aware that, in fact, he was shot

4    several times?

5    A.    Yes, I learned that later on.

6    Q.    And you've trained Sergeant MacLellan and Officer Reynolds

7    in marksmanship?

8    A.    Yes, I have.

9    Q.    And you are really the expert of the department, right?

10   A.    I don't know if I'm the expert, but I am a firearms

11   instructor for the department.

12   Q.    Take credit.  You're the best shot in the department,

13   right?

14   A.    I don't know about that.

15   Q.    So you hit him and he threw the gun or threw -- right,

16   threw the gun and hit you in the arm?

17   A.    Yes.

18   Q.    And then he continued to run towards the other folks that

19   were shooting, right?

20   A.    Yes.

21   Q.    And it was only after you tackled him -- and he went down

22   right away when you tackled him?

23   A.    Yeah.  I leapt up, and I know I probably came down from

24   about waist high on his shoulders.

25   Q.    And that took him down?

1    A.    Yes, it did.

2    Q.    During that period of time when he was marching down

3    towards Officer Reynolds and Sergeant MacLellan, there's a

4    little lull in the shooting?  There's no more shooting going

5    on?

6    A.    To tell you the truth, I don't know.  I was so focused on

7    chasing him, running after him as he was running towards the

8    other officers, that I really don't know if there was other --

9    if there were rounds being fired by anybody at that point.

10   Q.    When you tackled Tamerlan down on the ground, he continued

11   to be combative towards you?

12   A.    Correct; he continued to resist.

13              MR. WATKINS:  That's all I have, your Honor.

14              MR. CHAKRAVARTY:  Just one question.

15                        REDIRECT EXAMINATION

16   BY MR. CHAKRAVARTY:

17   Q.    Did you get hit at all by gunfire?

18   A.    No, I did not.

19              MR. CHAKRAVARTY:  That's all I have.

20              THE COURT:  Thank you, Sergeant.  You may step down.

21              THE WITNESS:  Thank you.

22              (The witness is excused.)

23                            *  *  *

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  7/30/15
13

14

15

16

17

18

19

20

21

22

23

24

25