UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**REDACTED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT
NOTWITHSTANDING VERDICT AND FOR NEW TRIAL**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this
Memorandum in support of his Motion [DE 1490] for New Trial Pursuant to Fed. R.
Crim. P. 33 and for Judgment Notwithstanding Verdict Pursuant to Fed. R. Crim. P. 29.

Judgment notwithstanding the verdict is required as to both guilt and penalty as a
matter of evidentiary insufficiency.  The government failed to prove each and every
element of each and every charged offense beyond a reasonable doubt, and failed to
prove each and every fact required to warrant the death penalty beyond a reasonable
doubt.  In the alternative, the Court should order a new trial as to both guilt and/or
penalty in the interests of justice, and the trial should be held in a different venue.

Without limitation, in further support of this motion, defendant renews here all of
the arguments made previously i) after the government rested its case in the guilt phase;
ii) after defendant rested his case in the guilt phase; iii) after the verdict in the guilt phase;
iv) after the government rested its case in the penalty phase; v) after the defense rested its
case in the penalty phase; and vi) after the verdict in the penalty phase.

1

The defendant also hereby incorporates by reference, as to venue, all of the substantive filings (with accompanying exhibits) made in connection with his Motion For Mistrial [DE 1267 (sealed)], the fourth venue motion [DE 1108], the third venue motion [DE 980, 981, 996], the second venue motion [DE 686, 696, 774, 779, 780, 852], and the first venue motion [DE 376, 461], as well as his filings concerning leaks of non-public information by law enforcement [DE 280, 336, 438, 616, 680].

Finally, in further support of this motion and also without limitation, defendant highlights certain issues below and supplements the record with this filing and exhibits submitted herewith.

## I.   VENUE IN BOSTON PRECLUDED IMPARTIAL ADJUDICATION IN BOTH FACT AND APPEARANCE.

A new trial in a different venue is required due to continuous and unrelenting publicity combined with pervasive connections between jurors and the events surrounding the Boston Marathon Bombing that precluded impartial adjudication in both appearance and fact.

A fair trial by an impartial jury is a fundamental constitutional right guaranteed by the Fifth and Sixth Amendments. *See Irvin v. Dowd*, 366 U.S. 717 (1961). "[R]egardless of the heinousness of the crime charged, the apparent guilt of the offender[,] or the station in life which he occupies, our system of justice demands trials that are fair in both appearance and fact." *Skilling v. United States*, 561 U.S. 358, 464 (2010) (Sotomayor, J., concurring in part and dissenting in part) (quoting *Irvin,* 366 U.S. at 722) (internal citations and quotation  marks omitted).   A change of venue is required where

"extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010). As *Skilling* reaffirmed, this entitlement is a "'basic requirement of due process.'" *Id*. (quoting *In re Murchison*, 249 U.S. 133, 136 (1955)).  In addition, Fed. R. Crim. P. 21(a) obliges a trial court to transfer proceedings to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  The constitutional stakes are heightened and the Eighth Amendment is also implicated where, as here, the defendant faced the death penalty.

In connection with the previous venue filings averred to above, the defendant submitted substantial evidence concerning local events and publicity.  More has surfaced in the aftermath of trial.  A sample of that additional information is summarized below concerning local events and publicity that occurred during the trial as well as the penetration of that information into individual jurors' social media.  Supporting materials — including those expressly mentioned in this Memorandum as well as many others — have been compiled in electronic form and are submitted herewith on a DVD as Exhibit A.  Information concerning individual jurors' social media is compiled in electronic form and submitted herewith on DVD as Exhibit B.

As these materials show, both the unprecedented levels of publicity and the extraordinary salience of the Marathon Bombings and their aftermath in the life of Boston and the surrounding communities, the basis of the defendant's motions for change of venue before trial, continued unabated during the actual trial and sentencing.  The totality of the circumstances demonstrates that it was error to deny a change of venue and

3

that therefore a new trial, or alternatively, a new capital sentencing proceeding, is
warranted.

### A.  Media, Events, and Publicity

#### 1.  One Boston Day

At the same time the jury was hearing evidence during the guilt phase of the trial,
Boston Mayor Martin Walsh announced a new Boston holiday named "One Boston
Day."  On April 15 of each year, Boston will celebrate the anniversary of the Boston
Marathon Bombing by "honoring the strength of our city, its people and their acts of
goodness toward one another."  *See* Mayor Walsh Announces April 15 as "One Boston
Day" (Mar. 20, 2015).  Indeed, shortly after the guilty verdict, and before the penalty
phase started, greater Boston celebrated the first One Boston Day.  Events included, but
were not limited to:

- A moment of silence at 2:49 P.M., the approximate time of the first explosion.
  The moment was observed by Mayor Walsh, City Hall, the Boston Red Sox
  and all of Fenway Park, Memorial Hall at the Statehouse, and numerous
  television channels and radio stations operating in the greater Boston area.
  During the moment of silence, church bells rang throughout Boston.  *See, e.g.*,
  Church Bells, Kind Acts Mark Two Years Since Boston Bombings, Boston
  Herald (Apr. 15, 2015); Red Sox Honor Boston Marathon Bombing Victims on
  Second Anniversary, Yahoo Sports (Apr. 15, 2015).

