, UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | CRIMINAL NO. 13-10200-GAO |
| ) | |
| DZHOKHAR TSARNAEV   ) | |

# EXHIBIT C

## DECLARATION OF DEBRA GARVEY

I, Debra Garvey depose and state as follows:

1.  I am employed as an investigator in the Federal Public Defender system and worked for the defense in the above-captioned case. I submit this declaration in support of the Defendant's Motion for Judgment Notwithstanding Verdict and for New Trial.

2.  Five female relatives of Mr. Tsarnaev (maternal aunts and cousins), all citizens of Russia, were paroled into the United States in order to testify on his behalf during the sentencing phase of the trial. The women ranged in age from 35 to 65 years old. The conditions of parole included 24/7 FBI escorts, extremely restricted movement, and wearing of large GPS monitor ankle bracelets at all times, including when the witnesses slept.

3.  The witnesses were accompanied on their regularly scheduled commercial flight into the United States by another investigator employed by the Federal Defender,

1

two interpreters employed by the defense team. The U.S. Marshals Service booked the travel and accommodation arrangements for the witnesses.

4. I and one other defense team member traveled to Boston Logan Airport to meet the arriving travelers on April 23, 2015, as directed by the FBI.

5. We arrived at the Terminal E (international terminal) passenger arrival area at around 12:20 p.m., as instructed by the FBI, in two unmarked passenger vans we had rented for the purpose of transporting the witnesses. Law enforcement agents met us, took over as drivers of the rented vans, and proceeded with the vans to wait in the remote "cell phone" parking lot. I remained at the terminal to wait for our travelers to clear immigration and customs.

6. At around 2 p.m., members of the media began to report, on Twitter and in other media (*e.g.*, radio, TV), that Tsarnaev family members had arrived in Boston and that reporters were traveling to the scene. Soon, a large number of reporters, including multiple TV camera crews, began to converge on the airport.

7. While in the terminal, I overheard one reporter, standing near me, receive a call on her cell phone; she then proceeded to repeat out loud to her camera crew detailed information being provided to her about the arrival of the witnesses, their process through the airport, and even the specific hallway they would use to emerge from screening by Homeland Security as well as which door they would be using to exit the airport.

8. The witnesses were subject to unusual and extensive security and immigration screening. They were individually interviewed at length by law enforcement

agents, their electronic devices (phones and tablets) were taken away for a period of time (presumably to be "imaged"/copied), and they (and their luggage) were subjected to intensive individual hand searches. The screening was eventually completed around 4:00 p.m.

9. As the witnesses entered the public part of the terminal, media swarmed around them in a frenzy. It was very difficult to load the travelers and their luggage into the waiting vans with reporters, microphones, and cameras pressing in on them from all sides. Reporters were screaming questions at the travelers, pressing microphones into their faces; it was difficult to walk due to the press of the crowd.

10. When the vans left the airport, they were chased by reporters in vehicles and multiple TV news helicopters to the nearby hotel where witnesses and their escorts were to stay. Helicopters continued to hover above the hotel and multiple reporters and television trucks surrounded the hotel.

11. The next morning, April 24, the large-scale media vigil surrounding the hotel continued. The FBI reported to us that it had been made aware of threats to the witnesses. At least one reporter tried to "infiltrate" the hallway where the witnesses were staying as he described his efforts over the phone on a live radio broadcast; ultimately he was turned back by an FBI agent. The witnesses were not permitted leave the wing of the corridor where they were staying to use any other hotel facilities.

12. That evening, as the media presence continued, the FBI decided to move the witnesses to a more remote hotel in another state. FBI agents informed us that they

would not be disclosing the location to other law enforcement agencies. Under cover of darkness, the witnesses and accompanying defense team members were transported in small groups by FBI agents in unmarked sedans to the new hotel.

13. While the media did not locate the new hotel, severe restrictions remained on the witnesses. For example, they were permitted to walk outdoors for the first time, at a strip mall near the hotel, with FBI escorts, on the evening April 30, a full week after their arrival. They were afforded similar FBI-escorted evening walks on succeeding days as well.

14. On days when the witnesses attended Court, they were transported into the courthouse via the "sally port" vehicle entrance in order to avoid the media. Despite these efforts, however, reporters learned of the timing of their arrival and even managed to capture photo and video of the witnesses through the open sally port door.

15. The witnesses experienced the media attention and the conditions of their stay under, in effect, "hotel arrest" to be very humiliating, stressful, and distracting to their preparation to testify. Two of the witnesses, one with a history of high blood pressure and one with a history of ulcers, experienced particular exacerbation of their health issues.

Sworn under the pains and penalties of perjury this 17th day of August, 2015.

                                                            /s/ Debra Garvey