UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
v.                                  )   Criminal Action
                                    )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY TWENTY-FIVE**

<u>**MOTION HEARING**</u>


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 2, 2015
10:03 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
 3           Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
 4       Suite 9200
         Boston, Massachusetts  02210
 5       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 6       By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
 7       1331 F Street, N.W.
         Washington, D.C.  20530
 8       On Behalf of the Government

 9       FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Court enters the courtroom at 10:03 a.m.)
 4              THE CLERK:  The United States District Court for the
 5     District of Massachusetts.  Court is in session.  Be seated.
 6              For a motion hearing in the case of United States
 7     versus Dzhokhar Tsarnaev, 13-10200.
 8              Would counsel identify yourselves for the record.
 9              MR. WEINREB:  Good morning, your Honor.  William
10     Weinreb for the United States.
11              MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your
12     Honor.
13              MS. PELLEGRINI:  Good morning, your Honor.  Nadine
14     Pellegrini for the United States.
15              MR. MELLIN:  Good morning, your Honor.  Steve Mellin
16     for the United States.
17              THE COURT:  Good morning.
18              MR. BRUCK:  Good morning, your Honor.  Appearing on
19     behalf of the defendant is Judy Clarke, Miriam Conrad, Bill
20     Fick and Tim Watkins.
21              THE COURT:  Good morning.
22              So there are some in limine issues that we want to
23     address that need to be addressed, as I understand it, or ought
24     to be addressed before opening statements.  This is not one, I
25     guess, but it's a place to start.
```

00:04 (line 10)
00:05 (line 20)

1          There is a -- well, let me start with the

2     government's -- the government has a motion regarding the

3     exclusion of mitigating evidence in the guilt phase.  Why don't

4     we start with that.  Mr. Chakravarty?

5          MR. CHAKRAVARTY:  Good morning, your Honor.

6          Your Honor, the Federal Death Penalty Act makes clear

7     about the bifurcated nature of death penalty cases.  There is a

8     liability phase which is a guilt -- the burden on the

9     government is to prove beyond a reasonable doubt that the

00:05 10   defendant has committed a crime, and the jury is narrowly

11    focused on the issue of whether the defendant did, in fact,

12    commit those crimes.

13         Only after that phase, as the jurors have been

14    reminded throughout the voir dire process, does the issue of

15    sentence -- what the appropriate punishment if somebody's found

16    guilty of a capital offense -- take place.  And it is

17    throughout the history of the Federal Death Penalty Act,

18    certainly in the last 20 years, that that second proceeding in

19    which aggravating evidence and mitigating evidence is

00:06 20   presented, is the forum in which any evidence of relative

21    culpability or other mitigating factors related to

22    sentencing -- where those issues are aired.

23         What the government is concerned about, and it's --

24    the defense response to its motion in limine bears that concern

25    out, is that the defense will intend to use the liability

1    phase, the guilt or innocence -- guilt or not guilt phase of

2    the trial, to advance its theories of mitigation.  And it's one

3    thing to simply challenge the admissible evidence in a guilt

4    phase of any trial, any criminal trial, by legitimate relevant

5    and non-prejudicial evidence, but it is another thing entirely

6    to advance an agenda, a didactic agenda, of the mitigation

7    theory of the case during that initial liability phase.

8            The concerns are, number one, the legal concern.

9    There is a reason for this bifurcation.  The jury ought not

00:07 10   move on and skip ahead to a penalty phase before a fair trial

11   both for the government as well as for the defense is had with

12   regards to the germane issues.  And the germane issues in the

13   liability phase are whether the elements of the indictment have

14   been proven.

15           But the other is a pragmatic concern, your Honor.

16   This jury is going to be instructed that they are not to not

17   only move on, but they are to consider the evidence related to

18   the elements of the offense.  Motive is not an element of an

19   offense but it is a concept, and evidence of motive feeds the

00:08 20   circumstantial evidence which is nature -- necessary in every

21   criminal case -- or many criminal cases I should say, to

22   demonstrate somebody's intent.  And so for that reason, the

23   government will present motive testimony.

24           The defense's rejoinder to that is they ought to be

25   able to present contrary testimony, whether it to be to the

1   defense's motive or other evidence in the case, which will

2   further advance their mitigation case.  And I think that goal

3   is both clear as well as is inappropriate under our

4   jurisprudence regarding criminal trials.

