UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )          Criminal Action
v.                                 )          No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
          Defendant.               )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

### JURY TRIAL - DAY THIRTY-THREE

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 16, 2015
10:23 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

I N D E X

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|

WITNESSES FOR THE
  GOVERNMENT:

JOSEPH REYNOLDS

       By Mr. Mellin          6              35
       By Mr. Watkins                33

JOHN MACLELLAN

       By Mr. Weinreb         35
       By Mr. Watkins                79

JEFFREY PUGLIESE

       By Mr. Chakravarty     84             116
       By Mr. Watkins               112

JAMES FLOYD

       By Ms. Pellegrini      118

ANDREW KITZENBERG

       By Mr. Mellin          131

HEATHER STUDLEY

       By Mr. Weinreb         143

FRANCIS HUGHES

       By Mr. Chakravarty     151            172
       By Mr. Watkins               166

E X H I B I T S

GOVERNMENT'S
  EXHIBIT    DESCRIPTION                FOR ID      RECEIVED

771      Map                                          39

772      Diagram of Laurel and Dexter streets        46

| | | | |
|---|---|---|---|
| 1 | | E X H I B I T S (cont'd) | |

GOVERNMENT'S

| EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 1522 | Photograph | | 53 |
| 1532 | Photograph | | 55 |
| 1530 | Photograph | | 57 |
| 1531 | Photograph | | 57 |
| 1533 | Photograph | | 57 |
| 775 | Diagram | | 60 |
| 1525 | Photograph | | 68 |
| 1527 | Photograph | | 69 |
| 776 | Photograph | | 72 |
| 777 | Photograph | | 73 |
| 845 | Photograph | | 73 |
| 948-7 | Photograph | | 74 |
| 948-8 | Photograph | | 75 |
| 948-285 | Photograph | | 76 |
| 948-174 | Photograph | | 76 |
| 948-187 | Photograph | | 77 |
| 948-178 | Photograph | | 77 |
| 948-179 | Photograph | | 77 |
| 1523 | Photograph | | 136 |
| 1524 | Photograph | | 139 |
| 1526 | Photograph | | 143 |

1                        E X H I B I T S (cont'd)

2

    GOVERNMENT'S
3    EXHIBIT        DESCRIPTION                    FOR ID        RECEIVED

4   1455    Overhead satellite-type image                         163

5

    DEFENDANT'S
6    EXHIBIT

7   3005    Photograph                                            82

8   3006    Photograph of Tamerlan and Dzhokhar
            Tsarnaev                                              112
9
    3034    Photograph                                            170
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2          THE CLERK:  All rise for the Court and the jury.
 3          (The Court and jury enter the courtroom at 10:23 a.m.)
 4          THE CLERK:  Be seated.
 5          THE COURT:  All right.  We're ready to proceed.
 6          MR. MELLIN:  Good morning, your Honor.  The United
 7     States calls Officer Joseph Reynolds.
 8                  JOSEPH REYNOLDS, duly sworn
 9          THE CLERK:  Have a seat.  State your name, spell your
10     last name for the record.
11          THE WITNESS:  Joseph Reynolds, R-E-Y-N-O-L-D-S.
12                     DIRECT EXAMINATION
13     BY MR. MELLIN:
14     Q.   Good morning, sir.
15     A.   Good morning.  How are you?
16     Q.   I'm doing good.  How are you doing?
17     A.   Good, sir.
18     Q.   Sir, where are you employed?
19     A.   The Watertown Police Department, Town of Watertown.
20     Q.   And what is your rank?
21     A.   I'm a patrolman.
22     Q.   Officer Reynolds, where did you grow up?
23     A.   I grew up in Watertown, Mass.
24     Q.   Did you go to high school in Watertown?
25     A.   Yes; all public school in Watertown.
```

00:58 (line 10)
00:59 (line 20)

1   Q.   After high school, what did you do?

2   A.   I went to college at Suffolk University for a year and

3   transferred to Worcester State College.

4   Q.   Did you get a degree from Worcester State?

5   A.   Yes, sir.

6   Q.   What kind of degree did you get?

7   A.   Health and nutrition education.

8   Q.   After that what did you do?

9   A.   I got employed by the Town of Watertown in 2006.

00:59 10   Q.   And when you were employed by Watertown, is that with the

11   police department?

12   A.   I'm sorry?

13   Q.   Were you with the police department?

14   A.   Yes.  Yes.

15   Q.   And have you been with the police department ever since?

16   A.   Yes, the past nine years.

17   Q.   During those nine years, generally what have you been

18   doing?

19   A.   I work patrol out in the streets.

00:59 20   Q.   Back on April the 18th at about 11:45 p.m., so just before

21   midnight on the 19th, did you report for work?

22   A.   Yes, sir.

23   Q.   What were you doing that day?

24   A.   That day before work?  I -- just a regular day.  As I was

25   getting ready for work that evening, I was watching the news,

1    as I usually do, and the photos were released of the two

2    marathon bombers.

3    Q.   When you went to work that night, did you have a roll call

4    before you actually went out on duty?

5    A.   Yes, sir, I did.

6    Q.   And what is a roll call?

7    A.   Usually we go over the last few days, just shift

8    briefings, any recent news.

9    Q.   Prior to getting to work that night, had you seen on the

01:00 10   news anything about the shooting?

11   A.   The shooting at MIT?  Yes.

12   Q.   Okay.  And what had you seen at that point or learned at

13   that point?

14   A.   We learned that MIT Police Officer Sean Collier had been

15   shot, and that there was two suspects that had not been caught.

16   Q.   Is that something you learned at the roll call?

17   A.   As well, yes.

18   Q.   And what were you told at roll call about that shooting?

19   A.   Just to be extra vigilant in our duties that evening.

01:01 20   Q.   How close is MIT to Watertown?

21   A.   Within three to four miles.  Very close.

22   Q.   When you left roll call and went out on patrol, what did

23   you do that now-very-early morning?

24   A.   I usually -- I just check my side streets, check

25   everything for any suspicious behavior.

```
 1   Q.   What side streets and what area at that point were you
 2   patrolling?
 3   A.   I work Route 5, which is the east end of Watertown.  It
 4   borders Cambridge, Brighton, Belmont.
 5   Q.   When you say "the east end of Watertown," so you're
 6   talking about the west end of Cambridge, then?
 7   A.   Yes, sir.
 8   Q.   Okay.  And how would you describe that area that you were
 9   patrolling?  Is it residential, is it mixed use, is it --
10   A.   Yeah, it's mixed.  It's residential.  There is businesses.
11   There's elementary schools as well.
12   Q.   While you were out on patrol after midnight, now into
13   April 19th, did you receive a call about a carjacking?
14   A.   Yes, sir, I did.
15   Q.   Can you tell us about that?
16   A.   At about 12:28 a.m. we first received a call -- or the
17   dispatcher received a call that in Cambridge there was an armed
18   robbery, and a few seconds later it turned out it was a
19   carjacking.
20   Q.   What were you told to do, or what were you going to do
21   based on that?
22   A.   Based on that information, I headed down to Mount Auburn
23   Street which leads into Cambridge, and, I just kind of stayed
24   in that area.  They gave out a BOLO for the vehicle.
25   Q.   Okay.  And if you can wait there.  Now, why did you head
```

1    towards Mount Auburn?

2    A.    Just to head down towards Cambridge Street in case we saw

3    the suspect, area into Watertown.

4    Q.    Now, you just said that they put out a BOLO.  What is a

5    BOLO?

6    A.    A BOLO is a "be on the lookout."

7    Q.    And what were you to be on the lookout for?

8    A.    They gave a description of a black 2013 Mercedes utility

9    with Mass. registration 137NZ1.

01:03 10   Q.    When you say a "Mercedes utility," you mean a sport

11   utility?

12   A.    Yes, sir.

13   Q.    An SUV?

14   A.    Correct.

15   Q.    Okay.  Once you received that information, what did you

16   do?

17   A.    I remained on my patrol, just keep on the lookout for that

18   vehicle, obviously, and just patrolling the streets.

19   Q.    At some point after that were you given more information

01:03 20   about the black SUV?

21   A.    Yes.  It was pinged to the area of Dexter Ave., and we

22   had -- I'm sorry.  They used the GPS in order to ping the

23   vehicle to Dexter Ave.

24   Q.    Once you got that information, what did you do?

25   A.    At that point I was on Arsenal Street and I was heading

1    eastbound.  I was in the immediate area, probably about 100

2    yards away from Dexter Ave.

3    Q.   You were 100 yards from Dexter?

4    A.   Yeah, approximately.  Yes.

5    Q.   Okay.  Given your vicinity to Dexter, what happened?

6    A.   I first turned left onto School Street, and I took an

7    immediate right onto Dexter Ave.  I sped up to the area they

8    gave us the ping --

9    Q.   Let me ask -- let me stop you there.  The area that you're

01:04 10   now in, can you describe that area?

11   A.   It's a residential area, all residences.  There's no

12   real -- too many businesses around there.

13   Q.   Are there homes lining the road?

14   A.   Yes.

15   Q.   Okay.  What did you do?

16   A.   I sped up to the area that they gave the description, or

17   the ping.  And I sped up to that area and then slowed down and

18   canvassed the area to see if I could locate the vehicle.

19   Q.   At some point did you locate the vehicle?

01:04 20   A.   Yes, sir.

21   Q.   Approximately how much time elapsed between the time of

22   the be-on-the-lookout until the time you located the vehicle?

23   A.   I would say about 20 minutes from when we received the

24   original BOLO.

25   Q.   What did you do?

1    A.   At that point I located a green -- later-model green Honda

2    Civic, and it had a black hood to it.  Directly behind it was a

3    black Mercedes.  I slowed down to get a good look at the plate

4    to see if it matched, in which it did.

5    Q.   Now, you mentioned a green Honda.  Was the green Honda in

6    front or behind the black Mercedes SUV?

7    A.   It was right in front of me.  Oh, I'm sorry.  It was right

8    in front of the Mercedes.

9    Q.   And at that point in time, had you had any information

01:05 10   about a green Honda?

11   A.   No.

12   Q.   So when you rolled by the green Honda, did you pay any

13   attention to it?

14   A.   No, sir.

15   Q.   What happened when you rolled by the black SUV?

16   A.   We were going probably about five to ten miles an hour.  I

17   looked over to observe the operator, in which I did.  So and we

18   locked eyes at each other.

19   Q.   And when you say we were rolling at five to ten miles per

01:05 20   hour, were you with anyone at that time?

21   A.   No, I was in a one-man cruiser.

22   Q.   So you were going about five to ten miles an hour?

23   A.   Yes, sir.

24   Q.   And approximately how fast were the Honda and the SUV

25   going?

1    A.    They were going just as slow.  It was very suspicious.

2    Q.    All right.  When you went by the SUV and you locked eyes

3    with the driver, did you recognize the driver?

4    A.    Not at that time, I did not.

5    Q.    Subsequently have you learned the identity of that driver?

6    A.    Yes, sir.

7    Q.    And who was the driver of the black SUV at that moment?

8    A.    Tamerlan Tsarnaev.

9    Q.    After you rolled by the black SUV and you saw the

01:06 10   defendant's brother driving it, what did you do?

11   A.    Immediately I turned left onto Hazel Street, and I

12   reversed back out -- almost a three-point turn, you could

13   say -- and started to follow the vehicle.  And I radioed to

14   dispatch that I had the vehicle we were looking for.

15   Q.    You were in a police cruiser, correct?

16   A.    Yes, sir.

17   Q.    What type of a car?

18   A.    We have an SUV.  It's a Ford Escape.

19   Q.    Okay.  Does it have lights on top?

01:06 20   A.    Yes, sir.

21   Q.    Did you at that time activate your lights?

22   A.    No, sir.

23   Q.    Why not?

24   A.    My patrol supervisor, Sergeant MacLellan, told me to wait

25   for backup to make a stop on the vehicle.

1   Q.   So what did you do?

2   A.   At that point I turned around.  As I was following them,

3   they both sped up for a bit.  I thought they were going to take

4   off, it might be a car chase.  But they immediately turned left

5   onto Laurel Street.  At that point I was still following them.

6   And they kind of slowed down.  I was keeping my distance, maybe

7   20 to 25 yards, trying to observe what they were going to do.

8   Q.   At that point what did they do?

9   A.   At that point they came to a stop in the middle of the

01:07 10   street on Laurel Street.

11   Q.   And at that point which car is in front?

12   A.   The green Honda Civic was in front of the Mercedes.

13   Q.   When those two cars came to a stop, what happened?

14   A.   At that point I was maybe, I would say, two car lengths

15   behind the black Mercedes.  That's when Tamerlan Tsarnaev got

16   out of his vehicle, out of the driver's side door, and he began

17   shooting at my cruiser.

18   Q.   When he began shooting at your cruiser, approximately how

19   far away were you from him?

01:08 20   A.   I would say about five to ten yards as he continued to

21   walk towards me.

22   Q.   Where did he shoot at the cruiser?

23   A.   I'm sorry.  Where did he shoot?

24   Q.   Yeah.

25   A.   I believe he was trying to hit me.

```
 1    Q.   What did you do?
 2    A.   At that point my only defense was my cruiser.  I didn't
 3    want to exit.  I didn't think it was a good vantage point for
 4    me.  So what I did was I ducked down behind my dashboard, I
 5    threw the cruiser into reverse, and I backed up about 30 yards.
 6    Q.   After you backed up, did you get out of your car?
 7    A.   Yes.  Before doing so I notified dispatch that we had
 8    shots fired.  "Shots fired."
 9    Q.   At that point in time, had anybody else come on the scene?
10    A.   I was still alone at that time, yes.
11    Q.   What did you do?
12    A.   I exited my driver's side door and I used that as cover.
13    And I was exchanging gunfire with Tamerlan, I believe.
14    Q.   You said "Tamerlan, I believe."  What do you mean by that?
15    A.   Well, Tamerlan was still from cover.  So it was Tamerlan
16    that was shooting at me at that time.
17    Q.   Where was he located in relation to the black SUV?
18    A.   At that time he was still beside -- I believe he was using
19    his driver's side door as cover.  All I could see was muzzle
20    flashes.
21    Q.   And when you say he was using his driver's side door as
22    cover, in what direction is the black SUV pointing?  Is it
23    pointed back at your vehicle or is it pointed down the street?
24    A.   No, sir.  It's still directly pointing down the street,
25    so...
```

1    Q.   Do you know approximately how many shots were fired at

2    that point in time?

3    A.   Did I fire or did --

4    Q.   No, that he fired at you.

5    A.   I couldn't count.  It was nonstop.

6    Q.   Did you return fire?

7    A.   Yes, sir.

8    Q.   And at that point, now where are you located while you're

9    returning fire?

01:09 10    A.   I'm still using my driver's side door as cover.

11    Q.   And what happens?

12    A.   At that point Sergeant MacLellan arrived on-scene, and he

13    pulled around to -- I was on the right side of the street.  He

14    pulled around to my left side.

15    Q.   What type of car does he have?

16    A.   He has an SUV, a Ford Expedition.

17    Q.   So it's a larger SUV than the car you were in?

18    A.   Yes, sir.

19    Q.   Okay.  What did you do?

01:10 20    A.   At that point Sergeant MacLellan had left the vehicle in

21    neutral -- or drive, and it continued to drive down Laurel

22    Street towards the suspects.

23    Q.   With the car rolling down towards the suspects, what

24    happened?

25    A.   I came out from cover behind my driver's side door.  I was

1    using the rear of his cruiser, and I was walking down the

2    street continuing to fire at the two suspects.

3    Q.    What was Sergeant MacLellan doing?

4    A.    At that time -- I had not realized at that time that he

5    had exited his cruiser and he had ran into the side yards of

6    one of the residences at Laurel Street -- on Laurel Street.

7    Q.    As you're using his car now as cover, what do you see in

8    front of you?

9    A.    I could see muzzle flashes at that point.

01:11 10    Q.    Where were the muzzle flashes?

11    A.    Coming from behind the black Mercedes.

12    Q.    Now, when you're saying it's behind the black Mercedes,

13    it's no longer behind the driver's door, it's someplace else?

14    A.    Yeah, in front of the hood -- in front of the front hood,

15    so...

16    Q.    At that point in time, were you able to tell who was

17    shooting?

18    A.    No.

19    Q.    What do you actually see?  You see muzzle flashes.  What

01:11 20    else?

21    A.    I could see muzzle flashes.  And at that time I saw

22    Sergeant MacLellan run into the side yard, so I followed him

23    over there to communicate what he wanted.

24    Q.    When you followed him to the side yard, describe what that

25    side yard looked like.

1  A.   It's a very narrow area.  There's a small tree that we

2  were using for cover.  There's bushes, a white plastic fence.

3  Q.   So are the two of you taking cover behind one tree?

4  A.   Yes.

5  Q.   What happened as you were doing that?

6  A.   We continued the gun fight with the two suspects.

7  Q.   Again, can you describe for us exactly what you see

8  happening at that point in time?

9  A.   I could see two men.  I could not distinguish who was who.

01:12 10  I could see muzzle flashes.  As well, I saw a lighter being lit

11  and a wick being -- what looked like a wick burning.

12  Q.   And when you saw that wick burning, did you see something

13  happen with that item?

14  A.   I saw -- I didn't see who threw it, but it was thrown

15  towards myself and Sergeant MacLellan.

16  Q.   What happened to that item?

17  A.   It landed in the middle of Laurel Street and exploded.

18  Q.   When it exploded, what did you do?

19  A.   At that point I ran back into -- to get more cover behind

01:13 20  the houses.

21  Q.   At the time that you are seeing these muzzle flashes and

22  this gunfire, are both of the suspects behind that black SUV?

23  A.   Yes, sir.

24  Q.   But you can't tell who is shooting?

25  A.   No.  No.

1   Q.   And you don't know who threw that first pipe bomb?

2   A.   I do not.

3   Q.   And then what happened when you went around to your

4   vehicle?

5   A.   Well, before that, sir, there were other bombs thrown.

6   Q.   Okay.  Tell us about that.

7   A.   Again, it was a long gun battle, approximately eight to

8   nine minutes.  They had thrown, I believe, three more -- four

9   more bombs -- or three more pipe-bomb types.  I could see those

01:13 10  being lit and being thrown at us as well as taking gunfire.

11   Q.   Did all of those explode?

12   A.   No.

13   Q.   Do you recall how many exploded?

14   A.   I believe two exploded.

15   Q.   Two more?

16   A.   Two more were exploded, yes.

17   Q.   Now, when you said they were being thrown at you, could

18   you tell who was throwing them?

19   A.   No, sir.  I could not.

01:14 20  Q.   What happened after that?

21   A.   Then as we were still in their yard taking gunfire, of

22   course, I could see -- I didn't see who threw it.  I saw it

23   coming through the air, but I saw a larger-type bomb being

24   thrown at us.

25   Q.   When you say you saw a larger-type bomb, what -- can you

1  describe what you saw?

2  A.   It was a cylinder, almost like a big cooking pot, a big

3  pan.

4  Q.   What exactly did you see?  Did you see it in the air?  Did

5  you see it being thrown?  What did you see?

6  A.   I could not see it being thrown.  I saw it coming through

7  the air at that time.

8  Q.   At that point in time, where were the two suspects?

9  A.   They were still behind the front of the Mercedes.

01:14 10  Q.   As you saw that going through the air, what did you do?

11  A.   I was closest to the street at that time, Sergeant

12  MacLellan was to my left.  I wasn't sure if he had seen the

13  size of the bomb coming towards us.  So what I did was I said,

14  "Run, Sarge.  Run, run, run."  And I grabbed his shoulder and I

15  pulled him along with me.  Obviously I thought there was going

16  to be a bigger blast radius, so I wanted to create as much

17  distance as possible.

18  Q.   Was there a bigger blast?

19  A.   Yes, sir.

01:15 20  Q.   Can you describe that blast?

21  A.   It shook me to my knees, my ears were ringing.  I could

22  hear all the car alarms going off throughout the many streets

23  around us.  There's a big, huge cloud of smoke.  I could feel

24  all the debris landing on top of me as well.

25  Q.   What type of debris did you feel landing on you?

1    A.   At that time I just thought it was -- it felt like little

2    pebbles or dirt.  I believe I created so much distance of --

3    lucky enough -- to get out of the initial radius of the --

4    where any damage could be done.

5    Q.   What did you do after that?

6    A.   At that point I wasn't sure if they had any more of those

7    pressure-cooker-type bombs, so I hopped the fence that we were

8    in.  And the house we were -- that we were taking cover is on

9    the corner of Laurel and Dexter, so what I did was I ran around

01:16  10  Dexter to return to where my cruiser was, and I continued to --

11    exchanging gunfire from there.

12    Q.   When you began to exchange gunfire again, where were the

13    suspects?

14    A.   They were still behind the black Mercedes.

15    Q.   During these eight or nine minutes that you were engaged

16    in this earlier gunfire and then when you started to engage

17    again, in addition to pipe bombs being thrown, what did you see

18    the suspects doing?

19    A.   I could see them ducking down underneath -- behind the

01:16  20  Mercedes.  That's about all I could see.  They were coming in

21    and out of cover.

22    Q.   Could you estimate about how many rounds were fired in the

23    direction of either you or Sergeant MacLellan?

24    A.   For eight minutes it felt like it was hundreds.  I

25    couldn't -- obviously I couldn't count.  But, I mean, lots of

         1    bullets.

         2    Q.    Were there times during the gunfire where there was a

         3    pause in the gunfire from the suspects?

         4    A.    Yeah, there was many times.

         5    Q.    And having been a police officer for as long as you've

         6    been a police officer, do you know at some point an

         7    automatic -- a semiautomatic weapon is going to run out of

         8    bullets, correct?

         9    A.    Yes, sir.

01:17   10    Q.    Okay.  And so if that happens, what do you have to do?

        11    A.    Reload the gun, sir.

        12    Q.    Did you have to reload your gun at times?

        13    A.    Yes.

        14    Q.    How many times did you reload?

        15    A.    I reloaded -- I have two spare mags on my belt as well as

        16    the one in my gun, and I used all my bullets.

        17    Q.    So what kind of gun did you have?

        18    A.    A Glock.

        19    Q.    And what caliber is it?

01:18   20    A.    .40 caliber.

        21    Q.    You talked about having two spare mags.  Just so we can

        22    clear that up, what's a mag?

        23    A.    That's where you -- it contains your bullets.

        24    Q.    Okay.  So that's a magazine?

        25    A.    Yes, sir.

```
 1    Q.    And it holds the bullets?

 2    A.    Correct.

 3    Q.    Okay.  And then you have to take out the one that is --

 4    the magazine that's empty and you put in a new one?

 5    A.    Correct, sir.

 6    Q.    All right.  Okay.  So when you came back around to your

 7    car and you started to engage in the gun battle again, what did

 8    you see?

 9    A.    At that point I saw Officer Colon had arrived on-scene, as

10    well as Sergeant Pugliese had arrived on-scene.

11    Q.    And what were the suspects doing?

12    A.    They were still engaging in gun battle with us.

13    Q.    At that point in time, approximately how far are you from

14    where they are located?

15    A.    I would say about 50 yards.

16    Q.    At some point does someone walk out from behind one of the

17    SUVs?

18    A.    Yes, sir.

19    Q.    Okay.  When does that happen in relation to this gunfire?

20    A.    That's when Sergeant Pugliese had flanked the suspects.

21    And he ran behind the yards on Laurel Street.  And that's when

22    I believe he exchanged in gunfire -- started to engage in

23    gunfire with Tamerlan.

