UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
v.                                  )   Criminal Action
                                    )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**LOBBY CONFERENCE - SEALED**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 2, 2015
2:40 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10            Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 2:40 p.m.)

4          THE CLERK:  The United States District Court for the

5    District of Massachusetts.  Court is in session.  Please be

6    seated.  For a motion hearing in the case of United States v.

7    Dzhokhar Tsarnaev, 13-10200.

8          Will counsel identify yourselves for the record,

9    please.

00:10 10          MR. WEINREB:  Good afternoon, your Honor.  William

11    Weinreb for the United States.

12          MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your

13    Honor.

14          MS. PELLEGRINI:  Good afternoon, your Honor.  Nadine

15    Pellegrini.

16          MR. MELLIN:  Steve Mellin.

17          MR. BRUCK:  Good afternoon, your Honor.  David Bruck,

18    Miriam Conrad, Judy Clarke, Tim Watkins and Bill Fick for the

19    defendant.

00:11 20          THE COURT:  You did that without looking.

21          (Laughter.)

22          THE COURT:  I gather the defendant has elected not to

23    be present?

24          MR. BRUCK:  That's correct.

25          THE COURT:  Okay.  I thought we'd start -- Jim

McAlear's here -- and talk a little bit just about the

mechanics of the exercise peremptories.  Let me just say I'm

still reading materials about motions to remove from the

qualified list people.  I expect to have that first thing in

the morning for you.  There are still some transcripts I want

to read.  So I think you'll know first thing in the morning, so

you may have to plan accordingly, but I'm sure you will.

So I've given it a good bit of thought, I think, and

I'm inclined with what the government has suggested as a method

of approaching the entire panel of, in the first instance, 52

and then 12.  And my principal reason for that is I think it

maximizes for both sides the utility of the peremptory

challenges.  It makes it more likely that more peremptories

will be used than if we proceeded in the other way.  And I

think that's consistent with what I think is the clear purpose

of the extra peremptories in the rule for death cases, that the

parties have greater ability to excuse people by reason of

peremptory.  So I think that's what we'll do.  Anybody in the

panel is open to the strikes.  And I think the suggestion of

going two by two is fine.

I guess what I haven't resolved is how physically we

do that.  It's not -- it's literally not necessary to have the

jurors here in the courtroom to do that.  In another case, an

ordinary case, we would be doing it at sidebar so neither the

jurors nor the public would know which side was responsible for

1   which strikes, and I think that's important to maintain.  So it

2   is possible to do it entirely on paper, I guess.

3        I do have some sense that it should be a public

4   proceeding, the public part, but not necessarily that the

5   information should be public.  In other words, it could be

6   observed being done without -- but I'm not sure how to do that.

7   So I invite any -- since it was the government's idea, maybe

8   they should have some ideas about this.

9        MR. MELLIN:  Your Honor, I guess if I can comment on

00:13 10  that, the one way that I've seen this handled is that each side

11  is exercising their strikes.  The Court looks at the two and

12  two.  We submit those up to the Court, the Court looks at that,

13  records the information, it comes back again to us to again

14  exercise two and two, that information goes to the Court.  At

15  no time, though, is the Court excusing Juror 22 and 48 at that

16  point in time; it's only at the end that the Court would then

17  excuse the 40 jurors that had been stricken.

18       THE COURT:  So on that, you'd hand them up and I'd

19  review them for my own purposes but not announce them.  Is that

00:14 20  it?

21       MR. MELLIN:  Correct.

22       THE COURT:  And then they would all be announced en

23  masse at the end:  The following 40 jurors are excused?

24       MR. MELLIN:  Yes.

25       MR. BRUCK:  Sounds fine.

1          THE COURT:  Are the bodies in the courtroom?

2          MR. MELLIN:  I would suggest the bodies be in the

3     courtroom just so we all have a chance to look at the jurors

4     once again before we do this process.

5          THE COURT:  Okay.

6          MR. MELLIN:  Typically --

7          THE COURT:  We might use the box but there are

8     different ways of doing it.  The easiest way would simply to be

9     go in sequence and put the first 18 in even though that would

00:14 10   not actually have any alternates there.  That would be the

11    difference from reality.  In other words, they would all be

12    part of the 52 rather than -- the first 52 rather than the

13    second 12.

14         MR. BRUCK:  Well, of course, with back-striking it's

15    quite arbitrary who's in the box and who's in the audience.

16         THE COURT:  Right.  It takes up fewer seats in the

17    audience so more people could be here.  That's one thing.

18         MS. CLARKE:  Judge, if you put them all in the

19    audience and the parties sit on this side of the table, they

00:15 20   can see the jurors and you're not straining around to figure

21    out who's there.  If you need some room for the public, they

22    could enjoy the jury box.

23         THE COURT:  I doubt we'd do that, but -- well, we have

24    74, I think, right?  That's what we hope will show up.

25         MR. McALEAR:  Yes, your Honor.

1          (Laughter.)

2          THE COURT:  That reminds me.  I should tell you that

3     there is one that -- late last week a juror remembered a March

4     vacation that began today, and we told her to go.

5          MS. CLARKE:  And who is that?

6          THE COURT:  Do you remember the number offhand?

7          MR. McALEAR:  Yes.  It's Juror No. 60.

8          THE COURT:  Yes.  Juror No. 60.  Okay.  So she's

9     flying south someplace, I imagine.

00:16 10          On that score, one juror was postponed for a similar

11     reason and we never actually got to him by the time we

12     suspended.  So that's Juror No. 647 who was effectively skipped

13     over in the sequence.  So if there's any problem with that, we

14     can address it.  If the parties have no problem with the fact

15     that he would be skipped in the sequence and never reached.

16          (Counsel confer off the record.)

17          MS. CLARKE:  Did the Court plan on voir diring him?

18          THE COURT:  That's an option.  We can have him come in

19     tomorrow morning and do that.  And I suppose if we went that

00:17 20     course, then we could insert him in his sequence.

21          (Counsel confer off the record.)

22          THE COURT:  If you want, I have his questionnaire

23     here, if anyone wants to look at it.

24          MS. CLARKE:  That would be great.  May I approach?

25          THE COURT:  Sure.  Paul?

1          MR. MELLIN:  May I look on, your Honor?

2          THE COURT:  Yes, of course.  Of course.

3          (Counsel confer off the record.)

4          MR. BRUCK:  We're content to just dismiss the juror.

5          THE COURT:  Yeah, I would just note he would be Number

6     71 in our sequence.  So it might be entirely moot, it might

7     not, but he would be up there.

8          MR. MELLIN:  I agree, your Honor.

9          THE COURT:  So both parties are content if we just

00:21 10    skip over him, treat him as effectively excused?

11          MR. MELLIN:  Yes.

12          MR. BRUCK:  Yes.

13          THE COURT:  Okay.  He's still -- he's still on the

14    hook for his nightly phone call, so we'll release him.

15          So we'll do as we discussed last week, I think 52 for

16    the jury proper and then the next -- so the question -- I don't

17    know whether this will arise or not, but if it were to be the

18    case that the total peremptories exercised actually were less

19    than 20 per side, we would slide the 12 down so that they would

00:21 20    be -- they would match in sequence.  In other words, if instead

21    of 40 being excused only 38 were, then it would have been -- 39

22    and 40 would become 1 and 2, basically, okay?  And a similar

23    adjustment at the other end.

24          MS. CLARKE:  The alternate pool would begin where --

25          THE COURT:  The alternate pool would drop down to

        1    where the jury pool ended if you didn't use --

        2          MR. BRUCK:  Drop down or move up?

        3          MS. CLARKE:  It would move up, essentially.

        4          (Laughter.)

        5          MS. CLARKE:  Try not to confuse us.

        6          MR. BRUCK:  Do you mean no matter what the alternate

        7    pool will begin at 53, or do you mean that it will slide up so

        8    that the first -- the alternate selection -- if two

        9    peremptories went unused, then we would start at 51 with the

00:22  10    alternates?  Is that what the Court --

       11          MS. CLARKE:  Yes, that's what I hear.

       12          MR. BRUCK:  -- meant to say?

       13          THE COURT:  If at the end of the jury proper

       14    selection, instead of 52 jurors having been addressed, 12

       15    remaining, 40 excused, only 50 had been, then the first

       16    alternate -- the alternate panel of 12 would begin at 51.

       17          MR. BRUCK:  Gotcha.  Okay.

       18          THE COURT:  I don't know whether that's up or down.

       19          (Laughter.)

00:23  20          THE COURT:  All right.

       21          MS. CLARKE:  Judge, if I might on the question of the

       22    Court's rulings on the strikes that are pending, if the Court

       23    makes a decision tonight late, is there some way to let us know

       24    or do you think it won't be made until we're in the courtroom?

       25          THE COURT:  I haven't thought that through.  I don't

1   know.

2          MS. CLARKE:  A tug on your left ear would mean

3   granted.

4          THE COURT:  Okay.  When the jury has been selected, we

5   have 18 people, they will get a little orientation now that

6   they're really focused from Jim.  That's customary.  It will

7   include the details about how their transportation will be

8   arranged and what their days will be like, all very practical

9   kinds of things.  We've talked about that -- I'm not sure if

00:24 10   we've talked recently about it, but I met with the marshals

11   last week and things are in progress to have them assemble

12   offsite, come into the building through the loading dock,

13   basically, just so they can all come in at once.  They'll come

14   into the back of the house; they won't have to be exposed to

15   victims, witnesses, participants and so on and so forth.  They

16   will have their lunches here.

17          It's acceptable to the marshals, and I have -- it was

18   my suggestion that they be allowed the use of their electronic

19   equipment during the lunch hour just for their convenience.

