UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )        Criminal Action
v.                             )        No. 13-10200-GAO
                               )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                               )
        Defendant.             )
                               )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**LOBBY CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 9, 2015
8:50 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Federal Public Defender
10         51 Sleeper Street
           Fifth Floor
11         Boston, Massachusetts  02210
           - and -
12         CLARKE & RICE, APC
           By: Judy Clarke, Esq.
13         1010 Second Avenue
           Suite 1800
14         San Diego, California  92101
           - and -
15         LAW OFFICE OF DAVID I. BRUCK
           By: David I. Bruck, Esq.
16         220 Sydney Lewis Hall
           Lexington, Virginia  24450
17         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.

3              I just wanted to get a sense of where we're going and

4    what the week holds and so on.  Did you have a lineup?

5              MR. WEINREB:  So we're going to begin this morning

6    with the last of the victim witnesses who will testify about

7    what happened at Scene B, the Forum.  Then we're going to --

8              THE COURT:  How many?

9              MR. WEINREB:  There are four all together.

10             And then we are going to move into the identification

11   of the brothers as suspects.  Also, his -- placing him at the

12   scene immediately afterwards and where he was in the day or two

13   following.  Then --

14             THE COURT:  Is that by video evidence?

15             MR. WEINREB:  That's by video evidence, swipe card at

16   UMass Dartmouth, video at the Whole Foods, and at the UMass

17   fitness center swipe card data.

18             Then we are going to go into -- oh, and some Twitter

19   tweets.

20             Then we're going to go into the collection of evidence

21   at Boylston Street, and after that the press conference at

22   which the identification of the suspects was made public, and

23   from there into --

24             THE COURT:  That's going to be narrowed?

25             MR. WEINREB:  Yes.

1          THE COURT:  Have you shared the narrowing?

2          MR. BRUCK:  Yes.  And we've told them we're fine with

3     one of the two stills, and I think the other still has a little

4     bit of the same problems, but it's a big improvement over

5     the -- so we object to one; we don't object to other.

6          THE COURT:  So there will be no video; there will just

7     be a couple of stills.  Is that it?

8          MR. BRUCK:  That's what Al indicates.

9          MR. WEINREB:  They know more than we do.

10          THE COURT:  All right.  Division of labor.

11          MR. BRUCK:  Let me handle this.

12          MR. WEINREB:  And then we'll begin with the

13     presentation of the evidence of the murder of Sean Collier

14     followed by the carjacking of Dun Meng, and basically a

15     chronological account.

16          THE COURT:  Okay.  This proceeded a little

17     unexpectedly quickly.  I mean, does that affect our overall

18     assessment of when we might get to a second phase?

19          MR. WEINREB:  I think so.  I mean, it's a little hard

20     to know whether it's going to continue at this pace.  In some

21     respects that's up to defense counsel.  But one thing we were

22     going to propose is that we had made our pitch early on that we

23     not necessarily go full days every day.  The Court had said you

24     would readjust as time went on.

25          We -- it might be helpful, I think to both sides, if

1   we had a little extra time to be prepping witnesses, to be

2   sharing exhibits with the defense that they want to see and so

3   on.  So, for example, what we'd very much like to do is, if

4   it's conceivable, we would reach the Sean Collier piece of the

5   presentation by tomorrow afternoon --

6           THE COURT:  Really?

7           MR. WEINREB:  -- which would be lightning fast.

8           Again, I don't know.  It depends a lot on the

9   cross-examination.

10          THE COURT:  Or non-cross-examination.

11          MR. WEINREB:  -- or non-cross-examination.

12          If there isn't any, then we definitely would like to

13  delay until Wednesday morning.  And I'm sure the defense will

14  agree because they'll want to take a look at the exhibits -- I

15  don't want to speak for you.

16          MS. CLARKE:  It is a little bit of a chaotic system

17  right now, due to the pace, of figuring out which exhibits

18  connect to which witnesses and do we have the exhibits and that

19  kind of thing.  And prosecution counsel has been pretty good

20  about trying to keep up.  I mean, I imagine we'll hit the same

21  problem in the penalty phase for us.

