```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )


          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE
```

**LOBBY CONFERENCE**

**SEALED TRANSCRIPT**

```
       John J. Moakley United States Courthouse
                   Courtroom No. 9
                  One Courthouse Way
             Boston, Massachusetts  02210
                Tuesday, March 10, 2015
                      9:15 a.m.



              Cheryl Dahlstrom, RMR, CRR
                 Official Court Reporter
             John J. Moakley U.S. Courthouse
             One Courthouse Way, Room 3510
              Boston, Massachusetts  02210
                     (617) 737-8728

       Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
               John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6             By:  Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
               By:  Miriam Conrad and William W. Fick
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13             By:  Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15             - and -
           LAW OFFICE OF DAVID I. BRUCK
16             By:  David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

```
 1    (LOBBY CONFERENCE AS FOLLOWS:
 2            THE COURT:  Whose turn?
 3            MR. WEINREB:  I'll start.  We just wanted to talk a
 4    bit about today's schedule.  As we mentioned yesterday, we're
 5    pretty confident that we will get through the next segment by
 6    the end of lunch, and that's the segment -- we'll finish up
 7    this part that we've been doing.
 8            THE COURT:  You mean before lunch, by 1:00?
 9            MR. WEINREB:  By 1:00, yes.  So the witness is on the
10    stand now.  There will be a couple other witnesses.  And then
11    we'll begin with the segment on the collection of evidence from
12    Boylston Street and the introduction of the exhibits that
13    display the evidence.
14            After that, we would begin with the presentation of
15    the Sean Collier evidence, and we'd prefer to start that
16    Wednesday morning, if that's possible, because those witnesses
17    were all told to come in Wednesday and Thursday, and they've
18    all adjusted their schedules accordingly.
19            THE COURT:  Any issue with that?
20            MS. CLARKE:  No.
21            THE COURT:  Other than with me?
22            MS. CLARKE:  No.
23            MR. WEINREB:  And then Tuesday afternoon -- this
24    afternoon, if the Court wishes, we can arrange for a viewing of
25    the boat.
```

1    THE COURT: Yeah, that sounds good. We'll get to that
2  -- at this pace, we'll get to that fairly soon, too.
3    MR. WEINREB: We will.
4    THE COURT: When do you think?
5    MR. WEINREB: We'll get to that?
6    THE COURT: Yeah. The beginning of next week?
7    MR. CHAKRAVARTY: Sometime next week.
8    THE COURT: Okay.
9    MR. WEINREB: Yeah, sometime next week. And then
10 we'll start -- we'll do the carjacking and those events
11 starting on Thursday, and then we'll move into Watertown. And
12 that concludes with the arrest of the defendant. So it will be
13 Monday, Tuesday, Wednesday of next week, something like that.
14    THE COURT: Just mentioning the cars, any viewing of
15 the cars?
16    MR. WEINREB: They're all there if the Court wants to
17 see them. We don't --
18    THE COURT: I mean, do you intend to offer a view?
19    MR. WEINREB: They were so well-photographed, it seems
20 unnecessary. Also, they're not in the same state now that they
21 were in. There has been too much manipulation of them, I
22 think, to make a view make sense.
23    With respect to the mechanics of the Court going to
24 see the boat, what's your preference?
25    THE COURT: I don't know. I just this morning was

          1    thinking about that.  I guess I would talk to the marshals and
          2    see what they can put together.  I don't know whether we -- I
          3    think they drive me anyway, and maybe others can come in their
          4    own cars.  That's probably the easiest thing to do.
          5         MR. WEINREB:  I think so.  So it's in a secure FBI
          6    facility.  There shouldn't be any security issues there.  As
          7    long as you have transportation --
          8         THE COURT:  I think they do that.  I haven't raised it
          9    with them, but I'll do that maybe at the midmorning break, see
00:02    10    if they can -- actually, we should probably do it beforehand.
         11    That would be with Kevin.  I'll have to talk to Kevin.
         12         THE CLERK:  Okay.  Very good.
         13         MR. CHAKRAVARTY:  One point on the boat is we have a
         14    witness who is going to describe the fact that there was a
         15    writing in the boat before we actually describe the more
         16    detailed -- what we want to do is cut out the note and present
         17    it.  But there will be that testimony today so -- just so it's
         18    not -- you're not caught unawares that that's coming.
         19         The other issue we wanted to raise was, the next
00:03    20    witness after Mr. Kimball is scheduled to be Chad Fitzgerald,
         21    who is the first expert witness.  And he is a cell-site
         22    location specialist.
