UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,        )
                              )
        Defendant.            )
                              )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY TWENTY-EIGHT**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, March 5, 2015
9:12 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad and William W. Fick,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                        I N D E X

2                              Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  FRANK CHIOLA

5       By Ms. Pellegrini          13

6  JEFFREY BAUMAN

7       By Mr. Mellin              24

8  RICHARD CLAFLIN

9       By Mr. Weinreb             45

10 JAMES MARINELLI

11      By Mr. Weinreb             54

12 ALAN HERN

13      By Mr. Mellin              71

14 LAUREN WOODS

15      By Mr. Chakravarty         98

16 ROSEANN SDOIA

17      By Mr. Mellin              116

18 THOMAS BARRETT

19      By Mr. Weinreb             136

20 WILLIAM RICHARD

21      By Ms. Pellegrini          155

22

23

24

25

1                          E X H I B I T S

2

   GOVERNMENT'S
3    EXHIBIT     DESCRIPTION              FOR ID       RECEIVED

4    23        Video from Forum surveillance system      67

5    29        Photograph                                 76

6    27        Photograph                                 81

7    28        Photograph                                 83

8    21-49 -
     21-52     Photographs                               110
9
     24        Photograph                                128
10
     25        Photograph                                130
11
     26        Photograph                                131
12
     2113
13   2125
     2126
14   2139
     634
15   30        Photographs                               150

16   37        Photograph of Richard family             160

17   21-2      Photograph of Richard family             167

18   34        Forum photograph                         169

19   32        Forum photograph                         172

20   36        Video clip                               178

21   39        Richard family post-blast                179

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 9:12 a.m.)

4          THE CLERK:  For a continuation of the Tsarnaev trial.

5     Be seated.

6          THE COURT:  Good morning.  There are, I think, a

7     couple of issues regarding potential exhibits that I wanted to

8     address before we brought the jury out.  I don't know if you've

9     talked about them.  Generally, I think the objections are

00:00 10     overruled.  I did think that the -- a number of the -- I guess

11     they're Forum still photographs, are cumulative, duplicative,

12     so I would suggest some subset of those.  That's 24, 25, 26,

13     27, 31, 32, 33, 34.  Some of them looked almost identical.

14          MS. PELLEGRINI:  Your Honor, actually, we have decided

15     to try to narrow that down a little bit and use fewer of those.

16     You said "Forum," but they're regular Boston street photos?

17     Photo stills?  I'm sorry.

18          THE COURT:  They're stills -- I'm looking at the email

19     that I guess everybody got a copy of.

00:01 20          MS. CONRAD:  The exhibits your Honor is referencing

21     are not Forum stills.

22          THE COURT:  Oh, they're not?

23          MS. CONRAD:  I have copies of them here if your Honor

24     wants to look at them.

25          THE COURT:  I've looked at them.

1          MS. CONRAD:  Okay.

2          THE COURT:  I read the email to indicate that they

3     were Forum, so -- they are Boylston Street photographs and they

4     seem cumulative, and I'm interested more in the

5     moving-things-along aspect than the prejudicial aspect,

6     frankly.

7          MS. PELLEGRINI:  We will not be using some of them

8     because they are very similar to one another, and we have

9     talked about that; however, with respect to the Forum stills,

00:01 10   which I believe is also in the email, that we feel is not

11    repetitive.  As the Court can see from yesterday, it's

12    difficult as they play a video, to stop the video at a specific

13    point.  We would be entitled to take a screen shot once we got

14    there and had it printed out for the record.  So we just have

15    done that ahead of time.

16         THE COURT:  Okay.  The only limitation I think is that

17    the number of similar photographs should be reduced, all right?

18    Okay.  Let's proceed.

19         MR. BRUCK:  We have two other matters, your Honor,

00:02 20   before the jury comes in.  If I could confer with Ms. Clarke

21    for just a moment?

22              (Counsel confer off the record.)

23         MR. BRUCK:  There's concerns on the question of what

24    we've described as victim impact evidence from

25    surviving -- survivors of the Boston Marathon bombing.  We have

1   today filed under seal, because it is in connection with a

2   sealed series of pleadings, a motion to renew a renewed motion.

3   And as the Court will recall, this issue was raised by a motion

4   we filed back in January, the government responded at the end

5   of February and represented that the sequelae of the -- of the

6   bombing injuries suffered by survivors would only be offered to

7   the extent they were necessary to show either what the

8   victim -- why the victim remembers particular parts of the

9   testimony or as it bears on the witness's ability to perceive

00:03 10   the events, which is a proper and very narrow justification.

11          However, during the extremely moving and poised and

12   articulate testimony of three of the survivors yesterday, we

13   realize that the government is not actually abiding by that

14   restriction, and so we have filed a motion to reassert the

15   reasonable and legal limitations that exist in a proceeding

16   like this.

17          We want to emphasize that the defense in absolutely no

18   way, shape or form wishes to limit the right of survivors of

19   the marathon bombing to have their day in court and to speak

00:04 20   fully about every aspect of the impact of these crimes on them

21   and on their lives and on their families, the only issue is at

22   which proceeding the law provides for this testimony to occur.

23          The law is well settled and the Federal Death Penalty

24   Act makes quite clear that non-homicide victim impact testimony

25   is not admissible at the penalty phase of a capital

1    sentencing -- of a capital trial, and it seems as though given

2    this restriction, the government is, in effect, attempting to

3    introduce that type of evidence at the guilt phase where it is

4    even less admissible, would not be admissible in any trial, let

5    alone a capital trial.

6          The evidence is being offered at the wrong proceeding.

7    And for that reason, and particularly in light of the testimony

8    that is scheduled for this morning, we have reasserted the

9    motion and we ask that the Court order the government to abide

00:05 10   by the very restrictions that it said it would be guided by

11   when it responded to our motion and caused us to withdraw the

12   motion because we thought there was no dispute.

13         MR. MELLIN:  Your Honor, in no way have we not abided

14   by that.  We are not asking about victim impact, we are not

15   asking one witness about how has this affected the future of

16   your life, how is this affecting whether or not you can get a

17   job, how has this affected others around you?  That is what

18   victim impact testimony is.  That is something that we will

19   elicit at the appropriate time.

00:06 20         It's ironic, I think, that Mr. Bruck just stood up and

21   said that he's not trying to limit these witnesses' ability to

22   talk about victim impact, yet then he turns around and says,

23   Well, actually, if they're not a decedent, then the government

24   is not allowed to talk about victim impact.  And that is, in

25   fact, the law.  The government is not talking about victim

1    impact.

2         We're asking these jurors -- or excuse me -- these

3    witnesses about their pre-blast activities to put them on the

4    scene, to explain how it is they were there, how they were able

5    to observe the things they observed, and then what happened

6    after the explosion and the extent of their injuries.

7    Specifically in the indictment we have alleged that individuals

8    were maimed or burned during these explosions.  That is what we

9    are eliciting, the extent of the injuries that occurred.

00:07 10         THE COURT:  All right.  I think the testimony

11    yesterday did not go out of bounds.

12         MR. BRUCK:  Well, if I could just, for the record, be

13    specific.  One example of where we think -- the reason for our

14    reasserting the motion was testimony concerning surgical

15    procedures that extended for nearly -- until a few weeks ago,

16    close to two years after the bombing.  We think that is an

17    example of where --

18         THE COURT:  All right.  I disagree.  I disagree with

19    that.

00:07 20         MS. CONRAD:  I have two matters, your Honor.  Just to

21    go back to the issue regarding the photographs.  I just want to

22    be clear because it was done by email that the exhibit numbers

23    that we are objecting to -- if I can find my email.  I just

24    want to put those on the record and inquire, first of all,

25    whether the government -- okay.  So those were Exhibits 24, 25,

```
 1   26, 27, 31, 32, 33, 34, 35, 20, 39, 40, 30 and 634.

 2          And so if the government now says it's going to limit

 3   those, if the government would be so kind to show us the

 4   exhibits before, or put them up on the screen but not for the

 5   jury before offering them -- yesterday they just asked, "Have

 6   you seen exhibits such and such and such"; and also, I would

 7   just ask if the -- our rights -- our objection is preserved

 8   with respect to those so we don't have to renew them in front

 9   of the jury.

10          THE COURT:  Yes to the last question.

11          MS. CONRAD:  Right.

12          THE COURT:  What I had in mind was the range -- it's

13   not every number between these -- but between 24 and 35.

14   That's what I was addressing.  I think those should be limited.

15   I'll leave it to the government to offer a subset of those.  I

16   don't think we have to go through them now.

17          As to the others, the objections's overruled.

18          MS. CONRAD:  And 20 is overruled?

19          THE COURT:  Yes.

20          MS. CONRAD:  Your Honor, the other matter is we had

21   raised with the Court before, the government wanted to have a

22   number of FBI agents who they described as case agents exempted

23   from the sequestration.  They've given us a list of four, one

24   of whom will not testify.  We have no objection to him being

25   present.  The other three we're told are likely not to testify,
```

```
 1   but I think that's a little less definitive than we feel
 2   comfortable with at this point.
 3              THE COURT:  Well, I think -- I don't know.  Normally a
 4   case agent who is present is also permitted to testify.
 5              MS. CONRAD:  A case agent.
 6              THE COURT:  Right.  And we said we could expand that
 7   by some number.  Four may be a little higher than I had in
 8   mind.
 9              MR. CHAKRAVARTY:  It's actually three, your Honor.
10              THE COURT:  Yeah, I thought we talked about three.
11              MR. CHAKRAVARTY:  It's been the same three.
12              THE COURT:  Yeah.  So I think that's within what we
13   discussed.
14              MS. CONRAD:  Can we be heard at sidebar, your Honor,
15   with regard to one, your Honor?
16              THE COURT:  If he's not going to testify this morning,
17   we'll do it some other time.
18              MS. CONRAD:  All right.  Thank you.
19              MR. BRUCK:  One last matter.
20              THE COURT:  Line up the jury while Mr. Bruck is making
21   his last point.
22              MR. BRUCK:  I'm sorry, your Honor?
23              THE COURT:  I'm asking the clerk to line up the jury
24   while you're making your point.
25              MR. BRUCK:  And that concerns the camera next to your
```

00:10 (line 10)

00:10 (line 20)

Honor that is trained, first of all, on defense counsel, also

slightly to a lesser extent on the government table.  It's

closer to us than it is to the government.  This is, of course,

for the overflow courtroom.

And we are asking that this camera be turned off.  It

is -- it affords a view to people in the overflow courtroom

that is not available to anyone sitting in this courtroom, and

it is trained directly on defense -- on the defense table.

Obviously, counsel and the defendant sitting at this table are

not in a private setting, but there is a tiny zone of privacy

in which we can confer with the client, interact with the

client, with our backs to the public and to the government, but

not to that camera.

If that was somehow part of the proceedings that

everyone was entitled to witness, then we would just have to

get used to being in a fishbowl, but it doesn't make any sense

to us to have a camera that gives unique access to the defense

table to the people in the overflow courtroom that is denied

everyone else in the courtroom.  And for that reason, we think

that that camera should be turned off and the people in the

overflow courtroom should see the same things that the people

who are here in the trial courtroom itself see.

THE COURT:  All right.  I take note of that and I'll

look into it.

MR. BRUCK:  Thank you.

1          THE COURT:  Ready?

2          THE CLERK:  All rise for the jury.

3          (The jury enters the courtroom at 9:24 a.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Good morning, jurors.

6          THE JURORS:  Good morning.

7          THE COURT:  I appreciate your patience.  The lawyers

8    and I had a few things we had to iron out before we getting

9    started.  We're ready to proceed.

00:13 10          Have you all followed my instructions to avoid any

11   contact with reporting about the case overnight and any

12   discussion with anyone?

13          THE JURORS:  Yes.

14          THE COURT:  Okay.  Thank you.

15          Next government witness.  Ms. Pellegrini?

16          MS. PELLEGRINI:  Yes, your Honor.  Officer Frank

17   Chiola.

18                    FRANK CHIOLA, duly sworn

19          THE CLERK:  State your name, spell your last name for

00:14 20   the record, speak into the mic so everybody can hear you.

21          THE WITNESS:  Police Officer Frank Chiola, last name

22   C-H-I-O-L-A.

23                      DIRECT EXAMINATION

24   BY MS. PELLEGRINI:

25   Q.   Good morning, Officer Chiola.

1    A.    Good morning.

2    Q.    Would you tell the jury by whom you're employed and how

3    long you've been so employed.

4    A.    I'm employed by the Boston police, been there close to ten

5    years now.

6    Q.    And what is your current assignment?

7    A.    District 4, South End.  I patrol and monitor the

8    community.

9    Q.    And prior to becoming a police officer, can you give us a

00:14 10   little bit of your educational and work background.

11   A.    Yup.  Prior to that I went to Northeastern University.  I

12   joined the Marine Corps, 1999 till 2003.  I left as a sergeant

13   of infantry.  And I was stationed in Iraq for a time.

14   Q.    Can you tell us when you were stationed in Iraq?

15   A.    Yes, ma'am.  It was February 2003 till July of the same

16   year.

17   Q.    And what were your duties there?

18   A.    It was to engage the enemy in the Iraqi war.

19   Q.    And what does that mean?

00:15 20   A.    We were at war with Iraq.

21   Q.    But when you say "engage" --

22           MR. BRUCK:  Your Honor, we object to this testimony on

23   grounds of relevance.

24           THE COURT:  What's the relevance?

25           MS. PELLEGRINI:  Your Honor, as we go further along,

1    the events of the marathon Monday and Officer Chiola's

2    impressions of those are consistent with his background --

3    military background.

4            MR. BRUCK:  If you need me to hear.

5            THE COURT:  Yes, the objection is sustained.

6    BY MS. PELLEGRINI:

7    Q.   Officer Chiola, in April of 2013, specifically, marathon

8    Monday, were you on duty on that day?

9    A.   I was.

00:16 10   Q.   And what was your assignment?

11   A.   I was to remain on the running route.

12   Q.   Where were you located specifically?

13   A.   Across the street by the Exeter Hotel.  That would be

14   Boylston and Exeter.

15   Q.   And your duties that day were what?

16   A.   Monitor the crowd, ensure public safety, stay on-call if

17   needed.

18   Q.   Had you ever performed that tour of duty at the marathon

19   prior to 2013?

00:16 20   A.   Yes; roughly nine years in a row.

21   Q.   Can you describe for the jury based upon that what your

22   experience is with the crowds, and describe for us the nature

23   of the crowds.

24   A.   The crowds are loud, boisterous.  They love the marathon.

25   They hang out, they cheer.  It's normally a good day.  It's a

 1    good day for everybody.  A lot of families are there.  The kids

 2    love it.  It's just a great day overall.

 3    Q.  On April the 15th, 2013, from your position what was

 4    across the street from you, if you recall?

 5    A.  There were flags.  There were a lot of people on that

 6    side.  Again, families.  There were wooden fences, small gates.

 7    Q.  How long had you been on duty that day?

 8    A.  That day I started my shift at 7:30 that morning.

 9    Q.  Did you ever leave your post during the day?

00:17 10    A.  About half-hour for lunch, maybe, but for the most part, I

11    remained there all day.

12    Q.  So were you in that location that you've described to the

13    jury at approximately 2:45 that afternoon?

14    A.  I was.

15    Q.  Can you tell the jury what you remember occurring?

16    A.  What I remember was a loud explosion, lots of white smoke.

17    It sounded as if a canon had gone off.  People running,

18    screaming, crying.  At one point immediately after there was a

19    silence, and then the screaming began.

00:18 20    Q.  What did you do?

21    A.  I ran from the point where I was across the street to

22    where the explosion went off.  As I was running, another one

23    had gone off at the same time -- shortly after.

24    Q.  And can you tell us where that second explosion occurred,

25    if you know?

```
 1   A.   About 50 yards -- maybe 20, 30 yards behind me.

 2   Q.   Now, as you ran across the street, tell us what you saw.

 3   A.   When I got there, immediately there were people on the

 4   ground.  I saw blood everywhere.  Shock.  People's faces

 5   were -- you couldn't tell who was alive, who was dead.  There

 6   were people lying all over the ground.  A crowd jumped in,

 7   tried to help, others were running away.  It was chaos.

 8   Q.   Officer Chiola, before coming to court today, have you had

 9   an opportunity to review a video that shows the Boston Marathon

10   finish line for that day?

11   A.   Yes.

12   Q.   And in reviewing that, are you, in fact, in that video?

13   A.   Yes, I am.

14        MS. PELLEGRINI:  Can we have Exhibit 5.

15        THE COURT:  I'm sorry, what number?

16        MS. PELLEGRINI:  Five, your Honor.

17        (Video played.)

18   BY MS. PELLEGRINI:

19   Q.   Officer Chiola, on the screen in front of you is the

20   beginning of this video.  Can you see yourself at this point in

21   the video?

22   A.   No, I cannot, ma'am.

23   Q.   So let us start.

24        (Video played.)

25   Q.   Officer Chiola, can you see yourself at this point?
```

```
 1    A.   I do, ma'am.

 2    Q.   And you may touch the screen and show us where your

 3    position is, please.

 4    A.   Okay.

 5    Q.   Touch it with your finger pad and it will make a circle.

 6    A.   Oh, okay.  I'm sorry.

 7    Q.   That's okay.

 8    A.   (Witness indicates.)

 9    Q.   Now, the circle at this point is approximately in the

10    middle of the screen and in the middle of the street?

11              THE JURORS:  We don't have it.

12              THE COURT:  All right now?

13              THE JURORS:  Yes.

14    BY MS. PELLEGRINI:

15    Q.   And, Officer Chiola, there's both an arrow, yellow arrow

16    now, and circle.  Where are you in relation to that marking

17    that you just made?

18    A.   I made such a mess of it I don't even know where I am.

19    Q.   All right.  If you could clear that by touching the upper

20    corner.  Or I can clear it.  Try that again.

21    A.   (Witness indicates.)

22    Q.   All right.  Now, there is now a yellow circle.  It's a

23    little to the left of the center of the street.  Where are you

24    in that circle, Officer Chiola?

25    A.   I think I'm underneath that little dot inside the circle.
```

```
 1    Q.   Okay.  I'll clear that.  And do you see yourself at this
 2    point?
 3    A.   Yes, I do.
 4    Q.   And where are you at this point?
 5    A.   Okay.  I'm right here, ma'am.  Right there (indicating).
 6    Q.   All right.  I'd note for the record there is a small
 7    yellow dot in almost the center of the street.
 8         And where are you headed to, Officer Chiola?
 9    A.   I'm headed into the direction of the first explosion.
10    Q.   So as you run from that location, what do you see?  What
11    are you doing?
12    A.   As I approached I saw -- again, I was in the middle of
13    smoke the first few seconds.  As the smoke cleared, that's when
14    I saw the bodies on the floor.  At that point me and a few
15    others -- the National Guard was running by at the same time.
16    We were pulling the fence away from everybody trying to get
17    across.
18    Q.   Did you know what had happened?
19    A.   I was fairly certain it was an explosion.
20    Q.   And did you know what type of explosion?
21    A.   I did not know what type.
22    Q.   So as you got to the sidewalk in that area, what, if
23    anything, did you do?
24    A.   Assessed the situation, immediately tried to get my
25    composure.  I was a little confused at first because it seemed
```

1   that the -- everybody was so bloody, so confused and so

2   chaotic, it just took me back.

3   Q.   I'm sorry.  Took you back where?

4        MR. BRUCK:  Objection.

5        THE COURT:  Sustained.

6   BY MS. PELLEGRINI:

7   Q.   After --

8   A.   I took a moment to realize where I was and what I was

9   doing.

00:23 10   Q.   And when you did?

11   A.   And when I did I looked up, the smoke cleared, and that's

12   when I saw the bodies and everybody else on the ground

13   screaming and crying.

14   Q.   And what, if anything, did you do?

15   A.   I helped people as best I can, removed the gates, applied

16   some tourniquets, applied CPR on one of the victims.

17   Q.   Can you describe this person for us?

18   A.   Yes.  Young lady, mid 20s, -appeared to me to be in her

19   mid 20s, young, wearing all blue.  Blue eye shadow.  I later

00:24 20   found out her name was Krystle.

21   Q.   What did you do?

22   A.   Performed CPR on her, chest compressions mainly.

23   Q.   And what observations, if any, did you make while you were

24   doing this?

25   A.   She had a friend near her calling out her name.  She

1    looked in shock.  She was coughing.  As I applied chest

2    compressions, smoke was coming out of her mouth.  She appeared

3    to be in a lot of pain.  I helped her as best I can.  I

4    immediately asked if someone could take over and continue the

5    chest compressions.

6    Q.   Officer Chiola, have you also reviewed a photograph of the

7    scene prior to coming into court today?

8    A.   I did.

9         MS. PELLEGRINI:  All right.  May we have Exhibit 8

00:25 10   already in evidence up on the screen for everyone?

11   Q.   Officer Chiola, I would ask you to look at Exhibit 8 now

12   on the screen and ask if, in fact, you see yourself in that

13   image.

14   A.   I do.

15   Q.   And can you point yourself out, please?

16   A.   (Witness complies.)

17   Q.   All right.  So I note for the record you've drawn a yellow

18   circle around what appears to be a person in uniform in the

19   lower left hand of the image.

00:25 20        How do you know that's you?

21   A.   I'm the only one that wears the radio over my shoulder.  I

22   would recognize my tag book on my right-hand side.

23   Q.   When you say recognize the shoulder --

24   A.   Yes, ma'am.

25   Q.   All right.  What are we referring to?

1    A.    The radio.  I wear it around my back and over my shoulder.

2    Q.    All right.  Can you point that out for us on the image,

3    please?

4    A.    That would be right here, ma'am (indicating).

5    Q.    All right.  So you've drawn the yellow line across the

6    black line the person in uniform.  Is that correct?

7    A.    That's correct.

8    Q.    And with respect to the person that --

9          MS. PELLEGRINI:  Can we go back to the image just

00:26 10    before?

11    Q.    -- upon whom you performed chest compressions, where was

12    that person located?

13    A.    It would have been near the curb close to where I was.

14    Q.    Could you point that out, please, on the image?

15    A.    This area here.  Now I'm not seeing it.  This area right

16    here.

17    Q.    All right.  So you've drawn for the record a yellow circle

18    approximately in the center of the image at the bottom.  Is

19    that correct?

00:27 20    A.    Yes, ma'am.

21    Q.    Now, Officer Chiola, how long did you stay with that

22    victim?

23    A.    About 30 seconds.  Twenty to 30 seconds.

24    Q.    And what else did you do then after leaving?

25    A.    Immediately I started helping whoever else needed help.

1    Q.    What did you do?

2    A.    Tourniquets; assisted people to get to the ambulances; I

3    grabbed a wheelchair, threw some people in wheelchairs; cleared

4    the scene, cleared the crowds.  That went on for the next 10,

5    15 minutes.

6    Q.    Officer Chiola, when you were performing the chest

7    compressions on the person you identified as being Krystle,

8    what observations other than the ones that you've mentioned did

9    you make of her?

00:27 10   A.    She was suffering.  She was in pain, in shock.

11   Q.    Did you see what her injuries were?

12   A.    I did.

13   Q.    Can you describe those?

14   A.    From the waist down it had been -- it's really tough to

15   describe.  It's complete mutilation.  That's as far as I

16   can -- I don't want to say.

17   Q.    How long overall did you remain at that location on

18   Boylston Street?

19   A.    About 20 minutes.  Twenty, 25 minutes, ma'am.

00:28 20   Q.    And where did you go to after you left there?

21   A.    Immediately after I went to the tent.  There was a first

22   aid tent available.  Everybody eventually made their way there.

23   And I stayed until about midnight.  During the course of my

24   time there I discovered that Krystle was there as well, so I

25   stayed with her till I was relieved of duty.

```
 1    Q.   Was she alive when you saw her in the medical tent?

 2    A.   She was not, ma'am.

 3         MS. PELLEGRINI:  I have no further questions from the

 4    officer.

 5         MR. BRUCK:  We have no questions for you.  Thank you,

 6    Officer.

 7         THE WITNESS:  Thank you, sir.

 8         THE COURT:  Thank you, Officer.  You may step down.

 9         THE WITNESS:  Thank you.

10         (The witness is excused.)

11         MR. MELLIN:  The United States calls Jeff Bauman.

12              JEFFREY BAUMAN, duly sworn

13         THE CLERK:  Have a seat.  State your name, spell your

14    last name for the record keep your voice up and speak into the

15    mic so everyone can hear you.

16         THE WITNESS:  My name is Jeffrey Bauman, J-E-F-F-R-E-Y

17    B-A-U-M-A-N.

18                   DIRECT EXAMINATION

19    BY MR. MELLIN:

20    Q.   Mr. Bauman, where did you grow up?

21    A.   Chelmsford, Massachusetts.

22    Q.   After high school, what did you do?

23    A.   I graduated high school and I went to Middlesex Community

24    College for a brief stint, and then I started -- decided to

25    work.  And I worked for my uncle's paving company, Allied
```

1   Paving out of Drum Hill.  And that was tough.  I did that for

2   about two years, you know, waking up at 5 a.m. and working the

3   hot asphalt.  Very tough.  So I went in one day and I told him

4   I had an epiphany and I -- you know, I retired my paving career

5   and I went back to school and tried to grind away at that.

6        And, you know, money was tight so I needed, you know,

7   another job so I looked online, what's a good job that's out

8   there without a college degree, and Costco Wholesale popped up.

9   And, you know, I filled out an online app and got hired.  And

00:31 10  it was a great, great company when I worked there.  I never

11  worked retail.  It was tough at first but then I got the hang

12  of it.  And I was great with people.

13  Q.    Let me ask you this:  By April of 2013, how long had you

14  been with Costco?

15  A.    Almost about two and a half years.

16  Q.    And what were you doing at that point for Costco?

17  A.    At that point I was in the service deli in the back.  And

18  I moved back there and I was getting great hours.  And, you

19  know, it was a little bit easier on you.  It's an easier

00:32 20  department to work in.

21  Q.    Now, for the record, as you walked into court this

22  morning, you came in with two prosthetic devices.  Is that

23  correct?

24  A.    Yes.

25  Q.    When did you lose your legs?

A.    On April 13th -- I mean, 15th, 2013.

Q.    And as you walked in here today, you're wearing shorts.
Is that right?

A.    Yeah.

Q.    And why is that?

A.    When I wear -- when I wear pants, it kind of trips me up
because I have two mechanical knees but they're not motorized
so they rely all on swing and pretty much momentum.  So if I
wear pants, it kind of gets in the way and, you know, I
don't -- it's -- I'm not used to them yet, so.

Q.    On April 15th, 2013, did you attend the Boston Marathon?

A.    Yeah.  Yup.

Q.    Why did you go to the Boston Marathon back then?

A.    I was watching my girlfriend -- my girlfriend run the
race.  It was my first marathon I've ever been to.

Q.    And the girlfriend you're referring to is Erin?

A.    Yeah, Erin Hurley.

Q.    And now is she your wife?

A.    Yeah, she's my wife now.  She said "yes."

         (Laughter.)

Q.    Lucky for you.

A.    Yeah.

Q.    What exactly did you do in the morning of April the 15th,
2013?

A.    I dropped -- I woke up early with her.  I remember we were

1    sleeping -- mand she couldn't get much sleep.  She was very

2    nervous.  So we woke up very early, like I did today.  And we

3    drove -- I drove her down to -- right on Huntington, right in

4    front of the Colonnade.  And she took a bus with her team that

5    she was running.  She worked at Brigham and Women's Hospital at

6    the time, and she had a team.  Team Stork.  And I dropped her

7    off with them and they took a bus out to Hopkinton, I believe.

