UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action |
| v. | ) | No. 13-10200-GAO |
| | ) | |
| DZHOKHAR A. TSARNAEV, also | ) | |
| known as Jahar Tsarni, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>JURY TRIAL - DAY TWENTY-NINE</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 9, 2015
9:20 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Federal Public Defender
10         51 Sleeper Street
           Fifth Floor
11         Boston, Massachusetts  02210
           - and -
12         CLARKE & RICE, APC
           By: Judy Clarke, Esq.
13         1010 Second Avenue
           Suite 1800
14         San Diego, California  92101
           - and -
15         LAW OFFICE OF DAVID I. BRUCK
           By: David I. Bruck, Esq.
16         220 Sydney Lewis Hall
           Lexington, Virginia  24450
17         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                           I N D E X

2                              Direct   Cross   Redirect   Recross
    WITNESSES FOR THE
3     GOVERNMENT:

4   JESSICA KENSKY

5       By Mr. Mellin              7

6   DANLING ZHOU

7       By Mr. Chakravarty        39

8   MATTHEW PATTERSON

9       By Ms. Pellegrini         69

10  JAMES BATH

11      By Ms. Pellegrini         83

12  ANTHONY IMEL

13      By Mr. Weinreb            99
        By Ms. Conrad
14
    JAMES HOOLEY
15
        By Mr. Weinreb           145
16
    WILLIAM G. GROSS
17
        By Mr. Chakravarty       155
18
    KAYTLIN HARPER
19
        By Mr. Weinreb           168
20
    GREGORY HOMOL
21
        By Mr. Weinreb           174
22
    CHRISTOPHER FRIAS
23
        By Mr. Weinreb           179
24

25

<pre>
 1                  I N D E X  (cont'd)

 2                      Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
 3     GOVERNMENT:

 4   STEVEN A. KIMBALL

 5      By Mr. Chakravarty          186

 6                  E X H I B I T S

 7
     GOVERNMENT'S
 8    EXHIBIT      DESCRIPTION           FOR ID       RECEIVED

 9   20        Photograph                                36

10   1474A     Bag containing two Kensky items           38

11   21-1 -
     21-3      Photographs                               53
12
     1499 -
13   1501      Photographs                               67

14   41        Video                                     77

15   40        Photograph                                79

16   21-43
     21-44
17   21-47     Photographs                               94

18   1170 -
     1172      Business records                          99
19
     22        Photographs and video                    115
20
     15-11     Image depicting second explosion         128
21
     1456      Video recording of Whole Foods           171
22
     1502      Receipt from Whole Foods                 173
23
     1180H5    Swipe date from UMass Dartmouth Fitness Center   178
24
     1504      Screenshot from UMass Dartmouth surveillance
25             video                                    183
</pre>

1                    E X H I B I T S (cont'd)

2

   GOVERNMENT'S
3    EXHIBIT      DESCRIPTION                    FOR ID      RECEIVED

4  1181    Video segment from UMass Dartmouth surveillance
           video                                              183
5
   1182 -
6  1183    Video segments from UMass Dartmouth surveillance
           video                                              184
7
   1105 -
8  1106    Video segments from UMass Dartmouth surveillance
           video                                              185
9
   1274    Twitter account for J_tsar                         190
10
   1264    Twitter account for Al_FirdausiA                   190
11
   1275 -
12 1320    Tweets from Exhibits 1264 and 1274                 194

13 1267 -
   1273    Individual Tweets from Al_FirdausiA account        202
14
   1266    Screenshot of Al_FirdausiA page                    202
15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2            THE CLERK:  All rise for the Honorable Court.
 3            (The Court enters the courtroom at 9:20 a.m.)
 4            THE CLERK:  For a continuation of the Tsarnaev trial.
 5    Be seated.
 6            THE COURT:  Good morning.
 7            COUNSEL IN UNISON:  Good morning.
 8            THE COURT:  Mr. Weinreb, you had something?
 9            MR. WEINREB:  Yes, your Honor.  If I might before we
10    begin, there have been several motions filed by members of the
11    media seeking access to exhibits and witness lists and other
12    things.  The government does intend to respond to those, and
13    we'd just ask until Friday of this week to respond.
14            THE COURT:  All right.  That's fine.
15            If there's nothing else, we'll bring out the jury.
16            (Pause.)
17            THE CLERK:  All rise for the jury.
18            (The jury enters the courtroom at 9:23 a.m.)
19            THE CLERK:  Be seated.
20            THE COURT:  Good morning, jurors.
21            THE JURORS:  Good morning, your Honor?
22            THE COURT:  I hope you had a pleasant weekend.
23            Have you been able to avoid any contact with the media
24    and other reports, any discussion of the case?  You've avoided
25    all of that?
```

```
 1              THE JURORS:  Yes.

 2              THE COURT:  Yes?  All right.  The jurors indicate

 3       "yes."

 4              All right, Mr. Mellin.

 5              MR. MELLIN:  Good morning, your Honor.  The United

 6       States calls Jessica Kensky.

 7                      JESSICA KENSKY, duly sworn

 8              THE CLERK:  State your name and spell your last name

 9       for the record, keep your voice up and speak into the mic so

10       everyone can hear you.

11              THE WITNESS:  Hi.  Good morning.  My name is Jessica

12       Kensky, K-E-N-S-K-Y.

13                       DIRECT EXAMINATION

14       BY MR. MELLIN:

15       Q.   Good morning, Ms. Kensky.  Where did you grow up?

16       A.   I grew up in Northern California, Sacramento.

17       Q.   Did you go to college?

18       A.   I did.  I'm collecting bachelor's degrees.  I went to the

19       University of Arizona and got a bachelor's there, and later to

20       Johns Hopkins and got a bachelor's in nursing.

21       Q.   Any more than that?

22       A.   I'm thinking about it.  I'm not sure yet.

23       Q.   After getting your bachelor's in nursing from Johns

24       Hopkins, what did you do?

25       A.   I -- well, the economy collapsed and I had a hard time
```

1    getting a job as a new grad, so I stayed in Baltimore and

2    worked at Johns Hopkins Hospital, which is across the street

3    from my nursing school, in surgical ICU that specialized in

4    taking care of oncology patients.

5    Q.   Okay.  What is a surgical ICU?

6    A.   Typically there's one in a hospital.  Hopkins is so big

7    there's two.  But they take any major surgeries, traumas, car

8    accidents, things like that.  But this hospital was so big that

9    all my patients actually had cancer and had a very large cancer

00:08 10   surgery and needed intensive care afterwards.

11   Q.   How long did you do that?

12   A.   About two and a half years.

13   Q.   While you were in kind of the Baltimore-Washington area,

14   did you meet someone named Patrick Downes?

15   A.   Yes.  That was actually before nursing school.  I moved to

16   Washington, D.C., in 2005.  That's when I wanted to be in

17   politics.

18   Q.   How did that go?

19   A.   Not well.  I learned pretty quickly that that wasn't a

00:09 20   good fit.  But I did meet my husband.  We were interns together

21   on Capitol Hill.

22   Q.   At some point did you ultimately get married?

23   A.   Yeah, but it took a really long time just for him to ask

24   me out on a date, so marriage took about seven years.

25            (Laughter.)

1   Q.   I told you I wasn't going to ask for that.  You

2   volunteered.  When did you get married?

3   A.   August 25th of 2012.

4   Q.   Prior to meeting Patrick Downes, had you run a marathon

5   before?

6   A.   Yeah, I ran a marathon in Sacramento.  That was my first

7   marathon.  And I was able to finish that with my father, who

8   has run several marathons.  He was doing marathons before it

9   was cool to do a marathon.  And then I ran the Boston Marathon

00:10 10   in 2005 as a bandit, which was illegal.

11   Q.   What is a bandit?

12   A.   A bandit is you didn't actually qualify or sign up but you

13   just hop in the race.  And one of my dear friends and running

14   buddies had qualified, and I told her if she qualified, I would

15   run it with her.  So I was in a crowd and hopped in and ran.

16   And ironically, my husband, who I hadn't met yet, was running

17   that year also.  He was a senior at Boston College.  I ran

18   much, much faster.

19   Q.   Again, I wasn't going to get into that.

00:10 20        (Laughter.)

21   Q.   As you came into court today, did you come in in a

22   wheelchair?

23   A.   Yeah, I did.

24   Q.   Prior to today, were both of your legs amputated?

25   A.   Yes.

```
 1    Q.   When was your first leg amputated?

 2    A.   My first leg was amputated right after the bombing, so

 3    April 15, 2013, and then my second leg was recently amputated,

 4    which is why I'm in the wheelchair today, on January 21st of

 5    this year.

 6    Q.   Do you have a prosthetic device yet for that leg?

 7    A.   No.  It's a long process getting a prosthetic, especially

 8    the kind of amputation I had.  They did a -- more internal work

 9    and did, like, a bone bridge and things like that, so it takes

10    several weeks to heal.  My wound also, unfortunately, had

11    opened up on me.  It wasn't healing properly.  And I had to go

12    back to the OR for another surgery right after Valentine's Day

13    of this year.  So it's just been a longer process than I was

14    hoping for.

15    Q.   And did you come into court today also with a dog?

16    A.   Yes; that's my first-born.

17    Q.   Okay.  And what is the name of your first-born?

18    A.   His name is Rescue Kensky.  He took my last name.

19                (Laughter.)

20    Q.   Thanks for clearing that up.

21         When did you get Rescue?

22    A.   I got him really early on.  Let's see.  September of 2013.

23    Q.   In 2013, where were you and Patrick Downes living?

24    A.   We lived in a very small apartment in Harvard Square.  It

25    was a fourth-floor walk-up.  It was about 600 square feet, so
```

 1   you had to really be in love to be living together, which we

 2   were and are.

 3   Q.   In April of 2013, where were you working?

 4   A.   I worked at Mass. General.  Instead of being a surgical

 5   cancer nurse, I became a medical cancer nurse which means I was

 6   giving chemo and blood products and supportive care to

 7   inpatient population with cancer.

 8   Q.   And at that time did you and Patrick Downes have plans to

 9   leave Boston at some point?

00:12 10   A.   Yeah, we did.  My husband, Patrick, had just been matched

11   for a fellowship in Northern California, which was very

12   exciting for my family, very sad for Patrick's family who are

13   local but it was a great professional opportunity so we were

14   getting ready to move the following fall, was the plan.  He had

15   accepted the fellowship.  And I had actually even told work and

16   I even had job interviews that I actually missed while I was in

17   the hospital.  So we were very seriously moving.

18   Q.   If you can go back to April the 14th of 2013, do you

19   recall working on that day?

00:13 20   A.   Yup.  That was the last shift I worked as a nurse in Mass.

21   General.  It was a day shift.  So I worked from, like, 7 a.m.

22   to about 7:30, 7:45 p.m.

23   Q.   And on that day what did you do?

24   A.   I had three patients.  I actually remember who my patients

25   were because it was the last time I ever worked.  One of them

1    had just had a bone marrow transplant, so he was receiving a

2    lot of supportive care, medications to help with the nausea and

3    the pain and a lot of blood products.  And then my other two

4    patients were receiving chemo.  They were in the earlier stages

5    of their therapies.  And these were patients that I had taken

6    care of for weeks to months because it's a very long stay.

7    Q.   On April 15th, did you have plans to go out?

8    A.   Yeah.  Our plans were really up in the air.  We had

9    worked -- I worked the weekend and Patrick was off, and so it

00:14 10   was an exciting day to spend together.  To have a whole day off

11   together was rare.  I purposely requested the shift off because

12   the year before I worked and didn't get to watch any of the

13   marathon.  So I made sure that this year that I requested it

14   off.  But it wasn't -- it was very kind of casual and random.

15   We weren't watching anyone specifically.  We didn't need to be

16   there at a specific time, we just knew we wanted to enjoy the

17   day, go for a walk.  The weather was getting nice.  So no exact

18   plans.

19   Q.   That morning what did you do?

00:14 20   A.   That morning I'm sure I woke Patrick up because I'm a

21   morning person.  We had breakfast together.  We decided that

22   you can't go for a run outside on Marathon Monday unless you're

23   running the marathon.  It's too embarrassing to just go for a

24   short run, so we agreed to go to our gym.  So we got in the car

25   and we drove to the gym.  And I ran for the last time with two

1    legs.  Patrick, I think, lifted weights.

2         We came home, we showered, we had lunch together.  Just

3    got dressed, got ready, and decided to kind of -- we

4    didn't -- we had on good walking shoes, jackets.  And we were

5    going to kind of just head out and enjoy the day but catch part

6    of the marathon.  My husband really likes rooting for the

7    underdog, so he likes being there for the ones that you can't

8    believe are really running a marathon.  Like that was kind of

9    our timing.  We wanted to get there later in the day.  We

00:15 10  figured the elite runners didn't really need us, so that was

11   our timing.

12   Q.   Do you know about what time you got down to the marathon?

13   A.   I know it was about the four-hour mark for those that

14   started the marathon.  I want to say around two-ish.  But

15   really, like, we weren't paying attention to time because it

16   was one of those fortunate days where you didn't have to.

17   Q.   So where did you head?

18   A.   We took the Red Line and got off at the Park stop on the

19   T.  We walked through the Boston Common.  We walked through the

00:16 20  Public Gardens where the December before, that's where Patrick

21   actually proposed to me, so that's a really meaningful spot for

22   us, so we made sure to walk by there.

23        We walked down Newbury Street, just kind of

24   window-shopping and checking out the crowds, and made our way

25   past the finish line before we made a left-hand turn and then

1    came back up toward the finish line on Boylston, so kind of

2    overshot the finish line, stopping, chatting with people,

3    taking pictures on our phones.  A couple had just finished the

4    race, they were from a country that I don't recall, and they

5    asked us to take their picture with their flags.  We were,

6    like, helping people take pictures.  And then we settled in

7    near the finish line.

8    Q.   Approximately how long had you settled in before there was

9    an explosion?

00:17 10  A.   Not long.  I want to say maybe 10 or 15 minutes.  We

11   weren't planning on staying there that long.  We were going to

12   kind of keep walking.

13   Q.   What happened at that time?

14   A.   What I remember is settling in the back of the crowd, and

15   so the people behind us were those that were kind of on the

16   walkway still.  And there were several rows of people and a

17   barricade in front of us.  And for some reason that day I stood

18   behind Patrick, put my arms around his shoulders, and I was on

19   my tippy toes to try to get a good view of the runners coming

00:18 20  in because the crowd was still pretty thick.  And I remember

21   being happy, I remember feeling sunlight on my face, I remember

22   feeling really free and just kind of holding each other and

23   laughing and smiling.  And the man on the microphone was really

24   kind of encouraging the crowd to cheer louder and naming people

25   that were coming through and who was running for what

1    organization.  So we were just kind of clapping and cheering.

2         And then I didn't see anything, I didn't hear anything, I

3    just felt like I was on a rocket.  I must have grabbed even

4    tighter to Patrick, and the two of us just -- it felt like shot

5    directly up in the air and then landed over, I think, far to

6    the right from where we were standing on the ground.

7         I had no idea what happened.  I thought very innocently

8    that something had backfired because there was all this

9    equipment by the finish line or, I don't know, a sewer.

00:19 10   Something unintentional had probably happened.  People were

11   screaming.  It was hard to hear.  Our eardrums were blown out.

12   And the feeling that that gave me was like you just kind of

13   hear yourself breathing, and your heart, and everyone else is

14   very faint.  So you hear, like, your internal noises really

15   loudly but it's hard to hear everything else.

16        There was smoke, there was blood.  I was most focused on

17   my husband who was right next to me still, and his foot and

18   part of his leg was completely detached, hanging on kind of by

19   a thin thread.  And I remember just feeling hypervigilant and

00:19 20   wanting to kind of go into like a nurse -- I guess my nurse

21   mode where inside I'm absolutely panicking and freaking out but

22   you don't want to let your patient know that.  So I remember

23   kind of trying to shift myself to block his leg.

24   Q.   And when you say "to block his leg," what are you trying

25   to do?

A.   I don't want him to see what his leg and how his foot is

detached.  I wanted to put a tourniquet on because he was

bleeding really badly.  My training is in a hospital setting

with supplies and staff and a very organized and clean

environment, and this was a war zone.  Something I've never

experienced before.  And I took my purse straps and I started

to try to put a tourniquet on to kind of block Patrick with my

back.

     I remember telling him people were coming, because I could

see them breaking down the barricade to me.  It felt like they

came very quickly.  And a man came over as I was trying to

fumble to put a tourniquet on Patrick and said, "Ma'am, you're

on fire.  You're on fire."  And he started to push me down to

the ground to try to put it out.  The fire was from my shoulder

blades all the way down my pants.

     He then proceeded to cut my clothes off, which I was

resisting because that feels really bizarre to be on a city

street and have people removing your clothing.  And that's when

I realized that I thought I knew what was going on and that I

was aware, but obviously -- I mean, I wasn't even aware that I

was on fire.  So I kind of released control at that point.

Q.   And when you say he pushed you to put out the fire, which

direction did he push you?

A.   Down to the ground.  I was sitting up and he pushed me

down to the ground.

1    Q.    So from your front onto your back?

2    A.    Yes.

3    Q.    When you saw Patrick's leg, what was going through your

4    mind about what the situation was involving?

5    A.    I knew it was grim.  I knew we needed help immediately.  I

6    really couldn't assess the full situation.  I didn't realize

7    how bad it was, how widespread it was.  I didn't know how many

8    people were hurt but I knew my husband was critically wounded.

9    I knew he was bleeding profusely and I knew he needed help.

00:22  10        I was aware at that point that I had been burned but I

11    looked like -- my legs were intact.  I couldn't see the level

12    of my injuries.  It was all down my back and, like, heals up.

13    So when I looked down at myself, it looked like my body was

14    there and I just knew I couldn't walk.  So I figured my legs

15    were broken.  So I was really more concerned with Patrick.

16    Q.    At that time were you feeling pain?

17    A.    No, I think just total shock.  I don't think my body

18    allowed me to feel pain till later.

19    Q.    Once you were laid down on your back to put out the fire,

00:23  20    what happened?

21    A.    They removed my clothing and saw parts of my legs that I

22    couldn't see.  And the men yelled to somebody else, like

23    "critical" something.  And they came over -- two more guys came

24    over and they loaded me on a stretcher.  Patrick was awake and

25    he was talking.  And he put his hand on me, on my stretcher,

1    and said, "That's my wife," which at the time was still a

2    really weird thing to hear.  We had only been married for,

3    like, six or seven months.  We were still getting used to those

4    terms.  And then he said to me -- they loaded me up.  They

5    lifted me off the ground.  And the last thing he said to me

6    was, "We'll figure this out."

7         At that point I made the assumption that they knew we were

8    together and wherever I was going, they would bring Patrick.

9    So I didn't resist leaving because I figured they were taking

00:23 10   me to get help and that he would be following.

11   Q.   Where did you go from there?

12   A.   They lifted me up and took me into the tent at the finish

13   line that was, you know, set up to deal with, like, dehydration

14   and muscle cramps.  And at that point it just looked like

15   absolute chaos:  people screaming, blood everywhere.  The

16   medical people who had volunteered to take care of dehydrated

17   patients were all of a sudden taking care of, like, soldiers on

18   a battlefield.

19        I really started to worry about Patrick at this point

00:24 20   because he did not come in the tent.  And I obviously know my

21   husband very well and he's a very caring and selfless person,

22   and when we would go to the movie theaters we would have to let

23   everyone out before we could leave.  He's just very generous in

24   that way and selfless.  And I was really concerned that he was

25   going to defer help to other people and not think of himself

```
 1   and allow himself to be cared for.
 2   Q.   And as a nurse, why was that a concern to you?
 3   A.   I thought he was going to bleed to death on the sidewalk.
 4   Q.   When he didn't arrive in the tent, what happened to you?
 5   A.   Terror.  Just sheer terror, trying to be calm and allow
 6   the staff in there to do what they needed to do and help other
 7   people, but also being very concerned about Patrick.
 8       A gentleman that had been running the race came over.  He
 9   had been providing first aid to people, and he went and tried
10   to find Patrick for me, and he couldn't find him anywhere.  And
11   then he just kind of stayed with me and tried to bring up
12   topics and talk me through things and tried to keep me calm.
13   And he actually rode in the ambulance with me and stayed with
14   me until I was back in surgery.
15   Q.   Prior to getting you to the hospital for surgery, did you
16   ever see Patrick again?
17   A.   I never saw Patrick again.
18   Q.   Okay.  When you got to the hospital, what happened?
19   A.   There were several people in the ambulance.  We were all
20   unloaded.  Some people could walk, some people couldn't.  I was
21   brought into -- like the emergency room is really a big room
22   with kind of just curtains everywhere.  And so I was in one of
23   the curtained rooms.  And I mean, you could hear people just
24   screaming, like very animalistic screams.  The staff was
25   rushing around.  The doctors were trying to figure out and
```

1    assess who needs to go back first, who's more critical.

2         I tried to kind of just lay still and let them put on all

3    the equipment and do everything that they needed to do to me

4    remembering that as a nurse, you know, they're there to help

5    me.  I just need to participate in this.  Giving them, let's

6    see, my family's numbers that I knew by heart because my phone

7    had exploded also, so trying to -- I was really concerned in

8    trying to contact people.  I was really concerned about trying

9    to stay awake and make sure they knew who I was, where my

00:27  10   husband was.  I gave my nurse my wedding rings because I knew I

11   was going into surgery and they were my grandmother's rings and

12   I didn't want to lose them.

13   Q.   Did you keep an eye on your vital signs?

14   A.   Yeah, they hooked me up to the monitor and I could see

15   that my blood pressure was dropping and my heart rate was going

16   up.  And at that moment the pain started to set in and the

17   nurse wanted to give me some pain medication and the doctor --

18   they were kind of arguing because my vital signs were so low,

19   and while pain medicine might help your pain, it could also

00:28  20   really lower your blood pressure, so you don't want to give it

21   in every instance.  But she was kind of advocating for me,

22   saying, "I mean, look at her injuries.  We need to make her

23   comfortable.  We don't know when she'll be taken back to the

24   OR."  So at that point I started to realize that maybe my

25   injuries were worse than I initially thought.

```
 1   Q.    What is the concern about pain medication and blood
 2   pressure?
 3   A.    You can -- they call it tank or drop your blood pressure
 4   so low that you're not getting blood to your vital organs or
 5   your brain.  You know, that's a severe case.  But I was
 6   certainly headed in that direction and losing a lot of blood
 7   that I didn't know about.
 8   Q.    What happened after that?
 9   A.    The gentleman that helped me, his name is Mr. Everett
10   Spain, he stayed with me.  He called my sister in California,
11   he called my best friend who was at work at Mass. General
12   because I knew -- I knew I needed to contact somebody local.
13   And it's amazing how much we rely on cell phones and how few
14   numbers you know by heart, but I knew my family in California
15   and I knew my work number, so I had him call work.  And I knew
16   as a nurse you know who's working what shifts, what friends you
17   have, and I knew she was at work.  And so I made sure she was
18   aware and so she could get to me and help me find Patrick.
19   Q.    While all this is going on around you, did you notice the
20   faces of the people attending to you?
21   A.    Yeah, they -- at one point they -- because they didn't
22   even, you know, obviously come in and introduce themselves or
23   explain anything.  I mean, this was like a horrible emergency
24   situation, so they would just kind of come in and -- at one
25   point they rolled me over, and that's when I could tell that
```

00:28 (line 10)
00:29 (line 20)

1   things were really bad, just by the looks on their faces.  I

2   think I looked so intact by the front, that to see the back of

3   me was just horrifying and shocking.

4   Q.   Did you have surgery that day?

5   A.   Yeah, they took me back to the operating room.  And at

6   that time they removed my left leg below the knee because it

7   was, according to them, not salvageable, and they tried to

8   reconstruct and clean out my right leg.  They did as much as

9   they could -- I had a combination of bomb parts, street and

00:30 10   dirt and burns that had -- and pieces of my clothing that had

11   all been blown into my -- from back down to my heels, and so it

12   was hard to treat all those different kinds of injuries in one

13   wound.  So in the OR they tried to remove as much of the

14   shrapnel and dirt, and they did what they call a washout.  They

15   tried to clean out as much as they can, and then I was taken to

16   an intensive care unit.

17   Q.   Do you know if they recovered BBs from inside your body?

18   A.   Yeah, I mean, I had multiple -- to this day I have about,

19   I don't know, 30 or 40 in my legs that just -- you can't remove

00:31 20   them because they're by all theses blood vessels and things.

21   And the thought is that eventually your body might reject it,

22   recognize it as foreign, but these ones are pretty deep.

23   Q.   In spite of the fact that your left leg was amputated, did

24   you still have pain in that leg?

25   A.   Yeah.  Being a young trauma patient, you're at high risk

1    for having horrible phantom pain because your nerves are

2    youthful and they function well.  And a trauma is such a shock

3    to your body that the nerves don't know what to do and they

4    just go crazy firing.  So phantom pain can range from just the

5    feeling of having a foot or it's itching or feeling it in a

6    shoe to these, like, electric pulses and shocks that just come

7    over you randomly.  So unfortunately, being young and healthy

8    and a trauma patient sets you up for the worse kind of phantom

9    pain that is really not well understood by the medical

00:32 10   community and it's very difficult to treat.

11   Q.   At some point did you see Patrick again?

12   A.   I was able to talk to him on the phone, I believe, on

13   Wednesday, but neither of us could hear very well, so my sister

14   was trying to repeat what he was saying on the phone and I

15   believe his family was trying to do the same thing.  So on

16   Wednesday I knew he was alive.  And we had to wait until we

17   were stable enough -- we were so sick -- that one of us could

18   be transferred to see the other one.

19        And I stabilized first, about two weeks after the bombing,

00:32 20   and my medical team found an ambulance to donate time, and

21   people boarded the ambulance with me, they gave us gift cards,

22   so my sister went to Target and bought shampoo, and a clean

23   shirt and some lip gloss and, you know, tried to help me feel

24   as normal as possible to go on what we called our first date.

25   And I was transferred to Patrick's hospital and was actually

1    put in his room in another hospital bed.

2    Q.   Did you stay there or did you actually go back, then, to

3    your hospital?

4    A.   No, our injuries were so complicated and we were both in

5    the process of -- I was trying to save a leg, he was trying to

6    save his left knee.  He was also infected and they were worried

7    about him going into septic shock.  They couldn't find what the

8    source was.  They were trying different antibiotics.

9         We just felt like as much as we wanted to be together, our

00:33 10   care -- man, after two weeks you're so close with your staff

11   and you trust the doctors and you -- as much as we wanted to be

12   together, we couldn't imagine leaving.  So we made the decision

13   to stay in separate hospitals, and that lasted for five weeks.

14   Q.   What was the extent of Patrick's injuries?

15   A.   Patrick immediately lost his left leg below the knee.  His

16   knee was still there, but the common problem with these sorts

17   of injuries is that the shrapnel that's placed in there

18   intentionally to rip and tear apart skin tore apart all the

19   skin and coverage for his knee, so he had these body parts with

00:34 20   no padding or coverage.  And that was a huge concern.  And

21   being an above-knee amputee and a below-knee amputee are very

22   different beasts, and if you can save a joint, you want to save

23   a joint.

24        So they were desperately working on that, at the same

25   time, like I mentioned before, he -- obviously this is a

very -- these bombs, they're very dirty.  They're intended to
be that way.  And so he had some kind of horrible infection.
So he was having fevers and night sweats and low blood -- you
know, abnormal vital signs.  And the staff was really
concerned.  Infectious disease became involved.  And as a
nurse -- you know, I became a nurse to help take care of
people, and my husband was in probably the most needy time in
his life and I could not be there.

Q.   Do you know approximately how many surgeries he's had?

A.   Oh, gosh.  We honestly lost count, but I'd say 15 to this
day.

Q.   And then about your injuries.  What was the extent of your
injuries?

A.   So like I had mentioned before, that day I lost my leg, my
left leg.  My right leg, I was missing my Achilles tendon.  The
whole tendon was blown off and that bone was exposed.  My right
ankle was shattered.  The heal pad that you walk on was blown
off, and then the heal bone, half of it was blown off and what
was left was very pointed and spikey.

     My burns were just -- from the heels all the way up,
shrapnel and burns in really unfortunate areas.  My vagina, my
rectum had to be washed out and cleaned and dressed on multiple
occasions.  My eardrums blew out, I had a shoulder injury.
Everything else seemed -- I mean, obviously cuts and bruises
and things, but those seemed fairly minor compared to

1   everything else.

2   Q.   How were the burns treated?

3   A.   I was assigned a burn care nurse because my wounds were so

4   bad and took such long dressings and expertise.  Your staff

5   nurse, your bedside nurse doesn't really have the time or

6   qualifications.  So I was assigned a wound nurse who would work

7   with me and changed dressings, I believe originally twice a

8   day, eventually maybe it went to once a day.  It was very

9   difficult because I had to lay on my back for most of the time,

00:37 10   so they would turn me.

11       It was embarrassing.  It was terrifying because you could

12   see the looks on people's faces.  I mean, I knew it was bad.

13   At one point I asked the nurse to take a picture of it with my

14   cell phone because I wanted to see for myself what I was

15   facing.

16   Q.   How painful was it?

17   A.   Absolutely horrendous.  The worst pain I've felt in my

18   life.  Because the phantom pain hadn't started quite yet at

19   this point, this is very early on with the burns -- and the

00:38 20   wounds lasted for -- end of the summer.  So it was horrendous.

21   Q.   How many surgeries have you had on your legs?

22   A.   I would say at least, I don't know, 15, 20.  Sometimes

23   they go in and they would work on one side, sometimes they

24   would go in and work on both sides.  We had to have outpatient

25   surgery for our ears, to take skin from other parts of your

1    body to cover your eardrums.  I lost -- I really lost count.

2    Q.   What attempts were made to save your right leg?

3    A.   I believe every attempt possible.  Our wounds were not

4    ones that were familiar to most doctors in Boston.  They

5    absolutely saved our lives and we're forever grateful, but

6    these are war wounds, and really military doctors are the ones

7    that are most qualified to make decisions and help piece you

8    back together.  They just have more experience.

9         So after I exhausted all my civilian options -- so I had

00:39 10   multiple surgeries at my original hospital, I went to other

11   Boston hospitals.  I flew, my gosh, to specialists in Seattle

12   and Texas and Philadelphia.  So getting opinions, trying

13   surgeries.  I did not want to become a bilateral amputee.  I

14   didn't want to be a single amputee, but to become a bilateral

15   amputee was terrifying.

16        I also wanted some memory of my body and toes and ankles

17   and legs, and I wanted to paint my toenails and I wanted to put

18   my feet in the sand.  I wanted to do all those things, and to

19   lose the second leg was a gut-wrenching, devastating decision.

00:40 20   Q.   At some point did you relocate to Walter Reed Hospital

21   outside Washington, D.C.?

22   A.   Yeah, after kind of a random series of events where I was

23   put in touch with a soldier who was wounded seven years ago in

24   Iraq with very similar injuries, I was in a very dark place.  I

25   wasn't mobile, I was in a lot of pain, no one else here really

1    had any other ideas or suggestions.  I was really not wanting

2    to live.

3         And my family was able to advocate for me and get me a

4    special status to be a patient at Walter Reed where I attempted

5    one last time -- I had a 12-hour surgery to try to save my

6    right leg again in this past August.  And I've been a full-time

7    patient there ever since, as well as my husband.

8    Q.   That ultimately did not succeed?

9    A.   So doing limb salvage is actually -- it's funny, because

00:41 10   people would look at me and say, "Well, at least you have one

11   leg.  You know, thank goodness you have one leg."  And I think

12   once you get over the initial response of the one that was

13   blown off being gone -- because it is very bizarre to have a

14   body part suddenly missing -- the agony and the pain of that

15   decision-making and getting your hopes up and trying something

16   and then realizing you still can't stand and walk and then

17   trying something else and realizing you still can't live the

18   kind of life you want to live is kind of -- I don't have words

19   for it.  It's just incredibly unnatural to have to make a

00:41 20   decision to remove a body part, and to think that if you do

21   that, you might actually be able to improve your quality of

22   life because the limb that you're left with is so

23   non-functional that a piece of metal and plastic is actually

24   better.

25   Q.   You said you were in Boston in the hospital for five

1    weeks.  How long were you in rehab?

2    A.    Patrick and I were reunited at Spaulding Rehabilitation

3    Hospital.  It had just opened in Charlestown.  And we were

4    there for another five weeks.  We were a little prolonged

5    because we couldn't find handicap-accessible housing.  We had

6    lived in a fourth floor walkup, classic, you know, Boston

7    100-year-old building, laundry in the basement.  None of the

8    doorways were wide enough for a wheelchair, couldn't get in the

9    bathroom, couldn't shower.

00:42 10       So we were faced with trying to find some

11   handicap-accessible housing -- we were both wheelchair-bound at

12   the time -- which took some time, believe it or not.  It's

13   actually really hard to find in the city.  So we actually ended

14   up moving to Medford, thanks to another survivor who actually

15   had a connection to an apartment building there.

16   Q.    After all of these weeks in either rehab or the hospital,

17   do you remember the first time you actually slept through the

18   night?

19   A.    Oh, my goodness.  That would have been between nightmares

00:43 20   and phantom pain -- which we both have phantom pain, so we'd be

21   up, you know, all night.  And again, there's nothing -- it's

22   not well understood.  There's -- you know, you try mirrors, you

23   try ice packs, you try distracting yourself.  The medications

24   you can take either totally snow you and knock you out or the

25   other nerve medications take weeks to work.  So I don't think I

