UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 13-10200-GAO |
| ) | |
| DZHOKHAR TSARNAEV ) | |

**MOTION FOR ORDER TO MAINTAIN PROTECTION OF
PRIVILEGED AND CONFIDENTIAL
DEFENSE INFORMATION AND WORK PRODUCT**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully requests that the Court enter an order to maintain existing protection of confidential and privileged defense information and work product. Specifically, the Court should bar the government from proceeding with its stated intention to unilaterally terminate the Agreement to Protect Defense Information and Work Product ("the Agreement," attached hereto as Exhibit A). The Agreement was entered into by the defense and the government in July 2014 and was accepted by the Court to address some of the issues raised in litigation challenging the effect of Special Administrative Measures ("SAMs") on the defendant and counsel. In addition, separate and apart from the issue of *prospective* operation and enforcement of the Agreement, the prosecution team should be barred from proceeding with its stated intention to obtain information and records of the "firewalled" AUSA, and/or from "firewalled" FBI agents, developed during operation of the Agreement and pursuant to this Court's orders establishing that visits among the defendant, the defense team and, *e.g.,* his sisters, should be deemed "legal" in nature.

1

The government cannot be permitted to renege on the commitments it undertook and upon which the defendant and defense counsel have relied. Nor can the government be permitted to undo orders of this Court retrospectively. Post-trial litigation is ongoing, while direct appeal, collateral challenge(s), and the possibility of an eventual re-trial lie ahead. Even apart from any active court proceedings, an attorney-client relationship continues to exist. Protection of that relationship in the face of SAMs — including protection of privileged communications, confidential work product, and day-to-day functioning of the defense team — is no less important simply because the capital trial has concluded and a death sentence imposed.

In support of this motion, defendant sets forth the following procedural background and argument, also incorporating by reference the prior pleadings and arguments referenced therein.

## Background

On August 27, 2013, the Attorney General, at the behest of the U.S. Attorney, imposed Special Administrative Measures ("SAMs #1") that severely restricted the defendant's interactions as well as the communications and activities of the defense team.

On October 2, 2013, defendant filed a Motion to Vacate the Special Administrative Measures [DE 110] arguing, *inter alia*, that they violated due process and thwart effective assistance of counsel. The government filed an opposition on October 21, 2013 [DE 127] and the defendant filed a reply on November 4, 2013 [DE 138].

The Court addressed the motion at a hearing on November 12, 2013. During that proceeding, the government conceded that the Court "can consider those allegations

which relate to restrictions which allege an infringement upon a Sixth Amendment right to counsel." 11/12/13 Tr. at 22. After that hearing, the government made certain modifications to the SAMs. By e-mail received on November 22, 2013, the government modified Section 2.d of the SAMs to permit two named FDO-employed investigators to disseminate contents of the defendant's communication to third parties for the purpose of preparing the defense. By memorandum received on or about November 27, 2013, the government further modified sections 2.d, 2.e, and 2.f of the SAMs to permit additional named defense team members to disseminate communications and to meet with the defendant without the need for one of the attorneys to be present.

On February 11, 2014, the defendant filed a supplemental memorandum in support of his motion to vacate SAMs [DE 181-1, unsealed copy docketed on 2/20/14]. The memorandum raised issues concerning FBI monitoring of visits with the defendant's sisters and a defense team member as well as BOP screening of materials brought in by counsel for review with defendant. The government filed an opposition on February 28, 2014 [DE 207] and the defendant filed a reply on March 5, 2014 [DE 210].

At a motion hearing on April 16, 2014, the Court addressed the additional SAMs filings. Counsel noted that the parties were negotiating how to address protection of attorney work product, including the BOP inspection of defense materials. With regard to FBI monitoring of visits, the Court stated:

> So I would be inclined to do one of two things: One is – which I think is simpler, is to simply regard it as a legal visit, and therefore, exempt from the monitoring. And I don't really think that the safety/security issue limits very large on the facts as I can appreciate them on what I have.

