```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Plaintiff,                )
                                  )  Criminal Action
v.                                )  No. 13-10200-GAO
                                  )
DZHOKHAR A. TSARNAEV, also        )
known as Jahar Tsarni,            )
                                  )
        Defendant.                )
                                  )



             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                    JURY TRIAL - DAY THIRTY



          John J. Moakley United States Courthouse
                      Courtroom No. 9
                     One Courthouse Way
               Boston, Massachusetts  02210
                 Tuesday, March 10, 2015
                        9:35 a.m.



                Marcia G. Patrisso, RMR, CRR
                 Cheryl Dahlstrom, RMR, CRR
                   Official Court Reporters
               John J. Moakley U.S. Courthouse
                One Courthouse Way, Room 3510
                 Boston, Massachusetts  02210
                      (617) 737-8728

           Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3         Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6             By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G.
10        Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13            By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
  GOVERNMENT:

STEVEN A. KIMBALL (Cont'd)

        By Mr. Chakravarty                              33
        By Ms. Conrad                         5

TODD BROWN

        By Mr. Chakravarty        38
        By Mr. Bruck                                    51

JEFFREY ROLANDS

        By Mr. Mellin             53

MICHAEL MACIAS

        By Mr. Mellin             81

JASON COSTELLO

        Ms. Pellegrini            92

PAULA ERNST

        By Ms. Pellegrini         106

SARAH DE LAIR

        By Ms. Pellegrini         121

E X H I B I T S

GOVERNMENT'S
    EXHIBIT        DESCRIPTION                    FOR ID      RECEIVED

    826            Photographs of inside of boat              46

    830            Transcript of writing inside of boat       47

    421            Can of BBs                                 61

1                    E X H I B I T S (cont'd)

2
     GOVERNMENT'S
3      EXHIBIT       DESCRIPTION              FOR ID      RECEIVED

4    136 and 137   Analyzed items from laboratory can        91

5    42 - 618      Bagged items from bomb scene             133

6    620           Boylston Street evidence                 136

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

            THE COURT:  Good morning, jurors.  Thanks for your
patience.  We were conferring about some matters and are now
ready to proceed.  The witness is on the stand.  Miss Conrad.

            MS. CONRAD:  Thank you very much, your Honor.  Good
morning.

CROSS-EXAMINATION BY MS. CONRAD:

Q.   Good morning, Mr. Kimball.

A.   Good morning.

Q.   My name is Miriam Conrad.  I'm one of the lawyers for Mr.
Tsarnaev.

      You told us about Exhibit 1274, which, if I could have the
laptop presentation camera, please, would be on the screen.

            MS. CONRAD:  Mr. Lyness, could I have the laptop,
please?  It's on.  Thank you.  I was looking in the wrong
place.  I was looking at Mr. Watkins.

Q.   Now, this shows created -- this is for the subscriber
information for J_tsar Twitter account, correct?

A.   Yes.

Q.   This shows it was created on October 20, 2011?

A.   Yes.

Q.   And it shows it was updated on July 3, 2013?

A.   Yes.

Q.   Correct?

A.   Yes.

1    Q.   And that was nearly three months after Mr. Tsarnaev was

2    arrested, correct?

3    A.   Approximately, yes.

4    Q.   So it was updated not by Mr. Tsarnaev but by somebody

5    else?

6    A.   I can't say for sure.

7    Q.   Well, sir, you know Mr. Tsarnaev has been in custody and

8    has not had access to the internet since his arrest on April

9    19, 2013, is that right?

10   A.   Yes.

11   Q.   So -- and on July 3, 2013, the FBI obtained a search

12   warrant for this account, correct?

13   A.   I do not recall the exact date.

14   Q.   Okay.

15        MS. CONRAD:  If I could have the camera then just for

16   the witness.  This is just for the witness.

17   Q.   Looking at that document, does that refresh your

18   recollection?

19   A.   Yes.

20   Q.   And, in fact, that was the date the search warrant was

21   issued to Twitter, correct?  If I could draw your attention to

22   the first sentence.

23   A.   July 3rd?

24   Q.   Yes.

25   A.   Yes.

1    Q.    Thank you.  And so those -- that account, as well as the

2    other account, the Al_FirdausiA account, remained open to view

3    and to people commenting on it after Mr. Tsarnaev's arrest,

4    correct?

5    A.    Yes.

6    Q.    I just want to show you, on Exhibit 1264, that's the

7    Al_FirdausiA account.  This is already in evidence.  That was

8    last updated at 4/27/2013, right?

9    A.    Yes.

10   Q.    Thank you.  So there's activity on those accounts that

11   occurred after Mr. Tsarnaev's arrest, right?

12   A.    Yes.  I'm unsure what form that would take, but, yes.

13   Q.    Well, retweeting by people who were writing, for example,

14   the media, and so forth, people commenting, right?

15   A.    Possibly.  Again, I don't know what the update signifies

16   as far as that --

17   Q.    I'm not asking about the update now.  I'm just asking

18   generally whether you're aware there has been activities on

19   those accounts, such as comments and tweets, since Mr.

20   Tsarnaev's arrest on April 19th.

21   A.    I'm not sure of that.  On that exact account, it could

22   have been -- other individuals could have been tweeting in

23   regards to that account that was open.

24   Q.    Okay.  Thank you.

25         Now, you said there were about 1,100 tweets?

1   A.   Approximately, yes.

2   Q.   In fact, there were actually 1,080, right?

3   A.   Yes.

4        MS. CONRAD:  May I approach the witness, please?

5        THE COURT:  You may.

6   Q.   Showing you what's been marked -- sorry.  Let me get up

7   here first.

8   A.   Thank you.

9   Q.   Showing you what's been marked for identification as

10  Exhibit -- Defendant's Exhibit 1, do you recognize that?

11  A.   Yes.

12  Q.   What is it?

13  A.   The J_tsar Twitter account.

14  Q.   The whole thing, right?  You want to take a few minutes to

15  look through?

16  A.   Yes.

17       MS. CONRAD:  Your Honor, I'd offer this.

18       MR. CHAKRAVARTY:  Objection, your Honor.

19       THE COURT:  I'll have to see you.

20       MS. CONRAD:  Now, out of these -- are we going up?

21  I'm sorry.  I didn't hear you object.

22  (SIDEBAR CONFERENCE AS FOLLOWS:

23       THE COURT:  What is it?

24       MS. CONRAD:  It's the entire Twitter account.

25       MR. CHAKRAVARTY:  It's a hearsay objection, your

 1  Honor.  These are defendant --

 2           MS. CONRAD:  It's not offered for the truth.

 3           MR. CHAKRAVARTY:  The statements are not

 4  contextualized based on their relation to other statements in

 5  there.  So what effectively this is, is -- from a 401

 6  perspective and a 403 perspective, is statements the defendant

 7  made about things unrelated to this case going back for two

 8  years.  And anything that was relevant first we tried to

 9  introduce; and, second, that would be hearsay because it would

10  be --

11           MS. CONRAD:  Your Honor, do you need to hear me?  It's

12  not offered for the truth.  I don't mind if the Court instructs

13  the jury as such.  But it's 106.  The government selected 45

14  tweets taken out of context, in some cases extracting the other

15  side of a conversation.  I think we're entitled to put in the

16  entire context because it informs what some of those tweets

17  are.  Some of them were totally innocuous and others made --

18           MR. CHAKRAVARTY:  So the government's concern is not

19  that -- if there was a tweet that puts another tweet in

20  context, that would come in under completeness.  The issue here

21  is, going back two years, the Court would be essentially saying

22  that any writing by the defendant about any matter unrelated to

23  any fact in this case was relevant because it would lay some

24  context about state of mind.  That just simply cannot be.

25           Here, these are absolutely innocuous, irrelevant, some

1    foolish, distracting, and confusing tweets going back to two

2    years when the account was first created.

3          MS. CONRAD:  Your Honor, I could go through all 45

4    tweets that the government put in, and we would be here for

5    another hour and a half to two hours, or I could give a few

6    examples and the jury can have the whole thing.

7          The government goes back to April 16, 2012, and

8    suggests that, because the Marathon was run that day, that the

9    tweet on that day is relevant to the Marathon even though

10   there's no mention of the Marathon.  I think it's entirely

11   appropriate to put into context not just the other tweets

12   surrounding the ones the government put in but what was on this

13   young man's mind during the relevant -- or what the government

14   has made the relevant period of time.

15         THE COURT:  You can have it.

16         MS. CONRAD:  Thank you.

17         THE COURT:  You made reference to a defendant's

18   exhibit list.

19         MS. CONRAD:  Yeah.  One will be forthcoming.

20         THE COURT:  I've never seen it.  Are you using others?

21         MS. CONRAD:  Right now, probably just things taken

22   from here, but we will get it straightened out.  Thank you.

23   .  .  .  END OF SIDEBAR CONFERENCE.)

24   Q.   So, Mr. Kimball, you extracted what?, about 45 -- we're

25   talking about the J_tsar account now, okay?

1    A.   Yes.

2    Q.   And that account was established in October of 2011,

3    right?

4    A.   I do not know that right now, but I'm assuming you're

5    correct.

6    Q.   I'm sorry?

7    A.   I'm assuming you're correct, yes.

8    Q.   Do you want to look at the subscriber information again?

9    A.   Yes.

10   Q.   Okay.  See that?

11        MS. CONRAD:  Could I have the laptop?

12   A.   Yes.

13   Q.   Actually, I'm going to leave the exhibit up there so you

14   can refer to it.  It will probably make things go a little

15   faster.

16   A.   Thank you.

17        MS. CONRAD:  Since it's now in evidence, if I could

18   just display Exhibit 1 for the jury, please.

19   Q.   That's the first page, or the profile page, right?

20   A.   Yes.

21   Q.   And it shows the number of tweets, right?

22   A.   Yes.

23   Q.   And it shows that it was started in October of 2011,

24   correct?

25   A.   Yes.

1    Q.   And do you know what that emblem is at the top?

2    A.   I do not.

3    Q.   Okay.  You didn't do any research to determine that that

4    was -- is actually the emblem of the Makhachkala foot -- soccer

5    team?

6              MR. CHAKRAVARTY:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.   Anyway, it's something in Russian, correct?

9    A.   I don't know.

10   Q.   Cyrillic letters?

11   A.   I don't know.

12   Q.   Didn't Mr. Chakravarty ask you about Cyrillic letters

13   yesterday?

14   A.   Yes, as far as that -- yes.

15   Q.   You don't recognize the Cyrillic letters?

16   A.   No.  I didn't make the translation.

17   Q.   I'm not asking for the translation.  I'm asking if you

18   recognize that those are Cyrillic letters.

19   A.   Now, yes.

20   Q.   Thank you.

21        How did you go about selecting the 45 or so tweets that

22   you presented to the jury yesterday?

23   A.   That selection was made by the prosecution team to be

24   presented to the jury.

25   Q.   So you were just given those that the government wanted to

1    show to the jury?

2    A.   Yes.

3    Q.   And you just read off those that the prosecution had

4    already selected ahead of time?

5              MR. CHAKRAVARTY:  Objection, your Honor.  Asked and

6    answered.

7              THE COURT:  You may answer it.

8    A.   Yes.

9    Q.   And you had no part in selecting those?

10   A.   Very little input.

11   Q.   But you did read all of them, didn't you?

12   A.   Yes.

13   Q.   So let's just go to a few of them.  I think you mentioned

14   that one of the tweets, Exhibit 1319, was from a rap song.  Do

15   you remember that?

16   A.   A what, ma'am?  I'm sorry.

17   Q.   From a rap song.

18   A.   Yes.

19   Q.   Did you determine that yourself?

20   A.   No.

21   Q.   How was that determined?

22   A.   Through a conversation I had with another FBI employee.

23   Q.   I'm sorry.  With another?

24   A.   Another FBI employee.

25   Q.   So did you ask someone or did you personally participate

1   in identifying the source of or make any effort to identify the

2   source of some of these tweets?

3   A.   Some, yes; some, no.

4   Q.   Okay.  So showing you what's already been introduced as

5   Exhibit 1319, this is the one that you said was from a rap

6   song?

7   A.   That was my understanding, yes.

8   Q.   And that was the posting on April 16, 2013?

9   A.   Yes.

10  Q.   And it's your understanding that comes from a song by the

11  rap star Eminem?

12  A.   Yes.

13  Q.   Are you also aware that the phrase, "the block is hot,"

14  which we saw in one of the other exhibits, is from another rap

15  song by the rap artist Lil Wayne?

16  A.   No.

17  Q.   So you didn't try to find out the source of that one?

18  A.   I did not, no.

19  Q.   You didn't ask anybody else to?

20  A.   I personally, no.

21  Q.   Do you know what "the block is hot" means?

22  A.   No.

23          MR. CHAKRAVARTY:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.   "I'm in a New York State of mind," that was another tweet

1    that you showed the jury yesterday.  Are you aware that that

2    comes from a rap song by the artist Nas?

3    A.   No.

4    Q.   And the exhibit you showed us yesterday that was in

5    Cyrillic letters, and you had it translated to "I shall die

6    young," it's on your screen now, Exhibit 1282.

7    A.   Yes.

8    Q.   Are you aware that that is from a Russian rap song?

9    A.   No.

10   Q.   And, in fact, are you aware that Mr. Tsarnaev, on April

11   11th, posted a -- hold on one second, sorry -- posted a link to

12   that song, to a YouTube video of that song?

13   A.   No.

14   Q.   And when you went to -- if you just bear with me one

15   second, I'm sorry.

16        But you did go through the entire Twitter feed, right?

17   A.   The majority of it.

18   Q.   Okay.  So that one, I think, was posted sometime in April

19   of 2012, right?

20   A.   I don't have the exact date.

21   Q.   Okay.  Let's go back to it for a second then because now

22   I'm not sure.

23        MS. CONRAD:  Nope, that's not it.  1281?  Thanks.

24   Q.   So if there were links -- let me just ask this:  If there

25   were links on the Twitter feed, in other words, Mr. Tsarnaev

