```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )



           BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE



                  JURY TRIAL - DAY THIRTY-ONE


           John J. Moakley United States Courthouse
                        Courtroom No. 9
                      One Courthouse Way
                  Boston, Massachusetts  02210
                   Wednesday, March 11, 2015
                          9:14 a.m.



                 Marcia G. Patrisso, RMR, CRR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
                        (617) 737-8728

          Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad and William W. Fick,
10             Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                    Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
3       GOVERNMENT:

4    SARAH DE LAIR, resumed

5         By Ms. Pellegrini        6
          By Ms. Clarke                     15
6
     CHAD FITZGERALD
7
          By Mr. Chakravarty       27                  94
8         By Ms. Conrad                     74                  101

9    JAMES EPPARD

10        By Mr. Chakravarty       102
          By Mr. Bruck                      113
11
     VICTOR A. DiFAVA
12
          By Ms. Pellegrini        116
13
     DAVID SACCO
14
          By Mr. Mellin            130
15
     CLARENCE HENNIGER
16
          By Mr. Weinreb           147
17
     BRENDAN O'HEARN
18
          By Mr. Chakravarty       166
19
     MATTHEW ISGUR
20
          By Mr. Weinreb           173
21
     NATHAN HARMAN
22
          By Mr. Weinreb           189
23

24

25

1                         I N D E X (cont'd)

2                             Voir Dire

   WITNESSES FOR THE
3    DEFENSE:

4   CHAD FITZGERALD

5       By Ms. Conrad                    68

6
                          E X H I B I T S
7

8   GOVERNMENT'S
       EXHIBIT      DESCRIPTION            FOR ID      RECEIVED
9
    1507            Poster board of suspect(s)            108
10
    1508            Poster board of suspect(s)            108
11
    1510            Poster board of suspect(s)            108
12
    676 and 678    Photographs                            122
13
    679            Audio recording                        137
14
    686            Audio recording                        139
15
    680            Photograph                             142
16
    681            Photograph                             145
17
    682            Diagram                                145
18
    685            Diagram                                147
19
    687            Audio recording                        156
20
    688            Photograph                             160
21
    689 and 690    Photographs                            160
22
    692 and 693    Photographs                            164
23
    721            Photograph                             177
24
    722            Photograph                             178
25

1                          E X H I B I T S

2
      GOVERNMENT'S
3      EXHIBIT      DESCRIPTION              FOR ID      RECEIVED

4      723            Video surveillance                    180

5      724            Segment of video surveillance         181

6      682            Diagram                               184

7      1461 - 1465    Photographs                           187

8      1466 and 1467 Video surveillance                     189

9      725            Segment of video surveillance         196

10     758 and 761    Photographs                           198

11
      DEFENDANT'S
12     EXHIBIT

13     2          T-Mobile Call Detail Record               84

14     3          Phone extraction records                  102

15     4          AT&T records                              102

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE CLERK:  All rise for the Court and the jury.

3          (The Court and jury enter the courtroom at 9:14 a.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Good morning, jurors.

6          THE JURORS:  Good morning.

7          THE COURT:  Go ahead, Ms. Pellegrini.

8          MS. PELLEGRINI:  Good morning, your Honor.

9                    SARAH DE LAIR, resumed

00:07 10           DIRECT EXAMINATION CONTINUED

11   BY MS. PELLEGRINI:

12   Q.   Good morning, Ms. De Lair.

13   A.   Good morning.

14   Q.   Agent De Lair, yesterday when we last spoke we discussed

15   the items that were collected from Boylston Street.  And I'd

16   like to direct your attention to several items specifically

17   from Scene B.

18          MS. PELLEGRINI:  Before I do, I would ask that Exhibit

19   620 be brought up, please.

00:07 20   Q.   Agent De Lair, before coming into court today, did you and

21   I select several items out of the approximately 542 items that

22   were entered into evidence yesterday?

23   A.   Yes.

24   Q.   I'd like to direct your attention first to Exhibit 50 now

25   in evidence.

1    A.    Yes.

2    Q.    All right.  And does that also have a Q number?

3    A.    Yes.

4    Q.    And what number is that?

5    A.    Q11.

6    Q.    Agent De Lair, that's before -- directing your attention

7    actually to the physical exhibit, looking at the screen and the

8    photo in front of you, do you recognize that?

9    A.    Yes.

00:08 10    Q.    And what is that?

11    A.    That's Scene B, and circled is the item that is contained

12    within this container.

13    Q.    All right.  So enlarging the picture on the screen, the

14    yellow circle to my right, is that the item in question?

15    A.    Yes.

16    Q.    All right.  And is that actually contained in the

17    container marked Exhibit 50?

18    A.    Yes.

19    Q.    I'd ask you now, with the permission of the Court, to open

00:08 20    the container.

21         THE COURT:  All right.

22    A.    (Witness complies.)

23    Q.    And if you would remove the contents?

24    A.    (Witness complies.)

25    Q.    And you're holding up the contents which are, for the

1    record, in several pieces.  It appears to be a black and white

2    item.  Do you know what that item is, Agent De Lair?

3    A.   Yes.

4    Q.   And what is that?

5    A.   It's a backpack.

6    Q.   And this was recovered from Scene B?

7    A.   Yes.

8    Q.   In the location on the photograph that's on your monitor?

9    A.   Yes.

00:09 10   Q.   Directing your attention to the second photo that appears

11   in Exhibit 620 on the screen, is that, in fact, a close-up of

12   the item we just looked at?

13   A.   Yes.

14   Q.   And continuing with those photos, do you know what this

15   is?

16   A.   Yes.

17   Q.   And what is this?

18   A.   It's the item contained inside that container.

19   Q.   And is this, in fact, what we call a Q photo?

00:10 20   A.   Yes.

21   Q.   And that means what?

22   A.   That the laboratory took that photo.

23   Q.   So do you know who uses the ruler, how that gets in that

24   photo?

25   A.   That would be the laboratory.

```
 1   Q.   And if one looks at the ruler, what do you see as the
 2   label on that ruler?
 3   A.   It's Q11, which is labeled on the container here.
 4   Q.   And on the Exhibit 620 on the monitors, that is listed
 5   under a classification of both "concealment" and "explosive
 6   residue."  Is that correct?  Am I reading that correctly?
 7   A.   Yes.
 8   Q.   All right.  The next item is Exhibit 74.
 9   A.   Yes.
10   Q.   All right.  And the Q number for that, please?
11   A.   Q44.
12   Q.   And can you tell us what that container contains?
13   A.   Yes.  It's part of a pressure cooker.
14   Q.   Can you open that, please, with the permission of the
15   Court?
16   A.   Yes.
17   Q.   So I'd note for the record you're holding up a large metal
18   object.  And you said it was part of the pressure cooker.  How
19   do you know that?
20   A.   Because I'm familiar with what it looks like.
21   Q.   And with respect to the location on 620 where those dots
22   are located, does that fairly and accurately indicate its
23   position when it was found?
24   A.   Yes.
25   Q.   All right.  And the picture that one can link to --
```

1    specifically I'll go to this one first -- what is this?  What

2    are we looking at here?

3    A.   You're looking at a photo of this item, which is Q44.

4    Q.   And can you tell us where this is located in this picture,

5    if you know?

6    A.   It's on Scene B in front of the Forum.

7    Q.   And more specifically, with respect to this item, does it

8    have a marker?

9    A.   Oh, yes.  Marker No. 2.

00:13 10   Q.   So enlarging the photo, at the bottom of the screen,

11   directly in the middle with a light green marker, is that, in

12   fact, the marker you're referring to?

13   A.   Yes.

14   Q.   And continuing on the photos that are linked to here, is

15   this a close-up of that same location?

16   A.   Yes.

17   Q.   Is that the same?

18   A.   It is.

19   Q.   And so is this, in fact, the location that was noted by

00:13 20   the observers and the collectors before it was taken from the

21   street at Boylston?

22   A.   Yes.

23   Q.   Again, a close-up?

24   A.   Close-up with scale.

25   Q.   And this item?

1    A.   That's a photo taken from the laboratory.

2    Q.   So again, what we call the Q photo?

3    A.   Correct.  And it's listed as Q44.

4    Q.   Now, this is listed under the color coding on 620 as under

5    "assembly material container and explosive residue."  Do you

6    know the difference between those categories and what those

7    mean?

8    A.   Yes.

9    Q.   And can you explain first with respect to "assembly

00:14 10   material," what that refers to?

11   A.   The "assembly material" is items that were used to make

12   the bomb.

13   Q.   And with respect to "concealment"?

14   A.   "Concealment" is something that would have contained items

15   to make a bomb or explosives.

16   Q.   And "explosive residue"?

17   A.   Is the actual residue from a bomb.

18   Q.   Moving on to Exhibit 82, please.

19   A.   Yes.

00:15 20   Q.   And Exhibit 82 has a Q number as well, I take it?

21   A.   Yes; Q51.

22   Q.   And Exhibit 82 with Q51, you've just removed that from the

23   bag?

24   A.   Yes.  Do you want me to further review it?

25   Q.   Yes, please.  All right.  So for the record, you're

```
 1   holding up a small piece of --
 2   A.   Wire.
 3   Q.   -- green wire.  Is that green?  Am I correct, the color?
 4   A.   It appears to be, yes.
 5   Q.   And, again, going to the photograph that's linked to this
 6   exhibit and this Q number on Exhibit 620, is this, in fact, the
 7   close-up of the Q photo of that item?
 8   A.   Yes.
 9   Q.   Next moving on to -- I'm sorry.  And what type of category
10   is this listed under?  It says "fusing system"?
11   A.   A part that would be used for the bomb that would make it
12   go off.
13   Q.   Moving on to Exhibit 86, please.
14   A.   I'm sorry.  What number?
15   Q.   I'm sorry.  Actually, let me step back a little bit.
16   Exhibit 157.
17          THE COURT:  Is that 157 or 167?
18          MS. PELLEGRINI:  157, your Honor.  157.
19          THE WITNESS:  Yes.
20   BY MS. PELLEGRINI:
21   Q.   And, Agent De Lair, you've just removed that item from the
22   plastic bag.  What is that?
23   A.   It's a piece of material that says the word "Fox" on it.
24   Q.   And do you know what that comes from?
25   A.   Yes; it comes from a backpack.
```

00:16 (line 10)
00:17 (line 20)

1    Q.    Is "Fox" the brand name?

2    A.    Yes.

3    Q.    And that is Exhibit 157.  And what Q number is that,

4    please?

5    A.    Q135.

6          MS. PELLEGRINI:  Mr. Bruemmer, can you bring that up,

7    135 on that?

8    Q.    Bear with me while I get this photo up.

9          Agent De Lair, with respect to Exhibit 157 and the

00:18 10   photograph that appears linked to it on Exhibit 620, could you

11   tell us what we're looking at here?

12   A.    This is a part of the scene.  I'm trying to see closer

13   where the item is.  So, yeah, closer up, that's the piece of

14   material that I was looking at.

15   Q.    And if I go back one photo, that appears to be slightly

16   off the sidewalk in the center.  I'm marking this with a little

17   red arrow now, correct?

18   A.    Correct.  And there's a close-up with scale.

19   Q.    And finally, this --

00:19 20   A.    This is the photo taken from the lab marked as Q135.

21   Q.    Thank you.  And the final exhibit I'm going to ask you

22   about is Exhibit, I believe it's 186.

23   A.    Yes.

24   Q.    All right.  And that's contained in a paint can, correct?

25   A.    It is.

1    Q.   And I would ask you to open that, please.

2    A.   (Witness complies.)

3    Q.   And can you describe for the jury and for the record what

4    is contained in there?  You can actually remove it, if you can.

5    A.   So it's pieces of shrapnel.  You have BBs encased in some

6    kind of paper, you have shards of metal, a zipper, pieces of

7    black material, small nails, and the bottom is -- let's see.

8    And some duct tape and lots of BBs at the bottom.

9    Q.   And this also has a Q number.  Can you tell us what that

00:20 10   is, please?

11   A.   Yes.  Q157.

12   Q.   And using Exhibit 620 and highlighting 157 and going to

13   the photo, are these the items that are, in fact, contained in

14   Exhibit 186?

15   A.   Yes.

16   Q.   And this is, in fact, another Q photo.  Is that correct?

17   A.   Yes; that's a photo taken from the lab.

18   Q.   Thank you.  Oh, I'm sorry.

19          MS. PELLEGRINI:  Can I have that back up on the

00:21 20   screen, please, Mr. Bruemmer.

21   Q.   Agent De Lair, there was one classification we did not yet

22   talk about and that's the sort of dark blue called

23   "fragmentation."  Do you know what that means in way of

24   classification?

25   A.   It's just items that may have been used in the bomb, but

```
 1    that can be BBs, nails, other things.

 2    Q.   All right.  Thank you.  I have no further questions.

 3              MS. CLARKE:  Just a few questions.

 4              THE COURT:  Okay.  All right.

 5                          CROSS-EXAMINATION

 6    BY MS. CLARKE:

 7    Q.   Good morning.  My name is Judy Clarke.  I'm one of

 8    Mr. Tsarnaev's lawyers.

 9    A.   Good morning.
```

00:22 10    Q.   I just had a couple of questions.  You focused us on --

```
11    one of the items was Q11, the backpack.  Q11.

12    A.   One second.

13    Q.   I could probably pull it up here, if I could see.

14    A.   Oh, the main backpack?  Yup.  Yes.

15    Q.   And in that backpack there appear to be some pieces of

16    paper?

17    A.   Do you want me to open it again?

18    Q.   Sure.  Or I can pull it up and you can look at it.

19    A.   Yeah, sure.
```

00:23 20    Q.   I might be able to pull it up.

```
21    A.   I can open it up.  It might be easier.

22              (Pause.)

23    Q.   I think I've got it with some able help here.  Q11, and

24    you can see it's circled in yellow on the screen?

25    A.   Yes.
```

1    Q.    I think I can point at it.  Right?

2    A.    Yes.

3          MS. CLARKE:  And then if we could enlarge that?  If I

4    can enlarge that.

5          Mr. Watkins can hold his computer up but I don't think

6    that will -- zoom out?

7    Q.    Have you got it?

8    A.    Yes.

9    Q.    And can you see that there are pieces of paper in there?

00:25 10    A.    Yeah, it's kind of Styrofoam-like?

11    Q.    Paper or Styrofoam?

12    A.    Yes.

13    Q.    And was this item submitted for fingerprints, do you know?

14    A.    I don't know.

15    Q.    Can you tell from the packaging?

16    A.    All I can tell from the packaging is there is a Q number,

17    which means it was entered into the laboratory for examination

18    and they took a photo of it.  From there it's -- it goes into

19    the laboratory evidence control, and then it's sent out for

00:25 20    whatever testing is necessary.  But I don't know.

21    Q.    You can't tell from that.  But the fact that we have this

22    Q photograph in front of us on the screen means that the

23    laboratory had it?

24    A.    Correct.

25    Q.    And took a photograph of it and would have passed it along

1    for testing?

2    A.    Correct.

3    Q.    Okay.  And that was at the -- outside of the Forum called

4    Scene B?

5    A.    Correct.

6    Q.    Can I take you to Scene 1, one of the items that you

7    entered into evidence yesterday.

8            MS. CLARKE:  Perhaps, Paul, you can take me to Scene

9    1.

00:26  10    Q.    And I want to just focus for just a second on Item 199,

11    Q199.  And can you tell us what Q199 is from that photograph?

12    A.    I cannot.  So the Q number was provided by the lab, so it

13    would have an S number for on-scene.

14    Q.    All right.  Can we go in more depth?  I can do that.  If

15    we can find Q199.26.  Oh, there we go.  It seems to be

16    cardboard.  Is that right?

17    A.    Yes --

18    Q.    Q199?

19    A.    -- that's what it appears to be.

00:27  20    Q.    Multiple pieces of shredded cardboard?

21    A.    With duct tape, it looks like.

22    Q.    And that would have also gone to the lab because it has a

23    Q number?

24    A.    Yes.

25    Q.    And pictures would have been taken of it at the lab?

1    A.   Yes.  If it was submitted to the lab, yes.

2    Q.   And you can tell it was submitted to the lab because it

3    has a Q number?

4    A.   Correct.

5    Q.   Q199.  And there seem to be multiple pieces of Q199.  So

6    would the lab have given them .1, .2, .3, that kind of

7    identifier?

8    A.   Yes.  So it would have gone to the lab as one piece, and

9    then based on what kind of analysis it had to have, they may

00:27 10   have repackaged it and given it the .1, or .2, or --

11   Q.   All the way up to .26 or .27 -- however many pieces?

12   A.   Correct.

13   Q.   And then the lab would have then sent it off for testing?

14   A.   Yes.

15   Q.   And Q199 is found at Scene 1, outside of Marathon Sports,

16   correct?

17   A.   Yes.

18   Q.   And Q11 was found outside of the Forum restaurant, Scene

19   2?

00:28 20   A.   Correct.

21        MS. CLARKE:  Thank you.  I have no further questions.

22        THE COURT:  All right, Agent.  Thank you.  You may

23   step down.

24        (The witness is excused.)

25        THE COURT:  What are you going to do with the

        1    exhibits?

        2            MS. PELLEGRINI:  I have to remove them, your Honor.

        3    If I may have a moment.

        4            MR. WATKINS:  Judge, while we're waiting, if we could

        5    have a sidebar with respect to the next witness.

        6            THE COURT:  All right.

        7            (Discussion at sidebar and out of the hearing of the

        8    jury:)

        9            MR. CHAKRAVARTY:  The next witness is Chad Fitzgerald,

00:29  10    the cell site location tech.

       11            THE COURT:  Okay.

       12            MR. WATKINS:  My turn?

       13            MR. CHAKRAVARTY:  Yeah.

       14            MR. WATKINS:  So what agent Fitzgerald is going to

       15    talk about is geolocation of phones.  We heard a little bit

       16    about that already.  The question -- the way this geolocation

       17    is derived is from phone records, right?  AT&T and T-Mobile

       18    were both subpoenaed to get all of their records.  Those

       19    records include cell towers that each phone bounced off of when

00:30  20    they made calls or sent texts.  From that information, that's

       21    what Agent Fitzgerald is going to testify to as far as where

       22    particular phones were at particular times.

       23            THE COURT:  Approximately, right?

       24            MR. WATKINS:  Approximate locations.  General

       25    locations.

1           MR. CHAKRAVARTY:  Approximate locations.

2           MR. WATKINS:  So there are two issues.  The first is

3    the period of April 15th to April 18th.  I don't think that's

4    really in any kind of dispute here.  What is in dispute on a

5    couple of levels is the geolocation before that period.  The

6    government wants to put in particular evidence about two days,

7    December 25th and December 26th.  He's going to testify from

8    those AT&T records about the geolocation position of those two

9    days.

00:30 10          Geolocation, where these phones were, is going to be

11   an ongoing issue, I believe, and it's certainly going to be an

12   issue right now.  The government is going to, at least as of

13   this morning, decline to put in all of the underlying records;

14   in other words, they're just going to have him testify to what

15   he found on those particular days without putting in the

16   underlying records.

17          The underlying records go back another month -- not

18   even another month, another two weeks before that.  Right

19   around December 11th is when the records begin for the AT&T

00:31 20  records.  In our view, in order for him to start pulling out

21   particular calls, all of the records should come in and be

22   available.  I believe he will testify that he looked at all of

23   these records.

24          I should say this is coming up somewhat at the last

25   minute.  I thought we had an agreement last night that they

1    were all going to come in.  I have records on a disk that was

2    supplied to us by the government dating back to December 9th,

3    and I'm prepared to put those in today.  So that's really, I

4    think, what the issue is, whether those records come in at this

5    point.

6              MR. CHAKRAVARTY:  So the -- the underlying telephone

7    records, as the defense raised yesterday, announced thousands

8    of pages, particularly the phone that -- the defendant had two

9    phones.  One of them a very brief number of calls, and the

00:32 10   majority of those records are already in evidence, by what we

11   call the "burner phone."

12             He had another phone that he used primarily back to --

13   as Mr. Watkins says, from the time of the bombing back to about

14   the second week of December.  We have those records.  Those are

15   hundreds of pages, I think 500 some-odd pages.  I think with

16   the data, I think maybe 600 some-odd pages.  They are archaic.

17   In fact, as an example of what they might look like, a few line

18   entries, there are thousands and thousands of line entries as

19   arcane as this and they're just not useful to the jury.

00:33 20            In lieu of introducing that volume of records, not

21   only for relevance but also because they'd be confusing, the

22   witness who has the relevant information for the week of the

23   marathon bombing and two days, or a 24-hour period in December

24   of 2012, is simply going to talk about the general geolocation

25   of those phones on those days, which is a five-day period.

1          The rest of those records, number one, I'd argue are

2     irrelevant.  Certainly he's not going to offer what the

3     relevance is.  But more importantly, this witness was an expert

4     witness.  This should come in as a 1,006 certainly, if not,

5     simply as direct testimony of what his analysis has been.

6          It seems as though the defense is trying to introduce

7     yet again something that they should be introducing in their

8     case under the guise of cross-examination or impeachment.

9     There's simply nothing impeaching about introducing other

00:34 10     records.  This is unlike the --

11          THE COURT:  Do you have an expert in this field

12     to -- who may testify?

13          MR. WATKINS:  If necessary he would testify, but the

14     issue really here -- I guess if I can respond a little bit

15     is -- first of all, the length of pages of records I would say

16     is a red herring.  I mean, if you print them out in Adobe,

17     indeed, they're 500 pages long.  What it is is a spreadsheet, a

18     text spreadsheet, that I'm sure this agent has been working

19     from.

00:34 20          It is always the case -- a mortgage fraud case is a

21     good example, might be thousands, tens, hundreds of thousands

22     of records that go back to the jury, and there is a 1,006

23     expert -- not expert, but a 1,006 witness go up there to make

24     them understandable to the jury.  That's not a reason to keep

25     the records out.

1          The records are going to come in at some point.  The

2    witness is going to say, "I looked at all these records."  And

3    if it's a matter of just what the order of presentation is,

4    that is to me not a legitimate reason not to introduce them.

5          THE COURT:  So let me just understand the setup here.

6    The government is not proposing to offer them.  It would

7    conduct the examination without them, right?

8          MR. WATKINS:  Right.

9          THE COURT:  So this arises because you want to put

00:35 10   them in?

11         MS. CONRAD:  Can I just talk to Mr. Watkins for just a

12   second?

13         (Counsel confer off the record.)

14         MR. WATKINS:  Just to make clear, the government's not

15   even introducing the underlying records for the December 25th

16   and 26th times that they --

17         THE COURT:  Right.  I'm just trying to get to who's

18   objecting to what.  I just want to get it formalized here.  I

19   mean, I understand the controversy.

00:36 20        MR. WATKINS:  We would object to not putting in the

21   records, the entire records, from December --

22         THE COURT:  I don't know how you object to not putting

23   something in, I guess is what I'm getting at.  You could then

24   try to put it in and then there will be an objection but --

25         MS. CONRAD:  But they're trying to introduce his

1    testimony about what the records show without putting in the

2    underlying records.  1,006 requires that the exhibits

3    themselves be in evidence.

4             THE COURT:  Wrong.

5             MS. CONRAD:  That is what the case law says.

6             THE COURT:  No, not 1,006.  The pedagogical summary

7    teaches the jury about exhibits that are in evidence.  1,006

8    summaries are a substitute.

9             MS. CONRAD:  The other issue is one of expert

00:36 10   disclosure.  The government's expert disclosure said that this

11   witness would focus on a period of April 15th to April 19th,

12   didn't mention December 25th to 26th.  In fact, the chalk that

13   I have that looks like what Mr. Chakravarty is holding doesn't

14   even have those dates in it.

15             Now, it's kind of -- if they want to stick to April

16   15th to April 19th, those records are fine.  If they want to go

17   past that, it seems to me that it's, number one, the rule of

18   completeness because they're trying to isolate records to show

19   that Mr. Tsarnaev was in a particular place at a particular

00:37 20   time.

21             THE COURT:  So tell me about the disclosure.

22             MR. CHAKRAVARTY:  Originally our disclosure said we

23   had said that they would introduce various dates of cell site

24   location dated from before the marathon.  Pursuant to defense

25   requests to further narrow that, we indicated we'd primarily

1    focus on a week after the marathon subsequent to that.  Now,

2    probably two, three months ago, we supplemented by providing a

3    graphic similar to this saying that we would also introduce the

4    cell site location data for December 25th and 26th.  So they've

5    had it for about three months.  It was not in our original

6    disclosure.

7              MS. CONRAD:  This is the expert disclosure.  I don't

8    think we have any amendment.  It says it will focus on April 15

9    through 19th.

00:38 10             I would like a copy of that.  I don't have it.

11             MR. CHAKRAVARTY:  Okay.  This is the older version.  I

12   don't have the newer version.

13             THE COURT:  All right.  We're going to move on.  Go

14   ahead.  The objection is overruled.

15             Something else?

16             MR. BRUCK:  It turns out there's one small thing.

17   We're going to get to the Collier testimony.  There are three

18   photos in the life of Officer Collier.  We object to one of the

19   three, which is him backed by his graduation photo --

00:38 20             THE COURT:  Will it be after the break?

21             MS. PELLEGRINI:  I think we have --

22             MR. WEINREB:  No.

23             MS. PELLEGRINI:  Is it going to be before?

24             MR. WEINREB:  I think it may well be before the break.

25             THE COURT:  Let me see the pictures at some point.

            1           MS. PELLEGRINI:  Okay.  I'll ask Mr. Bruemmer to bring

            2    them up so that you could look at them.

            3           THE COURT:  Well, you mean bring them up on that, on

            4    the machine?

            5           MS. PELLEGRINI:  To get them ready.

            6           THE COURT:  Are they in the binder?

            7           MS. PELLEGRINI:  Yes, they should be.

            8           THE COURT:  Do you know what the numbers are?

            9           MS. PELLEGRINI:  That's something I don't know.  I

00:39 10    have to check and I'll let Mr. Lyness know.

           11           (In open court:)

           12           MR. CHAKRAVARTY:  The government calls Chad --

           13           THE COURT:  Hold on a minute.  One of the jurors had a

           14    personal issue.

           15           (Pause.)

           16           THE COURT:  Okay.

           17           MR. CHAKRAVARTY:  The government calls Chad

           18    Fitzgerald.

           19           CHAD FITZGERALD, duly sworn.

00:40 20           THE CLERK:  Have a seat.  State your name, spell your

           21    last name for the record and speak into the mic so everyone can

           22    hear you.

           23           THE WITNESS:  Okay.  Chad Fitzgerald,

           24    F-I-T-Z-G-E-R-A-L-D.

           25                          DIRECT EXAMINATION

BY MR. CHAKRAVARTY:

Q.   And can you tell the jury where you're employed?

A.   The Federal Bureau of Investigation, or the FBI, out of

Atlanta.

Q.   Are you a special agent there?

A.   I am.

Q.   How long have you been with the FBI?

A.   A little over 18 years.

Q.   And what is your current assignment?

00:41  A.   I'm assigned to the Cellular Analysis Survey Team, or

CAST.  Our responsibilities include interpreting and analyzing

cell phone data as it's received from the different service

providers like the AT&Ts and Verizons.  And we primarily work

on -- we were put in place for child abductions, so we do a lot

of -- kind of like a fly team for that, but we also, day to

day, do -- help out in local investigations and prosecutions

such as murders, robberies.  We do bank robberies with the FBI

too.

Q.   Now, how did you start working on this team?

00:42  A.   The team started kind of ad hoc several -- about -- I'd

say in the neighborhood of eight years ago, and then we became

an official unit about five years -- five, six years ago.  So

we were kind of born out of the fugitive and robbery

investigations.  A bunch of us were doing phone analysis.

Q.   Have you received any special training?

```
 1   A.   I have, yes.

