## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.13-10200-GAO** |
| | ) | |
| **DZHOKHAR A. TSARNAEV,** | ) | |
| **Defendant** | ) | |

## OPPOSITION TO DEFENDANT'S MOTION FOR
## JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL

The United States of America, by and through its undersigned counsel, respectfully opposes Tsarnaev's motion for judgment notwithstanding the verdict and for a new trial. Tsarnaev's first argument -- that the Court must presume the jurors were not fair and impartial despite the absence of any evidence of actual prejudice -- has already been rejected three times by this Court and twice by the Court of Appeals. His new allegations in support of that argument are unproved, unsupported, and incorrect, and imputing bias to sitting jurors without evidence of actual partiality is contrary to law, regardless of the factual circumstances. Tsarnaev's second argument -- that the fifteen counts charging violations of 18 U.S.C. § 924(c) were not predicated on crimes of violence -- has been waived because it was not made in time. It is also based on an incorrect interpretation of section 924(c).

I.       **There is No Factual or Legal Basis For Imputing Bias To The Jurors.**

Tsarnaev offers no evidence that any juror was actually prejudiced or engaged in any misconduct. He concedes, as he must, that the Court repeatedly admonished the members of the venire and, later, the jurors, to refrain from any online research or other reading or watching of reports about the case in the media, and to avoid communicating about the case by telephone, text message, Skype, email or via social media such as Twitter or Facebook. (Deft. Mot. at 14).

He assumes for purposes of his motion that there was "scrupulous adherence" to those
admonitions on the jurors' part (Deft. Mot. at 13), and he offers no evidence to the contrary.  The
Court repeatedly asked the jurors -- usually after they were seated in the jury box, but at least
once individually in the jury room with lawyers for both sides present -- if they had followed the
Court's instructions to avoid publicity and communication about the substance of the case; each
and every time, the jurors individually affirmed that they had followed those instructions.  (See,
e.g., Tr. 28-13, 46-3, 50-32, 51-5, 52-1, 54-1, Tr. 04-06-13 (Lobby Conference) at 3-21).  The
Court found the jurors credible on each of those occasions.  (So the record is clear, the
government requests that the Court memorialize that finding in its order on Tsarnaev's new trial
motion.)

 In addition to routinely admonishing the jury to avoid all publicity and communication
about the case, the Court summoned the jury into court on April 14, 2015 just to give them the
following special instructions regarding outside events and publicity connected to the 2015
Boston Marathon:

  There's one other important point -- very important point that I want to
make with you.  As you're undoubtedly aware, this week marks the anniversary
of the crimes of which the defendant now stands convicted, and additionally, this
coming Monday is the running of the 2015 Boston Marathon.  Almost all of you
live outside of Boston.  Some of you live quite far from Boston.  And as a matter
of fact, you might think it a little odd that we asked you to come all the way in
here today for such a brief session.  The fact that we have done so should be taken
by you as an indication of how important these brief instructions are to your
service as fair and impartial jurors in this case.

  So I urge you to go about your lives in the coming week, between now and
next Tuesday, and avoid any events that would put you in the position of being
exposed to information that would be inappropriate for a juror on this case to see
or hear while serving as an active juror.

  Now, let me be quite direct about it.  Do not attend the Boston Marathon
or any related events or gatherings that are connected with the anniversary of the

2013 Marathon or to this year's running of the Marathon.  I expect, given where most of you live and work, this will not be a difficult thing for you to do.

Additionally, as you're surely aware, the Boston Marathon is a matter not just of local, but of national and international, interest.  It will be covered extensively not just in local media but in the national press.  Under the circumstances, again, continue to avoid any coverage of the Marathon, both in terms of the issues of this case and the current race.  This includes, of course, TV, radio, newspaper, magazines, Internet, social media, and communications with other people about the events.  If you happen to see or hear anything that sounds like it's related to the Marathon, related events in the media or from other people and so on, stop reading, turn off the TV or the computer, and put your attention in other places.  If you're at work and it should happen, you know, leave the room or see what your coworkers will do to accommodate your needs.

And, of course, please continue to refrain from any communication with anyone, including each other, about the issues in the case.  People are curious about what you're doing, but it's your duty to tell them if they inquire and discuss the issues -- and seek to discuss the issues with you that you cannot talk to them about it.  If anyone persists in trying to speak to you about the case, I remind you that you can let any court official know and we'll come to your assistance.  Make sure your family members and coworkers understand your position, basically.  I trust that you have been doing this all along, but I want to underscore that instruction now for this sensitive period.

(Tr. 46-3 to 46-7).

A.    Tsarnaev has offered no reason to presume that the jurors had more than incidental exposure to relevant outside events or attendant press coverage.

Tsarnaev first argues that certain events and their attendant press coverage -- namely, the celebration of the first "One Boston Day" on April 15, 2015, the running of the Boston Marathon on April 20, 2015, and events honoring specific victims and survivors -- necessarily prevented the jurors from being fair and impartial during the penalty phase (the liability phase had already concluded).  But Tsarnaev offers no evidence that the jurors actually attended any of those events or viewed any of the press coverage, despite being instructed not to.  He simply characterizes the events and press coverage as "intense and all-encompassing community immersion" (Deft. Mot. at 13) and argues, in essence, that the jurors must have been prejudiced by them.

