```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


                                     )
UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )   Criminal Action
v.                                   )   No. 13-10200-GAO
                                     )
DZHOKHAR A. TSARNAEV, also           )
known as Jahar Tsarni,               )
                                     )
          Defendant.                 )
                                     )



           BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE



                    JURY TRIAL - DAY THIRTY-TWO


            John J. Moakley United States Courthouse
                          Courtroom No. 9
                         One Courthouse Way
                     Boston, Massachusetts  02210
                       Thursday, March 12, 2015
                             9:09 a.m.



                    Marcia G. Patrisso, RMR, CRR
                       Official Court Reporter
                   John J. Moakley U.S. Courthouse
                    One Courthouse Way, Room 3510
                      Boston, Massachusetts  02210
                           (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10            Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  MICHAEL CASHMAN

5       By Mr. Weinreb           6

6  ANTHONY GRASSI

7       By Mr. Weinreb          19

8  RENÉ ROBINSON

9       By Mr. Mellin           30                        65
        By Mr. Watkins                        62
10
   ALAN MEDNICK
11
        By Mr. Weinreb          65
12
   EDDIE LAKKIS
13
        By Mr. Weinreb          78
14
   DUN MENG
15
        By Mr. Mellin           84                       147
16      By Mr. Bruck                          144

17 WILLIAM J. O'KEEFE, JR.

18       By Ms. Pellegrini     148

19 MICHAEL NICKERSON

20       By Mr. Weinreb        166

21 JOSEPH W. SULLIVAN

22       By Mr. Chakravarty    172

23

24

25

```
 1                          E X H I B I T S

 2
     GOVERNMENT'S
 3    EXHIBIT      DESCRIPTION                    FOR ID      RECEIVED

 4   1458          Screenshot of video                         16

 5   1459          Screenshot of video                         17

 6   1591-1521     Photographs                                 19

 7   694-701       Photographs                                 24

 8   706-714       Photographs                                 27

 9   728           Photograph                                  42

10   733           Photograph                                  46

11   729           Photograph                                  49

12   737           Photograph                                  52

13   735           Photograph                                  55

14   728           Photograph                                  60

15   742           Map                                         68

16   743-745       Photographs                                 68

17   746           Photograph                                  71

18   747           Photograph                                  72

19   748           Compilation video                          75

20   749-750       Photographs                                 77

21   751           Photograph                                  82

22   754           Lease agreement                            91

23   753           Motor vehicle registration - Mercedes      92

24   755           Bank of America ATM card                  113

25   752           Composite of audio and video of 9-1-1 call 135
```

1                         E X H I B I T S (cont'd)

2

    GOVERNMENT'S
3     EXHIBIT        DESCRIPTION              FOR ID      RECEIVED

4   795              Photograph                              142

5   796              Photograph                              144

6   797              Photograph                              145

7   768-769          Bank of America records                158

8   756              Surveillance video                     163

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  All rise for the Court and the jury.

(The Court and jury enter the courtroom at 9:09 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning, jurors.

THE JURORS:  Good morning.

MR. WEINREB:  Good morning, your Honor.  The United States calls Trooper Mike Cashman.

MICHAEL CASHMAN, duly sworn

THE CLERK:  Have a seat.  State your name, spell your last name for the record, keep your voice up and speak into the mic so everyone can hear you.

THE WITNESS:  My name is Michael Cashman, C-A-S-H-M-A-N.

DIRECT EXAMINATION

BY MR. WEINREB:

Q.   Good morning, sir.

A.   Good morning, sir.

Q.   Where do you work?

A.   I'm a trooper with the Massachusetts State Police.

Q.   How long have you been a trooper?

A.   Since 2002.

Q.   What are your job responsibilities currently?

A.   I'm currently assigned to the Middlesex County District Attorney's Homicide Unit.

```
 1   Q.   Do you investigate homicides?

 2   A.   Yes, sir.

 3   Q.   And how long have you been doing that?

 4   A.   Since 2012.

 5   Q.   How many criminal investigations of any kind have you

 6   participated in, would you say?

 7   A.   Hundreds.

 8   Q.   How many homicide investigations have you participated in?

 9   A.   Twenty to 25.

00:05 10   Q.   Did you participate in the Sean Collier murder

11   investigation?

12   A.   Yes, sir, I did.

13   Q.   On what date was Officer Collier murdered?

14   A.   April 18, 2013.

15   Q.   Did you go to the MIT crime scene that night?

16   A.   Yes, sir.

17   Q.   And then later that night or early the next morning did

18   you respond to another crime scene?

19   A.   Yes, sir.

00:06 20   Q.   Where was that second crime scene?

21   A.   Laurel Street in Watertown.

22   Q.   About what time did you get to Laurel Street?

23   A.   Probably about 11 a.m.

24   Q.   So that would have been on April 19th?

25   A.   On Friday the 19th.  Yes, sir.
```

1    Q.   And the crime that had taken place on Laurel Street, that

2    had taken place closer to 1 a.m. or so of April 19th?

3    A.   Yes, sir.

4    Q.   When you got there on the morning of April 19th, did you

5    focus your attention on a particular piece of evidence?

6    A.   Yes.

7    Q.   What was that?

8    A.   It was a green Honda.

9    Q.   What make?

00:06 10    A.   Civic.

11    Q.   Where was it?

12    A.   It was right in the center of Laurel Street.

13    Q.   Just abandoned there?

14    A.   Yes, sir.

15    Q.   Were you interested in the Honda Civic in particular?

16    A.   Yes.

17    Q.   Why?

18    A.   At the time myself and other investigators assigned to the

19    Collier homicide believed that that car was used as a getaway

00:07 20    vehicle from the scene.

21    Q.   And was that based on surveillance video you had seen?

22    A.   Yes, sir.

23         MR. WEINREB:  Could we have Exhibit 723, please.

24    That's already in evidence.

25         THE COURT:  It is in evidence?

1          MR. WEINREB:  It is.

2     BY MR. WEINREB:

3     Q.   Just looking at a screenshot of this video, do you

4     recognize it?

5     A.   Yes, sir.

6     Q.   Did you see it that night?

7     A.   Yes, I did.

8     Q.   I'm going to skip ahead to a point on the video which is,

9     according to the timestamp, 10:25:45 p.m.

00:07  10          (Pause.)

11     Q.   Okay.  Trooper Cashman, these screens in the courtroom

12     don't allow us to skip ahead and I don't want you to have to

13     sit here through the entire video, so let me just ask you:

14     What do you see in this video that you recall?

15     A.    It just went off, but in that video it's a view of the

16     courtyard at MIT.  On my left side is Sean Collier's cruiser,

17     which is parked on the pedestrian way, and there are

18     individuals that are -- I can see going from the right to the

19     left approaching Officer Collier's cruiser.

00:09  20     Q.   And after they get there -- they're there for a bit and

21     then what do they do?

22     A.   They flee from the scene, back the same way that they had

23     originally come from, towards Ames Street in Cambridge.

24     Q.   And when they -- when you say "Ames Street," could you

25     just indicate to us on the -- by describing it where Ames

1    Street would be in relation to this --

2    A.   As I'm looking at the screen, sir, Ames Street would be to

3    the right.   There's an alleyway between those two buildings to

4    the right side of the screen, and that would exit right onto

5    Ames Street in Cambridge.

6    Q.   Okay.   And, in fact, there are some tiny figures right at

7    the right side of the screen right now moving.   Do you see

8    those?

9    A.   Yes, sir.

00:10 10   Q.   And are they headed out towards Ames Street?

11   A.   It appears they are, yes.

12   Q.   Do you know what time the two figures who flee from the

13   car -- do you recall what time they leave the screen and hit

14   Ames Street?

15   A.   It's right about 10:26 p.m.

16        MR. WEINREB:   Could we have Exhibit 682, please.

17   Q.   Looking at 682, do you recognize this?

18   A.   Yes, sir.

19   Q.   What is it?

00:10 20   A.   That's a diagram of the courtyard that we were just

21   looking at on the video at MIT.

22   Q.   And where is Ames Street on this?

23   A.   It's on the right side of the diagram.   And it looks like

24   it's marked.

25   Q.   Okay.   So can you circle -- using your finger, can you

1    circle the area where somebody exiting the courtyard -- where

2    the two figures exited the courtyard and got to Ames Street?

3    A.   Well, the last time that you could see them from that

4    video, they exited right there (indicating).

5    Q.   Okay.  And then can you just, using your finger, draw a

6    line along Ames Street?

7    A.   (Witness complies.)

8    Q.   Okay.  Do you see -- you drew a line from north to south

9    along the street, along the right-hand side of the picture.

00:12 10   And towards the bottom of it, there's a pointy building that

11   points directly at Ames Street, correct?

12   A.   Yes, sir.

13               MR. WEINREB:  Can we have Exhibit 1466 for

14   identification just for the witness, please.

15   Q.   Do you recognize this video?

16   A.   Yes, I do.

17   Q.   Do you recall viewing it in the course of your

18   investigation?

19   A.   Yes, I do, sir.

00:12 20   Q.   What location is pictured in this video?

21   A.   That's a section of Ames Street where there's a crosswalk.

22   Q.   And do you see the pointy building in there that you saw

23   on the map?

24   A.   It's a little dark on this screen but, yes, I do see it.

25               THE COURT:  Mr. Weinreb, I think this was admitted

yesterday.

        MR. WEINREB:  Ahh, it was.  You're correct, your Honor.  Thank you.

        If we could publish it, that would make things easier.

BY MR. WEINREB:

Q.   So can you describe -- so this is not going to be touch sensitive at this point, but we're looking at a street.  You said there's a crosswalk.  Is that right?

A.   Yes, sir, on Ames Street.

Q.   All right.  And the pointy building, is that in the center of the photograph towards the top?

A.   Yes.

Q.   Turning your attention to the blue numbers that appear at the -- in the control portion of the player that is pictured in this screenshot, or this first frame of the video, can you see what date and time this was taken?

A.   April 18th, 2013, at 10:26 p.m.

Q.   So how does that compare to the time when the two figures are last seen leaving the courtyard?

A.   It's right at the same time.

Q.   At this point I'm going to play the video.  I'll just ask you to keep watching until the end.

        (Video played.)

Q.   We're seeing cars drive from left to right?

A.   Yes, sir.  That would be a north direction.

1    Q.   And now we're seeing a car drive from right to left.  Did

2    you see that?

3    A.   Yes, sir.

4    Q.   Okay.  Are you familiar with that car?

5    A.   Yes, I am.

6         MR. WEINREB:  Let's have Exhibit 1458, please.

7    Q.   Is that a -- is that a screenshot of that car on April

8    18th driving from right to left across the screen?

9    A.   Yes, sir.

00:15 10   Q.   And looking at the blue writing again down in the playing

11   portion, what's the date and time that that car reaches that

12   spot?

13   A.   Again, it's April 18, 2013, 10:26:56, or almost 10:27 p.m.

14   Q.   So approximately a minute after you last saw the figures

15   leave the courtyard?

16   A.   Yes, sir.

17   Q.   When you saw that car on the video, is that car familiar

18   to you?

19   A.   Yes, sir.

00:16 20   Q.   Do you recognize it?

21   A.   Yes, I do.

22   Q.   What does it appear to be?

23   A.   It's the Honda Civic.

24   Q.   When you say "the Honda Civic," you mean the one that you

25   found abandoned up on Laurel Street?

1    A.    Yes, sir.

2    Q.    Did you do anything to confirm that that's, in fact, the

3    Honda Civic?

4    A.    Yes, sir, I did.

5    Q.    What did you do?

6    A.    Myself and other investigators had the Honda towed back to

7    the scene.  It was in operable condition.  And we -- roughly

8    the same time of night to get the lighting correct, we drove

9    the Honda down Ames Street several times to use the same camera

00:16 10    of this same angle to get a comparison view to compare side by

11    side.

12              MR. WEINREB:  Can we have Exhibit 1467, please.

13    Q.    Do you recognize this?

14    A.    Yes, sir, I do.

15    Q.    Looking at the date and time down where the blue writing

16    appears, what date and time was this taken?

17    A.    April 25th, 2013, at 9:24 p.m.

18    Q.    So that's exactly a week later?

19    A.    Yes, sir.

00:17 20    Q.    At roughly the same time?

21    A.    It's not the same time but it's the same lighting.

22    Q.    Is this the -- a portion of the video that was taken by

23    the camera on that date when you reenacted the Honda driving

24    by?

25    A.    Yes, sir.

1    Q.    I'm going to play it now.

2          THE COURT:  This hasn't been offered yet.  If you're

3    playing it just for the witness, that's fine.

4          (Video played.)

5    Q.    Is this a fair and accurate --

6          MR. WEINREB:  I thought it was, your Honor.

7          THE CLERK:  I have it in.

8          MS. PELLEGRINI:  I think it's in.

9          THE COURT:  Correct.  You're right.  Correct.  It was

00:18 10   in yesterday, so I'll now expose it to the jury as well.

11         MR. WEINREB:  So I'm going to play that again.

12         Actually, before I do, your Honor, can we have the

13   screenshot from the first video, 1458?  If that hadn't been

14   offered, I offer it now.

15         THE COURT:  It was not offered before.

16         MR. WEINREB:  Then I offer it now and ask that it be

17   published to the jury.

18         MR. WATKINS:  No objection.

19         THE COURT:  All right.

00:19 20         (Government Exhibit No. 1458 received into evidence.)

21         MR. WEINREB:  Can we bring that up now, 1458?  All

22   right.

23         So this time for the jury.

24   BY MR. WEINREB:

25   Q.    This was taken on the night of April 18th at -- the

1    screenshot, you said, was approximately one minute after the

2    two figures are seen leaving the courtyard?

3    A.   Yes, sir, that's correct.

4    Q.   And you said that that was the Honda Civic -- or it

5    appeared to you to be the Honda Civic that was abandoned on

6    Laurel Street?

7    A.   That's correct.

8            MR. WEINREB:  Now let's take a look at the reenactment

9    video, 1467, please.

00:19 10         (Video played.)

11           MR. WEINREB:  Can we have 1459 just for the witness.

12           (Video played.)

13   Q.   Looking at the caption, do you recognize this?

14   A.   Yes, sir.  Yes, I do.

15   Q.   What is it?

16   A.   It's a still shot from that same angle on April 25th, the

17   reenactment.

18   Q.   And is that a fair and accurate picture -- snapshot from

19   the video?

00:20 20  A.   Yes, it is.

21           MR. WEINREB:  I offer 1459 and ask that it be

22   published.

23           MR. WATKINS:  No objection.

24           THE COURT:  Okay.

25           (Government Exhibit No. 1459 received into evidence.)

1       MR. WEINREB:  And, Mr. Bruemmer, if you could put the

2   two screenshots side by side, 1458 and 1459.

3   Q.   Comparing those two images, does it appear to you that the

4   car that drove away from the scene on the night of April 18th

5   at approximately 10:27 p.m. was the Honda Civic that was

6   abandoned on Laurel Street later that night?

7   A.   Yes, sir, it does appear to me to be the same vehicle.

8       MR. WEINREB:  Your Honor, if we could have Mr. Lyness

9   capture this, we'll offer it.

00:21 10       THE CLERK:  Give me one second.

11       (Pause.)

12   BY MR. WEINREB:

13   Q.   One last thing, Trooper Cashman.  After the defendant's

14   arrest, did you obtain a search warrant for a blood sample?

15   A.   Yes, I did.

16       MR. WEINREB:  Could we have 1591 just for the witness?

17   Q.   Do you recognize this?

18   A.   Yes, I do.

19   Q.   What is it?

00:22 20   A.   Those are three vials, or three tubes, of blood that I

21   obtained pursuant to the search warrant that I received from

22   Beth Israel Hospital.

23   Q.   All right.  Is that a fair and accurate photograph?

24   A.   Yes, sir, it is.

25       MR. WEINREB:  Could we have 1592, please.

1           Your Honor, I'm transposing the last two digits, so

2    that that was 1519, and now we're looking at 1520.

3    Q.   What's that?

4    A.   Those are my initials and my State Police ID number, 2962,

5    and the date.

6    Q.   Is that something you put on an evidence bag when it's

7    sealed?

8    A.   Yes, sir.

9           MR. WEINREB:  And 1521, please.

00:23 10   Q.   What's that a picture of?

11   A.   That's a photograph of the bag that I received directly

12   from the lab at Beth Israel.

13   Q.   1520 and 1521, are they also fair and accurate photographs

14   of what's depicted?

15   A.   Yes, sir.

16          MR. WEINREB:  Your Honor, we'd offer those at this

17   time but there's no need to publish them yet.

18          THE COURT:  All right.

19          MR. WATKINS:  May I just have a moment?

00:23 20        (Discussion off the record.)

21          MR. WATKINS:  No objection.

22          THE COURT:  Okay.

23          (Exhibit Nos. 1591, 1520 and 1521 received into

24   evidence.)

25          MR. WEINREB:  Thank you, Trooper Cashman.  No further

```
 1    questions.
 2             THE COURT:  Thank you, Trooper.  You may step down.
 3             THE WITNESS:  Thank you, your Honor.
 4             MR. WATKINS:  No questions.
 5             (The witness is excused.)
 6             MR. WEINREB:  The United States calls Anthony Grassi.
 7                    ANTHONY GRASSI, duly sworn
 8             THE CLERK:  Have a seat.  State your name, spell your
 9    last name for the record, keep your voice up and speak into the
10    mic so everyone can hear you.
11             THE WITNESS:  My name is Anthony, last name is Grassi,
12    G-R-A-S-S-I.
13                         DIRECT EXAMINATION
14    BY MR. WEINREB:
15    Q.    Good morning, sir.
16    A.    Good morning.
17    Q.    Where do you work?
18    A.    I work for the Cambridge Police Department.
19    Q.    For how long?
20    A.    Twenty-eight years.
21    Q.    What's your job there?
22    A.    I'm assigned as a detective to the Criminal Investigation
23    Unit.
24    Q.    What does a criminal investigator or detective do?
25    A.    We investigate criminal acts that include homicide,
```

```
 1    domestic abuse, sexual assaults.  We handle B&Es, robberies.

 2    We interview witnesses, we interview suspects, we interview

 3    victims of crimes.  We also obtain search warrants, subpoenas,

 4    and arrest warrants if needed, and we collect evidence and

 5    process crime scenes.

 6    Q.   Have you obtained training in doing all those things?

 7    A.   Yes.

 8    Q.   Including the processing of crime scenes?

 9    A.   That's correct.

10    Q.   Have you had experience investigating crime scenes?

11    A.   Yes.

12    Q.   Approximately how many have you investigated in the course

13    of your 28 years?

14    A.   Probably hundreds.

15    Q.   Did you investigate the Sean Collier crime scene?

16    A.   I assisted in that, correct.

17    Q.   What drew you to the scene?

18    A.   I was responding to an armed robbery call at the 7-Eleven

19    store on Central Square, and en route to the call our emergency

20    communications operator dispatched a call that an MIT police

21    officer was down at Main and Vassar, shots fired.  I was only

22    four blocks away from the call, so I responded to that

23    location.

24    Q.   How long did it take you to get there?

25    A.   Within 30 seconds.
```

1    Q.   And what did you see when you got there?

2    A.   Upon my arrival, I saw an MIT police officer down on the

3    ground.  He was bleeding profusely from trauma to his face and

4    head, and there were several MIT police officers rendering

5    first aid.

6    Q.   What did you do when you got there?

7    A.   When I arrived at the scene, I was told by an MIT police

8    officer that Officer Collier's gun was taken and there was an

9    active shooter in the area, so I provided cover for the units

00:27 10  responding, along with the medical personnel.

11   Q.   Then what?

12   A.   After Officer Collier was transported to the hospital, we

13   set up a crime scene perimeter.

14   Q.   Well, before we get there, so you said that when you got

15   there you received a report that Officer Collier's gun was

16   missing?

17   A.   That's correct.

18   Q.   Did that turn out to be true?

19   A.   No.  An MIT police officer informed me after Officer

00:27 20  Collier was transported to the hospital that his gun was

21   secured in an MIT police cruiser.

22   Q.   So I interrupted you.  What did you do then?

23   A.   After the -- after Officer Collier was transported to the

24   hospital, we set up a perimeter of a crime scene.

25   Q.   What does that mean?

```
 1   A.    We set up yellow tape around a crime scene and we had
 2   patrol officers doing security outside the tape.
 3   Q.    What's going on inside the tape?
 4   A.    Inside the tape was myself, Detective Clavette and
 5   Detective Regal began searching for evidence.
 6   Q.    Did you find any?
 7   A.    Yes.
 8   Q.    What did you find?
 9   A.    I was searching the back of Officer Collier's cruiser when
10   I observed three shell casings on the ground -- empty shell
11   casings on the ground.
12   Q.    What's a shell casing?
13   A.    A shell casing contains a primer with black powder and a
14   bullet.  When a gun is fired, it activates the primer which
15   causes exposure with the black powder, and the bullet is
16   projected out through the -- out from the casing and through
17   the barrel of the gun leaving an empty casing behind.
18   Q.    And then what happens to the casing?
19   A.    The casing suggests -- in a revolver the casings are
20   automatically ejected out of the gun.
21   Q.    What direction are they ejected in?
22   A.    Typically up and to the right.
23   Q.    What did you do with the shell casings you found?
24   A.    I placed three crime scene placards labeled 1, 2 and 3 in
25   the order in which I found the casings.
```

00:28 (line 10)
00:29 (line 20)

1          MR. WEINREB:  Can we have Exhibit 694 for

2     identification, please.

3     Q.   Detective Grassi, I'm going to show you a series of photos

4     now all in a row.  And when I'm done, I'm going to ask you if

5     they are fair and accurate photos of what's depicted in them.

6          MR. WEINREB:  So, Mr. Bruemmer, if we could just go

7     from 694 all the way through 701, please, just for the witness.

8          (Photographs displayed.)

9     Q.   Detective Grassi, are those all fair and accurate pictures

00:30 10     of the placards that you placed and the items you placed them

11     next to?

12     A.   Correct.  Those are the placards that I placed.

13          MR. WEINREB:  Your Honor, the government offers 694

14     through 701.

15          MR. WATKINS:  No objection.

16          THE COURT:  Okay.

17          (Government Exhibit Nos. 694 through 701 received into

18     evidence.)

19          MR. WEINREB:  So let's begin with 694.

00:30 20     BY MR. WEINREB:

21     Q.   Detective, what's pictured in this photograph?

22     A.   The picture is Officer Collier's cruiser.  And to the left

23     of the cruiser you could see where the medical personnel was

24     working on him, and then the back is where I found the three

25     casings.

