```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                     )
UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )   Criminal Action
v.                                   )   No. 13-10200-GAO
                                     )
DZHOKHAR A. TSARNAEV, also           )
known as Jahar Tsarni,               )
                                     )
          Defendant.                 )
                                     )


             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE



                 JURY TRIAL - DAY THIRTY-FOUR


            John J. Moakley United States Courthouse
                        Courtroom No. 9
                      One Courthouse Way
                  Boston, Massachusetts  02210
                   Tuesday, March 17, 2015
                          9:35 a.m.




                 Marcia G. Patrisso, RMR, CRR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

<pre>
1                           I N D E X

2                                Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3     GOVERNMENT:

4  DAVID HENNEBERRY

5       By Mr. Weinreb              5
        By Mr. Watkins                      24
6
   STEPHEN SILVA
7
        By Mr. Chakravarty         33
8       By Ms. Conrad                       86

9  MICHAEL NEALON

10      By Ms. Pellegrini         114
        By Mr. Watkins                     121
11
   JESSICA ULMER
12
        By Mr. Chakravarty        128
13      By Mr. Watkins                     142

14                        E X H I B I T S

15

16  GOVERNMENT'S
       EXHIBIT      DESCRIPTION            FOR ID      RECEIVED
17
   798            Photograph                              12
18
   804 and 806    Photographs                             13
19
   801 - 803      Photographs                             16
20
   805            Photograph                              19
21
   822 - 824      Photographs                             20
22
   1450           Photograph                              23
23
   1451           Photograph                              24
24
   926            Plea agreement                          35
25
</pre>

1                    E X H I B I T S (cont'd)

2
    GOVERNMENT'S
3    EXHIBIT        DESCRIPTION                FOR ID      RECEIVED

4   820             Photograph                                69

5   1341            Photograph                                71

6   1178            Photograph                                73

7   1179            Photograph                                38

8   930             Photograph                                54

9   928             Gun                                       56

10  1185-01
    1185-12
11  1185-36
    1201            Photographs                               65
12
    829             Box containing slats from boat           120
13
    807, 808
14  810, 811        Photographs of items at boat area        136

15  755,
    812,
16  815             Two iPhones and bank card                140

17

18  DEFENDANT'S
     EXHIBIT
19
    3035            Photograph                                26
20
    3036            Photograph                                27
21
    3037            Photograph                                28
22
    3027 - 3030     Photographs                               32
23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  All rise for the Court and the jury.

3          (The Court and jury enter the courtroom at 9:35 a.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Good morning.

6          THE JURORS:  Good morning.

7          THE COURT:  Happy St. Patrick's Day.

8          THE JURORS:  Same to you.

9          THE COURT:  Thank you for your patience.  The lawyers

00:06 10   and I had some things we had to confer about.  We're ready to

11   proceed with the evidence.

12          MR. WEINREB:  Good morning, your Honor.  The United

13   States calls David Henneberry.

14               DAVID HENNEBERRY, duly sworn

15          THE CLERK:  State your name, spell your last name for

16   the record, keep your voice up and speak into the mic.

17          THE WITNESS:  David Henneberry, H-E-N-N-E-B-E-R-R-Y.

18               DIRECT EXAMINATION

19   BY MR. WEINREB:

00:07 20   Q.   Good morning, Mr. Henneberry.

21   A.   Good morning.

22   Q.   Where do you live?

23   A.   Watertown.

24   Q.   How long have you lived there?

25   A.   All my life, basically.

```
 1    Q.    Did you go to school in Watertown?

 2    A.    Yes, I did.

 3    Q.    Where did you go?

 4    A.    Watertown High.

 5    Q.    What's your part of Watertown like?

 6    A.    Quiet but busy at the same time, you know.  It's quiet,

 7    basically.

 8    Q.    So mostly families or businesses?

 9    A.    Families.

10    Q.    And what are the homes like?  Are they single-family

11    homes, apartment buildings?

12    A.    Single-family and double -- two-family homes, I would say.

13    Q.    Do you work?

14    A.    No, I'm retired.

15    Q.    Where did you work?

16    A.    Phone company.  Telephone company.

17    Q.    In April 2013, did you own a boat?

18    A.    I did.

19    Q.    What kind?

20    A.    A 1981 SeaBird, it's called.

21    Q.    What kind of -- what powers that boat?

22    A.    The V8 engine, inboard.

23    Q.    What's an inboard engine?

24    A.    It's mounted inside the boat.  It's in the middle of the

25    boat, and it's a V8 motor like a car.
```

```
 1   Q.   When you say it's mounted inside the boat, what portion of
 2   the boat, if you were just looking at it from the side, would
 3   it be in?
 4   A.   Oh, in the middle.
 5   Q.   And is it, like, above the level of the floor of the boat
 6   or is it sunk below it?
 7   A.   A good portion is above.
 8   Q.   It's raised up?
 9   A.   Yes.
10   Q.   And is it encased in something?
11   A.   Yes, it is.  It's encased in a heavy Fiberglas cover.
12   Q.   Now, did you use the boat?  Did you use the boat when
13   you --
14   A.   Oh, yeah.
15   Q.   A lot?
16   A.   Oh, yeah.  Yeah.
17   Q.   And did you use it in the winter?
18   A.   No.
19   Q.   So what would you do with it in the winter?
20   A.   I'd have it towed into the yard and I'd shrink-wrap it --
21   have it shrink-wrapped and basically put it away for the winter
22   in the yard.
23   Q.   What yard?
24   A.   My own backyard.
25   Q.   In addition to having it shrink-wrapped, did you put
```

00:08  (line 10)
00:09  (line 20)

1    anything else on it to protect it from the elements?

2    A.   I put chafing guards on the shrink-wrap and put a door in

3    it -- a zipper door that I could check on its condition when I

4    wanted.

5    Q.   What are chafing guards?

6    A.   We have the -- around the hull where the strap -- just

7    like a paint roller.

8    Q.   So that you put paint rollers underneath the shrink-wrap?

9    A.   On a main strap that holds it, yeah.  So against the hull.

00:10 10   So it doesn't scratch the hull, yeah.

11   Q.   You said something about a zipper door?

12   A.   There was a zipper door that --

13   Q.   What did that let you do?

14   A.   It gave me access to the inside of the boat.  If I wanted

15   to get in, there was plenty of room to get in the boat, work

16   around.

17   Q.   Where was your boat on April 19th, 2013?

18   A.   In the backyard.

19   Q.   Was it all shrink-wrapped as you described?

00:10 20   A.   Yes, it was.

21   Q.   Do you recall the events of April 19, 2013?

22   A.   I do.

23   Q.   What happened?

24   A.   From...

25   Q.   You woke up on the morning of April 19th.  Did you have

1   some coffee?

2   A.   Yup, and we got the call of shelter-in-place.  And we were

3   looking out the window during the day, and the activity -- the

4   police activity.  And we just sheltered in place.  I...

5   Q.   Did you notice anything unusual about your boat?

6   A.   Well, I did.  One of the -- as mentioned, the chafing

7   guards -- two of them had fallen down from the boat, and the

8   shrink-wrap itself looked a little loose but I couldn't tell

9   cause I didn't go out there, so...

00:11  10   Q.   When was the last time you had looked at the boat?

11   A.   I see it every day.

12   Q.   So the last time you'd seen it before you'd woken up that

13   morning, were the chafing guards on the ground?

14   A.   No.

15   Q.   Was the shrink-wrap loose the last time you had looked at

16   it before the morning of April 19th?

17   A.   It was fine, yeah.

18   Q.   So when you woke up in the morning and you saw that thing

19   didn't look normal, did you go right out and investigate?

00:11  20   A.   No, because we had to shelter in place.  I didn't want to

21   be in the backyard.

22   Q.   Did you eventually go out to investigate?

23   A.   When they called it off at about six o'clock.

24   Q.   6 p.m.?

25   A.   Yes.

```
 1   Q.   What did you do then?
 2   A.   I said, "I'm going to go out and see what's going on," put
 3   the pads back up.  Simple.  And I just thought it was -- had
 4   come loose in the wind.  And --
 5   Q.   Can you just reach up there or did you need to use
 6   something to help you get up there?
 7   A.   It's only chest high, this particular part.  To get into
 8   the boat, I need a ladder.
 9   Q.   So what happened when you went out and checked it out?
10   A.   Well, I went and got the ladder and I put it up, and
11   rolling -- I have two doors.  I have a plastic door and one
12   made of shrink-wrap that I could roll up.  It's like a storm
13   door, I call it.  And I put the ladder up and I went to check
14   on the boat and basically see why the strap was loose, and I
15   noticed a lot of blood.
16   Q.   Where did you see the blood?
17   A.   On the deck of the boat inside.
18   Q.   Had that blood been there when you had put the shrink-wrap
19   on?
20   A.   No.
21   Q.   Was it like a pool of blood?
22   A.   Not a pool.  It was like if somebody got a bad cut and
23   dripping, smudge.  But not a huge amount, but enough, yeah.
24   Q.   So what did you do when you saw that blood?
25   A.   I just -- looking at it.  I'm standing on the ladder and
```

 1    I'm looking in the door and I'm, just, "Where's it coming

 2    from?"  And I followed it down, and along the sides, and more

 3    blood up forward on the boat.  And I think I -- I don't know

 4    how long.  I just kept fixating on this blood.  And then I

 5    just -- my eyes looked at the other side of the boat and that's

 6    when I saw a body in the boat, let's say.

 7    Q.   Where was the body in relation to the inboard motor you

 8    described earlier?

 9    A.   It was on the other side from the -- of the inboard motor,

00:14 10    and laying on the deck on the other side.

11    Q.   What part of the person could you see?

12    A.   I could see his boots, or shoes, black; I could see his

13    pants.  I think they were work-type pants.  A hooded

14    sweatshirt, dark color, pulled up over his head; back toward

15    me, facing the other way.

16    Q.   So lying on his side?

17    A.   Lying on his side, correct.

18    Q.   When you looked at him, was he moving around or was he

19    still?

00:14 20    A.   No movement at all.

21    Q.   What did you do then?

22    A.   I took it in for a split second and I got off the ladder

23    pretty quick and went in the house.  And my wife knew something

24    was wrong and handed me the phone and I called 9-1-1.

25    Q.   I'd like to show you a couple of photos.

A.    Okay.

        MR. WEINREB:  If we could have Exhibit 798, please,
just for the witness.

Q.    Do you recognize that?

A.    My house.

        MR. WEINREB:  The government offers 798.

        MR. WATKINS:  No objection.

        (Government Exhibit No. 798 received into evidence.)

BY MR. WEINREB:

00:15  Q.    Which -- this white house, the one right in the center,
that's yours?

A.    Yes, it is.

Q.    And there appears to be a driveway on either side of it?

A.    Correct.

Q.    Which is your driveway?

A.    The one with the car in it, right there.

Q.    So the one on the left?

A.    Yes.

Q.    If you walked down that driveway, what does it lead to?

00:15  A.    My boat.  Backyard and the boat.

        MR. WEINREB:  Can we have Exhibit 804, please, just
for the witness, and then 806.  Actually, hold on that.

Q.    Do you recognize this?

A.    The boat.

Q.    And do you see something leaning up against the boat?

1    A.    That's my ladder.

2    Q.    Is this a fair and accurate picture of how the boat looked

3    that night, the night of April 19th at some point?

4    A.    Later in the night, after the -- you know, the incident,

5    let's say.

6    Q.    And so this was after the person came out of the boat?

7    A.    Yes, correct.

8          MR. WEINREB:  And then 806, please.

9    Q.    What's that a picture of?

00:16 10   A.    That's my backyard, my stone wall.

11   Q.    And the portion that's not your backyard or that's on the

12   other side of the stone wall, what's that?

13   A.    That's my neighbor's driveway.

14   Q.    Is that a fair and accurate picture?

15   A.    Yes, it is.

16         MR. WEINREB:  The government offers 804 and 806.

17         THE COURT:  Any objection?

18         MR. WATKINS:  I'm sorry.  No objection.

19         THE COURT:  Okay.

00:17 20         (Government Exhibit Nos. 804 and 806 received into

21   evidence.)

22   BY MR. WEINREB:

23   Q.    So we'll start with 806, please.  Just leave that there.

24         So you said that to the right of the stone wall is your

25   neighbor's driveway?

1    A.    Yes.

2    Q.    And it seems to lead to a white structure in the back?

3    A.    Neighbor's garage.

4    Q.    To the left of that we see another white structure?

5    A.    My garage.

6    Q.    Do you see the boat?

7    A.    Right.

8    Q.    Could you -- if you -- that screen in front of you, it's

9    touch-sensitive.

00:18 10   A.    Okay.

11   Q.    If you push the pad of your finger sort of hard, you can

12   circle things.  Can you circle your boat?

13   A.    Right there.

14   Q.    Not working?

15   A.    No.

16   Q.    I'll circle this right here.

17   A.    That's --

18   Q.    Is that the boat?

19   A.    That's correct, yeah.

00:18 20   Q.    And is that how it looked, as you were saying, after the

21   individual who was inside of it had come out?

22   A.    Yes.

23         MR. WEINREB:  May we have 804, please?

24   Q.    This, you earlier said, was your boat with the ladder up

25   against it sometime later that night after the individual had

1    come out?

2    A.    Yes.

3    Q.    What's this right here that I'm circling?

4    A.    That's the shrink-wrap.  It's ripped up and torn down.

5    Q.    So I've circled what appears to be some plastic material?

6    A.    That's a piece of the door.  That's clear plastic.

7    Q.    On the left side of the photo?

8    A.    Yeah.

9          MR. WEINREB:  Now can we have Exhibits 8 -- well,

00:19 10   we'll start with 801 for the witness.

11   Q.    Do you recognize that?

12   A.    I do.

13   Q.    What is that?

14   A.    My boat.

15   Q.    Was -- and you see some police tape on your yard?

16   A.    I do.

17   Q.    So was this taken the following morning, April 20th?

18   A.    Yeah.  Yeah, I would say yes.

19   Q.    Does it appear to be a fair and accurate photo of what it

00:19 20   liked like --

21   A.    Yes.

22         MR. WEINREB:  802, please.

23   Q.    What's that?

24   A.    My boat.

25   Q.    Again, is that a fair and accurate picture of how it

 1  looked on April 20th?

 2  A.   Yeah.  Yes.

 3          MR. WEINREB:  803, please.

 4  Q.   Same question:  Is that a fair and accurate photo of what

 5  it looked like on April 20th?

 6  A.   Yes.

 7          MR. WEINREB:  The government offers 801, 802 and 803.

 8          MR. WATKINS:  No objection.

 9          (Government Exhibit Nos. 801 through 803 received into

00:20 10  evidence.)

11          MR. WEINREB:  Okay.  And if we could start with 801,

12  Mr. Bruemmer.

13  BY MR. WEINREB:

14  Q.   So now we're showing it to the jury and I'm going to ask

15  you some questions about it.

16          So looking at the boat from this perspective, where's the

17  cameraman standing?

18  A.   He would be standing in the neighbor's driveway.

19  Q.   The boat appears to be up against a fence on the left.  Is

00:20 20  that right?

21  A.   Not -- yes, with space in between.

22  Q.   So not touching it but near it?

23  A.   This much space (indicating).

24  Q.   So you said "this much" and you put your hands a few feet

25  apart.  Is that correct?

 1   A.   Yes.

 2   Q.   Is that where it was when you went out there to -- when

 3   you first noticed that something was wrong with it and you

 4   later went out to check it?

 5   A.   Yes.

 6        MR. WEINREB:   802, please.

 7   Q.   Is this just a closer-up photo of the boat?

 8   A.   Yup.

 9   Q.   It is?

00:21 10   A.   Would you say it again?

11   Q.   I'm sorry.  A closer-up photo of the boat?

12   A.   Oh, it appears to be, yeah.

13   Q.   The -- this area -- so you see the ladder that I've

14   circled towards the right-hand side of the frame?

15   A.   Yeah.

16   Q.   Is that where you put the ladder to access the door that

17   you spoke of earlier?

18   A.   Yes.

19        MR. WEINREB:   803, please.

00:21 20   Q.   Is this a perspective of the boat from the other side,

21   from looking over the fence that we discussed earlier?

22   A.   Yes, it is.

23   Q.   So the ladder would be approximately here?

24   A.   Correct.

25   Q.   Can you see the engine block in this photo?

1    A.    Just barely you can see it.

2    Q.    (Indicating.)

3    A.    Yeah, correct.  You got it.

4    Q.    So the item I've circled which is towards the aft of the

5    boat, it appears to be a long, white object, correct?

6    A.    Yes, correct.

7    Q.    And that whole thing is the engine block?

8    A.    Basically, yeah.  Yeah, it's...

9    Q.    And the person who you saw, were they on the side of it

00:22 10   closer to the fence or the side of it closer to the neighbor's

11   driveway?

12   A.    The fence.

13   Q.    Is that engine block solid metal?

14   A.    No; it's Fiberglas.

15   Q.    The covering is Fiberglas?

16   A.    Is Fiberglas.

17   Q.    Is the engine inside solid metal?

18   A.    Oh, yeah.

19   Q.    Solid enough to stop bullets?

00:22 20   A.    I don't know.  It's solid.

21        MR. WEINREB:  Can we have Exhibit 805 for the witness,

22   please?

23   Q.    Do you recognize that?

24   A.    I do.

25   Q.    What is that a picture of?

```
  1    A.    My boat with the torn up shrink-wrap.

  2              MR. WEINREB:  The government offers 805.

  3              MR. WATKINS:  No objection.

  4              (Government Exhibit No. 805 received into evidence.)

  5    BY MR. WEINREB:

  6    Q.    So again I'm going to circle that ladder, which is -- it

  7    seems to be on the far right-hand side of the boat.  Again, is

  8    that the same place where you climbed the ladder?

  9    A.    It appears to be, yes.

00:23 10              MR. WEINREB:  Mr. Bruemmer, may I please have Exhibit

 11    822 for the witness.

 12    Q.    I'm going to circle a -- first of all, do you recognize

 13    where this is taken?

 14    A.    In the berth.  In the forward berth of the boat.

 15    Q.    And do you see the tip of a pencil that I've just circled

 16    in red?

 17    A.    I do.

 18    Q.    I'm going to show you Exhibit 823.  Does that appear to be

 19    a close-up of the same pencil?

00:24 20    A.    It is.

 21    Q.    And does there appear to be blood on the tip of the

 22    pencil?

