```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )



             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                          LOBBY CONFERENCE


             John J. Moakley United States Courthouse
                          Courtroom No. 9
                        One Courthouse Way
                     Boston, Massachusetts  02210
                       Tuesday, March 17, 2015
                             8:50 a.m.



                    Marcia G. Patrisso, RMR, CRR
                       Official Court Reporter
                   John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 3510
                    Boston, Massachusetts  02210
                          (617) 737-8728

           Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        On Behalf of the Government

6        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
7            Federal Public Defenders
         51 Sleeper Street
8        Fifth Floor
         Boston, Massachusetts  02210
9        - and -
         CLARKE & RICE, APC
10       By: Judy Clarke, Esq.
         1010 Second Avenue
11       Suite 1800
         San Diego, California  92101
12       - and -
         LAW OFFICE OF DAVID I. BRUCK
13       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
14       Lexington, Virginia  24450
         On Behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2       THE COURT:  First, I just want to get a sense of

3  timelines, where we are.  We're moving along quickly.

4       MR. WEINREB:  So today is going to be a lot of

5  forensic evidence.  And I'm a little unclear how long that will

6  take.  I think we're planning on getting through -- we think

7  we'll probably get through most of it today and then there will

8  be some more of it tomorrow, and then we move into some of the

9  post-bombing searches, like the defendant's apartment.

10      THE COURT:  The warrants?

11      MR. WEINREB:  Yeah.

12      MR. CHAKRAVARTY:  So the unknown is we have Mr. Silva

13  testifying today.  Tomorrow we may have Mr. Tazhayakov testify,

14  who is another cooperator, and then on Thursday our plan is to

15  call the computer forensic expert.

16      THE COURT:  When?  I'm sorry?

17      MR. CHAKRAVARTY:  Thursday.

18      THE COURT:  Thursday?

19      MR. WEINREB:  So we'll clearly be going into the

20  following week.  And I think -- it's quite possible we will

21  finish up the following week, and then we'll be done.

22      THE COURT:  With computer stuff?

23      MR. WEINREB:  Computer stuff and the ME is --

24      MR. CHAKRAVARTY:  Yeah, the ME is going to testify.

25  And then to talk about some of the stuff on the computers will

 1    probably be early next week.

 2              MR. WEINREB:  There will be some expert testimony.

 3    And we might not make it all the way to the end.  Again, this

 4    is an area where there may be more cross-examination than we've

 5    seen before, so it could be longer.

 6              MS. CLARKE:  I don't think we've gotten notice of the

 7    three forensic people for today.

 8              MR. WEINREB:  Well, the fingerprint expert, Patrick

 9    Moynihan; the DNA expert, Jennifer Montgomery; and --

10              MS. CLARKE:  And then Tanguay.  It looks like --

11              MR. CHAKRAVARTY:  Yeah, Kelly King and Tanguay,

12    they're not experts.

13              The third expert is Chris Donahue who's not going to

14    testify until tomorrow.  We don't think we'll reach him until

15    tomorrow.

16              MS. CLARKE:  He's not on our list, right?

17              MR. WEINREB:  He's on a list because someone asked me

18    if he was going to testify today, and I said tomorrow.

19              MS. CLARKE:  I don't think we have a list with him on

20    it.

21              THE COURT:  What's his field?

22              MR. WEINREB:  He's also a fingerprint examiner.

23              THE COURT:  Okay.  And what do you expect when the

24    government is finished?

25              MS. CLARKE:  Well, we're trying to figure that out.

1     We have a few witnesses we're trying to list now to provide to

2     the government.  We have provided them a list of exhibits for

3     the guilt phase.  I don't expect we would go more than two or

4     three days.

5              THE COURT:  Okay.  So I'm just trying to do the

6     calendar in my head.  That would be the first week of April?

7              MS. CLARKE:  If you're done the middle of next week.

8              MR. WEINREB:  Yeah.  Or towards --

9              THE COURT:  I think March the 30th and 31st are the

10    Monday and Tuesday of the next week.

11             MS. CLARKE:  Some of it depends, Judge, on how much we

12    can do through cross, whether we have to call government

13    witnesses back.  We haven't been able to calculate that yet

14    because we haven't finished -- and I didn't know until this

15    minute that there was another cooperator testifying tomorrow.

16    You know, so some information can come out that way.  So that

17    really can affect us.

