UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
                          )
       Plaintiff,    )
                          )  Criminal Action
v.                    )  No. 13-10200-GAO
                          )
DZHOKHAR A. TSARNAEV, also  )
known as Jahar Tsarni,    )
                          )
       Defendant.    )
                          )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>JURY TRIAL - DAY THIRTY-FIVE</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, March 18, 2015
9:47 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10            Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                   Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
3       GOVERNMENT:

4    ROBERT MCCARTHY

5         By Mr. Mellin            7
          By Mr. Watkins                     45
6
     MATTHEW HESS
7
          By Ms. Pellegrini        4
8         By Mr. Bruck                       55

9    PATRICK MOYNIHAN

10        By Mr. Weinreb           66
          By Ms. Clarke                     115
11
     D.J. FIFE
12
          By Ms. Pellegrini      122
13        By Mr. Watkins                    127

14   STEPHANIE WAITE

15        By Mr. Weinreb          131
          By Mr. Watkins                    139
16
     JENNIFER MONTGOMERY
17
          By Mr. Weinreb          141              162
18        By Mr. Watkins                    159              164

19   BRIAN J. CORCORAN, JR.

20        By Mr. Weinreb          165

21                        E X H I B I T S

22   GOVERNMENT'S
        EXHIBIT       DESCRIPTION              FOR ID      RECEIVED
23
     831            Photograph                              15
24
     832            Photograph                              16
25

1                      E X H I B I T S  (cont'd)

2    GOVERNMENT'S
       EXHIBIT      DESCRIPTION                    FOR ID      RECEIVED
3
     833            Photograph                                    18
4
     834            Photograph                                    23
5
     964            Explosive recovered from Laurel Street        24
6
     835            Photograph                                    27
7
     840            Rendered-Safe elbow pipe                      28
8
     842            Photograph                                    29
9
     967            Photograph                                    30
10
     843            Photograph                                    32
11
     866            Photograph                                    34
12
     852            Photograph                                    38
13
     853            Photograph                                    41
14
     855            Photograph                                    43
15
     856            Photograph                                    43
16
     854            Tupperware container                          45
17
     1126           Hobby fuses with power sample                 45
18
     782            Photograph                                    54
19
     863            CD recovered from Mercedes                    55
20
     3040 - 3044    Photographs                                   59
21
     3046 - 3049    Photographs                                   59
22
     1554           Photograph                                    85
23
     869 - 875      Photographs                                   87
24
     1551           Photograph                                    90
25

1                          E X H I B I T S (cont'd)

2   GOVERNMENT'S
       EXHIBIT        DESCRIPTION              FOR ID        RECEIVED
3
    1553              Photograph                                91
4
    877               Photograph                                93
5
    1549              Photograph                                93
6
    1550              Photograph                                94
7
    878 - 880         Photographs                               95
8
    881               Photograph                                96
9
    1529              Photograph                                98
10
    883               Photograph                               100
11
    885               Photograph                               103
12
    782 and 783       Photographs                              108
13
    864 and 865       Photographs                              113
14
    895               Photograph                               114
15
    887               White gloves                             115
16
    888               Keys                                     115
17
    890               CD from Honda                            115
18
    894               9 mm Ruger magazine                      115
19
    921               Evidence envelope                        125
20
    907 - 910         Photographs
21                                                             134

22

23

24

25

<pre>
 1                    E X H I B I T S (cont'd)

 2   GOVERNMENT'S
      EXHIBIT        DESCRIPTION              FOR ID      RECEIVED
 3
     948-524,
 4   948-525,
     948-532,
 5   948-541,
     948-542,
 6   948-533 - 948-537,
     948-10 - 948-12,
 7   948-305,
     948-30,
 8   948-72 - 948-76,
     948-253,
 9   948-355,
     948-99 - 948-104,
10   948-307 - 948-310,
     948-416,
11   948-417,
     948-38 - 948-39,
12   948-210,
     948-211,
13   948-552,
     948-553,
14   948-33,
     948-34,
15   948-40,          Photographs                          184

16   DEFENDANT'S
      EXHIBIT
17
     3058             Photograph                            130
18
     3061             Sweatshirt                            130
19

20

21

22

23

24

25
</pre>

```
 1                   P R O C E E D I N G S
 2          THE CLERK:  All rise for the Court and the jury.
 3          (The Court and jury enter the courtroom at 9:47 a.m.)
 4          THE CLERK:  Be seated.
 5          THE COURT:  Good morning, jurors.
 6          THE JURORS:  Good morning.
 7          THE COURT:  Again, we appreciate your patience.  The
 8   lawyers and I were discussing some issues.
 9          Mr. Mellin?
00:05 10          MR. MELLIN:  Good morning, your Honor.  The United
11   States calls Robert McCarthy.
12                ROBERT McCARTHY, duly sworn
13          THE CLERK:  Have a seat.
14          THE WITNESS:  Thank you, sir.
15          THE CLERK:  State your name, spell your last name for
16   the record, keep your voice up and speak into the mic so
17   everyone can hear you.
18          THE WITNESS:  Robert McCarthy, M-C-C-A-R-T-H-Y.
19          THE CLERK:  Thank you.
00:06 20                     DIRECT EXAMINATION
21   BY MR. MELLIN:
22   Q.   Good morning, sir.
23   A.   Good morning, sir.
24   Q.   Where are you employed?
25   A.   I'm employed with the Massachusetts State Police.
```

```
 1    Q.    And what is your rank?

 2    A.    I'm a trooper.

 3    Q.    How long have you been with the Massachusetts State

 4    Police?

 5    A.    Nineteen years.

 6    Q.    During those 19 years, generally what has been your

 7    assignment?

 8    A.    I've been assigned to the road, field, assigned to the

 9    state fire marshal's office investigating origin and cause of

10    fires, and also assigned to the bomb squad.

11    Q.    How many years were you on the road?

12    A.    I was on the road for approximately four years.  Three,

13    four years.

14    Q.    And at some point you were investigating fires and arsons.

15    How long did you do that?

16    A.    I did that for six and a half years.

17    Q.    And then also bombs.  When did you begin investigating

18    bombs and explosives?

19    A.    I was transferred to the bomb squad in 2005.

20    Q.    And what exactly is the bomb squad?

21    A.    It's basically the hazardous devices unit.  We respond to

22    suspicious packages, explosive devices across the Commonwealth

23    of Massachusetts.  I also handle an explosive canine, so I do a

24    lot of sweeps, protective sweeps, dignitary sweeps.

25    Q.    Have you been on the bomb squad since 2005?
```

```
 1   A.    Correct.

 2   Q.    So going till April of 2013, about eight years in the bomb

 3   squad up to that point?

 4   A.    Yes, sir.

 5   Q.    Okay.  You mentioned a canine.  What is a canine?

 6   A.    It's an explosive dog.  I handle a black Labrador.

 7   Q.    And what does the dog do?

 8   A.    It's trained to sniff for explosives.

 9   Q.    In April of 2013, were you working in the bomb squad at

10   that time?

11   A.    Yes, sir.

12   Q.    And on the night of April the 18th of 2013, what were you

13   doing?

14   A.    That evening we were winding down for the day.  And I was

15   up at the bomb squad command post that was set up at the Lenox

16   Hotel.

17   Q.    At some point did you get information there had been a

18   shooting at MIT?

19   A.    Yes, sir.

20   Q.    What did you do in response to that?

21   A.    We were requested to respond with the explosive dogs over

22   to the scene of the shooting.

23   Q.    And what did you do with the dogs at that scene?

24   A.    We swept the area because -- explosives and also weapons,

25   guns, ammunitions is low explosives, so the dogs are also
```

00:08 (line 10)
00:08 (line 20)

1     trained to smell for weapons and evidence at a scene of a

2     shooting.

3     Q.   Generally how do you sweep something with the dog?

4     A.   There's two different ways with a dog.  We could detail

5     the dog to certain areas, or we put them on a long leash and we

6     just let them go walk the area, sniffing the ground looking for

7     items.

8     Q.   At MIT did the dogs alert on anything?

9     A.   No, sir.

00:09 10   Q.   Okay.  After you went to MIT, what happened?

11    A.   We were ready to secure at MIT, we were informed that

12    there was a carjacking over the river on the Cambridge side.

13    So we just got -- I got in my vehicle and we just started

14    heading over towards the Cambridge-Watertown area.

15    Q.   Why did you head towards that area?

16    A.   Just to split up, see if we could locate the carjacking.

17    Q.   What happened as you were proceeding towards Watertown?

18    A.   We were informed that the Watertown police were behind the

19    vehicle --

00:09 20   Q.   Did you --

21    A.   -- that matched the description of the carjacking.

22    Q.   Did you respond to that area?

23    A.   I did, sir.

24    Q.   What happened?

25    A.   At that time there was multiple radio calls of shots

1    fired.  "They're throwing bombs at us.  We need the bomb

2    squad."  And we happened to be a few blocks away at the time.

3    Q.   As you rolled up on the scene, can you describe what you

4    saw and heard?

5    A.   Yeah.  When we rolled up on the scene there was a lot of

6    police activity on the Laurel Street area.  We ended up going

7    by Laurel Street onto Cypress Street.  At that time we heard

8    what we believed to be some type of explosion, and we saw some

9    smoke in the street lamps.

00:10 10   Q.   Can you describe the explosion?

11   A.   We were in the truck.  There was so much chaos on the

12   radio and everything, we just -- from where we were, we just

13   heard like a loud pop and then we saw smoke in the area.  We

14   didn't know exactly where it was coming from.

15   Q.   When you say you were in the truck, what do you mean?

16   What kind of truck?

17   A.   I was in a bomb truck which is basically just a Ford F-350

18   with -- has all our equipment in the back of it.

19   Q.   When you got to that scene, what did you do?

00:10 20   A.   There were other police officers on Cypress Street.  They

21   basically jumped out in front of us.  They recognized the

22   vehicle.  They said, "They're throwing bombs at us."  I said,

23   "We know, we heard it."  At that time they pointed up a

24   driveway.  We attempted to go up that driveway.  At that time,

25   you know, we heard gunfire.  We didn't know where it was coming

```
 1    from.  So we retreated back to the vehicle, back to the truck.
 2    Q.   At some point did the gunfire stop?
 3    A.   We proceeded -- we tried to get over to that area but we
 4    could not due to the roads being blocked by other police
 5    cruisers.  We went around to School Street, I believe it was.
 6    And then at that time there was multiple, multiple calls that
 7    "We need the bomb squad."  "We need the bomb squad."
 8         We had other bomb squad members responding to the scene.
 9    At that time I was requested to respond up to Mount Auburn
10    Street for suspicious items in the road.
11    Q.   How far away is Mount Auburn from Laurel?
12    A.   I would say it's within a mile.
13    Q.   Did you go to Mount Auburn?
14    A.   I did go to Mount Auburn Street.
15    Q.   Anything happen there?
16    A.   There were multiples.  I assisted another trooper assigned
17    to the bomb squad.  He had a cardboard box that was in the
18    middle of the road.  Still there were multiple calls so we
19    rather than x-ray the item like we usually do, we just did a
20    general destruction with a water cannon on it to open the
21    package up.
22    Q.   Okay.  What do you mean by that?
23    A.   We just want to disrupt the package, see what the contents
24    of it are.  So we have -- basically it's like a shotgun but we
25    can shoot water out of it.  So we shot -- you know, it's like a
```

1    water cannon.  And we shot it at the suspected item, the

2    cardboard box, which opened it up and displaced all the

3    contents.

4    Q.   So that was not a bomb, as it turned out?

5    A.   No, it turned out to be nothing.

6    Q.   Okay.  So did you then go back to Laurel Street?

7    A.   Yeah, then I was requested to make my way down to the

8    intersection of Laurel and Dexter Street, that they had

9    potentially a couple of live devices in the middle of the

00:12 10   roadway and also a suspect vehicle that they wanted us to

11   clear.

12   Q.   By that time had the Mercedes SUV left the scene?

13   A.   Yes.

14   Q.   So as you got back to that scene, what happened?

15   A.   Basically we started coming up with an operational plan

16   with the devices in the road, should we render them safe where

17   they are or try to transport them to a safer location.  We also

18   wanted to clear the vehicle.  And we were informed that, you

19   know, there might be suspects in the area.  So we wanted to

00:13 20   determine how we were going to potentially deal with these

21   devices in regards to our own safety and the safety of the

22   residents.

23   Q.   And the vehicle you're talking about, is that the Honda

24   that was still left in the street?

25   A.   Yes, sir.

1    Q.   Okay.  You mentioned rendering something safe.  What does

2    that mean?

3    A.   It would mean -- we were told there were potential pipe

4    bombs in the middle of the road that were still live, still be

5    able to be functioned.  We have different tools to render them

6    safe.  Basically, open them up, vent them.  Basically, rather

7    than shoot water at it, we shoot some other round at it to open

8    them up.  At that time it was determined that we did not want

9    to render these items safe where they were, we wanted to --

00:14 10   Q.   Why not?

11   A.   Just for the safety -- there were still residents in their

12   homes.  We were informed there was a suspect in the

13   neighborhood.  So rather than potentially, you know, secure

14   these items and render them safe in the middle of the road, we

15   determined that we were going to transport them to another

16   location.

17   Q.   How is it you would go about picking up these items that

18   were out on the street?

19   A.   We did it robotically.

00:14 20   Q.   If I could have you look first at Exhibit 831.

21         MR. MELLIN:  Just for the witness.

22   Q.   Do you recognize Exhibit 831?

23   A.   I do, sir.

24   Q.   And, Trooper McCarthy, what is that?

25   A.   That belongs to the Cambridge Police Bomb Squad.  It's

1    basically a truck pulling the trailer, and on the trailer, we

2    call that a TVC, which is a total containment vessel, basically

3    a bomb pod.

4    Q.   If you can hold on for one second.  Is that a fair and

5    accurate photograph of that TVC on the street?

6    A.   Yes, it is.

7    Q.   From April the 19th?

8    A.   Correct, sir.

9         MR. MELLIN:  Your Honor, I would move into evidence

00:15 10   and ask to publish Exhibit 831.

11        MR. WATKINS:  No objection.

12        THE COURT:  Okay.

13        (Government Exhibit No. 831 received into evidence.)

14   BY MR. MELLIN:

15   Q.   All right, Trooper.  You were about to talk about what the

16   TCV is and what we see in Exhibit 831.  If you could for the

17   ladies and gentlemen, where is -- the vehicle towards the left

18   of this photograph, what is that?

19   A.   That is the Cambridge Police Department's bomb squad

00:15 20   vehicle.

21   Q.   And then what is the item behind that?

22   A.   That's their trailer, and on the trailer is their total

23   containment vessel.

24   Q.   And what exactly is a total containment vessel, or a TCV?

25   A.   It's basically a bomb pod.  We can put explosives in

1    there, close it up, transport them to another location.  If the

2    explosives were to go off, these vessels are able to withstand

3    the blast.

4    Q.    And is that actually the way these two pipe bombs were

5    transferred?

6    A.    Yes, sir.

7         MR. MELLIN:  If I could have just the trooper look at

8    832, please.

9    Q.    Do you recognize Photo 832?

00:16 10   A.    Yes, sir.

11   Q.    What is that?

12   A.    On the right-hand side is a vehicle belonging to the

13   Boston Police Department's bomb squad, in the middle of the

14   roadway is one of our robots, and on the left is the same

15   vehicle from a different angle.  That's the Cambridge Police

16   Department's bomb truck.

17   Q.    Is Exhibit 832 a photograph that is a fair and accurate

18   photo of the events that occurred on April the 19th, 2013?

19   A.    Yes, sir.

00:17 20        MR. MELLIN:  Your Honor, I would move into evidence

21   and ask to publish Exhibit 832.

22        MR. WATKINS:  No objection.

23        THE COURT:  All right.

24        (Government Exhibit No. 832 received into evidence.)

25   BY MR. MELLIN:

```
 1   Q.   Now, sir, just for the jury, you were mentioning that to
 2   the right of the photograph is what?
 3   A.   That is -- it's similar to our bomb trucks that we have
 4   but that belongs to Boston Police Department's bomb squad.
 5   Q.   And in the middle what do you see?
 6   A.   That is one of our robots.
 7   Q.   And then to the left you were describing -- what is that
 8   truck?
 9   A.   That's the Cambridge Police Department's bomb squad
10   vehicle.
11   Q.   Okay.  Now, looking at the robot, how is it that you use
12   the robot to acquire the devices?
13   A.   Basically, they handle from like almost a computer.  And I
14   believe that's what's on the table, the drawer to the right on
15   the vehicle, the Boston bomb squad, where someone would operate
16   it remotely, from a laptop almost.
17   Q.   And then if I could have you look at Exhibit 833.  Do you
18   recognize Exhibit 833?
19   A.   Yes.  This is a -- this is a different robot than the
20   other one in the other picture but that is one of our other
21   robots.
22   Q.   And is that also a fair and accurate photograph of what
23   was going on on Laurel Street on April the 19th of 2013?
24   A.   Yes, sir.
25            MR. MELLIN:  Your Honor, I would move into evidence
```

```
 1    Exhibit 833 and ask to publish that.
 2              MR. WATKINS:  No objection.
 3              (Government Exhibit No. 833 received into evidence.)
 4    BY MR. MELLIN:
 5    Q.    Trooper, as you look at Exhibit 833, you said the robot
 6    that we see is different from the other robot, correct?
 7    A.    Correct.
 8    Q.    Do you see an item in the middle of that photograph?
 9    A.    Yes.
10    Q.    And what is that?
11    A.    I believe that is one of the suspected explosive devices.
12    Q.    Okay.  And what does the robot do with that device?
13    A.    Well, this robot in particular has four cameras on it.  So
14    the operator is probably looking at the device, and then
15    towards the front of the robot is where it has grippers, and
16    almost like a robotic hand.
17    Q.    If you could just for -- just touch the screen.  You can
18    touch the screen with the pad of your finger.  If you could
19    just circle these grippers that you're referring to.
20    A.    (Witness complies.)
21          And there's a camera right above the grippers.
22    Q.    And so what do the grippers do?
23    A.    It's basically like a hand.  It opens and closes, and it
24    can pick items up, drag items, you know, numerous different
25    things.
```

```
 1    Q.   So did this robot pick up that explosive device?

 2    A.   Yes, eventually it did.

 3    Q.   Okay.  What do you do to make sure that no one is affected

 4    if this robot picks up a device that goes off?

 5    A.   Basically we clear out the area, and that's why it's done

 6    remotely by the operator.

 7    Q.   And then what does the robot do with the device once it

 8    picks it up?

 9    A.   It depends on the situation.  A lot of times it carries it
10:20
10    to a safer area where we might have, you know, put sandbags out

11    and moved it over to that area.  But in this case it was

12    transported to the total containment vessel and placed inside

13    the total containment vessel.

14    Q.   That's one of the devices.  You mentioned there was a

15    second device as well.  Is that right?

16    A.   Correct, sir.

17    Q.   And what happened to that device?

18    A.   That was also put into the total containment vessel.  Both

19    items were put in the same vessel.
00:20
20    Q.   Once they were put into the vessel, what happened?

21    A.   They were transported to a safer location out at Moon

22    Island out where the Boston Police Department has their gun

23    range.

24    Q.   Where's Moon Island?

25    A.   You go through Quincy.  It's by Quincy.  It's out over in
```

1    the Boston Harbor.

2    Q.    And what happened once the devices went to Moon Island?

3    A.    That vehicle in the total containment vessel stayed there,

4    was secured there.

5    Q.    Okay.  At some point were these devices investigated or

6    rendered safe?

7    A.    On Saturday morning --

8    Q.    The 20th?

9    A.    -- I believe it was the 20th, I went out there with

00:21 10   members of the Boston Police Department's bomb squad and

11   members of the FBI, who are also bomb techs, to render these

12   items safe.

13   Q.    And how was that done?

14   A.    We basically wanted to preserve them for evidence, so we

15   came up with the idea, we had a vice, and we put a vice on top

16   of a piece of plywood and secured that to one of the posts that

17   was out at the range.  And we were going to remove the items

18   robotically, place them in the vice, and then tighten the vice

19   to hold the suspected items.

00:22 20       And these pipes were -- we call it they were internally

21   threaded, so the threads were on the inside of the pipe, and it

22   did have like an area on the outside of the end cap where we

23   could grip that with another robot and unscrew it robotically.

24   Q.    Were you able to unscrew it without it exploding?

25   A.    Yes, sir.

1  Q.   Then what happens?

2  A.   We basically had a non-static plastic bag taped underneath

3  the vice, and then when the cap came off, the powder would fall

4  into the evidence bag.

5  Q.   If you can just generally describe how would one of these

6  devices work?  How would it explode?

7  A.   Basically, it's an explosive train.  You've got to ignite

8  the powder inside, usually with the fuse.  Sometimes it's

9  electronically, sometimes it's with a hobby fuse.  And when the

00:23 10  powder starts to burn, the gases build up inside that vessel,

11  whether it be a pipe, piece of PVC, plastic bottle.  Whatever

12  the vessel is.  The gases build up in that vessel until that

13  vessel cannot contain those gases anymore, and then it releases

14  and causes an explosion.

15  Q.   Now, after these items were rendered safe and the

16  gunpowder is poured out of them, or the explosive is poured out

17  of them, what happened to the items?

18  A.   I believe members of the FBI evidence team secured the

19  items.

00:23 20  Q.   And were they sent down to Quantico, to the FBI lab?

21  A.   Yes, sir.

22      MR. MELLIN:  If I could please have Exhibit 776.

23      THE COURT:  Is this in evidence?

24      MR. MELLIN:  I'm not sure, your Honor.

25      THE CLERK:  Yes, it is.

```
 1              THE COURT:  The clerk tells me it is.
 2              MR. MELLIN:  If I could ask to publish it, then.
 3    BY MR. MELLIN:
 4    Q.   Trooper, do you see the item that's in the middle of this
 5    photograph, Exhibit 776?
 6    A.   Yes, sir.
 7    Q.   What is that?
 8    A.   That is one of the suspected devices on Laurel Street.
 9    Q.   Okay.  Now, you were talking about how one of these items
00:24 10   would be detonated.  Do you see there's a green thread on the
11    device as you look at it?
12    A.   Yes, sir.
13    Q.   What exactly is that?
14    A.   That would be a piece of hobby fuse.
15    Q.   And how would you go about detonating something like this
16    with that hobby fuse?
17    A.   The hobby fuse would be the first item in the explosive
18    train.  The hobby fuse would have to be lit by an open flame.
19              MR. MELLIN:  And if I could pull up Exhibit 834,
00:25 20   please, which is not in evidence.
21    Q.   Trooper, do you see Exhibit 834?
22    A.   Yes, sir.
23    Q.   Is that a photograph of that device that we just saw in
24    the other photograph?
25    A.   Yes, it is.  It's after we rendered it safe and removed
```

1   one of the end caps.

2   Q.   And this actually has the Q number assigned by the FBI

3   lab.  Is that right?

4   A.   Yes, sir.

5          MR. MELLIN:  Your Honor, I would move into evidence

6   Exhibit 834.

7          MR. WATKINS:  No objection.

8          MR. MELLIN:  And ask to publish it.

9          THE COURT:  All right.

00:25 10          (Government Exhibit No. 834 received into evidence.)

11   BY MR. MELLIN:

12   Q.   And if you can describe what we see in this photograph?

13   A.   That is one of the suspected devices after we rendered it

14   safe and removed the powder to separate it from the pipe, and

15   then it was collected by the evidence team.

16   Q.   So at this point in time these items are rendered safe

17   because there's no longer the powder in them, correct?

18   A.   There's not the powder in them and there's no -- with the

19   end cap removed, there's no potential to have it burn and the

00:26 20   gas build up within the vessel.

21          MR. MELLIN:  Your Honor, if I may approach the

22   witness --

23          THE COURT:  Okay.

24          MR. MELLIN:  -- with Exhibit 964.

25   BY MR. MELLIN:

1    Q.   Trooper, could you look in that bag and see if you

2    recognize what's in that bag?

3    A.   Yes, sir.

4    Q.   Do you recognize what is 964?

5    A.   Yes, sir.  That was the item in the picture and also the

6    item that was recovered from Laurel Street.

7            MR. MELLIN:  Your Honor, I would move into evidence

8    Exhibit 964.

9            MR. WATKINS:  No objection.

00:27 10         THE COURT:  Okay.

11           (Government Exhibit No. 964 received into evidence.)

12   BY MR. MELLIN:

13   Q.   Trooper, as you look at what is inside that bag and what

14   is 964, can you describe what the items are?

15   A.    It's basically an elbow.  I'd say it's approximately two

16   inches in diameter, and it still has one end cap on it and one

17   end cap removed.  There is also a hole in the elbow and a piece

18   of hobby fuse.  And in the interior of the pipe it is lined

19   with some sort of epoxy and then lined with BBs.

00:28 20  Q.   Now, when you say there's a hole in it for the hobby fuse,

21   what are you talking about?

22   A.   That's when I explained the hobby fuse with the explosive

23   train, the hobby fuse would burn down into the pipe and then

24   ignite the powders, and that in turn would cause the powder to

25   burn to build up the gases within the vessel.

1    Q.   You mentioned it's an elbow.  And just for the record,

2    we're not talking about a human elbow, correct?  What are we

3    talking about?

4    A.   It's not a straight piece of pipe.  It's a 90-degree pipe.

5    Q.   And as you hold that piece of pipe, how heavy is it?

6    A.   It's really heavy.

7    Q.   Is there a reason that you're aware of why someone would

8    choose to use an elbow as an explosive device?

9    A.   We -- typically we don't see these types of pipe --

00:29  10           MR. WATKINS:  Objection, your Honor.  Objection.

