UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )   Criminal Action
v.                                 )   No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY THIRTY-SEVEN**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, March 23, 2015
9:10 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3         Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6             By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G.
10        Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13            By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                          I N D E X

2                              Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  KEVIN SWINDON (Cont'd)

5       By Mr. Chakravarty          7                109
        By Mr. Fick                          20                   120
6
   MATTHEW LEVITT
7
        By Mr. Chakravarty      122
8

9

10                          E X H I B I T S

11
   GOVERNMENT'S
12    EXHIBIT       DESCRIPTION              FOR ID      RECEIVED

13 1385-1389     Mobilsync backup data                      9
   1393, 1395
14
   1153          Extracted text messages from Kadyrbayev   11
15                phone

16 1438          Selected file listing from 1R6            20

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  Morning.

3          MR. CHAKRAVARTY:  Your Honor, Agent Swindon is still

4    on the stand.  I have a few minutes left with him just to

5    clarify some things, and then I would hand him over for

6    cross-examination.  My understanding there's anticipated to be

7    a lengthy cross-examination of this witness.  And the next

8    witness is Dr. Levitt, who is our terrorism expert.  He has a

9    flight to Europe scheduled for this afternoon after the court

00:00 10   day.  And so our hope was that we would get all of his

11   testimony in.

12          In light of the prospect of Mr. Swindon potentially

13   going longer than expected, if the Court has no objection, I'd

14   like to potentially call Mr. Levitt out of order -- Dr. Levitt

15   out of order and then conclude Agent Swindon's.

16          THE COURT:  Mr. Bruck?

17          MR. BRUCK:  That's fine with us, your Honor.  I should

18   note, however, that there is a motion in limine respecting the

19   terrorism experts, of which Dr. Levitt is one.  And his report

00:00 20   is specifically referenced in that motion.  So that will have

21   to be addressed before his testimony.

22          THE COURT:  Well, I've reviewed his report, and I

23   think he can testify.  So as to him, it's denied.  The motion

24   is denied as to him.  I've reviewed the report and the motion.

25   The motion was addressed to a number of people, and I take no

1    position whether it applies to others or not -- whether this

2    ruling applies to others or not.  As to him, he may testify.

3           MR. BRUCK:  That leaves me, I guess, with the question

4    about the extent to which I will have to continually object

5    during the course of his testimony on the grounds stated in the

6    motion in limine or whether we can have a continuing objection

7    to the background information.

8           THE COURT:  Yes, you may have a continuing objection

9    to it.

00:01 10           MR. BRUCK:  Thank you very much.

11           THE COURT:  How long will the Levitt testimony be?

12           MR. CHAKRAVARTY:  I anticipate -- it's my anticipation

13    so it might be generous -- about an hour and a half on direct,

14    your Honor.

15           THE COURT:  On direct?

16           MR. CHAKRAVARTY:  On direct.

17           THE COURT:  And how much on cross?

18           MR. BRUCK:  Considerably less than that, your Honor.

19           THE COURT:  Well -- so who's doing the cross of this

00:02 20    witness?

21           MR. FICK:  I am, your Honor.

22           THE COURT:  And your estimate?

23           MR. FICK:  Possibly a couple of hours.

24           THE COURT:  Yeah.  Well, why don't we proceed -- well,

25    there's two ways of doing it, I guess.  You can finish the

1    direct, and we can go to Levitt and get him done and then have

2    the cross uninterrupted, or you can have some cross and we'll

3    see how the clock goes.

4         MR. BRUCK:  As far as Levitt goes, I don't think

5    there's any danger, that if we proceed in the normal order,

6    that he wouldn't be finished by 4:00 at least based on --

7         THE COURT:  Okay.  All right.  Let's see how the

8    morning goes then in the normal order.

9         MR. FICK:  So we can proceed --

00:02 10      THE COURT:  So you'll begin with cross after the

11   direct; is that all right?

12        MR. FICK:  Yeah.  I'm going to have my consultant come

13   to the table.

14        THE COURT:  Fine.  Any other issues before we get the

15   jury?  So why don't you line them up.  It takes awhile usually.

16        Miss Conrad filed a motion under seal this morning.

17        MS. CONRAD:  Yes, your Honor.

18        THE COURT:  That matter has to be addressed to the

19   presiding judge in the other case.

00:03 20      MS. CONRAD:  Okay.  Thank you.

21        THE COURT:  As a preliminary matter.

22        MS. CONRAD:  Okay.  Thank you.

23        THE COURT:  It may then be appropriate depending on

24   the ruling, okay?

25        MS. CONRAD:  Yes.

```
 1   (The jury entered the courtroom at 9:13 a.m.)
 2           THE COURT:  Morning, jurors.  I hope you had a good
 3   weekend, and I hope you abided by my instructions not to
 4   discuss the case.  Did you?
 5           THE JURY:  Yes.
 6           THE COURT:  Thank you.  We'll resume with the direct
 7   examination of Agent Swindon.
 8           MR. CHAKRAVARTY:  Thank you, your Honor.
 9   CONTINUED DIRECT EXAMINATION BY MR. CHAKRAVARTY:
10   Q.   Good morning, Agent Swindon.
11   A.   Good morning.
12   Q.   I just wanted to clarify a few things before I hand you
13   over for cross-examination.
14        We had talked on Thursday about some of the items that you
15   had found on the Sony VAIO laptop, what you called the 1R6,
16   Exhibit 1142.  Do you remember that?
17   A.   Yes.
18   Q.   Was one of those items a folder that was marked as a
19   Mobilsync backup?
20   A.   There was a file named Mobilsync backup.
21   Q.   Can you just explain again what that was?
22   A.   The Mobilsync backup is a backup of the iPhone or an Apple
23   device that would be stored on the computer if you backed it
24   up.
25   Q.   And what kinds of data were stored in the Mobilsync
```

1    backup?

2    A.    The Mobilsync backup has a standard set of things it

3    attempts to try and store but not always successful.   Typically

4    it would be contacts, text messages, the actual ID of the

5    phone, of the SIM card ID on the phone, and maybe images and

6    other data that would be on the phone.

7    Q.    And so on the -- on that device, did you locate several

8    text messages that were then exported and you verified that

9    those did appear, in fact, on the Sony VAIO computer?

00:05 10    A.    The text messages were in the Mobilsync backup data that

11    was exported.

12    Q.    Specifically, were there Exhibits No. 1385 through 1389,

13    1393, and 1395?  Would it help to put them up on the screen?

14    A.    It would, yes.

15         MR. CHAKRAVARTY:  Your Honor, for the witness, please.

16    Q.    So this is 1385, 1386, 1387, 1388, 1389, 1393, and 1395.

17    Do you recognize those as being text messages that were

18    exported from the Sony VAIO laptop along with a redaction of

19    the identifying information of the counterparty to a

00:07 20    conversation?

21    A.    Yes.  Those messages were located in Mobilsync backup data

22    from the 1R6.

23         MR. CHAKRAVARTY:  I'd move into evidence 1385 through

24    1389, 1393, and 1395.

25         MR. FICK:  Same objection to the extent these are

1    derivatives compiled by somebody else.

2         THE COURT:  All right.  Overruled.  Admitted.

3    (Government Exhibit Nos. 1385-1389, 1393, 1395 received into

4    evidence.)

5    Q.   With regards to this Mobilsync backup, I had asked you a

6    little bit on Thursday with regards to whether you were able to

7    identify which phone actually produced those text messages.  I

8    should say which phone had synced with the laptop that resulted

9    in those text messages going over to the laptop.  Were you able

00:07 10  to determine that?

11   A.   Yes.  With the exception of 1385, the messages were

12   included in the iPhone 5 backup.

13   Q.   I'm sorry.  1385, was that a different iPhone?

14   A.   Yes.  That came from the iPhone 3.  That was another

15   Mobilsync backup that was on the device.

16   Q.   Thank you for clarifying that.

17        For the remainder, which phone were you able to attribute

18   those to?

19   A.   All but 1385?

00:08 20  Q.   All but 1385.

21   A.   Yes.  The iPhone 5.

22   Q.   And that's --

23        MR. CHAKRAVARTY:  I think this is in evidence.  Your

24   Honor, if I could have this published?

25        THE COURT:  Displayed?

1          MR. CHAKRAVARTY:  Yes, please.

2     Q.   This is what's marked 1411, also on the 1R6 device.  Was

3     there an ICC ID number on this?

4     A.   Yes.

5     Q.   Were you able to match that up with an ICC ID number

6     somewhere else in the investigation?

7     A.   Yes, from the iPhone 5 on -- I believe it's 2W1.

8     Q.   Moving over to --

9     A.   I'm sorry.

00:09 10   Q.   2W2?

11    A.   2W2, I'm sorry.

12    Q.   Were you able to read the SIM card, and is that the same

13    number?

14    A.   Yes.

15    Q.   I just pulled up on the screen 1151-16, which is a

16    photograph of the SIM card that you looked at on Thursday, is

17    that right?

18    A.   Yes.

19    Q.   In addition, I had asked you on Thursday whether there

00:09 20   were some text messages that were extracted from an iPhone of

21    Dias Kadyrbayev.  Do you recall that?

22    A.   I do, yes.

23    Q.   Over the weekend, were we able to redact a version of

24    those text messages?

25    A.   Yes.

1        MR. CHAKRAVARTY:  And I'd move into evidence Exhibit

2    1153, which is the redacted version.

3        MR. FICK:  Still the confrontation and foundation

4    objection.

5        THE COURT:  All right.  Subject to that objection,

6    overruled.  Admitted.

7    (Exhibit No. 1153 received into evidence.)

8        MR. CHAKRAVARTY:  Call up 1153 on Sanction, please.

9        THE COURT:  Publish?

00:10 10        MR. CHAKRAVARTY:  Yes, please.  Thank you.

11   Q.   Agent Swindon, are these text messages that were from

12   April 18, 2013, from Dias Kadyrbayev's phone between Dias and

13   the person listed as Jahar, with a phone number 857-247-5112?

14   A.   These messages were present on that phone, yes.

15   Q.   The text box on the right, does it say, "I saw the news"?

16   "Better not text me, my friend."  And then --

17   A.   Yes.

18   Q.   And then does that same user say, "If you want, you can go

19   to my room and take what's there, Smiley face, Bro, salaam

00:11 20   alaikum"?

21   A.   Yes.

22   Q.   Now, I wanted to clarify --

23        MR. CHAKRAVARTY:  Thank you, Mr. Bruemmer.

24   Q.   I wanted to clarify a few points about a couple of the

25   devices, the external hard drive devices.  There was one that

 1  was found in Watertown, on Laurel Street, that we've introduced

 2  as Exhibit 1475.  Do you recall that?

 3  A.   Yes.  Can you bring up the original exhibit that had the

 4  list, please?

 5  Q.   Sure.  You want the list, the spreadsheet?

 6  A.   Yes, please.

 7  Q.   So we were talking about the 1W16, is that right?

 8  A.   Yes, sir.

 9  Q.   And were there certain files that were -- appeared to be

00:12 10  scanned versions of Russian textbooks on this hard drive?

11  A.   There were files on that 1W16 that were in a format --

12  that were recovered in a format called DjVu.  DjVu is a

13  proprietary format, similar to, like, a PDF file or an Adobe

14  PDF, although not widely used anymore.  Those files were

15  converted from DjVu to PDFs for trial purposes or exhibit

16  purposes.

17  Q.   And so moving into that hard drive, is this an example of

18  the fact that those are now PDFs so that they can be opened in

19  front of the jury?

00:13 20  A.   Yes.

21  Q.   On that same hard drive, I think you mentioned on Thursday

22  that there was a file that appeared to be a document which was

23  a homework assignment of somebody that -- named Giovanni

24  Norgill.  Was that in the active directory of the computer hard

25  drive, or where did you locate that?

1   A.   Could you go back one, please?

2   Q.   Sure.

3   A.   Thank you.  Yeah, the 1475-03 was a carved/recovered file

4   from a previous directory structure that existed on the hard

5   drive.

6         MR. FICK:  Your Honor, I'd just ask the exhibit be

7   modified at a convenient time to conform to the format of the

8   other exhibits where carved files were stored separately so as

9   not to mislead anybody.

00:14 10         THE COURT:  I'm not sure I followed that.  They're

11   organized --

12         MR. FICK:  The exhibits have largely been organized to

13   sort of show the location of the files the way they were on the

14   active device.  Where there were carved files on most of the

15   other exhibits, those were put in a separate folder so no one

16   is confused about whether they were there or whether they were

17   deleted and recovered.

18         MR. CHAKRAVARTY:  I don't have a problem with that,

19   your Honor.

00:14 20         THE COURT:  Okay.

21   Q.   Now, these DjVu files -- DjVu is just a -- is that a

22   software tool?

23   A.   It's a file format that they would be put into.

24   Q.   Were there also DjVu files found on the thumb drive that

25   was found in the landfill that you've called L14 and we've

1    marked as 1150?

2    A.    Could you go back to the spreadsheet, please?  Yes.

3    Q.    And with regards to those DjVu files, were those also

4    converted to PDF?

5    A.    Those were also converted to PDF.

6    Q.    Were some of those DjVu files actually corrupted, and you

7    weren't able to access them?

8    A.    I believe that four of those files were corrupted and

9    unable to be accessed.

00:15 10   Q.    To refresh your memory, was it Files No. 26, 27, 28, and

11    33 that were corrupted?

12    A.    Yes, it was.

13    Q.    For purposes of trial presentation, were those replaced

14    with intact versions of those PDFs from another device?

15    A.    The disks that I was asked to review had an intact version

16    of that file on it.

17    Q.    But it wasn't intact when you found it?

18    A.    It was not.

19        MR. FICK:  Again, I'd ask the exhibit then be modified

00:15 20   to conform to what was actually there.

21        MR. CHAKRAVARTY:  Again, no objection, your Honor.

22        THE COURT:  Okay.

23    Q.    Now, the names of carved files, you explained what carving

24    is.  I'm not going to ask you to rehash what that is.  But what

25    did the names of carved files appear as when they're carved out

1    of this unallocated space?

2    A.    In the application software, it doesn't -- it's not coming

3    out of a directory so it doesn't have the name of the file,

4    although it might be able to carve that file out of the

5    unallocated space.  It has to find some way of accessing it in

6    the application software.  So it starts a numerical numbering

7    system unique to that carved file.

8    Q.    What is the name when your software exports a carved -- a

9    series of 1's and 0's that software recognizes to be a file,

00:16 10    what does it name that file?

11   A.    It would be a sequential number that was generated by the

12   application software.

13   Q.    Again, for trial presentation purposes, where there was no

14   name on the file itself, or no decipherable name on the file

15   itself, but there was in the document, were any of the

16   documents' titles changed in order to reflect the content?

17   A.    The carved file titles were changed to reflect the

18   content, yes.

19         MR. FICK:  Same request to correct the exhibit.

00:17 20         THE COURT:  Okay.  All right.

21   Q.    Now, sticking with this thumb drive that was found in the

22   landfill, were you able to determine whether that thumb drive

23   had ever been plugged into the Sony VAIO laptop computer, 1R6,

24   Exhibit 1142?

25   A.    Yes, we were.

1    Q.    How were you able to do that?

2    A.    Again, from Thursday, the registry file which is

3    associated with every Windows computer collects and stores

4    information of devices that were installed into that -- into

5    that computer.  And there was an entry in that registry that

6    showed the serial number from that thumb drive in the registry

7    file.

8    Q.    If I may ask to publish Exhibit 1142-02, does this show a

9    Kingston thumb drive being plugged into the 1R6 computer from

10   the registry information?

11   A.    This information was extracted from a link file, and it

12   shows the volume serial number which is unique to the Kingston

13   thumb drive -- or this particular Kingston thumb drive.

14   Q.    You checked the registry to match up that Kingston thumb

15   drive to the one that was found in the landfill?

16   A.    Yes.

17   Q.    We had talked a little bit about Tamerlan's computer, the

18   D385 that was found in Laurel Street in Watertown; do you

19   remember that?

20   A.    We did, yes.

21   Q.    You didn't do the same extraction of files or verification

22   of files that were on that computer, did you?

23   A.    We did not.

24   Q.    Did you find files of a similar nature on that computer as

25   those that you talked about?

A.   There was a cursory look of that computer done, and there
were numerous files that were of the same title.

Q.   Was there anything unique about how Tamerlan's computer
was set up?

A.   One unique thing is that on D385 had a TrueCrypt volume on
the drive.  And TrueCrypt is an encryption software.  It's
readily available and it's actually freeware.  You can
download, and it will allow you to be able to encrypt a file, a
folder or a drive -- or a volume, I'm sorry.

00:19  Q.   When you say "encrypt," what does that mean generally?

A.   Encrypt would be to change it from cleartext, which is
readable, to a ciphertext, which would be unreadable to anybody
who didn't have the password to decrypt it.

Q.   That's another type of password protection?

A.   It would be more data protection than password protection.

Q.   Finally, I asked you about some of the commonalities of
files across some of the devices on Thursday.

MR. CHAKRAVARTY:  Can we call up Exhibit 1438 just for
the witness?

00:20  Q.   Do you recognize this chart?

A.   I do, yes.

Q.   What is it?

A.   This is an MD5 hash analysis, as we talked about on
Thursday, which is the sort of fingerprint for the file.  And
this is an analysis of files that are common across 1R6, 1437,

1    14-6, and 3R5.

2    Q.   So those are four devices that you talked about on

3    Thursday?

4    A.   Yes.

5    Q.   And would this chart help you explain some of the

6    propagation of those files across those devices to the jury?

7              MR. FICK:  Objection to the form of the question.

8              THE COURT:  Overruled.  You may answer.

9    A.   Yes.

00:21 10              MR. CHAKRAVARTY:  Your Honor, I'd mark this as a

11   chalk, please, and ask to publish.

12             THE COURT:  Okay.

13   Q.   Agent Swindon, is this a selected file listing from the

14   1R6 Sony VAIO laptop, 1142?

15   A.   Yes, it is.

16   Q.   And are these some of the audio files from that computer

17   that we can see from the MP3 file type?

18   A.   Yes.

19   Q.   Did you see these across various devices?

00:21 20   A.   We did.

21   Q.   Moving on in the same chart, did you see the same files on

22   the iPod Nano labeled "Jahar"?

23   A.   Yes.

24   Q.   How did you determine that they were the same files?

25   A.   Not only do the -- in most cases, the title of the files

1    match but the MD5 hash value matches.

2    Q.   And the MD5 hash value you described as the fingerprint

3    for each file?

4    A.   Yes.

5    Q.   And did you find the same files on the iPod Shuffle that

6    was found in Watertown that was labeled "MP3 play"?

7    A.   Yes.

8    Q.   Again, was it through the same MD5 hash value analysis?

9    A.   Yes.

00:22 10   Q.   And the 3R5, which was the Samsung Finesse phone that was

11   found in the dormitory room at UMass Dartmouth, did you find

12   those same files?

13   A.   Yes.

14   Q.   And so does this table indicate the common files that --

15   those common files that you just mentioned that were on all

16   four of those devices?

17   A.   Those particular files, yes.

18        MR. CHAKRAVARTY:  Your Honor, I think foundation has

19   been met to move to introduce this as evidence under 1006, your

00:23 20   Honor, so I would so move.

21        MR. FICK:  I'd object to the word -- the title of the

22   file because it suggests a direction of the movement has not

23   been established.

24        THE COURT:  Overruled.  I'll admit it as an exhibit.

25   What's its number?

```
 1              MR. CHAKRAVARTY:  1438.

 2              THE COURT:  Okay.

 3    (Exhibit No. 1438 received into evidence.)

 4              MR. CHAKRAVARTY:  Those are all the questions I have

 5    for Agent Swindon at this time, your Honor.

 6              MR. FICK:  Just a moment to set up.

 7    CROSS-EXAMINATION BY MR. FICK:

 8    Q.   Good morning, Agent Swindon.

 9    A.   Good morning.

10    Q.   My name is Bill Fick.  I'm one of Mr. Tsarnaev's

11    attorneys.

12         You spent a good part of your testimony, both today and

13    last week, talking about Exhibit 1142, which are the collection

14    of files from the Sony VAIO, right?

15    A.   Yes.

16    Q.   And at one point last week when you were talking about

17    that exhibit, you said -- and I think -- I'm quoting, "This was

18    a representative sample that was given to us to verify."  Do

19    you remember saying that?

20    A.   Yes.

21    Q.   And that actually wasn't an accurate statement, right,

22    because there's nothing representative at all about what's on

23    1142, fair to say?

24    A.   That was a sample of what was on 1142.

25    Q.   A sample selected by the investigative team at the FBI,
```

1   right?

2   A.   By the investigative team.

3   Q.   So it's not representative in some proportional way of

4   what was on the Sony, right?

5   A.   There were hundreds of thousands of files on the Sony 1R6.

6   Q.   Just to make it a little more concrete, there was a lot of

7   Mr. Tsarnaev's homework on the Sony, right?

8   A.   I would have to confirm it by looking at it, but I wasn't

9   asked to verify that there was particular homework assignments

00:25 10   on it.

11   Q.   There was one homework assignment among the exhibits that

12   you talked about, right?  And that was an assignment about

13   drones from high school; do you remember that?

14   A.   If you could pull it up for me, sure.

15   Q.   Just to go backwards, you recognize this as being Exhibit

16   1142, right?  Going inside the Sony laptop, going to public,

17   and the first document there is the assignment about drones

18   that I believe you talked about, is that right?

19   A.   I verified that 147 existed on that computer, yes.

00:26 20   Q.   You're aware that there were other homework assignments on

21   the computer right?  You looked at the computer, and this was

22   one file that was selected for you to make sure was there?

23   A.   There was numerous documents and files on that computer.

24   Q.   And the Exhibit 1142 that you talked about also included a

25   selection of audio files, music, right?  The nasheeds we've

 1   been talking about that you verified?

 2   A.   Yeah.   There were nasheed files on that computer, yes.

 3   Q.   That was a selection that the investigative team gave you

 4   that you then verified were there, right?

 5   A.   Yes.

 6   Q.   And we're talking about -- it was a couple dozen files,

 7   something like that, that you talked about?

 8   A.   I'd have to see the exact number, but I don't have that in

 9   front of me.

00:27 10   Q.   All right.  Well, we can do that again.

11        THE COURT:  Mr. Fick, I'm not clear whether you want

12   this just for the witness or for the witness and the jury.

13        MR. FICK:  I'm going through stuff that's in evidence,

14   your Honor, so I would leave it on the screen if that's okay.

15        THE COURT:  Okay.

16        MR. FICK:  Thank you.

17   Q.   Well, whatever the number was, the bottom line is there

18   was a group of files that were on the disk that we talked about

19   -- that you talked about last week that you verified, right?

00:28 20   A.   There were files that I was asked to verify existed on

21   that commuter, yes.

22   Q.   And it was a small collection of the over 400 MP3 audio

23   files that were on that computer, right?

24   A.   I don't know the exact number of MP3 files on the

25   computer.

Q.   When you were in the process of verifying the files, you
looked at the 4,000-or-so-page long list of everything on the
computer, right?

A.   We did a comparison, yes.

Q.   So you have noticed, in looking at that list, there were
many hundreds of audio files on the computer, correct?

A.   Again, I don't know how many MP3 files were on that
computer in total.

Q.   Are you willing to even estimate that we're talking many
hundreds of files?

A.   Not without the time to be able to analyze the data.

Q.   Well, in any event, in addition to the nasheeds that you
talked about in your testimony --

          MR. FICK:  If I can get my screen back here.

Q.   -- there were -- there was pop music on the computer,
right?  Did you happen to notice that when you were looking at
the audio files?

A.   I would only recognize them by the titles of the MP3s when
I was looking through and verifying the ones I was asked to
verify.  I did not listen to the actual MP3 files.  We weren't
asked to verify.

Q.   Fair to say you recognized a large number of pop music
audio titles in verifying the MP3 files on the computer,
correct?

A.   There were a few titles there that I would recognize, yes.

1    Q.   Just by way of example, I'm going to pull up a screenshot

2    of Page 2126 of Exhibit 1142-152.  And, for example, the title

3    we've heard other times in this trial is on this computer,

4    Jay-Z, *Ain't No Love in the Heart of the City*; do you see that?

5    A.   I do see that.  1142, is that the actual exhibit that I'm

6    looking at?

7    Q.   Yes.  You're looking at Page 2126 from Exhibit 1142-151.

8    Do you see that?

9    A.   If that's the complete file listing from 1142, then, yes.

00:30 10   Q.   And that's the complete file listing or something like it

11   that you used to go through and verify whether various files

12   were on the computer, correct?

13   A.   That is one of the techniques that we used, yes.

14   Q.   And the total number of exhibits -- sub-exhibits numbered

15   on 1142, I think the highest number is 151 or something like

16   that, is that right?

17   A.   I would have to see it, sir.

18   Q.   Okay.  We'll pull it up again.  1142-151, that's the sort

19   of last document there.  That's the giant file listing we were

00:31 20   just looking at, right?

21   A.   I believe that's the last file -- the last exhibit from

22   that piece of evidence, yes.

23   Q.   151 sub-exhibits from this computer out of a half a

24   million files, is that right?

25   A.   That would be fair to say, yes.

```
 1    Q.   So we're talking about something like
 2    three-ten-thousandths of one percent of the files from that
 3    computer, right?
 4    A.   I don't think it's realistic that we looked at every
 5    single solitary file on that computer to show here in court.
 6    Q.   I'm not asking you if you looked at every single solitary
 7    file.  I'm just asking whether the selection that the
 8    investigative team included on this disk is a flyspeck compared
 9    to 500,000?
10    A.   I'm not sure what the definition of a flyspeck is, but if
11    you'd want to go back to the percentage, we could do the math,
12    I guess.
13    Q.   Who selected what files were going to go on this disk?
14    You said it wasn't you.
15    A.   There was an investigative team which was made up of
16    investigative analysts, case agents, prosecutors, forensic
17    specialists.  And that's primarily members of the investigative
18    team.
19    Q.   Can we put some names on that?  Do you know who actually
20    made the choice?
21           MR. CHAKRAVARTY:  Objection, your Honor.  It's asking
22    him to speculate.
23           THE COURT:  No.  You may answer if you know.
24    A.   I don't know who actually selected every single individual
25    one of these files.  I do not.
```

1    Q.   So do you believe it was different people that did it,

2    multiple people that did it?

3    A.   There were multiple analysts that were working on this

4    investigation, yes.

5    Q.   Who sort of provided you with the finished package?  Who

6    tasked you with, Here's a list?  Check and see if they are

7    there?

8    A.   That was a combination of the senior investigative

9    analyst, the case agents, and the prosecutors.

00:33 10   Q.   So who's the senior investigative analyst?

11   A.   John Petrozelli.

12   Q.   And him and a collection of case agents and the

13   prosecutors together, in some ceremonial forum, gave you the

14   disks altogether?

15   A.   Well, it wasn't very ceremonious.  It was, Here's a stack

16   of CDs, and I need you to verify and validate that there's

17   information on these CDs.

18   Q.   Bottom line is you're not the one who selected them?

19   A.   I did not select them, no.

00:33 20   Q.   Okay.  Now, what about the various spreadsheets that are

21   in each of these exhibit files, the various -- these derivative

22   exhibits you talked about, the spreadsheets of internet history

23   selections, et cetera?  Who made those?

24   A.   The investigative team also made those.

25   Q.   So as to any individual spreadsheet, can you say who in

1 particular actually made it?

2 A. Not every single one, no.

3 Q. For any of them, do you know who made them?

4 A. I do, yes; several, I do.

5 Q. For example, can you just tell me one of the ones on the

6 screen here and tell --

7 A. If you'd like to pick one, I could certainly --

8 Q. Yes, please.

9 A. Which number?

00:34 10 Q. Well, no.  You said you only knew some of them.  So pick

11 one that you know who made it and tell me.

12 A. Could you make the screen a little bigger, please, so I

13 can see the complete names of the file list?

14  So the selected internet -- the selected internet activity

15 or 001.

16 Q. Yes.

17 A. Yes, sir.

18 Q. Who made that one then?

19 A. That was John Petrozelli.

00:34 20 Q. When you went through to verify the materials on these

21 disks, did you verify each of the spreadsheets for accuracy as

22 well?

23 A. I went over the spreadsheets with Mr. Petrozelli, and we

24 accessed the Internet Evidence Finder data and compared the

25 two, yes.

```
 1   Q.   So did you compare them line by line?
 2   A.   We went line by line with the results from his Internet
 3   Evidence Finder search.
 4   Q.   Now, what about exhibits that aren't from internet
 5   evidence, exhibits that are fileless from the computer, did you
 6   verify those line by line?
 7   A.   The file list for the computers are generated by the
 8   forensic software, which they're approved tools.  Previous to
 9   us using the tool, that file listing is an accepted practice
10   within the SOPs of the guidelines.
11   Q.   I understand, for example, that -- correct me if I'm wrong
12   -- something like Exhibit 151, the massive 4,000-page list,
13   that's generated by a computer or software, right?
14   A.   That's generated -- actually, the name is in the title.
15   It's generated by a product called X-Ways Forensics.
16   Q.   But the other exhibits, the sort of subsets, the
17   derivative samples, the extractions of a limited number of
18   files, that's done by some human being, right?  If you just
19   take, for example -- let me just ask the question more
20   generally.  There's the 4,000-page list of all the files in the
21   computer, right?
22   A.   Yes, sir.
23   Q.   There were various other spreadsheets with lesser lists of
24   certain files that the FBI determined were relevant to the
25   investigation you should talk about, right?
```

1    A.    You mean lesser directory listing files?

2    Q.    Lists, sublists of the big one.  They contain a smaller

3    number of files in the list.

4    A.    There are derivative lists that have been entered in as

5    evidence that were sublists of other information or have been

6    gotten from the computer.

7    Q.    For example, 1142-13, right, these are various selected

8    user files from the Sony laptop, right?

9    A.    Yes.

00:37 10    Q.    And this is a five-page spreadsheet as opposed to 4,000

11    pages, right?

