```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )   Criminal Action
v.                                )   No. 13-10200-GAO
                                  )
DZHOKHAR A. TSARNAEV, also        )
known as Jahar Tsarni,            )
                                  )
          Defendant.              )
                                  )


             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE



                          LOBBY CONFERENCE


          John J. Moakley United States Courthouse
                        Courtroom No. 9
                       One Courthouse Way
                  Boston, Massachusetts  02210
                   Wednesday, March 18, 2015
                          9:06 a.m.



                   Marcia G. Patrisso, RMR, CRR
                      Official Court Reporter
                  John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2          OFFICE OF THE UNITED STATES ATTORNEY
            By: William D. Weinreb, Aloke Chakravarty and
 3               Nadine Pellegrini, Assistant U.S. Attorneys
            John Joseph Moakley Federal Courthouse
 4          Suite 9200
            Boston, Massachusetts  02210
 5          - and -
            UNITED STATES DEPARTMENT OF JUSTICE
 6          By: Steven D. Mellin, Assistant U.S. Attorney
            Capital Case Section
 7          1331 F Street, N.W.
            Washington, D.C.  20530
 8          On Behalf of the Government

 9          FEDERAL PUBLIC DEFENDER OFFICE
            By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10               Federal Public Defenders
            51 Sleeper Street
11          Fifth Floor
            Boston, Massachusetts  02210
12          - and -
            CLARKE & RICE, APC
13          By: Judy Clarke, Esq.
            1010 Second Avenue
14          Suite 1800
            San Diego, California  92101
15          - and -
            LAW OFFICE OF DAVID I. BRUCK
16          By: David I. Bruck, Esq.
            220 Sydney Lewis Hall
17          Lexington, Virginia  24450
            On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1          THE CLERK:  Good morning.

2          THE COURT:  All right?  Who wants to begin?

3          MS. CONRAD:  I'm sorry.  Go ahead.

4          MR. WATKINS:  Judge, I think we're still in a little

5  bit of bedlam here.  We do not have a list of witnesses out to

6  the end of trial.  We have expected witnesses, but there seem

7  to be more that are being added, unless the government is here

8  to say that what we were supplied last night is out to the end

9  of trial.

10          We didn't get the list until I think 5:45 or so, and

11  then we got an updated list about today's witnesses with

12  exhibit numbers.  So we got quite the late start on all this.

13          Ms. Conrad's about to correct me.

14          MS. CONRAD:  We did not get exhibit numbers for all

15  the witnesses, even on the 648.  I got the list we were sent.

16  There's a significant number with no exhibit numbers on them.

17  The list that we got last night at 6, whatever, p.m. included

18  Azamat -- I'm going to mess up the last name so I'm not even

19  going to try it.

20          And as I mentioned yesterday, we were not informed

21  that Azamat was even testifying this week until yesterday

22  morning.  He is a significant witness with a large number of

23  prior statements, as well as prior trial testimony, which I've

24  feverishly been trying to review since we got out of court

1    yesterday.

2         But the government didn't even give us the exhibit

3    numbers for him until after 8 p.m. last night.  And then -- and

4    I had mentioned this yesterday -- as with all the other

5    witnesses, they just gave us numbers.  These numbers, unless we

6    have the load file, are not matched up to anything in our

7    possession.  So we have an exhibit list that might just have

8    descriptors, but out of hundreds of thousands of documents we

9    don't know how to match those up.

10        We have received a load file through something like

11   Exhibit 400.  We're well past that now.  We understand an

12   exhibit load file has been prepared for us.  It has not yet

13   been given to us.  Last night, after I received at 8:09 p.m.

14   from Mr. Chakravarty the exhibit numbers for Mr. Azamat --

15        MR. WEINREB:  Tazhayakov.

16        MS. CONRAD:  -- I inquired after spending about 20

17   minutes searching to see what these exhibits were, what a

18   certain number was and said we didn't have it, and he responded

19   "Oh, that's a set of headphones."  Well, it would have been

20   helpful to know that before I spent 20 minutes searching

21   through thousands of documents for this exhibit number.  I

22   mean, this is just not helpful, it's not what the government

23   promised yesterday, it's not what the government said they

24   would do when we left and broke early yesterday.  And from a

25   purely selfish point of view, it is not sufficient for me to

1    prepare Azamat's cross-examination for today.

