IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DZHOKHAR TSARNAEV | No. 13-10200-GAO<br><br>**Filed under seal** |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO BAR GOVERNMENT ACCESS TO BOP RECORDS AND OTHER INFORMATION

The United States, by undersigned counsel, respectfully opposes Tsarnaev's motion captioned "Motion For Order to Maintain Protection of Privileged and Confidential Defense Information and Work Product." Tsarnaev requests an order barring the prosecution team from obtaining certain records regarding his pretrial and post-trial confinement as well as the pretrial and post-trial administration of the SAMs. The Court should deny the motion. The records in question are not privileged, confidential, or work product. They are, on the contrary, records that are routinely obtained by prosecutors either automatically or upon request. Tsarnaev is essentially asking this Court to apply different rules to him than apply to the other 200,000-plus inmates in federal custody. As shown below, there is no lawful basis or good reason for doing so.

### BACKGROUND

On May 7, 2013 -- just days after Tsarnaev was first transferred to FMC-Devens -- Tsarnaev moved for an order compelling BOP to provide a copy of his entire BOP file to his attorneys on a weekly basis. (Dkt. 30). Tsarnaev's motion included this second request as well:

> BOP counsel Les Owens advises that while defense counsel must obtain a release for medical files, and a court order for production of the remaining BOP files, all of these files are freely available to the prosecution, simply upon their request and without a court order. Defense counsel object to this unrestricted, free access to information regarding their client in this potential capital prosecution, and seek a

>protective order from this court, prohibiting FMC Devens/BOP from providing any files regarding Mr. Tsarnaev, absent an opportunity for defense counsel to object, and following a specific order of this Court directing the production.

Id. The government, in its response, did not object to Tsarnaev's request for his BOP records, but it did oppose Tsarnaev's request to block the government from freely accessing those records. (Dkt. 44). The government noted that Tsarnaev had cited no legal authority permitting a court to block BOP and the U.S. Attorney's Office -- two components of the same agency -- from sharing internal records. BOP routinely provides prosecutors with detainee and prisoner files, including records that identify (a) a detainee's visitors (both legal and social) and the dates of those visits; (b) the contents of a detainee's communications with individuals other than his attorneys (BOP does not monitor, record or review communications between a detainee and his attorneys); and (c) the contents of packages and correspondence exchanged by detainees and individuals other than his attorneys (BOP does not examine materials exchanged by a detainee and his attorney except to perform a cursory examination for contraband or other rules violations).

On May 20, 2015, Tsarnaev's motion was granted in part and denied in part. The Court (Bowler, M.J.) wrote: "Upon a written request by the defendant, the BOP shall provide the defendant with his daily activity logs; suicide watch logs; psychology data systems files; photographs; commissary file; and/or the BOP central file to the extent the BOP creates any such record. The request is denied insofar as the defendant seeks to prevent the BOP from providing these files to the government until the defendant's counsel has an opportunity to object and until a court order issues. See 5 U.S.C. § 552a(b)(7)." Tsarnaev never sought reconsideration nor district court review of this Order. It remains in force today.

On August 27, 2013, the United States Attorney General requested that BOP implement Special Restrictive Measures ("SAMs") "to restrict Tsarnaev's access to the mail, the media, the telephone, and visitors." A copy of the SAMs is Attachment A to this opposition. The SAMs did not give the government any special or enhanced authority to monitor Tsarnaev's visits or communications with others because no such authorization was needed; the government already had unrestricted authority under existing law and the Court's May 20, 2015 Order to obtain records of Tsarnaev's visits with others and to monitor Tsarnaev's non-legal communications.

On October 2, 2013, Tsarnaev filed the first of several motions to vacate or modify the SAMs. (See Dkt. 110, 138, 180, 210, 281). The government voluntarily agreed to modify the SAMs in several respects not relevant here -- see, e.g., *Notice of Post-Hearing Modifications to SAMs* (Dkt. 152) -- but otherwise opposed the motions. (See Dkt. 127, 207, 277). The Court denied all of Tsarnaev's motions to modify the SAMs (see Dkt. 384), but it made one ruling adverse to the government: on April 16, 2014, the Court issued an electronic Order that stated:

> On the Motion to Vacate Special Administrative Measures [Dkt 110], the Court rules that visits to the defendant by defense counsel or other member(s) of the defense team for the purpose of preparing the defense are regarded as legal visits, and the presence of his sisters does not take the visits out of that category. The government shall either allow these visits without contemporaneous monitoring or propose a plan of contemporaneous monitoring that excludes members of the investigative or prosecutorial team. The government is to file a proposal within two weeks.

