UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
v.                                 )   Criminal Action
                                   )   No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>JURY TRIAL - DAY THIRTY-SIX</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, March 19, 2015
9:11 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25

I N D E X

                                    Direct   Cross   Redirect   Recross

WITNESSES FOR THE
  GOVERNMENT:

BRIAN J. CORCORAN, JR., resumed

     By Mr. Weinreb              6
     By Mr. Watkins                         49

PHILIP CHRISTIANA

     By Mr. Chakravarty          59

KEVIN SWINDON

     By Mr. Chakravarty          75

                        E X H I B I T S


GOVERNMENT'S
     EXHIBIT        DESCRIPTION              FOR ID      RECEIVED

948-303        Photograph                                8

1543           Computer bag                             18

975            Documents                                19

949 and 950    Transmitters                             20

1019           Shoulder bag                             22

985            Zippo lighter                            23

951            Pressure cooker                          24

974            Pressure cooker lid                      29

772-A          Screenshot                               30

1002 - 1003    Cardboard disks                          32

963            Toggle switch                            35

979            9-volt battery                           37

```
 1                       E X H I B I T S (cont'd)

 2
        GOVERNMENT'S
 3        EXHIBIT      DESCRIPTION                FOR ID    RECEIVED

 4      1056           Locking mechanism from pressure cooker    39

 5      1009           End cap                                   45

 6      1028           BBs                                       47

 7      1064           BBs                                       47

 8      1065           (unidentified exhibit)                    47

 9      953            Pressure cooker handle                    47

10      1017           Transport bag                             48

11      948-202,
        948-204        Photographs                               49
12
        948-289        Photograph                                50
13
        775-A          Screenshot                                52
14
        775-B          Screenshot                                53
15
        1544           Laptop computer                           57
16
        948-203        Photograph                                57
17
        986            Lighter                                   59
18
        1020           Pencil                                    59
19
        1027           Cap                                       59
20
        1251-1,
21      1252-2,
        1252-3         Photographs of Carriage Drive area        64
22
        1534,
23      1558           Physical items taken from Carriage Drive  71

24      1142           Spreadsheet                               114

25
```

1                    E X H I B I T S (cont'd)

2

   GOVERNMENT'S
3    EXHIBIT        DESCRIPTION              FOR ID        RECEIVED

4   1143           CD-ROM                                     149

5   1144           CD-ROM                                     158

6   1145-1146      CD-ROMs                                    163

7   1141           CD-ROM                                     169

8   1147-1148      CD-ROMS                                    174

9   1149           CD-ROM                                     179
    X
10  1150           CD-ROM                                     182

11  1151           CD-ROM                                     188

12  1475           CD-ROM                                     192

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

THE CLERK:  All rise for the Court and the jury.

(The Court and jury enter the courtroom at 9:11 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning, jurors.

THE JURORS:  Good morning, your Honor.

THE COURT:  Jurors, it's been a little while since I asked, but I think I should ask again:  Have you all been faithful in following my instructions to avoid any discussion of the case and any contact with media reports?

THE JURORS:  Yes.

THE COURT:  All right.  Thank you.

All right.  We'll continue with Mr. Corcoran's examination.

BRIAN J. CORCORAN, JR., resumed

CONTINUED DIRECT EXAMINATION

BY MR. WEINREB:

Q.   Good morning, Mr. Corcoran.

A.   Good morning.

Q.   I'll just remind you you're still under oath.

A.   Yes.

Q.   I want to begin by showing you some of the photos that you authenticated yesterday before we stopped.  And I'll ask Mr. Bruemmer to pull them up for me.

MR. WEINREB:  Let's begin with 948-524.

```
 1              THE COURT:  You're going to stay within the list of
 2     admitted exhibits so we could just set the setting for the
 3     jury?
 4              MR. WEINREB:  I am, your Honor.
 5              THE COURT:  Okay.
 6              MR. WEINREB:  Actually, I'm not sure if this was shown
 7     to the jury yesterday, so let's begin instead with 948-303.
 8              THE COURT:  I don't think 303 was part of the list.
 9              MR. WEINREB:  This was not?
00:04 10         THE CLERK:  No.
11     BY MR. WEINREB:
12     Q.   Do you recognize that photo?
13     A.   I do.
14     Q.   What is that?
15     A.   It appears to be the blast seat from an explosion in the
16     street along Laurel.  In the left view are -- those two
17     vehicles are parked at 55 Laurel.  That is approximately in the
18     center of the street.
19     Q.   Just to be clear, putting aside the blast seat, do you
00:04 20    recognize that as an actual photo of Laurel Street on the day
21     when the evidence collection was taking place?
22     A.   I do.
23     Q.   What is a blast seat?
24     A.   So we refer to a blast seat as somewhere where there was
25     an object or a device that actually functioned and left an
```

1    impression or some type of sign that an explosion occurred at

2    that location.

3    Q.   So you didn't see the actual explosion?

4    A.   Correct; I did not see that.

5    Q.   But based on your training and experience, this appears to

6    be a place where an explosion took place?

7    A.   It does.

8    Q.   As a whole, is this a fair and accurate photo?

9    A.   It is.

00:05 10          MR. WEINREB:  The government offers 948-303.

11          MR. WATKINS:  No objection.

12          THE COURT:  Okay.

13          (Government Exhibit No. 948-303 received into

14    evidence.)

15          THE COURT:  Do you want it shown now?

16          MR. WEINREB:  Yes, please.

17    BY MR. WEINREB:

18    Q.   What street is this?

19    A.   That would be Laurel Street.

00:06 20    Q.   Which direction are we looking in?

21    A.   We are facing west looking towards Dexter.

22    Q.   So from the perspective of where the Honda and the

23    Mercedes were, is it behind the photographer or in front of the

24    photographer?

25    A.   That would be behind the photographer and slightly to the

1    left, in the center of the street.

2    Q.   The yellow placards that you see here, yesterday you

3    discussed the placing of placards?

4    A.   Yes.

5    Q.   What were these yellow placards marking?

6    A.   So as we discussed yesterday, they denote evidence.  In

7    this case, 467 for the blast seat, typically when we encounter

8    a blast seat, we take either vacuum samples or some type of

9    swab there.  So that would account for that placard in that

00:06 10   location.

11          MR. WEINREB:  If we could have 948-524.  That is in

12   evidence, as will be all the subsequent ones.

13          THE COURT:  Okay.

14   BY MR. WEINREB:

15   Q.   What is pictured in this photo?

16   A.   In that picture we have a laptop -- or a computer bag that

17   was removed from the Civic prior to my arrival.  And I can see

18   at least three of the items that were within that bag, two on

19   top of it and one just to the right of it.  Those items were

00:07 20   inside of the bag when I arrived on-scene.

21          MR. WEINREB:  948-525, please.

22   Q.   What's that a photo of?

23   A.   So that is the same bag.  In the upper left-hand corner

24   you have a portable hard drive, the center is a cell phone, to

25   the right of that are two batteries for the phone, and to the

1    lower right corner of the bag is the modified piece of

2    electronics that I discussed yesterday, a transmitter.

3    Q.   This transmitter, can you describe what the various

4    components of it are to the extent you know?

5    A.   Certainly.  In the center you have an LCD board that would

6    typically be on top of a handheld remote control that indicates

7    what channel the remote control is operating at.  Typically,

8    you wouldn't see the exposed circuit board that it's attached

9    to because there would be a housing around it to protect it

00:08 10   from elements or whatever else.  The piece laying across the

11   top of it is the antenna for that transmitter.

12   Q.   Can you just circle that?

13   A.   (Witness complies.)

14   Q.   So you've circled the long object on the right side of the

15   transmitter?

16   A.   Correct.

17   Q.   What is it again?

18   A.   So that would be the antenna for the transmitter.  They

19   obviously come in different sizes to allow the signal to get

00:09 20   further or shorter based on the size of the antenna.

21   Q.   What else on here can you describe for us?

22   A.   We have some wiring off on the right-hand side here that

23   goes from the circuit board, which is this piece here, to the

24   underside where you have your batteries that power that remote

25   control.

1    Q.    So the circuit board is green and the wires are --

2    A.    Off to the right; correct.

3    Q.    -- off to the right?

4          And what's this that I'm circling right in the middle of

5    the item?

6    A.    So that was a piece of tape used to affix the upper part

7    of the remote control to the lower part of the remote control

8    where the batteries are housed.  Typically there's a handle in

9    between that you would hold --

00:09 10         MR. WATKINS:  Your Honor, I'm going to object at this

11   point.  May we be seen at sidebar?

12              THE COURT:  All right.

13              (Discussion at sidebar and out of the hearing of the

14   jury:)

15              MR. WATKINS:  The government has noticed an expert

16   concerning the transmitter and the modification of the

17   transmitter.  It is not this witness.  This witness has not

18   been authenticated as an expert in that.  I let

19   Mr. Weinreb -- I did not object initially because a certain

00:10 20  amount of background is necessary, but it sounds like he's

21   going deeper into an area where this particular expert does not

22   have expertise and has not been noticed as an expert.

23              MR. WEINREB:  So I believe the expert Mr. Watkins is

24   referring to is the binding code expert.  He's not going to say

25   anything about binding codes, range of transmission or anything

1    like that, and he's not testifying as an expert; just relying

2    on his training and experience as a bomb tech to point out this

3    is a piece of tape, this is a wire, this is a circuit board.

4    That's it.

5            MR. WATKINS:  Well, he focused on the binding code.

6    That particular expert that is coming in in the future will

7    talk about the modifications made to the transmitter -- to the

8    radio-controlled device to make it a transmitter.  So it is

9    expert testimony.  That's not what this witness should be

00:11 10   testifying to.  He's not been noticed as an expert.  I would

11   question whether he has the training and experience to do that,

12   but he's not been noticed as an expert.

13           MR. WEINREB:  Your Honor, I don't think I'm going any

14   further on this because I think we've already exhausted --

15           THE COURT:  Yeah, I think he can testify from his

16   general experience about physical features of things without,

17   you know, that constituting expert testimony.

18           MR. WATKINS:  Well, your Honor, this is a very

19   specific thing, this radio-controlled transmitter.  It is not

00:12 20   something that this particular witness encounters every -- I

21   don't know how often he encounters it because he wasn't noticed

22   as an expert, so I was not permitted to find out whether indeed

23   he had the expertise to talk about how you modify a

24   radio-controlled transmitter.

25           THE COURT:  Okay.

1        MR. WATKINS:  I simply don't know if he has --

2        THE COURT:  Okay.  I don't think he's gone over the

3    line to give expert evidence at this point.  And I guess the

4    government's advised that he should not.

5        (In open court:)

6        MR. WEINREB:  Mr. Bruemmer, can we have Exhibit

7    940-532, please.

8    BY MR. WEINREB:

9    Q.   What is this a picture of?

00:13 10    A.   That is a view of the transmitter from the side looking

11   long ways down the transmitter.

12       MR. WEINREB:  940-541, please.

13   Q.   What's that a photo of?

14   A.   That photo is other contents that were within the computer

15   bag pictured in the right-hand side of the photo.

16   Q.   I'm going to zoom in on one of the items.  Do you

17   recognize that item?

18   A.   I do.  I recognize both items.  The one in the center on

19   top of the paper there was a laser pointer of some sort.  The

00:13 20   paper itself was some document that appears to be written in

21   Cyrillic with a picture in the upper left-hand side of Tamerlan

22   Tsarnaev.

23   Q.   And then this silver item in the middle of the photo, do

24   you know what that is?

25   A.   That's a Samsung laptop located within the same computer

1    bag.

2    Q.   There's a document pictured above the computer.  And by

3    "above" I don't mean on top of it, but higher than it in the

4    picture.  Do you recognize that?

5    A.   Yes.  It appears to be a diploma bearing the name of

6    Tamerlan Tsarnaev from Cambridge Rindge and Latin school.

7    Q.   These documents below the computer, do you recognize

8    those?

9    A.   I do.  There were some additional documents in there

00:15 10    indicating a class schedule as well as an attendance-type

11    record for a school.  Without looking at it a little closer, I

12    couldn't tell you which school it is.

13    Q.   I'm handing you what's been marked for identification as

14    Exhibit 1543.  Can you take a look at that and tell me if you

15    recognize it and, if so, what is it?

16    A.   The first item is the Samsung laptop that was contained

17    within the bag on the street, and the second item is the bag

18    itself that housed the laptop, as well as the other items we

19    have discussed.

00:16 20    Q.   You testified yesterday that those items were collected at

21    the scene and bagged for evidence, correct?

22    A.   Correct.

23    Q.   All right.  Take a moment to examine the bags there.  I'm

24    sorry.  And then you said some of them went down to the lab for

25    additional examination?

```
 1    A.    Correct.
 2    Q.    Looking at those bags, does it appear that the items have
 3    been handled in accordance with proper evidentiary procedures?
 4    A.    It does.
 5              MR. WEINREB:  The government offers Exhibit 1543,
 6    which is the computer bag, and 1544, which is the computer
 7    itself.
 8              MR. WATKINS:  Your Honor, may we have a look at those
 9    before they're admitted?
10              THE COURT:  Go ahead.
11              (Pause.)
12              MR. WEINREB:  Actually, your Honor, just for the
13    record, we're offering 1543, which is the computer bag.  We're
14    not going to offer 1544, the computer, at this time.  Only some
15    of it is relevant and admissible, and that will come in in a
16    different form.
17              THE COURT:  Okay.
18              MR. WATKINS:  Not the contents?
19              MR. WEINREB:  Not yet.
20              THE COURT:  So just 1543 is offered?
21              MR. WEINREB:  Just 1543, the computer bag.
22              (Counsel confer off the record.)
23              MR. WATKINS:  Judge, may we go to sidebar again?
24              THE COURT:  All right.
25              (Discussion at sidebar and out of the hearing of the
```

1    jury:)

2         MR. WATKINS:  We're in a little bit of shifting-sands

3    territory here.  We had understood the entire computer was

4    going to come in until just now.  We're now learning that the

5    government is going to object to us putting the computer in.

6         MR. WEINREB:  Your Honor, we -- I believe what I

7    represented to the defense was that for all of the items that

8    were collected in Watertown and on Boylston Street, we would

9    have no objection to their introduction by the defense on

00:19 10   authenticity or chain-of-custody grounds, but I did make very

11   clear that we might have objections on relevance and 403

12   grounds.  A computer, like many electronic devices of that

13   nature, generally have evidence that may be relevant and

14   admissible and may be filled with evidence that is irrelevant

15   and inadmissible.

16         The item has now been authenticated.  We will not

17   challenge that it was handled and preserved properly.  When the

18   defense has its opportunity to put in evidence, they can offer

19   portions of the computer, or the whole thing if they like, and

00:19 20   we'll object as appropriate.  The Court can rule at that time

21   whether the particular contents are admissible or not.

22         MR. WATKINS:  I'll let Mr. Fick speak on this.

23         MR. FICK:  I mean, any issue about the contents and

24   their admissibility are not going to be deferred until the

25   moment when that comes into issue.  Simply the object, however,

1      I don't see any reason why that might not come into evidence.

2            THE COURT:  How do you separate the object from what

3      it holds?

4            MR. FICK:  In terms of what the jury is able to look

5      at, understanding what we talk about.  We'll all be working off

6      of extractions of information off the computer.  The object,

7      simply the fact that it was recovered at the scene, that it

8      belonged apparently to --

9            THE COURT:  Well, that's in evidence.

00:20 10       MR. FICK:  But --

11            THE COURT:  It has an identification number.  The

12     testimony says it was there.

13            MR. FICK:  But I don't see any 403 harm to having the

14     object in evidence also.  The jury can handle it, talk about

15     it, look at it, we can discuss it with other witnesses --

16            THE COURT:  No.  I think you can in your case, I

17     guess, try to put it in and we'll listen to the substantive

18     objections.  But it's been identified as coming from there, so.

19            MR. FICK:  I think we might well do that on cross, I

00:20 20  suppose, but I don't see any reason why it has to wait till the

21     defense case.

22            THE COURT:  I don't know.  It seems the more plausible

23     way is direct, but we'll see.  Okay?

24            (In open court:)

25            THE COURT:  I gather there's no objection to 1543,

1    which is the bag?

2              MR. WATKINS:  There is not.

3              THE COURT:  Okay.

4              (Government Exhibit No. 1543 received into evidence.)

5    BY MR. WEINREB:

6    Q.   Agent Corcoran, I'm going to show you what has been marked

7    as Exhibit 975 for identification.  Do you recognize that?

8    A.   I do.  These are the paper contents that you see in the

9    picture on the screen that are laid out adjacent to the laptop

00:22 10   and the bag.  These were recovered from within the computer

11   bag.

12   Q.   Could I ask you to please cut that open, remove the

13   contents.  Just put them on the table in front of you.  And --

14   A.   Can I get some scissors?

15   Q.   I'm sorry?

16   A.   Can I get some scissors?

17   Q.   Yes.

18             THE CLERK:  Mr. Weinreb, I have scissors.

19             MR. WEINREB:  Thank you.

00:22 20   BY MR. WEINREB:

21   Q.   After you've spread them out, we'll let defense counsel

22   have a chance to look at them and then I'll ask you some

23   questions about them.

24             (Pause.)

25             MR. WATKINS:  Thank you.

```
 1    BY MR. WEINREB:
 2    Q.    Are those the documents you saw on the street that day?
 3    A.    They are.
 4              MR. WEINREB:  The government offers Exhibit 975.
 5              MR. WATKINS:  No objection.
 6              THE COURT:  All right.
 7              (Government Exhibit No. 975 received into evidence.)
 8    BY MR. WEINREB:
 9    Q.    Showing you what has been marked as both 949 and 950 for
10    identification, based on the contents of the bag do you
11    recognize 949 and 950?
12    A.    I do.
13    Q.    What are they?
14    A.    They're marked as "transmitter."  And this is typically
15    how we would collect it, in this type of can.
16    Q.    Does that appear to be the actual transmitter based on the
17    packaging that was collected on Laurel Street that day?
18    A.    Without opening it, yes.
19    Q.    Is it bagged consistently with how you remember the
20    transmitter being bagged at the time?
21    A.    It is.
22              MR. WEINREB:  The government offers Exhibits 949 and
23    950.
24              MR. WATKINS:  No objection.
25              THE COURT:  All right.
```

00:24 (line 10)
00:25 (line 20)

1                    (Government Exhibit Nos. 949 and 950 received into

2        evidence.)

3        BY MR. WEINREB:

4        Q.    Showing you what's been marked for identification as

5        Exhibit 1545 and Exhibit 1547, I'd ask you if you recognize

6        those, and if you do, please describe what they are.

7        A.    The first one here is 1547.  This was collected on the

8        street, Laurel.  It does have a B indicator, which means it was

9        in the street, which would have came from the bag, and it does

00:26 10   bear my name as the collector and does match what I saw that

11       day.

12       Q.    The other one?

13       A.    This is Exhibit 1545.  Once again, also was packaged by

14       myself.  My name's on there with signature.  And this is the

15       hard drive also in Zone B, labeled as 22B, external hard drive,

16       that was removed from the bag.

17                    MR. WEINREB:  Now, your Honor, the government is not

18       offering these as a whole but may offer relevant portions of

19       them at a later time.

00:27 20                 THE COURT:  All right.

21       BY MR. WEINREB:

22       Q.    Was an additional HTC cell phone found on the crime scene

23       in Watertown?

24       A.    There was one there.  I was not the collector for it, but

25       there was one on the scene closer to the corner of Dexter and

1    Laurel.

2    Q.   Showing you what's been marked as 1546, do you recognize

3    that?

4    A.   This is the cell phone that I did see closer to the corner

5    of Dexter and Laurel, T-Mobile.

6         MR. WEINREB:  I will now ask Mr. Bruemmer to bring up

7    948-533.

8    Q.   Do you recognize that?

9    A.   I do.

00:29 10   Q.   What is that a picture of?

11   A.   That is the bag that I described yesterday as a messenger

12   bag or a knapsack.  Basically, the top folds over.  That was

13   found on Laurel to the west of the Civic in the street closer

14   to the south side.

15   Q.   And how close was it to the Honda Civic?

16   A.   I would say maybe 15 feet, approximately.

17        MR. WEINREB:  Can we have -534, please?

18   Q.   What's that a photo of?

19   A.   That is the same bag, different view, just looking in a

00:29 20   different direction.

21        MR. WEINREB:  -535?

22   Q.   What's that?

23   A.   Same bag, a little closer zoom.  You can begin to see a

24   pencil just inside of the bag there.

25   Q.   Can you circle the pencil, please?

```
 1    A.    (Witness complies.)
 2          MR. WEINREB:  -536, please.
 3    Q.    What's that a photo of?
 4    A.    That is a picture of the pencil that I just circled as
 5    well as a mini thumb drive that was found within that bag.
 6          MR. WEINREB:  -537, please.
 7    Q.    What are those three -- what's depicted here?
 8    A.    So those are the two I previously described, the mini
 9    thumb drive, the UMass Dartmouth pencil, as well as a Zippo
10    lighter.
11    Q.    Were all of those items inside the shoulder bag that was
12    found next to the Honda?
13    A.    They were.
14    Q.    Showing you 1019, which is a shoulder bag, and 1020, which
15    is a pencil, for identification.
16    A.    Should I open these?
17    Q.    Yes, please.
18          (Pause.)
19    Q.    Is that the shoulder bag that you participated in
20    collecting from the Watertown crime scene?
21    A.    This is the shoulder bag.
22          MR. WEINREB:  The government offers 1019.
23          MR. WATKINS:  No objection.
24          (Government Exhibit No. 1019 received into evidence.)
25    BY MR. WEINREB:
```

00:30 (line 10)
00:33 (line 20)

1    Q.   I'm handing you 985 and 986.  Do you see in that bag the

2    silver lighter that is in the picture?

3    A.   I do.

4    Q.   Is it the same one that was recovered on Laurel Street?

5    A.   It is the same Zippo lighter, yes.

6         MR. WEINREB:  That was the one marked 985, and the

7    government would offer it at this time.

8         MR. WATKINS:  No objection.

9         THE COURT:  All right.

00:35 10        (Government Exhibit No. 985 received into evidence.)

11   BY MR. WEINREB:

12   Q.   Showing you Exhibit 1548 for identification, do you

13   recognize that?

14   A.   I do.

15   Q.   What is it?

16   A.   That is the same 8 gigabyte X mini thumb drive as in the

17   picture, also collected by myself bearing my name and initials,

18   also found in B, which would be the street where it was.

19   Q.   Thank you.

00:36 20        MR. WEINREB:  Mr. Bruemmer, can we have 948-10,

21   please.

22   BY MR. WEINREB:

23   Q.   Taking a look at the screen, what is that?

24   A.   That is the Honda that we discussed yesterday, four-door

25   Honda, parked in a resident's driveway along Laurel on the

1    north side of the street.  Embedded in the rear driver's side

2    door is a pressure cooker.

3              MR. WEINREB:  Mr. Bruemmer, can we have 772, please.

4    Q.   Using the map, can you just indicate where that car was

5    parked?

6    A.   Certainly.  It is at 60-62 Laurel, and is the car that

7    I've circled.

8    Q.   So you've circled the car closest to the street in the

9    driveway to the left, 60- -- I'm sorry.  I got that wrong.  The

00:37 10   driveway to the right of 60-62 Laurel, and it is the rightmost

11   car in that driveway closest to the street?

12   A.   That would be correct.

13             MR. WEINREB:  If we could go back to 948-10.  And then

14   can we have -11, please.

15   Q.   What is that a photo of?

16   A.   That is a closer view of the previous photo, still focused

17   on the rear driver's side door, lower portion.

18             MR. WEINREB:  -12, please.

19   Q.   What's that?

00:37 20   A.   Same picture, zoomed in a little closer.  You can begin to

21   see the insignia in the center of the bottom part of the

22   pressure cooker.

23             MR. WEINREB:  -305, please.

24   Q.   What is that?

25   A.   Once again, the same pressure cooker, slightly lower

```
 1    elevation that the picture is taken at.  And you can see the
 2    Fagor symbol in the center of the pressure cooker.
 3              MR. WEINREB:  -306, please.
 4    Q.   And what is that a picture of?
 5    A.   That is the insignia for the Fagor pressure cooker as well
 6    as the pressures that it operates above.
 7    Q.   You testified yesterday that in addition to collecting
 8    evidence in the Watertown crime scene, you had participated in
 9    the collection of explosives evidence at the Boylston Street
10    crime scene, correct?
11    A.   Correct.
12    Q.   Did you see any pressure cooker remains that were
13    collected from the Boylston Street crime scene?
14    A.   Yes, I saw several pieces of pressure cooker.  Yes.
15    Q.   In what way, if any, did those compare to this pressure
16    cooker?
17    A.   Those pieces were typically more fragmented, more cut up.
18    This was a better representation of the pressure cooker as a
19    whole.  You could actually make out the shape of the pressure
20    cooker at this scene versus the other scenes where it was much
21    more sharp, jagged pieces.
22    Q.   In terms of the brand names of the pressure cookers
23    recovered at both scenes, were they the same or different?
24    A.   They were the same.
25    Q.   Same type?
```

```
 1   A.    Same type.  Size, I believe, was different.
 2              MR. WEINREB:   Exhibit 951.
 3   Q.    Showing you Exhibit 951 for identification, would you
 4   please open that?
 5   A.    (Witness complies.)
 6   Q.    Do you recognize that?
 7   A.    This is the same pressure cooker that was removed from
 8   that door in the picture.
 9              MR. WEINREB:   The government offers 512 -- no, offers
10   951, and I'd ask to be able to approach the jury box and show
11   it to the jury.
12              MR. WATKINS:   No objection to the admission.
13              THE COURT:   Okay.  You may display it.
14              (Government Exhibit No. 951 received into evidence.)
15              (Exhibit No. 951 displayed to the jury.)
16              MR. WEINREB:   948-72, please.
17   BY MR. WEINREB:
18   Q.    Agent Corcoran, do you recognize that?
19   A.    I do.
20   Q.    What is it?
21   A.    That is 53 Laurel.  That is on the south side of the
22   street.
23              MR. WEINREB:   Can we have 772 again?
24   Q.    I'm going to enlarge Laurel Street again.  Could you
25   indicate which house that is?
```

00:40 (line 10)
00:42 (line 20)

```
 1   A.    (Witness complies.)

 2   Q.    And again, with an arrow can you indicate where the

 3   Mercedes and the Honda were?

 4   A.    (Witness complies.)

 5             MR. WEINREB:  Let's have Exhibit -72 again, please.

 6   Q.    So here we're looking at the front of that house?

 7   A.    Correct.

 8             MR. WEINREB:  -73, please.

 9   Q.    What's that?

10   A.    That's the numbers indicating it is 53 on Laurel.

11   Q.    And see around the left there's a metal fence?

12   A.    Correct.

13             MR. WEINREB:  -74, please.

14   Q.    Now, is this the left side of the house or the right side

15   of the house?

16   A.    Looking at the front of the house, that is the right side

17   of the residence.

18   Q.    It's the side yard, on the right side?

19   A.    Correct.

20   Q.    So this would be closer to Dexter, further from where the

21   cars are parked?

22   A.    Correct.  That would be the west side.  Correct.

23             MR. WEINREB:  -75, please.

24   Q.    When I say "where the cars were parked," I was indicating

25   where the Honda and the Mercedes were in the middle of the
```

1    street.

2    A.    Correct.  Just the Honda was the one that I saw.  The

3    Mercedes was not there at the time.

4    Q.    What's pictured in -75?

5    A.    That is the top to a pressure cooker.

6          MR. WEINREB:  Let's go back to -74 for a moment.

7    Q.    I'm going to circle this item that's in the middle of the

8    picture close to the -- adjacent to the right side of the

9    house.  Do you recognize that?

