UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                      )
UNITED STATES OF AMERICA,             )
                                      )
          Plaintiff,                  )
                                      )   Criminal Action
v.                                    )   No. 13-10200-GAO
                                      )
DZHOKHAR A. TSARNAEV, also            )
known as Jahar Tsarni,                )
                                      )
          Defendant.                  )
                                      )



          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE



              **JURY TRIAL - DAY THIRTY-EIGHT**


           John J. Moakley United States Courthouse
                       Courtroom No. 9
                     One Courthouse Way
                 Boston, Massachusetts  02210
                  Tuesday, March 24, 2015
                         9:10 a.m.



                 Marcia G. Patrisso, RMR, CRR
                 Cheryl Dahlstrom, RMR, CRR
                   Official Court Reporters
                 John J. Moakley U.S. Courthouse
                 One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
                       (617) 737-8728

          Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
  GOVERNMENT:

MATTHEW LEVITT, resumed

|  | Direct | Cross | Redirect |
|---|---|---|---|
| By Mr. Chakravarty | 6 |  | 38 |
| By Mr. Bruck |  | 11 |  |

COLLEEN M. TANGUAY

| By Mr. Weinreb | 40 |  |
|---|---|---|
| By Mr. Watkins |  | 51 |

DAVID CAHILL

| By Mr. Mellin | 53 |  | 107 |
|---|---|---|---|
| By Mr. Watkins |  | 97 |  |

MATTHEW RIPORTELLA

| By Mr. Weinreb | 108 |
|---|---|

TIMOTHY E. DOWD

| By Mr. Weinreb | 117 |  |
|---|---|---|
| By Mr. Watkins |  | 133 |

CHRISTOPHER DONAHUE

| By Mr. Weinreb | 144 |  |
|---|---|---|
| By Ms. Clarke |  | 158 |

JENNIFER MONTGOMERY (Re-called)

| By Mr. Weinreb | 161 |
|---|---|

MIGUEL COLON

| By Mr. Mellin | 163 |  |
|---|---|---|
| By Mr. Watkins |  | 175 |

MARK PREBLE

| By Mr. Chakravarty | 183 |
|---|---|

```
 1                    I N D E X (cont'd)

 2
                            Direct   Cross   Redirect   Recross
 3   WITNESSES FOR THE
       GOVERNMENT:
 4
     KIMBERLY FRANKS
 5
        By Ms. Pellegrini          193
 6
                        E X H I B I T S
 7
     GOVERNMENT'S
 8    EXHIBIT      DESCRIPTION          FOR ID      RECEIVED

 9
     948-433,
10   948-212,
     948-230,
11   948-231,
     948-268,
12   948-270,
     948-271,
13   948-259,
     948-277,
14   948-293,
     948-244,
15   948-264,
     948-261
16   948-265     Photographs                          45

17   702         Photograph                           70

18   704         Photograph                           70

19   726         Shell casing recovered at MIT        77

20   934         Pellet gun                           78

21   931         Previously Exhibit No. 928, magazine  83

22   895         Magazine recovered from Mercedes SUV  85

23   935         9 mm Luger ammunition                92

24   933         Magazine recovered from Laurel Street 96

25
```

E X H I B I T S (cont'd)

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 1164 | Firing range records | | 111 |
| 1165 | Firing range surveillance video | | 111 |
| 946 | Diagram | | 123 |
| 945 | Diagram | | 126 |
| 1563 | Field sketch | | 128 |
| 1559 | Photograph | | 131 |
| 948-160 through 948-166; 948-01 through 948-05 | Photographs of Laurel Street area | | |
| 937-940 | Photographs of ammunition box | | |
| 1180A through 1180C; 1180E; 1180J | UMass Dartmouth records re Jahar Tsarnaev | | |
| 620 | Interactive re UMass Dartmouth dorm room | | |
| 1109 | Box containing bag of BBs | | |
| 1110 | Bag containing BBs | | |
| 1244 | Packaging for BB gun | | |
| 1241 | Receipt from Dick's Sporting Goods | | |
| 1232 | Thumb drive taken from dorm room | | |
| 1247 | Black jacket taken from dorm room | | |
| 1231 | White hat taken from dorm room | | |

P R O C E E D I N G S

1

2          THE CLERK:  All rise for the Court and the jury.

3          (The Court and jury enter the courtroom at 9:10 a.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Good morning, everyone.

6          THE JURORS:  Good morning, your Honor.

7          MR. CHAKRAVARTY:  May I proceed?

8          THE COURT:  Mr. Chakravarty.

9          MR. CHAKRAVARTY:  Thank you, your Honor.

00:03 10                MATTHEW LEVITT, Ph.D., resumed

11                DIRECT EXAMINATION CONTINUED

12     BY MR. CHAKRAVARTY:

13     Q.   Good morning, Dr. Levitt.  This is not Berlin but I hope

14     this did not disrupt your plans too much.  Thank you very much

15     for being with us.

16     A.   Berlin has nothing on Boston.

17     Q.   We were talking yesterday about some of the writing and

18     some of the documents that you had reviewed that comported to

19     some of the writing.  I'd like to call up before we get back to

00:04 20     that an additional exhibit which is in evidence, 1143-97.

21          Do you recognize this screen?  It's a paused screen of a

22     video?

23     A.   Yes.

24     Q.   And what is that?

25     A.   "25 Promises of Allah to the Believers."

1  Q.   And was that another Awlaki lecture?

2  A.   Yes.

3  Q.   Was that one of the popular ones that he had?

4  A.   Yes.

5        MR. CHAKRAVARTY:  Now, if we could go back to the

6  split screen, Mr. Bruemmer, 830 on the one side, page 3.

7  Q.   I think, Dr. Levitt, we were down to -- we had just done

8  "we were promised victory and we will surely get it."

9        Can you read the next line, please?

00:05 10  A.   "Now, I don't like killing innocent people.  It is

11  forbidden in Islam.  But due to said..." bullet hole "...it is

12  allowed."

13  Q.   Is this a concept that you're familiar with?

14  A.   It is.

15  Q.   And what's the significance of it?

16  A.   The significance is that as I believe we discussed

17  yesterday, this idea that normally killing innocent people

18  would be forbidden but under certain circumstances it becomes

19  permissible, even praiseworthy, even a personal obligation

00:05 20  because of certain events, because of taking revenge, for

21  example, for the acts of the West or the United States against

22  Muslims around the world as we discussed yesterday.

23  Q.   Now, in this sentence it says that "it is allowed."  What

24  is "it" in this sentence?

25  A.   Well, "it," in general, is -- referring back to the

```
 1    beginning of the sentence -- killing innocent people.
 2            MR. BRUCK:  If it please the Court, I am going to
 3    object to the witness explaining plainly written statements in
 4    which he has no more expertise than anybody else to
 5    understand plain English.
 6            THE COURT:  I think you're right as to this question
 7    and answer.
 8            MR. CHAKRAVARTY:  If we could call up on the other
 9    screen 1142-88, page 3, please.
10    BY MR. CHAKRAVARTY:
11    Q.   This is another Inspire magazine?
12    A.   Yes.
13    Q.   Can you read starting from "however," the first full
14    sentence?
15    A.   "However, to bring down America, we do not need to strike
16    big.  In such an environment of security phobia that is
17    sweeping America, it is more feasible to stage smaller attacks
18    that involve less players and less time to launch, and thus we
19    may circumvent the security barriers America worked so hard to
20    erect.  This strategy of attacking the enemy with smaller, but
21    more frequent operations is what some may refer to as the
22    strategy of a thousand cuts.  The aim is to bleed the enemy to
23    death."
24    Q.   This notion of innocent people, does that have a special
25    connotation in the global jihad movement?
```

1    A.   Well, within Islam it is forbidden to kill innocent

2    people.  In the global jihad movement there is a redefinition

3    of who is and who is not innocent based on circumstances other

4    than whether or not they are actually involved in some other

5    action against you.  You can no longer be an innocent if you're

6    just walking down the street and are a citizen of, say, the

7    United States.

8    Q.   And why are those people not innocent anymore?

9    A.   Because by virtue of being a citizen of the United States,

00:09 10  by participating in the elections for American leaders who then

11   go on to approve actions which are perceived to be against

12   Islam, against the Islamic -- the Muslim ummah, the Muslim

13   nation, that Americans have some guilt for these actions.

14        MR. CHAKRAVARTY:  Now, on the left side of the screen,

15   Mr. Bruemmer, can we call up Exhibit 1451.

16   Q.   Now, this was also found in the boat.  Have you seen this

17   before?

18   A.   I have.

19   Q.   And can you read it?

00:09 20  A.   No.  Sorry.

21   Q.   Does it say "Stop killing our..." and then an arrow

22   "...innocent people and we will..." arrow "...stop"?

23   A.   Yes.

24   Q.   Now, was this proposal for a deal something that you're

25   familiar with?

1    A.    It is.

2    Q.    What is it?

3    A.    This is common within this literature that if only the

4    West would stop killing innocent Muslims, then there would no

5    longer be a need to carry out these reprisal attacks, to stand

6    up in the defense of the defenseless Muslims who can't defend

7    themselves against Western strikes, and that then these attacks

8    would stop.

9    Q.    And is this also something that you saw in the literature

00:10  10    that was relevant to this case?

11    A.    Yes.

12         MR. CHAKRAVARTY:  Could we call up Exhibit 11 on the

13    right side, 1142-91, page 15.

14    Q.    This is the first issue of *Inspire* magazine.  If you would

15    read Question 5 here, and then I'll ask you to read the answer.

16    A.    So this is from *Inspire* magazine.  If memory serves, this

17    is the question and answer that we referenced at one point

18    yesterday.  Someone is interviewing one of the leaders of

19    al-Qaeda in the Arabian Peninsula.

00:11  20         This is Question 5.  "What does al-Qaeda want from the

21    West for it to stop targeting it?

22         "Answer:  What we want from the West is one thing:  To

23    stop aggression and oppression against the Muslim nation and to

24    withdraw out of its land.  This solution was given by all of

25    our leaders and on more than one occasion.  The truce was

 1  offered by the one who has real authority to take such a

 2  decision on behalf of the Muslims, Sheikh Osama Bin Laden, may

 3  Allah preserve him.  His offer was refused.  Whenever we offer

 4  a sound plan, they escalate in their stubbornness so we are

 5  left with no option but to defend ourselves and fight the

 6  transgressors."

 7  Q.   It concludes?

 8  A.   "If the West refrains from attacking us and oppressing our

 9  nation, we will refrain from them.  Otherwise, we will have

00:12 10  them drink from the same cup that they have the innocent from

11  our nation drink from."

12  Q.   And is this this concept of stop killing our innocent

13  people and we will stop?

14  A.   Yes.

15         MR. CHAKRAVARTY:  That's all I have.  Your Honor.

16         THE COURT:  Mr. Bruck?

17                    CROSS-EXAMINATION

18  BY MR. BRUCK:

19  Q.   Good morning, Dr. Levitt.

00:13 20  A.   Good morning, sir.

21  Q.   I'm David Bruck, representing Jahar Tsarnaev, and I've got

22  a few things I would like to go over with you, if I could.

23  A.   Absolutely.

24  Q.   Thank you.  You mentioned that you were a Deputy Assistant

25  Secretary of the Treasury but you didn't tell us when.  That

1    was during the Bush administration.  Is that correct?

2    A.    Yes, sir.

3    Q.    2005-2007?

4    A.    Yes, sir.

5    Q.    Okay.  And much of your academic and your government work

6    has -- and your work as a witness in criminal cases has

7    concerned the financing of terrorist activity.  Is that

8    correct?

9    A.    A lot of it has.  Not all of it by any stretch of the

00:14 10   imagination.  I do a lot of work on illicit finance including

11   terror finance; a tremendous amount of work now on counter

12   violent extremism or counter-radicalization, it's the same

13   thing, the flow of foreign fighters and a host of other issues.

14   Q.    Okay.  And the main focus of your work has been on the

15   Middle East --

16   A.    Yes.

17   Q.    -- throughout your career?

18   A.    Yes.

19   Q.    And the main language in the Middle East is Arabic?

00:14 20   A.    Correct.

21   Q.    Which is a language that you don't speak?

22   A.    Correct.

23   Q.    You mentioned another language that you didn't speak that

24   was relevant to this case but you didn't tell us which language

25   that was.

1    A.   There was at least one document that was provided to me

2    that was written in Cyrillic script, Russian, perhaps, but I

3    don't read it so I couldn't tell you.

4    Q.   Okay.  So at least one document that was written in what

5    you think was Russian?

6    A.   Correct.

7    Q.   Okay.  But you couldn't read that either?

8    A.   Correct.

9    Q.   And I take it you're not an expert in the history of

00:15 10   Russia or Chechnya or Dagestan, the North Caucasus, correct?

11   A.   I've done a lot of work on the Chechen conflict as it

12   relates to international jihad, but I'm not an expert in Russia

13   or its history, no.

14   Q.   Or in the culture and history of the North Caucasus except

15   to the extent that it relates to your field of terrorism,

16   correct?

17   A.   Correct.

18   Q.   And you've already told us that you're not an expert on

19   Islam?

00:15 20   A.   Correct.  I have studied Islam and I have studied a lot

21   about it, it's necessary for the work that I do, but I

22   certainly don't consider myself an expert on religion, or Islam

23   in particular.

24   Q.   All right.  You said that -- in talking about the process

25   by which someone becomes radicalized, in your term, and then

1   moves to violence, and I think I'm quoting you, that someone

2   has to kind of hold your hand and pull you across that dividing

3   line.  And then you said, "There is a radicalizer in every case

4   that we see," right?

5   A.   Yes.  And as we continue, that can be an individual --

6   Q.   Yes?

7   A.   -- an actual person; it can be virtual.  And increasingly

8   today it is virtual.  It's increasingly rare to have an actual

9   person face-to-face, two eyes into two eyes, radicalize an

00:17 10   individual, but it does still happen.

11   Q.   You weren't asked to find out to determine, or were you,

12   who the radicalizer in this case was?

13   A.   No; I was asked to review the materials that were provided

14   to me, and that's what I did.

15   Q.   Okay.  And those materials were entirely from Jahar's

16   computer, correct?

17   A.   His computer and I believe some MP3 players.

18   Q.   And some MP3 files?

19   A.   Correct.

00:17 20   Q.   Okay.

21   A.   In other words, I don't know if all of those were

22   necessarily from his computer or from a -- I believe some of

23   them were downloaded to an actual MP3 player, an iPod or

24   something like that.

25   Q.   Okay.  About how many files in all did you look at?

1    A.    A few dozen.

2    Q.    I'm sorry.  Two dozen?

3    A.    A few dozen.

4    Q.    A few dozen?

5    A.    Yeah, two or three dozen, maybe four dozen, something like

6    that.

7    Q.    Somewhere between 24 and 48 files total?

8    A.    Yeah.

9    Q.    Okay.  And I think you said that it was not your job to

00:18 10   vet the information that you were given, correct?

11   A.    In other words, not to -- in some cases, you know, to be

12   able to vet whether this did, in fact, come from a person's

13   computer, I'm in no position to do that.  So in a case like

14   this, whether called by prosecution or defense, I have to rely

15   on what they've provided me, and it's up to the process, the

16   proceedings in court, to determine, in fact, where those

17   materials came from.

18   Q.    Okay.  And in the process of not vetting the materials,

19   you also didn't ask the prosecution for anything more than you

00:18 20   were given?

21   A.    I don't remember if I did or did not in this case.  I do

22   sometimes, if there's a need for it, if there's something that

23   stands out, you know, a specific *Inspire* magazine as opposed to

24   others.  I don't recall if I asked for more information in this

25   case.

1    Q.    Okay.  Do you think if you had asked for something more,

2    you might recall it?

3    A.    Honestly, no.  I do a lot of different work at a lot of

4    different times and I don't recall every conversation.

5    Q.    Okay.  You told us yesterday that your job is to provide

6    context to materials that you're given, whatever those are?

7    A.    Well, that was a job that was given to me, and my job now

8    is to -- whoever's asking me questions, to answer them as

9    truthfully and honestly to the best of my ability, to be able

00:19 10    to provide context.  That's what the expert is for.  I'm not a

11    fact witness.

12    Q.    And by "context," you meant the background in context to

13    the 24, 36, 48 files that you were given?

14    A.    That was part of the job that I was given.  I was also

15    given the task of explaining the context, the geopolitical

16    context, of what was going on at the time; what was going on at

17    earlier times, to be able to explain the context of some of

18    those documents; and then, yes, to provide context and

19    explanation of those documents of some of the individuals who

00:20 20    are either mentioned in or the authors of these documents or

21    lectures.

22    Q.    Okay.  Were you given any files from Tamerlan Tsarnaev's

23    computer?

24    A.    No.

25    Q.    Were you given any recordings from Tamerlan Tsarnaev's

1    computer, audio recordings about his discussions with --

2    concerning jihad in Russia that he conducted?

3    A.    No.

4    Q.    Did the government tell you anything about when the

5    materials that you've testified about appeared on each of the

6    various devices that were found by law enforcement in this

7    case?

8    A.    Not to that extent.  Not in -- not in each case to each

9    device.  There were -- I recall that there were certain

00:21 10   documents, and I can't remember which, that I remember being

11   told were accessed months, maybe a year, even, before the

12   events at the marathon, but in general, no.

13   Q.    Okay.  So if it were, in fact, the case that the vast

14   majority of the materials on Jahar's computer had actually been

15   dumped there by a thumb drive that originated with Tamerlan,

16   that's not your department?

17   A.    I could certainly comment on it if you're asking me to.

18   It wasn't what was asked of me by the prosecution.  Are you

19   asking me now?

00:21 20   Q.    No.  And the prosecution didn't give you any information

21   about that?

22   A.    That's not what I was asked to comment on.

23   Q.    My question is:  The prosecution didn't give you any

24   information about where all these files originated from in

25   terms of the various devices that were found?

1    A.    Again, there might have been one or two cases where that

2    came up, but that was not a focus and I don't remember getting

3    that for each and every instance.  The material that I was

4    given was presented to me as this is material that was on the

5    defendant's media.

6    Q.    Were you given any information about Tamerlan's overseas

7    travel to the Caucasus, to Dagestan and Chechnya in 2012 in

8    connection with your work in this case?

9    A.    Not by the prosecution.  Obviously, I had heard about it

00:22 10    beforehand, just as someone who follows these things

11    professionally.

12    Q.    But that was not something that you were asked to factor

13    into your analysis in this case by the prosecution?

14    A.    Correct.  And my understanding is that it was because I

15    was focused on the defendant and not the deceased.

16    Q.    Your understanding was that you were to focus on the

17    defendant and not on anyone else, correct?

18    A.    The defendant's the person on trial, yes.

19    Q.    Right.  Is it fair to say that to understand -- to draw

00:23 20    inferences from material that you find on someone's computer,

21    it would be helpful to know where those materials came from and

22    who provided them?

23    A.    Not necessarily.  The issue here is did the defendant

24    access and was the defendant affected by, radicalized by these

25    materials.  I think as we discussed earlier you can show direct

1    parallels between materials that were on those devices and the

2    defendant's own writings.

3        You can get these things directly off the Internet, you

4    can be handed them from somebody else.  At a certain point it

5    almost doesn't make a difference where you got them from if you

6    got them and then internalized them and were motivated and

7    operationalized by them.

8    Q.   Let me ask you this:  If someone else got these materials

9    first and internalized them and provided them to the defendant

00:24 10   and also talked to the defendant, and harangued him and

11   instructed him, would there be any way to tell whether the

12   defendant's views and feelings had come from being talked to or

13   had come from the materials on his computer?

14   A.   We are all products of our -- the totality of our

15   experience, so I can't get into the defendant's head.  All I

16   can tell you is that there are direct parallels between his

17   statement and the statements of the materials that were on his

18   devices.  Could other people have hit these points too, maybe

19   in that same verbatim language?  Possibly.  Could that have

00:25 20   contributed to the radicalization?  It could have.

21       How much -- you know, as we discussed yesterday, how much

22   can you parse out how much was a person affected by one

23   particular issue or input than another is really difficult to

24   say.  At the end of the day, if a person is radicalized but --

25   by whatever inputs to the point -- to the extreme of carrying

1  out violence against civilians, you've checked that box of

2  radicalization no matter how it happened.

3  Q.   Okay.  So of course in weighing that and analyzing that,

4  it's pretty much a given that if you only look at the materials

5  in isolation on one person's computer, you're not going to be

6  able to make any assessment of what the history of this process

7  was; you can only describe the end product, correct?

8  A.   Well, in part the end product describes what happened.

9  The end product is the defining moment of it all that makes it

00:26 10  something beyond radical ideas which are protected and violence

11  against civilians which is not.

12      I don't know if there were other materials that if they

13  had been provided to me could have given me more insight into

14  the history of his radicalization, but I also could not have

15  been a fly on the wall in the brothers' personal conversations.

16  At the end of the day, what we do know for a given is what

17  actually happened, the attack that took place, the defendant's

18  statement, and the direct parallels between that statement and

19  these materials.

00:26 20  Q.   Okay.  Some of these 24, 48, 36 files were very long,

21  weren't they?

22  A.   They were.

23  Q.   He had a book called the *Book of the End*.  Do you know

24  what that is?

25  A.   Not offhand, no.  There was lots of material.  And when it

1     came to books, I did not read every book that was -- the copies

2     of which, or the covers -- copies of covers of which were

3     provided to me.

4     Q.    Okay.  The *Book of the End*, you are not aware that is a

5     classic work of Islamic scholarship written in 17th-18th

6     century, which is the edition he had in English on his

7     computer, 748 pages long?

8     A.    I'm familiar with the book.  I may even have it on my

9     shelf.  But I did not review it for purpose of this case.

00:27 10    Q.    Okay.  Even though it was one of the files -- was it one

11    of the files you were provided, or do you know?

12    A.    I was not provided this file, to the best of my

13    recollection.  There were -- I believe there were pictures of

14    the covers of certain books, and this may or may not have been

15    one of them.

16    Q.    Now, when I say "book," I mean a PDF, a computer file.  It

17    doesn't ring a bell?

18    A.    As I said, the name rings a bell.  I don't think I was

19    given this file.  I'm quite certain I was not given this file.

00:28 20    Q.    Okay.  Were you shown "The Slicing Sword"?

21    A.    Possibly.

22    Q.    You don't remember?

23    A.    No.

24    Q.    Do you have a list with you of the 24 or 36 or 48 files

25    you were given?

```
 1    A.    I don't.  I don't.

 2    Q.    Okay.  Do you remember that you -- that they included

 3    various issues of Inspire magazine?

 4    A.    They did.

 5    Q.    And other than that, your memory is hazy?

 6    A.    I believe you have a copy of my report which gets through

 7    some of them, and I'm sure the prosecution could provide you

 8    with a list of things I was provided.  But, A, over the course

 9    of the time of my preparation I reviewed many, many things,

00:29 10   including many things that did not make it into the report,

11    which I was not commenting on or not asked to comment on, and

12    because I cover these types of issues professionally outside of

13    this case and the vast majority of my time is not on this case,

14    it's very difficult sometimes to remember did you see this

15    particular document in this context or in another context.

16    Q.    Now, a lot of the materials on this computer concerns

17    concepts of the end times, correct?

18    A.    Correct, from the materials that I saw.

19    Q.    And this is the idea that Quranic prophecy predicts signs,

00:29 20   in fact, Awlaki has devoted many lectures that were on the

21    computer to interpreting historical events and recent events as

22    showing that the end times are near?

23    A.    Correct.

24    Q.    And this will lead up to huge conflagration and really the

25    end of the world and leading up to the day of judgment,
```

1    correct?

2    A.    Right.

3    Q.    And people who internalize this, these theological

4    concepts, really think that we've come very close to the end of

5    the world?

6    A.    I'm not in a position to comment on what they or you or

7    the defendant really truly do believe or not.  There is a delta

8    between how these things are interpreted by, for lack of a good

9    term, kind of mainstream Muslim thought and the radicals.  That

00:30 10   I can tell you.  But I can't tell you what any particular

11   individual actually is thinking.

12   Q.    You talked about the "Hereafter Series" which you said on

13   its face, at least, is not jihadi; it is Awlaki's discussion of

14   what happens after death, essentially, in his view of Islam?

15   A.    In the context of there are Awlaki lectures that are about

16   Islam, there are Awlaki lectures that are about -- explicitly

17   about jihad.  And this is one that I put in the former

18   category.

19   Q.    Okay.  Okay.  And there were -- the "Hereafter Series"

00:31 20   includes about 24 or 22 audio files.  They're each somewhere

21   around an hour long?

22   A.    That sounds right.

23   Q.    Okay.  And those were found on the defendant's computer?

24   A.    As I understand it.

25   Q.    All right.  And those are essentially religious lectures?

1  A.   Again, they are religious lectures but there is a real

2  consensus among practitioners, both within government and

3  within -- among Islamic leaders about concern that these

4  earlier series that don't explicitly call for violence do

5  contribute to putting some on the path of violence.  It was one

6  of his former co-imams at a mosque here in the United States

7  who explained this specifically.

8  Q.   Sort of a gateway drug?

9  A.   Yes, a gateway or a conveyor belt, that someone, you know,

00:32 10  listens to these early lectures, as we discussed yesterday by

11  someone who is not shrill, he's professorial, and becomes

12  someone who's following this person's lecture series, then

13  continues to follow that person's lectures as they get more

14  explicitly violent.

15  Q.   And the "Hereafter Series" goes into tremendous detail

16  about the nature of paradise --

17  A.   Yes.

18  Q.   -- correct, and the nature of hell?

19  A.   Yes.

00:33 20  Q.   And the physical torments that await people in hell?

21  A.   Yes.

22  Q.   The -- and makes the point over and over again that if

23  someone understood what was awaiting them in hell, everyone

24  would be a good Muslim and do what they should do?

25  A.   I think that's the general theme.

```
 1   Q.   You described Awlaki as a very effective propagandist --
 2   A.   Yes.
 3   Q.   -- whose lectures had great allure for many, many
 4   listeners?
 5   A.   Correct.
 6   Q.   For many vulnerable listeners.  Let me rephrase that.
 7        For someone who did not have a strong background or
 8   education in Islam and was searching for Islamic ideas, to
 9   learn more about their faith online, Awlaki would be a very,
10   very seductive source of information, would he not?
11   A.   Well, of course it's important to note it's not like
12   Awlaki owns the Internet.  He's not the only voice out there.
13   But, yes, Awlaki proved to be a seductive voice for all kinds
14   of individuals, at risk and otherwise.
15   Q.   And on the Internet when you find somebody like that, you
16   can get a very distorted picture of how representative that
17   person is?
18   A.   You could, but I'd argue much more in the early years
19   about Awlaki's sermonizing.  By the time in question that we're
20   discussing here today, news of who Awlaki was was commonplace.
21   So a person who was just then choosing to listen to the Awlaki
22   series almost certainly was not stumbling innocently into an
23   exploration of Islam and happened to fall into an Awlaki
24   lecture series, this is someone who's all over the news, the
25   focus of U.S. government action.  Quite popular in the popular
```

1  media, that is.

2  Q.   Okay.  Hundreds of thousands, millions of people have

3  downloaded his material?

4  A.   Many people.  I don't know the number.

5  Q.   Now, you said yesterday that -- you were describing the

6  many different types of categories of people who are -- have

7  shown -- proving to be vulnerable to the radical jihadi

8  message.  And you listed one group as young Muslims responding

9  to a -- who feel excluded from their own societies, trapped in

00:36 10  poverty or hopelessness and authoritarian regimes.  That's one

11  group, right?

12  A.   I think that's from my report.  Maybe not from yesterday,

13  but yes.

14  Q.   Right.  But there were words to that effect yesterday.

15  Maybe not -- as one example.  Well, I'll go on.

16       Another -- you mentioned another group, well off and well

17  educated who live in Western democracies but struggle with

18  issues of belonging and identity and feel -- find that the

19  extremist message resonates?

00:36 20  A.   Correct.

21  Q.   And then you didn't mention this yesterday but it is in

22  your report, you wrote "Some either immigrants themselves or

23  descendants of immigrants from countries suffering from war,

24  natural disasters, political and/or economic oppression, war,

25  et cetera, are drawn to this radical and violent narrative

```
 1   based on national and/or religious affinity for their ancestral
 2   lands and empathy for the suffering of family, friends or
 3   fellow nationals still suffering there"?
 4   A.   That's right.
 5   Q.   You went through the boat writing yesterday line by line
 6   with Mr. Chakravarty.  Before I get to that, you looked
 7   at -- with him at Exhibit 1280, a tweet from 2012.  "They will
 8   spend their money and they will regret it and they will be
 9   defeated."  That was a line that was in Mr. Tsarnaev's Twitter
10   feed, correct?
11   A.   Correct.
12   Q.   And you compared that to a somewhat similar statement by
13   Awlaki?
14   A.   I think it was a very similar statement, yes.
15   Q.   Where does that line come from originally?  I don't mean
16   word for word, but do you know?
17   A.   It has scriptural sources.  I don't remember where.
18   Q.   You don't remember where it's from.  Is that right?
19   A.   Correct, beyond the radical literature of the type we went
20   through yesterday and the way -- the issue is not so much
21   whether it has other antecedents but how within the radical
22   ideological moue, how it is used.
23   Q.   Would it surprise you to know that is a quote from the
24   Qur'an?
25   A.   No, I think I just told you it's from scripture.
```

1  Q.   Scripture?  Okay.

2       Looking at the boat writing, can you tell us which

3  passages are passages from the Qur'an or from the Hadith, from

4  Islamic scripture?

5  A.   Certainly not without it up here, but probably only one or

6  two.  As I said, and as you asked and answered, I don't

7  consider myself a scholar in Islam or in the Qur'an.

8  Q.   Well, "There is no God but Allah and Mohammed is his

9  prophet."  Is that something that Mr. Tsarnaev got from *Inspire*

00:39 10  magazine?

11  A.   No.  Of course, as we said yesterday, this is the

12  Shahadah.  This is the statement of faith.  It is common to

13  restate it in times of stress, especially when one thinks one

14  is about to die.  But this is -- as I think I said explicitly

15  yesterday, there is nothing inherently extremist about the core

16  statement of belief of the world's Muslims.

17  Q.   When one is about to die, the profession of faith, the

18  Shahadah, is something that a Muslim is likely to say or write,

19  correct?  Is that what you just told us?

00:40 20  A.   Yes.  I can say it again if you want.

