```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY THIRTY-NINE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, March 25, 2015
9:13 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
             John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6            By:  Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
             By:  Miriam Conrad, William W. Fick and Timothy G.
10           Watkins, Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13           By:  Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15           - and -
         LAW OFFICE OF DAVID I. BRUCK
16           By:  David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                               I N D E X

2                                   Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
3      GOVERNMENT:

4    KIMBERLY FRANKS (Cont'd)

5        By Ms. Pellegrini          7                    15
         By Ms. Conrad                      13
6
     CHRISTOPHER DERKS
7
         By Mr. Chakravarty        16                    86
8        By Ms. Conrad                      39                       88

9    CHRISTIAN FIERABEND

10       By Mr. Weinreb            92                    129
         By Mr. Watkins                     121
11
     KENNETH BENTON
12
         By Mr. Mellin            133                    146
13       By Ms. Conrad                      144

14   OLGA LAFOND

15       By Mr. Chakravarty       149
         By Mr. Fick                        158
16
     MUNA SHISHANI
17
         By Mr. Chakravarty       163
18       By Mr. Fick                        169

19   HEIDI WILLIAMS

20       By Mr. Chakravarty       171
         By Mr. Fick                        180
21
22                            E X H I B I T S

23
     GOVERNMENT'S
24     EXHIBIT      DESCRIPTION                 FOR ID      RECEIVED

25   1249         Notebook taken from closet of dorm room        7

<pre>
 1
                        E X H I B I T S (cont'd)
 2
         GOVERNMENT'S
 3        EXHIBIT        DESCRIPTION                   FOR ID      RECEIVED

 4       1246           Book taken from dorm room                  9

 5       1112           Bag of BBs taken from dorm room            11

 6       1113           Firework taken from dorm room              12

 7       1230-6         Photograph of door of dorm room            14

 8       620            Interactive re Norfolk St. apt             26

 9       1201           Photograph of black flag                   44

10       1221           Photograph of iPhone boxes                 44

11       1192           Gasket taken from 410 Norfolk St.          45

12       1194           Black knob taken from 410 Norfolk St.      46

13       1206           Jar taken from 410 Norfolk St.             48

14       1187           HP computer taken from 410 Norfolk St.     50

15       1186           Flag taken from 410 Norfolk St.            50

16       1200           Pages from notebook taken from Norfolk St. 55

17       1077;          Items taken from 410 Norfolk St.           57
         1078;
18       1205;
         1094-
19       1099;
         1101;
20       1186-
         1189;
21       1191;
         1193;
22       1195;
         1199-
23       1200;
         1203;
24       1206;
         1208;
25       1210;
</pre>

39-5

E X H I B I T S (cont'd)

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 1214; 1216- 1218; 1197- 1198 | Items taken from 410 Norfolk St. | | 57 |
| 1152-06 | GPS plots | | 96 |
| 1159 | Excel spreadsheet | | 103 |
| 1152-07 | Map of GPS plots | | 107 |
| 1161-02, 1163-03 | Walmart receipt | | 109 |
| 1160-02 | NitroRCX invoice | | 113 |
| 1431 | Receipt | | 116 |
| 1256-11 | Photograph | | 136 |
| 1257 | Backpack | | 139 |
| 1258 | Thumb drive | | 140 |
| 1259 | Fireworks | | 142 |
| 1256-01, 1256-02, 1256-04, 1256-06, 1256-07 1256-09 | Photographs | | 154 |
| 1321, 1408 1409 | Documents in Russian | | 159 |
| 1407 | Document with Arabic terms | | 168 |

| 1 | | E X H I B I T S (cont'd) | | |
|---|---|---|---|---|
| 2 | DEFENDANT'S<br>EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
| 3 | 1387A | Entirety of excerpted Exhibit No. 387 | 185 | |
| 4 | 1185-11 | Photograph | | 64 |
| 5 | 3062 | Photograph | | 67 |
| 6 | 3063 | Photograph | | 69 |
| 7 | 3064 | Collection of various notebooks | | 72 |
| 8 | 3065 | Copy of Q78 | 78 | |
| 9 | 3066 | Photograph | | 79 |
| 10 | 3067 | Pages 3 and 4 of pleadings | | 89 |
| 11 | | Travel documents | | 82 |
| 12 | 1561 | Physical items | | 92 |
| 13 | 3099 | Photograph | | 193 |
| 14 | 3100,<br>3101 | Gloves | | 124 |
| 15 | | | | |
| 16 | 3096 | Photograph | | 127 |
| 17 | 3097 | Photograph | | 128 |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

                        P R O C E E D I N G S

1

2              THE COURT:  Good morning, jurors.  All right.  Miss

3    Pellegrini.

4              MS. PELLEGRINI:  Good morning, your Honor.  Your

5    Honor, Special Agent Franks is still on the stand from

6    yesterday.  She's still under oath.

7              And I would ask Mr. Bruemmer if you could bring up

8    Exhibit 620.

9    CONTINUED DIRECT EXAMINATION BY MS. PELLEGRINI:

00:21 10   Q.   Agent Franks, one of the things that doesn't appear here

11   as part of the graphic was a closet.  Do you recall that?

12   A.   Yes.

13   Q.   And was that part of your search?

14   A.   Yes.

15   Q.   So showing you what's been marked for identification as

16   Government Exhibit 1249, do you recognize that packaging?

17   A.   Yes.

18   Q.   And how do you recognize it?

19   A.   Because of the items of information that we put on our

00:21 20   evidence tag on every piece of evidence, which includes my name

21   and initials.

22   Q.   Is this, in fact, then an item that was removed from the

23   closet area of the dorm room?

24   A.   Yes.

25   Q.   And I'd ask you to open that now.

1        MS. CONRAD:  Excuse me.  May I see it?

2        MS. PELLEGRINI:  Uh-huh.  Got to open it.

3    Q.   Before you remove it, after you look inside, do you

4    recognize that item?

5    A.   Yes.

6    Q.   Is that, in fact, an item that you removed from the closet

7    area --

8    A.   Yes.

9    Q.   -- in the search?

00:22 10   A.   Yes.

11        MS. PELLEGRINI:  Your Honor, the government would now

12   offer Exhibit 1249.

13        MS. CONRAD:  No objection.

14        THE COURT:  Okay.

15   (Government's Exhibit No. 1249 received into evidence.)

16   Q.   If you could remove that, please.  Could you hold it up

17   for the jury?

18   A.   (Witness complies.)

19   Q.   Could you tell us what this is?

00:22 20   A.   It is a black, spiral, three-subject notebook.

21   Q.   Okay.  Looking at the image on the screen, Agent Franks,

22   I've now moved to the block marked "floor," "floor near bed."

23   And the photograph or photographs that are attached thereto, do

24   you recognize that area?

25   A.   Yes.

1    Q.   Showing you the first photograph, what are we looking at
2    here?
3    A.   We are looking at the bed and the armoire.
4    Q.   And for the second photograph, what are we looking at
5    here?
6    A.   We are looking at a bag and a book that was found in the
7    room.
8    Q.   Showing you then government exhibit marked for
9    identification 1246, do you recognize this item?
00:23 10   A.   Yes.
11   Q.   Since you can see it through the bag, we don't have to
12   open it up.  How do you recognize it?
13   A.   Because of the information on our evidence tag including
14   my name and initials.
15   Q.   And that's something that you collected from that area
16   during the search, is that correct?
17   A.   Yes.
18        MS. PELLEGRINI:  Your Honor, the government would
19   offer 1246 at this time.  It's a book.
00:24 20        MS. CONRAD:  No objection.
21   (Government's Exhibit No. 1246 received into evidence.)
22   Q.   If you could just take that out and describe that for the
23   jury, please.
24   A.   Take the book out?
25   Q.   Yes, ma'am.

1    A.   It is --

2    Q.   Hold it up.

3    A.   It is a book entitled, *Soldiers of God*, by Robert Kaplan,

4    and it says, "*With the Mujahidin in Afghanistan*."

5    Q.   Thank you.  I'm going to take these back because it's

6    crowded.

7         Moving now to the second box marked "floor" and "floor

8    near dresser," do you recognize this area?

9    A.   Yes.

00:25 10   Q.   In the pictures that we're looking at, is this the armoire

11   that you were talking about?

12   A.   Yes.  There were two of them.

13   Q.   Moving along from the first picture which I believe shows

14   the outside, is that correct?

15   A.   Yes.

16   Q.   What are we looking at here?

17   A.   This is a bag that was found.  It's Item No. 26.

18   Q.   And the third picture, what are we looking at here?

19   A.   Those are BBs.

00:25 20   Q.   Where were these located?

21   A.   They were fond inside the bag.

22   Q.   Showing you what's been marked for identification as

23   Government Exhibit 1112, do you recognize the items therein?

24   A.   Yes.

25   Q.   With respect to the 1112, can you tell us what that is?

1    A.    They are BBs.

2    Q.    And how do you recognize it?

3    A.    Because of the packaging information that is on the

4    outside of the evidence bag.

5    Q.    I'm not going to ask you to open these.  Just my luck,

6    they will go all over.  I'd ask you to hold these up.  Could

7    you describe them for the jury, please?

8    A.    They are BBs.

9    Q.    And what color?

00:26 10   A.    Copper.

11   Q.    Thank you.

12         MS. PELLEGRINI:  Your Honor, the government would move

13   Exhibit 1112 into evidence.

14         MS. CONRAD:  Just the previous --

15         THE COURT:  Preserving a previous objection.

16   Overruled.  It will be admitted.

17   (Government's Exhibit No. 1112 received into evidence.)

18   Q.    Finally, the box that indicates the "window area" and

19   "windowsill," do you recognize that area?

00:27 20   A.    Yes.

21   Q.    Looking at the photographs here, can you explain to the

22   jury what we are looking at?

23   A.    We are looking at the back of the armoire, which was

24   situated near the window and the windowsill.

25   Q.    Going to the second photo with the placard marked No. 1,

1    what are we looking at here?

2    A.   This is a picture of Evidence Item No. 1, which is a Big

3    Snow firework.

4    Q.   And Picture No. 3 attached thereto, what is that?

5    A.   That is another picture of the firework, the back.

6    Q.   I'm going to show you what's been marked for

7    identification as Government Exhibit 1113.  Again, do you

8    recognize that item?

9    A.   Yes.

00:27 10  Q.   Was this taken during the course of the search?

11   A.   Yes.

12   Q.   Is it marked so that you can, in fact, recognize it?

13   A.   Yes.

14        MS. PELLEGRINI:  Your Honor, the government would

15   offer 1113 at this time.

16        THE COURT:  Same?

17        MS. CONRAD:  Same.

18        THE COURT:  Yes.  Admitted.

19   (Government's Exhibit No. 1113 received into evidence.)

00:28 20  Q.   I ask you to open that.

21   A.   Take it out?

22   Q.   If you can.

23   A.   (Witness complies.)

24   Q.   Could you explain what you're showing to the jury, please?

25   A.   This is the Big Snow firework called Megabanger that was

1    found in the dorm room.

2         MS. PELLEGRINI:  Your Honor, if I may, because we're a

3    distance from the jury, show it to the jury closer to the box,

4    please?

5         THE COURT:  Yes, you may.

6    A.   It's dirty.

7         MS. PELLEGRINI:  One moment, your Honor.

8         Thank you, Miss Franks.  I have no further questions.

9         MS. CONRAD:  Sorry.  I didn't mean to jump the gun.

00:29 10        MS. PELLEGRINI:  That's okay.

11   CROSS-EXAMINATION BY MS. CONRAD:

12   Q.   Good morning, Agent Franks.  My name is Miriam Conrad.

13   I'm one of the lawyers for Mr. Tsarnaev.

14   A.   Good morning.

15   Q.   You participated in the search, right?

16   A.   That's correct.

17   Q.   And that was on April 20 -- April 19, is that right?

18   A.   I believe so.

19   Q.   And showing you --

00:30 20        MS. CONRAD:  This is just for the witness, please.

21        THE COURT:  On the document camera?

22        MS. CONRAD:  Yes.

23   Q.   -- what's been previously --

24        MS. CONRAD:  What's that?  That's what that is.

25   Great.  Thank you very much, Mr. Bruemmer.

1    Q.    -- what's been previously marked by the government, but I

2    think not introduced, as Exhibit 1230-6.  Do you recognize

3    that?

4    A.    Yes.  That is a picture of the door to the dorm room.

5    Q.    The dorm room that was searched?

6    A.    Yes.

7            MS. CONRAD:  I'd offer that, your Honor.

8            MS. PELLEGRINI:  No objection.

9            THE COURT:  Okay.  The number?  It's a government

00:30 10    number, right?  1230 dash --

11            MS. CONRAD:  1230 is previously numbered, so we might

12    as well stick with that, 1230-6.

13    (Government's Exhibit No. 1230-6 received into evidence.)

14            MS. CONRAD:  Let me see if I can zoom out.

15    Q.    And that's what the door looked like on the date of the

16    search?

17    A.    Yes.

18    Q.    And a couple of the items that you told us about, the

19    fireworks, for example, was just sitting right out in plain

00:31 20    view, right?

21    A.    That is correct.

22    Q.    It wasn't hidden?

23    A.    No.

24    Q.    Same thing with the hat, the white Polo cap, that was

25    right there on the bed?

1    A.   Correct.

2    Q.   I just wanted to clear up one thing.  You showed us the BB

3    gun, the Smith & Wesson, packaging?

4    A.   Uh-huh.

5    Q.   And you also talked about a receipt from Dick's Sporting

6    Goods?

7    A.   Yes.

8    Q.   And that receipt was for the BB gun, right?

9    A.   Correct.

00:32 10   Q.   And you didn't find any actual firearms in that room, did

11   you?

12   A.   No.

13   Q.   Or any actual ammunition?

14   A.   No.

15   Q.   Or any gun-cleaning kit?

16   A.   No.

17        MS. CONRAD:  Thank you.  I have nothing further.

18        MS. PELLEGRINI:  I just have one.  If you could leave

19   that exhibit up, please.  If I may, your Honor?

00:32 20       THE COURT:  Go ahead.

21   REDIRECT EXAMINATION BY MS. PELLEGRINI:

22   Q.   Agent Franks, with respect to Exhibit 1230-6, do you have

23   any idea who made these decorations?

24   A.   No.

25   Q.   Do you have any idea when they were put on the door?

```
 1    A.   No.

 2              MS. PELLEGRINI:  Thank you.  I have nothing further.

 3              THE COURT:  Okay.  Thank you, Agent.  You may step

 4    down.

 5              MR. CHAKRAVARTY:  One moment, your Honor.

 6              The government calls Special Agent Christopher Derks.

 7              THE CLERK:  Sir, you want to step up here to the box.

 8    Remain standing.  Raise your right hand.

 9              CHRISTOPHER DERKS, Sworn

00:34 10              THE CLERK:  Have a seat.  State your name.  Spell your

11    last name for the record.  Keep your voice up and speak into

12    the mic.

13              THE WITNESS:  My name is Christopher Derks.  My last

14    name is spelled D-e-r-k-s.

15    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

16    Q.   Where are you currently employed?

17    A.   I'm currently employed with the FBI in Washington, D.C.

18    Q.   And you're an FBI special agent?

19    A.   Yes, I am.

00:34 20    Q.   How long have you been an agent?

21    A.   Just a little bit under 13 years.

22    Q.   What are your duties currently at the FBI?

23    A.   Currently, I'm a member of the Washington field office's

24    Evidence Response Team.  I'm also the new team leader for

25    Hazardous Material Response Team.
```

1    Q.   And the Evidence Response Team is the team that goes out

2    and collects evidence at various crime scenes?

3    A.   Yes, it is.

4    Q.   Back in April of 2013, were you also part of the Evidence

5    Response Team at the Washington field office of the FBI?

6    A.   Yes, I was.

7    Q.   Did you have occasion to participate in a search at 410

8    Norfolk Street in Cambridge, Massachusetts?

9    A.   Yes, I did.

00:35 10   Q.   Did you have lawful authority to do that?

11   A.   Yes, we did.

12   Q.   Can you explain what day that was?

13   A.   That was on April 19th.

14   Q.   Was that before or after the remaining suspect had been

15   located?

16   A.   It was before.

17   Q.   So did you and fellow agents from the Evidence Response

18   Team respond to that apartment?

19   A.   Yes, we did, a little bit after noon on that Friday.

00:35 20   Q.   Did somebody enter the apartment to secure the apartment

21   before you entered to conduct your search?

22   A.   Yes.  An hour or so before we went in there, the members

23   of our Hostage Rescue Team cleared the apartment, made sure it

24   was safe to enter and that there was no devices in there that

25   could hurt us.

1    Q.   Was anybody in there at the time?

2    A.   No, there was not.

3    Q.   So did you make entry into the apartment?

4    A.   Yes, we did.

5    Q.   And can you explain to the jury what you did, just

6    generally?

7    A.   Generally, photographs were -- started to be taken.

8    Before most of the search team came into the apartment, myself

9    and another agent, we swabbed various items for explosive

00:36 10   residue.  And after an hour or two, we began the search in

11   earnest once our entry photos were taken care of.

12   Q.   What was your role in the search?

13   A.   My role in the search, aside from being a generalist

14   searching agent, I was what we call the seizing agent, where I

15   saw every item that was seized.  I saw it in place and would

16   witness it in place, and then I would sign the packaging for

17   every item before we left the scene.

18   Q.   Did you review the photographs that were taken that day?

19   A.   Yes, I have.

00:37 20   Q.   And did you review -- was there a sketch done of the

21   apartment that day?

22   A.   Yes, there was.

23   Q.   And did you review the evidence that was seized on that

24   day?

25   A.   Yes, I have.

1    Q.   Now, how long approximately was your team searching that

2    apartment?

3    A.   We were there for about 12 hours total.  I was still

4    working for another three or four hours to take it to the

5    evidence intake at the Black Falcon pier, and I was done

6    probably about 4 or 5:00 in the morning.

7    Q.   Were you permitted to take anything you wanted from the

8    apartment?

9    A.   No, we weren't.

00:38 10   Q.   Was there specific types of information that you were

11   allowed to seize?

12   A.   Yes.

13   Q.   Could you describe the apartment to the jury?

14   A.   It was a three-bedroom, one-bath, small apartment, under

15   800 square feet.  There were three bedrooms that -- one

16   appeared to have an adult female with her belongings inside.

17   The other room had children's materials inside, toys, games,

18   things like that.  And then there was a third bedroom which had

19   a set of bunk beds in it, a kitchen, small bathroom, and a

00:38 20   small closet that came up -- that was on the back side of the

21   apartment by some stairs.  And there were some closets in some

22   of the rooms as well.

23   Q.   Now, in anticipation of your testimony, did you review an

24   interactive exhibit which has been labeled as Exhibit, I think,

25   620?

```
 1    A.   Yes, I have.
 2              MR. CHAKRAVARTY:  If you could call that up, Mr.
 3    Bruemmer?
 4    Q.   Do you recognize this image?
 5    A.   Yes, I do.
 6    Q.   What is that?
 7    A.   This is the apartment that we searched.
 8    Q.   Okay.  It's an overview -- kind of a graphic
 9    representation?
10    A.   Yes, it is.
11    Q.   Now, I'm clicking on, "Search, April 19, 2013."  Are you
12    familiar with this?
13    A.   It's the same --
14    Q.   It's the same graphic?
15    A.   Yes.
16    Q.   Is this an interactive exhibit that allows you to focus on
17    each room and then highlight specific photos of pieces of
18    evidence?
19    A.   Yes, it is.
20    Q.   Is this fair and accurate, to the best of your
21    recollection, from the conducting of your search?
22    A.   Yes, it is.
23    Q.   Have you independently looked at each of those photographs
24    and confirmed that those are fair and accurate photographs of
25    each of the items of evidence that were seized that day?
```

1    A.   Yes.

2              MR. CHAKRAVARTY:  Your Honor, I would move in the 410

3    Norfolk Street, third-floor apartment, overlay of Exhibit 620.

4              MS. CONRAD:  Your Honor, in addition to the matter

5    raised prior to trial, which we would ask for a continuing

6    objection on, we object to the caption, the description.

7              THE COURT:  Well, let me see you briefly.

8    (SIDEBAR CONFERENCE AS FOLLOWS:

9              MS. CONRAD:  So, your Honor, the government --

00:40 10             THE COURT:  Are you talking about where it says,

11   "Residence of" --

12             MS. CONRAD:  "Residence of Jahar and Tamerlan

13   Tsarnaev."  And I would note that the government, in its

14   opposition to the motion to suppress that we filed, took the

15   position that that was not Mr. Tsarnaev's residence, that it

16   was the -- the sole occupants were Tamerlan and Catherine

17   Tsarnaev.  And I'm planning on offering an admission by a party

18   opponent to that effect taken directly from the government's

19   pleading.

00:41 20             THE COURT:  You've taken the opposite position in a

21   motion.

22             MS. CONRAD:  No.  We took the position that the

23   government's own search warrant was that it was his residence.

24   They cannot now put before the jury a document that says,

25   "Residence of Jahar and Tamerlan Tsarnaev," having -- first of

1    all, without a factual basis for that and, second of all,

2    having taken exactly the opposite position.

3         And I would note, your Honor, at the time we asked the

4    government to provide us with the underlying basis for those

5    factual assertions -- factual assertions -- that were not

6    attributed to any source.  And the government declined to do

7    so; and if memory serves, we filed a motion.  It now becomes

8    exculpatory evidence, your Honor, if the government is trying

9    to take the position that that location is the residence of

00:42 10   Jahar Tsarnaev.  They've cited that it was being used --

11        THE COURT:  I think we can solve this problem by

12   excluding any evidentiary assertion to the title of the chalk;

13   in other words, we could -- if you want.  That's merely as an

14   identifier and not evidence that it was Dzhokhar Tsarnaev --

15        MS. CONRAD:  I think it should be redacted.  I don't

16   think it should be displayed to the jury and admitted to the

17   jury in that format, or it's chalk.

18        MR. CHAKRAVARTY:  They've had this thing for months.

19   This is the first time we're hearing it.

00:42 20        MS. CONRAD:  It's not true.  We've made that point

21   before this.

22        MR. CHAKRAVARTY:  Second, there is an evidentiary

23   basis in the trial record that --

24        THE COURT:  There may be.  But I'm saying this

25   caption --

1          MR. CHAKRAVARTY:  And the government has no objection

2    to that.  I think this ameliorates any concern that the defense

3    has, and they can argue, whoever -- simply framing the issue

4    for -- framing what the property is and why it's relevant to

5    the jury -- I'm not saying that's why it's relevant, but it

6    let's them know, especially in a multi-overlaid exhibit, which

7    we will be clicking from one to another.

8          MS. CONRAD:  So I'm not sure I understand what's

9    happening.  Either they're going to see it or they're not going

00:43 10    to see.  Either it's in evidence or it's not.

11          THE COURT:  Well, no.  They can see it.  I can tell

12    them that it is for labeling purposes, and it's not evidence

13    that he actually lived there if you want me to say that.

14          MR. WEINREB:  Your Honor.

15          THE COURT:  There is -- we had some evidence yesterday

16    that he lived there because he put his address on the

17    university forms.

18          MS. CONRAD:  Right.

19          MR. CHAKRAVARTY:  So --

00:43 20          THE COURT:  It's not unrelated to what has been in

21    evidence.  So, I mean, I'm happy to say that, but I don't think

22    there's any reason to.

23          MS. CONRAD:  Why not just treat it as a chalk then?

24          MS. PELLEGRINI:  That doesn't make a difference.

25          THE COURT:  Because the rest of it, we've allowed the

1      other ones in.

2              MS. CONRAD:  Note my objection, your Honor.

3              THE COURT:  Do you want me to say that?

4              MS. CONRAD:  But I would ask that they be instructed

5      that the resident labeling is what the government chose to

6      label it.  It's not evidence.

7              MR. WEINREB:  Your Honor, on the other matter, I don't

8      believe it's proper for the defense to offer a search warrant

9      as --

00:44 10              MS. CONRAD:  It's not the search warrant.

11              MR. WEINREB:  I'm sorry, an argument -- a legal

12      argument that the government made.  It's not the government

13      that's trying to have it both ways.  It's the defense.  The

14      government's trying to have it one way that the Court ruled.

15              THE COURT:  Okay.  Yeah, I don't think that's a

16      judicial or evidentiary -- a party admission.

17              MS. CONRAD:  It's 801(d)(2), your Honor.  It's

18      clearly -- it's a statement by --

19              THE COURT:  It's a legal argument.

00:44 20              MS. CONRAD:  No.  Your Honor, I would ask your Honor

21      to look at the actual document, which is a document from 350,

22      and these were made as factual assertions.  And we specifically

23      asked for the underlying basis for those factual assertions.

24      So the government should either put up or shut up, quite

25      frankly.  And either they tell us what the basis for those

1   factual assertions were -- I'm not putting in the legal

2   argument.  They're saying, in fact, just to read this, "His old

3   bedroom had effectively become an extension of the living room

4   and was used by Tamerlan Tsarnaev's family as a storage and

5   computer room."

6               THE COURT:  Okay.

7               MR. WEINREB:  If they want to get into that, then the

8   Court should tell the jury that it ruled that it was Jahar

9   Tsarnaev's residence.

00:45 10               MS. CONRAD:  No, he had a legitimate --

11               MR. WEINREB:  Stop talking over me.

12               THE COURT:  We're not going to get into it.

13               MR. WEINREB:  You have your turn.  I have mine.  Don't

14   talk over me.

15               THE COURT:  It's excluded.  Quiet.

16               MS. CONRAD:  Well, your Honor --

17               THE COURT:  Done.

18               MS. CONRAD:  As to the discovery issue, as to the

19   underlying discovery issue?

00:45 20               THE COURT:  I'm sorry?

21               MS. CONRAD:  The government providing the information

22   that it relied upon in asserting, for example, that the -- that

23   the room was being used as a storage room and computer room,

24   that there was a curtain that was usually kept open and that he

25   kept only a few belongings there.

1          THE COURT:  This is not the occasion for that kind of

2   inquiry, so --

3          MS. CONRAD:  It's -- I don't know when the occasion

4   would be if not now.

5   .  .  .  END OF SIDEBAR CONFERENCE.)

6          THE COURT:  I don't have the --

7          MR. CHAKRAVARTY:  Sorry.  Mr. Bruemmer, can you put

8   620 back up.

9          THE COURT:  So I think we were at the offer.  On the

00:46 10  same terms as we've admitted other exhibits of this type, it

11  will be admitted.

12         MR. CHAKRAVARTY:  Thank you, your Honor.

13  (Government's Exhibit No. 620 received into evidence.)

14         THE COURT:  Let me just say to the jury, to the extent

15  that the caption is an assertion or could be read as an

16  assertion that this was the residence of the defendant, it is

17  not evidence of that.  It is simply a label for the exhibits so

18  you understand what it is.  If there is a factual issue about

19  whether this is his residence or not, you will resolve it from

00:46 20  other evidence in the case.

21  Q.   Agent Derks, I'm going to go to bedroom -- marked "Bedroom

22  3" and click on that.  Do you recognize this room?

23  A.   Yes, I do.

24  Q.   Could you describe the general layout of this room?

25  A.   It was a rather small room.  It was mostly occupied with

1    the bunk beds, which are in the lower right-hand side of the

2    diagram, with a computer table below the window at the far

3    side; a bookshelf.  With the small closet and the entry there,

4    what you can't see was that there was a lot of clothes that was

5    hanging up and almost like a curtain that went across it that

6    you had to manually wade your way through to get inside.

7            THE COURT:  Agent, would you pull the microphone a

8    little closer to you so you're speaking directly into it,

9    please?

00:47 10           THE WITNESS:  My apologies.

11   Q.   Agent Derks, the screen that you have in front of you is

12   interactive, and you can actually touch it.  There might be a

13   time when it's helpful to either circle something with the pad

14   of your finger or to touch it to indicate what you're talking

15   about.

16   A.   Okay.

17   Q.   The area where you said there were a lot of clothes and a

18   curtain, can you just flag that on the screen?

19   A.   (Indicating).  Is this -- am I doing the right thing?

00:48 20  Q.   You've circled the area that's marked "3 foot, 1 in."  Is

21   that the entrance to that room?

22   A.   Yes, it is.

23   Q.   Now, just to orient the jury, was there something up on

24   the wall on the left-hand side of this room?

25   A.   Yes, there was.  There was a large black flag with writing

1    on it.

2    Q.    Clicking on that, is that the flag that was in the room?

3    A.    Yes, it is.

4    Q.    When you first walked into the room, is this the vantage

5    point that you get?

6    A.    Yes.  That's one of our entrance photos.  That was taken

7    at the beginning of the search.

8    Q.    Does that show the bunk bed as well as what looks like a

9    computer table and a chair?

00:48 10    A.    Yes, it does.

11    Q.    Is that how it looked when you were conducting your

12    search?

13    A.    Yes, sir.  At the beginning that's how it looked.

14    Q.    Now, on the floor was there a bag?

15    A.    Yes.  There was a bag on the floor which had that item

16    number, which was a USB thumb drive with an Atlanta Falcons

17    image on it.

18    Q.    I've clicked on that.  Agent, is that a close-up of that

19    Atlanta Falcons -- or could that be Cambridge Rindge and Latin

00:49 20    Falcons?

21    A.    Very well could be.

22    Q.    On the shelf, is the view facing the shelf near the head

23    of the -- or the foot of the bunk beds?

24    A.    Yes.  That photo would have been taken right next to the

25    computer table, looking backwards towards the room.  Towards

1    the left, you can see the bar in the upper corner there where

2    the clothes were hanging from.

3    Q.    Just clicking to the second image, what are these?

4    A.    Those are two boxes for iPhones.

5    Q.    Were those seized?

6    A.    No, they were not.  They were photographed, however, with

7    the serial numbers and information on the backside of it.

8    Q.    Were the -- did the boxes have iPhones in them?

9    A.    No, they were empty.

00:50 10    Q.    Is this the back of those boxes?

11    A.    Yes.

12    Q.    Going to the second -- go back to here.  Do you see a 69

13    evidence marker?

14    A.    Yes, I do.

15    Q.    Is this a close-up of that?

16    A.    Yes, it is.

17    Q.    What is that?

18    A.    That's gun lubrication.

19    Q.    That was --

00:50 20    A.    I believe for a shotgun, but I could be wrong.

21    Q.    Gun lubrication, meaning something to lubricate the action

22    of a firearm?

23    A.    Yes.

24    Q.    Continuing on that shelf, do you see an evidence marker

25    for 74?