- After the moment of silence, the Massachusetts State Senate moved to recess
  for the remainder of the day in honor of the victims.  *See* MA State Senate,
  Twitter (Apr. 15, 2015) (announcing adjournment and stating "not even a
  guilty verdict can restore what was taken on April 15 . . .").

- Mayor Walsh, Governor Charlie Baker, other officials, and the Richard family
  gathered for a ceremony on Boylston Street.  At the ceremony, Mayor Walsh
  and members of the Richard family unveiled commemorative banners at the

blast sites on Boylston Street.  *See* Photos: Boston Raises Banners at Bombing Sites on 'One Boston Day', WBUR (Apr. 15, 2015).

- Governor Baker ordered all flags in the Commonwealth to be flown at half-staff in honor of the victims and survivors.  *See* Flags at Half Staff Today in Honor of Boston Marathon Bombing Victims, Masslive (Apr. 15, 2015).

- The Red Cross held a Boston Strong blood drive in honor of the victims, which Bill Richard attended.  *See* City, Region Holding Events to Commemorate One Boston Day, WCVB (Apr. 15, 2015); MA Red Cross Blood, Twitter (Apr. 15, 2015) (including a picture of Bill Richard donating blood).

- 7News and Lowes teamed together to clean the courtyard at Spaulding Rehabilitation Hospital.  Volunteers planted flowers and a vegetable garden, and donated equipment to the Hospital.  *See* 7News Gives Back to Spaulding Hospital for One Boston Day, 7News (Apr. 15, 2015).

- WZLX recruited its listeners to help clean Filippello Park as a service to the town of Watertown.  *See* Help Out on One Boston Day at Watertown's Filippello Park, Watertown News (Apr. 15, 2015).

- Teams preparing for the 2015 Boston Marathon organized training runs including one run at City Sports Back Bay to honor "resiliency, generosity, and strength" through the city of Boston.  *See* Group Runs and Community Service Will Commemorate Anniversary of Bombings, Runnersworld (Apr. 14, 2015).

- Boston Marathon race director David McGillivray, visited Medford High School—the alma mater of Krystle Campbell—to honor Ms. Campbell and the other victims.  *See* Boston Marathon's Race Director Honors Bombing Victim, 7News (Apr. 15, 2015).

- The Hyatt Regency Hotel collected old running shoes to donate to the homeless.  *See* Hyatt Regency Boston and St. Francis House Collect Sneakers for Downtown Boston Shelter Guests, Hyatt.com (Apr. 15, 2015).

- Survivors Jeff Bauman and Patrick Downes threw out the first pitch at the Red Sox game.  Several other injured survivors attended the game.  *See* Red Sox Honor Boston Marathon Bombing Victims on Second Anniversary, Yahoo Sports (Apr. 15, 2015).

- Brighton Music Hall held a free concert in honor of first responders, firefighters, and police officers.  *See* Bostonians Answer Mayor's Call for Acts of Kindness, Boston Globe (Apr. 15, 2015).

- Citizens attached small peace signs to various objects along Boylston Street. The signs were in "Boston Strong" colors and contained messages of remembrance for the victims.  *See* Keller @ Large: Every Day is One Boston Day, WBZ-TV (Apr. 15, 2015).

- Old South Church conducted a "service of resiliency."  *See* City, Region Holding Events to Commemorate One Boston Day, WCVB (Apr. 15, 2015); Kelley Tuthill, Twitter (Apr. 15, 2015) (including a picture of the service of resilience program).

- Various companies gave away free merchandise, food, and water, or offered discounts on their products.  *See, e.g.*, Red Sox Donate Fifty Tickets to Boston Fire and EMS, 7News (Apr. 15, 2015).

The above events only represent a fraction of the One Boston Day activities.  The events were well-attended.  *See* Bostonians Answer Mayor's Call for Acts of Kindness, Boston Globe (Apr. 15, 2015).  And One Boston Day was not limited to the city of Boston.  The celebrations extended to the greater Boston area, including towns in which the jurors reside.  *See, e.g.*, News Around Malden: One Boston Day, Malden Homepage (Apr. 13, 2015) (asking "Malden residents, businesses and organizations" to participate in One Boston Day); BostonCatholicSchls, Twitter (Apr. 15, 2015) (showing One Boston Day memorial service held at St. Brendan School in Dorchester); *see also* Wilmington Joins Boston in Observance of One Boston Day with Moment of Silence, Wicked Local Wilmington (Apr. 13, 2015) (asking citizens to observe the moment of silence); Framingham to Observe 'One Boston Day' on April 15, ThePatch (Apr. 14, 2015).