5        The sentencing factors ought not infect the jury's

6   consideration.  And you could imagine the circumstance where

7   during cross-examination or in argument the defense suggests

8   something to the jury which legally makes no difference with

9   regards to liability, only makes a difference with regards to

00:09 10   mitigation, and the jury is left trying to decipher what they

11   should be considering with regards to the liability of the

12   defendant.  That's the situation that we're trying to avoid.

13        Further complicating that, if the defense introduces

14   on cross-examination or in their case evidence of mitigation,

15   it would place the government in an awkward posture of having

16   to, frankly, invite error by introducing evidence of

17   aggravation as aggravation evidence.  And I think the point

18   here is the touchstone of the liability phase has to be the

19   defendant's culpability and the acts that relate to the

00:10 20   defendant's culpability.

21        The defense, in their papers, have clearly made the

22   point that they want to advance the theory of the

23   coconspirator's culpability in the liability phase.  And that

24   simply -- that person's character, his actions outside of the

25   context of the criminal conspiracy charged are simply not

1    relevant.  And even if there was some marginal relevance on

2    some of these facts, which the Court will assess as the trial

3    proceeds, then the risk of prejudice and the confusion to the

4    jury is so high that it would -- it should be -- under 403

5    concerns it should not be admitted.

6         And the pragmatic concern that the jury will not be

7    able to be sufficiently instructed either curatively or

8    precautionarily with regards to how they are to assess

9    mitigation evidence in the liability phase, your Honor, is

00:11 10   ultimately the reason why there is no case that the

11   government -- the government's searches have ever revealed this

12   expansion of capital case law to bring in mitigation evidence

13   into the liability phase of a capital case in order to help lay

14   the groundwork for a penalty proceeding.

15        That, I submit to your Honor, is a strategic choice.

16   And to the extent that we are going through with this liability

17   phase trial, then it should stay clean and it should stay like

18   every other criminal trial, not prejudging of somebody's -- of

19   the sentencing consequences of somebody's conduct and it should

00:11 20   stay focused on whether he actually committed the crimes.

21        Thank you, your Honor.

22        THE COURT:  Mr. Bruck?

23        MR. BRUCK:  Thank you, your Honor.

24        Well, since Mr. Chakravarty begins by invoking the

25   history of the Federal Death Penalty Act, I think it's probably

1    worth observing that not only has no court ever granted a

2    motion like this, but so far as we've been able to tell, since

3    the passage of the Federal Death Penalty Act in 1994, no lawyer

4    for the government has ever filed such a motion.

5         What the government is actually asking for is to

6    sanitize the liability phase evidence of any fact which places

7    any part of the defendant's side of the story into evidence so

8    that the jury will have for six weeks or two months or however

9    long it takes a completely distorted, one-sided and unrealistic

00:12 10   picture of the defendant's culpability and of his role in this

11   case.

12        This is a conspiracy case, and the notion that in a

13   conspiracy prosecution the defense is not allowed to present

14   through argument, evidence -- on cross-examination or perhaps

15   even evidence information about the relationship between the

16   two alleged conspirators is, to say the very least, a novel

17   proposition.  And it's not surprising that Mr. Chakravarty's

18   been unable to find a single case standing for that

19   prosecution.

00:13 20   Moreover, this notion that the government only will

21   present its sentencing case at the sentencing phase is

22   nonsense.  Of the 12 statutory and non-statutory aggravating

23   factors, all but 11 will probably be entirely proven by the

24   government's evidence at the liability phase.  That's -- the

25   government has known forever that this case is all about

1    sentencing, that that's really what we're here about, and their

2    liability phase will be aimed at the question of sentence.  And

3    every tactical judgment, every witness, every direct

4    examination will be focused on increasing the jury's sense of

5    the personal blameworthiness of the defendant.  And now they

6    say, Well, we can't respond to that.  Taken literally -- and

7    not literally, what they say is that we can't even mention to

8    the jury that the defendant was 19 years old until it gets to

9    the penalty phase.

00:14 10          The government's problem with respect to the death

11   penalty, that they've also known since the very beginning of

12   this case, is that the lead conspirator, the person who started

13   this whole thing, and but for whom the Boston Marathon bombing

14   would never have occurred, was the older brother who's dead,

15   and the defendant is the teenaged younger brother.  And that

16   presents a logical issue, a problem for the government's

17   request for the death penalty.