24    Q.    You said that he had flanked them.  What do you mean by

25    that?
```

1     A.    Basically just went behind all the yards so he could come

2     up on them from the side.

3     Q.    As Sergeant Pugliese approached on the side and you were

4     shooting from straight-on, what happened?

5     A.    At that point Tamerlan had come up from cover, and I

6     believe he was in the driveway of one of the residences there.

7     And he was exchanging gunfire with Sergeant Pugliese, at which

8     point I came out from cover, I started walking down the street.

9     I had a good visual on him, so I got down on one knee and I

01:19 10    started -- attempting to strike the suspect.

11    Q.    By shooting him?

12    A.    Yes.

13    Q.    Okay.  Why did you abandon your more-secure position?

14    A.    I believe I had a good shot on him that I could end the

15    threat.

16    Q.    Okay.  Do you know what the other suspect was doing at

17    that point in time?

18    A.    I could not see.

19    Q.    You came out, Sergeant Pugliese is engaging him in

01:20 20    gunfire, and you're shooting at Tamerlan Tsarnaev?

21    A.    Correct.

22    Q.    What do you do?

23    A.    At that point I was just down on one knee, like I said,

24    and just exchanging gunfire.  At that time I don't know what

25    happened with Tamerlan or Sergeant Pugliese, but Tamerlan

1     started running towards this officer, towards me.

2     Q.    Towards you?

3     A.    Yes.

4     Q.    Okay.  As he started to run towards you, what did you do?

5     A.    At that point I saw Sergeant Pugliese chasing him, so I

6     holstered, I started running down the street, and that's when

7     Sergeant Pugliese tackled him from behind.

8     Q.    When the defendant's brother started running at you, how

9     far was he from you?

01:21 10     A.    Probably about 30 yards.

11     Q.    At the time that he was tackled, how far were the two of

12     you apart?

13     A.    From when he was tackled, about ten yards.

14     Q.    When he was tackled by Sergeant Pugliese, what did you do?

15     A.    Sergeant MacLellan had come from where he was located, and

16     we all, the three of us, tried to subdue Tsarnaev -- or

17     Tamerlan.  Sorry.

18     Q.    When you say you tried to subdue him, how did you try to

19     do that?

01:21 20     A.    He was wrestling with us and we were trying to gain

21     control of him so we could get handcuffs on him.

22     Q.    Were you able to do that?

23     A.    No, not at that time.

24     Q.    Why not?

25     A.    He was a big kid.  He was wrestling with us.  We just

1    weren't able to control him at that time.

2    Q.   At some point did you hear a car rev up?

3    A.   Yes, sir.

4    Q.   What happened?

5    A.   At that point we were wrestling with Tamerlan, and all of

6    a sudden I could hear an engine revving and, you know, come

7    closer to us.  I screamed to the guys, I said, "Get off.  Get

8    off.  He's coming back towards us."

9    Q.   When you said "he's coming back towards us," what was

01:22 10   coming back towards you?

11   A.   The black Mercedes was aiming right at us.

12   Q.   How fast was that Mercedes coming at you?

13   A.   It was speeding up so I assume he -- you know, I hate to

14   say pedal to the metal, but that's what it, you know, sounded

15   like.

16   Q.   When you look up and you see that Mercedes, how far away

17   is it from you?

18   A.   At that point he was maybe 30 yards.

19   Q.   What did you do?

01:22 20   A.   I pulled my gun out and I attempted to shoot the operator

21   of the vehicle.

22   Q.   Were you successful?

23   A.   I don't know if I hit him but I know I hit the windshield.

24   Q.   Did the car stop?

25   A.   No.

1    Q.    What happened?

2    A.    The next thing that happened was myself, Sergeant

3    MacLellan and Sergeant Pugliese, we all kind of dispersed, and

4    Sergeant Pugliese attempted to pull Tamerlan off the road, or

5    off -- out of the way of the vehicle.

6    Q.    Was he successful in doing that?

7    A.    Negative.

8    Q.    What happened?

9    A.    He was ran over by the Mercedes.  I remember being -- I

01:23 10   was very close, maybe seven to ten yards away.  I saw Tamerlan

11   get run over, get stuck in the rear wheel well.  He then kept

12   going and ran over his brother.

13   Q.    Do you know who was operating the Mercedes at that point?

14   A.    It was Dzhokhar.

15   Q.    And for the record, do you see him in court today?

16   A.    Yes.

17   Q.    Can you identify him?

18   A.    Him (indicating).

19          MR. MELLIN:  Your Honor, I would ask that the record

01:24 20   reflect identification of the defendant.

21          THE COURT:  All right.

22   BY MR. MELLIN:

23   Q.    When you looked up and the defendant's driving that SUV,

24   what did you do?

25   A.    At that point Dzhokhar had struck my SUV.  He got stuck.

1    His driver's side front tire got held up into my front driver's

2    side and hit each other.

3    Q.   The way you just indicated, you kind of had both vehicles

4    moving and hitting each other, but was your --

5    A.   My vehicle was parked, and he struck my vehicle.

6    Q.   All right.  And he hits your vehicle in the front left

7    quarter-panel area?

8    A.   Yes.

9    Q.   Okay.  And he hits -- the vehicle he's in also is in the

01:24 10   front left quarter-panel, correct?

11   A.   Correct.

12   Q.   All right.  What happens when there's the impact?

13   A.   He got hung up on my -- on my vehicle.  At that point I

14   was maybe ten yards away, and again I tried to -- attempting to

15   hit the operator -- I'm sorry.  Shoot the operator.

16   Q.   And what happened?

17   A.   I don't believe I struck him at that time.

18   Q.   Where was Tamerlan Tsarnaev at that point?

19   A.   At that point he was probably about ten yards back, 15

01:25 20   yards back.

21   Q.   So he had been run over but at some point dislodged?

22   A.   Yes, sir.

23   Q.   After you attempted to shoot the defendant as he was

24   operating the SUV, what happened?

25   A.   He became disengaged with my vehicle.

```
 1    Q.   What do you mean by that?  Was he able to break free of
 2    your vehicle?
 3    A.   Yeah, he was speeding up, or again, you know, pressing on
 4    the gas to try to get loose to escape.
 5    Q.   Okay.  He was able to do that?
 6    A.   Yes.
 7    Q.   What happened?
 8    A.   At that point he crossed Dexter Ave., that intersection,
 9    and just kept going down Laurel Street.  And that's the last I
10    saw of him.
11    Q.   At that point in time are you -- did you attempt to shoot
12    the car?
13    A.   Negative.
14    Q.   Did other officers on the scene attempt to?
15    A.   Yes.
16    Q.   Okay.  He was able to get away?
17    A.   Yes.
18    Q.   What did you do?
19    A.   At that point I ran back to where Tamerlan was.  He was
20    with Sergeant Pugliese.  And he was still wrestling with
21    Sergeant Pugliese.
22    Q.   What did you do?
23    A.   I attempted to gain control.  Sergeant Pugliese was
24    yelling if I had handcuffs.  I pulled my handcuffs off my belt,
25    Sergeant Pugliese was able to gain control of his right arm, I
```

1   was able to gain control of his left arm, and I placed the

2   handcuffs on Tamerlan.

3   Q.   After the handcuffs were placed on him, what happened to

4   him?

5   A.   Sergeant Pugliese radioed for an ambulance.

6   Q.   Okay.  What did you do?

7   A.   At that point I could hear, "Officer down, officer down."

8   I was in close proximity of my cruiser, so I grabbed my medic

9   back and my valve mask, my oxygen bag.

01:27 10   Q.   Hold on a second.  So you go back to your car at that

11   point?

12   A.   Yes.

13   Q.   And you say you get a medic back?  What's in your medic

14   bag?

15   A.   Just basic necessities in case of an injury.

16   Q.   Had you had CPR training before?

17   A.   Yes.

18   Q.   Okay.  So what did you take with you?

19   A.   I took my medic back and my oxygen tank bag which contains

01:27 20   my bag valve mask.

21   Q.   You grabbed all of that.  Where did you go?

22   A.   I ran over to where I could hear "Officer down, officer

23   down."  Someone kept screaming -- I'm not sure who -- at which

24   point we located Officer Dic Donohue in one of the driveways on

25   Dexter Ave.

```
 1    Q.    How did Officer Donohue appear to you as you were coming

 2    up on him?

 3    A.    He was still talking at that point.  You could -- there

 4    was a lot of blood around our knees, but he was alive at that

 5    time.

 6    Q.    What did you do?

 7    A.    At that point one officer was performing CPR on him, and

 8    that's when I -- I said, "What do you need me to do?  What do

 9    you need me to do?"  And he said, "Get the bag valve mask."

10    Q.    What is that used for?

11    A.    To perform rescue breaths.

12    Q.    And what is a rescue breath?

13    A.    Just to pump oxygen into a person's lungs.

14    Q.    Was he having trouble breathing at that point in time?

15    A.    Yes.

16    Q.    Where are you located relative to him at that point in

17    time?

18    A.    I was -- if he was laying down, I was to the left of his

19    head.

20    Q.    And sitting down by his head, what did you do?

21    A.    I was leaning over on top of him -- well, not on top of

22    him, but leaning over him -- performing rescue breaths.

23    Q.    And how is it that you did that?

24    A.    Just by -- if I could show you.  It's a bag valve mask.

25    You just squeeze it and it blows out the air.
```

1    Q.   At that point in time, is Officer Donohue talking?

2    A.   At that time he had stopped talking.

3    Q.   And how did he appear?

4    A.   He appeared that he was dying.

5    Q.   Did you look at him?

6    A.   Yes, I kept -- I was directly over him, so I was looking

7    into him, and I kept telling him, "You're going to be fine.

8    You're going to be fine."

9    Q.   And was he looking at you?

01:29 10   A.   He was.

11   Q.   What happened?

12   A.   At this point Officer Donohue started -- he could kind of

13   just look right through you, you know, and you could tell that

14   he was probably going to die soon.

15   Q.   So what did you do?

16   A.   We radioed for an ambulance.  I remember I kept screaming,

17   "Please get me an ambulance quick, fast.  We need it now," at

18   which time we continued with CPR, rescue breaths, until an

19   ambulance arrived.

01:29 20   Q.   When the ambulance arrived, what did you do with Officer

21   Donohue?

22   A.   There was four other officers there at that time.  I

23   grabbed his right shoulder, another officer grabbed his right

24   leg, another officer grabbed his left leg and another officer

25   grabbed his left shoulder -- yes.  I'm sorry.  Left shoulder.

 1   We all lifted him up and we all ran him over -- ran him into

 2   the ambulance and placed him on the gurney.

 3   Q.   How did he appear at that point?

 4   A.   Dead.

 5   Q.   What did you do?

 6   A.   At that point I jumped out of the ambulance and awaited

 7   further instruction per Sergeant MacLellan.

 8           MR. MELLIN:  Thank you, your Honor.

 9           THE COURT:  Mr. Watkins?

01:30  10                   CROSS-EXAMINATION

11   BY MR. WATKINS:

12   Q.   Good morning, Officer Reynolds.

13   A.   Good morning.

14   Q.   All right.  You've since learned that Officer Donohue

15   recovered?

16   A.   Thankfully, yes.

17   Q.   And is, indeed, alive.  He did not die that evening.

18   A.   No, sir.

19   Q.   When you heard "officer down" and went to the driveway,

01:31  20   that's a driveway next to a house on Dexter?

21   A.   Correct.

22   Q.   And that house is 144 Dexter?

23   A.   I believe so, yes.

24   Q.   And the driveway is right next to 144 Dexter?

25   A.   Yes.

```
     1   Q.   When you heard "officer down," the gun battle had stopped
     2   at that point; the Mercedes was gone?
     3   A.   Yes, sir.
     4   Q.   Officer Reynolds, when you stopped the vehicles on Laurel,
     5   Tamerlan got out of the Mercedes, correct?
     6   A.   Yes.
     7   Q.   And Tamerlan had the gun when he got out of the Mercedes,
     8   right?
     9   A.   Yes.
01:31 10   Q.   And when Tamerlan got out of the Mercedes with the gun, he
    11   started shooting at you, right?
    12   A.   Yes.
    13   Q.   Turning now to the end, where you saw him come out to
    14   approach Officer Pugliese, that was Tamerlan with the gun then?
    15   A.   I couldn't tell.  Like I said, it's a dimly lit street.
    16   At that point I couldn't see who was shooting.
    17   Q.   But you did ultimately know it was Tamerlan that engaged
    18   with sergeant -- Officer Pugliese?
    19   A.   Because he started running towards us, yes.
01:32 20   Q.   And so it was Tamerlan with the gun at that point.  Is
    21   that correct?
    22   A.   At that point, yes.
    23   Q.   And it was Tamerlan then that after engaging with Officer
    24   Pugliese then ran towards you?
    25   A.   Yes.
```

```
 1              MR. WATKINS:  That's all I have.
 2                      REDIRECT EXAMINATION
 3    BY MR. MELLIN:
 4    Q.   Officer Reynolds, do you know who had the gun or who was
 5    firing during this entire exchange of gunfire?
 6    A.   No, sir.
 7    Q.   Okay.  Could it have been either one of the suspects?
 8    A.   Yes.
 9              MR. MELLIN:  Thank you.
10              THE COURT:  All right, Officer.  Thank you.  You may
11    step down.
12              THE WITNESS:  Thank you, sir.
13              (The witness is excused.)
14              MR. WEINREB:  Good morning, your Honor.  The United
15    States calls Sergeant John MacLellan.
16                      JOHN MACLELLAN, duly sworn
17              THE CLERK:  State your name, spell your last name for
18    the record, keep your voice up and speak into the mic.
19              THE WITNESS:  My name is Sergeant John MacLellan,
20    M-A-C-L-E-L-L-A-N.
21                      DIRECT EXAMINATION
22    BY MR. WEINREB:
23    Q.   Good morning.
24    A.   Good morning.
25    Q.   Where do you work?
```

|    |    |    |
|----|----|----|
| 1  | A. | Watertown Police Department. |
| 2  | Q. | How long have you worked there? |
| 3  | A. | 23 years. |
| 4  | Q. | What are your job responsibilities there? |
| 5  | A. | I'm a night patrol supervisor, sergeant. |
| 6  | Q. | And how long have you been a supervisor? |
| 7  | A. | Six years. |
| 8  | Q. | What's your rank there? |
| 9  | A. | Sergeant. |

01:34 10   Q.   What are your responsibilities as the night patrol

11   supervisor?

12   A.   On the street in full uniform in a marked cruiser.  I'm

13   a -- I'm out there patrolling with the other patrolmen, and I'm

14   the street supervisor.

15   Q.   On a typical night in Watertown, how many patrolmen are

16   out there patrolling?

17   A.   Anywhere from five to nine.

18   Q.   You supervise all of them?

19   A.   Yes.

01:34 20   Q.   How big a town is Watertown?

21   A.   Just a little over four square miles.

22   Q.   And what's it like policing Watertown?

23   A.   It's a good job.  It's a -- you know, we're fairly busy

24   right outside of the city of Boston.  It's a good job.

25   Q.   What kind of crimes do you usually encounter there?

A.   The majority of the crimes are everything from shoplifting

to domestics and -- all types of crimes.

Q.   Before April 2013, how often did you have to pull out your

gun in the course of your duties?

A.   Not very often.  A handful.  A handful of times.

Q.   Did you ever have to use it?

A.   No.

Q.   Were you on duty the night of April 18, 2013, around

midnight?

A.   Yes, I was.

Q.   Were you the night supervisor that night?

A.   Yes, I was.

Q.   Were you wearing a uniform?

A.   Yes, sir.

Q.   What were you driving?

A.   A fully marked SUV, Ford Explorer.

Q.   Were you the only one in it?

A.   Yes.

Q.   Were any special issues raised at roll call that night?

A.   Yes, sir.

Q.   What were they?

A.   We were told that there was a -- that there was an officer

shot and killed in Cambridge.  At the time we were told, I

believe, that it happened during a robbery.

Q.   When you went out on patrol, was there anything unusual on

1    the streets at first?

2    A.    No, it was just a regular night.  Just out, patrol.

3    Q.    Did there come a time shortly after midnight you got a

4    call on the radio?

5    A.    Yes.

6    Q.    What was that all about?

7    A.    We got a BOLO, it's a be-on-the-lookout, for a vehicle, it

8    was a Mercedes, that was carjacked, and to be on the lookout

9    for it.  They gave us the plate number of the vehicle.

01:37 10   Q.    What did you do when you got that information?

11   A.    I believe I wrote it on my hand.  I might not.  I wrote it

12   somewhere in the vehicle.  And I just kept it in my head,

13   looking for the vehicle.  I tried to put in my head what that

14   vehicle would look like.

15   Q.    And after that, did you get some more information about

16   the Mercedes over the radio?

17   A.    Yes.

18   Q.    What was that?

19   A.    We were told that the vehicle was now in Watertown at a

01:37 20   particular number on Dexter Street and that it was stopped.

21   They were not sure if it was -- if it was parked or if it was

22   just not rolling at the time.

23   Q.    I'm going to show you what's been marked as Exhibit 771

24   for identification.  Take a minute and look at that.  That's a

25   map, and it's an overhead -- almost like a satellite image, but

1     the streets are marked.  Do they appear to be marked correctly?

2     A.   It's very small.  Yes.  Okay.  Yup.

3     Q.   And is that a fair and accurate map of that area?

4     A.   Yes.  Yes.  Okay.

5          MR. WEINREB:  The government offers 771.

6          MR. WATKINS:  No objection.

7          THE COURT:  Okay.

8          (Government Exhibit No. 771 received into evidence.)

9     BY MR. WEINREB:

01:39 10     Q.   Sergeant MacLellan, the screen in front of you, it's a

11     touch-sensitive screen, and if you press firmly on it with the

12     pad of your finger, you're going to be able to draw lines and

13     circles and -- can you just draw a line along Dexter Avenue?

14     A.   Just Dexter Ave. itself?

15     Q.   Yeah, just Dexter Avenue itself for now.

16     A.   (Witness complies.)

17     Q.   And can you also draw a line along Laurel Street?

18     A.   (Witness complies.)

19     Q.   That neighborhood right there, what's it like?

01:39 20     A.   It's very tight, as you can see, with houses.  I believe

21     they're 50-foot lots, many two-family houses.

22     Q.   Is it primarily residential or commercial?

23     A.   I'd say 95 percent residential.

24     Q.   When you were driving that night, it was -- when you got

25     the BOLO, was it after midnight?

1    A.    Yes, it was.

2    Q.    Okay.  Was there a lot of activity on the streets?

3    A.    No, there wasn't.

4    Q.    Was it noisy, quiet?

5    A.    It was a pretty quiet night, yes.

6    Q.    When you heard that the Mercedes had been pinged on Dexter

7    Avenue, what did you do?

8    A.    I immediately started heading that way.

9    Q.    Can you show us maybe by drawing an arrow just which way

01:40 10   you headed?

11   A.    I was coming down Hazel.  Yeah, I was coming from up here

12   in this direction.

13   Q.    Did you hear anything -- after you heard that the Mercedes

14   had been pinged on Dexter Ave., did anything come over the

15   radio from any fellow officer?

16   A.    Yes; Officer Reynolds.

17   Q.    What did he say?

18   A.    He stated he was -- I'm not sure if he said he was on

19   Dexter Ave. or close to Dexter Ave.  He said, "I'm heading in

01:41 20   that location."

21   Q.    And then what?

22   A.    I got on the air immediately and told him that we were

23   told that there was a gun in the vehicle, he was taken at

24   gunpoint.  And I said, "I believe there's a gun in that

25   vehicle.  Please wait for backup before you take any action or

1    pull it over."

2    Q.   So you said that you started driving -- it looks like the

3    arrow is pointing south on Dexter?

4    A.   Yes.

5    Q.   Okay.  And did you eventually see the Mercedes that had

6    been described?

7    A.   Yes, I did.  Officer Reynolds -- I saw Officer Reynolds'

8    cruiser and I saw the vehicle in question in front of him.

9    Q.   Okay.  And did you see a third car in front of it at that

01:42 10    time?

11    A.   I did not.

12    Q.   Okay.  Were you aware there was even another car involved?

13    A.   No.

14    Q.   What did you see happen next?

15    A.   The vehicles in tandem, I saw the black Mercedes take a

16    left-hand turn onto Laurel.  Officer Reynolds was actually

17    making the corner -- or right before making the corner, and I

18    said, "Okay, Joe.  I'm right behind you.  Light them up."

19    Q.   What does that mean, "light them up"?

01:42 20    A.   What I meant in that was to turn on your lights, let them

21    know we're behind you, and let them know, you know, we want to

22    talk to you.  Pull the vehicle to the side of the road.

23    Q.   All right.  So "light them up," that's police lingo for

24    activate your flashing blue lights?

25    A.   That's what I used that night, yeah.

```
 1   Q.   Okay.  Now, when you see the vehicles turn left onto
 2   Laurel, can you draw an arrow to show which way they turned?
 3   A.   Sure.  (Indicating)
 4   Q.   Did Officer Reynolds ever have time to turn on his lights?
 5   A.   He did not.
 6   Q.   I'm going to enlarge that little section there.  So this
 7   section of Laurel Street that's now highlighted in the middle
 8   of the map, there are houses on both sides of the street?
 9   A.   Yes, there is.
10   Q.   And are those just homes where people live?
11   A.   Yes.
12   Q.   Do you know some of the people who live on that street?
13   A.   Excuse me?
14   Q.   Have you come to know in the course of investigating this
15   case some of the people who live on the two sides of that
16   street?
17   A.   Yes.
18   Q.   What happened after you saw the cars turn onto Laurel?
19   A.   When I came around the corner, Officer Reynolds either was
20   already in reverse or was putting his vehicle into reverse,
21   backing up.  And I looked further down in front of him and I
22   saw someone firing a weapon at him.
23   Q.   How far away was the car that was -- well, you say -- so
24   you saw Officer Reynolds.  His car was stopped or he was still
25   backing up?
```

1  A.   I can't be positive.  I can't be positive about it.

2  Q.   And did you see the Mercedes?

3  A.   I did.

4  Q.   Where was it?

5  A.   It was -- it wasn't pulled over totally to the side of the

6  street; it was a little further out, and the driver's side door

7  was open.

8  Q.   And using your -- can you show us again, just so we're all

9  clear, which way you turned onto Laurel?

01:44 10  A.   (Witness indicates.)

11  Q.   And which way was the Mercedes pointing?

12  A.   The Mercedes was pointing this way.

13  Q.   Okay.  And do you know roughly where on this street the

14  Mercedes had stopped?

15  A.   I want to say right about here.

16  Q.   So you drew -- you drew a point that appears to be about

17  halfway between 61 Laurel and 55 Laurel.  Is that accurate?

18  A.   Yeah.  I could probably do a little better if I had

19  another view of it, but that's about the area it was.

01:45 20  Q.   So its headlights were pointing east.  Is that right?

21  A.   Right.  Away from Dexter Ave.  Yeah, east.  Yes.

22  Q.   And the shooter -- or shooters, were they --

23       MR. WATKINS:  Objection.

24       THE COURT:  Overruled.  It may stand.

25       Go ahead.

1    BY MR. WEINREB:

2    Q.   On which side of the Mercedes were they positioned?

3              MR. WATKINS:  Objection to the "they," your Honor.

4              THE COURT:  Yeah.  Rephrase that.

5              MR. WEINREB:  All right.

6    BY MR. WEINREB:

7    Q.   How many people did you see?

8    A.   At this time I saw one.

9    Q.   All right.  And as time went on did you see more than one?

01:46 10   A.   Yes.

11   Q.   And on which side of the vehicle were they positioned?

12             MR. WATKINS:  Objection again to the "they."

13             THE COURT:  Overruled.

14             Go ahead.

15             THE WITNESS:  At different times they were in

16   different positions.  They moved around a lot.  They were in

17   front of the car, to the side of the car, depending on what

18   they were doing.  They were moving around.

19   BY MR. WEINREB:

01:46 20   Q.   When you say "they were in front of the car," does that

21   mean in front of the Mercedes is -- facing the front of the

22   Mercedes?

23   A.   Yes.  They were on the east side of the vehicle.  The car

24   was facing east and they were furthest away from us because the

25   car was -- they were in the front of it, but behind it as we're