00:25 20   They will, of course, receive constant and strong reminders of

21   how to use it or not use it, but I thought it would just

22   relieve a little bit of the tension for them during the day if

23   they had an opportunity at lunch to check in at the office or

24   at home or whatever they might need to do.

25          After Jim is finished with that I would like to meet

1    informally with the jurors just to give them a bit of a pep

2    talk.  And I would prefer to do it by myself just for the

3    environment.  So if the parties would not object to that, I

4    would like consent to do that.  If you want, we could put it on

5    the record.  I would rather, again, be informal about it.  I

6    just want to encourage them now that they're really focused

7    that it's going to be them, that we expect the highest duty

8    from them, so on, that kind of thing.

9              MR. WEINREB:  We have no objection, your Honor.

00:26 10              MR. BRUCK:  This was on the record but --

11              THE COURT:  I was hoping to do it off the record

12    but -- just because it made it less formal for them, but if

13    they see a reporter sitting there...

14              MR. BRUCK:  I understand the Court's preference, but

15    under the circumstances, I think we have to --

16              THE COURT:  Okay.  All right.  We'll hide her behind a

17    screen.

18              (Laughter.)

19              THE COURT:  It won't be long.  It's just kind of a --

00:26 20    partly courtesy, I think, and partly a personal touch kind of

21    thing, so.

22              Okay.  Are there any other juror-related --

23              MS. CLARKE:  There are, your Honor.  We have filed a

24    motion to strike the panel.

25              THE COURT:  Oh, yeah.  And so I was going to ask the

1       government whether it intends to formally oppose that or not.

2               MR. WEINREB:  Your Honor, the government opposes the

3       motion.  We didn't plan on filing a written response unless the

4       Court would like one, but we would incorporate by reference the

5       responses that we made during the course of the voir dire and

6       in the filings that were made in the Court of Appeals in

7       connection with this case, if that's acceptable to the Court.

8               THE COURT:  I don't have all -- well, maybe I do.

9       Maybe I have them and I don't have them.

00:27 10               MR. WEINREB:  They were served on the Court as a part

11      of the proceedings in the two mandamus --

12              THE COURT:  Are they on the docket?

13              MR. WEINREB:  They're on the docket in the Court of

14      Appeals.

15              THE COURT:  Right.  But here?

16              MR. WEINREB:  They're not on the docket here.  But I

17      don't know that the docket in the Court of Appeals isn't part

18      of the docket in this case.

19              THE COURT:  Okay.  All right.  So I'll treat that as a

00:28 20      statement that the record is complete as to that motion and I

21      can proceed to decide.

22              MR. WEINREB:  Yes.  If the Court has any question

23      about whether those -- our filings in the Court of Appeals --

24              THE COURT:  We can get them from the Court of Appeals'

25      docket.

1            MR. WEINREB:  Or we could just file a one-page

2     opposition and fashion it --

3            THE COURT:  I don't think that will be necessary.

4            MS. CLARKE:  Your Honor, we also have a challenge to

5     the jury panel, the plan and the selection of jurors in the

6     district and how it played out and the randomness issue.  We

7     filed that motion a week ago maybe.

8            THE COURT:  I thought that's the one you were just

9     talking about.

00:29 10            MS. CLARKE:  No, we filed a motion to strike the panel

11     based on what we've ended up with, and we also filed a

12     motion --

13            THE COURT:  Oh, I guess I haven't seen that one.  When

14     was that filed?

15            MR. FICK:  The motion to strike the panel was filed

16     under seal on Friday.  But previously, I'm not sure exactly

17     which day of the week it was filed, there was a public motion

18     filed under the statute and the jury plan.  That's on the

19     public docket.

00:29 20            THE COURT:  That's the one I'm aware of.

21            MR. FICK:  There's two separate pending motions.

22            THE COURT:  I wasn't aware of the second.  I'll find

23     it.  I was actually asking the government about the first.

24            MR. WEINREB:  Oh, I see.  Well, with respect to the

25     one that was filed under seal on Friday, we haven't had any

time to respond.  That's why we said that we oppose it, but

we're not planning on filing a written response unless the

Court needs one other than what we just said.

        With respect to the motion based on the jury plan, we

had prepared a written response which we will try to get filed

tomorrow.

        THE COURT:  Okay.  As soon as possible.  Both motions

have to be resolved before we swear the jury.

        MS. PELLEGRINI:  Tonight?

        MR. WEINREB:  Well --

        MS. PELLEGRINI:  I can't remember whether theirs was

filed under seal.

        MS. CLARKE:  Friday's was under seal and served on you

guys.

        THE COURT:  The other one was in the public.

        MR. WEINREB:  If the Court would give us permission,

we'll file it electronically tonight.  It may not be before six

o'clock, which is the normal filing deadline.

        THE COURT:  That's all right.

        MS. CLARKE:  And one final matter with regard to the

jury and jury selection in this district, your Honor.  We're

going to file this afternoon our fourth motion for change of

venue.  It's largely a record preservation and gathering the

various parts of the record together before this Court but we

wanted to give you the heads-up that that will be filed this

afternoon.  The Court can always change its mind but we thought
that it would be appropriate for the record to get it in.

THE COURT:  I think the record is rather clear.

MS. CLARKE:  Well, the record's rather clear that we
continue to lose the motion but we want to make sure that there
is no question of waiver --

THE COURT:  The objection is lodged, but do whatever
you have to do.

MS. CLARKE:  Thank you.

MR. CHAKRAVARTY:  Your Honor, one other jury issue
just for my clarification.  Maybe everybody else is clear on
it.  But is it going to be the Court's practice after the
peremptories that both the jury as well as the alternates will
be selected by the lowest juror number first, essentially, for
each category?  So it will be filling -- I just want to make
sure that that process --

THE COURT:  Yes.  Yes.

Okay.  If that's all on the jury -- Jim, do you have
anything yourself?

MR. McALEAR:  I do not, your Honor.

THE COURT:  Okay.  Then there are some pending motions
that I invite brief argument on.  And as I said this morning,
these are -- I think these are all perhaps under seal although
I'm not sure they really need to be, particularly at this stage
and certainly not after the jury is actually seated, I don't

think.  I mean, I don't think *Daubert* motions generally need to

be sealed, for example.  We were doing it in aid of the jury

selection process so there wasn't a lot of discussion about

things that might not ever be in evidence while we were in that

sensitive stage, but it's not unusual for -- once the case gets

going, for things like that to be in the public record.

So why don't we start -- there are two *Daubert* motions

that I think you had indicated you needed to -- or would like

to have resolved before the openings.  One is related to a DNA

matching and the other is related to polymer tapes and fiber

matching.

MR. WATKINS:  They're both mine, your Honor, so your

choice.  Which one would you like first?

THE COURT:  Either one.

MR. WATKINS:  In regard to the gloves, your Honor,

these are a pair -- well, they're unmatched golf gloves that

were found on the floor of the Honda Civic after the conclusion

of the shootout on Laurel and Dexter Street.  On the outside of

the gloves is the red blood stains -- red-brown stains that

turn out to be the blood of MIT Police Officer Sean Collier.

That is not at issue.  That will not be challenged at trial.

The DNA analyst will testify that that is indeed Officer

Collier's blood, and we do not intend to challenge that in any

way.

The gravamen of the motion is what is found on the

inside of the gloves, and it is different as to different gloves.  In the left glove there is DNA of two profiles.  The major profile is Tamerlan Tsarnaev, of course Jahar Tsarnaev's older brother.  There's a minor profile that is inconclusive as to Jahar Tsarnaev, in our view, that does not come in.  There's no possible way to exclude it.

If indeed the Court or the government were going to press it, I believe we would try to call an expert at an *Daubert* hearing to say that, in fact, he should be excluded as a source, a potential source, of the minor profile on the glove.

As to the right glove, it becomes a little more complicated because there are at least three contributors to the DNA that is on the inside of the glove, and there's no major profile or minor profile.  This is a mixture of DNA profiles that is found inside of the glove.

The analyst, shortly after the events at issue, did the DNA on it, concluded that neither Jahar Tsarnaev or Tamerlan Tsarnaev could be excluded; in other words, they could be included as possible donors of the DNA.  What she did not do at that point was give any kind of statistical analysis.  We believe, and continue to believe, that any kind of DNA conclusion has to be supported by some kind of statistical analysis or it becomes meaningless and, in fact, inadmissible because there's no way for the jury to properly evaluate it

1    other than to say that they could have been potential

2    contributors; that there's no statistical analysis of how

3    likely they are as opposed to anyone else in the world.

4         So that is where things stood at the beginning of

5    September and actually into October.  As part of our expert

6    disclosure in October, we flagged the issue, and specifically

7    in proffering our expert on DNA, flagged that particular issue,

8    that he would get up there and testify that scientifically it's

9    unsound criminalistics -- it's unsound to put forth a

00:36 10   conclusion without any kind of statistical evidence.

11        The government sat on that, did nothing at that point

12   at all.  *Daubert* motions were set.  The deadline set by this

13   Court was at the beginning of December.  I believe it was

14   December 5th.  Again, we filed a motion to exclude,

15   particularly those conclusions; again, not the fact that there

16   was blood by Officer Collier but what was in the interior of

17   the gloves.  And that was based on the fact that it was

18   inadmissible because there was no kind of statistical analysis;

19   therefore, the government at Jahar Tsarnaev's trial could not

00:36 20   introduce this as some kind of evidence that was probative of

21   really anything.

22        In the response, the government came back, having

23   hired a wholly new expert in statistical analysis of DNA

24   results that had been received by the -- by and forwarded to

25   the Massachusetts State Police, in other words, a statistical

1    analyst did what the Massachusetts State Police did not do.