22          THE COURT:  Okay.  Well, yeah, I don't want to make

23  any change wholesale, you know, on a -- on a particular day it

24  makes sense to postpone something till the next day, we could

25  take that as it comes.  I would like to still keep -- try to be

1   efficient.  You know, we have a lot of people we're

2   inconveniencing next door, and I would like to have that

3   limited.

4          MR. WEINREB:  I would say that the pace does, from our

5   perspective, make certain -- the pending motions in limine a

6   little more pressing, particularly the boat, from our

7   perspective.

8          THE COURT:  Yeah.  So about the boat, I want to -- I

9   think the best way for me to assess it is to look at it.  Now,

10  I don't know whether -- what you want.  I'd expect that at

11  least one person from each side would be there but I don't know

12  that everybody has to be there.  And so one possibility might

13  be if we had a shorter day, say, Tuesday or Wednesday,

14  whatever.

15         Where is it?  Is it at the Black Falcon.

16         MR. WEINREB:  No; it's in Wilmington.

17         THE COURT:  In Wilmington?  Okay.  Whether if I could

18  take an hour and go out there or something like that.

19         MR. BRUCK:  Couldn't the boat rather easily be brought

20  to the courthouse and -- I mean, that's what --

21         THE COURT:  Well, part of it is to see where it is

22  because that's part of the assessment of a view possibility as

23  well, is that people would go there to see it.  If the jury

24  were to take a full view of it, I think it would be more

25  convenient to do it there than here.  We have transport for the

1    jury anyway as a regular matter, so that's not a difficult

2    problem.  But particularly given the construction, the snow and

3    everything else around here, to bring it someplace outside -- I

4    have rarely, but I have done a view on Courthouse Way of a

5    piece of industrial equipment once.  They just brought it in on

6    a flatbed and everyone went outside but the weather conditions

7    were better at that time.

8            Anyway, so that's possible.  I assume it's accessible

9    whenever you want?

10           MR. WEINREB:  I assume so too.  I'll check with the

11   FBI.  It's at their facility.

12           MS. CLARKE:  It's in a large warehouse with a lot of

13   other pieces of evidence stored there, so I don't know if that

14   would be too convenient.

15           THE COURT:  Okay.  Anyway, that's one of the things I

16   want to assess.  If it's impractical to have a jury go there,

17   then that's one of the things I would like to look at.

18           So I had been thinking about doing that, perhaps on

19   Friday, but if, you know, there's a reason for doing it before

20   then because there's a pause in afternoon evidence or something

21   like that, maybe we could just put it together quickly.

22           MR. WEINREB:  I'll talk to the FBI as soon as we get

23   out of here.

24           The other motion, from the government's standpoint,

25   that is essential for us is the 12.2 issue.

1          THE COURT:  Right.

2          MR. BRUCK:  We have a couple of quick matters to raise

3    this morning.  One is to reiterate our concern about what could

4    be described as victim impact evidence regarding survivors; not

5    homicide victims but survivors.  And the first witness,

6    Ms. Kensky, today has the most gripping, dramatic and terrible

7    story of the whole almost two years since the bombing.  She

8    just recently had, I think, her second leg amputated.

9          MS. PELLEGRINI:  That's correct.

10         MR. BRUCK:  And, I mean, her 302 is replete with

11   evidence that the Court should consider but not in this trial.

12   Not now.  We're not at penalty.  And so we just want to renew

13   that motion that the government limit her testimony to her

14   injury and immediate sequelae and not the entire story that

15   followed.