         23         THE COURT:  Oh, yeah.
         24         MR. CHAKRAVARTY:  There was a motion to exclude such
         25    *Daubert* on that.  We've opposed it.  We think it can be

1   resolved on the papers.
2           MS. CLARKE:  We were given some materials last night
3   that run into the thousands of pages and have not had,
4   obviously, a chance to look at that.  So we would ask that the
5   government delay that witness until we have an opportunity to
6   at least look at what they provided us that may or may not be
7   relevant to his --
8           THE COURT:  I thought from the reply that that had
9   ceased to be an issue.
00:04 10        MS. CLARKE:  Yes, but they just gave us thousands of
11  pages of documents, and we have no idea what they are.  So if
12  we could get the government to delay that witness until we can
13  at least review those documents, that would probably be the
14  best way.
15          THE COURT:  What kinds of documents are they?
16          MS. CLARKE:  I have no idea.  We got them last night
17  by email.
18          MR. CHAKRAVARTY:  Three sets of phone records, which
19  we had produced before, that relate to the phones that were
00:04 20 located, the thousands of pages of documents which you haven't
21  had before, which are the phone companies' locations for the
22  cell towers.  So it's literally a list of every cell tower in
23  Massachusetts that was subscribed to by the phone company, and
24  it's that data which he had prepared his report with.  And we
25  realized that we didn't actually have that raw data.  He gave

1    me that, and we turned that over.

2               THE COURT:  Well, I think they should have a chance to

3    at least look through it.  We don't know how much it will be.

4               MS. CLARKE:  We don't know what added value it will

5    have, but we should look at it.

6               THE COURT:  So with respect to the other -- one of the

7    other Daubert motions, as long as we're talking about that, the

8    binding code fellow, is that an issue that we have to resolve?

9               MS. CLARKE:  We should get Mr. Watkins in to talk

10   about that.  That's been one of his areas.

11              THE COURT:  Do you know whether it's still a live

12   issue?

13              MS. CLARKE:  I would have to talk to him.  It just has

14   not been on the table.

15              THE COURT:  When would that fellow --

16              MR. CHAKRAVARTY:  Not until the end of the next week,

17   at the earliest, maybe the following --

18              THE COURT:  So we have time on that.

19              MR. WEINREB:  Actually, while we're on Daubert motions

20   -- and this one will come up early next week when we do the

21   Watertown presentation.  I want to make sure I understand the

22   Court's ruling about the DNA evidence.  And my understanding is

23   that the Court ruled -- excluded the evidence about the DNA on

24   the inside of the gloves on 403 grounds, that it lacked

25   sufficient --

1           THE COURT:  402, 403.  It wasn't shown to be
2   sufficiently relevant.
3           MR. WEINREB:  Right.  And that -- because of the
4   concern the Court stated, which is that there's no way of
5   knowing when the DNA got there --
6           THE COURT:  Right.
7           MR. WEINREB:  So I would assume that would apply
8   equally to the DNA of Tamerlan Tsarnaev on the inside of the
9   gloves.
10          THE COURT:  Yeah, I guess.
11          MR. WEINREB:  All right.  So, in other words, the
12  testimony --
13          THE COURT:  In other words -- yeah.  I don't know all
14  the details about this, but gloves -- unless there's some way
15  -- some external way to -- external to the DNA, to determine
16  when the DNA may have been deposited on the inside,
17  circumstantial evidence, for example -- I don't know whose
18  gloves they are.  If they're Collier's gloves, therefore, the
19  two brothers could only have had access to that night, then you
20  could time it.  But if they're their gloves or somebody else's
21  unknown gloves, then the DNA could have been deposited a week
22  before.  It would have no relevance to the Collier episode.  So
23  that -- I mean, if you can't tell when it may have been
24  deposited either by the DNA analysis or by circumstances that
25  could explain it, it seems to me there's not enough of a

1    connection.  That somebody had worn a glove that was found in
2    the person's car at some time just makes it too remote to
3    connect it to the Collier event.
4           MR. WEINREB:  So with that rationale in mind, unless
5    we hear some other evidence that we haven't heard yet, I assume
6    that that rationale would apply with equal force to the DNA --
7    all the DNA --
8           THE COURT:  I would think so.  And I would think also,
9    offering it, if that's what would happen, would invite the
10   response.