8    Q.    And what did you do?

9    A.    I went back to our apartment I went back to sleep.

00:34 10           (Laughter.)

11   Q.    All right.  At some point you woke up.  What time was

12   that?

13   A.    I don't know.  Maybe nine?  Nine o'clock?  And I was with

14   her best friend and -- both of her roommates, Remy Lawler and

15   Michelle Mahoney.  And, you know, it was awesome.  We were very

16   excited for her.  And we turned on the TV to watch the start

17   of -- I think the first heat was starting.

18         And so we started to make a sign.  You know, we wanted to

19   make a sign for her, so we made a sign at the apartment.  Then

00:34 20   shortly after that we watched the race start, and then we

21   headed to Newton.  I think it was like Mile 17 where the

22   firehouse is.  It turns on to Route 16, I believe.  And it

23   was --

24   Q.    What did you do there?

25   A.    We got there and -- first we stopped some kids on the

1   street to take a picture.  We got a nice picture.  We made our

2   way to the race.  And, you know, that was my first time

3   experiencing the marathon.  I was watching all the runners.

4   And it was an awesome time.  They had music going, like blaring

5   out of the firehouse.

6        And we were watching all the runners and we were trying

7   to, you know, figure out where Erin was.  We had her tracked on

8   GPS.  And I think there's only five checkpoints.  So we saw

9   that she made it past the checkpoint so we knew she was close.

00:35 10   And, you know, we were just watching all the runners.  And, you

11   know, right before we were about to leave and head to the

12   finish line, because we thought we missed her -- you know, we

13   saw her ran past and we screamed and, you know, she saw us and

14   she turned around and she gave us a hug.  And, you know, that

15   was it, really.  "We'll see you at the finish line."  And we

16   jumped in a cab and headed down, you know, as close as we could

17   towards the finish line.

18   Q.   How close did you get?

19   A.   Right off of Storrow.  Not that close.  We still had to

00:36 20   walk a good, you know, quarter to half mile to get down to the

21   actual finish line.

22   Q.   And at that point who were you with?

23   A.   Remy Lawler and Michelle Mahoney.

24   Q.   Did the three of you walk up to the finish line?

25   A.   Yeah.  We -- you know, when you get closer and closer to

1    it, the crowd, you know, is so thick and there's just so many

2    people.  And, yeah, so eventually we made it to the finish

3    line.  And it was, you know, like five times as crazy as it was

4    in Newton.  And, you know, the guy's on the PA and he's calling

5    people out and, you know, you see all these runners that you

6    saw -- that I saw in Newton.  I saw the guy in the hamburger

7    suit.  And I was, like, "Ahh, she's close.  She's close."  And

8    so we were there, we made our way a little bit past -- before

9    the finish line, before the race ended, and we were in a crowd

00:36 10    just watching the runners.

11    Q.   About how long were you in that crowd right by the finish

12    line?

13    A.   For a while.  I'd say 25 to 30 minutes.  Maybe a little

14    longer.

15    Q.   Okay.

16    A.   And it was a beautiful day and -- watching all these

17    runners.  We were -- she was supposed to finish around the

18    four-hour mark.  And, you know, we waited a little bit.  You

19    know, five minutes went past after it.  And I had some concerns

00:37 20    about her.  I was, like, you know, "Where is she?  She should

21    be finishing now."

22    Q.   You're not giving her a hard time, are you?

23    A.   Yeah, I was.  I was going to.  You know, I said, "She'd

24    better finish," you know, "under four hours."

25    Q.   At some point while you were at the finish line waiting

        1    for Erin to come down Boylston, did somebody bump into you?

        2    A.    Yeah.  Well, we were in the crowd and, you know, this

        3    guy -- you know, he's about my age -- he came up and he was

        4    trying to make his way through the crowd.  And, you know, it

        5    was a dense crowd and, you know, he kind of nudged me and I

        6    looked back at him.  And that's when I looked at him and he

        7    just looked very suspicious.  You know, he didn't look like

        8    anybody that was there.  He was alone; he wasn't, you know,

        9    watching the race, he wasn't -- you know, it didn't look like

00:38  10    he was having fun like everybody else.  Everybody else there

       11    was clapping, watching the race, you know, talking to each

       12    other.  And, you know, I looked at him and he kind of stared

       13    down at me and, you know, I just thought it was odd.  And, you

       14    know, I didn't really pay any more attention to him.  Michelle

       15    kind of -- the girl I was with, kind of, like, "Oh, you're

       16    going to miss her finish," and, you know, we were kind of just

       17    focusing on Erin at that point.

       18         And, you know, I looked back and, you know, I saw a bag

       19    there unattended.  And, you know, I thought that was very

00:38  20    weird.  I looked around for him and I was, like, you know -- I

       21    did notice that he did have -- he was carrying a bag but, you

       22    know, I didn't see him around.  I saw the bag there and --

       23    Q.    When you say a "bag," what type of bag was it?

       24    A.    If I had to -- it looked like just a regular school

       25    backpack.  It was black and, you know, like an Eastpack [*sic*]

 1    or a JanSport, you know, a regular backpack.

 2    Q.   When you saw that backpack on the ground, what did you do?

 3    A.   Well, I -- you know, I just thought it was weird.  You

 4    know, when you're at the airport -- that kind of went through

 5    my head.  You know, when you see any unattended luggage, you

 6    notify authorities.  And I just thought it was weird.  So it

 7    was kind of playing off in my head.  But, you know, it's like

 8    you're at the marathon, you know, he probably just forgot it or

 9    something.  You know, you never think of anything.  You're in

00:39 10    Boston, you know, stuff like this doesn't happen.

11        So I turned away and I was talking to Michelle and I was,

12    like, "Maybe we should get out of here.  I think she already

13    finished," because it was like, you know, getting to that five

14    to ten minutes after the four-hour mark, and so I wanted to go

15    see if she finished.  And Michelle was, like, you know, like,

16    "Five more minutes."  And, you know, two seconds later I saw a

17    flash, heard, like, three pops and I was on the ground.

18        And, you know, at first I opened my eyes and I could see

19    the sky, and I was like, "Wow."  I was, like, "That was a big

00:40 20    firework."  That's what I thought.  Because the first smell

21    that hit me was, you know, it smelled like the Fourth of July,

22    the fireworks.  And, you know, I lifted my head and, you know,

23    that's when I first saw the chaos around me, you know, the

24    smoke and, you know, all the stuff going on and people

25    screaming.  And, you know, my ears were ringing and everything

1   was muffled.

2       And the first person I saw was Michelle, and I looked at

3   her and she was looking at me and I looked down and I saw her

4   leg and I was, like, "Oh, her leg's bad."  You know, I saw the

5   bone in her leg and I was, like, "That's a really bad injury."

6   And that's what I was thinking.  And, you know, she was staring

7   at me and then I looked down and I saw my legs, and it was

8   just, you know, pure carnage.  You know, I could see my bones

9   and my flesh sticking out.  And, you know, I kind of just went

00:40 10   into tunnel vision and everything around me was there but I

11   wasn't paying attention to anything else but, you know, my legs

12   at that point.

13       And, you know, so many thoughts went through my head.  You

14   know, I was sitting there and I was like, you know, "This is

15   really messed up.  This is messed up.  This is messed up."

16   That's all I was saying in my head.  And, you know, I kind of

17   tried to get myself, you know, out of it a little bit and I

18   kind of laid down.  And I think someone put a jacket over me at

19   that point.  And, you know, I laid there for a while and I was

00:41 20   thinking, you know, "This is how it's going to end."  You know,

21   "This is it."  Do you know what I mean?

22       And then I was thinking, it was, like, "I had a great

23   life.  I had a great life."  I saw the world, and, you know, I

24   played sports growing up, I had great friends and I experienced

25   a lot in my 26, 27 years on this planet.  And I kind of made

```
 1   peace with myself at that point.

 2        And, you know, then something clicked.  You know, I did

 3   hear the second explosion and, you know, I was thinking, you

 4   know, "This is messed up."  I was, like, "We're under attack."

 5   That's what I was thinking on the ground.  And I was, like,

 6   "They're never going to get to me.  My injuries are bad."  You

 7   know, people around me are in worse shape than I was.  And alls

 8   I could think of at that point was, you know, I got to call my

 9   mom.  So I searched for my cell phone and, you know, I couldn't
```
00:42 10   find it, which is probably a good thing.  If I called her, she
```
11   probably would never forgive me.

12   Q.   When you said that something clicked, what did you mean by

13   that?

14   A.   Yeah.  Well, after the second explosion I was laying

15   there.  You know, I wasn't -- the change in my mental state

16   wasn't going anywhere.  I was still there on the ground, still

17   laying there.  Then I was kind of like, you know, "I'm not

18   going to just lay here."  You know, "I've got to try

19   something."  So, you know, I threw the jacket off me, I sat up
```
00:42 20   and I kind of had this second wind.
```
21        And I was looking around and I seen other people help, and

22   people were trying to help me.  And I hear one guy yelling, you

23   know, "Grab belts, grab shoelaces, tear shirts, anything you

24   can get for tourniquets."  And I was, like, "Oh, that's a good

25   idea."  And I was, like, you know, I don't have a belt on.  I'd
```

1    look and -- you know, at that point I was moving around and

2    they were like, you know, "Sit down."  You know, people were in

3    my face.

4         And then I see a guy in a cowboy hat and he comes up to me

5    and he's yelling at me.  He's like, "Stick with it."  And, you

6    know, he's yelling at other people around me.  And, you know, I

7    was just focusing on him and, you know, he was keeping me calm

8    and keeping me there.  You know, I had help at that point and I

9    was like, you know, "All right.  Now what?"  And --

00:43 10   Q.   Did anyone tie a tourniquet on your legs?

11   A.   You know, yeah, I believe so.  I mean, you know, I did

12   look at my wounds at that point and, you know, my right leg was

13   pretty devastated and I wasn't losing much blood out of my

14   right leg at that point.  There could have been -- there was

15   just a lot of stuff going on.  I couldn't really differentiate

16   what was on my leg at that point.

17        But I did look at my left leg, and that's where I noticed

18   most of my blood coming out.  And I noticed I still had my knee

19   intact but my fibula -- and I think it was my fibula, I'd say.

00:44 20   It was exposed.  I didn't have any leg beyond that point.  And

21   I noticed there was like a little stream of blood shooting out

22   from underneath my leg, so at that point I just grabbed my left

23   leg and squeezed it and I didn't let go until I was, you know,

24   going into the ambulance.

25   Q.   You just described the injuries to your left leg.  Can you

1    describe what you saw on your right leg?

2    A.   It just looked really devastated.  I didn't -- you know, I

3    didn't have my knee, I don't think, and, you know, there wasn't

4    any blood shooting out of it.  I didn't notice any blood.  It

5    looked pretty charred up.  Yeah, but that was about it.  I

6    didn't really focus on that.  Once I didn't see blood and -- on

7    that side, I focused where I did see blood shooting out of my

8    leg and I tried to stop it.  And I just, you know, put my hand

9    underneath and didn't let go.

00:45 10    Q.   Can you estimate about how long you were on the sidewalk

11    before you got taken away from the scene?

12    A.   They asked me in the hospital and I said -- you know, I

13    thought it was like 20 minutes.  It seemed like a lifetime to

14    me laying there.  And, you know, I guess it was only a

15    couple -- like probably about five minutes I was there.

16    Q.   At some point were you put into a wheelchair?

17    A.   You know, right after I did start squeezing my left leg

18    the guy in the cowboy hat, you know, he was, like, "This kid's

19    got to go right now."  And a wheelchair pulled up.  And I

00:45 20    didn't get a good look at the girl pushing the chair, but the

21    guy in the cowboy hat, Carlos, grabbed me with one hand, picks

22    me up and threw me in the chair.  And, you know, I was off

23    underneath -- you know, onto the street, underneath the finish

24    line.  And I remember everything from that point, and looking

25    at everybody.  And I saw a guy taking pictures and I was like,

1    "Oh, that's kind of messed up."

2        And, you know, we peeled into the medical tent, and I

3    didn't see the ambulance until I got to the very end, and then

4    I saw the ambulance.  And I was kind of really revived -- like

5    my spirits were really lifted when I saw the ambulance.  And I

6    was talking to them, telling them my name, and Carlos was

7    talking to them and...

8    Q.    Were you still holding onto your left leg?

9    A.    As soon as I saw them, they kind of told -- they said I

00:46 10   had to let go.  And, you know, at that point they were working

11   on me.  They were doing stuff.  And then they put me on a

12   board, I think, and then they put me up into the ambulance.

13   Q.    Where were you taken?

14   A.    To Boston Medical Center.

15   Q.    And when you arrived there, what happened?

16   A.    When I got there I was -- you know, it was like I was in a

17   TV show, like *ER*.  You know, you get wheeled in and you're

18   looking at everybody around you and they're all screaming

19   stuff, they're all talking to me.  One person was talking to me

00:46 20   asking, you know, some contact info.  I gave them my aunt's

21   info.  I gave them her cell number.  I was, you know, telling

22   them my name, telling them my mom's name, telling them

23   different people that they can contact.

24        And then I started to, like, try to tell them how to do

25   their job.  You know, I was, like, "I got to get put under.

1   This is, like, kind of too much for me."  And I kind of knew

2   once I was at the hospital I was probably going to make it.

3   And, you know, I was just really happy I was there.

4   Q.   When you were telling them to put you under, why did you

5   say "This is a little too much for me"?

6   A.   Because what I -- you know, what I saw, what I was -- from

7   that previous ten minutes, what I went through, I mean, that

8   was insane.  It was, you know, too much for me to handle.  And,

9   you know, I saw -- still wonder to this day how I stayed

00:47 10   conscious through that whole thing and I had no idea.  It was

11   just a lot for one person to see, I think.

12   Q.   During that time did you feel pain?

13   A.   No.  You know, I had burns, I had wounds in my back, I had

14   arm wounds, missing my legs.  And, no, I didn't feel any pain.

15   It felt, like, pressure, you know, someone squeezing my legs.

16   Q.   Once you got to the hospital, did you have surgery?

17   A.   Yeah.  You know, I don't recall.  I recall going into one

18   surgery, but I believe I had a total of three surgeries and I

19   don't recall the first two.

00:48 20   Q.   When you came to, do you recall who was in your room?

21   A.   Yeah.  It was my best friend, John Sullivan.  And he woke

22   me up on Tuesday.

23   Q.   What did you have to say to him?

24   A.   I was just very happy to see him.  You know, I do joke

25   around.  I say, you know, "I knew I wasn't in heaven because

1    Sully was standing in front of me."
2         (Laughter.)
3    A.   But, you know, he's a great person.
4    Q.   Did you know at that point that your legs had been
5    amputated?
6    A.   Yeah.  Well, I knew my legs were gone.  I knew they were
7    gone instantly, you know.  And -- yeah, so he was trying to
8    explain it to me.  And I had breathing tubes in and, you know,
9    he was shaking.  He was, like, "You don't have your legs."
00:49 10   And, you know, I couldn't communicate with him so he grabbed
11   me -- he actually grabbed me a pen and pad and I wrote
12   down -- the first thing I did write down was "Lieutenant Dan,"
13   because I was joking -- messing with him.
14   Q.   And just for the record, why did you write down
15   "Lieutenant Dan"?
16   A.   It's in *Forrest Gump*.  I think it's Gary Sinise that plays
17   Lieutenant Dan.  And he lost both his legs in Vietnam, I think
18   above the knee.  But, you know, I was just messing with him.
19        And, you know, after that I recalled, you know, the
00:49 20   suspicious kid that I saw.  And, you know, I didn't know for
21   certain that, you know -- that he was -- you know, what
22   happened, but I knew it was -- at that point I knew
23   pretty -- you know, I was pretty clear in my mind what
24   happened.  And, you know, I only had one goal in my mind at
25   that point, is to tell whoever I could what I knew.

1       And I wrote down to Sul, I said, "I saw -- I know what

2   happened.  I saw the guy.  I saw the kid and I know what

3   happened."  And, you know, he was shaking.  And he went out

4   and, you know, there was -- you know, my whole family was

5   outside the room and they came in.  And, you know, shortly

6   after that I have FBI standing in front of me and state police

7   and --

8   Q.   Did they ask you about what you saw?

9   A.   Oh, yeah.  You know, at first I couldn't talk.  I had the

00:50 10   breathing tubes in.  So, you know, at first I did write down

11   what I saw.  I wrote down exactly what I saw.  And, you know,

12   after that they were like, you know, "You have to get his

13   breathing tubes out," and, you know, they kind of worked on

14   that and they got my breathing tube out.  And, you know, from

15   there on I just worked with whoever came in.  I can't really

16   remember who came in, but I remember helping them and

17   describing what I saw and trying to do the best I can -- I

18   could.

19   Q.   Do you recall generally the description you gave them of

00:51 20   the person?

21   A.   Yeah.  When I first wrote it down, I wrote, you know, he

22   was about six-three to six-two, athletic build.  He was pretty

23   built.  He was taller than me.  I was only about five-eleven,

24   so I remember looking up at him.  He had a hat, a black hat,

25   pulled down, you know, real low.  He had, it looked like

            1    aviator shades.  And he was white and he had a five o'clock

            2    shadow.  He had a big jacket on that was black, with a hoodie,

            3    and he was carrying a black bag.  And I wrote all that down.

            4    And, you know, that was my description of him.

            5    Q.    And then at some point did the FBI show up with someone

            6    that tried to do a sketch of him?

            7    A.    Yeah.  Yeah, I did a sketch.

            8    Q.    Okay.  When was that?

            9    A.    I believe that was Wednesday, though, a couple of days

    00:51  10    after.

           11    Q.    Can you describe how that went?

           12    A.    Yeah.  You know, I think it was at nighttime.  And he came

           13    in and I just -- we worked for about an hour on it.  And it was

           14    difficult.  You know, some things, you know, weren't clear to

           15    me facial-wise, but I did the best I could with, you know, the

           16    hat and the glasses and the five o'clock shadow, what I

           17    remember of his face.

           18    Q.    Were you also shown photographs?

           19    A.    Yes.

    00:52  20    Q.    And those photographs that you were shown, did you

           21    identify any of those as the person?

           22    A.    No, I didn't.  I didn't see him.

           23    Q.    And sometime later, though, you do see a picture of that

           24    individual.  Is that right?

           25    A.    Yeah, I think -- the first time I did see him was, you

1    know, on the news on, like, the Friday or Thursday or...

2    Q.   Okay.  And you're still in the hospital.  Is that right?

3    A.   Yeah.

4    Q.   And when you see that picture on the news, what did you

5    do?

6    A.   Oh, I kind of -- I was with my brother.  I was like,

7    "That's the kid I saw.  That's him."  And he's like -- my

8    brother said, "I haven't seen you light up like that in a

9    while."  And, you know, it was kind of, you know, a relief to

00:53 10   know that, you know, I got to help out and, you know, do my

11   part.

12   Q.   When you saw that individual on the news, did you have any

13   doubt that that was the man that bumped you that was wearing

14   the black backpack next to you?

15   A.   No.

16   Q.   As a result of the bombing explosion, what injuries did

17   you sustain?

18   A.   I lost both my legs above the knee, I have -- you know, I

19   have a scar -- I have a hole in my arm.  Something went in and

00:53 20   came out, and it was in my tricep.  It took a good chunk of it

21   out.  And, you know, I have some burns and some scars on my

22   back.

23   Q.   And the burns and the scars, can you describe how it was

24   that the hospital dealt with that?

25   A.   Every day you'd -- with burns you have to change the

1    dressing.  So, you know, at first it was very painful.  You

2    know, the nurses come in -- the nurses are great but, you know,

3    they have to come in and take the bandage off and, you know,

4    pretty much take a layer of skin with it, dead skin.  And it's

5    very painful.  And, you know, every day for three weeks.

6    Q.    How long were you in the hospital?

7    A.    A little -- like I think a day over a month.  I think I

8    got out like May 16th.

9    Q.    And then how long were you in rehab?

00:54 10    A.    I just -- like two months ago I just recently stopped

11    doing outpatient at Spaulding.  I was walking pretty well on my

12    own, so I decided to take a break from going down to rehab.

13    Q.    Do you have any injuries to your abdomen?

14    A.    Well, I have a scar from -- it was one of my surgeries.

15    It was, again, when I was unconscious.  There was like an

16    exploratory surgery.  They just wanted to make sure there was

17    nothing wrong in my abdomen because it looked kind of funky, I

18    guess.

19    Q.    And as you sit here today, do you have any shrapnel or

00:55 20    anything still in your body?

21    A.    I don't -- I have no idea.  Probably.

22    Q.    Was there any impact on your hearing from the explosion?

23    A.    Yeah.  I have like a constant ringing in my ears and I

24    can't hear that well at all.

25    Q.    If I can have you look at two photos that are already in

1    evidence.  Before you came in here today, did you have a chance

2    to look at two photographs with me?

3    A.    Yeah.

4    Q.    Okay.  And did those photos fairly and accurately depict

5    the scene as you recall it on April the 15th?

6    A.    Oh, yeah.

7         MR. MELLIN:  If I could have Exhibit 1473 which is

8    already in evidence brought up.

9    Q.    Mr. Bauman, do you recognize Exhibit 1473?

00:56  10    A.    Yeah.

11    Q.    And as you look at that, do you see yourself in that

12    photo?

13    A.    Yup.

14    Q.    Can you do me a favor -- that's a touchscreen.  If you can

15    just draw a circle around you.

16    A.    (Witness complies.)

17    Q.    And just for the record, you drew a circle around the

18    individual below the red and white flag.  Is that right?  You

19    jumped the gun on me just a hair, Mr. Bauman.

00:56  20    A.    What?

21         (Laughter.)

22    Q.    You jumped the gun on me.

23    A.    Oh, sorry.

24    Q.    I was just describing the first circle you drew which was

25    around you, which you're right underneath a white and red flag

1    but directly under the red portion of that white and red flag?

2    A.   White and red flag?  Yeah.

3    Q.   And now you knew where I was going ahead of time.  You

4    drew a circle around someone else.  Why did you draw a circle

5    around that person?

6    A.   I suppose that's the guy you're going to ask me about.

7    Sorry I jumped the gun.

8    Q.   That's okay.  The circle you drew for him is an individual

9    underneath the white portion of that white and red flag, and

00:57 10   that's directly to your right.  Is that correct?

11   A.   Yup.

12   Q.   Okay.  And can you describe what that individual's wearing

13   in this photograph?

14   A.   What was that?  Sorry.

15   Q.   What is he wearing in this photograph?

16   A.   It looks like a hat and sunglasses.

17   Q.   And is that the individual that you saw with the backpack?

18   A.   Yeah.

19   Q.   And then if I could have you --

00:57 20            MR. MELLIN:  Or if we could please bring up Exhibit

21   17.

22   Q.   And as we look at Exhibit 17, Mr. Bauman, do you see

23   yourself in Exhibit 17?

24   A.   Yeah.

25   Q.   And can you, just for the record, circle yourself?

1    A.    (Witness complies.)

2    Q.    For the record, you circled the individual on the right

3    side of the photograph just above the woman in red.  Is that

4    right?

5    A.    Yup.

6              MR. MELLIN:  With the Court's indulgence.

7              (Counsel confer off the record.)

8              MR. MELLIN:  Thank you, your Honor.  Nothing further.

9              MS. CLARKE:  Thank you very much.  No questions.

00:58 10          THE COURT:  All right, Mr. Bauman.  Thank you.  You

11   may step down.

12             THE WITNESS:  Thank you.

13             (The witness is excused.)

14             MR. WEINREB:  The government calls Agent Richard

15   Claflin.

16                   RICHARD CLAFLIN, duly sworn

17             THE CLERK:  Have a seat.  State your name, spell your

18   last name for the record, keep your voice up and speak into the

19   mic so everybody can hear you.

01:00 20          THE WITNESS:  Richard Claflin, C-L-A-F-L-I-N.

21                      DIRECT EXAMINATION

22   BY MR. WEINREB:

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    Where do you work, sir?

1   A.   I'm a special agent with the FBI.

2   Q.   What's your -- where are you assigned?

3   A.   I'm currently assigned to an intelligence squad out of the

4   Boston office.

5   Q.   And how long have you been an FBI agent?

6   A.   Approximately 18 years.

7   Q.   Do you have any training as an FBI agent?

8   A.   I went through a 16-week academy when I initially became

9   an agent.  Over my 18-year career I've had numerous outside

01:00 10   trainings, most of it was in my field, which is violent street

11   gangs and narcotics investigations.

12   Q.   Okay.  As part of your basic training or any special

13   training, have you had training specifically in how to handle

14   evidence?

15   A.   Yes, I have.

16   Q.   Tell us a little bit about that.

17   A.   Initially, again, back in the academy I went through a

18   program where we were taught to handle evidence, procedures,

19   policies for the FBI.  Throughout my career, again, in-service

01:01 20   trainings with the FBI, usually a couple of times a year we're

21   updated on any new procedures or policies regarding evidence.

22   Q.   Now, were you assigned to work Marathon Monday of 2013?

23   A.   I was originally assigned to work a night shift down in

24   Providence, Rhode Island.

25   Q.   Did that change after the bombings occurred?

1    A.   Yes, it did.

2    Q.   What happened?

3    A.   I immediately responded to the bombings on Boylston

4    Street.

5    Q.   Okay.  And how long did it take you to get there?

6    A.   I arrived approximately 3:30, 3:45.

7    Q.   So do you know how long after the bombings that was?

8    A.   The bombings went off at approximately 2:49.

9    Q.   And when you got to Boylston Street, where did you go?

01:01 10   A.   I originally went to the California Pizza Kitchen on ring

11   road.

12   Q.   Where is that in relation to where the bombings occurred

13   on Boylston?

14   A.   Approximately a block away.

15   Q.   And why the California Pizza Kitchen?

16   A.   I was instructed to go there in my initial response by an

17   FBI supervisor.

18   Q.   Was something going on there?

19   A.   That's where most of the law enforcement investigators,

01:02 20   officers seemed to be setting up a command post.

21   Q.   All right.  Now, at that point had Boylston Street been

22   evacuated?

23   A.   Yes, it had.

24   Q.   All right.  And the owners of California Pizza Kitchen

25   told law enforcement they could stage their operations there?

1    A.    Yes.

2    Q.    All right.  And after you got there, what happened?

3    A.    Upon my arrival at the California Pizza Kitchen, I was

4    immediately dispatched by an FBI supervisor to go to a

5    secondary command post at the Westin Hotel up on Huntington

6    Ave.

7    Q.    And where is that in relation to Boylston Street where the

8    bombings happened?

9    A.    Approximately two or three blocks away.

01:02 10   Q.    When you got to the Westin, what happened there?

11   A.    I was assigned, along with Boston Police Department

12   Sergeant Earl Perkins, to head up a video canvass and

13   collection team within the Boylston Street area.

14   Q.    Okay.  What does "canvass and collection" mean?

15   A.    The mission of this team would basically be to be

16   dispatched down to the Boylston Street area, recover, collect

17   and preserve any potential video evidence that we could find.

18   Q.    Did you know where to go to look for it?

19   A.    Well, yeah.  We headed directly to the crime scenes.

01:03 20   Q.    And did people collect videos?

21   A.    Yes, they did.

22   Q.    Do you know the kinds of places they were collected from?

23   A.    On the initial night, on Monday night, we collected

24   approximately 35 to 40 pieces of video evidence, I believe

25   locations such as the Forum, Marathon Sports, LensCrafters.  I

1    believe there was a Dunkin' Donuts.  The Lenox Hotel itself

2    provided video, the Boston Public Library.