```
 1   slept through the night until I got my service dog home, which
 2   was probably in September.
 3   Q.   And that's Rescue, who's right next to you?
 4   A.   Yup.  He's snoring right over here.
 5   Q.   He's doing a great job.
 6        If I can have you look at a few photographs.
 7   A.   Sure.
 8        MR. MELLIN:  Pull up Exhibit 18, which is already in
 9   evidence, your Honor.
10   Q.   Do you see Exhibit 18 in front of you?
11   A.   Yup.
12   Q.   Do you recognize what that is?
13   A.   Yup.  That's before the bombs went off.  Patrick and I are
14   standing together, how I remember it.
15   Q.   And if you could -- just for the record, if you could
16   touch that screen and circle where you and Patrick are?
17   A.   Circle both of us?
18   Q.   Yes.
19   A.   (Witness complies.)
20   Q.   Thank you.
21        MR. MELLIN:  If I could also have Exhibit 1473 brought
22   up.
23   Q.   It's not the clearest picture, but do you see Exhibit
24   1473?
25   A.   Yes.
```

```
 1   Q.   And as you look at that, do you see Patrick in the
 2   picture?
 3   A.   Yes.
 4   Q.   Can you circle Patrick in the picture?
 5   A.   (Witness complies.)
 6   Q.   That is not a circle.
 7        (Laughter.)
 8   Q.   The record appears to be a broken heart, but...
 9        As you look and see Patrick in that picture, do you see
10   your back in that as well?
11   A.   Yeah.  Yes, only because I remember I had a really
12   bright-colored sweatshirt on, so I can see a little shade of
13   that and a little bit of my hair.
14   Q.   And do you see the individual that's actually right behind
15   you wearing a black cap?
16   A.   Yes.
17   Q.   Did you see that individual or do you recognize that
18   individual from that day?
19   A.   No, I do not.
20   Q.   Thank you.
21        MR. MELLIN:  If we could pull up Exhibit 16, please.
22   Q.   Do you recognize Exhibit 16?
23   A.   Yes, I do.
24   Q.   And can you -- who do you see in that photograph?
25   A.   So it's bizarre to look at these because we were all
```

1    strangers that day but now, you know, I see my now-friend Karen
2    Rand, I see Jeff Bauman, I see myself, I see Patrick.
3    Q.   If we can start with Karen Rand, can you please circle
4    where you see Karen Rand?
5    A.   I believe she's right here (indicating).
6    Q.   All right.  And I'll clear that.  If you -- you said Jeff
7    Bauman.  Do you see Mr. Bauman in that photograph?
8    A.   (Indicating.)
9    Q.   Thank you.  And just for the record, you circled -- when
00:46 10   you circled Karen Rand, you circled the woman who's in black
11   who's in about the middle of the picture next to the fence and
12   next to the woman who has her mouth open.  Is that right?
13   A.   Yeah.  I also recognize that woman now.
14   Q.   Okay.  And who is that woman?
15   A.   I never met her because she passed away that day, but
16   that's Krystle Campbell.
17   Q.   All right.  Now, when you circled Mr. Bauman, you circled
18   the man who's in a gray and kind of a black shirt in the middle
19   of the photograph.  Is that right?
00:47 20   A.   Yes.
21   Q.   All right.  I think you said that you see yourself and
22   Patrick in that photograph?
23   A.   Yeah, very, very faintly, but because I know what we were
24   wearing, I can see us.
25   Q.   Okay.  Could you circle Patrick in that photograph,

1    please?

2    A.    (Witness complies.)

3    Q.    And for the record, the individual whose face is situated

4    in the middle of the picture next to the woman in the black

5    coat.  Is that right?

6    A.    Uh-huh.

7    Q.    You have to say yes or no.

8    A.    Yes.  Sorry.

9    Q.    Thank you.  And then finally, if you could circle

00:47 10   yourself.

11   A.    Okay.  I also just saw another friend.

12   Q.    All right.  Let's stay with you for this one second.

13   A.    Okay.

14   Q.    For the record, you circled hair and a light yellow --

15   A.    Like a hoodie.

16   Q.    -- hoodie in the middle of the picture.  Is that fair to

17   say?  Next to Patrick?

18   A.    Yes.

19   Q.    All right.  And then you say you saw another friend.

00:48 20   Who's that?

21   A.    Bill White.

22   Q.    All right.  Where do you see Mr. White?

23   A.    Right in the back there.

24   Q.    Mr. White is on the ground wearing a red jacket.  Is that

25   right?

1    A.    Yes.

2    Q.    All right.  Thank you.

3          MR. MELLIN:  And then if I could have Exhibit 17

4    pulled up, please.  This is also in evidence, your Honor.

5    Q.    Do you recognize what Exhibit 17 is, Ms. Kensky?

6    A.    Yes, I do.

7    Q.    What is that a photo of?

8    A.    It's the same scene but a different angle, much closer

9    picture, right after the bomb went off.

00:49 10   Q.    Do you see yourself or Patrick Downes or both in that

11   photo?

12   A.    I see both.

13   Q.    Okay.  Could you please circle where Mr. Downes is?

14   A.    The primary part that you can see of him is what's

15   remaining of his leg, so that's his leg, and then his face is

16   really faint, but right there.

17   Q.    For the record, it's the face that you can barely see over

18   the jacket of the -- or the yellow jacket of the man to the

19   right in the photograph.  Is that right?

00:49 20   A.    Yes.

21   Q.    All right.  And you circled the portion of his leg which

22   is the leg -- the knee and a portion of his lower leg that's

23   between the two people in yellow jackets?

24   A.    Yes.

25   Q.    When you talked earlier about right after the explosion

1    you looked over at Patrick and you saw a portion of his leg, is

2    that what you saw?

3    A.    Yes.  The part that is detached is what I remember being

4    next to me.

5    Q.    And then also if you could do me a favor, you said you saw

6    yourself in that photograph.  If you could just circle

7    yourself.

8    A.    Yeah.  I mean, again, it's really faint, but I'm right

9    behind Patrick.

00:50 10   Q.    And for the record you're right behind Mr. Downes and

11   you're adjacent or next to the man who's in the blue jacket.

12   Is that right?

13   A.    Yes.

14   Q.    Okay.  And do you also see Mr. Bauman in that photo?

15   A.    Yes, I do.

16   Q.    Can you circle Mr. Bauman, please?

17   A.    (Witness complies.)

18   Q.    For the record, the gentleman on the right of the

19   photograph and, again, the gray or kind of black shirt.  Is

00:50 20   that fair?

21   A.    Yes.

22   Q.    And then you mentioned Karen Rand and Krystle Campbell.

23   Do you see them in the photograph?

24   A.    Yes, I do.

25   Q.    Can you circle them, please?

1     A.    Both?

2     Q.    Yes.

3     A.    (Witness complies.)

4     Q.    And for the record, you circled the two women who are on

5     the ground in the middle of the photograph.  Is that right?

6     A.    Yes.

7     Q.    Thank you.

8           MR. MELLIN:  And then, your Honor, if I could have

9     pulled up just for the witness Exhibit 20, please.

00:51 10    Q.    Ms. Kensky, do you recognize Exhibit 20?

11    A.    Yes, I do.  But I have a question.  Did you say just for

12    the witness?  I'm the only one seeing this photo?

13    Q.    You and counsel and the judge right now, okay?

14    A.    Okay.  So no one else has seen this photo?  Okay.

15    Q.    Do you see yourself in the photo now?

16    A.    Yes, I do.

17    Q.    Okay.  And does that photo fairly and accurately depict

18    the scene after the explosion on April the 15th of 2013?

19    A.    Yes, it does.

00:52 20          MR. MELLIN:  Your Honor, the government would move

21    into evidence and ask to publish Exhibit 20.

22          MS. CLARKE:  Your Honor, this is subject to the

23    previous objection.

24          THE COURT:  All right.  It's admitted.  Noted.

25          (Government Exhibit No. 20 received into evidence.)

```
 1    BY MR. MELLIN:

 2    Q.    Now, Ms. Kensky, if you could, as you look at Exhibit 20,

 3    could you please circle where you and Patrick Downes are?

 4    A.    Yes.

 5    Q.    For the record, you circled the gentleman in the plaid

 6    shirt who's on the ground in the upper left corner, and you are

 7    right behind him in a yellow windbreaker or hoodie, correct?

 8    A.    Correct, yes.

 9    Q.    And, again, do you see Mr. Bauman in that photo?

00:52 10    A.    Yes, I do.

11    Q.    Is he the individual in the middle of the photo laying on

12    his side?

13    A.    Yes.

14    Q.    And then finally --

15          MR. MELLIN:  Your Honor if I may approach Ms. Kensky.

16    Q.    Do you see the items that are in the bag?

17    A.    Yes.

18    Q.    Have you seen those items before?

19    A.    Yes.

00:53 20          THE COURT:  What's the number, Mr. Mellin?

21          MR. MELLIN:  It's 1474A, your Honor.

22    BY MR. MELLIN:

23    Q.    And, Ms. Kensky, the Exhibit 1474A, which is a plastic bag

24    holding two items, how do you recognize those items?

25    A.    I wore those on April 15, 2013.
```

1           MR. MELLIN:  Your Honor, the government would ask to

2    move into evidence Exhibit 1474A, the bag containing the two

3    items, and ask to publish that as well.

4           THE COURT:  All right.  Okay.  Admitted.

5           (Government Exhibit No. 1474A received into evidence.)

6    BY MR. MELLIN:

7    Q.   Ms. Kensky, I'm going to hold up one of the two items.  If

8    you could please describe for us what it is I'm holding up?

9    A.   That is like a tank top or undershirt that I wore that day

00:54 10   that has been -- you can see where my clothes caught on fire

11   and the holes and dirt and some, probably, parts of the bomb.

12   Q.   As you look at that, is the bottom portion of that cami

13   burned?

14   A.   I love that you just said "cami."  Thank you.

15   Q.   Thank you.  I learned very well.

16        You didn't answer my question, though.  Is that burned?

17   A.   Oh, yes.  That's burned, and it exactly matches all my

18   burn scars.

19   Q.   And then finally, holding up this yellow jacket hoodie, do

00:54 20   you recognize that?

21   A.   Yes, I do.

22   Q.   And what is that?

23   A.   That is an overpriced jacket that my dad bought for me two

24   weeks earlier, and it is a horrendous reminder of what

25   happened.  It's blood and burns and dirt and parts of the bomb.

 1    Q.   And as you look at Exhibit 1474A, the cami and the jacket,

 2    were those the items you were wearing on April 15, 2013?

 3    A.   Yes.

 4             MR. MELLIN:  Thank you, your Honor.

 5             MS. CLARKE:  Thank you very much.  I have no

 6    questions.

 7             THE COURT:  All right, Ms. Kensky.  You may be

 8    excused.

 9             THE WITNESS:  Thank you.

00:55 10        (The witness is excused.)

11             MR. CHAKRAVARTY:  Your Honor, the government calls

12    Danling Zhou.

13                      DANLING ZHOU, duly sworn

14             THE CLERK:  Have a seat.  State your name, spell your

15    last name for the record, keep your voice up and speak into the

16    mic so everyone can hear you, okay?

17             THE WITNESS:  My name is Danling Zhou.  My last name

18    spelled Z-H-O-U; my first name D-A-N-L-I-N-G.

19                      DIRECT EXAMINATION

00:58 20   BY MR. CHAKRAVARTY:

21    Q.   Good morning.

22    A.   Good morning.

23    Q.   Ms. Danling, I'm over here.

24        And just for the record, you spelled your last name -- is

25    it Z-H-O-U?

```
 1    A.    Yes.

 2    Q.    Ms. Zhou, how old are you?

 3    A.    Twenty-four.

 4    Q.    And where are you from?

 5    A.    China.

 6    Q.    Where in China?

 7    A.    Sichuan, Chengdu.

 8    Q.    Sichuan Province in China, and Chengdu, the city?

 9    A.    Yes.

10    Q.    And did you grow up there?

11    A.    Yes, I grow up there.

12    Q.    Did you go to college there?

13    A.    No, I go to college in Wuhan, Hubei.

14    Q.    Okay.  And that's also in China?

15    A.    Yes, that's also in China.

16    Q.    And can you spell the American version of what you just

17    said?

18    A.    The province is H-U-B-E-I, and the city is Wuhan,

19    W-U-H-A-N.

20    Q.    And is Mandarin your native language?

21    A.    Yes.

22    Q.    And do you understand English?

23    A.    Yes.

24    Q.    So if you have difficulty understanding me or if I'm

25    speaking too softly, if you'd please let me know.
```

```
 1   A.   Okay.

 2   Q.   And the microphone in front of you, if you want to bring

 3   that a little bit closer, then everybody in the court will be

 4   able to hear you.

 5   A.   Okay.

 6   Q.   Thank you.

 7        Is your family still in China?

 8   A.   Yes.

 9   Q.   And do you have any brothers or sisters?

10   A.   No, I'm the only child.

11   Q.   Okay.  And do you have extended family in China as well?

12   A.   Yes.

13   Q.   When did you come to the United States?

14   A.   Two years ago, '13 -- actually, three years ago, 2012.

15   Q.   And why did you come to the United States?

16   A.   Study, BU, Boston University.

17   Q.   You said you went to college in China.  Did you graduate

18   with a degree?

19   A.   Yes; economics and mathematics, bachelor degree.

20   Q.   And so when you decided to come to the U.S. to study, why

21   did you choose the U.S. of other places?

22   A.   I'm here to study for actuary.  Then there's like big

23   program, Society of Actuaries, that's South -- North

24   American -- South American based, so I choose U.S. to study.

25   Q.   Okay.  And so the study of actuary, many people don't know
```

00:59 (line 10)

01:00 (line 20)

        1    what that is.  If you wouldn't mind explaining it to us.
        2    A.   "Actuary" is a little hard to explain.  So it's basically
        3    for -- most of them is for insurance company.  So we calculate
        4    the risks for different scenarios and how we should hold our
        5    monies, how we should decide our assets to go in order to pay
        6    out the liabilities we have.
        7    Q.   And it assesses kind of future risks?
        8    A.   Yes.
        9    Q.   Okay.  But it uses a lot of math.  Is that fair to say?
01:01  10    A.   Yes.
       11    Q.   And you mentioned that the Society of Actuaries is based
       12    in America?
       13    A.   Yes, mostly U.S.
       14    Q.   And so did you apply to grad school programs here?
       15    A.   Yes, in Boston University, Actuarial Science Department.
       16    Q.   And is that where you began to attend in 2012?
       17    A.   Yes.
       18    Q.   Why did you choose Boston?
       19    A.   Because when I got the offer from Boston University, the
01:01  20    first thing I heard about Boston, I just feel like it's a nice
       21    city, the view is beautiful, and it's very close to the ocean.
       22    That's all I want, so I take the offer.
       23    Q.   And had you been to the U.S. before?
       24    A.   Yes.  When I was in high school there was like a school
       25    organization -- a school organized the event.  So we go to

1    California for a couple of days -- couple of weeks.

2    Q.    And so how long of a program was the BU graduate program

3    that you were in?

4    A.    It's two years' program.

5    Q.    And is that a master's program?

6    A.    Yes.

7    Q.    And when you came to the United States, did you

8    have -- get a visa to come to the U.S.?

9    A.    Yes, a student visa.

01:02 10   Q.    Okay.  And that allows you to come to the U.S. in order to

11   study?

12   A.    Yes.

13   Q.    And are you what's called an "international student"?

14   A.    Yes.

15   Q.    And that means you were still a national of China; you

16   just had permission to come to the U.S. and study?

17   A.    Yes.

18   Q.    Was there a community of students like you here at BU?

19   A.    There is a lot of Chinese and international students in

01:02 20   BU.

21   Q.    And what do you attribute the reason why there's so many

22   international students at BU?

23   A.    BU is very big school.  And I guess like lots of

24   international students come, so we have multi-culture things

25   and people thinking different ways.  So we talk to different

1   people.  And I guess it's a culture -- multi-culture thing.  I

2   don't know.

3   Q.   A multicultural environment?

4   A.   Yeah.

5   Q.   In addition to your coursework for your master's degree,

6   did you also do research?

7   A.   I don't do research, but I find a job to -- schoolwork to

8   help one of the professor in administrative department to do

9   the research work.  So I'm working as a research assistant.

01:03 10   Q.   Okay.  So you're a research assistant, but you're not

11   actually doing the experiments and that kind of thing?

12   A.   Not experiment.  It's more like -- it's more for finance.

13   So I use software to help the professor to build a model of the

14   regression stuff.

15   Q.   And as part of that job, was there an office space where

16   you and others would do your work as assistants?

17   A.   Yes, there's a couple of other students.  We share the

18   office; when we are working we can use that space and a

19   computer to do our work.

01:04 20   Q.   At some point in your BU experience did you come to know

21   someone named Lu Lingzi?

22   A.   Yes, she's one of my very good friend.

23   Q.   And the Chinese convention of saying the name and the

24   surname, is that the reverse of the American way; so the last

25   name goes first and the first name goes second?

```
 1   A.   Yes.

 2   Q.   So in America we would call her "Lingzi Lu"?

 3   A.   Yes.

 4   Q.   How did you know Lingzi?

 5   A.   When we first come here we took a math class together, so

 6   we start to know each other and become very good friend.  And

 7   we did our projects together for that class, so we become very

 8   close.

 9   Q.   Do you remember that class, what class that was?

10   A.   Yeah, that's a linear regression class.

11   Q.   Linear regression.  So it's another --

12   A.   Math class.

13   Q.   -- math class?

14   A.   Yes.

15   Q.   Was Lingzi, like you, a Chinese student?

16   A.   Yes.

17   Q.   And was she, like you, a Chinese national who came here on

18   a visa?

19   A.   Yes.

20   Q.   And what was she studying?

21   A.   She studying statistics.

22   Q.   And what kinds of things did you do with Lingzi?

23   A.   A lot of things girls will do.  So we shopping together,

24   talking together, and we are also cooking, just enjoying.

25   Q.   Lingzi's family, were they also in China?
```

```
 1   A.   Yes.  Most of their family -- most of her family's in
 2   China, and her aunt's in the U.S.
 3   Q.   Your voice trailed off a little.  Did you say her aunt
 4   lives in the U.S.?
 5   A.   Yes.
 6   Q.   Okay.  And is that her aunt Helen?
 7   A.   Yes.
 8   Q.   Did she have any pets?
 9   A.   Yes, a dog.  A small, cute dog.
10   Q.   How do you know that?
11   A.   She talks a lot about the dog and show me pictures and
12   videos, so I know that.
13   Q.   Would she communicate with her parents and friends back in
14   China?
15   A.   Yes.  Sometimes she will call them, Skype them, and
16   WeChat.  That's kind of software we use to texting, like,
17   Whatsapp.
18   Q.   So WeChat is a software application like, what did you
19   say, Whatsapp is another --
20   A.   Yeah, kind of like Whatsapp.
21   Q.   Okay.  That's a way to communicate with people in China?
22   A.   Yeah.
23   Q.   Did you take any trips together with Lingzi?
24   A.   Yes, we went to Orlando together in March.  Middle of
25   March, I think, during the spring break.
```

```
 1   Q.   Okay.  Spring break of 2013?

 2   A.   Yes.

 3   Q.   So that was about a month or less before the marathon?

 4   A.   Yes.

 5   Q.   Where did you go in Orlando?

 6   A.   Disneyland and Universal Studio.

 7   Q.   Aside from Lingzi, did you have another group of friends

 8   that you -- would socialize with you?

 9   A.   Yes, some other friends.

10   Q.   I'm going to draw you now to the day of the bombing.

11   A.   Okay.

12   Q.   Can you describe what you did when you got up that

13   morning?

14   A.   So school has that day off, so we have a day just to

15   exploring in Boston.  And marathon is a big thing here.  It's

16   very important.  So I think I should go to see how people

17   celebrate marathon.  And then I ask Lingzi -- because we are

18   very close to each other, we almost do everything together.  So

19   I ask her to go with me.  And then she says she will have exam

20   coming soon so she want to study.  So I said okay.

21        So I talk to two of my other friend, who we decide to go,

22   and the day before we are going or at the morning of that

23   day -- I can't remember.  And then she says she still want to

24   go with us.  So I'm very happy she can go with me.

25        So we went together.  We take the train to -- around that
```

1    place, and then we get off one stop earlier, I guess, and then

2    we walk to the Prudential Center because I think we can go

3    shopping and do some other things for fun while watching the

4    marathon.  And I also have appointment in Apple store for

5    fixing my phone, so I guess we just decide to go to Prudential

6    and then Apple store is around, so we can find a place to cross

7    the street so we can go to the Apple store.

8         And after we get there and go to the Prudential, we find

9    it's really hard to go to Apple.  We can't cross the street.

01:09 10   It's very far.  And we have to walk a long distance to cross

11   the street.  So we walk and then we cross the street and walk

12   back.  It's too -- it's going to take awhile, so I cancel the

13   appointment at Apple and make a new one.

14   Q.   Okay.  Let me just stop you there for a second.  So at

15   first Lingzi said she couldn't attend with you the marathon?

16   A.   Yes.

17   Q.   But then she changed her mind?

18   A.   Yes.

19   Q.   And then you began to go down -- you took the train down

01:10 20   to the marathon area?

21   A.   Uh-huh.

22   Q.   And that's from Boston University?

23   A.   Yes.

24   Q.   And who else was with you?

25   A.   My other friend, another Chinese friend can go with,

1    Tiffany.

2    Q.   And so there's Tiffany, Lingzi and you went down towards

3    the marathon -- towards the Boylston Street area.  Is that

4    right?

5    A.   Yes.

6    Q.   And you were intending to go to the Prudential Center to

7    do shopping?

8    A.   Yes.  I can't remember if -- I don't think we really

9    bought anything; we just more like watching the marathon.

01:10 10  There is way too many people and we are short, so it's hard to

11   see.  So we go shopping, and then just going to someplace more

12   empty.

13   Q.   Yeah, just to free up.

14        And then you mentioned you had scheduled an appointment at

15   the Apple store?

16   A.   Yes.

17   Q.   But then you cancelled the appointment?

18   A.   Yes.  I can't remember if we just missed it or cancelled,

19   I guess.

01:11 20  Q.   But you had to reschedule the appointment, in any event?

21   A.   Yes.

22   Q.   So then what happened after you were -- you tried

23   to -- you rescheduled the appointment?

24   A.   We rescheduled appointment because we feel, like, too

25   tired.  We don't want to -- in a rush.  So we go on the

```
 1    Boylston -- Newbury Street instead of Boylston Street because
 2    it's too crowded to walk.  And then we go to a restaurant on
 3    Newbury Street just to eat some food and then stay there for a
 4    while, and then after that we keep walking on the Newbury
 5    Street.  We try to walk back to the Boylston Street, but it's
 6    still very crowded, so we decide to keep walking on the Newbury
 7    Street.
 8        And I think one block -- two blocks before the Apple store
 9    we decide to take a turn because it's very close, so we take
01:12 10   turn on the Boylston Street and then walk a little bit.  And
11    when we reach the restaurant, and then the first bomb just
12    exploded --
13    Q.   Let me stop you here just to orient the jury as to where
14    you are.  You'd gone down Newbury Street.  You had eaten lunch.
15    Is that right?
16    A.   Yes.
17    Q.   And then you went back onto Boylston Street?
18    A.   Yes.
19    Q.   And then just as you -- somewhere near the finish line,
01:12 20   you had passed that area, and then the first bomb blew up?
21    A.   Yes; sort of close to the finish line.
22    Q.   Okay.  And where approximately on Boylston Street were you
23    when that happened?
24    A.   When the first bomb happened?
25    Q.   Yes.
```

```
 1   A.   Right in front of that restaurant, the --
 2   Q.   Is it the Forum restaurant?
 3   A.   The Forum restaurant.
 4   Q.   Okay.  And you weren't familiar with the Forum restaurant
 5   at the time, correct?
 6   A.   Not really.  We still go around that area a lot, but we
 7   never eat in that restaurant before.
 8   Q.   Okay.  And so who was there in front of the Forum
 9   restaurant when the first bomb blew up?
10   A.   There is a couple on my right side, a woman -- very tall
11   woman, her boyfriend, I guess, or her husband, and then there's
12   two guys in front of us.  Like still a lot of people in front
13   of us.  And then when we reach there, my friend is like --
14   Tiffany is not there because when we take the first turn to the
15   Boylston Street, she decide to take a picture.  There is a
16   stone or something, she can stand up there, so she can take a
17   picture.  And then Lingzi and I went to the Apple store.  So
18   that's why we're not together at that point.
19   Q.   Okay.  So the three of you split up a little bit.  Tiffany
20   stopped to take a photo, and you and Lingzi kept going up
21   westbound on Boylston Street towards the Apple store?
22   A.   Yes.
23   Q.   Okay.  When the first bomb exploded, how did you know that
24   something happened?
25   A.   I didn't really know that's a bomb.  So when the first
```

01:13  10
01:14  20

1   bomb -- the first thing happened, everybody around there is

2   like shocked.  So everyone is panicked.  Everybody is asking,

3   "What's happening?  What's that?"  I never think it's a bomb; I

4   just thought something happened, like noise, something like

5   that.

6       And then people were in a panic, I guess, because they saw

7   the smoke.  There's some smoke we can see from the finish line.

8   And I guess I'm not nervous about anything at that point.  I

9   just think it's just something, we don't know, but it cannot be

01:15 10   a bomb or anything like that.  So I was trying to calm my

11   friend -- calm Lingzi too.  She was worried too.  And also the

12   couple I mentioned before, because they are panicked, so I'm

13   just looking at them to see what is happening.

14       And then Lingzi's holding my arm at that point.  I just

15   trying to -- about to tell her, "Let's keep moving.  It's okay.

16   Let's go."  And then I haven't got a chance to say that, the

17   second bomb.

18   Q.   Okay.  Let me show you a couple of photos before we move

19   on.

01:16 20   A.   Okay.

21       MR. CHAKRAVARTY:  Can you call up -- these have not

22   yet been introduced.  21-1, -2 and - -3 just for the witness.

23   Q.   Ms. Zhou, is this one of the photos I showed you recently?

24   A.   Yes.

25   Q.   And do you recognize it as a photo of the time when you

         1    and Lingzi were walking by the Forum Restaurant on April 15,

         2    2013?

         3    A.   Yes, I can see her.

         4    Q.   Okay.  You can see Lingzi in this one?

         5    A.   Yes.

         6         MR. CHAKRAVARTY:  Okay.  Can we have 21-2.

         7    Q.   And do you see yourself in 21-2?

         8    A.   Yes.

         9         MR. CHAKRAVARTY:  21-3.

01:17   10    Q.   And do you see yourself in 21-3 and Lingzi's hand?

        11    A.   Yes.

        12    Q.   And are these fair and accurate photos of you and Lingzi

        13    just before the second bomb blasted?

        14    A.   Yes.  I can see the couple next to me too.

        15    Q.   Okay.

        16         MR. CHAKRAVARTY:  I'd move in Exhibits 21-1, -2 and -

        17    -3.

        18         MS. CLARKE:  No objection.

        19         THE COURT:  Okay.

01:17   20         (Government Exhibit Nos. 21-1, 21-2 and 21-3 received

        21    into evidence.)

        22         MR. CHAKRAVARTY:  I would move to publish Exhibit

        23    21-1, please.

        24    BY MR. CHAKRAVARTY:

        25    Q.   Ms. Zhou, is this the photo that you said depicts Lingzi

1    Lu?

2    A.   Yes.

3    Q.   Using your finger, can you just draw a circle on the

4    screen in front of you?  If you push a little bit hard with the

5    pad of your finger as you draw on the touch screen.

6    A.   (Witness complies.)

7    Q.   So you've just circled the woman in the blue jacket on the

8    left-hand side of the screen.  Is that right?

9    A.   Yes.  I think it's a shirt.

01:18 10   Q.   That's a shirt?  I'm sorry.  Not a jacket.

11        And does it appear she's holding her hand up to her mouth?

12   A.   Yes.

13   Q.   And describe what had just happened at this point.  Take a

14   moment.

15        (Pause.)

16   A.   I think the first bomb just happened at that point, so

17   everyone is looking.  And she's in a panic.

18        MR. CHAKRAVARTY:  Can we have 21-2, please?

19   Q.   Do you see yourself in this photo?

01:19 20   A.   Yes.

21   Q.   Please, there's a tissue and there's also some water there

22   if you want some.

23        (Pause.)

24   Q.   Can you circle yourself on this photo?

25   A.   (Witness complies.)