3

> If it seems that the security interest as opposed to the investigative interest is higher than it appears to me, then I would agree with the defense proposal that it be someone unassigned and unaffiliated with the prosecution and investigative team, in a sense, you know. And their papers refer to it is a tank [*sic* – "taint"] officer of some kind. I think that's more complex. But if you think that there's an important issue of security that has to be addressed in that way, then I think that.
>
> But I don't think that the defense team, whether it's an attorney or an investigator or a mitigation specialist, ought to have an opportunity in this limited way to have a two- or three-way conversation among the siblings.

4/16/14 Tr. at 12-13. The Court stated that it would not "crystalize the order at this point" and left the parties to continue their negotiations. *Id.* at 14. In a written order issued later that day, the Court stated:

> On the Motion to Vacate Special Administrative Measures 110, the Court rules that visits to the defendant by defense counsel or other member(s) of the defense team for the purpose of preparing the defense are regarded as legal visits, and the presence of his sisters does not take the visits out of that category. The government shall either allow these visits without contemporaneous monitoring or propose a plan of contemporaneous monitoring that excludes members of the investigative or prosecutorial team. The government is to file a proposal within two weeks.

[DE 254.]

At a further status conference on June 18, 2014, the government reported, with regard to meetings among defense counsel, defendant, and his sisters:

> [W]e agreed that we would wall off and have essentially a tanked [*sic* - "taint"] agent. In the interim since the government filed that proposal, there has also been discussions between the defense and the government regarding a potential agreement where there would be a further walling off, if you will; that is, that the agent would only communicate with an assistant United States Attorney who is not part of the prosecution team. And there would only be discussions with the prosecution team if by a preponderance of the evidence the tanked [*sic*] agent and the tanked [*sic*] AUSA felt that there would be a violation of the SAMs.

4

6/18/14 Tr. at 5-6. The Court responded:

> Okay. I think the government's proposal as amended is satisfactory. And so you will put that into – including the addition of a fire-walled AUSA . . . from another district.

*Id.* at 6.

By order entered on June 23, 2014, the Court ruled: "Accepting the government's proposed protocol, which will involve a firewalled Assistant United States Attorney and a firewalled FBI agent, the defendant's Motion to Vacate Special Administrative Measures (dkt. no. 110) is DENIED." [DE 384.]

By letter dated July 1, 2014, the government transmitted to the defense the written Agreement to Protect Defense Information and Work Product that is the subject of this motion (Ex. A), and identified the "firewalled" AUSA, located in Rhode Island. The defense countersigned the Agreement on July 3, 2014. The Agreement shields from the prosecution team information concerning materials shown to Mr. Tsarnaev as well as SAM affirmations, BOP clearance forms, and visitor logs concerning Mr. Tsarnaev. It provides that any question or disagreement concerning defense materials or visits that cannot be resolved with BOP counsel will be addressed to the firewalled AUSA, and that any defense requests to modify paragraphs 2(d), 2(e), or 2(f) of the SAMs will be addressed with the firewalled AUSA.

In an ensuing exchange of correspondence with the government, the defense sought to clarify certain issues concerning operation of the Agreement. As to issues which remained unresolved, the defense filed a Motion for Setting of Firewall Procedures on July 21, 2014 [DE 427]. The government filed an opposition on August 4,

2014 [DE 448]. The Court addressed the motion at a hearing on August 14, 2014. By order issued the same day, the Court denied the motion, "except that the firewalled AUSA is to maintain a log of communications made to the BOP, the firewalled FBI agent, or the prosecutors in the case" [DE 487].

Subsequently and to date, the defense addressed visitation and clearance issues with the firewalled AUSA. Multiple visits of the sort that the Court deemed to be "legal" in nature took place, during which a firewalled FBI agent appeared to take notes.

On or about August 25, 2014, the SAMs were renewed ("SAMs #2"). In substance, the above-referenced SAM modifications (permitting dissemination of communications by and visits with additional named defense team members) were included in SAMs #2.