```
 1  posted links, did you follow those links to see what he was
 2  linking to?
 3  A.   No.  That was not part of my duties.
 4  Q.   Was it part of anyone's duties?
 5  A.   I can assess, yes.
 6  Q.   I'm sorry?
 7  A.   Other FBI employees.
 8  Q.   Okay.  And they didn't share their results with you?
 9  A.   Not on this occasion, no.
10  Q.   Okay.  So it sounds like you just got what the government
11  presented to you and then just testified about it and didn't do
12  any of your own investigation.
13            MR. CHAKRAVARTY:  Objection, your Honor.
14            THE COURT:  You may answer it.
15  A.   Again, I was given what the prosecution team gave to me as
16  far as the Twitter accounts that were relevant for the jury.
17  Q.   I'm sorry.  As far as --
18  A.   What was being presented to the jury.
19  Q.   So that was their determination of what would be --
20  A.   The prosecution team, yes.
21  Q.   And as far as the tweet about September 10th, "You know
22  what tomorrow is," you remember that one?
23  A.   Yes.
24  Q.   Are you aware that that comes from a Comedy Central
25  comedian's sketch posted in 2010?
```

1    A.   No.  But I was aware that, obviously, September 11th was

2    the following day.

3    Q.   I'm sorry.  That's not my question, sir.  My question is

4    whether you are aware -- because there was a hashtag on that

5    one, right?  Let's go to that.

6         MS. CONRAD:  I'm sorry.  Bear with me a second.

7    Q.   First of all -- so this is from Exhibit 1, April 11, 2012,

8    "a little taste of Russian rap, fellas."  Do you see that?

9    A.   Yes.

10   Q.   YouTube.com?

11   A.   Yes.

12   Q.   You did not follow that link, did you?

13   A.   I did not know, no.

14   Q.   You did not see that, if you followed that link, it

15   would --

16        MR. CHAKRAVARTY:  Objection.

17   Q.   -- take you to a screen page that would match up to the

18   Russian tweet that you showed us during your direct

19   examination?

20        THE COURT:  The objection is sustained.

21   Q.   Going back to Exhibit 1303 that we were talking about a

22   moment ago -- that's on the screen now.  Well, it will be.

23   Right?  That's the one you referred to September 10th, right?

24   A.   Yes.

25   Q.   And that was actually not tweeted on September 10th.  It

1   was tweeted on March 14th, right, 2013?

2   A.   Yes.

3   Q.   And it's in quotes, right?

4   A.   Yes.

5   Q.   And there's a hashtag, "things you don't yell when

6   entering a room," right?

7   A.   Yes.

8   Q.   And you explained to us that a hashtag tells you that you

9   can then go to -- you can use that phrase to search through

10  Twitter for similar posts, right?

11  A.   Yes.

12  Q.   Or to link to other similar posts, right?

13  A.   Yes.

14  Q.   And so, if you search for "things you don't yell when

15  entering a room," you would find that that is a comedy skit

16  that includes that sentence?

17          MR. CHAKRAVARTY:  Objection, your Honor.

18          THE COURT:  Well, you may answer it if you know.

19  Q.   Are you aware of that?

20  A.   No.

21  Q.   You didn't make any effort to find that out?

22  A.   Again, that was not part of my duties.

23  Q.   Do you know if it was part of anyone's duties?

24  A.   It was part of other FBI personnel.

25  Q.   Do you know if they produced any information as a result

1    of that?

2    A.    Not to my knowledge.

3    Q.    Do you know what steps they took?

4    A.    I do not.

5    Q.    Okay.  Now, you introduced a few tweets and just -- you

6    pulled them out so they were just by themselves, right?  So,

7    for example, here's Exhibit 1294.  Remember that one?

8    A.    Yes.

9    Q.    "I kind of like religious debates."  That's November 29,

10   2012, right?

11   A.    Yes.

12   Q.    But if you go to that page, or that portion -- and you can

13   flip to that in Exhibit 1 if you'd like, or I'll just put it up

14   on the screen -- you can see that he followed that up with

15   another tweet.

16         MS. CONRAD:  I don't know why my computer is going so

17   slow today.

18         MR. CHAKRAVARTY:  Your Honor, just a lot of narration

19   going on without questions being posed.  I would ask that --

20         MS. CONRAD:  I was just apologizing for how long it

21   was taking me to get to the page.  I didn't think I was

22   providing any -- but I apologize.  Okay.

23   Q.    So this is the page from which that was taken, right?

24   A.    Yes.

25   Q.    And it's highlighted in yellow although not very

1    skillfully.

2              MS. CONRAD:  Sorry I commented again, Mr. Chakravarty.

3    Q.   "I kind of like religious debates," right?

4    A.   Yes.

5    Q.   And this is in reverse chronological order, right?

6    A.   Yes.

7    Q.   So then immediately after that Mr. Tsarnaev posted, "but I

8    also like when people stand by what they believe no matter what

9    any jerk like me says"?

10   A.   Yes.

11   Q.   Right?

12   A.   Yes.

13   Q.   But you left that out?

14   A.   Again, the prosecution team decided what --

15   Q.   I see.  The prosecution team left that out?

16   A.   Like I said, the prosecution team decided what was

17   presented.

18   Q.   Okay.  And in 1310 --

19             MS. CONRAD:  I'm sorry.  One second.

20   Q.   1308, rather, this is the one that you said you didn't

21   really know what it meant.  "You will have to make tough

22   decisions today and those decisions will influence your future,

23   hardships will arouse" -- probably "arise," and you will roll

24   up loud," right?

25   A.   I'm sorry.  Can you say the question again?

1    Q.   I'm just reading it.  Do you want me to read it again?  Do
2    you see it on your screen?
3    A.   Yes, that's what it says.
4    Q.   When you were talking about that one yesterday, you said,
5    Well, I don't really know what that means?
6    A.   Yes.
7    Q.   But if you looked at the context of that and you looked at
8    the other surrounding tweets, specifically this page of Exhibit
9    1, you would see that the tweet that followed immediately after
10   that is, "I just wrote y'all a horoscope for the day and most
11   of you will be like dam that [stuff] was so accurate."  Do you
12   see that?
13   A.   Yes.
14   Q.   And that, in fact, is the very next tweet?
15   A.   Yes.
16   Q.   So it appears that the first tweet was really just a
17   overly generalized prediction much like horoscopes read?
18            MR. CHAKRAVARTY:  Objection, your Honor.
19            THE COURT:  Sustained.
20   Q.   Now, you also talked about Exhibit 1309, which was April
21   8, 2013.  That was the one that says, "If you have the
22   knowledge and the inspiration, all that's left is to take
23   action," right?
24   A.   Yes.
25   Q.   You see that on that page?

1    A.    Yes.

2    Q.    And right before that is one that says, "I really don't

3    like it when I have one ear pressed against the pillow and I

4    start to hear my heartbeat.  Who can sleep with all that

5    noise."

6    A.    Yes.

7    Q.    And there are other very much unrelated postings around

8    that time, right?

9    A.    Yes, I would agree with that.

10   Q.    Now, on Exhibit 1310, which I think we put in -- you put

11   in yesterday, that came from this page of Exhibit 1, the one

12   that says, "Never get into a family plan with foreigners."

13   There it is, April 13th.  I can highlight it for you if that

14   helps.

15   A.    Thank you.  Yes.

16   Q.    And other places on that page, he talks about "dreams

17   really do come true.  Last night I dreamt I was eating a

18   cheeseburger and in the afternoon today guess what I was

19   eating?"

20   A.    Yes.

21   Q.    Is it fair to say, without going through all 1,080 tweets,

22   that, in addition to the 45 that the government chose for you

23   to introduce, there are a lot of tweets about things like

24   girls?

25   A.    Yes.

1    Q.   Cars?

2    A.   Yes.

3    Q.   Food?

4    A.   Yes.

5    Q.   Sleep?

6    A.   Yes.

7    Q.   Homework?

8    A.   Specifically, I don't recall any one on homework but most

9    likely, yes.

10   Q.   Complaining about studying?

11   A.   Yes.

12   Q.   Now, you also told us about Exhibit 1314.  That's April

13   15, 2013, actually, at 11:13 p.m., correct?

14   A.   Yes.

15   Q.   Once you adjust for Pacific Standard Time?

16   A.   Yes.

17   Q.   And the "God hates dead people" is in quotes.  Do you know

18   what that quote is from?

19   A.   I do not, no.

20   Q.   Are you familiar with the Westboro Baptist Church?

21   A.   Yes, I am.

22   Q.   Are you familiar with the fact that the Westboro Baptist

23   Church apparently was planning protests at the funerals of

24   Boston Marathon bombing victims?

25   A.   Yes.

1   Q.   Do you know what MelloChamp is?

2   A.   It's an account that's held by an associate of the

3   defendant.

4   Q.   A friend, right?

5   A.   I don't know if they're friends.  I know that they're

6   associates.

7   Q.   They certainly communicate with each other on Twitter,

8   right?

9   A.   Yes.

10   Q.   Or did, right?

11   A.   Yes.

12   Q.   And his name is Baudy Mazaev, is that right?

13   A.   I don't know the name of the individual who holds that

14   account.

15   Q.   Where it says "lol," do you know what that means?

16   A.   "Laugh out loud."

17   Q.   Do you know what "those people are cooked" means?

18   A.   No, I don't.

19   Q.   You're not familiar with the slang phrase "cooked"?

20   A.   I'm assuming it means, like, can I -- screwed.

21   Q.   I'm sorry?

22   A.   Screwed or, like --

23   Q.   Crazy?

24   A.   I'm not exactly sure.

25   Q.   Okay.  Well, let's go to another place on his page where

1    he uses that word.  Let's see if I can get this up in a way you

2    can see it.

3         All right.  So this is posted on October 13, 2012.  "Key

4    and peele shows mad cooked lol."  Do you know what that means?

5    A.   No, I do not.

6    Q.   Are you familiar with the TV show *Key & Peele*?

7    A.   No, I'm not.

8    Q.   Comedy show?

9    A.   No.

10   Q.   Lol?

11   A.   I know what that means.

12   Q.   Okay.  "Mad," do you know what "mad" means, "mad cooked"?

13   A.   No.

14   Q.   So you're not familiar with that as a phrase for very

15   crazy or very high or very stoned?

16   A.   No, I'm not.

17             MR. CHAKRAVARTY:  Objection, your Honor.

18             THE COURT:  You may answer it.  The answer was given.

19   Q.   At any rate, he used the phrase "cooked" when referring to

20   a TV show on October 31, 2012, right?

21   A.   Yes.

22   Q.   You were also -- Mr. Chakravarty showed you Exhibits 1315

23   and 1318 yesterday, and those refer to a picture of a man

24   crying at the Boston finish line.  And Mr. Tsarnaev posted

25   "fake story"; do you remember that?

1    A.    Yes.

2    Q.    And that was a fake story, wasn't it?

3    A.    I do not know.

4    Q.    You do not know?

5    A.    I don't.

6    Q.    How long have you been involved in this investigation,

7    sir?

8    A.    Specific roles in the investigation?  For two years.

9    Q.    I'm sorry?

10   A.    For specific roles in the investigation, for approximately

11   two years.

12   Q.    You also showed us this tweet, which was Exhibit 1280,

13   from April 16, 2012.  And, again, that's in quotes.  "They will

14   spend their money and they will regret it and then they will be

15   defeated."

16   A.    Yes.

17   Q.    And that's in quotes, right?

18   A.    Yes.

19   Q.    Do you know where that quote comes from?

20   A.    I believe it's from Anwar Awlaki.

21   Q.    You're not aware that it's actually from the Qur'an?

22   A.    Anwar Awlaki quoted that.

23   Q.    And it doesn't link to Anwar Al Awlaki, correct?

24   A.    No, it does not.

25   Q.    Are you aware that it is a quote from the Qur'an?

1    A.    No, I wasn't.

2    Q.    And you didn't do any research on that either?

3    A.    That specific quote?

4    Q.    Yes.

5    A.    No.

6    Q.    And you pointed out that that was the date of the 2012

7    Boston Marathon, right?

8    A.    Yes.

9    Q.    And there's nothing in that quote or anywhere else in Mr.

10   Tsarnaev's tweets during that month that indicate that he was

11   aware that April 16, 2012, was the 2012 Marathon?

12             MR. CHAKRAVARTY:  Objection.

13             THE COURT:  Sustained.

14   Q.    Well, you looked at all of these, right?

15   A.    The vast majority of them, yes.

16   Q.    Did you look at the ones for April 16, 2012?

17   A.    Yes.

18   Q.    Okay.  So let's take a look at those.

19        Okay.  So this is, again, from Defendant's Exhibit 1.  And

20   these are the tweets from April 15th through April 18th, right?

21   A.    Yes.

22   Q.    Again, reverse chronological order.  So April 15, 2012,

23   "bout to sleep for like 20 hours," right?

24   A.    Yes.

25   Q.    And then the quote that we just read, right?

1    A.    Yes.

2    Q.    Then, "hhmmm, get breakfast or go back to sleep, this is

3    always a tough one," right?

4    A.    Yes.

5    Q.    "Sleep after breakfast is so much sweeter."

6    A.    Yes.

7    Q.    It goes on in that vein.  But there's nothing on that page

8    that refers to the Boston Marathon, is that right?

9    A.    No.

10   Q.    The only connection was the one that you drew based on the

11   date, right?

12   A.    Yes.  The date is the same.

13   Q.    Now, you told us about the Ghuraba Twitter page, right --

14   or Twitter account, excuse me.  I'm still getting used to these

15   terms.  Let's just go to that for a second.  Well, unless you

16   know off the top of your head.

17         Fair to say that all of those tweets were posted between

18   the dates of March 10th and March 13th of 2013?

19   A.    Yes, I'll -- I don't see that, but, yes.

20   Q.    I'll find it.

21         MS. CONRAD:  If anybody remembers the exhibit number

22   offhand, that would be great, but I think I can figure it out

23   myself.  Here we go.  Nope.  I've got 1266, I think.  There we

24   go.

25   Q.    There's 1266, right?  That's the entire thing, that whole

1    page, right?

2    A.    Sorry.  Just came up.

3    Q.    I'm sorry?

4    A.    It just came up.  Yes.

5    Q.    And so, actually, if you look at the individual ones --

6    and we can go through those if you'd like.  But the first five

7    were actually all posted within about an hour of each other,

8    right?

9    A.    If you -- yes.  I -- I can't see them all.

10   Q.    I can go through them.  So 1267 was posted at 1:49 --

11   11:49 Pacific Standard Time on March 10th, which would be 2:49

12   a.m., March 11th, right?

13   A.    Yes.

14   Q.    And 1268 was -- and these are reverse chronological

15   order -- was five minutes earlier, 11:44 p.m. Pacific?

16   A.    Yes.

17   Q.    And 1269 was about four minutes before that, 11:40 p.m.,

18   Pacific Standard?

19   A.    I'm sorry.  There's a little bit of a delay between you

20   making -- me seeing the slide.

21   Q.    I'm sorry.  I'm not the most adept at this.  I apologize.

22         1270 is now 3:11 a.m. on March 11th?

23   A.    Yes.

24   Q.    So still within the same hour, right?

25   A.    Yes.

1    Q.   1271, 3:09 a.m., March 11th?

2    A.   Yes.

3    Q.   I think those are the first five.  And then there's one on

4    March 12th and another one on March 13th?

5    A.   Yes.

6    Q.   And, in total, I think there's seven or eight?

7    A.   Yes, approximately.

8    Q.   And all posted within about 48 hours?

9    A.   Yes.

10    Q.   And during that same time during that week of March 10th,

11    2013, do you know what kind of things -- kinds of things Mr.

12    Tsarnaev was posting on his J_tsar Twitter account?

13    A.   No, I do not.

14    Q.   Okay.  So let's just take a look.  Here's one on March 7,

15    2013.  "I haven't seen a silly rabbit trix are for kids

16    commercial in a while, did he finally get some or what?"

17    A.   Yes.

18    Q.   And, specifically, if we go down to March 11th, which I

19    think was the date that he posted five on the Al_FirdausiA

20    account, "I want to study a broad or two."

21    A.   Yes.

22    Q.   Fair to say that that's in keeping with sort of the vein

23    of the rest of his tweets during that time on J_tsar?

24         MR. CHAKRAVARTY:  Objection, your Honor.

25         THE COURT:  You may answer it if you can.

1   A.   I don't recall.

2   Q.   Why don't we take a look then.

3        Okay.  March 11th.

4        MS. CONRAD:  I don't know why it's over like that, but

5   we'll see what we can do.  There we go.

6   Q.   So there's the "I want to study a broad or two" tweet,

7   right?

8   A.   Yes.

9   Q.   "Currently whale watching outside of McDonald's"?

10  A.   Yes.

11  Q.   I know that looks like it's retweeting somebody else,

12  right?

13  A.   Yes.

14  Q.   You want me to go back down?

15  A.   No, that's all right.

16  Q.   "Shocking [stuff], more so than that time I found out a

17  tomato was a fruit."

18  A.   Yes.

19  Q.   March 11th, also, "People that say I hate posts about

20  religion like stop trying to convert me and then go on to post

21  some [stuff] about jersey shore," you see that one?

22  A.   Yes.

23  Q.   March 11th, also.  "MelloChamp, yo, let's hit the gym."

24  March 12th, right?

25  A.   Yes.

1    Q.    So March 13th, the last date that he posted on

2    Al_FirdausiA, "never try to fork a mini tomato while wearing a

3    white shirt," right?

4    A.    Yes.

5    Q.    Now, you told us that the picture that was on his

6    Al_FirdausiA account was a picture of Mecca?

7    A.    Yes, to the best of my knowledge, yes.

8    Q.    Where did you get that knowledge?

9    A.    That was a discussion with colleagues.

10   Q.    A discussion with colleagues?

11   A.    Uh-huh.

12   Q.    Did you ever bother to look at a picture of Mecca?

13   A.    No.

14   Q.    So I just want to show you something.

15        MS. CONRAD:  This is just for the witness.

16   Q.    And this looks like the same picture, right?

17   A.    Approximately, yes.

18   Q.    Would it surprise you that that's actually a picture of

19   Grozny in Chechnya?

20        MR. CHAKRAVARTY:  Objection, your Honor.

21        THE COURT:  Sustained to the form of the question.

22   Q.    Well, did you ever bother to look up that picture?

23   A.    I was given that information by other FBI colleagues.

24   Q.    By whom?

25   A.    By intel agents and other agents.

1    Q.   Do you know if they actually looked at a picture of Mecca?

2    A.   I didn't -- I do not know.

3    Q.   Do you know if they actually looked at a picture of

4    Grozny?

5    A.   I do not know.

6         MS. CONRAD:  Your Honor, I would offer this picture.

7         MR. CHAKRAVARTY:  Objection, your Honor, to impeach

8    anything he says.

9         THE COURT:  The objection is sustained.

10   Q.   May I show you then a different picture?  Do you know what

11   that is?

12   A.   I do not.

13        MS. CONRAD:  Perhaps the government would be willing

14   to stipulate that that's a picture of Mecca?

15        MR. CHAKRAVARTY:  Your Honor, I don't understand.  Is

16   there a question -- the government is not stipulating to

17   something that's irrelevant, your Honor.

18        MS. CONRAD:  I have no further questions then.  Thank

19   you so much.

20        MR. CHAKRAVARTY:  Briefly, your Honor.

21   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

22   Q.   Agent Kimball, when we went through and selected the

23   tweets to present to the jury, what was the principle behind

24   which tweets we were going to present?

25   A.   Essentially the ones that the prosecution team felt would

1   be --

2           MS. CONRAD:  Objection, objection to what the

3   prosecution team felt.

4           THE COURT:  Overruled.  No.  You opened it.

5   A.   To be best served for the jury.

6   Q.   And, in fact, for the Al_FirdausiA account, the second

7   account that the FBI discovered, did we, in fact, introduce all

8   of the tweets?

9   A.   Yes.

10  Q.   Do you know what Al Firdausia means?

11  A.   It means essentially the highest point in paradise.

12          MS. CONRAD:  Objection.

13          THE COURT:  Sustained.

14  Q.   Were all of the posts on the Al_FirdausiA account -- were

15  they of the same general type?

16          MS. CONRAD:  Objection.

17  A.   No.

18          THE COURT:  Sustained -- for themselves.

19  Q.   With regard to the J_tsar account -- this was the account

20  that had 11 -- sorry, 1,080 tweets -- were, in fact, there many

21  more different topic areas covered in the J_tsar account than

22  there were in the Al_FirdausiA account?

23  A.   Yes.

24  Q.   At the same time as the user of the J_tsar account was

25  tweeting on the J_tsar account, he was also -- for a period of

1  time in March, also using the Al_FirdausiA account, right?

2  A.   Yes.

3  Q.   Now, one of the posts Miss Conrad showed you for context

4  was 1280.

5       MR. CHAKRAVARTY:  Can we call that up?

6  Q.   She asked you about this one that was posted on Marathon

7  Monday of 2012, is that right?

8  A.   Yes.

9  Q.   She asked you a number of questions about whether you

10  could tell from the other tweets as to whether the poster, the

11  person named Jahar, whether he had also talked about the

12  Marathon?

13       MS. CONRAD:  Objection.  That was not the question,

14  your Honor.  It was about that month.

15       THE COURT:  Go ahead.

16  A.   Yes.

17  Q.   And, in fact, isn't it true that Jahar actually attended

18  the 2012 Boston Marathon?

19  A.   I believe so, yes.

20       MS. CONRAD:  Objection.  Foundation for that.

21       THE COURT:  Yeah.  We need a foundation.  Sustained.

22  Q.   Are you aware of whether the defendant attended the Boston

23  Marathon?

24       MS. CONRAD:  Objection.  Foundation.  May we be heard

25  at sidebar?