 2   Q.   Would you describe that?

 3   A.   Going back to school, I have a master's in electrical

 4   engineering specializing in communication systems, and since

 5   then, being part of this unit, we have been -- we go to

 6   training and we meet quite frequently with the different

 7   providers in the United States, you know, the Sprint, AT&T,

 8   Verizon, Metro PCS and Cricket.  I'm sure I'm leaving one out

 9   there.  But we meet with them, both subpoena compliance and the

10   engineering side, plus we go to specialized training for people

11   that work in that industry, different companies that provide

12   training to the cellular industry and others.

13   Q.   When you say "provide training," what types of aspects of

14   their businesses do you discuss with them?

15   A.   We do both how they maintain their records, but we're also

16   on the side of how their systems are designed -- how the

17   cellular systems are designed and meant to function, everything

18   from RF, radio frequency, to drive testing their networks and

19   how their network is maintaining the records and whatnot.

20   Q.   Before joining the FBI, did you have a technical

21   background at all?

22   A.   I did, yes.

23   Q.   What was that?

24   A.   My prior employment was Hughes Aircraft Company.  I worked

25   as an engineer there doing satellite -- we -- the unit I was
```

assigned to designed hardware for communication to satellite --
command to control of satellites, both commercial -- I mostly
worked on the commercial side, but we also had defense
satellites, and then I also, before that, have worked at IBM in
technical as well as in TV as an engineer.

Q.   And what's your education?

A.   I have a master's in electrical engineering.

Q.   Now, do you also perform trainings yourself?

A.   Yes, we -- part of our unit goes around the United States
training detectives, police departments, prosecutors.  We've
had -- we also go overseas and help train investigators
overseas just on techniques and methodologies they can use to
analyze phone records.  I think to date we've trained somewhere
in the neighborhood of 6,000.  I did about 100 about two weeks
ago myself.

Q.   And when you provide training, what kind of training do
you do?

A.   Just how we -- in our -- in the CAST unit how we -- what
we've done, how we've taken our practical experience as well as
our training with all the different providers and the cell
technology and we just kind of merge it into a fairly basic
two-day class where we teach people the methods we use and the
successes we've had using those methods.

Q.   And what's the ultimate point of this CAST -- the CAST is
the group that you -- the team that you're with.  Is that

1    right?

2    A.    Yes.

3    Q.    What is the ultimate addition to the arsenal of tools that

4    this offers to the FBI?

5    A.    It gives an interpretation for cell phone data.  So

6    somewhere in the neighborhood of more than -- it's 100 to 105

7    percent of the American population has a cell phone, so that's

8    a very strong tool to be able to exploit when you can receive

9    records.  And all the companies do it slightly different, and

00:46 10   we just help with that.  And it can be quite voluminous, so we

11   just help with techniques to analyze that information and

12   interpret it into, you know, where people can understand it and

13   see what's going on.

14   Q.    And is one of the functions of that kind of telephone

15   analysis to do what we call a cell site location?

16   A.    Yes.  So we do cell site analysis.  So the companies have

17   to know -- just by the nature of their business, they have to

18   know the general area of where their phone users are located to

19   deliver and allow them to make calls, and we can take that data

00:47 20   and determine the general geographic area of where a phone is

21   located.

22   Q.    Now, have you performed that type of analysis in many

23   other cases?

24   A.    Of course, yes.  All the time.  Every day.

25   Q.    About how many cases would you estimate you personally

1   have conducted that kind of analysis?

2   A.   I look at phone records every day.  I mean, it's

3   definitely in the thousands, I'm sure.

4   Q.   And do you use various technical tools to help you filter

5   through this volume of information?

6   A.   Yes.  So we have a couple of tools we've created on our

7   own with the help of computer programmers as well as just

8   basic, like Micro- -- that people would be familiar with,

9   Microsoft Excel, Google Maps or Google Earth.  We also use

00:47 10   Microsoft MapPoint, which is the mapping program.  So

11   everything from that on up to custom software that we've

12   developed.

13   Q.   Now, on occasion do you collaborate with other members of

14   this CAST team, the cell analysis team, in order to analyze

15   telephone data in a particular case?

16   A.   Yes.  So like I mentioned earlier, we're a pseudo fly

17   team.  So if there's a child abduction somewhere in the United

18   States that -- we get involved in quite a bit of those, we will

19   routinely fly either individually or a lot of times as a group

00:48 20   to provide coverage and work as a team on the -- you know,

21   there's a lot of records coming in in those, as well as like in

22   this case, we flew up here as soon as we got -- you know, as

23   soon as we knew that we were going to be needed up here.

24   Q.   When there's a large volume of data, do you separate roles

25   within the team and different people handle different types of

1   analysis?

2   A.   Yes.  So we have -- there will be different assignments

3   within the team to help get through all the data as well as

4   there's also kind of a peer-checking function too where we

5   might be working on the same thing but checking our work also

6   of each other.

7   Q.   And have you testified in various courts around the

8   country about this type of cell site analysis?

9   A.   Yes, this is the third time in the last week -- the

00:49 10  third -- about eight -- between last week and this week, this

11  is the third time in different states -- three different

12  states.

13  Q.   Is that fair to say that's a pretty regular pattern for

14  you?

15  A.   Not -- that's quite a bit, but it definitely -- we fly

16  around and testify a lot in state court, some federal court.

17  But definitely a lot of state court cases.  Yes, it's a

18  routine.  That's part of the nature of our assignments.

19  Q.   And so were you asked to conduct a cellular telephone

00:50 20  analysis in this case?

21  A.   I was, yes.

22  Q.   And were you involved with a portion of the investigation

23  back in April of 2013?

24  A.   I was.  I came here fairly quickly.

25  Q.   Okay.  And was the CAST team deployed to Boston to assist

1    in the investigation?

2    A.    Yes.   There were several members here -- both assigned

3    members and people that we have in training, both came here.

4    I'm not sure -- when I was here I think we had somewhere in the

5    neighborhood of five to six people on CAST, and then we got

6    relieved with another wave of people after about a week or so.

7    Q.    And particularly with regard to what your analysis was for

8    presentation to the jury, is that a small subset of all of the

9    analysis that was done over the last two years?

00:50 10   A.    Absolutely.   I mean, this is pared down to keep it -- try

11    to keep it somewhat simple.

12    Q.    In preparation for your testimony, did you prepare

13    any -- a presentation for the jury?

14    A.    I did, yes.

15         MR. CHAKRAVARTY:   Just for the witness, your Honor,

16    I'd call up Exhibit 1440.

17    Q.    Do you recognize this?

18    A.    Yes, that's the first page of my presentation I created.

19    Q.    And would this presentation assist you in presenting your

00:51 20   testimony to the jury?

21    A.    I hope.   That's the purpose of it.

22         MR. CHAKRAVARTY:   I'd move and publish Exhibit -- move

23    into evidence and publish Exhibit 1440.

24         MS. CONRAD:   There's multiple pages, your Honor.   I

25    don't have an objection to it being a chalk, but I think the

```
 1    foundation for the individual --
 2            THE COURT:  It seems more a chalk to me without
 3    knowing what's in it.
 4            MR. CHAKRAVARTY:  So --
 5            THE COURT:  Will it illustrate his testimony?  Is that
 6    what it does?
 7            MR. CHAKRAVARTY:  It will illustrate his testimony.
 8    The government would move it into evidence, but perhaps that
 9    foundation can be made during his testimony.
10            THE COURT:  We'll defer on that, then.  So we can
11    expose it now, as he testifies, to the jury as a chalk?
12            MS. CONRAD:  Yes.  No objection to that, your Honor.
13            THE COURT:  All right.
14    BY MR. CHAKRAVARTY:
15    Q.   Mr. Fitzgerald, is that the symbol of your CAST team?
16    A.   Right.  That's our logo, I suppose.
17            MR. CHAKRAVARTY:  Page 2, please.
18    Q.   What are these?
19    A.   So this is just a photo that I took of a fairly standard
20    cell tower.  This is what your phone is ultimately
21    communicating with.  There's antennas mounted at the top
22    of -- can I draw on this?
23    Q.   Yes, that's a touch screen.  If you just push with the pad
24    of your finger.
25    A.   So there's antennas mounted at the top of these triangular
```

00:51 10

00:52 20

1    structures, are mounted to those triangular structures and

2    pointed in different directions.  And that's ultimately what

3    your phone is monitoring.  So as my phone sits in my pocket,

4    it's in idle mode, not necessarily doing anything.  It's just

5    monitoring the air to see what the strongest, clearest signal

6    is.  Typically, it can see multiple different towers, multiple

7    different sectors, which I'll get to.  But ultimately, they're

8    communicating with these antennas that are antennas that are

9    mounted at the top of this structure.

00:53 10        Those antennas are attached or connected to equipment at

11    the base of this tower, and from there that equipment at the

12    base of the tower is then connected to a switch which is kind

13    of the brains behind the operation.  It connects to hundreds,

14    if not thousands, of towers and sectors, and from that switch

15    connected to the rest of the network, Verizon, AT&T network,

16    and then connected to the rest of the world.  So I can make and

17    receive a call through that general infrastructure.

18    Q.   Is that just a regular radio frequency signal that is

19    going through the --

00:54 20    A.   Right.  So each tower is putting out a signal.  And like

21    my phone is only programmed to speak to, you know, a certain

22    set of towers.  So my Verizon phone is -- it's no different

23    than a language -- is speaking the Verizon language and only

24    looking for Verizon towers; the AT&T phone is only going to

25    speak to AT&T towers.  So they're programmed for certain

1    languages.

2        So like in this instance this particular tower, which is

3    fairly standard, there's multiple layers of antenna on top of

4    it, and, you know, it can be just one company or it can be

5    multiple companies co-located on the same structure.

6    Q.    And so how does the cell phone communicate with these

7    towers?

8    A.    Well, so my phone will monitor the air and kind of rank

9    the strongest, clearest signal.  When I dial a number, hit the

00:55 10   green button or hit the send button, my phone will request

11   services from that strongest, clearest signal.  So a lot of

12   times I equate it to the teacher-student relationship in a

13   classroom.  If the tower is the teacher, and there's several

14   students in the classroom, would be the mobile phones, when my

15   phone wants to make a call, the student is going to raise -- or

16   ask a question, he's going to raise his hand, and when the

17   teacher is ready, the teacher will call on the student.  My

18   phone will ask for services saying it needs to make a call,

19   send a text.  The tower will then grant services to that

00:55 20   mobile, and that's when a record is generated, once those

21   services are granted.

22   Q.    Okay.  And once the tower gets the call, just for the

23   benefit of the jury, how does the call get to its ultimate

24   destination, just in summary?

25   A.    So like I said earlier, there's equipment attached to

those antenna at the top of the tower.  There's equipment at

the base of the tower typically, and that is connected to

switches.  The switch will then connect out to the rest of the

network and ultimately to the rest of the world when I dial a

number, or on the reverse, when a number is coming in -- a call

is coming in.

Q.   And do telephone companies keep records of when their cell

towers connect with cell phones?

A.   Yes.  So for every user on their network, they maintain a

record.  They have to for the nature of their business.  Like I

mentioned earlier, they have to know generally where you are to

deliver a call to you, and they have to know what piece of

equipment you're communicating through so that they cannot only

allow you to deliver -- you know, make a call, but also once

you're in that call, they need to know generally where you are

so they can keep your call connected as you're moving around,

you know, the city, the United States.  They have to hand off

from tower to tower, sector to sector.  They also -- what's

most important to them, they need to know how much you're

utilizing their services so they can bill you appropriately

each month.

Q.   And so how are cell towers designed?

A.   They're designed -- so every cell provider only has a --

set bands that it can operate in.  So the FCC, so the federal

government, you know, restricts them to a certain area that

1    they can operate in.  They have to be able to -- that's a very

2    specified area, so they have to make use of that as efficiently

3    as possible so that they can provide service to more people.

4         So a lot of times -- very common, you'll see that in very

5    densely populated areas, like the city of Boston, they'll put

6    towers very close to each other so that they can handle more

7    subscribers on each tower.  They will also further divide those

8    towers up into sectors.  So just think of if, you know, we

9    ordered a pizza -- there were three of us that ordered a pizza

00:58 10  and we wanted to cut it into three equal shares, or if we had a

11   pie or a cake and we wanted to have three equal shares, that's

12   the same thing they're doing with these towers.  They'll

13   sectorize it so they can support more subscribers.

14        I think that answers your question.

15   Q.   So typically they're sectored off in 120-degree pie

16   shapes?

17   A.   Right.  So if you -- the most common would be three

18   sectors.  And if you think of a 360-degree circle divided by

19   three, in theory you would have a 120-degree sector, you know,

00:59 20  on paper.

21        MR. CHAKRAVARTY:  If we could go to the next page.

22   Q.   What does this slide show?

23   A.   So like I was mentioning earlier, every phone is

24   programmed to speak a certain language, so -- and the towers

25   have different companies mounted on them.  So a lot of people,

1    when they see a tower across the street and they're wondering

2    why they're not getting service, it doesn't -- if I'm carrying

3    a Verizon phone and if Verizon doesn't have, you know, any

4    antenna on that tower that I see, it doesn't exist in my

5    phone's world.  So just because you see a tower doesn't mean

6    that's the one your phone is communicating with.

7        And I just put together a slide to show that just because

8    you don't see a tower doesn't mean that there isn't one nearby.

9    So they do try to disguise them occasionally depending on the

01:00 10   local ordinances or, you know, depending on where they're

11   trying to place their antenna.

12       So there could be one behind you, you know, instead of one

13   that you're communicating with in front of you.  So they're all

14   over the place.  So just because you do or don't see one

15   doesn't mean that your phone isn't communicating to the one

16   you're looking at or not.

17   Q.   So all the photos on this slide, do they have a cell tower

18   in each of the photos?

19   A.   Yes.

01:00 20       MR. CHAKRAVARTY:  Could we go to the next page?

21   Q.   All right.  And is this an example of some cell site

22   analysis that you do?

23   A.   Yes.  So every provider maintains a listing of where all

24   their towers are located.  Like I mentioned earlier, they have

25   to put towers -- they have to put them out to provide service.

        1    So if the AT&Ts of the world could go to downtown Boston, on

        2    the tallest building just put one antenna up, they'd be more

        3    than happy to do that to maintain maintenance, you know, just

        4    make it simple.  And if they could provide service to everyone,

        5    that would make it simple.

        6        But they obviously, like I spoke to earlier, have to put

        7    multiple towers, thousands, hundreds of thousands across the

        8    United States, out in the United States, and they maintain a

        9    list of where all those towers are located.  And that list has

01:01  10    a unique number identifying every tower within their system and

       11    sector.

       12        So if you think of it like a fingerprint, there's only one

       13    with that unique set of numbers.  And it provides a location of

       14    where the tower is, the direction from the tower that that

       15    sector's providing service to, and a couple of other pieces of

       16    information.  So in this sample, this is -- I just took a tower

       17    listing for the Boston area; I plotted it on a map to show with

       18    the blue dots that are in the presentation -- in this page

       19    where the towers are for this particular area.

01:02  20        And as I mentioned earlier, those towers are then further

       21    divided out by sector.  So if I'd look at this one in the

       22    middle, you can see I drew three 120-degree sectors, and I

       23    included the numbers for -- that make that tower and sector

       24    unique.  So if I was in this area and I wanted to make a call,

       25    my phone would communicate with the strongest, clearest signal,

which would be this 40361.  A record would be generated when I

made that call that I started my call on that tower and sector.

So we know the general area that that tower is providing

service to.

And once my phone is connected, it's nothing more than a

beacon reporting the signal quality back to the switch or the

network.  And as I -- if I were to move around this tower, as I

got closer to a sector boundary, the signal levels, the quality

of signal would degrade on one and increase on this neighboring

sector.

And when I get to -- they're going to have some built-in

overlaps.  They can hand my call off from sector to sector.  If

there was no overlap, your call would just be dropped.  And as

I get close to that sector, at some point the network is going

to -- the switch will hand off that call to the next -- the

better signal quality.

And if I were just to continue around clockwise, my phone

call would just be handed off from sector to sector.  And if I

were to get on the highway and travel west, I would just be

handed off, you know, from sector to sector, tower to tower,

and I could -- in theory, if everything is designed out

appropriately, I could get on a highway in this area and

drive -- and start a call, drive for however long I want to,

and I would never know that my call is being handed off from

sector to sector, tower to tower; my call would just maintain

1    connectivity to the person on the other end of the line.

2    Q.   Apparently you've never driven under the Prudential

3    Center, right?

4    A.   Everybody's experienced dropped calls.

5         (Laughter.)

6    Q.   So the list of all the cell towers around the country, did

7    you rely on that list of cell towers for purposes of your

8    presentation today?

9    A.   Yes, we can pare it down to the Boston area.

01:04 10   Q.   And is that thousands of pages' worth of data?

11   A.   Yes, it's very -- if it was printed out it would be inches

12   thick.

13   Q.   Does the orientation of the cell tower matter to your

14   analysis?

15   A.   Yes.  So like I said, we know not only where the tower

16   structure is, but within that tower list we can then determine

17   what direction that sector is providing service to.  So if you

18   think of it -- if there was a man standing at the top of that

19   tower and he's got a big floodlight, we can tell which

01:05 20   direction that floodlight is pointing down towards the earth.

21        So if it was, you know, zero degree azimuth, that

22   floodlight would be pointing due north, you know, out from that

23   tower structure, providing light or service out to that -- in

24   that direction.

25   Q.   And just for the court reporter, is the word that you said

1    "azimuth," A-Z-I-M-U-T-H?

2    A.   Yes.

3         MR. CHAKRAVARTY:   All right.   Next page, please.

4    Q.   What is this?

5    A.   So it's kind of hard to see on the screen, but this is --

6    like I mentioned earlier, every provider keeps a record of use

7    that a subscriber is using on their network.   So it's in the

8    form of a call detail record, or a CDR.   So a lot of them, from

9    carrier to carrier, contain the same types of information.

01:06 10   They might name it a little bit differently.

11        So starting left to right, a lot of the information is

12   fairly self-explanatory.   So in the first two columns you have

13   date and time; you have length of time that it took to set up

14   the call; you have an originating and terminating number, so

15   that's just the from-to call.   So who the call came from and

16   who the call is going to.   So if it's an incoming call to me,

17   the "from" will be the caller ID that will display on my phone,

18   the "to" column would be my phone number.   If I was placing a

19   call out, my number would be in the "from," the person I was

01:06 20   dialing would be in the "to" column.   So just a from-to,

21   nothing more.

22   Q.   Now, that's -- originating is "from" and terminating is

23   "to"?

24   A.   Correct.

25   Q.   Please continue.

A.   Then the next column we have the elapsed time that the
call took, the amount of time in seconds and minutes that the
call took; we have the number that was dialed, very similar to
the -- you know, who I'm trying to connect to, the "to" column.
The next two columns are just equipment identifiers, so one is
the IMEI, which is the serial number of the phone.  So it's the
serial number burned into the phone equipment.  The next one is
an MZ, which is the SIM card that you place into the phone.  So
the MZ is what's tied to your account, what authenticates you
and gives you service.

Finally, the next two columns, the second-to-last one is
going to be the direction.  So that tells us if it's an
incoming or outgoing call, and the last column is what gives us
that location information.  So there would be information in
there that has the first little section on this left-hand side
is that unique fingerprint, that number -- that unique number
identifier.  It's a combination of numbers that is unique
anywhere in that AT&T network.

So if I took one of these number combinations and went to
the entire United States for the AT&T network, which would be
hundreds of thousands of towers and sectors, there's only going
to be one entry for that number combination.  And then they
actually provide a longitude/latitude and the azimuth for that
tower, if available.

Q.   So when in the life cycle of a telephone call, a cell

1    call, is a record made by the phone company?

2    A.    When the call comes in to the switch, so there will be a

3    record -- that's when the record gets started.  When the tower

4    information is populated, that initial tower is the tower that

5    I'm initially granted services on.  So the teacher called on

6    me, allowed me to ask my question and granted me resources.  So

7    it said:  Go make your call on this channel; go make your call

8    or your text, or send me your text.  And so when that initially

9    occurs, that's when that initial cell tower is recorded.

01:09 10        On some carriers, we can get a terminating tower where the

11    call ended.  And with AT&T, every now and again you may get

12    some intermediate handoff tower, but it's not very often in the

13    grand scheme of things.

14    Q.    How about if the user of a cell phone, especially today's

15    smartphones, is using text message or some other data function?

16    A.    Right.  So with some of the providers, we can get a tower

17    used for a text message.  On other providers, because of the

18    way it's routed, we will see that the text occurred but we

19    won't get the actual tower information.  And then on some

01:10 20    providers, they don't provide us that information at all.  And

21    then likewise with some providers, we get data connections.

22    You know, when the person is checking their Facebook or surfing

23    the Internet, we will get some of those too.

24    Q.    Today's phones also sometimes allow people to call using

25    Wi-Fi or just your home network.

A.    Right.

Q.    Are those recorded on these call detail records?

A.    Typically not.  If you're using some type of app on your phone, like a Skype, that would recorded as a data connection. But if you're strictly connecting your phone up to Wi-Fi and -- like some of the networks, like T-Mobile will allow you to make texting -- or do texting and make calls over that connection, that would generally not touch the network where we get the CDR from.

Q.    Now, on this page, is this a sample of some records provided by AT&T Wireless for the telephone number (857) 247-5112?

A.    Yes.

Q.    And was that the phone associated by subscriber information to Jahar Tsarnaev?

A.    Yes.  I think at the time, in April, it was -- the service had been terminated for lack of payment, as I remember.

Q.    And meaning at the time of the marathon bombing?

A.    That's correct, yes.

Q.    And did you review records related to this phone number for purposes of your presentation and testimony?

A.    I did, yes.

Q.    And, in fact, did you focus on two distinct time periods?

A.    I did.

Q.    And was that the week of the marathon bombing, April 15th,

1    2013, through April 19th, 2013, as well as a day or so back in

2    December, around Christmastime of 2012?

3    A.    I did, yes.

4          MR. CHAKRAVARTY:  Next slide, please.

5    Q.    Would you explain what this is?

6    A.    So this is just T-Mobile's version of the call detail

7    records, just giving an explanation of each of their columns.

8    Like I said, a lot of the columns all have the same

9    information.  In this case T-Mobile gives us a little bit more

01:12 10   information for everything.  And it's obviously very difficult

11   to read on this screen, but on the far left I had to break it

12   up into two different lines because it's -- the spreadsheet is

13   so long, but starting on the far left on the upper side is the

14   number that was --

15   Q.    Sorry.  It's all right.  Go ahead.

16   A.    So on the far left we have the number that was requested,

17   the target phone number that was requested that the records

18   pertain to; then you have some equipment identifiers, same

19   thing, the IMEI, the electronic serial number of the phone, as

01:13 20   well as the MZ or the SIM card that you put in the phone; you

21   have the type of connection, whether it's voice, SMS, a text;

22   you have the date and time for the call; direction of the call,

23   just incoming and outgoing; you just have the other phone

24   number that the phone -- that the call was connected to, so

25   whatever the other party's number was.  Then you have a couple

1    pieces of information about the status of the call, whether it

2    was roaming or not.  And then kind of over here on the top half

3    of the far right --

4    Q.    I think you can touch the screen.

5    A.    There.  Now I can.

6         -- you have the -- once again, those unique identifiers in

7    their system, that unique number combination, that is like the

8    fingerprint within the T-Mobile network for what tower and

9    sector was used.  And they also provide a location,

01:14 10   latitude/longitude.  And then continuing on down to the second

11   row, you have the last tower and latitude/longitude that was

12   used when the call terminated.  And then you have the market

13   the tower is located in, the switch that was handling the call.

14   And then you have over here just different versions of the

15   duration or the amount of data that was used to send the text

16   message.  So you have minutes, seconds of duration, and the

17   data -- the amount of bytes.

18   Q.    So how do the call detail records vary from company to

19   company, just generally?

01:14 20   A.    Like I mentioned earlier, they all have generally the same

21   information.  They might word it a little bit differently, but

22   a lot of the columns are the same.  They're not identical to

23   each other, by no means, but a lot of the information is very

24   similar.

25   Q.    Now, for this case, for your presentation did you review

1    records provided by T-Mobile for the telephone number

2    (857) 928-4634?

3    A.   I did, yes.

4    Q.   And was that the cell phone that was subscribed to by

5    Tamerlan Tsarnaev?

6    A.   I did.  Yes, it is.

7    Q.   And again, did you cover the analysis for the same time

8    period of the week of the marathon bombing and then a brief

9    period of time back around Christmas of 2012?

01:15 10   A.   I don't think I look -- I think I only did the week around

11   the marathon bombing on this particular target number.

12        MR. CHAKRAVARTY:  Go to the next slide, please.

13   Q.   All right.  What is this?

14   A.   So this is just taking all that information, the call

15   detail records, the tower list or the base station list, and

16   marrying those two pieces of information up in relation to a

17   particular set of calls, and then displaying it graphically on

18   a map so it's more visual versus just lines on a piece

19   of -- you know, just numbers on a piece of paper.

01:16 20        So we have the telephone number that you mentioned

21   earlier, the 4634 number, the Tamerlan number.  I have a call

22   that was at 1449 and 8 seconds utilizing a tower and sector.

23   The tower is located right here, and the sector that was

24   utilized points off in this direction providing service, you

25   know, to that general area.

1          The kind of shaded area that I have on the map is not to

2     infer that that's the coverage.  That's just to give emphasis

3     which direction that sector is pointing and providing service

4     to.

5          And then I had another phone number, another T-Mobile

6     number that ends in 9151 that we analyzed, also a T-Mobile

7     number, and it also made a call at 1449, I think, and 6, I

8     think -- it's hard to see on this screen -- seconds utilizing

9     the same tower but a different sector that points off into the

01:17 10    opposite direction of the call.  And these two phones were

11    calling each other at that time during the call.  The 915

12    number actually dialed the Tamerlan number.

13         I was also provided addresses of the Forum restaurant and

14    Marathon Sports which I depicted on the map with red markers.

15    Q.   I neglected to ask --

16         MR. CHAKRAVARTY:  Mr. Bruemmer, if you could just go

17    back two slides to...

18    Q.   So when I asked you about this phone number, this was the

19    AT&T phone subscribed to Dzhokhar Tsarnaev, the 5112?

01:18 20   A.   Yes.

21    Q.   In addition to that phone, did you identify another phone

22    associated with Dzhokhar Tsarnaev?

23    A.   Yes, we eventually associated it with him.

24    Q.   And was that a phone that was a prepaid phone that was

25    subscribed to on April 14th of 2013?

1   A.   I don't remember the exact date, but I remember it was

2   very close to April 15th.  That sounds right.

3   Q.   Right.

4            MR. CHAKRAVARTY:  If we could call up 1170.  Page 2,

5   please.  Page 3.  Sorry.

6   Q.   Is this the subscriber information for that phone?

7   A.   Yes.  So you can see it's first name, Jahar; it

8   gives -- it's a prepaid phone so they can put whatever they

9   want on it; last name is T-S-A-R-N-I.  And it also shows the

01:19 10   date that it was activated, which was, like you said, April 14,

11   2013.

12   Q.   And so is that the phone that was being reflected in your

13   graphic, in Exhibit 1440?

14   A.   Yes.

15            MR. CHAKRAVARTY:  Back to 1440, please.

16   Q.   So that phone that we just were talking about, did you --

17   like the other phone records, did you review the phone records

18   for this phone?

19   A.   I did.

01:20 20   Q.   And did those phone records simply extend from April 14,

21   2013, to April 19, 2013?

22   A.   April 19th or 18th, somewhere in that -- one of those two

23   days.

24   Q.   All right.  And is the first call between the two phones

25   that you just mentioned on that day at 1449?

A.   Yes, I believe it was the first call of the day.

Q.   And the fact that they're both reflecting off of one tower, what does that tell you?

A.   They're both in the same general geographic area hitting that one tower, but further they're hitting different sectors pointing in opposite directions of each other.  So I believe the user of one phone is on one side of the tower and the user of the other phone is on the other side of the tower.

Q.   So with regards to the precision of your cell site analysis, can you tell with, you know, precise -- within like a GPS exactly where someone was within that sector?

A.   No, absolutely not.  I can't tell what street they're on, what side of the street.  I can't tell that.  I can just tell the general geographic area that that phone is located in.  And as you can see on this map, I have other red dots of other T-Mobile towers all in the downtown area near this site that we're displaying that was used.

Q.   And so if the marathon -- Boston Marathon finish line was in this area, the 4634 number was positioned closer to that finish line area than the 9151 number?

A.   It was pointing -- yes, it was utilizing services off of a sector that definitely points towards the finish line more than the other phone.

Q.   And the other phone was in a direction of the Forum restaurant.  Is that correct?

1    A.    That's correct, yes.

2          MR. CHAKRAVARTY:  Next slide, please.

3    Q.    What does this show?

4    A.    So this is just continuing chronologically.  We have the

5    9151 phone receiving a call at 1451, so 2:51 p.m., on the 15th,

6    and it's utilizing that tower and sector pointing in the same

7    direction that it was on the previous slide.  And then the

8    other phone, the Tamerlan phone, was actually placing a call to

9    that Jahar phone at the same time, just seconds before, and

01:22  10   utilizing the same tower structure but a sector that points

11   more towards the north.  So the service area would be up in

12   this direction versus the service area for this other tower and

13   sector being out to the west.  And then I've also left on the

14   map those same two reference points of the Marathon Sports and

15   the Forum restaurant.  Once again, they're calling each other.

16   Q.    So can your cell site analysis tell you how far away from

17   the tower either of these two callers were?

18   A.    No, we do not get that type of data with these providers.

19   Q.    All right.  But with regards to the 4634 number, you can

01:23  20   tell that that phone has been moving in the northerly

21   direction.  Is that fair?

22   A.    Well, it's utilizing a sector that's pointing more towards

23   the north.  I can't tell if it was actually moving from one

24   sector to the other or if it was just in that overlap area.

25   Like I mentioned earlier, there is a mutual boundary for those

1    two sectors and they could be right in that overlap area where

2    the signal quality is just as strong for both sectors.  So it's

3    going to be one or the other.

4    Q.   Okay.  And with regards to the 9151 number, can you

5    conclude that it's staying within the sector and maybe going

6    further away from the tower on the left-hand side?

7    A.   Right.  It's still in the same general area.  The service

8    is in the same general area.

9         MR. CHAKRAVARTY:  Next slide, please.

01:24 10   Q.   So that last call, was that about a minute and a half

11   after the first call at 1449?

12   A.   Right.  Yes.

13   Q.   And so what does this slide show?

14   A.   So this is showing -- and I can't -- if you could zoom in

15   on the one.

16        So this is both phones utilizing the same tower.  So the

17   tower's located here, the sector points to the north.  And

18   also, just kind of going chronologically a couple of minutes

19   later, at 2:53 p.m. -- and if you zoom back out -- so they're

01:25 20   both in -- I guess slightly to the north and east of the two

21   locations, the Marathon Sports and the Forum restaurant a

22   couple of minutes later.

23   Q.   And so this shows both of the phones in the same sector.

24   Is that correct?

25   A.   That's correct, yes.

1    Q.   So you don't know where in proximity, whether it's over

2    here by where the tower is or whether it's out here by the end

3    of the range of that tower -- you don't know where in that

4    sector they are?

5    A.   Right.  I can't say that they're standing right next to

6    each other or, you know, a block away from each other, but

7    they're utilizing -- they're in the same coverage area, that

8    same tower and sector.

9    Q.   And again, compared to the previous call, this call is

01:25 10   about a minute and a half later?  A little bit more than a

11   minute and a half?

12   A.   Right.  And it's the 9151 number, the Jahar phone, calling

13   the Tamerlan phone.

14        MR. CHAKRAVARTY:  Next slide.

15   Q.   Now, does this reflect calls from about 20 and about 40

16   minutes later?  I'm sorry, 35 minutes later?

17   A.   So at 3:14, and then I think it's 3:38 -- 3:36 two calls

18   from the -- on the Tamerlan phone utilizing two different

19   towers and sectors, one just to the north of the other one.

01:26 20   And I also depicted on the map a Whole Foods which came into

21   play when we were conducting the investigation.

22   Q.   Okay.  So just to orient the jury, is this the city of

23   Cambridge --

24   A.   Yes.

25   Q.   -- reflected on this chart?

1       And so the marathon -- and Boylston Street is on the other

2   side of the Charles River, to the south?

3   A.   It is, yes.

4   Q.   And let's focus in on, first, this call.  What does this

5   tell you?

6   A.   This is the Tamerlan number, has a call that was at 3:14

7   p.m. on April 15th.  So just kind of continuing on

8   chronologically.

9   Q.   And then a few minutes later is there another call?

01:27 10   A.   Yes, at 3:30 p.m.  So the next call that was recorded --

11   or the next phone activity that was recorded was at 3:30 and 32

12   seconds.

13   Q.   And again, the direction of the cell tower, the sector,

14   could be anywhere on this area up to any of these other

15   sectors -- other cell towers?

16   A.   Right.  So the coverage area will be generally in that

17   fashion.  Same with down here, it would be -- that's the

18   general service area for that phone -- for that sector.

19   Q.   Now, did that information become of investigative interest

01:28 20   during the investigation?

21   A.   Yes.  So when I was here at the time the investigation was

22   occurring, we had received information, I believe, from a

23   witness that the people involved stopped at a Whole Foods.

24       MS. CONRAD:  Objection.

25       THE COURT:  No, go ahead.

1          THE WITNESS:  I used that information.  Looking at the

2   phones, once we identified the phone numbers, I told the

3   investigative team that they probably want to go to the Whole

4   Foods and look at the video in between these two times, so

5   between the 3:15 and 3:30 time period, review the video to see

6   if that statement is true, that they might have been caught on

7   video.  And I was told the next day that when they --

8          MS. CONRAD:  Objection.

9          THE COURT:  No, overruled.

01:29 10          THE WITNESS:  When they returned, they were able to

11   locate video stills of the two suspects, or at least one of the

12   suspects at the Whole Foods in that time period that I provided

13   to them.

14          MR. CHAKRAVARTY:  Next slide, please.

15   BY MR. CHAKRAVARTY:

16   Q.   And what does this next slide show?

17   A.   So this is just continuing on with the Tamerlan phone,

18   just showing the tower and sector utilized from roughly 8:30 to

19   8:47.  And then I have another tower and sector depicted on the

01:30 20   map that shows kind of further into the night.  I believe it

21   was a little after ten o'clock.  And I also referenced the

22   address of 410 Norfolk Street, showing where it is in relation

23   to that 1028 call.

24   Q.   And 410 Norfolk Street you know to be the Tsarnaev family

25   residence?

1    A.    Yes.

2    Q.    And is that off of Prospect Street?  There's a cell tower

3    here near Prospect Street?

4    A.    Yes.

5          MR. CHAKRAVARTY:  Next slide, please.

6    Q.    Now, this is the next day.  Can you explain what this

7    slide shows?

8    A.    Yes.  So I was asked to look at the numbers just kind of

9    as they -- where they were generally being used on April 16th.

01:30 10   And if you zoom to the top half, please.

11         So this is just showing on the 16th both the Tamerlan

12   phone and the 5112 phone during -- from 3:30 the 5112 phone is

13   located in the Boston area.  The Tamerlan phone is also in

14   the -- utilizing towers in the Boston area at 5:23 -- around

15   5:23.

16         And then if you zoom to the other towers kind of down at

17   the bottom, it shows that later in the day the 5112 phone

18   traveled down to and utilized towers around 9:47 and 10:25 in

19   the New Bedford/Dartmouth area.

01:32 20   Q.    So in the afternoon there was phone activity from that

21   AT&T phone subscribed to Jahar Tsarnaev in the Cambridge area,

22   and then in the evening it was down in the New Bedford area?

23   A.    That's correct, yes.

24   Q.    And are you familiar with the UMass Dartmouth campus,

25   where that is?