3

Tsarnaev's allegations are speculative and overblown.  He makes it appear, for example, that "One Boston Day" received so much media coverage on April 15, 2015 that jurors must have viewed some of it; but he offers no evidence respecting the readership or viewership numbers of the news outlets that he says covered One Boston Day, which include "Yahoo Sports," "MA State Senate, Twitter," "Masslive," "WBUR [web page]," "MA Red Cross Blood, Twitter," "Watertown News," "Runnersworld," "Hyatt.com," "Kelley Tuthill, Twitter," "Malden Homepage," BostonCatholicSchls, Twitter," "Wicked Local Wilmington," and "ThePatch."  The same is true for the 2015 Boston Marathon and events honoring particular survivors and victims. As the Supreme Court has repeatedly held, however, the Court "'sits in the locale where the publicity is said to have had its effect'" and therefore is the best judge "'of the depth and extent of news stories that might influence a juror.'"  United States v. Skilling, 561 U.S. 358, 386 (2010) (quoting Mu'Min v. Virginia, 500 U.S. 415, 429 (1991)).  Accord Bishop v. Wainwright, 511 F.2d 664, 666 (5th Cir. 1975).   As the Court knows from its own experience, the media coverage of the events Tsarnaev cites was neither inflammatory nor pervasive; the Court should make a finding to that effect so the record is clear.

Moreover, Tsarnaev ignores the significance of the Court's instructions to the jurors – particularly its instructions on April 14, 2015.  Jurors are presumed to follow a court's instructions, see, e.g., United States v. Baez-Martinez, 786 F.3d 121, 127 (1st Cir. 2015); United States v. Acosta-Colon, 741 F.3d 179, 202 n.13 (1st Cir. 2013), including instructions to avoid publicity during a trial, see Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003); Cuevas-Burgos v. United States, 46 F.3d 1114, *1 (1st Cir. 1995) ("As for any publicity during the trial, Judge Acosta told the jurors not to listen to media accounts and to decide the case solely on the evidence presented in court.  Jurors are presumed to follow instructions.  United States v.

4

Boylan, 898 F.2d 230, 263 (1ˢᵗ Cir. 1990).").  Tsarnaev has offered no evidence to rebut the

presumption that the jurors followed the Court's instructions; he simply argues, contrary to law,

that the Court should presume the opposite.

A similar argument was made and rejected in United States v. Lampley, 127 F.3d 1231

(10ᵗʰ Cir. 1997), in which three defendants were convicted in the Eastern District of Oklahoma of

conspiracy to build an explosive device to damage or destroy several buildings.  Id. at 1235.  The

defendants claimed they were deprived of a fair trial because, among other things, "[t]he trial

coincided with the one-year anniversary of the Oklahoma City bombing; [and] the corresponding

. . . media publicity [was] pervasive."  Id. at 1236.  The Court rejected this claim.  It wrote:

> The facts in the record do not support Defendants' suggestion that the jury did
> anything other than follow the court's admonitions to not discuss the case with
> anyone, to refrain from viewing any publication or broadcast relating to the case,
> and to remain impartial.  According to the record, after the trial's recess the
> district court made a general query of the jurors concerning any influence that
> might have affected their impartiality.  The record shows that the jurors did not
> express any doubt about their ability to remain impartial or any concern about the
> publicity surrounding this case or the Oklahoma City bombing anniversary.
> Additionally, the record does not suggest that the district court improperly relied
> on the fundamental principle that the jurors would abide by the court's
> instructions and admonitions and remain impartial.  See Richardson v. Marsh, 481
> U.S. 200, 206 (1987) (endorsing "the almost invariable assumption of the law that
> jurors follow instructions"); Francis v. Franklin, 471 U.S. 307, 324 n. 9 ("The
> Court presumes that jurors . . . attend closely . . . , strive to understand, . . . and
> follow the [trial court's] instructions" in a criminal case.).  The trial court did not
> err in finding that the media coverage of this case and the Oklahoma City
> bombing anniversary did not deny Defendants a fair trial.

Id. at 127-38.  Here, as in Lampley, the record does not support Tsarnaev's suggestion that the

jury did anything other than follow the court's admonitions to not discuss the case with anyone,

to refrain from viewing any publication or broadcast relating to the case, and to remain impartial.

That disposes of his argument.

Tsarnaev alleges that family members who arrived from overseas to testify were adversely affected by their housing conditions and media harassment, but he fails to explain how these allegations -- even if true -- prejudiced him in any way.  The allegations appear to contribute nothing to his venue argument.  And he does not say how the allegedly adverse conditions affected the witnesses' testimony.  If Tsarnaev believed the witnesses would have testified more favorably under other conditions, he needed to make that argument immediately after the witnesses testified, when the Court still had an opportunity to determine if the claim had merit and, if warranted, to fashion a remedy.  By failing to raise the issue until now (and by still failing to explain how the witnesses would have testified differently under other conditions), he was waived it.

Tsarnaev also fails to note that had no right to the witnesses' testimony in the first place, because all of them were foreign nationals living outside the United States who could not obtain visas to travel here.  The witnesses appeared (and stayed an entire week) -- at great government expense -- only because the FBI petitioned the Department of Homeland Security ("DHS") to parole them into the United States for Tsarnaev's benefit; and DHS granted that request only pursuant to an agreement that the FBI secure the witnesses while they were here.

Tsarnaev also unfairly impugns the FBI's treatment of the witnesses.  The "draconian conditions" in which they were secured, as Tsarnaev puts it (Deft. Mot. at 9), consisted of being lodged in a hotel.  They were largely confined to the hotel, and monitored via GPS, to ensure that they did not disappear into the population in an effort to remain in the United States, as other parolees have done.  They were also confined to the hotel for their own safety and privacy.  To prevent the media from harassing them, the FBI found rooms for them on the day after they arrived in a new hotel, the location of which was kept secret.  Once there, the FBI took great

pains to keep them safe and secure.  Tsarnaev's claims respecting the foreign family witnesses lack merit.