```
 1   Q.    When you say "the back," you're referring to the back of
 2   the cruiser?
 3   A.    That's correct, the rear of the cruiser.
 4   Q.    All right.  It's actually the front of the photo?
 5   A.    Excuse me?
 6   Q.    It's actually the foreground of the photo?
 7   A.    Correct.
 8              MR. WEINREB:  695, please.
 9   Q.    What's this a picture of?
10   A.    That's also a picture of the placards 1 and 2.  There's a
11   yellow circle in it that I did not -- I did not place that
12   circle there.
13   Q.    Someone put that there later?
14   A.    That was done probably by the state police crime scene.
15   Q.    This is essentially what we just saw in 694 but from a
16   different angle?
17   A.    That's correct.
18              MR. WEINREB:  696, please.
19   Q.    And again, is this the same thing, just closer up?
20   A.    That's correct.
21              MR. WEINREB:  697, please.
22   Q.    What's that a picture of?
23   A.    That's the picture of the Placard No. 1 where I placed for
24   the first shell casing that I observed.  Again, I didn't do the
25   circle or the ruler.
```

00:31 (line 10)
00:32 (line 20)

1          MR. WEINREB:  698, please.

2    A.   That's Placard No. 1 against the first shell casing that I

3    saw.

4          MR. WEINREB:  699, please.

5    Q.   Number 2 is the second shell casing.

6          MR. WEINREB:  700, please.

7    Q.   What's that?

8    A.   That's Number 3.  That's where I found the third one.

9          MR. WEINREB:  701, please.

00:33 10   A.   That's the placard I placed on Number 3.

11   Q.   Did you actually collect those items?

12   A.   No, I did not.

13   Q.   You marked them for someone else to collect?

14   A.   That's correct.

15   Q.   In addition to looking for evidence outside of the car,

16   did you look inside the car?

17   A.   Yes, I did.

18   Q.   I'm going to show you another series of photos and at the

19   end I'm going to ask you the same question as I asked you last

00:33 20   time.

21   A.   Okay.

22         MR. WEINREB:  This time I would ask just for the

23   witness that we have 706 through 714.

24         (Photographs displayed.)

25   BY MR. WEINREB:

1   Q.   Detective, are those all fair and accurate photographs of

2   what you saw that night?

3   A.   That's correct.

4        MR. WEINREB:  The government would offer 706 through

5   714.

6        MR. WATKINS:  No objection.

7        THE COURT:  Okay.

8        (Government Exhibit Nos. 706 through 714 received into

9   evidence.)

00:34 10        MR. WEINREB:  Start with 706, Mr. Bruemmer.

11  BY MR. WEINREB:

12  Q.   What is this a picture of?

13  A.   That's a picture of the passenger side of Officer

14  Collier's cruiser.

15  Q.   The view from the camera here is through the front

16  passenger window?

17  A.   That's correct.

18        MR. WEINREB:  707, please.

19  Q.   What's this a picture of?

00:34 20  A.   That's Officer Collier's personal property that he had

21  placed on his -- on the front passenger seat.

22  Q.   Right in the center of the photo I've drawn a circle.  Do

23  you -- what's inside that circle?

24  A.   That's the fourth shell casing that I observed.  It was

25  resting on top of Officer Collier's hat.

|     |    |                                                               |
|-----|----|---------------------------------------------------------------|
| 1   |    | MR. WEINREB:  708, please.                                    |
| 2   | Q. | What's that?                                                  |
| 3   | A. | That's the close-up of the shell casing.                      |
| 4   |    | MR. WEINREB:  709.                                            |
| 5   | Q. | What's that a photo of?                                       |
| 6   | A. | That's the front passenger side of the vehicle.  On the       |
| 7   |    | floor we observed a bullet fragment and damage to the center  |
| 8   |    | console where the mic is normally held.                       |
| 9   | Q. | Now, in this photo, the door's been open, correct?            |
| 10  | A. | That's correct.                                               |
| 11  | Q. | When you got to the scene and just discovered the car the     |
| 12  |    | way it was, was the door open or closed?                      |
| 13  | A. | No, all doors were closed.                                    |
| 14  |    | MR. WEINREB:  710, please.                                    |
| 15  | Q. | What's that a photo of?                                       |
| 16  | A. | That's a bullet fragment.                                     |
| 17  | Q. | Where is it?                                                  |
| 18  | A. | It's located on the floor on the passenger front.             |
| 19  |    | MR. WEINREB:  711, please.                                    |
| 20  | A. | That's a close-up of the bullet fragment.                     |
| 21  | Q. | So this isn't a casing anymore; this is an actual piece of    |
| 22  |    | a bullet?                                                      |
| 23  | A. | Piece of a bullet that sheered off.                           |
| 24  |    | MR. WEINREB:  712, please.                                    |
| 25  | Q. | What's this a photo of?                                       |

00:35 (line 10)
00:36 (line 20)

1   A.   That's the radio console that holds the mics for

2   communication.

3   Q.   So this is the center console of the car?

4   A.   That's correct.

5   Q.   Do you see the cup holders over here?

6   A.   Correct.

7   Q.   And the white item that's broken in half, what exactly is

8   that?

9   A.   That's the microphone that we use to communicate back and

00:36 10   forth to our communications center.

11   Q.   And the red that we see in the photo?

12   A.   That's blood from Officer Collier's driver's side.

13        MR. WEINREB:   Exhibit 713, please.

14   Q.   What is that a photo of?

15   A.   That's a view of the backseat.  Officer Collier's report

16   tins are on the backseat, and you could see a puddle of blood

17   under the driver's seat.

18   Q.   And looking over to the rear passenger compartment, what

19   is it that I've circled there?

00:37 20   A.   That appeared to be a mic cover that covered a

21   communication microphone in the cruiser.

22        MR. WEINREB:   Exhibit 714, please.

23   Q.   Do we see that again?  I'll draw a circle around it.

24   A.   That's a cover to a mic for a radio.

25   Q.   And was that -- would that -- what relationship does that

 1    have to the white, actual, microphone that we saw split on the

 2    front seat?

 3    A.    To me that appeared to be like a handheld mic that we

 4    typically put on -- when we're in uniform to put on our

 5    shoulder to communicate.

 6    Q.    What did you do after searching for evidence?

 7    A.    After we searched for evidence, I gave all the information

 8    to Sergeant McHale who was in charge of the crime scene.  Then

 9    myself, Detective Mike Regal, Donna Mahoney and Michael Logan,

00:38 10    we entered the Stata building, and we started at the top floor

11    and worked our way down trying to find any witnesses who might

12    have seen something that happened out front.

13    Q.    Were you able to find any?

14    A.    None.

15    Q.    While you were interviewing, or looking for potential

16    witnesses with these other officers, was someone guarding the

17    crime scene?

18    A.    The crime scene was covered by Sergeant McHale who had

19    control of it.  We had patrol officers stationed on the outside

00:38 20    of the yellow tape, and Sergeant McHale assigned an officer as

21    a scribe to document who's been entering and exiting the crime

22    scene.

23    Q.    When you returned after your search for witnesses, was all

24    the evidence still in place, right where you had left it?

25    A.    Yes, it was.

1          MR. WEINREB:  Thank you.  I have no further questions.

2          MR. MELLIN:  Your Honor, may I one second?

3          MR. WEINREB:  Oh, I'm sorry.

4          (Counsel confer off the record.)

5          MR. WEINREB:  Thank you.

6          THE COURT:  Done?  Okay.

7          MR. WATKINS:  No questions.

8          THE COURT:  You may step down.

9          (The witness is excused.)

00:39  10          MR. MELLIN:  United States calls Dr. René Robinson.

11                    RENÉ ROBINSON, duly sworn

12          THE CLERK:  Have a seat.  State your name, spell your

13   name for the record, keep your voice up and speak into the mic.

14          THE WITNESS:  Sure.  My name is Dr. René Robinson.

15   Last name is spelled R-O-B-I-N-S-O-N.

16                    DIRECT EXAMINATION

17   BY MR. MELLIN:

18   Q.   Dr. Robinson, if I could have just one moment.

19          (Pause.)

00:41  20          Thank you.

21          Dr. Robinson, where are you employed?

22   A.   I'm employed at the Office of the Chief Medical Examiner

23   in Boston.

24   Q.   And if we could just briefly go through your background.

25   Where did you grow up?

1    A.    I'm sorry.  Where did I grow up?

2    Q.    Yes.  I'm throwing you way back.

3    A.    Okay.  I grew up in Ohio, actually.  Columbus in

4    Northeastern Ohio.

5    Q.    Did you not want to admit that in Massachusetts?

6    A.    Go Buckeyes.

7    Q.    I felt that was coming.  And where did you go to school?

8    A.    I did my undergraduate in Ohio, as well as my medical

9    school, and that was seven years combined.  After medical

00:42 10   school, I furthered my training by going to a pathology

11   residency at Dartmouth in New Hampshire.  That was four years.

12   Beyond that, I did one additional year in training for forensic

13   pathology in Richmond, Virginia, at which point I took a job

14   with Massachusetts.

15   Q.    The four-year residency, what was that about?

16   A.    Pathology residency is training for doctors.  And after

17   medical school, everybody takes a residency.  I took pathology.

18   And that's the study of disease in the human body.  Primarily

19   it's hospital-based.  And the best explanation I can give you

00:43 20   of what we do is, one, autopsies; but, two, in a hospital

21   setting, if you ever had a biopsy taken out by a surgeon, that

22   tissue specimen goes to pathology.  They put it on a

23   microscopic slide and the doctor looks at the slide underneath

24   the microscope and can render a diagnosis.

25   Q.    And you said you did a one-year study in Richmond, or were

1    you actually working for the medical examiner's office there?

2    A.   Both.  It's a training program, but you are working every

3    day in the capacity as a medical examiner.  This is in forensic

4    pathology.  It's one year.  And this is a specialization of

5    regular pathology in that not only are you studying normal

6    human disease and anatomy, but you're also studying abnormal

7    things like trauma and injury.

8    Q.   And when you say "abnormal things," are you also studying

9    how someone would die?

00:43 10   A.   Yes.  The forensic pathology fellowship was primarily

11   autopsies in a medical examiner office.

12   Q.   As you sit here today in 2015, have you performed

13   autopsies yourself?

14   A.   I have.

15   Q.   Approximately how many?

16   A.   Over a thousand.

17   Q.   Can you just briefly describe -- not all thousand, just

18   briefly describe how it is that you go about doing an autopsy.

19   A.   An autopsy can be broken into two parts.  The first part

00:44 20   is the external exam.  And during the external exam, I'm

21   walking around with a clipboard, I'm looking at the outside of

22   the body.  I'm noting any normal or abnormal things that I find

23   on the body.  In addition, I'm noting scars, tattoos, eye

24   color, hair color, all the finer details of the outside of the

25   body.  And I make notes of this on a body diagram that's on my

1    clipboard.  That's the first part of the autopsy.

2         The second part is actually opening up the body using a Y

3    incision, taking out all the organs one by one, and inspecting

4    them again for normal disease processes or abnormal processes

5    like trauma.

6    Q.   You mentioned the Y incision.  What is that?

7    A.   In order to get to the organs, a Y incision is performed.

8    And what that is is using a scalpel to cut the skin from each

9    shoulder to about the middle of the chest, and then bringing it

00:45 10   down to about the level of the navel and pulling the skin back

11   to get to the organs.

12   Q.   And what do you actually do with the organs?

13   A.   I take them out one by one, I dissect each of them in a

14   special way that will help me look for abnormal or normal

15   things.

16   Q.   Do you also examine the skull?

17   A.   I do.

18   Q.   How do you go about doing that?

19   A.   We make an incision into the scalp, pull the scalp forward

00:46 20   so that we can get to the bone of the skull, use a bone saw to

21   open the top of the skull to get to the brain.  At that point

22   we can look at the outside of the brain, take the brain out,

23   weigh it, dissect it and make our notes.

24   Q.   Typically, when you're looking at a brain, what are you

25   looking for?

A.   Usually in our setting we're suspecting trauma over
anything.  But we're looking for, again, maybe the person has a
natural disease going on.  So both natural and unnatural
things.

Q.   I'm assuming that a gunshot wound to the head is an
unnatural thing?

A.   It is.

Q.   Okay.  So how do you go about investigating a gunshot
wound to the skull and ultimately to the brain?

00:46 A.   When you're looking at a gunshot wound, the most important
part of the autopsy is the external exam, or the first portion.
We're looking at the gunshot wounds to note size,
characteristics, location on the body, and we're noting all
that down.  And that can help tell us what's an entrance,
what's an exit, how close the gun was to the body, things like
that.

Q.   You mentioned an entrance and an exit.  What are you
talking about?

A.   When a bullet goes through the body, it creates a hole,
00:47 which is the entrance, and if it goes through the body, it will
create an exit hole.  So entrance and exit holes.  But
sometimes the bullet does not leave the body and you only have
an entrance wound and the bullet will still be in the body.

Q.   Are entrance wounds and exit wounds essentially the same
or do they usually have different patterns?

1    A.    They usually have characteristic patterns that can help us

2    identify what's an entrance and what an exit is.

3    Q.    Okay.  And what kind of characteristics are you looking

4    for?

5    A.    The presence of a muzzle stamp, gunpowder residues,

6    various configurations of the size of the wound itself.

7    Q.    You mentioned a muzzle stamp.  What is a muzzle stamp?

8    A.    To describe a muzzle stamp I'm going to have to talk a

9    little bit about how a gun works.  When a gun is fired, it's

00:48 10    not just the bullet that comes out of the barrel of the gun;

11    there's burned and unburned powder residues, there's soot,

12    there's hot gases.  All of this is following the bullet out of

13    the end of the muzzle.

14        When the muzzle of the gun is pressed up against the skin,

15    it can create an abrasion or contusion, and that just means

16    scraping of the skin or bruising of the skin because the skin

17    pressed up against the end of the muzzle will create the

18    pattern of the end of the muzzle.

19    Q.    Looking at an entrance wound of a gunshot injury, are you

00:49 20    able to determine if it's a wound that was caused by having the

21    gun right next to the skin or if some distance very close to

22    the skin?

23    A.    Yes, we can tell that.

24    Q.    How do you go about telling that?

25    A.    A contact gunshot wound will create a muzzle stamp that I

talked about previously.  This is a pattern around the hole of

the entrance wound itself that is red to red-black in nature,

or in color, and has a pattern that is similar to the end of

the muzzle that created it.

Now, if the gun is not pressed up against the skin, you

can get something called stippling.  So if you remember before

when I said that other things than the bullet are coming out at

the end of the muzzle, the gases, the powder, if the gun is

near the skin but not pressed up against the skin, not only is

the bullet hitting the skin, but all these residues, these

gases, these unburned and burned powder residues, they will

create what's called tattooing into the skin, stippling.  I

think that's best demonstrated on your following exhibits.

Q.   Okay.  You're way ahead of me.  Have you ever testified as

an expert before in a court?

A.   I have.

Q.   Okay.  Approximately how many times?

A.   Over 20.

Q.   Okay.

MR. MELLIN:  Your Honor, at this time I would ask to

qualify Dr. Robinson an expert in forensic pathology.

THE COURT:  Is there any objection?

MR. WATKINS:  No.

THE COURT:  Okay.

BY MR. MELLIN:

1    Q.   Dr. Robinson, concerning this case, did you perform an

2    autopsy on Sean Collier?

3    A.   I did.

4    Q.   And as a result of that, did you actually prepare a

5    report?

6    A.   I did.

7    Q.   And in preparation of testimony here today and in

8    preparation of meeting with the prosecutors, did you also

9    prepare a bit of a PowerPoint presentation?

00:51 10   A.   I did.

11   Q.   Okay.  And do you have that with you today?

12   A.   I do.

13   Q.   Okay.  If you would like, you may refer to that while

14   you're testifying.

15        Let me take you back to April 19th, 2013.  On April 19th,

16   2013, did you perform the autopsy of Sean Collier?

17   A.   I did.

18   Q.   Can you describe for the ladies and gentlemen of the jury

19   what it is you did.

00:51 20   A.   I performed an autopsy on Mr. Collier, again looking at

21   the outside of his body, the first half of the autopsy, and the

22   second half, opening up his body to investigate his organs.

23   Q.   Based on your autopsy, did you determine a cause of death?

24   A.   I did.

25   Q.   And what was the cause of Sean Collier's death?

1    A.    Gunshot wounds of the head.

2    Q.    Did you also determine what is called the manner of death?

3    A.    I did.

4    Q.    And what is the manner of death?

5    A.    Homicide.

6    Q.    What do you mean by "manner of death"?

7    A.    So the medical examiners render a manner of death, and

8    this is a classification of how they died.  There's accident,

9    natural, homicide, suicide and undetermined.

00:52 10    Q.    And in this case you determined it was a homicide?

11    A.    Correct.

12    Q.    Okay.  In layman terms, can you please describe how it is

13    Sean Collier died.

14    A.    Well, as I stated before, the cause of death is gunshot

15    wounds of the head.  Bullets went into his brain, destroyed

16    vital parts of the brain that you cannot live with.

17    Q.    How many times was Officer Collier shot?

18    A.    He was shot three times in the head.

19    Q.    Okay.  And was he also shot somewhere else on his body?

00:53 20    A.    Yes.  His right hand demonstrated two gunshot wounds and a

21    graze.

22    Q.    Indicating three shots?

23    A.    Possible, yeah.

24    Q.    Now, you talked about three gunshot wounds to the head.

25    Are you able to determine which of the three gunshot wounds

1    happened first?

2    A.    I cannot tell you that.

3    Q.    And why is that?

4    A.    They happened in rapid succession and I did not see

5    anything in the autopsy that would tell me which one came

6    first.

7    Q.    Okay.  Now, in your report you list the three shots,

8    correct?

9    A.    I do.

00:53 10    Q.    Okay.  And in your first -- in shot 1, you indicate that

11    it is an intermediate-range penetrating wound, correct?

12    A.    Yes.

13    Q.    Okay.  What do you mean by intermediate-range penetrating

14    wound?

15    A.    When I say "intermediate range," that means that the gun

16    was not up against the skin but it also wasn't far away.  I

17    can't tell you exactly how close the gun was to the skin.  In

18    order to do that, the weapon used must be taken to the lab and

19    test-fired to create a pattern that's similar to the one that's

00:54 20    found on the skin.  That's the stippling I talked about

21    earlier.

22    Q.    Did you see signs of stippling with this first gunshot

23    wound?

24    A.    I did.

25    Q.    What was the location of this wound?

1    A.    It was between the eyes, closer to the left eye.

2    Q.    Now, the shot between the eyes, what types of signs of

3    stippling did you see?

4    A.    So around the main wound, or the main entrance defect, the

5    hole, there were tiny pinpoint areas of abrasion, which is just

6    the superficial layer of the skin coming off.  That was created

7    by, again, the burned and unburned powder from the end of the

8    gun telling me that the barrel of the gun was close to the

9    skin.

00:55 10    Q.    And when you say it was close to the skin, approximately

11    how close?

12    A.    Again, I can't give you an exact distance, but if I were

13    to go to a textbook, it could be a foot, foot and a half.

14    Q.    Okay.  So if I shoot you from the distance we're apart

15    here, there will be no stippling, correct?

16    A.    Correct.

17    Q.    I'd have to be much closer, almost at the witness stand

18    box?

19    A.    Likely, yes.

00:55 20    Q.    Okay.

21         MR. MELLIN:  Your Honor, at this time I would like to

22    have the doctor look at a few exhibits, and I just wanted to

23    verify that those will not be shown in the overflow courtroom

24    either.

25         THE COURT:  Yes, that's confirmed by our technician.

1           MR. MELLIN:  Thank you.

2           THE COURT:  And the public screens here will be

3    inoperable as well.  The jurors will see the pictures.

4    BY MR. MELLIN:

5    Q.   Dr. Robinson, if I could have you look at Exhibit 728.

6           MR. MELLIN:  And first just the Doctor for this one.

7    Q.   Do you recognize Exhibit 728?

8    A.   I do.

9    Q.   What is that?

00:56 10   A.   This is a photo of Mr. Collier's face taken at the time of

11   autopsy.

12   Q.   And is that a fair and accurate photograph of how he

13   appeared at the time of autopsy?

14   A.   Yes.

15          MR. MELLIN:  Your Honor, at this time the government

16   would move in Exhibit 728 and ask to publish Exhibit 728.

17          MR. WATKINS:  No objection.

18          THE COURT:  All right.

19          (Government Exhibit No. 728 received into evidence.)

00:56 20          MR. MELLIN:  Your Honor, may I continue part of this

21   inquiry up by the witness so that I can look at the photograph

22   while the witness is looking at the photograph?

23          THE COURT:  That's okay as long as you share the mic.

24          MR. MELLIN:  All right.  Is your court reporter okay

25   with that?

1          THE COURT:  It's important not only for the court

2    reporter but for the overflow.

3    BY MR. MELLIN:

4    Q.   Okay.  Dr. Robinson, as you look at Exhibit 728, can you

5    please first describe what it is you see?

6    A.   So as you can see, in the middle of his face between the

7    eyes, again closer to the left eye, there is a big hole, and

8    around his eyes, on his forehead, underneath his eyes

9    and -- may I use the --

00:57 10   Q.   Yes.

11   A.   You see these areas here and here, all these tiny little

12   red dots, that is the stippling pattern that surrounds the main

13   wound.

14   Q.   And for the record, you indicated the stippling pattern

15   was on his forehead, on his cheeks.  Is that correct?

16   A.   Right.  Forehead, cheeks, underneath his eyes.

17   Q.   All right.  Now, what else do you see then when you look

18   at this photograph?

19   A.   He has additional wounds on the left side of his face, but

00:58 20   you can't see those quite as clearly.

21   Q.   And what can you tell about the gunshot wound to the

22   middle of his face?

23   A.   Again, this is an intermediate-range wound.  The end of

24   the gun was close enough to the skin that the gases and powder

25   could reach the skin.

1    Q.    And can you tell if that's an exit or an entry wound?

2    A.    That is an entrance wound.

3    Q.    As you look at that photograph, how can you tell that?

4    A.    Because of the stippling pattern, but also because the

5    bullet did not leave the body.

6    Q.    Thank you.  You said the bullet did not leave the body.

7    How do you know that?

8    A.    Well, before we actually open the body, we do take X-rays

9    to let us know if there's any projectile in the body.  But

00:59 10   also, if you trace the wound path from the entrance down to the

11   side of his neck, it leads you right to the bullet.

12   Q.    How are you able to actually follow that wound path?

13   A.    Careful dissection of his face and upper body.

14   Q.    What was the wound path?

15   A.    Well, you saw the entrance wound on the front of the face.

16   It goes through the skin, it goes through his nose bone, it

17   goes at an angle down through his upper jaw, it goes into the

18   soft tissues of his neck and actually transects, or cuts, the

19   internal carotid artery.

01:00 20   Q.    What is important about that?

21   A.    The carotid artery is a vessel that helps take blood from

22   the heart up to your brain.  If you hold your fingers up

23   against neck, you can feel your own pulse, and that pulse is

24   from the carotid artery.  The internal carotid artery is just a

25   branch off of that main artery.

1    Q.    If your internal carotid artery is transected, is that

2    going to have an impact on your ability to sustain life?

3    A.    Yes, you can bleed out from that.

4    Q.    And then you said the bullet is actually recovered where?

5    A.    In the soft tissues of the neck.

6    Q.    About -- on your neck about where, if you can just

7    indicate for the...

8    A.    Below the right ear on the right side (indicating).

9    Q.    And so what direction is the wound path, from left to

01:00 10   right or right to left?

11   A.    It's from left to right.  And when I say "left to right,"

12   I mean Mr. Collier's left to right.

13   Q.    Did you also recover the bullet in Officer Collier's neck?

14   A.    I did.

15   Q.    If I could have you look at Exhibit 733.  Do you recognize

16   Exhibit 733?

17   A.    I do.

18   Q.    And what is that?

19   A.    It is the projectile that I pulled from his neck.  It was

01:01 20   a deformed bullet, and there was an additional small metal

21   fragment that came from the jacket that surrounds the bullet.

22   Q.    Okay.  And just for the record, this is a photograph of

23   that.  Is that right?

24   A.    Yeah, it's a photograph.

25   Q.    All right.  And is that fair and accurate, how it appeared

1    when you recovered that bullet on April the 19th, 2013?

2    A.   It's accurate.

3         MR. MELLIN:  Your Honor, I would move into evidence

4    Exhibit 733 and ask to publish.

5         MR. WATKINS:  No objection.

6         THE COURT:  Okay.

7         (Government Exhibit No. 733 received into evidence.)

8    BY MR. MELLIN:

9    Q.   Now, just for the ladies and gentlemen of the jury, can

01:02 10   you -- first off, there's some writing at the top, there's some

11   typed information.  What is that all about?

12   A.   The stuff that's handwritten is what I wrote, and it's a

13   description of the bullet:  "A deformed large-caliber gray

14   metal bullet with an orange metal jacket with" -- and then

15   underneath the label it says "gray fragment."

16   Q.   And then there's a number "1 - neck."  Is that right?

17   A.   Yes.

18   Q.   And why did you write that?

19   A.   To tell me and to tell the investigators where I recovered

01:02 20   it from.

21   Q.   Okay.  Now, if you look at the items just below that

22   little placard, there's two items.  Is that right?

23   A.   Yes.

24   Q.   Okay.  And can you please describe each for the jury?

25   Just circle the one you're describing each time.

1    A.    That one is the deformed bullet, that one is the piece of

2    metal fragment (indicating).

3    Q.    All right.  So the deformed bullet is the item on the

4    right of Exhibit 733?

5    A.    Correct.

6    Q.    Okay.  And the other one, is that a jacket, is that what

7    you said?

8    A.    Yes.

9    Q.    Okay.  And that's on the left in this photograph?

01:03 10    A.    Yes.

11    Q.    Okay.  So now let's talk about what is a bullet and what

12    is a jacket.

13    A.    The bullet is the gray part of the projectile.  Some

14    bullets have metal jackets on the outside.  These are usually

15    orange or yellow in color.  And the ballistic expert can speak

16    more to the markings on the jacket that can help them identify

17    a gun.

18    Q.    Is it fair to say that as these bullets enter and hit the

19    skull and enter the brain, that they may fracture apart?

01:03 20    A.    Yes.

21    Q.    Okay.  And is that what you're indicating here, that these

22    two actually fracture apart?

23    A.    They did.

24    Q.    If I could move on, then, to the second gunshot wound

25    which in your report you indicated was a contact range

1    penetrating wound.

2    A.   Yes.

3    Q.   What do you mean by that?

4    A.   "Contact" means the muzzle of the gun was up against the

5    skin, "penetrating" means the bullet went into the body but did

6    not exit.

7    Q.   If it's easier, you can set those reports up on the

8    witness stand.

9    A.   Thank you.  This chair is very high.

01:04 10   Q.   And you're able to tell, again, this is a contact wound

11   how?

12   A.   There is a large area of abrasion or contusion.  Again,

13   that's taking off the top layer of the skin and bruising around

14   the entrance defect.

15        MR. MELLIN:  If I may pull up Exhibit 729.  And again,

16   your Honor, if I may approach the witness.

17        THE COURT:  All right.

18   BY MR. MELLIN:

19   Q.   Do you recognize Exhibit 729?

01:05 20   A.   I do.

21   Q.   What is that?

22   A.   It is the left side of Mr. Collier's face.  This

23   photograph was taken at the time of autopsy.

24   Q.   Is it a fair and accurate photograph from the autopsy?

25   A.   Yes.

1          MR. MELLIN:  Your Honor, I move in Exhibit 729 and ask

2    to publish.

3          MR. WATKINS:  No objection.

4          THE COURT:  Okay.

5          (Government Exhibit No. 729 received into evidence.)

6    BY MR. MELLIN:

7    Q.   So looking at Exhibit 729, as you look at that photograph,

8    first, do you see the wound that we already talked about, the

9    wound that was between the eyes?

01:05 10    A.   I do.  It is on this portion of the photograph.

11    Q.   Thank you.  You just circled that it's the wound at the

12    top right of Mr. Collier's head in this photograph?

13    A.   Yes.

14    Q.   Okay.  And now we're talking about what you have marked as

15    Gunshot Wound No. 2.  Which wound are we discussing now?

16    A.   We're discussing the one on his cheek, his left cheek.

17    Q.   Okay.  And for the record, again, that's the one that's

18    kind of right in the center of the photograph?

19    A.   Yes.

01:06 20    Q.   Okay.  Now, as you look at that, how can you tell that's a

21    contact wound?

22    A.   So where I'm drawing now, that is the entrance defect.

23    That is actually a hole.  This area around that hole that I'm

24    circling right now, that is the damage to the surface of the

25    skin caused by the muzzle of the gun.

1    Q.   And when you look at a contact wound, will you see

2    stippling or will you see something completely different?

3    A.   You will not see stippling.

4    Q.   And why not?

5    A.   Because all of the gases and particles are going into the

6    wound path themselves; they're not hitting the outside of the

7    skin.

8    Q.   Again, were you able to follow the wound path of this

9    gunshot wound?

01:07 10    A.   I was.

11    Q.   And were you able to recover the bullet?

12    A.   I did.

13    Q.   Where did you recover the bullet?

14    A.   In the brain.

15    Q.   Where in the brain?

16    A.   I can talk about the path, if you'd like.

17    Q.   That's probably better.

18    A.   Okay.  So it enters on the left side of his cheek, it goes

19    through his left cheekbone, goes up through the base of the

01:07 20    skull.  It enters the right hemisphere of his brain, it goes

21    through a structure in the brain called the basal ganglia,

22    which is essential for life, and then it comes to rest in an

23    adjacent portion of brain.

24    Q.   Is it fair to say the wound path is left to right,

25    correct?

1    A.    Yes.

2    Q.    All right.  So now as this wound [*sic*] is going through

3    Officer Collier's brain, what is it actually doing?  What

4    portions of the brain is it hitting?

5    A.    It's destroying portions of the brain that it goes

6    through.  So it's destroying the base of the skull, it's

7    destroying brain matter.  It's destroying important structures

8    within the brain itself.

9    Q.    You mentioned the basal ganglia.  What does the basal

01:08 10   ganglia do?

11   A.    The basal ganglia are structures in the brain that are

12   located towards the middle of the brain.  And they're important

13   for things like voluntary movement, emotion, things like that.

14   It's also an important center of the brain because it's

15   interconnected to the rest of the brain, into the brain stem.

16   Q.    If your ganglia is destroyed, how would that impact your

17   ability to function?

18   A.    You can't function.

19   Q.    And if I may have you look at Exhibit 735, please.  Do you

01:09 20   recognize Exhibit 735?

21   A.    I do.  This one corresponds to Wound 3, however.

22   Q.    I'm glad we did that.  So then let's look at 737.

23   Disregard our numbering ability.  Do you recognize Exhibit 737?

24   A.    I do.

25   Q.    All right.  What is that?

1    A.   This is the bullet that corresponds to the gunshot wound

2    I've just been talking about.

3    Q.   And again, it's a photograph of the bullet?

4    A.   Yes.

5    Q.   All right.

6         MR. MELLIN:  Your Honor, I would move into evidence

7    Exhibit 737.

8         MR. WATKINS:  No objection.

9         (Government Exhibit No. 737 received into evidence.)

01:10 10         MR. MELLIN:  And I'd ask to publish it, please.

11   BY MR. MELLIN:

12   Q.   Dr. Robinson, again for the record, what are we looking at

13   in Exhibit 737?

14   A.   Well, there is an envelope that I wrote -- handwrote some

15   notes on; there's a label from the autopsy that indicates the

16   case numbering, Mr. Collier's name; and then underneath it,

17   which is what I'm circling right now, is the deformed bullet.

18   Q.   You mentioned in this photograph something about -- is it

19   a crib plate?

01:11 20   A.   Yeah, that was a note to myself at the time of autopsy to

21   remind me what part of the base of the brain that the bullet

22   went through.

23   Q.   All right.  Thank you.

24        If we can turn finally, then, to the third gunshot wound

25   to the head.  And again, this is another contact range

1    penetrating wound.  Is that correct?

2    A.    Correct.

3    Q.    All right.  And if I could pull up Exhibit 728 again.

4    Excuse me.   729.

5          Do you see Exhibit 729 in front of you again?

6    A.    I do.

7    Q.    Okay.  Now, we're talking about the third gunshot wound.

8    Which one are we talking about?

9    A.    We're talking about the one I'm circling now, which is

01:12 10   right in front of the left ear.

11   Q.    And as you look at that wound, what do you see from just

12   regular observation?

13   A.    Again, where I'm drawing, this is the entrance defect, or

14   the hole in the skin from the gun -- the gunshot wound, and

15   this area surrounding it -- sorry.  Here we go.  This area

16   surrounding it tells me that it's a contact gunshot wound.

17   Q.    And the area that you marked that surrounds it, just for

18   the record, is the very dark colored area?

19   A.    Yes.

01:12 20   Q.    And again, though, you are not able to determine which of

21   these two wounds to the left side of Officer Collier's face

22   were fired first, correct?

23   A.    Correct.

24   Q.    You just know that they were both contact wounds?

25   A.    Correct.

1    Q.    All right.  All right.  Were you able to recover the
2    bullet with that gunshot wound?
3    A.    I was.
4    Q.    The one I already showed you?
5    A.    Yes.
6    Q.    Did you determine the wound path?
7    A.    I did.  So this wound goes through the skin and the soft
8    tissue on the left side of his cheek, it goes through a part of
9    his cheekbone, goes into his skull at the base, and also goes
01:13 10    through the left hemisphere of his brain, again, damaging the
11    basal ganglia, and the bullet comes to rest in an adjacent
12    portion of the brain.
13    Q.    And again, like the other shots, it's left to right?
14    A.    This one is, yes.
15    Q.    And if I can have you now look at Exhibit 735.  For the
16    second time, do you recognize Exhibit 735?
17    A.    I do.
18    Q.    Okay.  And is that a picture of the bullet that you
19    recovered?
01:14 20    A.    Yes.  Again, the picture shows an envelope with my
21    handwriting --
22    Q.    If you can hold on one second.
23            MR. MELLIN:  Your Honor, I would move into evidence
24    Exhibit 735 and ask to publish.
25            MR. WATKINS:  No objection.

1          THE COURT:  All right.

2          (Government Exhibit No. 735 received into evidence.)

3    BY MR. MELLIN:

4    Q.   Thank you, Doctor.  Now, back to you.  You were about to

5    say?

6    A.   It's a picture of an envelope with my handwriting on it,

7    also has the autopsy identifiers.  And below it, which is where

8    I'm circling, that is the deformed bullet.

9    Q.   Below that to the right do you see some handwriting or

01:15 10   something?

11   A.   I do.

12   Q.   Do you know what that is?

13   A.   Yes.  These are, again, notes to myself at the time of

14   autopsy to remind me which path this bullet took.

15   Q.   In addition to those three gunshot wounds to Officer

16   Collier's head, did you also make some additional, or what you

17   called associated, findings?

18   A.   I did.

19   Q.   Can you describe for us, first, what are associated

01:15 20   findings and then what were your findings?

21   A.   Damage to the brain can manifest not only in the actual

22   parts of the brain that were damaged but also with what I call

23   associated findings.  So in this case Mr. Collier had bilateral

24   subdural hematomas.  Now, what that is is blood on his brain on

25   both sides, on both hemispheres.

1    Q.    Okay.  And when you say it's subdural, what does

2    "subdural" mean as opposed to subarachnoid?

3    A.    So your brain is covered by a thick membrane called the

4    dura.  When you have blood under the dura and on top of the

5    brain, that's called "sub."  So "subdural hemorrhage" is blood

6    that's underneath the dura but on top of the brain.

7    Q.    And this is an area that is actually on top of the brain

8    but it's inside the skull, correct?

9    A.    Correct.

01:16 10   Q.    Okay.  Then what is subarachnoid?

11   A.    So there's another layer of a thin membrane that covers

12   the brain.  So there's dura, and then there's arachnoid.  That

13   is the thin membrane that covers the brain.  And when you have

14   blood in between the arachnoid and the brain, that's called a

15   subarachnoid.

16   Q.    What does either a subdural hemorrhage or a subarachnoid

17   hemorrhage indicate to a pathologist?

18   A.    Trauma.

19   Q.    And any specific trauma or just general?

01:17 20   A.    General trauma.

21   Q.    Okay.  If there -- let me rephrase that.

22         Can you just describe for us what would have happened to

23   Officer Collier after receiving these three gunshot wounds to

24   his head?  Would he be able to move, would he be able to

25   breathe, would his heart function?