 23    A.    Yes.

 24    Q.    Now I'm going to show you Exhibit 824.  And does that

 25    appear to be the pencil -- now you could see the whole thing?
```

1    A.   Correct.

2    Q.   There's writing on the pencil.  Do you recognize it?

3    A.   I do.

4    Q.   Was that pencil in your boat when you wrapped it up before

5    storing it for the winter?

6    A.   It was.

7    Q.   How do you know that?

8    A.   Duffy Plumbing Corp. is my stepson.

9         MR. WEINREB:  Your Honor, the government offers 822,

00:25 10   823 and 824.

11        MR. WATKINS:  No objection.

12        THE COURT:  Okay.

13        (Government Exhibit Nos. 822 through 824 received into

14   evidence.)

15        MR. WEINREB:  Mr. Bruemmer, if we could go back to

16   822.

17   BY MR. WEINREB:

18   Q.   Now we're going to look at them with the jury.  So you

19   said this was in the berth of the boat.  Where is that -- is

00:25 20   that in the fore of the boat or the aft?

21   A.   Fore.

22   Q.   And for us non-nautical people, fore is the front of the

23   boat?

24   A.   The front of the boat.

25   Q.   And this, what I'm circling right here which appears to be

1    the tip of a pencil, is that the pencil you identified earlier?

2    A.   It is.

3         MR. WEINREB:   823, please.

4    Q.   And again -- I'm going to get that arrow out of the way --

5    I circled the tip of the pencil.   Is this what you said has

6    apparent blood on it?

7    A.   Yes.

8    Q.   When that pencil -- when you wrapped up the boat, was

9    there blood on the tip of that pencil?

00:26 10   A.   No.

11        MR. WEINREB:   824, please.

12   Q.   Earlier you said that you knew it was your pencil because

13   it said "Duffy Plumbing Corp."   That's your brother-in-law?

14   A.   My stepson.

15   Q.   Your stepson.   I apologize.

16        What relation does your stepson have to Duffy Plumbing

17   Corp.?

18   A.   Him and his father own it.

19        MR. WEINREB:   Mr. Bruemmer, can we have Exhibit 826,

00:26 20   please, which is already in evidence.

21   Q.   Mr. Henneberry, do you recognize where this is?

22   A.   Yes, I do.

23   Q.   Where is it?

24   A.   The side of the boat.   Inside of the boat.

25   Q.   Do you see there's writing there?

1    A.    I do.

2    Q.    And there's blood?

3    A.    I see it.

4    Q.    Was that there when you wrapped up the boat for the

5    winter?

6    A.    No, no, no.

7         MR. WEINREB:  Exhibit 827, please.

8    Q.    All right.  Again, is that inside the boat?

9    A.    It is.

00:27 10    Q.    Just below the writing we were just looking at?

11    A.    What was that question again?

12    Q.    Just below the writing we were just looking at, would it

13    be that portion of the boat just below what we just saw?

14    A.    Yeah.

15    Q.    And again, that wasn't there when you wrapped up the boat

16    for the winter?

17    A.    No.

18    Q.    All right.  Now we're going to go further down.

19         MR. WEINREB:  828, please.

00:27 20    Q.    Okay.  Once more, the writing and the blood you see there

21    was not there when you wrapped up the boat for the winter?

22    A.    No, it was not.

23    Q.    Now I want to draw your attention to this which appears to

24    be a wooden slat screwed into the side of the boat just to the

25    right of the writing near the bottom of the picture.

1    A.    Correct.

2    Q.    Is that a part of the boat?

3    A.    Yes, it is.

4    Q.    And when you wrapped up the boat for the winter, was that

5    slat -- did that have any writing carved into it?

6    A.    No.

7              MR. WEINREB:  1450 for the witness, please.

8    Q.    Do you see those same slats there?

9    A.    I do.

00:28 10   Q.    All right.  Do you see that there appears to be writing

11   carved into them?

12   A.    I do.

13   Q.    And again, that writing wasn't there when you wrapped up

14   the boat for the winter?

15   A.    No, it was not.

16   Q.    Is that, though, a fair and accurate picture of where the

17   slats are in the boat?

18   A.    Yes, sir.

19             MR. WEINREB:  The government offers 1450.

00:29 20            MR. WATKINS:  No objection.

21             (Government Exhibit No. 1450 received into evidence.)

22   BY MR. WEINREB:

23   Q.    For the jury's benefit I'm going to circle that writing

24   again.  Is that what you were referring to earlier?

25   A.    Yes.

1          MR. WEINREB:  And 1451 for the witness, please.

2    Q.   Now, do these appear to be the same slats having been

3    unscrewed and laid down on a piece of corrugated cardboard?

4    A.   They appear to be.

5          MR. WEINREB:  The government offers 1451.

6          MR. WATKINS:  No objection.

7          (Government Exhibit No. 1451 received into evidence.)

8    BY MR. WEINREB:

9    Q.   Now, here there appears to be -- you can see writing all

00:30 10  along the length of both boards.  Is that correct?

11   A.   Correct.

12   Q.   Does it appear to say "Stop killing our..." and then

13   there's an arrow pointing downwards "...innocent people and we

14   will..." and then there's an arrow pointing up "...stop"?

15   A.   Correct.

16   Q.   None of that was there when you wrapped up the boat?

17   A.   No.

18         MR. WEINREB:  Thank you, Mr. Henneberry.  That's all.

19                      CROSS-EXAMINATION

00:31 20  BY MR. WATKINS:

21   Q.   Good morning, Mr. Henneberry.

22   A.   Good morning.

23   Q.   Tim Watkins.  I'm one of Jahar Tsarnaev's attorneys.

24        Mr. Weinreb showed you a number of photos from April 20th

25   which was after the -- what you call the incident?

```
 1    A.    Uh-huh.

 2    Q.    And you went out and looked at the carnage of your boat

 3    afterwards?

 4    A.    Not afterwards.  I wasn't allowed out there.

 5    Q.    Oh, I see.  But you've looked at these pictures before and

 6    you know what your boat looks like afterwards?

 7    A.    Basically.  I just saw them from the prosecutor.

 8          MR. WATKINS:  So could this just be for the witness,

 9    your Honor?

10    Q.    I'm going to show you some pictures here.  Do you

11    recognize this?

12    A.    I do.

13    Q.    And what is that?

14    A.    My boat.

15    Q.    Now, is that the way your boat looked after the incident?

16    A.    After, yes.

17    Q.    Is that a fair and accurate representation of the back of

18    it?

19    A.    I never saw the back.

20    Q.    I see.  When Mr. Weinreb showed you some pictures, did

21    you -- you were able to recognize those pictures from April

22    20th?

23    A.    No, I can recognize them from now.  I wasn't at the boat.

24    I wasn't allowed back there.

25    Q.    So -- but this is your boat?
```

     1    A.    It is my boat.

     2    Q.    And it has, you see, holes in it, in the back.  Those

     3    weren't there before April 20th.  Is that right?

     4    A.    No.

     5    Q.    And there are other markings here.  That red blood

     6    stain -- that red-brown stain was not there before April 20th?

     7    A.    Not before, yeah.

     8    Q.    So that is a fair and accurate -- beyond those additions,

     9    that is the way your boat looked?

00:33 10   A.    Yeah, I guess.  Like I say, I never saw this in person

    11    afterwards.  I never saw it afterwards.

    12          MR. WATKINS:  Your Honor, I'd move to admit defense

    13    Exhibit 3035.

    14          MR. WEINREB:  No objection, your Honor.

    15          THE COURT:  All right.

    16          (Defense Exhibit No. 3035 received into evidence.)

    17          MR. WATKINS:  I'm going to show two more to you and

    18    then we'll show them to the jury.

    19    BY MR. WATKINS:

00:34 20   Q.    Do you have a picture up on your screen?

    21    A.    I do.

    22    Q.    And is that also your boat?

    23    A.    It is.

    24    Q.    With the exception of some of the holes that we talked

    25    about and this -- let me see if I can -- and up by this portion

1    here, is that the way your boat looked before April 19th?

2    A.    No.

3    Q.    I'm talking about before April 19th, before the incident,

4    with the exception of those marks and the bullet holes you see.

5    A.    With the exception of those?

6    Q.    Yes.

7    A.    Yes.

8            MR. WATKINS:  Your Honor, I'd seek to admit this as

9    Defendant's Exhibit 3034.

00:35 10            MR. WEINREB:  No objection, your Honor.

11            THE COURT:  All right.

12            (Defense Exhibit No. 3034 received into evidence.)

13            THE CLERK:  Mr. Watkins, hang on one second, please.

14            THE COURT:  The number was used yesterday for a

15    different photo.

16            MR. WATKINS:  So let's make that one 3036.

17            THE COURT:  Okay.

18            (Defense Exhibit No. 3036 received into evidence.)

19    BY MR. WATKINS:

00:36 20    Q.    Finally, do you see a picture up on your screen now?

21    A.    I do.

22    Q.    And what is that a picture of?  What part of the boat?

23    A.    The stern.

24    Q.    And that's the back part of the boat?

25    A.    The back part of the boat.

1    Q.   You see some markings on there, red-brown stains.  Were

2    those on there before the incident on April 19th?

3    A.   No, they were not.

4    Q.   And, of course, that marker that says 2W-200, that was not

5    on there either?

6    A.   No, it was not.

7         MR. WATKINS:  Your Honor, I would ask to admit this as

8    Exhibit 3037.

9         MR. WEINREB:  No objection, your Honor.

00:37 10        (Defense Exhibit No. 3037 received into evidence.)

11        MR. WATKINS:  Let's go back to 3035.  And may we

12   publish this to the jury?

13   BY MR. WATKINS:

14   Q.   And again, this is your boat taken from the rear.  The

15   picture is taken from the rear.

16   A.   Yes, it is.

17   Q.   And I'm not nautical either.  What do you call that deck

18   at the back of the boat there?

19   A.   Swim platform.

00:37 20   Q.   That's the swim platform?

21   A.   Yeah.  Yes.

22   Q.   And directing your attention -- directing your attention

23   here, the red-brown stains that you see there, were those on

24   the boat prior to the incident on April 19th?

25   A.   No, they weren't.

1    Q.   You see some markings on the swim platform here.  Were

2    those on there before the incident on April 19th?

3    A.   No, they were not.

4    Q.   Exhibit 3036, a little closer view.  And again, you also

5    see some bullet holes here.  Were those there before April

6    19th?

7    A.   No, they were not.

8    Q.   Finally, Exhibit 3037.  Those are red-brown stains also?

9    A.   Were not there.  Yeah.

00:39 10   Q.   And those were not there before April 19th?

11   A.   (Nonverbal response.)

12        (Pause.)

13        MR. WATKINS:  Your Honor, could we go back to just the

14   witness?

15   Q.   Mr. Henneberry, do you recognize what's depicted in that

16   picture?

17   A.   I do.

18   Q.   And what is that?

19   A.   The interior of the boat.  It's a part of the interior of

00:40 20   the boat.

21   Q.   And specifically which side of the boat?

22   A.   The right-hand side.

23   Q.   And this is what Mr. Weinreb pointed out was the portion

24   closer to the fence, correct?

25   A.   Yes, correct.

1    Q.   Now, were these items on the floor when you packed it up

2    in -- before April 19th?

3    A.   No, they were not.

4    Q.   And were these stains here -- there before April 19th?

5    A.   No, they were not.

6    Q.   With the exception of those items not being there and the

7    stains not being there, is this a fair and accurate

8    representation of the interior of your boat on the right side?

9    A.   Yes, it is.

00:40 10             MR. WATKINS:  Again, just for the witness.

11   Q.   Is this the same view of that same spot, a little closer

12   up?

13   A.   Yes, it is.

14   Q.   And again, without the stains that you see there, is this

15   a fair and accurate representation of what the floor of your

16   boat on the right side of the engine block next to the fence

17   looks like?

18   A.   Yes.

19   Q.   You've referred to this as the berth of the boat?

00:41 20   A.   Yes.

21   Q.   And this is the front part that Mr. Weinreb showed you

22   where the pencil was, right?

23   A.   Yes.

24   Q.   Drawing your attention here, was that red-brown stain

25   there before the incident of April 19th?

1    A.    No.

2    Q.    But is it otherwise a fair and accurate representation of

3    your boat?

4    A.    Yes.

5    Q.    Finally, do you recognize what's depicted in that picture?

6    A.    I do.

7    Q.    And what is that?

8    A.    My toolbox.

9    Q.    And is that a toolbox that was on the boat?

00:42 10    A.    Yes, it was.

11    Q.    And it was on there before April 19th?

12    A.    Yes, it was.

13    Q.    Was it opened up before you packed it away, packed the

14    boat away?

15    A.    I don't really know that.  I can't remember.

16    Q.    And is that a fair and accurate representation of your

17    toolkit along with a bottle that's sitting on top of it?

18    A.    It is.

19         MR. WATKINS:  Your Honor, I'd seek to introduce those

00:43 20    exhibits as Defendant's Exhibits 3027, 3028, 3029 and 3030.

21         MR. WEINREB:  No objection.

22         THE COURT:  Those numbers in the sequence in which

23    they were shown to the witness?

24         MR. WATKINS:  Yes.

25         MR. WEINREB:  No objection.

1          THE COURT:  Admitted.

2          (Defense Exhibit Nos. 3027 through 3030 received into

3     evidence.)

4     BY MR. WATKINS:

5     Q.    So now we'll go through it with the jury, Mr. Henneberry.

6     Showing you what's been identified as Exhibit 3027, can you

7     describe what that is?

8     A.    The interior of the boat.

9     Q.    To the right of the engine block on the right side of the

00:43 10     boat?

11     A.    Correct.

12     Q.    And these stains that you see on the floor there, those

13     were not there before April 19th?

14     A.    Were not.

15     Q.    Showing you Exhibit 3028, is more of a close-up here.  Was

16     that stain there on -- before April 19th, the incident?

17     A.    It was not.

18     Q.    Showing you Exhibit 3029, directing you to this part of

19     the berth, was that red-brown stain there when you winterized

00:44 20     your boat in the previous fall?

21     A.    It was not there.

22     Q.    And finally, this is the toolkit that you had in your

23     boat?

24     A.    Correct.

25     Q.    And directing your attention to this that's on top of the

1    tool boat [*sic*], is that also a pencil?

2    A.    It is.

3    Q.    And it says "Duffy Plumbing" on it also?

4    A.    Correct.

5         MR. WATKINS:  Nothing further.  Thank you very much,

6    Mr. Henneberry.

7         MR. WEINREB:  Nothing further, your Honor.

8         THE COURT:  All right, Mr. Henneberry.  Thank you.

9    You may step down.

00:45 10        THE WITNESS:  Thank you.

11         (The witness is excused.)

12         MR. CHAKRAVARTY:  The government calls Stephen Silva.

13                   STEPHEN SILVA, duly sworn

14         THE CLERK:  State your name, spell your last name for

15    the record, keep your voice up and speak into the mic.

16         THE WITNESS:  My name is Stephen Silva, S-T-E-P-H-E-N

17    S-I-L-V-A.

18                      DIRECT EXAMINATION

19    BY MR. CHAKRAVARTY:

00:47 20   Q.    Good morning.  Mr. Silva, how old are you?

21    A.    Twenty-one years of age.

22    Q.    Where were you born?

23    A.    Boston, Massachusetts.

24    Q.    Where did you grow up?

25    A.    Boston, Massachusetts, for about nine, ten years, then I

1    moved to Cambridge.

2    Q.    Do you have family here?

3    A.    Yes.

4    Q.    Who did you grow up with?

5    A.    My mother, my sister, my twin brother and my older

6    brother.

7    Q.    You say you have a twin brother?

8    A.    Yes.

9    Q.    What's his name?

00:47 10    A.    Steven Silva.

11    Q.    And is he an identical twin?

12    A.    Yes.

13    Q.    Where do you currently reside?

14    A.    I'm currently incarcerated.

15    Q.    For what?

16    A.    Gun possession and heroin charges, conspiracy,

17    distribution.

18    Q.    How long have you been incarcerated?

19    A.    About eight months.

00:47 20    Q.    And what is the status of your criminal case?

21    A.    Pending.

22    Q.    Have you pleaded guilty?

23    A.    Yes, I have.

24    Q.    Have you come to a plea agreement with the government?

25    A.    Yes, I have.

          1   Q.   And you've come before a judge in this court and you've

          2   pled guilty?

          3   A.   Yes, I have.

          4        MR. CHAKRAVARTY:  I'd call up Exhibit 926 for the

          5   witness, please.

          6   Q.   Do you recognize this?

          7   A.   Yes, I do.

          8   Q.   What is it?

          9   A.   It's the plea agreement.

00:48    10        MR. CHAKRAVARTY:  And could we go to the last page,

         11   Mr. Bruemmer.

         12   Q.   Is this page 15 of that agreement?

         13   A.   Yes, it is.

         14   Q.   Do you see your signature on that?

         15   A.   Yes, I do.

         16        MR. CHAKRAVARTY:  I'd move into evidence Exhibit 926.

         17        MS. CONRAD:  No objection.

         18        THE COURT:  All right.

         19        (Government Exhibit No. 926 received into evidence.)

00:49    20   BY MR. CHAKRAVARTY:

         21   Q.   Mr. Silva, can you explain in a sentence what you

         22   understand your obligation under this plea agreement to be?

         23   A.   It is my understanding that if I cooperate and give

         24   truthful testimony, I stand a better chance at sentencing.

         25   Q.   Who makes the decision on whether you get a better

```
 1   sentence?

 2   A.   The judge and only the judge.

 3   Q.   Now, after you were arrested for your criminal case, did

 4   you agree to talk to the government?

 5   A.   Yes, I did.

 6   Q.   Have you met with the prosecutors several times?

 7   A.   Yes, I have.

 8   Q.   Have you talked about your testimony in this case?

 9   A.   Yes, I have.

10        MS. CONRAD:  Objection to leading at this point, your

11   Honor.

12        THE COURT:  Go ahead.

13   BY MR. CHAKRAVARTY:

14   Q.   Do you know Jahar Tsarnaev?

15   A.   Yes, I do.

16   Q.   Do you see him in the courtroom today?

17   A.   Yes, I do.

18   Q.   How do you know him?

19   A.   I was close friends with him.  I recognize him.

20   Q.   Can you please point to him and identify him by something

21   he's wearing?

22   A.   He's wearing a black sports jacket.

23        MR. CHAKRAVARTY:  I'd ask the record reflect the

24   witness has identified the defendant.

25        THE COURT:  All right.
```

00:49 (line 10)
00:50 (line 20)

```
 1   BY MR. CHAKRAVARTY:

 2   Q.   You said you were friends with him.  Where did you first

 3   meet him?

 4   A.   Eighth grade.

 5   Q.   Where was that?

 6   A.   The Community Charter School of Cambridge.

 7   Q.   And how often did you see him while you were in eighth

 8   grade?