18             We have some experts to put on in guilt.

19             THE COURT:  What subjects?

20             MR. FICK:  Computer forensics and then Islamic --

21             MR. BRUCK:  And then responsive experts to the

22    terrorism expert.

23             THE COURT:  Is there a terrorism expert in the guilt

24    phase?

25             MR. CHAKRAVARTY:  There is.

1          MS. CLARKE:  We just don't know who.

2          THE COURT:  Who?

3          MR. CHAKRAVARTY:  It will likely be Matt Levitt on

4    Monday.

5          THE COURT:  Is he included in the motion as a -- sort

6    of a multi-witness motion about terrorism experts from the

7    defense?

8          MR. BRUCK:  Yes.

9          THE COURT:  He's one of the people --

10         MR. BRUCK:  Well, we haven't known until this moment

11   which expert would be --

12         THE COURT:  There are several people attacked, if I

13   can use that word, in the motion.

14         MR. BRUCK:  Yes.  Well, all of the reports had a

15   similar problem, which was the following out the biographies of

16   every author all the way through the history of the 21st

17   century.

18         THE COURT:  Okay.  Well, I want to begin to prepare

19   for the instruction phase, so I think in the government's trial

20   brief there is an outline of what the government thinks the

21   elements of the offense are.  I would be interested in any view

22   that the defense has about that substantively.  If you disagree

23   with the substance of the offense, we can deal with other kinds

24   of instruction issues, but I would like to get nailed down what

25   the substantive law is for the offenses, and if there's any

1    disagreement, resolve it.

2            MR. WEINREB:  Your Honor, I don't know that we briefed

3    it in detail in the trial brief, but I think that the --

4    ironically, the more unusual offenses being charged in this

5    case, like bombing a place of public use and so on, the

6    elements will be rather straightforward.  It's the 924(c) and

7    924(j) counts that get complicated.

8            THE COURT:  Right.

9            MR. WEINREB:  And I think all potential problems with

10   those can be resolved simply by having the jury make individual

11   findings with respect to the different components of those

12   offenses that are arguably elements that are -- rather than,

13   you know, the sentencing factors and things that raise the

14   maximum penalty, they need to make some findings specifically

15   about those.  And in addition, there is this case law that says

16   that user -- "using in furtherance of" and "carrying" are two

17   separate offenses.  And so if a jury only makes a single

18   decision where those are phrased in the alternative, that

19   that's actually either duplicitous or multiplicitous.  But

20   either way, if they make the finding separately, then it won't

21   be.

22           We'll prepare a proposed verdict form that will break

23   it out the way we think it needs to be broken out.

24           THE COURT:  Okay.

25           MR. WEINREB:  I don't know if the defense wants to --

```
 1              MS. CLARKE:  It would be nice if we could.
 2              THE COURT:  Yeah, that would be helpful.  I mean,
 3    obviously it would be better if there was agreement on it.
 4              MR. WEINREB:  Yes, of course.  I don't think there
 5    should be disagreement.
 6              THE COURT:  One question I had, which I have only
 7    framed as a question, I haven't done any looking at it, is some
 8    of them charge carrying during and in relation to use of a
 9    weapon of mass destruction when both the weapon of mass
10    destruction and the firearm are the same thing.  And I was
11    wondering whether that's duplicitous.
12              MR. WEINREB:  All --
13              THE COURT:  I just raise the question.
14              MR. WEINREB:  Okay.  I'll -- we'll --
15              THE COURT:  I mean, normally -- you know, the one we
16    see most commonly is the drug dealer carrying a gun.  The drugs
17    and the gun are different.
18              MR. WEINREB:  Right.
19              THE COURT:  Here the carrying of the bomb to use the
20    bomb.
21              MR. WEINREB:  Right.  So I know we researched that
22    question and I'm confident they're not but if the Court --
23              THE COURT:  It won't surprise me if they're not
24    because the law sometimes thinks that way, but I raise it.
25              MR. WEINREB:  Right.  I mean, we can -- again, we're
```

 1   certainly willing to discuss -- this is something we briefed

 2   way back when we indicted the case, so --

 3          THE COURT:  No, that raises a related question,

 4   whether it's necessary to send all 30 counts to the jury.

 5          MS. CLARKE:  We had that thought.

 6          THE COURT:  I'm sure you did.  You're somewhere around

 7   zero, probably?

 8          (Laughter.)