11           THE COURT:  Overruled.

12           THE WITNESS:  We don't see these type of pipe bombs;

13   they usually are a straight length.  In my field, rather than

14   calling this a pipe bomb, I almost called it an improvised

15   grenade.  Just from my experience, the reason why it would be

16   elbowed, so --

17           MR. WATKINS:  Objection, your Honor.

18           MR. MELLIN:  Your Honor, he said based on his

19   experience.

00:29  20           THE COURT:  Go ahead.

21           THE WITNESS:  That when it's tossed it will not roll

22   away; it will land and stop in its spot where it's intended to

23   be.

24   BY MR. MELLIN:

25   Q.   Now, you mentioned there were some items inside that

1    device even today.  Is that right?

2    A.    Yes, sir.

3    Q.    And what is it you see inside there?

4    A.    It looks like it's lined with BBs.

5    Q.    The explosive powder that was inside of it, can you

6    describe the quantity?  How much was inside of it?

7    A.    It was full.

8    Q.    And would you -- based on your training and experience, is

9    that a lot of explosive device?

00:30 10   A.    Yes, sir.

11         MR. MELLIN:  Your Honor, if I may pick up the item and

12   display it for the jury, please?

13         THE COURT:  Yes, you may.

14         (Exhibit No. 834 displayed to the jury.)

15   BY MR. MELLIN:

16   Q.    Trooper, as you look inside Exhibit 834, the BBs are

17   attached to the wall.  Is that right?

18   A.    Yes, sir.

19   Q.    Do you know how that happens?

00:31 20   A.    Some sort of epoxy or glue.

21   Q.    And as I hold this up, there's also the hole that you were

22   discussing.  Is that right?

23   A.    Yes, sir.

24   Q.    And that's where the fuse was?

25   A.    Yes, sir.

```
  1   Q.   I'll hand this back to you.
  2   A.   Thank you.
  3        MR. MELLIN:  If I could please have Exhibit 835
  4   brought up just for the witness.
  5   Q.   Do you see Exhibit 835 on your screen?
  6   A.   Yes, sir.
  7   Q.   Do you recognize what that is?
  8   A.   That is the length of hobby fuse that was secreted in the
  9   pipe.
 10        MR. MELLIN:  Your Honor, I would move into evidence
 11   Exhibit 835 and ask to publish.
 12        MR. WATKINS:  No objection.
 13        THE COURT:  Okay.
 14        (Government Exhibit No. 835 received into evidence.)
 15   BY MR. MELLIN:
 16   Q.   As you look at Exhibit 835, there's three pieces in that
 17   photograph.  Is that right?
 18   A.   Yes, sir.
 19   Q.   And what exactly is that and how does it work?
 20   A.   That is the hobby fuse that burns, like I said, it's the
 21   beginning of the explosive train, to ignite the device.
 22   Q.   And that's the fuse that was inside the hole that was in
 23   Exhibit 964?
 24   A.   It was in the interior and the exterior.
 25   Q.   If you wouldn't mind kind of setting those items aside.
```

1           MR. MELLIN:  And if I could have Exhibit 840 brought

2     up for the witness.

3     Q.   And finally, if you could just -- what is Exhibit 840?

4     A.   This is the same device, the 90-degree elbow pipe after

5     it's been rendered safe.  You could see the pipe lined with the

6     BBs and the hobby fuse in the interior.

7           MR. MELLIN:  Your Honor, I would move into evidence

8     Exhibit 840 and ask to publish.

9           MR. WATKINS:  No objection.

00:33 10         THE COURT:  Okay.

11           (Government Exhibit No. 840 received into evidence.)

12     BY MR. MELLIN:

13     Q.   And again, Trooper, this is the inside of the item that we

14     were just talking about.  Is that right?

15     A.   That's correct.

16     Q.   And you can see the BBs inside there?

17     A.   Yes, sir.

18     Q.   All right.  Thank you.

19           You mentioned there was a second pipe.  If I could have

00:34 20     you look at the Exhibit 842.  Actually, that's a close-up of

21     the one we just saw.  Is that right?

22     A.   I don't believe it is.  I believe that's the straight

23     device.

24     Q.   Actually, I stand corrected.  You're right.  All right.

25     And can you describe what you see there?

A.   That's basically just another pipe length.  It's straight
after it's been rendered safe and the powder's been removed.
And you could see the hobby fuse on the exterior and the
interior of the pipe.  And this pipe is also lined with BBs.

MR. MELLIN:  Your Honor, I would move into evidence
Exhibit 842 and ask to publish.

MR. WATKINS:  No objection.

THE COURT:  Okay.

(Government Exhibit No. 842 received into evidence.)

BY MR. MELLIN:

Q.   Okay.  Now, looking at this photograph, 842, this, again,
was the second item that was rendered safe.  Is that right?

A.   Correct.

Q.   How much powder was in this item?

A.   It was full.

Q.   And is that a substantial amount of powder for something
this size?

A.   Yes.

Q.   And you mentioned the BBs there, again, are lining the
inside of that container.  Is that right?

A.   Yes, sir.

MR. MELLIN:  If I may approach with Exhibit 967, your
Honor.

THE COURT:  All right.

BY MR. MELLIN:

1    Q.    Do you recognize the items in Exhibit 967?

2    A.    Yes, sir.

3    Q.    And what are they?

4    A.    This was another suspected device that was removed from

5    Laurel Street and taken out to the Boston Police Department's

6    gun range on Moon Island.

7    Q.    Is that the item that we just saw that was Exhibit 842,

8    the photograph?

9    A.    Yes, sir.

00:36 10        MR. MELLIN:  Your Honor, at this time I would move

11   into evidence Exhibit 967.

12        MR. WATKINS:  No objection.

13        THE COURT:  Okay.

14        (Government Exhibit No. 967 received into evidence.)

15   BY MR. MELLIN:

16   Q.    As you look at Exhibit 967, what do you notice about it?

17   A.    It's particularly the same device except it's a straight

18   length of pipe rather than a 90-degree elbow bend.

19   Q.    And has the fuse been pulled out of 967?

00:36 20   A.    It has.

21   Q.    Okay.  As we saw in 842, the photograph, the fuse was in

22   at the time?

23   A.    In at the time of recovery or --

24   Q.    Yes, in at the time of recovery.

25   A.    Yes, sir.

1            MR. MELLIN:  Your Honor, if I may approach again, grab

2     the item and display it.

3            THE COURT:  Yes.

4            (Exhibit No. 967 displayed to the jury.)

5     BY MR. MELLIN:

6     Q.   Trooper, do you recall the -- with the hole that is in

7     Exhibit 967 for the fuse, do you remember if that was taped in

8     or if that was just pushed in?

9     A.   I don't recall.

00:38 10   Q.   Do you recall seeing the electrical tape that was on the

11    other item?

12    A.   I do.

13    Q.   Okay.  And was that electrical tape the black electrical

14    tape used to hold that fuse in place?

15    A.   Yes, sir.

16    Q.   Finally, if I can have you look at Exhibit 843.  Do you

17    recognize Exhibit 843?

18    A.   Yes, sir.

19    Q.   What is that?

00:38 20   A.   That's the length of the hobby fuse for this item.

21    Q.   And is that a fair and accurate picture of the hobby fuse

22    that was in that item?

23    A.   Yes, sir.

24            MR. MELLIN:  Move into evidence Exhibit 843, your

25    Honor.

```
 1              MR. WATKINS:  No objection.

 2              THE COURT:  Okay.

 3              (Government Exhibit No. 843 received into evidence.)

 4              MR. MELLIN:  And if I may approach with Exhibit 968,

 5     your Honor.

 6     BY MR. MELLIN:

 7     Q.   Do you recognize Exhibit 968?

 8     A.   Yes, this is the length of the hobby fuse in the photo.

 9     Q.   So that's the hobby fuse that's shown in Exhibit 843?

10     A.   Correct.

11     Q.   What do you notice about the hobby fuse that you see in

12     843, or the actual item, 968 in front of you?

13     A.    It appears that, looking at this photo, the right side of

14     the hobby fuse, it appears that it was attempted to be ignited.

15     There's a little scorching burnt mark on the end of the hobby

16     fuse.

17     Q.   That indicates that it was lit, but it did not burn down?

18     A.   Correct.

19     Q.   Now, you mentioned on the scene the Honda was left behind.

20     Is that right?

21     A.   That is right.

22     Q.   And at some point did you search the Honda?

23     A.   I did.

24     Q.   How did you go about doing that?

25     A.   We initially sent the robots downrange to get a visual on
```

00:39 (line 10)
00:40 (line 20)

the Honda, look inside of it with the cameras to see if there

were any other potentially dangerous items in the area.  The

robot had difficulty opening the trunk, so I put on a bomb

suit -- one of our bomb suits, protective gear.

Q.   And exactly what is that?

A.   It's basically made of Nomex and Kevlar to protect us

from, you know, flammable -- or flames, and also explosives.

It's a head-to-toe bomb squad, as many people have seen, the

big green suit that we walk around in.

00:40 Q.   Why did you put that on?

A.   Because we -- the vehicle could not be totally cleared by

the robot.  So basically I put on the bomb suit, I went

downrange to the vehicle.  I took a rigging line with me, which

is basically just rope with a clamp, and I -- rather than just

go and open up the trunk, I hooked it onto the trunk latch on

the driver's side, I believe it was down by the floor, hooked

on the rope and the latch, I backed up to a safe distance and

then popped the trunk open, pulled the rope, and was able to

pop the trunk remotely.

00:41 Q.   Did you find any other explosive devices in the car?

A.   After we popped the trunk I went down and did another

visual inspection of the vehicle, and I did not observe any

other explosive items.

Q.   At some point did you find a computer bag in the car?

A.   I did, sir.

```
 1    Q.    And was that computer bag removed from inside the car?

 2    A.    Yes, sir.

 3    Q.    Okay.  If I could have you look at Exhibit 866, which I

 4    believe is in evidence.

 5          MR. MELLIN:  If it is not, then if I could just show

 6    it to the --

 7          THE CLERK:  No, it is not.

 8          MR. MELLIN:  All right.  I take that back.

 9    BY MR. MELLIN:

10    Q.    Trooper, do you see Exhibit 866?

11    A.    Yes, sir.

12    Q.    And do you recognize what that is?

13    A.    That is the suspect vehicle, the Honda, on Laurel Street.

14    Q.    And do you see the computer bag in that photo?

15    A.    I do.

16    Q.    Is that a fair and accurate photo of the scene on April

17    the 20th of 2013?

18    A.    Yes, sir.

19    Q.    Okay.

20          MR. MELLIN:  Your Honor, I would move into evidence

21    and ask to publish Exhibit 866.

22          MR. WATKINS:  No objection.

23          THE COURT:  Okay.

24          (Government Exhibit No. 866 received into evidence.)

25    BY MR. MELLIN:
```

00:42 (line 10)
00:42 (line 20)

1    Q.   As we look at Exhibit 866, that's a daytime photo,

2    correct?

3    A.   Correct.

4    Q.   So that's the following day or --

5    A.   Yes, sir.

6    Q.   Is it the 19th or the 20th?  I'm sorry.  Was it the

7    daytime of the 19th?

8    A.   I believe that was the daytime of the 19th, yes.

9    Q.   Okay.  Now, as we look at the photograph, in the middle of

00:42 10   the photograph is the green Honda.  Is that right?

11   A.   Yes, sir.

12   Q.   Where is the computer bag we are talking about?

13   A.   It is the bag on the street, I would say located closest

14   to the tree, in between the tree and vehicle.

15   Q.   If you could do me a favor and circle that, please?

16   A.   (Witness complies.)

17   Q.   And you just described the item, but it's the bag in the

18   middle of the photograph by the tree?

19   A.   Correct, sir.

00:43 20   Q.   All right.  Did you also see some bags to the bottom left

21   of that photograph?

22   A.   Yes, sir.

23   Q.   And are those backpacks that were left on the scene?

24   A.   I believe so, yes.

25   Q.   The computer bag itself, did you ever open that bag at

1    that time?

2    A.    I did not.

3    Q.    What was done to have some sense as to what was in the

4    bag, if anything?

5    A.    I removed the item, put it over closest to where one of

6    the robots were so the robot could try to secure it.  At that

7    time I didn't want to open it.  And we wanted to x-ray it to

8    see what the bag contained, any dangerous items.

9    Q.    Was it x-rayed at that time?

00:43 10    A.    It was x-rayed, yes.

11    Q.    Are you aware of it containing any dangerous items?

12    A.    Not that I was aware of, no.

13    Q.    And at that point then, you leave the bag alone?

14    A.    Yes.

15    Q.    At some point did you go to the scene where the Mercedes

16    was left?

17    A.    Yes, sir.

18    Q.    When did you do that?

19    A.    Actually, at the time there were -- the other bomb techs

00:44 20    were going downrange to x-ray this bag, I received a call.

21    Someone advised me that one of the special agent bomb techs

22    from the FBI was up the street at Spruce and Lincoln Street,

23    that he located a suspected explosive device in the vehicle and

24    he was requesting assistance.

25    Q.    The vehicle you're now talking about was in the Mercedes?

```
 1   A.   Correct, sir.

 2   Q.   So the item was in the Mercedes?  I'm sorry.

 3   A.   Yes, sir.

 4   Q.   Okay.  If I could have you look at what is already in

 5   evidence, Exhibit 795.

 6        Trooper, do you recognize Exhibit 795?

 7   A.   Yes, this is another one of the suspected vehicles, the

 8   Mercedes.

 9   Q.   Is this a photograph of the Mercedes?

10   A.   Correct, sir.

11   Q.   And is that where it was left on the street?

12   A.   Yes, sir.  When I arrived, that's where it was.

13   Q.   And then if I could also have you look at 796 which is

14   also already in evidence.

15        Do you recognize that photo?

16   A.   This is another photograph of the Mercedes.

17   Q.   Okay.  The -- in this photograph the front driver's door

18   and the front passenger door are both open.  Is that right?

19   A.   Yes, sir.

20   Q.   And the back door behind the driver is open as well.  Is

21   that right?

22   A.   Correct, sir.

23   Q.   Okay.  You mentioned that there was something found in

24   this car.  What was found in this car?

25   A.   It was basically a Tupperware box that was -- had
```

00:45 (line 10)

00:45 (line 20)

1   fuses -- had a fuse coming out of it.

2   Q.   Was there a concern at that time about that item?

3   A.   Yes, that that was another improvised explosive device.

4   Q.   And the item itself was actually found where in the car?

5   A.   It is found on the floorboard of the rear seat behind the

6   driver's seat.

7   Q.   So near the door -- as we look at 796, near the door on

8   the left that's open?

9   A.   Yes.

00:46 10   Q.   All right.  If I could have you look at Exhibit 852, which

11   is not in evidence yet, I don't believe.

12       Do you recognize Exhibit 852?

13   A.   Yes, sir.

14   Q.   What is that?

15   A.   That was the device that was removed from the Mercedes,

16   and then at this point it was considered rendered safe.

17   Q.   Is that a fair and accurate photograph?

18   A.   Yes, sir.

19       MR. MELLIN:  Move into evidence Exhibit 852, your

00:46 20   Honor, and ask to publish it.

21       MR. WATKINS:  No objection.

22       THE COURT:  Okay.

23       (Government Exhibit No. 852 received into evidence.)

24   BY MR. MELLIN:

25   Q.   Sir, if we look at Exhibit 852, the item itself is now not

 1    in the Mercedes but behind a Jeep.  Is that right?

 2    A.    Correct.

 3    Q.    Is that how it was when you came on the scene?

 4    A.    No, sir.

 5    Q.    Okay.  So how was that item removed from the Mercedes?

 6    A.    We wanted to remove it from the Mercedes to examine it

 7    further.  We called another robot to the scene.  We attempted

 8    to remove the item with the robot without success.  It was in

 9    an awkward position, it was a little heavy, so we were unable

00:47 10    to get it out with the robot.

 11          So it's the same as I did with the trunk release.  I had a

 12    rigging line, which is basically a rope with a clamp on it,

 13    went to the vehicle, put the clamp on the Tupperware container

 14    and then brought the rope back, you know, over a tree limb,

 15    over to -- and then I went behind a house -- took cover behind

 16    a house and pulled on the rope.  And basically, the Tupperware

 17    container came out of the vehicle and landed in the street.

 18    Q.    And did it land essentially where it is here in this

 19    photograph?

00:48 20    A.    Yes, sir.

 21    Q.    At that point, what did you do?

 22    A.    At that point we did x-ray the item.  We wanted to see

 23    what was in the item before we tried out our options to render

 24    it safe.

 25    Q.    When it came out of the vehicle, did the lid pop off of

1    it?

2    A.    No, the lid was still on top of it.  It was still intact.

3    Q.    So how did you go about rendering it safe?

4    A.    We talked about -- the same thing:  Shoot a water cannon

5    on it, destructing it.  You could put explosives on it to

6    countercharge it but, you know, we are in a residential

7    neighborhood.  We had other vehicles around.  We were confident

8    with this being Tupperware, and plastic on plastic, whereas

9    it's not metal on metal which can cause friction to ignite

00:48 10   powder -- it doesn't have to be a hobby fuse with flame.

11   Friction could ignite powders also.

12         So with this being plastic, and after x-raying it and

13   determining that it looked like just some more hobby fuse and

14   powder, it didn't look like the lid was booby-trapped in any

15   way, we had another bomb tech put on the bomb suit, went

16   downrange and just took the lid off the cover of it -- took the

17   cover off the container.

18   Q.    Got it.

19         MR. MELLIN:  If I could have the trooper look at 853,

00:49 20   please.

21   Q.    What is Exhibit 853?

22   A.    That is the device after removed from the Mercedes and

23   after we considered it, you know, rendered-safe.

24         MR. MELLIN:  Your Honor, I would ask to move into

25   evidence Exhibit 853 and ask to publish it.

1          MR. WATKINS:  No objection.

2          THE COURT:  Okay.

3          (Government Exhibit No. 853 received into evidence.)

4    BY MR. MELLIN:

5    Q.   Trooper, you mentioned that the robot had trouble picking

6    up this item because it was heavy?

7    A.   Yeah, it was at a bad angle on account of the street, and

8    the robot that we were utilizing was a smaller robot.  And it

9    just couldn't lift it.  It was rather heavy for being just a

00:50 10   piece of plastic.

11   Q.   As you look at Exhibit 853, can you describe the two items

12   that you see in 853?

13   A.   Basically you have the container, the bowl of the

14   Tupperware, which contained powder, and then on top of it was

15   multiple lengths of hobby fuse.  To the left was the lid for

16   the Tupperware container which had --

17   Q.   If you could just circle the lid just so we're all clear.

18   A.   (Witness complies.)

19   Q.   And in the photograph you circled the white item that has

00:50 20   a fuse in it?

21   A.   Yes, sir.

22   Q.   All right.  You mentioned it's heavy.  Plastic Tupperware

23   is not that heavy, is it, the container itself?

24   A.   No.

25   Q.   The fuses themselves are not very heavy, are they?

1    A.    No, sir.

2    Q.    What was providing the weight?

3    A.    Just the amount of powder that was in it.

4    Q.    How much powder was in it?

5    A.    I don't particularly know how much was in it.  Two to

6    three pounds.  I couldn't give you an exact.

7    Q.    And just so we're all clear, the item that was actually in

8    the car had the top on it.  Is that right?

9    A.    Correct.

00:51 10    Q.    So the fuse was going through the top?

11    A.    Yeah, there was a hole in the middle of the lid, and

12    actually three lengths of hobby fuse were taped together, and

13    it was protruding into the container.

14    Q.    If I could have you please look at Exhibit 855.  Do you

15    recognize Exhibit 855?

16    A.    Yes, sir.

17    Q.    What is that?

18    A.    I believe that's the Tupperware container after all the

19    items had been removed.  Obviously, a lab picture.

00:51 20    Q.    Is that a fair and accurate photo of the Tupperware

21    container?

22    A.    Yes, sir.

23         MR. MELLIN:  I'd move that into evidence, your Honor,

24    and ask to publish.

25         MR. WATKINS:  No objection.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Okay.                                            |
|       | 2  | (Government Exhibit No. 855 received into evidence.)        |
|       | 3  | BY MR. MELLIN:                                               |
|       | 4  | Q.   Just so we're all clear, that's a photograph of the   |
|       | 5  | container itself?                                           |
|       | 6  | A.   Yes, sir.                                              |
|       | 7  | Q.   Okay.  And there's what appears to be remaining items in |
|       | 8  | that container to some extent.  What would that be?        |
|       | 9  | A.   Just powder residue.                                   |
| 00:52 | 10 | Q.   And if I could have you please look at Exhibit 856.  Do |
|       | 11 | you recognize Exhibit 856?                                  |
|       | 12 | A.   That is the lid for the Tupperware container.         |
|       | 13 | Q.   Is that a fair and accurate photograph of it?         |
|       | 14 | A.   It is, sir.                                            |
|       | 15 | MR. MELLIN:  Move into evidence Exhibit 856, your          |
|       | 16 | Honor, and ask to publish it.                              |
|       | 17 | MR. WATKINS:  No objection.                                |
|       | 18 | THE COURT:  Okay.                                          |
|       | 19 | (Government Exhibit No. 856 received into evidence.)       |
| 00:52 | 20 | BY MR. MELLIN:                                              |
|       | 21 | Q.   Sir, do you see that photograph now in front of you? |
|       | 22 | A.   Yes, sir.                                              |
|       | 23 | Q.   Can you just describe for the ladies and gentlemen of the |
|       | 24 | jury what we're looking at.                                |
|       | 25 | A.   It's the bottom side of the lid to the Tupperware     |

1    container.  It still has some powder residue to it, and it also

2    has the hobby fuse placed through a center hole of the lid.

3    Q.   And you've referred repeatedly to hobby fuse.  What is a

4    hobby fuse?

5    A.   A hobby fuse is just, like I said, the beginning of an

6    explosive train.  It's the first stage to ignite an item, to

7    ignite fireworks, you know, so it burns down and then hits the

8    explosive charge.

9              MR. MELLIN:  Your Honor, if I may approach with two

00:53 10   other items?

11             THE COURT:  You may.

12   BY MR. MELLIN:

13   Q.   Sir, I just handed you two items.  I think they're Exhibit

14   854 and Exhibit 1126.  Do you recognize them?

15   A.   Yes, sir.

16   Q.   What are they?

17   A.   The first item I have here is the Tupperware container

18   with the lid on it, and there's also the hobby fuse that was

19   also through the top lid of the container.

00:54 20   Q.   Can you open that up and pull it out?

21   A.   I could try.

22   Q.   And as you look at that there, is that how that appeared

23   when it sat on the rear floorboard behind the driver's seat in

24   that SUV?

25   A.   It appeared like this but it also had the hobby fuse

1    protruding from the top.

2    Q.   All right.  And the other bag, Exhibit 1126, what are all

3    the items in there?

4    A.   I believe that is all the hobby fuse that was removed from

5    the container along with a powder sample.

6            MR. MELLIN:  Your Honor, if I may approach and display

7    the Tupperware item to the jury.

8            THE COURT:  All right.

9            MR. MELLIN:  Thank you.

00:55 10         THE COURT:  Actually, I think you have to -- it has to

11   be offered.

12           MR. MELLIN:  I'm sorry, your Honor.  I would move into

13   evidence --

14           MS. PELLEGRINI:  854.

15           MR. MELLIN:  -- one item, 854, and also the fuses,

16   which are Exhibit 1126, I believe.

17           MR. WATKINS:  No objection.

18           THE COURT:  Okay.

19           (Government Exhibit Nos. 854 and 1126 received into

00:56 20   evidence.)

21           (Exhibit Nos. 854 and 1126 displayed to the jury.)

22           MR. MELLIN:  Thank you, your Honor.  Nothing further.

23           MR. WATKINS:  Just a couple of questions.

24                        CROSS-EXAMINATION

25   BY MR. WATKINS:

1    Q.    Good morning.

2    A.    Good morning, sir.

3    Q.    So you initially arrived at the Laurel and Dexter area

4    while the bombs were going off?

5    A.    I believe while one of the bombs went off, yes.

6    Q.    And you were able to see that from where you were?

7    A.    We didn't see it; we just saw smoke through the

8    streetlights.

9    Q.    And you came up Cypress Street from Dexter Avenue,

00:57 10   correct?

11   A.    No, we came from the opposite side.  I believe we came

12   down from the Mount Auburn side and past Laurel, and then came

13   around the corner towards Dexter Street.

14   Q.    But I think you mentioned Cypress, didn't you?

15   A.    I was on Cypress, yes.

16   Q.    Oh, you were on Cypress?  Okay.

17   A.    Yeah, I never made it to Laurel Street.

18   Q.    I want to show you what's been marked -- admitted into

19   evidence as Exhibit 775.  Do you recognize that map as that

00:57 20   area?