12    A.    Yes.

13    Q.    So some human being picked some of the files on the

14    4,000-page list and included them on the smaller five-page

15    list, right?

16    A.    Yes.

17    Q.    Okay.  As to such spreadsheets, the smaller lists, the

18    sublists, did you go through each of those and verify that each

19    of the actual entries, the files and the dates and times

00:37 20    associated with them, were actually on the master list?

21    A.    These were generated from the master list.

22    Q.    They were generated from the master list in the form of

23    somebody cuts and pastes different entries, right?

24    A.    Again, I'm not sure the process, whether they were

25    hand-typed or cut and pasted, but these were generated from

```
 1    information that was from the main directory listing in the
 2    case.
 3    Q.   Okay.  Did you go through them line by line and make sure
 4    there was no error in the moving from here to there, as a
 5    general matter, for all of these spreadsheets?
 6    A.   Well, I verified that the information included in these
 7    spreadsheets is included in the master directory listing.
 8    Q.   My question is a little bit different.  I'm talking about
 9    did you go through line by line and make sure nothing
10    extraneous got in there, nothing fell out that should be there?
11    A.   I verified that the information that is in the
12    spreadsheets that were generated from the master directory list
13    was in the master directory list.
14    Q.   Did you do that on a line-by-line basis?
15    A.   For each of these?
16    Q.   For each of the spreadsheets that you've talked about
17    here.
18    A.   Yes.
19    Q.   Every single one?
20    A.   Every single one, from every single piece of evidence or
21    every single one from 1150 -- I mean 1142?
22    Q.   Speaking generally now about the collection of exhibits
23    that was put into evidence through you last week, each of those
24    disks has a number of derivative spreadsheets on them, fair to
25    say?
```

A.   They have a number of different types of spreadsheets,

yes.

Q.   Among those spreadsheets on each of them is a derivative

spreadsheet, a selected file list from each of the devices,

right?

A.   Not every single one.

Q.   Let me try and ask the question a little bit more

specifically then.  As to Exhibit 1142-13, the selected file

list off of the Sony, did you review that spreadsheet line by

line to make sure it was all accurate?

A.   I did.

Q.   Okay.  And did you do the same thing for all of the other

like spreadsheets that are derivative file lists in the other

exhibits?

A.   Right.  But there are a number of different types of

spreadsheets that are in each of the different types of

evidence, so there may have been different techniques used.

Q.   Okay.  As a general matter, for whatever the technique

was, did you verify each spreadsheet line by line?

A.   Not general but specifically, yes.

Q.   Now, you are a supervisory special agent, right?

A.   I am, yes.

Q.   And you're both an agent and a certified computer analyst,

right?

A.   Certified computer analyst?  I'm not sure what that means.

1  Q.   Well, you talked about the various kinds of training and

2  certification you have in computer forensics, right?

3  A.   Prior to being a supervisor, I was a certified forensic

4  examiner, yes.

5  Q.   And so you have training as both sort of the standard FBI

6  agent training, and you have additional specializations in

7  computer forensics, fair to say?

8  A.   Yes.

9  Q.   And you are the supervisor in Boston for both the Cyber

00:40 10  National Security Squad and for the CART team; as I understood

11  it, correct?

12  A.   Yes.  The CART program comes under my supervision.

13  Q.   And remind us again what CART stands for.

14  A.   It's the Computer Analysis Response Team.

15  Q.   And so the people you supervised did a lot of work

16  collecting, processing and analyzing the hundreds of pieces of

17  digital evidence that were collected in this case, right?

18  A.   Yeah, people that I directly supervise and then people

19  from other field offices also, yes.

00:40 20  Q.   But you are the CART supervisor in Boston, right?

21  A.   I am the supervisor for the CART program in Boston, yes.

22  Q.   And the various items, if we pull up, for example, the

23  little exhibit, the chalk, that Mr. Chakravarty talked about

24  with you a fair amount -- I believe it was marked as 1557.  In

25  general, the items that you've been talking about were all

1    processed at either Black Falcon or Center Plaza here, right?

2    A.    Or Quantico, yes.

3    Q.    Or Quantico, a few of them down at the bottom.  But a

4    large number of them at Black Falcon and Quantico, right?

5    A.    Center --

6    Q.    I'm sorry, Black Falcon and Center Plaza, right?

7    A.    Yes.

8    Q.    Those are the -- these -- that's where the CART people

9    worked that you supervise, right?

00:41 10   A.    Not permanently.  They work in Center Plaza.  Black Falcon

11   was the --

12   Q.    It was temporary?

13   A.    Yes.

14   Q.    But you supervise CART in Boston; that's the bottom line?

15   A.    Yes.

16   Q.    Now, so you then had an oversight role in the activities

17   of analyzing the data from the devices collected in the Boston

18   Marathon investigation, right?

19   A.    A -- I had an oversight role of the individuals or the

00:42 20   people that were responsible, yes.

21   Q.    As time went on, as a supervisor, you reviewed their work

22   product from time to time, right?

23   A.    We do periodic file reviews of what's assigned to

24   individual examiners, but I don't micro what they're working on

25   in any one given time.

1    Q.    But you're certainly aware of what the people under your

2    supervision are doing, right?

3    A.    Yes.

4    Q.    And you discuss issues that may come up from time to time,

5    right?

6    A.    Technical issues or personnel issues?

7    Q.    Issues related to the work that they are doing on the

8    investigation.

9    A.    Yes.

00:42 10    Q.    So you have an awareness of the investigation of digital

11    evidence related to the Boston Marathon bombing?

12    A.    Yes.

13    Q.    Pretty big investigation in your career, I take it, right,

14    in terms of scope and complexity?

15    A.    One of them, yes.  I mean, it's not -- it's the same

16    proportion as 911 or several others that I've been involved in,

17    yes.

18    Q.    Big, big operation?

19    A.    Yes.

00:43 20    Q.    I think you testified that the FBI has a very standardized

21    process for acquiring and processing digital evidence, right?

22    A.    The certification process has -- yes, has -- to become a

23    certified examiner, there is a standard process, yes.

24    Q.    The process of actually doing the investigation, taking

25    the device, imaging it, processing it, that's all very

```
 1    standardized also, isn't it?

 2    A.   Yes.

 3    Q.   It's important to document that process, too, at each step

 4    of the way, to record what has happened and who did it, right?

 5    A.   It's different for different devices, and each examiner is

 6    -- has their sort of own way of doing it.

 7    Q.   Well, there's a standard chain of custody, for example,

 8    that the FBI maintains for electronic evidence in these kinds

 9    of investigations, right?

10    A.   Yes.

11    Q.   So that keeps track of a device gets imaged, right?

12    That's part of what happens here.  There's a recording of the

13    fact of the device being imaged, right?

14    A.   Well, the chain of custody is for the handling of

15    evidence, not --

16    Q.   Right.

17    A.   Not the process of the imaging or the processing.

18    Q.   When a piece of evidence comes in and is imaged, that fact

19    is recorded as part of the chain of custody, right?

20    A.   No.

21    Q.   It's not?

22    A.   It is not.

23    Q.   Is there any other form in which the various steps taken

24    by the various people along the way in processing a piece of

25    digital evidence are recorded?
```

```
 1   A.   It would be in a final report.
 2   Q.   So there's no sort of ongoing, something -- there's
 3   nothing analogous to a chain of custody for each step in the
 4   process for a forensic investigation?
 5   A.   There is not, no.
 6   Q.   So, for example, going back now, we couldn't retrace the
 7   steps of who did what from the moment of collecting the Sony
 8   laptop through the present?  We couldn't retrace that in a
 9   paper trail?
10   A.   Well, we could, sure.
11   Q.   Using what then if there's no chain of custody that
12   records that?
13   A.   There's the chain of custody for the actual piece of
14   evidence.  We could show you who had custody of that piece of
15   evidence.  Then, typically, in the notes that you'll see --
16   that we saw that we included in 1R6, you can see the name of
17   the person who would have imaged it.
18   Q.   What about somebody who then processed the image, is that
19   recorded somewhere?
20   A.   That would be in a final 302 report or a final report,
21   yes.
22   Q.   So is it standard then for there to be some kind of a
23   final 302 report or other report about the analysis of a piece
24   of digital evidence?
25   A.   At the conclusion of the request from the case agent or
```

1    from an analyst, the CART examiner would do a final sort of

2    piece of paper -- a final, I guess you would say, report of

3    what the activities that took place during the --

4    Q.   A narrative report describing the examination of a device

5    is typically produced at the end of the road?

6    A.   It would be more technical.  It would be very technical,

7    but, yes.

8    Q.   I'm going to show you a document and see if you recognize

9    it.

00:46 10           MR. FICK:  May I approach, your Honor?

11           THE COURT:  You may.

12    Q.   Take a quick look at that, and tell me if you're familiar

13    with that document or you recognize what it is.

14         You recognize that document?

15    A.   I recognize that document.

16    Q.   It's a document you've seen before?

17    A.   I have, yes.

18    Q.   Is that something that you were involved in helping to

19    prepare?

00:47 20    A.   No.

21    Q.   Do people you supervise -- were people you supervised

22    involved in helping to prepare that?

23    A.   One of the names on the report is somebody I do supervise,

24    yes.

25    Q.   Who is that?

1    A.    Nathans.

2    Q.    Were you aware of the work being done on an ongoing basis

3    as that report was being put together?

4    A.    Again, I'm not from a micromanagement standard.  I do know

5    that Nick Nathans was assigned with Petrozelli, and they were

6    working on scoping down the voluminous information from the

7    investigation.

8    Q.    Okay.  So the report is 53 pages long, right?

9    A.    I have 53 pages, yup.

00:48 10   Q.    And this is -- it's essentially a report of examination by

11   FBI personnel about their review of the Sony VAIO, right?

12   A.    I would say it's more of an analytical product than it is

13   an examination product.

14   Q.    Well, it's a report of what the examiners found in looking

15   at the Sony VAIO, right?

16   A.    I believe, in the context of the way the report is

17   written, it's an analytical product that was worked on with the

18   forensic examiner.

19   Q.    Now, you see at the end -- actually, before the

00:48 20   appendices, there's a line that says --

21         MR. CHAKRAVARTY:  Objection to reading from this

22   report, your Honor.

23         MR. FICK:  Well.

24   Q.    This is not a final report, fair to say?

25   A.    This is an analytical report.  I'm not sure what you mean

1    by "final" or "not final."

2    Q.   Well, toward the end it says, "Analysis remains ongoing,"

3    right?

4    A.   Where does it say that, sir?

5    Q.   If we could turn to Page --

6         MR. CHAKRAVARTY:  Again, your Honor, I'm not sure this

7    is impeachment as opposed to just trying to testify to the

8    contents of the report that he's seen.

9         THE COURT:  Well, go ahead.

00:49 10        MR. FICK:  Thank you.

11   Q.   Very last page, actually, 53.

12   A.   Okay.

13   Q.   Last sentence, "Digital forensic analysis remains

14   ongoing"?

15   A.   Yes.

16   Q.   Do you know if there was a later iteration of this, a

17   further iteration of something like this, an update to it?

18   A.   I don't know what version that I have here in front of me,

19   but I did not see an additional version.

00:49 20   Q.   You're not aware of any additional version?

21   A.   I'm not aware of any additional version.

22   Q.   This version is undated, by the way, right?

23   A.   The copy that you have is, yes.

24   Q.   And do you know whether similar types of reports were

25   written about any of the other devices seized in the case?

```
 1   A.    There were a number of 302s that were produced by numerous
 2   examiners regarding the different pieces of evidence.
 3   Q.    So there were narrative reports describing the findings of
 4   the examiners, right, for other pieces of evidence?
 5              MR. CHAKRAVARTY:  Objection, your Honor.
 6              THE COURT:  Overruled.  You may answer it.
 7   A.    This report is unique in that it is a -- it's an
 8   analytical report that was worked on with the senior analyst
 9   and the CART examiner.  The other reports that I'm making
10   reference to were -- would have been final 302 reports or final
11   reports that were technical details of what was performed
12   during the examination, not an analytical product.
13   Q.    So the Sony was treated uniquely?  It wasn't treated the
14   same as like the Samsung or the HP computers?
15   A.    No.  I think they were all treated the same.  I think it
16   probably garnered the most attention.
17   Q.    Do you know whether analytic reports were produced as to
18   the HP or the Sony?
19   A.    Say that again.
20   Q.    Do you know whether analytical reports were produced as to
21   the HP or the Sony?
22   A.    Which numbers specifically are those, sir?
23   Q.    Going to your chart on your screen, the HP is 2R14 from
24   Norfolk Street, and the Samsung is the 1W3 from Watertown,
25   right?
```

00:50 (line 10)
00:50 (line 20)

1    A.    Yeah.  I don't recall whether or not there were reports

2    done on those two.

3    Q.    You don't know?

4    A.    I don't recall.

5    Q.    Anyway, these are the kinds of reports -- or this report

6    of the Sony is the kind of report that FBI agents and analysts

7    rely upon in the process of doing their investigations,

8    correct?

9    A.    I'm not sure what you mean by that question, but I know

00:51 10    this report was produced by the senior analyst that was

11    assigned to the case.

12    Q.    It's produced by the senior analyst and then provided to

13    people like investigating agents and prosecutors, right?

14    A.    It's provided to the team members, yes.

15    Q.    And the purpose is to give them some insight into what's

16    on that digital device, right?

17    A.    Give them some insight or -- because, again, the volume of

18    data is so voluminous that they need some way to be able to

19    scope down what's on there to what's relevant to the

00:52 20    investigation.

21    Q.    So this is a standard part of your practice, is to create

22    an analytical report and provide it to the people who need it,

23    right?

24    A.    It's not a standard part of the process.

25    Q.    So, again, the Sony was somehow treated differently?

A.    No.  I don't supervise the analytical branch, so I'm not
sure what is standard practice for analytical products.  I know
the forensic -- the computer forensic side.

Q.    Now, looking again at the chart on the screen, you
testified last week and introduced a bunch of exhibits related
to each of these devices, right?

A.    Not all of them but some of them, yes.

Q.    Do you know if the FBI has analyzed the interrelationships
between these devices themselves and between these devices and
other devices?

A.    There's been some analysis for that, yes.

Q.    Do you know if there's been analysis of whether files, for
example, can be traced moving from one to another?

A.    There's been -- yes.

Q.    Do you know whether there's analysis of whether these
devices were connected to each other at specific times?

A.    "Connected" meaning networked?

Q.    Attached.

A.    Attached?  I don't recall whether or not there's been
analysis of whether they were actually attached.  Are you
talking about specifically the computers or you mean, like, a
thumb drive put into a computer?

Q.    For example, a few minutes ago with Mr. Chakravarty you
talked about a single event where you looked at the registry
and found that the Kingston was plugged into the Sony at a

1    certain time, right?

2    A.    Yes.

3    Q.    Do you know whether's there's been sort of more

4    symptomatic investigation tracing the history of a thumb drive

5    among all the devices in the case?

6    A.    Among all of the computers in the case?

7    Q.    Sure.  Let's start with that.

8    A.    So 1R6, 2R14, and D385?

9    Q.    Right.

00:53 10    A.    Yes.  I don't recall there's been an encompassing report.

11    I do know that we've looked at whether or not what devices had

12    gone into 1R6 and 2R14.

13    Q.    So 1R6 is the Sony, and 2R14 is the Hewlett-Packard from

14    Norfolk Street, right?

15    A.    It is, yes.

16    Q.    Do you know if there's been similar analysis of tracing of

17    various devices to the Samsung, 1W3?

18    A.    D385?

19    Q.    Yes.

00:54 20    A.    Again, I did a cursory look of D385.  I didn't do an

21    exhaustive search or weren't asked to verify whether or not

22    those devices were in D385.

23    Q.    I'm not asking about your search of 385 yourself.  I'm

24    asking whether you are aware of whether the FBI did an

25    investigation of the history of device attachments into D385.

1   A.   I don't recall -- I haven't seen an analytical report, so

2   I can't comment on that.

3   Q.   You don't know?

4   A.   I cannot comment on that.

5   Q.   It is fair to say you would agree with me, wouldn't you,

6   that the interrelationship among devices can be an important

7   thing to know in an investigation, right?

8   A.   The interrelationship between the different pieces of

9   evidence, say, thumb drives and computers?

00:54 10   Q.   Yes.

11   A.   And external drives?

12   Q.   Yes.

13   A.   Yes.

14   Q.   That can tell you something about, for example, the

15   interrelationship among suspects, among other things, right?

16   A.   I think, like we said -- we had mentioned on Thursday,

17   barring having a camera over somebody's shoulder, I'm not sure

18   you could tell exactly who might be at the keyboard.

19   Q.   But it's useful to know when various devices might have

00:55 20   been connected to each other and interacted with each other,

21   right?

22   A.   It is, yes.

23   Q.   That can give you some evidence to make inferences about

24   the relationships among the people who may have used those

25   devices, right?

1    A.    Probably more pattern-of-life information than inferences.

2    Q.    You would also agree with me, wouldn't you, that there

3    were other devices that were important to the Boston Marathon

4    investigation that are not listed here at all?

5    A.    There are over 600 -- 600 pieces of digital media alone.

6    Q.    You have some knowledge, though, certainly of what the

7    investigation found and how it happened, right?

8    A.    I do in the first couple of weeks as I was intimately

9    involved in the operations of the command post.  When I assumed

00:55 10   my regular duties, I was overseeing the computer forensic

11   portion or the digital media portion.

12   Q.    Right.  So you supervised the CART team, the people that

13   are analyzing these devices, right?

14   A.    Yeah.  They're providing support to the analysts, yes.

15   Q.    Along the way then, you have knowledge of the kinds of

16   things the people that work under you are discovering, correct?

17   A.    In general, yes.

18   Q.    You're aware, for example, that there were a couple

19   computers seized also from Katherine Tsarnaeva, Tamerlan's

00:56 20   wife, correct?

21   A.    I would have to see the full evidence list.  I don't have

22   that list in front of me.  Again, with over 600 pieces of

23   evidence, I don't have the recollection.

24   Q.    It doesn't stick out in your mind whether or not a couple

25   of devices were seized from Tamerlan's wife?

```
 1    A.   I didn't memorize every single piece of evidence that was
 2    collected in this matter.
 3    Q.   I'm not asking that question.  That wasn't my question,
 4    sir.  My question was whether you have a memory or whether you
 5    have knowledge that computers were seized from Tamerlan
 6    Tsarnaev's wife.
 7    A.   Specifically from his wife or from the Norfolk location?
 8    Q.   Whether you have knowledge that computers attributed to
 9    Tamerlan Tsarnaev's wife were seized in the investigation?
10    A.   I don't recall.
11    Q.   You don't recall.  Are you aware that cell phones
12    attributed to Tamerlan Tsarnaev were seized in the
13    investigation on Laurel Street in Watertown?  They're not on
14    the list either, are they?
15    A.   There were over 200 cell phones that were seized in this
16    matter.
17    Q.   You would agree, right, that the cell phones belonging to
18    one of the two suspects are important pieces of evidence,
19    right?
20    A.   You mean during the course of the investigation or to date
21    right now?
22    Q.   In general.  If the suspect -- one of the two suspects in
23    the bombing has a cell phone, you understand that's going to be
24    an important piece of evidence, a valuable piece of evidence,
25    right?
```

1    A.   It was during the course of the investigation at the very

2    beginning, yes.

3    Q.   Okay.  Just trying to establish those are also not on this

4    list, right, Tamerlan's phones?

5    A.   I was not asked to verify any files from those devices.

6    Q.   Understood.  You would also agree with me that it can be

7    important -- sometimes be important to know when a computer

8    first began to operate or was manufactured, right?

9    A.   I'm not sure I understand that question.

00:58 10   Q.   Well, if you're trying to figure out when certain digital

11   events on a computer happened and how that fits into an overall

12   investigation, it can be a useful piece of information to know

13   when the computer first came into existence as we know it,

14   right?

15   A.   When it was made by the manufacturer or when it was

16   purchased from the store or when the owner bought it?

17   Q.   Any number of those things.  Any one of those facts could

18   be a useful fact, right?

19   A.   Potentially.

00:58 20   Q.   The date Windows was installed on a Windows computer is an

21   important fact to know in understanding where a particular

22   device fits into the history of events, right?

23   A.   Well, the Windows installation -- it depends.  I would

24   need to have more information in order to assess that.  Windows

25   installations -- you can actually install Windows multiple

         1    times over the course of the life of a computer.  So I could

         2    own a computer and do multiple installations of Windows.  So I

         3    would have to have more information to --

         4    Q.   So you're not willing to say whether it's at least a piece

         5    of information that might be useful to know?

         6              MR. CHAKRAVARTY:  Your Honor, objection to the

         7    argumentative style both of this lack of concession as well as

         8    Mr. Fick's questions asserting facts not in evidence.

         9              THE COURT:  Overruled.

00:59   10    A.   So could you repeat the question, please?

        11    Q.   Are you willing to acknowledge that the date Windows was

        12    installed on a computer could be an important piece of

        13    information to place the device in a time context relative to

        14    the investigation?

        15    A.   It is one piece of information that could be utilized.

        16    Q.   Okay.  Let's actually make it a little bit more concrete.

        17    Now, I'm going to pull up Exhibit 1142-11.  This is a document

        18    that describes or shows the date Windows was installed on the

        19    Sony VAIO, correct?

01:00   20    A.   When that particular version of Windows, with that product

        21    key, yes.

        22    Q.   So that's the date here, 2/26/11, correct?

        23    A.   That's what's reported in the registry.  That's from 11 --

        24    Q.   1142-11, right?

        25    A.   Yes.

1    Q.   Now, there's no evidence that any other version of Windows

2    previously existed on the Sony VAIO, is there?

3    A.   There's no evidence -- can you rephrase that or ask that

4    question, please, again?

5    Q.   There's no indication, no digital artifacts, on the Sony

6    VAIO to indicate Windows was ever installed before this date,

7    is there?

8    A.   Yes, but there's also no to say that it wasn't.

9    Q.   But as far as we know for purposes of this investigation,

01:00 10    the Sony laptop, as we know it, Windows on that laptop was born

11    on February 26, 2011, correct?

12    A.   That particular version, that particular license, was on

13    that date.

14    Q.   Okay.  And you're not aware of any evidence to suggest the

15    computer existed earlier or that -- I'm sorry, that there was

16    ever an earlier version of Windows, that the computer existed

17    in some earlier form?

18    A.   I haven't done the verification or analysis of that, no.

19    Q.   You don't know the answer?

01:01 20    A.   I haven't done the verification or analysis.

21    Q.   As far as the evidence that's in the case then at least,

22    the install date of Windows on the Sony was February 26, 2011,

23    right?

24    A.   This particular install of Windows, the date is collected

25    as 2/26.

1    Q.   And the Hewlett-Packard, the 2R14, from the family

2    apartment in Cambridge -- I'm going to pull up 1143-08.  This

3    shows that the Windows install date on that computer was

4    September 23, 2011, right?

5    A.   Yes.  Again, that particular license, that particular

6    product key, that particular software, yes, that's what's

7    collected in the registry.

8    Q.   Again, there's no evidence, at least none you're aware of,

9    to suggest that there was ever an earlier version of Windows on

01:02 10   that computer, correct?

11   A.   That, I don't know.  We'd have to do a further analysis

12   for that.

13   Q.   You don't know, in other words?

14   A.   What I'm saying is we'd have to do further analysis to

15   determine that.

16   Q.   It's not something that was ever brought to your

17   attention, right?

18   A.   I was not asked to verify whether or not there were

19   previously versions of Windows installed on the computer.

01:02 20   Q.   Sitting here today, you are not aware of any evidence to

21   suggest Windows ever previously existed on that computer?

22   A.   I can tell you factually from the registry report here

23   that this particular version of Windows was installed on that

24   date.

25   Q.   Okay.  My question is:  You're not aware of any evidence

```
 1   to suggest that Windows was ever there earlier, correct?

 2   A.   Yes, but I'm also not aware whether it wasn't or not.

 3   Q.   I understand.  But my question simply was:  You're not

 4   aware of evidence that Windows was there earlier?

 5   A.   I have not done the analysis to determine whether there

 6   were previously versions of Windows on this computer.

 7   Q.   Now, as to the Samsung -- no -- yes, the Samsung, the

 8   Samsung from Laurel Street in Watertown, Tamerlan's computer,

 9   as you put it?

01:03 10   A.   What number, sir?

11   Q.   Going back to your exhibit -- I'm sorry, your chalk, so to

12   speak, 1577, I believe, talking about the Samsung laptop, 1W3,

13   Watertown.

14   A.   So D385?

15   Q.   D385.  1W3 is in parentheses, yes.

16   A.   Yes.  That type of analysis was not done -- I don't have

17   access to that analysis for D385.

18   Q.   Right.  So my question is:  Are you aware of when Windows

19   was installed on that computer?

01:03 20   A.   I'm not.

21   Q.   Did you ever have an awareness of when Windows was

22   installed on that computer?

23   A.   I wasn't asked to verify or validate whether it was or was

24   not.

25            MR. FICK:  If I could just have the screen for the
```

1   witness, your Honor?

2   Q.   Showing you a document and see if this helps you to answer

3   the question.  First of all, do you recognize, in general, what

4   this kind of document is?

5   A.   It's a security account manager information file.

6   Q.   Does this help you answer the question, for example, of

7   when the Windows administrator account on the 1W3 was

8   installed?

9   A.   The administrators account are typically a part of the

01:05 10   standard installation, so I'm not sure whether or not this was

11   user created or whether or not it was machine generated.

12   Q.   Does this enable you to say or does this enable you to

13   agree with me that the Windows administrator account on the

14   Samsung laptop was created on September 21, 2011?

15       MR. CHAKRAVARTY:  Objection, your Honor.  There's no

16   foundation for what this document is, where it's from.

17       THE COURT:  Sustained.

18       MR. FICK:  If we can clear this, and we'll go back for

19   everyone in the courtroom to see again Mr. Swindon's summary

01:06 20   exhibit.  Are we back up?

21   Q.   So just to review, we established, if I'm not mistaken,

22   that the Sony VAIO Windows install was dated to February of

23   2011 just a few minutes ago, right?

24   A.   If that's what was on that exhibit that you showed, then,

25   yes.

1    Q.   And we established that the HP Pavilion was September of

2    2011, right?

3    A.   If that's from the exhibit report, then, yes.

4    Q.   And you're unable to say, sitting here today, when the

5    Samsung Windows install happened, right?

6    A.   I don't have the information available to make that

7    determination.

8    Q.   Now, at the time the Sony VAIO Windows install happened in

9    February of 2011, Mr. Tsarnaev was still a high school student,

01:07 10   right?

11   A.   I don't know that information.

12   Q.   Well, I mean, you know things like the names of his

13   friends, right?

14   A.   I do.  I am aware of some of his friends, yes.

15   Q.   You know he was arrested after the Marathon bombings in

16   2013 when he was a sophomore at UMass Dartmouth, right?

17   A.   I do.

18   Q.   So back in 2011, two years prior, he would have still been

19   in high school, correct?

01:07 20   A.   I'm not sure the dates he was in high school.

21   Q.   You're not aware of what, if any, computer the family

22   might have shared on Norfolk Street before September of 2011

23   when the HP Windows was installed, right?

24   A.   Can you reask that again, please?

25   Q.   We established, I think, with you that the desktop

1    computer, the Hewlett-Packard, at Norfolk Street, Windows was

2    installed on that computer in September of 2011, right?

3    A.   We've established that Windows was installed on that

4    computer, but that did not draw the conclusion that that's when

5    the computer was brought into the house.

6    Q.   You're not aware of any evidence that that computer

7    existed earlier, right?

8    A.   Not from the data that we have here, no.

9    Q.   You're not aware of any other evidence to suggest if any

01:08 10   computer existed earlier or if there was some other computer,

11   right?

12   A.   I don't have that information.

13   Q.   You just don't know.  But what we do know is that the Sony

14   VAIO, the Windows install on that that we know about, was in

15   February of 2011, right?

16   A.   The Windows install from the registry shows that that

17   install of Windows was done on that date on that computer.

18   Q.   And that's two years prior to the time when Mr. Tsarnaev

19   is a sophomore in college, right?

01:09 20   A.   Again, I'm not aware of the dates when his -- what his

21   student record was.

22   Q.   Now, talking further about the Sony, you talked a little

23   bit in your direct testimony about device attachments -- you

24   remember that -- just a few minutes ago with Mr. Chakravarty?

25   A.   I'm sorry.  You said --

1    Q.   Device attachments.  You talked about finding the date --

2    that one date when the Kingston was inserted into the Sony?

3    A.   That was one that we spoke on, yes.

4    Q.   Were you aware that Tamerlan's HTC phone was connected to

5    the Sony at least twice prior to September of 2011?

6    A.   I wasn't asked to verify that piece of information.

7    Q.   Is it something you ever came to learn in your

8    investigation, in your work on the investigation?

9    A.   There are multiple devices that were in the USB store

01:10 10   which comes out of the registry that were reported being

11   plugged into 1R6.

12   Q.   But you're not -- sitting here today, you're not aware

13   whether Tamerlan's phone was attached twice prior to September?

14   A.   I don't have that information in front of me to verify

15   that.

16   Q.   Do you know if anybody at the FBI ever dug that

17   information out?

18   A.   I'm aware that the registry was looked at and the

19   USB-stored devices were looked at, yes.

01:10 20   Q.   Was there some kind of written report prepared about that

21   that you know of?

22   A.   I don't have that to access.  I don't recall.

23   Q.   You don't know?

24   A.   I don't recall.

25   Q.   Are you aware that the Sony was used by multiple Skype

1    accounts, over the course of its existence, from your review of

2    the Internet Evidence Finder reports?

3    A.   I do know that the Skype was used by the defendant.

4    Q.   Okay.  Do you also know that Skype was used by an account

5    called Bella Rizvan?

6    A.   If you could pull up the report, I don't have the entire

7    internet history memorized.

8    Q.   So that's not something that you recall?

9    A.   I don't have the report memorized.

01:11 10   Q.   Do you have it with you?