2          On top of that, as far as Azamat is concerned, the

3    government provided -- some of the exhibits are -- a couple of

4    them are charts of text messages.  We don't have the underlying

5    data except in the form of an unextracted view of his cell

6    phone.  So now -- I mean, I just cannot, between yesterday at

7    one o'clock and this morning, or whenever Azamat's going to

8    testify, have someone try to extract that data and match it up

9    to these text messages.

10          So I know I sort of derailed Mr. Watkins, but I just

11   want to illustrate the seriousness of this issue.  I mean, we

12   have been asking all along for something that -- I'm sorry.

13   The Court ordered two weeks in advance witnesses with exhibits.

14   To get something like this at 6 p.m. at night for the next day

15   is just not sufficient for us to adequately prepare.

16          MR. WEINREB:  So, your Honor, in the normal case the

17   government provides -- both parties provide each other a

18   witness list and an exhibit list.  Normally the exhibits are

19   not matched to particular witnesses.  That's just something

20   that the defense learns as they go along.

21          We have no problem, you know, abiding by the Court's

22   order to give them a list that actually matches up particular

23   exhibits to witnesses, but it's something that we ourselves

24   don't make a call on until a day or two before we call

25   somebody.  That's, you know, a realistic feature of trial

 1    preparation, especially in a case going this fast.  We bring

 2    witnesses in for prep, you know, a day or two before they

 3    testify and we start showing them things and going over things

 4    with them and sometimes we toss this out, sometimes we realize

 5    we need to add this.  It's just not possible to do what they're

 6    asking this far in advance.  And we're doing our best.  I mean,

 7    we are giving it to them as soon as we, ourselves, have it

 8    compiled and can give it to them.

 9            With respect to the witness list to the end of the

10    trial, I think the Court said -- you know, that we agreed to do

11    that.  And as the Court said, you know, there are always going

12    to be sort of last-minute calls that you make, adding a

13    witness, subtracting a witness, but it should be 90 percent

14    complete, and it is.  As far as I know, the witness list we

15    gave is essentially a 90-percent accurate list of the witnesses

16    to the end of the guilt phase.

17            We don't yet have all the exhibits matched up to

18    particular witnesses, but 95 percent of the exhibits that will

19    be offered through those witnesses were on our exhibit list and

20    the defense has had it for weeks and weeks, if not months,

21    because we produced it at the end of December.

22            This business of the optical load file that has the

23    images or the copies of the exhibits with the numbers attached,

24    I never heard that phrase before yesterday.  I'm sure somebody

25    else has in the government.  But as soon as we were asked for

 1    one, I inquired, and one was made and given to the defense.

 2    So -- one was made.  Maybe it hasn't been handed over.

 3         MR. CHAKRAVARTY:  There was an earlier one, but

 4    there's an updated version which I think is what you're asking

 5    for.

 6         THE COURT:  What is it?

 7         MR. CHAKRAVARTY:  It's a load file.  It's our copy of

 8    our -- the data in our Sanction database that we use to project

 9    the images of the exhibits onto the court -- so that they would

10    have an exact duplicate of what we have.  So they have one from

11    two weeks ago.

12         MR. WEINREB:  I think there's another way of viewing

13    this whole thing, which is that we're being asked to do a lot

14    more in this case than the government normally does in a normal

15    case.  Normally we don't give the defense our own optical --

16    you know, our own data presentation software for them to use.

17    That's their job to come up with their presentation for their

18    exhibits.

19         And, you know, the defense is allowed to look at the

20    exhibits.  Oftentimes they come to our office and look at them,

21    and that's the exposure they get.  And very commonly it happens

22    a few days before trial.

23         We don't have a quarrel with what we're being asked to

24    do substantively, it's just the speed which we could possibly

25    get it done accurately.  You know, if we give them something

1    that's inaccurate, then they complain that it was inaccurate.

2         Yesterday we took the time, we did it for the number

3    of witnesses who we knew would be called today.  These happen

4    to be very exhibit-intensive witnesses, so it's a little

5    different from how it might be with respect to, let's say,

6    civilians who just have a few witnesses [*sic*].  But to a

7    large -- to a large degree the exhibits on the list today are

8    photographs of things that were collected in various places.

9    There's just not much controversial about them, and the

10   photographs certainly were produced, you know, a year ago.

11        THE COURT:  What's today like?  What do you --

12        MR. WEINREB:  So today is almost entirely going to be

13   forensic evidence about the -- I'm sorry -- testimony about the

14   forensic collection of evidence at the Watertown crime scene.