On April 30, 2014, the government filed a notice in which it proposed a plan of contemporaneous monitoring that excluded members of the investigative or prosecutorial team. (Dkt. 277). The government wrote:

> [T]he government proposes to address Tsarnaev's concerns about the prosecution team's access to his communications with his sisters by designating an agent who is not part of the prosecution team to monitor those visits. (It is the government's understanding that Tsarnaev is not requesting that any other social visits be unmonitored.) The monitoring agent will familiarize himself or herself with the facts of the case and the provisions of the SAMs. The monitoring agent will not

3

> provide any information to the prosecution team relating to the social visits unless he or she has a reasonable and articulable suspicion that there has been a violation of the SAMs. The monitoring agent may consult with the case agents, but the consultation will be narrowly limited to the question of whether there has been a violation under the SAMs.

Id. at 4. Tsarnaev filed a response in which he reiterated his argument that monitoring of any type -- even by a "firewalled" agent -- was unnecessary. (Dkt. 281). At a hearing on June 18, 2015, government counsel noted:

> In the interim since the government filed [its] proposal, there [have been] discussions between the defense and the government regarding a potential agreement where there would be a further walling off, if you will; that is, that the agent would only communicate with an Assistant United States Attorney who is not part of the prosecution team. And there would only be discussions with the prosecution team if by a preponderance of the evidence the taint agent and the taint AUSA felt that there would be a violation of the SAMs. Other than that, we receive no information. The government believes that that suffices for both the concerns of the defense and for the government.

(Trans. 06/18/14 at 5-6).

The Court adopted the government's amended proposal with only one proviso, namely, that the "firewalled" AUSA be from another district such as Connecticut or New Hampshire. Id. at 6. (See also Dkt. 384). That ruling resolved the last of Tsarnaev's then-outstanding court challenges to the government's access to Tsarnaev's communications and BOP records. Aside from the requirement that the government use a "firewalled" agent and AUSA to monitor meetings among Tsarnaev, his sisters, and members of his defense team, the government retained the same right of unrestricted access to Tsarnaev's BOP records (including visitation records) and non-legal communications that it has with respect to every other federal detainee in the country.

Several days later, on June 18, 2014, the Court issued a scheduling order that established deadlines for the identification of experts and the production of expert discovery. (Dkt. 385).

4

The order gave Tsarnaev several months in which to identify experts and produce expert discovery.

Approximately two weeks later, on or about July 3, 2014, the government agreed to sign a document that Tsarnaev had drafted and entitled "Agreement to Protect Defense Information and Work Product." A copy of the Agreement is attached as Exhibit B. In it, the government agreed to various measures designed to safeguard against disclosure of information about Tsarnaev's expert witnesses ahead of the dates the Court had set. Specifically, it agreed not to review Tsarnaev's BOP visitor log until Tsarnaev first had an opportunity to redact the names of defense experts and the dates of their visits; it agreed not to be involved in other procedures that might reveal the identity of Tsarnaev's experts (i.e. approving or clearing visitors, maintaining associated documents such as SAM affirmations and BOP clearance forms, and amending paragraphs 2(d), 2(e), or 2(f) of the SAMs); and it agreed to designate a "firewalled" AUSA to handle approvals, clearances, associated forms, and SAMs amendments.

The government also agreed to a provision that was not mainly about experts: it agreed not to access any "defense information" (i.e. information shown to Tsarnaev by his attorneys for the purpose of preparing his defense) and to refer any disputes about "defense information" to the "firewalled AUSA." As noted earlier, BOP does a cursory inspection of materials that attorneys bring into a prisoner's cell to make sure they don't contain contraband (such as razor blades or pornography) or violate any other BOP rules. In Tsarnaev's case, they also checked the materials for possible violation of the SAMs. On one occasion, BOP brought to the government's attention a photograph that it believed might constitute a violation of the SAMs. Tsarnaev considered this a violation of the work-product doctrine, and although the government

did not agree, it decided the matter was not worth litigating at the time and agreed to the provision in the Agreement regarding "defense materials."

On July 21, 2014, Tsarnaev filed a motion respecting the "firewalled" AUSA. He referred to that AUSA as the one the Court had ordered the government to put into place "in connection with combined legal and social visits." (Dkt. 427). He asked the Court to order that AUSA to follow certain procedures that he deemed desirable. (Dkt. 427). The government opposed the motion, and the Court denied it, requiring only that the "firewalled" AUSA maintain a log of communications. (Dkt. 487). That was the last issue concerning Tsarnaev's conditions of confinement to be litigated before the Court.