00:45 10    A.    It appears to be a hockey goal, a net.

11    Q.    And is that how it appeared when you saw it that day?

12    A.    That is exactly how it appeared.

13          MR. WEINREB:  Okay.  Now let's go back to -75.

14    Q.    Is that the same hockey goal?

15    A.    That is.

16    Q.    Do you see a metal disk object in the hockey goal?

17    A.    I do.

18    Q.    Could you circle it?

19    A.    (Witness complies.)

00:45 20          MR. WEINREB:  -76, please.

21    Q.    What's that?

22    A.    That is a closer view of the same pressure cooker lid.

23    Q.    Do you know what that is?

24    A.    A pressure cooker lid?  Yes, typically it would be affixed

25    to what we just witnessed here.

1    Q.    So that's where it landed after the bomb exploded?

2    A.    Correct.

3    Q.    Showing you 974 for identification, do you recognize that?

4    A.    I do.

5    Q.    What is it?

6    A.    This was found in the hockey net adjacent to 53 Laurel.

7          MR. WEINREB:   The government offers 974.

8    Q.    And I'd just ask if the witness would open the bag and

9    just display it for the jury.

00:46 10         MR. WATKINS:   No objection.

11          (Government Exhibit No. 974 received into evidence.)

12    A.    (The witness complies.)

13          MR. WEINREB:   Thank you.

14    BY MR. WEINREB:

15    Q.    So now that we've seen some photographs of the side of the

16    house where that lid was found, can you indicate on the map

17    where that hockey goal was?

18    A.    The square is a little off, but adjacent to the house,

19    tucked up against the house towards the rear of that driveway.

00:47 20    Q.    And indicate once more where the Honda and the Mercedes

21    were?

22    A.    (Witness complies.)

23    Q.    And where approximately was the seat of the blast on

24    Laurel Street, if you know?

25    A.    (Witness indicates.)

1            MR. WEINREB:  Could we print that for the jury, or for

2     the record, and assign it the number 772-A?

3            THE CLERK:  Are you talking to me?

4            MR. WEINREB:  Yes.  I'm sorry, Mr. Lyness.  Would you

5     mind?

6            MR. WATKINS:  I'm going to object to the admission as

7     an exhibit.

8            THE COURT:  No, I'll admit it as an exhibit.

9            THE CLERK:  772?

00:48 10            MR. WEINREB:  772-A will be the screen capture.

11            (Government Exhibit No. 772-A received into evidence.)

12     BY MR. WEINREB:

13     Q.   And for the record, the arrow on the right-hand side of

14     the photo was pointing toward the Honda and the Mercedes, the

15     other yellow mark in the middle of the street was the

16     approximate site of the seat of the bomb blast, and the

17     rectangular drawing to the left of 55 Laurel, was it, or 56?

18     A.   53.

19     Q.   I'm sorry.  53 Laurel is where the lid was found.

00:49 20            THE COURT:  Do you need the paper copy?

21            MR. WEINREB:  No, I just don't want to mess with it.

22            THE COURT:  I think it's been captured in the drive.

23            THE CLERK:  Yes, it's been captured.  I'm just trying

24     to get it printed out.

25            MR. WEINREB:  Can I have 948-202, please.

```
 1    BY MR. WEINREB:

 2    Q.    Is that the same house we were just looking at?

 3    A.    That is.

 4          MR. WEINREB:  -203, please.

 5    Q.    What's that a picture of?

 6    A.    A picture of a cardboard disk.

 7          MR. WEINREB:  -204, please.

 8    Q.    Is that a close-up of the disk?

 9    A.    That is.

10    Q.    You see the black markings on it?

11    A.    I do.

12    Q.    Do you know what those are?

13    A.    Both burn, and there also appears to be, when I was out

14    there, some type of residue on the actual cardboard.

15    Q.    How many pieces of cardboard of that size and shape were

16    found?

17    A.    At this scene here, Watertown along Laurel, we had three

18    pieces of cardboard.

19    Q.    The size of the cardboard disks, how did that compare to

20    the size of the pressure cooker that was removed from the --

21    embedded in the car on Laurel Street?

22    A.    It matched very closely with the circumference of the

23    pressure cooker found along Laurel.

24    Q.    If a bomb is constructed that includes both black powder

25    and other components --
```

00:49 (line 10)
00:50 (line 20)

```
 1              MR. WATKINS:  I'm going to object, your Honor.
 2              THE COURT:  Overruled.
 3   BY MR. WEINREB:
 4   Q.   If the powder and the components mix, does that jeopardize
 5   the functioning of the bomb?
 6   A.   It potentially could depending on what the componentry of
 7   the actual device was.  If there was some type of actuator or
 8   something else in there that would be inhibited by the powder
 9   touching it, it could.
10   Q.   And would circular disks made out of cardboard serve any
11   purpose?
12              MR. WATKINS:  Objection.
13              THE COURT:  Overruled.
14              THE WITNESS:  The cardboard could be used as almost a
15   barrier between two different layers within the device.
16   BY MR. WEINREB:
17   Q.   Showing you 1002 and 1003 for identification, do you
18   recognize this?
19   A.   I do.  These are two of the three cardboard disks
20   recovered from Laurel.
21              MR. WEINREB:  The government offers 1002 and 1003.
22              MR. WATKINS:  No objection.
23              (Government Exhibit Nos. 1002 and 1003 received into
24   evidence.)
25   BY MR. WEINREB:
```

 1    Q.   Could you please cut those open and just display them for

 2    the jury?

 3    A.   (Witness complies.)

 4    Q.   Agent, are you familiar with the term "dead man switch"?

 5    A.   I am.

 6    Q.   What is a dead man switch?

 7    A.   Typically in an improvised explosive device, or an IED, it

 8    would be used as almost a last-case resort to initiate the

 9    device should you be stopped or should --

00:53 10            MR. WATKINS:  Objection, your Honor.

11            THE COURT:  Yeah, let me see you at the side, please.

12            (Discussion at sidebar and out of the hearing of the

13    jury:)

14            THE COURT:  Let's start with Mr. Watkins.

15            MR. WATKINS:  Plus I'd add relevance.  I'm not sure

16    what the relevance of this is either.

17            MR. WEINREB:  So with respect to relevance, items were

18    recovered from Laurel Street which will be -- their relevance

19    will only become clear if the jury and the Court understands

00:54 20    what a dead man switch is.  This witness will not offer an

21    opinion that they were part of a dead man switch, but he will

22    say that they are consistent with the components of a dead man

23    switch.  They could also have been things that were just lying

24    around on Laurel Street.  He's not going to give any opinion

25    that they came from this item.  But I think the jury is

 1    entitled to know what they are, and then we later can argue an

 2    inference that it would be highly coincidental for those

 3    components to just be lying around Laurel Street without any

 4    expert testimony.

 5          MR. WATKINS:  On the relevance point, your Honor,

 6    there's no electronics of this particular pressure cooker that

 7    was down there.  There's no indication that that's how it was

 8    designed at all.  So that's the issue with relevance.

 9          He is clearly going into expert testimony.  He's

00:55 10   talking about how this might be used in an explosive device.

11    It simply wasn't noticed.

12          THE COURT:  Yeah, I think it's getting into expert

13    evidence.  Maybe there's another witness besides this one.

14          (In open court:)

15          MR. WEINREB:  Exhibit 948-253, please.

16    BY MR. WEINREB:

17    Q.   Do you recognize that picture?

18    A.   I do.

19    Q.   What is it?

00:56 20   A.   That is a toggle switch located along the northern side of

21    Laurel in the bushes.

22          MR. WEINREB:  And -355, please.

23    Q.   Is that a close-up of the same item?

24    A.   That is a close-up.  Here you're able to discern the wires

25    extending from the bottom of the toggle switch.

1    Q.    Showing you Exhibit 963 for identification, the item you

2    just identified in the photograph, is that item in that bag?

3    A.    Yes, it is.

4          MR. WEINREB:  The government offers Exhibit 963.

5          MR. WATKINS:  Subject to the relevance objection.

6          THE COURT:  All right.  The relevance is overruled.

7    I'll admit it.

8          (Government Exhibit No. 963 received into evidence.)

9          MR. WEINREB:  Exhibit 948-256, please.

00:57 10   BY MR. WEINREB:

11   Q.    Do you recognize what that's a photo of?

12   A.    That is a little further out but of the hedge line along

13   the northern end of Laurel.  The northern face of Laurel.

14         MR. WEINREB:  -361, please.

15   Q.    What's that a photo of?

16   A.    A closer view of the same area.  You can begin to see the

17   placards designated 1 and 22, as well as a chemical light.

18   Q.    And in between the two placards, do you see what's there?

19   A.    That is a 9-volt battery.

00:58 20   Q.    You mentioned the glow light.  Why would there be a glow

21   light there?

22   A.    Typically during missions that involve SWAT or bomb techs,

23   any type of hazards are typically denoted using a chemical

24   light.  It's typically not used for evidence, but if you do

25   have a battery -- and it is the night when we are out there --

1    it's not always possible to see what it is leading to, so that

2    is marked and designated with a chemical light.

3    Q.   You said that battery was found on the northern side of

4    Laurel Street?

5    A.   Correct.

6         MR. WEINREB:  May I have 722, please.  I'm sorry.

7    772.

8    Q.   If you recall, can you indicate approximately where on

9    Laurel Street that was recovered?

00:59 10    A.   I believe it was along the hedge line of 56, because 60 is

11    where the vehicles were parked.  I believe it was in this area

12    here.

13    Q.   You've indicated in front of -- the hedge line in front of

14    56 Laurel.  And where, if you recall, was the toggle switch

15    with the wire attached located?

16    A.   I believe in the same series of bushes.  This one is 61

17    Laurel, so it would actually be this series.  And the 9-volt

18    battery on the actual evidentiary packaging should indicate

19    which address it's in front of, if you do have that there.

01:00 20    Q.   Okay.  And 61 Laurel, can you point that out?

21    A.   (Witness complies.)

22    Q.   So on the opposite side of the street, what's the number

23    of that?

24    A.   I'm sorry.  That is 61.  I thought this was a range over

25    here.

1    Q.   So that's the toggle switch and the wire that you just

2    indicated?

3    A.   This is the toggle switch and the wire marked as 61 Laurel

4    Street, correct.

5              MR. WEINREB:  Your Honor, the battery itself is

6    Exhibit 979, and the government offers it at this time.

7              MR. WATKINS:  No objection.

8              THE COURT:  Okay.

9              (Government Exhibit No. 979 received into evidence.)

01:00 10              MR. WEINREB:  Exhibit 948-99, please.

11   BY MR. WEINREB:

12   Q.   What is that a photo of?

13   A.   That is a photo of 55 and 57 Laurel on the south side of

14   the street.

15   Q.   And by the way, before we leave what we saw before, what

16   is a toggle switch?

17   A.   A toggle switch is simply when -- you want to think of it

18   as basically a gate.  So it allows electricity or current, in

19   this case, to flow from one wire to the other wire.  In the

01:01 20   open position, no flow of electricity can go through.  When you

21   flip the switch, a contact basically occurs between the two and

22   allows the transmission of that electricity to go through the

23   wire.

24              MR. WEINREB:  -100, please.

25   Q.   Is that the same house, just a closer-up image?

1    A.    That is.  And that is where the numbers are on the

2    mailboxes indicating 55 and 57.

3    Q.    So 55 is on the right-hand side and 57 is on the left-

4    side as you look at this photo?

5    A.    Correct.

6          MR. WEINREB:  -101, please.

7    Q.    What is that a photo of?

8    A.    That is a photo of -- at least in this picture -- denoting

9    damage to the upper level of that residence.  In this case you

01:02 10   see a small marker flag that was placed in there to draw

11   attention to it.

12         MR. WEINREB:  -102, please.

13   Q.    What's that?

14   A.    That is the marker flag I just indicated.

15         MR. WEINREB:  -103, please.

16   Q.    And now what's happening with the ladder right now?

17   A.    So at this point one of the personnel on the evidence

18   recovery team for this portion of it is traversing the ladder

19   to gain access to whatever is embedded in the siding there.

01:02 20         MR. WEINREB:  -104, please.

21   Q.    What's that?

22   A.    That appears to be the locking mechanism for the lid

23   that's located along the handle, but the lid of a pressure

24   cooker.

25   Q.    And is that the item that was embedded in the wall of the

1    house that we just saw?

2    A.    That is.

3    Q.    I'm showing you 1056 for identification.  What's that?

4    A.    That is the same locking mechanism pictured on the screen

5    as well as what was recovered from the upper level of the

6    residence of 55 Laurel.

7              MR. WEINREB:  The government offers 1056.

8              MR. WATKINS:  No objection.

9              THE COURT:  All right.

01:03 10            (Government Exhibit No. 1056 received into evidence.)

11             MR. WEINREB:  948-307, please.

12   BY MR. WEINREB:

13   Q.    What is that a picture of?

14   A.    This is the residence located -- we're standing on Laurel

15   looking at the residence.  The street that you see off to the

16   left-hand side is Dexter.

17             MR. WEINREB:  Exhibit 772, please.

18   Q.    Can you indicate on the map where that lawn was?

19   A.    This is the residence the photo was taken, looking in the

01:04 20   direction of the arrow.

21   Q.    So you've circled the building labeled 130-132 Dexter, and

22   you've drawn an arrow to the south side of the building in the

23   lawn area?

24   A.    Correct, at the west corner.

25             MR. WEINREB:  Let's go back to 307, please.

```
 1   Q.   There are -- these yellow items we see affixed to the
 2   wall, do you know what those are?
 3   A.   Yes, they are indicating damage to the siding and possible
 4   evidence inside of that siding, much like we saw at 55, with
 5   the different type of flag marker.
 6   Q.   Is that just a close-up image of those damage marks?
 7   A.   That is.
 8   Q.   Returning your attention to the lawn for a moment.
 9        MR. WEINREB:  Can we have 308, please.
10   Q.   So you see that there's an item with a placard marked No.
11   1 on the lawn?
12   A.   Yes.
13        MR. WEINREB:  -309.
14   Q.   Is that a close-up of that item?
15   A.   That is.
16        MR. WEINREB:  And -310.
17   Q.   Do you recognize that item?
18   A.   I do.
19   Q.   What is it?
20   A.   That is a piece of metal pitted on the one side that you
21   can see in the picture, and towards the left side of the photo
22   you do see threads on the top of it.
23   Q.   The pitting, is that something that you've seen before in
24   connection with explosives?
25   A.   Typically when there's some type of additional
```

1    fragmentation added to a device, whether it be a pipe or

2    otherwise, you do get some pitting on it as a result of the

3    explosion.  It's the outward pressure of ball-bearings, screws,

4    nuts, bolts, whatever may be inside.

5    Q.   And this is where this item -- does this appear to be an

6    item that -- a piece of a pipe?

7    A.   It does.

8    Q.   And where you found it is where it fell after it exploded?

9    A.   That's correct.

01:07 10        MR. WEINREB:  -416, please.

11    Q.   When was this taken?

12    A.   Without a timestamp I can't give you an exact time, but

13    during the early morning hours of the 19th.

14    Q.   Where is -- where were you looking here?

15    A.   So at this point we are at the intersection of Dexter and

16    Laurel, and this should be looking west down Laurel away from

17    the scene behind us.

18        MR. WEINREB:  -417, please.  Actually, go back to -416

19    for a minute.

01:08 20    Q.   You see at the bottom of the photo towards the middle

21    there is a cone and a chalk circle with the number 43 next to

22    it?

23    A.   Yes.

24        MR. WEINREB:  Now can we have -417?

25    Q.   And that's that same item?

1    A.    That is.

2    Q.    What is it?

3    A.    It appears to be the upper portion, we're looking at the

4    outside face of a piece of pipe.

5          MR. WEINREB:  -39, please.

6    Q.    Do you recognize that photo?

7    A.    I do.

8    Q.    What is it?

9    A.    It is marked number 24, and it appears to be a piece of

01:08 10   metal in the lawn there.  Do we have a closer-up or a zoom-in

11    of that?

12    Q.    Yes.

13          MR. WEINREB:  -37, please.

14    Q.    That's --

15          MR. WEINREB:  And -38, please.

16    Q.    Now that you've got a close-up view, do you recognize it?

17    A.    So that is the threaded portion of a pipe.  In this case

18    the threads, based on the shape of it, are on the inside of a

19    pipe.

01:09 20         MR. WEINREB:  -210, please.

21    Q.    Do you recognize where that photo was taken?

22    A.    I do.  Those two vehicles were parked in the driveway of

23    55 Laurel, and the evidence placard 53 is an end cap that would

24    be threaded down into a pipe.

25          MR. WEINREB:  -211, please.

1    A.    A closer view of the same.  Here you can see the portion

2    of the end cap, which would be internally threaded down into a

3    pipe, as well as the marking that was off the back of that

4    vehicle that it came off.

5    Q.    I believe you referred to that placard as 53?

6    A.    Fifty-three.  Correction:  52.

7    Q.    Showing you 1027 for identification, do you recognize

8    that?

9    A.    This is the same metal end cap that was located at that

01:10 10    address and recovered in place.

11   Q.    Would you please remove it from the bag and hold it up for

12   the jury?

13   A.    (Witness complies.)

14        MR. WEINREB:  Exhibit 948-552, please.

15   Q.    Do you recognize that area?

16   A.    That is the street area on the west side of the street.

17   We are on Dexter facing northwest towards the residence along

18   Dexter.

19        MR. WEINREB:  Can we have 772 again, please.

01:12 20   Q.    Do you see that location on the map?

21   A.    I believe it's the second residence in from the corner.

22   This is Dexter.  Looking in this direction, that residence.

23   Q.    And just so we're clear, this is Laurel Street --

24   A.    Correct.

25   Q.    -- correct?

 1        And this is the direction in which the Honda and the Civic

 2   were?

 3   A.   Correct.

 4   Q.   And then this is the area in which -- are you aware of

 5   where Officer Reynolds' cruiser was?

 6        MR. WATKINS:  I'm going to object, your Honor, to the

 7   leading.

 8        THE COURT:  No, overruled.

 9        You may answer that, if you know.

01:12 10        THE WITNESS:  Yes.  Officer Reynolds' cruiser was

 11   approximately in this location, or down this end of the street,

 12   and Officer MacLellan's ended up further down the street at

 13   this location.

 14        MR. WEINREB:  If we could go back to -552.

 15   BY MR. WEINREB?

 16   Q.   And you see that in front of the house that you indicated

 17   on the map there's a placard number, it looks like 58, and a

 18   chalk number 45?

 19   A.   I do.

01:13 20   Q.   All right.

 21        MR. WEINREB:  -553, please.

 22   Q.   That's a close-up?

 23   A.   That is a closer view of the same, yes.

 24        MR. WEINREB:  -33, please, and -34.

 25   Q.   Are these all photos of a -- well, you tell me.  What are

1    those photos of?

2    A.   These are photos of an end cap with damage to the lower

3    portion of the thread.

4    Q.   And all of these end cap portions and pipe portions that

5    we were seeing, are they all in -- when we've seen them

6    pictured here, are they all in the locations where they fell

7    after the bombs exploded?

8    A.   They are.

9    Q.   Showing you 1009 for identification.  You can cut that

01:14 10  open if you'd like.

11   A.   This is the same end cap that was along Dexter Avenue and

12   is also photographed above.

13            MR. WEINREB:  The government offers 1009.

14            MR. WATKINS:  No objection.

15            THE COURT:  All right.

16            (Government Exhibit No. 1009 received into evidence.)

17            MR. WEINREB:  Can I have Exhibit -40, please.

18   BY MR. WEINREB:

19   Q.   Do you recognize that?

01:15 20  A.   I do.

21   Q.   What is it?

22   A.   That was some type of paper with a series of BBs or

23   fragmentation attached to it, or stuck to it.

24   Q.   And where was it found, do you know?

25   A.   I believe that residence is 49 Laurel, which is to the

```
 1    western side of Laurel on the south side.
 2              MR. WEINREB:  -41, please.
 3    Q.   Is that the same item?
 4    A.   That is.
 5              MR. WEINREB:  Let's go back to 772.  I think I picked
 6    a bad spot for that.  Can you shrink that?
 7    Q.   Can you indicate approximately where that item was found,
 8    if you recall?
 9    A.   I believe these driveways are a little off, as we saw with
01:17 10    the hockey net at 53, but I believe it was, 49 and there are
11    steps coming down in the front here.  And there's actually a
12    driveway in this area.  It is between two vehicles located in
13    the driveway.
14    Q.   But it was found in a driveway?
15    A.   Correct.
16    Q.   Do you recognize this?
17              MR. WEINREB:  And just for the record, that is 1028
18    for identification.
19    A.   This is the same.  It's a series of BBs, some type of
01:18 20    paper with a material affixing the two together, and there
21    appears to be some burning on the actual -- or discoloring of
22    the BBs.
23              MR. WEINREB:  The government offers 1028.
24              MR. WATKINS:  No objection.
25              THE COURT:  All right.
```

1                (Government Exhibit No. 1028 received into evidence.)

2    BY MR. WEINREB:

3    Q.   I'm now showing you Exhibit 1064 for identification.  Do

4    you recognize that?

5    A.   Very similar to the previous exhibit.  BBs attached to

6    some type of paper.  These ones are much more scorched than the

7    other ones.  And as indicated by the labeling, it's along 55

8    Laurel.

9                MR. WEINREB:  Exhibit 953 for identification.

01:19 10    Q.   Can you cut that one open, please?

11    A.   Certainly.

12    Q.   Do you recognize that?

13    A.   I do.  It appears to be the handle of a pressure cooker,

14    and this was located in Grid B, which would be the street

15    portion of Laurel.

16                MR. WEINREB:  The government offers 1064, 1065 and

17    953.

18                MR. WATKINS:  No objection.

19                THE COURT:  Okay.

01:20 20                (Government Exhibit Nos. 1064, 1065 and 953 received

21    into evidence.)

22    BY MR. WEINREB:

23    Q.   You mentioned that a computer bag was recovered on Laurel,

24    and we saw photos of that, and then a shoulder bag was

25    recovered also near the Honda.  Was there a third bag found on

1    the street?

2    A.    There was a backpack located on the street.  I believe it

3    was gray and black in color.

4    Q.    Where was it located?

5    A.    Adjacent to -- I would say no more than three or four feet

6    away from the knapsack-type bag, the -- what I referred to as,

7    like, a carrier bag, the one we witnessed here earlier.

8    Q.    I'm showing you 1017 for identification.  Do you recognize

9    that?

01:21  10   A.    I do.  This is the gray and black transport bag that was

11   on the street on Laurel.

12            MR. WEINREB:  The government offers 1017.

13            MR. WATKINS:  No objection.

14            (Government Exhibit No. 1017 received into evidence.)

15            MR. WEINREB:  In addition, your Honor, yesterday when

16   I was going through the photos and having the witness identify

17   them, I think I went through them too quickly and a number of

18   them were not marked down.  So those three were 948-202,

19   948-207, and 948-204.  All of them were shown to the witness

01:22  20   and authenticated.

21            The government would offer them into evidence at this

22   time.

23            MR. WATKINS:  No objection.

24            THE COURT:  All right.

25            (Government Exhibit Nos. 948-202, 948-207 and 948-204

```
 1  received into evidence.)
 2  BY MR. WEINREB:
 3  Q.   Based on your personal observations of the Laurel Street
 4  crime scene during the evidence collection process, was there
 5  shrapnel from the bombs on people's lawns?
 6  A.   There was.
 7  Q.   In their yards?
 8  A.   There was.
 9  Q.   On their front porches?
10  A.   Yes.
11  Q.   On their roofs?
12  A.   Yes.
13  Q.   Embedded in the walls of their houses?
14  A.   Yes.
15  Q.   Was shrapnel found as much as a block away?
16  A.   It was.
17       MR. WEINREB:  Thank you, Agent Corcoran.  I have no
18  further questions.
19                    CROSS-EXAMINATION
20  BY MR. WATKINS:
21  Q.   Good morning, Agent Corcoran.
22  A.   Good morning.
23  Q.   Mr. Weinreb showed you a picture of the piece of a
24  pressure cooker embedded in a Civic?
25  A.   Correct.
```

1    Q.    And that's something you looked at specifically yourself?

2    A.    I personally witnessed that, yes.

3    Q.    I want to show you --

4          MR. WATKINS:  This should just go to the witness, your

5    Honor.

6    Q.    Do you recognize that as a picture of that Civic?

7    A.    Correct.

8    Q.    And focusing in here, do you see that piece of a pressure

9    cooker that you identified?

01:24 10   A.    I do.

11   Q.    Is this a fair and accurate picture of the scene while you

12   were down there?

13   A.    It is.

14         MR. WATKINS:  Your Honor, this has been identified as

15   Government's Exhibit 948-289.  I would like to introduce the

16   government's exhibit.

17         MR. WEINREB:  No objection, your Honor.

18         THE COURT:  All right.

19         (Government Exhibit No. 948-289 received into

01:24 20   evidence.)

21         MR. WATKINS:  And may it be published to the jury?

22   BY MR. WATKINS:

23   Q.    So looking again here, I'm going to focus your attention,

24   this is the Civic that you talked about and the pressure cooker

25   embedded within it?

1    A.   Correct.

2    Q.   And of course here is a Watertown SUV police vehicle.  I

3    think you told us about it, that you had understood it had gone

4    down the street and lodged here, right?

5    A.   Correct.

6    Q.   And, of course, this cruiser was here when you went to the

7    scene that morning?

8    A.   Correct.

9    Q.   Mr. Weinreb showed you a map that's been identified as 772

01:25 10   in evidence.  And that's the Civic that you identified there,

11   is where it was lodged?

12   A.   Correct, in the rear driver's side door.

13   Q.   And do you see the cruiser depicted on this particular

14   map?

15   A.   I do not.

16   Q.   I want to show you what's been admitted as Exhibit 775,

17   and I'm going to focus in on that same area.  And is that,

18   indeed, that same area?

19   A.   It is.

01:26 20   Q.   Can you point to the cruiser that is -- that was depicted

21   in that picture that we saw?