21  Q.   No.  I just wanted to be sure.

22       You told us about the term "innocent" -- there was a

23  discussion a moment ago with Mr. Chakravarty about innocent

24  civilians -- or innocent people -- excuse me -- and you

25  explained some of the doctrine about why Americans would not be

1   viewed as innocent.  The writing in the boat actually used the

2   phrase "innocent people," correct?  "I don't like killing

3   innocent people"?

4   A.   I believe that's right.  I haven't memorized it and it's

5   not up on the screen, so I'll take your word for it.

6   Q.   Okay.  Have you -- you read all the *Inspire* magazines?

7   A.   Unfortunately.

8   Q.   Can you think of a single place in *Inspire* magazine where

9   Americans were described as innocent people?

00:41 10   A.   Well, I said I've read them all; I haven't said I've

11   memorized them all.  And they are long and so I can't -- I

12   can't answer that question.

13   Q.   Have you ever in any al-Qaeda propaganda seen Americans

14   referred to as "innocent people"?

15   A.   I can't recall.  And it's not impossible, as we saw in the

16   literature that we were looking at just a few minutes ago,

17   where there is this idea quite common --

18   Q.   Let me interrupt you.  I'm not asking about the idea; I'm

19   asking about the phrase "innocent people."

00:41 20   A.   Then asked and answered.

21   Q.   I'm sorry?

22   A.   Then asked and answered.

23   Q.   You don't remember?

24   A.   I don't.

25   Q.   Okay.  You said yesterday that you thought the writing in

1    the boat was addressed to the American public?

2    A.   I'm sorry.  Could you restate?

3    Q.   I'm sorry.

4    A.   That's okay.

5    Q.   You said yesterday you thought the writing in the boat was

6    addressed to the American public?

7    A.   Correct.

8    Q.   When someone recites the Shahadah, do you think that was

9    addressed to the American public?

00:42 10   A.   Well, in this context I think yes.  I think this was a

11   restatement of a self-identity.  And again, putting in context,

12   and I think as you said in an objection at one point, you don't

13   actually need a whole lot of expertise if you understand some

14   basic English grammar to be able to see what the note is trying

15   to accomplish.

16   Q.   As a matter of fact, these -- how long would it

17   take -- I'm not asking for your opinion about the person who

18   wrote this, I just have a simple question, which is:  The

19   statements -- the religious statements on the boat writing and

00:43 20   the political statements, if you will, how long would it take

21   someone to learn those slogans and those religious statements?

22   A.   One could learn them quite quickly.

23   Q.   Right.

24   A.   I think as we showed yesterday and this morning, it would

25   take some time to be able to go through all the literature that

1    you can draw parallels from.  But even that, you're talking

2    potentially, you know, hours and days, not necessarily months

3    and years, which gets to the issue we discussed yesterday:  The

4    radicalization has no one model and can happen very, very

5    quickly.

6    Q.   So the slogans and the religious statements that were

7    found on the boat, one would not have to have read an enormous

8    amount of material, let alone the 24, 36 or 48 files that you

9    reviewed, in order to be able to write that on the boat?

00:44 10   A.   I don't know how much or how little scientifically we

11   could say you would have needed to have internalized.  I don't

12   know that this statement in the boat could have been written by

13   someone who was not exposed to any of these ideas.  There are

14   clear parallels to these ideas.  But having read through some

15   of these materials, having listened -- or watched some of these

16   materials, one could have then written this statement, yes.

17   Q.   If -- and you've said before that a lot of this material

18   could have come from being -- from conversation, from being

19   talked to as well as from reading materials on the computer.

00:45 20   A.   Well, it's impossible to say, of course.  It would

21   have -- I think it would have been remarkable, if at all

22   possible, for it to have only come from conversations given the

23   very strong direct parallel to the text.  It's uncommon for

24   people in colloquial conversation to speak in the way that

25   we've seen this text, whether it's *Inspire* magazine or some of

1   these audio or video files.  So you might have gotten some of

2   the general ideas, but what was in part telling to me was how

3   strong the parallels were to these specific texts.

4   Q.   But they were parallels; they weren't quotes for the most

5   part, correct?

6   A.   That's what happens when you paraphrase.

7   Q.   Right.  You can paraphrase something you've read,

8   something you've been told, either one?

9   A.   Therefore, when the paraphrase is particularly close to

00:46 10   the text, that is a statement in and of itself.

11   Q.   And you found these paraphrases to be particularly close

12   to the text?

13   A.   I do.

14   Q.   Okay.  Bear with me just a moment.

15   A.   Of course.

16   Q.   You described yourself yesterday as a hired expert?

17   A.   I don't know if I did but I have been hired, yes.

18   Q.   Okay.  And at what rate?

19   A.   $450 an hour.

00:47 20   Q.   Okay.  Do you know how many hours you've put in?

21   A.   Total, no, but -- and I bill in stages, so.  But I imagine

22   that, you know, yesterday and today will end up being probably

23   about somewhere around 20 hours.  Traveling here Sunday,

24   yesterday, today traveling.

25   Q.   Okay.  But the 450 hours [*sic*] was for all of the work you

1    did on the case, not only the two days that you've been in

2    court?

3    A.    Correct.  It will be several thousand dollars.

4    Q.    Okay.  And now, have you talked about your testimony with

5    anybody after you -- court was finished yesterday?

6    A.    No, other than to kind of tell my wife that I testified

7    and I'm not going to Berlin and will be coming home early.  No.

8    Q.    But you listed your publications with Mr. Chakravarty.

9    You didn't include that you were a rather prolific user of

00:48 10   Twitter?

11   A.    I am.

12   Q.    And, in fact, you tweeted -- re-tweeted *Boston Globe* news

13   accounts of your own testimony within an hour or two after

14   getting off the witness stand yesterday?

15   A.    I did.  I re-tweeted three or four things, then thought

16   better of it.  I testify a lot.  It's not often in the press.

17   I obviously have not tweeted any of my own thoughts or even my

18   own commentary, but I don't have a problem in tweeting media.

19         My Twitter feed is all about the news in the world of

00:48 20   terrorism.  It's very common for me to tweet about cases.  I've

21   been very, very careful not to tweet about this one.  And then

22   after, whatever it was, two or three or four tweets, I thought

23   better of it and stopped.

24   Q.    You actually had been tweeting about this case, or

25   re-tweeting some of the news coverage before yesterday,

1  correct?

2  A.   It's possible one off here or there, but normally in a

3  case like this I would be tweeting a lot and would also be

4  providing opinion, and that I have not been doing.

5  Q.   Okay.  You've just been re-tweeting to your 7,000 Twitter

6  followers news articles about your own testimony here today?

7  A.   Two or three articles yesterday, then thought better of

8  it.  And probably, you know, I don't know, a very small handful

9  of articles in the whole period that this trial has been going

00:49 10  on, whereas I would normally have been doing much more.

11  Q.   Okay.  One last thing.  I wanted to ask you about one of

12  the intellectual figures in the world jihadi movement as you

13  described it.  And before I get to that, you said to begin with

14  that when you used the term "world jihadi movement" you're not

15  actually referring to a movement that issues commands to

16  followers, correct?  Or at least in a case like this that's not

17  what you meant?

18  A.   Well, I'll tell you what I meant.  I think the way I put

19  it is there's no office, there's no address.

00:50 20  Q.   Right.

21  A.   I think the way I put it yesterday is there's no command

22  in control.  But it certainly is the case that commands or

23  instruction are put out there.  That's the nature of the

24  impersonal communication, including some that we went through

25  yesterday.

1    Q.   And then whoever responds to it, responds?

2    A.   I'm sorry.  I couldn't hear you.

3    Q.   That's okay.  I think you've answered my question.

4         And you mentioned that one of the perhaps -- I don't know

5    if you used the phrase the sort of intellectual grandfather of

6    jihadi radicalism is a man named Sayyid Qutb?

7    A.   I think I used that phrase more to describe Sheikh

8    Abdullah Azzam.  Sayyid Qutb we discussed yesterday as well,

9    one of the founders of the Muslim brotherhood and one of the

00:51 10    original proponents of the idea of near-term jihad, that is to

11   say, the need to carry out jihad now as opposed to doing

12   things, proselytizing, trying to bring Muslims back to good or

13   traditional religious practice first and only then engaging in

14   jihad.  Sayyid Qutb's innovation was the idea that jihad should

15   come in parallel, at the same time, and it would have a

16   self-fueling cycle, whereby virtue of engaging in jihad, that

17   would help to bring people back to proper observance.

18   Q.   By the way, before I get back to Qutb, Azzam wrote "Join

19   the Caravan" in the late 1980s.  Isn't that correct?

00:51 20   A.   That's right.

21   Q.   And at that time you might say that he was with the Afghan

22   mujahidin, or with the mujahidin in Afghanistan?

23   A.   He was.

24   Q.   Fighting against the Russians?

25   A.   Correct.

1    Q.   And in that sense, he was allied with us?

2    A.   I would not say that.  I think that's a very common

3    misperception.

4    Q.   Let me put it differently.  The United States was

5    supporting the Afghan mujahidin, and so was he.  Would that be

6    a fairer way to put it?

7    A.   Yes.

8    Q.   Okay.  Qutb:  He was an Egyptian?

9    A.   He was.

00:52 10   Q.   Who wrote several books?

11   A.   Yes.

12   Q.   And had the ideas that you've described about jihad -- his

13   ideas had great impact upon subsequent thinking of radical

14   Islam.  Is that a fair statement?

15   A.   Within the radical community, yes.

16   Q.   And he continues to this day to be a very influential and

17   revered figure?

18   A.   He's influential within this, frankly, let's be honest,

19   very, very small subset of the world, small subset of the

00:53 20   Muslim community, this radical element within it, and far less

21   so with the vast majority of Muslims around the world.

22   Q.   Sure.  When I say "revered" I mean within the group of

23   jihadists about whom you've been testifying?

24   A.   Correct.

25   Q.   And who have, as in your description, posed this grave

1   challenge to peace and security, correct --

2   A.   Correct.

3   Q.   -- in other countries?

4   A.   And here.

5   Q.   Qutb died in 1966.  Is that correct?

6   A.   Yes.

7   Q.   Was he more famous before he died or after?

8   A.   I think it's hard to say.  He was famous when he lived and

9   was imprisoned, and then he was killed by the regime and was

00:53 10   famous then too, and maybe some might argue more so.  I think

11   it's safe to say that after he died he became more famous not

12   necessarily because of his life or death but because his

13   material book *Milestones*, in particular, was quoted and cited

14   over and over and over and given much more prominence by being

15   cited and referenced over and over.

16   Q.   And Qutb's name and his work have lived on through the

17   1970s, the 1980s, the 1990s, 2000 and to today?

18   A.   Books have staying power.

19   Q.   And when you say he was killed by the regime, he was

00:54 20   sentenced to death and hanged by the government of Egypt,

21   correct?

22   A.   That's right.

23   Q.   In 1966?

24   A.   In 1966, I believe, yes.

25           MR. BRUCK:  Thank you, your Honor.

1              MR. CHAKRAVARTY:  Briefly, your Honor.

2                      REDIRECT EXAMINATION

3     MR. CHAKRAVARTY:

4     Q.   Dr. Levitt, Mr. Bruck asked you several questions about

5     people who are introduced to Anwar Awlaki.  Is everyone who is

6     introduced to Anwar Awlaki's material -- does everyone become

7     radicalized?

8     A.   Absolutely not.

9     Q.   And does everyone who becomes radicalized by Anwar

00:55 10    Awlaki's material actually engage in an act of violence?

11    A.   No.  As counsel noted many, many people have accessed

12    Mr. Awlaki's sermons, both the earlier ones about the history

13    of Islam and the later ones particular to jihad, and thankfully

14    the vast majority of them have not, or have not yet, carried

15    out acts of violence.

16    Q.   Is there a continuum between the thought, the radical

17    thought, versus the action that is actually violent?

18    A.   There's not a necessary continuum, that is to say, it is

19    not an if-then statement, that if you are exposed to radical

00:55 20    ideas, you will then necessarily, because of that motivation,

21    be operationalized.  I do believe that there is a necessity

22    that it's -- I don't see how someone gets to the point of

23    carrying out an act without having had gone through some point

24    of the motivation.  But many, many people are exposed to these

25    ideas and do not carry out acts of violence for a whole host of

1  different reasons.

2  Q.   Mr. Bruck asked you several questions about some tweets

3  that the media had put out that you simply re-tweeted?

4  A.   That's right.

5  Q.   Did that happen last night?

6       Is there something secret about your testimony here today?

7  A.   I hope not.

8  Q.   In fact, the whole world is watching the Twitter feed

9  about your testimony.  Is that fair to say?

00:56 10  A.   Yes.  And this was my -- this is my line of thought:

11  Normally I would be providing commentary.  I was wise enough

12  not to do that; apparently not wise enough to say wait another

13  couple of days before tweeting anything.  I guess it's part of

14  the live and learn that we all go through with news social

15  media.

16  Q.   Fair enough.  Now, Mr. Bruck asked you some questions

17  about could someone learn the material that was written in the

18  boat very quickly.

19       MR. CHAKRAVARTY:  Speaking of tweets, can I ask

00:56 20  Mr. Bruemmer to call up Exhibit 1280, please?

21  Q.   Now, this tweet that we talked about a little yesterday,

22  this was a paraphrase from an Awlaki note.  Is that right?

23  A.   That's right.

24  Q.   And is the date of this tweet April 16th, 2012?

25  A.   It is.

```
 1    Q.   It's about a year before the Boston Marathon bombing?

 2    A.   Yes.

 3              MR. CHAKRAVARTY:  Thank you.

 4              THE COURT:  Mr. Bruck, anything else?

 5              MR. BRUCK:  No, sir.

 6              THE COURT:  All right.  Dr. Levitt, thank you.  You

 7    may step down.

 8              THE WITNESS:  Thank you, sir.

 9              (The witness is excused.)

10              MR. WEINREB:  Good morning, your Honor.  The United

11    States calls Colleen Tanguay.

12                   COLLEEN M. TANGUAY, duly sworn

13              THE CLERK:  Have a seat.  State your name, spell your

14    last name for the record, keep your voice up and speak into the

15    mic so everyone can hear you.

16              THE WITNESS:  Yes, sir.  Colleen M. Tanguay,

17    T-A-N-G-U-A-Y.

18                        DIRECT EXAMINATION

19    BY MR. WEINREB:

20    Q.   Good morning.

21    A.   Good morning.

22    Q.   Where do you work?

23    A.   I'm a trooper at the Massachusetts State Police, Crime

24    Scene Services.

25    Q.   How long have you worked there?
```

00:57 (line 10)
00:59 (line 20)

```
 1   A.   Crime scene for 13 years.  I've been with the state police
 2   for over 14, and I have 18 and a half years' law enforcement
 3   total.
 4   Q.   What's your official title?
 5   A.   I'm a trooper with crime scene.
 6   Q.   And what are your job responsibilities at the crime scene
 7   services section of the Massachusetts State Police?
 8   A.   To work in conjunction with federal, state and local
 9   agencies to assist them with their investigations.  These can
 10  pertain to homicides, suicides, motor-vehicle accidents, fatal
 11  motor vehicles, arsons, breaking and entering.  We assist them
 12  with the processing of their scene including documentation
 13  which can be photography, videography or diagrams.  We also
 14  help them process the scenes.  That includes fingerprint, tire
 15  track and footwear impressions.
 16  Q.   What kind of training have you had?
 17  A.   I have a bachelor's of science in criminal justice, I have
 18  a masters in criminal justice administration.  I've been
 19  through two police academies:  a local police academy and the
 20  Massachusetts State Police Academy.
 21       For crime scene services, started with 16 weeks of
 22  in-house training under the tutelage of senior troopers.  Plus
 23  in addition to that, I've had multiple external classes in
 24  photography, videography, crime scene investigations,
 25  processing scenes for evidence, latent print classes, palm
```

1    print classes, footwear and tire track examinations.

2    Q.   How many crime scenes have you processed in your career?

3    A.   Thousands, sir.

4    Q.   What's a case officer?

5    A.   A case officer tends to wear many hats, but the primary

6    goal is the collection -- organization, collection and

7    maintaining the records, documentations pertaining to the case

8    file.

9    Q.   So in connection with a particular crime scene, will there

01:01 10   always be a case officer?

11   A.   Yes, sir.

12   Q.   How does that person's duties differ from the duties of

13   the other crime scene people processing the scene?

14   A.   Everything eventually comes back to the case officer who,

15   as I said, maintains the files, the documentation, photographs,

16   videos, any records that pertain to that case file.

17   Q.   And how many crime scenes have you been a case officer?

18   A.   Hundreds, upwards to thousands.  Thousands.

19   Q.   Did you process the Laurel Street crime scene up in

01:01 20   Watertown on April 19th --

21   A.   Yes, sir.  I am the case officer for Watertown.

22   Q.   Okay.  And that's 2013?

23   A.   Yes, sir.

24   Q.   When did you arrive at Laurel Street on the 19th?

25   A.   Approximately 2:15 a.m.

```
 1    Q.    Did you begin processing the scene right away?

 2    A.    No, sir.

 3    Q.    Why not?

 4    A.    It was still what we considered a hot scene.  There

 5    were -- one, they were looking for a suspect who was still at

 6    large, so they were going from house to house making sure that

 7    he wasn't in the garage or anything of that nature, plus there

 8    were bomb parts and devices that they were still trying to

 9    clear to make sure that it was safe for us to enter the scene.

10    Also, we were contacting other -- because of the large area of

11    the scene and the amount of evidence within that scene, we were

12    contacting members of crime scene from all over the state to

13    come help and process the scene.

14    Q.    So when did you actually get started processing it?

15    A.    Shortly after six.  About 6:15 a.m.

16    Q.    And what did you do to process the scene?

17    A.    Because of the size of the scene, like I originally

18    stated, the scene was divided up into four areas.  Each one

19    contained a photographer, a videographer and a scribe.  That

20    scribe was the person who wrote down whatever pieces of

21    evidence were documented within that scene.  As the case

22    officer, I made sure I went through all the areas and were

23    familiar with everything that was happening, who my

24    photographers were, who my videographers were and who my

25    scribes were.
```

1          We helped document the scene and every piece of evidence.

2     As you'll see in some of the photos, there are placards.  Each

3     piece -- each item that we considered to be a piece of evidence

4     was given a placard.  Some of them you'll see were 1 through

5     100, some were paper, some were A through Z.  And then you'll

6     notice in some photographs they -- a line with chalk with the

7     corresponding placard number was around that item.  So that's

8     essentially what we ended up doing, is documenting the entire

9     scene for Laurel Street.

01:03 10     Q.   Were steps taken to record the precise locations of the

11     ballistics evidence, the shells, and in some cases slugs that

12     were found?

13     A.   Yes.  We started with paper logs indicating what the item

14     was.  If it was Placard No. 1, what the item was and its

15     approximate location.  After the entire scene was

16     photo/videoed, we had Sergeant Timothy Dowd from our accident

17     reconstruction unit come in.  And he has what's called a Leica

18     GPS, and it gave exact GPS coordinates of each and every piece

19     of evidence within that scene.

01:04 20     Q.   So if I understand you correctly, the -- after the scene's

21     cleared and you do your sort of your look over it, the steps

22     are put down the placards, photograph them in place, take the

23     GPS readings?

24     A.   Yes.  The GPS reading he started at some of the other

25     scenes.  But essentially yes, sir, that's the order.

1    Q.   And at some point is the ballistics evidence actually

2    collected by someone?

3    A.   Yes.

4    Q.   And who collected the evidence?

5    A.   Lieutenant Cahill from our ballistics unit came in after

6    everything was documented and marked and picked up every piece

7    of ballistics evidence.

8    Q.   The other evening did I review a series of photos with you

9    that were taken at the crime scene?

01:05 10   A.   Yes, sir.

11   Q.   And those photos which were given to defense counsel, were

12   they all fair and accurate representations of what was on the

13   crime scene on that date?

14   A.   Yes.

15        MR. WEINREB:   Okay.  Your Honor, those photos were

16   Exhibit 948-433, -212, -230, -231, -268, -270, -271, -259,

17   -277, -293, -244, -264, -261 and -265.  I would offer those

18   into evidence at this time.

19        MR. WATKINS:   No objection.

01:06 20        THE COURT:   Okay.  All of those may be admitted.

21        (Government Exhibit Nos. 948-433, 948-212, 948-230,

22   948-231, 948-268, 948-270, 948-271, 948-259, 948-277, 948-293,

23   948-244, 948-264, 948-261 and 948-265 received into evidence.)

24        MR. WEINREB:   Mr. Bruemmer, can we please have up on

25   the screen 948-433.

```
 1   BY MR. WEINREB:
 2   Q.   What's that a photo of?
 3   A.   That is a photo of Laurel Street.  Dexter Street would be
 4   behind me looking at this.  And this house here is 53, this
 5   over here is 55 and 57.  Do you see that green Honda is over
 6   there?  And right in this area -- sorry -- would be -- the
 7   Ruger would be behind one of the vehicles parked in the
 8   driveway of 55 Laurel Street.
 9   Q.   Okay.  The houses with addresses are easily identified,
10   but just for the record, you've circled a car that's near the
11   very top of the frame and more or less in the middle going down
12   the street?
13   A.   The center right, sir.
14   Q.   The center right.  That's the Honda?  No, I'm talking
15   about the Honda now.
16   A.   No, the Honda is the center left.
17   Q.   Okay.  And the location of the Ruger was the car that we
18   can just see the back of, center right?
19   A.   Yes, sir.
20   Q.   Okay.
21        MR. WEINREB:  And 948-212, please.
22   Q.   And what is that a picture of?
23   A.   That is a picture of the driveway at 55 Laurel Street.
24   You see in the top left is the Ruger, and those are the two
25   vehicles parked at 55 Laurel Street, sir.
```

1          MR. WEINREB:  948-230, please.

2    A.   It's another angle, close-up of Item No. 59, or Placard

3    No. 59, the Ruger, sir.

4          MR. WEINREB:  And 948-231, please.

5    A.   And again, a close-up of Placard 59 with the Ruger, sir.

6          MR. WEINREB:  948-268, please.

7    A.   Those are two items that were located down by the green

8    Honda, two backpacks.

9    Q.   And there's a --

01:08 10   A.   Or a backpack.

11   Q.   -- box that I'm circling that's more or less in between

12   the two backpacks.  Do you know what that is?

13   A.   That's a box of ammunition, sir.

14         MR. WEINREB:  Can we have -270, please.

15   A.   It's a closer image of the box.

16         MR. WEINREB:  -271.

17   A.   And again, another angle of the box with ammunition.

18   Q.   Now, when items like this, a box, are collected at the

19   scene, are they collected in such a way to preserve any

01:09 20   fingerprint evidence that might be on them?

21   A.   Yes, sir.  They are collected individually, put into its

22   own bag.  We take -- we use gloves when we handle any item so

23   that we don't transfer our fingerprints onto those items.

24         MR. WEINREB:  Exhibit -259, please.

25   A.   That's another angle.  That's just past 55 and 57 Laurel.

1  This is the green Honda in the top left, and this is the

2  backpacks with the box of ammunition.

3  Q.  Okay.  And what are the white placards that we see here?

4  What are they marking?

5  A.  Those are all items of evidence.  That could be ballistics

6  evidence or bomb evidence, sir.

7  Q.  When -- is a Ruger -- is that a semiautomatic pistol?

8  A.  I'm not sure.

9  Q.  Do you know whether a Ruger ejects shells after it fires a

01:10 10  bullet?

11  A.  Yes, it does.  Yes.

12  Q.  Do you know, are they ejected, they just shoot off --

13  A.  They tend to shoot off to the right.

14  Q.  Okay.

15      MR. WEINREB:  Exhibit -277, please.  Actually, no.

16  I'm sorry.  Can we stay -- go back to -259?  Okay.

17  Q.  So let me -- so that's Placard 124.  And do you see the

18  object right in front of it?

19  A.  That's a shell casing, sir.

01:10 20      MR. WEINREB:  Let's go back.  No, 259 still.  -259.

21  We'll blow up another one.

22  Q.  -120, there's an object that I'm pointing to here by the

23  back of the placard?

24  A.  It appears to be another shell casing.

25      MR. WEINREB:  Can we go back to the regular size?

```
 1    Q.   Again, here?

 2    A.   It appears to be another shell casing, possible.

 3         MR. WEINREB:  Now let's try -277.

 4    Q.   What's that a photo of?

 5    A.   That is another angle of Laurel Street.  The Honda would

 6    be behind me to my right, and those are additional items of

 7    evidence.

 8         MR. WEINREB:  Perhaps we could zoom in on some of

 9    them.

01:11 10   A.   Those are additional empty shell casings.

11    Q.   Do you know what this police vehicle is that's pictured in

12    the front?

13    A.   Yes, sir.  It's a Watertown police cruiser.  Just behind

14    that is the vehicle where the pressure cooker was embedded in

15    the side of the vehicle.

16    Q.   And this is Placard 84.  Do we see another item behind it?

17    A.   Yes, sir.  It looks like another shell casing.

18         MR. WEINREB:  -293, please.

19    Q.   Is that that -- in the upper left-hand corner of this

01:12 20   photo, is that that same cruiser?

21    A.   Yes, sir.

22    Q.   And again, all these placards, 76, 77, 78, what's

23    surrounding them all?

24    A.   All shell casings, sir.

25         MR. WEINREB:  Can I have -244, please.
```

1    Q.   What's pictured in the upper right-hand corner of this

2    photo?

3    A.   That's the Watertown police cruiser that we were just

4    looking at.  You can see right here is the pressure cooker.

5    This is now on the other side of the street, the left side of

6    the street, these are additional rounds, and some of them are

7    pieces of the bomb or bombs.

8         MR. WEINREB:  Can we have -264, please.

9    Q.   And is that that same house, now looking straight at it?

01:13 10   A.   It is, sir.

11   Q.   And all of these placards that we see, are these all, for

12   the most part, shell casings?

13   A.   Yes, sir.

14        MR. WEINREB:  Exhibit -261, please.

15   Q.   What's this a photo of?

16   A.   It's another angle of Laurel Street.  As you could see,

17   the green Honda, the backpacks with the ammunition.  These are

18   all -- these spots all over here are rounds, empty shell

19   casings, Watertown cruiser.  And behind that is the vehicle

01:14 20   with the pressure cooker embedded in the side.

21        MR. WEINREB:  -265, please.

22   A.   Again, another angle.

23   Q.   Now, without going through more pictures, just based on

24   your memory of your observations of the scene that night -- or

25   that day, were there bullets in people's houses?

```
 1   A.   Yes, there were.

 2   Q.   Were there bullets in people's cars?

 3   A.   Yes.

 4   Q.   Approximately how many items of ballistics evidence were

 5   marked at the crime scene that day?

 6   A.   Ballistics evidence I believe was upward of 250.  I know

 7   total evidence based on my logs for all four scenes was

 8   approximately 450 and up.

 9        MR. WEINREB:  Thank you.  No further questions.

10        MR. WATKINS:  Just a couple of quick things.  May I

11   have the monitor, please?

12                      CROSS-EXAMINATION

13   BY MR. WATKINS:

14   Q.   Showing you 948-264, which is in evidence.

15   A.   Yes, sir.

16   Q.   I want to draw your attention to this item here.  As a

17   case agent, you were responsible -- or oversaw the logging in

18   of various items?

19   A.   Yes, sir.

20   Q.   And Mr. Weinreb pointed you to a Ruger that was found in

21   the driveway.  That's not this one?

22   A.   That is not, sir.  That is a pellet gun that was found

23   behind the area of the Honda.

24   Q.   And when you say "pellet gun," it's not designed to expel

25   a bullet, projectile?
```

01:14 (line 10)
01:15 (line 20)

```
 1    A.   I'll be honest with you, sir.  I've never fired a pellet
 2    gun so I...
 3    Q.   And you said it was behind the Honda?
 4    A.   Yes, sir.
 5    Q.   So I want to show you Exhibit 261.  I should say 248 and
 6    261.  And we see that pellet gun back here?
 7    A.   Yes, sir.
 8              MR. WATKINS:  That's all I have, your Honor.
 9              THE COURT:  Anything else?
10              MR. WEINREB:  Nothing further.
11              THE COURT:  All right, Trooper Tanguay.  You may step
12    down.
13              THE WITNESS:  Thank you, sir.
14              (The witness is excused.)
15              MR. MELLIN:  The United States calls Lieutenant
16    Cahill.
17              MR. WATKINS:  Your Honor, can we be seen briefly at
18    sidebar before --
19              THE COURT:  Yes.  I was going to invite you.
20              (Discussion at sidebar and out of the hearing of the
21    jury:)
22              MR. WATKINS:  This is Trooper Cahill where I filed a
23    motion to --
24              THE COURT:  Right.
25              MR. WATKINS:  -- exclude.
```

```
 1            The Court indicated -- kind of intended a ruling, but

 2     did allow us to go through voir dire.  After considering it

 3     further, I would ask that we rely on the papers.  I made two

 4     arguments:  One is on a scientific basis, none of it should

 5     come in.  I would still rely on that.  I do not believe that

 6     there's a reason to have a protractive voir dire of this

 7     particular witness and will not object on that basis.

 8            THE COURT:  Okay.  Based solely on the event mentioned

 9     in the papers then, the motion is denied.  I think he's

01:18 10     qualified to testify.

11            MR. MELLIN:  Your Honor, based on the comment you made

12     the other day about experts, do you not want me to ask --

13            THE COURT:  I prefer not.

14            MR. MELLIN:  Okay.  That's fine.

15            THE COURT:  I think it's limited because -- well, I

16     think I expressed -- it depends on the question you ask.  If it

17     falls within their expertise, it's okay.  If you think it goes

18     beyond their expertise, your objection -- I don't like the

19     blanket ruling.

01:19 20            (In open court:)

21                    DAVID CAHILL, duly sworn

22            THE CLERK:  State your name, spell your last name for

23     the record and speak into the mic.

24            THE WITNESS:  David Cahill, C-A-H-I-L-L.

25                    DIRECT EXAMINATION
```

BY MR. MELLIN:

Q.   Good morning, sir.  I'm over here.  It's a trick.  Good morning.

A.   Good morning.

Q.   Sir, where are you employed?

A.   I'm a lieutenant with the Massachusetts State Police.

Q.   And how long have you been with the Massachusetts State Police?

A.   Twenty-eight years.

Q.   How do you become a lieutenant?  What various ranks do you go through?

A.   You start off as a trooper, take an exam for sergeant and take another exam for lieutenant.

Q.   During your 28 years, can you briefly describe what you've been involved in?

A.   The first 16 years I was a trooper assigned to patrol.  In my 16th year I was then transferred to the Firearms Identification Section at the crime lab.  At that time it was in Sudbury -- all of the crime lab in Sudbury.  I was promoted to sergeant, and then subsequently, two years ago, I was promoted to lieutenant.