```
 1    A.    Yes, I do.

 2    Q.    Is this a close-up of that?

 3    A.    Yes.

 4    Q.    What is that?

 5    A.    Those were two brands of -- two types of Gorilla glue.

 6    One was a Super Glue on the left, and the one on the right was

 7    a regular Gorilla glue.

 8    Q.    Near the top of the shelf, is this a view of some of the

 9    items that you had flagged on the top of the shelf?

00:50 10    A.    Yes.

11    Q.    Is this another document that was on the top of the shelf?

12    A.    Yes, it was.  It was inside of a folder, I believe.

13    Q.    What is that?

14    A.    That is an immigration and naturalization certificate for

15    citizenship in the United States.

16    Q.    Who is that for?

17    A.    It's for Mr. Tsarnaev.

18    Q.    Is that the defendant?

19    A.    Yes.

00:51 20    Q.    Dzhokhar Tsarnaev?

21          Does it list his date of birth as well?

22    A.    Yes, it does.

23    Q.    Is it July 22, 1993?

24    A.    I believe so, yes.

25    Q.    Second image of this box on the interactive chart shows
```

1    Item 68?

2    A.    Yes.

3    Q.    What are those?

4    A.    Those were computer disks, I believe.  Oh, this is next to

5    it.  That was more gun-cleaning equipment.

6    Q.    Is that a brush and a cleaning cloth?

7    A.    Yes.

8    Q.    The next box shows some additional items.  You see Item

9    67?

00:52 10    A.    Yes.  It's more gun-cleaning equipment.

11    Q.    Continuing on to the shelf, you see Item 73?

12    A.    Yes, I do.

13    Q.    What is that?

14    A.    Those are BB gun targets, I believe.

15    Q.    What's a BB gun target?

16    A.    There was one out in the living room.  It's a small bull's

17    eye target that -- just for target practice, shooting a BB gun.

18    There was one in the living room out front that had a -- kind

19    of against a bookshelf that had been shot up pretty well and

00:52 20    BBs all over the floor.

21    Q.    And then, finally, at the end of the shelf, what's Item

22    No. 1?

23    A.    That's a caulk gun with caulking tape inside of it.

24    Q.    Now, above the caulk gun in this photo, do you see what

25    this is?

1    A.    Yes, I do.

2    Q.    Can you describe what that is?

3    A.    That's a heavy-gauge carpentry paper, Rosen paper.

4    Q.    Did you seize that?

5    A.    No, we did not.

6    Q.    Over by the desk area, is that a computer that was there?

7    A.    Yes.  The tower -- the C.P. sections in the lower

8    right-hand corner.

9    Q.    So that's not a laptop computer; it's a desktop computer?

00:53 10    A.    Correct.

11    Q.    Is that the tower?

12    A.    Yes, it is.

13    Q.    Is this photo simply a photo from the vantage point of the

14    computer table?

15    A.    Yes.  This is another overall photo that would have been

16    taken at the entrance at the beginning of the search.

17    Q.    And close-up of the computer desk, do you see this flag?

18    A.    Yes, small white flag that was similar to the larger black

19    one that was hanging on the wall.

00:53 20    Q.    You don't recognize the exact script on the flag?

21    A.    No, I do not.

22    Q.    For several items, including those that you described,

23    with the exceptions that you described, were those seized from

24    that room?

25    A.    Yes, they were.

1    Q.   Going back to the living room, is this an overview of the

2    living room area?

3    A.   Yes, it is.

4    Q.   Now, this is the third-floor apartment?

5    A.   Yes.

6    Q.   And on the right side, is that the means of entry into the

7    apartment?

8    A.   Yes.  That was the stairway up into the apartment.

9    Q.   Was there also a back-door exit?

00:54 10    A.   Yes.  There was a back exit, almost like a fire escape.

11    Q.   Down past the kitchen?

12    A.   Yes.  In the overall picture, it's in the upper left-hand

13    corner.  It's in the lower right-hand corner of that picture.

14    It's the stairways out and the doorway out.

15    Q.   Over in this area?

16    A.   More --

17    Q.   Why don't you flag it, sir.

18    A.   Right in there.

19    Q.   Thank you.  In the living room, is this one of the shots,

00:54 20    one of the pictures from the vantage point of -- it looks like

21    a chimney or a flue?

22    A.   Yes.  And that was -- yes.  That was one of our entrance

23    photos as well.

24    Q.   In the drawer -- on the TV stand, was there a drawer with

25    a number of items that were seized in it?

```
 1   A.   Yes, there is -- there was.

 2   Q.   And, first, what is this item?

 3   A.   That was a BB gun, a CO₂-powered BB gun.

 4   Q.   CO₂, that's carbon dioxide?

 5   A.   Carbon dioxide.

 6   Q.   Do we actually see a carbon dioxide canister package in

 7   the photo?

 8   A.   Yes.

 9   Q.   Is that another view of that BB gun?

00:55 10   A.   Yes, that's a close-up of it.

11   Q.   What are these?

12   A.   Those are parts to the BB gun.

13   Q.   Looks like a magazine essentially for BBs?

14   A.   Yes.

15   Q.   Is that a CO₂ cartridge?

16   A.   Yes, it is.

17   Q.   Is this the view of the living room from the opposite side

18   -- opposite corner?

19   A.   Yes, it is.

00:56 20   Q.   And so this is a view extending down the hallway a little

21   bit, which would be this way?

22   A.   Correct.

23   Q.   And behind that were there numbers of documents on this

24   shelf area in the corner?

25   A.   Yes.  This is a bookshelf that I searched personally.
```

1    Q.   First, what are these?

2    A.   Those are a string of Christmas tree lights which were on

3    the floor, a little bit more towards the TV stand.

4    Q.   And --

5    A.   They were initially obscured by a carpeting, I believe.

6    Q.   Is this a close-up view of the Christmas tree lights?

7    A.   Yes.

8    Q.   Are these other documents that were found on the shelves?

9    A.   Yes.  That's one of them.

00:57 10   Q.   Is this a document addressed to Dzhokhar Tsarnaev?

11   A.   Yes, it is.

12   Q.   What is this?

13   A.   That appears to be some IRS forms.

14   Q.   Some tax forms?

15   A.   Yes.

16   Q.   Do you recall whether those were also in the name of

17   Dzhokhar Tsarnaev?

18   A.   Yes, they were.

19   Q.   Continuing on the shelf, were there a number of notebooks?

00:57 20   A.   Yes, there were.

21   Q.   Did they have writing in a foreign language?

22   A.   Yes, they did.

23   Q.   Were those seized as well?

24   A.   Yes, they were.  Those notebooks also had English writing

25   in them as well.

1    Q.   Thank you.  Were these some of the BBs and pellets that

2    you described earlier?

3    A.   Yes.  Those were on the floor of that room, in the area of

4    that bookshelf, which is where the target was.

5    Q.   So the target was in this vicinity?

6    A.   Yes.  It was taped up on a shelf in that area, and those

7    were just where they would rest after being shot.

8    Q.   Back to the overall view, this area here, is this like a

9    sofa?

00:58 10   A.   Yes, it is.

11   Q.   Now, you described the apartment as being about 800 square

12   feet, is that right?

13   A.   Or less.  It was around there.

14   Q.   It seems there are a lot of compartments.  While you were

15   searching this residence, could you hear what was happening in

16   the other rooms?

17   A.   I could at times.  I was very busy.  When other ERT

18   members would see an item, I was called to go look at it in

19   place.  So I was all over that day visualizing evidence in

00:58 20   place so I could later sign for it and verify it.

21   Q.   Were the floors creaky?

22   A.   Yes, they were.

23   Q.   Could you hear when other people were moving around as

24   well?

25   A.   Yes.

1            MR. CHAKRAVARTY:  Go to the first bedroom.

2    Q.   Is this an overview of that first bedroom nearest to the

3    stairs?

4    A.   Yes, it is.

5    Q.   First, to orient the jury, is this a shot from the window

6    area?

7    A.   Yes, from that corner.

8    Q.   And from the opposite corner?

9    A.   Yes.

00:59 10   Q.   And from coming in the front door?

11   A.   Yes.

12   Q.   Was there a shelf in here, I guess, on the floor?  Was

13   there another document found?

14   A.   Yes.  That's a -- it's a passport or a State Department

15   document.

16   Q.   Is that also in the name of Dzhokhar Tsarnaev?

17   A.   Yes, it is.

18   Q.   That's a close-up?

19   A.   Yes, it is.

00:59 20   Q.   Was there a closet there?

21   A.   Yes, there is.

22   Q.   Actually, at the floor of the closet is where you found

23   that document?

24   A.   Yes.

25   Q.   At the top of the document did you find something?

1    A.    There was a jar of nails.

2    Q.    Is Item No. 27 that jar of nails?

3    A.    Yes, it is.

4    Q.    When you say "jar of nails," what do you mean?

5    A.    There were small carpeting nails, very small in diameter,

6    but inside there were some other items that were felt, fabric

7    or plastic, but it was predominately the nails that were there.

8    Q.    The neighboring room, does this appear to be a child's

9    room?

01:00 10   A.    Yes.

11   Q.    Is this an image from the center of that room?

12   A.    Yes, it is.

13   Q.    And this is hovering over the restroom.  Did you seize

14   anything from the restroom, the bathroom?

15   A.    We did an explosive swab in the bathroom, but I believe

16   that was the only thing that was taken from there.

17   Q.    Do you know if that came back positive?

18   A.    I do not know.

19   Q.    Let's go to the kitchen area.  Is this a view of the

01:01 20   kitchen?

21   A.    Yes, it is.

22   Q.    And the photos that we're looking at, were they taken at

23   various stages during the search?  Some of them were taken when

24   you entered; some of them were taken after you completed your

25   search?

1    A.    Yes.  We take photographs when we go into a structure to

2    be searched.  At the end we take photographs as we're leaving.

3    Q.    This is one of the shelves?

4    A.    Yes.

5    Q.    Something was flagged here.  No pun intended.  Was it a

6    flag?

7    A.    Yes, it is.

8    Q.    This is another angle of the kitchen, facing the fridge.

9    And then is this the hallway?

01:01 10    A.    Yes.  That's the small hallway or kind of a utility

11    storage room going out to the back stairs.

12    Q.    Is that this area on the --

13    A.    Yes.

14    Q.    And on the counter, was there some, looks like, packing

15    tape seized?

16    A.    Yes, there was.

17    Q.    Throughout your search, did you seize several different

18    items of packing tapes?  Different types of tapes, I should

19    say.

01:02 20    A.    There were a large number of rolls of tape that we seized,

21    whether it was a clear strapping tape like this one here or

22    duct tape.

23    Q.    Let's go to that area just off the kitchen, in the back

24    hallway.  This is a shelf that had a number of items on it?

25    A.    Yes.  It was a shelf that was above your head.  Most of

1    the area below it was full of items, but items were taken from

2    these shelves.

3    Q.   Do they include this item, No. 58?  Was that a computer

4    hard drive?

5    A.   Yes, it is.

6    Q.   Now, also in this area, can you describe what this area

7    looked like?

8    A.   It almost looked like a construction site.  There were

9    tools everywhere, lots of debris in there.  As the search went

01:03 10   on, more and more items were pulled out of there.  As you go

11   down a layer each time through the search, the ERT members who

12   were in that area were there for a long time.  A fair amount

13   came out of there, but it was a large volume of just items and

14   debris in there that had to be gone through.

15   Q.   In fact, were some drawers of, like, plastic drawers or

16   shelf drawers, were the entire drawers seized?

17   A.   Yes.

18   Q.   Why did they seize the entire drawer?

19   A.   Well, because there were tools, and the mind-set was that

01:04 20   these tools could be used in the making of a device and that

21   those tools will leave unique toolmarks when analyzed in

22   laboratory.  So we don't do any analysis on a search, so we

23   went ahead and took everything in those drawers.

24   Q.   Let me go back one room.  Just make sure I got everything

25   here.  Back in the kitchen view, was there some additional tape

1    found, Item No. 9?

2    A.    Yes.

3    Q.    And then Item No. 79, is this one of those drawers?

4    A.    Yes, it is.

5    Q.    And is this a view of several of the tools and different

6    items that were in that drawer?

7    A.    Yes.  We took the entire drawer as one item.

8    Q.    And then each item was later broken up in the lab?

9    A.    The laboratory will sub-exhibit each item for testing.

01:04 10   But at the scene we want to keep everything together, and so we

11   took them all as one item.

12   Q.    These are some close-ups.  Do you recognize this?

13   A.    Yes.  That was in the drawer.

14   Q.    This is a gray polymer kind of a rubbery ring?

15   A.    It was like a gasket.

16   Q.    Do you recognize this as one of the items?

17   A.    Yes.

18   Q.    Does that appear to be a hobby fuse?

19   A.    Yes, like an igniter.

01:05 20   Q.    Do you recognize this?

21   A.    I do.

22   Q.    Is this the top of a pressure cooker lid?

23   A.    At the time, I didn't know.

24   Q.    Is this a roll of tape?

25   A.    Yes.

1    Q.    Particularly Gorilla-brand tape?

2    A.    Yes.

3    Q.    Is this a wire cutter?

4    A.    Yes, wire cutter, wire stripper.

5    Q.    Is this one of the types of things that you look at for

6    toolmarks?

7    A.    Yes, laboratory would do that.

8    Q.    And then is this a roll of plumber's tape, or PTFE?

9    A.    Yes, Teflon tape, I believe.

01:06 10    Q.    Now, when you conducted the search, did you seize a number

11    of items, over a hundred items, I believe?

12    A.    There were about 108 or 110 items that we took.

13    Q.    What did you do with those items?

14    A.    Those items, we -- myself and our team leader, Steve Ney,

15    from the New Haven division, we drove it in the New Haven's ERT

16    truck out to the Black Falcon pier, and that's where we

17    delivered our items.

18    Q.    And you followed the ERT protocol to do that?

19    A.    Yes.

01:06 20    Q.    Before your testimony today, did we go through several of

21    the items that were seized in 410 Norfolk Street, and did you

22    personally verify that those were items seized by your team?

23    A.    Yes, I did.

24         MR. CHAKRAVARTY:  For the record, those items were

25    Exhibits 1077 through 1079; 1083 through 1086; 1093 through

1    1101; 1186; 1187; 1189; 1191; 1193; 1195; 1196; 1199; 1200;

2    1203; 1205; 1206; 1208; 1210; 1214; 1216; 1217; and 1218.

3    Q.   Those were all items that were seized from 410 Norfolk

4    Street?

5    A.   Yes.

6         MR. CHAKRAVARTY:  I would move those into evidence.

7         MS. CONRAD:  Your Honor, I need an opportunity to view

8    what those items are.  I received an email late last night with

9    some additional items.  I haven't had a chance to review them.

01:07 10         THE COURT:  Do you have a list?

11         MR. CHAKRAVARTY:  I do.  They were all on the exhibit

12   list, and they have been for months.

13         MS. CONRAD:  The numbers have changed.

14         MR. CHAKRAVARTY:  I can give you -- do you need a list

15   of the numbers or the description?

16         MS. CONRAD:  If I could have a moment to review the

17   exhibits that are being offered, and I need to look at the

18   items.

19         MR. CHAKRAVARTY:  What do you need from me?  You have

01:08 20   the exhibit list.

21         MS. CONRAD:  I know.  I'm going to look at that.

22   Thank you.

23         I might need a few minutes, your Honor.  I had a list

24   that I previously reviewed and that was updated last night.

25         THE COURT:  Are you going to -- Mr. Chakravarty.  Mr.

```
  1    Chakravarty.
  2              MR. CHAKRAVARTY:  Yes, sir.
  3              THE COURT:  Why don't you forget the group offer and
  4    just offer them as you use them.
  5              MR. CHAKRAVARTY:  One at a time.  Fair enough.
  6              First there were two that I didn't identify because
  7    they're photographs.  Mr. Bruemmer, can we call up 1201?  This
  8    is just for the witness, your Honor, to identify.  I think he
  9    already had.
01:09 10    Q.   Is this the still photo of that black flag?
 11    A.   Yes, it is.
 12    Q.   And 1221, is this the photo of those iPhone boxes?
 13    A.   Yes, it is, but it's been rotated 90 degrees to the left.
 14    Q.   These are fair and accurate pictures of those two items --
 15    three items?
 16    A.   Yes, they are.
 17              MR. CHAKRAVARTY:  I'd move in 1201 and 1221.
 18              MS. CONRAD:  Just the previous issue.
 19              THE COURT:  Okay.  All right.  Admitted.
01:09 20    (Government's Exhibit No. 1201 received into evidence.)
 21    (Government's Exhibit No. 1221 received into evidence.)
 22    Q.   I'm going to show you a few items, Agent Derks.
 23              MR. CHAKRAVARTY:  May I approach, your Honor?
 24              THE COURT:  All right.
 25    Q.   Agent Derks, I've placed a few items in front of you,
```

1   Exhibits 1192, 1194, 1206, and 1186.

2            MS. CONRAD:  What was the last one?

3            MR. CHAKRAVARTY:  1186.

4            MS. CONRAD:  Thank you.

5   Q.   Do you recognize those?

6   A.   Can you say those again?

7   Q.   1192, 1194, 1206, and 1186.

8   A.   There's no 1192 here.  There's 1186, 1095.

9   Q.   Maybe it's labeled something else.

01:11 10            Is it labeled 1095?

11   A.   1095 is this one.

12   Q.   Let's change that premarked exhibit to 1192, please.

13   Let's start with that one.  What do you recognize that to be?

14   A.   This is the gasket that was taken out of a drawer which

15   had the -- a lot of the tools, the wire strippers that you had

16   earlier.  There was the roll of black Gorilla tape, the Teflon

17   tape, and the hobby fuse.  This was all in that drawer.

18   Q.   Did you later come to learn what that was?

19   A.   Yes, last week.

01:11 20   Q.   What did you learn that was?

21   A.   I learned that this was a gasket to a pressure cooker.

22   Q.   I move in 1192.

23            MS. CONRAD:  Same.

24            THE COURT:  Okay.  Admitted.

25   (Government's Exhibit No. 1192 received into evidence.)

1    Q.   Can we look at 1194, please?

2    A.   I don't have that one.

3    Q.   Do you have 1097?

4    A.   I do.

5    Q.   Okay.  Can you please change that to 1194?

6         What is it?

7    A.   This is the black knob that was also in that same drawer.

8         MS. CONRAD:  Sorry.  What number is that?

9         THE WITNESS:  It's now 1194, formerly 1097.

01:12 10        MR. CHAKRAVARTY:  And I would move in 1194.

11        THE COURT:  All right.

12   (Government's Exhibit No. 1194 received into evidence.)

13   Q.   And 1206, do you need a scissors to open that?

14   A.   There are some up here.  You want me to crack it, open it

15   up?

16   Q.   If you wouldn't mind, please.

17   A.   (Witness complies.)

18   Q.   Is that the jar that you found in the closet of the first

19   bedroom in 410 Norfolk Street?

01:13 20   A.   Yes, it is.

21   Q.   Would you mind opening the jar?

22   A.   Open this jar?

23   Q.   Yes, please.

24   A.   (Witness complies.)

25   Q.   And the nails and other objects in there, are those in

1    substantially the same condition as when you first saw them?

2    A.    Yes.  The nails are inside.  There's also other items in

3    here that were found inside that aren't nails.

4    Q.    Could you describe what those items are?

5    A.    May I put the top back on?

6    Q.    Yes.

7    A.    This is a paper bar code.  Appears to be a clip from a pen

8    that you can open and close with your thumb.

9          MS. CONRAD:  I'm sorry.  Can I just inquire whether

01:14 10   these are separately marked as exhibits or are they all one

11   exhibit?

12         MR. CHAKRAVARTY:  These are one exhibit.

13   Q.    Can you explain how these become sub-exhibits at the

14   Quantico lab?

15   A.    Sure.  All of these items that are in this paint can were

16   inside this jar at one point, and they are separated just

17   because they are unique and different from one another.

18   Q.    Does the lab then analyze these using these various

19   different disciplines?

01:15 20   A.    Yes.  The laboratory would split things up by their

21   likeness and then perform whichever test they deemed

22   appropriate at the time.  Would you like me to keep going?

23   Q.    Yeah, if there's anything else in that jar.

24   A.    Some triangular metal objects with holes in the middle and

25   then some plastic pads.  I don't know what they're called but

1    they're small, small pads; some more scraps of paper.  There

2    were some other nails that were inside.  They could have been

3    split out because they might be a different gauge.  Looks like

4    this is some hardware for cabinetry and then some -- looks like

5    paper, paper items, that appear to have been fingerprinted.

6    Q.   So all of that smorgasbord of stuff was in that jar?

7    A.   Everything was in this jar without the packaging.

8    Q.   And the nails, what condition are those nails in?

9    A.   They appear to be somewhat new and in good condition.

01:16 10   Q.   And they're -- do they appear to be used or not?

11   A.   No, they're not used.  They're all -- for the most part,

12   they're all straight, and a couple are a little bent.  But it

13   looks like they're all straight though.

14   Q.   Thank you.

15        MR. CHAKRAVARTY:  Your Honor, I don't know if I moved

16   in 1206 already, but I would do so now.

17        THE COURT:  Okay.

18   (Government's Exhibit No. 1206 received into evidence.)

19   Q.   And 1186, if you could open that?

01:17 20   A.   You want me to open it?

21   Q.   Yes, please.

22   A.   Would you like me to --

23   Q.   If you could unfurl that and hold it up.  If you need to

24   stand up --

25   A.   May I stand up?

1          MR. CHAKRAVARTY:  With the Court's permission.

2     A.   (Indicating.)

3     Q.   Can you hold it up?

4     A.   (Indicating.)

5          MR. CHAKRAVARTY:  May I approach, your Honor?

6          THE COURT:  You may.

7          MR. CHAKRAVARTY:  I don't mean to be disrespectful.

8     Q.   Is this the flag that you found on the wall?

9     A.   Yes, it is.

01:17 10    Q.   Was it similar to the smaller white-and-black flags that

11    you found on the computer table and then in the kitchen?

12    A.   They appear to be similar with the contrasting colors

13    being bluff.

14    Q.   I will collect those from you.

15         Mr. Mellin is handing you what's been marked as 1187.

16    Do you recognize that?

17    A.   Yes, I do.  This is the desktop computer from the room.

18    Q.   Is that a Hewlett-Packard desktop computer marked as 2R14,

19    the 14th item of your search?

01:19 20    A.   Yes, it is.  And I recognize it because my name and

21    initials are on the packaging.  This is the original packaging.

22         MR. CHAKRAVARTY:  Your Honor, I'd move in 1187 under

23    the provisions that we have been moving in electronic devices,

24    the physical item rather than the data.

25         THE COURT:  Rather than the data?

1          MR. CHAKRAVARTY:  Correct.

2          THE COURT:  Yes, okay.  It will be admitted under

3     those conditions.

4     (Government's Exhibit No. 1187 received into evidence.)

5          MR. CHAKRAVARTY:  If we could retrieve 1187.  I don't

6     believe I moved in 1186, your Honor, and I would ask to move

7     that into evidence.

8          THE COURT:  Okay.

9     (Government's Exhibit No. 1186 received into evidence.)

01:19 10   Q.   Now, I guess we'll go through each of the other ones.

11          MR. CHAKRAVARTY:  Mr. Mellin, if you could just take

12    one of those boxes and give it to Agent Derks, and we'll just

13    start walking through them.

14    Q.   Agent Derks, if you'd just take out a bag and describe

15    what it is.

16          MS. CONRAD:  May I just take a look?

17          THE COURT:  Go ahead.

18          MS. CONRAD:  Maybe Mr. Chakravarty could join us

19    because some of these don't seem to have exhibit numbers, so --

01:21 20          Thank you, your Honor.

21    Q.   Mr. Derks, if you could just pick each one up and just

22    describe what it is.

23    A.   Okay.  This is Exhibit No. 1208, and it's two rolls of

24    wire.  And these came out of the same drawer where the pressure

25    cooker gasket came out of and the wire strippers that you had

1       photos of.

2               Exhibit 1096 is a section of the hobby fuse that was

3       taken out of the same drawer.

4               This is Exhibit 1099, which is a roll of Teflon tape,

5       with the plastic covering for it, also out of the same drawer.

6               Exhibit 1101, this is the black roll of Gorilla tape

7       taken out of the same drawer.

8               This is Exhibit 1216.  This is a large number of BBs

9       and pellets for a pellet gun that were found in -- they were

01:23 10    found in the room with the bookcase where I was searching.

11      These were all over the floor near the Christmas lights.

12      Q.   We saw a picture of that a little while ago?

13      A.   Of this one, yes.

14              The next one, this is Exhibit 1214.  This is the white

15      flag with the black lettering that was in the bunk bedroom.

16      Would you like me to open it?

17      Q.   No, thank you.

18      A.   Okay.  This is Exhibit 1210, which is the Certificate of

19      Naturalization found also in the bunk bedroom, on the shelf.

01:24 20    You had a photograph of it earlier.  Would you like me to open

21      it?

22      Q.   No, thank you.

23      A.   This is Exhibit 1191.  This is the box of BB gun targets

24      that were found in the bunk bedroom with the flag.

25              And these are the -- this is the -- I'm sorry.

1    Exhibit 1218, these are the string of Christmas tree lights and

2    the box that they came in.

3    Q.   Thank you.

4    A.   This is a 2012 tax return, which was also on the same

5    bookcase -- on the bookcase.

6         MS. CONRAD:  Can we have the exhibit number?

7    Q.   Yeah, the exhibit number.

8    A.   I'm sorry.  1217.

9         MS. CONRAD:  Thank you.

01:25 10  A.   Open this one?

11   Q.   Yeah.  Do you need it for the individual exhibits that are

12   inside?  Collectively, I think that's Exhibit 1205.

13   A.   This is Exhibit 1078.  It's a roll of clear tape.  This is

14   a roll of silver duct tape.

15        This one does not have an exhibit number on it but,

16   with the laboratory number of this, came out of the same drawer

17   which had the gasket and the wire strippers and the knob.

18   Q.   We'll put that in Exhibit 1205, which will be a collection

19   of the tape.

01:26 20  A.   Okay.  It's very hard to see, but this is a roll of clear

21   tape.  This was found on the kitchen counter.  This is another

22   roll of clear tape.  Where it was located is obscured by the

23   evidence tape in front.

24   Q.   But it was also found during your search?

25   A.   Yes.

1          MS. CONRAD:  I'm sorry.  Can I just get clarification?

2     Is this all part of 1205 or are these separate exhibits?

3     Because I'm not getting exhibit numbers.

4          MR. CHAKRAVARTY:  Anything that is not separately

5     marked is part of 1205.

6          THE COURT:  And they're all tape?

7          MR. CHAKRAVARTY:  They're all tape.

8     A.   This one is 1078.

9          This is another roll of silver duct tape, maybe three

01:28 10    inches in width on it.  It's a little bigger than some of the

11    other ones.  And another roll of silver duct tape.  This is in

12    what we label as Room J, which I believe is that back room,

13    utility room, going out the back door.  That's it for this

14    batch.

15    Q.   Thank you.

16         MR. CHAKRAVARTY:  Mr. Mellin, can I ask you to

17    retrieve that stuff and --

18         MS. CONRAD:   Thank you.

19    Q.   Agent Derks, could you please continue with going through

01:30 20    the evidence?

21    A.   Okay.  This is Exhibit 1198, which is a soldering gun,

22    which was found in the kitchen, on the floor.

23         This is 1197 -- actually, there are two parts to 1197.

24    These are the two bottles of Gorilla glue.  This is the regular

25    Gorilla glue, and this is the Super Glue version of it that

1    were found in the bunk bedroom.

2           This is a gun-cleaning kit, which is Exhibit 1195,

3    found in the bunk bedroom, on the shelves.

4           This is Exhibit 1023, which are the wire strippers

5    from the drawer with the pressure cooker gasket and the hobby

6    fuse and the black Gorilla tape.

7    Q.   Can I ask you to change that number to 1203?

8    A.   I'm sorry.  It's 1203.

9    Q.   Thank you.

01:32 10   A.   This is 1199 and 1200.  This is a book -- a notebook with

11   a Russian language that was written inside of it that was found

12   on the shelves in the bunk bedroom.

13   Q.   Agent Derks, you can continue.

14   A.   This is Exhibit 1098, which is a -- looks like the top to

15   a -- like, a soup can.  And this was in the drawer with the

16   pressure cooker gasket and the wire strippers.  It looks like

17   the top of a soup can that's been cut out.

18          This is Exhibit 1193.  This is a battery charger for,

19   like, a remote-controlled car.  And this was found in the

01:33 20   living room out front, in the drawer underneath the TV, on the

21   TV stand.

22          And this was next to this item, which is 1189, which

23   is a BB gun, which was found in the drawer in that same front

24   room.

25          And this is a tube of clear silicon caulking that was

1    found in the bunk bedroom on the shelves, and it is Exhibit

2    1077.  And that's it for this box.

3    Q.   Can I ask you to grab that book, 1199, and open that?

4    A.   Open it up?

5    Q.   Please.  Again, this was a book that was found in that

6    bunk bedroom, on the shelf?

7    A.   Yes, it was.  It was found on one of the top two shelves.

8    Q.   Can you open it and see if there's any loose paper?

9    A.   Yes, there is.

01:35 10   Q.   Does that appear to be a preprinted page,

11   eight-and-a-half-by-eleven, with also some handwriting on it?

12   A.   Yes, it is.

13          MR. CHAKRAVARTY:  I'd mark that as Exhibit 1200.

14   (Government's Exhibit No. 1200 received into evidence.)

15   Q.   Agent Derks, can you read, to the extent that you can, the

16   handwriting?

17          MR. CHAKRAVARTY:  I'd move this into evidence, your

18   Honor, before he reads.

19   A.   The handwriting starting in the upper left-hand side says,

01:35 20   kalamullah.com, and below that it's scribbled out.  It appears

21   to be the No. 6 or the letter G, capital.  It says, "Tark

22   Mehena," M-e-h-e-n-a.  The next item over here towards the

23   right, it appears to be a name, Imram Hosien, H-o-s-i-e-n.

24   Next to that is the word "prophet."  Below that is a word that

25   I can't decipher.  And below that, in the right-hand side, I