### 2.   The 2015 Boston Marathon

Even before One Boston Day, the city and surrounding areas started to prepare for the 2015 Boston Marathon.  Boston observed "Marathon Monday" on April 20, 2015, one day before the jury returned to the courthouse for the commencement of the penalty phase.  Again, the media coverage was not limited to the city of Boston.  In fact, the race route stretched through several of the surrounding communities and the media coverage was widespread.  *See* Which Roads are Closed Around Boston on Marathon Monday, Boston Globe (Apr. 20, 2015); Crowds Cheering on Elite Runners in Boston Marathon, Boston Globe (Apr. 20, 2015); Under Gray Skies but in Bright Spirits, Marathoners Hit the Road, Boston Herald (Apr. 20, 2015).

Almost all of the coverage tied the 2015 Marathon to the events of 2013.  The winner of the 2015 race, Lelisa DeSisa, also won the race in 2013.  In 2013, DeSisa donated his medal to the city of Boston as a tribute to the victims and survivors.  After he won again in 2015, many articles discussed this donation.  *See* Lelisa DeSisa Wins Boston Marathon Men's Race Again, Boston Herald (Apr. 20, 2015); This Time, Lelisa DeSisa Can Relish his Boston Marathon Victory, Boston Globe (Apr. 21, 2015); Lelisa DeSisa Gets Second Boston Marathon Medal, and This Time He Gets to Keep It, Boston.com (Apr. 20, 2015).

Rebekah Gregory, an amputee survivor who testified at trial, ran the last 3.5 miles of the 2015 marathon on a prosthetic leg.  After crossing the finish line, she fell to her knees crying.  This powerfully emotional moment was videotaped and widely reported by the news media.  Gregory gave post-run interviews to the press.  *See* Boston Marathon

Bombing Amputee Returns to Cross the Finish Line, Talk Radio (Apr. 20, 2015); Video:

Bombing Survivor Rebekah Gregory Crosses Marathon Finish Line, MyFoxBoston (Apr.

20, 2015).

   After the bombing, the Richard family created "Team MR8, the Martin Richard

Charitable Foundation" in honor of Martin Richard. Team MR8 ran in the 2015

marathon. Actor Sean Astin (well-known for his roles in "Rudy" and "Lord of the

Rings") ran for Team MR8. *See* To There and Back, for Martin Richard, Boston Herald

(Mar. 27, 2015); Actor Sean Astin Running Boston Marathon in Honor of Martin

Richard, WCVB (Apr. 20, 2015); 'Rudy' Star Sean Astin Running Boston Marathon in

Honor of Martin Richard, CBSBoston (Mar. 20, 2015). In addition, Mayor Walsh's

Chief of Staff ran on Team MR8, and proposed to his girlfriend on the finish line after the

race. The media published several pictures of him in MR8 Team gear. *See* She Said

Yes: Proposal at the Boston Marathon Finish Line, MyFoxBoston (Apr. 20, 2015);

Mayor's Chief of Staff Proposes to Girlfriend at Finish Line, The Boston Globe (Apr. 20,

2015). Finally, the winner of the wheelchair division, Tatyana McFadden, competed for

Team MR8. Moments after the win, she gave her golden winner's wreath to Bill

Richard. *See* Wheelchair Race Winner Gives Crown to Richard Family, 7News (Apr. 20,

2015) ("I was really, really happy, emotional myself, but I told him, 'this is for you, and

it's about strength, courage, and hope, and thank you for being here today.'"). Overall,

Team MR8 raised more than $700,000 for the Martin Richard Foundation. *See* Brockton

Peace Project Honors Martin Richard, The Enterprise (Apr. 20, 2015).

### 3. Victim and Survivor Coverage

Throughout the trial, the media covered numerous other events honoring the victims and survivors.  For example, in addition to Team MR8's participation in the 2015 marathon, many runners for the team also participated in the Race for Peace 5k to raise money for the Martin Richard Foundation.  The Race for Peace took place on March 22, 2015.  *See* Hundreds Honor Martin Richard with Race for Peace, CBSBoston (Mar. 22, 2015); Road Race in Hingham Honors Martin Richard, 7News (Mar. 22, 2015); Runners to Remember Martin Richard with Race for Peace, WCVB (Mar. 21, 2015).

Denise Richard participated in a Mother's Day Walk for Peace in early May, during the defense presentation of evidence at the penalty phase.  *See* Thousands Participate in Mother's Day Walk for Peace, NECN (May 10, 2015).  Approximately 15,000 people walked through Dorchester to raise money for families who lost loved ones to homicide.  Richard marched with Ursula Ward, the mother of Odin Lloyd, the murder victim of Aaron Hernandez.  Their participation in the march received widespread media coverage.  The walk raised more than $330,000.  *See* Mothers of Martin Richard, Odin Lloyd March for Peace, CBSBoston (May 10, 2015); Thousands Join Mother's Day Walk to Remember Violence Victims, Boston Globe (May 10, 2015); Watertown Residents Rally at Walk for Peace, The Patriot Ledger (May 13, 2015); Letter: More than 80 Watertown Residents Participate in Peace Walk, Watertown News (May 21, 2015).