18          So their response is to file this unprecedented motion

19   to present the defendant's liability in artificial isolation in

00:15 20   the hopes that by the time we get to the penalty phase, as the

21   government knows we will, in six weeks or two months or however

22   long it takes, the jury's concept of Jahar Tsarnaev's

23   individual personal blameworthiness and responsibility and role

24   in the offense will be completely distorted and will have set

25   in like concrete and it will be impossible, or very difficult,

1   for the defense by presenting the real facts of this story then

2   to change the jury's mind.

3        Mr. Chakravarty refers to motive, as well he might.

4   The government doesn't have to prove motive.  It's not an

5   element of any of the 30 crimes alleged in the indictment.  But

6   the government chooses to go into motive, and that opens the

7   door for us to respond.  The government says the motive is

8   extremist jihadi ideology, and we are entitled to respond by

9   showing that a large part of the motive may well have been the

00:16 10   defendant's domination by, love for, adoration of,

11   submissiveness to, whatever, his older brother.  That is fair

12   game.  If the government goes into it, we can go into it.  And

13   the idea that the Court should somehow police the evidence so

14   as to allow the government to put every bit of their -- or

15   almost every bit of their case on -- or almost every bit of

16   their case on aggravation into the guilt phase, but the moment

17   we try to respond, whether in argument or cross-examination or

18   in any other way, the boom comes down, they object and we have

19   to sit back down and pretend that there's nothing to be said,

00:16 20   well, it's not surprising that no motion like this has ever

21   been filed, let alone granted.  And that's why Mr. Chakravarty

22   can't find any case law on it.  This would, to say the least,

23   be breaking new ground, and it's ground that shouldn't be

24   broken.

25        We also point out that we do know something about how

juries make decisions in capital cases and there are dangers to
be navigated.  The Capital Jury Project, after interviewing
nearly a thousand jurors who actually sat on capital cases in
11 states found that a great number of jurors make their
decision about penalty during the guilt-phase evidence, during
the evidence, before they've even heard guilt-phase
instructions in closing argument, let alone the entire penalty
phase.

         Now, there may be nothing we can do about that
problem.  It seems to come with the territory.  It's a very
disturbing finding.  But if there's one way we want to
guarantee that it's going to happen in this case, it's to allow
the government to present their full case to exaggerate and
distort the defendant's personal culpability and role in this
offense by eliding, pretending as though none of the other
evidence exists, letting the jury hear that, deliberate on it,
come back with a guilty verdict, and then -- if that's what
they do, and that's what the government expects -- and then see
if we can dig our way out of the hole by presenting the rest of
the story sometime in late April or May.  It is extremely
unlikely that this problem of prejudgment can be prevented
under those unnatural and unfair conditions.

         This -- when I first got -- when we first received
this motion we thought, well, maybe the government's filing
this because they think that we're going to call, you know,

1    expert witnesses or social history witnesses or to present our

2    full mitigation case at the penalty phase -- at the guilt

3    phase.  And we thought, Well, you know, maybe the motion's

4    really moot.  All we need to do is say we're not going to do

5    that.  But we come to find out that they actually want this to

6    be a completely one-sided and distorted evidentiary

7    presentation of a sort that has never occurred in any prior

8    case, and we don't think this should be the first one.

9         Thank you.

00:19 10         THE COURT:  Anything else?

11         MR. CHAKRAVARTY:  No, your Honor.

12         THE COURT:  Okay.  Well, okay.  I'll reserve it and

13    let you know later today.

14         The defense raised some issues that I think we need to

15    address partly in their so-called status report filed earlier

16    and then also in some motions.  I thought we might start with

17    the defense -- this is Number 923, defense motion to bar

18    spoliation of the so-called boat writings.

19         Mr. Fick?

00:20 20         MR. FICK:  Yes, your Honor.  So as the Court's aware,

21    the government had proposed -- or informed the defense that it

22    intended to cut out the panels and physical sections of the

23    boat on which writings were found and sort of bring those

24    panels into court to present them to the jury sort of as

25    separate pieces of evidence apart from the boat itself, and we

1    objected to that and requested that the boat be preserved and

2    that the boat be made available for the jury to view during the

3    trial.

4         And it's kind of -- there's a funny inversion of the

5    usual sort of logic in the arguments in these kind of issues.

6    The government seems to care more about the content of the boat

7    writings.  They say the words are going to prove the

8    defendant's motive and state of mind and such.  Usually, of

9    course, words can be proven by things like photographs,

00:20 10   transcripts, testimony, but the government says, No, no that's

11   not good enough.  We need the actual boat itself so people will

12   see it really was there and so they can hold it up close.