```
 1   looking at it.
 2   Q.   Were the headlights of the Mercedes on?
 3   A.   Yes.
 4   Q.   Was it shining on them?
 5   A.   Yes.
 6   Q.   Your car -- when you turned onto Laurel, Sergeant, where
 7   was Officer Reynolds' car?
 8   A.   When I turned onto Laurel?
 9   Q.   Well, did his car eventually come to a stop?
10   A.   It did.
11   Q.   And where did it come to a stop?
12   A.   I believe right about here.
13   Q.   Okay.  Which direction was it pointing?
14   A.   Still facing east.  He put it in reverse and shot back.
15   Q.   Were his headlights on?
16   A.   Yes.
17   Q.   Were they pointing down at the suspects?
18   A.   Yes.
19        MR. WEINREB:  Can I have Exhibit 772 for
20   identification, please?
21   Q.   Sergeant MacLellan, do you recognize this?
22   A.   Yes, I do.
23   Q.   What is this?
24   A.   This is also a version of the overhead, Dexter at Laurel.
25   Q.   Does it appear to be a fair and accurate diagram of that
```

 1    area?

 2    A.    Yes.

 3            MR. WEINREB:   The government offers 772.

 4            MR. WATKINS:   No objection.

 5            (Government Exhibit No. 772 received into evidence.)

 6    BY MR. WEINREB:

 7    Q.    So I'm going to highlight a portion of this.  So is this

 8    that same street we were just looking at, only this time it's a

 9    graphic representation instead of the photograph?

01:48 10    A.    Yes, it is.

11    Q.    All right.  What did you do after turning onto Laurel

12    Street?

13    A.    As I turned onto Laurel Street, I was a little past the

14    stop sign, probably right about here.

15    Q.    You're indicating just right by the -- you're showing

16    through a marking that you turned from Dexter onto Laurel and

17    stopped just beyond the stop sign right at the beginning of the

18    street?

19    A.    Right.

01:49 20    Q.    Laurel Street?

21    A.    Yes.

22    Q.    Yes.  Then what?

23    A.    Officer Reynolds was in reverse, and I believe as he was

24    in reverse he yelled into the mic, "Shots fired."  We had --

25    the dispatcher said, "Sergeant, can you repeat that?"  And I

1   repeated it three times:  "Shots fired.  Shots fired.  Shots

2   fired."

3   Q.   Could you hear shots being fired?

4   A.   Yes.

5   Q.   Then what happened?

6   A.   I went to put my vehicle in park and I took a round

7   through the windshield, got sprayed with glass.  And I knew,

8   okay.  We're being fired upon.

9   Q.   So a bullet came through your windshield?

01:50 10   A.   Yes.

11   Q.   Did it hit you?

12   A.   No.

13   Q.   What did you do then?

14   A.   I was -- I took -- I opened my driver's side door, using

15   it for cover, and I tried to get down under -- as low as I

16   could under the motor part of the vehicle to try to shield

17   myself as much as possible, and I was trying to retrieve my

18   rifle.

19   Q.   Were you able to get your rifle?

01:50 20   A.   No, I wasn't.

21   Q.   What did you do then?

22   A.   I made a decision I could -- I heard the bullets hitting

23   my vehicle.  I had no line of sight towards the suspects.  I

24   wasn't sure if they were advancing.  I made the decision to

25   jump up in the seat and put it in drive, and my thinking at the

1    time was to let the vehicle go, cause a diversion.  Maybe I

2    could gain some time, try to figure out how many suspects we

3    had.  And I let the vehicle go, and I stepped to the side of it

4    and used it as cover as it was rolling, and I tried to throw

5    some rounds down range.

6    Q.    And "throw some rounds down range," is that police talk

7    for shoot your gun towards the suspects?

8    A.    Yes, I was.  Yes.

9    Q.    What did Officer Reynolds do?

01:51 10    A.    At this time I'm not sure exactly what he was doing.  I

11   believe he was a little behind me.  The vehicle was traveling.

12   I believe he was behind my vehicle.  The vehicle rolled a

13   little, and I was following it down the street.

14   Q.    As your cruiser was rolling down the street and you were

15   taking cover behind it, were shots being fired?

16   A.    Yes.

17   Q.    At you?

18   A.    Yes.

19   Q.    And were you firing back?

01:51 20    A.    Yes.

21   Q.    Using your finger, can you show us the path that your car

22   took as it moved down the street?

23   A.    (Witness complies.)

24   Q.    That's fine.

25   A.    Right down the gutter line, and I believe it stopped

1  right -- I believe that -- I'm not sure if it's this house or

2  this house now, but right across from where the -- it landed

3  straight across from where the suspect vehicle was.

4  Q.   So that final arrow that you drew -- can you now just make

5  an X or a dot where the Mercedes was?

6  A.   (Witness complies.)

7  Q.   I'm going to clear this so we have a little better view.

8       How far down the street did you make it behind your car

9  before you took other cover?

01:53 10  A.   If you could see this driveway right here, and there's a

11  tree, I -- that's where I fired most of my rounds from.  It was

12  my only cover at the time.  There was plenty of concealment,

13  there was a plastic fence there and whatnot, but I figured that

14  tree might be able to stop some rounds, so I got behind that.

15  Q.   Okay.  So looking at the north side of the street, at the

16  time you took cover behind that tree, how many house lengths

17  were you away from the Mercedes where the shots were being

18  fired?

19  A.   On my side of the street, it looks like two, and on the

01:53 20  suspect's side, it looks like three.

21  Q.   In addition to taking fire from -- having shots fired at

22  you, did anything else come your way?

23  A.   Yes.

24  Q.   What?

25  A.   Throwing explosives.

1    Q.   So can you describe that?  What was the first thing of

2    that nature that occurred?

3    A.   The first one landed on the other side of my cruiser.  As

4    I said, I had an SUV.  It did explode.  It really wasn't that

5    impressive.  I actually think I said over the air that I think

6    they're throwing M-80s at us.  I think that was my first

7    thought.

8    Q.   How far away from you did that one explode?

9    A.   I can't be sure.  I know it was -- the vehicle was in

01:54 10   front of me.  I'm thinking it was probably right about here

11   when it went off, and the device was in front of that.

12   Q.   Could you see which of the two suspects threw that bomb at

13   you?

14   A.   I didn't that time, no.  I didn't -- I didn't -- it went

15   off without me even seeing anyone throw it.

16   Q.   Was there another bomb?

17   A.   Yes.

18   Q.   Okay.  Tell us about the second bomb.

19   A.   There was -- once the Mercedes went down the street, I'm

01:55 20   trying to look down and see how many suspects we have.  I saw

21   two and what I thought was -- they were both engaged in the

22   vehicle.

23   Q.   So the two suspects who you saw down the street, could

24   you -- what differences in their size or shape or clothing or

25   anything else did you notice between them?

```
 1    A.   I noticed one was bigger than the other and they had
 2    different styles of when they were throwing the devices.  And
 3    that's how I tried to keep them straight in my head.
 4    Q.   All right.  What were their different styles of throwing
 5    devices?
 6    A.   One was -- if you don't mind me standing.
 7    Q.   Not at all.  Go ahead.
 8    A.   One was throwing like a baseball (indicating).
 9         MR. WATKINS:  Objection.  If he could identify which
10    one.
11         THE COURT:  No, go ahead.  You may get to that, but go
12    ahead.
13         THE WITNESS:  And the other ones were being thrown
14    like a hook shot, over the head (indicating).
15    BY MR. WEINREB:
16    Q.   Okay.  Could you tell -- did each one have a distinctive
17    style of throwing?
18    A.   Yes, I believe so.
19    Q.   Well, which one was throwing and in which way, which
20    manner?
21    A.   The bigger of the two gentlemen was throwing like a
22    baseball and the skinnier of the two was throwing the hook
23    shot.
24    Q.   Who threw the second bomb at you?
25    A.   I believe it was the smaller of the two.
```

1    Q.    Did that one explode?

2    A.    I don't think that one went off.  Again, I've got a little

3    trouble with this from the beginning with the number of them

4    that were thrown.  Either the second one was the dud or the

5    third one was the dud.  But either the second or the third one,

6    the one that did go off, was thrown by the same people, second

7    and third.  Second, same person.  One went off, one didn't.

8    Q.    Okay.  So the one you identified as the skinnier one, he

9    threw both the second and the third bombs?

01:57 10   A.    Yes.

11   Q.    Do you see that person in the courtroom today?

12   A.    I do.

13   Q.    Where is he?

14   A.    The gentleman in the black blazer with the tan.

15         MR. WEINREB:  Let the record reflect the

16   identification of the defendant.

17         THE COURT:  All right.

18   BY MR. WEINREB:

19   Q.    When the third one -- the third bomb exploded, how far

01:57 20   away from you was it?

21   A.    A little over 20 feet.  Twenty to 22 feet away.

22   Q.    How loud was it?

23   A.    It was incredible.  It was horrendous.  Very loud.  I had

24   to re-holster my weapon to be able to straighten my head to be

25   able to see.

```
 1   Q.   What else did you notice?

 2   A.   A lot of debris -- debris raining down.  For some reason I

 3   thought shingles were coming off houses, but it was just stuff

 4   landing all around us, smoke, car alarms going off, people

 5   screaming.

 6   Q.   I want to show you some photos to get a better sense of

 7   the defendant's location.

 8           MR. WEINREB:  Can we have Exhibit 1522 for

 9   identification, please.

10   Q.   Do you recognize this photo?

11   A.   Yes, I do.

12   Q.   What -- is it -- what do you see in that photo?

13   A.   What I believe are the two suspects crouched

14   behind -- well, in front of the Mercedes but from my view,

15   behind the Mercedes.

16   Q.   And based on your observations that night, is this a fair

17   and accurate photo?

18   A.   Yes, that would be.

19           MR. WEINREB:  The government offers 1522.

20           MR. WATKINS:  No objection.

21           THE COURT:  Okay.

22           (Government Exhibit No. 1522 received into evidence.)

23   BY MR. WEINREB:

24   Q.   Sergeant MacLellan, the house that is directly behind

25   where the suspects are standing, do you see that in the photo?
```

01:58 at line 10
01:59 at line 20

1    A.    Not in this.

2    Q.    Well, I'll circle -- I'm talking about this house right

3    here.

4    A.    Yeah.  It's very dark but I can see the windows.

5    Q.    Do you know what the material is on the front of that

6    house?  Is it wood, is it brick?

7    A.    It's definitely not brick.  I would say it's either wood

8    or vinyl.

9    Q.    Okay.  And then here in between the house, that house and

02:00 10   the house to its right --

11   A.    Do you mind if I stand?  I can't see it sitting down.

12   Okay.  Yeah, I do see that.

13   Q.    That's like a white fence?

14   A.    Yeah, it looks like a plastic --

15           THE COURT:  You may also be able to move the tilt of

16   the monitor if that helps you.

17           THE WITNESS:  There you go.  Thank you, sir.

18   BY MR. WEINREB:

19   Q.    So what's that inside the circle I've just drawn just to

02:01 20   the right of the house?

21   A.    It looks like a fence and maybe a gate, but definitely a

22   fence.

23   Q.    Okay.  All right.  And the house that's next over to the

24   house, what's the facing of this house?

25   A.    It looks like brick.  Brick on the bottom with either wood

1   or, again, vinyl on the top.

2           MR. WEINREB:  Can we have Exhibit 1532 for

3   identification.

4   Q.   Do you recognize this?

5   A.   Yes, I do.

6   Q.   What is that a picture of?

7   A.   That's a picture of Laurel Street facing -- as I look at

8   it, facing east, towards Boston.

9   Q.   Is this the same direction that, when you turned onto

02:01 10  Laurel Street, the direction you were facing?

11  A.   Yes.

12  Q.   Does it appear to be a fair and accurate photo of Laurel

13  Street during the daytime?

14  A.   Yes.

15           MR. WEINREB:  The government offers 1532.

16           MR. WATKINS:  No objection.

17           THE COURT:  All right.

18           (Government Exhibit No. 1532 received into evidence.)

19  BY MR. WEINREB:

02:02 20  Q.   Sergeant MacLellan, do you see the white piece of fence

21  I've just circled?

22  A.   Yes, sir, I do.

23  Q.   Is that the same fence that you just identified in the

24  previous photo?

25  A.   Yes, it is.

1    Q.   And this house that I just circled, if you were facing

2    that fence, would be just to the left?

3    A.   Yes, sir.

4    Q.   Is that the house with the wooden front that you just

5    circled?

6    A.   Yes.

7    Q.   You just identified.  Okay.

8         And you see the streetlight that I just circled?

9    A.   Yes, I do.

02:03 10   Q.   Was that on that night?

11   A.   Yes.

12   Q.   Was it illuminating the two individuals who were standing

13   in front of the Mercedes?

14   A.   Yes, it would be lighting up the area.  Yes.

15   Q.   I'm going to show you three photos now, Exhibits 1530,

16   1531 and 1533 just for identification.

17        So that's 1530.  Do you recognize that?

18   A.   Yes.

19   Q.   And then 1531, do you recognize that?

02:03 20   A.   Yes, I do.

21   Q.   1533.

22        Are these all fair and accurate representations of Laurel

23   Street as you were just sort of driving down it in the

24   direction that we were just looking down it?

25   A.   Yes.

1           MR. WEINREB:  The government offers those exhibits.

2           MR. WATKINS:  I'd object on relevance grounds.

3           THE COURT:  Overruled.  They may be admitted.

4           (Government Exhibit Nos. 1530, 1531 and 1533 received

5      into evidence.)

6           MR. WEINREB:  If we could go back to 1530, please.

7      BY MR. WEINREB:

8      Q.   What is this a picture of?

9      A.   This is the corner that the suspects, then my -- Officer

02:04 10   Joe Reynolds and myself took the left from Dexter onto Laurel.

11     That's the corner.

12     Q.   You mentioned earlier that you -- when you got out of your

13     car and let it roll, you were just past a stop sign.  Is that

14     correct?

15     A.   Yeah, I believe somewhere -- somewhere in that area, yes.

16     Q.   Okay, sir.  Do you see the stop sign?

17     A.   Yes.

18     Q.   Can you circle it, please?

19     A.   (Witness complies.)

02:04 20   Q.   Okay.  So that's the stop sign that we see almost in the

21     center of the photo?

22     A.   Yes.

23     Q.   Towards the bottom?

24          Later on you said you took cover behind a tree.  Do you

25     see that tree?

```
 1   A.   I do.

 2   Q.   Could you circle that, please?

 3   A.   (Witness complies.)

 4   Q.   Okay.  If, instead of tapping the screen, you just put

 5   your finger down on it firmly and then make a circle, you'll be

 6   able to circle.

 7   A.   (Witness complies.)

 8   Q.   There you go.

 9        MR. WEINREB:  Could we have 1531, please?

10   Q.   Where's the tree now?

11   A.   (Witness indicates.)

12   Q.   And where's the house that the Mercedes was in front of?

13   A.   Right about here, but on the street, obviously.

14        MR. WEINREB:  If we could have 1533, please.

15   Q.   Okay.  The tree we see on our left, is that the tree?

16   A.   That's the tree, yes.

17   Q.   Okay.  And this streetlight that I'm circling, is that

18   where the Mercedes was?

19   A.   Yes.  I believe a little past that, but right in that

20   area, yes.

21        MR. WEINREB:  Exhibit 775 for identification, please.

22   Q.   This diagram is a little different from the one I showed

23   you earlier because there's some cars pictured in it.  Do you

24   see that?

25   A.   Yes, I do, sir.
```

```
 1    Q.    I'm going to highlight that.

 2          Do you see Officer Reynolds' car?

 3    A.    Yes, I do.

 4    Q.    Do you see the -- do you see your cruiser, where it

 5    stopped?

 6    A.    Yes.

 7    Q.    All right.  The -- do you see the Mercedes in this photo,

 8    in this diagram?

 9    A.    No, I don't.

10    Q.    All right.  But was there another car on the street in

11    addition to the Mercedes?

12    A.    Yes.

13    Q.    What was that?

14    A.    That was a Honda.

15    Q.    Are these -- and do you see the Honda, the green Honda?

16    A.    I do.

17    Q.    All right.  Are these cars positioned in the places that

18    they were in when they were all at rest on that evening?

19    A.    Yes.  It looks almost exactly but without the Mercedes

20    being there.

21          MR. WEINREB:  The government offers 775.

22          MR. WATKINS:  I'm going to object as an exhibit.  I

23    think it does -- it's fine to show it to the viewer as a chalk,

24    but we would object to it as being admitted.

25          THE COURT:  I think it can be admitted.
```

```
  1              Would you get the appropriate time frame for this?

  2              (Government Exhibit No. 775 received into evidence.)

  3    BY MR. WEINREB:

  4    Q.   So you testified earlier that your cruiser came to rest

  5    almost directly across from the Mercedes.  Is that right?

  6    A.   Yes.

  7    Q.   And did there come a time when the Mercedes left the

  8    scene?

  9    A.   Yes.

 10    Q.   Did the Honda leave the scene?

 11    A.   No.

 12    Q.   Did your cruiser stay where it had stopped?

 13    A.   Yes.

 14    Q.   At that time, is this a fair and accurate representation

 15    of where all the cars were?

 16    A.   Yes.

 17    Q.   Please circle Officer Reynolds' cruiser.

 18    A.   (Witness complies.)

 19    Q.   All right.  And please circle your cruiser.

 20    A.   (Witness complies.)

 21    Q.   All right.  So for Officer Reynolds' cruiser, you've

 22    circled the one alongside the right hand of this street in

 23    front of three cars that are parked all facing it, and for

 24    yours, it's on the left-hand side of the street as you look

 25    eastward, and there are a bunch of cars in a driveway facing
```

1    it.  Is that correct?

2    A.    That is correct.

3    Q.    And please circle the green Honda.

4    A.    (Witness complies.)

5    Q.    Now, you've circled a green car that's in the middle of

6    the street.  And then again, please circle the tree that you

7    were taking cover behind.

8    A.    (Witness complies.)

9    Q.    So you've circled the tree that is just to the right of a

02:09 10   blue car that's parked in a driveway towards the entrance of

11   Laurel Street?

12   A.    Yes, sir.

13   Q.    I'm going to erase these circles now.

14       Can you point out where you believe the first bomb

15   exploded that was thrown at you?

16   A.    Circle it or just point to it?

17   Q.    Sorry?

18   A.    Circle it or just point to it?

19   Q.    If you would just point to it.

02:10 20   A.    Right about there (indicating).

21   Q.    And then you said the defendant threw a second bomb at

22   you.  Where did that one land?

23   A.    They're all in a very tight, uh...

24   Q.    And you said the defendant threw a third bomb.  Where did

25   that one land?

1    A.    (Witness indicates.)

2    Q.    Okay.  So you've indicated all those bombs landed more or

3    less in the street just south of the tree that you were taking

4    cover behind?

5    A.    Yes.

6    Q.    During the time that these bombs were being thrown at you,

7    were shots also being fired at you at the same time?

8    A.    Yes.

9    Q.    Could you tell if Tamerlan Tsarnaev was shooting at you

02:11 10  and Officer Reynolds?

11   A.    I believe so.  To me, there were simultaneous flashes

12   coming towards us.

13   Q.    Explain what you mean by that.

14   A.    Like, we were told not to talk to anyone until we did our

15   interview, and I said in my interview -- they said --

16   Q.    I don't want to hear what you said before in your

17   interview.  Just tell us what you remember now.

18   A.    I remember that there was two handguns being shot at me.

19   Q.    What made you believe there were two handguns being shot

02:11 20  at you?

21   A.    Because I saw simultaneously two flashes or two -- what I

22   thought were muzzle flashes -- at the same time.

23   Q.    Okay.  Is it possible that one of the muzzle flashes you

24   saw was something else?

25   A.    It is possible.

```
 1   Q.   What else could it have been?
 2   A.   A lighter lighting the --
 3           MR. WATKINS:  Objection.
 4           THE COURT:  Overruled.
 5           THE WITNESS:  A lighter.
 6   BY MR. WEINREB:
 7   Q.   Please continue.
 8   A.   A lighter lighting the explosives.
 9   Q.   Do you have any idea how many rounds were fired at you?
10   A.   At me?
11   Q.   Or at -- by the suspects towards you.
12   A.   I don't know that, no.
13   Q.   Dozens?
14           MR. WATKINS:  Objection.
15           THE COURT:  Overruled.
16           THE WITNESS:  That night I thought it was hundreds
17   but, yeah, dozens, absolutely.
18   BY MR. WEINREB:
19   Q.   Did there come a time when Sergeant Pugliese arrived on
20   the scene?
21   A.   Yes.
22   Q.   Actually, before I ask you about Sergeant Pugliese, the
23   bomb you said that went off that created the gigantic boom,
24   were additional bombs thrown after that?
25   A.   Yes.
```

```
 1    Q.   Did they explode?

 2    A.   Some -- two did not explode, the rest did.

 3    Q.   So of all the bombs that were thrown, a total of two did

 4    not explode and all the rest exploded?

 5    A.   Correct.

 6    Q.   When Sergeant Pugliese arrived on the scene, what

 7    happened?

 8    A.   Again, I was facing the suspects.  I heard him call out

 9    over the radio.

02:13 10    Q.   Who's "him"?

11    A.   Sergeant Pugliese.  I heard him call out.  The next time I

12    saw him, he was coming up the middle of the street behind one

13    of our suspects.

14    Q.   Which one?

15    A.   The older brother.

16    Q.   What happened?

17    A.   I was standing in the middle of the street.  I had an

18    empty weapon at the time but the suspect didn't know that.  I

19    was giving him commands, "Get on the ground."  He had nothing

02:14 20    in his hands.  My thought was he was strapped with explosives.

21    I was telling him to get on the ground; I didn't want him to

22    get near me.  He was coming closer.  Sergeant Pugliese put his

23    hand on his shoulder, and he collapsed in the middle of the

24    ground -- in the middle of the street.

25    Q.   What did you do?
```

```
 1   A.   Well, I immediately told him, "Get off him.  Bombs.  Get
 2   off him.  Get off him.  Get off him.  Get off him."  He said,
 3   "No, we have got to cuff him.  We have got to cuff him."  And I
 4   jumped on top and tried to help him.
 5   Q.   Did he turn out to be strapped with any explosives?
 6   A.   No, he did not.
 7   Q.   Did you cuff him at that time?
 8   A.   We attempted to.
 9   Q.   Did something else happen?
10   A.   Yes.
11   Q.   What happened to prevent you from cuffing him?
12   A.   I was yelling out commands.  As we were trying to
13   ascertain if he had anything on him and trying to get his
14   hands, I was yelling out, "You still got someone down range.
15   Watch down range.  Watch down range."  And almost immediately I
16   heard, "Sarge, here he comes.  Here he comes."
17   Q.   Who are you referring to?
18   A.   The defendant.
19   Q.   What was he doing?
20   A.   He was in the Mercedes now.  You could hear the grinding
21   of gears.  You could hear that the vehicle was turning around.
22   I looked up and it was coming towards us.
23   Q.   How fast was it coming?
24   A.   Very fast.  My guess is 35, 40 miles an hour.
25   Q.   What happened?
```

1    A.   I told Sergeant Pugliese to disengage.  I told him, "Get

2    off him.  Get off him.  Here he comes."  I pushed off and the

3    vehicle struck the suspect and what I thought struck Sergeant

4    Pugliese.  It was a very violent -- the car was jumping back

5    and forth.  The body got stuck up under the wheels.  And as it

6    passed, I saw Sergeant Pugliese there, I asked him, "Are you

7    all right?"  He said, "I'm okay."  The vehicle continued on.

8    As I said, it was bouncing back and forth.  It struck the front

9    quarter-panel of the -- Officer Reynolds' vehicle, 465.

02:16 10   Q.   What happened to -- the suspect who was caught up under

11   the Mercedes, was that Tamerlan Tsarnaev?

12   A.   Yes, it was.

13   Q.   What happened to him when the defendant struck Officer

14   Reynolds' car?

15   A.   He was -- the body was pushed out from underneath the car.

16   It released the body from underneath the car.

17   Q.   What happened to the Mercedes -- what did the defendant do

18   at that point?

19   A.   Continued on past Laurel Street through the intersection

02:16 20   and just straight -- straight -- down Laurel, crossing, there's

21   another intersection.  And it was just gone.

22   Q.   Can you show us here which direction the Mercedes went

23   after it drove past Officer Reynolds' car?

24   A.   (Witness complies.)

25   Q.   So just continued going straight?

 1    A.    Yes, sir.

 2    Q.    What happened after the defendant escaped in the Mercedes?

 3    A.    I was told -- there was a lot of commotion.  As I said,

 4    there was people screaming, there was car alarms going off.  It

 5    was very hectic.  And I heard, "Sarge, one of ours is down.

 6    One of ours is down.  We need help."

 7    Q.    What did you do?

 8    A.    I ran to where they said the officer was down, which I

 9    believe is right here in this -- right here in this driveway

02:18 10    (indicating).

11    Q.    All right.  So you're -- you've indicated the driveway on

12    the southwest corner of Laurel and Dexter?

13    A.    Correct.

14    Q.    What did you see when you got there?

15    A.    I saw one of my officers, Officer Menton, holding, I

16    guess, a wound.  He said, "Sarge, I can't get a tourniquet on

17    it.  I can't stop the bleeding."  As he moved his hand, you

18    could see the blood squirting out.  I said, "Timmy,

19    concentrate.  Get your hand on that.  Do the best you can," and

02:18 20    I called for an ambulance.

21    Q.    And "Timmy" is Timothy Menton, the officer?

22    A.    Officer Menton.

23    Q.    Did the ambulance arrive?

24    A.    It did.

25          MR. WEINREB:  Can we have Exhibit 1525 for

1    identification.

2    Q.    Do you recognize this photo?

3    A.    Yeah.  Yes, I do.

4    Q.    All right.  What does it appear to be?

5    A.    I believe that's the Mercedes now facing west.  And that

6    dark -- right here, that dark spot in the middle, I believe, is

7    myself, Sergeant Pugliese, and the older brother on the ground.

8    I was trying to effect the arrest.

9    Q.    I'm going to circle -- is this the street lamp you

02:19 10   mentioned earlier that I just circled in red?

11   A.    Yes, it is.

12   Q.    And these cars here at the end of the street facing the

13   Mercedes, what are those cars?

14   A.    The first one I would believe, I would think, is Officer

15   Reynolds' car, the first two headlights, here and here.  And

16   the one behind that I would believe would be another cruiser

17   that's further out into the intersection.  It might have been

18   an MBTA cruiser.

19          MR. WEINREB:  The government offers 1525.

02:20 20         MR. WATKINS:  Your Honor, I'm going to object to it

21   getting in through this witness.  He did not take it.  I think

22   what he said was "I believe" certain aspects to it.

23          THE COURT:  I think it's sufficient.  I'll admit it.

24          (Government Exhibit No. 1525 received into evidence.)

25   BY MR. WEINREB:

1    Q.   So please circle again the -- you said what appears to be

2    the -- you and the other officers with Tamerlan Tsarnaev.

3    A.   (Witness complies.)

4         THE COURT:  Just to avoid confusion, could you move

5    the cursor?  Thank you.

6    Q.   So you've drawn a circle in the middle -- roughly in the

7    middle of the photograph closer to the top than to the bottom.

8         And then circle what appears to be Officer Reynolds'

9    cruiser.

02:21 10  A.   (Witness complies.)

11   Q.   So you've circled a cruiser with its headlights pointed

12   straight at that clump of people?

13   A.   Yes.

14        MR. WEINREB:  Can we have Exhibit 1527 for

15   identification, please.

16   Q.   Do you recognize that?

17   A.   Yes, I do.

18   Q.   What is that?

19   A.   That's Officer Reynolds' vehicle, 465.

02:22 20  Q.   Is that a fair and accurate representation of how it

21   looked that night?

22   A.   Yes.

23        MR. WEINREB:  The government offers 1527.

24        MR. WATKINS:  No objection.

25        THE COURT:  Okay.

1           (Government Exhibit No. 1527 received into evidence.)

2    BY MR. WEINREB:

3    Q.   The front door of that cruiser is open, correct?

4    A.   Yes, it is.

5    Q.   Which portion of that car was struck by the defendant when

6    he hit it with the Mercedes?

7    A.   It would be right behind that door.  I believe the door is

8    open.  To open the latch -- he had to get at his oxygen bag and

9    his medical kit to help.  He went right from the gun

02:22 10   fight -- Officer Reynolds went right from the gun fight to over

11   to where Officer Dic Donohue was to help render aid.

12   Q.   There's some apparent fluid here on the street.  Do you

13   know what that is?

14   A.   I believe that would be the suspect's blood.

15   Q.   Which suspect?

16   A.   The older brother.

17           MR. WEINREB:  Go back.

18   Q.   The cruiser, where is it parked in relation to the -- this

19   sidewalk?

02:23 20   A.   It looks like it might be up on the sidewalk a bit.  There

21   is no curbing in that -- on that section of that street.  When

22   Officer Reynolds was coming back, he had his head down and he

23   just was trying to get back as far as he could.  And I believe

24   he came up on the sidewalk of it.

25   Q.   Okay.  Do you see in this photo the street lamp that we

1    referred to earlier that was over the Mercedes?

2    A.    Yes.

3    Q.    Can you circle it, please?

4    A.    Sure (indicating).

5    Q.    So you've circled the street lamp that's almost up against

6    the left-hand side of the photo.

7         And can you circle for us where the struggle took place

8    with -- where Sergeant Pugliese -- you said he put his hand on

9    Tamerlan Tsarnaev and he collapsed.  Where did that happen?

02:24 10   A.    You can almost -- you can see the drag marks, so wherever

11   it stops.  I believe it's right here, is where I believe it was

12   (indicating).

13   Q.    So is that also nearly by the sidewalk?

14   A.    Yeah, to me it looks like it comes to an angle, more out

15   to the middle of the street but to the -- we weren't in the

16   middle of the street but we were -- it looks like -- I feel

17   that we were closer out to the middle than that far over to the

18   side.

19   Q.    When the Mercedes drove at you and Sergeant Pugliese and

02:25 20   Officer Reynolds, could the defendant have avoided you just by

21   driving to the right?

22   A.    Yes.

23             MR. WATKINS:  Objection.

24             THE COURT:  Overruled.

25   BY MR. WEINREB:

1    Q.   Could you repeat your answer?

2    A.   Yes.

3    Q.   So there was -- was there ample room for him to get by

4    you?

5              MR. WATKINS:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8              MR. WEINREB:  Exhibit 776 for the witness, please.

9    BY MR. WEINREB:

02:25 10   Q.   Do you recognize that?

11   A.   Yes.

12   Q.   What's that?

13   A.   That's one of the explosives that were thrown at me that

14   did not explode.

15   Q.   Is that a fair and accurate picture of what it looked like

16   that night on the street?

17   A.   Yeah.  Yeah.  Yes, it is.

18              MR. WEINREB:  The government offers 776.

19              MR. WATKINS:  No objection.

02:26 20            THE COURT:  Okay.

21              (Government Exhibit No. 776 received into evidence.)

22              MR. WEINREB:  Could we have 777 for identification,

23   please.

24   BY MR. WEINREB:

25   Q.   Do you recognize that?