2         The difficulty with this is it was now December 22nd.

3    As the Court knows, we were all in full -- running on all

4    cylinders getting ready for trial.  We filed a reply motion

5    arguing essentially that it was too late at that point for the

6    government to proffer yet another expert, and a particularly

7    thorny kind of expert in a very high octane field of

8    statistical analysis, and that it was really impossible for us

9    to prepare for that kind of expert at the late date that the

00:37 10   government did given that they declined to go forward for the

11   couple of months that they had knowledge that this was going to

12   be an issue there.  So that's where we stood at the end of

13   December.

14        So our argument right now is that it's too late for

15   the government to inject a new expert into this particular

16   issue.  And even if it weren't too late, it is a little bit --

17   under 403 analysis, it's -- it's not something that the Court

18   should do.  What the government is really trying to get across

19   here is that there is some kind of link between the Honda Civic

00:38 20   and Jahar Tsarnaev and Tamerlan Tsarnaev and Watertown to the

21   shooting of Officer Collier.

22        They got that.  That -- the fact that Officer

23   Collier's blood is on the gloves that's inside there, there's

24   simply not going to be any kind of challenge.  As the Court is

25   going to hear fairly quickly on, there will not be any

1    challenge that Mr. Tsarnaev, Jahar Tsarnaev, was at the scene

2    and was present at the shooting of Officer Collier.

3          So once you get to that point where there's not going

4    to be any kind of challenge, all the government really needs to

5    do is match up people on Laurel and Dexter Street in Watertown

6    with the people that were up in -- at the MIT campus when

7    Officer Collier was shot.  They've done that.  They get that

8    with the unchallenged evidence that we've given them.

9          It then becomes really confusing and a waste of time

00:39 10    and very prejudicial to Mr. Tsarnaev to go beyond that.  It

11    becomes confusing because the government is going to -- or the

12    government will put on a statistical expert -- it will be very,

13    very high-level kinds of testimony that is there.  If the Court

14    were inclined to do that, we would have to put up a statistical

15    analyst ourselves.  There would probably be -- we would contend

16    there would need to be a *Daubert* hearing as to the statistics

17    before either of them got up there.  And at the end of the day

18    it's going to be an exceedingly minor matter that matters not

19    to the government about proving the essential point that they

00:40 20    want to prove, which is that these two men here in Watertown

21    were the ones that were at MIT.

22          And it becomes pretty prejudicial because of the fact

23    that there are both Jahar Tsarnaev's DNA and Tamerlan

24    Tsarnaev's DNA.  Not the fact that they are both there, but the

25    fact that their profiles can potentially match what is there.

 1    The jury is very likely to take that in kind of the wrong way,

 2    that perhaps they both wore the glove at the time that this

 3    happened or that either one of them could and that's

 4    some -- that's close enough.

 5         But that's not what the statistics, of course, are

 6    going to mean.  It just means that either one of

 7    them -- there's no ability in this context to do any kind of

 8    relative culpability about who actually wore it on one

 9    occasion, who wore it more.  There's a slight statistical

00:41 10    probability that it's more likely that Tamerlan had the glove

11    and it's more likely him that wore it at some point than maybe

12    Jahar Tsarnaev, but even that gets very confusing to the jury.

13    If we get into that kind of fight, the jury is likely to use it

14    in a way that is very impermissible.

15         So it really does very little to prove anything that's

16    going to be at issue in this case.  It's going to become very

17    confusing.  At a minimum, we're going to waste a morning trying

18    to go through statistical analysis and teaching the jury some

19    very complicated concepts about how statistical analysis works.

00:41 20         A better course, and I think the only course for the

21    Court given that it was late disclosed and given that it

22    violates 403, is to simply to exclude it at this point.  Let

23    the government talk about Sean Collier's blood but no more.

24         MR. WEINREB:  Your Honor, listening to that argument,

25    it didn't sound like much of a *Daubert* argument to me at all.

 1    It's mainly an argument to exclude evidence on grounds of when

 2    it was produced and then on 403 grounds.  But let me start from

 3    the beginning.

 4          So there are two gloves here, a right glove and a left

 5    glove, as Mr. Watkins says.

 6          THE COURT:  I don't know whether this matters but are

 7    they a pair?  Are they a matched pair or are they odd gloves?

 8          MR. WEINREB:  They are a pair.  The only reason that

 9    it matters that one is a left glove and one's a right glove is

00:42 10    that it enables us to talk about them separately and keep track

11    of which is which.

12          So I would object to anything being argued about the

13    left glove here.  Nothing in his motion -- in Mr. Tsarnaev's

14    motion mentions the left glove.  If you look at the conclusion

15    of his motion it says, "Based on the foregoing, the defense

16    moves the Court to exclude testimony and evidence that the

17    defendant was a potential contributor to the DNA extracted from

18    the inside of the right glove recovered from the car."  And you

19    will search in vain in their motion of any mention of the left

00:42 20    glove.  That's all new here.

21          What the defense informed the government in a letter

22    at one point is that if our expert testifies that the defendant

23    cannot be excluded as a contributor of evidence from the left

24    glove, they will want to put on an expert to say that he should

25    have been excluded.  But that's not a *Daubert* challenge; that's

1   just what they're intending to do in their case, rebuttal

2   evidence, meeting the government's evidence.  So I think any

3   reference to the left glove in this argument is a red herring.

4   Now let's turn to the right glove.  So as Mr. Watkins

5   concedes, it had Sean Collier's blood on the outside of it.  On

6   the inside of it was DNA matching two individuals.  When you

7   find DNA inside -- when you find DNA on something and it comes

8   from only one person, then the statistical analysis is very

9   straightforward.  If you find DNA that's a mixture of two

00:43 10   people, the DNA analysis becomes more complicated.  That's

11   because unless you have a lot of DNA from one person and only a

12   little from another person, it can be difficult to tell just by

13   looking at the -- visually looking at the results of the DNA

14   analysis which profile belongs to one person and which profile

15   belongs to another.  If there's roughly equal amounts of DNA

16   from both people, then you have to use statistics, you have to

17   use math to calculate what the likely profiles are.

18   So the state lab, which is who initially examined the

19   gloves, just like virtually every other lab in the country

00:44 20   doesn't do that more complicated analysis.  I think they're all

21   on the verge of doing it, but they don't yet.  However, there

22   are other companies that do.  And it's called -- the method

23   that has been created by one company, Cybergenetics, called the

24   TrueAllele method, which is a way of doing it.

25   The math is not that complicated once you understand

1    it.  This is a scientifically validated method.  It's been

2    validated in any number of studies.  It's a well-understood

3    method.  It is a -- it's really a method no different from the

4    method used where you just have one person's DNA, it's just a

5    little more complicated.

6           The defense filed a motion on December 5th saying

7    that -- arguing that there was a need for a *Daubert* challenge

8    because it would be wrong for Jennifer Montgomery, the state's

9    expert, to testify that Jahar Tsarnaev was a potential

00:45 10   contributor of DNA to the inside of the glove if she could not

11   give a statistical likelihood of that.

12          So the government went up and got the statistical

13   likelihood.  And two weeks later, which is the time for

14   responding to motions, we filed our opposition.  We had already

15   served on the defense the results of the TrueAllele analysis,

16   and we filed our motion saying now we have the statistic, so

17   now there's no more need for a *Daubert* hearing.

18          I'm not really sure I'm hearing the defense say there

19   is a need for a *Daubert* hearing.  I would certainly be willing

00:46 20   to have one if they question the statistical method, but the

21   Court need not have one if it's clear that it's a reliable

22   method.  And I think if the Court looks at our opposition, it

23   will be satisfied that it is clear that this is a reliable

24   method and there's no need for a *Daubert* hearing.

25          So really what the defense argument boils down to is

1    that the government's doing this was untimely.  But it was done

2    back in December, and they had -- by mid December they had the

3    results.  It's now the beginning of March.  They've had plenty

4    of time if they want to show these statistical results to their

5    expert.  It's not like somebody would need to do experiments to

6    be able to assess this.  It's just math.  You just have to --

7         THE COURT:  So let me understand.  You're not

8    proposing -- in light of everything that's happened, including

9    your reply, you're not proposing to offer it without the

00:47 10   statistical evidence?

11         MR. WEINREB:  No, no, we are proposing -- so now we

12   have --

13         THE COURT:  That might be a *Daubert* question?

14         MR. WEINREB:  No, I would concede for purposes of this

15   argument that if we didn't have a statistic, it shouldn't come

16   in.  But now we have a statistic.

17         The defense's 403 argument, to the extent I understood

18   it, which I'm not sure I did, has no merit.  The defense argues

19   that there's no -- there's nothing probative about us

00:47 20   demonstrating that Jahar Tsarnaev's DNA was likely inside that

21   glove.  I think that -- just to state that argument is to

22   refute it.  Obviously it's probative that the gloves that have

23   Sean Collier's blood on them on the outside are -- if the

24   defendant's DNA is on the inside --

25         THE COURT:  Well, is there any way of determining when

1    either any sample of DNA is deposited?  It could have been a

2    week before?

3            MR. WEINREB:  That's true.  But that's a matter for

4    cross-examination.  That's often the case in any case.

5            THE COURT:  No, but doesn't the inability to answer

6    that question reduce significantly the probative value?

7            MR. WEINREB:  Well, it wasn't -- it doesn't make it

8    a -- you know, proof beyond a reasonable doubt but, you know, a

9    brick is not a wall.  This is just one piece of evidence.  It's

00:48 10   an indication that the gloves were worn by the defendant and by

11   the -- by his brother at some point.  Maybe they weren't worn

12   that night.  That's an easy enough question to ask the expert.

13   Can you say when that DNA got on there?  Couldn't it have

14   gotten on there a week earlier?  A month earlier?  So you don't

15   know that those gloves were worn by either of these individuals

16   that night, do you?  No.  But, I mean, it's probative the fact

17   that their DNA is inside of them and not somebody -- entirely

18   third person's DNA, for example.  These aren't difficult

19   concepts for a jury to understand.