16         MS. CLARKE:  There's also Dr. Bath who's coming on,

17   and his 302 has a lot of that.  Now, if the government is just

18   simply going to put in his observations -- he happened to be a

19   doctor nearby watching the marathon and then went to assist

20   with Martin Richard and then Lingzi Lu, and then he assisted

21   with I think --

22         MS. PELLEGRINI:  Adrianne Haslet-Davis.

23         MS. CLARKE:  -- Adrianne Haslet.

24         So his fact observations are one thing, but there's a

25   lot of impact on him that's in his 302, and that's what we seek

1   to limit.  And there also is Matthew Patterson, I think, who

2   may also have some -- he was a firefighter on the scene, raced

3   over and picked up Jane Richard and took her off the scene and

4   then came back and I think helped with another couple of

5   people.  And he may as well, other than just his factual

6   observations, have some impact on testimony and --

7           MR. BRUCK:  And some military background.

8           MS. CLARKE:  And also some military background.

9           MS. PELLEGRINI:  Let me address those one at a time.

10  So with Jessica Kensky, Steve Mellin is doing the direct, so

11  he's not here to speak for himself at the moment, but I know

12  that he would say with respect to the amputation of her second

13  leg, that is just simply a continuation of the grievous

14  injuries that she suffered as a result of the blast and that

15  the jury should hear about that.  Because Jessica could only

16  say that, in fact, immediately in the aftermath she lost one

17  leg, and then two years later, due to the injuries and the

18  nature of the injuries, she was forced to have the second leg

19  amputated.

20          THE COURT:  So that raises a broader question that

21  I've been thinking about in terms of what your plan is with

22  respect to a second phase.  Are you going to have the same

23  witnesses come back and amplify what they've said or are you

24  simply going to refer back to what they've said here?

25          MS. PELLEGRINI:  In a couple of cases people will

1    repeat.  So, for example, Bill Richard I would expect will be

2    testifying in the penalty phase as well, but we're also going

3    to ask that his wife Denise be permitted to testify in regard

4    to victim impact.  So some of the folks are the same but there

5    are others who have not yet been called.

6             MR. WEINREB:  I think it's fair to say largely they're

7    different.  There will be a few overlap, but the penalty-phase

8    victim-impact testimony is much broader.  It's, you know,

9    emotional sequelae, economic impact, social impact, the effect

10   on your marriage, the effect on your ability to earn a living,

11   upon your ability to enjoy life day by day given the loss you

12   suffered from the death of someone in the family and that sort

13   of thing.

14            MS. CLARKE:  I think we're in agreement that the

15   victim-impact testimony in the penalty phase is limited to the

16   homicide victims, not the non-homicide victims.  I think the

17   law is pretty clear on that.

18            THE COURT:  I didn't think so, actually, when I looked

19   at it.  Maybe you could --

20            MS. PELLEGRINI:  There's also the grave --

21            THE COURT:  I think it depends on the crime.  That may

22   well be true in the crime of murder when there is a particular

23   victim, but the use of a weapon of mass destruction resulting

24   in death, I'm not sure it's clear that the person who escapes

25   death but is victimized by the use of the weapon of mass

 1    destruction is not a victim within the statute.

 2         MR. BRUCK:  Well, I think that's right.  The issue is

 3    that the jury does not sentence for the non-capital counts, so

 4    it's the whole question about who hears the evidence.  The

 5    judge hears that evidence, not the jury.

 6         THE COURT:  Well, anyway --

 7         MS. CLARKE:  We'd perhaps better focus on that.

 8         THE COURT:  Well, if the government's not going to

 9    press it, it's more an academic point than anything else.  But

10    let me come back to the --

11         MR. WEINREB:  I don't think we were saying that.

12         THE COURT:  Right.  I understood Mr. Mellin to say

13    something similar the other day.  So I think it is an academic

14    point but.

15         MR. WEINREB:  I'm sorry.  I meant to say the opposite.

16    We're not conceding the point.

17         THE COURT:  Oh, you're not?

18         MR. WEINREB:  No.

19         THE COURT:  Oh, I thought he did.

20         MR. WEINREB:  No.  I think what he conceded only was

21    that during this portion of the trial that he agreed that that

22    other kind of victim-impact testimony would not be permitted

23    but that testimony about the physical injuries suffered by the

24    victims is admissible, even if it's injuries that they did not

25    become manifest until after the bombing itself, because the

1    bombing caused it.  And we don't have to prove that this was

2    not just any old murder, which is not what they're charged

3    with, a weapon of mass destruction.