11          MR. FICK:  The issue though, your Honor, was really
12   not -- I mean, the time came into play, but the issue with the
13   glove that was in dispute -- or the DNA that was in dispute
14   really had more to do with the conclusion that you couldn't
15   exclude Tamerlan or Jahar and that, therefore, it really had no
16   probative value in terms of who might have worn the glove on
17   that night or at any other time.  It wasn't so much a temporal
18   issue as an issue that it just -- it didn't help you make a
19   distinction that was important in the case.
20          THE COURT:  That's sort of the Daubert argument, but I
21   avoided the Daubert argument by concluding that it wasn't
22   relevant anyway even if you could do that under Daubert.  So
23   you don't reach that matter.  The motion was not denied as a
24   Daubert matter, or allowed, whatever.  The exclusion wasn't
25   based on Daubert.  It was based on simple relevance.  In other

1   words, my view was we don't need to resolve the Daubert
2   question because the evidence isn't probative enough in the
3   first place.  So it doesn't show -- unless there's evidence
4   that either of them wore it that night or close to the events
5   to connect the DNA to the presence and participation of that
6   particular depositor, that's my --
7          MS. CLARKE:  Then Daubert becomes an issue if we open
8   the door with the Tamerlan DNA, which is clearly in one glove.
9          THE COURT:  I don't know.  I guess it would depend on
10  where your evidence was, but there's certainly that
11  possibility.  I reserve judgment until I hear the actual
12  problem.
13         MR. FICK:  I just -- the temporal thing really hadn't
14  been our focus.  And, I mean, to take it to its logical
15  extreme, of course, the fact that Officer Collier's blood is on
16  the glove, we don't know when that happened.  I mean, the
17  obvious inference is it was that evening.
18         THE COURT:  I think that's an easier question.
19         MR. FICK:  I guess we'll have to think about the
20  implications of that.
21         THE COURT:  Well --
22         MR. WEINREB:  So the government's position is clear,
23  if the defense is going to offer evidence of Tamerlan's DNA on
24  the inside of the glove as probative of the fact that Tamerlan
25  was the one who wore the gloves that night and used them in the

1  murder of Officer Collier, then we believe we should be allowed
2  to put in evidence that Jahar Tsarnaev's DNA is also on the
3  inside --
4      MS. CLARKE:  It is not on the inside of the glove.
5  That's the point.  He cannot be excluded as a contributor.
6      MR. WEINREB:  No, no.  We're talking about the other
7  glove, the one in which the cytogenetics analysis shows that
8  the chances of -- that Jahar's profile is on the glove and that
9  the chances of randomly selecting someone from the population
10 with that same profile is one in 40,000.
11     MR. MELLIN:  I think it is fair rebuttal to say that
12 he cannot be excluded in the other one.
13     MS. CLARKE:  I don't think we should get into this
14 debate right now since Mr. Watkins has been our lead on this.
15     THE COURT:  I think you understand my position.  We're
16 not resolving the Daubert question because of other relevance
17 concerns.  If that changes and we have to resolve it, then we
18 should have enough advance notice of that that we can do that.
19     MS. CLARKE:  Sure.
20     MR. MELLIN:  Your Honor, can I raise one other issue,
21 which is the 12.2 issue?
22     THE COURT:  Yes.
23     MR. MELLIN:  I don't mean to poke the elephant in the
24 room, but we do need some time to be allowed to have these
25 experts do their analysis.

```
 1              THE COURT:  Right.  Understood.
 2              MS. CLARKE:  Judge, Mr. Fick will be the one from our
 3   team going with you to see the boat just for coordination
 4   purposes.
 5              THE COURT:  Okay.  All right.
 6              MR. WEINREB:  We're going to draw straws.
 7              THE COURT:  The loser goes?
 8   (Laughter.)
 9              MS. CLARKE:  This was a winner.
10              MR. WEINREB:  We've seen the boat enough.
11              THE COURT:  All right.
12              MS. CLARKE:  Thank you.
13              THE COURT:  Do you need the monitor, the big, clunky
14   monitor?
15              MR. CHAKRAVARTY:  We got the message that we should be
16   moving it out.
17              THE COURT:  It's partly in my way.  I can't see all of
18   the team here.
19              MS. CLARKE:  I want you to keep your eyes on them,
20   too.
21   (Laughter.)
22   .  .  .  END OF LOBBY CONFERENCE.)
23
24
25
```

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Cheryl Dahlstrom             September 25, 2015
Cheryl Dahlstrom, RMR, CRR      Dated
Official Court Reporter