3    Q.   And when the agents who went out came back with these

4    videos, did they bring them to the Westin?

5    A.   Yes, they did.

6    Q.   And what happened to them there?

7    A.   At the Westin, we had also established an intake area.  We

8    had evidence response team members from the FBI as well as

9    computer analyst team members from the FBI at the Westin.  They

01:04 10   set up an intake area where if an investigator went out,

11   retrieved a piece of evidence and they brought it back, it went

12   directly to this intake area.

13   Q.   Okay.  So let's take -- you said evidence response team

14   and then computer analysis.  So let's start with the first.

15   What is an evidence response team?

16   A.   The evidence response team for the FBI are our experts in

17   evidence.

18   Q.   Okay.  This is ERT, evidence recovery team?

19   A.   That's correct.  They're also referred to as ERT.

01:04 20   Q.   Okay.  And the ERT, or evidence recovery team people, what

21   do they do when the evidence comes in?

22   A.   When the evidence came in, they began to document that

23   evidence.  They took all pertinent information of where it was

24   collected, who collected it, the time it was collected, the

25   date it was collected.  That information from that investigator

1    who collected that piece of evidence was then entered into

2    their evidence system.  At that point a chain of custody was

3    established and I believe that piece of evidence was given a D

4    number.

5    Q.    And then once all that logging of it had taken place, what

6    happened to it then?

7    A.    At that point the evidence would be transported to the

8    Black Falcon Pier where the computer -- the remainder of the

9    computer experts were set up.

01:05 10   Q.    All right.  But you said there were some computer experts

11   right there at the Westin?

12   A.    On Monday night, yes, there were.

13   Q.    And when the evidence came in, were they looking at it?

14   A.    They began to triage it.

15   Q.    Okay.  What does that mean?

16   A.    They began to establish, to look at some of -- the pieces

17   that were coming in were in different forms.  There were disks

18   coming in, there were thumb drives coming in, there were some

19   iPhones coming in, there were cameras coming in, there were

01:06 20   hard drives coming in.  So I believe the computer experts began

21   to look at those computer hard drives.

22   Q.    So they know how to get the video out of those devices and

23   take a look at it?

24   A.    Yes, they do.  Something I'm not an expert at.

25   Q.    All right.  And how long did that go on for on April 15th?

1    A.   On Monday night, approximately 2 a.m., I was advised by

2    FBI supervisors that the 35 to 40 pieces of video evidence that

3    we had collected would be transported to either the Black

4    Falcon Pier or to the FBI office at One Center Plaza.

5    Q.   All right.  So let's talk about that.  What was happening

6    at the Black Falcon Pier?

7    A.   The Black Falcon Pier had been established as our evidence

8    intake for the Boston bombing.

9    Q.   Do you know what was there?

01:06 10    A.   Any evidence that was being obtained within this

11    investigation was sent directly to the Boston -- to the Black

12    Falcon Pier.

13    Q.   All right.  And was that basically just a big room that

14    they had set up in to collect evidence?

15    A.   Yes.  That's correct.  A big, huge warehouse.

16    Q.   Gotcha.  Then you said some of it went to the FBI

17    headquarters here in Boston?

18    A.   Yes.  If there was a piece of video evidence that was

19    deemed pertinent, it was delivered directly to the command post

01:07 20    at the FBI office.

21    Q.   Okay.  You mentioned that video was collected from the

22    Forum restaurant.  Do you know if there was also video

23    collected from a bar called Whiskey's on Boylston Street?

24    A.   Yes, it was during the week.

25    Q.   All right.  So let's talk about that.  What happened the

1  next day?

2  A.   So on Tuesday Sergeant Perkins and myself relocated our

3  command post from the Westin to the Lenox Hotel on the second

4  floor.  We again established an intake area where any

5  evidence -- video evidence that was collected could be brought

6  into that intake area, accounted for, chains of custody could

7  be established, and all the pertinent information could be

8  taken on those videos.

9  Q.   All right.  And on that day did you get some more

01:08 10  information about businesses on Boylston Street to help you

11  continue with your search?

12  A.   Yes, we did.

13  Q.   Tell us about that.

14  A.   We did two things:  Sergeant Perkins contacted the City of

15  Boston.  He obtained a list of businesses that are on Boylston

16  Street.  We also sent out four investigators on foot:  Two to

17  Crime Scene A, two to Crime Scene B, where they physically

18  noted addresses and names of businesses.  We took these two

19  lists and basically used those as a checklist to make sure that

01:08 20  we were canvassing every single business or residence in the

21  Boylston Street area.

22  Q.   Did you only search on Boylston Street?

23  A.   No, we did not.

24  Q.   Where else did you search?

25  A.   On Saturday, when we had more information regarding the

1    targets of this investigation, we had more information about

2    exit routes, we expanded our canvass in an orderly fashion

3    toward Storrow Drive.  We also expanded our canvass westerly

4    towards Mass. Ave. covering any potential exit routes for the

5    two subjects in this case.

6    Q.   How long did this video canvass and collection process go

7    on?

8    A.   With the exception of Thursday night into Friday night, it

9    stayed -- it remained operational until Sunday evening, I

01:09 10   believe that's April 21st, at approximately 6 p.m.

11   Q.   And were you heading up that team all through that time?

12   A.   Yes, I was.

13   Q.   And during that period were you observing the evidence

14   collection and the ERT function of logging it and keeping track

15   of it and so on?

16   A.   Yes, I was.

17   Q.   And did it all appear to be occurring according to FBI

18   procedures, the ones you had learned?

19   A.   Yes.

01:09 20        MR. WEINREB:  No further questions.

21        MR. BRUCK:  No questions.  Thank you very much.

22        THE COURT:  All right, Agent.  Thank you.  You may

23   step down.

24        (The witness is excused.)

25        MR. WEINREB:  The government calls agent James

1   Marinelli.

2                        JAMES MARINELLI, duly sworn

3           THE CLERK:  Have a seat.  State your name and spell

4   your last name for the record, keep your voice up and speak

5   into the mic so everyone can hear you.

6           THE WITNESS:  James Marinelli, M-A-R-I-N-E-L-L-I.

7                        DIRECT EXAMINATION

8   By MR. WEINREB:

9   Q.   Good morning.

01:11 10   A.   Good morning.

11   Q.   Where do you work?

12   A.   I work at the FBI in Boston.

13   Q.   And what's your title?

14   A.   Special agent.

15   Q.   How long have you been a special agent at the FBI?

16   A.   Seventeen years.

17   Q.   What's your current assignment?

18   A.   I'm currently assigned to the white collar squad.

19   Q.   Do you have any training as an FBI agent?

01:11 20   A.   I do.

21   Q.   What kind?

22   A.   Before -- you know, before being -- before becoming an

23   agent you go down to Quantico, you do a period of time for

24   initial training, and then there's various in-service training

25   after you join a field office, and on-the-job training is

1  continuous.

2  Q.   Have you had training in particular in evidence

3  collection?

4  A.   Yes.

5  Q.   What kind?

6  A.   There was training at Quantico in, you know, the bureau's

7  procedures and policies, and then just on-the-job training

8  from, you know, doing various searches and things for cases.

9  Q.   And what is emphasized in that training?

01:12 10  A.   I mean, primarily it's all -- you know, it's about how you

11  collect the piece of evidence.  So you have to, you know, be

12  careful when you take it.  You log it:  Write down, you know,

13  date and time, where you got it from, things like that.

14  Q.   And are you given training in how to preserve its

15  integrity so that it's not damaged or changed in the course of

16  being collected?

17  A.   Yes.

18  Q.   Did you work on the marathon bombing investigation?

19  A.   Yes, I did.

01:13 20  Q.   Starting when?

21  A.   Starting on the day of the bombing.

22  Q.   How soon after the bombings occurred did you get involved?

23  A.   I was -- well, I was on Boylston Street within 30 minutes.

24  Q.   And what did you do when you showed up at Boylston Street?

25  A.   At that point we were -- you know, the order was just to

1    get down there.  We were looking for some direction, trying to

2    figure out what went on.  Pretty quickly we -- there was a

3    rally point at California Pizza Kitchen, which is at

4    Huntington -- I think it's at Huntington and Ring Road.  So

5    investigative personnel gathered there.  And in the meantime,

6    they were setting up, I believe, a command post at the Westin

7    Hotel.

8    Q.    Did you go to the Westin at some point?

9    A.    Yes.  First I went to California Pizza Kitchen and then

01:13 10   was directed over to the Westin.

11   Q.    What happened when you got there?

12   A.    Well, the reason I was sent over there, and a number of us

13   were sent over there, is because they were going to start to

14   try to gather surveillance video from the businesses along

15   Boylston Street, so I went up there to go meet with Rich

16   Claflin, who was going to work that effort from our standpoint.

17   There was also Boston police and state police there.

18   Q.    What happened when you got there?

19   A.    They were gathering a list of businesses to contact.  And,

01:14 20   you know, initially there was -- you know, the Forum restaurant

21   was mentioned as one that needed to be collected, so myself and

22   another task force officer volunteered to go down and get that.

23   Q.    What happened when you got to the Forum restaurant?

24   A.    Well, we didn't go right to the Forum restaurant.

25   Obviously there was -- one of the crime scenes was right in

1    front of the restaurant.  We were on the corner of Ring Road

2    and Boylston and we were waiting for the owner of the Forum

3    restaurant to come meet with us.

4    Q.   Did that happen?

5    A.   It did.  Yup.  We waited there.  We were then -- we

6    couldn't go directly into the front for the same reason I just

7    stated, and we were led around -- around the crime scene area

8    to the back of the restaurant.  We entered through an alley and

9    down into the basement.

01:15 10   Q.   Why in the basement?

11   A.   Well, again, we ended up with Mr. Gouges -- he knew the

12   restaurant.  That's where the video surveillance system was.

13   He had an office down there and the video surveillance system

14   was down there.  So he led us directly down there to collect

15   the video.

16   Q.   So when you say the surveillance system was down there, do

17   you mean the cameras were down there?

18   A.   No, the cameras were, I believe, through the restaurant.

19   There was one also out -- directed toward Boylston Street in

01:15 20   front of the restaurant.  But the actual -- the system that

21   runs -- the video system itself was down in the basement.  So

22   there's a CPU down there, there were monitors down there.  The

23   cameras were posted throughout the restaurant.

24   Q.   And you say there were monitors.  Were they monitors that

25   show what's on the cameras?

1    A.   I believe so.  We weren't really looking at the monitors

2    per se, but I remember that they were down there.  And, yes,

3    they would show what the cameras are showing.

4    Q.   Is there some kind of device down there that was recording

5    what the cameras were seeing?

6    A.   Yes.  That was the CPU.  So there was actually a computer

7    unit that was recording the video.

8    Q.   So what did you do, if anything, with that computer unit?

9    A.   Well, first Mr. Gouges pointed out to us -- directed us to

01:16  10   where it was.  He then offered to contact the gentleman who

11   actually did the installation.  It was a recent installation.

12   And he, you know, offered to put us in touch with the gentleman

13   that installed it so that we could make sure we didn't disturb

14   anything by taking it.

15   Q.   Did that happen?

16   A.   It did happen.  He facilitated a phone call between myself

17   and Gene Scaff, who was the person -- it was his company that

18   installed the video.  And I spoke to him just to make sure we

19   were looking at the proper unit, the one that was actually

01:16  20   recording the video, and ask him about anything that we might

21   need to make sure that we can replay the video later.

22   Q.   Once you got all that information, what did you do?

23   A.   We unplugged the computer just to, you know, preserve it

24   in place, and then we disconnected everything from the CPU, and

25   we took the CPU and the power cord with it.  There was also a

1    thumb drive or a dongle plugged into the back of it, and that

2    was --  that partly ran the video system.  That had, I guess,

3    some of the code that ran the system.

4    Q.    So you took all of that with you?

5    A.    Correct.

6    Q.    And where did you take it?

7    A.    We took that back to the Westin where our command post was

8    set up, and we also had a room set up for evidence collection.

9    Q.    All right.  And did you see it get taken in through the

01:17 10   evidence collection room?

11    A.    Yes; I checked it into evidence myself.  There were some

12    of our evidence response personnel in there.  They're the

13    experts in handling evidence.  So we took it to them, they

14    checked it in, and we turned it over to them.

15    Q.    All right.  And then do you know if it was analyzed on the

16    spot by somebody there?

17    A.    I believe it was.  We knew just from the position of the

18    video that that was an important video to review.  And so we

19    had stated that.  You know, we called -- you know, we spoke to

01:18 20   someone at the command post and we said, "This needs to be

21    reviewed right away."  So I believe they started to review it

22    onsite, if not, they may have taken it right back to the office

23    and reviewed it.

24    Q.    And in the course of collecting it and bringing it to the

25    Westin and having it checked into evidence, did you follow all

```
  1    the evidence procedures that you had been trained to follow to

  2    preserve the integrity of the evidence?

  3    A.   Yes.

  4           MR. WEINREB:  No further questions.

  5           MR. BRUCK:  No questions.  Thank you.

  6           THE WITNESS:  Thank you.

  7           THE COURT:  All right, Agent.  Thank you.  You may

  8    step down.

  9           THE WITNESS:  Thank you.

 10           (The witness is excused.)

 11           MR. WEINREB:  The government calls James Tyra.

 12           MS. CONRAD:  May I confer with the government for a

 13    moment?

 14           THE COURT:  All right.

 15           (Counsel confer off the record.)

 16           THE COURT:  Witness?

 17           THE CLERK:  I'm just waiting for them.

 18           (Pause.)

 19           THE CLERK:  Sir.

 20                    JAMES TYRA, duly sworn

 21           THE CLERK:  Have a seat.  State your name --

 22           THE WITNESS:  James Tyra.

 23           THE CLERK:  Spell your last name for the record.

 24           THE WITNESS:  T-Y-R-A.

 25                      DIRECT EXAMINATION
```

01:18 (line 10)

01:19 (line 20)

```
 1    BY MR. WEINREB:

 2    Q.    Good morning.

 3    A.    Good morning.

 4    Q.    Where do you work?

 5    A.    I work at the FBI, the Federal Bureau of Investigation.

 6    Q.    And which branch of it?

 7    A.    Boston field office, Boston.

 8    Q.    And what's your assignment there?

 9    A.    My official title is a computer scientist.  I'm attached

10    to the cyber squad.

11    Q.    How long have you been there?

12    A.    About two and a half years now.

13    Q.    And what does the cyber squad do?

14    A.    We investigate all manner of computer-related crimes, I

15    guess is a good general description.

16    Q.    Where did you work before the FBI?

17    A.    Prior to the bureau I worked for the MITRE Corporation.

18    Q.    Is that a local company?

19    A.    It is, yeah.  In Bedford, Massachusetts.

20    Q.    What was your job there?

21    A.    I was a systems engineer.

22    Q.    What does that mean?

23    A.    It's putting computer systems together, like on the

24    Internet on a larger scale.  Making things work together and

25    talk to each other and stuff like that.
```

1    Q.    What degrees have you earned?

2    A.    I have a bachelor's degree in computer science as well as

3    a master's degree in computer science.

4    Q.    Are you what the FBI calls a CART tech?

5    A.    I am, yes.

6    Q.    And what is a CART tech?

7    A.    CART tech, we've had some minimal training -- so CART tech

8    is usually in conjunction with DEXT, which we call digital

9    extraction technician.  We are trained to handle digital

01:21 10   evidence, mainly the gathering of digital evidence.

11   Q.    Okay.  And are you what's known as -- now, you said

12   "DEXT."  That's D-E-X-T?

13   A.    Yes.

14   Q.    What does that stand for?

15   A.    Digital extraction technician.

16   Q.    And are you a DEXT-certified technician?

17   A.    Yes.

18   Q.    When you say "extract digital evidence," say more about --

19   what does that involve?

01:22 20   A.    Sure.  So at a crime scene, a lot of times nowadays you'll

21   encounter a computer or a digital video recorder or things

22   along those lines.  We're trained to properly, I guess, handle

23   those as evidence and pull the digital files, if you want to

24   call it, off of those correctly and retain them as evidence.

25   Q.    And just so we're clear, when you're talking about, let's

1    say, a digital video recorder and you pull a digital file off

2    of it, you're pulling video off of it?

3    A.    Correct.  Yes.  Yes.

4    Q.    Did you work the marathon bombing investigation?

5    A.    I did.

6    Q.    Starting when?

7    A.    Approximately five o'clock the day of the bombing we were

8    at the Westin Hotel.

9    Q.    And what did you do when you -- at the Westin Hotel?

01:22 10   A.    I was part of the team that was reviewing and, I guess,

11   processing digital evidence.

12   Q.    So how -- what was happening?  Digital evidence was coming

13   in to the hotel?

14   A.    Sure.  So there was a small conference room that we were

15   in.  We were stationed behind what the FBI calls ERT, which is

16   our evidence response technicians.  They're sort of the

17   professional evidence-handling people to bring evidence.  So a

18   piece of evidence would come in, they would process it.  What

19   that means is that they would start chains of custody, give it

01:23 20   an item number in our internal tracking system, you know, do

21   all the tracking stuff.  As soon as they were happy with their

22   tracking system, they would hand it off to us to start

23   examining what's on here, how do we get it off, how do we

24   preserve the evidence, how do we maintain the integrity

25   digitally.  All those sorts of things.

```
 1   Q.   And were you, in fact, involved in extracting and

 2   reviewing video and photographic and other kinds of computer

 3   evidence from devices that were being brought in to the Westin?

 4   A.   I was.

 5   Q.   And when you looked at them, what were you looking for?

 6   A.   I mean, they're generically evidence of a crime, evidence

 7   of a bombing, stuff like that.  It was really, yeah, very

 8   generic.

 9   Q.   Were you looking for suspects?

10   A.   Absolutely.  Yes.

11   Q.   Were you the only one doing it?

12   A.   No.  No.  I mean, at various times we had, depending on

13   what day you're talking about, there were a few people starting

14   to a whole lot of people eventually.

15   Q.   Okay.  Now, are you trained in how to do that in a manner

16   that preserves the evidence accurately so that the copies that

17   are pulled off are exact copies?

18   A.   Yes.

19   Q.   And the people who were with you, to your knowledge do

20   they have the same training?

21   A.   Yeah.  Yeah.

22   Q.   And did you perform that function in accordance with your

23   training so as to preserve the evidence and make exact copies?

24   A.   Yes.

25   Q.   And as far as you know, was everybody around you doing the
```

1    same?

2    A.   Yup.

3    Q.   So what did you do with the video that you extracted after

4    you extracted it and reviewed it?

5    A.   So we didn't get sort of a good extraction until the next

6    morning back at the FBI field office in Boston.  Once we were

7    able to obtain that, we started looking at it, I mean, just

8    reviewing it, seeing what was happening on the video.  You

9    know, there was a real big push to answer a lot of questions:

01:25 10   What had happened.  So --

11   Q.   Before we get ahead of ourselves, so let's stay on the

12   Westin for a minute.  So how long did you do this process at

13   the Westin?

14   A.   From 5 p.m. to approximately midnight, I believe.

15   Q.   Okay.  And during that time did you at least make a start

16   on extracting video from a surveillance system that had been

17   obtained from the Forum restaurant?

18   A.   Yes.

19   Q.   And were you -- so I cut you off earlier, but is that what

01:25 20   you were saying you started doing there and finished doing back

21   at the main FBI office?

22   A.   Yup.  Yup.  We finished up around midnight and started up

23   again the next day.

24   Q.   All right.  And did you extract video from that device?

25   A.   Yes.

1    Q.   What did it show?

2    A.   It showed a person approximately five minutes before the

3    bombing walk up to a place in front of the Forum there with a

4    backpack, casually turn, set the backpack down --

5              MR. BRUCK:  We object to the description of evidence

6    that will be admitted.  This is -- the witness is

7    characterizing --

8              THE COURT:  No, I think a general description is all

9    right.  I mean, the evidence I suspect is going to be offered,

01:26 10   and it will be the best evidence of the question.  But I think

11   a summary --

12             MR. BRUCK:  I guess my objection is to anything except

13   the general description.

14             THE COURT:  Yes, a general description.

15             MR. WEINREB:  That's fine.

16   BY MR. WEINREB:

17   Q.   Continue.

18   A.   In general, it showed someone setting down a backpack and

19   walking away and then a bomb blast going off very shortly after

01:26 20   that.

21   Q.   The other day did you review a copy of that same video in

22   my office?

23   A.   I did.

24   Q.   All right.  And was it a fair and accurate copy of the

25   video that you extracted and saw that night from the Forum

surveillance system, or the next morning?

A.   Yes, it was.

Q.   All right.  And was that Exhibit 23?

A.   Yes.

MR. WEINREB:  The government offers Exhibit 23.

THE COURT:  Any objection?

MR. BRUCK:  No objection.

THE COURT:  Admitted.

(Government Exhibit No. 23 received into evidence.)

BY MR. WEINREB:

Q.   Did you also analyze a GPS device in connection with this investigation?

A.   I did.

(Counsel confer off the record.)

Q.   I'm showing you Government's Exhibit 919, 9-1-9, for identification.  Do you recognize that?

A.   Yes, I do.

Q.   Is that the GPS device that you examined?

A.   I believe it is, yes.  Yup.  Yeah.

Q.   What did you do with this device?

A.   Basically we called our headquarters office, the specialists who work who are trained and have more knowledge than me, frankly, on GPS devices.  We told them what model we had and we asked them what the proper procedure was.  It turned out this model was relatively simple and that it plugs into any

1    computer and shows up like a thumb drive.  So we put what we

2    call a write blocker -- standard procedure is just to put a

3    device that blocks writing to things -- and we hooked it up to

4    one of our analysis computers and extracted the contents of the

5    GPS.

6    Q.   And the purpose of the write block is to prevent any data

7    from being put into the GPS --

8    A.   Yup.  Exactly.

9    Q.   -- so that stays the same.  And you just pulled it off the

01:29 10   GPS?

11   A.   Correct.

12          THE COURT:  Just to be clear, it's W-R-I-T-E, write?

13          THE WITNESS:  Yes.

14          THE COURT:  Correct?  I mean, it's a homonym.  I just

15   wanted to be sure everyone understood it was blocking writing.

16          Go ahead.

17          MR. WEINREB:  Okay.

18   BY MR. WEINREB:

19   Q.   And the data that you pulled off, did it -- what is the

01:29 20   data that you pulled off the device?

21   A.   I think you would call them GPS tracks, which is basically

22   a set of GPS coordinates that were taken very quickly.  So it

23   ends up being a plot of some time and location.

24   Q.   So it's where the GPS has been at various times?

25   A.   Exactly.

1    Q.   And did you plot those -- are those sometimes called

2    "waypoints"?

3    A.   Yeah, yeah, yeah.

4    Q.   And did you plot those waypoints for various times and

5    dates on a series of maps?

6    A.   Yes, at one point I did do that.

7    Q.   I'm showing you what's been marked for identification as

8    Exhibit 1152-03 --

9    A.   Uh-huh.

01:30 10   Q.   -- 1152-05, and 1152-06.  Do you recognize those?

11   A.   Yes, these look like what I pulled off.

12   Q.   Okay.  So these are three maps that have a series of dots

13   plotted along them.  Is that correct?

14   A.   Yes.

15   Q.   All right.  And the dots that are plotted along them, are

16   those waypoints that were extracted from the GPS device that

17   you analyzed?

18   A.   I believe so, yes.

19   Q.   Thank you.  And do they -- to the best of your

01:31 20   recollection today, does that fairly and accurately represent

21   the waypoints that you pulled off for those particular dates

22   and times?

23   A.   I didn't memorize everything but this looks familiar to

24   what I pulled off, yes.

25              MR. WEINREB:  Excuse me one second, your Honor.

```
 1              (Counsel confer off the record.)
 2    Q.   Agent Tyra -- I'm sorry.  Not "agent" but Mr. Tyra, you
 3    talked a little bit about the procedures for evidence handling
 4    and preservation and particularly the ones that the CART
 5    examiners use, the evidence examiners use.
 6    A.   Yes, I'm not a CART examiner; we're just DEXT-trained, but
 7    yes.
 8    Q.   Okay.  But you're one of the people who, as you've said,
 9    pulls digital data off devices?
01:32 10    A.   Yes.
11    Q.   And were there other people, not just at the Westin doing
12    that, but other people in the investigation doing that in other
13    places?
14    A.   Yeah.  Absolutely.
15    Q.   All right.  And to the best of your knowledge was
16    everybody following the same sets of procedures for doing it to
17    preserve and maintain the integrity of the evidence?
18    A.   Yes.
19              MR. BRUCK:  I object to how this witness would know
01:32 20    what other people were doing.
21              THE COURT:  Overruled.
22              You may answer it.
23              THE WITNESS:  Yes.
24              MR. WEINREB:  No further questions.
25              MR. BRUCK:  No questions.
```

```
 1              THE COURT:  All right, sir.  Thank you.  You may step
 2      down.
 3              (The witness is excused.)
 4              MR. MELLIN:  The United States calls Alan Hern.
 5                       ALAN HERN, duly sworn
 6              THE CLERK:  Have a seat.  State your name and spell
 7      your last name for the record and keep your voice up and speak
 8      into the mic.
 9              THE WITNESS:  Okay.  Alan Hern, H-E-R-N.
10                       DIRECT EXAMINATION
11      BY MR. MELLIN:
12      Q.   Good morning, Mr. Hern.
13      A.   Good morning.
14      Q.   Where do you live?
15      A.   In Martinez, California.
16      Q.   And where did you grow up?
17      A.   In Martinez, California.
18      Q.   At some point did you go to college?
19      A.   I did.  I went to the United States Naval Academy in 1989.
20      Q.   Did you graduate from the Naval Academy?
21      A.   Yeah, in 1993.
22      Q.   And did you have a roommate back then that you still keep
23      in touch with?
24      A.   Yeah.  My roommate was Luis Yepez.  He's from Paxton,
25      Massachusetts, and he now lives in Andover.
```

1   Q.   And Mr. Yepez is Y-E-P-E-Z.  Is that right for the record?

2   A.   Correct, yeah.

3   Q.   At some point did you leave the Navy?

4   A.   I did.  I left in October of 1998, and then I started

5   working as a defense contractor for Space and Naval Warfare

6   Systems command in San Diego because we were still stationed in

7   San Diego.  Then we moved back up to the San Francisco area

8   after about a year.

9   Q.   And as you sit here today, how are you employed?

01:34  10   A.   I'm a teacher.

11   Q.   And are you also a coach as well?

12   A.   I'm the varsity football coach at my high school, yes.

13   Q.   Do you have a family?

14   A.   I have a wife, I have three children.  Erin is 13 and my

15   daughter is 12, Abigail, and then Caroline is 16 months old.

16   Q.   In April of 2013 did you decide to come to Boston?

17   A.   We did.  My wife had qualified for the Boston Marathon.

18   We had run the San Francisco Marathon together in July of 2012

19   and she qualified.  And we actually weren't going to come

01:35  20   because it was expensive, and with the children.  And we just

21   kind of kicked it around for a long time.  And actually, she

22   missed the deadline to sign up and just got on -- we decided to

23   do it anyway, and we ended up coming out for the race.

24   Q.   When did you actually come to Boston?

25   A.   We came a few days before because we wanted to visit with

the Yepezes.  We don't see them very often being on the other

side of the country.  So we decided to kind of make a reunion

of it and we stayed with them at their house.  And they kind of

helped us with the logistics of getting down to the race and

going to the expo.

Q.    And when you say that you came here, who came with you?

A.    The whole family came.  At the time Katherine was pregnant

with Caroline.  She was three months pregnant.