```
 1   Q.   Thank you.  And where is Lingzi in this photo?

 2   A.   Right next to me, I think.

 3   Q.   And you've circled yourself, the woman in the, more or

 4   less, upper center of the photo?

 5   A.   I think she's on my left side.

 6   Q.   So behind the blonde woman?

 7   A.   Yes.

 8        MR. CHAKRAVARTY:  And can we go to 21-3, please.

 9   Q.   Now, again, can you circle yourself in 21-3.

10   A.   (Witness complies.)

11   Q.   And do you see a part of Lingzi in this photo?

12   A.   Yes, her head.

13   Q.   And is she holding your shoulder?

14   A.   Yeah; like she's grabbing my arms.

15   Q.   So were you particularly concerned about what had happened

16   down at the finish line area?

17   A.   At that point, no, because I can't see anything besides

18   the smoke.  I can only see there is the smoke up there.  And

19   everyone is panicked.  I don't know why.  I never feel

20   something like that would happen.  I feel safe, so...

21   Q.   And Lingzi, you said she was a little bit panicked?

22   A.   Yes, she scared, like everyone around.  Like I

23   guess -- like everyone is kind of worried about what's

24   happened -- what's happening.

25   Q.   Did she say anything?
```

1    A.   Yeah, she was asking me, like, "What's happened?" and

2    "What should we do?" something like that, like everyone else.

3    Q.   And did you respond?

4    A.   I said, "It should be okay.  Calm down," or things like

5    that.  I don't know what answer to give because I don't know

6    what's happening too.  And I just feel like it shouldn't be a

7    big problem; it should be just noise or something like that,

8    just like construction work or something like that.

9    Q.   Moments after this photo was taken -- I think this is a

01:21 10    still image from a video.  Moments after this image, what

11    happened?

12    A.   I remember like before I start -- at first I was looking

13    at the couple next to me so -- and then just like after a few

14    seconds, maybe, and then I turn back, trying to tell -- I'm

15    about to tell her to -- let's go, and then I think the second

16    bomb just exploded at that point, because I don't have a memory

17    of those few seconds.

18    Q.   Okay.  What is the next thing you remember?

19    A.   I remember I wake up laying on the fence, and it's like

01:22 20    smoke everywhere.  And I can't hear anything at that point.  I

21    saw blood, like, all over the ground.  And I remember there is

22    a man stand right in front -- used to be stand right in front

23    of me, and at that point he's sitting down and turning his face

24    towards me, like in a very slow, slow way.  It's like slow

25    motion.  And then I can see his face.  It's very scared.  And I

1    think he's yelling, but I cannot hear anything.  So he's

2    turning his face towards me, and I saw his legs not there

3    anymore.

4         And then I start to check my arms and my legs, and

5    Lingzi's arms and legs.  I saw I have both my legs and my arms,

6    so -- and I didn't see any wound at that point; I only saw

7    blood, and so I satisfied.  And then I saw Lingzi's legs and my

8    legs are actually together, like kind of across each other.

9    Q.   Like intertwined, your legs and Lingzi's legs?

01:23 10   A.   Yes.  Yes.

11        So I tried to stand up.  So I put my leg out, and trying

12   to stand up, and then I figure at that point I'm injured.  And

13   then --

14   Q.   Let me stop you there and just again clarify just a few of

15   the things.  You said that you were lying against a fence?

16   A.   Yes.

17   Q.   Is that right?

18        And the man that you saw who no longer had legs, did you

19   see that man moments before?

01:24 20   A.   I think he's one of the men standing right in front of me,

21   but I didn't see his face before because they are facing a

22   different way.

23   Q.   So you were facing his back?

24   A.   Yeah, I'm facing his back.

25   Q.   And you said you saw that you had your limbs?

A.   Yes.

Q.   Did you make observations of Lingzi at that time?

A.   Yes.  After I checked myself, I start to check her wound, and that's why I tried to stand up.  And then I saw she has her arms and legs, but she's injured in her leg, her thigh.  But I felt like it should be okay at that point.

Q.   Okay.  Let me stop you there.  When you looked -- turned to look to see if she was okay, you saw that she had her arms and legs.  Is that what you said?

A.   Yes.

Q.   But she had an injury to her thigh?

A.   Yes.

Q.   Okay.  And you said that you thought she would be all right?  Why did you think that?

A.   Because when I tried to stand up, I notice that I can't.  Then I figure out I was injured.  I have abdominal injury.  So I had to sit back.  And then I...

     (Pause.)

A.   I was thinking it may be better if I lose my arms or legs because I think then I have a chance to survive.  Because my wound, I have to hold it, so...  Like whole thing coming out from my insides.  So I think it's kind of dangerous for me.  So I sit there.  I sit back.  I stop trying to move.  And I was holding my stomach at that point.  And then I check Lingzi's wound.  I saw she -- she's yelling, so I know she's alive.  And

1    I tried to talk to her, but I can't at that point.  And so I

2    think I should try to calm her down.

3              (Pause.)

4    Q.   Ms. Zhou, let me ask you another question.  You said you

5    tried to stand up but you couldn't?

6    A.   Yes.

7    Q.   What was preventing you from standing up?

8    A.   Well, it hurt.  And also, just you don't have strength to

9    stand up and...

01:28 10   Q.   I'm sorry.  Go ahead.

11   A.   And I realized if I try to stand up, like my -- because I

12   got cut, because of the bomb, on my stomach, so if I try to

13   stand up, I don't think there is a good result.

14   Q.   And so your stomach was cut open?

15   A.   Yes, something like that.

16   Q.   And so in addition to -- I think you said you didn't have

17   the strength to stand up --

18   A.   Yes.

19   Q.   -- you were worried that your insides would come out?

01:28 20   A.   Yes.

21   Q.   And what were you doing in response to that?

22   A.   So I sit back.  I didn't move.  And then I hold it.

23   Q.   You were holding your --

24   A.   Yeah --

25   Q.   -- insides in?

A.    -- I need to push, like, with all my strength I have.  So
I pushed my stomach.  And that also help with the pain.

Q.    You said you saw Lingzi next to you?

A.    Yes.  Yes.

Q.    And in addition to the injury that you saw, what was she
doing?

A.    I saw she's yelling.  I can't hear, so I can only saw
she's yelling, and she's waving her hand a little bit.  And
she's like lying down.  And so I can saw her leg.  I can saw
her injury.  At that point you wouldn't think that's something
hard -- it's hard to look at because everybody's injured.  And
you just feel like it's something you have to look at to take
care of.

      So I look at her leg.  I think it's better than the man in
front of me because he doesn't have leg anymore.  So I think
she should be fine.  And then I just -- I -- kind of like a
relief, I think she would be fine.  So I just sit back.  And
then lots of people come inside and trying to help and...

Q.    So at that point could you see Lingzi anymore?

A.    After a while I cannot see her because people were --
people get in and block the way.  So I cannot see any other
injured people.

Q.    Were people attending to you?

A.    There were lots of people -- yeah.

Q.    And were people attending to her?

1    A.    Yeah, I think so.

2    Q.    And others around you as well?

3    A.    Yeah, everyone has a couple of people trying to help.

4    Q.    So explain what happened when the responders came to you.

5    A.    So there is -- so people came and tried to help, but they

6    need to know what kind of injury you had, so every -- like it's

7    a little bit messy there.  So if -- so, for example, there's

8    one coming to you and then somebody else is yelling for help,

9    and then they left and then somebody else came.  So every time

01:31 10   if they changed, you have to show them your wound, what injury

11   you are.  So it's really painful to kind of reveal it every

12   time.  So then there's --

13   Q.    Let me just clarify that.  You said it's painful to reveal

14   your wound --

15   A.    Yes.

16   Q.    -- every time a first responder comes to you?

17   A.    Yes.

18   Q.    Please continue.

19   A.    So I remember there is a lady who came to help and then

01:31 20   she tell me she's a nurse and everything, and like what's her

21   name and she's going to help me.  And then she tried to leave.

22   I just can't take changing -- every -- just changing people, so

23   I hold her pants -- like the bottom of her pants.

24   Q.    You tugged on her pants to prevent her from leaving?

25   A.    Yeah, yeah, so I -- because I don't want to talk.  I can't

1    really easy talk.  And I told her, "Can you stay here?" and she
2    stayed.  And after a while it's hard to brace, so I tried to
3    move, I tried to lie down.  I thought it would be easier, but
4    it's actually harder.  Like I want to throw up, so it will be
5    even harder to breath.
6    Q.   When you say "breath," you mean to breathe?
7    A.   Yeah, breathe.
8    Q.   Air coming in and out?
9    A.   Yeah.
01:32 10       So I lean backwards, still sit there.  And then it's still
11    hard -- getting harder and harder, and then -- because there's
12    a restaurant there, so people bring ice out.  And they put ice
13    in my mouth.  It helps a lot.  It just easier to breaths -- to
14    breathe.  And then just wait.
15       And then there's two ambulance -- or one ambulance come
16    and take the people right in front of me.  And then I ask how
17    long I should keep waiting, to tell me like soon.  And I know
18    the help is coming, but it just hard to wait there like that.
19    And --
01:33 20   Q.   Let me stop you before we talk about you leaving there.
21    I'm going to show you a couple of photographs and ask if you
22    can talk about those.  I think the first is Exhibit 34.
23            MR. CHAKRAVARTY:  34 is in evidence, your Honor.
24    Q.   Ms. Zhou, do you see yourself in this photo?
25    A.   Yes.

1   Q.   Again, can you circle yourself?

2   A.   (Witness complies.)

3   Q.   You circled the woman with her head down and looking off

4   to the side a little bit.  Seeing this photo, can you tell the

5   jury what you think was happening there?

6   A.   I think that's just like after the bomb.  And then I just

7   wake up and then trying to figure out all wounds.

8   Q.   And where's Lingzi relative to you?

9   A.   I think she's just right next to me, behind the man.

01:35 10   Because I remember she's very close to me.

11   Q.   And the man that you were talking about in front of you,

12   is that the man depicted in this photo?

13   A.   Yes, behind the tree.

14        MR. CHAKRAVARTY:  Let me have 24, which is also in

15   evidence, your Honor.

16   Q.   Okay, Ms. Zhou.  Can you identify yourself in this photo

17   as well as Lingzi?

18   A.   So this is me and this is (indicating).

19   Q.   You've circled the woman on the left as being you?

01:35 20   A.   Yes.  And this is Lingzi (indicating).

21   Q.   And you've circled the woman with her hands over her face

22   lying down as Lingzi?

23   A.   Yes.

24   Q.   Does this appear to be shortly after the earlier photo

25   that we looked at?

```
 1    A.   Yes, I think so.

 2    Q.   Can you describe what you were doing here?

 3    A.   I guess I'm just looking around and just -- I guess just

 4    waiting.

 5    Q.   Were you trying to conserve your energy?

 6    A.   Yes.

 7    Q.   Why?

 8    A.   Because I assume the soonest -- the soonest way the

 9    ambulance would come definitely takes more than five minutes.

10    And because I'm injured, I don't have lots of energy; I don't

11    want to waste them.  So everyone was yelling, and I just sit

12    there.  I thought I shouldn't waste any energy to just yelling,

13    and that will increase my heart speed and my bleeding.  So if I

14    yelling, then I will bleed faster, that will cause lots of

15    problem.

16    Q.   Do you remember being able to hear when you were sitting

17    there?

18    A.   At the first, maybe one minutes or something like that, I

19    cannot hear.  And then the hearing is coming back.  And then I

20    think it started to come back when people screaming.  And then

21    I can hear people are talking like, about, "Help this one, he

22    got injured," something like that.

23    Q.   Do you remember what it smelled like?

24    A.   I can't remember what it smelled like.  Smoke.  Smoke.

25    Just smoke.  It -- it's more like all the things has been shut
```

1  down, only nothing you can look at.

2  Q.   All your senses had shut down?

3  A.   Yeah, it feels like that way, so you cannot hear, you

4  cannot smell, I guess.  I just focus in on what I saw, I think.

5  Q.   Were you taken to the hospital?

6  A.   Yes.

7  Q.   And did you learn what your injuries were?

8  A.   I think it's pretty clear to me at that point because I

9  saw it.  And besides that, because of the bomb, I guess I'm

01:38 10  close -- very close, so my eardrum has injury too.  So there is

11  holes in my eardrum.  I guess it happens to lots of people.

12  Q.   Did you receive nerve damage as well?

13  A.   Yes, because of the cutting, that injured my nerves to

14  control the right leg.

15  Q.   Did they go into surgery to repair your abdomen?

16  A.   Yes, I had surgery right after the bomb twice, just to

17  clean up the wound.  And then because there is something get

18  inside your body, so it is very easy to get infection.  So I

19  got infection right after I get out of the hospital.  So I get

01:39 20  back in again.

21  Q.   About how long were you in the hospital as a result of

22  your injuries?

23  A.   I think it's around 20 to 30 days, I think.  It's hard to

24  track the time.

25  Q.   When you first arrived at the hospital, did you go -- when

```
 1   you went to get operated on, did you go to the ICU?
 2   A.   Yes.  So when I got off the ambulance, there is doctors
 3   waiting.  So I guess I directly go to the surgery room, and
 4   there I remember there is a doctor lady.  She's there.  She
 5   says like she -- they all keep asking me about my -- something
 6   like if you're allergic to anything, so I told them no.  And
 7   then I ask her if I can sleep, and she says yes, so I just
 8   sleep.
 9   Q.   When you woke up did you have visitors, and you talked to
10   others about what happened?
11   A.   Yes.  When I first wake up, I was in ICU and I can't talk
12   because I have that machine in my mouth and nose, so -- to help
13   me breathe.  And then I saw the -- my friends and Chinese
14   Embassy is there, and so I write down things.  I can only
15   write.  So I was lying there and write, "Tell them to find my
16   friend."  I write down her name.
17            (Pause.)
18   A.   And also tell the nurse and doctors, my friends and
19   everyone to look for her.
20   Q.   And you were talking about Lingzi?
21   A.   Yes.
22   Q.   When did you hear what had happened to Lingzi?
23   A.   I don't know how long it takes, but like after a while --
24   like I keep waking up and then go back to sleep because of the
25   medicine I'm taking.  And then all the family friends was
```

```
 1    visiting and then I, like -- every time I wake up, I ask them
 2    whether or not they find her.  And so I ask again, and then he
 3    says -- oh, he says, like, she passed away, and you don't know
 4    that?  So I guess everyone find out earlier, but they trying to
 5    protect me, so they didn't tell me.
 6              MR. CHAKRAVARTY:  Would you call up just for the
 7    witness, your Honor, Exhibits 1499 through 1501.
 8    Q.   Ms. Zhou, do you recognize 1499?
 9    A.   Yes.
10    Q.   Who is that?
11    A.   That's Lingzi.
12              MR. CHAKRAVARTY:  1500.
13    Q.   Who's that?
14    A.   That's her.
15              MR. CHAKRAVARTY:  1501.
16    Q.   And who is that?
17    A.   That's her too.
18              MR. CHAKRAVARTY:  I'd move in 1499 to 1501.
19              MS. CLARKE:  No objection.
20              THE COURT:  Okay.
21              (Government Exhibit Nos. 1499, 1500 and 1501 received
22    into evidence.)
23              MR. CHAKRAVARTY:  And I would ask to publish 1500.
24    BY MR. CHAKRAVARTY:
25    Q.   Do you recognize this photo?
```

```
 1    A.    Yes.

 2    Q.    Who took it?

 3    A.    I took it.

 4    Q.    Approximately when?

 5    A.    I can't remember.  Just, that's kind of a regular day for

 6    us, so we just hanging out.  And I think this is a restaurant

 7    close to the Fenway Park.  If it's correct, I think it's a Thai

 8    restaurant, and we are just -- I guess we are there for a

 9    movie, and then too early, or just after movie, so we decide to

10    eat things, and we just walk inside and take a picture.

11    Q.    That was a typical day for you?

12    A.    That's kind of our day for every day.

13               MR. CHAKRAVARTY:  Thank you, your Honor.

14               THE COURT:  Any examination?

15               MS. CLARKE:  No.  Thank you very much.  No questions.

16               THE COURT:  Thank you, Ms. Zhou.

17               THE WITNESS:  Thanks.

18               (The witness is excused.)

19               THE COURT:  We'll take the morning recess.

20               THE CLERK:  All rise for the Court and the jury.  The

21    Court will take the morning recess.  The.

22               (The Court and jury exit the courtroom and there is a

23    recess in the proceedings at 11:04 a.m.)

24               THE CLERK:  All rise for the jury.

25               (The Court and jury enter the courtroom at 11:27 a.m.)
```

| | |
|---|---|
| 1 | THE CLERK:  Be seated. |
| 2 | THE COURT:  Ms. Pellegrini? |
| 3 | MS. PELLEGRINI:  Your Honor, the government calls |
| 4 | Matthew Patterson. |
| 5 | MATTHEW PATTERSON, duly sworn |
| 6 | THE CLERK:  Have a seat.  State your name, spell your |
| 7 | last name for the record, keep your voice up and speak into the |
| 8 | record so everyone can hear you. |
| 9 | THE WITNESS:  Matt Patterson, P-A-T-T-E-R-S-O-N. |
| 02:09 10 | DIRECT EXAMINATION |
| 11 | BY MS. PELLEGRINI: |
| 12 | Q.   Good morning, Mr. Patterson. |
| 13 | A.   Good morning. |
| 14 | Q.   Will you tell the jury how you are employed currently. |
| 15 | A.   I'm currently employed with the City of Lynn Fire |
| 16 | Department.  I am a firefighter and a critical care paramedic |
| 17 | on the ambulance. |
| 18 | Q.   All right.  Now, before we go back to your job, where do |
| 19 | you live?  What town? |
| 02:09 20 | A.   I live in Lynn. |
| 21 | Q.   And are you a Massachusetts native? |
| 22 | A.   I am. |
| 23 | Q.   Can you give us something of your educational background? |
| 24 | A.   I was born and raised in Lynn, as I said.  Graduated from |
| 25 | Lynn Classical High School, joined the military.  Upon coming |

```
 1    back I received my bachelor's from Salem State and my master's
 2    degree from Anna Maria in public administration.
 3    Q.   And your bachelor's degree, is that any special course of
 4    study?
 5    A.   My bachelor's is in fire science.  I also have a -- my
 6    critical care paramedic is from Pro Ambulance out of Cambridge,
 7    Mass.
 8    Q.   Let me ask you about that.  First of all, how long have
 9    you been with the Lynn Fire Department?
10    A.   Eleven years.
11    Q.   All right.  And you serve two functions?
12    A.   I do.
13    Q.   Can you tell us about those?
14    A.   So as a firefighter and a paramedic, we split our time,
15    one, between the engine or the ladder truck, and the second,
16    between the ambulance or more EMS capacity.
17    Q.   In the EMS capacity, what exactly are you called upon to
18    do?
19    A.   Anything and everything you can need.  Call 9-1-1, as an
20    ALS provider anything that has to do with -- "ALS" is the
21    abbreviation for advanced life support, so cardiac related,
22    respiratory, bleedings, traumas, burns, anything where you need
23    immediate care.
24    Q.   And are you certified in that field?
25    A.   I am.
```

1    Q.   And when did you receive that certification?

2    A.   My initial -- my initial certification was December of

3    2013, and we recertify every two years.  So I actually just

4    recertified last month.

5    Q.   I'd like to direct your attention to Marathon Monday 2013.

6    Were you in Boston that day?

7    A.   I was in Boston.

8    Q.   And what were you doing?

9    A.   I was at Abe and Louie's for an event that I go to every

02:11 10   year.

11   Q.   And what's Abe and Louie's?

12   A.   Abe and Louie's is a restaurant-bar located on Boylston

13   Street.  Every year they throw a private party on Marathon

14   Monday, and every other day of the year it's a restaurant on

15   the street.

16   Q.   And do you have the address for them, where they're

17   located?

18   A.   I don't have the exact address.

19   Q.   Street?

02:11 20   A.   Boylston Street.

21   Q.   Okay.  And how long had you been at Abe and Louie's that

22   day?

23   A.   I was at Abe and Louie's -- I got there around 12:30.

24   Q.   Now, prior to 2013, had you ever been to the marathon

25   before?

A.    Yes.

Q.    How many times?

A.    Numerous.  Nine or ten at least.

Q.    And how many times had you attended the event at Abe and Louie's?

A.    This would be my third year in a row at Abe and Louie's.

Q.    While you were there at Abe and Louie's at approximately 2:30 to 2:45, did something occur?

A.    Something did occur.  I was seated with a few of my friends when we heard a loud explosion coming off in the distance.  It initially startled most of the people in the restaurant.  It gained my attention for a different reason.  I felt what can only be described as an energy release that I've had experience previously and I know that it's a very distinct feeling.  And when you feel it, it just -- it made me think something more was wrong than an accident or whatever else could be going on, a manhole explosion or anything of the such.

Q.    What did you do?

A.    I stood up, started to move towards the front.  People started talking around me.  I don't remember exact statements.  Moved towards the front of the building to more or less investigate what was going on.  As I made my way to the front, a second, much louder explosion and second release of energy that could only be attributed to someone punching me square in the chest, if I was to put it in my own words, was to hit me

1    again.  I knew at that point that my initial thoughts were

2    correct and that something was wrong.  At that point I

3    instructed everyone in there to get down or get back, and I

4    made my way towards the front and out the front window.

5    Q.   Mr. Patterson, do you recall what you were wearing that

6    day?

7    A.   I do.  I was wearing black pants and a red T-shirt.

8    Q.   And did you actually leave Abe and Louie's?

9    A.   I did.  I left Abe and Louie's.

02:13 10   Q.   So tell us what happened.

11   A.   So upon exiting Abe and Louie's, to the best of my

12   recollection I went out the front window.  There were some

13   people in front of me.  I, one, hopped off the window onto the

14   ground over the Abe and Louie's barrier, and then hopped over

15   the marathon barrier, making my way to the middle of the

16   street.  A quick left and right look, made my way down the

17   street and came upon the first victim which I saw needed the

18   most immediate care.

19   Q.   Tell the jury what you saw?

02:14 20   A.   What I saw was, I saw a girl laying in the street with an

21   apparent full leg amputation above the knee with her father and

22   at the time looked like her brother.  She was holding herself

23   up in complete shock.  I kneeled down, instructed her that my

24   name was Matt and I was here to help.  I was a paramedic.

25        I asked her her name.  She did respond at that time.  At

1     the time she responded, and what I thought she said was "Shane"

2     and not "Jane."  Due to her injuries, her leg aside, her hair

3     was singed, it was blown back, her face was full of soot.  She

4     looked more of a boy than she did as a girl at that particular

5     time to me.

6           The only importance I had was, from a medical point of

7     view, she was able to speak, allowing me to know her airway was

8     open, and patent.  She was able to maintain it.  I then go down

9     my other assessments and notice, like I said, a full left leg

02:15  10    amputation, and did what I could with what I had to control the

11    bleeding.

12    Q.   Before we get to that, were there other people with her in

13    the street?

14    A.   There was.  Her father and her brother were in the street.

15    Q.   And did you later come to learn her name?

16    A.   I did later come to learn her name.  It was not Shane; it

17    was Jane, in fact.

18    Q.   What did you do?

19    A.   On-scene?

02:15  20    Q.   On-scene.

21    A.   My initial on-scene -- like I said, I went through an

22    initial assessment.  I realized that the most immediate threat

23    to life was, in fact, the left leg amputation that she had.  I

24    was wearing a pretty good-sized leather belt that day so I knew

25    mine wouldn't work.  I stood up, I looked left, I looked right,

1    I noticed the gentleman on the sidewalk.  I ran up to him and

2    in a non-polite way instructed him to give me his belt.  He

3    took it off.  I ran back to Jane, applied it as best I could as

4    a tourniquet.

5        At this point other people had started to come up and

6    asked if they could help.  I instructed one of the gentleman

7    who asked what he could do that we needed to get moving, Jane

8    needed immediate medical attention, that he was to hold the

9    tourniquet as tight as possible as we moved her.

02:16 10   Q.   Mr. Patterson, you said that you observed that this was

11   the most immediate threat.  Why?

12   A.   As a trauma triage, we're taught ABCs, or BCAs, whatever

13   school you go to:  airway, breathing, circulation.  So in

14   asking a question and having the victim look at you directly

15   and answer, it lets me know that there's no brain injury

16   currently.  It also lets me know that she is breathing and

17   maintaining her airway because she's able to answer.  Once that

18   is accomplished, bleeding becomes the next most important

19   thing.  If you don't control the bleeding, eventually that's

02:16 20   what will kill you in the end.

21   Q.   So when you say a "full leg amputation," what do you mean?

22   A.   Her leg was amputated above the knee.  There was just

23   barely enough left to actually place a tourniquet.  Had that

24   not been there, the tourniquet would not have been applied.

25   The tourniquet is there to merely stop arterial bleeding.

1        As far as the wound, from what I could assess, it was

2   open, it was charred, it was just -- and it looked like as if

3   you were to put meat through a grinder, what would come out at

4   the other end.  It was just chunks and coagulated blood and

5   dried blood, and it had a very distinct, awful smell of four or

6   five different things mixed together.  I knew from looking at

7   it that once the tourniquet was on, if this child wasn't seen

8   immediately, she would either continue to bleed out or

9   infection or something else would set in almost immediately.

02:17 10   Q.   Mr. Patterson, before coming to court, did you have

11   occasion to review a video with me?

12   A.   I did.

13        MS. PELLEGRINI:  And this is Exhibit 41 for counsel

14   and the witness only, your Honor, at this point.

15   Q.   Mr. Patterson, I'm going to ask you to look at the screen

16   in front of you.  Is this, in fact, the video that you had

17   actually previously reviewed?

18   A.   This is.

19   Q.   And did you, in fact, recognize yourself in this video?

02:18 20   A.   I did immediately.

21   Q.   And did it, in fact, accurately and fairly depict the

22   events that you just described to the jury about your exiting

23   Abe and Louie's and your running down the street, Boylston

24   Street, on Marathon Monday of 2013?

25   A.   Yes.

1          MS. PELLEGRINI:  Your Honor, the government would move

2     this into evidence and ask that it be published to the jury.

3          MS. CLARKE:  No objection.

4          THE COURT:  Okay.

5          (Government Exhibit No. 41 received into evidence.)

6          MS. PELLEGRINI:  Hold that, please, Mr. Bruemmer.

7     BY MS. PELLEGRINI:

8     Q.   Mr. Patterson, we just saw a man in a red T-shirt come out

9     and hop the fence.  Is that, in fact, you?

02:18 10    A.   It is.

11          MS. PELLEGRINI:  All right.  Continue.

12          (Video played.)

13          MS. PELLEGRINI:  Stop right there, Mr. Bruemmer.

14          (Video played.)

15    Q.   Can you tell us and the jury what is happening here?

16    A.   What's happening here is this is the first victim I came

17    upon.  It was a little girl with the leg amputation.  I looked

18    down, noticed the injury.  At this point I immediately go into

19    my initial assessment of the injury and what I can do at this

02:19 20    time to render as much medical aid as possible in the field.

21    Q.   And is this where you made the decision that a tourniquet

22    was necessary?

23    A.   It was almost instantaneous that -- upon the visual,

24    looking at the wound, a tourniquet was the only thing that was

25    necessary.

1              MS. PELLEGRINI:  If we could play this to the end,

2    please.

3              (Video played.)

4    Q.   Mr. Patterson, where you went to the sidewalk on the

5    video, what's happening there?  What happened there?

6    A.   A bystander was taking off his belt and offering it as a

7    tourniquet.

8    Q.   And were you able, in fact, to apply the tourniquet to her

9    leg?

02:20 10   A.   I was.  That belt was sufficient in stopping what bleeding

11   was happening at the wound.

12   Q.   What did you do after the tourniquet was applied?

13   A.   After the application of the tourniquet, another gentleman

14   came up and had asked me if I needed assistance.  I instructed

15   him yes, that we needed to move this child to an ambulance

16   immediately.  We picked her up.  The other gentleman held the

17   tourniquet as tightly as possible.  We looked up and down the

18   street and I noticed that we had incoming EMS personnel away

19   from the finish line.  I initially looked towards the finish

02:20 20   line and decided to go in the opposite direction, to the

21   incoming EMS.  I ran about a half block up.

22        I initially ran into the first responding ladder truck

23   from the Boylston Street Firehouse, gave a quick assessment on

24   what had actually happened on-scene, what kind of injuries we

25   had and what kind of personnel we needed, and then continued on

1    to the next incoming ambulance in which transfer of care

2    happened, a quick report to those paramedics, and then I

3    returned to the scene.

4    Q.   Now, going back to what you just told the jury about

5    picking Jane up and removing her from the location in the

6    street --

7              MS. PELLEGRINI:  Can we have for the Court and the

8    witness only, your Honor, Exhibit 40 marked for identification.

9    Q.   Mr. Patterson, do you recognize this photograph?

02:21 10   A.   I do.

11   Q.   Have you previously seen this?

12   A.   I have.

13   Q.   Are you, in fact, in this photograph?

14   A.   I am.

15   Q.   And does this fairly and accurately depict the scene on

16   Marathon Monday with your care of Jane?

17   A.   It does.

18              MS. PELLEGRINI:  Your Honor, the government would move

19   this be published to the jury.

02:21 20          MS. CLARKE:  Subject to the same objection.

21              THE COURT:  Okay.  It will be admitted.

22              (Government Exhibit No. 40 received into evidence.)

23   BY MS. PELLEGRINI:

24   Q.   Mr. Patterson, tell us what's happening here.

25   A.   What's happening here is the gentleman in the blue -- his

```
 1   name was Michael, I came to find out later -- he is holding
 2   with as much pressure as he possibly can with the tourniquet --
 3   if you can see it, it is actually above what was left of the
 4   left knee.
 5   Q.   Actually, let me stop you there, Mr. Patterson.  You're
 6   able to touch the screen and make an arrow or a circle.
 7   A.   I am?
 8   Q.   Yes, and with the pad of your finger.  And if you could do
 9   so to the area you are describing to the jury at this time?
10   A.   (Witness complies.)
11        MS. PELLEGRINI:  All right.  So I'd note for the
12   record that it is an area of the leg, or what appears to be a
13   leg, slightly off the center to the right of the picture.
14   Q.   Is that correct?
15   A.   That is correct.
16   Q.   All right.  And I'm sorry.  Can you see the tourniquet in
17   this picture?
18   A.   You can.
19   Q.   And where is that?  Is that in the circle?
20   A.   The tourniquet is in the circle.  It would be on what
21   looks like above the knee.
22   Q.   And for the record, which person are you?
23   A.   I'm the person in red.
24   Q.   And so do you know by looking at this which way you were
25   facing at this time?
```

```
 1    A.   At this time I'm facing the finish line.