By e-mail dated May 8, 2015, while the sentencing phase of the trial was still under way, the government stated by email to the defense that "there is no longer any need for the prosecution team to be removed from matters relating to the administration of the SAMs. Effective immediately, the agreement is terminated." In a return email, defense counsel objected to the purported termination:

> We do not believe you have authority or basis to terminate the SAMs firewall Agreement unilaterally. As you know, the Court approved the Agreement and imposed a further communications logging requirement on firewall counsel by order dated 8/14/14 (DE 487).
>
> So long as we have an attorney-client relationship with Mr. Tsarnaev, all of the issues that required a firewall remain. Trial is still ongoing and both sides still are presenting testimony. An agreement to use a firewall until you decide it's not in your best interests isn't much of an agreement. Any circumvention of the firewall by the government would not only violate the letter and spirit of the Agreement but would also be a gross violation of

> attorney work product and the defendant's Sixth Amendment rights.
>
> Please inform us of the basis for the purported termination so that we can raise any issues with the Court.

The government responded in a further e-mail:

> Although the origins of the firewall Agreement make it far from clear which parts were ordered by the Court and which were simply negotiated by the parties, the issue is moot, because we currently have no intention of seeking any information currently limited to Firewall counsel except information relating to Sister Prejean's visits with your client. As we stated in lobby conference, we believe any work-product privilege arising from her meetings with the defendant has been waived by your stated intention of putting her on the witness stand, and/or has been rejected by the Court's requirement of a proffer of setting forth details of her visits with the defendant (which you have not provided).

After that exchange, the defense team continued to address visitation and clearance issues with the firewalled AUSA when necessary.

By e-mail dated May 14, 2015, in response to a defense request to schedule a visit for the defendant's sisters, BOP counsel replied that the visits would be scheduled as requested, but that, since the trial had concluded, the sisters would only be admitted alone as "social" visitors and could not be accompanied by a member of the defense team.

On August 15, 2015, renewed SAMs were imposed ("SAMs #3"). Certain earlier-incorporated modifications, *e.g.,* permitting dissemination of communications by defense team members other than attorneys, were removed from SAMs #3. The defense team has continued to address visitation and clearance issues with the firewalled AUSA.

By letter dated August 25, 2015, the government notified the defense that, once again, it intended to terminate the Agreement:

7

We are writing to notify you that effective September 4, 2015, the government will withdraw from the "Agreement To Protect Defense Information and Work Product" dated July 3, 2014. We have always viewed that agreement as strictly voluntary, and we believe changed circumstances -- namely, the defendant's conviction and imprisonment -- have rendered it obsolete and unnecessary. We intend to ask AUSA [T.D.] to transfer all of his files in this matter to us and inform him that his services as a "walled-off" AUSA in this matter are no longer needed.

Based on our review of the docket, we believe the Court issued only one order respecting the SAMs, namely, a requirement that mixed legal and social visits involving defense team members and one or both of the defendant's sisters be monitored, if at all, by a "walled-off" agent working in conjunction with a "walled-off" AUSA from another district. We believe this order was effectively terminated by the conclusion of legal proceedings in the district court.

We are providing 10 days' notice of our intent to withdraw from the Agreement to allow you time to seek relief in Court if you consider that necessary.

By letter dated August 28, 2015, the defense objected to the government's proposed course of action, requested an extension of time to September 28, 2015, in which to file a motion, and requested that the government agree to maintain the status quo until the Court resolves the issue. After subsequent communications, the government agreed to the September 28 filing date and to maintain the status quo pending the Court's ruling.

## Argument

The provisions in the Agreement designed to protect confidential and privileged defense information and work product as well as the Court's order requiring any monitoring of particular legal visits to be "firewalled" are necessary to protect the defendant's due process and Sixth Amendment rights as well as to protect well-

8

established principles of attorney-client privilege and work product. The Agreement has the force of the Court's acceptance, as modified by the additional requirement that the firewall AUSA maintain a written log of his communications. The Agreement does not contain any provision permitting unilateral termination and the government has provided no cogent justification for its stated intention to do so.