```
 1              THE COURT:  No.  He can answer whether he's aware.
 2    Then we'll find out how.
 3              MS. CONRAD:  Well, I think that's why we need to be
 4    heard at sidebar, your Honor.
 5              THE COURT:  Go ahead.
 6    A.   I believe so, yes.
 7    Q.   How are you aware?
 8    A.   Interaction with other colleagues.
 9    Q.   And did, in fact, Jahar attend the Marathon?
10              MS. CONRAD:  Objection.  Hearsay.
11              THE COURT:  Sustained.
12              MR. CHAKRAVARTY:  Can we go to 1303, please?
13    Q.   Miss Conrad asked you a number of questions about this
14    post, 1303, talking about September 11th.  And is the date --
15              MS. CONRAD:  Objection.
16              THE COURT:  Go ahead.
17    Q.   Was the date of this post March 14, 2013?
18    A.   Yes.
19    Q.   And so this is right after the entire Al_FirdausiA account
20    was created and all of the posts on that Al_FirdausiA account
21    were already posted?
22              MS. CONRAD:  Objection to leading.
23    A.   Yes.
24              THE COURT:  Overruled.
25    Q.   And the next post on either of the accounts was on March
```

1    14th, correct?

2    A.   Yes.

3    Q.   Miss Conrad also asked you questions about --

4          MR. CHAKRAVARTY:  Can we call up 1274, please?

5    Q.   -- about this date, July 3, 2013?

6    A.   Yes.

7    Q.   Now, is it customary, before an FBI conducts a search

8    warrant, that they ask an Internet Service Provider to preserve

9    the data that is going to be searched?

10   A.   Yes.

11   Q.   And did the search warrant get served on July 3, 2013?

12   A.   To the best of my knowledge, yes.

13   Q.   And was the last tweet on either account April 17 of 2013?

14   A.   Yes.

15         MR. CHAKRAVARTY:  That's all I have.

16         THE COURT:  All right, sir.  Thank you.  You may step

17   down.

18         MS. CONRAD:  I actually have one question, your Honor.

19         THE COURT:  No.  That's enough.  Next.

20         MR. CHAKRAVARTY:  The government calls Officer Todd

21   Brown.

22         MS. CONRAD:  Your Honor, may we just approach for a

23   minute about the last matter?  I'd like to proffer what I was

24   going to ask.

25         THE COURT:  We'll do it at a break.

1              TODD BROWN, Sworn

2         THE CLERK:  Have a seat.  State your name.  Spell your

3    last name for the record.  Keep your voice up and speak into

4    the mic so everyone can hear you.

5         THE WITNESS:  My name is Todd Brown.  Last name,

6    B-r-o-w-n.

7    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   Officer Brown, where are you currently employed?

11   A.   I'm a Boston Police bomb technician with the Boston

12   Police.

13   Q.   How long have you been a Boston police officer?

14   A.   Twenty-four years.

15   Q.   Have you had a variety of different roles in the BPD?

16   A.   Yes.

17   Q.   Can you just quickly run through some of them?

18   A.   I was on SWAT, Mobile Operations, K-9, and now I'm on the

19   Explosive Ordinance Unit.

20   Q.   What's the general mission of the Explosive Ordinance

21   Unit?

22   A.   We respond to suspicious packages and protecting

23   dignitaries.

24   Q.   Explosive ordinance, does that include bombs?

25   A.   Yes.

1    Q.    And Improvised Explosive Devices?

2    A.    Correct.

3    Q.    And do you use a K-9 Unit personally, or do you do other

4    functions?

5    A.    I don't have a canine.  I used to have a canine.  I do not

6    have one.

7    Q.    Canines are often used with the EOD teams?

8    A.    Yeah, we're a team.

9    Q.    Is one of your roles as an explosive ordinance technician

10   to clear areas to make sure that there's nothing that's

11   threatening as an explosive?

12   A.    Yes.

13   Q.    With regards to April of 2013, were you assigned to the

14   EOD team of the Boston Police Department?

15   A.    Yes.

16   Q.    And on the day of the Marathon, April 15, 2013, did you

17   work that day?

18   A.    Yes.

19   Q.    And did you respond to the Marathon after the bombings?

20   A.    Yes.

21   Q.    Were you there the day -- excuse me, during the day before

22   the bombings?  Were you at the Marathon before the bombings

23   occurred?

24   A.    No.

25   Q.    So after the bombings you arrived?

1    A.    Yes.

2    Q.    And so what was the general tasking to the EOD officers

3    after the bombing?

4    A.    To clear packages, make sure that there was no other

5    devices.

6    Q.    Can you describe very generally how that happened over the

7    course of the afternoon?

8    A.    We would -- you know, there would be a suspicious package

9    or whatever on Boylston Street.  We would go up there, clear

10   it, and then continue on to another package, to another

11   package.

12   Q.    Was one of the ways that these were cleared is some of

13   these packages were opened in a special technique that the EOD

14   team had learned?

15   A.    Yes.

16   Q.    In some cases, or very limited cases, you actually would

17   do what's called a controlled explosion?

18   A.    Correct.

19   Q.    On one occasion on Boylston Street, did some of your

20   colleagues actually conduct a controlled explosion?

21   A.    Yes.

22   Q.    Does the controlled explosion use what's called a blasting

23   cap or a controlled explosive device in order to burst

24   something open?

25   A.    Yes.

1   Q.   How many times do you think that happened?

2   A.   I believe once.

3   Q.   Now, did Boston Police EOD officers continue to

4   participate in the investigation for the course of the week of

5   April 15th through April 19th?

6   A.   Yes.

7   Q.   And on April 19th of 2013, did you respond, along with

8   other bomb techs from a variety of different agencies, to

9   Watertown, Massachusetts?

10   A.   Yes.

11   Q.   What was the reason that you were responding to Watertown,

12   Massachusetts?

13   A.   There was a suspect in a boat.

14   Q.   What was the EOD team's mission?

15   A.   We were going to have to clear the boat for explosives or

16   devices or booby traps.

17   Q.   At some point that afternoon, evening, did -- was someone

18   -- did someone come out of that boat?

19   A.   Yes.

20   Q.   Where were you in relation to the boat at that time?

21   A.   About three to four houses up from that location.

22   Q.   Was that person arrested and placed on a stretcher?

23   A.   Yes.

24   Q.   Did you see that person?

25   A.   Yes.

1    Q.   After you saw him, what did you do?

2    A.   We were going to go down to the location to start clearing

3    that area.

4    Q.   When you -- how did you learn that the person was in

5    custody?

6    A.   I believe with a police radio and then with a cheer, loud

7    cheers, and people celebrating.

8    Q.   What was the response of the non-EOD personnel?

9    A.   They started to head down towards that location.

10   Q.   What did the EOD personnel do?

11   A.   We stayed in place because the area wasn't secure.

12   Q.   And then eventually did EOD personnel move down towards

13   the boat?

14   A.   Yes.

15   Q.   About how long after the defendant was taken -- excuse me,

16   the suspect was taken into custody?

17   A.   About 10, 15 minutes maybe.

18   Q.   And when -- did you get to the scene where he was taken

19   into custody?

20   A.   Yes.

21   Q.   What did you see there?

22   A.   I saw a boat.

23   Q.   How many EOD bomb techs were in the area?

24   A.   Roughly six.

25   Q.   Were you given a particular task?

1    A.    Yes.

2    Q.    What was that?

3    A.    I was to clear the boat.

4    Q.    Okay.  So what did you do?

5    A.    I entered the boat and started to sweep the boat for any

6    kind of booby traps, explosives or anything like that.

7    Q.    When you say "sweep the boat," what does that mean?

8    A.    Look for it, identify, render them safe if possible.

9    Q.    And did you find anything that was dangerous to you?

10   A.    No.

11   Q.    While you were in the boat, did you notice anything that

12   you knew you had to communicate to your fellow colleagues?

13   A.    Yes.  I noticed something written inside the boat.

14   Q.    When you say "written inside the boat," what do you mean?

15   A.    It was written on -- with a -- it was written inside the

16   boat with a pencil.

17   Q.    You mean like on the inside of the hull of the boat?

18   A.    Yes.

19   Q.    Were there bullet holes in the boat?

20   A.    Yes.

21   Q.    And were those by law enforcement shooting at the person?

22   A.    I believe so.

23   Q.    And you weren't one of those people?

24   A.    No.

25   Q.    Was there blood in the boat?

1    A.   Yes.

2    Q.   Was blood actually lining down on the inside of the hull

3    on top of the writing?

4    A.   Correct.

5          MR. CHAKRAVARTY:  For the witness, your Honor, I call

6    up 826.

7    Q.   Officer Brown, is this one of three photos of the writing

8    that you just described?

9    A.   Yes.

10   Q.   Is this a fair and accurate depiction of what it looked

11   like, lighting conditions aside, when you saw it?

12   A.   Correct.

13         MR. CHAKRAVARTY:  827, please.

14   Q.   Is this another portion of the writing that you saw on

15   April 19th in the boat?

16   A.   Yes.

17         MR. CHAKRAVARTY:  And 828.

18   Q.   Is this the last photo of the writing in the boat?

19   A.   Yes.

20   Q.   Now, these three photos, are these three portions of the

21   writing that were separated by a divider of part of the boat?

22   A.   Yes.

23   Q.   But was it one contiguous writing?

24   A.   Correct.

25   Q.   Now, when you went into the boat, did you go in with

1    anyone else?

2    A.   Yes.

3    Q.   Was that another bomb tech?

4    A.   Correct.

5    Q.   Were you the first two people to enter the boat after the

6    suspect was taken out?

7    A.   Correct.

8    Q.   Incidentally, do you see, to the best of your memory, the

9    person who was taken out of the boat in the courtroom today?

10   A.   Yes.

11   Q.   Can you just point to him and identify him by something

12   he's wearing?

13   A.   He's got a dark jacket on.

14        MR. CHAKRAVARTY:  Ask the record to reflect the

15   witness identifying the defendant.

16        THE COURT:  All right.

17   Q.   In fact, when you saw the defendant, he was bloody, wasn't

18   that true?

19   A.   Correct.

20   Q.   And the -- after you had secured the scene, did anyone

21   else come into the boat, to your knowledge?

22   A.   No.

23   Q.   Exhibits 826 through 828, are they all fair and accurate

24   depictions of the writing that you saw in the boat that day?

25   A.   Yes.

1             MR. CHAKRAVARTY:  I ask that they be moved into

2     evidence.

3             THE COURT:  Any objection?

4             MS. CLARKE:  No.

5     (Government Exhibit Nos. 826-828 received into evidence.)

6             MR. CHAKRAVARTY:  Go to 826, please.

7     Q.   Officer Brown, the writing on the boat, did you

8     subsequently review a transcript of the writing of the boat and

9     determine whether it was a fair and accurate transcription of

10    the writing that was handwritten onto the boat?

11    A.   Yes.

12    Q.   And is it, in fact, a fair and accurate transcription?

13    A.   Yes.

14            MR. CHAKRAVARTY:  If we could, just the witness, your

15    Honor, 830, please.

16    Q.   Officer Brown, is this the first page of the writing on

17    the -- the transcription of the writing on the boat?

18    A.   Yes.

19    Q.   Does the first page capture the transcription of the

20    writing that applies to the first photo that we just saw, 826?

21    A.   Yes.

22    Q.   And does the second page of this Exhibit 830 conform to

23    the writing that was on the second photo, 827?

24    A.   Yes.

25    Q.   And does the third page of this transcription conform to

1    the writing that was on the third page -- third photograph,

2    Exhibit 828?

3    A.   Yes.

4            MR. CHAKRAVARTY:  I'd move in Exhibit 830.

5            MR. BRUCK:  No objection.

6            THE COURT:  No objection.  All right.

7    (Government Exhibit No. 830 received into evidence.)

8            MR. CHAKRAVARTY:  If we could go back to 826, we'll

9    toggle back and forth.

10   Q.   Now, Officer Brown, the writing that was transcribed, is

11   that the -- you know, what I just underlined there as an

12   example of the first line of writing?

13   A.   Could you repeat that, please?

14   Q.   The writing that's in the transcription, did I -- is that

15   writing accurately reflected on -- as being the writing from

16   826?  I just underlined the first line of the writing.  I just

17   want to identify the writing on the boat versus other features

18   on this photo.

19   A.   Yes.

20   Q.   And is this a hole that was presumably created by a bullet

21   going through the hole?

22   A.   Yes.

23   Q.   And you're not a ballistician.  You don't know that, but

24   it looks like a bullet hole?

25   A.   It appears to be one.

1  Q.   Is this the blood that was kind of trailing down from the

2  top of the note down?

3  A.   Yes.

4  Q.   Does it appear as if the blood was on top of the writing?

5  A.   Yes.

6  Q.   So the writing was done before the blood came down?

7  A.   Yes.

8         MR. CHAKRAVARTY:  For convenience of reading, can we

9  go to 830, please?

10  Q.   I'll read this panel and ask if I read it correctly.  "I'm

11  jealous of my brother who ha" -- then there's a hole -- "ceived

12  the reward of the jannutul Firdaus inshallah before me.  I do

13  not mourn because his soul is very much alive.  God has a plan

14  for each person.  Mine was to hide in his boat and shed some

15  light on our actions.  I ask Allah to make me a shahied (iA) to

16  allow me to return to him and be among all the righteous people

17  in the highest levels of heaven.  He who Allah guides no one

18  can misguide.  A" -- then there's a hole -- "bar!"  Did I read

19  that correctly?

20  A.   Yes.

21         MR. CHAKRAVARTY:  Can we go back to 826?

22  Q.   Does that accurately reflect what's here?

23  A.   Yes.

24         MR. CHAKRAVARTY:  Go to 827, please.

25  Q.   Is this the part of the boat that separated the first

1    portion of the writing with this portion?

2    A.   Yes.

3    Q.   And is this similar to the first portion of the writing

4    that there's some blood stains as well as some holes throughout

5    the note?

6    A.   Yes.

7         MR. CHAKRAVARTY:  Go to Exhibit 830, Page 2.

8    Q.   I'm going to read this transcription and ask if I read it

9    correctly.  "I bear witness that there is no God but Allah and

10   that Muhammad is his messenger."  Then there's a hole.  "R

11   actions came with" -- another hole -- "a" -- another hole --

12   "ssage and that is" -- hole -- "ha illalah.  The U.S.

13   Government is killing our innocent civilians but most of you

14   already know that.  As a M" -- and then a hole -- "I can't

15   stand to see such evil go unpunished.  We Muslims are one body,

16   you hurt one, you hurt us all, well at least that's how

17   Muhammad (pbuh) wanted it to be" -- hole -- "ever.  The ummah

18   is beginning to rise/awa," and then there's a hole.  Did I

19   correctly read that portion?

20   A.   Yes.

21        MR. CHAKRAVARTY:  Can we go to 828, please?

22   Q.   In 828, does the first two lines that we just read appear

23   on Exhibit 828, so this is a continuation of the same portion

24   of writing?

25   A.   Yes.

1          MR. CHAKRAVARTY:  Can we go to 830, Page 3, please?

2     Q.   And shaded out are the two lines we just read?

3     A.   Correct.

4     Q.   "...has awoken the mujahideen, know you are fighting men

5     who look into the barrel of your gun and see heaven, now how

6     can you compete with that.  We are promised victory and we will

7     surely get it.  Now I don't like killing innocent people it is

8     forbidden in Islam but due to said" -- hole -- "it is allowed.

9     All credit goes" -- then there's big hole.  Did I read that

10    correctly?

11    A.   Yes.

12    Q.   After you cleared the boat, what did you do with this

13    information that you had learned from the -- reading the inside

14    of the hull?

15    A.   I immediately told an FBI agent.

16    Q.   What were you and the remainder of the EOD teams doing

17    after you exited the boat?

18    A.   We continued to clear the backyard and surrounding areas.

19    Q.   Was that scene secured?

20    A.   Yes.

21    Q.   And then did the FBI ultimately come over and process that

22    scene?

23    A.   Yes.

24         MR. CHAKRAVARTY:  Thank you.

25    CROSS-EXAMINATION BY MR. BRUCK:

1   Q.   Good morning, Officer Brown.

2   A.   Good morning.

3   Q.   Just have a few questions to ask you, please.

4        Did I understand you to say that you arrived after the

5   individual, Mr. Tsarnaev, had been removed from the boat?

6   A.   I arrived in the backyard after he was removed.  I was on

7   Franklin Street before that.

8   Q.   Okay.  You did not see him emerge from the boat?

9   A.   No.

10  Q.   All right.  And I think you said you went to the boat

11  about 15 minutes after he was removed or after he got out of

12  the boat?

13  A.   About that.

14  Q.   Give or take?

15  A.   Yes.

16  Q.   All right.  The bullet holes that you described that went

17  through the writing, I know you're not, as Mr. Chakravarty