```
 1    A.    I am, yes.

 2    Q.    Is that in the vicinity of these cell towers?

 3    A.    As I remember, it was very close.

 4          MR. CHAKRAVARTY:  Next slide, please.

 5    Q.    What does this show?

 6    A.    Kind of more of the same, just showing where the phones

 7    are -- the towers that the phones are utilizing on the 17th.

 8    So once again, if you wouldn't mind zooming in to the top half.

 9          It's just showing the Tamerlan phone on the 17th as

01:33 10   utilizing towers all in the Boston area starting at 12:29 p.m.

11    and going all the way through 9:46 p.m.

12          And if you could zoom to the bottom.

13    Q.    Sure.  So this shows the Tamerlan phone, the 4634, in the

14    Boston area for the entire day, essentially?

15    A.    That's correct.

16    Q.    And what does this show?

17    A.    It's the records for the 5112 number, show the phone

18    utilizing towers once again in the New Bedford/Dartmouth area

19    in the eight o'clock hour, so 8:08 through 8:48 -- and 8:48.

01:33 20   Q.    So did you -- do you recall whether you had telephone

21    activity from the 5112, the phone subscribed to Jahar Tsarnaev,

22    in the morning on April 17th?

23    A.    No, I plotted the activity that was available.

24          MR. CHAKRAVARTY:  Next slide, please.

25    Q.    Now, is this a slide of April 18th, 2013, the Thursday
```

1    after the marathon bombing?

2    A.   It is.

3    Q.   And what does this show?

4    A.   So it's showing both the 9151 phone, the Jahar phone,

5    utilizing a tower kind of over in this side of the map and a

6    sector pointing to the south at 8:17.  And I also depicted the

7    two towers and sectors -- or three, actually, that were being

8    utilized by the Tamerlan phone starting at 5:34 and ending at

9    7:30 p.m.  So there's this tower and then two sectors pointing

01:35 10   in that direction.  And I also put where -- I kept on the map

11   410 Norfolk Street.

12   Q.   And so this shows that 9151 phone number subscribed to

13   Jahar Tsarni, the phone that was activated on the Sunday before

14   the marathon bombing, that was back in Cambridge,

15   Massachusetts, on Thursday at about 8:17 p.m.?

16   A.   I can't say it was back in.  It started being used on the

17   18th again in the Cambridge area.

18   Q.   And you hadn't seen any activity prior to that -- on that

19   phone before -- after April 15th?

01:35 20   A.   Right.  So the slides I spoke to earlier showing that

21   phone activity, that was it on the 15th, and then it doesn't

22   get used again until the 18th.

23   Q.   And just if we could go back quickly to --

24        MR. CHAKRAVARTY:  Go to Exhibit 1172.

25   Q.   So these are the phone records associated with that 9151

1    number.  On April 17th in between was there an SMS text that

2    apparently was coming in to that phone?

3    A.   Right.  So there's a text, but like I mentioned earlier,

4    we don't get data -- or tower information on texts for

5    T-Mobile.  And I'd also like to note also that with T-Mobile,

6    texting is in Pacific time.  So to add further confusion to the

7    whole thing, instead of 9:06 a.m. Eastern time, that text

8    actually occurred at a little after noon.  So you have to add

9    three hours for texts in T-Mobile.

01:37 10   Q.   And this originating number, 7777, what significance does

11   that have?

12   A.   That's typically a network message of some sort, like

13   maybe something about their bill or voicemail or something to

14   that effect, some kind of text network-generated, is typically

15   what I see.

16        MR. CHAKRAVARTY:  Back to 1440.

17   Q.   All right.  And what does this slide show?

18   A.   So this is just showing the night of the 18th.  There's a

19   call between the two phones, the Tamerlan phone as well as the

01:38 20   9151 phone a little after 11 p.m., and utilizing two different

21   towers and sectors, which I've depicted on the map, so you

22   have, you know, the general coverage area for the one and then

23   general coverage area for the other, and just showing they're

24   calling each other.  The Tamerlan phone is calling the Jahar

25   phone, and just showing the general area of where that service

```
 1    is being provided.
 2    Q.   So this is the Thursday night at about 11 p.m., correct?
 3    A.   Correct.
 4    Q.   So it's about three hours after the earlier call that was
 5    reflected on the 9151, Jahar Tsarni phone?
 6    A.   Yes.
 7    Q.   And separating the calls -- or the towers from which these
 8    phones used is the Charles River, so one person, Tsarni, is in
 9    Cambridge, and the Tamerlan Tsarnaev phone is in Boston.  Or I
01:39 10   should say the tower off of which the Tamerlan Tsarnaev phone
11    uses --
12    A.   The towers are located there.  It doesn't mean --
13    obviously, you don't plug into the base of the tower.  So the
14    service is provided in the directions that I've depicted on the
15    map.  So they could definitely be -- the furthest south tower
16    I'm sure has service on both sides of that river.
17    Q.   Now, does a cell phone always use the nearest tower?
18    A.   No.  There could be something physically blocking it.
19    Like if I'm off standing on the other side of the mountain and
01:39 20   the tower is physically closer to me but it's getting blocked
21    from that topology, the actual earth, my phone won't be able to
22    see it.  So there are situations where the towers get blocked
23    either by, you know, solid structures, the mountains, hills.
24    But obviously the network engineers know the area and they
25    place the towers to provide service in the most appropriate
```

```
       1   area, immediately around that tower and sector.
       2   Q.   Now, testing your Boston area geography a little bit, is
       3   this the direction of Watertown and this the direction of
       4   Cambridge?
       5   A.   Being from Atlanta I have no idea, but I'll take your word
       6   for it.
       7        (Laughter.)
       8   Q.   Fair enough.
       9        MR. CHAKRAVARTY:  Next slide, please.
01:40 10   Q.   Now, in addition to -- is that the last call activity
      11   between the two phones the week of the marathon bombing?
      12   A.   It is.  And I've also depicted on the map the address of
      13   45 Laurel Street and where it is in relation to that last call
      14   between them.
      15   Q.   And you prepared this exhibit for testimony today from the
      16   records that you had reviewed from each of these phone
      17   companies and the cell towers?
      18   A.   Correct.  The phone records as well as the tower lists.
      19   Q.   All right.
01:41 20        MR. CHAKRAVARTY:  Your Honor, I would move to
      21   introduce this into evidence.
      22        MS. CONRAD:  I'm sorry.  I don't even -- can I just
      23   see what it is because I don't even have -- just this one page
      24   or the whole thing?
      25        MR. CHAKRAVARTY:  All of 1440.
```

1          MS. CONRAD:  Then I would like to be heard.

2          THE COURT:  Yeah, we'll talk about it.

3          MS. CONRAD:  Thank you.

4          MR. CHAKRAVARTY:  Just for the witness, can I show

5     1485, please?

6     BY MR. CHAKRAVARTY:

7     Q.    Do you recognize what this is?

8     A.    Yes.

9     Q.    What is that?

01:41 10    A.    This is a slide I was asked to put together just showing

11    the activity on December 25th and December 26th to just show

12    the area that was being used for the AT&T phone, the

13    5112 -- the Jahar -- I'm sorry.  I don't know which name you

14    said -- what you're calling that phone, but the AT&T 5112

15    number.

16    Q.    The Jahar Tsarnaev phone.

17    A.    Sorry.

18    Q.    So is this, like the other slides you showed, a fair and

19    accurate depiction of your plotting of the cell site location

01:42 20    for that use of that phone in that 24-hour period?

21    A.    Yes.  So I just -- I took that entire day's worth of

22    activity and just kind of put it all on one map showing all the

23    different towers and sectors to show where that phone, you

24    know, was -- the towers and sectors that phone was utilizing

25    for that two-day period, and I also depicted the 410 Norfolk

1    Street address.

2           MR. CHAKRAVARTY:  I would move into evidence Exhibit

3    1485 which for all intents and purposes is just another page to

4    the presentation that he had just done.

5           MS. CONRAD:  Your Honor --

6           THE COURT:  The same situation?

7           MS. CONRAD:  Well, yes, and also the underlying data.

8           THE COURT:  Yeah.  That objection's overruled.

9           This was so far -- you may use it -- we're deferring

01:43 10   the exhibit/chalk question, but it may be used as a chalk and

11   I'll expose it now to the jury.

12          MR. CHAKRAVARTY:  Thank you, your Honor.

13   BY MR. CHAKRAVARTY:

14   Q.   Agent Fitzgerald, is this also, as with the phone records

15   that you described, about the phone activity on the Tsarnaev

16   brothers' phones the week of the marathon bombing -- does this

17   show the use of the Jahar Tsarnaev AT&T phone on December 25th

18   and 26th of 2012?

19   A.   Yes.

01:43 20   Q.   And can you go through and explain what the phone activity

21   shows you?

22   A.   So there were several text messages -- mostly text

23   messaging, if not all -- utilizing, what -- one, two, three,

24   four -- five different sectors in the Cambridge area over that

25   time period.

1    Q.   And, again, as with some of the previous plots, you showed

2    where the Tsarnaev family residence was at 410 Norfolk Street?

3    A.   Yes.

4    Q.   And this was that Prospect Street cell tower that you were

5    talking about -- or actually, this is an AT&T cell tower also

6    in the vicinity of Prospect Street?

7    A.   Right.  It might be at the same location.  I don't recall.

8    Like I say, sometimes they co-locate on the same structure, the

9    same building, and sometimes they are just nearby each other.

01:44 10   I can't remember if exactly -- if this was in the same exact

11   location, but it's definitely near that.

12   Q.   And does this show that this phone, the one that ends in

13   5112, was using cell towers in the Cambridge area from December

14   25th in through December 26th, at least through 12:35 of that

15   day?

16   A.   Right.  I believe that -- I think this one over here might

17   be 12 -- yeah, 12:31.  So, yeah, through 12:35, noon.  And it

18   starts as early as a little after -- well, there's actually --

19   on 12:26 there's another one up here, 5:55.  So all the way

01:45 20   through 5:55.  And then it starts as early as -- let's see, a

21   little after noon on Christmas Day.

22   Q.   So if that's when Christmas break was for -- or the

23   holiday break, I should say, for UMass Dartmouth, then it's

24   possible that the phone was being used back at home on Norfolk

25   Street?

```
 1    A.   I mean, my kids were on break those same two days.  I

 2    mean, as far as the university, I assume that they're also on

 3    break Christmastime.  But, yes, the phone was being utilized in

 4    Cambridge, and it definitely could have been 410 Norfolk

 5    Street.  In that area for sure.  That tower and sector to the

 6    north is providing service to that address.

 7              MR. CHAKRAVARTY:  Just a moment, your Honor.

 8              (Counsel confer off the record.)

 9              MR. CHAKRAVARTY:  No further questions.

10              MS. CONRAD:  Your Honor, I do have cross-examination,

11    but there's a discovery issue that I would like to discuss with

12    your Honor, and perhaps if we could take a break and discuss

13    that.

14              THE COURT:  All right.  A different one, I presume?

15              MS. CONRAD:  I'm sorry?

16              THE COURT:  A different one?

17              MS. CONRAD:  Yes.

18              THE COURT:  All right.  We'll take the morning recess.

19              THE CLERK:  All rise for the Court and the jury.  And

20    we'll take the morning recess.

21              (The Court and jury exit the courtroom at there is a

22    recess at 10:57 a.m.)

23              THE CLERK:  All rise for the Court.

24              (The Court enters the courtroom at 11:21 a.m.)

25              THE CLERK:  Be seated.
```

1          MS. CONRAD:  Do you want me back at counsel table,

2     your Honor, or can I be --

3          THE COURT:  That's fine.

4          MS. CONRAD:  Okay.  Your Honor, just a couple of

5     matters.  First of all, I think we've resolved the chalk, I'll

6     call it for now, that Mr. Chakravarty was using, had a page

7     that was not in the one that we had been provided in discovery.

8     So he gave me a hard copy of his, and I now have it.  But that

9     was the discovery issue.

02:11 10          THE COURT:  Okay.  So that's solved?

11          MS. CONRAD:  That's solved.

12          I do have some issues about *Jencks* material.  I could

13     ask, if the Court would allow me, Agent Fitzgerald, outside the

14     presence of the jury, about *Jencks* material.  We have been

15     provided no reports, no memoranda, no emails, nothing other

16     than this chalk and the summary expert witness disclosure.  No

17     worksheets.

18          MR. CHAKRAVARTY:  I've inquired of him, and there's no

19     *Jencks* material that the government is aware of.  If Ms. Conrad

02:12 20     wants to ask Mr. Fitzgerald that question in lieu of asking in

21     front of the jury, then the government has no objection to it.

22          THE COURT:  All right.  Right now.

23          MS. CONRAD:  Thank you.

24                    VOIR DIRE EXAMINATION

25     BY MS. CONRAD:

```
 1    Q.   Good morning, sir.  I'm Miriam Conrad.  I'm one of

 2    Mr. Tsarnaev's lawyers.

 3    A.   Hi.

 4    Q.   In preparing what the jury has now seen, the

 5    multiple-page, I think 14-page document, did you take any notes

 6    in preparation of that?

 7    A.   No.  It's all just done on the computer utilizing the

 8    records and the tower list and the mapping and so forth.

 9    Q.   And do you create spreadsheets as you're doing that?

10    A.   They're just derivative of the original spreadsheet.  So

11    they might be pared down to, like in this case, the April 15th

12    through the 18th, but there's no -- I don't create an original

13    spreadsheet, no.

14    Q.   And did you provide copies of those documents to the

15    government?

16    A.   The call detail record?

17              MR. CHAKRAVARTY:  Objection, your Honor.

18              THE COURT:  It's not clear what documents you mean.

19    BY MS. CONRAD:

20    Q.   Well, you created documents that were essentially a

21    summary of what you reviewed, the records you reviewed.  Is

22    that right?

23    A.   I utilize the records, the original call detail records,

24    and then I can filter it out -- or filter it down to the calls

25    I'm interested in versus having the thousands of calls.
```

1    Q.   I see.  All right.  And did you write any reports or

2    memoranda regarding what you found?

3    A.   No.  I mean, I've emailed back and forth like the drafts

4    and stuff like that for peer review or to the prosecutors.

5    Q.   So when you say "drafts," drafts for what?

6    A.   The presentation.

7    Q.   Okay.

8         MS. CONRAD:  And I'd ask to be provided with those.

9         MR. CHAKRAVARTY:  Ms. Conrad just complained that she

02:13 10  had the draft of the presentation that we sent her.

11        MS. CONRAD:  Okay.  Let me ask a different question.

12   BY MS. CONRAD:

13   Q.   How many drafts did you prepare?

14   A.   I only sent one draft up to Al.  I mean, that's the draft.

15   I mean, that was the draft, and that draft becomes a final.

16   Q.   And you said there were emails back and forth?

17   A.   Right.  To the person who is doing the peer review, asking

18   them to do the peer review, as well as to Al, showing him that

19   the draft was done and to contact me after he reviewed it.

02:14 20  Q.   And was there any substance in those emails?

21   A.   No, it was all logistics.

22   Q.   Okay.  Thank you.

23        THE COURT:  All right?

24        MS. CONRAD:  Yes.

25        THE COURT:  Just while we have the jury out of the

 1   room, after this witness?

 2           MR. CHAKRAVARTY:  We have a brief witness who's going

 3   to describe the press conference and introduce some photos from

 4   the press conference that we've agreed upon, and then we'll

 5   move to MIT.

 6           THE COURT:  Okay.  And there was a controversy about

 7   one of the pictures?

 8           MR. BRUCK:  Yes, your Honor.

 9           THE COURT:  Let me see the numbers.  So I'm told

02:15 10   they're 676, 677 and 678.  Do you know which one it is

11   you're --

12           MS. CONRAD:  The picture we object to is the

13   graduation photo in which Officer Collier is back by the flag,

14   and we just think that's -- 77.

15           MS. CLARKE:  677.

16           MR. BRUCK:  677.

17           THE COURT:  I guess my question is:  Why do we need

18   three photographs?

19           MS. PELLEGRINI:  Well, your Honor, having Chief DiFava

02:15 20   explain how Sean Collier was hired by MIT and his experience

21   before he joined the MIT police force, we were asking him about

22   what path Sean took, and one of them was that he attended the

23   police academy.  I asked him about what uniform he was in at

24   that time.  He said Somerville, and he explained why it was

25   Somerville and not MIT, and that he recognized this as being

```
 1    his graduation photo.  So that was part of his story of how
 2    Sean joined the force.
 3           And then the other picture is of him in his MIT
 4    uniform which, as the Court can see, is different.  And the
 5    explanation for that is that is that uniform, and that was also
 6    his identification card.
 7           THE COURT:  Well, I think it's cumulative.  I don't
 8    believe you need more than one, frankly.
 9           MS. PELLEGRINI:  Well, can I use --
10           THE COURT:  You can have the narrative of what his
11    career path was but --
12           MS. PELLEGRINI:  Can I use the one they're not
13    complaining of, then, the general one and the other?
14           THE COURT:  Fine.  You can use the civilian one as
15    well.
16           MR. CHAKRAVARTY:  Your Honor, since the jury is not
17    here, if Ms. Conrad intends to attempt to introduce phone
18    records that the government objects to, introducing defense
19    evidence in the government case, perhaps we should deal with
20    that now as opposed to wasting the jury's time when they come
21    out.
22           THE COURT:  I think I've already ruled on that.
23           MR. CHAKRAVARTY:  Okay.
24           MS. CONRAD:  Well, your Honor, I am planning to ask
25    Agent Fitzgerald questions about his review of phone records,
```

1    and I assume that that is permissible.  And I also -- to the

2    extent there are excerpts from phone records that are in the

3    government's chalk, I intend to show the phone records from

4    which those were drawn.

5         THE COURT:  Well, we'll see how it goes.  I don't

6    think the records themselves -- the volume of records

7    themselves should be admitted.  So something else?

8         MR. MELLIN:  Yes.  While the jury is out of the room,

9    it may surprise you we're actually in agreement on the point

02:17 10   I'm about to raise, and that concerns the autopsy photos of

11   Officer Sean Collier.

12        There are three photos that we intend to use.  I don't

13   think there's any objection to those three photos.  What we

14   would like to do, though, is not have those photos broadcast,

15   that those photos just be shown to your Honor and to the jury,

16   to the witness, but not put on the big screens.

17        THE COURT:  Well, somebody, I don't know who, gave me

18   a set of --

19        MR. MELLIN:  I gave you --

02:18 20   THE COURT:  -- autopsy photos.

21        MR. MELLIN:  -- the PowerPoint that was put together

22   by Dr. Robinson.

23        And if you look at the first photo of the head of

24   Officer Collier, we will use that photograph.  As you turn the

25   page, the next photo of the side, and then a picture --

1          THE COURT:  I think this is -- we've had some

2     discussion about autopsy photographs in general, and I think

3     the consensus is that they need not -- because of the nature of

4     them, they need not be displayed publicly beyond the jury out

5     of respect for the victims and their families.

6          I think perhaps the most feasible way would be the

7     old-fashioned way and let the jury see paper copies.  The

8     electronics are a little more complex because of the way the

9     system is configured.

02:19 10          MR. MELLIN:  That's fine, your Honor.  Over lunch hour

11    we'll make 18 copies -- or 19 copies, one for the Court.

12          THE COURT:  Any disagreement with that approach?

13          MS. CLARKE:  No, that's fine.  My understanding is

14    that the big screens can be unplugged, and it works that way.

15          THE COURT:  Yes, but it's more disruptive, I think,

16    than using the paper.  Anyway -- okay.  Let's get the jury.

17          (Pause.)

18          THE CLERK:  All rise for the jury.

19          (The jury enters the courtroom at 11:32 a.m.)

02:23 20          THE CLERK:  Be seated.

21          MS. CONRAD:  Thank you, your Honor.

22                    CROSS-EXAMINATION

23    BY MS. CONRAD:

24    Q.   Good morning, Mr. Fitzgerald.  My name is Miriam Conrad.

25    I'm one of Mr. Tsarnaev's lawyers.

A.   Hi.

Q.   I would like to ask you a few questions about the work you

did regarding the location of the two phones being used by

Jahar and Tamerlan Tsarnaev on April 15th.

     Now, those were both T-Mobile phones, correct?

A.   Right.  There was one -- well, on April 15th, yes, they

were both T-Mobile.

          MS. CONRAD:  And, Mr. Bruemmer, if you would be kind

enough to turn to -- I think it's Slide 7, page -- no, this

one.  Thank you.

Q.   So that one shows a phone call approximately 2:49 p.m.

from Jahar Tsarnaev to Tamerlan Tsarnaev, correct?

A.   That's correct, yes.

Q.   And the work that you did -- I know you can't pinpoint

exactly, but it shows that the -- their locations at that time

were consistent, or the information you found was consistent

with Jahar Tsarnaev being in the vicinity of the Forum

restaurant and Tamerlan Tsarnaev being in the vicinity of

Marathon Sports, correct?

A.   Right.  That's fair to say, yes.

Q.   In the vicinity, right?

A.   Yes.

Q.   And turning to the next slide, which reflects the phone

call made from Tamerlan Tsarnaev to Jahar Tsarnaev at

approximately 2:51 p.m., that also is consistent with Tamerlan

1    Tsarnaev being in the vicinity of Marathon Sports and Jahar

2    Tsarnaev being in the vicinity of the Forum restaurant.  Is

3    that correct?

4    A.   Right.  It's all the same area, yes.

5    Q.   Now, you extracted this information from T-Mobile records,

6    correct?

7    A.   That's correct, yes.

8    Q.   And those T-Mobile records, I think they're shown for

9    April 10th, anyway, on the previous slide?

02:25 10          MS. CONRAD:  Is that right, Mr. Bruemmer?  I'm sorry.

11   Two back.  Well, let's start with that since it's on the

12   screen.

13   Q.   That's the AT&T Wireless call detail, correct?

14   A.   Correct.  The call detail records, yes.  Just a small

15   sampling of what we received.

16   Q.   And by the way, that record was drawn from a much larger

17   portion -- excuse me -- from a much larger set of records you

18   got from AT&T, correct?

19   A.   That's correct, or the government got from AT&T.

02:26 20          MS. CONRAD:  And if I could just for the witness now

21   display on the screen -- could we have the -- thank you.  Just

22   for the witness, please.

23   BY MS. CONRAD:

24   Q.   So that's the record that Mr. Bruemmer just had up on the

25   screen, right?