Finally, Tsarnaev's claim that the jurors were "necessarily exposed" to "prejudicial evidence of the local impact of the Marathon Bombings" (Deft. Mot. at 12) is unsupported and incorrect.  The photographs he submits are not evidence of actual "exposure" to anything and do not even support many of his specific allegations.  Tsarnaev offers no evidence of the dates, times, and locations that jurors were "necessarily exposed" to the cement trucks, banner, I-93 billboards, and memorabilia, that he mentions in his motion (Deft. Mot. at 12), making it impossible to respond to his allegations.  He offers no evidence, nor can he, that the same purportedly prejudicial items would not have been present if the case had been tried in another jurisdiction.  Nor does he explain how any of these things were prejudicial, or why the Court should disregard the presumption that the jurors ignored them even if they saw them, as they were instructed to.

This Court sat day after day in exactly the same surroundings as the jurors and is in the best position to judge whether the jurors were "necessarily exposed" to "prejudicial evidence." The Court should find as a factual matter that they were not.  Moreover, the Supreme Court has repeatedly declined to impute bias to a juror simply because he has "been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Because it "is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," id., due process requires only that jurors credibly affirm that they can remain fair and impartial despite those contacts and influences, id.  That is what happened here; and to the extent it did not, it is only because Tsarnaev failed to ask that the inquiry be made.

      **B.**     Tsarnaev has offered no reason to presume that the jurors were influenced by prejudicial Facebook posts.

Tsarnaev next argues that the jurors were not fair and impartial because of things that other people posted on Facebook.  Citing those posts, Tsarnaev alleges that the jurors' Facebook News Feeds were "saturated" with "inflammatory images, headlines, and comments," necessarily prejudicing them during the penalty phase (Tsarnaev cites virtually no posts occurring during the liability phase).  (Deft. Mot. at 13-14).  He also alleges that this purported "social media saturation would have been highly unlikely in a venue" other than the Eastern Division of Massachusetts.  (Deft. Mot. at 13).  Tsarnaev's argument was not raised in time and is based on unproved factual allegations and an apparent misunderstanding of how Facebook works; it should be rejected as both untimely and completely speculative.

First, Tsarnaev waived any argument based on Facebook posts by failing to raise it in time.  If Tsarnaev was concerned about Facebook posts by the jurors' Facebook "friends," he should have looked for those posts and brought them to the Court's attention *before* the jurors began deliberating – when there was still time to question the jurors about them (if warranted) and fashion a remedy (if needed).  The Court expressly prompted Tsarnaev to do so in a lobby conference held immediately before closing arguments.  (Tr. 05-12-15 (Lobby Conference) at 12-13).  Tsarnaev's failure to discover and raise the issue of the "inflammatory" posts before closing arguments – something that with due diligence he could have done – amounts to a waiver of his argument.

Second, Tsarnaev has not shown, and cannot show, that the "inflammatory" posts ever actually appeared in jurors' Facebook News Feeds -- or that, if they did appear, they remained there long enough, and were "high" enough in the News Feeds, for the jurors to notice them.  Absent such evidence, the posts are no more relevant than, say, newspaper articles that appeared

in other states or countries; there is simply no basis upon which to conclude that the jurors actually saw them.

As Facebook explains on its "Help Center" web page:  "News Feed is the constantly updating list of stories in the middle of your home page.  News Feed includes status updates, photos, videos, links, app activity and likes from people, Pages and groups that you follow on Facebook."  (Appx. A – "How News Feed Works").   But a Facebook user's News Feed does not necessarily include all, or even most, of the "status updates, photos, videos, links, app activity and likes from [all of the] people, Pages and groups" that the user follows.  Rather, as Facebook also explains in on its "Help Center" web page, it curates each user's News Feed by including only *some* status updates, comments, photos, and so on, posted by the user's Facebook "friends:"

> Q.      How does News Feed decide which stories to show?  ["Story" is Facebook's term for an item that appears in a user's News Feed.]

> A.      The stories that show in your News Feed are influenced by your connections and activity on Facebook. This helps you to see more stories that interest you from friends you interact with the most. The number of comments and likes a post receives and what kind of story it is (ex: photo, video, status update) can also make it more likely to appear in your News Feed.

(Appx. A – "How News Feed Works")

> Q.      Will all of the people who like my Page see my Page's posts in their News Feed?

> A.      It's possible that an update you publish on your Page may not be shown to everyone who likes your Page because News Feed space is limited.  The News Feed algorithm uses several factors to determine top stories shared by people and Pages, including the number of comments, who shared the story, and what type of post it is (ex: photo, video, status update).

(Appx. A – "Will all of the people who like my Page see my Page's posts in their News Feed?").

A recent Time Magazine article about Facebook's News Feed reports that "most users see only a sliver of the potential posts in their network each day."  (Appx. A - "Here's How

Facebook's News Feed Actually Works"). Moreover, "Facebook says the average user has access to about 1,500 posts per day but only looks at 300," or approximately 20%. Id. Numerous Facebook users have lodged bitter complaints on Facebook's "Help Center" web page about routinely failing to see posts from even their closest friends in their News Feeds. (Appx. A – "Is there a News Feed setting that will allow me to see all of my friends' posts?"; "Can I get my news feed to show ALL of my friends posts in recent to oldest?").