```
 1   A.    He'd have no purposeful movements.  He's essentially dead
 2   right away.
 3   Q.    And why is he essentially dead right away?
 4   A.    Major parts of his brain have been disrupted.  That's
 5   going to stop breathing, stop your heart rate.  It's going to
 6   cause total cardiorespiratory death.
 7   Q.    And in this case, how is it that he would actually die?
 8   A.    When you destroy vital centers of the brain, the rest of
 9   your body cannot function without input from the brain.  So
10   it's direct destruction of the brain.
11   Q.    So does he die because his heart stops or does he die
12   because he's not breathing or what?
13   A.    Well, that's the end result, is your heart stops.
14   Q.    Did you also make notations about his lungs?
15   A.    I did.
16   Q.    And did you note that there was hemoaspiration?
17   A.    Yes.
18   Q.    What does that mean?
19   A.    Hemoaspiration means that Mr. Collier inhaled his own
20   blood.  And I could see that at autopsy because there was blood
21   in the air spaces of his lung and also within his windpipe.
22   Q.    As a forensic pathologist, what would that indicate to
23   you?
24   A.    Trauma.
25   Q.    Okay.
```

1    A.    Most of the time.

2    Q.    Now, the findings that you made, are they consistent with

3    someone firing one shot from a -- some distance away from

4    Officer Collier and then firing two more shots with the muzzle

5    of the gun against his face?

6    A.    Yes.

7    Q.    You mentioned earlier that Officer Collier was also

8    shot -- well, when he was shot the three times in the head,

9    would he be able to move his arms and legs at that point?

01:19 10    A.    Not purposefully.

11    Q.    When you say "not purposefully," what do you mean by that?

12    A.    I mean I can't say whether or not -- there might have been

13    a jerk or two, but he would not be able to move his extremities

14    as he wished.

15    Q.    So he wouldn't have the voluntary ability to move his arms

16    or legs?

17    A.    Correct.

18    Q.    But he might have a reflexive movement of arms or legs or

19    feet?

01:20 20    A.    I can't really say.

21    Q.    Now, let me turn to the three shots in the hand.  The

22    three shots in the hand:  First off, were those fatal wounds?

23    A.    No, they were not.

24    Q.    And can you tell in what order they were fired?

25    A.    No, I can't.

1    Q.   Are you able to tell if those shots were fired before or

2    after the shots to the head?

3    A.   I cannot.

4    Q.   Let's turn to -- the first gunshot wound to the hand you

5    said is an intermediate-range perforating gunshot, correct?

6    A.   Indeterminate.

7    Q.   Indeterminate.  I'm sorry.  Is that right?

8    A.   Yup.

9    Q.   Okay.  And what do you mean by that?

01:20 10    A.   Far away, but I don't know how far.

11    Q.   And when you say it's a perforating gunshot wound, what

12    does that mean?

13    A.   This means the bullet goes in but it also exits.

14    Q.   If I could have you look at Exhibit 727.

15         MR. MELLIN:  And, your Honor, if I may approach again.

16         THE COURT:  Yes.

17    BY MR. MELLIN:

18    Q.   Do you recognize Exhibit 727?

19    A.   I do.

01:21 20    Q.   What is that?

21    A.   This is a picture of Mr. Collier's right hand.

22    Q.   Is this a fair and accurate photo of his right hand from

23    the autopsy on April 19, 2013?

24    A.   It is.

25         MR. MELLIN:  Your Honor, I would move into evidence

1    Exhibit 727.

2              MR. WATKINS:  No objection.

3              THE COURT:  Okay.

4              (Government Exhibit No. 728 received into evidence.)

5    BY MR. MELLIN:

6    Q.    Now, as we look at Exhibit 727, can you describe generally

7    what you see as you look at that photograph?

8    A.    Well, in this particular photograph it only shows four

9    wounds.  In order to determine the nature of these wounds, I

01:22 10   needed to dissect the hand.  And I determined that the wound

11   I'm circling now, which is on the back of the hand, more

12   towards the thumb, that wound corresponds to this wound that

13   I'm circling that's at the base of the pinky finger.  And when

14   I say "corresponds," I mean they connect.  This is one wound

15   path.  In fact, the bullet entered the hand in the direction

16   that I just indicated.

17   Q.    And just for the record, you drew an arrow?

18   A.    Yes, I drew an arrow on the one by the base of the thumb

19   and exits out the hole that's at the base of the pinky finger.

01:22 20   Q.    How are you able to determine that?

21   A.    I look at the characteristics of both wounds and it can

22   tell me the direction that this is going based on those

23   characteristics.

24   Q.    And why do you say it's an indeterminant range?

25   A.    In this case it's definitely not contact.  It doesn't have

1  those findings around the wound that we saw in the other

2  contact wounds, and it's not close because I don't see

3  stippling like we saw in the first wound.  So in this case I

4  can't determine how far away the gun was.

5  Q.   Can you determine the direction of the shot?

6  A.   I can.

7  Q.   And what is that?

8  A.   So it enters here, again, at the base of the thumb, comes

9  out at the base of the pinky.  I call this right to left, and

01:23 10  this is his right to left.  And it's done in what's called the

11  anatomic -- standard anatomic position in which case the body's

12  oriented with palms facing up.

13  Q.   So now if his palm is turned over and if he's seated in

14  the vehicle and the shot hits his -- the top of his right hand,

15  what direction is the shot going?

16  A.   If his hand's in that configuration, it's going from his

17  left to his right.

18  Q.   Now, it appears as if that shot does not go very deep into

19  his hand.  Is that fair?

01:24 20  A.   Yes.  It only destroyed some of the bones of his hand and

21  also some of the tendons.

22  Q.   Let me move on to the Gunshot Wound No. 2.  Again, you

23  determined that was an indeterminate-range perforating gunshot

24  wound.  Is that right?

25  A.   Again, yes.

1   Q.   Exactly the same description as the last one, correct?

2   A.   Yes.  I can't tell how far away it was.  And it did exit.

3   Q.   Okay.  Did you see it indicated on this photograph,

4   Exhibit 727?

5   A.   I see the entrance portion.

6   Q.   Okay.  Where's the entrance portion?

7   A.   It's at the back of the wrist.

8   Q.   And is there an exit portion?

9   A.   There is, but it's not visible on this photograph.

01:25 10   Q.   Okay.  And is it on the other side of the hand?

11   A.   Yes.

12   Q.   Okay.  And just for the record, we're talking about

13   Officer Collier's right hand, correct?

14   A.   Correct.

15   Q.   Okay.  And what did you determine about the wound path or

16   anything about that particular wound?

17   A.   Again, this wound path, it goes in and the bullet comes

18   out, and it disrupts some of the bones of the wrist.

19   Q.   And then finally, do you see the graze wound that you had

01:25 20   as the Gunshot Wound No. 3?

21   A.   I do.

22   Q.   Where is that?

23   A.   It's in the middle on the back side of the hand.

24   Q.   What can you tell us about that wound?

25   A.   This is what is called a graze wound, meaning that a

```
 1   bullet or a fragment from a bullet just takes off the top layer
 2   of the skin here.  It does not disrupt any muscle or bones.
 3   It's superficial.
 4   Q.   Now, those three gunshot wounds to the hand that we were
 5   just discussing, are your findings all consistent with Officer
 6   Collier sitting in his police vehicle and having his right hand
 7   rested on the console region of his car?
 8   A.   It could be consistent.
 9   Q.   When you say "could be consistent," you're saying that
10   because you don't know for a scientific fact?
11   A.   I mean, using what I know, it's entirely possible, but his
12   hand could have been oriented in other ways.  I wasn't there.
13   Q.   Got it.
14           MR. MELLIN:  With the Court's indulgence.
15           (Counsel confer off the record.)
16           MR. MELLIN:  Thank you, Dr. Robinson.
17                     CROSS-EXAMINATION
18   BY MR. WATKINS:
19   Q.   Good morning, Dr. Robinson.
20   A.   Good morning.
21   Q.   I'm Tim Watkins.  I'm one of Dzokhar Tsarnaev's attorneys.
22       You taught us about what happens when a gun goes off and
23   the gases and the burned powder and the unburned powder that is
24   expelled from the muzzle?
25   A.   Yes.
```

1   Q.   And that causes stippling on the skin if it's close to the

2   skin?

3   A.   Yes.

4   Q.   That -- gases and burned powder and unburned powder

5   doesn't just go straight ahead; it can go pretty diffuse.  Is

6   that correct?

7   A.   Yes.  To try to put it in simple terms, if you think of a

8   spray paint can, the closer you hold the nozzle up to a

9   surface, the more concentrated the spray paint is going to be.

01:28 10   The further away you spray the spray can, the more dispersed

11   the spray paint is going to be.

12   Q.   And using your spray paint analogy, that spray can can

13   actually spray three to five sheet of that particular matter.

14   Is that correct?

15   A.   You know, I don't play around with spray cans too much.  I

16   would assume.

17   Q.   Turning specifically to gunshot residue, the burnt and

18   unburnt powder that is projected, expelled by the gases, that

19   can be expelled three to five feet in every direction.  Is that

01:28 20   correct?

21   A.   I suppose so.

22   Q.   You talked about intermediate -- I'm sorry, in that three

23   to five feet, that could land on clothing, that could land on

24   the seats of the car, it can land on the shooter, correct?

25   A.   It's possible.

Q.   And indeed, you've been involved in investigations where
there are attempts to get gunshot residue from shooters?

A.   It's rare in Massachusetts, but sometimes state police do
like to do GSR tests on the hands.

Q.   And that would be consistent with what you told us, that
these gases, unburnt powder and burnt powder, are disbursed
throughout the air?

A.   I'm sorry.  I don't follow.

Q.   I think what you told us is like a spray can, these gases
and the particulate matter will disburse throughout the air the
farther you get, correct?

A.   Correct.

Q.   And so if you are the shooter, that can indeed come back
on to you?

A.   It's possible.

Q.   Also, when a bullet pierces the skin, there are fine
droplets of blood that are created?

A.   You're talking about spatter?

Q.   Yes.

A.   It's possible.

Q.   And again, that spatter can be quite diffuse and go all
over the place?

A.   It can be, yes.

Q.   And both forward, in the direction of the bullet, but also
back from the wound?

| | |
|---|---|
| 1 | A.   I suppose it could bounce back.  This is probably better |
| 2 | answered by a blood spatter expert. |
| 3 | MR. WATKINS:  Thank you. |
| 4 | That's all I have, your Honor. |
| 5 | MR. MELLIN:  Your Honor, very briefly. |
| 6 | THE COURT:  Okay. |
| 7 | REDIRECT EXAMINATION |
| 8 | BY MR. MELLIN: |
| 9 | Q.   Dr. Robinson, concerning the stippling in this case, was |
| 01:30 10 | the stippling in this case dispersed over a large area or was |
| 11 | the stippling on the face of Officer Collier? |
| 12 | A.   It was on his face. |
| 13 | MR. MELLIN:  Thank you.  Nothing further. |
| 14 | THE COURT:  All right, Doctor.  Thank you.  You may |
| 15 | step down. |
| 16 | (The witness is excused.) |
| 17 | MR. WEINREB:  The United States calls Alan Mednick. |
| 18 | ALAN MEDNICK, duly sworn |
| 19 | THE CLERK:  Have a seat.  State your name, spell your |
| 01:32 20 | last name for the record, keep your voice up and speak into the |
| 21 | mic so everyone can hear you. |
| 22 | THE WITNESS:  Alan Mednick, M-E-D-N-I-C-K. |
| 23 | DIRECT EXAMINATION |
| 24 | BY MR. WEINREB: |
| 25 | Q.   Good morning, Mr. Mednick. |

```
 1   A.   Good morning.

 2   Q.   Where do you work?

 3   A.   At Memorial Shell at 820 Memorial Drive in Cambridge.

 4   Q.   How long have you worked there?

 5   A.   Five years.

 6   Q.   What's your job there?

 7   A.   I am the owner.

 8   Q.   Do you also work in the station?

 9   A.   Yes, I do.

10   Q.   What do you do?

11   A.   I -- daily functions:  Manage the employees, do the

12   financials.  Oversee the whole operation.

13   Q.   You said the address of the station is 822 Memorial Drive

14   in Cambridge?

15   A.   No, it's 820.

16   Q.   820?

17   A.   Memorial Drive.

18   Q.   Is there a cross-street there?

19   A.   Yes, it's on the corner of Memorial and River Street.

20   Q.   Is there another gas station on that same corner, so to

21   speak, but across the street?

22   A.   Yes, across the street there is a Mobil station.

23        MR. WEINREB:  Can we have Exhibit 742 for the witness,

24   please.