 9   A.   Every day.

10   Q.   And did that continue through high school?

11   A.   Yes.

12   Q.   Did you graduate together?

13   A.   Yes.

14   Q.   When was that?

15   A.   June 2011.

16   Q.   All right.

17        MR. CHAKRAVARTY:  Can I call up Exhibit 1179?

18   Q.   What's that?

19   A.   That's a picture of me and Jahar before graduation.

20   Q.   That's how you appeared back in June of 2011?

21   A.   Yes.

22        MR. CHAKRAVARTY:  Move into evidence 1179.

23        MS. CONRAD:  No objection.

24        THE COURT:  All right.

25        (Government Exhibit No. 1179 received into evidence.)
```

00:50 (line 10)

00:50 (line 20)

```
 1              MR. CHAKRAVARTY:  Ask to publish, your Honor.
 2    BY MR. CHAKRAVARTY:
 3    Q.   When you were in high school -- I'm sorry.  I'll give it a
 4    second.
 5         When you were in high school, how often would you interact
 6    with the defendant?
 7    A.   Every day usually.
 8    Q.   And describe your relationship.
 9    A.   We had a very close relationship.  He was the person who I
10    would consider, you know, one of my best friends back in the
11    day.
12    Q.   Did you know him by any other names?
13    A.   I called him "Jizz."
14    Q.   How often would you see him after graduating?
15    A.   Pretty often.
16    Q.   Did you graduate together in June 2011?
17    A.   Yes, we did.
18    Q.   What did you do after high school?
19    A.   After high school I went to college down in Tampa,
20    Florida.
21    Q.   And do you know where the defendant went to school?
22    A.   Yes.
23    Q.   Where did he go?
24    A.   UMass Dartmouth.
25    Q.   Did you stay in touch with him?
```

```
 1   A.   Yes, I did.
 2   Q.   How often?
 3   A.   Pretty often.
 4   Q.   How would you keep in touch with him?
 5   A.   Text messages, phone calls, Facebook.
 6   Q.   What kinds of things would you talk about with the
 7   defendant?
 8   A.   You know, how college, first semester -- you know, girls,
 9   partying, you know, getting accustomed to being in college.
10   Q.   Where did your brother go to college?
11   A.   His first semester, freshman year he also attended UMass
12   Dartmouth.
13   Q.   Was your brother close with the defendant as well?
14   A.   Yes.
15   Q.   After you graduated high school, as you were going to
16   college, what did you do for money?
17   A.   I was lifeguarding, I was also selling weed, marijuana.
18   Q.   When you say lifeguarding, was that at a pool?
19   A.   Yes.
20   Q.   Where was that?
21   A.   At one of the Harvard pools in Allston, Massachusetts.
22   Q.   And did the defendant at one point also do that?
23   A.   Yes, he did.
24   Q.   You said you were selling weed?
25   A.   Yes.
```

00:52  (line 10)
00:52  (line 20)

1    Q.    You mean marijuana?

2    A.    Yes.

3    Q.    When did you first start selling marijuana?

4    A.    About 16, 17, in high school.

5    Q.    How much marijuana were you selling after you graduated

6    high school?

7    A.    After I graduated high school, selling about quarter

8    pounds, half pounds.

9    Q.    Per week?

00:53 10    A.    Less than that.  Maybe every two weeks, three weeks

11    depending.

12    Q.    About how much money were you making from selling

13    marijuana after high school?

14    A.    It depends.  Anywhere between 500, a thousand dollars,

15    maybe a little less, maybe a little more.

16    Q.    When you went down to Florida, where would you get your

17    marijuana?

18    A.    I was getting it from local suppliers in the Tampa area.

19    Q.    At some point did you come back to Massachusetts?

00:53 20    A.    Yes, I did.

21    Q.    When was that?

22    A.    During the spring 2012, after my freshman year was over.

23    Q.    So in the spring of 2012, when you came back did you see

24    the defendant then?

25    A.    Yes, I did.

1    Q.    And what would you do?

2    A.    Same things we always did:  Hung out.

3    Q.    Describe for the jury what would happen when you guys

4    would just hang out.

5    A.   He'd usually pick me up in his car, we'd hang out, smoke

6    weed, listen to music, talk, go to the pool, maybe.  Hang out.

7    Sometimes he would take me to this reservoir spot near

8    Swampscott, you know, jump off a cliff, hang out, drink.  You

9    know, normal teenager stuff.

00:54 10    Q.    Did you continue to sell drugs when you came back to

11    marijuana -- excuse me -- back to Massachusetts?

12    A.    Yes.

13    Q.    Why did you go down to Florida and leave Massachusetts to

14    go to college?

15    A.    I wanted to get out of Massachusetts for a little bit.  I

16    feel like I had spent my whole life in Mass., and I wanted to

17    you know, experience something a little different, something I

18    wasn't used to.

19    Q.    After your freshman year of college, did you go -- did you

00:54 20    decide to stay in Massachusetts?

21    A.    After my freshman year I decided to stay in Massachusetts

22    for a little bit.  Yes, I did.

23    Q.    And did you continue to sell drugs up here?

24    A.    Yes.

25    Q.    Now, near the end of 2012 did you go back to Florida?

```
 1   A.    Yes, I did.

 2   Q.    Were you enrolled as a student?

 3   A.    No, not at that time.

 4   Q.    Why did you go back?

 5   A.    Some things had came up around Boston.  I just felt it

 6   necessary to get out of Boston for a little.  So I thought I'd

 7   just take a little vacation and go back down to Florida.

 8   Q.    What came up in Boston?

 9   A.    Supposedly my mother told me the police came to my house

10   looking for me, asking questions about something drug related.

11   So I just decided it was best for me to leave the area for a

12   little bit.

13   Q.    And what did you do when you got down to Florida?

14   A.    When I got down to Florida I just hung out at a friend's

15   house and continued selling weed.

16   Q.    How long did you do that for?

17   A.    From about the middle of August until the end of November.

18   Q.    November 2012?

19   A.    Yes.

20   Q.    And then did you come back to Massachusetts?

21   A.    Yes, I did.

22   Q.    Where did you go?

23   A.    At that time I came back from Florida, my brother and

24   friend had an apartment in Revere, Massachusetts.

25   Q.    And who is your friend?
```

```
 1    A.    My friend Nicholas Silva.

 2    Q.    So your brother Steven Silva and your friend Nicholas

 3    Silva --

 4    A.    Yes.

 5    Q.    -- were in an apartment together?

 6    A.    Yes.

 7    Q.    Did you have a business relationship with them as well?

 8    A.    Yes.

 9    Q.    What was that business relationship?

10    A.    Just primarily selling marijuana.

11    Q.    Where were you getting your supply of marijuana from?

12    A.    A local supplier.

13    Q.    Did you repackage the marijuana?

14    A.    Yes.

15    Q.    About how much money were you making per week when you

16    came back?

17    A.    By the time I came back I was selling more quantity, so

18    between a thousand and two thousand, give or take.  Less maybe.

19    Q.    Did the defendant come to your apartment?

20    A.    Yes.

21    Q.    How often?

22    A.    At least a few times a month.

23    Q.    How often would you communicate with the defendant around

24    this time?

25    A.    Pretty often.
```

```
 1   Q.   What does "pretty often" mean?

 2   A.   At least a couple of times a week.

 3   Q.   Can I ask you whether any of your business partners had

 4   ever been robbed?

 5   A.   Yes.

 6   Q.   Who?

 7   A.   My twin brother.

 8   Q.   Approximately when was that?

 9   A.   About October 2012.  October.

00:57 10   Q.   Was he robbed of money?

11   A.   No.

12   Q.   What was he robbed of?

13   A.   Marijuana, product.

14   Q.   About how much?

15   A.   About two pounds.

16   Q.   How much was that worth if you broke it up?

17   A.   Anywhere between six, ten thousand dollars.

18   Q.   Was being robbed a concern of yours?

19   A.   Yes.

00:57 20   Q.   And did the three of you who lived together have that

21   concern?

22   A.   Yes.

23   Q.   Did you ever have discussions about obtaining a gun?

24   A.   Yes.

25   Q.   With who?
```

1   A.   My brother and my cousin, my friend Nick.

2   Q.   And what was that conversation?

3   A.   After my brother was robbed, we just started talking about

4   maybe obtaining a gun, you know, for protection.

5   Q.   And near the end of 2012 did an opportunity arise

6   to obtain --

7   A.   Yes.

8   Q.   Explain that opportunity.

9   A.   Well, like I said, me and my brother and my friend had

00:58 10   been talking about obtaining a gun, and around the same time a

11   friend of mine from my neighborhood, he had asked me if I could

12   do him a favor and hold down a firearm for him because he

13   needed to get it out of his house.

14   Q.   What was his name?

15   A.   Howie.

16   Q.   And did you agree to take the gun?

17   A.   Yes.

18   Q.   Did he get you the gun?

19   A.   Excuse me.  Repeat that?

00:58 20   Q.   Did he get you the gun?

21   A.   Yes.

22   Q.   What kind of gun was it?

23   A.   It was a P95 Ruger.

24   Q.   After you got the gun, what did you do with it?

25   A.   I put it -- I stored it away in my apartment, in a ceiling

```
 1  panel.
 2  Q.   Who else knew --
 3           THE COURT REPORTER:  I'm sorry, in your apartment
 4  in...
 5           THE WITNESS:  In my apartment in Revere.
 6           THE COURT:  In a ceiling panel.
 7  BY MR. CHAKRAVARTY:
 8  Q.   The court reporter is taking down everything you're
 9  saying, so if you speak slowly, she'll get it.
10  A.   Okay.
11  Q.   The ceiling panel in your apartment in Revere, is that
12  where you put the gun?
13  A.   Yes.
14  Q.   Who else knew about the gun?
15  A.   My twin, my friend and a few close associates.
16  Q.   And did you tell people?
17  A.   Yes.
18  Q.   Some of those close associates?
19  A.   Yes.
20  Q.   Did you tell the defendant?
21  A.   Yes.
22  Q.   What was his reaction when you told him that you had a
23  gun?
24  A.   It wasn't much of a reaction.  He just acknowledged it.
25  Q.   When people -- some of your close associates came to the
```

1    house, did you show them the gun?

2    A.   Yes.

3    Q.   Did you ever take the gun out of the apartment?

4    A.   Yes.

5    Q.   What's the first time you remember taking the gun out of

6    the apartment?

7    A.   I took the gun out of the apartment sometime in December

8    to commit a robbery.

9    Q.   And who was with you?

01:00 10    A.   My friend Nicholas.

11    Q.   And how did you set up the robbery?

12    A.   Through a mutual friend.

13    Q.   And was this going to be a drug deal?

14    A.   Yes.

15    Q.   And where was the robbery going to occur?

16    A.   Cambridge.

17    Q.   And did you go to Cambridge?

18    A.   Yes.

19    Q.   Who did you go with?

01:00 20    A.   I went with my friend Nicholas.

21    Q.   Who had the gun?

22    A.   Me and Nicholas.

23    Q.   When you got there, did you meet with two individuals?

24    A.   Yes, I did.

25    Q.   Was it in their car?

1    A.    Yes.

2    Q.    Explain what happened.

3    A.    Me and Nicholas got into the car.  We were in the

4    backseat, there were two individuals in the front passenger

5    seat.  We had talked very shortly, for a couple of minutes.  We

6    had asked to see the money, they had asked to see the

7    marijuana.  When the person in the passenger seat passed me the

8    money I put it in my pocket, and then Nicholas reached into a

9    bag, pulled out the gun, cocked back the slide, and then that

01:01 10   was pretty much it.

11   Q.    What was the reaction of the two individuals?

12   A.    They were in a state of panic and shock.

13   Q.    Did they leave?

14   A.    We left the car after we had the money and then they

15   eventually, I assume, drove back home.

16   Q.    Did you tell other people what happened?

17   A.    Yes.

18   Q.    And before that incident, had you ever handled a gun

19   before?

01:01 20   A.    A little bit, yes.

21   Q.    So had you handled a gun besides this gun?

22   A.    No.

23   Q.    Did you tell the defendant about the robbery?

24   A.    Yes.

25   Q.    What was his reaction?

1   A.   He laughed.

2   Q.   Did you take the gun out of your residence again?

3   A.   Yes, one more time.

4   Q.   When was that?

5   A.   New Year's Eve 2012.

6   Q.   And where did you take it?

7   A.   To a friend's apartment in Medford, Massachusetts.

8   Q.   What was happening there?

9   A.   Nothing.  We were just throwing a New Year's Eve party.

01:02 10   Q.   Why did you take it there?

11   A.   I was just being stupid.  I wanted to show it off.

12   Q.   And did you?

13   A.   Yes.

14   Q.   Did the defendant come to that house?

15   A.   Yes.

16   Q.   Did you bring it back ultimately to your apartment at some

17   point?

18   A.   Yes, I did.

19   Q.   You say you did.  Who else knew about the gun?

01:02 20   A.   Me, my twin brother, the defendant and a few close

21   associates.

22   Q.   And how about Nicholas?

23   A.   Yes.

24   Q.   Now, after that early January trip with the gun, did you

25   talk to the defendant again about the gun?

```
 1   A.   Yes.

 2   Q.   About when was that?

 3   A.   Sometime in January.

 4   Q.   How did you have that conversation?

 5   A.   It started over the phone and then talked about it with

 6   him in person.

 7   Q.   When you talked to him about the gun, did he ask you for

 8   anything?

 9   A.   Yes.

10   Q.   What did he ask you for?

11   A.   He asked me to potentially borrow the gun.

12   Q.   Why did he ask you to borrow the gun?

13        MS. CONRAD:  Objection to that in that form.

14        THE COURT:  Sustained to the form of the question.

15   BY MR. CHAKRAVARTY:

16   Q.   For what purpose did he ask for the gun?

17        MS. CONRAD:  Objection.  Same objection.

18        THE COURT:  Yeah, rephrase it.

19   BY MR. CHAKRAVARTY:

20   Q.   Did he tell you why he needed the gun?

21   A.   Yes.

22   Q.   What did he tell you?

23   A.   He said he wanted to rip some kids from URI.

24   Q.   When you say "rip," what does that mean?

25   A.   Rob.
```

1    Q.    Is that what you did with Nicholas a few months earlier?

2    A.    Yes.

3    Q.    Did he make arrangements to come by your apartment?

4    A.    Yes.

5    Q.    Approximately when did he come by your apartment?

6    A.    Within the next couple of weeks after we started talking

7    about the gun.

8    Q.    And was he regularly coming to your apartment around this

9    time?

01:04 10    A.    Yes, about a few times a month when he could.

11    Q.    And did he actually come to talk about the gun?

12    A.    Yes.

13    Q.    Was he with anyone?

14    A.    Yes, he was.

15    Q.    Who was he with?

16    A.    Dias.  I can't pronounce his last name.

17    Q.    Is it Dias Kadyrbayev?

18    A.    Yes.

19    Q.    Was he a friend of the defendant's?

01:04 20    A.    Yes.

21    Q.    Did you know him as well?

22    A.    Yes, I did.

23    Q.    Where did you know him from?

24    A.    He was a good friend of my brother and the defendant's

25    from UMass Dartmouth.

1    Q.   Who else was there?

2    A.   Nicholas, my twin brother, and my friend Abdul.

3    Q.   And what did you guys do?

4    A.   We just hung out, chilled, smoked weed.  Same thing we

5    usually do.

6    Q.   At some point did the conversation turn to the gun?

7    A.   Yes.

8    Q.   What did you do?

9    A.   I took the gun out the ceiling panel and showed it to the

01:05 10   defendant and Dias.

11   Q.   What was the gun stored in?

12   A.   It was stored in a sock.

13   Q.   Just a regular tube sock?

14   A.   Yes.

15   Q.   Did you hand the defendant the gun?

16   A.   Yes.

17   Q.   What did he do with it?

18   A.   Handled it, acknowledged it, tried to pass it to Dias.

19   Dias didn't want to touch it.  And he gave it back to me and I

01:06 20   put it away.

21   Q.   Did you talk about ammunition?

22   A.   Yes.

23   Q.   Did you have ammunition?

24   A.   Yes.

25   Q.   Where was that?

```
 1   A.    It was in another sock inside the ceiling panel.

 2   Q.    Did you show him that?

 3   A.    Yes.

 4   Q.    About how much ammunition did you have?

 5   A.    About ten rounds.

 6   Q.    Is ten rounds ten bullets?

 7   A.    Yes.

 8   Q.    Was there a magazine as well?

 9   A.    Yes.

10   Q.    Did the defendant say anything when you handed him the gun

11   or the ammunition?

12   A.    He just took the gun, looked at it, acknowledged it,

13   didn't really say much.

14   Q.    Describe the gun.

15   A.    The gun's black.  It was kind of -- looked a little rusty.

16   The top slat part had kind of like a little reddish-orange hue

17   to it.  The serial number was obliterated on a silver panel.

18   And it said "P95" on the top slide, and it also says "Ruger" on

19   the side of the gun.

20   Q.    Now, do you know much about guns?

21   A.    No, not really.

22   Q.    You said the serial number was obliterated.  What does

23   that mean?

24   A.    Scratched off, or made to appear so that you can't read

25   it.
```

1    Q.   And have you pled guilty to possessing this gun with the

2    obliterated serial number?

3    A.   Yes, I have.

4         MR. CHAKRAVARTY:  Call up Exhibit 930 for the witness.

5    Q.   Do you recognize that?

6    A.   Yes.

7    Q.   What is it?

8    A.   That's the gun I possessed.

9    Q.   How do you recognize it?

01:07 10   A.   Because I've had it in my hands, I've seen it multiple

11   times, I've dealt with it.

12        MR. CHAKRAVARTY:  I'd ask that Exhibit 930 be

13   introduced.

14        MS. CONRAD:  No objection.

15        THE COURT:  All right.

16        (Government Exhibit No. 930 received into evidence.)

17        THE COURT:  Displayed?

18        MR. CHAKRAVARTY:  Please.

19        I'd like to approach in the meantime.

01:08 20   Q.   Looking at this picture, Mr. Silva, can you describe some

21   of the features you mentioned earlier?  There's a screen

22   on that you can touch, and if you put your finger on it, then

23   it will put notes on the screen, so the jury can see what

24   you're talking about.

25   A.   The serial number is obliterated.  This is the silver

1    panel.  It says "Ruger" on the side of the gun.  It has the

2    reddish rust tint I referred to earlier.  As you can see from

3    the picture, it looks pretty rusty.  There's a lot of color to

4    the gun.  "P95" around there.  And that's about it.

5            MR. CHAKRAVARTY:  May I approach, your Honor?

6            THE COURT:  You may.

7            (Pause.)

8            MR. CHAKRAVARTY:  For the record, your Honor, I have

9    an item in my hand that has been rendered safe, and I want the

01:09 10   witness to know that before I hand it to him.

11   BY MR. CHAKRAVARTY:

12   Q.   Mr. Silva, do you recognize this item?

13   A.   Yes.

14   Q.   What do you recognize it to be?

15   A.   The gun I gave to the defendant.

16   Q.   How do you recognize it?

17   A.   From all the characteristics I've already explained, and

18   the Ruger, that obliterated serial number, the reddish hue

19   tint.

01:10 20   Q.   When did you give this gun to the defendant?

21   A.   About sometime in February 2012 -- 2013.

22           MR. CHAKRAVARTY:  I move into evidence Exhibit 928.

23           MS. CONRAD:  No objection.

24           THE COURT:  All right.  928 is admitted.

25           (Government Exhibit No. 928 received into evidence.)

1    BY MR. CHAKRAVARTY:

2    Q.   Mr. Silva, after you had your conversation with the

3    defendant and you showed him the gun, did he take it?

4    A.   Not at that specific time, no.

5    Q.   How long after you showed him the first time did he take

6    it?

7    A.   Within a few weeks.

8    Q.   Did he tell you that he was going to come over to pick it

9    up?

01:10 10   A.   Yes.

11   Q.   And why did he not pick it up on that day?  What did he

12   tell you about why he didn't pick it up on that day?

13   A.   Either he told me that he didn't want to drive back with

14   that -- with that type of, you know, things on him.  I think he

15   already had marijuana or something on him; he didn't want to

16   drive with all the hassle.

17   Q.   Were you expecting to get the gun back shortly after you

18   gave it to him?

19   A.   Yes, I was.

01:11 20   Q.   And how long after you had given him the gun did you

21   expect to get it back?

22   A.   Within a couple of weeks at most.

23   Q.   Let's talk a little bit more about the interaction where

24   he actually picked up the gun.  Did he come to your house?

25   A.   Yes.