 9          MS. CLARKE:  No, but we had that thought quite some

10   time ago on a motion to dismiss.

11          MR. WEINREB:  And I think our answer is that the state

12   of the law is, in fact, unsettled on many of these questions

13   and that given that, although it's more work for the jury, the

14   safest approach is to have them make findings on everything so

15   that if afterwards certain ones have to be struck or

16   eliminated, we don't have to go back and retry the whole case;

17   we can just take care of everything afterwards.

18          So I think a carefully crafted verdict form and

19   instructions will solve all problems.

20          THE COURT:  Okay.  Well, I just want to encourage that

21   process to get going so that we can be ready when the time

22   comes, if it comes faster than we think, so...

23          MR. WATKINS:  May I just go back to scheduling a

24   little bit because we're trying to -- the Court originally set

25   kind of a two weeks in advance, two weeks witnesses' notice.

1    We've not adhered to that really at all.  I know that this has

2    raced by faster than even the government -- but it's creating

3    quite a bit of problems, as we talked about yesterday.

4           For example, today I just heard that we're kind of

5    racing towards the end, we talked about forensics being done

6    today.  But, of course, there are many expert witnesses from

7    the FBI that the government has noticed about the

8    bomb-building, for example.  We have not touched on that at all

9    in this recitation.  I didn't hear anything about that.  If the

10   government is going to drop that, fine, I'm going to move on to

11   something else, but if it's going to come up as a surprise that

12   we're now sticking that in, then personally, I don't see how

13   they could be done by the end of next week and put in what is

14   some pretty complicated testimony, explaining to the jury about

15   what some of these factors are about.  So I'm just trying to

16   get some clarity about where these kinds of things are going.

17   So that's one thing.

18          Ms. Clarke talked about the two or three or three or

19   four days.  The government is being quite stingy, for want of a

20   better word, about what they're going to let us put in on their

21   case.  An example was yesterday, there's this issue about

22   Officer Donahue being injured by friendly fire as opposed to a

23   stray bullet.  I'm not clear at all whether the government is

24   conceding that.  If, indeed, they're conceding that it's

25   friendly fire, we should say that outright to the jury.  I have

1    not heard that.

2            If they're not going to do that, we need to put on

3    witnesses, government witnesses that were on their list at one

4    time but were taken off.  These were people who were supposed

5    to testify yesterday, including Officer McCormack, who was part

6    of the firefight down at the Mercedes; Watertown officer Menton

7    who actually did attend to Officer Donahue in that driveway.

8    I'm very worried that it was unclear.  I was prepared to point

9    those kinds of things out.

10           There's also an issue with the chalk, Exhibit 775 that

11   was put in, for that same reason.  It puts the cruiser -- the

12   MBTA cruiser in a way that the jury, if they looked at it,

13   would say he was in Tamerlan's line of fire.  And that's

14   inaccurate.  It simply cannot be allowed to stand.

15           If the government were willing to, you know, enter

16   into a stipulation about the friendly fire, then we don't need

17   to do that, but that, I would think, is almost a day just to --

18   or at least a morning of us putting on government witnesses.

19   So that may add to the time a little bit.

20           Those are some of my concerns.  And those are concerns

21   that are exemplary more than specific; in other words, it seems

22   to keep coming up that we're preparing for witnesses that the

23   government shakes off at the very last minute.

24           MR. WEINREB:  I wanted to add one thing on the general

25   topic of the defense putting in defense evidence in the

1    government case, which is that we received an email from

2    Mr. Watkins at 6 a.m. today asking us to have various items of

3    evidence in court for witnesses who will testify today that the

4    defense wants to introduce through cross-examination of those

5    witnesses.  And we object to that.  I think it would be easier

6    to frame the issue if I give the specifics.

7         So one of the witnesses who will testify today is

8    Brian Corcoran, an FBI agent who collected electronics and

9    explosives evidence on Laurel Street.  One of the things that

10   was collected was a computer from a computer bag which the

11   defense will say was Tamerlan Tsarnaev's computer.

12        As it happens, we have no -- that issue is moot

13   because that computer, will, in fact, come through -- in the

14   government's case through Agent Corcoran.  But we have no

15   objection to it anyway because he had personal knowledge of his

16   collection.  But they've also said that -- as the Court will

17   recall, yesterday Sergeant Pugliese testified -- he was shown a

18   picture of the two brothers crouching behind a car.  He was

19   asked which one was Tamerlan and which one was Dzhokhar, and

20   based on the color of their clothing he gave an answer which

21   obviously was not the answer the defense was expecting.