21   A.    Yes, sir.

22   Q.    And I'll point out a couple of things.  That's Laurel

23   Street there?

24   A.    Correct.

25   Q.    That's Cypress Street there, right?

```
 1    A.    Correct.
 2    Q.    And so it was Cypress Street here that you came up or
 3    Cypress Street up here?
 4    A.    Up top.  Yes, sir, we came down that street.
 5    Q.    You could actually tap on the screen to show --
 6    A.    I believe we came in from this direction here.
 7    Q.    Okay.  And when you came in from that direction, from
 8    Mount Auburn on Cypress Street, you were trying to approach
 9    Laurel, right?
10    A.    Yeah, we were trying to approach Laurel.  I just didn't
11    know the exact location.  Until looking at a map later, I
12    didn't even know what street we were on.
13    Q.    And so -- but now you know it was Cypress at that
14    direction?
15    A.    Correct, sir.  Yup.
16    Q.    And coming in from that direction, you were blocked from
17    getting down to Laurel by other marked cruisers?
18    A.    I believe there were vehicles there or we just bypassed
19    the street.  You know, we just kept going.
20    Q.    Oh, I see.  You bypassed Laurel Street?
21    A.    Yeah, we bypassed Laurel Street.  I never --
22    Q.    So you went actually down all the way here --
23    A.    I went all the way down -- the map doesn't show it -- and
24    around.  That street bends to the right and goes back to
25    Dexter.
```

00:58  (line 10)
00:58  (line 20)

1   Q.   Right.  And there were police vehicles all over the scene

2   at that point, right?

3   A.   Yes, there were.

4   Q.   And they were coming in from all different directions the

5   same way you were, down Cypress from other directions?

6   A.   I don't know who was around us.  I know -- because we were

7   in a truck, marked vehicles passed us and we passed other

8   vehicles.

9   Q.   And, again, you were seeing vehicles here at that area,

00:59 10   right?

11   A.   I believe there were some vehicles there, yeah.

12   Q.   And after you dowsed the package up on Mount Auburn, you

13   came back up to Laurel Street?

14   A.   Yeah, we came back down Dexter Street to Laurel Street.

15   Q.   And Dexter Avenue, actually.

16   A.   Okay.  Sorry about that.  Dexter Avenue.

17   Q.   No worries.

18        And this is where the containment vehicle eventually was

19   parked --

01:00 20   A.   Yes, sir.

21   Q.   -- and the robots were sent from there?

22   A.   Correct, sir.

23        MR. WATKINS:  That's all I have, your Honor.  Thank

24   you.

25        THE COURT:  Anything else?

1           MR. MELLIN:  No, your Honor.  Thank you.

2           THE COURT:  All right.  Thank you, sir.  You may step

3   down.

4           THE WITNESS:  Thank you, your Honor.

5           (The witness is excused.)

6           MS. PELLEGRINI:  The United States calls Trooper

7   Matthew Hess.

8                      MATTHEW HESS, duly sworn

9           THE CLERK:  State your name, spell your last name for

01:02 10   the record, keep your voice up and speak into the mic so

11   everyone can hear you.

12           THE WITNESS:  My name is Matthew Hess.  My last name

13   is spelled H-E-S-S.  I'm a trooper with the Massachusetts State

14   Police.

15                      DIRECT EXAMINATION

16   BY MS. PELLEGRINI:

17   Q.   Good morning, Trooper Hess.

18   A.   Good morning.

19   Q.   Can you tell the ladies and gentlemen of the jury how long

01:02 20   you've been employed by the Massachusetts State Police?

21   A.   Thirteen years.

22   Q.   And what is your current assignment?

23   A.   My current assignment is with Crime Scene Services in

24   Worcester.

25   Q.   What does that mean?

A.    Crime Scene Services, what we do is we respond to crime
scenes, unattended deaths.  And what we do is we take
photographs, videotape, and also processes fingerprints and
collect other evidence that are on the scenes.

Q.    And how long have you been doing that assignment?

A.    Approximately, now, eight years.

Q.    All right.  Now, you said you're assigned to Worcester?

A.    Correct.

Q.    Do you, though, have occasion to be assigned to other
locations?

A.    Yes, as needed.

Q.    As needed?  And do you work with anyone else?

A.    We work with the district attorneys' offices and, as
needed, different district attorneys' offices when they need
crime scenes to be processed.

Q.    All right.  And in that capacity, did you have occasion on
or about April the 21st of 2013 to respond to a location for
evidence collection?

A.    Yes.

Q.    And can you tell the jury about that.

A.    I responded to Watertown PD, the headquarters there in
Watertown.  There was located a black Mercedes in the garage.
I was helping and assisting ballistics process the vehicle for
ballistic evidence.

Q.    And where exactly was the Mercedes located when you

1    arrived at that location?

2    A.   It was in the garage at Watertown PD.

3    Q.   All right.

4         MS. PELLEGRINI:  May I have Exhibit 795 up, which is

5    already in evidence.

6    Q.   Trooper Hess, do you recognize the vehicle in this photo?

7    A.   Yes.

8    Q.   Particularly the one on the left side, the Mercedes?

9    A.   Yes.

01:04 10   Q.   All right.  This is not the location at which you examined

11   it, correct?

12   A.   Correct.

13   Q.   But is this, in fact, the vehicle that you went to look

14   at?

15   A.   That is the vehicle.

16   Q.   All right.  Thank you.

17        And when you got --

18        MS. PELLEGRINI:  You can take that down.

19   Q.   -- to the location at Watertown PD in the garage, what did

01:04 20   you do?

21   A.   Ballistics was there first and they told me what they were

22   going to do.  Then I received a phone call from Middlesex.  A

23   few troopers, they were asking me to look for a specific piece

24   of evidence.

25   Q.   What were you asked to look for?

1   A.   I was asked to look for a CD.  But what I first did was

2   just photograph the vehicle as it was in place.  And then I

3   worked my way, taking different sides of the vehicle,

4   photographs.  And then the vehicle did not have power to it, so

5   we had to call a tow truck to get power to the vehicle, to put

6   a battery to it.

7   Q.   All right.  And once that happened, once the battery was

8   attached, what happened?

9   A.   I turned on the radio and pushed the button to get the CD

01:05 10   out.

11   Q.   And so you extracted the CD at that time?

12   A.   What I first did when the CD was extracted, I took

13   photographs of it in place, and then took the photo of the CD

14   as it was in the vehicle and then placed it in the bag.

15   Q.   Okay.

16        MS. PELLEGRINI:  So if I may approach, your Honor?

17        THE COURT:  All right.

18   BY MS. PELLEGRINI:

19   Q.   Trooper Hess, I'm going to show you what's been marked for

01:05 20   identification as Government's Exhibit 863, and ask you to look

21   at that item and ask you if you recognize that.

22   A.   Yes, that's the bag.

23   Q.   All right.  That's the bag into which you placed the CD?

24   A.   Yes.

25   Q.   How do you recognize it as such?

```
 1   A.   I recognize it.  It's my handwriting on the bag and -- all
 2   my writing on the bag from the vehicle.
 3   Q.   All right.  And have you had occasion prior to coming into
 4   court today to actually open the bag and review the article
 5   therein?
 6   A.   Yes, I did.
 7   Q.   And is that, in fact, the same CD that you retrieved from
 8   the Mercedes on April the 21st?
 9   A.   It is.
10   Q.   Could you remove it from the bag and show it to the jury,
11   please.
12   A.   (Witness complies.)
13   Q.   Thank you, Trooper Hess.
14        Trooper Hess, did you also have occasion in looking at the
15   vehicle to make any observations particularly of the bumper of
16   the vehicle, if you recall?
17   A.   The bumper?
18   Q.   Yes.
19   A.   I took photos of the vehicle, just saw the vehicle as it
20   was, and that -- I know that the bumper was damaged.  I didn't
21   make any notes of it.
22        MS. PELLEGRINI:  Let me have just for the witness,
23   please, your Honor, Exhibit 782.
24   Q.   Trooper Hess, do you recognize the image before you?
25   A.   Yes.
```

1    Q.   And is that, in fact, the bumper of the Mercedes?

2    A.   It is.

3    Q.   And is that, in fact, in the same condition as when you

4    observed it in the garage?

5    A.   Yes.

6    Q.   All right.  And particularly did you make any observations

7    about damage or any other items connected to or on the bumper,

8    if you recall?

9    A.   I just recall that we were doing ballistic evidence.  I

01:07 10   don't recall seeing anything of significance on the bumper,

11   just taking photographs of it in place.

12   Q.   All right.  But this does fairly and accurately represent

13   the bumper as you saw it?

14   A.   Yes, that is fair and accurate.

15        MS. PELLEGRINI:  Your Honor, the government would move

16   this and ask it be published at this time.

17        MR. BRUCK:  No objection.

18        THE COURT:  Okay.

19        (Government Exhibit No. 782 received into evidence.)

01:07 20   BY MS. PELLEGRINI:

21   Q.   Trooper Hess, I am going to draw on the screen --

22   hopefully I will draw on the screen -- a circle.  Do you recall

23   making observations of this area on the bumper?

24   A.   I remember seeing that it was damaged, yes.

25   Q.   Do you recall anything else?  Any discoloration on the

```
 1    bumper at all?

 2    A.    I don't remember.

 3    Q.    All right.  Thank you.

 4              MS. PELLEGRINI:  That can go down.

 5              May I have a moment, your Honor?

 6              (Counsel confer off the record.)

 7              MS. PELLEGRINI:  Thank you.  No further questions for

 8    Trooper Hess.

 9              MS. CLARKE:  Just one moment.

01:08 10          (Pause.)

11              MS. PELLEGRINI:  I'm sorry, your Honor.  If I did not

12    offer before the trooper leaves 863, I would offer it now.

13              THE COURT:  I'm sorry.  The CD?

14              MS. PELLEGRINI:  The CD.

15              MR. BRUCK:  Subject to our motion.

16              THE COURT:  Yes.  It will be admitted.

17              (Government Exhibit No. 863 received into evidence.)

18              MR. WATKINS:  May we have just a moment, your Honor?

19              (Counsel confer off the record.)

01:09 20          MR. WATKINS:  May we have the camera?  Thank you.

21                           CROSS-EXAMINATION

22    BY MR. BRUCK:

23    Q.    Good morning, Trooper Hess.  I'm David Bruck.  I'm one of

24    Mr. Tsarnaev's attorneys.

25              MR. BRUCK:  If we could have for the witness, your
```

1   Honor, Exhibit 3039.

2   Q.   Trooper Hess, is that one of the photographs that you took

3   that morning on the 21st?

4   A.   Yes.  Yes.

5   Q.   And does that fairly and accurately represent the right

6   side of the Mercedes about which you were testifying a moment

7   ago?

8   A.   Yes.

9   Q.   All right.  I'm going to show you a series of additional

01:10 10   photos and ask you whether all of them -- each of them fairly

11   and accurately represents the Mercedes as you saw it on the

12   21st of April, 2013.

13         MR. BRUCK:  For the witness, 3040, please.

14   A.   That's a fair and accurate representation.

15   Q.   3041?

16   A.   Yes.

17   Q.   3042?

18   A.   Yes.

19   Q.   3043?

01:11 20   A.   Yes.

21   Q.   3044?

22   A.   Yes.

23         MR. WATKINS:  Hold on.

24         MR. BRUCK:  I'm getting ahead of -- I'm sorry.

25         THE WITNESS:  Yes.

```
  1   BY MR. BRUCK:

  2   Q.   Let's see.  That was 3043.  And then 3044?

  3   A.   Yes.

  4   Q.   Skipping now to 3046?

  5   A.   Yes.

  6   Q.   Thank you.  3047?

  7   A.   Yes.

  8   Q.   3048?

  9   A.   Yes.

01:12 10   Q.   And 3049?

 11   A.   Yes.

 12   Q.   To summarize, these are all pictures that you took of the

 13   Mercedes that day?

 14   A.   Correct.

 15   Q.   And they fairly and accurately represent how it appeared

 16   at that time?

 17   A.   Yes.

 18        MR. BRUCK:  We offer.

 19        MS. PELLEGRINI:  Your Honor, the government objects

01:12 20   and we wish to be heard at sidebar.

 21        THE COURT:  Okay.

 22        (Discussion at sidebar and out of the hearing of the

 23   jury:)

 24        MS. PELLEGRINI:  Your Honor, to the extent that this

 25   is outside of the scope and it becomes the defense's witness,
```

we've received no notice in advance of any of these photographs

being moved into evidence.  And the second ground is the

relevance of any of what is shown in the photographs sought to

be admitted.

MR. BRUCK:  Your Honor, the government has moved these

in to show the --

MS. PELLEGRINI:  No, the defense.

MR. BRUCK:  I'm sorry.  No, the government has moved

in the photograph of the fender to show and to corroborate

their testimony about driving down the street and banging into

a police cruiser, and there has been testimony that -- that, in

turn, relates to the testimony about how the defendant

attempted to make his escape.

These are photographs, of course, showing the

trajectories of an enormous number of bullets which supports

the inference that the defendant would be ducking and not

likely to have at all times seen where he was going.  And we

think that this is responsive to the evidence that was

introduced on direct from this witness having to do with the

way the defendant was driving down the street.

MS. PELLEGRINI:  Your Honor, the way the defendant was

driving down the street was a factual matter and it's been

testified to and simply supported by the evidence.  This --

asking the jury to draw an inference where there is no evidence

before the jury about what the defendant was doing while he was

 1     driving far exceeds what has been asked of the witness.

 2              THE COURT:  The objection is overruled.

 3              (In open court:)

 4              THE COURT:  They're admitted.

 5              (Defense Exhibit Nos. 3040 through 3044 and 3046

 6     through 3049 received into evidence.)

 7              MR. BRUCK:  Thank you, your Honor.

 8     BY MR. BRUCK:

 9     Q.   Trooper, I would like to start with 3039.

01:15 10     A.   Yes, that's a fair and accurate representation.

11     Q.   Thank you.  And what do the markings appear to be that are

12     highlighted with tape in these photographs?

13     A.   I believe those to be bullet holes.

14     Q.   Those are all bullet holes on the right side of the

15     vehicle?

16     A.   Yes.

17     Q.   All right.  And turning to 3040, if you could tell us what

18     part of the car that appears to be.

19     A.   That seems to be, I believe, one of the pillars on the

01:16 20     passenger side.

21     Q.   On the passenger's side.  And again, that shows bullet

22     holes?

23     A.   I believe it does.

24     Q.   What is depicted in 3041?

25     A.   The white tape signifies bullet holes.

1    Q.    And 3042?

2    A.    Again, bullet holes.

3    Q.    Can you see how many bullet holes there appear to be in

4    the windshield?

5    A.    I'm not a ballistician, but there appears to be seven.

6    Q.    Approximately seven?

7    A.    Approximately.

8    Q.    Including several that are on the driver's side?

9    A.    Yes.

01:16 10   Q.    3043 is a close-up that you took of the driver's side of

11   the windshield, correct?

12   A.    Correct.

13   Q.    Showing that the windshield was penetrated by how many

14   bullet holes?

15   A.    It appears to be six.

16   Q.    And 3044, again, depicts numerous bullet holes on the

17   driver's side of the car?

18   A.    Correct.

19   Q.    Would you tell us what 3046 appears to show.

01:17 20   A.    It appears to be a bullet through a headrest.

21   Q.    And do you know from looking at this picture, or do you

22   recall, which headrest that is in the car?

23   A.    I believe that's the center of the rear seat.

24   Q.    In the rear seat?  Okay.

25         Drawing your attention now to 3047.

```
 1    A.   That's the driver's side headrest.

 2    Q.   That is how many bullet holes apparently passing through,

 3    or have passed through -- have hit the driver's side headrest?

 4    A.   I believe that's one.  Again, I'm not a ballistician.  I'm

 5    not an expert on projectile.

 6    Q.   Okay.  And again 3048.  More bullet holes in --

 7    A.   Yes, in the headrest.

 8    Q.   And that would be both the driver's side and passenger's

 9    side headrest in the front?

01:18 10    A.   Yes.

11    Q.   And then the -- what is depicted by 3049?

12    A.   That is the rear of the vehicle.

13    Q.   And what does that indicate?

14    A.   The window shattered.

15         MR. BRUCK:  Thank you, Trooper Hess.  That's all we

16    have.

17         MS. PELLEGRINI:  No redirect, your Honor.

18         THE COURT:  Thank you, Trooper.

19         (The witness is excused.)

01:19 20         MR. WEINREB:  Your Honor, the next witness will be

21    rather lengthy so...

22         THE COURT:  All right.  Why don't we take the morning

23    recess at this point.

24         THE CLERK:  All rise for the Court and the jury.  The

25    Court will take the morning recess.
```

1              (The Court and jury exit the courtroom and there is a

2        recess in the proceedings at 11:02 a.m.)

3              THE CLERK:  All rise for the Court and the jury.

4              (The Court and jury enter the courtroom at 11:29 a.m.)

5              THE CLERK:  Be seated.

6              MR. WEINREB:  The United States calls Patrick

7        Moynihan.

8              MR. WATKINS:  Judge, just one issue before we get

9        started.  It came to our attention that during our cross of

01:48 10   Trooper McCarthy there was an admitted exhibit that I was

11       showing to Trooper McCarthy.  It was unclear whether that went

12       to the jury or not.

13             THE JURORS:  It did not.

14             MR. WATKINS:  It did not go to the jury.

15             THE COURT:  That was probably my error.

16             MR. WATKINS:  A wise error.

17             (Laughter.)

18             THE COURT:  What do you want to do?

19             MR. WATKINS:  The court reporter is prepared to read

01:49 20   back the testimony.  I can play it through the exhibit as she

21       reads it.

22             MR. MELLIN:  Your Honor, or I can step out and see if

23       Trooper McCarthy is outside and just have him re-called.

24             THE COURT:  Well, is it a contained portion of the

25       transcript, I mean, relatively contained?

1          MR. WATKINS:  It was pretty short.

2          THE COURT:  Yeah, that might be the easiest way to do

3     it.

4          MR. WATKINS:  Can I do that now, then?

5          THE COURT:  I don't care.  If he's right there and you

6     want to call him back, it may be better for him to explain it.

7          (Pause.)

8          THE COURT:  All right.  So we'll have the reporter

9     read back -- you'll tell her what portions?

01:50 10        MR. WATKINS:  I think we've already discussed where it

11    is.  She may have to go a little slow as I remind myself of

12    what I did.

13         THE COURT:  Could you just give us the page and line

14    just as a beginning?

15         THE REPORTER:  Yes, but it won't line up.

16         THE COURT:  Right.  Yes, I understand.  Subject to

17    change.

18         THE REPORTER:  Page 55, line 25.

19         "QUESTION:  I want to show you what's been marked --

00:57 20    admitted into evidence as Exhibit 775.  Do you recognize that

21    map as that area?

22         "ANSWER:  Yes, sir.

23         "QUESTION:  And I'll point out a couple of things.

24    That's Laurel Street there?

25         "ANSWER:  Correct.

         1              "QUESTION:  That's Cypress Street there, right?

         2              "ANSWER:  Correct.

         3              "QUESTION:  And so it was Cypress Street here that you

         4     came up or Cypress Street up here?

         5              "ANSWER:  Up top.  Yes, sir, we came down that street.

         6              "QUESTION:  You could actually tap on the screen to

         7     show --

         8              "ANSWER:  I believe we came in from this direction

         9     here.

00:58   10              "QUESTION:  Okay.  And when you came in from that

        11     direction, from Mount Auburn on Cypress Street, you were trying

        12     to approach Laurel, right?

        13              "ANSWER:  Yeah, we were trying to approach Laurel.  I

        14     just didn't know the exact location.  Until looking at a map

        15     later, I didn't even know what street we were on.

        16              "QUESTION:  And so -- but now you know it was Cypress

        17     at that direction?

        18              "ANSWER:  Correct, sir.  Yup.

        19              "QUESTION:  And coming in from that direction, you

00:58   20     were blocked from getting down to Laurel by other marked

        21     cruisers?

        22              "ANSWER:  I believe there were vehicles there or we

        23     just bypassed the street.  You know, we just kept going.

        24              "QUESTION:  Oh, I see.  You bypassed Laurel Street?

        25              "ANSWER:  Yeah, we bypassed Laurel Street.  I never --

1           "QUESTION:  So you went actually down all the way

2     here --

3           "ANSWER:  I went all the way down -- the map doesn't

4     show it -- and around.  That street bends to the right and goes

5     back to Dexter.

6           "QUESTION:  Right.  And there were police vehicles all

7     over the scene at that point, right?

8           "ANSWER:  Yes, there were.

9           "QUESTION:  And they were coming in from all different

00:59 10     directions the same way you were, down Cypress from other

11     directions?

12           "ANSWER:  I don't know who was around us.  I know --

13     because we were in a truck, marked vehicles passed us and we

14     passed other vehicles.

15           "QUESTION:  And, again, you were seeing vehicles here

16     at that area, right?

17           "ANSWER:  I believe there were some vehicles there,

18     yeah.

19           "QUESTION:  And after you dowsed the package up on

00:59 20     Mount Auburn, you came back up to Laurel Street?

21           "ANSWER:  Yeah, we came back down Dexter Street to

22     Laurel Street.

23           "QUESTION:  And Dexter Avenue, actually.

24           "ANSWER:  Okay.  Sorry about that.  Dexter Avenue.

25           "QUESTION:  No worries.

```
 1              And this is where the containment vehicle eventually
 2    was parked --
 3              "ANSWER:  Yes, sir.
 4              "QUESTION:  -- and the robots were sent from there?
 5              "ANSWER:  Correct, sir.
 6              "MR. WATKINS:  That's all I have, your Honor.  Thank
 7    you."
 8              MR. WATKINS:  And that is, indeed, all I have.  Thank
 9    you, your Honor.
01:54 10        THE COURT:  All right.
11              MR. WEINREB:  The United States calls Patrick
12    Moynihan.
13                   PATRICK MOYNIHAN, duly sworn
14              THE CLERK:  Have a seat.  State your name, spell your
15    last name for the record, keep your voice up and speak into the
16    mic so everyone can hear you.
17              THE WITNESS:  Patrick Moynihan.  And it's
18    M-O-Y-N-I-H-A-N.
19                        DIRECT EXAMINATION
01:55 20   BY MR. WEINREB:
21    Q.   Good morning.
22    A.   Good morning.
23    Q.   Where do you work, sir?
24    A.   I work for the state police.
25    Q.   How long have you worked there?
```

```
 1   A.    Thirteen years.

 2   Q.    What are your current job responsibilities?

 3   A.    I work in the Crime Scene Services section.

 4   Q.    Where did you go to school and what degrees have you

 5   earned?

 6   A.    I have a bachelor's of arts from LaSalle University in

 7   Pennsylvania in criminal justice and sociology.  I got that in

 8   2000.  I also have a master's in science I got in 2008 from

 9   Westfield State University in criminal justice.

10   Q.    What is the state police Crime Scene Services section?

11   A.    The Crime Scene Services section, we were responsible for

12   responding to local state and federal crime scenes.  Our

13   responsibilities include but are not limited to responding to

14   homicide scenes, to responding to B&Es, bank robberies, arson

15   fires, and reports of sexual assaults.  When we get on-scene,

16   our job is to develop and to document latent fingerprints, to

17   develop and document footwear impressions as well as tire

18   impressions.  We transport evidence and we write reports on all

19   of our findings.

20   Q.    In addition to your undergraduate and graduate training in

21   computer justice, have you received any training in how to

22   handle evidence properly?

23   A.    Yes.

24   Q.    Have you received specialized training in how to document

25   crime scenes properly?
```

1    A.    Yes.

2    Q.    Have you received training in fingerprint identification

3    and comparison?

4    A.    I have.

5    Q.    Is that in-house training or external training?

6    A.    Both.  We do both.

7    Q.    Please describe your internal training.

8    A.    Our internal training starts in the classroom and then we

9    learn about the history of latent fingerprints, why it's

01:57 10   important, the actual orientation of a latent fingerprint.  We

11   learn about ridgeology, which is the biology, the morphology of

12   actual friction ridge skin; we learn about digital photography:

13   how to take digital images; we learn chemical processing

14   safety; and entering fingerprints into the two databases that

15   we're responsible for entering in.

16   Q.    Did you also learn how to compare one fingerprint to

17   another?

18   A.    We do.

19   Q.    What about your outside training?

01:58 20   A.    Well, at this point I've -- I have about 700 hours of

21   external training.  We started immediately.  I started with an

22   FBI basic fingerprint class.  In 2008 we are constantly going

23   to external training in regards to all the disciplines that

24   we're responsible for.  It's part of our ASCLD/LAB

25   accreditation as well.

1    Q.   So you just talked about your lab accreditation, but how

2    about you personally.  After getting trained, did you have to

3    take some kind of examination to make sure you had learned

4    everything properly?

5    A.   I did.  I took -- once we complete the six-month process

6    in the beginning, the initial process, I took a proficiency --

7    it's a competency exam -- to make sure that I had enough

8    knowledge to actually do the work.  And I did that in 2008.

9    Q.   Did you pass the exam?

01:59 10   A.   I did.

11   Q.   After passing that exam, are there other exams you've had

12   to take since to make sure that your skills are still up to

13   snuff?

14   A.   Yes.  We take yearly proficiency exams in the disciplines

15   that I'm responsible for, and that basically tests us to make

16   sure that we're still efficient in what we do.

17   Q.   Okay.  So do fingerprint professionals like you have a

18   professional association that they belong to?

19   A.   We do.  The IAI is the largest and the oldest

01:59 20   organization.  It's the International Association for

21   Identification, and I'm also a member of the NEDIAI?

22   Q.   NEDIAI?

23   A.   Yeah, it's the New England division of the IAI.

24   Q.   In the course of your work, how many fingerprints have you

25   identified at crime scenes and documented and preserved for

1    possible later comparison?

2    A.    Thousands.

3    Q.    And in the course of your work, how many fingerprints and

4    palm prints have you actually analyzed by doing comparisons?

5    A.    Thousands.

6    Q.    Are there occasions where you have identified a person by

7    comparing the person's fingerprints to fingerprints found at a

8    crime scene?

9    A.    I have.

02:00 10   Q.    And are there occasions where you've excluded a person by

11   comparing that person's fingerprints to fingerprints found at a

12   crime scene?