11   A.   Is it a part of the report that -- in the exhibit?

12   Q.   Your report wasn't given to us.  I'm asking you if you've

13   got access to it.

14        MR. CHAKRAVARTY:  Objection, your Honor.  Your report

15   wasn't given to us.  This witness didn't draft a report.

16   There's no evidence of any report.

17        THE COURT:  Well, let's get -- we haven't even

18   identified what the report is, so --

19   Q.   Well, in your testimony last week, you talked about

01:11 20   reviewing the various computers with an application called

21   Internet Evidence Finder, right?

22   A.   Yes.

23   Q.   And that extracts certain information about the computer's

24   internet activity over its life, right?

25   A.   It evaluates and parses out the internet activity from a

 1    particular computer, yes.

 2    Q.    Among the things Internet Evidence Finder isolates are

 3    artifacts indicating or suggesting uses of Skype, correct?

 4    A.    It does have a social media component to it, yes.

 5    Q.    That includes Skype, right?

 6    A.    Yes.

 7    Q.    Skype is a communication program, voice and text-type

 8    messages between computers over the internet, right?

 9    A.    It's like a peer-to-peer video chat, yes.

01:12 10    Q.    Okay.  And you just said a minute ago you are aware that

11    there was a log-in for Jahar Tsarnaev on Skype on the Sony,

12    right?

13    A.    Yes, because that was a part of one of the exhibits that

14    we produced for 1R6.

15    Q.    I'm asking you now:  Are you also aware there was an

16    account on there called Bella Rizvan on the Sony?

17    A.    I was not asked to verify whether or not that account was

18    on that computer.

19    Q.    My question, sir, wasn't whether you were asked to verify

01:12 20    that.  It's whether you know that from yourself looking,

21    presumably recently, at the Internet Evidence Finder reports?

22            MR. CHAKRAVARTY:  Objection, your Honor.  Asked and --

23            THE COURT:  Overruled.

24    A.    I don't have that information here to make that

25    determination.

```
 1   Q.   Whether or not you have it here in front of you now, do

 2   you recall seeing that information when you looked at the

 3   evidence --

 4   A.   I do not recall.

 5   Q.   You do not recall?

 6   A.   I do not recall.

 7   Q.   You do know that Bella is the name of one of Jahar's

 8   sisters, right?

 9   A.   I do not.

10   Q.   So you know a friend of his from UMass Dartmouth is

11   Giovanni Norgill, right?  You said that last week?

12   A.   I knew that from -- yes.

13   Q.   You know that Dias Kadyrbayev is a friend of his, right?

14   A.   I do know they were defendants in another matter, yes.

15   Q.   You know that Katherine Tsarnaeva is Tamerlan's wife,

16   right?  You said that last week?

17   A.   Yes.

18   Q.   But you don't know that Jahar had a sister named Bella?

19   A.   The part of the investigation that I was responsible for

20   had no dealings with other siblings.

21   Q.   That name never came up in your work with people under

22   your supervision about the electronic devices in the case?

23        MR. CHAKRAVARTY:  Objection, your Honor.

24        THE COURT:  You may answer it.

25   A.   It did not.
```

1    Q.    Now, I'm going to go to Exhibit 1142-01, which is the

2    selected internet history from the VAIO.  I'm going to zoom in

3    on sort of part of it here, just the beginning.

4        Now, Exhibit 1142, this -- whoever created this called Key

5    Internet History it's just one page, right?  It's one page

6    pulled out of the internet history?

7    A.    It is one page pulled out of the -- generated from the

8    Internet Evidence Finder.

9    Q.    Okay.  And so I think you said there was something like

01:14 10   30,000 internet history entries on the Sony, right?

11   A.    I believe so, yes.

12   Q.    And so this one-page selection is a very, very small part

13   of that, right?

14   A.    Yes, less than 30,000, yes.

15   Q.    Substantially less?

16   A.    Yes.

17   Q.    And this was a selection made not by you but by the

18   investigative team, right?

19   A.    Yes.

01:15 20   Q.    But in the process of verifying this, you went back for

21   each -- if I understood your testimony, you went back for each

22   of these line items and went to the internet history to confirm

23   it's there, right?

24   A.    Went to the internet history -- we went to the Internet

25   Evidence Finder results.

Q.   To confirm that everything in this spreadsheet is actually there?

A.   We went to the results of the internet finder -- Internet Evidence Finder and -- yes, and confirmed that it was there.

Q.   You've been saying "we" again.  You said "we" a few times last week.  When you say "we," do you really mean I, or were there multiple people doing it?

A.   I was with John Petrozelli, the senior analyst.

Q.   In verifying the spreadsheets line by line, you did that together, is that fair to say?

A.   Yes.

Q.   But you personally participated in every aspect of it, correct?

A.   Absolutely, yes.

Q.   Now, in the process of verifying these items, you obviously saw the entirety of the internet history, correct?

A.   These were subreports from the larger base, so we were confirming only what was on these reports.

Q.   But in order to confirm them, you had to go back to the original, to the collective, right?

A.   The 30,000 entries?

Q.   Yes.

A.   Yes.

Q.   And so, in the process of doing that, you had occasion to observe that the bulk of the internet history on the Sony was

1   activity on Facebook and VK, which is a Russian Facebook

2   equivalent, right?

3   A.   I'm sorry.  What --

4   Q.   Is it fair to say that the course of seeing the entire

5   internet history --

6   A.   Right.

7   Q.   -- you could observe -- you did observe that the bulk of

8   the internet history on the Sony was Facebook activity and

9   VK.com activity, a Russian Facebook equivalent?

01:17 10   A.   I'm not sure I can assess that sitting here.  We went line

11   by line to determine and validate and verify that this stuff

12   was there.  It was so voluminous, I couldn't tell you whether

13   it was a percentage or not.

14   Q.   You didn't even notice in passing where most of the web

15   addresses were coming from on that giant collection?

16   A.   We went to these entries to make sure that they were there

17   and existed.  As far as assessing what else was there, as far

18   as a percentage in its totality, we did not.

19   Q.   So you were narrowly focused on these entries, didn't even

01:17 20   notice anything else on the overall record you were reviewing?

21   A.   Other than that there was other internet activity there,

22   yes.

23   Q.   Wasn't of interest to you where the predominant amount of

24   internet activity was?

25   A.   It was of interest to me to make sure this information

1    existed in those reports.

2    Q.    That's your sole and narrow focus; is this information

3    there?  That's it?

4    A.    That was my job, yes.

5    Q.    In the course of your investigation earlier, in dealing

6    with the people under your supervision who reviewed the Sony

7    over the course of two years, did that topic ever come up?

8    A.    Not specifically, no.

9    Q.    Never had a discussion inside the FBI CART team about the

01:18 10    nature of the Sony's internet activity?

11    A.    Not specifically the internet activity.

12    Q.    Now, you're aware, correct, that the FBI did an analysis

13    of the search history, the internet search history, on the

14    Sony, right?

15    A.    Some of those entries are included in these reports, yes.

16    Q.    You are aware that the FBI did a separate analysis of the

17    search history on the Sony, correct?

18    A.    What type of search history?

19    Q.    Well, let me just put more of a point on it.  The 53-page

01:18 20    report we were talking about before in front of you that

21    contains an analysis of the search history, correct?

22    A.    Can you refer to what page that is, please?

23    Q.    Sure, Page 46.

24    A.    This looks like it's a collection of search terms.

25    Q.    Right.  So you testified that you're familiar with this

1   report, right?

2   A.    In general, yes.

3   Q.    You've seen it before, right?

4   A.    Yes.

5   Q.    Petrozelli and Nathans, the people who worked on it, are

6   people you work with, right?

7   A.    Yes.

8   Q.    And so you're aware that the FBI did an analysis of search

9   terms on the Sony that are indicative of his predominant

01:19 10   internet usage, right?

11  A.    According to this report, yes.

12  Q.    Well, you don't have any reason to think the report is

13  wrong, do you?

14  A.    No.

15  Q.    And it's fair to say that the top two terms in the

16  predominant search history are words that you might --

17          MR. CHAKRAVARTY:  Objection.

18  Q.    -- expect to see in the computer of an adolescent male?

19          THE COURT:  Overrule.

01:19 20  A.    Am I answering that question?  Can you rephrase that

21  again, please?

22  Q.    The top two search terms are terms you would not be

23  surprised to find in the computer of adolescent male, fair to

24  say?

25  A.    I'm not going to say that.  I'm not an adolescent

```
 1   psychologist, so I don't know whether or not an adolescent male
 2   would be searching for those terms.
 3   Q.   Among the top 16 search terms identified in this
 4   predominant usage chart is the single word "Chechnya," correct?
 5   A.   Yes.
 6   Q.   You're aware that the defendant's family, his paternal
 7   side of the family, comes from Chechnya, correct?
 8   A.   I'm aware they are from Chechnya, yes.
 9   Q.   Also fair to say that, among these top 16 predominant
10   usage search terms, there is nothing about Islam or jihad?
11             MR. CHAKRAVARTY:  Objection, your Honor.
12             THE COURT:  Sustained.
13   Q.   Now, I'm going to move on to Exhibit 1142-13.
14   A.   Are we done with this report?
15   Q.   For the moment.  You can leave it on your desk if you'd
16   like.
17        This is 1142-13, selected user files from the VAIO,
18   correct?
19   A.   Yes.
20   Q.   And this is a report that's about four-and-a-half-pages
21   long, correct?
22   A.   Yes.
23   Q.   And this is, again, a list of files selected by somebody
24   on the investigative team, correct?
25   A.   Yes.
```

```
 1    Q.   And in addition to the name and path of the file, if we go

 2    back to the top of the spreadsheet, there are these two columns

 3    here, "created in local time" and "file system record in local

 4    time."  Do you see that?

 5    A.   Yes.

 6    Q.   It's correct, isn't it, that Windows maintains a variety

 7    of date-and-time information about files?

 8    A.   Yes.

 9    Q.   And that's -- there are certain descriptors or categories

 10   of each of the pieces of information Windows maintains,

 11   correct?  One of them is "created"?

 12   A.   That's one of them, yes.

 13   Q.   "Modified"?

 14   A.   Yes.

 15   Q.   "Accessed"?

 16   A.   Yup.

 17   Q.   Something called "MFT entry modified," the "master file

 18   table entry modified"?

 19   A.   The "born on" date would be more appropriate.

 20   Q.   You're familiar with those categories of information that

 21   Windows holds about files, right?

 22   A.   Yes.

 23   Q.   And fair to say the meaning and significance of that data

 24   is not always intuitive or obvious?

 25   A.   It is to the forensic specialist but not to sort of the
```

```
 1    general computer population.
 2    Q.   Okay.  Now, the created date is, generally speaking, the
 3    date or time that the file appeared on the computer or device
 4    where the file is located, correct?
 5    A.   Depending on what versions of Windows, yes.
 6    Q.   And for the purposes of your chart here, which of the
 7    Windows time categories is file system record date in local
 8    time?
 9    A.   This was adjusted -- these were adjusted numbers for local
01:23 10    time.  As we had talked about, some of them were --
11    Q.   I want to break that down into two pieces.  Put aside the
12    time zone issue for a moment.  What is meant by "file system
13    record date"?  That's not a term that shows up in Windows
14    itself, right?  So what do you mean?
15    A.   That was an adjusted time for the time record, for the
16    Zulu time.
17    Q.   But both of these are local time, right?  We have "created
18    in local time," and we have "file system record date in local
19    time," right?  Both are local time?
01:24 20    A.   If you could pull the thing out so I can see it in its
21    entirety, please?
22    Q.   Sure .
23    A.   So the created local time -- sorry.  What was your
24    question again?
25    Q.   I'm asking you about "file system record date in local
```

```
 1    time."  What is that?  Which of the Windows time artifacts does
 2    that come from?
 3    A.    That is not a Windows time artifact.  That was, like, with
 4    some of the -- several of the other spreadsheets, that was
 5    added by the analyst.
 6    Q.    So added by the analyst on what basis?
 7    A.    I didn't create the report.  We determined that this is a
 8    user -- selected user file from the main directory listing
 9    report.
10    Q.    Sir, you didn't create the report, but you verified the
11    report, right?
12    A.    I verified, yes, that the web cam media was created in
13    local time, yes.
14    Q.    How did you verify file system record date in local time
15    if you can't tell me which Windows artifact it is?
16    A.    When I sat with the analysts, we went over line by line to
17    determine that the web cam media entry was in the directory
18    listing, the main directory listing.
19    Q.    So are you saying you did not verify the time entries in
20    the spreadsheets?
21    A.    I did not create the file record time category.
22    Q.    You didn't create the category.  I'm asking if you
23    verified it.
24    A.    I verified with the person who created the report, yes.
25    Q.    So what?  They just told you it was correct?
```

01:24 appears at line 10
01:25 appears at line 20

1  A.   I sat with the analyst, and we went through the main

2  directory listing of what you're looking at here to determine

3  that the created local time.  And we sat with the -- the senior

4  analyst that made this report, and we went over it line by line

5  together, yes.

6  Q.   I understand you verified created in local time with the

7  analyst.  What is file system record date in local time?

8  A.   That's something that the analyst -- that is a --

9  something that the analyst made.

01:26 10  Q.   Based on what?

11  A.   I don't have that information in front of me.

12  Q.   So when you sat with the analyst and verified the entries

13  line by line, the question didn't come up:  What is that?

14  A.   There were over -- there were a number of different

15  documents.  I don't recall specifically this particular

16  document.

17  Q.   Well, apart from this particular document, these two

18  categories, right, "created in local time" and "file system

19  record date in local time," those are all over multiple

01:26 20  spreadsheets that you put into evidence with Mr. Chakravarty

21  last week, right?

22  A.   Yes.

23  Q.   So what is "file system record date in local time"?

24  A.   I would have to go back and ask the analyst.  We went line

25  by line to determine that the "created in local time" came from

1    the master file list and that the path of the files were there

2    for selected user time.

3    Q.   So bottom line is you can't answer that question sitting

4    here today, What is file system record date?

5    A.   I don't have the information in front of me to answer that

6    question.

7    Q.   You don't recall even knowing at the time you verified the

8    spreadsheet?

9    A.   We went over multiple spreadsheets over a period of three

01:27 10   or four days.

11    Q.   Right.  But this category, file system record date on

12    multiple spreadsheets, you don't remember what that is?

13    A.   I don't recall.

14    Q.   Okay.  So then, certainly, you would agree then, since you

15    don't know what it is, that the fact that the time the file was

16    created and the time in the second column doesn't necessarily

17    say anything about whether the file was ever opened?

18    A.   The created in local time was when it was created on that

19    --

01:27 20   Q.   Right.  So it's simply the fact that there's another

21    column with a different time on it that's later doesn't mean

22    the file was opened on that date because you don't even know

23    what that column means, right?

24    A.   I would have to get the information from the analyst to

25    verify what that information is.

1    Q.   It's at least fair to say that from this spreadsheet one

2    cannot infer that the fact that there are two different times

3    means this file was ever opened?

4    A.   Exactly, or that it was not or that it was.

5    Q.   Right.   There's no information?

6    A.   I don't have the information to determine that from this

7    particular spreadsheet.

8    Q.   Now, I want to go to a particular file on here.   I'm going

9    to expand it just by way of example.   See this

01:28 10   fundamentalconcepts.pdf?   See that?

11   A.   Uh-huh.

12   Q.   Created date, September 1, 2004?

13   A.   Okay.

14   Q.   That can't be right, can it?

15   A.   Well, it could be.   If it was created on another device,

16   that creation date could have been carried over when it was

17   populated from a removable media device.

18   Q.   I thought you just told us a few minutes ago that all of

19   the created dates here are the dates the file was created on

01:28 20   the Sony?

21   A.   It's when the file was born with the exception of when

22   something is done with removable media or downloaded from the

23   internet.

24   Q.   So your belief then is that this created in local time

25   simply reflects when Fundamental Concepts might have been

1   created on some other device?

2   A.   I don't have that information in front of me, but I would

3   -- yes, based on the information here.

4   Q.   Well, let's try comparing then to see what created certain

5   looks like on the master file table for this item.   If I can

6   open Exhibit 1142-151, Page 1872, can you see that on your

7   screen, fundamentalconcepts.pdf, and then the highlighted

8   creation date?

9   A.   Barely but -- can you zoom it out?

01:30 10   Q.   You know, I think I might have to actually open it in PDF

11   to do that.   But one moment.   Go to Page 1872; zoom.   Here we

12   have Fundamental Concepts.   I thought I had it.   Sorry.

13   Fundamental Concepts, going across, across, across.   Creation

14   date of October 10, 2011.

15   A.   Can you possibly bring up the other one, also, please, in

16   the other report?

17   Q.   Which one?

18   A.   The original report we were --

19   Q.   Yes, absolutely.   So we will go back to that, which is

01:32 20   1142-13, Fundamental Concepts, September 1, 2004.

21   A.   Can you go back to the other report again, please?

22   Q.   Sure.

23   A.   Okay.

24   Q.   So the created file in the master list, the 4,000-plus

25   page document, September 10, 2011, for Fundamental Concepts, on

1    your derivative -- or the FBI's derivative spreadsheet, it's

2    the 2004 date?

3    A.   There were multiple different types of applications used.

4    This particular sheet that you're looking at was an X-Ways

5    forensic file listing export, and that report could have been

6    made from AD Labs.

7    Q.   So there's -- a different software might give a different

8    answer to a question to when a file was created on a computer?

9    A.   Potentially, yes.

01:33 10   Q.   What did you actually use when you verified the derivative

11   exhibit, the one that showed 2004?  How did you verify that

12   date?

13   A.   We used multiple data sets.  One of them was we wanted to

14   make sure that this entry -- that the file actually existed on

15   the computer and that the entry was in the file listing.

16   Q.   So you're saying you didn't verify the dates?

17   A.   We didn't -- the information that we used at the time was

18   -- could have been from the AD Labs.  Could have been from the

19   other product.

01:34 20   Q.   So different products, you're saying, can give a different

21   answer about when a file was created on a computer?

22   A.   It's possible.

23   Q.   Sitting here today, you don't know which is correct?

24   A.   I don't know which is correct; I do not.

25   Q.   It sort of stands to reason, though, that a computer where

1    Windows was installed in 2011 couldn't have had a file created

2    on it in 2004, right?

3    A.    Not unless that file was created someplace else, either

4    the internet or a removable media and then copies to that

5    device.

6    Q.    But it still has a creation date, a date it was born on

7    the device where it was --

8    A.    Would be the born-on date, yes.

9    Q.    As I understood it, the derivative spreadsheet was

01:34 10   supposed to show, as I understood it, the date the file was

11   born on the Sony, right?

12   A.    I'm sorry.  Can you ask that question again?

13   Q.    As I understood the purpose of the derivative spreadsheet

14   and your description of it a few minutes ago, that column is

15   supposed to tell us when the file was born on that computer,

16   right?

17   A.    It was created in local time on that computer, yes.  I'm

18   sorry, when the file was created in local time.

19   Q.    On that computer or not?

01:35 20   A.    Not necessarily on that computer.

21   Q.    Not necessarily, right?

22   A.    Depending on how that file -- where that file was

23   originally created from.

24   Q.    So how do you know the difference?  How can we interpret

25   any one of these items what it means?  Are you able to do that

1    sitting here today?

2    A.    Not sitting here today, no.  We would need further

3    analysis on the file.  The file does exist on the computer, and

4    the file entry does exist on the directory listing.

5    Q.    But you're not confident about the dates in these

6    spreadsheets?

7    A.    I don't think any forensic person would ever be a hundred

8    percent confident in dates and times generated by the operating

9    systems.

01:35 10   Q.    I'm still curious.  What happened when you tried to verify

11   this date?  You must not have compared it to the 4,000-page

12   list that's in the exhibit because that has a different date,

13   right?

14   A.    Must be, yes.

15   Q.    But sitting here today, you don't know what device output

16   or what software output you used to make the verification?

17   A.    Not for this particular spreadsheet, no.

18   Q.    For any of the spreadsheets, can you say where the data

19   came from?

01:36 20   A.    We had -- there were hundreds of files, and there were at

21   least 50 or 60 spreadsheets that we were verifying.

22   Q.    So you didn't have a standard procedure to verify the

23   dates and times in the spreadsheets?

24   A.    There was no standard procedure because it was a bunch of

25   different types of devices.  It was cell phones, thumb drives,

1   hard drives.

2   Q.   Let's just stick with computers.  Did you have a standard

3   operating procedure to verify dates and times for lists of

4   files from computers?

5   A.   There was no standard procedure, no.

6   Q.   Just to -- this is not an isolated problem, fair to say?

7   A.   I can't determine that with the information in front of

8   me.

9   Q.   Well, let's take a look at a couple more examples at

01:37 10   least.  I'm going to go to Page -- well, there's the next one

11   right here, fundamentalconcepts.pdf, February 14, 2006.  That's

12   also a date that's like -- something like five years before the

13   Windows install on the Sony, right?

14   A.   If the -- the 2011 date, when that particular install of

15   Windows, yes.

16   Q.   So certainly would raise a question in your mind:  How is

17   it that a file could be created on the Sony in 2006, right?

18   A.   That file could have been created on the internet in 2006

19   and then put on the Sony --

01:37 20   Q.   Again, it's just --

21   A.   -- in 2011.

22   Q.   It's just an example of that date doesn't necessarily

23   reflect the creation date on the Sony?

24   A.   Depending on what type of file it is, where that file was

25   created, it may not reflect when it was created on the Sony.

1    Q.    Just as a point of comparison, going to the master file

2    table for that file, the Exhibit 1142-151, Page 150.

3    A.    That's not the master file table, but it is a directory

4    listing.

5    Q.    For purposes of the exhibit in this case, there was a

6    4,000-plus-page exhibit which you represented to be a complete

7    list of all the files on the Sony, right?

8    A.    That's the complete list that the software product

9    produces, yes.

01:38 10   Q.    And so if we go to that list and look for the

11   fivegrounrules.pdf document, we again see a September 2011

12   creation date rather than a 2006 date, right?

13   A.    Can you blow that up a little, please?

14   Q.    Go to Page 150.  Here we go.  Five Ground Rules.  Scroll

15   across.  We get a date September 10, 2011, again, right?

16   A.    Yes.

17   Q.    So the created data in this file listing doesn't match the

18   created data on the FBI's derivative exhibit again, right?

19   A.    That data is different, yes.

01:39 20   Q.    So fair to say it would not be appropriate to rely on the

21   derivative exhibit, which is 1142-13, to figure out what date a

22   file might have appeared on the Sony VAIO?

23   A.    We'd rely on -- yes.  I would rely on the master file -- I

24   mean, the complete list.

25   Q.    Okay.  Now, if I'm hearing you, you're saying the complete

1   list is correct?

2   A.   The complete list is generated by the approved software

3   tool.

4   Q.   So the derivative list was generated by some unapproved

5   software tool?

6   A.   No.  The generated list was created by the senior analyst

7   and the examiner that worked with him.

8   Q.   Out of the air or they used some tool?

9   A.   They used multiple different pieces of information.

01:40  10   That's why it's called derivative.

11   Q.   Okay.  They used an unapproved tool to create the

12   derivative exhibit?

13   A.   I'm not sure specifically what tool -- I mean, they used

14   -- it's an Excel spreadsheet, but the data came from multiple

15   different data sets as processed by the evidence -- or the

16   evidence was processed by.

17   Q.   You don't know what tool was used to generate the data on

18   the derivative spreadsheet, one, right?

19   A.   I'm not sure a tool was used to generate the derivative

01:40  20   spreadsheet.  The information came from multiple places to get

21   to the derivative spreadsheet.

22   Q.   Wherever it came from, you don't know where it came from?

23   A.   I don't have it in front of me to make that determination.

24   Q.   Okay.  And the authoritative, I guess, you're saying,

25   table, you didn't -- in the process of verifying the derivative

1    spreadsheet, you didn't check that data against the

2    authoritative table?

3    A.    That file creation date could have been from AD Labs.

4    Again, we used multiple tools for this to create these

5    derivative spreadsheets.

6    Q.    So the tools conflict with each other?

7    A.    Possibly, yeah.

8    Q.    So --

9    A.    Depending on --

01:41 10   Q.    Where does that leave the bottom line?  What's your -- as

11   an expert computer forensic examiner on the witness stand

12   today, which set of data can we rely on?  The complete list

13   we've got up on the screen here showing September 11th or the

14   derivative list showing a date in 2006?  Can we rely on either

15   of them?

16   A.    It depends on what you're trying to determine.

17   Q.    If you're trying to determine when a file will appear or

18   was created on the Sony VAIO, what would you rely on?

19   A.    I would rely on the master file list.

01:42 20   Q.    Which is the thing that's on the screen right now?

21   A.    The thing that's on the screen right now, yes.

22   Q.    So if that's what the reliable source is, why didn't you

23   verify the derivative evidence against the reliable source?

24   A.    That derivative evidence could have been when that file

25   was created in another location.

```
 1   Q.   But if that's not what the exhibit is supposed to be
 2   portraying, why wouldn't you correct it?
 3   A.   I'm not sure that that's accurate.  If you pull it up, it
 4   doesn't say created on the 1R6.  It just says "file created."
 5   Q.   The spreadsheet doesn't say anything about what created
 6   means.  That's why I asked you initially.  If I understood you
 7   correctly, your initial response was created means the date it
 8   was born on the Sony.
 9   A.   No, I did not say that.
10   Q.   Okay.  At least we're clear now.  Created date on those
11   derivative listings is not a reliable way to assess when a file
12   appeared on the Sony?
13   A.   Creation date was when that file was created, not -- it
14   would not be indicative of when it potentially could have been
15   created on the Sony, yes.
16   Q.   It would not be indicative of when it potentially could
17   have been created on the Sony, okay.
18        Now, I'm going to return to discussing a few more
19   big-picture things about some of these devices.  I'm going to
20   go back to your list, 1577 -- I'm sorry, 1557.  I'm going to
21   talk about the Samsung a little bit here again, the 1W3, D385.
22   Do you see that?
23   A.   Yes.
24   Q.   Now, you testified last week that the FBI concluded that
25   this was, in fact, Tamerlan's laptop computer, correct?
```

01:42  10
01:43  20

A.   I testified that we were aware that it was Tamerlan's

computer, yes.

Q.   And you know that both from your understanding of what was

found on the computer itself and other investigative

information, correct?

A.   Yeah.  I did a cursory -- as a part of this process, did a

cursory look of D385.

Q.   You're also aware of other investigative information that

ties the computer to Tamerlan, right?

A.   I'm not -- I don't know what specifically you're referring

to but in the general course of the investigation, yes.

Q.   Well, you are aware, for example, it was found in a

computer bag with his high school diploma, right?

A.   I'm aware that it was found in a computer bag.  I don't

know what the rest of the contents of the bag were, but I am

aware that it was a computer bag.

Q.   You're aware that the computer was connected to the

internet in Russia multiple times between January and July of

2012 when Tamerlan was there, right?

A.   I don't have that information in front of me to determine

that.

Q.   Well, is that something you ever became aware of in your

work on this investigation?

A.   Not me personally, no.

Q.   You never became aware of information that Tamerlan

1    traveled to Russia from January to July of 2012?

2              MR. CHAKRAVARTY:  Objection, your Honor.

3              THE COURT:  Overruled.  You may have it.

4    A.   I'm not sure that that's what you asked me.  I think you

5    asked me if whether or not the computer was connected to the

6    internet when he was traveling in Russia.

7    Q.   Let's take it step by step.  Are you aware of information

8    that Tamerlan Tsarnaev traveled to Russia between January 21

9    and July 17 of 2012?

01:45 10   A.   I'm aware that Tamerlan traveled to Russia, yes.

11   Q.   In roughly that time frame?

12   A.   In roughly that time frame, yes.

13   Q.   And are you aware that there are digital artifacts on the

14   Samsung showing that that computer was connected to the

15   internet in Russia during that time frame?

16   A.   I do not have that information in front of me, nor am I

17   aware of that.

18   Q.   You never were aware of that?

19   A.   I was never aware of that.

01:45 20   Q.   Are you aware that the web history on the Samsung includes

21   information about Tamerlan's log-in to multiple accounts

22   associated with him?

23              MR. CHAKRAVARTY:  Objection, your Honor.

24              THE COURT:  Sustained.

25   Q.   You said you did a cursory review of the Samsung in

1   connection with preparing for your testimony here, correct?

2   A.   I did a cursory review of the computer because it was

3   listed on this evidence sheet, yes.

4   Q.   And during the course of the last two years, you

5   supervised individuals who worked on the analysis of this

6   computer, correct?

7   A.   That's correct.

8   Q.   And you over that time became aware of things that they

9   were doing and finding, correct?

01:46 10   A.   I'm aware of what they were doing in general, yes, as a

11   supervisor.

12   Q.   Particular findings were never brought to your attention?

13   A.   Specific findings, no.

14   Q.   Reports that they wrote -- that the people under your

15   supervision wrote about the Samsung were never brought to your

16   attention?

17   A.   Other than through the general approval process, I don't

18   have the specifics of the reports in front of me.

19   Q.   Well, again, part of the general approval process, you're

01:47 20   the supervisor.  You would review reports written by the people

21   you supervise, correct?

22   A.   Yes.

23   Q.   That would include reports that people you supervise wrote

24   about the Samsung, correct?