15   There will be the collection of explosives evidence at the

16   crime scene, ballistics evidence at the crime scene, some blood

17   evidence, and then testimony from a fingerprint expert, DNA

18   expert, just to talk about the Collier blood, and --

19        MR. CHAKRAVARTY:  Those are the main.

20        THE COURT:  Tazhayakov?

21        MR. WEINREB:  Tazhayakov we did not bring in today.

22        MR. CHAKRAVARTY:  He is here today but we probably

23   won't get to him.

24        Just let me say on the record on Tazhayakov, not only

25   has the defense known that he is a cooperator who has already

1    testified in another case and is likely to testify in this

2    case -- this is for purposes of the record, to mute some of the

3    surprise expressed by the defense.  The exhibits that he would

4    be testifying to are things like his plea agreement, text

5    messages from his telephone which are clearly marked in the

6    exhibit list.  The exhibit which Miss Conrad asked about

7    yesterday, it's clearly marked in the exhibit list, described

8    what it is.  The exhibits that he will be talking about are

9    bunched together on the exhibit list so it's clear that --

10   photos from his residence and from the backpack that was

11   disposed of are all in sequence.  So there is absolutely no

12   risk of surprise when at least four months ago this information

13   was made available, and frankly, it was probably more

14   intuitive --

15          THE COURT:  I'm interested in the near horizon.

16          MS. CONRAD:  Can I -- there is an issue.  If he's

17   coming in tomorrow, I still have a discovery issue on him, but

18   we could save that.

19          This business about the -- one thing I neglected to

20   say, some of the exhibits that were listed on this list we were

21   sent last night, we didn't even have those.  We were sent those

22   after we got the list.

23          MR. WEINREB:  Right, because they didn't exist until

24   minutes before we sent them --

25          MS. CONRAD:  Well, you know, your Honor, I mean, I'm

1    not trying to dump on the government.  I'm really not.  We have

2    been moving at a pace much faster than we anticipated and that

3    has placed a burden on the government as well as a burden on

4    us.

5         And, you know, I certainly agree with Mr. Chakravarty

6    that we knew Azamat was going to testify but, unfortunately,

7    I'm not preparing my cross-examination and -- my witness

8    examination, you know, a week in advance.  I'm looking at who's

9    coming up next for that week.

10        But if -- you know, the government legitimately asked

11   for time off yesterday to try and pull things together so that

12   we could get more organized.  With respect to this point about

13   "We don't usually give them our load file," well, usually you

14   provide premarked exhibits, and this is the equivalent of a

15   premarked exhibit.  But if the government is having trouble

16   putting this together in a fashion that they can give us enough

17   notice that we can adequately prepare to effectively represent

18   our client, then maybe we need to take a day or two off to

19   allow them the time to catch their breath and give them [sic]

20   what they promised yesterday they would give us.

21        THE COURT:  Well, we'll have a day or two in the

22   next -- after tomorrow.  So I'm -- that's when I say "the short

23   horizon."  I'm interested in today and tomorrow.  And

24   then -- so, now, for the rest of the trial, whatever the phrase

25   was, that's a week plus a day or two?  Is that what you think

1    now?  I mean, what --

2            MR. CHAKRAVARTY:  We still think by the end of next

3    week we should be done.

4            THE COURT:  All right.  So, again, give or take --

5            MR. WEINREB:  Give or take.

6            THE COURT:  -- next week, maybe into the beginning of

7    the following week, maybe not?

8            MR. WEINREB:  Yes.

9            THE COURT:  Okay.  So over the weekend all of what

10   we've been talking about, the matching up of exhibits as well

11   as, as best you can, with expected witnesses can be provided

12   before the start of the week?

13           MR. WEINREB:  Yeah.  We will provide -- as soon as we

14   actually have the list we will provide it to the defense.  And

15   we'll provide it to them progressively so they're not sitting

16   around all weekend waiting for it.  That's typically how we do

17   it.  Witnesses come in, we prep them, we actually go through

18   the exhibits and then we put our list together.  We're willing

19   to email it off as soon as we have it.  So they'll have it

20   literally as soon as we have it.

21           I mean, we all had access to the exhibits.  The only

22   thing we're talking about here is information about which ones

23   the government has selected to offer through which witness.

24           THE COURT:  Okay.  Is there any expert testimony today

25   and tomorrow?