## ARGUMENT

Although Tsarnaev argues that "[t]he Agreement [already] has the force of the Court's acceptance" (Deft. Mot. at 9), he cites nothing in the record to support that contention, nor can he. This is the first time the Court has ever seen the Agreement. The Court did not require it, review it, "accept" it, or approve it at any time. Tsarnaev also argues that the Court should enforce the Agreement as if it were a plea or proffer agreement. (Deft. Mot. at 10). But those types of agreements are enforceable because they are like contracts, i.e. the defendant provides consideration to the government in exchange for a benefit. See, e.g., United States v. Clark, 55 F.3d 9, 12-13 (1st Cir. 1995). The Agreement, in contrast, is not like a contract. Tsarnaev provided no consideration to the government, and the Agreement recites none. Instead, the Agreement is like many others that are often reached between the parties in a criminal case: the defendant asks for something to which the government does not believe he is legally entitled, but the government agrees to provide it anyway because there is no compelling reason not to. It is also worth noting that the Agreement contains no provision preventing either side from

6

amending it, withdrawing from it, or terminating it, at will; so even if it is treated like a contract, there is no basis in contract law to enforce it prospectively.

The question, therefore, is simply whether the Court may, and should, order the government to continue doing indefinitely various things it voluntarily undertook to do at a certain point during the trial; and the answer to that question is no. There are two reasons. First, the Court lacks the authority to do so. Second, there is no good reason for it.

> A. The Court lacks both authority and any good reason to enforce the Agreement prospectively.

The circumstances that gave rise to the Court's power to make orders respecting Tsarnaev's conditions of confinement have ceased to exist. On November 12, 2014, during the hearing on Tsarnaev's motion to vacate the SAMs, the Court ruled on the extent of its authority to make orders respecting Tsarnaev's conditions of confinement. It held, in essence, that under 18 U.S.C. § 3142 (a pretrial detention statute) and the Court's "general and inherent powers to manage a case," it could issue orders designed to prevent "actual interference with the preparation of the defense." (Tr. 11/12/14 at 16-17). But Tsarnaev is no longer in pretrial detention, and he is no longer preparing his defense. He has been tried, convicted, sentenced, and remanded to the custody of BOP to serve out his sentence. A new trial motion has been filed and opposed and is awaiting decision. The record is closed. There will be no more trial witnesses, and no more need for legal visits that include Tsarnaev, members of his defense team, and one of his sisters. Whatever authority the Court had to issue orders respecting Tsarnaev's conditions of confinement arose from circumstances that no longer exist.

Even assuming the Court had authority to grant Tsarnaev's motion, there is no reason for it to do so. All of the issues the Agreement was designed to address are now nonexistent or purely theoretical. Paragraph 1 of the Agreement provides that BOP will not provide members

7

of the prosecution team information about "defense materials," i.e. materials shown to Tsarnaev by members of the defense team for purposes of preparing his defense. (Those are the only types of materials an attorney is allowed to show to a detainee or inmate.) As noted earlier, however, BOP does not review, photograph, or record such materials; it merely performs a cursory inspection of them to ensure that they do not include contraband (and, in Tsarnaev's case, do not violate the SAMs). Even when Tsarnaev was preparing for trial, these BOP inspections never posed a serious threat to the work-product doctrine, because the likelihood that BOP would actually deem a "defense material" to be contraband and share it with the government was extremely small. Now that the trial is over, and the need to show Tsarnaev "defense materials" is concomitantly diminished -- if not nonexistent – the likelihood is even smaller. If Tsarnaev is entitled to such an order, moreover, so is every one of the other 205,000 inmates in federal custody -- a far-reaching proposition this Court should decline to endorse, especially in connection with a largely hypothetical problem. If Tsarnaev has an actual problem with BOP inspection of "defense materials" going forward, he can seek relief from the proper authority at that time.

The same logic applies to the remainder of the Agreement. Paragraph 2 states:

> No one on the Prosecution Team shall be involved in clearing or approving visitors, including defense experts, to Mr. Tsarnaev. All SAM affirmations and BOP clearance forms henceforth shall be maintained by individuals who are not part of the Prosecution Team. No one on the Prosecution Team shall be provided with a copy of the visitors log until the defense has had an opportunity to redact the names of defense experts, and the dates of their visits.

The sole purpose of this provision, from the government's point of view, was to reassure the suspicious defense team that the government would not do an "end run" around the Court's expert-discovery scheduling order by looking at BOP or SAMs-related documents that might reveal the identity of Tsarnaev's experts before he was required to disclose them. It is clear the

8

provision was not meant to prevent the government from learning the identity of other visitors (including members of the defense team), because it permits the government to view Tsarnaev's visitors log once the names of experts have been redacted. Now that the dates for expert disclosure are long past, and there will be no more visits from experts for purposes of preparing the defense, there is plainly no purpose for this provision.