22   A.   (Witness complies.)

23   Q.   And can you point to the Civic again?

24   A.   (Witness complies.)

25   Q.   So that was the scene as you saw it that morning and when

```
 1  you investigated that pressure cooker lid?
 2  A.   Correct.
 3          MR. WATKINS:  Your Honor, can we take a screenshot of
 4  this as Exhibit 775-A?
 5          THE CLERK:  Government?
 6          MR. WEINREB:  No objection, your Honor.
 7          (Government Exhibit No. 775-A received into evidence.)
 8  BY MR. WATKINS:
 9  Q.   Now, I'm going to enlarge this here to this area.  Can you
10  note again the approximate position of the blast seat as you
11  understand it on this map?
12  A.   (Witness complies.)
13  Q.   And again, will you point to the Civic?  And as best you
14  can, the position where that was lodged, the pressure cooker
15  bomb?
16  A.   (Witness indicates.)
17          MR. WATKINS:  May we take a screenshot of this and
18  identify it as 775-B?
19          MR. WEINREB:  No objection.
20  BY MR. WATKINS:
21  Q.   Agent Corcoran --
22          THE CLERK:  Wait a minute.
23          THE COURT:  Mr. Watkins, can you put it back to what
24  you wanted?
25          MR. WATKINS:  I'm sorry.  I thought you did.
```

```
 1              THE CLERK:  It takes a while to download it.

 2              MR. WATKINS:  My apologies.

 3              THE CLERK:  That's all right.  Just put up the second

 4    one.

 5              MR. WATKINS:  Let me bring it back up here for you

 6    again.

 7              THE CLERK:  Which one, this one here?

 8              MR. WATKINS:  It needs to be marked.

 9    BY MR. WATKINS:

01:28 10    Q.   Could you again put the blast site -- your understanding

11    of the approximate location of the blast site and where on that

12    Civic the pressure cooker came?

13    A.   (Witness complies.)

14              MR. WATKINS:  That would be 775-B, please.

15              THE CLERK:  Hang on one second, please.

16              (Government Exhibit No. 775-B received into evidence.)

17              THE CLERK:  Okay.  Go ahead.

18              MR. WATKINS:  Thank you.

19    BY MR. WATKINS:

01:29 20    Q.   Showing you Exhibit 948-542 that the government entered

21    into evidence.

22    A.   Correct.

23    Q.   And on the other side of the screen, Exhibit 975, do you

24    see that?

25    A.   I do.
```

```
 1   Q.   I'm going to highlight it.  And you told us there that
 2   that is Tamerlan Tsarnaev's diploma.  Or at least that is his
 3   name on it, of course, correct?
 4   A.   Correct.
 5   Q.   I think you identified that also as Tamerlan Tsarnaev?
 6   A.   I did.
 7   Q.   And while I'm getting these back up, these were found in
 8   that computer bag that you found a few feet away from the Honda
 9   Civic?
10   A.   That is correct.
11   Q.   And also in the computer bag was that physical computer?
12   A.   Correct.
13            MR. WATKINS:  May I have Government 844?  Or 1844?
14   Oh, I'm sorry.  It's up there already.
15            May I approach, your Honor?
16            THE COURT:  Yes.
17            MS. CLARKE:  It was 1544.
18            MR. WATKINS:  The actual computer?  1544 is where?
19   BY MR. WATKINS:
20   Q.   Showing you what was marked for identification as
21   Government's Exhibit 1544, that's a laptop computer?
22   A.   Correct.
23   Q.   And you took it out of that computer bag that had the same
24   documents of Tamerlan Tsarnaev in them?
25   A.   Correct.
```

```
 1    Q.   And looking at this computer, is it in the same condition

 2    as when you collected it from Laurel Street?

 3    A.   It appears to be, yes.

 4    Q.   And it's got a power cord inside of it also?

 5    A.   It does, as was in the picture, yes.

 6              MR. WATKINS:  Your Honor, the defendant would move to

 7    introduce Government's Exhibit 1544 into evidence.

 8              MR. WEINREB:  Your Honor, the government objects.

 9    Portions of the computer may --

10              THE COURT:  Let me see you at the side.

11              (Discussion at sidebar and out of the hearing of the

12    jury:)

13              MR. WEINREB:  So the nature of the objection is

14    relevance on 403 grounds.  First of all, the relevance of any

15    particular item on the computer has not been established, and

16    yet what's being offered is not simply the empty shell, but the

17    contents of the computer as well.  It's possible that the

18    defense can establish the relevance of particular items on the

19    computer, but it needs to do so before the entire thing may be

20    admitted.

21              Contrary to what Mr. Fick suggested earlier, admitting

22    the whole thing is not a harmless formality even though the

23    jury won't be able to necessarily view it in the back without

24    special equipment, because it will then all be in the record.

25    It will be part of the evidence in the case.  If they ask to
```

1    see what's on it, for example, there would be no reason to

2    prevent them from seeing it, and that's not proper.

3    Undoubtedly, there are loads of relevant --

4            THE COURT:  Could that be solved by a ruling that the

5    physical structure is admitted but the data is not?

6            MR. WEINREB:  Yes, that we would have no objection to.

7            THE COURT:  Is that acceptable?

8            MR. WATKINS:  For now.

9            MR. FICK:  We simply -- you know, I think there's a

01:34 10    goose and gander issue here.  We would make the same -- we'd

11    take the same -- or a reciprocal position as to other pieces of

12    evidence regarding --

13            THE COURT:  We'll take them one by one.

14            MR. WEINREB:  The government didn't offer any of the

15    other electronic evidence for that reason, and we don't expect

16    to offer --

17            THE COURT:  Okay.  If the government's content with

18    the physical structure, but the data is not admitted in

19    evidence for the record, we'll leave it at that.

01:35 20            (In open court:)

21            MR. WATKINS:  May the physical laptop computer be

22    admitted into evidence.

23            THE COURT:  Yes.  The physical thing is admitted; the

24    data is not -- the electronic data, I should say.

25            (Government Exhibit No. 1544 received into evidence.)

1          MR. WATKINS:  That's all I have for this witness.

2     Thank you.

3          THE COURT:  Mr. Weinreb, anything further with Agent

4     Corcoran?

5          MR. WEINREB:  Only one brief matter to correct the

6     record.  The government offered 948-207, and I misspoke.  I

7     should have said 948-203.  That's the one that was actually

8     shown to the witness.

9          THE COURT:  All right.  So we'll strike 207 and add

01:36 10   203.

11          (Government Exhibit No. 948-203 received into

12     evidence.)

13          MR. WEINREB:  Thank you, your Honor.  That's all.

14          THE COURT:  All right, sir.  Thank you.  You may step

15     down.

16          THE WITNESS:  Thank you.

17          THE COURT:  Who's the next witness?

18          MR. CHAKRAVARTY:  It will be a shorter witness, Phil

19     Christiana from the FBI.

01:36 20        THE COURT:  Short?

21          MR. CHAKRAVARTY:  He'll be relatively short.  And

22     then --

23          THE COURT:  So let's clear the table and proceed.

24          MR. CHAKRAVARTY:  Your Honor, there's an issue we

25     would like to discuss.  It may make sense if the Court is

1    willing to break now for 15 minutes and then we'll --

2              THE COURT:  With respect to this witness?

3              MS. CONRAD:  Yes.  Just a discovery issue that we

4    could resolve.

5              THE COURT:  Let me see you briefly.

6              (Discussion at sidebar and out of the hearing of the

7    jury:)

8              MR. CHAKRAVARTY:  So this witness is the special agent

9    who went to the apartment of the defendant's friends and

01:38 10   acquired the defendant's laptop and a cell phone.  He's

11   testified to this a couple of times.  We've provided a

12   transcript of his prior testimony, and he is going to be a very

13   brief witness, and I thought a non-controversial witness.  The

14   defense has raised an issue that they're not sure what --

15             MS. CONRAD:  No, that's not what I said.  I would like

16   to speak for myself, thank you.

17             The issue is that I don't have that transcript handy

18   at the moment because Mr. Chakravarty said we might squeeze

19   this witness in at the end of the day, so when I was in the

01:38 20   office this morning I asked someone to pull that for me.  So

21   that's still a work in process.  I think I probably have the

22   transcript on my laptop.

23             THE COURT:  All right.  So if we take a break you'll

24   have them?

25             MS. CONRAD:  Yes.  I don't know how long, but it's

1   appreciated.

2           THE COURT:  All right.  We will take the morning

3   recess at this point.

4           THE CLERK:  All rise for the Court and the jury.  The

5   Court will take the morning recess.

6           (The Court and jury exit the courtroom and there is a

7   recess in the proceedings at 10:48 a.m.)

8   (The Court entered the courtroom at 11:18 a.m.)

9           MR. WEINREB:  Your Honor, before we begin, just as a

02:09 10   housekeeping matter, there were three items that were

11   identified by the previous witness that were not formally

12   offered into evidence.  They're 986, the lighter; 1020, pencil;

13   and 1027, which was identified as a cap.  The government offers

14   them now.

15           MR. WATKINS:  There was no objection.

16           THE COURT:  Okay.  Those are admitted.

17   (Government Exhibit No. 986 received into evidence.)

18   (Government Exhibit No. 1020 received into evidence.)

19   (Government Exhibit No. 1027 received into evidence.)

02:09 20           MR. CHAKRAVARTY:  Thank you, your Honor.  The

21   government calls Special Agent Phil Christiana.

22           PHILIP CHRISTIANA, Sworn

23           THE CLERK:  Have a seat.  State your name.  Spell your

24   last name for the record.  Keep your voice up and speak into

25   the mic.

```
  1              THE WITNESS:  It's Philip Christiana,

  2    C-h-r-i-s-t-i-a-n-a; Philip with one L.

  3    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

  4    Q.   Good morning.

  5    A.   Good morning.

  6    Q.   Are you a special agent with the FBI?

  7    A.   I am.

  8    Q.   How long have you been a special agent?

  9    A.   Twenty-three years.

02:10 10  Q.   Did you have many different roles over that time?

 11    A.   I have.

 12    Q.   What is your current assignment?

 13    A.   I'm assigned to the Boston division in the New -- Bedford,

 14    New Hampshire, resident agency.

 15    Q.   Back in 2013, what was your assignment?

 16    A.   I was assigned the same place at the time.

 17    Q.   Is there a resident agency or a smaller satellite office

 18    down in New Bedford?

 19    A.   It is.  It's Bedford, New Hampshire.

02:10 20  Q.   Bedford, New Hampshire, I'm sorry.

 21         Do you have any special skills as a special agent?

 22    A.   I do; I do.

 23    Q.   What are those?

 24    A.   I'm a special agent bomb technician also.

 25    Q.   Do you know Special Agent Brian Corcoran who just
```

```
 1    testified?

 2    A.    I do.

 3    Q.    One of your colleagues?

 4    A.    Yes.

 5    Q.    Did you participate in the Boston Marathon Investigation?

 6    A.    I did.

 7    Q.    Did you respond on April 15, 2013?

 8    A.    I did.

 9    Q.    Where did you go then?

10    A.    To Boylston Street.

11    Q.    Then later that week, did you have additional duties?

12    A.    I did.

13    Q.    And then on that Thursday and the Friday, April 18th and

14    April 19th, 2013, I'm going to ask you what you did on those

15    days.

16    A.    On Thursday, the 18th, I was -- I spent the majority of

17    the workday on Boylston Street helping process the scene.

18    Thursday night, I was in Cambridge, Massachusetts, helping out

19    with an operation there.  And then Friday, I was dispatched to

20    New Bedford, Massachusetts.

21    Q.    Okay.  Where were you going in New Bedford, Massachusetts?

22    A.    I was going to 69A Carriage Drive.

23    Q.    What was at 69A Carriage Drive?

24    A.    It was an apartment associated with associates of the

25    defendant.
```

1    Q.   At what point did you realize that this was a location of

2    interest?

3    A.    That morning.  Myself and Special Agent Dave Scott were

4    basically assigned to go down there.  We were told, you know,

5    that it was -- that this apartment was associated with the

6    associates of the defendant.

7    Q.   When you got down to 69A Carriage Drive in New Bedford,

8    were there other teams that were staging or in the area?

9    A.   We arrived down there -- not initially.  We did interact

02:12 10   with one other special agent there.  It was, like, early

11   afternoon when we arrived.  We were apparently down there very

12   early.  So we were there.  We engaged this one agent.  We were

13   there for a very short time period.  We were told to stay off

14   of the residence.  And then we returned there several hours

15   later.

16   Q.   And this is on Friday, April 19th?

17   A.   Correct.

18   Q.   Do you know whose residence that was?

19   A.   Yes, I do.

02:12 20   Q.   Who was that?

21   A.   Dias Kadyrbayev and Azamat Tazhayakov.  I'm going to mess

22   up the last name.

23   Q.   And those were friends of the defendant?

24   A.   Correct.

25   Q.   And what was your specific task down there?

A.   The reason we were sent there, Special Agent Scott and
myself, we were sent there to assist the Hostage Rescue Team as
bomb technicians.  That was the intention of us being there.

Q.   What kind of duties would that entail as a bomb
technician?

A.   Essentially, after the Hostage Rescue Team cleared the
apartment for people, then we were to assist in sweeping the
residence, the apartment, for any hazards, any potential
hazards.

Q.   And at the time that you -- that the apartment was swept
by the Hostage Rescue Team, had the defendant been located?

A.   The defendant was not -- no, he was not.

Q.   Did the Hostage Rescue Team go in?

A.   They did.  My understanding is that they went in, and they
removed three individuals from the apartment.

Q.   Did that -- did you arrive during that process?

A.   I arrived on the tail end of it.  I actually saw the last
person being removed from the apartment, and then I did what I
needed to do.

Q.   What was that?

A.   Well, initially engage the Hostage Rescue Team to see what
they saw in there as potential hazards and to see to what
extent they swept the apartment for things other than people
and then to go in and physically do a sweep for hazards, myself
and Special Agent Scott.

```
        1              MR. CHAKRAVARTY:  For the witness, your Honor, I'll
        2    call up Exhibit 1252, and there are four photos there.
        3    Q.   Do you recognize 1252?
        4    A.   I do; I do.
        5              MR. CHAKRAVARTY:  Can we go to the next page?
        6    Q.   And do you recognize this photo?
        7    A.   I do.  They're photos that I took, both of them.
        8              MR. CHAKRAVARTY:  And the next page.
        9    Q.   Do you recognize that?
02:15  10    A.   I do.  I recognize that as the backside of the apartment.
       11              MR. CHAKRAVARTY:  And the next page.
       12    Q.   You recognize that?
       13    A.   That does not look familiar to me.
       14    Q.   Okay.  So the first three photographs, are those
       15    photographs that you took?
       16    A.   No, I didn't take the third one.  I just recognize the
       17    backside of that residence.  I took the first two.
       18    Q.   So I'd -- are they fair and accurate depictions of what
       19    the residence looked like on April 19, 2013, when you went in?
02:15  20    A.   Absolutely, the first two.
       21              MR. CHAKRAVARTY:  I move in evidence Exhibits 1252-1
       22    through 3.
       23              MS. CONRAD:  No objection.
       24              THE COURT:  Okay.
       25    (Government Exhibit Nos. 1252-1, 1252-2, 1252-3 received into
```

```
        1    evidence.)
        2            MR. CHAKRAVARTY:  Can we go to 3, please?  I'd ask to
        3    publish, your Honor.
        4    Q.   Is that the apartment, 69A Carriage Drive, New Bedford?
        5    A.   I believe so.  I'm -- I recognize it, but I really didn't
        6    have that vantage point.  So that photo, I can't say definitely
        7    is the apartment.
        8    Q.   But it was in that vicinity where you entered that day?
        9    A.   What?  I'm sorry.
02:16  10    Q.   Is that structure in the vicinity of where you entered?
       11    A.   Yes.
       12    Q.   Okay.  But you're just not sure where the entrance is?
       13    A.   Yeah.  I'm trying to orient myself on the picture, to be
       14    honest with you.  I mean, I didn't take that photo.  I don't
       15    know that vantage point.
       16    Q.   Okay.  Fair enough.  Let's go to the photos you did take.
       17            MR. CHAKRAVARTY:  Let's go to Exhibit 1252-1.
       18    Q.   At some point you entered the apartment, is that right?
       19    A.   I did, correct.
02:16  20    Q.   What does this depict?
       21    A.   This is -- this is one of the photos that I took.  This is
       22    standing basically from the -- the entranceway of the
       23    apartment, the main entrance, looking into the living area, the
       24    common area, of the apartment.
       25    Q.   Just inside the door?
```

1    A.    Yes.  I'm a little deeper than just inside the door, but

2    there's a little -- there's basically a hallway.  I'm standing

3    at the end of that hallway, at the edge of that living area.

4    Q.    When in the day did -- approximately did you take this

5    picture?

6    A.    I took it -- it was in the evening hours.  It was

7    approximately 8, 8 p.m.

8    Q.    Do you know whether the defendant had been located at that

9    point?

02:17 10   A.    I don't believe he was located at that point.

11   Q.    So sometime in the evening?

12   A.    Excuse me?

13   Q.    It was sometime in the evening of April 19th?

14   A.    He was, yes, absolutely he was, that evening.

15   Q.    When -- were there other individuals in this room who had

16   been brought out before you got in?

17   A.    The residents.

18   Q.    Aside from Dias Kadyrbayev and Azamat Tazhayakov, who was

19   the other resident who was taken out?  If you don't know, just

02:18 20   say you don't know.

21   A.    I don't know.

22         MR. CHAKRAVARTY:  Let's go to 1252-2.

23   Q.    What is that?

24   A.    That's a picture of the dining area of the apartment.

25   Q.    Is this how it appeared when you went in?

1   A.   It is.

2   Q.   Again, is this in the evening of April 19th?

3   A.   Correct.

4   Q.   Can you describe what we see on the table?

5   A.   It's a table.  There's a laptop computer on the table just

6   below that red and blue baseball cap.

7   Q.   Can you just point to the laptop computer on the screen in

8   front of you and tap it?

9   A.   (Witness complies.)

02:19 10   Q.   And you just identified what appears to be a black shiny

11   flat object in the middle of the table?

12   A.   Correct.

13   Q.   What else was on there?

14   A.   There's -- I mean, the baseball cap, an ashtray.  There's

15   a -- looks like a drink bottle, some flowers.

16   Q.   Did you do anything with that laptop computer?

17   A.   I seized it.

18   Q.   What did you do after you seized it?

19   A.   I documented the seizure and then turned it over to

02:19 20   another special agent to be brought up to Boston and entered

21   into evidence.

22   Q.   What happens when you seize computers as evidence?

23   A.   They're imaged and processed.

24   Q.   Is that so you can see the content of the computer?

25   A.   Correct.

```
 1   Q.   Is there a special team of agents that does that?

 2   A.   Absolutely.

 3   Q.   This particular computer, do you know whether it later got

 4   the identifying number called 1R6?

 5   A.   I do, yes.

 6   Q.   In addition to the computer, did you seize any phones from

 7   that apartment?

 8   A.   I did.

 9   Q.   Particularly, did you seize the phone of Dias Kadyrbayev?

10   A.   I did.

11        MR. CHAKRAVARTY:  If I may approach, your Honor?

12        THE COURT:  You may.

13   Q.   I'm handing you what's been marked as Government's Exhibit

14   1558.  Have you opened that bag before?

15   A.   I have, just approximately an hour ago.

16   Q.   What's inside that bag?

17   A.   It's an iPhone 4s that I seized and documented.

18   Q.   At the risk of indulging your patience, Agent Christiana,

19   can I ask you to open that again?

20   A.   Sure, sure.  I can try.  All right.

21   Q.   Agent Christiana, do you recognize that?

22   A.   I do.

23   Q.   Is that, in fact, the phone you seized from Dias

24   Kadyrbayev?

25        MS. CONRAD:  Objection.  Seized from Dias Kadyrbayev?
```

```
 1    I don't know that that's --
 2              THE COURT:  Rephrase it.
 3    Q.   Where did you seize that phone from?
 4    A.   I seized it from 69A Carriage Drive.
 5    Q.   Where in the apartment, do you remember?
 6    A.   That came out of the bedroom, one of the two bedrooms.
 7    Q.   One of the two bedrooms.
 8         Was there another phone seized?
 9    A.   There were two other phones seized.
10    Q.   Where were those phones?
11    A.   One phone was in the same bedroom as this phone, and there
12    was another phone in the second bedroom.
13    Q.   Were there personal belongings identifying the resident of
14    that room?
15    A.   There were items that indicated the residents of the room,
16    absolutely, there were.
17    Q.   The one you have in front of you, whose room was that?
18    A.   It was associated with the room we believed to be Dias'.
19    Q.   Now, did you lawfully seize that phone?
20    A.   Absolutely.
21    Q.   And with regard to the laptop computer that we just
22    mentioned, the 1R6, was a search warrant later obtained for
23    that computer?
24    A.   That's my understanding, yes.
25    Q.   Now, you had mentioned that the HRT, or the Hostage Rescue
```

1    Team, had gone in?

2    A.    Correct.

3    Q.    And caught you unawares with regard to who the third

4    person was who had come out of the house.  But what is the job

5    of the Hostage Rescue Team?

6    A.    They're a counterterrorism, a tactical team, full-time

7    counterterrorism team.

8    Q.    Were there any hostages in that apartment at that time?

9    A.    There were not.

02:23 10   Q.    They do a variety of things.  Is it like a SWAT team?

11   A.    Yeah, exactly.

12   Q.    Is there -- on what I've shown you as 1558, is there an

13   FBI identifying number on that?

14   A.    I'm -- on the package or the phone?

15   Q.    On either.

16   A.    Well, the bag is clearly an FBI bag that I actually

17   completed myself when I seized the phone.

18   Q.    Was that later identified as 1W -- sorry, 1R3A?

19   A.    Yes, yes, yes, it was.

02:24 20        MR. CHAKRAVARTY:  If I may approach again, your Honor?

21   Q.    Showing you what's been marked as Government's Exhibit

22   1534, do you recognize that?

23   A.    I do.

24   Q.    What is that?

25   A.    This is the Sony VAIO laptop that's depicted in the

1    picture on the dining room table.

2    Q.   So that wasn't in any of the bedrooms?

3    A.   It was not.

4    Q.   That laptop computer, does that have the 1R6 label on

5    it -- on the bag, I should say?

6    A.   I know that's your designation.  Let me pull it out and

7    see if it's on the laptop still.  Actually, it's right on the

8    bag, yes, yup.

9         MR. CHAKRAVARTY:  At this point I'd offer just the

02:25 10   physical devices, not the data, from both 1534 and 1558.

11        MS. CONRAD:  No objection.

12        THE COURT:  Okay.  Under those terms, they're

13   admitted, the physical objects.

14   (Government Exhibit Nos. 1534 and 1558 received into evidence.)

15   Q.   Were both of those objects, Agent Christiana, brought back

16   to Boston for processing by those computer technicians?

17   A.   They were.

18        MR. CHAKRAVARTY:  That's all I have, your Honor.

19        MS. CONRAD:  I don't have any questions.  Thank you

02:25 20   very much.

21        THE COURT:  All right, Agent.  Thank you.  You can

22   step down.

23        THE WITNESS:  Thank you.

24        MR. CHAKRAVARTY:  Government calls -- sorry.

25   Government calls Supervisory Special Agent Kevin Swindon.

1           MR. FICK:  Can we approach, your Honor?

2           THE COURT:  All right.

3     (SIDEBAR CONFERENCE AS FOLLOWS:

4           MR. FICK:  We object to this witness being called at

5     this time in light of the government's late disclosure

6     yesterday of incredibly voluminous material yesterday.  Just

7     after 6 p.m., we received a stack of CD-ROMs in our office

8     containing essentially a reworking of the exhibits for this

9     witness.  This witness is an expert who is going to be -- at

02:27 10    least the government hopes he's going to be the vehicle to

11    introduce literally hundreds of files from computers and dozens

12    of very dense analytic spreadsheets about the contents of the

13    computers.  Yesterday the government made this new production

14    which, among other things, adds new spreadsheet analytic

15    exhibits, two of them in excess of several thousand pages.  One

16    is, like, 4,600 and one is 2,500 something.  Other exhibits are

17    renamed.  Other exhibits are modified.  Frankly, some exhibits

18    were taken out.  Some exhibits were added.  Frankly, I haven't

19    had a chance even to really get through and figure out the

02:27 20    correlation from the old exhibits to the new ones yet, and

21    there was no accompanying list describing the changes.  For

22    that reason, we simply can't be in a position to cross-examine

23    an expert like this today.

24          MR. CHAKRAVARTY:  So the changes to the disks were

25    very modest.  The two voluminous documents that were added were

1    the complete file listings for the laptop computer which you

2    heard about today, and there was a desktop computer that was

3    found at the Norfolk Street house.

4         The reason for the introduction of that as an exhibit

5    is in light of defense strategy throughout the trial of

6    suggesting that we were cherry-picking, as came out clearly

7    during the Twitter cross-examination.  We felt it was prudent

8    to have at least the full file listings which shows that we're

9    not hiding the content and have it available.  It was never the

02:28  10   government's intention that that would go back and the jury

11   would parse through 4,000 pages.  We're fine with having that

12   marked for identification, but this witness is simply going to

13   acknowledge that that exists.  Everything else simply

14   acknowledges that that exists.  They put it onto the disks so

15   that they're not ignoring it.  Everything else was taking

16   things off of the disks partially because the defense

17   complained about some of the language, some of the

18   characterizations on the spreadsheets.  For example,

19   "jihad-related activity" was changed to "selected activity" so

02:29  20   that we were kind of making it more neutral, more appropriate,

21   those kinds of changes.

22        Organizationally, some files were moved from one

23   folder to another folder.  These are extremely modest changes.

24   We did not change the substance or the files that were

25   designated or that we were going to be introducing.

1          MR. FICK:  Even crediting Mr. Chakravarty's

2     characterization, which I actually don't agree with completely,

3     simply the reorganization makes it impossible to do an

4     effective cross or to understand what's coming in during the

5     direct here.  Quite apart from the question of whether the

6     thousand-plus-page exhibits are going to come into evidence, at

7     a minimum, we ought to be able to look at it with our expert to

8     determine if there are things we can extract from that to use

9     on cross-examination.  I can guarantee you there likely are.

02:30 10    Under the circumstances, it's simply unreasonable to expect us

11    to go forward today with this witness.

12          THE COURT:  How long will your direct be?

13          MR. CHAKRAVARTY:  Approximately two hours.

14          THE COURT:  We'll proceed with the direct.  If it

15    appears after the direct that you need further time, we can

16    postpone the cross-examination.

17          MR. FICK:  Thank you, your Honor.

18          THE COURT:  Maybe.  No.  I mean, I'll assess it.  I'll

19    see what the direct sounds like.  We'll confer again.  But

02:30 20    that's a solution.  We'll at least make some progress with the

21    evidence.

22          MR. FICK:  I expect there are going to be some

23    foundation -- *Melendez-Diaz*-complication-type challenges to the

24    exhibits along the way just to sort of flag that.

25          MR. CHAKRAVARTY:  Your Honor, one other point.  I

1    should have mentioned it in chambers before.  But some of the

2    devices about which he's -- he analyzed and processed have not

3    yet been introduced into evidence and presented to the jury.

4    So we'd ask that that testimony be taken de bene depending on

5    what's --

6              THE COURT:  All right.

7    .  .  .  END OF SIDEBAR CONFERENCE.)

8              MR. CHAKRAVARTY:  Supervisory Special Agent Kevin

9    Swindon.

02:31 10              THE CLERK:  Sir, you want to step up to the box,

11    please.

12              KEVIN SWINDON, Sworn

13              THE CLERK:  State your name.  Spell your last name for

14    the record.  Keep your voice up and speak into the mic so

15    everyone can hear you.

16              THE WITNESS:  Thank you.  First name is Kevin.  Last

17    name is Swindon, S-w-i-n-d-o-n.

18    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

19    Q.    Good morning.

02:31 20    A.    Good morning.

21    Q.    Where do you work?

22    A.    I work for the Federal Bureau of Investigations.

23    Q.    In what capacity?

24    A.    The supervisory special agent for the Cyber Squad in the

25    Boston division.

1    Q.    What does the Cyber Squad do?

2    A.    The Cyber Squad is responsible for investigating cyber

3    matters in Maine, New Hampshire, Rhode Island, and

4    Massachusetts as it relates to computer intrusion matters for

5    criminal and national security.

6    Q.    Do you supervise any other units or squads?

7    A.    I do.  In our program -- I'm here in Boston.  We also have

8    the Computer Forensic Analysis Team, or CART.  And, lastly, we

9    have the photo program, which is also under the Cyber Squad

02:32 10   here in Boston.

11   Q.    What does the Computer Analysis Recovery Team do?

12   A.    The Computer Analysis Response Team is responsible --

13   Q.    Response.

14   A.    -- for the imaging and processing of digital media for all

15   the investigative responsibilities for the FBI.

16   Q.    How long have you been a special agent?

17   A.    I've been a special agent a little over 18 years.

18   Q.    Have you had particularized training in computer

19   forensics?

02:33 20   A.    I have.  Prior to being the supervisor of the program, I

21   was a certified forensic examiner for ten years.