Q.   At some point -- did you go to college?

A.   Yes, I did.

Q.   Where did you go to college?

A.   I have a bachelor's degree in science, in criminal

1     justice, from Western New England University, and a master's

2     degree in criminal justice from the University of Massachusetts

3     at Lowell.

4     Q.   Now, you mentioned firearms identifications.  What is

5     that?

6     A.   It's a section at the lab -- at the crime lab.  What we

7     deal with is firearms relating to crimes.

8     Q.   And how do you go about determining if a firearm was

9     involved in some shooting?

01:21 10    A.   Most of the time -- well, there's two ways:  One, we can

11    be called to the scene of the crime, we recover all -- I would

12    recover all evidence regarding firearms.  The second one is if

13    an agency, be it local, state or federal, recovers a firearm

14    and they want it examined by our section, they will bring it to

15    us and submit it to us at the lab in Maynard.

16    Q.   Did you receive certain training related to firearm

17    identification?

18    A.   Yes, I did.

19    Q.   Can you describe for us what training you have?

01:21 20    A.   Yes.  Over the first two years assigned to the section

21    it's an apprenticeship program.  You're working with

22    qualified -- under qualified examiners.  And during that two

23    years, you're sent out to numerous training opportunities.

24    Myself, I've been sent down to the ATF school for the NIBIN

25    system in Largo, to the FBI Academy in Quantico, Virginia, for

1

advanced technician firearms identification.  I've also been to

several in-house trainings that we've hired people to come in

and train us in toolmarks and firearms.  And I've also been to

several weapons manufacturers:  Colt, Berettas, Glock,

Smith & Wesson.  And during those armorers' courses, usually

you learn how they make and maintain their firearms.  I mean, a

couple of them, like Beretta -- not Beretta -- on Colt,

Smith & Wesson and Ruger, we actually observed the

manufacturing processes of how these weapons are manufactured.

01:22   Q.   You mentioned Ruger.  Do you know where Rugers are

manufactured?

A.   They have plants in Freeport, New Hampshire, and also

Prescott, Arizona.

Q.   Do they have a plant in Massachusetts?

A.   No, they do not.

Q.   Is the field of firearms identification generally

accepted?

A.   Yes; it has been for close to 85 years.

Q.   Are there treatises that apply to firearms identification?

01:23   A.   Yes, there are.

Q.   And are those subject to peer review?

A.   Yes, they are.

Q.   And are those generally accepted in the field?

A.   Yes.

Q.   Are there also generally accepted procedures that you

1    follow to do an identification?

2    A.   Yes; we have certain protocols and procedures at the lab

3    itself.

4    Q.   You mentioned protocols.  What type of protocols do you

5    follow?

6    A.   Well, we have a firearms identification protocol, and it

7    explains step by step of how we recover evidence, how we're to

8    examine it, how we're supposed to generate our reports

9    afterwards.

01:23 10   Q.   Approximately how many firearms identifications have you

11   done?

12   A.   In excess of 3,000.

13   Q.   And of those thousands, are those subject to peer review?

14   Does someone oversee your work?

15   A.   Yes, they do.

16   Q.   And at times do you oversee the work of others?

17   A.   Yes, I do.

18   Q.   And how does that process go?

19   A.   In regards to making identifications under the microscope,

01:24 20   if we were to identify a cartridge case, either to itself or to

21   a firearm, we'd have them put it on the microscope, we'd do the

22   ID, then we would ask another examiner to come and verify our

23   identification.

24       After that's all said and done, after the verification

25   process, we generate our reports.  Once the reports are done,

1    they're submitted for technical and administrative review by

2    another -- a supervisor, usually of a higher rank than the

3    person who was issuing the report.

4    Q.    You talked about the Massachusetts state lab.  Is that an

5    accredited lab?

6    A.    Yes, it is.  It's ASCLD accredited.

7    Q.    It is what?

8    A.    ASCLD.  Association of Crime Lab Directors.  It's an

9    organization that certifies labs.

01:24 10   Q.    You mentioned you've done over a thousand examinations.

11   Of those over a thousand, are you aware of anyone ever claiming

12   that your work was unreliable?

13   A.    No.

14   Q.    Has anyone ever claimed after the fact that any

15   conclusions you rendered or reached was unreliable?

16   A.    No.

17   Q.    Have you testified previously as an expert in firearms

18   identification?

19   A.    Yes, I have.

01:25 20   Q.    Approximately how many times?

21   A.    Over a hundred times.

22   Q.    Lieutenant Cahill, if you could just generally describe

23   for us how does someone go about identifying a firearm and

24   whether or not it was used in a shooting?

25   A.    When we would recover the firearm, we would examine the

1

1    firearm first to make sure -- you know, check its operability;

2    check the condition of the firearm; make, model, serial number;

3    note the condition as it's submitted.  Once we determine the

4    weapon is safe to fire, we would then test-fire the weapon.  We

5    have a facility at the lab to test-fire firearms.  We would

6    take those tests that we generated and then go into our

7    microscope room where we have a comparison microscope, and then

8    we would compare the tests from the firearm to the recovered

9    evidence.

01:26 10   Q.    Okay.  You mentioned a test-fire.  If you could just tell

11   us what is that?

12   A.    It is we take either -- we could take ammunition that was

13   recovered with the weapon at the scene, or we have a large

14   reference section in our lab of ammunition.  What we do is we

15   check the weapon to see what the caliber is, we get the same

16   caliber ammunition, we take it into our test-fire room, we load

17   the weapon and we test-fire it.  We fire the weapon.

18   Q.    If you're dealing with a semiautomatic weapon that has

19   shell casings, how do you go about making an identification of

01:26 20   shell casings?

21   A.    Again, we have -- if the shell casings are recovered by

22   themselves with no weapon, we'd take the shell casings -- first

23   we'd make -- we take them into our workroom, we make note of

24   the make, manufacturer and caliber of the shell casings, record

25   those.  Then we bring the shell casings into our microscope

1    room.  We then place the microscope -- there's a comparison

2    microscope.  There's a stage on the right and the left, and it

3    has one eyepiece so you could look at both stages at the same

4    time.  And then we're looking for specific markings left behind

5    on those shell casings generated through the firing process to

6    make our identification.

7    Q.   If you have a number of shell casings but don't have a

8    firearm recovered, are you still able to determine whether or

9    not those shell casings were all fired from a single weapon?

01:27 10   A.   Yes, we can.

11   Q.   If you have the firearm recovered, are you then able to

12   make a comparison to determine if that firearm fired those

13   shell casings?

14   A.   Yes, we can.

15   Q.   And how do you make that comparison?

16   A.   Again, we test fire the firearm, we look at the test under

17   the microscope to make sure there's enough microscopic marks

18   left behind on the test to make the identification.  Then we

19   take the evidence -- we look at all the evidence first together

01:28 20   to make sure that they're all fired -- or they all possess the

21   same microscopic markings.  Then we take a sample from the

22   recovered evidence and the test-fires, and we compare those

23   against each other under the microscope and make the

24   identification through the individual microscopic marks left

25   behind.

1    Q.   Are you, as well, able to determine whether or not a

2    recovered projectile or a bullet was fired by a particular

3    weapon?

4    A.   Yes, we can.

5    Q.   And how do you go about doing that?

6    A.   Again, we test fire the weapon, we recover the projectile,

7    we look for the individual markings left behind on the

8    projectile from the test against the individual markings on the

9    submitted evidence.  Again, we bring them to the microscope

01:28 10    room, we put the test-fire on one side of the microscope and

11    the recovered evidence on the other side, and we're looking for

12    those striated individual markings left behind during the

13    firing process to make our identification.

14    Q.   And generally, when you're talking about a round of

15    ammunition or a bullet or a projectile, as sometimes you like

16    to refer to it as, what are you looking for on that projectile

17    to make a comparison?

18    A.   Okay.  Well, what most people call a bullet, we would call

19    it a live round of ammunition.  It has four different

01:29 20    components to a live round of ammunition.  One would be what

21    people would normally refer to as the bullet, we would call it

22    a projectile.  That's the casing that contains the projectile.

23    Inside the casing is the powdered charge, and on the base of

24    that casing is the primer.

25         MR. MELLIN:  And if I may have just brought up for the

1

1    witness right now, your Honor, Exhibit 940.

2    Q.   Do you see Exhibit 940 in front of you?

3    A.   I do now, yes.

4    Q.   Very good.  Do you recognize what that is?

5    A.   Yes, I do.

6    Q.   Is that a photograph of a -- well, you tell me.  What is

7    that a photograph of?

8    A.   It appears to be a photograph of one live round of

9    ammunition.

01:30 10         MR. MELLIN:  Your Honor, if the witness may use this

11   just as a chalk?

12         THE COURT:  All right.

13   BY MR. MELLIN:

14   Q.   Lieutenant Cahill, looking at Exhibit 940, as you look at

15   that, what do you see on the right side of that photograph?

16   A.   That's a ruler or a scale.

17   Q.   That's on the left side.

18   A.   That's the projectile -- or the live cartridge, I should

19   say.

01:30 20   Q.   Okay.  And as you look at that, if you could -- this is a

21   screen that's interactive so you could touch it.  As you look

22   at it, what are the component parts that we're looking at?

23   A.   Okay.  Right here would be the nose or the projectile or

24   the bullet.  On here, the brass-colored item is the cartridge

25   case.  Inside this cartridge case would be the powder or the

1

1   propellant for the cartridge.  And on the base underneath is

2   the primer.  Usually it's silver in color.  In order to operate

3   this, you load it into a weapon, the firing pin would then

4   strike the primer, setting off an explosive charge that would

5   ignite the powder inside the cartridge, creating pressure for

6   one to force a projectile down the barrel of the weapon.

7   Q.   All right.  And for the record, you indicated that the

8   copper-colored portion of this photograph is what?

9   A.   A bullet, or projectile.

01:31 10   Q.   Okay.  So now the bullet, when there is -- the firing pin

11   hits the bottom of this casing and there causes some type of

12   internal explosion, what happens to the bullet?

13   A.   The bullet is forced down the barrel of the weapon.

14   Q.   And as the bullet is being forced out the barrel, what's

15   happening to the bullet?

16   A.   On weapons that are rifled, what happens is the projectile

17   is grabbed by the rifling as it's being forced down the barrel.

18   Rifling is designed to impart a spin on the projectile, making

19   it a much more accurate weapon.

01:32 20   Q.   Hold on right there.  You keep talking about rifling.

21   What do you mean by "rifling"?

22   A.   Rifling in weapons is grooves, lands and grooves, that are

23   cut down the length of the inside of the barrel.  These are

24   done by, you know, hardened cutters.  And they cut actually

25   grooves into the projectile -- excuse me, into the barrel.  And

1

1    during that process, it could be towards the right or to the

2    left.

3    Q.   And what is the purpose of this internal rifling in the

4    barrel of a weapon?

5    A.   Again, it imparts a spin on the projectile as it's

6    traveling down the barrel, making it much more accurate.

7    Q.   Just like throwing a football, if you have a tight spiral

8    it's much more accurate than if it flutters?

9    A.   Yes.

01:32 10   Q.   Okay.  So what are you able, as a firearms identifier or

11   examiner, able to do with those rifling marks?

12   A.   So what happens, after the projectile travels down, it

13   picks up what we call microscopic individual markings left

14   behind during the -- by the rifling.  As the rifling is cut,

15   hardened-steel tools are dragged down the barrel and they cut

16   into the hardened steel of the barrel leaving microscopic

17   imperfections in the barrel.  The projectile --

18   Q.   You mean on the bullet or on the barrel?

19   A.   On the barrel.  When the projectile travels down the

01:33 20   barrel, it picks up those microscopic markings and leaves

21   behind marks on the projectile itself.

22   Q.   So the bullet is shot out the barrel.  Is that right?

23   A.   Yes.

24   Q.   What happens to that casing?

25   A.   Depending on what kind of weapon is used, a revolver, the

1

1    casing would stay inside the weapon itself.  A semiautomatic

2    weapon, it would actually be thrown outside the weapon.

3    Q.   When you said a revolver, is that the gun that has the

4    cylinder on it?

5    A.   Yeah.  It's like what the cowboys used to have.  It has a

6    cylinder, it has a number of live rounds.  And every time you

7    fire it, the cylinder rotates to the next live cartridge.

8    Q.   And when you say the casing is kicked out, where does it

9    go after it's kicked out?

01:34 10   A.   Depending on the weapon -- the ejection point is on the

11   right or the left, it's usually -- both weapons have an

12   ejection point on the right side of the weapon.  You eject it

13   to the right and somewhere to the rear of the weapon.

14   Q.   And if someone is standing on a street or on a sidewalk or

15   some hard surface and these casings are ejected out, what

16   happens when that casing hits that hard surface?

17   A.   Most of the time it will bounce and roll.  They won't

18   actually stay where they first hit, they have a possibility of

19   bouncing and rolling.

01:34 20   Q.   Now in this case did you do a firearms identification?

21   A.   Yes, I did.

22   Q.   And generally what did you do?

23   A.   I responded to the scene and recovered all the

24   firearms-related evidence, brought it back to the lab, examined

25   it, generated my report.

1    Q.   As you're going through your testimony, would it help to

2    have a copy of your report in front of you?

3    A.   Yes.

4         MR. MELLIN:  Your Honor, if I may approach with

5    Government's Exhibit 1567.  I'm not going to introduce it into

6    evidence, but I think it would be helpful if the Lieutenant had

7    it.

8         THE COURT:  Okay.

9         MR. WATKINS:  No objection, your Honor.

01:35 10        THE COURT:  Okay.

11   BY MR. MELLIN:

12   Q.   Lieutenant, just for the record, Exhibit 1567, is that

13   your report?

14   A.   Yes, it is.

15   Q.   Okay.  And it's a relatively voluminous report.  Is that

16   fair to say?

17   A.   Yes.

18   Q.   How many pages?

19   A.   Thirty-two.

01:35 20   Q.   Okay.  And what is the date on your report?

21   A.   The date it was generated was August 22, 2013.

22   Q.   Generally, when you got to the scene at Watertown, what

23   did you do?

24   A.   I checked in with the crime scene services and the

25   detectives from the Middlesex County District Attorney's Office

1

1    just to let them know I was at the location.

2    Q.    Okay.  Prior to arriving at Watertown, what did you do?

3    A.    I was at the scene of a shooting in the city of Cambridge

4    on Vassar Street.

5    Q.    How did you end up there?

6    A.    I was called to that scene from my home.

7    Q.    And so that was at MIT?

8    A.    Yes, it was.

9    Q.    And did you recover the ballistics evidence at MIT as

01:36 10   well?

11   A.    Yes, I did.

12   Q.    Now, the findings and conclusions that you've reached in

13   this case either regarding the MIT shooting or the Watertown

14   ballistics evidence, were those subject to peer review?

15   A.    Yes, they were.

16   Q.    Who reviewed your work?

17   A.    My immediate supervisor, Detective Lieutenant Michael

18   Coleman.

19   Q.    Let me talk first about the MIT evidence.  What did you

01:36 20   recover at MIT?

21   A.    At MIT we recovered five 9 mm Luger caliber discharge

22   cartridge casings and two projectiles.

23          MR. MELLIN:  If I could have the witness look at

24   Exhibit 698, please.

25   Q.    Do you recognize Exhibit 698?

1    A.    Yes, I do.

2    Q.    What is that?

3    A.    That is a 9 mm caliber discharged cartridge case with the

4    Placard No. 1 from the scene at MIT.

5              MR. MELLIN:  I move into evidence and ask to publish

6    698.

7              MR. WATKINS:  No objection.

8              THE COURT:  I'm told it's already in.

9              THE CLERK:  It's already in.

01:37 10             THE COURT:  If it isn't, it is now.

11             MR. MELLIN:  Thank you.  Redundancy.

12   BY MR. MELLIN:

13   Q.    Lieutenant Cahill, do you see Exhibit 698?

14   A.    Yes, I do.

15   Q.    Okay.  And that casing that you see there, that is one of

16   the three that you recovered outside the car.  Is that right?

17   A.    Yes, it is.

18   Q.    Okay.  If I could have you look at Exhibit 699.

19             MR. MELLIN:  Not knowing whether or not that's in,

01:38 20   your Honor --

21   Q.    Well, first, do you recognize that?

22   A.    Yes, I do.

23   Q.    What is that?

24   A.    That is a second shell, 9 mm Luger caliber discharged

25   shell casing from the scene at MIT with Placard No. 2.

1

1          MR. MELLIN:  I'm told that's already in as well, your

2     Honor.  If I can please have that published?

3     Q.   And again, just for the record, what do you see in that

4     photo?

5     A.   A 9 mm Luger caliber discharged cartridge case.

6     Q.   And then if I could have you look at 701?

7          THE COURT:  Is that in?  Okay.

8     Q.   Do you recognize 701?

9     A.   Yes, I do.

01:38 10   Q.   What is that?

11    A.   That is a third 9 mm Luger caliber discharged cartridge

12    case with the Placard No. 3 next to it.

13    Q.   And all three of these casings were found outside of

14    Officer Collier's vehicle.  Is that right?

15    A.   Yes, to the rear of the cruiser.

16    Q.   If I could have you look at Exhibit 702, please.  Do you

17    recognize Exhibit 702?

18    A.   Yes, I do.

19    Q.   What is that?

01:39 20   A.   That is the front seat of Officer Collier's cruiser.

21    Q.   Is that a fair and accurate photograph of how the cruiser

22    looked?

23    A.   Yes.

24         MR. MELLIN:  I'd move into evidence Exhibit 702 if

25    it's not already in.

1

1          MR. WATKINS:  No objection.

2          THE COURT:  Okay.

3          (Government Exhibit No. 702 received into evidence.)

4          MR. MELLIN:  Ask to publish it, your Honor.

5     BY MR. MELLIN:

6     Q.   Lieutenant Cahill, as you look at Exhibit 702, what do you

7     see there?

8     A.   In the center of the seat, in the pool of blood is the 9

9     mm Luger caliber discharged cartridge case.

01:40 10          MR. MELLIN:  And if we could pull up Exhibit 704,

11     please.

12     Q.   Do you recognize Exhibit 704?

13     A.   Yes.  That's a close-up of the seat with the discharged

14     cartridge casing.

15          MR. MELLIN:  Your Honor, I'd move into evidence and

16     ask to publish Exhibit 704.

17          MR. WATKINS:  No objection.

18          (Government Exhibit No. 704 received into evidence.)

19     BY MR. MELLIN:

01:40 20     Q.   Lieutenant Cahill, as you look at Exhibit 704, there's a

21     casing in the middle of that photo.  Is that right?

22     A.   Yes; right on the scale where it says "130."

23     Q.   I was just going to ask you to circle that, if you don't

24     mind.

25     A.   (Witness complies.)

1

1   Q.   All right.  And for the record, it's right in the middle

2   of the photograph?

3   A.   Yes, it is.

4   Q.   Okay.  And this is a -- 704 is a closer photograph than

5   702, the one we just saw.  Is that right?

6   A.   Yes.

7   Q.   And again for the record, this is the front driver's seat?

8   A.   Yes, it is.

9   Q.   All right.  If I could have you look at Exhibit 708,

01:41 10  please.

11          MR. MELLIN:  I believe that's in, your Honor.

12   Q.   Do you see what 708 is?

13   A.   Yes, I do.

14   Q.   What is that a photograph of?

15   A.   A 9 mm Luger caliber discharged cartridge casing that was

16   located on the passenger-side seat on top of Officer Collier's

17   hat or cover.

18   Q.   So as we look at 708, this is a close-up and his hat is to

19   the right?

01:41 20  A.   Yes.

21   Q.   And are those now the five casings that you recovered from

22   the scene, three outside and these two in the car?

23   A.   Yes.

24   Q.   All right.  And if I could have you look at 710, please.

25          MR. MELLIN:  I believe 710 is already in as well.

1

Q.    Do you see Exhibit 710?

A.    Yes, I do.

Q.    What is that?

A.    That is the passenger front seat of Officer Collier's
cruiser.

Q.    And what do you see, as a firearms examiner, that's of
note to you?

A.    In the center of the picture is a copper-colored -- it's a
copper jacket or lead-spent projectile.

01:42 Q.    Is that the top of one of these rounds that we were
talking about?

A.    Yes, it is.

Q.    In addition to this projectile that was recovered in the
car, at some point did you recover additional projectiles?

A.    Yes, I did.

Q.    How did you go about recovering additional projectiles?

A.    The next day Officer Collier's autopsy was performed and
three additional copper jacket lead-spent projectiles were
received from the chief medical examiner.  The day after that
01:42 we returned to the Cambridge PD and examined Officer Collier's
cruiser a second time, and a fifth copper jacket or lead-spent
projectile was recovered from underneath the carpeting on the
driver's side front seat.

Q.    How did you go about recovering that?

A.    We had to remove the seat, and we removed the carpeting

1

1       from the cruiser.

2       Q.   And how is it that it would have been able to fall under

3       the carpeting?

4       A.   It looks like when it was fired, they hit the center

5       console inside the cruiser and it ricocheted down and under the

6       carpeting.

7       Q.   If I could have you look at Exhibit 726 for just a moment.

8            MR. MELLIN:   If I may approach, your Honor?

9            THE COURT:   Yes.

01:44  10  BY MR. MELLIN:

11      Q.   Do you recognize what Exhibit 726 is?

12      A.   Yes, I do.

13      Q.   What is that?

14      A.   This is a 9 mm Luger caliber discharged cartridge case

15      with Number 13-08091.  This is from the scene in Cambridge,

16      Officer Collier's shooting.

17      Q.   And how are you able to recognize that as one of the

18      casings from that shooting?

19      A.   One, it's my handwriting on it.

01:44  20  Q.   And if you could, just open that up.

21      A.   (Witness complies.)

22      Q.   Is that one of the casings recovered?

23      A.   Yes, it is.

24      Q.   Now, as you look at that, what do you see on the -- kind

25      of the headstamp of that casing?

1

1   A.   On the base of the cartridge case is the manufacturer

2   headstamp.  It says "Win," and underneath that, "9 mm Luger."

3   Q.   What does "Win" mean, do you know?

4   A.   "Win" is an abbreviation for the manufacturer, which is

5   Winchester.

6   Q.   And it says "9 mm Luger"?

7   A.   Yes.  That's the caliber designation for this cartridge

8   case.

9   Q.   Now, when we're talking about caliber, like 9 mm, can you

01:45 10   describe briefly kind of what are the various types of

11   calibers?

12   A.   Caliber has to do with the diameter of a projectile that

13   travels down the barrel.  So in this case, "9 mm" would mean it

14   was 9 mm in diameter, or roughly .355 inches in diameter.

15   Q.   What are some other calibers that are used?

16   A.   There's .40 caliber, there's .45 caliber.  There's

17   hundreds of different calibers.

18   Q.   Okay.  What about like a 380 or a 38?

19   A.   Yes, .380, .38, 9 mm, those are all in the same .38

01:46 20   caliber class, which mostly means the diameter is pretty much

21   the same but the weight of the projectile is different.  Like a

22   .380, a normal weight for that would be 95 grams, a 9 mm is

23   around 115 grams, and .38s can get up to like 140 grams.

24   Q.   And what about a .40 caliber?

25   A.   A .40 caliber about 180 grams, but again, that's not in

1

1   the same caliber class because a .40 caliber is .40 inches in

2   diameter.  So it's a different caliber class than 9 mm.

3   Q.   And again, a .45?

4   A.   A .45, again, is .45 inches in diameter, and they can

5   range from 230 grams, a little lighter, a little heavier

6   depending on the manufacturer.

7   Q.   Okay.  Is a .45 caliber weapon able to fire a 9 mm round?

8   A.   It's not designed to, no.

9   Q.   And vice versa, if you have a .45 caliber round, are you

01:46 10   able to put that into a 9 mm?

11   A.   It's physically impossible to do that.

12   Q.   Now, when you recovered all those five casings, what were

13   you able to determine about them?

14   A.   I brought them back to the lab, I made a microscopic

15   comparison.  I made a determination that they were all fired by

16   the same unknown weapon.

17   Q.   And at that point unknown?

18   A.   Yes.

19   Q.   Okay.  And again, just to briefly describe it, how can you

01:47 20   compare a casing and determine that it's fired by the same

21   weapon?

22   A.   Again, we're looking for the individual markings left

23   behind during the firing process.  When the weapon's fired,

24   again, the firing pin strikes the primer, sets off the charge.

25   And the primer, which ignites the powder, develops between 15-

1

1       and 20,000 pounds of pressure inside the chamber of that

2       weapon.  The pressure does two things:  In a semiautomatic

3       pistol, one, it forces the projectile down the barrel, outside

4       the barrel.  In a semiautomatic pistol, what happens is that

5       casing is then slammed up against what's called the breech face

6       of the weapon, and it's where the firing pin comes through, and

7       it stamps those individual microscopic markings left behind

8       during the manufacturing process onto the base of that

9       cartridge.  Again, the firing pin also striking it leaves an

01:48 10      indentation in the primer, leaving some individual markings

11      behind.

12      Q.   And all of those markings were consistent for all five of

13      those casings?

14      A.   Yes, they were.

15      Q.   Now, if we can just briefly turn to the Watertown -- not

16      so briefly, but Watertown --

17           THE COURT:  No, if you're going to do that, why don't

18      we pause and take the midmorning recess.

19           MR. MELLIN:  All right.

01:48 20           THE CLERK:  All rise for the Court and the jury.  The

21      Court will take the morning recess.

22           (The Court and jury exit the courtroom and there is a

23      recess in the proceedings at 10:56 a.m.)

24           THE CLERK:  All rise for the Court and the jury.

25           (The Court and jury enter the courtroom at 11:26 a.m.)

1

1          THE CLERK:  Be seated.

2          THE COURT:  Proceed.

3          MR. MELLIN:  Thank you, your Honor.  Your Honor, I'd

4     also move into evidence Exhibit 726, which was the shell casing

5     recovered from the scene at MIT.

6          MR. WATKINS:  I have no objection.

7          THE COURT:  All right.  Do you want it shown?

8          MR. MELLIN:  No, that's fine.  He's already talked

9     about it.

02:19 10          THE COURT:  Oh, the actual object?

11          MR. MELLIN:  Yes.

12          (Government Exhibit No. 726 received into evidence.)

13     BY MR. MELLIN:

14     Q.   Lieutenant Cahill, when you responded to Watertown, did

15     you locate weapons at that scene?

16     A.   Yes, I did.

17     Q.   Did you locate a pellet gun as well as a 9 mm?

18     A.   Yes, I did.

19          MR. MELLIN:  If I may approach, your Honor, with

02:20 20     Exhibit 934.

21     Q.   Do you recognize Exhibit 934?

22     A.   Yes, I do.

23     Q.   And what is that?

24     A.   That's a pellet gun I retrieved from Laurel Street in

25     Watertown.

1

1          MR. MELLIN:  Your Honor, the government would move

2     that into evidence and ask if it may be published.

3          MR. WATKINS:  No objection.

4          THE COURT:  All right.

5          (Government Exhibit No. 934 received into evidence.)

6     BY MR. MELLIN:

7     Q.   If I may just have you hold it up and show it to the

8     ladies and gentlemen of the jury.

9     A.   (Witness complies.)

02:21 10    Q.   And Lieutenant Cahill, when you look at that pellet gun,

11    how would you describe it?

12    A.   It's an Airsoft pellet gun.  The caliber's .177.  It's a

13    copy of a Smith & Wesson M&P 40 real gun.

14    Q.   What do you mean by "it's a copy"?

15    A.   It's not manufactured by Smith & Wesson; it's just a

16    knockoff of one of their firearms.

17    Q.   Okay.  You also recovered a 9 mm?

18         MR. MELLIN:  If I may approach with Exhibit 928, your

19    Honor, and take back that other exhibit.

02:21 20        THE COURT:  All right.

21    BY MR. MELLIN:

22    Q.   Do you recognize Exhibit 928?

23    A.   Yes, I do.

24    Q.   What is that?

25    A.   It's the Ruger 9 mm caliber Model P95 semiautomatic pistol

1

1     I recovered from the scene at Laurel Street.

2               MR. MELLIN:  If I may pull up 948-213, which is in

3     evidence.

4     Q.   Do you see the photograph in front of you?

5     A.   Yes, I do.

6     Q.   What is that?

7     A.   That's a picture of the weapon that I recovered from

8     Laurel Street.

9     Q.   Is that the 9 mm?

02:22 10   A.   Yes, it is.

11    Q.   You mentioned something about a serial number?

12    A.   Yes.  The serial number has been defaced, or obliterated,

13    on the weapon.

14    Q.   As you look at 948-231, can you circle where that serial

15    number was located?

16    A.   (Witness complies.)

17    Q.   For the record, it's the silver plate on the handle of the

18    weapon?

19    A.   Yes, it is.

02:22 20   Q.   In addition to the gun being in that box, Exhibit 928, is

21    there another item in there?

22    A.   Yes, there is.

23    Q.   What is that?

24    A.   It's the magazine for that weapon.

25              MR. MELLIN:  Your Honor, I would move in 928 and --

1    which includes both the magazine and the weapon.

2             THE COURT:  I'm told it's in already, but if not it

3    will be.

4             MR. WATKINS:  Yeah.

5             MR. MELLIN:  Thank you.

6             If I could have Lieutenant Cahill hold that up as

7    well, your Honor, and not point it at anyone?

8             THE WITNESS:  The weapon?

9    BY MR. MELLIN:

02:23 10    Q.   Yes.  And just for the record, is it rendered safe?

11    A.   Yes.

12    Q.   How is it rendered safe?

13    A.   It has a cable lock going through the slide of the weapon

14    down the barrel.

15    Q.   Okay.  Is there any ammunition in it?

16    A.   No, there is not.

17    Q.   All right.

18    A.   This is a Ruger Model P95 semiautomatic pistol.

19    Q.   And what caliber?

02:23 20    A.   9 mm.

21    Q.   And if I could have you hold up the magazine?

22    A.   This is the magazine that was recovered with the weapon on

23    Laurel Street.

24    Q.   All right.  And as you hold that up, do you -- there's a

25    bottom portion of that that is larger than the top portion.  Is

1

1    that right?