```
 1    believe it says, "Anwar Awlaki."
 2    Q.   I'm going to retrieve that from you.
 3         MR. CHAKRAVARTY:  And, your Honor, I'd ask to publish
 4    that with the ELMO.
 5         THE COURT:  Okay.
 6    Q.   I'm underlining the kalamullah.com, the first thing that
 7    you said.
 8    A.   Yes.
 9    Q.   And here it says, "Prophet."  Could that be "series"?
01:37 10  A.   Yes, that makes sense.
11    Q.   And then "Anwar al-Awlaki"?
12    A.   Yes.
13         MR. CHAKRAVARTY:  Thank you, Mr. Mellin.  Could I
14    enlist you once again?
15    Q.   What is the box that Mr. Mellin just gave you?
16    A.   This is Exhibit No. 1094; and based upon the laboratory
17    numbers, these are a set of tools and other items from the
18    drawer which had the pressure cooker gasket that -- they're
19    from the same box, same drawer.
01:38 20  Q.   And so does this contain all of those items that we
21    previously identified, that you've separately showed the jury
22    and are separately marked, as well as the remainder of the
23    items that were in that drawer?
24    A.   Correct.  These are the remainder of the items that have
25    not yet been discussed but would show up in that initial
```

1    photograph of the drawer pulled out.

2    Q.   All right.

3         MR. CHAKRAVARTY:  At this point, your Honor, I would

4    move into evidence Exhibit 1077; 1078; 1205, which was the

5    collection of a number of items of tape; 1094; 1095; 1096;

6    1097; 1098; 1099; 1101; 1186; 1187, under the proviso of it's

7    just the computer, not the data; 1189; 1191; 1193; 1195; 1199;

8    1200; 1203; 1206; 1208; 1210; 1214; 1216; 1217; 1218; as well

9    as 1198; and 1197.

01:39 10        MS. CONRAD:  Your Honor, we still need to straighten

11   out this issue with the numbers, so maybe we could do that over

12   the break.

13        THE COURT:  I'll conditionally admit all of those, and

14   we'll double-check to make sure the numbering is accurate, it

15   corresponds to the actual items.

16        MS. CONRAD:  Thank you.

17   (Government's Exhibit Nos. 1077; 1078; 1205; 1094-1099; 1101;

18   1186-1187; 1189; 1191; 1193; 1195; 1199-1200; 1203; 1206; 1208;

19   1210; 1214; 1216-1218; 1197-1198 received into evidence.)

01:40 20        MR. CHAKRAVARTY:  Just one moment, your Honor.

21        Thank you, your Honor.  That's all.

22        THE COURT:  Actually, why don't we take the break at

23   this point, and you can take an audit of the items before

24   cross-examination.

25        MS. CONRAD:  Thank you very much.

1                THE COURT:  Okay.  We'll break a little early.

2                THE CLERK:  All rise for the Court and jury.  Court

3      will take the morning recess.)

4      (Recess taken at 10:34 a.m.)

5                (After the recess:)

6                THE CLERK:  All rise for the Court.

7                THE CLERK:  Be seated.

8                MR. CHAKRAVARTY:  Your Honor, before Ms. Conrad

9      commences cross, there are some items -- recognizing that the

02:07 10      witness is still in the room, there are some items that the

11      defense may seek to introduce through this witness which the

12      government has an objection to, not for authentication grounds

13      but rather with regards to the substance being both irrelevant

14      and prejudicial.  They are essentially notebooks which are in

15      predominantly a foreign language, although there is some

16      English in it as well, which appear to contain the handwriting

17      of Tamerlan Tsarnaev, amongst others.

18                And the likely utility of this information is -- by

19      the defense is to suggest evidence about Tamerlan which the

02:08 20      government suggests is both irrelevant, certainly at this state

21      of the proceedings, and otherwise inadmissible.  If there is an

22      alternative ground, just showing that Tamerlan resided there,

23      then that can be made simply by showing his name without any

24      substance of the writing.

25                MS. CONRAD:  Well, your Honor, the government just

1    introduced a large number of writings, notes, with unidentified

2    handwriting on them, and there are other writings and other

3    items found in that apartment that are relevant.  I mean, we

4    can take it item by item but it seems to me that it's primarily

5    an issue of 106, of completeness.  The government can't say,

6    Well, we just put this in and we're going to exclude everything

7    else because we don't want it in.

8              THE COURT:  What is the volume --

9              MS. CONRAD:  Not much.  There's four notebooks --

02:08 10          I'm sorry?

11             (Counsel confer off the record.)

12             MS. CONRAD:  Yeah, he identified pictures of the one

13   collection of notebooks.  There's one additional notebook.

14   There is a newspaper, there is a -- I have to double-check my

15   notes.  Wait a second.

16             (Pause.)

17             MS. CONRAD:  There are some items that would be coming

18   in through a second witness from a second search of this

19   apartment but I don't know if we need to address those now.

02:09 20          There's a note that is inside a plastic bin that was

21   found in the bunkbed room.  I also planned to -- I think that

22   that's it for this witness.

23             THE COURT:  If it's just those few items, you can have

24   them.

25             MS. CONRAD:  Thank you.

1          And, your Honor, also, with respect to the matter

2     addressed at sidebar, I'd like to make a proffer at this time,

3     if I may?

4          THE COURT:  We'll do it later.  The jury is standing

5     outside the door.

6          MS. CONRAD:  Well, I'm going to -- okay.  I mean, can

7     I --

8          THE COURT:  You can protect the record.

9          MS. CONRAD:  I'm sorry?

02:10 10        THE COURT:  If it's just to protect the record, which

11    I --

12         MS. CONRAD:  No, it's to specify the portions of the

13    document that I referred to that I would like to introduce,

14    because the Court made a ruling, I think, without me having an

15    opportunity to specify what was being offered.

16         THE COURT:  I don't think the details matter to the

17    ruling, but you could put it on the record at some point.

18         MS. CONRAD:  Thank you.

19         MR. CHAKRAVARTY:  Your Honor, with regard to the

02:10 20   notebooks, recognizing they're authentic, before the

21    substance -- especially the Russian language stuff that would

22    have to be translated, before that is published to the jury, we

23    would just like to be heard again on this -- about the hearsay

24    and the substance of -- those statements are hearsay.

25         MS. CONRAD:  It's not for the truth.

1          THE COURT:  Yeah, I wouldn't think it's offered

2     as -- to prove the assertion but simply that it belonged to

3     somebody else, in this case an alleged coconspirator.

4          MR. CHAKRAVARTY:  And the government's position is

5     that can be done without introducing -- not through hundreds of

6     pages of Russian language translation which we've just received

7     the defense --

8          MS. CONRAD:  I'm not offering the translation at this

9     time.  Sorry, I didn't mean to talk over.

02:11 10          THE COURT:  No, I didn't understand that there were

11     translations involved.

12          MS. CONRAD:  I'm just putting the physical objects in.

13          THE COURT:  Right.  In a sense, this is like the

14     computer box.

15          MR. CHAKRAVARTY:  All right.

16          MS. CONRAD:  Right.  Thank you.

17          THE COURT:  All right.

18          (Pause.)

19          THE CLERK:  All rise for the jury.

02:11 20          (The jury enters the courtroom at 11:05 a.m.)

21          THE CLERK:  Be seated.

22          THE COURT:  Go ahead.

23          MS. CONRAD:  Thank you.

24               CHRISTOPHER DERKS, resumed

25                  CROSS-EXAMINATION

BY MS. CONRAD:

Q.   Good morning, Agent Derks.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

     You said that there was no one at the apartment when you arrived at 410 Norfolk Street, correct?

A.   Nobody had been inside it prior to the hostage rescue team reaching the doors.

Q.   So you're not aware of the fact that Tamerlan Tsarnaev's wife and child were there at the time that the search team arrived?

A.   I didn't see them.

Q.   So you're not aware.  They might have been there when the hostage rescue team arrived, but you didn't see that?

A.   I was further up the street towards -- on Norfolk towards an intersection where a lot of these cameras were set up, and we were backed off the scene because they breached the doors explosively.

Q.   Okay.  So you don't know, then, yourself whether anyone was there when law enforcement first arrived?

A.   Correct.

Q.   And the room that you identified as the bunkbed room --

A.   Yes.

Q.   -- and I think on your chart originally when you did a diagram of the apartment as part of the seizure of evidence, you identified that as Room H?

1    A.    Yes.  Somebody else did the sketch, but that was Room H

2    for purposes of the search.

3    Q.    And that appeared to be using it -- being used as sort of

4    a computer or storage room.  Is that right?

5    A.    Well, that was in there amongst other things.

6    Q.    I'm sorry?

7    A.    That was in there.  Computers and storage items were in

8    there.

9    Q.    So it appeared that it was being used for that purpose,

02:13 10    correct?

11    A.    As well as having two beds in there.

12    Q.    And there were things piled on the floor, right?

13    A.    There were items on the floor, yes.

14    Q.    And there were things piled on the shelf, right?

15    A.    Yes.

16    Q.    And I just want to show you this photograph.  I think we

17    saw it but I don't think it was offered.

18                MS. CONRAD:  And I don't know what the next

19    exhibit number was.  It might have actually been marked by the

02:14 20    government.  Maybe -- yeah.  1185-11.

21    Q.    Is that what it looked like when you went -- oops.  Let me

22    go out.  Is that what the room looked like when you went in

23    there?

24    A.    I believe so.

25                MS. CONRAD:  I'd offer that, your Honor.

1        MR. CHAKRAVARTY:  No objection, your Honor.

2        THE COURT:  The number again?

3        MS. CONRAD:  1185-11.

4        (Defense Exhibit No. 1185-11 received into evidence.)

5        THE WITNESS:  Was this taken from our ERT case book,

6    the photograph?

7    BY MS. CONRAD:

8    Q.   I would have to ask the government since it's their

9    photograph.

02:14 10   A.   We had photographs taken as we went in and when we left

11   and then there was a subsequent search.  Actually, this was at

12   the beginning.

13   Q.   I'm sorry.  This was at the beginning?

14   A.   Yes.  I see the computer and the flag on the wall, so this

15   would have been at the beginning of the search.

16   Q.   And you showed us some items that appeared to be on top of

17   some kind of plastic container.

18        MS. CONRAD:  If I could just have the computer

19   presentation for a moment.

02:15 20   Q.   Do you see that Item 69?

21   A.   It hasn't come up yet.

22   Q.   I'm sorry?

23   A.   I don't see it.

24   Q.   Oh, okay.  This is from, I think, 620, which is already

25   in?

1    A.    Yes.

2    Q.    Do you see it?

3    A.    Yes, I do.

4    Q.    Okay.  So that was placed on top of that container by the

5    FBI in order to take that photograph, correct?

6    A.    Yes, it was probably moved.  I saw it in place, and it was

7    photographed some other time.

8    Q.    And so -- I'm sorry.  So that's not where it was when it

9    was first discovered?

02:16 10    A.    I don't recall at this moment.

11    Q.    And the same is true -- let me make sure I can get this

12    right -- of this item which I think has already been

13    introduced.

14    A.    Yes.

15    Q.    And again, that was not placed on top of that purple

16    plastic lid when it was discovered, right?

17    A.    I don't recall at this moment.

18    Q.    I'm sorry?

19    A.    I don't recall exactly if it was in the bin or if it was

02:16 20    on top.

21    Q.    Well, don't they both look like, in those two pictures --

22    one is, I think, 67 and the other is 69 --

23    A.    Right.

24    Q.    -- they are placed alone on top of that lid?

25    A.    Sure.  Things will be moved to be photographed out of the

1    context from which they were found, sometimes with the scale,

2    sometimes without, just to have its own dedicated photo.

3    Q.   So would you agree with me that those two photos appear to

4    have been placed on top of that purple plastic lid for purposes

5    of being photographed?

6    A.   Sure, it's very possible.

7    Q.   And going back for a minute to 620 -- oh, there's another

8    one that's been placed on top of that lid, Item 73?

9    A.   Yes.

02:17 10   Q.   And those are the paper targets that you referred to

11   before?

12   A.   Yes.

13   Q.   The BB targets, that is?

14   A.   Yes.

15   Q.   And showing you this photograph of the shelves in that

16   bedroom where you see the Items 19 and 68.

17   A.   Yes.

18   Q.   Nineteen was a collection of electrical cords, correct?

19   A.   Yes.

02:17 20   Q.   And that was Q685.  Am I right?

21   A.   I don't know.  That's a laboratory number.

22   Q.   Okay.

23        MS. CONRAD:  If I could just have this for the

24   witness, please.

25   Q.   Do you see where it says "Q685" on the bottom?  That's an

1     FBI lab tag?

2     A.   Right in the center?

3     Q.   Yes.

4     A.   I can't see.  You'd have to zoom in.

5     Q.   I'll try to zoom in.

6     A.   Oh, yes.  On the left-hand side?

7     Q.   Yes.

8     A.   Okay.

9     Q.   And that's a picture of that bin that was on those shelves

02:18 10    in Room H, right?

11    A.   Correct.

12              MS. CONRAD:  I'd offer this, your Honor.

13              MR. CHAKRAVARTY:  No objection.

14              THE COURT:  What's the number?

15              MS. CONRAD:  I don't know.

16              THE CLERK:  Ms. Conrad, the next defense number is

17    3062.

18              MS. CONRAD:  Thank you very much.

19              THE CLERK:  You're welcome.

02:19 20             MS. CONRAD:  So I'd offer this as 3062, and if it

21    could be published to the jury, please.

22              THE COURT:  All right.

23              (Defense Exhibit No. 3062 received into evidence.)

24    BY MS. CONRAD:

25    Q.   And do you see a piece of paper up near the top of that?

1    A.    Yes, I do.

2    Q.    And was that seized and sent to the lab as Q685.1?

3    A.    The entire bin and their items, their contents, were

4    submitted as one item from us.  So they would have been split

5    out at the laboratory as a sub-exhibit.

6          MS. CONRAD:  May I approach the witness?

7          THE COURT:  Yes.

8    BY MS. CONRAD:

9    Q.    And can you read what the Q numbers on that envelope are,

02:19 10   please?

11   A.    Sure.  The Q numbers are 685.1 and 685.3.

12   Q.    Could I ask you to open that, please, and just remove

13   Q685.1?

14   A.    Okay.

15   Q.    Do you need scissors?

16   A.    I've got some here.

17   Q.    Okay.

18          (Pause.)

19   A.    I don't want to cut anything in half.

02:20 20   Q.    I understand.  I think it's the handwritten...

21   A.    This is .1.

22   Q.    Okay.  So there's two handwritten pages, it looks like

23   torn out of a notebook there?

24   A.    Yes, and one of them is torn and a half.

25   Q.    And it looks like those were tested at the lab as Q685.1?

1    A.    Yes.

2          MS. CONRAD:  Your Honor, I could offer that, or maybe

3    it's easier because of the condition if I just offer a copy if

4    the government doesn't have an objection.

5          MR. CHAKRAVARTY:  If I can see the copy, that should

6    be fine, your Honor.

7          MS. CONRAD:  I'm sorry?

8          MR. CHAKRAVARTY:  If I can see it.

9          (Pause.)

02:22 10          MR. CHAKRAVARTY:  No objection, your Honor --

11          THE COURT:  Okay.

12          MR. CHAKRAVARTY:  -- in light of our earlier --

13          THE COURT:  Yes.  The next number?  3063?

14          MS. CONRAD:  I'm sorry.  I should have remembered.

15    3063?  Thank you.

16          (Defense Exhibit No. 3063 received into evidence.)

17    BY MS. CONRAD:

18    Q.    And I'm just going to put that up on the screen.  And that

19    appears -- is that a copy of the actual paper that you have in

02:23 20    front of you?

21    A.    Yes.  This passage here is the page I have that's torn in

22    half on the left side.

23    Q.    Right.  And so then just turning it sideways, you see

24    Q685.1.  And that matches, right?

25    A.    Yes.

1    Q.   And that's the lab number, right?

2    A.   Yes, it is.

3    Q.   And then this is the second page?  Let me zoom out.

4    A.   Yes, it appears to be the same.

5    Q.   And, again, Q685.1 is at the bottom?

6    A.   Yes.

7    Q.   And that's the number that's given at the lab when the

8    analyst tested it, in this case for fingerprints, correct?

9    A.   Fingerprints and other tests that they perform on it.  But

02:23 10   it's assigned at the laboratory.

11   Q.   Right.  Now --

12        MS. CONRAD:  Could I please have Q708, please?  It's

13   multiple notebooks.

14   A.   Would you like me to put these back into the envelope?

15   Q.   Sure.  Well, yes, thank you.  I don't think we're going to

16   need them now.

17        And you also -- I think you testified about a number

18   of notebooks that you found in Room H?

19   A.   No, they were in Room B, which was the front room.

02:24 20   Q.   Okay.  And if I could just have a moment to try and get

21   there.

22        (Pause.)

23   Q.   Tell me when I've got the right room.

24   A.   Go down one.  There, and in the far right-hand corner at

25   the bottom there's a -- right in there.

1           (Pause.)

2    Q.   I think it's actually this one.  Let's see.  Yeah, there

3    it is, right?

4    A.   Yes.

5    Q.   And I think you have -- no, you're about to have the box

6    in front of you.

7           Can I ask you to take a look at the wrapping and also

8    at the contents of that bag?

9    A.   Okay.

02:25 10  Q.   And are those the notebooks that you located in that

11   living room?

12   A.   Yes, they are.

13          MS. CONRAD:  And I'd offer those as well, your Honor.

14   I believe it would be Exhibit 3064.

15          MR. CHAKRAVARTY:  No objection, your Honor.

16          THE COURT:  They're admitted.  How many are there?

17          MS. CONRAD:  One, two, three -- actually, let's ask

18   Agent Derks.  He's got them in front of him.

19          THE WITNESS:  I would have to open it up.

02:26 20  BY MS. CONRAD:

21   Q.   Oh, yes.  Could you open it up, please?

22          (Pause.)

23   A.   Okay.

24   Q.   And could you tell us how many notebooks there are there?

25   A.   There's one --

1          MS. CONRAD:  Ms. Clarke suggests that they each be

2    marked individually, 3064-1, -2 -- and so forth.

3          MR. CHAKRAVARTY:  The government objects to that.

4    Given the purpose for which they're being offered, there's no

5    sense in separating them out, your Honor.

6          MS. CONRAD:  I think it's going to be easier later for

7    identification purposes when contents are introduced.

8          THE COURT:  If they're introduced.  I think it's

9    sufficient to have them as a group exhibit right now.  If

02:27 10   circumstances change, we can adjust.

11   A.   Okay.  There are four spiral notebooks, a composition

12   book, a small book with birds on them with graph paper inside,

13   and a portfolio binder, Bunker Hill Community College.

14   BY MS. CONRAD:

15   Q.   So six items altogether?

16   A.   Yes, and there's some leftovers.

17   Q.   Okay.  Thank you.

18         MS. CONRAD:  I don't know if I -- did I move those in?

19   I think I did.

02:28 20        THE COURT:  To be clear, as per our previous

21   discussion, they're not in for the truth of any matter asserted

22   in them, just for their existence.

23         (Defense Exhibit No. 3064 received into evidence.)

24         MS. CONRAD:  Right.

25   BY MS. CONRAD:

1    Q.   And did you also seize another notebook, which is Q714?

2    A.   I don't have a lab number.

3    Q.   Okay.  I think it's 2R077, if that rings a bell?

4    A.   77 would have been an item number from our search.

5    Q.   Right.

6    A.   I would have to look at our case book to see which one it

7    was.

8    Q.   All right.  We had asked that it be produced, but I'm not

9    sure that it's been located.

02:29 10          MS. CONRAD:  Well, may I approach the witness?

11          THE COURT:  Yes.

12   BY MS. CONRAD:

13   Q.   Do you recognize this as copies of Q714?

14   A.   I believe there's another -- a book with a red cover on it

15   which had Russian writing which -- I would want to see the

16   photographs taken at the search; these were taken at the

17   laboratory.

18   Q.   I'll try to find them.

19          (Pause.)

02:29 20   Q.   There also was a newspaper that was found.  Is that right?

21   A.   There were several.

22   Q.   Called the *Sovereign*?

23   A.   Yes.

24   Q.   And that's Item 2R93?

25   A.   Yes.

1        MS. CONRAD:  May I approach?

2    A.    Are we done with these?

3    Q.    Sure.

4        Could you open -- do you recognize that envelope?

5    A.    Yes, I do.  It has my name on it.

6    Q.    And that was the newspaper that was seized from I think

7    the living room.  Is that right?

8    A.    Yes.  It was on top of the TV stand to the left of the TV.

9    Q.    Okay.  Could you open that, please?

02:30 10   A.    Sure.

11        (Pause.)

12   A.    Okay.

13   Q.    And is that the item that you found on the TV stand in the

14   living room?

15   A.    Yes, it is.

16        MS. CONRAD:  I'd offer that, your Honor.

17        MR. CHAKRAVARTY:  Your Honor, I would object to these

18   on relevance grounds.  These are different than those other

19   documents.

02:31 20        THE COURT:  Let me just see you at the side with the

21   exhibit.

22        (Discussion at sidebar and out of the hearing of the

23   jury:)

24        MR. CHAKRAVARTY:  Your Honor, the agent advised that

25   the hydro spray that they use to try to lift fingerprints could

1     be a carcinogen, so he just doesn't want to handle it much

2     more --

3             THE COURT:  What are these?

4             MR. CHAKRAVARTY:  These papers are the -- this is a

5     magazine, I would just say for characterization, in which

6     certain passages are highlighted.

7             MS. CONRAD:  Do you want gloves?

8             MR. CHAKRAVARTY:  Sure.

9             THE COURT:  Who publishes it?

02:33 10        MR. CHAKRAVARTY:  It's one of these private -- I don't

11    know if it's a nonprofit or not, but it's a private

12    organization that encourages resistance.

13            MS. CONRAD:  It's an extremist organization.

14            THE COURT:  What's the point of it?

15            MS. CONRAD:  The point of it was that Tamerlan

16    Tsarnaev was engaged for quite some time with these various

17    sort of extreme ideas.

18            THE COURT:  How does that bear on --

19            MS. CONRAD:  Well, the government had a witness

02:33 20   testify at length about the process of radicalization, and it

21    seems to me that the story of radicalization cannot be told

22    solely in terms of Jahar Tsarnaev; it has to be termed -- to

23    use the expert witness's phrase -- in context, and this is the

24    context of Tamerlan Tsarnaev.

25            MR. CHAKRAVARTY:  Tamerlan --

1          THE COURT:  No.  Without tying it more directly to

2    this defendant, I don't think it should be in.

3          MS. CONRAD:  Well, I'm sorry, your Honor.  I just

4    don't understand.  So things that prove the defendant's guilt

5    are admissible on the part of the government but things that

6    put that in context by pointing to another person's

7    involvement, specifically a coconspirator, are not?

8          THE COURT:  I don't think I would adopt that

9    characterization.

02:34 10          MS. CLARKE:  Judge, can we just mark them so we have

11    them?

12          THE COURT:  Sure, you can mark them.

13          MS. CLARKE:  While I've got you up here, the

14    government did the same thing to us.  They collected a bunch of

15    stuff and gave it one number.  That's why I wanted to get each

16    of these notebooks a number so that we can distinguish them if

17    we ever start debating them for purposes --

18          THE COURT:  Well, you can talk about them.  I don't

19    know enough about them to know if it's a good idea or not.

02:34 20          MS. CLARKE:  Well, it's not a bad idea.  Let me put it

21    to you that way.

22          THE COURT:  All I know is that they're notebooks that

23    I presume suggest that they belonged to somebody other than the

24    defendant, but for whatever value that has, I will allow them

25    in.  But I don't know that distinguishing them by number is