On April 29, 2015, thousands of Boston residents gathered for a memorial service in honor of Officer Sean Collier.  At the service, MIT formally dedicated a permanent

memorial in honor of Office Collier.  The memorial is a 190-ton granite star-shaped

structure that sits on the corner of Vassar and Main Street.  Cambridge Mayor David

Maher stated "The sheer size and imposing design of the memorial will ensure that all

who pass by this site, whether it's this week, or days from now, or years or decades from

now, will know who Office Collier was, and the spirit that he embodied."  *See* MIT

Dedicates Monument to Sean Collier, Boston Globe (Apr. 29, 2015); Sean Collier Never

to be Forgotten, Boston Herald (Apr. 30, 2015); MIT Dedicates Permanent Memorial to

Officer, CBSBoston (Apr. 29, 2015).

In February 2015, the Mayor of Medford announced the city had reached its goal

of $1.128 million to fund construction of a peace garden in honor of Krystle Campbell.

In March, hundreds gathered at a reception to make donations to support the park.  *See*

Support Bolsters Marathon Victim's Kin, Boston Globe (Mar. 12, 2015); Krystle

Campbell Peace Garden Expected to be Complete in 2016, 7News (Mar. 12, 2015).

#### 4.  Media Circus Surrounding Foreign Family Witnesses

During the penalty phase of the trial, the defense called members of Mr.

Tsarnaev's family from Russia to testify on his behalf.  The witnesses traveled to the

United States in order to testify.  They were admitted subject to draconian conditions

including GPS monitoring and 24/7 FBI accompaniment that amounted to what was in

effect "hotel arrest."  Immediately upon their arrival at Logan Airport, after an apparent

leak from law enforcement sources, the media swarmed the international witnesses and

covered them constantly until they left the country.  Helicopters followed them from the

airport, and the hotel whether the FBI initially brought them was swarmed by media

vehicles and reporters around the clock. *See* Tsarnaev Mom's Rumored Arrival Sparks

Media Frenzy as Reports Differ, Boston Herald (Apr. 24, 2015); Family of Marathon

Bomber Dzhokhar Tsarnaev Arrives in Boston, NECN (Apr. 24, 2015); Tsarnaev Family

Members Arrive in Boston, CBSBoston (Apr. 23, 2015).

The media coverage was prejudicial. Many articles conveyed outrage over the

supposedly high travel expenses for the witnesses. *See* Tsarnaev's Russian Relatives

'Enormous Expense, Distraction', WCVB (Apr. 29, 2015); Survivors Outraged After

Learning Tsarnaev's Family's Trip to US Paid for with American Tax Dollars,

MyFoxBoston (Apr. 24, 2015).

The constant coverage created a stressful and unsafe environment for the

witnesses. Reporters attempted to "infiltrate" the hotel while on the air. *See* 007

Cooksey Infiltrates the Tsarnaev Hotel, The Kuhner Report Transcript (Apr. 24, 2015).

The hotel at which the FBI was housing the witnesses received numerous complaints

about the media presence. *See* Inn Hosting Terrorist's Clan Hit with Cancellations,

Complaints, Boston Herald (Apr. 27, 2015). The media frenzy forced the FBI to move

the family members to a different hotel far from Boston in order to keep them safe. *See*

Police: FBI Moved Tsarnaev Family from Revere Hotel, CBSBoston (Apr. 25, 2015).

The prejudicial coverage continued until the witnesses left the country. *See* Penalty

Phase Suspended Until Monday, Boston Globe (Apr. 30, 2015). Members of the defense

team accompanying the family witnesses personally experienced this media frenzy and

observed its effect on the witnesses. Their declaration is attached hereto as Exhibit C.

### 5.  Physical Surroundings.

Even if the jurors could have avoided media and public event exposure altogether, they could not avoid their physical surroundings.  Starting in early Spring of 2015, banners bearing promotional images for the 2015 Marathon lined the streets of Boston. The messages on the banners encouraged solidarity and unity.  *See* Pictures Collected by Defense Team (including photographs of banners taken in the vicinity of the courthouse and Post Office Square where jurors gathered each morning).  Across from the courthouse, cement and other trucks with "Boston Strong" written on the side worked in a construction site.  A large "Boston Strong" banner hung in Rowes Wharf, facing Atlantic Avenue.  The trucks and banner were was visible from the courtroom doors.  *See* Ex. A, Pictures Collected by Defense Team.