13        Oddly enough, that serves the effect of taking the

14   words out of their context.  The context in which the writings

15   were made is really the key piece that's going to allow the

16   jury -- or potentially allow the jury to evaluate what was the

17   defendant's state of mind, what was he thinking, what was his

18   motive, under what conditions and circumstances were those

19   writings made?

00:21 20        The boat -- we see no reason why the boat could not be

21   brought to the courthouse, or alternatively, why the jury could

22   not be brought to the warehouse or some other warehouse where

23   the boat is stored.  The defense has viewed the boat by taking

24   a few steps up a step ladder or going up on a hydraulic lift.

25   It's visible.  To the extent anyone has trouble seeing the

1    writing from a few feet away, well, then certainly we have the

2    photographs and the transcripts and such.

3            But the bottom line is that the evidence here is the

4    boat.  It's movable.  And it's very powerful.  It really

5    provides the context.  And to the extent anything more than the

6    words is necessary, the boat should be left in integral whole

7    and the jury should be able to see it.  I mean, it's really

8    quite striking.  There's no substitute for being able to see

9    it.  You can imagine Mr. Tsarnaev lying in that boat, much as

00:22 10   one might lie in a crypt, while making those writings.  And the

11   jury should be able to see that in its entirety.

12           THE COURT:  Can you do both?  In other words, as I

13   understand it, the proposal is to cut out a section to make it

14   portable and be able to be brought to the courtroom, but could

15   be repositioned or the rest of the boat could also be seen

16   without the piece?  I mean, why is it all or nothing, I guess

17   is the question?

18           MR. FICK:  I think the other piece of this is I think

19   it's actually prejudicial for the jury to see the writings just

00:22 20   on cutout panels, because then you have something that's more

21   tactile, more immediate, more, I guess you might want to say

22   real, than simply a photograph or a transcript or testimony

23   about the writings, but it's divorced from the context.  And so

24   that then has the effect of isolating the jury on these panels

25   and losing the effect of what the context is, so --

```
 1              THE COURT:  Right.  But what I'm asking is why
 2     couldn't you then also do the context?  In other words, the
 3     government wanted to show it as a piece, then the defense could
 4     ask to have the jury brought -- I mean, I don't know why
 5     it's --
 6              MR. FICK:  But I guess lingering --
 7              THE COURT:  -- either/or I guess.
 8              MR. FICK:  At the end of the case we would be left
 9     with -- under that scenario, we would be left with the panels
10     cut out of the boat, and that could go back to the jury room
11     and sort of have this lingering, constant presence in the case
12     that would be sort of a tunnel vision in which we would lose
13     the context.
14              And the other issue is it's not -- given the way the
15     writings are positioned in the boat, I worry about the
16     logistical cleanliness, so to speak, and the ability to
17     reconstruct or replace the writings back in the boat after
18     they've been cut out.  You know, it seems to me to the
19     extent -- being able to remember, refer to, look back at the
20     writings, to the extent that's important, photographs,
21     transcripts, testimony, that does that job, but to see the
22     actual evidence, there's a real risk of distortions if any
23     piece of the actual evidence is ripped from its context and
24     left as something that continues to have a life in the case.
25              And so the boat should be viewed as the boat, is our
```

00:23 (line 10)
00:24 (line 20)

 1    position, and that to do otherwise would be prejudicial.

 2         THE COURT:  Okay.  Mr. Weinreb?

 3         MR. WEINREB:  Your Honor, this is essentially a motion

 4    for review, and the Court should deny it for two reasons.

 5    Courts have a lot of discretion when it comes to granting or

 6    denying a motion for review, and the two main factors that the

 7    Court should consider is whether the defendant can establish

 8    whatever it wants to establish and other means from the view;

 9    for example, from photographs, through diagrams, through other

00:24 10    things; and secondly, just how practical it would be to

11    actually conduct the view -- or how impractical it would be.

12         In this case, this boat was much photographed,

13    videotaped, diagramed at the very moment that it was

14    discovered, that the evidence was discovered.  It was

15    photographed at night, during the daytime.  It was photographed

16    from every angle.  It was photographed with the tarp on, with

17    the tarp off, from the inside, from the outside.  And all of

18    that has been provided to the defense.  Everything they want to

19    establish about the context, as they put it, in which this

00:25 20    writing was made is available to them, and they can do without

21    the necessity for a view.