```
 1    A.    Yeah.

 2    Q.    What is it?

 3    A.    That's the other one that did not go off.

 4    Q.    The other pipe bomb that didn't explode?

 5    A.    Yes.

 6    Q.    Is that a fair and accurate picture of what it looked like

 7    on the street that night?

 8    A.    Yes, it is.

 9              MR. WEINREB:  The government offers 777.

10              MR. WATKINS:  No objection.

11              (Government Exhibit No. 777 received into evidence.)

12              MR. WEINREB:  845 for identification, please.

13    BY MR. WEINREB:

14    Q.    Do you recognize that?

15    A.    Yes.

16    Q.    What is that?

17    A.    That's a better picture of the one that was -- the pipe

18    bomb that was just in the middle of the street.

19              MR. WEINREB:  The government offers 845 -- I'm sorry.

20    That's 845 for identification.  The government offers it.

21              MR. WATKINS:  No objection.

22              (Government Exhibit No. 845 received into evidence.)

23              MR. WEINREB:  Mr. Bruemmer, can I please have Exhibit

24    948-7 for identification.

25    BY MR. WEINREB:
```

```
 1   Q.   Do you recognize that photo?

 2   A.   Yes.

 3   Q.   What's that?

 4   A.   That's my cruiser.  That's my -- that's my cruiser.

 5   Q.   It might help if you talked a little more into the

 6   microphone.

 7   A.   I'm sorry.  That's my cruiser.

 8   Q.   Where is it?

 9   A.   That's in its final resting place across from where the

10   suspect's vehicle would be.

11   Q.   This photo, was this taken the following day?

12   A.   I believe so.

13   Q.   Is it a fair and accurate representation of where your

14   cruiser landed?

15   A.   Yes.

16            MR. WEINREB:  The government offers 948-7.

17            MR. WATKINS:  No objection.

18            THE COURT:  All right.

19            (Government Exhibit No. 948-7 received into evidence.)

20            MR. WEINREB:  948-8 for identification, please.

21   BY MR. WEINREB:

22   Q.   Do you recognize that?

23   A.   Yes.

24   Q.   What is that?

25   A.   That's a picture of my cruiser and the area where the
```

1    Watertown police were shooting from, looking back, the tree

2    from where I was shooting from with the white flowers on it.

3              MR. WEINREB:  The government offers 948-8.

4              MR. WATKINS:  No objection.

5              (Government Exhibit No. 948-8 received into evidence.)

6              THE COURT:  You don't have it?

7              MR. WEINREB:  No.

8              THE COURT:  For some reason there's a delay.

9    BY MR. WEINREB:

02:30 10   Q.   So the tree you just mentioned that you were taking cover

11   behind, can you circle it?

12   A.   Yes, sir.

13   Q.   Okay.  And you've circled a tree on the right-hand side of

14   this street, the only one we see.  In April of 2013, did that

15   tree have any leaves on it?

16   A.   Flowers.  I don't believe it had -- I don't believe it has

17   leaves, no.

18             MR. WEINREB:  Exhibit 948-285 for identification,

19   please.

02:31 20   Q.   What's that a picture of?

21   A.   That's still a picture of my cruiser.

22   Q.   Is that a fair and accurate picture?

23   A.   Yes, it would be.

24             MR. WEINREB:  The government offers 948-285.

25             MR. WATKINS:  No objection.

```
 1              THE COURT:  Okay.

 2              (Government Exhibit No. 948-285 received into

 3       evidence.)

 4       BY MR. WEINREB:

 5       Q.    Sergeant MacLellan, I'm circling what appears to be a

 6       bullet hole towards the left-hand side of the picture.  Do you

 7       see that?

 8       A.    Yes, I do, sir.

 9       Q.    And I'm also circling a smashed window that's right

02:32 10      directly in the center of the picture.  Did that occur that

11       night during the gun battle?

12       A.    Yes.

13              MR. WEINREB:  948-174 for identification, please.

14       Q.    Do you recognize that?

15       A.    Yes, I do.

16       Q.    What is that a picture of?

17       A.    That's the round I took as I was putting my vehicle in

18       park.

19              MR. WEINREB:  The government offers 948-174.

02:32 20      MR. WATKINS:  No objection.

21              (Government Exhibit No. 948-174 received into

22       evidence.)

23       BY MR. WEINREB:

24       Q.    Can you please circle the bullet hole that you just

25       referred to and that you took as you put your vehicle in park?
```

```
 1    A.    (Witness complies.)

 2    Q.    You've circled what appears to be the only bullet hole in

 3    the windshield of that car.

 4              MR. WEINREB:  948-187 for identification, please, and

 5    948-178 and 948-179.

 6    Q.    Do you recognize what that series of pictures shows?

 7    A.    I believe it looks like a bullet that's in the

 8    back -- backseat of our 468 vehicle.

 9    Q.    And that's your car?

10    A.    Yes.

11              MR. WEINREB:  The government offers those three

12    exhibits.

13              MR. WATKINS:  No objection.

14              (Government Exhibit Nos. 948-187, 948-178 and 948-179

15    received into evidence.)

16              MR. WEINREB:  Can we publish 948-177.

17    BY MR. WEINREB:

18    Q.    And I'm going to circle an item towards the backseat

19    there.  Do you see that?

20    A.    Yes.

21    Q.    Is that the bullet you were referring to?

22    A.    Yes.

23              MR. WEINREB:  Can we have 948-178.  And then 948-179.

24              Excuse me a moment.

25              (Counsel confer off the record.)
```

1    BY MR. WEINREB:

2    Q.    Sergeant MacLellan, during the time that you were taking

3    fire, could you tell whether it was Tamerlan Tsarnaev firing

4    the gun, Jahar Tsarnaev firing the gun, or them taking turns or

5    alternating?

6    A.    I could not.

7    Q.    You said that the first bomb that exploded sounded

8    something like an M-80.  What is an M-80?

9    A.    I believe it's like a quarter stick of dynamite or an

02:35 10    eighth of a stick of dynamite.  I'm not sure of the exact size.

11    It's a very loud explosion, but fireworks.  It's fireworks,

12    not -- I believe it was just behind the vehicle.  And I didn't

13    get -- the full vehicle just absorbed most of the -- most of

14    the percussion, I imagine.

15    Q.    Now, the explosion -- you said there was -- the second

16    bomb that you saw the defendant throw that caused you to

17    re-holster.  Why did you re-holster?

18    A.    My eyes were shaking violently in my head.  I couldn't

19    see.  I couldn't see straight.  And I was still being shot at

02:36 20    and I was behind a plastic fence, and I was afraid I was going

21    to get killed.  I had to -- tactically it was a pretty poor

22    decision to re-holster during a gun fight, but I couldn't see.

23    Q.    And was that because of the force of the bomb that had

24    just gone off near you?

25    A.    Yeah.

```
 1                MR. WEINREB:  No further questions.

 2                THE COURT:  Are you going to be using your cart

 3      computer?

 4                MR. WATKINS:  I would like to, your Honor, yes.

 5                           CROSS-EXAMINATION

 6      BY MR. WATKINS:

 7      Q.   Good afternoon, Sergeant MacLellan.

 8      A.   Good afternoon, sir.

 9      Q.   I'm going to show you Government's Exhibit 775, which was

02:39 10      that map that we looked at.

11      A.   All right.

12      Q.   When you were pointing out on this map, of course, the

13      Mercedes was not on this map.  Is that correct?

14      A.   I don't have a picture.

15                THE COURT:  Everybody should have it.

16      Q.   Is it up there now?

17      A.   I do have a picture, yes.

18                THE COURT:  No?

19                MS. PELLEGRINI:  No.

02:39 20      BY MR. WATKINS:

21      Q.   So on this map, we see the Civic and we see your

22      cruiser --

23                MR. MELLIN:  I don't believe the jury has it.

24                THE COURT:  The jurors still aren't getting it.

25                THE JURORS:  We've got it.
```

```
 1              THE COURT:  Okay.  Go ahead.
 2   BY MR. WATKINS:
 3   Q.   Sergeant MacLellan, you have it up?
 4   A.   Yes, I do, sir.
 5   Q.   And now the audience does too, so we're good to go.
 6        So now you see where you've marked the Civic and your
 7   cruiser?
 8   A.   Yes, I do.
 9   Q.   And the Mercedes during this period of time that you were
10   testifying was back here also.  Is that correct?
11   A.   Yes, sir.
12   Q.   It just wasn't shown on this particular map.  Is that fair
13   to say?
14   A.   Yup.  Yes.
15   Q.   Also on this same map, I want to direct your attention
16   over to this side where you talked about what happened after
17   you heard "officer down."  First, you heard "officer down"
18   after the Mercedes had gone up Laurel Street on towards Spruce
19   Street.  Is that correct?
20   A.   I can't be positive exactly when.  I'm sorry.  I can't be
21   positive exactly when it happened.
22   Q.   Well, you were out on the street with Tamerlan Tsarnaev,
23   correct, having cuffed him?
24   A.   Yes.  Yes.
25   Q.   And the Mercedes had gone by -- there were lots of
```

```
 1   gunshots as the Mercedes went by Laurel and Dexter, right?
 2   A.    Yes.
 3   Q.    And it's after that that you heard the "officer down"
 4   signal?
 5   A.    Again, I can't be positive, but I believe that's when it
 6   was, yes.
 7   Q.    Now, did you actually, yourself, go over to where Officer
 8   Donohue was?
 9   A.    Yes.
10   Q.    And that was in the driveway, right?
11   A.    That's where they were working on him, yes.
12   Q.    Right.  And the driveway we see here, we see 144 Dexter
13   Avenue.  Can you point that out?
14   A.    Do you want me to circle it?
15   Q.    Yeah.
16   A.    Okay (indicating).
17   Q.    And there is a driveway right next to 144 Dexter Avenue?
18   A.    Yes.
19   Q.    Right?
20        And was it that driveway that you were working on Officer
21   Donohue or where you saw people working on Officer Donohue?
22   A.    That's possible.  It's one of these two.  Either one of
23   those.  I can't be positive.  Looking at this picture, it does
24   look like it's that one, yes.
25   Q.    When you say "looks like that one" --
```

1    A.    The smaller one of the two.

2    Q.    All right.  So where you said it was up here, now probably

3    down here is more likely?

4    A.    No.  Originally I thought it was here, but I'm saying I

5    can't be positive which one it is, which spot it is.  I'd have

6    to see it -- a real-time picture of it to be able to figure it

7    out.

8    Q.    You were shown Government's Exhibit 1522, which was this

9    photo here?

02:43 10          MR. WATKINS:  Could I now have the monitor just for

11   the witness, please?

12   Q.    I'm showing you what's marked for ID Defendant's Exhibit

13   3005.  Do you see that photograph?

14   A.    I do, sir.

15   Q.    Does that fairly and accurately depict another moment of

16   time?

17   A.    That's fair to say, yes.

18          MR. WATKINS:  Your Honor, I would seek to admit

19   Defendant's Exhibit 3005.

02:44 20          MR. WEINREB:  No objection.

21          THE COURT:  Okay.

22          (Defense Exhibit No. 3005 received into evidence.)

23   BY MR. WATKINS:

24   Q.    And you told us about the two figures there, one larger

25   than the other, right?

```
 1   A.   Yes, I did say that.
 2   Q.   And in this particular photograph, the larger one is to
 3   the left?
 4   A.   I can't be sure from that photo.  They're both pushed
 5   down.  I can't say.
 6   Q.   Eventually you helped in apprehending Tamerlan Tsarnaev
 7   further on down Laurel Street, right?
 8   A.   Yes.
 9   Q.   Tamerlan Tsarnaev, when you tackled him, had a dark jacket
10   on?
11   A.   I can't remember.  I can't remember what he was wearing
12   exactly.
13   Q.   Did you become aware that a weapon was recovered from the
14   scene, a firearm?
15   A.   When?  When, sir?
16   Q.   After the shootout a Ruger pistol was --
17   A.   Yes.  Yes.
18   Q.   And you were also aware that a BB gun was recovered after?
19           MR. WEINREB:  Objection, your Honor.  This is all
20   based on hearsay with this witness.
21           THE COURT:  Go ahead.
22   BY MR. WATKINS:
23   Q.   Did you become aware that a BB gun had been found at the
24   scene?
25   A.   I heard that, yes.
```

1  Q.   And you would agree that a BB gun doesn't have a muzzle

2  flash?

3  A.   No, it does not.

4       MR. WATKINS:  I have nothing further, your Honor.

5       MR. WEINREB:  No further questions.

6       THE COURT:  All right, Sergeant.  Thank you.  You may

7  step down.

8       THE WITNESS:  Thank you, sir.

9       (The witness is excused.)

02:46 10      THE COURT:  Jurors, because of our schedule a little

11  bit today we didn't take the midmorning break.  Is everybody

12  okay to keep going until about one o'clock?  Do you need a

13  break now?  No?  Okay.  Good.

14       MR. CHAKRAVARTY:  The government calls Sergeant

15  Jeffrey Pugliese.

16            JEFFREY PUGLIESE, duly sworn

17       THE CLERK:  State your name and spell your last name

18  for the record and speak into the mic.

19       THE WITNESS:  My name is Jeffrey Pugliese; last name

02:47 20  is spelled P-U-G-L-I-E-S-E.

21       THE CLERK:  Thank you.

22                 DIRECT EXAMINATION

23  BY MR. CHAKRAVARTY:

24  Q.   Good afternoon.  Sergeant Pugliese, are you with the

25  Watertown Police Department?

```
 1   A.   Yes, I am.

 2   Q.   And what's your rank?

 3   A.   Sergeant.

 4   Q.   How long have you been with the Watertown Police

 5   Department?

 6   A.   35 years.

 7   Q.   And are you from Watertown?

 8   A.   Yes, I am.

 9   Q.   Grew up there?

02:48 10  A.   Yes.

11   Q.   Before you became a police officer in Watertown, what did

12   you do?

13   A.   I was in the U.S. Army.

14   Q.   And what was your role there?

15   A.   I was a military police officer.

16   Q.   And when did you become a sergeant?

17   A.   1993, I believe.

18   Q.   And in addition to your role as a sergeant, do you have

19   collateral duties on the Watertown P.D.?

02:48 20  A.   Yes, I do.

21   Q.   What are they?

22   A.   I'm a firearms instructor.

23   Q.   Back in April of 2013, what was your assignment as a

24   sergeant?

25   A.   I was assigned to the night patrol division, patrol
```

1    supervisor, uniform.

2    Q.   And what does that entail?

3    A.   You're out driving around the town, supervising, making

4    sure the officers are doing what they need to do, or you're

5    available to assist the officers in any critical incidents.

6    Q.   And about how many other police officers do you supervise

7    when you're on shift?

8    A.   It varies depending on the night of the week.  It can be

9    upwards of ten, it could be a minimum of four.

02:49 10    Q.   Do you recall the week of the Marathon bombings, April 15,

11   2013?

12   A.   Yes, I do.

13   Q.   During the day, what were you doing that week?

14   A.   That particular day of the bombings?

15   Q.   On the day of the bombings.

16   A.   Yes.  I was actually in Lowell, Massachusetts, at our

17   annual in-service training.

18   Q.   And how did you hear about the bombing?

19   A.   The class had let out somewhere around two o'clock.  I was

02:49 20   getting in my vehicle, and I turned on the radio, WBZ radio,

21   and I heard that there was just an explosion at the Boston

22   Marathon finish line.

23   Q.   Do you listen to a lot of news when you're in your

24   cruiser?

25   A.   Yes, I do.

1    Q.    Later that week, did you continue to attend that

2    in-service up in Lowell?

3    A.    Yes.  It's a Monday through Thursday, four-day class.  And

4    so I was going Monday, Tuesday, Wednesday, Thursday that week.

5    Q.    Now, on Thursday, April 18th of that week, were you

6    scheduled to work after your in-service?

7    A.    Yes, I was.

8    Q.    And what was your shift that night?

9    A.    Three-thirty to midnight.

02:50 10   Q.    And did you head back to the Watertown area from Lowell

11   that afternoon?

12   A.    Yes, I did.

13   Q.    And did you go along with your shift duties without

14   incident until the evening?

15   A.    Yes.

16   Q.    What happened around 10 p.m. that evening?

17   A.    I was in the police station writing a report on an

18   incident that had occurred at a licensed establishment in town,

19   and I heard on my portable radio that Cambridge -- or an MIT

02:51 20   police officer had been shot.

21   Q.    And so what did you do after you heard that?

22   A.    I continued to finish my report.  I was actually in the

23   police station until just about the end of my shift.  About

24   11:30, 11:35, I finished the report and sent it off to the

25   lieutenant for approval -- or his review and approval.  And

1    then I went out, took my cruiser over to my personal vehicle,

2    put my gear in the back and went back into the building.

3    Q.   So you were transitioning from your cruiser to your

4    personal vehicle?

5    A.   Yes.

6    Q.   And when you went back into the station, was there any

7    further conversation?

8    A.   Yes.  The lieutenant was looking for me.  He had told me

9    that he thought he had inadvertently deleted the report that I

02:52 10   had written, asked me if I could see if I could pull it back

11   up.  And I subsequently spent about, I don't know, 40, 45

12   minutes or so trying to find the report, to no avail.

13   Q.   While all that was happening, did a call come in?

14   A.   Yes.

15   Q.   Explain that.

16   A.   Well, let me just back up just a -- not while that was

17   going on.  I had left the building at this point, figured I

18   would let the computer people try to figure that report out in

19   the morning.  And I was actually out in my own vehicle when I

02:52 20   learned about a carjacking.

21   Q.   Okay.  So you gave up on the report issue and went back

22   out to your car?

23   A.   Yes.  Yes.

24   Q.   Okay.  So, now, were you still in uniform?

25   A.   Yes, I was.

1   Q.   And you were sitting in your car?

2   A.   Yes, I was.

3   Q.   But did you still have your police radio?

4   A.   Yes, I did.

5   Q.   All right.  So what did you hear?

6   A.    I heard that there was a vehicle that had been carjacked

7   in Cambridge and that it was being -- I believe our dispatcher

8   said the cell phone was being pinged, but it ultimately -- I

9   believe turned out to be the GPS system on the vehicle.  But

02:53 10   that it was being pinged, and it was on Dexter Avenue in

11   Watertown.

12   Q.   And you were at the Watertown police headquarters?

13   A.   Yes.

14   Q.   Which is on Main Street?

15   A.   Yes, it is.

16   Q.   So how far is that from Dexter Avenue?

17   A.   Mile and a half to two miles.

18   Q.   So what did you do after you got that?

19   A.   So I was sitting, listening to the radio, and the vehicle

02:53 20   was being pinged in Watertown.  And I then heard Officer

21   Reynolds say that he had located the vehicle.  And at that

22   point -- I knew that there had been four officers working the

23   midnight shift plus the patrol supervisor -- I decided that I

24   would take a ride in that direction in case there was a vehicle

25   pursuit, and if anybody driving the vehicle bailed out of the

1    car and there would be a foot pursuit, I figured in my own

2    vehicle I would be an extra set of eyes.

3    Q.   And at the time you were heading over towards Dexter

4    Street -- Dexter Ave. -- excuse me -- did you know who the

5    suspects were?

6    A.   No.

7    Q.   Okay.  Incidentally, you mentioned earlier that the

8    Watertown P.D. is on Main Street?

9    A.   Yes.

02:54 10   Q.   Is there a Bank of America very close by, right across the

11   street?

12   A.   It's probably -- maybe a half mile away down in the

13   Watertown Square area.

14   Q.   And that's also on Main Street?

15   A.   Yes, it is.

16   Q.   So did you head towards Dexter Ave.?

17   A.   Yes, I did.

18   Q.   Was this your personal vehicle or in the cruiser?

19   A.   My personal vehicle.

02:54 20   Q.   How long did it take you to get there?

21   A.   Initially I was probably doing the speed limit, you know,

22   driving along, and then eventually I heard the radio broadcast

23   from the officers on-scene that they're being fired upon,

24   they're taking gunshots at them.  And at that point I was

25   probably anywhere between Main and Waverley Avenue and Main and

1    Whites Ave.  And from there to the scene, it probably took me a

2    minute, if that.  I was doing probably 70, 80 miles an hour

3    up -- down through Watertown Square, up Arsenal Street.

4    Traffic was very light at that time.

5    Q.    And could you tell who was talking through the microphone

6    that they said that shots were being fired?

7    A.    Yes; it was Officer Reynolds and Sergeant MacLellan.

8    Q.    And was Sergeant MacLellan the shift supervisor who took

9    over for you?

02:55 10    A.    Yes.  Yes.

11    Q.    What was their tone when they were saying that?

12    A.    A little bit excited.

13    Q.    Did you get down there pretty quickly?

14    A.    Pardon me?

15    Q.    Did you get down to the scene pretty quickly?

16    A.    Very, very quickly.

17    Q.    And where did you park your car?

18    A.    I parked my vehicle on Dexter Avenue just prior to Laurel.

19    Yeah, just prior to Laurel.

02:55 20    Q.    And what did you do when you got there?

21    A.    I opened the -- I drive a Chrysler minivan.  I opened the

22    sliding door, put my vest back on because I had taken it off at

23    the end of my shift, and I started approaching Dexter Avenue to

24    where the gunshots were coming from.

25    Q.    Okay.  And when you say "vest," you mean a bulletproof

1    vest?

2    A.   Yes.

3    Q.   That's a standard issue that when you're on duty you wear?

4    A.   Yes.  Yes.

5         MR. CHAKRAVARTY:  Can we call up Exhibit 775, which is

6    in evidence.

7    Q.   Do you recognize this diagram, Sergeant Pugliese?  I can

8    zoom in.

9    A.   Yes, I do.

02:56 10   Q.   Okay.  And is this Dexter Street -- Dexter Ave. over here?

11   A.   That would be Dexter Avenue, yes.

12   Q.   And then this is Laurel Street?

13   A.   Yes.

14   Q.   And on this diagram, can you just make a notation -- or

15   just touch the screen in the general vicinity of where you

16   parked your car?

17   A.   Okay.

18   Q.   And you've motioned close -- right in front of 144 Dexter

19   Ave.  Is that right?

02:57 20   A.   I don't know what the number is, but that is the location.

21   As a matter of fact, I was just about in front of that

22   residence's driveway.

23   Q.   Okay.  And was this cruiser there already?

24   A.   I don't believe so.  I don't recall that cruiser being

25   there.