00:49 20          At one point Mr. Watkins said there is a much greater

21   likelihood of Tamerlan Tsarnaev's DNA being in the gloves than

22   Jahar Tsarnaev's.  That I think is a misunderstanding on his

23   part of the statistics that are cited here.  It's true that the

24   likelihood of selecting from the population at random somebody

25   with the profile that was found in these gloves is -- it's only

 1   45,000 for the Caucasian population for Jahar Tsarnaev and it's

 2   155,000 for Tamerlan Tsarnaev, but that has nothing to do with

 3   the likelihood of whose DNA is in the gloves; it just has to do

 4   with how common each of their DNA profiles is in the

 5   population.

 6        I'd also say that this 403 argument is being made for

 7   the first time -- literally the first time right here in this

 8   courtroom out of Mr. Watkins' mouth.  Nothing has been filed on

 9   this.  So I could -- it may be that, you know, the government

00:50 10   could cite case law to you about DNA, about cases where you

11   can't prove exactly when the DNA got there that would be useful

12   to the Court.  I haven't had an opportunity to do that because

13   they never moved to exclude the information on this ground.

14        This is a *Daubert* motion.  This was supposed to be an

15   argument about a *Daubert* hearing, now we're hearing something

16   completely different.  This argument could be made, who knows

17   when Officer Collier's blood got on the gloves?  Who knows when

18   any DNA gets on anywhere?  That's always an issue with DNA.

19        THE COURT:  The only urgency to this is if you wanted

00:51 20   to talk about it in your opening.

21        MR. WEINREB:  Yes.  So we do want to say that the -- I

22   mean, the murder of Officer Collier is different from the

23   marathon bombings.  There is surveillance video of two people

24   walking up to Officer Collier's car and running away, but the

25   video is taken from so far away that you can't see who they

1    are.  And so this is a circumstantial case to some degree when

2    it comes to proving the defendant and his brother guilty of

3    that murder.

4         The defendant could have -- Tamerlan Tsarnaev could

5    have been there with another person.  It doesn't necessarily --

6    you know, even assuming one of those two people is one of the

7    Tsarnaevs, it doesn't mean the other one was.  So we need to

8    prove that they killed him.  And we intend to prove it in a few

9    ways.  One is that the gun used to kill him is the same gun

00:52  10    that was used in the shootout in Watertown.  But another very

11    important way, maybe the most important evidence, is that

12    Officer Collier's blood is on this pair of gloves that is found

13    in the car and both brothers' DNA is found in those gloves.

14         To the extent the defense wants to make the point that

15    that doesn't mean that either one of them in particular, let

16    alone both of them, was wearing the gloves that night, that's

17    easy enough to make during cross-examination.  That's easy

18    enough of an argument to make to the jury.  But the government

19    has the burden of proof here.

00:52  20         And the defense keeps saying, as they said this

21    morning, everything -- nothing is in dispute.  Everything's,

22    you know, pretty much agreed to.  So the government -- what

23    they seem to take from that is -- or what they seem to think

24    flows from that is the government doesn't have the right to put

25    in any evidence that the defense thinks, you know, might have,

1    you know, an extremely strong impact on the jury.  But that's

2    not the law.

3            The jury isn't going to take its job as being just to

4    decide the few things that the defense decides to contest and

5    not the others.  They're going to be instructed that we have to

6    prove each and every element of every crime beyond a reasonable

7    doubt.  And identity is an element of every crime.  We're

8    entitled to our best evidence.  This is good evidence.  And the

9    defense has not made any kind of compelling argument why we

00:53 10  shouldn't be able to use it.  And I don't think they should be

11   permitted to make the argument without giving us the slightest

12   notice that it was coming down the pike.

13           THE COURT:  All right.

14           MR. WATKINS:  Just two brief -- very brief points,

15   perhaps.  As I understand the government, they would agree that

16   this is inadmissible as to the right glove if indeed the Court

17   rules that they're too late on the statistical analysis and it

18   can't come in.  The government often reminds us in pleadings

19   ever more strident strike that deadlines have consequences.

00:53 20  This is a case where there was a deadline by the Court.  The

21   government knew we were raising this issue.  They waited till

22   the eve of trial.

23           While it is technically true that between December

24   22nd and now we could have gone into a whole other expert, the

25   Court knows how hard, not just the defense, all of the parties

1    are working here.  It's the wrong time to bring this forward.

2           As far as the 403 argument, I think Mr. Weinreb forgot

3    about the reply where we did argue from pages 4 to 8 of the

4    defendant's reply exactly the arguments that are made today.

5    To the extent he's saying somehow he's surprised about that,

6    that's simply wrong.  We argued 403 in there, we'll continue to

7    argue it.

8           In regard to the left glove, if the government indeed

9    is trying to put in an inclusive result as to Mr. Tsarnaev,

00:54 10   that's a relevance problem.  I don't understand how that comes

11   in at all, *Daubert* or beyond.  If there's some kind of

12   scientific basis or legal basis for putting in an inconclusive

13   result as to Mr. Tsarnaev, I think we will need a hearing

14   before the government tries to put that kind of evidence in at

15   trial because that's going to be a mistrial when the expert

16   testifies to that and the Court has to strike it.

17          THE COURT:  Why don't you remain standing and address,

18   if you're the one, the polymer motion.

19          MR. WATKINS:  The polymer is somewhat similar but it

00:55 20   presents different kinds of issues.  I may -- I put this motion

21   under a somewhat broad heading because it encompasses different

22   kinds of evidence, but at the core they are all much the same.

23   What the government seeks to do here is to take detritus from

24   Boylston Street polymers -- caulking, for want of a better

25   word, from -- that was found at the marathon bombing site,

1  also, pieces of tape, clear tape, gray tape and black tape, and

2  match those in some fashion to the items that were found in the

3  home at 410 Norfolk.

4      But these are not -- these are not -- unlike DNA,

5  these are not anything you could call a conclusive match.  As

6  the government's expert is going to admit, it's what they're

7  calling a Level 3 association; in other words, they can't say

8  for sure that it is this roll or this caulking that was found

9  inside of this -- that was found on Boylston Street, but

00:56 10  rather, it matches something that is similar to that or

11  manufactured in some kind of a similar way.

12      So even on the government's theory taking it in, you

13  know, the light most favorable to it, a Level 3 association

14  tells the jury almost nothing.  Unlike the DNA context, there

15  is no statistical analysis that could be done about how likely

16  it is that it is this roll or how likely it is this

17  manufacturing of any of that stuff.  There's simply no clear

18  standards by which an analyst can conclude that these two

19  things are similar enough that one can conclude that they're

00:57 20  somehow a match.

21      The only times this -- well, the vast majority of

22  times that the government cites in its brief are when there are

23  much more definite matches, when, for example, the end of a

24  tape in connection with all of the other chemical properties of

25  it can be matched up.  Those are the kinds of cases where

courts are inclined to allow this kind of evidence in.  But
here that's not what they're trying to do; they're simply
trying to say it's pretty much like the stuff that was found at
410 Norfolk.

        And that is where the main issue is.  Even if they
were going to be allowed to do that, there are serious
questions.  And we've gone into it in some detail in the
briefs.  I don't want to hit every point.  But there are still
significant questions about whether they can even say that,
whether on a scientific basis as to the polymers and to the
tapes, that they can say that their tests are conclusive.  Even
on that level to say it's scientifically or chemically
consistent with what was found at 410 Norfolk.  And
that -- that, again, is something that can only be resolved at
a *Daubert* hearing if the Court were inclined to let the
government have it in.

        But again, much like the DNA issue, the question is
what is the probative value.  The government is going to put
into evidence items that were found at 410 Norfolk Street.
They're going to put in rolls of clear tape, rolls of silver
tape, rolls of black tape.  They are going to put in caulking
that they found, a caulking gun.

        Again, it's difficult to see that there's going to be
any kind of relevance basis to exclude that there, so they're
going to get, to the extent that they need it, some kind of

1    corroboration there.  To then add some kind of scientific

2    patina on all of it is simply unwarranted.  It's particularly

3    unwarranted where the science does not conclude what it is that

4    the government seeks to argue at the end of the day:  that they

5    made this -- that these items here were used to build these

6    pressure cooker bombs.  It simply does not support that kind of

7    conclusion.  There's a grave danger that the jury's going to

8    misuse it as such and conclude that, in fact, those were the

9    rolls that were used to build the bombs.

01:00  10          Given all that, it simply should not come in.  It

11    should not be allowed to be used in a very prejudicial way that

12    is not supported by science.

13          MR. CHAKRAVARTY:  Your Honor, again, the issue of

14    *Daubert* reliability versus 403 or the probative value of the

15    testimony appears to be conflated here.  And, in fact, the type

16    of source-specific matching of the polymer evidence has been

17    the only circumstance in which *Daubert* has really been an issue

18    throughout the case law.  And of course, as the government says

19    in its pleadings, source-specific matching was not done in this

01:00  20    case.

21          To the contrary, the analysts reviewed the

22    characteristics of the polymers found, particularly tapes and

23    sealants, both at the Boylston Street detritus, as Mr. Watkins

24    calls it, as well as 410 Norfolk Street, and determined using a

25    series of objective and widely accepted criteria, both in the

1    industry -- the polymer adhesives' industry as well as in

2    forensic science, in order to determine the class

3    characteristics.  And so short -- this is not the circumstance

4    that could be unfairly prejudicial where an analyst says that

5    this particular piece of tape was taken off of this particular

6    roll in the defendant's residence.  Instead, that witness is

7    going to say, I have examined this tape.  This is -- it's more

8    than just a visual inspection.  I've run this series of tests

9    on this tape.  These are the tests that are used in the

01:01 10   industry and in forensic science in order to determine what the

11   class characteristics are of the tape.  And I identified that

12   the class characteristics of the tapes and the polymers that

13   were found in -- at defendant's residence were consistent with

14   those same characteristics.