4              MS. PELLEGRINI:  With respect to --

5              THE COURT:  It still has to be focused on the question

6    of guilt of the offense, though.

7              MR. WEINREB:  Yes.

8              THE COURT:  And that's why I was asking about whether

9    some people would be back to amplify, because their testimony

10   could be more focused on the elements of the crimes charged.

11             MR. WEINREB:  As a practical matter, we only have two

12   more victims testifying, so.

13             MS. PELLEGRINI:  To speak to Dr. Bath, I was planning

14   to -- he made his observations, and to the extent that his

15   observations are detailed and graphic, I think the jury is

16   entitled to hear that.  He's not, I don't believe -- and I'm

17   not going to lead him to the point where we're talking about

18   the effect, necessarily, it had on him, just what he saw as an

19   observer to the scene.

20             With Matt Patterson --

21             MS. CLARKE:  If I could just interrupt very quickly,

22   some of the government witnesses have had a narrative that they

23   tell and they tell and tell and tell, and we would appreciate

24   it if government counsel would interrupt occasionally with a

25   question.  That might help avoid the problem that Nadine is

1    talking about.

2         THE COURT:  Yeah, that occurred to me a couple of

3    times last week, that perhaps the witness was going on a little

4    too long.  I mean, it is direct examination and you want the

5    witness to give his or her own testimony, basically, but just

6    to be sure they don't stray off into some area that they

7    shouldn't be getting into.

8         MR. WEINREB:  That's fine, your Honor.  But I don't

9    think we should move forward on the premise that the defense

10   need not object during the testimony if they have an objection

11   to the question.  I mean, it's not our job to anticipate their

12   objections.  And some things can't be decided in advance.  And

13   they may not want to object, but they decided to go to trial

14   and that's part of it.

15        MS. CLARKE:  And I think Nadine has done a pretty good

16   job of interrupting and asking the witness a question and

17   guiding the witness's testimony.  I just bring that up.

18        MS. PELLEGRINI:  With respect to Matt Patterson,

19   again, I don't think Matt's testimony is necessarily victim

20   impact as a firefighter and an EMT.  So he's had a lot of

21   experience.  So I can't imagine that we're going to even touch

22   upon the impact it had on him.  He's actually quite clinical in

23   that way; however, part of his background is that in the

24   military, where he received his basic military training,

25   including how to correctly apply a tourniquet, so I think that

     1   that is important because he's the one who applied the

     2   tourniquet to Jane Richard's leg.

     3          MS. CLARKE:  He also had EMT training outside the

     4   military --

     5          MS. PELLEGRINI:  Yeah, both.

     6          MS. CLARKE:  -- so that could also suffice as his

     7   training.

     8          THE COURT:  Well, if it's limited to training, but I

     9   don't want to get into, you know, he was in combat in Iraq --

    10          MS. PELLEGRINI:  Well, actually, he was in Uzbekistan.

    11          THE COURT:  -- or wherever.

    12          That may be worse.

    13          MS. PELLEGRINI:  But I don't actually believe he saw

    14   combat.  I think he was the military police.  But can I at

    15   least question -- and I can ask him ahead of time -- I'll

    16   remind him ahead of time that we're not getting into the nature

    17   of his service, just that he was in the service and received

    18   some medical training there.

    19          MS. CLARKE:  We would ask that it just simply be that

    20   he did receive medical training.

    21          THE COURT:  No, I think you can show just that.

    22          MS. PELLEGRINI:  Medical training in the --

    23          THE COURT:  No testimony about observing IEDs and

    24   things like that.