Q.    Yet she was still going to run the race?

A.    Right, yeah.

Q.    All right.  On the morning of April 15th, 2013, what did

you do?

A.    We got to the race, we parked.  We had to kind of walk

pretty far to get to -- because there were so many people.  We

staked out a place closer to the finish line.  We were right

near where all the flags were.  We actually were right near

where LensCrafters and the sports store and the Candy Heaven.

We bought some candy for the kids.  They were playing catch.

The sidewalk is really wide on that part of the street.

      Lou's wife, Gisela, she put a chair up and she just kind

of set up a place for us there so everybody else could kind of

move around.  And we were there for probably, like, three

hours.  We decided to -- Lou and I were taking pictures, and we

decided to walk up the street and around to Hereford to watch

the female elite runners come in and take pictures, and that's

1    when we noticed that there was less of a crowd farther up

2    Boylston.

3         So we made our way back down to the rest of the group and

4    we told them, "Hey, let's go up the street and find a little

5    easier place to see."  So then we walked up the street, and

6    that's how we ended up near the Forum restaurant and the

7    Atlantic Fish Company.

8    Q.   And from what you described, the first location you were

9    at was actually the location where later the first bomb would

01:37 10   go off?

11   A.   Right where it was, yes.

12   Q.   And then you moved down to the Forum area after that?

13   A.   Correct.

14   Q.   All right.  By the time you got to the area around the

15   Forum, who was with you?

16   A.   My son Aaron; Lou's son David.  They were standing

17   together just kind of on the other -- we were probably 12 or 15

18   feet away, Lou and I.  And then Gisela was on the other side of

19   us, and my daughter was close with me, Abigail.

01:38 20   Q.   In April of 2013, how old was Aaron?

21   A.   Aaron was 11.  His birthday is on May 1st, so he was going

22   to be 13 [*sic*] after the race.

23   Q.   And do you know how old David was?

24   A.   David, I believe, was a freshman in high school at the

25   time.

```
 1    Q.    Were you keeping track of your wife on the run?
 2    A.    We were.  We had the -- we had signed up for the text
 3    messages, so we knew where she was at different checkpoints
 4    throughout the race.  I was worried about her because she was
 5    pregnant.  I mean, she had been training.  We had run two
 6    marathons before this, and the doctor said it was fine for her
 7    to do it because she had been training.  But still, it was a
 8    concern.  But she was doing really well.  She was doing better
 9    than I thought she would, actually.  So we kind of had an idea
10    about when she was going to come across our location.
11    Q.    Just prior to the second explosion, do you know where she
12    was located?
13    A.    Not exactly because I think the last checkpoint we had was
14    farther down the course.  So we were just guessing about how
15    far she was away and about when that would put her where we
16    were at.  So I really had no idea exactly where she was.
17    Q.    Had she finished at that point?
18    A.    No.  She told me later that she'd turned the corner,
19    Hereford onto Boylston.  She was thinking how thankful she was
20    for how things had worked out for our family, that things were
21    going well with the baby, that she felt good, and that's when
22    the bombs went off, when she was coming down Boylston.
23          MR. MELLIN:  If I could just for the witness, your
24    Honor, have the witness look at Exhibit 29.
25    Q.    Do you see Exhibit 29 in front of you, Mr. Hern?
```

1    A.    Yes.

2    Q.    Do you recognize what that is?

3    A.    That's the location of the second bomb, where we were

4    standing.

5    Q.    Who do you see in that photograph?

6    A.    That's my son Aaron.

7    Q.    We're going to get back to that in just a minute.  If you

8    can just for the record say who you see in that photograph.

9    A.    Okay.  My son Aaron, David.  I see Jane Richard, Martin

01:40 10   Richard, Bill Richard, Denise Richard.

11   Q.    All right.  Let me ask you:  Is that a fair and accurate

12   photograph of April the 15th, 2013, in front of the Forum?

13   A.    Yes.

14        MR. MELLIN:  Your Honor, at this time we would move

15   into evidence Exhibit 29 and ask that it be published.

16        THE COURT:  Any objection?

17        MR. BRUCK:  No objection.

18        THE COURT:  Okay.  Admitted.

19        (Government Exhibit No. 29 received into evidence.)

01:40 20   Q.    All right, Mr. Hern.  I've had a bad habit today of having

21   people jump ahead of me.  You had already circled where Aaron

22   was.  Now if we could just do that again.

23   A.    Sure.  Right there and right there.  That's Aaron.

24   Q.    And for the record, you've circled a young boy who's on a

25   fence line about four children down from the left of that

 1    photograph?

 2    A.    Correct.

 3    Q.    All right.  Can you see Abigail in this photograph?

 4    A.    No, Abigail was with me.  There's another tree that's up

 5    the street about 12 or 15 feet, and she's standing near by me

 6    at that spot.

 7    Q.    And do you see Mr. Yepez in this photograph?

 8    A.    No.  He was with me also next to the other tree.

 9    Q.    And what about David?

01:41 10    A.    David is right here.  That's him (indicating).

11    Q.    All right.  And for the record, you circled -- let me just

12    clear these, but you circled the person standing next to your

13    son, to the right of your son in this photograph?

14    A.    Correct.

15    Q.    All right.  Now, you said you were not in this photograph.

16    As you look at this photograph, how far down were you from the

17    edge of this photograph?

18    A.    From the edge of the photograph, probably six to eight

19    feet.

01:42 20    Q.    At the time of the explosion, what happened?

21    A.    The first or the second explosion?

22    Q.    Actually, that's a very good point.  What happened after

23    the first explosion?

24    A.    The first explosion, everyone turned and faced down the

25    street back towards the finish line.  There was -- I could see

1    a cloud of smoke come off the building.  And at that time I

2    don't think anybody -- I didn't think anything was really out

3    of the ordinary.  I thought maybe it was a transformer had

4    blown, maybe a gasline blown up, something like that.  And we

5    were just kind of watching the trail of smoke and then the

6    second bomb blew up right in front of us.  And then at that

7    point I knew that there was -- that was not normal.

8    Q.   As you look at Exhibit 29, you said when the first bomb

9    exploded, everyone looked down.  As you look at this

01:43 10    photograph, would people be looking to the left or to the

11    right?

12    A.   They would be turned to the left.

13    Q.   All right.  After the second explosion what do you

14    remember happening?

15    A.   There was a loud concussion.  It made me disoriented for a

16    few seconds.  I wasn't really sure what had happened or where I

17    was.  There was a big cloud of smoke that enveloped all the

18    people that were to my left.  I didn't see anything inside the

19    cloud.  It smelled of gunpowder.  And it kind of felt like you

01:43 20    were under water.

21         And then I turned and I faced towards the Fish Company

22    restaurant, and that's where I saw my daughter was standing in

23    front of me.  And I grabbed her thinking, "Well, at least I

24    have one of my kids."  I wasn't sure where Aaron was.  I knew

25    he was somewhere in the cloud.  I wasn't sure what happened to

1    him.  So I grabbed her and then I headed up the street away

2    from that -- the bomb, not knowing if there was going to be

3    another bomb, just moving away from that direction and took her

4    up to the street to the Abe and Louie's restaurant, just

5    happened to run into that restaurant.

6    Q.   How was Abigail?  Was she injured in any way?

7    A.   She wasn't injured.  She had some powder marks on her

8    jacket.  She was just hysterical from what had happened.  She

9    was crying.  Just -- when I went to the restaurant, I happened

01:44 10   to find Gisela Yepez was in that restaurant, right where the

11   maître d' station is.  And I handed her over to Gisela.  And

12   Gisela was crying.  And then I -- I went back down the street

13   to look for Aaron.

14   Q.   Were you injured at all at that time?

15   A.   No.

16   Q.   All right.  When you went down to find Aaron, where did

17   you find him?

18   A.   At that point the smoke had cleared.  There were people on

19   the sidewalk.  I was looking around for him.  And then we

01:45 20   just -- I caught his eye and he caught my eye, and he's my son.

21   I did recognized him.  My friend Lou was there and he said,

22   "Where's Aaron?"  I said, "He's right there."  And he didn't

23   recognize him because he had black soot all over his face and

24   his hair was standing straight up, but I knew him right away.

25        And so he took a couple of steps towards me, and then some

1    people said, "Hey, lay him down on the sidewalk."  And so they

2    laid him down on the sidewalk and I went over and knelt down by

3    his head.  And I was talking to him and some other people were

4    trying to help.  Somebody said, "Grab a belt."  Somebody took a

5    belt off and they put it around his leg.  And I was just trying

6    to comfort him and tell him that I loved him and that he needed

7    to hang in there.

8        And he said, "It really hurts, Dad.  It really hurts."  I

9    said, "I know.  Just hang in there.  We're going to get help."

01:46 10   Q.   Can you describe the injuries that you saw on him?

11   A.   He had his shorts on and -- like I was near his head, and

12   I looked down and on his outer left thigh was a crater about as

13   big as my hand that was --

14   Q.   Just for the record, you held your hand up?

15   A.   It was about that big.  It was mangled flesh, full of

16   blood.  It looked like something you'd see in a war movie, like

17   he'd gotten hit by a hand grenade.  I didn't see the extent of

18   his other injuries at that time other than his eyebrows were

19   singed and, again, his hair was sticking straight up and he

01:46 20   had -- his legs were all black from the blast.

21   Q.   What were you thinking at that time?

22   A.   I was angry.  Aaron plays football and he had gotten hurt

23   in September.  He had a dislocated left elbow.  And it was a

24   pretty gruesome injury, it was on the field.  They had to give

25   him morphine.  The ambulance came and took him off the field.

1    And I was worried about the health of his arm for the long run.

2    And I remember thinking -- that's the first thing that came to

3    my head, is like he's not even 12 years old and I can't believe

4    this has happened twice.  And he's going to have to go off in

5    the ambulance again and I had no idea how severe the injury was

6    going to be in the long run and just why did this happen to

7    him.

8    Q.   If I could have you --

9              MR. MELLIN:  And just the witness, your Honor.

01:47 10   Q.   -- look at Exhibit 27.

11   A.   (Witness complies.)

12   Q.   Mr. Hern, do you recognize what is depicted and shown in

13   Exhibit 27?

14   A.   Yes.

15   Q.   What do you see in that photograph?

16   A.   I see my son Aaron.  He's behind the sign.  He's got his

17   Nike sweatshirt on.

18   Q.   And does that photo fairly and accurately depict how Aaron

19   looked after the explosion on April 15, 2013?

01:48 20   A.   Yes.

21             MR. MELLIN:  Your Honor, I would move into evidence

22   Exhibit 27 and ask to publish it.

23             MR. BRUCK:  Subject to a previous motion.

24             THE COURT:  All right.  As indicated, I will admit it.

25             (Government Exhibit No. 27 received into evidence.)

1    BY MR. MELLIN:

2    Q.   Mr. Hern, as you look at Exhibit 27, can you please

3    indicate for the ladies and gentlemen where it is that Aaron is

4    in this photo?

5    A.   That's Aaron (indicating).

6    Q.   And for the record, you put an arrow over the top of the

7    young boy on the far left of this photograph?

8    A.   Yes.

9    Q.   And is that essentially the area that Aaron was at when

01:48 10   you walked up and saw him?

11   A.   That was a little bit before I came up.  When I came up,

12   he stood up and made a couple of steps up the street towards

13   me.

14        MR. MELLIN:  And then if I could have just Mr. Hern

15   see Exhibit 28, please.

16   Q.   Mr. Hern, do you recognize Exhibit 28?

17   A.   Yes.

18   Q.   What is that a photo of?

19   A.   That's Aaron on the ground, people trying to help.  That's

01:49 20   me in the black.

21   Q.   Does that photo fairly and accurately depict the events of

22   April 15, 2013?

23   A.   Yes.

24        MR. MELLIN:  Your Honor, I would ask to move in

25   Exhibit 28 and publish it.

1           MR. BRUCK:  Same objection.

2           THE COURT:  Same ruling.  Yeah.

3           (Government Exhibit No. 28 received into evidence.)

4    BY MR. MELLIN:

5    Q.   Now, Mr. Hern, the photo's in front of you and the jury.

6    Can you please indicate where you are in this photograph?

7    A.   That's me.

8    Q.   All right.  And you indicated the man who's standing to

9    the right in the photograph with a black shirt and blue pants?

01:50 10   A.   Yes.

11   Q.   That didn't really distinguish you, I guess, from the

12   other individual.  The one on the right, though, correct?

13   A.   Correct.

14   Q.   All right.  And where is Aaron in this photograph?

15   A.   Aaron's right here (indicating).

16   Q.   Can you just draw a circle?  Are you able to do that?  All

17   right.

18   A.   (Witness complies.)

19   Q.   And the circle you just drew is the young boy who's in the

01:50 20   middle of the bottom of that photograph between the two men

21   that are hunched over?

22   A.   Correct.

23   Q.   All right.  Do you know who these men were who were next

24   to Aaron?

25   A.   Not at the time.  I later met this gentleman right here

```
 1    but I don't know the other two people.
 2    Q.   Okay.  Now, as you're looking at this photograph, can you
 3    tell us exactly what is going on at that point in time?
 4    A.   At that time we were, you know, trying to help Aaron.  I
 5    kind of let them take over in terms of the first aid because I
 6    wanted to talk to him.  And I wasn't sure what was going to
 7    happen to him, so I wanted to make sure that I talked to him
 8    and told him I loved him before.
 9         So they were busy trying to -- like I said, one guy pulled
10    a belt out and put it on his leg as a tourniquet.  There was
11    just, you know, a lot of jostling around.  I wasn't able to
12    talk to him for very long, maybe like 20, 30 seconds, and then
13    they scooped him up and then took him over the barricades
14    towards an ambulance.
15    Q.   When you were near Aaron, did you notice any metal objects
16    around?
17    A.   Yeah, when I knelt down near his head, I was on the left
18    side of his body, and I took a look over just to my left and I
19    noticed a piece of metal about as big as a Kleenex box next to
20    his head -- it had jagged edges around the side of it -- laying
21    on the sidewalk.
22    Q.   For the record, you just held your hands up.  And
23    essentially the size of about 6 or 8 inches long.  Is that
24    right?
25    A.   Uh-huh.
```

1    Q.    And about how wide?

2    A.    Probably 2 to 3 inches.

3    Q.    Did you notice any other people that were injured around

4    that area?

5    A.    Initially I just kind of saw out of my peripheral vision

6    because I was really focused on trying to find Aaron.  When he

7    was picked up and he left, I kind of -- I stood back up and

8    then kind of tried to take in the scene.  And at that point a

9    lot of people had been taken away, but the last thing I did see

01:52 10   was Martin Richard on the sidewalk and there were two people

11   trying to revive him still.  But I could see his eyes clearly

12   and I didn't think he was alive.

13        At that point there was really nothing else to do.  There

14   was no one else really left to help.  So I turned, and my

15   friend Lou at that point said, "Where's David?  I haven't found

16   David."  And so we went to go find David.  So we went back up

17   to the restaurant to find Gisela and my daughter and see if we

18   could find where David ended up.

19   Q.    Where was Aaron taken?

01:53 20   A.    I had no idea at the time.  I wish I would have asked.  I

21   don't know if they knew where he was going.  I was just happy

22   at the time he was getting assistance and he was leaving.  So

23   we actually didn't know for a couple of hours where he actually

24   went.

25   Q.    Did you ultimately find David?

1    A.   We did.  When we went back to the restaurant, he was

2    there.  He had the -- he was -- looked kind of like Aaron did

3    with the smoke on his face and the hair.  And he said he was

4    hurt.  He had pain in the back side of his leg and on his

5    buttocks.  And so Lou just pulled his pants down right there in

6    the restaurant, and he had a large wound down the back of his

7    leg.  So we tried to get him out of the restaurant, back out to

8    the street to try and get help.

9         When we first got out to the sidewalk, there was just kind

01:54 10   of people running by.  We flagged down someone who

11   was -- looked like a medic.  And he took a quick look at David

12   and said, "I hate to tell you this, but there's people worse

13   off than him so I'm going to have to keep going down the

14   street."  So that guy took off and left.  I flagged down

15   another guy who came over, stopped, and then he took David and

16   walked him to an ambulance.

17        David brought his cell phone with him, and so he texted us

18   in the back of the ambulance and told us that they were taking

19   him to Tufts Medical Center.  So based on that, that's where we

01:55 20   headed.  I was with Lou and Gisela and my daughter Abigail.  We

21   tried to sync up with my wife, and our goal was to try to get

22   to Tufts in hopes that Aaron was there with David.

23   Q.   Was Aaron at Tufts?

24   A.   He was not.  As soon as we got into the door, the

25   receptionist at the front had a computer screen up.  And I kind

1    of peeked over and I looked, and I could see David's name on

2    the list of people who had been admitted and Aaron wasn't on

3    the list so I was pretty sure he wasn't there.  And then they

4    confirmed that he wasn't at Tufts but they weren't sure where

5    he was.

6    Q.   How did you find out where he was?

7    A.   It was a long, convoluted experience.  They took us to

8    another room, there was a bomb scare in the hospital, they

9    weren't share what was going on.  They brought all the patients

01:55 10    out to this kind of open area in the hospital, then they took

11    us down to a lower auditorium.  The cell phone reception wasn't

12    very good in there.  Hospital people -- different people kept

13    coming up and saying they were trying to find him.

14        The Boston Police Department came to interview me, and

15    this was about two hours into it, and just as I was finishing

16    talking to them, one of the hospital people came in and said,

17    "We found your son.  He's at Boston Children's Hospital."  So

18    at that point we were trying to figure out how to get to that

19    location.  They gave us a voucher for a taxi but none of the

01:56 20    taxis were stopping and no one showed up.

21        My wife, who had just finished running the marathon wanted

22    to walk to Boston Children's, and she was really not in a

23    condition to do that.  She was barely able to move around.  And

24    a friend of ours flagged down a Lincoln Town Car and convinced

25    the guy to give us a ride, so he gave us a ride to the

1    hospital.  And by the time we arrived in the lobby, there were

2    two social workers from the hospital and they told us that he

3    was just coming out of surgery and in about 40 minutes or so

4    we'd be able to see him.

5         So they took us up to the floor that he would be on, the

6    ICU.  And we put Catherine on the carpet and gave her ice bags

7    and a blanket because she was in pretty bad shape having just

8    finished, and we just waited until we got a chance to go into

9    the room and see him.

01:57 10   Q.   When you saw him, can you describe what injuries you saw?

11   A.   Well, he was beat up pretty good.  He had a black eye.

12   His hair still was kind of burned and singed.  His eyebrows

13   were singed off.  He had the breathing tube in.  He was not

14   conscious; he was sleeping.  They had given him a drug to help

15   with breathing tube.  And then he had the hospital gown on.

16   And then we saw -- they kept the wound open, so they had a

17   dressing on his leg and then a drain that went down to the

18   floor to try and drain it out, I guess keep it clean until they

19   were going to do a further surgery.

01:58 20   Q.   Ultimately, did they do the further surgery?

21   A.   Right.  So -- well, initially there was a lot of doctors

22   that came in and out of the office the first -- of the room the

23   first day or so.  We had a specialist come in about his ears,

24   because both his eardrums were punctured from the blast.  And

25   then the hair -- the celia in his ear they were afraid had been

1    damaged so they said that he needed to go on a course of

2    steroids to help with the inflammation so his hearing -- if we

3    did it early, they said that hopefully his hearing would

4    recover.

5         Then we had people from -- I think the disease control

6    came in and said they'd found bone fragments of somebody else

7    in his wound and that as a precaution that he would have to

8    take this course of antiviral therapy that is common for people

9    who have HIV, just to make sure.  They said he's probably okay

01:59 10   because of the heat and the blast, but just to make sure they

11   thought that was a good idea.  And then the various other

12   specialists that came through, the nurses to dress his wounds.

13   It was a very busy time just trying to get everything under

14   control.

15        Three days later they went back in and did a cleaning of

16   the wound again, and then they were going to now see if it was

17   possible to close it back up.  There was a possibility that he

18   would need skin grafts to close up the wound because they

19   didn't know if there would be enough skin left over to close

01:59 20   it.

21        The fascia, the covering over your muscles, had been torn

22   and some of it was gone, so when they -- they went in, they

23   were able to sew that part back together but it kind of caused

24   a puckering effect and his leg doesn't look like his other leg.

25   But anyway, fortunately they were able to get the skin

1    together, and then they stapled the skin together.

2    Q.   Do you know how many staples it took to close that wound?

3    A.   Well, that wound was -- he had staples all over both legs.

4    So there were other injuries besides that one.  I didn't see

5    that initially at the bomb site, but he had zipper-like wounds

6    all down both legs, he had tattooing.

7    Q.   What do you mean by zipper-like wounds?

8    A.   When the stitches went in, they were long scars, about

9    that long, that looked like zippers.  He had --

02:00 10   Q.   You just indicated about, what, 3, 4, 5 inches?

11   A.   Right.  So he had a few on his right leg, also on his left

12   leg.  He had some BB marks on his abdomen.  The doctor said

13   that his scrotum had been clipped by a piece of something.

14   Fortunately it didn't damage anything.  And his shins, because

15   he had the shorts on, were tattooed from debris, they said, on

16   the ground.  So it was a solid rectangle from his kneecap down

17   to his ankle, and it looked like pencil lead, just thick on

18   both legs.  So all those had to be cleaned and stapled as well.

19   So between the two legs and the major injury in his left leg,

02:01 20   he had 62 staples in his legs.

21   Q.   How many days did Aaron end up spending in the hospital?

22   A.   He was there for nine days.

23          MR. MELLIN:  With the Court's indulgence.

24          (Counsel confer off the record.)

25          MR. MELLIN:  Thank you, your Honor.  Nothing further.

```
 1              MR. BRUCK:  Thank you, Mr. Hern.  We have nothing.
 2              THE COURT:  All right, Mr. Hern.  Thank you.  You may
 3      step down.
 4              (The witness is excused.)
 5              THE COURT:  We'll take the morning recess at this
 6      point.
 7              THE CLERK:  All rise for the Court and the jury.  The
 8      Court will take the morning recess.
 9              (The Court and jury exit the courtroom and there is a
10      recess in the proceedings at 11:14 a.m.)
11              THE CLERK:  All rise for the Court.
12              (The Court enters the courtroom at 11:50 a.m.)
13              THE CLERK:  Be seated.
14              THE COURT:  I apologize for the brief delay.  There
15      are sometimes other things that come up.
16              MS. CONRAD:  Your Honor, I just wanted to bring a few
17      matters to the Court's attention with respect to witnesses who
18      are coming up.  One with respect to the witness Roseann Sdoia.
19      The government indicated that it intends to offer Exhibits 24,
20      25 and 26.  These were among those that we identified as
21      cumulative and unduly prejudicial.  It seems like the
22      government had gone from two -- after having said they were
23      going to reduce the number of exhibits, they've gone from two
24      to three.
25              So I would beg your Honor's judgment on that.
```

```
 1              THE COURT:  Well --

 2              MR. MELLIN:  Your Honor, actually, we've reduced other

 3    ones.  But we didn't add any but we are intending on use all

 4    three of those with Ms. Sdoia.  They show --

 5              THE COURT:  Can you show them to me right now?

 6              MS. CLARKE:  I can.  I've got them right here in the

 7    binder.

 8              THE COURT:  I have them right here.

 9              MS. CONRAD:  Mr. Mellin is quicker than I.

10              (Pause.)

11              THE COURT:  With respect to 24, is the witness going

12    to identify herself?

13              MR. MELLIN:  Yes.

14              THE COURT:  Is she in all three pictures?

15              MR. MELLIN:  Yes.

16              THE COURT:  I think they're different enough that they

17    can all be --

18              MS. CONRAD:  Note our objection.

19              THE COURT:  Okay.

20              MS. CONRAD:  With respect to -- the government has

21    produced this large TV screen.  I don't know what the exact

22    measurements are for the record.  It is considerably larger

23    than any of the monitors certainly and probably larger than the

24    JERS screen that is in the back for jury deliberations.

25              The government had previously raised this issue during
```

1  a chambers conference.  I don't know if your Honor wants to

2  hear us at sidebar in light of that fact.  But the bottom line

3  is none of us recall your Honor stating that they could use

4  this.  We have not seen the videos on this screen and don't

5  know what it's going to look like and how it's going to impact

6  the jury.

7         We continue in our objection to it, but we certainly

8  would like an opportunity to view it ourselves before it's

9  shown to the jury.  The government has indicated that there was

02:40 10  some ruling but we have no recollection of that collectively.

11         THE COURT:  Well, I don't remember myself, the

12  particulars.  I do know it was discussed.  My understanding is

13  the request was because the nature of the material to be

14  displayed was digital as opposed to analog and the system is

15  generally analog.  It --

16         MS. CONRAD:  I don't know that there was ever any

17  showing, your Honor, that was the case.

18         THE COURT:  No, I don't know there was a showing.

19  There was a representation.  I didn't cross-examine them on it.

02:40 20         But let me just say ordinarily equipment issues are

21  not something that rise to this level so I don't think we spend

22  a lot of time on it.  If somebody wants to bring in some

23  display equipment, generally if it works --

24         MS. CONRAD:  I'm sorry.  I can't --

25         THE COURT:  I said from time to time people ask

1    permission to bring in display equipment and generally we allow

2    it.  I mean, it's not usually a controversial matter.

3         MS. CONRAD:  Well, it's controversial because of the

4    nature -- the graphic nature of the video.  And we did raise

5    this, your Honor, in chambers and registered an objection.

6         THE COURT:  I don't know who wants to --

7         MR. MELLIN:  Your Honor, it doesn't change the video

8    at all.  The video is the video.  All this does is it provides

9    a little better resolution and has a larger screen.

02:41 10        THE COURT:  Is this the Watertown vid- -- I mean

11   Cambridge?

12        MS. CONRAD:  No, this is the Forum.

13        MR. MELLIN:  No, no, no, no, no.  This is the Forum

14   video.

15        THE COURT:  Oh.

16        MS. CONRAD:  I mean, all of this imagery is digital.

17   I don't know what they mean by analog.

18        THE COURT:  It's this (indicating).  It gets -- as I

19   understand it -- I am not a techie, but my understanding is

02:41 20   that our system is incompatible with some digital media, that's

21   all.

22        MR. WEINREB:  The original media is digital, the court

23   system is analog.  When you go from digital to analog the video

24   degrades considerably.  By having a digital display, the jurors

25   see what was actually recorded as opposed to some artificially

1    deteriorated version of it which is just an artifact of the

2    nature of the system in the court.

3           THE COURT:  How is this connected?

4           MR. WEINREB:  It is connected digitally to the display

5    device, to the --

6           THE COURT:  To the source computer?

7           MR. WEINREB:  Yes.

8           THE COURT:  Does that mean it won't be showing through

9    the system?

02:42 10          MR. BRUEMMER:  Your Honor, actually, I believe it

11   comes up under the "all" category.  When your Honor chooses,

12   display "all."

13          THE COURT:  So it will be both?  It will be both here

14   and in the system?

15          MR. BRUEMMER:  Right.

16          MR. WEINREB:  Yes.

17          THE COURT:  All right.  I think we can -- you've seen

18   the video, right?

19          MS. CONRAD:  Yes, we've seen the video.  We haven't

02:42 20   seen it in this format.

21          THE COURT:  I don't think there's a substantial issue

22   as to what its resolution is.

23          MS. CONRAD:  In addition, your Honor, I believe the

24   next witness is Officer Lauren Woods.

25          THE COURT:  Yes.

1          MS. CONRAD:  We have a motion pending.  Your Honor was

2     given --

3          THE COURT:  I've reviewed the statement, and she may

4     testify.