 2    Q.   All right.  So this is where you indicated you didn't know

 3    where the ambulances were or where to go?

 4    A.   Yeah, at this point I had not determined the best route to

 5    take for -- the quickest route for care.

 6    Q.   Mr. Patterson, also when you described Jane, you indicated

 7    that her hair was blown back?

 8    A.   Yes.

 9    Q.   Can you see that in this picture?

10    A.   You can.

11    Q.   Can you circle her head for us?

12    A.   (Witness complies.)

13    Q.   So looking over, then, your left shoulder, brown hair?

14    A.   Yes.

15    Q.   Thank you.

16         So after you transferred care of Jane, what did you do?

17    A.   After I transferred care, I returned to the scene to look

18    for other victims, anyone else that might need medical

19    attention.

20    Q.   And can you tell us what your observations were of the

21    scene when you went back?

22    A.   By the time I got back, more help had arrived, but the

23    scene was more or less in utter chaos.  There was people

24    everywhere.  They were in the street, they were on the

25    sidewalk.  It was tough to tell who was walking wounded, who
```

1   was there to help.  There was not much of uniformed police or

2   EMS at this time.  I noticed that a large crowd had formed on

3   the sidewalk outside of the Forum.

4   Q.   What else did you observe?

5   A.   I observed CPR was being done, in progress, on -- it

6   looked like two victims at the time -- and I made my way over

7   to see if I could help.

8   Q.   And were you able to provide any assistance?

9   A.   I was not.  I made my way to what was the second victim

02:24 10   that I encountered.  It looked to be a boy, juvenile-ish,

11   between nine and 11, I would say, years old.  I knelt down by

12   the head, made room.  I noticed that he was ashen in color, his

13   cheeks were sunken in, his eyes were darkened and conjugate

14   gaze to the right side.  His shirt was removed.  He had severe

15   abdominal wounds.

16       I just tried to adjust the airway to see if I could -- or

17   if the child would breathe.  And he was just -- from what I had

18   seen, there was nothing that could be done at that time.

19   Q.   So did you move on?

02:24 20   A.   I did.  I actually instructed everyone at that location

21   that there was nothing that could be done and that other people

22   need help and they should move on to help those that they can.

23   Q.   And were you able to assist anyone else at the scene?

24   A.   I was.  I think I made my way to another gentleman and was

25   able to make a tourniquet on his left leg with a shoelace.

1    Q.   How long did you remain at the scene, at the Forum?

2    A.   In my mind it seemed like an eternity.  I would probably

3    say two or three minutes in reality.

4    Q.   Were you able ever to return to Abe and Louie's that day?

5    A.   I did.  I returned to Abe and Louie's to retrieve my

6    jacket and my girlfriend, and made my way out the back door and

7    to a local firehouse.

8    Q.   All right.

9         MS. PELLEGRINI:  Thank you.  I have no further

02:25 10   questions.

11        MS. CLARKE:  Thank you.  No questions.

12        THE COURT:  No questions?  All right, sir.  Thank you.

13   You may step down.

14        THE WITNESS:  Thank you.

15        (The witness is excused.)

16        MS. PELLEGRINI:  Dr. James Bath.

17                  JAMES BATH, duly sworn

18        THE CLERK:  Have a seat.  State your name, spell your

19   last name for the record, keep your voice up and speak into the

02:26 20   mic so everyone can hear you.

21        THE WITNESS:  James Bath.  Last name is B-A-T-H.

22                  DIRECT EXAMINATION

23   BY MS. PELLEGRINI:

24   Q.   Good morning, Dr. Bath.

25        I'm over here.

```
 1          Will you tell the jury what town you reside in?
 2     A.   I live in Charlestown, Massachusetts.
 3     Q.   And can you tell us how you're employed?
 4     A.   I'm a general practitioner, and I work over in Somerville.
 5     Q.   Tell us a little bit about your educational background?
 6     A.   Sure.  I went to college up in Maine, up in Lewiston, and
 7     then I went to medical school at the University of
 8     Massachusetts, and did my residency at Tufts Family Medicine
 9     Residency.
02:27 10    Q.   And are you associated with a particular hospital or a
11     particular practice currently?
12     A.   Yup.  I work in a group of family physicians over in
13     Somerville, and I'm part of Hallmark Health, which is part of
14     Melrose-Wakefield.
15     Q.   And how long have you worked for them?
16     A.   Eight years.
17     Q.   Now, Dr. Bath, I want to direct your attention to April
18     the 15th of 2013.  Did you happen to partake in any of the
19     festivities surrounding Marathon Monday?
02:27 20    A.   Yes.  That morning me and my wife, we took the day off,
21     which is something we do every year.  And we went and we had
22     lunch near the Red Sox game.  And after that we walked down
23     to -- we were going to walk down to the marathon.  We had some
24     friends who were going to be finishing up the marathon.  And we
25     parted ways.  She wanted to go home and get some work done, so
```

1    she hopped on the train, and I kept walking down toward Newbury

2    Street.

3    Q.    And tell us what happened.

4    A.    So I was walking down Newbury Street.  And as I said, I

5    was going to go meet some friends.  And I got right to the

6    corner of Newbury and Gloucester when I heard a very loud

7    explosion.  And at first I didn't know what it was.  I thought,

8    you know, it sounded odd that they would be setting a cannon

9    off halfway through the marathon, but that's what I thought it

02:28 10    was.  And I stood for a moment, and about ten seconds later I

11    heard the second explosion, which was much louder and seemed to

12    be much closer.

13        At that point I looked up Gloucester toward Boylston

14    Street, and I started to see all of the spectators and all of

15    the runners running back in the other direction, starting to

16    come back down Gloucester.  And at that point I thought that

17    there might have been some sort of explosion in a restaurant,

18    and so I ran up Gloucester and went over one of the barricades

19    and stood in the middle of the street, just looking down the

02:28 20    street to see what I could see.

21        And the first thing that I saw was a gentleman who

22    was coming down the street in clothes tattered.  He was a

23    little bit bloody, was in shock.  And I stopped him and he

24    stated to me that "All of my friends are dead.  I need to get

25    out of here," is what he kept repeating to me.  So I just did a

1   quick review of him and found that, thankfully, none of his

2   injuries were life-threatening but he was definitely in shock.

3   So I sat him down, and fortunately a Boston police officer came

4   over and sat down with him, and I proceeded down the street.

5        And I could see the smoke coming out of the front of what

6   is now the Forum restaurant, and just kept running down toward

7   the sidewalk.  And right when I was getting up to the area, the

8   Boston police officers were just starting to pull away the

9   barricades so I could get up onto the sidewalk, or right in

02:29 10  front of it.

11  Q.   Dr. Bath, let me ask you, in addition to the gentleman

12  that you just described and seeing the smoke, were there any

13  other observations you made about the scene before you actually

14  got to the Forum area?

15  A.   Honestly, I don't remember much.  I remember, you know,

16  people going by in either direction, but nobody really else on

17  the street.  I was pretty much focused on, you know, the smoke

18  that I saw and what I could see, which wasn't too far in the

19  distance.  There were a lot of people sort of crowded in one

02:30 20  area, but I don't remember anything to either side.

21  Q.   I'm sorry.  Go on.

22  A.   Okay.  And when I got to the front of the Forum, the thing

23  that struck me first was the unmistakable smell of burning

24  tissue and blood which, you know, going through medical

25  training is something that, you know, you get accustomed to.

1    But it was fairly overwhelming at that point.  And I took a

2    quick look onto the sidewalk and it had looked like people had

3    just been dropped like puzzle pieces onto the sidewalk, was

4    sort of my first impression.  And there was, you know, a fair

5    amount of blood and there was -- I remember seeing a severed

6    foot was right on the curb in front of me.  But this all

7    happened very quickly.

8        And there was a girl lying on the -- against sort of the

9    back fence on the sidewalk who I gravitated to first.  I can't

02:31 10   remember why but I just did.  And so I ran around.  So I was on

11   her right.  And so it was a young Asian woman and who had been

12   very seriously injured.  When I got to her, I kneeled down

13   right at about her thigh.  And she was still alive at this

14   point.

15   Q.    How do you know that?

16   A.    She was still breathing.  She was unconscious but she was

17   breathing.  And she was writhing a little bit.  You know, she

18   wasn't responding to anybody.  And I was trying to ascertain

19   her wounds.  And since I was at her leg, and seeing that there

02:31 20   were other leg injuries I rolled her right leg toward me.  And

21   she essentially had a very deep, long laceration all the way

22   from the pelvis all the way down to about her ankle.  So

23   basically her leg had been filleted open down to the bone.  And

24   the gentleman who sitting across from me also rolled back her

25   leg, and she had other deep injuries there but not as severe as

1    the right.

2         So he and I proceeded to just try to tourniquet her leg.

3    I used my belt, and he took off his.  And we tried to

4    tourniquet her, although at that point I started to realize

5    that there wasn't much blood coming out anymore.

6    Q.   What does that mean?

7    A.   So what it means is that, you know, even though this is --

8    especially up in the upper thigh is where a very large

9    neurovascular bundle lies, you know, femoral artery, femoral

02:32 10   vein, that a lot of her blood was now on the sidewalk and not

11   in her.  And, you know, as I was there and we were tying her

12   off, I took her pulse at one point.  It was very thready, which

13   means that there really wasn't much of a pulse left, and within

14   a minute or two she started agonal breathing.

15   Q.   I'm sorry.  Agonal?

16   A.   So agonal breathing is the type of breathing someone does

17   when they're in the throes of dying.  It's the body's last

18   gasp, essentially, to try to take in air when you know there's

19   really not much else that can be done.

02:33 20        And at that point I realized she was dying.  You know, she

21   hadn't died yet but she was going to shortly, and so I felt it

22   was best if I go and see if there was anybody else who needed

23   help.  She had a lot of people around her who were really

24   chipping in and trying to help.  I asked one of the folks at

25   the head of her to start CPR, realizing that that was not going

1    to save her but, you know, hoping I was wrong or holding out

2    some sort of hope.

3        And so I stood up, and that's when I heard someone behind

4    me say that there were people inside.  And so I stood up and I

5    turned around, and there was a little fence there.  I climbed

6    over it.  And when I went into the Forum, I noticed that there

7    was a young woman and a gentleman who were lying on the stairs

8    who were being attended to by some folks as well.

9        And so when I went over there, she was -- they were lying

02:34 10   on the stairs, and she was sort of half on top of him.  And I

11   quickly realized she had suffered a leg injury.  At that point

12   someone had draped something over her foot, but I lifted it up

13   and her foot had been sheered off on the dorsal foot, which is

14   what we consider the top part of the foot through the ankle,

15   and had been cut clean off, but the gentleman she was with had

16   the wherewithal to tourniquet off her leg, and so that saved

17   her from losing more blood than she had already lost at that

18   point.

19       And he -- there was no obvious injury, but then I picked

02:34 20   up his feet, and that's when blood started pouring out of his

21   shoes.  And so one of the staff members from the Forum was

22   there, and he helped get some napkins for us to start to tie

23   the lower half of his legs off to make sure the bleeding wasn't

24   more serious, and we propped his legs up on a pillow.

25       And a very interesting thing, during that time -- they

1    were both still talking and they were both still in a little

2    bit of shock but chatting.  And, you know, it was interesting.

3    He kept saying sorry that he was -- brought her there, and she

4    kept saying it was all right.  And it was sort of very

5    interesting little couple banter during the midst of all this.

6    Q.    Do you know who she was?

7    A.    I do, yes.

8    Q.    And who was that?

9    A.    Adrianne Haslet.

02:35 10   Q.    And how long did you remain with Adrianne?

11   A.    I stayed with them for a little bit, and then to the best

12   of my recollection I think they had -- another staff member had

13   said there were more people in the restaurant.  So I left them

14   and went to check on some other people and then came back

15   and -- until the stretchers came, because at that point in time

16   there was, I think -- there were just not many stretchers to be

17   had at that point.

18        So I waited until they came in.  And everything was stable

19   at that point until they had to lift her onto the stretcher,

02:35 20   and then that's when the screams of pain started, which were

21   pretty profound.  And then we got him onto the stretcher as

22   well.  And at that point -- you know, then they were with first

23   responders, so they were secure at that point -- I went

24   outside, and there was a gentleman lying in front of me.  He

25   had already been tourniqueted off.  I just went down to make

1    sure he was still conscious.  He was still littered with, you

2    know, the dust and debris and still in shock himself, but

3    alive.

4        And I did notice that I was standing right next to the

5    little boy who ended up dying, and he had already been covered

6    with a tablecloth.  And I went back over to where the

7    Asian -- Lingzi Lu had been lying.  And they were still

8    performing CPR, although it was to no avail at that point.  I

9    think she had passed at that point.  I can't say for sure.  And

02:36 10   then went into the restaurant next door.  Someone had said

11   there was someone in there as well.  So we attended to a

12   gentleman who had a large amount of shrapnel injuries to his

13   legs and got him on a stretcher and back out.  And he was,

14   fortunately, conscious and lucid.

15       And I went back out to the sidewalk and just helped some

16   folks, you know, get into ambulances and making sure that

17   everything had been attended to.  And, you know, when I came

18   out, you know, I was sort of struck by the sort of amount of

19   blood and body parts and everything else that was still

02:37 20   littered on the sidewalk.  But everyone had pretty much been

21   attended to so there was really not much else for me to do.

22   Q.   Dr. Bath, when you say -- I know as a doctor you're

23   probably focused on the people, and you say you noticed blood

24   and body parts.  What else was on the sidewalk and on the

25   street, if you made observations of it?

1    A.    Certainly there were parts of limbs as far as -- well, I

2    think you asked that.  And there was just a lot of burnt

3    clothing and tissue.  And, you know, that was really it.  The

4    rest was sort of covered up by all the people who were then

5    around.

6    Q.    Did you see any particular type of debris on the sidewalk

7    or on the street?

8    A.    I didn't in particular, but one thing I did see was

9    when -- when I returned to where Lingzi Lu was lying, her purse

02:38 10   was there.  And I happened to be standing next to one of the

11   EMTs who had the good wherewithal to mention to get it so he

12   could keep it with her so people would know who she was.

13         And as I was going through getting her ID, there was a

14   warm piece of metal in the purse.  And so that struck me as

15   something, a piece of debris that I came across when I was

16   helping.  And that stayed in her purse and went with her.

17         I'll be honest with you.  The rest I'm not really too sure

18   of.

19   Q.    Dr. Bath, before you came here today, did you have

02:38 20   occasion to review some photographs with me?

21   A.    I did.

22   Q.    All right.

23         MS. PELLEGRINI:  For counsel and the witness only at

24   this point, your Honor, may we have 21-43.

25   Q.    Dr. Bath, in looking at this photograph, do you recognize

1    this?

2    A.    I do, yes.

3    Q.    And are you, in fact, in this photo?

4    A.    Yes.

5    Q.    And do you recall what you were wearing that day?

6    A.    I do.  I was wearing a red and gray windbreaker, jeans,

7    baseball hat -- Patriots hat, and a white shirt underneath.

8    Q.    And does this photo fairly and accurately show the scene

9    as you arrived?

02:39 10   A.    Yes.

11         MS. PELLEGRINI:  May I have 21-44 next for the witness

12   and counsel.

13   Q.    And, Dr. Bath, are you also in this photograph?

14   A.    I am.

15   Q.    And, again, is this shortly after the first photograph I

16   just showed you?

17   A.    Uh-huh.  Correct.

18   Q.    And does this fairly and accurately show your location as

19   you moved about the sidewalk area in front of the Forum on

02:40 20   Marathon Monday?

21   A.    Yes.

22         MS. PELLEGRINI:  Next may we have 21-47, please.

23   Q.    And finally, this photograph, are you also in this?

24   A.    Yes.

25   Q.    And, again, does this fairly and accurately depict your

```
 1   location as you moved from the front of the sidewalk going

 2   towards the Forum on that day?

 3   A.   It does.

 4        MS. PELLEGRINI:  Your Honor, I'd ask that these be

 5   admitted into evidence and published to the jury.

 6        THE COURT:  Okay.

 7        (Government Exhibit Nos. 21-43, 21-44 and 21-47

 8   received into evidence.)

 9        MS. PELLEGRINI:  May we start with, please, 21-43.

10   BY MS. PELLEGRINI:

11   Q.   Dr. Bath, by using the touchscreen, can you circle where

12   you are in this photograph?

13   A.   (Witness complies.)

14   Q.   So for the record, you've drawn partially a yellow circle

15   around a person wearing -- it looks like a windbreaker and a

16   baseball hat.  Is that correct?

17   A.   Correct.

18   Q.   All right.  And tell us what's happening here.

19   A.   So this was right after I arrived on the scene.  So I'd

20   gone on to -- gone around to the far end, and that's when

21   I -- en route I had noticed, you know, that the -- Lingzi Lu

22   had been lying against the fence, so I could see her from the

23   street.  And I was just trying to get around to a point where I

24   could help.  There was nobody at that point sitting, you know,

25   sitting around waist height on her on that right side.
```

 1   Q.   All right.  So she's not visible in this particular

 2   photograph.  Is that correct?

 3   A.   She's not.

 4   Q.   All right.  But can you tell us where her approximate

 5   location is?  You could make an arrow, you can draw it on a

 6   circle.

 7   A.   Sure.  Her head is right here, and then she's extended out

 8   this way.

 9   Q.   And did you notice anybody else at that point or were you

02:41 10   just simply focused on Lingzi?

11   A.   I did.  To the degree that I knew there were people around

12   her, and there was a gentleman who was also sitting next to me

13   who, you know, was a baldish, stocky fellow.  But I can't

14   recognize him because I think he's kneeled down in this.

15          MS. PELLEGRINI:  Could we have the next one,

16   Mr. Bruemmer, 21-44, please.

17   Q.   And, Dr. Bath, also with this photograph, can you circle

18   your location?

19   A.   (Witness complies.)

02:42 20   Q.   So now you've come around and you're facing the opposite

21   direction.  Is that correct?

22   A.   Correct.

23   Q.   What's happening here?

24   A.   So I'm looking down on her right now, and it's just about

25   before I kneel down, and just knowing that at this point, you

 1    know, she is unconscious but breathing, and just starting to

 2    get ready to do an assessment.

 3    Q.    What was the -- how would you describe her breathing at

 4    this point?

 5    A.    At this point it was shallow and she was writhing a bit,

 6    so her breathing was tending to come in -- more gaspy as she

 7    was writhing.  She had also been vomiting at one point, and so

 8    there was some vomitus around her, but it wasn't -- it hadn't

 9    gotten to the point where it was agonal breathing at this

02:42 10    point.

11            MS. PELLEGRINI:  And may we have the next one, 21-47,

12    please.

13    Q.    So, Dr. Bath, can you circle yourself here?

14    A.    (Witness complies.)

15    Q.    And for the record, you've drawn a circle around the

16    gentleman with the reddish jacket and the baseball cap and

17    heading in towards the Forum.  Is that correct?

18    A.    Correct.

19    Q.    So what is happening here, for the jury?

02:43 20    A.    So at this point I didn't feel like I could be any more

21    help to Lingzi Lu, and I'd climbed over the fence that

22    separates the patio from the sidewalk.  And at that point I had

23    heard someone say there's people inside, so I was heading into

24    the front.

25    Q.    Dr. Bath, how long -- again, I'm sorry if I asked this

```
 1   already, but how long did you remain on-scene before you left?
 2   A.   For what I believe was about 30 to 45 minutes.
 3           MS. PELLEGRINI:  Thank you.  I have no further
 4   questions.
 5           MS. CLARKE:  Thank you.  No questions.
 6           THE COURT:  No questions?
 7           All right, Doctor.  Thank you.  You may step down.
 8           (The witness is excused.)
 9           MR. WEINREB:  The government calls Anthony Imel.
02:44 10         Your Honor, while he's coming in, I'd ask Mr. Bruemmer
11   to bring up, just for the parties and the Court, Exhibit 1169.
12           THE COURT:  I'm sorry?
13           MR. WEINREB:  Exhibit 1169.  And there are two
14   attachments to it, which I'll bring up in a moment.  And then
15   in light of 1169, I will offer the two attachments.  So if we
16   could bring up 1170, and that's a multi-paged exhibit, so if we
17   could just go through the pages one by one, and then 1172,
18   please.
19           MS. CONRAD:  May I confer with Mr. Weinreb for a
02:45 20   moment, please?
21           (Counsel confer off the record.)
22           MR. WEINREB:  Your Honor, the government offers 1170
23   and 1172.
24           THE COURT:  Any objection?
25           MS. CONRAD:  May I have a moment, please, your Honor?
```

1          (Counsel confer off the record.)

2          MS. CONRAD:  We're still trying to determine, your

3     Honor, where 1172 came from.  The government has made a

4     representation that we have not as of yet confirmed, but I

5     don't have a problem with it coming into evidence.

6          THE COURT:  Can the witness answer that question?

7          MR. WEINREB:  No.

8          THE COURT:  Could I see 1170 --

9          MS. CONRAD:  My understanding is 1172 is not part of

02:47 10    1170.  That's the issue.

11          THE COURT:  Can I have it larger so I can...

12          Okay.  And the next page?  How about the certificate

13    page?

14          MR. WEINREB:  That would be 1169.

15          THE COURT:  Do I understand that 1170 and 1172

16    accompanied the certificate?  Both of them did?

17          MR. WEINREB:  I believe, your Honor, that 1170 and

18    1172 were obtained in a particular fashion, and then T-Mobile

19    was asked for -- to -- a certificate with respect to what they

02:49 20    had produced and they -- to certify that they were, in fact,

21    business records.  And this is what we received.

22          THE COURT:  The certificate applies to both?

23          MR. WEINREB:  Yes.

24          THE COURT:  That was really my question.

25          MR. WEINREB:  Yes, it does.

         1              THE COURT:  They may be admitted, then.

         2              (Government Exhibit Nos. 1170 and 1172 received into

         3     evidence.)

         4              THE COURT:  Okay.

         5              THE CLERK:  Sir, do you want to step up to the box,

         6     please.

         7                      ANTHONY IMEL, duly sworn.

         8              THE CLERK:  Have a seat.  State your name, spell your

         9     last name for the record, keep your voice up and speak into the

02:50   10     mic so everyone can hear you.

        11              THE WITNESS:  Anthony Imel, I-M-E-L.

        12                      DIRECT EXAMINATION

        13     BY MR. WEINREB:

        14     Q.   Good afternoon, Mr. Imel.

        15     A.   Good afternoon.

        16     Q.   Where do you work?

        17     A.   I work for the Federal Bureau of Investigations at the

        18     Forensic Audio, Video and Image Analysis Unit in Quantico,

        19     Virginia.

02:50   20     Q.   Okay.  I'll ask you in a minute what that meant, but how

        21     long have you been at the FBI?

        22     A.   Four and a half years, sir.

        23     Q.   And have you worked all that time in the Digital Evidence

        24     Laboratory?

        25     A.   I have.

```
 1   Q.   What does the Digital Evidence Laboratory do?

 2   A.   The Digital Evidence Laboratory is the forensic laboratory

 3   for the FBI that deals with digital evidence.  It can be cell

 4   phones, computers, and in my case, digital imagery.

 5   Q.   What does "forensic" mean?

 6   A.   Forensic is a type of science that we use for criminal

 7   investigations.

 8   Q.   So the lab examines digital evidence in connection with

 9   criminal investigations?

02:51 10   A.   Yes, sir.

11   Q.   Do you focus on a particular kind of digital evidence?

12   A.   My focus is on digital video and still imagery.

13   Q.   Where does that video and still imagery typically come

14   from, what types of devices?

15   A.   It comes from closed-circuit television systems, cell

16   phones, digital cameras, anything that actually records digital

17   images.

18   Q.   During the past four years during your work in the lab,

19   have you analyzed a lot of videos and photos?

02:51 20   A.   Yes, I have, sir.

21   Q.   When you analyzed them, what are you typically looking

22   for?