The government's contention in its August 25, 2015, letter that "the Court issued only one order respecting the SAMs, namely, a requirement that mixed legal and social visits involving defense team members, and one or both of the defendant's sisters be monitored, if at all, by a "walled-off" agent working in conjunction with a "walled-off" AUSA from another district" is not only beside the point but also incorrect.

As noted above, the government has now barred defense team members from accompanying defendant's sisters on visits, and presumably has ceased using a "firewalled" FBI agent to monitor such visits. The defense is not challenging those steps by the government at this time given the current stage of the underlying litigation. However, there can be no justification for the government to now obtain information and notes concerning prior visits that the Court deemed to be "legal" in nature and which the defense conducted with the understanding that they would remain privileged and confidential.

Moreover, the visitation issue is separate and distinct from the Agreement to Protect Defense Information and Work Product, as the government itself has recognized. For example, referring to the Agreement in a pleading, the government stated: "In agreements with Tsarnaev negotiated outside of Court the government has voluntarily

9

submitted to many restrictions on its own authority under the SAMs" [DE 448].   While the government may have entered the Agreement "voluntarily" just as any party enters a contract voluntarily, it did so in the shadow of the SAMs litigation to address some of the legitimate and serious defense objections to the SAMs.  The prosecution team has no right to know the details of every defense team visit with Mr. Tsarnaev nor the contents of materials the defense team is reviewing with Mr. Tsarnaev.  The Agreement protects this work product.  The Court was provided with a copy of the agreement and entered an additional order requiring the firewall AUSA to maintain a log of communications.  [DE 487.]

The First Circuit has repeatedly recognized in a variety of contexts that when the government enters an agreement with the defense in a criminal case, its promises are enforceable in accordance with ordinary contract principles.  *See, e.g.*, *United States v. Jimenez-Bencevi*, 788 F.3d 7 (1st Cir. 2015) ("Informal immunity agreements such as proffer agreements, are shaped . . . by the language of the contract conferring the immunity.") (internal quotation marks omitted, ellipsis in original); *United States v. Canada*, 960 F.2d 263 (1st Cir. 1992) (sentence vacated and remanded where prosecutor breached plea agreement in recommending sentence and in failing to inform court of full nature and extent of defendant's cooperation).  The government's promises in the Agreement, upon which the defense relied, must similarly be enforced here.

The government's assertion in its August 25 that the Agreement is "obsolete and unnecessary" in light of the defendant's conviction and imprisonment is unfounded.  The defendant's motion for a new trial is still pending in this Court, while direct appeal,

10

collateral challenge(s), and the possibility of an eventual re-trial or resentencing lie ahead. Even apart from any active court proceedings, an attorney-client relationship continues to exist. Notably, courts have taken measures to protect privileged information and work product even where a defendant has waived those protections in connection with a collateral challenge based on ineffective assistance of counsel. For example, in *Bittaker v. Woodford*, 331 F. 3d 715 (9th Cir. 2003), the court affirmed a protective order that limited the use of confidential and privileged materials for any purpose other than litigating the prisoner's federal habeas petition, and barred any sharing of the information with law enforcement or prosecutorial agencies. The court reasoned:

> If a prisoner is successful in persuading a federal court to grant the writ, the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free. Giving the prosecution the advantage of obtaining the defense case file – and possibly even forcing the first lawyer to testify against the client during the second trial – would assuredly not put the parties back at the same starting gate.

*Id.* at 722-723. Where, as here, no express or implied waiver has occurred, and where the protected material and information was created in reliance on a Court-approved promise of confidentiality, the imperative to protect confidential defense information — both prospectively and retrospectively — is even stronger.

## Conclusion

For the foregoing reasons, the Court should bar the government from unilaterally terminating the Agreement. Separate and apart from the prospective force of the Agreement, the Court should also bar the government from obtaining from firewall

counsel and/or firewall FBI agents information and documents created during operation of and in reliance upon the Agreement and this Court's orders.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document has been served by e-mail PDF upon counsel for the United States on September 28, 2015.