18  said, a ballistics expert, but did they appear to you to be

19  bullet holes that went from outside the boat in?

20  A.   Yes.

21  Q.   All right.  Did you see any bullet holes that appeared to

22  be going from inside the boat out?

23  A.   No.

24  Q.   And you said that you searched the boat for any dangerous

25  material that might be there?

1   A.   Correct.

2   Q.   You were looking for explosives?

3   A.   Correct.

4   Q.   Bombs?

5   A.   Correct.

6   Q.   And you found nothing?

7   A.   Nothing.

8   Q.   You were also looking for weapons of any other sort?

9   A.   Yes.

10  Q.   Including guns?

11  A.   Yes.

12  Q.   And you found no gun?

13  A.   No.

14  Q.   You found no BB gun?

15  A.   No.

16  Q.   You found no weapon of any sort?

17  A.   No.

18            MR. BRUCK:   Thank you.

19            MR. CHAKRAVARTY:   No further questions.

20            THE COURT:  All right, Officer.  Thank you.  You may

21  step down.

22            Mr. Mellin.

23            MR. MELLIN:   The United States calls Jeff Rolands.

24            THE CLERK:   Sir, want to step up here, please?

25            JEFFREY ROLANDS, Sworn

1          THE CLERK:  Have a seat.  State your name.  Spell your

2   last name for the record.  Keep your voice up and speak into

3   the mic so everyone can hear you.

4          THE WITNESS:  Jeffrey Rolands, R-o-l-a-n-d-s.

5   DIRECT EXAMINATION BY MR. MELLIN:

6   Q.   Good morning, sir.  Where are you employed?

7   A.   I'm employed with the FBI.

8   Q.   What is your role right now?

9   A.   Special agent.

10  Q.   Agent Rolands, when did you join the FBI?

11  A.   In 2009.

12  Q.   Prior to that, where did you grow up?

13  A.   In Detroit, Michigan.

14  Q.   At some point did you go to college?

15  A.   Yes.

16  Q.   Where did you go to college?

17  A.   Michigan State University.

18  Q.   What type of a degree did you get?

19  A.   A degree in medical technology, bachelor of science.

20  Q.   After college, what did you do?

21  A.   I began an internship with the Detroit Police Department

22  Crime Lab, along with the Oakland County Sheriff's Office Crime

23  Lab, both in Michigan.

24  Q.   How long did you work with them?

25  A.   I worked with the Detroit Police Department Crime Lab for

1    approximately five years.  I was hired on as a full-time

2    employee, as a DNA analyst.

3    Q.   After that tour of duty, where did you go?

4    A.   I went to Reno, Nevada, where I worked for the Washoe

5    County Sheriff's Office Crime Laboratory as a criminalist, also

6    a DNA analyst.

7    Q.   How long were you there?

8    A.   I was there for approximately nine years.

9    Q.   While you were there for these nine years, can you give us

10   a brief description or overview of what you did?

11   A.   I was a DNA analyst.  I would attend crime scenes,

12   specializing in DNA collection but processing mainly biological

13   materials for DNA.

14   Q.   When you say "processing," what do you mean by that?  How

15   does that apply to something where there's DNA at a crime

16   scene?

17   A.   I would examine swabs, blood stains, semen stains, saliva

18   stains and obtain a DNA profile from those items, interpret

19   those results and develop a report.

20   Q.   Up to the point that you joined the FBI, approximately how

21   many cases had you worked on?

22   A.   With regard to?

23   Q.   Any type of evidence recovery or crime scene.

24   A.   Thousands.

25   Q.   You joined the FBI in 2009, is that right?

1    A.    Correct.

2    Q.    Did you go to Quantico, undergo training?

3    A.    Yes, I did.

4    Q.    After that, did you get any type of evidence recovery

5    training?

6    A.    Yes, I did.

7    Q.    When did you get that?

8    A.    That was the Evidence Response Team basic class, and that

9    was in March of 2011.

10   Q.    When you joined the FBI in 2009, where were you assigned?

11   A.    I was assigned to the Violent Crime Task Force which

12   investigates bank robberies, extortion, crimes aboard aircraft,

13   kidnappings, crimes aboard cruise ships, the high seas, et

14   cetera.

15   Q.    Where were you assigned?

16   A.    Boston.

17   Q.    Have you been assigned to Boston from 2009 until today?

18   A.    Yes.

19   Q.    In addition to your role as part of the Violent Crime

20   Unit, did you also do evidence recovery work?

21   A.    Yes, I did.

22   Q.    When did you start doing that for the FBI?

23   A.    In approximately October of 2010.

24   Q.    From October of 2010 up to April of 2013, approximately

25   how many cases did you work on regarding evidence recovery?

1    A.   I would say probably at least 25 to 30.

2    Q.   On April 15 of 2013, where were you?

3    A.   I was actually in Washington, D.C.

4    Q.   Why were you in Washington?

5    A.   To attend a class.

6    Q.   At some point did you return to Boston?

7    A.   Yes, I did.

8    Q.   And how did that come about?

9    A.   I took one of the last planes out and arrived around 11

10   p.m. on April 15th, back into Boston.

11   Q.   Did you go to the crime scene at some point?

12   A.   Yes, I did.

13   Q.   When was that?

14   A.   In the morning of April 16th.

15   Q.   What happened on that morning?

16   A.   There was a brief, a team meeting, for the Evidence

17   Response Team, and along with other agencies, and the teams

18   were essentially chosen for each scene.

19   Q.   What was your role?

20   A.   My role was the team leader for Scene A.

21   Q.   What was Scene A?

22   A.   Scene A was the crime scene associated with the Marathon

23   Sports, in front of 671 Boylston.

24   Q.   So you were assigned the first explosion?

25   A.   Correct.

1   Q.   Was someone assigned to Scene B, or the second explosion?

2   A.   Yes.

3   Q.   Who was that?

4   A.   Sarah DeLair.

5   Q.   When you received these assignments, what were you to do?

6   A.   My role as team leader was to ensure the proper collection

7   and preservation of the evidence with regard to the crime

8   scene, assign personnel to search areas, ensure the safety of

9   the personnel along with the security of the crime scene, a lot

10  of logistical issues with infrastructure.  That was my role, to

11  take care of those as well.

12  Q.   When you arrived on the morning of April 16th, was the

13  scene secured?

14  A.   Yes, it was.

15  Q.   How was it secured?

16  A.   It was secured by Boston Police Department along with the

17  National Guard.

18  Q.   Who was allowed in and out of that scene at that point?

19  A.   Only law enforcement personnel.

20  Q.   Had you ever responded to a scene this large before?

21  A.   Never.

22  Q.   How did you go about deciding how to recover the evidence

23  at that scene?

24  A.   I canvassed my team for specialties, which was partially

25  done for me, and then assigned groups, making sure to include

1    each member of the organizations that were represented, which

2    were the Boston Police Department, the ATF, FBI, other local

3    agencies, state police, and assigned them to teams, included a

4    special agent bomb tech with each of the teams and divvied

5    those up to different search locations.

6    Q.    Why did you assign a bomb tech to each of the teams?

7    A.    The possibility of secondary devices and to look for

8    specific components with regard to this explosion.

9    Q.    You mentioned the ATF.  Could you just -- what does ATF

10   stand for?

11   A.    Alcohol, Tobacco & Firearms.

12   Q.    Is that a federal law enforcement agency?

13   A.    Yes, it is.

14   Q.    Once you set up these teams, what did you go about doing?

15   A.    Initially, we went down for a preliminary examination of

16   the scene, doing a walk-through to assess what type of

17   packaging materials, what type of evidence, what type of

18   biohazards, personal protective gear is needed, and then went

19   forward with that.

20   Q.    Just generally, kind of stepping out of this crime scene,

21   can you just describe how do you go about recovering evidence,

22   and then what does the FBI do with it?

23   A.    We photograph -- we identify a piece of evidence with a

24   marker.  It's just a number on-scene.  The item is photographed

25   in place, and then it is collected and packaged.  And depending

1    on the type of evidence, it's packaged either for biologicals,

2    as an example, in paper.  There are seven identifiers that are

3    put on that bag to include the case number, the date, the

4    location the item was found, the description of the item, and

5    the two individuals that observed the item and collected that

6    item.  From there, that item was taken to our evidence intake

7    where it is entered into an electronic case management system

8    and given an actual item number.

9    Q.   Were those steps followed in this case?

10   A.   Yes.

11   Q.   Let's get back then to April 16, 2013, Scene A, the first

12   explosion.  How did you go about deciding how you were going to

13   record what was recovered?

14   A.   In the same manner as our policy and our protocols.  We

15   would go through and do initial photographs, which began in the

16   morning of -- for my scene, the morning for -- of the 16th.

17   Photographs were taken.  And then there was special agent bomb

18   techs along with ERT personnel that did swabbing of the blast

19   seat, the explosion area.

20        After that, we began to section off areas almost in, like,

21   a grid pattern to start and begin our searches.  We had a lot

22   of items that were -- high concentration of items in a small

23   area around the actual explosion site.  So there was a lot of

24   debris and biological materials.

25   Q.   When you say a lot of items in a small area, what small

1    area are you talking about?

2    A.    In the area on the sidewalk in front of Marathon Sports.

3    Q.    How did you handle that?

4    A.    Scene A was sectioned off into the areas in front of the

5    businesses, and those were gridded out as search areas,

6    specific search areas.  So, for instance, a search area in

7    front of Marathon Sports, that was one area.  Items that were

8    identified in that area were given a placard number, a marker

9    number, photographed in place, and then the process of

10   collecting it was taken.

11        In addition, sketches were made of the area with the item

12   numbers, those placard numbers, into those sketches, and

13   surveying equipment was utilized to plot those evidence marker

14   numbers into a mapping system.

15   Q.    Approximately how many pieces of evidence did the FBI

16   recover in Scene A?

17   A.    Over 450.  I believe it was 458.

18        MR. MELLIN:  Your Honor, if I may approach the

19   witness?

20   Q.    Agent Rolands, I just handed you an item.  What did I just

21   hand you?

22   A.    A paint can that has evidence tape on it.

23   Q.    For the record, is it marked as Exhibit 421?

24   A.    Yes, it is.

25   Q.    All right.  What is inside that paint can?

1    A.   As described on the can, it says "BBs."

2    Q.   Is that the evidence that was collected by the FBI from

3    the crime scene, specifically Scene A, in April of 2013?

4    A.   Yes, it was.

5         MR. MELLIN:  Your Honor, I'd move into evidence

6    Exhibit 421.

7         MS. CLARKE:  No objection.

8         THE COURT:  Okay.

9    (Government Exhibit No. 421 received into evidence.)

10   Q.   If you could just do me a favor.  Looking at Exhibit 421,

11   the can itself, the can was not on the crime scene, correct?

12   A.   Correct.

13   Q.   So what did the FBI do with these BBs?

14   A.   These BBs were collected and packaged in this can, sealed,

15   entered into evidence, and then shipped off to the laboratory.

16   Q.   As you look at Exhibit 421, do you see these identifiers

17   that you were talking about before listed on that can?

18   A.   Yes.

19   Q.   And so what does 421 indicate?

20   A.   421 indicates that there is a case number.  There is the

21   date that it was collected.

22   Q.   What date is that?

23   A.   April 18, 2013.  Along with the time that it was

24   collected.  It was at approximately 9:58 a.m.  The location of

25   Scene A, Grid 2C, as in Charlie.  The description of the items

1    within the can are BBs.  The marker number was identified as

2    171.  And the individuals that collected it, their names are on

3    here as well.

4    Q.   All right.

5    A.   Those are Crystal Komara and Douglas Klapec.

6    Q.   You mentioned it was recovered on April 18th, correct?

7    A.   Correct.

8    Q.   How long were you at Scene A collecting evidence?

9    A.   Until April 21st.

10   Q.   So from the morning of the 16th until the evening of April

11   21st?

12   A.   Correct.

13   Q.   So during that is when these BBs were recovered?

14   A.   Yes.

15   Q.   You mentioned there was a grid, Grid 2C, is that correct?

16   A.   Correct.

17   Q.   Could you briefly describe where that's located, if you

18   know?

19   A.   I do not recall where Grid 2C is located.

20   Q.   Fair enough.  And then you indicate that there's a marker

21   number.  I think you said 171, is that right?

22   A.   Correct.

23   Q.   What does that refer to?

24   A.   That was the marker number referring to the location of

25   these items on scene.  So on scene, there's a photograph taken

1    in place with these items there; and then once they're

2    collected, they're actually given then an item number when

3    they're entered into an electronic case management system.

4    Q.   Are they recovered by one person and collected by another

5    or observed by another?  How does that work?

6    A.   It's a combination.  We -- by policy, we have two

7    individuals that observe the item in its original location and

8    collect it, and that could be vice versa.  In this instance,

9    it's not indicated.

10   Q.   Once those items are collected, what happens to them?

11   A.   Once they're collected, then, again, they were brought

12   into an evidence intake area and issued -- and entered into the

13   electronic case management system and issued an "S" number or

14   an item number.  In this instance, this item was S266.  They

15   are -- they have been sealed and packaged properly, and then a

16   chain of custody will be assigned to this item.

17   Q.   What is a chain of custody?

18   A.   It is a chain of the individuals and the location that

19   this item has traveled.

20   Q.   So once that item is recovered, where does it go?

21   A.   This item went to Black Falcon pier, and then I believe it

22   went down to the laboratory.

23   Q.   For the record, you were looking at the item as you said

24   you believe it went down to the laboratory.  Can you look at

25   that item and tell if it went down to the laboratory?

1    A.   Actually, it did.  There was a "Q" number on here, which

2    is a question item number.  And that is assigned and there are

3    more initials on it.  So, yes, it did go down to the

4    laboratory.

5    Q.   Let's talk about that Q number in a minute.  You mentioned

6    Black Falcon.  What is Black Falcon?

7    A.   It is the seaport for cruise ships.

8    Q.   How did that become involved in the FBI's investigation of

9    the crime scene?

10   A.   It was our evidence intake area and kind of collection

11   area.  After moving from the scenes, because there was so much

12   evidence, it was then processed and kind of sorted on priority

13   on which items were going down to the lab or not, and that was

14   over at Black Falcon pier.

15   Q.   Now, you mention there's an S number and a Q number.  What

16   is an S number?

17   A.   The S number was the item number that was given to this

18   item on scene, Scene A.

19   Q.   What is a Q number?

20   A.   The Q number is the question number, which is given at the

21   laboratory, when it's received at the laboratory.

22   Q.   The laboratory we're talking about is the FBI's laboratory

23   at Quantico, Virginia?

24   A.   Yes.

25   Q.   So the item is collected and then sent down -- some items

1    are sent down to Quantico for analysis?

2    A.    Yes, they were.

3    Q.    You mentioned there were, I think, 458 items collected or

4    pieces recovered from the scene, is that right?

5    A.    Yes, from Scene A.

6    Q.    Okay.  Were all of those items recovered essentially in

7    the way that we just talked about?

8    A.    Yes.

9           THE COURT:  Mr. Mellin, we've reached 11:00.  Maybe

10   this is a good time to take the morning recess.

11          MR. MELLIN:  That's fine, your Honor.

12          THE COURT:  Okay.  We'll take the morning recess.

13          THE CLERK:  All rise for the Court and the jury.

14   Court will take the morning recess.

15   (The jury left the courtroom at 11:06 a.m.)

16   (SIDEBAR CONFERENCE AS FOLLOWS:

17          THE COURT:  Yes, counsel, please.  This is for the

18   proffer that defense wanted to make.  I guess it was Mr.

19   Chakravarty's witness.

20          MS. CONRAD:  Your Honor, I'm not quite sure why I

21   wasn't allowed to do recross; but had I been allowed to do

22   recross -- Mr. Chakravarty elicited on redirect that -- in a

23   leading question that the tweet about September 10th was the

24   first tweet after the last Al_Firdausia tweet, if I understood

25   him correctly, and that's simply not correct.  There's a tweet