```
 1   A.   It's only part of the screen; it's not --
 2   Q.   I just want to show you now the record that you took that
 3   information from.  If you'd just bear with me for a second.
 4        While Mr. Watkins is trying to figure that out, let me ask
 5   a different question.  Going back to the record that
 6   Mr. Bruemmer had up on the screen.
 7            THE COURT:  Do you want to go back to the computer?
 8            MS. CONRAD:  Yeah, the AT&T, the portion.  Thank you.
 9   BY MS. CONRAD:
10   Q.   Do you see where it says "seizure time"?
11   A.   Yes.
12   Q.   And can you explain what that means?
13   A.   Typically, it's the amount of time it took to set up the
14   call.
15   Q.   And that varied, at least on April 10th, from anywhere
16   from four seconds to 21 seconds?
17   A.   Correct.
18   Q.   And just to use your analogy earlier of when someone makes
19   a call, it's sort of like a kid in the classroom raising their
20   hand, right, and asking to be called on, right?
21   A.   Right.  That's what I used, yes.
22   Q.   From the time someone dials a number and then hits send,
23   it takes some time before the call actually goes through,
24   right?
25   A.   It can.
```

1    Q.   And it can be anywhere from four seconds to 21 seconds,

2    right?

3    A.   It can be any amount of time.

4    Q.   So, for example, if you make a telephone call, sometimes

5    you'll dial the number and you press "send" on your cell phone,

6    and you don't necessarily even hear ringing right away, right?

7    A.   Right.  It would be like call blocking, yes.

8    Q.   Well, sometimes that's the time when your phone is trying

9    to communicate with the most available tower, correct?

02:29 10    A.   I mean, that's one instance, yes.

11    Q.   So without the seizure time, you don't know how long an

12    actual -- or even with the seizure time, for that matter,

13    because you don't know how long it took someone to answer the

14    phone -- you don't know how long the actual conversation was.

15    Is that correct?

16    A.   That would be under the elapsed time of the call --

17    Q.   So for --

18    A.   -- for AT&T.

19    Q.   So for this record, for AT&T it would show the elapsed

02:29 20    time, correct?

21    A.   That's correct.

22    Q.   And you're saying that would be the length of the actual

23    conversation?

24    A.   Yes; that's what AT&T tells us.

25    Q.   And is that from the time the person receiving the call

1    actually answers the phone?

2    A.   Well, when I say it's the length of the call, the

3    channel's being used, so I don't know -- you mentioned that's

4    when that person answered the phone.  It's not

5    necessarily -- the person doesn't have to physically pick up

6    the phone; it's just that's what they're billing you under.

7    That's going to be how long you used up that channel.

8    Q.   Sure.  But my question is whether you can tell from

9    looking at that how long the actual conversation was.

02:30 10   A.   I don't even know that a person picked up the phone.  I

11   don't know what the content of the call was.  No, I do not know

12   if the call was physically connected person to person.

13   Q.   And with respect to the T-Mobile records --

14        MS. CONRAD:  If we could just go to that next slide,

15   please, Mr. Bruemmer.

16   Q.   -- there's no column -- I know this is actually two sets

17   of columns that are cut into two pieces to fit on the page,

18   right?

19   A.   Correct.

02:30 20   Q.   So there's a lot of columns here?

21   A.   Right.

22   Q.   Is that fair to say?

23   A.   Absolutely.

24   Q.   And in a second I'm going to show you the columns -- or at

25   least some of the columns for April 15th.  Is it fair to say

1    that T-Mobile does not give you the seizure time?

2    A.   Right.  So their system is just set up differently, and

3    then they give us the duration of the call.

4    Q.   And the duration includes the time it takes to connect,

5    right?

6    A.   I believe the time starts when you start utilizing

7    resources on the tower.  So that would be once you get

8    that -- those resources granted from the tower, that's when the

9    timestamp occurs and that's when your duration starts with

02:31 10   T-Mobile.  So your call would be -- you would be in a, like,

11   call mode, if you will.

12   Q.   So just to make sure I understand this correctly, so I

13   pick up my phone, I dial the number, I press "send," a signal

14   goes out to a tower, right?

15   A.   Right.  You request services.

16   Q.   They make sure that I've paid my bill, right?

17   A.   Hopefully -- you usually register before that part.

18   Q.   All right.  And at that point the signal starts searching

19   for the person being called, right?

02:32 20   A.   No, because you have to get resources from the tower.

21   Q.   Right.  Once you get resources from the tower, which would

22   be when this record shows the call, the time starts running on

23   that call, correct?

24   A.   Right.  Once those resources are granted from the tower,

25   that's when the duration and the timestamp occurs.

1    Q.   Okay.  But the call does -- is not necessarily received by

2    the person whom I'm calling at that moment?

3    A.   Right.  When your resources are granted, you still have to

4    then navigate through the rest of the system and through

5    whoever you're contacting's system, back down to the mobile,

6    the page has to occur, all that.

7    Q.   And so the person that I'm calling -- if I'm calling

8    Mr. Chakravarty, he doesn't know yet that I'm trying to call

9    him, right?

02:33  10    A.   Right.  I mean, when you dial the phone, your phone

11    requests services, you're granted those services, and

12    everything starts getting routed out to whatever his service

13    provider is.

14    Q.   Okay.  So showing you --

15    A.   But the time has already started on your end.

16    Q.   Now, sir --

17         MS. CONRAD:  Maybe this is just for the witness unless

18    Mr. Chakravarty doesn't have an objection.

19         MR. CHAKRAVARTY:  I don't know what it is.

02:33  20         MS. CONRAD:  Could we just get that on -- I'm going to

21    plug this in -- or try to.

22         It's a page from the call detail from T-Mobile.  It's

23    on the screen.

24         MR. CHAKRAVARTY:  Can you zoom in, please?

25         MS. CONRAD:  I'm sorry?

1              MR. CHAKRAVARTY:  Can you zoom in, please?

2              MS. CONRAD:  Yes.

3              MR. CHAKRAVARTY:  I think this is an exhibit.

4              MS. CONRAD:  I'm sorry?

5              MR. CHAKRAVARTY:  This is an exhibit.

6              MS. CONRAD:  I think a portion of it is.  But if it's

7    an exhibit -- if it is, it's 1172.  I'm just asking if you have

8    any objection if I show it to --

9              MR. CHAKRAVARTY:  The witness?

02:34 10           MS. CONRAD:  -- the witness and the jury.

11             I'll ask the witness first.

12   BY MS. CONRAD:

13   Q.   Mr. Fitzgerald, do you recognize what's on your screen?

14   A.   Yes.

15   Q.   Okay.  And that's a portion of the T-Mobile records,

16   correct?

17   A.   It appears to be, yes.

18   Q.   And let me just slide it over a little bit more and then

19   slide it up so you can see the top column, right?

02:34 20   A.   Yes.

21   Q.   And that says "duration seconds," right?

22   A.   Yes.

23   Q.   And again, that is the time from when the caller started

24   using the resources, as you put it, of the phone -- cell tower,

25   correct, to when the call ended?

```
 1    A.   Well, assuming it's an outgoing call, yes.

 2    Q.   Okay.  All right.  Well, let's go back --

 3    A.   In reference to that call.

 4         MS. CONRAD:  Your Honor, if it's not in evidence, I'd

 5    offer it at this time.

 6         MR. CHAKRAVARTY:  No objections.  I'm sorry.

 7         THE COURT:  Okay.

 8         MS. CONRAD:  I guess that would be Defendant's 2.

 9         THE COURT:  Do you want to give it Defense 2?

02:35 10         MS. CONRAD:  Unless we changed over.  Did we change

11    over to 3,000 to --

12         THE COURT:  We'll fix that later.

13         MS. CONRAD:  Okay.

14         (Defense Exhibit No. 2 received into evidence.)

15    BY MS. CONRAD:

16    Q.   And that shows that the phone call from 9151 -- which

17    would be Jahar's phone, right?

18    A.   Yes.

19    Q.   -- at 2:49 p.m., outgoing call, it lists it as 19 seconds,

02:36 20    correct?

21    A.   That's correct.

22    Q.   But that's not the length of the conversation?

23    A.   That's the length that that phone was using utilizing

24    T-Mobile resources.

25    Q.   So presumably the length of the conversation was shorter
```

        1   than that?

        2   A.   It's absolutely possible, yes.  If there was a

        3   conversation at all.  I don't even know if there was a

        4   conversation.

        5   Q.   But if there was a conversation, it was certainly shorter

        6   than this, right?

        7   A.   Well, the phone on the other end does have to ring and

        8   that is included in this phone duration.

        9   Q.   And looking at the next phone call, which is a phone call

02:36  10   from Tamerlan to Jahar at 2:51, that's listed as 30 seconds,

       11   right?

       12   A.   That's correct.

       13   Q.   And again, it would be -- that's not the length of the

       14   time that they were actually talking on the phone, if they did

       15   talk on the phone?

       16   A.   That's correct.

       17   Q.   Now, did you, by any chance, review the extraction from

       18   Tamerlan's phone?

       19   A.   It probably came into our area where we were working in

02:37  20   the original investigation, so it's very possible that I saw

       21   it.  But we didn't rely on it for any of our maps or anything.

       22        MS. CONRAD:   Okay.  If I can just have the camera for

       23   the witness only, please.

       24   A.   And can I clarify it?

       25   Q.   Oh, sure.  Please do.

1    A.   On that extraction, we might have used contacts.  Like so
2    if a contact was listed as a certain person associated with a
3    phone number, that's how we would have used that extraction.
4    Q.   Okay.  All right.  I'm not sure I understood what you just
5    said, but it may help me if I'm looking at something --
6    A.   To marry up a name to a phone number is what we use it
7    for.
8    Q.   Okay.
9         MS. CONRAD:  Again, just for the witness.
02:38 10  Q.   Do you see an entry for 4:15 -- let me go back down,
11   actually -- no, let me stay there.  4:15 --
12        MR. CHAKRAVARTY:  Your Honor, I'm sorry.  I'm just not
13   clear why is the witness being impeached, or what is the
14   question?
15        MS. CONRAD:  No, I'm eliciting information.  I thought
16   that's what --
17        THE COURT:  Go ahead.
18   BY MS. CONRAD:
19   Q.   Thank you.  4/15/2013, and it says 6:51, but then it says
02:38 20  UTC.  Do you know what "UTC" is?
21   A.   The GMT about this time of year, it would be four hours'
22   difference.
23   Q.   Is "GMT" Greenwich Mean Time?
24   A.   Yes.
25   Q.   So that actually would be the 2:51 call?

```
 1    A.    Yes.

 2    Q.    And do you see what the length of that phone call is?

 3    A.    Yes.

 4    Q.    And that's 18 seconds?

 5    A.    According to the phone, yes.

 6    Q.    And that's an extraction, meaning that's information taken

 7    from the phone physically itself?

 8    A.    Right, it's a forensic report generated from the actual

 9    hardware -- the actual phone -- mobile phone itself.

02:39 10  Q.    So that's -- instead of 30 seconds that you got from the

11    cell tower records, it's 18 seconds for the 2:51 call, right?

12    A.    I thought it was 18 or 19 -- oh, 2:51?  Yes.

13    Q.    2:51, not 2:49.

14    A.    Yes, that's a different time.

15    Q.    And these are records for Tamerlan Tsarnaev's, correct?

16          MR. CHAKRAVARTY:  Objection, your Honor.  There's no

17    foundation that this witness has even seen this.

18          THE COURT:  Use the phone number.

19          MS. CONRAD:  Well, it's an extraction.  The

02:39 20  government, I hope, would be aware of this.  It's an extraction

21    from Tamerlan's phone.  I don't have the phone number.  It's

22    not toll records; it's an extraction done by the government.

23          THE COURT:  Go ahead.  Proceed.

24          MR. CHAKRAVARTY:  Just, your Honor, this witness has

25    analyzed phone records, not data extracted from a phone.
```

```
      1            THE COURT:  I understand.

      2            Go ahead.

      3   BY MS. CONRAD:

      4   Q.   So that was the 2:51 call, right?

      5   A.   Right.

      6   Q.   And that was outgoing, right?  Just, I could scroll back

      7   up if you want to look at it again.

      8   A.   Yeah, according to whatever system they used here,

      9   Cellebrite or whatever extraction they used.

02:40 10   Q.   And there's an earlier call, 6:49 UTC, which would be

     11   2:49 p.m. Boston time, right?

     12   A.   That's correct, yes.

     13   Q.   And that's shown as incoming, right?

     14   A.   Right, yes.

     15   Q.   From 9151 -- excuse me.  From 9151, correct?

     16   A.   That's correct, yes.

     17   Q.   And that would be Jahar's phone, right?

     18   A.   Yes.

     19   Q.   And that shows a duration of eight seconds?

02:40 20   A.   That's correct, yes.

     21   Q.   And so we've got an eight-second call at 2:49 -- or

     22   eight-second conversation, I guess, right, at 2:49?

     23   A.   I don't know how Cellebrite or whatever forensic utility

     24   was used.  I don't know how they determine the duration, if

     25   it's the actual -- if the call's connected, if it's the
```

1    conversation or if it's when the call comes in.  I don't know

2    how this system works or the extraction software works.

3    Q.    But just to clarify, it's not inconsistent that the phone

4    would reflect an eight-second call when the cell tower data

5    reflects a 19-second call?

6              MR. CHAKRAVARTY:  Objection, your Honor.

7              THE COURT:  Overruled.

8              You may answer it.

9              THE WITNESS:  Like I said, I don't know much about

02:41 10    Cellebrite other than how to operate it.  I don't know the

11    detail ins and outs that it pulls from the call logs.  I mean,

12    this is like from a call log versus network resources that are

13    used in the network.  So you're kind of comparing -- although

14    it's talking about the same information, you're kind of

15    comparing two different entities or two different things.

16    BY MS. CONRAD:

17    Q.    I guess really I'm just asking, the fact that one shows a

18    shorter time period does not -- it's not inconsistent with the

19    fact that the cell tower reflects a longer time because it

02:42 20    includes the connection time, right?

21    A.    I don't think that's unusual.  But, like, once again, I

22    don't know how it determines this duration or time.  I assume

23    it's the call.  It's like when the -- you know, the actual call

24    is occurring.  But what happens when a call's missed, I don't

25    know the answer to that.  So whether you say it's inconsistent

```
 1    or consistent, I don't know the answer to that because I'm not
 2    familiar enough with what they're extracting out of the actual
 3    mobile phone itself.  I deal with more the networks.
 4    Q.   I understand.  Thank you.
 5         But the -- showing you the slide that I think is Number 9
 6    which is the -- well, let's go to Number 8 -- which is the 2:49
 7    call, I think, right?
 8              MS. CONRAD:  And could we have that on the screen,
 9    please?
10    Q.   That shows -- I'm sorry.  It's the 2:51 call, but let's
11    just stay there for a second.
12         It shows for one -- that's just one phone call even though
13    there's two times shown, right?
14    A.   Two diff- -- yes, they're calling each other, so it's in
15    respect to two different phones.  So we received call detail
16    records for one phone number and call details for another phone
17    number.  I'm showing them both on the screen in respect to each
18    of those call detail records, but, yes, the two phones are
19    calling each other.
20    Q.   And the 2:51 call we know was a call from Tamerlan to
21    Jahar, right?
22    A.   Yes.
23    Q.   And one of them says 14:51:18.  The other one shows
24    14:51:19.  Is that because the cell data for each of them would
25    be different?
```

A.   Well, yeah, it's in respect to that phone itself.

Q.   Right.  But again, the 14:51:19 is not the time that in this instance Jahar picked up the phone and started talking?

A.   Well, it's the instant in which his phone responded to the page.  So when a phone's incoming, like I said, the network has to generally -- or know the general area where you are.  So if I have an incoming call, the area where I am, a page signal would go out.  When that page signal goes out, it's kind of like going back to the teacher-student relationship.  The teacher's calling my name.  As the mobile I raise my hand; the teacher calls on me and says:  Hey, you have a call.  Go over here and you can complete your call.  That's when -- when those resources are granted, that's when the record is generated and that timestamp is generated.

Q.   Okay.  But not when the conversation necessarily began?

A.   Right, not when I hit the green button.  But like I'm getting caller ID, my phone is ringing, that's typically when you're starting to look for those resources.  And right before I hit the green button, that's when, you know, I'm going to actually connect and we can communicate with each other.

Q.   And the records or the -- excuse me -- the maps and diagrams that you showed us for days after April 15th were not necessarily calls between the brothers.  Is that right?

A.   Right.  There are some that are between them, but I think the majority of them, or the bulk of the calls that are

1   displayed, are not between the two.

2   Q.   So the purpose of that was just to show where each phone

3   was located at those particular times, right?

4   A.   The general area, yes.

5   Q.   And in order to put that information together, you

6   reviewed in this case AT&T records going back from April

7   2014 -- excuse me -- April 2013 going back to -- into December

8   of 2012, right?

9   A.   They continued on beyond that.

02:46 10   Q.   Okay.  But you reviewed all of them.  Is that right?

11   A.   I had them on my system.  Like there were

12   several calls -- yes.  I mean, when we were in the

13   investigation, we were trying to come up with leads, yes, we

14   did review in bulk, like, who they're contacting, what phone

15   numbers they're contacting.  But for the purposes of this

16   presentation, I only looked at the dates and times that I have

17   displayed.

18   Q.   But you are generally familiar with those underlying

19   records.  Is that correct?

02:47 20   A.   Absolutely, yes.

21        MS. CONRAD:  May I have a moment, please?

22        (Counsel confer off the record.)

23        MS. CONRAD:  Okay.  We're going to give this another

24   try with Mr. Watkins.  Again, just for the witness, please.

25   Q.   So what you see on the screen now is your presentation,

1    right?

2    A.    That's correct, yes.

3    Q.    A portion of the AT&T records from April 10th, 2013?

4          (Pause.)

5          MS. CONRAD:  Thank you.  If I could just have my

6    laptop this time for the witness.

7    Q.    Is that the record from which you took that?  I can make

8    it bigger.  Sorry.

9    A.    Yeah, it looks on the surface like it is.  Yes.

02:49 10   Q.    Well, that's April 10, 2013, right?

11   A.    Yes.

12   Q.    And those are the records that you put into the

13   presentation, right?

14   A.    Yeah, I just grabbed a screen shot of a couple of lines.

15         MS. CONRAD:  And could I have this --

16   Q.    And those are records that were received by the government

17   from AT&T for Jahar Tsarnaev's AT&T cell phone, correct?

18   A.    Right, I think they received a couple different -- you

19   know, like they got a certain time period, then they wanted to

02:50 20   extend that time period.  So which set I used, you know,

21   between the two time periods that were obtained, because one

22   was much longer than the other, I don't recall off the top of

23   my head.

24   Q.    But you reviewed records for that phone going back, at

25   least, until December 2012, which is how you prepared your

1    other presentation --

2    A.   Yes.  Yes.

3    Q.   -- correct?

4         To December 11, 2012, correct?

5    A.   Like I said, for this phone, I only went back to -- you

6    know, as I testified to earlier, I only went and did December

7    25th and 26th.

8         MS. CONRAD:  Your Honor, I'd ask that these be

9    marked -- this be marked for identification.

02:50 10         THE COURT:  All right.

11         MR. CHAKRAVARTY:  No objection to identification; not

12   as an exhibit, though.

13         THE COURT:  I'm sorry?

14         MR. CHAKRAVARTY:  No objection as to identification,

15   not as an exhibit.

16         THE COURT:  Yes.

17   BY MS. CONRAD:

18   Q.   In reviewing those records, you told us about Jahar's

19   location on December 25th and 26th, correct?

02:51 20   A.   That's correct, yes.

21   Q.   And you know he was a student at UMass Dartmouth during

22   that time, correct?

23   A.   Yes.

24   Q.   And I think you testified about that being the Christmas

25   break?

1    A.    Correct, yes.

2    Q.    And in the records that you reviewed, did you note that

3    Mr. Tsarnaev, Jahar Tsarnaev, spent much of his time in the

4    Dartmouth area based on his cell phone data usage?

5    A.    Yeah.  As I remember, it definitely went down there, even

6    the week of April 15th.

7    Q.    Thank you.

8          MS. CONRAD:  I don't have any further questions.

9          THE COURT:  Anything else?

02:51 10          MR. CHAKRAVARTY:  I do have some brief follow-up.

11                     REDIRECT EXAMINATION

12   BY MR. CHAKRAVARTY:

13   Q.    Agent Fitzgerald, you were asked several questions about

14   these calls that occurred on the 15th, the date of the marathon

15   bombing, at about 1449.  Is that 2:49 for those of us who

16   haven't been in the military?

17   A.    Yes.

18   Q.    So at 2:49, is that the first call contact between the two

19   phones, the one -- the new T-Mobile phone that was subscribed

02:52 20   to by Jahar Tsarni and the T-Mobile phone that was subscribed

21   to by Tamerlan Tsarnaev?

22   A.    Right.  I believe it was the first -- if I remember

23   correctly, it was the first call of the day, even.  But, yes,

24   it was definitely the first call between them.

25          MR. CHAKRAVARTY:  Can we call up 1172?

1    Q.    And this reflects those calls?

2    A.    Yes.  So as you can see, the first call of the day on the

3    15th is the 2:49 call you were asking about.

4    Q.    And is that a call of 19-second duration outgoing from

5    Jahar's phone to Tamerlan's phone?

6    A.    It is.

7    Q.    Now, Ms. Conrad asked you a number of questions about what

8    the call duration means.  The 19 seconds that appear here, what

9    can you definitively say that means in terms of the phone

02:53 10   contact of the 9151 phone?

11   A.    That's how long that phone utilized resources on the

12   T-Mobile network.

13   Q.    And did you also review Tamerlan's phone records around

14   that -- for that same call?

15   A.    Yes.

16   Q.    And did that, in fact, show that there was a call on the

17   same date and time for 17 seconds?

18   A.    Right.  I think it might be off by a second, but, yes,

19   it's relatively the same time.

02:53 20   Q.    And that seizure period, or the handshake period where the

21   phone is talking to the cell tower, can that be just a matter

22   of less than a second up to maybe several seconds?

23   A.    Right.  I think several people have experienced both ends

24   of that, where you dial the number, hit "send" and your call

25   starts connecting, or sometimes, like the defense mentioned,

1    you'd dial your number, hit "send," and it might take a little

2    while before your phone call actually gets connected.

3    Q.   Do you know whether this call was made before or after the

4    marathon bombing?

5    A.   I believe it was --

6            MS. CONRAD:  Objection.  Foundation, your Honor.

7            THE COURT:  Yes, sustained.

8    BY MR. CHAKRAVARTY:

9    Q.   How do you know when this call was made vis-à-vis the

02:54 10   marathon bombing?

11           MS. CONRAD:  Objection.

12           THE COURT:  Sustained.  It's also not proper redirect.

13   BY MR. CHAKRAVARTY:

14   Q.   So Ms. Conrad asked you about a call at 1451, which is the

15   very next call.  Do you remember that?

16   A.   Yes.

17   Q.   And she highlighted that there was a slight discrepancy

18   between Jahar's phone records and Tamerlan's phone records of

19   one second.  I think one was at 20:51:18 and one was at

02:55 20   20:51:19.  Do you remember that?

21   A.   Yes.

22   Q.   And can you explain the discrepancy?

23   A.   Well, once again, it's the person making the call, it's

24   just how long each call was using resources.  The person

25   dialing the phone, you know, logically, that call, when you're

1    dialing and hitting the green button, it's going to happen

2    sooner than the person receiving the call.

3            MR. CHAKRAVARTY:  Can we call up Exhibit 1440?  I

4    believe it's page 8.

5    Q.    Does this reflect that call?

6    A.    Yes.

7    Q.    And so this reflects that if there's a school over here,

8    that the 4634 number was in the vicinity -- or was in the

9    sector assigned to that school?

02:56 10           MS. CONRAD:  Objection, your Honor.

11            THE COURT:  Sustained.

12   BY MR. CHAKRAVARTY:

13   Q.    Ms. Conrad asked you some questions about phone

14   extraction.  Can you explain to the jury why data collected

15   from a handset or of a phone is different from the data

16   collected from the phone company that provides the tower log

17   records?

18   A.    Right.  So the phone company pulls that information from

19   the switch that -- like I mentioned earlier on direct, it's

02:56 20   pretty much the brains behind the operation; it's the one

21   controlling all the handoffs.  That's where the phone detail

22   records occur.  The phone extraction software, like I testified

23   to, I don't know where it's grabbing the information from, how

24   it's grabbing the information, or even from provider -- or from

25   manufacturer to manufacturer, an iPhone versus an S5, even a

```
        1   Samsung versus an HTC, I don't know how that phone software
        2   maintains those logs, but that's what the phone extraction, or
        3   the forensic tool, is relying on to obtain those records that
        4   were brought up by the defense.
        5   Q.   And does a cell phone capture all of the same data that is
        6   captured by the cell phone network?
        7   A.   No.  For a perfect example, the phone extraction is not
        8   going to be able to tell you what tower and sector was being
        9   utilized versus the switch knows what tower and sector was
02:57  10   being utilized.
       11   Q.   Now, on this graphic, does this show, then, that the call
       12   by Tamerlan was made in the sector -- this sector over here?
       13   A.   Yes.
       14            MR. CHAKRAVARTY:  Can we go to --
       15            THE WITNESS:  This is a little wider -- I mean, it
       16   goes out to this edge right here.
       17            MR. CHAKRAVARTY:  Can we go to the previous page?
       18   Q.   And the call at 1449 it shows in this sector?
       19   A.   The phone, yeah.
02:58  20   Q.   The phone?
       21   A.   Yes.
       22   Q.   Does that suggest movement in your business?
       23            MS. CONRAD:  Objection, your Honor.
       24            THE COURT:  Sustained.
       25   BY MR. CHAKRAVARTY:
```

```
 1    Q.   Ms. Conrad asked you some questions about connectivity, I

 2    mean, calls between these two cell phones, the 9151 T-Mobile

 3    phone, the prepaid T-Mobile phone, and Tamerlan's phone, 8634.