Even a post that manages to make it into a user's News Feed, moreover, may not stay there long enough, or ever appear "high up" enough in the News Feed, for the user actually to see it. A user's News Feed is like a stack of approximately 1,500 sheets paper where each sheet represents one Facebook "story." Facebook continually updates each user's stack of "stories" by removing some sheets, adding others, and reshuffling the stack so that the selection and order of "stories" is continually changing. (Appx. A – "Why Are Stories I've Already Seen Still Appearing in My News Feed?"). That means even jurors who scrolled through their News Feeds on a daily basis might never have seen any of the "inflammatory" stories Tsarnaev cites because Facebook had already removed them from the stack (or "demoted" them) before he or she ever reached them.

In addition, Facebook users can curate their own News Feeds by "unfollowing" Facebook "friends" whose Facebook activity they do not wish to see in their News Feeds. (Appx. A – "Why am I seeing stories about people I'm not friends with or groups I'm not a part of in my News Feed?"). These individuals still appear in the user's listing of "friends," but their Facebook activity no longer appears in the user's News Feed. Id.

In short, the first problem with Tsarnaev's social media "saturation" argument is that it is entirely speculative. Tsarnaev has not quantified the likelihood that any of the "inflammatory"

posts he cites actually made it into the jurors' Facebook News Feeds.  The likelihood could well

be *de minimis*.  Consequently, those posts are no more relevant to a venue analysis than the

billions of other posts made by Facebook's 1.5 billion users during the trial period.

The second problem with Tsarnaev's social media "saturation" argument is that it is

vastly overblown.  Even assuming the jurors with Facebook accounts actually viewed all of the

"inflammatory" posts made by their respective Facebook "friends," those posts still would

represent only a tiny fraction of the total number of "stories" that likely appeared in their "News

Feeds" over the 71-day trial period.  The following chart lists, for each of the 12 jurors:

- the juror's total number of Facebook "friends" (if any);[1]
- the total number of "stories" that potentially appeared in the juror's "News Feed" during the 71-day trial period assuming the juror's Facebook "friends" each generated just one "story" per day (i.e. posted even one comment, even one status update, even one photo, even one video, even one link, or registered even one "like" during the course of the day);
- the total number of purportedly inflammatory "stories" that appeared in each juror's "News Feed" over the 71-day trial period as calculated by Tsarnaev; and
- the percentage of "inflammatory" posts as compared to the total number.

| Juror Name | Number of Facebook "friends" | Total number of "stories" assuming one per "friend" per day | Total number of "inflammatory" posts per Tsarnaev | Percentage of "inflammatory" posts |
|---|---|---|---|---|
| | No Facebook acct. | N/A | N/A | N/A |
| | No Facebook acct. | N/A | N/A | N/A |
| | 1,203 | 85,413 | 0 | 0% |
| | 420 | 29,820 | 16 | .05% |
| | 711 | 50,481 | 15 | .03% |
| | 139 | 9,869 | 6 | .06% |
| | 225 | 15,975 | 7 | .05% |
| | 380 | 26,980 | 6 | .02% |
| | 99 | 7.029 | 3 | .04% |
| | 1,075 | 76,325 | 63 | .08% |
| | Unknown | Unknown | 1 | Unknown |
| | No Facebook acct. | N/A | N/A | N/A |

---

[1] The chart lists the jurors' total number of Facebook "friends" as of the date this opposition is being filed (i.e. September 30, 2015).  It is not possible to determine from publicly available information how many friends each juror had on the date each "inflammatory" post was made.   Documentation of each juror's number of "friends" appears in Appendix B.

These figures refute Tsarnaev's claim that the jurors' News Feeds were "saturated" with "inflammatory" posts.  Even if all the "inflammatory" posts made it into the jurors' News Feeds and were long-lived enough and high up enough to be viewed, they still amounted to nothing more than a drop in the bucket.  Moreover, many of the "inflammatory" posts were nothing more than photos or comments that referenced the 2015 Boston Marathon or the slogan "Boston Strong" without even mentioning Tsarnaev, the Marathon bombings, or the trial proceedings.  The evidence shows, and the Court should find, that no juror's Facebook feed was in fact "saturated" with "inflammatory" information.

Finally, Tsarnaev has offered no factual support for his assertion that jurors in another jurisdiction would have been substantially less likely to have Facebook "friends" making "inflammatory" posts.  Tsarnaev simply assumes -- without any offering any evidence, let alone proof -- that the jurors' Facebook "friends" are made up of  their actual "friends, families, and acquaintances;" that these "friends, families, and acquaintances" were themselves "immersed in the sequelae of the Marathon bombing;" and that but for this "immersion" they would not have made "inflammatory" posts.  (Deft. Mot. at 13).  Each of those allegations, once again, is wholly speculative.  A Facebook "friend" is anyone who sends you a "friend" request that you accept (and vice-versa).  It might be someone who shares a hobby, a high school classmate you have not seen for 20 years, a person you met on vacation, or even a total stranger trying to accumulate "friends."  These individuals could live anywhere in the United States or the world.  Tsarnaev has offered no evidence, let alone proved, that any of the jurors' Facebook "friends" were in fact "immersed in the sequelae of the Marathon bombing;" that the "inflammatory" posts were in fact made by people "immersed in the sequelae of the Marathon bombing;" or that jurors in other

jurisdictions would have had fewer Facebook "friends" who were "immersed in the sequelae of the Marathon bombing."

The Court informed the parties before trial began that the jurors would be permitted to use Facebook and other social media during the trial period so long as they obeyed the Court's instructions to avoid publicity and communication about the case.  Tsarnaev did not object. Although Facebook is a relatively new invention, courts have already held that a juror's use of it during a trial -- even to comment on the trial itself or to "friend" fellow jurors -- is not a basis for a new trial so long as the juror credibly affirms that he or she remained fair and impartial.  See, e.g., United States v. Ganias, 755 F.3d 125, 131-132 (2nd Cir. 2014); United States v. Fumo, 655 F.3d 288, 305-06 (3rd Cir. 2011).  That is the case here.