25   Q.   Mr. Mednick, I'm going to show you a series of four
```

photos, and I'm just going to ask you whether they are fair and

accurate representations of what is in them.

This first one is a map.  Is it a fair and accurate

representation of that area?

A.   Yes, it is.

MR. WEINREB:  743, please.

Q.   This is a photograph.  Is this fair and accurate?

A.   Yes, it is.

MR. WEINREB:  744.

Q.   Same thing here?

A.   Yes.

MR. WEINREB:  And 745.

Q.   Also a fair and accurate photograph?

A.   Yes.

MR. WEINREB:  Your Honor, the government offers 742 to

745.

MS. CLARKE:  No objection.

THE COURT:  All right.

(Government Exhibit Nos. 742 through 745 received into

evidence.)

MR. WEINREB:  So if we could have 742, please, for the

jury.

BY MR. WEINREB:

Q.   So what does this map show?

A.   It shows the location of my station if -- in yellow there.

1    It's Memorial Drive, Cambridge Street coming over the river to

2    River Street.  And if you're going from that direction, on the

3    left-hand side would be my station, the Memorial Shell.

4    Q.   Could you circle your station just using the pad of your

5    finger?

6    A.   (Witness complies.)

7    Q.   This direction, going in this -- where I've just drawn an

8    arrow, is that the direction to Boston?

9    A.   Yes.  Brighton is on the other side of the river there.

01:35 10   Q.   Where is the -- and for the record, initially you drew a

11   circle around the gas station that's above River Street as it

12   appears on this map.  And then where's the Mobil station that's

13   across the street you mentioned earlier?

14   A.   The mobile would be right here on the other side of River

15   Street.

16   Q.   You drew a circle there near the intersection of River and

17   Memorial Drive?

18   A.   Correct.

19        MR. WEINREB:  Exhibit 743, please.

01:35 20   Q.   What's this a picture of?

21   A.   This would be standing by the Mobil station facing my

22   station, the Shell.

23   Q.   Are we looking across River Street?

24   A.   Yes, you are.

25   Q.   The street that runs along the left-hand side of the

1  picture, what street is that?

2  A.   On the left side, that would be Memorial Drive.

3  Q.   Beyond that is the river?

4  A.   Yes, it is.

5  Q.   The Charles River?

6       And then beyond that is Boston?

7  A.   Yes, it is.

8       MR. WEINREB:   744, please.

9  Q.   Are we -- now what are we looking at?

01:36 10  A.   We're on River Street.  On the left side is my station,

11  the Shell, on the right side would be the Mobil.

12       MR. WEINREB:   745, please.

13  Q.   What's this a picture of?

14  A.   This would be from my station, the Shell station, looking

15  towards the Mobil across River Street.

16  Q.   Does your station, the Shell station, have security

17  cameras?

18  A.   Yes, it does.

19  Q.   How many?

01:36 20  A.   Sixteen.

21  Q.   What areas do they cover?

22  A.   They cover outside -- most of the property outside, and

23  inside cameras too.

24  Q.   From time to time have you had to look at the video that

25  they take to check it for one thing or another?

1   A.   Absolutely.

2   Q.   Do they take fair and accurate video of what they're

3   pointed at?

4   A.   Yes, absolutely.

5        MR. WEINREB:  Exhibit 746 for the witness, please.

6   Q.   What's this a picture of?

7   A.   That's my station.  On the right side is the convenience

8   store, and then you'll see the pumps over there on the left

9   side.

01:37 10   Q.   Is this a fair and accurate picture?

11   A.   Yes, it is.

12        MR. WEINREB:  I'd offer 746.

13        MS. CLARKE:  No objection.

14        THE COURT:  Okay.

15        (Government Exhibit No. 746 received into evidence.)

16   BY MR. WEINREB:

17   Q.   So you said the convenience.  What did you mean by that?

18   A.   It's a convenience store.  It's where we sell our products

19   for cigarettes and sodas, beverages and snacks.

01:37 20   Q.   Can you circle the entrance to the store?

21   A.   (Witness complies.)

22        MR. WEINREB:  For the record, the witness has circled

23   the pair of double doors underneath the yellow strip that says

24   "Food Mart."

25   Q.   Let me ask you to now take a look at something I'm going

1    to circle.  What is that?

2    A.    That's one of my cameras.

3    Q.    What does it point at?

4    A.    That points at the pumps on the island facing Memorial

5    Drive.

6    Q.    So I've circled a camera on the -- near the right-hand

7    border of the screen.  I'm going to draw an arrow now.  And

8    that points directly at the island.

9         So is that a fair representation of what that camera

01:38 10  points at?

11   A.    Absolutely.

12        MR. WEINREB:  If I could have 747 for the witness,

13   please.

14   BY MR. WEINREB:

15   Q.    What's this -- is this a fair and accurate picture?

16   A.    Yes, it is.

17        MR. WEINREB:  The government offers 747.

18        MS. CLARKE:  No objection.

19        (Government Exhibit No. 747 received into evidence.)

01:38 20  BY MR. WEINREB:

21   Q.    What is this a picture of, sir?

22   A.    This is a picture of -- from River Street facing my

23   station, the Shell station.

24   Q.    And, again, could you circle the doors to the convenience

25   store?

1    A.    (Witness complies.)

2    Q.    You've again circled the double doors underneath the

3    yellow strip that says "Food Mart."

4          What happened on the night of April 18th, 2013?

5    A.    I was awoken.  I received a phone call from my cashier at

6    approximately 12:30.  At that time my cashier had mentioned

7    that the police were there, that they would need to talk to me.

8    A police officer had got on the phone and had said that they

9    need me at the gas station immediately.  They had asked me

01:39 10   where I lived, how long it would take to get down there, and

11   that I need to be down there immediately.

12         At that point I hung up the phone, started getting

13   dressed.  And I noticed on my phone -- I have a news app on my

14   phone, and I noticed that it had said an MIT police officer had

15   been shot.  At that point I knew the urgency.  I got down there

16   as quickly as I can.  It took me about 25 to 30 minutes to get

17   down there.

18         When I got down there I noticed the station, the outside,

19   the lights were all off and the station was taped with police

01:40 20   tape.  I drove up to it, a police officer lifted it up, allowed

21   me in.  I got out of the car.  Another police officer said to

22   me not to go inside.  They don't want me looking at any video

23   until the FBI get there.

24         A little while later, Detective Flynn from the Cambridge

25   police had arrived and had asked me to come in and look at the

1     video right away.  We went inside to the office where my video

2     is, I played the video back for him.  At that time a state

3     trooper had come in also.  I did the same for him.  And at that

4     time I -- they had given me flash drives.  I put the flash

5     drives in and I made copies for them.

6          At that time Detective Flynn had also asked me if I could

7     print a picture, that they were going to be having a conference

8     soon.  I carry a portable color printer in my car with me, and

9     I was able to go to the car and get the printer out and made a

01:41 10   copy for them.

11         They had left soon after that, and then a little while

12    later two FBI agents came in and I had done the same for them,

13    played the video back and made a copy on a flash drive for

14    them.

15    Q.   You said in the beginning that you were woken up at 12:30.

16    So that's 12:30 a.m.?

17    A.   Yes, it is.

18    Q.   So technically, it was now April 19th, the following day?

19    A.   Yes, it is.

01:41 20   Q.   And when you got down there, about what time was it?

21    A.   It was approximately one o'clock in the morning.

22    Q.   The tape that you made for them, was that a tape of the

23    surveillance video from more than one camera?

24    A.   Yes, it was.

25    Q.   Have you -- at the time that you -- well, let me ask you a

 1    different question.  Have you recently viewed a version of the

 2    surveillance tape that you gave them that combines tape from

 3    different cameras?

 4    A.    Yes, I have.

 5    Q.    Kind of a compilation video.

 6          And -- so the answer is yes?

 7    A.    Yes, I have.

 8    Q.    And that compilation video that you viewed, was that a

 9    fair and accurate copy of portions of the tape that you gave to

01:42 10    the police that night?

11    A.    Absolutely.

12          MR. WEINREB:  Your Honor, that's Exhibit 748, and the

13    government would offer it now.

14          MS. CLARKE:  May I just have one moment, your Honor?

15          (Counsel confer off the record.)

16          MS. CLARKE:  Thank you, your Honor.  No objection.

17          THE COURT:  No objection?  All right.

18          (Government Exhibit No. 748 received into evidence.)

19          MR. WEINREB:  May I have Exhibit 748, please?

01:43 20    BY MR. WEINREB:

21    Q.    So I'm going to play a portion of this tape at this time.

22    A.    All right.

23          (Video played.)

24    Q.    So a car has driven up here to the island.  Is this the

25    island at your station, the Shell station?

1    A.   Yes, it is.

2         (Video played.)

3    Q.   Okay.  So a figure just got out of the car.  Did you see

4    that?

5    A.   Yes.

6    Q.   In what direction is he headed in?

7    A.   Right now he's headed towards the front door of the

8    convenience store.

9         (Video played.)

01:44 10   Q.   Okay.  Now we're back outside looking at that same car?

11   A.   Yes.

12   Q.   And does it appear as if someone has just jumped out of

13   the car and is running?

14   A.   Yes.

15        (Video played.)

16   Q.   Where did he run?

17   A.   Across River Street to the Mobil station.

18   Q.   Now, that person who just crossed the screen, from where

19   did he just come from?

01:46 20   A.   The car we previously saw at Pump 5 on Memorial Drive

21   towards the store, at the front doors.

22        (Video played.)

23   Q.   Now, that black circle, that wasn't in the original video.

24   Is that correct?

25   A.   No, the black circle was not.

1    Q.   Do you know approximately what time of the evening is

2    captured on this video?

3    A.   It was approximately twelve-fifteen, twelve o'clock,

4    somewhere around there.  It was midnight, somewhere around

5    there.

6    Q.   Of April 18th?

7    A.   Yes, going into April 18th.

8         MR. WEINREB:  Can we have Exhibit 749 just for the

9    witness, please?  And then Exhibit 750.

01:48 10   Q.   Do you recognize these two photos?

11   A.   Yes, I do.

12   Q.   What are they?

13   A.   They're the photos that I made for Detective Flynn

14   and -- I'm sorry.

15   Q.   No.  No, go on.

16   A.   They were from the video, I was able to make still

17   pictures of the front door of the entrance to the store.

18        MR. WEINREB:  Your Honor, the government offers 749

19   and 750.

01:48 20        MS. CLARKE:  No objection.

21        THE COURT:  All right.

22        (Government Exhibit 749 and 750 received into

23   evidence.)

24        MR. WEINREB:  Go back to 749, please.

25   BY MR. WEINREB:

```
 1    Q.   So this shows the two figures at the door?

 2    A.   Yes, it does.

 3              MR. WEINREB:  And then 750, please.

 4    Q.   Thank you, Mr. Mednick.  I have no further questions.

 5    A.   Thank you.

 6              MS. CLARKE:  No questions.

 7              THE COURT:  No examination?

 8              All right, sir.  Thank you.  You may step down.

 9              THE WITNESS:  Thank you.

10              (The witness is excused.)

11              THE COURT:  We'll take the morning recess at this

12    time, ladies and gentlemen.

13              THE CLERK:  All rise for the Court and the jury.  The

14    Court will take the morning recess.

15              (The Court and jury exit the courtroom and there is a

16    recess in the proceedings at 10:57 a.m.)

17              THE CLERK:  All rise for the Court.

18              (The Court enters the courtroom at 11:21 a.m.)

19              THE CLERK:  Be seated.

20              MR. WEINREB:  Your Honor, can we approach for a brief

21    sidebar?

22              (Discussion at sidebar and out of the hearing of the

23    jury:)

24              MR. WEINREB:  So we have now begun a presentation of

25    the carjacking, kidnapping and so on, and I think that's going
```

01:49 (line 10)

02:13 (line 20)

1    to take us through to the lunch hour.  I think the parties are

2    in agreement that if we succeed in doing that, we would like to

3    put off until Monday the beginning of the Watertown case.

4    Again, things are moving so quickly that I don't know if the

5    defense has seen all of the exhibits that are going to be

6    coming in through the witnesses.

7            THE COURT:  All right.  Okay.  I want to talk more

8    broadly about scheduling after we finish this morning.  It will

9    only take a couple of minutes.

02:14 10          MR. WEINREB:  Sure.

11            (In open court:)

12            THE CLERK:  All rise for the jury.

13            (The jury enters the courtroom at 11:25 a.m.)

14            THE CLERK:  Be seated.

15            THE COURT:  Mr. Weinreb?

16            MR. WEINREB:  Your Honor, the United States calls

17    Eddie Lakkis.

18                    EDDIE LAKKIS, duly sworn

19            THE CLERK:  Have a seat.  State your name, spell your

02:18 20    last name for the record, keep your voice up and speak into the

21    mic.

22            THE WITNESS:  Sure.  Eddie Lakkis, L-A-K-K-I-S.

23                    DIRECT EXAMINATION

24    BY MR. WEINREB:

25    Q.   Good morning, Mr. Lakkis.

```
 1    A.    Good morning.

 2    Q.    How old are you?

 3    A.    Twenty-six.

 4    Q.    Where do you work?

 5    A.    Memorial Drive Mobil.

 6    Q.    How long have you worked there?

 7    A.    Five years.

 8    Q.    Where is -- where on Memorial Drive is the Memorial Drive

 9   Mobil station?

02:18 10    A.    Intersecting with River Street.

11    Q.    And what's your job?

12    A.    Manager.

13    Q.    What does that mean?  What do you do?

14    A.    In charge of daily operations, IT and security.

15    Q.    What does "IT" stand for?

16    A.    Information technology:  the servers, dispensing

17   equipment, cash registers.

18    Q.    Surveillance cameras?

19    A.    And surveillance cameras, yes.

02:19 20          THE COURT:  Mr. Lakkis, will you pull the microphone

21   closer to you just so you're speaking more directly into it?

22          THE WITNESS:  Sure.

23          THE COURT:  Thank you.

24          THE WITNESS:  You're welcome.

25          MR. WEINREB:  Mr. Bruemmer, may we have Exhibit 742,
```

```
 1   please.

 2   BY MR. WEINREB:

 3   Q.   Could you take a look at the screen in front of you?

 4   A.   Yes.

 5   Q.   Do you recognize what that is?

 6   A.   Yes; that's the intersection where we're at, and the Shell

 7   is right across the street.

 8   Q.   Could you circle the Mobil station?

 9   A.   (Witness complies.)

10         MR. WEINREB:  Let the record reflect that the witness

11   has drawn a circle around the dot that's labeled "Mobil

12   station" that's just -- it's below River Street on the diagram

13   and just to the right of Memorial Drive.

14         May we have 745, please?

15   Q.   Do you recognize that?

16   A.   Yeah, that's the Mobil station.

17   Q.   Where is this picture being taken from?

18   A.   From the Shell station.

19         MR. WEINREB:  Exhibit 751, please.

20   Q.   What's that a picture of?

21         THE COURT:  Not admitted.

22         MR. WEINREB:  Oh, I'm sorry.  This is a different

23   witness.

24         751 just for the witness now.

25   BY MR. WEINREB:
```

02:19 (line 10)
02:20 (line 20)

```
 1    Q.    What's that a picture for?

 2    A.    The Mini Mart.

 3    Q.    Is that part of the Mobil station?

 4    A.    Correct.

 5    Q.    Is that a fair and accurate picture?

 6    A.    Yes.

 7          MR. WEINREB:  The government offers 751.

 8          MS. CLARKE:  No objection.

 9          THE COURT:  Okay.

10          (Government Exhibit No. 751 received into evidence.)

11    BY MR. WEINREB:

12    Q.    Mr. Lakkis, if you don't mind, could you circle the

13    entrance to the Mobil mart?

14    A.    Sure (indicating).

15    Q.    What is the Mobil mart?

16    A.    A convenience store.

17    Q.    How many security cameras does the station have?

18    A.    Sixteen.

19    Q.    Are there any that are inside the Mobil mart?

20    A.    Four.

21    Q.    In the course of your work as manager, do you sometimes

22    look at the video from the surveillance cameras?

23    A.    All the time.

24    Q.    Do the cameras take accurate video?

25    A.    Yes.
```

1    Q.   Do the recordings that the cameras make have a date and

2    timestamp?

3    A.   Yes.

4    Q.   Are those accurate?

5    A.   Yes.

6    Q.   Did you go to the station shortly after midnight on April

7    18, 2013?

8    A.   Yes.

9    Q.   Why?

02:21 10   A.   I was called down by Cambridge police.

11   Q.   What happened when you got there?

12   A.   The station was taped off.  I got in there and I was asked

13   to pull the video off the DVR.

14   Q.   Did you pull surveillance video from all the interior

15   cameras?

16   A.   Yes.

17   Q.   Did you review it at the time you pulled it?

18   A.   Yes.

19        MR. WEINREB:  Exhibit 752 just for the witness,

02:22 20   please.

21   Q.   This is the first frame of a video.  I'm just going to

22   play some portion of it for you.

23        (Video played.)

24   Q.   Do you recall viewing this in my office not long ago?

25   A.   Yes.

Q.   Is this a composite of video from several different video
cameras?

A.   Yes.  This video, yes.

Q.   Other than the clips in the very beginning which -- do you
know where those are taken from?

A.   The Shell station.

Q.   Is the video portion of this exhibit a fair and accurate
copy of what you provided to the police that night?

A.   Yes.

MR. WEINREB:  I have no further questions at this
time.

MS. CLARKE:  No questions.  Thank you.

THE COURT:  All right.  Thank you, Mr. Lakkis.  You
may step down.

THE WITNESS:  Thank you.

(The witness is excused.)

MR. MELLIN:  The United States calls Dun Meng.

(Lilun Zhang, Certified Mandarin Interpreter, is duly
sworn.)

THE CLERK:  Thank you.  Would you have him raise his
right hand.

DUN MENG, duly sworn through the interpreter

THE CLERK:  State your name and spell your last name
for the record and keep your voice up and speak into the mic if
you would.

```
 1            THE WITNESS:  My name is Dun Meng.

 2                 DIRECT EXAMINATION (In English)

 3   BY MR. MELLIN:

 4   Q.   And how do you spell your name?

 5   A.   My first name is D-U-N.

 6   Q.   And last name?

 7   A.   M-E-N-G.

 8            MR. MELLIN:  Your Honor, if I may ask the interpreter

 9   to spell her name as well.

10            THE COURT:  Yes.  Let me -- just a couple of

11   logistics.  We can get a chair for the interpreter, if she

12   would like to sit on the podium with the witness.

13            THE CLERK:  Would you like a chair?

14            THE INTERPRETER:  Yeah.

15            THE COURT:  And actually, if the English will be

16   spoken by the interpreter, the microphone should be in front of

17   her rather than --

18            MR. MELLIN:  Actually, your Honor, I think that we are

19   probably going to conduct most, if not all, of this in English,

20   but we have the interpreter just in case Mr. Meng needs the

21   interpreter.

22            THE COURT:  To the extent the interpreter is called

23   upon to translate Mr. Meng's Chinese into English, then I would

24   ask the interpreter to speak into the microphone with the

25   English answer, okay?
```

```
 1              MR. MELLIN:  Just for the record, if I may have the
 2      interpreter -- is your first name spelled L-I-L-U-N?
 3              THE INTERPRETER:  Yes.
 4              MR. MELLIN:  And last name is Z-H-A-N-G?
 5              THE INTERPRETER:  Yes, that's correct.
 6              MR. MELLIN:  Thank you.
 7      BY MR. MELLIN:
 8      Q.   Mr. Meng, as you sit here in court today, you have the
 9      interpreter next to you.  Is that right?
10      A.   Yes.
11      Q.   And do you understand that if there's anything you need
12      the interpreter for, that we can have the questions
13      interpreted?
14      A.   Yes, sir.
15      Q.   And if they were to be interpreted, what language would
16      you be asking the interpreter to help you out in?
17      A.   Mandarin.
18      Q.   In Mandarin?
19      A.   Yes.
20      Q.   And where did you grow up, Mr. Meng?
21      A.   I grew up in China.
22      Q.   Did you go to school in China?
23      A.   Yeah, I go to school in China.  I go to -- I graduate.  I
24      go to middle school, high school and college in China.
25      Q.   At some point did you begin the study of English?
```

```
 1    A.    Yes.  I begin studying English in middle school.

 2    Q.    In middle school?

 3    A.    Yeah.

 4    Q.    Okay.  And at some point, then, did you come to the United

 5    States?

 6    A.    Yeah.  I came into the United States in 2009.  And I came

 7    here for graduate study.

 8    Q.    Do you have a family back in China?

 9    A.    Yes.

02:27 10    Q.    Parents as well as siblings?

11    A.    My parents in China, and I have -- my sister's in China

12    right now.

13    Q.    When you came to the United States, where did you go?

14    A.    I went to Northeastern University.

15    Q.    And why did you go to Northeastern University?

16    A.    Couple of reasons.  I think the first one is I approved by

17    the Northeastern University.  I get offer from Northeastern

18    University.

19    Q.    You got a waiver?

02:28 20    A.    An offer.

21    Q.    An offer?

22    A.    Yeah.

23    Q.    All right.

24    A.    And another reason for me I think in 2009, Northeastern

25    University's in Boston, and I think I like to go to Boston to
```

1    study.

2    Q.    What were you studying?

3    A.    I study transportation engineering.

4    Q.    What is transportation engineering?

5    A.    So transportation engineering is about traffic analysis

6    and some public transportation, and also we study about bike

7    lanes.

8    Q.    Okay.  So you're talking about public transportation, and

9    bike lanes as well?

02:29 10    A.    Yes.

11    Q.    Did you ultimately get your master's degree at

12    Northeastern?

13    A.    Yes.

14    Q.    What year?

15    A.    I get a master degree from Northeastern in 2012.

16    Q.    After getting your degree, did you decide to stay in the

17    United States?

18    A.    Yeah, after I graduated from Northeastern, I first -- I

19    was -- I decided to stay in United States, but I had to get a

02:29 20    visa.  So I applied for a work visa after I graduated.

21    Q.    When you say you had to get a visa, you were here already

22    on a visa, is that right, when you were at school?

23    A.    Uh-huh.

24    Q.    Yes?

25    A.    Yes.

1    Q.    Okay.  But you had to change the visa now from being a
2    student to getting a work visa?
3    A.    Yes, because after my graduation, my student visa expired.
4    Q.    Understood.  So you were able to get a work visa, what's
5    called an H-1B visa?
6    A.    It's called H-1B.
7    Q.    All right.  So after getting this visa that allowed you to
8    come to the United States to work, what did you do?
9    A.    After I get this visa, I work in a company, sponsor my
02:30 10   work visa, and then the company, it's -- I'm the founder of the
11   company, so I'm a partner of the company.
12   Q.    As a partner of the company, what does the company do?
13   A.    Our company is Mobil application right now.  So we have
14   like iPhone app, and the app is for food delivery.  And we --
15   Q.    Wait.  It's for what?
16   A.    For food delivery.
17   Q.    Okay.  For the delivery of food?
18   A.    Yeah.
19   Q.    So do you use the app if you want to get food from some
02:31 20   local restaurant and they'll deliver it to your address?
21   A.    Yeah.  And you can -- only for Asian food delivery.  So if
22   you like to order Asian food delivery, you can order on the
23   iPhone ap.  Just open the app, and you can see the menu, the
24   restaurant, and somebody will deliver to you.
25   Q.    When did you begin putting that together, this app and

1    this business?

2    A.   It's been started between us about two years ago.  I mean,

3    it's been a lot of times to develop the ap, yeah.

4    Q.   In April of 2013 what were you doing?

5    A.   In April of 2013 I just came back to United States for

6    about, I think, two months, maybe less than two months.  So I

7    was just going to work every day.

8    Q.   In the middle of April of 2013, where was work located?

9    A.   It's located in Cambridge, Kendall Square.

02:32 10   Q.   On April 18th of 2013 were you at work?

11   A.   Yes, I was.

12   Q.   Do you recall how long you were at work that night?

13   A.   That night I work until 10:30 -- about 10:30 in the night.

14   Q.   At about 10:30 p.m. on April 18th, what did you do?

15   A.   After day of work, I -- after like about 10:30 I finished

16   the discussion with my partner.  So I left my workplace.  I

17   feel a little tired, so I decided to drive with my car out to

18   get a ride to relax.

19   Q.   In April of 2013, what type of car did you have?

02:33 20   A.   I had a Mercedes SUV 350.

21   Q.   When you say it's a Mercedes SUV, it's a sport utility

22   vehicle?

23   A.   Yes.

24   Q.   Okay.  Did you buy that or did you lease it?

25   A.   I leased it.

```
 1   Q.   If I could have you look at Exhibit 754.

 2        MR. MELLIN:  And just for the witness for now.

 3   Q.   Mr. Meng, as you look at Exhibit 754, do you recognize

 4   what that is?

 5   A.   Yes.

 6   Q.   And what is it?

 7   A.   It's a lease agreement.

 8   Q.   And do you see what I just zoomed in on?

 9   A.   Yes.

02:34 10   Q.   Is this a portion of that lease agreement?

11   A.   Yes.

12   Q.   And is this a lease agreement between you and

13   Mercedes-Benz of Boston?

14   A.   Yes.

15   Q.   Is it a fair and accurate copy of that agreement?

16   A.   Yes.

17        MR. MELLIN:  Your Honor, I would move in Exhibit 754

18   and ask to publish.

19        MR. BRUCK:  No objection.

02:34 20        THE COURT:  Okay.

21        (Government Exhibit No. 754 received into evidence.)

22   BY MR. MELLIN:

23   Q.   And again, Mr. Meng, just for the jury, this is a

24   zoomed-in -- the top portion of that document.  Is that right?

25   A.   Yes.
```

Q.   Okay.  And on this document do you see the date of the

lease is 3/4/2013?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And do you see down below who the lessee is?

A.   It's me.  It's my name.

Q.   And this is for a 2013 Mercedes, correct?

A.   Yes.

Q.   All right.  Is that the vehicle you were driving on the

night of April the 18th, 2013?

A.   Yes.

Q.   If I can also have you look at Exhibit 753.  And do you

recognize Exhibit 753 as the registration for that Mercedes?

A.   Yes.

        MR. MELLIN:  Your Honor, I would move into evidence

Exhibit 753.

        MR. BRUCK:  No objection.

        THE COURT:  All right.

        (Government Exhibit No. 753 received into evidence.)

BY MR. MELLIN:

Q.   And very quickly, as we look at Exhibit 753 on the screen

is that a MassDOT Registry of Motor Vehicles registration for

the Mercedes-Benz?

A.   Yes.

1    Q.    Thank you.

2          So, Mr. Meng --

3              THE COURT:  Excuse me, Mr. Mellin.  Maybe I can make a

4    suggestion.  Maybe the interpreter and Mr. Meng can change

5    seats so he can see the screen better.

6              MR. MELLIN:  Thank you, your Honor.

7    BY MR. MELLIN:

8    Q.    So, Mr. Meng, on -- going back to April 18, 2013, at about

9    10:30 p.m., you left work in your Mercedes-Benz SUV.  What did

02:37 10    you do?

11   A.    So after I drove out to my Mercedes from the parking

12   garage, I decided to drive along the Charles River to take a

13   relax.  I don't have actually, like, destination where to

14   drive, you know.  I just want to drive along the river, maybe

15   have a relax.

16   Q.    Okay.  So you go out for this drive, destination unknown?

17   A.    Unknown.

18   Q.    Where do you go?

19   A.    I went down to Memorial Drive in Cambridge.  And after I

02:38 20    make a left turn out of BU Bridge into Boston.

21   Q.    You said the BU Bridge.  Boston University Bridge?

22   A.    Yes.

23   Q.    Okay.  So now you've turned left and you're going over the

24   Charles River?

25   A.    Charles River, yes.