```
 1   Q.   And what happened?
 2   A.   We hung out for a little bit, did the same things we
 3   usually do.  At some point I gave the defendant the gun.
 4   Q.   Did he ask for anything else?
 5   A.   I gave him ammunition.
 6   Q.   Did he use a particular phrase to ask for the ammunition?
 7   A.   I remember him saying something like "food for the dog."
 8   Q.   What did you take that to mean?
 9   A.   Ammo, bullets.
```
01:12 10   Q.   How would you refer to the gun with the defendant?
```
11   A.   We would -- we wouldn't talk about it over the phone, you
12   know, we wouldn't say "gun" or anything.  We would refer to it
13   in phrases that were less definite.
14   Q.   Was that just in case someone was listening?
15   A.   Yes.
16   Q.   When you gave him the gun, was he alone or with anyone?
17   A.   No, he was alone.
18   Q.   Do you remember what car he was driving?
19   A.   I think it was a black Camaro.
```
01:12 20   Q.   And did you recognize that car?
```
21   A.   Yes.
22   Q.   Whose was it?
23   A.   It was a friend of the defendant's, some Indian kid from
24   UMass Dartmouth.
25   Q.   Was that a car you had seen him driving before?
```

```
 1   A.   Yes.
 2   Q.   After you gave him the gun, when's the next time you
 3   talked to him about the gun?
 4   A.   Oh, a couple of weeks, three weeks after I gave it to him.
 5   Q.   And why was that?
 6   A.   Because I just wanted to ask him what happened with the
 7   situation and if he was done using it because I wanted it back.
 8   Q.   Why did you want the gun back?
 9   A.   Around that time the person who gave it to me, Howie, he
10   kept calling me and asking me to return the gun.  So I wanted
11   to give him back, you know, the gun that he let me borrow.
12   Q.   Did Howie explain to you why he gave you the gun in the
13   first place?
14   A.   Yeah, he gave it to me because his mother had searched his
15   room and he needed to get it out of the house.
16   Q.   Did he tell you anything about the gun?
17   A.   He told that me it was, quote/unquote --
18        MS. CONRAD:  Objection.
19        THE COURT:  Sustained.
20   BY MR. CHAKRAVARTY:
21   Q.   Was -- when you received the gun, was the serial number
22   obliterated or not?
23   A.   Yes, it was obliterated.
24   Q.   Did you tell Howie why you couldn't give the gun back?
25   A.   No, I did not.
```

```
 1   Q.   Did you continue to have contact with the defendant

 2   through February and into April of 2013?

 3   A.   Yes.

 4   Q.   About how often?

 5   A.   Same amount as usual.

 6   Q.   About once a week?

 7   A.   Yeah, around there.  Once a week, twice a week.

 8   Q.   Did the defendant give you the gun back?

 9   A.   No, he did not.

10   Q.   Did you continue to ask him for the gun?

11   A.   Yes, I did.

12   Q.   In addition to yourself asking, did other people ask him?

13   A.   Yes.

14   Q.   Who else asked him?

15   A.   Nicholas.

16   Q.   How did Nicholas ask him?

17   A.   He sent him a text via phone.

18   Q.   Did the defendant respond to Nicholas?

19   A.   No, he did not.

20   Q.   Did the defendant respond to you?

21   A.   Yes, he did.

22   Q.   What did the defendant tell you as to why he couldn't give

23   the gun back?

24   A.   He just kept coming up with excuses saying he -- when he

25   would come, he was in a rush, "I couldn't bring it," was just
```

```
 1   beating around the bush, I'd say.
 2   Q.   Did he mention he was doing anything with the gun at that
 3   point?
 4   A.   No.
 5             MS. CONRAD:  Objection.  Objection.
 6             THE COURT:  Overruled.
 7   BY MR. CHAKRAVARTY:
 8   Q.   Did he mention what he did on spring break?
 9   A.   No, he did not.
10   Q.   Did he tell you -- strike that.
11        How were you communicating with the defendant during this
12   time?
13   A.   Cell phone usually.
14   Q.   Was that text as well phone calls?
15   A.   Yes.
16   Q.   Do you still have the phone that you were using?
17   A.   No, I do not.
18   Q.   Where is it?
19   A.   No idea.  It was disposed of.
20   Q.   We'll get to that in a second.
21        Let's talk a little bit about the defendant.  How good of
22   a student was the defendant?
23   A.   The defendant was a very good student in high school.
24   Q.   What did he tell you about his grades?
25   A.   I know in high school he had a pretty high grade point
```

1    average, in the high 80s.

2    Q.   And how about in college?

3    A.   We didn't -- he told me his first semester he had kind of

4    struggled a little bit, but then his second semester he had

5    stopped messing around and improved his GPA highly.

6    Q.   Did you take classes with him in high school?

7    A.   Yes, I did.

8    Q.   And particularly in junior and senior year, did you take a

9    class with Mr. Matteo and Ms. Otty?

01:16 10   A.   Yes.

11   Q.   Were there ever conversations about terrorism in those

12   classes?

13   A.   In Ms. Otty's class, yes.

14   Q.   And did the defendant participate in one of those

15   conversations?

16   A.   Yes.

17   Q.   Describe it.

18   A.   Ms. Otty, she had raised the question about

19   whether -- whether we as students believed that terrorism is

01:17 20   ever justified and what is terrorism, why do people -- or why

21   do sometimes people resort to acts of terrorism to prove their

22   point, something along those lines.

23   Q.   And did the defendant answer?

24   A.   Yes.

25   Q.   What did he say?

```
 1   A.   At this point in class I remember we were having a debate

 2   about American foreign policy in the Middle East and what are

 3   the sort of issues that America deals with in the Middle East.

 4   And the defendant had raised a point that American

 5   soldiers tend -- American foreign policy sometimes tends to be

 6   a little hostile towards the Middle East, you know, persecuting

 7   Muslims, going to war, trying to take over the people's

 8   culture, you know, to tell them what to do, stuff like that.

 9   Q.   And because of that, what?

10   A.   And because of that, you know, it's wrong.  Americans

11   shouldn't be allowed to just go wherever they want and try to

12   force people to believe in what they believe and not let them

13   live their own lives or believe their own things that they want

14   to believe in.

15   Q.   Did you ever visit the defendant at his residence in

16   Cambridge?

17   A.   Yes.

18   Q.   When?

19   A.   About the same time, in the summer of 2012.

20   Q.   So that's after you graduated, after you had already gone

21   to college, when you came back?

22   A.   Yes.

23   Q.   Why did you visit him that summer?

24   A.   I remember that specific night me and my mother had gotten

25   into an argument, and me and my twin brother left the house for
```

1    the night so we needed a place to stay.

2    Q.    So was it you and your brother went there?

3    A.    Yeah.

4    Q.    When you got to his house in Cambridge, had you been there

5    before?

6    A.    I had been around his house.  I think that was the first

7    time I had entered his home.

8    Q.    And was there anyone else at home when you got there?

9    A.    It was just me and my twin brother, Jahar, and I believe

01:19 10    his niece and brother's wife.

11    Q.    Brother's wife?

12    A.    Yes.

13    Q.    What did you guys do?

14    A.    We were inside his -- the defendant's bedroom.  I was on

15    the top bunkbed and the defendant and my brother were watching

16    "The Walking Dead" on his computer.

17    Q.    The TV show?

18    A.    Yes.

19    Q.    Is that a TV show that he enjoyed?

01:19 20    A.    Yes.

21    Q.    I'm going to show you some pictures.

22              MR. CHAKRAVARTY:  Call up 1185-01.

23              This is for the witness, your Honor.

24    Q.    Do you recognize that?

25    A.    Yes.

```
 1   Q.   What is it?

 2   A.   The defendant's home.

 3            MR. CHAKRAVARTY:   1185-12.

 4   Q.   What's that?

 5   A.   That's the defendant's bedroom.

 6   Q.   And particularly, do you recognize the bed?

 7   A.   Yes.   The top bed bunk [sic] is where I slept that night.

 8            MR. CHAKRAVARTY:   1185-36.

 9   Q.   Do you recognize that?

10   A.   Yes.

11   Q.   What is that?

12   A.   The defendant's desktop/laptop computer.

13   Q.   Is it a desktop or a laptop?

14   A.   It looks like a desktop.

15   Q.   And was that in that room?

16   A.   Yes.

17   Q.   The same room with the bed?

18   A.   Yes.

19   Q.   Was that the defendant's room?

20   A.   Yes.

21            MR. CHAKRAVARTY:   1201, please.

22   Q.   Do you recognize that?

23   A.   Yes.

24   Q.   What is that?

25   A.   That's a flag.
```

```
 1   Q.   Was that in the bedroom?

 2   A.   Yes.

 3            MR. CHAKRAVARTY:  I'd move into evidence 1185-01,

 4   1185-12, 1185-36 and 1201.

 5            MS. CONRAD:  Objection to 1185-36, your Honor, because

 6   I don't think it's been established that's what it looked like

 7   at that time.

 8            THE COURT:  I think it's sufficient.  I'll admit it.

 9            (Government Exhibit Nos. 1185-01, 1185-12, 1185-36 and

01:21 10   1201 received into evidence.)

11            MR. CHAKRAVARTY:  Ask to publish, your Honor.

12            THE COURT:  Which one.

13            MR. CHAKRAVARTY:  I'm sorry.  1185-01 we'll start

14   with.

15   BY MR. CHAKRAVARTY:

16   Q.   Is this the structure in which the defendant lived?

17   A.   Yes.

18   Q.   Was it the third floor of this apartment?

19   A.   Yes.

01:22 20            MR. CHAKRAVARTY:  1185-12.

21   Q.   And is this the bed in his room?

22   A.   Yes.

23   Q.   It's a bunkbed?  In this picture, in which direction was

24   the computer?

25   A.   To the right side of the bed towards --
```

```
 1    Q.   Over there?  Okay.

 2         MR. CHAKRAVARTY:  1185-36.

 3    Q.   And this is a computer?

 4    A.   Yes.

 5    Q.   And is this where they were watching "The Walking Dead"?

 6    A.   Yes.

 7    Q.   And where in relation to this was the flag?  Which

 8    direction?

 9    A.   I believe the flag was along the wall towards the middle

01:22 10   of the room.

11         MS. CONRAD:  Can we get some clarification on which

12    flag we're talking about?  The flag that's depicted here or the

13    other picture?

14         MR. CHAKRAVARTY:  We could move on.

15    BY MR. CHAKRAVARTY:

16    Q.   The flag on the wall that I showed you earlier, was that

17    on the wall to the right?

18    A.   Yeah.

19         MR. CHAKRAVARTY:  Okay.  Can we go to that exhibit,

01:23 20   1201?

21    Q.   So is this flag facing the bed?

22    A.   Yes.

23    Q.   How long -- did you leave that morning?

24    A.   The next morning, yes.

25    Q.   Is that the only time you spent the night at the
```

 1   defendant's house?

 2   A.   Yes.

 3   Q.   Has he come to your home?

 4   A.   Yes, he'd come to my home before.

 5   Q.   Where is your home?

 6   A.   My mother has an apartment in Cambridge near the Charles

 7   River.

 8   Q.   Is that off of Memorial Drive?

 9   A.   Yes.

01:24 10          MR. CHAKRAVARTY:  I'd ask to show Exhibit 742.  This

11   is in evidence, your Honor.

12          THE COURT:  This is in evidence?

13          MR. CHAKRAVARTY:  It is in evidence.

14   BY MR. CHAKRAVARTY:

15   Q.   Do you recognize this intersection?

16   A.   Yes, I do.

17   Q.   And does it show where your mother lives?

18   A.   Yes, it does.

19   Q.   Can you just circle that area?

01:24 20   A.   (Witness complies.)

21   Q.   All right.  So you just --

22   A.   Sorry.

23   Q.   That's all right.  So let me just orient you a little bit.

24   Are there two gas stations in that intersection?

25   A.   Yes.

1  Q.   And there's a Shell Gas Station and a Mobil Gas Station?

2  A.   Yes.

3  Q.   And next to the Mobil Gas Station where you just circled,

4  is there an apartment tower?

5  A.   Yes.

6  Q.   Okay.  And is that where you grew up?

7  A.   Yes.

8  Q.   One of the places you grew up?

9  A.   Yes.

01:25 10  Q.   How much would the defendant visit you there?

11  A.   During high school, a lot.

12  Q.   What's "a lot" mean?

13  A.   A few times a week.

14        MR. CHAKRAVARTY:  Exhibit 743.

15  Q.   Is this the Shell Gas Station from across the street?

16  A.   Yes, it is.

17  Q.   How often would you go there?

18  A.   Every day.

19  Q.   Would you go there with the defendant?

01:25 20  A.   Multiple times I've gone there with the defendant, yes.

21  Q.   Why would you go there with the defendant?

22  A.   Cop snacks, water, Gatorade, blunts to roll marijuana in.

23  Q.   It sounds like you hung out with the defendant a fair

24  amount up through high school?

25  A.   Yes.

```
 1   Q.   And then even afterwards, in college.  Is that right?
 2   A.   Yes.
 3   Q.   Did you ever know him to wear a knit hat, like in the
 4   winter?
 5   A.   Yes.
 6   Q.   I show you Exhibit 820.
 7             MR. CHAKRAVARTY:  Just for the witness, your Honor.
 8   Q.   Do you recognize that?
 9   A.   Yes.
01:26 10  Q.   What do you recognize it to be?
11   A.   The defendant's Boston Red Sox winter hat.
12   Q.   And you had seen him wearing this?
13   A.   Yes.
14             MR. CHAKRAVARTY:  I'd move into evidence Exhibit 820.
15             MS. CONRAD:  No objection.
16             THE COURT:  All right.
17             (Government Exhibit No. 820 received into evidence.)
18             MR. CHAKRAVARTY:  Exhibit 1341 just for the witness.
19   I'm not sure whether this is in.  Strike that.  1349.
01:26 20             Go back to 1341, please.
21   BY MR. CHAKRAVARTY:
22   Q.   Do you recognize this picture?
23   A.   Yes.
24   Q.   What do you recognize it to be?
25   A.   The defendant in his bedroom, it seems.
```

```
 1   Q.   And how do you know that it's the defendant in his
 2   bedroom?
 3   A.   The flag on the wall.
 4   Q.   The same flag you just were talking about a little while
 5   ago?
 6   A.   Yes.
 7   Q.   Do you recognize the chair?
 8   A.   Yes.
 9   Q.   Do you recognize the computer table?
10   A.   Yes.
11   Q.   And was this in substantially the same condition of his
12   room when you were there?
13   A.   Yes.
14        MR. CHAKRAVARTY:  I'd move into evidence Exhibit 1341.
15        MS. CONRAD:  No objection to the photograph, your
16   Honor, but I can't even see what the writing is, and I don't
17   think there's any foundation on that.
18        MR. CHAKRAVARTY:  We can redact that at this point,
19   and it will --
20        MS. CONRAD:  You should redact it before it's
21   published, then.
22        THE COURT:  Well, it's illegible.
23        MS. CONRAD:  My eyes are pretty bad.  The jury's
24   vision might be a little better than mine.
25        THE COURT:  I think we can --
```

```
 1              MR. CHAKRAVARTY:  I can zoom in, your Honor.

 2              THE COURT:  That's a better...

 3              All right.  And the rest will be redacted.

 4              MR. CHAKRAVARTY:  Yes, your Honor.

 5              THE COURT:  Okay.

 6              MR. CHAKRAVARTY:  Or another witness will lay the

 7    foundation.

 8              THE COURT:  All right.  Fine.

 9              (Government Exhibit No. 1341 received into evidence.)

01:28 10   BY MR. CHAKRAVARTY:

11    Q.   Did you ever go to the apartment of Dias Kadyrbayev?

12    A.   Yes, one time.

13    Q.   Where was that?

14    A.   New Bedford, Massachusetts.

15    Q.   And who did he live with?

16    A.   He lived with Aza and a couple of other Kazakhstans.

17    Q.   Who is Aza?

18    A.   Azamat -- I don't know how to pronounce his last name.

19    He's a friend of the defendant's.

01:28 20   Q.   Is it Tazhayakov?

21    A.   Yes.

22    Q.   And were they students at UMass Dartmouth?

23    A.   Yes.

24    Q.   How often would you go there?

25    A.   Repeat that?
```

```
 1  Q.   How often would you go to their apartment?
 2  A.   I just went to their apartment one time.
 3  Q.   When was that?
 4  A.   Sometime the spring of 2013.
 5  Q.   And who else was there when you got there?
 6  A.   Me and the defendant, Aza, Dias, a couple of Kazakhstans
 7  that I don't know the names of, a girl named Pamela, and
 8  another black student.  I don't remember his name.
 9  Q.   I'm going to show you a photograph.
10        MR. CHAKRAVARTY:  1178 just for the witness, your
11  Honor.
12  Q.   Do you recognize these people?
13  A.   Yes.
14  Q.   Who do you recognize them to be?
15  A.   I recognize Aza, Dias and the defendant.
16  Q.   Do you know the two people at the ends?
17  A.   I don't.  I don't remember them.
18  Q.   Do you know when this photograph was taken?
19  A.   I believe in November.
20  Q.   Were you present?
21  A.   No.
22  Q.   But you've seen this photograph before?
23  A.   Yes.
24  Q.   All right.  And does it fairly and accurately depict the
25  defendant, Aza and Dias?
```

```
 1   A.   Yes.
 2              MR. CHAKRAVARTY:  I'd move into evidence 1178.
 3              MS. CONRAD:  No objection.
 4              (Government Exhibit No. 1178 received into evidence.)
 5              MR. CHAKRAVARTY:  Thank you, your Honor.
 6   BY MR. CHAKRAVARTY:
 7   Q.   For the jury, can you just circle Aza and Dias again?
 8   A.   This is Aza, Dias.
 9   Q.   Do you know how often the defendant would go to New York?
01:30 10   A.   No, I do not.  I know he went there a few times.
11   Q.   Did you ever go with him?
12   A.   No.
13   Q.   Do you know whether he went with his Kazakh friends aside
14   from this occasion?
15              MS. CONRAD:  Object, your Honor.  Foundation.
16              MR. CHAKRAVARTY:  I'll ask another question, your
17   Honor.
18   BY MR. CHAKRAVARTY:
19   Q.   Do you know whether he went in February of 2013?
01:30 20   A.   No, I do not.
21   Q.   When's the last time you saw the defendant?
22   A.   About a day or two after my 20th birthday.
23   Q.   When was that?
24   A.   April 2013.
25   Q.   Was it early April?
```

```
 1    A.    Yes.
 2    Q.    And where did you see him?
 3    A.    I met with him inside the parking lot of my mother's
 4    apartment complex.
 5              MR. CHAKRAVARTY:  Go to Exhibit 743, please.
 6              I think this is in evidence, your Honor.
 7              I'm sorry.  744.
 8              Your Honor, I believe this is in evidence.  I don't
 9    know if it's been published.
10              THE COURT:  It is.
11              MR. CHAKRAVARTY:  Thank you.
12    BY MR. CHAKRAVARTY:
13    Q.    So do you recognize this intersection?
14    A.    Yes, I do.
15    Q.    Is this the intersection where the Shell Gas Station is on
16    one side and the Mobil Gas Station is on the other?
17    A.    Yes, it is.
18    Q.    And where on this picture is your mother's apartment?
19    A.    (Witness indicates.)
20    Q.    That building?  And that's a tower?
21              And where is the parking lot in which you met the
22    defendant?
23    A.    (Witness indicates.)
24    Q.    Okay.  You've circled what appears to be a parking
25    structure.  That's the second main building on the right?
```

1    A.   Yes.

2    Q.   Why were you meeting with the defendant after your

3    birthday?

4    A.   He was meeting with me to purchase some marijuana.

5    Q.   And was he with anyone?

6    A.   Yes.

7    Q.   Who?

8    A.   Dias.

9    Q.   What happened when you guys met?

01:32 10   A.   He was in -- I believe that day he was in Dias's BMW.  I

11   went downstairs, I met up with him inside the car.  I was with

12   my twin brother, Steven.

13        I got in the car.  The defendant was driving, Dias was in

14   the passenger seat.  We had talked very shortly.  The defendant

15   handed me some money, and then I left the car to go grab the

16   marijuana.

17   Q.   And you went to somebody else's car to do that?

18   A.   Yes.

19   Q.   Did you get the marijuana?

01:33 20   A.   Yes.

21   Q.   Did you come back?

22   A.   Yes.

23   Q.   What happened?

24   A.   Can you repeat that?

25   Q.   What happened when you got back?