22        So they told us today that through another witness,

23   Stephanie Waite, who is a criminalist at the MSP lab, they want

24   to show her the clothing of the various suspects so -- and

25   introduce it through her.  That's one where we do object.

1          Stephanie Waite's job is primarily to test items of

2     evidence for blood and then prepare that evidence so that the

3     blood can be DNA-tested.  She does sometimes go to crime scenes

4     and checks surfaces and things for blood, but often she just

5     receives items in the lab, she opens up the evidence bags, she

6     takes little snippets of things, tests them for blood.  And if

7     there's blood on them, puts them in the test tube, puts it in

8     the refrigerator so a DNA analyst can retrieve it.

9          This is a situation where the clothing of the brothers

10    was simply submitted to the lab, and she has no idea who was

11    wearing what.  She has no personal knowledge of it.  And yet --

12    you know, she photographed them, which she does in the lab, but

13    prior to cutting the little things out of them.  And the

14    photographs may well say, you know, who it was seized from, but

15    that's just hearsay through her.

16         And we believe that if the defense wants to put in the

17    clothing of Tamerlan Tsarnaev or Dzhokhar Tsarnaev, they're

18    certainly entitled to do that, but that's evidence that they

19    should put in in their own case.  If they need a government

20    witness to do it, they just need to give us adequate notice and

21    we'll make that witness available.  We'll certainly make the

22    evidence available.

23         But it should come in through their witness, through

24    direct examination of their witness, so that the government has

25    an opportunity -- and we should have notice of it and we should

1    have notice of the exhibits just like we give them, even if

2    it's short notice, so that we can prepare cross-examination

3    that's appropriate of a witness who has actual knowledge of

4    what they're talking about.  So, for example, if they bring in

5    a black jacket of Tamerlan Tsarnaev, we can say, "Wasn't he

6    also wearing a white shirt?"  Stephanie Waite can't possibly

7    say whether he was also wearing a white shirt because she has

8    no idea what he was wearing.

9         And the idea of them putting in evidence through a

10   witness with no personal knowledge of it through

11   cross-examination, where they essentially tell the witness the

12   answer and the witness has a choice, on a national stage,

13   essentially, of either saying, "I don't know what on earth

14   you're talking about and, therefore, I seem like I don't know

15   what I'm doing," or, "yes," to simply make the question go

16   away, that's just not fair.  They shouldn't be put in that

17   position and the government shouldn't be put in that position.

18        So, you know, we're happy to talk about these things

19   with the defense ahead of time, propose a solution.  Getting

20   notice at 6 a.m. makes it harder.  I understand we're all

21   operating on short time here so I'm not -- I just think the way

22   that it is proposed to be done is not appropriate and we would

23   object to it.

24        MR. WATKINS:  Just to clear up a couple of things,

25   it's not that Stephanie Waite has no connection to this at all.

1    I'm reading through her case notes where she talks about

2    Tamerlan Tsarnaev's jacket.  I mean, this is really not a

3    serious issue by the government.  If what they're trying to do

4    is to make us do a chain of custody for the evidence that the

5    government has done, we're going to be here for a long time and

6    I'm going to need to take some time off to reconstruct that.

7    There were just a lot of people involved in this.

8          The jacket went to -- from both -- from the hospital,

9    I believe, or the EMTs, on through to the FBI where it stands

10   today.  Maybe a dozen people touched it, more than that might

11   have touched it.  Similar with the sweatshirt.

12         If what the government means to do is to put us

13   through that test and see if we can make every instance in the

14   chain, it seems a little bit unfair because we do not have

15   access -- the kind of access that they do, and it seems very,

16   very time-consuming to put us through that kind of exercise for

17   what is very -- really going to be an uncontested point, which

18   the sweatshirt of Dzhokhar -- the jury has seen that.  The

19   jacket was collected.

20         I can try to go back through that chain and find the

21   person who actually did it, but it seems silly where this is a

22   relatively minor point.  It's quite right -- Mr. Weinreb is

23   quite right.  I got a wrong answer yesterday.  I seek to

24   correct it because that, indeed, was a black jacket that he had

25   on.