13   A.    I have.

14   Q.    And have you done each one of them many times?

15   A.    Yes.

16   Q.    Approximately how many?

17   A.    Thousands of times.

18   Q.    As part of your job, are you expected to testify in court

19   about your examinations and the results of those examinations?

02:00 20   A.    I am.

21   Q.    How many times have you testified in court?

22   A.    Approximately 25 times.

23        MR. WEINREB:  Your Honor, at this time the government

24   would ask that Trooper Moynihan be qualified as a fingerprint

25   expert.

```
 1              MS. CLARKE:  No objection.
 2              THE COURT:  Okay.
 3     BY MR. WEINREB:
 4     Q.   Which parts of the human body are capable of leaving
 5     prints?
 6     A.   We have two areas on our body that have friction ridge
 7     skin:  It's the plantar and palmer areas of the body.  The
 8     palmer areas, the friction ridge starts right here at your
 9     wrist bracelet and it continues all the way up over the top of
02:01 10  your fingertip to your fingernail.  On our feet, they start at
11     our heel and it continues all the way along the bottom of our
12     foot all the way to the tops of our toes underneath the
13     fingernail.
14     Q.   You used the phrase "friction ridge skin."  And just in
15     layman's terms, does the skin on the hands and the feet have
16     tiny raised ridges?
17     A.   They do.
18     Q.   But the skin on the rest of your body doesn't?
19     A.   No.
02:01 20  Q.   Is that what makes them capable of leaving prints, those
21     ridges?
22     A.   Yes.
23     Q.   Can two individuals have the same fingerprints?
24     A.   No.
25     Q.   What about identical twins?
```

1     A.    No.

2     Q.    How can you be so sure?

3     A.    Because I've actually done comparisons of identical twins.

4     And I just know that every human being has different friction

5     ridge skin.  And the reason that happens is when -- your ridges

6     are formed before you're born, and the ridges form because of

7     the pressures that you experience inside your mother's womb.

8     So it's the pressures of when you're moving inside your mom

9     that actually help form the ridges that you have on these

02:02 10    areas.

11    Q.    Okay.  Would it be fair to say that millions of

12    fingerprint comparisons have been done by professionals over

13    time?

14    A.    That's -- yes.

15    Q.    And has anyone ever found two people with the exact same

16    fingerprints?

17    A.    No.

18    Q.    What is a latent print?

19    A.    A latent fingerprint is a fingerprint that isn't seen;

02:02 20    it's hidden.  It's a term that latent fingerprint examiners or

21    analysts use to describe a latent fingerprint -- to describe a

22    latent fingerprint at a crime scene or in the lab when we're

23    processing a piece of evidence in the lab.  It's a fingerprint

24    from the areas that I've been talking about:  it's from

25    your -- the palmar areas of your hand and the plantar areas of

1    your feet.

2    Q.   So a latent fingerprint is a fingerprint you find at a

3    crime scene?

4    A.   Yes.

5    Q.   And when you first find it, just by looking at it, you

6    can't know whose it is?

7    A.   No.

8    Q.   What's a known print?

9    A.   A known fingerprint is -- for instance, when we roll a

02:03 10   fingerprint for an attorney or a doctor, it's like an ink print

11   or a computer-made impression where you would see it on a

12   tempur card where you could see the actual known fingerprint

13   when it's taken.

14   Q.   Let's break that down a little bit.  You talked about

15   rolling?

16   A.   Right.

17   Q.   What does that refer to?

18   A.   Well, rolling is what we describe as -- it's controlled.

19   It's a controlled roll.  We're rolling it from the nail to

02:04 20   nail.  So we're actually rolling it from fingernail on one side

21   to the fingernail on the other side.  So we're trying to get as

22   much of the friction ridge detail when we're rolling the

23   fingerprint.

24   Q.   All right.  And so to help the jury visualize that,

25   correct me if I'm wrong, a person puts their finger on some

```
 1    ink, like an ink pad?
 2    A.    Yes.
 3    Q.    And then they put their finger on a piece of paper or
 4    cardboard, and then they roll it a little bit from right to
 5    left?
 6    A.    That's correct.
 7    Q.    And that leaves an image of their print?
 8    A.    That's correct.
 9    Q.    And these days you don't even need to put your finger on
10    ink, you can just do it on a glass plate, like a Xerox machine,
11    and a computer can take a picture of it?
12    A.    That's correct.
13    Q.    Now, when a person leaves a fingerprint on something, what
14    exactly is it that he or she is leaving?  And by that I mean,
15    what is a print made of?
16    A.    Well, a latent fingerprint is made up of 90 percent water.
17    The other 1 percent of a latent fingerprint are made up of
18    hundreds of compounds, but primarily it's made up of amino
19    acids, lipids and salts.  And these are things that we can use
20    as well.
21    Q.    So the water that -- is that sweat?
22    A.    Yes, it's perspiration.  Yup.
23    Q.    And the component of the fingerprint that you said were
24    lipids and other things, is that -- like a layman's term for
25    that oil?
```

1    A.    Yes.

2    Q.    All right.  So the fingerprint consists of sweat and oil

3    from a person's finger or feet?

4    A.    Yes.

5    Q.    All right.  So if you touch something and your fingers

6    aren't sweaty or oily, will you leave a fingerprint?

7    A.    Well, you could, but there's a potential that you might

8    not.

9    Q.    Let's say there's zero sweat or oil on your finger.  Could

02:06 10   you leave a fingerprint?

11   A.    No.

12   Q.    Are some people naturally more prone to having sweat and

13   oil on their fingers than other people?

14   A.    Yes.

15   Q.    Do other things affect whether a person's fingers are

16   likely to have sweat or oil on them?

17   A.    Yes.

18   Q.    Other than just the way they're born?

19   A.    Yes.

02:06 20   Q.    What are those things?

21   A.    Temperature.  Typically in the wintertime, temperature

22   with cold -- temperatures -- your actual pores will constrict

23   and there's potential for not to leave a fingerprint there.  In

24   extreme heat, some people actually excessively sweat so it

25   might actually obliterate, meaning that you might -- I mean,

1   there's so much sweat on there that you might actually not

2   leave a fingerprint.  Actually, being nervous and having a lot

3   of tension can also cause you to sweat as well from these areas

4   that I'm talking about.

5   Q.   All right.  And what if you just like wiped your fingers

6   on your pants before you touched something.  Could that be

7   enough to --

8   A.   That could be possible.

9   Q.   Are there other reasons a person who touches a surface

02:07 10   might not leave fingerprints?

11   A.   Yup.  There's the potential of washing the hands right

12   before you touch something, there could be -- was the person

13   wearing gloves?  There's was there a lot of dust or dirt on the

14   actual surface that the person touched before leaving -- or

15   actually trying to grip or something like that?

16   Q.   And let's say a person touched something like a component

17   of a bomb or the outside of a bomb and left a fingerprint but

18   then the bomb exploded.  Is there anything about that process

19   that could destroy the fingerprints?

02:07 20   A.   Absolutely.

21   Q.   What would that be?

22   A.   I mean, you have to understand that a fingerprint

23   is -- it's very delicate and it can be destroyed very easily.

24   And with any type of friction -- I mean, heat -- there's a lot

25   of different things that can destroy.  Wiping, I mean, that can

       1    destroy a fingerprint.  And that -- that's primarily some of

       2    the reasons why it wouldn't be there.

       3    Q.   So are you saying that if anything is exposed to extreme

       4    heat, the heat can effectively vaporize the fingerprint or

       5    destroy it in some other fashion?

       6    A.   It can.

       7    Q.   What are some of the larger features of a fingerprint that

       8    an examiner uses to distinguish one person's fingerprint from

       9    another person's?

02:08 10    A.   Well, we have three major patterns, they're called flow

      11    patterns, on our fingers that we use.  And we call them flow

      12    patterns.  We have arches, loops and whirls, and they all look

      13    different.

      14    Q.   Let me pause you right there.

      15    A.   Okay.

      16         MR. WEINREB:  Can I have Exhibit 1535 just for the

      17    witness, please?

      18    Q.   Trooper, do you see that exhibit?

      19    A.   I do.

02:09 20    Q.   Okay.  Would that help you illustrate --

      21    A.   Absolutely.

      22         MR. WEINREB:  Your Honor, the government's not

      23    offering it as evidence, just using it as a chalk.

      24         THE COURT:  Okay.

      25    BY MR. WEINREB:

1   Q.   Go ahead.

2   A.   The loop is all the way to the left-hand side.  So the

3   ridges will actually come in from the same side, loop around

4   the top of what we call the core, which is where the ridges

5   actually are coming up and around, and they'll exit out the

6   same side.  So if you're looking at this, this would be a left

7   slant loop.  So the ridges came in from the left, they looped

8   up and around what is the center of the fingerprint, and then

9   they exit out the left-hand side.  The whirls --

02:10 10   Q.   Before you continue, let me just let you know, the screen

11   in front of you is touch-sensitive.  If you would like to mark

12   on it, just use the pad of your finger and press hard and

13   you'll be able to.  Also, if you touch the screen, it will

14   leave an arrow.  There you go.  If you want to clear it, the

15   right upper-hand corner of your screen will clear it.

16   A.   So this is what I'm talking about, with -- the ridges were

17   coming in from the left-hand side, looping up and around the

18   core, and they exit out the same side.

19   Q.   Trooper, you have to do the trick of pressing it and

02:10 20   talking into the microphone at the same time.

21   A.   I apologize.

22   Q.   No problem.

23   A.   The whirl-shaped pattern -- this is the core right here,

24   and that circular area, that's what we're looking at as far as

25   the core.  And a whirl is constantly circular, and it's

1    circular all the way out to the deltas.  An arch enters in from

2    one side, continues all the way through and exits out the

3    opposite side.

4    Q.   Are there other features of a fingerprint that are more

5    minute, tinier, that you also use to compare one fingerprint to

6    another?

7    A.   There are.

8         MR. WEINREB:  Can we have 1536 for the witness,

9    please.

02:11 10    Q.   Again, would this diagram help you illustrate for the jury

11   those minutia, as they're called?

12   A.   Yes.

13        THE COURT:  Okay.

14        THE WITNESS:  Okay.  So the first thing I'm going

15   to --

16   Q.   Hang on.  It takes a little bit for the photos to come up

17   on the screens.

18   A.   I apologize.

19   Q.   No problem.  Go ahead.

02:11 20   A.   So this area right here -- that I'm marking right here

21   would be the core.  That's the center point of a latent

22   fingerprint impression that you would see with a loop or a

23   whirl.  A bifurcation is actually one ridge, and I'm marking it

24   now, that is becoming two separate ridges.  That would be a

25   bifurcation.  An ending ridge which I'm going to describe right

1    here, down here, right over by the delta, is an ending ridge.

2    It's an actual ridge that comes to an abrupt end.

3         This would actually be considered a short ridge, this

4    ridge that I'm -- I just marked there.  That's also another

5    characteristic that we can see.  This area right here is an

6    island.  Typically, an island is as high as it is wide.  It's a

7    very small piece of a ridge.  And this area right here is what

8    I was referring to as a delta.  Loops have deltas and whirls

9    have deltas.  So a loop will only have one and -- a loop will

02:13 10   only have one and a whirl will have two.

11   Q.   And delta is a term sometimes used to -- for the shape of

12   a triangle, essentially?

13   A.   That's correct.

14        And the last thing that is indicated here, where you sweat

15   out of -- when you're perspiring and what allows you to leave a

16   fingerprint is a pore.  And down right here where I just marked

17   where the line is indicating to is a pore.  It's an open area,

18   and the reason why you see that actual -- as an open space

19   there is because of the fact that it goes down, and that's

02:14 20   where you're actually sweating from.

21   Q.   When you find a latent fingerprint at a crime scene, does

22   it always have enough detail that you can compare it to a known

23   print?

24   A.   No.

25   Q.   Why is that?

 1   A.   Well, when you're actually touching something or a
 2   surface -- I mean, it depends on the actual pressure.  It
 3   depends on how you touched it, what was the temperature, were
 4   you sweating.  There's many different factors on whether or not
 5   you leave a fingerprint.  And also, what was your movement when
 6   you touched, because you can actually smudge and actually
 7   obliterate and destroy a fingerprint by how you might be
 8   grabbing a surface.
 9   Q.   So if you leave a fingerprint on something but either it's
02:14 10   only a partial print or a smudged print, can that be used in
11   fingerprint comparison?
12   A.   It can.
13   Q.   And if there's not enough detail there or if it's too
14   smudged, is it possible to confidently make a comparison?
15   A.   If there's not enough there, then, no, I would not make a
16   comparison.
17   Q.   So -- but if a latent fingerprint does have enough detail
18   and it's not too smudged, what method do you use to compare it
19   to a known print?
02:15 20   A.   We use the ACE-V methodology.
21   Q.   ACE-V.  So let me just break that down.  That's ACE-V?
22   A.   Correct.
23   Q.   What does the A stand for?
24   A.   Analysis.
25   Q.   What does that mean?

```
 1    A.    Analysis is what we're looking at.  And we're looking at
 2    the ridge flow, we're looking at everything I just described
 3    here with all these characteristics that I just showed you.
 4    And we're looking at edgeoscopy and pores and possibly scars.
 5    Like right here, this area right here is -- could be a scar or
 6    could be a flection crease, but I would say that that would
 7    probably be a scar that this person probably received, you
 8    know, during, just, natural -- like just living.
 9    Q.    What does the C in ACE-V stand for?
02:16 10    A.    It's comparison.  It's the comparison phase.  It's when we
11    actually take the latent, that we document it at the scene,
12    we're comparing it to a known fingerprint card or a known that
13    we receive.
14    Q.    What does the E stand for in ACE-V?
15    A.    Evaluation.
16    Q.    What does that mean?
17    A.    That's when I'm making a determination.  That's when I can
18    say it's either an individualization, an exclusion or it's
19    inconclusive.
02:17 20    Q.    If you take a latent print and you individualize it to a
21    known print, isn't that the same as saying you've identified
22    the known print and the latent print as being sufficiently
23    similar that you can say it comes from the same person?
24    A.    Yes.
25    Q.    And then what does the V stand for?
```

1    A.    Verification.

2    Q.    Explain that.

3    A.    We have a process with the state police, if I make an

4    individualization or identification to a latent fingerprint,

5    that it's passed on as two clean -- like there's two clean

6    copies of what I was looking at, and they go through an ACE-V

7    process as well where they're making comparisons to the known

8    and latent and they have to decide as well if it's an

9    individualization or an identification as well.  I can't just

02:17 10   be the only one.  There's the verification phase, so I'm being

11   backed up by two other personnel, latent print analysts, and

12   one of them is always going to be a supervisor.

13   Q.    This ACE-V method you've just described, is that a widely

14   used method?

15   A.    It is a widely used method, and it's the system by which

16   most latent print examiners are taught.

17   Q.    Let me ask you about another fingerprint expert term:

18   Fuming.  What is fuming?

19   A.    Fuming is a process by which we heat Super Glue.  We heat

02:18 20   it to the point where it becomes a vapor.  The vapor adheres to

21   the friction ridge residue that we leave behind when we touch a

22   surface.  This -- it makes it more visible for us to see and

23   actually document and also helps us with further processing of

24   some friction ridge or a latent print that we see.

25   Q.    What is latent fingerprint powder?

1    A.    Latent fingerprint powder is a formula that we use.  It

2    comes in different colors.  And if, say, we have a darker

3    substrate like the top of this binder that I have here, I would

4    want to use white fingerprint powder on a substrate like this

5    so I could actually see the fingerprint that was left behind.

6    If I was using -- if I had, like, something white, I would

7    use -- want to use black.

8          So we're just using -- it's a contrast in color so we can

9    actually see the latent fingerprint.  It's a part of

02:19 10   processing.

11   Q.    On April 20th, 2013, did you process two automobiles that

12   had been recovered in Watertown on Laurel Street and Spruce

13   Street the day before, on April 19, 2013?

14   A.    I did.

15   Q.    Where were the automobiles located at that time?

16   A.    They were in the garage at the Watertown Police

17   Department, which is a controlled environment.

18   Q.    What were the make, model and color of the two

19   automobiles?

02:20 20   A.    There was a black Mercedes SUV.  I think it was -- can I

21   refer to my report, if you don't mind?

22   Q.    Yes.  If you need it to refresh your recollection, you go

23   right ahead.

24   A.    Thank you.  It's a Mercedes ML-350 black SUV, and a green

25   Honda Civic color -- a green Honda Civic.

1    Q.   Was anyone else processing those vehicles with you?

2    A.   Yes.  There was Lieutenant Steve Bennett, Sergeant William

3    Tarbokas, Christopher -- Trooper Christopher Dolan, and Trooper

4    Robert Quigley, and members of the crimanlistics unit.

5    Q.   Did you recover items of evidence from the Honda and

6    witness other people recovering items of evidence from it?

7    A.   We did.

8    Q.   Did you personally?

9    A.   I did.

02:21 10        MR. WEINREB:  Could I have Exhibit 1554 for the

11   witness, please.

12   Q.   Do you recognize that?

13   A.   I do.

14   Q.   Is that a fair and accurate picture of the Honda in the

15   garage?

16   A.   It is.

17        MR. WEINREB:  The government offers 1554.

18        MS. CLARKE:  No objection.

19        (Government Exhibit No. 1554 received into evidence.)

02:21 20 BY MR. WEINREB:

21   Q.   Is this the green Honda you were just referring to?

22   A.   It is.

23   Q.   And is this the place where you examined it?

24   A.   It is.

25        MR. WEINREB:  Exhibit 869 for the witness, please.

1    Q.    Do you recognize that?

2    A.    I do.

3    Q.    What is that a picture of?

4    A.    It's the front passenger compartment of the Honda Civic.

5    Q.    You say the "passenger compartment."  Where is the

6    steering wheel in that?

7    A.    It's right to the left-hand side.  It's right in front of

8    the car seat.

9    Q.    Okay.  So what do you mean by passenger compartment?

02:22 10   A.    It's where the -- the people driving would sit, or anybody

11   that was traveling in the car.

12   Q.    Okay.  Is this a fair and accurate picture of how the

13   Honda looked when you first laid eyes on it in the garage?

14   A.    It is.

15   Q.    I'm going to show you a series of pictures now, and I'm

16   going to ask you the same question about each one.

17          MR. WEINREB:  870, please.

18   Q.    Fair and accurate?

19   A.    That's the same area that we were just looking at.  The

02:22 20   driver's side door is open.

21   Q.    Okay.  I'm going to ask you to describe the images in a

22   minute for the jury.  Now I just want to know whether they're

23   fair and accurate photos.

24   A.    They're fair and accurate.

25   Q.    Okay.  That's one.  Let's look at 871.

```
 1   A.   Fair and accurate.

 2   Q.   872?

 3   A.   Fair and accurate.

 4   Q.   873?

 5   A.   Fair and accurate.

 6   Q.   874?

 7   A.   Fair and accurate.

 8   Q.   And 875.

 9        Now, that's a slightly different picture.  That's not,

02:23 10   obviously, of the Honda, but do you recognize the items in

11   there?

12   A.   I do.

13   Q.   And do they appear to be the same pair of white gloves

14   that was inside the Honda?

15   A.   They do.

16        MR. WEINREB:  The government offers 869 through 875.

17        MS. CLARKE:  No objection.

18        THE COURT:  All right.  Admitted.

19        (Government Exhibit Nos. 869 through 875 received into

02:24 20   evidence.)

21   BY MR. WEINREB:

22   Q.   So let's now start with 869.  Just wait a moment for it to

23   come up.

24        All right.  So this is a picture of the Honda taken

25   through the front driver's side window?
```

```
 1   A.    It is.
 2   Q.    If you look in the wheel well or the -- strike that.  Not
 3   the wheel well, but if you look in the -- where the driver's
 4   feet would be, what is pictured there?
 5   A.    You could see a glove up by where the pedals would be, and
 6   you could see the fingers of another glove underneath the
 7   bottom of the driver's side seat.
 8   Q.    Can you circle that second glove to make it easier to see?
 9   A.    (Witness complies.)
10   Q.    Okay.  Now, is that exactly where they were when you got
11   to the Watertown garage?
12   A.    Yes.
13              MR. WEINREB:  870, please.
14   Q.    What's this a picture of?
15   A.    It's a picture of the same areas that we were just talking
16   about.  It's the driver's side of the car with the driver's
17   side door opened.
18              MR. WEINREB:  871, please.
19   Q.    All right.  Again, is that just another angle of the
20   same --
21   A.    Yup.  It's just a different angle of what we were just
22   looking at.
23              MR. WEINREB:  872, please.
24   BY MR. WEINREB:
25   Q.    And that's a close-up?
```

1    A.    Yes.

2          MR. WEINREB:   873.

3    Q.    Is that a close-up of one of the gloves?

4    A.    It is.

5          MR. WEINREB:   874, please.

6    Q.    And is that a close-up of the other glove?

7    A.    It is.

8          MR. WEINREB:   And then 875, please.

9    Q.    All right.   Is that a photo of the two gloves having been

02:26 10   removed from the Honda?

11   A.    It is.

12   Q.    All right.   Do you know where this was taken?

13   A.    It was taken directly alongside of the Honda.

14   Q.    So that after the gloves were photographed in place, they

15   were removed from the Honda?

16   A.    That's correct.

17   Q.    What's the surface they've been placed on?

18   A.    It's on butcher paper.

19   Q.    That's to prevent it from being contaminated?

02:26 20   A.    That's correct.

21   Q.    And then it was photographed again?

22   A.    That's correct.

23   Q.    And then did somebody collect them and bag them for

24   evidence purposes?

25   A.    That's correct.

```
 1    Q.   Who did that?

 2    A.   I did that with Chemist Kelley King.

 3    Q.   And was it done according to proper procedures in order to

 4    maintain the integrity of the evidence and prevent it from

 5    being contaminated?

 6    A.   It was.

 7         MR. WEINREB:  Can I have Exhibit 1551 for the witness,

 8    please.

 9    Q.   Do you recognize these items?

10    A.   I do.

11    Q.   How do you recognize them?

12    A.   I recognize them from where we -- from this picture and

13    from remembering taking the photo where they were.

14    Q.   Does this fairly and accurately depict those items?

15    A.   It does.

16         MR. WEINREB:  The government offers 1551.

17         MS. CLARKE:  No objection.

18         (Government Exhibit No. 1551 received into evidence.)

19    BY MR. WEINREB:

20    Q.   Were these items in the car?

21    A.   They were.

22    Q.   Where in the car were they when you first saw them?

23    A.   The driver's door pocket on -- there's -- if you look at

24    the driver's side door, there's a pocket underneath where you

25    would open the door.  These contents -- these items were
```

1  located in the pocket alongside there.

2  Q.   After you found them there, did you remove them?

3  A.   I did.

4  Q.   And were they removed in such a way to preserve any

5  fingerprints that might be on them?

6  A.   They were.

7  Q.   Again, are we seeing them laid out on the butcher paper

8  next to the car?

9  A.   Yes.

02:28 10  Q.   What's the item at the very top of the picture?  And I'll

11  circle it.  It's at the top in the center, it's a little

12  rectangle.

13  A.   That would be an Apple iPod Shuffle.

14          MR. WEINREB:  Can I have Exhibit 876 for the witness,

15  please.

16          Exhibit 1553 for the witness, please.

17  Q.   Do you recognize this?

18  A.   Yes.

19  Q.   Is that a fair and accurate picture of the Honda from the

02:29 20  angle at which it's taken?

21  A.   Yes.

22          MR. WEINREB:  The government offers 1553.

23          MS. CLARKE:  No objection.

24          THE COURT:  Okay.

25          (Government Exhibit No. 1553 received into evidence.)

```
 1    BY MR. WEINREB:

 2    Q.   What angle was this taken from?

 3    A.   This angle is taken from the passenger's side through the

 4    passenger's side window.

 5    Q.   Focusing on the portion of the photo that I've just

 6    enlarged, what's right in the center of that photo?

 7    A.   The center keys, the gear box and the radio.

 8    Q.   Let's just focus on the keys.  Were those in the ignition

 9    when you found the Honda in the garage?

02:30 10    A.   Yes.

11    Q.   And the keys and these tags, were they also part of the

12    key chain at that time?

13    A.   Yes.

14         MR. WEINREB:  The government offers 1553.

15         MS. CLARKE:  No objection.

16    BY MR. WEINREB:

17    Q.   So again, this is the Honda through the passenger window?

18    A.   It is.

19    Q.   All right.  And the keys that you were just describing,

02:31 20    that's them right there?

21    A.   Yes.

22         MR. WEINREB:  Exhibit 877 for the witness, please.

23    Q.   Is that a fair and accurate picture of the keys?

24    A.   Yes.

25         MR. WEINREB:  The government offers 877.
```

```
 1              MS. CLARKE:  No objection.

 2              (Government Exhibit No. 877 received into evidence.)

 3    BY MR. WEINREB:

 4    Q.   And can you read what it says on the tag to the extent

 5    that it's visible?

 6    A.   I could see part of a word that says, probably,

 7    "university"; I see M-A-S, and I see D-A-R-T.

 8              MR. WEINREB:  Exhibit 1549 for the witness, please.

 9    Q.   Is that a fair and accurate photo?

02:32 10   A.   Yes.

11              MR. WEINREB:  The government offers 1549.

12              MS. CLARKE:  No objection.

13              (Government Exhibit No. 1549 received into evidence.)

14    BY MR. WEINREB:

15    Q.   What's pictured in Government's Exhibit 1549?

16    A.   What you see here is just contents, miscellaneous, things

17    that you would probably see in any compartment like that.  It's

18    Band-Aids, you see --

19    Q.   Just the general -- that's the center console?

02:33 20   A.   Yes.

21    Q.   Okay.  Because I have a better photo that will help you

22    describe the contents.

23              MR. WEINREB:  1550 for the witness, please.

24    Q.   All right.  And are those the contents of the center

25    console spread out on the butcher paper?
```

1    A.   They are.

2              MR. WEINREB:  We offer 1550.

3              MS. CLARKE:  No objection.

4              (Government Exhibit No. 1550 received into evidence.)