25   A.   Reports that -- any reports that they would write, yes.

```
 1   Q.   Okay.  And that's a normal kind of thing that you would
 2   rely on in the course of your work as a supervisor, correct?
 3   A.   Rely on for what, sir?
 4   Q.   Rely on for performing your duties.
 5   A.   Rely on -- I think the relationship as a supervisor of the
 6   forensic team is a little different than normal.  The forensic
 7   person is actually assigned to the investigation, so any
 8   investigation subject matter would be decided or run by the
 9   case agents.  I would make sure -- mine is more day-to-day
10   operations.  Mine is:  Did you come in to work on time?  Is
11   your -- you know, type of information.
12   Q.   You still have occasion to read the reports that the
13   analysts write about the Samsung, correct?
14   A.   The forensic examiners write, yes, not the analysts.
15   Q.   The forensic analysts write reports about their findings
16   to pass them along to others in the FBI and the prosecution
17   team to know what the evidence means, correct?
18   A.   Their technical reports, if they worked for me, would go
19   through me, yes.
20   Q.   They go through you, and they go from you to investigating
21   agents, case agents, prosecutors, and the like, correct?
22   That's the reason they exist?
23   A.   They would go to the case file.  I'm not sure where they
24   would be distributed from there.
25   Q.   So you don't know whether the reports that your
```

 1   subordinates write about important pieces of digital evidence
 2   ever see the light of day?
 3   A.   I approve them for accuracy and make -- and then once
 4   they're uploaded to the file, within the case file, I'm -- I
 5   don't make the investigative decisions on any particular case.
 6   Q.   Well, you did tell Mr. Chakravarty, right, that you're
 7   aware from your exposure to the Samsung over the last two years
 8   that a lot of similar kinds of files to those on the Sony were
 9   on the Samsung, correct?
01:49 10   A.   Actually, I think I said, in the course of reviewing the
 11   evidence and validating, verifying for the trial, I am aware of
 12   a cursory look of D385.
 13   Q.   Okay.  So you became aware, if you weren't already aware,
 14   that a lot of the same kinds of material is also on the
 15   Samsung, right?
 16   A.   Yes.
 17   Q.   And you also talked about the fact that there is
 18   encryption software on the Samsung, correct?
 19   A.   I talked about I was aware that there was a TrueCrypt
01:49 20   volume on the drive, yes.
 21   Q.   And TrueCrypt is a very powerful piece of encryption
 22   software, fair to say?
 23   A.   I'm not sure I would characterize it as powerful, but it's
 24   a freeware product that anybody can download to encrypt data.
 25   Q.   Well, if one has a good password in TrueCrypt, it's pretty

1    hard, even for very sophisticated tools, to get inside, right?

2    A.   If the software is configured properly and the password is

3    strong enough, it would be difficult, yes.

4    Q.   Even for the most sophisticated U.S. Government tools,

5    very difficult, right?

6    A.   For the purposes of this, yes.

7    Q.   But you understand, because you supervised the people who

8    did it, that it was possible to get into Tamerlan's encrypted

9    volumes because he had a bad password, right?

01:50 10    A.   No, I'm not aware of that.

11    Q.   You're not away the password was Allahu Akbar, with a

12    number after it?

13    A.   I'm not.

14    Q.   You don't know how FBI analysts managed to find out what

15    was in the encrypted volumes on Tamerlan's computer?

16    A.   I'm aware that they are able to access that.  I'm not

17    aware how they were able to get the password.

18    Q.   Now, fair to say that the use of encryption is considered

19    something -- in investigative terms, it's considered tradecraft

01:50 20    when it's used by terrorists or criminals, right?

21    A.   I'm not sure I can make that assessment.

22    Q.   As a trained FBI agent, that's not the kind of assessment

23    you would make?

24    A.   What's that?

25    Q.   Well, what constitutes tradecraft for criminals or

```
 1    terrorists.
 2    A.    I mean, that's a very easy question with a very long
 3    answer.  Tradecraft can be a number of different things.
 4    Q.    Is it fair to say that the use of encryption by a
 5    terrorism suspect is an example of tradecraft?
 6    A.    I'm not aware of any terrorism suspects that have used
 7    encryption, so I'm not sure I can answer that question.
 8    Q.    Well, are you aware that *Inspire Magazine*, one of the ones
 9    that you talked about with Mr. Chakravarty last week,
01:51 10    recommends that people who want to engage in terrorism should
11    use encryption?
12    A.    I'm not aware of that, no.
13    Q.    I'm just going to pull up a copy of Exhibit 1475-22.
14            MR. CHAKRAVARTY:  Objection, your Honor.  This is not
15    impeachment.
16            THE COURT:  Sustained.
17            If this is a pausing to go to a new thing, it's 11:00.
18    We'll take the morning recess.
19            MR. FICK:  Sure.  Thank you.
01:51 20    (Recess taken at 11:02 a.m.)
21            THE CLERK:  All rise for the Court and the jury.
22            (The Court and jury enter the courtroom at 11:28 a.m.)
23            THE CLERK:  Be seated.
24            THE COURT:  Mr. Fick?
25            MR. FICK:  Yes, your Honor.  Thank you.
```

```
  1   BY MR. FICK:

  2   Q.    So good morning again, Agent Swindon.

  3   A.    Good morning.

  4   Q.    Just a few more questions about your knowledge of the

  5   Samsung laptop here among the devices seized, Tamerlan's

  6   laptop.  We talked a bit about TrueCrypt a few minutes ago.  Do

  7   you remember that?  That's the encryption software?

  8   A.    Yes.

  9   Q.    It's true, isn't it that TrueCrypt is not among the

02:19 10   software on the Sony VAIO?

 11   A.    I'm not aware of TrueCrypt being on the Sony VAIO, no.

 12   Q.    Well, and, in fact, you introduced last week an exhibit

 13   listing all of the software on the Sony VAIO, correct?

 14   A.    Yes.

 15   Q.    And that list did not include TrueCrypt, correct?

 16   A.    It did not include TrueCrypt, yes.

 17   Q.    So it's not just that you're not aware of TrueCrypt being

 18   on the Sony VAIO, in fact, TrueCrypt is not on the Sony VAIO?

 19   A.    TrueCrypt is not on the Sony VAIO.

02:19 20   Q.    Thank you.

 21         Now, in the course of your cursory review of the Samsung,

 22   or previously in your work as the supervisor of the CART team,

 23   did you ever have occasion to see what the desktop of the

 24   Samsung looked like, the wallpaper, the background, all of

 25   that?
```

```
 1   A.    On D385.

 2   Q.    On the Samsung, Tamerlan's laptop?

 3   A.    No.

 4   Q.    You never saw what the desktop looked like?

 5   A.    I never saw what the desktop looked like.

 6   Q.    Did your cursory review of the Samsung include the

 7   Internet history of the Samsung?

 8         MR. CHAKRAVARTY:  Objection, your Honor, to going

 9   through each of the portions of --

10         THE COURT:  Yes, sustained.

11         MR. FICK:  I'm sorry?

12         THE COURT:  Sustained.

13         MR. FICK:  I'm not sure what the objection was.

14         THE COURT:  I take it as relevance.

15         MR. FICK:  May we approach?

16         THE COURT:  All right.

17         (Discussion at sidebar and out of the hearing of the

18   jury:)

19         MR. FICK:  So two things:  I would suggest, first of

20   all, the government opened the door to at least probe the

21   witness's knowledge of the Samsung by itself, the prosecution,

22   asking questions about what he knew about the Samsung.

23         Second, this is going nowhere near mitigation

24   evidence.  This is strictly evidence about the crime itself and

25   the potential motives of the crime.
```

1          THE COURT:  How?

2          MR. FICK:  Information about the contents of

3    Tamerlan's laptop and how that reflects on his state of mind.

4    Potential preparation of the crime is evidence of the crime, of

5    the motive.

6          MR. CHAKRAVARTY:  I understand Mr. Fick saying it goes

7    to Tamerlan's state of mind, evidence that might be on his

8    computer that this witness, the computer forensic specialist

9    who didn't even verify that information would somehow be

02:21 10   capturing Tamerlan -- the coconspirator's state of mind when

11   there's no evidence that this defendant had any access, knew

12   what was on there or even that some of these questions about

13   where the surface tree was and some of those things.  I don't

14   think the defendant's argument is that the defendant

15   participated in that; in fact, it's just the opposite.  They're

16   suggesting that Tamerlan was doing a bunch of other things that

17   the defendant was not.  All that is outside this witness's

18   basis of knowledge with regards to the device as well as it's

19   not relevant to the conspiracy charge.

02:22 20        MR. FICK:  I'm asking the witness questions about what

21   he knows about what's on the computer.

22        THE COURT:  And so what issue does that go to?

23        MR. FICK:  It goes to Tamerlan's role in the

24   conspiracy, among other things.  I mean, it's evidence of --

25        THE COURT:  Well, that sounds inculpatory; in other

1    words, it goes to prove the offense is a conspiracy.

2          MR. FICK:  Well, there's no requirement, I would

3    suggest, that the defense is only ever allowed to elicit

4    exculpatory evidence.  I mean, if it's evidence of the crime,

5    if it's evidence of a motive of a coconspirator, it is relevant

6    to the case, and simply the fact that we happen to be the

7    defense of one of the conspirators does not mean that we can't

8    elicit evidence about the offense to put in the context and to

9    correct the misimpression that the government's presentation is

02:22 10   making.

11          MR. CHAKRAVARTY:  Right there it's motive evidence.

12   The motive evidence is to the extent that the government is

13   offering to show that was not the defendant's motive is one

14   thing, but to show alternative motives or in this case that the

15   motive was even greater for the coconspirator seems to be a

16   relative culpability issue and has nothing to do with --

17          MR. FICK:  Relative culpability matters in terms of

18   correcting misimpressions that the government's presentation of

19   the case is creating at this stage of the case.  It's evidence

02:23 20   about the offense, it's evidence about the alleged offender

21   that is specifically tied to not only the motive for the crime

22   but what he did in terms of committing the crimes.

23          THE COURT:  No.  Excluded.

24          (In open court:)

25   BY MR. FICK:

1    Q.    So, Agent Swindon, I'd like to talk a little bit now about

2    how one traces the history of when a USB device was attached to

3    a computer, okay?

4    A.    Okay.

5    Q.    Okay?  So you've heard of something called SetupAPI is a

6    registry artifact in Windows.  You're aware of that?

7    A.    I have to look at the registry report, but I believe it is

8    one of the categories in a registry report, yes.

9    Q.    Right.  And that captures information about when a USB

02:24 10   memory device is plugged into a computer for the first time,

11   correct?

12   A.    I'm not sure what the chronological of events are, but I

13   do know there is information stored there, yes.

14   Q.    SetupAPI stores information about USB device attachments

15   into a computer?

16   A.    I would have to test that.  I don't have that information

17   in front of me.

18   Q.    Well, I'm not talking about a specific computer, I'm

19   talking about the methodology of doing the investigation now,

02:24 20   okay?  So as a general matter, SetupAPI contains date and time

21   information about when a device is first plugged into a

22   computer, correct?

23   A.    You have to pull that up so I can see a registry report to

24   see what you're referring to.

25   Q.    So you don't know what SetupAPI is sitting here today?

1    A.    I'm familiar with it.  It's an entry in the USB report

2    that comes from the registry, yes.

3    Q.    And so you're not aware that that records the first time a

4    USB device is attached?

5    A.    It records when it is attached.  I'd have to see the

6    report to know that that is the first time that was in that.

7    Q.    The registry, apart from SetupAPI, also contains other

8    information about incident -- incidents when a USB is attached,

9    correct?

02:25 10   A.    Yes, it does.

11   Q.    Okay.  Now, these two sources I've mentioned, the SetupAPI

12   and other data in the registry, actually record the event of

13   the attachment, right?

14   A.    It would be the physical attachment or the physical

15   putting of the USB drive into that particular machine.

16   Q.    And in addition to those pieces of data, there's -- there

17   are also artifacts called shortcuts and links that I think you

18   testified about with Mr. Chakravarty, right?

19   A.    Yes.

02:25 20   Q.    Okay.  And shortcuts and links and jump lists contain

21   information about files that a user may have accessed on a USB

22   device, right?

23   A.    Among other things, but yes.

24   Q.    Okay.  So those record information about the files

25   themselves, not the event of the USB connecting, correct?

 1    A.   It could be the same event.  But, yes, it does capture the

 2    file information.

 3    Q.   So in other words, you might be able to infer something

 4    about when a USB was attached from the jump list or link

 5    information but that's -- the jump list or link information

 6    itself records information about the file on the USB storage

 7    device, right?

 8    A.   Right.  So just for clarification, the registry contains

 9    the information about the hardware and the connection of when

02:26 10    that piece of hardware went into that particular computer as

11    opposed to the link file is going to have information regarding

12    a file or files or folder that was accessed on that removable

13    drive.

14    Q.   Right.  So those are -- they're related but different

15    things, right?

16    A.   Yes.

17    Q.   Okay.  So I'm going to pull up Exhibit 1142-02 which is

18    the exhibit called "External Device Access on the Sony."  You

19    remember this spreadsheet that you talked about with

02:27 20    Mr. Chakravarty, right?

21    A.   I do, yes.

22    Q.   Okay.  And this spreadsheet is based on jump list and

23    shortcut data about files that were viewed on the Sony that

24    were located on external devices, correct?

25    A.   These are the information from the jump list records that

1    existed on the computer, yes.

2    Q.    Okay.  Jump list and shortcut records?

3    A.    Yes.

4    Q.    Okay.  So this is not a listing of the device attachment

5    registry information?

6    A.    It includes some of the same information but it is not the

7    registry report.

8    Q.    It's not the registry report about the event of the device

9    attachment, it's information about the files that were viewed

02:27 10    on the external devices?

11    A.    Yes.

12    Q.    Okay.  Now, the creation date for each of these entries is

13    the date the file was created on the external device, correct,

14    because these are jump lists and links, right?

15    A.    I believe this might be the creation date of the actual

16    link file.  Let's see.  1B shortcut.

17    Q.    Do you know?

18    A.    Can you give me a minute because this is the only -- this

19    is a -- a derivative report does not include all the

02:28 20    information.  So I would need to see the file, the information

21    about the file, and then also the information about the

22    Kingston thumb drive and the registry to determine that.

23    Q.    Well, this is a spreadsheet that you reviewed and deemed

24    to be accurate enough to include in an exhibit, correct?

25    A.    Yes.

1    Q.   So sitting here today, you don't know what the creation

2    date column refers to?

3    A.   I would need the other two pieces of information that we

4    verified this with to determine that.

5    Q.   Sitting here today you don't remember what those other two

6    pieces of information were?

7    A.   We verified hundreds of pieces of information on various

8    spreadsheets.

9    Q.   Okay.  So sitting here you cannot tell me, then, whether

02:29 10   this is the creation date of the file on the thumb drive or

11   whether it's the date the thumb drive was inserted in the

12   computer?

13   A.   Not without the supporting information.

14   Q.   You just don't know?

15   A.   Not without the supporting information.

16   Q.   Okay.  Now, this Patriot thumb drive here, I believe you

17   talked about that with Mr. Chakravarty, the serial number

18   reflected there, that's not the same as the Patriot thumb drive

19   that was recovered in the investigation and was included as an

02:29 20   exhibit, correct?

21   A.   This is the -- you're talking about the volume serial

22   number?

23   Q.   Right.

24   A.   Yes, that is not the Patriot that was --

25   Q.   And, in fact, this Patriot thumb drive with this volume

1    serial number was never recovered in the investigation, was it?

2    A.   I don't have it, no.

3    Q.   You're not aware of it being recovered?

4    A.   I'm not aware of it being recovered.

5    Q.   Now, do you know whether the FBI ever traced the artifacts

6    from this missing Patriot across all of the electronic devices

7    in the case?

8    A.   I'm not sure I understand the question.

9    Q.   Well, for example, what we have here on this chart

02:30 10   reflected in the first line is a data artifact taken from the

11   Sony about this particular Patriot thumb drive at a particular

12   point in time, right?

13   A.   Yes.

14   Q.   At some point in time, it was attached to the Sony and

15   this file on the Patriot thumb drive was viewed from the Sony,

16   right?

17   A.   Yes.

18   Q.   Okay.  Now, did the FBI, to your knowledge, do any

19   investigation of whether this Patriot thumb drive, the missing

02:30 20   Patriot, was attached to other devices seized in the case?

21   A.   I believe that there was an analysis done on that, yes.

22   Q.   And was any kind of writing produced from that analysis?

23   A.   I don't have access to that report.

24   Q.   Do you know whether --

25   A.   Or a report.

```
 1          I don't know.
 2     Q.   Now, another one of the devices you talked about was the
 3     Hewlett Packard desktop computer seized from 410 Norfolk
 4     Street, the Tsarnaev family apartment.  You remember that?
 5     A.   If you could bring it up to reference it, yes.
 6     Q.   Of course.  I'm bringing back up 1557.  The second line
 7     here, 2R14, HP Pavilion, 410 Norfolk, that's a desktop computer
 8     seized from 410 Norfolk Street, the Tsarnaev family apartment
 9     in Cambridge, correct?
02:31 10     A.   It was seized from 410 Norfolk, yes.
11     Q.   Okay.  And I think you testified on direct with
12     Mr. Chakravarty last week that you acknowledge -- the FBI
13     acknowledges that that computer was used by many people, right?
14     A.   I believe people -- yeah, many people had access to that
15     computer, yes.
16     Q.   A large number of Tsarnaev family members at various times
17     lived in that apartment, right?
18     A.   I don't know.  "Large" isn't a number.  I'm not sure that
19     we were able to determine how many, whether small or large, who
02:32 20     had access to that computer.
21     Q.   Well, you testified that you're aware of Tamerlan's wife
22     Katherine, who she is, right?
23     A.   Yes.
24     Q.   You heard the name, Jahar's father, Anzor?
25     A.   Only from the computer username.
```

1    Q.   You have no other knowledge of his father's name being

2    Anzor from the investigation?

3    A.   I don't.  I don't.

4    Q.   Ever heard of his mother, Zubeidat?

5    A.   I didn't have anything to do with his parents in this

6    investigation.

7    Q.   So you know a number of people had access to the computer

8    at 410 Norfolk Street, this computer, but you don't know who

9    that might have been?

02:32 10    A.   Not from the information in front of me, I can't determine

11    that, no.

12    Q.   Well, apart from the information in front of you, from

13    your knowledge of the investigation, being a supervisor of the

14    CART team for two years -- for the last two years, do you know

15    anything about that?

16    A.   Well, there are a number of pieces of information we would

17    use to determine access to a computer.  We would use the

18    username that's associated with the computer.  There would also

19    be pattern-of-life investigative information that we would use.

02:33 20    And then there would be email access, Skype access and

21    different types of maybe social media or access that we would

22    be able to determine who was using that computer.

23    Q.   And when you say "pattern-of-life information," that's

24    information developed from the investigation about people who

25    may have had access to the computer, right?

A.   It's more -- not specifically the computer but pattern of
life would be when somebody comes and goes either for work or
for school or --

Q.   And your testimony was you do know that multiple people
had access to this computer, right?

A.   Yes.

Q.   But you don't know who -- you can't sort of list for me
who that might have been?

A.   I can't specifically tell you who specifically had access
to that computer.

Q.   Now, one of the artifacts that you looked at in Exhibit
1143-01, which I will pull up here -- these are exhibits in
evidence.  I'm going to go to 1143, 1143-01.  You testified
about an artifact in this derivative spreadsheet noting that on
January 1st at 2013 at 1:47 a.m. there was a log in to Yahoo
email for Jahar Tsarnaev.  Do you see that?

A.   I do see that, yes.

Q.   Isn't it true that that is the one and only time there is
any record on this computer of that email account being
accessed?

A.   I don't have that information in front of me.

Q.   And apart from it being in front of you, do you know that
to be true or not?

A.   I don't know that to be true.

Q.   But you don't know that is not true?

```
 1   A.    I don't know it's not true.

 2   Q.    Sitting here today you can't say whether there was ever

 3   another occasion on which Jahar Tsarnaev's email was accessed

 4   from that computer?

 5   A.    I don't have the information in front of me to make that

 6   determination.

 7   Q.    Did anyone ever ask you to make that determination?

 8   A.    No.

 9   Q.    And I'm going to also open 1143-05A, which is a derivative

10   spreadsheet -- sorry.  One moment.  Bear with me one moment.

11         (Pause.)

12   Q.    So 1143-05A is the complete -- well, it's the lengthy

13   2,000 page or so long complete spreadsheet of the files from

14   the Hewlett-Packard computer at 410 Norfolk, correct?

15   A.    It was generated, yes, by X-Ways Forensics, yes.

16   Q.    And I just want to draw your attention to the date and

17   time information that's generated on this spreadsheet on this

18   computer.  You see there's some -- some of the date and time

19   information has real, like, normal dates and times after it.

20   Do you see that?  And then some of the same columns have

21   information that does not appear to be in the format of a date

22   or time?

23   A.    Okay.  That's what -- that's what this -- you're

24   displaying, yes.

25   Q.    Well, that's what was submitted to the Court as an
```

02:36 (line 10)
02:37 (line 20)

1    exhibit, right?

2    A.    The complete list was -- the complete list that X-Ways

3    Forensics generated was provided as an exhibit, yes.

4    Q.    And that's what this is, right?

5    A.    If you're looking at --

6    Q.    1145- -- 1143-005A?

7    A.    Okay.

8    Q.    So at least in this form, this spreadsheet could not be

9    used to verify any of the filed time data in your derivative

02:38 10   spreadsheet because it's missing --

11   A.    I'm not sure all of the columns have the time and date

12   listed the way that it is but, again, we used both AD Labs and

13   X-Ways Forensics to verify the information.

14   Q.    Do you know which one you used in this particular

15   instance?

16   A.    I do not know which one.

17   Q.    Can you explain why this particular tool generated date

18   and time information that's not comprehensible?

19   A.    I don't know.

02:38 20   Q.    I'm going to go now to Exhibit 1150 which is the Kingston

21   thumb drive found in the landfill that you talked about.  Do

22   you remember that?  Do you remember talking about that?

23   A.    If you could bring up the spreadsheet again we could

24   confirm.

25   Q.    Hold on.  Exhibit 1145-01 -- I'm sorry -- 1150-01.

1          Now, the bulk of the files that you talked about on this

2     thumb drive were carved; in other words, they were recovered

3     from deleted space, correct?

4     A.    They were either recovered or carved, yes.

5     Q.    And when we see this path, "path unknown" with all of

6     that -- those numbers, et cetera, directory markers before the

7     file name, that's an indication that the file was carved,

8     right?

9     A.    Using this particular software product, yes, it would tell

02:39 10    you that -- that CL is a cluster number of where that file was

11    located or started.

12    Q.    And there's no way to know when the files were deleted off

13    that thumb drive, correct?

14    A.    There's not.  As again, with carved and deleted files,

15    it's more of access for investigative purposes than it is for

16    the date and timestamps.

17    Q.    And one of the carved items retrieved from this thumb

18    drive, Exhibit 1150-09, was a rental application from Katherine

19    Tsarnaev, correct?

02:40 20    A.    Yes.

21    Q.    Okay.  And a few pages in it includes her pay stub, right?

22    A.    If that's '09, then yes.

23    Q.    Let's talk a little bit more about 1475 which is the hard

24    drive seized from the street in Watertown.  The derivative file

25    listing for that exhibit -- actually, rather than showing you

1    the file listing, what I think I'm going to do is go to the

2    file directory here.

3         Now, you testified last week and I think today that these

4    four folders at the top here actually existed in that form on

5    that hard drive, right?

6    A.   Yes, I believe so.  Yes.

7    Q.   And this English paper that's still listed on the top

8    here, that actually was not visible in the hard drive as an

9    active file at the time it was seized.  That, in fact, was

02:42 10   carved from having been deleted at some point in the past,

11   correct?

12   A.   Yes.

13   Q.   And the hard drive sort of contains a kind of greatest

14   hits collection, right?  There's Awlaki materials, audio files

15   in that first folder, right?

16   A.   I'm not sure what you mean by "greatest hits" but --

17   Q.   Well, a lot of files that we've seen on -- that you talked

18   about from the Sony and other devices, a lot of those files --

19   a very large number of them are all here collected together on

02:43 20   this hard drive from Laurel Street in Watertown.  Is that

21   right?

22   A.   Can you slide the screen over so I can see the next half?

23   Q.   I'm sorry.  So that's a collection of Awlaki audio files,

24   correct?

25   A.   Those are a collection of Awlaki files, yes.

1    Q.    And there are these Russian textbooks about explosives, et

2    cetera, right?

3    A.    There are Russian textbooks in there, yes.

4    Q.    Well, and you remember looking at the translations from

5    the derivative file exhibit that the titles have to do with

6    explosives and munitions and that kind of thing, right?

7    A.    You're going to refer to each of them specifically or do

8    you want --

9    Q.    Well, as a general category.  You've looked at the

02:43 10   translations of these titles in your spreadsheet, right?

11   A.    Well, yeah.  Do you want to make reference back to that or

12   are you asking --

13   Q.    I'm trying to ask some general questions about the

14   category, the type of materials first.  If you want to look at

15   the list, we can.

16   A.    Well, if you'd like to ask me specifically, I can comment

17   on --

18   Q.    Well, the first thing I want to do is ask as a general

19   matter this collection of DjVu e-reader files in Russian, it's

02:44 20   a collection of lengthy texts about explosives and munitions,

21   correct?

22   A.    We can go through each one and look at the top page and I

23   can tell you --

24   Q.    Well, your own exhibit, the derivative exhibit, contains

25   translations in the side, right, titles include "Detonation of

1    Explosive Media," "Physics of Explosion and Impact," "Blast

2    Effects of Explosions," "Initiating Explosive Substances," et

3    cetera, right?  Those are the titles of those files, correct?

4    A.   Yes.

5    Q.   And you testified that carved artifacts of those files

6    were found on one of the thumb drives, right?

7    A.   Yes.

8    Q.   But it's true, isn't it, that none of these files or any

9    artifacts reflecting these files exist on the Sony VAIO

02:44 10   computer?

11   A.   I'd have to go back to the information that we have, but I

12   don't have that all committed to memory.  I mean, I do know

13   they existed here.  If you would like to go back and look at

14   the file listing we can identify whether or not they were

15   there.

16   Q.   As far as you know sitting here today it's true, isn't it,

17   or at least as far as you can recall, that these files do not

18   exist on the Sony VAIO?

19   A.   I don't know that for a fact.  I would have to go back and

02:45 20   look at the listing.

21   Q.   You don't know?

22   A.   I don't have the information to make that determination.

23   Q.   Okay.  Now, in addition to those materials, there's a

24   collection of *Inspire* magazines as well, right?

25   A.   Yes.

1    Q.    Okay.  And there were also some files on the top level of

2    this hard drive that -- when it was recovered that were not

3    included in this exhibit, correct?

4    A.    I think there were.  I was asked to verify these to make

5    sure that they existed.

6    Q.    Okay.  I just want to pull out some things from the

7    complete file listing just to nail that down.

8          Pulling up a page out of 1475-02A, which is the complete

9    file listing from this drive, there were some other items at

02:46 10   the top level of the drive that are highlighted in yellow here

11    that we have seen on other exhibits but that also were on this

12    hard drive recovered in Watertown, correct?

13    A.    Yes.  If this is from 02A, then, yes, that is a directory

14    listing from the drive.

15    Q.    So "Book of the End," "Join the Caravan," those are all

16    on, as well, the top level of this hard drive when it was

17    recovered, correct?

18    A.    Apparently so, yes.

19    Q.    And further down the file list you're aware that there are

02:46 20   a couple of Russian language documents also on the top level of

21    this drive when it was recovered, correct?

22    A.    Yes.

23    Q.    And these are documents that have Russian language

24    instructions about making explosives, correct?

25    A.    I don't know that.

```
  1    Q.   You don't know what these files have?

  2    A.   No, I did not look in the translation for those files.

  3    Q.   Did anybody under your supervision at the CART team of the

  4    FBI ever find out what was in those files?

  5    A.   Not that I'm aware of.

  6              MR. CHAKRAVARTY:  Objection, your Honor.

  7              THE COURT:  No, it may stand.

  8    BY MR. FICK:

  9    Q.   Now, isn't it true that this hard drive retrieved on

02:47 10    Laurel Street in Watertown was formatted by Tamerlan's Samsung

 11    computer?

 12    A.   I don't have the information to determine that.

 13    Q.   You don't know?

 14    A.   I do not have the information to determine that.

 15    Q.   Well, whether you have it in front of you now, do you know

 16    from anything you ever did in the case whether that is true?

 17    A.   I don't have the information in front of me to confirm

 18    that.

 19    Q.   Again, putting apart what you do or don't have in front of

02:47 20    you, did you ever become aware from your work on this case as a

 21    supervisor of the Boston CART team whether Tamerlan's computer

 22    was the computer that formatted this hard drive?

 23    A.   I don't have that information to be able to make that

 24    determination.

 25    Q.   Again, I'm asking not only about today but whether you
```

1  ever came to know -- or whether this was true in the past?

2  A.   No.

3  Q.   You don't know?

4  A.   I don't know.

5  Q.   Do you know whether anybody else at the FBI checked?

6  A.   Checked what, sir?

7  Q.   Checked to see what computer formatted this hard drive.

8  A.   No.

9  Q.   Isn't it true that every single file and folder on this

02:48 10  hard drive is owned by Tamerlan's computer, using the "owner"

11  as used in Windows parlance?

12          MR. CHAKRAVARTY:  Objection, your Honor.

13          THE COURT:  Overruled.

14          You may answer it.

15          THE WITNESS:  Again, I don't have that information to

16  be able to make that determination nor did I, you know,

17  validate or verify that.

18  BY MR. FICK:

19  Q.   Well, whether you have it in front of you now or validated

02:48 20  it or verified it, did you ever become aware in your role as a

21  supervisor of the CART team in Boston that every single file

22  and folder on this hard drive was created by Tamerlan's Samsung

23  computer?

24  A.   No.

25  Q.   You never became aware of that?

1    A.    No.

2    Q.    Do you know whether anyone else at the FBI ever became

3    aware of that?

4    A.    I'm not aware of that.

5              MR. FICK:  If I may have one moment, your Honor?

6              (Counsel confer off the record.)

7              MR. FICK:  I have nothing further.

8              MR. CHAKRAVARTY:  Just briefly, your Honor.

9                        REDIRECT EXAMINATION

02:49 10   BY MR. CHAKRAVARTY:

11   Q.    Agent Swindon, you were asked several questions about

12   different pieces of information on different devices, that you

13   weren't able to recall whether that information that Mr. Fick

14   asked you was, in fact, on those devices.  Can you explain for

15   the jury what the conditions are in which you go through in

16   order to verify that certain documents are, in fact, on the

17   different devices that you've talked about?