1          MR. WEINREB:  Yes.

2          THE COURT:  Who?

3          MR. WEINREB:  Patrick Moynihan is an fingerprint

4  expert.  I don't think there was any *Daubert* motion with

5  respect to him.  Jen Montgomery is a DNA expert.  That's been

6  resolved.  There's nothing left pending.  Chris --

7          MR. WATKINS:  May I just interrupt there?  On

8  Ms. Montgomery, there is an issue that I want to flag for the

9  Court.  In Mr. Weinreb's opening he talked about DNA on a set

10  of keys within the Civic.  That was not noticed as part of

11  their Rule 16 disclosure back in December so we will object to

12  that.  We were given no notice of that particular part on

13  Ms. Montgomery's testimony.  The gloves will not be an issue.

14  That will not be anything.  But the --

15          THE COURT:  The keys aren't in her report?

16          MR. WATKINS:  Pardon me?

17          THE COURT:  The keys are not mentioned in her report?

18          MR. WATKINS:  They're mentioned in her report; they

19  are not mentioned in the government's Rule 16 disclosure last

20  September.

21          MR. WEINREB:  So the DNA test was done after that and

22  then we supplemented it.

23          MR. WATKINS:  That's incorrect.  It was in August and

24  there was no supplement.

25          MR. CHAKRAVARTY:  There was a supplement to the report

1    that she would testify.

2              MS. CONRAD:  Can we be provided with a copy of that

3    because we've been told before that we've been provided with

4    things that we haven't been provided with.

5              MR. WEINREB:  They've had the report of the DNA

6    results since the day we had it.

7              THE COURT:  I understand the issue and it will have to

8    be resolved.

9              MR. WEINREB:  Chris Donohue is another fingerprint

10   expert.  No issues with respect to him --

11             MS. CLARKE:  Is he on today?

12             MR. WEINREB:  No.  Well, it depends how fast we go,

13   but I don't think so.  He's on-call to come in.  That's it.

14             MS. CONRAD:  Can I just note I don't think he was even

15   on this list that we were sent last night.

16             MR. WEINREB:  Yeah, because we don't expect to reach

17   him.

18             MS. CONRAD:  But this was supposed to be through the

19   end of trial.

20             MR. WEINREB:  I don't know why he's not on that list

21   but I mentioned him to you yesterday right after court.  You

22   asked me about him and I told you.

23             MR. WATKINS:  Again, many of these things are not

24   surprises.  You're quite right, the exhibits may not be

25   surprises.  The reason -- historically, of course, the Court

1    remembers a tremendous amount of discovery, lots of exhibits in

2    this case, so it's not the usual case here.  And the government

3    resisted our motions for a continuance regularly saying they

4    were going to be ready for trial here, and that does include

5    notification of which exhibits go with which witnesses.  And

6    that's why we are in this position that we are.  We're moving

7    so very quickly that it's now less than 24 hours' notice that

8    we're getting of witnesses and exhibits.  I'm sorry.  I'm

9    taking Mr. Weinreb off of this.

10            MR. WEINREB:  I disagree with what "ready for trial"

11   means but we don't need to debate it.  I don't believe there

12   are any other experts.

13            MR. CHAKRAVARTY:  Tomorrow the computer expert, Kevin

14   Swindon, who is going to be introducing a variety of the

15   computer evidence that was --

16            THE COURT:  From various computers?

17            MR. CHAKRAVARTY:  Various computers that were found --

18            THE COURT:  So he will be a while, I would think.

19            MR. CHAKRAVARTY:  I think so, just to mechanically go

20   through them.  He's not going to do a deep dive into each of

21   them, but there were probably a dozen computers -- devices that

22   were talked about.

23            One of the issues with that is he kind of has a hard

24   date tomorrow because on Monday we have a terrorism expert

25   coming in.

1          THE COURT:  Who?

2          MR. CHAKRAVARTY:  Matt Levitt.

3          MR. BRUCK:  That's Monday?

4          MR. CHAKRAVARTY:  Monday.  And he has --

5          THE COURT:  Who are you going to call on terrorism

6    experts?  Because there's a motion about them, right?

7          MR. CHAKRAVARTY:  Right.  Just Matt Levitt for

8    liability, and we'll see how the penalty phase plays out.