Paragraphs 3 and 4 are linked to paragraphs 1 and 2 and have no other purpose.

Paragraph 5 provides that "[any] defense request to modify paragraphs 2(d), 2(e), or 2(f) of the SAMs so as to add named individuals shall be addressed with the" firewalled AUSA and kept from the prosecution team. Those paragraphs state:

> d. **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense - and not for any other reason - on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.
>
> e. **Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client** - The inmate's attorney's precleared paralegal(s) may meet with the inmate without the need for the inmate's attorney to be present. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.
>
> f. **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF. An investigator or interpreter/translator may not meet alone with the inmate.

Tsarnaev wanted Paragraph 5 in the Agreement so that he could expand the number of people on this defense team permitted to meet with him and disseminate his conversations without the government's knowing who those people were. The government saw no legal basis for this request, but it agreed to it anyway because Tsarnaev wanted it and it seemed to place only a modest additional burden on the "firewalled" AUSA. But it no longer makes sense to have an AUSA from another district with no ongoing knowledge about Tsarnaev, this case, or the

9

conditions of his confinement, to make decisions about amending the SAMs. Even assuming, therefore, that the Court had authority to fashion Paragraph 5 of the Agreement into a Court Order, the equities weigh strongly against doing so.

In sum, now that Tsarnaev is a convicted defendant serving a sentence rather than a pretrial detainee preparing for trial, the Court lacks authority to make orders respecting his conditions of release. Even assuming, moreover, the Court still had that authority, the measures he wants the Court to order are not needed to prevent "actual interference with the preparation of the defense."

> B. The Court should not bar the government from obtaining the "firewalled" AUSA's file in this matter.

The Court also should not bar the government from obtaining the "firewalled" AUSA's file on this matter. As noted earlier, the Agreement's chief purpose was to assure Tsarnaev that the government would not prematurely access information about his experts. That purpose has been achieved. It is now time for the prosecution team to resume full responsibility for maintaining the SAMs, and to do that responsibly, the government needs a complete file -- one that includes a complete visitors log along with all SAMs affirmations, BOP clearances, requests for SAMs amendments, and so on, that occurred during the case. Tsarnaev has not identified, and cannot identify, any prejudice -- let alone any actual violation of the attorney-client privilege or work-product protection -- that would flow from transferring the "firewalled" AUSA's file to the prosecution team.

Tsarnaev in his motion identifies only two things even potentially in the "firewalled" AUSA's file that he says the government has no right to see. The first is "information and notes concerning prior visits [among Tsarnaev, his attorneys, and his sisters] that the Court deemed to be 'legal' in nature." (Deft. Mot. at 9). Tsarnaev argues that these visits are covered by the

10

attorney-client privilege and work-product doctrine, but he has not proven that claim. The meetings cannot have been covered by the attorney-client privilege because the sisters were not members of Tsarnaev's defense team and the Court's order respecting "legal" vs. "social" visits did not make them members. Tsarnaev also has not demonstrated that anything in Tsarnaev's conversations with the sisters, let alone anything that might have made it into the "firewalled" AUSA's file, is covered by the work-product doctrine -- or even could be. That argument is simply unavailing.

The second thing Tsarnaev identifies is "the contents of materials the defense team" reviewed with him. (Deft. Mot. at 10). But Tsarnaev has not alleged that BOP found any "defense materials" objectionable after the Agreement was signed; and if it did not, the "firewalled" AUSA would not have become aware of those "defense materials," let alone have them in his file. Absent such an allegation, this argument is also unavailing.

In short, the time has come for the prosecution team to resume full authority for maintaining the SAMs and resolving issues concerning Tsarnaev's conditions of release, and to do so responsibly it needs a complete file. Tsarnaev, for his part, has not shown that returning the file to the prosecution team will violate his rights or prejudice him; his arguments about what the government "should not" be able to do are essentially policy arguments, not arguments about what the law actually provides. The government's willingness to accommodate Tsarnaev during the trial without any legal obligation to do so should not now become the basis for tying the government's hands for blocking its access to information that Tsarnaev has no right to withhold.

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny Tsarnaev's motion to protect defense information in its entirety.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ William D. Weinreb
WILLIAM D. WEINREB
ALOKE S. CHAKRAVARTY
NADINE PELLEGRINI
STEVEN MELLIN
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document was served on Dzhokhar Tsarnaev's counsel, Judy Clarke, Esq., by electronic mail, on October 13, 2015.

/s/ William D. Weinreb
WILLIAM D. WEINREB