22   Q.    What is a forensic examiner?

23   A.    A certified forensic examiner in the Bureau is an employee

24   who's trained and responsible for the collection and processing

25   of digital media for all types of investigations.

```
 1    Q.   You say "digital media."  Can you give examples of what
 2    digital media is?
 3    A.   Sure.  Digital media can be a thumb drive.  Could be a
 4    computer.  Could be a server.  Could be anything where digital
 5    media would be housed or stored.
 6    Q.   Has that role of computer forensics increased over time?
 7    A.   Absolutely.  It's increased a hundredfold over time.  I
 8    think every investigative responsibility that the FBI has has
 9    seen an increase in digital media associated with it.
02:34 10    Q.   Before you became a forensic examiner, did you have
11    particular training in computer forensics?
12    A.   I came out of the computer industry in the private sector
13    before joining the FBI in 1996.
14    Q.   And then in the FBI did you have any training?
15    A.   We did.  The certification for the forensic program is
16    intensive, requires an A+ and Net+ certifications.  There's a
17    two-week basic data recovery, a one-week advanced data
18    recovery, practical exams, and then a moot court in order to be
19    completely certified.
02:34 20    Q.   You mentioned that you had been in the private industry as
21    well.  What was your job then?
22    A.   My private industry job prior to the Bureau, I did network
23    consulting to the hospitality industry.
24    Q.   What's your education?
25    A.   I have a bachelor in science and industrial management
```

1   from University of Lowell.  I have a master's in business

2   administration from Northeastern and a master's in finance from

3   Boston College.

4   Q.   Aside from your computer forensic certifications, have you

5   had any other certifications in your career in computers?

6   A.   In computers.  The cyber training program, to be a cyber

7   agent, there are several phases of classes that you go through

8   or that you progress through.  And that was -- those classes

9   were taken through -- there's four phases for a cyber special

02:35 10   agent, and I completed the three of the four phases.

11   Q.   You also stay up to date through your supervisory duties?

12   A.   Yes.  Supporting or managing the program requires a

13   constant update of staying current with technology and aware of

14   the current threats and trends in cyber.

15   Q.   Are you active in InfraGard?

16   A.   We have a full InfraGard chapter here in Boston, which is

17   a public/private organization where the FBI partners with

18   private sector to provide training and awareness on cyber

19   threats and trends.

02:35 20   Q.   Do you present on computer forensics?

21   A.   I do.  Typically have -- give presentations 15 to 20

22   probably per year on cyber-specific threats and trends and then

23   several computer forensic presentations.

24   Q.   Have you personally completed computer forensic

25   examinations over your career?

1    A.   I have.

2    Q.   About how many?

3    A.   In the -- to get an exact number would be very difficult,

4    but it's over a couple of hundred.

5    Q.   In addition, have you participated in and supervised

6    others doing their forensic --

7    A.   I have.  I have been the program manager or the supervisor

8    of the CART program for the time that I've been the supervisor

9    in Boston.

02:36 10    Q.   Over the course of that time, has there been peer review

11    of your work and have you conducted peer review of others'

12    work?

13    A.   Yeah.  As a part of the forensic process, there's a

14    certain percentage of -- certain percentage of examinations

15    that get peer reviewed and admin reviewed, and I've been both

16    -- I've participated in both processes.

17    Q.   Have you testified previously as a computer expert in

18    computer forensics?

19    A.   I have.  Yes, I have.

02:37 20    Q.   Have you testified before Federal District Court in

21    Massachusetts?

22    A.   I have.

23    Q.   And have you testified in other courts as well?

24    A.   Yes.

25    Q.   Have you done computer forensic analysis in terrorism

1   cases before?

2   A.   Yes, I have.

3   Q.   About how many times?

4   A.   Probably four or five times specific to terrorism matters.

5        MR. CHAKRAVARTY:  At this point, your Honor, I'd ask

6   to qualify Agent Swindon as an expert in computer forensics.

7        MR. FICK:  No objection.

8        THE COURT:  All right.

9   Q.   Agent Swindon, can you explain to the jury what computer

02:37 10  forensics is?

11  A.   Computer forensics has really evolved over the last number

12  of years where previous -- as technology started to become what

13  it is today, the process has changed.  It's become more of a

14  forensic science where there's a process and procedure for most

15  things that we do including how we handle the evidence upon

16  collection, what we do when we image it, and then how we

17  process it.  It sort of has become much more standardized over

18  the course of time.

19  Q.   And the forensics part of it, what are the primary

02:38 20  objectives of conducting forensic analysis?

21  A.   The primary focus would be to -- you know, to acquire

22  evidence in a forensically sound way so as not to change that

23  evidence but, in the process, being able to collect that

24  evidence and make it usable in legal proceedings.

25  Q.   What types of digital media are prone to computer forensic

1    analysis?

2    A.    We process a variety of different types of digital media.

3    It can range from thumb drives or USB thumb drives to external

4    hard drives, to laptops, to computers, to servers in

5    businesses.  Anything where digital media would be stored we

6    have the -- we have the ability to process.

7    Q.    Is there a general -- are there general phases of the

8    computer forensic process?

9    A.    There are general phases although each may differ slightly

02:39 10   based on the type of media or the digital media that you're

11    processing.  But, typically, it's sort of a two-phase process

12    where there's an imaging phase and then a processing phase.

13    Q.    What is the imaging phase?

14    A.    The imaging phase would be the process by which you

15    acquire the initial image of that evidence.  We would use

16    either a piece of hardware or a piece of software to acquire a

17    bit-by-bit image of -- or a forensic copy of that device or

18    digital media.

19    Q.    What types of techniques do you use to do that?

02:39 20   A.    If it was a software technique, for example, if it was a

21    hard drive, if it was your home computer, and we had to image

22    that home computer, we would remove that hard drive from the

23    computer, connect it to another computer in our lab with a --

24    the ability to write protect so as to not write back to that

25    drive.  And we would use a software application to image that

1    drive.

2    Q.   The software applications that you use in your computer

3    forensics work, are those industry standard software

4    applications?

5    A.   They are commercially available, and most of the tools we

6    use are commercially available.

7    Q.   Are those used routinely by FBI offices around the

8    country?

9    A.   Yes.  Forensic practitioners around the country would be

02:40 10   utilizing those tools.

11   Q.   Agent Swindon, you used the word "image."  Can you explain

12   what that means in the world of computer forensics?

13   A.   Sure.  Typically, there are two types of images we can

14   make of a piece of digital media.  There's going to be a

15   logical copy and a physical image.  The physical image is going

16   to be a bit-by-bit copy of that piece of digital media.  It's

17   going to ignore the operating system.  So whether it was, for

18   example, an Apple computer or a Windows computer, that imaging

19   process would ignore that operating system and then image that

02:41 20   drive bit-by-bit.

21       The other alternative, if that's not available to do,

22   would be a logical copy.  For example, if you were on your home

23   computer at home and you wanted to copy files off, you could go

24   to your computer -- Windows computer and copy from your C drive

25   over to another drive, would be a logical copy.

1    Q.    So when you're talking about an image, you're not talking

2    a photograph.  You're talking about the content of the media?

3    A.    The physical image would be an exact duplicate of what was

4    on that drive at the time it was seized.

5    Q.    When you say "bit-by-bit copy," you mean the little bits

6    of data?

7    A.    It goes down to the disk and, again, ignores the sort of

8    operating system that's on that drive and would make a

9    bit-by-bit copy.

02:41 10   Q.    How do you verify that an image was done properly?

11   A.    There are several techniques that you can do that, but the

12   most widely accepted is going to be an MD5.  I'll explain what

13   that is.  A MD5 is a technique that we use in forensic sciences

14   to validate or verify that an image is made and collected

15   properly or matches the drive that you're copying.

16        MD5 would be similar to like -- an MD5 value would be

17   similar to say, like, a fingerprint.  We would run a program

18   against a folder, a file or a drive, and that program would

19   generate that MD5 hash value.  And that value would be unique

02:42 20   to that file folder or drive.  We then could compare that

21   number, that unique number, to that file folder or drive at any

22   point in time during the process to verify that no changes were

23   made to that image or collection that we made.

24   Q.    Is that routinely done when an image is made pursuant to

25   the FBI's CART protocol?

1    A.    Yeah.  Most imaging software have it automated as a part

2    of their process now.  So when you do make that physical image,

3    it would also calculate an MD5 hash value.

4    Q.    You said that was the first phase of the computer

5    forensics process?

6    A.    Yes.  Imaging is the first phase and, typically, the most

7    important phase.

8    Q.    So what comes after the imaging phase?

9    A.    After the imaging phase, depending on the investigation or

02:43 10   the case and the request of the actual case agent who's in

11   charge of the case, we would then process that image or process

12   the data that we would have collected in their image form.

13   Q.    What do you process that data with?

14   A.    We -- typically it's commercially available software that

15   we would process with.  We would try that first.  And then that

16   commercially available software would do a number of things.

17   It would take a look at that image.  It would look inside that

18   image that we just made and be able to pull the data out of

19   that image, for example, the documents, the spreadsheets,

02:43 20   photos or images that might be on that drive.  It would also

21   give us access to other things on that drive that you may not

22   see as a user, which would include deleted files or recovered

23   files that you may think are deleted on the computer but are

24   still recoverable by the forensic software.

25   Q.    What are the tools that you typically use at the FBI?

```
 1    A.    Typically use -- we have a number of tools that have been
 2    tested and validated.  Typically, the primary choice is going
 3    to be AD Labs, which is a product made by Forensic Toolkit or
 4    AccessData.  And then, secondly, X-Ways Forensics has a new
 5    tool that's been provided in our toolkit of tools that have
 6    been tested and validated.
 7    Q.    So once you've processed the data that was imaged, can you
 8    make that available then for agents or other people to be able
 9    to look at that?
```
02:44
```
10    A.    We do.  Once it's processed, we have a -- for lack of a
11    better term, a graphical user interface, that we would provide
12    that processed image to a case agent or an analyst to be able
13    to review.  It would allow them to be able to look on that
14    computer or look into that computer to see what files existed
15    or look in that image.
16    Q.    That would go for some of the other digital files that you
17    mentioned earlier, like video files or pictures?
18    A.    Sure, yes.  The forensic software typically breaks them
19    out and categorizes them by Word documents, Excel spreadsheets,
```
02:45
```
20    PDFs, JPEG or images that might be on your computer.
21    Q.    How does this differ from -- if the typical circumstance
22    where a person might take a memory card out of their camera and
23    plug it into their computer?
24    A.    Well, what happens is when -- if you were to take that
25    card out of your camera and put it into the computer, it would
```

1    actually make changes to that card.  The forensic process, we

2    would make sure that the way that we image that piece of media,

3    there would be no changes made to it or the image upon

4    collection.

5    Q.    In addition to the pictures that may be in what we call

6    active space, could you find other data on that card?

7    A.    The software -- the forensic software has the ability to

8    do several things.  One of the tools it has, it can identify

9    previously deleted files.  So, for example, if you had a file

02:46 10   on your computer that you deleted and it still existed or the

11   data still existed on that drive, the application software

12   would have the ability to identify that it had been deleted and

13   then be able to recover that file and make it usable or visible

14   to the person who's reviewing.

15   Q.    Once that process is complete and the analysis of the data

16   on a computer is complete, what's the next phase of the

17   process?

18   A.    What typically we would do is, based on the request, we

19   would then provide that processed image to a either case agent

02:46 20   or team or team of analysts or a team of investigators who

21   would then review that data.

22   Q.    And then, if that team then identified particular files

23   that they wanted to extract from a particular computer device,

24   how do you do that?

25   A.    Typically, the investigative team or the reviewers would

1    then -- they may -- if they were using AD Labs, which is a

2    typical software we would use, they would make bookmarks or

3    they would -- like bookmarks in -- if you were reading a book

4    and put a bookmark to save your page, they have electronic

5    bookmarks that they would mark data that we then, as a forensic

6    examiner, then can go back into that software afterwards and

7    then export those files that they had identified as being

8    significant.

9    Q.   How do you export those files without changing the

02:47 10   original data on the device?

11   A.   Well, typically, we would then have the -- we would have

12   the MD5 hash value for that file if it was a file of

13   significance.  And then we would -- just like you would burn a

14   CD at home, we would burn that file to something or a piece of

15   media that couldn't be written to again.  Typically, like, we

16   would use a CD-R which you could burn once.  We would write

17   those files to and then provide that to the investigative team

18   as what we would call derivative evidence.

19   Q.   Now, as a computer forensic examiner, would you select

02:48 20   which files need to be exported?

21   A.   In most cases probably not.  It would -- we don't know the

22   most about the cases.  The investigators or the analysts know

23   the most about the cases.  We can assist them if it was a --

24   sort of a -- say it was a complex white collar crime, and the

25   agent might be a white collar expert but not a technology

1    expert.  We may help them through the process of identifying

2    where the evidence might be, but they're going to know best

3    what evidence is most important to the case.

4    Q.    What steps are taken -- you mentioned that there was an

5    MD5 hash taken after an examination, is that right?

6    A.    The MD5 hash is collected or first calculated at the point

7    of imaging.

8    Q.    Okay.  So you explained that that's a unique number.  But

9    what does an MD5 hash value go to?  Is it a computer?  Is it a

02:49 10   file or what?

11   A.    It can actually verify a file, a folder or a complete

12   drive or an image.  If you were to run that program or the

13   program that generates the MD5 hash value for that file, folder

14   or drive.  You would then hold that, and that becomes a part of

15   your admin file, your log file, so that way later you can

16   compare to make sure that no changes were made to that original

17   evidence.

18   Q.    The process that you just described of the imaging, the

19   processing, the analysis, and the export of digital data from

02:49 20   media, is that a standard process that the FBI uses?

21   A.    It is.  I mean, it's part of the forensic training for new

22   examiners, or for examiners.

23   Q.    Is that a process you've done as long as you've examined

24   computers?

25   A.    Yes.

```
 1   Q.    Now, let's draw your attention to this investigation, this

 2   case.  Have you been working on the Boston Marathon

 3   investigation off and on over the last couple of years?

 4   A.    Yes, I have.

 5   Q.    At the beginning of the investigation, what was your role?

 6   A.    My role at the time, I was temporarily assigned as an

 7   acting ASAC for the office for the cyber and

 8   counterintelligence branch.

 9   Q.    And so after the Boylston Street explosions, what was your

10   duty?

11   A.    Immediately following the Boston Marathon bombing event, I

12   became responsible for overseeing the digital media collection

13   and, operationally, sort of the day shift, if there really was

14   one, in the command post.

15   Q.    The digital media collection, what types of digital media

16   were being collected?

17   A.    There was a number -- again, there was a number of

18   different types of media that were collected as a part of this

19   investigation.  There were cell phones and thumb drives and

20   computers, DVRs such as the DVRs that were taken from Boylston

21   Street, and a number of different types of evidence.

22   Q.    At some point did your role change in the last two years?

23   A.    It did.  Operationally, once the person that I was acting

24   for came back from their temporary duty assignment, I then -- I

25   resumed my duties as the supervisor of the Cyber Squad in
```

1    Boston.

2    Q.   What was your role for purposes of testimony in this case?

3    A.   For purposes of testimony in this case, I was asked by the

4    investigative team to validate and verify those -- as we spoke

5    about earlier, those sort of selected files that were made from

6    those processed -- the processed pieces of evidence.

7    Q.   Now, how many people have worked on the computer forensics

8    process in this case?

9    A.   Immediately following the bombing, we mobilized teams from

02:52 10   a number of different offices, to include, New York,

11   Philadelphia, and as far away as Miami, to come help support

12   the collection or ingest the computer forensic evidence.  So I

13   would say, would estimate, there would have been over 50

14   different sort of certified forensic examiners that were

15   involved in either collection or processing.

16   Q.   And that's in addition to the people who actually seized

17   items of evidence?

18   A.   That is in addition.

19   Q.   That is in addition to the people who actually analyzed

02:52 20   the evidence?

21   A.   Yes.  It may be different, yes.

22   Q.   Were there other agencies that participated in that

23   process as well?

24   A.   There were several task force agencies during the actual

25   initial event that were assisting in the collection, the

1    collection of -- there were so many scenes that had to be

2    processed, that we utilized some of the other agencies that

3    provided assistance.

4    Q.   And were all -- was all of the evidence that was collected

5    by the FBI, the digital evidence, was it processed using the

6    computer forensic process that you described earlier?

7             MR. FICK:  Objection to foundation.

8             THE COURT:  Overruled.

9    A.   Yes.  At both Black Falcon and One Center Plaza were the

02:53 10   two sort of forensic collection points for digital media.  They

11   were staffed with fully certified forensic examiners who follow

12   the same SOP, standard operating procedures, and guidelines.

13   Q.   Were you supervising them at the time?

14   A.   I oversaw the collection, yes.

15   Q.   Did you go to Black Falcon?  Did you go to the Center

16   Plaza?

17   A.   I did.  I was assigned to Center Plaza, which the

18   forensics lab is right next to, where the command post was set

19   up and made daily visits over to Black Falcon to brief them on

02:53 20   the events of what was going on.

21   Q.   As part of the FBI's analysis protocol, were there steps

22   to ensure that you have legal authority to actually search

23   these devices?

24   A.   Absolutely.  All the evidence in this case was seized

25   pursuant to legal authority.

```
 1   Q.   At Black Falcon, you've mentioned, is this the staging
 2   area where evidence was taken after the bombings?
 3   A.   Black Falcon was initiated to help -- have one place where
 4   evidence could be.  There was -- evidence was so voluminous
 5   that we needed to find a place where we could bring in -- a
 6   large enough area to bring in all the evidence.  And Black
 7   Falcon was provided, I believe, by Massport to be the ingest
 8   for evidence, including the digital media.
 9   Q.   And can you explain a little bit how the computer
10   forensics work was happening at Black Falcon?
11   A.   We set up a lab at Black Falcon that mirrored the lab that
12   we have that's permanent in One Center Plaza.  We have a mobile
13   sort of command post per se that came up from New York and has
14   full access and full technology that we would have in a typical
15   permanent lab, and they deployed -- they can deploy it in the
16   field.
17   Q.   How was the computer forensic process happening at Center
18   Plaza?
19   A.   According to -- our forensic lab is a permanent lab.  So,
20   really, it was -- other than being busier, it was -- it was
21   standard procedure for us there.
22   Q.   Let's draw our attention to some particular devices in
23   this case.  About how many devices were seized in the course of
24   the Boston Marathon investigation?
25   A.   I believe at last count there were over 600 pieces of
```

1    digital media that were collected.

2    Q.    Did you examine each one of those?

3    A.    I did not examine each one of those.

4    Q.    In fact, do you know if any one person has?

5    A.    I do not believe one person has examined all 600 pieces of

6    digital media -- or one single person, I'm sorry.

7    Q.    Is it fair to say that, of the 600 devices, there were a

8    variety of different types?

9    A.    Yeah.  There were numerous different types, as we

02:56 10    described before, whether it be phones, thumb drives,

11    computers, laptops, digital video recorders from businesses.

12    Q.    Would the data on those devices amount to, you know,

13    megabytes and gigabytes and terabytes worth of data?

14    A.    Yeah, there were terabytes of data.

15    Q.    Were you asked to look at some specific devices in this

16    case?

17    A.    I was.  As a part of the process, as we described earlier,

18    there was an imaging, a processing, and then a team views or

19    exhaustively searches the processed material.  Once they've

02:56 20    identified the files or items of interest, I was then asked to

21    validate and verify that those items of interest existed on the

22    pieces of evidence where they originated from.

23    Q.    When you say "pieces of evidence," on the devices that

24    were seized by the FBI?

25    A.    On the devices, right, that were associated with the

1    investigation -- on the number of different investigations,

2    yes.

3    Q.   You were confirming what material -- some of the materials

4    that were on those devices?

5    A.   Yes.

6    Q.   And how did you do that?

7    A.   There was a set of disks that we have, and those disks had

8    evidence files that were numbered.  And based on a numbering

9    system of an exhibit number, the files were then, to the best

02:57 10   of their ability, kept the true name.  They were then compared

11    to files on the computer of where they originated from.

12    Q.   And how did you compare it with the files from the

13    original computer device that was seized?

14    A.   We went back into -- when we talked about earlier, the

15    forensic software called AD Labs, which is where the evidence

16    or the images of those evidence were staged.  We went back in

17    -- or I went back in with the CDs, went into AD Labs, and

18    validated and verified that that -- that those files existed.

19    Q.   How did you know which computers they were associated

02:58 20   with?

21    A.   The files were labeled where the images or where -- the

22    files were labeled of what piece of evidence, where they came

23    from.

24    Q.   Is that pursuant to the standard imaging process that you

25    described earlier?

1    A.   Well, the numbering system is typically established with

2    our Evidence Response Team.

3             MR. FICK:  Objection.  I don't understand the

4    question.

5             THE COURT:  Why don't you reask it.

6    Q.   I'll reask the question.  How did you know what devices

7    the files were from?

8    A.   It was identified -- there's a numbering system that

9    exists, and we cross-referenced the numbering system for the

02:58 10   exhibit numbers to the evidence numbers that -- as we heard

11   earlier, the Evidence Response Team numbers things on scenes --

12   at scenes.

13   Q.   As a computer analyst, do you -- are you generally

14   familiar with where pieces of evidence were found?

15   A.   Typically.  I mean, typically, because we would have to

16   review the documentation before an exam proceeded.  We'd need

17   to make sure that legal authority was in proper order.  We

18   would need to know the locations of where things were from.  We

19   would need to know the background of that before the exam

02:59 20   began.

21   Q.   That's part of the standard practice?

22   A.   That's part of the standard practice.

23   Q.   As you verified the contents of these CDs, did you create

24   something that would help explain your testimony?

25   A.   We did.  The number of pieces of evidence were so

1   voluminous and the number of files that we're asked to validate

2   and verify, we created sort of a spreadsheet to be able to

3   recall what pieces of evidence that we would be talking about

4   today.

5           MR. CHAKRAVARTY:  I'd ask for the witness, 1153.

6   Excuse me.  Sorry.  1557.  Excuse me.

7   Q.   Agent Swindon, do you recognize this?

8   A.   I do.

9   Q.   What is it?

03:00 10  A.   That is the spreadsheet that we made when we were first

11  asked to start to validate and verify this process.  It was a

12  spreadsheet that we put together to be able to track what

13  pieces of evidence we were using, and it gave us a snapshot of

14  a quick reference.

15  Q.   Would this be helpful in presenting your testimony today?

16  A.   Tremendously, yes.

17          MR. CHAKRAVARTY:  Your Honor, I'd ask that 1557 be

18  marked as a chalk.

19          MR. FICK:  No objection to the chalk except that I'd

03:00 20  like him to clarify when he says "we" prepared this exhibit.

21  Who's "we"?

22  Q.   Who did you work with to prepare this exhibit?

23  A.   No one.  I created it.

24          THE COURT:  I'll expose it.

25          MR. CHAKRAVARTY:  Thank you, your Honor.

1    Q.    Agent Swindon, can you read that?

2    A.    I can, yes.

3    Q.    How did you select these particular devices to make this

4    chart about?

5    A.    I didn't actually select the devices.  These devices

6    corresponded to the files that I was asked to validate and

7    verify.

8    Q.    And so this is the universe of the devices that you looked

9    at?

03:01 10   A.    Yes, sir.

11   Q.    Now, with the exception of a couple of these devices, did

12   you actually go in and check file by file whether files that

13   are going to be presented to the jury were, in fact, on these

14   devices?

15   A.    I was provided these CDs for the exhibit numbers and

16   verified that the files existed on the pieces of evidence that

17   are listed on the sheet here.

18            MR. CHAKRAVARTY:  If I may approach, your Honor?

19            THE COURT:  All right.

03:02 20   Q.    Handing you a binder, Agent Swindon, do you recognize

21   that?

22   A.    I do.

23   Q.    What is it?

24   A.    It's a two-inch, three-ring binder, with two CD

25   placeholders in it.

```
 1   Q.   Are there several CDs in there?

 2   A.   There are.  There are 13 total CDs.

 3   Q.   Do you know what those CDs are?

 4   A.   I do.  These are the CDs I was provided with to be able to

 5   check the files to make sure that these files that are on these

 6   CDs existed on these pieces of evidence.

 7   Q.   Did you, in fact, verify that?

 8   A.   I did.

 9        THE COURT:  What was the number of CDs?

10        THE WITNESS:  Sorry.  There are 13, sir.

11   Q.   And, specifically, if I may, Agent Swindon, I'm going to

12   read off a list of numbers on the CDs, exhibit numbers, and ask

13   if you can verify that those CDs are in there.

14   A.   Okay.

15   Q.   1141?

16   A.   Yes.

17   Q.   1142?

18   A.   Yes.

19   Q.   1143?

20   A.   Yes.

21   Q.   1144?

22   A.   Yes.

23   Q.   1145?

24   A.   Yes.

25   Q.   1146?
```

```
 1   A.   Yes.

 2   Q.   1147?

 3   A.   Yes.

 4   Q.   1148?

 5   A.   Yes.

 6   Q.   1149?

 7   A.   Yes.

 8   Q.   1150?

 9   A.   Yup.

03:03 10   Q.   And 1151?

11   A.   Yes.

12   Q.   Is there also an 1152 in there?

13   A.   Yes, sir.

14   Q.   Sorry.  There's one more.  1457?

15   A.   No.

16   Q.   1457 is not in there?

17   A.   No, it is not.

18   Q.   Okay.  I'll have to get that.

19        With regards to 1141 through 1151, do those contain

03:04 20   documents that were on each of the devices that they correspond

21   to?

22             MR. FICK:  Objection.  May we approach?

23             THE COURT:  All right.

24   (SIDEBAR CONFERENCE AS FOLLOWS:

25             MR. FICK:  The objection is he's asking the question
```

1    based on a false premise.  These CDs contain not only files

2    from the various devices but various analytic spreadsheets of

3    the -- either the FBI's or the U.S. Attorney's Office's own

4    making.  So it's, like, to ask the question in that form is

5    itself misleading.  And it sort of raises again the notice

6    problem we had because these are the new disks we got yesterday

7    that now have different contents than what we thought they had

8    before.

9              MR. CHAKRAVARTY:  I'll certainly clarify that there

03:05 10   are analytical files or metadata that's also put on there that

11   he will explain, and he will go through each of the CDs

12   explaining which ones correspond to which devices.

13             MS. CONRAD:  But are you offering the entire disks?

14             MR. CHAKRAVARTY:  I am going to offer the entire

15   disks, not at this time.

16             MR. FICK:  When the time comes, we'll deal with the

17   issue.

18   .   .   .   END OF SIDEBAR CONFERENCE.)

19   Q.   Agent Swindon, do these CDs have the data extracted from

03:05 20   the -- each of the devices that they correspond to?

21   A.   Do the numbered CDs have the data extracted from the

22   numbers of the -- corresponding to the pieces of evidence on

23   the spreadsheet?

24   Q.   Correct.

25   A.   Yes, they do.

1    Q.   Does it have all of the data for each of the devices?

2    A.   It does not have all of the data for each of the devices.

3    The data for each of the devices would be too voluminous to fit

4    on this many CDs or DVDs, so it was -- a sample or particular

5    files were identified by the team and then extracted and put

6    onto these CDs or DVDs.

7    Q.   Is it fair to say there are thousands and thousands of

8    files on those computers?

9    A.   There are.

03:06 10   Q.   So can you explain what this -- sorry.

11        In addition to the files that were actually extracted and

12   put onto these computers -- excuse me, the CDs, were there any

13   other types of metadata or other files that were also put onto

14   these CDs?

15   A.   There are other files on the CDs.  The other files would

16   include a directory file listing for each of the devices when

17   they could -- when they're appropriate or could be made.  And

18   then there are some derivative reports or derivative

19   spreadsheets made from the data on that also.