2    A.    Yes, it is.

3    Q.    And what is that?

4    A.    This is an extended magazine, so when you insert it inside

5    the weapon, the magazine sits below the grip of the weapon.

6    It's just like a plastic cover on the magazine.

7    Q.    And as we look at 948-231, do you see that magazine

8    actually in that weapon?

9    A.    Yes, it is.

02:24 10    Q.    Now, for the record, what is a magazine?

11    A.    A magazine in a semiautomatic pistol is what holds the

12    ammunition for that weapon.  In order to fire this weapon, you

13    load the right caliber ammunition inside the magazine, you

14    place the magazine inside the grip, or the bottom of the

15    weapon, in order to load the weapon.  Then on the top of the

16    weapon where the barrel is, where I showed where the cable lock

17    was coming out is called the slide.  You pull onto the slide,

18    pull it to the rear.  It's under spring tension.  As you pull

19    it to the rear and release it, it strips off the live

02:24 20    ammunition on the top of that magazine.

21         In order to operate this weapon, you then pull the

22    trigger, the trigger releases the firing pin, the firing pin

23    strikes the primer, again, develops pressure inside the

24    cartridge case.  The pressure forces the projectile down the

25    barrel, and the remaining pressure operates the slide of the

1

1    weapon, or the top.  It pushes that slide to the rear.  So it

2    pulls it all the way to the rear, and the spring tension of the

3    weapon pulls it forward, strips off the next live cartridge,

4    and the weapon is ready to fire again up until you've fired all

5    the ammunition that is inside the magazine.

6    Q.   Now, when you've fired all of the ammunition, at that

7    point this magazine is empty, right?

8    A.   Yes, it is.

9    Q.   Is there a way to eject that magazine and put either a new

02:25 10  one in or to reload the one that you had?

11   A.   Yes.  On the side of the weapon right by the trigger guard

12   is called a magazine release.  You press that button, it

13   releases the catch that's on the magazine, the magazine can

14   then be removed from the weapon.

15   Q.   And the magazine that we're talking about that's Exhibit

16   928, is that an extended magazine?

17   A.   Yes, it is.

18   Q.   What does that mean?

19   A.   The original magazine for this weapon, went to the bottom

02:26 20  of the weapon, usually holds ten live cartridges.  This

21   magazine holds 18.  So in order to fit the 18 cartridges, the

22   magazine has to sit below the bottom of the grip of the weapon.

23         MR. WATKINS:  Your Honor, may I interrupt and have a

24   moment with Mr. Mellin?

25         (Counsel confer off the record.)

1

1          MR. MELLIN:  Your Honor, we had previously listed the

2     magazine as 931.  We'll just do that for the record.

3          THE COURT:  So you'll take it out of 928 and make it

4     931?

5          MR. MELLIN:  Correct.

6          (Government Exhibit No. 928 is replaced by Exhibit No.

7     931.)

8     BY MR. MELLIN:

9     Q.   In addition to this magazine that you see inside of the

02:27 10    handgun that is recovered, did you recover other magazines as

11    well?

12    A.   Yes, I did.

13    Q.   What did you recover those from?

14    A.   One magazine for this weapon was recovered at the scene by

15    the Honda on Laurel Street, the second magazine was recovered

16    from the SUV at the Watertown PD.

17         MR. MELLIN:  If I may approach, your Honor?

18         THE COURT:  All right.

19    BY MR. MELLIN:

02:27 20    Q.   Lieutenant Cahill, I just handed you two items, Exhibit

21    894 and Exhibit 893.  Do you recognize Exhibit 894?

22    A.   Yes, I do.

23    Q.   What is that?

24    A.   It's the magazine that I recovered from the street -- on

25    Laurel Street in Watertown.

1

1  Q.   Wait.  Which one are we talking about?

2  A.   This.

3  Q.   All right.  What's the exhibit number on that one?

4  A.   933.

5  Q.   All right.  You're trying to trick me.  All right.  I had

6  said 894 but let's talk about 933.  That's the magazine

7  recovered on Laurel Street?

8  A.   Yes, it is.

9  Q.   Okay.  And then 894, do you see that?

02:28 10  A.   Yes, I do.

11  Q.   What is that?

12  A.   This is the magazine that was recovered out of the

13  Mercedes SUV by my unit at the Watertown Police Department.

14  Q.   And did that magazine actually have live rounds in it?

15  A.   Yes, it did.

16  Q.   How many live rounds did it have in it?

17  A.   It had seven live cartridges in the magazine.

18  Q.   If I could have you --

19       MR. MELLIN:  Just the witness, please.

02:29 20  Q.   -- look at Exhibit 931.  I'm sorry.  931 is -- I take that

21  back.  It's 895.  If I could have you look at Exhibit 895.

22       Do you recognize that?

23  A.   Yes, I do.  It's the magazine that was inside the Mercedes

24  SUV.

25       MR. MELLIN:  I'd move into evidence Exhibit 895.

1

1          MR. WATKINS:  No objection.

2          THE COURT:  Okay.

3          (Government Exhibit No. 895 received into evidence.)

4          MR. MELLIN:  If I may have that published, please.

5     BY MR. MELLIN:

6     Q.    Lieutenant Cahill, as you look at that photograph, you

7     mentioned there was -- how many rounds were in that?

8     A.    Seven.

9     Q.    Okay.  And how many does that magazine actually hold?

02:30 10    A.    Ten.

11    Q.    Thank you.  When you went to the --

12          MR. MELLIN:  You can pull that down, Mr. Bruemmer.

13    Q.    When you went to the scene on Laurel Street, did you

14    recover the casings that were on that scene?

15    A.    Yes, I did.

16    Q.    And in total, how many casings did you recover?

17    A.    In total, 266.

18    Q.    And of those 266, how many were 9 mm?

19    A.    Fifty-six.

02:30 20    Q.    Did you also recover projectiles, or these bullets?

21    A.    Yes, I did.

22    Q.    How many bullets or projectiles did you recover?

23    A.    Ninety-five.

24    Q.    And could you -- of the projectiles, do you remember how

25    many were a Ruger type of a projectile?

1    A.    There were eight 9 mm caliber projectiles.

2    Q.    That you were able to find?

3    A.    Out of those 95, yes.

4    Q.    Okay.  So of the 56 casings of 9 mm, you were only able to

5    find six to eight of those projectiles?

6    A.    Yes.

7    Q.    At some point did you analyze those 56 casings?

8    A.    Yes, I did.

9    Q.    What were you able to determine about your analysis of

02:31 10    those casings?

11    A.    Upon examining the 56 recovered, I made the determination

12    they were all fired by the same unknown weapon.

13    Q.    And when you say "the same unknown weapon," what type of a

14    weapon would that have been?

15    A.    A 9 mm caliber weapon.

16    Q.    Now, in addition to saying there was an unknown weapon,

17    did you at some point attempt to determine whether or not those

18    56 casings were related to Exhibit 928, the 9 mm you recovered

19    on the scene?

02:32 20    A.    Yes, I did.

21    Q.    And what did you determine?

22    A.    I test-fired the 9 mm, I compared the test from the 9 mm

23    to the 56 cartridges recovered from the scene, and it was my

24    opinion the 56 live -- the 56 discharged cartridge casings were

25    fired by the 9 mm Ruger Model P95 semiautomatic pistol.

1

Q.   You mentioned the other casings that were on the scene.
There were 56 9 mm.  Were there other rounds as well that were
fired?

A.   Yes, there were -- approximately 210 other rounds that
were -- casings that were recovered.

Q.   And were you able to determine that those -- well, did you
receive the firearms of Watertown police and other police that
responded to the scene?

A.   Yes, I did.

Q.   And were you able to determine that none of the police
weapons fired any of the 56 9 mm weapon -- rounds that were
recovered?

A.   Yes, I was.

Q.   How were you able to determine that?

A.   One, there was a different caliber class; two, I
test-fired all of the submitted weapons of the police agencies,
and I identified all of the cartridges of those 210 back to
those police weapons.

Q.   And in addition, you excluded, then, the 9 mm from those
rounds?

A.   From those weapons, yes.

Q.   Okay.  And on the flip side of that, these .40 caliber --
or what other caliber were the police firing?

A.   There was .40 and .45 caliber.

Q.   And so were you able to exclude those .40 and .45s as

1

1   firing the 9 mm casings?

2   A.   Yes, I was.

3   Q.   When you did your comparison testing, did you actually

4   take photographs of the analyses you were doing?

5   A.   Yes, I did.

6   Q.   If I could have you look just at Exhibit 943, please.  Do

7   you recognize what Exhibit 943-01 is?

8   A.   Yes, I do.

9   Q.   What is that?

02:34 10   A.   It's a microscopic comparison -- a picture of a

11   microscopic comparison I did at the lab.

12   Q.   And is that from the MIT shooting?

13   A.   Yes, it is.

14   Q.   Okay.

15        MR. MELLIN:  Your Honor, if I may use 943-01 just as a

16   chalk for the witness to explain.

17        THE COURT:  Okay.

18        MR. MELLIN:  If I may have that published?

19   BY MR. MELLIN:

02:34 20   Q.   Lieutenant Cahill, as we look at Exhibit 943-01, what are

21   we looking at?

22   A.   It's a side-by-side image from a picture of what I was

23   looking at on the comparison microscope back at the lab.  If

24   you look on the left side of that image, there's Item -714,

25   which was one of the rounds or projectiles that was recovered

1    from the MIT shooting.  On the right-hand side of the picture

2    is the test-fire from the Ruger that I compared it to.

3    Q.   Okay.  So this is actually a comparison of the

4    projectiles?

5    A.   Yes, it is.

6    Q.   Okay.  Now, the projectiles are the two that are in the

7    police cruiser.  Is that right?

8    A.   Yes.

9    Q.   In addition to the three from the autopsy.  Is that right?

02:35 10   A.   Yes.

11   Q.   All right.  As you look at 943-01, can you circle on the

12   screen kind of the area that you're talking about that you were

13   able to analyze, show the comparison?

14   A.   Yes.  This red box is the area I was looking at that

15   I -- one of the areas I was looking at that I made my

16   identification on.

17   Q.   And as a trained examiner, what do you see in that

18   photograph and in that red box?

19   A.   I see the striated -- you know, microscopic -- individual

02:35 20   markings left behind from the barrel of the Ruger imparted on

21   the projectiles.  So I used them to make my identifications.

22   Q.   So as you look at this under a microscope, how are you

23   able to make a finding or come to a conclusion that that's the

24   same weapon that fired the bullet?

25   A.   If you see inside the circle or the red box, those lines

1

1    that match up -- those are what we call striated toolmarks, and

2    they match up from the test-fire on the right to the evidence

3    on the left.  And this is just one area that we're using as an

4    identification.  If you were to then roll that projectile,

5    there would be several other areas that we would use to make

6    that identification.

7    Q.   And we're actually just looking at one of the areas of --

8    or one of the photographs of the areas of comparison.  Is that

9    right?

02:36 10   A.   Yes, it is.

11   Q.   There are several others in addition?

12   A.   Yes, there are.

13        MR. MELLIN:  If I could please have Exhibit 733 pulled

14   up, which is already in evidence.

15   Q.   What is Exhibit 733?

16   A.   That would be one of the projectiles from the autopsy of

17   the chief medical examiner.

18   Q.   Now, when you are able to make a comparison -- when you

19   were making the comparison of this projectile to a test-fire

02:37 20   projectile, as we look at Exhibit 733, how were you making that

21   comparison?

22   A.   Well, it's tough to see from this picture but it's

23   probably sitting on its base.  So if you look at the base of

24   the projectile, we're looking for the rifling on that

25   projectile.  If you look at those inner marks inside the

1

1    rifling, those individual marks that we're comparing against

2    from the test-fires.

3    Q.   And so even on something that is deformed like this

4    projectile that has gone through a skull, you're still able to

5    make those determinations?

6    A.   Not every time but in this case I was able to.

7    Q.   If I could have you please look at Exhibit 733 -- excuse

8    me -- 735.

9         Again, is this one of the projectiles that was recovered

02:38 10    from inside the skull of Sean Collier?

11    A.   Yes, it was.

12    Q.   All right.  And even though it is deformed, you're still

13    able to make your conclusions?

14    A.   Yes, I am.

15    Q.   Okay.  And then finally, 737:  Is that another one of the

16    projectiles recovered from inside the skull of Officer Sean

17    Collier?

18    A.   Yes, it is.

19    Q.   And even though that one looks even more deformed than the

02:38 20    other, you're still able to make a determination?

21    A.   Yes, I was.

22    Q.   At times are you unable to make determinations?

23    A.   Not on the projectiles from the MIT scene.  All five were

24    identified back to the weapon that was recovered from

25    Watertown.

1  Q.   I'm sorry.  I asked a really poor question.  I was asking

2  in general, at times are you unable to make an identification

3  because there are not enough markings on a projectile?

4  A.   Yes.

5  Q.   But in this case you were able to identify all three of

6  these casings -- or projectiles?

7  A.   Yes, I was.

8  Q.   In addition to the weapon, the two weapons and the

9  casings, did you also recover live rounds at the scene?

02:39 10  A.   Yes, I did.

11  Q.   Okay.  If I may take back most of that.

12          MR. MELLIN:  And, your Honor, if I may approach with

13  Exhibit 935.

14  Q.   Do you recognize Exhibit 935?

15  A.   Yes, I do.

16  Q.   What is that?

17  A.   It's a box of Winchester 9 mm Luger caliber ammunition

18  that was recovered from the Laurel Street scene.

19          MR. MELLIN:  I'd move into evidence Exhibit 935.

02:40 20          MR. WATKINS:  No objection.

21          THE COURT:  Okay.

22          (Government Exhibit No. 935 received into evidence.)

23  BY MR. MELLIN:

24  Q.   Are there still live rounds in that box?

25  A.   Yes, there are.

1

1   Q.   How many live rounds are still in the box?

2   A.   There are four.

3         MR. MELLIN:  If I could have the witness please look

4   at Exhibit 941.  Actually, if I could have him look at Exhibit

5   866.  I believe it's in evidence.

6   Q.   Do you recognize Exhibit 866?

7   A.   Yes, I do.

8   Q.   And as you look -- is that a photograph of Watertown, on

9   Laurel Street?

02:41 10   A.   Yes, it is.

11   Q.   Okay.  Is that from the crime scene search?

12   A.   Yes, it is.

13   Q.   And the box of ammunition that you have in front of you,

14   do you see that in this photograph?

15   A.   No, I do not.

16   Q.   All right.  Do you remember seeing backpacks out there?

17   A.   Yes, I do.

18   Q.   If I blow that up, do you see the box that we're talking

19   about?

02:41 20   A.   Yes, I do.

21   Q.   Where do you see it?

22   A.   The lower left-hand corner right by where Placard 109...

23   Q.   Lieutenant Cahill, I'm not sure if I asked you, but the

24   projectiles that were recovered on the scene on Laurel Street,

25   were you able to tie those back to the 9 mm as well?

1

1    A.    Yes, I was.

2    Q.    And those are the six to eight we were talking about?

3    A.    Yes.

4    Q.    And did you do a comparison of those as well?

5    A.    Yes, I did.

6           MR. MELLIN:  If I can have just the witness, please,

7    look at Exhibit 944.

8    Q.    Do you recognize Exhibit 944-01?

9    A.    Yes, I do.

02:42 10   Q.    What are we looking at there?

11   A.    It's a picture of one of my comparisons under the

12   microscope.  On the left-hand side of the screen is the

13   test-fire from the recovered weapon, and on the right-hand side

14   of the screen, it's my Item 4-89, both 9 mm Luger caliber

15   discharged cartridge casings.

16          MR. MELLIN:  Again, your Honor, I would ask to publish

17   it just as a chalk.

18          THE COURT:  Okay.

19   BY MR. MELLIN:

02:43 20   Q.    As 944-01 comes up, is this just one of a series of

21   microscopic photos that you took?

22   A.    Yes, it is.

23   Q.    Okay.  Now, if you can please describe for the ladies and

24   gentlemen what it is you see in that.

25   A.    On the screen you see a microscopic picture of what I was

1

1    looking through under the microscope.  Again, on the left-hand

2    side it's a split screen, so if you see the line going straight

3    down the middle of the picture, on the left-hand side is the

4    test-fire I conducted from the 9 mm Ruger P95 I recovered from

5    the scene, and on the right-hand side is one of the discharged

6    cartridge casings, my Item No. 4-89, that was recovered from

7    the scene at Watertown.

8    Q.   And similar to Exhibit 943, there's an area of agreement

9    that you have in a red box?

02:44 10   A.   Yes.  If you like, I can circle it or --

11   Q.   Please.

12   A.   (Witness complies.)

13        If you look inside the circle, there's a red box in there

14   which we call the "area of agreement."  It's the individual

15   microscopic markings on that cartridge casing that we compared

16   one to the other that I was able to determine that that was

17   fired by the Ruger.

18   Q.   And again, are there other areas of agreement in addition

19   just something like this?

02:44 20   A.   Yes, there are.

21   Q.   All right.

22        MR. MELLIN:  With the Court's indulgence.

23        (Counsel confer off the record.)

24   Q.   At one point you mentioned that the weapon recovered is a

25   Ruger 9 mm.  Is that right?

1

1    A.    Yes, it is.

2    Q.    And then at another point you mentioned something called

3    "Luger."  Do you know what that was about?

4    A.    Yes.

5    Q.    What was that?

6    A.    Ruger is the manufacturer of the firearm; Luger is the

7    caliber designation of the weapon.  So a Luger -- a 9 mm Luger

8    is the caliber designation developed by Ruger before World War

9    I as a certain weapon for the German Army.

02:45 10    Q.    I may have failed to ask you this, but based on your

11    analysis of the scene at MIT as well as the recovery of the

12    projectiles from Officer Sean Collier, were you able to make a

13    determination that all five of those projectiles were fired by

14    that 9 mm Ruger?

15    A.    Yes, I was.

16    Q.    And based on your analyses of the evidence found at the

17    scene, were all 56 of the 9 mm shell casings tied to that exact

18    same 9 mm Ruger?

19    A.    Yes, they were.

02:46 20          MR. MELLIN:  Your Honor, I'd move into evidence

21    Exhibit 933.

22          MR. WATKINS:  No objection.

23          THE COURT:  Okay.

24          (Government Exhibit No. 933 received into evidence.)

25          MR. MELLIN:  Thank you.  Nothing further.

1

```
 1                    CROSS-EXAMINATION
 2    BY MR. WATKINS:
 3    Q.   It's still good morning, Lieutenant.
 4    A.   Good morning, sir.
 5    Q.   I'm putting before you Exhibits 928, which is the Ruger,
 6    931, which is the extended magazine, and then 934 is the pellet
 7    gun?
 8    A.   Yes.
 9    Q.   Would you take out Item 931, which is the extended
10    magazine from the Ruger.
11    A.   (Witness complies.)
12    Q.   And just hold it up.
13    A.   (Witness complies.)
14    Q.   So you work in the Firearms Identification Section of the
15    Massachusetts State Police lab.  Is that correct?
16    A.   Yes.
17    Q.   And there are other divisions and other laboratories
18    within the Massachusetts State Police?
19    A.   Yes.
20    Q.   Forensic Services Group, Firearms Identification Section,
21    a whole host of laboratories?
22    A.   Yes.
23    Q.   And when you collect evidence at the scene, for example,
24    the Ruger, the extended magazine and the pellet gun, you're not
25    the first one that analyzes something necessarily.  Is that
```

1

1    correct?

2    A.    That's correct.

3    Q.    So in this case before you did any kind of analysis, those

4    items went to the fingerprint identification section?

5    A.    Yes, it did.

6    Q.    And all three of them were analyzed for fingerprints,

7    correct?

8    A.    Correct.

9    Q.    And reports came with those fingerprint results, right?

02:48 10    A.    They generated reports but I never received them.

11    Q.    But those reports follow along with the weapon as it goes

12    through the Massachusetts State Police system?

13    A.    Yes, they generated it.

14    Q.    And did you -- well, do you know whether the items were

15    compared to the fingerprints of Jahar Tsarnaev and Tamerlan

16    Tsarnaev?

17    A.    I do not.

18    Q.    But a report would have been generated in the ordinary

19    course?

02:49 20    A.    Yes, they would have.

21    Q.    Now, I want to put up in front of you what's been

22    previously admitted as Exhibit 775.  Have you seen that map

23    before?

24    A.    I'm not exactly sure of this one but I've seen diagrams of

25    the scene.

1

1    Q.   And you recognize that to be a diagram of the Laurel and

2    Dexter area?

3    A.   Yes.

4    Q.   And this is the area from which you collected items on the

5    morning of April 19th?

6    A.   Yes.

7    Q.   And that was something done by you personally after other

8    folks had done other collection or other identification of

9    items there?

02:50 10   A.   Yes, myself and other members of my unit.

11   Q.   So we heard from -- for example, Trooper Tanguay was there

12   first, and then Trooper Dowd came in and did the GPS, and then

13   you came in.  Is that --

14   A.   When they were all done, yes, I recovered everything.

15   Q.   And there was videotaping done and photographs being done,

16   right?

17   A.   Yes.

18   Q.   And there were several teams all around this area doing

19   similar work, right?

02:50 20   A.   Yes.

21   Q.   So just to be clear, the 9 mm cartridges you collected

22   were all from around this general area, right?

23   A.   Yes.  The majority, yes.

24   Q.   Trooper Dowd will tell us precisely where they are, but as

25   a general matter they were up in this area of the Watertown

1

1    cruiser and the Civic, right?

2    A.    Yes.

3    Q.    And none were collected down in this area, which is the

4    actual intersection of Laurel and Dexter, right?

5    A.    Correct.

6    Q.    So you told us a total of 266 identifiable rounds shot

7    around that area?

8    A.    Casings, yes.

9    Q.    I'm sorry?

02:51 10   A.    Discharged cartridge casings, yes.

11   Q.    Discharged cartridge casings.  There were projectiles --

12   some projectiles you were able to find also, correct?

13   A.    Yes.

14   Q.    And these would be both 9 mm projectiles and also law

15   enforcement projectiles, .40 caliber and .45 caliber, right?

16   A.    Yes.

17   Q.    And subtracting the 56 cartridges from the Ruger, that

18   leaves 210 cartridges unaccounted for outside of the Ruger, not

19   unaccounted for -- because you did account for all of them.  Is

02:52 20   that correct?

21   A.    Yes.

22   Q.    You had access to every law enforcement weapon that was

23   fired at that scene on that morning, correct?

24   A.    I believe so, yes.

25   Q.    Obviously, if somebody fired and didn't report it --

1

A.   I never found -- I never not had a cartridge casing match

back to a gun.

Q.   Right.  You matched every single one of them found down

there to one of those, right?

A.   Yes.

Q.   And every one of them, except for the 9 mm casings, were

to law enforcement weapons, right?

A.   Yes.

Q.   And Mr. Mellin was asking you about the different

02:53 calibers.  The vast majority of the casings -- cartridge

casings you recovered were .40 caliber?

A.   Yes.

Q.   And that's understandable.  That's kind of standard issue

for police departments.  Many police departments use .40

caliber, right?

A.   Yes.

Q.   Some upgrade to .45 caliber?

A.   Yes.

Q.   But in this case, 176 of these cartridges were .40

02:53 caliber; only 18 were .45 caliber, right?

A.   Yes.

Q.   And again, these were all cartridges that you matched up

to law enforcement weapons, right?

A.   Yes.

Q.   There were also 16 rifle cartridges, right?

1

1    A.   Yes.

2    Q.   5.56 mm, right?

3    A.   Yes.

4    Q.   So there was -- somebody down there actually was able to

5    get their rifle out and fire?

6    A.   No, that scene was several blocks away.  Those weren't

7    recovered at the Dexter and Laurel scene.

8    Q.   That was four blocks away, on a kind of separate incident

9    of law enforcement, right?

02:54 10   A.   Yes.

11   Q.   So from the Dexter and Laurel scene, those .40 and .45

12   caliber, those were all collected, all law enforcement and all

13   at the scene, right?

14   A.   Yes.

15   Q.   And more specifically, looking at Exhibit 775, those

16   cartridges were found in this area, right?

17   A.   A good number of them were, yes.

18   Q.   I'm sorry?

19   A.   A good number of them were.  Not all of them.

02:54 20   Q.   A good number.  Well, some of them were found maybe a

21   little further over here to the right, which is where the

22   Watertown officers were shooting, right?

23   A.   Correct.

24   Q.   But there were quite a number found in these areas.  Is

25   that right?

1

A.   Yes.

Q.   And because you had access to the law enforcement weapons

and you had access to who submitted those weapons, you got a

pretty good idea of who was shooting from where based on the

cartridges, right?

A.   Yes.

Q.   We don't know, because as a cartridge we don't know which

direction they're shooting, but you know generally where they

were standing when they were shooting, correct?

A.   Yes.

Q.   So, for example, taking this northeast corner here, you're

able to identify five different weapons that were firing from

that northeast corner.  Is that correct?

A.   Yes.

Q.   A Watertown Police Department officer was firing from

there?

A.   Yes.

Q.   Four Boston Police Department officers were firing from

that northeast corner, right?

A.   Yes.

Q.   And over on this side we have three Boston Police

Department officers firing from that side, right?

A.   Yes.

Q.   And one Massachusetts state trooper firing, right?

A.   Yeah, he was a little farther down the street but in that

1

```
 1    general area.
 2    Q.    I'm sorry?
 3    A.    He was a little farther down the street, but, yes.
 4    Q.    Again, generally -- I mean, you can point to it if you --
 5    A.    He was farther down.
 6    Q.    Oh, I see.  To the left there.
 7    A.    Yes.
 8    Q.    But he was in that general area there, right?
 9    A.    Yes.
02:56 10    Q.    And down here also officers firing.  There would be Dic
11    Donohue, from whom we heard from.
12    A.    He was -- I don't believe Officer Donohue fired his
13    weapon.
14    Q.    Officer -- a Cambridge Police Department officer and two
15    Watertown Police Department officers firing from that
16    direction?
17    A.    Yes, sir.
18    Q.    Now, you also were -- you were able to collect projectiles
19    from a Mercedes SUV?
02:57 20    A.    Yes, we were.
21    Q.    I'm putting before you what's been admitted as Exhibit
22    339.  Is that the Mercedes SUV that you collected spent
23    projectiles from?
24    A.    Yes.
25    Q.    And showing it from another angle, which is Exhibit 3044,
```

1

1    that is the left side of it, correct?

2    A.   Yes.

3    Q.   And from inside of the Mercedes -- or embedded in the

4    Mercedes itself were 32 spent projectiles.  Is that correct?

5    A.   Yes.

6    Q.   Let me go back again to -- oh, and again, were you able to

7    match these to law enforcement weapons?

8    A.   No, I was not.

9    Q.   Going back again, then, to Exhibit 775, when you were

02:58 10   collecting evidence you were aware that a vehicle had been

11   reported fleeing in that direction through this intersection,

12   correct?

13   A.   Yes.

14   Q.   And what you found embedded in the Mercedes was consistent

15   with that and consistent with where you knew officers to be,

16   right?

17   A.   Yes.

18   Q.   So to state the obvious, I guess, the officers were

19   shooting at the Mercedes as it was going by?

02:59 20   A.   Correct.

21   Q.   There were also bullets through the windshield that you

22   saw in that Mercedes, but there were holes in the side --

23   either side, correct?

24   A.   Yes.

25   Q.   So we've heard evidence about Officer Donohue being

1

1    injured in this -- or this vicinity.

2    A.   Uh-huh.  That vicinity.

3         MR. MELLIN:  Your Honor, objection to this line of

4    questioning at this point.  This is speculation.  This is a

5    firearms' examiner who's talking about the casings that were

6    recovered and making identifications of the weapons.

7         THE COURT:  Overruled.  I'll allow it.

8    BY MR. WATKINS:

9    Q.   So again, you've testified about officers having shot from

03:00 10   this direction, and we've heard about Dic Donohue being in this

11   area on this driveway, and the Mercedes fleeing in this

12   direction.

13        MR. MELLIN:  Your Honor, objection as to where counsel

14   just says there's been testimony as to where Mr. Donohue was --

15   Officer Donohue was at the time.  He has two different arrows,

16   there's two different locations.

17        THE COURT:  No, I think...

18        MR. WATKINS:  I've taken it off, your Honor.

19        THE COURT:  All right.

03:00 20   BY MR. WATKINS:

21   Q.   Four officers in that area -- sorry -- five officers in

22   that area shooting at a fleeing vehicle.  Certainly if one of

23   them missed, you would expect to find a projectile in this area

24   here.

25   A.   Is that a question?

1

```
 1    Q.   It is.
 2              MR. MELLIN:  Objection, your Honor.  It's complete
 3    speculation.
 4              THE COURT:  Yeah, I think it is.  Sustained.
 5              MR. WATKINS:  I have nothing further.
 6                        REDIRECT EXAMINATION
 7    BY MR. MELLIN:
 8    Q.   Lieutenant Cahill, are you always able to find the casings
 9    at a crime scene?
03:01 10    A.   No.
11    Q.   Why is that?
12    A.   They could be lost; a vehicle could drive through the
13    scene, get caught in the tire and leave the scene; people pick
14    them up as souvenirs sometimes.
15    Q.   Right.  So if a car is driving down Laurel Street, they
16    could run over one of these casings, and these casings become
17    embedded in the tire, correct?
18    A.   Correct.
19    Q.   All right.  Now, we talked a little bit about bullets in a
03:01 20    windshield.  Did you also look at bullets in another car and
21    into a windshield?
22    A.   There were two Watertown cruisers that we --
23    Q.   What did you determine about that?
24    A.   That one of the 9 mm rounds from the weapon was recovered
25    from the Watertown cruiser.
```

1

1    Q.   And when we're saying "one of the 9 mm rounds," we're

2    talking about the weapon that you recovered on the scene.  Is

3    that right?

4    A.   Yes.

5    Q.   And you recovered the spent projectile inside that

6    Watertown police car, correct?

7    A.   Yes.

8    Q.   And it was shot through the windshield?

9    A.   Yes.

03:02 10   Q.   And it was tied back to that gun?

11   A.   Yes, it was.

12        MR. MELLIN:  Thank you.  Nothing further.

13        MR. WATKINS:  Nothing.

14        THE COURT:  All right, Lieutenant.  Thank you.  You

15   may step down.