```
 1    going to matter.
 2              MS. CLARKE:  Well, for purposes of the record it does.
 3              THE COURT:  Only if they're separated at some point.
 4              MS. CLARKE:  Okay.
 5              MR. CHAKRAVARTY:  We can talk about how to divide them
 6    up.
 7              MS. CONRAD:  So, your Honor, would it be appropriate
 8    if I had a copy of that marked for identification just because
 9    of the difficulty in terms of the handling or --
02:35 10              THE COURT:  Yeah.  If you want to -- just to preserve
11    the point?
12              MS. CONRAD:  Yes.
13              THE COURT:  Yeah, I think a copy will do.
14              MR. CHAKRAVARTY:  That's fine.
15              (In open court:)
16              MS. CONRAD:  So just for the witness, please, the
17    document camera.
18    BY MS. CONRAD:
19    Q.   Does this appear to be a copy of Q78?
02:35 20    A.   You're going to have to zoom in on that probably.
21    Q.   Okay.
22    A.   Yes.
23    Q.   And there are multiple pages here?
24    A.   There are.
25              MS. CONRAD:  Your Honor, I would ask that that be
```

1     marked for identification -- a copy be marked for

2     identification as Defendant's 3065.

3              THE COURT:  Right.  It may be marked for

4     identification only.

5              (Defense Exhibit No. 3065 marked for identification.)

6     BY MS. CONRAD:

7     Q.   Now, you testified about a drawer in the room behind the

8     kitchen where there were a number of items that were marked as

9     79, correct?

02:36 10    A.   As Item 79 or 725?

11    Q.   I think it was 79.  Yes.

12    A.   Yes.

13    Q.   Right?

14    A.   Yes.

15    Q.   And this is another view --

16             MS. CONRAD:  If I could have the document camera,

17    please.

18    Q.   -- of that drawer?

19             THE COURT:  May I make a suggestion?  I think every

02:37 20    time you shut it off and turn it back on it recycles, so it was

21    in the pause.

22             MS. CONRAD:  I'm just terrified that I'm going to put

23    my notes on there and everyone is going to see my messy notes,

24    so that's why I do that.

25    BY MS. CONRAD:

1    Q.   Let me zoom out a little bit.  Is that another view of

2    that drawer?

3    A.   Yes; that's a photograph that would have been taken at our

4    laboratory.

5         MS. CONRAD:  And I would offer this, your Honor.

6         MR. CHAKRAVARTY:  No objection.

7         THE COURT:  Okay.

8         MS. CONRAD:  So 3066?  I'm picking this up,

9    Mr. Lyness, thank you.

02:37  10        (Defense Exhibit No. 3066 received into evidence.)

11   BY MS. CONRAD:

12   Q.   And drawing your attention to this --

13   A.   Yes.

14   Q.   -- do you know what that is?

15   A.   I said earlier it looks like the top of a soup can or

16   something like that.

17   Q.   It's got some marking on it?

18   A.   In this picture, yes.

19   Q.   And that was tested at the lab as well?

02:38  20   A.   I do not know what tests were performed on it at the

21   laboratory.

22   Q.   Okay.  But it looks like it's got some black powder on it?

23   A.   There is some smudging on it, yes.

24        MS. CONRAD:  I think -- if I already offered this,

25   then I'll move on.  Thank you.

1    Q.    Mr. Chakravarty asked you about a desktop computer and

2    introduced that, an HP, Hewlett-Packard, right?

3    A.    Yes.

4    Q.    But you also seized two other computers, did you not?

5    A.    I believe there was a laptop.

6    Q.    There were two laptops, right?

7    A.    I believe so, yeah.  I would have to look.

8    Q.    There was a MacBook Pro, right?

9    A.    I would have to look at our case notes to refresh my

02:38 10   memory.

11    Q.    Okay.

12          MS. CONRAD:  Okay.  Just for the witness.

13    Q.    Drawing your attention to 2R-034, do you see there was a

14    laptop computer found on the top of the dresser drawer in

15    Room C?

16    A.    Right.  That was the room where the drawer of nails were.

17    Q.    Okay.  And you don't, I assume, offhand remember what

18    the -- oh, here we go.  And there's also Item 2R-028 which was

19    found also in Room C but on the floor of the closet?

02:39 20   A.    Yes.

21    Q.    And those both were seized by the FBI?

22    A.    Yes, they were.

23          MS. CONRAD:  May I have one moment, please?

24          (Counsel confer off the record.)

25    Q.    And another item that was seized --

1          MS. CONRAD:  Again, just for the witness.

2     Q.   Drawing your attention to 2R-023.

3     A.   Yes.

4     Q.   Was that a travel document, an airplane ticket or receipt,

5     for Tamerlan Tsarnaev?

6          MR. CHAKRAVARTY:  Objection, your Honor.  First, the

7     document is being offered to refresh the witness's

8     recollection, and the attorney is --

9          MS. CONRAD:  I was about to show it to him and then

02:41 10    offer it, so I could do that if Mr. Chakravarty prefers.

11          THE COURT:  No, overruled.  Go ahead.

12    BY MS. CONRAD:

13    Q.   Was that an airplane ticket, Russian airplane ticket, for

14    Tamerlan Tsarnaev?

15    A.   I remember it looking like an old-fashioned plane ticket

16    from a while ago.

17    Q.   Let me see how adept I am with this computer.  Maybe I can

18    show it to you.  I think it's Exhibit 1219, if Mr. Bruemmer

19    would be so kind.  I'd rather him do it than me because he's

02:41 20    more likely to get it right.

21          Is that the document you saw?

22    A.   Yes, it is.

23          MS. CONRAD:  I would offer that, your Honor, Exhibit

24    3066 --  -67.

25          MR. CHAKRAVARTY:  Object to relevance.

```
 1              THE COURT:  Overruled.  I'll admit it.
 2              MS. CONRAD:  And could that be published, please.
 3              (Defense Exhibit No. 3067 received into evidence.)
 4              MS. CONRAD:  Could you maybe zoom in on the written
 5      portion of that?  Thank you.
 6      BY MS. CONRAD:
 7      Q.   So that appears to be for Tamerlan Tsarnaev, right?
 8      A.   That's what it says in the upper left-hand corner.
 9      Q.   And it looks like it's more of a receipt than a -- than an
10      actual ticket, right?
11      A.   It looks that way.
12      Q.   And can you read the date on that, in the center?
13      A.   Yes.
14      Q.   I'm going to circle it if I --
15      A.   July 17th, 2012.
16      Q.   Okay.  And does it indicate where the travel is to?
17      A.   I'm not familiar with this type of receipt.
18      Q.   Are you familiar with the airline Aeroflot, if I'm
19      pronouncing that correctly?
20      A.   Yes, I am.
21      Q.   And is that a Russian airline?
22      A.   Yes, it is.
23              MS. CONRAD:  Thank you very much, Mr. Bruemmer.
24              MR. CHAKRAVARTY:  Your Honor, just on that exhibit, I
25      think Ms. Conrad called that 3066, and I think there already is
```

1       a 3066.  The government had labeled that 1219.

2               MS. CONRAD:  Oh, that's right.  Okay.  So let's stick

3       with 1219.

4               And actually, I don't know if this would be a good

5       time, your Honor, this has nothing to do with this witness, but

6       there is a numbering issue with some previous defense exhibits

7       that perhaps I could put on the record right now.

8               THE COURT:  Okay.

9               MS. CONRAD:  Previously the defense had offered

02:43 10    Defendant's Exhibit 1, which was the Twitter account for

11      Mr. Tsarnaev, Dzhokhar Tsarnaev, as Defendant's Exhibit 1.

12      That has been renumbered as Exhibit 3000.  And similarly,

13      Exhibit 2, Defendant's Exhibit 2, which was an extract of phone

14      records for -- and cell locations introduced during the

15      testimony of Agent Fitzgerald has been renumbered as 3001.

16              THE COURT:  That's just to conform to the convention

17      that the defense exhibits will be 3000 --

18              MS. CONRAD:  At some point we're going to refer back

19      to those, and I want to make sure we're all on the same page

02:44 20    when we do that.

21              May I just have one moment, please, your Honor.

22              (Counsel confer off the record.)

23      BY MS. CONRAD:

24      Q.   Ms. Clarke reminds me that I need to go back to 714.  You

25      mentioned that that had a red cover, correct?

1    A.    I believe so.  I would like to see a photograph of it.

2    Q.    Sure.  Oh, here it is.

3          MS. CONRAD:  Again, just for the witness.

4    Q.    Is that what you're thinking about?

5    A.    It's not showing up.

6    Q.    Oh, it's not?  I didn't even turn it off this time.

7          THE COURT:  No, it should be there.

8    A.    Is there another photograph with the front cover?

9    BY MS. CONRAD:

02:46 10   Q.    I don't have the front.  This was the one I showed you

11   before.  Oh, maybe that's the front.  I can't tell if that's

12   the front or the back.

13   A.    That appears to be it, but I'll be more comfortable with

14   this photograph of it from --

15   Q.    Let me see if I can find that.

16   A.    It would be in the logbook.

17   Q.    But while I'm doing that, while I'm looking for that, can

18   I also ask you if you also participated in a search a day or

19   two later at an address 69A Carriage Drive in New Bedford,

02:47 20   Massachusetts?

21   A.    Yes, that was, I believe, on a Monday morning.

22   Q.    I'm sorry?

23   A.    That would have been a Monday.

24   Q.    So that would have been the 22nd?  April 22nd?  The 19th

25   was Friday, the --

1    A.    Yeah, sure.

2    Q.    And at that time did you recover a book about Islam?

3              MR. CHAKRAVARTY:  Objection, your Honor.  Both for the

4    relevance of this book as well as other items from 69A Carriage

5    Drive through this witness.

6              THE COURT:  Well, yeah.  I think it's beyond the scope

7    of the examination, so...

8              MS. CONRAD:  It was to save time later if we need to

9    go back to it later, your Honor, but...

02:48  10         (Pause.)

11   BY MS. CONRAD:

12   Q.   I asked you at the beginning whether that room, Room H,

13   was being used as a storage room or computer room?

14   A.   It was -- there was a computer in there but it's --

15             MR. CHAKRAVARTY:  Objection, your Honor.  There's no

16   question on the table.

17             THE COURT:  All right.  Ask a question.

18             MS. CONRAD:  Okay.

19   BY MS. CONRAD:

02:49  20   Q.   Did you at some point have a discussion with the

21   prosecution about --

22             MR. CHAKRAVARTY:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MS. CONRAD:  May I -- your Honor, I would like to have

25   marked for identification at this time the statement that I

1     previously mentioned at sidebar.

2              THE COURT:  You may have it marked for identification,

3     yes.

4              MS. CONRAD:  So that would be -- and this would be

5     Docket 350, so pages 3 and 4 of that pleading.  And I'd like it

6     marked as Exhibit 3068 for identification.

7              THE COURT:  Okay.

8              (Defense Exhibit No. 3068 marked for identification.)

9              MS. CONRAD:  Nothing further.

02:49 10              MR. CHAKRAVARTY:  Briefly.

11                        REDIRECT EXAMINATION

12     BY MR. CHAKRAVARTY:

13     Q.   Agent Derks, did you find evidence that many people lived

14     at the 410 Norfolk Street residence?

15     A.   Yes.

16              MS. CONRAD:  Objection.

17              THE COURT:  Overruled.

18              MS. CONRAD:  Scope.

19              THE COURT:  No.

02:49 20     BY MS. CONRAD:

21     Q.   Did you find evidence of documents identifying Dzhokhar

22     Tsarnaev in a few of those rooms?

23     A.   Yes.

24     Q.   And in that room that Ms. Conrad asked about, Room H, the

25     one with the flag and the bunk beds, did you find documents in

1    Dzhokhar Tsarnaev's name in that room?

2    A.   Yes.

3    Q.   And, in fact, his naturalization certificate, was that in

4    that room?

5    A.   Yes.

6    Q.   The handwriting that Ms. Conrad showed you, was that

7    handwriting different from the handwriting which we looked at

8    earlier from the note that was in that book that was on that

9    same shelf?

02:50 10  A.   I'm not a handwriting expert so I cannot comment on if

11   it's a different pen or not.

12   Q.   And there was a variety of different types of writing that

13   were seized from that house?

14   A.   Yes.

15   Q.   Thank you.

16        MR. CHAKRAVARTY:  Your Honor, just -- if there's not

17   going to be recross, I just want to make sure the record is

18   clear as to what exhibits have been moved in and the earlier

19   list.

02:50 20       MS. CONRAD:  There is going to be a recross.

21        THE COURT:  Not very much.

22        MS. CONRAD:  No, not very much.

23        MR. CHAKRAVARTY:  Your Honor, there are two

24   corrections on the exhibit numbers that I had read off earlier.

25   I said "1095" and "1097," but I believe on the stand I asked

1    the agent to change those to 1192 and 1194.  Thank you.

2              (Government Exhibit Nos. 1095 and 1097 are replaced

3    with Exhibit Nos. 1192 and 1194.)

4                         RECROSS-EXAMINATION

5    BY MS. CONRAD:

6    Q.   Agent Derks, are you aware that numerous documents bearing

7    the name of Tamerlan Tsarnaev were found in that apartment?

8    A.   Yes.

9    Q.   Are you aware that numerous documents and objects

02:51 10   belonging to Katherine Tsarnaev were found in that apartment?

11   A.   Yes, there were.

12   Q.   Are you aware that the children's bedroom that we saw

13   belonged to the daughter of Katherine and Tamerlan Tsarnaev?

14   A.   I believe it was a little girl that stayed there.

15   Q.   And do you know if her name was Zahara?

16   A.   I don't recall.  And just so you know, at the time of the

17   search it was still an active investigation so our knowledge

18   was very limited.

19   Q.   Are you aware that many of the items that were introduced

02:51 20   here today bore the fingerprints --

21             MR. CHAKRAVARTY:  Objection, your Honor.

22   Q.   -- of Tamerlan Tsarnaev?

23             THE COURT:  Sustained to that.

24             MS. CONRAD:  I have nothing else.

25             THE COURT:  All right.  Agent, thank you.  You may

 1    step down.

 2              (The witness is excused.)

 3              THE COURT:  Somebody has to attend to the objects.

 4              MS. CONRAD:  I'm supposed to tell the Court that I

 5    messed up the numbers and so the exhibit for identification

 6    should be 3067, not 3068.

 7              (Defense Exhibit No. 3068 is replaced by Exhibit No.

 8    3067.)

 9              (Pause.)

02:53 10            THE COURT:  Are you all organized?

11              MR. MELLIN:  I think we are.  I'm not sure yet.

12              THE COURT:  All right.  Go ahead.

13              MR. MELLIN:  Your Honor, two other housekeeping

14    matters.  I believe Ms. Clarke is going to join me at some

15    point.  First, we have a stipulation.  The parties hereby

16    stipulate and agree that the 2013 Mercedes-Benz ML350 with the

17    vehicle identification number 4JGDA5HB1DA193885 was

18    manufactured in Tuscaloosa, Alabama, and shipped to Herb

19    Chambers Mercedes-Benz of Boston, 295 McGrath Highway,

02:54 20            Somerville, Massachusetts, in February 2013.  Herb Chambers

21    Mercedes-Benz subsequently leased that vehicle to Dun Meng on

22    or about March the 5th of 2013.  That is that stipulation, your

23    Honor.

24              The other is the contents of the wallet, and I believe

25    Ms. Clarke wants to show a few photographs.  The wallet and the

1      contents are marked as Exhibit 1561.

2             MS. CLARKE:  Your Honor, these were exhibits that a

3      witness did not have with him when we talked about it and the

4      government agreed to bring them so we could show them to the

5      jury, and there are some pictures that do it.

6             If I could ask Mr. Bruemmer to call up 920-01 for

7      everybody to see.  The government is stipulating.

8             THE COURT:  I thought it was just the exhibit without

9      the indexing.  There it is.  Okay.

02:56 10        (Pause.)

11            MS. CLARKE:  If we could take it down for just a

12     moment.  I think we have some questions about some numbers.

13            THE COURT:  While this is happening, let me just say

14     to the jury that a -- one source of evidence in a case like

15     this can be a stipulation by the parties, which means the

16     parties agree that certain facts may be taken as true by you;

17     there's no controversy about them.  That's what this is.  The

18     parties are stipulating to some facts that you can take as

19     established.

02:58 20        (Counsel confer off the record.)

21            MS. CLARKE:  Your Honor, I believe what we'd like

22     shown to the jury is 948-563.  This is the --

23            THE COURT:  Is that what's on the screen?

24            MS. CLARKE:  Yes.

25            This is the contents of the wallet that was found in

1    the back of the Honda Civic, the back behind the driver's seat

2    in the Honda Civic.  The wallet was identified as having papers

3    belonging to Tamerlan Tsarnaev, his identification and credit

4    cards.  So we'll show 563 as the full contents and the jury

5    will have the full contents.

6              The next picture is 94-571.

7              THE COURT:  I take it it's 948-571?

8              MS. CLARKE:  Yes.  And if Mr. Bruemmer could enlarge

9    the purchase -- the item purchased.

03:00 10             The next photograph, your Honor, is 948-572.  That was

11    what was just enlarged.

12             The next photograph is another receipt, 948-573.  If

13    Mr. Bruemmer could enlarge...

14             The next photograph is 948-574.  If Mr. Bruemmer could

15    enlarge...

16             The next photograph, your Honor, is 948-575.  If

17    Mr. Bruemmer could enlarge...

18             The next photograph, your Honor, is 948-576.  I

19    believe we have a couple more photographs that show the

03:03 20    sections of that maybe better:  948-577, 948-578, 948-579.  If

21    Mr. Bruemmer could enlarge the center section.

22             Thank you, your Honor.  I would move in 1561 and the

23    photographs that were just shown to the jury.

24             THE COURT:  1561 is the physical items?

25             MS. CLARKE:  The physical items, yes.

```
 1              THE COURT:  Okay.

 2              MS. CLARKE:  Thank you.

 3              (Defense Exhibit No. 1561 received into evidence.)

 4              (Pause.)

 5              MR. WEINREB:  We're also waiting for one of the

 6       attorneys.

 7              THE COURT:  Okay.

 8              (Pause.)

 9              MR. WEINREB:  Your Honor, the United States calls

03:07 10       Christian Fierabend.

11                        CHRISTIAN FIERABEND, duly sworn

12              THE CLERK:  State your name, spell your last name for

13       the record, keep your voice up and speak into the mic.

14              THE WITNESS:  Christian Fierabend, F-I-E-R-A-B-E-N-D.

15                             DIRECT EXAMINATION

16       BY MR. WEINREB:

17       Q.   Good afternoon.  Where do you work?

18       A.   I work for the FBI.

19       Q.   How long have you worked with the FBI?

03:08 20       A.   Approximately nine years.