In addition to this unavoidable exposure near the courthouse, jurors traveling to and from the courthouse or around the greater Boston area were necessarily exposed to other prejudicial evidence of the local impact of the Marathon Bombings.  For example, large billboards promoting Team MR8 were visible from I-93 southbound before the Zakim Bridge.  Another billboard promoting the Krystle Campbell Scholarship Fund was visible from I-93 northbound near Medford.  Shops and street kiosks around Boston sold Boston Strong memorabilia.  Memorabilia was also sold at South Station — which would have been used by many jurors traveling by bus, commuter rail, or subway — and at Logan Airport.  *See* Ex. A, Pictures Collected by Defense Team.

**B.  Jurors' Social Media.**

The intense and all-encompassing community immersion described above is reflected vividly in the social media of the petit jurors who sat in judgment at trial in this case.  This saturation of the trial jurors' own social media shows that for residents of Eastern Massachusetts, the impact of the events and the aftermath of the Boston Marathon Bombing extended well beyond the municipalities of Boston, Cambridge, and Watertown that were most directly affected.  This social media saturation would have been highly unlikely in a venue where jurors' social networks — that is to say, their friends, families, and acquaintances —  were not themselves  so immersed in the sequelae of the Marathon bombing.  The social media activity of individual jurors and of their social media contacts is highly relevant to the question of venue, because it further demonstrates a constitutionally-intolerable level of risk to the fairness of the trial created by intense and widely-diffused  public feeling in eastern Massachusetts before and during the proceedings. Supporting materials, subdivided by juror, have been collected in digital form (DVD) and are submitted herewith under seal as Exhibit B.[1]

Even assuming scrupulous adherence to the Court's admonitions — *e.g.,* to "refrain from any online research or other reading or watching of reports about this case in the media until the process has been completed," Tr. 5-28, and that "you must not

---

[1] Notably, these materials only include publicly-available social media postings.  The defense has no access to social media of jurors who may have privacy settings that limit public access to their "friends" or approved contacts.  In other words, there are other possible reasons why some or all of a person's social media activity may not be publicly accessible or visible.   Thus, for all of the jurors — not just those as to whom some social media activity is compiled herein — there may well be additional postings or activity by them or their contacts that is not accessible to the defense.

communicate about this case; or allow anyone to communicate about it with you, by telephone, text message, Skype, email, or via social media such as Twitter or Facebook," Preliminary Instructions to the Venire at 7 — the breadth and depth of inflammatory images, headlines, and comments that regularly passed through their social media feeds supports the argument that the trial should not have proceeded in Boston.



Put simply, prejudicial media coverage, events, and environment saturated greater Boston, including the social networks of actual trial jurors, and made it an improper venue for the trial of this case. The Court should take into account this midtrial saturation along with all of the evidence presented prior to and during jury selection in evaluating the defendant's claim concerning the fundamental fairness of the trial and sentencing proceedings.

## II.   THE RECENT SUPREME COURT DECISION IN *JOHNSON* REQUIRES ACQUITTAL ON 924(c) COUNTS OF CONVICTION AND A NEW PENALTY TRIAL.

Mr. Tsarnaev was convicted of 15 counts of possession and use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (counts 3,

5, 8, 10, 13, 15-18, 20, 22, 24, 26, 28, and 30).  Of the section 924(c) counts, six alleged that the underlying crime of violence was the use of a weapon of mass destruction, namely a destructive device, against a person and property within the United States in violation of 18 U.S.C. § 2332a (counts 3, 5, 24, 26, 28, and 30).  Two counts alleged the underlying crime of violence to be the delivery, placement, discharge and detonation of an explosive and other lethal device in, into, and against a place of public use  in violation of 18 U.S.C. § 2332f (counts 8, 10).  Two counts alleged  the underlying crime of violence to be the malicious damage and destruction by means of fire and explosive of a building, vehicle, and other real and personal property in violation of 18 U.S.C. § 844(i) (counts13, 15).  One count alleged the underlying crime of violence to be carjacking in violation of 18 U.S.C. § 2119 (count 20).  One count alleged the underlying crime of violence to be a Hobbs Act robbery in violation of 18 U.S.C. § 1951 (count 22).  Three counts alleged conspiracies to violate 18 U.S.C. §§ 2332a, 2332f, and 844(i) as the underlying offenses (counts 16-18).

The jury was instructed that all of the underlying or "predicate" offenses were crimes of violence as required by 18 U.S.C. § 924(c).[2]  Section 924(c)(3) defines "crime of violence" as

> an offense that is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical

---

[2] Determining whether an offense is a crime of violence is a judicial function.  *United States v. Weston*, 960 F.2d 212, 217 (1st Cir. 1992).

force against the person or property of another may be used in the course of committing the offense.[3]

Neither the indictment nor the Court specified which of the two clauses of the "crime of violence" definition — 924(c)(3)(A) or 924(c)(3)(B) — applied to each predicate.

As elaborated below, under the recent Supreme Court decision in *Johnson v. United States*, 135 S.Ct. 2551 (Jun. 25, 2015), § 924(c)(3)(B) is unconstitutionally vague. Moreover, none of the predicate offenses categorically satisfy § 924(c)(3)(A). Therefore, all of the 924(c) convictions in this case must be vacated.