22         The government isn't in the same position as the

23    defense, though, when it comes to presenting it.  I mean, it's

24    true.  We have photographs of writing that we could produce in

25    court.  But we have a heavy burden in this case.  We have to

1    prove the defendant's guilt beyond a reasonable doubt, and this

2    writing is an important part of that.

3         And as we mention in our motion, there have

4    been -- there have been suggestions made in the media and

5    elsewhere that the writing wasn't actually there, that it's

6    implausible, that it actually got written, how did he write it,

7    was it written in blood?  There's all these misconceptions, and

8    we want to, and I believe we're entitled to, show the jury the

9    actual evidence so they believe the actual evidence exists.

00:26 10   That's a basic task of the government and a basic right the

11   government has because of the burden it bears.

12        As for the impracticality of the view, this is a very

13   large boat.  I'm not sure it could be brought to the

14   courthouse.  And I don't think it makes any sense to make the

15   jurors go out and view it in any event.  It's not easy to see

16   this writing in the boat.  It's a little difficult to read

17   unless you're quite up close to it, and we don't want the

18   jurors to be getting into the boat and being right up close to

19   it.

00:26 20        The boat it filled with dried blood, with broken

21   glass, with all sorts of debris.  It's not easy to get into,

22   it's not easy to get out of.  It's not really sanitary.  It

23   could take them awhile to read it, and they'll have to each

24   take turns doing it.  We're worried that they're not going to

25   take the time to do it because they're not going to want to

1    inconvenience their fellow jurors.  Many of them may not even

2    want to do it.  And as I say, the images -- the circumstances

3    under which it was written will be every bit as evident from

4    all the photographic and video evidence and so on as it would

5    be from actually seeing it.

6              In addition, this idea that there's some context to

7    the way in which the note was written that must be shown to the

8    jury, it still to this day really has never been articulated by

9    the defense.  What exactly is the context?  I mean, there will

00:27 10   be testimony that the defendant had been hiding in this boat

11   all the time that the search for him was going on in Watertown,

12   and that he wrote the note at that point.  You'll see pictures

13   of the boat with the tarp on it.  It will be clear to the jury

14   that he was hiding out in a boat in a backyard in Watertown

15   with a tarp over it all the time when this happened.

16             I think that it is fair to say that what the defense

17   really wants the jury to see is a boat riddled with bullet

18   holes because that perhaps will create some sympathy for the

19   defendant.  But to the extent that that's what they want,

00:28 20   they'll have every opportunity to do it if they want to show

21   some pictures of the boat.  In fact, the note itself has bullet

22   holes right through it and it has blood dripping on it.  So to

23   the extent they want to have an image of the note that will

24   convey to the jury -- in fact, to the extent that they want to

25   convey the context to the jury at all, it's all right there in

1    the piece that we're proposing to bring into court.  I think we

2    attached some pictures to it, to our opposition to their

3    motion.  I think it makes quite clear that everything that they

4    might want to say about that note -- or everything they might

5    want to develop can be done without the need for a very

6    impractical view of the boat.

7         THE COURT:  Okay.  I'll reserve this as well.  I may

8    want to take a view myself before it's an issue.

9         In the status report I think several matters to be

00:29 10   discussed -- one is the defense objection to the clip of

11   the -- what's called the April 18th law enforcement video.

12        MR. BRUCK:  Yes, your Honor.  Thank you.

13        The issue here is really quite narrow.  Obviously, the

14   fact that the defendant's and his brother's pictures were

15   publicized, released to the news media on the afternoon of

16   April 18th, is relevant.  And there's not any question about

17   that.  The question is whether that fact, which could be proven

18   in any one of a number of ways, should be accompanied by what

19   amounts almost to a closing argument, a lawyer's argument, a

00:30 20   very dramatic press conference by Special Agent in Charge Rick

21   Deloria in which he did several things.

22        Now, again, I want to make clear that we are not -- we

23   are also not the least bit critical of anything Mr. Deloria

24   said or did at this press conference.  Our point is simply that

25   it is not evidence in a criminal trial for the reasons that we

1  set out in our motion.