```
 1    Q.    Okay.  So could that be your cruiser?

 2    A.    Pardon me?

 3    Q.    No, you weren't in your cruiser.

 4    A.    No, I was in my personal vehicle.

 5    Q.    Okay.  And where did you go on this diagram?

 6    A.    I -- do you want me to touch and --

 7    Q.    If you can.

 8    A.    I exited my vehicle about here, I walked along this hedge

 9          line here, along the sidewalk.  And then when I was about where

10          my finger is stopped right now, I could hear the gunshots, and

11          I heard an explosion at this point.  I continued on, and I cut

12          into this walkway here leading into this residence, and I saw

13          two officers.  And I recognized one as Officer Reynolds.  The

14          other one I didn't recognize immediately, which turned out to

15          be ultimately one of our Watertown officers, Officer Miguel

16          Colon.

17               As I stepped in behind them, they turned around to me and

18          said, "Sarge, Sarge, get down.  They're shooting at us."  I

19          took a position of cover.  We had the vehicles -- if you look

20          there, in the driveways there were vehicles.  We were able to

21          use those for cover.

22    Q.    And then did you assess the situation from there?

23    A.    Yes, I did.  I kind of looked around, and I saw Sergeant

24          MacLellan behind a tree down on my left, and he was returning

25          fire to the suspects and verbalizing to them, "Give it up.
```

```
 1    Give it up," you know, among other things.  I don't really -- I
 2    just remember, "Give it up.  Give it up."
 3    Q.   And there's only one tree on that side of the street?
 4    A.   That would have been this tree there, yes.
 5    Q.   Where could you tell that the -- could you tell from which
 6    direction the gunfire was coming?
 7    A.   The gunfire was coming from the east end of Laurel Street.
 8    Q.   Okay.  Is that in this direction?
 9    A.   Correct.
10    Q.   So -- sorry.  They were shooting at you?
11    A.   Right.  Right.  But it was coming from -- correct.
12    Q.   Could you see anything from where the gunfire was coming?
13    A.   Yeah, there was -- I could actually see a couple of
14    vehicles down in the street.  One of them was a police cruiser
15    off to the left; another one was a black, you know, SUV; and
16    there was another vehicle in front of that.  And I could see
17    what I thought to be -- I could hear the gunshots and I saw
18    muzzle flashes -- what I thought to be muzzle flashes coming
19    from both sides of the vehicle.
20    Q.   When you say "the vehicle," is it the black SUV?
21    A.   Yes.
22    Q.   Was this where Sergeant MacLellan's cruiser ultimately
23    came to rest?
24    A.   Yes.
25    Q.   And was it there when you first came upon the scene?
```

1     A.    Yes.

2     Q.    Where was the black SUV in relation to that cruiser, if

3     you could just touch the screen?

4     A.    Right about there (indicating).  Did it take?

5     Q.    It didn't take.  If you could use the pad of your finger?

6     A.    Yes, I am.  Right about --

7     Q.    I'm sorry.  Do it again.

8     A.    Right about -- right in this area here.

9     Q.    After you assessed where the gunfire was coming from, what

03:01 10    did you do?

11    A.    I made a determination that Sergeant MacLellan, Officer

12    Reynolds and Officer Colon were pinned down, and so I decided

13    that I was going to try to work my way through some backyards

14    and try to flank the individuals that were firing at the other

15    officers.

16    Q.    Why did you decide to flank the individuals?

17    A.    It was -- I wanted to protect the other officers on the

18    scene.  I wanted to help save their lives in case they were

19    going to get shot.

03:01 20    Q.    Could you see a direct route?

21    A.    If I had gone directly straight down the street I would

22    have been exposing myself to the gunfire, so I decided to cut

23    through backyards and flank them that way.

24    Q.    Okay.  So again, using your finger, if you could just

25    trace, as you did earlier, your path?

1    A.    Okay.  I was in this front yard here.  I went up alongside

2    of this house like this.  I went over a chain-link fence there,

3    through this backyard, over another fence here (indicating).

4    Q.    Let me stop you there.  Right where you had -- your

5    path -- you stopped, did you see -- notice anything happen

6    behind the houses?

7    A.    Yes.  That second house that I was going behind, after I

8    went over the fence I was kind of watching my feet to see where

9    I landed.  It was dark out.  I focused my attention to get

03:02 10   ahead of me and I saw an individual at the bottom of the set of

11   stairs there and he started to flee, I guess that would be

12   southerly, towards Cypress Street.

13   Q.    So can you describe the individual?

14   A.    Yeah, it was a white male.  He had dark hair and he was

15   wearing a white T-shirt.

16   Q.    Did you know whether he was one of the suspects?

17   A.    At that time I did not.

18   Q.    What did you do?

19   A.    I aimed my pistol at him, I ordered him to stop.  He

03:03 20   didn't stop; he just kept going.  He went over a chain-link

21   fence in the backyard.  And what I did then is I radioed into

22   Watertown Control, our dispatch, that there was an individual

23   that was fleeing from the area, gave a description, and advised

24   that I didn't know if he was a suspect or a resident just

25   fleeing for his own safety, and told them to keep an eye out

```
 1    for him, any other units responding.
 2    Q.   Did you later learn who he was?
 3    A.   Yes, I did.  He was a resident of that house right there
 4    where I saw him at the back -- the bottom of the stairs.
 5    Q.   Why didn't you chase him?
 6    A.   He was fleeing and I did not think he was a threat to the
 7    officers that were on-scene because there was still gunshots
 8    going off.  And I figured if he's running, you know, he's not
 9    going to hurt the officers, he's going to be gone, and we could
10    always try to hunt him down later.
11    Q.   What did you do?
12    A.   Then I continued through the backyards.
13    Q.   Please continue to describe your path, if you can.
14    A.   I continued through here.  And I was cutting through the
15    backyards here, I believe it is.  And when I got about to this
16    point here, I heard a loud explosion (indicating).  I saw a big
17    flash, huge, huge plume of smoke.  Something actually came by
18    and hit me in the cheek -- fortunately, I didn't get any
19    injuries -- and then stuff started raining down on me.  It kind
20    of stunned me for a moment, you know.  I kind of stopped for a
21    moment, kind of gathered my wits again and continued up to
22    about this point here.  And I was looking to my right and I
23    could see the black SUV and I could see a couple of individuals
24    in front of it.
25         The headlights to the vehicle were on, and it was casting
```

1    the light onto the two individuals that were in front of the

2    vehicle, illuminating their bodies to a certain degree.  And I

3    could see activity going back and forth.  I could see muzzle

4    flashes once again and hear gunshots.

5           MR. CHAKRAVARTY:  Mr. Bruemmer, can I call up Exhibit

6    1522, please.

7    Q.   Sergeant Pugliese, is this the SUV with the headlights

8    facing easterly on Laurel Street?

9    A.   Yes.

03:05 10    Q.   And is that the position of the two individuals that you

11    saw in front of the SUV?

12    A.   For the most part, yes.

13    Q.   Now, in relation to this photograph -- in relation to

14    those individuals in this photograph, approximately where were

15    you?

16    A.   This house here -- is that going to touch -- this house

17    here, a little bit beyond that doorway there, there's a

18    driveway to the right of that house, then there's -- there were

19    two vehicles in that driveway, then there's a chain-link fence.

03:05 20    And I was on the other side of that chain-link fence.  So I was

21    probably maybe 25 feet from that location roughly.

22    Q.   Okay.  And were the individuals who were in front of the

23    car which I just circled, were they stationary or were they

24    moving?

25    A.   They were moving around back and forth.  I don't know

1    exactly what they were doing back there, but there was

2    movement.

3    Q.    So what did you do?

4    A.    I saw the muzzle flashes -- I could still hear Sergeant

5    MacLellan tell them to give it up, give it up, they don't have

6    a chance, and they continued to fire.  And what I did is I drew

7    my service pistol, I took aim at the one individual -- I guess

8    I'll call him Suspect 1.  If you want, I can identify who it

9    ultimately turned out to be.

03:06 10   Q.    Is it somebody you later had a personal encounter with?

11   A.    Yes.

12   Q.    And who was that?

13   A.    That was Tamerlan Tsarnaev.

14   Q.    Okay.  And did you see him when you were behind that

15   chain-link fence?

16   A.    Yes, I did.

17   Q.    Okay.  So explain what happened.

18   A.    I drew my pistol, I took careful aim, and I fired three or

19   four shots at the individual.  I thought I was hitting him but

03:07 20   I didn't know whether or not I did.  I just -- you know, I

21   wasn't rushing my shots so I thought I was probably, you know,

22   hitting my target, but it didn't seem to be having any effect.

23   Q.    So what happened next?

24   A.    Then I decided -- I could see their feet and ankles from

25   underneath the vehicle.  As I said, if you look at the picture,

1    you can see how the headlights have illuminated their bodies.

2    So that light was being cast down off of their bodies, kind of

3    like reflecting it downward, and I could see their ankles and

4    their feet.

5         And what I decided to do was take a few skip shots, and

6    that's you aim at the ground in front of your target and you

7    kind of bounce the bullets -- the trajectory of the bullets,

8    you'll come down, and the bullets will hit the ground and then

9    bounce up and they'll reach a plane of about six to eight

03:07 10   inches and then continue on on that plane.  They don't come

11   down like on this angle and bounce back up again like many

12   people think they would; they kind of just pick up and get that

13   trajectory.

14        And I thought if I could, once again, take my time, aim,

15   and get these bullets to count, maybe I could take their ankles

16   out and get them to, you know, stop with the aggressive

17   behavior they were doing.

18   Q.   So that skip shot, the ricochet shot, is that a special

19   shot that you learned --

03:08 20   A.   I've learned -- I've learned it -- I've been a firearms

21   instructor for the department for probably 30 years of my 35

22   years on the job.  And I know somewhere in those 30 years that

23   I've been trained in that at one of the firearms instructor

24   schools, whether it be one or two classes over the years or

25   several, but I know I've been trained in that.

1    Q.   And what effect did that have after you shot --

2    A.   When I was doing that, that's when Suspect 1 noticed where

3    I was.  I saw him kind of look at me.  And he came charging up

4    the street firing his firearm at me, and I returned fire as he

5    was approaching.

6    Q.   So you made eye contact with him?

7    A.   Yes.  Yes.

8    Q.   Did you see what the other person was doing?

9    A.   At this point now -- I now focused on the one that was

03:09 10   charging me and shooting at me.

11   Q.   Was he shooting at you as he was coming at you?

12   A.   Yes, he was.

13   Q.   All right.  How many times do you think he shot at you?

14   A.   I'm guessing four to six.  Somewhere in there.  I don't

15   know.  I wasn't really counting.

16   Q.   Did he get to that driveway that you described earlier?

17   A.   Yes, he did.

18   Q.   And what did he do?

19   A.   There was about a three-foot gap between the chain-link

03:09 20   fence and one of the vehicles that was parked there.  He ran up

21   that driveway about five feet or so and continued to fire at

22   me.

23   Q.   Okay.  On this diagram, can you just draw the general path

24   in which he took to get to you?

25   A.   Just right up the sidewalk.  And the picture stops shy of

 1   where his destination was there.

 2          MR. CHAKRAVARTY:  Mr. Bruemmer, if we could go back to

 3   755, please?  I'm sorry.  Did I read that wrong?  775.  Excuse

 4   me.  Thank you.

 5   Q.   So, Sergeant Pugliese, I think you earlier indicated that

 6   the Mercedes was in this area and that you were in this area.

 7   Is that right?

 8   A.   Correct.

 9   Q.   Okay.  And so on this diagram, can you draw where Tamerlan

03:10 10   Tsarnaev was shooting at you?

11   A.   As I say, he left his position of cover here, ran up the

12   sidewalk here, and came in -- there's a chain-link fence.  I

13   don't see it depicted on this map.  But he stopped about there,

14   and once again, I was right about there (indicating).

15   Q.   So you're -- right face-to-face with each other?

16   A.   We're about six feet, maybe eight feet at the most apart

17   from each other.

18   Q.   And did you continue to shoot at him?

19   A.   As he was advancing towards me and firing, I was returning

03:11 20   fire, yes.

21   Q.   How many times do you think you shot at him?

22   A.   I'm guessing five or six only because magazines hold 13

23   rounds of ammunition.  I had one in the chamber of my pistol,

24   gave me 14 rounds, and I had run out of ammunition at a certain

25   point there.  So I'm guessing while he was standing there and I

1    was standing there, he was continuing to fire.  My pistol ran

2    out of ammunition and I had to reload in the middle of this

3    battle.

4    Q.   And did you do that?  You dropped your magazine?

5    A.   Yes, I did.  I reloaded, dropped the magazine right by my

6    feet, threw another magazine into the pistol, and continued to

7    exchange fire with him.

8    Q.   And what did he do?

9    A.   He continued to fire at me.  Ultimately, he had a problem

03:12 10   with his pistol.  I don't know if it jammed or he ran out of

11   ammunition.  He kind of just looked at his gun, he looked at

12   me, we looked at each other, and I think out of frustration he

13   threw his gun at me.  It hit me in my left bicep and the gun

14   fell.  And then he turned -- do you want me to --

15   Q.   Yes, please.  What did he do after that?

16   A.   After he threw the firearm at me, he turned, ran down the

17   sidewalk -- the driveway, out into the street, turned left, and

18   started running in this direction here.  I, in turn -- there

19   was a picket fence along this property line here, there was a

03:12 20   gate right here (indicating).  I holstered up and I started

21   chasing after him myself, and I tackled him right about in this

22   area here.

23   Q.   When you went to go chase down Tamerlan Tsarnaev, do you

24   know what the other person was doing?

25   A.   I really don't know what he was doing at that time.  My

        1    focus was on the older brother, or Tamerlan.

        2    Q.    Did you catch up with him?

        3    A.    Yes, I did.

        4    Q.    And what happened?

        5    A.    I tackled him, brought him to the ground.

        6    Q.    When you brought him to the ground, was he wounded?

        7    A.    Yes, he was.

        8    Q.    What kind of wounds, in your estimation?

        9    A.    He was bleeding.  I don't know exactly what the extent of

03:13  10    the wounds were at that point.  I didn't know.  But I did know

       11    that he was bleeding.

       12    Q.    Okay.  And so what happened when you brought him down?

       13    A.    He was continuing to resist Sergeant MacLellan.  He was

       14    still in this position, under cover over here by this tree.  He

       15    came out, came over to assist.  Officer Reynolds, I don't know

       16    if he was still in that front yard or not or if he had advanced

       17    forward, but he came down and he was trying to assist, and the

       18    three of us were trying to get handcuffs on Tamerlan.

       19    Q.    So there were three of you in this area right here?

03:13  20    A.    Yes.

       21    Q.    And was -- were you able to handcuff Tamerlan at that

       22    point?

       23    A.    No.  He was face down.  We were able to get his right hand

       24    behind his back, and his left hand -- at one point he had it

       25    underneath him, then it was flailing around a little bit, and

1    then he got it underneath him again, and we were trying to get

2    him.  I know my own personal thought is I didn't want him to

3    roll over because we didn't know what he had on him, so we

4    wanted to keep him face down.  That was my thought.

5         And while we're trying to get control of his arms, Officer

6    Reynolds said, "Sarge, Sarge, look out.  The other guy's in the

7    car.  He's coming at us."

8    Q.   So, now, were you paying attention to what was happening

9    behind you?

03:14 10   A.   At that point, no, I was still focused.  I gave a quick

11   glance to my right and I saw some headlights down the road and

12   then I turned my attention back to Tamerlan.

13   Q.   And what did Sergeant MacLellan and Officer Reynolds do?

14   A.   They withdrew from that position.  Officer Reynolds

15   disappeared to my left, which would have been -- he headed to a

16   westerly position, and Sergeant MacLellan withdrew back to the

17   safety of the tree area there.

18   Q.   Okay.  Did you look behind you at that point?

19   A.   I looked to my right, and I could hear an engine racing,

03:15 20   and I saw the headlights moving towards me from the SUV.

21   Q.   Okay.  On the diagram, could you just in your best

22   estimation mark where you first saw the SUV coming towards you?

23   A.   I would venture to say right about here maybe

24   (indicating).

25   Q.   And so when you first came on the scene, the headlights

1    were facing away from you?

2    A.   Correct.

3    Q.   Is that fair to say?

4    A.   Yes.

5    Q.   And now they're facing towards you?

6    A.   Yes, they were.

7    Q.   Now, you had described when you came on the scene that

8    there were cruisers at this end of Laurel Ave. [*sic*].  Is that

9    right?

03:16 10    A.   Correct.

11    Q.   Were there any police cars down at this end?

12    A.   None that I can recall.

13    Q.   And you were one of the first people on-scene.  Is that

14    fair to say?

15    A.   Yeah, I think I was probably the fourth officer on-scene.

16    As I said -- yeah, fourth officer on-scene.  There was Sergeant

17    MacLellan, Officer Reynolds, Officer Colon, and then myself.

18    Q.   And these roads all connect.  And does this go back

19    towards Arsenal Street?

03:16 20    A.   Yes, that would -- Cypress Street?  Let me think.

21    Q.   I can zoom in on it for you.

22    A.   I believe that's -- yeah, Cypress Street.  Cypress Street,

23    it will actually come down and it hooks around to the right,

24    brings you back out to Dexter Avenue.  And then if you take a

25    left, it would bring you back to School Street, or if you went

1    straight, it would take you to School Street.

2    Q.   Now, when the SUV was coming in your direction, were you

3    closer to the southerly side of Laurel Ave. or the northerly

4    side?

5    A.   I was close to the sidewalk on the southerly side of the

6    roadway.

7    Q.   And was there anything in the middle of the road that

8    would prevent travel?

9    A.   No, not in that area.

03:17 10        MR. CHAKRAVARTY:  Can we go to Exhibit 1525, which is

11    in evidence.

12    Q.   Do you recognize that picture?

13    A.   Yes, I do.

14    Q.   What is that?

15    A.   That's a picture of Laurel Street looking westbound.  And

16    it looks like it may be the Mercedes SUV going up the roadway,

17    and it looks like it may actually -- the picture's a little

18    fuzzy, but I'm guessing that may be me standing in the middle

19    of the road there, or on the side of the road.

03:18 20    Q.   We'll zoom in now.  And can you just circle the mass that

21    you think may include you?

22    A.   (Witness complies.)

23    Q.   How quickly did that car come up on you?

24    A.   Very, very rapidly.  It was accelerating at a very high

25    rate of speed.

```
 1    Q.   And so once Officer Reynolds and Sergeant MacLellan

 2    withdrew, what did you do?

 3    A.   I saw that the vehicle was on the wrong side of the road

 4    heading directly at me, and Tamerlan -- what I did is I reached

 5    down and I grabbed Tamerlan by the back of the belt, and I was

 6    trying to drag him out of the street to prevent him from

 7    getting struck.

 8    Q.   Was the car coming straight at you?

 9    A.   Yes, it was.

10    Q.   Were you successful in dragging him off?

11    A.   I was able to pull him about a foot towards the sidewalk,

12    and then the black SUV just -- it was right in my face.  Like I

13    kind of looked to the right, and the headlight was just like

14    almost there, and I kind of rolled back onto my back.  And as I

15    did so, I could feel the breeze of the vehicle go by my face.

16    I looked down and I saw Tamerlan -- the front wheels were over

17    Tamerlan.  He kind of bounced up and underneath the

18    undercarriage a couple times.  He got hung up in the rear

19    wheels of the vehicle.  The vehicle dragged him about 25 or 30

20    feet, and it struck one of our police cars that was off to the

21    left side of the roadway there on the south side of the street.

22              MR. CHAKRAVARTY:  With the Court's permission, I would

23    like to ask the witness to get off the stand and demonstrate

24    how he rolled off of Tamerlan.

25              THE COURT:  All right.
```

         1              (The witness steps off the witness stand.)

         2    BY MR. CHAKRAVARTY:

         3    Q.   Sergeant Pugliese, if you wouldn't mind demonstrating in

         4    the well.

         5    A.   Where would you like me to go?

         6    Q.   In the well of the court.

         7    A.   Right here?

         8    Q.   Yes.

         9         So can you just -- if you wouldn't mind, get in a position

03:20 10    that you were over Tamerlan Tsarnaev as you were trying to pull

        11    him to safety.

        12    A.   Yeah, I was in a position like this.  I grabbed him by the

        13    back of the belt, and I was trying to pull him towards the

        14    sidewalk, which the southerly side would have been behind me

        15    here.

        16    Q.   And then when the SUV was right upon you, can you

        17    demonstrate how you got out of the way?

        18    A.   Well, like I said, I kind of looked like this.  I saw the

        19    headlights.  They were like right here in front of --

03:20 20    approaching my face, and I just kind of rolled back like that,

        21    and I was watching the SUV go by me.

        22              (Demonstrating.)

        23    Q.   How close -- please.  Thank you.  Resume the stand.

        24              (The witness resumes the witness stand.)

        25    Q.   How close did the wheels come of the SUV to you?

1    A.    Oh, they were within inches of my feet as it went by me.

2    Q.    And what happened to the vehicle when it ran over

3    Tamerlan?

4    A.    It continued to travel for, like I said, 25 or 30 feet.

5    Tamerlan was hung up in the rear wheels.  And it crashed into

6    our car 465, which was parked on the south side of Laurel

7    Street.

8    Q.    And did the -- did the SUV ultimately get loose of that

9    vehicle?

03:21 10    A.    Yes, it did.

11    Q.    And did it continue down Laurel Street?

12    A.    Yes, it did.  It continued down Laurel Street across

13    Dexter Ave.  And again, continuing down Laurel Street, that's

14    the last time I saw the taillights.  I got back up and

15    refocused my attention back onto Tamerlan.  Officer Reynolds

16    came back down.  We got him handcuffed.  He was still moving

17    around.  Once again, we didn't know if he had any other

18    explosive devices on him or anything else, so what I did is I

19    literally stood up and put my foot in the small of his back and

03:22 20    held him down, got on the radio and called for an ambulance.

21    Q.    As you were doing that, did you check to see if you were

22    injured?

23    A.    No, I was focused on keeping Tamerlan from rolling over.

24    Like I said, I didn't know if he had any explosive devices or

25    anything else on him.

```
 1    Q.   And were you able to get him handcuffed?

 2    A.   Yes, with Officer Reynolds' handcuffs.  He handed them to

 3    me, and the two of us got him handcuffed.

 4    Q.   And did an ambulance come?

 5    A.   Yes, it did.

 6    Q.   And did you get him into the ambulance?

 7    A.   Yes.  He was -- Boston EMS arrived.  They cut his clothes

 8    off him.  And as they were cutting his clothes off, rolled him

 9    over a little bit at a time, saw that there were no other

 10   devices with him or anything like that, put him on a stretcher,

 11   put him in the back of an ambulance, and I believe off to Beth

 12   Israel Hospital.  I may be mistaken on the hospital they took

 13   him to.

 14        (Counsel confer off the record.)

 15   Q.   Sergeant MacLellan, I --

 16        MR. CHAKRAVARTY:  Excuse me.  Can we have 775 again?

 17   Q.   I asked you those questions about Cypress Street and

 18   getting back onto Dexter Ave. and then off to Arsenal.  To the

 19   best of your knowledge, as long as you were on-scene, was there

 20   anything from preventing the Mercedes from continuing in this

 21   direction?