15        It does not mean -- the "consistent with" language

16   notwithstanding, it does not mean that the expert is going to

17   say that the tape was from 410 Norfolk Street.  That would be

18   something abundantly clear, as Mr. Watkins has already

19   indicated, it's a Level 3 association at best.  And what that

01:02 20   means is the fact that the tape could not be excluded -- first,

21   it's a natural question by the jurors.  You're going to see

22   duct tape found in the street, you're going to see duct tape

23   seized in the residence.  They're going to wonder:  Is this the

24   same duct tape?  The government has the right to say we did an

25   analysis to determine that.  We found they are both of the same

 1    class characteristics but we could not make a stronger

 2    conclusion than that.  It's that kind of candor which

 3    demonstrates this is not prejudicial testimony; however, it's

 4    another -- as Mr. Weinreb says, it's another brick in the wall.

 5         But it also emphasizes that this goes to the weight of

 6    this evidence, not the admissibility.  The government is not

 7    going to argue simply from that type of correlation, those

 8    class characteristics, that this evidence means that the

 9    defendant made the pressure cooker bombs; rather, it's going to

01:03  10   say that items in the household in which he had resided were

 11   consistent with the items -- with some of the construction

 12   materials of the device itself.

 13        The government has to explain what these devices were

 14   to the jury because that's going to be -- it's not just

 15   curiosity, it's the very mechanism of the crimes.  And so it's

 16   important evidence for the jury -- for the government to

 17   introduce.  It goes to weight, not admissibility, and there's

 18   no prejudice coming from the fact that tape is tape.  That's

 19   essentially what the witness is going to be saying.  And

01:03  20   they're going to say of the varieties of tape, some of the

 21   samples are consistent with some of the samples that were found

 22   on the street.

 23        A final point:  The government has -- you know, this

 24   testimony, if it's going to come in, it's going to come in

 25   weeks into trial.  To the extent that the testimony is

1   necessary, given what the lay of the land is at the time that

2   the witnesses are expected to testify, it's possible that the

3   government doesn't even elicit the evidence.  But to say under

4   *Daubert* grounds or 403 grounds that testimony about actual

5   physical evidence found at the scene that is consistent with

6   and could give rise to an inference that people in Norfolk

7   Street constructed the devices I think is an important one that

8   the government should be allowed to make.

9           THE COURT:  All right.  This motion is denied for the

01:04  10   simple reason that the government, as I hear it, doesn't

11   propose to offer the possible testimony that might implicate a

12   *Daubert* question.  The "consistent with" is different from the

13   source specific, and I think the "consistent with" is really --

14   I think it's really a relevance issue and not a *Daubert* issue

15   at all.  So anyway, that motion is denied.

16           MR. WATKINS:  Just for the record, I raised *Daubert*

17   issues there that, in fact, there are no standards by which

18   even a Level 3 association could be made that there are

19   not -- that that's not a scientifically supportable ground.  So

01:05  20   I think at a minimum, even if the Court under 403 purposes is

21   going to allow it, you would still need to have a hearing in

22   order to admit it at trial.

23           THE COURT:  I don't think so.

24           Now, let's talk about foreign witnesses.  Let's start

25   with the deposition issue, defendant's motion for foreign

1    deposition.

2         MR. FICK:  Yes, your Honor.  So this is the request

3    that -- to authorize the deposition and to order the government

4    to take steps to make the witness available, among them Magomed

5    Kartashov, who is a maternal cousin, probably is the best

6    source of evidence about Tamerlan Tsarnaev's radicalization,

7    his state of mind and what he was interested in and obsessed

8    with at the time that he traveled to Russia in 2012.

9         Mr. Kartashov is not available to come to testify here

01:06 10   because he's in jail in Russia.  The government, however,

11   procured his presence for an interview with the FBI on a prior

12   occasion by a request of the Russian government.  So in that

13   sense, the government has the ability to at least solicit his

14   presence.  And we'd request that they do that again for

15   purposes of a deposition, or at this point given the time,

16   alternatively, if arrangements for a video connection were

17   possible, of course that would be an alternative means of

18   procuring his testimony.

19         The essential argument the government makes in

01:06 20   response is, Well, the Court can't order the government to

21   exercise the government's prerogatives under our Mutual Legal

22   Assistance Treaty.  First, it's not entirely clear the Mutual

23   Legal Assistance Treaty effected the means by which way they

24   procured his presence for the FBI in the first instance, and

25   really, the cases that -- we have reached this conclusion

1    previously simply to say that the Legal Assistance Treaty

2    itself does not create a right for other parties to act, but

3    that sort of conflates the means with the right.  The defendant

4    is arguing here that the right in here is in the Sixth

5    Amendment to the Constitution, and the Legal Assistance Treaty

6    is simply means by which the government not only can but has

7    procured access to the witness.

8         The most relevant First Circuit case which I think

9    actually, given the way the timing of this unfolded, was cited

01:07 10   in connection with a different motion, not this one, but the

11   case is Filippi, 918 F.2d. 244.  That case held that the

12   failure of the government to assist in obtaining parole for

13   foreign witnesses through executive means was a Sixth Amendment

14   violation, and I think by analogy that tells the Court that

15   there is a basis to say to the extent the government has de

16   facto access to a witness, it should be required at least to

17   make efforts to exercise that ability of access.  And so that

18   essentially is the basis of the motion.

19        Now, the government also in its response says, Well,

01:08 20   there's other evidence of Tamerlan Tsarnaev's radicalization.

21   There are, for example, voice recordings of Mr. Tsarnaev on his

22   computer, et cetera.  That of course is wonderful.  If the

23   government is willing to stipulate that Tamerlan Tsarnaev's

24   voice is, in fact, Tamerlan Tsarnaev's voice, that would be

25   helpful.  But again, the government has made this argument over

and over again, the parties ought to be able to put their best

evidence in, and the best evidence of Tamerlan Tsarnaev's

radicalization is testimony that Magomed Kartashov could

provide.

THE COURT:  Do you have any current information about

it?

MR. FICK:  As far as we know, he is still serving his

sentence in the -- sort of a prison colony.  It's not really a

facility; it's more like a little town where prisoners live

with their families in Voronezhskaya Oblast, which is in the

European part of Russia, you know, a couple of hours south of

Moscow.

My understanding is that when he was interviewed by

the government previously, he was -- I know, I can spell that

for the court reporter.

(Laughter.)

MR. FICK:  But my understanding is when the government

interviewed him previously, he was brought out of that -- out

of wherever he was detained to an office setting where that

meeting took place.

THE COURT:  And so what specifically would you suggest

if it's not the MLAT Treaty that the government might do?

MR. FICK:  Well, I'm not privy to what mechanisms,

either formal or informal, that the government may have to

solicit cooperation from Russia in a law enforcement effort.

1    You know, if there's something other than the MLAT Treaty,

2    something less formal that they used before, presumably they

3    can use it again.

4         And I'd also note, going back to the agreement that I

5    cited, you know, the case law about the MLAT Treaty simply says

6    there's no right of action for the third party under the MLAT

7    Treaty, but again, they're saying the right of action is the

8    Constitution.  The MLAT Treaty is the mechanism the government

9    has in its hands much like the parole process to bring

01:10 10   witnesses in.  That was at issue in Filippi.

11         MR. CHAKRAVARTY:  Your Honor, I inquired with the FBI

12   as to what other options there might be aside from an MLAT, and

13   they inquired with the foreign government, and they said

14   that -- and this is months ago now -- that there will be no

15   cooperation with any request, whether it be from the FBI or

16   from the U.S. government at large, without a request

17   from -- through the Mutual Legal Assistance Treaty.  So

18   whatever vehicle was used back in the summer of 2013 is not

19   even a possibility even if we wanted it to be a possibility

01:10 20   which -- but that's jumping ahead a little bit.

21         Because in assessing this request for a deposition, or

22   even Mr. Kartashov as a witness, we first have to address the

23   threshold issue of what is the relevance of the witness.  And

24   at best, unless, you know, there's information that the defense

25   has that we don't and that we haven't provided to them, he

1    offers testimony about Tamerlan Tsarnaev before the conspiracy

2    charged in the case had even begun, what Tamerlan Tsarnaev did

3    in 2012 before the plot that was -- that resulted in the

4    bombing of the marathon.

5          And it's an important distinction because everything

6    that flows from the defense request, talking about how critical

7    of a witness he is, suggests that to the extent that he has any

8    value in a mitigation case, it would come to not talking about

9    the defendant's individualized liability, or even his relative

01:11 10   culpability versus his brother's, but rather, simply character

11   evidence or the evolution of Tamerlan Tsarnaev's own thoughts.

12          So that prevents fundamentally them from being able to

13   meet the extraordinary threshold of -- required by Rule 17

14   saved for extraordinary cases, especially when witnesses reside

15   in a foreign country where the penalties of perjury and the

16   other accoutrements surrounding reliability of testimony aren't

17   going to be in place, that they have a burden to meet.

18          And I suggest that they haven't met that burden.  They

19   haven't proffered a 401 reason or the analog in it for -- in a

01:12 20   death penalty sentencing phase as to why his testimony is

21   necessary.  Having not met that burden, they then can't further

22   justify this extraordinary step.

23          The case law is clear that even though this -- this

24   unique circumstance has not been squarely addressed by the

25   First Circuit or by the Supreme Court, those cases that have

 1    reviewed the ability for individuals to access the right of an

 2    MLAT have routinely been denied that access, and that's for

 3    good reason.  The MLAT is designed for state-to-state

 4    interactions and cannot be co-opted by the interest of a few

 5    even when weighed against the Fifth and Sixth Amendment rights

 6    that a criminal defendant is afforded.