    25          MS. PELLEGRINI:  Okay.

1          MR. BRUCK:  One last request, and I'm sorry to prolong

2     this, but we would ask that when you caution the jury to avoid

3     publicity starting today and for the rest of the trial you

4     include any other criminal trial or case as well as this one,

5     and the reason has to do with the end of the Jody Arias case in

6     Arizona last week.  That is the second-most high-profile death

7     penalty case going on in the country, and it ended in a really

8     very disturbing fiasco in which the jury split 11 to 1 for

9     death.  That meant she gets life.

10          The holdout juror has been identified.  The sheriff in

11     Phoenix is having to afford her protection because she is felt

12     to be in danger.  The victim's family has held a press

13     conference to bemoan the fact that she did not go along with

14     the rest of the jury.

15          Whether any of our jurors have read about that we

16     don't know, but it is the most prejudicial type of publicity

17     one could imagine for a case of this type.  The horse is out of

18     the barn as far as that goes, but who knows what is going to

19     happen in the future.  And it just seems there's no reason why

20     jurors should be reading about other high-profile cases and

21     speculating about nonexistent connections between that one and

22     this one.  So we would just ask the Court extend the

23     instruction.

24          MR. WEINREB:  Well, I mean, I'm of two minds on this:

25     I have no objection in theory to the jurors not reading news

1    about it, but I don't want the record to reflect that if one of

2    them does come across some publicity about it, that they were

3    unable to shield themselves from, that then becomes a ground

4    for excusing jurors.  I don't think that's fair.  I mean, we

5    ask a lot of jurors, especially in a case like this.  They have

6    to be very alert to avoid publicity about this case.  The more

7    we keep expanding their responsibilities, the more likelihood

8    it is that there is going to be an accidental slip-up which can

9    create an issue.

10         So I think it's fine for the Court to say something

11   mild, you know, if possible, make your best efforts but we

12   understand -- something that makes it clear that we're not

13   going to be kicking people off the panel if they get exposed to

14   other case information.

15         THE COURT:  Okay.  I thought you were going to say

16   something else, actually.  I thought you were going to talk

17   about the other possible pending cases in this court that are

18   related, which I do think they should be -- without naming

19   them, they should be discouraged from looking at.

20         MR. WEINREB:  That's fine.  I think cases related to

21   the marathon bombing would be easy for them because it all

22   falls within the same ambit --

23         THE COURT:  They'll probably get reported that way.

24         MR. WEINREB:  Yeah.  Just glancing at it, they'll

25   probably assume it's part of the overall proceedings.  But now

1    once we start getting into:  Don't even allow yourself to be

2    exposed to any news about an unrelated case in Arizona, I think

3    that's asking too much of them.

4              MS. PELLEGRINI:  One more thing, your Honor.  So our

5    first witness today has a service dog.  So I was told that that

6    would be permitted.  Are you okay with that?

7              THE COURT:  And one is in a wheelchair?

8              MS. PELLEGRINI:  It's the same person.

9              THE COURT:  Same person?  We have a ramp, I'm told.

10   The ramp is in place?

11             THE CLERK:  Yes, the ramp is hooked up.

12             Just to let you know, they did have to move the one

13   screen that was next to the witness box that's been used for

14   the --

15             THE COURT:  Is it still operating?

16             THE CLERK:  No, I think it's cut, at least for this,

17   so --

18             THE COURT:  All right.

19             THE CLERK:  It's just because of the way the

20   electronics --

21             THE COURT:  Can they reset it up at the break?

22             THE CLERK:  What the thought was -- because they need

23   about a half-hour, maybe a little more, to put up the ramp.

24   They were thinking maybe at lunch.  Maybe this morning keep

25   everything as it is, then after the lunch break they'll be gone

1    and we'll go back to the normal setup.

2         THE COURT:  That reminds me.  We also met with the

3    staff on Friday to consider your concern about the camera.

4    They told us they rarely show the defense or the prosecution

5    tables, that when the witnesses are testifying, the camera is

6    almost exclusively on the witness.  They don't shift around.