5          MS. CONRAD:  May I have one moment, please?

6          (Counsel confer off the record.)

7          MS. CONRAD:  Thank you.  I'm sorry.  One moment.

8          Your Honor, just note our objection.

9          THE COURT:  Okay.

02:43 10          MS. CONRAD:  Thank you.

11          MR. BRUCK:  There is --

12          THE COURT:  Jury.

13          MR. BRUCK:  There's one last matter.  Earlier today,

14     quite unexpectedly an FBI analyst began to characterize the

15     crucial moments of the Forum video describing the defendant as,

16     quote, casually putting down a backpack before we could rise to

17     object, and the Court, of course, sustained the objection.

18          We would ask the Court to instruct the government to

19     inform all of its witnesses that they are not to provide

02:43 20     characterizations or interpretations of evidence that is on the

21     video.  There are crucial matters, such as the defendant's

22     intent with relation to the children, that Mr. Weinreb has

23     already given the government's inferences in opening argument,

24     but it's critically important that witnesses not provide their

25     interpretation or their opinion about what the video shows.

1          And so we make that motion in limine.

2          MR. WEINREB:  Your Honor, I don't object to that in

3     principle.  I agree witnesses shouldn't give their opinions

4     about things that are facts.  My recollection is that the Court

5     did not sustain the objection.  It said that it was fine for

6     the witness to talk about it in general terms.  The word

7     "casual," it's very hard to dictate the precise words that come

8     out of witnesses' mouths, so we take the defense's point and --

9          THE COURT:  All right.  As a general matter the

02:44  10    witnesses should not be interpreting or opinion.  We'll

11    proceed.

12          MR. MELLIN:  And, your Honor, may Mr. Bruemmer unplug

13    this screen for now and then plug it back in when Officer

14    Barrett is called?

15          THE COURT:  As necessary.

16          MR. MELLIN:  Thank you.

17          THE CLERK:  All rise for the jury.

18          (The jury enters the courtroom at 11:57 a.m.)

19          THE CLERK:  Be seated.

02:45  20    MR. CHAKRAVARTY:  Your Honor, the government calls

21    Officer Lauren Woods.

22                    LAUREN WOODS, duly sworn

23          THE CLERK:  Have a seat.  State your name, spell your

24    last name for the record, keep your voice up and speak into the

25    mic so everyone can hear you.

1           THE WITNESS:  Lauren Woods, L-A-U-R-E-N W-O-O-D-S.

2                       DIRECT EXAMINATION

3     BY MR. CHAKRAVARTY:

4     Q.    Good afternoon.  You're a Boston police officer?

5     A.    Yes, I am.

6     Q.    How long have you been a Boston police officer?

7     A.    I've been on the department for about four and a half

8     years.

9     Q.    And what did you do before you became a police officer?

02:47 10    A.    I worked at the mayor's office of neighborhood services

11    for the City of Boston.

12    Q.    And what was your role there at the neighborhood services?

13    A.    I was the Dorchester coordinator liaison, one of his

14    outreach people for all the neighborhoods.

15    Q.    Are you from Boston originally?

16    A.    I'm from Dorchester originally, yes.

17    Q.    Did you go to school here?

18    A.    I did.  I went to Boston Latin School and then I went to

19    UMass Amherst.

02:47 20    Q.    When you were in the neighborhood coordinator, what type

21    of activities did you do?

22    A.    I would represent the mayor -- at the time Mayor Menino --

23    in and out of community meetings, civic meetings, events in the

24    neighborhood that he'd attend, neighborhood coffee hours.  I

25    would represent him at the zoning board of appeals, licensing

      1    unit and things of that nature.

      2    Q.   Now, in your capacity as the neighborhood services

      3    coordinator, had you had occasion to meet the family of Martin

      4    Richard?

      5    A.   I've met them several times.  I've known them since 2006,

      6    since I started.  Bill is a very involved community member,

      7    involved with the Ashmont-Adams Neighborhood Association, St.

      8    Mark's Main Street.  And we actually did an event at their

      9    house where the BigBelly recycle bins were the first

02:48 10    distributed at their home in the neighborhood.

     11    Q.   When's the first time you saw Martin?

     12    A.   On Denise's hip at a civic meeting, probably when he was

     13    one.

     14    Q.   What have been your duties on the Boston police force?

     15    A.   I have been assigned to area South Boston, C-6; followed

     16    by E-18, Hyde Park; then Roxbury, B-2; and I lastly went to

     17    District 4 in the South End-Back Bay.  And now I'm currently

     18    assigned to the Youth Violence Strike Force, also known as the

     19    Gang Unit.

02:49 20    Q.   Back on April 15th of 2013, were you assigned to B-4?

     21    A.   I was assigned to District 4, D-4, yeah.

     22    Q.   D-4.  I'm sorry.  District 4 is the Back Bay area?

     23    A.   Yes, it is.

     24    Q.   And what was your particular assignment?

     25    A.   ^ I was Delta 1 on -- 3 D unit, which was a rapid unit,

1    and we were assigned to the Back Bay.

2    Q.   So on April 15, 2013, you weren't working the marathon?

3    A.   I was not assigned to the actual event, no.

4    Q.   Had you worked the marathon in previous years?

5    A.   I had worked the year before.  I was on the bicycles for

6    the day where we would do crowd control and -- specifically in

7    the areas of where a younger population would be hanging out.

8    So we rode out all the way to Brighton, we rode the route all

9    the way back in, and kept control over Audubon Circle for the

02:50 10   rest of the day -- the rest of the afternoon.

11   Q.   And when you were doing that mobile patrol, what was your

12   primary function?

13   A.   Crowd control.  Just checking the crowds, keeping order,

14   making sure any public drinking really wasn't going on, that

15   nature.

16   Q.   I'm going to draw you to a little after 2:30 in the

17   afternoon on April 15th.  What did you do?

18   A.   About 2:30 my partner and I received a radio call to

19   dispatch to the Prudential Center for a shoplifter in the

02:50 20   Microsoft store in the Prudential Center.  And so we responded

21   there, and we were in the Prudential Center around 2:30.

22   Q.   Can you describe the Prudential Center for folks who may

23   not know what it is?

24   A.   The Prudential Center is a mall along Boylston Street that

25   also has entrances on Dalton Street on the back side, Ring

```
  1   Road.  And it's -- it has multiple stores.  The particular area

  2   of the Microsoft store is along a corridor near the food court

  3   all the way out to the Boylston Street exit.

  4   Q.   Okay.  And just --

  5        MR. CHAKRAVARTY:  Could we call up Exhibit 774 which

  6   was published to the jury yesterday?

  7   Q.   Officer Woods, do you recognize what this is?

  8   A.   Yes, I do.  It's a mockup of Boylston Street.

  9   Q.   And if I zoom in on this portion, do you see where the

02:51 10  Prudential Center is on this?

 11   A.   Yes.  That's basically above the vestibule of the stairway

 12   and exit from the Prudential Center.

 13   Q.   Okay.  And you can tap on the screen if you just use some

 14   pressure with the pad of your finger.  And just flag where the

 15   Prudential Center is.  Is it also known as the Pru?

 16   A.   The Pru, yeah.

 17   Q.   Thank you.

 18        And so you and your partner responded to the Pru?

 19   A.   Yes.

02:52 20  Q.   And when you got there, what did you do?

 21   A.   We were speaking with the manager at the Microsoft store

 22   to find out what occurred in the store.  This person attempted

 23   to steal merchandise from their store.  It's actually a very

 24   open wide store; it's not just one door in and out.  And while

 25   we were speaking with them, people started screaming
```

1    frantically and running in the corridor outside of that store

2    in the direction away from Boylston Street, so towards where I

3    was located.

4    Q.   All right.  So turning back to the diagram quickly, were

5    you somewhere inside the Prudential Center where I just

6    indicated?

7    A.   Yup.  Just further in.

8    Q.   Further inside the building?

9    A.   Further inside.  That was the exit in the corridor where

02:53 10   everybody was coming from.

11   Q.   And were people coming into the building as in the

12   direction of the arrow that I just made?

13   A.   That is correct.

14   Q.   And incidentally, while we have this up, does this appear

15   to be a fair and accurate depiction of Boylston Street as far

16   as you know?

17   A.   Yes.

18   Q.   There's been some question as to -- do you see these

19   things?

02:53 20   A.   Trees.

21   Q.   And is there something at the base of those trees?

22   A.   Grates.

23   Q.   How do you know that?

24   A.   I know that there's grates on all the trees on Boylston

25   Street.  It was a handicap accessibility issue under Mayor

1    Menino, and he had to install grates underneath all of the

2    trees.

3    Q.   So a bunch of people start running into the Prudential

4    Center?

5    A.   Yes.

6    Q.   What happened next?

7    A.   As people were running through screaming, I knew something

8    was wrong.  So I left the situation I was in, got over the

9    radio, and started running against the grain.  Over my radio,

02:54 10   handheld, I said to operations, "What do you have on Boylston

11   Street?  People are screaming and running in the Prudential

12   Center."  And they said -- they responded with, "There's a

13   possible fire."  And I said -- I kept running outside.

14        As I approached outside I heard a loud boom, and I looked

15   outside right in front of that area and I said, "I don't see a

16   fire.  I don't know if there's fireworks."  They said

17   ShotSpotter is going off, which is a program that the city has

18   to identify some type of noise.  Sometimes it will actually

19   pick up backfires of cars as well.  And at that time I looked

02:55 20   to my right and saw that there was smoke in the air, and just

21   started running towards what I thought was something wrong had

22   happened with some type of explosion.

23   Q.   So back on 774, when you came out onto Boylston Street,

24   approximately where were you on this graphic?

25   A.   (Witness indicates.)

```
 1   Q.   Okay.  And so when you heard the noise, were you inside
 2   the building or had you already come out of the building?
 3   A.   I was approaching the outside and heard the loud noise.
 4   Q.   All right.  And then once you got out, what did you see?
 5   A.   When I got out, I saw people -- people running away from
 6   my right-hand side.  So if I traveled from down the street
 7   towards the Mandarin, they were running against -- towards me.
 8   Q.   So this is the Mandarin Hotel here where I highlighted?
 9   A.   Yes.
10   Q.   So people were running in this direction?
11   A.   Yes.
12   Q.   And for the record, I just drew a leftward arrow on the
13   graphic.
14        What did you do after you saw that?
15   A.   I ran down the street, stopping at anyone I had seen that
16   looked like they were upset.  Particularly one female was on
17   the side of the ground somewhere in front of the Mandarin.  I
18   asked her if she was okay.  She said she was fine, that there's
19   people injured worse than her and to keep going.  So I kept
20   running further down Boylston Street.  I saw a female in the
21   middle of the road frantically screaming and crying on the
22   phone, yelling that there was a bomb.  And I asked her if she
23   was okay, and she said, "There's a bomb."  And I said, "Are you
24   okay?"  "I'm fine."  Then I was just trying to get her off the
25   street.
```

```
 1        I went into a type of control mode.  Police are supposed
 2   to control chaos.  We train for riot training and any time that
 3   there's a type of victory in the city of Boston with a sports
 4   team.  I felt like it's something you have to do, crowd
 5   control.  So I was just trying to clear the street.  And we
 6   also have active shooter training, and that teaches you to
 7   continue to go further if there's people that don't really need
 8   your help immediately right in front of you.  So that's why I
 9   kept running.  And I found myself at the corner of Ring Road
10   where you have the First Republic Bank, I think.
11   Q.    Down in the right-hand corner?
12   A.    Where there are barriers for the crowds, for people
13   running the marathon to stay on one side of the barriers.  So I
14   was trying to just pull the barriers to keep people off the
15   street.
16   Q.    Okay.  I've just reframed the image.  Can you just mark on
17   774 approximately where you set up?
18   A.    (Witness complies.)
19   Q.    And there were barricades there preventing people from
20   going --
21   A.    Steel barricades.
22   Q.    Okay.  And this is Ring Road over here?
23   A.    Yes.
24   Q.    How long were you there trying to move the barricades?
25   A.    It could only have been a few seconds because I realized
```

1    as I looked around, I looked across the street, there were

2    still injured -- there were injured people on the ground in

3    front of the Forum restaurant.  And so I ran over to see if I

4    could help there because that seemed more important than any

5    crowds.

6    Q.    So did you then run over in this direction?

7    A.    Yes, I did.

8    Q.    And that's -- I made an arrow towards the Forum

9    restaurant.  Is that right?

02:59 10    A.    Yes, you did.

11    Q.    What did you see when you got there?

12    A.    I saw a couple of victims on the ground.  Specifically, I

13    saw an Asian female being surrounded by an EMT, a firefighter,

14    innocent -- some bystanders of some sort, some citizens in

15    plainclothes just trying to assist in any way.

16        So I found -- it seemed like there was just an opening for

17    me to go and attend to this person, who I later found out was

18    Lingzi Lu.  And I went to the ground and saw that she had been

19    vomiting profusely, and continued to vomit as they were doing

03:00 20    chest compressions on her.  So I ran to her side and tried to

21    just remove the vomit from her mouth and her airways to clear

22    the airways to make sure she was getting breaths.

23    Q.    Okay.  Let me stop you there.  Were there a lot of people

24    around the area or -- both around that woman as well as others?

25    A.    There were several people around her.  That's why I said

1   there seemed to just be an opening, like one opening that I

2   could come in and help at that angle.  And I know there was

3   other people around, but my focus just was drawn to that

4   location.

5   Q.   About how long had it been since you heard that boom

6   before you exited the Prudential Center and when you got to

7   Lingzi Lu?

8   A.   It could have only been a minute or so.

9   Q.   So you had run all the way down the street, you had moved

03:01 10  some of the barricades and then you made it over?

11  A.   Right.

12  Q.   Was there any smell in the air when you got there?

13  A.   Yeah, I smelled, like, the residue of smoke.  The way I

14  would describe it is if you were at the fireworks display at

15  the Esplanade or a Memorial Day service where they pull off

16  cannons, and you were near the cannons, you would smell that

17  powdery smell from that.  That's what it smelled like.

18  Q.   So when you got down to Ms. Lu, were people already

19  working on her?

03:01 20  A.   Yes.

21  Q.   And was somebody already performing CPR?

22  A.   Yes.

23  Q.   You said you made observations that her -- she had

24  vomited.  Is that right?  Have you had any medical training?

25  A.   My medical training consists of I was a lifeguard for

```
        1    six-plus years growing up.  So continued first aid, CPR
        2    training.  And the Boston Police Department provides CPR
        3    training.  So I'm up to date on CPR, first aid, and I had
        4    just -- actually, prior to that day, just a few weeks before
        5    had been recertified.
        6    Q.    Recertified in CPR?
        7    A.    In CPR and first aid.
        8    Q.    On the Boston police force?
        9    A.    On the Boston Police Department.
03:02  10    Q.    Okay.  And so on this graphic, can you just make a circle
       11    around the general vicinity in which you recall being with
       12    Lingzi Lu?
       13    A.    It's not...
       14    Q.    It's not coming out?  And you just made a circle right in
       15    front of the Forum restaurant.
       16          MR. CHAKRAVARTY:  And this might be a good time to ask
       17    Mr. Lyness, with the Court's permission, to create a screen
       18    capture of that.
       19          THE CLERK:  The image has been captured.  We're just
03:04  20    looking into printing it now.  But it's been captured and
       21    saved.
       22          MR. CHAKRAVARTY:  Thank you.  I'll move on.
       23    BY MR. CHAKRAVARTY:
       24    Q.    Officer Woods, what did you do when you saw Ms. Lu and saw
       25    that she had vomited?
```

1    A.   I attempted to clear her airways by sticking my fingers

2    down her throat to remove the vomit, tilting her head to the

3    side to continue to open up that airway.

4    Q.   Are you trained to do that as part of performing CPR?

5    A.   Yes.

6    Q.   And it's because you need to breathe to have CPR function,

7    correct?

8    A.   You do.

9    Q.   Was there any way that there were -- the people who were

03:04 10   already responding to her were getting air into her lungs?

11   A.   I don't know when she started vomiting, so I would think

12   that they were able to get air in there until she started doing

13   that.

14   Q.   Did you make any other observations of what her injuries

15   may have been?

16   A.   I briefly saw that her lower torso had extensive injuries,

17   specifically to her legs.  I could see blood, flesh, bone.  But

18   my focus just became what I could do.  And there was people

19   working on her lower half, so I stayed with what I know, the

03:05 20   CPR and clearing her airways.

21   Q.   All right.

22        MR. CHAKRAVARTY:  Can we call up Exhibit 2149?  This

23   is for just the Court.

24   Q.   Ms. Woods, did I show you four photos yesterday, and did

25   you recognize yourself in all of them?

```
 1    A.   Yes, I did.

 2    Q.   All right.  And I just put up 21-49.  Do you see yourself

 3    in the photo?

 4    A.   Yes, I do.

 5    Q.   And where are you in the photo?  Before you make a mark on

 6    it, just describe where you are.

 7    A.   Oh, I am in the left lower corner.  You can see a police

 8    patch on my right arm.

 9    Q.   Okay.  And the four photos, 21-49 through 21-52, are those

10    fair and accurate depictions of what the scene was like that

11    you had arrived on near the Forum restaurant on April 15, 2013?

12    A.   Yes.

13         MR. CHAKRAVARTY:  I'd move Exhibits 21-49 through -52

14    into evidence.

15         THE COURT:  All right.

16         (Government Exhibit Nos. 21-49 through 21-52 received

17    into evidence.)

18         MR. CHAKRAVARTY:  And I'd ask to publish -49 please.

19    BY MR. CHAKRAVARTY:

20    Q.   Now, Officer Woods, would you just draw a circle around

21    yourself on this picture?

22    A.   (Witness complies.)

23    Q.   And is that you?

24    A.   Yes, that's a zoomed-in picture of me.

25    Q.   Okay.  And there are several people appearing to be
```

1    hunched over something on the ground.  Can you describe what

2    that is?

3    A.    That's Lingzi Lu.

4    Q.    Now, when you cleared her airway -- and I think I noticed

5    you had gloves on.  Why did you put gloves on?

6    A.    I put the gloves on as I basically was responding to the

7    scene.  When I saw injured people, I always carry gloves in

8    case I have any contact with individuals and any type of bodily

9    fluids of some sort.

03:08 10   Q.    So did you lean over and -- hunch down and get down on

11   your knees?

12   A.    I went right to her side and got down -- was crouched down

13   on my knees, on my shins, kneeling, and tilting her head to the

14   side and clearing her throat from the vomit.

15   Q.    What was her reaction after you cleared her throat?

16   A.    I would say that her whole body was shaking, quivering.

17   She had vomit in her hair, debris in her hair, and her eyes had

18   kept rolling in and out of facing forward and looking.

19   Q.    And were you communicating with the other responders?

03:09 20   A.    Yeah.  I mean, the EMT had been doing chest compressions,

21   and at a certain point after I had arrived an EMT said, "You

22   know she's not going to make it," and said that they had to

23   move on to help other victims, because as you could see from

24   that scene in the picture, there were other victims still in

25   the area.  So I moved around and I continued chest compressions

1    on her.

2    Q.   And as you started doing chest compressions of her, did

3    you make any observations of her?

4    A.   I made eye contact with her.  As I said, her eyes would

5    roll in and out.  But you know when you make eye contact with

6    someone.  Her eyes appeared shaky, like she couldn't understand

7    what was going on to her.  She didn't, like, realize maybe what

8    had happened.  But she was still with us.  And I just kept

9    talking to her.

03:10 10         At that point right prior to getting to -- myself doing

11   the chest compressions, another citizen that was there had

12   given me her bag and I had seen that there was a Boston

13   University identification card with her name, Lingzi Lu, so it

14   was at that time I understood who she was.  So I just kept

15   talking to her as I did chest compressions saying, "Lingzi,

16   stay with us.  You can do this.  You're going to be okay.  Stay

17   strong."  And as I said, I made eye contact with her and her

18   eyes would roll back and forth.

19   Q.   How long do you think you were doing chest compressions on

03:10 20   her?

21   A.   It couldn't have been that long.  Maybe a minute or two.

22   There was a firefighter there that took over utilizing the pump

23   that's used for pumping air into her mouth with a mask.  And he

24   asked if I needed to switch out, which is done many times in

25   CPR, and I said, "No, I got this.  I'll keep going.  I'm fine."

1    But it wasn't much longer after that that someone came over

2    with a backboard to get her, to move onto an ambulance to

3    transport her out.

4            MR. CHAKRAVARTY:  Can I get Exhibit 21-50, please?

5    Q.    Is this you just starting to lean -- kneel down?

6    A.    (Nonverbal response.)

7    Q.    Exhibit 21-51.  This is now you'd gotten down and you're

8    starting to treat her?

9    A.    Yeah, that was when I had her on the side trying to remove

03:12 10   the vomit from her throat.

11   Q.    21-52.  This is you again?

12   A.    Yes.

13   Q.    What happened when the people with the backboard came?

14   A.    We moved her body onto the backboard and rushed her over

15   to an ambulance right in the middle of the street within feet,

16   and got her onto the back of an ambulance.  And a paramedic

17   went on and told us to take her off because she was gone and he

18   needed to keep the ambulance available for people who they

19   could save and people that they could bring to the hospital.

03:13 20       So we took her back off.  And he kept a white sheet over

21   her, a cover.  And the paramedic asked someone to stay with the

22   body of Lingzi and to stay with her until further notice.  So I

23   immediately volunteered and another officer that I don't know

24   who it was stayed with me.  And we basically were two

25   storefronts over at that point set back on the sidewalk

1    basically in front of Crate and Barrel and stayed with her

2    covered because she was part of the crime scene now.

3    Q.   When somebody gave you her Boston University ID, did they

4    tell you anything more about her?

5    A.   It was a female, a lady, older lady that gave it to me and

6    said that she had been with two of her friends and that she

7    didn't know who they were but they were both gone.  One was

8    definitely injured, and that this was her bag, Lingzi's bag.

9    Q.   After you were with Lingzi and she had been covered, what

03:14 10   happened next?

11   A.   We stayed on-scene.  And shortly thereafter they thought

12   that there might be a third device on the street, so they were

13   clearing the area of Boylston Street by Ring Road, the

14   Mandarin.  And I was ordered to leave her by my actual captain,

15   Captain Ivens.  And I said, "Well, let's take her with us if

16   there's a third device.  We shouldn't just leave her here."

17   And he said, "No, you're alive.  You need to go.  She's part of

18   the crime scene.  You need to get off the street."

19   Q.   After you -- so you challenged, essentially, your

03:15 20   captain's order?

21   A.   I did.  Which I usually don't do.

22   Q.   Why did you do that?

23   A.   I just at that point thought of her family and thought of

24   her face in tact, and if there was a third device I couldn't

25   imagine if she was injured even further and they couldn't get

1    to see their daughter, sister, et cetera -- you know, at that

2    time I didn't know her background, that they wouldn't get to

3    see her again.  And I have personal experience with that as my

4    cousin was killed in Iraq and I never got to see him again, so

5    that went through my mind.

6    Q.    Did you ultimately comply and you left the scene?

7    A.    I did.

8    Q.    At some point later did you meet Lingzi's parents?

9    A.    I met them when they traveled in to Boston from China.  I

03:16 10   had reached out to the Boston Police Department -- I mean,

11   Boston University Police and told them who I was and that I had

12   been with Lingzi when she passed.  So they kept me involved and

13   informed of anything that happened with their campus as well as

14   when they came to visit the scene on Boylston Street, I was

15   able to be there with them.  And we went to that location and

16   we had a little prayer service.  They wanted to know where she

17   was exactly laying on the ground.  And I just told them that

18   she wasn't alone when she died.

19             MR. CHAKRAVARTY:  Thank you.

03:17 20             MS. CONRAD:  No questions.  Thank you.

21             THE COURT:  Officer, thank you.  You may step down.

22             (The witness is excused.)

23             MS. CONRAD:  May we approach for a minute?

24             THE COURT:  No, we'll address it later.

25             MS. CONRAD:  Thank you.

1          MR. MELLIN:  The United States calls Roseann Sdoia.

2                    ROSEANN SDOIA, duly sworn

3          THE CLERK:  Have a seat.  State your name, spell your

4     last name for the record, keep your voice up and speak into the

5     mic so everyone can hear you.

6          THE WITNESS:  Roseann, last name is Sdoia, S as is

7     "Sam," D as in "David," O-I-A.

8                         DIRECT EXAMINATION

9     BY MR. MELLIN:

03:18 10    Q.    Ma'am, where do you live?

11    A.    Currently I live here in the city of Boston.

12    Q.    And where did you grow up?

13    A.    I grew up north of Boston in a town called Dracut.

14    Q.    Did you go to college?

15    A.    Yes, I did.  I went to the University of Lowell in Lowell,

16    Massachusetts.

17    Q.    After graduating from college, did you get involved with

18    property management?

19    A.    Yes, I did.

03:18 20    Q.    And back in April of 2013, what were you doing?

21    A.    Well, back in April 2013 I was anticipating spring and

22    summer.

23    Q.    I gave you a really crappy question.

24          (Laughter.)

25    Q.    Where were you working in April 2013?

A.    April 2013 I was working for a company called National

Development, and they do property management.  I was the vice

president of the residential properties.

Q.    Prior to April of 2013, had you ever attended either the

Boston Marathon or the Red Sox game at Fenway Park on Patriots'

Day?

A.    Absolutely.  I would go with my dad and my sister when we

were little.  For so many years we actually had a neighbor who

would run the marathon.  And then as years kind of went on the

tradition stayed the same but I would go with friends.  And

we'd go to the Red Sox game and then we would go over to

Boylston Street to watch runners come in.  Some years I had

friends running, some years I didn't.

Q.    Was there a typical place you would go on Boylston Street?

A.    Yes.  We would always end up -- it used to be what was

called Vox, V-O-X.  Then it changed names eventually, and now

it's called Forum.

Q.    On April 14 of 2013, what did you do?

A.    April 14th, 2013, I ran the BA 5K that Sunday morning with

three of my girlfriends.  I wasn't sure I would ever run the

Boston Marathon, although it seemed that I would always get

energized by it and always say "next year."  But one easy way

to cross the finish line, I kind of cheated and I did the 5K.

Q.    And just for the record, how long is a 5K?

A.    3.1 miles.

```
 1    Q.   So not 26.2?

 2    A.   No, not even close.

 3    Q.   Now, so you ran that race on April the 14th.  What did you

 4    do in the morning of April 15th?

 5    A.   Had plans for the day.  So I got up, started to get

 6    dressed for the day.  One of my girlfriends -- we had tickets

 7    to the Red Sox game -- and her dad picked us up to drive us

 8    over to Fenway so we wouldn't have to take a car or a cab, and

 9    got dropped off at the Red Sox game.

10    Q.   Did you go to the game?

11    A.   Yes.  Went to the game for most of it but had gotten an --

12    I made it an alert on my cell phone that a friend who was

13    running was coming close -- making her way to the city, so we

14    decided to start our venture over to Boylston Street.

15    Q.   How did you get from Fenway Park to Boylston Street?

16    A.   Walked.

17    Q.   And did you walk along the runners' route?

18    A.   In and out of it, yes.

19    Q.   And at some point did you get to the Forum?

20    A.   Yes, we did.

21    Q.   Who was with you when you got to the Forum?

22    A.   My girlfriend, Sabrina Dello Russo.

23    Q.   What did you do when you got there?

24    A.   Went inside, walked around to see if any of our other

25    friends were there.  We probably weren't there for more than
```

1  10, 15 minutes, got another automated alert that our friend was

2  at Kenmore Square.  So we decided that it was time to probably

3  step outside and wait for her because she should be there

4  shortly.  So we actually had just gotten drinks, left them at

5  the hostess stand, telling the hostess we would be back in a

6  few minutes, and went out to the course.