23   A.   It really depends on the case.  So for video, typically I

24   will just enhance the video to ensure that those individuals

25   who view it see it clear.  With images, I have the ability to
```

1    do facial comparisons, image comparisons, make model

2    comparisons, height determinations, things of those sorts.

3    Q.   And just in the general sense, though, when the lab is

4    investigating or looking at photos and videos in connection

5    with a criminal investigation, what are the kinds of things

6    you're looking for in the video?  What makes them useful?

7    A.   Basically you're looking for identifiable marks:  people's

8    faces, the types of crimes that are being committed, enabling

9    us to go back and find those individuals and show the purported

02:52  10   crime that has been recorded.

11   Q.   Have you had any specialized training related to your

12   work?

13   A.   Yes, sir.  I've gone through two years worth' of training

14   through the FBI.  I've gone through a multitude of tests,

15   reviews.  I have to be able to speak in front of court systems.

16   I've gone through several contracting courses outside of the

17   FBI through video forensics, through image analysis and

18   comparisons, facial comparisons.  I've gone through Photoshop

19   courses, Adobe Premier courses, an extensive training period

02:53  20   over my lifetime as a forensic examiner.

21   Q.   Are you trained in how to preserve the integrity of

22   digital evidence?

23   A.   That is one of the beginning courses that I take within

24   the FBI.

25   Q.   What does it mean to preserve the integrity of the

1    evidence?

2    A.    To ensure that there's no damage to the original evidence,

3    to be able to go back to the original evidence if there's a

4    question as to its authenticity.

5    Q.    Have you taught others how to analyze images and video?

6    A.    Yes, sir, quite a few.

7    Q.    Before working at the FBI lab, did you do the same type of

8    work elsewhere?

9    A.    Yes, sir.  I ran the video forensics laboratory for the

02:53 10   State Department for two years.

11   Q.    Were you assigned to the Boston Marathon bombing

12   investigation?

13   A.    I was, sir.  I was requested to come up onsite the day

14   after the explosion.

15   Q.    When did you arrive?

16   A.    It would be April 16th.  The night of April 16th.  I drove

17   up.

18   Q.    So when you say "the night of April 16th," are you

19   saying -- well, what time on April 16th?

02:53 20   A.    It was around midnight.  I actually drove a van from

21   Quantico.  They had me pack the van up.  I was on the road from

22   about two o'clock on.  2 p.m.

23   Q.    So when you arrived -- did you leave on April 15th?

24   A.    No, sir.  The next day.

25   Q.    Okay.  And when you arrived, what was your job?

1    A.   My job was essentially to go to Black Falcon, which is a

2    warehouse that the FBI acquired to process some of the

3    imagery -- or all of the imagery.  I was requested to go

4    onsite, set up viewing stations.  I set up -- I think it was

5    approximately ten viewing stations and several forensic

6    stations.  As the video was coming, or being received there at

7    the evidence collection unit, it was passed to me.  I was

8    basically set up to put them on the computers and allow

9    different analysts and examiners to review the video as it was

02:54 10   coming in and identify any subjects that were identified on the

11   video.

12   Q.   What's a view station?

13   A.   A viewing station was several Mac systems, Mac computers,

14   that I set up in the Black Falcon area.  And basically, a lot

15   of the video that was coming in was proprietary video.  I had

16   to install those proprietary videos on the systems so we could

17   view the video as it was recorded.

18   Q.   Say more about that.  What do you mean by proprietary

19   system?

02:55 20   A.   Each digital video recorder has its own proprietary system

21   inherent into that system.  When you export that video, many of

22   the players, instead of having like a normal Windows operating

23   player like an MOV or WMV, it's actually in its proprietary

24   format.  It's just a recording system that the manufacturer

25   makes to allow you to view what has been recorded on that DVR.

1    Q.    Okay.  So basically for different types of surveillance

2    systems, for example, you might need different types of

3    software to play the video?

4    A.    Yes, sir.

5    Q.    What -- you said before you set up ten viewing stations

6    and two forensic stations?

7    A.    Approximately.

8    Q.    What's a forensic station?

9    A.    So the forensic station was there for my use.  When a

02:56 10   subject was identified on the video, that proprietary video was

11   then reestablished onto my forensic viewing station.  I

12   processed the video, basically took it out of its proprietary

13   format into an open format, took stills -- still images of that

14   video, produced prints, put that video on a DVD or a CD, and

15   then sent it up to our headquarters that we had there in

16   Boston.

17   Q.    What's an open format?

18   A.    An open format is simply a video format that any open

19   player can actually use.  So, again, your media -- Windows

02:56 20   media player, is an open format player.

21   Q.    How many others were working with you doing this?

22   A.    There was one other forensic examiner that last -- that

23   was there onsite for about four days, and then just myself as

24   far as a video examiner.  There were a multitude of different

25   analysts that came in from several agencies.  We were working

1    24 hours a day, seven days a week until the subject was found.

2    Q.   How were the video images getting to Black Falcon?

3    A.   Different officers and agents were collecting them

4    throughout the city and then bringing them over to Black

5    Falcon.  And that's where they were processed in and signed in

6    as evidence.

7    Q.   And what was that intake procedure like for the evidence?

8    A.   The first place they could go as soon as they walked in

9    the door was the evidence collection unit.  Any media that they

02:57 10   had or -- excuse me -- forensic media that they had, they would

11   actually sign it in, and we would start a chain of custody

12   right then and there, and then it was logged in to the FBI

13   evidence logs.

14   Q.   And what kind of information was kept track of in

15   connection with each of these things?

16   A.   The individual who collected the information, the

17   individual actually signed in the information, where it was

18   collected, what type of video we were expecting to see, whether

19   it was images, video.  And again, there was over 655 different

02:57 20   types of submissions so -- brought in from all over the city.

21   So it was numerous different types of information.

22   Q.   All right.  So among the information, did it include where

23   the video images came from?

24   A.   Yes.  Yes, there was a standard sheet that they filled out

25   requesting that information, as much as they could provide.

1    Q.    And were these items assigned some kind of number to track

2    them?

3    A.    Yes.  As it came in, it was assigned a D number, or

4    digital number, 1 through a continuous number until we shut

5    down the operating area sometime in mid-May.

6    Q.    And after items came in and were processed in this

7    fashion, what's the next thing that happened to them?

8    A.    Usually those pieces of evidence were logged in.  Once

9    they were logged in, they came over to my station.  I either

02:58 10   uploaded them or ensured that the individual who checked it out

11   uploaded it onto the system, made sure that those viewing

12   systems were operational, and that that individual could

13   actually view the video clearly without any problems, after

14   which they were sent back into evidence.

15        The viewing system continued on, and then at some point

16   the computer folks would come in and actually upload those

17   systems to a larger hard drive, which we could draw multiple

18   videos at any point in time without actually having to get

19   ahold of the original evidence.

02:59 20   Q.    How long were you at Black Falcon doing this?

21   A.    I was there for approximately one month.

22   Q.    What were your hours like during those days?

23   A.    My hours usually started out about between 6 and 7 a.m.,

24   and I usually got out of there about midnight.

25   Q.    Did you follow the evidence-handling procedures that

1    you've described throughout?

2    A.   I did, sir.  There were three or four young ladies that

3    were very adamant in the evidence collection system that I did

4    not touch it without a signature.

5    Q.   And so to the best of your knowledge, did everybody else

6    working there that you could observe follow the same

7    evidence-handling procedures?

8    A.   Yes, sir.

9    Q.   How many videos and images were analyzed at Black Falcon?

03:00 10   A.   By my count, I took in 655 submissions.

11   Q.   And how many actual distinct images and videos were in

12   those submissions?

13   A.   Are you asking about as far as which ones contained the

14   subject?

15   Q.   No, just total.

16   A.   Total?  Well, so one submission could include a single

17   image.  I found one submission that included up to 22,000

18   images.  Over the course of three to four months, I actually

19   reviewed every one that was submitted through Black Falcon.

03:00 20   Q.   Every single video and digital image you personally

21   reviewed?

22   A.   Yes, sir.  Yes, sir.

23   Q.   In the course of reviewing these videos and images, did

24   the FBI identify suspects in the marathon bombings?

25   A.   They did.

1    Q.    Now, when they were initially identified, did the FBI know

2    who the people pictured were?

3    A.    No, sir, they did not.

4    Q.    How were they referred to at that time?

5    A.    At that point we referred to them as "white hat" and

6    "black hat."

7    Q.    And is that because of the colors of the hats each one was

8    wearing?

9    A.    Yes, sir.

03:01 10    Q.    Did you, in fact, find images of these two suspects in

11    more than one video and photo?

12    A.    Yes, sir, quite a few.

13    Q.    What did you do when you found videos or photos of the

14    suspects?

15    A.    So during the review process at Black Falcon, if myself or

16    one of the examiners actually viewed one of the subjects,

17    again, that system or that video would be processed over to my

18    forensic system.  Individual images were taken of those

19    subjects, an open format video was extracted from the

03:01 20    proprietary format, if it was in the proprietary format, and

21    then we sent it up -- sent it up to Boston to the command post

22    for their knowledge base.

23          While I was back at Quantico, during the review process

24    if, again, I did find or identify one of the images that was

25    not previously identified, again, I would process it and alert

1    the folks at -- in Boston.

2    Q.   And when these videos and images were copied from the

3    original devices they came in on onto the system and the hard

4    drive, did you do that copying?

5    A.   Can you state that again, sir?

6    Q.   Sure.  When these images and videos came in, were copied

7    from the -- extracted from the devices that they originally

8    came in to Black Falcon on, and were copied or uploaded onto

9    the system or copied onto a hard drive, did you do that

03:02 10   personally?

11   A.   No, sir.  The computer forensics folks there were hashing

12   the systems, one for one.  So we kept two folders:  One which

13   was a complete hash, or an identical copy of the originals, and

14   one working copy that we processed our images from.  Myself,

15   during the process there at Black Falcon, there were many times

16   that identified problems with the upload over onto the open

17   format, which I actually fixed by pulling the original evidence

18   back out.

19   Q.   Okay.  And were you overseeing this whole process?

03:03 20   A.   Yes, sir.

21   Q.   So the copies that were made of the images and videos from

22   the original devices they came in on to where everybody could

23   view them, was that done to preserve the images in a fair and

24   accurate manner?

25   A.   Yes, sir.  That's one of the processes that the FBI has

1   set up to ensure that we're not always working with the

2   originals, that we are working with a forensic clone of the

3   digital imagery.

4   Q.   A clone meaning an exact copy?

5   A.   Yes, sir.

6   Q.   Is it possible to tell from the videos and the images that

7   you received there exactly what time they were taken?

8   A.   They're approximate.  On many of the videos and images

9   there are date timestamps that are associated with those videos

03:03 10   or images.  That is limited to whoever records that video and

11   what time that they put in on that individual system or the

12   camera itself.

13   Q.   When you have video and images that are overlapping or

14   depict some of the same things, is it possible to use that

15   information to reconcile the times and come up with a more

16   accurate account of the timeline of the events?

17   A.   So if there's an action within the video that you can see

18   or visualize and you can actually account that to a specific

19   time period that is recorded with a true and accurate clock,

03:04 20   there is ways to back that up and find out exactly when that

21   picture image is taken.  In this case, a lot of the runners had

22   numbers across them, and as they crossed the finish line, you

23   could actually adjust the time for those individuals.

24   Q.   And did you do that?

25   A.   Me personally?  No, sir.

1   Q.   But was that done, to your knowledge?

2   A.   I believe that there were some instances where those

3   runners' times were recorded.

4   Q.   Similarly, is it possible to tell from a photo as opposed

5   to a video what time the photo was taken?

6   A.   So again, depending on the camera and the individual using

7   the camera, there are instances where the individual has the

8   time stamped directly on the image itself.  There are also ways

9   to go in and retrieve what they call metadata, which is

03:05 10   information that is contained within that image to extract when

11   that image was taken.  Again, this is approximate and it is

12   limited to that individual on who sets up the time within the

13   camera.

14   Q.   When you viewed videos and images of let's say the events

15   on Boylston Street, were you able to tell exactly where the

16   places were that were pictured in the images and the videos?

17   A.   Yes, sir.  On several occasions I actually went down to

18   Boylston Street.  I also used Google Maps extensively so I

19   could get down into the street view of Google Maps while I was

03:05 20   in Virginia so I could identify where those streets are, where

21   those businesses were within the videos.

22   Q.   Did there come a time where you put together a compilation

23   of videos and photographs that traces the paths of the two

24   suspects who were known then as "white hat" and "black hat" as

25   they walked down Boylston Street and then later leave Boylston

1    Street?

2    A.    Yes, sir, I've put several compilations, video

3    compilations, together from the time the subject was arrested

4    up until I think December of last year.  Yes, I have done

5    several timelines.

6    Q.    And the one -- is there one in particular that you

7    reviewed with me the other day?

8    A.    Yes, there is, sir.

9    Q.    The video and photos that were used to create that, are

03:06 10   they fair and accurate copies of the actual video and photo

11   evidence that was seized from surveillance cameras on Boylston

12   Street and cameras and other things?

13   A.    Yes, sir.  I've actually gone back to the original

14   evidence and ensured that the integrity of those images are

15   true and accurate to the original formats.

16   Q.    And are they, to the best of your ability to determine, in

17   chronological order on that tape?

18   A.    Approximately with the limitation of the time and those

19   people that actually set the times, but yes, sir.

03:07 20   Q.    Now, in the video compilation that you created, are there

21   captions added showing where the videos were taken from?

22   A.    Yes, sir, there are.

23   Q.    And did you put those there?

24   A.    They are, yes, sir.

25   Q.    And are those a fair and accurate account of where the

1    videos and pictures were -- what's pictured in them, where they

2    are?

3    A.   They're just title screens before each video to show you

4    where that recording was taken and the approximate time, if I

5    had that available to me.

6    Q.   What steps have you taken to make sure that those captions

7    are accurate?

8    A.   I re-reviewed them multiple times.  I have been able to

9    look at those videos.  And the video timeline itself is limited

03:08 10   as far as how many videos that we had produced.  There's

11   multiple cameras showing the same angles.  I've produced the

12   best possible pictures in this timeline, but outside of this

13   one that you will see here later on, there are other videos and

14   images connected to this timeline that verify, in different

15   angles and different individuals that recorded, that accurately

16   depict the same actions.

17   Q.   Okay.  And did you actually walk Boylston Street to see

18   where the surveillance cameras are on the buildings and where

19   they're pointed at and make sure that the -- what you're seeing

03:08 20   in the video seems to line up with where the cameras are?

21   A.   I have.

22   Q.   You said you looked at other videos and pictures that

23   aren't in this timeline.  Approximately how many images and

24   videos did you examine that include the two -- one or both of

25   the suspects?

A.    With the media that was sent down to Black Falcon that I

processed the 655 submissions, there were over 70 different

submissions with images depicting the subjects.

Q.    And some of those were duplicates?

A.    Yes, sir.

Q.    But some of the submissions had more than one image?

A.    Yes, sir.

Q.    Okay.  Those particular images and videos, how many times

have you analyzed each one?

03:09  A.    Unfortunately, I'd have to say that I've seen each one of

these videos hundreds of times.  I've seen the explosions well

over 500 times.  It's been an interesting case for me.

          MR. WEINREB:  Bring up Exhibit 22 just for the

witness.

          Your Honor, we're going to bring up Exhibit 22 just

for the witness and the Court.

Q.    Do you recognize this as the first slide of the

compilation that you put together?

A.    Yes, sir.

03:10          MR. WEINREB:  Your Honor, the government offers

Exhibit 22.

          MS. CONRAD:  Your Honor, we have no objection to this

as a chalk, but to the extent there are these cards -- title

cards inserted, we do think those should only be -- come in as

a chalk.  The videos themselves, the pictures themselves, we

1    have no objections to.

2           MR. WEINREB:  Your Honor, photos and videos themselves

3    frequently have this --

4           MS. CONRAD:  Your Honor, I would object to this

5    argument being heard in open court.

6           THE COURT:  That's all right.  The objection is

7    overruled.  I actually think it may be admitted.  It may be

8    admitted on the existing foundation, but I think it may also

9    qualify as a 1,006.  So it may be admitted.

03:10 10          (Government Exhibit No. 22 received into evidence.)

11   BY MR. WEINREB:

12   Q.   Now, based on the information --

13          THE COURT:  Do you want it exposed at this point or --

14          MR. WEINREB:  No, not yet, your Honor.  Thank you.

15   BY MR. WEINREB:

16   Q.   Based on the information that you developed from analyzing

17   all of these photographs and videos and everything else that

18   you've said, have you been able to determine what paths the two

19   suspects took walking down Boylston Street and then retreating

03:11 20   from Boylston Street?

21   A.   Yes, I have.

22          MR. WEINREB:  And if we could just bring up for the

23   witness and the Court Exhibit 623.

24   Q.   Just keep your eyes on the exhibit for a minute.

25          (Video played.)

1    Q.   Okay.  What you've just seen, is that a fair, accurate

2    account of the paths that were taken by the two suspects

3    walking down Boylston Street?

4    A.   It is.

5           MS. CONRAD:  Objection.

6           THE COURT:  Overruled.

7           MS. CONRAD:  Well, with respect -- well, when we get

8    to this coming in, we again maintain this is a chalk.

9           THE COURT:  It might be.

03:12 10   BY MR. WEINREB:

11   Q.   Now, please keep your eye on it again.

12          (Video played.)

13   Q.   Okay.  And does that accurately and fairly represent the

14   exit paths?

15   A.   It is, sir.

16   Q.   And now this diagram of Boylston Street, based on your

17   acquaintance with that area, that you described having walked

18   it and checked surveillance cameras and so on and so forth, is

19   this a fair and accurate depiction of the section of Boylston

03:13 20   Street that's pictured here?

21   A.   It is, sir.

22          MR. WEINREB:  Your Honor, the government offers

23   Exhibit 623.

24          MS. CONRAD:  Again, we submit it's a chalk --

25          THE COURT:  Yeah, I'll reserve on it.  It can be used

1    as a chalk, at least, but I'll reserve on it.

2         MR. WEINREB:  Can we bring up 620, please.

3    BY MR. WEINREB:

4    Q.   Mr. Imel, do you recognize this?

5    A.   I do, sir.

6    Q.   Okay.  Is this the same diagram of Boylston Street we were

7    just looking at?

8    A.   It is.

9    Q.   There are dots on the diagram.  What does each one of

03:14 10   those represent?

11   A.   Each one of those dots represents a security camera that

12   was recording at the time of the explosion, sir, during the

13   marathon.

14   Q.   And do those fairly and accurately represent the locations

15   of the cameras?

16   A.   They do, sir.

17   Q.   All right.  And I'm going to click on one of the dots

18   right now.  And a frame has popped up.  What is that?

19   A.   So this is the security camera that recorded from the

03:14 20   Whiskey's bar and grill.  This is the initial point where the

21   subjects enter Boylston Street rounding this corner.

22   Q.   Okay.  And if I click on the "play" button in that little

23   box -- first I can enlarge it here.  And if I click on the

24   "play" button, what are we seeing here?

25   A.   It is a time-lapsed video, basically a recording that was

1    recorded at the Whiskey's bar of the -- what was going on at

2    that time period during the marathon.

3    Q.   And then when I click on one of the dots representing the

4    cameras, if you look at the dot, there's a blue sort of

5    fan-shaped image connected to the dot.  What does that

6    represent?

7    A.   So that would be the field of view of the camera.  So

8    every camera has a point at which it records from the far left

9    and the far right.  So it's just a view of the camera.

03:15 10   Q.   And does the directional -- the direction of the cameras,

11   as reflected in those blue images, is that a fair and accurate

12   representation of the direction of the cameras at the time the

13   videos were taken?

14   A.   It is, sir.

15   Q.   And are the videos themselves fair and accurate copies of

16   the videos that were taken by those cameras that you analyzed?

17   A.   They are.

18            MR. WEINREB:  I'm going to offer Exhibit 620.

19            MS. CONRAD:  Wait.  I'm sorry.  Same objection.  It's

03:16 20   a chalk.

21            THE COURT:  All right.  Same ruling for the time

22   being.

23            MR. WEINREB:  Very well.

24            Can we have 623?

25   BY MR. WEINREB:

```
 1   Q.   So 623 again, please --
 2            THE CLERK:  I just have to check the mics here.
 3            THE COURT:  All right.
 4            MR. WEINREB:  Your Honor, may we have 623 for the
 5   jury?  That's what's up there right now.
 6   BY MR. WEINREB:
 7   Q.   Mr. Imel, is this the diagram you referred to earlier that
 8   shows the paths of the two suspects as they walked down
 9   Boylston Street?
10   A.   It is, sir.
11   Q.   All right.  And yellow was the path of the suspect who
12   later was identified as Jahar Tsarnaev?
13   A.   It is.
14   Q.   And orange, the path of the suspect later identified as
15   Tamerlan Tsarnaev?
16   A.   Yes, sir.
17   Q.   And then clicking on this arrow that I've highlighted
18   right here, does that show their combined paths?
19   A.   Yes, sir.
20   Q.   At this point I'm going to play...
21            (Video played.)
22   Q.   So just for the record, this shows the two suspects
23   rounding the corner of Gloucester and Boylston, onto Boylston
24   Street, and then walking eastbound towards the marathon finish
25   line?
```

1    A.   It does, sir.

2    Q.   And can you -- using the pad of your finger, can you

3    circle the finish line?

4    A.   I believe the finish line is right there (indicating).

5    Q.   And using the pad of your finger, can you circle the Forum

6    restaurant?

7    A.   (Witness complies.)

8    Q.   Now, by clicking on the arrow again, I'll show the paths

9    taken by the suspects as they left the location.  So again for

03:19 10   the record, this shows the suspect identified as Tamerlan

11   Tsarnaev walking back along the original direction on Boylston

12   Street, rounding the corner on to Exeter?

13   A.   Yes, sir.

14   Q.   And then going north, correct?

15   A.   Yes, sir.

16   Q.   All right.  And there's a building pictured on the map

17   where the last dot shows him.  What building is that?

18   A.   That's the Montessori school.

19   Q.   And was surveillance video taken at the Montessori school?

03:19 20   A.   There were two video cameras at that location, yes, sir.

21   Q.   And then the animation shows the suspect identified as

22   Jahar Tsarnaev going back the same way he came and rounding the

23   corner onto Fairfield Street.  Is that correct?

24   A.   Yes, sir.

25   Q.   And it stops.  Why does it stop there?  Is that --

1    A.   There were no other video cameras or images recorded past

2    that point.

3              MR. WEINREB:   Let's have 620, please.

4    Q.   So this is the exhibit that has been identified as 620.

5    I'm clicking on camera locations.   And are these the pink dots

6    that we were discussing earlier?

7    A.   Yes, sir.

8    Q.   And I'll just click on one here.   And for the record, I'm

9    clicking on one that is -- moving from the left of the image to

03:21 10   the right, the second building.   There's a bunch of dots

11   representing cameras and then a break, and then we see some

12   more.   And I'm clicking on the first of the others.

13             And what is that?

14   A.   That would be an internal camera to the Bank of America.

15   Q.   And clicking on the right-hand corner of it, I'm enlarging

16   it.   And then clicking on this "play" button at the bottom, do

17   you see what that camera captured?

18   A.   Yes, sir.

19             (Video played.)

03:21 20            MR. WEINREB:   May we now have Exhibit 22, please.

21   Q.   Now, is this the timeline video that you created?

22   A.   It is, sir.

23   Q.   So I'm playing it now.

24             (Video played.)

25   Q.   What are we looking at here?

1    A.   This is the corner of Boylston and Gloucester, the Whiskey

2    bar.  Throughout this, to show where exactly this is, I took

3    Google Maps' images to identify this location just because it's

4    easier to follow the videos themselves.

5    Q.   So this is a photo you took just to illustrate what the

6    corner looks like?

7    A.   It's one that I took off of the Internet from Google Maps,

8    yes, sir.

9         (Video played.)

03:23 10  Q.   What are we seeing here?

11   A.   You're seeing the two subjects approach the corner of

12   Gloucester and Boylston.

13   Q.   And have those circles been drawn around them to make it

14   easier to keep track of where they are in the frame?

15   A.   Yes, sir.  It's easier to identify subjects in a crowd if

16   you highlight them or circle them.

17   Q.   Now, as we move forward during just this little section

18   here, what are we going to see happen?

19   A.   You're going to see this camera fade over to then come

03:23 20  across the corner and then enter Boylston Street.

21   Q.   And then do you then just switch from one camera on

22   Whiskey's to another as they round the corner and begin walking

23   away?

24   A.   Yes, sir, as they round the corner and continue up

25   Boylston.

1                (Video played.)

2    Q.   Okay.  Now, focusing on the individual in the white hat,

3    is he carrying a bag over his shoulder?

4    A.   Yes, sir.  It appears to be a backpack.

5    Q.   So this image, we see Whiskey's here on the left.  Where

6    is the Back Bay Social Club in relation to Whiskey's?

7    A.   The Back Bay Social Club is right next to Whiskey's.  It's

8    the building right -- yes, sir, right there, with "867" printed

9    on the outside.

03:25  10                (Video played.)

11   Q.   So now these -- I'm going to just point here.  These

12   captions here, "Back Bay Social Club," is that the same Back

13   Bay Social Club that we were just seeing in the video?

14   A.   Yes, sir.  I just put these in just to allow you to see

15   where they progress through the video walking up Boylston

16   Street just to identify that location.

17   Q.   All right.  And where is the Bank of America that was just

18   referenced in the caption?

19   A.   Just to the right of the Back Bay Social Club.

03:26  20                (Video played.)

21   Q.   And the Walgreens, where is that in relation to the Bank

22   of America?

23   A.   It's just to the right side of Bank of America.  It's the

24   next door over.

25                (Video played.)

1   Q.   Which suspect is that crossing in front of the monitor?

2   A.   This would be Tamerlan, the older brother.

3        (Video played.)

4   Q.   The caption said "Crate and Barrel."  And for the record,

5   the Crate and Barrel is pictured in the screen we're looking at

6   now, just to the left of center?

7   A.   Yes, sir.

8   Q.   And where is the Forum restaurant in comparison to that?

9   A.   So you have the Crate and Barrel, you'll have the Atlantic

03:28 10   Fish Company, and the Forum is on the right side of that.

11   Q.   These are images taken of the suspect pictured in front of

12   the Crate and Barrel?

13   A.   It is.

14        (Video played.)

15   Q.   Now, I want to stop this for a moment.  Is the backpack

16   still on this person's shoulder?

17   A.   It appears to be, sir, yes.

18   Q.   In all of the videos and images that you saw of him

19   leading up to this point, does he have the backpack on his

03:29 20   shoulder?

21   A.   Yes, sir.

22        (Video played.)

23   Q.   After that momentary dip to the right and then back up, do

24   we ever see the backpack on his back again?

25   A.   Not on his back, no, sir.

1    Q.   Where do you see it in future pictures?

2    A.   There is an image with the backpack at his feet.

3         (Video played.)

4    Q.   Do you see the backpack in that photo?

5    A.   Yes, sir, down at his feet through the crowd.

6    Q.   Can you circle it, please?

7    A.   (Witness complies.)

8         (Video played.)

9    Q.   Now, throughout the video that you said you've watched

03:33 10   hundreds of times, are there people moving behind the

11   defendant -- I'm sorry -- behind the person pictured in the

12   video?

13   A.   Yes, sir.

14   Q.   But the people in front of him are stationary?

15   A.   Pretty much.  They move around left to right, but they

16   don't seem to exit the area.

17   Q.   And is that true of the children standing on the railing

18   facing the street?

19   A.   Yes, sir.

03:33 20        (Video played.)

21   Q.   What just happened with the subject there?

22   A.   It appears that he made a phone call.

23   Q.   Okay.  I'm going to pause the video here for a minute and

24   then ask Mr. Bruemmer to bring up Exhibit 1170.

25        MR. WEINBERG:  If we could have the second page of it,

1    please.

2    Q.   Now, does this -- if you could just tell us, who is

3    the -- looking to billing account name, the third line down,

4    who is this phone billed to?

5    A.   Tamerlan Tsarnaev.

6    Q.   And looking further down to where it says "mobile number

7    name," who is the person using the phone?

8    A.   Again, it's Tamerlan Tsarnaev.

9    Q.   And the telephone number of the phone, what are the last

03:36 10   four numbers of it?

11   A.   4634.

12        MR. WEINREB:   And if we could have the next page,

13   please.

14   Q.   Now, who is the -- looking at the third line down, who is

15   this phone billed to?

16   A.   Jahar, I believe it's Tsarni.   I'm not sure really how to

17   say that name.

18   Q.   And then looking down to the mobile number name, is it the

19   same?

03:36 20   A.   It is.

21   Q.   And what -- looking at the "date account established,"

22   when was that phone account established?

23   A.   That would be April 14, 2013, the day before the

24   marathon -- two days before the marathon -- one day before the

25   marathon, yes.

1    Q.   Just one day before the marathon?

2    A.   Yes, sir.

3    Q.   What are the last four numbers of the phone?

4    A.   9151.

5         MR. WEINREB:  And if we could have Exhibit 1172,

6    please.

7    Q.   If I could direct your attention to this call right here

8    that I'm underlining, what does it indicate about the phone

9    that made that call?

03:37 10  A.   It indicates an outgoing call at 2:49:06

11   from number -- excuse me -- connected to 4634, would be the

12   last four.

13   Q.   And so it was originated by the 9151?

14   A.   9151.  So Jahar actually called Tsarnaev [*sic*].

15   Q.   And it's a voice call?

16   A.   Yes.

17   Q.   And it lasts for 19 seconds?

18   A.   Yes, sir.

19        MR. WEINREB:  If we could go back to Exhibit 22,

03:38 20  please.  And now continue playing the video.

21        (Video played.)

22   Q.   Now, what did you just see the crowd do in that video?

23   A.   They were alerted to the first explosion, so everybody was

24   turning left towards that explosion.

25   Q.   Now I'll ask you to keep your eyes on the individual in

1    the white hat.

2           (Video played.)

3    Q.   Can you tell us what the individual is doing at this

4    point?

5    A.   He's looking back to where he was standing prior to.

6           (Video played.)

7           MR. WEINREB:  Your Honor, if we could have the ELMO

8    just for the witness for a moment.

9    Q.   Okay.  Showing you Exhibit 15-11, do you recognize that?

03:40 10   A.   I do.

11   Q.   Is that one of the images you analyzed in connection with

12   making this video?

13   A.   It is, sir.

14   Q.   And what does it depict?

15   A.   This depicts the second explosion at the Boston Marathon.

16          MR. WEINREB:  The government offers Exhibit 15-11.

17          MS. CONRAD:  Objection to the caption, your Honor.

18          THE COURT:  I think it's all right.  It will be

19   admitted.

03:41 20          (Government Exhibit No. 15-11 received into evidence.)

21          MR. WEINREB:  And if we could publish it to the jury,

22   please.

23          Your Honor, if we could return to the...

24          (Video played.)

25   BY MR. WEINREB:

1    Q.   Now, is this the building you referenced earlier when you

2    were describing the exit path of Tamerlan Tsarnaev?

3    A.   It is.  This is the Montessori school.

4         (Video played.)

5    Q.   And is this the corner you referenced earlier when you

6    were discussing the exit path of the suspect identified as

7    Jahar Tsarnaev?

8    A.   It is.

9         (Video played.)

03:43 10        MR. WEINREB:  I have no further questions.

11        MS. CONRAD:  I do have some cross, your Honor.  I

12    don't know if you want me to start now or after lunch.

13        THE COURT:  How long -- well, so you won't feel

14    pressured, we'll do it after lunch.

15        MS. CONRAD:  Thank you.

16        THE COURT:  We'll take the lunch recess, ladies and

17    gentlemen.

18        THE CLERK:  All rise for the Court and the jury.  The

19    Court will take the lunch recess.

03:43 20        (The Court and jury exit the courtroom and there is a

21    recess in the proceedings at 1:04 p.m.)

22    (The Court and jury entered the courtroom at 2:09 p.m.)

23    CROSS-EXAMINATION BY MS. CONRAD:

24    Q.   Good afternoon, Mr. Imel.  My name is Miriam Conrad.  I'm

25    one of Mr. Tsarnaev's lawyers.

A.   Yes, ma'am.

Q.   You said you put together several of these composites or
more than one composite?

A.   Over the last two years, yes, ma'am.

Q.   And how many did you put together?

A.   I would say, round-about figure, probably about 20 of
them.

Q.   The one that we're seeing today is the last one you put
together?

A.   Yes, ma'am.

Q.   You told us that the times that appear on the cards that
are interspersed with the different scenes that we see are not
a hundred percent accurate, correct?

A.   No, ma'am.  It really depends on who set up the actual
times on those video cameras or the cameras themselves.  It was
just an approximate as the information that I had for me at
that time.

Q.   And just to make sure I understand, you took a lot of
different images from a lot of different cameras, right?

A.   Yes, ma'am.

Q.   And some of those cameras had timestamps on them, right?

A.   They did, yes.

Q.   Like the Forum video has a timestamp?

A.   Yes, ma'am.

Q.   You don't know if that timestamp, for example, on the

1    Forum video is accurate?

2    A.    No, ma'am.

3    Q.    And with respect to some of the still photos, you said

4    that you took metadata from the camera images that you found,

5    correct?

6    A.    I did, yes.

7    Q.    And metadata is basically internal information from that

8    camera that tells you a little bit about the creation of that

9    image, right?

04:50 10    A.    Yes.   The definition of metadata is basically data about

11    data.

12    Q.    And, again, that depends on each individual camera that

13    was used to take those pictures, right?

14    A.    Yes.   The information placed on there is usually defined

15    by the user and the manufacturer of the camera.

16    Q.    And so each of these different sources may have different

17    times even if they were taken at the same time?

18    A.    Yes, ma'am.

19    Q.    And when you put these together, you just put times on the

04:50 20    cards that we see in between the scenes that you thought best

21    represented the sequence of events, correct?

22    A.    That was given to me from that imagery at that time, yes.

23    It is all approximate, yes.

24    Q.    I'm sorry.   When you say given to you from that image --

25    A.    Derived from the evidence that I received.