```
 1    about "never fork a mini tomato while wearing a white shirt"

 2    was tweeted at 2:18 p.m. on March 13th.  The September 10th

 3    tweet was more than 24 hours after that.  I want to introduce

 4    the actual tweets, which -- the entire Exhibit 1 does not show

 5    the times.  It just shows the dates.  But I had this prepared

 6    as an exhibit to put in to show the time, and I'm not sure I

 7    understand why Mr. Chakravarty gets to do direct and redirect

 8    and I cannot do recross.

 9            THE COURT:  Recross isn't guaranteed.  But at any

10    rate, that explanation confirms to me it was --

11            THE COURT REPORTER:  I'm sorry, Judge.  I didn't hear

12    you.

13            THE COURT:  It's there.  You can argue it if you want

14    to argue it.  It's in the evidence.

15            MS. CONRAD:  Well, I don't think the jury should be

16    left with --

17            THE COURT:  Your offer is made.

18            MS. CONRAD:  -- an inaccurate presentation.

19    .  .  .  END OF SIDEBAR CONFERENCE.)

20    (Recess taken at 11:06 a.m.)

21            (After the recess:)

22            THE CLERK:  All rise.

23            (The Court enters the courtroom at 11:22 a.m.)

24            THE CLERK:  Be seated.

25            THE COURT:  Mr. Weinreb, you had something?
```

```
1           MR. WEINREB:  Yes, your Honor.  I believe it's
2    unprofessional, to say the least, for the defense to ask in
3    front of the jury if the government will stipulate to something
4    that we've never seen before and no mention has been made, no
5    request for a stipulation has been made ahead of time, we're
6    surprised by it, and it's all happening in the jury's presence.
7    I can only imagine how the defense would react if we started
8    asking them in the jury's presence if they would stipulate to
9    things that are not favorable to their client.  And they would
10   have to object or say no.  That's not how we've done things in
11   this case.  The parties have communicated ahead of time about
12   things like proposed stipulations.  And that's the way it's
13   done in every case and that's the way it should be done; not as
14   a show for the jury.
15           THE COURT:  Right.  Noted.
16           MS. CONRAD:  I thought Mr. Chakravarty would know what
17   Mecca looks like, that's all.
18           THE COURT:  All right.  Let's get the jury.
19           (Pause.)
20           THE CLERK:  All rise for the jury.
21           (The jury enters the courtroom at 11:24 a.m.)
22           THE CLERK:  Be seated.
23           MR. MELLIN:  Thank you, your Honor.
24           And, your Honor, if I haven't already done so, I would
25   move in Exhibit 421.  I believe I did that but I'm not
```

1    positive.

2              THE COURT:  You did.

3              MR. MELLIN:  Thank you.

4    BY MR. MELLIN:

5    Q.    Agent Rolands, were there concerns about going to Scene A

6    or Scene B regarding whether or not the scenes were safe?

7    A.    Yes, there were.

8    Q.    And what steps were taken to make sure that they were safe

9    or they were rendered safe?

10   A.    Special agent bomb techs did secondary sweeps of the

11   locations.  In addition, the Boston Fire Department -- there

12   was hanging glass above some of the locations where the

13   businesses were, and so they went into those locations, broke

14   down the glass, and actually inspected some of the buildings

15   and those fronts, the interiors, to assure us that those

16   locations were safe to search under and around.

17   Q.    The evidence that was recovered in this case, have you

18   reviewed those items of evidence that have been marked as

19   exhibits in this case?

20   A.    Yes, I have.

21   Q.    And are those the actual items that were recovered from

22   the scene, Scene A, during the week of April 16th through the

23   21st, 2013?

24   A.    Yes.

25   Q.    Thanks.  Okay.  And just generally, where were these items

1    recovered from that scene?

2    A.    Between the streets of Exeter and Berkeley to include

3    Newbury Street, between those -- that area, that street, and

4    St. James, to include the medical tent and the Copley Square,

5    in that general vicinity.

6    Q.    And were the items all recovered on the ground, or where

7    were they recovered?

8    A.    They were recovered from rooftops, ledges, on the ground,

9    interior of buildings.

10   Q.    From the public library across the street?

11   A.    Correct.

12   Q.    Now, when you say "rooftops," do you recall any rooftops

13   in particular?

14   A.    Yes, from the rooftops on the Charlesmark Hotel, and those

15   that were on the odd-numbered side of Boylston.

16   Q.    And approximately how tall is the Charlesmark Hotel?

17   A.    I believe that is four stories.

18            THE COURT:  Which is the odd side of the street, north

19   or south?

20            THE WITNESS:  The north side of the street.

21            MR. MELLIN:  Thank you, your Honor.

22            Thank you.

23            MS. CLARKE:  Thank you.  No questions.

24            THE COURT:  Oh, you're done?  I'm sorry.  All right,

25   sir.  Thank you.  You may step down.

1           THE WITNESS:  Thank you.

2               (The witness is excused.)

3           MS. PELLEGRINI:  The government calls Special Agent

4    Kristen Koch.

5                    KRISTEN KOCH, duly sworn

6           THE CLERK:  Have a seat.  State your name, spell your

7    last name for the record, keep your voice up and speak into the

8    mic so everyone can hear you.

9           THE WITNESS:  Okay.  Kristen Koch, K-O-C-H.

10                       DIRECT EXAMINATION

11   BY MS. PELLEGRINI:

12   Q.   And will you tell the jury by whom you're employed?

13   A.   The Federal Bureau of Investigation in Boston.

14   Q.   And in what capacity?

15   A.   As a special agent.

16   Q.   And how long have you been so employed?

17   A.   Eleven and a half years.

18   Q.   And can you go back a little bit and give us some of your

19   educational background?

20   A.   Sure.  I have a bachelor's degree in biochemistry from

21   Boston University and I have a master's degree in forensic

22   science with a concentration in molecular biology from George

23   Washington University.

24   Q.   And prior to working for the bureau, any work experience

25   before that?

1    A.    Yes, I worked for Cellmark Diagnostics in Germantown,

2    Maryland, as a lab assistant and then a DNA analyst.

3    Q.    In your work, then, with the FBI, you've been assigned to

4    Boston that entire time?

5    A.    Yes, I have.

6    Q.    And what are your roles?

7    A.    I am assigned to our Organized Crime Squad as an

8    investigator, I am also on our Evidence Response Team, and I

9    serve as a team leader, and I am also a firearms instructor.

10   Q.    With respect to the ERT and being a team leader, what does

11   that entail?

12   A.    We -- our team is comprised of approximately 32

13   individuals, and it's broken into four components of eight

14   teams.  So I serve as the team leader for one of those four

15   teams.  And my responsibility is to oversee my group of team

16   members when we process crime scenes.

17   Q.    And can you give us some of your training in ERT?

18   A.    Yes.  I attended our 80-hour basic course in Quantico,

19   Virginia.  I have attended a two-day post-blast training course

20   provided by the ATF.  I've also had advanced training in both

21   fingerprint processing and -- actually, two fingerprint --

22   advanced courses in fingerprint processing.

23   Q.    All right.  And with respect to being an ERT team leader,

24   how many crime scenes have you responded to and processed?

25   A.    Probably -- I'm trying to think over the years -- 50 to

1    100, somewhere in there.

2    Q.    Now, with respect to the investigation involving the

3    bombings at the Boston Marathon, what role did you play?

4    A.    I was the individual that set up and oversaw the evidence

5    collection, or processing center, that we established at the

6    Black Falcon Pier in South Boston.

7    Q.    So, Agent Koch, we've heard a lot about Black Falcon.

8    When you first began work there at the time of the bombing,

9    what was at Black Falcon for you to work with?

10   A.    Basically it was an empty warehouse approximately the size

11   of two football fields and there were some tables and chairs.

12   Q.    What did you have to do?

13   A.    Pretty much from the beginning set everything up, get

14   anything that we needed out there.  So as far as supplies:

15   Pens, pencils, you know, bags, gloves, anything that we would

16   need usually to -- you know, crime scene tape, evidence tape,

17   you know, printers, computers.  So we started from scratch and

18   basically built that up to basically be able to accept all the

19   evidence that we were collecting in the field.

20        And then it also included staffing up with personnel, so

21   that would be other members of the Evidence Response Team such

22   as myself.  We had members from the Massachusetts State Crime

23   Scene Services Section as well as the Boston Police Crime Scene

24   Unit to assist us.  We had evidence technicians both from our

25   office and from around the country that came in and assisted us

1   with that evidence collection.  And then separately from my

2   role but using the same facility was -- our Computer Analysis

3   Response Team set up a video review section also in the same

4   space.

5   Q.   When did you begin to set up that process at Black Falcon?

6   A.   It was approximately 9 p.m. on April 15th.

7   Q.   And tell us how long you worked, how long you were there,

8   what hours you kept.

9   A.   In the first couple of days I was probably there about 22

10  hours a day.  The warehouse itself and the center was staffed

11  24 hours, seven days a week.  There were lots of personnel

12  there both to help assist with the evidence as well as we had

13  security provided by Massport police because that's their

14  property, as well as state police and Boston police.

15  Q.   So, Agent Koch, with respect to where in the process Black

16  Falcon was with respect to the evidence moving from one point

17  to another, can you give the jury a sense of what purpose Black

18  Falcon served?

19  A.   Sure.  So once the evidence is collected at the crime

20  scene, whether that was at Boylston, whether that was evidence

21  that we received from the number of the hospitals in the area

22  that were treating patients, whether that was from the medical

23  examiner's office, search warrants that we conducted following

24  the bombing, any type of evidence, Black Falcon would serve as

25  the central location point for the collection of all of that

1    evidence.

2    Q.   And what happened to the evidence when it came into Black

3    Falcon?

4    A.   Once it came into Black Falcon Pier -- it depended on what

5    type of evidence it was.  If it was coming directly from

6    Boylston Street, that evidence would be reviewed by myself

7    along with special agents and chemists from the laboratory to

8    determine what were priority items of evidence that needed to

9    be sent to the laboratory.

10        If it was digital evidence, that would just be logged in

11   to our computer system and then the individuals from the

12   Computer Analysis Response Team would come and take that

13   evidence for review.

14        If it was evidence that was coming from the hospital, a

15   lot of that evidence was still very wet and bloody and needed

16   to be dried.  You can't just leave bloody evidence in paper --

17   or plastic bags, for that matter; the evidence needed to be

18   dried out, separated from any type of cell phones or valuable

19   evidence such as money that might be in with the clothing that

20   came from the patients, and then repackaged once that evidence

21   was dried out.

22        And so from that point, then it would be -- all the

23   different types of evidence would then -- could then be

24   determined where it needed to go, if it was needed to go to the

25   laboratory or held for storage at that point.

1    Q.   So when evidence came in, then, there was the possibility

2    it would be repackaged by the folks working at Black Falcon?

3    A.   Not from Boylston Street.  It was pretty much the -- most

4    of the evidence that we were handling or packaging would be

5    evidence coming from the hospitals, because a lot of that was

6    just placed in bags by the hospital personnel.  Or, for

7    instance, digital evidence was coming in from all different

8    types of law enforcement agencies where people would, for

9    instance, bring in their cell phone and say, "I have a

10   photograph that might be useful.  Here it is," hand it to their

11   local police department.  They would bring it to us, so then we

12   would then package that up properly.

13        Most of the -- all of the evidence that was coming from

14   either the crime scene at Boylston Street or other search

15   warrants came to us already packaged, labeled and sealed

16   properly, so we didn't have to do anything further with that

17   other than send it to the laboratory if necessary.

18   Q.   And was there a way to determine whether, in fact, it had

19   been sealed and labeled properly?

20   A.   Yes.  So we would take a look at all of the bags.  And so

21   we -- most of the evidence tape that we use is red so it's very

22   visible and very easy to see that it had evidence tape that is

23   sealed.  You just do a quick inspection of the bag.  And then

24   we're very familiar with the -- we label all of our items of

25   evidence, the bags themselves, with seven different things,

1  items, and you just take a quick read to make sure that all

2  seven of those things were printed on the bag or the can or

3  box, whatever it came in.

4  Q.   All right.  And once you determined that that is, in fact,

5  done, what happens?

6  A.   So what we do -- the items themselves were provided with a

7  number at whichever scene it was coming from.  We would then

8  take that number, it would -- the information along with our

9  chain of custody would be entered into the computer system.

10  It's assigned a bar code for tracking purposes, and our

11  evidence system also assigns it what we call a 1B number.  And

12  so that number is just another individual number that is placed

13  on the bag or on the item containing the evidence along with

14  the bar code.

15  Q.   Agent Koch, we've heard several times the term "chain of

16  custody."  Very basically can you explain what that means?

17  A.   Sure.  The chain of custody is basically a way for us to

18  determine who has handled every item of evidence from the time

19  it's collected all the way until the final disposition.  So,

20  for instance, the chain of custody from evidence at Boylston

21  Street would have been initiated from the people that collect

22  it there.  It's a form we fill out.  They sign their name, they

23  put the date and the time.  When they bring it to me at Black

24  Falcon Pier, I write on the received line that I received it, I

25  put the date and time.  Then when it gets transported down to

1    the laboratory, then we note on the chain of custody the date

2    and the time that the item was transported to the lab.

3         Then the laboratory initiates their own chain of custody

4    at the lab, and then once the item is sent back after

5    processing and it goes back into our evidence, the evidence

6    control people would then also then put their name, date and

7    time that they received it.  So it's a way to make sure that

8    the evidence has been in the control and custody of the FBI or

9    the investigating agency the entire time.

10   Q.   And, Agent Koch, with respect to the procedures that

11   you've described, are there safeguards to make sure that, in

12   fact, the evidence is being processed in the way you just

13   explained to the jury?

14   A.   Yeah.  I mean, it's basically by taking a look at the

15   chain of custody and then also taking a look at the item that

16   contains the evidence itself.  So whether it's a bag or a can,

17   it would be sealed with evidence tape, and a date and an

18   initial of the person that sealed it is on the evidence tape

19   itself.  And so you can inspect the bag, you can look at the

20   initials, you can see that that matches up with whose name is

21   on the chain of custody.  And if for some reason the bag or can

22   or whatever were opened, then you'd know that there might be an

23   issue.  But as long as the seal is intact and there aren't any

24   other holes or anything like that in the bag, then you know

25   that it has been maintained properly.

1    Q.   How long were you at Black Falcon processing evidence or

2    doing evidence intake?

3    A.   Until -- I think we closed operations there around May

4    1st.

5    Q.   Do you have an estimate of how many items came in for

6    intake?

7    A.   I think there were approximately 3,000.

8    Q.   Now, with respect to items that were then leaving Black

9    Falcon to, in fact, go to the lab at Quantico, how did that

10   happen?

11   A.   In the first week the FBI -- what I would do is once the

12   bomb technicians and the chemists determined what items would

13   need to be sent to the laboratory, the FBI has aircraft, and

14   they would have two flights a day, approximately, in that first

15   week.  So then I would take the items designated to be sent to

16   the laboratory, I would drive it to Logan Airport, out onto the

17   tarmac, and physically personally put it onto the bureau

18   aircraft which is flown by special agents, and then that flight

19   would go down to Manassas, Virginia, and laboratory personnel

20   would pick that evidence up.

21   Q.   And during the time that you were at Black Falcon, what

22   security measures were in place?

23   A.   So the entrance to the facility itself was on the water

24   side of the warehouse.  That entire section of the pier was

25   secure access guarded by both a Massport police officer and a

1    Massachusetts state trooper, so only law enforcement personnel

2    were allowed in.  There was also another Boston police officer

3    posted at the door to the facility itself with a sign-in sheet,

4    so anybody who came and went would sign in.  And so basically,

5    there was really no way for the public, for the media or

6    anybody to get access to the entrances and exits of that

7    facility.

8    Q.   Okay.  Agent Koch, I'm going to show you -- this is

9    Exhibit 421 currently in evidence.

10              MS. PELLEGRINI:  May I approach, your Honor?

11              THE COURT:  Yes.

12   BY MS. PELLEGRINI:

13   Q.   Agent, taking a look at Exhibit 421, what can you tell us

14   about the labeling that appears on that?

15   A.   So you can see that it has the item number from the scene,

16   it describes what it is, it has the names of the individuals

17   that collected this particular item of evidence.  And then you

18   can see there's a bar code on here which is put on when it came

19   to the Black Falcon Pier, as well as the 1B number.  And the

20   other markings over here in this section are the markings that

21   are put on the item when it's received by the laboratory.  You

22   can also see through the plastic the red evidence tape, and

23   around and on the evidence tape are the initials of the

24   individuals that would have sealed this particular item.

25   Q.   If it's ever unsealed, what happens?  How is that

1    memorialized if somebody opens up the item?

2    A.    Sure.  So it would be reflected on the chain of custody.

3    There's a section, purpose of why you took that item into your

4    custody.  So, for instance, one of the purposes would be

5    storage, another one would be review.  So if an agent or an

6    analyst took this item out to review it or look at it or

7    analyze it, they would note in there either "review" or

8    "analysis," and then they would open the item.

9         When they were finished with the item, they would reseal

10   it and put new evidence tape on it.  And you would be able to

11   see basically by the layers of the evidence tape and the

12   initials and dates that are on there that it matched up to the

13   chain of custody.  It would be reflected there.

14   Q.    Now, with all the procedures you just described, was it

15   your job to oversee others doing that as well?

16   A.    As far as?

17   Q.    As far as making sure that when you weren't there, that

18   items were being processed in the same way?

19   A.    Yes; that's correct.

20   Q.    All right.  And can you say that, in fact, the items that

21   were processed through Black Falcon were all done in accordance

22   with the protocols that you've just described to us?

23   A.    Yes.

24            MS. PELLEGRINI:  May I have a moment, your Honor?

25            (Counsel confer off the record.)

```
 1              MS. PELLEGRINI:  I have no further questions.  Thank
 2    you.
 3              MS. CLARKE:  No questions.  Thank you.
 4              THE COURT:  All right, Agent.  Thank you.  You may
 5    step down.
 6              (The witness is excused.)
 7              MR. MELLIN:  The United States calls Dr. Michael
 8    Macias.
 9                        MICHAEL MACIAS, duly sworn
10         THE CLERK:  State your name, spell your last name for
11    the record, keep your voice up and speak into the mic so
12    everyone can hear you.
13         THE WITNESS:  Michael Macias, M-A-C-I-A-S.
14                        DIRECT EXAMINATION
15    BY MR. MELLIN:
16    Q.   Good morning, sir.
17    A.   Good morning.
18    Q.   Where do you work?
19    A.   I work at the FBI lab in Quantico, Virginia.
20    Q.   Where did you grow up?
21    A.   I grew up in Sumpter, South Carolina.
22    Q.   Did you go to college?
23    A.   I attended University of Lander, University of Clemson and
24    University of South Carolina.
25    Q.   Did you get a degree at the University of Clemson?
```

1    A.   A bachelor's in electrical engineering at the University

2    of Clemson.

3    Q.   And when you went to the University of South Carolina, did

4    you get a degree?

5    A.   I got a bachelor of science in chemistry at the University

6    of South Carolina.

7    Q.   Did you go to school after that?

8    A.   I attended Florida International University for graduate

9    school.

10   Q.   And what did you obtain there?

11   A.   A Ph.D. in chemistry.

12   Q.   So as you sit here today, you're a doctor?

13   A.   That's correct.

14   Q.   Dr. Macias, when did you join the FBI?

15   A.   I entered on duty with the FBI in September of 2011.

16   Q.   And what do you do there?

17   A.   My title is a physical scientist in the explosives unit at

18   the FBI lab.  I handle evidence, help teach post-blast

19   investigator schools.

20   Q.   Do you have specific training in post-blast situations?

21   A.   We do.  We train at Eglin Air Force base in the demolition

22   phase of their explosives course down there for the military on

23   how to handle, appropriately, explosives.

24   Q.   Specifically, as to the investigation of the bombings in

25   Boston, how did you get involved in that?

1    A.   My -- the supervisor I work for and I were assigned the

2    Boston bombing case.  So any evidence that came into the lab

3    would fall into our purview and our assortment and analysis.

4    Q.   Did you do any specific investigations or scientific work

5    on this evidence that was recovered?

6    A.   Yes.  The evidence that came in, when it came to the

7    explosives unit, at the end of the analysis phase we did all

8    the physical measurements and did the analysis on the actual

9    evidence that was submitted in order to determine whether or

10   not there was viable evidence to rebuild an explosive device

11   and identify any parts based on markings and where they may

12   have sourced from.

13   Q.   In April of 2013, where were you?

14   A.   I was at work at the FBI lab.

15   Q.   At what point did you get involved in this investigation?

16   A.   Right after the bombings occurred on April 15th, we were

17   notified that we would be deploying some of our members of our

18   unit to Boston to help collect and identify evidence.  And that

19   night I was also informed that we would be the ones primary on

20   the evidence as it came into the lab.  So we started prepping

21   the room for storage and inventory the evidence as it came in

22   on the 15th.

23   Q.   And who was the primary person responsible for the intake

24   of those items at the FBI lab?

25   A.   I was the primary responsible.

1    Q.    So at some point would you go to Manassas, Virginia, to

2    pick up items?

3    A.    I was not responding to Manassas to deliver the items to

4    the lab.  Some of the other members of our unit who were

5    qualified to handle and transport evidence brought it to the

6    laboratory.

7    Q.    And why were people going to Manassas, Virginia?

8    A.    That is where the evidence was being delivered for the FBI

9    flights.

10    Q.    And generally where is Manassas in relation to either

11    Washington, D.C., or Quantico?

12    A.    Manassas is about halfway between D.C. and Quantico; about

13    20 miles from D.C. and 20 miles from Quantico, Virginia.

14    Q.    After these items were delivered on aircraft to Manassas,

15    Virginia, what would happen to them?

16    A.    The items were brought to the lab.  We received them,

17    signed chains of custody to accept all the different boxes that

18    were brought in.  We began our check-in procedure which

19    included documentation of all the containers that we received

20    as well as inventorying of each specific item and the packaging

21    as it was brought into the lab.  Our inventory process did

22    include assigning a unique identifier number to each item of

23    evidence, as well as photographing the evidence as it was

24    received into the lab.

25    Q.    The unique identifying number, what is that number?

1   A.    In this case it was a Q number, "Q" meaning questioned

2   item, item of evidence that was brought in.  And so it would be

3   a Q assigned with a specific number, sequential number as we

4   received more and more evidence.

5   Q.   So even though there's already a number that has been

6   assigned in Boston, there's a new number that's assigned when

7   it comes into the lab?

8   A.    That's correct.  The laboratory assigns specific

9   identifier numbers for our records.

10  Q.   When a piece of -- or piece of evidence would come into

11  the lab and it was assigned a Q number, then what would happen

12  to it?

13  A.    After assigned a Q number and the photography was done to

14  document the evidence as received, we then developed an

15  examination plan for each piece of evidence to determine what

16  units within the lab would go for analysis, and monitor chain

17  of custody as it proceeded throughout the lab.

18  Q.   And what type of units are you talking about that

19  something could go to?

20  A.    Some of the examples of the units would be the DNA unit.

21  The latent prints or fingerprint unit; the trace exam for hair

22  and fiber unit; tool marks unit; chemistry unit; and explosive

23  chemistry unit.

24  Q.   Let's go to some of that.  If it went to the trace unit,

25  what is it going there for?

1    A.   Trace helps remove tape from different devices to look for

2    specific hairs and fibers that may be help to identify and

3    source to other items.  So they remove the tape so that no

4    contamination has occurred, no extra hairs or fibers fall into

5    it, and then they'll use that to identify the hairs and fibers

6    for classification purposes.

7    Q.   If it goes to the firearms or tool marks unit, what is

8    going on there?

9    A.   The firearms and tool marks unit, we're looking at tool

10   marks and comparison tools that may have been recovered from

11   search scenes to try and identify if the tool marks found on

12   the actual items of evidence that were submitted from the crime

13   scenes would match the tool marks that were created from the

14   tools that were recovered from the search scenes.

15   Q.   If it goes to the latent fingerprints or the fingerprints

16   unit, what is going on there?

17   A.    In that case they are looking for fingerprints,

18   identifying according to their protocol based on their methods

19   of recovering fingerprints to try and match those fingerprints

20   to other fingerprints that may be submitted or other items that

21   may have been submitted.

22   Q.   What would happen if something went to the DNA lab or the

23   DNA unit?

24   A.   The DNA unit would swab different pieces of evidence where

25   they, according to their protocols, would determine likely

1    source of DNA, could be determined, and then report those

2    results as a comparison to DNA samples from known people.

3    Q.   And if something were to go to the chemistry lab, what is

4    going on there?

5    A.   Within the chemistry lab, there are several subunits,

6    including metallurgy, and they can determine the composition of

7    different pieces of metal that were submitted.  There's paints

8    and polymers, and they would determine pattern matches for

9    things like polymer tapes as well as the adhesive material

10   underneath in order to source match those items to related

11   items that had been submitted.

12   Q.   Once the items were submitted to one of these other units,

13   would they come back to you?

14   A.   After each item was submitted to each unit, it would come

15   back to us in chain of custody to ensure all items were

16   present, and then we would move the item to the next unit in

17   the prepared examination plan.

18   Q.   And after you've gone through these units, at some point

19   does it go to the explosive lab if it needs to?

20   A.   After all examinations were performed by the other units

21   of the lab, all evidence was returned to the explosives unit

22   where we performed our examinations.

23   Q.   And then was there someone at the explosives unit who was

24   in charge of overseeing and putting together an expert report

25   in this case?

1    A.   Edward Knapp -- Special Agent/bomb tech Edward Knapp was

2    in charge of developing the report based on the results that

3    we -- an examination of the evidence in the explosives unit.

4    Q.   You mentioned when an item comes in, you do somewhat of an

5    initial examination.  What are you looking for at that time?

6    A.   The initial examination is just to document the state of

7    the item as it comes in and the general description of the item

8    as we receive it.

9    Q.   So if you received a BB, what would you -- how would you

10   go about describing that?

11   A.   A BB would be recorded as a spherical metal item.  If it

12   is known as an actual BB, we can refer to it as a BB.

13   Q.   And then what about like a piece of wire?  How would you

14   go about measuring that?

15   A.   Measuring wire, we would actually document the color of

16   the sheathing, the color of the strands, any print that was on

17   the actual sheathing of the wire.  We'd measure the diameter of

18   the wire in an effort to determine the actual gauge of the

19   wire.

20        MR. MELLIN:  And, your Honor, if I may approach with

21   Government's Exhibit 136 and 137.

22        THE COURT:  Okay.

23   BY MR. MELLIN:

24   Q.   Dr. Macias, do you recognize what I've just handed you?

25   A.   Yes, I do.

1    Q.    What is this?

2    A.    This is Item Q122 that we received into the laboratory.

3    Q.    And is that an item that was analyzed by the lab?

4    A.    That is correct.

5    Q.    Okay.  And is that in the same condition that it was at

6    the time that it was received or is there some analyses on

7    items as they come in?

8    A.    The item was received with most of the information seen on

9    this can pre-prepared by the evidence retrieval unit on-scene,

10   and then we add our unique numbers attached to this, including

11   the Q number I mentioned before, as well as my initials to

12   identify that this has been checked in and inventoried, and

13   then the analysis on these items would be performed.

14          MR. MELLIN:  Your Honor, I would move in Exhibit 136

15   and 137.

16          MS. CLARKE:  Is that two exhibits, your Honor, or one?

17          THE COURT:  That was my question.

18          MR. MELLIN:  It's two exhibits inside of that can,

19   your Honor.

20          THE COURT:  Just for clarity, it was identified, I

21   thought, by a single Q number, Q122.

22          MR. MELLIN:  Correct.

23          THE COURT:  That had both items under that

24   classification?

25          (Counsel confer off the record.)

1   BY MR. MELLIN:

2   Q.   Actually, Dr. Macias, maybe that's a question that you can

3   answer better than I can, the reason why.

4   A.   When we receive the evidence into the laboratory,

5   sometimes it's multiple pieces of evidence, or as I mentioned,

6   tape was removed from evidence for latent prints, for an

7   example.  So the evidence, as it's being analyzed, will be

8   separated into multiple items.  In this case, Item Q122 is the

9   original item, and Q122.1 was an item that was separated out

10  and given a separate number in the system, but it sources from

11  the original number the ERT gave when we received it into the

12  laboratory.

13          THE COURT:  So one of those, 136 is 122, and the 137

14  is 122.1.

15          THE WITNESS:  Correct.

16          THE COURT:  Admitted then.

17          MR. MELLIN:  Thank you, your Honor.

18          (Government Exhibit Nos. 136 and 137 received into

19  evidence.)

20  BY MR. MELLIN:

21  Q.   Dr. Macias, if you can, just looking at that can, can you

22  describe for the jury what is on the outside of that can and

23  how this process worked, specifically about that can?

24  A.   About this can?  We've got the ERT information as they

25  collect it, so there's seven points of information including

1    date, location and who collected it.  And they assign a

2    specific number on-scene, what they refer to as an S number, in

3    this case S2056.  Then as it's prepared at their -- from what I

4    understand, as it's gathered at their warehouse, they are

5    adding a 1B number, FBI identification number, as well as bar

6    code number for identification purposes within their system.

7         So that information was then received on this can as we

8    got it into the lab as well as the seal across the top.  Once

9    we received it into the laboratory and we've opened it up and

10   identify what the item is, we assign a laboratory number.  And

11   that is based on the set of evidence that is received.  Each

12   shipment gets a unique identifying laboratory number.  Then

13   each item in that shipment is given a separate Q number, and in

14   this case again Q122 and 122.1.  And then my initials are added

15   to that and the can is resealed and initialed as it moves

16   around the lab for examination purposes.

17   Q.   And you say your initials are on that.  Is that because

18   you received it?

19   A.   That is correct.

20   Q.   And was that procedure followed with all of the pieces of

21   evidence that were sent down to the lab?

22   A.   All pieces of evidence were followed under the same

23   procedure, standard, in the explosives unit.

24            MR. MELLIN:  Thank you.

25            Thank you, your Honor.