 4    Aside from the contact on April 15th and then again later in

 5    the week on the 18th, did -- was the principal phone that was

 6    subscribed to by Jahar Tsarnaev, the AT&T phone, the one that

 7    communicated with Tamerlan Tsarnaev?

 8              MS. CONRAD:  Objection.  Scope.

 9              THE COURT:  No, but I'm not sure the question is

10    clear.  Why don't you replay it.

11              MR. CHAKRAVARTY:  I'll ask another question.

12              Mr. Bruemmer, can you fast-forward about four slides?

13    One more, please.

14    BY MR. CHAKRAVARTY:

15    Q.   So this is the next day.  At this time it's not the 9151

16    phone that was being used -- the Jahar Tsarni phone that was

17    being used to communicate with Tamerlan Tsarnaev; it was the

18    AT&T phone?

19              MS. CONRAD:  Objection.

20              THE COURT:  Overruled.

21              You may answer it.  Go ahead.

22              MS. CONRAD:  It's the assumption in the question,

23    "being used to communicate with Tamerlan Tsarnaev."

24              THE COURT:  Right.  That's enough.

25              Go ahead.
```

1          THE WITNESS:  I don't remember how many calls there

2     were, if any, during this time period between 4634 and 5112.

3     And as I remember, the service had been disconnected on the

4     5112.  But kind of a side product, they don't eliminate

5     texting.  So the user could still use it for texting, and I

6     believe that's what was -- if my memory serves correctly, I

7     believe that's what was being used on the 5112 number at this

8     time period.

9     BY MR. CHAKRAVARTY:

03:00 10    Q.   And that 5112, if it hadn't paid for its service, could

11    also use the wireless signals, the Wi-Fi signals?

12    A.   Right.  It could connect via Wi-Fi or do the texting even

13    though it would have been shut off.

14    Q.   Does Apple have an iMessage communications means?

15          MS. CONRAD:  Objection, your Honor.

16          THE COURT:  Sustained.

17          MR. CHAKRAVARTY:  That is all I have, your Honor.

18          MS. CONRAD:  Your Honor, I neglected to ask that the

19    phone extraction for Tamerlan's phone be marked for

03:01 20    identification, so I would ask that that be marked as Exhibit 3

21    for identification, and then the AT&T records be marked for

22    identification as Exhibit 4.

23          THE COURT:  All right.

24          MS. CONRAD:  And I would actually ask that -- given

25    the redirect examination, I would ask that the AT&T records for

```
 1    April 15th, 16th, 17th and 18th, at least, be admitted at this
 2    time, or those -- excuse me -- that were reviewed.
 3    Mr. Chakravarty just asked a series of questions about what
 4    those records showed.
 5              MR. CHAKRAVARTY:  I would object to that, your Honor.
 6              THE COURT:  No.  You may have them all marked for
 7    identification.
 8              (Defense Exhibit Nos. 3 and 4 marked for
 9    identification.)
10            MS. CONRAD:  May I ask just a couple of questions on
11    redirect, please?
12              THE COURT:  Recross.
13              MS. CONRAD:  Recross.  Thank you.
14              THE COURT:  Only as to that matter.
15              MS. CONRAD:  Yes.  Absolutely.
16                         RECROSS-EXAMINATION
17    BY MS. CONRAD:
18    Q.   Sir, Mr. Chakravarty just asked you some questions about
19    being able to make calls wirelessly, correct?
20    A.   Yes.
21    Q.   Those wouldn't be reflected on cell tower data, would
22    they?
23    A.   No.  Well --
24    Q.   And --
25              MS. CONRAD:  May I just have a moment?
```

1    A.    -- they would be reflected in the data connection part,

2    but we didn't rely on any of those.

3    Q.    Right.  That's not what you were referring to in these

4    charts?

5    A.    Right.  Right.

6              MS. CONRAD:  May I just have one moment, please?

7              (Counsel confer off the record.)

8              MS. CONRAD:  Thank you very much, sir.

9              THE COURT:  All right.  Thank you, sir.  You may step

03:02 10   down.

11             THE WITNESS:  Thank you.

12             (The witness is excused.)

13             MR. MELLIN:  The government calls James Eppard.

14                     JAMES EPPARD, duly sworn

15             THE CLERK:  State your name, spell your last name for

16   the record, keep your voice up and speak into the mic so

17   everyone can hear you.

18             THE WITNESS:  James Eppard, E-P-P-A-R-D.

19                         DIRECT EXAMINATION

03:03 20   BY MR. CHAKRAVARTY:

21   Q.    Good afternoon.  Where do you work?

22   A.    I work at the FBI.

23   Q.    What job?

24   A.    I work in the office of public affairs.  I'm a web manager

25   in the FBI.gov and Internet Operations Unit.

1    Q.    What are your responsibilities there?

2    A.    Manage content on the website, upload material to the

3    website.  Pretty much everything having to do with maintaining

4    the FBI's websites.

5    Q.    Is that the FBI.gov website or are there other websites?

6    A.    There's the FBI.gov website and then each of the field

7    offices have websites, and there are some FBI-related websites,

8    but primarily the FBI's main website FBI.gov.

9    Q.    What kind of things do you put up on FBI.gov?

03:04 10    A.    Outreach material, fugitive publicity material if we're

11    trying to reach out to the public to enlist their help in

12    getting tips on ongoing cases.  We upload stories, we have

13    videos, wanted posters, seeking information posters.

14    Q.    And what did you do before you joined the FBI?

15    A.    I was a newspaper reporter for seven years, a community

16    paper in Washington, D.C., and after that, I worked at AOL as a

17    news editor for seven years.  I've been at the FBI for ten

18    years.

19    Q.    Now, were you working back on April 15, 2013?

03:05 20    A.    Yes.

21    Q.    And did you and your unit begin mobilizing after the

22    Boston Marathon bombing?

23    A.    Yes, after the explosions and the FBI's involvement in

24    Boston, we created a page that would include continuous updates

25    on the case.

1    Q.    And when you say "continuous updates," what do you mean?

2    What was being published publicly?

3    A.    Any press conferences, any press releases related to the

4    ongoing investigation were posted on this page.

5    Q.    And were there several of those statements during the week

6    of the marathon?

7    A.    Yes.

8    Q.    Now, fast-forward to the days after the marathon while the

9    investigation was continuing.  Were statements about the status

03:06 10    of the investigation and what help law enforcement was asking

11    for, was that published on FBI.gov?

12    A.    Yes, it was.

13    Q.    Was there a tip line also set up?

14    A.    Yes, a tip line was established, and it was put on that

15    page along with information for victims in the case and the

16    continuing updates in the case.

17    Q.    On that Thursday, April 18th, was there a press conference

18    that afternoon?

19    A.    Yes, there was a press conference.  It was held by the

03:07 20    FBI.  The special agent in charge called a press conference for

21    5 p.m. that day.

22    Q.    And were various other law enforcement agencies who were

23    participating in the investigation, were they also part of that

24    press conference?

25    A.    Yes.

```
 1    Q.   And where were you during this time?

 2    A.   I was at FBI headquarters.  I was working.

 3    Q.   And what were you preparing to do?

 4    A.   In the hours leading up to that press conference, we'd

 5    received images of the two suspects in the case as well as

 6    video -- surveillance video of the case, and we were preparing

 7    that for upload to the FBI website.  So we had multiple images

 8    and video uploaded to the site and prepared for release to

 9    coordinate with the press conference.

10    Q.   And what was the intended purpose of uploading that

11    information and coordination?

12    A.   This was going to be the first images of the primary

13    suspects in the case.  In the days leading up to that release

14    there was a lot of speculation in the media, and the intent of

15    the press conference was to focus everybody's attention on

16    these two suspects.

17    Q.   And was it also to exclude other individuals who had been

18    identified?

19    A.   Yes.  Yes.  The special agent in charge at the time stated

20    that during the press conference.

21    Q.   And were you watching the press conference during this

22    time?

23    A.   Yes, I was.

24    Q.   And during the press conference, did, in fact, you release

25    those videos and photos onto the FBI.gov website?
```

1    A.   Yes.  During the press conference -- there was actually a

2    moment during the press conference when the posters were

3    essentially turned around for the public to view.  At that

4    point we made everything live on our website so it would be

5    available for the public to view and for news media to access

6    and download.

7            MR. CHAKRAVARTY:  Can we, Mr. Bruemmer, if you

8    wouldn't mind calling up 1507.

9            These are not yet admitted, so just for the witness,

03:09 10   your Honor.

11   Q.   Is this one of the images that was released that day?

12   A.   Yes.

13           MR. CHAKRAVARTY:  And 1508.

14   Q.   And is this a close-up of the -- one of the poster boards

15   that was released that day?

16   A.   Yes; that's correct.

17           MR. CHAKRAVARTY:  And 1510, please.

18   Q.   And is this a wider view of the press conference depicting

19   two poster boards that depicted the suspects?

03:09 20   A.   Yes, it is.

21           MR. CHAKRAVARTY:  I'd move into evidence and ask to

22   publish 1507, 1510 and 1508.

23           THE COURT:  Any objections?

24           MR. BRUCK:  No.

25           THE COURT:  Those three exhibits are admitted and now

```
 1   publicized.
 2            MR. CHAKRAVARTY:  Thank you, your Honor.
 3            (Government Exhibit Nos. 1507, 1508 and 1510 received
 4   into evidence.)
 5   BY MR. CHAKRAVARTY:
 6   Q.   Now, Mr. Eppard, can you describe what's depicted in the
 7   image?
 8   A.   In the image, these two posters, one was of Suspect No. 1,
 9   one was of Suspect No. 2.  They contain video screen grabs made
10   from the surveillance video as well as some of the images that
11   were released on FBI.gov.
12   Q.   And what did the FBI ask for during the course of the
13   press conference?
14   A.   The special agent in charge at the time asked
15   for -- enlisted the public's help to submit tips, information
16   in the case that might support the investigation.
17            MR. CHAKRAVARTY:  Can we show Exhibit 1508, please.
18   Q.   And is this one of the subjects, the subject later
19   identified as Jahar Tsarnaev?
20   A.   Yes.
21            MR. CHAKRAVARTY:  And Exhibit 1507, please.
22   Q.   And is this a still shot of video that was released of
23   surveillance video that day?
24   A.   Yes.
25   Q.   So once these images were released, what did you do?
```

1    A.   Well, I watched the coverage.  Once everything was pushed

2    live on our site, we were watching the news coverage, and

3    almost simultaneously we saw the footage that we had released

4    and that was released at the press conference being played on

5    multiple networks.

6    Q.   So the news media carried it and you were -- did you check

7    various different outlets to see if they were carrying the same

8    images?

9    A.   Yes.  Yes.  In my observation, it was widely covered.

03:12 10    Q.   And did the news media, all the various outlets, also

11   cover the press conference?

12   A.   Yes.

13   Q.   Did you see it in all sorts of media:  print coverage, on

14   the Internet, as well as on TV and radio?

15   A.   Yes, I did.

16   Q.   In addition to seeing that it was widespread amongst the

17   media, does the FBI have a way of capturing analytics related

18   to how much traffic your website is getting?

19   A.   The video -- yes, the video was released on YouTube, on

03:13 20   the FBI's YouTube channel.  That video is also embedded within

21   our own pages, and the metrics on that showed that we -- the

22   page was viewed 12 million times within the first 24 hours of

23   its release.

24   Q.   And how does that compare to the typical viewing activity?

25   A.   That's more than we get in a month.  We get about 10

1    million in a month.

2    Q.    In addition to the surveillance video, were there other,

3    just, visits to the FBI.gov web page?

4    A.    Yes.  So when we released the video and the images, they

5    were placed on top of this running investigative updates page.

6    There was a photo montage on that page.  If you clicked on the

7    photo montage, that would take you to all of the photos that

8    had been released so far in the case.  In the first 24 hours,

9    that had been viewed more than 4 million times.  So we knew

03:14 10   that we were getting a lot of traffic to the site.  I mean,

11   traffic to the FBI site was unprecedented on that day.

12   Q.    Did that press conference occur a little after 5 p.m. on

13   Thursday, April 18th?

14   A.    Yes.

15   Q.    And over the next 24 hours, how would you describe the

16   media coverage of the release of those images?

17   A.    It was -- in my observation, it was quite broad.

18   Q.    And how about the traffic to the FBI.gov website?

19   A.    Again, unprecedented.

03:14 20   Q.    Were there more images released over the next 24 hours?

21   A.    There were additional images released around 2 a.m. on

22   April 19th, early in the morning, and then again around 8:20 on

23   the morning of April 19thth there was another image.  The

24   images at 2:00 were of both suspects, just clearer, sharper

25   images, and then at 8 a.m. -- 8:20 a.m. there was an image

1    released of Suspect No. 2 who at that time was identified as

2    Tsarnaev.

3    Q.   When you say "Tsarnaev," you mean Dzhokhar Tsarnaev?

4    A.   Yes; correct.

5    Q.   And was he still not located by law enforcement at that

6    time?

7    A.   Correct.  He was -- he was still being sought.  Additional

8    posters had been created seeking his capture -- seeking tips to

9    aid in his capture, information in the case.

03:15 10   Q.   And was that also put up on the FBI.gov website?

11   A.   That was also put up on the FBI.gov website as well.

12        MR. CHAKRAVARTY:  Just for the witness, your Honor,

13   Exhibit 1439.

14   Q.   Do you recognize this?

15   A.   Yes.

16   Q.   What is it?

17   A.   That is the digital version of the wanted poster seeking

18   Dzhokhar Tsarnaev that we posted on the website.

19   Q.   And this was out on the website at some time

03:16 20   between -- well, when did you know that this was on the

21   website?

22   A.   This would have been after -- after 8:20 in the morning of

23   April 19th when we had a new image.  The image in that poster

24   on the left was the image that we released at 8:20 a.m., so it

25   would have been after that time.

1          MR. CHAKRAVARTY:  I'd move into evidence Exhibit 1439.

2          MR. BRUCK:  May we approach?  We do have a matter

3     concerning this.

4          THE COURT:  All right.

5          (Discussion at sidebar and out of the hearing of the

6     jury:)

7          MR. BRUCK:  The poster states the person is considered

8     armed and extremely dangerous.  Before this goes to the jury,

9     we think that should be redacted.  The same is true -- and I

03:17 10    failed to notice -- that the press conference display, which is

11    already in, also states "armed and extremely dangerous."  It

12    suggests that there may have been additional information that's

13    not in evidence, and there will not be evidence.  That was from

14    law enforcement.  And, in fact, we know this is a standard

15    description issued in the case of this nature.

16         But in order to avoid speculation by the jury we would

17    ask that this not be published at this time and that the "armed

18    and dangerous" designation from both exhibits be redacted.

19         MR. CHAKRAVARTY:  We don't need to introduce this

03:18 20    exhibit but we do think the "armed and dangerous" on the

21    earlier exhibit is important.  It goes to what information was

22    disseminated that he may have seen that led him to take

23    subsequent actions.

24         THE COURT:  Okay.  So you're not offering this present

25    one?

```
 1              MR. CHAKRAVARTY:  No.

 2              THE COURT:  Okay.  And as to the other one, I think it

 3      is fair to have in evidence what was actually said.  Okay?

 4              (In open court:)

 5      BY MR. CHAKRAVARTY:

 6      Q.   Agent Eppard, is this a standard wanted poster that the

 7      FBI issues when it's looking for a fugitive?

 8      A.   Yes.

 9      Q.   And again, that was released only after the defendant was

03:18 10    identified at some point in the morning of Friday, April

11      18th -- excuse me, April 19th?

12      A.   Yes.

13      Q.   Now, in response to the FBI's publishing a -- I think a

14      phone number and the website for purposes of receiving tips,

15      did, in fact, the FBI receive tips?

16      A.   Yes.  In this case a tip line was established that would

17      accept images, video, text, any types of tips that the public

18      had to offer.  And we got an enormous number of tips through

19      that channel.

03:19 20    Q.   And did that continue for the next several days, if not

21      longer?

22      A.   Yes, it did.

23              MR. CHAKRAVARTY:  That's all I have, your Honor.

24                          CROSS-EXAMINATION

25      BY MR. BRUCK:
```

```
 1    Q.   Good afternoon, Mr. Eppard.  My name is David Bruck.  I'm
 2    one of Jahar Tsarnaev's attorneys.
 3    A.   Good afternoon.
 4    Q.   And I've just got very few questions for you, please.
 5              MR. BRUCK:  Mr. Bruemmer, can you pull up 1507?  Is
 6    that it?  Thank you.
 7    Q.   Mr. Eppard, that is, of course, one of the video
 8    surveillance photographs that you published on the website?
 9    A.   That is a screen grab from the video that was published on
10    the website.
11    Q.   A screen grab from a television broadcast?
12    A.   Yeah.  In this case, yes.
13    Q.   Okay.  But the way the light and shadow is shown is -- was
14    something that was done by you, by the FBI, or it was done by
15    the news organization?
16    A.   The shadowing wasn't done by the FBI.
17    Q.   Okay.  So this was something that apparently CBS News did
18    in order to highlight the suspect of interest.  Is that
19    correct?
20    A.   Possibly, yeah.  I can't speak to that, but, yeah, I could
21    only assume.
22    Q.   Okay.  And, in fact, this is a surveillance video that the
23    FBI had received earlier?
24    A.   Yes.
25    Q.   And it shows, does it not, outside of the -- let me ask
```

1    you this:  Were similar shots isolating the other individual of

2    interest also exhibited at the same time?

3    A.    In the video that we released?

4    Q.    Yes.

5    A.    Both Suspect No. 1 and Suspect No. 2 were seen.

6    Q.    Okay.  And at the press conference posters were exhibited

7    that showed -- and I think we've seen these, that showed an

8    individual in a black hat and an individual in a white hat,

9    correct?

03:22 10    A.    Correct.

11    Q.    And they were shown at the same time?

12    A.    Yes.

13    Q.    So that contrary to any impression that this picture would

14    suggest, there was not an emphasis on the individual with the

15    white hat?

16    A.    On the FBI -- on the video that we released, no.

17    Q.    Right.  And, in fact, the news organizations also, so far

18    as you're aware, focused on both suspects, not simply the

19    person in the white hat?

03:22 20    A.    At the time the video was released, yes.

21    Q.    Right.  Outside of the bright area containing the

22    individual in the white hat, do you see on this exhibit a

23    backpack in the lower left-hand corner, what appears to be a

24    backpack?

25    A.    In the lower left-hand corner?

1    Q.    Yes.

2    A.    I can't tell.

3    Q.    Well, you're familiar with the video surveillance

4    photographs, correct?

5    A.    Yes.

6    Q.    Are -- do you recall that that figure, or that bit of a

7    figure in the lower left-hand corner of this screen grab is, in

8    fact, the suspect with a black hat?

9    A.    Are we looking at the same image?  You're talking about --

03:23 10   if I was to see this video without the shading, you're asking

11    me what I would be seeing right now?

12    Q.    No, I'm asking you if you know what we're looking at in

13    Exhibit 1507.

14    A.    Yes.

15    Q.    So that is video surveillance that shows the individual in

16    the white hat walking behind the individual of interest in the

17    black hat?

18    A.    As I recall, yes.

19    Q.    And the black hat individual, of course, was subsequently

03:24 20   identified as Tamerlan Tsarnaev?

21    A.    Correct.

22          MR. BRUCK:  Thank you.

23          THE COURT:  All right, sir.  Thank you.  You may step

24    down.

25          (The witness is excused.)

```
 1          MS. PELLEGRINI:  Chief John DiFava.

 2          JOHN DiFAVA, duly sworn.

 3          THE CLERK:  State your name, spell your last name for

 4     the record, keep your voice up and speak into the mic.

 5          THE WITNESS:  Sure.  My name is John DiFava, first

 6     name common spelling, second -- last name D-i-F-A, V as in

 7     "Victor," A.

 8                          DIRECT EXAMINATION

 9     BY MS. PELLEGRINI:

10     Q.   Good afternoon, Chief DiFava.

11     A.   Good afternoon.

12     Q.   Will you tell the jury how you are currently employed?

13     A.   I'm employed by the Massachusetts Institute of Technology

14     as the chief of the MIT Police Department.

15     Q.   And how long have you held that position?

16     A.   I'm in my 14th year.

17     Q.   Prior to joining the MIT Police Department force, can you

18     tell the jury what your professional and educational background

19     is?

20     A.   Yes, ma'am.  I spent 28 years on the Massachusetts State

21     Police.  I held every rank on the department, and I retired in

22     2002 as a colonel and superintendent.  I have a bachelor's

23     degree in sociology from Long Island University and a master's

24     in education from Boston University.

25     Q.   And when you joined MIT, you joined as the chief?
```

```
 1    A.    That's correct.

 2    Q.    All right.  And can you tell the jury what your duties

 3    are?

 4    A.    My duties are administrative -- chief administrating

 5    officer of a department of 62 individuals -- those are 62 sworn

 6    officers -- and three civilian support staff.  I'm responsible

 7    for the policing and the security and the public safety of the

 8    campus.

 9    Q.    So, Chief DiFava, can you explain to the jury what is the

03:26 10    scope of the authority of the MIT Police Department?

11    A.    Yes, ma'am.  Under Massachusetts General Laws, Chapter

12    22C, Section 63, we are appointed as special State Police

13    officers under the authority of the colonel of the

14    Massachusetts State Police, and we have police jurisdiction in

15    areas owned, operated, leased or rented by the respective

16    university.

17    Q.    So does that include, for example, the ability to make an

18    arrest?

19    A.    That's correct.

03:27 20    Q.    Does it include the ability to execute search warrants?

21    A.    That's correct.

22    Q.    What else?  What have I missed?

23    A.    We have the exact same jurisdictional authority for the --

24    for example, the Cambridge police or the Boston police or the

25    State Police.
```

1    Q.   And what is the relationship between the MIT Police

2    Department and, say, the Cambridge Police Department?

3    A.   We have a superb working relationship with the City of

4    Cambridge; in fact, we train with them, we do our recurrent

5    in-service training with them, we send our officers to the

6    Cambridge Police Academy.

7    Q.   Do all of the officers go to the Cambridge Police Academy?

8    A.   Not all of them.  We have some officers that have been

9    trained by the State Police, by the Transit Authority, but my

03:28 10   practice has been for the last 13 years that any new officers

11   that require police training, we send them to the Cambridge

12   academy.

13   Q.   Now, you indicated that there are 62 officers?

14   A.   From myself down to the junior officer; that's correct.

15   Q.   And what are the different ranks that are held within that

16   department?

17   A.   We have a patrol officer; we have sergeant, captain,

18   deputy chief, chief; and then we have detectives as well.

19   Q.   With respect to the equipment, what type of equipment do

03:28 20   the officers receive from the department?

21   A.   All of our equipment is issued by the institute; the

22   officers purchase nothing on their own.  We have a traditional

23   French and electric blue color uniform, police uniform, summer

24   wear, winter wear.  We also carry issued firearms, baton and

25   pepper spray.

```
 1   Q.   And with respect to the vehicles?

 2   A.   The vehicles were the traditional Ford Victorias; now

 3   we're transitioning over to an SUV type of vehicle.

 4   Q.   And are they marked in any way?

 5   A.   They are marked.  They are black and white, clearly

 6   marked, with "Massachusetts Institute of Technology Police

 7   Department."

 8   Q.   So just generally for the jury, can you explain what the

 9   typical duties of an officer on your force would do?

03:29 10   A.   We divide up the campus into sectors.  We have three

11   shifts:  There's a three to eleven -- 3P to 11; 11P to 7 a.m.;

12   and then 7A to 3 p.m.  We'll have roll call; officers will be

13   assigned different sectors.  And they'll do the patrolling

14   either by motor vehicle, by bicycle, by motorcycle or foot

15   patrol.  We also -- if we have enough officers working, we will

16   utilize plainclothes as well.

17   Q.   Now, with respect to Officer Sean Collier, were you the

18   police chief when Officer Collier was hired?

19   A.   I was.

03:29 20   Q.   Are you familiar with the path that he took in order to

21   become a member of the MIT Police Department?

22   A.   I am.

23   Q.   What was that?

24   A.   Officer Collier was a civilian member of the Somerville

25   Police Department.  I believe he worked in records.  Sean was
```

1    what is known as a self-sponsored attendee to a police academy.

2    What that means is that Sean had the Somerville police sponsor

3    him to the Transit Authority Academy.  That's the academy that

4    Somerville utilized at that time.  He paid his own way through

5    the academy.  He had no guarantee of employment.  When he

6    graduated, it gave him a leg up for departments that were not

7    civil service.

8    Q.   And when did he join the MIT Police Department

9    specifically, if you recall?

03:30 10   A.   I believe it was around January of 2012.

11   Q.   All right.

12        MS. PELLEGRINI:  May I have Exhibit, first, 676, for

13   counsel and the witness only at this point.

14   Q.   Chief DiFava, on the monitor in front of you is an image.

15   And do you recognize the person in that image?

16   A.   I do.

17   Q.   And who is that?

18   A.   That is Officer Sean Collier.

19   Q.   And what is he wearing at this time?

03:31 20   A.   He's wearing the MIT patrol officer's uniform.

21        MS. PELLEGRINI:  May I also have Exhibit 678 for the

22   witness and counsel at this time.

23   Q.   And do you recognize who appears in the exhibit marked for

24   identification as 678?

25   A.   I do.

Q.   And who is that?

A.   And that's Officer Sean Collier in civilian attire.

        MS. PELLEGRINI:  Your Honor, the government would

offer 676 and 678 at this time, and may it be published to the

jury.

        MR. BRUCK:  No objection.

        THE COURT:  Okay.

        (Government Exhibit Nos. 676 and 678 received into

evidence.)

03:31   MS. PELLEGRINI:  Can we go back, please, Mr. Bruemmer,

to 676.

BY MS. PELLEGRINI:

Q.   Chief DiFava, when you described the uniform, you said a

particular color about the shirt.  Tell us about that.

A.   The uniform of the MIT Police Department is very similar

to that worn by the Massachusetts State Police in terms of

color.  It's a light blue shirt and dark blue trousers.

Q.   And is there also a hat when he's not in this particular

pose?

03:32   A.   There is.  It's a traditional police headgear, visor.  We

also allow them to wear baseball hats, under certain

circumstances, and they also have a winter hat which is a

trooper's hat with the earmuffs all around.

Q.   Do you actually -- do you recognize this particular photo,

what this is used for, the photo at 676?

1    A.    I believe that was his photograph taken when he enlisted

2    for his ID.

3              MS. PELLEGRINI:   May I have 678, please.

4    Q.    And for 678, you indicated that he's in civilian attire?

5    A.    That's correct.

6    Q.    And do you happen to know where this photo was taken, by

7    any chance?

8    A.    I believe that was taken in the City of Somerville.

9    Q.    Chief DiFava, I would like to ask you a couple of

03:32 10   questions about the weapon and the holster that is issued to

11   the members of your department.  I take it you are familiar

12   with those -- both of those?

13   A.    I am.

14   Q.    Is everyone issued the same type of weapon?

15   A.    Yes, they are.

16   Q.    And what type of weapon is that?

17   A.    The weapon is a Smith & Wesson military and police

18   semiautomatic pistol.  It's chambered for .45 ACP, .45

19   automatic Colt's pistol caliber.

03:33 20   Q.    And was Officer Collier issued one of these weapons?

21   A.    He was.

22   Q.    And with respect to how the weapon is carried by the

23   officer, is there a particular type of holster that is issued

24   to the officer of your department?

25   A.    They are.

```
 1    Q.   Are you familiar with that?

 2    A.   I am.

 3    Q.   Can you describe that for us?

 4    A.   Yes.  It's manufactured by a company called Safariland.

 5    They're a very large police supply organization.  The

 6    particular holster that Sean was issued, as well as all members

 7    of the department, is the Safariland medium-level Triple-Threat

 8    holster.

 9    Q.   All right.

03:33 10              MS. PELLEGRINI:  May I approach, your Honor?