In sum, Tsarnaev waived any argument relating to posts by jurors' Facebook "friends" by failing to raise it in time.  He has not shown a sufficient likelihood that any juror was exposed to "inflammatory" Facebook posts, let alone that any juror's Facebook News Feed was "saturated" with them.  He also has not established that jurors in another jurisdiction would have had fewer Facebook "friends" posting "inflammatory" posts, or even that the bulk of the posts he actually complains of were actually prejudicial.  His argument is untimely and based on pure speculation. It should be rejected.

## II.      All of The Section 924(c) and 924(j) Counts Were Predicated on Crimes of Violence.

Fifteen counts of the indictment charged Tsarnaev with using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and/or § 924(j).  Section 924(c)(3)  defines a "crime of violence" as a felony offense that

> (A)  has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Paragraph (A) is commonly referred to as the "force" clause, and paragraph (B) is commonly referred to as the "residual" clause.  Tsarnaev now argues, for the first time, that all fifteen of the section 924(c) counts should have been dismissed because their respective predicates were not "crime[s] of violence" under either the force clause or the residual clause.  He also contends that the residual clause is unconstitutionally vague.  Tsarnaev's argument must be rejected because he waived it by failing to raise it in time.  It also lacks merit.

   A.   Tsarnaev waived his "crime of violence" argument by failing to raise it in time.

   Federal Rule of Criminal Procedure 12 requires that all defenses and objections based on defects in the indictment be raised prior to trial (or by any earlier deadline set by the court).  See Fed. R. Crim. P. 12(b)(3) and 12(c).  (Although Rule 12 was amended effective December 1, 2014, this requirement did not change.)  If a defendant does not meet the deadline, the defense or objection is deemed waived, see Fed. R. Crim. P. 12(e) (repealed Nov. 30, 2014), or untimely, see Fed. R. Crim. P. 12(c)(3) (eff. Dec 1, 2014).  See United States v. Rodriguez, 738 F.2d 13, 15 (1st Cir. 1984); Flying Eagles Pub., Inc. v. United States, 273 F.2d 799, 803 (1st Cir. 1960); see also United States v. Smith, 866 F.2d 1092, 1098 (9th Cir. 1989).  An exception exists only if the defendant can show "good cause" for exceeding the deadline, see Fed. R. Crim. P. 12(e) (repealed Nov. 30, 2014) and Fed. R. Crim. P. 12(c)(3) (eff. Dec 1, 2014), or if the basis for the motion was not "then reasonably available," see Fed. R. Crim. P. 12(b)(3) (eff. Dec 1, 2014).  Those exceptions do not apply here.

The Court set a filing deadline of February 28, 2014 for any motion to dismiss the indictment (Dkt. 148), and Tsarnaev filed a motion to dismiss on that date (Dkt. 208).  He filed two additional motions to dismiss on August 22, 2014 (Dkt. 506) and February 26, 2015 (Dkt. 1080), respectively.  Trial commenced on January 5, 2015 and concluded on April 8, 2015 with guilty verdicts on all thirty counts.  During all that time, Tsarnaev never filed a motion objecting that the predicates for the section 924(c) counts were not crimes of violence.  In addition, the government's proposed jury instructions, filed on April 2, 2015, included, for each section 924(c) count, an instruction that the predicate crime was a "crime of violence."  (Dkt. 1232). Tsarnaev never objected to those instructions orally or in writing (although he objected to other proposed instructions).  (Dkt. 1234, 1237).  Similarly, the Court gave the parties draft instructions, and later gave the jury actual instructions, in which it identified the predicate offenses as crimes of violence.  Tsarnaev never objected to those instructions either before or after they were given.  That is the essence of a waiver.

> B.     All of the section 924(c) and 924(j) predicates are crimes of violence under the "force" clause.

In any event, each of the predicate crimes qualifies as a crime of violence under 18 U.S.C. § 924(c)(3)(A) (the force clause) because each "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  In Johnson v. United States, 559 U.S. 133 2010 ("Johnson I"), the Supreme Court, interpreting identical language in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(i), held that "physical" in this context "plainly refers to force exerted by and through concrete bodies -- distinguishing physical force from, for example, intellectual force or emotional force . . . [and] 'physical force' means *violent* force -- that is, force capable of causing physical pain or injury to another person."  Id. at 138, 140.  Thus, a crime has as an element the "use . . . of physical force"

if committing it requires the use of matter or energy sufficient to cause physical pain or injury. There is no additional requirement, as Tsarnaev seems to suggest, that the matter or energy be deployed using physical violence.

Counts Three, Five, Eight, Ten, Thirteen, Fifteen, Twenty-Four, Twenty-Six, Twenty-Eight, and Thirty are all predicated on the use of a weapon of mass destruction, in violation of 18 U.S.C. § 2332a.  An offender commits that crime if he "uses" a "weapon of mass destruction" "against" a person or property.   A "weapon of mass destruction" is defined as:

> (A) any destructive device as defined in section 921 of this title;
>
> (B) any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;
>
> (C) any weapon involving a biological agent, toxin, or vector (as those terms are defined in section 178 of this title); or
>
> (D) any weapon that is designed to release radiation or radioactivity at a level dangerous to human life;

A section 2332a offense has as an element the "use . . . of physical force" because it can only be committed through the use of physical matter or energy (including toxins, chemicals, biological agents, and subatomic particles) capable of causing physical pain or injury to another person. The impact of these things on people is no less physically forceful than the impact of, say, a bullet or of shrapnel.  Tsarnaev appears to suggest that in the case of toxins, chemicals, and biological agents, a section 2332a violation involves the "use . . . of physical force" only if the injurious substance is deployed through physical violence, e.g., by hurling the substance in someone's face rather than simply releasing it into the air they breathe or sending it to them through the mail.  That is an absurd reading of definition of "crime of violence" that Congress could not have intended and that the Supreme Court plainly did not adopt in Johnson I.