```
 1    Q.    Okay.  Where do you go?
 2    A.    After BU Bridge, I make a right turn onto Columbus Avenue,
 3    and then I make a left turn onto Commonwealth Avenue, and I
 4    turn right onto Harvard street or avenue, I'm not sure.
 5    Harvard Avenue, I think.
 6          So after Harvard, I make a right turn onto Brighton
 7    Avenue.  After Brighton --
 8    Q.    Onto Brighton Avenue?
 9    A.    Yeah, Brighton Avenue.
10    Q.    Okay.
11    A.    On Brighton Avenue, at some point I just found out -- I go
12    to text message from my friend from that day.  I haven't get a
13    chance to respond to text message.  So I decided to pull over
14    to take spot to text message.  Because I'm a transportation
15    engineer, so I know it's unsafe to -- I feel it's unsafe to
16    text when I'm driving, so I decided to pull over to the curb.
17    Q.    All right.  So when you pull over to respond to this text
18    message, what happened?
19    A.    After I pulled over, I was texting a message, and I was
20    typing in the phone.  Like a few seconds later I saw another
21    car, a sedan, pull up behind --
22    Q.    Just a minute.  You just said sedan, I believe?
23    A.    Yeah.
24    Q.    And when you refer to a sedan, what are you referring to?
25    A.    I refer to a four-door.  A four-door car.
```

02:38 (line 10)
02:39 (line 20)

1    Q.   And at the time that you're in the car that you're

2    texting, is anyone in the car with you?

3    A.   No, just myself.

4    Q.   Okay.  So you see this sedan pull up or come on the scene.

5    What did you notice about the sedan?

6    A.   I notice about sedan pull over to the curb very quickly,

7    very fast.

8    Q.   To the curb?

9    A.   To the curb very fast.  I thought it's unusual -- unusual

02:40  10   for people to park in like that fast.  And --

11    Q.   Did they pull over in front of you or behind you?

12    A.   Right behind me.

13    Q.   What happened?

14    A.   And very quickly a man just walk out from that car and

15    walk towards me.  And he knocked on the front passenger window

16    of my car trying to --

17    Q.   Let me stop you there.  When this person got out of the

18    car that was behind you and walked up, was that person a

19    passenger in the car behind you?

02:41  20   A.   Yeah, I think he was on the passenger seat.

21    Q.   Okay.  All right.  So this person gets out of the car and

22    walks up towards you.  Is that right?

23    A.   Yes.

24    Q.   What happened?

25    A.   He looked -- he was trying to -- I thought he was trying

1    to ask me some question.  He was talking.  And he knocked the

2    passenger window of my car.  And so I lowered down a little bit

3    of the window.  He asked me to lower it down a little bit more.

4    So I thought he was trying to ask some directions.  I rolled

5    down the window a little bit more.  Suddenly, he put his

6    hands -- his right hand through the window into my car and he

7    opened up the door of my car and jumped into the car.

8    Q.   So the person that was on the outside where you rolled the

9    window down, that person reached in with their right hand and

02:42 10   opened up the door?

11   A.   Yes.

12   Q.   Okay.  When that person jumped into your car, what

13   happened?

14   A.   He jumped in very quickly and closed the door immediately

15   and pointed the gun to me, right to my head.  And he asked for

16   money first.  Asked, "Where's the cash?"  So I gave him all my

17   cash in my car.  It's not too much.  I think it's -- I remember

18   it's about 40 or 45 dollars in the car.

19        First after I give him the cash, he said, "You only have

02:42 20   that amount of cash?  That's not enough."  He asked me,

21   "Where's your wallet?"  So I give him my wallet too.  And

22   there's no cash in the wallet.

23   Q.   So the individual, he sat in the front passenger seat of

24   the car; he pointed a gun at you, correct?

25   A.   Yes.

```
 1    Q.    How close was the gun to you?

 2    A.    Very close.

 3    Q.    At that point how did you feel?

 4    A.    I was -- I feel totally shocked.  I was like:  What is

 5    this?  I said, What's going on with this?  Someone jumping in

 6    my car and pointing a gun at me?  It just feels like what's

 7    just happened?

 8    Q.    When you gave that person the $45, what did you do with

 9    your wallet?

10    A.    Can you repeat that question?

11    Q.    Sure.  What did you do with your wallet?  What happened to

12    your wallet?

13    A.    Okay.  He asked me the wallet.  So my wallet, actually, I

14    remember was in the other side of the pocket in the car.  So I

15    took out the wallet, and I hand it over to him.

16    Q.    Now, when you say it was in the other pocket, do you mean

17    the pocket that's in the door of the driver's door?

18    A.    Yes, in the door, driver's door.

19    Q.    All right.  You handed over the wallet to him.  Was he

20    still pointing the gun at you?

21    A.    Yes, sir.

22    Q.    Okay.  And what happened?

23    A.    I told him that's all the cash I have.  I remember he took

24    it -- take a look at the wallet, there's no cash in it.  And he

25    put the wallet -- I don't know -- on the other side of -- I
```

1    don't remember.  But he didn't give it back to me.  And then he

2    pulled a magazine out -- a magazine with a gun out to show me

3    there's bullets in the gun.  So he told me that, "You know I'm

4    serious, so don't be stupid."

5    Q.   After he pulled the magazine out and showed it to you and

6    told you to be -- that he was serious, what did he say?

7    A.   After that he asked me, "Do you know the Boston Marathon

8    explosion?"  I said, "Yes, I know."  And then he asked, "Do you

9    know who did it?"  I said, "No, I don't."  He said, "I did it,

02:45 10   and I just killed a policeman in Cambridge."

11   Q.   So the man that was sitting in your front passenger seat

12   said that he did the Boston Marathon explosion and that he just

13   killed a policeman in Cambridge?

14   A.   Yes.

15   Q.   Did you know anything about the shooting of Officer Sean

16   Collier at that point in time?

17   A.   I don't know anything about a shooting of the officer, any

18   shooting about that, but actually that night I drive -- I drove

19   from Cambridge -- actually, from Memorial Drive.  When I was on

02:46 20   Memorial Drive near the MIT campus, I saw a lot of police cars

21   with blue lights drive into the MIT campus.  It's about a five

22   or six, maybe more than that, police cars.

23        So I thought that maybe something happened there, but I

24   don't know what happened.  But after he told me that he killed

25   a policeman in Cambridge, I think maybe it's something related

1   to the police cars.  So I believed him, he's serious, he's

2   telling me the truth.

3   Q.   All right.  So after he told you that, how did you feel?

4   A.   Terrified.  I mean, the whole world -- everybody is

5   looking for them at that time, and I can't believe I just met

6   them, you know, like they just -- first when they jump into my

7   car, I thought it's money, cash robbery.  I just gave them

8   cash, I should be okay.  But after he told me that, I thought

9   it's going to be something different.

02:47 10   Q.   What happened after he told you he had done the Boston

11   Marathon bombing and had just killed an officer at MIT?

12   A.   Then he asked me to pull out, wanted me to drive.

13   Q.   Where did he want you to drive?

14   A.   First of all, he asked me to make a left turn, like make a

15   U-turn.  But after I pulled out the car, he changed his mind

16   immediately and asked me to make a right turn.  So I made a

17   right turn into a -- onto a street.

18   Q.   When you made that right turn onto the street and started

19   down that street, what happened to the sedan that was behind

02:48 20   you?

21   A.   I don't know.  I didn't notice the sedan at that point, so

22   I don't know what happened to the sedan at that point.

23   Q.   Okay.  When did you notice the sedan?

24   A.   I noticed the sedan like I think about 20 or 30 minutes

25   later after we pulled over on the street in Watertown.  The

1    sedan pulled up behind -- right behind us.

2    Q.   While you were driving and he was in the front passenger

3    seat, where did you go?

4    A.   Can you repeat that question, please?

5    Q.   Sure.  Where did you go while you were driving?  After you

6    pulled out and then you turned right, where did you go?

7    A.   After we made a right turn, we continue on that small

8    street, and then after that small street we made a right turn

9    onto Commonwealth Avenue.

02:49 10   Q.   So you turned onto Commonwealth Avenue, and where did you

11   go?

12   A.   After Commonwealth -- we continued on Commonwealth Avenue

13   for about, I think, maybe two miles, until we made a right turn

14   near Brighton.

15   Q.   Who was deciding where you were going?  Was he telling you

16   where to go?

17   A.   Yeah, the man who jumped in, he ordered me to every

18   direction.

19   Q.   And what was the man with the gun saying while you were

02:49 20   driving?

21   A.   Can you --

22   Q.   Was he talking to you or saying things to you?

23   A.   Yeah, we had a conversation.  He was talking to me.

24   Q.   All right.  And what was the conversation about?

25   A.   First he asked me my name and he asked me where I from.

1    And after the first few minutes, I was -- my hands were

2    shaking, I can't manage to drive.  He asked me to drive like

3    normally.

4    Q.   Why were your hands shaking and why were you having

5    trouble driving?

6    A.   Because I was very scared.

7    Q.   At some point did you answer his question about your name?

8    A.   Yes.

9    Q.   What did you tell him?

02:50 10   A.   I answer him my English name at that time.  I told him my

11   name is Manny.  He didn't get it on the first time.  He said,

12   "Money"?  So he laughed about it.  "Money?  You must got a lot

13   of money."  So I said, "No, not Money."  I said, "My name is

14   Manny, M-A-N-N-Y."  And after that question, he asked me,

15   "Where are you from?"  I said, "China."  He didn't get it the

16   first time, so I repeat it.  I said, "I'm Chinese."

17   Q.   What did he say?

18   A.   So he said, "Okay.  You are Chinese.  I'm Muslim.  Muslims

19   hate Americans."

02:51 20   Q.   When he said that, how did you respond?

21   A.   I respond, you know, "I'm Chinese.  Chinese are very

22   friendly to Muslim."

23   Q.   What did he say?

24   A.   He said, "Okay.  I love you are Chinese.  Just be relaxed

25   and just keep driving."

1    Q.   So when he told you to drive down Commonwealth Avenue for

2    a while and you turned, what happened?

3    A.   We made a right turn.  I don't remember the name of the

4    street the first time we made a right turn, but later on I

5    remember we were driving on Market Street in Brighton.  So he

6    asked me couple other questions.  He asked me, "How long have

7    you came here to the United States?"  "What do you do?"

8    Questions like that.

9    Q.   What did you say?

02:52 10   A.   I said, "I came here for study.  I went to Northeastern

11   University.  My English is not very good."  And he asked me,

12   "Who do you live with?"  I say, "I live with roommates."  Then

13   he asked me --

14   Q.   He asked who you lived with?

15   A.   Yeah.

16   Q.   Why did you think he was asking you that?

17   A.   I didn't know at first time the reason he asked me, but

18   later on he asked me some other questions, I think I know why

19   he is asking me that question.  So later he asked me, "Is there

02:53 20   anyone care about you?"  So I think he's worried about someone

21   will worry about me if I didn't go back home until that

22   night -- the people who care about me would be nervous.

23   Q.   How did you feel when he asked if there was anyone there

24   to care about you?

25   A.   I feel he's trying to -- his concern, and I feel I have to

1    tell him that nobody's concerned, care about me, so makes him

2    like very relaxed.  Don't like, you know, pay too much

3    attention on me.

4    Q.    After that conversation, did it continue or was that the

5    end of it?

6    A.    After our conversation we had a break for a couple of

7    minutes and we continue driving on -- back on the street.  At

8    some point he ask me my -- the PIN code of my bank card.

9    Q.    He asked for your PIN code on your bank card?

02:54 10   A.    Yes.

11   Q.    What did you say?

12   A.    I tell him the PIN code.  And the PIN code was starting

13   with 86, somebody's birthday.  And then he asked me, "Did you

14   born 1986?"  I said, "Yes."

15   Q.    Are you actually born in 1986?

16   A.    Yes.

17   Q.    Was that birth date PIN code your birth date or someone

18   else's?

19   A.    It's not my birthday; somebody else's birthday.

02:55 20   Q.    Okay.  So after he asked if you were born in 1986, how did

21   the conversation go?

22   A.    After he asked me about 1986, he said, "That your

23   birthday?"  I said, "No, it's not my birthday; it's my

24   girlfriend's birthday."  And then he ask me, "Where is your

25   girlfriend?"  I mean, so I told him my girlfriend is not here;

1    she's in China.

2    Q.    What happened after that?

3    A.    After that we continued driving.  And I think we made a

4    left turn at some point onto -- onto Arsenal Street.

5    Q.    Onto Arsenal Street?

6    A.    Yeah, in Watertown.

7    Q.    All right.  So at some point now you're in Watertown from

8    driving around?

9    A.    Yes.

02:56 10   Q.    And where do you go once you get onto Arsenal Street?

11   A.    After a short one-minute drive on Arsenal Street, he ask

12   me to -- order me to make a right turn onto a local street or

13   dock.  I don't remember the name of the street.

14   Q.    All right.  So you turned on the street off of Arsenal.

15   And what happened?

16   A.    At some point he ask me question, like, "Do you -- do you

17   think all the white people look the same?"

18   Q.    Wait.  What was that question?

19   A.    He said, "Do you think all the white person looks like the

02:57 20   same?"

21   Q.    He asked if you --

22   A.    Yeah, I didn't get the question the first time.  I said,

23   "What?  I'm sorry?"  And then he said, "Do you think the white

24   person looks like the same like do you think the black person

25   looks like the same?  And so you won't remember my face,

```
 1  right?"  So I said, "Yes.  No, I don't remember anything."
 2  Q.    Why did you tell him you don't remember anything?
 3  A.    I feel like if I tell him that I remember your face, I
 4  remember everything, then he will, you know -- I think he will
 5  do something not good for me later on.  I just feel safer if I
 6  tell him that I don't remember anything.
 7  Q.    All right.  So after he asked you if everyone
 8  looked -- all white people looked the same to you or if you
 9  would recognize him, what happened?
 10 A.    He continue order me to drive in -- on the street, made
 11 some turns, and about a few minutes later, we pull over
 12 to -- on a local street in Watertown.
 13 Q.    Do you remember the name of that local street in
 14 Watertown?
 15 A.    I think it's -- maybe it's called Dexter Street.
 16 Q.    At that point in time was the sedan now behind you?
 17 A.    After we pulled over to a curb, immediately a sedan pulled
 18 right behind us.
 19 Q.    When you pulled over and the sedan pulled in behind you,
 20 what happened?
 21 A.    After the sedan pulled over, he order me to get out of the
 22 car and switch my seat, so order me to sit in the front
 23 passenger seat.  So he took out the car keys, and I was -- I
 24 took off the car and go run to the front side of my car and sit
 25 in the front passenger seat.
```

02:58 (line 10)
02:59 (line 20)

1    Q.   At that point how come you didn't run?

2    A.   I'm sorry.  Can you repeat that?

3    Q.   Why didn't you run away right then?

4    A.   Before he took out the car key, I did think about run

5    away, but he took out the car key very quickly, I think I got

6    no chance to run away because he got a gun, it's very dark

7    street.  Nobody there.  And there's another car pulled behind

8    us, I don't know what's either.

9    Q.   All right.  So you get out of the driver's seat and you

03:00 10   run around the front of your SUV to the other side.  Is that

11   right?

12   A.   Yes.

13   Q.   Okay.  What happens while you're doing that?

14   A.   While I was sitting in the front passenger seat, he opened

15   the trunk of my car and I saw another person get out from the

16   sedan right behind us.

17   Q.   Let me stop you there.  You said he opened the trunk of

18   your car.  It's an SUV, so it's really kind of a hatchback that

19   opens up.  Is that right?

03:00 20   A.   Yes.

21   Q.   Okay.  You're now in the front passenger seat or you're

22   about to get into it.  Which one?  Are you already in the seat?

23   A.   Yes, I'm already in the seat.

24   Q.   Okay.  What happens to the person that was in the sedan?

25   A.   He get off the sedan and walk to my car and they had

1    some -- a little bit of conversation.

2    Q.   You said they had a conversation.  So how many people are

3    now in the back of your car near the hatchback?

4    A.   I think two people.

5    Q.   Okay.  The conversation that's being had, is that in

6    English or some other language?

7    A.   I didn't -- I cannot hear anything clearly at that point

8    so I'm not sure.

9    Q.   After the conversation between those two individuals, what

03:01 10   happened?

11   A.   I heard, and it feels like they are moving something from

12   the sedan into the Mercedes SUV.

13   Q.   Could you tell what they were moving from the sedan into

14   the SUV?

15   A.   No, I don't know what they are moving.

16   Q.   Did you look back to see what it was?

17   A.   No, I didn't.

18   Q.   Why not?

19   A.   Because like I remember just a few minutes earlier he

03:02 20   asked me do I remember his face, so I feel like he doesn't want

21   me to recognize him, he don't like me to look at him, so I

22   didn't.

23   Q.   Okay.  Approximately how many items did they load into

24   your car?

25   A.   I'm not sure.  Maybe -- I'm not sure but definitely more

1    than one or two.

2    Q.   As you're sitting in that front passenger seat and this is

3    going on, what did you notice?  Did you ever look to the side?

4    Did you look, you know, to one side or the other?

5    A.   I just look at what's in front of me.  I trying to

6    remember something, so I look at the car parked in front of my

7    car and I look at another side street, look at those signs and

8    I try to remember the name of the street.

9    Q.   Why are you trying to remember the name of the street?

03:03 10   A.   I don't know.  I just trying to -- maybe feels like maybe

11   it will be useful later.  It's just something come from the

12   inside of me.  I don't have any specific reason for that.

13   Q.   After they loaded these unknown items into the back of the

14   car, what happened?

15   A.   After the loading is finished, so the man who jumped into

16   my car, he became the driver.  He's sitting in the driver's

17   seat.  And another man sitting in the Mercedes, he sit in the

18   backseat, right behind me.

19   Q.   The other man who sat in the backseat behind you, do you

03:04 20   see him in court today?

21   A.   Yes.  Yes.

22   Q.   Can you point him out for the record, please?

23   A.   That gentleman over there.

24   Q.   Is he wearing a black coat?

25   A.   Yes.

1          MR. MELLIN:  Your Honor, I would ask the record

2    reflect the identification of the defendant.

3          THE COURT:  All right.

4    BY MR. MELLIN:

5    Q.   When the defendant climbed into the backseat behind you,

6    did he say anything?

7    A.   He didn't speak to me, but maybe they had some talk, but I

8    really don't remember very clearly about that.

9    Q.   So after the defendant climbs into the back, the other

03:05 10    individual climbs into the front, what happened?

11    A.   So he started to drive.  I don't know in what direction

12    to.  He made a lot of turns.  Like driving in, I think it's

13    Watertown.  Like about ten minutes later he pulled over to

14    a -- right in front of a bank, ATM.  And one of the guy -- one

15    of the men just get out of the car and took my bank card and

16    went to the ATM.

17    Q.   Let me slow that down just a little bit.  Now,

18    subsequently did you learn the identity of the man who is now

19    driving your car?

03:06 20    A.   Huh?

21    Q.   Were you able to identify later on the name and the

22    picture of the individual that was driving your car?

23    A.   Yes.

24    Q.   And was that Tamerlan Tsarnaev?

25    A.   Yes.

1    Q.    All right.  So as the defendant's brother drove the car to

2    the Bank of America ATM, what happened?

3    A.    So the man sit in the backseat, he get out of the car, and

4    I remember he knock on the window, ask the PIN code again.

5    Q.    Let me stop you there again.  You say -- again, this is

6    the defendant that we're talking about that knocks on the

7    window?

8    A.    Yes.

9    Q.    He knocks on which window?

03:07 10    A.    I remember it was the front passenger window.

11    Q.    Okay.  You were sitting in the front passenger seat,

12    correct?

13    A.    Yes.

14    Q.    So does he ask you for the PIN number?

15    A.    I'm not sure who he's asking, but I did give him the PIN

16    code again.

17    Q.    Okay.  So he asked for the PIN number; you answer and tell

18    him what the PIN is, correct?

19    A.    Yes.

03:07 20    Q.    Okay.  And then what happened?

21    A.    So he went into the ATM store, and I was staying in the

22    car with the man from the -- the first man whose name was

23    Tamerlan, you just told me.

24    Q.    Before the defendant walked in to the ATM machine, do you

25    recall any conversation between the defendant and his brother

1    about how much money to withdraw?

2    A.   No, I don't remember that.

3    Q.   Okay.  Did the man driving the car ever tell the defendant

4    the exact amount of money to take out?

5    A.   No, I don't know.

6    Q.   So as the defendant was at the ATM machine and the -- his

7    brother was in the front driver's seat, what were you thinking?

8    A.   I was thinking maybe this is chance for me to run because

9    they told me they both have guns and I think I have no chance

03:09 10   if both of them are in the car.

11   Q.   Now, when did they tell you that they both had guns?

12   A.   I think it's after the -- some point -- I don't know if it

13   was that time, but at some point both of them were in the car.

14   Q.   So when you were driving when they were both in the car,

15   about how much time elapses between the time when they both

16   climb into the car and you get to the Bank of America ATM?  Do

17   you follow me?  How long was the trip from when they both got

18   into the car until you got to the ATM?

19   A.   I think it's about ten to 15 minutes.

03:09 20   Q.   Okay.  And so it's during this ten or 15 minutes that they

21   both tell you that they have guns?

22   A.   Yes.

23            MR. BRUCK:  I object to "they told."  If the

24   government would ask the witness to indicate who told.

25            THE COURT:  If you can.

1          MR. MELLIN:  Your Honor, I'm going with what the

2     witness said.  He used the term "they."

3     BY MR. MELLIN:

4     Q.   When you said they told you, did they both tell you or did

5     one tell you?

6     A.   You know, it was Tamerlan tell me.

7     Q.   Okay.  So the man in the driver's seat tells you they both

8     have guns, right?

9     A.   Yes.

03:10 10   Q.   Does the man sitting behind you at any time say, "I don't

11    have a gun"?

12    A.   No.

13          MR. MELLIN:  Your Honor, if I may approach?

14          THE COURT:  All right.

15          MR. MELLIN:  I'm going to show the witness what has

16    been marked as Government's Exhibit No. 755.

17          THE COURT:  Is that 75-5?

18          MR. MELLIN:  I'm sorry, your Honor.  755.

19    BY MR. MELLIN:

03:11 20   Q.   Mr. Meng, do you recognize what is inside the envelope in

21    Government's Exhibit 755?

22    A.   I can say a bank card.

23    Q.   Okay.  And whose bank card is that?

24    A.   It's mine.

25    Q.   And is that the bank card that the defendant used to

 1    withdraw cash from the ATM out of your account?

 2    A.    I think so.

 3    Q.    Did you have another bank card?

 4    A.    Yes.

 5    Q.    Okay.  Was that the one, though, that was taken from you?

 6    A.    Different.

 7    Q.    Which is a different one?

 8    A.    I got a couple of others, but different color.  I know

 9    this one, I put my picture on it.  I only put this one with my

03:11 10    picture on it.

 11   Q.    Okay.

 12         MR. MELLIN:  Your Honor, at this time I would move

 13   into evidence Exhibit 755.

 14         MR. BRUCK:  No objection.

 15         THE COURT:  All right.

 16         (Government Exhibit No. 755 received into evidence.)

 17   BY MR. MELLIN:

 18   Q.    Mr. Meng, when the defendant went in to the ATM, did he

 19   come back with money that he showed you?

03:12 20   A.    No, he didn't show to me.

 21   Q.    Did he at any time tell you how much money he had taken

 22   out of your account?

 23   A.    No.

 24   Q.    Did he at any time tell his brother, the driver, how much

 25   money he had taken out of the account?

1    A.    They have some talk but in a language I don't understand,

2    so I don't know.

3    Q.    The conversation in a language you didn't understand, when

4    did that occur?

5    A.    I think the first time after the defendant was in the car

6    and they have some talk.  They had a few talks.  I don't

7    remember every time the talk happened.  But every time when

8    they talk to each other, they speak in a different language.

9    When they speak to me, we talk in English.

03:13 10  Q.    What happened as you left the Bank of America ATM?

11   A.    After we left Bank of America ATM?  Okay.  After the bank

12   ATM, Tamerlan continued driving.  I think he was driving

13   further from the city we were in.  He was driving towards

14   Waltham, the direction.

15   Q.    He's driving toward Allston?

16   A.    Waltham.

17   Q.    Waltham?

18   A.    Yeah.

19   Q.    I'm sorry.  Waltham.

03:14 20  A.    So he continued driving, and at some point he ask me, "How

21   many gas left in your car?"  I said, "Only a quarter."  And he

22   asked, "How long that amount of gas can drive; how far?"  I

23   answered, "I don't know.  Maybe 50 miles."  So we continued

24   driving.

25   Q.    Continued driving towards Waltham now?

1    A.    Yeah, towards Waltham.  And I -- I remember we passed a

2    police station, and after a few miles he made a U-turn, like

3    driving back.

4    Q.    Driving back to the same direction you had just come?

5    A.    Yeah, the direction we just came from the ATM machine.

6    Q.    Okay.  What happened after he did the U-turn?

7    A.    After the U-turn, I think a conversation happened.  He

8    asked me -- I'm not sure it happened at that point or maybe a

9    few minutes later.  He asked me, "Can your car go out of

03:15 10    state?"  I was -- I didn't get the question on the first time

11    because I didn't want to have a conversation with him so I

12    answered, "I'm sorry.  What did you ask?"  And he asked me,

13    "Can your car go out of state, like to New York?"  I said,

14    "Yes, my car can go out of state and I have driven to New York

15    a few times."

16    Q.    When he asked if this car could go out of state and you

17    said New York, what happened after that?

18    A.    He also ask me do I have GPS in the car.  I said no.

19    Q.    You told him no, you don't have GPS?

03:16 20    A.    Yeah, I told him no.

21    Q.    Is that true?

22    A.    No, that's not true.  I did have a GPS in my car and I

23    didn't tell him that I have GPS.

24    Q.    Why didn't you tell him the truth and tell him that you

25    had GPS?