```
 1    A.    When I got back I put the marijuana in the -- Dias' car's
 2    trunk, and then I talked to the defendant very shortly.
 3    He -- I don't know.  He wasn't really talking to me much.  I
 4    was trying to get into a deeper conversation with him but he
 5    said he was in a rush.  And I asked him about the gun and he
 6    gave me another excuse on why he couldn't -- why he didn't
 7    bring it that day.
 8          And then I remember Dias saying, "Oh, we're in a rush,
 9    we're in a rush."  So I only talked to him for a little bit,
10    told the defendant, you know, I loved him, and then I got out
11    of the car.
12    Q.    Did he say specifically why he didn't bring the gun?
13    A.    He just came up with an excuse, said he was in a rush, he
14    had to -- he was driving fast, he didn't want to be speeding.
15    Q.    Do you believe that?  Did you believe that was the reason?
16    A.    I just took it as another excuse, so I don't know.
17    Q.    Did you continue to communicate with him into the weekend
18    before the marathon?
19    A.    Yes.
20    Q.    How?
21    A.    The defendant's cell phone had been turned off so I
22    reached out to him on Twitter.
23    Q.    So you communicated with him through Twitter?
24    A.    Social media.
25    Q.    And where were you during the 2013 marathon?
```

```
 1    A.    I was at my friend's grandmother's house.

 2    Q.    Had you ever spoken with the defendant before about the

 3    marathon?

 4    A.    Yes.

 5    Q.    When?

 6    A.    Sometime before the marathon.  I know that the defendant

 7    and my brother went to the marathon in 2012, I believe.

 8    Q.    Do you remember what conversation you had with the

 9    defendant about it?

10    A.    No, I don't remember the conversation in the detail.  No.

11    Q.    When did you first see pictures of the defendant after the

12    2013 marathon?

13    A.    That Thursday night, April 18th, I believe.

14    Q.    Do you remember what photos they were?

15    A.    Yeah.  They were photos of him at the Shell Gas Station.

16          MR. CHAKRAVARTY:  Ask to pull up Exhibit 750.

17    Q.    Do you recognize --

18          MR. CHAKRAVARTY:  I think this is in evidence, your

19    Honor.

20    Q.    Do you recognize this photo with the exception of the

21    circle?

22    A.    Yes.

23    Q.    And who do you recognize in the photo?

24    A.    The defendant.

25    Q.    Now, the person who's circled, did you ever meet that
```

1   person before?

2   A.    No, I have not.

3   Q.    Did you ever speak with that person before?

4   A.    No, I have not.

5   Q.    The sweatshirt that the defendant is wearing, had you seen

6   him wearing that sweatshirt before?

7   A.    Yes, I have.

8         MR. CHAKRAVARTY:   Go to Exhibit 751.   Sorry.

9   Q.    Is that the Mobil station?

01:36 10   A.    Yes.

11        MR. CHAKRAVARTY:   749, please.

12  Q.    And again, is this -- I'm circling this person.   Is that

13  the defendant?

14  A.    Yes.

15  Q.    Do you see what he's carrying?

16  A.    It looks like Red Bull.

17  Q.    Red Bull the energy drink?

18  A.    Yes.

19  Q.    What was your reaction after you saw him on TV?

01:36 20   A.    I was in a state of huge shock, disbelief, paranoia.

21  Q.    What did you do?

22  A.    I did nothing.   I just disposed of my phone.   I was pretty

23  shocked.   I didn't really want to talk to people.   I didn't

24  really want to go outside.   I stopped selling.

25  Q.    So you described getting rid of your phone and stopped

1   selling.  Do you mean stopped selling drugs?

2   A.    Yes.

3   Q.    Marijuana?

4   A.    Yes.

5   Q.    At some point later in 2013 did you start selling again?

6   A.    Yes.

7   Q.    When?

8   A.    About the fall 2013.

9   Q.    And what kinds of drugs did you sell at that point?

01:37 10   A.    I started selling some cocaine, some Molly, prescription

11   pills.

12   Q.    Why did you expand your repertoire?

13   A.    That's just what my clientele had been asking for, so I

14   had to accommodate my clientele.

15   Q.    You said cocaine?

16   A.    Yes.

17   Q.    Molly.  What is Molly?

18   A.    A form of Ecstasy.

19   Q.    Ecstasy is the street name of MDMA?

01:37 20   A.    Yes.

21   Q.    And prescription pills you said as well?

22   A.    Yes.

23   Q.    And did something happen to you in November of 2013?

24   A.    Yes.  I was arrested at JFK UMass train station.

25   Q.    For what?

| | | |
|---|---|---|
| 1 | A. | For possession of marijuana with intent to distribute. |
| 2 | Q. | What's the status of that case? |
| 3 | A. | Pending. |
| 4 | Q. | Did you post bond in that case? |
| 5 | A. | Yes, I did. |
| 6 | Q. | After you got out, did you continue to sell? |
| 7 | A. | Yes, I did. |
| 8 | Q. | What kinds of stuff? |
| 9 | A. | Same.  Weed.  Same other drugs I was selling. |
| 01:38 10 | Q. | In 2014, just last year, did you sell heroin? |
| 11 | A. | Yes, I did. |
| 12 | Q. | To whom? |
| 13 | A. | A confidential informant. |
| 14 | Q. | When you say "confidential informant," what do you mean? |
| 15 | A. | A person who was working with the government. |
| 16 | Q. | And how many times did you sell drugs to that person? |
| 17 | A. | About eight to ten times. |
| 18 | Q. | Of heroin? |
| 19 | A. | Yes. |
| 01:38 20 | Q. | Do you know about how much heroin you sold him? |
| 21 | A. | I don't know, about two, three hundred grams. |
| 22 | Q. | Do you know how much money that was worth? |
| 23 | A. | Not exactly, but it was worth thousands of dollars. |
| 24 | Q. | After selling that person the heroin over that period of |
| 25 | | time, did you get arrested? |

```
 1   A.   Yes, I did.

 2   Q.   What were you charged with?

 3   A.   Conspiracy to distribute heroin and gun possession.

 4   Q.   And is it the same gun that's up on the table?

 5   A.   Yes, it is.

 6   Q.   Now, as part of your plea agreement, does it spell out

 7   what the maximum sentences are and the minimum sentences are in

 8   your case?

 9   A.   Yes.

10   Q.   What is your understanding of what the maximum sentence is

11   in your case?

12   A.   Twenty years max for each count, and I believe it's about

13   eight counts, so 160 years, somewhere around there.

14   Q.   And that's a statutory maximum?

15   A.   Yes.

16   Q.   Are you familiar with the sentencing guidelines?

17   A.   Yes.

18   Q.   And what are those?

19   A.   Sentencing guidelines are the guidelines, depending on how

20   much points you have of criminal history is what the judge

21   usually goes when he's deciding sentencing.

22   Q.   And what is your idea of how much time you're looking at

23   under the sentencing guidelines?

24   A.   Between five and seven years.

25   Q.   And is there a minimum mandatory sentence for you?
```

01:39 (line 10)
01:40 (line 20)

```
 1    A.    Yes.

 2    Q.    And what is that?

 3    A.    Five years.

 4    Q.    How can you get out from that five-year sentence?

 5    A.    By cooperating with the government.

 6    Q.    After you were arrested did the government show you video

 7    recordings of those transactions you made with the confidential

 8    informant?

 9    A.    Yes, they did.

01:40 10    Q.    Did you tell that person about the gun that you had given

11    to the defendant?

12    A.    Yes.

13    Q.    Why?

14    A.    I was just being stupid, trying to show off.

15    Q.    After you were arrested, did you, in fact, cooperate?

16    A.    Yes.

17    Q.    And have you told the government about your drug-dealing

18    activities?

19    A.    Yes, I have.

01:41 20    Q.    Did you tell the government about some of your suppliers?

21    A.    Yes.

22    Q.    Did you tell the government about who you got the gun

23    from?

24              MS. CONRAD:  Objection.  Leading.

25              THE COURT:  Overruled.
```

BY MR. CHAKRAVARTY:

Q.    Did you tell the government about who you got the gun
from?

A.    Yes.

Q.    Are there any promises that you've received as a result of
your testimony here today?

A.    I've received no promises, I've just been told if I
cooperate, give truthful testimony, the government will file a
5K1 motion.

Q.    Now, with the confidential informant, did you also propose
an additional business transaction?

A.    Yes.

Q.    What was that?

A.    I discussed the possibility of whacking somebody, harming
somebody.

Q.    When you say "whacking somebody," what did you mean?

A.    Getting someone potentially hurt or shot.

Q.    And why?

A.    At the time I was -- I had been robbed by a former friend.
I was very angry.  I was saying things out of anger.

Q.    And did you propose to actually pay to have the informant
do that?

A.    Yes.

            MR. CHAKRAVARTY:  Excuse me.

            (Counsel confer off the record.)

1          MR. CHAKRAVARTY:  Your Honor, it is 11:10.  I don't

2     have much more, but I probably have at least five minutes.  I

3     mean, there may be more, but at least that much.

4          THE COURT:  All right, we'll take the morning recess

5     at this point.

6          THE CLERK:  All rise for the Court and the jury.  The

7     Court will take the morning recess.

8          (The Court and jury exit the courtroom and there is a

9     recess in the proceedings at 11:12 a.m.)

01:42 10  (The Court and the jury entered the courtroom at 11:44 a.m.)

11    Q.    Just a few more questions, Mr. Silva, if you'd please just

12    keep your voice up.

13          Mr. Silva, when we broke, I was asking you about your

14    conversation with what you called informant about hurting

15    somebody.  Have you had conversations with other people about

16    potentially hurting somebody?

17    A.    No, not really.

18    Q.    With regards to this -- the conversation you had with the

19    informant, did you follow through?

02:14 20  A.    Of course not.

21    Q.    Did you pay him any money to do anything?

22    A.    I did not.

23    Q.    After you were arrested, did you have conversations with

24    some friends about what should happen to the person who

25    introduced you to this informant?

1    A.    Yes.

2    Q.    What did you say?

3    A.    I said -- I remember saying someone should smack her, spit

4    in her face, something along these lines.

5    Q.    Did you say anything about the prosecutor who was

6    prosecuting you?

7    A.    Yes.

8    Q.    What did you say?

9    A.    I said, He's not -- at the time I said, He's an asshole.

02:14 10    Someone should spit in his face.

11    Q.    Why did you say these things about those people?

12    A.    I was just very angry at the time.  When you're angry, you

13    say stupid things.

14    Q.    Have you ever seen the defendant get angry?

15    A.    Not much but a couple times.

16    Q.    What were those times?

17    A.    Times where -- I used to joke around with the defendant,

18    call him a Russian refugee.  That kind of ticked him off

19    because he's very proud of his Chechen nationality.

02:15 20    Q.    What was his reaction?

21    A.    He'd get upset.  He'd get angry, tell me shut up.  I'm not

22    Russian.

23    Q.    Did he ever call you any names?

24    A.    Yeah, a couple times.

25    Q.    What kind of names would he call you?

```
 1              MS. CONRAD:  Objection.

 2              THE COURT:  Overruled.

 3    Q.   What kind of names did he call you?

 4    A.   This one time he called me a kafir.

 5    Q.   Kafir.  What is a kafir to you?

 6    A.   I believe it's -- it means, like, nonbeliever, something

 7    along those lines, like, infidel, something along those lines.

 8    Q.   Were there any other occasions that you can remember?

 9    A.   Besides a joking manner, no.

02:16 10  Q.   Last time you saw the defendant before today was back in

11    April of 2013?

12    A.   Yes, it was.

13    Q.   Was it a couple weeks before the Marathon?

14    A.   Yes, it was.

15              MR. CHAKRAVARTY:  That's all I have, your Honor.

16    CROSS-EXAMINATION BY MS. CONRAD:

17    Q.   Good morning, Mr. Silva.

18    A.   Good morning.

19    Q.   My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's --

02:17 20  Jahar's lawyers.

21         Mr. Chakravarty just asked you something where you said

22    that one time Jahar called you a kafir?

23    A.   Yes.

24    Q.   When was that?

25    A.   This was a long time ago, sometime in January, 2013.
```

1    Q.   Now -- but you -- he never talked to you about religion,

2    did he?

3    A.   We talked about religion a few times, not much.

4    Q.   Didn't you tell the government, when you first spoke to

5    them, that he didn't really talk much about religion?

6    A.   Yes, I did.

7    Q.   And that was true, right?

8    A.   We'd talk about religion, not in depth, not all the time,

9    no.

02:17 10   Q.   You also told the *Rolling Stone* that he never talked about

11   religion?

12   A.   Yes.

13   Q.   You were interviewed by *Rolling Stone Magazine*, right?

14   A.   Yes.

15   Q.   And but you used a different name, right?

16   A.   Yes.

17   Q.   That name is Sam?

18   A.   Yes.

19   Q.   Mr. Chakravarty asked you how you reacted to news of the

02:18 20   -- of seeing pictures of Jahar after the Boston Marathon

21   bombing.  You said you were shocked, right?

22   A.   Yes, I was.

23   Q.   You were shocked because you had not seen anything in

24   Jahar that would make you believe that he could or would do

25   something like that, right?

```
 1   A.   At the time, yes.
 2   Q.   And you even posted on your Facebook pages that it must
 3   have been his brother who got him into it?
 4        MR. CHAKRAVARTY:  Objection, your Honor.
 5        THE COURT:  Overruled.  You may answer it.
 6   A.   Can you -- I have --
 7   Q.   You can answer it.  Do you want me to ask the question
 8   again?
 9   A.   Can you ask the question again?
10   Q.   Yeah, sure.  You even said at the time that it must have
11   been his brother who got him into it?
12   A.   At the time, that's what I felt, yes.
13   Q.   And you were interviewed by the FBI on April 20, 2013,
14   right?
15   A.   Yes, I was.
16   Q.   Right after this happened?
17   A.   Yes, I was.
18   Q.   And you told them that at the time, right?
19        MR. CHAKRAVARTY:  Objection, your Honor.
20        THE COURT:  No.  Overruled.
21   A.   Yes.  That's what I told them at the time.
22   Q.   And during -- in fact, what you told them was that you
23   felt 150 percent that Tamerlan influenced Jahar to do the
24   bombing?
25        MR. CHAKRAVARTY:  Objection, your Honor.
```

```
 1              THE COURT:  Sustained to that.
 2    Q.   You also told them -- well, strike that.
 3         And you thought that it must have been Tamerlan who built
 4    the bombs, right?
 5              MR. CHAKRAVARTY:  Objection, your Honor.
 6              THE COURT:  Sustained.
 7    Q.   Now, you were friends with Jahar since eighth grade,
 8    right?
 9    A.   Yes.
10    Q.   Close friends?
11    A.   Yes, very close friends.
12    Q.   Spent almost every day together?
13    A.   Yes.
14    Q.   And he was even -- in fact, I think you said on direct
15    that he was one of your closest friends?
16    A.   I considered him a best friend.
17    Q.   And he was well-liked, right?
18    A.   Yes, he was.
19    Q.   Popular?
20    A.   Yes, he was.
21    Q.   And one of the realest and coolest kids that you knew?
22    A.   Yes, that's what I felt.
23    Q.   And you felt that way still even after you started
24    cooperating, as you put it, with the prosecution in this case,
25    right?
```

```
 1    A.   Yes.
 2    Q.   In fact, you told them on October 28th that he was one of
 3    the realest and coolest kids you'd ever met?
 4    A.   Yes.
 5    Q.   And he wasn't violent, right?
 6    A.   No.  I've never seen him violent.
 7    Q.   And he never picked on anybody?
 8    A.   No.
 9    Q.   He was kindhearted?
02:20 10    A.   Yes, he was.
11    Q.   And he -- even though he was -- he had training as a boxer
12    and as a wrestler, you never saw him fight with anybody?
13    A.   No, I did not.
14    Q.   And he was humble?
15    A.   Yes, he was.
16    Q.   And the only examples you could come up with -- or example
17    you could come up with of him getting annoyed or angry was when
18    someone referred to him as a Russian refugee, right?
19    A.   Yes.
02:21 20    Q.   That was because he was proud of his culture, right?
21    A.   Yes.
22    Q.   But you never heard him say anything that showed that he
23    had any resentment to the United States of America, did you?
24    A.   No.
25    Q.   In fact, even in November of 2012, he posted on his
```

```
 1    Twitter page about celebrating Obama being reelected?
 2              MR. CHAKRAVARTY:  Objection, your Honor.
 3    A.   Yes.
 4              THE COURT:  Sustained.
 5    Q.   Well, you were on his Twitter page, right?
 6    A.   Yes.
 7    Q.   You communicated with him through his Twitter page?
 8    A.   Sometimes, yes.
 9    Q.   In fact, he posted birthday greetings to you and your twin
10    brother on your birthday?  Was that April 1 of 2013?
11    A.   Yes.
12    Q.   He said, "Happy 20th to the twins"?
13    A.   Yes.
14    Q.   Do you remember that?
15    A.   I do.
16    Q.   And do you remember him posting about Obama being
17    reelected?
18              MR. CHAKRAVARTY:  Objection, your Honor.
19              THE COURT:  Sustained.
20    Q.   And you talked a little bit about how you and he smoked
21    weed together, right?
22    A.   Yeah.
23    Q.   And that was one of the things that you did together,
24    right?
25    A.   Yup.
```

```
 1   Q.   But there were other things you did together, too, right?
 2   A.   Yes.
 3   Q.   For example, you said you went up to Swampscott and jumped
 4   off cliffs?
 5   A.   Yes.
 6   Q.   Was that, like, a swimming hole or something?
 7   A.   A lake, reservoir.
 8   Q.   And you played basketball?
 9   A.   Yes.
10   Q.   And you went to the pool?
11   A.   Yes.
12   Q.   Chased girls?
13   A.   Yes.
14   Q.   And sort of typical teenage things, right?
15   A.   Yeah.
16   Q.   In fact, it was you who introduced him to smoking
17   marijuana, right?
18   A.   I guess you could say that, but I don't think I smoked
19   with him his first time.
20   Q.   You didn't tell the government that you used peer pressure
21   to get him to try marijuana?
22        MR. CHAKRAVARTY:  Objection to the relevance of this,
23   marijuana smoking.
24        THE COURT:  Overruled.
25   A.   I can't recall.
```

```
 1              MS. CONRAD:  One moment.
 2   Q.   So you knew he was easy to influence, right?
 3              MR. CHAKRAVARTY:  Objection, your Honor.
 4              THE COURT:  Sustained.
 5              MS. CONRAD:  Well, I'll move on since I can't find it
 6   at the moment.
 7   Q.   Didn't you post on your Facebook page on April 24th that
 8   you knew how easy it was to corrupt him?
 9              MR. CHAKRAVARTY:  Objection, your Honor.  It's being
10   offered for the truth.
11              THE COURT:  Sustained.
12              MS. CONRAD:  It's impeachment.
13              THE COURT:  Sustained.
14   Q.   Did you think that he was someone who could be easily
15   corrupted?
16              MR. CHAKRAVARTY:  Objection, your Honor.
17              THE COURT:  Sustained.
18   Q.   Now, you were really good friends with him, but I think
19   you said it was summer -- no, I'm sorry.  When was it that you
20   went to his apartment?
21   A.   Summer of 2012, I believe.
22   Q.   That was between freshman and sophomore years of college?
23   A.   Yes.
24   Q.   And you had been friends with him at that point for,
25   what?, six, seven years, at least, eighth grade?
```

1    A.    Yeah, give or take.

2    Q.    Okay.  And in all that time you both lived in Cambridge,

3    right?

4    A.    Yes.

5    Q.    Saw each other almost every day?

6    A.    Yes.

7    Q.    And you had never been to his apartment?

8    A.    I can't remember going to his apartment besides that one

9    time.

02:25 10    Q.    He came to your apartment a lot, right?

11    A.    Yeah.

12    Q.    But did you ever ask him about that?

13    A.    Not really, no.

14    Q.    Did you ever wonder why he didn't want you to come to his

15    apartment?

16          MR. CHAKRAVARTY:  Objection, your Honor.

17          THE COURT:  Sustained.

18    Q.    Did he -- you said you never met his brother Tamerlan,

19    right?

02:25 20    A.    No, I never met his brother.

21    Q.    And did he tell you, You don't want to meet my brother?

22          MR. CHAKRAVARTY:  Objection, your Honor.

23          THE COURT:  Overruled.  You may answer that.

24    A.    Yes, he did.

25    Q.    What did you think that meant?