1        MR. WEINREB:  So if I can just add, whether it's

2   unfair or not, that's not what we're proposing to do.  We have

3   no -- we are not trying to put the defense through their paces

4   or make them establish chain of custody.  As soon as they call

5   a witness who has -- can say this clothing was on Tamerlan

6   Tsarnaev and it was removed and taken into government custody,

7   we'll admit -- we have no objection to it being admitted.  But

8   somebody actually has to have knowledge of what he was wearing

9   as opposed to simply offering selected pieces to somebody who

10  just photographed them in a lab.

11       THE COURT:  Well, I guess it depends on what the

12  witness would say.  I mean, I don't see any reason in principle

13  why a defense exhibit couldn't come in on cross-examination

14  from an appropriate witness.  So the question really is, is

15  this an appropriate witness based on what she knows about the

16  matter and I'm not familiar in detail with that.  If -- I don't

17  know, for example, whether reading off the label of the package

18  that presents the matter to her is enough.

19       MR. WATKINS:  Perhaps I could suggest that the

20  government could find that out from Miss Waite today because I

21  think the answer to that is going to be yes, she saw the label.

22  She identifies it in her case notes as the jacket of Tamerlan

23  Tsarnaev; the sweatshirt is Dzhokhar Tsarnaev.  I don't think

24  there's going to be an issue through this witness about that.

25  If the government can look into that today, then all of a

1    sudden we have a whole morning free that we don't have to mess

2    around with.

3            THE COURT:  Okay.  So anyway, I guess as a generalized

4    objection, I don't think I would sustain it, but we'll have to

5    see what the witnesses say.

6            Let's go back to the identification of upcoming

7    experts -- notice of them, that is -- so the defense can be

8    ready for them.  It sounds like there's going to be a lot of

9    expert evidence in the next week and a half.

10           MR. WEINREB:  May I have one moment, your Honor?

11           (Counsel confer off the record.)

12           MR. WEINREB:  So we were in the process yesterday

13    afternoon of preparing a list of witnesses from now all the way

14    to the end of the case which we're prepared to give to the

15    defense.  I think that we -- I know we went upstairs last night

16    and we got most of the way, and then I think we got diverted

17    onto witness prep for today.  But we'll finish that today and

18    we'll get it to the defense so they'll know everybody who is

19    going to testify all the way through the end of the guilt

20    phase.

21           MR. WATKINS:  May I make a suggestion then?  As I

22    understand it, Stephen Silva is going to be Witness No. 2 after

23    Henneberry today?

24           MR. CHAKRAVARTY:  That's right, yeah.

25           MR. WATKINS:  Perhaps -- I expect that that's going to

 1   take the morning.  Perhaps we could break today at one o'clock

 2   and get back onboard with this -- the government's witness

 3   list.  Because it really is -- becomes very difficult for us to

 4   plan.  I know the Court wants an exhibit list and a witness

 5   list from us, but it becomes a moving target where we have to

 6   deal with these kinds of issues at a very last minute.

 7           MS. CONRAD:  May I just add one thing to that?  I

 8   mean, this is the first time that we're hearing that Azamat is

 9   testifying tomorrow.  He is a major witness.  He's going to

10   require a lot of preparation.  The Court had asked the

11   government to give us witnesses two weeks in advance.  It

12   hasn't turned out that way.  They gave us a list, I think it

13   was on Friday, of 20 witnesses.  Azamat's name was not on

14   there.  We had no reason to think he was even coming up this

15   week, much less tomorrow.

16           To put us in a position where they tell us 24 hours

17   ahead of time that a major witness, who they had not previously

18   notified us was even close is going to be on tomorrow, I mean,

19   I would ask that they at least postpone Azamat for a day to

20   give us time to prepare for that cross in light of the fact

21   that, you know, this list of 20 witnesses didn't even

22   include --

23           MR. WATKINS:  I will add one thing to that.  I had a

24   conversation with a member of the prosecution team -- not

25   here -- about what the next two days was going to be, and that

 1   witness did not come up at all -- at all -- in that

 2   combination.  It's a name we've been waiting for so that we can

 3   prepare appropriately for it.  So that's all I'll say.  It's

 4   very difficult to prepare under these kinds of circumstances.