5    BY MR. WEINREB:

6    Q.   I'd just like to focus your attention on one item right

7    now, which is the one that I'm highlighting.  What is that, if

8    you know?

9    A.   It looks like an iPod, an Apple iPod.  And there's other

02:33 10   contents there too.  There's a power cord there --

11   Q.   That's okay.  We'll just stick with the iPod.  Is that

12   known as an iPod Nano?

13   A.   Yes.

14             MR. WEINREB:  Exhibit 878 for the witness, please.

15   Q.   Do you recognize that?

16   A.   I do.

17   Q.   Okay.

18             MR. WEINREB:  Exhibit 879, please.

19             And Exhibit 880, please.

02:34 20   Q.   Are those all fair and accurate photos of items found in

21   the backseat of the Honda?

22   A.   They are.

23             MR. WEINREB:  The government offers those three

24   exhibits.

25             MS. CLARKE:  No objection.

```
 1              THE COURT:  Okay.
 2              (Government Exhibit Nos. 878, 879 and 880 received
 3      into evidence.)
 4              MR. WEINREB:  Let's go back to 878, Mr. Bruemmer.
 5      BY MR. WEINREB:
 6      Q.    What are we looking at here?
 7      A.    This is the backseat of the Honda Civic with the
 8      back -- the rear driver's side door open.
 9              MR. WEINREB:  Exhibit 879.
10      Q.    Is that a close-up?
11      A.    Yes.
12      Q.    Does there appear to be a wallet along the bottom of the
13      frame towards the middle?
14      A.    Yes, there's a black wallet there.
15              MR. WEINREB:  Exhibit 880, please.
16      Q.    Was the wallet open so this picture could be taken?
17      A.    It was.
18      Q.    And that is a driver's license photo?
19      A.    Yes.
20      Q.    I will highlight the name here.  Does it appear to be the
21      driver's license for Tamerlan Tsarnaev?
22      A.    It is.
23              MR. WEINREB:  Exhibit 881 for the witness, please.
24      Q.    Was there a CD found in the glove box of the Honda?
25      A.    There was.
```

1    Q.   Is this a fair and accurate photograph of that CD?

2    A.   It is.

3         MR. WEINREB:  I'm going to offer 881.

4         MS. CLARKE:  Your Honor, subject to the same objection

5    we had before.

6         THE COURT:  Okay.  Well, this is just a photo of it

7    anyway, I guess, right?  You're not offering the item.

8         MR. WEINREB:  The government will be about to offer --

9         THE COURT:  For now it's the photo?

02:36 10        MR. WEINREB:  Yes.

11         (Government Exhibit No. 881 received into evidence.)

12   BY MR. WEINREB:

13   Q.   What did you do with these items after you removed them

14   from the car?

15   A.   After they were removed, they were placed into evidence

16   bags.  After they were documented, they were placed in an

17   evidence bag and they were secured.

18   Q.   By placing -- what does it mean to place something in an

19   evidence bag and secure it?

02:36 20   A.   Well, when we -- anytime we're dealing with any piece of

21   evidence, we're going to have all the proper protection on our

22   hands, our bodies, our feet, our faces to protect ourselves so

23   we don't contaminate any piece of evidence.  So with a rubber

24   glove I picked up the CD and I placed it into an evidence bag.

25   The evidence bag was already premarked with identifiers, so we

```
 1    knew that it was a purple CD, and that's primarily -- we place
 2    it in the CD and then it's properly secured and then later
 3    transported.
 4    Q.   All right.  So that happened with the gloves?
 5    A.   I had rubber gloves on.
 6    Q.   No, I'm sorry.  That happened with the white gloves that
 7    you recovered from the Honda?
 8    A.   That's true, yes.
 9    Q.   And it happened with the CD?
10    A.   Yes.
11    Q.   And the keys?
12    A.   Yes.
13    Q.   And with the two iPods?
14    A.   That's correct.
15         MR. WEINREB:  Your Honor, may I just have one moment?
16         (Counsel confer off the record.)
17         MR. WEINREB:  May I have Exhibit 1529 for the witness,
18    please.
19    Q.   Do you recognize that?
20    A.   I do.
21    Q.   What is that?
22    A.   It's a latent fingerprint card.
23    Q.   Latent or known?
24    A.   It's a known.  I'm sorry.  It's a known fingerprint card.
25    Q.   And who is it the known fingerprint card for?
```

```
 1   A.    Dzhokhar Tsarnaev.

 2   Q.    The writing, the handwritten notations on it, who put

 3   those there?

 4   A.    Those are us.  Whoever made an individualization.  When we

 5   individualize something, there's a process we go through and we

 6   mark the actual known fingerprint card as well as make markings

 7   on some of the other paperwork that we have as well.

 8   Q.    All right.  Is this a fair and accurate picture of the

 9   actual known fingerprints of Dzhokhar Tsarnaev that you used to

10   make comparisons?

11   A.    It is.

12              MR. WEINREB:  The government offers 1529.

13              MS. CLARKE:  It sounds like it may be a combination

14   exhibit and chalk, your Honor.  I'm not clear given the

15   handwriting on it.  We have, obviously, no objection to the

16   known prints of Mr. Tsarnaev being before the jury.

17              MR. WATKINS:  May I have just a moment?

18              THE COURT:  All right.

19              (Discussion off the record.)

20              MR. WATKINS:  Thank you.

21              THE COURT:  I'll admit it.

22              (Government Exhibit No. 1529 received into evidence.)

23   BY MR. WEINREB:

24   Q.    Could you just walk us through this and explain what

25   the -- ignore the writing; I'm just interested in the
```

1     fingerprints.

2     A.   Well, the way we take fingerprints on a card like this is

3     we start with the right hand first.  So the right thumb is all

4     the way to the left in the top box, and that's a rolled right

5     thumb.  Right next to that in the second box is the right index

6     finger, next to that is the right middle, next to that is the

7     right ring, and next to that is the right little.

8          Underneath -- on the second row underneath is the left

9     thumb, in the first box; the second box is the left index, left

02:40 10    middle, left ring and left little -- I'm sorry.  So it starts

11    off with the left thumb, left index, left middle, left ring,

12    left little.

13    Q.   And then below it?

14    A.   Those are what we call "slap prints."  They're just a --

15    instead of rolling them, we actually take a fingerprint where

16    we're just actually just placing the fingerprint straight down

17    onto the piece of paper or onto the actual glass.

18    Q.   Okay.

19         MR. WEINREB:  Can I have Exhibit 883 just for the

02:41 20    witness.

21    Q.   Do you recognize that?

22    A.   I do.

23    Q.   What is that?

24    A.   It's a latent fingerprint that we found on the Honda

25    Civic.

1    Q.    Okay.  When you say "we found it," did you find it

2    personally?

3    A.    I did.

4    Q.    Is that a fair and accurate photo of the fingerprint you

5    found on the Honda?

6    A.    It is.

7              MR. WEINREB:  The government offers 883.

8              MS. CLARKE:  No objection.

9              (Government Exhibit No. 883 received into evidence.)

02:42 10   BY MR. WEINREB:

11    Q.    Is this a photograph of a fingerprint?

12    A.    This is a photograph of the fingerprint on the vehicle

13    with -- after it was fumed and powdered.  And it has a

14    measurement tool in it as well.

15    Q.    So you -- so we're actually looking at the surface of the

16    Honda right here?

17    A.    Right here.

18    Q.    And the raised things are the water and oil you spoke

19    about earlier?

02:42 20   A.    Yes.  What you're actually seeing are white ridges here.

21    So the areas that you're seeing the white are the actual ridges

22    of the fingerprint.

23    Q.    So you used the Super Glue fuming and the powder and then

24    you took a high-resolution photo of it?

25    A.    I did.

1    Q.   And that's what you used to compare it to Mr. -- to the

2    defendant's known fingerprints?

3    A.   I did.

4         MR. WEINREB:  Exhibit 14 -- actually, excuse me one

5    second here, your Honor.

6         Exhibit 884, please, just for the witness.

7    Q.   Is this a diagram you prepared to help illustrate for the

8    jury how you did your comparison?

9    A.   It is.

02:43 10       MR. WEINREB:  I'd ask that it be published and used as

11   a chalk.

12        THE COURT:  Okay.

13   BY MR. WEINREB:

14   Q.   Did you conclude that the fingerprint taken from the Honda

15   was one of the defendant's fingerprints?

16   A.   I did.

17   Q.   Okay.  Can you walk us through how you reached that

18   conclusion?

19   A.   So the process -- what I was talking about before with

02:44 20   ACE-V, I had already gone through the analysis phase, and I

21   went into the comparison phase and I compared it to Dzhokhar's

22   fingerprints.  And when I got to the right index finger of

23   Dzhokhar, I saw similarities in ridge flow.

24   Q.   Although it's fine, his name is Dzhokhar Tsarnaev, he'll

25   be "the defendant" for inside the courtroom.

```
 1   A.    The defendant.

 2         So what I did was I saw the ridge flow -- similarities in

 3   the ridge flow, and then I started looking farther into the

 4   actual fingerprint itself and I started looking at minutia,

 5   which are those smaller characteristics which I described like

 6   the bifurcations, the ending ridges, and started making a

 7   comparison to the right index finger of the defendant.

 8   Q.    What were the characteristics that you focused on in

 9   particular with this print?

10   A.    Well, immediately what I noticed that caught my eye was

11   the core area.  If you look at the questioned fingerprint, you

12   could see three major ridges in the core.  And if you look over

13   to the known fingerprint, you could see -- and I have that

14   indicated with F in that area.  If you look at F, that's the

15   actual center ridge of the two other ridges that I'm talking

16   about when I'm marking these.

17         So those three main ridges and the core are what caught my

18   eye immediately, and then I started working off of that core

19   area.  And what stood out to me primarily in the smaller

20   details are the unique characteristics and the uncommon things

21   that we're always looking for are -- if you look at C and D,

22   that's what we would refer to as a "short ridge."  And if you

23   look over on C and D on a known fingerprint, you could see

24   where C and D is.  And then if you see the spatial relationship

25   that you could see over on both of them where it's actually
```

```
 1   located, that's what I saw as far as similarities.  If you

 2   actually walk up where C and D are, you will find A, and that

 3   is a pretty large bifurcation.

 4        There was many pieces of minutia that were marked.  These

 5   were pieces of minutia that I just used to help myself with

 6   talking to you.

 7   Q.   And I apologize if you already said this, but where on the

 8   Honda did you find this print?

 9   A.   Can I refer to my report?

02:47 10   Q.   Certainly.

11   A.   Thank you.

12        (Pause.)

13   A.   It was on the rear driver's side door.

14        MR. WEINREB:  Can I have Exhibit 885 for the witness,

15   please.

16   Q.   Now, is this another latent fingerprint that was found on

17   the exterior rear driver's side door?

18   A.   It is.

19   Q.   Is that a fair and accurate image for it?

02:48 20   A.   It is.

21        MR. WEINREB:  The government offers 885.

22        MS. CLARKE:  No objection.

23        (Government Exhibit No. 885 received into evidence.)

24   BY MR. WEINREB:

25   Q.   Once again, was this print taken using that fuming and
```

1    powder method?

2    A.    Yes, it was.

3         MR. WEINREB:  Exhibit 14 -- I'm sorry.  Exhibit 886

4    for the witness, please.

5    Q.    And again, would this chart help you illustrate your

6    comparison?

7    A.    It will.  Can you actually come into the actual -- just

8    zoom in on the questioned fingerprint for me when I start

9    talking about it?

02:48 10   Q.    Yes, I will.

11   A.    Thank you.

12        MR. WEINREB:  The government offers 886.

13        MS. CLARKE:  I'd --

14        MR. WEINREB:  I'm sorry.  Does not offer it but asks

15   that it be published to the jury and used as a chalk.

16        THE COURT:  Okay.

17   BY MR. WEINREB:

18   Q.    I'm just going to take a moment so the jury can take this

19   in, and then I'll zoom in as you wish.

02:49 20        (Pause.)

21   Q.    So these letters, A through F on the right and G through M

22   on the left, are those all points of comparison that you found?

23   A.    Yes.

24   Q.    And based on those points of comparison, did you conclude

25   that this latent print was Dzhokhar Tsarnaev's fingerprint?

1    A.    I did.

2    Q.    All right.  I'm going to zoom in on the latent now.  Is

3    that enough or --

4    A.    Yes.

5    Q.    Okay.  Go ahead.

6    A.    Okay.  So when I'm looking at this, of course, like I was

7    describing before, these are white ridges.  Now, the known is

8    black ridges because that was either inked -- or when we have

9    it rolled in the computer system, it comes out black.  So these

02:50 10   are white ridges.  So what I immediately saw with this detail

11   was the core again.  You can see a lot of ridge endings or

12   ending ridges.  There's many bifurcations that you could see.

13        Can you go back out, please?  Thank you.

14        So what I'm indicating there in this comparator is there's

15   black ridges underneath the known and there's white ridges

16   underneath the questioned latent fingerprint.  So immediately

17   when I started looking at the core and the ridge flow, I could

18   see immediately that the ridge flow and some of the actual

19   ridges looked very similar to me.  So, again, what I did was, I

02:50 20   went down to -- past, you know, looking at the minutia and all

21   the characteristics, I started going and looking at known

22   fingerprints and I came to the right index finger of the

23   defendant and I started seeing similarities in the ridge flow

24   and then I started to make a further comparison using the

25   actual points that I show here on the comparator.  There was

1    ending ridges, there was bifurcations.  That's pretty much what

2    I did here.

3    Q.    Now, I'm not going to go through this with every one of

4    them --

5    A.    Okay.

6    Q.    -- but did you also find the defendant's prints on the

7    inside of the Honda?

8    A.    Yes.

9    Q.    Where did you find them?

02:51 10    A.    This actual fingerprint here is off the face of the radio.

11    Q.    Anywhere else?

12    A.    No, not that I recall.

13    Q.    Okay.  What about any on any of the items found inside the

14    Honda?

15    A.    Yes.

16    Q.    Which ones?

17    A.    There was many items.

18    Q.    Okay.  Was his fingerprint found on the iPod Nano that you

19    recovered?

02:52 20    A.    Yes.  Yes.

21    Q.    Did you find any of Tamerlan Tsarnaev's prints on the

22    outside of the Honda using this same method?

23    A.    We did.

24    Q.    Do you recall how many you found?

25    A.    I believe -- well, no.  There was one.

1    Q.   Just one?

2    A.   Just one.

3    Q.   Where was it?

4    A.   It was on the passenger's side of the vehicle.

5    Q.   Did you find Tamerlan Tsarnaev's prints on any of the

6    items inside the Honda?

7    A.   We did.

8    Q.   On how many?

9    A.   Many.

02:52 10   Q.   You also processed the Mercedes SUV, you said?

11   A.   That's correct.

12        MR. WEINREB:   Could I have Exhibit 782 for the

13   witness, please.

14   Q.   Do you recognize what this is a photo of?

15   A.   I do.

16   Q.   What is it a photo of?

17   A.   It's a photo of the front of the Mercedes, the bumper

18   area.  I was taking this photo on the ground when I took this

19   photo.

02:53 20   Q.   This is in the Watertown garage?

21   A.   It is.

22   Q.   Is it a fair and accurate photo of what you saw when you

23   took the picture?

24   A.   It is.

25        MR. WEINREB:   Exhibit 783 for the witness, please.

1    Q.   And that's a close-up?

2    A.   It is.

3    Q.   And is that also a fair and accurate photo?

4    A.   It is.

5         MR. WEINREB:  The government offers 782 and 783.

6         MS. CLARKE:  No objection.

7         THE COURT:  Okay.

8         (Government Exhibit Nos. 782 and 783 received into

9    evidence.)

02:53 10        MR. WEINREB:  782, please.

11   BY MR. WEINREB:

12   Q.   So the -- would it be fair to say that the portion of the

13   Honda that appears on the right part of the frame is referred

14   to as the right front -- the driver's side quarter-panel or the

15   left front quarter-panel?  You just tell me what you refer to

16   it as.

17   A.   I would refer to that -- the front quarter-panel would be,

18   to me, like the piece that would be over the wheel, and this

19   would be the bumper area or on -- like showing the bumper of

02:54 20   the Mercedes.

21   Q.   Fair enough.

22        MR. WEINREB:  Can we have the close-up, 783, please?

23   Q.   And is that an accurate photo of the left bumper of the

24   Mercedes?  I mean, the left side of the bumper -- of the front

25   bumper of the Mercedes?

1   A.   If I was to be sitting in the driver's seat, that would be

2   the left side of the car.

3   Q.   And those red deposits, do they appear to be blood to you?

4   A.   They look like red-brown stains to me.

5   Q.   Okay.  So you can't say if they're blood or not?

6   A.   No, I can't.

7        MR. WEINREB:  Exhibit 898 for the witness, please.

8   Q.   Do you recognize this?

9   A.   I do.

02:55 10   Q.   Is this an illustration of a fingerprint comparison you

11   did with respect to the Mercedes?

12   A.   It is.

13   Q.   All right.

14        MR. WEINREB:  Can we show the jury 898, please?

15   Q.   Where was this latent fingerprint lifted from?

16   A.   This latent was found and documented -- this is an actual

17   digital image of it on the vehicle, on the Mercedes.  And this

18   was found on the gas tank cover of the Mercedes on the

19   passenger side.

02:56 20   Q.   Did you match it to Dzhokhar Tsarnaev?

21   A.   I individualized this to the right index finger of the

22   defendant.

23        MR. WEINREB:  904 for the witness, please.

24   Q.   Does this chart help illustrate another comparison you

25   did?

1    A.   It does.

2         MR. WEINREB:  I'd ask it be published.

3    Q.   The latent fingerprint pictured in this exhibit, where was

4    that found?

5    A.   It was found right next to the previous one.  It was right

6    next to 13-1.3.  They were right next to each other on the

7    door -- on the exterior of the door of the gas tank.

8    Q.   Okay.  And did you individualize this latent print to the

9    right index finger of Dzhokhar Tsarnaev?

02:57 10   A.   I did.

11        MR. WEINREB:  Exhibit 900 for the witness, please.

12   Q.   Does this chart illustrate another comparison you did?

13   A.   It does.

14        MR. WEINREB:  If we could publish 900, please.

15   Q.   Where was this latent fingerprint found?

16   A.   This latent fingerprint was found on the passenger-side

17   front corner-panel up towards the front of the car of the

18   Mercedes.

19   Q.   So it was found on the outside of the Mercedes?

02:58 20   A.   It was.

21   Q.   And where the hood is?

22   A.   It was right next to the hood and -- the area of the car

23   that's right above the wheel where the wheel well is, it's that

24   piece of the metal that's right above the wheel.

25   Q.   On which side, driver's --

 1    A.    On the passenger's side.

 2    Q.    Did you individualize that latent print to the left ring

 3    finger of Dzhokhar Tsarnaev?

 4    A.    I did.

 5          MR. WEINREB:  And then Exhibit 902 for the witness,

 6    please.

 7    Q.    Again, does that illustrate another comparison that you

 8    did?

 9    A.    It does.

02:58 10         MR. WEINREB:  I'd ask that 902 be published.

11    Q.    Where did you find this latent fingerprint?

12    A.    This was located right next to the item that we just saw.

13    It was right next to 13-1.17.

14    Q.    On the outside of the Mercedes?

15    A.    Yes, it was.

16    Q.    And did you individualize this print to the known left

17    middle finger of Dzhokhar Tsarnaev?

18    A.    I did.

19    Q.    How many of the defendant's fingerprints did you find on

02:59 20   the outside of the Mercedes?

21    A.    Can I refer to my notes?

22    Q.    Yes.

23    A.    Can you repeat the question for me, please?

24    Q.    How many total of the defendant's fingerprints did you

25    find on the outside of the Mercedes?

 1    A.    On the inside and --

 2    Q.    Not the inside, the outside.

 3    A.    The outside?  Ten.

 4    Q.    How many, if any, of Tamerlan Tsarnaev's fingerprints did

 5    you find on the outside of the Mercedes?

 6    A.    Three.

 7    Q.    How many of Dzhokhar Tsarnaev's fingerprints did you find

 8    on items inside the Mercedes?

 9    A.    Two.

03:00 10   Q.    And how many of Tamerlan Tsarnaev's fingerprints did you

11    find on items inside the Mercedes?

12    A.    Seven.

13           MR. WEINREB:  Exhibit 864 for the witness, please.

14    Q.    Was a CD recovered from the CD player inside the Mercedes?

15    A.    It was.

16    Q.    What's pictured in 864?

17    A.    The CD.

18           MR. WEINREB:  865 for the witness, please.

19    Q.    And what's pictured in 865?

03:00 20   A.    That's the back side of the CD.

21           MR. WEINREB:  The government offers 864 and 865.

22           MS. CLARKE:  I realize it's just photos, but we want

23    to preserve the objection.

24           THE COURT:  All right.  I'll admit the photos.

25           (Government Exhibit Nos. 864 and 865 received into

1    evidence.)

2          MR. WEINREB:  Can we have 864.

3    BY MR. WEINREB:

4    Q.   So that's the front of the CD?

5    A.   That's correct.

6    Q.   And the rear?

7          MR. WEINREB:  Could we have 865?

8    Q.   The rear?

9    A.   Yes.

03:01 10   Q.   Was this CD removed in such a way to preserve any

11   fingerprint evidence on it?

12   A.   It was.

13   Q.   Did you find a fingerprint on the CD?

14   A.   We did.

15   Q.   Whose fingerprint was it?

16   A.   The defendant's.

17   Q.   Did you also recover a magazine for a Ruger 9 mm pistol

18   from inside the Mercedes?

19   A.   I did.

03:01 20   Q.   Where was it?

21   A.   It was in the -- on the driver's side next to the driver's

22   side seat.

23          MR. WEINREB:  Exhibit 895 for the witness.

24   Q.   Do you recognize that?

25   A.   I do.

```
 1    Q.   Is that the magazine that was recovered?

 2    A.   It is.

 3              MR. WEINREB:  The government offers 895.

 4              MS. CLARKE:  No objection.

 5              (Government Exhibit No. 895 received into evidence.)

 6    BY MR. WEINREB:

 7    Q.   Now, earlier you talked about items that were recovered

 8    from inside the Honda.  I'm going to identify them now for you

 9    by exhibit number.  Exhibit 887 is the white gloves, Exhibit

03:02 10    888 were the keys from the ignition, and Exhibit 890 is the CD

11    from the glove compartment.

12              MR. WEINREB:  Your Honor, at this time the government

13    offers those into evidence.

14              MS. CLARKE:  The actual items?

15              MR. WEINREB:  The actual items into evidence.  He

16    testified they were recovered and packaged properly and

17    preserved.

18              THE COURT:  Okay.

19              MS. CLARKE:  I think we preserved the objection.

03:03 20              THE COURT:  Yes.  As we previously discussed, the CD

21    and the keys and the gloves will be admitted.

22              MS. CLARKE:  Is it two CDs or one CD?

23              (Counsel confer off the record.)

24              MR. WEINREB:  I believe the CD from the Mercedes is

25    already in evidence and the -- this is the CD from -- 890 is
```

1    the CD from the Honda.

2              THE COURT:  The Mercedes CD from yesterday?

3              MR. WEINREB:  No, I believe it was this morning.

4              THE COURT:  Oh, was it this morning?  Time flies.  All

5    right.  These three exhibits are admitted.

6              (Government Exhibit Nos. 887, 888 and 890 received

7    into evidence.)

8              MR. WEINREB:  And one more, which I believe is 894,

9    which is the magazine, the 9 mm Ruger magazine that the witness

03:04 10   testified he recovered from the inside of the Mercedes, we

11   offer that.

12             THE COURT:  Pictured in the photos that were just

13   shown?

14             MR. WEINREB:  Yes.  Pictured in 895.

15             THE COURT:  All right.  Admitted.

16             (Government Exhibit No. 894 received into evidence.)

17             MR. WEINREB:  Thank you.  The government has no

18   further questions.