18   A.    It was different for each of the different -- it was a

19   variety of devices and a variety of different types of files.

02:50 20   In they were in active space and an MD5 was available, as we

21   spoke earlier, we would do that MD5 match to verify that that

22   was there.  If they were carved in recovered space, we would

23   sit and go file by file and do a visual as we did like in the

24   DjVu files.  So there was -- we used a different -- a variety

25   of different information to verify the information that was on

        the exhibits.

Q.   And is this the kind of activity that you can do on the

fly when -- during cross-examination?

        MR. FICK:  Objection.

        THE COURT:  Sustained.

BY MR. CHAKRAVARTY:

Q.   What are the circumstances -- what are the resources you

have at your disposal to do that?

A.   Well, we have the forensic team here in Boston, and we

were -- I mean, the process to validate and verify took days to

do, 20-hour days, probably four, five days of looking through

every single one of the files on the exhibits.  And this was

just a subset of the totality of all the files that were seized

in the case or that were a part of the forensic process in the

case.

Q.   In response to one of the questions from Mr. Fick you said

that it's -- you weren't sure what one of the files on one of

the -- I think the file system record date was.  Is that right?

A.   I was actually not sure of where that information actually

originated from.

Q.   Right.  And at one point did you know that and just didn't

remember?

A.   Again, we used a variety of different tools to verify that

information.

Q.   Can I show you something that might refresh your

1   recollection?

2   A.    Okay.

3          MR. CHAKRAVARTY:  May I approach, your Honor?

4          THE COURT:  You may.

5          MR. FICK:  Can I ask to see what he's showing the

6   witness?

7          THE COURT:  Show it to Mr. Fick.

8          (Pause.)

9   BY MR. CHAKRAVARTY:

02:52 10   Q.    I'm handing you a note.  Can you read that to yourself,

11   please?

12   A.    Okay.

13   Q.    Does that help refresh your recollection?

14   A.    It puts the information in context.

15   Q.    All right.  And is that just a note?

16   A.    It's just a handwritten note.

17   Q.    What I've just handed you is a handwritten note?

18   A.    Yes.

19   Q.    With that information could you explain what the file

02:52 20   system record date was that was in that column?

21   A.    The record column was the column, as we had spoken about,

22   was created by AD Labs, or was taken from AD Labs.

23   Q.    And is that your memory that you're testifying from?

24   A.    Yes.

25   Q.    And so various tools -- different tools were used at

1    different times in order to both extract data as well as to

2    verify data.  Is that fair to say?

3    A.    Yes.

4    Q.    And if you used two different tools to do the same

5    function, does it sometimes produce different results?

6    A.    It depends on where it's pulling that information from.

7    Q.    So if you're comparing data from one tool with data from

8    another tool, is that like comparing apples to oranges?

9    A.    For the most part, yes.  The tools are tested and

02:53 10   validated, although there are different version of the tools.

11   And, again, I would have to go back to the original tool to get

12   to the specific on that.

13   Q.    Mr. Fick asked you about some of the activity that

14   occurred on the Sony VAIO computer.  And when you had extracted

15   files from the Sony VAIO computer, did you make observations of

16   other files that were on that computer other than the ones that

17   you extracted?

18   A.    I didn't extract the files; I just utilized the exhibits

19   and went back to the original file set in the software and

02:54 20   determined that they were there.

21   Q.    And were you able to make a determination as to who the

22   user was of that Sony VAIO computer?

23   A.    Based on the activity that we were preparing and verifying

24   from the exhibits that -- you know, we determined that it was

25   Jahar's laptop.

1    Q.   And the fact that other devices were also plugged into

2    that laptop, how did you come to that conclusion?

3    A.   Well, again, as we had spoke about before, in the registry

4    there is a report that will track all of the physical devices

5    that are plugged in through the USB ports.

6    Q.   So when Mr. Fick asked you as to whether some of the dates

7    of the creation of some files on that laptop predated -- I

8    think the date that he used was September 2011, does -- from

9    the file listing, if the file listing was created -- or showed

02:55 10   that a file was created after September of 2011, could you

11   conclude as to who the likely user of that laptop was for that

12   file list?

13   A.   I'm not sure.  Can you rephrase the question?

14   Q.   I'll rephrase.  It was a bad question.

15        The complete file listing, did it show the dates that the

16   files were accessed on that computer?

17   A.   It would show a created/modified/accessed in the file

18   record or born-on update.

19   Q.   And you described that no good computer forensic scientist

02:55 20   would rely exclusively on the Windows information.  Is that

21   right?

22   A.   There are a number of different pieces of information that

23   we would draw on to make a determination.

24   Q.   Okay.  And could you explain just to the jury why just if

25   they see a date, that's not dispositive as to when something

might be accessed?

A.   Well, it depends -- when files are created, depending on

where they're created, sometimes if they were created on the

Internet and you put a thumb drive in a computer and download

that file from the Internet to the thumb drive, it's never

really born on the computer; it could have been created

someplace else and then written to the thumb drive.  So you

would have to use a number of different pieces of information

to determine the actual, you know, creation date on that

02:56 10   computer.

Q.   And so the file that Mr. Fick showed you actually had a

creation date of October 10th of 2011.  Do you remember that?

A.   Which file?  He showed me --

Q.   I think it was the Five Ground Rules.  It was a very dense

chart.  It's not worth putting it back up on the screen, but it

was a very dense chart that you had to zoom in on.  Do you

remember that?

A.   Yes.

Q.   And so October 10, 2011, in the complete file listing,

02:56 20   what does that mean?

A.   What column was that --

Q.   I think it was in the creation --

A.   In the creation?  With the X-Ways report, it would have

been when that was created, or created on that computer.

Q.   So that means during the school year of 2011, that file

1    was created on the Sony laptop?

2            MR. FICK:  Objection.

3            THE COURT:  Sustained.

4    BY MR. CHAKRAVARTY:

5    Q.   What does that tell you about the -- in relation to the

6    school year as to when that file was created on the Sony

7    laptop?

8            MR. FICK:  Objection.

9            THE COURT:  Sustained.

02:57 10   BY MR. CHAKRAVARTY:

11   Q.   Can you conclude anything about the creation date of that

12   file on that computer?

13   A.   Other than the report shows that it was that date of

14   October 11th.

15           MR. CHAKRAVARTY:  Call up 1143-01.

16   Q.   This was a document that Mr. Fick showed you.

17           MR. CHAKRAVARTY:  Can we go down to the last page, or

18   two pages down, please?  Keep going down to -- I think it's

19   January 1st.  Keep going.  Right there.

02:58 20   Q.   So he highlighted this entry where the JTsarnaev Yahoo

21   mail account was accessed.  Is that right?  Do you remember

22   that?

23   A.   Yes.

24           MR. CHAKRAVARTY:  And so if we can go back to the

25   earlier page, Mr. Bruemmer.

1    Q.   Just to clarify, this spreadsheet was generated from the

2    desktop computer that was at the residence of 410 Norfolk

3    Street.  Is that right?

4    A.   Can you go back up to the top of the report, please?

5         MR. CHAKRAVARTY:  Page 1, please.

6    A.   At 2R14.  Yes, the HP desktop.

7    Q.   So this showed that somebody logged into the JTsarnaev

8    Yahoo email account on that computer on January 6th?

9    A.   There was a browser history record on that computer of

02:58 10   somebody logging into that email account.

11   Q.   And Mr. Fick also asked you about when Tamerlan Tsarnaev

12   was not in the country, and he gave you like a six-month period

13   through July of 2012.  Do you remember that?

14   A.   He asked that question, yeah.

15   Q.   And so all these dates that occurred before July of 2012,

16   that would suggest that it was somebody else using this

17   computer.  Is that fair to say?

18        MR. FICK:  Objection.  Those aren't the dates on the

19   screen.  The dates on the screen are 2013 dates.  Oh, I'm

02:59 20   sorry.  I'm on the wrong screen.

21        THE COURT:  All right.  Go ahead.

22   BY MR. CHAKRAVARTY:

23   Q.   Sir, you can answer the question.  The question was:  Does

24   it mean that the user of this computer was not Tamerlan

25   Tsarnaev during that time?

1    A.    It was not Tamerlan Tsarnaev.

2    Q.    So all of this ESPN, MTV, all that stuff was not Tamerlan

3    Tsarnaev, right?

4    A.    It was not.

5    Q.    Okay.

6          MR. CHAKRAVARTY:  Can we go to the next page?

7    Q.    And that goes on for another page.

8          MR. CHAKRAVARTY:  Go down to the next page.

9    Q.    And another page.  It looks like somebody's watching "Teen

03:00 10   Wolf."

11         MR. CHAKRAVARTY:  Next page.

12   Q.    And Netflix as well, and then "Walking Dead."  These are

13   all things that that person liked to watch?

14   A.    That was the Internet access that was recorded during that

15   time.

16         MR. CHAKRAVARTY:  Now can we go to the file listing of

17   1143?

18   Q.    So going back to 1143, we called up one of the folder

19   directories.  These are some of the files that were on the

03:00 20   1143, the desktop computer in the Norfolk Street residence,

21   right?

22   A.    Except for the ones that are denoted with an A, they're

23   actually the translations for the files that correspond to the

24   numbers.

25   Q.    So all of the "Hereafter Series" is in there from Anwar

         1    Awlaki.  Is that right?

         2    A.   Yes, they are in that folder.

         3    Q.   And a number of audio files, or nasheeds.  Is that right?

         4    A.   Can you scroll over for a second?

         5    Q.   In fact, some of these nasheeds were also found on the

         6    1R6.  Is that fair to say?

         7    A.   I would have to look at the verification, but I recognize

         8    some of the titles from --

         9    Q.   Some of the titles.  But until you see an MD5#, you

03:01  10    wouldn't be able to --

        11    A.   No.

        12    Q.   And there's some videos as well?

        13    A.   That came out of the new folder, yes.

        14         MR. FICK:  Object to the scope at this point.

        15         THE COURT:  All right.

        16         MR. CHAKRAVARTY:  I'm done with this.

        17         THE COURT:  All right.

        18    BY MR. CHAKRAVARTY:

        19    Q.   Now, you were also asked about whether there were any

03:02  20    other computers in the Tsarnaev family household prior to this

        21    desktop computer that -- whether you were aware of any other

        22    computers.  Do you remember that?

        23    A.   Yes, I was asked that question, yes.

        24    Q.   And going to 1557, we haven't talked much about the 2R58.

        25    Do you see that?

1    A.   Yes.

2    Q.   What do you know about that device?

3    A.   Well, from the description --

4             MR. FICK:  Object to the scope.

5             THE COURT:  Sustained.

6    BY MR. CHAKRAVARTY:

7    Q.   Were there other devices found in 410 Norfolk Street?

8    A.   There are other devices on this list that were found from

9    410 Norfolk Street.

03:03 10   Q.   And with regard to the data that is on the disks that

11   you've entered into evidence, with the exception of those

12   pieces such as translations and the derivative analytical

13   products which have some titles and things on them, was

14   everything else that you brought into court actually found on

15   each of the devices that you have talked about?

16   A.   With the exceptions that we spoke about this morning with

17   the titles of the corrupted files and the DjVu files that were

18   converted, yes.

19            MR. CHAKRAVARTY:  That's all I have, your Honor.

03:03 20            MR. FICK:  Very briefly.  Just one moment.

21            (Pause.)

22            MR. FICK:  Could we have the screen back to the

23   monitor here?

24            THE COURT:  I'm waiting for something to come up.

25            MR. FICK:  Okay.  Is this the cord that's attached,

 1  because it should be --

 2          THE COURT:  No, I have it.  I'm just waiting to see

 3  whether there's an image and then I'll expose it.

 4          MR. FICK:  Oh, I see.

 5          (Pause.)

 6                      RECROSS-EXAMINATION

 7  BY MR. FICK:

 8  Q.   Now, Mr. Chakravarty asked you some questions to

 9  clarify -- or at least try to clarify the meaning of this

03:05 10  file -- system record date in local time, right?

11  A.   Yes.

12  Q.   He showed you something on a handwritten piece of paper.

13  Who wrote that?

14  A.   I don't recognize the handwriting on that.

15  Q.   So anyway, your answer to the question was the data from

16  the second column came from the AD Labs tool, right?

17  A.   I said the record column is in AD Labs.  That's what all

18  that --

19  Q.   All right.  But regardless of what tool we're talking

03:05 20  about, all of these tools extract information from the -- from

21  Windows and from the Windows metadata, correct?

22  A.   They do.  But they also could interpret it in different

23  ways.

24  Q.   But ultimately there is an answer, for example, to the

25  question about when a file was created on a local computer,

1    right?

2    A.   There's information available from numerous sources that

3    were used to determine when that file was created on that

4    computer.

5    Q.   And if tools conflict, one would have to look deeper to

6    figure out what the conflict is and answer the question, right?

7    A.   They would have to do some additional analysis to

8    determine that.

9    Q.   Now, quite apart from what tool generated this file system

03:06 10   record date, my question is still which Windows artifact is the

11   file system record date?

12   A.   I'd have to check with AD Labs.  I don't have that

13   information sitting here today.

14   Q.   Okay.  So even if now you remember from the handwritten

15   note that AD Labs generated this information, you still can't

16   tell me what that information means?

17   A.   Not without having the software in front of me, no.

18   Q.   Okay.

19        MR. FICK:  That's all.

03:07 20        THE COURT:  All right, Agent.  Thank you.  You may

21   step down.

22        THE WITNESS:  Thank you.

23        (The witness is excused.

24        MR. FICK:  May we approach for one moment, your Honor,

25   on an evidence matter?

1           THE COURT:  All right.

2           (Discussion at sidebar and out of the hearing of the

3     jury:)

4           MR. FICK:  In light of the witness's testimony on his

5     lack of foundation and knowledge about how the various

6     derivative spreadsheets were generated and the accuracy of the

7     data they're in, we would renew our foundation and

8     confrontation objections and move to strike all of the

9     exhibits.

03:07 10          MR. CHAKRAVARTY:  I think he laid a sufficient

11    foundation for the exhibits.  He individually verified each

12    entry both on the spreadsheets as well as the files that were

13    extracted, and I think it's sufficient.

14          THE COURT:  I think it's sufficient for admission.  It

15    goes to the weight and the jury's evaluation.

16          (In open court:)

17          MR. CHAKRAVARTY:  The government calls Dr. Matthew

18    Levitt.

19              MATTHEW LEVITT, Ph.D., duly sworn

03:09 20          THE CLERK:  State your name and then spell your last

21    name for the record, keep your voice up and speak into the mic

22    so everyone can hear you.

23          THE WITNESS:  Dr. Matthew Levitt, M-A-T-T-H-E-W L-E V

24    as in "Victor" I-T-T.

25                          DIRECT EXAMINATION

```
  1   BY MR. CHAKRAVARTY:

  2   Q.   Good afternoon.

  3   A.   Good afternoon.  Is this okay?

  4   Q.   Yes, please.  The microphone both amplifies as well as

  5   carries your voice into some other rooms.

  6        Thank you for your patience.

  7        Where are you currently employed?

  8   A.   I'm employed at a think tank called The Washington

  9   Institute for Near East Policy.

03:10 10   Q.   And what do you do there?

 11   A.   I direct a program on counterterrorism and intelligence,

 12   and I'm a senior fellow there.

 13   Q.   How long have you been there?

 14   A.   On and off for several years.  I've been there now since

 15   2007.  My first time there was 1998.

 16   Q.   And are you here to talk to the jury about geopolitics and

 17   terrorism?

 18   A.   I am.

 19   Q.   What did you do before the Washington Institute?

03:10 20   A.   Before The Washington Institute, I served as the Deputy

 21   Assistant Secretary for Intelligence and Analysis of the U.S.

 22   Department of Treasury.

 23   Q.   What does The Washington Institute do?

 24   A.   The Washington Institute is a non-partisan educational

 25   think tank, an institute, focused on U.S. policy towards the
```

1   Middle East.

2   Q.   Do you have a particular area of specialty?

3   A.   My area of specialty is counterterrorism and intelligence.

4   Q.   And what did you do at the Department of Treasury?

5   A.   At the Department of Treasury, as the Deputy Assistant

6   Secretary for Intelligence and Analysis, I was the Deputy Chief

7   of the Treasury Department's intelligence branch.  So it was a

8   kind of dual-hatted position.  I was a member of the Senior

9   Executive Service within the Department of the Treasury and I

03:11 10   was also the deputy chief of one of the U.S. government's

11   intelligence agencies under the kind of rubric of the Office of

12   the Director of National Intelligence.

13   Q.   So that's an arm of the intelligence community?

14   A.   Yes.

15   Q.   And before you were deputy assistant secretary, what did

16   you do?

17   A.   Before that I was again with The Washington Institute

18   where I was a senior fellow in the terrorism program, directing

19   the terrorism program.  And I was there for, at that time about

03:11 20   four years, until I went to the Treasury Department in 2005, I

21   think.

22   Q.   So what did you do before that four-year stint at The

23   Washington Institute?

24   A.   Before that I was a counterterrorism intelligence analyst

25   at the Federal Bureau of Investigation at headquarters in

1   Washington, D.C., in the International Terrorism Analysis Unit

2   focused on Middle East terrorist organizations' activities here

3   in the United States.

4   Q.   Now, in addition to your work experience in this field,

5   have you had any education particularized with this field?

6   A.   I have.

7   Q.   Describe it, please?

8   A.   I hold a Ph.D. in international relations from the

9   Fletcher School of Law and Diplomacy at Tufts here in Medford,

03:12  10   and a master's of law and diplomacy also from the Fletcher

11   School.  My concentrations there were international security

12   studies, the Middle East and international conflict resolution,

13   and the Ph.D. was on the impact of terrorism on negotiations.

14   And before that I earned a bachelor's, a BA in political

15   science at Yeshiva University in New York City.

16   Q.   Are you from this area originally?

17   A.   I am.

18   Q.   Your doctoral thesis, was it ultimately published in a

19   book?

03:13  20   A.   It was.

21   Q.   And what was the topic again?

22   A.   "Negotiating Under Fire - Preserving Peace Talks in the

23   Face of Terror Attacks."

24   Q.   So can you describe a little bit about how you crafted

25   that thesis?

1    A.   Well, I spent a good chunk of time on the ground in

2    Israel, the West Bank and the Gaza Strip.  It was a series of

3    case studies of terrorist attacks by Islamic extremists and

4    Jewish extremists both, and how those attacks undermined the

5    then nascent, the beginning of the Oslo peace process.

6    Q.   So is that when you first started going about a particular

7    method in order to gather information about terrorism?

8    A.   Yes.  That was the first time I did excessive field

9    research.  And that kind of primary field research is only one

03:14 10   part, but arguably the most important part of the kind of

11   research I do.

12   Q.   When you went on to the FBI, the Treasury Department and

13   The Washington Institute, how did you continue to do your work

14   in the area of terrorism and geopolitics?

15   A.   Well, it's different in each of those circumstances.  You

16   can separate into the government service and the think tank

17   academic service when I was at the think tank or teaching at

18   the university.  In government I did do some travel and I did

19   meet with others but it wasn't what I would call primary field

03:14 20   research, it was liaison, working with others, working on

21   similar issues.  There is the element of exchanging ideas and

22   vetting ideas and information that is similar to primary field

23   research, but that wasn't really for research; that was for

24   case work.

25        Also in government you have ongoing education.  And so I

1    took a long list of courses, some provided by the FBI, some

2    provided by other parts of the U.S. intelligence community on

3    counterterrorism, counterterrorism analysis and the like, which

4    were required in part for my advancement -- professional

5    advancement within government service, up the government GS

6    scale.

7    Q.   Well, when you were deputy secretary it was no longer on

8    the GS scale.  Is that fair to say?

9    A.   Correct.  By the time I was hired at the Treasury

03:15 10   Department that was above the GS scale and I was in the senior

11   executive service.

12   Q.   In addition to your thesis which was later published, have

13   you written other books?

14   A.   I have.

15   Q.   Can you describe what they are?

16   A.   I've written a book on Hamas which was published by Yale

17   University Press in 2006, and more recently I wrote a book on

18   Hezbollah published by Georgetown University Press here in the

19   United States and by Hurst Publishers in Europe, and now about

03:16 20   to be published by a third publisher in Spanish in Argentina;

21   and beyond those outside publications, a variety of monographs

22   published by The Washington Institute and others, peer-reviewed

23   journal articles, popular journal articles things like foreign

24   policy, foreign affairs, op-eds, policy briefs, et cetera.

25   Q.   Is it fair to say you write a lot, is the axiom of publish

1    or perish?  Is that true in your field as well?

2    A.   I wouldn't say publish or perish, which is a term in

3    academia, but part of my job is to publish.  And it's not that

4    I have to publish a certain amount of material or in a certain

5    number of places, but if you work in a think tank like the one

6    that I work in, you do it because you enjoy publishing and you

7    enjoy researching and sharing what you learn, and so I do

8    publish a lot.

9    Q.   You mentioned that some of your articles appeared in

03:17 10   peer-reviewed publications.  Can you explain what that means?

11   A.   "Peer review" is an academic term in which an author

12   writes something and then it is reviewed by peers, other

13   experts in the field who are unknown to the author, and they

14   will be sought out by the publication or the publisher to make

15   sure that the work meets academic standards.  And so the

16   university press books that I published by Yale and Georgetown

17   were certainly peer-reviewed, many of my articles are

18   peer-reviewed in that peer academic sense.  And then almost

19   everything I write has some peer review for it but not all of

03:18 20   it has that kind of formal, anonymous peer review that many

21   journals and academic presses do.

22   Q.   And have you also conducted peer review of others'

23   articles?

24   A.   Yes, frequently.  I'm often asked by university presses or

25   journals to do peer review -- anonymous peer review of the work

1    of others.

2    Q.    Do you teach?

3    A.    I don't right now but I have.

4    Q.    Where have you taught?

5    A.    I taught at Johns Hopkins University School of Advanced

6    International Studies; and also at the Zanvyl Krieger School

7    of -- graduate school; and I taught for several years as an

8    adjunct professor a variety of courses on counterterrorism.

9    Q.    Do you engage in speaking engagements on your topic?

03:18 10   A.    I do.

11   Q.    And how frequently?

12   A.    If you ask my wife, too frequently.  Almost every week

13   there's several lectures.

14   Q.    In fact, are you scheduled to go to one tomorrow or -- go

15   to one today for tomorrow?

16   A.    I am.

17   Q.    Where is that?

18   A.    Berlin.

19   Q.    How often do you do international lectures?

03:19 20   A.    It varies but it can be frequently, so last week I gave

21   several lectures in Europe, this week I'm scheduled to give

22   several more in Europe.  It can be abroad, it can be domestic.

23   Living in Washington, which is the heart of policymaking, many

24   of my lectures are domestic and don't require travel at all.

25   Q.    Have you testified before Congress?

1    A.    I have.

2    Q.    About what?

3    A.    International terrorism, illicit finance issues, sanctions

4    issues.  Most of the testimony has been about various aspects

5    of international terrorism.

6    Q.    Have you testified in other cases in court?

7    A.    Sorry.  I'm getting over a cold.  I have.

8    Q.    How often?

9    A.    I've done it probably a few dozen times.  Two or three

03:19 10   dozen times total.

11    Q.    Were you qualified as what we call an expert witness in

12    those areas?

13    A.    Every time.

14    Q.    Has your work been cited by other courts?

15    A.    I'm sorry.  Can you --

16    Q.    Has your work been cited by other courts?

17    A.    It has.

18    Q.    Can you name some?

19    A.    Some of my work was cited by the Supreme Court in the

03:20 20   Humanitarian Law Project, a case which upheld the material

21    support statute.  That's the most prominent that comes to mind.

22    Q.    Have you received awards and recognitions for your work in

23    this field of terrorism geopolitics?

24    A.    I have.

25    Q.    Can you give a very brief overview?

A.   I received numerous awards and commendations for my work

in government at the FBI, and things like the Exceptional

Service Award for my work at the Treasury Department.  I've

received Speaker Specialist Awards by the State Department,

selected to be sent by the State Department to give lectures

abroad on behalf of the local U.S. embassy; selected by CNN as

an up and coming thinker.  There are a host of others.

Q.   Do you continue to consult with government agencies?

A.   I do.

Q.   And how about non-governmental agencies, or NGO's as we

call them?

A.   Yes.

Q.   And do you consult with media outlets?

A.   Frequently.

Q.   When you work on a criminal case, what do you do in those

cases?

A.   I review the material that is provided, so the case

material, and I might put that in context, either historical

context or context of issues that come up in the context of

that case.  Every case is different.  Some cases require me to

review a tremendous amount of material specific to that case,

some very little.

Q.   And have you worked as an expert witness in cases in other

countries as well?

A.   I have.

1    Q.    What other countries?

2    A.    France, Scotland, twice in Denmark, and Canada.

3    Q.    And for your role in this case, were you asked to write an

4    expert report?

5    A.    I was.

6    Q.    Okay.  Can you describe what that is?

7    A.    An expert report is the report of the hired expert

8    witness, in this case me, laying out the findings on the issues

9    that the -- in this case prosecution, although it would be the

03:22 10    same if I was called by defense, ask the expert to opine on.

11    That can be history as context, it can be terrorist trends as

12    context.  And then it can also, of course, be analysis of some

13    of the material that was provided to me specific to the

14    material in this case.

15    Q.    And have you testified in both civil cases as well as

16    criminal cases like this one?

17    A.    I have.

18    Q.    And did you do a report in this case?

19    A.    I did.

03:23 20    Q.    And what was the purpose of writing a report versus just

21    testifying?

22    A.    It's for me to be able to kind of make sense of all the

23    material that's being provided to me and for me to be able to

24    provide context for the case for the lawyers who have hired me,

25    in this case the prosecution.

1    Q.    Describe the methodology you use when you analyze evidence

2    for purposes of testimony to a jury.

3    A.    I have to take the evidence at face value.  I'm in no

4    position to be able to vet it, but I'm in a position to be able

5    to comment on it, put it into context -- the larger context of

6    other material like it that I've come across in my own

7    research, again, historical context, the context of different

8    themes, different trends, different modus operandi.  Is this

9    something that is unique?  Is this something that is common?

03:24 10   Does this make sense?  Does it not make sense?  Does it have

11   historical precedent?  Who are key individuals who might have

12   come up in reference, key ideas that might have come up, terms

13   to help explain those for a jury that maybe doesn't spend all

14   of its time focused on these issues.

15   Q.    And did you examine some of the evidence -- did the

16   government provide you with some of the evidence in this case

17   to ask you to do just that?

18   A.    Yes.

19         MR. CHAKRAVARTY:  Your Honor, at this point I would

03:24 20   ask that the Mr. --

21         THE COURT:  Let me just see you at the side for a

22   minute.

23         (Discussion at sidebar and out of the hearing of the

24   jury:)

25         THE COURT:  I don't know whether you need to renew it

1    to preserve it but I'll give you an opportunity to renew your

2    objection.

3         MR. BRUCK:  Oh, thank you.  I would just like to renew

4    the objection as made in a motion in limine that the Court

5    denied today, and that particularly goes to the background of

6    the various authors and figures, jihadi or radical Islamic

7    figures who are referenced in Dr. Levitt's report and I gather

8    are about to be referenced in his testimony.  And the -- and we

9    have a continuing -- wish to have a continuing objection to the

03:25 10   biographies of those figures and to the people that

11   influenced -- there's a whole back story of each of these

12   individuals on the grounds that there has been and will be no

13   showing that the defendant was aware of any of them, and even

14   if he was, we think under 403, extraordinary prejudicial effect

15   of essentially putting in the history of Islamic terrorism in

16   the 21st century and burdening this defendant with everything

17   that has gone on since 9/11 and before and after is far -- the

18   prejudicial effects far outweighs its probative value.  We also

19   think that it injects an arbitrary factor in violation of the

03:26 20   Eighth Amendment in a capital case, and for the rest of it I

21   would like to rest on our papers.

22         THE COURT:  Okay.  As I've indicated, I think the

23   testimony is admissible.  I do think 403 is an important

24   consideration, and I trust the government won't step too far on

25   this, but it is relevant.

1          Let me also say for -- a different reason for calling

2   you over here, I've never been attracted by the idea of

3   declaring an expert to be an expert because it has always been

4   my view that it depends on what he gets asked.  So I've done it

5   already on a couple of other experts because I just didn't want

6   to offer the resistance, but this guy may be different so I

7   will not give him blanket qualification.  But I suspect within

8   the scope of things in his report, he is qualified to testify

9   as an expert.

03:27 10          MR. CHAKRAVARTY:  Thank you.

11          MR. WEINREB:  Your Honor, if I may clarify something,

12   I understand the Court's ruling is a denial of the defense

13   motion in limine that as a categorical matter everything should

14   be excluded on either 401 or 403 grounds, but I don't

15   understand the meaning of a continuing objection of relevance

16   on 403 grounds.  I don't think that we should assume that every

17   single question has to be objected to --

18          THE COURT:  No, I agree with that.  I guess when I was

19   talking about a continuing, I was thinking of his

03:28 20   qualifications to testify under Rule 702.  That was the context

21   of that.  Other matters I think are more appropriate.

22          MR. BRUCK:  So I will have to object each time he goes

23   into these back story details about -- I mean, we gave --

24          THE COURT:  No, I don't -- I mean, to the extent he

25   wants to talk about a particular source of jihadi

1    encouragement, I don't think you have to object to each

2    question.

3            MR. WEINREB:  Yeah, I guess the motion in limine

4    addresses categories of evidence.  And the Court has denied it

5    and at the same time cautioned the government to be prudent in

6    its questioning.  But the parties and the Court could all be of

7    different minds about what crosses the line into irrelevance of

8    403, and without an objection we're not going to have a ruling

9    and the defense will be in a position to say that there's no

03:29 10    plain error review here because it has a standing objection to

11    every single question being asked on relevance of 403 grounds.