9          THE COURT:  All right.

10          MR. CHAKRAVARTY:  He's going to be a relatively narrow

11   witness but we have to get him on and off Monday.  He's flying

12   back to Europe Monday evening.  So in light of the fact that

13   some of the material he's going to be talking about, like

14   *Inspire* magazine and other things that were found on the

15   defendant's computer, Swindon has to testify on Thursday.

16          So if some of the locations -- we haven't presented

17   the search witnesses for some of those locations -- for

18   example, the landfill had a thumb drive in it -- we would ask

19   that Swindon be able to testify de bene to the fact that he

20   processed the -- that he extracted data from that thumb drive

21   and put it on a CD.  And you will have a series of CDs that we

22   will be moving into evidence, and we'll later call the CD

23   person.

24          THE COURT:  Okay.

25          MS. CONRAD:  So tomorrow is just Swindon or is Azamat

1    tomorrow?

2         MR. CHAKRAVARTY:  Azamat was scheduled for today.

3         MS. CONRAD:  I know that.

4         MR. CHAKRAVARTY:  We'll see how things play out today.

5    Swindon has to get on tomorrow.  Azamat does not have to get

6    on.

7         MS. CONRAD:  Okay.  Can I ask my discovery question

8    about Azamat now?  Is that appropriate?

9         THE COURT:  Why don't you talk about it and see if you

10   can resolve it?

11        MS. CONRAD:  Well, I've made an inquiry and I haven't

12   gotten a response back.  We have a good couple of issues

13   about --

14        MR. WATKINS:  I'm interested to hear which other

15   experts, for example, Cahill there is a motion in limine.

16        MR. WEINREB:  I'm sorry.  Cahill?

17        MR. CHAKRAVARTY:  David.

18        MR. WEINREB:  David Cahill is a ballistics expert.

19   He's going to testify that the Ruger casings and slugs that

20   were recovered at MIT and at Watertown matched the Ruger.

21        MR. WATKINS:  And that was the subject of a motion in

22   limine where there's not yet been a ruling.

23        THE COURT:  Right.

24        (Pause.)

25        THE COURT:  I think my reaction when I read the papers

 1  just a little bit ago was that it will depend on the foundation

 2  that he establishes.  I mean, the question as I understood it

 3  was the reliability of the science of matching -- I forget the

 4  terms that he used, but striata or something.

 5              MR. WEINREB:  Striata, deformities.

 6              THE COURT:  Right.  Frankly, it appeared to me to be

 7  likely admissible, but I would hear the -- and if it was

 8  necessary to have a voir dire, we could do that.  That was my

 9  reaction.

10              MR. WATKINS:  We've requested a voir dire before that

11  evidence comes in.

12              THE COURT:  All right.  We can do that.

13              MR. WEINREB:  That's fine.

14              MR. WATKINS:  And so that would be today also, do you

15  anticipate?

16              MR. WEINREB:  That will likely be today.  That will be

17  today.

18              THE COURT:  Okay.

19              MR. WATKINS:  Your Honor --

20              MS. CLARKE:  There are a couple of other -- yeah.

21              MR. WATKINS:  I would say I'm not prepared for that

22  particular aspect of the trial.  Again, most of these

23  witnesses, as the Court has seen, are my witnesses going

24  forward here.  Had I known that there was going to be a voir

25  dire on the reliability today, I would have turned my focus to

1    that particular issue.  I have not done so because I'm

2    concentrating, and was concentrating all last night, on the

3    exhibits that the government was able to identify with

4    particular witnesses, but not until yesterday.

5         So I would ask that we put the voir dire and Trooper

6    Cahill off to a different time so I'd be able to prepare for

7    that aspect of the case, which I did not know was going to

8    happen today.

9         MR. WEINREB:  Your Honor, I'd object to that.  We

10   are -- because of the rapidity with which the trial has moved,

11   we're doing a lot of people's schedules.  People absolutely

12   have to get on at certain points or the trial is going to be

13   over before they have an opportunity to testify.

14        Ballistics matching is something that has been going

15   on in courtrooms for decades.  The issue was briefed months and

16   months and months ago.  It's something that I don't

17   think -- it's not a -- it doesn't involve complicated science.

18   You match ballistics by taking pictures of a test fire and

19   looking at pictures of actual things and see if you can match

20   them up.  I don't believe that this expert in particular is one

21   who warrants being put off someplace completely out of order

22   for this kind of voir dire, this kind of routine.