03:07 20   Q.   Okay.  So what is a directory file listing?

21   A.   A directory file listing would be a listing of all of the

22   files that would exist on that computer.

23   Q.   And what are the derivative spreadsheets?

24   A.   A derivative spreadsheet would be a spreadsheet that would

25   be created by someone that maybe aggregated information from

1    several different places, maybe from the directory listing or

2    maybe from other files on the computer for the ease of

3    understanding.

4    Q.   Can you give an example of a derivative file listing?

5    A.   If -- for example, if you had a file listing for your

6    whole computer or your whole computer at home, most of it would

7    be useless because you've got your Windows directory there with

8    files that you don't need to see.  But if you wanted a

9    directory listing of just your documents and settings, you

03:08 10   could do a full directory listing for your whole hard drive and

11   then only select what you may want to see in your documents and

12   settings.  Gives you a snapshot of a smaller subset of what was

13   on that computer.

14   Q.   Are you familiar with internet history?

15   A.   I am familiar with internet history.

16   Q.   How is internet history exported from a computer?

17   A.   Internet history resides on your computer, typically your

18   browser, whether you're using either Mozilla or Internet

19   Explorer or Chrome, would track a history of you being online

03:08 20   or an internet history file where that history would reside.

21   You can do a couple things.  You could export that file

22   individually to look inside of it, or there are other

23   applications that we would use post processing to assist us in

24   trying to look at that file and make it understandable and

25   usable.

1    Q.   Can you pare that down so you're only exporting some of

2    the internet history?

3    A.   Once you have access to that internet history file, you

4    can either select a range of dates or you can select maybe a

5    particular type of web page or URL that you were looking for

6    and filter it by that.

7    Q.   Were those derivative spreadsheets that you described,

8    were those the result of that kind of a process?

9    A.   In some cases on these CDs, yes.

03:09 10   Q.   What other types of information were put on these CDs?

11   A.   These represent several different types of media.  So, for

12   example, there are -- one of the CDs is from a couple of --

13   from iPhones that were collected as a part of the

14   investigation.  And they contain data on them that would --

15   from the SIM card on the cell phone.  So a typical directory

16   structure, as we were discussing with a computer or a piece of

17   media -- digital media, it would look differently on the disk.

18   Q.   And what's a SIM card?

19   A.   A SIM card is a card that would go into your cell phone

03:10 20   that has a unique ID number which would allow you access to --

21   cellular networks would use it to authenticate your phone onto

22   their networks.

23   Q.   Let's go through the spreadsheet now and explain what each

24   of the columns are.

25   A.   The media was a description of the type of media that

1    piece of evidence was.  The ID number was the ID number that

2    was assigned typically by the Evidence Response Team

3    appropriate to a search scene.  A media description was a

4    simple, short as we could keep it, description of what it was;

5    the location where it came from.  The "I" would be where it was

6    imaged.  The "P" would be where it was processed.  And then we

7    did sort of a synopsis of the file types in that last column

8    there.

9    Q.   Let's start with the file types.  Can you describe what

03:11 10   those file types are?

11   A.   Some of them are abbreviations.  But the file type we'd --

12   the dir would be a directory listing.  IH would be internet

13   history.  In the first line, iTunes would be -- or iTunes are a

14   backup associated with an iTunes account.  Audio or visual

15   files; Adobe files; Word documents; or pictures.

16   Q.   For the first one, it says over 500,000 total files.  Is

17   that how many --

18   A.   We were trying to get the scope of how voluminous things

19   were, and for particularly 1R6, it was over half a million

03:11 20   files associated with that drive.

21   Q.   The "P," is that what you said where the item was

22   processed?

23   A.   I'm sorry?

24   Q.   What does the "P" stand for?

25   A.   The "P" is where the items were processed.

1    Q.   What does the "CP" --

2    A.   "CP" would designate Center Plaza, which is where one of

3    the forensics labs was located; and then "BF" was Black Falcon.

4    And there were some items that actually went directly down to

5    Quantico for processing, and that would be the -- designate the

6    "QT."

7    Q.   That appears down here where I'm circling?

8    A.   Yes, sir.

9    Q.   Center Plaza, incidentally, is that where the FBI

03:12 10   headquarter office is in Boston?

11   A.   One Center Plaza, Suite 600, in Boston, Mass.

12   Q.   And the media, it says "C."  What does that stand for?

13   A.   "C" would stand for computer.

14   Q.   What does "TD" stand for?

15   A.   Would be thumb drive.

16   Q.   What does "HD" stand for?

17   A.   Hard drive.

18   Q.   And CD?

19   A.   CD-ROM.

03:12 20   Q.   And "IPOD"?

21   A.   IPods.

22   Q.   And "cell"?

23   A.   Would be cell phones or cellular telephones.

24   Q.   And "GPS"?

25   A.   GPS devices.

1   Q.   With regards to the data that you got for this

2   spreadsheet, was this data that was collected by the -- during

3   the Boston Marathon investigation?

4   A.   Yes.  This was from -- what originated from a number of

5   different locations.  A chain-of-custody form would contain

6   some of the pieces of information such as the description, the

7   location.  The imaging and the processing information would

8   have come from our CART reports.  And the file types would have

9   come from a review or a cursory view of what types of files

03:13 10   were on that piece of media.

11   Q.   Are you familiar with what a log file is?

12   A.   I am.

13   Q.   What is that?

14   A.   A log file can be a number of different things, but

15   typically a log file would be a clear text file that would have

16   information in it that would provide a log of activity.

17   Q.   Were log files maintained for these -- the devices as well

18   or for some of them?

19   A.   For some of them, yes.

03:13 20   Q.   Were those put onto the CDs as well?

21   A.   If they were available, they were put onto the CDs, yes.

22   Q.   How familiar are you with each of these devices?

23   A.   I'm -- most of the devices, I'm very familiar with because

24   they correspond to a CD with files that were verified.  There

25   are several -- one was a -- done a cursory look, and there were

1   several that were actually physically unable to be -- you know,

2   to be processed.  So it was just the SIM cards that were

3   processed.

4   Q.   Now, does computer forensics allow you to know whose

5   computer some -- a computer device is?

6        MR. FICK:  Objection.

7        THE COURT:  Overruled.  You may answer it.

8   A.   There are certain limitations to computer forensics.  As

9   we've moved into -- computer forensics has moved into more of a

03:14 10   forensic science, we rely on the data that we're able to

11   collect to make determinations of access, determinations of

12   files where they may reside.  We also rely on the information

13   that we get from the computer knowing, as we all know, our home

14   computers aren't sometimes the most reliable.  They don't

15   always collect all pieces of information that we need.  Some of

16   the things can be deleted either through user intervention or

17   deleted automatically through program files or even wiped

18   through applications that you could download on the internet.

19   So we can only rely on what we have, you know, what we collect

03:15 20   at the time when we collect it.

21   Q.   So in your computer investigations, how do you know who

22   owns a computer?

23   A.   Typically, we would look at a number -- we'd start with a

24   number of areas to look in the computer.  When you first turn

25   on your computer and register that computer, your name would be

1    captured, or if you did enter your user name, would be captured

2    in the Window's registry file which is the file within Windows

3    that stores all of the information about that computer, would

4    be one way of identifying who potentially may be using or

5    accessing that computer.  In general, internet activity, you

6    may be able to tell who is logging onto your email or an email,

7    who may be using social media or who may be using certain

8    applications to do certain things.

9    Q.    So you look at the content of what's on the computer to

03:16 10   help figure that out?

11   A.    We need to review the content to determine who would be

12   utilizing it.

13   Q.    In addition to the materials on the computer, do you do

14   other investigations outside of the computer forensics in order

15   to make those determinations?

16   A.    Of course.  The forensic examiner would provide as much

17   information as he can to the investigative team who then may do

18   additional interviews to determine usage.

19   Q.    Is there any limit to how you can determine who was using

03:16 20   a computer on a specific day?

21   A.    I guess, barring having a computer over somebody's

22   shoulder and filming them on the keyboard, there are

23   limitations.  We sometimes have to make assumptions, or based

24   on internet activity we put together facts based on internet

25   information and the technology.

1   Q.   Is it true that sometimes you cannot say, to a degree of

2   certainty, that you feel comfortable as to who was using a

3   computer?

4   A.   That's true, yes.

5   Q.   Now, with regards to the devices in this case, can you

6   testify regarding the content of those devices that you did not

7   examine or verify?

8   A.   That are on this list?

9   Q.   Yes, on this list or not.

03:17 10   A.   Okay.  The ones on the list -- the ones that we have CDs

11   for, yes.  The ones we do not have CDs for, where several of

12   them there was a cursory look or check done and -- but as far

13   as the scope of the media collected, the over 600, absolutely

14   not.

15   Q.   So on this spreadsheet, which of those that you did not do

16   that verification process for?

17   A.   On D385, which is the third "C" down on the computer, the

18   Samsung laptop from -- there was just a cursory look done of

19   the directory structure.

03:17 20   Q.   Are you aware whose computer that was associated with?

21   A.   I believe, based on the location and other investigative

22   information, that it was Tamerlan's computer.

23   Q.   Was there another device that you did not do an in-depth

24   look at?

25   A.   It was the two cell phones that belonged to Azamat and

1    Dias were processed as a different investigation.

2    Q.   Okay.  Now --

3    A.   I'm sorry.  There's just one more.  1V1, the GPS 1V1, I

4    did not process or look at that.

5    Q.   Despite the fact that you didn't process or look at those

6    devices, were those examined by the FBI?

7    A.   All pieces of digital media were imaged, processed, and

8    reviewed by somebody on the investigative team for the FBI.

9    Q.   In fact, was there an army of analysts who were looking

03:18 10   through these things?

11   A.   You could define an army, but, yeah, it was a large team

12   of investigators that looked at or culled through the evidence.

13   Q.   Let's start with the 1R6.  Does that correspond to the CD

14   labeled Government's Exhibit 1142?

15   A.   Yup, it does.  1142, yes.

16   Q.   What computer does that CD contain data from?

17   A.   That contains data from a Sony Vaio laptop that was

18   collected at 69 Carriage Street that investigative, we believe,

19   belonged to Jahar.

03:19 20   Q.   The computer did?

21   A.   The computer did, yes.

22   Q.   Was that processed -- was that imaged at Black Falcon and

23   processed at Center Plaza?

24   A.   It was imaged at Black Falcon, yes, and processed at

25   Center Plaza.

1    Q.   And the CD that you have in front of you, does that

2    contain files that were actually on that computer that were

3    imaged near the time that they were seized and then exported

4    onto that CD?

5    A.   It contains files that were identified on that computer by

6    the investigative team, written to the CD, and then verified

7    that they existed on 1R6 along with the other spreadsheets that

8    we had discussed earlier.

9         MR. CHAKRAVARTY:  At this time, your Honor, I'd move

03:20 10   into evidence Exhibit 1142.

11        MR. FICK:  Objection.

12        THE COURT:  Let me see you at the side.

13   (SIDEBAR CONFERENCE AS FOLLOWS:

14        MR. FICK:  So this is the contents, at least as of

15   yesterday, of this exhibit, the disk exhibit here.  These four

16   directories contain the various files from inside the computer,

17   as far as I can tell.  These are the various derivative

18   spreadsheets that somebody at the FBI, the U.S. Attorney's

19   Office, I don't know who, created.  And without a foundation, I

03:21 20   don't see any basis to admit those things into evidence.

21        MR. CHAKRAVARTY:  He's verified each of those

22   spreadsheets.  He didn't personally create them, but he knows

23   what they are, and he knows how they were created.  And he has

24   verified that that content is on that computer.

25        MR. FICK:  As I heard his testimony, he verified the

1   files that were on the computer.  He didn't say he verified the

2   images.

3           THE COURT:  Can I --

4           MR. FICK:  Absolutely.

5           Whether or not he verified it, there's a question, a

6   foundational question, of who made it, what procedures they

7   used to make it.  If he doesn't know, I would suggest a huge

8   confrontation clause, *Melendez-Diaz* and its progeny, problem

9   about this kind of evidence.

03:21 10        MR. CHAKRAVARTY:  First, he's an expert.  He's allowed

11  to provide hearsay for *Melendez-Diaz* purposes.  But, more

12  importantly, if he's confirmed that this is data that's on the

13  computer in a variety of the different metadata exports that

14  forensic software allows them, then that's his competence.

15  That's what he is allowed to say.

16          MS. CONRAD:  May I just --

17          THE COURT:  How do I get back to the list?

18          MR. FICK:  Just exit the --

19          THE COURT:  Maybe just do that?

03:22 20        MR. FICK:  Even if an expert can rely on hearsay, to

21  put in the actual documents into evidence is another question

22  entirely.  You know, these are not -- the contents of the

23  spreadsheets are not -- the spreadsheets themselves were not on

24  the computer.  What some human being has done is collected the

25  information, put it in the spreadsheet, and presented it.  It's

1    like a summary chart except the person who makes the summary

2    chart ought to testify about how it was made and to verify that

3    it's accurate.

4          THE COURT:  Maybe.  But I don't think necessarily if

5    it's someone with knowledge of what it is and can say that's

6    what it is.

7          MR. FICK:  I think our ultimate position would be that

8    all he's testified about now is verifying the files.  There's

9    no foundation there about the spreadsheets.

03:23 10         THE COURT:  I agree with that.  I think we need

11   additional information about how those spreadsheets were

12   prepared.  I think it's likely that they will be submitted.

13        MR. FICK:  We would maintain a confrontational

14   *Melendez-Diaz* objection on top of the basic foundation issue.

15         That's actually a good suggestion Miss Conrad makes.

16   The spreadsheets really ought to be a separate exhibit so that

17   the jury doesn't get confused about what's from the computer

18   and what's derivative.  Right now, the way the government has

19   done it is the disk has an exhibit number; the spreadsheets

03:24 20    have a subnumber.

21        THE COURT:  I think it can be made clear.  It might be

22   a better idea to have them separate.  I don't think it's

23   confusing for them to have --

24        MR. FICK:  Please note the objection.

25   .  .  .  END OF SIDEBAR CONFERENCE.)

1           THE COURT:  That's 1142, I guess, right?  1142, is

2    that it?

3           MR. CHAKRAVARTY:  Yes, your Honor.

4           THE COURT:  All right.  That's admitted.

5    (Exhibit No. 1142 received into evidence.)

6           MR. CHAKRAVARTY:  So, Mr. Bruemmer, if I could ask you

7    to open the display copy of 1142.

8           THE COURT:  Is this all for everyone, right?

9           MR. CHAKRAVARTY:  I think so.  If it's admitted, then

03:25 10   1142 can be, your Honor.

11   Q.   This first folder structure has identified just what

12   device this was from?

13   A.   Yes.  That corresponds to the spreadsheet, yes.

14   Q.   And so what is this?

15   A.   This is the main root directory structure within that CD.

16   The several files that are identified as where possible files

17   were found on that computer in addition to there's a number of

18   files there that were, as we talked about before, those

19   derivative files that were created.

03:25 20   Q.   The first four folders, is that what you meant that they

21   correspond to the structure?

22   A.   Actually, just Anzor files and public correspond.

23   Q.   I'm sorry.  What was Anzor?

24   A.   I'm sorry.  Anzor and public correspond files, and

25   derivative derived Mobilsync do not.

1          THE COURT:  I'm not following.

2          MR. CHAKRAVARTY:  I'm not following either.

3     Q.   Can you explain what the first four folders are?

4     A.   There are four folders on that drive:  one called Anzor;

5     one called derived Mobilsync data; one called files; and one

6     called public.  Both Anzor and public existed on the drive in

7     that way or in that -- the way that it looks on the screen

8     there.  Mobilsync data and the files were added for

9     organizational purposes on the CD.

03:26 10   Q.   Okay.  So were the contents of these folders actually on

11    the 1R6 Sony Vaio computer?

12    A.   The Anzor and the public, yes; the derived Mobilsync data

13    has information in there that was derived from the Mobilsync

14    backup on the computer.  And then the files do have files that

15    were derived from that -- from 1R6, yes.

16         MR. FICK:  Object and ask to clarify whether he's

17    talking about all or some.

18    Q.   So can you explain whether you're talking about all of the

19    contents of these folders was from the computer?

03:27 20   A.   No.  As we discussed earlier, the sum of everything is

21    voluminous.  This was strictly just selected files that were

22    provided to me to verify and validate whether they existed on

23    1R6.

24    Q.   Who provided you with the files that were of interest?

25    A.   The investigative team did.

1   Q.   So you said that there were, I think, derived files in the

2   derived Mobilsync data folder and the files folder.  What did

3   you mean by that?

4   A.   On 1R6, there existed Mobilsync backup files.  Mobilsync

5   backup files are associated with typically an Apple product.

6   If you had an iPhone and you plugged your iPhone into your

7   computer and wanted to do a backup of it, it creates a backup

8   file on that computer which would store a number of pieces of

9   information including potentially contacts, information about

03:27 10   the phone, your address list, your previous texts, your

11   previous calls and your call log and images also from the

12   phone.

13   Q.   And the Anzor and the public folders, do those correspond

14   to two different user accounts on the computer?

15   A.   They do.  I recognize those as being two different user

16   accounts from the 1R6.

17   Q.   And the files folder, what's in that?

18   A.   The files folder was created for organizational purposes.

19   Inside that files folder are other files from the drive.

03:28 20   Q.   Okay.  Then outside of each of those folders, there's a

21   number -- there are a number of PDF files, with the exception

22   of one text file, numbered 142-1 through 13 and 142-151.  Can

23   you explain what each of those are in turn?

24   A.   Would you be able to bring those up one by one?

25   Q.   Sure.

```
 1    A.    Thank you.
 2    Q.    This is 1142-01.  What is this?
 3    A.    A little difficult to read on the screen.  What this is
 4    this was an export of the internet activity that was identified
 5    on 1R6.
 6    Q.    And how is internet activity exported?
 7    A.    There are internet history files that exist on your
 8    computer.  And a product -- a third-party product application
 9    was used for analysis called Internet Evidence Finder.  It
10    takes the internet history files and then puts them in a usable
11    format.  This here is a selection of the internet activity.
12    Q.    And so is this a subset of all of the internet history
13    that was exported using that software?
14    A.    Yeah.  I believe so, yes.  I was given this file to
15    determine whether or not these -- this internet history existed
16    on the drive.
17    Q.    And did you, in fact, confirm that?
18    A.    We did.
19    Q.    Is that through AD Labs, that software tool that you said
20    earlier?
21    A.    We used Internet Evidence Finder to parse out or to look
22    into the internet history files.
23    Q.    I'm sorry.  Internet Evidence Finder, is that another
24    commercially available tool?
25    A.    Commercially available product, yes.
```

1    Q.   Let's go to 1142-2.  What is this?

2    A.   This spreadsheet here is going to take a little bit of an

3    explanation.  This spreadsheet here is a snapshot of -- in

4    Windows 7 and above, there are files on that computer called

5    jump files or a jump list.  A jump list is similar to what we

6    would think of as a shortcut.  When you create a shortcut on

7    your desktop or you create a shortcut for a file, Windows

8    creates these things called jump lists.  What jump lists track

9    is a number of different things that happen when you open up a

03:30 10   file.  You need a third-party application like Internet

11   Evidence Finder to be able to look into that jump-list file.

12   But in there are several different artifacts, what you see

13   here.

14   Q.   So can you explain what these columns are and what

15   information they tell you?

16   A.   In the jump list, utilizing the parser software, we're

17   able to see this -- typically, this report was provided as

18   removable media or drives or anything associated -- it was

19   associated with a D drive, which is typically an external drive

03:31 20   or other than your C drive, which would be your hard drive on

21   your computer.  What happened -- this would be a designation of

22   what information existed in the jump list for these dates and

23   times for these files.

24   Q.   Okay.  When you say "external drive" and you talk about a

25   "D" drive, what is -- explain how the computer assigns it the

1    letter D.

2    A.   What happens in Windows is it's your first -- typically,

3    your hard drive on your computer is a C drive.  That becomes

4    your initial -- or your drive where your operating system is

5    stored.  If you don't have a CD-ROM or a DVD or those are not

6    designated, what will happen is Windows then goes to the next

7    letter to designate the next drive that you put in that

8    computer.

9          So if you only had your C drive on your computer and you

03:32 10   took a thumb drive or some external hard drive and plugged it

11   into your computer, in order for Windows to access it, it needs

12   to give it a drive letter.  It would give the next drive letter

13   available, and in this case, it was -- it would have been the

14   D.

15   Q.   And so does this spreadsheet indicate when devices were

16   plugged into this computer?

17          MR. FICK:  Objection.

18          THE COURT:  Overruled.

19   A.   The jump-start file, the jump-start information, has a

03:32 20   bunch of information within it -- encapsulated within that jump

21   list.  In there could be when the creation date or when that

22   first device or when that date and time of when that first file

23   was created on that computer or viewed on that computer.

24   Q.   When you say "could be," why do you say "could"?

25   A.   There's a lot of variables based on time -- your date and

1    time on your computer may not be completely in sync with the

2    date and time that we're looking at right now here in the

3    courtroom or maybe there's some other reason why it didn't

4    collect the date and time when it was inserted into the

5    computer.

6    Q.    The volume label and the volume serial number, what are

7    those?

8    A.    The volume label is typically associated with the device

9    itself.  It may designate the device.  The volume serial number

03:33 10   is the unique ID that Windows would give it in order to access

11   the -- make the drive accessible within Windows.

12   Q.    And some of these, they don't have a name.  Is there a

13   reason for that?

14   A.    Yeah.  Other than I recognize those directory structures

15   as being associated with a camera, I don't know why there's a

16   volume -- not a volume label there.

17   Q.    And the word "Patriot" -- the words "Patriot" and

18   "Kingston," what do those means?

19   A.    In this investigation or in this spreadsheet here?

03:34 20   Q.    In the spreadsheet.

21   A.    In the spreadsheet, they would be associated with the name

22   of a thumb drive.

23   Q.    Can you --

24   A.    Or the manufacturer of a thumb drive.

25   Q.    Can you explain local path, what this content is in that

```
 1   column?
 2   A.   Typically, in the local path -- what this would show is
 3   that this volume label or this Patriot, this device that was
 4   named Patriot, was plugged into this -- you scrolled up on me
 5   there.
 6   Q.   Sorry.
 7   A.   This YouTube video, this word, Rasool Allah, Inspiring
 8   Words of Truth, video was accessed on this computer, and then
 9   Windows created this jump list which then collected this
10   information.
11   Q.   Looking at the last two entries, can you interpret what
12   this -- the last -- the second -- the penultimate entry
13   indicates based on this spreadsheet?
14   A.   The last two entries appear to be link files, exclusively
15   link files, which show that the D drive -- or if we're looking
16   at the second one from the bottom, again, then the Patriot
17   volume label had a file on there called completeinspire.pdf
18   with that volume and was accessed at that date and time.
19   Q.   For the Complete Inspire, it says January 21, 2012?
20   A.   Yes.
21   Q.   And what's the next file?
22   A.   It says, "jointhecaravan.pdf."
23   Q.   Does that say it was created on January 28, 2013?
24   A.   Yes, it does.
25   Q.   And last accessed March 15, 2013?
```

```
 1    A.    If you can scroll up to the top column?
 2          Yes.  That typically would be the last time that that file
 3    potentially could have been accessed.
 4    Q.    Now, in the course of your --
 5    A.    I'm sorry.  Accessed on that computer.
 6    Q.    On this computer.  On the --
 7    A.    Thumb drive -- if that thumb drive went to another
 8    computer, that last access time of that file is not going to
 9    match that last access time on that computer.
03:36 10   Q.    So this spreadsheet only reflects data on the defendant's
11    computer?
12          MR. FICK:  Objection to the leading.
13          THE COURT:  Overruled.
14    A.    This information was taken from 1R6, yes.
15    Q.    And not from that thumb drive?
16    A.    It was not taken from the thumb drive, no.
17    Q.    Go to the next one, 1142-03.  What are these?
18    A.    If this were two images that were exported from 1R6,
19    probably the most important part to figure out where it came
03:36 20   from is if you look at the path.  It's a long string of a
21    naming convention.  But most importantly, from the root, if we
22    take it four in from the root and start with users, that was
23    the user's folder on the drive.  Anzor was the user.  And the
24    documents and web cam, web cam media, capture, and it was an
25    image.2.jpeg.
```

1    Q.   Mr. Swindon, I think you just discovered it on your own,

2    but if you want to annotate something on the screen, please

3    just touch the screen.

4    A.   I did that.  Sorry about that.

5    Q.   Were these all of the photos that were on the computer?

6    A.   Those were not all of the photos on the computer.

7    Q.   Like the other items, were they selected by the

8    investigative team?

9    A.   Selected by the investigative team.

03:37 10   Q.   1142-06, what is this?

11   A.   As we talked about for 01, this is an internet activity

12   report derived from Internet Evidence Finder on -- from the

13   Sony 1R6.

14   Q.   And so is this all of the internet history in the

15   computer?

16   A.   That is not all of the internet history.  I believe there

17   were over 30,000 entries across a number of different browsers

18   on 1R6, and this was a subset of that information.

19   Q.   And some of these entries have a date, and then some of

03:38 20   them do not.  What explains that?

21   A.   That -- typically, what may happen is in some cases the

22   internet history would grab a date and timestamp along with it

23   depending on the product or depending on the browser itself,

24   you know, whether it be -- again, Mozilla, Chrome or internet

25   are the three sort of major ones.  They all handle that

1    internet history potentially differently.  So there may not be

2    a date and time associated with an internet history entry that

3    you see here.

4    Q.   And all of this data on this spreadsheet, like the others,

5    is this exported using the tools that you were describing

6    earlier?

7    A.   Exported using Internet Evidence Finder, yes.

8    Q.   The dates and times on this spreadsheet and on the other

9    spreadsheets related to internet history, how do you know

03:39 10    whether those are accurate with regards to Eastern Standard

11    Time?

12    A.   Those are collected by the browser, and those would

13    correspond to the date and time on the computer.

14    Q.   So whatever the computer time was affects that?

15    A.   Typically, yes.

16    Q.   What is this next file, 1142-08?

17    A.   As we had discussed earlier, a log is made when the

18    imaging process is done for that piece of evidence.  So this

19    was -- this is the log entry for a device that we would call a

03:39 20    TD3.  That's an external standalone device that we would use to

21    image the drive.  It tells you the start/stop time and then

22    what examiner created that image.  And then down the bottom, as

23    we mentioned, you'll see the MD5 hash value as we talked about

24    earlier.

25    Q.   So this reflects also the type of computer hard drive?

1    A.    It does.  It collects the hardware information about the

2    actual hard drive that's in the computer.

3    Q.    How big was the hard drive on the defendant's computer?

4    A.    That drive, it's -- according to the TD report, is 500

5    gigabytes.

6    Q.    What's the next file, 1142-09?

7    A.    This file here is representative of the installed software

8    that existed on the computer at the time it was imaged.  This

9    information is derived from the registry file.  Windows has a

03:40 10   registry file, which is typically the index for the computer.

11   It stores information such as your user names, passwords, last

12   accesses, different drives that had been connected to the

13   computer.  And it also includes a list of the installed

14   computer.

15   Q.    Does the registry file also serve as sort of a table of

16   contents for the computer?

17   A.    Not for the files on the computer within the directory

18   structure, but what it does is it keeps all of the user

19   information stored for the computer.

03:41 20   Q.    Okay.  Thank you.  Is there a way that a computer keeps a

21   table of contents?

22   A.    I'm not sure I understand.

23   Q.    Are you familiar with a master file table?

24   A.    Yeah.  Master file table is -- so the directory listing

25   for the computer is basically your table of contents for human

1    interaction.  But the computer needs to be able to figure out

2    where all those files are and translate that into the computer

3    world of where it needs to access that on the disk.  And the

4    master file table would be where that information is stored.