16        THE WITNESS:  Thank you, your Honor.

17        (The witness is excused.)

18        MR. WEINREB:  The United States calls Agent Matthew

19   Riportella.

03:03 20                 MATTHEW RIPORTELLA, duly sworn

21        THE CLERK:  Have a seat.  State your name, spell your

22   last name for the record, keep your voice up and speak into the

23   mic.

24        THE WITNESS:  Matthew Riportella, R-I-P-O-R-T-E-L-L-A.

25                      DIRECT EXAMINATION

1

1   BY MR. WEINREB:

2   Q.   Good afternoon.

3   A.   Good afternoon.

4   Q.   Where do you work?

5   A.   At the FBI in Boston.

6   Q.   How long have you worked there?

7   A.   Approximately two and a half years.

8   Q.   What's your current assignment there?

9   A.   I'm on the FBI Boston Organized Crime Task Force.

03:04 10   Q.   What kind of training have you received as an FBI agent?

11   A.   I had 21 weeks of training at the FBI Academy in Quantico.

12   Q.   Despite being assigned to the organized crime unit at the

13   FBI, did you participate in the Boston Marathon bombing

14   investigation in the weeks after it occurred?

15   A.   I did.

16   Q.   And in the course of that investigation, on April 24th of

17   2013, did you go to the Manchester firing range in New

18   Hampshire to obtain some records?

19   A.   I did, but on a different date.  April 23rd.

03:04 20   Q.   I'm sorry.  April 23rd.

21        And what is the Manchester firing range?

22   A.   It is a gun supply store as well as a firing range that's

23   open to the public that they can practice their firearm skills.

24   Q.   What does that mean?  What's a firing range?

25   A.   A range where you can go and have a target, and you can

1

1    shoot a gun at a target.

2    Q.    Do you have to bring your own gun?

3    A.    No, you do not; you can rent guns.

4    Q.    Do they have a variety of guns that you can rent?

5    A.    Yes, I believe they do.

6    Q.    Do you have to bring your own ammo?

7    A.    No.

8    Q.    How do you shoot if you don't have ammo?

9    A.    You can buy ammo from the place as well.

03:05 10   Q.    And do they have the ammo necessary for the variety of

11   guns that they rent out?

12   A.    Yes.

13   Q.    When you got to the Manchester firing range, did you talk

14   to the owner?

15   A.    I did.

16   Q.    What was his name?

17   A.    Jim McCloud.

18   Q.    What, if anything, did you ask him to do?

19   A.    I asked him if we could have permission to look through

03:05 20   video and paperwork that he had related to Dzhokhar and/or

21   Tamerlan Tsarnaev.

22   Q.    And in response to that, did he give you some records?

23   A.    He did.

24         MR. WEINREB:  Mr. Bruemmer --

25   Q.    Did you review those records in my office the other day?

1

1    A.    Yes, I did.

2    Q.    Did you also ask Mr. McCloud if there was surveillance

3    video?

4    A.    I did.

5    Q.    For that date and time?

6    A.    Yes.

7    Q.    And as a result of that request, did you obtain some

8    video?

9    A.    Yes, I did.

03:06 10    Q.    Did you also review that video in my office the other day?

11    A.    Yes, I did.

12    Q.    So the records are Exhibit 1164 and the video is Exhibit

13    1165.  Were the records that you obtained, fair and accurate

14    copy -- the ones you viewed, were they fair and accurate copies

15    of the records that you obtained that day?

16    A.    Yes, they were.

17    Q.    And the video that you viewed, is that a fair and accurate

18    excerpt of the surveillance camera video that you obtained that

19    day?

03:06 20    A.    Yes, it was.

21              MR. WEINREB:  The government offers 1164 and 1165.

22              MR. WATKINS:  No objection.

23              THE COURT:  Okay.

24              (Government Exhibit Nos. 1164 and 1165 received into

25    evidence.)

1

1            MR. WEINREB:  Can we have 1164 on the screen, please.

2    BY MR. WEINREB:

3    Q.   Do you see that?

4    A.   Yes.

5    Q.   I'm just going to wait for it to come up on the big

6    screen.

7         So is this one of the records you received?

8    A.   Yes, it is.

9    Q.   I'm going to enlarge the top portion of it.  Actually,

03:07 10   this is a record, and stapled to the front there appears to be

11   a receipt?

12   A.   Yes.

13   Q.   All right.

14            MR. WEINREB:  Can we have the next page of that

15   exhibit, please?

16   Q.   So is this the same record but without the receipt on top?

17   A.   Yes, that's correct.

18   Q.   Let me -- so what does it say up here at the very top?

19   What kind of document is this?

03:07 20   A.   This is the check-in card.

21   Q.   And who's the customer?

22   A.   Dzhokhar Tsarnaev.

23   Q.   Does it give an address for him?

24   A.   410 Norfolk Street, Number 3, Cambridge, Massachusetts.

25   Q.   And does it give a date of birth?

1

```
 1    A.    Dated 7/22/93.

 2    Q.    Phone number?

 3    A.    (857) 247-5112.

 4    Q.    So over here next to "firearm," what's the description

 5    that's given here?

 6    A.    A Glock 17.

 7    Q.    And what's the next one?

 8    A.    The second one I originally thought said Glock 39, but now

 9    I actually believe it's a Glock 34.  That's a four, not a nine.

03:08 10    Q.    Are you familiar with what is the caliber of those two

11    weapons?

12    A.    I am.

13    Q.    What are they?

14    A.    9 mm.

15    Q.    Does this indicate the rental of two 9 mm weapons?

16    A.    Yes.

17    Q.    And what's next to the word "ammunition"?  What's

18    indicated here?

19    A.    9 mm.

03:09 20    Q.    And what do these marks mean?

21    A.    Four dashes, which I was told meant four boxes of 9 mm

22    ammo.

23    Q.    Do you see the boxes that say "in" and "out"?

24    A.    Yes.

25    Q.    What do they indicate?
```

1

1   A.   The time in the range and then the time out of the range.

2   Q.   So roughly an hour?

3   A.   Roughly an hour, yes.

4   Q.   The grand total cost for renting these two weapons and

5   buying the four boxes of ammunition?

6   A.   $170.75.

7        MR. WEINREB:  Can we have the next page?

8   Q.   So this actually --

9        MR. WEINREB:  I'm sorry, can you go back to the...

03:10 10   Q.   So this says "firearms experience," "range safety" and

11   "release"?

12   A.   Yes.

13   Q.   And here, the person is asked to check certain boxes?

14   A.   That's correct.

15   Q.   Okay.  What did Dzhokhar Tsarnaev say his experience was

16   with a handgun?

17   A.   Intermediate.

18   Q.   And in response to the question of whether he had a

19   history of mental illness, what did he say?

03:10 20   A.   No.

21   Q.   And when he was asked if he was a user or addicted to

22   marijuana or any other drug, what did he say?

23   A.   No.

24   Q.   And that's dated and then there's a signature?

25   A.   That's correct.

1

1          MR. WEINREB:  Can we have the next page.

2     Q.   Is this the same kind of check-in card we saw before?

3     A.   Yes.

4     Q.   And it gives the name of Tamerlan Tsarnaev?

5     A.   That's correct.

6     Q.   And the same address?

7     A.   That's correct.

8     Q.   And what's the phone number given?

9     A.   (857) 928-4634.

03:11 10    Q.   But he didn't rent or buy anything or pay for anything?

11    A.   Based off of that, no.

12         MR. WEINREB:  Can we have the next page, please?

13    Q.   So when it came to his experience with a handgun, what did

14    he say?

15    A.   That he was an intermediate.

16    Q.   The same as his brother?

17    A.   Correct.

18    Q.   And when asked whether he had any history of mental

19    illness, he also said no?

03:12 20    A.   That's correct.

21         MR. WEINREB:  Can we now have Exhibit 1165, please.

22    Q.   Do you recognize what's in this frame that I've frozen

23    here?

24    A.   I do.

25    Q.   What is it?

1

1   A.   It's part of the security video that we obtained from the

2   Manchester firing range.

3   Q.   You actually went there?

4   A.   I did.

5   Q.   So is this what you see outside the door of the Manchester

6   firing range?

7   A.   Yes.

8           (Video played.)

9   Q.   Is that the door?

03:13 10   A.   Yes.

11   Q.   This indicates March 20th at -- it's clipped off the

12   right-hand side of the screen, but a time around two o'clock.

13   Is that during the -- is that at one end of the period when the

14   receipt indicated that Dzhokhar Tsarnaev and his brother had

15   been in the range practicing?

16   A.   Yes, shortly after.

17   Q.   All right.  I'm going to finish running it at this size

18   and then I think we're going to make it smaller and I'll run it

19   again.  There we go.

03:14 20           (Video played.)

21   Q.   Have you seen those two individuals before, or images of

22   them before?

23   A.   I've seen images of them before.

24   Q.   Okay.  And who's the one on the left?

25   A.   Would be Dzhokhar Tsarnaev.

1

1    Q.    And the one on the right?

2    A.    I believe that to be Tamerlan Tsarnaev.

3          MR. WEINREB:  I have no further questions.

4          MR. WATKINS:  No questions.

5          THE COURT:  No questions?  All right, sir.  Thank you.

6    You may step down.

7          THE WITNESS:  Thank you.

8          (The witness is excused.)

9          MR. WEINREB:  The United States calls Timothy Dowd.

03:16  10          TIMOTHY E. DOWD, duly sworn

11          THE CLERK:  State your name, spell your last name for

12   the record, keep your voice up and speak into the mic.

13          THE WITNESS:  Timothy E. Dowd, D-O-W-D.

14                    DIRECT EXAMINATION

15   BY MR. WEINREB:

16   Q.    Good afternoon.

17   A.    Good afternoon.

18   Q.    Where do you work?

19   A.    I work for the Massachusetts State Police.

03:16  20   Q.    How long have you worked there?

21   A.    Twenty years.

22   Q.    What is your official title?

23   A.    Sergeant.

24   Q.    What are your job responsibilities?

25   A.    I'm currently assigned to the Collision Analysis and

1

Reconstruction Section.  I'm assigned to the northeastern part
of the state where I'm a supervisor of seven troopers.  The
Collision Analysis and Reconstruction Section responds to fatal
and serious-injury motor vehicle collisions.  In addition to
that, we respond to crime scenes where we use specialized
equipment to document the evidence at the crime scenes.

Q.   Would you mind pulling that microphone a little closer to
your mouth so that both the court reporter and everyone else
can hear you.

03:17   What kind of special equipment do you use to document
crime scenes?

A.   We use Total Station equipment, and we also use GPS
equipment which is essentially the Total Station that is run
off of GPS satellites.

Q.   What does it mean to document a crime scene using those
kinds of devices?

A.   When I respond to crime scenes, I am typically led around
by a member of the crime scene section and they identify
different pieces of evidence and they ask me to document it.

03:18   In this case, using the GPS equipment, the equipment consists
of a pole with a GPS receiver and also a data collector
attached to it.  I essentially put the pole on the piece of
evidence and record each piece of evidence in the data
recorder.

Q.   What does it mean to record a piece of evidence in a data

1

1    recorder?

2    A.    So using the GPS equipment, our GPS equipment -- like I

3    said, it runs off satellites, and it also attaches to something

4    called the CORS network, which is a network of 18 bay stations

5    throughout the state.  When I go on a piece of evidence and I

6    hit the button, it essentially tells it to collect the data.

7    It takes a reading off of the satellites and it also, via

8    Internet, connects to one of the CORS network stations -- in

9    this case it was the Woburn station -- which gives me an

03:19 10    accurate reading to 3 centimeters on each piece of evidence.

11    Q.    So the bottom line is that it records the GPS coordinates

12    of that item within 3 centimeters?

13    A.    Yes.

14    Q.    What kind of training have you had?

15    A.    So as far as forensic mapping, which is another term for

16    recording that evidence, I've been in the Collision Analysis

17    Reconstruction Section for 12 years.  I've been using the Total

18    Station equipment for the 12 years.  I've been trained in the

19    Topcon Total Station, which is the Total Station instrument.  I

03:19 20    received AutoCAD training back in 2002 when I entered the

21    section.

22         Since acquiring the GPS equipment, which was 2012, I was

23    trained by Leica, which is the company that makes the

24    equipment; I was trained by Massachusetts Department of

25    Transportation, which they are the ones who set up the entire

1

1    CORS network.  So I was trained in utilizing the CORS network

2    with the equipment.  Additionally, I was trained by Main

3    Technical Source on two different occasions.  They're the

4    company who sold that company to the state police.

5    Q.   You used the term "AutoCAD" in there as part of your

6    training.  What does "AutoCAD" refer to?

7    A.   So AutoCAD is a designer program that we use to create the

8    diagram.

9    Q.   So the GPS coordinates of various items, that information

03:20 10   is most useful if it's plotted on a diagram?

11   A.   Yes.

12   Q.   Of a location?

13   A.   Yes.

14   Q.   And the AutoCAD program is what enables you to draw the

15   diagram and plot the points on it?

16   A.   That's correct.

17   Q.   How many accident scenes have you processed, the fatal and

18   other serious accidents?

19   A.   Approximately 400.

03:21 20   Q.   How many crime scenes have you processed?

21   A.   I'd say between 50 and 75.

22   Q.   Did you help process the Laurel Street crime scene in

23   Watertown?

24   A.   I did.

25   Q.   When did you arrive on Laurel Street?

1    A.    At approximately 12 noon on April 19th.

2    Q.    When did you begin processing the scene?

3    A.    Shortly afterwards.  I couldn't give an exact time.  I

4    would say approximately an hour after arriving.

5    Q.    At the time you arrived, what was going on there?

6    A.    There were evidence technicians collecting evidence and

7    identifying evidence throughout the scene.

8    Q.    Were they already picking it up off the street and putting

9    it in bags?

03:21 10    A.    Some of it was picked up.  I believe most of it that I

11    identified was picked up, and in its place were placards.

12    Q.    What did you do when you got there?

13    A.    So when I got there, we met with Detective Lieutenant

14    Robin Fabry, who's in charge of our crime scene section.  She

15    assigned Trooper Colleen Tanguay to essentially walk through

16    the crime scene with me and identify which evidence they wanted

17    recorded.

18    Q.    Did you take GPS readings of all the items of evidence

19    they wanted recorded?

03:22 20    A.    Yes.

21    Q.    Were there other items on the scene that you didn't take

22    GPS readings of?

23    A.    Yes.

24    Q.    All right.  Do you know which ones you focused on for the

25    GPS readings?

1

1    A.    So I focused on the pieces of evidence that Trooper

2    Tanguay identified for me.  Anything that she did not identify,

3    I didn't record.

4    Q.    After you got all that evidence -- or when you say you

5    took the GPS readings, what did you do with that data after you

6    got it?

7    A.    So once I collected the data, it's stored in what's called

8    a field book.  The data collector is downloaded, so that field

9    book data comes out of that and into my computer.

03:23 10    Additionally, in order to create my diagram, we use

11    georeferenced orthophotos, which are essentially aerial

12    photographs with georeference data embedded within them.

13              MR. WEINREB:  Mr. Bruemmer, may I have Exhibit 946 for

14    the witness, please.

15    Q.    Do you recognize that diagram?

16    A.    Yes.

17    Q.    What is it?

18    A.    That is a part of the diagram that I created utilizing the

19    GPS data of Laurel and Dexter.

03:24 20    Q.    There are a bunch of purple-colored images and placards on

21    it.  What are those?  What do those represent?

22    A.    All of the markers that were colored magenta represent

23    ballistics evidence from the Ruger weapon.

24    Q.    Is that an accurate diagram?

25    A.    Yes.

1

1          MR. WEINREB:  The government offers 946.

2          MR. WATKINS:  No objection.

3          THE COURT:  Okay.

4          (Government Exhibit No. 946 received into evidence.)

5    BY MR. WEINREB:

6    Q.   I want to begin by asking you about the houses, the trees,

7    the street, the length of it, the shape of it, that's all

8    pictured on this diagram.  How did you get that information?

9    A.   So once we finish at the scene, the next step is to bring

03:25 10   in, as I mentioned a few seconds ago, an orthoimage.

11   Massachusetts Department of Transportation contracts with a

12   company that does flyovers.  And doing the flyovers, they use

13   an instrument that records photographs and it also records

14   geodata.

15        So I go on to the Mass. Department of Transportation

16   website.  They have a certain website called "Oliver."  Within

17   that website I can locate the area that I want to focus on,

18   download that image.  And the first thing I do is import that

19   image into AutoCAD.

03:25 20   Q.   So that's basically an overhead photograph of the area in

21   question?

22   A.   Yes.

23   Q.   Please continue.

24   A.   So that photo serves as basically a reference layer to my

25   diagram.  I then import all the points that I took that were

1

1    collected at that scene, and those points fall on the image

2    where they would be on the actual roadway.  So using that

3    image, the houses were drawn onto this diagram, the edges of

4    the road, the sidewalks, the things that would basically act as

5    more or less a canvas for my diagram.

6    Q.   So this is a diagram version of an overhead photograph of

7    the area?

8    A.   Yes.

9    Q.   What about the magenta placards that are pictured here;

03:27 10   what do they represent?

11   A.   Those were collected with the GPS equipment at the scene.

12   Q.   All right.  You said earlier that they represent a Ruger

13   ballistic evidence?

14   A.   Yes.

15   Q.   So this is only shell casings and projectiles from the

16   Ruger that was recovered from Laurel Street?

17   A.   In this diagram, yes.

18   Q.   In this.  In other words, the magenta ones are just the

19   Ruger?

03:27 20   A.   Correct.

21   Q.   And by the way, these magenta placards, do they actually

22   have numbers on them?

23   A.   They do.

24   Q.   Those are the actual numbers that were on the placards?

25   A.   Yes.

1

1          MR. WEINREB:  Go back up.

2    Q.   So looking all the way over here, for example, that's a

3    ballistics item associated with the Ruger?

4    A.   Yes.

5    Q.   Okay.  Same thing over here and over here?

6    A.   Yes.

7          MR. WEINREB:  Can we have Exhibit 945 -- no,

8    actually --

9          So, your Honor, if we could move to the ELMO here.

03:28 10          THE COURT:  Is this something that's in or --

11          MR. WEINREB:  No.  I'll show it to the witness.

12   BY MR. WEINREB:

13   Q.   So this is Exhibit 945 for identification.  Do you

14   recognize that?

15   A.   Yes.

16   Q.   What is that?

17   A.   That's the diagram of the scene at Laurel and Dexter, and

18   it has the explosive evidence as well as the ballistics

19   evidence that was collected.

03:29 20   Q.   Is this an accurate diagram to the best of your knowledge?

21   A.   Yes.

22          MR. WEINREB:  The government would offer 945.

23          MR. WATKINS:  No objection.

24          THE COURT:  Okay.

25          (Government Exhibit No. 945 received into evidence.)

1

1          (Pause.)

2          THE COURT:  It's not working, I guess is the technical

3    term.

4          MR. WEINREB:  It's on the screen on the ELMO.

5          MR. CHAKRAVARTY:  Your Honor, it's on the screen but

6    perhaps it's not on the right --

7          THE COURT:  No.

8          MR. WEINREB:  We're seeing it on the screen here.

9          THE COURT:  You are, huh?

03:30 10          MR. CHAKRAVARTY:  And the screen isn't moving.

11          THE COURT:  You're getting the same thing I get,

12    right?  Are you seeing the image on your monitors?

13          MR. WEINREB:  We're not seeing it on the monitors but

14    we're seeing it on the screen on the ELMO, and the monitor is

15    not showing what the ELMO is showing.

16          THE COURT:  Right.  That accurately describes the

17    problem.

18          (Laughter.)

19          MR. WEINREB:  Okay.  Then I guess I'll just publish it

03:31 20    to the jury by passing it along to them, if that's acceptable.

21          THE COURT:  Fine.

22          (Exhibit 945 is published to the jury.)

23    BY MR. WEINREB:

24    Q.   So this diagram has both the -- actually, I have some more

25    copies of it --

1

1          (Pause.)

2   Q.   So this diagram, in addition to the magenta placards, has

3   placards of other colors as well, correct?

4   A.   Yes, correct.

5   Q.   And those, you said, represent items of explosives

6   evidence that were recovered on the scene?

7   A.   Correct.

8          THE COURT:  Is that a second copy of the same thing?

9          MR. WEINREB:  They're all the same thing.

03:32 10          THE COURT:  Maybe one could go to the back?  Oh, there

11   are multiples?  Never mind.

12          (Pause.)

13          MR. WEINREB:  May I have Exhibit 1563 for the witness,

14   please?

15   BY MR. WEINREB:

16   Q.   So I asked you about how the -- I asked you about how the

17   houses and the streets and so on, how you diagramed those, and

18   you gave us the answer to that, and I asked you about how the

19   ballistics evidence was marked, you testified about that,

03:33 20   through the GPS device.

21          Now I want to ask you about the cars that we see located

22   on the street.  How did you -- are those the cars that were

23   actually there on that date when you were mapping the scene?

24   A.   Are you asking about the diagram in front of me here?

25   Q.   I am.

1

1    A.    Okay.  Yes.

2    Q.    How did you determine the location of those -- how did you

3    determine where to put them on your diagram?

4    A.    So when we were mapping the evidence at the scene,

5    we -- it was sort of a team process.  Trooper Michael George,

6    who's also assigned to the car section, was walking with me.

7    Some of the cars that weren't identified as actually pieces of

8    evidence were documented in a field sketch which is on the

9    monitor now.  He documented the plates on each car and he

03:34 10    provided me with listings on each car so that I would know the

11    make and type of the car.  And then they were placed sort of by

12    looking at the field sketch, not by actual points that were

13    recorded at the scene.

14    Q.    So you just said that what's on the screen right here is

15    the field sketch that was made that day?

16    A.    So the scene was much larger than this.  There's several

17    pages of the field sketch, but this is one of the pages of the

18    field sketch, yes.

19            MR. WEINREB:  The government offers 1563.

03:35 20            MR. WATKINS:  No objection.

21            (Government Exhibit No. 1563 received into evidence.)

22    BY MR. WEINREB:

23    Q.    So just so we get oriented, there's a -- when you were on

24    the scene, did you notice a Honda Civic that was in the middle

25    of the street?

1

1   A.   Yes.

2   Q.   And is that the car I've circled right here?

3   A.   Yes.

4   Q.   In the very middle of the diagram?

5   A.   Yes.

6   Q.   And then there was a cruiser that had come to a stop by

7   essentially crashing into another car?

8   A.   Correct.

9   Q.   And that's this right here, correct?

03:35 10   A.   Yes.

11   Q.   And now I've circled the other horizontal vehicle at the

12   end of a driveway right above where the Honda is.  And then

13   there are several cars parked in the driveway there?

14   A.   That's correct.

15   Q.   All right.  And did you notice that one of them had

16   a -- the bottom of a pressure cooker embedded in its side?

17   A.   Yes.

18   Q.   All right.  And is that this car right here, the one with

19   the number 1 on it?

03:36 20   A.   Correct.

21        MR. WEINREB:  Can we go back to Exhibit

22   946 -- actually, can you put 946 and this one side by side?

23   Okay.

24   Q.   Okay.  So looking at 946 on the right and the sketch on

25   the left, on the right, on 946, it appears as if in the

1

1    driveway the two cars closest to the sidewalk are

2    roughly -- they're parked the same distance into the driveway;

3    in other words, the rears of those cars would more or less line

4    up in your diagram, correct?

5    A.   Correct.

6    Q.   All right.  But on the sketch that's not the case.  Is

7    that right?

8    A.   Correct.

9    Q.   Okay.  On the sketch, the car on the left is further up.

03:37 10   Is that right?

11   A.   Yes.

12   Q.   Okay.  When you created this diagram on the right, did you

13   believe it was important the precise placement of cars in a

14   driveway?

15   A.   No; I was more concerned with just placing the cars so

16   that it would indicate that there were cars in that driveway.

17   Q.   But based on your memory as well as on photographs of the

18   scene that you have reviewed, which is the more accurate

19   depiction of where the cars in the driveway were?

03:37 20   A.   The field sketch.

21        MR. WEINREB:  Can I have Exhibit 1559, please.  And

22   this should just be for the witness for a moment.

23   Q.   Is this a fair and accurate photo of the scene that was

24   taken that day?

25   A.   Yes.

1

1          MR. WEINREB:  The government offers 1559.

2          MR. WATKINS:  No objection.

3          (Government Exhibit No. 1559 received into evidence.)

4    BY MR. WEINREB:

5    Q.    So this is looking down Laurel Street towards the

6    direction where the Honda and the Mercedes were?

7    A.    Correct.

8    Q.    In fact, you see the Honda?

9    A.    Yes.

03:38 10   Q.    Can you circle that?

11   A.    Can I circle it?

12   Q.    Yes.  Just using the pad of your finger, you can just

13   press hard on the screen and you'll be able to draw a circle on

14   it.

15   A.    (Witness complies.)

16   Q.    Okay.  So that's one Honda.  Let me ask you about the

17   Honda that's in the middle of the street.

18   A.    (Witness indicates.)

19   Q.    All right.  So you've circled the Honda that's sort of

03:39 20   near the right-hand side of the photo.

21          And then do you see the cruiser that essentially crashed?

22   A.    Yes.

23   Q.    Can you circle that?

24   A.    (Witness complies.)

25   Q.    All right.  I'm going to erase those now.

1

1      Do you see this mark right here in the middle of the

2  street?

3  A.   I do.

4  Q.   I've circled a black mark and -- essentially in the center

5  of the picture.  Do you know what that is?

6  A.   I do.

7  Q.   What is it?

8  A.   It was sort of a divot out of the road with some black

9  soot and -- well, that's essentially what it was.

03:39 10  Q.   Okay.  Is that the seat of an explosion?

11  A.   Yes.

12  Q.   And then can you circle the car that had the pressure

13  cooker embedded in its side?

14  A.   (Witness complies.)

15  Q.   Okay.  That was also a Honda?

16  A.   Yes.

17  Q.   So based on this photo and on your own memories of the

18  scene, is there a direct line from the seat of the blast right

19  to that car in between the cruiser on the right and the car

03:40 20  parked on the left-hand side of the driveway?

21  A.   Yes, there is.

22  Q.   All right.  Was there ample room for the --

23          MR. WATKINS:  Objection.  Leading here.

24          MR. WEINREB:  Okay.

25  BY MR. WEINREB:

1

1   Q.   Was there or was there not in your -- based on your

2   observation, room for a pressure cooker to fit in between those

3   two cars and embed itself in the side of the Honda?

4   A.   There was.

5        MR. WEINREB:  No further questions.

6                      CROSS-EXAMINATION

7   BY MR. WATKINS:

8   Q.   Good afternoon.

9   A.   Good afternoon.

03:41 10   Q.   So you created not only the maps we saw, 945 and 946, but

11   a number of aerial diagrams for this case?

12   A.   Yes.

13   Q.   Showing you Exhibit 775, is that one of the maps that you

14   created for purposes of this case?

15   A.   Yes, it is.

16   Q.   And just to be clear, we are talking about this section

17   that's here, where the cars are inaccurately drawn on there?

18   A.   Correct.

19   Q.   And that's because you didn't take the GPS right at the

03:42 20   tires as you did for other vehicles?

21   A.   Correct.

22   Q.   But aside from that inaccuracy, this is your map that you

23   drew?

24   A.   It is, yes.

25   Q.   Not only did you go to the cars and the ballistic evidence

1

1     that we saw on 945 and 946, you marked all kinds of ballistic

2     evidence all over that scene, correct?

3     A.   Yes.

4     Q.   Did you also mark ballistic evidence for a few blocks away

5     from another incident?

6     A.   Where are you --

7     Q.   Down on Adams Street in Watertown.  Did you go down there

8     also?

9     A.   I may have.

03:43 10   Q.   All right.  But in any case, you marked all kinds of

11    different evidence here at the scene, including around Laurel

12    and Dexter, right?

13    A.   Yes.

14    Q.   You created those maps, 945 and 946, about where the Ruger

15    cartridges were and the explosive materials were.  Did you

16    create a map of where law enforcement ballistic evidence was

17    found?

18    A.   No.

19    Q.   And it's fair to say that the maps you did create were at

03:43 20   the request of the U.S. Attorney's Office in this case?

21    A.   So I created a diagram initially that had all the

22    evidence.  It was further broken down from that point.

23    Q.   Oh, I see.  So there was actually a diagram at one point

24    of all of the evidence there?

25    A.   I believe there were 448 pieces of evidence collected --

1

1    or not pieces of evidence, rather, points recorded in total.

2    Q.   And you -- points -- so it wasn't just ballistic evidence,

3    it was cars, as you did other things that people thought were

4    important, correct?

5    A.   Yes, sir.

6    Q.   And there was a map that included all of these, one of

7    these diagrams that you created, of all of that.  Is that

8    correct?

9    A.   Yes.

03:44  10   Q.   Did you provide that to the U.S. Attorney's Office also?

11   A.   Yes.

12   Q.   So that other map that you have would have documented

13   evidence in this intersection of Laurel and Dexter, right?

14   A.   Yes.

15   Q.   And there were many, many cartridge casings and other

16   items of interest in that intersection.  Is that correct?

17   A.   As I explained before, I pretty much document the

18   placards.  I'm not sure what the placards are.  You could tell

19   me Placard 452, that's what I record it as.

03:45  20   Q.   So there were many, many placards down around this area

21   that you documented?

22   A.   Well, throughout the entire scene.  I can't say for that

23   corner how many were there.

24   Q.   Turning to Laurel and Dexter specifically, there were

25   many, many placards in that area that you took measurements of?

1

A.   Yes.

Q.   Did you also take measurements from here about where Dic

Donohue was injured?

          MR. WEINREB:  Objection, your Honor.

          THE COURT:  Sustained.

          MR. WATKINS:  I'm sorry?

          THE COURT:  Sustained.

          MR. WATKINS:  I'm not understanding the --

          THE COURT:  Relevance.

03:45     MR. WATKINS:  -- basis.

          THE COURT:  Relevance.

          MR. WEINREB:  Relevance and stating facts that haven't

been elicited from this witness or that he hasn't testified to.

          THE COURT:  All right.  I think relevance is enough.

BY MR. WATKINS:

Q.   You have created -- well, let me go back.  You talked

about the AutoCAD program and how it gets material from aerial

photos and georeferences, things of that nature?

A.   Yes.

03:46 Q.   Does the AutoCAD also create this green and orange and

gray map that we see before us?