21       Q.   All that time in Boston?

22       A.   Yes.

23       Q.   What's your current job assignment?

24       A.   I'm assigned to the violent crimes squad.

25       Q.   Are you a special agent?
```

1    A.    Yes.

2    Q.    And have you had all the training that special agents

3    receive at the FBI?

4    A.    Yes.

5    Q.    How many investigations have you worked on in your career

6    at the FBI?

7    A.    Numerous.

8    Q.    Did you participate in the Boston Marathon bombing

9    investigation?

03:08 10    A.    Yes.

11    Q.    Are you familiar with the types of pressure cookers that

12    were used on Boylston Street and on Laurel Street in Watertown?

13    A.    Yes.

14    Q.    What kind were they?

15    A.    They were Fagor Elite pressure cookers.

16    Q.    What retail stores sell Fagor Elite pressure cookers?

17    A.    They're exclusively sold at Macy's.

18    Q.    What size pressure cookers were used on Boylston Street

19    and on Laurel Street?

03:09 20    A.    Boylston was six quart, and Laurel Street was four quart.

21    Q.    Did the FBI obtain purchase records from Macy's for Fagor

22    Elite pressure cookers as part of their investigation in this

23    case?

24    A.    Yes.

25    Q.    For what time period?

1    A.    From August of 2012 until April of 2013.

2    Q.    So approximately a seven- or eight-month time period?

3    A.    Correct.

4    Q.    And for what geographic area did you get the receipts?

5    A.    The entire United States.

6    Q.    Approximately how many six-quart Fagor Elite pressure

7    cookers did Macy's sell during that period just in the

8    northeast of the United States?

9    A.    Approximately 4,000.

03:09 10    Q.    And approximately how many four-quart pressure cookers,

11    Fagor Elite pressure cookers, did Macy's sell just in the

12    northeast during that time period?

13    A.    Seventy-four.

14    Q.    How many of those 74 were purchased -- were paid for in

15    cash?

16    A.    Five.

17    Q.    How many of those five were purchased in Massachusetts?

18    A.    Three.

19    Q.    Where in Massachusetts were those three purchased?

03:10 20    A.    Two in Boston, one in Saugus.

21    Q.    So you had the purchase records for those purchases?

22    A.    Correct.

23    Q.    And did they include the date and time of each purchase?

24    A.    Yes.

25    Q.    Now, was a GPS device recovered from a Mercedes abandoned

1    on Spruce Street in Watertown on April 19th, 2013?

2    A.    Yes.

3    Q.    What kind of GPS was it?

4    A.    It was a Garmin nuvi.

5    Q.    And what's a Garmin nuvi?

6    A.    It's a portable GPS device.

7    Q.    Approximately what size?

8    A.    Handheld.

9    Q.    So you could move it from car to car?

03:10 10   A.    Yes.

11   Q.    What was done with that GPS after it was seized from the

12   Mercedes?

13   A.    The data was extracted and plotted on a map.

14   Q.    And did you compare that data from the GPS with the dates

15   and times of the three cash purchases of the four-quart Fagor

16   Elite pressure cookers that were sold in Massachusetts?

17   A.    Yes.

18         MR. WEINREB:  Can I have Exhibit 1152-06, please, just

19   for the witness.

03:11 20   Q.    Do you recognize that?

21   A.    I do.

22   Q.    What is that?

23   A.    The GPS plots.

24         MR. WEINREB:  The government offers 1152-06.

25         MR. WATKINS:  Judge, we don't object to the exhibit

 1    but can we be seen at sidebar, please?

 2              THE COURT:  Okay.

 3              (Government Exhibit No. 1152-06 received into

 4    evidence.)

 5              (Discussion at sidebar and out of the hearing of the

 6    jury:)

 7              MR. WATKINS:  It says "hijack."  No, it doesn't say

 8    anything.

 9              (Laughter.)

03:12 10         MR. WATKINS:  In caps there it says "hijacked

11    vehicle."  We pointed this out to the government a couple of

12    times, that that part should be removed.  It's a GPS device;

13    "hijacked vehicle" is --

14              MR. MELLIN:  In the vehicle that was hijacked.

15              MR. WATKINS:  It was found in the vehicle that was

16    hijacked, but it's a very confusing piece of --

17              THE COURT:  Let me take a closer look.

18              Do you have a paper copy of it?

19              MR. WEINREB:  I don't, but let me just see...

03:13 20         MR. WATKINS:  Can you put it back on?  Yeah, put it

21    back on on the screen.  He just took it down.

22              THE COURT:  Well, I wanted to read the writing.  I

23    thought I saw a paper copy earlier.

24              MR. WEINREB:  Can I just inquire, I'm not entirely

25    sure whether the nature of the objection goes to a dispute

1       about whether the Mercedes was actually carjacked by someone or

2       whether it's --

3               MR. WATKINS:  It is both.  There's no necessity of

4       putting it in "from hijacked vehicle."  It's mostly confusing

5       in that what happened is it was recovered from the Mercedes but

6       it was actually used in other cars, and specifically in the

7       CR-V and the Odyssey.  It's going to be terribly confusing to

8       the jury when they --

9               THE COURT:  Who prepared the chart?

03:14 10        MR. WEINREB:  Someone at the FBI.

11              THE COURT:  Not this guy?

12              MR. WEINREB:  No.

13              MR. CHAKRAVARTY:  Particularly, the witness James Tyra

14      has already authenticated the plots.

15              MS. CLARKE:  And when he did, we talked about changing

16      the word "hijacked" to "Mercedes."  I thought Mr. Weinreb

17      agreed to do that, that's why he didn't admit the exhibit at

18      the time, because he was going to change it.

19              THE COURT:  Well, go ahead.

03:14 20        MR. WEINREB:  I'm still not sure I understand whether

21      the objection is that it's misleading to say that it was

22      recovered from the Mercedes because of the defense argument

23      that it was used in other cars, or whether the objection is to

24      just the word "highjacked," in which case I'm not sure it's

25      really a well-taken objection because there's no real prejudice

1    to the defense from the idea that the Mercedes was carjacked,

2    the car was abandoned in the middle of Spruce Street.  I mean,

3    maybe there's a claim that the accused didn't carjack it, but

4    that's different from saying that the vehicle itself wasn't

5    taken from its owner.

6              MR. WATKINS:  In general terms in a summary exhibit,

7    which is what that is, there shouldn't be those kinds of

8    pejorative terms.  Aside from that, it's confusing to the jury

9    to talk about it being recovered from a hijacked vehicle when

03:15 10  the testimony is going to be as to these plots it was in a

11   different vehicle.

12             THE COURT:  Well, I think the second part is a more

13   substantial one, the possibility of confusion of the jury.  I

14   first thought that this was the Mercedes-Benz's GPS.

15             MR. WEINREB:  That's why I led him through the fact

16   that it's a Garmin nuvi that can be moved from car to car, but

17   this is the vehicle from which it was recovered.

18             THE COURT:  How do you tie -- assuming that the jury

19   understands that it's not the Mercedes car, how do you tie it

03:16 20  to the defendant?  I mean, can you show what cars it was used

21   in?

22             MR. WEINREB:  No.  But there was testimony from Dun

23   Meng that, I believe, that Tamerlan Tsarnaev had a GPS device

24   in his hands that he was programming.

25             THE COURT:  Right.  But that's not for this journey.

1          MR. WEINREB:  Frankly, there's no other way to tie it.

2    Frankly, it's a Garmin nuvi GPS that was found in the Mercedes.

3    The truth is that the defense does not want to keep this

4    information out, they want it in, because it tends to show that

5    Tamerlan Tsarnaev is the one who bought the Fagor pressure

6    cookers, so I don't understand their wanting to exclude it at

7    all.  Frankly, their goal is to make it as clear as possible

8    that it was Tamerlan Tsarnaev's GPS and I think they're

9    entitled to do that to the extent they can, but they can't -- I

03:17 10   don't think they're entitled to preclude the government from

11   identifying it in a factually correct way, which is a device

12   recovered from this car.  All the other charts identified the

13   places by what car they were found in.

14          THE COURT:  I don't think there's much doubt on the

15   evidence that the Mercedes was taken from Dun Meng.  You can

16   call that "hijacked."  So I think it can be used now without

17   anybody calling attention to that and -- but I think it would

18   be better if the jury sees the exhibit finally and has it in

19   the jury room, that it be edited so it doesn't say that.  I

03:17 20   don't think it's a big issue in this case but it is --

21          MR. WEINREB:  Well, it has to be identified some way.

22   We have identified all the portable GPS devices based on where

23   they were recovered.  If it just says "GPS" on it --

24          THE COURT:  No, no, it can say Dun Meng's.

25          MR. WEINREB:  It has nothing to do with Dun Meng.

1          MS. CLARKE:  "Found in the Mercedes."

2          MR. WEINREB:  "Found in the Mercedes"?  Okay.  That's

3     fine.  Okay.  Okay.

4          THE COURT:  But for now I think we can just blow it

5     by.

6          MR. WATKINS:  So at least for now where the exhibit is

7     going to go up to the jury, how can we fix it in front of the

8     jury so they're not --

9          THE COURT:  I'm going to tolerate them seeing it now

03:18 10   and -- but when they have it more permanently --

11          MR. WEINREB:  I'll ask a couple of questions to try to

12     highlight it and hopefully that will take care of it.

13          MR. WATKINS:  That it was found in other cars.

14          MR. WEINREB:  No, not that.

15          THE COURT:  That it was taken from Dun Meng.

16          MR. WATKINS:  So how does the jury know it was in

17     another car?

18          MR. WEINREB:  That's for the defense to prove, quite

19     frankly.  I can't guess it was in other cars.  I don't have any

03:18 20   evidence of that.

21          THE COURT:  Was it fingerprinted?

22          MR. WEINREB:  There were no fingerprints found on it.

23          THE COURT:  Okay.  All right.

24          MR. WATKINS:  Thank you.

25          (In open court:)

1          THE COURT:  Could we put it up -- let me just take

2     a -- so I suppose it's admitted and I'll now expose it to the

3     jury.

4     BY MR. WEINREB:

5     Q.   Agent Fierabend, I want to ask you some questions about

6     that data, but before I do, I just want to clarify with you:

7     So this GPS device was recovered from the seat of the Mercedes,

8     correct?

9     A.   I know it was recovered in the Mercedes.  I don't know

03:20 10    exactly where in the Mercedes it was recovered.

11    Q.   Okay.  But it's not part of the Mercedes?  It's not like a

12    built-in GPS device?

13    A.   No.

14    Q.   It's a portable device that could be plugged into any

15    vehicle?

16    A.   Correct.

17    Q.   And the data that you recovered doesn't say -- doesn't

18    tell you what vehicle it was in at the time the data was

19    recorded, correct?

03:20 20    A.   No.

21    Q.   All right.  So this chart has some numbered boxes on it.

22    Is that correct?

23    A.   Would you repeat the question?

24    Q.   I'm sorry.  This chart has some numbered boxes on it,

25    correct?

1    A.   Correct.

2    Q.   So, for example, I'm going to highlight the first box.

3    Oh, I guess that's the last box.

4         MR. WEINREB:  Can we shrink that, Mr. Bruemmer?

5    Q.   So this would be a better one to highlight.  So could you

6    read that?

7    A.   "GPS stops at 8:13 p.m. near 1201 Broadway, Square One

8    Mall, Saugus, Massachusetts.  Travel resumes at 8:42 p.m."

9    Q.   That narrative, those words obviously weren't in the GPS,

03:21 10   correct?

11   A.   Correct.

12   Q.   But there was data in the GPS that says, at least to some

13   degree, where it stopped and what time it stopped there?

14   A.   Yes.

15        MR. WEINREB:  Could we go back to the whole exhibit?

16   Q.   So what does the data reveal about where the GPS stopped

17   on this particular date, which is January 31st, 2013?

18   A.   It shows it stopped by the Square One Mall in Saugus at

19   8:13 p.m. and resumed at 8:42 p.m.

03:22 20   Q.   Okay.  And then it traveled to some other locations and it

21   winds up back on -- after midnight near 397 Norfolk Street in

22   Cambridge?

23   A.   That's correct.

24   Q.   Okay.  So let's just return to the 8:13 stop.

25        MR. WEINREB:  And could I have Exhibit 1159 for the

1   witness, please.

2   Q.   All right.  Now, this is written in small letters, but did

3   you review this recently?

4   A.   I did.

5   Q.   And so do you recognize it?

6   A.   I do.

7   Q.   The information, the purchase information you got from

8   Macy's, what form was it in?  Was it a spreadsheet, a PDF?

9   A.   It was an Excel spreadsheet.

03:23 10   Q.   And it had all these purchases sorted by date and time?

11   A.   Yes.

12   Q.   So this thing you're looking at here, is this an excerpt?

13   A.   Yes.

14   Q.   And is it a fair and accurate excerpt?

15   A.   I believe so.

16         MR. WEINREB:  The government offers 1159.

17         MR. WATKINS:  No objection.

18         THE COURT:  Okay.

19         (Government Exhibit No. 1159 received into evidence.)

03:23 20   BY MR. WEINREB:

21   Q.   So now I'm going to try to highlight it, at least the top

22   portion.  So I'm going to try to highlight this -- actually,

23   let me get this top part in too.  All right.  So the leftmost

24   column -- if the letters are too small to read on your screen,

25   just let me know, but what's in the leftmost column?

        1    A.    It's the date.

        2    Q.    And what date is this record for?

        3    A.    It's for January 31, 2013.

        4    Q.    And what time?

        5    A.    It's 2038, or 8:38 p.m.

        6    Q.    And what -- where -- all the way over near the right where

        7    it says where these Fagor pressure cookers were purchased,

        8    where does it say they were purchased?

        9    A.    Square One.

03:24  10    Q.    And the -- they were purchased -- under "associate," that

       11    would be the -- like the register who sold them, is it the same

       12    person?

       13    A.    I believe the associate is the person and the register is

       14    the number.  Fifty-one is the register.

       15    Q.    The number of the register?  And it indicates how many

       16    pressure cookers were purchased?

       17    A.    Based on the SKUs, it appears there are two different size

       18    pressure cookers.

       19    Q.    What sizes?

03:24  20    A.    Our investigation shows that the SKU's were a six-quart

       21    pressure cooker and a four-quart pressure cooker.

       22    Q.    So one of those three four-quart pressure cookers sold in

       23    Massachusetts during the relevant time period were sold on this

       24    date and time in Saugus, at the Square One Mall in Saugus,

       25    Mass.?

1    A.    Yes.

2    Q.    And how does that compare to when that GPS that was found

3    in the Mercedes was at the Square One Mall in Saugus?

4    A.    I believe the purchase is a few minutes before the GPS

5    starts to move again.

6    Q.    Okay.  Does this data tell you what car the GPS was in at

7    the time?

8    A.    No.

9    Q.    Does it tell you who was driving the car?

03:25 10    A.    No.

11    Q.    Does it tell you who might have been a passenger in the

12    car?

13    A.    No.

14    Q.    Does it tell you who in the car, if anyone, actually

15    purchased the pressure cooker?

16    A.    No.

17    Q.    Was there any surveillance video available from that

18    Macy's to help determine who might have actually purchased

19    those pressure cookers?

03:25 20    A.    No.

21    Q.    So you can't be sure who actually purchased them?

22    A.    Correct.  I cannot be sure who actually purchased them.

23          MR. WEINREB:  Could we go back to the full exhibit of

24    1159?

25    Q.    Now, down in the second part of that exhibit, that shows a

1    purchase on March 17th, 2013?

2    A.    Yes.

3    Q.    At what time?

4    A.    1417, or 2:17 p.m.

5    Q.    Based on the SKU number, can you tell what this was a

6    purchase of?

7    A.    We know this was a six-quart pressure cooker.

8    Q.    And it was purchased where?

9    A.    The Square One.

03:26 10    Q.    Okay.  Now, is there any GPS data corresponding to that

11    purchase?

12    A.    No.

13    Q.    So can you say for certain who purchased that pressure

14    cooker?

15    A.    No.

16    Q.    It's just another six-quart pressure cooker sale from that

17    same mall?

18    A.    Correct.

19    Q.    Do you even know if that six-quart pressure cooker was one

03:27 20    of the ones used on Boylston Street in the bombing?

21    A.    No.

22    Q.    Were GPS devices also found in a Honda Odyssey that was

23    registered to Jahar Tsarnaev's father, Anzor Tsarnaev?

24    A.    Yes.

25    Q.    What types of GPS devices were those?

```
 1    A.    They were also handheld GPS devices.

 2    Q.    The same kind that can be moved from car to car?

 3    A.    Yes.

 4          MR. WEINREB:  Can I have Exhibit 1152-07, please.

 5    Q.    Do you recognize this?

 6    A.    Yes.

 7    Q.    What is it?

 8    A.    It's a map of GPS plots.

 9    Q.    From one of those GPS devices?

03:27 10   A.    Yes.

11          MR. WEINREB:  The government offers 1152-07.

12          MR. WATKINS:  No objection.

13          (Government Exhibit No. 1152-07 received into

14    evidence.)

15    BY MR. WEINREB:

16    Q.    What does this map show?

17    A.    It shows travel into New Hampshire.

18    Q.    And does it show stops at various places?

19    A.    Yes.

03:28 20   Q.    And various times on March 6th?

21    A.    Yes.

22    Q.    And does it also indicate that at least in some cases the

23    stops were near particular stores?

24    A.    Yes.

25    Q.    So, for example, looking at Number 5, there was a stop
```

1    near a Walmart --

2    A.    Yes.

3    Q.    -- at approximately 5:59 p.m., and then travel resumed

4    about 14 minutes later?

5    A.    Correct.

6              MR. WEINREB:  All right.  If you could zoom back out.

7    Q.    And that was a Walmart in Hudson, New Hampshire?

8    A.    Yes.

9    Q.    And then there was also a stop earlier, in Amherst, New

03:28 10   Hampshire, at about 5:12 p.m.  Is that right?

11   A.    Yes.

12             MR. WEINREB:  All right.  Could we go back out?

13   Q.    And earlier a stop near a Walmart in Manchester, New

14   Hampshire, correct?

15   A.    Yes.

16   Q.    Did the FBI get receipts from all the Walmart stores

17   corresponding to those locations where there was a Walmart

18   store that matched the dates and times of those stops?

19   A.    Yes, we got various Walmart receipts.

03:29 20             MR. WEINREB:  Can I have Exhibit 1161-02 for the

21   witness.

22   Q.    Is that one of those Walmart receipts?

23   A.    I'm actually having a hard time reading that.

24   Q.    Yup.  Let me enlarge it for you.  That didn't help that

25   much.  Is there some portion of it you'd like me to enlarge

```
 1    that would make it better?
 2    A.   If I could find the -- I'm just looking for the name of
 3    the Walmart on the receipt.  I can't see the name of the
 4    Walmart on the receipt.
 5    Q.   Okay.  There is a --
 6             MR. WEINREB:  Can we move back out?  And move back out
 7    again, please?
 8    Q.   Looking at the information on the receipt, does that look
 9    familiar to you?
10    A.   Yes.
11    Q.   As a receipt you have seen?
12    A.   Yes.
13    Q.   And is it familiar to you as a receipt that you obtained
14    from Walmart?
15    A.   Yes.
16             MR. WEINREB:  And can we look at 1161-03, please.
17    Q.   And again, does that look to you -- is that familiar to
18    you as a receipt you have seen from a different date and time
19    but also of a purchase from a Walmart?
20    A.   Yes.
21             MR. WEINREB:  The government offers 1161-02 and
22    1163-03.
23             MR. WATKINS:  No objection.
24             THE COURT:  All right.
25             (Government Exhibit Nos. 1161-02 and 1163-03 received
```

1       into evidence.)

2               MR. WEINREB:  If we could go back to 1161-02, please.

3       BY MR. WEINREB:

4       Q.    So what is the date and time of the purchase here?

5       A.    The date is March 6, 2013, and the time of the purchase is

6       1522 and 11 seconds, which is 3:22 p.m. and 11 seconds.

7       Q.    And what was purchased?

8       A.    BB ammo.

9       Q.    Do you know, based on the SKU numbers, what size boxes of

03:32 10    BBs these were?

11      A.    They were 6,000 count copper-head BBs.

12      Q.    Two boxes were purchased?

13      A.    Yes.

14      Q.    Paid for in cash?

15      A.    Yes.

16      Q.    So -- and looking at the -- comparing that to the data on

17      the GPS plot, does that correspond to one of the stops made by

18      the GPS device on that date?

19      A.    Can you pull up the work product for the map?

03:33 20    Q.    Yes.  That's 1152-07.

21      A.    Yes, it does.

22      Q.    Okay.  Which one?

23      A.    Number 2, the one you're highlighting.

24      Q.    So that's approximately -- corresponds approximately to

25      that stop?

1    A.    Yes.

2          MR. WEINREB:   And then can we go back to 1161-03,

3    please.

4    Q.    What is this a purchase of?

5    A.    BB ammo.

6    Q.    Same size boxes?

7    A.    Yes.

8    Q.    And the date and time?

9    A.    March 6, 2013, 17:34:06, which is 5:34 p.m. and six

03:33 10   seconds.

11   Q.    And does that correspond to one of the stops that the GPS

12   made on that day?

13   A.    Can you pull the map back up?

14   Q.    Uh-huh.

15   A.    It corresponds to Number 4.

16   Q.    And that's in Hudson, New Hampshire?

17   A.    No.

18   Q.    No?  I highlighted the wrong one.  Here we go.

19   A.    Amherst, New Hampshire.  Yes, it does.

03:34 20   Q.    Did you go to those stores?

21   A.    I did not.

22   Q.    Okay.  Did somebody involved in this investigation?

23   A.    I know that the records were produced from those stores.

24   I'm not sure exactly who took a drive to New Hampshire to go to

25   those stores.

1    Q.   That's fine.  Was it possible to obtain surveillance video

2    of those purchases?

3    A.   No.

4    Q.   So once again, does this data tell you what car the GPS

5    was in at the time that it traveled to the stores?

6    A.   No.

7    Q.   Does it tell you who was driving that car?

8    A.   No.

9    Q.   Does it tell you who might have been a passenger in the

03:34 10   car?

11   A.   No.

12   Q.   Does it tell you who in the car actually purchased the

13   BBs?

14   A.   No.

15   Q.   Or whether it was only one person or more than one person

16   making the purchase?

17   A.   No.

18   Q.   Did the FBI obtain receipts from an online retailer called

19   NitroRCX.com?

03:35 20   A.   Yes.

21   Q.   What does that retailer sell?

22   A.   Radio-controlled cars.

23   Q.   What's a radio-controlled car?

24   A.   It's a car that moves with a remote control.

25   Q.   Okay.  So "radio" doesn't -- it's not the kind of radio

1    you listen to?

2    A.    No.

3    Q.    And the remote control, is that something you hold in your

4    hand?

5    A.    Yes.

6    Q.    And there's something in the car that -- and there are

7    radio waves that go from the transmitter to the receiver?

8    A.    Yes.

9          MR. WEINREB:  Can I have Exhibit 1160, please.  Let's

03:36 10   have 1160-02.

11   Q.    Do you recognize that?

12   A.    I do.

13   Q.    What is it?

14   A.    It's an invoice from NitroRCX.

15         MR. WEINREB:  The government offers 1160-02.

16         MR. WATKINS:  I have no objection.

17         (Government Exhibit No. 1160-02 received into

18   evidence.)

19   BY MR. WEINREB:

03:36 20   Q.    I'm going to highlight parts of this and ask you to read

21   them.  So first of all, what's the date of the purchase?

22   A.    The date is Friday, February 18, 2013, and the time of

23   1920 and 30 seconds.

24   Q.    You said 18th.

25   A.    I'm sorry.  February 8th.

1    Q.   And the ship-to address, can you read that?

2    A.   The ship-to is 410 Norfolk Street, Number 3, Cambridge,

3    Massachusetts 02139.

4    Q.   And who is the person it's being shipped to?

5    A.   Tamerlan Tsarnaev.

6    Q.   And the bill-to address is the same?

7    A.   Correct.

8    Q.   And the email associated with that, is that one you

9    recognize as being an email address associated with Tamerlan

03:37 10   Tsarnaev?

11   A.   Yes.

12   Q.   And it was paid for with a Visa card?

13   A.   Yes.

14        MR. WEINREB:  Can you move back out?

15   Q.   And what exactly was purchased?

16   A.   It was one Exceed Rally Monster RTR, off-road Rally truck

17   in blue, an 8-pack of AA 220 NiMH rechargeable batteries,

18   FS-GT3B digital transmitter-receiver, and an extra FS-GT3

19   channel receiver.

03:38 20        MR. WEINREB:  All right.  Can we move back out?

21   Q.   And is this a comment the person using the website can

22   leave about their purchase?

23   A.   Yes.

24   Q.   And what did the purchaser say?

25   A.   It says, "You have a good website but a lot of your stuff

1    is out of stock.  It's a little bit sad.  Well, I'm just going

2    to enjoy with what you have got, I guess."

3         MR. WEINREB:  Can you go back out.

4    Q.   Did the FBI also obtain receipts from Amazon.com?

5    A.   Yes.

6    Q.   And on April 4th, 2013, did someone using Tamerlan

7    Tsarnaev's Amazon.com account make a purchase?

8    A.   Yes.

9    Q.   What was purchased?

03:39 10    A.   It was one Duratrax electronic speed controller, a Tamiya

11    banana plug, and Tenergy batteries.

12    Q.   Are those all items associated with radio-controlled cars?

13    A.   Yes.

14    Q.   Was a receipt found during the search of the 410 Norfolk

15    Street residence?

16    A.   Yes.

17         MR. WEINREB:  Can I have Exhibit 1431 for the witness,

18    please.

19    Q.   Do you recognize that receipt?

03:39 20    A.   Yes.

21    Q.   Is that the one that was found there?

22    A.   Yes.

23         MR. WEINREB:  The government offers 1431.

24         MR. WATKINS:  No objection but just --

25         (Counsel confer off the record.)

```
 1              MR. WEINREB:  Let's just move on, and I may return to

 2       one question in a bit.

 3              MR. WATKINS:  There will be no objection.

 4              THE COURT:  So it may?

 5              MR. WEINREB:  Yes.

 6              Your Honor, may I have a moment?

 7              (Pause.)

 8              (Government Exhibit No. 1431 received into evidence.)

 9       BY MR. WEINREB:

03:40 10  Q.    I think I misled you before with one of my questions.

11       This particular receipt, was this one found in a Honda CR-V

12       registered to Tamerlan Tsarnaev?

13        A.    Yes.

14        Q.    All right.  My mistake.  I apologize.

15              So I'm going to enlarge this and ask you, first of

16       all, who is the -- what's the store?

17        A.    It's RC Cars of Boston.

18        Q.    Do you know what they sell there?

19        A.    Radio-controlled cars.

03:41 20  Q.    And who is the bill-to name?