In light of the sheer number of 924(c) convictions, the Court should also order a new penalty trial. The jury's imposition of the death penalty on other counts was likely influenced by the number and nature of 924(c) convictions. *See United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) (excessive number of counts "may prejudice the jury against the defendant by creating the impression of more criminal activity."); *United States v. Lawrence*, 555 F.3d 254, 266 (6th Cir. 2009) (capital sentencing jury "very likely" considered the particularly "culpable mental state" inherent in the elements of the capital § 924(c) conviction," when jury "weigh[ed] the mitigating and aggravating factors and determin[ed] the appropriate sentence"). There is no way the Court can be confident "beyond a reasonable doubt," 18 U.S.C. § 3595(c)(2), that not a single juror would have declined to render a death verdict had all (or even one) of the section 924(c) counts been dismissed from the case before the penalty phase, as *Johnson* now makes clear they should have been.

---

[3] This is the same language use in 18 U.S.C. § 16, defining the term "crime of violence."

**A.  The Definition of "Crime of Violence" in 18 U.S.C. § 924(c)(3)(B) is Unconstitutionally Vague Under *Johnson*.**

*Johnson* concerned another provision of the firearms statutes, 18 U.S.C. §924(e), the Armed Career Offender Act (ACCA).  It provides enhanced penalties for certain persons who have prior convictions for a "violent felony," defined, in relevant part, as a felony that

> (2)(B)(i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

On June 26, 2015, the Supreme Court held in *Johnson* that the portion of section 924(e)(ii) defining a violent felony as a felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another" (commonly called the "residual clause") is unconstitutionally vague.  *Johnson* renders this Court's section 924(c) instructions invalid and requires vacating Mr. Tsarnaev's convictions on all of the §924(c) counts.

The Supreme Court requires that trial courts employ a categorical approach to determine whether a particular offense qualifies as a violent felony or crime of violence. "Under the categorical approach, a court assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.'" *Johnson*, 135 S.Ct. at 2557; *see also Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) (court looks "to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [a

defendant's] crime" in determining whether offense is crime of violence under §16); *United States v. Fish*, 758 F.3d 1, 5 (1st Cir. 2014) (same).

The residual clause required a court to estimate the risk posed by "the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Johnson*, 135 S.Ct. at 2557. This raised certain practical questions: "How does one go about determining what kind of conduct the 'ordinary case' of a crime involves? 'A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?'" *Id.* at 2557. How does a court "apply an imprecise 'serious potential risk' standard …to a judge-imagined abstraction." *Id.* at 2558. In *Johnson*, the Court held that the "grave uncertainty" in estimating the risk posed by a particular crime, coupled with the difficulty of determining the quantum of risk involved in the "ordinary case," "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 2557, 2558.

Like the residual clause of the ACCA and § 16(b), § 924(c)(3)(B) requires application of the categorical approach and assessment of risk in the ordinary case[4] and, therefore, suffers from the same unconstitutional vagueness found in *Johnson*. Indeed, the Solicitor General acknowledged in his Supplemental Brief in *Johnson* that §924(c)(3)(B) is "equally susceptible to petitioner's central objection to the residual

---

[4] Section 16(b) [and §924(c)(3)] and the residual clause of the ACCA "closely resemble[]" each other. *Chambers v. United States*, 555 U.S. 122, 133 n.2 (Alito, J., concurring). The phrase "by its nature" in §924(c)(3)(B) and §16(b) is equivalent to the "ordinary case" in the ACCA residual clause analysis. *See James v. United States*, 550 U.S. 192, 208-209 (2007).

clause," namely that it is unconstitutionally vague.  Supplemental Brief of the United

States, *Johnson v. United States*, 2015 WL 1284964, \*\*22-23 (March 20, 2015).

**B.  The Predicate Convictions in this Case Are Not Crimes of Violence Under 18 U.S.C.§924(c)(3)(A).**

Mr. Tsarnaev submits that in light of *Johnson* the offenses charged as the

underlying "crimes of violence" in the counts alleging a violation of 18 U.S.C. § 924(c)

must be evaluated to determine whether each offense meets the definition of "crime of

violence" in § 924(c)(3)(A) — whether it "has as an element the use, attempted use, or

threatened use of physical force against the person or property of another."  If it does not

constitute a crime of violence under (c)(3)(A), the conviction relying on that underlying

offense must be vacated.