2        The press conference was a -- was a dramatic, and I

3  think it's fair to say emotional, appeal to the public for

4  support and help.  It began by trying to -- by extolling, I

5  think quite properly, the effort that law enforcement had made

6  during the days between the bombing and April 18th, praising

7  the work of the FBI and of local and state law enforcement, and

8  assuring the public that everything that could humanly be done

9  by law enforcement had been done prior to this stage.  Then it

00:31 10  was what you could fairly describe as a patriotic appeal to the

11  public to do its duty in order to bring the suspects to

12  justice.  And the phrase "bring to justice" is repeated several

13  times during the -- during the press conference.

14        That's why we say that the emotional, prejudicial

15  effect of this really outweighs the nonexistent marginal

16  utility of using the actual press conference, rather -- tape of

17  the press conference, rather than the fact of its release.

18  There are a couple of other things I think that need to be kept

19  in mind about this.  This is the same special agent in charge,

00:32 20  Rick Deloria, who appeared very, very shortly after his

21  retirement from the FBI, in both the *60 Minutes* program that

22  was aired a little while before the first anniversary of the

23  bombing and in the *National Geographic* reenactment, docudrama,

24  I guess.

25        In both cases, Agent Deloria made a very emotional

1    presentation.  In the *60 Minutes* piece, he described his first

2    glimpse of the defendant in court at his arraignment, perhaps

3    unaware that he was looking at a man whose -- half of whose

4    face was paralyzed from bullet wounds and described him as

5    smirking and said that his appearance was despicable.  This was

6    broadcast to a national audience.

7         He also described videotape of the defendant

8    deliberately placing the backpack right behind the child victim

9    in this case, videotape which quite literally does not actually

00:33 10    exist.  There is videotape from which one can infer various

11    things, and you can put your own interpretation on it, but what

12    he described is something which doesn't exist, but during the

13    voir dire examination you heard jurors say they had seen it.

14    What they had seen was Agent Deloria describing that.

15         So, you know, you usually think that any given piece

16    of pretrial publicity is not really going to resonate a year or

17    a year and a half later when the jurors come into court, but

18    this did.  This does.  And the Court expressed concern about

19    Mr. Deloria's performance on these two unauthorized

00:34 20    appearances.  The government said, Well, we can't do anything

21    about it because he doesn't work for the government anymore,

22    and the Court let it be known, you know, that that was not to

23    occur again.  And the Court asked the government whether

24    Mr. Deloria would be a witness.  And you were immediately and

25    promptly and unequivocally informed that he would not be, and

1    now here he is.

2            Now, I realize he's not a witness, he's simply -- not

3    a witness in the sense that he can't be cross-examined, but he

4    will be appearing.  The government says the risk of harm is

5    speculative.  There's nothing speculative about the fear that

6    jurors who saw those programs will see this clip and remember

7    the feelings that were stirred up in them by Mr. DeLoria's

8    appearance on the *60 Minutes* show and the *National Geographic*

9    show -- an appearance, by the way, that was not only

00:35 10   characterized by the things that I've described but also by

11   tearing up.  This was pretty intense stuff.

12           Mr. Deloria's a very impressive man with very

13   impressive law enforcement credentials and very impressive

14   performance in this whole story, and we don't take any of that

15   away from him.  But if you could ever point to a piece of

16   evidence that is calculated to increase passion and prejudice

17   while contributing nothing of additional value to the state's

18   case, it would be the actual videotape of this press

19   conference.

00:35 20           Let the government prove it however they want.  The

21   important thing is that Agent Deloria says at the press

22   conference, Within seconds these pictures will be broadcast

23   over the Internet and through the mass media around the world

24   and throughout the country.  That's what happened.  That is the

25   operative fact.  That's the point that the government is

1    entitled to prove.  But they shouldn't do it by the actual

2    videotape of this press conference.

3            THE COURT:  Okay.

4            MR. CHAKRAVARTY:  Your Honor, that is the point that

5    the government is offering evidence of, the suspects who were

6    being sought and the gravity of the offenses and the scope of

7    the manhunt for them.  And the defense's suggestion as to what

8    that effect will have on the jurors by having a historical

9    videotape documenting what happened at that time I suggest is

00:36 10   entirely speculative, not based in real reactions and real

11   information that we've gleaned from jurors, but rather, based

12   on this cult of personality that the defense is building around

13   is Mr. Deloria and other witnesses -- other individuals who

14   happen to be witnesses, unlike Mr. Deloria, in the case.