 22   A.   No, there was nothing -- no police cars were down there.

 23   And the two vehicles, the green -- I believe it's a Honda,

 24   which was in front of the black SUV was more over to the south

 25   side of the street.  And I believe the SUV did a three-point
```

1    turn when he turned to come back in our direction.  He could

2    have just as easily gone around the Honda.

3            MR. CHAKRAVARTY:  That's all I have, your Honor.

4                      CROSS-EXAMINATION

5    BY MR. WATKINS:

6    Q.   Good afternoon, Sergeant Pugliese.

7            MR. WATKINS:  May I have the screen just for the

8    witness?

9    Q.   The government showed you Exhibit 1522.  And you

03:25 10   identified the two suspects there?

11   A.   Yes.

12   Q.   Do you recall that?

13        I want to show you what I'm marking for identification,

14   Defendant's Exhibit 3006 from that same series.  Is that the

15   same two suspects there?

16   A.   It appears to be.

17   Q.   And is that a fair and accurate representation of what was

18   going on that night?

19   A.   I would say yes.

03:25 20        MR. WATKINS:  I would move into evidence Defense

21   Exhibit 3006.

22           MR. CHAKRAVARTY:  No objection.

23           THE COURT:  All right.

24           (Defense Exhibit No. 3006 received into evidence.)

25   BY MR. WATKINS:

1    Q.   Now I'm going to blow up a portion of that.  And you can

2    see two figures?

3    A.   Yes, sir.

4    Q.   There is one to the left in darker clothing?

5    A.   Yes.

6    Q.   Do you recognize that as Tamerlan Tsarnaev?

7    A.   No, I don't.

8    Q.   There's a person to the right in what appears to be

9    lighter or illuminated clothing.  Do you recognize that as

03:26 10  Tamerlan Tsarnaev?

11   A.   I believe that one was Tamerlan.

12   Q.   And what makes you believe that that is Tamerlan rather

13   than Jahar?

14   A.   Tamerlan was wearing light-colored clothing when he

15   advanced towards me.

16   Q.   He was wearing a jacket that night?

17   A.   I don't recall if he had a jacket on or not.

18   Q.   A dark blue or even black jacket?  You don't recall?

19   A.   I don't.  I thought it was light clothing he was wearing.

03:26 20  Q.   I'm showing you now what's been marked as Government's

21   Exhibit 1525.

22   A.   Yes.

23   Q.   We talked about that portion of it where I've blown it up.

24   A.   Uh-huh.

25   Q.   Now, here one can see two headlights on the left side and

1    two headlights on the right side?

2    A.    That's what it appears to be, yes.

3    Q.    And I think you also already testified this is the

4    Mercedes as it was coming towards you?

5    A.    That's what I believe it is, yes.

6    Q.    I'm going to show you Exhibit 775, which is in evidence,

7    and also, if I can, Exhibit 1525.  Now I'll do 775.

8         So looking at these two maps -- I'll blow that up again --

9    it appears to be two pairs of headlights pointed down towards

03:28 10   the Mercedes in that picture?

11   A.    Yeah, I guess it does appear to be.

12   Q.    And were those -- the set of headlights closer to us, it

13   looks like you're right next to that in this picture?

14   A.    Yeah, that's what it looks like.

15   Q.    I think you've told us that that was a fair and accurate

16   representation of the Mercedes going towards you?

17   A.    Yup.

18   Q.    So it's fair to say from what you've seen there, there

19   actually is another car parked there next to where you are

03:29 20   tackling Tamerlan?

21   A.    I would say yes.

22   Q.    It sounds like you're a truly excellent marksman to be

23   able to do those skip shots and hit Tamerlan Tsarnaev.

24   A.    I'm a fairly good shot, yes.

25   Q.    And Tamerlan Tsarnaev, with a gun, started walking towards

1    you, where you were?

2    A.    Running towards me.

3    Q.    Running towards you?

4    A.    Yes.

5    Q.    And the two of you exchanging shots?

6    A.    Yes.

7    Q.    You hit him; fair to say?

8    A.    I would think I was hitting him.  I don't know if I was.

9    Q.    When you saw him down -- when you tackled him, he was

03:30 10   injured at that point, correct?

11   A.    Yes.

12   Q.    You could see the visible wounds that he had on him?

13   A.    Not at that point, I could not.  He had clothing on.  I

14   could see blood on him.

15   Q.    Right.  And you are aware that, in fact, he was shot

16   several times?

17   A.    Yes, I learned that later on.

18   Q.    And you've trained Sergeant MacLellan and Officer Reynolds

19   in marksmanship?

03:30 20   A.    Yes, I have.

21   Q.    And you are really the expert of the department, right?

22   A.    I don't know if I'm the expert, but I am a firearms

23   instructor for the department.

24   Q.    Take credit.  You're the best shot in the department,

25   right?

```
 1    A.   I don't know about that.
 2    Q.   So you hit him and he threw the gun or threw -- right,
 3    threw the gun and hit you in the arm?
 4    A.   Yes.
 5    Q.   And then he continued to run towards the other folks that
 6    were shooting, right?
 7    A.   Yes.
 8    Q.   And it was only after you tackled him -- and he went down
 9    right away when you tackled him?
10    A.   Yeah.  I leapt up, and I know I probably came down from
11    about waist high on his shoulders.
12    Q.   And that took him down?
13    A.   Yes, it did.
14    Q.   During that period of time when he was marching down
15    towards Officer Reynolds and Sergeant MacLellan, there's a
16    little lull in the shooting?  There's no more shooting going
17    on?
18    A.   To tell you the truth, I don't know.  I was so focused on
19    chasing him, running after him as he was running towards the
20    other officers, that I really don't know if there was other --
21    if there were rounds being fired by anybody at that point.
22    Q.   When you tackled Tamerlan down on the ground, he continued
23    to be combative towards you?
24    A.   Correct; he continued to resist.
25              MR. WATKINS:  That's all I have, your Honor.
```

1          MR. CHAKRAVARTY:  Just one question.

2                    REDIRECT EXAMINATION

3    BY MR. CHAKRAVARTY:

4    Q.   Did you get hit at all by gunfire?

5    A.   No, I did not.

6          MR. CHAKRAVARTY:  That's all I have.

7          THE COURT:  Thank you, Sergeant.  You may step down.

8          THE WITNESS:  Thank you.

9          (The witness is excused.)

03:32 10          THE COURT:  We'll take the luncheon recess at this

11   point.

12          THE CLERK:  All rise for the Court and the jury.  The

13   Court will take the lunch recess.

14          (The Court exits the courtroom and there is a recess

15   in the proceedings at 12:58 p.m.)

16          THE CLERK:  All rise for the Court and the jury.

17          (The Court and jury enter the courtroom at 2:05 p.m.)

18          THE CLERK:  Be seated.

19          THE COURT:  Ms. Pellegrini?

04:42 20          MS. PELLEGRINI:  Good afternoon, your Honor.  The

21   government calls James Floyd.

22                    JAMES FLOYD, duly sworn

23          THE CLERK:  Please state your name, spell your last

24   name for the record, keep your voice up and speak into the mic.

25          THE WITNESS:  My name is James Floyd, F-L-O-Y D.

                          DIRECT EXAMINATION

1   BY MS. PELLEGRINI:

2   Q.    Good afternoon, Mr. Floyd.

3   A.    Hi.

4   Q.    Where were you born?

5   A.    I was born in Florence, South Carolina.

6   Q.    And at some point did you move to Massachusetts?

7   A.    About five years ago.

8   Q.    And in April of 2013, where were you living?

9   A.    I was living at 56 Laurel Street in Watertown.

10  Q.    And who was living there with you?

11  A.    My wife and my three-week-old son.

12  Q.    And on the night of April the 18th going into the

13  early-morning hours of April 19th, what do you recall

14  happening?

15  A.    I was sleeping on the couch.  My son was downstairs, as

16  was our routine.  Sometime after midnight or so I heard, you

17  know, some loud banging outside.  I hopped up, peeked out the

18  window, saw some gunfire, which was -- and then went and

19  scooped up my son and took him up to the second floor, to the

20  back of the house.

21        When I got to the top of the stairs, my wife stopped and,

22  you know, she was frantically asking what was going on.  I told

23  her I didn't know.  I went and set the baby down and went out

24  to our bedroom window, which was on the second floor, and

1    started looked out the window at what was going on.

2    Q.   Mr. Floyd, let's go back a little bit.  The house at 56

3    Laurel, single-family, two-family?

4    A.   It's a single-family.

5    Q.   And the front yard, what's that like?

6    A.   It kind of has more of a side yard.  And we have a vinyl

7    fence mostly around -- you know, that completely encloses the

8    side of the yard.  There's a pear tree in the yard, which is in

9    the back, and then a big plum tree at the front of the yard,

04:45 10   you know, the corner of the yard.

11   Q.   All right.  And how would you describe the neighborhood in

12   which you live?

13   A.   It's a mixed neighborhood, very quiet neighborhood.

14   Mixture of older, young people, mixture of single families and

15   renters.  It's pretty diverse.

16   Q.   And with respect to the closest -- or the side of the

17   yard, how would you describe the houses on Laurel Street?

18   A.   I think we have a pretty decent-size yard for the area.

19   You know, I have a whole yard, which is one of the reasons we

04:45 20   moved there.  I want to say we're a fifth of an acre, is the

21   size of our plot.  You know, a nice size for this area, I

22   think.

23   Q.   All right.  So I'd like to show you what's in evidence

24   already as Exhibit 772.

25              MS. PELLEGRINI:  Mr. Bruemmer, if you would bring that

1       up, please.

2       Q.    And do you see this diagram in front of you, Mr. Floyd?

3       A.    Yes.

4       Q.    All right.  And I'm going to enlarge this part right about

5       here.  Can you point out -- your screen is a touch screen in

6       front of you.  If you touch it with the pad of your finger, you

7       can make a circle, you can have an arrow.  Can you point out to

8       the jury where you were living in April of 2013?

9       A.    Right here (indicating).

04:46 10      Q.    All right.  So you've made a little yellow mark on the

11      second house in.  I actually think it is marked as 56 Laurel

12      Street.  And what I'm going to point to right here, is that the

13      tree you were talking about, or one of them?

14      A.    Yes; that's the plum tree.

15      Q.    All right.  And so this part looks out onto Laurel Street.

16      Is that correct?

17      A.    Yes.

18      Q.    All right.  Now, so when you said that you were downstairs

19      and you said that had been part of your routine, whose routine

04:47 20      when you're sleeping downstairs?

21      A.    Our family routine.  We had a three-week-old.  We tried to

22      get through the nights as best we could with as much sleep as

23      possible.  So she would feed the baby, go upstairs, try to get

24      as much sleep as she could.  I'd give the baby a bottle

25      whenever it woke up and then go upstairs, and hopefully one of

1    us got a decent night's sleep.

2    Q.   And the living room area in which you said you were

3    resting on the couch -- is that right?

4    A.   Yes.

5    Q.   -- is that front -- the front part of your house, does

6    that come up to the front?

7    A.   The actual room extends from the front to the back.  Front

8    to the back.  The couch was probably right -- sort of in the

9    middle of the room.

04:48 10   Q.   And the noises that you heard that woke you up, how would

11   you describe those?

12   A.   Well, at first I thought it could have just been some

13   fireworks going off.  It was -- you know, it woke me up out of

14   a sleep, so I didn't really have any bearings about me at

15   first.  And so I looked outside and I could see -- you know, I

16   could see, you know, guns firing.  I could mostly -- at that

17   point I could see people to my right, which would have been to

18   the west and sort of underneath where the tree is.  But I

19   didn't look for long.  I saw that it was, you know, pretty

04:48 20   serious, and I wanted to get my kid back to the back of the

21   house upstairs in his crib.

22   Q.   All right.  And so once you looked out and you saw what

23   you saw, you took the baby and went upstairs?

24   A.   Right.  Put the baby in the crib in the back of the house.

25   And then my wife and I went and couldn't help but look out of

1    the second-floor window in our bedroom.

2    Q.   All right.  Now, from the second floor, is there any

3    obstruction of your view by the -- it's a plum tree, right?

4    A.   It's a plum tree.  At the time it was pretty -- it was

5    blooming pretty good and so I couldn't really see a lot

6    of -- so, yes, there was some obstruction to the view as I

7    looked down and to the right.  Once I was downstairs, I could

8    kind of see -- I didn't have to look through the tree.  But

9    once I was on the second floor, it was kind of hard to see

04:49 10   through the trees at exactly what was going on down there.

11   Q.   All right.  So when you first looked out, and you

12   said -- well, tell me what you saw.

13   A.   When I was downstairs and I looked out, I saw guns firing

14   and people screaming.  And this was to my right.  And then I

15   basically stopped and got the kid and I ran upstairs.  So I

16   didn't see much at that time.  Then when we got upstairs, we

17   looked for a more extended period.

18   Q.   All right.  But when you were downstairs, could you tell

19   if anybody was in uniform at that time that you saw outside?

04:49 20   A.   The only thing I could say for sure is I saw blue lights.

21   Q.   Blue lights?

22   A.   So there was that assumption, that someone was in uniform.

23   But which one, who was firing, no, I couldn't see any of that.

24   Q.   When you got upstairs and you were able to look out the

25   second-floor window, what did you see?

A.   So out of the second-floor window, I could see a lot

better and it -- to my left and -- which I guess would be

facing east, so --

Q.   If you can mark that on the map which is still in front of

you, 772?

A.   So somewhere around this area --

Q.   Okay.

A.   -- I could see there was two cars, both facing this

direction, I guess which would have been east.  I could see two

cars and I could see two individuals firing back to the west.

Q.   Can you --

A.   Firing.

Q.   Can you tell what kind of car was involved here?

A.   I saw there was a sedan, and it was easy for me to see one

of them was a black Mercedes SUV just because of the

pretty -- it has a pretty distinctive shape to it.

Q.   And where were these two individuals in regard to the

location of the Mercedes?

A.   Between them.  Between them taking cover.  They would pop

up and out from time to time, and then go back.  Seemingly,

they had things with them and they kept going back to the

ground to grab things.

Q.   What do you mean?

A.   It seemed like maybe they had a bag of things that they

were going to to either -- I don't know whether it was

1    ammunition.  I know at several points I saw a fuse being lit

2    and, you know, what I then found out were bombs being thrown.

3    When actually they threw them, you know, you could hear -- sort

4    of throwing them like a baseball, you'd hear the clink, clink,

5    clink and then an explosion.  I definitely saw four of those

6    things happen, but only two I remember actually exploding.

7    Q.   And with respect to the two individuals, was there any way

8    that you could differentiate between the two?

9    A.   No.

04:52 10   Q.   Were both individuals doing the same type of thing or was

11   one doing one?  What happened?

12   A.   Well, while they were taking cover between the vehicles,

13   it was really tough to see what was going on.  It was just kind

14   of a barrage of gunfire in both directions.  And also, you

15   know, they would pop up from time to time and, you know, come

16   out.  And, you know, I saw them throw the bombs.  Sort of --

17   that kind of went on for an extended period of time.  And at

18   some point one of them came out from that cover and started

19   moving forward, which would be west.  And once he kind of came

04:52 20   out from the car, he kind of seemed to get into some sort of

21   really close-range gunfight.  I didn't see who he was doing

22   that with, but he was obviously shooting -- exchanging fire

23   with someone.  And I'm not sure, you know, the exact, you know,

24   sequence of things, but at some point the --

25           MR. WATKINS:  I'm going to object, your Honor.

1           THE COURT:  New question?

2           MR. WATKINS:  Yes.

3           THE COURT:  Let's have a new question.

4    BY MS. PELLEGRINI:

5    Q.   What's the next thing you saw after you saw the person

6    start down the street?

7    A.   The next thing I saw was -- I looked back and I could see

8    the individual that was still behind the car pull out something

9    larger.  It seemed to me that it was in a bookbag.  It seemed

04:53 10   to be -- light a fuse.  And where the other -- and then he kind

11   of took the bookbag like this, and it seemed like it was heavy

12   just by the way he was throwing it.  And he seemed to throw it

13   out this way.  Actually --

14   Q.   Let me just stop you right there, Mr. Floyd.  So for the

15   record, you're indicating with your arm outstretched and

16   starting down low?

17   A.   Yes.  He was standing up or -- from what I could remember,

18   and he grabbed the bookbag by the -- you know, one of the

19   bookbag straps and seemed to launch it as far as he could,

04:54 20   which wasn't, you know, very far, from what I could tell.  The

21   bomb did not make it very far -- or the thing did not make it

22   very far before it blew up.

23   Q.   All right.  And when it blew up, what happened?

24   A.   It was far and away much bigger explosions than the other

25   ones, than the other smaller explosions that happened, and it

1    was a very, very bright light.  Blinding light.  We ducked

2    down.  A couple of pictures came off of our wall.  And we

3    looked back out and the scene was very smokey.  And at that

4    point we saw the person that was still by the cars get into his

5    car and make a -- somewhat of a three-point turn and turn his

6    car, the Mercedes, heading east, and floored it.  I mean, just

7    really floored it.

8    Q.    What could you hear?

9    A.    Well, just heard the engine roar loudly and then it seemed

04:55 10    like he was heading straight toward where everyone was

11    gathered, including the other person who had been tackled to

12    the ground at that point.  My wife made a shriek because it

13    looked to her and us that he was going straight for, you know,

14    the whole crowd of police officers there.  And we heard

15    a -- you know, it was kind of like a thud and we saw the

16    headlights -- the taillights, excuse me -- raise up off the

17    ground.  He had obviously -- obviously hit something and run

18    over it.  Then lots of gunfire.  But he somehow made it -- the

19    vehicle somehow made it down through Dexter and up the street.

04:55 20    Q.    Mr. Floyd, let's go back just a little bit.  You said that

21    when you first looked back and you heard gunfire.  Could you

22    see the exchange of gunfire?

23    A.    Yes.

24    Q.    All right.  I'm talking now about the two individuals who

25    were by the Mercedes.  What, if anything, could you see either

1    one doing?

2    A.   Just, I mean, other than firing, not much.  There was just

3    a lot of activity, you know, so there wasn't constant firing.

4    There would be firing followed by a brief delay where it seemed

5    like they would be digging back into whatever they had at their

6    feet.

7              MR. WATKINS:  Objection to "seems like."

8              THE COURT:  I'm sorry.  I didn't hear you.

9              MR. WATKINS:  I'm saying -- could we have another

04:56 10   question?

11             THE COURT:  I think he's still answering the same

12   question.  Go ahead.

13             THE WITNESS:  So I just saw, you know, these two

14   individuals were firing and launching -- well, when I was

15   downstairs I didn't see any of the things thrown, only saw the

16   gunfire at that point.  And I was not --

17   BY MS. PELLEGRINI:

18   Q.   Let me stop you there.  When you said you only saw

19   gunfire, with respect to the Mercedes, where did you see the

04:56 20   gunfire?

21   A.   It was coming from behind the Mercedes.

22   Q.   Could you tell who was firing the -- any weapon from

23   behind the Mercedes?

24   A.   I couldn't distinguish one from the other at that point,

25   no.

1    Q.   And then when the individual came out from behind the

2    Mercedes, let me -- so this person walked down Laurel Street?

3    A.   Right.  Walked down Laurel Street to about -- you know, I

4    would say about right here (indicating).  You know, somewhere

5    in this area.  And stood there for a while and exchanged

6    gunfire with something that I could not see.

7    Q.   All right.  So you could not see whether or not there were

8    police officers in this location at that time from your --

9    A.   I couldn't tell.

04:57 10   Q.   You could not tell?

11   A.   I couldn't tell.  Right.

12   Q.   And the other individual remained where, if you saw?

13   A.   Behind the Mercedes.

14   Q.   By the way, how could you differentiate between the

15   gunfire and -- when you talked about being -- fuses being lit?

16   A.   Well, you know, I've shot guns in my life.  I've been

17   around guns, so I know what that's like.  And then, you know,

18   I've seen fuses being lit at least on, you know, fireworks.

19   It's very distinguished -- it's a very easy thing to see what a

04:58 20   fuse going looks like:  It's slow and has sparks flying off it

21   versus a gunfire, which is, you know, muzzle blast.

22   Q.   Now, when you indicated that the Mercedes was heading in

23   the direction of people who were down the street, were you able

24   to see at that point who was down the street?

25   A.   No.  What I saw was the suspect who wasn't -- or the

1    individual that wasn't by the car.  He started to just

2    seemingly just walk in this direction, just oddly, just not

3    firing, just walking, almost maybe walking fast, straight

4    towards where, you know, kind of all the police activity was

5    down here.  Well, that doesn't --

6    Q.   That's okay.  So you've made an arrow a little past your

7    house and a line?

8    A.   I probably should change that.  That's --

9    Q.   I can do that.  Go ahead.

04:59 10   A.   So there was -- most of the police cars seemed to be

11   around here.

12   Q.   All right.

13   A.   And then someone started walking from -- he started

14   walking from this way, that way.  And at that point I did see a

15   shadow come out from behind this yard, through the gate, tackle

16   him to the ground.

17   Q.   All right.  When you say "come out from behind this yard,"

18   you made no indication on the map.  Can you tell us where

19   you're speaking --

04:59 20   A.   This yard right here.

21   Q.   Okay.  So a shadow comes out, intercepts a person walking

22   down the street?

23   A.   Tackles him to the ground.  I saw other figures jump on

24   top and looked back and saw someone, the other guy, get in the

25   car and do some sort of three-point turn and --

1   Q.   Can I stop you there, Mr. Floyd?  What do you mean by a

2   three-point turn?

3   A.   Well, the car was pointing east.  So he had to turn the

4   car around in the middle of the road to make it back so it was

5   going west.  So I don't remember if he pulled forward first and

6   then backward first, but basically he did that kind of turn

7   that you have to do in the middle of a street when you're going

8   to turn around.

9   Q.   All right.  And what's the next thing that you remember?

05:00 10   A.   He just went very, very fast, seemingly as fast as he

11   could go, straight to where it seemed like the people had been

12   tackled to the ground.  So there was also police vehicles in

13   the street or other vehicles in the street, so that also

14   happened to be the same area where, you know, he had gotten

15   tackled.

16   Q.   All right.  And once the vehicle made contact with

17   the -- well, did you know who the vehicle made contact with,

18   from your vantage point?

19   A.   No, we didn't know.  Our assumption was it made contact

05:00 20   with everyone and that it was bad.  We didn't think there was

21   any way anyone could have gotten up and moved.

22   Q.   All right.  And tell me, what did you see the vehicle do

23   specifically?

24   A.   It -- well, you could distinctly see the headlights raise

25   up like it had hit something and bounced over it, and you could

 1   hear a thud, like a ka-koo (indicating), and then just lots and
 2   lots of gunfire.
 3   Q.   Now, Mr. Floyd, as you sit here today, is it your memory
 4   that, in fact, the person you saw do the underhand movement and
 5   throw the container that made the big blast was the same person
 6   who drove the Mercedes back down the street toward the police
 7   officer?
 8   A.   Absolutely without question.
 9   Q.   I'm sorry.  Say it again.
05:01 10   A.   Without question it was the same person.
11            MS. PELLEGRINI:  Thank you.  I have no further
12   questions.
13            MR. WATKINS:  No questions.
14            THE COURT:  No questions?  All right, Mr. Floyd.
15   Thank you.  You may step down.
16            (The witness is excused.)
17            MR. MELLIN:  The United States calls Andrew
18   Kitzenberg.
19                    ANDREW KITZENBERG, duly sworn
05:02 20            THE CLERK:  State your name, spell your last name for
21   the record, keep your voice up and speak into the mic so
22   everyone can hear you.
23            THE WITNESS:  Andrew Kitzenberg.  That's
24   K-I-T-Z-E-N-B-E-R-G.
25                    DIRECT EXAMINATION

```
 1    BY MR. MELLIN:

 2    Q.   Good afternoon, sir.  Where did you grow up?

 3    A.   I grew up in Minneapolis, Minnesota, just outside the

 4    city.

 5    Q.   At some point did you come to the Boston area?

 6    A.   Yes; I came here for college.

 7    Q.   Okay.  And after college, did you stay in this area?

 8    A.   Yeah, I -- after I graduated, I moved into Watertown.

 9    Q.   Okay.  When did you move into Watertown?

05:03 10   A.   In 2010.  August of 2010.

11    Q.   What was the address?

12    A.   62 Laurel Street.

13    Q.   How long did you live on Laurel Street?

14    A.   About two and a half years.

15    Q.   In April of 2013, were you living on Laurel Street?

16    A.   Yes, I was.

17    Q.   And on April the 18th of 2013, what were you doing late in

18    the evening?

19    A.   I was up late working and watching a hockey game.

05:03 20   Q.   In the early morning hours of April the 19th, did anything

21    happen outside your residence?