 7         The defense also appears, I should add, in their

 8    papers -- and based on Mr. Fick's knowledge of the situation --

 9    has more and closer access to being able to even talk to

01:13 10   Mr. Kartashov than the government does.  If he is in a facility

 11   run by the federal government in Russia, then not only can

 12   we -- are we unable to even ascertain that definitively from

 13   the government, but we certainly don't have access to

 14   communicate with him.

 15        He hasn't indicated that he would be willing to go

 16   through this procedure, and what we're talking about is

 17   essentially a detour from focusing on the case, a pragmatic

 18   problem of both expense as well as having to go over to Russia

 19   to try to attempt to knock on a door and say, Hey, we want to

01:14 20   talk to one of your prisoners for a little while, and then

 21   hopefully getting some kind of reliable testimony that this

 22   jury is going to be able to assess within the context of

 23   everything else in the mitigation case, your Honor.

 24        It's just -- not only have they not met the legal

 25   threshold, it just doesn't make sense pragmatically.  And so

 1    the government would ask that the motion be denied.

 2            MR. FICK:  Very briefly, your Honor, I'm frankly sort

 3    of dumbfounded to hear the government try to suggest

 4    Mr. Kartashov would not be relevant not only for the mitigation

 5    case, but given the way the government has described the way

 6    it's going to frame the motive in the guilt phase of the case,

 7    frankly, the testimony could be relevant there.  The government

 8    essentially has said -- indicated to us that it's going to

 9    argue that Jahar Tsarnaev was self-radicalized, whatever that

01:14 10   means.

 11           Our answer to that, our belief and the truth of the

 12    matter is that, no, that is not the case, that Tamerlan

 13    Tsarnaev radicalized his brother and his path to radicalization

 14    started much earlier and was much more intense including a trip

 15    to the Caucasus for the specific purpose of joining the

 16    insurgence.  Magomed Kartashov is the living person who can

 17    provide the best and strongest corroboration of that evidence,

 18    and so for that reason we think his testimony is critically

 19    important.

01:15 20           THE COURT:  Okay.  I'll reserve it.

 21           Then there's the motion to delay the identification

 22    of -- or the disclosure of foreign witnesses.

 23           MR. FICK:  Yes.  And the original relief sought there

 24    was to delay to either seven days before the beginning of the

 25    mitigation case -- or before the guilt phase or until such time

1    as the witnesses are on an airplane headed to the United

2    States, and we maintain that request at this time.  Or

3    alternatively, I think this is also sought in the motion, a

4    protective order that would bar the government from making

5    efforts through a foreign government to interview the witness

6    overseas given the intimidating circumstances in which that can

7    sometimes happen.

8         I think that the potential for witnesses to be -- who

9    were reluctant to come in the first place is beyond question,

01:16 10    and, you know, for the same types of reasons that this kind of

11    relief was allowed in the Rwanda case, I think it should be

12    permitted here as well.

13         And then a separate piece of the motion, quite apart

14    from the question of when a disclosure or foreign witness

15    identity is made to the government, separately there was a

16    request that a firewall, essentially an Immigration and Customs

17    agent, be designated to work with the defense.  I need

18    witnesses who may need to be paroled into the country as

19    opposed to simply receiving ordinary U.S. visitor visas.  And

01:16 20    for similar reasons, simply so the government -- the

21    prosecution team is not sort of neck deep in the defense's

22    business, they assume the requirement that they designate an

23    agent in this case would also be appropriate.

24         MR. CHAKRAVARTY:  Your Honor, the reason the Court set

25    a disclosure deadline for witnesses is so the parties wouldn't

1    be surprised.  We're on the eve of trial.  The time has come

2    when we need to know who the witnesses are and what the theory

3    of the case is against which we are going to be presenting

4    evidence.  We need to know what questions to ask the witnesses

5    when they're on the stand, we need to know both for the

6    liability phase as well as the penalty phase.

7         The sole justification for the defense's extraordinary

8    request is that they -- the witnesses that they propose are

9    likely to be intimidated.  And while intimidation could happen

01:17  10   in a variety of circumstances, there's absolutely zero

11   evidence, at least that the government is aware of, I don't

12   know what may have been filed with the Court, to suggest that

13   that kind of intimidation that they're envisioning, number one,

14   has or will happen; but number two, that it will happen because

15   of disclosure to the government.  And what I mean by that is

16   that the foreign government from whence these witnesses are

17   coming are likely to know, regardless of any U.S. government

18   involvement, of the purpose and the nature of why these people

19   are coming to the United States, especially if some kind of

01:18  20   extraordinary permissions are granted for purposes of coming to

21   the United States.

22        The example that they use and is the sole

23   precedential -- I guess it's not even precedential, but the

24   sole example of such extraordinary steps having been taken were

25   in the Rwanda cases.  The Rwanda cases -- the case in New

1    Hampshire as well as in Massachusetts -- involved witnesses for

2    both the sides coming over from Rwanda, from a small village in

3    this sub-Saharan country which is considerably different

4    demographically in terms of sophistication from Russia or the

5    Caucasus, Kyrgyzstan and these other places -- and it was a

6    shared witness pool.  And the concern the defense had at that

7    point, given a regime that they believed would intimidate their

8    witnesses and in support of that belief they advanced as the

9    primary theory of their defense that the Rwandan government was

01:19 10   going to be manipulating these witnesses.

11        And there was a particular narrative that they wanted

12   to further, and they presented expert testimony in that regard,

13   when it was a core -- at the core of their defense the simple

14   solution that the judge saw in New Hampshire in this case was

15   to say, Well, why do you have to designate?  Why don't you just

16   give a list of witnesses to get their travel documents in order

17   and then wall off the prosecutors from knowing who those

18   witnesses are until they hit American soil?

19        That procedure failed miserably.  The witnesses were

01:20 20   able to come without a problem but many of them didn't testify

21   at all -- I'm speaking of defense witnesses -- and those that

22   did perjured themselves.  And the whole point of knowing who

23   the witnesses are is so that we can learn more about them and

24   we can learn -- we can prepare for them on cross-examination.

25        The Rwandan cases involved illiterate farmers.  We

1    have no idea who is coming over from -- in this case, we have

2    no idea for the purposes for which they're coming over, and

3    we're at a considerable disadvantage from not knowing even

4    that.  It's one thing to know who a witness is, it's another

5    thing to go out and to try to interview a witness.  And it's a

6    third thing to realize the harm which they are considering,

7    which is to contact a foreign government, tell them the nature

8    of the witness, and ask them -- or give them certain facts that

9    would then enable them -- or incentivize them to actually

01:21 10   intimidate the witness to come here.  And I could tell you

11   right now the government has no intention to do that.

12          And so it's that worst-case scenario for which the

13   defense has proposed this most restrictive means.  And while

14   two months ago that may have been appropriate before we were

15   able -- before we were right engaged in the case and, frankly,

16   we would not have done very much in the last two months, we

17   would have asked the FBI to look into that more, but that's a

18   different question from now when we actually have to present

19   the case and don't know who these witnesses are.

01:21 20          The -- another point about the -- how this procedure

21   would not only prejudice the government but would encourage bad

22   evidence coming in, in the Rwanda cases, the witnesses all

23   testified about a very narrow piece of history in a small

24   village for which the government had thoroughly investigated,

25   and so we had some context as to in what circumstances their

1    testimony might be false and what circumstances we might be

2    able to present contradictory evidence.

3            In this case we don't have that.  In this case we have

4    somebody who can come up and say anything they want about the

5    defendant or his family's history, presumably, without the

6    government having any basis to be able to even conduct an

7    investigation to be able to cross-examine.  And if they -- to

8    do it -- if they testify themselves, then at least we get a

9    right to cross-examination.  But if they just come here to

01:22 10   speak with the defense mitigation experts, and then through

11   hearsay the mitigation experts present that testimony, we are

12   at an even further disadvantage.

13           At the very least, your Honor, we need to know who

14   these people are so we can prepare for their case -- the

15   testimony that's going to arise from them in the case both in

16   the liability phase so that we can anticipate it as well -- and

17   we don't overreach and argue something that we know that

18   they're going to have witnesses on who are going to be

19   eyewitnesses to some event that we're aware of, as well as,

01:23 20   most importantly, in the mitigation phase.  And given the fact

21   that we're all going to be fully engaged in trial, we ask for

22   that to be done now.

23           MR. FICK:  Very briefly.  I think there's a difference

24   between -- what we were doing is we're calling the mitigation

25   witnesses to talk about family history.  It's very different

from talking about contentious historical facts about the
Rwandan genocide.  That aside, the risk and the potential of
witnesses being afraid and sort of not wanting to come is very
real and is palpable.

At the beginning of this case, shortly after the
marathon bombings, the FBI went over to Russia, and with the
help of a Federal Security Service in Russia -- this is the
successor agency to the KGB -- people were summoned to
essentially meet at the FSS -- or KGB -- headquarters to do an
interview.  Over the course of the last 18 months we have made
trip after trip, spent hours and hours with these people
helping to put them at ease, trying to convince them that it's
safe for them to come to the United States, they're unlikely to
be harassed further.  And to suggest that it would not be
intimidating for these same people to get summoned by the
Federal Security Service again just before they're about to
come here to testify, it's fundamentally unhistorical and
preposterous.

So at a minimum, again, I think even if the defense
has to give over the names at some point sooner than -- shortly
before the beginning of the penalty phase, there ought to be a
protective order to prevent the government from communicating
the information about their identity or seeking to do anything
with regard to interviews abroad.