7         So if somebody's at the podium examining, they don't

8    go back and forth between the examiner and the witness; they

9    just keep focused on the witness.  If there is a colloquy at

10   the tables, you know, that's extended, they'll cut to that, but

11   if it's just a one-word objection and a ruling, they don't

12   bother to go to counsel or me; they just keep it on the witness

13   so --

14        MS. CLARKE:  Well, what they showed us was the camera

15   focused on counsel table.  So that camera turns to witnesses?

16        THE COURT:  No, they don't -- they may -- that is in

17   position for the podium principally.  It's panned out to show

18   the courtroom generally, and I think they use it when the jury

19   comes in so that you don't see the jury coming in.  But the

20   camera that is most commonly used is the one in the corner by

21   the jury that shoots across the room to the witness stand.

22        MS. CLARKE:  So the one that's up to the Court's left

23   that looks focused on us --

24        THE COURT:  Right.  I'm told it's not used very much

25   at all.

1        MS. CLARKE:  Because we asked about it and they showed

2    us the photo.

3        THE COURT:  I mean, my recollection is they said they

4    will use that --

5        MS. CLARKE:  I'm not trying to impeach the Court.

6        THE COURT:  No.  They will use that as sort of a

7    general scene when the jury comes in and then -- as a matter of

8    fact, what they said was they've been getting complaints from

9    the press in the overflow courtrooms that they aren't showing

10   other participants, including the defendant.  So the press is

11   not happy that they're not showing the defendant.

12       MR. BRUCK:  I have a feeling what may be happening is

13   when nothing else is going on, which is precisely the moment

14   that we would be interacting with our client, that's when they

15   would --

16       MR. WEINREB:  Your Honor, just for the record, we

17   oppose this again, this idea that this should not be a public

18   proceeding in this respect.  I mean, the jurors are positioned

19   to see everything that's going on at the defense table and

20   they're the ones that really matter.  There's no reason why the

21   public should not be in a position to see what's happening in

22   the courtroom.  If they see something that people in the

23   courtroom fortuitously could not see because they're positioned

24   behind the defense table, then all the better to have cameras

25   that make it more of a public proceeding.  And the government

 1    is also chatting with one another and passing notes or looking

 2    at notebooks.  We're all in the same boat here.  And there's no

 3    zone of privacy at all in a courtroom.

 4          THE COURT:  Well, I don't want the -- whatever

 5    decisions of the IT staff to become an issue in the case.  They

 6    are -- so they're doing what they've done in other cases, I

 7    guess, and they're following that, and that is that they focus

 8    on the testimony given by the witness, essentially.  There are

 9    other scenes that are seen.  I'm sure that if, you know, during

10    the preliminaries, my instructions, I'm sure the camera was on

11    me rather than elsewhere.

12          So they're generally focusing on who's doing the

13    talking.  And in examination and witness, that's the witness,

14    not the examiner.  And they don't try to go back and forth, so

15    I'm told.  There may be general scenes other than that, but

16    it's not like the camera is staring at the defense table

17    throughout the proceedings.

18          MR. WEINREB:  Just so the record is complete on this

19    issue, the victims have a statutory right to witness the

20    proceedings and they can't all be in the room, and this is an

21    opportunity for them to witness everything that's going on in

22    the courtroom, not just a little slice of it.

23          There's one other thing that I would actually like to

24    raise in open court, if we could just have one moment before we

25    call in the jury, and that's the government was going to inform

1    the Court that the media has filed various motions for access

2    to exhibits and other things, and we intend to respond, and we

3    were going to ask that we be given until Friday, the end of the

4    week to do so.  And I think it would be useful to have that on

5    the record so everybody knows what's happening.

6              THE COURT:  Fine.  Thank you.

7              MS. PELLEGRINI:  Can we have a couple of minutes so I

8    could get ready?

9              THE COURT:  Yup.  Yup.

10             (The proceedings adjourned at 9:15 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12   Date:  9/25/15

13

14

15

16

17

18

19

20

21

22

23

24

25