7  Q.   When you say you went out to the course, where did you

8  actually go?

9  A.   Straight across from the entrance of the door of Forum,

03:22 10  pretty much, there's a mailbox.  Initially, Sabrina and I

11  started out on the left-hand side of the mailbox with the

12  runners approaching from the right, but because I'm short and

13  couldn't see over the mailbox, unfortunately, in hindsight I

14  moved to the right side of the mailbox and Sabrina stayed on

15  the left side.  And then a few other friends joined us at that

16  point, but they all pretty much stayed on the opposite side of

17  the mailbox.

18  Q.   And when you say "hindsight," is that because that was a

19  bad decision that would have an impact later on?

03:23 20  A.   Absolutely.

21  Q.   So you moved to the other side of the mailbox.  How long

22  were you there?

23  A.   Probably maybe within ten minutes or so.

24  Q.   Did you ever see your friend run by?

25  A.   No; she got stopped.

1    Q.   Okay.  What happened when you were on that other side of

2    the mailbox?

3    A.   I know we were out there waiting for, you know, probably

4    about ten minutes or so.  And at one point there was a loud

5    explosion down to my left.  And I kind of looked down -- and

6    it's amazing how quickly ten, 11 seconds, 12 seconds goes --

7    but in my head I was thinking to myself that that's odd that

8    there was this loud noise.  There's never been celebratory

9    cannons or anything like that.  Elite runners had come by hours

03:23 10   earlier.  And it was really strange.

11        Someone had yelled that they thought the building had

12   fell, and then a guy to my right yelled, "Get in the street."

13   But I realized that I'm, again, short and there was no way for

14   me to get over the barricade to jump over it to get in the

15   street, and not even thinking why he was yelling that.  So I

16   decided that I probably should run, and I turned to my right

17   and I ran, and I saw two flashes of white light exploding at my

18   feet.

19   Q.   When you saw those explosions, or that explosion, what do

03:24 20   you remember next?

21   A.   I remember -- and I think it's probably before I hit the

22   ground, but in my head it registered that I probably -- I lost

23   my leg because when I came to, I looked down, and I guess

24   fortunately my leg was sort of tucked under me and I never

25   really saw what happened to it, but all I could see was blood

1    was pouring out of -- sort of where my knee should have been.

2    And in front of me there was a foot that had a little sock on

3    it, and in my mind I had to go through and ask myself what I

4    wore for shoes that day, and I had to ask, "Did I have a sock

5    on my foot?"  And my answer was no, so it was somebody else's

6    foot in front of me.

7         And then to my right I saw someone walking around who was

8    covered with soot.  Their hair was singed straight up.  And

9    they were walking around like a zombie.  I can't even tell you

03:25  10   if they were male or female.  It was just awful.  And it was

11   almost like starring -- I was starring in a horror movie, and

12   as everybody else was around me.  People were kind of running

13   in all different directions.

14        And I think when it initially happened, and knowing that

15   my leg was severely injured, I -- someone came running over to

16   me and told me I had to get out of there, and I told them I

17   couldn't get up.  I didn't have a leg.  I couldn't get up.  And

18   at some point between falling to the ground and this person

19   coming over to me, I went through my mind in regards to "I

03:26  20   don't want to live as an amputee."

21        And I knew it was bad.  I knew that I was -- I'm not

22   anywhere near a doctor or anything like that, but I knew I was

23   bleeding out and I needed to stay calm and stay conscious

24   because if I didn't, I would die.  And even though I

25   didn't -- I asked myself if I wanted to -- I told myself I

1    didn't want to live as an amputee, but the thought of my

2    nieces, my grandmother and my parents and my sister, I couldn't

3    die.  So I fought to stay conscious through the whole trip to

4    the hospital.

5    Q.    As you sat on kind of the edge of the sidewalk next to the

6    street, did you see others around you?

7    A.    Sort of.  Sort of.  I think because I was in such a shock

8    of what just happened that, you know, it was really kind of

9    those three things that I can fully recollect seeing, was the

03:27 10   blood, the ankle, and that person walking around that

11   had -- I'm not sure, but they had been exposed to something.

12   Q.    How did you feel at that point?  Did you feel pain or did

13   you not feel any pain?

14   A.    I think it took a minute for the pain to register, but as

15   the person who picked me up off of the sidewalk started

16   carrying me to the middle of the street, the pain started to

17   kick in and I had to do another assessment because it felt as

18   if my shoe was kind of dangling from my foot.  So I did a

19   little assessment of what shoes I wore that day thinking I wore

03:28 20   strappy sandals.  And when I realized I hadn't and that was

21   actually my foot dangling, I just had -- I started to get

22   nauseous and the pain was excruciating, and I told him he had

23   to put me down because I thought I was going to pass out at

24   that point.  And at that point he did, he put me down in the

25   middle of Boylston Street.

```
 1    Q.    Did you know that person that came over to help you stand
 2    up?
 3    A.    I did not know him, no.
 4    Q.    Could you describe him?
 5    A.    Yes.  He's a college student at Northeastern University,
 6    he's 22, and just happened to be, for me, at the right place at
 7    the right time and decided to return towards whatever happened
 8    and to try to help out.
 9    Q.    As this man picked you up and brought you into the street,
10    what happened after he sat you down?
11    A.    He sat me down and some other gentleman came over and
12    helped him apply a belt, I guess, as a tourniquet to my right
13    leg to help stop the bleeding.  And also, then a Boston police
14    officer, she came over and stayed with me as well.  So I had
15    the -- he was a physician's assistant on my left and the police
16    officer on my right.
17          Shortly thereafter some Boston firefighters came over
18    trying to keep me calm.  Two of my friends came over.  They
19    found me in the street.  They started to get a little
20    hysterical and I asked them to calm down because it wasn't
21    helping me.  And then I remember them straightening my right
22    leg out, and it was the most excruciating pain ever that one
23    could ever anticipate.  And I remember asking, "How quickly can
24    I get morphine?"
25    Q.    At some point were you moved from the street into an
```

1   ambulance?

2   A.   I was actually put into the back of a paddy wagon.  The

3   ambulances, you could hear them coming and going, and every

4   time you could hear ne in the distance coming and approaching,

5   the siren would pass me.  And again I thought, "Okay.  I'm

6   going to die."  And I mean, so much so that I actually gave

7   my -- I gave them my sister's phone number because I couldn't

8   have someone called my parents and say that I died on Boylston

9   Street.

03:30 10       So they loaded me in the back of a patty wagon with a

11   firefighter holding me on a backboard that they had

12   straightened my leg out and put me on.  And in the back of the

13   paddy wagon it was myself, this firefighter holding me on the

14   board, holding the tourniquet, and then on the other side was

15   another injured person with another firefighter.

16   Q.   Did you see the injuries of the other person?

17   A.   I did not.  I did not.  I did hear them on a phone call.

18   But other than that, no, I -- I really tried to keep my eyes

19   closed because I'm not good with a paper cut, let alone what

03:31 20   was going on there that day.  So I really tried to keep my eyes

21   closed as much as possible but really listen to what was going

22   on around me and pay attention to that.

23   Q.   Where did you go in the paddy wagon?

24   A.   They brought me to Mass. General Hospital.  And actually,

25   en route there I ended up bending my left leg and there was

1    like a splash, and so I knew that it was the blood.  So to me,

2    we couldn't get to Mass. General fast enough.  I had requested

3    to go to Mass. General because my primary care is there.

4    Whether or not that's why they took me there, I don't know.

5    But we ended up at Mass. General.

6    Q.    And what happened when you arrived there?

7    A.    I vaguely remember at this point the doors opening up,

8    because in my mind I had kept myself alive to this point, and

9    after that point it was up to the doctors to save me and

03:32 10   there's nothing else I could do until that point.  Up until

11   that point I could keep myself awake and alive but they were

12   the ones that could try to save me.

13   Q.    Did you go into surgery shortly thereafter?

14   A.    They rushed me right in.  I don't remember really -- I

15   think I was hallucinating, thinking I was going into a

16   gymnasium.  But they brought me into the ER pretty much

17   immediately.  And a friend of a friend is a nurse there, and I

18   do vaguely remember her telling me that she was there as they

19   were prepping me, and then just -- I just remember her saying

03:33 20   it was Patty, and that was it.

21   Q.    When you woke up, where were you?

22   A.    It was Tuesday evening and I was in a hospital room at

23   Mass. General.

24   Q.    What had happened to your leg?

25   A.    The doctor told me that it had been amputated below the

1    knee, and that he was going to try to keep it below the knee if

2    he could, but he had to go in to clean it further.  And the

3    result, I ended up amputated above the knee.

4    Q.   Is there a difference between a below-the-knee as opposed

5    to an above-the-knee amputation?

6    A.   Yes.

7    Q.   What complications come from that?

8    A.   It's a huge difference.  It's -- your knee joint is

9    something that is -- I think anybody who has two legs takes for

03:34 10   granted.  And it's extremely difficult to learn how to walk

11   again, to learn how to run again.  It's really hard in the

12   winter living here in the city having to deal with the snow.  I

13   have to rely on a microprocessor to move my leg for me.

14   Q.   Ms. Sdoia, how long were you actually in the hospital?

15   A.   I was in Mass. General for a week, Spaulding for three

16   weeks.  I was released for a couple of weeks until I got my

17   prosthetic, and then I was readmitted for a week in Spaulding

18   to learn how to use it.

19   Q.   And you mentioned Spaulding.  Is that a rehab center?

03:34 20   A.   Yes, Spaulding Rehabilitation Hospital.

21   Q.   In addition to the injuries to your legs, what other

22   injuries did you have?

23   A.   I had burns to my right hand, I have a burn to my left leg

24   as well as a gash that had to be stapled up, and I also had

25   exploratory surgery to my abdomen because there was bruising

1    and they didn't know if I had shrapnel in my abdomen or if I

2    had any internal bleeding.  I've had ear surgery on my right

3    ear, which has left mild hearing loss, and I also had to go in

4    for dialysis because my kidneys shut down.

5    Q.    Have you also experienced phantom pain?

6    A.    Yes.  Yes.  It comes and goes but there's no control of

7    it.

8    Q.    And what is it?

9    A.    Phantom pain is when you lose a limb and you experience

03:35 10   pain in that limb that's no longer there.  So it seems as

11   though that at times I'm getting tasered on my right foot, and

12   there's no right foot, and sometimes you have itches, and

13   there's no place to itch.  Sometimes the tasering can keep you

14   up all night, and it kind of hits and then goes away and then

15   hits and then goes away.  It can be sporadic, it can last for a

16   minute, it can last for a second and it can last on and off for

17   24 hours.

18   Q.    As you walked into court today, for the record, are you

19   wearing your prosthetic leg?

03:36 20   A.    Yes, I am.

21   Q.    When did you receive that?

22   A.    I received my first prosthetic in June of 2013.

23         MR. MELLIN:  With the Court's indulgence.

24         (Counsel confer off the record.)

25   Q.    I'd forgotten.  If I could have you look at three

1    photographs starting with Exhibit 24?

2           MR. MELLIN:  Just for the witness, please.

3    Q.   Ms. Sdoia, do you recognize what Exhibit 24 is?

4    A.   Yes.

5    Q.   And what is Exhibit 24?

6    A.   It's a photo -- it's a photo right outside of Forum right

7    by the mailbox that I was standing at, right by the tree that

8    was next to me where, when I turned to my right, I saw the two

9    flashes of white light and where I ended up on the sidewalk

03:37 10   injured.

11   Q.   Is that a fair and accurate photograph of April 15, 2013,

12   in front of the Forum?

13   A.   Absolutely.

14          MR. MELLIN:  Your Honor, at this time I would move

15   into evidence Exhibit 24 and ask that it be published.

16          THE COURT:  All right.

17          (Government Exhibit No. 24 received into evidence.)

18   BY MR. MELLIN:

19   Q.   Ms. Sdoia, as you look at Exhibit 24 now -- you have an

03:38 20   interactive screen there.  Could you please touch the screen

21   and circle yourself?

22   A.   (Witness complies.)

23   Q.   And for the record, you circled in yellow the woman with

24   blonde hair on the right side of the photograph, now just on

25   the street.  Is that right?

1    A.    Yes.

2    Q.    Okay.  The man that you see next to you in that

3    photograph, do you know who that is?

4    A.    Yes.  That's the college student, Shores Salter, who

5    helped me that day.

6    Q.    As you look at Exhibit 24, do you see the mailbox?

7    A.    Absolutely.

8    Q.    And is that the mailbox that you went from one side to the

9    other?

03:38 10  A.    Yes.

11   Q.    If I could have you --

12         MR. MELLIN:  And just the witness, please.

13   Q.    -- see Exhibit 25.

14         Do you recognize Exhibit 25, Ms. Sdoia?

15   A.    Yes.

16   Q.    What is that?

17   A.    That's me on the ground with shorts, putting the

18   tourniquet on my leg, and the physician's assistant on the

19   other side of me.  It's my right leg severely mangled.

03:39 20  Q.    Is that a fair and accurate picture of how you appeared on

21   April the 15th of 2013?

22   A.    Having not seen below the knee, I would say yes from where

23   I am today with this prosthetic.

24         MR. MELLIN:  Your Honor, at this time I would move

25   into evidence Exhibit 25 and ask that it be published.

1          THE COURT:  Okay.

2          (Government Exhibit No. 25 received into evidence.)

3     BY MR. MELLIN:

4     Q.   As you look at Exhibit 25, can you just describe for us

5     the people that you see in that photograph -- or indicate,

6     actually.  You said the young man who's putting on the

7     tourniquet, is that the man on the left in the photograph?

8     A.   Yes, correct.  Sorry.  Yes, that's Shores Salter on the

9     left and, unfortunately, I don't know the physician's assistant

03:40 10    on the right.  He's never come forward.

11    Q.   As you look at Exhibit 25, though, he's leaning over you?

12    He's got a gray shirt on?

13    A.   Yes, gray shirt, jeans.

14    Q.   And just for the record, you're the woman who's laying

15    down in the middle of the photograph?

16    A.   Absolutely.

17    Q.   Is this located in the middle of the street?  Is this

18    where --

19    A.   It's kind of right at the intersection of Boylston and

03:40 20    Ring Road.

21          MR. MELLIN:  And finally, if I could have the witness

22    look at Exhibit 26.

23    Q.   Do you recognize Exhibit 26?

24    A.   Yes.

25    Q.   What is that?

```
  1   A.   That's Shores, the college student, carrying me from the

  2   sidewalk over with my right leg really twisted.

  3          MR. MELLIN:  Your Honor, at this --

  4   Q.   Is that a fair and accurate photo of you on April 15,

  5   2013?

  6   A.   Yes.

  7          MR. MELLIN:  Your Honor, I would move into evidence

  8   Exhibit 26 and ask to publish Exhibit 26.

  9          THE COURT:  All right.

03:41 10       (Government Exhibit No. 26 received into evidence.)

 11   BY MR. MELLIN:

 12   Q.   And again, just for the record, as the jury can now see

 13   that photograph, you were in the middle of the photograph?

 14   A.   Correct.

 15   Q.   Okay.  And the area that you had been moved from is where

 16   in this photograph?

 17   A.   Just where -- kind of to the right of that other

 18   police -- the police officer on the right, so you can see the

 19   mailbox.

03:41 20  Q.   Can you do me a favor and just circle that area?

 21   A.   Yes.

 22   Q.   For the record, you circled in yellow an area just to the

 23   right of the mailbox that --

 24   A.   To the -- yeah.

 25   Q.   And it's where there's a crowd of people?
```

```
 1    A.   Correct.

 2    Q.   All right.

 3         MR. MELLIN:  With that, your Honor, I have nothing

 4    else.  Thank you.

 5         MR. BRUCK:  Thank you, Ms. Sdoia.  We don't have any

 6    questions.

 7         THE WITNESS:  Thank you.

 8         THE COURT:  All right, Ms. Sdoia.  You may step down.

 9    Thank you.

10         THE WITNESS:  Thank you.

11         (The witness is excused.)

12         THE COURT:  We're close enough to one o'clock, we'll

13    take the lunch recess now.  We'll resume at two o'clock.

14         THE CLERK:  All rise for the Court and the jury.

15         (The Court and jury exit the courtroom and the

16    proceedings concluded at 12:55 p.m.)

17         (After the recess:)

18         THE CLERK:  All rise.

19         (The Court enters the courtroom at 2:03 p.m.)

20         MR. BRUCK:  If it please the Court, we have a matter

21    arising once again concerning victim impact testimony and

22    testimony about the intertwining of our soldiers' experience in

23    Iraq with this crime, all in the same witness, which was

24    Officer Lauren Woods.  Ms. Woods seems like a wonderful young

25    woman and a great officer, and there's no criticism intended of
```

her at all.  But the question, why she had a -- why she tried

to contradict or argue with her superior was probative of

absolutely no issue in this case, and it produced a series of

statements from the witness which included victim impact

testimony about or led to Ms. Lingzi Lu.  And, more

importantly, the story about how she had lost a cousin in Iraq

and had never been able to see him before his death -- and,

therefore, she had -- it had particular meaning to her that if

Ms. Lu's body was left and there was a third bomb and her face

was damaged and her family wasn't able to see her, that really

hit home.  This is not relevant testimony for this part of the

trial, and it's falling into a pattern.  Now, it could well be

that Mr. Chakravarty didn't know that that story was going to

come out, but he could have avoided it by not asking a question

that had no relevancy in the first place.

Secondly, there was a series of questions designed to

elicit what is only able to be described as victim impact

testimony, very touching, moving testimony about the service

that was held on Boylston Street, that Officer Woods helped the

parents of this young woman arrange.  You know, I don't know

what to do.

The last thing I want to say is that there is no way

to object to this in the presence of the jury without greatly

increasing the prejudice, and so we're just sort of helpless if

we don't have opposite counsel who are following the rules and

1    preparing their witnesses to avoid these topics.

2         The last point to make about this military theme -- it

3    seemingly keeps coming back in again and again -- is that this

4    is peculiarly prejudicial in a case involving an immigrant

5    Muslim defendant.  It is -- it creates a frame that -- in which

6    this case is about us versus them, and the defendant is them.

7    This operates very, very powerfully even if at a subconscious

8    level.  And for the government to continually stoke that

9    paradigm is extremely unfair and will make it very hard, even

04:55 10   harder, for the jury to abide by the statutory requirement of

11   the Federal Death Penalty Act that it sentence without regard

12   to the religious faith or the national origin of either

13   defendant or victim in the case.

14        MR. CHAKRAVARTY:  Your Honor, first, on the relevancy,

15   the government knew the story that Miss Woods obviously lived

16   through.  The intention was not to elicit a statement about her

17   cousin who died in Iraq, although it just so happens that that

18   cousin had a memorial at a scholarship breakfast this morning

19   from which the police officer had just come from.  When we

04:56 20   prepped, it was intended that she would say that she knew from

21   personal experience.

22        The line of questioning, however, your Honor, was

23   probative of the fact that Miss Lu is a foreign national.  She

24   had died already at that time so it was not victim impact

25   testimony.  It could not be.  And it was simply to recount the

1   events of that day and to relay that -- through this witness, a

2   witness who is going to testify about a victim whose parents

3   are 10,000 miles away, about the fact that they came here from

4   China.  And she showed them where her -- Miss Lu expired.  That

5   was the purpose for which that testimony was being offered.

6   And that's the purpose for -- the fact that the devices created

7   by -- used by the defendant actually led to that death is

8   what's on trial here, and that was the purpose for which it was

9   offered.

04:56 10          The government is cognizant -- and we've had

11   conversations with the defense about some of the concerns that

12   they have raised with the Court.  And we will do our best for

13   -- if there is not a highly probative value -- excuse me, to

14   only offer such testimony if there is a probative value, as we

15   see it, and to alert the defense before we anticipate that

16   happening so that if there are any issues that can be raised

17   with the Court before they're elicited.

18          THE COURT:  Well, this is getting into the, I guess,

19   related and perhaps reverse issue that we discussed, I guess,

04:57 20   at the beginning yesterday about mitigation evidence for the

21   defense being not relevant to the question of guilt or not.

22   And some of this evidence, while perhaps were it properly

23   relevant to aggravating factors, may not be relevant to the

24   question of guilt.  There's -- as I said yesterday, there are

25   no bright lines necessarily on this measure in either

         1    direction.  Sometimes -- and the government should have a full

         2    opportunity to present a case convincingly so that a jury can

         3    be convinced beyond a reasonable doubt on the question of guilt

         4    or not.  So I don't think it should be limited too strictly.

         5    But I think several times we've gotten into matters that are

         6    more relevant to potential punishment than to the question of

         7    guilt or not.  I ask the government to be aware of that and

         8    consider that in their preparation of witnesses.

         9             As to the -- we had two Iraq incidents this morning.

04:58   10    One was -- they were both with Boston police officers.  I think

        11    that's entirely unnecessary, and the witnesses should be

        12    counseled against volunteering those matters.  There will be a

        13    time, I expect, from what the government's opening was, that

        14    discussions of Iraq may be appropriate in connection with

        15    review of materials on the defendant's laptop and so on.  But

        16    with victims, I think it is not relevant.  And so I don't want

        17    to hear the word "Iraq" or "Afghanistan" without prior

        18    permission until we get to that other stage of the case.  Okay.

        19             Who's the witness?

04:59   20             MR. WEINREB:  Officer Tommy Barrett.

        21             (The jury enters the courtroom at 2:14 p.m.)

        22             MR. WEINREB:  Your Honor, may I call the next witness?

        23             THE COURT:  Yes.

        24             MR. WEINREB:  The government calls Officer Tommy

        25    Barrett.

1              THOMAS BARRETT, Sworn

2              THE CLERK:  Have a seat.  State your name.  Spell your

3    last name for the record.  Keep your voice up and speak into

4    the mic so everyone can hear you.

5              THE WITNESS:  My name is Thomas Barrett.  My last name

6    is B-a-r-r-e-t-t.

7    DIRECT EXAMINATION BY MR. WEINREB:

8    Q.   Good afternoon.

9    A.   Good afternoon.

05:02 10   Q.   Where do you work, sir?

11   A.   I work for the Boston Police Department.

12   Q.   How long?

13   A.   I've been with the Boston Police for ten years.

14   Q.   Are you -- what's your rank?

15   A.   Patrolman.

16   Q.   What are your job responsibilities?

17   A.   Respond to 911 calls.  I write reports.  In the past I've

18   been assigned to anti-crime, traffic duty; I've had a walking

19   beat.  We do all the basic things that you think a police

05:02 20   officer does:  respond to first-aid calls, crimes in progress.

21   Mostly, I write a lot of reports.

22   Q.   Have you been assigned to work the Boston Marathon in the

23   past?

24   A.   Yes, I have.

25   Q.   How many times?

1    A.   Since I've been with the Boston Police, three times.

2    Q.   And have any of those times been down near the finish line

3    on Boylston Street?

4    A.   Yes.  All three times I've been assigned between the

5    finish line and Hereford Street.

6    Q.   The finish line to Hereford Street, is that the part of

7    downtown that's called the Back Bay?

8    A.   Yes, on Boylston Street.

9    Q.   So what's Marathon Monday typically like?

05:03 10  A.   For me, it usually starts with a roll call where the

11   captain addresses us.  He gives us our assignments, tell us to

12   get out to our posts on time; and then once we're on our posts,

13   we are on the street side of the barricades.  So the spectators

14   are on the other side of the barricades.  It's usually a very

15   festive atmosphere.  It's a lot of fun.  It's a lot of fun for

16   the officers to work sometimes.  Sometimes we do have minor

17   problems with spectators wanting to cross, but that's usually

18   the biggest problem that I've ever had to deal with, and

19   pickpockets.

05:04 20  Q.   What kinds of people normally attend the Marathon?  Old,

21   young, singles, families?  What's it like there?

22   A.   I'd say every type of person out there would attend:

23   young people with their kids and strollers; teenagers; adults;

24   older people; people that have lived in Boston all their lives;

25   people that have come just for the Marathon from around the

country, around the world.  All kinds.

Q.   Were you on duty on Marathon Monday 2013?

A.   Yes, I was.

Q.   What was your assignment that day?

A.   I was assigned the Marathon route on Boylston Street, and my post was between Ring Road and Fairfield Street, on the even side.

Q.   What was the weather like that day?

A.   The weather was nice for the runners.  It was cold for me. I seemed to be cold all day.  And I had a winter coat on.  At lunch time I had to go get a pair of gloves.  But it was a nice day.

Q.   Where were you located exactly when the bombs exploded?

A.   I was on the even side of Boylston Street, in between a restaurant named Sol de la Terre, and there's another restaurant in the opening of the Mandarin Hotel.  I don't know the name of the restaurant.  I've never been inside.

          MR. WEINREB:  Can I have Exhibit 774, please?  That's in evidence -- not in evidence but if you could --

          THE COURT:  It's been used, you're correct.

Q.   If you look at your monitor -- let me see if I can make it a little bigger -- can you see there where you were?

A.   Yes.

Q.   Okay.  So that's a touchscreen you've got in front of you. If you just touch it with the pad of your finger, it will make

1    an arrow point.  If you could just touch where you were?

2    A.    Sure.

3    Q.    Is this the area that I'm -- do we see it here, or did I

4    make that too zoomed in?

5    A.    If it's the yellow dot, it's on the outside.

6    Q.    Okay.  Let's try -- okay.  Let's give it another try.

7    A.    Okay.

8    Q.    Okay.  So that's the side of the street you were on?

9    A.    Yes, sir.

05:07 10   Q.    And you say you were on the street side of the barricades?

11   A.    Yes.  The spectators would be on the sidewalk, and the

12   officers were on the street.  So the metal barricade was

13   between the officers, the runners, and then the spectators.

14   Q.    Okay.  Which direction is the finish line from here?  Is

15   it to the right or to the left?

16   A.    It would be to my right on the screen.

17   Q.    So as we're facing this diagram, it's off to the right?

18   A.    Yes.

19   Q.    And do you see the Forum restaurant?

05:08 20   A.    Yes, I do.

21   Q.    Can you just tap above that so we'll have an arrow there?

22   A.    (Indicating.)

23   Q.    Okay.  So that's right here?

24   A.    Yes, it is.

25   Q.    When the first bomb exploded, what did you notice first?

1    A.   I heard the sound and to me it was like somebody was

2    firing a cannon.  If you've ever been to the Fourth of July,

3    that's what it sounded like on the Esplanade.  They fire off

4    the cannons.  And then I could see white smoke.  And then I

5    could see black smoke and a little bit of orange flame.

6    Q.   How long before the second bomb exploded?

7    A.   Fifteen seconds.

8    Q.   And what did that one sound like?

9    A.   It sounded much like the first one but a lot louder.

05:09 10    Q.   Did you see it explode?

11    A.   Yes.

12    Q.   What did it look like?

13    A.   An orange fireball.  The same thing, the white smoke

14    first, then the original fireball, and then black smoke right

15    after it.

16    Q.   What did you do when you saw that bomb explode?

17    A.   I ran over to where it exploded.

18    Q.   When you got there, did you notice a smell in the air?

19    A.   It smelled like sulfur as if you were at the firing range,

05:09 20    you know, like heavy smell of gunpowder.

21    Q.   How many -- how long do you think it took you to get over

22    to in front of the Forum?

23    A.   Probably not more than a few seconds.

24    Q.   When you got there, did you feel anything unusual?

25    A.   The heat.  I could liken it to opening up the oven and

1    your face is right in front of it.  That's what it felt like.