```
 1    Q.    Okay.  If we can just take a look at Exhibit 22 for a
 2    moment, and I'm just going to --
 3          MS. CONRAD:  If I could just have my laptop hooked up
 4    to the display, if I can get it plugged in, which I hope I can.
 5    Q.    So where we see here, this is in front of Whiskey's, is
 6    that right, or Back Bay Social Club?
 7    A.    That would be the Back Bay Social Club, yes.
 8    Q.    The times that we see on the lower left hand, where did
 9    that time come from?
04:51 10    A.    That would be derived from the metadata.
11    Q.    You wrote that down somewhere?
12    A.    That would be -- yeah.  That would be from the metadata
13    itself.  If you go onto the imagery, a right click and do
14    properties, you can receive the metadata from there.
15    Q.    My question is:  Did you keep a record somewhere of that
16    metadata as you compiled this?
17    A.    I can go back to the original imagery and extract it any
18    time I need.
19    Q.    Can you just tell me whether you wrote it down?
04:52 20    A.    No, ma'am.  Other than on the imagery, no.
21    Q.    If we go forward from here just to the Bank of America
22    image, now, Bank of America, as someone's heading east on
23    Boylston Street, is after Back Bay Social Club, right?
24    A.    Can you state that again, please?
25    Q.    Sure.  As someone walks east on Boylston Street, they
```

1    would get to Bank of America after Back Bay Social Club, right?

2    A.    Yes, if you go towards the finish line.

3    Q.    Right, okay.  So this is -- you see both locations in this

4    image, correct?

5    A.    Yes.

6    Q.    Just for the record, that's at 1:44 on the timeline.

7    A.    Okay.

8    Q.    And on this, the time and date that appears sort of in the

9    lower portion of that image, indicates 2:28:53 p.m., right?

04:53 10   A.    2:28, yes, ma'am.

11    Q.    And so that's the time that was recorded by that camera,

12    right?

13    A.    If it was on there, yes.  Again, that is outside of what I

14    would apply on there, yes.

15    Q.    I'm sorry.  Can you just explain that to me for a minute?

16    A.    So with the proprietary players, you have the ability,

17    some of them, to actually apply the date/time group or not

18    apply the date/time group.  I was asked during the processing,

19    that if it did have a date/time group, to ensure that that

04:53 20   date/time group was visible regardless if the time was correct

21    or not.

22    Q.    So 2:28:53 would actually -- if that time were accurate,

23    would place that image before the previous image we saw, which

24    was in front of Back Bay Social Club, correct?

25    A.    Correct.

1    Q.   We know that's probably not true because one wouldn't get

2    to Bank of America until after passing the Back Bay Social

3    Club, correct?

4    A.   Correct.

5    Q.   Did you insert a time down here?  It's a little hard for

6    me to see.  But on the bottom, it says, "Boylston Street

7    office" --

8    A.   No, ma'am.  That was probably off of the proprietary as

9    well.

04:54 10   Q.   Now -- and you told us that you put these in order as best

11   you could, right?

12   A.   I could, yes.

13   Q.   And you put the image of the Montessori -- that's not

14   where I want to be.  That's in front of the Montessori, right?

15   A.   Yes, ma'am.

16   Q.   Those legs that are circled, that's Tamerlan Tsarnaev,

17   right?

18   A.   They are, yes.

19   Q.   The Montessori school is a greater distance from Marathon

04:54 20   Sports than Fairfield and Boylston Street is from the Forum, is

21   that correct?

22   A.   Yes, ma'am.

23   Q.   So -- and the time that you have on here of -- it says,

24   "14:50:24"?

25   A.   Yes.

1    Q.   Again, that's information that came from the camera, and

2    you don't know if that's accurate?

3    A.   Correct.

4    Q.   And so you don't know whether Tamerlan Tsarnaev passed the

5    Montessori school on Exeter Street before or after Jahar

6    Tsarnaev turned the corner of Fairfield and Boylston?

7    A.   No, I do not.  Again, this was just a timeline video that

8    I placed on there:  first explosion, second explosion, and then

9    the exodus of the two subjects, the first individual and then

04:55 10   the second individual.

11   Q.   And it's at least possible, if not even likely, that Jahar

12   Tsarnaev passed the corner of Fairfield Street before Tamerlan

13   Tsarnaev passed the Montessori school?

14            MR. WEINREB:  Objection.

15            THE COURT:  It's a bit of a compound question.

16            MS. CONRAD:  Okay.  I'll break it down.

17   Q.   So you decided to place the image of Jahar Tsarnaev

18   passing the corner of Fairfield and Boylston Street after the

19   image of Tamerlan Tsarnaev passing the Montessori school,

04:56 20   right?

21   A.   I did.

22   Q.   And what was that based on?

23   A.   It was just the proper way that I laid it out.  There was

24   no specific reason why I placed one in front of the other.

25   Q.   And did you take into account the distances involved?

```
 1    A.   No, I did not.
 2    Q.   And you did not have any images of Tamerlan Tsarnaev
 3    between the point where he was in front of Marathon Sports to
 4    the point where he passed the Montessori school?
 5    A.   Not a positive image, no, no, ma'am.
 6    Q.   Well, you certainly don't see one in here, right?
 7    A.   No.
 8           MS. CONRAD:  If we could see Exhibit 620 for a moment,
 9    please?
10           THE COURT:  Is this switching back to the other
11    computer?
12           MS. CONRAD:  To Mr. Bruemmer who has kindly offered to
13    assist me.
14    Q.   So looking at what's -- has not been introduced but the
15    jury has seen as Exhibit 620, the red dots over to the right of
16    Exeter Street near the finish line, that's approximately in
17    front of Marathon Sports, is that right?
18    A.   It is.
19    Q.   And then the two red dots we see a little past the corner
20    of Exeter and Newbury Street are other cameras, right?
21    A.   Correct.
22    Q.   And so the -- there are no cameras between the finish line
23    and --
24           MS. CONRAD:  Oops, I didn't mean to do that.  How do I
25    clear this?  Thank you.  Thank you, Mr. Watkins.
```

1    Q.    So there are no cameras between those two points, right?

2    A.    I believe there might have been some interior cameras but

3    not exterior.

4    Q.    But you don't have any images showing exactly where or how

5    Tamerlan Tsarnaev went from Point A, being Marathon Sports, to

6    Point B, being the Montessori school, right?

7    A.    No, ma'am.

8    Q.    Now --

9          MS. CONRAD:  If we could have Exhibit 623, please?

04:58 10   And if you could play the combined path, please?  If you could

11   pause if that's possible?  Thank you.  Oops.  It's not

12   possible?  Okay.  I'll do the best I can with this, then.

13   Thank you very much, Mr. Bruemmer.

14   Q.    So this animation, if you will, shows Mr. Jahar Tsarnaev

15   and Tamerlan Tsarnaev walking in a path where they are side by

16   side from Gloucester Street going down to Boylston Street,

17   correct?

18   A.    Yes, ma'am.

19   Q.    And that's not what the videos show, right?

04:59 20   A.    I believe their positions switched several times

21   throughout the walk between those places.

22   Q.    I'm sorry.  When you say "switched," what do you mean?

23   A.    Yes, sir -- yes, ma'am.  One would be in the lead, and

24   then the other one would be in the lead.

25   Q.    There's actually no images where Jahar Tsarnaev is in the

```
  1  lead, are there?
  2  A.   I do believe, outside of the Back Bay Social Club, he was
  3  in front of his brother at some point.
  4  Q.   Okay.  Well, let's take a look at that then.
  5       Actually, Back Bay Social Club is about where they split
  6  up, isn't it?
  7  A.   No, ma'am.  They split up just before the Forum.
  8  Q.   Okay.  Well, let's just --
  9       MS. CONRAD:  If I could have the laptop on the
05:00 10  display, please?
 11  Q.   Is that the image you're talking about?
 12  A.   No, ma'am.  Again, if you go through those images one
 13  after the other, you can see their positions switch back and
 14  forth.
 15  Q.   Okay.  Let's just play that.
 16  (Video played.)
 17  Q.   At that point, it looks like Jahar is by himself, right?
 18  A.   He's actually -- his brother is off to the left as we look
 19  at it.  So he's behind that first runner.
05:00 20  Q.   Can you just circle where you see him?
 21  A.   Yes.
 22  Q.   I'm sorry.  I'm not seeing.  Did you circle it on the
 23  screen?
 24  A.   Oh, I would say that he is right behind there
 25  (indicating).
```

1    Q.    Okay.  Actually, let me back up a little bit more first.

2    (Video played.)

3    Q.    So as they're coming onto Boylston Street, would you agree

4    with me that Tamerlan is in the lead?

5    A.    Of course, yes, ma'am.

6    Q.    By about five feet?

7    A.    I wouldn't have any area of measure on this.

8    Q.    And as they continue along, that distance at some point

9    gets much greater, right?

05:01 10    A.    Actually, it closes because you can see right there that

11    Tamerlan -- or, excuse me, Dzhokhar, he actually goes to the

12    left, and his brother is to the right.

13    Q.    But would you agree with me that they are not in lockstep

14    the entire way down Boylston Street?

15    A.    It depends on when you're talking because there's several

16    places where they stop and they are standing together.

17    Q.    Okay.  But in the video -- excuse me.  In the animation

18    that's been introduced as 620 -- -3, excuse me, it appears that

19    they are walking side by side the whole time?

05:02 20    A.    That is correct.

21    Q.    And that is not accurate, correct?

22    A.    There are several positions where they actually do stop

23    and then switch places.  But in the videos that I have seen, he

24    is -- the older brother is leading these two individuals.

25    Q.    And that's not what's shown on 623, right?

1    A.    Correct.

2    Q.    Okay.

3          MS. CONRAD:  If I could just go a little further

4    along.  Thank you.

5    Q.    Now, this is in front of Crate & Barrel.  And you only see

6    Jahar in that image, right?

7    A.    Correct.  Tamerlan has actually continued past the Forum

8    past this point.

9    Q.    So they split up before the Forum?

05:02 10   A.    Yes, ma'am.

11   Q.    I'm sorry.  I thought you said a few minutes ago they

12   split up at the Forum.

13   A.    No, prior to the Forum.  They stopped here.  He went

14   forward on the Forum that we can see in the video, and then he

15   follows on.

16   Q.    And, in fact, when you look at the Forum video, you

17   actually see Tamerlan go through the frame alone before you see

18   Jahar go through, correct?

19   A.    Correct.  This is -- his brother has actually already

05:03 20   continued on before this.

21   Q.    Okay, thank you.

22         And the image -- maybe I asked you this already, in which

23   case I apologize.  But the image of Fairfield and Boylston does

24   not have a time on it, correct?

25   A.    Well, listed, no.  However, I did go back this morning;

1    and in the -- within the metadata, there is a timestamp in

2    there of 2:49 and then one past it; there was one at 2:50.

3    Q.   Of 2:50, right?

4    A.   Yes.

5    Q.   Again, the image of Tamerlan in front of Montessori school

6    is also 2:50, right?

7    A.   Correct.

8    Q.   Again, those are individual to those cameras and do not

9    necessarily reflect the relevant -- the relative period of

05:03 10   time?

11   A.   The accurate time, no, ma'am.

12   Q.   You testified about a phone call that's visible on the

13   Forum video at the time that shows on the Forum video as

14   somewhere around -- I think it's 4:49?

15   A.   Yes, ma'am.

16   Q.   Again, you don't know that that's the actual time, right?

17   A.   No, ma'am.  That was precisely what the phone records

18   list.

19        MS. CONRAD:  And if I could just have a moment to get

05:04 20   to that image.  Again, could I have the laptop for presentation

21   purposes?  Actually, let me back up a little bit from that.

22   Q.   Now, we're watching -- that's Jahar within the circle,

23   right?

24   A.   Yes, ma'am.

25   Q.   And just for the record, we're approximately 14:48:21 on

1    the Forum timestamp?

2    A.    Yes, ma'am.  14:48:27, yes.

3    Q.    And the original Forum video had the times down to

4    hundreds of a second, right?

5    A.    I would have to look at it.  Depending on what player you

6    have, depending on what outline you laid, you could switch it

7    out.  This was a very simple timestamp that was displayed on

8    the proprietary player.

9    Q.    Okay.  Well, we'll go back to that in a second.

05:06 10      This is at 14:48:44, right?

11   A.    Yes, ma'am.

12   Q.    And it looks like it's -- Jahar is looking down, right?

13   A.    Yes, ma'am.

14   Q.    Then he's looking up.  He's not on the phone, right?

15   A.    He is on the phone now.

16   Q.    And you don't know if this phone call actually occurred at

17   14:49, do you?

18   A.    No, ma'am.  I would have to go back to the phone records

19   to see what timeline they have.

05:06 20   Q.    You looked at the phone records before.  And here's

21   Exhibit 1172.  And there's an out-going call at 2:49:06, right?

22   A.    Yes, ma'am.

23   Q.    And that would be from Jahar to Tamerlan, right?

24   A.    Yes, ma'am.

25   Q.    And there's an incoming call at 2:51, correct?

1    A.    I see three -- which one are we talking about?

2    Q.    The one right under 2:49.

3    A.    Okay.  Yes, I see it.  Yes, ma'am.

4    Q.    Do you see that there's an incoming call at 2:51, correct?

5    A.    Yes, yes.

6    Q.    And same phone numbers, right?

7    A.    Yes.

8    Q.    Is it fair to say that appears to be a phone call from

9    Tamerlan to Jahar?

05:07 10   A.    Let's see here.  Incoming, yes.

11   Q.    Is that correct?

12   A.    I believe so, yes.

13   Q.    And so you don't know, as you sit here today, whether the

14   phone call that we just saw on the Forum video is a phone call

15   from Jahar to Tamerlan or from Tamerlan to Jahar?

16   A.    Again, it's all about time, and then I don't have a

17   relative time that's accurate.  So I can only tell you what I

18   see on the records versus the video.

19   Q.    But, again, those two times don't correlate with each

05:07 20   other necessarily, right?

21   A.    Correct.

22   Q.    So your answer to my question is, no, you don't know which

23   of those two phone calls is depicted?

24   A.    No, ma'am.

25          MS. CONRAD:  Thank you very much.

1          MR. WEINREB:  Just briefly, your Honor.

2    REDIRECT EXAMINATION BY MR. WEINREB:

3    Q.   You were asked on cross whether the time depicted on the

4    video at the Montessori school was 2:50?

5    A.   Yes.

6    Q.   And the answer is yes?

7    A.   That was the depiction, yes.

8    Q.   And then you were asked whether the time in the metadata

9    for the photograph of Jahar Tsarnaev rounding the corner onto

05:08 10  Fairfield Street was 2:50?

11   A.   Yes.

12   Q.   And the answer to that was also yes?

13   A.   One of the images are, yes.

14   Q.   Okay.  And it may well be that those are both accurate?

15   A.   It's possible, yes.

16   Q.   You just can't necessarily -- you can't say for sure that

17   it's accurate?

18   A.   No, sir.  I did not actually extract these videos, and I

19   wasn't on-site during that time period.

05:09 20  Q.   Similarly, the Forum video shows the explosion take place

21   at a particular time, correct?

22   A.   Correct.

23   Q.   And the phone record shows that the call that took place

24   right before that explosion was from Jahar Tsarnaev to his

25   brother Tamerlan Tsarnaev, correct?

```
 1              MS. CONRAD:  Objection to --

 2              THE COURT:  Sustained.

 3              MS. CONRAD:  Thank you.

 4   Q.   And the -- there was a time on the Forum video for the

 5   explosion?

 6   A.   Yes.

 7   Q.   And there was a time on the phone call from Jahar Tsarnaev

 8   to Tamerlan Tsarnaev?

 9   A.   There was.

05:09 10   Q.   And how did they -- in what order do they take place

11   according to those records?

12              MS. CONRAD:  Objection.

13              THE COURT:  He may answer it.

14   A.   They correlated.

15   Q.   Which happens first?  The phone call?

16   A.   The phone call and then the explosion.

17              MR. WEINREB:  That's all.  Thank you, your Honor.

18              THE COURT:  All right, sir.  Thank you.  You may step

19   down.

05:10 20              MR. WEINREB:  The government calls James Hooley.

21              JAMES HOOLEY, Sworn

22              THE CLERK:  Have a seat.  State your name; spell your

23   last name for the record.  Keep your voice up and speak into

24   the mic so everyone can hear you.

25              THE WITNESS:  My name is James Hooley, H-o-o-l-e-y.
```

```
 1   DIRECT EXAMINATION BY MR. WEINREB:

 2   Q.   Good afternoon.

 3   A.   Good afternoon.

 4   Q.   Where do you work, sir?

 5   A.   Boston Emergency Medical Services.

 6   Q.   How long have you worked there?

 7   A.   It was 36 years last June.

 8   Q.   What is Boston Emergency Medical Services?

 9   A.   We're the provider for emergency medical services for the

10   city of Boston, the 911 prehospital provider.

11   Q.   What do emergency medical services consist of?

12   A.   Well, it consists of field operations, which is

13   ambulances, ALS, advanced life support, basic life support.  We

14   have a training division where we train and prepare personnel

15   as well, and we have a dispatch operations and some

16   administration staff.

17   Q.   So in the city of Boston, if someone calls 911, says, I

18   need an ambulance, it's your -- your operation that responds?

19   A.   Yes, sir.

20   Q.   What's your position there?

21   A.   I'm the chief of the department.

22   Q.   What are your job responsibilities as the chief?

23   A.   To oversee the various bureaus at -- and departments at

24   Boston EMS, the largest being field operations, but also

25   dispatch operations, training, and some of our planning and
```

1    budgetary responsibilities as well.

2    Q.    Emergency medical services, that's EMS?

3    A.    Yes, EMS.

4    Q.    Did you oversee Boston EMS operations during the 2013

5    Boston Marathon?

6    A.    Yes.  In the incident -- in the action plan that day, I

7    functioned as the EMS command for Boston.

8    Q.    What personnel and equipment did you deploy on the final

9    stretch of the race course?

05:13 10    A.    We had -- in addition to the 24 ambulances that we had in

11    service for regular city service, we had deployed 13 ambulances

12    for the final zones.  We also had personnel assigned to medical

13    tents.  We had proceed-out teams on golf courts, John Deere

14    Gators.  We had EMTs and paramedics on bicycles.  The total --

15    and also people in various command posts, communication posts.

16    It was probably about 120 or so extra personnel on that day.

17    Q.    An EMT, that's an emergency medical technician?

18    A.    Yes, sir.

19    Q.    You said, in addition to the 24 ambulances that service

05:14 20    the city of Boston, you had 13 extras at the Marathon?

21    A.    That's correct.

22    Q.    So where were the other 24?

23    A.    Interspersed about the city providing coverage for our

24    usual 911 calls.  We do about 320 of those a day.

25    Q.    Where were you personally when the bombs exploded?

1    A.   I was at the rear of Alpha, or the main medical tent.   I

2    was standing outside at St. James Avenue on Dartmouth Street.

3    Q.   Where is the main medical tent in relation to the finish

4    line?

5    A.   It's probably 75 yards from the finish line.   The front

6    entrance -- it's right on Dartmouth Street.   It's just past --

7    if you're running the race, you would go beyond the finish

8    line, and the next intersection you come to is Dartmouth.   And

9    the tent takes the whole length of Dartmouth Street, down to

05:15 10   St. James Avenue.

11   Q.   Is there another medical tent?

12   A.   There's a second medical tent.   We call it Bravo, A and B.

13   Bravo is down on Berkeley Street, St. James, adjacent to what

14   is known as the family meeting area.   It's where a lot of

15   people get reunited afterwards.   It's a little bit smaller

16   tent, but it's also staffed with medical professionals,

17   volunteers, EMS.

18   Q.   What did you do personally after the blasts occurred?

19   A.   Well, when I heard the explosions, I started heading

05:15 20   towards the front of the tent, towards Boylston Street.

21   Especially when you heard the second one, it didn't leave, you

22   know, a whole lot of doubt that something bad had happened.

23   And then our radios immediately picked up -- we had personnel

24   on scene reporting that they just had two devices explode and

25   many casualties.

1          I went up to Boylston Street where we had folks forward

2     deployed, and like everyone else in our department, we shifted

3     into mass casualty mode.

4     Q.    What does that mean?

5     A.    Well, we had a mass casualty situation.  It's something

6     that we, you know, train and prepare for whether it's a

7     transportation accident or something like -- God forbid,

8     something like this.  We had -- this is -- the first thing we

9     did is we notify all the area hospitals.  Immediately it goes

05:16 10    out simultaneously across radio network that there's a mass

11    casualty in effect, and then we try to paint them a picture

12    that we had in excess of at least 40 people seriously injured.

13    That was the initial size-up.  And that grew.  About a minute

14    or two after that, we notified the private ambulances that

15    provide back-up support to Boston, should we need it, that we

16    were establishing a staging area over on Huntington Avenue.

17    But while this was going on, our EMTs and paramedics then began

18    to triage, treat, and prioritize for transport, the patients.

19    Q.    Before I ask you about that, if you want water or

05:17 20    anything, there's some right there for you.

21    A.    Thank you.

22    Q.    So what does that mean to triage and prioritize?

23    A.    So triage is to sort.  So when you have a lot of people

24    who are injured all at once, you want to do the most good for

25    the most number of people.  So we begin our system of

1    prioritizing by checking for vital signs, various symptoms.

2    There are three categories that we use.  Basically, they're

3    color-coded.  We use red, yellow, green.  And we deploy or

4    employ triage tags with those colors on them to help us start

5    to prioritize who's going to get out first and then second,

6    then third.

7    Q.   What does red signify?

8    A.   Red is immediate or critical.  Red where personnel who

9    would -- I'm sorry, patients who would have a high likelihood

05:18 10   of succumbing to their injuries if they weren't treated very

11   quickly, certainly within the hour; people with

12   life-threatening trauma; people who may not just need an

13   emergency room, but they likely need an operating room.

14   Q.   How many people were judged to need a red tag that day?

15   A.   Our initial -- 30 people were tagged red.

16   Q.   That was initially?

17   A.   Initially, yup.

18   Q.   Did that number change over time?

19   A.   I don't believe so.  It was -- 30 is the count that I

05:18 20   remember from that day.

21   Q.   What does a yellow tag signify?

22   A.   Yellow is the next level down in acuity.  It's delayed,

23   some would call it.  It just means that those will be the folks

24   that you would -- or the patients that you would move out next.

25   They might still have some serious injuries, but they're not

1    injuries that you would deem to be life threatening, maybe

2    could be a burn, could be a broken ankle, could be somebody who

3    fell and they'll -- but they're not as injured as the first

4    group.

5    Q.    And how many people were tagged yellow that day?

6    A.    Twenty-five.

7    Q.    What does a green tag signify?

8    A.    Green is what we commonly refer to as walking wounded.  If

9    you have a lot of people who can either be assisted or are able

05:19 10    to assist themselves, even though they may have some visible

11    injury, their vital signs are okay.  Their pulse is good.

12    They're up.  They're walking.  They're breathing.  They're

13    awake.  So you can more or less corral them in a treatment area

14    and hold them while you evacuate the higher priority patients

15    out.

16    Q.    How many were tagged green?

17    A.    Thirty-five.

18    Q.    So if I'm doing my math right, that's a total of about 90

19    people?

05:20 20    A.    Yes, sir.

21    Q.    Were they all transported by ambulance to hospitals?

22    A.    Yeah.  Those -- the 90 patients were transported by

23    hospitals [sic] and then -- later, after that, we also

24    identified -- we had a total of 118 that were transported by

25    ambulance.

1    Q.   All from Boylston Street?

2    A.   Yeah, Boylston Street or from the events, yeah.  Some

3    people we encountered on Newbury Street or two or three blocks

4    over, but they all reported that their injuries came from

5    Boylston Street.

6              MR. WEINREB:  Could you please bring up Exhibit 633?

7              THE COURT:  Just for the witness?

8              MR. WEINREB:  Just for the witness for now.

9    Q.   Sir, if you'd take a look at the screen in front of you,

05:21 10   are you familiar with that chart?

11   A.   Yes, I am.

12   Q.   Is it a chart that would assist you in testifying about

13   the different hospitals to which patients were sent?

14   A.   Yes.  This was actually a chart that we put together some

15   time back so that we could account for what happened on that

16   day.  And there's two pie charts on there.  One was --

17   represented the ambulances involved.  For example, the one --

18   Q.   Before we get into the details --

19   A.   You can't see it.  I'm sorry.

05:22 20             MR. WEINREB:  Your Honor, government would like to use

21   this as a chalk only.

22             THE COURT:  Okay.

23   Q.   So turning to the chart on the left, the smaller one, what

24   does that represent?

25   A.   That represents the number of patients and how -- what

      1   agency transported them.  There were 76 patients transported by

      2   Boston EMS ambulances, and then the other figures on there show

      3   some other private companies, for example, EasCare, Fallon,

      4   LifeLine.  I won't read them all unless you want me to.  And it

      5   shows you the number of patients that they accounted for each.

      6   Q.   Turning to the chart on the right, what does that one

      7   represent?

      8   A.   That's a chart of -- I think it's nine of the Boston

      9   hospitals, and it shows what the patient distribution was,

05:23 10   where the patients were brought to by Boston EMS.

     11   Q.   So just looking at the right-hand side of the chart for a

     12   moment, BWH, that's Brigham and Women's Hospital?

     13   A.   Yes.

     14   Q.   How many patients were sent there?

     15   A.   Twenty-three patients.

     16   Q.   Right above that is Boston Medical Center?

     17   A.   Correct.

     18   Q.   How many were sent there?

     19   A.   Nineteen.

05:23 20   Q.   And then on the left-hand side of the chart, the light

     21   green entry, Mass. General Hospital, or MGH, how many were sent

     22   there?

     23   A.   Sixteen patients went to Mass. General.

     24   Q.   You said that red-tagged individuals are individuals

     25   suffering life-threatening injuries?

1    A.    Yeah, potentially, yes.

2    Q.    And, typically, in order to be tagged red, how much time

3    before they die if they don't get to medical treatment?

4    A.    Well, what we try to teach our people, these are

5    priorities.  We want to get somebody to definitive care within

6    the hour.

7    Q.    How long is the trip from Boylston Street to Brigham and

8    Women's Hospital if you have the red lights flashing?

9    A.    Fortunately, most of these hospitals were within a

05:24  10   two-mile radius, I believe, and so the -- once we were able to

11   load patients, the travel time wasn't long.  It was probably

12   four or five minutes.

13   Q.    So were all the red-tagged patients gotten to hospitals

14   well within an hour of when you picked them up?

15   A.    Yes, yes.  About 30-plus minutes was the last time we had

16   a patient -- when we're transporting patients, if I may, we --

17   when it's a mass casualty, the units in the field aren't

18   supposed to make a decision where to go when it's multiple

19   patients.  You're supposed to come on -- either a loading

05:25  20   officer makes that determination, who's speaking with -- it's

21   called Boston CMED.  It's up in our dispatch center.  They're

22   trying to make an attempt to distribute patients.  If you're at

23   loading, if you've made it to loading, they will say, I have

24   Boston Paramedic 2.  We have two red patients or three yellow

25   patients.  CMED will tell them, Go to Brigham, go to Tufts, go

1    to whatever.  Then that way we try to distribute the patients

2    so that no one hospital gets overwhelmed.

3            MR. WEINREB:  Excuse me one moment.

4    Q.   To your knowledge, were there people who were injured at

5    the Marathon scene who made it to the hospital without using

6    one of the ambulances here?

7    A.   Yes.  I certainly suspect that's the case.  I know at

8    least one patient that was transported by -- in our Boston

9    police wagon, I understand, went to Mass. General.  And other

05:26 10   people self-presented at the hospital, walked in either later

11   that day or even hours later.  And, you know, reportedly, some

12   patients went as far away as South Shore Hospital.  They just

13   went there later for some minor complaints.

14           MR. WEINREB:  Thank you, sir.

15           THE COURT:  Any examination?

16           MR. BRUCK:  No questions.

17           THE COURT:  All right.  Thank you, sir.  You may step

18   down.

19           MR. CHAKRAVARTY:  Government calls Chief Willy Gross.

05:27 20   THE CLERK:  Sir, you want to step up here, please.

21           THE WITNESS:  Yes, sir.

22           WILLIAM G. GROSS, Sworn

23           THE CLERK:  Have a seat.

24           THE WITNESS:  Good afternoon.

25           THE CLERK:  State your name; spell your last name for

       1    the record.  Keep your voice up and speak into the mic.

       2           THE WITNESS:  Yes, sir.  Good afternoon, everyone.

       3    I'm William G. Gross.  Last name is spelled G-r-o-s-s.

       4                        DIRECT EXAMINATION

       5    BY MR. CHAKRAVARTY:

       6    Q.    Where do you work?

       7    A.    I'm currently employed by the Boston Police Department.

       8    Q.    What's your rank there?

       9    A.    I am the chief of police, superintendent and chief.

05:28 10    Q.    Does that mean you're the No. 2 person?

      11    A.    Yes, sir.

      12    Q.    How long have you been with the Boston Police?

      13    A.    May 15th will be my 30th year, sir, so since 1985.

      14    Q.    What kinds of duties have you had in those years?

      15    A.    Well, starting in 1985, for nine or ten years, I was a

      16    patrolman.  Then I went into the Gang Unit, did five years

      17    undercover in the Drug Control Unit; two years as an academy

      18    instructor.  And then I became a supervisor in Roxbury, both in

      19    uniform and plainclothes officer, as well as a duty supervisor.

05:29 20    Then I went into the Investigative Field, the Bureau of

      21    Investigative Services, as a sergeant, sergeant detective.  And

      22    then six and a half years ago, I found myself on the command

      23    staff as a deputy in charge of Zone 2.  Zone 2 encompasses

      24    Roxbury, Mattapan, Mission Hill, and South Boston and

      25    Dorchester.  Then I became the deputy of the Drug -- excuse me,

1    the Gang Unit and the School Police Unit and then onto night

2    commander as superintendent.  And for the last year, I've been

3    the superintendent-in-chief, sir.

4    Q.   Back in April of 2013, were you the night commander for

5    the Boston Police?

6    A.   Yes, sir.

7    Q.   That means you were in charge of everything that happened

8    at night?

9    A.   At night, yes.

05:29 10   Q.   So during the day, were you working on April 15th?

11   A.   Yes, sir, I was.

12   Q.   What was your role that day?

13   A.   My role that day was the Zone 6 commander.  There were ten

14   zones.  Six were in the Back Bay.  Three were in Brighton, and

15   the tenth zone was for traffic.  I was a Zone 6 commander, and

16   that location was Audubon Circle, the Brookline town line,

17   Boston town line, into Kenmore Square.

18   Q.   Now, those ten zones, were those planned around the 117th

19   running of the Boston Marathon?

05:30 20   A.   Yes, sir, they were.

21   Q.   So what types of logistics do the Boston Police -- does

22   the Boston Police provide for the Marathon?

23   A.   Well, there's a lot of detailed planning.  Like, of

24   course, Monday's Marathon day.  But the previous Wednesday,

25   Superintendent Evans at the time, now commissioner, we had a

1  multijurisdictional meeting where we went over the logistics of

2  the Marathon so -- with several police agencies, to the

3  inclusion of state police, transit police, all local law

4  enforcement and also the city departments, like parks and rec

5  and licensing.  So a lot of detailed planning went into the

6  logistics of the Marathon.

7       On the day of the Marathon, again, to go over the

8  logistics and the responsibilities, all of the commanders,

9  including the command staff, commissioner, superintendent and

05:31 10  chief, deputy sergeants, lieutenants, captains, had a roll call

11  at Morse Auditorium at B.U. at 7 a.m.

12  Q.   And a roll call is a meeting where you -- amongst police

13  personnel where you address the group, and you advise of what

14  the state of information is?

15  A.   That's correct.

16  Q.   So what happened there?

17  A.   Basically, we briefed the zone commanders, right, and

18  their subordinates who were the supervisors, again going over

19  logistics.  Our goal there was to ensure that everyone could

05:32 20  meet the responsibilities of providing the most efficient and

21  effective uses of our police resources.  And, again, that would

22  be to ensure that everybody's protected that day:  the citizens

23  of Boston, the business owners, businesses, the spectators as

24  well as the participants in the race.

25  Q.   So approximately how many Boston Police personnel were

1    assigned to work the Marathon that day?

2    A.    Approximately 840 to 43.

3    Q.    Is the department somewhere around the order of 2,100

4    personnel?

5    A.    2,185, yes, sir.

6    Q.    So to provide security, what types of precautions did the

7    BPD take?

8    A.    Again, we went over the logistics and the responsibilities

9    of every zone commander to ensure that everybody under their

05:33 10   command adhered to three of our principles when we have special

11   events:  Number 1, respectful treatment.  Treat everyone as

12   though you -- like you would want to be treated.  Had a lot of

13   visitors that day, over 27,000 runners, hundreds of thousands

14   of folks.  So just respectful treatment.  Have patience.  A lot

15   of people aren't used to the Marathon.  And plus all eyes are

16   on Boston.  We want to be the best that we can be.

17        Number 2, zero tolerance for drinking in public.  Zero

18   tolerance as well for anyone that would go outside of a

19   licensed premises with an alcoholic beverage.  So you would

05:33 20   either arrest or cite or give a verbal warning.

21   Q.    Why so strict on Marathon Monday?

22   A.    Marathon Monday, quite frankly, it's a family day.  It's

23   not a day to be there partying.  It's a family day.  It's an

24   international event where Boston hosts its best capability.

25   It's a time to showcase Boston as a perfect host for that