```
 1              Hold on.  I'm not done.
 2   Q.   One other small area.  When an item is received, it gets a
 3   Q number.  At some point is it also photographed?
 4   A.   It's photographed as it's received into the lab along with
 5   the inventory process.  So it's assigned a Q number and then we
 6   photograph it immediately.
 7   Q.   And all items would be photographed?
 8   A.   That's correct.
 9              MR. MELLIN:  Thank you.
10              MS. CLARKE:  No questions.
11              THE COURT:  All right, sir.  Thank you.  You may step
12   down.
13              (The witness is excused.)
14              MS. PELLEGRINI:  Jason Costello.
15              THE CLERK:  Step up here, please.
16                    JASON COSTELLO, duly sworn
17              THE CLERK:  Have a seat.  State your name, spell your
18   last name for the record, keep your voice up and speak into the
19   mic so everyone can hear you.
20              THE WITNESS:  Special Agent Jason Costello,
21   C-O-S-T-E-L-L-O.
22                    DIRECT EXAMINATION
23   MS. PELLEGRINI:
24   Q.   Agent Costello, can you tell us by whom you're employed.
25   A.   I work for the FBI.
```

1    Q.   And for how long?

2    A.   Since July 2004.

3    Q.   And can you give us your educational background?

4    A.   I received a bachelor of science in engineering.

5    Q.   From?

6    A.   From Tulane University in New Orleans.

7    Q.   And prior to beginning work for the FBI, did you have any

8    prior work experience?

9    A.   Yes.  I was an Army officer for four years on active duty,

10   and then I worked in the engineering sector as a project

11   manager before coming in to the FBI.

12   Q.   And since your assignment with the FBI, what are your

13   duties?

14   A.   I'm assigned as an investigator on the Organized Crime

15   Task Force.  As a collateral duty, I'm a member of the Evidence

16   Response Team.

17   Q.   And do you have a specific function as a member of the ERT

18   team?

19   A.   I do both the ballistics reconstruction work and also the

20   total station operator for the team.

21   Q.   All right.  So total station is what I would like to focus

22   in on.  What is total station?

23   A.   Total station is -- it's essentially survey equipment.  We

24   use it to electronically diagram a crime scene.  Any crime

25   scene, we sketch and we measure and we record where evidence

1    lies within the crime scene.  A total station allows us on

2    larger, more complex crime scenes, to electronically diagram

3    that, where manual measurements and sketching would just be too

4    cumbersome.

5    Q.    So exactly how do you go about utilizing the equipment you

6    have to determine the location of an item?

7    A.    Well, the survey equipment -- if you've ever driven by a

8    construction site, you've seen it.  It's equipment that sits on

9    top of a tripod and, you know, men operate it to, you know,

10   either lay things out or record where things are.  Essentially

11   it measures angles, and it can measure distance through a range

12   finder.  So from a reference point that we establish, we take

13   measurements to all of the various items of evidence as well as

14   objects within the crime scene, fixed objects for point of

15   reference, or other objects that have significance.  We can

16   simply measure where they are.

17        That creates a data set and essentially a CAD or

18   computer-aided drafting diagram that our laboratory can then

19   turn into a more user-friendly depiction of the crime scene.

20   Essentially, an electronic sketch is what the end product

21   typically is.

22   Q.    Now, in addition to your background in engineering, did

23   you receive specific training with respect to total station?

24   A.    I did.

25   Q.    And when did that take place and where?

1    A.   I've been assigned the total station operators for about

2    five years.  Generally speaking, every year we train.  So my

3    initial training was about five years ago.  We receive

4    in-service training every year, so, to keep our skills fresh

5    and to, you know, train on the latest equipment or to just work

6    best practices with other operators throughout the FBI.

7    Q.   And does that training take place here in Boston?

8    A.   It can.  We do on-the-job training here in Boston.  I have

9    people that assist me with it, so we do trainings here.  But we

10   train all over the country.  We've trained down in

11   Fredericksburg, Virginia, where we have a facility.  We've also

12   trained at other off-site locations.

13   Q.   Do you know a woman by the name of Paula Ernst?

14   A.   I do.

15   Q.   Were you trained by Paula Ernst?

16   A.   I was.

17   Q.   In using total station?

18   A.   Yes.

19   Q.   And who is Paula Ernst?

20   A.   Paula is now the unit chief for our Operational Projects

21   Unit at the laboratory.  We have -- the total station program

22   has a close working relationship with that unit because they're

23   the ones who would take my data collected in the field and

24   translate it to generally an exhibit or something we can

25   actually display the crime scene or depict it.

1    Q.   And have you, prior to this investigation, been able to

2    review data you've provided that has ended up in a graphic

3    form, if you will, in an electronic sketch?

4    A.   Yes.

5    Q.   And are you able to determine whether or not the data you

6    provided is accurately reflected in that graphic exhibit?

7    A.   Yes.

8    Q.   And how do you make that determination?

9    A.   Well, my data, when I produce it, it -- the equipment that

10   I use, it creates essentially a very crude drawing or a sketch.

11   It's a lined drawing.  We see points and lines.  And when they

12   produce their diagram or their product, we -- I can simply

13   compare it side by side to make sure it accurately represents

14   what I produced in the field, that it's been translated.

15        Often there's a back-and-forth, and if they have questions

16   on the work I did, they'll ask me, and there's an exchange of

17   information.  But at the end, we verify that it actually

18   transferred from what I saw in the field to how they're

19   presenting it.

20   Q.   Now, you mentioned just previously CAD?

21   A.   Uh-huh.

22   Q.   What is that?

23   A.   Computer-aided drafting.  It's an engineering program.

24   I'm by no means familiar with using it.  I haven't used it in

25   years.  But it's essentially -- it's how things are designed

1    and drawn.  But the soft -- the equipment we use, that's how it

2    represents the data.  It's a three-dimensional drawing, if you

3    will.  It's appropriate and -- again, in a complex scene where

4    we have evidence located, you know, in a lot of different

5    places and where elevation is a key thing, it helps because,

6    again, it can represent things in a three-dimensional way that

7    a two-dimensional sketch drawing just can't.

8    Q.    So, Agent Costello, with respect to the Boston Marathon

9    bombing, were you called to perform that service at any of the

10   scenes?

11   A.    Yes, I was.

12   Q.    And which scene did you go to and when?

13   A.    I responded to the Boylston Street scene and I began

14   documenting the scene on Tuesday morning, the 16th, until it

15   was complete, the following Sunday or Monday.

16   Q.    Now, we've heard reference to Scene A and Scene B.  Which

17   scene did you use total station on?

18   A.    I was working on the Scene B side, which was the Forum

19   side.

20   Q.    So when you started on Tuesday, tell us what you did.

21   A.    Well, when I first went out to the street, I just

22   initially take a look around to get an appreciation for the

23   scope and scale of what I'll be shooting and to try to have an

24   initial understanding of where we expect to find evidence.

25   Sometimes we see it, sometimes, you know, we have to search for

1    it.

2    Q.   Do you have to -- I'm sorry to interrupt.  Do you have to

3    consult with anybody in particular?

4    A.   Well, we coordinate with the team leader on that scene

5    because it's a coordinated approach that we use.  So the team

6    leader is managing the searchers.  My job is a very unique job,

7    so I know what my responsibilities are.  So once it's agreed

8    who's going to be working where, I work quasi independently at

9    that point, although I'm staying in communication with the team

10   leader as we document things working through.

11   Q.   All right.  So upon your arrival, what did you do?

12   A.   Well, I immediately started just mapping in fixed objects,

13   sidewalks, building corners, things like that, so the drawing

14   that I started creating had some relevance.  We generally -- we

15   don't document the evidence until the actual evidence

16   collectors have a chance to go through, find it, collect it.

17   And once they've marked the location where the evidence is,

18   they bring it to my attention, and that's when we map it and

19   memorialize where it was.

20   Q.   So how long did this process take?

21   A.   We started Tuesday morning.  We worked 14-hour days.  We

22   wrapped up -- I believe it was either Sunday night or Monday

23   night is when we finally wrapped up.  So it was about six or

24   seven days of straight shooting.  You know, long days.

25   Q.   And can you tell us or estimate how many items you mapped

1  at Scene B in front of the Forum?

2  A.    Scene B, between both physical evidence and human remains,

3  I believe I mapped in approximately 407 items.  But with the,

4  you know, again, that's only part of it.  We also map fixed

5  features, other features that our OPU section would use to

6  actually create the model.  So we took probably 4,000 or so

7  shots of -- just to accurately depict -- and that's what was

8  there.  And that was just on the Scene B side.

9  Q.    Do you know who worked Scene A?

10  A.    Yes.

11  Q.    And who was that?

12  A.    Susan Garst, who is an agent out of our New York field

13  division.  She's the total station operator for New York.  So

14  we -- they arrived sometime late on Tuesday, and since I was

15  already working the B side, her and her partner started working

16  the side A.

17  Q.    Now, Agent Costello, just one thing.  You said you work

18  with the other ERT folks and that there are markers.  What are

19  those?  What are you referring to?

20  A.    Well, sometimes evidence has a little tent next to it just

21  to give it an item number, and that's for us to keep track of

22  through photography, through evidence logs.  And it has a

23  number.  In the case of our side, at least on Scene B, because

24  there were so many items, and tents weren't practical after a

25  certain point, the evidence collectors would identify it and

1    then someone would mark the actual number -- item number it was

2    given on the street with chalk next to where the item was

3    recovered.

4    Q.   By the way, did personnel from OPU, the Operational

5    Products Unit that you mentioned, come up and assist in this

6    regard with respect to measuring the scene and other aspects of

7    it?

8    A.   Yes.

9    Q.   And how many people, if you know?

10   A.   Well, two that I know of were actually doing detailed

11   measurements and drawings of certain things that they would

12   need later in their work.  And there are a whole host of other

13   individuals that were operating, you know, three-dimensional

14   scanners doing spherical photography work as well as kind of

15   collecting our data at the end of every day to kind of start

16   putting it all together.

17   Q.   So with respect to the data that you did collect, when you

18   completed that task, what did you do with that information?

19   A.   I'd give it to our Operational Projects Unit.

20   Q.   And how did you provide it?  In what form?

21   A.   It gets downloaded.  We work on a data collector.  It's

22   essentially a computer.  We download the data onto a thumb

23   drive because of the volume of it.  And we provide it to them

24   and they put it onto their system for further use.

25   Q.   And have you seen the results of your work as interpreted

1    by OPU?

2    A.   Yes.

3           MS. PELLEGRINI:  May we have -- I know it's been

4    marked but not yet offered, but Exhibit 620 just for counsel

5    and the witness at the moment.

6    Q.   Agent Costello, do you recognize the graphic in front of

7    you?

8    A.   I do.

9    Q.   And how do you recognize it?

10   A.   This is the Scene B.  This is the area around the Forum

11   restaurant.

12   Q.   All right.  And with respect to the small colored dots

13   that appear in this graphic, do you know what those represent?

14   A.   Yes, I do.

15   Q.   What are they?

16   A.   They are the items of evidence that I mapped doing my

17   total station work.

18   Q.   And have you had occasion to determine whether these --

19   the placement in this graphic fairly and accurately depicts the

20   location that you saw these items in on Boylston Street when

21   you mapped them?

22   A.   Yes.

23   Q.   And how do you know that?

24   A.   I've compared their location with the work that I did.

25          MS. PELLEGRINI:  Your Honor, the government does

1    intend at some point to offer this fully as an exhibit but at

2    this point I'd like to publish it as a chalk so the witness can

3    continue with his testimony.

4            MS. CLARKE:  We have no objection to it being

5    published as a chalk, your Honor.  There is a concern about it

6    being an exhibit.

7            THE COURT:  All right.  Well, we'll regard it for now

8    as a chalk and it will be displayed.

9            MS. CLARKE:  And, your Honor, I think that this

10   witness is only focusing on Boylston Street.  There are some

11   other areas attached to this particular chalk but -- which I

12   assume we're not going into yet.

13           THE COURT:  You mean this is multiple images?

14           MS. CLARKE:  Multiple locations.

15           THE COURT:  Right.  But the document is -- to use a

16   paper word, it's multiple pages?

17           MS. PELLEGRINI:  That would be correct.

18           THE COURT:  Okay.  So you're offering just the front

19   one now?  You're not offering it.

20           MS. PELLEGRINI:  I have several other witnesses.

21           THE COURT:  I understand.

22   BY MS. PELLIGRINI:

23   Q.   All right.  So, Agent Costello --

24           MS. PELLEGRINI:  This is now in front of the jury,

25   your Honor?

1          THE COURT:  Yes.

2          MS. PELLEGRINI:  All right.

3   BY MS. PELLIGRINI:

4   Q.   So can you describe to the jury what they're seeing when

5   they look at this graphic?

6   A.   Well, this is -- the Forum restaurant is located about in

7   the center.  The highest concentration of the multicolored dots

8   exist right in front of the Forum restaurant.  And those are

9   not all of the evidence items that were there but that is a

10  large amount of them and that's them being mapped.  They're

11  color-coded to differentiate different types of evidence.

12  Q.   And with respect to the location of these items -- now,

13  I'll just point with my finger right there -- like, for

14  example, this little blue dot, how are you able to locate this

15  item and map it using total station?

16  A.   Well, the search teams locate it through just an

17  exhaustive, you know, line search process they conduct.  Once

18  they locate it, they call it to my attention.  I -- we shoot --

19  or we say "shoot."  It's a bad term.  But we measure from a

20  number of established control points that we set up.  So from

21  one spot I can't see all the pieces of evidence on the scene so

22  I'll have to move several times throughout the course of my

23  work to get everything.

24       That particular blue dot was up on top of a bridge going

25  between the Lord & Taylor building and the one next to it.

1    Because it was up high, I actually was shooting from a rooftop

2    across Boylston Street to get a lot of the evidence that was

3    located both on top of the Lord & Taylor building, the Mandarin

4    Oriental.  Anything up high, essentially.  So my partner who is

5    holding a striped pole with a reflective prism on top, he goes

6    and stands over the piece of -- where the evidence was marked,

7    the location of it, and from my vantage point I take a

8    measurement to the device that he's holding.  And that's how we

9    can accurately map where that is.

10   Q.   And just referencing Scene A for a moment, have you had

11   occasion -- or do you know about the data that was inputted for

12   Scene A?

13   A.   Yes.

14   Q.   All right.  And have you had occasion to compare the data

15   collected with the graphic prepared for Scene A?

16   A.   Yes.  We -- as an ongoing process, every day when we

17   would, you know collect data -- our Operational Projects Unit

18   would download our data every day.  So we were always seeing an

19   updated CAD drawing for the entire street scene.  So I was

20   seeing the New York team's data as we all worked, and I then

21   recognize it from what's in front of me here, or the Scene A

22   side.

23   Q.   I'm just going to push this up here for a second.  So I've

24   now switched to Scene A.

25   A.   Yes.

1    Q.   And are you saying that, in fact, this does fairly and

2    accurately represent the location of the items as collected by

3    the -- I'm sorry -- as photographed by the team with respect to

4    Scene A?

5    A.   Yes.  That shows the concentration of evidence around the

6    first device near the finish line near Marathon Sports.

7    Q.   Going back to Scene B for a minute.  Now, Agent Costello,

8    did you participate in the labeling of the items at all?

9    A.   No.

10   Q.   All right.  And do you know who did that?

11   A.   Labeling each item?  No, I don't.

12   Q.   Now, with respect to the items that do appear here, are

13   these all of the items that you shot at Scene B?

14   A.   No.  It's my understanding that not all items were put

15   onto this just due to the amount.

16   Q.   All right.  One moment, please.

17        MS. PELLEGRINI:  Thank you, Agent Costello.  I have no

18   further questions.

19        MS. CLARKE:  No questions, your Honor.

20        THE COURT:  All right, sir.  Thank you.  You may step

21   down.

22        (The witness is excused.)

23        MS. PELLEGRINI:  Paula Ernst.

24        Your Honor, the government would request to use the

25   larger screen at this time.