11              THE COURT:  You may.

12    BY MS. PELLEGRINI:

13    Q.   Chief DiFava, I've put in front of you an envelope

14    containing what has been marked for identification as

15    Government's Exhibit 691.  Have you had occasion to look at

16    that item containing that bag before coming to court today?

17    A.   I did.

18    Q.   And what type of item is in there?

19    A.   Contained inside is a holster containing a safety pistol,

03:34 20    a training pistol, color blue.

21    Q.   And do you recognize this type of holster?

22    A.   It looks very much like the Safariland medium-level

23    triple-retention holster that we carry.

24    Q.   All right.  And I'd ask you to take it -- remove it from

25    the bag at this time.
```

1    A.    (Witness complies.)

2    Q.    Chief DiFava, with respect to the blue weapon that appears

3    in there, is that a real weapon?

4    A.    It is not.  It's a resin weapon.  There's nothing

5    operable.  This will not fire.

6    Q.    Thank you.  With respect to the holster, when you

7    described the tier section, can you, using that item, describe

8    what you're talking about to the jury?

9    A.    Certainly.  When we say it's a "triple retention," it

03:35 10   provides three levels of protection for the officer wearing

11   this particular piece of equipment.  Handgun retention is

12   extremely important in police work.

13        The first protection is from the front.  This device here

14   is called a "hood."  This will prevent someone from reaching in

15   front of you and being able to remove the weapon forward.  The

16   second is there is a switch at the side that you would push

17   down to put the hood in the forward position.  That's your

18   second protection.  And then your third is another device where

19   you would push that down with your thumb and you would be able

03:35 20   to remove this weapon.  My finger is not on the trigger even

21   though it's not real.

22        So it is triple -- again, triple retention, and it

23   provides a level of safety for the officer so the weapon cannot

24   be removed from the holster by someone other than himself or

25   herself.

1   Q.   And with respect to the ability to remove the weapon and

2   the holster, is the holster fitted to the particular officer?

3   A.   Well, it's only fitted in terms of right-handed or

4   left-handed, but it's a standard-issue piece of equipment.

5   Q.   So based upon your experience and training, if an officer

6   is wearing that holster and they're seated, how difficult is it

7   for someone to remove that weapon from that holster?

8   A.   It would be very difficult.

9   Q.   Why?

03:36 10  A.   Well, part of going to a holster like this is it goes hand

11  in glove with the training of the weapon.  We converted from a

12  Sig Sauer semiautomatic pistol and .40 caliber to the

13  Smith & Wesson, which required a holster change because it's

14  not all universal.  So most -- these decisions are at my end,

15  but I consult with the staff and with the equipment officer and

16  the training staff, and we decided that it was time to up the

17  level of protection for the officer by going to a more secure

18  retention holster, and this is the one we chose.

19  Q.   Thank you.  Chief DiFava, I would like to ask you now and

03:37 20  direct your attention to April the 18th of 2013.

21  A.   Yes, ma'am.

22  Q.   Did you serve on duty that day?

23  A.   I worked that day.  Yes, ma'am.

24  Q.   All right.  And did you see Officer Sean Collier that day?

25  A.   I did.

```
 1    Q.    When did you last see him?
 2    A.    I was leaving campus approximately 9:35 p.m.  I parked my
 3    vehicle in the Stata parking garage, in the bottom level.  I
 4    just have a force of habit of parking at the same place every
 5    day.  And as I was exiting the garage at the rear leading to
 6    Vassar Street, I observed a marked MIT police unit pulled over
 7    to the side.  As is always my habit when I see one of the
 8    officers, I always make it a point, whether I'm driving or
 9    walking, to go over and say hello.  This was no exception.
10          I pulled up to the vehicle, I rolled down the window on
11    the passenger side of my vehicle.  His window was already down.
12    And it was, in fact, Sean Collier.  I chatted with him for a
13    few minutes.  I told him to be safe and I left.
14    Q.    Now, you said he was in a marked vehicle?
15    A.    He was in a marked vehicle.
16    Q.    Was he in uniform?
17    A.    He was in uniform.
18    Q.    And if he is in a marked vehicle and in uniform, does he
19    also have his weapon with him?
20    A.    That's correct.
21    Q.    And how long did this conversation take place?
22    A.    Probably three or four minutes.
23    Q.    And then you left that area?
24    A.    Then I did, yes.
25    Q.    Did you ever see Sean Collier alive again after that?
```

1    A.    I did not.

2            MS. PELLEGRINI:  I have no further questions for Chief

3    DiFava.

4            MR. BRUCK:  Thank you, Chief DiFava.  We have no

5    questions for you.

6            THE COURT:  All right, Chief.  Thank you.  You may

7    step down.

8            (The witness is excused.)

9            THE COURT:  You'll collect the exhibit,

03:38 10   Ms. Pellegrini?

11           MS. PELLEGRINI:  Yes.

12           MR. MELLIN:  Your Honor, do you want a new witness or

13   lunch break?

14           THE COURT:  I think maybe we'll break at this point.

15   We're straddling the -- so we'll take the lunch recess a little

16   bit early.  We'll resume at two o'clock.

17           THE CLERK:  All rise for the Court and the jury.  The

18   Court will take the lunch recess.

19           (The Court and jury exit the courtroom and there is a

04:55 20   recess in the proceedings at 12:49 p.m.)

21           THE CLERK:  All rise for the Court.

22           (The Court enters the courtroom at 2:06 p.m.)

23           THE CLERK:  Be seated.

24           MR. WEINREB:  Your Honor, can we have a quick sidebar?

25           THE COURT:  All right.

1           (Discussion at sidebar and out of the hearing of the

2      jury:)

3           MR. WEINREB:  So the time in which we would be

4      offering the boat note into evidence is approaching so rapidly

5      that the ship may have sailed, to use a metaphor, on us to be

6      able to cut it out and use it.  And --

7           THE COURT:  Can we talk about that at the end of the

8      day?

9           MR. WEINREB:  Yeah.  Yes.  Sure.

04:57 10          THE COURT:  Okay.

11          MR. MELLIN:  Your Honor, can we --

12          MS. CLARKE:  There is something --

13          MR. MELLIN:  So here are the copies that I made for

14     the jury, which is a copy of Exhibit 727, 728 and 729.

15          THE COURT:  Okay.  Is this through the ME?

16          MR. MELLIN:  Correct.

17          MR. WATKINS:  Who we may get to by the end of the day.

18     We checked around.  It's easy enough to turn these two monitors

19     off.  Just turn the power off.  We can lay all these screens

04:58 20     flat.  This way we'd have the advantage of -- the ME is going

21     to be able to use the pointer that is on the screen to be able

22     to point things out to the jury rather than having to describe

23     it.

24          THE COURT:  Okay.  I was concerned about the

25     disruption of people running around trying to find buttons.

        1           THE CLERK:  Did you talk to Richard?

        2           MR. WATKINS:  We did talk to Richard.

        3           THE COURT:  You touched on the thing I didn't address

        4    or thought of before, and that is the screens.

        5           MR. WATKINS:  Right.  Right.

        6           THE COURT:  They have to go down because they're

        7    easily visible.

        8           MR. WATKINS:  And they lay all the way flat down so

        9    it's impossibile to see them.

04:58  10           THE COURT:  Okay.

       11           (In open court:)

       12           THE CLERK:  All rise for the jury.

       13           (The jury enters the courtroom at 2:09 p.m.)

       14           THE CLERK:  Be seated.

       15           THE COURT:  Mr. Mellin?

       16           MR. MELLIN:  Thank you, your Honor.  The government

       17    calls Officer David Saco.

       18                    DAVID SACCO, duly sworn

       19           THE CLERK:  State your name, spell your last name for

05:02  20    the record, keep your voice up and speak into the mic so

       21    everyone can hear you.

       22           THE WITNESS:  David Sacco, S-A-C-C-O.

       23                    DIRECT EXAMINATION

       24    BY MR. MELLIN:

       25    Q.   Good afternoon, sir.  I'm over here.

```
 1              How are you doing?

 2    A.   Good, sir.

 3    Q.   Sir, where are you employed?

 4    A.   MIT police.

 5    Q.   And what is your rank?

 6    A.   I'm a police officer, patrolman.

 7    Q.   Officer Sacco, what is your duty assignment generally?

 8    A.   Generally I patrol campus and surrounding buildings that

 9    are owned and operated by MIT.

10    Q.   Where did you grow up?

11    A.   I grew up in Medford, Massachusetts.

12    Q.   Where did you are go to high school?

13    A.   Medford High.

14    Q.   What did you do after high school?

15    A.   I went to some, like, college courses, but started at MIT

16    as a civilian working in the safety office.

17    Q.   Why were you working in the safety office at that time?

18    A.   At that time.  I have -- my mother works at the safety

19    office.  I was brought in to help clear up some computers and

20    set up some new computers.  And just my duties evolved and they

21    ended up hiring me.

22    Q.   At some point did you also become a special officer for

23    Medford?

24    A.   Yes.  In 1999 I self-sponsored myself to the North Reading

25    Police Academy, and I was hired as a special police officer in
```

1    Medford.

2    Q.   When you say you self-sponsored, what does that mean?

3    A.   "Self-sponsored" meaning that I applied and you get

4    yourself sponsored -- you know, the chief of police has to

5    sponsor, and you pay -- and you put yourself through the police

6    academy.

7    Q.   After going through that police academy, did you join the

8    Medford Police Department?

9    A.   As a special police officer, yes, I did.

05:04 10   Q.   How long were you there?

11   A.   Two years.

12   Q.   At some time did you move over to MIT?

13   A.   At the same time, around 1999 I was employed by the MIT

14   Police Department as a civilian clerical, payroll and other

15   functions, administrative.

16   Q.   At some point did you become a member of the MIT Police

17   Department?

18   A.   Yes.  In 2002 Chief DiFava came, he hired me at the rank

19   of patrolman.

05:04 20   Q.   And since 2002 have you been at the MIT Police Department?

21   A.   Yes, sir.

22   Q.   On a typical day how many officers are assigned to MIT?

23   A.   On a typical day two shifts are on, two groups.  It can be

24   anywhere from eight patrolmen to one dispatcher.

25   Q.   So typically one person at the desk and then seven or

1    eight people out on the street?

2    A.   Yes.

3    Q.   Let me take you back to 2013, April 15th of 2013.  Do you

4    remember what you were doing that day?

5    A.   I was on a day off, most of the day running errands with

6    my wife.  My son was on a class trip, April vacation, in New

7    York City.  So we spent the day getting things done.

8    Q.   At some point did you become aware of the explosions on

9    Boylston Street?

05:05 10   A.   Yes.  We were having dinner at a restaurant and then the

11   alert came up on the phone of what was going on.

12   Q.   Did you have to report to MIT at that point?

13   A.   No.

14   Q.   Do you remember what you did -- or when was the next day

15   that you reported for duty?

16   A.   The next day I reported for duty was the 18th.  I was on

17   days off.

18   Q.   So on April the 18th, what did you do?

19   A.   When I arrived, I was informed by my supervisor that I was

05:05 20   on the desk tonight, which is dispatching.

21   Q.   And what shift were you working that night?

22   A.   Three to eleven.

23   Q.   Approximately what time do you arrive for work if you're

24   on the three-to-eleven shift?

25   A.   Your shift starts at 3:15, you arrive at 2:30.

1    Q.    At some point is there a meeting with the shift before the

2    shift is actually deployed?

3    A.    Yes.  The 3:15 roll call is presented -- the dispatcher

4    reports to the desk.

5    Q.    And at the roll call, was there any discussion about what

6    had been going on in and around Boylston Street since April

7    15th?

8    A.    Since I was at the desk, I didn't attend the roll call.

9    Q.    What did you think about being at the desk that day?

05:06 10    A.    I anticipated phone calls from the public, questions.

11    Q.    At some point did you see a press conference that was on

12    television?

13    A.    Yes.  In our dispatch area we do have a TV on.  And the

14    news was on, I would say five o'clock.  I did view it, as the

15    public did, the press conference of the FBI that showed what

16    they presented.

17    Q.    What do you remember them presenting at that point in

18    time?

19    A.    I remember them presenting a billboard with various

05:07 20    pictures of persons of interest, and I was just watching and --

21    Q.    At that point did you recognize either of the two people

22    or the two suspects?

23    A.    No, sir.

24    Q.    Now, when you're at dispatch, what exactly are you doing?

25    A.    At dispatch you're servicing calls for service, monitoring

1    alarm systems, monitoring nearby -- other agencies.

2    Q.    Are you monitoring 9-1-1 calls?

3    A.    Yes, sir.

4    Q.    And so if a 9-1-1 call comes in, what do you do?

5    A.    If a 9-1-1 call comes in, I ascertain what the situation

6    is and promptly dispatch the units that need to respond.

7    Q.    Do you know an officer by the name of Sean Collier?

8    A.    Yes, sir.

9    Q.    How did you know Sean?

05:08 10    A.    I knew Sean -- Sean worked the same shift, three to

11   eleven.  I worked with him for a year when he was hired.  Also,

12   you know, from working in a group, I got to know him really

13   well.

14   Q.    Was he working on April the 18th?

15   A.    Yes.

16   Q.    Do you know what he was doing that night?

17   A.    I believe his assignment was Sector 1-2 and he was

18   assigned Cruiser 285.

19   Q.    What is Sector 1-2?

05:08 20    A.    Sector 1-2 encompasses -- each sector is a group of

21   buildings geographically from the east to the west campus.

22   Sector 1-2 is combined from the east -- two sections of the

23   east campus that are a walking route.

24   Q.    Had you been in communications with Officer Collier that

25   night?

1    A.    Via the radio, yes, and personally through texts.

2    Q.    Anything come up over the texts or email or anything like

3    that?

4    A.    We were texting back and forth.  There was a motor vehicle

5    that we towed and there was confusion who towed it.  And I was

6    just calling and asking him about -- the person wasn't too

7    happy about her car being towed.

8    Q.    She was not happy about it?

9    A.    No.

05:09 10    Q.    At about 10:20 that night did you get a call about loud

11    sounds outside?

12    A.    Yes, sir, I did.

13    Q.    Tell us what you remember about that.

14    A.    I remember I received a call and the reporting party

15    stated to me that he heard what he believed to be, but he

16    wasn't sure, gunshots.  But he believed it to be more like loud

17    banging, like somebody banging on the drum.  And I asked him, I

18    said, "Banging on a drum?"  And he said, "Yeah, it sounds -- it

19    startled us.  We immediately hit the floor."  I could hear

05:09 20    people in the background from him calling.  And when they came

21    up they said, "We look out the window but we see one of your

22    police cars out there."  So I said, "Okay.  We'll respond."

23    Q.    Before coming here today, have you and I had a chance to

24    listen to that call?  Or have you had a chance to listen to

25    that call?  Let me rephrase that.

```
 1   A.   About a month -- maybe over a month ago.

 2   Q.   And was that a fair and accurate recording of that call?

 3   A.   Yes.

 4        MR. MELLIN:  Your Honor, I would move in Exhibit 679,

 5   which is the 9-1-1 call, and ask to play it.

 6        MR. WATKINS:  No objection.

 7        THE COURT:  Okay.

 8        (Government Exhibit No. 679 received into evidence.)

 9        (Audio recording played.)

05:11 10  BY MR. MELLIN:

11   Q.   Is that the 9-1-1 call that you received?

12   A.   Yes, sir.

13   Q.   Okay.  During that discussion there's some mention of the

14   Koch Institute?

15   A.   Yes.

16   Q.   Do you remember that?

17        After having been at MIT for at least 11 years up to that

18   point, if not more, working as a safety officer, did you know

19   where the Koch Institute was located?

05:12 20  A.   Yes, it's a fairly new building within the last five

21   years.  But, yes, I know exactly where that is.

22   Q.   So based on that call, what did you do?

23   A.   Based on that call -- that's why I asked whether it was

24   the Stata or Main Street side -- I dispatched Sector 1-2

25   because that's the geographical section that he would cover.
```

         1    And assuming that maybe he was the one that was in the area, so

         2    I dispatched -- called over the radio for Sector 1-2 to respond

         3    to suspicious noises or loud noises within that area.

         4    Q.   And when you say "Sector 1-2," who was that?

         5    A.   Officer Collier.

         6    Q.   Did you hear back from Officer Collier after you put out

         7    the dispatch?

         8    A.   No, I did not.

         9    Q.   What did you do after that?

05:12   10    A.   After that I tried again.  We didn't get any response.

        11    Other units on the air -- I personally tried calling his cell

        12    phone because we were texting -- you know, probably my last

        13    text with him was a half an hour before that.  I texted him,

        14    you know, trying to return a radio, it was not uncommon, or

        15    didn't get back.  I assume other people were calling him at the

        16    same time.  It became an amount of time that wasn't

        17    comfortable.  Sergeant Henniger stated that he saw him last.

        18    He drove by on Main Street and saw him sitting there and he

        19    would go back.  And he went back to see.

05:13   20    Q.   When Sergeant Henniger went back, did you receive a radio

        21    transmission about Officer Collier?

        22    A.   When Sergeant Henniger went back, he -- his radio

        23    transmission was very -- he says, you know, "Get me help here.

        24    Officer down.  Get me help here."

        25    Q.   Have you heard that radio transmission and is it a fair

1    and accurate -- what you heard a fair and accurate copy of that

2    transmission?

3    A.   Yes, sir.

4         MR. MELLIN:  Your Honor, I'd move into evidence

5    Exhibit 686.

6         MR. WATKINS:  No objection.

7         THE COURT:  Okay.

8         (Government Exhibit No. 686 received into evidence.)

9         MR. MELLIN:  And if I may play 686.

05:14 10        (Audio recording played.)

11   BY MR. MELLIN:

12   Q.   Officer Sacco, as you listen to that transmission, the

13   first part of that, is that when you asked either having Sector

14   1-2 to respond or have other people check it out?

15   A.   Yes.

16   Q.   And the last voice you hear in that radio transmission,

17   who is that that responded talking about officer down?

18   A.   Sergeant Henniger.

19   Q.   When you heard that transmission, what did you do?

05:16 20   A.   I heard that transmission, I -- it startled me.  I

21   knew -- it kind of threw me off a little bit, but my first

22   phone call was to Pro Ambulance to let them know the location,

23   get the ambulance going, and started to notify other agencies.

24   We had a supervisor in the house that started helping to

25   notify.

1   Q.   Do you know where Pro Ambulance is located?

2   A.   They're in Cambridge.

3   Q.   Do you know about how long it took them to respond?

4   A.   No, I don't.

5   Q.   Given that you were in the dispatch, what did you do at

6   that point?

7   A.   At that point I was getting inundated with phone calls, a

8   lot of phone calls.  I was receiving a lot of phone calls for

9   assistance and I wasn't denying anybody.  A lot of phone calls.

05:17 10   The chief had called.  I briefed him on the situation, what had

11   happened.  He gave me the directions of what he would like to

12   do.  At that point in the time frame some of the midnight shift

13   was coming in for their shift.  I let them know what happened

14   and they started assisting me with phone calls.

15   Q.   At some point did you consider the location and where you

16   thought security cameras might be?

17   A.   In knowing the area, I didn't know exactly where the

18   cameras would be, but I assumed definitely there would be

19   cameras in that area.

05:17 20   Q.   So did you do something along those lines?

21   A.   The overnight, 12 to 7 a.m. dispatcher came in and he took

22   over the desk.  And I was in the main foyer area of the

23   station.  I observed Matt Isgur come in, and I'm assuming

24   somebody higher ranking called him in because he controls the

25   cameras.  And he had his laptop.  And I asked him, I said,

1    "Matt, what do we have for cameras?" and I gave him the

2    location.  He said, "There's one on 54."  So we sat there in

3    the lobby, he pulled the laptop out, and I gave him the time

4    frame and he was able to put the time frame in, and we observed

5    the motion of that around the time.

6    Q.    What were you able to see?

7    A.    We see on the Stata side, and then this is the Main Street

8    side -- I'm sorry.  The left side to right side -- two persons

9    walk from the Main Street side, walking along the Koch

05:18 10    Institute, they walk to the back of the cruiser.  They're there

11    for some time.  And then the two figures walk back -- follow

12    the same route and go back to Main Street.

13    Q.    If I could have you look at Exhibit 680.

14            MR. MELLIN:  Just the witness for now.

15            THE COURT:  We're getting an artifact on this.  Is it

16    the computer or is it the system?

17            MR. BRUEMMER:  It's the system, your Honor.

18            THE COURT:  I thought it was the computer.  Sorry.  I

19    would have done it earlier.

05:19 20    BY MR. MELLIN:

21    Q.    Officer Sacco, do you see Exhibit 680 in front of you up

22    on the screen?

23    A.    Yes, I do.

24    Q.    Do you recognize that photo?

25    A.    Yes, that is North Court.  To the right of the photo is

1   the Koch Biology Building, the front building is the Koch

2   Institute, to the left of that is the Stata Center.

3   Q.   Is that a fair and accurate photograph of how that looked

4   back in April of 2013?

5   A.   Yes, sir.

6        MR. MELLIN:  Your Honor, at this time we would move in

7   Exhibit 680.

8        MR. WATKINS:  No objection.

9        THE COURT:  Okay.

05:20 10        (Government Exhibit No. 680 received into evidence.)

11   BY MR. MELLIN:

12   Q.   Officer Sacco, the screen in front of you is interactive.

13   If you touch it, you'll be able to move around.  If you could

14   just indicate for the ladies and gentlemen, you said that two

15   individuals walked across and they walk up to the car, the

16   cruiser.  Is that right?

17   A.   Yes.

18   Q.   Can you just indicate on this diagram the path that they

19   walked?

05:20 20   A.   The Main Street side is here, the path followed along the

21   building to here, which Officer Collier's cruiser was parked

22   here, and they were there for a duration of time (indicating).

23   Q.   And just for the record, what you just drew is -- you

24   started with an arrow on the right, between the two buildings

25   on the right, and the path goes in front of the building that's

1  in the top middle of the photograph.  Is that right?

2  A.   Yes.

3  Q.   And then you put an X where Officer Collier's cruiser was,

4  and that's on the path that's on the left of the building

5  that's in the middle of the photograph?

6  A.   Yes.  That's when -- when I viewed the video, that's where

7  I spot where his cruiser is.  That's the only vehicle that's

8  there.

9  Q.   And as you look at this photograph, is this photograph

05:21 10  essentially the same view that the security or the surveillance

11  camera had of that scene?

12  A.   Yes.

13  Q.   Where is this location as you look at it?

14  A.   This is the top of Building 54, which is our atmospheric

15  science building.  It's about 22 to 24 stories high.

16  Q.   Let me just clear this.  If you could, just for the ladies

17  and gentlemen of the jury, where is the Koch Institute?

18  A.   The Koch Institute?

19  Q.   Yes.

05:21 20  A.   Right here.

21  Q.   Okay.  And so that's the large building in the middle top

22  of this photograph?

23  A.   Yes.

24  Q.   Okay.  And then what is the building to the left on the

25  edge?

1    A.   This one here?

2    Q.   Yes.

3    A.   This is the Stata Center, it's called.  And that would be

4    the Gates side.  It's divided into two sides, Dreyfoos, Gates.

5    That's the Gates side.

6    Q.   For the record, you indicated the building on the left in

7    the photograph, correct?

8    A.   Yes.

9    Q.   If I could have you also --

05:22 10        MR. MELLIN:  And just the witness.

11   Q.   -- look at Exhibit 681.  Do you recognize Exhibit 681?

12   A.   Yes.

13   Q.   What is that?

14   A.   That is now the zoomed-in version of the Koch Institute

15   and Stata Center still in view but more towards Vassar Street.

16   There's a visual in there.

17   Q.   And is that a fair and accurate photograph of how that

18   appeared back in April of 2013?

19   A.   Yes, sir, it is.

05:22 20        MR. MELLIN:  Your Honor, we would move in Exhibit 682.

21        THE COURT:  I think you said '1.

22        MR. WATKINS:  No objection.

23        MR. MELLIN:  Or 681.  I apologize.  681.

24        MR. WATKINS:  Still no objection.

25        MR. MELLIN:  And ask to publish it.

```
 1              THE COURT:  Okay.

 2              (Government Exhibit No. 681 received into evidence.)

 3    BY MR. MELLIN:

 4    Q.   As you look at Exhibit 681, Officer Sacco, can you again

 5    indicate where Officer Collier's car was in this photograph?

 6    A.   Yes, sir.

 7    Q.   And again for the record, on 681 you're indicating it's on

 8    the sidewalk to the left of the Koch Institute?

 9    A.   Yes, sir.

05:23 10    Q.   Thank you.  Now if I could have you look at Exhibit 682.

11    Do you recognize Exhibit 682?

12    A.   Yes.  That's an overview of the North Court area, and

13    there is a view of the McDermott Court area as well.

14    Q.   All right.  And is that a fair and accurate diagram of

15    that area?

16    A.   Yes, sir.

17    Q.   All right.

18              MR. MELLIN:  Your Honor, I would move in Exhibit 682.

19    I think counsel has already waived his objection to it.

05:24 20              THE COURT:  Okay.

21              (Government Exhibit No. 682 received into evidence.)

22              MR. MELLIN:  If I may publish it, your Honor.

23    BY MR. MELLIN:

24    Q.   Officer Sacco, as you look at this, what do you see in

25    this diagram?
```

1    A.   The top red building is the Koch Institute.

2    Q.   If you could just do me a favor and just touch the

3    building.

4    A.   Yes.  Koch Institute, Koch Biology Building, Stata Center,

5    alumni pool.  And this area here is what we consider North

6    Court.

7    Q.   And the security camera that we're talking about, does the

8    building that it's on top of appear in this diagram?

9    A.   The security camera will be on this building here.

05:24 10    Q.   And for the record, you just picked -- what building is

11    that?

12    A.   54.

13    Q.   Building 54.  And that's the building at the bottom of

14    this diagram in the middle?

15    A.   Yes.

16    Q.   And then finally, if I could have you look at Exhibit 685.

17    Do you recognize Exhibit 685?

18    A.   Yes.  That's a more -- closer view, and the Koch Institute

19    would be here and Vassar Street would run along here.  So the

05:25 20    tip of Stata and where Officer Collier's cruiser was parked.

21    Q.   Is that a fair and accurate close-up diagram of that area?

22    A.   Yes, sir.

23         MR. MELLIN:  Your Honor, I would move in Exhibit 685

24    and ask to publish it.

25         MR. WATKINS:  No objection.

```
 1              THE COURT:  Okay.

 2              (Government Exhibit No. 685 received into evidence.)

 3    BY MR. MELLIN:

 4    Q.   And, Officer Sacco, you just touched a couple of the

 5    buildings.  If you could, for the ladies and gentlemen, look at

 6    this diagram.  Where was the Koch Institute again?

 7    A.   The Koch Institute is here, sir.

 8    Q.   All right.  And that's on the right in this diagram?

 9    A.   Yes.

05:26 10    Q.   And then where is the Gates entrance?

11    A.   The Gates entrance of Stata is on the left, sir.

12    Q.   Thank you.  And then finally, there is a police cruiser in

13    this diagram.  Is that right?

14    A.   Yes.

15    Q.   And is that where Officer Collier's car was?

16    A.   Yes.

17    Q.   Thank you.  After you saw the video that we talked about,

18    what did you do?

19    A.   After spending the time with Matt Isgur, we viewed the

05:26 20    video.  I told him, "I need to bring you down to the scene to

21    let the command post see the video."  We took my personal

22    vehicle down Vassar Street.  I parked as close as I could and I

23    walked him to the command post.