16

Counts Eight and Ten are based on the predicate crime of bombing a place of public use, in violation of 18 U.S.C. § 2332a.  A person violates that statute if he "delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use."  Once again, Tsarnaev claims that this statute is not a crime of violence because the acts of "deliver[ing]" and "plac[ing]" a bomb do not involve violent physical force.  That theory is contrary to the reasoning of <u>Johnson</u> I and would produce absurd results.  The delivery or placement of a bomb is no less a use of violent "physical force" than the discharge or detonation of that bomb because it is the bomb itself that constitutes the violent physical force required by section 924(c)(3)(A); the manner of deploying the bomb is irrelevant.

Counts Thirteen and Fifteen are based on the predicate crime of malicious destruction of property in violation of 18 U.S.C. § 844(i).  A person violates that statute if he "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle or other real or personal property."  Tsarnaev simply asserts that this crime does not require the use of violent physical force without actually offering an argument why that is so -- presumably because he could not think of one.  The use of fire or an explosive to damage or destroy plainly involves the use of physical matter or energy sufficient to cause physical injury.  It therefore meets the definition of crime of violence in section 924(c)(3)(A).

Counts Sixteen, Seventeen, and Eighteen are predicated on conspiracy to use a weapon of mass destruction, conspiracy to bomb a place of public use, and conspiracy to maliciously destroy property, respectively.  It is well-settled in this circuit that "when a conspiracy exists to commit a crime of violence . . . the conspiracy itself poses a substantial risk of violence."  <u>United States v. Turner</u>, 501 F.3d 59, 67 (1st Cir. 2007).  <u>Accord</u> <u>United States v. Castro-Vazquez</u>, 2015

WL 5172839 (1st Cir. 2015); United States v. Fiore, 983 F.2d 1, 3 (1st Cir. 1992).  That is the case here.

Count Twenty is predicated on the crime of carjacking, in violation of 18 U.S.C. § 2119.  An offender commits that crime if he "takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation."  Tsarnaev argues, incorrectly, that "intimidation" does not require the "threatened use of physical force" within the meaning of section 924(c)(3)(A).  It does (although the threat need not be explicit).  See, e.g., United States v. Henson, 945 F.2d 430, 439-40 (1st Cir. 1991); United States v. Kelley, 412 F.3d 1240, 1244 (11th Cir. 2005).  As for Tsarnaev's other two arguments, he offers no support for the proposition that a person can violate section 2119 by negligently or recklessly threatening the use of physical force, or by using intellectual or emotional force as opposed to physical force; the Supreme Court has held, on the contrary, that section 2119 requires proof that "the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car."  Holloway v. United States, 526 U.S. 1, 12, (1999).  This Court should join the many other circuits that have found carjacking categorically to be a crime of violence.  See, e.g., United States v. Mohammed, 27 F.3d 815, 819 (2nd Cir.1994); United States v. Singleton, 16 F.3d 1419, 1423 (5th Cir.1994) ("Carjacking is always and without exception a 'crime of violence' as that term is defined in 18 U.S.C. § 924(c)(3)."); United States v. Brown, 200 F.3d 700, 706 (10th Cir. 1999) ("The substantive offense of carjacking is always a crime of violence."); United States v. Moore, 43 F.3d 568, 572-73 (11th Cir. 1994) ("The term 'crime of violence' as Congress defined it in 18 U.S.C. § 924(c)(3) clearly includes carjacking.  'Tak[ing] or attempt[ing] to take by force and violence or by intimidation,' 18 U.S.C. § 2119, encompasses 'the use, attempted use, or threatened use of physical force.'").

Finally, Count Twenty-Two is predicated on the crime of robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951(a).  A person commits that crime if he

> obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by robbery . . . or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section.

"Robbery" is defined in section 1951(b) as:

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

Tsarnaev argues that stealing a car from someone by "generating a fear [in the victim] of injury to the person or property of another . . . [is] conduct that does not require the use, attempted use or threatened use of physical force" (Deft. Mot. at 37-38); but he cites no support for that proposition, and he fails to explain how an offender could induce fear in the victim of injury to another person without communicating some kind of physical threat.  He also fails to mention that the First Circuit has already held that Hobbs Act robbery is a crime of violence within the meaning of 18 U.S.C. § 924(c).  United States v. Morales-Machuca, 546 F.3d 13, 21 (1st Cir. 2008).

C.    All of the section 924(c) predicates also are crimes of violence under the residual clause, which is not unconstitutionally vague.

We have already shown that each of the section 924(c) predicates has an element the use, attempted use, or threatened use of physical force.  It necessarily follows that each also, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).  The predicates therefore are crimes of violence under section 924(c)(3)'s residual clause as well.