```
 1    A.   Because another time I was thinking -- because I have
 2    really good GPS in the car, you can find anything, like gas
 3    station, hotels, everything on the map.  So because I know they
 4    told me -- they ask about -- mention about New York, so I know
 5    they are going somewhere further.  I'm thinking maybe they're
 6    looking for something.  If they find out there's GPS in the
 7    car, then they can go to anyplace they want to go.
 8    Q.   Were you worried at that point they're not going to need
 9    you at all?
10    A.   Yeah, I worried about that.  And the defendant at that
11    time also asked him -- I think that's the first time he was
12    talking to me, he asked me, "Can you connect your car --
13    connect an iPhone in your car?  Can I play music in your car?"
14    And I said yes.
15    Q.   After that discussion, what happened?
16    A.   After that discussion we pulled over to a gas station on
17    that street.  And so they pulled over to the gas station.  So
18    the defendant get out of the car and try to pump -- put some
19    gas into the car.  And he asked me which one is my credit card.
20    Q.   Who asked you which one is your credit card?
21    A.   The defendant today.
22    Q.   At that point does he have your wallet?
23    A.   Yes, he had my wallet.
24    Q.   What did you say?
25    A.   I told him the ZIP code.  Oh, he asked me -- I told him
```

03:17 10
03:17 20

1    which one is my credit card.  And then he asked me the ZIP

2    code, so I told him the ZIP code.

3    Q.    Which one was your credit card?

4    A.    The credit card also was a Bank of America credit card.

5    Q.    Okay.  What happened after you told the defendant your ZIP

6    code?

7    A.    So he took the card to the pump station, trying to add

8    some gas, and he spend about two or three minutes there, and

9    then he came back and sit in the car and he talk to Tamerlan.

03:18 10    I don't know what they're talking about.

11    Q.    Again, when they talked, did they talk in some other

12    language?

13    A.    Yeah, in another language.

14    Q.    How would you describe the tone of that conversation?

15    Were they screaming and yelling back and forth or just a normal

16    conversation?

17    A.    I would describe it as normal conversation.

18    Q.    So the defendant was not yelling at Tamerlan; Tamerlan's

19    not yelling at the defendant?

03:19 20    A.    No, I don't remember that.

21    Q.    Okay.  All right.  So after this conversation between the

22    two of them, what happened?

23    A.    They continued driving -- continued driving.  Tamerlan

24    was -- asked me how to play the radios.  He turned on the

25    radios in the car.

```
 1    Q.   Let me stop you there.  When you were at this gas station,

 2    do you know if any gas was actually put into your SUV at this

 3    gas station?

 4    A.   I think -- I think they didn't put any gas into the car

 5    because at the gas station the lights were off.  Nobody was

 6    there.  It looks like it was closed.  But they didn't tell me.

 7    But after the gas station they didn't -- they drive back to the

 8    ATM direction where we originally drive from, so I saw that

 9    they didn't get gas at this gas station.

03:20 10   Q.   How did you see that they didn't get gas?

11    A.   Because they talk about -- I think in two sense:  They

12    didn't spend enough time at the gas station to pour the gas.

13    That's the first answer.  The second reason is I heard they

14    talk about New York.  So if they go to New York, it would go to

15    waste.  They want to go back to the direction they came from.

16    That's what I was thinking.

17    Q.   All right.  So when you left this gas station you were

18    headed east, back towards Boston and not towards New York?

19    A.   Yes, I think so.

03:21 20   Q.   All right.  So what happened after that?

21    A.   After that he drive back to the first place we stopped in

22    Watertown, the street in front of the house, and he stop at the

23    house again.  In front of the house again.

24    Q.   All right.  Now, let me just stop you there.  "He" being

25    Tamerlan Tsarnaev?
```

1    A.    Yeah, Tamerlan.  Sorry.  Tamerlan, yeah.

2    Q.    So he drives back to the same location where the green

3    sedan was located?

4    A.    Yes.

5    Q.    All right.

6    A.    I think the defendant today, he got out of the car and

7    grab something from the sedan again and get back in the car

8    very quickly.

9    Q.    Do you know what the defendant grabbed out of the green

03:22 10    sedan?

11   A.    I don't know at that point, but I think later on I think

12   it's -- it was something like a CD or something.

13   Q.    Okay.  Why do you say you think he grabbed a CD?

14   A.    Because later on they put a CD into my car to play music.

15   Very different music.  A style I never heard of before.

16   Q.    How would you describe that kind of music?

17   A.    I would describe it as a little bit weird.  It sounds like

18   religious.

19   Q.    It sounds very religious?

03:22 20   A.    Yeah.

21   Q.    How did that make you feel when that music was being

22   played in your car?

23   A.    Nervous.

24   Q.    After the defendant got out of the car, got something from

25   the other car, got back into your car in the back, was he again

1   right behind you?

2   A.   Yes, same spot.

3   Q.   Okay.  What happened at that time?

4   A.   After that Tamerlan start driving again.  I don't know

5   where he's heading to but he made a right turn into a very

6   small, dark street.  It's a dead-end street.  And he stop there

7   for four, five seconds, didn't do anything.  I don't know

8   what -- I thought at the point maybe he will kill me at that

9   place.  But fortunately he didn't, and he made a U-turn again

03:24 10  and drive out of that dead-end, go back to the street.

11   Q.   After you pulled out of that dead-end, where did he go?

12   A.   He went down the street.  I don't remember the name of the

13   street but it's not -- heading toward the ATM direction we went

14   to before.  And it looks like he's heading to -- towards Boston

15   direction.

16   Q.   So now we're back -- essentially driving east towards

17   Boston again?

18   A.   Yes.

19   Q.   Okay.  And what happens?

03:24 20  A.   At some point we were -- the three of us were in the car

21   and my roommate called in.  First time she called in, we missed

22   that call.  And Tamerlan was asking me, "Who is calling you?"

23   Q.   Let me stop you there.  So when you say that your

24   roommate's calling you, is it an actual cell phone call as

25   opposed to like a text message?

```
 1    A.    Cell phone call.

 2    Q.    Okay.  Do you have the ringer on or off?

 3    A.    It's on because it's connected to my car.  So when a call

 4    is in the car, the whole car can hear that, and that the call

 5    is coming in.

 6    Q.    Okay.  So when you had this first call, what did Tamerlan

 7    say to you?

 8    A.    He just -- first time he just ask me who is calling me.

 9    And after we talk about -- we were talking, and the time is

03:26 10    up -- the time is up on the phone, we just missed the call.

11    And a few, two -- a couple of minutes later I get a message

12    from my roommate.

13    Q.    Is this a text message or what is it?

14    A.    This time it's a text message.

15    Q.    All right.

16    A.    So the text message was in Chinese.  I remember it was

17    about asking something, "Where are you?  It's dangerous

18    outside.  Come home earlier" in Chinese.

19    Q.    All right.  So when you received the text message that

03:27 20    it's dangerous outside, where are you --

21    A.    Yes.

22    Q.    -- how do you respond, or what do you do?

23    A.    I didn't respond to the text message, to her immediately.

24    Tamerlan look at the message.  He doesn't know Mandarin.  So he

25    asked me, "What's the text message?"  So I told him my
```

1    roommate's just asking me where I am and she said it's

2    dangerous outside, the truth translation of the text message.

3    Then he asked me how to spell "no" in Chinese.

4    Q.   How to spell what?

5    A.   No.

6    Q.   N-O?

7    A.   N-O, yes, in Chinese.

8    Q.   Yes.

9    A.   So I tell him how to spell "no" in Chinese.  And later he

03:28 10   asked me where is a dictionary.  "A dictionary application in

11   your phone?"  So I give him English-to-Mandarin dictionary.

12   Q.   On your phone?

13   A.   Yeah, on my phone.

14   Q.   Okay.  So he's doing this while he's driving the car, at

15   the same time?

16   A.   I think we stopped for a while, stopped for a couple of

17   minutes at that time because we were driving on the -- no car

18   was on the street.  Nobody was on the street.  So he stopped

19   for a while to try to find the dictionary out.  And he typed

03:28 20   "no" in the dictionary and he got the translation from the

21   Mandarin, just one word, texted back it my roommate.

22   Q.   At that time where is the gun, do you know?

23   A.   At that time I don't know where the gun -- I think it was

24   in the driver door side in the pocket.  But what happened next,

25   I think I know the gun.

```
 1    Q.   Right.  But as you pulled over and he was checking how to

 2    spell "no" in Mandarin, why did you not run at that point?

 3    A.   I didn't think about running at that time because he

 4    had -- both of them have guns.  And not just him, but other --

 5    the defendant today was sitting right behind me.  And nobody

 6    was on the street.  I have no place to run.  And they can

 7    drive.  They have car.

 8    Q.   When you stopped on the road and he was checking the text

 9    message for the translation, did the defendant ever get out of

10    the car?

11    A.   No, he didn't.

12    Q.   Did he ever run away?

13    A.   No.

14    Q.   Okay.  What happened?

15    A.   So after he text back the message, later on, I think just

16    very shortly, one minute later, another roommate who is

17    boyfriend of the -- the roommate who text me, so he called me

18    again.

19    Q.   Now, this other roommate that is contacting you, he's

20    calling you?

21    A.   Yeah, he calling me on cell phone.

22    Q.   Okay.

23    A.   And this time because of the -- after he call me, this

24    time Tamerlan became a little bit nervous.  Anxious, it looks

25    like.  He asked me, "Who is calling you again?"  I said, "My
```

1    roommate."  And I become a little nervous too.  I said, "If you

2    don't want to answer -- you don't want me to answer the phone,

3    I won't answer the phone.  I won't say anything."  But he

4    said -- he took the gun, again point it to me, he said, "You

5    have to answer the phone."

6    Q.   So now the driver, Tamerlan, pulls out the gun again, his

7    gun again, and points it at you?

8    A.   Yes.

9    Q.   Where does he point it?

03:31 10   A.   He point to me.  I said, "If you don't want me to answer

11   phone, I won't."  He said, "No, you have to answer the phone."

12   Q.   Where is the gun pointed?  At you?

13   A.   At me.  At my head.  And he said, "You have to answer the

14   phone, but if you say any single word in Chinese, I will kill

15   you right now."

16   Q.   He told you that if you said anything in Chinese on the

17   phone, he would kill you right now?

18   A.   Yes.

19   Q.   What did you do?

03:32 20   A.   When we were having that conversation, we missed the call

21   again.  But the roommate call right back again.  So he point a

22   gun to me, and I said, "Okay.  I will answer in English."

23   Q.   Did he point the gun at you again?

24   A.   Still pointing to me.  And I ask him, "What do you want me

25   to say?"  He said, "Just say you are sick.  Just say you feel

```
 1   sick, you're staying at a friend's home tonight."  So I pick up
 2   the phone and answer in English, which is unusual, it's weird
 3   because my roommates are Chinese too.  We talk in Mandarin
 4   every day.  We never speak English, not even on the phone.  So
 5   I answer in English and I say, "I'm very sick.  I'm going to
 6   stay at my friend's home tonight."
 7   Q.   What does your roommate say in response to that?
 8   A.   He -- he sounds like little bit surprised.  He said,
 9   "What?" in Chinese.  "Why you speak English?"  And I repeat,
10   again, I say, "I'm sick.  I stay at a friend's home tonight.
11   And I've got to go right now.  I talk to you later."  Then he
12   said, "Okay," and he hung up.
13   Q.   After that phone call, what happened?
14   A.   After that phone call Tamerlan just feels little
15   bit -- looks like he feels a little bit happier.  He told me,
16   "Good job, boy.  Good job."  So I feel relaxed too because I
17   was nervous at a point.  And then we continued driving.  He
18   continued driving, Tamerlan.
19   Q.   Where did you go from there?
20   A.   I think he was driving back to -- he was driving back to
21   Boston direction.  Maybe it was Soldiers Field Road.  At some
22   point he looked at the other side of the street.  He looked and
23   he see some lights were on from a gas station.  And he
24   feel -- I remember he was excited at the moment.  He said,
25   "Yes."  He said, "Yes" or something.  He feels like excited.
```

03:33 (line 10)
03:34 (line 20)

1    Q.   As you were on Soldiers Field Road, did you feel like you

2    started to know that area a little bit better too?

3    A.   A little later on I feel better.  After he made a right --

4    a left turn from the Soldiers Field Road to Cambridge, because

5    after we went to Cambridge, I feel it's very familiar with that

6    area.

7    Q.   You said that Tamerlan Tsarnaev pointed the gun at you

8    when these phone calls were coming in, correct?

9    A.   Yes.

03:35 10   Q.   Did you ever see Tamerlan Tsarnaev point the gun at his

11   brother?

12   A.   No, never.

13   Q.   Did he ever threaten his brother during any of the time

14   you were in that car?

15   A.   In my understanding, I mean, even English speaking, I

16   didn't think so.

17   Q.   And did you ever see him yell at his brother?

18   A.   No, I didn't see.

19   Q.   As you were now coming back into Cambridge, what happened?

03:36 20   A.   Now coming into Cambridge, he driving to a gas station.  I

21   remember it was a Shell Gas Station.  So he pulled over into

22   gas station.

23   Q.   At that point had you been to that Shell Gas Station

24   before?

25   A.   I never made it to the gas station.  I never purchase gas

1    from that gas station.  But I drive past by that gas station

2    multiple times.

3    Q.    So you knew that location?

4    A.    Yes, I do.

5    Q.    As he pulled into that Shell Gas Station, what happened?

6    A.    After pulling into the gas station, the defendant today

7    get out of the car again.  He was -- he tried to buy the gas by

8    using the credit card again.  I remember he had a conversation

9    with me -- the ZIP code again.  He asked me what was the ZIP

03:37 10   code again, so I told him the ZIP code.  But a few seconds

11   later he knocked on my window again and asked it -- told

12   Tamerlan in English, he said, "Cash only."

13         I remember Tamerlan asking me, "How much money you think

14   you need to spend to fill the tank of your car?"  I said, "I

15   don't know, maybe 50, 60."  And then Tamerlan told the

16   defendant today to put $50 in for the gas.  And he also said

17   super.  Super.  The super grade.  And so the defendant today,

18   he went into the store to pay for the gas.  Then I was with

19   Tamerlan.  Only two of us in the car.

03:38 20   Q.    At that point, do you know where Tamerlan's gun was?

21   A.    I remember it was in a pocket on the driver's side.

22   Q.    And that's the same pocket where you had your wallet

23   before?

24   A.    Yes.

25   Q.    Okay.  So with the gun in the pocket, what were you

thinking?

A.   I was thinking about running away at that time because I think -- thought about running away in Watertown before.  So I saw that they were heading to New York, maybe I don't have another chance, but right now they're adding gas.  It may be my last chance.  And I thought about the conditions for me to running away.

Q.   And what conditions did you think about?

A.   I thought about the three conditions.  First of all, if two of them or both are in the car, I have no chance to run; second of all, if I have to run away, I have to do a few things.

Q.   What are the few things you'll do?

A.   First of all, I'm back in my seatbelt and the car door is locked.  So if I have to open the door of the car on my side, I have to press the unlock button first.  So that's the second thing.  And then the third is I have to do -- I have to open the door with the handle, pull the handle and open the door and run away.  So because at that point so I only have one person in the car and he was -- he didn't have the gun in his hand.

Q.   What was he doing at that time?

A.   He was -- both of his hands was on the GPS, a Garmin GPS device.

Q.   Was that your Garmin GPS?

A.   No, it's from their -- I don't have that GPS device.

1    Q.   Do you know when they got that Garmin GPS out of their

2    car?

3    A.   I'm not sure it's the first time the moving luggage or the

4    second time when we go back to Watertown.  I think -- I

5    personally think it's the second time because I didn't see he

6    was using the GPS the first time.

7    Q.   As he's sitting in the front driver seat working with the

8    GPS, what are you thinking?

9    A.   I think this is my best chance because only one of them be

03:41 10   in the car and the door is -- the door of the car is unlocked.

11   I only have to do two things, in my opinion:  unbuckle my

12   seatbelt, open the door and jump out.

13   Q.   What did you do?

14   A.   So I count down in my mind 1, 2, 3, 4.  So it's very tough

15   decision for me at that moment.

16   Q.   How are you feeling at that moment?

17   A.   Every time when I recall this, this was the most

18   terrifying moment.  It's most difficult decision in my life.

19   Q.   Why do you say it's the most difficult decision of your

03:42 20   life?

21   A.   Because I ask Tamerlan before when both of us in the car,

22   I ask him, "Are you going to kill me tonight?"  He told me that

23   "I'm not going to kill you.  Just relax, man."  And "maybe we

24   will drop you off at someplace very far away from any person,

25   you have to walk about five or six miles to find any person."

1       So I was struggling about should I trust him about that?

2   Should I just follow his order and maybe he will release me

3   later on, or should I take this chance by myself to run away?

4   So, I mean, the decision -- I say the decision based on the two

5   choice I think I have at that time.

6   Q.   Right.  What did you do?

7   A.   So I count down 1, 2, 3, 4, and I -- fortunately, I

8   unbuckle my seatbelt and open the car door quickly

9   successfully, jump out of the car, and I dashed into the

10  street.  I can feel he was trying to grab me.

11  Q.   When you say you could feel he was trying to grab you, how

12  could you feel he was trying to grab you?

13  A.   You could feel his hands were so close to my left hand.

14  You can feel kind of like wind on my left hand and he was

15  shouting.  He was like saying some word.

16  Q.   He was shouting at you?

17  A.   Shouting -- not at me, shouting a word.

18  Q.   Okay.  Do you know what word he was shouting?

19  A.   He said, "Fuck."  Can I speak that?

20       (Laughter.)

21  Q.   You've done it now.

22       (Laughter.)

23  A.   Sorry.  I should have asked first.

24  Q.   All right.  When he said that, what did you do?

25  A.   I dash into the street.  And I can see there is another

1    gas station on our side of the street, so I run across the

2    street.  Fortunately, there's no car driving on the street at

3    that time.  So I can see the lights from that gas station was

4    on, but I'm not sure the gas station is open or locked.  So I

5    was like praying, "Please open.  Please somebody be there."

6         So I got to the door of the gas station, I open the door,

7    it opened.  The attendant was there.  I beg him to call 911.

8    And he didn't get me at the first time.  And I just say,

9    "Please call 911.  Please."

03:45 10   Q.   When you told him to please call 911, did you stay at the

11   front door?  What did you do?

12   A.   Yeah, I stayed at the front door, but I tried to lower

13   down my body so they cannot see me through the windows.

14   Q.   Did you look back to see if they were following?

15   A.   No.

16   Q.   Why not?

17   A.   I don't know.  It just feels like I'm very terrified.  It

18   feels like -- I was very worried about them in front of me.  I

19   feel like if I don't look back there, then maybe they won't

03:45 20   follow me, something like that.  I didn't have too many reason

21   in my mind after that time.

22   Q.   When you asked for a 911 call to be made, was one made?

23   Did the attendant call 911?

24   A.   Yeah, after a few seconds he called 911.

25   Q.   And as he was calling 911, what did you do?

1   A.   I went to the side of -- they have a storage room behind

2   the desk.

3   Q.   All right.  So did you go behind him into a storage room?

4   A.   Yeah, I go behind him, the storage room.

5   Q.   Why did you do that?

6   A.   I'm worried about they were coming in front of me.  I just

7   want to hide.  In case they came into the store, they cannot

8   see me.

9   Q.   They cannot what?

03:46 10   A.   They cannot find me.

11   Q.   As you were hiding in the back, do you know if there was a

12   call that was placed to 911?

13   A.   Yes, I can hear that.

14   Q.   At some point is the phone given to you?

15   A.   Yes, the attendant gave me the phone later, a few seconds

16   later.

17   Q.   After the phone call is made, do the police arrive?

18   A.   Yeah.  The police arrive quickly.  When I was still

19   talking on the phone, the attendant knock on the door of the

03:47 20   storage room and told me that the police is here.

21          MR. MELLIN:  Your Honor, if I could have the witness

22   look at Exhibit 744, which I believe is already in evidence.

23          THE COURT:  All right.

24   BY MR. MELLIN:

25   Q.   Mr. Meng, do you recognize what Exhibit 744 is?