```
 1              MR. CHAKRAVARTY:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3     Q.   Did you ask him what that meant?

 4              MR. CHAKRAVARTY:  Objection, your Honor.

 5              THE COURT:  No.  You may answer that.

 6     A.   Can you repeat the question?

 7              MS. CONRAD:  If I could remember it, I could.

 8     Q.   Did you ask him what he meant by that?

 9     A.   Yes, I did.

10     Q.   What did he say?

11              MR. CHAKRAVARTY:  Objection, your Honor.

12              THE COURT:  Overruled.

13     A.   From my perspective and options from the conversation, he

14     said his brother was very strict.  He was very opinionated and

15     that since I wasn't a Muslim, you know, he might give me a

16     little shit for that.

17     Q.   Do you remember when that conversation was, or was it on

18     more than one occasion?

19     A.   I remember on more than one occasion.

20     Q.   When was the last time?

21     A.   I can't recall.

22     Q.   Did there come a time in -- over Christmas of 2012 when he

23     complained that his brother was keeping him on a short leash?

24     A.   Yes.

25              MR. CHAKRAVARTY:  Objection, your Honor.
```

```
 1          THE COURT:  Sustained.  I'll strike the answer.
 2  Q.   Did you ever observe, when you were out with him, how he
 3  would react if his brother would call him?
 4  A.   Yes.
 5  Q.   Tell us about that.
 6          MR. CHAKRAVARTY:  Objection, your Honor.
 7          THE COURT:  Sustained.
 8  Q.   Did he ever express concern about making sure his car
 9  didn't smell of weed because his brother would be angry?
10          MR. CHAKRAVARTY:  Objection, your Honor.
11          THE COURT:  Sustained.
12          MS. CONRAD:  State of mind, your Honor.
13  Q.   Were you aware of his brother's reputation?
14          MR. CHAKRAVARTY:  Objection, your Honor.
15          THE COURT:  Let me see you.
16  (SIDEBAR CONFERENCE AS FOLLOWS:
17          THE COURT:  That's as much as you're going to get.
18          MS. CONRAD:  Well, your Honor, I do think the
19  government went through his entire relationship with him, and I
20  think this is part of it, what he told him about his family.
21          THE COURT:  No.
22          MR. CHAKRAVARTY:  That's the whole point of doing
23  motions in limine so --
24          THE COURT:  Okay.  New topic.
25  .  .  .  END OF SIDEBAR CONFERENCE.)
```

02:27  (line 10)
02:28  (line 20)

1          MS. CONRAD:  Your Honor, I just need a -- I'm getting

2   a little assistance here.  Let me go back to something for a

3   minute now that Mr. Watkins has assisted me.  If I could have

4   the presentation camera, please, just for the witness.

5   Q.   Okay.  Mr. Silva, if you would look at the screen in front

6   of you, if I could just draw your attention to the last

7   sentence on that page and just ask you to read it silently.

8   A.   From the top, at the beginning?

9   Q.   Right here next to my finger, where it starts out, "While

02:30 10   at Rindge."

11   A.   "While at Rindge" --

12   Q.   No, no, to yourself.

13   A.   (Witness complies).

14        Okay.

15   Q.   Looking at the top, that was an interview you gave on --

16          MR. CHAKRAVARTY:  Objection, your Honor.

17   Q.   -- on August 4th?

18          MR. CHAKRAVARTY:  First --

19          MS. CONRAD:  It's impeachment.

02:30 20          MR. CHAKRAVARTY:  It's -- it's not clear whether it's

21   a prior statement being used to refresh his recollection.

22          MS. CONRAD:  It's not being used to refresh -- it's

23   impeachment.  I'll ask the question I asked before again.

24   Q.   Did you use peer pressure on Mr. Tsarnaev to get him to

25   try marijuana?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.   I smoked weed with him.  I wouldn't say I used peer

4    pressure.

5    Q.   But that's what you told the prosecution --

6          MR. CHAKRAVARTY:  Objection, your Honor.

7          THE COURT:  Overruled.

8    Q.   That's what you told the prosecution on August 4th of last

9    year, right?

02:30 10   A.   That's what I said, but I stated it wrong.

11   Q.   You stated it wrong?

12   A.   Yeah.  I didn't mean peer pressure, and it's -- in

13   retrospect, if I -- like, as if I forced him to smoke weed.  I

14   didn't force him to smoke it.  We were smoking weed together,

15   and he chose to smoke with me.

16   Q.   Didn't you say, Hey, come on, try it?

17   A.   I can't -- I don't remember.

18   Q.   What did you mean when you said "peer pressure" to the

19   prosecution on August 4th?

02:31 20   A.   I don't -- back then, I don't think I used the correct

21   term.

22   Q.   So -- but you would agree with me that the report says

23   that "Silva and his friends" --

24          MR. CHAKRAVARTY:  Objection.

25          THE COURT:  Overruled.

1    Q.    -- "had to use peer pressure to get Tsarnaev to smoke

2    marijuana"?

3    A.    Yes.   That's what the report says.

4    Q.    Now, when Mr. Chakravarty showed you some photographs of

5    the apartment on Norfolk Street, there were some items in the

6    picture of his bedroom, right?

7    A.    Yes.

8    Q.    And that was the only time you had been there, right?

9    A.    The only time I remember, yes.

02:32 10   Q.    And at that time, Mr. Tsarnaev was a college student,

11   right?

12   A.    Yes.

13   Q.    So he was just home for Christmas break; is that when this

14   was?  Summer break?

15   A.    Yes.

16   Q.    And you don't know who used the items in that room when he

17   was gone, do you?

18   A.    No, I do not.

19   Q.    You don't know, for example, who else might have used that

02:33 20   computer?

21         MR. CHAKRAVARTY:  Objection, your Honor.  Asked and

22   answered.  He said he didn't know.

23         THE COURT:  No.  Go ahead.  You can have a little bit

24   of it.

25   Q.    You don't know who else would have used that computer,

        1    right?

        2    A.    No, I do not.

        3    Q.    You don't know who put the items that you saw in those

        4    pictures in that room, right?

        5    A.    No, I do not.

        6    Q.    Now, Mr. Chakravarty asked you some questions about the

        7    gun, the Ruger, right?

        8    A.    Yes.

        9    Q.    Now, let me make sure I've got the sequence of events

02:33  10    straight because I'm a little bit confused.

       11         So you got the gun, and you told -- you and Nick and your

       12    brother got the gun to protect your business, right?

       13    A.    Yes.

       14    Q.    And you told Jahar about the gun, right?

       15    A.    Yes.

       16    Q.    And then -- and that was what?, over the phone or over

       17    Twitter?

       18    A.    I can't recall.  It was either over the phone or in

       19    person.

02:34  20    Q.    When you told him about it -- I'm sorry.  The first time

       21    you talked to him about it in person, you showed him the gun,

       22    right?

       23    A.    I can't recall the exact situation.

       24    Q.    So you don't remember whether you showed him -- told him

       25    about the gun over the phone or something before you actually

1    showed it to him?

2    A.    Yes.  I don't remember.

3    Q.    But, at any rate, you showed it to him before he asked you

4    to borrow it, right?

5    A.    Yes.

6    Q.    So the -- and that conversation about borrowing it wasn't

7    until February, is that right?

8    A.    Sometime in January or February.

9    Q.    And you don't remember exactly, right?

02:34 10   A.    I don't remember the exact date, no.

11   Q.    And at the time he asked you for it, you had already told

12   him about the robbery that you and Nick Silva had done

13   together, right?

14   A.    Yes.

15   Q.    So -- and you had already described to him that robbery,

16   right?

17   A.    Yes.

18   Q.    And after you loaned Jahar the gun, you kept asking for

19   him to give it back, right?

02:35 20   A.    Yes, I did.

21   Q.    And he never did, right?

22   A.    No, he did not.

23   Q.    So when you're charged, for example, in your Indictment,

24   you're charged with possessing the gun before you gave it to

25   Jahar, right?

```
 1    A.   Yes.

 2    Q.   It's not like you got it back later and then were arrested

 3    with it, right?

 4    A.   You're right.

 5    Q.   And so when you kept asking him to give it back, you said

 6    he kept giving you excuses, right?

 7    A.   Yes.

 8    Q.   And you didn't believe those excuses, did you?

 9    A.   No.  I just felt like he was BS'ing me.

02:35 10    Q.   Did it ever occur to you that he didn't have the gun

11    anymore?

12              MR. CHAKRAVARTY:  Objection, your Honor.

13              THE COURT:  Sustained.

14    Q.   Did you ask him if he still had the gun?

15    A.   I did.

16    Q.   And what did he say?

17    A.   He told me he still had it.

18    Q.   Did you believe him?

19    A.   Yes, because he did not give it back to me, so where else

02:36 20    would it have been?

21    Q.   Well, what if he gave it to somebody else?

22              MR. CHAKRAVARTY:  Objection, your Honor.

23              THE COURT:  Sustained.

24    Q.   He wouldn't be able to give it back to you if he didn't

25    have it any longer, would he?
```

```
 1              MR. CHAKRAVARTY:  Objection, your Honor.
 2              THE COURT:  Sustained.
 3     Q.   Would you have loaned him the gun if he told you it was
 4     for his brother?
 5              MR. CHAKRAVARTY:  Objection, your Honor.
 6              THE COURT:  You may answer that.
 7     Q.   Would you have loaned him the gun if he told you it was
 8     for his brother?
 9     A.   No.
02:36 10  Q.   Now, this robbery that you told us about, you -- that you
11     did?
12     A.   Yes.
13     Q.   You didn't tell the Feds about that the first, second,
14     third or even fourth time that you sat down with them, did you?
15     A.   Initially, no, I did not.
16     Q.   In fact, what you told them was that you didn't believe in
17     sticking people up?
18     A.   Yes, I did.
19     Q.   And, in fact, you told them that you had never discussed a
02:37 20  robbery with anyone before Jahar asked to borrow the gun,
21     right?
22     A.   Yes.
23     Q.   And both of those were lies, right?
24     A.   Yes.
25     Q.   And you lied to them because you wanted to make yourself
```

1  look good?

2  A.   Yes.

3  Q.   And because you wanted to get your deal?

4  A.   No.

5  Q.   But you knew you were looking at a five-year minimum

6  mandatory sentence, right?

7  A.   Yes.

8  Q.   I think you made a reference -- Mr. Chakravarty asked you

9  something about a 5K1?

02:37 10  A.   Yes.

11  Q.   And a 5K1 is a motion that the prosecutor can file in your

12  case to get your sentence below the sentencing guidelines,

13  right?

14  A.   Yes.

15  Q.   And it could also get the sentence below a minimum

16  mandatory sentence, right?

17  A.   Yes.

18  Q.   And you know that the judge doesn't have to go with the

19  guidelines, but the judge has to go with a minimum mandatory,

02:38 20  right?

21  A.   Yes.

22  Q.   And until the prosecutor files that motion, the judge has

23  to give you five years?

24  A.   Yeah, something along those lines.

25  Q.   So when Mr. Chakravarty asked you, well, it's not -- who's

1   it up to what your sentence is and you said the judge, that's

2   not actually completely true, is it?

3          MR. CHAKRAVARTY:  Objection, your Honor.

4          THE COURT:  Overruled.  You may answer it.

5          MS. CONRAD:  I'm sorry?

6          THE COURT:  He may answer it.

7   A.   To my knowledge, it's only up to the judge.

8   Q.   It's only up to the judge if the prosecutor files the

9   motion, right?

02:38 10   A.   Yes.

11   Q.   Without that motion, you're getting five years, right?

12   A.   Yes.

13   Q.   And, in fact, you're hoping to get -- you're hoping to get

14   time served out of this case, aren't you?

15   A.   I'm hoping to get the best deal I can possibly get.

16   Q.   Your original sentencing date was for today, right?

17   A.   Yes, it was.

18   Q.   And it got moved, right?

19   A.   Yes, it has been.

02:39 20   Q.   Because you didn't want to get sentenced until after

21   you've had a chance to fill your end of the deal for the

22   government, right?

23   A.   Yes.

24   Q.   And they didn't want you to get sentenced until after you

25   testified in this case?

```
 1              MR. CHAKRAVARTY:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3    Q.   I just want to show you your plea agreement for a second.

 4              MS. CONRAD:  This is just -- actually, no.  It's in

 5    evidence so I guess the jury can see this, too.

 6    Q.   You recognize this as part of your plea agreement?

 7              MS. CONRAD:  Why is it not on?  Thank you.

 8    Q.   You recognize that language there, Part B, "substantial

 9    assistance motion"?

02:40 10  A.   Yes.

11              MS. CONRAD:  And I forget what exhibit number this is.

12    Maybe the government can assist me on that.

13              926.  Mr. Mellin is nodding yes.

14              MR. MELLIN:  Yes, it is.

15              MS. CONRAD:  Thank you very much.

16    Q.   Just drawing your attention down to that last paragraph,

17    "The determination whether defendant has provided substantial

18    assistance rests solely in the discretion of the U.S.

19    Attorney."  Did you read that part?

02:41 20  A.   Can you repeat that question?

21    Q.   Yeah.  I'm just asking you to read that sentence, the last

22    full paragraph on Page 9.  "The determination whether defendant

23    has provided substantial assistance rests solely in the

24    discretion of the U.S. Attorney."

25    A.   Yes, I read it.
```

1    Q.   And that means it's up to the prosecutor to decide whether

2    you get that 5K motion, right?

3    A.   Yes, it is up to the prosecutor.

4         MS. CONRAD:  May I have a moment, please?

5         I don't have anything further for you, Mr. Silva.

6    Thank you very much.

7         MR. CHAKRAVARTY:  A brief redirect, your Honor.

8         Can we call up that exhibit again, 926?  Can we go to

9    Page 10 -- 9, please?

02:42 10   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

11   Q.   Mr. Silva, this is the page of the agreement that Miss

12   Conrad showed you, is that right?

13   A.   Yes.

14        MR. CHAKRAVARTY:  Can we turn the page to Page 10?

15   Q.   All of this pertains to the conditions under which the

16   government will file this 5K motion, correct?

17   A.   Yes.

18   Q.   Let me go first to this provision marked D, letter

19   immunity.  Does this provision say, "In return for the

02:43 20   defendant's full and truthful cooperation, the U.S. Attorney

21   agrees not to use any information provided by the defendant

22   pursuant to this agreement or pursuant to the proffer letter

23   dated July 23, 2014, or any information directly or indirectly

24   derived therefrom against defendant in any criminal case except

25   in a prosecution for:  1), for perjury or obstruction of

```
  1  justice, or for making a false statement after the date of this
  2  agreement; or, 2), for an act of physical violence against the
  3  person of another or conspiracy to commit any such act of
  4  violence"?
  5  A.   Yes.
  6  Q.   And what do you understand that to mean?
  7  A.   That for -- whatever I say in my testimony won't be used
  8  against me unless it's an act of violence.
  9  Q.   And what about the first provision, what do you understand
 10  perjury and obstruction to justice mean?
 11  A.   Perjury means lying; obstruction of justice, hiding the
 12  truth.  That's what I understand that to mean.
 13  Q.   What do you understand happens to you if you lie or you
 14  obstruct justice?
 15  A.   I will not get my 5K1 motion.
 16  Q.   And what else does this particular provision regarding
 17  immunity mean?
 18  A.   It means I won't be subject to getting immunity.  I could
 19  get prosecuted.
 20  Q.   So you could both be prosecuted as well as -- for the lies
 21  as well as you wouldn't get the benefit of your 5K1 motion,
 22  right?
 23  A.   Yes.
 24       MR. CHAKRAVARTY:  Can we go to Page 11?
 25  Q.   What does this say?
```

```
 1   A.   Would you like me to read it?

 2   Q.   Can you read the title?

 3   A.   "Court not bound by agreement."

 4   Q.   What do you understand that to mean?

 5   A.   That the Court, if they don't -- if they -- they're not

 6   bound to go with the motion if they don't feel that -- they

 7   don't feel that I -- my testimony was truthful or not.

 8   Q.   The part that I'm highlighting here, does this say,

 9   "Within the minimum maximum sentence the defendant faces under

10   the applicable law, the sentence to be imposed is within the

11   sole discretion of the Court"?

12   A.   Yes.

13   Q.   So who do you understand controls your sentence?

14   A.   The Court.

15        MR. CHAKRAVARTY:  Go to Page 12, please.  And Page 13.

16   Q.   Does Paragraph 14 describe what happens if there's a

17   breach of the agreement?

18   A.   Yes.

19   Q.   And that includes whether the government breaches the

20   agreement or whether the defendant breaches the agreement,

21   right?