 5          MS. CLARKE:  There's another little logistical

 6   issue -- and I completely understand, you know, how things get

 7   all crazy when you're putting on a case.  But we were notified

 8   last night, I think, that Christopher Derks would testify

 9   today.  Christopher Derks --

10          MR. CHAKRAVARTY:  Not today.

11          MS. CLARKE:  No?

12          MR. CHAKRAVARTY:  Not today.

13          MR. WATKINS:  By the end of this week?

14          MR. CHAKRAVARTY:  By the end of this week.

15          MS. CLARKE:  Well, it looks like he's the Norfolk

16   apartment-seizing agent who will put in the items seized at

17   Norfolk although, you know, a whole host of agents were in

18   there, and we have no idea what exhibits he intends to

19   introduce.  So it would be useful -- because then we could

20   decide again along the lines of this question of are they

21   putting in what we believe should be put in from Norfolk.

22          I mean, it's a painstaking detail-oriented analysis

23   for both sides, but we can't do it unless we know what they're

24   putting in.  So that would be helpful to have.

25          MR. FICK:  And one final note, we really appreciate

 1    the government's notice that the forensic expert is likely to

 2    come in on Thursday, and we simply -- you know, to the extent

 3    that's going to change, from our logistical point of view it

 4    can't change in a sooner direction because we have to get our

 5    forensic guy in place, he's difficult to schedule, he's

 6    expensive, et cetera.  So Thursday's fine, we can be ready for

 7    that, and we can be ready for something after it if it changes,

 8    but, you know, that needs to stick, otherwise, we'll be in

 9    mayhem tomorrow.

10         THE COURT:  Well, who do you have this afternoon?  Do

11    you agree that Silva might take the morning?  Is he going to be

12    that long?

13         MR. CHAKRAVARTY:  I don't think he'll -- I don't know

14    what the defense strategy is going to be on cross with him.  As

15    with any cooperator, we budget a couple -- two times the amount

16    of direct.  So I estimate an hour on direct but, you know, he's

17    a cooperator so...

18         MS. CONRAD:  We still have a --

19         THE COURT:  We're coming to that.

20         MR. CHAKRAVARTY:  So that could go to most of the

21    morning and then we would have --

22         THE COURT:  So then after that?

23         MR. CHAKRAVARTY:  Evidence collection from --

24         THE COURT:  From Watertown?

25         MR. CHAKRAVARTY:  From Watertown.

```
 1              MR. WEINREB:  Watertown, yes.  All the evidence
 2    collection from Watertown which I think will be pretty
 3    uncontroversial.
 4              MS. CLARKE:  And I don't think we have the exhibits
 5    for that either.
 6              THE COURT:  Is that going to have an exhibit like we
 7    had for Boylston Street?
 8              MR. WEINREB:  No.
 9              MR. WATKINS:  We're low tech at this stage.
10              MR. CHAKRAVARTY:  In terms of the exhibits we intend
11    to introduce for many of the searches, our exhibit list is
12    pretty good about -- you know, specifying by both the FBI
13    numbers --
14              MS. CLARKE:  It doesn't attach to a witness, is the
15    problem.
16              MR. CHAKRAVARTY:  That is true but --
17              MS. CLARKE:  Not to complain but --
18              MS. CONRAD:  And it doesn't attach to a Bates number.
19              MS. CLARKE:  And it doesn't attach to a Bates number.
20              MR. CHAKRAVARTY:  But there should be an evidence
21    number and then there's a description.
22              MS. CLARKE:  Well, for example, this morning I was
23    looking for a certain number, we don't have it, in your
24    numbered list and, you know, an hour later we find it in
25    discovery.  But, you know, we don't have a Bates number, we
```

1    don't have it in the numbered list.

2         I understand how we get here as lawyers, but that's

3    just a little bit of the logistical problem we face.

4         MS. CONRAD:  I mean the government's exhibit list in

5    many respects just has an exhibit number and a description.

6    There are hundreds of thousands of Bates numbers and --

7         MR. WATKINS:  And one final complaint, because that

8    sounds like what we're doing here, is there are now exhibits

9    coming in in the higher numbers that we have not been provided

10   as exhibit numbers; in other words, they might appear on the

11   list.  Hunting and pecking through the discovery to match that

12   up -- we were given, you know, an electronic version of the

13   exhibits at the beginning.  I hear that there's an update

14   around but we have not been provided that.  So it is the case

15   sometimes I'm going into court, I'm pretty sure I know what the

16   exhibit is when it gets called up but I can't tell you until

17   they actually put it up on the screen what it is.