19             MS. CLARKE:  Just a few.

03:04 20                         CROSS-EXAMINATION

21   BY MS. CLARKE:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   I think you've indicated to us, at least in your

25   reporting, and I'm not sure if you've indicated it to the jury

```
     1   yet, there were 66 identified prints in the Mercedes?

     2   A.    Yes, there were.

     3   Q.    And 22 of those were on items inside the Mercedes?

     4   A.    Can I refer to my report?

     5   Q.    Surely.

     6   A.    Okay.  Thank you.

     7   Q.    In fact, I could probably help you with where I got that

     8   information from.

     9   A.    That's correct.

03:05 10   Q.    You got it?

    11   A.    Yeah, I have it right here.

    12   Q.    And you testified about Mr. Tsarnaev -- Dzhokhar

    13   Tsarnaev's prints in the Mercedes, correct?  You testified

    14   about finding prints of Mr. Tsarnaev in the Mercedes?

    15   A.    Yes; that's correct.

    16   Q.    But you also found prints of his older brother, Tamerlan,

    17   on and in the Mercedes?

    18   A.    We did.

    19   Q.    All right.  You also testified about prints found in the

03:06 20   Honda.  Now, if someone owned a car or drove a car regularly,

    21   you would expect to find their prints in the car.  Is that

    22   correct?

    23   A.    That's correct.

    24   Q.    And I take it by the identification of a print on a radio

    25   faceplate, you can't say when that print was placed there,
```

```
 1    right?
 2    A.   No, I can never -- I don't know when someone leaves a
 3    fingerprint.  We can't determine that.
 4    Q.   Fair enough.  And if -- if the older brother, Tamerlan,
 5    had driven that Honda, you wouldn't always find his prints on
 6    it either?
 7    A.   That's correct.
 8    Q.   I think that you retrieved the wallet from the back of the
 9    Honda.  Is that correct?
10    A.   That's correct.
11    Q.   The wallet that we saw in one of the pictures?
12    A.   Yes.
13    Q.   And you found a print of Tamerlan Tsarnaev on the wallet,
14    correct?  Do you need to look at your report?
15    A.   Yeah, if you don't mind.
16    Q.   That would be fine.
17              (Pause.)
18    A.   We did.
19    Q.   And you also retrieved that wallet from the back of the
20    car?
21    A.   I did.
22    Q.   And there were receipts inside that wallet?
23    A.   That's correct.
24    Q.   Can you tell the jury what receipts you found inside that
25    wallet?  Do you have an independent memory of that?
```

```
 1   A.    No.

 2   Q.    I think they're shown in Government's Exhibit 882, if I

 3   might Shanghai that exhibit.

 4         MS. CLARKE:  For the witness first.

 5   Q.    Does that appear to be at least a photograph of one

 6   receipt and some others around the side?

 7   A.    It appears to be.

 8   Q.    Does that refresh your recollection about how many

 9   receipts were found in the wallet?

10   A.    No, it doesn't.

11   Q.    All right.  If I showed you a 302 about the collection of

12   these receipts, would it perhaps refresh your recollection?

13   A.    Perhaps.

14         MS. CLARKE:  May I approach?

15         THE COURT:  You may.

16         MS. CLARKE:  If we can both stand and look at the same

17   report, your Honor?

18   BY MS. CLARKE:

19   Q.    Does that refresh your recollection about the receipts you

20   retrieved from the wallet?

21   A.    Yes, it does.

22   Q.    All right.  And can we tell the jury the receipts you

23   found in the wallet including the type of receipt and the date?

24   A.    The first one is a Target receipt dated 4/14 of 2013,

25   reflected -- do you want me to continue to read?
```

1    Q.   If that refreshes your recollection, you can tell them,

2    yes.

3    A.   Reflecting the purchase of two backpacks.  There was also

4    a MoneyGram receipt dated 4/13 of 2013, reflecting a transfer

5    of $900 with a destination to Russia.

6    Q.   And that was in the name of Tamerlan Tsarnaev?

7    A.   I'd have to actually look at the actual receipt itself --

8    Q.   Okay.

9    A.   -- to see whether or not that's --

03:10 10   Q.   We'll do that.

11   A.   I just have to see it.

12   Q.   That's fine.

13   A.   But, I mean -- and there's also a Home Depot receipt from

14   3/30 of 2013 reflecting a purchase of a soldering gun.

15   Q.   Any other receipts?

16   A.   Stateline Gun and Ammo Archery receipt dated 4/11 of 2013

17   from New Hampshire.

18   Q.   And those receipts were all found in Tamerlan Tsarnaev's

19   wallet?

03:11 20   A.   That's correct.

21   Q.   And the sunglasses that were found with the wallet, do you

22   recall them?

23   A.   I do.

24   Q.   And you found a print of Tamerlan Tsarnaev on that.  Is

25   that correct?

```
 1    A.    I'm going to have to refer to my report.
 2          (Pause.)
 3    A.    That is correct.
 4    Q.    Did you bring the receipts and the wallet with you to
 5    court today?
 6    A.    No, I didn't.
 7    Q.    You did not have possession of it to bring it, I take it?
 8    A.    No.
 9          MS. CLARKE:  I'd like to see if we can bring up
03:12 10    pictures of the receipts, your Honor.
11          MR. WATKINS:  Can I have this computer?
12          MS. CLARKE:  For the witness first.
13          (Pause.)
14          MS. CLARKE:  Judge, in case this is going to take a
15    couple of minutes, do you want to take the lunch break and then
16    we can come back and do the receipts and be done?
17          THE COURT:  It depends on Mr. Watkins' estimate of how
18    long it will take.
19          MS. CLARKE:  Here we go.  I'm bringing up what I'd
03:13 20    like to have marked as Defendant's Exhibit -- next in order.
21          MR. WATKINS:  3051.
22          MS. CONRAD:  3051.
23    BY MS. CLARKE:
24    Q.    Do you recognize that receipt?
25    A.    I do.
```

            1            MS. CLARKE:  Perhaps since this is a little

            2    cumbersome, we should just go and -- I'll move to admit it.

            3            MR. WEINREB:  Yes.  Your Honor, this witness is a

            4    fingerprint expert, so instead of having him just read

            5    receipts, the government will stipulate that all of these items

            6    were found in Tamerlan Tsarnaev's wallet, and has no objection

            7    to them being admitted as evidence if the defense wishes to do

            8    so.

            9            MS. CLARKE:  That would make things easier.  Your

03:14   10    Honor, he didn't testify just as to fingerprints; he collected

           11    a sizable amount of evidence.

           12            THE COURT:  Well, if he doesn't have them, I gather

           13    they're available someplace and they can be admitted.

           14            MS. CLARKE:  That would be great.  That would be

           15    easier.

           16            THE COURT:  Okay.

           17            MS. CLARKE:  Thank you.  Nothing further.

           18            THE COURT:  Any redirect?

           19            MR. WEINREB:  No, your Honor.

03:14   20            THE COURT:  All right, sir.  Thank you.  You may step

           21    down.

           22            THE WITNESS:  Thank you, your Honor.

           23            (The witness is excused.)

           24            THE COURT:  And we will now take the lunch recess.

           25            THE CLERK:  All rise for the Court and the jury.  The

1    Court will take the lunch recess.

2         (The Court and jury exit the courtroom and there is a

3    recess in the proceedings at 12:58 p.m.)

4         THE CLERK:  All rise for the Court and the jury.

5         (The Court and jury enter the courtroom at 2:11 p.m.)

6         THE CLERK:  Be seated.

7         THE COURT:  Ms. Pellegrini?

8         MS. PELLEGRINI:  The United States calls D.J. Fife.

9                   D.J. FIFE, duly sworn

04:30 10       THE CLERK:  State your name, spell your last name for

11   the record, speak into the mic and make sure everyone can hear

12   you.

13        THE WITNESS:  My name is D.J. Fife.  My last name is

14   spelled F-I-F-E.

15                   DIRECT EXAMINATION

16   BY MS. PELLEGRINI:

17   Q.   Good afternoon, Mr. Fife.

18   A.   Good afternoon.

19   Q.   Will you tell the jury by whom you're employed.

04:30 20  A.   I'm employed by the FBI.

21   Q.   In what capacity?

22   A.   I'm a physical scientist, forensic examiner in the Latent

23   Prints Operations Unit at the FBI laboratory in Quantico,

24   Virginia.

25   Q.   And how long have you held that position?

A.   Almost 11 years.

Q.   And briefly, could you give us some of your educational and professional background?

A.   I have a bachelor's degree from Utah State University in Logan, Utah, and I have a master's degree in molecular microbiology from UMass Boston.  I completed an 18-month training program with the bureau to become a physical scientist forensic examiner.

Q.   And also briefly, can you tell the jury what a physical scientist does?

A.   So in my case I work in the latent print unit.  So what I do is I receive items of evidence.  I process those items of evidence for the presence or detection of latent fingerprints.  I can compare those latent fingerprints to known fingerprints, I can also launch those prints in a database, do automated searches.  And then I issue a report, and I can testify to that in court.

Q.   Now, as a result of your duties, do you often go to various crime scenes yourself?

A.   I am ERT-trained.  I don't go that often, but I -- sometimes.

Q.   In this particular case, did you happen to get called to Boston on April 19th of 2013?

A.   Yes.

Q.   And when did you actually arrive in Boston?

1    A.   It was later in the evening sometime.  Like we had been

2    rescheduled a couple of times, so...

3    Q.   And where did you go to?  What was your assignment,

4    actually?

5    A.   My assignment was to collect known fingerprints from two

6    individuals.

7    Q.   And where were you going to go to do that?

8    A.   The first -- they picked us up at the airport and they

9    drove us to a location where we printed one person, and then we

04:32 10   were taken to the second location where we printed the second

11   person.

12   Q.   And was one of those locations Beth Israel Hospital here

13   in Boston?

14   A.   Yes.

15   Q.   Now, I know we've talked about fingerprints, but I'm not

16   going to ask you about any fingerprints at this phase.  What I

17   want to ask you about is did you see the receipt of property

18   from the defendant, Dzhokhar Tsarnaev?

19   A.   Yes, I did.

04:32 20   Q.   All right.  And you were present when property was taken

21   from his person and bagged into evidence?

22   A.   Yes.

23   Q.   All right.  I'd like to show you what's been marked as

24   identification as Government's Exhibit 921.

25            MS. PELLEGRINI:  May I approach, your Honor?

          1            THE COURT:  All right.

          2    BY MS. PELLEGRINI:

          3    Q.   Do you recognize that package?

          4    A.   Yes.

          5    Q.   And do you recognize the contents?

          6    A.   The contents or the content?

          7    Q.   The contents.

          8    A.   Would you like me to open it?

          9    Q.   Not just yet.

04:33    10    A.   Okay.

         11    Q.   But do you recall seeing this property removed from the

         12    defendant and being taken into evidence and bagged in that

         13    manner?

         14    A.   Yes.  I remember Special Agent Crow and Lord writing these

         15    labels on the bag.

         16    Q.   And with respect to the contents, did you see the contents

         17    of the bag specifically?

         18    A.   Before it was bagged everything was placed on brown paper

         19    and photographed.

04:33    20            MS. PELLEGRINI:  Your Honor, the government would

         21    offer the Exhibit 921.

         22            MR. WATKINS:  No objection.

         23            (Government Exhibit No. 921 received into evidence.)

         24    BY MS. PELLEGRINI:

         25    Q.   Agent Fife, I'm going to ask you to open the evidence

```
 1    envelope which is currently sealed.

 2    A.    (Witness complies.)

 3    Q.    In removing the contents, can you describe for the jury

 4    what they're seeing.

 5    A.    It's labeled "952.27 in U.S. currency."

 6    Q.    Now, you indicated that you saw this currency laid out on

 7    paper before it was bagged?

 8    A.    Yes.

 9    Q.    Did you make any particular observations about the nature

04:34 10    and denominations of the currency?

11    A.    It was taken out of a wallet.  There were some

12    identification cards and there was also cash.  There was a

13    large number of crisp $20 bills.

14    Q.    Do you recall the amount of the large -- the large amount

15    of the crisp $20 bills?

16    A.    It was probably close to $900.

17    Q.    And thereafter it was taken from the hospital and it went

18    into evidence, correct?

19    A.    After we left the hospital, we took this -- all the

04:35 20    evidence, and we took it to the evidence location and signed it

21    into evidence storage, yes.

22    Q.    All right.  Thank you.

23              MS. PELLEGRINI:  I have no further questions.

24              THE COURT:  Any defense examination?

25              MR. WATKINS:  Yes.
```

                     THE COURT:  Okay.

                          CROSS-EXAMINATION

BY MR. WATKINS:

Q.    Good afternoon, Agent Fife.

A.    Good afternoon.  I'm actually not an agent, just for the
record.

Q.    I'm sorry.  Mr. Fife.

      You actually went over to Beth Israel Deaconess Medical
Center?

A.    Yes.

Q.    And that's where you obtained the items that you -- that
you forwarded to the lab?

A.    Yes; I was part -- I don't think my name appears on the
chain of custody, but I was in the room when it happened, yes.

Q.    And there were several FBI special agents and other
persons like yourself?

A.    Yes; I think there were five.  There was a photographer
and special agents and ERT personnel and two latent fingerprint
examiners.

Q.    In addition to those items that you collected, you also
collected clothing of Mr. Tsarnaev?

A.    I didn't collect it, but, yes, it was collected.

Q.    You were present while it was being collected?

A.    Yes.

Q.    And Mr. Tsarnaev was actually undergoing medical

1    procedures at the time.  Is that correct?

2    A.    Yes.

3    Q.    He was visibly quite injured?

4    A.    Yes.

5    Q.    And particularly in regard to the clothes, did you observe

6    doctors cutting off or taking off the clothes?

7    A.    Yes.

8    Q.    And were those immediately collected by one of the team

9    that was with you there?

04:37 10   A.    I believe what happened is that the doctor placed them

11   into biohazard bags and then they were passed into the room

12   next door, and in the room next door is where they were removed

13   from the bags and where they were inventoried and the labels

14   were written and the photographs were taken.

15   Q.    And that was, again, something that you were present for?

16   A.    Yes.

17   Q.    I want to show you --

18         MR. WATKINS:  This is just for the witness.

19   Q.    -- what's been marked Defendant's Exhibit 3058.

04:37 20         Is that the jacket that -- or the sweatshirt that you saw

21   being cut off of Dzhokhar Tsarnaev and that was put

22   into -- processed by your team?

23   A.    It wasn't processed, but it was collected, yes.

24   Q.    And to your knowledge, where was that sweatshirt taken, or

25   given after that?

1    A.    Where was it physically taken?

2    Q.    Was it given to the Massachusetts State Police?

3    A.    I don't know the answer to that.  I don't think so.  I

4    don't know.  I thought it stayed in bureau possession.

5          MR. WATKINS:  May I approach, your Honor?

6    Q.    I'm placing before you what is identified as Defendant's

7    Exhibit 3061.  And can you read what the writing is on the

8    front of that?

9    A.    It says -- it has the case ID number at the top, and then

04:38 10   it says -- would you like me to read out the case ID?

11   Q.    Please.

12   A.    415MBS2814367.  It just says "April 20th, 2013," and that

13   was actually just after midnight so the date is both the 19th

14   and the 20th on some of the evidence.  It says "Adidas brand

15   medium-sized black-hooded sweatshirt from person of Dzhokhar

16   Tsarnaev.  Beth Israel Hospital, Boston, Massachusetts."  And

17   then it has the name Christopher -- Special Agent Christopher

18   Lord and Special Agent Alexia Crow, and they have initialed the

19   packaging.

04:39 20   Q.    And based on your experiences being in the -- were those

21   two agents in the room with you?

22   A.    Yes.

23   Q.    Does the description on the bag match the photograph

24   you're looking at?

25   A.    Yes.

1          MR. WATKINS:  Your Honor, I would ask to admit Exhibit

2     3058, which is the picture of the sweatshirt, and 3060, which

3     is the sweatshirt itself.

4          MS. PELLEGRINI:  3060 or 3061?

5          THE COURT:  You said 3061 earlier.

6          MR. WATKINS:  I'm sorry.  3061.

7          MS. PELLEGRINI:  No objection, your Honor.

8          THE COURT:  Okay.

9          (Defense Exhibit Nos. 3058 and 3061 received into

04:40 10    evidence.)

11          MR. WATKINS:  And may we publish the picture to the

12    jury.

13    BY MR. WATKINS:

14    Q.   And again, Mr. Fife, given the description on that bag,

15    this is the -- and your experiences in the Beth Israel

16    Deaconess Medical Center observing the procedure, this is a

17    picture of a sweatshirt that was taken off of Dzhokhar

18    Tsarnaev?

19    A.   Yes.

04:40 20          MR. WATKINS:  That's all I have, your Honor.

21          MS. PELLEGRINI:  No redirect, your Honor.

22          THE COURT:  All right.  Thank you, Mr. Fife.  You may

23    step down.

24          THE WITNESS:  Thank you.

25          (The witness is excused.)

```
  1              MR. WEINREB:  The United States calls Stephanie Waite.
  2                    STEPHANIE WAITE, duly sworn
  3              THE CLERK:  Have a seat.  State your name and spell
  4     your last name for the record, keep your voice up and speak
  5     into the mic.
  6              THE WITNESS:  Stephanie Waite, W-A-I-T-E.
  7                         DIRECT EXAMINATION
  8     BY MR. WEINREB:
  9     Q.    Good afternoon.
 10     A.    Good afternoon.
 11     Q.    Where do you work?
 12     A.    Massachusetts State Police Crime Laboratory.
 13     Q.    How long have you worked there?
 14     A.    Almost seven years.
 15     Q.    What are your job responsibilities?
 16     A.    I'm a forensic scientist in the Crime Scene Response and
 17     Criminalistics units.
 18     Q.    Where did you go to school and what degrees have you
 19     earned?
 20     A.    I have an undergraduate at Lycoming College in
 21     Pennsylvania, I have a master's of forensic science as well
 22     from the University of New Haven, and in undergraduate, I have
 23     biology and chemistry bachelor of science degrees.
 24     Q.    Can you say a little more about what you do for a living?
 25     A.    The Crime Scene Response Unit, I respond to crime scenes
```

04:42 (line 10)
04:42 (line 20)

1    to process items and the area for biological evidence and trace

2    materials.  Biological evidence would be things like blood,

3    semen, saliva, and then trace materials could be gunshot

4    residues and hairs and fibers.  And then in the lab I do mostly

5    the same thing with items that I have either collected from the

6    crime scene or that other agencies have collected and submitted

7    to the lab.

8    Q.   Do you have any specialized training in doing those things

9    you just described?

04:43 10   A.   In addition to the in-house training that I was under,

11   I've also taken courses in blood stain pattern analysis.

12   Q.   After getting trained, did you have to take an examination

13   to ensure that you knew how to do what you do properly?

14   A.   Yes.  During the training there were written and

15   competency tests, and then at the end there was a cumulative

16   written exam and a cumulative competency test.

17   Q.   Did you pass?

18   A.   Yes, I did.

19   Q.   Any additional training over the years?

04:43 20   A.   No.

21   Q.   I'm sorry.  Any additional tests over the years?

22   A.   Yes.  Every year I have what we call proficiency tests,

23   and it's just to make sure that I'm still able to perform all

24   of the testing as I should be.  I have one in crime scene, one

25   in trace, and one in biological fluid identification each year.

1    Q.   So in the course of your work, how many blood, semen,

2    other types of samples have you analyzed?

3    A.   I'm not sure because we don't count by sample; I count by

4    case, and I have been involved in over a thousand cases.

5    Q.   Did you participate in the Sean Collier murder

6    investigation?

7    A.   Yes, I did.

8    Q.   As part of that investigation, did you process items for

9    blood?

04:44 10   A.   Yes, I did.

11   Q.   How do you determine if there's blood on an item of

12   evidence?

13   A.   It's two separate tests.  The first one is a screening

14   test, and that can indicate that a stain either is or is not

15   blood, and that's called the Ouchterlony, or OT, test.  And

16   then if I get a positive result with that one, I will go on and

17   do a more confirmatory test -- it's the HemaTrace test -- and

18   that confirms that the sample is blood and indicates the

19   species origin is from a human.

04:44 20        MR. WEINREB:  Can I have Exhibit 907 for the witness,

21   please.

22   Q.   So looking at your screen, do you see Exhibit 907?

23   A.   Yes, I do.

24   Q.   And that's a photograph of a pair of gloves?

25   A.   Yes, it is.  Well, they're not a pair of gloves; it's two

```
 1    separate gloves.
 2    Q.   Fair enough.  But they're two gloves.  And at the bottom
 3    of the picture are the initials SJW, correct?
 4    A.   Yes.
 5    Q.   Are those your initials?
 6    A.   Yes, they are.
 7    Q.   Now I'd like you to take a look at the Exhibit 908.
 8         (Photograph displayed.)
 9    Q.   And now 909.
10         (Photograph displayed.)
11    Q.   And now 910.
12         (Photograph displayed.)
13    Q.   Are those four photographs fair and accurate photographs
14    of what's depicted in them?
15    A.   Yes.
16              MR. WEINREB:  The government offers 907 to 910.
17              MR. WATKINS:  No objection.
18              THE COURT:  Okay.
19              (Government Exhibit Nos. 907, 908, 909 and 910
20    received into evidence.)
21              MR. WEINREB:  Let's start with 907.
22    BY MR. WEINREB:
23    Q.   So what are we looking at here?
24    A.   This is the exterior dorsal, or back side, of the gloves.
25    Q.   Did you take this photo?
```

1    A.    Yes, I did.

2    Q.    Where did you take it?

3    A.    At the crime laboratory.

4    Q.    Where did you first see these two gloves?

5    A.    When I was on-scene in Watertown on Laurel Street, there

6    was a Honda Civic parked in the middle of the street, and this

7    set of gloves was in there, in the front driver's side floor

8    area.

9    Q.    Who collected the gloves from the Honda?

04:46 10   A.    Kelley King.  She's another criminalist that works with

11   me.

12   Q.    Do you know what she did with them?

13   A.    She collected them the next day and put them in a brown

14   paper bag and submitted them to the crime lab.

15   Q.    And then that's how you received them?

16   A.    Correct.

17   Q.    When you received them, were they packaged properly?

18   A.    Yes, they were.

19   Q.    Were they assigned a lab number?

04:47 20   A.    Yes, they were.

21   Q.    What number?

22   A.    13-08140.

23   Q.    Did they get an item number in addition to the -- that

24   number?

25   A.    Yes.  They're Item No. 12-9.

1    Q.    Did you test the outside of these gloves for blood?

2    A.    Yes, I did.

3    Q.    Did you collect -- well, let's just take a look.  So you

4    said we're looking at the backs of the gloves here?

5    A.    Correct.

6          MR. WEINREB:  Can we have 908, please.

7    Q.    And what's that a picture of?

8    A.    This is the exterior palmar side of the gloves.

9          MR. WEINREB:  909, please.

04:47 10   A.    That one is the interior palmar side.

11   Q.    Let's just focus on the outside of the gloves.  Did you

12   test the outside of the gloves for blood?

13         MR. WEINREB:  If you could go back to 908, please.

14   A.    Yes, I did.

15   Q.    What was the result of the test?

16   A.    I did confirm the presence of blood and indicated that it

17   was from a human.

18   Q.    Did you collect a sample of that blood for DNA testing?

19   A.    I collected four separate samples.

04:48 20   Q.    How did you do that?

21   A.    Once I had confirmed what stains were blood, I took a

22   sterile swab, I added some water to it and I just swabbed up

23   the stain.  And then once the swabs were dry, I packaged them

24   in a little tube and put it in a special storage area for DNA

25   testing.

```
 1    Q.    Why four?

 2    A.    I had wanted one from each side, so exterior palmar and

 3    dorsal of left and right separately.

 4    Q.    How were the samples labeled?

 5    A.    Each tube has the case number, my initials, the date I

 6    made the sample, and then the separate sample number of each

 7    item.

 8    Q.    Where did you actually put those samples after you took

 9    them?

10    A.    Once I was done with them, we put them in a -- I put them

11    in a cold room, which is essentially a very large refrigerator

12    that is temperature and humidity controlled.

13    Q.    And is that something that DNA analysts have access to so

14    they can get those materials when they need them?

15    A.    Yes, they do.

16    Q.    Now, the way that you processed the gloves, everything

17    you've said to us, is that the standard practice at the lab for

18    collecting and preserving blood samples for DNA testing?

19    A.    Yes, it is.

20    Q.    Did you also prepare a blood sample obtained from the

21    defendant, Dzhokhar Tsarnaev, via search warrant for DNA

22    testing?

23    A.    Yes, I did.

24          MR. WEINREB:    Exhibit 1519, please, which is already

25    in evidence.
```

```
 1   Q.   Do you recognize this?

 2   A.   Yes.  That's a biohazard bag that has a blood tube in

 3   it -- or three blood tubes, rather.

 4            MR. WEINREB:  And 1521, please.

 5   A.   That is the same bag, just the other side of it.

 6   Q.   And again, you took these pictures?

 7   A.   Yes, I did.

 8   Q.   These were assigned an identifying number?

 9   A.   Yes.

10   Q.   What's the number?

11   A.   They're with Case No. 13-08091, and specifically, Item No.

12   12-1 within that case.

13   Q.   How did you prepare this known blood sample for DNA

14   testing?

15   A.   I took just a portion of the liquid blood from each tube

16   separately and put it on a special piece of paper that has

17   preservatives to preserve the DNA in there.  And once it dried,

18   I put it into an envelope and put it into that cold room area

19   again.

20   Q.   Thank you.

21            MR. WEINREB:  I have no further questions.

22                        CROSS-EXAMINATION

23   BY MR. WATKINS:

24   Q.   Good afternoon, Ms. Waite.

25   A.   Good afternoon.
```

1    Q.   Did you also process a sweatshirt?

2    A.   Yes, I did.

3    Q.   And was that an Adidas sweatshirt?

4    A.   Yes, it was.

5    Q.   Do you recognize this picture that's on the monitor now?

6    A.   Yes; that's the sweatshirt I processed.

7    Q.   And I'm showing you what's been admitted as Exhibit 3061.

8    Do you recognize that as --

9    A.   Yes, this is the packaging for the sweatshirt you see in

04:51 10   the photo.

11   Q.   Now, that's FBI packaging.  Is that correct?

12   A.   Yes.

13   Q.   And when -- do you know, after the Massachusetts State

14   Police were done with it, did it indeed go to the FBI?

15   A.   Yes; I transferred it to an FBI agent.

16   Q.   Before you transferred it to the FBI agent, did you

17   conduct the similar kinds of tests for blood and other fluids?

18   A.   I tested for blood, yes.

19   Q.   And did you find blood on this Adidas sweatshirt?

04:51 20   A.   Yes, I did.

21   Q.   You found blood on several different spots, right?

22   A.   Yes, I did.

23   Q.   And actually, seven different spots that you processed for

24   further testing, right?