12    That's just not appropriate.

13            The defense may wish that it didn't have to get up and

14    object to things, but that's the way trials work so the Court

15    can focus on a particular question.  And whether it, in fact,

16    asks for irrelevant or unduly prejudicial evidence, there's no

17    way to make that ruling one way or the other with respect to an

18    entire line of questions.

19            THE COURT:  Well, I think there are some categorical

03:30 20    qualities to what I meant by the ruling, which is he can

21    testify about the history of recent terrorist activity,

22    particularly the encouragement of jihadi actions by particular

23    prominent figures.  I don't think every time a question gets

24    asked about al-Awlaki, that he has to stand up and object to

25    that.

1           MR. WEINREB:  Well, I understand.  So I understand

2      there's a continuing objection to certain categories of

3      evidence, but if it is the view of the defense that the

4      government has gone beyond what the Court has permitted, then I

5      think it needs to get up and object so the Court can decide if

6      it's on this side of the line or the far side of the line,

7      especially since many questions may be in a blurry area.

8           THE COURT:  Okay.

9           MR. BRUCK:  Well, it's going to become unwieldy.  And

03:30  10  I don't know what the government intends to do, but his

11     report -- Dr. Levitt's report goes into areas like -- there's

12     al-Maqdisi.  He's a Jordanian jihadi figure -- was the mentor

13     to al-Zarqawi, the head of al-Qaeda in Iraq.  And of course

14     people will recall the American war to try to -- and they were

15     eventually successful in killing al-Zarqawi.

16          Now, you know, to our way of thinking, that way

17     crosses the line.  It's -- that's the back story.  Now, do

18     I -- you know, I feel like we should have a continuing

19     objection to things like that.

03:31  20          THE COURT:  It's that kind of evidence.  But I

21     think -- I guess understanding that I will permit it to some

22     degree, I guess the 403 objection has to be that you think it's

23     gone beyond the degree to which I will permit it.  I don't know

24     how else to say it.

25          MR. BRUCK:  I would just object.  I would like the

1    record to reflect, if it may, when I make a 403 objection, I

2    intend that to include an Eighth Amendment constitutional and

3    due process constitutional objection, this being a death

4    penalty case especially.  I mean, I could recite the entire

5    legal litany each time I get to my feet but I would rather just

6    have that be a shorthand for Fifth and Eighth Amendment and 403

7    when I say "403," if that satisfies the Court.

8         MR. WEINREB:  That I think isn't problematic as long

9    as we have the objections and the rulings in real time so the

03:32 10   government can perhaps rephrase a question, ask a different

11   question --

12        THE COURT:  Yeah.

13        MR. WEINREB:  -- or knows that it's now going into an

14   area that the Court thinks has crossed the line; otherwise, we

15   have no idea.  We could create an error without even knowing

16   it.

17        MR. BRUCK:  One last thing.  I trust your witness is

18   on a short leash about this and will not simply give -- in

19   response to a simple question about al-Maqdisi, will give the

03:32 20   entire back story without another question, because then it's

21   extremely hard to know where you're going.

22        MR. CHAKRAVARTY:  We've been very sensitive to

23   Mr. Bruck's concerns from the motion in limine.  I don't

24   anticipate there will be many back stories at all.  Those back

25   stories that will be testified about are going to be relevant

1    to people like Awlaki, like Maqdisi, other people who are the

2    authors of the documents on his computer that further suggest

3    were both either accessed or otherwise relevant to his actions

4    that he later cited.  There's going to be a lot of reading from

5    those documents and not a lot of -- you know, maybe a sentence

6    or two into background about those people.

7            MR. MELLIN:  Your Honor, while we're here, may I

8    suggest that when we take the break for lunch, that everyone be

9    given a little bit of leeway to talk to this expert, if we get

03:33 10   a sense of -- 10 or 15 minutes, kind of where he -- how he's

11   handling the situation and how best to avoid these concerns?

12           THE COURT:  Do you have a problem with that?

13           MR. BRUCK:  Do you have a problem with my being

14   present for that?

15           MR. MELLIN:  No.

16           MR. BRUCK:  All right.  Then let's do that.

17           MR. CHAKRAVARTY:  Not for the admonishment, no.

18           THE COURT:  I'm not sure that I understood what the

19   answer was.  But, yes, to encourage him to stay focused on the

03:34 20   question and answer the question in a direct way, not expand.

21           (In open court:)

22           MR. CHAKRAVARTY:  May I proceed, your Honor?

23           THE COURT:  Yes, please.

24   BY MR. CHAKRAVARTY:

25   Q.   Dr. Levitt, thank you for your patience again.  We weren't

```
 1    talking about you.  Not the whole time.
 2    A.    That's a shame.
 3          (Laughter.)
 4    Q.    Did you examine some evidence in this case before you
 5    drafted your expert report?
 6    A.    I did.
 7    Q.    And before you prepared for your testimony today?
 8    A.    I did.
 9    Q.    And did we go through some of the scope of what I would be
10    asking you today?
11    A.    Yes.
12    Q.    And just to be clear as to what your qualifications are,
13    do you read or write Arabic?
14    A.    I do not.
15    Q.    And the materials that you reviewed, what language were
16    they in?
17    A.    Most of the materials that I reviewed were in English.
18    There were a small number of materials that I reviewed for the
19    report that were in Arabic which I had to go through with
20    someone who could help me understand the Arabic.  But the vast
21    majority of the materials were in English.  There were some
22    materials in -- I think there was at least one other language
23    which I communicated back to you I couldn't review because I
24    didn't speak the language.  It wasn't Arabic.
25    Q.    And you haven't reviewed all of the evidence in this case.
```

1    Is that fair to say?

2    A.    No, I have not.

3    Q.    So specifically, did I provide you with evidence that I

4    told you was from the defendant's computer?

5    A.    Yes.

6    Q.    Now, Dr. Levitt, can you explain to the jury what the

7    global jihad movement is?

8    A.    The global jihad movement is an idea.  It's not a

9    movement, per se.  It's not a group that has an office.  It's

03:36 10   not led by a committee or an individual.  It's the idea of

11   like-minded people who are pursuing in their mind this idea of

12   a global jihad, and it will include people from different parts

13   of the world who even disagree with one another on certain

14   precepts, theological ideas, tactical ideas.  It will include

15   people who say that their implementation, their

16   operationalization of these ideas should be local, in their

17   home countries, and others will say, no, it should be done more

18   globally.

19         But the idea behind it that there is a need for a global

03:37 20   effort on behalf of Muslims to unite as a nation among the

21   Arabic, to defend itself, to do that through acts of violence,

22   this is something that has a continuum going back several

23   decades now through to today.

24         And there are things that have been constant in terms of

25   some of the core precepts, some of the key pieces of ideology,

1    some of the key ways that it manifests itself, and there are

2    things that have changed over time in terms of geographic

3    focus, in terms of emphasizing this ideological precept more

4    than that ideological precept.

5        So it is accurate to say that there is, especially in the

6    minds of its adherence, a global jihadi movement.  You have

7    people who, whether they're talking to other human beings or

8    they're reading or hearing or watching this on various types of

9    media on their computer screens, feel that they are part of a

03:38 10   large, singular following, like-minded followers.  But that

11   doesn't mean we're talking about an organization incorporated

12   or an office or anything like that.

13   Q.   So do you have to be in a terrorist group to be part of

14   the global jihadi movement?

15   A.   No, by definition you don't.  It can and certainly does

16   include terrorist groups, and it can include individuals, what

17   we describe today as home-grown violent extremists or lone

18   offenders who will feel that they are part of something bigger

19   and will be acting in concert with and on behalf of something

03:39 20   bigger but don't have to sign up, don't carry a membership

21   card.

22       Once upon a time you really had to travel to meet with one

23   of these groups, to get trained by one of these groups, to meet

24   people.  Nowadays the world is flat through social media.  You

25   can get your indoctrination, you can get your motivation, you

1    can get your schooling and skill set just online and you don't

2    have to have traveled, or even necessarily communicated with

3    anybody, in order to be able to carry out an action that in

4    your own mind would be in concert with those other people.

5    Q.    So what ties adherence to the global jihadi movement

6    together?

7    A.    Ideas.  Ideology both in terms of the things that motivate

8    them, the ideas that motivate them, the things in which -- for

9    which they think they're acting on behalf of, and then also

03:40 10   frequently the how; the what they do.  So you don't have to

11   have met with an individual or belonged or signed up or pledged

12   an oath, a pledge of loyalty or allegiance, in order to believe

13   that there is a requirement to engage in militant jihad; that

14   the primary type of jihad is not what is usually called the

15   more important jihad, which is self-improvement, but rather,

16   the lesser jihad of militancy; that this is to be done on

17   behalf of this larger Muslim nation, the ummah; that one's

18   affiliation really is to that ummah and not to any -- this

19   Muslim nation, not to any local ethnicity, nationality

03:40 20   community; that there are rewards for engaging in this

21   behavior, rewards of a national level, this kind of altruistic

22   doing on behalf of others who can't, coming to the defense of

23   the people who can't defend themselves.  And also, a more

24   selfish deliverance:  Forgiveness of past sins, getting into

25   heaven.  Not just heaven but the highest levels of heaven.

1          And so these types of ideas also remove disincentives.  So

2    for most people the idea of killing innocents is forbidden, but

3    what if through this ideology it's no longer forbidden; in

4    fact, it's permitted.  And what if it's no longer just

5    permitted but it's also praiseworthy.  And what if it's not

6    only praiseworthy, but it's also a personal obligation upon you

7    if you want to be a good member of this community, this ummah,

8    if you want to be a good Muslim.  So you've now gone the

9    spectrum, from killing innocents is not okay all the way to

03:42 10   this is something that's not only okay, it's not only

11   praiseworthy, this is something that is incumbent upon you.

12         And so these types of ideas have motivated a whole host of

13   different types of characters, from people who operate as

14   groups to people who coalesce together as networks that may

15   have some tangential connection to a group or may not, to

16   individuals, to lone offenders.

17   Q.   So there are some concepts there that I just wanted to

18   have you explain a little bit to the jury.  I think you started

19   to explain what jihad was.  Are you a religious scholar?

03:42 20   A.   I'm not.

21   Q.   Okay.  So what is the basis of your understanding of these

22   concepts?

23   A.   Well, one of the things that I've developed expertise in

24   in the course of my studying terrorism studies is the concepts

25   in the process of radicalization.  Arguably, one of the most

1    important issues we're dealing with today:  How is it that

2    people are being radicalized around the world to want to go out

3    and carry out acts of terrorism in whatever venue that may be:

4    at home, today in Syria, whatever it is.

5         And within that area of study I've had to learn a lot of

6    different things, from things that relate to social work and

7    psychology, because one aspect that drives people is either

8    local grievances, particular circumstances to an individual,

9    anger over international grievances, foreign conflicts; but

03:43 10   then the other half of the equation is ideology.  And the fact

11   is that Islam is not terrorism full stop, and the fact is that

12   all religions have the capability for extremism, but the fact

13   is that today the radicalization that we are seeing kind of as

14   almost a global insurgency is happening in the name of Islam;

15   not in the name of the Islam practice by the vast majority of

16   Muslims, but it's happening in the name of Islam, and the

17   twisting of certain Islamic concepts.

18        And so I've spent a tremendous amount of time studying

19   these to have a better understanding, not as a Muslim scholar

03:44 20   to be sure, but as a scholar of terrorism studies, how are

21   these being used and implemented to radicalize, motivate and

22   then operationalize, dispatch and send people to engage in

23   these types of acts of terrorism.

24   Q.   So you explained that there was a kind of a greater jihad

25   and a lesser jihad.  How do adherence to the global jihad

1    movement refer to jihad?

2    A.    So the greater jihad is traditionally the jihad of one's

3    self, and that is self-improvement, becoming a better person,

4    and that can be as behaviorally, just being a better person,

5    being kind to one's neighbor and family, and also becoming a

6    more pious person, you know, giving more charity, making the

7    pilgrimage, et cetera.  And these are praiseworthy.

8         The lesser jihad traditionally was militant, was a violent

9    jihad.  And it can be done in a defensive manner and it can be

03:45 10   done in an offensive manner.  The radicalizers within this

11   global jihadi movement over a period of decades -- and

12   different individuals have done it can differently, but one of

13   the common themes is their argument that, in fact, it is this

14   lesser jihad, the jihad of militancy, which is actually the

15   more important, the more religiously obligatory, the more

16   impactful; that if you do this, and you do this violent jihad

17   faithfully and with proper intent, not to enrich yourself or

18   not to become a famous person but for the right reasons, then

19   it can be even more powerful than someone who, say, was a pious

03:46 20   person all their life and prayed five times a day or

21   what-have-you, trying to promote this idea that violent jihad

22   is something primary, violent jihad is something core to the

23   practice of a good Muslim and that it is a personal obligation.

24        There's this idea within Islam of something that is the

25   obligation of a community, which means not every single

1   individual has to do it, and something that is a personal

2   obligation, that is the obligation of each individual.  And the

3   jihadi idiologs go to great lengths to say that this militant

4   jihad, this is an obligation on the individual.  So if you,

5   individual, want to be a good practicing Muslim, this is

6   something you need to do, and you can't shirk that

7   responsibility.

8   Q.   You mentioned something called the ummah, U-M-M-A-H.  What

9   is that?

03:47 10   A.   The nation.  The Muslim nation.

11   Q.   Now, is there a relationship between the global jihad

12   movement and the United States of America?

13   A.   Not a friendly one.  So the United States has for many

14   years now been at the receiving end of much of the anger of a

15   global jihad movement and for a variety of reasons.  Idiologs

16   within this milieu have described the United States as the

17   force backing regimes, in the Middle East in particular, that

18   were seen to be totalitarian, bad to their citizens, and

19   insufficiently Islamic.  And that the way, for example, to

03:48 20   defeat Mubarak in Egypt back in the day, or others in other

21   Arab countries or Muslim countries, Muslim-majority countries,

22   would be not necessarily to try and take the fight to those

23   governments which were very heavy-handed, but to take the fight

24   to the United States, their backer.  And if the United States

25   were to withdraw its backing for these countries, they would

1    fall like dominoes.

2         There's anger over the United States and its perceived

3    interventions against Muslims around the world in conflicts

4    around the world.  So there will be anger about the United

5    States in Iraq, the United States in Bosnia, the United States

6    support for Israel in the context of Israeli-Palestinian

7    conflict, et cetera, and it comes down to a foundational idea

8    that there's a war between the Muslim ummah and the West with

9    the United States kind of leading the West.

03:49 10         THE COURT:  Mr. Chakravarty, we're just about at one

11   o'clock.  I think perhaps we'll take the lunch recess at this

12   point.

13         THE CLERK:  All rise for the Court and the jury.  The

14   Court will take the lunch recess.

15         (The Court and jury exit the courtroom and there is a

16   recess in the proceedings at 1:00 p.m.)

17         THE CLERK:  All rise for the Court and the jury.

18         (The Court and jury enter the courtroom at 2:09 p.m.)

19         THE CLERK:  Be seated.

04:59 20         THE COURT:  Go ahead, Mr. Chakravarty.

21   BY MR. CHAKRAVARTY:

22   Q.   Good afternoon, Dr. Levitt.

23   A.   Good afternoon.

24   Q.   Can you explain how the global jihad movement has evolved

25   over the last decade?

A.   The global jihad movement has evolved over several

decades, but over the past decade in particular we've seen

really tectonic changes, that is to say, you know, about ten

years ago the biggest threat on the horizon was an organized

al-Qaeda.  But with several years of international

counterterrorism efforts, al-Qaeda itself began to almost break

apart, and with the rise of social media and kind of the

flattening of the earth and the ability to communicate via

social media around the world you had two phenomena:  The first

is the rise of al-Qaeda affiliates, both formal affiliates,

that is to say, recognized by al-Qaeda, and others, kind of

al-Qaeda want-to-be affiliates, groups that saw themselves like

al-Qaeda, aspired perhaps to maybe officially be part of

al-Qaeda, but whether they were officially or not were of that

same ilk in different regions.

     The ones that were truly al-Qaeda franchises would have

their focus in a region.  So, for example, al-Qaeda in the

Arabian Peninsula, in Saudi Arabia and Yemen; al-Qaeda in

Islamic Maghreb in North Africa; the Shabaab group in Somalia.

And they would certainly do things locally, but they would also

have interests in things international.

     Other groups that were more aspired to be part of

al-Qaeda, some of which had asked to join but hadn't received a

response, others that hadn't even asked, they might be more

local in their activities than, say, the Sinai desert or other

 1   places.  With time, again, more crackdowns from --

 2   counterterrorism crackdowns by the international community and

 3   the rise of social media, what we found is a new phenomenon

 4   that in some ways is more difficult to contend with.  I won't

 5   necessarily say more dangerous, because it's not quite as

 6   capable to carry out kind of spectacular attacks, but much

 7   harder to identify and stop, and that is the home-grown violent

 8   extremists, HVE, or the lone wolf or lone offender, as I prefer

 9   to call it.  And this can be a lone individual or it can be a

05:02 10   lone small group of individuals.

11       These are much harder to stop -- identify and stop because

12   they don't necessarily engage in the types of activities that

13   set off the trip wires that security intelligence,

14   counterterrorism entities have placed to try and figure out

15   who's doing what; in particular, three:  travel, communication

16   and moving and receiving money.

17       So if they're not setting off these trip wires, if they're

18   not going to bring themselves to the attention of law

19   enforcement by virtue of traveling to a place that terrorists

05:03 20   are known to go to, or communicating with people who are known

21   or suspected of engaging in terrorist activity, or sending

22   funds to or receiving funds from people who are known or

23   suspected of being involved in terrorist activity, they stay

24   under the radar and they're much harder to identify.

25       And many officials, both here in the United States and

         1    abroad, have articulated this concern, of just how hard it is
         2    to deal with these types of home-grown violent extremists.
         3    They won't necessarily have the capabilities to do a
         4    spectacular attack, but the expectation is -- and the President
         5    himself said this -- that over time they're going to be more
         6    frequent.  And since terrorism at the end of the day is not
         7    necessarily about killing the maximum amount of people,
         8    wounding the maximum amount of people alone, it's also about
         9    getting media attention, it's also about literally terrorizing
05:04   10    society, making people afraid, this can be a very, very
        11    effective means of accomplishing that goal.
        12    Q.   And so in the last ten years, has this decentralized way
        13    become the strategic choice of the global jihad movement?
        14    A.   So this decentralization is a fact of life, and it means
        15    that it's not like the old school terrorism has gone away.
        16    Al-Qaeda in the Arabian Peninsula, for example, has attempted
        17    to carry out multiple attacks targeting the West over the past
        18    few years.  There are other al-Qaeda elements, one based out of
        19    Syria today that we're very concerned, is plotting out of
05:04   20    Syria -- not attacks in Syria but attacks in the United States
        21    and in Europe.  That kind of organized al-Qaeda or al-Qaeda
        22    franchise model still does exist.  But on top of that, the much
        23    more immediate threat and phenomenon that we're seeing more
        24    frequently is this phenomenon of the home-grown violent
        25    extremist, the individual or the small group.

 1    Q.   So is there a command and control relationship between the

 2    individual, the small group and one of these terrorist

 3    organizations?

 4    A.   There need not be, and in most of the cases we're seeing

 5    today there isn't.  Again, that doesn't mean that there can't

 6    be.  And over the past few years there have been some

 7    instances, although at this point they're really more of the

 8    exception, where there is I wouldn't say full command and

 9    control, but interaction between senior, say, al-Qaeda or other

05:05 10   terrorist group leaders and operatives trying to do things

11    abroad.

12         Most of the plots we're seeing nowadays are not like that.

13    They do not have command and control.  And in some cases there

14    is some communication, in many cases there is no communication,

15    and the -- as if command and control authority, say al-Qaeda,

16    will simply log the attack after it happens, this was people

17    following on our call to go do what has to be done.  You don't

18    have to come to a foreign battlefield to do it.  You're welcome

19    to if you want to, but you can also do it at home, especially

05:06 20   in the West.  And that's become a major theme of radical

21    propaganda:  Do it at home.

22    Q.   And are the terrorist organizations that are part of the

23    global jihad movement, are they monolithic in the sense of

24    their encouragement of this type of activity?

25    A.   They're not monolithic.  They encourage this type of

1    activity.  They also encourage people to travel to other

2    places.  A common refrain is:  Come here.  But if you don't

3    come here, do something at home.

4         We discussed earlier this personal obligation, right?  You

5    can't shirk this responsibility.  If you still are intent on

6    living amongst unbelievers, then at least you've got to do what

7    you've got to do:  terrorist attacks at home.  They welcome you

8    to come and fight somewhere else too.  And this is not only

9    al-Qaeda; now the so-called Islamic state or ISIS --

05:07 10        MR. BRUCK:  I'd object to bringing in organizations

11   that have nothing to do with --

12             THE COURT:  As a general background I think it's all

13   right.  Go ahead.

14   BY MR. CHAKRAVARTY:

15   Q.   You were talking about ISIS.  That we've all heard of,

16   ISIS.  How does that relate to the global jihad movement?

17   A.   ISIS is the latest incarnation of this global jihad

18   movement, a group that in the region in the Middle East is

19   fighting with al-Qaeda and yet it won't be uncommon to see

05:07 20   people who have a primary affiliation with al-Qaeda and people

21   who have a primary affiliation with ISIS somewhere in diaspora

22   doing something together as we've seen in just the past few

23   weeks, in one instance.

24        ISIS, like al-Qaeda, has glossy magazines, and even better

25   than al-Qaeda very impressive online radical and radicalization

1    literature.  And it too explicitly says:  Come.  But if you

2    don't come -- you don't have to come -- just do something back

3    home.

4    Q.   So is there a common narrative to these global jihadi

5    groups?

6    A.   Well, as we discussed before, there's plenty of things

7    that divide them on theological points, on points of strategy.

8    What should you do first?  Should you target the near enemy;

9    say, for example, the government of Egypt first, or should you

05:08 10   target the far enemy, say the government of United States

11   first, or could they be done concurrently?

12        Where there is this commonality is in the motivational

13   ideology, the idea that there is a personal obligation upon

14   every good Muslim, every member of this ummah to this Muslim

15   nation to do their part for which they can be rewarded both

16   altruistically, that is to say, giving of themselves on behalf

17   of this ummah, defending those who are defenseless.  And you

18   can do that -- you know, you can defend people in, you know,

19   some foreign conflict at home if you're in the United States by

05:09 20   targeting the United States, which is this head of the snake as

21   it were, but you also get this personal, if you will, selfish

22   individualized benefit which is absolution, deliverance, entry

23   into the highest levels of paradise.

24   Q.   So is there a particular demographic or particular traits

25   of people that this narrative attempts to appeal to?

A.   Well, as I said earlier, you know, Islam does not equal
terrorism full stop.  I can't stress that enough.  But this
particular set of radicalized ideologies is an extremist
variation of Islamic concepts.  And so it is targeted towards
Muslim youth -- youth in particular.  Not only Muslim but
particularly Muslim youth.  Beyond that, you know, there is no
single profile.  We have people who have been radicalized who
were experiencing poverty and lack of opportunity, and we've
had people who were very successful professionals, engineers,
doctors, you know, people who had money, people from the West,
people from the Middle East, people who seem to be quite well
integrated into their societies, people who are not at all well
integrated into their societies.

     The bottom line is, the way I describe it is there are two
general baskets into which the issue sets fall, and it's like a
salad bar of options.  If you go to the salad bar and I go to
the salad bar, we're going to, odds are, pick slightly
different salads.  What makes you laugh and me laugh and you
cry and me cry is going to be slightly or very different.
We're all individuals.

     It's the same for radicalization.  There tends to be
something that provides a cognitive opening.  Some combination
of local grievances can be -- I just had a case last week -- my
girlfriend dumped me; to feeling discrimination; to feeling
pulled by different types of identity crisis:  Am I primarily,

 1    saying this country, American?  Am I primarily Muslim?  Is my

 2    primary national ethnic identity or national identity being an

 3    American?  Is it being part of the Muslim ummah?  Do I belong?

 4    Those types of local grievances.

 5         I'd also include in that first box the international

 6    grievances:  concern about foreign conflicts, Palestine, Iraq,

 7    Chechnya, this type of thing.  Those types of issues create in

 8    an individual a cognitive opening into which dangerous ideas

 9    can then fill the gap.

05:12 10        So there's going to be some component of grievance,

11    there's going to be some component of ideology, and for every

12    single person the division of how much grievance and how much

13    of which grievance and how much ideology and what type of

14    ideology -- not only how much ideology, but how much exposure

15    to ideology, over how much time, over how many medium, by

16    individuals, not by individuals, online only, will be

17    different, and we've seen cases that can fit anywhere across

18    that spectrum.

19    Q.   So are you talking about the process of radicalization?

05:12 20   A.   Yes.

21    Q.   What is radicalization?

22    A.   Radicalization is the process by which an individual

23    adopts extremist or radical ideas and then possibly is

24    mobilized to operationalize, to do something about them.  You

25    can, of course, have someone who adopts radical ideas and

1    doesn't act on them, right?  And ideas, even radical ideas, are

2    protected in this country.  So our concern is ultimately about

3    action.

4         Within the -- within the study of radicalization there are

5    two schools of thought, however.  One says:  Yes, ideas are

6    protected, but we have to be concerned or at least start being

7    concerned when people start digesting really radical ideas

8    which are about violence, whether or not they actually then

9    have or have yet acted on it, prefer that they might

05:13 10   potentially very quickly.  And others say:  No, dangerous ideas

11   are protected in this country and we're quite proud of that,

12   and so the only thing we're concerned about is action.

13        What's absolutely clear is that for an individual who has

14   gone through a process of radicalization and mobilization and

15   operationalize those and has carried out an act of violence,

16   that is, by definition, full-fledged radicalization.  This is

17   not someone who maybe is contemplating radical ideas like you

18   might contemplate, you know, you might study fascist ideology

19   in college; this is someone who has then acted on them.  And so

05:14 20   by then any definition of either of those two schools of

21   thought, this would obviously be a case of concern.

22   Q.   And how does radicalization take place?

23   A.   Yes.

24        (Laughter.)

25   A.   There is no one model for how radicalization takes place.

1    Every single one of us is an individual.  Our experiences are

2    different.  What makes us happy and makes us angry is different

3    and, therefore, every single case of radicalization is going to

4    be at least a little bit different.

5        And you'll be able to find cases that are similar to one

6    another, and that may be interesting to look at, but at the end

7    of the day it's the combination of these two baskets:

8    grievances, local and international; and some type of ideology.

9        Now, mind you, of course, it doesn't have to be a

05:15 10    deviation of Islam.  It doesn't have to be radical Islamist

11    ideology, right?  We've seen a rise of white supremacist

12    activity in this country since we elected an African-American

13    president, right?  But that combination of grievance and

14    ideology.  Some thing, either someone or some -- now in the age

15    of social media and digital media, someone doesn't have to be

16    in person, but someone has to be able to kind of hold your hand

17    and pull you across that dividing line to the point where you

18    mobilize and actually do, operationalize, these ideas.

19    Q.   When you say "someone," what do you mean?

05:15 20    A.   There is a radicalizer in every case that we'll see.  It

21    won't necessarily be someone with a clear-cut name.  The

22    radicalizer can be the totality of things that someone has

23    heard and read and watched online; it could be exposure to

24    individuals; it could be long treatises; it could be

25    140-character tweets.  In all likelihood, it will be some

1    combination of that and everything in between it.

2        Our concern is that, you know, unlike, say, ten years ago

3    or so when much of the material that was put out there online

4    were these mostly theological treatises written in language --

5    if it was written in English at all, and it wasn't particularly

6    accessible.  Nowadays you have glossy magazines; Twitter

7    accounts; Facebook accounts; treatises; videos; chants,

8    nasheeds, which are like devotionals -- which can be devotional

9    in a purely, you know, religious way, but many radical Islamist

05:17 10    groups use them to -- in singing a song to some type of

11   percussion music promoting dangerous radical, explicitly

12   violent ideas -- all these types of media are accessible today

13   and it's removed barriers to entry.

14       You don't have to be able to become an Islamic

15   jurisprudent, you don't have to wade through really complicated

16   writings of people who are a whole lot older than you and whose

17   English maybe isn't so great.  You can hear, you can read, you

18   can watch people who speak your language -- not just English

19   but American English; not just American English but colloquial

05:17 20   English -- and put things in terms that you use every day and

21   that removes barriers to entry.

22   Q.   Is there a way to measure how radicalized somebody is?

23   A.   Lots of people have tried.  The simple answer is:  Until

24   someone actually acts, there's complete room for debate, all

25   right?  There's no quantifiable, this is a 3.2 radicalization.

1          MR. BRUCK:  Your Honor, if you'd please, I'm going to

2    object to any further testimony along this line without a

3    showing of any scientific basis for measuring how radical

4    someone is whether they have acted or not.  This is a *Daubert*

5    issue.  We did not have notice of this.

6          MR. CHAKRAVARTY:  I can move on, your Honor, but it's

7    a simple, you know, general question.

8          THE COURT:  All right.

9    BY MR. CHAKRAVARTY:

05:18 10   Q.   Does the length of time that someone consumes radical

11   material indicate how radicalized somebody is?

12   A.   No.  Again, we're all individuals.  For some people, to

13   get radicalized you'd need to be exposed to material for a long

14   period of time; for other people it's very, very quick.  The

15   problem that we have nowadays -- and this is something I

16   studied closely, especially over the past few months -- is that

17   the pace of radicalization is much, much faster, the time

18   period is much, much shorter over the past few years than we

19   have seen in the past.

05:19 20   Q.   How about the nature and the volume of propaganda or other

21   materials that somebody amasses.  Is that dispositive as to how

22   radical somebody might be?

23   A.   Not necessarily, no.  Again, it depends on the individual.

24   Some people would need to have a lot of material and be

25   reviewing it all the time and really, you know, immersing

1    themselves in it, some people, short-term immersion of just a

2    few particularly inspiring pieces of radicalization written,

3    audio, video will be enough.