23        THE COURT:  How long will he be?

24        MR. WEINREB:  As a witness?

25        THE COURT:  Hmm.

1          MR. CHAKRAVARTY:  Maybe an hour.

2          MR. WEINREB:  An hour?  I know it's tough to say

3    but -- yeah, he collected all of the ballistics evidence, so

4    without him none of it is going to come into evidence.  We have

5    people here who, you know, diagrammed where it was and so on.

6    And he's sort of an essential piece of the puzzle.

7          So he collected every single piece of ballistics

8    evidence, both at MIT and in Watertown, and can say where it

9    all was when he collected it, and he then did the test fires,

10   compared it.  He can say that the Tsarnaev brothers -- he can

11   say that none of the other officers were firing a Ruger.  I

12   mean, there are a lot of very important things that he needs to

13   say that have nothing to do with his expertise, but we need his

14   expertise as well.

15         MS. CONRAD:  May I suggest that perhaps, then, his

16   testimony could be bifurcated?

17         MR. WEINREB:  That would make no sense.  Again, it's

18   going to confuse the jury more than it's going to help them.

19   Again, we're not talking about DNA mixtures or something

20   complicated here.

21         THE COURT:  Yeah, I frankly don't think that -- I'll

22   give you the chance at the voir dire, but I frankly don't think

23   that it's going to alter the likelihood of his testifying to an

24   opinion.  So I think we can go forward with it.

25         MR. WATKINS:  May I just ask a question because this

1    brings up something new?  I did not understand Trooper Cahill

2    to be testifying to actually picking things up.  None of the

3    exhibits seem to be tied to those particular picking up.  What

4    we have are pictures of the -- right.  The comparison pictures.

5    The exhibits, as far as picking things up, are not tied to him.

6                THE COURT:  All right.

7                MR. WATKINS:  I thought it was a complete --

8                THE COURT:  You had something else?

9                MS. CLARKE:  I had just a couple --

10               Did you want to raise them, though?

11               Just a couple of things.  There's a Kelley King on the

12   witness list, your Honor, that I don't think was on the

13   statutorily required list production and we have no exhibits

14   and no idea what Kelley King is on the list for.  And then

15   there's a Christopher Derks that we've been advised will be

16   putting on items seized at Norfolk.  And as you might imagine,

17   there were lots of items seized at Norfolk, and we really would

18   need to know what the government is putting in to see if

19   there's a completion picture that we need to put in.  So we're

20   concerned about that because we've got no exhibits on it.  And

21   so --

22               MS. PELLEGRINI:  Actually, I think Norfolk is on the

23   2D.  So the exhibits that are listed there --

24               MS. CONRAD:  There are no exhibits listed.

25               MS. PELLEGRINI:  I'm sorry?

1          MS. CONRAD:  What we got yesterday did not list any

2     exhibits for Derks.

3          MS. PELLEGRINI:  But it might have said the 2D,

4     because the exhibits are listed there as well as pictures.

5          THE COURT:  How about the first one?

6          MR. WEINREB:  Kelley King did two things:  She

7     collected the white gloves from the Honda and put them in an

8     evidence bag.  I mean, other people saw her do it, so she's not

9     actually essential for that purpose.  And she also swabbed the

10    keys for a sample of blood.  Again, I suppose she's not

11    essential for that purpose because it was -- other people

12    witnessed enough of it that -- so.  But she's a minor witness.

13    So she'll be on and off the stand, from our perspective, in ten

14    minutes.  I don't think there's anything controversial about

15    her testimony.

16         MR. WATKINS:  One more lingering issue from yesterday.

17    There was the issue about the sweatshirt and the jacket coming

18    in.  We had conversations afterwards about how to sort through

19    that immediately rather than putting us on.

20          I was under the impression that the jacket and the

21    sweatshirt would be here today to be introduced

22    through -- actually, at least one witness with personal

23    knowledge that was at the hospital that got our guy's

24    sweatshirt, Dzhokhar's sweatshirt, and that another witness

25    would be able to testify to the jacket coming in to the

1    Massachusetts State Police.

2            We do not have those physical items today.  The

3    government has them obviously, but they are not here today,

4    which leaves me in a difficult position of how to introduce

5    what we need to introduce without the physical item here.