5    If you go to the directory structure to select a file, it would

6    then point it to the master file table where it would find it

7    on the hard drive.

8    Q.   If a file is deleted, what does that mean for the master

9    file table?

03:42 10   A.   When a file is deleted, there's a character that's

11   changed, and it is no longer seen or visible to the user, but

12   the entry may still be available in the master file table, and

13   the data may still exist on the drive.

14   Q.   If something has been deleted and then that space has been

15   reclaimed by the computer, what happens to that data?

16   A.   The data would be overwritten, and it would not be able to

17   be recovered.

18   Q.   I'm going to 1142-10.  What is this?

19   A.   This file is also out of the registry.  It's the -- or the

03:42 20   SAM file, which is the Security Accounts Manager.  And this is

21   going to list all of the users on the computer.  As you can

22   see, it shows administrator, guest account.  And if you scroll

23   down, these are all the users that were on that computer.

24   Q.   So here it says, on the second page, user name, Anzor;

25   full name, Jahar?

1   A.   Yes.

2   Q.   What does that mean?

3   A.   That Anzor would have been a user on the laptop, on 1R6.

4   Q.   Is that one of the folders that was -- one of the user

5   folders that was exported in contents from that user profile?

6   A.   Anzor was, yes.

7   Q.   The -- does this show the last login date under the user

8   name, Anzor; full name, Jahar?

9   A.   It does.

03:43 10   Q.   When was that?

11   A.   The last login was Thursday, April 18th at 025.

12   Q.   That's 2013?

13   A.   2013.  But the designated Z is Zulu time.  I believe, with

14   daylight savings, minus 4, I believe is what it is.

15   Q.   So it was last accessed, according to this data, sometime

16   on Wednesday evening, April 17th?

17   A.   Yes.

18   Q.   1142-11, what is this?

19   A.   Again, out of the registry, this is the -- this shows that

03:44 20   there's a valid Windows license on the computer; who the owner

21   of the computer was based on the user; and then the product ID;

22   and the product key for Windows.

23   Q.   1142-12, what is this?

24   A.   This was a derivative report of selected link files, are

25   those -- as we talked about before, the shortcut files from the

1    computer.

2    Q.   So explain a little bit more about what a link file is.

3    A.   Link file is a shortcut or the Windows creates a shortcut.

4    If you were -- for example, one way a link file would be

5    created is if you were -- created a shortcut on your desktop,

6    it would create a link file.  Sometimes when you open files, it

7    creates -- automatically creates link files.  So this would be

8    a Windows-generated file that would be created.

9    Q.   Does a link file get created every time somebody opens a

03:45 10   file on their computer?

11   A.   I haven't tested every piece of software that's out there,

12   so I'm not sure how that would operate in the Windows 7

13   environment.  I can't be for certain that every single software

14   application that exists creates a link file.

15   Q.   What are some circumstances in which a link file might not

16   be maintained by the computer when you export the file

17   activity?

18   A.   Well, there could be several reasons.  One of the reasons

19   may be a user could go in and actually delete a link file.  If

03:45 20   they were technically savvy enough to know where to find them,

21   they could go in and delete the link file.  Also, some programs

22   create or keep a last-access list or a most-recently-used list.

23   And it typically would hold maybe the ten last accesses or ten

24   last access -- files accessed.  And those are going to be sort

25   of first in, first out, last -- yeah, first in, first out.

```
 1    Q.   And so the list here as -12, what can this tell you, as a
 2    computer forensics analyst, with regards to what usage was made
 3    of this computer?
 4    A.   Well, evaluating the report, I was asked to make sure that
 5    these link files existed on the computer.  We validated or
 6    verified that they did exist on the computer, existed on 1R6.
 7    If you're asking me to assess what this report is, I can look
 8    and say, from the information that's on here, at some point in
 9    time, these files were opened or accessed on this computer.
03:46 10    Q.   This is 1142-13.  What is this?
11    A.   This is a spreadsheet that is a direct -- or a listing of
12    the files and directories that existed in the user Anzor, a
13    selected group of files -- folders that were in the user Anzor.
14    Q.   When you say "the user Anzor," what does that mean?
15    A.    If we go back -- reference back to the registry file that
16    we had, it shows that Anzor was a user of the computer.  So
17    when they -- whoever established -- originally established the
18    computer, which it says Anzor and Jahar, whoever established
19    that user name decided to call that user name Anzor.  And then
03:47 20    Windows will create a folder called Anzor to store the
21    documents, the photos, the videos that were associated with
22    that user.
23    Q.   So that's a user-defined field?  It's not automatic?
24    A.   It is a user-defined field although the operating system
25    creates it.
```

1    Q.   So there are more files here than appeared on the

2    file-access spreadsheet with the link files.  Does that mean

3    that these files weren't accessed?

4    A.   This list here is a list of the files that existed -- or

5    selective list of the files that existed within that user

6    Anzor.

7    Q.   What can you say about whether these files were accessed?

8    A.   I would have to look.  If you can scroll to the right a

9    little, there's actually -- in this particular spreadsheet

03:48 10   here, access time is not -- the last access is not -- I'm

11   sorry.  The last time the file was modified is not listed in

12   there.  This is a directory listing of the files that existed

13   in the user Anzor.

14   Q.   In computer forensics, how do your determine whether and

15   when certain files were accessed?

16   A.   We would have to look -- we could look in the link or the

17   shortcuts.  We could look in the registry.  There's a number of

18   different places we could determine whether or not a file was

19   opened.

03:49 20   Q.   Are those exhaustive?

21   A.   Yeah.  The searches are exhaustive, yeah.

22   Q.   The searches are exhaustive.  Can you tell definitely

23   whether a file was accessed?

24   A.   In some cases, you may not be able to.  You could see when

25   it was created on the computer, but you may or may not have

      1    record of the last time that that file was accessed.

      2    Q.   You can only testify to what you have a record of; is that

      3    fair to say?

      4    A.   I can testify, yes, what the data that we collected on the

      5    computer.

      6    Q.   What's 1142-51?

      7    A.   1142-51 is the file listing for the entire computer.

      8    Q.   Okay.  So this is, like, 4,670 pages long, right?

      9    A.   Yes, it is.

03:49 10   Q.   Why is this on here?

     11    A.   Because this includes all of -- a directory listing of all

     12    of the files on the computer.  So a majority of the

     13    spreadsheets that we just introduced or that we talked about

     14    are derivative from the file listing.

     15    Q.   Let's open the first folder.  Again, this is for the user

     16    Anzor?

     17         THE COURT:  Mr. Chakravarty, if you're going to start

     18    a new topic, I think we're close enough to 1:00.  We'll take a

     19    lunch recess at this point.

03:50 20        THE CLERK:  All rise for the Court and the jury.  The

     21    Court will take the lunch recess.

     22    (Luncheon recess taken at 1:00 p.m.)

     23    (The Court and jury entered the courtroom at 2:08 p.m.)

     24         THE COURT:  Go ahead.

     25    Q.   Good afternoon, Agent Swindon.  When we left, we were just

1    getting to dive -- getting ready to dive into the folders of

2    the files that are on this -- this first CD, the 1142.

3         Now, did you personally verify each of the files on these

4    CDs that they came from, the computers -- for each of the

5    computers that you were talking about?

6    A.   Yes.  The CDs were provided to me by the team.  We then

7    went in and verified each file existed on the computer.

8    Q.   Did you personally verify that each of these spreadsheets

9    that describe some of the data about what was on the computer,

05:01 10   that that data itself was, in fact, on the computer?

11   A.   We verified -- based on the data sets that were available,

12   yes, we verified that the data was there on the spreadsheets

13   from the computer.

14   Q.   You were personally verifying that, right?

15   A.   Yes, I did.

16   Q.   So in the 1142-10, the registry SAM file, we had talked

17   about the user with the full name Jahar, is that right?

18   A.   Yes, sir.

19   Q.   And that person created an account name called Anzor; is

05:01 20   that fair to say?

21   A.   Yes, sir.

22   Q.   And can a user of a Windows Operating System designate any

23   word as their account name?

24   A.   The user name can be -- it's a user-defined field that

25   they could name it anything that they would like.

1    Q.    So you can name it after your kids?

2    A.    Yes.

3    Q.    You can name it after your parents?

4    A.    Yes.

5    Q.    And so one of the account names was Anzor on this

6    computer?

7    A.    Yes.

8    Q.    On the defendant's computer.

9          So let's go to the Anzor folder.

05:02 10          MR. CHAKRAVARTY:  Mr. Bruemmer, if you could.

11   Q.    Now, what is this?

12   A.    These are four folders that look similar to the folders

13   that were on the -- in the user folder on the 1R6.

14   Q.    And so these are basically Windows folders?  Any Windows

15   Operating System has folders like this; most of them do?

16   A.    Yes.  They are similar to folders that would be in a user

17   directory structure of Windows.

18   Q.    Did the disks that includes 1142 that you brought with you

19   today -- do they, as much as reasonable, try to marry that same

05:02 20   structure?

21   A.    Again, the volume of data was such that we needed to make

22   it easily understandable and -- for today or for court purposes

23   or trial purposes.  So we tried to keep it to the best

24   structure we could to make it look like it was in the computer

25   where it came from or the folder that it came from.

1    Q.    So if I click on the desktop folder, does that mean that

2    any contents of that were on the desktop of the defendant's

3    computer?

4    A.    Could you click on it, please?

5    Q.    Sure.

6    A.    Yes.  Those folders were on the desktop of the laptop.

7    Q.    So on this laptop, on the desktop of the computer, these

8    five folders existed?

9    A.    Yes.  So if you're sitting at your computer with your

05:03 10   screen up in Windows, these would be folders that would be

11   displayed or on your desktop.

12   Q.    And there's a PDF as well on this, 1142-15, *Effects of

13   Intention*.  Was that also on the desktop?

14   A.    Yes, it was.

15   Q.    And you know this because you personally checked the image

16   of the computer?

17   A.    Yes.

18   Q.    And that tells you the file path; it tells you where on

19   the computer these files were?

05:04 20   A.    Yes.  We used AD Labs as the processing software, as we

21   spoke about this morning, to go in and see the path of where

22   the files were.

23   Q.    Clicking on *Effects of Intention*, is this the contents of

24   that file *Effects of Intention*?

25   A.    It looks similar to the file that was verified, yes, or it

1    is the file that was verified.

2    Q.   Click on the first folder, al Makdissi.  Are these three

3    files -- were these three files within that folder?

4    A.   Yes, they were.

5    Q.   It's 1142-16 through 18.

6         Now, there was a documents folder.  Is like the My

7    Documents folder of a Windows Operating System?

8    A.   Windows would call it "documents," yes.

9    Q.   And in this folder, was there a subfolder called "web cam

05:05 10   media"?

11   A.   Yes.

12   Q.   And in that, was there another folder called "capture"?

13   A.   Yes.

14   Q.   And then there are these images?

15   A.   Yes, those images.

16   Q.   Were these the images that were also referenced in that

17   spreadsheet that you earlier spoke about?

18   A.   Yes.

19   Q.   Then there was a folder called "downloads," is that right?

05:05 20   A.   Yes.

21   Q.   And were all of these -- this folder and these files in

22   the downloads folder?

23   A.   Yes.  Those files were in the downloads folder.

24   Q.   So clicking on an image, this was one of the images in the

25   downloads folder?

```
 1   A.   It was.  The only difference on this -- on the next three
 2   or this one here was that the file extension was changed to
 3   have it display as a picture.
 4   Q.   The .jpeg file extension?
 5   A.   Yes.
 6            MR. CHAKRAVARTY:  This was 1142-98 for the record.
 7   Q.   Then there were two other photos in that folder?
 8   A.   Yes.
 9   Q.   In the music folder, was there a subfolder called
10   "nasheed"?
11   A.   Yes.
12   Q.   Have you heard that term before?
13   A.   I'm familiar with nasheed.
14   Q.   What is a nasheed in your understanding?
15   A.   My understanding of nasheed is --
16            MR. FICK:  Objection, foundation.
17            THE COURT:  Overruled.
18   A.   My understanding is that a nasheed is a sort of chant and
19   typically popular in Islamic culture.  A lot of them are in
20   Arabic.  I don't speak Arabic, so I'm not sure I would be able
21   to recognize what they're saying, but I am familiar that they
22   do exist.
23   Q.   Clicking on that folder, the nasheed folder, are there a
24   number of files number 1142-100 through 136 on that folder?
25   A.   Yes.
```

```
 1    Q.   And these are all audio files?

 2    A.   Those are -- if you could expand it?  The title, please?

 3    Yes, those are MP3 files, or audio files, yes.

 4    Q.   And there's one that's on this disk in the parent folder

 5    "music"?

 6    A.   Yes.

 7    Q.   Now, is this all of the music that was on this computer

 8    hard drive?

 9    A.   No.

05:07 10    Q.   Then there was another folder that was specifically called

11    "music," is that right?

12    A.   Yes.

13    Q.   And there was a folder called "playlists"?

14    A.   Yes.

15    Q.   What's a playlist?

16    A.   A playlist is a file that is sort of like a table of

17    contents that a Windows Media Player or a similar program would

18    create to keep a sort of file list of songs or, say, a table of

19    contents of songs that you would create.

05:07 20    Q.   So I clicked on the playlists subfolder.  And are there

21    two playlists here?

22    A.   Yes.

23    Q.   And the WPL extension means it's a playlist?

24    A.   It's a Windows Playlist.

25    Q.   Windows Playlist, excuse me.  Can you view that using a
```

1    text editor?

2    A.    Yes.  You could use that text editor or Notepad.

3    Q.    Does this list in the computer code the various files that

4    were on the playlist?

5    A.    Yes.

6    Q.    Now, there was another user folder called "public" on this

7    computer, is that right?

8    A.    Yes.  That's a Windows-created folder typically used for

9    -- when you have sharing set up amongst computers, that the

05:08 10   public folder would be the file or the folder where you would

11   be able to share documents with other users.

12   Q.    So this is the user profile that anybody who's using the

13   computer can see?

14   A.    Yes.

15   Q.    And were there several files in this folder that were not

16   exported onto the CDs?

17   A.    These two files here were in the public folder.

18   Q.    And opening 1142-147, is that a Microsoft Word file?

19   A.    The extension of .docx, yes, that's a Microsoft Word file.

05:09 20   Q.    Is this the contents of that Microsoft Word file?

21   A.    Yes.

22   Q.    Is the -- at the top left-hand corner of this file, is it

23   written, "Jahar Tsarnaev, Modern World History, Miss Auty"?

24   A.    Yes.

25   Q.    And then the title of the document is called, *The Predator*

1   *War*?

2   A.   Yes.

3   Q.   Opening 1142-148, is this a 578-page PDF file that's in

4   Cyrillic?

5   A.   It is a PDF file.  In the top left-hand corner, it is

6   recognized it is 578 pages.  And I don't -- can't speak the

7   language, but I do recognize that as Cyrillic language.

8   Q.   For foreign-language documents that you encountered when

9   you were -- you and the rest of the investigative team were

05:10 10   analyzing the various devices, what happened with those in the

11   FBI?

12   A.   What would happen is, if the team encountered something

13   that they needed translated, we have a full staff of linguists

14   who are proficient in numerous different languages that would

15   be able to translate that.

16   Q.   With regards to the content on these CDs, for some of the

17   foreign-language documents, are, in fact, there translations

18   that linguists at the FBI did and put on there?

19   A.   Yes.

05:11 20   Q.   Now, the files folder, I'm clicking on an exhibit marked

21   1142-150, "work resume."  Was this in the files folder?

22   A.   Yes, it was.  No.  Files folder is what we created, so

23   this came off of the hard drive.

24   Q.   So you called this folder "files"?

25   A.   Yes.

1    Q.    For files that were not in one of those other folders?

2    A.    Yes.

3    Q.    And so is this the resume of a person named Jahar Tsarnaev

4    from 410 Norfolk Street, No. 3?

5    A.    Yes.

6    Q.    Does he list his email address as j.tsarnaev@yahoo.com and

7    his phone number as 857-247-5112?

8    A.    Yes.

9    Q.    Is it a one-page of content?

05:12 10   A.    It appears to be two pages, but one page has the content.

11   Q.    He lists himself as a student at University of

12   Massachusetts at Dartmouth, is that correct?

13   A.    Yes.

14   Q.    The other image in this folder is called 1142-149-carved,

15   and then there's a number.  What does that mean?

16   A.    So the forensic software that we use to process digital

17   evidence, as we mentioned earlier this morning, has the ability

18   to carve files out of space that is no longer being used by the

19   computer.  It's a fairly simple process.  Each file has a

05:12 20   specific header associated with it so the computer will be able

21   to identify what kind of file that is.  There's a specific

22   header associated with a JPEG or a document or a spreadsheet.

23   So the program will go out into unallocated or free space on

24   the computer that's no longer being used, and it will look in

25   that area of the computer to try and identify any of the files

1    that can potentially be recovered out of a space.

2        Once it identifies a file that it recognizes, it then

3    continues to try and rebuild what may have been in that space

4    before.  And this would be an example of something that was

5    carved out of free space on the computer that is now depicted

6    as a JPEG.

7    Q.   Go back to the Anzor account name, and I open the folder

8    called "YE."  The first document in that folder, 1142-71, has a

9    number of blank underlines.  What does that mean?

05:14 10    A.   Sometimes the forensic software has a hard time with

11   non-English alphabet characters.  So if it was Cyrillic

12   characters, sometimes through the processing with the forensic

13   application, it doesn't know how to translate it.  If it

14   doesn't know how to translate it into an English equal or does

15   not have the ability to depict the Cyrillic language, it will

16   replace it with typically an underscore, which is what you're

17   seeing here.

18   Q.   And so that particular document, is that a

19   foreign-language document?

05:14 20    A.   It appears to be, yes.

21   Q.   Again, like the other documents that were in foreign

22   language, were those given to the translators to translate?

23   A.   I'm not sure if this particular document was, but, yes,

24   they were given to the translators to translate.

25   Q.   On this one, there's no translation on the CD of that

1    document, is that correct?

2    A.    Correct.

3    Q.    I'm going to go down to the file 1142-91,

4    completeinspire.pdf.  Have you seen that name throughout your

5    analysis of these CDs?

6    A.    Yeah.  The name of that file was apparent on numerous of

7    the different CDs that we had or that we looked at or the

8    different pieces of media that we looked at.

9    Q.    In fact, on the spreadsheets that we looked at before the

05:15 10   lunch break, did we see that in both the external drive access

11   as well as amongst the link files?

12        MR. FICK:  Objection.  I didn't understand the

13   question.

14        THE COURT:  I didn't hear you.

15        MR. FICK:  I'm not sure I understood the question.

16        THE COURT:  Try it again.

17        MR. CHAKRAVARTY:  I'll try again.

18   Q.    Did the name of that file, *Complete Inspire* -- did that

19   name appear in both the external access spreadsheets that we

05:15 20   went through earlier as well as the file access or link history

21   spreadsheet?

22   A.    Yes, it was on that spreadsheet.

23   Q.    Is this the first page of 1142-91, completeinspire.pdf?

24   Is this the first page?

25   A.    Yes, it is.

1    Q.    Do you recognize it?

2    A.    Only from seeing it -- from viewing it on the disks and

3    the different pieces of media.

4    Q.    So do you know what it is?

5    A.    I know it's from -- other than reading the first page, I

6    know it's a magazine and in -- from what it says on the cover.

7    Q.    Does the cover call it "The Periodical Magazine Issued By

8    the Al-Qaeda Organization in the Arabian Peninsula"?

9    A.    Yes, it does.

05:16 10   Q.    Is this a 67-page document?

11   A.    Yes, it is, 67 pages.

12   Q.    Is one of the articles, *Make A Bomb In The Kitchen Of Your*

13   *Mom*?

14   A.    That's what it says on the cover, yes.

15   Q.    Now, you're not an expert on this document, right?

16   A.    No, sir.

17   Q.    Is this, on Page 33, the beginning -- apparently the

18   beginning of the article, *Make A Bomb In The Kitchen Of Your*

19   *Mom*?

05:17 20   A.    Yes, Page 33, yes.

21   Q.    And go through how many pages the article is.  Is that a

22   seven-page article?

23   A.    It started on 33 and ended on 40.  Yes.

24   Q.    Going to the subfolder, the *Hereafter Series,* on the

25   desktop under Anzor, what are these files?

```
      1    A.   They are -- can you display them differently, please?

      2    File details.  Those are depicted by the icon on the left.

      3    They apparently -- they appear to be RealPlayer files.

      4    Q.   So the icon on the left, you mean these icons?

      5    A.   Yes.

      6    Q.   It tells you generally what kind of a file Windows

      7    recognizes it to be?

      8    A.   Windows would associate -- with that file type would

      9    associate the RealPlayer icon.

05:18 10    Q.   And do 1142-49 through 1142-70 appear to be different

     11    files with the name -- different titles, all of which have the

     12    name Imam Anwar al-Awlaki?

     13    A.   If you could please scroll down?  Yes.  They all appear to

     14    say al-Awlaki.

     15    Q.   Going now to the folder "papka," you don't know what

     16    "papka" means in Russian, do you?

     17    A.   I do not.

     18    Q.   So there are a number of PDF files in this folder, is that

     19    right?

05:19 20    A.   Yes.

     21    Q.   And clicking on 1142-36 called *Join the Caravan* --

     22         MR. CHAKRAVARTY:  Can we try to get that again, Mr.

     23    Bruemmer?  Sorry.  There we go.

     24    Q.   Is this the substance of the document called *Join the*

     25    *Caravan*?
```

```
 1    A.    It is labeled "Join the" -- it's labeled "Join the
 2    Caravan," yes.
 3    Q.    Is this a 35-page PDF?
 4    A.    It's a 35-page PDF, yes.
 5          MR. CHAKRAVARTY:  Mr. Bruemmer, if you can just get me
 6    back to that title screen?
 7          MR. FICK:  What's showing now is not in evidence.
 8          MR. CHAKRAVARTY:  It's not evidence.  Clear the screen
 9    as well.  Thank you.
10          The one with all the folders.
11          THE COURT:  I've taken it down until you get to the
12    place you want.
13          MR. CHAKRAVARTY:  Thank you, your Honor.
14          I'm there, your Honor.  Thank you.
15    Q.    Back in that papka folder, is there a document in here
16    called "Issue 9," 1142-35?
17    A.    Sorry.  Yes.
18    Q.    Does that appear to be another issue of the Inspire
19    Magazine?
20    A.    Yes, it does.
21    Q.    Is there a folder called "Islam" in this subfolder?
22    A.    Yes, there is.
23    Q.    Exhibit 1142-45 entitled, "Saif al Bader," is this a
24    56-page PDF?
25    A.    Yes, it is.
```

1    Q.   Does the cover page indicate that the name of the document

2    is "The Slicing Sword"?

3    A.   Yes, it does.

4    Q.   Now, were these documents that were -- that you verified

5    on these disks, were these English-language documents with the

6    exception of the two, I think, that -- or the one, I guess --

7    two that we talked about?

8    A.   I'm sorry?

9    Q.   Were these English-language documents?

05:22 10   A.   Not all of them were English-language documents.

11   Q.   If they were in a foreign language, with the exception of

12   the two that we saw, would there be a translation as well?

13   A.   If there was a requested translation done and it was

14   included on the disk, it would be depicted in the same path as

15   where the file was you're seeing here.

16   Q.   And all these are English-language titles, correct?

17   A.   Yes.

18   Q.   There's also 1142-41 entitled, Sheikh Anwar al-Awlaki --

19   sorry, "Sheikh Anwar Awlaki:  The Battle of Uhud, Part 5-5,

05:23 20   YouTube," what kind of a file is that?

21   A.   Can you please extend the file to the right?  It's an MP3

22   file.

23   Q.   An MP3 file is an audio file?

24   A.   Yes.

25   Q.   Now, we've looked at files of a general type.  Were there

1   other types of files on this computer?

2   A.    Yes.  There were a lot of files on the computer.

3   Q.    What kinds of files were on the computer?

4   A.    There was the -- just like any other computer, there was

5   the Windows Operating System.  There was a lot of other files

6   that existed there that would be a part of a normal Windows

7   installation.

8   Q.    What other types of files were there?

9   A.    I'm sorry?

05:23 10   Q.    What other types of files were there?

11   A.    There were other -- when we went back into the thing to

12   verify that these documents -- and we looked at the drive --

13   there was over -- as we had showed earlier in the directory

14   list, there's over a half million files on the drive itself.

15   So this was a representative sample that was given to us to

16   verify.

17   Q.    Were there internet search histories or other things

18   related to sports or homework or other types of topics?

19   A.    Yes.

05:24 20   Q.    We didn't ask you to pull those and put those on the CDs,

21   right?

22   A.    You did not.

23   Q.    Let's move onto Exhibit 1143.  Would it be helpful to have

24   1557 up for you?

25            MR. FICK:  Just to clarify, this next one is not yet

     1    in evidence, as I understand it, is that correct?
     2              MR. CHAKRAVARTY:  It is not.
     3              Can we have 1557, please?  Thanks.
     4    Q.   Now, what does disk 1143 correspond to?
     5    A.   1143 corresponds to 2R14, which is the second one on the
     6    list.
     7    Q.   Is that a desktop computer that was seized from 410
     8    Norfolk Street in Cambridge?
     9    A.   According to the list, yes.
05:25 10   Q.   Was that also imaged and processed like the defendant's
    11    computer?
    12    A.   I'm sorry?
    13    Q.   Was that also imaged and processed like the defendant's
    14    computer?
    15    A.   It was imaged at Black Falcon and processed at Center
    16    Plaza.
    17    Q.   It was pursuant to the same protocols you had described
    18    earlier?
    19    A.   Yes.
05:25 20   Q.   The disk that you have in front of you as 1143, did you
    21    verify that all of the information, with the exceptions of the
    22    titles of some of the documents, the exhibit numbers and the
    23    translations, that all of that content was on that computer?
    24    A.   Existed on the computer, yes.
    25              MR. CHAKRAVARTY:  I would move in 1143.

```
 1            MR. FICK:  Same foundational objection especially with
 2     regard to the spreadsheets.
 3            THE COURT:  Overruled.  I'll admit it.
 4            MR. FICK:  And, actually, the translations.  Those, I
 5     think, we got yesterday.  I haven't had a chance to verify them
 6     yet.
 7            THE COURT:  Well, I'll admit it.
 8     (Exhibit No. 1143 received into evidence.)
 9            MR. CHAKRAVARTY:  Sorry.  I'm just waiting.  Thank
05:26 10     you, your Honor.
11     Q.   Is this the file directory or the files that are in the
12     2R14 HP desktop folder?
13     A.   These are the files.  These are the files that are on
14     1143.
15     Q.   We'll just go through them again.  You can explain what
16     they are.
17          What's the first folder?
18     A.   First folder was a folder called "Umar," which, like on
19     1R6, was the user folder that was on the Windows machine.
05:27 20     Q.   So somebody named this computer account Umar?
21     A.   Yes.
22     Q.   1143-01, what is this?
23     A.   This is a report that was generated utilizing Internet
24     Evidence Finder, which depicts social media and internet
25     activity on the desktop.
```

1    Q.    Okay.  Is this, like the one for the defendant's computer,

2    it's a portion of the internet evidence that was found,

3    correct?

4    A.    Yes, yes.

5    Q.    1142-3, what is this?

6    A.    Again, like 2R6, this is a directory listing or a listing

7    of the link files, or the shortcut files, that existed on --

8    I'm sorry.  These are the files from the desktop on 2R14.

9    Q.    And 1143-4, what is that?

05:28 10   A.    It's the log file for the original imaging.