A.   No.

Q.   That is something that you create?

A.   Yes.

Q.   Turning now to this specific location, I see you've

1

1   written "144 Dexter Avenue" on this building here.  Is that

2   correct?

3   A.   Yes.

4   Q.   And what appears to be two driveways going out into the

5   street on Dexter Avenue.  Is that accurate?

6   A.   I believe one of them was a walkway, but yes.

7   Q.   Okay.  So this was actually a driveway here, and that's

8   the way you created it?

9   A.   Yes.

03:47 10         MR. WATKINS:  Is Exhibit 771 in evidence yet?  I

11   believe it is.

12         THE CLERK:  Yes, it is.

13   BY MR. WATKINS:

14   Q.   I'm going to show you Exhibit 771.  That's the actual

15   aerial photograph of this area -- I'm sorry about that -- of

16   the Laurel and Dexter area, amongst other things, which I'm

17   showing here.  Do you see that?

18   A.   I do, yes.

19   Q.   And do you see where it's marked "144"?

03:48 20   A.   Yes.

21   Q.   Based on that diagram you saw, what you see here, is that

22   144 Dexter Avenue?

23   A.   (No verbal response.)

24   Q.   And can you point out where that driveway is that you put

25   on your map?

1

1    A.   I can't see it with the shadows.  It looks like it's

2    possibly above the "144," but it's hard to see.

3    Q.   I'm sorry?

4    A.   It's hard to see in this image that you're showing me.

5    Q.   Let's try this, then.  I'm going to put this over here for

6    now.

7         MR. WATKINS:  And if I could have now the monitor just

8    go to the witness.  Let me get that one bigger too.

9    Q.   Is this a map also of that same scene?

03:49 10   A.   Yes.

11   Q.   Now, you're familiar with Google Earth?

12   A.   I am.

13   Q.   And Google Earth is indeed a program developed by Google

14   that relies on global positioning satellites, aerial photos and

15   georeferences quite like you rely on for the AutoCAD, right?

16   A.   Similarly, yes.

17   Q.   And so this picture, does that accurately diagram the same

18   scene that we saw in 771?

19        MR. WEINREB:  I object to this on relevance grounds.

03:50 20        THE COURT:  Sustained.

21        MR. WATKINS:  Your Honor, perhaps we could be seen

22   quickly at sidebar?

23        THE COURT:  Okay.

24        (Discussion at sidebar and out of the hearing of the

25   jury:)

1

1          MR. WATKINS:  Judge, the issue is the government has

2     opened -- promised the jury that a stray bullet was -- caused

3     the injury of Dic Donohue.  One of the -- the placement of one

4     of the officers and particularly this driveway seems to suggest

5     that -- I believe to the jury -- that one of Tamerlan

6     Tsarnaev's bullets -- or one of the bullets from the end of the

7     street could have caused that.  I do not believe that's

8     factually accurate.

9          While the government has put this into play and made

03:51 10     it unclear, I think there is a lot of relevance to where that

11     driveway actually is.

12          MR. WEINREB:  Well, even if that were so, it's way

13     beyond the scope of the direct.  This witness simply took GPS

14     readings of bullets and evidence on the street.  If they want

15     to put on in their case evidence of who shot the officer, then

16     we can address the relevance, but it's not appropriate to start

17     putting in Google Earth and asking him to authenticate that

18     when he can't possibly do it.  He has no personal knowledge of

19     what the scene looks like from the air.

03:51 20          MR. WATKINS:  He identified just now --

21          THE COURT:  Well, I guess the question is:  Is this an

22     issue in the case, whether the shooting of Donohue was the

23     defendant or the deceased brother?

24          MR. WEINREB:  The government has no information

25     definitely who or how -- who shot Dic Donohue.

1

1           THE COURT:  Right.  So there's no -- any conclusion on

2      that would be speculation.

3           MR. WEINREB:  I believe so, yes.

4           THE COURT:  So it shouldn't be in the case on either

5      side.

6           MR. WEINREB:  We're not going to argue that the

7      defendant or his brother shot Officer Donohue because we can't

8      say.

9           MR. WATKINS:  It's already in because he said a stray

03:52 10  bullet right in the openings.  If we stop now, the jury is

11     allowed to draw whatever speculation they do -- they want.  It

12     needs to be made clear.  The government should stipulate --

13          MR. WEINREB:  I don't think the government in the

14     opening said a stray bullet hit Dic Donohue.  Dic Donohue got

15     shot.  Obviously, a bullet hit him.  We did not say either one

16     of the brothers shot Dic Donohue.  We didn't suggest it.  All I

17     said in my opening statement was a stray bullet hit Dic

18     Donohue.  That's the opposite of arguing the defendant or his

19     brother was the one who shot him.

03:53 20          MR. MELLIN:  And, your Honor, one of the witnesses

21     testified they did not recover the bullet from Dic Donohue so

22     no one will be able to say this one or that one fired this

23     shot.  So it's all speculation.

24          MR. WATKINS:  I do not intend to say specific -- I

25     need to rule out Tamerlan Tsarnaev's gun.  It's physically

1

1    impossible, I believe.  And if I were allowed to go through

2    this --

3              THE COURT:  Well, you have evidence to that effect --

4    that the gun had been abandoned -- from one of the officers.

5    It hit him in the arm.

6              MR. WATKINS:  I do.  But on the basis of the evidence

7    so far, I do believe a juror could say as he was shooting down

8    there, one of those stray bullets hit Dic Donohue.  And if the

9    juror -- if some juror could say that, I think we have the

03:53 10   ability to react to that.

11             THE COURT:  No, I don't think it's a big-enough issue.

12   Don't worry about it.  So...

13             MR. WATKINS:  I'm sorry?

14             THE COURT:  No, I don't think it's -- I don't think

15   it's relevant.

16             MR. WATKINS:  Judge, the whole testimony will take

17   about five minutes.  Perhaps we could do a voir dire of it now

18   that we've reached one o'clock.  I can go through and show the

19   Court, because I think there's extreme relevance here.  If the

03:54 20   government, as they say, has no evidence that Tamerlan

21   Tsarnaev -- it might have been Tamerlan Tsarnaev, it might have

22   been somebody else.  They simply -- it's not true.  I mean,

23   that's what they want to argue, that's what they want the jury

24   to believe.

25             THE COURT:  Well, no, they haven't gotten to argument.

1

1        I'm not going to -- they will be able to argue that.

2                MR. WATKINS:  But, your Honor, what if they say a

3        stray bullet -- if they continue to say a stray bullet hit

4        Mr. Tsarnaev [sic], a juror sitting there could believe

5        wrongly, factually wrongly, that --

6                THE COURT:  It's not related to any of the actual

7        offenses, is it?

8                MR. WATKINS:  An actual defense?

9                THE COURT:  Offense.  Any of the charged offenses?

03:54 10                MR. WATKINS:  Yes, it does.  He is charged with Dic

11       Donohue being injured as a result of fleeing.

12               THE COURT:  Okay.

13               MR. WATKINS:  As you'll recall, the defense -- we do

14       have a defense on that, that there was no intentionality by

15       Mr. Tsarnaev to cause injury to Mr. Donohue.

16               MR. WEINREB:  There's nothing in the indictment that

17       charges either --

18               THE COURT:  So the injury is derivative of the general

19       actions?

03:55 20                MR. WEINREB:  Right.  That but for the actions of the

21       Tsarnaev brothers --

22               THE COURT:  Which would include getting shot by a

23       police officer.

24               MR. WEINREB:  That's correct.

25               MR. WATKINS:  But they've made it an issue in this

1

1    case.

2              THE COURT:  Yeah.  No, I don't see it.  So that being

3    the case, do you have --

4              MR. WATKINS:  Let me just take a look at my notes.  I

5    don't think I have anything else.

6              THE COURT:  All right.

7              (In open court:)

8              MR. WATKINS:  Just a very quick question here.  A

9    couple of questions.

03:56 10            THE COURT:  Okay.

11   BY MR. WATKINS:

12   Q.   I'm showing you 771 again, and I'm going to highlight this

13   block -- or this portion of the picture, Laurel and Dexter

14   Street.  Can you point out where 144 Dexter Avenue is by

15   tapping next to it?

16             MR. WEINREB:  Your Honor, I object again.  There's no

17   relevance.

18             THE COURT:  Well, go ahead.  You could do that.

19   BY MR. WATKINS:

03:56 20   Q.   Just tap on 144.

21   A.   (Witness complies.)

22   Q.   Can you tap on 61 Laurel Street, in front -- in the street

23   of 61 Laurel Street?

24   A.   (Witness complies.)

25             MR. WATKINS:  That's all I have, your Honor.

1

1          THE COURT:  Anything else?

2          MR. WEINREB:  No, your Honor.

3          THE COURT:  All right.

4          All right, sir.  You may step down.  Thank you.

5          THE WITNESS:  Thank you.

6          (The witness is excused.)

7          THE COURT:  And we will take the lunch recess.

8          THE CLERK:  All rise for the Court and the jury.  The

9    Court will take the lunch recess.

03:57  10          (The Court and jury exit the courtroom and there is a

11    recess in the proceedings at 1:05 p.m.).

12    (The Court and jury entered the courtroom at 2:11 p.m.)

13          MR. WEINREB:  Good afternoon, your Honor.  The United

14    States calls Christopher Donahue.

15          CHRISTOPHER DONAHUE, Sworn

16          THE CLERK:  Have a seat.  State your name.  Spell your

17    last name for the record.  Keep your voice up and speak into

18    the mic so everybody can hear you.

19          THE WITNESS:  My name is Chris Donahue, D-o-n-a-h-u-e.

05:04  20    DIRECT EXAMINATION BY MR. WEINREB:

21    Q.   Good afternoon.

22    A.   Good afternoon, sir.

23    Q.   Where do you work?

24    A.   I work with the Massachusetts State Police.

25    Q.   In what section?

1

1    A.    I work out of Crime Scene Services Section out of the

2    Maynard laboratory.

3    Q.    How long have you worked there?

4    A.    I worked with the state police approximately nine years

5    now and with the crime scene for approximately a little over

6    seven years.

7    Q.    What are your job responsibilities in the Crime Scene

8    Services Unit?

9    A.    My responsibilities are to document, to process, collect,

05:04 10   and analyze evidence.

11   Q.    Does that include fingerprint evidence?

12   A.    Yes.

13   Q.    Where did you go to school, and what degrees have you

14   earned?

15   A.    I'm currently in a Ph.D. program at UMass Lowell.  It's in

16   criminal justice and criminology.  I have a master's in

17   criminal justice.  I have a graduate certificate in leadership

18   policy and development.  I have a graduate certificate in

19   forensic psychology.  I have a -- I earned a bachelor's from

05:05 20   UMass Boston.

21   Q.    Have you received training in how to handle evidence?

22   A.    Yes.

23   Q.    Have you received specialized training in how to document

24   crime scenes?

25   A.    Yes.

1

1      Q.    Have you received training in fingerprint identification

2   and comparison?

3      A.    I have.

4      Q.    Both in-house and external training?

5      A.    Yes, I have.

6      Q.    What kind of in-house training have you received?

7      A.    Initially, when I came into the unit, into Crime Scene

8   Services, there was approximately five months of in-house

9   training where at that time we had training from senior

05:06 10   troopers to train us in the examination and analysis of

11   evidence, the handling of evidence, the processing of evidence,

12   and the analyzation of fingerprints, footwear, and tire tread.

13      Q.    What about external training?

14      A.    External training, I received external training from

15   various law enforcement agencies such as the FBI, Boston

16   Police, other law enforcement agencies.  Also, agencies,

17   civilian agency, such as Ron Smith and Associates.

18      Q.    Did that training specifically include fingerprint

19   analysis and identification training?

05:06 20      A.    Yes.

21      Q.    After getting trained, did you have to take some kind of

22   exam to be qualified to do fingerprint analysis?

23      A.    Yes.

24      Q.    What was that?

25      A.    After this initial training, I take a competency exam, and

1

1     I passed that back in 2008.

2     Q.    Following that, was there a kind of apprenticeship where

3     you do your work under the supervision of a more senior

4     analyst?

5     A.    Yes.

6     Q.    How long did that last?

7     A.    That lasted approximately a year.  It was called

8     supervised casework.  So all the casework I worked on for that

9     year was mentored by a senior trooper.

05:07 10    Q.    Have you had additional testing over the years to make

11    sure your skills are up to snuff?

12    A.    Yes.

13    Q.    Tell us about that.

14    A.    Each year I'm required to take proficiency exams and --

15    internal and external proficiency exams.  And those are

16    evaluated through a process through our quality assurance.

17    Q.    In the course of your work, how many fingerprints have you

18    identified at crime scenes and documented and preserved for

19    later analysis?

05:08 20    A.    Well, process and collected, thousands.

21    Q.    And how many of those have you actually analyzed by doing

22    comparisons between them and known prints?

23    A.    Thousands.  Everything that I process and collect at

24    scenes, I also analyze.

25    Q.    Are there occasions when you have identified a person by

1

comparing the person's fingerprints to fingerprints found at a

crime scene?

A.   Yes.

Q.   Are there occasions when you've excluded a person by

comparing their known prints to fingerprints found at a crime

scene?

A.   Yes.

Q.   As part of your job, are you expected to testify in court

about your examinations and the results of those examinations?

05:08 A.   Yes.

Q.   How many times have you testified in court about

fingerprint evidence?

A.   Close to 50 times.

Q.   Did you help document the Laurel Street crime scene on

April 19, 2013?

A.   Yes.

Q.   Among other things, did you photograph a bullet from a

Ruger that had penetrated the wall of the home located at 40

Laurel Street?

05:09 A.   I did photograph a discharged bullet.  However, I did not

-- I wasn't able to analyze it, so I'm not quite sure what the

caliber was.

Q.   Fair enough.  But you're the one whose job it was to

photograph what that bullet had done to that house?

A.   Yes.

1

1        MR. WEINREB:  Exhibit 772, please.

2   Q.   Do you recognize this?  Do you have it in front of you

3   yet?

4   A.   Yes.

5   Q.   Do you recognize it?

6   A.   Yes.

7   Q.   What is it?

8   A.   This here is the area of Dexter and Laurel Street in

9   Watertown.

05:10 10  Q.   Just to remind the jury, can you draw an X at the

11  intersection of Dexter and Laurel?

12  A.   (Indicating).  Can I --

13  Q.   Here, I'll clear that for you.  If you press hard with

14  your finger, it will draw a line, or you can just tap it.

15  A.   (Witness complies.)

16  Q.   That's fine.  Is that the intersection?

17  A.   Yes, sir.

18  Q.   And then I'm going to enlarge that area.

19       Do you see 40 Laurel Street on this map?

05:10 20  A.   Yes, I do.

21  Q.   Could you circle it?

22  A.   (Indicating.)

23       MR. WEINREB:  Can I have Exhibit 948-160 just for the

24  witness, please?

25  Q.   Trooper, I'm going to show you a series of photos, and at

1

1    the end I'm going to ask you if they're fair and accurate

2    photos of what you saw that day.

3              MR. WEINREB:  Let's have -161, please; -162, -163,

4    -164, -165, -166, -01, -02, -03, -04, and -05.

5    Q.   Are all those photos you took that day?

6    A.   Yes.

7    Q.   Are they fair and accurate photos?

8    A.   Yes, they are.

9              MR. WEINREB:  The government offers them into

05:12 10   evidence.

11             MS. CLARKE:  No objection.

12             THE COURT:  All right.

13   (Government's Exhibit Nos. 948-160 through 948-166; 948-01

14   through 948-05 received into evidence.)

15   Q.   So let's go back now to 948-160.  What's that a picture

16   of?

17   A.   That's a picture of the front entrance to 40 Laurel

18   Street.

19             MR. WEINREB:  -161, please.

05:13 20   Q.   What's that a picture of?

21   A.   That's a picture of the front door and the front porch of

22   40 Laurel Street.

23             MR. WEINREB:  -162, please.

24   Q.   What's that a picture of?

25   A.   That's the -- if you were looking at the house, the right

1

1    side, at the front of the house, the right side of the 40

2    Laurel Street.

3    Q.   So if you were standing -- do you know where the Honda

4    Civic was abandoned in the middle of Laurel Street?  Are you

5    familiar with where a Honda Civic was abandoned on Laurel

6    Street on April 19th?

7        That's okay.  If not, let me ask the question a different

8    way.  If you were standing on Laurel Street, not near the

9    corner of Laurel and Dexter but further down, further east

05:14 10   along Laurel Street --

11   A.   Yes.

12   Q.   -- and looking back towards the corner of Dexter and

13   Laurel, is this the side of the house that you would be seeing?

14   A.   Yes, sir.

15        MR. WEINREB:  -163, please.

16   Q.   Is this a close-up of that side of the house?

17   A.   Yes, it is.

18   Q.   I'm going to circle -- you see the -- what looks like a

19   black dot or hole that I've circled there?

05:15 20   A.   Yes.

21   Q.   Are there others in the house as well?

22   A.   Yes.

23        MR. WEINREB:  -164, please.

24   Q.   Is that a close-up of one of those holes?

25   A.   Yes, it is.

1

1  Q.   When you observed it on that day, did that appear to be a

2  bullet hole?

3  A.   Yes.

4       MR. WEINREB:  -165, please.

5  Q.   Is that that same bullet hole?  Should I go back to 164 or

6  --

7  A.   If you go back one, please.

8  Q.   Yeah, -164.  If you can't tell, that's fine.

9  A.   If you go forward, please.

05:15 10  Q.   -165.

11  A.   No.  I believe that's a different bullet hole, sir.

12  Q.   Fair enough.

13       -166, and then I'm going to circle two.  Does this appear

14  to be the first one we saw, and this the second one in the past

15  series of photos?

16  A.   Yes.

17       MR. WEINREB:  Now, can we have -01, please?

18  Q.   What's this a photo of?

19  A.   This is the upstairs on the 40 Laurel Street, second

05:16 20  floor, inside the apartment.

21  Q.   So this is that same wall we were just looking at but on

22  the inside?

23  A.   Yes, sir.

24  Q.   And this right here in the middle that I've circled, this

25  hole in the wall, does that correspond to one of the bullet

1

```
 1  holes on the outside?

 2  A.   Yes.

 3       MR. WEINREB:  -02, please.

 4  Q.   What's this?

 5  A.   This is inside the apartment, and that's a door in the

 6  bedroom that leads into one of the bedrooms there.

 7  Q.   So is that that same room that we just saw in the previous

 8  photograph but the opposite wall?

 9  A.   Yes.

10  Q.   Do you see this hole right here in the wall?

11  A.   Yes.

12  Q.   Was that also a bullet hole?

13  A.   Yes.

14       MR. WEINREB:  Could we have -03, please?

15  Q.   What's this?

16  A.   That's -- it's a picture that was hanging on the wall.

17  Q.   Where is it in relation to the picture we just saw?

18  A.   It's on the -- if we step back one, please.

19       MR. WEINREB:  Go back to -002.

20  A.   That there is a picture.  I believe -- it may be in a

21  different room other than this room that we're looking at now.

22  Q.   Is it the room through this doorway?

23  A.   It may be through that door right there.

24  Q.   Okay.

25       MR. WEINREB:  Let's go back to -003.  Then could we
```

1

1      have -004 and -005.  Go back to -004 for a moment.

2      Q.    Is that where the bullet came to rest?

3      A.    Yes.

4      Q.    Did you also fingerprint items of ballistic evidence

5      recovered from the Watertown crime scene?

6      A.    I did.

7      Q.    What method did you use to compare the latent prints that

8      you found to known prints?

9      A.    I used the -- what is called the HV process.

05:18 10      Q.    That HV method, is that the same method that's used by

11      your colleague, Patrick Donahue, and all other Massachusetts

12      State Police fingerprint experts?

13      A.    It's Trooper Patrick Moynihan.

14      Q.    I'm sorry.

15      A.    Yes.  And it is the process that we use within the lab and

16      all other analysts within our lab.

17      Q.    Are you trained in that method?

18      A.    I am.

19      Q.    Are you experienced in that method?

05:19 20      A.    I am.

21      Q.    Are you proficient in that method?

22      A.    I am.

23            MR. WEINREB:  Exhibit -268, which I believe is in

24      evidence already.

25      Q.    I show you -- does that look familiar, the box of

1

1    ammunition in that photograph, not in that location but just

2    the box?

3    A.    I'm not -- that box --

4    Q.    Let me ask you a different question.  Were you asked to

5    fingerprint a box of ammunition that was recovered from Laurel

6    Street?

7    A.    Yes.

8              MR. WEINREB:  Could we have -270 just for the witness

9    now?

05:20 10          THE COURT:  This is 948-270?

11             MR. WEINREB:  Yes.  And then 948-271.  Actually, those

12   are both in evidence.  That's all right.  It doesn't matter.

13   Then could we have 948-937?  I'm sorry, 937, just Exhibit 937

14   and then Exhibit 938, 939, and 940.

15   Q.    Do you recognize the items that were pictured in those

16   photographs?

17   A.    I do, but I had taken different photos at a different time

18   with -- there.  So that was either after I processed it, those

19   photos were taken.

05:21 20   Q.    But are those photos of the ammunition box that you were

21   asked to fingerprint from Laurel Street?

22   A.    Yes.

23             MR. WEINREB:  I'd offer 937 through 940.

24             MS. CLARKE:  No objection.

25             THE COURT:  Okay.

1

1      (Government's Exhibit No. 937-940 received into evidence.)

2              MR. WEINREB:  So let's go back to 937 then.

3      Q.   So this is a photo of the ammo box you were asked to

4      fingerprint?

5      A.   Yes.

6      Q.   And the initials here indicate that it was photographed by

7      Stephanie Waite?

8      A.   Yes.

9      Q.   She's the criminalist at the lab?

05:22 10     A.   Yes.

11              MR. WEINREB:  And 938, please.

12     Q.   That's the box with the contents removed?

13     A.   Yes.

14              MR. WEINREB:  939.

15     Q.   Is that a close-up?

16     A.   Yes.

17              MR. WEINREB:  940, please.

18     Q.   Same here?

19     A.   Yes.

05:22 20     Q.   Were any fingerprints recovered from the ammunition box?

21     A.   Yes.

22     Q.   What did you recover?

23     A.   I recovered a partial palm print and a partial fingerprint

24     on the box.

25     Q.   Were you able to match either of those to either Jahar

1

1    Tsarnaev or Tamerlan Tsarnaev?

2    A.    Yes.

3    Q.    What was the results of your analysis?

4    A.    I identified on the outer box the left middle finger of

5    Jahar Tsarnaev on the outside of the box, on the outer box.

6    Q.    Was there also a magazine for the Ruger pistol recovered

7    from Laurel Street that you were asked to fingerprint?

8    A.    Yes.

9    Q.    Were there any fingerprints on the magazine?

05:23 10    A.    Yes.

11    Q.    Were you able to identify them to one of those two

12    individuals?

13    A.    Yes.

14    Q.    What was the results of that analysis?

15    A.    I identified a partial palm print and a partial

16    fingerprint to Tamerlan Tsarnaev on the magazine, and it was

17    the left palm and the left middle finger of Tamerlan Tsarnaev.

18    Q.    Was there an air gun that fires metal pellets or BBs also

19    found on Laurel Street?

05:24 20    A.    Yes.

21    Q.    Were there any fingerprints on the air gun?

22    A.    Yes.

23    Q.    What was the results of your analysis of the air gun?

24    A.    I identified the right index finger of Jahar Tsarnaev on

25    the trigger of the pellet/air gun.

1

1    Q.    Now, do you know when any of those fingerprints got there?

2    A.    No, I do not.

3    Q.    Does the absence of a person's fingerprint on an object

4    mean that they never touched it?

5    A.    No, it does not.

6    Q.    So it's possible a person could touch something and either

7    not leave a fingerprint or the fingerprint could get rubbed off

8    later somehow?

9          MS. CLARKE:  Calls for speculation.

05:25 10          THE COURT:  Overruled.  He may answer it.

11    A.    Yes.

12          MR. WEINREB:  No further questions.

13          MS. CLARKE:  Just a couple.  Just one moment, your

14    Honor.

15    CROSS-EXAMINATION BY MS. CLARKE:

16    Q.    Good afternoon.

17    A.    Good afternoon, ma'am.

18    Q.    I believe we met over some spilled water up there.

19    A.    Yes, we did, ma'am.

05:25 20    Q.    My name is Judy Clarke.  I'm one of Mr. Tsarnaev's

21    lawyers.

22          Mr. Weinreb asked you about fingerprints that you located

23    on -- on the ammo box, correct?

24    A.    Yes, ma'am.

25    Q.    And you indicated to him that you located a print of Jahar

1

1    Tsarnaev on the outside of the ammo box, right?

2    A.   Yes, ma'am.

3    Q.   I understand you also located prints on the live rounds

4    inside the ammo box, is that correct?

5    A.   Yes, I did.

6    Q.   And those were prints of Tamerlan Tsarnaev, correct?

7    A.   That is correct.

8    Q.   Not of Jahar Tsarnaev, correct?

9    A.   That's correct.

05:26 10   Q.   The magazine that you printed and found Tamerlan

11   Tsarnaev's prints was inside the Ruger pistol, is that correct?

12   A.   When it came to me, it was separated.  However, the

13   magazine came with that Ruger.  So it was possible that that

14   magazine was inside that firearm.

15           MS. CLARKE:  Maybe we could pull up -- Mr. Bruemmer,

16   if you could help me -- 948-230, which I believe is in

17   evidence, and I hope it's the right picture.  231, I think is

18   what I want.

19   Q.   Does that appear to be the Ruger that you took into your

05:27 20   possession?

21   A.   Yes.

22   Q.   And does the -- let me draw something around.  Does that

23   appear to be the magazine?

24   A.   Yes, it does.

25   Q.   That you tested?

1

1    A.    Yes, ma'am.

2    Q.    And found Tamerlan Tsarnaev's prints on it?

3    A.    Yes.

4    Q.    And not Jahar Tsarnaev's prints?

5    A.    Yes.

6              MS. CLARKE:  Thank you.  I have no further questions.

7              MR. WEINREB:  Nothing further, your Honor.

8              THE COURT:  All right, sir.  Thank you.  You may step

9    down.

05:27 10             THE WITNESS:  Thank you, sir.

11             MR. WEINREB:  Your Honor, may we approach for a

12   moment?

13             THE COURT:  Yes.

14   (SIDEBAR CONFERENCE AS FOLLOWS:

15             MR. WEINREB:  So the government would like to re-call

16   Jennifer Montgomery at this time.

17             MR. WATKINS:  Your Honor, we would raise the same

18   objection.  I don't think they showed good cause at this point,

19   not having complied with the Court's order.

05:28 20             THE COURT:  Well, we gave time, I think, to prepare

21   for it, so I don't think we will press it at this point.  I'll

22   allow it.

23             Can I just, while you're here, get a read on when we

24   might have to have the Tazhayakov issues?  Is that going to be

25   today or tomorrow?

1

1          MR. WEINREB:  Not today.

2          THE COURT:  I think I'd like to have a brief lobby

3     conference at the end of the day about that and a couple other

4     issues.

5     .   .   .  END OF SIDEBAR CONFERENCE.)

6          MR. WEINREB:  Your Honor, the government would re-call

7     DNA Analyst Jennifer Montgomery at this time.

8          THE COURT:  Miss Montgomery, you remain under oath

9     from your prior appearance.

05:30 10          JENNIFER MONTGOMERY, RE-CALLED

11     DIRECT EXAMINATION BY MR. WEINREB:

12     Q.   Good afternoon.

13     A.   Good afternoon.

14     Q.   The last time you were here, you testified about your

15     expertise as a DNA analyst?

16     A.   Correct.

17     Q.   And you were asked some questions about two white gloves

18     found in the Honda Civic on Laurel Street?

19     A.   Yes.

05:30 20     Q.   And you testified that the blood on the outside of them

21     was Officer Sean Collier's?

22     A.   Yes.

23          MR. WEINREB:  Can we have Exhibit 877, please?

24          THE COURT:  Is this in evidence?

25          MR. WEINREB:  Yes.

1

1    Q.    Now, were you also asked to compare Jahar Tsarnaev's DNA

2    to blood found on keys -- I'm sorry, not Jahar Tsarnaev's DNA

3    but Sean Collier's DNA to blood found on keys taken from the

4    ignition of the Honda Civic on Laurel Street?

5    A.    Yes.

6          MR. WEINREB:  Can we have --

7    Q.    Did you, in fact, do that comparison?

8    A.    Yes, I did.

9          MR. WEINREB:  Can I have Exhibit 914, please?

05:31 10   Q.    Would this diagram -- or this chart help you illustrate

11   your testimony about the keys?

12   A.    Yes.

13         MR. WEINREB:  Then, your Honor, I'd ask to show it to

14   the jury.

15         THE COURT:  As a chalk?

16         MR. WEINREB:  As a chalk.

17   Q.    Please help -- explain to us what this chart shows about

18   the comparison between Sean Collier's DNA and the blood found

19   on the keys in the Honda.

05:32 20   A.    On the left column is the known head hair standard from

21   Sean Collier, and then on the right-hand side is the swab of

22   the red-brown stains found on a key card from the Honda Civic.

23   If you go down, looking at each location that we test for,

24   you'll see that there's a match.

25   Q.    Based on that, was your conclusion that the blood from the

1

1    outside of the keys matched the DNA of Sean Collier?

2    A.   Yes.

3            MR. WEINREB:  I have no further questions.

4            MR. WATKINS:  No questions.

5            THE COURT:  Fine.  Thank you.  Miss Montgomery, you

6    may step down.

7            MR. MELLIN:  United States calls Miguel Colon.

8            THE CLERK:  Sir, you want to step up here, please?

9    Step up to the box, if you would.  Remain standing and raise

05:34 10   your right hand.

11           MIGUEL COLON, Sworn

12           THE CLERK:  Have a seat.  State your name.  Spell your

13   last name for the record.  Keep your voice up and speak into

14   the mic so everybody can hear you.

15           THE WITNESS:  Miguel Colon, C-o-l-o-n.

16   DIRECT EXAMINATION BY MR. MELLIN:

17   Q.   Good afternoon, sir.

18   A.   Sir, good afternoon.

19   Q.   Sir, where are you employed?

05:34 20   A.   I was born in Puerto Rico.

21   Q.   I didn't ask where you were born.  I asked where you were

22   employed.