21        A.    Tamerlan Tsarnaev.

22        Q.    Based on the item number, do you know what this was for?

23        A.    Yes.

24        Q.    What was it for?

25        A.    A Spectrum transmitter and receiver.
```

1    Q.   And is that another one of these transmitter-receivers

2    that are used in radio-controlled cars?

3    A.   Yes.

4    Q.   Were several receipts found in Tamerlan Tsarnaev's wallet

5    after his arrest?

6    A.   Yes.

7    Q.   This was a wallet found in the back of a car?

8    A.   Yes.

9         MR. WEINREB:  May I have Exhibit 882 for the witness,

03:41 10   please?  Now, I believe this may already be in evidence under

11   another number, but...

12        So I think it will be more convenient if we use the

13   previously marked number.  So let's have it as 948-576.  I

14   don't think that is going to be more convenient, so let's go

15   back to -- this is too blurry to be read.  Okay.  We could do

16   it as this:  948-575.

17   Q.   So this isn't the entire receipt, it's just the top half,

18   but do you recognize it?

19   A.   Yes.

03:43 20   Q.   And is that the receipt that was found in the wallet?

21   A.   Yes.

22   Q.   Or one of the receipts?  Okay.

23        So what does it indicate that -- first of all, where

24   does it indicate that this purchase was made?

25   A.   Watertown.

1    Q.   On what date?

2    A.   April 14th of 2013.

3    Q.   And that was the day before the Boston Marathon?

4    A.   Yes.

5    Q.   What was purchased?

6    A.   Two backpacks.

7    Q.   Based on the numbers, do you know what kinds of backpacks

8    those were?

9    A.   I note two backpacks were purchased, one Ful and one

03:43 10   JanSport.

11   Q.   So Ful is F-U-L?

12   A.   Correct.

13   Q.   Were the remains of a Ful backpack recovered from what was

14   called Scene A on Boylston Street, the site of the Marathon

15   Sports explosion?

16   A.   Yes.

17   Q.   And was a JanSport backpack later recovered from the

18   Laurel Street crime scene?

19   A.   Yes.

03:44 20   Q.   Was there also a receipt in that wallet for a shoulder

21   holster?

22   A.   Yes.

23   Q.   One purchased on April 11, 2013?

24   A.   Yes.

25   Q.   Was Tamerlan Tsarnaev wearing a holster when he was

1    arrested?

2    A.    No.

3            MR. WATKINS:  Your Honor, I'm going to object.  Can we

4    be seen at sidebar?

5            THE COURT:  No, I'll sustain the objection.

6    BY MR. WEINREB:

7    Q.    Do you know if Tamerlan Tsarnaev was wearing a holster?

8            MR. WATKINS:  I'm going to object again.

9            THE COURT:  Sustained.

03:44 10   BY MR. WEINREB:

11   Q.    Was a shoulder holster --

12           MR. WATKINS:  I'm going to object.  If we could be

13   seen at sidebar?

14           THE COURT:  All right.

15           (Discussion at sidebar and out of the hearing of the

16   jury:)

17           MR. WATKINS:  So the actual receipt does not identify

18   the item purchased as being a holster.  We've agreed to a

19   certain amount of hearsay through this witness.  I did not

03:45 20   understand that this receipt was going to be one of the things

21   offered by the government here.  I would object to that part of

22   the hearsay for this particular witness.

23           MR. WEINREB:  Your Honor, it was my understanding that

24   everything coming in through this -- everything coming in

25   through this witness is hearsay, and the parties had an

1    agreement that they were going to allow it.  Frankly, I thought

2    we were putting it in for the benefit of the defense who wanted

3    it in.  This is a somewhat unusual situation.

4            THE COURT:  What's the significance of the holster?

5    This is the first ever I heard about the holster.

6            MR. WEINREB:  I thought the defense wanted it into

7    evidence.

8            THE COURT:  Does it have any other role in the case?

9            MR. WATKINS:  No, it doesn't.  Just to be clear, these

03:46 10   were originally going to go in as defense exhibits, and that's

11   why we're trying to cast it around up here.  If I knew

12   Mr. Weinreb was going to do it, I would have raised it.

13           MR. CHAKRAVARTY:  For the record, the holster was not,

14   in fact, found.  He may have personal knowledge as to that but

15   it's irrelevant.

16           THE COURT:  Okay.  So no holster.

17           MR. WEINREB:  Okay.

18           MR. WATKINS:  I guess I'd like an instruction to the

19   jury they disregard any mention of a holster.

03:46 20        MR. WEINREB:  It's fine by me.

21           THE COURT:  Don't you think of a pink elephant?

22           MR. WEINREB:  I think we can just move on.

23           THE COURT:  It always emphasizes it.  Do you want me

24   to say it or not?  I can say questions that are not --

25           MS. CLARKE:  Disregard the question.

1          THE COURT:  I can say that questions that are not

2    answered produce no evidence.  Is that okay?

3          (In open court:)

4          THE COURT:  All right.  We'll move on.

5          Let me just remind the jurors that questions that are

6    not answered produce no evidence.

7          MR. WEINREB:  Thank you, Agent Fierabend.  I have no

8    further questions at this time.

9                        CROSS-EXAMINATION

03:47 10   BY MR. WATKINS:

11   Q.   Good afternoon, Agent.  You're aware over the course of

12   this investigation there were many searches and many records

13   retrieved from various spots and organizations?

14   A.   Yes.

15   Q.   There were, as we've heard, searches of 410 Norfolk

16   Street.  There were also searches of automobiles outside of 410

17   Norfolk Street?

18   A.   That's correct.

19   Q.   One of those was of a Honda CR-V that was registered to

03:49 20   Tamerlan Tsarnaev?

21   A.   Yes.

22   Q.   And there was a search also of a Honda Odyssey out on the

23   street which was registered to Anzor Tsarnaev?

24   A.   Yes.

25   Q.   And you know from the investigation that an Anzor Tsarnaev

1    is the father of Tamerlan and Jahar Tsarnaev?

2    A.   Yes.

3    Q.   Inside the CR-V the evidence recovery team took certain

4    pieces of evidence, correct?

5    A.   Yes.

6    Q.   We heard about the RC Cars of Boston receipt came from

7    inside Tamerlan's Honda CR-V, right?

8         MR. WEINREB:  I object to -- no, never mind.  I take

9    it back.

03:50 10       THE COURT:  Go ahead.

11   BY MR. WATKINS:

12   Q.   That RC Cars' receipt we saw that Mr. Weinreb pointed out

13   was inside of that Honda CR-V?

14   A.   Yes.

15   Q.   Other item were found inside of the CR-V also, right?  A

16   series of items?

17   A.   Yes.

18   Q.   There were, for example, gloves found, latex gloves found

19   within that Honda CR-V?

03:50 20   A.   Yes, I do believe there were gloves found there.

21        MR. WATKINS:  If I could just have it for the witness,

22   your Honor.

23   Q.   I'm very sorry.  My computer has not yet woken up this

24   morning.  It will get there.

25        And while I'm waiting for it, you know from your work

1    at the FBI and your training and experience that once items are

2    found in the Honda CR-V, or any item, they would be sent to the

3    Quantico laboratory for analysis?

4    A.   Yes, if they're deemed to have items of value on them.

5    Some items are sent to Quantico, yes.

6    Q.   For example, what I'm showing you in this picture here,

7    which has a Q number of 667 -- you know what a Q number is?

8    A.   I do.

9    Q.   And a Q number is what it's assigned once a piece of -- an

03:51 10   item of potential evidence comes into the Quantico laboratory,

11   right?

12   A.   Yes.

13   Q.   And this is the picture in the Quantico laboratory of the

14   gloves that were found in Tamerlan Tsarnaev's CR-V?

15   A.   Yes, I believe so.

16         MR. WATKINS:  May we admit this photograph as

17   Defendant's Exhibit 3099 and publish it to the jury.

18         MR. WEINREB:  No objection.

19         THE COURT:  Okay.

03:52 20        (Defense Exhibit No. 3099 received into evidence.)

21   BY MR. WATKINS:

22   Q.   So again, once the evidence recovery team got this item,

23   they would send it down to Quantico for further analysis,

24   correct?

25   A.   Yes.

1    Q.   And of course you know from -- this investigation involved

2    explosive powders and explosive devices, right?

3    A.   Yes.

4         MR. WATKINS:  Just for the witness again, your Honor.

5    Q.   Showing you Defendant's Exhibit 3100, is that also a latex

6    glove that you know to have been found in the Honda CR-V?

7    A.   Yes, I believe so.

8    Q.   And also going on to Exhibit 3101, is that also a glove

9    found in the Honda Civic that was identified -- I'm

03:53 10    sorry -- the Honda CR-V with -- identified with a Q number of

11   671?

12   A.   Yes, it is.

13        MR. WATKINS:  I'd move items Defendant's Exhibit 3100

14   and 3101 into evidence and ask to publish them to the jury.

15        MR. WEINREB:  No objection.

16        THE COURT:  Okay.

17        (Defense Exhibit Nos. 3100 and 3101 received into

18   evidence.)

19   BY MR. WATKINS:

03:54 20   Q.   So this glove -- again, we see some black discoloration on

21   it.  That would have gone down to the Quantico laboratory for

22   analysis?

23   A.   Yes.

24   Q.   And 3101, the same thing, would have gone down to the

25   Quantico laboratory for any kind of analysis that they wanted

1    to do on that item?

2    A.    Yes.

3    Q.    In addition to actual physical evidence found or tangible

4    things found in the CR-V and the Odyssey that were parked at

5    410 Norfolk, you're aware that the evidence recovery team also

6    took vacuums through those automobiles?

7    A.    I believe they did, yes.

8    Q.    And those are specific tools to gather up particles and

9    dust, whatever might be of evidentiary value, right?

03:55 10   A.    Yes.

11   Q.    And what is produced at the end of that kind of search

12   where they vacuumed to look for specific particles is a trace

13   filter -- what's called a vacuum trace filter?

14   A.    Yes.

15   Q.    And again, you know that ordinarily those items would be

16   sent down to Quantico for analysis by chemists and others

17   there?

18   A.    Yes.

19   Q.    And here those items would be Q669, which was a trace

03:55 20   filter from the Tamerlan Tsarnaev Honda CR-V, and 733, a vacuum

21   filter from Anzor Tsarnaev's Honda Odyssey?

22   A.    Do you have a photo of them?

23   Q.    I do not because they are vacuum filters.  But do you know

24   that vacuum traces were sent to each of those -- trace filters

25   were sent from each of those cars?

1    A.   I believe they were.

2    Q.   Mr. Weinreb put in this receipt from Target from April 14,

3    2013, at 4:06 p.m.  Do you recall that?

4    A.   Yes.

5    Q.   This is Exhibit 948-575.

6         Were you aware that other agents went to the Target in

7    Watertown to try to obtain surveillance video?

8    A.   Yes.

9    Q.   And were they indeed successful in obtaining surveillance

03:57 10   video?

11   A.   Yes.

12   Q.   Did you personally look at that surveillance video or did

13   others?

14   A.   I have seen it in the past, yes.

15   Q.   As part of the -- the surveillance video from Target has

16   many, many cameras.  Is that fair to say?

17   A.   Yes.

18   Q.   And there is an individual walking through the store and

19   purchasing -- first selecting and then purchasing two backpacks

03:57 20   within the store?

21   A.   Yes.

22   Q.   And that is consistent again with this receipt that we

23   have before us of two backpacks?

24   A.   Yes.

25   Q.   And those surveillance video cameras follow him all the

1    way through the checkout process and then back outside of the

2    store, correct?

3    A.   Yes.

4    Q.   As part of what was captured from the Watertown Target,

5    there were pictures of someone leaving through the exit

6    vestibule?

7    A.   Yes.  As part of the video, yes.

8         MR. WATKINS:  Just for the witness, your Honor.

9    Q.   Showing you what is Defendant's Exhibit 3096, is that one

03:58 10   of the still photographs from the video that you saw of the

11   exit vestibule?

12   A.   Yes.

13   Q.   And indeed it says "4/14/2013 at 4:07 p.m., exit

14   vestibule"?

15   A.   Yes.

16   Q.   And again, that's consistent with that receipt that we saw

17   from Target, right?

18   A.   Yes.

19         MR. WATKINS:  I would move for admission of

03:58 20   Defendant's Exhibit 3096.

21         THE COURT:  Any objection?

22         MR. WEINREB:  No, your Honor.

23         (Defense Exhibit No. 3096 received into evidence.)

24   BY MR. WATKINS:

25   Q.   And I'm now showing you Defendant's Exhibit 3097.  This is

1    a close-up photograph from the exit vestibule at the Target on

2    April 14th, the day before the bombing?

3    A.    Yes.

4    Q.    And in those videos that you observed, and also in these

5    photographs, there was just one person in the store; it wasn't

6    with -- one person with this person.  There was not two people

7    buying the backpacks, correct?

8    A.    Correct.

9          MR. WATKINS:  I'd move to admit Defendant's Exhibit

03:59 10   3097.

11         MR. WEINREB:  No objection.

12         THE COURT:  Okay.

13         (Defense Exhibit No. 3097 received into evidence.)

14         MR. WATKINS:  May we publish 3096 first to the jury.

15   BY MR. WATKINS:

16   Q.    And that is the person with a bag walking out of the

17   Target in Watertown the day before the bombing at 4:07 p.m.?

18   A.    Yes.

19   Q.    And do you recognize who that is, having worked on this

04:00 20   case?

21   A.    I do.

22   Q.    And who is it?

23   A.    It's an individual that closely resembles Tamerlan

24   Tsarnaev.

25   Q.    Showing you Defendant's 3097, that's a close-up of a

1   similar picture going through that vestibule.  That's also

2   Tamerlan Tsarnaev?

3   A.   I believe so, yes.

4        MR. WATKINS:  May I have one more item, your Honor,

5   just for the witness.

6   Q.   The agents that went to the Watertown Target also obtained

7   verification from the store side of that receipt that we saw.

8   Is that correct?

9   A.   I'm actually not sure exactly what they did for

10  verification.

11  Q.   But you see what is in front of you which talks about a

12  transaction log, and it has the same items that were in the

13  original receipt that we saw, 948-575?

14  A.   Yes.

15  Q.   In fact, maybe I can put them both up here.  So I'm

16  blowing up a portion of 948-575.  I'm going to try to blow up

17  this portion of the receipt.

18        These are substantially identical as far as the amount

19  of money paid and the SKU numbers?

20  A.   Yes.

21        MR. WATKINS:  That's all I have, your Honor.  Thank

22  you.

23                    REDIRECT EXAMINATION

24  BY MR. WEINREB:

25  Q.   So, Agent, you were asked about three cars.  One is

```
 1    a -- was a Honda Civic registered to Anzor Tsarnaev.  That's
 2    where the wallet was found?
 3    A.   I don't know who the Civic is registered to, but I believe
 4    the Civic is where the wallet was found, yes.
 5    Q.   And then there's a Honda Odyssey registered to Anzor
 6    Tsarnaev?
 7    A.   Correct.
 8    Q.   And there's a Honda CR-V registered to Tamerlan Tsarnaev?
 9    A.   Yes.
10    Q.   And the exhibits and data you've looked at today in court,
11    that doesn't tell you who was driving the car at any particular
12    time, does it?
13    A.   No.
14    Q.   Or who put items in the car at any particular time?
15    A.   No.
16    Q.   Or whether the car was used more by one person or more by
17    another person?
18    A.   No.
19    Q.   Or what dates and times it might have been used by
20    particular people?
21    A.   No.
22              MR. WEINREB:  Your Honor, may we approach the bench on
23    just one last thing?
24              THE COURT:  All right.
25              (Discussion at sidebar and out of the hearing of the
```

1    jury:)

2           MR. WEINREB:  I have to confess that the conversation

3    we had earlier about the holster was unique in my experience in

4    litigation, so it's left me a little confused about what's in

5    and what's out.  My understanding was that the defense was

6    saying that the holster is entirely out of the case, and I just

7    want to make sure.

8           THE COURT:  That's what I thought.

9           MR. WATKINS:  Yes.

04:04 10           MR. WEINREB:  I want to make sure that's the case.

11           THE COURT:  It's not going to come back later, in

12    other words?

13           MR. WEINREB:  That the defense wants to get the

14    receipt for the holster in but block the government from asking

15    whether it was recovered or anything like that.

16           MR. WATKINS:  The receipt itself is in, right?

17           THE COURT:  No, I don't think so.  I think -- I'd have

18    to go back and look.

19           MR. WEINREB:  Well, the entire contents of the wallet

04:04 20    came in.

21           MR. WATKINS:  Perhaps -- it is one o'clock right now.

22    Perhaps we could think about it a little bit and think of a way

23    out of it.

24           MR. WEINREB:  Well, I mean, I think if the defense

25    wants to make an issue that the receipt for a holster was found

1    in Tamerlan's wallet, I think it's only fair for the government

2    to be able to ask questions whether a holster was found on

3    Tamerlan or anywhere else.  If the holster is completely out of

4    the case, we don't have any objection to that, but otherwise,

5    it's speculative.

6              THE COURT:  Why don't you talk about it and see what

7    the issue is after that, and we can discuss it after that.

8              Other than that, you're finished with the witness?

9              MR. WEINREB:  I am.

04:05 10              THE COURT:  Yeah.  Okay.

11              (In open court:)

12              MR. WEINREB:  Your Honor, the government has no

13    further questions for Agent Fierabend at this time.

14              THE COURT:  Okay.  Agent, you may step down.

15              (The witness is excused.)

16              THE COURT:  And, ladies and gentlemen, we'll take the

17    luncheon recess.

18              THE CLERK:  All rise for the Court and the jury.  The

19    Court will take the lunch recess.

04:06 20              (The Court and jury exit the courtroom and there is a

21    luncheon recess at 12:59 p.m.)

22              THE CLERK:  All rise for the Court and the jury.

23              (The Court and jury enter the courtroom at 2:15 p.m.)

24              THE CLERK:  Be seated.

25              MR. MELLIN:  The United States calls Agent Kenneth

1    Benton.

2                        KENNETH BENTON, duly sworn

3              THE CLERK:  State your name, spell your last name for

4    the record, keep your voice up and speak into the mic so

5    everyone can hear you.

6              THE WITNESS:  Kenneth Benton, B-E-N-T-O-N.

7                        DIRECT EXAMINATION

8    BY MR. MELLIN:

9    Q.    Sir, where are you employed?

05:23 10  A.    Special agent with the FBI.

11   Q.    How long have you been with the FBI?

12   A.    Twenty-seven years.

13   Q.    And where have you been assigned?

14   A.    I've been assigned to the Boston office, and now currently

15   the Lakeville Resident Agency.

16   Q.    What is the -- what is a resident agency?

17   A.    It's a satellite office.

18   Q.    When did you go to Lakeville?

19   A.    Approximately ten years ago.

05:23 20  Q.    At some point did you become involved in the investigation

21   of the Boston Marathon bombing?

22   A.    Yes.

23   Q.    Okay.  And based on information that you received from an

24   associate of the defendant, did you proceed to the Crapo

25   Landfill to attempt to recover a backpack associated with the

1    defendant that had been thrown into the trash from 69A Carriage

2    Drive in New Bedford, Mass.?

3    A.    Yes.

4    Q.    Did you receive information that the trash had been

5    collected from 69A Carriage Drive in a Dumpster, and that

6    Dumpster had been dumped at Crapo Landfill?

7    A.    Yes, we received that information.

8    Q.    And that had been dumped on April 19th of 2013 at

9    approximately 1:45 p.m.?

05:24 10    A.    That's correct.

11    Q.    Okay.  Based on that information, what did you do?

12    A.    I was given the task of putting together a team to go out

13    and search the landfill for that particular backpack, which I

14    did.  I got together a group of agents, as well as I got with

15    our hazardous response team, got the specialized equipment that

16    we need.  We put it all together and went out and did the

17    search.

18    Q.    Did you also talk to the owners or the operators of the

19    Crapo Landfill to talk about where that Dumpster would have

05:25 20    been dumped at the landfill?

21    A.    Yes.  On the evening of the 21st, which would have been

22    Sunday evening, myself and another agent went out to the

23    landfill and spoke with the superintendent of the landfill,

24    Scott Alphonse.  He showed us the approximate location of where

25    that particular Dumpster would have been dumped, the trash, and

1    from there we cordoned off that particular area.

2    Q.   And when you say cordoned it off, what did you do?

3    A.   The following -- we went out to the landfill Sunday night,

4    so the following Monday morning I went out there and staked off

5    an area approximately 60 feet by 60 feet and put yellow caution

6    tape around it to designate the area we would be searching.

7    Q.   And other than that Dumpster having been dumped in that

8    area, was anything dumped on top of that?

9    A.   Yes.  On Friday afternoon after the Dumpster that we were

05:26 10   interested in had disposed of its trash, approximately ten

11   other trucks came in and dumped trash.  So what happens, at the

12   end of the day on Friday the landfill would have covered that

13   trash with two or three inches of mulch, dirt and sand to cover

14   it up.  They can't leave the trash exposed.  The following

15   Saturday, approximately 15 other trucks of trash came in, and

16   after Saturday they again covered that up with a layer of mulch

17   and rock.

18   Q.   And then Sunday is when you began to cordon that off

19   and -- Monday is actually when you cordoned it off?

05:26 20   A.   Monday morning, yes, that's when I staked off the

21   particular area we were interested in.  They only work in a

22   small area, about 75 feet by 75 feet at any one time, so we had

23   it honed down pretty good to a particular area.

24        MR. MELLIN:  If I could have the witness look at

25   Exhibit 1256-11.

1    Q.   Agent Benton, do you recognize what is shown in that

2    photograph?

3    A.   That's the entrance to the landfill.  You'd be coming down

4    this road, and in the center of that particular photograph is

5    the -- was the active area of the landfill.

6              MR. MELLIN:  Your Honor, I would move into evidence

7    Exhibit 1256-11 and ask to publish.

8              MS. CONRAD:  No objection.

9              THE COURT:  Okay.

05:27 10              (Government Exhibit No. 1256-11 received into

11    evidence.)

12    BY MR. MELLIN:

13    Q.   Agent Benton, as you look at 1256-11, it's a pretty

14    exciting photograph, can you show us exactly where you were

15    talking about where you saw the -- where the active area of the

16    landfill was?

17    A.   At that particular time it would have been right in the

18    center of the photograph.

19    Q.   Can you actually touch that screen and kind of circle the

05:27 20    area you're talking about?

21    A.   It would be right around there (indicating).

22    Q.   And for the record, you're exactly in the center of that

23    photograph?  Okay.

24              On Monday when you went and you cordoned off an area,

25    what happened?

1    A.   Monday morning, again, I met with the superintendent of
2    the landfill, cordoned it off, staked it off, again put up the
3    yellow tape.  I then contacted the chief of police of Dartmouth
4    and asked that he assign a police officer to the landfill to
5    keep watch on that particular area so no one disturbs it, goes
6    into it.  I also got with --
7    Q.   You might want to push that a little farther away.
8    A.   I also got with the superintendent and asked him to
9    process the incoming trash at another location so they don't
05:28 10   dump near that particular area.
11   Q.   At some point did you start the search of that area?
12   A.   Thursday, the 25th.
13   Q.   Okay.  What happened between Monday or Tuesday and
14   Thursday?
15   A.   I had to get together the search team, I had to coordinate
16   with our hazardous response team to get the proper equipment
17   out there since it was a hazardous area.  And then if my memory
18   serves me correctly, we had some bad weather on Tuesday and
19   Wednesday, rain, which prevented us from going out there.
05:29 20   Q.   On Thursday, were you able to locate an item of interest?
21   A.   On Thursday, no.
22   Q.   Okay.  And what day did you find it?
23   A.   On Friday, the 26th.
24   Q.   Okay.  So on Thursday, what did you do?
25   A.   On Thursday we spent the day searching from about 8 a.m.

1    until about 5 p.m.  We set up our equipment and did trash

2    recovery for that day.  Again, after we were done, we tarped

3    off the trash that we had exposed, we stationed a police

4    officer at that site for the time that the landfill was active

5    till about 11 p.m., and then we came back Friday morning to

6    continue to search.

7    Q.   And on Friday what did you find?

8    A.    Friday afternoon, probably around 2 p.m., we had just laid

9    out a couple of lines of trash which we were raking through.

05:29 10   As we started that search, I came across what I -- a backpack

11   of interest which I then pulled aside.

12   Q.   And when you pulled it aside, what did you do with it?

13   A.    I pulled it aside.  It matched the description that we

14   were interested in.  I pulled it out, turned it over, found

15   that it was a JanSport backpack.  I then opened up the top

16   compartment.  The zipper on the top compartment was open three

17   our four inches already, so I opened it up a little bit more --

18   Q.    If I can, Agent, just when you opened it, were you able to

19   see into the backpack?

05:30 20   A.   Yes.

21   Q.   Okay.  And in the backpack were you able to find a thumb

22   drive?

23   A.    At that time I did not see a thumb drive, no.

24   Q.   Later on was a thumb drive found in that backpack?

25   A.   Yes.

1    Q.   Was there also paperwork concerning the University of

2    Massachusetts Dartmouth that was -- belonged to the defendant

3    in that backpack?

4    A.   Yes.

5    Q.   And in addition, was there also fireworks found in that

6    backpack?

7    A.   Yes.

8    Q.   If I could have you look at Exhibit 1257, which is in

9    front of you.  Do you recognize Exhibit 1257?

05:31 10   A.   This is the backpack that I located at the landfill.

11         MR. MELLIN:  Your Honor, I would move into evidence

12   Exhibit 1257.

13         THE COURT:  Okay.

14         (Government Exhibit No. 1257 received into evidence.)

15   BY MR. MELLIN:

16   Q.   And if I could then have you look at Exhibit 1258.

17   A.   Okay.

18   Q.   What is that?

19   A.   A thumb drive.

05:31 20   Q.   Was that the thumb drive that was found in that backpack?

21   A.   Yes.

22         MR. MELLIN:  Move into evidence Exhibit 1258.

23         THE COURT:  All right.

24         (Government Exhibit No. 1258 received into evidence.)

25   BY MR. MELLIN:

1   Q.   And then 1259.  Do you recognize that?

2   A.   Yes.

3   Q.   And what is 1259?

4   A.   These are the various fireworks that we found in the

5   backpack.

6   Q.   Do you know, those fireworks, were they in the same

7   condition today as they were at the time they were in that

8   backpack?

9        MS. CONRAD:  Well, objection to the form.

05:32 10        MR. MELLIN:  I'll rephrase it.

11   BY MR. MELLIN:

12   Q.   Do you know if those fireworks were sent down to the lab

13   at some point?

14   A.   Yes.

15   Q.   Okay.  There's a Q number on those?

16   A.   That's correct.

17   Q.   Okay.  Thank you.

18        MR. MELLIN:  If I didn't already move those in,

19   your Honor, I would move in 1259, the fireworks?

05:32 20        THE COURT:  All right.

21        (Government Exhibit No. 1259 received into evidence.)

22   BY MR. MELLIN:

23   Q.   Now, concerning the fireworks specifically, when you found

24   the backpack, approximately how far was the backpack open?

25   A.   When I initially found the backpack, there -- let me back

1    up.  There's three compartments in that backpack.  The main

2    compartment, the zipper was open two or three inches.  When I

3    pulled it aside, I saw that.  I opened it up a little bit more

4    so I could peer in.  I didn't want to disturb it too much.  And

5    initially when I opened it up another six or seven inches, I

6    saw this white piece of paper which I pulled out.

7    Q.   And that's the piece of paper that deals with UMass and

8    the defendant?

9    A.   That's correct.

05:33 10   Q.   Okay.  And then what else did you do?

11   A.   After I pulled that white piece of paper out, what I saw

12   in there was a crushed yellow and blue cardboard canister.  And

13   at that time I could see there appeared to be like a fireworks

14   pattern on it.  And at that time I believed I had found what we

15   were looking for, that particular backpack.

16        That's when I stopped my search of the backpack,

17   closed it up, and I called in our bomb tech from the

18   Massachusetts State Police to help us secure the backpack.

19   Q.   And then after the backpack was secured, was it actually

05:33 20   processed by Agent Fife?

21   A.   Yes.  I handed that backpack off to her at which time she

22   catalogued the inventory in the backpack.

23   Q.   If I could have you look at a few photographs.  Exhibit

24   1256-01.  Let me have you look at just six in a row, if you can

25   just tell me if they're fair and accurate photographs:

1    1256-01, if I can go to 1256-02, 1256-04, -06, -07, and -09.

2          And, Agent Benton, were those photographs that you

3    just saw, 1256-01 -02, -04, -06, -07 and -09, were they fair

4    and accurate photographs of what you found in that backpack?

5    A.    Yes.

6    Q.    Thank you.

7          MR. MELLIN:  Your Honor, I would move into evidence

8    Exhibit 1256-01, -02, -04, -06, -07, -09 and ask to publish

9    them.

05:34 10          THE COURT:  Okay.

11          (Exhibit Nos. 1256-01, 1256-02, 1256-04, 1256-06,

12    1256-07 and 1256-09 received into evidence.)

13          MR. MELLIN:  If we could first pull up 1256-01.

14    BY MR. MELLIN:

15    Q.    Agent, do you see that?

16    A.    Yes.

17    Q.    And what is that a picture of?

18    A.    The backpack that I located in the landfill.

19    Q.    Okay.  1256-02.  What is that?

05:35 20    A.    That's a black plastic garbage bag with a red tie on it.

21    Q.    Do you know what the connection was to this?

22    A.    When we got information that we were in search of the

23    backpack, we were told that the backpack was put into a black

24    trash bag with a red tie on it.

25    Q.    1256-04.  What is shown in 1256-04?