In evaluating whether the offense alleged to be a crime of violence meets the

requisite definition under the categorical approach, the Court must also determine

whether the statute is a divisible statute — one that contains multiple alternative elements

and in some of its elemental forms meets the definition of a crime of violence, or an

indivisible statute — one that does not contain alternative elements, but criminalizes

broader conduct than that defined as a crime of violence.  *See Descamps v. United States*,

133 S.Ct. 2276 (2013).  If a statute is divisible, a court may employ a modified

categorical approach, examining whether the elements of one of the alternative offenses

constitutes a crime of violence.  If a statute is indivisible, a court may not examine the

manner in which a particular offense was committed.  In *Descamps,* the Supreme Court

examined a California burglary statute to determine whether a conviction counted as an

ACCA predicate under the categorical approach.  It concluded that the statute was not

divisible, but simply defined burglary more broadly than the generic burglary constituting

an ACCA predicate under the enumerated offenses provision.  The California statute

provided that "any person who enters" any of a number of structures "with intent to

commit grand or petit larceny or any felony is guilty of burglary"; it did not require an

unlawful entry, an element of the generic burglary offense qualifying as an ACCA

predicate.

      In an earlier case, also titled *Johnson v. United States*, 559 U.S. 133 (2010), the

Supreme Court addressed the meaning of "physical force" as used in 18 U.S.C. §

924(e)(2)(B)(i). It concluded that, in the context of defining a violent felony, "force"

required more than an offensive touching.  "We think it clear that in the context of a

statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force –

that is, force capable of causing physical pain or injury to another person." 559 U.S. at

140.  *See also United States v. Fish*, 758 F.3d at 9 (physical force in § 16(a) means

violent force).

### 1.  Weapon of Mass Destruction

      Under 18 U.S.C. §2332a it is, in relevant part, an offense to "use[], threaten[], or

attempt[] or conspire[] to use a weapon of mass destruction  . . . against any person or

property within the United States…."  The term "weapon of mass destruction" is defined

in  §2332a(c)(2) as: "(A) any destructive device as defined in section 921 of this title; (B)

any weapon that is designed or intended  to cause death or serious bodily injury through

the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;

(C) any weapon involving a biological agent, toxin or vector…; or (D) any weapon that is designed to release radiation or radioactivity at a level dangerous to life;…"

This offense does *not* require the use of violent physical force.  For example, in *United States v. Davila,* 461 F.3d 298 (2d Cir. 2006), the defendant wrote a note to a state prosecutor "containing the words 'ANTRAX' [sic] and "AKA Bin Laden.'"  461 F.3d at 300.  He put it and some baby powder in an envelope and mailed it.  While the court held this conduct sufficient to support a conviction under §2332a, it plainly did not involve the use of *violent* physical force.[5]

## 2.  Bombing Place of Public Use

Under 18 U.S.C. § 2332f it is, in relevant part, an offense  to "unlawfully deliver[], place[], discharge[], or detonate[] an explosive or other lethal device in, into, or against a place of public use… (A) with the intent to cause death or serious bodily injury, or (B) with the intent to cause extensive destruction  of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss.."

The "delivery" and "placement" of an explosive do not involve violent force.

---

[5] *But see United States v. Guevara*, 408 F.3d 252 (5th Cir. 2005) (finding that mailing envelope containing white powder and letter stating, *inter alia*, "All [A]mericans will die as well as you.  You have been now been (sic) exposure (sic) to anthrax"  supports conviction under §2332a and constitutes crime of violence under U.S.S.G. §4B1.2(a), defining crime of violence as offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another.").  However, *Guevara* predates the 2010 *Johnson* decision, which clarified the "violent force" requirement, and interprets the advisory sentencing guidelines, not a criminal statute.

### 3.  Malicious Destruction of Property

Under 18 U.S.C. §844(i) it is, in relevant part, an offense to: "maliciously damage[] or destroy[], or attempt[] to damage or destroy, by means of fire or an explosive, any building, vehicle or other real or personal property…."

In *United States v. Mitchell*, 23 F.3d 1, 2 and n.3 (1st Cir. 1994), the First Circuit held that aiding and abetting an offense under §844(i) was a crime of violence as defined in 18 U.S.C. §3156(a)(4) (a provision of the release and detention statutes containing the same definitions as §924(c)(3)) under the "residual clause" analog.  The statutory elements, however, do not necessarily require the use of *violent* physical force required by *Johnson*.

### 4.  Carjacking

Under 18 U.S.C. §2119 it is, in relevant part, an offense to "with the intent to cause death or serious bodily harm take[] a motor vehicle…from the person or presence of another by force and violence or by intimidation, or attempt[] to do so,…"

The carjacking statute is violated when a vehicle is taken not only by "force and violence," but alternatively by "intimidation."  "Intimidation" does not require any threat, explicit or otherwise, from the defendant. Instead, all that is required is "the commission of some act or the making of some statement that would put a reasonable person of ordinary sensibilities in fear of bodily harm." *See United States v. Robinson*, 527 F.2d 1170, 1172 (6th Cir. 1975) (identical "intimidation" element of federal bank robbery held established under "ordinary"-victim standard, though defendant never threatened victim); *United States v. Gilmore*, 282 F.3d 398, 402 (6th Cir. 2002) (fact that defendant

demanded money from teller satisfied "reasonable"-victim test for "intimidation," despite absence of "even a verbal or nonverbal hint of a weapon").