15           But what the defense is ignoring is it was this press

16   conference that was broadcast and to which the defendant

17   responded to.  He went back to Cambridge after this broadcast

18   was sent out, he got with his brother, and then he went and --

19   knowing the scope of the manhunt, knowing the extent to which

00:37 20   law enforcement and the community was being asked to look for

21   him that resulted in Sean Collier's death and then the events

22   in Watertown.  And it's the effect on that listener that is the

23   reason why the government is offering this.

24           Now, could this video be sanitized?  Could there be

25   stills?  Could there be a description of the press conference?

```
 1    Of course there can be.  But that's not what the defense has
 2    tried to broker here; instead, they've been asking for a
 3    wholesale exclusion of the video and theoretically everything
 4    that goes along with it.  The government is more than willing
 5    to provide a sanitized version, perhaps one without the,
 6    frankly unemotional testimony of FBI special agent in charge,
 7    which makes the point that there was a manhunt, that there were
 8    particular images released, and that that was broadcast
 9    nationwide, worldwide, and one of the consumers of that was the
10    defendant.
11              MR. BRUCK:  If I may, your Honor, it sounds like we
12    have an agreement.  I had not realized that the government was
13    prepared to do that.  And I think if we get together, we can
14    probably solve this problem.
15              THE COURT:  Well, maybe it's worth exploring.  We'll
16    hold off on it and see what progress you make.  Let me just add
17    I think it's a good idea.
18              (Laughter.)
19              THE COURT:  There's a motion regarding -- from the
20    defense to preclude the government from offering victim witness
21    impact statements, which I'm not really clear on.  I don't know
22    why that would occur, I guess.
23              MR. BRUCK:  I think after hearing from the government
24    that may not really be a problem, so I think that perhaps is
25    best handled by discussion and see -- we were --
```

1          THE COURT:  Can we regard that as withdrawn for the

2     time being and --

3          MR. BRUCK:  Withdrawn without prejudice?  Yes.

4          THE COURT:  Yes.

5          MR. BRUCK:  Thank you.

6          THE COURT:  Then I guess the next thing would be some

7     of the photographs.  These were raised at various places in the

8     status report, I think, the autopsy photographs and other

9     graphic images, I guess.

00:39 10          MS. CONRAD:  Yes.  Thank you, your Honor.  Your Honor,

11     the government obviously will be offering -- and has the right

12     to offer -- the images of the carnage that these bombings

13     inflicted.  The question is how much and the scope of what that

14     means.  I think perhaps some of that with respect to the

15     portion regarding to the -- related to the aftermath of the

16     bombing itself on Boylston Street is best addressed by viewing

17     or listening to the individual tapes.  I don't know if the

18     Court's had an opportunity --

19          THE COURT:  I haven't yet but I will.

00:40 20          MS. CONRAD:  I think probably it's better to just rest

21     on that rather than go through it in detail.

22          With respect to the autopsy photos, your Honor, these

23     are highly sensitive, highly disturbing images, multiple

24     images, of the victims.  And right now I'm talking about the

25     bombing victims.  The images of Officer Collier are completely

1    different.  They show the actual wounds, and we understand that

2    they may have some relevance.

3            But the other autopsy photographs of the three victims

4    of the bombings are largely full-body images of the naked

5    bodies of the victims.  They are horrific.  They are

6    disturbing.  They do not go to any disputed question of fact in

7    this case.  And even if the Court agrees with the parties that

8    they should not be made available to the public in any form

9    after they're admitted, their actual admission makes it more

00:41  10   likely that at some point they will be viewed by the public

11   causing even greater emotional distress for the grieving

12   families of the victims.

13           They're just -- the cause of death is not at issue,

14   your Honor.  These images show much more than simply the cause

15   of death, and we submit that they are unnecessary and would

16   cause too much emotional distress to the families and to the

17   jurors, frankly.

18           Thank you.

19           MS. PELLEGRINI:  Your Honor, I challenge anyone to

00:42  20   find an autopsy photo that isn't graphic and disturbing,

21   particularly when it is of several young people, but regardless

22   of the fact that there -- Ms. Conrad said there is no

23   question -- we still have the burden.  The defendant has

24   entered a plea of not guilty to all of the counts, and the

25   government has the burden of proving that there was a weapon of

 1   mass destruction that caused the death of these three people.