22    A.   Yes.

23    Q.   What happened?

24    A.   There was gunfire and a shootout outside of my apartment.

25    Q.   When you heard the gunfire, what did you do?
```

1    A.   I first ran to the window to see what was happening out on

2    the street, and when I saw an exchange of gunfire, I ran up to

3    my bedroom on the third floor of my apartment, ran onto my bed

4    and right under the window sill, and started taking pictures.

5    Q.   If I could have you look first at Exhibit 775.  If you

6    would look at that, Mr. Kitzenberg.  If I could zoom in on one

7    little area here, do you recognize what I zoomed in on on

8    Exhibit 775?

9    A.   Yes, I do.

05:04 10   Q.   And what is that?

11   A.   That is Laurel Street and a diagram of cars and my -- the

12   apartment I was living in.

13        MR. MELLIN:  Your Honor, this is already in evidence.

14   If I may have that published.

15        THE COURT:  Do you have it?  No?  Now?

16        THE JURORS:  Yup.

17        THE COURT:  Okay.

18   BY MR. MELLIN:

19   Q.   Mr. Kitzenberg, if you would touch the screen where it was

05:05 20   you were living on April 18th and the 19th, 2013.

21   A.   (Witness complies.)

22   Q.   And for the record, you circled 60 Laurel Street?

23   A.   Yup.  60 and 62 Laurel Street.

24   Q.   You said you went upstairs at some point and began taking

25   photographs.  Is that right?

 1    A.   That's correct.

 2    Q.   Now, from the time that you were living on Laurel

 3    Street --

 4         MR. MELLIN:  If we could actually just go back to

 5    Exhibit 775 for a minute, not zoomed in.

 6    Q.   And as you look at this exhibit, do you see the streets

 7    that are depicted on this map, this diagram?

 8    A.   Yes, I do.

 9    Q.   And what street is running diagonal through Exhibit 775?

05:06 10   A.   That would be Dexter Avenue.

11    Q.   Okay.  And then you have Laurel Street right in front of

12    where you were residing, correct?

13    A.   Correct.

14    Q.   And as you look at Laurel Street, if you go to the -- as

15    you're looking at this, if you go to the right down Laurel

16    Street, where does that lead?

17    A.   When I look at it going to the right?

18    Q.   Correct.

19    A.   There's Cypress Street.

05:06 20   Q.   Okay.  And then where does Cypress Street lead?

21    A.   That leads into a corner, and it's a corner that then

22    turns left and goes north.

23    Q.   So is either Laurel Street or Cypress Street a dead-end at

24    that point?

25    A.   Laurel Street becomes a dead-end.  Like I said, it

1    turns -- bends left and then goes north.

2    Q.   Okay.  Now, when you said you went upstairs to the third

3    floor, what did you see?

4    A.   That's where I saw two vehicles outside directly in front

5    of my window and two men standing behind the vehicle, the black

6    SUV.  And that was right in front of the apartment.  When I

7    first got into the apartment, I also -- when I first got into

8    the third-floor bedroom, I could also see down towards the

9    sidewalk right in front of the apartment and could see the

05:07  10   SUV -- the police SUV down on the sidewalk.

11   Q.   Okay.  The one that had crashed into the other cars?

12   A.   Correct.

13   Q.   Okay.  When you -- at some point did you attempt to take a

14   video of what you saw?

15   A.   I did.  When I first got in front of the window I tried to

16   take a video, and it was too dark to recognize anything, so I

17   started to take pictures.

18   Q.   If I could have you look at Exhibit 1522, which is already

19   in evidence.  Mr. Kitzenberg, do you recognize Exhibit 1522?

05:08  20   A.   Yes, I do.

21   Q.   How do you recognize that?

22   A.   This is a photo that I took from my bedroom window.

23   Q.   And you took a number of photos from your bedroom window?

24   A.   Yes, I did.

25   Q.   Okay.  And as you look at 1522 --

1          MR. MELLIN:  That may be published as well, your

2    Honor.

3          THE COURT:  It's supposed to be.  No?

4          THE JURORS:  Yes.

5          THE COURT:  Okay.

6    BY MR. MELLIN:

7    Q.   As you look at Exhibit 1522, is that a fair and accurate

8    photo of -- or copy of the photograph that you took?

9    A.   Yes, it is.

05:08 10   Q.   So as you were looking down at these individuals, what did

11   you see them do?

12   A.   I could see gunfire, I could see them crouching behind the

13   car, also going into bags or backpacks at their feet, as well

14   as going into the green sedan that was behind them.  The green

15   sedan had its doors open, and I could see them going back to

16   that car and back in front of the SUV.

17   Q.   If I may have you look at Exhibit 1523, please, which is

18   not in evidence yet.  Do you recognize Exhibit 1523?

19   A.   Yes, I do.

05:09 20   Q.   What is that?

21   A.   That's another picture I took from my bedroom.

22   Q.   Is that a fair and accurate photograph?

23   A.   Yes, it is.

24          MR. MELLIN:  Your Honor, I would move into evidence

25   Exhibit 1523.

1          THE COURT:  Any objection?

2          MR. WATKINS:  No objection.

3          (Government Exhibit No. 1523 received into evidence.)

4          MR. MELLIN:  Ask to publish it, please.

5    BY MR. MELLIN:

6    Q.   You said the individuals were crouching down, they were

7    going through a backpack, and then also going to a green sedan.

8    Is that right?

9    A.   That's correct.

05:10 10   Q.   And do you see that car in this photograph?

11   A.   Yes.

12   Q.   And if you could just circle it for the record?

13   A.   This is the green sedan (indicating).

14   Q.   Okay.  In Exhibit 1523, it's the car on the left.  Is that

15   right?

16   A.   That's right.

17   Q.   Okay.  And what did you see these individuals doing with

18   that car?

19   A.   They were going back to that car and grabbing bags out of

05:10 20   that car.

21   Q.   Okay.  When you say they were going there, were both of

22   them at various times going to that car?

23   A.   Yes.

24   Q.   And once they were behind the SUV, what did you see those

25   individuals doing?

```
 1    A.   I could see them there -- they dropped the bag at their

 2    feet, and I could see them going in and out of that bag,

 3    grabbing objects.

 4    Q.   Could you tell what the objects were?

 5    A.   I couldn't.  I couldn't make out what the objects were.

 6    Q.   Could you see gunfire?

 7    A.   Yes, I could.

 8    Q.   Could you tell if both individuals were shooting or was

 9    one shooting or what could you see?

10    A.   I couldn't see -- I really couldn't make out who was

11    shooting.  I couldn't make out any individuals and didn't know

12    kind of who was doing what, but I could see both of them going

13    into the backpacks and crouching and kind of taking cover

14    behind the SUV.

15    Q.   If I could have you also look at Exhibit 1524, I believe

16    it is.

17         MR. MELLIN:  And just for the witness, your Honor.

18    Q.   Do you recognize Exhibit 1524?

19    A.   Yes, I do.

20    Q.   Again, is that one of the photographs you took?

21    A.   Yes, it is.

22         MR. MELLIN:  Your Honor, I would move into evidence

23    Exhibit 1524 and ask to publish.

24         MR. WATKINS:  Your Honor, it's actually in as

25    Defendant's 3006, so I don't mind entering it in a second time
```

         1    if the government needs it.

         2         THE COURT:  Do you want to enter it in under your own

         3    number?

         4         MR. MELLIN:  Yes, thank you.

         5         (Government Exhibit No. 1524 received into evidence.)

         6         MR. MELLIN:  And again, your Honor, if we may publish

         7    that.

         8    BY MR. MELLIN:

         9    Q.   And, Mr. Kitzenberg, is this a fair photograph of what you

05:12   10    saw these individuals doing?

        11    A.   Yes, it is.

        12    Q.   Okay.  Now, they appear to be crouched down, the two of

        13    them in this photo.  Is that right?

        14    A.   Yes.

        15    Q.   You mentioned that they were going through backpacks or

        16    into backpacks.  Where were those located?

        17    A.   At their feet.

        18    Q.   At some point did you hear or see bombs being thrown or

        19    hear them explode?

05:13   20    A.   I could hear them and feel them.

        21    Q.   What can you tell us about that?

        22    A.   I first -- there was a first bomb that went off and I

        23    could -- I didn't see it.  I didn't see where it was but I

        24    could sort of feel that it was -- went off eastward, I guess to

        25    my right down Laurel Street.  From my room I could actually

1     feel my room shake with those explosives.  And so I

2     felt -- felt and heard two explosions that were similar, and

3     then a third that was much larger and shook the room.

4     Q.   Could you tell who it was that threw any of those

5     explosive devices?

6     A.   I couldn't, no.

7     Q.   Now, when you said the third one was much larger, can you

8     describe that?

9     A.   That one I actually could see the spark of it being lit.

05:14 10   And when I saw that, I laid down on the floor of my bedroom,

11     and then I could actually feel it go off.  And it really

12     shook -- shook my bedroom.  And then I popped my head up up to

13     the window and I could see the cloud of smoke rise up from that

14     one.

15     Q.   Shortly after that, did you see the Mercedes turn around

16     and go back down the street?

17     A.   Yes, I did.

18     Q.   Now, as you look at Exhibit 1524, is there room to the

19     right of that green Honda to just continue straight down Laurel

05:14 20   Street if you were driving that SUV?

21     A.   Yes, I think so.

22     Q.   And even to the left of that green Honda, is there room to

23     continue driving straight down Laurel Street?

24     A.   Yes.

25     Q.   Is that what that Mercedes did?

```
 1   A.    No.

 2   Q.    What did you see the Mercedes do?

 3   A.    I saw it do a U-turn and kind of drive through the

 4   sidewalk and turn back in the opposite direction down Laurel

 5   Street and accelerate down the street.

 6   Q.    And when you said accelerated down the street, can you

 7   describe how it sounded or what you saw?

 8   A.    It seemed like the vehicle was being floored and, like,

 9   accelerating as quickly as it could.

05:15 10   Q.    If I could have you please look at Exhibit 1532, which is

11   already in evidence.

12         Now, do you recognize Exhibit 1532?

13   A.    Yes, that is my apartment.

14   Q.    Okay.  And when you say "that is my apartment," can you

15   just circle where you're indicating is your apartment on

16   Exhibit 1532?

17   A.    (Witness complies.)

18   Q.    And for the record, you circled the top floors of the

19   building on the left?

05:16 20   A.    Yes, the second and third floor.

21   Q.    Now, you said at some point you're looking out the window

22   on the third floor looking down on what's happening.  Is that

23   right?

24   A.    That's correct.

25   Q.    Which window is that?
```

1    A.   It would be that window looking straight down to the

2    street.

3    Q.   Okay.  And for the record, that's the third-floor window

4    that faces on Laurel Street on the building on the left?  Is

5    that right?

6    A.   Yes.

7    Q.   All right.  Now, at some point when the SUV turned around

8    and began going down the street away from you, did you take

9    photographs?

05:16 10  A.   Yes, I did.

11   Q.   And out of what window did you take photographs?

12   A.   This window here (indicating).

13   Q.   And for the record, again, it's the building on the left,

14   the third floor, and now it's the window that essentially is

15   straight ahead in the photo?

16   A.   Yes, it is.

17   Q.   Okay.  If I could have you then look at Exhibit 1525,

18   which is already in evidence as well.  Do you recognize Exhibit

19   1525?

05:17 20  A.   Yes, I do.

21   Q.   Is that the photograph that you took of the SUV going down

22   Laurel Street?

23   A.   Yes, it is.

24   Q.   And then finally, if I could have you look at Exhibit

25   1526?

          1              MR. MELLIN:  And that's not in evidence yet, your

          2    Honor.

          3    Q.   And what is 1526?

          4    A.   That is a picture after the SUV had taken off and what was

          5    left on Laurel Street with a green sedan and backpacks on -- in

          6    the street.

          7    Q.   And is that a fair and accurate photograph of Laurel

          8    Street?

          9    A.   Yes, it is.

05:18    10              MR. MELLIN:  Your Honor, we would move into evidence

         11    Exhibit 1526.

         12              MR. WATKINS:  No objection.

         13              (Government Exhibit No. 1526 received into evidence.)

         14              MR. MELLIN:  Ask to publish it.

         15    BY MR. MELLIN:

         16    Q.   And again, for the record, Mr. Kitzenberg, this is after

         17    the SUV has turned around and gone down the street?

         18    A.   Yes, it is.

         19              MR. MELLIN:  With the Court's indulgence.

05:18    20              (Counsel confer off the record.)

         21              MR. MELLIN:  Thank you.  Nothing further, your Honor.

         22              MR. WATKINS:  No questions.  Thank you.

         23              THE COURT:  All right, sir.  Thank you.  You may step

         24    down.

         25              (The witness is excused.)

```
 1              MR. WEINREB:  Your Honor, the government calls
 2     Dr. Heather Studley.
 3                    HEATHER STUDLEY, duly sworn
 4              THE CLERK:  State your name and spell your last name
 5     for the record.
 6              THE WITNESS:  It's Heather Studley, S-T-U-D-L-E-Y.
 7                         DIRECT EXAMINATION
 8     BY MR. WEINREB:
 9     Q.    Good afternoon.
10     A.    Good afternoon.
11     Q.    Doctor, where do you work?
12     A.    I work at South Shore Hospital.
13     Q.    For how long?
14     A.    I've been at South Shore Hospital for about -- almost two
15     years now.
16     Q.    What do you do there?
17     A.    I'm an emergency medicine physician.
18     Q.    Please tell us where you went to school and what degrees
19     you earned.
20     A.    I went -- for undergraduate I went to Wesleyan University
21     and I have a Bachelor of Arts.  I went to Tufts Medical
22     School -- School of Medicine, and I have an M.D.
23     Q.    When did you get your M.D. from Tufts?
24     A.    2006.
25     Q.    After that, did you train in any specialty?
```

 1   A.    I did.  I trained at the Harvard-affiliated emergency

 2   medicine residency at the Brigham and Mass. General program,

 3   and finished in 2010.

 4   Q.    What is emergency medicine?

 5   A.    It is a staff physician who is in the emergency department

 6   trained to deal with a broad spectrum of trauma that comes in,

 7   and also non-traumatic illness.

 8   Q.    So typically you work in the emergency room?

 9   A.    I only work in the emergency, yup.  I'm board-certified in

05:20 10   emergency medicine.

11   Q.    What kinds of trauma do you see in the emergency room?

12   A.    Everything from minor trauma, stubbed toes, to traumatic

13   arrests.

14   Q.    I'm sorry?

15   A.    Everything from minor trauma to traumatic arrests.  So

16   from shootings, car accidents.  The whole gamut.  Everything

17   comes through us.

18   Q.    Were you working on April 19th, 2013, at approximately one

19   in the morning?

05:21 20   A.    I was.

21   Q.    Did you treat an MBTA officer who had been shot in

22   Watertown that night?

23   A.    I did.

24   Q.    What was his name?

25   A.    Dic Donohue.  Richard Donohue.

1    Q.    What was Officer Donohue's medical condition when he was

2    brought into the emergency room?

3    A.    When he arrived he was unresponsive, not breathing, and

4    his heart was not beating.  He was essentially dead.

5    Q.    How did he look?

6    A.    He looked dead.  Pale, like you would expect.

7    Q.    Like a corpse?

8    A.    Yeah.

9    Q.    Do you know how much earlier in the evening he had lost

05:22 10   his life?

11   A.    It's hard to say.  I wasn't on the scene, but I would say

12   based on what we saw when he arrived, it would had to have been

13   at least, I would say, a minimum of ten to 15 minutes but

14   probably not too much more than that.  But I'm not entirely

15   sure because I wasn't at the scene.

16   Q.    Could you tell what had happened to him?

17   A.    When we first examined him -- we always hear the story

18   from -- when we first examined him we did see the gunshot wound

19   to the groin, and when we first looked there was no bleeding

05:22 20   there.

21   Q.    What could explain the fact that there was no bleeding?

22   A.    That he had bled out almost his entire blood volume on the

23   street in Watertown, and that because his heart wasn't beating,

24   there's no blood forward flow to cause any bleeding there.

25   Q.    How much blood is in the human body?

1    A.    There's about five to six liters of blood in the human

2    body.

3    Q.    Is a liter the same as a quart, a little less?

4    A.    A liter -- well, when you think about blood units, usually

5    people think about pints because that's what you donate.  And I

6    think that it's about a half of a pint in one liter so -- or

7    the other way around.  Sorry.  So one liter is -- one pint is

8    half a liter, so it's ten pints of blood.

9    Q.    So ten pints of blood, approximately five quarts of blood

05:23 10   in the human body?

11   A.    Sounds about right.

12   Q.    And all that was gone?

13   A.    I mean, there's always going to be some residual, but,

14   yes, for the purposes of life, that was gone.

15   Q.    Were you able to bring Officer Donohue back to life?

16   A.    We were.

17   Q.    How did you do that?

18   A.    He had continuous CPR from the pre-hospital providers and

19   also from us when he arrived in the emergency department.  We

05:23 20   were able to put a breathing tube down to help him breathe, and

21   we also had a large IV that we were able to place to give him

22   lots of blood very quickly to help bring him back.  And

23   ultimately, used a medication called epinephrine which helps

24   the heart to start to beat again.

25   Q.    How long was he essentially dead?