It's not my purpose here to sort of impugn the

1    government or legal system of Russia, but, you know, these are

2    sensitive matters, and for that reason we filed these motions

3    under seal and we would request that they stay under seal

4    because I suspect I, and certainly other members of the defense

5    team are going to continue to have to travel to these places

6    during the course of the trial, and certainly all this

7    discussion being public would not be helpful in that regard.

8         THE COURT:  But isn't it the case that some

9    authorities in Russia are necessarily aware of the witnesses

01:25 10   because of visa applications and other exit visas and so on?

11        MR. FICK:  There's no requirement for an exit visa

12   from Russia anymore for the last couple of decades.  People

13   apply for a foreign travel passport, which is a standard thing,

14   through a local administrative office.  And then the travel

15   documents that are necessary are travel documents -- are U.S.

16   travel documents, either a visa from the United States Embassy

17   or a parole letter from Immigration and Customs Enforcement.

18        You know, while this case has certain political

19   sensitivity in Russia, particularly when attention is drawn to

01:25 20   it either by the presence of law enforcement or the defense in

21   various places -- on the other hand, simply the travel of

22   people in and out of the country is not something that's

23   necessarily going to attract that level of attention.  There's

24   no reason to think that a request by the FBI to interview

25   somebody is going to be treated the same as someone who is

1    simply getting a passport or getting a travel document to come

2    to the United States.  There may be an inference about why the

3    person is coming or something, but the sort of pointed request

4    of U.S. law enforcement to go talk to those people, there's no

5    reason to think that something like that should happen and they

6    would be intimidated.  It's really a very different kind of

7    thing.

8            MR. CHAKRAVARTY:  Your Honor, there's one point I

9    didn't raise -- well, I didn't respond to, which is the issue

01:26 10   of the parole.  The government's, obviously, argument was about

11   the fact we need to know the witnesses, but we also lay out in

12   our opposition that some of these witnesses may need government

13   permission to come in outside of the, you know, green card,

14   citizenship or visa process.  Those processes are incumbent

15   upon themselves -- on the witnesses, or with the assistance of

16   the defense team to go through the regular procedures in order

17   to obtain those.  But some of these witnesses may not be

18   eligible, and we explained, as occurred in the Rwanda cases,

19   and the Defender's office knows, that the process to apply for

01:27 20   administrative parole is a very different process and requires

21   a lot more lead time.  And there is -- because administrative

22   parole is permission for a very limited, narrow purpose in

23   order to come to the United States, there are often -- or there

24   is a security plan that has to be proposed in place at the time

25   that one of these people comes in.

1          In some cases that security plan could mean

2     incarceration, as occurred in some of the -- in the instance of

3     some of the Rwandans, in some cases that could mean an

4     electronic bracelet, and others it could mean there has to be

5     24-hour surveillance or some other kind of a very

6     resource-intensive security procedures which the investigative

7     agency responsible for the case has to do.

8          In this case the FBI is that investigative agency.  So

9     procedurally, and I don't know how many, if any, of the

01:28 10    witnesses -- proposed witnesses would have to go through that

11    procedure, but their names, some information about their

12    background, both for vetting for security clearance purposes

13    but more importantly for -- to ensure that there is an adequate

14    security plan.  I mean, if these are known terrorists from

15    Russia -- I'm not proposing that they are, but if they were --

16    the security plan would be a much different one, much more

17    restrictive, than there would be if they were permitted to come

18    at all, it would be very different if it's a family member who

19    doesn't pose that kind of a physical risk.

01:28 20         But in addition to the physical risk assessment and

21    requirements, then there are also waivers and other procedures

22    that have to be in place so that these people won't come to the

23    United States and claim asylum or some other relief from

24    persecution, for example, or other events.

25         All of that takes a lot of time and requires more than

1    just the investigative agency, the FBI.  They, once they have

2    an adequate security plan, then have to petition to the

3    Department of Homeland Security, which hopefully on Friday will

4    still be operating, so then Homeland Security has to both

5    approve that plan and then issue the appropriate paperwork.

6    That paperwork then goes over.  And that's notwithstanding

7    whether there's any watch list or anything else that might be

8    preventing them from travel.  So that's an elaborate process.

9              I explain that all for your Honor's benefit but also

01:29 10   to make the record that the government has made known to the

11   defense that they need to provide that information to the

12   FBI -- and we gave them the names and numbers of the FBI

13   personnel who happened to be the supervisors of the case -- and

14   we haven't received any information.  And the inability for

15   those people to travel is not the responsibility of the

16   government if the defense has, in the interest of protecting

17   the secrecy of their witnesses, has chosen strategically not to

18   provide that information.  If they plan to do it now, then they

19   have to recognize that the FBI will do what they can to try to

01:30 20   process that paperwork, and we will as well.  And we'll crack

21   the whip as much as we can.  But given the passage of time, and

22   I don't know when these witnesses would be expected to testify,

23   but it could very well be that they may not be here on time.

24   And that burden cannot fall on the government when we've made

25   it clear to the defense as to what the process is and they just

1    simply haven't availed it.

2         I just finally conclude just as a caveat that I don't

3    know how many, if any, of the proposed witnesses will fall into

4    this category, but to the extent that any do, those are the

5    witnesses who both have to file -- they have to provide

6    information for -- to the government, and those are the

7    witnesses who, in the New Hampshire case, were walled off from

8    a so-called taint ICE agent.  That could not be the process

9    here because there are two different investigative agencies

01:30 10  involved, and each of them would have to have their own filter

11   procedures.  But for the reasons I said earlier, at this point

12   there's no more need for that wall.  We need to know who they

13   are.

14        MR. FICK:  Very quickly, I think Mr. Chakravarty

15   conflated a couple of different issues here.  Bottom line:

16   Immigration and Customs Enforcement controls the border.  Any

17   issues that Mr. Chakravarty has talked about are precisely the

18   kind of thing that a fire-walled ICE agent could handle in the

19   first instance, and then bring to the attention of the

01:31 20  investigative agency or the Court if necessary.

21        While there certainly is the possibility that the FBI

22   could be the requesting party to immigration, to bring somebody

23   into the country, that is certainly not the exclusive

24   mechanism.  As Ms. Conrad utilized in the Almohandis Saudi

25   firecracker case, for lack of a better description, the Court

1    also has the ability to request public interest parole to

2    immigration directly.  The bottom line is whatever issues may

3    arise to be vetted by a fire-walled agent in the first instance

4    will protect all parties' rights and make the process more

5    efficient.

6              THE COURT:  I'll reserve it.

7         I think that's my list.  Anybody else have anything?

8              MR. MELLIN:  Your Honor, one issue that came up today,

9    we had brought up a few of the victim witnesses to consider the

01:32 10   layout of the courtroom, and there are really two issues that

11   came up.  The first is that a few of the victims are very

12   concerned by the presence of the defendant so close to them and

13   the proximity of the defendant to them while they're

14   testifying.

15        As the Court knows, as we look at the court right now,

16   the witness stand is probably five to eight to maybe ten feet

17   from where the defendant will be sitting.  When the witnesses

18   walk in, they will be probably four to five feet from the

19   defendant.  They were very concerned about their safety, their

01:32 20   security, and also, the fact that they are understandably very

21   sensitive to the fact that the defendant will be right next to

22   them while they're testifying.

23        So I don't know if there's something that can be done

24   to try to either relocate the defendant or relocate those

25   witnesses so that they are able to give their testimony without

1   the defendant being literally just beyond their arms' reach.

2           THE COURT:  Well, I don't think so, is the short

3   answer.  There's a lot of different competing considerations to

4   how we set up, and I think it -- I understand what you're

5   saying.  I just don't think there's any -- I'll give it some

6   thought, I guess, but my initial reaction is it's unavoidable.

7   He's going to be present in the room someplace with them.  I

8   don't know that the number of feet is itself a determinant,

9   but...

01:33 10          MR. MELLIN:  Your Honor, I appreciate that he has to

11  be present, it's just that in this layout, he is incredibly

12  close, and that's just something that -- you know, I don't know

13  if you could move the defendant and have him sit where

14  Mr. Bruck is sitting.  I'm not sure if the marshals would be

15  okay with that.  But we would suggest that there be some change

16  in the way in which this courtroom is currently set up for

17  these witnesses.  Because I can tell you, they were very much

18  intimidated by -- and fearful of walking into this courtroom

19  with that defendant being so close to them.

01:34 20          The other issue is one of the witnesses is in a

21  wheelchair, and I'm not sure how the Court wishes to address

22  that.  I'll raise that and just leave it to the Court to decide

23  that.

24          THE COURT:  Well, we've had that before.  We can make

25  an accommodation for that including, perhaps, maybe an entry

1    from another doorway so it's a smoother passage through, for

2    example.  I know I've had a juror who was in a wheelchair and

3    we accommodated that.  I don't remember the -- we've had -- I

4    think they just sit in front of the witness box.

5              MR. MELLIN:  And that, again, put them that much

6    closer --

7              THE COURT:  In the past we've been able to do a ramp

8    up to the -- I think to the box itself.  I know we did that in

9    the jury box.  We ramped up so the person could sit in with the

01:34 10   others.  I'm not sure how much would be involved in trying to

11   do that here but --

12             MR. MELLIN:  Again, your Honor --

13             THE COURT:  -- as the time approaches we could --

14             MR. MELLIN:  -- the problem with having the wheelchair

15   in front of the witness box is that once again the witness is

16   now even closer --

17             THE COURT:  Actually, it could even be farther away.

18   It could be at the corner of the box.

19             MR. MELLIN:  And then the other concern we have, your

01:35 20   Honor, the witnesses, while they're waiting in the witness

21   room, as I understand it will be all the way around and down

22   the hall.  So there may be a point in time where it's going to

23   take a few minutes for a few of these witnesses to actually

24   make it from the witness room into the courtroom.