2    That was the only part of my body that wasn't covered.  I had a

3    sweater on, my police jacket, long underwear, gloves, and a --

4    my department hat.  But my face was uncovered, and you could

5    just feel it right on my face.

6    Q.   Where was the heat coming from?

7    A.   Just the area where the bomb exploded.

8    Q.   So it was just coming up off the ground?

9    A.   Yes.

05:10 10          MR. WEINREB:  Can we have Exhibit 23?  First, can we

11   turn on the --

12   Q.   So I'm going to play for you a video, Exhibit 23, that's

13   already in evidence.

14   (Video recording played.)

15   Q.   So do you recognize what's pictured in this video?

16   A.   Yes, I do.

17   Q.   What are we looking at?

18   A.   That's the front of the Forum restaurant, the runners on

19   Boylston Street, and then, you know, the spectators on both

05:11 20   sides of Boylston Street.

21   Q.   Where are you in relation to the Forum restaurant looking

22   at this -- from this angle?

23   A.   The yellow awning is the -- that restaurant, Sol de la

24   Terre.  On the screen, I would be to the right, off of the

25   screen.

1    Q.   And this -- you see at the bottom of the frame, there's

2    what looks like the top of a doorway.  Do you know what's that

3    the doorway to?

4    A.   That's the door to the Forum restaurant, I believe.

5    Q.   So the camera that's taking this video is positioned right

6    above that doorway?

7    A.   Yes.

8    Q.   So according to the timestamp here in the lower right-hand

9    corner, we're stopped at 2:43 p.m., is that correct?

05:12 10    A.   Yes.

11    Q.   So I'm going to skip ahead the video now to 2:45, almost

12    2:46 p.m.  I'd just ask you to turn your attention to this area

13    right here.  And a figure is going to appear.  I'd just like

14    you to follow that figure.  I'll ask you a question about it

15    afterwards.

16    A.   Okay.

17    (Video recording played.)

18    Q.   You see a figure there with a white hat on?

19    A.   Yes.

05:13 20    Q.   Okay.  Now, based on the crowds that you were -- were all

21    around you at the Marathon that day, did that person look any

22    different from anybody else or did he just blend in?

23    A.   No, he doesn't look any different than anybody in the

24    crowd that I saw.

25    Q.   Okay.  So we're now at -- according to the timestamp here,

1    almost at 2:47 p.m., and I'm going to skip ahead to close to

2    2:49 p.m., okay?  I'd just ask you to keep your eyes on the

3    screen because I'm going to ask you a question about what

4    happens next.

5    A.   Okay.

6            MR. WEINREB:  Can we have 23-C?

7    Q.   So that -- the figure that we saw earlier, do you see him

8    there?

9    A.   Yes, I do.

05:15 10   Q.   Okay.

11   (Video recording played.)

12   Q.   Okay.  Now, you just notice everybody just turn to look at

13   their left, is that correct?

14   A.   Yes.

15   Q.   Where were you, did you see other people doing the exact

16   same thing?

17   A.   I don't remember anybody else that I saw, but I was intent

18   on watching what I had seen.  I wasn't focused on the crowd or

19   anything like that.  I was looking down Boylston Street at the

05:16 20   explosion.

21   Q.   Okay.  But when the first explosion occurred, did you see

22   people around you also looking in that direction?

23   A.   Yes.

24   Q.   And you were looking in that direction?

25   A.   Yes, I was.

1    Q.    Okay.  So -- and you said -- how many seconds later did

2    the second explosion occur?

3    A.    About 15 seconds.

4    Q.    So, again, I'm going to ask you to just keep your eyes on

5    this figure, the one with the white hat, as we continue.

6              MR. WEINREB:  If you'd just play the next segment,

7    please.

8    (Video recording played.)

9    Q.    Okay.  I want to turn your attention to a figure in a

05:17 10    yellow emergency-type vest in the middle of the screen, near

11    the top of the frame.  Do you know who that is?

12    A.    Yes.  That's me.

13    Q.    That's you?

14    A.    Yes.

15              MR. WEINREB:  Can we have 23-E, please?

16    (Video recording played.)

17    Q.    Now, what are you doing here?

18    A.    When I first got there, you know, there was so many people

19    that were hurt seriously that it was hard to choose who to

05:18 20    begin helping first.  So that's what I was doing, just trying

21    to pick who -- maybe who was hurt the worst, in my view.

22    Everybody was hurt really bad, but I was trying to pick who I

23    could help first.

24              MR. WEINREB:  23-F, please.

25    (Video recording played.)

```
 1   Q.   Now, there's a figure lying on the ground.  There's
 2   something flashing in between his legs.  Can you see that?
 3   A.   Yes.
 4   Q.   Off to the left?
 5   A.   Yes.
 6   Q.   Now you're over there patting him.  What's going on there?
 7   A.   His clothes had been blown off, and he was on fire.
 8   Q.   And what did you do?
 9   A.   I used my hands to put out the fire.
10   Q.   And then what?
11   A.   As I was putting out the flames, somebody came up behind
12   me and poured a -- I don't know if it was a beer or drink or
13   something on him to help.  So he helped me.  And then there was
14   also a woman that was -- she was using a napkin to wrap up one
15   of his legs that had been blown off.  And then another woman
16   came up on the street, and I -- I was trying to get my belt
17   off, but I had my gun; I had my radio.  And I couldn't leave my
18   gun on the street by itself.  So I asked her, I said, Can you
19   give me your belt?  Can you take your belt off?  Could you give
20   me the strap to your purse, something like that?  She didn't --
21   I don't think she understood me at first, but she eventually
22   did.  I kind of motioned, Take your belt off.  She gave me her
23   belt.  I took the belt, and I wrapped it around that
24   gentleman's right thigh.  And the woman that was holding the
25   bottom of his leg, you know, I told her, I'm going to tie the
```

        1    belt around.  I'm going to pull it as tight as I can, and you
        2    just keep pulling it as tight as you can.  That's what I did.
        3    Q.   Were you able to get a tourniquet onto the stump of his
        4    leg?
        5    A.   Yes.
        6    Q.   And did that stop the bleeding?
        7    A.   I don't know if it stopped the bleeding, but it's the best
        8    action that I could take and then to have her pull it as tight
        9    as she could while she was there, and then I could move on sort
05:21  10    of to the next -- the next person I could help.
       11    Q.   Okay.
       12             MR. WEINREB:  Can we have 23-G, please?
       13    (Video recording played.)
       14    Q.   Okay.  So let me just pause this for a second.  Where are
       15    you in this video?
       16    A.   I'm right in front of the tree.
       17    Q.   Okay.
       18    A.   It looks like I'm stepping over somebody.
       19    Q.   Now, what's happening right here?
05:21  20    A.   Somebody yelled, you know, There's a kid here or a child
       21    here or something like that, and that's what got my attention.
       22    So that's what I went to.  That man was holding a young boy.
       23    Q.   Do you know how old he is or was at the time?
       24    A.   He was three.
       25    Q.   Do you know his name?

A.    It's Leo.

Q.    Did he appear injured to you?

A.    Yes, he did.  He had blood coming down the side of his
head.

Q.    What was he doing?

A.    I don't know if he was crying or screaming or anything.  I
don't remember.

        MR. WEINREB:  Can we play the next segment?

(Video recording played.)

Q.    So this is you taking hold of the child?

A.    Yes.

Q.    Then you just ran off the screen to the left here?

A.    Yeah.  I carried him across Boylston Street, sort of
almost to the other side.  And I -- the way he was handed to me
is the way I carried him out.  So he wasn't facing me.  He was
facing away.  And I could see that there was blood coming down
his -- you know, the right side of his head.  I think it was
the right side of his head.  His hair was all messed up,
disheveled, whatever you call it.

        So I saw that he was bleeding so I just grabbed him.  And
the best way I can describe it is I carried him like a
football.  I knew that the medical tent was at Boylston and
Dartmouth Street.  So I said, you know, that's what I'm going
to do.  I can at least carry him down to the medical tent, to
Boylston Street and Dartmouth Street, and get him the hell out

1    of there.

2    Q.   Did you do that?

3    A.   I got -- I ran down with him at Boylston and Exeter

4    Street.  A Boston EMS ambulance was coming down Exeter Street

5    from Huntington Avenue.  So I waved them down, and it was -- I

6    found out later on what the unit was, Paramedic 40.  They

7    stopped for me.  Both of the paramedics got out, and I told

8    them, you know, I have a young boy.  Looks like he has a head

9    injury.  I don't know how seriously injured he is.  But, you

05:24 10   know, can I give him to you guys, put him in the back of the

11   ambulance?  And then I told the guys, I said, We need you up at

12   Boylston and Ring Road, or whatever address I gave them.  I

13   said, you know, We need you up here.  And they took Leo.  One

14   went in the back.  The other guy drove.  And I ran back to the

15   front of the Forum and the ambulance followed me.

16   Q.   Officer Barrett, the other day did you review some

17   photographs with me?

18   A.   Yes, I did.

19   Q.   Are all those photographs of this same scene in which you

05:25 20   personally appeared?

21   A.   Yes.

22        MR. WEINREB:  Those were, for the record, Exhibit

23   2113, 2125, 2126, 2139, 634, and 30.  And those have all been

24   shown to defense counsel right before their lunch hour.

25   Q.   Were those all fair and accurate depictions of the things

1    that appeared in the photographs?

2    A.   Yes.

3              MR. WEINREB:  Your Honor, I offer those exhibits.

4              MR. BRUCK:  Subject to our --

5              THE COURT:  Subject to the same reserved objection,

6    they will be admitted.

7    (Government Exhibit Nos. 2113, 2125, 2126, 2139, 634, and 30

8    received into evidence.)

9              MR. WEINREB:  Can we have 2113, please?

05:26 10   Q.   So the -- again, this figure here, is that you?

11   A.   Yes, it is.

12   Q.   2125, there's a figure at the very far left of the frame

13   in the middle, which I'm drawing a magenta circle around.  Who

14   is that?

15   A.   When I met with the U.S. Attorney back in -- I think it

16   was September.

17   Q.   You don't need to tell me his name.  Is that somebody you

18   talked about earlier?

19   A.   Yes.

05:27 20   Q.   Who is it?

21   A.   It's Mark Fucarile.

22   Q.   And did you testify about him earlier?

23   A.   Yes.

24   Q.   Is he the one who you tied off his leg with a belt?

25   A.   Yes.

```
          1              MR. WEINREB:  2126, please.
          2     Q.   Is that you leaning over him there?
          3     A.   Yes, it is.
          4              MR. WEINREB:  2139, please.
          5     Q.   Now, what's happening right here?  I'm drawing a magenta
          6     circle around a figure of somebody taking something in their
          7     arms from somebody else.  What's that?
          8     A.   That's me taking Leo.
          9              MR. WEINREB:  Can we have 634, please?
05:28    10     Q.   What's that a picture of?
         11     A.   That's me carrying Leo.
         12              MR. WEINREB:  Can we have Exhibit 30, please?
         13     Q.   What is that a picture of?
         14     A.   That's me carrying Leo.
         15     Q.   And this was right after you picked him up and you were
         16     carrying him to the medical tent, as you said?
         17     A.   I was walking across from the -- from the front of the
         18     Forum to the other side of Boylston Street.
         19     Q.   How many injured people did you see in front of the Forum
05:28    20     restaurant when you ran over there?
         21     A.   Twenty to thirty, give or take.
         22     Q.   What kinds of injuries did you see?
         23     A.   It was -- it was brutal.  You know, there was blood, a lot
         24     of blood on the ground, mixed with -- it looked like charring.
         25     There was a person's leg on Boylston Street that I -- later on,
```

1    while I was backing up, after helping somebody, I stepped on

2    it.  I stepped on somebody's leg.  People were missing legs,

3    and, you know, the legs were ripped off.  It wasn't anything

4    clean or neat.  A lot of people had, you know, clothes that

5    were torn, shredded.

6         At one point, when I was kneeling over somebody, helping

7    somebody, I looked up, and there was a woman that was sitting

8    up, and she had been eviscerated across her abdomen.  And she

9    was holding onto her insides, holding them in.  And I said to

05:30 10   myself, you know, quickly, There's nothing I can do for her,

11   you know.  There's really nothing that I could do at that point

12   to help this woman that is holding in her insides, but there

13   were other things that I could help people with.  Those are the

14   people I had to move to.

15   Q.   Did you see a man who had some strange marks on his body?

16   A.   There was one -- after I had brought Leo to the ambulance

17   and brought the ambulance back, I went back, and there were a

18   lot of people that ran over to help.  There were spectators,

19   you know, maybe runners, watching the Marathon, that they --

05:30 20   you know, they did some really brave things.  They came in and

21   helped us.  They didn't think of themselves.  They came in to

22   help, and they were helping a lot of people.

23        So once I brought Leo back, when I went to help some other

24   people, you know, they were asking, you know, Do we have any

25   stretchers or backboards or anything like that to carry people?

And at the time we didn't have anything.  There was a fire

truck there that was on Boylston Street, Ladder 15, I think it

was.  So the fire truck has compartments.  They usually have

backboards.  So I climbed on top of the fire truck and was

opening the compartments looking for anything that I could use.

So I found two backboards, two red backboards and then -- it's

a metal litter that you carry somebody in.  So I grabbed those

off the truck.  And if you've ever thrown a surfboard across

the sand or across the water, that's what I did with them

05:32 because I was, like, 25 feet away.  I just grabbed the

backboards and threw them over to the sidewalk.  People there,

they were helping, you know.  We took one person that -- he had

lost his leg.  So we put him on the backboard.  Other people, I

think, had tied a tourniquet.  And people were asking me, you

know, Do you have any straps to carry the person on the

backboard?  Usually the backboard has straps so you can tie

them on.  If you've ever carried somebody on a backboard, if

their arm falls off to the right, usually the person would roll

off the backboard.  So you want to tie them down with straps.

05:32 We didn't have any straps.  At least I couldn't find them.  So

I said, Take off your belt, tie it around his legs, tie it

around anywhere you can.

So there were six of us, three on each side, that carried

the guy to the ambulance.  That first ambulance that was there,

it had Leo, and then we filled it with three adults.  So it was

three adults plus Leo.  We put him in the ambulance.  I asked

the ambulance where it was going.  They told me Mass. General.

Okay.  They left.  Now other ambulances were coming down.

So I went back, and the next person I helped, it looked

like he maybe was standing next to a barricade because at the

middle of his thighs was starting to turn black and blue as if

both of his legs were broken.  He was complaining that his back

hurt and his neck hurt and his head hurt.  People were helping

there.  Again, I had a nurse -- I think it was a nurse, you

know, come up and say, I'm a nurse, you know.  How can I help?

I was, like, you can help right here.  Or I'm a doctor.  Jump

right in.  I'm not going to stop you.  That's for sure.  You

don't need to ask my permission.  So they were jumping in.

They were helping.

So people were asking for C collars.  I said to the

person, We don't have any of that stuff, you know.  We're just

going to have to get them on the backboards and try and get

them out of here as best we can.  We rolled him over as best we

could.  He was in a lot of pain.  He was moaning.  So we got

him on the backboard, and, again, six of us carried him over to

an ambulance.  That ambulance was full.  So then we had to back

out, walk to the next ambulance.  That ambulance was full.

And, finally, after the third time, we found an ambulance to

put him in.  And that was -- that's what we did.

MR. WEINREB:  Excuse me one second.

```
 1              Thank you, Officer Barrett.  No further questions.
 2              MR. BRUCK:  Thank you, Officer.  We have no questions
 3      for you.
 4              THE WITNESS:  Thank you.
 5              THE COURT:  All right, Officer.  You may step down.
 6              THE WITNESS:  Thank you, your Honor.
 7              MS. PELLEGRINI:  The government calls William Richard.
 8              WILLIAM RICHARD, Sworn
 9              THE CLERK:  Be seated.  State your name and spell your
05:36 10    last name for the record.
11              THE WITNESS:  Sure.  William Richard, R-i-c-h-a-r-d.
12      DIRECT EXAMINATION BY MS. PELLEGRINI:
13      Q.   Good afternoon, Mr. Richard.
14      A.   Good afternoon.
15      Q.   If you can't hear me at any time, please let me know.
16      I'll speak up and speak into the microphone.
17      A.   Sure.
18      Q.   Mr. Richard, will you tell the jury where you reside?
19      A.   I live in Dorchester, in Dorchester, Mass. with my family.
05:36 20    Q.   Your family, who is your wife?
21      A.   My wife is Denise.
22      Q.   How long have you been married?
23      A.   You told me you weren't going to ask me any trick
24      questions.
25      Q.   Tough question.
```

1    A.    A long time.

2    Q.    A long time.  Do you and Denise have children?

3    A.    Yes.  We have a son Henry, a daughter Jane, and our son

4    Martin is deceased.

5    Q.    Is your son Martin Richard the child who died on Marathon

6    Monday in April -- on April 15, 2013?

7    A.    Yes.

8    Q.    Mr. Richard, with respect to the Marathon, prior to 2013,

9    had you and your family ever attended the Marathon or any of

05:37 10    the events surrounding it?

11    A.    We attended the Marathon and the events surrounding the

12    Marathon several times.

13    Q.    Can you tell us about that?

14    A.    Sure.  It was -- the Marathon always fell on the first day

15    of April vacation, so it was always a school holiday.  I --

16    Denise and I had attended the Marathon before we had kids, even

17    through college, just hanging out on Heartbreak Hill or

18    wherever.  But when we had kids, we kind of made it a ritual to

19    go in.  And we always knew someone who was running.  Even if we

05:38 20    didn't know someone who was running, it was just something we

21    did as part of living in the city.  We loved living in the

22    city, and we loved participating in anything that involved

23    jumping on the T and hustling through town.

24    Q.    Were you yourself a runner?

25    A.    Yes.

1    Q.    Did you ever run the Marathon?

2    A.    No.

3    Q.    Were your children involved in running activities?

4    A.    We were a very active family.

5    Q.    And, in fact, in April 2013, did your children participate

6    in one of the BAA-sponsored events?

7    A.    The children have been participating in what's called the

8    Youth Relay, which occurs the Saturday before Marathon Monday,

9    for the past several years perhaps -- well, at this point, we

05:39 10    missed -- we may have missed one, but for at least four or five

11    years.

12    Q.    In 2013, who participated in the Youth Relay?

13    A.    Henry, Martin, and Jane.

14    Q.    Is there an age limit for the children in the Youth Relay?

15    A.    Not that I recall, no.

16    Q.    Was this Jane's first time?

17    A.    Yes.  I believe it was her first time participating in the

18    relay.

19    Q.    Now, on Marathon Monday, can you tell us how you got to

05:39 20    the Marathon?

21    A.    Sure.  We -- as we always do, we were late getting out of

22    the house.  My goal is to always get in place on Hereford

23    Street to see the lead runners.  So it's where we live, which

24    is close to the Red Line.  It's kind of pointless to drive.  So

25    like we always do, we're hustling out of the house, grabbing

1    snacks and duffel bags and whatever we need for a long -- ends

2    up usually being a long day in the city.

3        And we jumped on the Red Line at Ashmont and got off at

4    Park Street.  And we walked up -- I think this time we walked

5    up Comm Ave and then eventually over to Newbury Street.  And I

6    was walking quickly because we were running late, and so we

7    were segmented a little bit.  And we eventually got to Hereford

8    Street, and the lead runners had already gone by so we missed

9    them.  But we've been there in the past for them, so it was

05:40  10    just unlucky that day.

11   Q.   Did you have favorite places to go to having previously

12   been to the Marathon?

13   A.   Favorite places to watch?

14   Q.   To watch, yes.

15   A.   Yeah.  We would -- as far as I can recall, as a family, we

16   would -- we had been going to Hereford Street for at least five

17   years.  Before Jane was born, we went to the finish line, and

18   Denise was actually carrying Martin in one of those baby Bjorns

19   with Henry, and our good friend was running.  And he wasn't a

05:41  20    fast runner but he always finished.  One of the best pictures

21   we have is him finishing about five and a half hours after the

22   start.

23       But when we started having children, we would -- the

24   finish line just became so hectic that we tried to find a space

25   that was a little less hectic and gave us a little breathing

1    room.  The corner of Hereford Street and Newbury Street kind of

2    offered that spot just as the runners took the turn down

3    Boylston but allowed us to have some space to breathe if we

4    needed to.

5    Q.   Was there also another attraction, at least for the

6    children, in that particular area?

7    A.   There was -- stores, in particular, some ice cream and

8    smoothie stores that would be giving away free samples.  Kids

9    would be leaving the area where the runners are and going to

05:42 10   get a free smoothie.  Then we would eventually make our way to

11   one of the ice cream shops and get ice cream as we're tracking

12   runners, just kind of go back and forth because, as young kids,

13   they're really into watching the runners, but you get a little

14   tired, you know, looking up one direction for too long.

15   Q.   Now, I'm going to go back to that smoothie and ice cream.

16   But in 2013, was there a runner in particular that you and your

17   family were watching?

18   A.   We were there to watch coaches of the kids.  The kids are

19   part of a track program, and we were there watching and trying

05:43 20   to track in particular runners from that we knew -- that

21   happened to be the kids' coaches.  But other people we knew

22   just randomly.  So everyone in this room probably knows someone

23   that's running the Marathon that day, so we probably knew a

24   half a dozen people that were running.  In particular, we were

25   there so the kids could see their coaches that helped them the

1    previous Saturday.

2    Q.   Now, going back to -- we're talking about that spot where

3    there's smoothies and ice cream.

4         MS. PELLEGRINI:  May I have Exhibit 37 marked for

5    identification for counsel and the witness only at this point,

6    your Honor?

7    Q.   Mr. Richard, do you see the image on the screen before

8    you?

9    A.   Yup.

05:44 10  Q.   All right.  Do you recognize that image?

11   A.   I do.

12   Q.   Can you tell us briefly and generally what this depicts?

13   A.   This is looking from the Marathon course down Newbury

14   Street.  So we are at the spot that I just described, looking

15   at the runners just before they take the turn, which would be a

16   left-hand turn onto Boylston Street.

17   Q.   And does this fairly and accurately represent your family

18   in the position that they were in at that location on Marathon

19   Monday in 2013?

05:44 20  A.   It does.

21        MS. PELLEGRINI:  Your Honor, the government would

22   offer Exhibit 37 to be published.

23        THE COURT:  Okay.

24        MR. BRUCK:  No objection.

25   (Government's Exhibit No. 37 received into evidence.)

1    Q.    Mr. Richard, the screen in front of you is a touchscreen,

2    and if you use your finger, the pad of your finger, it can make

3    a circle or an arrow.  So I'm going to ask you to look at that

4    and identify the family members in the image if you will.

5    A.    Sure.  So you want me to circle and identify?

6    Q.    Yes.

7    A.    Okay.  That's Henry.

8    Q.    For the record, so you've drawn a yellow circle over the

9    boy with the bangs on the left side of the picture.

05:45 10   A.    That's Jane.

11   Q.    All right.

12   A.    With two legs.

13   Q.    Little girl in the green jacket standing on the fence.

14   A.    That's Denise.

15   Q.    The woman wearing the cap.

16   A.    And that's Martin.

17   Q.    A little boy also standing on the fence, kind of a black

18   jacket.  Do you know what he has in his hands?

19   A.    No.  Probably a snack of some sort or a wrapper it looks

05:46 20   like.  I can't tell.

21   Q.    Do you know where you were?

22   A.    I was probably either behind the street sign there or off

23   to our left, which we would often kind of walk back and forth

24   from that area.  If you found a spot on the rail, you typically

25   just kind of grabbed it and held it.  But I at that point was

1    probably just getting away from the crowd.

2    Q.    I see both Jane and Martin are standing on the railing.

3    Did you try to find spots where that could happen?

4    A.    Absolutely.

5    Q.    All right.  From this location, can you tell us where you

6    went?

7    A.    So we left this location because it was time for ice

8    cream.  And we decided to -- we were trying to track the

9    runners, as I mentioned, having difficulty with the cell

05:47 10    coverage and stuff like that.  So many people running by,

11    sometimes they run by and you actually miss them.  So we

12    thought, well, let's -- or perhaps we had realized that we had

13    a little more time left, I think is what it was.

14         We decided that we should get ice cream and come back.  So

15    rather than going -- normally we'd go to a place right next

16    door called Emack & Bolio's, but we decided to walk down

17    Newbury Street to Ben & Jerry's.  And we were able to get a

18    seat inside.  So we sat inside.  The three kids had ice cream.

19    Denise and I took some bites of theirs.  And I can even

05:48 20    remember the details of what each of them ordered, but unless

21    you want to know, I'll keep that to myself.

22    Q.    I'll let you have your memories.

23         How long did you stay at Ben & Jerry's?

24    A.    Oh, 20 minutes.

25    Q.    And from there where did you all go?

1    A.   Well, because we were far enough down Newbury Street at

2    that point -- and in years past, you know, Jane would be a

3    little smaller and the kids had had their ice cream, so they

4    had a little more energy to -- it was either kind of do we go

5    home or do we kind of try to go back and stick it out for a

6    little longer?  So we decided to do something that we usually

7    don't do and try and find a place closer to the finish line.

8    Q.   At that point, though, were you or Denise tracking a

9    particular runner with updates on a phone or anything like

05:49 10    that?

11   A.   Yes.

12   Q.   Do you know whether -- at this point had your friend gone

13   through the finish line?

14   A.   It was telling us no, but I had a BlackBerry.  I couldn't

15   track much with that.  And for whatever reason, we just weren't

16   clear.  So we just figured we'd give it a try.  So we weren't

17   sure.  We thought it was going to be close.  If we got to the

18   finish line, we knew it was going to be close.

19   Q.   So from your location on Newbury Street at the ice cream

05:49 20   store, how did you get to Boylston?  How did you get to that

21   spot on Boylston?

22   A.   Right.  So we walked up one of the streets that run

23   perpendicular to Newbury and Boylston Street, and we ended up

24   close to the finish line.  And it was really crowded, so we

25   started walking up the sidewalk on Boylston Street and might

1  have stopped once and just kept going until we found a spot

2  that was a little thinner that we could get the kids a seat --

3  a location where they could stand as they are now.

4  Q.   Now, you say that the crowd is dense in some place,

5  thinner in others.  Generally, what were the crowds like there

6  on Boylston Street?

7  A.   Oh, it was very busy.  You know, it was people bumping

8  into each other as you're walking, and it was hustling and

9  bustling.  It was a beautiful day.

05:50 10  Q.   And did you eventually come to a location where you

11  stopped on Boylston Street to watch?

12  A.   Yes.  We -- it was very random.  We had no reason to stop

13  where we did other than it was -- there was just -- there was

14  just an opening, and so we took it.

15  Q.   Where was that?

16  A.   It was in -- I didn't even know it at the time, but it was

17  in front of the Forum restaurant.

18        MS. PELLEGRINI:  May I have Exhibit 29, which I

19  believe is already in evidence?

05:51 20  Q.   Mr. Richard, I'm going to ask you to look at this image

21  before you.  Do you recognize your family here?

22  A.   I do.

23  Q.   Again -- I'm not real good at this, but -- can you tell us

24  where everybody is as far as you know?

25  A.   Sure.  That's me.  That's Jane with two legs.  And that's

 1   Martin.

 2           MS. PELLEGRINI:  Can we go back on that, Mr. Bruemmer?

 3   Can we enlarge again.  Original, please.

 4   Q.   I've made it a little bit back to its original size.  Is

 5   Henry in this picture as well?

 6   A.   Yeah.  He's a little more difficult to -- he's grown so

 7   much in the last two years, but that's him right there.

 8   Q.   And behind him, with the hat?

 9   A.   Oh, yeah.  Denise is just at the top of the circle that I

05:52 10   drew.  You can see her brown hat.  So Denise is standing right

11   behind Henry.