```
 1   event.
 2   Q.   And you said there's a third principle?
 3   A.   Yes.  The third, be very cognizant and/or vigilant for any
 4   suspicious activities, suspicious persons or suspicious
 5   packages.  And there was protocol for that as well.  Isolate
 6   the package, create a 300-yard perimeter -- 300-foot perimeter,
 7   and call in your Explosive Ordinance Unit and keep everyone
 8   away.
 9   Q.   Does the Explosive Ordinance Unit of the Boston Police --
10   does it do sweeps before the Marathon?
11   A.   They did.  Our roll call was at 7.  So the assignment of
12   EOD officers and canines were to sweep the area of Boylston
13   Street where the race finishes.  They were assigned to sweep
14   that around 7:30 a.m.
15   Q.   In addition to the Marathon, are there other significant
16   events along the route of the Marathon in the city of Boston?
17   A.   Yes.  That's the day as well where we -- excuse me, the
18   Red Sox traditionally hold a morning game.  It starts at, like,
19   11.  They were playing the Tampa Bay Rays, I believe.
20   Q.   How does that play into the logistics of security
21   planning?
22   A.   Well, once the game lets out, of course, the crowd of over
23   30,000 adds to the masses of spectators in Kenmore Square.  So
24   it directly let's out into Kenmore Square or people will go
25   other places as well, but mostly everyone comes onto Kenmore
```

1    Square to watch the race.

2    Q.   Now, that morning on April 15 of 2013, did everything go

3    according to the plans that you had laid out?

4    A.   Yes, they did.  Everything went swimmingly.  Everything

5    was -- it was a perfect day.

6    Q.   What happened around 2:49 p.m.?

7    A.   2:49 p.m., I was monitoring the Boston Police radio,

8    Channel 1.  That channel was exclusively for our event.  And I

9    heard the voice of Sergeant Detective Keeler, who I've known

05:36 10   and worked with for years.  Usually very calm on the radio, but

11   he was literally screaming in the radio.  "Stop the race.  Get

12   me everything you have.  Stop the race."  And then,

13   unfortunately, other folks jumped on the radio, and his

14   transmission was interrupted.  But, again, he would come over

15   yelling, "Give me everything you have to Boylston Street."

16   Q.   And so what was the response of the BPD?

17   A.   We sent resources.  I myself, I immediately called

18   operations, our 911 operations center, and asked, "What's going

19   on on Boylston Street?" because I couldn't get through on the

05:36 20   radio.  And I was told by the personnel there that two

21   explosions had taken place, and they didn't know what type of

22   explosions at that time.

23       So I sent any additional resources I had.  It just so

24   happened in Audubon Circle that several officers were taking a

25   break.  There's a -- it's kind of a parkway adjacent to that

1    section of Charles River.  I says, "Everybody let's go.  Go to

2    Kenmore.  Get direction and go to Boylston Street."  So I sent

3    all the assets to Boylston Street.  The Zone 5 commander,

4    Superintendent Fitzgerald, also sent additional units.  Those

5    units were assigned to the Youth Violence Strike Force --

6    that's a tactical response unit -- and the Drug Control Unit,

7    as a POP platoon, which means Public Order Platoon.  They were

8    also sent to Boylston Street, the finish line.

9    Q.   What happened to the Marathon race itself?

05:37 10   A.   At Audubon Circle, under my command, it went on for

11   approximately maybe 30 more minutes.  And I received

12   information from the Unified Command Center, which we call the

13   UCC, that the explosions were believed to be bombs and to halt

14   the race at that point at Audubon Circle where the Town of

15   Brookline's border met Boston.  So I did so with the assistance

16   of the state police, the transit police, as well as the B.U.

17   Police Department.  We shut it down at that location.

18   Q.   And then where did -- what were the priorities of the

19   Boston Police in terms of responding to the Marathon sometime

05:38 20   after the explosions?

21   A.   Our responsibilities were primary to the people that were

22   hurt at the finish line.  So we sent all the resources we had.

23   Even when we ran out of ambulances, we sent our wagons and any

24   vehicles we could to transport those that were injured.  The

25   First Responders, as well as the civilians and the businesses,

1    helped the over 240 injured persons to safety, and that took

2    approximately 21 or 22 minutes to do so.

3    Q.    So that's the actual scenes where the explosions occurred?

4    A.    Yes, sir.

5    Q.    So is that called clearing the -- those scenes?  That was

6    done --

7    A.    Yes.  That was done within 21 to 22 minutes.

8    Q.    After those scenes were cleared -- sorry.  Strike that.

9    I'll ask you another question.

05:39 10       In addition to clearing the scenes, what other concerns

11    did the BPD have in terms of what you took action for?

12    A.    Here's the actions.  We had no idea who planted the bombs

13    or who detonated them, if it was one person, if it was two

14    persons, if it was an entire cell.  So we gave the directions

15    to be very vigilant and cognizant again of any suspicious

16    persons, any suspicious packages.  Also, that prompted us to do

17    more EOD sweeps, explosive ordinance sweeps, especially at the

18    location of the finish line.  So we swept that entire area.

19       And I'd like to add, sir, that -- we have a phrase called

05:40 20    slash and tag.  So if there's a suspicious package, the

21    explosive ordinance personnel would slash the bag, looked into

22    it.  If it was deemed suspicious, they would plant a green glow

23    stick on it.  If it wasn't deemed a threat, they might mark it

24    with white tape or some other marking.  And so that's what was

25    being done at the finish line.

1   Q.   And the what you call the EOD or --

2   A.   Explosive ordinance --

3   Q.   Teams.  They went out and did this?

4   A.   Yes, sir.

5   Q.   What was the state of communications for the, you know, 20

6   or 30 minutes after the explosions?

7   A.   Tough communications.  After the original transmission by

8   Sergeant Detective Keeler, the transmissions were garbled.

9   Then everything bottled neck.  You couldn't get through.  You

05:41 10   couldn't get through on the radio, and you couldn't get through

11   on the cell phone as well.  So it took awhile for

12   communications to resume.

13        When somebody has a primary on the radio, they're on the

14   scene calling out what happened and what's going on.  The other

15   people around tend to stay off the radio and let that person

16   have the channel.  So we stayed off the channel, and we just

17   monitored.  But it was tough to get through.  Communications

18   were at a bottleneck.

19   Q.   Despite the communications difficulties, did you

05:41 20   coordinate with federal, state, and local partners after the

21   crime scene was cleared?

22   A.   Yes, sir, we did.  And we teamed with -- I mean, one of

23   the first calls we received was from the senior agent in

24   charge, DesLauriers of the FBI; State Police Colonel Alben;

25   also from the Massachusetts Emergency Management Agency, MEMA;

```
 1    National Guard.  Everybody came to Boston to help out.

 2    Q.   And who was in charge of the crime scene for the next

 3    couple of hours?

 4    A.   The next couple of hours, under then Commissioner Ed Davis

 5    and Superintendent-in-Chief Linskey, they took command of the

 6    crime scene.  And we sent in our Crime Scene Response Unit, our

 7    forensics units, and any additional personnel that we can spare

 8    from the Boston Investigative Services.

 9    Q.   And then at some point did that transition to another

10    agency?

11    A.   Yes, in the evening.  Probably 7:30, 7:45, the FBI took

12    jurisdiction of the investigation.

13    Q.   Were areas of Boston, around Boylston Street, cordoned off

14    and secured for purposes of that investigation?

15    A.   Yes, sir, for a 12-block radius.  We utilized Boston

16    police officers as well as the National Guard to man the

17    perimeter of the crime scene as well the Green Line was shut

18    down.  And those areas were also manned by National Guard,

19    transit police, and we sent in our K-9 officers, not only to

20    the Green Line but additionally to other MBTA stations.

21    Q.   So you say the Green Line.  You mean the MBTA?

22    A.   Yes.

23    Q.   The T?

24    A.   The trolley line.

25    Q.   The trolley?
```

```
 1    A.    Yes, sir.

 2    Q.    In addition to that MBTA -- those closures, were there

 3    other closures in and around the city of Boston that day?

 4    A.    Yes, there was.  And at least the services were slowed

 5    down until we could again perform sweeps and man those

 6    stations.  Again, we had no idea where the threats were coming

 7    from, if it was one person, two, a cell.  We had no idea.  So

 8    we manned the MBTA stations as well.

 9    Q.    So in addition to train traffic, do you know whether

10    Amtrak or Massport had shut down air and other types of travel?

11    A.    Yes, sir.  Everything was halted.  It was a no-fly zone

12    under the direction of the folks at Logan Airport.  Everything

13    was at a standstill until we could get more information as to

14    where the attacks were coming from.

15    Q.    Were sporting events that day canceled as well?

16    A.    The Bruins game was canceled.  Again, folks, everything

17    shut down in Boston.

18    Q.    In terms of the address to the public, what was -- what

19    did Boston Police ask from the public?

20    A.    As with any investigation where deaths occur -- as we all

21    know, unfortunately, three people died that day on Boylston

22    Street:  Martin William Richard, Krystle Campbell and Lingzi

23    Lu.  Over 240 people were injured.  Now we know over 17

24    amputees.  We asked for the public's help.  If you saw

25    anything, you took pictures, anything, any amount of
```

05:44  (line 10)
05:44  (line 20)

```
 1   evidence -- nothing is too small -- please contact the Boston
 2   Police Department.  You could call in.  You could text
 3   anonymously, call in anonymously.  Call us.  And we also had
 4   social media resources.  We had a Twitter account as well as
 5   BPD News was our blog.  And that volume went from 53,000 to
 6   over 300,000 hits.  So we were getting a lot of participation.
 7   Q.   And, in fact, did you get hours and hours of video and
 8   photos and other tips and leads from the public?
 9   A.   The Boston Police Department, over the next three to four
05:45 10  days, received several hundred calls for suspicious packages.
11   Several people turned in video surveillance and pictures.  And
12   I would be remiss if I didn't mention the valuable, valuable
13   resources that the businesses provided with their camera
14   system.  I believe we had over 4,000 hours of video that was
15   turned in as evidence so that we could glean through that.
16   Q.   And after the crime scene was secure and the Feds were
17   processing it, did Boston Police continue to support the
18   investigation and participate in other aspects of the
19   investigation as it went forward?
05:46 20  A.   Yes, we did.
21            MR. CHAKRAVARTY:  No further questions.
22            MR. BRUCK:  Thank you, Chief.  No questions.
23            THE COURT:  Chief, thank you.  You may step down.
24            THE WITNESS:  Good afternoon, your Honor.
25            MR. WEINREB:  The government calls Kaytlin Harper.
```

```
 1              THE CLERK:  Ma'am, over here, please.  Step up to the
 2      box, if you would.  Remain standing.  Raise your right hand.
 3                        KAYTLIN HARPER, duly sworn
 4              THE CLERK:  Have a seat.  Please state your name.
 5      Spell your last name.  Keep your voice up and speak into the
 6      mic so everybody can hear you, okay?  It's adjustable.
 7              THE WITNESS:  My name is Kaytlin Harper, H-a-r-p-e-r.
 8      DIRECT EXAMINATION BY MR. WEINREB:
 9      Q.   Good afternoon, Miss Harper.  Where do you work?
10      A.   Whole Foods Market.
11      Q.   Whole Foods Market.  That's a kind of supermarket?
12      A.   Correct.
13      Q.   How long have you worked for Whole Foods?
14      A.   Since 2001.
15      Q.   So 14 years?
16      A.   Yup.
17      Q.   What's your current position?
18      A.   I am the associate store manager.
19      Q.   For which store?
20      A.   I currently work in Melrose.
21      Q.   What store did you work in at the time of the Marathon
22      bombings?
23      A.   The Prospect Street store in Cambridge.
24      Q.   Is that in Central Square?
25      A.   Yes.
```

1    Q.    What was your position there?

2    A.    The same position, associate store manager.

3    Q.    What were your job responsibilities?

4    A.    Daily operations of the store, financial, making sure

5    everything runs smoothly, just managing the teams.

6    Q.    Did the store have surveillance cameras?

7    A.    They did.

8    Q.    How many?

9    A.    I can't give you an exact amount, maybe 14, 14 to 16.

05:49 10   Q.    Just generally speaking, not exact locations, but where

11   generally were they located?

12   A.    Outside the building, entrances, registers, and then all

13   throughout the store, mainly one in every department.

14   Q.    Was the video from the surveillance cameras recorded?

15   A.    Yes.

16   Q.    How long were you assistant manager, associate manager,

17   there?

18   A.    At the Prospect Street location?

19   Q.    Yes.

05:49 20   A.    For about a year.

21   Q.    During the course of your job, did you ever need to review

22   the tapes to see what was on them?

23   A.    Yes.

24   Q.    Did the recordings appear to be fair and accurate

25   recordings of what the cameras were pointed at?

1    A.    Yes.

2    Q.    Did the recordings have a date and timestamp on them?

3    A.    They do.

4    Q.    And were those accurate?

5    A.    Yes.

6    Q.    Were you asked to review surveillance video in connection

7    with the Marathon bombing investigation?

8    A.    I was, yes.

9    Q.    How did that come about?

05:50 10    A.    Two FBI agents came into the building, and they basically

11    said that they thought that someone was in the building and if

12    I could walk them through the security cameras.

13    Q.    Did you pull up security cameras for the day of the

14    Marathon bombings?

15    A.    I did, yes.

16    Q.    Did you recently review a compilation of surveillance

17    camera videotape in my office?

18    A.    I did.

19    Q.    Was that a composite of the surveillance video that you

05:50 20    showed to the agents on that day?

21    A.    Yes, it was.

22    Q.    Did you watch it with them on that day?

23    A.    I did, yes.

24    Q.    Was what you saw in my office a fair and accurate copy of

25    what you showed to the officers on that day?

1    A.    Absolutely.

2    Q.    And what was on the surveillance system?

3    A.    Yup.

4    Q.    By "composite," I mean it shows images from different

5    cameras in sequence.

6    A.    Correct.

7    Q.    Okay.

8          MR. WEINREB:  That's Exhibit 1456, which the

9    government offers into evidence.

05:51 10          MS. CLARKE:  No objection.

11          THE COURT:  All right.

12   (Government Exhibit No. 1456 received into evidence.)

13          MR. WEINREB:  Mr. Bruemmer, if I might have 1456.

14   Before we start playing it, actually --

15   Q.    So the date stamp in the lower left-hand corner, can you

16   read what date and time that says it is?

17   A.    4/15/2013 at 3:12:37 p.m.

18   Q.    So 3:12, it's -- 37 is the seconds?

19   A.    Correct.

05:51 20   Q.    So what are we -- what's the camera aimed at right here?

21   A.    This is the main entrance to the building, the in-and-out

22   door.

23   Q.    I'm pausing it for a second.  There's a white circle

24   there.  I assume that wasn't in the original?

25   A.    Correct.

1    Q.    So that's been drawn around this particular figure?

2    A.    Yes.

3    Q.    Is that the person who the police said they were

4    interested in seeing images of if he was there?

5    A.    Yes.

6    (Video played.)

7    Q.    Is this basically tracking this individual as he walks

8    through the store?

9    A.    Yes.

05:52 10   Q.    What's right there where he's stopped?

11   A.    That's the dairy set.  So he just lifted milk off the

12   shelf.

13   Q.    Okay.  So it appears he just paid for the milk?

14   A.    Correct.

15   Q.    And according to the timestamp here, it's 3:14?

16   A.    Correct.

17   (Video played.)

18   Q.    So at the time he exits the building, can you tell us what

19   time it says on the videotape?

05:54 20   A.    3:15:01.

21   (Video played.)

22   Q.    Now, what time does the video show?

23   A.    3:16.

24   Q.    When people pay for their purchases at that store and get

25   a receipt, is an electronic copy of the transaction kept in the

1      store system?

2      A.    There is, yes.

3      Q.    Is it possible to retrieve the copy later?

4      A.    Yes.

5      Q.    Did you do that in this case?

6      A.    I did not.  Someone -- a member of customer service did.

7            MR. WEINREB:  Can we have Exhibit 1502 just for the

8      witness, please, your Honor?

9      Q.    Do you recognize what's on the screen?

05:57 10   A.    I do.

11     Q.    Is that the receipt?

12     A.    Yes, it is.

13     Q.    How does the date and time on the receipt compare to the

14     date and time of the milk purchase on the video?

15     A.    Just about spot on, 4/15/2013 at 14:15, so military time.

16           MR. WEINREB:  Your Honor, the government offers 1502.

17           MS. CLARKE:  No objection.

18     (Government Exhibit No. 1502 received into evidence.)

19           MR. WEINREB:  If we could publish it to the jury.

05:57 20   Q.    What does this receipt reflect?

21     A.    This is the purchase for High Lawn Farms milk, whole milk.

22     Q.    How much was purchased?

23     A.    3.49, paid with cash of $20 and received 16.51 back.

24     Q.    What does that buy you when you're buying High Lawn milk,

25     how much milk?

1    A.    It's a half gallon of milk.

2              MR. WEINREB:  Thank you.

3              MS. CLARKE:  No questions.  Thank you very much.

4              THE COURT:  Thank you.  You may step down.

5              MR. WEINREB:  The government calls Greg Homol.

6              THE CLERK:  Sir, step up here, please.  Remain

7    standing.  Raise your right hand.

8              GREGORY HOMOL, Sworn

9              THE CLERK:  Have a seat.  State your name.  Spell your

05:59 10   last name for the record.  Keep your voice up and speak into

11   the mic so everyone can hear you.

12             THE WITNESS:  Gregory Homol, H-o-m-o-l.

13   DIRECT EXAMINATION BY MR. WEINREB:

14   Q.    Good afternoon, Mr. Homol.

15   A.    Good afternoon.

16   Q.    Where do you work?

17   A.    At UMass Dartmouth.

18   Q.    At what part?

19   A.    I'm the director of the fitness center.

05:59 20   Q.    What's your job at the UMass Dartmouth Fitness Center?

21   A.    I am the director.

22   Q.    How long have you been the director?

23   A.    Fifteen years.

24   Q.    What are your job responsibilities there?

25   A.    Overall management of the facility, day-to-day operations.

1    I supervise professional staff, work study students, aerobics

2    instructors.  And I oversee our strength and conditioning

3    program for the Athletic Department.

4    Q.    Who's allowed to used the fitness center at UMass

5    Dartmouth?

6    A.    Students, faculty, staff, alumni, and employee family

7    members.

8    Q.    Can they use it more or less whenever they want?

9    A.    Yes.

06:00 10   Q.    How do you limit use to the people who are allowed to use

11   it?

12   A.    We don't limit use.

13   Q.    What I mean is how do you prevent just random people from

14   walking in off the street and using it?

15   A.    Okay.  We have a check-in, a card check-in system.  When a

16   person comes in, the first thing they do is they swipe in.

17   Q.    So they have some kind of UMass Dartmouth issued ID?

18   A.    Yes.  It's a key tag, barcoded.

19   Q.    What does it mean to swipe in?

06:00 20   A.    There's an eye, an electronic eye, that they put the card

21   in front of.  When it does that, it triggers our system to pull

22   up the member's profile basically with a picture and their

23   standing.  If they're in good standing, they're able to use the

24   facility.

25   Q.    Does the system store the swipe data?

1    A.    Yes.

2    Q.    Does it store the date and time that each particular

3    person swiped in?

4    A.    Yes.

5    Q.    By their name?

6    A.    Yes.

7    Q.    During your 15 years as director of the fitness center,

8    have there been times when you've had to pull up swiped data?

9    A.    Yes.

06:01 10   Q.    How many times?

11   A.    Many times.

12   Q.    To the best of your knowledge, have the data been

13   accurate?

14   A.    Yes.

15   Q.    Are there also security cameras at the fitness center?

16   A.    Yes, there are.

17   Q.    Where are they located?

18   A.    At the -- at that time we had two:  one behind the

19   reception desk and one pointing down the main hallway.

06:01 20   Q.    Again, during your 15 years as director of the fitness

21   center, have there been times when you had to review

22   surveillance video?

23   A.    Yes.

24   Q.    To the best of your knowledge, has the video been

25   accurate?

1    A.    Yes.

2    Q.    Do you remember the morning of April 19, 2013?

3    A.    Yes, I do.

4    Q.    What happened that morning?

5    A.    It was kind of a quiet morning.  There was news that

6    something had gone on with the bombing suspects, and so we had

7    the television on.

8    Q.    Just to be clear, the bombing itself had taken place on

9    April 15th?

06:02 10    A.    Correct.

11    Q.    So that was about five days earlier?

12    A.    Yes.

13    Q.    And you heard something had happened with the suspects?

14    A.    Yes.

15    Q.    Please continue.

16    A.    Somebody -- a coworker had come in and said that one of

17    the suspects was a student, and I had instructed that person to

18    not spread rumors, that we have no knowledge of that, that, you

19    know, let's not cause any rumors getting spread out.  I had my

06:02 20    work study student who was sitting at the desk just punch in a

21    name; and when he did, the profile popped up that, in fact, it

22    was a student.

23    Q.    So a student at UMass Dartmouth?

24    A.    Yes.

25              MR. WEINREB:  Can we have Exhibit 1180H5 just for the

```
 1  witness, please?

 2  Q.   If you could look at the screen in front of you, do you

 3  recognize what that is?

 4  A.   Yes.  That's one of the reports from my system.

 5  Q.   Is that swipe data --

 6  A.   Yes.

 7  Q.   -- that you were describing?

 8       To the best of your knowledge, is that accurate data?

 9  A.   Yes, it is.

10          MR. WEINREB:  The government offers Exhibit 1180H5.

11          MS. CLARKE:  No objection.

12          THE COURT:  Okay.

13  (Government Exhibit No. 1180H5 received into evidence.)

14  Q.   If you could look at the second name up from the bottom,

15  does that say "Jahar Tsarnaev"?

16  A.   Yes.

17  Q.   And when does it indicate that he -- does he indicate that

18  he swiped into the fitness center at a particular date and

19  time?

20  A.   It does.

21  Q.   What date and what time?

22  A.   March 16, 2013, at 9:05 p.m.

23  Q.   Just so the record is clear, you said "March," but there's

24  a "4" there.

25  A.   I'm sorry.  April 16th.
```

```
 1    Q.   Now, this particular swipe system, they don't have to
 2    swipe out, is that correct?
 3    A.   Correct.
 4    Q.   But the surveillance camera system, would that -- if you
 5    saw the same person go out who would come in, would that let
 6    you know when they had come out?
 7    A.   Yes.
 8              MR. WEINREB:  No further questions.
 9              MS. CLARKE:  Thank you.  No questions.
10              THE COURT:  Thank you, Mr. Homol.  You may step down.
11              MR. WEINREB:  Your Honor, the government calls
12    Christopher Frias.
13              CHRISTOPHER FRIAS, Sworn
14              THE CLERK:  State your name.  Spell your last name for
15    the record.  Keep your voice up and speak into the mic so
16    everyone can hear you.
17              THE WITNESS:  Christopher Frias.  Last name is
18    F-r-i-a-s.
19    DIRECT EXAMINATION BY MR. WEINREB:
20    Q.   Good afternoon, Mr. Frias.
21    A.   Good afternoon.
22    Q.   Where do you work?
23    A.   UMass Dartmouth.
24    Q.   What's your job there?
25    A.   IT infrastructure project manager.
```

1    Q.    What does "IT" stand for?

2    A.    Information technology.

3    Q.    How long have you had that job?

4    A.    Be 12 years in June.

5    Q.    What are your job responsibilities?

6    A.    To administer the network, voice, cable TV, security, and

7    access control systems.

8    Q.    Do the security and access control systems include

9    surveillance camera systems?

06:06 10   A.    It does.

11   Q.    In the course of your work, do you sometimes review

12   surveillance data -- surveillance video taken by the system?

13   A.    Yes.

14   Q.    Does the system take fair and accurate videos?

15   A.    Yes.

16   Q.    Do the surveillance videos have a date and timestamp on

17   them?

18   A.    Yes.

19   Q.    In your experience, are they accurate?

06:06 20   A.    Yes.

21   Q.    Were you asked to help in the Marathon bombing

22   investigation?

23   A.    Yes.

24   Q.    How?

25   A.    On Friday, I was called into work.

1    Q.   Do you remember what the date was?

2    A.   It was the 19th.  I was called into work, and I was asked

3    to assist the UMass Police with gathering information and

4    preserving data.

5    Q.   So what did you do to preserve data?

6    A.   On the access control system and the camera system, we

7    took a snapshot, which is basically like taking a picture and

8    preserving that data.

9    Q.   Were you asked to do anything in particular in connection

06:07 10   with the fitness center?

11   A.   Yes.  I was approached by the police with a time and date

12   and to look for a person of interest.  So what we did is we sat

13   down at our console and reviewed the video until we found what

14   they were looking for.

15   Q.   If you could --

16        MR. WEINREB:  If we could have 1180H5 again, please?

17   This is already in evidence, your Honor.

18   Q.   So if you'd direct your attention to that exhibit and look

19   at the second line up from the bottom where it says "Jahar

06:08 20   Tsarnaev," were you asked to pull surveillance video for the

21   fitness center from that date and time?

22   A.   Yes.

23   Q.   And did you?

24   A.   Yes.

25   Q.   How many segments of video did you pull?

```
 1   A.   So a total of three segments of data.

 2   Q.   What did the first one show?

 3   A.   So it was the entry and then the exit of the fitness

 4   center.

 5        MR. WEINREB:  Your Honor, now just for the witness,

 6   could we have Exhibit 1504, please?

 7   Q.   Do you recognize this?

 8   A.   I do.

 9   Q.   What is it?

10   A.   That is an image of the Indigovision software that we use

11   at the fitness center and on campus.

12   Q.   Is that a screenshot from a surveillance video?

13   A.   Yes.

14   Q.   The -- and is it a screenshot from the first video segment

15   you pulled?

16   A.   Yes.

17   Q.   Looking in the lower left-hand corner, does it show what

18   the date and time is of the segment?