```
 1              THE COURT:  Okay.
 2              MS. PELLEGRINI:  Thank you.
 3                         PAULA ERNST, duly sworn
 4              THE CLERK:  Have a seat.  State your name, spell your
 5      last name for the record, keep your voice up and speak into the
 6      mic so everyone can hear.
 7              THE WITNESS:  Okay.  My name is Paula Ernst,
 8      E-R-N-S-T.
 9                         DIRECT EXAMINATION
10      BY MS. PELLEGRINI:
11      Q.   Good afternoon, Ms. Ernst.  I'm over here.
12      A.   Good afternoon.
13      Q.   Will you tell the jury how you are employed?
14      A.   I'm employed by the Federal Bureau of Investigation.  I
15      work in the FBI laboratory in Quantico, Virginia.
16      Q.   And what is your current position?
17      A.   I'm currently the chief of what's called the Operational
18      Projects Unit.  The FBI laboratory is divided into five
19      different sections.  I work in the Forensic Response Section of
20      that laboratory.  As the chief of the unit, I oversee a unit of
21      35 employees, and we focus on the development of demonstrative
22      exhibits, crime scene documentation, photography.  And that's
23      our specialty.  That's the only thing that we do in the
24      laboratory.
25      Q.   All right.  Well, let's go back a little bit and let's
```

1    tell the jury, where did you go to school?

2    A.   I went to the University of Hartford.  I graduated in 1988

3    with a degree in mechanical engineering.  After I left college,

4    I got a job as an accident reconstructionist.  I worked for a

5    private company in Connecticut and investigated hundreds of car

6    accidents, transportation accidents of different sorts.  And

7    then I applied for a job with the FBI, and I entered on duty in

8    March of 1998.

9    Q.   And in that time, have you received any specific training?

10   A.   Yes.  Everyone who's brought into the laboratory goes

11   through a training process.  I came in under the title of

12   visual information specialist, so I came in as an entry-level

13   job.  We get trained in the crime scene response methodologies,

14   we work with the Evidence Response Team's training unit program

15   to get trained in how to do documentation, we learn about all

16   the different processes.  There's a 12-step process of

17   documenting a scene.  And I brought a lot of experience with

18   me, I got training in different software programs.  We use a

19   lot of software that's used in the engineering and the graphics

20   world, like computer-aided drafting and Adobe Photoshop and all

21   that kind of thing.  So I got training in that stuff also.

22   Q.   How about total station?

23   A.   Yes.  So in 2000 or so, right before 9/11 happened, there

24   was a discussion about bringing Total Stations, or surveying

25   equipment, into the FBI for the Evidence Response Team.  As an

1    engineer in the accident transportation world, I learned

2    surveying with that job and brought that skill set with me.

3    When I was hired by the FBI, they actually had a civil engineer

4    give me a test in surveying, which I passed.

5         As a result, we developed, with the Evidence Response Team

6    Unit, which is within my section in the laboratory -- the

7    Evidence Response Team Unit oversees all the ERT teams around

8    the country.  So every field office has an Evidence Response

9    Team in their office, and under this concept they're all

10   trained exactly the same way, the same procedures.

11        So when we started the total station program -- it

12   actually got running in 2002, and I am considered -- my unit is

13   considered the subject matter experts in this technique.  We

14   are -- we work in concert with Evidence Response Team Unit, and

15   we train and teach all the teams that have this equipment

16   throughout the field.  So I brought that expertise with me, and

17   I keep up with my current training as a -- I was a visual

18   information specialist in the unit.  Over the past four years,

19   I've moved into supervisory roles, and in the past two years

20   I've been the unit chief.  So I'm more of an administrator at

21   this point in time but I do oversee all the training in this

22   work.

23   Q.   With respect to total station, do you know a Special Agent

24   Jason Costello?

25   A.   Yes, I do.

1    Q.   How do you know him?

2    A.   So all the agents in the field, all the teams that we

3    train come to our training classes.  So I met Jason when he

4    came to training in -- I believe it was Seattle, was his first

5    training class.  The other responders to the scene in Boston

6    from other offices I've also trained through our program.

7        All of them are trained the same way.  We use the same

8    technique.  They're taught all the same codes, all of the --

9    the way to measure properly, how to use control points, how to

10   bring it all together.  And they are required to send every

11   survey that they do into our office to get it checked.

12   Q.   And with respect to the type of projects that your unit

13   does, can you just briefly and generally tell us what your unit

14   does?

15   A.   So our -- our -- we're support to the response components

16   of the FBI, and we support all FBI field investigations in a

17   capacity beyond what they can handle within their offices.  So

18   I -- for instance, we helped the Denver field office with the

19   Columbine High School shooting.  And I was out there for two

20   weeks helping to document that scene.  After 9/11, we went to

21   the Pentagon and helped document that scene.

22       All field offices can call the laboratory and ask for

23   assistance with anything that they're doing.  So we help them

24   process scenes, document them, and then we produce

25   demonstrative exhibits.  We work with case agents and

1    prosecutors to help tell the story of their investigation and

2    their case.

3    Q.    Now, with respect to the Boston Marathon bombings, did

4    you, in fact, receive a request for assistance?

5    A.    Yes, we did.

6    Q.    What did you do in response?

7    A.    So the beginning hours after something happens are a

8    little bit confusing, but the call did come in that the Boston

9    office was going to need assistance in processing these scenes.

10   The ERTU, the Evidence Response Team Unit, is actually in

11   charge of the lab team that comes out here.  So I coordinated

12   with the special agent there assigned to this project to get a

13   handle on how big the scene was, how many people might possibly

14   be needed and what we would have to send up here.

15       So in that capacity, I pulled four people together the

16   first day of the incident.  Over the course of that night, as

17   politics work their way through, we sent a team up to Boston

18   the next morning.  They came up here.  So I sent somebody to

19   support photography and I sent three people to help support

20   documentation as graphic specialists, technical specialists.

21       Over the course of this week in investigation it became

22   apparent they needed more assistance.  Eventually, we sent up

23   our mobile imaging truck which is a vehicle equipped with

24   printers and platters and computers, so we can process data on

25   a scene and make sure we have everything.  And then I also got

1  a request that they were short photographers, so I sent up

2  another set of photographers and another technical person to do

3  documentation.

4  Q.   Now, with respect to the documentation that was done

5  onsite on Boylston Street here in Boston, what type of

6  information was collected that related to an exhibit that you

7  were going to prepare?

8  A.   So we focus on the documentation of a scene and we make

9  sure we collect as much data as we can, not knowing what we're

10  going to have to prepare as exhibits.  So by the time my team

11  got up here, the Boston team was already on-scene.  They

12  started with their total station process.  The New York office

13  was up here.  They were getting started with their total

14  station process.

15      We support what they're doing.  We make sure they're doing

16  it properly.  On top of that, we took hand measurements at

17  these scenes if we couldn't get to it with a total station.  A

18  grid system was utilized at Scene A that we referenced.  We

19  also brought up laser scanning technology which is a modern

20  version of surveying equipment that engineers use, and we

21  laser-scanned Boylston Street all the way through Scene A and

22  Scene B.

23      I also got a request after the first day that we may need

24  some imagery of the scene, so on the 17th I sent a plane.  We

25  have an aerial photographic program within my group.  We sent

1    our plane up from Virginia.  It is equipped with a camera

2    that's embedded in the belly of the plane, and this camera, it

3    syncs in with GPS, and we take a series of high-resolution

4    photographs.  We took them all up and down Boylston Street at a

5    certain elevation.  Then we mosaic all these photographs

6    together, and through the GPS technology, we can create a

7    geo-referenced aerial image that's from overhead and that's to

8    scale.

9    Q.   And did you do that with respect to both Scene A and Scene

10   B?

11   A.   Yes, we did.

12        MS. PELLEGRINI:  Can I have Exhibit 620 up, please?

13   Q.   Ms. Ernst, showing you the graphic that appears on the

14   screen at this point, do you recognize this image?

15   A.   Yes, I do.

16   Q.   And what is this?

17   A.   This is the crime scene diagram of Boylston Street that

18   was created by my unit.

19   Q.   And is this, in fact, to scale?

20   A.   Yes, it is.

21   Q.   And was it done using the different techniques that you

22   just explained to the jury?

23   A.   Yes.  So we used -- we collect all the data that the

24   Evidence Response Teams collect at these scenes.  So we get all

25   the photographs, we get all the surveying data, we get all the

1    photo logs, we get the evidence logs.  Everything that's

2    collected, we get copies of all that data, and we compile all

3    this data and we cross-referenced and checked it with our scan

4    data and our aerial imagery to make sure that everything was

5    accurate and lining up.

6              THE COURT:  Ms. Pellegrini, just so you understand,

7    the jury is not seeing this.

8              MS. PELLEGRINI:  Okay.  May this be published to the

9    jury at this time as a chalk?

10             THE COURT:  Okay.

11   BY MS. PELLEGRINI:

12   Q.   So, Ms. Ernst, now for the jury's benefit, what they're

13   seeing -- when you say "to scale," what does that mean?

14   A.   It means that we measured the width of the road, we

15   measured where all the trees are located, we measured the

16   checked and lined up the stripes that are in the road.

17   Everything that's in the road as it normally is there, we use

18   those known locations of things to create the diagram.

19        The survey teams that survey, they put common points

20   between their two surveys so that we can tie all the data that

21   they collected together.  We take all that raw data that's

22   collected and overlay it onto the aerial image and line it all

23   up.  Then we add in with the computer-aided drafting all the

24   hand measurements.  I believe my team also got blueprints from

25   some of the facilities to help us with how big each building

1    is.

2         So when I say it's to scale, we measured it with the same

3    technology that civil engineers use.  We drew it up in our

4    computer-aided drafting programs and made sure that it was

5    drawn to the scale that you see.  So if we took measurements on

6    the computer back in our office, the road is actually the width

7    of the road that it should be, the stripes are the right

8    length, the buildings are the right sizes.

9    Q.   And did you, in fact, use this graphic also for another

10   portion of Exhibit 620 -- which, by the way, you recognize

11   Exhibit 620, correct?

12   A.   Yes, I do.

13   Q.   And is this, in fact, an exhibit that your unit created?

14   A.   Yes, it is.

15   Q.   And is this an exhibit that you oversaw the creation of?

16   A.   Yes.  So as a unit chief, I'm responsible for all the work

17   product that our unit develops.  Over the course of the

18   production time, I get updates on where we are and I also make

19   sure it's peer-reviewed.  And then I also in this case did some

20   checks and balances myself, took some spot measurements off the

21   diagram, compared it to the known data that we had and ensured

22   it was right.

23   Q.   What's peer review?

24   A.   So a peer review is when one of my graphics people who's a

25   visual information specialist drew up this diagram.  I had

1    another visual information specialist within the program check

2    the work of the other visual information specialist.

3    Q.   So, now, with respect to the portion of Exhibit 620 which

4    relates to Scene B, and now the other items that appear here,

5    can you explain to the jury what they're seeing?

6    A.   So we took the survey data that Jason would have explained

7    earlier, and where you see a dot on the diagram is the location

8    of a piece of evidence that was collected at the scene.  So as

9    the evidence gets marked and surveyed in, the dots represent

10   the different types of evidence that were collected at that

11   scene and where it was found.

12   Q.   Now, if I have the mouse hover over a dot, what appears?

13   A.   A Q number.

14   Q.   And the Q number is what?

15   A.   So while we're in the field, everything that gets marked

16   is marked with an evidence response number at the scene.  That

17   evidence number is then cross-referenced with what the number

18   is in the survey.  When it comes to the FBI laboratory, those

19   evidence numbers are given Q numbers.  So we had a spreadsheet

20   where we cross-referenced all these numbers, so we knew that Q

21   Number 129 was that particular piece of evidence in the survey.

22   Q.   So again, do the dots fairly and accurately represent the

23   information that you received from Boylston Street ERT

24   regarding the location of these items?

25   A.   Yes.  And if we -- there are some items that we were

1    unable to specifically locate due to the -- being moved at the

2    scene.  Some items are grouped.  If it was not specifically

3    located, it is referenced in this exhibit that it was

4    approximated or generalized.

5    Q.   Now, with respect to other information that appears within

6    this, what other type of information is here?

7    A.   So on the right side of the screen is a list of the FBI

8    laboratory numbers of all these pieces of evidence.  These are

9    the pieces of evidence that -- so when we create these

10   exhibits, we work with the case agents and the task force in

11   that field office.  So in this case we worked with Boston.

12        Of all the things that were found at the scene, these are

13   the ones that were important to this part of the case.  So the

14   laboratory numbers are the Q numbers.  There's a description.

15   The evidence description is carried on from the evidence logs

16   through what that piece of evidence is.  And then the dots are

17   colorized to organize them as to what different types of

18   evidence they are.

19   Q.   And is there also a link to, when available, images of the

20   items?

21   A.   Correct.  So if -- as you hover over each significant

22   item, the Q number for that item comes up.  That is linked to

23   the actual photographs of that item, both the ones taken in the

24   field and the ones taken back at the laboratory.  So you can

25   see where that piece of evidence is located and then you can

1    click to see exactly what it is.

2    Q.   And how did you cross-reference the accuracy of the

3    photographs that are here with the items?

4    A.   So it's the same system of checks and balances.  We

5    actually had the field office crosscheck all the photographs

6    against the Q numbers.  They became our peer reviewers for this

7    part of the project, and then I also had the items checked at

8    the laboratory.

9    Q.   And just for the final aspect of this, is it possible to

10   simply click on one type of -- or color of a dot and only that

11   type of item appear?

12   A.   Yes, it is.

13   Q.   All right.  So if I click on orange -- I'm not sure I'm

14   doing it very well.  I think I have to reset.

15        How does that work?

16   A.   So if you click on the assembly materials, those are only

17   the items that are related to what we classified as assembly

18   materials.  The scene is also divided.  It's not the whole

19   street.  So we broke the street up into three different zones

20   so that would be more viewable on the screen.  So at this time

21   for this scene, those are only those items related to assembly

22   materials.

23        There's also -- you could break it apart by the other

24   categories listed, so concealment items, container items,

25   explosive residue and fragmentation and the fusing system,

1    those are all linked to those categories and those categories

2    only.

3    Q.   And if I reset, it all comes back?

4    A.   Correct.

5    Q.   All right.  And was this process that you just described

6    to us also followed for Scene A?

7    A.   Yes, it was.

8    Q.   All right.  And with respect to the underlying graphic,

9    I'm going to the camera location's frame of this exhibit.

10   Again, was -- is this accurate and to scale?

11   A.   Yes, this is the same diagram as in the other exhibit.

12   Q.   How did you determine the placement of the cameras?

13   A.   Oh, the placement of the cameras, some of them were

14   surveyed in by the survey team, some of them were located by

15   someone actually walking around and telling us where they were,

16   some of them -- everything we do is cross-referenced back to

17   the photographs.

18        In addition to the laser scanning that we did up and down

19   Boylston Street, we took pictures, spherical photography all up

20   and down Boylston Street.  I think we also did spherical video.

21   So spherical photography is high-resolution photography from

22   one location.  They use it now in like architectural and real

23   estate sites.  And you can look all the way around the

24   photograph and zoom in on things.  We also did video up and

25   down the street to ensure that if we didn't know where

1   something was, we could find it in the photographs.

2   Q.   Ms. Ernst, I don't think I asked you, but what exactly is

3   laser scanning?

4   A.   So laser scanning is the newest technology in the

5   surveying world that we utilize.  When surveying firms -- you

6   see them along the side of a highway.  They use a device, and

7   it measures one point at a time.  That's how they're laying out

8   your roads, that's how they're laying out your property lines

9   for your house.  We use that same exact technology to document

10  what we find at different scenes.

11       Laser scanning is a whole step above regular surveying.

12  It's a device that -- we can place a laser scanner in the

13  middle of this room.  The laser spins around in 360 degrees and

14  reflects off of every object that it sees.  It's built in such

15  a way that both of these devices that were used use the

16  mathematics of trigonometry to figure out spatial relationships

17  of things, and they come up with X, Y and Z coordinates for all

18  of these objects.

19       So everything that we documented at the scene we do in a

20  three-dimensional world.  It's a true space world.  So if the

21  distance from me to you is 30 feet, it will be measured that

22  way by this laser device.  And you have to move the laser

23  device around multiple stations in order to get all the

24  different sides of things.

25       So we measured probably 36 different positions along just

1    one of these scenes to get enough scan data so that when we

2    merged it all together, we have a total visual point cloud of

3    what that scene looks like.

4    Q.   Ms. Ernst, not to put you on the spot, but do you -- can

5    you give us an estimate of how many items are listed here in

6    Scene A and Scene B, approximately?

7    A.   I would say approximately a couple hundred.

8    Q.   And with respect to the images that are linked to each

9    item, how many images are included in the exhibit?

10   A.   There are much more images than there are items because

11   there are multiple photographs for each item.  There are

12   photographs from the scene itself and also the photographs from

13   the laboratory when it came back.  So there are hundreds of

14   photographs in this exhibit.

15            MS. PELLEGRINI:  Very good.

16            (Counsel confer off the record.)

17            MS. CLARKE:  No questions.  Thank you.

18            THE COURT:  All right.  Thank you.  You may step down.

19            (The witness is excused.)

20            MS. PELLEGRINI:  Agent Sarah De Lair.

21            THE CLERK:  Ma'am, do you want to step up here,

22   please?  Step up to the box.

23                      SARAH DE LAIR, duly sworn

24            THE CLERK:  Have a seat.  State your name, spell your

25   last name for the record, keep your voice up and speak into the