24    Q.   Where was the command post set up?

25    A.   Command post is in that diagram.  The tip of Stata, there
```

1    was a large cafeteria area there, and the state police and

2    other agencies set up their command post in there.

3    Q.   At some point did you learn that Officer Collier died?

4    A.   I learned that before I'd left the station.

5    Q.   And approximately what time did you leave the station that

6    night?

7    A.   At this point I want to say it is 11:15, closer to 11:30.

8            MR. MELLIN:  Thank you.  Thank you, your Honor.

9            MR. WATKINS:  Nothing, your Honor.  Thank you.

05:27 10         THE COURT:  No exams?  All right, Officer.  Thank you.

11   You may step down.

12           (The witness is excused.)

13           MR. WEINREB:  The United States calls Sergeant

14   Clarence Henniger.

15               CLARENCE HENNIGER, duly sworn

16           THE CLERK:  State your name, spell your last name for

17   the record, and keep your voice up.

18           THE WITNESS:  Clarence Henniger, H-E-N-N-I-G-E-R.

19                   DIRECT EXAMINATION

05:29 20   BY MR. WEINREB:

21   Q.   Sergeant Henniger, good afternoon.

22   A.   Good afternoon.

23   Q.   Where do you work?

24   A.   MIT police.

25   Q.   For how long?

```
 1   A.    Forty years.

 2   Q.    What positions have you held there over the 40 years?

 3   A.    I'm presently a sergeant.

 4   Q.    And before that?

 5   A.    I was a patrolman.

 6   Q.    Did you have any training in connection with your work

 7   there?

 8   A.    Yes, I did.

 9   Q.    Would you just tell us briefly about it.

05:29 10   A.    I completed a full police academy with the Quincy Police

11   Academy in 1974.

12   Q.    Since then have you had on-the-job training?

13   A.    Yes, I have.

14   Q.    How long have you been a sergeant?

15   A.    Fourteen years.

16   Q.    What are your job responsibilities as an MIT police

17   sergeant?

18   A.    I'm a patrol supervisor.

19   Q.    Can you tell us what that means?

05:29 20   A.    I'm usually on patrol making sure that my officers are

21   responding to calls; if needing a supervisor to be on the

22   scene, I respond to that; make sure that the paperwork is all

23   done, completed and submitted.

24   Q.    Okay.  And as a very experienced officer and as a

25   sergeant, do you work with the younger officers?
```

```
 1   A.   Yes, I do.

 2   Q.   Do you help train them and mentor them?

 3   A.   I have.

 4   Q.   Did you work with Officer Sean Collier?

 5   A.   Yes, I did.

 6   Q.   What was your relationship with him?

 7   A.   He was on my squad on the three-to-eleven shift.

 8   Q.   Did you help train him and mentor him?

 9   A.   Yes, I did.

10   Q.   Were you working on the night of April 18th, 2013?

11   A.   Yes, I was.

12   Q.   What was your assignment?

13   A.   Patrolling, supervising the campus.

14   Q.   Is one of the people you were supervising that evening

15   Sergeant Collier -- I'm sorry -- Officer Collier?

16   A.   Yes.

17   Q.   Do you remember the events of that night?

18   A.   Yes, I do.

19   Q.   Do you know where Officer Collier was at around 10:20

20   p.m.?

21   A.   Yes, I do.

22   Q.   Where was he?

23   A.   He was parked in the plaza next to the Koch building on

24   the MIT campus.

25   Q.   On the Stata side or the Main Street side?
```

1    A.    Actually, both.  He was facing the Main Street next to

2    the -- between the Stata and the Koch building.

3    Q.    How do you know where he was?

4    A.    Approximately about 10:20 that evening I was returning

5    back to the station.  I was coming down from Main Street, took

6    a right on Vassar, and I observed Officer Collier's cruiser

7    parked there next to the Koch building.

8    Q.    Did anything seem unusual about him or the cruiser at the

9    time?

05:31 10   A.    None at all.

11          MR. WEINREB:  Can I have Exhibit 680, please.

12    Q.    If you look at the screen in front of you, you'll see an

13    exhibit.  It's been marked as Exhibit 680.  Do you recognize

14    what's pictured there?

15    A.    That's the area that we call the North Court.

16    Q.    Do you see the Koch Institute in that picture?

17    A.    Yes, I do.

18    Q.    So that's a touch-sensitive screen.  If you use the pad of

19    your finger and press on it, you'll create an arrow.  And then

05:32 20   if you move your finger around, you can draw.  If you could

21    just show us -- here, I'm going to clear the screen.  Can you

22    show us which is the Koch Institute?

23    A.    The building directly in front of me.

24    Q.    Okay.  Towards the top of that photo?

25    A.    Yes.

1    Q.   And where was -- where did you see Sean when you drove by

2    him that night?

3    A.   It's not too clear here but it's right here, Main Street.

4    I took a right on to Vassar, and his vehicle was parked right

5    here.

6    Q.   Okay.

7              MR. WEINREB:  Can I have 683, please?

8              Actually, before we go, just let the record reflect

9    that the witness drew a path in the upper left-hand corner of

05:33 10   the screen going clockwise, starting at twelve o'clock and

11   going in a clockwise direction, and then indicated that the

12   cruiser was parked just to the left of the building on the top

13   of the frame.

14             THE COURT:  We can capture the image for you with the

15   markings, if you'd like.

16             MR. WEINREB:  I'll ask for that later, your Honor, but

17   not with respect to this one.  Thank you.

18             Exhibit 681, please.

19   BY MR. WEINREB:

05:33 20   Q.   What are we seeing here?

21   A.   That's a closer view of the picture there.  So --

22   Q.   So just in case that wasn't audible, so that's a close-up

23   view of what we were just looking at?

24   A.   Correct.

25   Q.   Okay.  And you just drew a yellow line to the left of the

1    building that figures prominently in the frame.  Is that where

2    Officer Collier's car was?

3    A.    Yes, it was.

4    Q.    After you saw him there and you drove by, where did you

5    go?

6    A.    I returned back to the station.

7    Q.    About how far away is that?

8    A.    Patrol drive, about four to five minutes.

9    Q.    Four or five minutes, did you say?

05:34 10   A.    Four to five minutes.

11    Q.    Okay.  Did you reach the station about four or five

12    minutes later?

13    A.    Yes.

14    Q.    And what happened when you got there?

15    A.    At that time Dispatcher Sacco was attempting to reach

16    Officer Collier's car.  After the third time of not succeeding,

17    I asked him the nature of the call.  He responded that he had

18    received a call about loud noise, drums -- some type of loud

19    noise/drums coming from that direction where he was at, from

05:34 20   the Stata area.

21    Q.    Where Sean Collier was at?

22    A.    Correct.

23    Q.    So what did you do?

24    A.    I asked him to use the emergency alert button.  At that

25    time I said I had just seen him, I will return, thinking that

1    he was possibly already responding to the call in that area.

2    Q.   What happened next?

3    A.   I was en route to his location.  I tried calling him

4    twice, and the phone went automatically to voicemail.

5    Q.   Now, in your experience is it unusual for an officer not

6    to respond to a radio call, and then an emergency tone, and

7    then cell phone calls?

8    A.   Not to that extreme.  Usually we're pretty responsive with

9    the alert tone unless you're in a bad location.  There are

05:35 10   areas of MIT, because of the construction area, that at times

11   communication is a bit broken up.

12   Q.   At that time did it occur to you that something had

13   happened to Officer Collier?

14   A.   None at all.

15   Q.   What happened next?

16   A.   When I arrived at the scene, Officers Collier's cruiser

17   was still at the same spot I had seen it earlier, lights on,

18   vehicle running, the only exception was that the door, the

19   driver's side door, was open.

05:36 20   Q.   Was his window open or closed, do you recall?

21   A.   I recall later on that it was down, yes.

22   Q.   When you saw that, what did you do?

23   A.   I parked about eight to ten meters from him, walked over

24   to the cruiser.  And when I arrived at the cruiser I looked

25   inside and that's when I discovered Officer Collier had been

```
 1    shot.
 2    Q.    What exactly did you see?
 3    A.    I observed a wound to the head, to the temple; I observed
 4    a wound to the neck; I observed a wound to his right hand.
 5    Q.    Was he still sitting in his seat?
 6    A.    At that point he was beginning to lean more towards the
 7    right side.
 8    Q.    Was there blood?
 9    A.    Yes, sir.
05:36 10   Q.    Where?
11    A.    All over the car, his body.
12    Q.    Was he breathing?
13    A.    At that time once I observed that he had been shot, I
14    immediately backed away and I did a security check to make sure
15    the area was safe.  And while I was performing that I got on
16    the radio and requested help.  I requested officers respond as
17    well as medical.
18    Q.    Were you able to see whether he seemed to be breathing or
19    not when you first came to the car?
05:37 20   A.    Not till the second time.
21    Q.    What did you see then?
22    A.    The second time I went and I took his pulse, and there was
23    a slight pulse still beating from his carotid pulse, and I
24    could hear a gurgling sound coming from his mouth.
25    Q.    Tell us exactly what you did when you found Officer
```

1    Collier shot.  You said that you -- you did a security check.

2    Why did you do that?

3    A.    I had no idea whether the area was still hot, whether

4    there might have been a suspect still, might have been an

5    ambush.  So I had to take precaution for that.

6    Q.    And what did you do?

7    A.    I then, after I checked him -- Officer West was the first

8    responding officer who came to the scene.  At that point --

9    Q.    Before we get there, you said that you radioed for

05:38 10    assistance?

11    A.    Correct.

12    Q.    I'd like to -- did you review -- not -- a while ago with

13    me the radio traffic, or a bit of it, from that evening?

14    A.    Yes, I did.

15    Q.    Was that a fair recording of what the radio traffic

16    sounded like after you got to the scene?

17    A.    Yes, it was.

18          MR. WEINREB:  That's Exhibit 687, your Honor, and I

19    would offer it into evidence at this time.

05:38 20          MR. WATKINS:  No objection.

21          THE COURT:  Okay.

22          (Government Exhibit No. 687 received into evidence.)

23          MR. WEINREB:  Can we play Exhibit 687, please?

24          (Audio recording played.)

25    BY MR. WEINREB:

```
 1    Q.   What did you just say there?

 2    A.   Yes, I did.

 3    Q.   What were the words that you said?

 4    A.   I said, "Officer down.  Officer down."

 5         (Audio recording played.)

 6    Q.   Is that you yelling there, "Get on it"?

 7    A.   Uh-huh.

 8    Q.   What were you trying to get happen?

 9    A.   I just wanted to have medical and police assistance.

05:39 10       (Audio recording played.)

11    Q.   What did you just ask for there?

12    A.   Can you repeat that again, please?

13    Q.   Sure.

14         (Audio recording played.)

15    A.   Oh, I requested for ALS as well.

16    Q.   What's that?

17    A.   That's the advanced medical service.

18    Q.   So you're calling for an ambulance?

19    A.   Yes.

05:40 20       (Audio recording played.)

21    Q.   So that response, "We've got an incoming," and you

22    responded, "Roger," what did you understand that to mean?

23    A.   That meant he was going to send me additional help.

24    Q.   I interrupted you before but you were saying that Officer

25    West was the first to respond?
```

1    A.    Yes, he was.

2    Q.    How long did it take him to arrive?

3    A.    I would say probably within -- he was also responding in

4    the search for Sean Collier.  He knew the location he was last

5    seen, so he was also responding prior to my arrival.  So I

6    would say he was there within 45 seconds.

7    Q.    What happened when he arrived?

8    A.    He came and he approached me and I led him to where Sean

9    was.  We got there, he looked, he froze for a second or two.

05:41 10   And I told him, "Let's get him out."  Joe went up for the

11   shoulder, I went for his legs.  We were able to extract him out

12   of the vehicle, put him on the ground, and began to give him

13   medical treatment.

14   Q.    Was there some difficulty getting him out of the car?

15   A.    Yes.  His right foot apparently was caught between the

16   brake and the gas pedal.  And because of the amount of blood

17   that was over his body, it was very difficult to get a grip of

18   him to remove him.

19   Q.    Did Officer West ask Officer Collier anything?

05:41 20   A.    Once we had him on the ground and we began to perform CPR

21   and medical treatment, he was asking him to hang in there.

22   "Just hang in there.  You'll be okay."

23   Q.    Did he ask him "Who did this to you"?

24   A.    He asked him once.  There was no response from Sean.  I

25   believe Sean at that time may have been unconscious.

1            MR. WEINREB:  Could I have Exhibit 688 just for the

2     witness, please.

3     Q.   The photo that you're seeing here, was this taken on the

4     night of Officer Collier's murder?

5     A.   Yes, it was.

6     Q.   The building that's straight ahead of you in the frame,

7     what building is that?

8     A.   That's the Koch building.

9     Q.   The car that's parked in front of it, whose car is that?

05:42 10    A.   Sean Collier's.

11    Q.   In this photo the door's closed, correct?

12    A.   Correct.

13    Q.   But you said that when you got there, the door was open?

14    A.   Correct.

15    Q.   So this was taken sometime after?

16    A.   Yes, it was.

17    Q.   And, in fact, the debris that's on the ground next to the

18    car, do you know what that is?

19    A.   Yes.

05:43 20    Q.   What is it?

21    A.   That's all the medical equipment that we used for Sean.

22    Q.   So by the time that this picture was taken, Sean had

23    already been taken away in an ambulance?

24    A.   Correct.

25    Q.   Is this a fair and accurate picture of what the car looked

```
 1   like at that time?
 2   A.   Yes, it is.
 3             MR. WEINREB:  The government offers Exhibit 688.
 4             MR. WATKINS:  No objection.
 5             THE COURT:  All right.  Admitted.
 6             (Government Exhibit No. 688 received into evidence.)
 7             MR. WEINREB:  Could I have Exhibit 689, please, just
 8   for the witness.
 9   BY MR. WEINREB:
10   Q.   Is this the same scene from a different angle?
11   A.   That's correct.
12             MR. WEINREB:  690 for the witness, please.
13   Q.   Same thing here?
14   A.   Same thing, correct.
15             MR. WEINREB:  The government offers 689 and 690.
16             MR. WATKINS:  No objection.
17             THE COURT:  Okay.
18             (Government Exhibit Nos. 689 and 690 received into
19   evidence.)
20             MR. WEINREB:  If we could please publish 689 to the
21   jury.
22   BY MR. WEINREB:
23   Q.   So again just so the jury's oriented, where -- the
24   building that's in the right-hand side of the screen there, is
25   that the Koch Institute?
```

```
 1   A.   Yes, it is.

 2   Q.   And the car that's parked just to the left of it, is that

 3   Sean Collier's cruiser?

 4   A.   Yes, it is.

 5        MR. WEINREB:  690, please.

 6   Q.   What's this?  Can you tell us what this is a picture of?

 7   A.   This is the aftermath.  Still Sean's cruiser next to the

 8   Koch building.  We had began to cordon off the area.

 9   Q.   When you found Officer Collier in his cruiser, did he

10   still have his firearm?

11   A.   Yes, he did.

12   Q.   What, if anything, did you do with it?

13   A.   Initially I thought that the firearm was missing.  We have

14   a holster designed -- it's a three-prong retention on top of

15   our gun for safety issues.  And I noticed that one out of the

16   three detentions had been breached.  At that point, with the

17   amount of blood that I saw all over his body, I thought that

18   his weapon was missing.  That was corrected once we extracted

19   him out of the vehicle, and Officer West did see his weapon

20   still in his holster, minus the retention was down.

21   Q.   So his holster was still -- his gun belt was still on, the

22   holster was still there and the gun was still inside of it?

23   A.   Correct.

24   Q.   It was just so covered with blood that you hadn't noticed

25   it at first?
```

```
 1   A.   Correct.

 2   Q.   Before we leave this picture let me just ask you a

 3   question.  Is this -- the brightness that we see in this photo,

 4   is that normally what the courtyard looks like there at that

 5   time or is that lights from the camera people?

 6   A.   It could possibly be both.  I mean, we do have -- I should

 7   say we do have lightposts there as well, so...

 8             MR. WEINREB:  May I approach the witness, your Honor?

 9             THE COURT:  Yes.

05:46 10   BY MR. WEINREB:

11   Q.   Sergeant Henniger, this is Exhibit 691.  It's been

12   previously identified as a holster and a fake plastic gun that

13   isn't capable of shooting.  Do you recognize the type of

14   holster?

15   A.   It's the one that we're assigned to, yes.

16   Q.   Do all MIT police officers wear that kind of holster?

17   A.   Patrol officers do.

18   Q.   So Sean Collier had that kind of holster?

19   A.   Yes, he did.

05:47 20   Q.   What kind of gun do patrol officers carry?

21   A.   We carry the .40 Smith & Wesson weapon, a semiautomatic.

22   Q.   So it's .40 caliber?

23   A.   Correct.

24   Q.   Could you show us -- demonstrate for us what you were

25   telling us about the holster that you said the retention was
```

1    part way open?  Can you pick that up and just demonstrate for

2    us what you mean by that?

3    A.    Okay.  This is the three-prong, like I say, safety.  We

4    got the hood, this is called, then we have the second safety

5    that you pull forward, and the third one comes out as well.

6    Q.    So tell us again what was open and what was closed.

7    A.    The second latch was down.  And for you to extract the

8    weapon out, there's a button here that you have to press to

9    release it.

05:48 10   Q.    Thank you.

11   A.    Without pressing it, no matter what you do, the gun will

12   not be released.

13   Q.    What did you do with -- if anything with the -- Sean

14   Collier's belt and holster and gun after he was laid on the

15   ground and officers began CPR?

16   A.    I removed -- I removed the belt from him, brought it to my

17   cruiser, and I secured it.

18   Q.    Why did you do that?

19   A.    I'm sorry?

05:49 20   Q.    Why did you remove it?

21   A.    It just is normal procedure.  It was -- we had -- we

22   just -- we just had a -- an incident that occurred, and I just

23   wanted to make sure that his weapon was secure.

24          MR. WEINREB:  Could I have Exhibit 692 for the

25   witness, please.

```
 1    Q.   Do you recognize that?

 2    A.   Yes, I do.

 3    Q.   What is that a photo of?

 4    A.   That's Sean Collier's Garrison belt.

 5    Q.   Is that a picture of it as you put it in the car to

 6    safeguard it?

 7    A.   Correct.

 8         MR. WEINREB:  Exhibit 693 for the witness, please.

 9    Q.   Again, is that the same thing just from a slightly

 10   different angle?

 11   A.   Yes, it is.

 12        MR. WEINREB:  The government offers 692 and 693.

 13        MR. WATKINS:  No objection.

 14        THE COURT:  Okay.

 15        (Government Exhibit Nos. 692 and 693 received into

 16   evidence.)

 17        MR. WEINREB:  Can we publish 692, please, to the jury.

 18   BY MR. WEINREB:

 19   Q.   Looking at the gun belt, can you see blood on any part of

 20   it?

 21   A.   Yes, I do.

 22   Q.   Which part?

 23   A.   On his weapon.

 24   Q.   Is that consistent with what you saw with your own two

 25   eyes that night when the gun was on him?
```

```
 1    A.   Yes, it is.
 2              MR. WEINREB:   693, please.
 3    Q.   And again, with a little more light on it, do you see
 4    blood on the weapon and the holster?
 5    A.   Yes, I do.
 6    Q.   Do you see blood anywhere else on the belt?
 7    A.   A couple of areas here on the -- right there, and on the
 8    holster, and I believe on his handcuff.
 9    Q.   Thank you.
05:51 10   A.   Right there as well.
11    Q.   You said that patrol officers carry a .40 caliber weapon?
12    A.   Yes, we do.
13    Q.   Has it always been that way or was it --
14    A.   No, we just converted to that, I think within the last two
15    and a half -- the last three years now.
16    Q.   Okay.  And before that was it --
17    A.   Before that we had the Sig Sauer.
18    Q.   The Sig Sauer?
19    A.   Yes.
05:51 20   Q.   Was that the .40 --
21    A.   I'm sorry.  Let me correct myself in regards to the
22    weapon, I just realized.  The weapon we are now assigned is the
23    .45 Smith & Wesson.  That was my error.
24    Q.   No problem.
25    A.   Prior to that we had the .40 Sig Sauer.
```

```
 1    Q.   So what Sean Collier had that day was a .45?

 2    A.   Yes --

 3    Q.   After Officer West showed up and you and he began the

 4    process of CPR, did other officers show up?

 5    A.   Yes, they did.

 6    Q.   What, if anything, did you do at that point?

 7    A.   When Officer Magliozzi arrived, he took over for me

 8    rendering first aid.  That's when I went in and removed Officer

 9    Collier's Garrison belt.

05:52 10   Q.   What did you do then?

11    A.   I then proceeded to keep bringing medical equipment

12    towards the officers.

13    Q.   Were you there when Sean Collier was finally taken by

14    ambulance to the hospital?

15    A.   Yes, I was.

16    Q.   Did you ever see him alive again?

17    A.   No, I did not.

18         MR. WEINREB:  No further questions.

19         MR. WATKINS:  Thank you, sir.  No questions.

05:52 20        THE COURT:  All right, Sergeant.  Thank you.  You may

21    step down.

22         (The witness is excused.)

23         MR. CHAKRAVARTY:  Officer Brendan O'Hearn, please.

24              BRENDAN O'HEARN, duly sworn

25         THE CLERK:  State your name, spell your last name for
```

```
 1    the record, keep your voice up and speak into the mic.

 2           THE WITNESS:  Brendan O'Hearn, O-'-H-E-A-R-N.

 3                      DIRECT EXAMINATION

 4    BY MR. CHAKRAVARTY:

 5    Q.   Good afternoon, Officer O'Hearn.

 6    A.   Good afternoon.

 7    Q.   Where are you currently employed?

 8    A.   The Cambridge Police Department.

 9    Q.   And are you a police officer there?

 10   A.   I am.  I'm a detective there now.

 11   Q.   How long have you been with the Cambridge Police

 12   Department?

 13   A.   I transferred there in January of 2011.  Prior to that I

 14   was a Watertown police officer, and I began there in April of

 15   2006 when I attended the academy.

 16   Q.   If I could just ask you to bring that microphone a little

 17   bit closer to your mouth.  You don't have to get it too close.

 18   Thank you.

 19        When did you start with the Watertown Police Department?

 20   A.   I went to the academy in April of 2006, so I believe I was

 21   on the street by September of 2006.

 22   Q.   And how long have you been a detective with the Cambridge

 23   Police Department?

 24   A.   I just transferred to the detectives January of this year.

 25   Q.   So back in April of 2013, what were your -- what was your
```

```
 1  rank at the Cambridge Police Department?
 2  A.    A night patrolman.  A patrolman assigned to nights.
 3  Q.    And how long had you been on the Cambridge P.D. at that
 4  time?
 5  A.    Since January of 2011.
 6  Q.    Before you became a police officer, did you have any
 7  special training aside from the academy that you talked about?
 8  A.    No.
 9  Q.    Okay.  When you became a police officer, did you have any
10  emergency medical training?
11  A.    We -- yes, we do that in the academy.  We do, I believe
12  it's a week period, and we do annual in-service training which
13  includes --
14  Q.    Which includes --
15  A.    CPR.
16  Q.    -- CPR and medical training?
17  A.    Yes.
18  Q.    Thank you.
19        On April 18th of 2013, that Thursday night, were you
20  working that day?
21  A.    I was.
22  Q.    What was your assignment?
23  A.    I was assigned to Central Square as a walking unit.
24  Q.    And what was your shift that night?
25  A.    I believe it was the three-to-eleven shift the, 3 p.m. to
```

1    11 p.m.

2    Q.   You say you were on foot?

3    A.   I was.

4    Q.   Okay.  Sometime after about 10 p.m., did anything out of

5    the ordinary occur?

6    A.   I was speaking with Officer Keno.  He was operating a

7    single-man cruiser in Central Square.  I was talking to him in

8    the 600 block of Massachusetts Avenue when a call came in for

9    an armed robbery at the 7-Eleven in Central Square.

05:56 10   Q.   And so what did you do?

11   A.   I got into his cruiser, and we responded to the area to

12   check for suspects.

13   Q.   So you were already talking to him, so you just jumped in

14   and went over to the 7-Eleven?

15   A.   Correct.

16   Q.   About how far away was that from where you were?

17   A.   Very close proximity.

18   Q.   Did you make it to the 7-Eleven?

19   A.   We began to check the area.  We never entered into the

05:57 20   7-Eleven.

21   Q.   What happened?

22   A.   While we were checking the area, we got a call for an

23   officer down in the area of Vassar Street.

24   Q.   Vassar Street, is that near the MIT campus?

25   A.   Yes.

```
        1   Q.   So what did you do?

        2   A.   We immediately detoured and responded there.

        3   Q.   How far of a drive is that from where you were?

        4   A.   If I -- approximately quarter mile at the most, I would

        5   say.  I can't be certain on that.

        6   Q.   When you got there, what did you see?

        7   A.   It was an MIT cruiser stationery, and Officer Collier was

        8   laying on the ground, face up, and there were MIT officers

        9   rendering assistance to him.

05:57  10   Q.   Were there any other police departments there at the time?

       11   A.   That's just -- that's who I remember.

       12   Q.   About how many other police officers do you think were

       13   there?

       14   A.   I can't be certain.  I can only remember two from my

       15   memory but...

       16   Q.   What did you do when you got there?

       17   A.   Myself and Officer Keno went over to them and we began to

       18   assist and -- with CPR.  Officer Keno began to ventilate

       19   Officer Collier while I began to perform chest compressions.

05:58  20   Q.   How far, approximately, was Officer Collier lying from the

       21   front door of his cruiser?

       22   A.   He was in close proximity -- very close proximity to the

       23   cruiser.

       24   Q.   It appeared like he had just been taken out of the

       25   cruiser?
```

A.    It appeared that way.

Q.    And were people already attending to him when you arrived?

A.    MIT officers were attending to him already.

Q.    When you went to go provide assistance, did you bring
anything with you?

A.    I did.  I brought a medical bag that was in the cruiser
which consisted of -- I just know it as an Ambu bag, just
to assist -- which Officer Keno used for ventilations.

Q.    When you say "Ambu bag," you mean A-M-B-U bag?

A.    Yes.

Q.    Okay.  And it has a bunch of medical supplies in it?

A.    There's a bunch of supplies in the bag itself, but it was
a ventilatory-assistance device.  I believe it's called an Ambu
bag.

Q.    As he went to ventilate, what did you do?

A.    I began chest compressions.

Q.    Okay.  And is that part of the CPR process?

A.    Yes.

Q.    Did you relieve whoever was attending to him?

A.    Yes.

Q.    When you were over Officer Collier, what observations did
you make of him?

A.    His face and his neck were covered in blood, he had some
type of a wound to his head, there was blood coming from his
mouth.

1    Q.    Did you hear anything?

2    A.    It sounded almost like a gurgling from his mouth.

3    Q.    As you performed compressions, did he react in any way?

4    A.    Not that I noted.

5    Q.    How long do you think you were performing CPR on Sean

6    Collier?

7    A.    I couldn't be certain.  It felt -- obviously, it felt like

8    a long period of time, but I was assisted at some point by

9    Officer Martins and Officer Pascoe.  They responded.  And

06:00 10   Officer Martins assisted me with compressions, I got a break,

11   and then I went back and did more chest compressions at some

12   point.  And we continued with that until the Cambridge Fire

13   Department arrived and began to perform their interventions.

14   And we continued CPR while they were doing their interventions

15   until the ambulance came and he was transported.

16   Q.    Did the Cambridge Fire Department had medics, paramedics,

17   who were performing --

18   A.    They have a rapid response vehicle which I believe is

19   staffed with two paramedics that arrived on-scene first.

06:01 20   Q.    In addition to the wounds on his head and face area, did

21   you see any other wound on Officer Collier?

22   A.    There was some type of trauma to one of his hands, but I

23   can't recall which one it was.

24   Q.    How much of his body was covered with blood?

25   A.    His head and his neck.  And while I was doing chest

1    compressions, it was bloody there as well.  I don't know if it

2    was -- I'm not sure of the exact cause of that, but there was

3    blood everywhere.

4    Q.    Did it get transferred to you?

5    A.    Yes, all over me.

6    Q.    Did an ambulance arrive?

7    A.    Yes.

8    Q.    And what happened when the ambulance arrived?

9    A.    He was loaded into the ambulance.  Officer Keno remained

06:02 10   with him, assisting the fire department and the crew on the

11   ambulance, and they responded to the hospital.

12   Q.    Were they still performing CPR?

13   A.    Yes.

14   Q.    So somebody had taken over for you again?

15   A.    I continued with chest compressions right until we got to

16   the ambulance, and then someone took over from there.

17   Q.    Did you stay at the scene?

18   A.    I did.

19   Q.    What did you do after Sean Collier had left the scene?

06:02 20   A.    At that point it was a crime scene under the direction of

21   Sergeant McHale.  The area was taped off and I took over -- I

22   began a log of all the people that were on the crime scene and

23   then all the arriving people that were entering into the crime

24   scene.  I later turned that over to Officer O'Callaghan.

25   Q.    Is that part of the securing-the-scene process?