Tsarnaev argues, incorrectly, that section 924(c)(3)(B) is unconstitutionally vague because the Supreme Court held in Johnson v. United States, 135 S.Ct. 2551 (2015) ("Johnson II"), that the residual clause in a differently-worded definition of crime of violence -- a broader and more confusing definition that has repeatedly confounded the Court and split the circuits -- is unconstitutionally vague.  The Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B), defines a "violent felony" as a felony that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

The Court in Johnson II held that the final or residual clause of this definition (i.e. "otherwise involves conduct that presents a serious potential risk of physical injury to another") is unconstitutionally vague.  In doing so, however, it relied on language in section 924(e)(2)(B) that is not present in section 924(c)(3)(B) and that makes the former broader and less definite than the latter.  Specifically, it relied on the introductory list of crimes ("burglary, arson, or extortion"), which is not present in 924(c)(3)(B); the broadening of the definition to include risks of injury that arise both during and after the crime is committed (in contrast to section 924(c)(3)(B), which requires that the risk of injury occur "in the course of committing the offense"); and the broadening of the definition to include all crimes that present a substantial risk of "injury to another" (in contrast to section 924(c)(3)(B), which more narrowly requires that the crime involve a substantial risk of the use of "physical force").  As explained below, these are material distinctions that save section 924(c)(3)(B) from being unconstitutionally vague under Johnson II.

The Johnson II Court invalidated the ACCA's residual clause because of various "uncertainties" that, in combination, rendered its definition of violent felony unconstitutionally

vague.  Id. at 2560.  The "uncertainties" were that the definition, which requires a calculation of

"serious potential risk:"

> (1) "leaves grave uncertainty about *how* to estimate the risk posed by a crime . . . [because it] ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime," id. at 2557 (emphasis added);

> (2) "leaves uncertainty about *how much* risk it takes for a crime to qualify as a violent felony," id. at 2558 (emphasis added);

> (3) "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes -- burglary, arson, extortion, and crimes involving the use of explosives. . . [even though these] offenses are 'far from clear in respect to the degree of risk each poses,'" id. at 2558 (quoting Begay v. United States, 553 U.S. 137, 143 (2008)); and

> (4) "[has resulted in] repeated attempts and repeated failures [by this Court] to craft a principled and objective standard," id. at 2558.

Only one of those "uncertainties" is present in section 924(c)(3)(B), namely, the need to consider

the "ordinary" version of the crime in determining whether the crime, "by its nature," involves a

substantial risk of the use of physical force.  But the Johnson II Court did not hold that that

uncertainty alone rendered the ACCA's residual clause unconstitutionally vague, and  in fact

suggested the opposite.  See 135 S.Ct. at 2560.

Unlike the ACCA, Section 924(c)(3)(B) does not contain an introductory list of disparate

crimes carrying varying risks of injury to which other candidate violent crimes must be

compared to determine whether they carry commensurate risk.  The presence of that list – and

the concomitant need for a potentially confusing and unproductive comparison -- was a

determinative factor in Johnson II.  The enumerated list had troubled members of the Court since

James v. United States, 550 U.S. 192, 215-16, 230 n.7 (Scalia, J., joined by Stevens and

Ginsburg, J.J., dissenting) (stating that comparing a predicate offense with its closest analog

among enumerated offenses is an unhelpful test if the analog is not obvious because the listed

offenses have little in common).  The Court also struggled with the list in Begay, where even the

majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses."  553 U.S. at 143.

The continuing confusion over how to interpret the list in conjunction with the residual clause ultimately convinced the Johnson II Court of the ACCA's vagueness.  The interpretive difficulties posed by the list pervaded the Court's analysis.  For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes -- burglary, arson, extortion, and crimes involving the use of explosives."  135 S.Ct. at 2558.  The Court again referred to the enumerated crimes in explaining why its decisions in Begay and Sykes v. United States, 131 S.Ct. 2267 (2011), did "not succeed in bringing clarity to the meaning of the residual clause."  Id. at 2559 (Begay's test, which turned on similarity of crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); id. ("common sense" used in Sykes was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes").  And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they did not "link[] a phrase such as 'substantial risk' to a confusing list of examples."  Id. at 2561.  Section 924(c)(3)(B), like the statutes the Court distinguished in Johnson II, contains no "confusing list" to cloud its analysis.  It does, however, contain language identical to many other federal and state statutes.  See, e.g., 18 U.S.C. §§ 16(b), 521(d)(3)(C), 3142(f)(1)(A) and (g)(1), 3663A(c)(1)(A), 5032; R.I. Gen. Laws 1956, § 21-28-4.07.2(a); Utah Code Ann. § 76-9-802(5)(b)(i).  Thus, while the Johnson II Court stated that invalidating the ACCA's residual

clause would have little effect on other risk-based statutes, see 135 S.Ct. at 2561, a decision striking section 924(c)(3)(B) would significantly impact other federal and state laws.

Another uncertainty about the ACCA identified in Johnson II but absent from section 924(c)(3)(B) is the need for courts to evaluate not only "the chances that the physical acts that make up the crime [night] injure someone" but also the risk for injury even "after" completion of the offense.  Johnson II, 135 S.Ct. at 2557; see also id. at 2559 (noting that "remote" physical injury could qualify under ACCA, but that the clause does not indicate "how remote is too remote").  The Court explained that "[t]he inclusion of burglary and extortion among the enumerated offenses" confirms that courts assessing risk have to go "beyond evaluating the chances that the physical acts that make up the crime will injure someone."  Id.  That is so because risk of injury could arise in a burglary after the breaking and entering had occurred, and an extortionist might become violent after making his demand.  Id.  The consideration of post-offense conduct was therefore part of the ACCA's indeterminate "wide-ranging inquiry."  Id.