```
 1    A.    I can say on the left side is a Shell Gas Station, on the
 2    right side is a Mobil gas station which I dash into.
 3    Q.    Right.  So this is -- on the left side is the Shell that
 4    you were at, and you ran across the street to the Mobil on the
 5    right?
 6    A.    Yeah, and run across the street.
 7          MR. MELLIN:  And just if we could have 745 brought up,
 8    please, which I also believe is already in evidence.
 9    Q.    And do you recognize Exhibit 745?
10    A.    Yes.
11    Q.    Okay.  And what is that?
12    A.    It's a Mobil Gas Station where the attendant called 911.
13          MR. MELLIN:  Your Honor, this may be a good time to
14    break just because I was going to play the video and audio
15    attached.
16          THE COURT:  Yes?  Okay.  So we'll take the lunch
17    break, ladies and gentlemen, and resume at two o'clock.
18          THE CLERK:  All rise for the Court and the jury.  The
19    Court will take the lunch recess.
20          (The Court and jury exit the courtroom and there is a
21    recess in the proceedings at 12:57 p.m.)
22          THE CLERK:  All rise for the Court and the jury.
23          (The Court and jury enter the courtroom at 2:06 p.m.)
24          THE CLERK:  Be seated.
25          THE COURT:  Do we have the witness?
```

03:48 (line 10)
03:49 (line 20)

1            Go ahead, sir.

2            MR. MELLIN:  Thank you, your Honor.

3                      DUN MENG, resumed

4                DIRECT EXAMINATION CONTINUED

5    BY MR. MELLIN:

6    Q.   Good afternoon, Mr. Meng.

7    A.   Good afternoon.

8            MR. MELLIN:  And good afternoon, Miss Zhang.

9            THE INTERPRETER:  Good afternoon.

04:59 10          MR. MELLIN:  For the record, your Honor, Ms. Zhang is

11   seated next to Mr. Meng to help with interpretations this

12   afternoon as well.

13   BY MR. MELLIN:

14   Q.   Mr. Meng, we stopped for the lunch break when you were

15   looking at some photographs of both the Shell Gas Station and

16   the Mobil Gas Station.  Do you remember that?

17   A.   Yes.

18   Q.   In addition to having a chance to view those before, did

19   you also have a chance to watch the video from the Shell Gas

05:00 20   Station and also the Mobil Gas Station?

21   A.   Yes.

22   Q.   And are those fair and accurate videos of what you did

23   that day?

24   A.   Yes.

25   Q.   Okay.  And in addition to that, have you had a chance to

```
 1   listen to the 911 call that was placed initially by the clerk
 2   in the Mobil Gas Station, but at some point you actually speak
 3   on it, correct?
 4   A.   Yes, correct.
 5   Q.   And have you had a chance to listen to that 911 call?
 6   A.   Yes.
 7   Q.   And is it a fair and accurate recording of what was said
 8   that day?
 9   A.   Yes.
10           MR. MELLIN:  And, your Honor, for the record, I would
11   seek to move into evidence Exhibit 752, which is actually a
12   composite of the videos as well as the audio from the 911 call
13   overlaid where it's appropriate.
14           THE COURT:  Is there any objection?
15           MR. BRUCK:  No.
16           THE COURT:  All right.
17           (Government Exhibit No. 752 received into evidence.)
18           THE COURT:  We don't have it.
19           (Pause.)
20           THE COURT:  All right.
21           (Video recording played.)
22           MR. MELLIN:  If we could pause it there for just one
23   moment.
24   BY MR. MELLIN:
25   Q.   Mr. Meng, did you see who just dashed out of the black SUV
```

1    and onto the screen?

2    A.   Yes, it was me.

3    Q.   All right.

4         (Video recording played.)

5         MR. MELLIN:  If we could pause it there for one

6    minute.

7    Q.   Mr. Meng, in the video right now that is playing, you are

8    inside the Mobil Gas Station.  Is that right?

9    A.   Yes.

05:02 10    Q.   What is it you're telling the clerk behind the counter?

11   A.   I think I was telling him that someone has guns, want to

12   kill me.  Please call 911 right now, please.

13        MR. MELLIN:  Continue, please.

14        (Video recording played.)

15        MR. MELLIN:  Could you pause it, please?

16   Q.   Again, Mr. Meng, that portion of the video, you are still

17   at the counter talking to the man behind the counter.  Is that

18   right?

19   A.   Yes.

05:03 20   Q.   And at some point you actually get down somewhat on your

21   knees and put your hands up as if to pray.  Is that right?

22   A.   I'm trying to tell him, trying to say, "Please, please

23   call 911," because in the first couple of minutes, first few

24   seconds, he didn't make the call.  So I wanted him to make the

25   call right now, immediately.

1    Q.   And just before that you actually turned towards the door

2    and kind of put your hands up on the inside of the door to the

3    Mobil.  Do you remember that portion of the video?

4    A.   Yes.

5    Q.   And what were you trying to do there?

6    A.   I was trying to ask him, "Can you please lock the door?"

7    And I don't know how to lock it, but I try -- I'm afraid they

8    were following me.

9    Q.   And so had you attempted to lock the door?

05:03 10   A.   Yes.

11        MR. MELLIN:  If we could continue, Mr. Bruemmer.

12   Thank you.

13        (Video recording played.)

14        MR. MELLIN:  You could stop it right there, please.

15   Q.   Now, Mr. Meng, if you can describe, what were you doing

16   right there as you went around the back of the counter?

17   A.   So I was -- I was trying to go inside, trying

18   to -- because I'm really worried they will follow me.  So I was

19   trying to find a place to hide.  And the attendant, he was

05:04 20   trying to maybe stop me.  He said, "Sir, you cannot go in

21   there."  But I was very scared.  So I just go inside and I find

22   a storage room on the right side, so I went into a storage

23   room.

24   Q.   Okay.  So now as we look at the screen in this video,

25   you're moving off to the right behind the rack of items for

1   sale, correct?

2   A.   Yes.

3   Q.   So what is it that is behind that wall?

4   A.   Behind that wall is a storage room.

5        MR. MELLIN:  Thank you.

6        (Audio and video recording played.)

7   Q.   Mr. Meng, now at the start of that audio, it's the voice

8   of the attendant, correct?

9   A.   Yes.

05:06 10   Q.   Now, towards the latter portion of that, who is speaking?

11   A.   Later I was speaking.

12   Q.   So he hands you the phone and now you're on the phone?

13   A.   Yes.

14   Q.   Okay.  Now, right where we cut off, what did you just tell

15   the person on 911?

16   A.   That it is hard to understand better.  I was saying that

17   they told me they did the explosion, the marathon explosion.

18   Q.   So you had said that they did the marathon explosion?

19   A.   Yes.

05:07 20        MR. MELLIN:  Okay.  If we could play...

21        (Audio and video recording played.)

22   Q.   Now, Mr. Meng, what were you trying to -- or you indicated

23   that you were trying to explain what they looked like, correct?

24   A.   Yes.

25   Q.   And what were you trying to say there?

1    A.    I was trying to say it looks like from Middle East or

2    Middle Asia.

3    Q.    Okay.  That they looked Middle Eastern.  Is that what you

4    were trying to say?

5    A.    Yes.

6    Q.    Okay.

7              (Audio and video recording played.)

8              MR. MELLIN:  If you could stop it there, please.

9    Q.    Now, Mr. Meng, on the video that we're looking at, you

05:10 10    have just walked out from the storage room back in behind the

11    clerk's counter, correct?

12    A.    Yes.

13    Q.    Okay.  And there's a police officer now who has arrived on

14    the scene?

15    A.    Yes.

16              MR. MELLIN:  All right.  If we could roll it, thanks.

17              (Video recording played.)

18    Q.    And now as we're watching the video, and the video just

19    ended, you were speaking to the police officer.  Is that right?

05:11 20    A.    Yes.

21    Q.    And what did you talk to him about?

22    A.    I -- the first police officer, I think I remember the

23    first time I told him that -- the others -- told me the others

24    are suspect of the Boston Marathon bombing.  And then I say to

25    them maybe it's in the other gas station right across the

1    street.  And I said to the police station -- the police officer

2    that they have my cell phone in the car already still and that

3    my car has a GPS tracking system.  They can track -- so they

4    can track the location of the car if they want.

5    Q.    Okay.  Now, why did you tell the police that your phone

6    was still in the car?

7    A.    I really feel unsafe.  I feel they come back, to please

8    find them and take care of this.  So I tried to provide them

9    with useful information so they could find them quickly.

05:12 10   Q.    You told them there was a tracking device on the car,

11   right?

12   A.    Yeah.  I told them my car has a tracking system.

13   Q.    Do you know the name of that tracking system?

14   A.    It's a tracking system from Mercedes called MB Brace

15   [*sic*].

16   Q.    So MB Brace.

17        And so that is something that Mercedes has, and if you

18   need to find the car, Mercedes is able to find where the car is

19   located?

05:12 20   A.    Yes.  And if I -- if I give them Mercedes account

21   information, they can locate it.

22   Q.    So what happened after you told the officer that?

23   A.    After I told them that, the police officer called Mercedes

24   and I give him -- I gave him my account information, like MB

25   Brace account number, maybe password, I don't remember.  But I

1    remember I gave him the account number so they were able to

2    find the car.  And also I gave the police officer my bank

3    account because they had my bank card number.  So I told him

4    they just withdraw some cash in the ATM machine, so...

5    Q.    Mr. Meng, did you ever get your car back?

6    A.    No.

7    Q.    When you were seated in the car when you were texting your

8    friend back around 10:30 and then -- at night on April the

9    18th, do you remember what items you had in the car at that

05:14 10   time?

11   A.    I only remember like I have my wallet, sunglass, small

12   items in the car.  I don't remember I have any other items in

13   the car.  Maybe water, a bottle of water.

14   Q.    Did you ever put a Tupperware bomb in your car?

15   A.    No.

16   Q.    Do you remember someone during the night bringing a CD

17   into your car?

18   A.    Yeah, I remember they play CD, the different music CD.

19   Q.    Was that your CD?

05:15 20   A.    No.

21   Q.    Mr. Meng, did you ever hit a human being or an animal with

22   the front quarter-panel of your car?

23   A.    No, never before.

24   Q.    Did you ever cause any damage to the front left

25   quarter-panel of your car?

1    A.    No.

2    Q.    Did you ever leave any blood on the front left

3    quarter-panel of your car?

4    A.    No, I don't remember.

5    Q.    Prior to April the 18th at 10:30 p.m., had you ever had

6    any bullet holes in that car?

7    A.    No.

8           MR. MELLIN:  If I could pull up Exhibit 795 for the

9    witness.

05:15 10   Q.    Mr. Meng, do you see what is Exhibit 795?

11   A.    Yes.

12   Q.    Do you recognize the vehicle in that photograph?

13   A.    The black Mercedes looks like the type of my car, but the

14   condition is totally different.

15          MR. MELLIN:  Your Honor, I move into evidence Exhibit

16   795.

17          MR. BRUCK:  No objection.

18          THE COURT:  All right.

19          (Government Exhibit No. 795 received into evidence.)

05:16 20        MR. MELLIN:  Ask to publish.

21   BY MR. MELLIN:

22   Q.    Mr. Meng, as you look at the photograph of the black

23   Mercedes in 795, do you see all of that damage to the front

24   quarter-panel?

25   A.    Yes.

```
 1    Q.   Do you know how that happened?

 2    A.   No.

 3    Q.   You'll also see in this photograph what I've just

 4    enlarged?

 5    A.   Yes.

 6    Q.   And I just enlarged the front driver's door, correct?

 7    A.   Yes.

 8    Q.   And do you see these bullet holes in the front driver's

 9    door?

05:16 10    A.   Yes, I see.

11    Q.   Was that ever in that car before April 18th at 10:30 p.m.?

12    A.   No.

13    Q.   Thank you.

14         MR. MELLIN:  If we could pull up Exhibit 796 just for

15    the witness, please.

16    Q.   Mr. Meng, do you see the photograph which is 796?

17    A.   Yes.

18    Q.   And can you describe what that is?

19    A.   That's my car.

05:17 20    Q.   Okay.  Now you're able to say that's your car based on the

21    tag on the car.  Is that right?

22    A.   Based on the plate number.

23         MR. MELLIN:  Your Honor, I move into evidence Exhibit

24    796 and ask to publish.

25         MR. BRUCK:  No objection.
```

1          (Government Exhibit No. 796 received into evidence.)

2    BY MR. MELLIN:

3    Q.   Mr. Meng, prior to April 18th, was your back window shot

4    out or damaged?

5    A.   No.

6    Q.   During the time that you were riding around in the car in

7    the front passenger seat, was that back window shot out or

8    damaged?

9    A.   No.

05:18 10    Q.   And I just enlarged a portion of that photograph showing

11   the back window, also the Mercedes symbol, and then to the

12   right of that is another bullet hole.  Do you see that?

13   A.   Yeah, I see it right now.

14   Q.   Was that in your car at any time prior to April 18, 2013,

15   at 10 p.m.?

16   A.   No.

17        MR. MELLIN:  Finally, if I could pull up 797, please,

18   for the witness.

19   Q.   Do you recognize what is 797, Mr. Meng?

05:18 20   A.   Yes.

21   Q.   Is that a picture of the VIN number, of the vehicle

22   identification number, on the Mercedes?

23   A.   It's the VIN number.

24        MR. MELLIN:  Your Honor, if I may move Exhibit 797

25   into evidence.

1           MR. BRUCK:  No objection.

2           (Government Exhibit No. 797 received into evidence.)

3           MR. MELLIN:  I'd ask to publish that alongside Exhibit

4    754, which is the lease agreement.

5    BY MR. MELLIN:

6    Q.   And, Mr. Meng, now in front of you on the screen is

7    Exhibit 797 with the VIN number from the Mercedes and the lease

8    agreement which is 754.  Do you see that?

9    A.   Yes.

05:19 10   Q.   And do they have a matching vehicle identification number?

11   A.   Let me take a look.  Yes, they have the same number.

12   Q.   Thank you.

13          MR. MELLIN:  Thank you, your Honor.  Nothing further.

14          THE COURT:  Mr. Bruck?

15                      CROSS-EXAMINATION

16   BY MR. BRUCK:

17   Q.   Good afternoon, Mr. Meng.

18   A.   Good afternoon, sir.

19   Q.   My name is David Bruck, and I'm one of Jahar Tsarnaev's

05:20 20   lawyers.

21   A.   Okay.  Nice to meet you.

22   Q.   And do you mind if I ask you just a few questions?

23   A.   You can ask any questions.

24   Q.   I'm sorry?

25   A.   You can ask any questions.

1    Q.   Okay.  I only have a few.

2    A.   Okay.

3    Q.   The person who came up to your car that night when you

4    were parked, typing on your phone, that person was Tamerlan,

5    correct?

6    A.   Yes.

7    Q.   And Tamerlan was the person who opened your door and got

8    in the car, correct?

9    A.   Yes.

05:20 10   Q.   And pointed a gun at you and robbed you?

11   A.   Can you repeat that question?

12   Q.   Tamerlan is the person who pointed a gun at you and robbed

13   you that night in the car?

14   A.   Yes.

15   Q.   And threatened to kill you?

16   A.   Yes, I did [*sic*].

17   Q.   Okay.  And the first time you had ever seen Tamerlan was

18   when he tapped on your window, correct?

19   A.   Yes.

05:21 20   Q.   And even when he did that, you didn't yet think anything

21   was necessarily the matter, correct, that he was going to harm

22   you?

23   A.   No, I thought he was trying to ask me some questions the

24   first time.

25   Q.   You thought maybe he was going to ask you for directions?

1    A.    Yes.

2    Q.    And that's why you lowered your window?

3    A.    Correct.

4    Q.    After Tamerlan got in the car and took your money and

5    pointed the gun and made you drive, did there come a time when

6    he made a cell phone call while you were driving?

7    A.    I don't remember that.  I don't.

8    Q.    Okay.  Mr. Mellin asked you a series of questions about

9    Tamerlan's gun.  Did you ever see any other gun that night?

05:22 10   A.    No.

11   Q.    So Tamerlan's gun was the only gun you saw?

12   A.    Yes.

13   Q.    And I think you said that the first thing that Jahar ever

14   said to you was to ask you if the stereo system -- or if the

15   sound system on your car would work with the iPhone -- with an

16   iPhone, correct?

17   A.    Yeah.  According to my memory, he was asking me can

18   I -- in my car, can I accommodate somebody's iPhone to the car

19   to play music.

05:23 20   Q.    To play music.

21   A.    Yeah.

22   Q.    And before that Jahar hadn't said anything to you,

23   correct?

24   A.    Yes; that's correct.

25   Q.    I think that's all.  I just have to check.  Can you bear

1      with me a moment?  I'm going to ask...

2              (Counsel confer off the record.)

3              MR. BRUCK:  Mr. Meng, thank you so much.  That's all I

4      have.

5              THE WITNESS:  All right, thank you.

6              MR. MELLIN:  Your Honor, briefly, redirect?

7              THE COURT:  Briefly.

8                          REDIRECT EXAMINATION

9      BY MR. MELLIN:

05:23 10   Q.   Mr. Meng, who was the person that loaded items into your

11     car when you stopped and the green sedan pulled up?

12     A.   I didn't look back, but I can say both of them -- they

13     were talking, and the both of them, I feel like two person

14     moving something, not just one single person.

15     Q.   Who is the person who got out of the green sedan and got

16     into the car behind you at that time?

17     A.   Jahar.

18     Q.   Who is the person who asked for a PIN number when you

19     pulled up to the Bank of America ATM?

05:24 20   A.   Jahar.

21     Q.   Who is the person who walked into the ATM and withdrew

22     money from your account?

23             MR. BRUCK:  I object.  This is beyond the scope.

24             THE COURT:  Overruled.

25             You may have it.