22   A.   Yes.

23   Q.   And what happens if you breach the agreement?

24   A.   Then I won't get the 5K1.

25   Q.   And you -- what could happen to you in terms of what you
```

1    have told the government?

2    A.    It can be used against me.

3    Q.    What is the agreement, to your understanding?

4    A.    The agreement, to my understanding, is, if I give a

5    truthful testimony, I stand my best chance at sentencing.

6              MR. CHAKRAVARTY:  Can we go to Page 2, please?  Sorry.

7    Page 3.  Page 4.

8    Q.    As we page through this plea agreement, does this

9    carefully lay out the details of what the agreement is with the

02:47 10   government?

11   A.    Yes.

12             MR. CHAKRAVARTY:  Page 5.

13   Q.    Is this where it says what the sentencing recommendation

14   might be?

15   A.    Yes.

16   Q.    Does it say it will be within the guidelines?

17   A.    Yes.

18   Q.    When Miss Conrad asked you some questions, something she

19   put up on the screen, was that something that you had written?

02:48 20   She asked you to read something that was put up on the screen

21   aside from the plea agreement.

22   A.    Yes.

23   Q.    Was the item that was put up on the screen something that

24   you wrote yourself?

25   A.    Yes.

1    Q.   What was it?

2    A.   It was the report.

3    Q.   Did you write the report?

4    A.   I didn't write the report, no.  It wasn't written by me.

5    Q.   So some agent wrote the report?

6    A.   Yes.

7    Q.   Had you seen that report before?

8    A.   Yes.

9    Q.   The statements that were being read to you, was that

02:48 10   refreshing your memory as to what you told the police?

11   A.   Yes.

12        MR. CHAKRAVARTY:  That's all I have, your Honor.

13        MS. CONRAD:  Some questions.

14   RECROSS-EXAMINATION BY MS. CONRAD:

15   Q.   Mr. Silva, so it's your understanding under your plea

16   agreement that if you do one of the things that's listed in

17   there and the government doesn't like it, they can cancel your

18   plea agreement, right?

19        MR. CHAKRAVARTY:  Objection, your Honor.

02:49 20        THE COURT:  Sustained.

21   Q.   It's your understanding of the plea agreement that, if you

22   lie or commit a crime, they won't file a 5K for you, right?

23   A.   Yes.

24   Q.   And that portion about sentence recommendation that Mr.

25   Chakravarty showed you, by the way, that says, "If the

1    government doesn't file a 5K motion, it will recommend a

2    sentence within the guidelines," right?

3    A.    Yes.

4    Q.    And you have, in fact, lied to them, right?

5    A.    Yes.

6    Q.    You lied to them about the robbery, right?

7    A.    Yes.

8    Q.    Oh, and by the way, you said that you saw the defendant's

9    sister-in-law when you were at the Norfolk Street apartment?

02:50  10            MR. CHAKRAVARTY:  Objection, your Honor.

11            THE COURT:  Sustained.  Scope.

12    Q.    And the plea agreement says very clearly that if you do

13    not -- well, strike that.

14            And you also -- since you've been down at the jail, you've

15    done a few things that are certainly illegal, right?

16            MR. CHAKRAVARTY:  Objection, your Honor.

17            THE COURT:  Sustained.

18            MS. CONRAD:  Well, it has to do with violating the

19    plea agreement, your Honor.

02:50  20    Q.    Well, okay.  Have you -- in fact, you have violated the

21    terms of the plea agreement?

22            MR. CHAKRAVARTY:  Objection.  Argumentative.

23            THE COURT:  Again, the objection is sustained.

24    Q.    Has the government informed you that it is going to cancel

25    your plea agreement?

1    A.    No.

2    Q.    Has the government told you that, because you've lied,

3    they're not interested in filing a 5K?

4           MR. CHAKRAVARTY:  Objection, your Honor.

5           THE COURT:  You may answer.

6    A.    No.

7    Q.    Has the government told you that, because you discussed

8    having friends use fake IDs to come visit you, they're

9    canceling the 5K?

02:51 10          MR. CHAKRAVARTY:  Objection, your Honor.

11          THE COURT:  Sustained.

12   Q.    Has the government told you that, because you have been

13   making homemade alcohol --

14          MR. CHAKRAVARTY:  Objection, your Honor.

15          THE COURT:  Sustained.

16   Q.    And your plea agreement says that, unless the government

17   files a motion, the judge has no choice but to give you five

18   years minimum?

19          MR. CHAKRAVARTY:  Objection.

02:51 20          THE COURT:  You may answer that.

21   Q.    Right?

22   A.    Yes.

23          MS. CONRAD:  I don't have anything further.  Thank

24   you, Mr. Silva.

25          THE COURT:  All right.  Mr. Silva, you're excused.

1           MS. PELLEGRINI:  United States calls Special Agent

2    Michael Nealon.

3           THE CLERK:  Sir, step up here, please.

4           MICHAEL NEALON, Sworn

5           THE CLERK:  Have a seat.  State your name.  Spell your

6    last name for the record.  Keep your voice up and speak into

7    the mic.

8           THE WITNESS:  Yes, sir.  Michael Nealon.  Last name is

9    N-e-a-l-o-n.

02:53 10   DIRECT EXAMINATION BY MS. PELLEGRINI:

11   Q.   Good afternoon, Agent Nealon.

12   A.   Ma'am.

13   Q.   Will you tell the jury by whom you're employed?

14   A.   I am a special agent with the Federal Bureau of

15   Investigation.  I've been employed in that capacity for about

16   seven and a half years.

17   Q.   And can you give us something of your educational

18   background and your professional background?

19   A.   I was a CPA so a certified professional accountant.  I

02:53 20   have a master's in business administration.  I have -- like I

21   said, I've been with the Bureau for seven and a half years in

22   our Pittsburgh division; and while in Pittsburgh, I've been on

23   the Evidence Response Team for about four years, roughly.

24   Q.   And the Evidence Response Team is sometimes also referred

25   to as ERT?

1    A.   Yes, ma'am.

2    Q.   And with respect to the training that you've received

3    specifically with respect to ERT, can you tell us about that?

4    A.   We all go through an 80-hour training initially.  After

5    that, we've got refreshers that we go to, and we have quarterly

6    training every year.

7    Q.   In your capacity as a special agent, how many crime scenes

8    have you responded to in -- over the course of the last seven

9    years?

02:54 10   A.   Multiple.  If I had to guess, maybe a dozen or so.

11   Q.   In that capacity, with respect to ERT, I understand that

12   there are certain roles particular people play when they're

13   assigned to a team, is that correct?

14   A.   Yes, ma'am.

15   Q.   What roles have you participated in?

16   A.   Over the years, most of them.  Some of the roles I've done

17   is helped with photography, photo log, searcher, seizing agent

18   of the evidence.  Yes, so multiple roles.

19   Q.   Agent Nealon, you indicated you're assigned to the

02:55 20   Philadelphia office, is that correct?

21   A.   Pittsburgh division.

22   Q.   I'm sorry.  Pittsburgh office?

23   A.   Yes, ma'am.

24   Q.   In April of 2013, did you have occasion to report to the

25   District of Massachusetts?

1    A.    Yes, ma'am.

2    Q.    And for what?

3    A.    We responded to the Boston bombing, and our team

4    particularly was assigned to the Franklin Street crime scene.

5    Q.    And with respect to the Franklin Street crime scene, what

6    was your role on ERT?

7    A.    My role was ultimately the seizing agent of the evidence;

8    once again, to help with the photo log and evidence recovery.

9    Q.    And in that capacity, did you have occasion to observe the

02:55 10    boat located in the backyard at 67 Franklin Street in

11    Watertown, Massachusetts?

12    A.    Yes, ma'am.

13    Q.    When did you first arrive on scene there?

14    A.    I believe it was the 20th.

15    Q.    And that would be the Friday of that week?

16    A.    I believe so.

17    Q.    Saturday?

18    A.    I'm not sure of the day.

19    Q.    Who did you respond to that scene with?  How many people?

02:56 20    A.    A number of people.  It was probably 20 or so.  It was our

21    entire team, and I believe we had some agents from the

22    Philadelphia division, too.

23         MS. PELLEGRINI:  May I have, please, Mr. Bruemmer,

24    Exhibit -- may I have Exhibit 802 already in evidence, please?

25    Q.    Agent Nealon, do you recognize the image on the screen in

1    front of you?

2    A.    Yes, ma'am.

3    Q.    What is that?

4    A.    That is the boat that was at 67 Franklin.

5    Q.    Were you part of the team that processed the evidence

6    found in the boat at 67 Franklin?

7    A.    Yes, ma'am.

8    Q.    I'd like to ask you a series of particular questions

9    relating to wooden slats within the boat.  Did you recall items

02:56 10   of that nature?

11   A.    Yes, ma'am.

12   Q.    Can you tell the jury what you recall?

13   A.    Once we made entry into the boat, it was noticed -- it was

14   identified that there was what appeared to be carvings on a

15   couple of the wooden rails along the -- which would be the

16   portside of the boat, close to the mid-port.  We also noticed

17   that there was what I would guess to be discharge from the fire

18   extinguisher.  So the carvings in the wood were highlighted by

19   this white powdery substance which inlaid itself in the

02:57 20   carvings.  Anyway, that's what we observed when we got in

21   there.

22        MS. PELLEGRINI:  May I have Exhibit 1450 already in

23   evidence up for all parties?

24   Q.    Agent Nealon, looking again at the image on the screen in

25   front of you, do you recognize that?

1    A.    Yes, ma'am.

2    Q.    And what is that?

3    A.    It is evidence item -- appears to be 2W-212, which would

4    be the two wooden slats that were eventually removed from the

5    boat.

6    Q.    Okay.  Agent Nealon, the touchscreen in front of you is

7    interactive.  If you press it with the pad of your finger, you

8    can place an arrow or you can draw a circle.  So the placard

9    that appears, 2W-212, can you point that out, please?

02:58 10    A.    (Indicating.)

11    Q.    Who would have placed that there?

12    A.    A member of the Evidence Response Team.

13    Q.    What is the purpose of the placard?

14    A.    When we initially go through the crime scene, we try and

15    identify evidence that we may or may not seize just so it's not

16    moved so that the photographer can photograph it in place.

17    Q.    Is that part of the ERT protocol to photograph in place

18    before any movement of the item?

19    A.    Yes.

02:58 20          MS. PELLEGRINI:  May I have 1451 up on the screen,

21    please, also in evidence?

22    Q.    Agent Nealon, do you recognize the image here?

23    A.    That is the two wooden slats from the previous photo that

24    we have removed and are in the process of packaging for

25    transport.

1   Q.   I'm sorry, Agent Nealon.  You were going to finish your

2   sentence.

3   A.   For transport.

4   Q.   In fact, these two slats were, in fact, removed from the

5   boat, is that correct?

6   A.   That is correct.

7   Q.   Were you present when they were removed?

8   A.   I don't recall if I was there.

9   Q.   Do you recall if you were present when they were packaged?

02:59 10   A.   Yes, ma'am.

11   Q.   Agent Nealon, I'm going to show you what's been marked for

12   identification as Government Exhibit 829.  Do you recognize

13   this item?

14   A.   Based on the description of the box, yes, that's the items

15   we discussed there.

16   Q.   All right.  And, in fact, does your name appear on that

17   box?

18   A.   Yes, ma'am.

19   Q.   Is this, in fact, the box that contains the slats that are

02:59 20   shown in the images on 1450 and 1451?

21   A.   Yes, ma'am.

22   Q.   I'd ask you to open up this box now.  You need scissors?

23   You need gloves?

24   A.   (Witness complies.)

25   Q.   Agent Nealon, before these items come out of the box, I'm

1    going to ask you to take a look at -- as best you can and let

2    us know if those are, in fact, the two items you removed from

3    the box -- I'm sorry, removed from the boat?

4    A.   Yes, ma'am.

5    Q.   Those, in fact, are the same?

6    A.   Yes, ma'am.

7         MS. PELLEGRINI:  Your Honor, the government would

8    offer Exhibit 829.

9         MR. WATKINS:  No objection.

03:01 10        THE COURT:  All right.

11   (Government Exhibit No. 829 received into evidence.)

12        MS. PELLEGRINI:  Your Honor, with the Court's

13   permission, may I stand here for a moment?

14        THE COURT:  Yes.

15   Q.   Agent Nealon, holding these up so that those in the

16   courtroom and the jury can see, can you tell us what we see

17   here?

18   A.   These are obviously the two slats that we removed from the

19   boat.  There's carvings here.  The white powdery substance is

03:01 20   all over, more so down the end there, but has filled in some of

21   the carvings.  We may have lost some of the powder in transport

22   but --

23   Q.   Is this, in fact, the same condition as at the time it was

24   removed from the boat?

25   A.   Yes, ma'am.

```
 1    Q.   Are you able to read the writing there?

 2    A.   I can give it a shot.  "Stop killing our innocent people

 3    and we will stop."

 4    Q.   When you said -- are there arrows on this?

 5    A.   Yeah.  It's a little difficult to follow because it starts

 6    up top, and there's arrows that kind of direct you to the next

 7    line here.  It kind of jumps around a little bit.

 8    Q.   Can you show us the arrows, please?

 9    A.   You've got arrows here, arrows there.  I think that's it.

10         MS. PELLEGRINI:  Your Honor, this is a little bit

11    difficult to see.  With the Court's permission, may I approach

12    the jury box?

13         THE COURT:  Yes, you may.

14    Q.   Agent Nealon, in looking at the slats in question, are you

15    able to tell how the writing is made on the slats?

16    A.   It appears to be carved in the wood.

17         MS. PELLEGRINI:  Thank you.  I have no further

18    questions for Agent Nealon.

19    CROSS-EXAMINATION BY MR. WATKINS:

20    Q.   Good afternoon, Agent Nealon.

21    A.   Sir.

22    Q.   You arrived from Pittsburgh on Friday?

23    A.   Here, today?

24    Q.   No.  On the -- on April 20th, you came in from Pittsburgh;

25    is that what you testified?
```

1   A.   I don't know the days.  I know the dates.  I think we

2   drove up the 19th possibly.

3   Q.   And there were already people on the scene on Franklin

4   Street, in the vicinity, is that correct?

5   A.   The day we took custody of the site, we took it from -- I

6   believe it was a New York ERT team.

7   Q.   Those are also FBI agents, right?

8   A.   Correct.

9   Q.   To your knowledge, they had had custody of the scene since

03:05 10   shortly after the incident happened, right?

11   A.   Yes, sir.

12   Q.   It wasn't just you.  It was really lots of Evidence

13   Recovery Team individuals down there, right?

14   A.   Yes, sir.

15   Q.   Not just the Pittsburgh team but other teams?

16   A.   We may have had some help from the Philadelphia and/or New

17   York team, yes.

18   Q.   You actually searched around the area, not just the boat

19   but the entire Franklin Street area?

03:05 20   A.   Yes, sir.

21   Q.   That search took six full days to complete, right?

22   A.   My recall is about a week, yeah.

23   Q.   Some of it every day -- not every day but a few days on

24   the boat, right, just itself?

25   A.   Certainly.

Q.   And there was also recovery of ballistic evidence from all
around the area?

A.   Yes, sir.

Q.   Showing you what's been admitted as the Government's
Exhibit 1455, I'm going to highlight this area that has been
previously described as the 67 Franklin Street area.  You
wouldn't know it from your -- you're from out of town, I
suppose?

A.   Yes, sir.  I'm not familiar with the area other than the
week I spent there.

Q.   But what you do see here are a number of houses close
together in that circle, that green circle?

A.   Sure.

Q.   And you located -- and you see the spot here that I'm
pointing to here?  I'll even put a -- do you know whether or
not that would be where the boat is on 67 Franklin?

A.   If that's the property that is representing 67 Franklin,
that would be the approximate location of the boat.

Q.   And you and other members of your team actually collected
ballistics from nearly every spot that is circled here, houses
two and three doors away, correct?

A.   There was other residents.  I couldn't say how many.  I
didn't go to every house.  But we did collect evidence from
several houses in the area.

Q.   You went to different yards of houses to collect bullets,

1    cartridges, casings?

2    A.    That is correct.

3    Q.    That was a lot of what the work was done in that Franklin

4    Street area, right?

5    A.    Yes, sir.

6    Q.    To do that, you used a tool called Total Station?  Are you

7    familiar with that?

8    A.    I know of it.  I don't use it.  But, yeah, I'm familiar.

9    Q.    But someone else on an Evidence Recovery Team would use

03:07 10    Total Station?

11    A.    There's generally two members of our team that are

12    assigned to use it.

13    Q.    Do you know whether that was done in this case?

14    A.    It was.

15    Q.    And, to your knowledge, why does one use a Total Station?

16         MS. PELLEGRINI:  Objection, your Honor.  Beyond the

17    scope of the direct.

18         MR. WATKINS:  I just have a couple questions.

19         THE COURT:  I'll allow it.  Go ahead.

03:07 20    Q.    Do you know why that is done?

21    A.    Why Total Station is used?  It is used as a tool to give

22    as close an exact replication of where certain items were

23    located.

24    Q.    Now, you personally took items out of the boat, seized

25    items from the boat?

1    A.   Yes, sir.

2    Q.   So how many hours did you spend inside of the boat and

3    around the boat?

4    A.   I couldn't be specific.

5    Q.   But it's certainly hours rather than minutes, correct?

6    A.   Yes, sir; yes, sir.

7    Q.   I want to show you a couple of exhibits that have been

8    admitted.  This is Defendant's Exhibit 3027.  Do you see it up

9    on the screen?

03:09 10    A.   No, sir.

11         MR. WATKINS:  I believe this has been admitted.

12    A.   Okay.  It's up there now.

13    Q.   In that, do you see red-brown stains?

14    A.   Yes.

15    Q.   Defendant's 3028, do you see red-brown stains?

16    A.   Yes, sir.

17    Q.   And as part of your duties in evidence collection or

18    someone on your team, would swabs have been made of those blood

19    stains?

03:09 20    A.   I don't think swabs were taken of those particular blood

21    stains.

22    Q.   But certainly there were people on your Evidence Response

23    Team who did take swabs of blood?

24    A.   There were swabs taken of different portions of the boat,

25    yes.

         1    Q.   Showing you an exhibit, 3029.  Was a swabbing taken of

         2    that?  First, do you recognize that red-brown stain as having

         3    been there?

         4    A.   I recognize it from the photos, yes.  And was a swab

         5    taken?  I don't know.

         6    Q.   You see the evidence placard there?

         7    A.   Yes, sir.

         8    Q.   Does that indicate "swab"?

         9    A.   Yes, it does.

03:10   10    Q.   Of course, nobody else is jumping onto the boat to give

        11    you guys a hand, right?  That's -- one of your team wrote that

        12    there?

        13    A.   Yeah, correct.

        14    Q.   Since you don't -- you might not have taken a swab, I

        15    suppose you don't know the results, whether it's the

        16    defendant's blood or anybody else?

        17         MS. PELLEGRINI:  Objection.

        18    A.   I don't.

        19         THE COURT:  Well, the answer may stand.

03:11   20    Q.   And this is Exhibit 3030.  Did you take this photograph?

        21    A.   I did not take that photograph.

        22    Q.   Do you recognize that toolkit as being something that was

        23    on the boat at the time?

        24    A.   Yes, sir.

        25    Q.   Defendant's Exhibit 3037, this red-brown stain here, do

1    you recall that from your investigation?

2    A.    Specifically, no; but if we took the photograph, yes.

3    Q.    Again, you don't know whether anybody on the team tested

4    to see whose blood that was?

5    A.    I don't.

6    Q.    There was ballistic evidence inside the boat also, spent

7    bullets?

8    A.    When you say "spent bullets," are you talking about shell

9    casings?  Are you talking about the actual metal frag?

03:12 10    Q.    The actual metal fragments.

11    A.    Yes.

12    Q.    And there was an engine block in the middle of the boat.

13    Do you know where that is or do you recall that, I suppose?

14    A.    I do recall it.  I'm not sure we've seen it in the photos

15    yet.

16    Q.    No, we haven't.  But you do recall that, right?

17    A.    Sure.

18    Q.    Do you recall opening up or having a member of your team

19    open up that engine hatch and finding a bullet fragment in

03:12 20    there?

21    A.    Yes.

22    Q.    So, indeed, a bullet could, and in this case did, go

23    through that engine cover to lodge there?

24    A.    I don't know if it fully penetrated.  It certainly was

25    embedded at least partially into the engine block.