18         So these are some of the issues that I think are a

19   result of moving very quickly -- too quickly through this

20   trial.

21         THE COURT:  Yeah.  So the original thought when we

22   were talking about a two-week span was to identify exhibits to

23   witnesses.  Have you been doing that?

24         MR. CHAKRAVARTY:  We have for when -- essentially

25   giving a list of 20 witnesses because that's what we were

1  mapping out and giving ourselves some flexibility to move

2  people around.  For those we were giving --

3         MS. CLARKE:  Oh, no, oh, no.

4         MR. WATKINS:  No, no, no.

5         MS. CONRAD:  It certainly wasn't on the list from

6  Friday.

7         MS. CLARKE:  The first 20, yes.

8         MR. WATKINS:  Kind of.

9         MS. CLARKE:  The second 30, no.

10         MR. CHAKRAVARTY:  Well, whether that be the case or

11  not, as the week goes on, we don't every day go back and update

12  simply because we're just so -- trying to assemble all of that

13  and preparing our case.

14         THE COURT:  Well, fine.  So there's some, you know, 10

15  percent variance or something like that.  That's -- that may be

16  tolerable.  But if there's no exhibits, then I think it's a

17  different story.  I mean, I think it is fair to tell that

18  Witness X is going to talk about these seven exhibits

19  principally, and if it turns out there be six or eight, that's,

20  as I say, a tolerable variance, but --

21         MS. CLARKE:  And we've been actually pretty good,

22  Judge, about not raising this as a complaint each time an

23  exhibit is shown to counsel only -- to the witness and counsel

24  only, and we haven't seen it, it hasn't been connected to that

25  person, we very quickly go, "Okay, we've seen that.  We know

1   what that is" and have not objected.  As you noticed, we

2   haven't objected to a lot of them.

3            THE COURT:  So I think that perhaps it is a good idea

4   to stop at one today and prepare at least that kind of

5   information for the rest of this week, anyway, and then going

6   forward as you get to next week, so that people know what the

7   exhibits are.

8            Let's -- so let's come back to the issues about

9   Stephen Silva.  We had a brief discussion about it the other

10  day.  I don't think this is 404(b) because it's not offered for

11  404(b) purposes.  So I think it's part of the government's

12  narrative, and the government, I think, is entitled to show why

13  it is plausible that Silva did what he will testify he did;

14  that is, provide a gun.  That has to be put in context.  And I

15  think the plausibility for the government is increased if the

16  actual context is shown.  So I think the discussion about what

17  the purpose was is admissible:  The intent to use in the drug

18  business.

19           I don't think it's necessary to have evidence of the

20  robbery of the Rhode Island kids.  I think that's perhaps

21  cumulative.  That's less on point.  But I think that the

22  interaction between Silva and the defendant and explaining why

23  Silva -- why he knew Silva, I guess, and knew that Silva might

24  have access to this weapon and then went to him to get it and

25  so on and so forth, I think that's all part of the narrative

1    that the government is entitled to.

2           The government has --

3           MS. CONRAD:  May I have a continuing objection to

4    that, your Honor, or do you want me to make it on the record?

5           THE COURT:  I think it's clear but if you want to make

6    it again.

7           MS. CONRAD:  It may be clear to you but I want to make

8    sure it's clear for the First Circuit.

9           THE COURT:  I don't think they're that sticky.

10   They're stickier on instructions to objections.

11          The government also has a motion about Silva which is

12   testimony about the relationship between the brothers.  My

13   interpretation of the motion is it's kind of a personal

14   knowledge objection.  Anything he would know would be

15   secondhand.

16          MS. CONRAD:  Well, you know, first of all, I haven't

17   heard the direct yet so I can't tell you what the cross is

18   going to be.  But I think some of it, you know, it depends on

19   what the direct is.

20          THE COURT:  Right.

21          MS. CONRAD:  And I think some of it also -- I mean,

22   certainly not for the truth of the matter but state of mind as

23   to certain things that are going to come up.  But I think it's

24   better to deal with it question by question because I don't

25   think --

```
1              THE COURT:  Right.  We'll evaluate it as the occasion
2     arises.  In general there will have to be a personal knowledge
3     basis for it.  That's one thing.  There will also have to be
4     relevance.  So it will have to be the right kind of evidence
5     about the relationship.  It can't be mitigation evidence,
6     frankly.  So there's two hurdles to it.