25   A.   There were ten areas that I identified blood on.  Eight of

1    those were tested later on in DNA.

2    Q.   And you anticipated my next question.  You did indeed send

3    those samples on for DNA processing?

4    A.   That's correct.

5    Q.   Now, at the Massachusetts State Police Criminalistics,

6    there a lot of different kinds of tests that can be performed

7    and a lot of people who can perform them, correct?

8    A.   Yes.

9    Q.   So in addition to DNA, there's also gunshot residue that

04:52 10   can be tested for?

11   A.   Yes, it can.

12   Q.   Moving back to the gloves that the government introduced,

13   that was -- are -- those gloves were also sent for gunshot

14   residue testing?

15   A.   I took a sample from the gloves and sent that forward for

16   GSR, or gunshot residue, primer testing.

17   Q.   And that's not a test that you do; there's a specialist

18   who does that test?

19   A.   That's correct.

04:53 20   Q.   And that would be John Drugan?

21   A.   Yes.

22   Q.   Similarly, the sweatshirt that you see before you on the

23   screen, was that sent for gunshot residue testing?

24   A.   I did take another sample from the sweatshirt and I did

25   send that to John as well for gunshot residue testing.

1           MR. WATKINS:  That's all I have.  Thank you.

2           MR. WEINREB:  I have nothing further.

3           THE COURT:  All right.  Thank you.  You may step down.

4           (The witness is excused.)

5           MR. WEINREB:  The United States calls Jennifer

6     Montgomery.

7                      JENNIFER MONTGOMERY, duly sworn

8           THE CLERK:  State your name and spell your last name

9     for the record, keep your voice up and speak into the mic.

04:54 10          THE WITNESS:  My name is Jennifer Montgomery.  Last

11    spelled is spelled M-O-N-T-G-O-M-E-R-Y.

12                          DIRECT EXAMINATION

13    BY MR. WEINREB:

14    Q.    Good afternoon, Ms. Montgomery.

15    A.    Good afternoon.

16    Q.    Where do you work?

17    A.    I'm currently employed at the state police crime lab.

18    Q.    What do you do at the crime lab?

19    A.    I'm a Forensic Scientist 2 in the DNA unit and the

04:54 20    crime-scene response unit.

21    Q.    So you're a DNA analyst?

22    A.    Correct.

23    Q.    How long have you worked at the crime lab?

24    A.    Since May of 2008.

25    Q.    Where did you go to school and what degrees did you earn?

A.   I got my bachelor's of science in biology from UMass

Dartmouth and my master's of science with a concentration in

forensics from the University of Florida, Gainesville.

Q.   After graduating with your master's degree in forensic

science but before joining the state police lab, did you do

other lab work?

A.   Yes; I have approximately eight years' experience in

molecular biology and genetics labs.

Q.   Do you have any specialized training in DNA analysis?

A.   Yes.  When I first started at the crime lab, I

participated in a six-month training program.  This included

lectures as well as required readings and written and oral

exams.  At the end of that training I took a competency test to

determine whether or not I was able to do casework, and I

passed that test and I've been a casework analyst since.

Q.   Has there been additional testing of you over the years?

A.   Yes.

Q.   How frequently?

A.   I'm given a proficiency test every six months.

Q.   Have you always passed?

A.   Yes.

Q.   In the course of your work, how many DNA samples have you

analyzed?

A.   Approximately 10,000.

Q.   Are there occasions when as a result of your analysis you

1    have excluded a person by comparing the person's DNA to DNA

2    found at a crime scene?

3    A.   Yes.

4    Q.   How many times?

5    A.   It happens all the time.

6    Q.   As part of your job, are you expected to testify in court

7    about your examinations and the results of those examinations?

8    A.   Yes.

9    Q.   How many times have you testified in court?

04:56 10    A.   Approximately 50 times.

11         MR. WEINREB:  Your Honor, the government asks that

12    Ms. Montgomery be qualified as a DNA expert.

13         MR. WATKINS:  No objection.

14         THE COURT:  Okay.

15    BY MR. WEINREB:

16    Q.   What is DNA?

17    A.   DNA stands for deoxyribonucleic acid, and it's found in

18    almost all the cells of your body.  You inherit a half from

19    your mother and half your DNA from your father, and it's

04:57 20    responsible for, among other things, physical traits such as

21    hair color, eye color and height.

22    Q.   Is it sometimes referred to as the genetic blueprint for a

23    person?

24    A.   Yes.

25    Q.   Can you explain the process you used to analyze the DNA

1    evidence in this case?

2    A.    Yes.  I used a four-step process.  The first step is

3    called extraction, and that's when we open the cells to release

4    the DNA.  The second step is called quantitation, and that's

5    where we take a small amount of the sample and put it into a

6    machine which determines how much DNA we have in that sample.

7    The third step is called amplification, and that's where we

8    make millions and millions of copies of the DNA of interest.

9    And the fourth step is called separation, and that's where,

04:57 10   again, we take a small amount of the sample, put it into a

11   machine, and it separates out the DNA by size.

12   Q.    Do the processes that you just described, are they

13   standardized processes that are followed at the state police

14   lab?

15   A.    Yes.

16   Q.    They're documented in protocols and procedures?

17   A.    Correct.

18   Q.    Did you follow all of those in doing your work in this

19   case?

04:58 20   A.    Yes, I did.

21   Q.    What do you do to make sure your work is accurate?

22   A.    After I'm done with all of my testing, my file will be

23   reviewed by a senior analyst.  They'll go through the whole

24   file and look for technical accuracy.

25   Q.    Did you do DNA testing in connection with the murder of

1    Officer Sean Collier?

2    A.    Yes, I did.

3    Q.    Were you asked to compare Sean Collier's DNA to blood

4    found on the outside of two white gloves?

5    A.    Yes.

6    Q.    How did you obtain Sean Collier's DNA?

7    A.    I obtained a known head hair standard from the OCME, and I

8    processed that using that same four-step process in order to

9    determine a DNA profile for him.

04:58 10    Q.    So even in our hair you can find DNA?

11    A.    Yes; it's in the root of the hair or a follicular tag

12    attached to the root.

13    Q.    And how did you obtain blood from the outside of the two

14    white gloves?

15    A.    A swab was taken by a criminalist and then given to me to

16    process through DNA.

17    Q.    How were you able to identify it as blood from the outside

18    of the white gloves?

19    A.    The criminalist will take notes and do testing to confirm

04:59 20    that.

21    Q.    Was it also given a case number and an item number?

22    A.    Yes.

23    Q.    Do you know what the case number and item number were for

24    the two gloves?

25    A.    Yes.

1    Q.    What were they?

2    A.    The case number was 13-8140, and the two items that I

3    tested were Item No. 12-9.1.1 and 12-9.2.1.

4    Q.    So 12-9.1 is -- or 12-9 were the gloves?

5    A.    Correct.

6    Q.    And then 12-9.1?

7    A.    Would be the swabs.  And then the criminalist will take a

8    portion of those swabs and put that forward for DNA, saving the

9    other half.

04:59 10   Q.    And that becomes 12-9.1.1?

11   A.    Correct.

12   Q.    Okay.  Did the test tube indicate who had prepared the

13   sample?

14   A.    Yes.

15   Q.    Who?

16   A.    Stephanie Waite.

17   Q.    She's someone you work with regularly?

18   A.    Yes.

19   Q.    In your experience is her work reliable?

05:00 20   A.    Yes.

21   Q.    Were you able to develop a DNA profile for Sean Collier?

22   A.    Yes, I was.

23   Q.    Were you able to develop a DNA profile for the blood from

24   the outside of the white gloves?

25   A.    Yes, I was.

```
 1              MR. WEINREB:  Can I have Exhibit 912 for the witness,
 2     please.
 3     Q.   Does this diagram -- will this help you explain your
 4     testimony if you have this up?
 5     A.   Yes.
 6     Q.   Okay.
 7              MR. WEINREB:  The government asks that 912 be
 8     published.
 9              MR. WATKINS:  No objection.
05:00 10              THE COURT:  Okay.
11     BY MR. WEINREB:
12     Q.   What does it mean to develop a DNA profile for a person or
13     for an item like blood from the outside of gloves?
14     A.   We're looking at 15 specific locations as well as one
15     location that tells us whether the sample is from a male or a
16     female.
17     Q.   Okay.  Now, let me just stop you there.  By "locations,"
18     do you mean locations on the gloves or --
19     A.   Locations on the chromosome.
05:01 20     Q.   Explain what that means.
21     A.   So we're looking at these 15 specific locations that are
22     highly variable from one person to the next, so it makes it
23     useful to use for forensic identity purposes.
24     Q.   Okay.  Locations on their DNA?
25     A.   Yes.
```

```
 1   Q.   And you said they're highly variable from person to
 2   person?
 3   A.   Correct.
 4   Q.   So everybody has those locations?
 5   A.   Yes.
 6   Q.   But you don't often find the same thing at that
 7   location -- at a particular one of those locations in two
 8   different people?
 9   A.   You can find it in two different people.  But when you do
05:01 10  all 15 locations, only identical twins have the same profile.
11   Q.   What is this -- let's just focus on the three columns on
12   the left-hand side of the page.  Let's start with the first
13   column.  What's in the first column.
14   A.   Under "sample description," to the right of that is HHS,
15   Sean Collier.  And "HHS" stands for "head hair standard."  And
16   the item number is listed below that.  And then along the
17   left-hand side, all of the numbers and letters represent the
18   different locations that we're looking at.
19   Q.   Okay.  Let me stop you right there.  So it says -- just on
05:02 20  the left-hand column, the one where everything is bold on the
21   left, it says "sample description," then it says "item number."
22   That refers to these two items.  10-4.1 going across is the
23   Collier head hair sample, and then 12-9.3.1, that's one of the
24   samples from the outside of the glove?
25   A.   Yes.
```

1    Q.   All right.  Now let's just -- on the left-hand column

2    there are a bunch of numbers that have a D or a C or a T in

3    front of them.  What are those?

4    A.   Those are just the specific locations on the chromosome

5    that we're looking at.

6    Q.   So it's like an address?

7    A.   Correct.

8    Q.   And then in the second column, under the name "Sean

9    Collier" there are pairs of numbers?

05:03 10    A.   Yes.

11    Q.   What do those represent?

12    A.   So the type of DNA testing that we do at the lab is called

13    DNA STR testing.  "STR" stands for short tandem repeat, and

14    that just means we're -- it's a small section of DNA that

15    repeats itself over and over and over.  And what we do at the

16    lab is count how many times that sequence repeats itself and

17    assign a number.  So after -- underneath the head hair standard

18    for Sean Collier in the first column it says D8S1179.

19    Q.   I'm sorry.  You said the first column.  You mean the first

05:03 20    row?

21    A.   All the way on the left-hand column is the location --

22    Q.   Yup.

23    A.   -- and then at that location he has 13 repeats and 14

24    repeats.

25    Q.   Okay.  Why two numbers?

1    A.   Because you inherit half your DNA from your mother and

2    half from your father.

3    Q.   So at each address, you actually have two different sets

4    of repeats?

5    A.   Yes.  They can be the same.  You can get the same repeat

6    from each parent.

7    Q.   Go on.

8    A.   So we just do that at each of those locations.  And if you

9    go down towards the bottom, third from the bottom, there's a

05:04 10   location that says "AMEL," and next to it is an X and a Y.  And

11   that means that this sample was obtained from a male.

12   Q.   And then on the third column, "swab of red-brown stains on

13   the exterior dorsal side of the pinky of the left glove," what

14   are those numbers?

15   A.   Those -- that is the profile that I developed from that

16   swab of red-brown stain.

17   Q.   Okay.  And at each address did the number of repeats in

18   the Sean Collier sample match the number of repeats in the

19   glove sample?

05:04 20   A.   Yes.  The sample -- the profile that I obtained from this

21   sample was a mixture with a major profile, and the minor

22   profile in this mixture was insufficient for comparison so I

23   didn't -- I wasn't able to make any comparisons to that.  But I

24   was able to make a comparison to the major profile.

25   Q.   Okay.  And what were the results of your comparison?

1    A.    The DNA profile obtained from this item indicated the

2    presence of a mixture of DNA from more than one source.  The

3    major source of the DNA from this item has been interpreted,

4    and this major male profile matched the DNA profile from Sean

5    Collier.

6    Q.    All right.  Now let's go over to the next -- so just to

7    summarize, the blood that you found on the outside of the

8    gloves at that location was Sean Collier's blood?

9    A.    At all of the locations, yes.

05:05 10   Q.    Okay.  But when I say "that location," I mean that

11   location on the glove.

12   A.    Yes.

13   Q.    On the outside of the glove.

14        All right.  And then the next chart, you said you analyzed

15   another sample from the outside of the gloves?

16   A.    Yes.

17   Q.    And again, was the results of your analysis that the DNA

18   in the blood found on the outside of the gloves at that

19   location on the gloves was Sean Collier's blood?

05:06 20   A.    Yes.  This was a single-source profile, meaning only one

21   person was seen in the profile, and it was a match to the -- to

22   Sean Collier.

23        MR. WEINREB:  Can I have Exhibit 914 for

24   identification, please.

25        MR. WATKINS:  Your Honor, object.  Notice.

1            THE COURT:  Let me see you briefly.

2            (Discussion at sidebar and out of the hearing of the

3    jury:)

4            THE COURT:  Is this the keys?

5            MS. CLARKE:  Yes.

6            MR. WEINREB:  Your Honor, at least six months ago we

7    sent the defense the report and an email stating that in

8    addition to her testifying about the gloves, that this witness

9    was going to talk about the keys.  It wasn't in our initial

05:07 10    disclosure, that's true, because we got the report later.  But,

11    in fact, we did give them the evidence many, many months ago

12    and in an email said we were going to use it.

13            THE COURT:  Do you have it?

14            MR. WEINREB:  The email?

15            MR. CHAKRAVARTY:  We could get it.  We need five

16    minutes.

17            MR. WATKINS:  I don't think we ever got it.  It's true

18    we have the report, but the strictures of 16(a)(1)(G) are

19    quite --

05:07 20            MS. CLARKE:  It's not in there.

21            MR. WEINREB:  This was the original disclosure.  We

22    did it shortly afterwards because we got the report shortly

23    afterwards.  But we did send the report with all of the

24    information.

25            THE COURT:  Well, given what the testimony is likely

1   to be, I mean, is there prejudice?

2          MR. WATKINS:  Well, your Honor, it wasn't noticed.  I

3   mean, that's the bottom line.

4          MS. CLARKE:  It's Sean Collier's blood on the keys.

5   And I don't know what the government's argument's going to be

6   but they're going to try to place our client in the driver's

7   seat leaving the scene.

8          THE COURT:  I guess my question is:  Would

9   the -- would your approach to this witness be any different if

05:08 10   you had received it?

11         MR. WATKINS:  I don't know that there's a requirement

12   for that.  There is a requirement of good cause shown on the

13   government.  I don't know what the good cause would be at this

14   point.

15         THE COURT:  They said they could get it.  You're

16   saying you didn't get it.  Those things happen.  I don't know

17   who's right on that one.  But if they're right, then -- we

18   could pause.

19         MR. CHAKRAVARTY:  Five minutes, your Honor.

05:08 20         MR. WEINREB:  Although we would argue -- although we

21   have the email, I don't know if there's any need to pause for

22   five minutes.  We sent them a report saying Collier's blood was

23   found on the keys.  And the one reason for doing that was

24   because we were notifying them this is the result that they

25   should expect to see in evidence.

```
 1              THE COURT:  Have you looked at the email since this
 2    morning?
 3              MR. CHAKRAVARTY:  Not since this morning.
 4              THE COURT:  Let's take a short break and see if you
 5    can get the email.
 6              MS. PELLEGRINI:  Okay.
 7              (In open court:)
 8              THE COURT:  We're going to take a short recess.
 9              THE CLERK:  All rise for the jury.  The Court will
10    take a short recess.
11              (The Court and jury exit the courtroom and there is a
12    recess in the proceedings at 2:52 p.m.)
13              THE CLERK:  All rise for the Court.
14              (The Court enters the courtroom at 3:26 p.m.)
15              (Discussion at sidebar and out of the hearing of the
16    public:)
17              THE COURT:  There's no jury here, but...
18              MR. WEINREB:  So on June 30th we provided the defense
19    with an Excel spreadsheet of all the reports and experts' names
20    and CVs and everything else, and gave notice that the experts
21    would testify consistently with their reports.  On August 15th
22    we provided this report, which is the report of the examination
23    of the car keys.  The defense filed a motion -- because this
24    report was produced -- this examination was done and this
25    report was produced after this letter was sent.  So we
```

1    supplemented by sending the report.

2         On September -- the defense meanwhile had filed a

3    motion saying that just giving them the reports, no matter how

4    detailed the reports were, was not sufficient and we needed to

5    do it in a narrative fashion, and the Court agreed.  So on

6    September 2nd we provided them, in narrative fashion, an

7    extremely detailed account of how Jennifer Montgomery does her

8    DNA analysis.  In that we did not reference the keys report,

9    although it had already been produced, because our argument

05:45 10   will be that the defense was already on notice that these

11   experts would testify consistently.

12        We subsequently did send them -- there was yet more

13   DNA testing done, this was the DNA testing of the hat found,

14   and we supplemented that so that there was a -- there was the

15   initial disclosure that the experts will testify consistent

16   with the reports, and then there was subsequent production of

17   reports over time along with a detailed explanation of the

18   witnesses' [*sic*] methodology --

19        THE COURT:  Where is that?

05:45 20       MR. WEINREB:  In here.  It starts here.

21        (Pause.)

22        MR. WEINREB:  As with any claim, under Rule 16 the

23   question should be did the defense have adequate notice and can

24   they show prejudice.  If there's anything they can say they

25   would have done differently, they would have litigated this

1    case differently, they would have done some test differently,

2    they would have opened differently, anything if this were done

3    in any way different.

4         And I can't because they have had the report, knowing

5    that it was their client's DNA on the keys, ever since we

6    produced the report.  We notified them.  And the only reason we

7    were doing these tests and giving them these reports, as we

8    said, way back in June, the experts are going to testify

9    consistent with their reports, we were never asked for a single

05:47 10  bit of follow-up discovery, anything in connection with that

11   report although they acknowledge they've had the report since

12   August or September of 2014.

13        MR. WATKINS:  Yeah, there have been dozens of reports,

14   dozens of tests, dozens of experts proposed that were

15   potentially available in this case.  This September 2nd letter

16   is really the bible of the experts.  It was hotly litigated

17   about when the government would --

18        THE COURT:  Did this happen before?  Where's Jane?

19   This happened before.  The volume all of a sudden kicks out.

05:47 20       MR. WATKINS:  What's that?

21        THE COURT:  The volume kicks out.  It's like the

22   delays on the pictures.

23        MR. WATKINS:  So the -- the fact of the matter is

24   there's not notice there about the keys, there's not notice

25   anywhere about the keys.  The knit cap, indeed they noticed

1    that.  There was no particular reason for us to argue that

2    there wasn't good cause once they did notice us, but they did

3    not notice us on the keys and have not.

4         We -- I should note that we did file a motion to

5    exclude DNA results.  We did not argue about the keys' DNA

6    results.

7         THE COURT:  It wasn't Collier's DNA results you were

8    trying to exclude.

9         MR. WATKINS:  Well, that's correct.  To the extent

05:48 10   that the government is suggesting that the issue was somehow

11   joined, I don't think that it was.  I don't think there's any

12   evidence of that.

13        THE COURT:  And how would you have done things

14   differently if you had known?

15        MR. WATKINS:  Your Honor, I can't say how we would

16   have done things differently.  What I can say is that we

17   noticed that it was not in here.  We did not concentrate on

18   that.  We did concentrate on the many other experts that there

19   are in this case.  As the Court knows, there are very

05:48 20   complicated and very complex on a number of different -- there

21   is a reason the rule requires that there be notice or otherwise

22   good cause for late notice.  There's simply not good cause for

23   this late notice at the beginning of the case.

24        THE COURT:  Well --

25        MR. WATKINS:  I don't think it's the determinative

 1    argument, but there's plenty of other evidence that the

 2    government has available to them.

 3            MR. WEINREB:  Your Honor, we can give notice today and

 4    put the expert -- call the expert a week from now.  There's

 5    still nothing different that they're going to say next week.

 6            MR. CHAKRAVARTY:  The only reason for disclosing this

 7    report was so -- it's a Rule 16 disclosure related to the

 8    expert.  It's not exculpatory --

 9            MR. WATKINS:  That doesn't do it.  We received

05:49 10   literally dozens, if not hundreds of, quote/unquote, expert

11    reports in this case, all -- many of which the government did

12    not use, declined to use for whatever reason.  The fact that

13    they disclosed a report that's good enough for notice is simply

14    not adequate.

15            MR. WEINREB:  I agree.  But there's also the letters.

16            MR. WATKINS:  But that's as broad as they get.

17            THE COURT:  I'll let you re-call the expert next week

18    if you want.

19            MR. WEINREB:  Okay.

05:50 20   THE COURT:  Okay?  You have notice now.  Whatever you

21    can negotiate on the timing.

22            MR. WEINREB:  Okay.

23            (In open court:)

24            THE CLERK:  All rise for the jury.

25            (The jury enters the courtroom at 3:34 p.m.)

1          THE CLERK:  Be seated.

2          THE COURT:  Go ahead.

3          MR. WEINREB:  Your Honor, we have no further questions

4    for Jennifer Montgomery at this time subject to re-calling her

5    at a later date.

6          THE COURT:  All right.

7          MR. WEINREB:  The United States calls Special Agent --

8          MR. WATKINS:  I'm sorry.  I'm going to do some

9    cross-examination.

05:51 10          MR. WEINREB:  Oh, I'm sorry.  I thought we were going

11   to do that at a later date but evidently we'll do it now.

12          THE COURT:  Is Ms. Montgomery here?

13                JENNIFER MONTGOMERY, resumed

14                     CROSS-EXAMINATION

15   BY MR. WATKINS:

16   Q.   Good afternoon, Ms. Montgomery.

17   A.   Good afternoon.

18   Q.   In addition to the gloves that you tested, were you also

19   asked to test a sweatshirt that was -- belonged to Dzhokhar

05:52 20   Tsarnaev?

21   A.   Yes; I tested eight samples that were taken from the

22   sweatshirt.

23   Q.   And in preparation for that -- doing that comparison, you

24   talked with Mr. Weinreb about developing DNA profiles.  Did you

25   also develop DNA profiles for Dzhokhar Tsarnaev and for

1    Tamerlan Tsarnaev?

2    A.    Yes, I did.

3    Q.    And that's in addition to the profile that was developed

4    for Sean Collier?

5    A.    Correct.

6    Q.    And when you did that testing of the eight separate spots

7    on the sweatshirt of Dzhokhar Tsarnaev, were you able to

8    develop a DNA profile from that?

9    A.    Yes, I was.

05:53 10    Q.    You talked a little bit about single profiles versus

11    mixtures.  Was this a single profile or a mixture?

12    A.    They were all single-source profiles.

13    Q.    And when you compared the single-source profile to those

14    eight spots, did they match Tamerlan Tsarnaev's?

15    A.    No, they did not.

16    Q.    Those eight spots on the sweatshirt, do you recall where

17    on the sweatshirt you developed those from?

18    A.    They were swabs taken by the criminalist on various areas

19    on the exterior of the sweatshirt including the arms, the cuffs

05:54 20    of the sweatshirt, I believe the abdomen.

21    Q.    And are you able to show the jury where on yourself those

22    were taken from?

23    A.    Yes.  If I can refer to my notes?

24    Q.    Absolutely.

25    A.    Item No. 15-3.3.1, swab of red-brown saturation stain on

 1  lower exterior front and back of right sleeve near cuff, so in

 2  this area.

 3  Q.   Thank you.

 4  A.   Do you want me to do all seven?

 5  Q.   Yes, please.

 6  A.   15-3.4.1 was a swab of a red-brown stain on the exterior

 7  front right sleeve near shoulder of sweatshirt, so the exterior

 8  front right.

 9       15-3.6.1, swab of red-brown saturation stain on exterior

05:54 10  abdomen, so in this area.

11       15-3.8.1, swab of red-brown saturation stain on middle

12  portion of exterior front right sleeve of sweatshirt, so this

13  area.

14       5-3.10.1, swab of red-brown saturation stain on exterior

15  back right shoulder of sweatshirt, so back here.

16       15-3.9.1, swab of 5 millimeter times 3 millimeter

17  red-brown stain on middle portion of exterior front right

18  sleeve, so right in this area.

19       5-3.11.1, swab of red-brown stain on exterior lower right

05:55 20  back of sweatshirt, back here.

21       15-3.2.1, swab of red-brown stain on exterior front left

22  sleeve of sweatshirt, so here.

23  Q.   You talked about finding -- doing a DNA profile on part of

24  the abdomen.  I don't think we could see that terribly clearly.

25  Could you perhaps stand up and demonstrate to the jury what

1    part?

2    A.    The abdomen would be right here.

3    Q.    Thank you.

4         And the results of that single-source profile, when you

5    compared it to Sean Collier's blood, what was the outcome?

6    A.    He could not have been a source of the DNA on those items.

7    Q.    And when you compared the single-source profile from those

8    eight spots on the sweatshirt, did that match Dzhokhar

9    Tsarnaev?

05:56 10    A.    Yes, it did.