4    Q.   In the course of your study, have you found a way to

5    predict whether somebody was going to be a terrorist or not?

6    A.   No, and I don't know anybody else who has.

7    Q.   What are the channels through which this global jihadi

8    movement actually recruits people to engage in the activities

9    that you're talking about?

05:20 10    A.   So there's a spectrum again.  You know, back in the day it

11    was primarily by drawing people to terrorist training camps

12    around the world, and there are still people who will travel

13    either for training camps or for opportunity to fight in

14    foreign conflicts, but that is increasingly the exception.

15    Increasingly, it is reaching out to people, and not necessarily

16    to a particular individual, in kind of a direct communication,

17    through online social media communication:  putting out there

18    these audio files, these video files, these documents

19    manifestos that people can access, you know, in their mama's

05:21 20    basement without having had to travel.  And that is our

21    greatest concern right now.

22    Q.   And how do they use the Internet to communicate this

23    information?

24    A.   Well, they post things online.  It can be radicalization

25    material; it can be, you know, if you want to contribute to the

1   cause in other ways, such as giving money, they can communicate

2   ways of giving money; they communicate if you want to -- if you

3   decide that you'd rather travel someplace, there's now

4   instructions on here's places you could go.  Here's types of

5   things you should bring.  Here's what you'll need to know if

6   you're going to go someplace.  If you decide not to go, here's

7   what you could do.

8       So it's not just the question anymore about radicalizing

9   and mobilizing, inspiring someone with these radical ideas, now

05:21 10  it's also operationalizing them.  Again, removing another level

11  of barrier to entry.  This time not barrier to radicalization

12  but barrier to operationalization.  And this has, therefore,

13  been described as "terrorism on the go," right?

14      So you want to know how to put together a bomb?  You can

15  see that online.  You want to know how to communicate securely?

16  There's stuff about that online.  You want to know, on the

17  other hand, how to go and travel someplace and what to expect

18  when you get there and what types of things you should bring?

19  That's available too.

05:22 20  Q.   Are there particular websites that these extremist groups

21  use?

22  A.   There are a whole host of them.  And some of them got

23  knocked down and they pop up elsewhere.  The most common theme

24  about them is there are certain types of common radicalization

25  propaganda that they tend to put up on there; in particular

1   *Inspire* magazine which was published by al-Qaeda in the Arabian

2   Peninsula.

3   Q.   Okay.  We'll talk about that in a moment.  I'm just going

4   to ask you about a few websites and ask if you're familiar with

5   these.  Tibyan Publications?

6   A.   Tibyan Publications, if I recall correctly, actually isn't

7   up anymore.  But it was -- and its publications are still

8   available on other websites, mirror sites.  But it was a

9   prominent jihadi kind of online publication house, if you will,

05:23 10   for a whole host of different types of al-Qaeda and other

11   publications.

12   Q.   Kavkaz Center?

13   A.   Kavkaz Center is a website that was affiliated with the

14   Chechen jihadi movement.

15   Q.   Hunafa.info?

16   A.   Also a website with jihadi information.  And if I recall,

17   also about -- related to Chechnya.

18   Q.   Ghuraba.info?

19   A.   Ghuraba, the stranger.  Again, another one of these

05:23 20   websites where you could access this type of material.

21   Q.   And then there are -- a website, one called Memri,

22   M-E-M-R-I.  Are you familiar with that?

23   A.   Yes.

24   Q.   And also Jihad Watch.  Are you familiar with that?

25   A.   Yes.

1    Q.    What are those?

2    A.    They're a host of websites that are maintained by people

3    who track radicalization and track extremism and terrorism.

4    There's a spectrum, thereto, from the left to the right, and

5    those are both examples of kind of anti-jihadi, anti-terrorism

6    websites that maintain a collection of this material for

7    scholars and counterterrorism people to be able to access

8    without accessing the jihadi websites themselves.

9    Q.    Now, does this movement specifically message to people in

05:24 10    the United States?

11    A.    It does.

12    Q.    How does it do that?

13    A.    Online.

14    Q.    And what is that message?

15    A.    The message is, again, as we've said, you can come here,

16    wherever the "here" may be in that particular case, but if you

17    don't, you should do what has to be done at home.  And you can

18    do things at home.  Take the fight to the enemy, the United

19    States, at home.  In some cases it will be alternative

05:25 20    messages:  If for some reason you think you absolutely can't,

21    then you should at least -- you know, be a fighter, you should

22    at least fund a fighter.  The general theme is:  This is a

23    personal obligation; you have to do at least what you can do.

24    Q.    And what's the value proposition offered by their

25    narrative?

A.   The value proposition, as we've discussed, is twofold:   On

the one hand, it's selfless, right?   Do on behalf of the

greater ummah, the greater nation.   There are people who are

being oppressed by the United States and others; there are

people who can't -- who are defenseless, who can't defend

themselves.   We need to defend them.   You need to defend them.

You need to be one of these elite.   This is a personal

obligation.   And then you'll be rewarded for that.

     There's also something that is a benefit to the

individual, you might describe it as the selfish or at least

the personal benefit, which is this absolution, this cleansing

of past deeds, and the ability, even if you weren't such a

great believer before -- which includes, by the way, being a

Muslim, just not a jihadi Muslim -- in these people's world

view, this can give you absolution.

     So this is so much greater a service.   This type of

violence is so much greater a religious service that it can

absolve even if you haven't been a good person at prayer or

going on the Hajj, the pilgrimage, or giving of charity, a

zakat, et cetera.

Q.   You mentioned a moment ago *Inspire* magazine.   What is

that?

A.   *Inspire* magazine is a glossy English language magazine

produced by al-Qaeda in the Arabian Peninsula out of Yemen.

Its publication was a watershed, as I said earlier, because it

1   was written in American colloquial English.  So it's so

2   accessible and understandable to Western, in particular

3   American, youth.  Some of the authors were people who were born

4   or lived in the United States and could speak to their American

5   experiences to be able to make a connection with the reader.

6          It's a glossy magazine like a *Newsweek* or, you know, a

7   typical American magazine only it's not about, you know, the

8   current news around the world; it's about jihad, the need to do

9   jihad, to radicalize and mobilize people to jihad, and then

05:27 10   removing the last barrier, giving how-to instructions.  So you

11   don't know how to build a bomb?  Here's how you build a bomb.

12   Step-by-step instructions with pictures, very, very clear, not

13   unlike the kind of step-by-step instructions with pictures that

14   my kids use when they put together a Lego that I bought them.

15   Q.   Who started this magazine?

16   A.   So the key person behind it was Anwar al-Awlaki.  Anwar

17   al-Awlaki was an American-born Islam imam, preacher, lived in

18   the southwest, lived at one point in Virginia, came up at one

19   point in the 9/11 investigation, and ultimately left the United

05:28 20   States and moved to Yemen.

21          By virtue of having lived here much of his life, he was

22   able to draw on those experiences, speaking American colloquial

23   English combined with his knowledge of radical Islamist

24   propaganda.  And he was a gifted speaker, very calm, very

25   professorial, and was an extraordinarily effective radicalizer.

1    Q.    What happened to him?

2    A.    He was killed in a U.S. drone strike.

3    Q.    Aside from *Inspire* magazine, what other types of media

4    information did Anwar Awlaki produce?

5    A.    Aside from the video, the most famous are the audio.  Some

6    are him over-speaking some of these nasheeds, these chants,

7    these devotionals, in this case not devotionals about kind of

8    mainstream religious ideas but violent ones, and also a whole

9    series of -- a lecture series.

05:29 10       He has two different types of lecture series:  some that

11    are about the history of Islam, kind of Islam 101; the history

12    of the life of the prophet.  It's called "The Life of the

13    Prophet Series," or another one is the "Hereafter Series."  And

14    some of these earlier series are not jihadi at all; they are

15    introductions to Islam.  And they were very, very popular among

16    people who were either Muslim but weren't particularly

17    practicing or among converts and potential converts.  Again, a

18    gifted orator, a very kind of calm and steady tone.

19       But then he developed these explicitly violent jihadi

05:30 20    sermons.  And authorities and fellow Muslim preachers both have

21    cited their concern about the continuum between these two sets

22    of lectures, that many people get hooked on the Awlaki lectures

23    that are just about the history of Islam and that don't call on

24    people to engage in violence, but they get hooked on them, this

25    guy's now effectively their kind of online teacher, and then

1    they follow him into his expressly violent, there's an

2    obligation upon you to engage in terrorism, violence lectures.

3    And there's tremendous concern, therefore, today even about

4    those earlier lecture series.

5            MR. CHAKRAVARTY:  So if I may call up for the jury,

6    your Honor, 1143-71, which is in evidence.  Page 1.

7    Q.   Does this is appear to be a translation of one of his

8    lectures?

9    A.   Yes.

05:31 10         MR. CHAKRAVARTY:  Go to page 2, please.  I'm sorry.

11   Page 3, and page 4.

12   Q.   And is this a picture of Mr. Awlaki?

13   A.   It is.

14   Q.   And it has a little biographic of him as well?

15   A.   It does.

16           MR. CHAKRAVARTY:  If you would go to page 8 quickly?

17   Q.   Can you read the portion of this lecture that I just

18   highlighted?

19   A.   "So let them spend their money as that's how they will be

05:32 20   defeated as Allah 'Azza wa Jall says they need to spend their

21   money first and then they will be defeated.  So we should be

22   happy that they are spending their money to fight Islam as that

23   means that victory for Islam is soon; victory is on its way."

24   Q.   What's the significance of that passage?

25   A.   He's arguing that it's not just that the effective attacks

```
 1    are in the actual explosions; let them spend their money on

 2    trying to prevent us from carrying these out, and that too is a

 3    means of being effective.  They're spending their money to

 4    fight Islam.  In these radical interpretations of Islam,

 5    there's supposed to be this penultimate battle where the West

 6    tries to defeat Islam.  That means that this ultimate victory

 7    for Islam is coming, this process has begun, victory is on its

 8    way.

 9              MR. CHAKRAVARTY:  Mr. Bruemmer, can I call up Exhibit

10    1280, which is also in evidence.

11    Q.   Do you recognize this quote?

12    A.   I do.

13    Q.   And what is that?

14    A.   "They will spend their money and they will regret it and

15    then they will be defeated."

16    Q.   And is that a paraphrase of what we just read?

17    A.   It is.

18    Q.   Aside from Anwar Awlaki, are there other major figures in

19    the contemporary global jihad movement?

20    A.   Many.

21    Q.   Are there various al-Qaeda figures?

22    A.   There are.

23    Q.   Are you familiar with somebody named Abdullah Azzam?

24    A.   I am.

25    Q.   Who is he?
```

A.   Abdullah Azzam is often referred to as the grandfather of
the modern-day jihad.  He was a Palestinian who went to
Afghanistan and became one of the leaders of the jihad against
the Soviets in the 1980s.  And one of his key partners there
was a guy who would later become very famous named Osama Bin
Laden.  Azzam wrote a treatise, the most significant of which
was "Join the Caravan," that is to say, join the caravan of the
mujahidin, the jihad fighters.  He later wrote that he had no
idea it would become as popular and influential as it did, but
it did, and it is often found among the radicalizing literature
of people radicalized to violence today and in the period since
then, in the 1980s.  It's been often referred to as the key
manifesto, the go-to thing that people need to read to
understand the kind of history.

That was written, of course, in the context of come fight
the jihad against the Soviets here in Afghanistan, but what he
argues there is that there are many reasons why jihad is
obligatory and you need to do it, and it's something that's
incumbent upon you to do it.  And those are critical concepts
for moving someone beyond traditional Islam to this radical
Islamist ideology that says that there is an obligation to
engage in jihad against the enemy.

Q.   Now, people like Awlaki and some of the al-Qaeda figures,
did they refer back to these Azzam works?

A.   Certainly.

1    Q.    And did Azzam himself refer back to others who preceded

2    him?

3    A.    Yes.

4    Q.    Are you familiar with someone named Sayyid Qutb?

5    A.    I am.

6    Q.    Who is he?

7    A.    Sayyid Qutb is a major figure in the Muslim brotherhood,

8    and his major contribution to the concept of jihad that we're

9    talking about was the idea that it's not sufficient to try and

05:36 10   work to bring Muslims back to the proper -- the proper carrying

11   out of their faith, the proper observance of their faith, and

12   only then to engage in jihad against the enemy; he felt that

13   the jihad against the enemy had to be uploaded, front-loaded,

14   and that by virtue of people participating in that jihad, they

15   would also become better Muslims.

16         Now, as we discussed earlier, there's many disagreements

17   within the kind of global jihadi movement ideological

18   waterfront.  And many people in al-Qaeda would then say Qutb

19   didn't go far enough.  There are many people who were Muslim

05:37 20   brotherhood who didn't subscribe all the way to al-Qaeda.  But

21   those ideas of his were picked, maybe even cherry-picked, and

22   became key pillars of the writings of still more radical people

23   like Abdullah Azzam.

24   Q.    Now moving from individuals to places, you talk a little

25   bit about what the geopolitical situation was in the Caucasus,

1    particularly in Chechnya, as it relates to this global jihad

2    movement in the last 20, 30 years?

3    A.   When the Soviet Union fell, the Republic of Chechnya

4    rebelled.  And there were two distinct wars in the 1990s.

5    Within these, there also grew a jihadi element.  And Chechnya

6    became a prominent rallying cry for the jihadists.  Not all of

7    this war was jihadi; there were Chechens who were rebelling

8    against the new Russia and they weren't jihadis.

9         But the jihadists used this as a platform.  And many key

05:38 10   jihadists tried to go to Chechnya.  Many did.  Some current

11   al-Qaeda leaders tried to go and made it close but didn't get

12   all the way there, but the fact that they were trying to get

13   there shows how prominent it was at the time in the jihadi

14   landscape.  And it has continued to be ever since one of many

15   foreign conflicts that jihadis have taken for themselves,

16   whether it was originally theirs or not, to use to radicalize

17   people.  Look what the infidels, in this case the Russians, are

18   doing to Muslims, in this case in Chechnya.

19   Q.   Are you familiar with Commander Ibn al-Khattab?

05:39 20   A.   I am.

21   Q.   And who is he?

22   A.   Commander Khattab was a Jordanian -- some say Saudis, but

23   most likely Jordanian -- who became a very senior jihadi

24   commander in Chechnya.  After he was killed, battalions were

25   named for him.  There are Chechen battalions fighting in the

1    Syrian conflict now.  I believe one is named for him.  He

2    became a very prominent personality in the Chechen context, in

3    the Chechen jihadi context.

4    Q.   Moving on to Syria, what's the role of the Syrian conflict

5    in this global jihadi movement?

6    A.   Can't be overstated.  We just marked four years since the

7    beginning of what, when it started, was a rebellion against the

8    rule of Bashar al-Assad.  But as has been the case in Chechnya

9    and other place, jihadis use this opportunity to take a

05:40 10   rebellion and make it a jihad of their own, and it has become a

11   rallying cry around the world.

12       We talked earlier about the different types of

13   radicalization.

14       MR. BRUCK:  I'm going to object to the whole

15   discussion of Syria that goes beyond the date of any of the

16   events alleged in the indictment.

17       THE COURT:  Overruled.

18       THE WITNESS:  Sticking even to the first two years of

19   the Syrian conflict two years ago, there's a whole host of

05:40 20   different things that drew jihadis to this conflict.  Some were

21   drawn by jihadi ideology and wanted to go fight with the next

22   incarnation of al-Qaeda, and some were drawn to defend Muslims,

23   Sunni Muslims who were being butchered by the Assad regime.

24   Some of those people didn't go farther and stayed with what you

25   might call moderate, or non-Islamist, non-jihadi battalions.

1    Many did move to still more radical battalions.

2           Within the radical literature circulating in the home

3    of any person who has a computer, online Syria has become the

4    most powerful magnet drawing people to fight jihad.  And not

5    just to fight in Syria, or now more recently in Iraq as well,

6    but again, as al-Qaeda in the Arabian Peninsula said even

7    earlier through its *Inspire* magazine, today groups like this

8    Islamic state which has a magazine called *Dabiq*, glossy,

9    English, very much like *Inspire* magazine, echoes *Inspire*'s

05:41 10    message saying:  Come here if you want, but you don't have to.

11   And if you don't come here, take it to the infidels at home and

12   hit them at home.

13   BY MR. CHAKRAVARTY:

14   Q.   Pakistan and Afghanistan:  How do they relate to the

15   contemporary global jihad movement as of 2013?

16   A.   After the war in Afghanistan -- well, first, the war in

17   Afghanistan after 9/11, and after years of fighting in

18   Afghanistan what was left of the al-Qaeda core and some

19   al-Qaeda affiliates was in that border area of

05:42 20   Afghanistan/Pakistan, and in some cases individuals or cells

21   elsewhere in large cities in Pakistan.  And this was something

22   of the everyday news, of coalition forces continuing to fight

23   the remnants of al-Qaeda and the Taliban in Afghanistan and in

24   Pakistan, increasingly through the use of drones which has

25   become a very controversial tactic, which in and of itself

1    according to many scholars has attributed to radicalization.

2         Some drone strikes, I think it's hard to argue, have not

3    been effective; have been able to reach places you'd never be

4    able to reach on foot and removed some very dangerous people,

5    and some the exact opposite end of the spectrum, were complete

6    misses and killed innocents, which as you can imagine,

7    radicalizes people.

8    Q.   Let's turn now to *Inspire* magazine in greater detail,

9    Dr. Levitt, if you will.  Can you tell us the significance of

05:43 10    the first issue of *Inspire* magazine?

11         MR. CHAKRAVARTY:  And I'll call up what's in evidence

12    as 1142-091.

13    A.   So the release of the first issue of *Inspire* magazine, as

14    I said, was a watershed event.  You'd be able to access this

15    through your computer.  It's not for sale; it's for free.  It's

16    popping up in mirror sites.  It is in accessible American

17    colloquial English.  It's glossy.  It's got a table of

18    contents.  It bulletizes in the front some of the key things to

19    look forward to in the edition, what page you can flip right

05:44 20    to.  And it's extraordinarily accessible, and really for the

21    first time in this type of American English, doesn't stop at

22    you really should do stuff.  It's incumbent upon you to do

23    stuff.  It takes it to the next step:  Here are ideas for what

24    you might want to do, and here's how you might go about doing

25    them, removing barriers and disincentives to entry.

1        So it's inspiration on the go, it's know-how on the go.

2   And what they're hoping for and unfortunately ultimately

3   succeeding, enabling terrorism on the go.

4            MR. CHAKRAVARTY:  If we could go to page 2, please.

5   Q.   Is this a letter to the editor?

6   A.   Yes.

7   Q.   And does this spell out what the purpose is of *Inspire*

8   magazine?

9   A.   Yes, it explains the derivation of the name, why they use

05:45 10   the name "Inspire" and what they're trying to do.

11            MR. CHAKRAVARTY:  Go to page 17, please.

12   Q.   I'd ask you to read this and explain its significance.  It

13   actually goes on to the next column.

14   A.   So this is a series of questions.  We're starting here

15   with Question 9.  If memory serves, this is from an interview

16   with one of the leaders of al-Qaeda in the Arabian Peninsula,

17   and the editors of the magazine are asking this individual the

18   ninth question, Question 9:  "In the end, what is your advice

19   to the Muslims in the West?"  And the answer is:  "My advice to

05:46 20   my Muslim brothers in the West is to acquire weapons and learn

21   methods of war.  They are living in a place where they can

22   cause great harm to the enemy and where they can support the

23   messenger of Allah."

24   Q.   And does it continue up here?

25   A.   It does.  "There is no meaning in life if the messenger of

1    Allah is cursed while they listen to and see such crimes being

2    committed in front of their eyes.  It is not enough to defend

3    him, may my father and mother be sacrificed for him, to

4    participate in demonstrations and protests because these

5    methods would not stop the West, which is already used to them.

6    The successful means are through explosive devices and

7    sacrificing souls."

8    Q.   And what is the speaker communicating here?

9    A.   It's not enough to protest, it's not enough to write

05:47 10   letters to the editor.  The West is used to this type of thing.

11   The way to truly defend the name of God and the name of the

12   Prophet Muhammad is through violence.

13          MR. CHAKRAVARTY:  Page 31 and 32, if you could call

14   these up side by side.

15   Q.   What is "Open Source Jihad"?

16   A.   So "Open Source Jihad" is a section of the magazine that

17   appears in multiple editions.  This is obviously the first

18   time; this is the first edition.  It's a play on the idea of

19   open source intelligence, which is something that has been

05:47 20   widely reported in the media, about trying to leverage not just

21   classified information but information that is what -- when I

22   was in the intelligence community -- we would call the open

23   source, online or elsewhere.  A play on that is "Open Source

24   Jihad."

25          So the idea is instead of having to go to some classified

1    place, some closed members-only chat room, instead of having to

2    go to some training camp where someone has to vouch for you and

3    you need to get there and pay for your travel and whatnot, here

4    is "Open Source Jihad" available to you, easily accessible on

5    the Internet.  And in this first inaugural edition, it says in

6    this section:  "Make a bomb in the Kitchen of Your Mom"; and

7    the second point, "How to use Asrar al-Mujahideen," which was

8    an al-Qaeda secure communication -- online communication

9    network.

05:48 10          MR. CHAKRAVARTY:  If you would go to a single screen,

11    next page, 33.

12    Q.   Are you familiar with this page?

13    A.   I am.

14    Q.   And is this the first page of that article on "Make a Bomb

15    in the Kitchen of Your Mom"?

16    A.   It is.  By what they describe as the al-Qaeda chef.

17    Q.   So let me first start with the first paragraph.  Would you

18    just read the white portion of that?

19    A.   "Can I make an effective bomb that causes damage to the

05:49 20    enemy from ingredients available in any kitchen in the world?

21    The answer is yes.  But before how, we ask why?  It is because

22    Allah says."  And then there's a quote.

23    Q.   And is that a quote from a religious scripture?

24    A.   It is.

25    Q.   Can you read the next section?

A.   "And it is also because every Muslim is required to defend
his religion and nation.  The Jews and Christians have
dishonored the Muslims, desecrated our holy places and cursed
the beloved prophet.  Today they are holding contests for the
best blasphemy of Muhammad.

"The western governments today are waging a relentless war
against Islam.  They brought together a coalition and have the
support of their population in invading and destroying Muslim
land.

"But there is a small band of sincere Muslims who are
striking back at the enemy.  The efforts of this small group of
mujahidin have had a great effect in hindering the plans of the
enemy.  So now we have a balance of forces.  As they kill
Muslims, Muslims respond by killing among them.  This is the
effect of a small group of sincere mujahidin, so what would the
effect be if the Muslim ummah wakes up?"

Q.   Pause there for a moment.  What is mujahidin?

A.   Jihad fighters.

Q.   And the "ummah" is the same word you mentioned earlier for
Muslim nation?

A.   So if a small number of fighters have had this much
success, imagine how much more success there would be if a much
larger grouping -- if the whole nation were to rise and engage
in this activity.

Q.   Please continue.

A.   "There are many Muslims who have the zeal to defend the
ummah, but their vision is unclear.  They believe that in order
to defend the ummah, they need to travel and join the mujahidin
elsewhere and they must train in their camps.  **But we tell the
Muslims in America and Europe** there is a better choice, an
easier one to give support to your ummah.  That is individual
work inside the West such as the operations of Nidal Hassan and
Faisal Shahzad with a few 'failed' operations - as they claim.

"The Director of National Intelligence was forced to
resign.  With a few more 'failed operations' we may have the
resignation of the President of the United States."

Q.   Dr. Levitt, it sounds like there's a political dimension
to this exhortation.  Is there?

A.   Yes.  In part, that's what makes it terrorism and not just
murder.  Terrorism has to be by -- there are many definitions
of terrorism, but the basic commonality is targeting civilians
to achieve some type of political goal.

Q.   At the bottom of this -- start here after this passage.
First it recites to another part of scripture, and then can you
read from where it says "the results"?

A.   "The results of these trials would be the highest levels
of paradise, the pleasure of Allah, heaven in the hearts in
this world and eternal pleasure in the afterlife.  My Muslim
brother, **we are conveying to you our military training right
into your kitchen to relieve you of the difficulty of traveling**

1    **to us.**  If you are sincere in your intentions to serve the

2    religion of Allah, then all what you have to do is enter your

3    kitchen and make an explosive device that would damage the

4    enemy if you put your trust in Allah and then use this

5    explosive device properly.  Here are the main qualities of this

6    bomb."

7        The following are four bullet points.  The first bullet:

8    "Its ingredients are readily available"; second bullet:

9    "Buying these ingredients does not raise suspicion"; third

05:54 10    bullet:  "It is easily disposed of if the enemy searches your

11    home.  Sniffing dogs are not trained to recognize them as

12    bomb-making ingredients"; fourth bullet:  "In one or two days

13    the bomb could be ready to kill at least ten people.  In a

14    month, you may make a bigger and more lethal bomb that could

15    kill tens of people."

16    Q.   Does the magazine then go on to explain how to build these

17    bombs?

18    A.   It does.

19        MR. CHAKRAVARTY:  Can we go to page 45 and 46 side by

05:54 20    side, please?

21    Q.   What is this?

22    A.   Pardon?

23    Q.   What is this?

24    A.   This is another section of this first edition of *Inspire*

25    called "What to Expect in Jihad - Part One."

1    Q.   And does this explain the process of traveling overseas to

2    join a terrorist organization or a group that's fighting?

3    A.   It describes the things that one needs to know in advance

4    to overcome potential barriers to entry.  In fact, one of the

5    titles given in one of these is "cut out piece of paper" -- you

6    can see even here the kind of fine-tuned graphics, there's

7    language barrier.  It's telling people you have to be prepared

8    to overcome the language barrier.  If you can, bring a

9    companion.  There will be downtime; it would be much better to

05:55 10   have someone with you.  There's a cultural issue of blending

11   into the culture if you go fight in some foreign land.  Don't

12   expect it to be America or the United Kingdom or wherever

13   you're from.  What to bring, what not to bring, all sorts of

14   advice what to do and what not to do to make it easier for you

15   to make the decision to go and to then make it easier for you

16   to actually do it once you decide to go.

17        MR. CHAKRAVARTY:  Can we have page 56, please?  Can we

18   have 58 on the other screen?  Thank you.

19   Q.   What is this portion?

05:56 20   A.   This is a message from Anwar Al-Awlaki, Sheikh Anwar, to

21   the American people and Muslims in the West.

22   Q.   And is it an extensive speech explaining what he thinks is

23   the appropriate actions by Muslims in America?

24   A.   In America in particular, but also more generally in the

25   West.  In some points in here he speaks specifically to the

1    Muslims in the United States, and other times more generally to

2    Muslims wherever they may be in the West.

3    Q.   Page 58, I'm highlighting just the last portion.  Can you

4    read that?

5    A.   "Hence, my advice to you is this:  You have two choices:

6    Either hijra," which is immigration, "or jihad.  You either

7    leave or you fight.  You leave and live among Muslims or you

8    stay behind and fight with your hand, your wealth and your

9    word.  I specifically invite the youth to either fight in the

05:57 10   West or join their brothers in the fronts of jihad:

11   Afghanistan, Iraq and Somalia.  I invite them to join the new

12   front, Yemen, the base from which the great jihad of the

13   Arabian Peninsula will begin, the base from which the greatest

14   army of Islam will march forth."

15   Q.   Is this concept of choosing either hijra or jihad one that

16   you've seen before?

17   A.   Many times.

18   Q.   Can you explain what hijra is?

19   A.   It's migration, and it's following in the footsteps of the

05:57 20   Prophet Muhammad who in his day also made a migration.  This

21   idea is to make a migration to places where there's a Muslim

22   majority; where you can live with fellow Muslims as opposed to

23   living in a place where you are a minority as a Muslim.

24       At least if you live among Muslims, it will be easier for

25   you to live as a Muslim, is the idea, plus on top of that, the

1    overlay from the radical jihadi perspective of being able to

2    fight in jihadi conflicts.  And if you don't do that and if you

3    do decide to stay wherever you are in the diaspora, then as he

4    says, you either join us or you fight.

5    Q.   Were there other copies of *Inspire* magazine that we sent

6    to you that were similar in terms of the types of exhortations

7    that the editors of the magazine were making?

8    A.   Quite a few.

9    Q.   I'm going to draw your attention now to Exhibit 1142-89.

05:58 10   Is this one of those issues?  Excuse me.  Yeah, 1142-89.

11   A.   It is.

12   Q.   And this is the spring of 2011 issue.  Is that right?

13   A.   Yes, the fifth issue.

14   Q.   And was this a significant issue?

15   A.   They're all significant.  Yes, it was.

16        MR. CHAKRAVARTY:  Can we go to page 8, please?

17   Q.   Is there a portion that discusses the various reactions to

18   *Inspire* magazine?

19   A.   Yes.

05:59 20   Q.   And this one, can you read that?

21   A.   "They're not looking to outdo the readership of the

22   *Economist* or *Time Magazine*, they only need to inspire one or

23   two people to blow something up in the right place and they'll

24   make back their start-up costs."

25   Q.   Now, the highlighted passages were "inspire one or two

1   people" and "in the right place."  Is that correct?

2   A.    Correct.

3          MR. CHAKRAVARTY:  Can we go to page 62 and 63 side by

4   side, please?

5   Q.    And is this an interview of Anwar Awlaki as to "Why did I

6   choose al-Qaeda"?

7   A.    Exactly.

8   Q.    And does he say in Section 4 -- would you read that

9   passage except for the scripture?

06:01 10   A.    "Because they are the strangers (al Ghuraba)" and then he

11   quotes scripture.  After the scripture he continues,

12   "Thereupon, regarding this prophetic description for the people

13   of the truth about their status of estrangement, there is no

14   doubt that the one who lives in a state of fear about his soul

15   being taken for death as a result of this 'aqidah and jihad is

16   the one who lives in the status of being strange.  He lives in

17   the state of estrangement because he is accused of having

18   deficiency in his 'aqidah," in his creed, in other words.