6            We talked about pictures.  The only picture I can get

7    my hands on right away is the one that's in evidence with him

8    climbing out of the boat with his hands up.  So I would propose

9    that I could put that in through the witness D.J. Fife, who is

10   the one who collected it from the hospital.  He would then be

11   able to identify that sweatshirt as the one that he picked up,

12   and then we're on our way, as far as if that is agreeable to

13   the government.

14           MR. WEINREB:  So pictures of the items of the

15   defendant's clothing that were seized in the hospital room were

16   produced in discovery.  I have them upstairs.  I'm perfectly

17   willing to get Mr. Watkins what he needs.  And in addition, we

18   won't object to the actual clothing coming in later,

19   essentially by stipulation.  We don't have to actually read a

20   stipulation to the jury; we just won't object.  The only thing

21   is that I would need a minute to go up there and find it and

22   print it out for him, but I'm certainly willing to do that.

23           As for Tamerlan Tsarnaev's jacket, I assume we have a

24   picture of that that I could lay my hands on and I'm willing to

25   do that.  Alternatively, we could just agree that it will just

1   come in later on somehow and make it clear to the jury that

2   it's coming, but it's Tamerlan Tsarnaev's jacket.  It's

3   biohazard evidence, which is why we don't keep it here, just

4   like we don't keep the ballistics here and other stuff here.

5   It's kept in a special place.  But we can have it brought in.

6           MS. PELLEGRINI:  I don't think it can be opened.

7           MR. WEINREB:  Yeah, I don't think it can be opened,

8   but at least we could say it and there would be a picture of

9   it.

10          MR. WATKINS:  The difficulty in it coming in later, of

11  course, is that we're about to move away from the Watertown

12  scene, which is where temporarily these things came in.

13          THE COURT:  Well, will a picture do?  This is light or

14  dark, isn't it?  Isn't that the issue?

15          MR. WATKINS:  Yes.  And that's why actually having it

16  physically in the courtroom is --

17          THE COURT:  Well, it depends on how good the picture

18  is, I guess.

19          MR. WATKINS:  And if I had known -- again, this is the

20  pace we're moving at.

21          THE COURT:  Or perhaps a stipulation that it was a

22  dark jacket.

23          MR. WEINREB:  I think we could have it brought over

24  during lunchtime.  I mean, it's in Boston.  It's probably over

25  at the JFK.  So I'll ask one of the agents to get it and bring

1    it.

2              MR. WATKINS:  I suspect the witness will be off the

3    stand by that point.

4              MR. WEINREB:  I mean, we could do it.

5              MS. CONRAD:  How about the morning recess?

6              THE COURT:  Well, whatever.

7              MS. CONRAD:  May I raise --

8              THE COURT:  Wait a minute.  I want to --

9              MS. CONRAD:  Sure.

10             MR. BRUCK:  One quick thing.  The second witness

11   today, Matthew -- Trooper Hess, as I understand it, is going to

12   introduce the CD of the nasheeds, the Arabic vocal music that

13   Mr. Dun Meng described as weird.  I understand there are things

14   about this that arguably are relevant, but we think that the

15   music itself is not and will do nothing but create prejudice

16   and bias.  It is simply a cultural divide between Middle

17   Eastern music and -- which in this context will sound hateful

18   and disgusting.  I mean, that's -- you know, and that burdens

19   the obligation of the jury not to consider religion and

20   national origin and everything else in their sentencing

21   decision in a capital case.

22             I don't think the Court has to rule on it today.

23   We're just going to object to it coming in today.  It can be

24   identified.  There won't be a problem about chain of custody

25   but --

 1              THE COURT:  Were you going to play it?

 2              MR. BRUCK:  -- the actual playing of the MP3

 3    digital --

 4              MS. PELLEGRINI:  It will be played later.

 5              MR. CHAKRAVARTY:  Later.

 6              THE COURT:  So it doesn't have to be -- just to be

 7    obscure about it, I think it's likely it will get played.

 8              MS. CONRAD:  I think if it's not going to get played,

 9    then it should be marked for identification.

10              MS. PELLEGRINI:  No, I think it comes in.

11              MS. CONRAD:  Then we have an objection to it coming

12    in.  That's the point.

13              THE COURT:  I expect I will admit it over objection.

14              MR. BRUCK:  Well --

15              THE COURT:  I understand the objection.

16              MR. BRUCK:  Okay.  I want to be clear that it is as a

17    constitutional basis and the due process clause as well as the

18    statute.