11   Q.    And this lists again the person who imaged it as well as

12   the type of hard drive it was?

13   A.    Yes.

14   Q.    And was this a one-terabyte hard drive?

15   A.    Yes.  That's the software that the hardware is reporting,

16   yes.

17   Q.    1143-05, what is this?

18   A.    It's a -- it's a select -- as the title notes, it's a

19   selected user files from the computer on the Umar folders.

05:28 20   Q.    What does that mean?

21   A.    These folders would have existed -- or these files --

22   these paths would have existed in the Umar user on the computer

23   of 2R14.

24   Q.    Again, is this all of the activity on that computer?

25   A.    It is not all the activity on the computer.

1    Q.   1143-05-A, what is this?

2    A.   That's the complete file listing for the computer.

3    Q.   So this is a 2,544-page document.  Is this similar to the

4    defendant's computer, or is this a listing of all the files on

5    the computer?

6    A.   This is a complete file listing for the entire computer.

7    Q.   1143-06, what's that?

8    A.   This is the -- a list of the installed software that was

9    on 2R14.

05:29 10   Q.   Is this -- like you did for the defendant's computer, this

11   is --

12          MR. FICK:  Objection to the continued use of

13   defendant's computer, which I don't think has been established.

14          THE COURT:  Refer to it by its number.

15          MR. CHAKRAVARTY:  I will, your Honor.

16   Q.   Like you did for 1142, is this a list of the applications

17   that were installed on this computer?

18   A.   On 2R14, yes.

19   Q.   1143-07, what is this?

05:30 20   A.   This is the file for the information that holds the

21   security account manager for Windows, which would include the

22   names of the users that were on that computer.

23   Q.   So unlike the other computer that had the full name Jahar,

24   in this case, the 2R14, there was no full name listed, correct?

25   A.   There was no full name listed, no.

```
 1    Q.   Whoever set this computer up, just called the account Umar

 2    without putting their own name in?

 3    A.   Yes.

 4    Q.   Does it list on here -- excuse me -- when the last login

 5    date was?

 6    A.   The last login for the user?

 7    Q.   For the Umar account, yes.

 8    A.   Yes.

 9    Q.   When was that?

05:31 10  A.   March 21, 20:34:07, on 2013.  But, again, the Z would

11    denote that it was Zulu time.

12    Q.   1143-08, what is this?

13    A.   This is the information, like 1R6, which is the Windows

14    installation -- or the Windows information for the computer,

15    verifies that the licenses are -- gives the user license for

16    the Windows and what version it's running.

17    Q.   And 1143-09, what is that?

18    A.   This is an internet activity history report.

19    Q.   Is this also generated with the Internet Evidence Finder

05:32 20  tool?

21    A.   Yes.

22    Q.   Again, is this a partial internet history?

23    A.   The data that's on this spreadsheet was generated from

24    Internet Evidence Finder.

25         MR. FICK:   Again, object to the translations as I'm
```

1    seeing them for the first time now.

2          THE COURT:  All right.

3    Q.   This is a 20-page document, is that right?

4    A.   Yes, it's a 20-page document.

5    Q.   And like the spreadsheet that we saw on the previous

6    computer, there are dates on some of the entries, and there are

7    no dates on some of the entries?

8    A.   Yes.

9    Q.   So let's pick a couple of these to focus in on.  So this

05:33 10   file here, it says, "J:completeinspire.pdf."  What does that

11   entry mean to you?

12   A.   On the column on the right, all the way -- I'm sorry, all

13   the way to your right.  The Internet Evidence Finder would have

14   grabbed this information out of what we would call -- okay --

15   the "U" would be for unallocated space.  So that remnant or

16   that file structure, that file name, was recovered by Internet

17   Evidence Finder and shows possibly at some point that file --

18   that this file was accessed on this computer by -- on a J

19   drive.

05:34 20   Q.   What's the J drive?

21   A.   The J drive -- J would be the file letter that Windows

22   would give whatever -- the next one in line or assigned by a

23   user to a removable media device or something that was plugged

24   into the computer.

25   Q.   There's a date over here.  What does that date correspond

1    to?

2    A.   Well, because it came out of an unallocated space, the

3    date really -- it's not really very reliable.

4    Q.   Okay.  And you say "unallocated space."  Do you know that

5    because of --

6    A.   Because of the --

7    Q.   This U?

8    A.   Yes.

9    Q.   What does unallocated space mean?

05:35 10   A.   That's the portion of the computer that we talked about

11   earlier where it's sort of the space that's not being used by

12   the hard drive or by the operating system or by any

13   applications anymore.

14   Q.   Now, going down a few entries, we see the same file name

15   being accessed on the J drive, right?

16   A.   Yup, yes.

17   Q.   And that's an allocated space, right?

18   A.   Yes.

19   Q.   And what's the date of that access?

05:35 20   A.   12/26/2012, at 2:39 p.m.

21   Q.   Now, this email address, j.tsarnaev@yahoomail, is that the

22   email address that was on the 1R6, the Exhibit 1142 user

23   profile?

24   A.   That was in the -- that was in several locations on 1R6.

25   Q.   Excuse me.  That wasn't on the user profile.  I think it

1    was on the resume?

2    A.   Yes.

3    Q.   Does it show that that access, according to the Internet

4    Evidence Finder, that email account was accessed on New Year's

5    Day?

6    A.   Right.

7    Q.   On 2013?

8    A.   Right.  If we look at the column to the left, that's going

9    to give you the URL or the web page that was accessed, that it

05:36 10   grabbed as a part of the history.  And that's the -- the

11   Internet Evidence Finder generates that middle column, and it

12   then associates the date and time with that activity --

13   internet activity.

14   Q.   This column called "title," this column, what kind of data

15   is indicated in that?

16   A.   Well, the title is generated by the Internet Evidence

17   Finder.  It types -- it's the type of traffic that it

18   recognizes.

19   Q.   And the various content of these columns, what does that

05:37 20   indicate?

21   A.   Did you want me to read every single one?

22   Q.   No.  Just for the first one, what does it say, if you can

23   read it?

24   A.   It says, Junies Uderoff (ph) Google search.

25   Q.   What does that tell you?

1   A.   It says that that string to the left would be something --

2   if you were going to go to Google.com and do a search for

3   something, and you typed, for example, that name in the box in

4   the middle of Google and sent that search request back to

5   Google, that's -- the string on the left would be the actual

6   request going back to Google.  So Internet Finder would parse

7   out that information, recognize that it's a Google search, and

8   include that in the title.

9   Q.   So I just underlined the entry in the URL field.  Is that

05:38 10   what you were talking about?

11   A.   Yeah.  Actually, you can see -- if you go up to the first

12   line, you can see -- after Google.com, you can see the search

13   term there.

14   Q.   And so on the entry that says, "Anwar Awlaki Abu Bakr

15   (RA), Part 1/8, YouTube," does that mean that that website

16   titled that was accessed on January 1, 2013, at about 3 p.m.?

17   A.   If you look to the left, again, Internet Evidence Finder

18   identified the URL on the computer as being that number or that

19   URL and then associated it with that file name -- or with that

05:38 20   name and then created the date visited.

21   Q.   I'm going to go through a few more pages and then move on.

22   Are these -- in the URL column, are these various websites that

23   were visited?

24   A.   In the URL column, Internet Evidence Finder would have

25   parsed out through the internet history files associated with

```
       1   all the different browsers that are available and then would
       2   have been exported to this report.  So, yes, these are -- those
       3   are websites that would have been visited.
       4   Q.   So those websites like ghuraba.info, Jamaat Shariat, as
       5   well as Netflix?
       6   A.   Yes.
       7   Q.   There's a lot of entries for this website called Kav Kaz
       8   Center.  Did you see that throughout this computer?
       9   A.   I recognize that from the report, yes.
05:40 10   Q.   And the -- for a lot of the Kav Kaz entries, there is
      11   Cyrillic writing; is that fair to say?
      12   A.   That's -- I recognize it as Cyrillic writing, yes.
      13   Q.   Now, just as we had talked about the general content that
      14   was on the 1R6, the Sony Vaio laptop that's numbered 1142, was
      15   there a variety of different types of content on the 1143
      16   desktop that was seized from Norfolk Street?
      17   A.   There was a variety of different files on the computer,
      18   yes.
      19   Q.   And were you able to determine whether this was used by
05:40 20   only one person or many people?
      21   A.   Given -- as we spoke this morning about combining the
      22   investigative information with the information that's on the
      23   computer, I think it was used by many people.
      24   Q.   1144, what does that correspond to?
      25   A.   Back to the report, 1144 corresponds to 3R4, which would
```

1    have been a thumb drive designated as Micro Center,

2    two-gigabyte thumb drive, seized from the Pine Dale Hall and

3    imaged at Black Falcon and processed at Center Plaza.

4    Q.    Pine Dale Hall you know is a dormitory at the UMass

5    Dartmouth campus?

6    A.    Yes.

7    Q.    And "TD" means thumb drive?

8    A.    Yeah.  That was our designation, yup.

9    Q.    As with the computer devices, did you confirm that the

05:41 10   contents on the disk 1144 reflects a selected portion of the

11   contents of that thumb drive?

12   A.    Yes.

13          MR. CHAKRAVARTY:  I'd move in 1144, your Honor.

14          MR. FICK:  Same objection.

15          THE COURT:  Same ruling.  Admitted.

16   (Exhibit No. 1144 received into evidence.)

17   Q.    So in the 3R4 folder, what do we see here?

18   A.    3R4 folder, there are a file listing PDF, a text file,

19   which is a log file, as we've looked at the other two.  And

05:42 20   there are two files that were found on that thumb drive.

21   Q.    And so the first folder says "carved files."  What does

22   that mean?

23   A.    As discussed earlier, when the software application that

24   we use has the ability to carve files out of that unallocated

25   space where a file may have previously been.  Those would have

1   been files that were associated with that process of carving

2   that were identified by the software application.

3   Q.   Let's click on 1144-01.  What is this?

4   A.   It's a file listing for the 3R4.

5   Q.   So unlike the computers, which have thousands of pages of

6   files, this only has three.  Why is that?

7   A.   It's a smaller device.  It doesn't have an operating

8   system.  And it would be used just to transfer files.

9   Q.   1144-02, what is this?

05:43 10   A.   It's the log file.  The log file for FTK Imager, which was

11   used to image the thumb drive.

12   Q.   Again, this also shows how much storage you had on this --

13   A.   Yes.

14   Q.   -- on this -- I'm just trying to find out how much storage

15   that is.  Can you tell?

16   A.   It's approximately two gig.

17   Q.   Two gigs, all right.

18       1144-05, completeinspire.pdf, is that the same file or

19   same document that was on the -- both of the two computers

05:44 20   we've seen already?

21   A.   With the visual inspection, yes.

22   Q.   In fact, I actually hadn't done that with the second

23   computer so go back a second.

24       I went through the spreadsheets with you on the desktop

25   computer, but I didn't go through each of the user files.  I'll

1    try to do it quickly.

2         MR. FICK:  Could we make sure the record is clear what

3    exhibit we're in?

4         MR. CHAKRAVARTY:  Sure.  We're back on 1143.

5    Q.   On the desktop, were there a number of folders in the

6    desktop?

7    A.   Yes.

8    Q.   There were subfolders as well?

9    A.   Yes.

05:45 10   Q.   And they had audio files just like the other computer?

11   A.   Yes.

12   Q.   And they had these YouTube files as well?

13   A.   Yes.

14   Q.   They had a folder called the *Hereafter Series* also?

15   A.   Yes.

16   Q.   And like the 1142, it had a number of Anwar al-Awlaki

17   documents or audio files in that folder?

18   A.   Yes.  Could you change the view to details, please?

19   Q.   Sure.

05:46 20   A.   Yes.

21   Q.   And in 1143, it was 1143-43 to 1143-64 that were all these

22   Anwar al-Awlaki audio files, correct?

23   A.   Yes.

24   Q.   Then there were a number of documents on the desktop that

25   would be visible to somebody who was accessing that user

1    account, correct?

2    A.    Yes.

3    Q.    The documents folder went into subfolder called "blio,"

4    subfolder entitled "tema."  Is there a document called 1143-69,

5    *Inspire*, March 2011?

6    A.    Yes.

7    Q.    And that reflects another copy of *Inspire Magazine* for a

8    different issue?

9    A.    Yes.

05:47  10    Q.    Now, that March 2011 magazine has this picture and the

11    title called, "The Tsunami of Change," is that correct?

12    A.    That's what's depicted, yes.

13    Q.    Going back now to where we had left off at 1144, which was

14    the thumb drive that was found in the defendant's dorm room, is

15    that right?  Sorry.  Do you need the chart again?

16    A.    1144 was -- yeah, Pine Dale Hall, yes.

17    Q.    Now, in the carved files, what are these?

18    A.    Again, the forensic software is able to carve files out of

19    that -- the unused space on that device by that process of

05:48  20    identifying a file header and trying to capture as many or as

21    much of that files as it can.  And it carved JPEGS out of the

22    unallocated space on the thumb drive.

23    Q.    I called up 1144-07-24.  Is that the same JPEG or image

24    file of the cover of the Spring 2011 issue of *Inspire Magazine*?

25    A.    That's a JPEG, a single JPEG, depicting the first page of

the PDF that we looked at.

Q.   So it's not -- what you were able to recover on the thumb
drive was not the entire PDF document but rather a series of
images or JPEGS, correct?

A.   Yes.

Q.   Did you verify that that's, in fact, what all of these
images are?

A.   I'm sorry?

Q.   What are all of these images in this folder?

A.   These are carved images out of the unallocated space on
the thumb drive that match photos or images that are on that --
the March 2011 *Inspire Magazine*.

Q.   In addition to that *Inspire* -- issue of *Inspire Magazine*,
was that *Complete Inspire* magazine that we had seen before also
on there?

A.   In PDF form, yes.

Q.   Was this in the active space so it wasn't carved?  It
didn't have to be recovered?

A.   I'm sorry.  Yes, it was in active space.

Q.   In addition, 1144-06, was this a scanned document that was
on the thumb drive?

A.   Yes.

Q.   What does it appear to be?

A.   It appears to be a pay stub for Katherine -- from Donald
Larking, 1600 Washington Street.

1    Q.   It was found in the defendant's dorm room?

2    A.   The thumb drive was found in the dorm room, yes.

3    Q.   Let's move onto 1145.  What is that?

4    A.   1145 was the files extracted from an iPod Shuffle.

5    Q.   And 1146?

6    A.   1146 was from an iPod Nano.

7    Q.   And the files on those CDs, are those, like the other

8    ones, you verified that they're actually on those items of

9    evidence?

05:50 10   A.   Yes.

11   Q.   Were those iPod -- the iPod Shuffle and Nano found in the

12   Honda Civic that was recovered in Laurel Street?

13   A.   If you could bring back up --

14   Q.   Sure, sorry.

15   A.   Yes.

16   Q.   Those are the items that actually already have been

17   introduced in this case?

18   A.   Yes.

19        MR. CHAKRAVARTY:  I'm sorry.  I would move in the data

05:51 20   collected from 1145 and 1146.

21        MR. FICK:  Same objection.  Foundation, improper

22   confrontation.

23        THE COURT:  Admitted.

24   (Exhibit Nos. 1145 and 1146 received into evidence.)

25   Q.   I've opened 1145.  Can you explain this structure?

1    A.    1145 would have been the -- an iPod Shuffle.  So the text

2    file would show the imaging log for the imaging of the device.

3    Q.    And I'm first opening 1145-02.  What is that?

4    A.    That's the log file for the imaging that took place on

5    that.

6    Q.    1145-01?

7    A.    Is a derivative file list, a file list of files that were

8    found on the iPod Shuffle.

9    Q.    So this is some of the audio files that was on the iPod

05:52 10   Shuffle?

11   A.    Yes.

12   Q.    And 1145-01-A?

13   A.    Is the complete file list of all the files that were found

14   on the Shuffle.

15   Q.    So the previous exhibit was a subset of this?

16   A.    Yes.

17   Q.    Under "files," are these that subset of the audio files

18   that were on the computer -- excuse me, on the iPod?

19   A.    I'm sorry?

05:52 20   Q.    Were these a subset of files that were on the iPod?

21   A.    These files we verified were on the iPod, yes.

22   Q.    1145-24, entitled, "The Man Who Went to Jannah Without

23   Praying, MP3," did you see that in your verification of other

24   devices?

25   A.    I recognize the title from other places.

1    Q.   Do you remember which other devices that was on?

2    A.   I don't.  But if I had the directory listings, I'd --

3         MR. CHAKRAVARTY:  Can we call up just for the witness

4    1553, please.  Court's indulgence, your Honor.

5         I'll move on in the interest of time and come back.

6    Q.   Let's go to 1146, which is the other iPod that I believe

7    I've moved into evidence now.  On this iPod, the 1146, there

8    are four-digit names for files.  Why is that?

9    A.   I'm aware that the iPod, or the iTunes software, when they

05:55 10   install the MP3s or the files on of the device that it changes

11   the name of the file and creates a pointer to that.  So if you

12   go back, there will be, like, a playlist, as you had recognized

13   from all of your songs, and it creates that -- the playlist

14   would create pointers to those files.

15   Q.   And 1146-01, is this a derivative file listing, listing

16   those files?

17   A.   Yes, it is.

18   Q.   1146-01-A, is this the complete file listing for all the

19   files on that --

05:55 20   A.   Complete file listing of everything that was on the

21   device.

22   Q.   And 1146-27, is this a log file?

23   A.   Yes.

24   Q.   It's listed as an iPod, Apple iPod device?

25   A.   Yes.

         1    Q.   Now, were you -- did you compare whether some of the audio
         2    files were common across various devices?
         3    A.   Yes.
         4    Q.   Okay.  Explain what you did.
         5    A.   Well, we -- I mean, when we recognized the names across
         6    several of the devices, we -- when we were going through
         7    verifying and validating, we recognized that some of the titles
         8    were the same and played them to verify that they were on the
         9    devices.
05:56   10    Q.   So some of the iPod files that come in four-digit titles,
        11    did you verify that those files were actually also the same
        12    files that were -- the same audio files that were on some of
        13    these other devices?
        14    A.   It's difficult to do through just listening, but we did
        15    use another process to verify that they were the same.
        16    Q.   What was that process?
        17    A.   We talked earlier about the MD5 hash values.  We use them
        18    to verify images of computers, but we can also use them to
        19    compare files.  So if we created an MD5 hash value for a file,
05:57   20    we then could run that -- find that value in other places, and
        21    then it would show scientifically that it was the same file.
        22         MR. CHAKRAVARTY:  Now, your Honor, just for the
        23    witness, please, 1438, please.
        24    Q.   Do you recognize what this is?
        25    A.   It's a spreadsheet that was put together by the team that

1    was depicting the propagation of the files.

2    Q.   All right.  Did, actually, you create an updated version

3    of this particular spreadsheet?

4    A.   There's an updated version of this spreadsheet, yes.

5    Q.   Does that updated version actually compare the MD5 hash

6    values?

7    A.   It does.  It includes the MD5.  We added a column of the

8    MD5 hash values for each of the files across the devices.

9    Q.   What commonalities did you find over -- after looking at

05:58 10   the MD5 hash values?

11   A.   If the hash values matched, the file is essentially the

12   same or is the same.  So we just compared the MD5 hash values.

13   And once we were able to show that it was the same across all

14   of the devices, we can verify that it's the same files.

15   Q.   Did you, in fact, find that some of the audio files were

16   the same across various devices?

17   A.   Yes.

18   Q.   What were devices that you found being similar across

19   the --

05:59 20   A.   1R6, 1437, 14-6, and 3R5.

21   Q.   We haven't discussed 3R5 yet, right?

22   A.   We have not.

23   Q.   Were these particular audio files that were common across

24   those devices?

25   A.   They were MP3 files.

1    Q.    Particularly the file that I had just clicked on but

2    haven't played is, "The Man Who Went to Jannah Without

3    Praying."  Was that one of them?

4    A.    Yes.  That was one of them that was common all across all

5    four devices.

6    Q.    Was there also another audio file called "The Most Amazing

7    Nasheed" that was common across all four devices?

8    A.    Yes, across all four devices, yes.

9    Q.    Was there also the file called "The Most Wonderful

06:00 10   Nasheed" that was common across all four devices, although the

11   title of the file was different?

12   A.    Yes.

13   Q.    So was that -- did the MD5 hashes compare favorably on

14   that?  How does an MD5 hash stay the same if the file name

15   changes?

16   A.    It doesn't change any substance of the file.  This could

17   have been a pointer.  If you could -- I'm sorry.  So depending

18   on how the file was handled within the device or the iPod, it

19   wouldn't make any substantive changes to the file which

06:00 20   wouldn't change the MD5.

21        MR. CHAKRAVARTY:  All right.  Thank you, Mr. Bruemmer.

22   Go back to the other screen.

23   Q.    The 3R5, does that correspond with Exhibit 1141?

24   A.    Yes, it does.

25   Q.    I've just called up 1557 again.  What was the 3R5?

1    A.   The 3R5 was a Samsung Finesse cell phone seized at the

2    Pine Dale Hall location.   It was imaged at Black Falcon and

3    processed at Black Falcon.

4    Q.   Again, was this a cell phone found in the defendant's dorm

5    room?

6    A.   Yes.

7    Q.   And was this one of the devices that had those audio files

8    on it?

9    A.   Yes, it was.

06:01 10         MR. CHAKRAVARTY:  I'd move in 1141 into evidence, your

11   Honor.

12         MR. FICK:  Same objection.

13         THE COURT:  All right.  Noted and admitted.

14   (Exhibit No. 1141 received into evidence.)

15   Q.   Now, this is the first cell phone that we're looking at

16   the digital extraction for, is that right?

17   A.   Yes.

18   Q.   So what do we see here in the UFED Samsung CDMA SCHR810

19   finds?

06:02 20   A.   Cell phones are processed a little differently.  They're

21   several different ways we can process cell phones.  One way is

22   through a product called UFED, or CelleBrite.  And that's how

23   this phone was imaged.  And it creates a report from the phone

24   and allows you to extract the files from the phone.

25   Q.   The first file, 1141-01-07211546.jpeg, what's that?

1    A.    It's a JPEG that was extracted from the phone.

2    Q.    Were there several other JPEGS or image files that were

3    found on this phone?

4    A.    Yes, there was.

5    Q.    You didn't extract them all, right?

6    A.    I was asked to verify this was on the phone.

7    Q.    Were there other pictures of the defendant on that phone?

8    A.    Yes, there were.

9    Q.    What is this?

06:03 10   A.    This is a copy of the phone examination report.

11   Q.    Is this something that the software generates?

12   A.    Yes.  This is software-generated.

13   Q.    What type of information is in this 131-page document?

14   A.    This would -- depending on the type of phone and the

15   process used, this could include contacts, text messaging,

16   photos, files that were on the phone.  It would include maybe

17   the SIM card information if there was a SIM card associated

18   with the phone.  It would be anything -- or data that would be

19   associated with the phone.

06:03 20   Q.    Does it also include the phone contacts?

21   A.    Contact lists, yes.

22   Q.    So I'm just going to scroll through the list of contacts

23   here.  Is that about 17 pages of contacts?

24   A.    Which page did you start on?

25   Q.    Sorry.  I start on Page 2.

1   A.   2 to --

2   Q.   2 to 18?

3   A.   I can't really tell because the pagination might not be

4   right, but it's on or about --

5   Q.   Thank you.

6   A.   -- that number pages.

7   Q.   Then there's some call data here?

8   A.   Yes.

9   Q.   And is the call data obtained from the phone handset or

06:04 10   from the telephone company that provides service?

11   A.   This report is generated from data that's on the phone.

12   Q.   In your experience as a computer forensic examiner, have

13   you compared whether phone data from a handset is the same as

14   phone data from a cell phone company?

15   A.   I mean, it would be a separate legal process, but you

16   would have to subpoena the phone records or -- and do a

17   comparison.

18            MR. FICK:   I'm actually going to object to this

19   version of this exhibit which appears to have lost the image --

06:05 20   I'm sorry.  I'm objecting on completeness grounds because it

21   looks like this version that's now the exhibit has lost the

22   image thumbnails that go in the report.

23            THE COURT:   You can examine on it.  We'll deal with it

24   if --

25   Q.   These are bookmarks for a variety of different images that

```
 1    were taken on the phone?
 2    A.   On the left-hand column is the information that is -- is
 3    the file names that were on the phone, yes.
 4    Q.   And looks like there are hundreds of images on this phone,
 5    right?
 6    A.   Yes.
 7    Q.   And then, in addition to images, are there audio files on
 8    this phone?
 9    A.   Yes.
06:06 10   Q.   And, again, like the images, all of these -- the audio
11    files themselves are not on this disk, correct?
12    A.   They are not.
13    Q.   I'm just getting to the bottom.  It looks like there's
14    over a hundred audio files in this phone as well?
15    A.   Yes.
16    Q.   Then there are some video files, correct?
17    A.   Yes.
18    Q.   And all of that data was not exported to these CDs,
19    correct?
06:06 20   A.   It was not.
21    Q.   Going into the audio folder on this now, was this the
22    folder that contains the files that were actually extracted and
23    put on the CD for the jury?
24    A.   Was that the actual folder that was on the phone?
25    Q.   No.  Was the folder on the CD --
```

```
 1    A.    Yes.

 2    Q.    Does that contain the actual files that --

 3    A.    Yes.  These audio files were on the phone, yes.

 4    Q.    So this is not the hundreds of audio files that may have

 5    been on the CD?

 6    A.    No, no.

 7    Q.    Can we just go through and read the titles of these files

 8    that were on the Samsung phone?

 9          MR. FICK:  Objection.  It speaks for itself.

10          THE COURT:  Sustained.

11    Q.    Is it fair to say that 1141-03 through 1141-11 were all

12    audio files that were on the Samsung phone?

13    A.    Yes.

14    Q.    And several of them were also on those other devices that

15    you just described, the two iPods as well as the laptop

16    computer, the Sony Vaio?

17    A.    1R6, yes.

18    Q.    1R6.  Let's move onto the next CD.  I think it's 1147 --

19    1147 and 1148.  What are those?

20    A.    1147, 1148 correspond to 2V7B and 32-2.  They were

21    CD-ROMs.  One was seized -- or identified and seized in the

22    Honda Civic.  It was imaged at Center Plaza, processed at

23    Center Plaza, and contained audio files.  And 32-2 was a CD-ROM

24    seized in the Mercedes, imaged at Center Plaza, processed at

25    Center Plaza, and contained audio files.
```

```
 1    Q.   And so these were the two CDs that were found in the two

 2    vehicles that were in Watertown on April 18 and April 19, 2013?

 3    A.   Yes.  They were found in the Honda Civic and the Mercedes,

 4    yes.

 5    Q.   The Mercedes one, do you recall if that was the CD that

 6    was in the radio that they -- the state police was able to get

 7    out?

 8    A.   I didn't seize it from the Mercedes but, according to the

 9    description and the location, yes.

06:09 10    Q.   And the other CD, was that the one from the Honda Civic?

11    I think it was in the glove box?

12    A.   Yes.

13    Q.   And, again, did you extract -- did you verify that the

14    data on the extracted CDs that you have in front of you is, in

15    fact, data from those two CDs?

16    A.   Yes.

17              MR. CHAKRAVARTY:  I'd move in Exhibits 1147 and 1148.

18              MR. FICK:  Same objections.

19              THE COURT:  All right.  Admitted.

06:09 20    (Exhibit Nos. 1147 and 1148 received into evidence.)

21    Q.   32-2, the folder marked 32-2, which is in 1147, is this

22    the one-page file listing of the files on that?

23    A.   Yes.

24    Q.   1147-03, is that a playlist for the CD?

25    A.   Yes.
```

1    Q.   Clicking on the files folder, is this the file structure

2    that was on that CD?