23   A.   Oh, sorry.  I'm employed for the Watertown Police

24   Department.

25   Q.   Okay.  That's all right.

1

1      Where were you born?

2   A.   Puerto Rico.

3   Q.   You're dying to tell us so we'll get to it.

4   A.   I got everyone smiling here.

5   Q.   At some point did you move from Puerto Rico to the United

6   States?

7   A.   Fourteen.  I was fourteen years old.

8   Q.   Where did you move to?

9   A.   Lawrence, Mass.

05:35 10   Q.   Did you go to high school in that area?

11   A.   Lawrence and Belmont High.

12   Q.   Did you also go to college at some point?

13   A.   Yes, sir.

14   Q.   Where did you go to college?

15   A.   UMass Boston.

16   Q.   At some point did you join the Watertown Police

17   Department?

18   A.   Yes, sir.

19   Q.   What year was that?

05:35 20   A.   2006.

21   Q.   From 2006 'til 2013, were you employed by the Watertown

22   Police Department?

23   A.   Yes, sir.

24   Q.   As you sit here today, are you still employed by them?

25   A.   Yes, sir.

1

1    Q.   What job assignments have you held while you're been

2    employed at the police department?

3    A.   Night patrol.

4    Q.   Let me take you back to April 19, 2013.  At some point did

5    you respond to the scene on Laurel Street?

6    A.   Yes, sir, I did.

7    Q.   Do you recall about what time you responded?

8    A.   Approximately quarter of 1.

9    Q.   When you drove up, what happened?

05:35 10   A.   I saw a scene.  Sergeant MacLellan and Officer Reynolds

11   were engaged in a gunfight.

12   Q.   Let me ask you if you could please look at Exhibit 771,

13   which is already in evidence.  Officer Colon, as you look at

14   771, do you recognize it?

15   A.   Yes, sir.

16   Q.   What is that?

17   A.   Watertown, Mass., Laurel Street area.

18   Q.   Do you recall how it is you got to the scene at Dexter and

19   Laurel?

05:36 20   A.   How I arrived there?

21   Q.   Yes.

22   A.   I knew the gunfight was somewhere in Laurel Street.  I

23   took Arsenal Street, went northbound on School Street, past

24   Laurel Street.  I don't know if I can --

25   Q.   You can.  And that's an interactive screen.  So if you

1

1     just touch it, you can draw a diagram where you're going.

2     A.   So School Street this way.  This is Laurel Street.  I knew

3     they were somewhere in there.  I wasn't sure if they were on

4     the east or west side of Laurel Street.  I continued past, went

5     down Putnam, continued this way, Hazel Street.  At the Hazel

6     Street, I came out this way, and that's when I saw the scene.

7     Q.   Okay.  Just for the record, you kind of do a little bit of

8     a circle on this map, is that right?

9     A.   Yes, sir.

05:37 10    Q.   You go up School Street, come over Putnam.  As Putnam kind

11    of comes to an end, it turns to the left, continues onto Hazel

12    Street?

13    A.   Yes, sir.

14    Q.   And then you took Hazel Street down to Dexter, turned

15    right and came down Dexter?

16    A.   Yes, sir.

17    Q.   Let me ask you about a couple of the other streets that

18    are on this map.  Over in this area, there's a street with a

19    name.  Do you see that?

05:37 20    A.   Yes, sir.  That's Quinby Street.

21    Q.   Quinby?

22    A.   Yes, sir.

23    Q.   Okay.  And so now Quinby goes down past Laurel, is that

24    right?

25    A.   Yes, sir.

1

1    Q.   And where there's that corner below that, is that Cypress

2    Street that is coming over?

3    A.   Yes.

4    Q.   So is it a -- you can drive straight through down Quinby

5    to the turn that puts you on Cypress, is that right?

6    A.   Yes, sir.

7    Q.   All right.  So let me ask you:  When you came on the

8    scene, Sergeant MacLellan and Officer Reynolds were already

9    engaged in the fight?

05:38 10    A.   Yes, sir.

11    Q.   Do you recall hearing a radio response from Sergeant

12    MacLellan about where officers should respond and where they

13    should not?

14    A.   Yes, I do.  The gunfight -- Sergeant MacLellan requested

15    they can have a unit coming off of Quinby Street to the end of

16    Laurel Street, and then he scratched that and said it would be

17    a dangerous situation for crossfire.

18    Q.   Have you had a chance to listen to that radio transmission

19    recently?

05:38 20    A.   Yes, sir.

21    Q.   Is that a fair and accurate recording of that

22    transmission?

23    A.   Yes, sir.

24         MR. MELLIN:  Your Honor, at this time I'd ask to play

25    Exhibit 1564, which is a short clip of the radio transmission.

1

1          MR. WATKINS:  No objection.

2     (Audio recording played.)

3     Q.   Officer Colon, is that the transmission?

4     A.   Yes, sir.

5     Q.   Again, is Sergeant MacLellan saying at first, "Come down

6     Quinby," but then he says, "Scratch that"?

7     A.   Yes, sir.

8     Q.   He doesn't want to have crossfire there?

9     A.   Yes, sir.

05:39 10    Q.   What is crossfire?

11    A.   When another person is in the line of fire.

12    Q.   So based on that, did any officers at any time block the

13    far end of Laurel Street or where Quinby is?

14    A.   No, sir.

15          MR. WATKINS:  Objection.

16          THE COURT:  Foundation.  Sustained.

17    Q.   Did you ever see any officers block the far end of Laurel

18    Street at Quinby when you were on the scene?

19    A.   No, sir.

05:40 20    Q.   Was that -- let me hold that.

21         At some point did you see an SUV coming down the street in

22    your direction?

23    A.   Yes, sir.

24    Q.   At that time where are you parked?

25    A.   When I arrived, I parked my vehicle maybe two vehicle

1

1    lengths from Officer Reynolds' cruiser, in the middle of the

2    road, at an angle.

3              MR. MELLIN:  If I could have Exhibit 775 brought up,

4    please.

5    Q.   Officer Colon, do you see Exhibit 775?

6    A.   Yes, sir.

7    Q.   Is that a diagram of some of the vehicles that were on the

8    scene on Laurel Street?

9    A.   Yes, sir.

05:41 10   Q.   If I blow up this portion, do you recognize the blown-up

11   portion as the block of Laurel that -- where the gun battle was

12   occurring?

13   A.   Yes, sir.

14   Q.   You see Sergeant -- excuse me, Officer Reynolds' car on

15   the left side of this?

16   A.   Yes, sir.

17   Q.   Can you circle that for me, please?

18   A.   (Indicating.)

19   Q.   And then, sir, there's a green Honda that's down the

05:41 20   street.  Do you see that?

21   A.   Yes, sir.

22   Q.   Can you circle that, please?

23   A.   (Indicating.)

24   Q.   As you drove up and came on the scene, where is it in

25   general where you parked?

1

A.   When I arrived, I parked somewhere in this area, middle of

the road, at an angle.  My headlights were facing the SUV.

Q.   And just for the record, the SUV is not on this diagram,

correct?

A.   No, it's not.

Q.   Okay.  And for the record, also, you indicated that you

parked on the street between 49 Laurel and 132 Dexter?

A.   That area, sir, yes.

Q.   So down the street a little bit from where Officer

05:42 Reynolds parked but not on the same side of the street?

A.   Yes, sir.

Q.   All right.  At some point did you try to flash a light on

what was going on down the street?

A.   Sir, when I arrived on scene, Sergeant MacLellan was in

this area.  His vehicle was in this area.  I observed that he

was exchanging gunfire.  His vehicle was moving.  I feared that

he was -- his cover -- he was going to be exposed to gunfire.

So I parked a little further up, and I tried to get the

suspect's attention by putting my spotlight on him.

05:42 Q.   When you say you parked a little further up, a little

further up than where you indicated on this?

A.   Yes, right in this area.

Q.   In that area, very good.  You pointed what light on them?

A.   Excuse me?

Q.   What did you shine on them?

1

1    A.    The spotlight.  It's on an A pillar of the vehicle.  You

2    can move it around and place it to wherever you want to see.

3    Q.    When you attempted to point your spotlight down the

4    street, what happened to the spotlight?

5    A.    I received gunfire.  The spotlight got hit.  I had the

6    door open.  The door got hit as well.

7    Q.    At some point did you see the SUV coming down the street

8    at you?

9    A.    Yes, sir.

05:43 10   Q.    Could you see who was driving that car?

11   A.    Yes, sir.

12   Q.    Who was driving that car, sir?

13   A.    (Indicating.)

14         MR. MELLIN:  Your Honor, for the record, the witness

15   pointed at the defendant.

16         THE COURT:  Okay.

17   Q.    When you saw that SUV coming down the street, what did you

18   do?

19   A.    I went behind 465, towards the driver's side.

05:44 20   Q.    You indicated 465.  What are you talking about?  Officer

21   Reynolds' car?

22   A.    Yes, sir.

23   Q.    Okay.  You went behind Officer Reynolds' car.  And then

24   what did you see?

25   A.    I observed -- as the SUV was coming down, I saw my --

1

three of my officers jump out of the way.  Sergeant Pugliese,

MacLellan, and Reynolds jumped out of the way.  As it drove by,

the vehicle hit the person on the ground, dragged them, and hit

Cruiser 465 on the driver's side, front quarter panel area.

Q.   As that car was driving down the street, you pointed out

that you saw the defendant driving it.  How was he driving that

car?

A.   As he went past me, after he released from the Cruiser

465, I saw him leaning towards the middle console, but he was

05:45 still kind of looking at the road.

Q.   For the record, you've indicated that the defendant was

leaning to the right and ducking down but looking over the

dash?

A.   Yes, sir.

Q.   Were you able to see him do that?

A.   Yes, sir.

Q.   After the defendant drove away, what did you do?

A.   I went and checked on the officers on scene.  They had

cuffed a suspect.  They were treating him.  And then I got in

05:45 471 and drove out to follow the vehicle.

Q.   Okay.  And 471 is your car?

A.   Yes, sir.

Q.   If I could have you look at Exhibit 787.

MR. MELLIN:  Which is in evidence, your Honor.

Q.   Officer Colon, do you recognize Exhibit 787?

1

1    A.    Yes, sir.

2    Q.    What is that?

3    A.    Laurel Street.

4    Q.    Do you see -- as you look at that, do you see your vehicle

5    in that photograph?

6    A.    Can you repeat that, sir?

7    Q.    Do you see your vehicle in that photograph?

8    A.    Yes.

9    Q.    Which one is it?

05:45 10    A.    (Indicating.)

11    Q.    For the record, you circled the car on the right with the

12    headlights pointing in the direction of the photograph?

13          THE COURT:  You don't have it?  We've seen a very

14    similar one.  I know that.  Is there any objection to it if it

15    isn't in?

16          MR. WATKINS:  I believe this is in.

17          MR. MELLIN:  I thought that was in as well, your

18    Honor.

19          THE COURT:  I thought so, too, because I've seen it

05:46 20    before.

21          MR. MELLIN:  If it's not, I would move it into

22    evidence and ask to publish it a bit late.

23    Q.    Officer Colon, you circled the vehicle on the right with

24    the headlights pointing down the street towards the camera, is

25    that right?

1

1    A.    Yes, sir.

2    Q.    The vehicle with the headlights to the left, do you know

3    whose car that was?

4    A.    Officer Reynolds, 465.

5    Q.    And you see the SUV coming down the street?

6    A.    Yes, sir.

7    Q.    You see that?

8          Was there room for the SUV to go between the -- where the

9    people were on the ground and your car to avoid contact?

05:46 10   A.    I positioned my cruiser about one to two car lengths ahead

11   of Officer Reynolds.  There was room for a vehicle to go by.

12   Q.    Now, after, you say you left.

13              MR. MELLIN:  If I could have Exhibit 775 pulled up.

14   Q.    I just blew up the bottom portion of 775.  Can you

15   indicate to the ladies and gentlemen where it is you went after

16   you checked on the status of the other officers and then you

17   left the scene?

18   A.    I drove straight ahead, this way, this way.

19   Q.    And so, for the record, you drove down Laurel Street and

05:47 20   turned right on Cypress Street?

21   A.    Yes, sir.

22   Q.    There was room to pass on the right of the green Honda?

23   A.    That's where the SUV was parked.

24   Q.    Before it left?

25   A.    Yes.

1

1   Q.   Was there room to pass on the left of the green Honda --

2   A.   There was room.

3   Q.   -- as well?

4        So on either side of that, there was room to pass?

5   A.   Yes, sir.

6   Q.   Was there anyone blocking your exit down at Laurel and

7   what is shown here as Cypress but up above it would be called

8   Quinby?

9   A.   There was nothing blocking the road, the intersection.

05:48 10   Q.   How much time do you think elapsed between the time when

11   you saw the SUV leave the scene and the time that you left the

12   scene?

13   A.   Less than a minute.

14        MR. MELLIN:   Thank you.   Nothing further.

15   CROSS-EXAMINATION BY MR. WATKINS:

16   Q.   Good afternoon, Officer.

17   A.   Good afternoon.

18   Q.   Showing you Exhibit 771, as I understand it, you drove

19   this way?

05:50 20   A.   No.   That I drove that way?

21   Q.   You drove from School Street up Dexter Avenue?

22   A.   No.   School Street, down Putnam, then turned at the Hazel

23   Street.   When Hazel and Dexter hit, I took a right on Dexter,

24   and I approached Laurel Street.

25   Q.   Can you draw on this map again how you went when you

1

1    arrived at the scene?

2    A.    (Indicating.)

3    Q.    I thought before when you testified you talked about being

4    up here on Quinby Street?

5    A.    I was not on Quinby Street at any point.

6    Q.    You were never at Quinby Street at any point?

7    A.    Never.

8    Q.    So when Mr. Mellin asked you about seeing people up at

9    that end of the street, you don't know whether there were

05:50 10    people up at that end of the street?

11   A.    Where the arrow is?

12   Q.    Yes.

13   A.    I have no idea.

14   Q.    How about here, do you have any idea?

15   A.    From where I was, I could see that area.

16   Q.    But you were not at this end of the street, is that

17   correct?

18   A.    No, sir.  No, sir.

19   Q.    So you came down --

05:51 20        MR. MELLIN:  Objection as to what time.

21        THE COURT:  Sorry?

22   Q.    Were you ever at that end of the street before the end of

23   the incident?

24   A.    Can you ask the question again, please?

25   Q.    Before -- you came up on the scene, correct?

1

1      A.    Yes, sir.

2      Q.    There was shooting, right?

3      A.    Yes, sir.

4      Q.    And at that point you were not at Quinby Street; you were

5      down here at Dexter and Laurel, right?

6      A.    Where I indicated right there.

7      Q.    And that's where your car stopped, right?

8      A.    Yes.

9      Q.    And that's where you stayed?

05:51 10   A.    No.  I fired some rounds from that -- from my vehicle

11     after they hit my cruiser, and then I went to behind Officer

12     Reynolds' cruiser because it's a bigger, larger car.

13     Q.    But your cruiser remained down at that end of Laurel

14     Street where this -- approximately here, is that right?

15     A.    Somewhere in that area, yes.

16     Q.    You saw the people shooting from the other end of the

17     street, right?

18     A.    Yes.

19           MR. MELLIN:  Objection as to "the other end of the

05:52 20   street" reference.

21     Q.    Down Laurel Street, looking down towards that Honda Civic

22     you've testified that you saw people --

23     A.    The people that were shooting were in front of the

24     Mercedes, the front bumper area.

25     Q.    And what you saw was one person shooting, right?

1

A.   I could -- I couldn't tell.

Q.   You were interviewed a few days after the incident,
correct?

A.   Yes.

Q.   That was audiotaped, and it was an investigation by the
Massachusetts State Police, correct?

A.   Yes.

Q.   At that point you said, "I focused on one shooter.  That's
all I saw."  Correct?

05:52 A.   All I saw was muzzle flash, and that's what my attention
went to.

Q.   Was that one shooter and the muzzle flash?

A.   The muzzle flash.

Q.   After that is when the Mercedes came around, correct?

A.   During the gunfight, yes.

Q.   Showing you 775, your cruiser does not appear on this
diagram, is that correct?

A.   No, sir.

Q.   Do you recognize that cruiser, what cruiser that would be?

05:53 A.   465.

Q.   And that would be Officer Reynolds' cruiser, is that
correct?

A.   Yes, sir.

Q.   And your car was two car lengths up, right?

A.   Approximately, yes.

1

1   Q.   And two car lengths, ordinary car, your cruiser, do you

2   know how long your cruiser is?

3   A.   I couldn't tell you right off the bat.

4   Q.   Fifteen feet maybe?

5   A.   Couldn't tell you.

6   Q.   But it would be two ordinary car lengths, right?

7   A.   If you say so.

8   Q.   Well, you drove it.

9   A.   I couldn't tell you.  I don't know how big my cruiser is.

05:54 10   Q.   And that's where your cruiser was as the Mercedes came

11   down the street towards all of you?

12   A.   That area, yes, sir.

13             MR. WATKINS:  That's all I have.

14             MR. MELLIN:  Nothing, your Honor.

15             THE COURT:  All right, sir.  Thank you.  You may step

16   down.

17             MR. CHAKRAVARTY:  The government calls Mark Preble.

18             MR. BRUCK:  I think we'll need to approach on this

19   witness, your Honor.

05:55 20             THE COURT:  All right.  I'll see you at the side.

21   (SIDEBAR CONFERENCE AS FOLLOWS:

22             MR. BRUCK:  Does the government still intend to

23   introduce the handwritten statements?

24             MR. CHAKRAVARTY:  Yes.

25             THE COURT:  Who's this?

1

1          MR. CHAKRAVARTY:  This is a witness from UMass

2     Dartmouth.  He'll authenticate a variety of records.

3          MR. BRUCK:  The records, we have no objection to most

4     of them.  They establish the residence and so forth.  But they

5     include two handwritten statements that the defendant

6     apparently wrote, judging by the records, giving somewhat false

7     or exaggerated claims about the reasons why he has not

8     completed his obligations, academic obligations.  They include

9     something about his family and -- what was the other?

05:56 10        MR. CHAKRAVARTY:  They both relate to family.

11         MR. BRUCK:  They're both related to family.  We don't

12    see any relevance.  These records were, as I understand it,

13    intended to show his residence and that he was a student at

14    UMass Dartmouth, but these are quite prejudicial indications

15    that he was telling falsehoods in order to get his academic

16    scholarship restored despite his bad grades.  We can't see how

17    that has any relevance to any aspects --

18         MR. CHAKRAVARTY:  It goes to a few things.  I have the

19    records here.  This is 1180C and 1180D, I believe.

05:57 20        THE COURT:  What's the --

21         MR. CHAKRAVARTY:  There's a few things.  So one is,

22    these are statements made by the defendant during the course of

23    the conspiracy in which he cites to, amongst other things, what

24    we allege are false explanations about what his -- what was

25    going on.  But more pragmatically, these are dated and signed

1

1    evidence of the defendant's handwriting.  The defendant's

2    handwriting is a key part of the evidence that's in the boat,

3    and this exemplar of his handwriting is perhaps the best

4    evidence.  It's near close in time.

5          And in addition to that, the substance of it itself is

6    also, I would suggest, very relevant to go to show that he has

7    this kind of duality of his existence both in his private world

8    versus what -- and then what he's publicly manifesting in order

9    to get whatever benefits he's going to get.

10         THE COURT:  Is there another one?

11         MR. CHAKRAVARTY:  Yes, I'm sorry.

12         THE COURT:  This is --

13         MR. CHAKRAVARTY:  August --

14         MR. BRUCK:  There are numerous other exemplars from

15   the dorm room of his handwriting.  I think that is not an

16   adequate reason to introduce such prejudicial material.  The

17   period alleged in the Indictment of the conspiracy is in 2013.

18   This is -- all predates that.  It's really, I think, just a

19   backdoor way of getting in pretty prejudicial stuff.

20         MR. CHAKRAVARTY:  The government's position is it's

21   both relevant to his state of mind.  The substance suggests why

22   he's doing poorly in school.  We're not proving up that there

23   are falsehoods.  So to the extent that it's prejudicial, it's

24   not clear to me what the prejudice is unless, in the penalty

25   phase, it becomes relevant.

1

1          THE COURT:  Well, what number is this?

2          MR. CHAKRAVARTY:  1180C.

3          THE COURT:  I think this one is admissible because of

4   the references about paying attention to events in Chechnya,

5   about which there will be some context.  This one, I think,

6   less so.  It's also less remote in time.

7          MR. BRUCK:  We'd like to emphasize that the period

8   alleged of the conspiracy begins in March of 2013, and this is

9   January 2013.

05:59 10        THE COURT:  Conspiracy isn't the only measure of the

11   relevance.

12         MS. CONRAD:  It's also 403, your Honor.  I just

13   frankly -- the government -- the Court has taken a pretty

14   strict line in terms of motive evidence with respect to the

15   defense presenting things, and I don't see how just the fact

16   that he uses the word "Chechnya" in there is relevant to

17   anything.

18         THE COURT:  Well, all right.  I think it ties up to

19   some of the things we heard this morning about -- I think that

06:00 20   one's admissible.  The other one I don't think is useful.

21   .  .  .  END OF SIDEBAR CONFERENCE.)

22         THE CLERK:  Sir, want to step up here, please?  Remain

23   standing.  Raise your right hand.

24         MARK PREBLE, Sworn

25         THE CLERK:  State your name.  Spell your last name for

1

1    the record.

2          THE WITNESS:  Mark Preble, P-r-e-b-l-e.

3    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

4    Q.   Good afternoon.  I'm over here.

5         Mr. Preble, where do you work?

6    A.   UMass Dartmouth.

7    Q.   What is your position there?

8    A.   I'm the vice chancellor of administration and finance and

9    the chief financial officer.

06:01 10   Q.   Who, if anyone, is above you in the pecking order at UMass

11   Dartmouth?

12   A.   The chancellor.

13   Q.   Can you explain what some of your duties are as the vice

14   chancellor?

15   A.   I have responsibilities -- basically, I'm the chief

16   business officer.  My responsibilities cover all of the

17   nonacademic -- generally all the nonacademic areas:  finance,

18   human resources, public safety, facilities, construction, those

19   kinds of places.

06:01 20   Q.   As part of your role, were you asked to authenticate some

21   documents that are going to be presented to the Court?

22   A.   Yes.

23   Q.   Have I shown you what we previously marked as --

24          MR. CHAKRAVARTY:  Your Honor, if we could have the

25   screen just for the witness.

1

1    Q.   I'll just show you the first page, and I'll ask you to

2    describe them in a minute.

3            MR. CHAKRAVARTY:  1180A, please.

4            THE COURT:  Sorry.  Wrong computer.

5            MR. CHAKRAVARTY:  1180B, 1180C, 1180E, and 1180J.

6    Q.   Do you recognize those documents?

7    A.   Yes.

8    Q.   Are you familiar with them?

9    A.   Yes.

06:03 10  Q.   Are all those documents that are kept by UMass Dartmouth

11   with regards to specifically a student named Jahar Tsarnaev?

12   A.   Yes.

13           MR. CHAKRAVARTY:  I'd move in 1180A, B, C, F, and J --

14   excuse me, not F; E and J.

15           THE COURT:  Subject to our conversation at the side,

16   admitted.

17   (Government's Exhibit No. 1180A-1180C, 1180E, 1180J received

18   into evidence.)

19           MR. CHAKRAVARTY:  If we could go to 1180A, please.

06:03 20  Q.   Now, Mr. Preble, what is this document?

21   A.   This document is a part of a package that is prepared when

22   a student is looking for housing on campus.

23   Q.   Is the name of the student and his biographical data

24   listed up here?

25   A.   Yes.

1    Q.   And the person's address when they're applying for school

2    or whenever the date is listed down at the bottom?

3    A.   Yes.

4         MR. CHAKRAVARTY:  Can we go to Page 2, please?

5    Q.   Is this the housing preference form?

6    A.   Yes.

7    Q.   Do you recognize this room number?  Do you know which dorm

8    that's in?

9    A.   I can't tell specifically by the number, but my

06:04 10   understanding it was in Pine Dale.

11   Q.   And it's Room 7341-1?

12   A.   Correct.

13        MR. CHAKRAVARTY:  Go to 1180 B, please.

14   Q.   What is this document?

15   A.   This is a report of our card access system.  Our

16   dormitories have swipe cards, and so whenever anybody enters

17   the building, it records the swipe.  And reports can be printed

18   afterwards based on those swipes and those entries.

19   Q.   When you say a "swipe card," can you describe what kind of

06:05 20   a swipe card you have down at UMass Dartmouth?

21   A.   We use a single card for a variety of things.  It's used

22   as a key, but it's also used in the dining hall.  It's used in

23   the library.  It's a credit card size.  It has a magnetic strip

24   on the back.

25   Q.   Now, for this report, is the date range of the swipe card

1

1     data that was queried for the last name Tsarnaev the entire

2     school year from August 1st up to April 19 -- August 1, 2012,

3     up to April 19, 2013?

4     A.   That's not the entire school year.  The school year went

5     beyond April 19th.

6     Q.   Thank you.  And working backward, what does the first

7     section of the report describe?

8     A.   The first section of the report, there's the date and time

9     of entry, the event, access granted, no entry made.  The system

06:06 10    actually records two different pieces of information when the

11    card is swiped and then when the door is opened.  So this

12    report recorded that the card was swiped, but the contact

13    didn't break to open the door, so it says, "No entry made."

14    Q.   Was that a common problem back in 2013, that the contact

15    of the door --

16    A.   On the front door at Pine Dale, yes, not on the back door,

17    on the front door.

18    Q.   And so what does this record show about when the swipe

19    card for the name Jahar Tsarnaev was swiped in Pine Dale Hall

06:06 20    after April 15, 2013?

21    A.   It shows a date of April 17, 2013, 5:46.

22    Q.   And this data doesn't tell you which direction somebody

23    traveled.  It just tells you that a swipe was made; is that

24    fair to say?

25    A.   They don't have to swipe to go out.  They can just swipe

1    to go in.

2        MR. CHAKRAVARTY:  Go to Page 2, Page 3, Page 4, Page

3    5, 6.

4    Q.   So there were six pages of swipes for Pine Dale front, the

5    front of Pine Dale Hall; is that fair to say?

6    A.   Yes.

7    Q.   Now, focusing in on the Pine Dale rear, was there another

8    set of doors into the rear of Pine Dale Hall?

9    A.   Yes.

06:07 10   Q.   Again, is Pine Dale a dormitory residence at UMass

11   Dartmouth on the campus?

12   A.   Say that again.  I'm sorry.

13   Q.   Is Pine Dale a dormitory that's on campus at UMass

14   Dartmouth?

15   A.   Yes.

16   Q.   And so what does this say about swipe data -- evidence of

17   swiping the card that belonged to Jahar Tsarnaev after April

18   15, 2013?

19   A.   So there's three dates:  April 16th, a swipe at 8:54:57.

06:08 20   You can see it says, "Access granted," but it doesn't say, "No

21   entry."  So the contacts on the back door were working.

22   Q.   Was that what I just underlined there?

23   A.   Yes.

24   Q.   Please continue.

25   A.   After that, there were -- on 4/17/2013, there were three

1

1    swipes:  11:29:32; 11:29:25; and 11:39:33 [sic].  Excuse me,

2    the last one was a.m.  The other two were p.m.

3    Q.    Is the last one 12:39:33 a.m.?

4    A.    A.m., correct.

5    Q.    So there are two that are within seconds of each other.

6    What would explain that?

7    A.    I'm not really sure.  There could have been a swipe, and

8    there may have been a delay between the swipe and the door

9    being pushed.  So you have to swipe again to open the door.

06:09 10    Q.    And then was there a swipe on April 18th, the Thursday?

11    A.    On April 18, 2013, yes.

12    Q.    And was that at 4:02:43 in the afternoon?

13    A.    Yes.

14    Q.    Now, just on this report, were there -- in addition to

15    Pine Dale, were there other doors on UMass campus which are

16    reflected as being swiped by the card belonging to Jahar

17    Tsarnaev on the report?

18    A.    On this report?  I'm not aware of any that shows that.

19              MR. CHAKRAVARTY:  So just go to Page 12, please.

06:10 20    Q.    These are other swipes for Roberts Hall, but this is --

21    predates the Marathon bombing; is that fair to say?

22    A.    Yes.

23    Q.    What is Roberts Hall?

24    A.    Roberts Hall is another residence hall on campus.  It's a

25    first-year residence hall.

1

1        MR. CHAKRAVARTY:  Can we go to 1180C, please?

2   Q.    What is this document?

3   A.    This document is a form that is part of the satisfactory

4   academic progress appeal process.

5   Q.    Can you explain what that means?

6   A.    When a student gets financial aid and they are not making

7   satisfactory academic progress, they're in jeopardy of losing

8   their financial aid.  So the student is notified, and they can

9   appeal that denial by following this process.  It starts with

06:11 10   this form.

11   Q.    This is a form completed by the student?

12   A.    This form is completed by the student, correct.

13   Q.    This is called a Satisfactory Academic Progress Appeal, is

14   that right?

15   A.    Yes.

16   Q.    So does that mean that a determination had been made that

17   the student was no longer eligible for financial aid?

18   A.    Yes.  It's an automatic trigger when the student's

19   progress drops below a certain academic process based on GPA,

06:11 20   percentage of completed course, and anticipated time to

21   graduate.

22   Q.    And then the student has an opportunity to submit

23   something to explain why he still needs financial aid?

24   A.    Yes.

25        MR. CHAKRAVARTY:  Zoom in a little bit more.

1

1    Q.    Is the student listed for this application Jahar Tsarnaev?

2    A.    Yes.

3    Q.    You might have some difficulty seeing it there.  Can you

4    see it?

5    A.    If I take my glasses off.

6    Q.    If you could read that for us.

7    A.    "This year I lost too many of my loved relatives.  I was

8    unable to cope with the stress and maintain school work.  My

9    relatives live in Chechnya, Russia, a republic that is opposed

06:12 10   by Russian soldiers."

11   Q.    Let me stop you there.  Does it say "occupied by Russian

12   soldiers"?

13   A.    "Occupied," yup.  I am a sorry.  "...by Russian soldiers

14   that falsely accuse and abduct innocent men under false

15   pretenses and terrorist accusations.  I am at a point where I

16   can finally focus on my school work.  I wish to do well so one

17   day I can help out those in need in my country, especially my

18   family members."

19   Q.    Then is it signed in the name of Jahar Tsarnaev on January

06:13 20   24 of 2013?

21   A.    Yes.

22   Q.    Do you know whether this application was granted or

23   denied?