```
 1    A.    That's a photograph of the fireworks that were found in
 2    the backpack.
 3    Q.    1256-06.  What is this?
 4    A.    Another photograph of the fireworks we found in the
 5    backpack.
 6    Q.    Is this more of a close-up?
 7    A.    Yes.
 8    Q.    Okay.  1256-07.  What is -07?
 9    A.    That's a photograph of the fireworks canister that I
10    initially saw when I opened up the backpack.
11    Q.    When we look at this, we see there's a "G," a space and
12    "snow."  Do you know what the first word is?  Do you recall?
13    A.    I don't recall.
14    Q.    Okay.  And then 1256-09.  What is that?
15    A.    That's a thumb drive that was found in the backpack.
16    Q.    Okay.  And that's the same thumb drive that was in the bag
17    and marked as 1258?
18    A.    Yes.
19            (Counsel confer off the record.)
20            MR. MELLIN:  If I could actually go back to 1256-06, I
21    think.  Do you know what, Mr. Bruemmer.  Maybe it's -04.
22    1256-04.
23    Q.    Agent, as you look at this photograph, is this the
24    condition those fireworks were in when they were in that
25    backpack?
```

1       MS. CONRAD:  Objection in that form.

2    Q.   At the time they were recovered?

3    A.   Yes.

4    Q.   Is that how it appeared when you looked in the backpack or

5    when they were recovered from that backpack?

6    A.   When I first looked in the backpack, I could not see all

7    the fireworks.  I just saw that blue canister, the one on the

8    right.  When the backpack was inventoried, it was laid out like

9    that, that's when I saw all the fireworks that came out of the

05:37 10   backpack.

11   Q.   Thank you.

12       MR. MELLIN:  Thank you, your Honor.

13                    CROSS-EXAMINATION

14   BY MS. CONRAD:

15   Q.   Good afternoon, Agent Benton.  My name is Miriam Conrad.

16   I'm one of Mr. Tsarnaev's lawyers.

17   A.   Good afternoon.

18   Q.   Mr. Mellin asked you some questions about information you

19   received.  The information that you got that led you to that

05:37 20   landfill, was that a friend of Mr. Tsarnaev's had gone to his

21   room, his dorm room, and removed that backpack?  That is, a

22   friend removed the backpack, correct?

23   A.   At that time I did not know that.

24   Q.   Did you come to learn that?

25   A.   Excuse me?

1    Q.    Did you come to learn that?

2    A.    Yes, I did.

3    Q.    And that friend is the one who placed that backpack in a

4    black plastic bag and then into a Dumpster, right?

5    A.    Correct.

6    Q.    And the Dumpster is actually a compactor in the vicinity

7    of 63A Carriage Drive in New Bedford.  Is that correct?

8    A.    That's correct.

9    Q.    And so the backpack was placed in that Dumpster -- or

05:38 10   compactor, rather -- on April 19th, a Friday, correct?  That

11   was your information?

12   A.    It was either Thursday night or Friday.

13   Q.    Okay.  And it was compacted before it was picked up for

14   delivery to the landfill, correct?

15   A.    That I don't know.

16   Q.    You didn't receive information to that effect from the

17   garbage service that picked it up?

18   A.    I don't recall that.

19   Q.    And then you told us that on Saturday, the 20th, more

05:39 20   trash would have been dumped on top of what was delivered on

21   Friday, right?

22   A.    Correct.

23   Q.    And each time trash is dumped at the landfill, it's

24   compacted, right?

25   A.    Yes.

1    Q.    And so -- and then each day whatever's been dumped is

2    covered with dirt and mulch and rocks, right?

3    A.    Yes.

4    Q.    And it's compacted each day that there are trash

5    deliveries, correct?

6    A.    Yes.

7    Q.    And so this would have occurred several times between the

8    time the trash was dumped on the 19th and the time that you

9    cordoned off that section on Monday, April 22nd, right?

05:40 10    A.    Yes.

11    Q.    And you said that it rained on April 23rd and April 24th?

12    A.    Yes.

13    Q.    And then before the search was commenced, a bulldozer

14    skimmed trash off the top of that area?

15    A.    Yes, it did.

16    Q.    And an excavator pushed it aside to put it into rows for

17    you to search?

18    A.    Yes.

19    Q.    And so you did not observe the condition of the contents

05:40 20    of that backpack before it was placed in the Dumpster, did you?

21    A.    No.

22         MS. CONRAD:  I have nothing further.

23                    REDIRECT EXAMINATION

24    BY MR. MELLIN:

25    Q.    Ms. Conrad just asked you some questions about the

1    information you had about why or how that backpack ended up at

2    the Dumpster.  Did you have information that a friend of the

3    defendant had collected the belongings of the defendant to put

4    in that backpack?

5    A.    I heard that later.

6    Q.    Okay.  And was that friend named Dias?

7    A.    Yes.

8              MR. MELLIN:  Thank you.

9              THE COURT:  All right, Agent.  Thank you.  You may

05:41 10    step down.

11             THE WITNESS:  Thank you.

12             (The witness is excused.)

13             MR. CHAKRAVARTY:  The government will call Olga

14    LaFond.

15             MR. FICK:  Can we actually approach briefly?

16             THE COURT:  Okay.

17             (Discussion at sidebar and out of the hearing of the

18    jury:)

19             MR. FICK:  My understanding is this witness is an

05:42 20    interpreter or linguist, and all of the exhibits about which

21    she is going to testify and the translations are already in

22    evidence, so I'm not sure what the point of the testimony is if

23    these translations are already admitted.

24             MR. CHAKRAVARTY:  I think there are a couple that

25    aren't in, but mostly she's going to say that she has fairly

1    and accurately translated them.

2              THE COURT:  All right.  What are they?

3              MR. CHAKRAVARTY:  The items from the computer.  There

4    were some Russian documents that we introduced.

5              THE COURT:  The VAIO?  The Sony VAIO?

6              MR. CHAKRAVARTY:  They're actually from the HP, and

7    then I have some from one of the thumb drives as well.

8    Mr. Fick had raised an objection during the admission of all of

9    that that all of the work was not done by the agent, and the

05:43 10   agent made clear that aside from the translations, that he had

11   verified everything else, so we felt it incumbent upon us just

12   to make sure the record is clear that the person who then

13   verified the translations has also testified --

14             MR. FICK:  The only objection to the translations, Mr.

15   Chakravarty, was because we had gotten them the night before.

16   Having now looked at them, they're more or less fine and

17   they're already in evidence, so I don't see the purpose of the

18   testimony other than just repeating what's already been

19   displayed to the jury.

05:43 20             MR. CHAKRAVARTY:  I'm not going to publish it to the

21   jury.

22             THE COURT:  It won't take long.  You might as well.

23             (In open court:)

24                       OLGA LAFOND, duly sworn

25             THE CLERK:  Have a seat.  State your name and spell

1   your last name for the record, keep your voice up and speak

2   into the mic so everyone can hear you.

3           THE WITNESS:  My name is Olga LaFond, L-A-F-O-N-D.

4                       DIRECT EXAMINATION

5   BY MR. CHAKRAVARTY:

6   Q.   Good afternoon.

7   A.   Good afternoon.

8   Q.   Are you a linguist with the Federal Bureau of

9   Investigation?

05:44 10   A.   That's correct.

11   Q.   And are you particularly a language specialist?

12   A.   Yes, I am.

13   Q.   What does that mean?

14   A.   That means that I translate whatever materials come to my

15   desk; all kinds of written, audio materials, printed matter.

16   Whatever needs to be translated from English into Russian or

17   from Russian into English, I do that.  Not only I, we have

18   quite a few Russian linguists too.

19   Q.   And are you a certified Russian linguist by the FBI?

05:45 20   A.   Yes, I am.

21   Q.   And is there a training protocol that is required before

22   you can be certified?

23   A.   There's not a training protocol.

24   Q.   I'm sorry.  Competency testing?

25   A.   Yes.

1    Q.   Can you just briefly explain what that is?

2    A.   When a candidate applies to work at the FBI as a linguist,

3    there is a battery of tests that this person has to take,

4    written tests and speaking proficiency tests.  So if you pass

5    the written tests, Russian into English, then the next phase is

6    the speaking proficiency test.  And if you pass that, then

7    after the polygraph and background investigation and all of

8    that, then you get hired.

9    Q.   And did you pass those tests?

05:45 10    A.   Yes, I did.

11    Q.   And is there different rankings that you receive when you

12    take those tests?

13    A.   Yes.

14    Q.   And how did you do on that test?

15    A.   I did the highest score.  The highest score is three out

16    of three, and I tested the three.

17    Q.   And are you a native Russian speaker?

18    A.   Yes, I am.

19    Q.   And are you fluent in English as well?

05:46 20    A.   I think I am.

21         (Laughter.)

22    Q.   Now, for purposes of this trial, did you review various

23    Russian documents that were ultimately to become exhibits in

24    this case for the jury?

25    A.   Yes.

1    Q.   And did you review them to determine whether they were

2    fair and accurate translations of Russian language into

3    English?

4    A.   Yes.

5    Q.   And when you translate from Russian into English, can you

6    explain whether you're translating literally or for the meaning

7    of the phrase or the words?

8    A.   The first no-no of a translation is a literal translation

9    because it does not convey the meaning.  We translate not

05:46 10   word-for-word but meaning-for-meaning, because in different

11   languages the same ideas are expressed through different means,

12   so -- or through different words, different phrases.

13        So that's what we do.  We translate

14   meaning-for-meaning, and we try to preserve, of course, the

15   accuracy of the original text, the source document, as we call

16   it, and we try to make the end product, the target language

17   translation, sound as natural, in my case, in English, as we

18   can.

19        But since the bureau does not do literal -- literary

05:47 20   translations, we do government stuff, then sometimes we go more

21   with awkward wording if it preserves the accuracy more than

22   make our end product look pretty.  So we'll go more with

23   accuracy than with the pretty stuff.

24   Q.   And does sometimes the context of a translation change

25   based on other information that you have, either from the type

1   of communication that exists or if you have a writing that is

2   either self-contained or a portion of a writing?

3   A.   That's why it's a good idea when you get a document to

4   translate, to read through the document and understand what it

5   means, because if you start translating right away, then you

6   may see, may not -- but may see something, Oh, this is not

7   about that.  This is a completely different thing.  So that

8   will give you a much better idea if you start with reading

9   through the document and understanding what the document is

05:48 10   about, verifying the terminology, making sure that you

11   understand what it is about and that you're not making any

12   mistakes, and then you start translating it.

13   Q.   Is the Russian language written in the Cyrillic alphabet?

14   A.   Yes.

15   Q.   And that is not the same alphabet that is used by English

16   speakers.  Is that fair to say?

17   A.   That is correct.

18   Q.   Is there also a transliteration of that kind of Russian

19   language into -- can Russian language be transliterated into

05:49 20   English characters?

21   A.   Well, you can do that but it will be gibberish.  To an

22   English speaker, it will be gibberish.  If a Russian speaker

23   looks at a word that is written in English letters, and if

24   it's -- if the Russian speaker recognizes it as a Russian word,

25   then, yes, it is understandable.

1   Q.   Okay.  So as an example, there's a word called "horosho"

2   in Russian.  What does that mean?

3   A.   It means good.

4   Q.   And I'm sure there's a Cyrillic way to write horosho?

5   A.   Yes.

6   Q.   You could also write "horosho" also H-O-R-O-S-H-O?

7   A.   In English, yes.

8   Q.   So a Russian speaker could understand something that's

9   communicated in English?

05:50 10  A.   Yes.  There's actually -- at the early stages of Internet

11  and emailing, when we didn't have the Russian capability, we

12  would write to our friends an email in English letters, Russian

13  in English letters.  And then, of course, with the development

14  of technology, with the possibility of downloading Russian

15  fonts, then we switched to Russian.  But before that, we did

16  that in English letters.  It looks funny.

17  Q.   So for purposes of your testimony today, did you review a

18  number of computer files with me and confirm that those were

19  fair and accurate translations of the Russian --

05:51 20  A.   Yes.

21  Q.   Okay.  And I'm just going to read off a list of exhibit

22  numbers and ask if you can verify that those are the exhibits

23  that -- and these are the exhibits that we looked at last

24  night:  1282, 1321, 1408, 1409, 1143-09, 1143-10A, -13A, -15A,

25  -37A, -38A, -39A, -40A, -41A, -66A, -72A, -73A, -74A, -80A,

```
 1   1150-01B, 1150-3, and 1150-7A.
 2          Were those all Russian language -- they
 3   had -- documents that contained Russian language that you
 4   verified the translations for?
 5   A.   I think they are.  I remember all of the 1143s and 1150s.
 6   And I don't quite remember the 12 whatever.  But I --
 7   Q.   Fair enough.  I'll call them up on the screen just for
 8   your convenience.
 9          MR. CHAKRAVARTY:  Just for the witness, your Honor.
05:52 10  1282, please.
11   Q.   Do you recall that one?
12   A.   Yes.  I remember that one, yes.
13   Q.   1321, page 2?
14   A.   Yes.
15   Q.   1408?
16   A.   Yes.
17   Q.   And 1409?
18   A.   Yes, I remember them.
19          MR. CHAKRAVARTY:  Your Honor, I believe the 1143
05:53 20  series and the 1150 series are already in evidence.  I would
21   move into evidence 1321, 1408 and 1409.
22          MR. FICK:  No objection.
23          THE COURT:  Okay.
24          (Government Exhibit Nos. 1321, 1408 and 1409 received
25   into evidence.)
```

1          MR. CHAKRAVARTY:  If we could go to 1408, please.

2          If we could publish this, your Honor.

3     BY MR. CHAKRAVARTY:

4     Q.   Ms. LaFond, is this a document that was pulled from the

5     Sony VAIO laptop, Exhibit 1142?

6     A.   I do not remember from where it was pulled from.  I do

7     know this document.  I've seen it and I've reviewed it.

8     Q.   Okay.

9          MR. CHAKRAVARTY:  If we could, Mr. Bruemmer, just go

05:53 10    quickly to the computer evidence, 1142.

11    Q.   I'm calling up 1142-148.  Does this appear to be a

12    Russian-language document?

13    A.   Yes.

14    Q.   And did you translate portions of this in verbatim?

15    A.   I did not translate any of the documents almost.  I think

16    I translated one.  I reviewed them all for court.  We have a

17    special procedure when the documents go to court.  We have a

18    second, and sometimes a third pair of eyes to take a look so

19    that everything's correct and accurate.

05:54 20    Q.   Thank you for clarifying.  So you didn't translate these

21    originally, but then you verified the accuracy of the

22    translations?

23    A.   Yes.  I got all the translations from my supervisor and I

24    reviewed them for accuracy.

25    Q.   So for this document, 1148, below does it -- down here

1    does it describe what that document is?  Or sorry.  Are these

2    the literal translations of the words that appear on the

3    screen?  I shouldn't have said "literal."  Are these the

4    verbatim translations?

5    A.    Yes.

6    Q.    And is this a Ukrainian website which is -- reading

7    Section D -- the title is "Shooting the Handgun.  Techniques

8    and Routines, Method of the Death to the Spies Directorate"?

9    A.    Yes.

05:55 10   Q.    And it appears to be a Ukrainian document?

11   A.    It's not a Ukrainian document.

12   Q.    Okay.  The website is --

13   A.    The website is Ukrainian but there is a wealth of Russian

14   language stuff on the Ukrainian website.

15   Q.    Okay.  But it's in the Russian language?

16   A.    This one was in the Russian language originally.

17         MR. CHAKRAVARTY:  Page 2, please.

18   Q.    And this is the title page, and it lists that it was

19   published, Trading House in Moscow in 2001, it looks like?

05:55 20   A.    Correct.

21         MR. CHAKRAVARTY:  Next page, please.

22   Q.    And this is just kind of a summary of the document?

23   A.    Yes, that's true.

24   Q.    And does it read "The Practical Study Guide on the

25   Shooting of Combat Handguns in Various Conditions"?

1    A.    Yes, it does say that.

2    Q.    And then it goes on to talk about the Soviet military?

3    A.    Yes.

4          MR. CHAKRAVARTY:  Can we go to 1409, please.

5    Q.    Now, various computer files, did they have Cyrillic titles

6    to the computer files?

7    A.    Yes.

8    Q.    And is this document a translation of some of those

9    titles?

05:56 10  A.    The file names, yes.

11         MR. CHAKRAVARTY:  Can we go to page 2 and page 3.

12   A.    Yeah, that's a continuation of the list.

13         MR. CHAKRAVARTY:  Okay.  Just go back to page 1.

14   Q.    Now, just to orient the jury on how this works, the

15   original title is in -- so using Item 1, for example, the

16   original title is in Cyrillic.  Does it appear to have some

17   Cyrillic characters there?

18   A.    Yes.

19   Q.    And then right underneath that for Item 1 is the

05:57 20  translation?

21   A.    The translation, yes, of the first line.

22   Q.    So the first example, the translation of the file name is

23   "Why Do We Hate Them"?

24   A.    That is correct; yes.

25         MR. CHAKRAVARTY:  That's all I have, your Honor.

```
 1                        CROSS-EXAMINATION

 2    BY MR. FICK:

 3    Q.   Good afternoon, Ms. LaFond.

 4    A.   Good afternoon.

 5    Q.   My name is Bill Fick.  I'm one of Mr. Tsarnaev's lawyers.

 6    I'm going to put up on the screen one of the exhibits that was

 7    just entered into evidence.  It's Exhibit 1321, I believe.  If

 8    I could get my computer to cooperate.  And this exhibit, which

 9    I believe Mr. Chakravarty showed you, is a Microsoft Word file

05:58 10   that contains certain translations of Mr. Tsarnaev's tweets.

11    Is that correct?

12    A.   I don't have it.

13    Q.   Oh, I'm sorry.

14         MR. FICK:  Your Honor, could I have the --

15         THE COURT:  I wanted to make sure it is in evidence.

16    I didn't see it on my list of numbers.

17         MR. FICK:  I believe it's one of the numbers

18    Mr. Chakravarty just admitted, if I'm not mistaken.  1321.

19         THE COURT:  Maybe I missed it.

05:59 20   BY MR. FICK:

21    Q.   1321, this is a cover page of that exhibit with your name

22    on it, right?

23    A.   Right.

24    Q.   And this is an exhibit that contains the translations of a

25    number of different tweets from Mr. Tsarnaev.  Do you remember
```

1    that?

2    A.   Right.

3    Q.   And just to talk about a few of these things here, this

4    one here -- and I can show you the Russian from his tweets if

5    you'd like, this is actually a quote from a famous poem by the

6    Russian poet Sergey Esenin, correct?

7    A.   I don't know.

8    Q.   Let me show you the Russian original and see if that

9    refreshes your memory.

05:59 10   A.   I remember the Russian original.  Yeah, I tried to even

11   introduce some rhyme to it so it would look like a poem.

12   Q.   So one moment.  I'll pull up the actual tweet and see if

13   the particular language of the tweet refreshes your memory or

14   rings a bell with you.  I believe the date was October 30th of

15   2012, if I might.  This is Exhibit 3000 in evidence, the

16   defense exhibit of all of the tweets.  I believe -- I'll just

17   scroll to October 30th of 2012.

18                    (Pause.)

19           Okay.  Here we go.  This text here is the text that

06:01 20   you translated, right?  (Speaking in Russian).

21                    THE REPORTER:  I'm sorry.  I can't write in

22   Russian.

23                    MR. FICK:  I apologize.  The interpreter can

24   interpret it.  I apologize.

25   BY MR. FICK:

1    Q.   The circled text here, that is the text that we looked at

2    there just a minute ago that you had translated, correct?

3    A.   Yes.

4    Q.   And now looking at the Russian, do you recognize that as

5    being a line from a poem by Sergey Esenin?

6    A.   No.

7    Q.   Did you -- at the time you did the translation, did you do

8    any research to see if you could find where that phrase in

9    Russian came from?

06:01 10   A.   No, I didn't.

11   Q.   Is Sergey Esenin someone you're generally familiar with?

12   A.   Of course.

13   Q.   I'm sorry?

14   A.   Yes, of course.

15   Q.   There was another tweet on, I believe, the 21st of April

16   2012 that I'll go to here.

17        MR. CHAKRAVARTY:  Objection, your Honor.  She's

18   already translated these.  She has the translation.  The

19   language of the court is English.  They can read the English

06:02 20   translation to make any point they want to make.

21        THE COURT:  No, go ahead.  I don't know how much we'll

22   have of it, but go ahead.

23   BY MR. FICK:

24   Q.   Oh, actually, yes, I can actually pull up the individual

25   tweet and that will make it easier.  I believe it's Exhibit

1    1282, which was one of the ones you just talked about.  Bear

2    with me for one moment while I pull it up.  It would help if I

3    had the device attached that contains --

4         MR. FICK:  Oh, I'm sorry.  That's actually a good

5    idea.  It's Government Exhibit 1282.  If Mr. Bruemmer could

6    pull it up for me, that may save us some time.  That's it.  And

7    if we could switch to his screen.

8    Q.   This is a tweet that you had translated as "I shall die

9    young," right?

06:03 10   A.   Right.

11   Q.   Now, the word "young" in Russian is this word right here,

12   correct?

13   A.   Yes, with two mistakes.

14   Q.   And actually, it's misspelled, right?  There shouldn't be

15   an A at the beginning, it should actually be an O?

16   A.   Yes.

17   Q.   And are you aware -- well, first of all, if you were to

18   take this word and divide it in half and you had two words, the

19   first word would be "malo," correct?

06:04 20   A.   Yes.

21   Q.   And the -- if this were a separate word, the second

22   syllable of the second word, "dim," would be "smoke," correct?

23   A.   Yes.

24   Q.   And are you aware there is a Russian rap song with this

25   title with the word broken up like that, "I Shall Die with

        1    Malo'dim," and "malo" and "dim" are broken in half?

        2    A.    No, I'm not aware of that.

        3    Q.    Did you do any research to see where that phrase might

        4    have come from?

        5    A.    No.

        6    Q.    But if, for example, we had the phrase in Russian that

        7    were broken like that, instead of one word at the end here,

        8    malodim, if we had "malo" and then "dim" --

        9    A.    It will make no sense.

06:04  10    Q.    Well, the meaning would be "I shall die not enough smoke,"

       11    essentially, right?

       12    A.    No, it doesn't make any sense.

       13    Q.    Well, there would be -- there is a word "not enough,"

       14    right?

       15    A.    There's a word "breakfast" in English.  There is "break"

       16    and there is "fast."

       17    Q.    Right.

       18    A.    But you don't break fast in the morning; you eat breakfast

       19    in the morning.  You don't break the word apart.  And if

06:05  20    you -- yes, of course there is a word -- there are words that

       21    when you break them, they will consist of two different words,

       22    but then you take everything in context.  And if you take this

       23    phrase in context, it makes no sense.

       24    Q.    You would agree there are, for example, singers, poets,

       25    jokesters, people like that that often do plays on words, puns,

1    correct?

2    A.   Yes, absolutely.  Yes.

3         MR. CHAKRAVARTY:  Objection, your Honor.

4         THE COURT:  Yeah, sustained.  The witness principally

5    in her direct just identified the translations that she did.

6         MR. FICK:  That's fine, your Honor.  I have nothing

7    further.

8         MR. CHAKRAVARTY:  Thank you, your Honor.

9         THE COURT:  Okay.

06:06 10        THE WITNESS:  I'm excused?

11        (The witness is excused.)

12               MUNA SHISHANI, duly sworn

13        THE CLERK:  Have a seat.  State your name, spell your

14   last name for the record, keep your voice up and speak into the

15   mic so everyone can hear you.

16        THE WITNESS:  My name is Muna Shishani.  My last name

17   is S-H-I-S-H-A-N-I.

18                     DIRECT EXAMINATION

19   BY MR. CHAKRAVARTY:

06:07 20   Q.   Good afternoon.

21   A.   Hello.

22   Q.   I'm over here, Ms. Shishani.  Sorry.

23   A.   Oh.

24   Q.   Ms. Shishani, are you a language specialist at the FBI?

25   A.   Yes, correct.

1    Q.    And what languages do you translate?

2    A.    I translate Chechen and Arabic.

3    Q.    And are you Chechen by ancestry?

4    A.    Yes, I am.

5    Q.    And "Chechen" means somebody who's ethnically from the

6    region of Chechnya?

7    A.    Correct.

8    Q.    And you said you also speak Arabic?

9    A.    Yes, I do.

06:07 10   Q.    Do all Chechens speak Arabic?

11   A.    All Chechens?  No, not all Chechens.

12   Q.    But you grew up in an Arabic-speaking country and you

13   learned Arabic?

14   A.    Correct.

15   Q.    Are you fluent in Arabic?

16   A.    Yes, I am.

17   Q.    Are you fluent in Chechen?

18   A.    Yes, I am.

19   Q.    And are you fluent in English?

06:08 20   A.    Yes, I am.

21   Q.    When you became a language specialist did you, like other

22   linguists, go through a battery of competency tests?

23   A.    Correct.

24   Q.    And did you pass those?

25   A.    Correct.

1    Q.    And are you certified to translate in Chechen and Arabic?

2    A.    Yes, I am.

3    Q.    And with regards to your Chechen background -- in fact,

4    "Shishani" means "Chechen."  Is that correct?

5    A.    In the Arabic language, yes, "Shishani" means "Chechen."

6    Q.    Now, does -- Chechen last names, are they in -- when in

7    Russia, are they spelled the same as they are within the

8    Chechen community?

9    A.    I know Chechen last names in official documents in Russia,

06:08 10    the "aev" or "ev" added at the end, some are for the last -- on

11    the official documents, that's what's added on the Chechens'

12    last names in Russia.

13    Q.    But among Chechens there's a --

14    A.    It's not added.  Yeah, we don't add the "aev" or the "ev"

15    at the end.  Yeah, we just keep that amongst us, just the last

16    name itself without the addition.

17    Q.    Of the aev or the --

18    A.    The aev or the ev.

19          MR. CHAKRAVARTY:  I'm going to call up 1170 just as a

06:09 20    demonstrative.  Page 2, please.

21    Q.    Just to illustrate this point, these records, this name is

22    Tamerlan Tsarnaev.  Is that correct?

23    A.    Yes.

24          MR. CHAKRAVARTY:  And could we go to page 3?

25    Q.    And this account name is Dzhokhar Tsarni.  Are those names

1    the same?

2    A.    They are the same.  The way it's said in Chechen would be

3    "Tsarni," and "Tsarnaev," the "aev" is added to -- it's the

4    Russian addition on the Russian official documents that

5    sometimes they add that to Chechen last names.  But amongst us,

6    we would call -- we would say "Tsarni" if it's just Chechen.

7    Amongst Chechens it would be just "Tsarni."

8    Q.    Now, for purposes of this case, were you asked to review

9    any documents that may have had Chechen in them --

06:10 10    A.    Yes.

11    Q.    -- for purposes of the trial?

12    A.    Yes.

13    Q.    And did you find any such documents?

14    A.    Any Chechen documents?  There's some Chechen words.  Yeah,

15    some.

16    Q.    So are Chechen words -- what script are Chechen words

17    written in?

18    A.    In Cyrillic.

19    Q.    So is that the same script that Russian is written in?

06:11 20    A.    Correct.

21    Q.    And to the extent that there was a Chechen word here or

22    there on any document, did you provide a fair -- or did you

23    verify that the translation of that word was fair and accurate?

24    A.    Correct.  And it gets reviewed also by other linguists,

25    too.

1    Q.   And with regards to Arabic words, did you partially

2    prepare and also verify completely the accuracy of a list of

3    Arabic words that may be related to this case?

4    A.   Correct.

5         MR. CHAKRAVARTY:   Okay.  I'm going to call up for the

6    witness Exhibit 1407.

7    Q.   Do you recognize this?

8    A.   I can't see it very well.

9    Q.   Maybe I can blow it up a little bit?

06:11 10   A.   Yeah.

11    Q.   Just let me -- do you see your name as the reviewer?

12    A.   Yes.

13    Q.   And then there's a list of a number of words there?

14    A.   Yeah.

15    Q.   And did you list the Arabic word using English letters on

16    the left, and then on the right the English translation of that

17    word?

18    A.   Yes, correct.

19    Q.   Now, when you do translations, do you do

06:12 20   meaning-for-meaning translations?

21    A.   Yes, correct.

22    Q.   And so if you just see a word in a vacuum, it might not

23    have the full context of what that writing was in, correct?

24    A.   Yes.

25    Q.   So you did your best just to create essentially a

        1    dictionary here?

        2    A.    Correct.

        3          MR. CHAKRAVARTY:  And could we go to page 2?

        4    Q.    And so this is the rest of those words, that were words

        5    that you saw throughout the trial evidence in this case?

        6    A.    Correct.

        7          MR. CHAKRAVARTY:  I would move into evidence Exhibit

        8    1407.

        9          MR. FICK:  No objection.

06:12  10          THE COURT:  All right.

       11          (Government Exhibit No. 1407 received into evidence.)

       12          MR. CHAKRAVARTY:  And if we could go back to page 1.

       13    BY MR. CHAKRAVARTY:

       14    Q.    And so, again, for --

       15          MR. CHAKRAVARTY:  If I can ask to publish, your Honor.

       16          THE COURT:  They have it.

       17    BY MR. CHAKRAVARTY:

       18    Q.    So again this is a document that you reviewed here?

       19    A.    Correct.

06:13  20    Q.    And so just as an example, the word "ummah" you translated

       21    as "nation," correct?

       22    A.    Correct.

       23    Q.    Particularly, the "ummah" means the Muslim nation?

       24    A.    Yes.

       25    Q.    There's a word that's not on here, but if I can ask you to

1    explain what it means, the word "shaytan," S-H-A-Y-T-A-N.  What

2    does that mean?

3    A.   It means in Arabic "satan" or "devil."

4    Q.   And is that a word that I did not ask you to translate and

5    put on paper before today?

6    A.   No.

7    Q.   And Ms. Shishani, how long have you worked for the FBI?

8    A.   Almost five years.

9    Q.   How long have you lived in the United States?

06:14 10   A.   For almost 17 years now.

11             MR. CHAKRAVARTY:  Thank you.  That's all I have.

12                         CROSS-EXAMINATION

13   BY MR. FICK:

14   Q.   Good afternoon, Ms. Shishani.

15   A.   Good afternoon.

16   Q.   My name is Bill Fick.  I'm one of Jahar Tsarnaev's

17   lawyers.

18             Mr. Chakravarty asked you whether all Chechens speak

19   Arabic, and you responded, of course, no.  That's correct,

06:14 20   right?

21   A.   Yes.

22   Q.   But it is fair to say that it's common both in Chechnya

23   and other Muslim- but non-Arabic-speaking countries to sprinkle

24   Arabic words into conversation even if you don't know Arabic,

25   correct?

1    A.   Because the religion is Islam, yes, they do -- they use

2    the Arabic words in the prayer in Arabic because of the

3    religious people, yes.

4    Q.   Or even non-religious people, right?  I mean, it's very

5    common, for example, to say "salamu alaykum," which means

6    "hello," it's a greeting, in a Muslim country even if you don't

7    speak Arabic, correct?

8    A.   Correct.

9    Q.   And other words from this list that you have, for

06:15 10   example --

11         MR. FICK:  If I could just have the screen again

12    briefly.

13    Q.   -- in the exhibit Mr. Chakravarty just showed you and

14    introduced, you see the word here, "Insha'Allah," for example,

15    right, which essentially means "God willing" or "Allah

16    willing"?

17    A.   Correct.

18    Q.   That's another word that's very commonly just sprinkled

19    into conversation by people in Muslim countries that don't

06:15 20   speak Arabic, right?

21    A.   Correct.

22    Q.   Similarly, another word down the list here, "alhamdulilah"

23    which is essentially "praise be to God" or like "hallelujah" as

24    an English speaker would say.  The same kind of deal, right?

25    A.   Correct.

1    Q.   So it would be very common for a Chechen speaker to just

2    sprinkle Arabic words like that through their conversation and

3    their writing?

4    A.   Correct.

5         MR. FICK:  Okay.  I have nothing further.  Thank you.

6         MR. CHAKRAVARTY:  Nothing, your Honor.

7         THE COURT:  All right, Ms. Shishani.  You're excused.

8    Thank you.

9         THE WITNESS:  Thank you.

06:16 10         (The witness is excused.)

11        MR. CHAKRAVARTY:  The government calls Special Agent

12   Heidi Williams.

13                    HEIDI WILLIAMS, duly sworn

14        THE CLERK:  Have a seat.  State your name, spell your

15   last name for the record --

16        THE WITNESS:  Heidi Williams, W-I-L-L-I-A-M-S.

17                    DIRECT EXAMINATION

18   BY MR. CHAKRAVARTY:

19   Q.   Good afternoon, Agent Williams.

06:17 20   A.   Good afternoon.

21   Q.   How long have you been an FBI agent?

22   A.   In May it will be 11 years.

23   Q.   For purposes of this case -- for purposes of this trial, I

24   should say, did I ask you to do something?

25   A.   Yes, you did.