The intimidation element of carjacking also sweeps more narrowly than the "threatened use of physical force" prong of § 924(c)(3)(A) because, as described above, it does not require that the defendant intend or know that the victim is being intimidated or, indeed, have any mental state at all as to the intimidation. Because the "use" of physical force means intentional use, *United States v. Portela*, 469 F.3d 496, 498-99 (6th Cir. 2006), the "threatened use" of such force means an intentional threat. *See, e.g.*, *United States v. Johnson*, 376 Fed. Appx. 205, 207 (3d Cir. 2010); *United States v. Melchor-Meceno*, 620 F.3d 1180, 1186 (9th Cir. 2010). Indeed, the Supreme Court recently recognized that a "threat" element in a similar criminal statute requires that the defendant intend or at least know his communication will be viewed as a threat. The Court specifically held that it is not sufficient that a reasonable victim would regard it as such — the very gravamen of intimidation. *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015).

Finally, "bodily harm" (which the "ordinary" victim must fear for there to be intimidation and thus a carjacking) does not necessarily require "physical force" (the threat of which must be an element for a crime of violence under § 924(c)(3)(A)). Bodily harm could be threatened, for example, by threatening to lock an occupant in a car on a hot summer day, to introduce an odorless poison gas into the car, or to deprive a seriously ill occupant of the car of his medicine. But none of those threatened acts would constitute the use of physical force against the victim's person. *See United States v. Torres-Miguel*,

36

701 F.3d 165, 168-69 (4th Cir. 2012); *United States v. Perez-Vargas*, 414 F.3d 1282,

1286 (10th Cir. 2005); *United States v. Vargas-Duran*, 356 F.3d 598, 606 (5th Cir. 2004);

*Chrzanoski v. Ashcroft*, 327 F.3d 188, 196 (2d Cir. 2003). But see *United States v.*

*Anderson*, 695 F.3d 390, 402, 404 (6th Cir. 2012) (Gibbons, J., majority opinion; White,

J., dissenting).

Thus, for all three of these independent reasons, because a defendant can, by

statutory definition, commit carjacking under the intimidation prong of § 2119 without

the actus reus or the mens rea required for "threatening" the use of "physical force,"

carjacking is not categorically a "crime of violence" under § 924(c)(3)(A).

### 5.  Robbery Affecting Interstate Commerce (Hobbs Act)

Under 18 U.S.C. §1951(a) it is, in relevant part, an offense to: "in any way or

degree obstruct[], delay[], or affect[] commerce or the movement of any article or

commodity in commerce by robbery…or attempts or conspires to do so, or commits or

threatens physical violence to any person or property in furtherance of a plan or purpose

to do anything in violation of this section…."  "Robbery" is defined in §1951(b)(1) as:

"the unlawful taking  or obtaining of personal property from the person or in the presence

of another, against his will, by means of actual or threatened force, or violence, or fear of

injury, immediate or future, to his person or property or property in his custody or

possession, or the person or property of a relative or member of his family or of anyone

in his company  at the time of the taking or obtaining."

While a Hobbs Act robbery *may* in some instances be a crime of violence (*see,*

*e.g., United States v. Turner*, 501 F.3d 59, 67-68 (1st Cir. 2007)), by its terms, the crime

can also be committed by generating a fear of injury to the person or property of another,

conduct that does not require the use, attempted use or threatened use of violent physical

force against the person or property of another as required by *Johnson*.

### III.    THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL.

Prior to trial, the defendant filed a Motion to Preserve Constitutional Challenges to

the Federal Death Penalty Act [DE 291], which the Court denied based on "binding

precedent." [DE 384.]  Recently, however, in his dissent in *Glossip v. Gross*, 135 S.Ct.

2726 (2015), Justice Breyer observed:

> Today's administration of the death penalty involves three fundamental
> constitutional defects: (1) serious unreliability, (2) arbitrariness in
> application, and (3) unconscionably long delays that undermine the death
> penalty's penological purpose. Perhaps as a result, (4) most places within
> the United States have abandoned its use.

*Id*. at 2755-56.  Justice Beyer went on to "describe each of these considerations,

emphasizing changes that have occurred during the past four decades,"  and

concluded that

> it is those changes, taken together with my own 20 years of
> experience on this Court, that lead me to believe that the death
> penalty, in and of itself, now likely constitutes a legally prohibited
> "cruel and unusual punishmen[t]." U.S. Const., Amdt. 8.

*Id*.

For the reasons set forth in his original motion, as well as those advanced by

Justice Breyer in *Glossip*, the defense renews its challenge to the constitutionality of the

federal death penalty and requests that the Court vacate the death sentence and enter

judgment notwithstanding the verdict as to penalty.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys


  /s/ William W. Fick

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 17, 2015.


            /s/ William W. Fick