 2        Our photos show the nature and extent of those

 3   injuries.  Full body is required because they are injured

 4   everywhere on their body.  There are huge gaping wounds, that

 5   is true, but there's also burns, scrapes, shrapnel embedded in

 6   ears, fingers, the back.  And these are going to be used to

 7   corroborate the findings of the medical examiners.  And that's

 8   important because we're going to show both the manner and cause

 9   of death by this.

00:43 10        The fact that they are graphic, we took steps to limit

11   the number of photos, but they are -- and we have taken steps

12   to block out the private areas of the bodies to try to limit

13   that aspect of it as much as we can.  To the extent that it is

14   upsetting to the victims, it's upsetting that their loved ones

15   died.  They are aware that the government is seeking to use the

16   autopsy photos, they were aware of our prior request to not

17   have the defendant view them, and we talked about them -- to

18   them at that time of using the photos during the course of the

19   trial.

00:43 20        But they are important to the government's case.  And

21   they have been chosen carefully and in a very limited way that

22   is not overly emotional.  They are not gruesome or graphic just

23   simply to be gruesome and graphic, but they're gruesome because

24   they show the death of three young people by what we claim is a

25   bomb.

1          THE COURT:  All right.

2          MS. CONRAD:  Your Honor, I neglected to mention that

3     one option would be if there's specific aspects of the photos

4     that the government wishes to show, because I think that the

5     full-bodied photos do not show, for example, some of the

6     specific things that Ms. Pellegrini referred to.  Perhaps they

7     could be cropped in such a way that would make them less

8     disturbing and more relevant, if there is any relevance.

9          THE COURT:  Okay.  I'll reserve this one as well.

00:44 10         We have some other evidence-related motions?  I guess

11    because we have been -- at least until the jury is sworn been

12    careful about discussing the evidence.  I guess I thought we

13    might discuss those in an in camera session.  I'm thinking of

14    *Daubert* motions right now and perhaps some others.

15         So with that caution, are there any other matters now

16    that -- of this nature, in limine, preopening, that you think

17    we need to talk about?

18         MR. BRUCK:  Not from the defense, your Honor.

19         MR. WEINREB:  No, your Honor.

00:45 20        THE COURT:  Okay.  And I thought we would have a

21    session this afternoon at 2:30 to talk about some of these

22    things in camera.  That would also include a final discussion

23    of the mechanics of the peremptory challenge exercise which

24    we'll do this afternoon and other jury-related issues.

25         Let me just ask a couple of trial management related

 1   issues.  Is the government's order of witnesses the same now as

 2   it was when it was disclosed a few weeks ago for the first

 3   couple of weeks?

 4            MR. MELLIN:  Your Honor, I think essentially that's

 5   correct.  There have been a few witnesses -- one or two that

 6   have been removed and one or two that we've moved their

 7   location in the lineup based on their availability.

 8            THE COURT:  Okay.  Could you make sure both the

 9   defense and I get the revised list --

00:46 10          MR. MELLIN:  Yes.

11            THE COURT:  -- which I assume would also call for some

12   revision of the matching exhibits?

13            MR. MELLIN:  Correct.

14            THE COURT:  Okay.  If we could get that.

15            And going forward, we've had this two-week -- we

16   settled on this two-week period.  I would like that as a

17   rolling obligation for the government so that as you get into

18   the second week, another second week comes into view; in other

19   words, at the end of the first week, we'll hear about the third

00:47 20  week, and so on, so that people can have a look ahead.

21            The government furnished us a copy of the government's

22   witness list.  A hard copy.  If it's possible, we would like an

23   electronic copy of that just so that we could search it.  And I

24   don't know that we have an exhibit list from the defense.

25            MS. CLARKE:  We provided one -- we can make sure you

1    have an electronic copy.

2            THE COURT:  Thank you.

3            So we'll have our in camera session this afternoon.

4    We'll also reconvene tomorrow morning at ten for the exercise

5    of peremptory challenges and the selection of the final jury.

6            Anything else today?

7            MS. CLARKE:  No, thank you, your Honor.

8            THE COURT:  Or this morning, I should say.  There is

9    today.

00:48 10         Thank you.  We'll be in recess.

11           THE CLERK:  All rise for the Court.

12           (The Court exits the courtroom at 10:47 a.m.)

13           THE CLERK:  Court will be in recess.

14           (The proceedings adjourned at 10:47 a.m.)

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12

13   Date:  9/8/15

14

15

16

17

18

19

20

21

22

23

24

25