```
 1    A.    In the emergency department, approximately 30 minutes, I
 2    would say, and then add on the pre-hospital time, anywhere --
 3    you know, like I said, ten to fifteen minutes.
 4    Q.    On top of that?
 5    A.    On top of that, yeah.
 6    Q.    What happened when you got his heart beating again?
 7    A.    So when he started -- when he had his heart start to beat
 8    again, he started to again hemorrhage through the initial
 9    gunshot wound.
10    Q.    Were you able to repair that wound in the ER?
11    A.    No, we weren't able to repair; we tried to stop the
12    bleeding with direct pressure and ultimately had to -- I had to
13    get up on the stretcher to put my knee into the wound to get
14    enough pressure on there because it was such a significant
15    wound that there was no other way to stop the bleeding before
16    he went to the operating room.
17    Q.    Did he then go to the operating room?
18    A.    He did then go to the operating room.
19    Q.    And were surgeons able to repair his wound?
20    A.    They were -- I think -- he was in the operating room for
21    quite a while, and they were ultimately able to, I think over a
22    couple of surgeries, repair the wound.
23    Q.    Do you know what happened to the bullet that wounded him?
24    A.    I believe it's still in Dic's leg.
25    Q.    Is that normal, if somebody's been shot and the bullet
```

1    didn't exit the body, to just leave it there?

2    A.   It is.  Unless they come across it in the operating room

3    and it needs to be removed, they will often leave it, because

4    sometimes removing the bullet can do more harm than good.

5    Q.   Do you know how much blood had to be given to Officer

6    Donohue to save him that night?

7    A.   I believe he received a total of 28 units of blood.

8    Q.   Twenty-eight units?  That's 28 pints of blood?

9    A.   Uh-huh.

05:25 10    Q.   And in addition to blood, did he have to receive other

11    constituents --

12    A.   He did.  He received something called fresh frozen plasma

13    which is another blood product, which is basically the plasma

14    of the blood minus the red cells.  And I have to double-check

15    but I think it was -- he received about -- somewhere between

16    eight and 11 units of fresh frozen plasma as well as platelets.

17    Q.   Platelets are what help blood clot?

18    A.   Correct.

19    Q.   How many units of platelets did he need to survive?

05:26 20    A.   I believe it was six.  I would have to double-check the

21    medical record on that but I believe it was six.

22    Q.   After Officer Donohue emerged from the operating room,

23    what happened next?

24    A.   He went to the intensive care unit and spent quite a lot

25    of time in the intensive care unit initially in a

1    medically-induced coma.  He was cooled to try to preserve

2    neurologic function.  And I think he spent about a month in the

3    intensive care unit at Mass. General -- I mean, at Mount

4    Auburn.

5    Q.    Did you follow his case after the surgery?

6    A.    I did.  I went -- would go up and visit him.  I also was

7    in contact with the surgeons and the other staff taking care of

8    him.

9    Q.    So after he spent a month in the intensive care unit, do

05:27 10   you know what happened to him next?

11   A.    I believe he went to Spaulding Rehab.

12   Q.    What's Spaulding Rehab?

13   A.    It's a high -- acute rehabilitation hospital in Boston.

14   Q.    What kinds of things do they do at Spaulding Rehab?

15   A.    They do everything from -- you know, all ranges of both

16   physical rehab and people who are not quite hospital level of

17   care but aren't ready to go home yet.  I'm assuming in Dic's

18   case it was a lot of physical rehab to get him moving.  When

19   you don't spend -- when you're in the intensive care unit,

05:27 20   you're not moving, you're not getting up out of bed.  It's very

21   hard.  It takes a long time to regain that sort of function.

22   Q.    Do you know how long Officer Donohue had to remain at

23   Spaulding Rehab before he could go home?

24   A.    I do not know how long he was there.

25              MR. WEINREB:  Thank you, Doctor.  I have no further

1    questions.

2              MR. WATKINS:  Thank you.  No questions.

3              THE COURT:  All right, Doctor.  Thank you.  You may

4    step down.

5              THE WITNESS:  Thank you.

6              (The witness is excused.)

7              MR. CHAKRAVARTY:  The government calls Major Frank

8    Hughes.

9                      FRANCIS HUGHES, duly sworn

05:29 10         THE CLERK:  State your name, spell your last name for

11   the record, keep your voice up and speak into the mic so

12   everyone can hear you.

13             THE WITNESS:  Good afternoon.  My name is Francis

14   Hughes, H-U-G-H-E-S.

15                       DIRECT EXAMINATION

16   BY MR. CHAKRAVARTY:

17   Q.   Good afternoon.  Are you a Massachusetts State Police

18   trooper?

19   A.   Yes, I am.

05:29 20   Q.   And what is your rank?

21   A.   I'm a major.

22   Q.   And how long have you been with the Massachusetts State

23   Police?

24   A.   I'm in my 29th year.

25   Q.   I assume you've had many different roles over that 29

 1   years.  What is your role now?

 2   A.   Currently I'm the deputy division commander for the

 3   Division of Investigative Services.

 4   Q.   And explain what that is.

 5   A.   Basically, in my role right now I have nine investigative

 6   units that I have operational control over:  four homicide

 7   units, the Organized Crime Unit, Violent Fugitive Arrest Squad,

 8   Special Operations Investigations, and the newly formed Gaming

 9   Enforcement Unit.

05:30 10   Q.   And when did you first have -- get this role of Director

11   of Investigative Services?

12   A.   It's been about two and a half years now.

13   Q.   I draw your attention back to April 19th -- the evening of

14   the 18th and the early morning hours of April 19th.  Was that

15   your position at that time?

16   A.   Yes, sir, it was.

17   Q.   And after 10 p.m., around 10:30, did you get some

18   information?

19   A.   I did.

05:30 20   Q.   What did you learn?

21   A.   I was called by my boss, Lieutenant Colonel Frank

22   Matthews.  He advised me to head over to MIT.  He advised me

23   that an MIT police officer had been shot and he was in grave

24   condition.

25   Q.   Okay.  And did you respond there?

1    A.    Yes, I did.

2    Q.    And while you were there, were they processing the scene

3    and preparing to secure that?

4    A.    Yes, they were.

5    Q.    Then later that evening, in the early morning hours,

6    around midnight, did you get more information?

7    A.    I did.

8    Q.    What information was that?

9    A.    Approximately 20 past twelve information came to my

05:31 10   attention that there was a carjacking in the City of Cambridge.

11   The victim of the carjacking had provided information that he

12   had been kidnapped by two parties who claimed to be involved in

13   the Boston bombing and had also made statements that he had

14   been responsible for --

15        MR. WATKINS:  Objection, your Honor.

16        MR. CHAKRAVARTY:  It's not for the truth, your Honor.

17        THE COURT:  I think that's a sufficient answer.  You

18   can ask another question.

19        MR. WATKINS:  Can we move to strike what was told to

05:31 20   him?

21        THE COURT:  All right.  I'll strike the answer.

22        The jury will disregard the answer.

23        Ask another question.

24   BY MR. CHAKRAVARTY:

25   Q.    So you received some information.  In response to that

1   information, what did you do?

2   A.   I ensured that a trooper had been assigned to go speak

3   with the party involved.

4   Q.   And did that trooper ultimately report back to you in the

5   chain of command as to what happened?

6   A.   Yes, they did.

7   Q.   And then did you go somewhere?

8   A.   Later in the night I did, yes.

9   Q.   And where did you go?

05:32 10   A.   I headed to Watertown.

11   Q.   Now, were you monitoring the radio traffic when you were

12   on your way to Watertown?

13   A.   Yes, I did.

14   Q.   What did you hear?

15   A.   Initially I heard there were numerous shots fired in the

16   area of Laurel and Dexter Street.  As I continued in that

17   direction, I received information that explosive devices were

18   being deployed at police officers.  At one point in time I

19   heard that there was a very large explosion, described as a

05:32 20   massive explosion.  Officers were being told over the

21   radio to --

22            MR. WATKINS:  I would object at this point, your

23   Honor.

24            MR. CHAKRAVARTY:  I'll ask another question.

25   BY MR. CHAKRAVARTY:

1    Q.   Once you responded to Watertown, where did you go?

2    A.   I went to the area of -- originally Arsenal Street.

3    Q.   And what was at Arsenal Street?

4    A.   Roads were being shut down to protect the area, to shut

5    down the area due to items in the roadway that they thought may

6    have been explosives.

7    Q.   And the area where all of the shooting and the devices

8    that you described earlier, where was that?

9    A.   That was the area of Laurel and Dexter Street.

05:33 10   Q.   How far away was that from where you were on Arsenal

11   Street?

12   A.   Approximately a block, two blocks.

13   Q.   And did you come up with a security plan at that point?

14   A.   There was one, yes.

15   Q.   Okay.  And what was that?

16   A.   Originally, hasty teams were being deployed in the area.

17   What I mean by "hasty teams," these are quickly formed search

18   teams consisting of a K-9 officer and his K-9 unit, officers

19   with rifles, generally two rifles, and two other officers.

05:34 20   These teams were being comprised of officers from different

21   agencies in order that communication could be consistent back

22   and forth.  So there was generally a couple of troopers, maybe

23   a Boston police officer, Watertown officer, MBTA officer.  It

24   was different.

25   Q.   And what was their mission?

A.   To search the area of -- originally it was to search the
area of Spruce and Lincoln Street.

Q.   And what was at Spruce and Lincoln Street?

A.   A black SUV Mercedes was located abandoned at that
location.

Q.   Was that a short distance away from Laurel and Dexter
Street?

A.   Probably two blocks.

Q.   And, in fact, Laurel Street turns into Spruce Street?

A.   Yes, it does.

Q.   And is that one of the areas that was being searched?

A.   That's correct.

Q.   What was happening back at Laurel and Dexter Street from
the Massachusetts State Police personnel?

A.   The area had been cordoned off, crime scene tape had been
put up.  The Crime Scene Service Section, which consisted of
people assigned to the chemist, photograph people,
video-tographers were coming in to start processing the scene,
along with ballisticians.

Q.   Now, as time continued that evening, did you establish a
security perimeter?

A.   There was one, yes.

Q.   Okay.  And what steps did you take to ensure the security
of the public at that point?

A.   Generally officers were assigned in the area to take up

1    stationary locations, all the streets surrounding Dexter and

2    Laurel, streets surrounding Spruce Street, Lincoln Street, all

3    the way down to Arsenal Street.

4    Q.    As the morning wore on, were additional security steps

5    taken?

6    A.    These hasty searches lasted approximately about an hour

7    and a half to about 2:30 in the morning.  At that point in time

8    a decision was made to stop the searches with the K-9s.  There

9    was a concern that the K-9s that were being used were not

05:36 10   trained to properly deal with explosives.  Explosive dogs act

11   in a certain manner, utility dogs act in a different manner.

12   So they were afraid that the utility dogs may -- if they came

13   across an explosive device, may activate it by touching it.  So

14   the decision was made to stop using the utility dogs and just

15   stand by until tactical teams could be brought into the area.

16   Q.    Were tactical teams brought in?

17   A.    Originally a plan was set up.  There was a command post

18   set up in the Arsenal Mall; specifically, a tactical team

19   command post.  The tactical teams from the state police, Boston

05:37 20   police, NEMLEC and MetroLEC formed up at that point in time and

21   they began to develop a plan on how they were going to begin

22   searching the area.

23   Q.    Okay.  When we say tactical teams, is that like a SWAT

24   team?

25   A.    Correct.

1    Q.   And so those organizations that you mentioned are

2    different -- collaboratives of different law enforcement

3    agencies?

4    A.   That's correct, sir.

5    Q.   And so were those SWAT teams or tactical teams ultimately

6    deployed to do a search of the area?

7    A.   Yes.  What happened was the area was cordoned off into

8    four quadrants.  Each one of these teams was given a specific

9    quadrant to begin searching.  And they began searching at that

05:37 10  point -- this was maybe an hour before daylight -- going house

11   to house.

12   Q.   So when you say "house to house," this is just searching

13   the exterior of the property or were they going in as well?

14   A.   No, they were actually -- this is when they began to start

15   going house to house, inside, knocking on people's doors,

16   asking if they could be allowed in to look through their

17   residences.

18   Q.   And it may sound obvious, but what were you looking for?

19   A.   There was one suspect -- looking for -- that had fled the

05:38 20  scene in a black SUV.

21   Q.   As the tactical teams were continuing to search these

22   different quadrants, at the management level and with the

23   management of the state police which you were a part, did you

24   discuss other protective measures for the area?

25   A.   The secretary of EOPS -- executive officer of Public

1    Safety and Security, Kurt Schwartz, had been on the phone

2    shortly after the kidnapping took place with the governor.  He

3    had been maintaining a constant contact with the governor every

4    half-hour to an hour.  Discussions had been made during the

5    course of the night on different operational decisions on how

6    to handle things.  At some time prior to five o'clock there was

7    a meeting at an MBTA command post with several agency heads.

8    That would include MBTA Chief Bob Macmillan, Watertown Chief

9    Deveau, Colonel Alben, I believe -- I believe -- Kurt Schwartz

05:39 10   was there also.

11   Q.   Let me just interrupt you.  Was there a decision made at

12   that meeting?

13   A.   Yes, there was.

14   Q.   All right.  And earlier you said kidnapping.  Did you mean

15   after the carjacking?

16   A.   Correct; yes.

17   Q.   What was the decision that came out of that meeting?

18   A.   The decision from that meeting basically was they were

19   planning on shutting down public transit.  The MBTA began at 5

05:39 20   p.m.

21        MR. WATKINS:  I'd object at this point.

22        THE COURT:  Well, yeah.  I think we have a personal

23   knowledge issue here.

24   BY MR. CHAKRAVARTY:

25   Q.   Major Hughes, do you know what security steps were taken

1    as a result of the manhunt?

2    A.   Yes, I do.

3    Q.   Okay.  And you were part of the conversation and part of

4    the radio traffic as to what those decisions were?

5    A.   Yes, I was.

6    Q.   So can you explain what those security cautions were?

7         MR. WATKINS:  Again, I'm going to object on 403

8    grounds.  I'm not sure what this has to do with anything.

9         THE COURT:  Overruled.  Go ahead.

05:40 10        THE WITNESS:  There were several security steps taking

11    place.  Troopers were being assigned to assist the MBTA police

12    at bus and train stations throughout the Greater Boston area;

13    troopers at the state police, Logan had initiated roadblocks on

14    all traffic coming into the airport.

15        MR. WATKINS:  Judge, again, I object.

16        THE COURT:  Okay.  Overruled.  We'll take it.

17        THE WITNESS:  Troopers at the airport were assigned

18    with automatic weapons to be curbside; undercover officers were

19    in the airport assigned as -- we call them behavioral detection

05:41 20    officers, BDOs; plainclothes looking for hostile activity or

21    any kind of hostile behavior.  The --

22        THE COURT:  Let's have another question,

23    Mr. Chakravarty.

24    BY MR. CHAKRAVARTY:

25    Q.   So you described restrictions on various transportation.

1    Were there other restrictions that were imposed?

2    A.    Yes, there was.

3    Q.    What else?

4    A.    The governor had requested that a shelter-in-place take

5    place in six different communities.

6    Q.    And what does that mean?

7    A.    Basically what -- a shelter-in-place was a request to the

8    public that they remain within their residences and they avoid

9    any motor vehicle traffic outside in their area, stay inside

05:41 10   until further notice.

11   Q.    Were there other public functions cancelled that day?

12   A.    Yes, there was.

13   Q.    At some point during that Friday was the shelter-in-place

14   lifted?

15   A.    Yes, it was.  It was sometime shortly after 6 p.m. that

16   night.

17   Q.    And was the manhunt over?

18   A.    No, it was not.

19   Q.    So explain what happened after 6 p.m., after the

05:42 20   shelter-in-place had been lifted.

21   A.    After the shelter-in-place had been lifted, yeah, the

22   State Police Air Wing No. 3 helicopter had returned back to the

23   area, had been on a refueling mission.  They refueled and came

24   back in the area, was taking up a position above the Watertown

25   area.  Officers continued to search house to house, yard to

1   yard, looking for people until a certain -- a specific event

2   happened.

3   Q.   Okay.  And though the shelter-in-place had been lifted,

4   had the public been notified through press conferences or other

5   means as to what the status of the manhunt was?

6   A.   Yes, they had.

7   Q.   And so what was the event that next changed your focus?

8   A.   Well, the Watertown police received a 9-1-1 call from a

9   subject stating that --

05:43 10              MR. WATKINS:  Objection.

11              THE COURT:  No.  I'll admit it not for the truth but

12   for the fact that it's a communication.

13   BY MR. CHAKRAVARTY:

14   Q.   Please continue.

15   A.   They received a call from a gentleman at 67 Franklin

16   Street in Watertown who advised them that he believed there was

17   a party within his boat in his backyard.

18   Q.   And so how did you and the other units respond?

19   A.   Air 3 took up a position above the location, provided

05:43 20   information to us that they had reason to believe there was a

21   party in the boat.  Officers were deployed to the scene, the

22   street was shut down, and the perimeter was taken up around the

23   house.

24   Q.   Now, in addition to that location, did you still have

25   personnel at the other locations in Watertown that day?

 1   A.   Yes, we did.

 2        MR. CHAKRAVARTY:  For the witness, your Honor, Exhibit

 3   1455.

 4   Q.   Do you recognize this?

 5   A.   Yes, I do.

 6   Q.   What is it?

 7   A.   This is a map of the Dexter and Laurel Street neighborhood

 8   of Watertown.

 9   Q.   Does it also depict the Spruce and Lincoln Street area and

05:44 10   the Franklin Street area?

11   A.   Yes, sir, it does.  And that would be to my left on the

12   screen.

13   Q.   Does this appear to be like a Google Maps type of overhead

14   satellite view?

15   A.   It does, sir.

16   Q.   And with the particular areas that you've discussed,

17   they're in diagram -- kind of cartoonized into a diagram form.

18   Is that right?

19   A.   Correct.

05:44 20   Q.   Is this a fair and accurate depiction of that area of

21   Watertown?

22   A.   Yes, it is.

23        MR. CHAKRAVARTY:  I'd move into evidence Exhibit 1455

24   and ask to publish.

25        MR. WATKINS:  No objection.

1           (Government Exhibit No. 1455 received into evidence.)

2    BY MR. CHAKRAVARTY:

3    Q.   So Dexter and Laurel was -- let's start with that scene.

4    What types of state police personnel were working this scene

5    when you got -- when that 9-1-1 call came in?

6    A.   You had chemists from the State Police Crime Lab; you had

7    troopers assigned to the Massachusetts State Police Services

8    Section who -- basically they were involved in fingerprinting

9    and photographing the scene, documenting the scene; you also

05:46 10   had troopers from the Fire and Explosion Unit there along with

11   FBI officials from their bomb unit.

12   Q.   And Fire and Explosion, that's basically the bomb squad?

13   A.   That's correct.

14   Q.   At the Spruce and Lincoln Street area, what kind of units

15   did you have there?

16   A.   Again, you had members from the Crime Scene Services

17   Section there at a certain point in time, you also had troopers

18   assigned to the Fire and Explosion Unit.  That area had been

19   cordoned off earlier in the evening after the events had taken

05:46 20   place.

21   Q.   Now, is this a bit on a hill as compared to down here by

22   Franklin Street?

23   A.   Yes, it is.

24   Q.   And what kind of units deployed to Franklin Street after

25   that 9-1-1 call?

1  A.   I believe every type of law enforcement agency in the area

2  was there.

3  Q.   And the area depicted is the 67 Laurel -- 67 Franklin

4  Street property, the one I just circled?

5  A.   That's correct, sir.

6  Q.   Now, while -- did you respond as well?

7  A.   Yes, I did.  Yes.

8  Q.   Now, at some point while you were on-scene, was the

9  individual you were searching for located?

05:47 10  A.   He was, yes.

11  Q.   And was that person ultimately taken out of a boat?

12  A.   Yes, he was.

13  Q.   And was he arrested?

14  A.   That's correct.

15  Q.   Did you see him that day?

16  A.   Yes, I did.

17  Q.   Do you see him in the courtroom?

18  A.   Yes, I do.

19  Q.   Would you please point to him and identify him?

05:48 20  A.   The subject seated at the first table before the Court in

21  the black shirt.

22       MR. CHAKRAVARTY:  I'd ask the record so reflect, your

23  Honor.

24       THE COURT:  Okay.

25       MR. CHAKRAVARTY:  Just one moment.

1          (Counsel confer off the record.)

2          MR. CHAKRAVARTY:  Thank you, your Honor.  That's all I

3     have.

4                        CROSS-EXAMINATION

5     BY MR. WATKINS:

6     Q.    Good afternoon.

7     A.    Good afternoon, sir.

8     Q.    So after you got the 9-1-1 call and every law enforcement

9     agency reported down there, there was some period of time

05:49 10    before Mr. Tsarnaev was arrested?

11    A.    Yes, there was.

12    Q.    How long a time was that?

13    A.    It may have been an hour and a half.

14    Q.    And during that time law enforcement continued to arrive,

15    law enforcement agencies all through that time?

16    A.    Some officers, yes.

17    Q.    And most were self-deployed, weren't requested to be

18    there; they just came of their own accord.

19    A.    I don't know who requested them, if they were requested or

05:50 20    they weren't requested.

21    Q.    But there were also some who just came to volunteer?

22    A.    I don't know that.

23    Q.    You were there during the entire time from that 9-1-1

24    call, or shortly after the 9-1-1 call, until Mr. Tsarnaev's

25    arrest?

1    A.    I believe I arrived probably ten minutes after the 9-1-1

2    call and I was there till the end, yes.

3    Q.    And during that point there was a large amount of gunfire

4    directed at the boat?

5    A.    There was no gunfire when I arrived.

6    Q.    After you arrived, at some time there was gunfire?

7    A.    No, sir.

8    Q.    You arrived after the gunfire?

9    A.    That's correct.

05:51 10   Q.    You saw all of the bullet holes in the shrink wrap and in

11   the boat when you arrived, correct?

12   A.    That is not correct.

13   Q.    You did not see any of that.  You did not see the boat?

14   A.    No.

15   Q.    You did see Mr. Tsarnaev actually arrested at some point?

16   A.    I saw him travel by me on a stretcher.

17   Q.    Now, during the course of that hour and a half, flash

18   bangs were deployed inside of the boat?

19   A.    Yes, sir, there were.

05:51 20   Q.    And that's something you were aware of?

21   A.    That's correct.

22   Q.    There were several flash bangs thrown into the boat?

23   A.    Yes, sir.

24   Q.    Those flash bangs are -- they produce a bright flash of

25   light.  Is that right?

```
 1   A.   Yes, sir.

 2   Q.   They're intended to temporarily blind somebody?

 3            MR. CHAKRAVARTY:  Objection.  Intention.

 4            THE COURT:  Rephrase it.

 5   BY MR. WATKINS:

 6   Q.   Are you familiar with flash bang grenades?

 7   A.   I am somewhat.

 8   Q.   And there's a use for them, right, in law enforcement?

 9   A.   There is.

10   Q.   And one of the uses is that they produce a bright flash of

11   light that blinds somebody temporarily?

12   A.   They're used to disorientate a person, yes.

13   Q.   There's two ways they do that:  One is the bright flash of

14   light which temporarily blinds them, right?

15   A.   That's correct.

16   Q.   The other way is a loud sound, about 170 decibels?

17   A.   I don't know what the decibel level is.

18   Q.   But it's loud.

19   A.   It is loud.  I concede to that.

20   Q.   And the one reason to make it loud -- one reason to make

21   it loud is it also makes somebody dizzy?

22   A.   Disoriented.

23   Q.   And it's also to produce a reaction to have somebody get

24   out from wherever those are thrown in, right?

25   A.   Yes.
```

1    Q.   And there were several of those thrown into the boat.

2    There's no reaction immediately from Mr. Tsarnaev, correct?

3    A.   They were thrown over a period of time.  It wasn't one

4    after another; it was over a significant period of time in

5    between them.

6    Q.   But after each one and a significant period of time there

7    was not a reaction from Mr. Tsarnaev, correct?

8    A.   Not that I know of, no.

9         MR. WATKINS:  May I have it just for the witness, your

05:53 10  Honor?

11   Q.   Showing you on your monitor a picture, do you recognize

12   that picture?

13   A.   I do.

14   Q.   And that is a -- well, that's a picture of Mr. Tsarnaev

15   being arrested?

16   A.   It appears to be a picture of him on the boat prior to

17   being arrested.

18        MR. WATKINS:  Your Honor, I'd ask to admit this as

19   Defendant's Exhibit 3034.

05:54 20       MR. CHAKRAVARTY:  Your Honor, I would just ask for a

21   little more foundation.  I don't know that the witness said

22   that he was there when this was taken.

23   BY MR. WATKINS:

24   Q.   Have you previously seen this photograph?

25   A.   I have.

```
 1    Q.   And you've seen this photograph as part of your role as
 2    commander?
 3    A.   Yes.
 4    Q.   And this is the kind of photograph you would see in the
 5    course of a large investigation like this, correct?
 6    A.   One of many; yes, sir.
 7              MR. WATKINS:  Your Honor, I'd ask that it be admitted.
 8              MR. CHAKRAVARTY:  I'd still object, your Honor.
 9              THE COURT:  Overruled.  I'll admit it.
10              (Defense Exhibit No. 3034 received into evidence.)
11              MR. WATKINS:  May we publish it?
12    BY MR. WATKINS:
13    Q.   And do you recognize that to be Mr. Tsarnaev?
14    A.   Yes.
15    Q.   And what are the position of his hands?
16    A.   They're in front of his torso.
17    Q.   What kind of sweatshirt does he have on?
18    A.   A gray, blue and yellow sweatshirt.
19              MR. WATKINS:  Your Honor, may I have just for the
20    witness again?
21    BY MR. WATKINS:
22    Q.   Do you see the photograph that's up on your screen?
23    A.   Yes.
24    Q.   You've seen that photograph as part of your participation
25    with the investigation of this matter?
```

05:54 (line 10)
05:55 (line 20)

1    A.   I've seen a photo but I don't believe it was during the

2    course of the investigation.

3    Q.   But you have seen this photograph?

4    A.   Yes, sir.

5    Q.   You've just identified Mr. Tsarnaev in a sweatshirt with

6    yellow Adidas -- yellow writing across the top.  Is that what's

7    shown in this photograph?

8    A.   The color of the sweatshirt's consistent from the other

9    one.

05:56 10   Q.   And what we see in this photograph is a person from the

11   ATF -- you're aware that they were at the scene at that time?

12         MR. CHAKRAVARTY:  Objection, your Honor.  The witness

13   doesn't know because he wasn't there.

14         THE COURT:  Yeah, I think that's right.  I mean, he

15   can describe, I guess, the picture and his own personal

16   knowledge, but if he's going to describe it as a scene that he

17   didn't observe, I think the objection is sustained.

18   BY MR. WATKINS:

19   Q.   So did you ever observe -- you said you saw Mr. Tsarnaev

05:57 20   going by.  What were the circumstances of that?

21   A.   He was on Franklin Street, he was on a stretcher, and he

22   went directly by me.

23   Q.   And was he in similar condition to what is shown in the

24   photograph that's before you?

25   A.   No, he had a blanket on him.

```
 1    Q.   Other than that, did he have the blood that you see on
 2    here and the other attributes?
 3    A.   I did not see that, no.
 4         MR. WATKINS:  I have no further questions, your Honor.
 5         MR. CHAKRAVARTY:  Just very briefly.
 6                        REDIRECT EXAMINATION
 7    BY MR. CHAKRAVARTY:
 8    Q.   Agent Hughes, what's the purpose of using devices like
 9    flash bangs?
10    A.   They're generally used to disorientate a person and to --
11    also to encourage them to surrender.
12    Q.   And had the defendant surrendered in the time that police
13    officers were calling to him?
14    A.   No.  Numerous requests were made; they were ignored.
15    Q.   Was there a concern that the defendant was armed?
16    A.   Absolutely.
17    Q.   How did law enforcement accommodate for that during the
18    standoff?
19    A.   How did we form that opinion?
20    Q.   Yeah.
21    A.   By that point in time, the investigation had shown
22    numerous reasons --
23         MR. WATKINS:  I'm going to object, your Honor.
24         THE COURT:  Yeah.  Sustained.
25    BY MR. CHAKRAVARTY:
```

05:57 (line 10)
05:58 (line 20)

1    Q.   Aside from the basis for why you felt that, what did you

2    do, what precautions did you take as you were in the standoff

3    that ultimately resulted in you throwing the flash bangs in?

4              MR. WATKINS:  I'm going to object.

5              THE COURT:  Overruled.

6              You may answer that.

7              THE WITNESS:  Houses in the general area were

8    evacuated on both sides of 67 Franklin Street, on the street

9    itself.  A perimeter had been set up and a tactical team had

05:59 10   moved in to take care of the inner perimeter of the scene.

11   Police officers formed a second perimeter on the outside of the

12   scene around it.

13   BY MR. CHAKRAVARTY:

14   Q.   Was the Air Wing still up in the air?

15   A.   Yes, it was.

16   Q.   And did you know whether he had any weapons?

17   A.   We did not know.

18   Q.   Did you know whether there were any explosives there?

19   A.   We did not know, no.

05:59 20   Q.   Was there a bomb squad nearby?

21   A.   Yes, there was.

22             MR. CHAKRAVARTY:  That's all I have, your Honor.

23             THE COURT:  Mr. Watkins?

24             MR. WATKINS:  Your Honor, just to be clear, I thought

25   I had mentioned the exhibit with the hands up, is Defendant's

          1    Exhibit 3034.  That did come in?

          2              THE COURT:  Yes.

          3              Wait a minute, Major.  I want to make sure they're

          4    done.

          5              MR. CHAKRAVARTY:  Yes.

          6              THE COURT:  Okay, sir.  Thank you.

          7              (The witness is excused.)

          8              MR. WEINREB:  The United States calls David

          9    Henneberry.

06:00    10              (Pause.)

         11              MR. WEINREB:  Your Honor, may we approach for a

         12    minute?

         13              THE COURT:  All right.

         14              (Discussion at sidebar and out of the hearing of the

         15    jury:)

         16              MR. WEINREB:  Evidently there was some confusion on

         17    our part and Mr. Henneberry was told he would be starting first

         18    thing tomorrow morning.  After him we're done with the

         19    narrative and we're going off into many different places.  So

06:01    20    we would ask to end now and start with him tomorrow morning.

         21              THE COURT:  Okay.  Could we just caucus about 8:45

         22    tomorrow morning to go over various things?

         23              MR. WEINREB:  Sure.

         24              MR. WATKINS:  Before then, your Honor, can I ask, the

         25    government has pared down, at least significantly, the witness

1    list they gave me.  I want to find out how much more it's going

2    to be pared down in the next couple of days so we can be ready.

3              THE COURT:  That's one of the things I want to discuss

4    in the morning.

5              MR. WATKINS:  But we have to prepare

6    cross-examination.

7              THE COURT:  You're okay till tomorrow, right?

8              MR. WATKINS:  They've been bouncing around here quite

9    a bit.

06:02 10             MS. PELLEGRINI:  I gave you a list of 21 witnesses.

11             MR. WATKINS:  Correct.  But also numerical where

12   you're bouncing around so we don't know exactly when to

13   cross-examine.  We're all working very hard --

14             MS. PELLEGRINI:  We only changed the order of Floyd

15   and Kitzenberg today.

16             THE COURT:  Well, perhaps you can review what you

17   expect tomorrow to be.

18             MR. WEINREB:  Just so your Honor knows, some of these

19   calls are made at the last minute.  If we manage to establish

06:02 20  something with one witness, we don't waste time.  We're trying

21   not to have a duplicative witness.

22             MR. WATKINS:  There's also issues with the exhibits.

23   There's a lot of -- as you heard during this trial, there's

24   exhibits that seem to get a couple of different numbers just

25   from the government, and the exhibits are getting added at the

```
 1   last minute.  And it makes it very difficult.  Again, I
 2   understand we're all working very hard, but this puts quite a
 3   strain on those of us who have to defend.
 4            MR. WEINREB:  And I would just say so the record is
 5   clear we've been adding a very small number of exhibits.  In
 6   many cases it's a Google street image or something, and in
 7   other cases it's something that's been in discovery long ago
 8   and we're breaking it out into a separate exhibit.
 9            I'm not disputing what Mr. Watkins is saying --
10           (Laughter.)
11            MR. WEINREB:  -- except to that extent, that the
12   problem shouldn't be overstated.
13            THE COURT:  Okay.
14            MR. CHAKRAVARTY:  As to the scheduling, Mr. Silva
15   could be reached as early as tomorrow.
16            THE COURT:  I think he was on the second list you gave
17   us.
18            MR. CHAKRAVARTY:  I want to make sure you --
19            MS. PELLEGRINI:  I couldn't hear the name.
20            THE COURT:  Silva.
21            MS. PELLEGRINI:  No, he's on the list.
22            THE COURT:  You think you'll hit him?
23            MR. CHAKRAVARTY:  I think he'll be tomorrow.  But we
24   did file a motion in limine this morning with regard to one
25   issue that affects the scope of his testimony, and so we're
```

1    hoping for a resolution of that before he takes the stand.

2          THE COURT:  Okay.  That's something we can do in the

3    morning.

4          (In open court:)

5          THE COURT:  Jurors, the good news, I guess, is that

6    we're making progress rather expeditiously; the bad news is

7    that sometimes we run out of witnesses, and that has happened

8    again for today.  So we're going to end the day a little early.

9    We started a little early so we'll end it a little early.

06:04 10   We'll recess and see you tomorrow and continue with the

11   evidence in the case.

12          I remind you again of no discussion, no investigation.

13   It occurred to me during today's presentation, sometimes people

14   are interested in seeing the physical locations of events that

15   they've heard.  Please don't go to Watertown and look at any of

16   these places, okay?

17          Enjoy the rest of the day and the evening and we'll

18   see you tomorrow morning.

19          THE CLERK:  All rise for the Court and the jury.

06:05 20   Court will be in recess.

21          (The Court and jury exit the courtroom and the

22   proceedings adjourned at 3:31 p.m.)

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

8     United States of America v. Dzhokhar A. Tsarnaev.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12

13    Date:  9/8/15

14

15

16

17

18

19

20

21

22

23

24

25