25             I'm not sure if there's something we can do to

1    accommodate that.

2          THE COURT:  We can think about that.

3          MS. CONRAD:  Your Honor, there was one matter the

4    Court did not address.  It was, I think, contained in our

5    status report.  It was an evidentiary issue.  One of the first

6    20 witnesses was an officer -- or is expected to be, unless

7    there's been a change, Officer Lauren Woods, who

8    attempted -- who was, I think, in the ambulance with Lingzi Lu,

9    one of the deceased victims in this case.

01:36 10          And based on the discovery that we've received,

11   Officer Woods valiantly tried to resuscitate and save Lingzi Lu

12   as what appears to be after the point at which she was dead.

13   And she describes her throwing up, which seems like it was

14   probably an involuntary response after she was already dead.

15          I don't know how much the government intends to go

16   into this.  Obviously, the fact that she was present with her

17   and the fact that she's going to testify is one thing, but the

18   question of how much detail she's going to go into starts to

19   sound like really just 403 in terms of its potential impact on

01:36 20   the jury and not being really probative with respect to any

21   issues in this case.  I mean, there's no question that she's

22   deceased.

23          THE COURT:  Let me just -- this is slightly different

24   from my looking at autopsy pictures or video and so on and so

25   forth because I can't -- I don't know what her testimony will

1    be in its fullness.  So I guess that will be the question.

2         MS. PELLEGRINI:  First, she wasn't in the ambulance.

3    The officer responded to the scene at the Forum on Boylston

4    Street, and being a police officer, she has some emergency

5    response training -- received medical training, and she did

6    assist with trying to do chest compressions and intubate

7    Lingzi Lu.

8         Ms. Conrad -- as I understand it, the information is

9    that the vomiting which Officer Woods cleared from her is not

01:37 10    an involuntary action.  And in any event, her testimony would

11   be that she was making eye contact with Lingzi Lu, who followed

12   her facial movements and who followed her eyes.  So she was not

13   dead at that time.

14        It's the government's responsibility again to prove

15   that these victims were killed by a bomb set by the defendant,

16   and we believe strongly that this evidence goes exactly to

17   that, that the evidence prior to Officer Woods getting upon the

18   scene was that Lingzi Lu was walking down the street herself,

19   the bomb went off, and Officer Woods responded to the scene.

01:38 20   There she was, on there, still alive.  There was also another

21   witness whose testimony, at least the 302 has been provided to

22   the defense, that she had a pulse, it was thready but it was

23   still there, and that the chest compressions were continuing

24   while she was alive.  Whether or not they continued after she

25   had expired is, frankly, of no consequence with respect to the

           1   immediacy of Officer Woods' response to Lingzi Lu at that

           2   scene.

           3            THE COURT:  Well, in terms of judging whether the

           4   testimony is too much or not, is there some summary that I

           5   could look at, whether it's a 302 or other report like that,

           6   that would give me some idea of what her testimony would be?

           7            MS. PELLEGRINI:  Yes, your Honor.  I have Officer

           8   Woods BPD called an F26.  And I can hand it up to the Court.

           9            THE COURT:  And that gives us an idea of what her oral

01:39     10   testimony would be?

          11            MS. PELLEGRINI:  Yes.  And I just want to be sure I

          12   have pulled the various -- yes.

          13            THE COURT:  Okay.

          14            MR. WATKINS:  Could we put a Bates number of that

          15   document in just so we're clear?

          16            MS. PELLEGRINI:  I don't remember it off the top of my

          17   head.

          18            MR. WATKINS:  Perhaps the date of it, maybe?

          19            THE COURT:  Well, it's a two-page memo from Officer

01:39     20   Woods to Captain Ivens, I-V-E-N-S, dated 4/23/2013.

          21            MR. WATKINS:  Thank you, your Honor.

          22            THE COURT:  It doesn't have Bates numbers on it.

          23            MS. CONRAD:  Your Honor, just on that issue,

          24   perhaps -- I mean, I realize it's difficult for the Court to

          25   determine the exact parameters of the testimony.  What we're

1    concerned about, obviously, is the extent to which this becomes

2    inflammatory.

3         I mean, the testimony, the evidence is going to be

4    very graphic and very disturbing, and we get that.  And we get

5    that some of it comes with the territory.  The question is:

6    Where do you draw the line?  And this might be an instance in

7    which a very brief voir dire out of the presence of the jury

8    would help the Court to tailor it without us having to object

9    during the course of what I'm sure will be emotional testimony.

01:40 10         THE COURT:  All right.  Okay.

11         MR. WEINREB:  Your Honor, I have one very minor

12   request, and that is assuming I can get my hands on one, just

13   for purposes of the opening statements, I can substitute a

14   different podium from this one?  I'm having trouble with my

15   back that makes it painful to stand for long periods of time

16   unless I can elevate one of my legs, and the other kind of

17   podium, the one that's sort of more solid, has a shelf on the

18   bottom and it makes it perfect to sort of -- so we would bring

19   it in, we would take it out afterwards.

01:41 20         MS. CLARKE:  No objection.

21         THE COURT:  That sounds fine as long as both sides get

22   to use it.

23         (Laughter.)

24         MR. WEINREB:  By all means.

25         MS. CLARKE:  As long as both sides don't have to share

1    the backache.

2              May I just have one moment?

3              (Counsel confer off the record.)

4         MS. CLARKE:  Your Honor, there is an evidentiary issue

5    but apparently not before opening statement, and that is a

6    timeline that the government intends to introduce.  There have

7    been discussions between Mr. Watkins and Ms. Pellegrini that

8    have apparently not proven as fruitful as we'd hoped.

9              THE COURT:  Is this a chalk?

01:42 10         MS. CONRAD:  That's one of the issues.

11         MS. CLARKE:  I think that's one of the questions.

12         MR. WEINREB:  Well, the government intends to offer it

13    as evidence.  Basically we call it a timeline, but unless I'm

14    mistaken, what it is is a -- it's a series of excerpts from

15    surveillance videos on Boylston Street that have been arranged

16    so that they track the progress of the defendant and his

17    brother as they walk down Boylston Street to the points where

18    they put the bombs.  So it's essentially a -- I mean, we could

19    put in each of the surveillance videos and then just cue them

01:43 20    up from the points we wanted to publish them to the jury and

21    play them one after another, and this just essentially makes it

22    easier by putting them together.

23              Now, there are, in addition, the little segments of

24    video that we're going to play are separated by, you know, like

25    a graphic that says what the place is, like the Forum

 1    restaurant, but there's nothing more than that.

 2         So it would be an exhibit just like any other

 3    surveillance video would come into evidence as an exhibit.  And

 4    frankly, I don't even know what the objection could be.  I

 5    mean, they could all be played individually one after another,

 6    so having a single exhibit that combines them all just

 7    streamlines the process of presenting it to the jury and makes

 8    it more probative, frankly, because it's easier to follow

 9    what's going on.

01:43 10        THE COURT:  So is the only fight over whether it goes

11    into the jury room at the end of the case?

12         MR. WATKINS:  If I may, Mr. Weinreb is talking about a

13    different issue and a different problem.  There is a

14    compilation video that has a different kind of problem to it in

15    addition to whether it's a chalk or an exhibit.  There are also

16    these interactive -- what are called interactive Adobe flash

17    exhibits.  There are actually two of them.  One of them has all

18    kinds of different evidence encapsulated within it.  And that's

19    where the real question is going to be.

01:44 20        We're all going to get confused if we try to argue it

21    here without actually seeing them in front of us.  If the Court

22    wanted to address this tomorrow, again, given that -- the

23    present work, it didn't seem like it was going to come in

24    during the first couple of days of trial or in opening.  We

25    could try to do it tomorrow, if there's a rush to do that, as

1   long as perhaps if we had Friday available, for example, to

2   hash this out.  That might be better-served time.

3         I understand them to have said that it's not coming in

4   at the opening.

5         THE COURT:  If that's the case, then we could try to

6   find a --

7         MR. WEINREB:  So, your Honor, neither one of them -- I

8   mean, they're exhibits.  They're not going to be implicated by

9   the opening statements, which is just talk.  But --

01:45 10         THE COURT:  Well, that's a good question, by the way

11   whether either of you are going to use anything other than talk

12   in your opening statements.

13         MR. WEINREB:  Yes.  So I've already previewed for the

14   defense, the only things we intend to show the jury during

15   opening statement, with the Court's permission, would be

16   pictures of the four decedents in the case taken before they

17   were injured, just the faces of them, so that the jury sees who

18   the individuals are.  And we also plan to -- I plan to read to

19   the jury a portion of the note that he left in the boat.  And

01:46 20   there will be a typed version of what I read just so the jury

21   can follow along.  It won't be the actual note itself.

22         So -- by the way, though, although those exhibits

23   won't be implicated by the opening, they will come in pretty

24   quickly after we get going.

25         THE COURT:  This week?

 1          MR. WEINREB:  Possibly.

 2          MS. PELLEGRINI:  I'm sorry.  Excuse me.

 3          (Counsel confer off the record.)

 4          MR. WEINREB:  Perhaps not till Monday, but soon.

 5     Within the first --

 6          THE COURT:  If it's not till Monday, we could probably

 7     find some time on Friday to do it.  I think there may be more

 8     pressing things tomorrow.

 9          MR. WEINREB:  Not until Monday, your Honor.

01:46 10          THE COURT:  Okay.  All right.  Thank you very much.

11     Thank you.

12          THE CLERK:  All rise for the Court.

13          (The Court exits the courtroom at 4:17 p.m.)

14          THE CLERK:  The Court will be in recess.

15          (The proceedings adjourned at 4:17 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12

13   Date:  9/8/15

14

15

16

17

18

19

20

21

22

23

24

25