12   Q.   Did you know anybody else in this area as depicted in this

13   photo?

14   A.   No, no.  We made friends with, you know, a couple of the

15   boys standing next to us, but that was about it.

16   Q.   Mr. Richard, did you ever see this man with the white hat,

17   bill turned backwards?

18   A.   Until today in person, no.

19   Q.   When you were at this location, tell us what happened,

05:53 20   what you remember.

21   A.   Repeat.

22   Q.   When you got to this location -- let me ask you this:

23   What's the next thing that you recall happening?

24   A.   Well, depending on exactly when this photo was taken,

25   which I suspect it was just moments before the first explosion,

1    we were all simply looking up Boylston, and we heard a

2    thunderous explosion down towards the finish line.  And

3    everybody just kind of looked down towards the finish line and

4    really didn't know what to make of it.  I thought it was -- the

5    first thing that popped into my head was a sewer explosion

6    because they had been in the news recently.  And nobody could

7    see it because it was on the inside of the road.  So while

8    we're all looking down, it was happening on the sidewalk, so we

9    really couldn't see anything.

05:54 10         And time slowed down, and I just recall -- and I recall

11    thinking, Okay.  We should probably go.  And I heard somebody

12    -- I wasn't sure.  I wasn't sure if we should go or if we

13    should just stay calm.  It didn't appear to anybody standing in

14    front of the Forum that there could be a second bomb.  Whatever

15    happened down the road, we didn't even know -- it was even --

16    as booming as it was, you couldn't even predict how bad it was.

17    You just knew it wasn't good.

18         And at that point I heard somebody yell, Get in the

19    street.  And it registered with me as well that whatever

05:55 20    happened happened on the sidewalk or came out of one of the

21    storefronts.  So I thought, Okay.  Let's go over this railing

22    and start walking up Boylston Street.

23    Q.   Can I just stop you right there?

24              MS. PELLEGRINI:  Again, for counsel and the witness

25    only, it's 21-2.

1    Q.    Mr. Richard, have you seen this image previously?

2    A.    Yes.

3    Q.    Do you recognize what is depicted here in this photograph?

4    A.    The first bomb had just exploded, and everybody is trying

5    to see what it was that happened.

6    Q.    And to the best of your recollection, does this fairly and

7    accurately depict where your location was and, in fact, depict

8    you at the time of the first explosion as you just explained to

9    us?

05:56 10    A.    Yes.

11           MS. PELLEGRINI:  Your Honor, the government would

12    offer 21.2.

13           THE COURT:  Okay.

14    (Government's Exhibit No. 21-2 received into evidence.)

15           MS. PELLEGRINI:  May it be published?

16    Q.    Mr. Richard, looking at that image now on the screen, do

17    you see yourself there?

18    A.    I believe so, yes.

19    Q.    Let me ask you this actually before I go on.  You

05:57 20    indicated that there was the first explosion.  Which direction

21    did you look -- did you, if you looked, towards?

22    A.    I looked -- when the first explosion happened, I looked

23    toward the explosion.

24    Q.    And did you look around to see what others were doing as

25    well?

```
 1    A.    Yes.  Everybody else was looking in the same direction.

 2    Q.    And, in fact, isn't that what's depicted here?

 3    A.    Yes.

 4    Q.    Now, at this location, directing your attention to the --

 5    let me see if I can do it -- the tree area.

 6    A.    Right.

 7    Q.    Had you moved from your location?

 8    A.    Well, when the first bomb exploded, some people kind of

 9    reconfigured a little bit.  I do remember people just kind of

 10   merging together a little bit.  And I can't remember exactly

 11   where I moved from, to.  But I do remember trying to move

 12   closer to where -- because there were two people separating my

 13   family.  So I recall trying to get closer to say to Denise that

 14   we're going to go.  And I believe I did say the words, We're

 15   going to go.

 16   Q.    Did you have a chance to move?

 17   A.    Well, my intention -- thinking so many steps ahead, I

 18   thought what I was going to do was get myself over the

 19   barricade and then lift the kids over and assuming that -- and

 20   then Denise could get herself over, and we'd simply just walk

 21   calmly up Boylston Street.

 22   Q.    Were you able to do that?

 23   A.    No.  I recall trying -- the last thing I remember is the

 24   beginning of hoisting myself over the fence.

 25   Q.    What's the next thing that you remember after that?
```

     1    A.    The next thing I remember is hearing -- unlike the first

     2    bomb that was just a loud thunderous boom, this one was an

     3    ear-piercing sound that was very more high pitched than the

     4    first.  And I remember getting up from -- I was blown into the

     5    street, and I -- would you like me to continue?

     6    Q.    Yes, please.

     7    A.    So I was blown into the street, and I remember getting up,

     8    orientating myself, and immediately walking back to where I

     9    came from.

05:59 10    Q.    So I'd like to show you what's been marked for

    11    identification -- again, counsel and witness only -- Exhibit

    12    34.  Mr. Richard, do you recognize the scene shown here?

    13    A.    Yes.

    14    Q.    And, in fact, are you in this photograph?

    15    A.    Yes.

    16    Q.    I'm going to just -- can you tell us where you are and, if

    17    you know, where your family members are?

    18    A.    Yes.

    19    Q.    I'm sorry.  Actually, Mr. Richard, I'm sorry.  Does this

06:00 20    fairly and accurately represent the scene immediately after the

    21    blast when you found yourself out in the street?

    22    A.    It does.

    23         MS. PELLEGRINI:  Your Honor, the government would

    24    offer Exhibit 34.

    25         THE COURT:  Okay.

1    (Government's Exhibit No. 34 received into evidence.)

2    Q.   So, Mr. Richard, can you tell us what we're looking at

3    here?

4    A.   You're looking at the scene of the Forum after the second

5    bomb exploded and I've made my way back to the sidewalk, and

6    I'm lifting the barricade that had fallen to an upright

7    position.

8    Q.   Could you circle yourself, sir?

9    A.   I'm sorry?

06:01 10    Q.   Could you make a circle?

11    A.   Yes.  I'm right there.

12    Q.   You've indicated the person whose back is to us a little

13    off center on the left-hand side?

14    A.   I'm sorry?

15    Q.   A little off the center, you've drawn a yellow circle

16    around you, is that correct?

17    A.   Yes.

18    Q.   Who else is in this photo that you know?

19    A.   Right.  So that's Jane.

06:01 20    Q.   You drew a circle, another yellow circle, a little girl

21    wearing a green jacket close to the tree?

22    A.   Right.  That's Henry.

23    Q.   Little boy with a gray hoodie all the way to the left?

24    A.   And Denise is right there.

25    Q.   Right next to Henry.  Do you know where Martin is at this

```
     1    time?

     2    A.   Martin is on the ground where Denise is reaching.

     3    Q.   Do you know if we can see any portion of Martin's body

     4    here?

     5    A.   I'm sorry.  Do I know if I can see any portion?

     6    Q.   Yes, of his body, in this photo, if I enlarge this.

     7    A.   No.

     8         MS. PELLEGRINI:  Go back to the original size.

     9    Q.   So, Mr. Richard, you indicated that you are taking the

06:02 10    barrier back.

    11    A.   Right.

    12    Q.   What happens next?

    13    A.   What happens next is I -- at that point I hadn't seen

    14    Jane.  I had seen Denise; I had seen Martin; and I had seen

    15    Henry.  And after I lifted the barrier, Henry walked towards me

    16    and we embraced.  And he said, Is this really happening?  And I

    17    said yes.  I said, You need to help me find your sister.  And

    18    even though she was standing or kneeling right behind me, I

    19    hadn't seen her.  And he pointed out -- at that time he pointed

06:03 20    out Jane to me.

    21    Q.   Did you make observations looking at Jane at that time?

    22    A.   I did.  I didn't know the extent of her injuries.

    23    Q.   What did you know?

    24    A.   I knew that she was scared.

    25         MS. PELLEGRINI:  May I have, again, for the counsel
```

1    and the witness Exhibit 32.

2    Q.   Mr. Richard, looking at the image in front of you, Exhibit

3    32 marked for identification, do you recognize the scene shown

4    here?

5    A.   Yes.

6    Q.   And, in fact, are you in this photograph?

7    A.   I am.

8    Q.   Does this fairly and accurately represent the scene

9    immediately after the blast on Boylston Street?

06:04 10   A.   Yes.

11         MS. PELLEGRINI:  Your Honor, the government would

12   offer Exhibit 32.

13         THE COURT:  Okay.

14   (Government's Exhibit No. 32 received into evidence.)

15   Q.   Mr. Richard, can you tell us what's happening here?

16   A.   It's the -- I'm -- had not seen Jane.  I'm walking towards

17   my son Henry.  Henry is in the gray sweatshirt with his hand on

18   his head, and I'm reaching for him to come towards me.

19   Q.   Mr. Richard, I notice, looking at your pants leg that's

06:04 20   right here --

21   A.   Right.

22   Q.   What's happened here?

23   A.   I, like many people, suffered -- my pants were torn apart.

24   My sneakers were torn apart.  And I suffered shrapnel and

25   severe burning to my legs.

1    Q.   Mr. Richard, what could you hear at this time?

2    A.   I couldn't hear much of anything.  It was deafening.  I

3    could -- it was muted chaos.  I could hear -- I could hear but

4    it was very difficult.

5    Q.   And what other physical effects did you take note of?

6    What did you smell?  What did you see?

7    A.   It smelled -- it smelled like gunpowder, sulfur, burned

8    hair.  It smelled vile.

9    Q.   Now, in the exhibit on the screen at the moment -- let me

06:05 10   clear this.  Can you tell us where Henry is?

11   A.   Circle.

12   Q.   So drawing a yellow circle again around a little boy with

13   a gray hoodie.  At this time you say you haven't seen Jane?

14   A.   That's right.

15   Q.   And have you seen Denise and have you seen Martin?

16   A.   I had seen Denise kneeling over Martin.  I did not know

17   the extent of Martin's injuries.

18   Q.   Did you -- with respect to Jane, when did you find Jane?

19   A.   After this photograph, Henry walked to the end of the

06:06 20   fence and we turned around.  My -- I was thinking that I needed

21   to get people off the sidewalk.  So I wanted to simply just get

22   Henry off the sidewalk and at least off the curb into the

23   street.  And it was then when Henry said, There's Jane, and she

24   was by the mailbox.

25           MS. PELLEGRINI:  May I have Exhibit 24 up?  I believe

        1    it's already in evidence.

        2    Q.   Mr. Richard, this photograph here is already in evidence.

        3    Do you see yourself in this photo?

        4    A.   I do.

        5    Q.   Now, you indicated that you had seen Henry and that at

        6    some point he came toward you?

        7    A.   Right.

        8    Q.   Is that when this happened?

        9    A.   Yes.

06:07  10    Q.   Do you see Jane in this photograph?

       11    A.   I do.  And I previously said the "mailbox."  I meant the

       12    tree.  She was closer to the mailbox, but I do see Jane.

       13    Q.   Again, for the jury, can you circle where Jane is?

       14    A.   Sure.

       15    Q.   You've drawn a circle around a girl wearing a green shirt

       16    or jacket.

       17    A.   Right.

       18    Q.   A little off the center of the tree.

       19    A.   Right.

06:08  20    Q.   Again, at this point could you make any observations of

       21    Jane's injuries?

       22    A.   No.

       23    Q.   So once you got ahold of Henry, what happened?

       24    A.   I recall walking towards Jane, and she tried to get up and

       25    she fell.  And it was then when I noticed her leg.  So I picked

1    her up in one arm and I took Henry in the other, trying to

2    shield both of their eyes.  And I walked across Boylston

3    Street.

4    Q.   What specific observations did you make about Jane's leg?

5    A.   That it was -- she didn't have it.  It was blown off at

6    the site.

7    Q.   And where did you go from the sidewalk?

8    A.   I was bringing -- at that point I knew that she needed

9    help, so I was trying to find medical attention for her.  And

06:09 10   so I walked into the street until someone approached us to

11   help.

12   Q.   And do you know who that was?

13   A.   I don't -- there were several people helping, and at the

14   time I didn't know who it was.

15   Q.   What happened there at that site?

16   A.   So they took Jane, and they put her on the ground, and

17   they started treating her.  And I said that I needed to go back

18   and check on my wife and son.  So I -- Henry was clinging to

19   me, and I walked back across Boylston, not the entire way, from

06:10 20   where we were.  And I could hear Denise yelling my name.  And I

21   was still covering Henry's eyes.  And I believe at that time I

22   think -- I walked back at least two times across Boylston

23   Street, once with Henry and once without him.  And I left him

24   on -- I sat Henry down on the other side of Boylston Street

25   with someone who assured me that he was safe and that he -- and

1   I told them that I would be right back.  And I went back across

2   the street to check on Denise and Jane -- Denise and Martin.

3   Q.   When you got back to their location, what happened?

4   A.   Well, I saw Denise and other people hovering over trying

5   to help Martin.  And I knew that I needed to get back to help

6   Jane.  When I saw Martin's condition, I knew that he wasn't

7   going to make it.  So I -- I knew Denise was okay, though I

8   didn't know the extent of her injuries.  And I told her that I

9   was going to go be with Jane, that Jane was okay, but I needed

06:11 10   to go in the ambulance with Jane and Henry.

11   Q.   Did Denise say anything to you?

12   A.   She agreed, and she was crying.  And I -- again, given

13   what I saw, it was at that time when I basically saw my son

14   alive barely for the last time.

15   Q.   Did you say anything to Martin before you left?

16   A.   No.

17   Q.   When you say that based upon what you saw that he was

18   barely alive, can you tell us what you saw?

19   A.   I saw a little boy who had his body severely damaged by an

06:12 20   explosion.  And I just knew from what I saw that there was no

21   chance, the color of his skin and so on.  I knew in my head

22   that I needed to act quickly or we might not only lose Martin,

23   but we might lose Jane too.

24   Q.   So from the area where Martin and Denise were, where did

25   you go?

1    A.   I went -- it's a little -- I'm a little unsure exactly.

2    Jane, I believe, was being carried to an ambulance at that

3    point.  I found Henry, who was sitting on the opposite side of

4    Boylston Street.  And he and I either followed Jane in the

5    ambulance or were told which ambulance she was in.  But I knew

6    if we didn't move fast that they were going to leave without

7    me.

8    Q.   Now, before we move on, I'd like to show you -- again,

9    only for witness and counsel -- Exhibit 36 marked for

06:14 10   identification.  Mr. Richard, on the screen before you, have

11   you also reviewed a portion of the Forum video right

12   immediately after the blast?  Have you previously viewed that?

13   A.   Yes.

14   Q.   In fact, are you seen in this video at various times?

15   A.   Am I seen?

16   Q.   Yes, not particularly in this particular frame, but are

17   you, in fact, in this video?

18   A.   Oh, I'm sorry.  Yes, yes.

19   Q.   After your review of it, does this fairly and accurately

06:15 20   reflect the scene right after the blast?

21   A.   Yes.

22   Q.   I'm going to start to play this.

23           THE COURT:  Is this in evidence?

24           MS. PELLEGRINI:  I'm sorry, your Honor.  Your Honor,

25   the government moves Exhibit 36.

```
 1              THE COURT:  And this is a clip from the so-called
 2   Forum video?
 3              MS. PELLEGRINI:  A clip from the previous video.  It's
 4   a smaller version.
 5   (Government's Exhibit No. 36 received into evidence.)
 6         MS. PELLEGRINI:  May I play, your Honor?  I'm sorry.
 7              THE COURT:  Yes.
 8         MS. PELLEGRINI:  Thank you.
 9   (Video recording played.)
10   Q.   Mr. Richard, directing your attention to the person who
11   I've drawn a circle around, do you recognize that person?
12   A.   It looks like me.
13   Q.   What are you doing here?
14   A.   Running back to where I came from.
15   Q.   Clearing this, do you know who this is?
16   A.   Well, I believe -- now I believe that's Jane.
17   Q.   All right.  Stopping it there again, in fact, is this you
18   picking up the barrier that you mentioned?
19   A.   Right.
20   Q.   Mr. Richard, we just saw you put both hands to your head
21   in that video.  What is happening there?
22   A.   I'm trying to process what's happening.
23   Q.   And here?
24   A.   I'm taking Henry.  You could see in the previous frame
25   Jane tried to get up and fell, but I am taking Henry away and
```

1   trying to get him off the sidewalk.

2   Q.   All right.  Just for the record, I'm drawing a magenta

3   circle around the two figures that are sort of to the left of

4   that screen.  Is that you and Henry?

5   A.   Yes.

6   Q.   What's happening here, Mr. Richard?

7   A.   It's the time when I grabbed Jane, and I'm trying to lift

8   her up from the sidewalk.

9   Q.   And there, what has happened?

06:18 10   A.   That's where I stopped to put Jane down and was just

11   praying for someone to come over and help.

12        MS. PELLEGRINI:  May I have only for counsel and the

13   witness Exhibit 39.

14   Q.   Mr. Richard, do you recognize this photograph?

15   A.   Yes.

16   Q.   And, generally speaking, what are we looking at here?

17   A.   You're looking at Boylston Street.  I'm carrying Jane, and

18   I've got Henry around my right arm and Jane's left leg has been

19   blown off by the explosion.

06:19 20   Q.   And, again, does this fairly and accurately represent you,

21   Henry and Jane --

22   A.   Yes.

23   Q.   -- on that day?

24        MS. PELLEGRINI:  Your Honor, the government moves

25   Exhibit 39.

```
 1              THE COURT:  All right.  Admitted.

 2     (Government's Exhibit No. 39 received into evidence.)

 3              MS. PELLEGRINI:  Publish to the jury.

 4     Q.   Mr. Richard, did, in fact, someone come to help you as you

 5     carried Jane down the street?

 6     A.   Yes.

 7     Q.   What happened from that point?

 8     A.   I was attempting to rip my pants to do something to help,

 9     and it was that time when I started hearing calls for, you

06:19 10     know, tourniquets and belts and stuff like that.  And my

11     attempts to tear my pants in a way were either -- it wasn't

12     fast enough because, by the time I was able to complete that,

13     they were already assisting Jane.

14     Q.   Did you and Jane and Henry leave the scene together?

15     A.   It's a little unclear, my memory.  But I believe it was

16     after that point when I knew that Jane was being tended for

17     that I walked Henry to the other curbside, and that's when I

18     went back to see Denise and Jane -- to see Denise and Martin.

19     Excuse me.

06:20 20     Q.   Is this a second time?

21     A.   Yes.

22     Q.   And what happened at this second point?

23     A.   No.  It was the -- that was the -- it was -- if I went --

24     if I saw them the first time, I wasn't quite clear to the

25     extent of the injuries.  It was the second -- it was the second
```

1    time I went back to them is when I told -- when I realized that

2    Denise was injured but not severely injured, and that's when I

3    had already testified about Martin, so --

4    Q.   So getting back then to leaving the Boylston Street area,

5    how did that happen?

6    A.   Right.  So I told Denise that I was going to go be with

7    Jane.  I tried to give her some assurance that she was going to

8    be okay, but I had to go.  And I looked at Martin for the last

9    time, and I went back across the street, grabbed Henry, and we

06:21 10   were brought onto an ambulance that Jane had already been

11   loaded onto.

12   Q.   And from there, where did you go?

13   A.   To Children's Hospital.

14   Q.   What happened there?

15   A.   We arrived.  And it was like a scene from the movies and

16   it was just -- we were probably -- I think we were the first

17   ones to arrive.  There were just dozens of doctors and nurses

18   lined in triage just waiting.  And, really, it -- you always

19   think it's not good when you see the look of horror on doctors'

06:22 20   faces, but that's what I recall seeing.  And they took Henry,

21   and they immediately took Jane into the emergency room.

22   Q.   Let's talk about Henry first.  Did he have any injuries?

23   A.   He did.  He had some cuts and scrapes and some temporary

24   hearing loss.  But, thankfully, aside from what he witnessed

25   that day, physically, he turned out okay.

1    Q.    And for Jane?

2    A.    Jane was devastatingly injured.  She lost her -- they

3    amputated her leg, her left leg, below the knee.  And she had

4    -- I've lost count.  They must have removed over 20 shrapnel

5    pieces from all areas of her body, including behind her ear, in

6    her back, in her other leg, in her torso, everywhere.

7    Q.    How old was Jane when her leg was amputated?

8    A.    I'm sorry?

9    Q.    How old was Jane when her leg was amputated?

06:23 10   A.    Six.

11   Q.    Did you eventually find out where Denise was taken that

12   day?

13   A.    I did.  Denise eventually called me from a -- from

14   somebody's phone.  I had had my phone because it was in my

15   pocket.  Denise's was in her hand so hers was gone, so I

16   couldn't call her from the ambulance.  But she called me when

17   we were at Children's Hospital.

18   Q.    And did you find out, first of all, what happened to

19   Denise?

06:24 20   A.    Yes.  She said she was okay but that there was something

21   wrong with her eye.

22   Q.    And, in fact, would she lose her sight in that eye?

23   A.    She did.

24   Q.    And was there anything else that you spoke of?

25   A.    She told me that Martin was dead.

1    Q.    Did you already know that?

2    A.    I told her -- I told her -- I said, I know.

3    Q.    And you yourself, Mr. Richard, were you injured?

4    A.    I was injured, not as badly as so many other people.  But

5    I had shrapnel in my left leg and asphalt and severe burns on

6    my legs.  And I suffered two perforated ear drums and, if you

7    haven't noticed by now, some hearing loss and constant ringing,

8    high-pitched ringing, which is called tinnitus.  But I can

9    still hear you.  I can still hear music.  I can still hear the

06:25 10   beautiful voices of my family.

11   Q.    Did you receive, yourself, any medical treatment that day?

12   A.    I was at Children's and Jane was in surgery.  And Henry

13   was checked out and deemed to be okay physically.  So they --

14   even though I was at Children's, they insisted on checking my

15   body as well, which I agreed to let them do.  And they took an

16   X-ray, and they found a piece of metal in my leg.  And they

17   said it's -- you know, it's bad but it's okay right now.  We

18   don't need to remove it right now if you don't want to.  And I

19   had asked the kind doctor if he would be so kind to try and

06:26 20   remove the piece of metal from my leg now because I knew that I

21   didn't want to be distracted with having it removed in the next

22   24 to 48 hours because I had an idea of what was ahead of me.

23   Q.    Were they able to remove it?

24   A.    No.

25   Q.    When they were trying to remove it, did you receive any

1    type of anesthesia?

2    A.   No, not because I'm a big, tough guy, but I just did not

3    want to go under general anesthesia.  I wanted simply for him

4    to cut and try to get it out, but he was unable to, and he's

5    probably upset that I'm still telling the story.  But he

6    apologized.  And after about -- trying for about 45 minutes, he

7    gave up and said that I'd have to have surgery.

8    Q.   But you didn't have it that day?

9    A.   No.

06:27 10   Q.   In fact, when you eventually left the hospital, where did

11   you go?

12   A.   I went -- from Children's, I went over to Beth Israel

13   Hospital.

14   Q.   Is that where Denise was?

15   A.   Yes.

16   Q.   Were you able to see her then?

17   A.   Right.  So I was able to -- I had told Henry before we got

18   to Beth Israel that Martin had died, and I assured him that

19   Jane was going to be okay and that his mom was okay as well.

06:28 20   Q.   After leaving Beth Israel, where did you go?

21   A.   Well, I was there for quite some time.  I saw Denise, and

22   they gave Denise, Henry, and I time to be alone in Denise's

23   room.  She had had emergency surgery on her eye, but they

24   weren't able to remove the piece of metal from her eye.  It was

25   just kind of to stabilize it.  And after checking back at

1    Children's, I made -- I believe I made one trip back to

2    Children's Hospital and then back again to Beth Israel and at

3    that time made sure that there was somebody with Jane.  So Jane

4    was never left alone at Children's.  So it was either one of

5    her aunts or uncles were staying with Jane.  So Henry and I

6    went to Beth Israel.

7         And as it got later in the evening and people started to

8    show up, I think what you're asking me is where I went.  And I

9    told my brother-in-law I needed him to take me home.

06:30 10   Q.   While you were at home, what did you do?

11   A.   I got home and I went home because I knew that it was

12   going to be a long time before I'd be home again.  And it turns

13   out that that was the case.  So I went home knowing that it was

14   probably my only opportunity to go home given the gravity of

15   what happened.  And so I just couldn't get the smell off my

16   body and it was making me nauseous.  And I went home to collect

17   some things, some clothes for Denise, some clothes for Henry.

18   And I took a shower.  And it was just my time to kind of think

19   about the days, weeks, months ahead.  It was just my time to

06:31 20   kind of get that awful smell off my body but to really just put

21   into perspective what had just happened to our family.

22   Q.   Mr. Richard, you said you saw Martin for the last time

23   when he was on Boylston Street.  How old was Martin Richard

24   when he died on April 15, 2013?

25   A.   He was eight years old.

1          MS. PELLEGRINI:  I have nothing further.  Thank you,

2     Mr. Richard.

3          MR. BRUCK:  Thank you, Mr. Richard.  We don't have any

4     questions.

5          THE WITNESS:  Okay.

6          THE COURT:  Mr. Richard, thank you, sir.  You may step

7     down.

8          Unless you have a very brief witness, I think we're

9     close enough to the end of the day that we'll recess here.

06:32 10          So, jurors, this will be it for this week.  Tomorrow,

11     we have other things to do, I'm sure.  We'll reconvene on

12     Monday according to the same practices and begin again with the

13     evidence Monday at 9.

14          Once again, of course, I remind you, please, every

15     effort that you can possibly muster to avoid discussing the

16     case or seeing any accounts of the case in the press or

17     otherwise.  Otherwise, I hope you have a good day tomorrow and

18     weekend, and we'll see you on Monday.

19          Let me just stay briefly with the lawyers for

06:32 20     logistical issues.

21     (The jury left the courtroom at 3:45 p.m.)

22          THE COURT:  I have really one principal thing on my

23     mind, and that is a preview.  We had a projection of 20

24     witnesses from the government for the beginning stages of the

25     case.  We've now gone through, I think, at least 17 of them.

1    Could we have by the end of the day both me and, of course, the

2    defense counsel a projection for next week and perhaps the week

3    after?  At least next week?

4         MR. WEINREB:  Your Honor, it's a little hard to

5    predict.  Defense, because they haven't cross-examined any of

6    the witnesses, it went much faster than we expected.  That may

7    change going forward.  Can we give the Court and counsel the

8    next 20 witnesses and the exhibits to go with them and then

9    take it from there?

06:34 10         THE COURT:  Okay.  Fine.  If there are no other -- we

11   will look into the camera question.  We'll have some time to

12   try to examine those issues.

13         MR. BRUCK:  One minor administrative matter.  We filed

14   under seal this morning a motion having to do with the victim

15   impact, and I have to confess that it was without a motion for

16   leave to seal.  On top of that, we don't think there's any

17   further need for it to be under seal.

18         THE COURT:  I agree with that.  That was my reaction

19   when I saw it, actually.  I don't think it's necessary -- it

06:34 20   can be filed -- we have the -- I think we can just give it to

21   the clerk and have it scanned.  Is that any problem?

22         MR. WEINREB:  Okay.  That will be fine.

23         THE COURT:  It is received for filing.

24         MR. BRUCK:  Thank you, your Honor.

25         THE CLERK:  All rise for the Court.  Court will be in

1    recess.

2        (Whereupon, at 3:47 p.m. the trial recessed.)

1               C E R T I F I C A T E

2

3         We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14

15   Date:  9/25/15

16

17

18

19

20

21

22

23

24

25