19   A.   Yes, it does.

20   Q.   What's the date and time of that segment?

21   A.   April 16th, and the time is 21:05.

22   Q.   "21" meaning 9:05 p.m.?

23   A.   Yes.

24   Q.   And then --

25        MR. WEINREB:  Your Honor, the government would offer
```

1    Exhibit 1504.

2              MS. CLARKE:  No objection.

3              THE COURT:  Okay.

4    (Government Exhibit No. 1504 received into evidence.)

5              MR. WEINREB:  If we could publish it?

6    Q.   Do you recall reviewing this segment in my office the

7    other day?

8    A.   I do.

9    Q.   The -- not just this picture but the video segment that

06:09 10   this is a screenshot from?

11   A.   Yes.

12   Q.   Was that a fair and accurate copy of the video segment you

13   pulled on that day?

14   A.   Yes.

15             MR. WEINREB:  The government offers Exhibit 1181.

16             MS. CLARKE:  No objection.

17             THE COURT:  Okay.

18   (Government Exhibit No. 1181 received into evidence.)

19             MR. WEINREB:  If we could have 1181 and play it,

06:10 20   please.

21   (Video played.)

22   Q.   Now, that gesture that person just made, what was that?

23   A.   When you check into the gym, you present a bar code, and

24   that's what verifies that you're active or not active.

25   Q.   So that was the swipe?

1    A.    Yes.

2    Q.    And now the door that person just entered, what is that

3    the door to?

4    A.    That's the door to the fitness center.

5    Q.    Exhibits 1182 and 1183, did you also review the other two

6    segments that you described, the exit and the hallway videos?

7    A.    Yes.

8    Q.    Were they fair and accurate?

9    A.    Yes.

06:11 10          MR. WEINREB:  The government offers 1182 and 1183.

11          MS. CLARKE:  No objection.

12          THE COURT:  Okay.

13   (Government Exhibit Nos. 1182-1183 received into evidence.)

14   Q.    And 1505 and 1506, were those screenshots from the first

15   frames of those videos?

16   A.    Yes.

17          MR. WEINREB:  Could we have 1505, please?  Yes, 1505.

18   Q.    So you testified earlier that the earlier segment began at

19   9:05 p.m.  What is the date and time of this segment?

06:12 20   A.    April 16th, and the time is 22:08.

21   Q.    That's 10:08 p.m.?

22   A.    That's correct.

23          MR. WEINREB:  If we could play 1182, please.

24   (Video played.)

25          MR. WEINREB:  1506, please.

```
 1              THE COURT:  I don't know that you formally offered
 2    1505 and 6.
 3              MR. WEINREB:  I'm sorry.
 4              THE COURT:  Any objection?
 5              MR. WEINREB:  I thought I had but if I hadn't, I offer
 6    them now.
 7              THE COURT:  I don't think so.  So they're admitted.
 8              MR. WEINREB:  Very well.
 9    (Government Exhibit Nos. 1105-1106 received into evidence.)
06:13 10              MR. WEINREB:  1506, please.
11    Q.   And what's the date and time indicated on this segment?
12    A.   April 16th, and the time is 22:08.
13    Q.   So 10:08.  What are we seeing here?  What's the --
14    A.   So this camera shows a secondary means of egress out of
15    the fitness center, the back door, if you will, and that's what
16    it's looking down.
17              MR. WEINREB:  If we could play 1183.
18    (Video played.)
19              MR. WEINREB:  Thank you, Mr. Frias.
06:14 20              THE COURT:  Any exam?
21              MS. CLARKE:  Thank you.  No questions.
22              THE COURT:  Thank you.
23              MR. CHAKRAVARTY:  The government calls Agent Steve
24    Kimball.
25              STEVEN A. KIMBALL, Sworn
```

```
 1              THE CLERK:  Have a seat.  State your name.  Spell your
 2     last name for the record.  Keep your voice up and speak into
 3     the mic.
 4              THE WITNESS:  Yes, sir.  Steven A. Kimball,
 5     K-i-m-b-a-l-l.
 6     DIRECT EXAMINATION BY MR. CHAKRAVARTY:
 7     Q.    Good afternoon.  Where are you employed?
 8     A.    Appointed?
 9     Q.    Where are you employed?  Excuse me.
10     A.    With the FBI office in Boston.
11     Q.    Are you an FBI special agent?
12     A.    Yes.
13     Q.    How long have you been an agent?
14     A.    Approximately ten years.
15     Q.    What different -- have you worked in different field
16     offices?
17     A.    Yes.  I worked in the Newark FBI office.  I've also worked
18     out of our headquarters components.
19     Q.    Back in April of 2013, were you assigned to the Boston
20     Field Division?
21     A.    Yes.
22     Q.    As part of your roles as an agent, did you participate in
23     the Boston Marathon investigation?
24     A.    Yes, I did.
25     Q.    In fact, after the Boston Marathon explosions that
```

1    occurred, was the entire field office mobilized to respond?

2    A.    Yes, it was.

3    Q.    In the days after the Boston Marathon bombing, was a

4    command post set up at the Boston field office headquarters?

5    A.    Yes.

6    Q.    Can you describe generally what the atmosphere was there?

7    A.    Basically, we had a lot of government agencies from across

8    the state and region that were centered on the eighth floor and

9    tried to coordinate the effort as far as the investigative

06:16 10    effort, in reaction to the bombings.

11    Q.    Now, after the suspects were identified --

12    A.    Yes.

13    Q.    -- were there internet searches to determine whether those

14    individuals had any social media accounts?

15    A.    Yes, there was.

16    Q.    Were certain social media accounts actually identified?

17    A.    Yes, there was.

18    Q.    Was there particularly a Twitter account that was

19    associated with Jahar Tsarnaev?

06:16 20    A.    Yes, there was.

21    Q.    How did you discover that?

22    A.    That was discovered in the morning hours after reviewing

23    essentially open-source media and also receiving tips from the

24    public.

25    Q.    Do you remember the handle that was used by Jahar Tsarnaev

```
 1   for his --

 2   A.   J_tsar.

 3   Q.   J_tsar?

 4   A.   Uh-uhm.

 5   Q.   At some point later, was there another Twitter account

 6   associated with the defendant?

 7   A.   Yes, there was.

 8   Q.   What was that called?

 9   A.   Al_FirdausiA.

10   Q.   How did you find that?

11   A.   That was basically found -- essentially, it was connected

12   to that account from -- they basically were linked together

13   because they were essentially following each other, is the best

14   way to explain it.

15   Q.   Now, as part of your role in the investigation, at some

16   point later, did you apply for search warrants?

17   A.   Yes, I did.

18   Q.   And part of some of those search warrants -- were there

19   dozens of search warrants that you applied for for various

20   different things?

21   A.   Yes.

22   Q.   Were some of the search warrants for these Twitter

23   accounts?

24   A.   Yes.

25   Q.   The Twitter account under the name J_tsar and the Twitter
```

1    account for the name Al_FirdausiA?

2    A.    Yes.

3    Q.    Did you -- did the FBI receive results of those search

4    warrants?

5    A.    Yes, they did.

6    Q.    Are Twitter accounts available for the public to view

7    without a search warrant?

8    A.    Yes, in most cases, yes.

9    Q.    Can you just explain for the, jury for those who don't

06:18 10   have their own Twitter account, just how Twitter works a little

11   bit?

12   A.    Twitter is basically a public messaging system where

13   someone creates an account with a user name and a display

14   profile, and they can post information to the internet and

15   share that information with other like-minded users who want to

16   share that information.

17   Q.    With regards to the J_tsar Twitter account, did -- when

18   the Twitter provided records related to that account, did it

19   provide subscriber information for that account?

06:18 20   A.    Yes, it did.

21        MR. CHAKRAVARTY:  I'm going to ask Mr. Bruemmer to

22   pull up just for the witness and the Court Exhibit 1264.

23   Excuse me.  Sorry.  1274.

24   Q.    Is this the subscriber information for the J_tsar account?

25   A.    Yes, it is.

1            MR. CHAKRAVARTY:  And 1264.

2     Q.   Is the subscriber information for the Al_FirdausiA

3     account?

4     A.   Yes, it is.

5            MR. CHAKRAVARTY:  I'd move 1264 and 1274 into

6     evidence.

7            THE COURT:  Any objection?

8            MS. CLARKE:  No objection.

9            THE COURT:  Okay.

06:19 10   (Exhibit No. 1274 received into evidence.)

11    (Exhibit No. 1264 received into evidence.)

12           MR. CHAKRAVARTY:  Could we just publish, please, your

13    Honor?

14    Q.   Agent Kimball, after you received the response from

15    Twitter with regards to the contents of each of these accounts,

16    can you compare them with the data that had been collected

17    through just publicly browsing to those two Twitter accounts?

18    A.   Yes.

19    Q.   And did they compare favorably?

06:20 20   A.   Yes, they did.

21    Q.   Now, this exhibit -- excuse me.

22         So this Exhibit 1264, is this the subscriber information

23    for the Al_FirdausiA account?

24    A.   Yes, it is.

25    Q.   Does it list the person who -- the name of the person who

```
  1   opened this account?

  2   A.   Not here.

  3   Q.   So how do you know who that person is based on this

  4   information?

  5   A.   That was through subscriber information of the Gmail that

  6   is listed there.

  7   Q.   So there's an email address associated with the Twitter

  8   account?

  9   A.   Yes.

06:20 10  Q.   That's this email address here I just circled,

 11   Tsar1Jahar@gmail.com?

 12   A.   Yes.

 13   Q.   Subsequently, did you obtain -- actually, did you

 14   separately obtain from Gmail, which is the Google's email

 15   service, the subscriber information to that account?

 16   A.   Yes.

 17   Q.   Was that, in fact, subscribed to Jahar Tsarnaev?

 18   A.   Yes.  It came back to the defendant.

 19   Q.   And the date that this account was created, is that listed

06:21 20  here that I just underlined in red?

 21   A.   Yes.

 22   Q.   That's March 11, 2013?

 23   A.   Yes.

 24   Q.   Do you know what this means?

 25   A.   That is the creation IP.
```

1    Q.   Do you know, in laymen's terms, what an IP is?

2    A.   Internet Protocol.  Essentially, it's the address on the

3    internet where that was created.

4    Q.   Are you familiar with where this internet protocol address

5    resolves to?

6    A.   Yes.  It resolves back to the University of Massachusetts

7    Dartmouth.

8              MR. CHAKRAVARTY:  Back to 1274.

9    Q.   Is this similarly the subscriber information that Twitter

06:21 10   provided with regards to the J_tsar Twitter account?

11   A.   Yes, it is.

12   Q.   And is this the email address associated with the account?

13   A.   Yes.

14   Q.   And did you also apply for a search warrant for -- excuse

15   me.  Did someone apply for a search warrant for the contents of

16   that account?

17   A.   Yes, they did.

18   Q.   And was that -- did that account also come back to Jahar

19   Tsarnaev?

06:22 20   A.   It did.  It came back to the defendant.

21   Q.   And this IP address, are you familiar with that?

22   A.   Yes, I am.

23   Q.   Where did that resolve to?

24   A.   That also resolves back to the University of Massachusetts

25   Dartmouth.

1    Q.   And this account was created back in 2011; is that fair to

2    say?

3    A.   Yes, it was.

4    Q.   All right.  So I'm going to ask you now to go through some

5    of the tweets or the posts on this account, the J_tsar account,

6    that were observed after the bombing.  Do you know

7    approximately how many tweets there were on that account?

8    A.   There are approximately 1,100.

9    Q.   We don't have all 1,100 today, right?

06:22 10   A.   No.

11   Q.   There are just a select few that we selected?

12   A.   Yes.

13              MR. CHAKRAVARTY:  Can we call up Exhibit 1320 --

14   excuse me.  1320, please, yes.  I'm sorry, 1313, we'll start.

15   Q.   Now, is this one of the tweets that was extracted from the

16   publicly available Twitter account of J_tsar?

17   A.   Yes, it was.

18   Q.   Was this tweet also within the contents of the search

19   warrant we were talking about?

06:23 20   A.   Yes, it was.

21   Q.   Was that true for all of the tweets that we've looked at

22   that you're going to present to the jury?

23   A.   Yes, it is.

24   Q.   And so is it fair to say that Exhibits 1274 -- excuse me,

25   1275 through 1320 are all fair and accurate renditions of the

1  tweets posted on the J_tsar account and the Al_FirdausiA

2  account?

3  A.   Yes, they are.

4       MR. CHAKRAVARTY:  I'd move into evidence Exhibits 1275

5  through 1320.

6       MS. CONRAD:  No objection.

7       THE COURT:  Okay.

8  (Exhibit Nos. 1275-1320 received into evidence.)

9       MR. CHAKRAVARTY:  If I could publish, your Honor?

06:24 10  Q.   Agent Kimball, is this the first tweet on the J_tsar

11  account that occurred after the Boston Marathon bombing?

12  A.   Yes, it is.

13  Q.   Just to orient the jury on the contents of this page, can

14  you describe the various features of what appears on this page?

15  A.   Sure.  The first thing you're going to look at is the user

16  name, or Twitter handle is another commonly-used term.  That's

17  the @J_tsar.  Then you have the display name, which is Jahar,

18  J-a-h-a-r.  And then you have a display picture, which in this

19  case is a lion.  That's essentially it.

06:24 20  Q.   Now, the -- this was put on for purposes of the

21  presentation to the jury, is that right?

22  A.   Yes.

23  Q.   So this content -- to explain how Twitter works, is this a

24  message that the user of the account types into the account?

25  A.   Yes.

1    Q.    And then that is visible by everyone?

2    A.    Yes, it is.

3    Q.    And this date and time that appear, did you determine what

4    time zone that time is from?

5    A.    That time zone is Pacific Standard Time.

6    Q.    Was that compared to the results of the search warrant to

7    determine that?

8    A.    Yes.

9    Q.    So Pacific Standard Time is three hours behind Eastern

06:25 10   Standard Time, is that right?

11   A.    Yes, it is.

12   Q.    So at around 8 p.m. Eastern Standard Time, is it fair to

13   say this tweet was made?

14   A.    Yes.

15   Q.    And can you read it, please?

16   A.    "Ain't no love in the heart of the city, stay safe,

17   people."

18            MR. CHAKRAVARTY:  1314, please.

19   Q.    Agent Kimball, are you familiar with when, before a tweet

06:26 20   goes out, that there is an @ and then the name of another user,

21   what that means in Twitter language?

22   A.    Essentially, you're directing that tweet or message at

23   that user.

24   Q.    Do other people who surf to this account get to see that

25   tweet?

 1    A.    Yes.

 2    Q.    So it's not a private message?

 3    A.    No.

 4          MR. CHAKRAVARTY:  1315, please.  And 1316.

 5    Q.    Can you read this message, please?

 6    A.    "There are people that know the truth but stay silent &

 7    there are people that speak the truth but we don't hear them

 8    cuz they're the minority."

 9    Q.    Now, this tweet was at 12:34 on April 16th, is that right?

06:27 10    A.    Yes.

11    Q.    And that's because I added three hours to this number up

12    here, right?

13    A.    Yes.

14    Q.    Back to 1315.  I didn't mean to ignore this.  Now, is this

15    a tweet from the J_tsar account?

16    A.    No.  That is a tweet that the J_tsar account is responding

17    to.

18    Q.    So the user of this account responded to this tweet?

19    A.    Yes.

06:27 20          MR. CHAKRAVARTY:  I'm sorry.  Is there a second page

21    to this?  No.  Sorry.  Is there a first page?  1314, please.

22    Is there a second page to that?  Go back to 1315.

23    Q.    Do you remember what the J_tsar tweet was related to this

24    account -- related to this post?

25    A.    The J_tsar tweet in regards to this was essentially --

1    "fake story" was the response that was tweeted out to this

2    story.

3    Q.   So the user of J_tsar wrote "fake story"?

4    A.   Yes.

5              MR. CHAKRAVARTY:  Exhibit 1317, please.

6    Q.   Now, is this a tweet from April 16th, at approximately

7    1:22 p.m.?

8    A.   Yes.

9    Q.   Can you read that, please?

06:28 10   A.   "So then I says to him, I says, relax bro my beard is not

11   loaded."

12             MR. CHAKRAVARTY:  And Exhibit 1318.  Sorry.

13   Q.   Is this the tweet I was referring to earlier --

14   A.   Yes.

15   Q.   -- that you already described?

16             MR. CHAKRAVARTY:  Exhibit 1319, please.

17   Q.   Can you read this?

18   A.   "Nowadays everybody wanna talk like they got somethin to

19   say but nothin comes out when they move their lips; just a

06:29 20   bunch of gibberish."

21   Q.   Agent Kimball, did you learn what this is?

22   A.   This is basically lyrics to a rap song.

23   Q.   Again, this is April 16, the day after the Marathon

24   bombing?

25   A.   Yes.

1           MR. CHAKRAVARTY:  Exhibit 1320, please.

2   Q.   Agent Kimball, is this the last tweet authored by the user

3   of J_tsar?

4   A.   Yes.

5   Q.   And can you read it?

6   A.   "I'm a stress free kind of guy."

7   Q.   Now, before the Marathon bombing, were there -- I think

8   you described there are over a thousand tweets, is that right?

9   A.   Yes, approximately.

06:29 10          MR. CHAKRAVARTY:  Can we go to Exhibit 1312, please?

11   Now, this is the last tweet from the J_tsar account before the

12   Marathon bombing; is that fair to say?

13   A.   Yes.

14   Q.   This is close to midnight on the night before the bombing,

15   11:39 p.m.?

16   A.   Yes.

17   Q.   And was this a message to another person with this user

18   name?

19   A.   Yes, it was.

06:30 20          MR. CHAKRAVARTY:  Go to 1313, please.  Sorry.  1311,

21   please.

22   Q.   Two days before the bombing, was there this message?

23   A.   Yes.

24   Q.   And, again, is this to a specific person using @Kid_Wavyy?

25   A.   Yes, it is.

1    Q.   Can you just read it?

2    A.   "@Kid_Wavyy, yea man never get into a family plan with

3    foreigners."

4    Q.   Do you know what that means?

5    A.   I do not.

6         MR. CHAKRAVARTY:  Exhibit 1310, please.

7    Q.   This is on April 10th, which is just before the weekend,

8    the week before the bombing, I think the Thursday.  Can you

9    read this one?

06:31 10   A.   "Most of you are conditioned by the media."

11         MR. CHAKRAVARTY:  1309, please.

12   Q.   Can you read this one?

13   A.   "If you have the knowledge and the inspiration all that's

14   left is to take action."

15   Q.   This is a little over a week before the Marathon bombing,

16   is that right?

17   A.   Yes.

18         MR. CHAKRAVARTY:  1308, please.

19   Q.   Can you read this one?

06:31 20   A.   "You have to make tough decisions today and those

21   decisions will influence your future.  Hardships will arouse

22   and you will role up loud.

23   Q.   Do you know what that means?

24   A.   I don't.

25         MR. CHAKRAVARTY:  1307, please.

        1   Q.   This is on March 20 of 2013.

        2   A.   "Evil triumphs when good men do nothing."

        3        MR. CHAKRAVARTY:  Exhibit 1306, please.

        4   Q.   This is, again, on March 20, 2013, another one.  Can you

        5   read this one, please?

        6   A.   Yes.  "Once you feel you are avoided by someone never

        7   disturb them again."

        8        MR. CHAKRAVARTY:  1305, please.

        9   Q.   Can you read this one?

06:32  10   A.   "People come into your life to help you, hurt you, love

       11   you and leave you and that shapes your character and the person

       12   you were meant to be."

       13        MR. CHAKRAVARTY:  Exhibit 1304, please.

       14   Q.   This is just a message to somebody to say come outside?

       15   A.   Yes.

       16        MR. CHAKRAVARTY:  Exhibit 1303, please.

       17   Q.   Can you read this one?

       18   A.    "September 10th baby, you know what tomorrow is.  Party

       19   at my house?" #things you don't yell when entering a room."

06:33  20   Q.   Now, in Twitter language, what does something that appears

       21   after a hashtag mean?

       22   A.   A hashtag is basically a way to wrap a conversation around

       23   a certain topic, or you can also search by a hashtag.  So if

       24   you want to view individuals who have also posted under that

       25   same hashtag, you can search that hashtag and view those

     1    postings.

     2    Q.   Now, this was on March 14 of 2013?

     3    A.   Yes.

     4    Q.   I'm sorry.  Agent Kimball, was this post on March 14 of

     5    2013?

     6    A.   Yes.

     7         MR. CHAKRAVARTY:  Exhibit 1302, please.

     8    Q.   Can you read this one?

     9    A.   "Never underestimate the rebel with a cause."

06:33 10    Q.   Now, this post was on March 10, 2013, at about three

    11    minutes before midnight, is that right?

    12    A.   Yes.

    13    Q.   Now, the Al_FirdausiA account, on that same day, into the

    14    next day, did you see activity on that account from that day?

    15    A.   Activity on that account, the Al_FirdausiA account,

    16    occurred approximately three hours after this tweet.

    17    Q.   Okay.

    18         MR. CHAKRAVARTY:  Can we go to Exhibit 1267, please?

    19    I'm sorry, your Honor.  I'm not sure whether I moved in.

06:34 20         THE COURT:  1267 is not in.

    21    Q.   Were the Al_FirdausiA tweets that you matched up with the

    22    results of the search warrant -- were those Exhibits 1273

    23    through -- sorry, 1267 through 1273?

    24    A.   Yes.

    25    Q.   Sorry.  Were those -- did those also match up -- the

1    content of the search warrant matched what you saw that was

2    publicly available?

3    A.   Yes, they did.

4         MR. CHAKRAVARTY:  I would move in 1267 to 1273.

5         MS. CONRAD:  No objection.

6         THE COURT:  Okay.

7    (Exhibit Nos. 1267-1273 received into evidence.)

8    Q.   Is this the -- if you go back -- sorry.

9         MR. CHAKRAVARTY:  I'd also move in 1266, which is a

06:35 10   screenshot of the whole page.

11        THE COURT:  All right.

12        MS. CONRAD:  No objection.

13   (Exhibit No. 1266 received into evidence.)

14        MR. CHAKRAVARTY:  1266, please.

15   Q.   As I just suggested, is this what the Twitter page would

16   look like or did look like to the FBI person who downloaded

17   this?

18   A.   Yes, it did.

19   Q.   I'm just going to zoom in a little bit.  Let me start with

06:35 20   this.  In the upper left-hand corner, there's a word here and

21   then the account name here, is that right?

22   A.   Yes.

23   Q.   Do you know what this word is or what it means?

24   A.   Ghuraba, roughly translated, means stranger or strangers.

25   Q.   Is that the handle -- or the screen name, excuse me?

```
 1    A.    The screen name, yes.

 2    Q.    Is this a user-selected image?

 3    A.    Yes, it is.

 4    Q.    And is this also a user-selected image?

 5    A.    Yes, it is.

 6    Q.    Does that appear to be the holy city of Mecca?

 7    A.    Yes, it does.

 8    Q.    And then the tweets, are they listed in consecutive order

 9          on the Twitter page?

06:36 10   A.    Yes.

11    Q.    So is it reverse chronological order so the most recent

12          tweet is at the top?

13    A.    Yes.

14    Q.    So let's go to the first tweet.  Are these all of the

15          tweets that appeared on the Al_FirdausiA account?

16    A.    Yes.

17    Q.    So is this the first tweet that is available on this

18          account?

19    A.    Yes.

06:37 20   Q.    Can you read that?

21    A.    "I want the highest levels of Jannah, I want to be able to

22          see Allah every single day for that is the best of pleasures

23          #islam #alfirdaus."

24    Q.    Here I think you mentioned earlier that this account

25          followed the J_tsar account.  In fact, on the screenshot, does
```

         1    it say, "Ghuraba followed Jahar," amongst others?

         2    A.   Yes, it does.

         3         MR. CHAKRAVARTY:  Can we go to 1267.

         4    Q.   Is this another tweet from that account?

         5    A.   Yes, it is.

         6    Q.   Was this on March 11, 2013, at about 2:49 in the morning?

         7    A.   Yes.

         8    Q.   Can you read this one?

         9    A.   "Listen to Anwar Awlaki (a shaheed iA) the here after

06:38   10    series, you will gain an unbelievable amount of knowledge

        11    #islam #Muslim."

        12    Q.   Without saying who he is, you're familiar with who Anwar

        13    Awlaki is?

        14         MS. CONRAD:  Objection.  Foundation, your Honor.

        15         THE COURT:  You may answer if you know.

        16    A.   Yes, I am.

        17         MR. CHAKRAVARTY:  1268, please.

        18    Q.   Is this the post that you read from the screenshot --

        19    A.   Yes.

06:38   20    Q.   -- moments ago?

        21    A.   Yes.

        22         MR. CHAKRAVARTY:  1269.

        23    Q.   Is this one on March 11th at about 2:40 p.m.?

        24    A.   Yes.

        25    Q.   Does it say, "Salam aleikum wa rahmatullahi wa barakatu!"?

1    A.    Yes.

2    Q.    "Dear Muslim brothers & sisters, follow me for some

3    Islamic insight #islam #muslim"?

4    A.    Yes.

5    Q.    The first phrase, that first sentence, is that the

6    transliteration of an Arabic phrase?

7    A.    Yes.

8    Q.    Without knowing what specifically the words mean, do you

9    recognize that as a greeting in --

06:39 10   A.    Yes.

11          MR. CHAKRAVARTY:  Exhibit 1270, please.

12   Q.    Can you read this one on March 11th?

13   A.    "Ghuraba, means strangers.  Out here in the west, we

14   should stand out among the nonbelievers as one body #islam."

15          MR. CHAKRAVARTY:  1271, please.

16   Q.    Can you read this one?

17   A.    "Strive to be a better Muslim, be greedy with your time,

18   devote most of it to the Almighty for it is his satisfaction

19   that you need #islam."

06:40 20         MR. CHAKRAVARTY:  1272, please.

21   Q.    Can you read this one from the next day, March 12th?

22   A.    "Dua is truly the weapon of the believer, pray for the

23   oppressed it is your duty #islam, #muslim."

24          MR. CHAKRAVARTY:  Exhibit 1273, please.

25   Q.    Can you read -- is this the last post on the Al_FirdausiA

1   account by the user of the account?

2   A.   I believe it is.

3   Q.   Can you read this one?

4   A.   "It's our responsibility my brothers & sisters to ask

5   Allah to ease the hardships of the oppressed and give us

6   victory over kufr #islam #dua."

7   Q.   Just quickly going back to the J_tsar account, were there

8   other tweets on that J_tsar accounts before March 10 of 2013?

9   A.   Yes, there were.

06:41 10        MR. CHAKRAVARTY:  Can we go to Exhibit 1301, please.

11   Q.   Can you read this one?

12   A.   "Death is the destroyer of all pleasures."

13        MR. CHAKRAVARTY:  1300.  1299.

14   Q.   Does this say, "I'm in a New York State of mind?"

15   A.   Yes, it does.

16        MR. CHAKRAVARTY:  1298.

17   Q.   Is this a retweet -- excuse me, a response to somebody

18   else's tweet?

19   A.   Yes, because it starts with basically an @ and then the

06:41 20   muftimenk.

21   Q.   The date of this is about January 19 of 2013?

22   A.   Yes.

23        MR. CHAKRAVARTY:  And Exhibit 1297.

24   Q.   Can you read this one?

25   A.   "I don't argue with fools who say Islam is terrorism, it's

```
 1   not worth a thing, let an idiot remain an idiot."

 2        MR. CHAKRAVARTY:  1296.

 3   Q.   Can you read that one?

 4   A.   "You can hit the gym all you want but if you're a coward

 5   at heart dudes will still step all over you."

 6        MR. CHAKRAVARTY:  1295.

 7   Q.   Can you read that?

 8   A.   "It takes a lot of faith to elude hypocrisy."

 9        MR. CHAKRAVARTY:  1294.

10   Q.   Can you read that?

11   A.   "I kind of like religious debates, just hearing what other

12   people believe is interesting and then crushing their beliefs

13   with facts is fun."

14        MR. CHAKRAVARTY:  1293.

15   Q.   Does it say, "Free Palestine"?

16   A.   Yes.

17        MR. CHAKRAVARTY:  1292.

18   Q.   Can you read this one?

19   A.   "You guys know that the suicide rate for active duty

20   American soldiers is at an all time high for 2012, a suicide a

21   day, what's the #problem?"

22        MR. CHAKRAVARTY:  1290, please.  1289.  1288.  1286.

23   Q.   This has an Arabic word at the beginning "alhamdulillah,

24   for my family"?

25   A.   Yes.
```

```
 1              MR. CHAKRAVARTY:  1285.
 2    Q.   Now, is this tweet from back in May of 2012?
 3    A.   Yes.
 4    Q.   Can you just reed that?
 5    A.   "Freedom, we could use some of that especially where we
 6    from."
 7              MR. CHAKRAVARTY:  1284.
 8    Q.   What does that say?
 9    A.   "Proud to be from #chechnya."
06:44 10         MR. CHAKRAVARTY:  1283.
11    Q.   Can you read that?
12    A.   "When money speaks, truth doesn't."
13              MR. CHAKRAVARTY:  1281.
14    Q.   Now, is this Cyrillic writing?
15    A.   Yes.
16    Q.   Was that translated in 1282?
17    A.   Yes.
18              MR. CHAKRAVARTY:  1282, please.
19    Q.   Is this the translation?
06:44 20    A.   Yes, it is.
21              MR. CHAKRAVARTY:  1280, please.
22    Q.   Can you read that?
23    A.   "They will spend their money and they will regret it and
24    then they will be defeated."
25    Q.   You know what was happening that day?
```

1    A.    That was the Boston Marathon in 2012.

2              MR. CHAKRAVARTY:  That's all I have, your Honor.

3              THE COURT:  Anything?

4              MS. CONRAD:  Yes, your Honor.  Do you want me to start

5    now?

6              THE COURT:  No, I think we'd better not.

7              So we'll suspend here, jurors, and resume tomorrow at

8    9.  Remember my instructions.  Please avoid the news as much as

9    you can and avoid any discussion of the case.

06:45 10              Have a good evening.  We'll see you tomorrow and begin

11    again.  We'll be in recess.

12              THE CLERK:  All rise for the Court and the jury.

13    Court will be in recess.

14    (Whereupon, at 4:05 p.m. the trial recessed.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4   Dahlstrom, RMR, CRR, Official Reporters of the United States

5   District Court, do hereby certify that the foregoing transcript

6   constitutes, to the best of our skill and ability, a true and

7   accurate transcription of our stenotype notes taken in the

8   matter of Criminal Action No. 13-10200-GAO, United States of

9   America v. Dzhokhar A. Tsarnaev.

10

11  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
12  Official Court Reporter

13  /s/ Cheryl Dahlstrom
    CHERYL DAHLSTROM, RMR, CRR
14  Official Court Reporter

15
    Date:  9/25/15
16

17

18

19

20

21

22

23

24

25