```
 1   mic.
 2            THE WITNESS:  It's Sarah De Lair, and the last name is
 3   D-E L-A-I-R.
 4                        DIRECT EXAMINATION
 5   BY MS. PELLEGRINI:
 6   Q.   And, Agent De Lair, will you tell the jury by with whom
 7   you're employed.
 8   A.   I'm a special agent with the FBI.
 9   Q.   And for how long have you held that position?
10   A.   Approximately eleven years.
11   Q.   And can you give us a little bit of your educational
12   background first?
13   A.   Yes.  I've an undergraduate degree from the University of
14   North Carolina at Wilmington in environmental science and a
15   master's degree from the Florida Institute of Technology in
16   oceanography.
17   Q.   And after getting your degrees, what did you do?
18   A.   I worked as a pharmaceutical company in a microbiology
19   lab, and then also worked for the City of Melbourne in the --
20   doing water testing for the municipality.
21   Q.   And how long did you do that for?
22   A.   Approximately two years.
23            THE COURT:  Can we just wait until movement has
24   ceased.
25            MS. PELLEGRINI:  Certainly, your Honor.
```

1          THE COURT:  All right.  Go ahead.

2          MS. PELLEGRINI:  Thank you, your Honor.

3     BY MS. PELLIGRINI:

4     Q.   I'm sorry, Agent De Lair.

5     A.   Approximately two years.

6     Q.   All right.  And after that?

7     A.   I entered the FBI in January of 2004.

8     Q.   And what is your current assignment?

9     A.   I work out of the Boston Division, Lakeville Resident

10    Agency.  It's a satellite office out of the Boston Division.  I

11    work criminal cases, typically cyber matters and crimes against

12    children, healthcare fraud, white-collar crimes.

13    Q.   And do you also perform a function with respect to ERT, or

14    evidence recovery?

15    A.   Yes.

16    Q.   And what is that?

17    A.   I'm a member of the Boston Evidence Response Team and one

18    of the four team leaders.

19    Q.   So give us some of your background and training for ERT.

20    A.   So I completed the basic 80-hour ERT class.  I've done

21    advanced impressions, digital evidence collection, field

22    processing of latent prints.  I've done rugged terrain

23    collection as well as the instructor development course and the

24    post-blast class, indoor post blast and large vehicle post

25    blast training.

1    Q.   And was all that completed prior to April of 2013?

2    A.   Yes.

3    Q.   And in 2013 did you, in fact, respond to the area at

4    Boylston Street --

5    A.   Yes.

6    Q.   -- on April 15th?

7    A.   Yes.

8    Q.   And when did you go there?

9    A.   I arrived approximately 5:45 p.m. onto the streets.

10   Q.   And this would be Monday?

11   A.   Correct.

12   Q.   And what was your function at that time?

13   A.   We got the message for all ERT members to respond, so I

14   arrived on the street.  There were bomb techs and several other

15   law enforcement entities on Boylston, and we were just trying

16   to figure out where to begin.

17   Q.   So in order to find out where to begin, what do you do?

18   A.   There's a senior team leader who runs the Boston Evidence

19   Response Team, so we were trying to get in touch with that

20   person.  At the time, though, there's bomb techs on the street.

21   Our Boston field photographer was starting to take photos, and

22   that's when the bomb tech said they wanted everyone off the

23   street because they wanted to make sure that they did another

24   sweep just to make sure it was safe.

25   Q.   So were you able to do a visual or a walk-through that

1    evening?

2    A.   At that point, no.  We all rallied to the Solas Pub and

3    coordinated going to the Westin Hotel to meet with other ERT

4    members.

5    Q.   And what did you do while you were there?

6    A.   When we were at the Westin, we decided what team leaders

7    were going to go to what locations.  Kristen Koch was a team

8    leader.  She went to -- kind of rallied the evidence and went

9    to the Black Falcon Pier; myself and another team leader and

10   some Boston P.D. representatives went back to Boylston around

11   11 p.m. to meet with the medical examiner's office transport in

12   order to pick up the deceased.

13   Q.   So there were still deceased persons on the street at that

14   time?

15   A.   Yes.

16   Q.   Do you know who had to be removed?

17   A.   Yes.

18   Q.   How many people?

19   A.   Three bodies.

20   Q.   And did you continue to stay on Boylston Street that

21   evening?

22   A.   Yes.  So we went back to Boylston Street around eleven

23   o'clock with the field photographer.  We took photos of the

24   deceased, first going to the medical tent in Scene A, took

25   photos of Krystle Campbell, and medical examiners transport

1    took her body.  And then we went to the other part, Scene B,

2    where there were two other bodies and other evidence.

3    Q.   And did you become a team leader for a particular scene?

4    A.   Yes.  So I was a team leader for Scene B, which was the

5    explosion near the Forum.

6    Q.   And so in that regard, what did you do?

7    A.   So what happened at the end of that day -- so that evening

8    into the morning we collected approximately ten items of

9    evidence, three bodies and one body part, and at the end of the

10   day the scene was secured and we came back the next morning.

11   That's when all of the law enforcement met at the Lenox and

12   tried to come up with a game plan.

13       What we did is we got a list from law enforcement

14   management of other agencies to see who would be participating

15   in the search and what their expertise were.  At that point

16   myself and another agent separated individuals based on their

17   expertise into the two scenes, so Scene A and Scene B.

18   Q.   And what type of expertise did people have?

19   A.   You had individuals who were photographers; we had bomb

20   techs, sketchers, and people who were experienced in total

21   station.

22   Q.   So, Agent De Lair, when you prepare people to go onto a

23   scene, what has to be done before they actually step onto that

24   scene?

25   A.   Well, before we step onto a scene, everyone is kind of

1  given a role; however, we met with the bomb techs and talked

2  about the scene ahead of time.  In this case we had to be

3  concerned about safety, so we had protective equipment that we

4  had to wear.  We had to come up with a game plan as to how we

5  were going to start to process the scene.  In the case of Scene

6  B where I was a team leader, we divided it into four grids and

7  divvied up the individuals in order to search those areas.

8  Q.   What type of protective equipment did people have to wear?

9  A.   Well, this was a scene that had explosive residue and we

10 still had lots of tissue on the scene, so we had Tyvek suits as

11 well as boots.

12 Q.   And with respect to other types of procedures that you had

13 to put into place before people got onto the scene, what about

14 firearms?

15 A.   So no firearms were allowed on the scene because of

16 the -- because it was an explosive scene.

17 Q.   And how was the scene secured?

18 A.   So the scene was secured initially with the National Guard

19 and also Boston Police Department.

20 Q.   So when did you actually get onto the scene to start the

21 collection of evidence?

22 A.   So Tuesday, April 16th, we had the meeting starting at

23 eight.  The meeting lasted until about 11:30 a.m. where we were

24 just organizing the teams.  At that point we had a briefing and

25 showed the individuals where the entry and exit point of the

1  search team was going to be; we talked about the sign-in sheet

2  because you had to sign in and sign out every time you were on

3  the scene.  And it was approximately a little bit after noon

4  when the bomb tech and I did a briefing to our team to let them

5  know how we were going to start processing and what their roles

6  were.

7  Q.   Agent De Lair, with respect to the various personnel who

8  were on the teams, how was -- what protocol was employed and

9  how were people informed of the protocol?

10 A.   So when we had that brief that morning on Tuesday when we

11 had all the agencies together, we went over the FBI protocol on

12 how to conduct a search.  We also went over photography

13 protocols and went over the safety and talked about how we

14 would be conducting the search.

15 Q.   And with respect to how the teams then were formed, in

16 addition to the expertise that a person may have, was there any

17 other consideration that went into forming a particular team?

18 A.   We just wanted to make sure that all of the agencies were

19 represented across both of the teams.

20 Q.   And was there always an ERT person with each team?

21 A.   Yes, there were several ERT persons.  Actually, within

22 each quadrant there were ERT persons to make sure if anyone had

23 any questions, they could come to them or to me.

24 Q.   So, Agent De Lair, before you start collecting, how do you

25 know, or do you, what types of packaging is necessary?  What do

1   you collect ahead of time?

2   A.   Right.  So we had whatever packaging we had, but then

3   also, because it's an explosive case, any explosive or arson

4   investigation we use paint cans which also traps the vapors.

5   We had paper bags in case there was any biologicals, and then

6   also plastic bags in case we needed anything for latent prints.

7   Q.   So I want to get more into the search, but I'd like to ask

8   you what types of evidence did you collect, you and your team,

9   at Scene B on Boylston Street?

10  A.   We collected everything from human remains to bomb

11  components to parts of backpacks.  It was kind of a wide range

12  of things.

13  Q.   All right.  Now, did you or your team receive evidence

14  from local hospitals?

15  A.   Part of the ERT did but we were focused on Boylston, so

16  that would have probably been going through Kristen Koch at

17  Black Falcon.

18  Q.   Now, you mentioned that the decedents were removed via the

19  ME's office, the medical examiner's office.  When other body

20  parts were recovered, what happened to those?

21  A.   So actually, throughout the week of us processing the

22  scene, we would be calling the medical examiner's office

23  several times a day in order to come over and to collect

24  tissue.

25  Q.   Now, so going back, how was the scene laid out so that the

1   teams didn't, you know, interrupt one another?

2   A.   Right.  So Scene B was from essentially Exeter and

3   Boylston all the way down to Dalton and Hereford intersection.

4   So we had four quadrants:  One quadrant was in the Forum, in

5   the buildings; the second quadrant was in the blast seat, which

6   was in front of the Forum; and then dividing the street from

7   Ring Road up and then towards Exeter, those were also

8   quadrants.

9   Q.   And once a quadrant was determined, what happened within

10  that quadrant?

11  A.   Within that quadrant we had an individual assigning

12  numbers, we had a sketcher, a photographer, and then a photo

13  log person going -- and as people identified items of evidence,

14  would have to point it out.  They would give it a number, mark

15  it, the individual would get the packaging necessary to bag

16  that item after it had been photographed in place and the

17  sketcher knew where that was.  And then after whatever, if it

18  was a bag or a paint can was packaged, they would have seven

19  items of evidence -- or items that you would put on that

20  container to bring it to the intake.

21  Q.   And what are those seven items?

22  A.   So the seven items, it's the case number, the item number,

23  the date, the description of the item, the location of where it

24  was located and then two collectors.

25  Q.   And with respect to the collection of evidence, did it

1    just -- did you just collect from the street itself?

2    A.   Well, no.  There was collection from the street, we went

3    inside the buildings, we did rooftops, anywhere we

4    could -- anywhere within the scene.  I mean, there were even

5    planters that were very heavy and were moved via forklift to

6    see if there was anything underneath.

7    Q.   Did you also take things like soil samples?

8    A.   Yes.

9    Q.   And where did that occur?

10   A.   So that was near the blast scene, it was soil samples.

11   Q.   And with respect to the buildings on Boylston Street, were

12   people allowed inside buildings?

13   A.   No.  At -- okay.  Go ahead.

14   Q.   Go ahead.

15   A.   Later in the week business owners, for whatever reason,

16   needed to get a laptop or something, asked if they could get

17   into their building.  So we would escort them onto Boylston

18   Street.  So they would have to put on the Tyvek and the booties

19   and then also sign in.  We would escort them, they would get

20   whatever they needed, and then they were escorted off and would

21   sign out.

22   Q.   And as far as you know were, in fact, businesses closed in

23   that area on Boylston Street and other streets?

24   A.   Yes.

25   Q.   All right.  Do you know how long?

1    A.   Yes.  Until we released the scene on April 22nd at 5 p.m.

2    Q.   And what about people who lived on Boylston Street; what

3    happened there?

4    A.   They were evacuated.

5    Q.   And were they allowed to return, then, after the 22nd?

6    A.   Yes.

7    Q.   So with respect, then, going back to the searching on the

8    street, did you also go into the buildings?

9    A.   Yes.

10   Q.   All right.  And what happened there?

11   A.   We would get the keys from the businesses and the

12   residences and we would go in and search to see if we had any

13   evidence.  In addition to that, near the end of the week we got

14   keys for all the businesses in order to do a safety check with

15   Boston Fire, and we went -- sweeped with canines just to make

16   sure there wasn't any safety hazard.

17   Q.   Agent De Lair, prior to coming into court today --

18        MS. PELLEGRINI:  And, your Honor, I have advised

19   defense counsel of the nature of the items in the boxes on the

20   carts and underneath the table in front of the clerk.

21   Q.   -- did you and other agents review the items that were

22   collected from Boylston Street to determine whether or not they

23   are, in fact, the same ones that you collected during the time

24   period that you've just explained to us?

25   A.   Yes.

1    Q.   And did you go through all of the bagged items from

2    Exhibits 42 through Exhibit 618?

3    A.   Yes.

4    Q.   And are they, in fact, the same items?

5    A.   Yes.

6              MS. PELLEGRINI:  Your Honor, the government would move

7    into evidence with the exception of those several that have

8    been done earlier today, Items 42 through 618.

9              MS. CLARKE:  And that is the representation the

10   government made because we have not seen the boxes again today.

11             THE COURT:  All right.  I take it that's what's in

12   those boxes?

13             MS. PELLEGRINI:  Yes, your Honor.

14             THE COURT:  All right.  They'll be admitted.

15             (Government Exhibit Nos. 42 through 618 received into

16   evidence.)

17   BY MS. PELLIGRINI:

18   Q.   Agent De Lair, with respect to the evidence contained in

19   those exhibits, 42 through 618, have you also had occasion to

20   look at and analyze the graphic that we're calling Exhibit 620

21   with respect to the location and the classification of the

22   items?

23   A.   Yes.

24   Q.   All right.

25             MS. PELLEGRINI:  May I have that up on the screen,

1    please?

2    Q.   So, Agent De Lair, with respect to the items that appear

3    here, those are, in fact, the items that are contained in these

4    boxes and that you have reviewed.  Is that correct?

5    A.   Yes.

6    Q.   Now, with respect to the photographs, did you also review

7    each and every photograph that's contained in this exhibit?

8    A.   Yes.

9    Q.   And are they, in fact, those photographs that fairly and

10   accurately represent the scene photographs and also those that

11   represent the Q?

12   A.   Yes.

13        MS. PELLEGRINI:  Your Honor, at this point the

14   government would offer as an exhibit Scenes A and B and the

15   Boylston Street scene of Exhibit 620.

16        MS. CLARKE:  Your Honor, we see this as a

17   demonstrative or a chalk and not as an exhibit.

18        THE COURT:  I think it may be admitted as an exhibit

19   but I'm not clear by your qualification whether you're offering

20   all of 620.

21        MS. PELLEGRINI:  No, your Honor.  At this point

22   subject to connection for the other layers, if you will, that

23   appear --

24        THE COURT:  Isn't it better to wait and just do it

25   once?

1            MS. PELLEGRINI:  Well, it might be.  I don't want to

2       lose the chance.

3            THE COURT:  I was just concerned about how to identify

4       what has been -- if you think Scene A, Scene B and Boylston

5       Street is enough --

6            MS. PELLEGRINI:  I do, your Honor, because that has a

7       heading on the locations.  So at this point the Boylston

8       Street -- I would also offer the camera locations based upon

9       the testimony of Ms. Ernst.  So all of Boylston Street the

10      government would be offering at this time.  If the remaining

11      part doesn't go in, it can be delinked and not provided.

12           THE COURT:  Yeah.  I'm concerned that the record be

13      clear as to which parts of this are admitted and how that

14      is -- how the description in the record will match to the --

15           MS. PELLEGRINI:  What I can do, your Honor, is under

16      the category that I'm now in, in locations, there is one layer

17      or one image that is Boylston Street without anything else,

18      there is a layer that is Boylston Street camera locations,

19      there is a layer that is Scene 1, Scene A, and Scene 2, Scene

20      B.

21           At this time the government is offering those portions

22      of this exhibit.

23           THE COURT:  All right.  Those may be admitted.

24           (Government Exhibit No. 620 received into evidence.)

25           THE COURT:  We're at one o'clock.

1           MS. PELLEGRINI:  Oh, I still have a little more to go,

2      so...

3           THE COURT:  Well, is the planning still as we had

4      discussed earlier?

5           MR. WEINREB:  Yes, it is, your Honor.

6           THE COURT:  I think we'll continue in the morning.

7           MS. PELLEGRINI:  You mean with Agent De Lair?

8           THE COURT:  Yeah.

9           MS. PELLEGRINI:  Okay.  That's fine.

10          THE COURT:  That's the way I understood it.  We have

11     some other business we have to do this afternoon.  We're going

12     to actually finish early for you folks, but I think we'll

13     finish with Agent De Lair tomorrow.

14          MS. PELLEGRINI:  Thank you, your Honor.

15          THE COURT:  Okay?  So your day is over for now as we

16     attend to some other business.  This may happen from time to

17     time.  There are some things the lawyers and I have to do

18     without you.  So you can go about your business.  You can stop

19     and have lunch before you leave, if you'd like.

20          Again, enjoy the rest of the day.  Please avoid any

21     exposure to news accounts of this case or other related cases,

22     and we'll see you tomorrow and continue with the evidence.

23          THE CLERK:  All rise for the Court and the jury.  The

24     Court will be in recess.

25          THE COURT:  I'll stay with the lawyers and do some

 1  logistics.

 2          (The jury exits the courtroom at 1:01 p.m.)

 3          THE COURT:  I'll make arrangements -- you can be

 4  seated for a minute.

 5          MS. PELLEGRINI:  May I excuse Agent De Lair, your

 6  Honor?

 7          THE COURT:  Yes, she may step down.

 8          (The witness is excused.)

 9          So we've discussed -- there's a pending motion

10  regarding how to handle the evidence that is the boat that

11  we've heard about.  And in order to resolve that issue, I have

12  decided I want to go look at it.  So we're going to do that

13  this afternoon.  I don't know whether -- what time constraints

14  people -- we talked about somebody from each team being at the

15  scene when I go.  I've got to make the arrangements with my

16  transportation to get there.

17          Would it be best if we just met at the particular

18  point and then all departed at the same time or something like

19  that?  Does that make sense?

20          MS. CLARKE:  I think so.

21          THE COURT:  Two o'clock?  I assume that I can make the

22  arrangements for two o'clock.

23          MR. WEINREB:  That's good, your Honor.

24          THE COURT:  Why don't we just meet in the robing room

25  and go to the respective transportation devices from there.

1    Does that make sense?

2              MS. CLARKE:  That makes sense.

3              THE COURT:  Okay.  All right.  We'll see you at two.

4              MS. CLARKE:  Thank you, your Honor.

5              THE COURT:  So we'll be in recess.

6              THE CLERK:  All rise for the Court.  The Court will be

7    in recess.

8              (The Court exits the courtroom and the proceedings

9    adjourned at 1:04 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4   Dahlstrom, RMR, CRR, Official Reporters of the United States

5   District Court, do hereby certify that the foregoing transcript

6   constitutes, to the best of our skill and ability, a true and

7   accurate transcription of our stenotype notes taken in the

8   matter of Criminal Action No. 13-10200-GAO, United States of

9   America v. Dzhokhar A. Tsarnaev.

10

11  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
12  Official Court Reporter

13  /s/ Cheryl Dahlstrom
    CHERYL DAHLSTROM, RMR, CRR
14  Official Court Reporter

15
    Date:  9/30/15
16

17

18

19

20

21

22

23

24

25
```