```
 1    A.   You have to have accountability for everyone who was
 2    on-scene.
 3    Q.   At this point you were still covered in blood?
 4    A.   Yes.
 5              MR. CHAKRAVARTY:  One moment, your Honor.
 6              (Counsel confer off the record.)
 7              MR. CHAKRAVARTY:  Thank you.
 8              THE WITNESS:  Thank you.
 9              MR. WATKINS:  No questions.  Thank you, sir.
10              THE COURT:  All right, Detective.  Thank you.  You may
11    step down.
12              THE WITNESS:  Thank you.
13              (The witness is excused.)
14              MR. WEINREB:  The United States calls Matthew Isgur.
15                      MATTHEW ISGUR, duly sworn
16              THE CLERK:  State your name and spell your last my
17    name for the record, keep your voice up and speak into the mic.
18              THE WITNESS:  Matthew Isgur I-S-G-U-R.
19                      DIRECT EXAMINATION
20    BY MR. WEINREB:
21    Q.   Good afternoon.  Where do you work?
22    A.   MIT.
23    Q.   What's your job there?
24    A.   I maintain the video surveillance system.
25    Q.   How long have you had that job?
```

1    A.    About six years now.

2    Q.    What are your job responsibilities?

3    A.    To manage the system, to order new cameras, repair and

4    maintain the current ones.

5    Q.    Does MIT have a number of cameras?

6    A.    We do, about 1,200 of them.

7    Q.    Are you familiar with all of them?

8    A.    I am, yeah.

9    Q.    Could you pull that a little closer because I'm having a

06:05 10    little trouble hearing you.  Thanks.

11          In the course of your work, do you look at the video

12    that's taken by MIT surveillance cameras?

13    A.    I do.

14    Q.    Frequently?

15    A.    Whenever we have an investigation, yes.

16    Q.    Do the cameras make fair and accurate recordings of the

17    things that they're pointed at?

18    A.    They do.

19    Q.    Do these recordings have date and timestamps on them?

06:05 20    A.    They do.

21    Q.    Are those accurate?

22    A.    They are.

23    Q.    Are you familiar with the layout of the MIT campus?

24    A.    Yes.

25    Q.    Are you familiar with the locations of each of the MIT

1    surveillance cameras at all the different locations?

2    A.    I am.

3          MR. WEINREB:  Could we have Exhibit 680, please.

4    Q.    If you'll look at the screen in front of you, do you

5    recognize what's pictured there?

6    A.    Yup.  This is North Court on MIT's campus.

7    Q.    What's the building at the top of the frame that we're

8    looking directly at?

9    A.    That's the Koch building, Building 76.

06:06 10   Q.    The building to the left of the frame?

11   A.    That's the Stata Center, Building 32.

12   Q.    Do you know where these photos were taken from?

13   A.    I do.

14   Q.    Where?

15   A.    From a camera on the rooftop of Building 54, which is

16   MIT's green building.

17         MR. WEINREB:  Can we have Exhibit 721 for the witness,

18   please.

19   Q.    Do you recognize that?

06:07 20   A.    I do.

21   Q.    Is that a fair and accurate photo?

22   A.    It is.

23         MR. WEINREB:  The government offers Exhibit 721.

24         MR. WATKINS:  No objection.

25         THE COURT:  Okay.

                    (Government Exhibit No. 721 received into evidence.)

1  BY MR. WEINREB:

2  Q.    What's that building in the distance?

3  A.    That is Building 54.

4  Q.    The path that occupies most of the right-hand part of the

5  screen that's leading towards it appears to go by a courtyard.

6  What courtyard is that?

7  A.    That's MIT's North Court.

8  Q.    So that's what we were just looking at?

9  A.    Correct.

10 Q.    And where is the Koch Institute?

11 A.    The Koch Institute is to our left.

12 Q.    That's the building, we can just see the corner of it

13 there on our left?

14 A.    Correct.

15 Q.    And to the right we see a piece of the Stata Center?

16 A.    That's correct.

17 Q.    The screen in front of you is touch sensitive so that if

18 you just touch it you'll create an arrow and if you move your

19 finger you can create a circle.  Can you circle where the

20 camera is on Building 54?

21 A.    (Witness complies.)

22 Q.    And it points down towards the courtyard?

23 A.    It does.

24              MR. WEINREB:  Exhibit 722, please.

1    Q.    This is an exhibit that makes it possible to create a

2    360-degree view of the area.  Do you recall seeing this photo

3    before?

4    A.    I do.

5    Q.    And is it a fair and accurate depiction of what's in it?

6    A.    Yes.

7              MR. WEINREB:  The government offers Exhibit 722.

8              MR. WATKINS:  No objection.

9              THE COURT:  Okay.

06:09 10             (Government Exhibit No. 722 received into evidence.)

11             MR. WEINREB:  If we could publish that.

12   BY MR. WEINREB:

13   Q.    So what's pictured in this image right now the way -- in

14   the direction we're looking at it?

15   A.    This is also in North Court.

16   Q.    Is that the Koch Institute on our left?

17   A.    Yes.

18   Q.    And then as I turn the camera, are we now -- as we zoom

19   around, is that the North Court?

06:10 20   A.    Correct.

21   Q.    And that's -- and Building 54, is that visible?

22   A.    That's correct.

23   Q.    And moving in the other direction, what's down at the end

24   of that path?

25   A.    So that's the corner of, I believe, Main and Vassar.

```
 1    Q.   And if we keep panning around?

 2    A.   Yeah, that's Main and Vassar.

 3    Q.   Okay.

 4    A.   And this is the Stata Center.

 5    Q.   Okay.  And we're going to come fully around.  And that's

 6    Building 54 again?

 7    A.   Uh-huh.

 8    Q.   On April 18th, 2013, did you assist in the Sean Collier

 9    murder investigation?

10    A.   I did.

11    Q.   How did that come about?

12    A.   I was called in by Deputy Chief Jay Perault, and when I

13    got on-scene I reviewed the footage from this camera, Building

14    54.

15    Q.   Were you asked to pull footage for a particular time

16    period?

17    A.   I was, between 10 p.m. and 11 p.m.

18    Q.   Did you review a -- recently review a composite of that

19    video?

20    A.   I did.

21    Q.   Okay.  And that essentially consists of segments of the

22    full hour of video that you pulled.  And that points -- a

23    segment plays and then it skips ahead in time to another

24    segment.  Is that correct?

25    A.   That's correct.
```

1    Q.   And there's a text indication on the screen as to what

2    time it's stopping and what time it's starting up again?

3    A.   Correct.

4    Q.   Is that a fair and accurate composite of the surveillance

5    video that you pulled on that evening?

6    A.   It is.

7         MR. WEINREB:  Could we -- that's Exhibit 723, your

8    Honor, and the government offers it at this time.

9         MR. WATKINS:  No objection.

06:12 10       THE COURT:  Okay.

11        (Government Exhibit No. 723 received into evidence.)

12        MR. WEINREB:  I would like to play that.

13        Actually, your Honor, can we pause for one moment?  We

14   need to bring out the screen.

15        (Pause.)

16   BY MR. WEINREB:

17   Q.   So right now the screen is frozen on April 18, 2013, at

18   10:16 p.m.  Is that correct?

19   A.   That is correct.

06:13 20        (Video played.)

21   Q.   Now, for the record, what's showing here on the left-hand

22   portion of the screen?

23   A.   That's Sean Collier in his police cruiser.

24   Q.   Where is the car located -- it's come to a spot.  Where is

25   it that it's located?

1    A.    The car is located on the Main and Vassar point of North

2    Court, so in between Koch and Stata.

3    Q.    And that was at 10:16:50, correct?

4    A.    Correct.

5    Q.    And what does the screen indicate now, about what time?

6    A.    10:23 p.m.

7    Q.    Is the car still there?

8    A.    It is.

9    Q.    Now, I'm just going to pause for a second.  Do you see on

06:14 10   the right-hand portion of this screen a yellow circle has

11   appeared?

12   A.    I do.

13   Q.    That's not in the original, right?

14   A.    Correct.

15   Q.    But that's been added to highlight an image, correct?

16   A.    That's correct.

17   Q.    And what's inside the circle?

18   A.    Two individuals entering from the Main and Ames corner.

19   Q.    And that's on the right-hand of the screen?

06:14 20   A.    It is.

21          (Video played.)

22   Q.    So for the record, the individuals have rounded the

23   corner.  And then does it appear that the brake lights of the

24   car have come on?

25   A.    That's correct.

```
             1              (Video played.)
             2    Q.   Again, for the record, does it appear that the individuals
             3    are now going back the same way they came?
             4    A.   Correct.
             5              (Video played.)
             6    Q.   Have the individuals now left the screen entirely?
             7    A.   They have.
             8    Q.   And what time is it on the video?
             9    A.   It's 10:26 p.m.
06:17       10    Q.   And it indicates here we've now moved ahead four minutes,
            11    to 10:30.  Is that correct?
            12    A.   That's correct.
            13    Q.   And does it appear somebody has emerged from the left-hand
            14    side of the screen and walked over to the door?  Were you able
            15    to see that?  Here, let me run it some more.  Do you see a
            16    figure moving now around the car?
            17    A.   It's a little dark, what I'm looking at.
            18              (Video played.)
            19    A.   Yes, I see it now.
06:18       20              (Video played.)
            21    Q.   In addition to viewing this video, did you also view a
            22    shorter segment of this video that was essentially a close-up
            23    version?
            24    A.   I did.
            25    Q.   And is that a fair and accurate copy, except that it's a
```

```
 1   close-up?

 2   A.   It is.

 3           MR. WEINREB:  That's Exhibit 724, your Honor.  The

 4   government asks to admit it now and to publish it.

 5           MR. WATKINS:  No objection.

 6           THE COURT:  Okay.

 7           (Government Exhibit No. 724 received into evidence.)

 8   BY MR. WEINREB:

 9   Q.   Just so we're all oriented, do you see Sean Collier's car?

06:19 10   A.   Yes.

11   Q.   Where is it?

12   A.   It's in the left pane.

13   Q.   That's in -- is it fair to say it's near the center of the

14   larger image --

15   A.   Yes.

16   Q.   -- near the top of the screen?

17   A.   Yes.

18   Q.   Okay.  And then in the lower right-hand pane -- it might

19   be easier to see what that is when we start playing it, okay?

06:20 20   So let me focus your attention now to the lower right-hand

21   pane.  Do you see those two figures --

22   A.   I do.

23   Q.   -- walking there?

24           (Video played.)

25   Q.   Mr. Isgur, were there any other cameras in the area of the
```

        1    Koch Institute that would have captured what happened where

        2    Sean Collier's cruiser is at that time?

        3    A.    Not at that position, no.

        4          MR. WEINREB:  Could I have Exhibit 719 for the

        5    witness, please?  Let's have, actually, 683 for the witness.

        6    Q.    Do you recognize this diagram?

        7    A.    I do.

        8    Q.    What is it a diagram of?

        9    A.    This is a diagram of the North Court area on MIT's campus.

06:22  10    Q.    Is it fair and accurate?

       11    A.    It is.

       12          MR. WEINREB:  The government offers 683.

       13          MR. WATKINS:  No objection.

       14          THE COURT:  Okay.

       15          (Government Exhibit No. 682 received into evidence.)

       16    BY MR. WEINREB:

       17    Q.    Can you circle in this where Sean Collier's cruiser was

       18    parked that evening?

       19    A.    Uh-huh.

06:23  20    Q.    And then can you also trace with your finger the path that

       21    the two figures took to get to the car?

       22    A.    Sure.

       23    Q.    And you testified earlier they retreated along the same

       24    path according to the video surveillance?

       25    A.    That's right.

1    Q.   So what street would they have wound up on on the

2    right-hand side?

3    A.   Ames Street.

4         MR. WEINREB:   Could I have Exhibit 682 for the

5    witness, please.

6         I believe 682 is already in evidence.

7         THE COURT:   I think it is, yes.

8         MR. WEINREB:   So if I could actually have it for the

9    jury as well.

06:24 10   BY MR. WEINREB:

11   Q.   In this exhibit do you see Ames Street there?

12   A.   I do.

13   Q.   Now, please follow Ames Street south from the point where

14   it meets -- or it essentially meets the Koch Institute.  And as

15   you go south, do you see a building that comes to a point and

16   is essentially pointed at Ames Street?

17   A.   Right here.

18   Q.   Could you circle it, please?

19   A.   (Witness complies.)

06:24 20   Q.   Do you also see a piece of a building that is across the

21   street from that building and a little lower than it?

22   A.   I do.

23   Q.   Is there a surveillance camera on that building that

24   points directly at the point of that pointy building?

25   A.   There is.

1        MR. WEINREB:  Could I have Exhibit 1461?

2   Q.   Do you recognize this?

3   A.   I do.

4   Q.   What is that a picture of?

5   A.   That's the crosswalk between E15 media lab and Building

6   66.

7   Q.   Is that Ames Street?

8   A.   It is.

9   Q.   The building that's right in the middle of that photo, is

06:25 10   that the point of the pointy building?

11   A.   Uh-huh.

12   Q.   You have to say yes or no.

13   A.   Yes.

14   Q.   Okay.  Did you review this along with a series of other

15   photos that essentially depict a 180-degree sweep around from

16   that pointy building to the other building you identified

17   having the camera on it?

18   A.   That's correct.

19   Q.   And were they all fair and accurate photos of what they

06:25 20   depict?

21   A.   Yes.

22        MR. WEINREB:  Your Honor, those are Exhibits 1461

23   through 1465.  The government would offer those at this time.

24        MR. WATKINS:  No objection.

25        THE COURT:  Okay.

1            (Government Exhibit No. 1461 through 1465 received

2      into evidence.)

3            MR. WEINREB:  So if we could start by publishing 1461

4      to the jury.

5      BY MR. WEINREB:

6      Q.   So, again, the point in between what appear to be two

7      Dumpsters, that's the point of that pointy building?

8      A.   Correct.

9            MR. WEINREB:  And 1462.

06:26 10    Q.   And now we've essentially -- if that were a clock and we

11     were facing 12, what direction are we now facing in?

12     A.   Eleven o'clock.

13     Q.   So we've turned sort of -- started turning

14     counterclockwise?

15     A.   Correct.

16     Q.   And the street we're seeing now fully, what street is

17     that?

18     A.   This is Ames Street.

19           MR. WEINREB:  1463, please.

06:26 20         (Pause.)

21           Let's try 1464.

22     Q.   What building is that?

23     A.   That is E15, the media lab.

24     Q.   And is that the building that was across the street from

25     the pointy building?

```
 1    A.    Correct.
 2              MR. WEINREB:  1465, please.
 3    Q.    Is that a -- in the -- near the roof line of that
 4    building, do you see something?
 5    A.    I do.
 6    Q.    What is it?
 7    A.    That's a camera.
 8    Q.    Could you circle it, please?
 9    A.    Sure.
06:27 10  Q.    And is that camera pointed essentially right at the point
11    of that pointy building?
12    A.    It is.
13    Q.    Were you asked to pull video surveillance footage from
14    that camera?
15    A.    I was.
16              MR. WEINREB:  1466 just for the witness, please.
17    Q.    Do you recognize this?
18    A.    I do.
19    Q.    What is it?
06:28 20  A.    This is a video we pulled of the -- of a car fleeing Ames
21    Street.
22    Q.    And that's, according to the date and timestamp, on April
23    18th, 2013, at -- looking where the player controls are --
24    10:26 p.m.?
25    A.    Correct.
```

         1    Q.   And did you also pull video from that same camera exactly

         2    a week later at approximately the same time?

         3    A.   I did.

         4    Q.   Were both of those videos fair and accurate videos of what

         5    the camera was pointed at at the respective times?

         6    A.   They are.

         7         MR. WEINREB:  The government offers 1466 and 1467.

         8         MR. WATKINS:  No objection.

         9         THE COURT:  All right.

06:29   10         (Government Exhibit Nos. 1466 and 1467 received into

        11    evidence.)

        12         MR. WEINREB:  But we do not intend to publish those at

        13    this time.

        14         THE COURT:  Okay.

        15         MR. WEINREB:  Thank you, Mr. Isgur.  No further

        16    questions.

        17         THE WITNESS:  Thanks.

        18         MR. WATKINS:  Nothing, your Honor.

        19         THE COURT:  All right, Mr. Isgur.  Thank you.  You may

06:29   20    step down.

        21         (The witness is excused.)

        22         MR. WEINREB:  Your Honor, the government calls Nate

        23    Harman.

        24                   NATHAN HARMAN, duly sworn.

        25         THE CLERK:  Have a seat.  Keep your voice up, state

```
 1    your name, spell your last name for the record and speak into
 2    the mic so everyone can hear you.
 3              THE WITNESS:  Nathan Harman, H-A-R-M-A-N.
 4                        DIRECT EXAMINATION
 5    BY MR. WEINREB:
 6    Q.   Good afternoon.
 7    A.   Good afternoon.
 8    Q.   Mr. Harman, if you wouldn't mind, pull the mic a little
 9    closer just so we can hear you a little better.  And if you get
06:30 10    thirsty at any time, there's water there right next to you so
11    feel free.
12              How old are you?
13    A.   Twenty-four.
14    Q.   What do you do?
15    A.   I'm a graduate student at MIT.
16    Q.   What are you studying?
17    A.   Mathematics.
18    Q.   How long have you been at MIT?
19    A.   I'm in my third year.
06:30 20    Q.   Did you go to college?
21    A.   Yes.
22    Q.   Where did you go?
23    A.   UMass Amherst.
24    Q.   What kind of degree did you get?
25    A.   I got a bachelor's in mathematics.
```

1    Q.   What kind of degree are you studying for now?

2    A.   I'm working on my Ph.D.

3    Q.   And so you've been there three years.  You're in your

4    third year of -- is it a five-year program?

5    A.   Yup.

6             MR. WEINREB:  Can I have Exhibit 682, please.

7             That's in evidence, your Honor.

8    Q.   Do you see that diagram in front of you?

9    A.   Yup.

06:31 10  Q.   Do you recognize that area?

11   A.   Yeah; that's MIT.

12   Q.   Is it a particular part you're familiar with?

13   A.   Oh, yeah.  I mean, this is one of the main courtyards at

14   MIT.  There's the Stata Center.  I walk through here all the

15   time.

16   Q.   And, in fact, do you have an office at MIT?

17   A.   Yeah, my office is currently there (indicating), and then

18   my old office is sort of off the bottom left corner of the map.

19   Q.   Okay.  So initially you tapped a building that left a

06:32 20  little yellow dot, and that's on the right-hand side of Ames

21   Street?

22   A.   Yeah, that's where my office is now.  But two years ago it

23   was sort of down this way (indicating).

24   Q.   All right.  How many times have you traveled through that

25   courtyard at night during your three years at MIT?

```
 1    A.    Way too many to count.  All the time.

 2    Q.    How well lit is the courtyard?

 3    A.    Fairly well lit.  There's lights all along all of the

 4    major walkways.

 5    Q.    Are there also streetlights as you near Main Street?

 6    A.    Yeah.  Once you get to the roads there's streetlights.

 7    The buildings are always lit at night so it's pretty well lit.

 8    Q.    Were you in your office on the night of April 18, 2013?

 9    A.    Yes.

10    Q.    What were you doing?

11    A.    I was there working on a problem set that was due the next

12    day.

13    Q.    Approximately what time did you leave?

14    A.    After ten.  Maybe 10:20.  Once I noticed it was after ten,

15    that's how I knew it was time for me to give it up and go to

16    bed.

17    Q.    At that time, how did you get back and forth around the

18    campus?

19    A.    I rode my bike to and from campus every day that it was --

20    weather permitting.

21    Q.    Did you ride your bicycle that night?

22    A.    Yes.

23    Q.    Can you -- I'm going to clear that -- that -- what you

24    made.  Can you show us the route --

25                MR. WEINREB:  It might actually be easier if we pulled
```

up 683.  Can you do that?

Q.    That's just a closer up view of the courtyard?

A.    Yeah, same thing.

Q.    Can you just, by using your finger, show us the route you took when you left on your bicycle?

A.    Sure.  I would have come right up here and then up that way (indicating).

Q.    Okay.  Did you notice anything unusual when you biked through the courtyard?

06:33 A.    Yes; there was a parked police cruiser, like, right here.

Q.    Okay.  Let me clear this.  It's getting a little crowded with yellow.

Why don't you just circle the cruiser.

A.    Right here-ish.

Q.    Was there anything unusual about the cruiser that you noticed?

A.    When I went by, there was -- the front door was open, the driver's side door, and there was someone leaning into the driver's side door.

06:34 Q.    What do you mean by leaning into it?

A.    I mean, they were sort of bent around the waist with their head and sort of the upper part of their torso inside the police car as I was coming up, and then they sort of stood up, startled, when I rode my bike by them.

Q.    Okay.  So explain that.  So you're riding down the path.

1    And how close to the back of that person who you saw did you

2    come?

3    A.    Within five or six feet.

4    Q.    And what happened exactly -- happened exactly as you drove

5    by them?

6    A.    He sort of snapped up, stood up and turned around, and he

7    looked startled, and then I just, you know, didn't think

8    anything of it and rode off.

9    Q.    Did he look at you?

06:35 10    A.    Yes.

11    Q.    Did you look at him?

12    A.    Yes.  We made eye contact.

13    Q.    Did you get a good look at his face?

14    A.    Pretty good.

15    Q.    What did he look like?

16    A.    I mean, he was young.  I just assumed he was an MIT

17    student.  Young, normal height, thin.  Yeah.  He was wearing a

18    dark sweatshirt and a hat.  Yeah.

19    Q.    Did you notice, did the sweatshirt have anything on it or

06:35 20    was it just plain?

21    A.    Well, so I saw -- well, as I was coming up I just saw the

22    back of his sweatshirt, and then when he turned around there

23    was the door there, but there was something on the front, some

24    sort of -- so the sweatshirt itself was dark and there was a

25    lighter thing on the front, but I didn't actually see what it

1    was.

2    Q.    Were you able to tell what race he was, or color?

3    A.    I thought he was white.

4    Q.    Did he seem skinny, fat?

5    A.    Skinny, yeah.  Thin.

6    Q.    When you say like normal height, what does that mean to

7    you?

8    A.    I mean, shorter than me.  I'm six foot-ish.  So I would

9    guess maybe -- not particularly short, but maybe five-eight?  I

06:36  10    don't know.  I'm not good at judging that.

11    Q.    Any facial feature that stood out for you?

12    A.    I remember thinking he had a big nose, but nothing beyond

13    that really.

14    Q.    Do you see that person in the courtroom today?

15    A.    Yes.

16    Q.    Can you indicate for us where he is and an item of

17    clothing that he's wearing?

18    A.    He's right there (indicating).  He has a blue shirt on.

19    Yes.

06:37  20          MR. WEINREB:  Your Honor, may the record reflect the

21    identification of the defendant.

22          THE COURT:  All right.

23          MR. WEINREB:  Can we have Exhibit 725 just for the

24    witness for a moment.

25    BY MR. WEINREB:

```
 1    Q.   Do you recognize what this is a --

 2    A.   The same courtyard as the last picture.

 3    Q.   Do you recall reviewing a segment of this video that

 4    you --

 5    A.   Yes, I've now seen this video.  It's been shown to me a

 6    few times.

 7    Q.   And is it a fair and accurate picture of what's depicted

 8    in it?

 9    A.   Yeah, to the best of my recollection.  Yes.

10         MR. WEINREB:  The government offers 725.

11         MR. WATKINS:  No objection.

12         THE COURT:  Okay.

13         (Government Exhibit No. 725 received into evidence.)

14    BY MR. WEINREB:

15    Q.   So I'm playing the video now.  Let me just draw your

16    attention to the pathway that leads up to the cruiser.  Do you

17    see a figure on a bicycle biking up that path?

18    A.   Yeah.  That's me.

19         (Video played.)

20    Q.   So when the figure snapped up and looked you in the eyes

21    and you made eye contact, you didn't stop at that point; you

22    just kept going?

23    A.   No, I just laughed, actually.  I thought I just startled

24    him and I kept going.

25    Q.   Did you see a second person by the car?
```

```
 1    A.    No, I only saw the one person.
 2          MR. WEINREB:   Could I have Exhibit 758 for
 3    identification, please.   And can I also then have --
 4    Q.    Can you just take a look at 758, please?
 5          MR. WEINREB:   Can I also have Exhibit 761 for
 6    identification.
 7    Q.    Do you recognize the person pictured in 760 and -- I'm
 8    sorry -- 758 and 761?
 9    A.    Yes.
10    Q.    How does that person compare to the person you saw that
11    night?
12    A.    That definitely could have been the person I saw that
13    night.
14    Q.    The design on the front of the sweatshirt, is that
15    consistent with what you saw that night?
16    A.    That's definitely consistent with what I saw.
17    Q.    What about the -- you said the person was wearing a cap of
18    some kind.   Is this what he was wearing?
19    A.    That's not the hat that I remember seeing.   I remember
20    seeing a, like, more knit hat that you pull over your head.
21    Q.    So the thing that's more like a knit cap that you pull
22    over your head, did it have a bill?
23    A.    Not that I remember, no.
24    Q.    Okay.   And was it the same height on the person's head all
25    the way around, like an ordinary knit cap?
```

```
 1   A.   I don't know.

 2   Q.   It was just looked like a knit cap?

 3   A.   Just a knit cap, yeah.

 4        MR. WEINREB:  Your Honor, the government offers 760

 5   and 761.

 6        MR. WATKINS:  No objection.

 7        THE COURT:  I'm sorry?

 8        MR. WEINREB:  I'm sorry.  758 and 761.  I'm sorry.

 9        MR. WATKINS:  No objection.

10        (Government Exhibit No. 758 and 761 received into

11   evidence.)

12        MR. WEINREB:  If we could start with 758, and then

13   761, please.

14        (Exhibits displayed.)

15   BY MR. WEINREB:

16   Q.   Now I would like to show you Exhibit 821 for

17   identification.

18        (Pause.)

19        MR. WEINREB:  Your Honor, could you turn it off,

20   please.

21        (Pause.)

22        MR. WEINREB:  Let's try 820 for identification.

23   Q.   Do you see the hat that's pictured in that photo?

24   A.   Yeah, I see it.

25   Q.   Okay.  Is that the same kind of -- I'm not saying it's
```

1    that one, but is that the same kind of cap that you saw the

2    individual wearing?

3    A.    Yeah, it was that kind of cap.  I don't remember the,

4    like, particular pattern or the logo or anything, but it was

5    that type of cap.

6             MR. WEINREB:  Your Honor, we're not going to offer

7    that at this time.

8             Thank you, Mr. Harman.  No further questions.

9             MR. WATKINS:  No questions, your Honor.

06:44 10            THE COURT:  All right, Mr. Harman.  Thank you.  You

11   may step down.

12            (The witness is excused.)

13            THE COURT:  I think in light of the hour, that's as

14   far as we'll go today.  We'll recess until nine tomorrow.  Have

15   a pleasant evening.  Follow my instructions about avoiding any

16   discussion of the case or any exposure to media accounts about

17   the case.  Enjoy the evening and we'll see you tomorrow.

18            We'll be in recess.

19            THE CLERK:  All rise for the Court and the jury.  The

06:44 20   Court will be in recess.

21            (The Court and jury exit the courtroom and the

22   proceedings adjourned at 3:54 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  9/30/15
13

14

15

16

17

18

19

20

21

22

23

24

25