Section 924(c)(3)(B) eliminates this uncertainty because it applies only when the risk of force occurs "in the course of committing the offense."  See Leocal v. Ashcroft, 543 U.S. 1, 7, 10 & n.7 (2004) (discussing identical language in 18 U.S.C. § 16(b)); United States v. Hernandez-Neave, 291 F.3d 296, 299 (5th Cir. 2001) ("The nature of the crime is enclosed within the completion of [the offense] conduct."); United States v. Serafin, 562 F.3d 1105, 1109 (10th Cir. 2009) (emphasizing "the textual difference between 18 U.S.C. § 16(b) and" the ACCA residual clause, and explaining that "for an offense to qualify as a section 16(b) crime of violence, the risk of force must arise in the course of committing the crime and not merely as a possible result").  Unlike the ACCA, section 924(c)(3)(B) does not go beyond "the physical acts that make up the crime."  Johnson II, 135 S.Ct. at 2557.  Further, section 924(c)(3)(B) depends on the

risk of the "use of force" rather than the much broader "risk of injury."  Section 924(c)(3)(B)'s

focus on the use of force during an offense, rather than on the potential risk and effects of the

offense, limits the statute's reach and avoids the kind of speculation about extra-offense conduct

that the Johnson II Court found so troubling.  See id. at 2557, 2559.

     The third significant difference between the ACCA and section 924(c)(3)(B) is the

Johnson II Court's emphasis on its own "repeated" inability to develop a "principled and

objective standard" for applying the ACCA.  Johnson II, 135 S.Ct. at 2558.  That concern was a

factor in the Court's decision.  See id. at 2559 (noting that Johnson II was the Court's "fifth

[case] about the meaning of the [ACCA] residual clause"); see also Sykes, 131 S.Ct. at 2287

(Scalia, J., dissenting) (stating that the Court's repeated failures in addressing the ACCA are

"[w]hat sets ACCA apart" and "confirms" its vagueness).  The Johnson II Court expressed clear

frustration that its ACCA's decisions had been a "failed enterprise."  135 S.Ct. at 2560.  It also

noted that there were numerous lower court splits about "the nature of the inquiry" that a court

should conduct under the ACCA, and that those disagreements "went beyond matters of degree."

Id. at 2560.  In contrast, neither the Supreme Court nor the lower courts have had any difficulty

developing principled and objective standards for applying section 924(c)(3)(B)'s definition of

violent crime, which, as noted earlier, appears in many other federal statutes as well.  See, e.g.,

Leocal v. Ashcroft, 543 U.S. 1 (2004) (interpreting 18 U.S.C. § 16(b)).

     Under Leocal and Johnson I, a crime of violence for purposes of 18 U.S.C. § 16(b) (and

thus for section 924(c)(3)(B) as well) is limited to one that (1) naturally involves a disregard of a

substantial risk of force against another, and (2) gives rise to the risk during the actual

commission of (3) an active, violent offense.  See Leocal, 543 U.S. at 10-11; see also United

States v. Lanier, 520 U.S. 259, 266 (1997) (clarity may be provided by judicial gloss on an

otherwise uncertain statute).  In fact, the Federal Public Defender's brief in Johnson II agreed

that "[t]hese requirements are meaningfully different than the ACCA's residual clause and make

§ 16(b) narrower."  See Supplemental Reply Brief for the Petitioner, Johnson v. United States,

2015 WL 1641122, at *15.

The inquiry under section 924(c)(B)(3) is straightforward and involves none of the

speculation that the Court found so troubling in Johnson II.  An offense is a crime of violence if,

but only if, the offense elements themselves "naturally involve a person acting in disregard of the

risk that physical force might be used against another in committing an offense."  Leocal, 543

U.S. at 11.  Unlike the ACCA's residual clause, section 924(c)(3)(B) does not require inquiry

into events occurring after the offense has been completed, or whether physical injury is likely to

result.  There is nothing vague or speculative about asking whether an offense naturally involves

a risk of the use of force during its commission; the phrase "by its nature" in section

924(c)(3)(B) simply triggers application of the categorical approach, which, of course, limits the

inquiry to offense elements.  See United States v. Velazquez-Overa, 100 F.3d 418, 420 (5th Cir.

1996) ("the phrase 'by its nature' compels a categorical approach").  The Supreme Court has

long examined the "nature" of predicate offenses for enhancement purposes without finding the

inquiry unprincipled or too subjective.  See, e.g., Moncrieffe v. Holder, 133 S. Ct. 1678, 1684

(2013) (comparison of predicate offense to its "generic" counterpart requires Court to assess

"whether the state statute shares the nature of the federal offense that serves as a point of

comparison").

Finally, even assuming for the sake of argument that section 924(c)(3)(B) is vague in

some applications, Tsarnaev has failed to show -- as he must -- that it is vague as applied to him.

Johnson II did not overrule the Supreme Court's numerous cases requiring a court to analyze a

vagueness challenge outside of the First Amendment context on the facts of the particular case before it.  See, e.g., Chapman v. United States, 500 U.S. 453, 467 (1991) (vagueness challenge to sentencing statute); United States v. Powell, 423 U.S. 87, 92 (1975); United States v. Mazurie, 419 U.S. 544, 550 (1975).  The Court invalidated the ACCA's residual clause in all of its applications because it considered the provision "a judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction."  Johnson II, 135 S.Ct. at 2562 (internal quotation marks omitted).  The same is not true of section 924(c)(3)(B).

Because section 924(c)(3)(B) is not unconstitutionally vague in all its applications, and Tsarnaev has not shown -- and cannot show -- that it is vague as applied to him, his vagueness challenge to the statute must be rejected.

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's motion for judgment notwithstanding the verdict and motion for new trial in its entirety.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:    /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
STEVEN MELLIN
Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

/s/ William D. Weinreb
WILLIAM D. WEINREB