```
 1              THE WITNESS:  Jahar.
 2     BY MR. MELLIN:
 3     Q.   Who was the person who got out of your car twice to fill
 4     it up with gas?
 5              MR. BRUCK:  Objection.  Leading.
 6              THE COURT:  No, overruled.
 7              THE WITNESS:  Jahar.
 8     BY MR. MELLIN:
 9     Q.   Did the defendant ever tell you he did not have a gun?
05:25 10    A.   No.
11              MR. MELLIN:  Thank you.
12              THE COURT:  Anything else?
13              MR. BRUCK:  No, sir.
14              THE COURT:  All right, Mr. Meng.  Thank you.  You may
15     step down.
16              THE WITNESS:  Okay.  Thank you.
17              (The witness is excused.)
18              MS. PELLEGRINI:  The United States calls William
19     O'Keefe.
05:25 20              WILLIAM J. O'KEEFE, JR., duly sworn
21              THE CLERK:  Have a seat.  State your name and spell
22     your last name for the record and keep your voice up and speak
23     into the mic.
24              THE WITNESS:  Sure.  It's William J. O'Keefe, Jr.,
25     O-'-K-E-E-F-E.
```

                          DIRECT EXAMINATION

BY MS. PELLEGRINI:

Q.   Good afternoon, Mr. O'Keefe.

A.   Good afternoon.

Q.   Will you tell the jury by whom you are employed.

A.   I'm employed by Bank of America.

Q.   And what is your position at Bank of America?

A.   I'm vice president for corporate security for the

Protective Service Division assigned to Boston.

Q.   Before getting into the details of your position, can you

give us a little bit of your educational and professional

background?

A.   I've been in the bank security business for 15 years, and

I'm also an admitted attorney for 16 years.

Q.   And with respect to bank security, what does that involve?

A.   Basically the protection of people, property and assets.

Q.   And specifically, with your position for Bank of America

as protective services manager, what are your duties?

A.   My responsibilities align with the Bank Protection Act

which basically is the minimum standards to provide security,

such as alarms and video cameras, to our banking centers, to

our ATMs and to our buildings based upon the need and the

assessment of the risk.

Q.   All right.  Now, with respect to Bank of America itself,

am I correct in saying it is a federally insured financial

1    institution?

2    A.    Yes, it is.

3    Q.    And when I say "federally insured," what do I mean?

4    A.    That we're in the stream of commerce.

5    Q.    And does that mean also that its deposits are insured by

6    the FDIC?

7    A.    Absolutely.

8    Q.    Which stands for what?

9    A.    Federal Deposit Insurance Corporation.

05:27 10   Q.    And when you talk about being in the stream of commerce,

11   what are we talking about?

12   A.    In terms of how money is exchanged for business purposes,

13   for personal purposes, throughout the nexus of the Commonwealth

14   of Massachusetts, the United States and globally throughout the

15   world.

16   Q.    Now, with respect to your particular position, what is

17   your familiarity, then, with the particular security systems

18   used in Bank of America's ATMs?

19   A.    I'm familiar with the video technology as well as the

05:28 20   alarm systems that are set up based upon the standards that

21   have been incorporated by the bank.

22   Q.    All right.  And what does that require?

23   A.    A digital video recorder for all transactions that occur

24   in ATMs as well as an alarm system to protect the money at

25   those particular ATMs or banking centers.

1    Q.    Now, I know that we say "ATM" because it seems to be part

2    of our vocabulary, because it stands for what?

3    A.    Automatic transaction machine.  Automated or automatic.

4    Q.    All right.  And with respect to the types of ATMs, there

5    are some that are in banks themselves and others that are in

6    their own little space.  Am I correct about that?

7    A.    Yes, there are remote locations based upon the

8    marketability of a particular location, which they do

9    demographic studies in order to basically support the

05:29 10    customers' needs.

11    Q.    Now, going back, then, to the types of video systems, in

12    your time with Bank of America, have you had occasion to review

13    video retrieved from the surveillance systems in the ATMs?

14    A.    Yes, I have.

15    Q.    How many times?

16    A.    Countless.

17    Q.    All right.

18    A.    Countless times.

19    Q.    And in your experience, are those -- when you have

05:29 20    reviewed them, do they fairly and accurately record what is

21    happening within the ATM space?

22    A.    Oh, absolutely.  Absolutely.

23    Q.    All right.  Are they dated and timed in any way?

24    A.    Yes.  They're encrypted with the date and timestamp of the

25    transactions that are made when an individual goes up and

1    swipes or inserts their card into the ATM machine, depending on

2    the type of ATM machine there is.

3    Q.    Which reminds me.  If it's an ATM that is in its own space

4    or kiosk, what is required to gain entry into that space?

5    A.    You need an ATM card or a magnetic stripe that has

6    basically your bank information on it.  You insert it in.  With

7    Bank of America we use a Parabit card-reader system which

8    basically only allows bank network cards to open up the ATM,

9    and then you can go into the ATM and use that same bank card to

05:30 10   basically insert it into your ATM in order to basically pull up

11   your account.

12   Q.    And what about a personal identification number, or PIN?

13   A.    Right.  That's a unique PIN that's assigned or inputted by

14   the customer.  When they open up their bank relationship, they

15   have the opportunity to switch that PIN number at their leisure

16   either through the ATM or through customer service.

17   Q.    And with respect to the information that's contained on,

18   for example, Bank of America debit cards, are you familiar with

19   the type of information stored in the card's magnetic stripe?

05:30 20   A.    Yes.

21   Q.    And what type of information is that?

22   A.    That's your bank portfolio in terms of your financial

23   relationship with that particular financial institution.

24   Q.    And in your position, are you able to retrieve that

25   information in any way?

A.    Yes, we're able to retrieve that based upon our platform

system that each bank has.

Q.    And with respect also to the video surveillance, are you

able to retrieve that?

A.    Yes, I am.

Q.    All right.  So directing your attention, then, to the

evening of April the 18th of 2013, in the evening hours where

were you?

A.    I was home.

05:31 Q.    All right.  And did you receive a request to retrieve

information?

A.    I received a request to retrieve information with regards

to a transaction, yes.

Q.    And who did you receive that request from?

A.    Our ATM support network group who received a call from law

enforcement.  I believe it was through the Boston Regional

Intelligence Center, Maggie Murphy.

Q.    And what did you do in response to receiving that call?

A.    I'm able to remotely access into our video system.  So I

05:31 was able to go in, pull the transaction up, pull the video up,

download the video to a thumb drive, and then provide that

video to the BRIC.

Q.    Let's go back a little bit.  With respect to what you were

asked to retrieve, were you given a particular location?

A.    Yes.  I was given 39 Main Street, Watertown,

 1    Massachusetts.

 2    Q.   And is there, in fact, a Bank of America ATM kiosk

 3    standalone there?

 4    A.   Yes.

 5    Q.   All right.  And are you familiar with that?

 6    A.   Yes.

 7    Q.   And in retrieving that information, as you downloaded it,

 8    did you review it yourself?

 9    A.   I did review it, yes.

05:32 10    Q.   I'm sorry.  You did?

11    A.   Yes, I did review it in terms of looking at the video, the

12    timeline that was requested, and then sent it off.

13    Q.   What timeline was requested?

14    A.   You mean -- not offhand, not without seeing the documents,

15    but it was -- it was a certain time during the night that was

16    requested.

17    Q.   All right.  Now, in addition to retrieving the video,

18    which we'll come back to, did you also retrieve information

19    relating to the trans- -- any transactions that had occurred

05:33 20    within the time period?

21    A.   Yes, we received the customer information which is on our

22    BOSS system, which is the Banking Online Support System, that

23    basically shows the relationship that you have with the bank

24    and the transaction that was made at that particular ATM

25    location.

1    Q.   And what information were you given about the customer?

2    A.   About the customer?

3    Q.   Yes.

4    A.   I was told that he was involved in an incident where I

5    believe he was carjacked and that they were looking to get

6    information in terms of photographs of the individuals that

7    used that particular ATM.

8    Q.   Now, with respect to the records that record ATM

9    transactions, again, did you have remote access to those

05:33 10    records?

11    A.   I did not have remote access to those records, I only had

12    remote access to the video.  So they had to provide me with

13    that information.

14    Q.   All right.  With respect to the record for the

15    transaction, did you subsequently review the records relating

16    to that?

17    A.   Yes, I did.

18    Q.   How did you do that?

19    A.   They were provided to me.

05:34 20    Q.   All right.

21    A.   So I was able to look at them and correlate between the

22    video as well as the sequence of events on that particular

23    customer's card.

24    Q.   And with respect to those types of financial records, in

25    your time with Bank of America how many occasions have you had

1    to review those types of records?

2    A.    Countless times.  Every day.

3    Q.    All right.  And are those kept in the normal course of

4    business by Bank of America?

5    A.    Yes, they are.

6    Q.    All right.  Now, with respect to, then -- actually, let's

7    start with those records, if we may.

8            MS. PELLEGRINI:  So just for the witness and counsel,

9    your Honor, may we have first starting with exhibit marked for

05:34 10   identification 768.

11   Q.    Mr. O'Keefe, do you recognize this document before you?

12   A.    Yes, I do.

13   Q.    And have you had occasion to review this prior to coming

14   to court today?

15   A.    Yes, I have.

16   Q.    And what type of document is this?

17   A.    This is the transaction that occurred at the ATM off our

18   BOSS system, which is, again, the Banking Online Support System

19   that shows the account relationship with our customer Dun Meng.

05:35 20   Q.    All right.  And does this fairly -- actually, is this, in

21   fact, a copy of the record kept by Bank of America in the

22   normal course of business?

23   A.    Yes, it is.

24           MS. PELLEGRINI:  And just also for the witness and

25   counsel, please, Exhibit 769.

1    Q.    And, Mr. O'Keefe, what is 769?  What type of document is

2    this?

3    A.    Same thing.  It's the Banking Online Support System that

4    shows the relationship that Bank of America has with this

5    customer.

6    Q.    And again, is this a copy of the record kept in the normal

7    course of business by Bank of America?

8    A.    Yes, it is.

9           MS. PELLEGRINI:  Your Honor, the government would

05:35 10   offer 768 and 769 at this time.

11          MS. CLARKE:  No objection.

12          THE COURT:  All right.

13          (Government Exhibit Nos. 768 and 769 received into

14   evidence.)

15          MS. PELLEGRINI:  Let me go back to 768 and publish for

16   the jury, please.

17   BY MS. PELLEGRINI:

18   Q.    Mr. O'Keefe, can you tell the jury, what does this

19   document tell you about the transaction?

05:36 20   A.    Well, what this tells me about the transaction was that as

21   you go into the ATM, we have a 2318 on 4/18/13, someone

22   accessing this ATM in order to make a transaction.

23   Q.    Mr. O'Keefe, let me just stop you.

24   A.    Sure.

25   Q.    Your screen is a touchscreen.  And if you use the pad of

1   your finger you can make an arrow or circle or a line.  So with

2   respect to the information that you're referring to -- and I'll

3   clear that for a second -- can you just point out to the jury

4   what section of the document you're talking about?

5   A.   Sure.  I'm starting from the bottom up.

6   Q.   Okay.

7   A.   And basically, as it indicates, at 2318 that card was put

8   into the ATM machine and it was verified, okay?  And then the

9   passcode, in order to access that account, as you see on the

05:37 10   left-hand side here, the "rej" means it was rejected.

11   Q.   All right.  So you're talking about this right here?

12   A.   Yes.  Where your red is, yes.

13   Q.   Okay.

14   A.   Okay?  And then again another attempt was made on that

15   particular card where it was accepted as the pass -- PIN code

16   was accepted for the ATM in order to basically begin the bank

17   relationship, and $800 was withdrawn --

18   Q.   All right.

19   A.   -- as you can see over on the other side, to the right

05:37 20   here.  Let me circle it.

21   Q.   All right.  So you've drawn a circle around the first 800

22   that appears from the bottom up.

23       Now, this transaction, though, would require the correct

24   insertion of the PIN number.  Is that correct?

25   A.   Absolutely.

1    Q.    All right.  So what's the next thing this document tells

2    you?

3    A.    The next thing it tells me is that -- and we're going up

4    to the third line here.  I'll put the third line here.  That

5    another attempt for $800 was made to be withdrawn and it was

6    rejected based upon the account relationship where it was too

7    much money taken out within a 24-hour period.

8    Q.    Does the code C8 that's right there by the rej mean

9    anything?  Is that a particular code for anything?

05:38 10   A.    Correct.  That's the code that indicates the request is

11   over the limit.

12   Q.    Is over the limit allowed on that account.  Is that

13   correct?

14   A.    Based on the relationship with the customer.  Now, each

15   customer can have their own relationship in terms of the amount

16   they want to take out of their ATM card.  This particular

17   relationship had a minimum.

18   Q.    All right.  And I know it sounds kind of obvious, but how

19   does this tell you where this transaction took place; that is,

05:38 20   how does it tell you where this ATM was?

21   A.    How does it tell us where the ATM was?

22   Q.    Uh-huh.

23   A.    In terms of location, it has the Watertown, Massachusetts,

24   transaction amount, where it's Watertown, Massachusetts.

25   Q.    Okay.  Do you know the particular address of that

1    particular Watertown Bank of America ATM?

2    A.    Yeah, it's 39 Main Street.

3    Q.    All right.  Now, before we go on to Exhibit 769, is there

4    a way for you to tell what type of card was used to access the

5    account?

6    A.    I can tell by the account number which is up in the

7    top -- my left-hand side -- it might be your right-hand side --

8    which basically indicates the account relationship.

9    Q.    All right.

05:39 10         MS. PELLEGRINI:  If I may approach, your Honor.

11   Q.    Mr. O'Keefe, I'd like to show you --

12        MS. PELLEGRINI:  First, this is Government Exhibit 755

13   which I believe is in evidence, your Honor?

14        THE COURT:  Yes.

15   BY MS. PELLEGRINI:

16   Q.    And, Mr. O'Keefe, do you recognize that item contained in

17   that bag?

18   A.    Yes.  It's a Bank of America debit MasterCard.

19   Q.    All right.  And is this, in fact, the debit card that was

05:39 20   used to make these transactions on the night of April 18th,

21   2013?

22   A.    Absolutely.

23   Q.    How do you know?

24   A.    I know because the account number on this particular card,

25   which I can read into the record, is the same account number

1    that is on our system that we're looking at right now, which is

2    our BOSS system.  So the account number correlates with the

3    card number 5312620002844097.

4    Q.   Okay.  And that's what you're saying appears here?  I'm

5    just drawing a little red thing --

6    A.   Yes.

7    Q.   -- on 768.

8         MS. PELLEGRINI:  May I have 769, please.

9    Q.   And, Mr. O'Keefe, with respect to this document, what is

05:40 10   this?

11   A.   This is the account relationship that he has with the bank

12   where -- we have our keep-the-change program.  So we round

13   everything up.  I'm not making a sales pitch, but we round

14   everything up to the dollar.  So that links into your account

15   and also shows the transaction of $800 being debited from his

16   account.

17   Q.   All right.  Thank you.

18        Now, Mr. O'Keefe, we talked about the video that you

19   retrieved.  That you were able to remotely access that night,

05:41 20   correct?

21   A.   Yes.  Yes.

22   Q.   And in addition to reviewing it that night, have you

23   reviewed it prior to coming into court today?

24   A.   Yes.  Yes.

25   Q.   And is this, in fact, the video that you retrieved and

1   does it fairly and accurately depict what occurred in that ATM

2   in Watertown on the night of April 18, 2013?

3   A.   Absolutely.

4        MS. PELLEGRINI:  All right.  So with respect to

5   Government Exhibit 756, your Honor, the government would offer

6   this now and ask that it be published to the jury.

7        MS. CLARKE:  No objection.

8        THE COURT:  No objection?  Okay.

9        (Government Exhibit No. 756 received into evidence.)

05:41 10  BY MS. PELLEGRINI:

11  Q.   Before we start, Mr. O'Keefe, do you recognize the

12  screenshot here?

13  A.   Yes; it's the ATM in Watertown.

14  Q.   And also -- so somewhere in the middle is there also --

15  very faintly, though -- the logo for Bank of America?

16  A.   It's our standard emblem, yes.

17       MS. PELLEGRINI:  If we could play this along,

18  Mr. Bruemmer.

19       (Video played.)

05:42 20  Q.   Mr. O'Keefe, I stopped the video right here.  When the

21  person was at the door on the outside, did you know what was

22  happening here in terms of how is this person gaining access?

23  A.   There's a Parabit reader that's outside.  He's able to

24  swipe the card in order to open that door that allows him into

25  the ATM based upon the mag stripe that's on the back of the ATM

card.

Q.   So let me ask you this:  If you have the card, the ATM

doesn't know who you are unless you have the card and the PIN,

correct?

A.   Unless you just -- to get into the door here, just the

card.  You don't need the PIN to get into the door.

Q.   Just the card?

A.   Yes.

Q.   All right.

05:43   MS. PELLEGRINI:  If we could continue.

(Video played.)

MS. PELLEGRINI:  Let me just stop it right here.

Q.   So with respect to the actual -- whoops.  It's not

stopping -- ATM itself and the location of the video camera,

where is this?

A.   Where is this?  This is in the vestibule of the ATM

outside the banking center.

Q.   And where is the actual location of the machine in

relation to the person who appears here on the right side of

05:44   our screen?

A.   It's in the wall.  So it's a through-the-wall ATM.  We

have two types of ATM:  One's the cash dispenser and one's a

full-service ATM.  This is a full-service ATM.

Q.   All right.  We'll continue.

(Video played.)

1    Q.   Mr. O'Keefe, from this video, approximately how long did

2    it take for the individual -- how long did the individual stay

3    within the ATM?

4    A.   About three minutes.

5    Q.   And is there also information on this video that you can

6    see at this point which tells you approximately the time that

7    these transactions were occurring?

8    A.   Yes; it was 2321.

9    Q.   Okay.  I'm never good at military time.

05:46  10    A.   Yeah.  It's 11:21.

11    Q.   Thank you.

12        Mr. O'Keefe, one other question:  Do all of the ATMs issue

13    currency in the same denomination?

14    A.   The ATMs that are out in the field all issue $20

15    denominations.

16    Q.   So the withdrawal of $800 that occurred in this

17    transaction would have occurred all in $20 bills.  Is that

18    correct?

19    A.   Correct.  Correct.  There are ATMs that do tens and 50s,

05:47  20    but they're very, very obsolete, and they normally are in

21    private buildings.

22    Q.   All right.  But so this ATM --

23    A.   Is 20s.

24    Q.   Is always 20s?

25        MS. PELLEGRINI:  All right.  Now, may I have exhibits

1    in this order:  758, please, which I believe is already in

2    evidence.

3    Q.   Mr. O'Keefe, showing you Exhibit 758, an image, do you

4    recognize this as being from the video that we all just

5    watched?

6    A.   Exactly.

7    Q.   And is this, in fact, the same individual who made the

8    transactions at the ATM on April the 18th?

9    A.   Yes.

05:48 10         MS. PELLEGRINI:  And may I have Exhibit 761, please.

11   Q.   Again, is this a video from the -- I'm sorry -- a still

12   from the video that we just observed?

13   A.   Yes.

14        MS. PELLEGRINI:  May I have just a moment?

15        (Counsel confer off the record.)

16        MS. PELLEGRINI:  Thank you.  I have no further

17   questions, Mr. O'Keefe.

18        MS. CLARKE:  No questions.

19        THE COURT:  No questions?  All right, sir.

05:48 20   Mr. O'Keefe, thank you.  You may step down.

21        (The witness is excused.)

22        MR. WEINREB:  The United States calls Officer

23   Nickerson.

24             MICHAEL NICKERSON, duly sworn

25        THE CLERK:  State your name, spell your last name for

1    the record, keep your voice up and speak into the mic.

2            THE WITNESS:  Sure.  It's Michael Nickerson,

3    N-I-C-K-E-R-S-O-N.

                    DIRECT EXAMINATION

5    BY MR. WEINREB:

6    Q.   Good afternoon.

7    A.   Good afternoon.

8    Q.   Where do you work?

9    A.   I work for the Cambridge Police Department.

05:50 10    Q.   How long have you worked there?

11    A.   I've worked there for the last seven years.

12    Q.   What's your current job there?

13    A.   I work in uniform patrol.

14    Q.   Were you a police officer at a different agency before

15    then?

16    A.   I was.

17    Q.   Where?

18    A.   I worked in Redding, Massachusetts.

19    Q.   Also as a patrolman?

05:50 20    A.   That's correct.

21    Q.   For how long?

22    A.   Just about ten years.

23    Q.   What are your duties?

24    A.   I work patrol function, where I service calls and do

25    uniform patrols around the city of Cambridge.

1    Q.    So regular police work?

2    A.    That's correct.

3    Q.    Are you in a marked cruiser?

4    A.    Some shifts, yes.

5    Q.    What about April 18th, 2013.  Were you working on that

6    night?

7    A.    Yes, I was.

8    Q.    In what capacity?

9    A.    I was assigned to a two-man cruiser, to Car 4, which

05:50 10   stretches from Harvard Square, West Cambridge up to the

11    Watertown line.  But due to the shooting I was -- we were

12    redeployed to east of Harvard Square.

13    Q.    What time did you start work that night?

14    A.    11 p.m.

15    Q.    What shooting are you referring to?

16    A.    The MIT shooting.

17    Q.    How did you find out about it?

18    A.    I was on my way to work.  I was in front of Bunker Hill

19    Community College on the way -- driving in, and I received a

05:51 20   text from a fellow officer stating that a cop was shot at MIT.

21    Q.    So they reassigned you to that area?

22    A.    Yes.  Since they had a lot of people tied up at the

23    shooting scene, they wanted to put extra officers down east to

24    assist with the calls.

25    Q.    Did you get any calls?

```
 1    A.    Yes, I did.

 2    Q.    What call?

 3    A.    Around 12:19 we were dispatched to 816 Memorial Drive for

 4    report of a carjacking.

 5    Q.    What's at 816 Memorial Drive?

 6    A.    A Mobil gas station.

 7    Q.    Did you drive there?

 8    A.    I did.

 9    Q.    What happened when you got there?

10    A.    Me and my partner entered the gas station, and we were met

11    by the clerk who stated that some gentleman ran into the store

12    and told him to call 9-1-1.

13    Q.    Then what happened?

14    A.    We asked the clerk to bring the person out so we could

15    speak with him.

16    Q.    What did he seem -- how did he seem when you talked to

17    him?

18    A.    When he came out you could tell he was very upset.  He was

19    trembling.  He was very scared.  You could tell that

20    something -- you know, he was a victim of something.  He was

21    very -- you could tell he was scared.

22    Q.    What did he tell you?

23              MS. CONRAD:  Objection.

24              THE COURT:  Sustained.

25    BY MR. WEINREB:
```

```
 1   Q.   When he came out, did you get information from him about a
 2   vehicle?
 3   A.   I did.
 4   Q.   What did he say had happened with respect to that car?
 5            MS. CONRAD:  Objection.
 6            MR. WEINREB:  Your Honor, it's not being offered for
 7   the truth of the matter.
 8            MS. CONRAD:  That's fine.
 9            THE COURT:  You may have it not for the truth.
10   BY MR. WEINREB:
11   Q.   What did he say happened about a car?
12   A.   He said that someone approached him when he was pulled
13   over to text over on Brighton Ave. in Brighton.
14   Q.   We don't need the whole story.  Just what did he say
15   about the -- what information did he give you about the car?
16   A.   He said it was a black Mercedes-Benz SUV.
17   Q.   And did he say that he had been carjacked?
18   A.   He did.
19   Q.   In addition to telling you it was a black Mercedes SUV,
20   did he give you any information specifically about the car?
21   A.   Yeah, he gave us his registration number on the license
22   plate.
23   Q.   What did you do?
24   A.   At that time I radioed to our control, Cambridge Control,
25   and stated that this gentleman was carjacked, a description of
```

1     the car, and I gave out the license plate number.

2     Q.   Did he say anything about the car having a tracking system

3     in it?

4     A.   Yes.  Later on he told me that he had Mbrace.

5     Q.   What's that?

6     A.   Mbrace is a tracking device from Mercedes-Benz that you're

7     able to track your car.

8     Q.   When you called in the information about the car, the

9     license plate and the description, what was the purpose of

05:54 10    that?

11    A.   To notify the units out in the city of -- to be on the

12    lookout for that vehicle so we could, you know, apprehend the

13    people.

14    Q.   And about -- when you got the information about the Mbrace

15    system, what, if anything, did you do with that information?

16    A.   At that time I Googled the number for Mbrace and I called

17    Mbrace.

18    Q.   What happened?

19    A.   I talked to one of their people and informed them what was

05:54 20    going on and I was wondering if they could track the car.

21    Q.   What did they say?

22    A.   They told me that they were speaking to two different law

23    enforcement agencies and they're going to deal with them.

24    Q.   About this very same matter?

25    A.   Yes.

1    Q.   Was one of them Cambridge Police Department?

2    A.   Yes.

3    Q.   Do you know who was the dispatcher that night at the

4    Cambridge Police Department?

5    A.   It was Dispatcher Sullivan.

6    Q.   Was he one of the people on the phone with Mbrace?

7    A.   Yes.

8    Q.   So given that he was talking to Mbrace, what did you do?

9    A.   I hung up the phone with Mbrace.

05:55 10    Q.   Okay.  And did you later hear Officer Sullivan give out

11   some information about the Mercedes, its location?

12   A.   Yes, I did.

13           MR. WEINREB:  Thank you.  I have no further questions,

14   Officer.

15           THE WITNESS:  Thank you.

16           MS. CONRAD:  No questions.  Thank you, Officer.

17           THE COURT:  All right, Officer.  Thank you.  You may

18   step down.

19           THE WITNESS:  Thank you.

05:55 20           (The witness is excused.)

21           MR. CHAKRAVARTY:  The government calls Joseph

22   Sullivan.

23                   JOSEPH W. SULLIVAN, duly sworn

24           THE CLERK:  Have a seat.  State your name, spell your

25   last name for the record, keep your voice up and speak into the

```
 1    mic so everyone can hear you.

 2          THE WITNESS:   Joseph W. Sullivan, S-U-L-L-I-V-A-N.

 3                         DIRECT EXAMINATION

 4    BY MR. CHAKRAVARTY:

 5    Q.    Good afternoon.

 6    A.    Good afternoon.

 7    Q.    Where are you employed?

 8    A.    The City of Cambridge Emergency Communications Department.

 9    Q.    And how are you employed there?

10    A.    As a communications supervisor.

11    Q.    And when you say "communications supervisor," is that for

12    purposes of dispatch and radio communications with police

13    officers around the city of Cambridge?

14    A.    Yes.

15    Q.    And you perform other functions as a supervisor as well?

16    A.    We also dispatch fire and EMS as well.

17    Q.    And are you a police officer or a civilian?

18    A.    A civilian supervisor.

19    Q.    Before you were a supervisor, what was your role at the

20    Cambridge P.D.?

21    A.    I was a dispatcher.  And prior to that I was an intern in

22    the Criminal Crime Scene Services Unit.

23    Q.    And how long have you been with the Cambridge P.D.?

24    A.    Approximately 22 years.

25    Q.    And how long as a supervisor?
```

1    A.    Since around the year 2000, so 15 years.

2    Q.    And do you have communications to Cambridge police

3    officers as well as other police officers who might not be on

4    the Cambridge P.D.?

5    A.    Yes.

6    Q.    And are there different channels with which you can

7    communicate with all of those people?

8    A.    Yes.

9    Q.    Were you working on the evening of April 18, 2013, the

05:57 10    Thursday after the marathon bombing?

11   A.    I was.

12   Q.    And what shift were you working?

13   A.    I was working the eleven-to-seven shift.

14   Q.    Is that 11 --

15   A.    Eleven -- I'm sorry.  11 p.m. to 7 a.m.  That's my shift.

16   I arrive -- usually arrive a half an hour to 45 minutes early

17   for our shifts.

18   Q.    And so did you arrive earlier than 11 p.m. on that

19   Thursday?

05:58 20   A.    Yes.

21   Q.    And were you aware that there were some images of the

22   suspected marathon suspect -- bombing suspects released earlier

23   that day?

24   A.    Yes.

25   Q.    Now, at some point did you learn about a shooting at MIT?

1     A.    Yes, I did.

2     Q.    And what did the -- what role did the Cambridge P.D.

3     dispatch unit do with respect to the MIT shooting?

4     A.    Well, we received a report of an officer down from MIT, so

5     we dispatched a sector car over there, Sector Car 3 to the

6     location.  I believe it was Vassar Street.  And everything --

7     we went from there.  That's pretty much what we did for that

8     part of the call.

9     Q.    Okay.  And were there communications about the MIT

05:59 10   shooting for the next several minutes or hour?

11    A.    Yes.

12    Q.    Okay.  At some point a little after midnight, was there a

13    report of a carjacking?

14    A.    Yes.

15    Q.    Okay.  And can you explain what you and the dispatch

16    office did?

17    A.    We received a call on 9-1-1.  I believe the victim went

18    over to the gas station opposite Memorial Drive, which he was

19    at the other gas station.  We received a call on 9-1-1.  The

05:59 20   dispatcher processed the call, put it in.  And then we had some

21    questions for him.  He said that he was carjacked, and then

22    further in the call he stated that --

23              MS. CONRAD:  Objection.

24              THE COURT:  No.  Again, the same basis.  Not for the

25    truth of the matter but just the events.

1          Overruled.

2          THE WITNESS:  Continue?

3     BY MR. CHAKRAVARTY:

4     Q.   Continue, please.

5     A.   The dispatcher that was on the 9-1-1 phone further got

6     more information from the victim.  He stated that he was

7     kidnapped -- I mean, carjacked by the -- what he said, the

8     marathon bombers.  So we -- he said that they carjacked -- took

9     his car as well.  And we asked -- he said he had a Mercedes, so

06:00 10    with the newer model Mercedes, they usually have LoJack.  So

11    one of the dispatchers said, "Does he have LoJack?"  Questioned

12    him.  He said, "No, but I have Mercedes Tracker."

13         So we immediately asked for his plate number.  He didn't

14    know his plate number.  And so in that part of the conversation

15    I asked him -- I asked the dispatcher to get his name and date

16    of birth to run it in the CJIS system.  We ran his name and

17    date of birth in the CJIS system and retrieved his plate that

18    way.  The dispatcher on P.D. Channel 1 Googled the number for

19    Mercedes Tracker, gave it to me, and which in turn I called

06:01 20    Mercedes Tracker to start the GPS on the vehicle.

21    Q.   Okay.  Now, in addition to that research for purposes of

22    calling the Mercedes tracking service, was an officer

23    dispatched to go speak with the victim?

24    A.   Yes, sir.

25    Q.   All right.  Is the Mercedes tracking service called

```
 1  Mbrace?
 2  A.    Yes, sir.
 3  Q.    And did you speak with a representative that evening of
 4  Mbrace?
 5  A.    I spoke to, I believe, a couple of representatives that
 6  evening.
 7  Q.    And while you were on the phone with them, were other law
 8  enforcement agents also trying to contact Mercedes to try to
 9  locate this vehicle?
06:01 10  A.    Yes, sir.
11  Q.    All right.  And is the vehicle that you were locating the
12  same vehicle that the carjacking victim said had been
13  carjacked?
14  A.    Yes, sir.
15  Q.    And were you eventually able to get through the customer
16  service to get to a representative?
17  A.    Eventually, yes.
18  Q.    And did that person tell you how they could locate the
19  vehicle?
06:02 20  A.    Did they explain the process of it?
21  Q.    Not the technical aspect of it but how precisely they
22  might be able to locate it.
23  A.    Well, I do believe he said they could within, give or
24  take, I guess a few yards or something.  That I don't recall.
25  Q.    Okay.  But they're able to ping the vehicle, essentially?
```

1    A.    Oh, yes.  They're able to ping the vehicle and tell you

2    where it is, but within a couple of -- I don't know how many

3    yards or feet.  But they can tell you where the vehicle is by

4    pinging it.

5    Q.    And so did the call take several minutes with Mercedes

6    tracking service?

7    A.    Yes.

8    Q.    By the end of the call, were they able to ping the

9    vehicle?

06:02 10   A.    Yes.

11   Q.    And were they able to give you a location of where that

12   vehicle had been located?

13   A.    Yes.

14   Q.    Where did they say it was located?

15   A.    It was -- I believe the location at first was 87 Dexter

16   Ave. in Watertown.

17   Q.    And once they told you the location in Watertown, what did

18   you do?

19   A.    I immediately got on the radio, on BAYPERN 3, and the

06:03 20   dispatcher got on Channel 1 and announced it to the police

21   units.

22   Q.    Okay.  So you said a couple of technical terms pretty

23   quickly.  You said you got on the BAYPERN.  What's BAYPERN?

24   A.    It's a citywide channel that usually on 3 it's the -- or

25   Central, they call it now, is the Middlesex County area, which

1    it allows the officers from other towns and cities to monitor

2    our transmissions and for us to monitor their transmissions,

3    and everybody on the same channel.

4    Q.   Okay.  And then you also said Channel 1.  What's that?

5    A.   Which is our main frequency channel for the police

6    department, which we give out all the calls.

7    Q.   So you communicated the location of the Mercedes SUV to

8    all of those channels -- to both of those channels?

9    A.   Yes, sir.

06:03 10   Q.   And did you continue to talk to the Mbrace folks?

11   A.   Yes, I did.  I wanted to keep them on the line till we

12   actually got the vehicle.  I didn't want to have to hang up and

13   have to go through the process again of retracking it so I

14   stayed on the line with them, and they just gave us some

15   updated coordinates -- they can bounce from 87 to maybe low 90s

16   or maybe lower 80s as the officers were responding there.

17   Q.   So the signal moved but it was within that proximity?

18   A.   Exactly.

19   Q.   That was Dexter Avenue in Watertown?

06:04 20   A.   Yes, sir.

21   Q.   When did you hang up on the Mbrace people?

22   A.   I hung up as soon as the officers arrived there, I

23   believe, when the incident started, shots were being fired.

24   And I hung up the phone with them knowing we had the vehicle

25   there.

1    Q.    So police officers had made contact with the vehicle?

2    A.    Yes.

3    Q.    Okay.  And this was at some point after midnight, around

4    one o'clock in the morning, a little before then, maybe?

5    A.    What I can recall, yes.

6    Q.    Okay.  So that's on Friday, April 19th, 2013?

7    A.    Yes.

8          MR. CHAKRAVARTY:  That's all I have.

9          MS. CONRAD:  No questions.  Thank you very much.

06:04 10          THE COURT:  All right, sir.  Thank you.  You may step

11    down.

12          THE WITNESS:  Thank you.

13          (The witness is excused.)

14          THE COURT:  Okay.  Pursuant to a prior conversation

15    with counsel, I understand that's the last witness who's

16    available today.  This sometimes happens.  Planning is not

17    always a certain process.  And so we're done for the day.  And

18    for the week.

19          So, again, you have the next three days to yourselves.

06:05 20    Spend it that way.  Put the case out of your mind.  Don't be

21    thinking about the things.  Of course, not talking about it or

22    watching any reports about it.  We'll resume on Monday morning

23    on our regular schedule.  Enjoy the weekend.

24          We'll be in recess.

25          THE CLERK:  All rise for the Court and the jury.  The

1    Court will be in recess.

2              (The Court and jury exit the courtroom and the

3    proceedings concluded at 3:13 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  10/2/15
13

14

15

16

17

18

19

20

21

22

23

24

25