```
 1    Q.    In the search of the boat, did you ever find any gun?
 2              MS. PELLEGRINI:  Objection.
 3              THE COURT:  Sustained.
 4    Q.    Did you find any ammunition?
 5              MS. PELLEGRINI:  Objection.
 6    Q.    Other than the spent --
 7              THE COURT:  Sustained.
 8              MR. WATKINS:  I have nothing further, your Honor.
 9              MS. PELLEGRINI:  I have no redirect, your Honor.  If I
03:13 10   may have a moment to remove the evidence?
11              THE COURT:  Guess that's it.  Thank you.
12              MR. CHAKRAVARTY:  The government calls Jessica Ulmer.
13              THE CLERK:  Ma'am, want to step up here, please?
14         JESSICA ULMER, Sworn
15              THE CLERK:  Have a seat.  State your name.  Spell your
16   last name for the record.  Keep your voice up and speak into
17   the mic.
18              THE WITNESS:  Special Agent Jessica Ulmer, U-l-m-e-r.
19   DIRECT EXAMINATION BY MR. CHAKRAVARTY:
03:15 20   Q.    Good afternoon, Agent Ulmer.  You're an FBI agent?
21    A.    Yes.  I'm currently assigned to the New York division.
22    Q.    How long have you been an FBI agent?
23    A.    For six years.
24    Q.    What did you do before that?
25    A.    Prior to that I was a Dallas police officer in Dallas,
```

1       Texas.

2       Q.    For how long was that?

3       A.    For five years.

4       Q.    Were you one of the Evidence Response Team personnel who

5       responded to 67 Franklin Street area in Watertown,

6       Massachusetts, back in 2013?

7       A.    I was.

8       Q.    Were you notified that someone had been arrested that

9       evening and that area needed to be processed?

03:16 10  A.    Yes.

11      Q.    Was the area secure when you arrived?

12      A.    There was multiple first responders still at the scene

13      upon our arrival.  At that point we locked down the scene and

14      made it secure.

15      Q.    What are some of the ways that you secure a scene?

16      A.    I believe local P.D. shut down the street by putting

17      police cars at the end of each block to make sure that there's

18      no through-traffic going through.  There was another squad car

19      the block behind the location to prevent people kind of going

03:16 20  through the yards.  Then we also secured the front of what we

21      deemed to be the crime scene location by having a person sit

22      out there with a table with an entry log, and then we logged

23      any person that came or went from the crime scene at that

24      point.

25      Q.    You were with your New York Evidence Response Team?

1    A.    Yes.

2    Q.    Were there other Evidence Response Teams that worked that

3    scene over the next several days?

4    A.    We were relieved the following morning by the team from

5    Pittsburgh.

6    Q.    Did it continue like that where different teams would

7    relieve each other over the course of the week?

8    A.    Yes.  It was typically one team at a time that was

9    processing the scene.

03:17 10    Q.    How soon after the arrest of the individual did you

11    arrive?

12    A.    Approximately maybe an hour, an hour and a half.  I'm not

13    sure what time he was arrested.  We got there at 9:45.

14    Q.    What happened when you got there?

15    A.    Upon arrival, we took custody of the scene.  All the First

16    Responders, anyone that was still remaining at the scene, left.

17    And we began to process the scene.

18    Q.    Was there a boat on the scene?

19    A.    Yes, there was.

03:17 20    Q.    Was there a shed as well?

21    A.    Yes.  There was a shed behind 63 but also 67.

22    Q.    So there was a shed on the property of 67 Franklin Street?

23    A.    Yes, next to the boat.  And then there was also a shed on

24    63.

25    Q.    63 is the neighboring property?

```
 1   A.   Yes, to the right.
 2   Q.   What separated 67 Franklin Street from 63 Franklin Street?
 3   A.   There was a small raised sort of cement wall that was
 4   maybe approximately two feet high.
 5   Q.   As you were surveying the scene, determining where you
 6   would look to collect evidence, how far around the area of the
 7   boat did you go?
 8   A.   As far as the line search?
 9   Q.   No, before, when you're just assessing where --
03:18 10   A.   So upon arrival we did what was called an initial
11   walk-through.  Basically two agents from the ERT team went
12   through and kind of looked for what type of evidence was going
13   to be collected, what kind of forensic processing needed to be
14   done.  The initial walk-through I think encompassed 63 and 67.
15   We did end up also looking at some of the property in 71 and 73
16   as well.
17   Q.   71 and 73 Franklin Street?
18   A.   Yes.
19   Q.   What did you identify in -- let's start with 73 Franklin
03:19 20   Street?
21   A.   73 Franklin Street, there was a parked vehicle in the
22   driveway.  We observed some blood splatter on the hood of the
23   parked vehicle.
24   Q.   What did you find at 71 Franklin Street?
25   A.   71 Franklin Street, there was some blood on a garage door.
```

Q.   And 67 Franklin Street, where the boat was, I gather you
saw blood?

A.   Yes, inside the boat.

Q.   How about 63 Franklin, the adjoining property?

A.   63 Franklin Street, there was actually an interior
bathroom that was kind of the back entrance to the house.
There had been some -- I believe it was broken glass or
something and blood on the floor of that bathroom that we
found.  And then we also found two cell phones and a debit card
there.

Q.   We'll get to that in a second.

     You had started to talk about this earlier.  But at some
point was a line search done?

A.   Yes.  So one of the first things that we did is we wanted
-- we knew that the boat was going to be a major piece of
evidence, so we wanted to clear a path to and from the boat, an
entry point for future technicians to use.  So we did a line
search to make sure that there was no evidence that was going
to get destroyed on the path going to the boat.  So what we did
is we stood shoulder to shoulder and did a line search through
the grass from the front of the parking lot at 63 up and into
the entrance to the boat.  Then we marked any potential
evidence, small items typically, with flags.

Q.   And did you and others go around the area after doing the
line search and identify other pieces of evidence?

1    A.   The only piece of evidence that we identified was anything

2    that was going to potentially be destroyed.  At the time of our

3    arrival, it started to sprinkle.  Shortly after, it started to

4    downpour.  So we tried to look for any evidence that might be

5    destroyed by the rain.  We had been told by one of the First

6    Responders upon arrival that there was two cell phones and

7    debit card behind the shed at 63.  So we collected those items

8    to prevent any further damage.  And then at that point we also

9    looked for any blood evidence that might be washed away by the

03:21  10   rain.

11   Q.   What steps did you take to protect surfaces from the rain?

12   A.   We covered any blood evidence that we could with tarps or

13   plastic to try to preserve it the best that we can.  In the

14   instance of the vehicle parked at 73, there was such a small

15   amount and the vehicle was so wet that the best we could do was

16   to use swabs to try to preserve the blood and submit it to the

17   lab believing that a tarp wouldn't suffice to protect that one

18   drop of blood that was on the hood.

19   Q.   So what did you do to collect the evidence before the rain

03:21  20   kind of washed away some of it?

21   A.   For the blood or for the --

22   Q.   For physical evidence, sorry.

23   A.   Okay.  Well, in the case of blood evidence, what we'd do

24   is a controlled swab in an area using sterile water to just

25   make sure that there's no chemicals or something that might

1    interfere in the actual Q-tips.  Then we do swabbing of the

2    actual blood sample and submit those to the laboratory for the

3    analysis.

4         Now, in the case of the phones and the debit card, the

5    first thing we would do is photograph the items in place, which

6    we did in this case, and then collect the items, package them,

7    and submit them to the laboratory.

8    Q.   Let's look at the photographs, and we'll slow down the

9    description of how you found those.  Let's look at 807.

03:22 10           MR. CHAKRAVARTY:  Just for the witness, please.

11    Q.   Do you recognize that?

12    A.   Yes.

13    Q.   What is it?

14    A.   So to the left of the picture is the boat.  The shed

15    behind 67 -- yeah, behind 67 is immediately in the middle of

16    the picture, and to the right is the shed for 63.

17    Q.   Is this a fair and accurate picture of the crime scene

18    either that evening or the next morning?

19    A.   Yes.

03:23 20           MR. CHAKRAVARTY:  808.

21    Q.   Do you recognize what that photo is?

22    A.   Yes.  That's the area behind the shed of 63.

23    Q.   Is this a fair and accurate depiction of the -- that area

24    as it appeared that evening that you were there?

25    A.   Yes.

1    Q.   And this is a dark photo that you can't see very much,

2    right?

3    A.   No.

4         MR. CHAKRAVARTY:   802.  I think this is in evidence.

5    Q.   What is that?

6    A.   That's the boat from 67.  In this picture, it's uncovered.

7    At the time we were there, it was covered by the tarp.

8         MR. CHAKRAVARTY:   Exhibit 810.

9    Q.   What is that?

03:23 10  A.   These are the two cell phones and the debit card that we

11   located behind the shed at 63.

12   Q.   Is this a fair and accurate depiction of how they appeared

13   before you collected them?

14   A.   Yes.

15        MR. CHAKRAVARTY:   And 811.

16   Q.   What is that?

17   A.   After the first photograph was taken in place, then we

18   took the items out to document what was actually there in the

19   pile.  So in this case there's a black iPhone, a white iPhone.

03:24 20  At the bottom is the backing of the white iPhone.  And then a

21   debit card.

22        MR. CHAKRAVARTY:   I'd move into evidence Exhibits 807,

23   808, 810, and 811.

24        MR. WATKINS:   No objection.

25        THE COURT:   Okay.

```
 1    (Government Exhibit Nos. 807, 808, 810, 811 received into

 2    evidence.)

 3              MR. CHAKRAVARTY:  Go back to 807, please, and publish.

 4    Q.   Now, Agent Ulmer, would you just circle or make a notation

 5    with the pad of your finger on the screen the area where you

 6    found the cell phones and a bank card?

 7    A.   Yes.  It would be right here.

 8    Q.   And did you go over to that area and then take further --

 9    with somebody else to take further pictures?

10    A.   Yes.

11              MR. CHAKRAVARTY:  Can we go to Exhibit 808, please?

12    Q.   Can you describe what this is?

13    A.   So this is the area behind the shed at 63.  It's a

14    walkway.  The white pole there you see is actually the corner

15    of the shed, and to the left there would be a fence.  Right

16    around this area, close up to the wall, on the ground, on the

17    base of the wall there is where the phones were located.  Now,

18    also, there's a bunch of loose slate in the area, and then

19    these cement blocks.

20    Q.   So there's cinderblocks as well as slate slabs?

21    A.   Yeah.  It appeared that the homeowner was doing some sort

22    of construction, maybe putting slate in the back garage.  So

23    there's a bunch of piles of loose slate in the area.

24              MR. CHAKRAVARTY:  Go to 810, please.

25    Q.   Is this what you saw that night?
```

```
 1    A.    Yes.

 2    Q.    So can you describe what you're seeing here?

 3    A.    There's a larger, loose -- piece of loose slate at the

 4    bottom here.  Here's a smaller piece of loose slate.  They both

 5    had kind of white markings on them, particularly in this area

 6    right here.  There was two damaged cell phones.  The flakes

 7    from the damage were all over the slate from the white phone

 8    particularly.  You could see in some of the areas here in the

 9    picture, it appeared they had flaked off right there.  Then

03:26 10    there was damage on the screen of the black iPhone as well.

11    Underneath the phones was the debit card.

12    Q.    Is that this item here that I just underlined?

13    A.    Yes.  That's the debit card.

14    Q.    The item you signaled over here that I just circled, about

15    how large was that?

16    A.    Approximately the size of the cell phone so about this

17    big.

18    Q.    You're making a motion about a little bit bigger than a

19    candy bar?

03:26 20    A.    Yeah.

21    Q.    All right.

22          MR. CHAKRAVARTY:  Exhibit 811, please.

23    Q.    Describe to the jury what this is.

24    A.    This is the items laid out in a row for documentation

25    purposes.  It's a black iPhone, a debit card, a white iPhone,
```

```
 1   and the back of the white iPhone case.
 2             MR. CHAKRAVARTY:  Can you -- zooming in on the debit
 3   card, can you make out what that says?
 4   A.    Is it D-U -- I can't really read it.
 5   Q.    Could it be D-u-n?
 6   A.    Yes.
 7   Q.    M-e-n-g?
 8   A.    Yes.
 9   Q.    There's a photograph of a young man?  Sorry.
10   A.    Yes.
11   Q.    Is there a photograph?
12   A.    Yes.  And the name was documented in the paperwork.  I
13   just can't read it here.
14   Q.    That's fine.  Now, when you collected these, did you
15   process these pursuant to your Evidence Response Team protocol?
16   A.    Yes, we did.
17   Q.    Were they put into bags?
18   A.    They were.
19   Q.    They were then further sent along the chain to whoever
20   else had to either keep custody of it or analyze it?
21   A.    Yes.  They would have been sent to the Boston office, and
22   then it would have been up to the case agent to do.  Whether
23   they wanted to send it to the lab for further processing would
24   have been up to them.
25             MR. CHAKRAVARTY:  May I approach, your Honor?
```

```
 1              THE COURT:  You may.
 2   Q.   I've placed in front of you what's marked government
 3   Exhibit 812, 815, and 755.
 4   A.   Yes.
 5   Q.   Do you recognize these?
 6   A.   Yes.  These are the items I collected.
 7   Q.   Are these the two phones and the bank card?
 8   A.   They are.
 9   Q.   All right.  If you wouldn't mind just opening the white
10   iPhone bag and putting the contents onto that board that I put
11   --
12   A.   Okay.
13        Okay.  Do you want me to take out the memory board or
14   leave that?
15   Q.   Why don't you leave that in the bag.
16        Is that -- how would you describe that compared to the
17   condition of that today versus the condition in which you first
18   seized it?
19   A.   It's a little bit more -- I believe, when they process it,
20   the lab, they took the memory board out of the phone.  However,
21   the back section is very similar.  It had been falling off like
22   this.  And this is the front screen of the phone.  The night
23   that I saw them, there was a lot of broken glass that was out
24   on the slate behind the shed and a lot of these white sort of
25   broken chips of white paint off the phone itself.
```

1    Q.   And the other two items of evidence, 815 and 755, are

2    those substantially in the same condition as when you first

3    seized those?

4    A.   Yes.  The black iPhone also has a very damaged, cracked

5    front screen also similar to this one.  However, the damage on

6    the white phone was more severe.

7         MR. CHAKRAVARTY:  At this point, I'd move into

8    evidence 812, 815, and 755.

9         MR. WATKINS:  No objection.

03:31 10        THE COURT:  Okay.

11   (Government Exhibit Nos. 755, 812, 815 received into evidence.)

12        MR. CHAKRAVARTY:  Retrieving the evidence, your Honor,

13   if I could have the ELMO for a moment to publish?

14        THE COURT:  Yes.

15   Q.   Now, Agent Ulmer, is this what you were talking about,

16   these flakes that were coming off the phone?

17   A.   Yes.  It's glass shards and then there's also white paint

18   flakes, like, right here that come off the back of the iPhone.

19   Q.   And can you point out the screen on this thing?

03:32 20   A.   The screen is this area right here.

21   Q.   The casing of the phone, can you see indentation on the

22   casing of the phone?

23   A.   Yes.

24   Q.   What do those appear to be caused by?

25   A.   It appears to have been caused by some sort of object

1    being smashed against the phone.

2    Q.    Is this the battery?

3    A.    Yeah, I believe so.

4    Q.    Does this also have indentations in it?

5    A.    Yes.

6    Q.    And then the main housing, is this the condition you found

7    it in?

8    A.    Yes.

9    Q.    Was the -- you mentioned some differences between the

03:33 10    black iPhone and the white iPhone.  How were they different?

11    A.    On the white iPhone, there appeared to be heavier damage

12    on it, and the back casing on the back of the cell phone had

13    fallen off and was sort of located in the pile with the cell

14    phones.

15    Q.    After you seized these, did you continue to process the

16    scene after the rain stopped?

17    A.    No, we did not.  We tried to cover as much of it and

18    preserve the evidence as well as we could, but then at that

19    point we froze the scene down and waited for daylight and

03:34 20    waited for the team from Pittsburgh to take over the scene.

21          MR. CHAKRAVARTY:  Go back to Exhibit 807 for a second

22    to orient the jury again.  Back to the exhibits.

23    Q.    Now, is this the boat at 67 Franklin Street?

24    A.    It is.

25    Q.    And then that was -- that was the tarp that you put on

1    there?

2    A.   Yes.

3    Q.   And then this is the vicinity in which you found these

4    phones?

5    A.   Yes.

6         MR. CHAKRAVARTY:   That's all I have, your Honor.

7         MR. WATKINS:   Perhaps you could just keep 807 up

8    there.

9    CROSS-EXAMINATION BY MR. WATKINS:

03:35 10   Q.   Good afternoon.   You talked about doing a line walk?

11   A.   Yes.

12   Q.   On Exhibit 807, that would have started from the right

13   over to the boat?

14   A.   It actually started from the driveway at 63 coming from

15   the front of the house, down the driveway, and then took a left

16   up the wall here.   And then if you see the area between the two

17   crime scene tapes here, that's the area that we cleared.

18   Q.   And that was part of that line walk?

19   A.   Yes.

03:35 20   Q.   In that portion of that area, did you observe blood

21   stains?

22   A.   It would have been very difficult to.   It was nighttime.

23   So I don't recall -- we looked for more larger objects such as

24   bullet casings and stuff like that.

25   Q.   But this area in the middle here, that was -- it was

1    beaten down for want of a better word?  There was lots of

2    evidence of activity there?

3    A.    Yes.

4            MR. WATKINS:  I have nothing further, your Honor.

5            MR. CHAKRAVARTY:  Nothing further.

6            THE COURT:  All right.  Thank you, Agent.  You may

7    step down.

8            That's it for the morning; and, as a matter of fact,

9    for you, jurors, it's it for the day again.  The lawyers have

03:36 10   something else to attend to this afternoon.  We won't be able

11   to continue.  We will generally keep to the schedule, but this

12   is an exception.  We'll break a little bit early for you.  I

13   think there's a lunch waiting for you.  After lunch, you can go

14   on your way.  Enjoy the rest of the day, and we'll see you

15   tomorrow and continue with the presentation of the evidence.

16   We'll be in recess.

17           THE CLERK:  All rise for the Court and jury.  Court

18   will be in recess.

19   (Whereupon, at 1:06 p.m. the trial recessed.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4   Dahlstrom, RMR, CRR, Official Reporters of the United States

 5   District Court, do hereby certify that the foregoing transcript

 6   constitutes, to the best of our skill and ability, a true and

 7   accurate transcription of our stenotype notes taken in the

 8   matter of Criminal Action No. 13-10200-GAO, United States of

 9   America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso_____
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Cheryl Dahlstrom_____
14   CHERYL DAHLSTROM, RMR, CRR
     Official Court Reporter
15

16
     Date:  10/5/15
17

18

19

20

21

22

23

24

25
```