7              MS. CONRAD:  I understand.
8              MR. CHAKRAVARTY:  So being wary not to open the door
9     to any of that, one of my intended questions was to establish
10    that he had never met and never had contact with Tamerlan.  I
11    want to be able to safely do that without risking that she then
12    says -- she meaning the defense -- the illustrious defense
13    counsel.
14             MS. CLARKE:  You mean Ms. Conrad.
15             MS. CONRAD:  I'm looking around.  Who is he talking
16    about?
17             MR. CHAKRAVARTY:  -- would, you know, perceive that as
18    opening the door somehow.
19             THE COURT:  That wouldn't open the door necessarily.
20             MR. CHAKRAVARTY:  One other question on Mr. Silva.
21             MS. CONRAD:  It depends on what the question would be
22    on cross.
23             MR. CHAKRAVARTY:  Mr. Silva is in prison garb and the
24    marshals have indicated that they would prefer to have his leg
25    shackles on.  Mr. Silva is represented and he would prefer --
```

1          THE COURT:  Who is his counsel?

2          MR. CHAKRAVARTY:  Jonathan Shapiro.

3          THE COURT:  Do you expect him to be here?

4          MR. CHAKRAVARTY:  He is here.

5          THE COURT:  Yeah.

6          MR. CHAKRAVARTY:  And --

7          THE COURT:  Does he have anything to say about it?

8          MR. CHAKRAVARTY:  He would prefer that he not be

9  shackled, or rather, that the jury not see him shackled.  So

10  the issue is if he is put in the box outside of the presence of

11  the jury -- we take a break -- but given that hopefully it will

12  be half an hour into the trial, that might be inconvenient.

13  The marshals did also say there will be two extra marshals

14  there just to establish security for this prisoner.

15          THE COURT:  Do you have any viewpoint?

16          MS. CONRAD:  Not off the top of my head.

17          THE COURT:  Do you have any viewpoint independent of

18  the marshals?

19          MR. CHAKRAVARTY:  I think that in my lay assessment,

20  but in my experience as a prosecutor, he does not present a

21  risk of flight or harm, and having the shackles removed would

22  facilitate him getting to the stand without controversy.

23          THE COURT:  I think with all the marshals in the room

24  we don't need them, but I haven't heard from the marshals.  But

25  that would be my inclination.  There's plenty of marshals

1    present.

2         THE CLERK:  Judge, there was one question with respect

3    to bringing up Mr. Silva.  I mean, it sounded like, speaking

4    with Rob, I don't know if he's going to be in the back while

5    the trial is going on or if they need to go down and bring him

6    up and take any kind of a break.

7         THE COURT:  How soon do you need him?

8         THE CLERK:  They mentioned that.

9         MR. CHAKRAVARTY:  We expect Mr. Henneberry to go about

10   a half an hour at the most.

11        THE COURT:  So they could time it, right?

12        MR. WEINREB:  Yeah, say 20 minutes.

13        THE COURT:  Is there cross of Henneberry if they're a

14   half-hour?

15        MR. WATKINS:  Nothing.

16        MS. CLARKE:  Very short.

17        THE COURT:  Yeah, so have him up --

18        THE CLERK:  Ten o'clock?

19        THE COURT:  -- about half an hour from when we get

20   going.

21        MR. WEINREB:  I would say, to be safe, I think -- I'll

22   do Henneberry quite quickly, I think, 20 minutes.

23        MS. CLARKE:  Do they have an issue with where they're

24   housing --

25        THE CLERK:  I think it's just a matter of making sure

1    they're kept separate and, you know, they're bringing him up

2    and having him in the cell --

3            MS. CLARKE:  Our guy stays up.

4            THE CLERK:  I understand.  I'm telling you what Rob's

5    concern was in terms of they may need to have a couple of

6    minutes to --

7            THE COURT:  They may need to switch them in an

8    intermission.

9            MS. CLARKE:  Right.  Just leave Dzhokhar with us in

10   the courtroom.

11           THE COURT:  Right.  Okay.  I think we should get

12   going.  I do have one ex parte matter with the defense.

13                   (The lobby conference concluded at 9:25 a.m.)

14                           *  *  *

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  10/5/15
13

14

15

16

17

18

19

20

21

22

23

24

25