11    Q.    So all of the spots that were tested were from Dzhokhar

12    Tsarnaev and no one else?

13    A.    Correct.

14              MR. WATKINS:   I have nothing further, your Honor.

15              MR. WEINREB:   Just briefly.

16                        REDIRECT EXAMINATION

17    BY MR. WEINREB:

18    Q.    Ms. Montgomery, you say that you tested swabs that were

19    taken from various areas on the sweatshirt?

05:56 20    A.    Yes.

21    Q.    So a swab of a particular area, it just picks up the blood

22    in that area, correct?

23    A.    Correct.

24    Q.    It doesn't pick up all the blood in all the areas?

25    A.    No, just that specific area that the sample was taken

 1   from.

 2   Q.   Right.  And if there was an area that wasn't swabbed, then

 3   we wouldn't know whose blood that was, correct?

 4   A.   Correct.

 5   Q.   And even if there was an area that was swabbed, if the

 6   swab didn't happen to hit the entire area, cover all of it,

 7   then you wouldn't know necessarily whose blood that was,

 8   correct?

 9   A.   Correct.

05:57 10   Q.   And if somebody is swabbing areas of blood on a sweatshirt

11   but there are, let's say, little pinpoints of blood or tiny

12   droplets of blood elsewhere --

13           MR. WATKINS:  I'm going to object at this point.

14           THE COURT:  Sustained.

15   BY MR. WEINREB:

16   Q.   Do you know whether every single droplet of blood on that

17   sweatshirt was swabbed?

18           MR. WATKINS:  I object.

19           THE COURT:  You may answer that.

05:57 20           THE WITNESS:  I do not know.

21   BY MR. WEINREB:

22   Q.   Do you know whether it is -- whether there was a request

23   that every single droplet of blood be swabbed?

24           MR. WATKINS:  I'm going to object.

25           THE COURT:  Sustained.

```
 1   BY MR. WEINREB:

 2   Q.   All you can say is that the swabs that you happened to

 3   test did not have anyone's blood besides Dzhokhar Tsarnaev's?

 4   A.   Correct.

 5            MR. WEINREB:  No further questions.

 6            MR. WATKINS:  Just one.

 7                          RECROSS-EXAMINATION

 8   BY MR. WATKINS:

 9   Q.   I think on direct examination you talked about working

10   with Stephanie Waite?

11   A.   Yes.

12   Q.   And you worked with her for years?

13   A.   Yes.

14   Q.   I believe you told Mr. Weinreb that she's very

15   experienced?

16   A.   Yes.

17   Q.   And she would be the one that would determine where to

18   test from, correct?

19   A.   She's the one that samples the sweatshirt, yes.

20   Q.   So do you rely on her experience to look for every single

21   spot that was testable?

22            MR. WEINREB:  Objection.

23            THE COURT:  Yes, sustained.

24            MR. WATKINS:  I have nothing further.  Thank you.

25            THE COURT:  Okay.  Thank you, Ms. Montgomery.  You may
```

 1    step down.

 2              (The witness is excused.)

 3              MR. WEINREB:  The United States calls Special Agent

 4    Brian Corcoran.

 5                   BRIAN J. CORCORAN, JR., duly sworn

 6              THE CLERK:  Have a seat.  State your name, spell your

 7    last name for the record, keep your voice up and speak into the

 8    mic.

 9              THE WITNESS:  Brian J. Corcoran, C-O-R-C-O-R-A-N, JR.

05:59 10                        DIRECT EXAMINATION

11    BY MR. WEINREB:

12    Q.   Good afternoon.

13    A.   Good afternoon.

14    Q.   Where do you work?

15    A.   I work for the Federal Bureau of Investigation in Boston.

16    Q.   How long have you worked there?

17    A.   Five years in April.

18    Q.   What is your current job assignment?

19    A.   My current job assignment is a special agent bomb

06:00 20    technician.

21    Q.   How long have you been a bomb technician?

22    A.   Since May of 2012.

23    Q.   What are the responsibilities of a bomb technician at the

24    FBI?

25    A.   The FBI, we are tasked with training state and local

1    partners; assisting on any call-outs, whether they be real

2    devices or hoax devices; maintaining communication with those

3    partners for any type of investigative purposes such as

4    counterterrorism investigations; or any explosive incidents

5    involving WMDs.

6    Q.   As part of your training as a bomb technician, did you

7    learn how to recognize explosive devices and components?

8    A.   Yes.

9    Q.   Did you learn how to handle them safely?

06:00 10   A.   Yes.

11   Q.   And proper procedure for taking them into evidence?

12   A.   Yes.

13   Q.   Did you participate in the marathon bombing investigation?

14   A.   I did.

15   Q.   Was that both on April 15th when the bombing occurred, and

16   then later on April 18th, 19th, 20th, up at the Watertown crime

17   scene?

18   A.   Correct; all occurrences.

19   Q.   When did you -- did you go to the Watertown crime scene?

06:01 20   A.   Correct.  I was called there as part of a larger response

21   back to the field office.  Tasked as a special agent bomb tech,

22   we were sent directly to the scene to assist state, local and

23   other and federal assets.

24   Q.   When did you arrive there?

25   A.   Middle morning.  I would say approximately three,

1    three-thirty.  Once I was on-scene, the two devices that were

2    loaded into TCV were already currently in there.  The techs had

3    just finished clearing the Civic for what they felt were any

4    devices in there as well as a general safety sweep.

5    Q.    Okay.  So you said 3:30.  That's 3:30 in the morning?

6    A.    Correct; a.m., 19th.

7    Q.    And the two devices that had been cleared, what were those

8    two devices?

9    A.    So as I arrived on-scene, I was briefed that there were

06:02 10   two pipe bombs.  I was told they were a little irregular

11   because they were internally threaded.  They were located out

12   on the street and placed in a TCV via robot.  And those were

13   the two main hazards that they had identified that were still

14   active.

15   Q.    And TCV, that's total containment vessel, a safe vessel

16   for putting a potentially live bomb into?

17   A.    Correct.

18   Q.    You said the Honda Civic had been cleared?

19   A.    Correct.

06:02 20   Q.    That was the Honda Civic on the street?

21   A.    The Honda Civic was on the street on Laurel somewhere

22   just -- I would say just east of 56 or 55 Laurel.

23   Q.    What did you personally do after you arrived?

24   A.    So after we arrived, the techs that were down-scene

25   returned.  Myself, along with other state and local techs,

1    proceeded to do a quick search down the street for any

2    remaining devices that may not have been as obvious.  We were

3    obviously interested in getting the residents out of their

4    house, based on what had happened earlier, did what they call a

5    secondary search, which is when you're looking for those

6    devices, not necessarily in a full bomb suit but in protective

7    gear.  Once we did that, pulled back --

8    Q.    Let me stop you.  So were any additional live devices

9    found?

06:03  10   A.    No.

11   Q.    Okay.  Continue.

12   A.    Pulled back towards the corner of Dexter and Laurel where

13   the TCV was still located, hadn't left the scene yet.

14   Residents were evacuated from the house, the ones that were

15   remaining that had not left, the rear of the residences, and we

16   basically formulated a plan as far as evidence recovery for

17   that portion of the street.

18   Q.    Okay.  So everybody who lived on that block of Laurel

19   Street was asked to leave their homes?

06:03  20   A.    Correct.

21   Q.    Why was that?

22   A.    Obviously, we still had somebody at large in the area.

23   There was a concern that, A, he could have been in any of the

24   houses, so we were doing it primarily to see if someone was in

25   any of those houses.  And even though a secondary search was

1   done, you never know what you're really going to find out there

2   when you're working the scene of an active explosion.

3   Q.   By the time all of that was done, what time of day was it?

4   A.   It was approximately -- I mean, I couldn't give you the

5   time of day.  It was daylight.  The sun was starting to come up

6   at that time.

7   Q.   So it was around dawn?

8   A.   Correct.

9   Q.   What happened after all that was done and the sun began to

06:04 10   rise?

11   A.   At that point we gathered all the assets that were down

12   there, state local and federal.

13   Q.   Okay.  Assets:  That's police talk for law enforcement

14   officers and --

15   A.   Right.  Law enforcement officers which would consist of

16   patrol officers, evidence response personnel that are tasked

17   with gathering up evidence, as well as techs -- bomb techs that

18   know how to handle those various devices should you come upon

19   one.

06:04 20   Q.   So all those people gathered.  And what happened?

21   A.   At that point we formulated a plan.  Based on the number

22   of personnel onsite -- Massachusetts State Police had a large

23   amount of personnel there that had responded from the MIT

24   scene.  Based on that and the fact that FBI personnel, largely

25   ERT, were still processing Boylston --

```
 1    Q.   ERT?

 2    A.   Evidence response technicians.

 3    Q.   People who collect evidence?

 4    A.   Correct.

 5    Q.   They're still down at the marathon bombing scene?

 6    A.   They are preparing for that day, to work down at Boylston,

 7    to finish up the evidence collection down there, as well as any

 8    other scenes they may have been tasked to at that point in the

 9    morning.  At that point we had identification for one of the

10    subjects, and they were basically staging to go to another

11    location to gather evidence.

12    Q.   So there were a lot of Massachusetts State Police

13    officers?

14    A.   Correct.

15    Q.   And members of other state and local law enforcement

16    agencies?

17    A.   Correct.

18    Q.   How did you go about beginning to process the crime scene

19    up on Laurel Street?

20    A.   So as part of that we basically divided the total crime

21    scene into a ballistics portion and a potential explosives and

22    intelligence portion.  For the intelligence and explosives

23    portion, that's, you know, where I came in.  And Mass. State

24    Police basically divided the street, Laurel Street, into three

25    different zones:  A, B and C.  A was the north side of the
```

1    street, including the yards, residential areas, the house, side

2    yards; B was the center part of the street; and C was the south

3    side, or the odd numbers going down the street.

4    Q.   So those are geographic zones?

5    A.   Correct.

6    Q.   And then when you said explosives portion and ballistics

7    portion, you're talking about teams with different purposes?

8    A.   Correct.

9    Q.   Okay.  What was the purpose of the explosives group?

06:06 10   A.   So ours was what you would consider post-blast recovery.

11   So we're basically going around, looking for evidence of the

12   actual explosion, whether that be any type of powders,

13   fragmentation, containers, concealment devices, anything along

14   those means, and like I said also, the intelligence that may

15   tie that to something else as well.

16   Q.   Okay.  So what's fragmentation?

17   A.   So fragmentation can come in a variety of different forms.

18   It can be either loose-packed, whether it be BBs, nails, brads,

19   or it can be the actual container that holds what is the bomb,

06:07 20   whether it's the explosives -- you know, high explosive or low

21   explosive -- all contained in there.  And then the actual

22   container can become fragmentation as it separates and it's

23   sent down the street.

24   Q.   So it's called fragmentation because when it blows up it

25   turns into fragments of something?

1    A.    Correct.

2    Q.    What happened when you identified one of those types of

3    explosives' evidence on the street or in a yard or in a house

4    or somewhere else?

5    A.    Certainly.  So as you work your way down the street, if

6    something was noticed it was placarded.

7    Q.    What does that mean?

8    A.    It means using a small -- and depending on which side you

9    were, there were a variety of different things used out there.

06:07 10   So it would be either a small triangle that has a number on it,

11   it could be a cone with a number on it, or in some cases based

12   on the total volume, we just had so much, they actually used

13   chalk with a number adjacent to it.  Each one of the zones was

14   broken out.  And obviously, as you work through 1 through 100,

15   you don't want to have any confusion across the zones.

16   Q.    Okay.  And within each zone, each placard had a unique

17   number?

18   A.    Correct.

19   Q.    Like one, two, three, four, five?

06:08 20   A.    Correct.

21   Q.    And what's the purpose of marking a piece of evidence with

22   a numbered placard or a circle or a cone?

23   A.    So basically, you want to tie it -- ultimately, as you go

24   through the investigation, you want to be able to tie it

25   together throughout the course of events.  So you're going to

        1    have that number there that's always associated with that piece

        2    of evidence.  It will be photographed as such, both from a far

        3    distance and up-close so you get a good idea of where it was

        4    and then the specific detail of it.  And also, once the

        5    evidence is ultimately collected, it's written on the bag,

        6    signed by the collector, and it has that unique identifier tied

        7    to it at that point.

        8    Q.   So Step 1 is identify the item?

        9    A.   Correct.

06:08  10    Q.   Step 2 is put down the placard?

       11    A.   Correct.

       12    Q.   Step 3 is photograph it?

       13    A.   Correct.

       14    Q.   And then Step 4 is collect it?

       15    A.   Correct.

       16    Q.   All right.  Were you aware that some evidence are also GPS

       17    readings being taken?

       18    A.   Yes.  The Massachusetts State Police in the course of this

       19    investigation was able to use GPS coordinates.  I know that

06:08  20    they did that 100 percent for the firearms portion, and I'm not

       21    sure if they did it 100 percent for the explosives portion.

       22    Q.   Once explosives' evidence on the scene was marked,

       23    photographed, collected, bagged and documented in the way

       24    you've described, what physically happened to it?  Where did it

       25    go?

1    A.   So in this case, since Massachusetts State Police was the

2    lead agency for the actual collection of it, they collected it.

3    As the FBI, we had specific interests in a portion of it based

4    on its intelligence or things that could basically tie it to

5    someone, whether we could get some type of forensics off of it

6    or whether it matched other devices we had previously seen.

7    Those devices we asked for that day, on the 19th, to be turned

8    over directly to the FBI.

9    Q.   Okay.  So when you say they have intelligence value, you

06:09 10  mean they can teach you something about the crime, perhaps give

11   you a lead?

12   A.   Certainly.  So for a device, it could be something in how

13   it was constructed, you know, what the initiation system was,

14   or also, the intelligence we were interested in is if there's

15   any electronics out there, maybe something we can pull

16   forensics off of, whether it be -- tape often catches quite a

17   bit as far as fingerprint detail.  So things of that nature

18   we're interested in to get down to our lab as soon as possible.

19   Q.   So how did they make their way to the lab?

06:10 20  A.   So in the course of this investigation, state police

21   collected it, I immediately took custody of it.  We took it to

22   our command post that we had set up in Watertown that day at

23   which point it was assigned an FBI number, transferred to Black

24   Falcon, and placed on a plane that evening to go to Quantico.

25   We were making at least one, if not two, trips to Quantico each

1   day with a plane to get the evidence down there for immediate

2   inspection.

3   Q.   In the course of doing your secondary search down Laurel

4   Street to make sure it was safe, did you encounter a computer

5   bag that was lying on the ground?

6   A.   I did.

7   Q.   Do you know how that computer bag was handled when it was

8   discovered?

9   A.   When we came out to the scene during the initial brief, we

06:11 10   were told that as part of the Civic -- the Honda Civic that was

11   on-scene clear, the bomb techs did remove some items from the

12   car, one specific item being that laptop bag.

13   Q.   So that came out of the Honda?

14   A.   Correct.

15   Q.   And where did it go?

16   A.   So it went to the rear passenger side of the vehicle in

17   the street.

18   Q.   Okay.  So once it was cleared and -- was it deemed safe at

19   that point?

06:11 20   A.   When the scene was turned over to us, it was, "us" being

21   the collectors for that portion of the day.  The techs that

22   were out there that did some of the initial work had to respond

23   to another scene, so they had left at that point.

24   Q.   Did somebody then take a further look into the bag?

25   A.   So as we worked our way down the street, one of the

1   personnel that was out there, a non-bomb tech, looked inside of

2   the bag and saw a piece of electronics equipment that looked

3   like it was modified, drew a little suspicion on their part.

4   At that point the attention of the bomb techs on-scene was

5   flagged and we were asked to take a closer look at it.

6        In an abundance of caution, we x-rayed that bag just to

7   determine there was nothing in there that was missed earlier.

8   Obviously, it was dark when a lot of the other work was done,

9   so we just wanted to be safe for everybody out there.  It was

06:12 10  deemed that there was no IED in there, there wasn't the other

11  components required to form an explosive, but there was a piece

12  of modified electronics in that bag.

13  Q.   The contents of that bag, what happened to them?

14  A.   So they were taken out of the bag, photographed on ground

15  in place.  And obviously, the bag itself before it was removed

16  was photographed in place.  Everything was laid out --

17        MR. WATKINS:  Objection, your Honor.  Could we see if

18  this is personal knowledge?

19        THE COURT:  Go ahead.

06:12 20  BY MR. WEINREB:

21  Q.   Do you have personal knowledge of what you're talking

22  about?

23  A.   Yes; I was there for it.  I witnessed it being removed

24  from the bag, I personally took the transmitter out of the bag

25  and questioned the modified electronics.

1    Q.   Please continue.

2    A.   So those items were removed from the bag, photographed in

3    place and collected.

4         MR. WEINREB:  Can I have the Exhibit 772 for the

5    witness?  Actually, this is in evidence so we could have it for

6    everyone.

7    Q.   Do you recognize this?

8    A.   This appears to be Laurel Street going this way across the

9    street with the intersection of Dexter traveling down.

06:13 10       MR. WEINREB:  Your Honor, at this point I intend to

11   show just the witness a lengthy series of photos and ask him at

12   the end if they're fair and -- fair and authentic copies of

13   what he saw on the scene, and then I would propose to move them

14   all into evidence at once.

15        THE COURT:  All right.

16        MR. WEINREB:  So with the Court's permission, I'll

17   begin.  Can we have Exhibit 948-524.

18   BY MR. WEINREB:

19   Q.   Do you recognize that?

06:14 20   A.   That is the computer bag that we discussed.  At this point

21   what was inside of the bag -- at least some of the items.  Not

22   all of them -- are on top of the bag.  You see two specific

23   ones there:  one being the transmitter, closest to us, and one

24   which appears to be the HTC phone that was inside of the bag in

25   the center of the bag.

Q.   Is that a fair and accurate photo of the objects as they appeared the day that you saw them?

A.   Yes.

     MR. WEINREB:  948-525, please.

Q.   Again, is that a fair and accurate photo?

A.   That is.

     MR. WEINREB:  948-532.

Q.   Fair and accurate photo?

A.   It is.

06:15     MR. WEINREB:  Mr. Bruemmer, can you bring up the photos now -- I'm not going to give the 948- prefix, but that's true for all of them.  541.

Q.   Fair and accurate photo?

A.   Yes.

     MR. WEINREB:  542.

Q.   Is that a fair and accurate photo?

A.   Yes.

     MR. WEINREB:  533.

Q.   What's this a photo of?

06:15 A.   That is a bag, opens like a typical messenger bag, that was on the street, not removed from the Civic per the techs that cleared it.

Q.   Is that a fair and accurate photo?

A.   It is.

     MR. WEINREB:  534, please.

```
 1   Q.   Is that a fair and accurate close-up?

 2   A.   It is.

 3        MR. WEINREB:  535, please.

 4   Q.   Again, fair and accurate?

 5   A.   It is.

 6        MR. WEINREB:  536, please.

 7   Q.   Is that an item that was inside the bag?

 8   A.   It is, both items.

 9   Q.   Both items.  And is that a fair and accurate photo?

06:16 10   A.   They are.

11        MR. WEINREB:  537, please.

12   Q.   Again, a fair and accurate photo?

13   A.   It is.

14        MR. WEINREB:  10, please.  948-10.

15        THE CLERK:  I'm sorry, Mr. Weinreb.  I didn't hear the

16   number.

17        MR. WEINREB:  948-10.

18   BY MR. WEINREB:

19   Q.   What is that a photo of?

06:16 20   A.   That is a photo of a Honda four-door with the rear

21   driver's side door where a pressure cooker is embedded in the

22   lower portion of it.

23   Q.   Okay.  That's not the same Honda that was in the middle of

24   the street?

25   A.   That is not.
```

```
  1   Q.   Is this some person's Honda who was parked in the

  2   driveway?

  3   A.   Correct.

  4   Q.   Is that a fair and accurate photo?

  5   A.   It is.

  6           MR. WEINREB:  948-11, please.

  7   Q.   And is that a fair and accurate close-up?

  8   A.   It is.

  9           MR. WEINREB:  -12, please.

06:17 10   Q.   Again, fair and accurate close-up?

 11   A.   It is.

 12           MR. WEINREB:  -305, please.

 13   Q.   Fair and accurate close-up?

 14   A.   Yes.

 15           MR. WEINREB:  -306, please.

 16   Q.   And is that a fair and accurate close-up?

 17   A.   It is.

 18           MR. WEINREB:  Now, 948-72, please.

 19   Q.   Do you recognize that?

06:17 20   A.   I do.  That is a residence on the south side of Laurel.  I

 21   believe it's Residence No. 53.

 22   Q.   Is that a fair and accurate photo of how the residence

 23   appeared on the morning when you were doing your evidence

 24   collection?

 25   A.   That morning it was, yes.
```

```
      1              MR. WEINREB:  948-73, please.

      2    Q.   Is that a fair and accurate close-up?

      3    A.   Yes.

      4              MR. WEINREB:  -74, please.

      5    Q.   That's a fair and accurate photo?

      6    A.   Correct, yes.

      7              MR. WEINREB:  -75.

      8    Q.   Also fair and accurate?

      9    A.   Yes, it is.

06:18 10              MR. WEINREB:  -76.

     11    Q.   Again, fair and accurate?

     12    A.   Yes, it is.

     13              MR. WEINREB:  948-253, please.

     14    Q.   Is that a photo of an item that was collected at the

     15    scene?

     16    A.   It is.

     17    Q.   And is it a fair and accurate photo of it?

     18    A.   It is.

     19              MR. WEINREB:  -355, please.

06:18 20    Q.   Is that a close-up of it?

     21    A.   It is.

     22              MR. WEINREB:  -99, please.

     23    Q.   Do you recognize that?

     24    A.   I do.

     25    Q.   What is it?
```

```
 1    A.   That is the residence of 55 and 57 Laurel also on the
 2    south side of Laurel Street.
 3    Q.   Is that how it appeared on the morning when the evidence
 4    collection was taking place?
 5    A.   It was.
 6         MR. WEINREB:  -100, please.
 7    Q.   Is that a close-up of the same house?
 8    A.   It is.
 9         MR. WEINREB:  -101, please.
10    Q.   Same thing?
11    A.   It is.
12         MR. WEINREB:  -102, -103 and -104.
13    Q.   Are these all fair and accurate photos of that house and
14    an object that was removed from it?
15    A.   It is.
16         MR. WEINREB:  -307.
17    Q.   Do you recognize that?
18    A.   This residence is at the intersection of Laurel and Dexter
19    on the north side of the street.
20    Q.   Is that how it appeared during the day you did the
21    evidence collection?
22    A.   Yes.
23         MR. WEINREB:  -308, please, -309, -310.
24    Q.   Are these all fair and accurate photos of that house, the
25    lawn beside it, and an item that was recovered from the lawn?
```

 1    A.    Yes, they are.

 2            MR. WEINREB:  -416.

 3    Q.    Do you recognize that?

 4    A.    That is obviously during the night when we arove [*sic*]

 5    there.  That is the intersection of Dexter and Laurel that is

 6    looking west down Dexter.

 7    Q.    And so away from where the --

 8    A.    Away from the scene would be behind us where the Civic is,

 9    correct.

06:20 10          MR. WEINREB:  -417, please.

11    Q.    Are those two fair and accurate photos of that area and

12    the item that was found there?

13    A.    They are.

14            MR. WEINREB:  -39, please.

15            THE CLERK:  What's the number?

16            MR. WEINREB:  948-39.

17    BY MR. WEINREB:

18    Q.    What's that a photo of?

19    A.    So that is looking at the same exhibit you just pointed

06:21 20    out of the same picture, but looking east down Laurel toward

21    the scene.  Same intersection with Dexter going across.

22            MR. WEINREB:  -37 and -38.

23    Q.    Are those fair and accurate photos of that scene and an

24    item that was recovered there?

25    A.    They are.

1          MR. WEINREB:  -210, please, and -211.

2     Q.   Are those fair and accurate photos of an address on Laurel

3     Street and an item that was recovered there?

4     A.   Yes.  That is in front of 55 Laurel, correct.

5          MR. WEINREB:  -552, -553, -33 and -34.

6     Q.   Once again, are those four photos fair and accurate photos

7     of a house on Laurel Street and an item that was recovered

8     there?

9     A.   Yes, they are.

06:22 10          MR. WEINREB:  -40, please, -41.

11    Q.   Are those fair and accurate photos of the location on

12    Laurel Street and an item that was recovered there?

13    A.   Yes, they are.

14         MR. WEINREB:  Your Honor, at this time the government

15    offers all of the preceding identified exhibits into evidence.

16         MR. WATKINS:  No objection.

17         THE COURT:  Okay.  They are all admitted.

18         (Government Exhibit Nos. 948-524 and 948-525, 948-532,

19    948-541 and 948-542, 948-533 through 948-537, 948-10 through

20    948-12, 948-305, 948-30, 948-72 through 948-76, 948-253,

21    948-355, 948-99 through 948-104, 948-307 through 948-310,

22    948-416 and 948-417, 948-38 and 948-39, 948-210 and 948-211,

23    948-552 and 948-553, 948-33 and 948-34, 948-40, received into

24    evidence.)

25         THE COURT:  I think that's as far as we'll go today

1    with the witness.

2            Jurors, again we'll recess.  I remind you of my

3    instructions again to avoid any discussion of the case, any

4    contact with any news reporting about the case.  And we'll see

5    you in the morning and continue with the evidence.

6            Thank you.

7            THE CLERK:  All rise for the Court and the jury.

8    Court will be in recess.

9            (The Court and jury exit the courtroom and the

10   proceedings adjourned at 4:06 p.m.)

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10
     /s/ Marcia G. Patrisso
11   MARCIA G. PATRISSO, RMR, CRR
     Official Court Reporter
12

13   Date:  10/13/15

14

15

16

17

18

19

20

21

22

23

24

25