19   "This is not the case; rather, it is because he is steadfast

06:01 20   upon the truth in a time where the supporters have become less

21   in number.  Indeed he is a stranger."

22   Q.    And what does that mean?

23   A.    Being a stranger is not just living in the diaspora, being

24   a stranger is living in a state of fear about whether or not

25   you're going to live or die, because there is something greater

```
 1    in the afterlife.
 2    Q.    Are you familiar with a person named Abu Muhammad
 3    al-Maqdisi?
 4    A.    I am.
 5    Q.    And who is he?
 6    A.    Al-Maqdisi is one of the most prominent Jordanian radical
 7    Islamist preachers, been in and out of jail many, many times.
 8    His materials are frequently included among the jihadi
 9    materials on these various websites, and is a very well-known
10    and prominent jihadi ideologue.
11    Q.    And did you read documents authored by him as part of the
12    materials that we sent?
13    A.    I did.
14          MR. CHAKRAVARTY:  Can we call up 1142-16, page 2?
15    Q.    Is this one of those documents?
16    A.    It is.
17    Q.    And is this published by a Tibyan Publications, the
18    publication you mentioned earlier?
19    A.    It is.
20    Q.    Can you read the title?
21    A.    "Precaution, Secrecy and Concealment:  Balancing Between
22    Negligence and Paranoia."
23    Q.    And what is the topic of this document?
24    A.    Well, as the title suggests, it's about the need for
25    operational security and how this is not only permissible but
```

 1    required for the Islamist fighter, the jihadi, and how on the

 2    one hand you can go overboard; on the flip side, you can be

 3    negligent, and either of those is dangerous.  So he describes

 4    in talking about something innocent with one of your

 5    compatriots, you insist on talking in code thereto, you could

 6    make the authorities think you're up to something dangerous and

 7    bring law enforcement scrutiny to yourself that was

 8    unnecessary.  So you shouldn't be engaging in, you know, covert

 9    code all the time.  And yet, if you think that no one's ever

06:04 10    listening to you and you don't take security precautions, you

 11    also open yourself up to potential law enforcement scrutiny.

 12    And many of our operatives, he explains, have been thwarted

 13    that way as well.

 14        He, as an ideologue -- this is not just kind of as an

 15    operator's incentive, he explains the ideological, theological

 16    basis for this.  This becomes now a matter of religion as well.

 17    Q.   Now, has this message of operational security been

 18    simplified for easier consumption?

 19    A.   Absolutely.

06:04 20        MR. CHAKRAVARTY:  If we could go to 1142-89, page 11.

 21    Q.   Would you read that?  Should I open that up a little bit

 22    more?  Can you read that?

 23    A.   "We have noticed that the year 2010 alone saw the most

 24    arrests in the West for home-grown jihadi operations.  Most of

 25    those arrested were arrested in groups, one connected to

1    another.  Sometimes the enemy would even set up the brother in

2    a sting operation, fooling him into believing that he was

3    working with the mujahidin.  Keeping that in mind, we have

4    witnessed that operations done by lone individuals has proven

5    to be much more successful.

6         "So what can we learn from this?"  I think the last two

7    cutoff words are "group operations have a greater tendency of

8    failing than lone operations due to the idea (of the operation)

9    escaping the mind and tongue to other individuals.  Even if

06:06 10   those individuals are trustworthy in your eyes, there is still

11   that 1 percent chance that someone from the intelligence

12   agencies are listening in and paying attention to your groups'

13   actions or that the person you are talking to might be working

14   for the enemy or that he might be pressured..."

15         MR. CHAKRAVARTY:  Next page, please.

16   Q.   Just to finish that thought.

17   A.   "...at a later period to give information to them.  With

18   lone operations, however, as long as you keep it to yourself,

19   nobody in the world would know what you're thinking and

06:06 20   planning."

21         MR. CHAKRAVARTY:  Call up Exhibit 1142-15.

22   Q.   Are you familiar with this document?

23   A.   I am.

24   Q.   And is this another Tibyan Publications document?

25   A.   It is.

```
 1   Q.   And what was the substance of this document?
 2   A.   This, again, is another document putting the idea of jihad
 3   in a religious context.
 4   Q.   "The effects of intention upon it."  Did it say anything
 5   about the type of intentions that bring the greatest rewards?
 6   A.   Well, this is the whole point, right, that to get rewards,
 7   whether it's that selfless, what you're doing on behalf of the
 8   ummah, or the benefits for one's self of entry into the highest
 9   levels of paradise, these only come if they're done for true
10   intentions, right?  So if you do it for monetary gain, you
11   don't get that reward.  If you do it for personal glory, you
12   don't get that reward.
13        You have to do what you do for the right reasons, which
14   makes it in the eyes of these extremists not an act of
15   terrorism, not an act of killing civilians that is forbidden,
16   but an act -- a religious act of violence that is not only
17   permissible but praiseworthy, and not just praiseworthy, but a
18   personal obligation, but only if you do it for the right
19   reasons and the right intention.
20   Q.   And what are the right reasons?
21   A.   Service of God, defense of the ummah.
22        MR. CHAKRAVARTY:  Would you go to 1142-36.
23   Q.   Are you familiar with this document?
24   A.   This is the Abdullah Azzam document, "Join the Caravan,"
25   that we mentioned earlier.
```

06:07 (line 10)
06:08 (line 20)

 1   Q.   Since we talked about it earlier, I won't go through it in

 2   detail at this moment.

 3        In addition to some of these documents, did you review

 4   some of these audio files that you had discussed?

 5   A.   Too many.

 6   Q.   Were there a few short ones that you were able to both

 7   listen to as well as see a transcript of?

 8   A.   Yes.

 9        MR. CHAKRAVARTY:  Just for the witness, your Honor,

06:09 10   Exhibit 1405A.  Just the transcript.

11   Q.   And is this three pages of transcript excerpts of three of

12   the audio files that we're going to listen to?

13   A.   I have here in front of me one paragraph of one of them,

14   yes; and a second, yes; and a third.

15   Q.   And do these transcripts fairly track the words of the

16   audio files that you listened to?

17   A.   They do.

18        MR. CHAKRAVARTY:  Your Honor, I would ask to publish

19   1405A as a chalk while we play three short audio clips.

06:09 20        MR. BRUCK:  I'd like to note our previously made

21   objection.

22        THE COURT:  All right.  Subject to that, they'll be

23   played.

24   BY MR. CHAKRAVARTY:

25   Q.   So if we could first play 1142-24 -- 124.  Excuse me.

1          (Audio recording played.)

2    Q.   Dr. Levitt, do you recognize the voice of the speaker in

3    that?

4    A.   That was Sheikh Awlaki, Anwar al-Awlaki.

5    Q.   And what's the significance of that passage that he

6    recited?

7    A.   So this Battle of Uhud is one that he talks about a lot,

8    he has a lecture series on it, among other battles, the Battle

9    of Badr, for example.  In this one, it's a theme we talked

06:13 10   about earlier, he's saying:  Look, if you do this act of jihad

11   with true intention -- the individual is asked, "Did you come

12   to fight here for the sake of your people or for the sake of

13   God?"  And he answers, "For the sake of God."  And then later

14   on his deathbed he says the Shahadah, the statement of faith,

15   and dies and is given entry into the highest levels of paradise

16   even though he had not been a good Muslim until then.  He had

17   not prayed, he had not fasted, et cetera.

18          And so there is this idea that engaging in an act of

19   jihadi violence for the right reasons and intentions is a

06:13 20   religious act, and not just a religious act.  One that can be

21   more spiritually fulfilling than any other type of religious

22   observance.

23          MR. CHAKRAVARTY:  Go to 1142-110 and page 2.

24          (Audio recording played.)

25   Q.   Dr. Levitt, first, there's some references, again, is this

1    Mr. Awlaki?

2    A.    This is Awlaki again, yes.

3    Q.    And what's the significance of this?

4    A.    Well, I think there are three things that are significant

5    here:  The first is you can see how he's trying to convince

6    people that to be a good Muslim, you have to break with Western

7    ideas.  I mean, the idea of a birthday.  This is a bad thing,

8    whereas, of course, many, many, many Muslims celebrate

9    birthdays and there's absolutely nothing wrong with that.  This

06:17 10    idea of breaking, having to be different and apart.

11         But more importantly it's two things:  One, there's a

12    clock ticking.  Don't waste a moment.  Act now.  It's:  Don't

13    push off to tomorrow what you can do today, right?  Death could

14    come tomorrow.  You don't know what's going to be.  We should

15    be not wasting a moment of our life, to try and do what has to

16    get done, whatever that may be, including this violent activity

17    that he talks about elsewhere.

18         Second is this idea of predestined time of death.  And

19    that is to say, you know, this is not something to fear.  This

06:18 20    is not something to be afraid of, as we read in an earlier

21    quote; this is something that's going to happen.  The date, the

22    time, the how, this is all predetermined.  It's not like if you

23    are more careful or less careful -- it is going to happen, so

24    you therefore have to take this time while you're here to do

25    the right thing.  And you don't have to be afraid of death

1    because it's going to happen, it's preordained when, how, what.

2        And this again removes the disincentive.  For many people

3    the idea of carrying out an operation in which they're not

4    going to survive is something that's difficult for them to wrap

5    their head around.  This is one way that the radical

6    individuals -- again, let's not associate this with traditional

7    Islam -- try and overcome that dissidence.

8    Q.   There are a couple of words that I don't think we talked

9    about yet here.  Is "dunya" basically this mortal life that

06:19 10   we're talking about?

11   A.   Yes, this world.

12   Q.   And kuffar, or "kufar"?

13   A.   The infidel, or non-believer.

14   Q.   Now, in the background there's some chanting or singing.

15   Is that the nasheed that you described earlier?

16   A.   It is.  So here you have a kind of overlay of an al-Awlaki

17   sermon on top of the chanting of a nasheed.

18   Q.   And in the earlier clip, which was entitled "The Man who

19   went to Jannah Without Praying," what is Jannah?

06:19 20   A.   Paradise.

21   Q.   I'll play one more short clip.  I'm not going to go

22   through the whole thing but a portion of it, which is 1142-32

23   and page 3.

24             (Audio recording played.)

25   Q.   Dr. Levitt, this was a considerably different tenor.  Was

1  this Anwar Awlaki?

2  A.    No, this is not Awlaki.  This -- you can completely hear

3  the difference between the measured kind of professorial tone

4  of Awlaki and this shrill, very, very excited speaker here.

5  And this is obviously much more graphic in terms of trying to

6  portray Islam in this violent context.

7  Q.    And audio files like these which are short clips of the

8  various different types, how are they used by the global jihadi

9  movement with regards to their messaging?

06:22  10  A.    Short or longer, they're very, very popular because

11  they're relatively small files.  They're meant to be downloaded

12  to players, and they are inspiration on the go.  So you don't

13  need to be tethered to your home computer, you don't even need

14  to be carrying your laptop around.  You can, you know, download

15  them to your MP3 player or to your car and you can listen to

16  them any time, as many times as you want.

17  Q.    Dr. Levitt, I want to now turn to the final series of

18  questions that I'm going to have for you, and they relate to

19  Exhibits 826 through 828.

06:23  20        MR. CHAKRAVARTY:  If you'd call that up on the left

21  side?

22  Q.    Dr. Levitt, did you recognize those photos as being photos

23  of a writing that's of significance in this case?

24  A.    Yes.

25  Q.    And this transcript, is this a transcript of the writing?

```
 1    A.    It is.

 2    Q.    And have you had a chance to study that writing?

 3    A.    I have.

 4    Q.    Were you able to glean from just the four corners of the

 5    writing itself who the audience is for this writing?

 6    A.    I think it's clear from the grammar that the audience is

 7    kind of the American public.  This is clearly not written for

 8    fellow travelers, fellow jihadis; this is an attempt to explain

 9    what's been done, and I think the grammar is quite clear there.

06:24 10    Q.    As we read through, if you can point those out -- point

11    out those clues that give you that conclusion.  We'll do that.

12    But before we start reading, have you seen the concepts in this

13    document before?

14    A.    Yes.

15    Q.    Where?

16    A.    We've seen them in Awlaki's statements and writings and

17    other writings from the radicalizers that was among the

18    material that was provided to me to review in this case.

19    Q.    The themes that weave throughout this writing, are they

06:25 20    common themes in the global jihad movement?

21    A.    They are.

22    Q.    Let's first start with the first sentence.  Would you read

23    that, please?

24    A.    "I'm jealous of my brother who ha..." and there's a bullet

25    hole.  Presumably it's "...has received the reward of Jannutul
```

1    Firdaus, Insha'Allah..." which means the highest level of

2    paradise, God willing "...before me."

3    Q.   To stop you there.  Just some of the grammar.

4    "Insha'Allah" means "God willing"?

5    A.   Yes.

6    Q.   And "Jannutul Firdaus," that's the highest level of

7    paradise?

8    A.   Yes.

9    Q.   And is this a concept we've seen in some of the other

06:25 10   documents that you've reviewed?

11   A.   It is.

12        MR. CHAKRAVARTY:  Can we call up on the second page

13   1142-36, which is "Join the Caravan"?  Can we go to page 17,

14   please?

15   Q.   And can you read Section 8?

16   A.   Section 8 the title is "Hoping for Martyrdom and the High

17   Station in Paradise."

18        "It has been reported in the authentic hadith narrated by

19   Imam Ahmad and Tirmidhi on the authority of Miqdam Ibn Ma that:

20   'The martyr has seven special favours from Allah:  He is

21   forgiven with the first spurt of his blood, he sees his place

22   in Paradise, he is clothed with the garment of Faith, he is wed

23   with seventy-two wives from the beautiful Houris of Paradise,

24   he is saved from the punishment of the grave, and he is

25   protected from the Great Terror onQiyamah, on his head is

1   placed a crown of dignity, the jewel of which is better than

2   the world and all in it.'"

3   Q.   Please continue.

4   A.   Starting with the first full sentence:  "He is granted

5   intercession for 70 people of his household."

6   Q.   And then there is another reporting by a scholar and then

7   another piece of scripture?

8   A.   Yes.

9   Q.   And is this a common theme in some of the global jihadi

06:27 10   movement?

11   A.   Yes.

12   Q.   And were there numerous other references to Jannutul

13   Firdaus throughout the materials that you reviewed in this

14   case?

15   A.   Yes.

16   Q.   Read the next sentence of the writing in the boat.

17   A.   "I do not mourn because his soul is very much alive.  God

18   has a plan for each person.  Mine was to hide in his boat and

19   shed some light on our actions.  I ask Allah to make me a

06:28 20   shahied (IA)..." presumably Insha'Allah, God willing "...to

21   allow me to return to him and be among all the righteous people

22   in the highest levels of heaven."

23   Q.   And, Dr. Levitt, you had pointed out that there's a line

24   where it says "God has a plan for each person.  Mine was to

25   hide in the boat and shed some light on our actions."  Have the

1    actions that are relevant in this case been suggested

2    throughout the media that you reviewed?

3    A.    They have, and this is also one of those references that I

4    think makes clear that this note is intended to explain to a

5    broad public what was just going on, about what these actions

6    were about, "shed some light on our actions."

7    Q.    This word "shahid," I don't know that you've explained

8    what that means.  Would you mind?

9    A.    Martyr.  In this case, a martyr for God.  To be killed in

06:29 10    the process of doing an act of jihad.  It's not the only

11    definition of martyr, but in the radical jihadi context, that's

12    what it's referring to.

13    Q.    And I asked you whether you saw these references in the

14    media that I sent you.  What did I send you?

15    A.    I'm sorry.  Ask that again?

16    Q.    Media.  I didn't mean media as in news media.  What did I

17    send to you that you reviewed, these materials?

18    A.    In totality?

19    Q.    The types of materials that I sent you.

06:30 20    A.    The nasheeds, the -- some videos, the *Inspire* magazines.

21    The publications that we went through and a whole host of

22    others.

23    Q.    I wanted to clarify it wasn't newspapers I sent to you.

24    A.    No, this was jihadi media.

25    Q.    Can you read the bottom of -- if you can make out on page

1    56 of this issue of *Inspire* magazine, can you read what I've

2    highlighted there?

3    A.    "Another option for the individual jihad is the idea we

4    proposed in 'Make a Bomb in the Kitchen of Your Mom.'  The

5    pressurized cooker should be placed in crowded areas and left

6    to blow up.  More than one of these could be planted to explode

7    at the same time.  However, keep in mind that the range of the

8    shrapnel in this operation is short range, so the pressurized

9    cooker or pipe should be packed close to the intended targets

06:31 10    and should not be concealed from them by barriers such as

11    walls."

12    Q.    Were there other references to operational planning for

13    the types of actions in this case?

14    A.    Yes.

15    Q.    The next portion of this note, the writing, says -- asks

16    Allah to make the author a shahid and to return him to the

17    righteous people in the highest levels of heaven.  What do the

18    "highest levels of heaven" mean?

19    A.    This is the Jannutul Firdaus that we talked about.  By

06:32 20    tradition, there are many levels of heaven and the differences

21    between them are significant.  And this is the highest level of

22    heaven reserved for the prophets, the most pious and the

23    martyrs.

24    Q.    Would you read the next line, please?

25    A.    "He who Allah guides, no one can misguide."

```
 1    Q.   What does that mean?

 2    A.   That if you were doing something in the name of and in

 3    defense of and for Allah, for God, you cannot be misguided.

 4    Q.   And the last phrase?

 5    A.   The letter A, then a bullet hole, bar exclamation point

 6    which in all likelihood read "Allahu Akbar," praise to God,

 7    praised is God -- God is great.

 8    Q.   And is that a common phrase in the materials that you

 9    reviewed over the course of your experience as a terrorism

10    expert?

11    A.   Yes.

12    Q.   And what does that mean?

13    A.   God is great.  Again, it need not be jihadi; it can be

14    said in other contexts too.  But in this context, this has a

15    jihadi connotation.

16         MR. CHAKRAVARTY:  The next page, please.

17    Q.   Please continue.

18    A.   "I bear witness that there is no God but Allah and that

19    Muhammad is his messenger."  There's a hole and then an R which

20    likely read "our actions came with a..." there's a bullet hole

21    and then the letter A, bullet hole, "ssage," "...came with a

22    message, and that is..." hole -- bullet hole, "...ha,"

23    Illallah.

24    Q.   The last phrase, is that an Arabic phrase?

25    A.   Yes.
```

1    Q.   And is that frequently known as the "Shahadah"?

2    A.   Yes.

3    Q.   What is that?

4    A.   It is a statement of faith.  And again, nothing radical

5    about this, per se.  This is the statement of faith of all

6    believing Muslims.  But it is also traditional to state it at a

7    time of death on the deathbed.  Again, harking back to the

8    Maqdisi document about intention, it's important before and

9    after an act in particular to state and restate one's true

06:34 10   intentions to be able to get that reward.

11   Q.   The first portion of this sentence, "I bear witness that

12   there's no God but Allah and that Muhammad is his messenger,"

13   is that essentially the English translation of the first

14   portion of the Shahadah?

15   A.   Yes.

16   Q.   Let me show you Exhibit 1341.  And this flag back here.

17   Do you recognize that?

18   A.   I recognize it.  As I stated earlier, I don't speak

19   Arabic, but I've seen this many times, and this is the Arabic

06:35 20   of the Shahadah; again, nothing inherently radical though many

21   jihadi groups have taken to putting the Shahadah in white

22   against the black backdrop as a symbol for them.

23        MR. BRUCK:  I think that image is not currently in

24   evidence.

25        THE COURT:  I thought it was.  This was the one that

1    was talked about being redacted, at the bottom.

2            MS. CONRAD:  It was redacted, your Honor.

3            MR. MELLIN:  No, your Honor.  The writing below it was

4    redacted; that image was entered.

5            THE COURT:  Right.  The picture was in.

6            MS. CONRAD:  The whole thing was displayed, your

7    Honor, for the jury.

8            THE COURT:  Yeah, but I don't think anyone could read

9    it.  The document should be redacted, though.  It didn't affect

06:35 10   anything that was shown to the witness.

11   BY MR. CHAKRAVARTY:

12   Q.   We'll move on to the next sentence, Dr. Levitt.

13   A.   "The U.S. government is killing our innocent civilians but

14   most of you already know that."

15   Q.   And here it says "most of you already know that."  What

16   significance do you attribute to that?

17   A.   Again, the grammar, this is speaking to an American

18   audience, this is speaking to a Western audience.  The author

19   is not associating himself with this audience, but it's "our,"

06:36 20   "your," us versus them, but I think this makes clear that this

21   is, again, as stated earlier in the message, in the statement,

22   trying to explain what just happened.

23   Q.   Now, did you find references amongst the materials in the

24   *Inspire* magazine particularly that make reference to the same

25   concept?

 1    A.    Yes.

 2              MR. CHAKRAVARTY:  Go to 1142-89, page 57.

 3              MR. BRUCK:  I don't think that's the way it's supposed

 4    to be displayed.

 5              THE COURT:  If you can take down the unredacted...

 6    BY MR. CHAKRAVARTY:

 7    Q.    Can you read that, please?

 8    A.    "America is a terrorist state and Americans are complacent

 9    in some of the worst forms of terrorism our Muslim nation has

06:38 10    been subjected to.  Millions of Muslim lives has been lost to

 11    American brutality.  It is about time Muslims wake up and pay

 12    back America what is due to it."

 13              "In this section, the OSJ" -- so that's Open Source

 14    Jihad -- "we give our readers suggestions often how to wage

 15    their individual jihad.  Here is one idea of how an individual

 16    Muslim may do so.  It is a simple idea and there is not much

 17    involved in its preparation.  All what is needed is the

 18    willingness to give one's life for Allah."

 19    Q.    There are several other passages like this throughout the

06:39 20    Inspire magazines particularly that demonstrate enmity towards

 21    America?

 22    A.    Yes.

 23              MR. CHAKRAVARTY:  Go back to the note, please.

 24              And, Mr. Bruemmer, you can take that down.

 25    Q.    Can you please keep reading?

A.   "As a M..." and then a bullet hole, presumably Muslim.
"As a Muslim I can't stand to see such evil go unpunished.  We
Muslims are one body.  You hurt one, you hurt us all.  Well, at
least that's how Muhammad, peace be upon him, wanted it to
be..." bullet hole "...ever," presumably "however, the ummah is
beginning to rise..." presumably "awaken."  There's a bullet
hole.

Q.   And before we move on to the next page to finish that
clause, this notion of "we Muslims are one body," is that that
concept of ummah?

A.   That and more, yes.

Q.   When you say "more," what do you mean?

A.   It's not just the idea of a single ummah, a single Muslim
nation, it's the idea that it is if you hurt one Muslim in any
part of the world, it's incumbent upon a Muslim -- it's a
personal obligation upon a practicing Muslim elsewhere in the
world to do something about it.  It's not like if Muslims in
Chechnya or Palestine or Iraq are being hurt but you're being
treated well here in the United States, you're okay here.  You
still need to do something because we are all one body.  You
hurt one of us, you hurt all of us.

Q.   And just before it says "I can't stand to see such evil go
unpunished," is punishing a theme throughout these materials?

A.   Yes.

          MR. CHAKRAVARTY:  Can we go to 1142-79?  Page 33,

1    please.

2    Q.    And is this a statement by Anwar al-Awlaki?

3    A.    Yes.

4          MR. CHAKRAVARTY:   Page 34, please.

5    Q.    Can you read that?

6    A.    "The declaration goes on to claim that we may not

7    terrorize those who enjoy safety and security.  To throw out

8    such a blanket statement that we are not allowed to terrorize

9    those who enjoy safety and security in light of the present

06:41 10  state of the world is another reckless statement.  According to

11   these scholars, we the Muslims are not allowed to terrorize the

12   Israelis or the Americans or the British who are living in

13   safety and security while millions of Muslims are being

14   terrorized by them.  We are told to never mind the insecurity

15   of the Palestinian or the Chechen or the Kashmiri.  Never mind

16   them.  We are simply not allowed to terrorize..."

17         MR. CHAKRAVARTY:   Next page, please.

18   A.    "...period.  No.  We do not agree with that.  We do not

19   agree with that because Allah says" -- and then there's a quote

06:42 20  from the scripture.  Would you like me to read it or not?

21   Q.    No, thank you.

22   A.    After the quote from the scripture it says, "We say that

23   whoever terrorizes us, we will terrorize them and we will do

24   what we can to strip them of their safety and security as long

25   as they do us the same."

```
 1    Q.   Were there other passages like this throughout the Inspire
 2    magazine particularly?
 3    A.   Yes.
 4    Q.   The idea of Muslims are one body, you hurt one, you hurt
 5    us all, was that evident in "Join the Caravan" as well?
 6    A.   Yes.
 7              MR. CHAKRAVARTY:  Go to 1142-36 at page 23.
 8    Q.   Can you read that?
 9    A.   Yeah, with difficulty.  I'm not as young as I once was.
10              (Laughter.)
11    Q.   How about if I read it and you tell me?
12    A.   I got you.
13    Q.   Okay.
14    A.   I'm not willing to give in quite yet.
15         "The jurists have documented that the lands of the Muslims
16    are like a single land, so that whichever region of the
17    Muslims' territory is exposed to danger, it is necessary that
18    the whole body of the Islamic ummah rally together to protect
19    this organ which is exposed to the onslaught of the microbe.
20    What is the matter with the scholars, that they do not arouse
21    the youths for jihad, especially since arousal is compulsory."
22    Q.   And is this that notion that if you hurt one, you hurt us
23    all?
24    A.   That and the compulsory nature of this standing up and
25    defending the ummah.
```

06:43 (line 10)
06:44 (line 20)

1    Q.   We'd finished this page, with "The ummah is beginning to

2    rise/awake."

3              MR. CHAKRAVARTY:  Can we go to the next page?

4    Q.   Please keep reading from the new portion.

5    A.   "How Muhammad, peace be upon him, wanted it to be..."

6    bullet hole "...ever," presumably "however, the ummah is

7    beginning to rise awa..."  bullet hole, presumably "awake, has

8    awoken the mujahidin.  Know you are fighting men who look into

9    the barrel of your gun and see heaven.  Now how can you compete

06:45 10   with that?  We are promised victory and we will surely get it."

11   Q.   And just before we move on, this idea of awakening the

12   mujahidin, is that a theme that you saw throughout the

13   materials?

14   A.   It is.

15             MR. CHAKRAVARTY:  Go to 1142-89, page 35.

16   Q.   And read this portion.  I'm sorry.  Can you read this

17   portion?

18   A.   "We must also awaken in the hearts of the ummah the spirit

19   of resistance and jihad; confrontation of aggression,

06:46 20   oppression and tyranny; firmness on the truth; and rejection of

21   the culture of concession and methodology of backtracking,

22   which has led some to abandon the government of the Sharia and

23   concede four-fifths of Palestine.

24   Q.   Now going back to the note, the writing in the

25   boat -- sorry.

1          MR. CHAKRAVARTY:  Mr. Bruemmer, can you go back to

2     page 3?

3     Q.    The next phrase is, "Know you are fighting men who can

4     look into the barrel of your gun and see heaven."  Are you

5     familiar with that concept?

6     A.    I am.

7     Q.    What is it?

8     A.    Again, this is the idea of not fearing death, looking into

9     the barrel of the gun and seeing heaven, seeing the

06:47 10    opportunity.  Again, presumably if having done for the right

11    reasons, being able to go to heaven, maybe even the highest

12    levels of heaven.  It's articulating to this Western audience

13    that how can you compete with that?  How can you fight people

14    who aren't afraid to die for their cause?

15    Q.    Read the next line, please?

16    A.    "We are promised victory and we will surely get it."

17    Q.    Now, this concept of victory, an assured victory, is that

18    a theme throughout these materials?

19    A.    It is.

06:47 20          MR. CHAKRAVARTY:  Go to 1142-91, page 57.

21    Q.    This is that first issue of *Inspire* magazine?

22    A.    It is.

23    Q.    Can you read that?

24    A.    "It is true that we are facing the arsenal of the greatest

25    army on earth with our simple modest means, but victory is on

1   our side.  Victory is on our side because there is a difference

2   between us and you.  We are fighting for a noble cause.  We are

3   fighting for God and you are..."

4        MR. CHAKRAVARTY:  Next page, please.

5   A.   "...fighting for worldly gain.  We are fighting for

6   justice because we are defending ourselves and our families and

7   you are fighting for imperialistic goals.  We are fighting for

8   truth and justice and you are fighting for oppression.  You

9   have your B-52's, your Apaches, your Abrams and your cruise

06:48 10  missiles, and we have small arms and simple improvised

11  explosive devices, but we have men who are dedicated and

12  sincere, with hearts of lions."

13       MR. CHAKRAVARTY:  Your Honor, I still have a little

14  bit more to go and it's four o'clock.

15       THE COURT:  Let me see you at the side first.

16       (Discussion at sidebar and out of the hearing of the

17  jury:)

18       THE COURT:  Is he staying?

19       MR. CHAKRAVARTY:  Once we got to lunch we realized

06:49 20  he's not going to make it.

21       THE COURT:  Okay.  How much more?

22       MR. CHAKRAVARTY:  Ten, 15 minutes.

23       THE COURT:  How much time do you have?

24       MR. BRUCK:  10, 15 minutes.  No more than a half hour.

25  I would hate to be overtime with an expert with a jury.

1          THE COURT:  Fair enough.

2          (In open court:)

3          THE COURT:  Okay.  We will pause here.  There is more

4    to go but we have reached the four o'clock hour.  We'll

5    adjourn.  Remember my instructions, obey them, and we will see

6    you tomorrow and finish with the testimony.

7          Enjoy the evening.

8          THE CLERK:  All rise for the Court and the jury.  The

9    Court will be in recess.

06:50 10          (The Court and jury exit the courtroom and the

11   proceedings adjourned at 4:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Officia Court Reporter

15
     Date: 10/13/15
16

17

18

19

20

21

22

23

24

25