19              THE COURT:  All right.

20              MS. CONRAD:  So first of all, I just wanted to

21    clarify.  Kelley King:  Our objection based on the statutorily

22    required list is overruled or is she not going to testify?

23              THE COURT:  I think it's trivial, from what I hear, so

24    I guess it's overruled.

25              MS. CLARKE:  Do we need to object when she takes the

1    stand?

2          THE COURT:  No, I think this is sufficient.  This is

3    sufficient.

4          MS. CONRAD:  This is on a -- first of all, I also

5    wanted to -- to the extent the government is going to provide

6    us something over the weekend on a rolling basis, which is

7    great, again, if we could just either get the load file or get

8    something that associates the exhibit numbers with a Bates

9    number or some other identifier that we can match it up in our

10   database and that --

11         MR. WEINREB:  That we cannot do.  Bates numbers --

12         MS. CONRAD:  Well, what about the load file?

13         MR. WEINREB:  -- is not something we have an index

14   anything to.

15         MS. CONRAD:  Apparently, the load file is a substitute

16   for --

17         THE COURT:  Well, okay.  I don't want to get into this

18   here.

19         MS. CONRAD:  It's like a premarked exhibit.

20         THE COURT:  I want the government to do its best to

21   provide guidance as to which witnesses will have which exhibits

22   within practical limits, okay?  And now I want to start the

23   evidence.

24         MS. CONRAD:  Well, I have two things that are related

25   to exhibit numbers, and one is really housekeeping and the

1    other is just something that I think the Court should be aware

2    of.  The government has been, I think appropriately, providing,

3    except for -- well, with one, maybe, exception -- providing

4    exhibits -- copies of exhibits that have been admitted to the

5    press.  And apparently there is a website or some electronic

6    medium where the press can access that.

7         Yesterday a photograph -- or a portion of a photograph

8    was introduced from the -- of Mr. Tsarnaev with the Arabic

9    flag.  And apparently, as presented on this website, it was

10   presented not with its exhibit number but with a caption that

11   indicated that it came from Mr. Tsarnaev's Instagram account

12   with the caption "My Flag."  And this was picked up on by the

13   press and by the media.

14        And I would ask that that be corrected, and that if

15   the government is going to provide exhibits -- we have the

16   link.  Mr. Chakravarty's shaking his head.  We have the link.

17        MR. CHAKRAVARTY:  Because that photo was from an

18   Instagram.  Instagram is something intended for the public.

19        MS. CONRAD:  That's not a live Instagram account.

20   That's not how it came in.  There was no testimony about it.

21   If the government is going to provide exhibits to the press,

22   the only identifier on them should be an exhibit number.  A

23   caption that was not a file or a caption that was not

24   introduced should not be on there during trial.  It is a

25   violation of the local rules regarding extrajudicial

1    statements.

2              MR. CHAKRAVARTY:  We did not provide that image.  We

3    provided the image that was introduced in court with the

4    exhibit number.

5              MS. CONRAD:  With the filing.

6              MR. CHAKRAVARTY:  And because this is something that

7    was like a Twitter account at one point --

8              THE COURT:  Somebody could use that to go find it.

9              MR. CHAKRAVARTY:  They found it on the Internet, they

10   downloaded it and they put it out --

11             MS. CONRAD:  That's just not my information.  And the

12   Instagram account is not live.  And I think Mr. --

13             THE COURT:  Okay.  What's the other?

14             MS. CONRAD:  The other one is at some point I just

15   want to make sure the jury is told that the exhibits originally

16   admitted at Defendant exhibits 1 and 2 have actually been

17   renumbered as Exhibit 3000 and 3001 respectively.

18             MR. CHAKRAVARTY:  Your Honor, one final point on that,

19   and just because I don't want to belabor it, but if the defense

20   wants to introduce exhibits from Norfolk Street, for example,

21   which there's a series of exhibits in our exhibit book which

22   are all from Norfolk Street, I think they're pretty clearly

23   marked as being from Norfolk Street.  But if it's not

24   all-inclusive, then, as we're learning with regards to the

25   clothing, it will take some transit time to go into the JFK

1    building where the stuff is stored and transport it here.

2    We'll need at least 24 hours to make those arrangements because

3    there's not somebody permanently manned there.

4                THE COURT:  All right.

5                (The proceedings adjourned at 9:41 a.m.)

1                       C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  10/13/15
13

14

15

16

17

18

19

20

21

22

23

24

25