3    A.   Those were the files that were on the CD, yes.

4    Q.   And for 1147, in the parent folder under "files," are

5    there several documents with the name Sheikh Anwar Awlaki in

6    them?

7    A.   Yes.

8    Q.   At least Exhibits 1147-09 through 1147-16?

9    A.   I'm sorry?

06:10 10    Q.   Sorry.  Do those -- just for the record, I just wanted to

11    make clear which of those files we're referring to.  1147-09

12    through 1147-16, do these all start with "Sheikh Anwar Awlaki

13    and the Battle of Badr and the Battle of Uhud"?

14    A.   Yes.

15    Q.   Each of the subfolders themselves have additional files?

16    Some appear to be in a foreign language, correct?

17    A.   Yes.

18    Q.   If we go to 1148, do we see similar file structure?

19    A.   Yes.

06:11 20    Q.   Instead of those Sheikh Anwar Awlaki Battle of Uhud and

21    Battle of Badr, we see, "Minor Signs of the Day, Anwar Awlaki,

22    the *Hereafter Series*," 1148-07 through 1148-11, correct?

23    A.   Yes.

24    Q.   And then, like the other CD, there are a variety of

25    additional folders which themselves have audio files in them,

1    is that correct?

2    A.    Yes.

3    Q.    Like the other CD, did you verify that this was the file

4    listing on the CD?

5    A.    Yes.

6    Q.    Now, this is -- again, is this all of the files on them or

7    just a select files?

8    A.    This was all of the files.

9    Q.    What is this, 1148-02?

06:13 10    A.    This was a different -- these are -- as opposed to the log

11    file, as we had previously -- these are screenshots that are

12    depicting the same information that would be available in that

13    log file.

14    Q.    Does a CD have to be processed differently than a cell

15    phone or a thumb drive or a computer?

16    A.    I mean, the imaging process is different because you're

17    using maybe a different device, but the forensic process is

18    similar.

19    Q.    And this 1148-05, what is that?

06:13 20    A.    It's an FTK image or log file.  So there's a bit of

21    redundancy here because the same information is --

22    Q.    Sorry.  The same information is?

23    A.    Is in the previous screenshots.

24    Q.    In the screenshots, right.

25          Can we go to 1149, please?

1    A.    1149?

2    Q.    Yes, please.

3    A.    Is a thumb drive corresponding with 1W15.  Media

4    description is a Patriot thumb drive, seized or found at the

5    Watertown, Laurel Street, location.  It was imaged at Black

6    Falcon, processed at Center Plaza.

7    Q.    Now, Patriot thumb drive, is that the brand of the memory

8    that allows -- that's put onto a memory stick?

9    A.    What Patriot designates -- I believe designates the type

06:14 10   of thumb drive it was.  Like, there are different brands, and

11   this happened to be a Patriot thumb drive.

12   Q.    Does the Patriot also sub-brand out their memory so they

13   can be branded in different ways?

14   A.    That, I don't know.

15   Q.    The contents of that thumb drive, was that -- excuse me.

16   Was that thumb drive found in Laurel Street in Watertown?

17   A.    That's the search location it was seized from, yes.

18   Q.    We had seen earlier on the -- on a couple of these

19   histories, the spreadsheets that you had described earlier, a

06:15 20   Patriot external device plugged into a phone.  Is this the same

21   device?

22   A.    It is not.

23   Q.    How do you know that?

24   A.    Well, when a -- there's a -- a thumb drive has a unique

25   serial number associated with it.  So when you put it into a

1    computer, the registry would record that serial number.  And it

2    sits in the registry until either it's removed or the registry

3    would make a change to it.  But that serial number is collected

4    in the registry.

5    Q.   And so the contents of 1149, is that -- are the contents

6    of that CD files from the Patriot thumb drive marked as 1W15

7    that was seized in Laurel Street?

8    A.   Are you going to --

9    Q.   Yeah.

06:16 10   A.   Yes.  The files from the thumb drive are on the CD.

11   Q.   Not all of them, though?

12   A.   If you could open the file up, please?

13            MR. CHAKRAVARTY:  Well, I'd move into evidence 1149

14   first.

15            MR. FICK:  Same objection and a relevance objection on

16   this one, which I could explain perhaps at sidebar.

17            THE COURT:  All right.  I'll see you.

18   (SIDEBAR CONFERENCE AS FOLLOWS:

19            MR. FICK:  So, as far as I understand, the only real

06:16 20   content of this thumb drive is some of Dias Kadyrbayev's

21   homework.  So other than the fact it was found on Laurel

22   Street, I'm not sure what it has to do with the case.

23            MR. CHAKRAVARTY:  It just goes to the association.

24   It's not the substance of the content.  We expect the defense

25   is going to say that everything on Laurel Street was

1    Tamerlan's.  This was actually the defendant's friend's stuff.

2            THE COURT:  Okay.

3    .  .  .  END OF SIDEBAR CONFERENCE.)

4    (Exhibit No. 1149 received into evidence.)

5            MR. CHAKRAVARTY:  Your Honor, may I go ahead and

6    publish 1149?

7            MR. FICK:  Just note the objection.

8            THE COURT:  Yes, okay.

9    Q.    1149, 1149-01, is this the file listing?

06:17 10   A.    It is a derivative file listing.

11   Q.    So this is a portion of what was on there?

12   A.    Yes.

13   Q.    And does it list apparently some homework and some things

14   about Kazakhstan?

15   A.    Yes.

16   Q.    1149-01-A, this is the more complete file listing?

17   A.    Yes.

18   Q.    Again, a log file?

19   A.    Yes, of the imaging.

06:18 20   Q.    Of the image.  Then there's just a couple of homework

21   assignments in here that are on that CD, correct?

22   A.    Yes.

23   Q.    I'm going to click on 1149-03.  This appears to be some

24   kind of a term paper or something called, "The Definition and

25   Examples of Manifest and Latent Function in Society"?

```
 1    A.    Yes.

 2    Q.    Is the name at the top Dias Kadyrbayev?

 3    A.    Yes.

 4    Q.    And do you know that Dias Kadyrbayev was one of the

 5    defendant's friends?

 6              MR. FICK:  Objection.

 7              THE COURT:  Sustained to the form of the question.

 8    Q.    Do you know who he is?

 9    A.    I do know who he is.

10    Q.    Who do you know him to be?

11              MR. FICK:  Objection, basis of knowledge.

12              THE COURT:  Overruled.

13    A.    During my involvement with the initial investigation and

14    in the command post, the name was recognized both to me as a

15    part of the investigation that was going on in the New Bedford

16    area.

17    Q.    1149-04, is that another homework assignment?

18    A.    Yes, it is.

19    Q.    Again, it's from the same person, Dias Kadyrbayev?

20    A.    Yes.

21    Q.    Now, at some point did you actually examine Dias

22    Kadyrbayev's cell phone?

23    A.    I did.  Similar to the process here, I verified and

24    validated that there was information on the phone.

25              MR. CHAKRAVARTY:  And just for the witness, your
```

1    Honor, 1553 -- I'm sorry.  Did I say that wrong here?  1153.

2    Q.   What do you recognize this to be?

3    A.   As titled, I recognize it to be text messages from Dias'

4    phone.

5    Q.   In fact, with respect to communications between Dias and

6    the defendant's phone number, 857-247-5112, did you verify that

7    these text message exchanges were actually on Dias Kadyrbayev's

8    phone?

9    A.   Yes.

06:20 10         MR. CHAKRAVARTY:  Your Honor, I'd move to introduce

11   1153 for -- primarily for the communications between the

12   defendant and Dias, not the extraneous communications.

13         MR. FICK:  Well, I think I have the same objections as

14   before, and then perhaps we ought to have a redacted exhibit if

15   they're only offering it for --

16         THE COURT:  I agree.  I won't admit it unless it's

17   redacted.

18         MR. CHAKRAVARTY:  We'll do that, your Honor.

19         Mr. Bruemmer, we can go back to --

06:21 20   Q.   Can we go now to Exhibit 1150?  What is that?

21   A.   1150 is a -- corresponds with the Kingston thumb drive,

22   1B2734L14.  Location was the Crapo landfill.  It was imaged at

23   Quantico and processed at Center Plaza.

24   Q.   Was this a thumb drive that was found in a backpack that

25   was found in the landfill down in New Bedford?

1    A.    Yes.

2    Q.    Does 1150, the disk in front of you, reflect files that

3    were on that thumb drive?

4    A.    Yes.

5              MR. CHAKRAVARTY:  I'd move 1150, your Honor.

6              MR. FICK:  Same objections.

7              THE COURT:  All right.  Admitted.

8    (Exhibit No. 1150 received into evidence.)

9    Q.    Now, we'll go to 1150-01-A.  Is this the complete file

06:22 10   listing?

11   A.    Yes.

12   Q.    1150-01-B, is this the X-Ways derivative file listing?

13   A.    It's a derivative file listing.  It's a derivative list or

14   derivative file that was made from the other information on the

15   complete list.

16   Q.    Does this also include a translation column?

17   A.    Yes, it does.

18   Q.    And so, again, was that created by FBI translators to

19   explain what the foreign language was?

06:23 20   A.    Yes, it was.

21   Q.    1150-01, what's that?

22   A.    It's an additional derivative file listing from the drive.

23   Q.    This doesn't have that translation, correct?

24   A.    It does not.

25   Q.    1150-02, what's that?

1    A.    It's the log file showing the imaging.

2    Q.    And 1150-03, are these translations for some of those

3    foreign language files?

4    A.    Yeah.  That -- yeah.  This was not on the thumb drive, so

5    I did not verify that it came from the thumb drive because it

6    didn't.  But it's added to the data set because it includes

7    translations from the files that are on there.

8    Q.    So that the jury can understand what those files are?

9    A.    Yes.

06:24 10    Q.    Let's open the folder "carved, recovered files of

11    interest."  What are these?

12    A.    Back to the carving process again, the -- back to the

13    carving process again, it recovers files from unallocated and

14    deleted space.  And also -- these are also -- in this file is

15    carved and recovered, so there are carved files and also

16    recovered files, which are, as we spoke before, stuff that's

17    recovered from deleted space.

18    Q.    Now, are carved files always able to be recovered in the

19    sense of being able to access and treated like as if they had

06:24 20    never been deleted?

21    A.    Carved files are kind of hit or miss.  If it can recover

22    part of the file, it will -- the application software will do

23    as much as it can to render what it would -- what it used to be

24    or using the data that it can get back.  But it's not -- it

25    doesn't always be able to render the entire file.  So, for

1   example, if it was a JPEG, it may render only half of the file,

2   and the bottom may be pixilated, and you may not get the entire

3   file back.

4   Q.   So the files on this, 1150, on this piece of media, were

5   all of these files that we can see the titles of, are all of

6   them able to be opened and accessed?

7   A.   Can you scroll down to see the -- they should be able to,

8   yes.

9   Q.   Okay.  Is it possible that some of them are corrupted?

06:25 10   A.   I'm sorry?

11   Q.   Is it possible that some of them are actually corrupted

12   and you can't open them?

13   A.   Yes.

14   Q.   So they appear as if they're an intact file, but you can't

15   actually open it?

16   A.   Exactly, yes.

17   Q.   So why would that happen in the carving process?

18   A.   If it can't get the whole file back and it knows that it's

19   a PDF, Adobe or another application might try and open that

06:26 20   file.  And when it doesn't have all of the data from that file,

21   it doesn't allow it to open.

22   Q.   I'm going to click on 1150-34.  Did we get an error saying

23   that it can't be opened?

24   A.   Right.  That would be an example.  So it was able to

25   recover the title of the file and maybe a portion of the data

```
 1   but not be able to be opened.
 2   Q.   So I opened a file called 1150-14-169, "A Message to Every
 3   Youth."  Is this a document that on the top says, "At-Tibyan
 4   Publications, A Message to Every Youth, by the martyred Imam
 5   Abdullah Azzam"?
 6   A.   Yes, it is.
 7   Q.   Is this a 28-page document?
 8   A.   Yes, it is.
 9   Q.   Which is in English but also has Arabic in it?
06:27 10   A.   I'm not sure if that's Arabic, but, yes, it's English in
11   there.
12   Q.   At the end of this document, is there also a section
13   called, "Also available from Tibyan Publications"?
14   A.   Yes.
15   Q.   Does this list other titles of documents?
16   A.   Yes.
17   Q.   Now, opening 1150-09-02, does this appear to be a scanned
18   document that was also found on this thumb drive?
19   A.   Yes.
06:28 20   Q.   Again, this was also in carved space?
21   A.   It was either recovered or carved.
22   Q.   And it was in the folder called "carved, recovered files
23   of interest"?
24   A.   They're both carved and recovered files.
25   Q.   Yup, carved or recovered.  Does this appear to be a rental
```

1    application from a -- prepared by Katherine Tsarnaeva?

2    A.    Yes.

3    Q.    Do you know who she is?

4    A.    The defendant's sister-in-law is what I know.

5    Q.    Go on to 1151.  What is that?

6    A.    1151 is one CD containing the reports for 2W1 and 2W2,

7    which is an iPhone 4s and an iPhone 5, from Watertown, on

8    Franklin Street.  They were both attempted to be processed.

9    They were processed -- imaged down at Quantico, processed at

06:29 10   Quantico.  The phones were physically broken, as noted there,

11   and the only data that could be collected from it was the SIM

12   data, or the SIM card.

13   Q.    Were these the two phones that were found nearby to where

14   the defendant was arrested?

15   A.    Yes.

16          MR. CHAKRAVARTY:  Mr. Bruemmer, if we could just call

17   up Exhibit 810, which is in evidence?

18   Q.    Are these those smashed phones?

19   A.    Without looking at the serial -- they appear to be the

06:29 20   smashed phones, but without being able to verify the serial

21   number, yes.

22   Q.    Where were these sent?

23   A.    Down to Quantico, Quantico, Virginia, the lab.  I'm sorry.

24          MR. CHAKRAVARTY:  Could we go to 811.

25   Q.    811, did you see these phones shortly after they were

1    seized?

2    A.   Yes.  They came into -- they came into the lab, but they

3    were -- came into evidence -- the Evidence Response Team before

4    they were shipped down to Quantico.

5    Q.   As you did with Dias' phone and with the Samsung phone,

6    did you attempt to extract the data that was on these phones?

7    A.   Because -- due to the conditions of the phones, it was

8    impossible to extract the data from the phones.

9    Q.   So what did you do?

06:30 10   A.   They were shipped down to Quantico, to the lab, to attempt

11   to try and extract the information.  They have different

12   techniques that we don't have available to us in the field.

13   Q.   Were they able to do that?

14   A.   They were unsuccessful also.

15   Q.   Was there any part of the phone from which they were able

16   to get any data from?

17   A.   Well, the phones themselves contain SIM cards.  As we had

18   mentioned earlier, the SIM card is a small sort of almost like

19   an SD card that would go in your phone.  The SIM card has a

06:31 20   unique serial number which is associated with that SIM card.

21   The SIM cards are utilized by the carriers to authenticate your

22   phone.  And on that SIM card will have information such as your

23   telephone number and -- potentially the telephone number,

24   serial number of the phone, and, in Apple's case, not much more

25   information than that.

1   Q.   Was the lab able to extract information from the SIM card?

2   A.   The SIM cards were imaged, yeah.  There was an extraction

3   done of the SIM cards, yes.

4   Q.   Did that also happen back at Center Plaza when you were --

5   A.   Yes, we did -- yes.

6   Q.   So on Exhibit 11 -- excuse me, 1151, what exists on that?

7   A.   1151 are the reports from the SIM cards.

8        MR. FICK:  These are not in evidence yet, as I

9   understand it.

06:32 10      MR. CHAKRAVARTY:  They're not.  I'm going to move it

11   in now.

12        MR. FICK:  The screen is up.

13        MR. CHAKRAVARTY:  I haven't gone to it yet.  At this

14   time, I'd move in 1151, which is the content of the SIM card

15   reports.

16        MR. FICK:  Same objections.

17        THE COURT:  All right.  Admitted.

18   (Exhibit No. 1151 received into evidence.)

19   Q.   Now, Agent Swindon, was one of the phones given the

06:32 20   alphanumeric identifier of 2W1 and the other given 2W2?

21   A.   Yes.

22   Q.   Going first to 2W1, are these a series of images of that

23   item?

24   A.   Those are images taken, yes, of that item.

25   Q.   These are just evidence images of the bag and the remnants

1    of the device?

2    A.    Yes.

3    Q.    And then I'm opening up 1151-10.  Is this a photo of the

4    SIM card?

5    A.    This is a SIM card mounted in sort of a tray-type piece.

6    Q.    So unlike the other exhibits which you've talked about,

7    this actually has images of the item that you extracted data

8    from?

9    A.    Yes.

06:33 10   Q.    Are those fair and accurate images of what the device

11   looked like?

12   A.    Yes.

13   Q.    Now I'm opening up 1151-14-report.  Is that an Internet

14   Explorer file -- sorry, an HTML file?

15   A.    Yes.  That's the format that the forensic process or the

16   UFED CelleBrite presents the report in.

17   Q.    So what is this that we're looking at now?

18   A.    This is the report.

19   Q.    And does it list the ICC ID number up here?

06:34 20   A.    Yes, which is unique to the SIM card.  And if you scroll

21   down in the report, you'll see the phone number.

22   Q.    Is this the phone number here?

23   A.    Yes.

24   Q.    617-286-9151?

25   A.    With this SIM card, yes.

1    Q.   Do you know that to be the phone that was subscribed to by

2    Jahar Tsarni on April 14, 2013?

3    A.   I don't have that information here in front of me.

4    Q.   Is that one of the two phones that was subscribed to Jahar

5    Tsarni?

6    A.   Yes.

7    Q.   Let's go to the other one.  Does this also have a number

8    of images of the device?

9    A.   Yes.

06:35 10   Q.   And both in the evidence bag as well as outside the

11   evidence bag?

12   A.   Yes.

13   Q.   And also has pictures of the SIM card?

14   A.   Yes.

15   Q.   Are all of those fair and accurate?

16   A.   Yes.

17   Q.   Clicking on the report, is this the SIM card extraction

18   report for 2W2, the other phone?

19   A.   Yes.

06:35 20   Q.   Does this show both the unique ICC ID number --

21   A.   For that SIM card, yes.

22   Q.   -- as well as the phone number?

23   A.   Yes.

24   Q.   Is the phone number here 857-247-5112?

25   A.   Yes.

1    Q.   Is that the same number that was on the defendant's

2    resume?

3    A.   Yes.

4    Q.   Was that the same number that was on Dias' phone?

5    A.   In the text chat, yes.

6    Q.   Now, were you able to extract any other information from

7    the phones that were destroyed?

8    A.   They were unsuccessful in extracting any other information

9    off of the chips or off of the phones themselves.

06:36 10   Q.   Does that mean --

11   A.   The only thing that was available was the SIM card.

12   Q.   Were you able to get any of the content off the phone,

13   like internet surfing history?

14   A.   No.

15   Q.   How about any songs or video files?

16   A.   No.

17   Q.   Any documents that had been accessed?

18   A.   No.

19   Q.   Any chats or communications with anyone?

06:36 20   A.   No.

21   Q.   Now, earlier -- it must be my head cold, but I think I

22   asked you whether you had Exhibit 1457 in that folder.  I meant

23   to ask you if you had Exhibit 1475 in that folder.

24   A.   Yes.

25   Q.   What does Exhibit 1475 correspond to?

1   A.   1475 corresponds to a -- the 1W16 CD external hard drive,

2   was seized in Watertown, Laurel Street.  It was imaged at

3   Center Plaza, processed at Center Plaza.

4   Q.   Was that the hard drive that was found on the street in

5   Watertown after the shootout?

6   A.   Yes.

7   Q.   Does 1475 reflect data that was extracted from that hard

8   drive?

9   A.   Yes.

06:37 10   Q.   Like the other devices that you've talked about, have you

11   personally verified that those -- each of these CDs contains

12   data that was on each of those devices?

13   A.   Yes.

14        MR. CHAKRAVARTY:  I'd move to introduce Exhibit 1475,

15   please.

16        MR. FICK:  Same objection.

17        THE COURT:  All right.  Admitted.

18   (Exhibit No. 1475 received into evidence.)

19   Q.   First I'm going to open 1475-01.  What is that?

06:37 20   A.   It's the FTK report, the log report that shows the

21   imaging.

22   Q.   Does that reflect that the descriptor for this device was

23   a My Passport, 500 gigabyte USB HDD, or hard drive?

24   A.   Yes.

25   Q.   1475-02-A, what is that?

```
 1   A.   It is a complete file listing.

 2   Q.   1475-2-B?

 3   A.   Was a derivative file listing.

 4   Q.   This is a portion of the --

 5   A.   Portion of the complete file listing, yes.

 6   Q.   So just looking through this listing, is there -- let's

 7   focus on this one.  Is there a foreign-language word followed

 8   by a completeinspire.pdf as one of the files?

 9   A.   That's the name of the folder that the -- that that would

06:38 10  have been on the drive -- on the thumb drive.

11   Q.   So the v-d-o-h-n-o-v-l-y-a-i is a folder name?

12   A.   Yes.

13   Q.   Do you know what that means in Russian?

14   A.   I don't.

15   Q.   But the completeinspire.pdf you've seen before?

16   A.   Yes.

17   Q.   You've seen that on a variety of the devices that we've

18   gone through today, correct?

19   A.   Yes.

06:39 20  Q.   Does this say that it was created on this device at

21   12/27/2012?

22   A.   Yes.

23   Q.   Does this column have a translation that is consistent

24   with the translations that the linguists at the FBI put on

25   there after they were processed?
```

1   A.   Yes.  I didn't create that column, but, yes, that's

2   consistent with the other --

3   Q.   As with all of the other CDs that you've described, the

4   translation column is not one that was native on those original

5   electronic media?  That's something the linguists did and added

6   to the spreadsheet?

7   A.   Yes.

8   Q.   Were there additional files that you saw on other media,

9   like inspirefall2010.pdf, inspirejanuary2011.pdf,

06:39 10   inspiremarch2011.pdf, inspirenovember2010.pdf,

11   inspiresummer2011.pdf, issue9.pdf, jointhecaravan.pdf?

12   A.   Those were consistent with file names that we recognized

13   across several other pieces of data.

14   Q.   And all these files that we've seen throughout your

15   examination today, is that fair to say?  The Sheikh Anwar

16   Awlaki, Battle of Badr, Sheikh Anwar Awlaki, Battle of Uhud, do

17   you recognize those?

18   A.   I recognize those names, yes.

19   Q.   The files folder on this device, were there -- this is the

06:41 20   file structure that was in that folder or partial file

21   structure?

22   A.   Partial file structure that was in that -- on that --

23   Q.   Was there a folder called, "Anwar al-Awlaki lectures"?

24   A.   Yes.

25   Q.   Were Exhibits 1475-04 through 1475-11 in that?

1    A.    Yes, they were.

2    Q.    Is there a folder marked "tema"?

3    A.    Yes.

4    Q.    Are there foreign-language files in this folder that were

5    actually converted from a proprietary e-book format into a PDF

6    file?

7    A.    I confirmed that these files were resident on the original

8    image.

9    Q.    Was there a folder called "TT" as well, which have more

06:41 10   foreign-language files?

11   A.    Yes.

12   Q.    Then there's a folder called v-d-o-h-n-o-v-l-y-a-i that

13   has what appears to be a number of *Inspire* magazines; is that

14   fair to say?

15   A.    Yes.

16   Q.    1475-03 is marked "English 2612.docx."  Is that a Word

17   document?

18   A.    Appears to be a Word document, yes.

19   Q.    Does that appear to be a submission for English class by

06:42 20   someone named Giovanni Norgill (ph), on February 4, 2012?

21   A.    His name is on the document.

22   Q.    Do you know who he is?

23   A.    I do not.

24   Q.    Do you know whether he was a classmate of the defendant's?

25   A.    I do not.

1          MR. FICK:  Your Honor, I object to the way this one is

2    presented, which I'm seeing for the first time now.  As I

3    understand it, if I'm not mistaken, that last file, 1475-03,

4    was actually carved and was not actually in the top structure

5    of the drive.  As I see this, I believe it's misleading, so I

6    lodge the objection.

7          THE COURT:  Again, I think it's a matter for your

8    examination.

9    Q.    This external hard drive that you verified the files were

06:43 10   on there --

11   A.    Yes.

12   Q.    -- did you export all of the files that you were able to

13   recover from that drive?

14   A.    We -- these files were selected by the team, the

15   investigative team, and we verified that these files existed on

16   the computer.

17   Q.    In fact, were there, on some of these devices, many more

18   audio files and pictures and documents and surf history that we

19   haven't presented?

06:43 20   A.    Yes.

21   Q.    Let's go back to the 1R6, the 1142.  The *Hereafter Series*,

22   this is a folder and a collection of files that we've seen on

23   some of these other devices; is that fair to say?

24   A.    I recognize the name al-Awlaki, yes.

25   Q.    And this 1142, Sony Vaio laptop, it had several *Inspire*

1    magazines on it; is that fair to say?

2    A.    Yes.

3    Q.    1142-79, 1142-82, 1142-88, 89, 91, and 93, are all *Inspire*

4    magazines, is that correct?

5    A.    Those are the titles.

6    Q.    In addition, it had a number of audio files that you saw

7    on all the devices, correct?  An example, "Rasool Allah,

8    Inspiring Words of Truth"?

9    A.    You're referring to these here, or which are you referring

06:44 10   to?

11   Q.    Yes.  I'm sorry.  The ones that are in front of you.

12   A.    I would have to actually see them all together.  I can't

13   confirm that they were all in all the other places.

14   Q.    And some of these files under the papka folder you found

15   throughout all the other devices; is that fair to say?

16        MR. FICK:  Objection to the vagueness of the question

17   and the documents speak for themselves.

18        THE COURT:  Sustained.

19        MR. CHAKRAVARTY:  Fair enough.

06:45 20   Q.    Do you recognize these files from the thumb drive that was

21   found in the landfill?

22        MR. FICK:  Same objection.

23        THE COURT:  You may answer that.

24   A.    We need to compare the two.

25   Q.    1150-10 was entitled "completebalance.pdf," is that fair?

1    And that is also on the file called -- "complete balance" is

2    also on the --

3    A.    The names are similar, yes -- or the names are the same,

4    yes.

5    Q.    We can do that with a variety of different devices and

6    variety of different files from the 1142, is that accurate?

7    A.    From 1142, from 1R6, yes.

8    Q.    From 1R6, comparing that to a variety of other devices

9    that you talked about?

06:46 10   A.    Yes.

11   Q.    I don't need to do that with every one, but I wanted to

12   use that as an example.

13              MR. CHAKRAVARTY:  Just one moment, your Honor.

14              Your Honor, I believe I'm done.  Given that we're at

15   the end of the day, however, I would like -- before I turn it

16   over to the -- for cross-examination, I would just ask to hand

17   that baton over on Monday morning.

18              THE COURT:  That's fine.  This is as far as we'll go

19   today, jurors, and this week.  So we're off for the next three

06:47 20   days.

21              Again, I remind you of all of my cautions, no

22   discussion, no exposure to any media, no independent research.

23   Don't try to educate yourself on computers over the weekend.

24   Your evidence must come here from the courtroom and not from

25   other sources.

1          Enjoy the weekend.  We'll see you Monday, and we'll

2    continue with the evidence.

3    (Whereupon, at 3:56 p.m. the trial recessed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Cheryl Dahlstrom
14   CHERYL DAHLSTROM, RMR, CRR
     Official Court Reporter
15

16   Date:  10/14/15

17

18

19

20

21

22

23

24

25