24   A.    My understanding -- this is the second semester so this

25   was denied.

1

1        MR. CHAKRAVARTY:  Can we go to 1180E?

2    Q.   Do you recognize what this is?

3    A.   This is a transcript.

4    Q.   This is just his grades in school?

5    A.   Correct.

6    Q.   Is it broken down by his first semester, fall of 2011?

7    A.   Yes.

8    Q.   And these are his courses on the left and his grades on

9    the right?

06:13 10  A.   Yes.

11   Q.   Spring of 2012 is on the bottom left.  There's four

12   courses, and, again, his grades are on the right?

13   A.   Yes.

14   Q.   2012, fall, again, four courses, and grades on the right?

15   A.   Yes.

16   Q.   And the spring semester, which he didn't complete, is that

17   fair to say?

18   A.   Yes.

19   Q.   It doesn't show any grades?

06:14 20  A.   Correct.

21       MR. CHAKRAVARTY:  Can we go to 12 -- excuse me, 1180J,

22   please?

23   Q.   What is this?

24   A.   This is a screenshot from our student record system.

25   Q.   What kind of information do you put in the student record

1

1     system?

2     A.    We keep lots of information about students in the student

3     record system.  A lot of it is taken from the application when

4     a student first applies.  Other records, financial records,

5     grade records, where they live on campus, their dining plan.

6     Just about everything about a student is kept in the student

7     record system.

8     Q.    And is this student-provided information?

9     A.    Mostly, it's student-provided information, but grades are

06:15 10    provided by faculty, obviously.  Dining and housing information

11    is provided through those offices.

12          MR. CHAKRAVARTY:  If we go to Page 2, please.

13    Q.    Does it provide the various contact information such as

14    email addresses and telephone numbers?

15    A.    Yes.

16    Q.    Does it list, at least at the time of this entry, as of

17    May 9, 2013, the residence hall assigned to him was Pine Dale,

18    7341-1?

19    A.    Correct.

06:16 20    Q.    That's the same room number that we had seen in 1180A, is

21    that correct?

22    A.    Yes.

23          MR. CHAKRAVARTY:  That's all I have, your Honor.

24          MR. BRUCK:  No questions of Mr. Preble.

25          THE COURT:  All right.  Mr. Preble, you may step down.

1

```
 1              THE WITNESS:  Thank you.

 2              MS. PELLEGRINI:  United States calls Special Agent

 3      Kimberly Franks.

 4              THE CLERK:  Ma'am, up here, please.  Step up to the

 5      box.  Remain standing.  Raise your right hand.

 6              KIMBERLY FRANKS, Sworn

 7              THE CLERK:  Have a seat.  State your name.  Spell your

 8      last name for the record.  Keep your voice up and speak into

 9      the mic, okay?

06:17 10              THE WITNESS:  Kimberly Franks, F-r-a-n-k-s.

11      DIRECT EXAMINATION BY MS. PELLEGRINI:

12      Q.   Miss Franks, will you tell the jury by whom you are

13      employed?

14      A.   The FBI.

15      Q.   In what capacity?

16      A.   I'm a supervisory special agent at FBI headquarters in the

17      Criminal Investigative Division.

18      Q.   FBI headquarters is located where?

19      A.   Washington, D.C.

06:17 20      Q.   How long have you held that position?

21      A.   Approximately one year.

22      Q.   And prior to that?

23      A.   I was an agent at the Washington field office in

24      Washington D.C.

25      Q.   How long did you hold that position?
```

1    A.    Approximately seven years.

2    Q.    Can you give us some of your educational background,

3    please?

4    A.    Yes.  I went to undergraduate at Campbell University.  I

5    went to law school at Wake Forest University.  And I practiced

6    law as a corporate attorney for about seven years before

7    joining the Bureau.

8    Q.    With your current assignment with the FBI, what are your

9    duties?

06:18 10   A.    I am in the Financial Institution Fraud Unit.  So I

11   program manage our money laundering units, our asset

12   forfeiture, our mortgage fraud and bank fraud investigations,

13   in various field offices throughout the country.

14   Q.    So I want to focus also on another duty which you may

15   have, and that relates to the ERT, the evidence recovery?

16   A.    Correct.

17   Q.    Do you have duties relating to that aspect?

18   A.    Currently, I do not.  While I was an agent at Washington

19   field offices, I was on the Evidence Response Team.

06:19 20   Q.    We've heard a lot about Evidence Response Team, or ERT.

21   Just briefly, what training did you have?

22   A.    I went to what's called ERT basic, which is 80 hours of

23   crime scene investigation.  I also had monthly training on our

24   ERT team at WSO.  And I went to post-blast investigation, which

25   is a week-long course, to investigate post-blast scenes.

1

1    Q.    Did you still have those duties as a potential ERT member

2    in April of 2013?

3    A.    Yes, I did.

4    Q.    And in that capacity, did you have occasion to respond to

5    Boston in April of 2013?

6    A.    Yes, I did.

7    Q.    When did you come to the Boston area?

8    A.    We came approximately a day after the blast.  We had been

9    notified immediately after the blast that we would probably be

06:19 10   deployed.  And it took about a day to get all of our equipment

11    together and get organized and get on the plane to come up.

12    Q.    Was your specific task at that time to be a member of an

13    ERT team?

14    A.    Yes.  It was as a member of the Washington field office

15    ERT team.

16    Q.    And with respect to those duties then, did you have

17    occasion on April 21 of 2013 to respond to the UMass campus in

18    Dartmouth?

19    A.    Yes.

06:20 20   Q.    What time did you arrive at that location?

21    A.    It was past midnight; maybe 1 or 2 in the morning.

22    Q.    What were your specific duties?

23    A.    I was assigned to be a searcher at the search scene, which

24    was the dorm room.

25    Q.    And do you know what dorm room you went to?

1

1    A.   I went to the -- Dzhokhar Tsarnaev's dorm room.

2    Q.   If I give you a casebook, would that refresh your

3    recollection as to the name of the dorm and the dorm room?

4    A.   Yes.  It was Pine Dale Hall.

5    Q.   Thank you.  Let me just give you the casebook.

6    A.   Thank you.

7    Q.   I ask you to look at that and ask you if that refreshes

8    your recollection as to the dorm room number.

9    A.   Yes.  It was Room 7341.

06:21 10   Q.   Thank you.  Now, Agent Franks, with respect to the team

11   that responded to that location, how many members were on that

12   team?

13   A.   There was approximately seven or eight members.

14   Q.   And your job as a searcher meant what?

15   A.   It meant that my only responsibility was to search the

16   actual room.  So we have other members that do various other

17   tasks, such as sketch or various things, and my role was just

18   to search.

19   Q.   And in doing so, were you able though to observe the

06:21 20   performance of the other members on the team and speak with

21   them about what they were doing?

22   A.   Yes.  On a search, especially this one, we worked very

23   closely together.  And you know what the sketch artist is

24   doing.  You know what the team leader is doing.  There's a lot

25   of communication back and forth, and I was aware of what the

1

1    other team members were doing.

2    Q.   With respect to your entry to that room -- first of all,

3    let me ask you:  When you got there, was the room secured?

4    A.   Yes, it was.

5    Q.   By whom and in what way?

6    A.   There were FBI agents there that had been posted there.

7    They were from New York.  There was also a campus security

8    guard.

9    Q.   With respect to your entry into the dorm room, did you

06:22 10   enter under lawful authority?

11   A.   Yes.

12   Q.   Now, you also just mentioned about sketches and diagrams.

13   A.   Yes.

14   Q.   That was done once you were in the room, is that correct?

15   A.   Correct.  That process typically takes place as we're

16   doing the searching.

17        MS. PELLEGRINI:  For the witness and counsel only,

18   your Honor, although a portion of it is in evidence.  May I

19   have Exhibit 620?

06:22 20   Q.   Agent Franks, with respect to the image on the screen in

21   front of you, do you recognize that image?

22   A.   Yes, I do.

23   Q.   Just generally tell us what are you looking at.

24   A.   I am looking at a diagram of the dorm room that we

25   searched in Pine Dale Hall.

1

1    Q.   And with respect to this diagram, have you had occasion to

2    determine whether or not it fairly and accurately represents

3    the layout of the dorm room, including where objects were in

4    relation to one another, when you entered and when the search

5    was performed on April 21st?

6    A.   Yes.

7    Q.   Have you also had occasion to review all of the

8    photographs that are enclosed in this graphic?

9    A.   Yes.

06:23 10   Q.   Do they fairly and accurately represent the scene as you

11   saw them during the course of the search?

12   A.   Yes.

13            MS. PELLEGRINI:   Your Honor, I would at this time

14   offer Exhibit 620, this portion of Exhibit 620, which is called

15   the Dartmouth dorm room.

16            MS. CONRAD:   May we be heard at sidebar for a moment,

17   please?

18            MS. PELLEGRINI:   Take that down, Mr. Bruemmer.

19   (SIDEBAR CONFERENCE AS FOLLOWS:

06:24 20            THE COURT:   Is that package 620 that you gave her?

21            MS. PELLEGRINI:   No, sir.

22            THE COURT:   You're talking about -- sounds like a

23   multiple-page document.

24            MS. PELLEGRINI:   No, no.   It's a document.   The image

25   in front of her -- I'm sorry, your Honor -- was 620.   We call

1

1       it the 2D interactive.  Previously, portions of it had been

2       entered into evidence when we did the Boylston Street scene,

3       the evidence recovery.  This is another graphic that is

4       included in this, which is of the same nature.  I thought you

5       could see it on your screen.

6              THE COURT:  It's another chapter in the book.

7              MS. PELLEGRINI:  It's another chapter.  It's another

8       layer.

9              MS. CONRAD:  We filed a motion to suppress the search

06:24 10      of the dorm room, so I just want to register that objection to,

11      again, preserve the record.

12             THE COURT:  It's been ruled on.

13             MS. CONRAD:  Right.  I understand that.  I just want

14      to make sure it hasn't been waived, and we're preserving the

15      objection.  And also two other things, one general and one

16      specific.  I think that to the extent the government is using

17      this interactive it should be treated as a chalk as opposed to

18      an exhibit.

19             And, second of all, one of the images, I believe,

06:25 20      that's embedded, if you will, in that -- or maybe two of them

21      -- in that interactive is the document that Mr. Tsarnaev wrote

22      in January of 2013, to which there was a previous objection.

23      So to the extent that another image is coming at this point --

24             THE COURT:  Same thing?

25             MS. CONRAD:  Same, right, right.  As far as the

1   chalk --

2          THE COURT:  I don't remember previous use of it.

3          MS. PELLEGRINI:  Your Honor, if I could refresh your

4   recollection on the Boylston part.  It's similar to what we

5   have here.  So we have an exhibit that basically lays out for

6   the jury a way of organizing what we would normally put in, a

7   number of photographs that -- you can click on a spot.

8          THE COURT:  This is the same exhibit, is that --

9          MS. PELLEGRINI:  It's the same exhibit, but it's a

06:26 10   different portion of it.

11          THE COURT:  No, I understand that.  All the

12   interactives are in one even though they relate to different

13   topics?

14          MS. CONRAD:  There's different foundations for each

15   one.  I mean, on Boylston Street, that had to do with where

16   certain cameras were and so forth.  On this, it's basically

17   providing a view.  I don't have an objection to the

18   photographs.  I have an objection to the chalk itself.

19          THE COURT:  We did treat the other as a summary and

06:26 20   admitted it as an exhibit.

21          MS. CONRAD:  I'm not sure that the Boylston Street was

22   ever admitted because there was an objection.

23          MS. PELLEGRINI:  It was admitted.  It was overruled

24   and admitted.

25          THE COURT:  I think we did.  So I'll be consistent and

1

1    apply that to this as well.)

2    .  .  .  END OF SIDEBAR CONFERENCE.)

3         MS. PELLEGRINI:  May I have that back on the screen,

4    Mr. Bruemmer?

5    Q.   Miss Franks, I think the last thing I asked you about was

6    about the photographs that are attached or able to be viewed

7    through this graphic, is that correct?

8    A.   That is correct.

9    Q.   You indicated that you have reviewed those; and, in fact,

06:27 10   those are the photographs that fairly and accurately represent

11   the status and state of the dorm room during the course of the

12   search, is that correct?

13   A.   That's correct.

14        MS. PELLEGRINI:  Your Honor, I would offer this as the

15   second portion or third portion of Exhibit 620, which relates

16   to the Dartmouth dorm room and ask that it be published to the

17   jury so that I can work with it.

18        THE COURT:  Okay.  My only question is:  Is there a

19   way of identifying the parts to the whole?

06:27 20        MS. PELLEGRINI:  Yes, there is, your Honor.  On the

21   left-hand side of the screen when it appears, there's a bar,

22   which basically leads to an index.  And when that is -- I don't

23   know if it's in front of the Court at the moment.  But when

24   that is clicked, it leads to an index, and you can see how it

25   is divided up and that the layers are identified.

1

1          THE COURT:  Okay.  This index that you've now shown is

2     specific to the UMass Dartmouth dorm room?

3          MS. PELLEGRINI:  No.  The index includes a way of --

4     basically, it's a little map.

5          THE COURT:  Never mind.  I can read the --

6          MS. PELLEGRINI:  Okay.

7          THE COURT:  Okay.  All right.  Well -- so on the

8     index, there is a heading, "Dartmouth Dorm Room."

9          MS. PELLEGRINI:  Correct.

06:28 10        THE COURT:  Are you offering -- just so the record is

11    clear, are you offering what is included under that heading in

12    this exhibit?

13         MS. PELLEGRINI:  Yes, your Honor, we are.

14         THE COURT:  Okay.  It's admitted.  I just wanted to be

15    sure it was clear what the dimensions of the admission was --

16    were.

17         MS. PELLEGRINI:  Are or whatever.

18         THE COURT:  Go ahead.

19         MS. PELLEGRINI:  Thank you.

06:28 20    (Government's Exhibit No. 620 received into evidence.)

21         MS. PELLEGRINI:  Is that up and now open before the

22    jury, please, your Honor?

23    Q.  All right.  Agent Franks, with respect to Exhibit 620, can

24    you tell us what we're looking at now that the jury can see the

25    image before them?

1

1    A.   We are looking at a representation of the dorm room at

2    Pine Dale Hall, Room 7341.

3    Q.   With respect to that portion that you searched, if I move

4    my mouse over, little boxes appear.  Do you see that?

5    A.   Yes.

6    Q.   Are those, in fact, related to areas where the search team

7    recovered items and took those items into their possession?

8    A.   Yes.

9    Q.   I'm going to go to the first one where a label appears as

06:29 10   "Shelf."  Do you recall that area?

11   A.   I do.

12   Q.   Now, the screen has split, and we have the graphic of the

13   dorm room on the left-hand side and the desk shelf on the

14   right-hand side, is that correct?

15   A.   That's correct.

16   Q.   Do these photos, of which there are two, fairly and

17   accurately represent what you saw as you entered the dorm room

18   and what was seized that day?

19   A.   Yes.

06:30 20   Q.   What are we looking at here for desk shelf?

21   A.   We are looking at a shelf beside his bed -- beside the

22   bed.  It is Evidence Item No. 25 that we found, which was a

23   box.

24   Q.   And do you recall what was in the box?

25   A.   BBs.

1

1    Q.    And what's the little yellow square with the No. 25 on it?

2    A.    That's how we identify pieces of evidence as we're

3    searching.  We start with No. 1, and we work our way through as

4    many items of evidence as we find.

5    Q.    So going to the second photo on the desk shelf, what are

6    we looking at here?

7    A.    This is a close-up of the box of BBs that were found on

8    the shelf.

9          MS. PELLEGRINI:  May I have -- may I approach again,

06:30 10   your Honor?

11         THE COURT:  All right.

12   Q.    Agent Franks, I'd like you to look at what I've put in

13   front of you which is marked for identification as Government

14   Exhibit 1109.  It's in a clear plastic bag.  Do you recognize

15   the contents therein?

16   A.    I do.

17   Q.    How do you recognize that?

18   A.    We have a label that we put on every item of evidence, and

19   it has various items of information.  One is my name and my

06:31 20   initials.

21   Q.    So you actually processed this particular piece of

22   evidence, is that correct?

23   A.    That's correct.

24   Q.    All right.  And just in a very general way, what -- with

25   respect to the picture on the graphic and the Placard No. 25,

1

1   is this, in fact, the same item?

2   A.   Yes, it is.

3         MS. PELLEGRINI:  Your Honor, the government would

4   offer 1109.

5         MS. CONRAD:  Just the previously raised issue.

6         THE COURT:  All right.  Admitted.

7   (Government's Exhibit No. 1109 received into evidence.)

8   Q.   Agent Franks, if you could open that, please?

9         So you've removed two bags from the larger one, is that

06:32 10  correct?

11  A.   That's correct.

12  Q.   All right.  Can you tell us what we're looking at here?

13  A.   We are looking at the original box that was found in this

14  bag.  And then the BBs have been separated out into another

15  bag.

16  Q.   The BBs, I believe, have a second government exhibit, is

17  that correct?

18  A.   That's correct.

19  Q.   And that's 1110?  Am I looking at that correctly?

06:32 20  A.   Yes.

21        MS. PELLEGRINI:  Your Honor, the government would

22  offer Exhibit 1110 as well.

23        THE COURT:  All right.  Same ruling.

24  (Government's Exhibit No. 1110 received into evidence.)

25  Q.   So this is the box and those are the BBs correct?

1

1    A.    That is correct.

2    Q.    You can put those back.

3          Heading on to the second location in the graphic, we have

4    an item labeled as "drawer," correct?

5    A.    Correct.

6    Q.    And what are we looking at here?

7    A.    This is the drawer that was also found next to the bed,

8    and the drawer is opened with several evidence item numbers

9    inside.

06:33 10   Q.    All right.  See if we can get that -- it doesn't go any

11   larger, unfortunately, in this.  But what are we looking at

12   here?

13   A.    It looks like --

14   Q.    A close-up of the same photo?

15   A.    Yes, that's correct.

16   Q.    All right.  And what are we looking at in this graphic?

17   A.    This is Evidence Item No. 15, which consisted of a receipt

18   from Dick's Sporting Goods.

19   Q.    Do you know what this is for?

06:33 20   A.    Yes.

21   Q.    What is this receipt for?

22   A.    It is for a Smith & Wesson and then the warranty plan that

23   was purchased with it.

24   Q.    Showing you what's been marked for identification as

25   Government Exhibit 1241, do you recognize that item?

1

1     A.    Yes.

2     Q.    Is that the same item, in fact, that appears in the

3     graphic, that is, the Dick's Sporting Goods receipt?

4     A.    Yes.

5     Q.    How do you recognize it as such?

6     A.    Again, we have our items of information that we put on

7     every piece of evidence when we seize it, and I recognize the

8     information on the evidence tag.

9     Q.    All right.  Could you open that one, please?

06:34 10          So, for the record, you've removed two separate receipts,

11    is that correct?

12    A.    That's correct.

13    Q.    Thank you.  And this third item in the desk drawer, do you

14    recognize this item?

15    A.    Yes.

16    Q.    What are we looking at here?

17    A.    It was Item No. 16 that was collected, and it's the

18    packaging for the Smith & Wesson BB gun.

19    Q.    All right.  I'd like to show you what's been marked for

06:35 20    identification as Government Exhibit 1244 and ask you if you

21    recognize this packaging.

22    A.    I do.

23    Q.    Again, how do you do so?

24    A.    Because of the information that we put on our evidence

25    label, which includes my name and initials.

1

1    Q.   All right.  In fact, can you open this up for us, please?

2         Agent Franks, for the record, could you describe what

3    you've just taken out of the package?

4    A.   It is the packaging for a Smith & Wesson BB gun.

5    Q.   All right.

6              MS. PELLEGRINI:  Your Honor, if I haven't done this, I

7    offer 1244.

8    (Government's Exhibit No. 1244 received into evidence.)

9    Q.   When you say "a Smith & Wesson BB gun," what do you mean?

10   A.   That's the brand name and the type of weapon, as indicated

11   on the packaging.

12   Q.   And does it also indicate that -- any usage of BBs?

13   A.   Yes.

14   Q.   Is that on the packaging?

15   A.   Yes.

16             MS. PELLEGRINI:  May I have Exhibit 934 already in

17   evidence?

18   Q.   Agent Franks, I'm going to ask you to look at Exhibit 934

19   and ask you to hold that up.  With respect to the item that's

20   in Exhibit 934, is that, in fact, consistent with the packaging

21   of the Smith & Wesson that we just looked at?

22   A.   Yes, it is.

23   Q.   Does it, in fact, have the name Smith & Wesson on it?

24   A.   Yes, it does.

25   Q.   I'll take some of these back.  It's getting kind of

1

1      crowded.

2              THE COURT:  Miss Pellegrini, just to keep the

3      accounting straight, I'm not sure you offered 1241, which were

4      the receipts.

5              MS. PELLEGRINI:  Then I do so, your Honor.

6              THE COURT:  No objection?

7              MS. CONRAD:  The same.

8              THE COURT:  Just the same.  Okay, fine.

9      (Government's Exhibit No. 1241 received into evidence.)

06:38 10            MS. PELLEGRINI:  They're -- I'm sorry, your Honor.

11     For the record, they went in?

12             THE COURT:  1241 and 1244 are in.

13             MS. PELLEGRINI:  Thank you.

14     Q.   All right.  Agent Franks, with respect to the next

15     location in the dorm room, I have the mouse over an item marked

16     "chair."  Do you recognize this?

17     A.   Yes.

18     Q.   And with respect to the photos being shown here, what are

19     we looking at here?

06:38 20   A.   We are looking at a photo in the dorm room of the chair

21     and then the desk behind it.

22     Q.   Going to the next photo, what is this item?

23     A.   This is Evidence Item No. 27, which was a black coat that

24     was found on the chair in the dorm room.

25     Q.   I show you what's been marked for identification as

1

1    Government's Exhibit 1232.  Do you recognize that item?

2    A.    Yes, I do.

3    Q.    And this is what?

4    A.    This is the black jacket that was found on the back of the

5    chair in the dorm room.

6    Q.    How do you recognize it as such?

7    A.    Again, the items of information that we put on all of our

8    evidence items when we seize them.

9    Q.    I'm going to ask you to leave that there on the side for a

06:39 10   second.

11         Going to the space marked "shelf near bed" and the

12   attendant pictures, do you recognize that area?

13   A.    Yes.

14   Q.    And starting with the picture, do you recognize this area

15   shown here?

16   A.    Yes.

17   Q.    What do you recall was seized from this area?

18   A.    I recall papers, personal papers.

19   Q.    And what else?

06:40 20   A.    And also a hat.

21   Q.    And with respect to personal papers, now, why would you

22   seize personal papers?

23   A.    This was to help establish which side of the room each of

24   the individuals was living on.

25   Q.    Were you able to do that through review of the papers?

1

1   A.   Yes.

2   Q.   Were you able to establish that this, in fact, was

3   Dzhokhar Tsarnaev's side of the room?

4   A.   Yes.

5   Q.   And second picture here, do you recognize this item?

6   A.   Yes.

7   Q.   What is this?

8   A.   This is Evidence Item No. 4, which is a thumb drive.

9   Q.   Showing you Exhibit 1247 marked for identification, do you

06:41 10   recognize the packaging for this?

11   A.   Yes.

12   Q.   And this is what?

13   A.   This is the Micro Center two-gigabyte thumb drive.

14   Q.   How do you recognize it as such?

15   A.   Again, the items of information that are on all of our

16   evidence tags, which include my name and initials.

17   Q.   I'd ask you to open up --

18        MS. PELLEGRINI:  Actually, your Honor, I would offer

19   at this time Government's Exhibits 1247 and 1232.

06:41 20        THE COURT:  Subject to the same objection, it's

21   overruled and admitted.

22   (Government's Exhibit No. 1232 received into evidence.)

23   (Government's Exhibit No. 1247 received into evidence.)

24   Q.   All right.  Agent Franks, it's a long way to the jury box.

25   I'm going to ask you to take that out of the package and hold

1

1       that up so the jury can see it.

2       A.    (Indicating.)

3       Q.    Is this, in fact, the thumb drive that's in the image on

4       the screen now and was found in the Defendant Tsarnaev's dorm

5       room?

6       A.    Yes, it is.

7       Q.    Next from the shelf near the bed, do you recognize these

8       items?

9       A.    Yes.

06:42 10    Q.    And what are these?

11      A.    These are cell phones.

12      Q.    And they were located in this area?

13      A.    Yes.

14      Q.    By the way, Agent Franks, what's the purpose of the -- I

15      can't write on this one -- of the measurement, the ruler at the

16      bottom?

17      A.    We use those in our close-up photos just to get an idea of

18      the size.

19      Q.    I'd like to show you what's been marked for identification

06:43 20    as Government's Exhibit 1248 and 1251.  Do you recognize those

21      items?

22      A.    Yes.

23      Q.    And what are they?

24      A.    It is two cell phones, one Samsung and one iPhone.

25      Q.    How do you recognize it -- them?

1

1    A.   The items of information that we put on our evidence tag,

2    which include my name and initials.

3         MS. PELLEGRINI:  Your Honor, the government would

4    offer both Exhibits 1248 and 1251.

5         THE COURT:  All right.  Admitted.  Which is which?

6         MS. PELLEGRINI:  I'll let Agent Franks answer that

7    question.  Actually, she may not know.

8         THE WITNESS:  I don't think I do.

9         MS. PELLEGRINI:  I'll have to go back to the exhibit

06:44 10  list, your Honor.  1248 is the Samsung.  I'm looking for the

11   second.  And 1251 is an iPhone.

12        THE COURT:  Okay.

13   Q.   What is -- in this image, Agent Franks, what are we

14   looking at here?

15   A.   This is Evidence Item No. 7, which was a white hat that

16   was found on the bed in the dorm room.

17   Q.   And this image as well?

18   A.   The same item, just from the opposite side.

19   Q.   So if I go back, this is the image from the front with the

06:45 20  brim, correct?

21   A.   Correct.

22   Q.   And the back --

23   A.   Correct.

24   Q.   -- of the hat?

25   A.   Yes.

1

1   Q.   And, for the record, with respect to what the image

2   indicates, is the logo or any identifying information on the

3   hat, what does that read?

4   A.   Polo Ralph Lauren, MCMLXVII.

5   Q.   So showing you what's been marked for identification as

6   Exhibit 1231, do you recognize that item?

7   A.   Yes, I do.

8   Q.   Is that, in fact, the hat in question?

9   A.   Yes, it is.

06:45 10   Q.   How do you recognize it as such?

11   A.   Again, the items of information that we put on our

12   evidence tag, which include my name and initials.

13   Q.   Can you open that, please?

14        MS. PELLEGRINI:   Before removing it from the other bag

15   inside, your Honor, the government would offer Exhibit 1231 at

16   this time.

17        THE COURT:   All right.   Same terms.

18   (Government's Exhibit No. 1231 received into evidence.)

19   Q.   Agent Franks, is that, in fact, the hat that was located

06:46 20   in the defendant's dorm room?

21   A.   Yes.

22   Q.   Now, I note, for the record, that there appears to be a

23   hole and a little marking in there, is that correct?

24   A.   That's correct.

25   Q.   Do you know -- actually, there's several.  Do you know

1

| | |
|---|---|
| 1 | what those are from? |
| 2 | A.   I believe from the lab and any evidence techniques that |
| 3 | they would have performed on it. |
| 4 | Q.   In fact, does this have what we call a Q number? |
| 5 | A.   Yes, it does. |
| 6 | Q.   Am I correct in saying that that would be a question item? |
| 7 | A.   Yes. |
| 8 | Q.   Is there also a laboratory sticker? |
| 9 | A.   Yes. |
| 06:46 10 | Q.   So that meant that this item was sent to the laboratory in |
| 11 | Quantico, Virginia? |
| 12 | A.   Correct. |
| 13 | Q.   For a minute, I'd just like to leave this exhibit.  We'll |
| 14 | come back to it. |
| 15 |      MS. PELLEGRINI:  And I'd like to go to Exhibit 22.  I'd |
| 16 | like to go to the first point, Mr. Bruemmer.  This is already |
| 17 | in evidence, your Honor.  So it's up for the jury, I hope. |
| 18 | 133.  Thank you. |
| 19 | Q.   Agent Franks, do you see the image on the screen before |
| 06:47 20 | you? |
| 21 | A.   Yes. |
| 22 | Q.   And do you see the hat -- |
| 23 | A.   Yes. |
| 24 | Q.   -- on the person in the center of the picture? |
| 25 | A.   Yes. |

1

1    Q.   Is that hat consistent with the one that you found in the

2    Defendant Tsarnaev's dorm room?

3    A.   Yes.

4         MS. PELLEGRINI:   Can you go to the second point, Mr.

5    Bruemmer, on the same exhibit?

6    Q.   And looking at the image that appears now, is that

7    consistent with the hat, particularly the number and the

8    styling on that white hat?

9    A.   Yes.

06:48 10   Q.   And from the back, with the logo that appears -- it's

11   backwards, so the logo of the horse and rider is on the back of

12   the head, is that correct?

13   A.   Yes.

14   Q.   Is that also on the white hat that we just talked about?

15   A.   Yes, it is.

16        MS. PELLEGRINI:   All right.   Thank you, Mr. Bruemmer.

17        I still have a little ways to go, your Honor.

18        THE COURT:   How much?

19        If you're that uncertain, why don't we break.

06:48 20        MS. PELLEGRINI:   I don't like to be rushed.

21        THE COURT:   We'll call it a day, jurors.

22        MS. PELLEGRINI:   I have three more boxes.

23        THE COURT:   Okay.   Again, my instructions about no

24   communications of any kind and exposure to media.   We'll see

25   you in the morning and continue with making progress with the

1

1    case.

2            I do want to have a little bit of a lobby conference

3    on scheduling.

4    (Whereupon, at 3:55 p.m. the trial recessed.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4   Dahlstrom, RMR, CRR, Official Reporters of the United States

5   District Court, do hereby certify that the foregoing transcript

6   constitutes, to the best of our skill and ability, a true and

7   accurate transcription of our stenotype notes taken in the

8   matter of Criminal Action No. 13-10200-GAO, United States of

9   America v. Dzhokhar A. Tsarnaev.

10

11  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
12  Official Court Reporter

13
    /s/ Cheryl Dahlstrom
14  CHERYL DAHLSTROM, RMR, CRR
    Official Court Reporter
15

16  Date:  10/15/15

17

18

19

20

21

22

23

24

25