```
 1    Q.   What did I ask you to do?
 2    A.   You asked me to review some text messages that were found
 3    on the Sony VAIO laptop.
 4    Q.   And so did you do that?
 5    A.   I did.
 6    Q.   And are you here today to simply read a few materials that
 7    are already in evidence to the jury?
 8    A.   Yes.
 9    Q.   And did you extract these text messages?
10    A.   No.
11    Q.   Did you do research on the -- all of the conversations
12    around each of these text messages?
13    A.   Not really.
14    Q.   Okay.  So in addition to the text messages, was there a
15    report from a -- one of the computers that was seized in the
16    case and already entered into evidence that you also reviewed?
17    A.   Yes.
18    Q.   And was that part of the Internet activity from the Sony
19    VAIO laptop computer?
20    A.   Yes, it was.
21    Q.   And again, did you do -- are you an expert in the history
22    or the computer forensics on how those were extracted?
23    A.   No, I'm not.
24    Q.   And did you read those, and are you going to read some of
25    those records that are already in evidence to the jury today?
```

1    A.   Yes.

2         MR. CHAKRAVARTY:  If we could, Mr. Bruemmer, first

3    call up Exhibit 1385.

4    Q.   Agent Williams, if you would just read this text message

5    which appeared on the Sony VAIO laptop on November 6, 2012, at

6    approximately 10:30 p.m. and 59 seconds?

7         THE COURT:  So, Mr. Chakravarty, this is an exhibit

8    already in evidence?

9         MR. CHAKRAVARTY:  I believe so.  Yes, your Honor.

06:18 10   Agent Swindon introduced these.

11        THE COURT:  And you want it exposed?

12        MR. CHAKRAVARTY:  Yes, please.  Sorry.  All of the

13   evidence which Agent Williams is going to be reading is in

14   evidence.

15        THE WITNESS:  So this is from the defendant.

16        MR. CHAKRAVARTY:  Wait one moment.  Thank you.

17        THE WITNESS:  We good?

18   BY MR. CHAKRAVARTY:

19   Q.   Yes.  Please proceed.

06:19 20   A.   Okay.  This is from the defendant, and he says, "Elections

21   are whatever.  I want the lesser of two evils to win, which

22   would be Obama, but either way they're shaytan as niggas,

23   puppets of the system.  Killing Muslims is the only promise

24   they will fulfill."

25   Q.   Now, the "to" person to whom this was sent is redacted in

1  this exhibit.  Is that correct?

2  A.   That's correct.

3  Q.   And that's correct for all of the text messages that

4  you've reviewed, correct?

5  A.   Yes.

6  Q.   Now, independently you've reviewed -- you know who those

7  persons are, you just redacted it for purposes of these

8  exhibits?

9  A.   I do.

06:19 10       MR. CHAKRAVARTY:  Go to Exhibit 1387.

11  Q.   And is this a text message exchange on Christmas day of

12  2012?

13  A.   Yes, it is.

14  Q.   And is it about 12:56 a.m., so shortly after midnight on

15  the 24th, Christmas Eve?

16  A.   Yes.

17  Q.   Now, on this one, because there's an exchange, if we

18  could -- we'll read it and call response, and I will be

19  the -- if you could read the texts from the defendant and I

06:20 20  will read the person who's on the other end.

21       At 12:25 -- excuse me -- 12:56 a.m. and 08 seconds the

22  person says, "What's your plan?  Stay at Dartmouth or transfer

23  out?  Yale?  MIT?  Harvard?  Have you thought about what

24  school?"

25  A.   "One more semester and I'm probably going to transfer.

1    Not probably, most definitely."

2    Q.   "Oxford or are all those schools too easy for you?"

3    A.   "Nah, not ivy."

4    Q.   "Ivy schools are a force.  Oh, shit.  He's going to

5    Harvard.  That's crazy.  None other reason than this.  No point

6    in going there other than to look good."

7    A.   "Something manageable.  Not for working, slaving myself

8    and crying myself to sleep."

9    Q.   N word "need to understand you don't ivy school to be

06:21 10    successful."

11    A.   "I'm trying to go to an ivy for masters though.  Not going

12    to lie."

13    Q.   "What do you want to be?  Sniper?  Pyro?  Engineer?

14    Knowledge to become imam?  Biologist?  That shit crazy.  WTF."

15    Is that a phrase for, what, the F word?

16    A.   Yes.

17    Q.   "Imam Tsarnaev then?  Spy?"

18    A.   "I wanna bring justice for my people."

19         MR. CHAKRAVARTY:  Go to Exhibit 1388, please.

06:22 20    Q.   Now, is this later that evening at about 11:43 p.m. and

21    two seconds, again on Christmas Day, December 25, 2012?

22    A.   Yes.

23    Q.   And these are texts from the defendant?

24    A.   Yes.

25    Q.   And do you know if they were to the same person?

1    A.    Yes, they are.

2    Q.    And what did the defendant say?

3    A.    "Doing something with Tamerlan.  I'll hit you up in a bit,

4    bro."

5          MR. CHAKRAVARTY:  Could we go to Exhibit 1395, please.

6    Q.    Now, is this another exchange between the defendant and

7    the same person?

8    A.    Yes, it is.

9    Q.    And was this about a month later, on January 28th, 2013,

06:22 10   beginning at about 11:36 p.m. and 12 seconds?

11   A.    Yes.

12   Q.    Okay.  If you could begin with reading the defendant's

13   part?

14   A.    "Come May I'm out."

15   Q.    "Oh, yeah.  You're getting yourself a wifey?"

16         "You getting yourself a wifey?  Good shit."

17   A.    Well, IDK," I believe to be I don't know "about that, but

18   we'll see."

19   Q.    "I think it's a little too early.  I don't even know if I

06:23 20   want I get married, bro."

21   A.    "LOL.  Yea, I know.  I'm just trying to finish school."

22   Q.    "To?."

23   A.    "I mean, there's one other option, bro.  The highest level

24   of Jannah."

25   Q.    "The only good thing about having a wife is" the P word is

1   "halal."

2   A.   "If you know what I mean."

3   Q.   "Jihad?  I really am down for that jihad life though.

4   I've been thinking about that lately.  LOL" or laugh out loud,

5   "yeah, true, true."

6   A.   "Yeah, with your desires, c'mon, son.  Don't be hot over

7   the phone.  LOL.  Be for that man."

8   Q.   "And it's affecting my future plans.  I don't even know if

9   I want to go to college."

06:24 10   A.   "I'm with you on this one.  I wanna talk to you in person

11   sometime soon."

12   Q.   "Aight.  We gotta chill sometime, man.  I'm trying to

13   study Islam or the Qur'an.  No bueno.  I didn't get a chance to

14   chill with you over the break."

15   A.   "Yo, man.  That sounds good.  Do that.  But you have to go

16   to school in Medina somewhere.  For now read a lot of Islamic

17   literature."

18   Q.   "There has to be Islamic schools other than at Medina.  If

19   not, then I gotta save up my money and go there."

06:24 20   A.   "I mean, like, there other schools but not in America."

21   Q.   "You're looking at a future imam.  When are you coming

22   back for break?"

23   A.   "Insha'Allah.  IDK," I don't know.  "I'll be back either

24   this weekend or next weekend.  I'll let you know.  But for now,

25   all I'm saying is go to school or just chill and educate

1    yourself.  I got a plan."  I'll tell you about it later.  "I'll

2    tell you later about it."

3    Q.   "I prefer jihad than an imam.  LOL.  I'm not a very good

4    public speaker.  And damn we definitely gotta chill, bro."

5    A.   "But imam, though?  That's gonna be a lot of studying."

6    Q.   And these conversations that we've excerpted and presented

7    as exhibits, they're part of longer conversations.  Is that

8    fair to say?

9    A.   Correct.

06:25 10   Q.   And do these portions of the conversations appear to be a

11   part where they're talking about one subject matter?

12          MR. FICK:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes, they appear to be all about the

15   same subject matter within the context of each conversation.

16   BY MR. CHAKRAVARTY:

17   Q.   Within the context of each conversation.  Thank you.

18          Now, this was on January 28, 2013.  Is that right?

19   A.   Yes.

06:25 20   Q.   And just to clarify, the person with whom this

21   conversation was happening was not Tamerlan Tsarnaev.  Is that

22   right?

23   A.   No, it was not.

24          MR. CHAKRAVARTY:  Can we go now to Exhibit 1142-06.

25   This is on the computer.

1    Q.   And is this the other document that I asked you to review

2    and read?

3    A.   It is, but I can barely read it.

4    Q.   I'll zoom in.  So is this the report generated by the FBI

5    for selected Internet activity from the 1R6, the Sony VAIO

6    laptop computer?

7    A.   Yes.

8    Q.   We'll go down now to page 14 of this document and I'll

9    zoom in.  I'm just going to read a few of the entries.

06:26 10   Starting with these two, can you read the website that this

11   computer went to?

12   A.   Sure.  It's "www.FoxNews.com, U.S. slide show, 2013,

13   04/15, multiple casualties reported after two explosions at

14   Boston Marathon," and it appears to be Slide 25 and 26.

15   Q.   And I'm going down to the bottom of page 16.  This is a

16   little harder to read, so I'll ask you to read the parsed-out

17   description of the page.

18   A.   It says, "Boston April 15th.  A man confronts an injured

19   woman on sidewalk at the scene of the first explosion on

06:27 20   Boylston Street near the finish line of the Boston Marathon."

21   Q.   And then it attributes the photo -- or a photo?

22   A.   Yes.

23   Q.   And I think you said "confronts."  Is it "a man comforts"?

24   A.   "Comforts."  I'm sorry.  It's really hard to read.

25   Q.   Page 17.  Are there more entries about the Boston

1    Marathon?

2    A.    Yes; there are three.  Do you want me to read them all?

3    Q.    Yes, please.

4    A.    "A second explosion goes off (rear) as a runner was blown

5    to the ground by the first explosion near the finish line of

6    the 117th Boston Marathon," and then the photo's credited.  The

7    second one says, "Boston April 15th.  The injured are helped at

8    the scene of the first explosion on Boylston Street near the

9    finish line of the Boston Marathon," and that photo is

06:28 10    credited.  And then the third one says, "Boston police officer

11    clears Boylston Street following an explosion at the finish

12    line of the 2013 Boston Marathon."

13    Q.    And finally the last entry that I'm going to ask you to

14    read.

15    A.    "Boston April 15th.  Police officers with their guns drawn

16    near the second explosion down the street.  The first explosion

17    knocked down a runner at the finish line of the 117th Boston

18    Marathon."

19    Q.    Thank you, Agent Williams.

06:28 20                        CROSS-EXAMINATION

21    BY MR. FICK:

22    Q.    Good afternoon, Agent.  Just a couple of questions.  That

23    text, Exhibit 1387, the one you read that talks about -- they

24    sort of drop the names of a bunch of colleges.  Do you remember

25    that text exchange?

1    A.    Yes.

2    Q.    Now, that exchange that you read from is a part of a

3    larger exchange, correct?

4    A.    Correct.

5    Q.    And just prior to that Mr. Tsarnaev and the person he's

6    talking to in the text go back and forth about how Tamerlan has

7    become more religious, correct?

8    A.    You'd have to put it in front of me.  I mean, there were

9    thousands of messages I read.

06:29 10    Q.    Let me see if I can refresh your memory.

11    A.    Thank you.

12    Q.    I direct your attention to the page there but feel free to

13    look at as much of that as you want.

14    A.    Thank you.

15          THE COURT:  What is the exhibit number, Mr. Fick?

16          MR. FICK:  1387, but I'm showing her a larger

17    collection.

18          THE COURT:  Right.

19          (Pause.)

06:30 20    A.    Yes, several minutes before that's what they're talking

21    about.

22    BY MR. FICK:

23    Q.    There's a reference to how Tamerlan has become more

24    religious, and Mr. Tsarnaev's response, something to the

25    effect, "He's very influential.  I've been sober for a month,"

```
 1   right?
 2          MR. CHAKRAVARTY:  Your Honor, the government has no
 3   objection to context, but not to reading in items that are not
 4   in evidence.
 5          THE COURT:  Go ahead.
 6          MR. FICK:  I'm sorry?
 7          THE COURT:  You may have it.
 8   BY MR. FICK:
 9   Q.   So in effect, the conversation -- the back-and-forth in
10   that section is a discussion about how Tamerlan has become more
11   religious, and Mr. Tsarnaev responds with words to the effect,
12   "He's very influential.  I've been sober for a month," correct?
13   A.   Well, I want to correct that because I don't know
14   specifically that they're talking about Tamerlan.  I'm not
15   quite sure where you're seeing that.  Are you saying that
16   "Tima" is Tamerlan?
17   Q.   There's a reference -- there's a discussion about somebody
18   named Tima who has become more religious, correct?
19   A.   He says he loves -- or the person that he's speaking with
20   says he loves Tima for that.  "He's a role model for us."  But
21   I can't say that "Tima" is Tamerlan.
22   Q.   As part of your investigation, you didn't drill down to
23   see what they were talking about in that text exchange?
24          MR. CHAKRAVARTY:  Objection, your Honor.  It's beyond
25   the scope.
```

 1          THE COURT:  Sustained.

 2    BY MR. FICK:

 3    Q.    In any event, whoever Tima is, Mr. Tsarnaev's response in

 4    that text exchange is that he's influential, essentially, and

 5    has been sober for a month, right?

 6    A.    He says whoever Tima is "has some talent."

 7    Q.    Oh, thank you.  I have nothing further.

 8          THE COURT:  Or don't.  Okay.  Anything else?

 9          MR. CHAKRAVARTY:  Nothing further, your Honor.  Thank

06:31 10   you.

11          THE COURT:  Thank you, Ms. Williams.  You may step

12    down.

13          (The witness is excused.)

14          MR. FICK:  Actually, your Honor, can we offer into

15    evidence the entirety of that text stream as opposed to just

16    the excerpt that's already in?

17          MR. CHAKRAVARTY:  The government would object to that.

18    The testimony is already in, your Honor.

19          THE COURT:  I thought these were in.  I thought that

06:32 20   was what you said.

21          MR. CHAKRAVARTY:  Portions are in, not the thousands

22    and thousands of text messages, which is another portion of the

23    text message which would be the defendant's statement.

24          THE COURT:  I don't think an in-gross offer is

25    appropriate.

1          MR. FICK:  This was an offer of the rest of the same

2     conversation.  It's a few additional pages.

3          MR. CHAKRAVARTY:  There's no context aside from what,

4     you know, the defendant has...

5          MR. FICK:  Can we have it marked for identification,

6     at least?

7          THE COURT:  You could certainly have it marked for

8     identification, but now I'm confused about the numbering.  1387

9     was the prosecution's selected excerpt?

06:32 10          MR. CHAKRAVARTY:  Correct.

11          THE COURT:  So this wouldn't be 1387; it would be

12     something else if it were a broader --

13          MR. FICK:  We could call it 1387B or we could give it

14     a defense number.

15          THE COURT:  Right.  Okay.  I just wanted to -- they're

16     not the same thing.

17          MR. FICK:  It's the larger from which the subset was

18     drawn.  So whatever the Court's preference for numbering is.

19          THE COURT:  Why don't we have it marked for

06:33 20     identification.  If you want, I'll look at it over the break

21     and decide whether it ought to be in evidence or not.

22          MR. FICK:  Thank you, your Honor.  This copy has some

23     stray pen marks of mine but of course we could provide --

24          THE COURT:  You could get it to me later.

25          MR. WEINREB:  Can we approach, your Honor?

1          (Defense Exhibit No. 1387A marked for identification.)

2          (Discussion at sidebar and out of the hearing of the

3     jury:)

4          THE COURT:  Mr. Weinreb has the floor.

5          MR. WEINREB:  So we are requesting that we break for

6     the day.  We're about to move into some lengthy expert

7     testimony, and I think it's going to be hard to follow it if

8     it's broken up.

9          THE COURT:  Who is it?

06:33 10        MR. WEINREB:  It's a pair of --

11         MR. CHAKRAVARTY:  An explosive chemist and then

12    following him would be the explosives expert.  He's going to

13    describe how the IEDs were made.

14         THE COURT:  Okay.

15         MR. WEINREB:  We only have a half-hour left in the

16    day.

17         THE COURT:  That's fine.  I don't have a problem with

18    that.  So tell me, how long are they tomorrow?

19         MR. WEINREB:  Well, we think that Mr. Knapp will

06:34 20   probably be quite some time because he has to look at a lot of

21    physical evidence.  So between the two of them and cross,

22    several hours.

23         THE COURT:  Okay.

24         MS. CONRAD:  May I just inquire of -- this is somewhat

25    relevant to today.

1          THE COURT:  That's good.  That's a start.

2          MS. CONRAD:  I'll let you be the judge of that.

3          I believe there was a witness the government was going

4     to call today who for other purposes was going to put in -- who

5     participated in the May 5th search at 410 Norfolk, and we were

6     going to put some items in through that witness.  Is that

7     witness not available today?

8          MR. CHAKRAVARTY:  No, that might be a witness

9     tomorrow.  I think tomorrow we might call somebody who was

06:35 10    present during the search.

11          MS. CONRAD:  But I thought the agreement was we could

12     put items in from the search --

13          MR. CHAKRAVARTY:  We could authenticate -- we can work

14     that out.

15          MS. CONRAD:  I'm just looking for something short we

16     could do.

17          MR. CHAKRAVARTY:  We don't have an objection to

18     something -- the authentication of something that we obviously

19     seized, and so we'll have a witness tomorrow that will be able

06:35 20    to do that.

21          MS. CONRAD:  I just thought if that person was

22     available today, that would be something we could do before the

23     end of the day.  The other thing is -- and maybe I'm the only

24     one who's confused.  I thought Mr. Chakravarty said that 1387

25     already was in evidence.  I thought maybe that came in.  No?

1          MR. FICK:  1387 is in evidence, but 1387 is an excerpt

2     of a longer text conversation.  I put the whole conversation in

3     front of the witness, and now I'm marking that for ID.

4          MS. CONRAD:  I thought 1387 maybe came in through

5     Swindon, but maybe I'm confused.

6          MR. FICK:  Well, I think it did because that's where

7     it came from.

8          MR. MELLIN:  A bigger issue:  I think there's probably

9     a very good chance we'll wrap up tomorrow, just to give the

06:36 10    Court some --

11          MR. WEINREB:  There is a very good chance that we'll

12     wrap up tomorrow, but we're not 100 percent.

13          MS. CLARKE:  And, no, we won't be ready to start.

14          THE COURT:  No, no.  Will you be ready to tell us what

15     you'll do?

16          MS. CLARKE:  Oh, yes.

17          THE COURT:  Today?

18          MS. CLARKE:  Yes.

19          THE COURT:  Okay.

06:36 20    MS. CLARKE:  You just haven't been involved in our

21     conversations.

22          THE COURT:  That's right.  I haven't been.  I just

23     want to -- all I'm thinking is timing and planning for the jury

24     and everything else.  I just want to get an idea what the

25     future holds for us.

1          MR. FICK:  Just for housekeeping, we should get a

2     number on the record before we break today.

3          THE CLERK:  Is it one of the 3000 series?

4          MR. FICK:  Sure.  Whatever the next 3000 is.

5          THE COURT:  Actually, I think it would be better to

6     give it a letter.

7          MR. FICK:  387A or something.

8          THE CLERK:  That's fine.

9          MS. CLARKE:  That sounds right.

06:36 10          MR. FICK:  And I'll leave it with your Honor because

11     your Honor said --

12          MR. WEINREB:  Your Honor, as a court issue I would

13     like to raise something but we don't need to leave the jury in

14     the box.  Or I could raise it now, whichever you prefer.

15          THE COURT:  No, let's get rid of them.

16          (In open court:)

17          THE COURT:  Jurors, we're going to break a little bit

18     early today in order not to chop up the next witness's

19     testimony, half today and the rest tomorrow maybe.  I'm told it

06:37 20     may be more coherent if you hear it all at once.  So we'll just

21     end a little bit early.

22          Again, thanks for your attention.  We appreciate your

23     continued adherence to the instructions to avoid any

24     communications about the case or any discussions of it.  Enjoy

25     the evening and we'll see you tomorrow morning.

1          We'll stay in session briefly.

2          THE CLERK:  All rise for the jury.

3          (The jury exits the courtroom at 3:31 p.m.)

4          MR. WEINREB:  So these need to be addressed at the

5     sidebar.

6          THE COURT:  You want to be at the side?  I'm sorry.

7          (Discussion at sidebar and out of the hearing of the

8     public:)

9          MR. WEINREB:  Just two quick things:  Yesterday the

06:38 10    Court ruled on a defense motion with respect to some autopsy

11    photos, and there was a question raised about the photo of

12    Martin Richard where he's wearing his clothing.  And we believe

13    that the state of the clothing is relevant in and of itself.

14    We don't object to the Court's ruling insofar as the Court does

15    not want multiple pictures of Martin Richard's corpse, but we

16    would ask that we at least be allowed to show the jury the

17    clothing because it's evidence of the mechanism of the bomb --

18    the burn, the shredded, that it did various other things --

19    that we allege in the indictment and have argued to the jury

06:39 20    that these bombs did.  So no photos, but we just have clothing.

21          THE COURT:  All right.  Let me look at it with that in

22    mind.

23          MR. WEINREB:  Okay.  And then the second issue is the

24    government's motion with respect to 12.2.  I don't know --

25          THE COURT:  You'll have an order by the end of the

1       day.

2               MR. WEINREB:  Very well.  Thank you.

3               MS. CONRAD:  Your Honor, earlier you had said that to

4       the extent I took the position that information showing that

5       Mr. Tsarnaev, the defendant, was not residing at 410 Norfolk,

6       which the government asserted in its opposition to the motion

7       to suppress, to the extent that the government has information

8       upon which it based that assertion, we would take the position

9       that it's *Brady* material given the government's current

06:40 10  position that he, in fact, resided at and occupied that as

11      demonstrated by Exhibit 620.

12              And so I can file a written motion for production of

13      that, but once again, I would -- I'm pressing the point that

14      the government should disclose the basis for any information it

15      has that supports the assertions it made in Docket No. 350.

16              MR. WEINREB:  So all information upon which that

17      argument was based has been disclosed in discovery.

18              MS. CONRAD:  Well, I am not aware of a single report

19      that says that it was used as a closet or storage room, and the

06:41 20  government made that factual assertion on page 3 and 4 of

21      Docket 350.

22              THE COURT:  Okay.  I'm not going to alter any of the

23      rulings.  I will say in terms of a proffer or anything like

24      that, you have the docket entries related to the search

25      warrant.  I think that's sufficient.  I don't think you need a

1   further proffer.  You had some pages that you wanted to use

2   from the --

3          MS. CONRAD:  I'm not talking about the proffer; I'm

4   talking about evidence.

5          THE COURT:  No, I understand.

6          MS. CONRAD:  I'm talking about discovery for purposes

7   of admitting evidence which as of now the defense has been

8   prohibited from offering.  And if the government has evidence

9   supporting those assertions, we would like to offer that

06:41 10   evidence.

11          THE COURT:  Okay.  No relief.  I don't know exactly

12   what the target --

13          MS. CONRAD:  The target is discovery.

14          THE COURT:  I don't know.

15          MR. WEINREB:  The representation on which that was

16   based --

17          THE COURT:  I think the issue is --

18          MS. CONRAD:  It's never been produced.  I don't

19   know --

06:42 20          THE COURT:  It's not an evidentiary issue.

21          MS. CONRAD:  It's a discovery issue.  That's what your

22   Honor said, and your Honor said it was not ripe at that moment.

23   It's ripe now.

24          THE COURT:  The discovery issue arises because of

25   evidence.  Anyway, nothing will be done.

1          (In open court:)

2          THE COURT:  All right.  We'll be in recess.

3          THE CLERK:  All rise for the Court.

4          (The Court exits the courtroom at 3:36 p.m.)

5          THE CLERK:  Court will be in recess.

6          (The proceedings adjourned at 3:36 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date:   10/15/15
16

17

18

19

20

21

22

23

24

25