UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )    Criminal Action
v.                             )    No. 13-10200-GAO
                               )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                               )
        Defendant.             )
                               )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY FORTY**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, March 26, 2015
9:13 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
3        Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6            By:  Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
7        1331 F Street, N.W.
         Washington, D.C.  20530
8        On Behalf of the Government

9        FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G.
10       Watkins, Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13           By:  Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                              I N D E X

2                                  <u>Direct</u>  <u>Cross</u>  <u>Redirect</u>  <u>Recross</u>
     WITNESSES FOR THE
3      GOVERNMENT:

4    DAVID McCOLLAM

5        By Mr. Chakravarty          6                    45
         By Mr. Watkins                    35
6
     EDWARD S. KNAPP
7
         By Mr. Chakravarty         47
8        By Mr. Watkins                    140

9    JENNIFER HAMMERS

10       By Mr. Weinreb              159

11

12                           E X H I B I T S

13
     GOVERNMENT'S
14     <u>EXHIBIT</u>    <u>DESCRIPTION</u>              <u>FOR ID</u>    <u>RECEIVED</u>

15   1387A       Complete text of Exhibit 1387          5

16   1230-10     Photograph contained in 2-D exhibit    35

17   3102        Photograph of hobby fuse               42

18   1573        Photograph of IED explosion            69

19   1582        Photograph                             89

20   957A        Photograph of Exhibit No. 957          94

21   1122A       Photograph of Exhibit No. 1122         95

22   949A        Photograph of Exhibit No. 949          98

23   652         Campbell autopsy photograph           167

24   655         Campbell autopsy photograph           169

25

1                          E X H I B I T S  (cont'd)

2
   GOVERNMENT'S
3    EXHIBIT      DESCRIPTION              FOR ID     RECEIVED

4  654           Campbell autopsy photograph            171

5  651,
   656
6  659           Photographs of foreign objects recovered
                 during Campbell autopsy                 172
7
   657-A,
8  658-A,
   659-A,
9  660-A
   661-A         Swabs and foreign material collected at
10               Campbell autopsy                        178

11

12 DEFENDANT'S
    EXHIBIT      DESCRIPTION              FOR ID     RECEIVED
13
   3093          Fragmented remains of cardboard         147
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Morning, jurors.
 3          THE JURY:  Good morning, your Honor.
 4          THE COURT:  Just two matters before we continue with
 5    the evidence.  There were two issues from yesterday.  After
 6    review, I will admit the proffered 1387A, proffered by Mr.
 7    Fick, which is the complete text from which selections were
 8    made.  That will be admitted.
 9    (Exhibit No. 1387A received into evidence.)
10          THE COURT:  There was a discussion of a couple of
11    photographs, and I will -- that I had expressed some concern
12    about.  Those may be used.  I'm satisfied that the reason --
13    there is a value added for those that is not available from the
14    other evidence.
15          MR. CHAKRAVARTY:  Your Honor, just to clarify, 1387A,
16    that would be with the redactions that we had discussed?
17          THE COURT:  Yes.  You mean personal identifiers?
18          MR. CHAKRAVARTY:  Correct.
19          THE COURT:  Yes.  And I don't have a copy that has
20    that, but I'm sure one can be prepared.  All right.
21          MR. CHAKRAVARTY:  Your Honor, the government would
22    call David McCollam.
23          THE CLERK:  Sir, want to step up here, please, up to
24    the box, if you would.  Remain standing.
25          DAVID McCOLLAM, Sworn
```

```
 1              THE CLERK:  Have a seat.  State your name.  Spell your
 2    last name for the record.  Keep your voice up and speak into
 3    the mic.
 4              THE WITNESS:  My name is David McCollam,
 5    M-c-C-o-l-l-a-m.
 6    DIRECT EXAMINATION BY MR. CHAKRAVARTY:
 7    Q.    Good morning, Mr. McCollam.
 8    A.    Good morning.
 9    Q.    Do you work at the FBI?
10    A.    Yes.
11    Q.    What do you do there?
12    A.    I'm a chemist forensic examiner assigned to the Explosives
13    Unit.
14    Q.    Are you a special agent?
15    A.    I am not.
16    Q.    What did you do before you joined the FBI?
17    A.    I was a tour guide at the FBI while I was in college; and
18    before that I was just a student majoring in chemistry at Old
19    Dominion University.
20    Q.    Is that your entire education?
21    A.    Yes.
22    Q.    After you graduated with your chemistry degree, when did
23    you join the FBI?
24    A.    I started off in the Chemistry Unit in August of 1995.
25    Q.    And can you describe your progress through the FBI
```

1    laboratory and the various roles that you've had there?

2    A.    In August of 1995, I was assigned in the Chemistry Unit to

3    a supervisory special agent who worked with explosives.  As his

4    chemist, I trained under him and other qualified examiners

5    learning the proper chemical techniques and instrumental

6    techniques that we utilize at the laboratory to identify

7    explosives or energetic materials.

8         A wide variety of training samples or practice samples was

9    part of my training.  At the end of that particular training, I

00:03 10   would take a series of batteries of competency tests.  At the

11   end those competency tests, I was then able to work

12   independently within the laboratory.  I've taken past yearly

13   proficiency tests.  And then in January of 2000, there was a

14   reorganization of the laboratory where we got shifted over to

15   the Explosives Unit.  And then in July of 2004, I became a

16   qualified forensic examiner.

17   Q.    What is a qualified forensic examiner?

18   A.    The extra training, aside from the bench chemistry that I

19   was trained in the Chemistry Unit, it's just a series of

00:03 20   writing reports, working with more samples, a series of oral

21   board evaluations on explosives, administrative functions

22   within the laboratory.

23   Q.    You mentioned something called bench work.  What's bench

24   work?

25   A.    Bench work is just analyzing evidence that's submitted to

1    the laboratory using different procedures, techniques, to get

2    those chemicals, residues or explosive material onto the

3    instruments that we utilize on a daily basis.

4    Q.   What is the purpose of forensic chemistry in explosives

5    investigation?

6    A.   With forensic chemistry, we're just using very scientific

7    principles to identify explosive compounds or compounds that

8    can be used to make explosives with a wide variety of analytic

9    techniques, scientific methods, to arrive at a conclusion.

00:04 10   Q.   What kind of explosives can you test for?

11   A.   Pretty much everything.  There's a wide variety of

12   different type explosives.  There are low explosives.  There

13   are high explosives.  There are hundreds of different types of

14   explosives that exist that we're able to analyze and identify.

15   Q.   Now, continuing with your background, as you progressed as

16   a chemist at the FBI lab, did you have an opportunity to

17   actually conduct forensic examinations on submissions,

18   evidentiary submissions, for testing for chemicals?

19   A.   Yes.

00:05 20   Q.   And approximately how many times have you conducted

21   forensic chemistry exams in explosives cases?

22   A.   Literally thousands of samples involving hundreds of

23   different cases.

24   Q.   Was your work peer-reviewed on a general level, and on

25   specific occasions did people verify your work?

1   A.   Whenever we -- or I write a report at the laboratory, the

2   data that I generate, the report that I've written, has to go

3   through a technical review process.  So there's another chemist

4   examiner who has the same qualifications, who's been through

5   the same training process that I have.  That individual would

6   review the report and the technical data with my conclusion;

7   and if he agrees with it, then he'll sign the report out.

8   There's also administrative review that's done as well in

9   conjunction with that.

00:06 10   Q.   And do you work with a team of various analysts, agents,

11   and examiners?

12   A.   Correct.

13   Q.   In the course of your work at the FBI, have you had an

14   opportunity to continue continued education or on-the-job

15   training?

16   A.   Yes.  The FBI mandates that we have to have approximately

17   eight hours of continuing education, so that can exist either

18   by taking classes which are sponsored by the instrument

19   manufacturers that I use at the laboratory to study the theory,

00:06 20   or I can take, you know, explosives classes that are offered.

21   There's a wide variety of those.  I can attend conferences on

22   explosives with the United States or overseas as well.

23   Q.   Have you continued to do that --

24   A.   Yes.

25   Q.   -- during your time, now almost 20 years at the FBI?

A.    Yes.

Q.    Now, as part of the Boston Marathon investigation, what was your role?

A.    I stayed back at the laboratory, and then I started receiving many submissions on April 16th centered around the investigation.  So it was my job to coordinate the efforts in the laboratory that evening.  Many samples were received from the two devices at Boylston Street, the incident at Watertown, and then in subsequent searches during the following weeks of the investigation.

Q.    And, ultimately, did you analyze that evidence?

A.    Yes.  Myself and my team analyzed approximately 300 pieces of evidence.

Q.    Did you draft a report?

A.    I did.

Q.    Did you prepare to come up here to testify in the case?

A.    I did, yes.

Q.    Have you testified in other cases?

A.    I have.

Q.    About how many times?

A.    This is my tenth time.

Q.    That's always in this capacity of talking about explosives chemistry?

A.    Correct, yes.

Q.    What is an explosive?

1    A.    An explosive can be described as a pure substance or a

2    mixture of substances that's capable of producing explosion by

3    its own energy.  What they're designed to do is they're

4    designed to react very quickly, within thousandths of a second

5    or hundreds of thousandths of a second.  And all they're

6    designed to do is just release a tremendous amount of gas, and

7    that gas is generated.  It's designed to do work, to blow stuff

8    up in mining, engineering or, with military applications, just

9    to shatter and destroy things.

00:08  10        So since there's so many different types of explosives and

11    they react differently, they have to be classified into two

12    different categories.  We have low explosives and high

13    explosives.  And they're based on how quickly they react.  So a

14    low explosive, the material that's reacting is going at less

15    than the speed of sound.  A high explosive, on the other hand,

16    reacts faster than the speed of sound.  So examples of high

17    explosives you may have heard of would be TNT or C4, dynamite,

18    nitroglycerin.  Those are all military-type explosives that we

19    can see.

00:09  20        On the other hand, we have low explosives.  These are

21    commonly referred to as propellents.  They're mixtures of

22    different chemicals.  They're mixtures of oxidizers and fuels.

23    Now, in order to get that fuel to burn, it needs a chemical

24    source of oxygen.  It's like I stated earlier, they're designed

25    to work or react so quickly they can't take oxygen from the

1    air, can't diffuse that fast, so we have to bring in a chemical

2    source of oxygen called the oxidizer.  There are many different

3    types of oxidizers out there:  potassium nitrate, potassium

4    perchlorate, barium nitrate.  And all they do is supply that

5    oxygen to the fuel, which could be carbon or sulfur, aluminum

6    powder, magnesium as well.

7        Low explosives, pyrotechnics are low explosives, and also

8    propellents.  A propellent would be, like, black powder or

9    smokeless gunpowder, which is commonly found in ammunition.

00:09 10    And for pyrotechnics, that category, it's used by the military

11    for signaling, like, smoke grenades.  You can find them in

12    common household kitchen matches, road flares, signaling

13    flares, and also commercially available pyrotechnics or

14    fireworks.

15    Q.    So you talked about two different types of explosives:

16    high explosives and low explosives.

17    A.    Yes.

18    Q.    High explosives, I think you explained, are military grade

19    or they're commercially available for the specific purpose of

00:10 20    blowing things up essentially?

21    A.    Correct, yes.

22    Q.    And low explosives, can you describe some of the

23    nondestructive applications of low explosives?

24    A.    Again, low explosives are -- like I said, they're road

25    flares, kitchen matches.  There's pyrotechnic material that's

1    on there.  Black powder, people can go to, as a hobby, black

2    powder guns, Civil War reenactments, Revolutionary War

3    reenactments.  Those guns or canons use the black powder.  When

4    it burns, it reacts.  It generates that pressure very quickly,

5    and it's designed to propel something.  And then fireworks,

6    Fourth of July, stuff like that.  And then the smokeless

7    powder, that's the ammunition propellent.  People -- some

8    people are reloaders.  So they can go to, like, Dick's Sporting

9    Goods store or Wal-Mart, and they can buy pounds of smokeless

00:11 10   powder, and they can reload their own ammunition instead of

11   buying it.

12   Q.   So what is the difference between how high explosives

13   explode versus how low explosives explode?

14   A.   Low explosives are designed to deflagrate or burn, so

15   typically they're initiated with a match or some type of heat

16   source, whether it's a hot wire or a match.  And that gets the

17   reaction going.  It's very easy.  It's very simple to do.

18        On the other hand, most high explosives need to have some

19   type of shock initiation to them.  They're relatively

00:11 20   insensitive but they need a shockwave, typically in the form of

21   a detonator, to get them to go.  For example, TNT, if I had a

22   block of TNT for demonstration purposes and I took a match to

23   it, it would burn but it wouldn't detonate because there's not

24   enough energy to get those molecules to decompose to react to

25   achieve a shockwave.

1          So in the blasting industry or military operations, they

2     have commercially available blasting caps.  So there's energy

3     put into that blasting cap which starts the explosive train, we

4     call it.  There's a shockwave that's developed within that

5     blasting cap, and that blasting cap then propagates that

6     shockwave to the TNT to get it to go.

7     Q.   And how does the low explosive work?

8     A.   Again, it could be a simple match, like a firework.

9     There's a fuse sticking out of it.  You light a match.  It's a

00:12  10     safety fuse, so you can light it and then get away in time, so

11     you could have some type of hot ember or hot -- it's just

12     energy.  That heat has to come from some form of energy.  It

13     could be a flame.  It could be a hot wire.  It could be

14     friction is generating energy just enough to get those

15     molecules within that low explosive to start decomposing to get

16     that energy going that it needs to sustain the reaction.

17     Q.   And so for low explosives to actually explode as opposed

18     to just burn, do they need to be contained?

19     A.   Yes.  If I -- for example, if I bought two cans of black

00:13  20     powder and we went outside and I demonstrated by taking one can

21     and pouring it on a surface, and I took a match and I lit that

22     black powder, you would feel the heat from the thermal

23     decomposition.  You would see smoke.  It would be white smoke.

24     You would smell the sulfur burning.  Black powder is potassium

25     nitrate, oxidizer, sulfur, and carbon as the fuels.  They're

1    burning in that oxidizer.  So you would see this reaction.  It
2    wouldn't explode.  It's relatively harmless other than just,
3    you know, the awe of it.  If I take that same amount of powder
4    from the second can, which is a pound of it, and I put that in
5    some type of container, now what's happening is that gas that I
6    talked about earlier that's being generated, that pressure that
7    has built up, it has to go somewhere.  It cannot stay within
8    that container.  So that pressure, as it builds up over time
9    very quickly within that container while the material is
00:14 10   burning, that pressure is going to overcome that container in
11   some fashion causing it to peel apart, bust open.  That's the
12   explosion that you're hearing.  The black powder isn't
13   exploding.  It's a chemical reaction.  It's causing a
14   mechanical explosion which is the failure of the container
15   which it's contained in.
16   Q.   And how quickly does that process happen?
17   A.   Low explosives are designed to function or react
18   thousandths of a second.  In contrast, high explosives are
19   designed to react one, one-hundred-thousandths of a second so
00:14 20   several orders of magnitude quicker.  It's a relatively slow
21   reaction, but on a chemical scale, it's pretty quick.  For us
22   to interpret how fast it's reacting, we have a wide variety of
23   instruments or engineers that study these compounds.  There's
24   all these instruments they use to understand the reaction rate,
25   the pressure that's generating, and how fast the reaction is

1    going.

2    Q.   When you see an explosion, are there signals from the

3    observations that you can make about the explosion that might

4    tell you whether it's likely a high-explosive or a

5    low-explosive explosion?

6    A.   When explosives react, you know, the energy that they

7    release is in the form of heat, light, and sound.  If you're

8    looking at an explosion going off, you're going to see the

9    light that's going off.  You're going to hear it as a loud

00:15 10   sound.  But there's another process or another -- not a flaw,

11   but what happens with some of the military-type explosives,

12   like TNT, if I initiate a pound of TNT, there's going to be a

13   black cloud that's associated with that because there's a lot

14   of extra carbon within TNT.  There's not enough oxygen to react

15   with that.  So that carbon soot goes away, and that's the cloud

16   that we see.

17        On the other hand, with low explosives, there is a lot of

18   oxidizer left over.  Some of the products that they're forming,

19   when they start off and they're burning, the products that are

00:15 20   left behind are a little bit different.  But when they release

21   their gas and energy, there is all these different types of

22   compounds, and they're typically white in color.

23   Q.   So one distinction is a white plume of smoke versus a

24   black plume of smoke?

25   A.   Correct.

1    Q.   Now, in addition to examining explosives when they're in

2    their bulk form or they're intact form, are you able to do

3    post-blast investigation?

4    A.   Yes.

5    Q.   And how do you do that?

6    A.   Post-blast, we're just looking for residues.  There may be

7    microscopic traces of material left behind.  So there's various

8    procedures that we go through, rinsing them with the material

9    that comes in with chemical solvents, water and then acetone.

00:16 10   It's a screening technique that we're achieving.  Based on the

11   results from those screening techniques will navigate as to

12   other instruments that we may use.

13   Q.   What is the purpose of doing that kind of a post-blast

14   forensic examination?

15   A.   Like I said earlier, there's going to be little bits of

16   residue left behind, so we're using these solvents to determine

17   what explosive may have been used to cause the explosion.

18   Q.   And can you determine using that process specifically what

19   brand of explosive was used, or what's the level of specificity

00:17 20   that you can arrive at?

21   A.   With low explosives, it's practically impossible.  It's

22   difficult to determine what brand it was or anything like that.

23   We don't try to determine, you know, the manufacturer or

24   anything like that.

25        For high explosives, it's a little bit easier.  For

example, TNT I talked about earlier.  If that material goes
off, there's microscopic traces of TNT residues left behind.  I
can state with confidence that the explosive contained TNT
within there.  Whereas, with low explosive, we can't determine,
like, a particular brand name or a manufacturer that made that
material.

Q.   Now, did you examine the evidence from the Boston Marathon
investigation?

A.   Yes.

          MR. CHAKRAVARTY:  Mr. Bruemmer, if we could just call
up Exhibit 620.

          THE COURT:  This is 620 which is in evidence?

          MR. CHAKRAVARTY:  It is 620 in evidence, your Honor.

Q.   Now, Examiner McCollam, starting with Boylston Street, did
you examine evidence from a variety of the places where it was
collected on Boylston Street from the blast scene of Scene A?

A.   Yes.

Q.   Examining that evidence, did you arrive at a conclusion as
to what the nature was of the explosives involved?

A.   Yes.

Q.   What did you conclude?

A.   That the residues that were present from the specimens
that were submitted from Scene A, those residues are consistent
with the deflagration products of a pyrotechnic or
firework-type material.

1    Q.    And with regards to Scene B, again, did you examine the

2    evidence submitted that had chemical residues on it and

3    determine the nature of the explosive for Scene B?

4    A.    Yes, I did.  Again, the residues from Scene B are

5    consistent with the deflagration products of a low-explosive,

6    pyrotechnic-type material.

7    Q.    Did you also examine the evidence submitted from the

8    Watertown crime scene?

9    A.    Yes.

00:19 10    Q.    And that included both a pressure cooker device as well as

11    several pipe bombs?

12    A.    Yes.

13    Q.    Did you also examine the intact, rendered safe, pipe-bomb

14    material?

15    A.    Yes.

16    Q.    Did you also examine the bulk powder that was in a

17    Rubbermaid container that had not been ignited?

18    A.    Yes.

19    Q.    And did you conclude -- draw any conclusions about the

00:20 20    nature of those explosives?

21    A.    Yes.

22    Q.    What were those?

23    A.    The bulk material was definitely pyrotechnic

24    flash-powder-type material.

25    Q.    Now, can you explain to the jury what a pyrotechnic

1    flash-powder-type material is?

2    A.   Pyrotechnics are designed for our amusement.  They're

3    Fourth of July-type events.  They're made here in the United

4    States, but the bulk of fireworks are made in Asia.  They're

5    brought over.  And, again, it's just a combination of

6    oxidizers.  There's chemical sources of oxygen mixed with the

7    various types of fuel.  And the fuel specifically, they're

8    highly reactive fuels such as aluminum or magnesium.  That

9    flash that you see, that bright flash is aluminum or magnesium

00:21 10   burning.

11   Q.   Are there combinations of commercially available

12   pyrotechnics, are they consistent in terms of what elements are

13   contained within those?

14   A.   It's a very complex process how they make them, and it

15   depends on the customer who's ordering the fireworks, what they

16   want.  All these different chemical oxidizers that go in there

17   have a various function.  Not only are they designed to supply

18   the oxygen during the reaction but the element that's

19   associated with them as well.  For example, barium nitrate,

00:21 20   they add barium nitrate to fireworks because that burns green.

21   So when you're watching fireworks burn, if you see green, it's

22   because the oxidizer barium nitrate is in there.  If you see

23   red, that means that the oxidizer strontium nitrate is in

24   there.  If you see blue, then you have copper salts or copper

25   nitrate, various compounds that are in there.  So the engineers

```
 1    and the people that make this stuff understand the different
 2    colors that these chemicals produce, so they can design these
 3    fireworks.  So when they're burning in the sky, those materials
 4    that you see burning are because of the different elements and
 5    the different oxidizers that are associated with them.
 6    Q.   All right.  And so when you conducted your analysis of
 7    each of those various crime scenes and pieces of evidence, can
 8    you explain to the jury how you did that?
 9    A.   So when the evidence came in, there were many, many pieces
10    that came in.  Both from the Scenes A and B were big pieces of
11    metal fragment.  In observing those pieces of metal, I could
12    see black-colored material, discoloration on there, residue
13    that was left behind.  There was also swabs from the scene.  We
14    swab surfaces that can capture residue.  And also vacuum
15    samples were submitted as well both from Scene A and B and then
16    the Watertown incident as well.
17         So what myself and my team did is that we -- if the piece
18    of metal had black residue or discoloration on there, if we
19    were able to scrape that off, we would set that aside for
20    further analyses but decided to focus our analyses -- since
21    there were so many items, to focus our analyses on a technique
22    called ion chromatography.  What I'm doing with that is there's
23    a water wash that I'm using, so I rinse the items with water.
24    I filter that water.  And then what it's designed to do is
25    these organic -- sorry, inorganic compounds, those oxidizers
```

1    I'm talking about, are soluble in water.  So they're going to

2    be trapped within the water.  It's kind of like a chemical

3    soup.  So this material goes on the ion chromatograph system.

4    We call that IC.  That IC system separates out all those

5    individual components based on how much time they want to spend

6    in the system.  So I can get -- say, for example, if I had

7    eight compounds, I could separate out those eight compounds.

8    These are called anions.  They have a negative charge to them.

9    So I can determine if there's chloride, if there's nitrate, if

00:24 10   there's sulfate, if there's perchlorate, all these different

11   ions that are associated with that.  It's just a piece of the

12   puzzle.

13        Next step would be to analyze that black residue material

14   that we scraped off.  We'll grind that up in a mortar.  That's

15   going to go on a system called an X-Ray Diffractometer.  We

16   call that XRD.  What that XRD system does is its sample is

17   sitting in an instrument, and X-rays are focused on that

18   sample.  And what the sample does is it rotates through

19   predetermined degrees.  It goes from approximately 5 to 75

00:24 20   degree angle.  And those X-rays that are focused on the

21   instrument -- or, sorry, the sample will diffract at certain

22   angles because of the crystal lattice structure of the sample

23   that's in there.  No two chemicals have the same crystal

24   lattice.  We can only do this for solid material.  We can't do

25   it for liquids or gels or anything like that.  It's only for

1    solid material.  So it develops what we call a diffraction

2    pattern which is unique to those specific chemicals or crystal

3    structures.  If there's a mixture in there, it can easily

4    separate the mixtures out and give me a diffraction pattern.

5    And that diffraction pattern is searched against a known

6    library of materials that's associated with the instrument.

7         Finally, that black material is then going to be analyzed

8    by an instrument called Scanning Electron Microscopy with

9    Energy Dispersive X-Ray Spectroscopy.  That's a mouthful, so

00:25 10   we'll just call that SEM.  So what the SEM does, well, there's

11   a detector called the EDS detector.  What that detector does is

12   it determines the elemental composition of the material that's

13   in there.  It doesn't determine structure or anything like

14   that.  It just determines what elements are present.  So a lot

15   of these samples contain carbon.  They contain oxygen, silicon,

16   sulfur, barium, potassium, chlorine, aluminum, magnesium, all

17   chemicals that are commonly found in pyrotechnic material.

18   Q.   Similarly, are those elements not commonly found on

19   Boylston Street and on Laurel Street in Watertown?

00:26 20   A.   No.

21   Q.   Now, once you have identified a number of the different

22   chemicals, how do you conclude -- what can you do with that

23   combination of the various chemicals that you have?  How do you

24   use that information?

25   A.   Well, then we just -- once all the data has been

1    collected, we sit down and I start going through all the data,

2    all the notes.  And that's when I start arriving at the

3    conclusion that these materials present are consistent with the

4    deflagration of pyrotechnic materials.  I've analyzed cases

5    from fireworks before, people making flash powders.  We've seen

6    it many times before.  I've burn them myself; I've analyzed

7    them myself.  So I arrive at that conclusion, and that's when

8    the report process starts to be written.

9    Q.   You drafted a report.  I suspect that's the report in

00:26 10   front of you, is that right?

11   A.   Yes.

12   Q.   The analysis you described can tell you what kinds of

13   materials were used.  Can you tell how much of that material

14   was used?

15   A.   You can.  There's a technique called quantitation,

16   determining how much of something you have.  The Explosives

17   Unit on the chemistry side, we don't quantitate anything.

18   We're just trying to determine what's present.  Is there an

19   explosive there or not.  So I did not determine how much of

00:27 20   anything was present.

21   Q.   Now, a pyrotechnic mixture comes from fireworks, right?

22   A.   They can.  Like I said earlier, there's pyrotechnics for

23   road flares, kitchen matches; the military uses it for various

24   applications.  It not just fireworks, but that's a common

25   source of it.

1   Q.   For a civilian who doesn't work in those other industries

2   which use fireworks -- excuse me, which use pyrotechnics, how

3   would one extract from a firework the pyrotechnic mixture that

4   would be the explosive that you described?

5   A.   Someone would have to mechanically go into the pyrotechnic

6   device to get the filler or the explosive material out of

7   there.  For example, a small firecracker, the small, little

8   cylindrical objects you see, by law, they can only have 50

9   milligrams of material inside of that.  But yet there are other

00:28 10   commercially available fireworks that are sold that can contain

11   up to hundreds of grams of pyrotechnic material, all legal,

12   depending on what state you live in and how the laws are set up

13   where you can buy them.

14       But somebody would have to actually go in, cut through the

15   cardboard.  Those cardboard tubes and some of those materials

16   are relatively thick.  Again, that thickness of the cardboard

17   is to contain the pressure so that the firework could be

18   projected vertically.  So there's a lot of effort that will go

19   into separating out the pyrotechnic or firework explosive.

00:28 20   Q.   What would happen if you have pyrotechnic mixture from a

21   variety of different low-explosive sources so, like, black

22   powder as well as firework flash powder as well as other types

23   of things?

24   A.   They all burn pretty much the same.  Flash powder burns or

25   fireworks burn a little bit hotter than just regular black

powder.  But they will function -- if they're mixed together,

they pretty much function the same.

Q.   And to extract from fireworks a pound of explosive --

low-explosive material, about how many fireworks would that

require?

A.   Again, it depends on what has been purchased.  Some of the

products -- like I said, the firecracker would be not worth

your time because there's only 50 milligrams.  There's 454

grams in a pound, so that wouldn't be a good way of doing it.

But there are mortars that you can buy.  Certain states sell

mortars.  They can contain up to maybe 30 grams or more of

explosive material within them.  So if you're looking for a

pound, 30 grams, 454 grams in a pound, you would need dozens of

those mortars just to create a pound of explosive material.

          MR. CHAKRAVARTY:  Can we call up Exhibit 1230-10?  I

believe this is in evidence.

Q.   Do you recognize that?

A.   I've seen the picture before, but I don't know if I've --

I believe I analyzed it in the lab in a different form.  When

it came into the laboratory, it had already been dismantled or

taken apart.

Q.   All right.  Can I show you Exhibit 1256-04?

          MR. CHAKRAVARTY:  Which is also in evidence, I

believe.

Q.   Do you recognize that?

A.    Yes.

Q.    Does that appear to be a disassembled version of the earlier photo?

A.    Yes.

Q.    And what did you analyze that to be?

A.    So I mechanically removed some of the powder that you can see from the different firework-type material, and the powder that was contained within is pyrotechnic, low-explosive material.

Q.    If you can estimate, without precision but just as a ballpark, how many of these you would need to extract a pound of explosives?

A.    It would be quite a lot, hundreds, I would guesstimate. It's really inaccurate, but it would be hundreds because there's not a lot of material.  There's three different kinds. You can see there's a Roman-candle-type product up at the top. I didn't analyze that.  But then you can see those from, I guess, south to north, you can see finger-type or long cylindrical-type materials.  There's a couple milligrams or a gram or so of material within each of those.  And then off to your left at about 9:00 or 10:00, there's more cylinders that are chained together with a fuse.  I opened up one of those. There's approximately a half a gram to a gram of material within each one of those.

Q.    Did you have various receipts and other exemplars of other

1    fireworks that were purchased as part of this investigation

2    that you analyzed?

3    A.    Yes.  One sample was sent down to us.

4    Q.    Was there a lock-and-load mortar kit that you examined?

5    A.    Yes.

6    Q.    Was that the largest firework that you examined?

7    A.    Yes.

8    Q.    And how many of those would you need to create a pound of

9    explosive material?

00:32 10    A.    If I recollect correctly, the lock and load, one of those

11    mortars contained a little bit more than 30 grams, about 35

12    grams of material.  So, again, you would need a couple dozen of

13    those to get up to a pound.

14    Q.    In order to extract explosives from firework materials,

15    can you describe how clean or dirty that process is?

16    A.    In my experience, it's a pretty dirty process.  Again,

17    because -- when I've talked about the low explosives, oxidizers

18    and the fuel, the most common fuel used is aluminum powder

19    because it's cheap and it's very reactive.  So that's pretty

00:33 20    much the go-to fuel for a lot of these firework manufacturers.

21    But when you work with this material, it appears -- since it's

22    mixed so well commercially, it appears to just look silver in

23    color.  You almost can't discern any heterogeneous compounds

24    within there, like a mixture of different things, until you put

25    it under a microscope and start looking at it.  And then you

1    can see the many different things that go in there.  But

2    working with that, we definitely use gloves, but it's almost

3    impossible not to get the material coating on your hands, the

4    silver powder, which is aluminum powder or magnesium powder

5    which may be in there as well.

6    Q.   And if you were to use black powder as if from a

7    propellent or as a -- or just in bulk form, how clean or dirty

8    is that to extract and to make into a low-explosive device?

9    A.   Black powder is pretty unique because it literally looks

00:34 10   like very small pieces of coal.  It comes in various grain

11   sizes depending on what application the -- the people that use

12   it for hunting or black-powder rifles.  It has four different

13   sizes.  But they're very highly polished, little, irregularly

14   shaped lumps of powder material.  So if I handle that, I'll get

15   a little bit of chemical residue on me, but it's not going to

16   really notice -- or be able to see on my hands, yes, I just

17   handled black powder because my hands are all black now.  It

18   doesn't work that way.  It's coated with graphite to keep the

19   friction down, so if you're pouring it, it doesn't generate

00:34 20   friction which could set it off.

21   Q.   Now, as part of this investigation, you said that you had

22   analyzed a number of bulk materials submitted as well as

23   post-blast materials --

24   A.   Yes.

25   Q.   -- correct?

1          With regard to the bulk materials submitted, for example,

2     in that plastic container in Watertown, was there several

3     pounds of explosives in that container?

4     A.   I didn't weigh out the material.  It was presented to me

5     in smaller, couple grams of material to analyze.

6     Q.   But to create that bulk material, would you expect to see

7     residues of that bulk material wherever it was created?

8     A.   In that volume and that mass that was produced, yes.

9     Q.   And if there was the same type of powder in the pressure

00:35 10    cooker devices and the pipe bombs, then you would expect that

11    there would be even more bulk material that would have had to

12    have been prepared before they could have been used in those

13    devices?

14    A.   Yes.

15    Q.   Again, did you, in your investigation, see traces or

16    evidence that was consistent with a -- the volume of particles

17    of residue that would indicate where specifically these devices

18    were assembled?

19    A.   No.

00:36 20          MR. WATKINS:  I'm going to object.  Very confusing.

21          THE COURT:  Well, in light of the answer, I'll let it

22    stand.

23    Q.   Did you also receive in the lab for analysis trace filters

24    from various vacuum samples?

25    A.   Yes.

1    Q.   And did you see -- receive those from various search

2    locations in the investigation?

3    A.   Yes.

4    Q.   Was there any one set of trace filters that you received

5    that indicated that there was a large volume of traces of

6    either black powder or low-explosive, pyrotechnic mixture?

7    A.   I'm going to have to refer to my report.  Is that okay?

8    Q.   Please, to refresh your recollection.

9    A.   So there are going to be specimens Q933, that whole

00:37 10   sequence from -- let's see here -- 410 Norfolk Street,

11   Apartment No. 3.  So the residues -- so some of the filters

12   that I analyzed did contain residues of pyrotechnic material.

13   Q.   So how much residue was there?

14   A.   They contained -- again, we don't quantitate.  I don't

15   know how much residue was there.  But there's the perchlorate

16   ion.  There's the nitrate -- elevated nitrates, sulfates,

17   materials like that.

18   Q.   So you don't -- you don't measure from the quantity of

19   these materials when you do the analysis?  You just measure

00:38 20   whether those materials actually exist?

21   A.   Correct, if they're present.

22   Q.   Aside from Norfolk Street, were there any other locations

23   where you tested for residue?  I guess the question is whether

24   you tested for residue in other places.

25   A.   There were some gloves that were -- some latex or some

1    type of disposable gloves from a vehicle that contained

2    residues as well.

3    Q.    Was that a Honda CR-V that was parked outside of 410

4    Norfolk?

5    A.    Correct.

6    Q.    Again, was that pyrotechnic mixture on the fingertips of

7    those gloves?

8    A.    Yes, consistent with pyrotechnic material.

9    Q.    Aside from that, was there anything else?

00:39 10    A.    Some of the samples from 410 Norfolk Street.  There were

11    four samples that contained small grains of black powder as

12    well, not just the residues of the ions, the oxidizers that we

13    were detecting, but actual physical black powder grains were

14    identified.

15    Q.    Now, in a case involving as much explosives as you --

16            MR. WATKINS:  I'm going to object, your Honor.

17            MR. CHAKRAVARTY:  I'll ask a new question.

18    Q.    In this case, would you expect to have seen more residue?

19            MR. WATKINS:  I object.

00:39 20            THE COURT:  Sustained, sustained, without foundation.

21    Q.    Do you expect to see residue -- residues of the creation

22    of IEDs or, Improvised Explosive Devices, when they are created

23    in the course of --

24    A.    Correct.  In this type of operation, if material is being

25    extracted from fireworks and then ground up somehow, it's hard

1    to keep a clean surface.  It's hard to not contaminate or

2    spread this material around to the surfaces or areas you're

3    working in or getting it on your person, yourself, within your

4    clothes and then tracking it to other areas.  It's very

5    difficult.

6    Q.   So is it fair to say that there was at least a large --

7         MR. WATKINS:  Objection, your Honor.  Leading.

8         THE COURT:  No.  Overruled.  Go ahead.

9    Q.   -- an unquantifiable but a substantial amount of explosive

00:40 10   powder that was necessary to create the devices on Boylston

11   Street and in Watertown?

12   A.   Yes.

13   Q.   And did you find the residues that were commensurate with

14   that volume --

15        MR. WATKINS:  I'm going to object, your Honor.  Can we

16   be seen at sidebar?

17        THE COURT:  Okay.

18   (SIDEBAR CONFERENCE AS FOLLOWS:

19        MR. WATKINS:  He's trying to get into an opinion that

00:41 20   hasn't been noticed.  I'm not exactly sure where he's going in

21   the long term of the guilt phase here, trying to suggest that

22   the bombs weren't built in Norfolk or built somewhere else.  I

23   don't know what that has to do really with anything in the

24   guilt phase.  So I'm wondering about relevance on that.

25        I was not noticed about this particular aspect of the

1    testimony where he's really speculating about where -- what Mr.

2    Chakravarty is trying to do is get a conclusion that the bombs

3    were not built at Norfolk Street through a series of questions,

4    "wouldn't you expect."  I don't know that he's going to ask

5    that, but that certainly suggests to the jury.  And on that

6    aspect, really what he's trying to do is elicit an expert

7    conclusion without soliciting an expert conclusion.

8            MR. CHAKRAVARTY:  I'm not trying to elicit an expert

9    conclusion.  I'm doing two things:  one is preempting what I

00:42 10  anticipate to be a line of questioning from the defense.  So

11   I'm simply exposing what his analysis was about those trace

12   explosives and other things that Mr. Watkins raised yesterday.

13   So he's exposing that.  And in order to provide the context of

14   what those -- that analysis means, I'm eliciting from him the

15   fact of the residues that he found there was a relatively small

16   amount of residue versus the amount of explosives that he had

17   -- the amount of explosives that appeared to have been

18   involved.  That's precisely the question I'm asking for.

19   There's no line of questioning.

00:42 20          THE COURT:  What about the notice issue?  Was this in

21   his report?

22           MR. CHAKRAVARTY:  What's in his report is that there

23   are trace amounts of the explosives and the residues, and it's

24   -- what's not in his report is an opinion as to whether the

25   trace amount would be proportional to the amount of explosives

1    that may have been involved in the case because, frankly, at

2    the time he did the report, he didn't know what the trace

3    amount was.  I'm not sure that that's an expert opinion.

4            THE COURT:  I think it is so I'd exclude it.

5            MR. CHAKRAVARTY:  Okay.

6    .  .  .  END OF SIDEBAR CONFERENCE.)

7            MR. CHAKRAVARTY:  Your Honor, a moment ago I showed

8    Mr. McCollam Exhibit 1230-10, and that's part of the 2-D

9    exhibit and it's in evidence, but it's not separately marked as

00:44 10    such.  So I would move that into evidence.

11           MR. WATKINS:  Are we talking about the photograph?

12           MR. CHAKRAVARTY:  The photograph.

13           MR. WATKINS:  Then no objection.

14    (Government's Exhibit No. 1230-10 received into evidence.)

15           THE COURT:  Okay.

16           MR. CHAKRAVARTY:  Thank you, Mr. McCollam.

17    CROSS-EXAMINATION BY MR. WATKINS:

18    Q.   Good morning, Mr. McCollam.

19    A.   Good morning.

00:45 20    Q.   Mr. Chakravarty was asking you a series of questions about

21    other items that you tested in the laboratory for explosive

22    residues?

23    A.   Yes.

24    Q.   And there was really a whole lot of items that you

25    analyzed?  You were a very busy man in this case; is that fair

 1    to say?

 2    A.    Yes.

 3    Q.    And your report is quite lengthy and goes on to identify a

 4    whole host of items that you examined and/or tested for

 5    explosive residues, right?

 6    A.    That's correct.

 7    Q.    Showing you what's been admitted as Exhibit 3099 -- I'm

 8    waiting for it to come up.

 9          You mentioned in your report a Q number.  Exhibit 3099 is

00:46 10    Q667.  Do you see that in your report?

11    A.    I do.

12    Q.    What was the -- your analysis of exactly what was found on

13    those gloves in Q667?

14    A.    Within some of those gloves there was black smudging on

15    some of the fingertips.  So that smudging in that fingertip

16    area, I couldn't scrape off any residue, per se, like I could

17    with the metal fragments that were from the explosions.  So I

18    prepared an SEM slide, or an SEM stub is what it's called.  So

19    I just take the sample holder that's utilizing the SEM

00:47 20    instrument, and I dabbed it on the fingertip of that glove to

21    get any residue that's off.  That specimen was analyzed on the

22    SEM.  Then I did a water wash of that -- those black-tipped

23    from the particular gloves that were within Specimen 667 and

24    668, actually.

25    Q.    You told us about ions and anions that you look for when

1    you're doing your analysis?

2    A.    Correct.

3    Q.    You found those on these -- this set of gloves, right?

4    A.    I found some anions, yes.

5    Q.    Residues detected carbon, oxygen, iron magnesium.  You

6    explained to us already that those are items that are included

7    in low explosives?

8    A.    They're included in some pyrotechnic formulations.  They

9    can be in some low explosives, but they're commonly found --

00:48 10    those, in particular, were common for firework material.

11    Q.    Actually, those things can be found everywhere in nature,

12    but the combination starts to suggest fireworks and pyrotechnic

13    formulations?

14    A.    Correct.

15    Q.    Going on, silicone, sulfur, calcium, chlorine, potassium,

16    barium and zinc, those are things also found when you analyzed

17    these gloves that were found in the Honda CR-V?

18    A.    Yes.

19    Q.    Again, you analyzed many, many things, and for many of

00:48 20    them you concluded there was no explosive residue, right, on

21    many of the items that came into your laboratory?

22    A.    Correct.

23    Q.    But these certainly were of note because of that

24    particular collection of elements indicated pyrotechnic

25    formulations, right?

1    A.   Yes.

2    Q.   And you mentioned -- you anticipated already 668, the same

3    thing, another latex glove found in the CR-V.  You found the

4    same kinds of ions and anions on that glove also, correct?

5    A.   Yes.

6    Q.   And, again, you've analyzed a lot of different things.

7    And if there were no collection of those elements, you wouldn't

8    report a finding or you'd report no finding.  But certainly

9    this was of interest given those collection of elements on the

00:49 10   glove, right?

11   A.   Yes.

12   Q.   Also, 671, another latex glove found in the CR-V, it was

13   notable because it had --

14        MR. CHAKRAVARTY:  Objection, your Honor.  I think this

15   is the same photo from the -- same glove from a different

16   angle.

17        MR. WATKINS:  Is it?  I'm sorry.  This is Q671.  Maybe

18   I hit the wrong one before.

19   Q.   These are different, aren't they?

00:50 20        MR. CHAKRAVARTY:  I stand corrected.

21   Q.   668 and 671?

22   A.   Correct, yes.

23   Q.   So they're two different gloves.  They look very much the

24   same, right?

25   A.   They do, but they have different numbers, Q numbers.

1  Q.   Which means they're different items?

2  A.   Yes.

3  Q.   But there was explosive powder found on each of them?  I'm

4  sorry.  "Explosive" is the wrong word.  There were elements on

5  those gloves consistent with pyrotechnic formulations?

6  A.   On 667 and 668 but not on 671, that second picture you

7  showed.

8  Q.   Right.  671 found chloride nitrate and sulfate items,

9  right, according to your report?

00:51 10  A.   Yes.

11  Q.   That's here, 671.  Not as many elements as those other

12  items but still enough to warrant a finding in your report or

13  at least a mention in your report, right?

14  A.   Yes.  I listed chloride, nitrate, and sulfate on those

15  items.

16  Q.   Because those are also consistent with pyrotechnic

17  formulations and low explosives?

18  A.   They can be, yes.

19  Q.   In addition to actual items, you received vacuum

00:52 20  filters --

21  A.   Yes.

22  Q.   -- to analyze, right?

23  A.   Yes.

24  Q.   And vacuum filters come from vacuum sweeping?  There are

25  forensic vacuums that the FBI has for this purpose?

1    A.    Yes, they're special filters.

2    Q.    Special vacuums and special filters and actually written

3    procedures about how one goes about vacuum-sweeping an area,

4    right?

5    A.    Those -- I'm not aware of those procedures.  I'm not an

6    ERT member, so I didn't collect any of these samples.

7    Q.    But you do get those trace filters back to the lab and

8    that's what you analyze?

9    A.    Yes.

00:52  10    Q.    There's no picture for it because it's, you know, trace

11    filter.  But Q669 is also a vacuum filter from the Honda CR-V

12    at 410 Norfolk.  Do you see that in your report?

13    A.    Yes.

14    Q.    Again, you identified that as having residues of chloride,

15    nitrate, and sulfate, right?

16    A.    Yes.

17    Q.    Again, consistent with pyrotechnic formulations,

18    low-explosive residue?

19    A.    Some, yes.

00:53  20    Q.    Finally, Q732 was a vacuum filter from a sweep of a Honda

21    Odyssey at 410 Norfolk, the same for that contained residues of

22    chloride, nitrate, and sulfite, right?

23    A.    That's sulfate.

24    Q.    Sorry, sulfate.

25    A.    Yes.

1    Q.    In addition to the items found -- Q667, just to go through

2    and make it clear for the record, I showed you Exhibit 3099,

3    which was Q667.  I showed you Exhibit 3100, which is Q668.  Is

4    that correct?

5    A.    Yes.

6    Q.    And then Exhibit 3101, this is a second picture -- not a

7    second picture -- a picture of a second glove, which was Q671,

8    is that correct?

9    A.    Yes.

00:55  10    Q.    Have you also analyzed a set of tools and other items that

11    were denoted Q725?  It was a box of tools and other things that

12    was admitted yesterday as Exhibit 1094.

13    A.    Yes.  Q725 I analyzed.

14    Q.    I'm sorry?

15    A.    Yes.  I analyzed Q725.

16    Q.    What that involves is a lot of different items that were

17    found in a drawer at 410 Norfolk?

18    A.    Yes.

19    Q.    There were two items on that that also included evidence

00:56  20    of low explosives?

21    A.    Yes.

22            MR. WATKINS:  Your Honor, I don't think this is in

23    evidence, so perhaps we can go just to the witness.

24    Q.    Showing you a picture of 725.11, is that one of the items

25    that you analyzed?

1    A.   Yes.

2    Q.   That is a picture -- do you recognize that as a picture

3    that you looked at because it was taken in the Quantico

4    laboratory?

5    A.   Yes.

6           MR. WATKINS:  I'd seek to admit Exhibit 3102.

7           MR. CHAKRAVARTY:  No objection, your Honor.  I think

8    it may also have a government exhibit number.

9    (Defendant's Exhibit No. 3102 received into evidence.)

00:56 10           MR. WATKINS:  Is it?  There you have it.  May we

11    publish that?

12           THE COURT:  Yup.

13    Q.   And that -- it's a hobby fuse, right?

14    A.   That's one of the names -- common names for it, yes.

15    Q.   And there are traces of potassium perchlorate and carbon

16    on the hobby fuse?

17    A.   Not traces.  There's actual bulk explosive --

18    low-explosive material that is contained within the core of

19    that.  You can't see it on the outside, but it's contained with

00:57 20    the inside of it.

21    Q.   I want to direct your attention to Q725.24.  Now, there's

22    not a separate picture of that item, but that would be --

23           THE COURT:  Is this in evidence?  It's all part of the

24    interactive anyway, I think.  It was shown in that.  I don't

25    know that it was separately marked.  Any problem showing it to

1    the jury?

2              MR. CHAKRAVARTY:  No, your Honor.

3              THE COURT:  Okay.

4              MR. WATKINS:  May I have just a moment?

5    Q.   Anyway, this picture that's up before you with a red

6    circle around a lid, did you analyze that black lid?

7    A.   I analyzed the lid, yes.

8    Q.   I'm sorry.  Analyzed the lid with the black residue on it?

9    A.   Yes, sir, I did.

00:58 10   Q.   And that was notable for high explosives, nitroglycerin,

11   on it, right?

12   A.   Correct.  Nitroglycerin is a high explosive.

13   Q.   You told us about smokeless powder.  These items were

14   consistent with smokeless powder?

15   A.   Right.  The residues that I detected on that can lid

16   contained nitroglycerin and another chemical called ethyl

17   centralite.  Those two chemicals are commonly found in some

18   smokeless powder formulations.  It will be a double-based

19   smokeless powder.

00:59 20   Q.   Again, I'm told this picture was introduced as Exhibit

21   3066 yesterday.  This picture is in evidence.  And it is a

22   collection of items that you understand through your notes was

23   collected at 410 Norfolk, in a drawer, right?

24   A.   Correct.

25   Q.   You received vacuum filters for analysis sometime in July

1   or August of 2013?  I would be referring to Q1283 through 1293.

2   A.    Yes.

3   Q.    When did you receive those items?

4   A.    I don't recall the exact date that I received them, but

5   they came into the laboratory -- because when evidence comes

6   into the laboratory, it's assigned a unique identifying number.

7   It appears that those came in August 16, 2013.

8   Q.    And these were more vacuum filters, right, for analysis?

9   A.    Q1283 through Q1291 were vacuum filters.  Q1292 was a vent

01:01 10   filter.  And then I believe you said 1293 -- you said Q1293

11   were swabs.

12   Q.    In your report, you have those identified with particular

13   locations where they were from, that they had been collected

14   from?

15   A.    When the evidence is inventoried within the laboratory,

16   they just have a disclaimer stating where these items were

17   collected from.  I don't know where they're collected from

18   other than what somebody tells me.

19   Q.    Right.  What were you told that -- where they were

01:01 20   collected from?

21         MR. CHAKRAVARTY:  Objection, your Honor.

22         THE COURT:  Overruled.

23         MR. WATKINS:  Sorry?

24         THE COURT:  Overruled.  You may have it.

25   A.    The following items were recovered from UMass Dartmouth,

1    Pine Dale Hall, Room 7341, North Dartmouth, Massachusetts, by

2    FBI Boston.

3    Q.   So, again, these are vacuum filter traces consistent with

4    the kinds of evidence you would get if somebody had vacuumed up

5    an area and sent it to you for analysis?

6    A.   Yes.

7    Q.   And you analyzed all of those vacuum filters?

8    A.   Yes.

9    Q.   Did you find any of the traces that you talked about with

01:02 10   the jury as being indicative of pyrotechnics?

11   A.   No.  The screening technique showed that they were

12   negative for any typical explosive residue traces that we

13   screen for.

14        MR. WATKINS:  That's all I have, your Honor.

15        MR. CHAKRAVARTY:  Very briefly, your Honor.

16   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

17   Q.   Mr. McCollam, you testified that there may have been

18   pounds of low explosives that were used in this case?

19   A.   Correct.

01:03 20   Q.   And you testified that it's an extremely messy process to

21   create those low explosives?

22   A.   Yes.

23   Q.   And as far as you know, with regards to the trace amounts

24   of low explosives that Mr. Watkins asked you about, you found

25   them on some gloves, and you found some in some vacuum filters

1    from 410 Norfolk Street?

2    A.   Yes.

3    Q.   And that's the only trace amounts that you found in this

4    case; is that fair to say?

5    A.   Yes.

6    Q.   And unlike trace amounts of explosive product, there was

7    actually intact fireworks found in the dorm room in Pine Dale

8    Hall, isn't that right?

9    A.   If it was submitted to the laboratory coming from there, I

01:04 10   analyzed it, so, yes, there were.

11   Q.   And in the landfill, there was a bag containing intact

12   amounts of low-explosive, pyrotechnic mixture?

13   A.   Yes.

14   Q.   Did you ever find a location, a single location, where

15   there was a production facility for these IEDs?

16        MR. WATKINS:  Objection, your Honor.

17        THE COURT:  Sustained.

18        MR. CHAKRAVARTY:  That's all I have, your Honor.

19        THE COURT:  Anything else?

01:04 20        All right, sir.  Thank you.  You may step down.

21        MR. CHAKRAVARTY:  The government calls Edward Knapp.

22        THE CLERK:  Sir, want to step up here, please.  Step

23   up to the box.  Remain standing.  Raise your right hand.

24        EDWARD S. KNAPP, Sworn

25        THE CLERK:  Have a seat.  State your name.  Spell your

1    last name for the record.  Keep your voice up and speak into

2    the mic so everyone can hear you.

3            THE WITNESS:  Edward S. Knapp, K-n-a-p-p.

4    <u>DIRECT EXAMINATION BY MR. CHAKRAVARTY</u>:

5    Q.   Morning, Agent Knapp.  Are you a supervisory special agent

6    with the FBI?

7    A.   Yes, I am.

8    Q.   How long have you been with the FBI?

9    A.   Over 19 years.

01:05 10   Q.   Before the FBI, what did you do?

11   A.   I was in the United States Navy.

12   Q.   How long were you in the United States Navy?

13   A.   A little over eight years.

14   Q.   What unit were you in in the United States Navy?

15   A.   I was Naval Special Warfare, and that was -- basically

16   that's Navy SEAL.

17   Q.   Before that, what did you do?

18   A.   I went to college and graduated from the United States

19   Naval Academy.

01:06 20   Q.   As long as you've been an agent, have you had a variety of

21   different duties?

22   A.   Yes, I have.

23   Q.   And can you just give the jury an overview of your career?

24   A.   I was afforded regular basic FBI agent training.  Then I

25   went down to the Miami Field Division.  I investigated violent

1    crime, kidnapping, extortions.  At the same time, I got to go

2    to bomb technician school through the FBI in Huntsville,

3    Alabama, where all state and local bomb technicians are

4    trained.  And I was afforded that opportunity.  And I went back

5    to Miami.  Then I went and applied for a position up in the FBI

6    laboratory where I currently reside since the late 2003.

7    Q.    So let's -- at one point you were a -- I don't want to say

8    "regular" special agent because it doesn't make sense.  But you

9    were --

01:07 10    A.    Special agent.

11    Q.    You were a special agent.  Then you specialized in -- as

12    being a bomb tech, a special agent bomb tech?

13    A.    Yeah, that's correct.

14    Q.    So can you describe the process to become a special agent

15    bomb tech?

16    A.    Well, it was a course, a six-week course, basically how to

17    become a bomb tech, things of -- as far as explosives, handling

18    explosives, circuitry, what are bombs made up of, training

19    basic to render safe RSP bombs, how to deal with that.

01:07 20    Q.    RSP, does that stand --

21    A.    Render Safe Procedure, to neutralize an IED or a bomb.

22    Q.    Are there a variety of field divisions that have special

23    agent bomb techs?

24    A.    Yes.  All 56 field divisions have a bomb technician.

25    Q.    What are the duties of a special agent bomb technician?

1    A.   They basically coordinate.  They liaise state and local,

2    assist them at times for special events or if there's

3    call-outs.

4    Q.   What kind of activities do you do if there's a call-out?

5    A.   I might respond with that particular bomb unit to a call.

6    Things are reported back through them to our FBI headquarters

7    notifying that there's an incident going on.

8    Q.   And those incidents amount from, like, suspicious packages

9    all the way to an explosion, is that right?

01:09 10    A.   Correct.

11    Q.   And when you respond, do you do a variety of evidence

12    collection techniques?

13    A.   I imagine they do.  I mean, at this point that's up to --

14    in that field division, what's going on there at that time.

15    Q.   Just describing your -- when you were an SABT, did you go

16    out and respond to scenes?  And describe some of the things

17    that you did.

18    A.   If, yeah, there was a scene or go -- suspicious package or

19    there's some material that looks like maybe explosives or hand

01:09 20    grenade or might be explosive material, to assess if it's a

21    hoax or not.

22    Q.   And then did you also do render safe procedures?

23    A.   Practiced a lot.  But, I mean, I ended up leaving there

24    after a year or two to come up to the FBI laboratory.

25    Q.   You mentioned earlier that you attended the Huntsville

1    bomb tech training course.  Can you explain what that is?

2    A.    That's a six-week process.  You're familiar with

3    electrical and nonelectric fusing systems to detonate

4    explosives.  You handle explosives.  You look at render-safe

5    tools, tools that are used to disrupt IEDs, X-ray

6    interpretation, things like that.  And you have training and

7    then scenarios.  And you get qualified after that if you pass

8    tests and meet the standards.

9    Q.    And who is administering these tests and standards?

01:10 10    A.    That's the Hazards Device School, and it's run by the FBI.

11    And there's -- there was military bomb techs or retired

12    military bomb techs, you know, retired or public safety bomb

13    techs that are assigned as instructors down there in that

14    school.

15    Q.    And they evaluate you before they qualify you?

16    A.    Yeah.  There's practical application scenarios, getting in

17    the bomb suit, taking a disrupter, and neutralizing an IED.

18    Q.    As a result of that, do you get certified as a hazardous

19    device technician?

01:11 20    A.    No.

21    Q.    Okay.  How does that happen?

22    A.    That's a bomb technician.

23    Q.    Bomb technician, excuse me.  Is there a certification for

24    that?

25    A.    For?

1    Q.    For a bomb technician.

2    A.    That is the -- down in Huntsville, Alabama.

3    Q.    Is there ongoing training or a way to assess whether your

4    skills are up to date?

5    A.    There's periodic IED training with state and locals.  That

6    all depends, like I said, on the division where you're at and

7    the bomb techs with their state and local counterparts.

8    Q.    Have you continued to do that since this training?

9    A.    No.  I'm in the FBI laboratory, in the Explosives Unit.

01:12 10   Q.    I'm just trying to get a sense of, after your training,

11   how long you were in the field doing this work and then before

12   you came to the FBI lab.

13   A.    It was about a year and a half.

14   Q.    And during that time, did you investigate explosives

15   incidents?

16   A.    It's been awhile, but there's one or two, you know, and

17   then doing special events with the state and locals over down

18   in Florida where I was assigned.  But, you know, it's been

19   awhile but one or two times at some call-outs at night, but

01:12 20   other than that --

21   Q.    So the bulk of your experience has been at the FBI

22   laboratory?

23   A.    I had to be trained and certified, yes.

24   Q.    So please explain that.

25   A.    There's a process.  I'm a hazardous device examiner in the

1    FBI, and we fall under the TEDAC section under the FBI

2    laboratory.  And we have --

3    Q.   Let me pause there.  What is TEDAC?

4    A.   The acronym is Terrorist Explosive Device Analytical

5    Center.  But in the course of -- in the Explosives Unit,

6    there's training that basically I had to complete.  It takes

7    several years.  There's actually working cases, doing oral

8    examinations, explosives, the admin oral boards for as far as

9    the FBI laboratory protocols and procedures and how evidence is

01:13 10   handled and sent through our laboratory besides working cases

11   with a qualified examiner and then also outside training that

12   was afforded along with -- actually, they would test --

13   basically test us.  Basically we would -- you know, a case -- a

14   mock case would come in.  We would have to go from start to

15   finish.  Then we'd have to basically write reports and then

16   testify in a mock room setting.  You had to complete so many

17   cycles of that type of training.  And then once you completed

18   all that training, if you completed it, then you would be

19   certified as a hazardous device examiner.

01:14 20   Q.   So can you explain to the jury the difference between a

21   bomb tech and a hazardous device examiner?

22   A.   Well, we had additional training outside, going to

23   commercial explosive manufacturers, military manufacturers.  We

24   have liaison with those type industry reps.  We had basically a

25   little more extensive training as to be an examiner, you know.

     1    Bomb tech, you know, they render safe some type of device and,

     2    you know, it's sent to us.  And we're trying to put the pieces

     3    back together and try to figure out the functionality of this.

     4    Was it actually a device or was it not or what they call a hoax

     5    device.

     6    Q.    So you examine evidence that's submitted from the field?

     7    A.    Yes.

     8    Q.    I jumped the gun earlier to say -- when I asked whether

     9    you had been certified to do that.  Have you been?

01:15 10    A.    Yes.

    11    Q.    When -- for how long have you been a certified hazardous

    12    device examiner?

    13    A.    Since approximately 2007.

    14    Q.    In the course of the last eight years, have you had

    15    occasions to conduct not just the mock hazardous device exams

    16    but actual real cases of hazardous device exams?

    17    A.    Yes, I have.

    18    Q.    About how many do you think you've participated in?

    19    A.    Dozens.

01:16 20    Q.    And have you had training in this last eight years as well

    21    after you have been certified?

    22    A.    Yes.

    23    Q.    Can you describe -- you described some of it.

    24    A.    I mean, each year you have to go through a proficiency

    25    testing to make sure you're still qualified, and you have to

1    pass those testing.

2    Q.   And is that administered by others in your field who are

3    also hazardous device --

4    A.   It's a requirement in the FBI laboratory under the -- as a

5    forensic laboratory under ASCLD.

6    Q.   And the process of conducting a forensic exam, is that a

7    collaborative process that you have -- you do with a team and

8    various disciplines?

9    A.   Well, as far as when the case comes to me, it's checked

01:16  10   in.  It comes to us.  There's a process of checking it in.  I

11   mean, I have a technician that is assigned to me.  And this is

12   checked in.  We then go to send the evidence out to other

13   forensic disciplines within the lab, DNA, latent fingerprints,

14   question documents, trace evidence, firearm toolmarks.  So this

15   evidence is then being sent to the other disciplines for them

16   to work on their discipline to find DNA or latent prints.  And

17   it would be transferred with the proper protocols through the

18   different disciplines, and it would come back to us.  But at

19   the end, at the end point, I'm looking and analyzing the

01:17  20   material that had come in to me on a case and whatever field

21   division in the FBI.

22   Q.   Then you render your assessments about that evidence?

23   A.   Well, whether it is an IED or a bomb, a homemade bomb, or

24   it's not.  It could be a hoax bomb.  Yes.

25   Q.   And in many of the cases that you've examined, have items

1   been submitted to you that hadn't exploded?

2   A.   Sometimes, yes.

3   Q.   And in other cases, there are so-called post-blast

4   investigations; you get the remnants of materials?

5   A.   Yes, that's correct.

6   Q.   In addition to Improvised Explosive Devices, have you had

7   training in other types of explosive devices?

8   A.   I mean, when you talk about an Improvised Explosive

9   Device, it can be commercially available, military available

01:18 10   materials or commonly, readily available you can find and buy.

11   And it's just form fashion as the term is "improvised."

12   Sometimes we get an actual -- could be some military munitions,

13   and we have to deal with that, you know.  But normally they

14   come in and they're improvised somehow, not designed as they

15   were meant to be functioned.

16   Q.   Can you elaborate on that?  Improvised Explosive Device, I

17   think we understand what those words mean by themselves.  But

18   can you explain --

19   A.   In an Improvised Explosive Device, you have to have two

01:19 20   things.  You have to have a main charge, some type of

21   explosives, and some type of fusing system.  It could be an

22   electrical fusing system or nonelectrical fusing system.  Those

23   are the two main components.  And then sometimes how -- what

24   explosive you use, whether it's a high explosive, like a

25   military grade, or a low explosive, like a powder, you might

1    need a container to use in a low-explosive device.

2    Q.    Is that because the gases that build up is what causes the

3    explosion in a low-explosive explosion?

4    A.    Yeah.  You have to have some type of confinement.  And

5    basically the chemical reaction in it relieves it mechanically,

6    and there's an explosion in that container.

7    Q.    Okay.  So as a hazardous device examiner, how do you go

8    about conducting a post-blast evidence forensic examination?

9    A.    Well, when the material comes in, you know, it's just a

01:20  10    bunch of, you know, bits and pieces, and we're trying to

11    segregate out stuff that's -- you know, it's not part of the

12    bomb or what I'm looking for, an IED, and then trying to start

13    to recognize pieces of maybe parts of the bomb, whether the

14    fusing system, depending on what type it is, if there's a

15    container.  There might be a concealment container.  Then

16    you're basically trying to identify, I have a power source, or,

17    yes, here's a switch, all kinds of, you know, ways someone

18    could fashion a bomb so --

19         And then we're trying to determine the functionality of

01:21  20    the bomb.  And then sometimes there's also -- something might

21    have happened in one scene, and then there's a search at

22    another scene, and they might collect some evidence.  And then

23    they might ask -- this is the field division or the people

24    request an exam that maybe we compare items from a search scene

25    and from the bombing scene.

Q.   And so when you assemble the evidence and you're trying to
figure out what parts are what, how do you go about it?  Do you
take measurements?  Do you take pictures?  What are you looking
at?

A.   We're looking at roughly trying to separate, like I said
before, you know, electrical fusing system needs certain
components in it, and we're trying to look for those.  An
electrical fusing system, you can have some sort of power
source.  It could be varied type of battery.  You have to have
a conductor, some wire.  You would have to have some type of
switch or switches in combination.  And also, at the end, we
call a load or the -- where the detonator or refer to, like, a
blasting cap, or it could be an improvised detonator or
initiator.

So you're looking through all the material, and you're
trying to find if there is a viable fusing system in there and
also then separating out, if there was a container used, the
pieces that are coming together, all these little pieces.
There might have been sometimes fragmentation that was added,
you know, into a device or there's a container or it was
transported in a box or, you know, some other means.  Then
there might be little bits and pieces left at the scene there.
But you're going -- concentrating on that to figure out.  And
also, you know, things are being sent to our explosive chemist
for testing to try to see what type of explosive material was

```
 1   used.
 2   Q.   Okay.  You just mentioned several things there.  Are each
 3   of those different systems, different components of an IED, a
 4   fusing system, a container, and an explosive main charge?
 5   A.   Yeah, that's correct.
 6   Q.   Is an energy source also necessary for that?
 7   A.   A power source.
 8   Q.   A power source.  For an electrical system, it would be a
 9   power source?
10   A.   Some type of power source.
11   Q.   For something like a pipe bomb, what would the energy be
12   from?
13   A.   It just depends on how it's made.  It could be a simple,
14   like, a firecracker fuse or those green -- that hobby fuse,
15   what we call, just lighting that with a match, or it could be
16   an improvised initiator and you're using a battery with some
17   type of switch to complete the circuit, and you could function
18   it that way.
19   Q.   Okay.  With regards to each of these components, the
20   energy source, the fusing system, a main charge or a container,
21   can you give some examples of each of those that you've seen
22   before or you've read about?
23   A.   Well, I mean, for an energy power source, nine-volt
24   batteries, six-volt lantern batteries, car batteries, things
25   like that.  I mean, I've seen regular commercial blasting caps,
```

1    commercial nonelectric blasting caps that were improvised to

2    make them electric blasting caps, blasting caps that were

3    improvised and made, initiators that were -- could be from an

4    SD rocket ignitor used as an initiator.

5    Q.   How about the various different vessels or containers that

6    you've seen?

7    A.   Pipes, pressure cookers, I've seen those; pipes; in a box;

8    PCV pipe.

9    Q.   Can you describe for the jury how these various components

01:25 10   interact together to create an IED?

11   A.   If we're talking in this -- in general or --

12   Q.   In general, and then we'll move to this case.

13   A.   In general, I mean, if you have that low explosive, you're

14   going to have to have a container.  And then it depends.  It's

15   as simple as putting a hobby fuse in it and lighting the hobby

16   fuse or, like I said before, you had some improvised initiator,

17   and you have to have a power source attached to it and then

18   some type of switch that will close that circuit and send a

19   current to that improvised initiator to ignite the low

01:26 20   explosive.

21   Q.   And then, because of the containment of the low explosive,

22   it will explode?

23   A.   If that's what the -- yeah, main charge was, yes.

24   Q.   Now, for purposes of this case, were you assigned to lead

25   the forensic examination of the explosives?

1   A.   Yes, for the Explosives Unit, yes.

2   Q.   So can you explain what you did early on in the

3   investigation?

4   A.   It started that next day.  Evidence started flowing into

5   the laboratory.  And as far as it was coming in, it was being

6   checked in, our process of checking it in, photographing it,

7   documentation, setting up an exam plan for all the other

8   disciplines.  And it just -- it kept coming in every about 12

9   hours.  There was a shipment at night, shipment in the morning.

01:27 10   And technicians were receiving the evidence in.  We were

11   looking -- looking at it.  Sometimes it was sent -- some of the

12   material was sent over maybe to DNA, if there was an issue,

13   they wanted to get DNA or latents.  But all these examiners,

14   material was going to them.  And then it was coming back to us

15   to -- to our unit but specifically me to analyze and start

16   looking through this.

17        I mean, there was over 1,300 submissions.  There might

18   have been 1,300 submissions, but it wasn't one single item.

19   We're talking hundreds.  So there was probably thousands of

01:27 20   little bits and pieces of trying to go look through this stuff,

21   all this material.  And you started separating and then started

22   recognizing, you know, what I talked before about, if there was

23   a piece of a battery, a piece of some type of switch.  Then you

24   started getting through the material that was just, you know,

25   collected up at that scene.

1    What I was specifically looking for, you know, what type

2    of -- if there was a container, if there was some type of

3    fusing system.  And what I started to find, that there was a

4    container or, like, a backpack.  Then there was pieces of

5    metal, larger pieces of metal that was the container, with the

6    bomb -- you know, it was contained, like, because then found

7    there was a low explosive in it.  Then we started seeing bits

8    of wire and pieces of electronic or R/C model -- hobby model

9    components within and amongst the debris.  And that all started

01:28 10   coming in and started separating out, looking for what you need

11   for that electrical fusing system and started putting back the

12   pieces.  And then we went on to look at it and test the

13   functionality, if this would work.

14   Q.   Okay.  So once you get the pieces, you analyze them.  You

15   figure out how they interact with each other?

16   A.   We started to figure out what those pieces -- those

17   components were from.  You know, in our unit, we also will do

18   testing if we need.  Sometimes things come in and we'll test it

19   on the explosives range, but we'll try to re-create the actual

01:29 20   device.  We knew the type of receivers, the electronic -- there

21   was electronic speed controllers in there from model cars.  The

22   type of model R/C car, we were purchasing some.  We started

23   seeing, like, bits of the container, the Fagor container, the

24   pressure cooker.

25        We started going out there and looking and purchasing for

1    exemplars because then we'd even take that, and we'd break

2    apart, say, the R/C component because, in the explosive event,

3    it's not going to look the same.  Some of it, there was bits of

4    capacitors and bits of a circuit.  We actually had an exemplar.

5    We were taking a look because we'd find tiny pieces of wire,

6    tiny pieces of the connectors from the chaotic event, from that

7    explosion.  So we also did that for purchasing.

8        And then eventually it came down we put the functionality,

9    the fusing system together, and did some testing.  Then, of

01:30 10  course, on -- out there in the public domain, the internet and

11   the manuals for those particular type of R/C transmitter, the

12   transmitters for the radio cars, also the receiver types for

13   their -- looking at those and seeing their compatibility and so

14   forth and doing some testing with that.

15   Q.   After you determined what the evidence submitted was, then

16   you went out and you tried to buy each of these things as

17   exemplars, intact things?

18   A.   Correct.

19   Q.   Then you'd use those to figure out exactly how they

01:31 20  interacted?

21   A.   That's correct.

22   Q.   Is that customary in your field, to try to purchase

23   exemplars and then create mock-ups?

24   A.   Yes, it is.  Even if there was a vehicle that was in an

25   explosion, to go take -- go to the manufacturer, look at the

1    vehicle, what type of wiring, what type of systems, if it was a

2    device that was blown up in a car.  But, yes.

3    Q.    Just before we move on to specifically how you

4    reconstructed those, did you arrive at a conclusion as to what

5    exploded on Boylston Street on April 15, 2013?

6    A.    Yeah.  There were two devices in pressure cookers, two

7    bombs that were carried in there in backpacks, and they were

8    pressure cookers.  They had electrical fusing system that was

9    an R/C model hobby car components in it, and there was a low

01:32  10    explosive in it.  And they were placed on -- down in those

11    areas where they went off.

12    Q.    And a few days later, there were some explosions in

13    Watertown, on April 19th.  Did you arrive at conclusions as to

14    what exploded there?

15    A.    Yeah.  There was another pressure cooker, a smaller Fagor

16    pressure cooker.  It was -- they recovered, we talked before,

17    two pipe bombs.  There was an elbow and a pipe coupler.  But

18    they had internal end plugs, and they had what I talked before,

19    just simple hobby fuse.  And also there was some fragmentation

01:33  20    recovered that came in that were bits of pipe and end caps that

21    had exploded.

22    Q.    And in addition to the exploded materials, were there also

23    intact submissions that you saw?

24    A.    That's correct.  And there was also approximately three

25    pounds of a low explosive in a container with hobby fuse coming

1   out of it and also with this green hobby fuse inside the

2   container, too.

3   Q.   Was that also an IED?

4   A.   Yes, that is.

5   Q.   You may have mentioned that there were a couple of pipe

6   bombs that had been rendered safe.  Did you examine those as

7   well?

8   A.   Yes.  And they had some fragmentation on the inside of

9   them.

01:34 10   Q.   Now, are all these Improvised Explosive Devices or

11   destructive devices?

12   A.   Yes.  They're a bomb.

13   Q.   And so when bombs go off, do you do your own reenactments

14   of those devices?

15   A.   At times.  It depends for the explosive effect.  But there

16   was no need for that.  I mean, there was widely available that

17   two devices functioned.

18   Q.   So let's move on to some of the evidence collection and

19   some of the evidence that you looked at.

01:34 20        MR. CHAKRAVARTY:  If we could call up Exhibit 620.

21   This is the 2-D.  This is in evidence, your Honor.

22   Q.   Agent Knapp, have you seen this interactive exhibit

23   before?

24   A.   Yes.

25   Q.   So as far as -- sorry about that.  As far as your

 1   analysis, what does this -- this is -- I've focused on Scene A.

 2   What was significant to your analysis in terms of what evidence

 3   that you were looking at?

 4   A.   Well, I mean, this gives a pretty good description of

 5   where the blast seat was and then where the pattern of some of

 6   the materials radiated out from 360 degrees.

 7   Q.   You said the word blast "seat."  Is that where the blast

 8   originated essentially?

 9   A.   Wherever that device was placed.  You can see where it --

01:35 10   it radiates out.  This is a good representation.

11   Q.   There's different colors.  Do each of these depict

12   different types of the systems that you had mentioned earlier,

13   like --

14   A.   Yeah, correct, you know, where some of the backpack, some

15   of the container, the actual pressure cooker, and then there

16   was also in the -- in this scene, there was copper -- there was

17   BBs for added fragmentation in there and also where the fusing

18   system -- you know, pieces happened to land at.

19   Q.   Okay.  You mentioned "fragmentation."

01:36 20   A.   Correct.

21   Q.   Can you explain what fragmentation is?

22   A.   In terms of -- fragmentation could be primary or secondary

23   fragmentation.  Primary fragmentation would be, like, in a

24   military ordinance, the casing.  When it explodes, that's

25   primary fragmentation.  You might have secondary, which

1    basically, depending on the violence and the pressures built

2    and as far as that pressure wave going, it picks up pieces in

3    the surrounding environment and hurls them out -- hurls them

4    out in all directions.  And secondary fragmentation can pick up

5    just from the scene or sometimes what they call shrapnel or

6    added fragmentation, where someone places something on a bomb

7    to try to cause more damage.  Usually, you see that, what they

8    call anti-personnel type devices, where you're trying to cause

9    as much damage or inflict, maim, kill, or injure personnel.

01:37 10   Q.   Now, in terms of how an Improvised Explosive Device works,

11   if there's no fragmentation, how does that -- how does a bomb

12   actually injure people?

13   A.   Well, there's always -- I mean, there's a bare charge,

14   but, normally, there's the overpressure and the extreme

15   pressures going out imparted on the surrounding area, you know,

16   picks up fragmentation from the surrounding.  But it's usually,

17   you know, overpressure from -- if there's no fragmentation,

18   it's really the overpressure that's coming to hit an individual

19   and can cause significant damage and death.

01:38 20   Q.   Is that like the shockwave that comes out of the

21   explosion?

22   A.   Yes.

23   Q.   Is there also heat sometimes generated?

24   A.   Well, there's the thermal effect.  If you're close enough

25   to the -- what particular material there is, you know, the

1    fragmentation, but is a big one, and then basically the

2    pressure, the overpressure, from -- imparted onto the

3    surrounding is a big one.

4    Q.   All right.  So back to the Scene A device, when you

5    started examining the evidence collected at Scene A, where did

6    you first start in order to try to reassemble what the

7    architecture of that device looked like?

8    A.   I mean, there was just evidence coming in.  It was not

9    like it all came in from Scene A.  There was stuff coming from

01:39 10   the Medical Examiner's Office, Scene A, Scene B.  And we

11   basically then started piecing it together and seeing -- I'd

12   see the power -- like I talked before, the fusing system of

13   this one particular on Scene A was a particular one.  And then

14   on Scene B, the fusing system, the power source was

15   particularly another -- another type.

16   Q.   I see.  For each scene there was a different -- your

17   examination started with a different component based on what

18   was either unique or the evidence that you found?

19   A.   It just came into the lab; and as it came into the lab, a

01:39 20   process of examining it.  It would come back to us.  And

21   basically I knew these particular items were from Scene A.

22   These particular items were from Scene B.  And then you started

23   analyzing those particular items, looking through the paint

24   cans with all the material in it, looking through the bags that

25   came in with numerous things and material inside those.  Then

1   you started -- what I talked about is start looking for the

2   particular components in the fusing system, the container, and

3   the bag.

4   Q.   So let's go to Scene A and explain what you found that was

5   significant about the device at Scene A.

6   A.   On this scene we found the power source.  We found the

7   receiver, the electronic speed controller, also a little part

8   of the improvised initiator in there, the container.  There was

9   fragmentation and then the bag that was -- that it carried --

01:40 10   that it was carried in.

11   Q.   Now, before I go to the components, I just wanted to show

12   you a photograph.  With regard to the explosion -- you had just

13   described how an explosion works regardless of the

14   fragmentation.  You described the shock and you described the

15   fire.

16            MR. CHAKRAVARTY:  I'm putting up on the ELMO for the

17   witness, your Honor, what I'm going to mark now as Exhibit

18   1573.

19   Q.   You see the cloud of smoke and the flames off to the

01:41 20   right?

21   A.   Yes.

22   Q.   Is that an accurate description of what an explosion of an

23   IED would look like?

24            MR. WATKINS:  Your Honor, I'm going to object at this

25   point for a couple of reasons.  This exhibit was only provided

1    last night.  We actually thought it was coming in through a

2    different witness.  I don't know whether there's been a

3    foundation for this laid with this witness.

4            THE COURT:  All right.  Both objections are overruled.

5    He may answer the question.

6    A.   I mean, this is class -- like, in a detonation or

7    explosion, depending what type of explosive it is.  You see the

8    thermal effect usually close to the seat of the explosion, and

9    then pressures are radiating out and also fragmentation.  I

01:42 10   mean, we -- besides being an examiner, we instruct and teach

11   post-blast investigation.  And we show students the different

12   effects of explosives and what happens when they go off,

13   different type of explosives.  So this is just common.  That's

14   an explosion with the thermal effect, which is usually close to

15   the -- in the seat of the explosion.

16           MR. CHAKRAVARTY:  I know it's being published, your

17   Honor.  I don't know if I actually moved it in yet, but I do

18   move it in.

19           THE COURT:  What's the number?

01:43 20         MR. CHAKRAVARTY:  1573.

21   (Government's Exhibit No. 1573 received into evidence.)

22           MR. CHAKRAVARTY:  Go back to the computer, please.

23           THE COURT:  Actually, we're just about at 11:00.  Why

24   don't we take this opportunity to take the morning recess.

25           MR. CHAKRAVARTY:  Thank you.

1          THE CLERK:  All rise for the Court and jury.  The

2     Court will take the morning recess.

3     (Recess taken at 10:57 a.m.)

4          (After the recess:)

5          THE CLERK:  All rise for the Court and the jury.

6          (The Court and jury enter the courtroom at 11:26 a.m.)

7          THE CLERK:  Be seated.

8          THE COURT:  Proceed.

9          MR. CHAKRAVARTY:  Thank you, your Honor.

02:12 10   BY MR. CHAKRAVARTY:

11     Q.   Agent Knapp, when we broke we were just getting ready to

12     look at some of the evidence that was collected at Scene A.

13          Did you find some evidence related to the fusing system of

14     the device that exploded at Scene A?

15     A.   Yes.

16          MR. CHAKRAVARTY:  Calling up on 620.

17     Q.   Is this one of those items?

18     A.   Yeah, it's the remains of the electronic speed controller.

19     Q.   What is an electronic speed controller?

02:13 20   A.   In the model car, it basically sends the power to the

21     motor, whether it makes it go faster or slower or reverse or

22     forward, in the model car.

23     Q.   And so what function does that perform in an improvised

24     explosive device?

25     A.   It's just basically a switch in the fusing system.  And

1    you can see one of the outputs.  That hooks up -- the small

2    leads there hook up to the receiver, and that larger red, you

3    know, that hooks up to the power source battery, and then

4    there's -- there should be -- well, it's so damaged.  But in

5    the exemplar there's two leads that go to the output of the

6    motor, and that's where I found that the improvised detonator

7    was hooked up to those two outputs that would normally go into

8    the motor of the R/C car.

9    Q.   I'm sorry.  Just "R/C car," do you mean a

02:14 10   remote-controlled --

11   A.   Remote-controlled, the hobby car.

12   Q.   And the screen in front of you, Agent Knapp -- actually,

13   if you touch it, it will leave a mark.  So if you want to

14   circle something or show the jury what you're talking about,

15   you can just touch that area or draw a circle around it.

16        So, now, you described that in the piece of evidence that

17   you found, some of the components had been burned off or

18   otherwise destroyed, but in the exemplar, you're able to make

19   out further definition of what this particular item is?

02:14 20   A.   Yes.  This is damaged.  And in the exemplar, pristine

21   condition, you can see where the different connections to the

22   battery, to the receiver, and then to where the -- you would

23   hook it up to the motor of the hobby car.

24   Q.   And is this part of the circuit board to that electronic

25   speed controller?

```
 1    A.    Yes.

 2    Q.    Is this the lab photo?

 3    A.    That's correct.

 4    Q.    And what is this last photo?

 5    A.    That's the photo of the two leads that come off that

 6    electronic speed controller.

 7    Q.    You mentioned that they come off and they go to the

 8    detonator?

 9    A.    Well, in normal configuration that goes to the motor, but

10    the two outputs that go to the motor would be connected with

11    the improvised initiator.

12    Q.    What's an initiator?

13    A.    Something to set off the main charge, like I talked

14    before, blasting cap, an improvised blasting cap, or some type

15    of improvised initiator that would set that main charge off.

16    Q.    And what was the initiator in the two devices on Boylston

17    Street?

18    A.    Well, on one, Scene A, there was just a small

19    fragmentation of a Christmas tree -- basically the green

20    Christmas tree lightbulbs that are strung out in like 50- or

21    200-strand for decoration purposes.  And the other scene

22    nothing was found, but that's not to be expected.

23          Because the violent nature, the reaction, sometimes you

24    just don't find it remaining or left.

25    Q.    Do you recognize what this is?
```

A.   Yeah, those are just -- like I said, it had a lot of that, the fragmentation there, the bits and pieces.  And there's part of a -- that circular thing was part of one of the batteries, this area -- you know, part of that there was the, you know, part of the Christmas tree bulb.

Q.   The Christmas tree lightbulb?

A.   Yes.

Q.   And does a Christmas tree lightbulb have enough power to set off a low-explosive charge?

A.   Yes.

Q.   Did you find other items related to the energy or the power for that fusing system?

A.   Yes.  The power source, they were Sub-C-size batteries, but some of that was still connected to part of the leads of the battery and other parts of the cells were disbursed amongst the scene.

Q.   And I'm showing what's marked as Q208.  What's that?

A.   Yeah, I think that was the -- that's the casing of an Exceed R/C battery.  That was 7.2 volts, and that, I think, was 1800-milliamp rated.

Q.   And so what was the -- explain how the battery interacted with that --

A.   Well, the battery is the -- you know, it basically powers, you know, the motor of an R/C car.  But the battery, that was the power source to provide current to the improvised initiator

1    and also provided power to the electronic speed controller and

2    also the R -- the receiver, the small receiver, that was found

3    also at the scene.

4    Q.   Let's go to that.  I'm showing you what's marked Q178, a

5    photo of Q178.  What is that?

6    A.   That was the remains of the Flysky receiver.

7    Q.   When you say "Flysky," is that the name brand of the

8    receiver?

9    A.   245 was the model, yeah, the brand of the receiver.

02:19 10   Q.   So can you explain what a Flysky receiver is?

11   A.   A Flysky receiver basically receives a signal from the

12   transmitter.  In a normal R/C, the model hobby car, you'll have

13   a transmitter or controller, what you steer or drive the car

14   forward or reverse.  The receiver is in the model car.  You

15   have the electronic speed controller in there that deals with

16   the motor once you hook those leads up.  And then you plug

17   the -- plug the receiver into the electronic speed controller.

18   And obviously that battery, that Sub-C pack, is in there

19   providing power for the car in normal operation.

02:20 20        What has to happen is that receiver has to be connected to

21   that transmitter.  And then in the manufacturer -- in the

22   literature it's available, and then even in that particular

23   manual that transmitter has a code, an identifier, a number.

24   And basically, you have to bind that receiver to that

25   transmitter so they can talk to each other.

1       And once that's done, that function's performed, then the

2    receiver's bound to that transmitter, then you can use that

3    controller and turn the steering wheel or press the trigger to

4    that controller and the car will perform, you know, whatever

5    desired function you have in normal operation.

6       And this particular -- this particular type of this

7    manufacturer, Flysky, they use, in their literature,

8    frequency-hopping.  And basically, that's just one type of

9    system that's used for this particular transmitter/receiver.

02:21  10    And then other manufacturers use a different type of

11   technology -- or called "digital sequencing."

12      There's two different ways to run your R/C cars, but this

13   particular one, you have to make sure that you have the

14   compatible type of receiver/transmitter to perform driving an

15   R/C car or boat.

16   Q.   Okay.  So was that receiver connected to the electronic

17   speed controller which was connected to the initiator, the

18   Christmas tree bulb?

19   A.   It was.  But I mean, all that was all damaged.  But that

02:22  20   had to be connected up in that -- we talked a fusing system to

21   operate the improvised initiator in this particular scene.

22   Q.   Continuing on, did you find a toggle switch?

23   A.   Yeah.  Like I said before, testing the functionality and

24   seeing how these things were constructed, we noticed without

25   just putting the receiver, the electronic speed controller in

1   there with the battery and then hooking it up to an improvised

2   initiator, in this particular -- in this particular electronic

3   speed controller, when you hit the little slide switch and

4   power it up where it initializes and the receiver then receives

5   power, it's sent output signal to the two leads that were

6   connected to our improvised initiator, which we used as a

7   Christmas tree bulb, and it basically lit the bulb momentarily,

8   so...

9       And we also -- during the scene, through all that

02:23 10   material, we found the remnants of a heavily damaged -- what

11   was a toggle switch.  We couldn't identify it, but it was an

12   illuminated toggle switch.  And that was within the parts that

13   we looked at.  And for this particular device at Scene A, had a

14   toggle switch also which sometimes they're referred to as a

15   safe-and-arming switch, because if you turn that little slide

16   switch on the electronic speed controller on, and it's sent

17   that output to that Christmas tree bulb to light it up, it

18   would have detonated the bomb.

19       So to interrupt that circuit, a toggle switch, just like a

02:24 20   light on your on-and-off switch, it broke the circuit -- it

21   just needed to be done for a few seconds, and then the toggle

22   switch just needed to be flipped to the armed position.  And

23   then once you went and gave it the appropriate signal from the

24   transmitter, it would function the Christmas tree lightbulb.

25   Q.   So are you saying for that receiver to bind with the

1    transmitter without actually igniting the Christmas tree light,

2    you need to have this toggle switch on?

3    A.   No, the binding of the receiver and transmitter is already

4    complete.  It's basically -- the transmitter you can set aside.

5    You're not worried about -- we're not worried about the

6    transmitter.  It's the fusing system.  You needed a toggle

7    switch within -- between -- to break the continuity between the

8    electronic speed controller, the receiver battery, just had to

9    have a break in that continuity.  Because if you didn't, if you

02:25 10   didn't have that toggle switch in when the receiver, electronic

11   speed controller and battery are all put together, and we

12   tested it with a Christmas tree lightbulb on the outputs of

13   that electronic speed controller, when you slid and powered up

14   that electronic speed controller, it had enough output to send

15   current down to that Christmas tree lightbulb momentarily for a

16   second or two, but it would light up, so...

17       And we found in the evidence, like I said, that damaged

18   toggle switch.  And that toggle switch was used to break that

19   once you turned on the electronic speed controller, and then

02:26 20   they flipped it on to the -- or someone would flip it on to the

21   armed position then, and now it's armed and it's just waiting

22   for a signal from the transmitter.

23   Q.   So the toggle switch was necessary for the arming

24   procedure?

25   A.   Yes.  In that particular scene.

1    Q.   So for that scene, the pressure cooker pot, somebody would

2    have had to turn on the device before deploying it?

3    A.   In both of them.  But in this particular instance, just

4    the way that electronic speed controller sent a signal or

5    output to that -- where that Christmas tree -- improvised

6    Christmas tree bulb would have been, it would have set it off.

7    Q.   And this toggle switch -- was there a similar toggle

8    switch found in Scene B?

9    A.   No.

02:26 10   Q.   Now, in addition to this fusing mechanism, did you find an

11   alternative fusing mechanism for the device at Scene A?

12   A.   Yes, we did.  We found a very small piece of what we

13   talked before, hobby fuse, that green hobby fuse that's used in

14   fireworks.  There was two pieces taped up with electrical tape.

15   And they were at both scenes also.

16   Q.   I'm putting up on the screen Q192.  Is that the hobby fuse

17   that was recovered from the site of Scene A?

18   A.   Yes.

19   Q.   So can you explain why there would be hobby fuse in a

02:27 20   device that already had an electric fusing system?

21   A.   Well, there was two forms of initiation.  We talked

22   before, there's electrical and non-electrical.  The primary

23   means of initiation would be electrical by remote-control car,

24   but if somehow that failed, then all you would have to do is,

25   you know, light the hobby fuse and walk away, and that would be

1    sufficient to set off the low explosive.

2         So, you know, when I saw that there, just that

3    small -- that small piece, it appeared that it was cut off --

4    once that violent reaction, that explosion, it was cut off, and

5    that was the small fragment that remained amongst the many

6    pieces of debris at each scene.

7    Q.   So when someone lights hobby fuse, describe what the

8    deflagration looks like.

9    A.   It's just you light it with a match or a lighter, and it

02:28 10    starts burning and it's giving off smoke.  It might smell like

11    a sulphur smell, but it's burning down.  And there would be

12    smoke around.

13    Q.   And does it take a little bit of time depending on how

14    long it is?

15    A.   Right.  Normally it's two seconds per inch, but it varies.

16    But it's just commonly available, manufactured hobby fuse.

17    Q.   In fact, for both of the scenes on Boylston Street, did

18    you find evidence of hobby fuse?

19    A.   Yes.

02:29 20    Q.   In addition, did you find components of a container?

21    A.   Yes, the Fagor container.

22    Q.   That's Q10.  What's that?

23    A.   That's the lid of the pressure cooker.

24    Q.   And did -- the deformities to this pressure cooker, what's

25    that evidence of?

 1    A.    An explosive event.  And you could see it was crisscrossed

 2    with tape.  The container had tape on it.  And it was

 3    crisscrossed around the container also.

 4    Q.    You're referring to the kind of clear marks here?

 5    A.    That's correct.

 6    Q.    And this particular lid was found some distance away?

 7    A.    Yes, it was found some distance away.

 8    Q.    So according to the interactive exhibit where I'm hovering

 9    over here, does that sound right?  I know you weren't on the

02:30 10   scene --

11    A.    I wasn't at the scene but...

12    Q.    Were there also components of the backpack that was used

13    to conceal these devices?

14    A.    Yes.  It's identified as a Ful backpack.

15    Q.    Going to Q109, just quickly scroll through these, are

16    these the lab photos of that backpack?

17    A.    That's correct.

18    Q.    And I'm sorry.  This identified the brand as Ful?

19    A.    And then on the inside, in the liner of the material

02:31 20   there, it had the Ful brand in there.

21    Q.    All right.  Now let's move on to Scene B.  And as with

22    Scene A, did you find radio-controlled remote-control

23    components?

24    A.    Yes, we did.

25    Q.    Calling up Q41, what are these?

1    A.   That's a portion of another -- an electronic speed

2    controller, but that was -- there was two portions to that, and

3    that was a Duratrax Sprint electronic speed controller.

4    Q.   And the Duratrax speed controller, that's different from

5    the Accede that you found at Scene A?

6    A.   Yes; just a different type of electronic speed controller.

7    Q.   What does the speed controller do in a typical

8    remote-control car?

9    A.   I said it went and basically provided power to the motor,

02:32 10   if you wanted to go faster or slower, reverse or forward.  And

11   it would provide the input, and the current would go and engage

12   the motor.  And it would go forward, backwards or slower or

13   faster.

14   Q.   Thank you.  And so Q52, is this another portion of the

15   electronic speed controller?

16   A.   Yeah, that's a piece off that -- 52 and 51 is the board,

17   the electronic speed controller board.

18   Q.   Did you also find evidence of a receiver at --

19   A.   Yes.

02:33 20   Q.   A remote-control receiver?

21   A.   Yes, we did.

22   Q.   Q122:  Do you recognize that?

23   A.   Yes; that's a Spektrum receiver.

24   Q.   The company Spektrum?

25   A.   Yes.

1   Q.   "Spektrum" with a K?

2   A.   Yes.

3   Q.   It looks like there's -- the name is printed actually

4   here.  Is that right?

5   A.   That's correct.

6   Q.   Now, how does the Spektrum receiver differ from a Flysky

7   receiver?

8   A.   As we talked before, it's just how they communicate and

9   what technology that manufacturer had.  And that was direct

02:34 10   sequencing.  It's just a different way that it talks to the

11   receiver/transmitter.  But the same process of binding -- you

12   know, they have their receiver and transmitter.  The

13   transmitter has a unique ID, and basically it is bound.  Once

14   you bind that to the transmitter, they will talk, like

15   communicate.

16   Q.   Did you also find a power source at Scene B?

17   A.   Yes, we did.  A damaged Tenergy Sub-C pack.

18   Q.   Is that --

19   A.   That's the brand name, the Tenergy battery.

02:34 20   Q.   Another battery pack?

21   A.   Right.

22   Q.   Did you also find evidence of the hobby fuse?

23   A.   Yes, we did.

24   Q.   And then finally, did you find portions of the backpack

25   itself?

1    A.   The Fox backpack, yes.

2    Q.   This was different from the Ful backpack?

3    A.   Correct.

4    Q.   And finally, the -- did you find pieces of the container

5    as well?

6    A.   Yes.  The container again -- once again, it was a Fagor

7    pressure cooker.  And there was also, you know, we talked

8    before, fragmentation, some small nails and BBs in this scene,

9    and compared to just the BBs in Scene A.

02:35 10   Q.   Now, we've just looked at a sampling of some of the pieces

11   of evidence, but did you examine each piece of evidence and

12   come up with the configuration of how you surmised that these

13   devices were constructed?

14   A.   Well, yes, the configuration that these particular R/C

15   components had to be put into and how they would have

16   functioned the device.

17   Q.   And did you create mockups?

18   A.   Yes, we did.

19   Q.   And you described how you went out and bought components.

02:36 20   How did you configure the mockup devices?

21   A.   Based on the -- what was found at the scenes, the

22   particular type of transmitters/receivers, we purchased

23   the -- there was a -- we actually purchased several monster

24   rally trucks where the electronic speed controller, the power

25   source, everything was provided.  It was a full, intact one,

1   which was the same components found at the scenes.

2       And then we -- then I went and constructed the fusing

3   system, like I talked about, placing the receiver, binding it

4   with a transmitter, and then hooking up a -- in this

5   particular, just hooking up a Christmas tree bulb to it.

6   Q.   And for the device at Scene B, you described earlier that

7   there was no toggle switch found?

8   A.   Right.  We -- I said before we tested those -- that

9   Spektrum receiver with the Duratrax.  And when I talked before

02:37 10   about having to initialize and we have to turn on the

11   electronic speed controller in Scene A, power -- some output

12   went to those two leads that had the Christmas tree bulb.

13       When we tested it for the Duratrax electronic speed

14   controller hooked up, there was no output.  It didn't light up

15   the Christmas tree bulb, and there was no evidence of a toggle

16   switch remaining at the scene.  But it did not function it,

17   once you powered it, initialized it up, so the light did not

18   come on.

19   Q.   So unlike the device at Scene A, the device at Scene B

02:38 20   with that Spektrum receiver and the Duratrax electronic speed

21   controller, when you armed it, it didn't set off the Christmas

22   tree lightbulb?

23   A.   That's correct.  The fusing system there, yes.

24   Q.   But like the Scene A, did that device have to be armed

25   before it was deployed?

1    A.    You had to turn on that slide switch so it would power up,

2    and then it's waiting for the signal from the transmitter.

3    Q.    Let's talk a little bit before we move on about -- you

4    described the components within the fusing system of the

5    pressure cooker.  What else would have been -- what else did

6    you find evidence of within the pressure cookers?

7    A.    Well, within the pressure cooker, the way they were

8    constructed, there was, I said -- in Scene A there were the

9    copper -- the BBs, and there was pink material, a red

02:39 10  rosin-type paper backing.  But some of the BBs, we found that

11   they had some adhesive -- sealant-type material -- they were

12   like embedded into the sealant-type material.

13        And also in Scene B, likewise, the same type of material

14   was found.  They had the BBs.  Or there was BBs and then there

15   was some small nails in it.  And also there was -- we started

16   seeing when all this evidence came in, there were pieces of

17   cardboard -- circular pieces of, like, fragmented cardboard

18   with duct tape taped around the edges of it.  And we started

19   noticing each scene had cardboard, and then there were some

02:40 20  tape associated with those.

21   Q.    And then you also described, I think, some tape on the

22   exterior of one of the --

23   A.    Well, and each device, basically it was crisscrossed with

24   tape around the pod.

25   Q.    So before deploying that device, someone would have had to

1    arm the device and then resealed it before deploying it?

2    A.    They would have had to go in and make sure the slide

3    switch on that electronic speed controller was on so it would

4    power up that fusing system, what we talked about, the

5    components of it.

6    Q.    And then resealed the container, the vessel?

7    A.    Yes.

8    Q.    And is that because the low explosive --

9          MR. WATKINS:  Objection to the leading nature, your

02:40 10   Honor.

11   BY MR. CHAKRAVARTY:

12   Q.    Why does a low explosive need to have a sealed container?

13   A.    Well, it builds up pressure.  But we've done tests

14   where -- I mean, low explosives, it just has to have enough

15   confinement and then it can, you know, explode, you know, and

16   the container can fragment.  But we've done tests where you

17   don't have, like, say on a pipe, two end caps.  One might be

18   off and it's still -- that's enough confinement to detonate

19   that pipe, so...

02:41 20        And even if you have enough material by itself, the weight

21   of that material can cause enough confinement to start a

22   violent reaction and explode.

23   Q.    When you say "material," you mean explosive material?

24   A.    Yeah, by itself the way that -- if you have enough.

25   Q.    And is there a correlation between how sealed -- how

1    confined something is with how violently it will explode?

2    A.   Of course if you have, you know, a heavier case, you know,

3    a thicker pipe -- you know, it just has to have enough

4    confinement in it.  But, you know, if it's a thicker pipe,

5    sealed better, time to build up more pressure, but it relieves

6    itself, but just enough confinement.  And in this case there's

7    enough confinement to explode these two containers.

8    Q.   In exploding a container, breaching the confinement, does

9    that in itself create fragmentation?

02:42 10   A.   That's -- the container itself is fragmentation along with

11   the added fragmentation.

12   Q.   And when it -- when an explosion breaches a containment

13   vessel, how does the physics work in terms of breaking the

14   containment?

15   A.   It just depends, you know, low explosives, how violently

16   they react.  You might have bigger pieces or smaller pieces

17   depending on the explosives that were used.

18   Q.   Okay.  So in addition to the gas being released, is that

19   also when the thermal effect occurs?

02:43 20   A.   Well, initially we talked before, the closer the thermal

21   effect is closer to, you know, the explosive or the seed, and

22   then the fragmentation and the pressure is radiating out.

23   Q.   Does it radiate out in any specific direction?

24   A.   It's just 360.  Just pressures are built up, and 360

25   degrees out, just imparting that onto the surrounding

1    environment or whatever else is in its way.

2    Q.   Let me show you a couple of photographs.

3         (Pause.)

4    Q.   Agent Knapp, I just wanted to show you a few photographs

5    to see if these are consistent with what the effect is of an

6    explosion on a containment vessel.

7              MR. CHAKRAVARTY:  Can we go to 2D, please?

8              THE COURT:  Is this something in evidence?

9              MR. CHAKRAVARTY:  I'm first going to go to the 2D

02:44 10   which is in evidence, your Honor.  Sorry.

11   BY MR. CHAKRAVARTY:

12   Q.   Agent Knapp, what does this show?

13   A.   That is the fragmented remains of a pressure cooker.

14   Q.   And the distortions of the ends and the discoloration, is

15   that all effects of the explosion?

16   A.   Could you repeat that?

17   Q.   The distortions at the ends -- the edges of the metal, is

18   that all the result of an explosion versus something else that

19   may have been done to it?

02:45 20   A.   It was ripped apart in the explosion.  It came apart, the

21   container.

22   Q.   And do you notice that there appear to be some

23   indentations here, almost as if stamped out of the metal?

24   A.   Right.

25              MR. CHAKRAVARTY:  Now, if I can have one moment.  I

1    wanted to see if -- rather than using the ELMO, see if we could

2    project it out electronically.

3            Just for the witness, your Honor.  It's not in

4    evidence.

5    Q.    Agent Knapp, showing you an exhibit marked 1582, do you

6    see the grates at the bottom of this photo?

7    A.    Yes.

8    Q.    Are those indentations on Q126 --

9            MR. WATKINS:  Objection, your Honor.  This is the

02:47 10   subject of expertise, and this is not an expert in that.

11           THE COURT:  All right.  Overruled.  I'll allow the

12   answer.

13   BY MR. CHAKRAVARTY:

14   Q.    Are the indentations that we just saw on Q126 consistent

15   with the pattern on the grate depicted in this 1582?

16   A.    When this device went off, it was placed close to the

17   ground and then the force was imparted on it and it just left

18   impressions in the metal on the container that was fragmented

19   from that grating.

02:47 20          MR. CHAKRAVARTY:  So I'd move in Exhibit 1582, your

21   Honor.

22           MR. WATKINS:  Objection.

23           THE COURT:  Overruled.  I'll admit it.

24           (Government Exhibit No. 1582 received into evidence.)

25   BY MR. CHAKRAVARTY:

1    Q.   Again, was the grating that you're talking about this type

2    of grating?

3    A.   Yes.

4         MR. CHAKRAVARTY:  Mr. Bruemmer, if we can go back to

5    the 2D and call up...

6    Q.   And this is what I had identified earlier as that kind of

7    stamp?

8    A.   Correct.

9    Q.   Now, going to -- moving on to the Watertown crime scene,

02:48 10   did you use a similar methodology to examine the evidence at

11   Watertown as you did for the Boylston Street explosions?

12   A.   Yes.

13   Q.   And did you identify -- let's first talk about the

14   pressure cooker device there.  Did you identify the vessel that

15   was used?

16   A.   It was a smaller Fagor pressure cooker.

17   Q.   So for the Watertown scene, Agent Knapp, I think I'm just

18   going to show you the physical items because I don't have the

19   exhibit numbers -- excuse me -- the photo numbers handy.

02:49 20        So there was a Fagor pressure cooker device that was

21   smaller, I think you said earlier?

22   A.   Just a little smaller in size, yes.

23   Q.   And the fact that it was smaller, what significance did

24   that have to you as an explosives analyst?

25   A.   Nothing.

```
 1    Q.    And does it matter how large a vessel it is for purposes
 2    of determining an explosion analysis?
 3    A.    No.
 4    Q.    Why is that?
 5    A.    Obviously the -- I mean, obviously if it's bigger, you can
 6    put more explosives in it.  But, I mean, it's just a
 7    containment vessel and it just happened to be that size.
 8    Q.    And so how much -- the fact that it's a smaller vessel
 9    means that it can hold less items.  Is that fair to say?
02:50 10    A.    Material.
11    Q.    Material?
12    A.    Possibly.
13    Q.    So were you able to estimate how much explosive material
14    was in these devices?
15    A.    In the Scene A and Scene B?
16    Q.    Start with wherever you want.
17    A.    You know, for the -- I mean, they were -- the same size
18    pressure cookers in Scene A and Scene B, and they were like
19    six-liter-size pressure cookers, and roughly -- it could be
02:51 20    anywhere from eight pounds to 16 pounds in those pressure
21    cookers.  And obviously, the other one was a four-liter,
22    four-quart size.  And obviously, that would be a smaller, you
23    know, eight pounds in there, so forth, approximating.
24    Q.    And you're approximating.  That's estimating if it was
25    half full of explosive material?
```

1    A.    Half full to full.

2    Q.    So that's the range that you described?

3              MR. WATKINS:  Objection to the leading, your Honor.

4              THE COURT:  Overruled to that question.

5    BY MR. CHAKRAVARTY:

6    Q.    Now, for the Watertown scene, in addition to the Fagor

7    pressure cooker, which we've seen photos of the lid and the

8    vessel, what other components of significance were there?

9    A.    In the pressure cooker itself, obviously when that went

02:52 10   off, they did find wire, a 9-volt battery and a toggle switch

11   at the scene.  And then they also had collected two intact pipe

12   bombs.  One was an elbow and one was a straight coupler.  And

13   they had internal end plugs.  And then they also collected

14   fragmentation, or bits and pieces, of pipe at that scene.  And

15   they also collected a container with material in it with green

16   hobby fuse coming out of the lid.

17   Q.    So you said a few moments earlier that it doesn't really

18   matter how sealed something is or -- in terms of whether it

19   will explode.  Would the device that was made out of plastic

02:52 20   that had powder in it and hobby fuse, would that have exploded

21   like an IED?

22   A.    There's confinement there, and that just happens to be

23   plastic.  But there's confinement, and that right there was a

24   device also because it had all the components, the

25   non-electrical fusing system, the main charge and the

```
  1    container.

  2              MR. CHAKRAVARTY:  Can we call up Image 951, please?

  3    I'm sorry.  957.

  4    Q.   This is a Q photo of 582.  Do you recognize that?

  5    A.   That's a toggle switch that was found at Watertown.

  6    Q.   And what significance did that have to the device?

  7    A.   Well, there was -- it was connected.  They had a

  8    9-snap-volt battery connector.  There was a 9-volt battery

  9    found.  That toggle switch with a length of wire, that right

02:54 10    there -- obviously there was no initiator on the end of the

 11    wires, but that was found at some distance away from the

 12    pressure cooker.  And as far as in my course of investigation,

 13    being overseas, you have a toggle switch, and basically it's

 14    just an on-and-off switch, you have a power source, and you'd

 15    have some type of initiator at the end of that.  And all you do

 16    was to close the circuit, just flip the toggle switch.  And if

 17    that was in an explosive, it would detonate and explode.

 18    Q.   So this was another way to trigger an explosive device?

 19    A.   Well, in --

02:54 20              MR. WATKINS:  I'm going to object, your Honor.  That

 21    wasn't his testimony.

 22              THE COURT:  Yeah, sustained to that.

 23    BY MR. CHAKRAVARTY:

 24    Q.   So let's just clarify a few things.  You mentioned that in

 25    the course of the investigation you have come to learn this.
```

```
 1   Do you mean in the course of your training and experience as an
 2   investigator?
 3   A.   In dealing with material coming in, or overseas, bombing
 4   investigations, seeing the type of fusing systems out there.
 5   And this is a particularly used -- what we normally have is --
 6   a dead-man's switch or a suicide bomber would have this type of
 7   configuration.
 8         MR. WATKINS:  I'm going to object, your Honor.
 9         THE COURT:  No, overruled.  That may stand.
10   BY MR. CHAKRAVARTY:
11   Q.   And in addition to this system, was there
12   another -- evidence of another fusing system found on Laurel
13   Street?
14   A.   Well, there was the hobby fuse.  It's non-electric.
15   Basically, the burning of the green hobby fuse.  They had it in
16   the pipes; they had it in the container, the plastic container.
17         MR. CHAKRAVARTY:  One moment, your Honor.  I believe
18   Exhibit 957 is in evidence, but I'm not sure whether it's the
19   image or the physical piece of evidence.  I'm just confirming
20   that.
21         (Pause.)
22         MR. CHAKRAVARTY:  So, your Honor, I believe 957 is the
23   physical piece of evidence.  If I could offer this exhibit as
24   957A, which is a photo of that.
25         MR. WATKINS:  No objection.
```

         1              THE COURT:  Okay.

         2              (Government Exhibit No. 957A received into evidence.)

         3    BY MR. CHAKRAVARTY:

         4    Q.   This is that switch that you just described that was found

         5    in Watertown?

         6    A.   Yes, it was.

         7              MR. CHAKRAVARTY:  I'd call up Exhibit 1122.

         8              THE COURT:  Is this in or not?

         9              MR. CHAKRAVARTY:  Again, it is in, your Honor.  I

02:57  10    just, again, don't know if it's physical or --

        11              (Pause.)

        12              MR. CHAKRAVARTY:  Your Honor, similarly, if not, I'd

        13    make clear that this is 1122A, which is a photograph of --

        14              THE COURT:  All right.

        15              MR. CHAKRAVARTY:  Q71.

        16              (Government Exhibit No. 1122A received into evidence.)

        17    BY MR. CHAKRAVARTY:

        18    Q.   And so this is the lid that you were mentioning earlier?

        19    A.   Of the container?  Yes.

02:57  20    Q.   So there's hobby fuse on here that we can see.  Is that

        21    fair to say?

        22    A.   Yes.  It was coming out of the lid of the container.

        23    Q.   So in addition to this hobby fuse, was there other hobby

        24    fuse found in Laurel -- at the Watertown scene?

        25    A.   There was a bit of hobby fuse inside the container, so

```
 1   with the powder that was in there.
 2   Q.   And so the pressure cooker device that was exploded, was
 3   there any hobby fuse associated with that, or how did you
 4   determine that?
 5   A.   You couldn't determine -- I mean, usually, hobby fuse
 6   burns.  That explosion happened, and the hobby fuse usually is
 7   no longer there.
 8           MR. CHAKRAVARTY:  May we go to Exhibit 848.
 9           I'm not sure whether this is in evidence.
10   Q.   Do you see this area over here?
11   A.   Yes.
12   Q.   Is that significant to you?
13   A.   It looks like a darker spot in the ground.
14   Q.   What happens when an IED explodes on asphalt?
15   A.   It can leave a cratering pattern or it could leave some
16   residue near there.
17           MR. CHAKRAVARTY:  If we could go to Exhibit 852.
18           This is in evidence, your Honor.
19   Q.   Is this that collection of hobby fuse that you were
20   talking about?
21   A.   Yes.
22           MR. CHAKRAVARTY:  Go to Exhibit 853.
23   Q.   This is another angle.
24           MR. CHAKRAVARTY:  Could we go to Exhibit 833, please.
25   834.
```

1           I don't think that's in evidence, your Honor.

2           THE CLERK:  834 is in.

3           MR. CHAKRAVARTY:  834 is in, yes.

4           THE COURT:  Is or isn't?

5           MR. CHAKRAVARTY:  834 is.  My apologies, your Honor.

6    BY MR. CHAKRAVARTY:

7    Q.   Is this one of those rendered-safe pipe bombs that were

8    found in Watertown?

9    A.   Correct.

03:00 10   Q.   Could you describe the configuration of this?

11   A.   That was an elbow pipe, two-inch diameter with internal

12   end plugs, it had some Teflon tapes on the threads, and then on

13   the inside it had, once again, BBs inside, encased inside, and

14   there was a green hobby fuse coming out of a hole that was in

15   the elbows.

16           MR. CHAKRAVARTY:  Could we do 842, which is also in

17   evidence.

18   A.   That shows you a picture of the inside, but the same

19   thing.  That's just a straight coupler with the internal end

03:01 20   plugs and hobby fuse coming out of it.

21   Q.   And like the other mockup devices that you made, did you

22   make mockup devices of each of these devices:  the pipe bombs,

23   the plastic container containing hobby fuse and explosive

24   material, as well as the pressure cooker that was found in

25   Watertown?

1    A.    Yes.

2    Q.    In addition to the explosives, the exploded IEDs -- the

3    remnants of the exploded IEDs as well as the rendered-safe, did

4    you also find a transmitter in Watertown?

5    A.    Yes, there was a transmitter that was submitted with this

6    evidence.

7             MR. CHAKRAVARTY:  And if we could call up Exhibit 949,

8    which I would move into evidence 949A as a photo of this.

9             MR. WATKINS:  No objection.

03:02 10            THE COURT:  Okay.

11            (Government Exhibit No. 949A received into evidence.)

12   BY MR. CHAKRAVARTY:

13   Q.    And what is that?

14   A.    That's the modified Flysky transmitter, or basically the

15   R/C hobby controller.

16   Q.    So you said it's a modified Flysky.  Is "Flysky" the name

17   brand?

18   A.    Yes, of the transmitter, the controller.

19   Q.    And so it's the same name brand as the receiver that was

03:02 20   found at Scene A?

21   A.    That's correct.

22   Q.    And you said it was modified.  How was it modified?

23   A.    Well, normally if you had an intact one, there's the

24   battery pack on the bottom, and it has like a pistol grip where

25   you can hold it, and on the top it has the -- that -- that's

1    the electronic display.  And there's usually buttons up there.

2    And then on one side there's a little steering wheel, and it

3    has -- on the grip there's like a little trigger for operating,

4    you know, the forward and reverse of your car and the steering

5    wheel to turn your R/C car.

6    Q.   Now, as part of the investigation, did the FBI obtain

7    various receipts or other records to see whether there were

8    other radio-controlled/remote-controlled components involved in

9    the case?

03:03 10   A.   Yeah, other receipts had come in of purchases.

11   Q.   Right.

12            MR. CHAKRAVARTY:  If we could call up Exhibit 1160,

13   please, which I believe is in evidence.  Page 2.

14   Q.   Is this one of the receipts that you reviewed?

15   A.   This is one of them that had come in.

16   Q.   And could you describe the items on this receipt?

17   A.   Up on the top you see the "Accede R/C electric rally

18   Monster Off-Road Rally Truck, stripe blue."  That was a whole

19   intact package of an actual R/C car.  We purchased several of

03:04 20   those for our exemplars.

21   Q.   Did you find any evidence related to that vehicle, like --

22   A.   On that one, the electronic speed controller and the --

23   the electronic speed controller, the receiver and the battery

24   were found at Scene A.

25   Q.   Okay.  Please continue.

```
 1   A.    And then there's a -- it looks like there's a transmitter
 2   and receiver, and then another receiver, a Flysky receiver, in
 3   that list.
 4   Q.    And is there also some batteries?
 5   A.    Right.
 6   Q.    So this transmitter and receiver, does the "FS" stand for
 7   Flysky?
 8   A.    Yeah.   That's the model number, Flysky model.
 9   Q.    All right.   And so this entry is for a combination package
10   of both the transmitter and the receiver that are compatible
11   with each other?
12   A.    Yes.
13   Q.    And the last entry is for an extra receiver.   That's also
14   compatible with those?
15   A.    Correct.
16         MR. CHAKRAVARTY:   Can we call up Exhibit 1431, please,
17   also in evidence.
18   Q.    Did you also have an opportunity to learn more about what
19   this was a receipt for?
20   A.    That was a receipt for a transmitter -- what we talked
21   about before, the Spektrum transmitter -- controller and a
22   receiver.
23   Q.    And so was the receiver consistent with the receiver, the
24   remnants of which were found at Scene B?
25   A.    Yes.
```

```
 1   Q.   Did you ever find in the investigation the Spektrum
 2   controller?
 3   A.   No.
 4   Q.   In fact, were there any other controllers found in the
 5   investigation aside from the one we just saw from Watertown?
 6   A.   No.
 7   Q.   Was the Spektrum receiver that was found in Scene B -- was
 8   that compatible with the Flysky receiver that we were just
 9   looking at?
10   A.   We talked about -- earlier about the two different ways
11   they communicate those two different manufacturers have, the
12   frequency hopping and then the direct sequencing.  That's not
13   compatible with -- the Spektrum receiver with the Flysky
14   transmitter.
15           MR. CHAKRAVARTY:  Back to 949A.
16   Q.   Did you determine whether this transmitter bound with the
17   receiver that was found on Scene A?
18   A.   Did I --
19           MR. WATKINS:  Objection, your Honor.
20           THE WITNESS:  Basically --
21           MR. WATKINS:  Objection.
22           THE WITNESS:  Basically --
23           THE COURT:  Wait.  Hold on a moment.
24           Is it related to disclosure?
25           MR. WATKINS:  No.
```

1          THE COURT:  Let me just see you briefly.

2          (Discussion at sidebar and out of the hearing of the

3     jury:)

4          MR. WATKINS:  So this relates to the so-called binding

5     testimony.  I had filed a motion in limine.  The Court's never

6     ruled on that.  It's actually not this witness that did any of

7     the work.

8          We've agreed, I thought up until now, that we would

9     allow a certain amount of testimony by Agent Knapp here that

03:08 10    included work done by other people for him.  I specifically --

11    when we were talking about this carved-out -- that binding code

12    issue, I had understood up until this minute that he would not

13    seek to admit that through Agent Knapp.  I believe it's

14    complete hearsay as to this agent.  He didn't run any of the

15    tests that would result in that conclusion.  I don't even think

16    the other one had, ran a test.

17         So I'm asking that that be excluded.

18         MR. CHAKRAVARTY:  The intention is not to elicit that

19    the binding code is the same on each.  He didn't do a test to

03:09 20    figure out what the binding code was.  But he can say -- he's

21    going to say -- what I wanted to elicit -- and I can ask

22    another question to elicit that -- is was the Flysky receiver

23    that was found compatible with the Flysky receiver that was

24    found in Watertown.  The transmitter pair -- were they

25    compatible with each other.  And if they determined that they

1    actually were -- worked together, I guess is the correct --

2            MR. WATKINS:  That is not the question you asked.  You

3    said "bind."  If you want to ask are they compatible, that's

4    good.

5            THE COURT:  What does "compatible" mean?

6            MR. CHAKRAVARTY:  That they can talk to each other as

7    opposed to --

8            THE COURT:  Right.  And how is that different from

9    binding?

03:10 10         MR. CHAKRAVARTY:  So binding is the more precise idea

11   that there was a specific code on one that matched the code on

12   the other.  And my point is I want to be more general but still

13   show that these two can talk to each other, and they can't talk

14   to the device on Scene B.

15           THE COURT:  Well, I think he's already said the

16   latter.  I don't think --

17           MR. CHAKRAVARTY:  Yes.

18           THE COURT:  Okay.

19           MR. WEINREB:  I'm sorry, your Honor.  Before we

03:10 20  leave --

21           THE COURT:  Yeah.

22           MS. CLARKE:  While I've got you.

23           (Laughter.)

24           MR. WEINREB:  Can I just add that -- I'd assume that

25   the binding code like -- the reasoning -- the defense is not

1   going to be permitted to inquire of this witness about binding

2   codes, or specifically to ask questions intending to

3   elicit -- if he is going to ask questions intending to suggest

4   to the jury that Tamerlan Tsarnaev might have detonated at the

5   scene two bombs, that would be trying to -- asking the jury to

6   assume facts not in evidence in bad faith because the defense

7   knows that Jahar Tsarnaev in fact did detonate the second bomb.

8   And to ask questions to elicit otherwise would not be

9   good-faith cross-examination.

03:11 10         THE COURT:  Okay.  Is there an issue?

11         MR. WATKINS:  There is an issue, your Honor.  It's a

12   longer issue.  I understand the Court is going to break at

13   12:45.  I don't know how much Mr. Chakravarty has left.  I'm

14   not sure that that won't --

15         MR. CHAKRAVARTY:  There's not much more other than

16   he's going to explain the mockups that he created, we're going

17   to do a demonstration, and then we're going to talk about the

18   *Inspire* magazine.  I think if we're breaking early for lunch

19   today, it would take us at least to that.

03:11 20         MR. WATKINS:  So I will consider what Mr. Weinreb has

21   talked about, and we will come to some kind of agreement on

22   that, or agree to disagree.

23         THE COURT:  Well, okay.  I'll leave it at that for

24   now.

25         MR. CHAKRAVARTY:  One other point that might implicate

1    this again is before we do the mockup and the demonstration,

2    he's going to -- he had created a device, and he was going to

3    actually activate the device.  In order to do that, he has to

4    bind the transmitter with the receiver, so -- which he's

5    already explained there is a binding process, and now he's

6    bound to that.

7          THE COURT:  Is it in his disclosure that he's going to

8    do that?

9          MR. WATKINS:  We're getting into larger issues here.

03:12 10   We spoke on Sunday about some of the -- Mr. Chakravarty, I

11   think, is going to introduce some mockups of each of these

12   individual items and do some demonstrations.  That was one of

13   them that I identified that we would object to, that -- using

14   that mockup, because that essentially gets them to the same

15   place where their expert that they did not call would try to

16   get them.

17          THE COURT:  Isn't that part of the instructions that

18   comes with the car?

19          MR. CHAKRAVARTY:  It is.  That's the only way these

03:13 20   cars would work.

21          THE COURT:  I don't know if that's expert.  That's

22   just sort of -- it's the way some 12-year-old gets the car to

23   run.

24          MR. WATKINS:  That is true as a general matter, but

25   what they are trying to prove is that this specific one bound

1    with that specific receiver down there, and that is the subject

2    of expert testimony.  It could have, but for them to say that

3    it absolutely did...

4        THE COURT:  Well, that it could be the subject of

5    expert testimony doesn't necessarily mean that it is; in other

6    words, it might be an inference from other non-expert evidence.

7    I don't know.  It depends on how it's presented.  But it sounds

8    elementary, that you have to punch in the code that you have to

9    use in order to identify the car to the transmitter.

03:13 10        MR. WATKINS:  That part of it is true, that they would

11   identify -- that the two of them -- whether this particular

12   transmitter identified with this particular receiver -- it's

13   not functioning anymore.  They can't do it.  They're unable to

14   do it, so they do it in a roundabout way.

15       MR. CHAKRAVARTY:  That's a separate question.  In the

16   actual piece of evidence versus in the exemplar, which he has

17   to say that's what he did in order to get the thing to work.

18       MR. WATKINS:  And that's why I think it's

19   objectionable.  It doesn't come in because of that exact

03:14 20   reason.

21       THE COURT:  No, I think he can say that's what he did.

22   He's not offering an opinion about these two other devices, so

23   he could go there.

24       MR. WATKINS:  Okay.  As long as -- because we're up

25   here and we're talking about the mockups, there's also a mockup

1    of the so-called Tupperware bomb.  I don't think that comes in

2    at all because they don't have the same Tupperware container.

3              MR. CHAKRAVARTY:  We're going to use the amount of

4    powder in the Tupperware.  There's an inert material that

5    they're using as an example of that.  That I wanted to put into

6    the actual piece of evidence so that the jury can see how heavy

7    this thing is.  So we wouldn't be moving the Rubbermaid in, but

8    we would be moving the material inside of the bag.

9              MR. WATKINS:  So as I understand it, they're mixing

03:15  10   exemplar material with an actual exhibit.  I would object on

11   that ground because they're moving those two things in --

12             MR. CHAKRAVARTY:  The exemplar would be the

13   separate -- would be a new exhibit number, and we would put

14   that new exhibit number in an existing exhibit number for

15   demonstrative purposes.  It wouldn't itself --

16             THE COURT:  Why can't you just have a similar

17   container?

18             MR. CHAKRAVARTY:  We have a similar one.  That's what

19   Mr. Watkins is objecting to.

03:15  20             MR. WATKINS:  They bought the wrong darn container.  I

21   mean, it's the wrong size; it's the wrong color.

22             MR. WEINREB:  We have the actual container.  We can't

23   put real explosive powder in it, so we're proposing to put

24   substitute explosive powder.

25             THE COURT:  As long as it doesn't alter the exhibit.

1          MR. CHAKRAVARTY:  It won't alter the exhibit.  I'll

2     see if they can do it.

3          MR. WATKINS:  And then finally, the government is

4     seeking to admit all of these.  I understand that they're

5     mockups, they're exemplars, but they do not get into evidence

6     as a general matter, any of these mockups.

7          MR. CHAKRAVARTY:  So we think it's important that they

8     do because, first, you can't appreciate the intricacies of the

9     fusing system unless you're handling it.  It's one thing to

03:16 10     pass it around; it's another thing to actually feel how heavy

11     this thing is.  It's important to see how the charges are

12     separated from each other.  I think based on his foundation,

13     him saying, "This is how I assembled it," it goes to weight,

14     literally and figuratively.

15          THE COURT:  I'll have to think about that.

16          MR. WATKINS:  One more:  the kill switch.  In

17     Watertown -- I object to -- the mockup they have actually has

18     the kill switch being inside of the pressure cooker itself, or

19     at least as I viewed it.  That's pure speculation.  The kill

03:16 20     switch shows no signs of burning.  There was nothing to

21     indicate it was on the inside.

22          As he has testified, there is no evidence of the

23     Christmas tree light that would be responsible, exploded or

24     unexploded.  Both the battery and this kill switch quite

25     obviously were separate.  Maybe they were going to do something

1    with that -- maybe Tamerlan was going to do something with

2    that, but there was -- they were completely separate.  It's

3    pure speculation as to this mockup, certainly in his testimony,

4    generally to say that there was a kill switch mechanism.

5         THE COURT:  I think it's a matter for

6    cross-examination, that point.  You can expose that on

7    cross-examination.

8         MR. WATKINS:  Yeah.

9         THE COURT:  Okay?

03:17 10        (In open court:)

11   BY MR. CHAKRAVARTY:

12   Q.   Agent Knapp, based on this evidence that you -- was

13   submitted to you, 949 and 949A, did you create a modified

14   version of an exemplar transmitter that would be comparable to

15   the one that was seized in this case?

16   A.   Yes.

17   Q.   And how did you make the modifications to the version of

18   the device that you bought off the shelf?

19   A.   Removed the trigger and the cutback on the throttle, put

03:18 20   the battery pack up beneath where the LCD or the circuit board

21   was.  This stuff was -- like I said, we have all kinds of

22   examiners in the FBI in our operational technology division.

23   They have examiners there also.  So evidence went over to them,

24   besides in our laboratory, to determine examinations on

25   particular items, whether they're with computers or like this

1    transmitter here that had gone over to them also.

2         But the modifications we made were like the modifications

3    of that transmitter.  And that transmitter basically was

4    modified in such a way that when you turn on the power button,

5    it's going to send a full output to that electronic speed

6    controller which then is going to, you know, send the

7    current -- all the current, to those where we talked about,

8    those two outputs to the motor.  And where that would have

9    been, that's where the initiator -- the improvised initiator

03:20 10   would have been, and it would have -- you know, it would light

11   up.

12   Q.   So instead of having to turn the throttle or to pull a

13   trigger, just turning the transmitter on would send a full

14   signal?

15   A.   The power button on that Flysky, yes.  When you turn that

16   on, it would send a full output to the electronic speed

17   controller because what it was seeing was a full reverse --

18   like you were running the car full reverse.

19   Q.   So, Agent Knapp, how sophisticated would you have to be in

03:21 20   order to create the improvised explosive device you described?

21            MR. WATKINS:  I'm going to object, your Honor.

22            THE COURT:  Go ahead.  You can answer.

23            THE WITNESS:  You have knowledge of hobby cars, the

24   components.  You might do a little bit of a testing to make

25   sure you, you know, get the right hookups.  But commonly

available out there in the Internet, how to modify.  There's

other Internet sites out there.  It's not that too

sophisticated.  I mean, if you know you have the components of

the hobby car, once you use your transmitter, press a button,

and you can get it to the output of the electronic speed

controller, it's not too difficult of a system to build.

BY MR. CHAKRAVARTY:

Q.   And you mentioned information is available on the Internet

about that?

A.   Right.  Widely available on just R/C models and

transmitters, different receivers, how to increase power to

your cars.  All these hobbyists out there that go around and

fly planes or race cars.

Q.   And so that's all with regards to the R/C component, the

radio-controlled, remote-control component to this?

A.   Right.

Q.   How about the assembly of improvised explosive devices?

A.   There's many sites out there available on the website.

Some give you step-by-step instructions on how to build an IED

or bomb.

Q.   And have you seen pipe bombs many times in your career?

A.   Yes.

Q.   And the principles behind building a pipe bomb, are those

pretty widely available as well?

A.   Correct.

1    Q.   Now, have you had a chance to review the *Inspire* magazine

2    which details the instructions they propose to build an

3    improvised explosive device?

4    A.   Yes.

5         MR. CHAKRAVARTY:  If we could call up 1142-91, page 3.

6    Sorry.  Next page, please.

7    Q.   Agent Knapp, does this first section of the "how to"

8    portion of this article say that there are two types of

9    explosions?  The first is a chemical explosion.  "This

03:23 10   explosive causes great pressure that would kill living beings

11   within a certain radius.  Examples are all the military-grade

12   explosions such as TNT, CR and RDX."  Did I read that first

13   section properly?

14   A.   Yes, just the chemical explosion and you have mechanical

15   explosions.

16   Q.   And so the type of IED that you've described on Boylston

17   Street in Watertown, those are not chemical explosions, right?

18   A.   Well, there was a chemical reaction for the low explosive,

19   and then the container relieved and mechanically separated with

03:24 20   the pressure being built up from the explosives.

21   Q.   Okay.  So does this article next go on to read, "The

22   mechanical explosion:  This results from the burning of an

23   inflammable material within a confined space.  An example is

24   putting gunpowder inside an iron pipe with a small opening

25   enough only for a fuse.  When the gunpowder is ignited, great

1    pressure results from the gunpowder turning into gases, and

2    which result in the exploding of the iron pipe, turning it into

3    shrapnel flying at a high speed."

4        Did I read that properly?

5    A.    Correct.

6    Q.    And is that the type of explosion that you were describing

7    earlier?

8    A.    Yeah.  I mean, it relieves the container, it relieves --

9    just like any buildup of pressure, whatever that comes from,

03:25 10   there's a buildup of pressure and it relieves the vessel or

11   container.

12   Q.    And does the *Inspire* magazine also suggest an elbow pipe,

13   some flammable material which I think *Inspire* calls

14   "inflammable substance," and then what appears to be a

15   Christmas tree light?

16   A.    Yes.

17   Q.    Section B gives instructions on how to extract the

18   inflammable substance.  And does it say that -- does it propose

19   to strike the head of the match softly?

03:25 20       MR. WATKINS:  Your Honor, I'm going to object to

21   Mr. Chakravarty continuing to read all of this.  If he wants

22   the witness to read...

23   BY MR. CHAKRAVARTY:

24   Q.    Agent Knapp, if you wouldn't mind reading --

25   A.    "Grind the substance and filter to obtain a fine powder.

1    In the picture you will see the fine powder and you will add

2    sugar equivalent to one-quarter its quantity.  Mix the two

3    substances until they become uniform in color."

4    Q.   What's the purpose of these instructions?

5    A.   Basically to get a low explosion composition, harvest it

6    off of matches, and stick a fuel in there and mix it up and you

7    have a low explosive.

8             MR. CHAKRAVARTY:  Next page, please.

9    Q.   Preparation of the decoration lamp?

03:26  10  A.   Yeah, this basically is telling you, you know, be careful

11   how you open up a little Christmas tree bulb.  Be careful of

12   the filament, because if you break the continuity of that,

13   you're not going to have an initiator.  There's a little

14   filament in there, and they say to carefully place it inside

15   your low explosive.  Just an improvised initiator using a

16   Christmas tree bulb.

17   Q.   And is that a process that takes some experience in doing

18   effectively?

19   A.   It's -- sometimes it can be tricky when you break that

03:27  20  glass bulb and then you ruin the inside filament, but it just

21   takes, you know, just a little bit of ability to crack the

22   glass just right.  But nothing too sophisticated about that.

23   Q.   This next section talks about preparation of the iron pipe

24   and it suggests drilling a hole in the pipe.  Is that right?

25   A.   Right.  I mean, you have to insert your initiator somehow,

1    whether it was a Christmas tree light as they're talking this

2    way, or just a piece of that green hobby fuse into your pipe.

3              MR. CHAKRAVARTY:  Next page, please.

4    Q.   It says the final preparation.  Can you read this, please?

5    A.   "Pour some inflammable substance into the lamp.  Do so

6    gently in order not to tear the filament, which is very

7    sensitive.  The device will not explode if the filament is

8    torn.

9         "Insert the lamp into the pipe with the wires sticking

10   out.

11        "Fill the pipe with the inflammable substance.  Avoid

12   having any of the substance on the threads of the pipe so that

13   it won't ignite when closing the pipe.

14        "Wrap tape around the pipe to close the hole which was

15   drilled into the pipe only leaving the wires sticking out.  The

16   tape will surround the wires, closing any gaps in the pipe and

17   will not wrap around them."

18   Q.   It continues down here.

19   A.   "You may substitute the inflammable substance extracted

20   from the matches by gunpowder used in cartridges but you may

21   also use powder from fireworks instead.  Note:  You do not have

22   to use one substance.  You may mix together the substance from

23   matches, gunpowder or fireworks, but in doing so, you'll need

24   to mix them well," and it goes on to talk about electricity

25   source.

1    Q.   So just on the flammable substance they're talking about,

2    those are all low explosives that they describe there?

3    A.   Yeah, that's low explosive.

4    Q.   Okay.  Please continue with the electricity source.

5    A.   "The importance of the electricity source in the explosive

6    device is that it is the key in igniting the device.  The

7    electricity that is sufficient to turn on a small lamp is

8    sufficient to cause an explosion.  This electrical current may

9    reach to the lamp directly through a battery, by a time circuit

03:29 10   or by a remote-controlled circuit."

11    Q.   And is the hobby car fusing system that you described

12    earlier -- is that a remote-controlled circuit?

13    A.   That's correct.

14         MR. CHAKRAVARTY:  Next page.

15    Q.   Now, did they give an example of the timed circuit here?

16    A.   Yeah, they have chosen for you a timed circuit as it is

17    simple.  "We set up the circuit which is composed of a 9-volt

18    battery, a wire connected to the plus of the battery and a

19    nail, the red wire, a wire connected to the negative of the

03:30 20   battery, and a test lamp, the black wire.

21         "Note:  You may use any small lamp here.  Take notice that

22    this is not a lamp we filled before with the inflammable

23    substance.  We connect from the other pole of the lamp a green

24    wire.  When this wire touches the nail, the circuit is closed

25    and the lamp should light."

1        This is simply a very basic -- you got a power source.

2   The switch they have is the nail touching the other side of the

3   wire, and the power source is hooked up and you have a little

4   light and it will come on.

5   Q.    So far with the exception of the typos, are the

6   instructions they've been giving consistent with how you

7   understand an IED would work?

8   A.    Consistent with a fusing system, a simple fusing system,

9   yes; that you could use in an IED, yes.

03:31 10        MR. CHAKRAVARTY:  Next page, please.

11  Q.    And then this page, it describes the --

12  A.    Modifying a mechanical clock in using two contacts.  Once

13  they touch, it's a switch.  Just like in the previous, they use

14  the nail to the wire.  They're just using the hands of the

15  clock with a wire.  And once -- they're talking about using one

16  of the hands, and once it comes and touches a nail, it

17  completes the circuit, a simple circuit.

18        MR. CHAKRAVARTY:  Next page, please.

19  Q.    This middle section, is it more details about that timed

03:31 20  explosive?

21  A.    Yeah, correct, using the timer to function up in the top,

22  the light or how you could set it up to function that pipe

23  bomb.

24  Q.    I want to focus in on this bottom section which talks

25  about fragmentation.  Can you read that?

1    A.   Yeah.  "It is important to put a quantity of small nails

2    on the surface of the iron pipe from the inside.  You do that

3    by sticking them to the wall of the pipe by using glue.  The

4    pipe used here is a 2-inch one.  The inflammable substance used

5    to fill it was extracted from 80 match heads.  The explosion

6    that results from this device is a mechanical one.  It results

7    from the pressure caused by the gases and, therefore, it only

8    works if contained in a high-pressure environment.  So you may

9    use iron pipes, pressure cookers, fire extinguishers or empty

03:33 10   propane canisters.  The point is that the inflammable substance

11   needs to be" --

12        MR. CHAKRAVARTY:  Next page, please.

13   A.   -- "contained in a strong container that would allow the

14   pressure to build up and thus cause a damaging explosion."

15   Q.   All right.  If I could ask you to stop there?

16        MR. CHAKRAVARTY:  Your Honor, I think we were going to

17   break a little early?

18        THE COURT:  How much more do you have on this topic?

19        MR. CHAKRAVARTY:  This topic, just to the end of this

03:33 20   article.  So just a couple more minutes?

21        THE COURT:  Yeah, go ahead.

22   BY MR. CHAKRAVARTY:

23   Q.   Now, they mention fragmentation such as small nails?

24   A.   Right.

25   Q.   Which of the devices in this investigation had small nails

1    as an apparent secondary fragmentation?

2    A.    That was at Scene B.

3    Q.    And that's the blast in front of the Forum restaurant?

4    A.    That's correct.

5    Q.    Would you please continue reading?

6    A.    "However, in order to fill, for example, a pressurized

7    cooker with the substance from matches, it would take a lot of

8    matches to do so; therefore, you may want to use gunpowder or

9    powder from fireworks.

03:34 10        "You need to also include shrapnel.  The best shrapnel are

11    the spherical-shaped ones.  As you can see in the figures

12    below, you need to glue them to the surface of your canister.

13    If steel pellets are not available, you may use nails instead.

14    Above is a 2-inch iron pipe with nails inside it.  You fill the

15    inflammable substance afterwards."

16    Q.    Please continue.

17    A.    "The next three points illustrated by the previous images

18    are for shrapnel used with a gas canister.  The shape of nails:

19    You may place the nails in a mold or pour glue over them, and

03:34 20    when dry you remove them from the mold, wrap the molded nails

21    around the canister.  After wrapping the shrapnel around the

22    canister, empty the canister from the gas and open the valve

23    and then fill it with the inflammable substance.  Insert the

24    lamp with the wires sticking out just as you did earlier with

25    the iron pipe.

1      "With that said, here are some important steps to take for

2   an effective explosive device:  Place the device in a crowded

3   area.  Camouflage the device with something that would not

4   hinder the shrapnel, such as cardboard."

5   Q.   When it's talking about gas canister in this article, do

6   you understand that to mean like a propane-gas-type canister

7   or --

8   A.   Any type of -- yeah, fire extinguisher, propane canister.

9   Q.   And in this investigation did you recover materials such

03:35 10   as cardboard --

11   A.   Yes, we did.

12   Q.   -- from each of the scenes, on Scenes A and B?

13   A.   Correct.

14   Q.   Read the iron pipe method.

15   A.   "The iron pipe method is effective if more than one is

16   used simultaneously.  To do so, bundle one wire from each pipe

17   together and then bundle the remaining wires together as you

18   may see in the illustration to the bottom right.  One bundle

19   would represent the green wire which connects to the clock's

03:36 20   hour arm.  The other bundle connects to the...on the battery."

21   The negative of the battery.

22   Q.   The negative terminal of the battery?

23      All right.  Read this section, please.

24   A.   "The pressurized cooker is the most effective method.

25   Glue the shrapnel to the inside of the pressurized cooker, then

1    fill in the cooker with inflammable material.  Insert the

2    prepared lamp into the inflammable material gently in order not

3    to break the filament of the lamp.  Then have the wires

4    sticking out of the hole in the lid of the cooker.  Wrap some

5    tape around the hole to seal any openings and connect the wires

6    to the electric source in the same way we did with the iron

7    pipe."

8    Q.   With regards to the non-electrical fusing system that you

9    found from the Boylston Street devices, are these instructions

03:37 10    consistent with what you uncovered in your investigation?

11    A.   Right.  They add the fragmentation, the shrapnel.  They

12    had the BBs in Scene A embedded with a sealant, and they had

13    the fragmentation with the BBs and the small nails inside the

14    pressure cooker in Scene B, in a sealant.

15    Q.   And then you described earlier the nuance with getting the

16    Christmas tree light done right?

17    A.   That's correct.

18    Q.   I'll conclude with this.  Read the safety precautions.

19    A.   "The following are a few safety precautions:  Put your

03:38 20    trust in Allah and pray for the success of your operation.

21    This is the most important rule:  To wear gloves throughout the

22    preparation of the explosive to avoid leaving behind

23    fingerprints.  Three, this is an explosive device so take care

24    during preparation and handling.  In the article we covered one

25    of the many ideas for a lone mujahideen.  We ask Allah to

1    assist our brothers in targeting his enemies and we ask Allah

2    to grant us victory."

3            MR. CHAKRAVARTY:  This is a good place to break, your

4    Honor.

5            THE COURT:  All right.  We'll take the recess at this

6    point.

7            THE CLERK:  All rise for the Court and the jury.  The

8    Court will take the lunch recess.

9            (The Court and jury exit the courtroom and there is a

04:55 10   recess in the proceedings at 12:53 p.m.)

11           THE CLERK:  All rise for the Court and the jury.

12           (The Court and jury enter the courtroom at 2:13 p.m.)

13           THE CLERK:  Be seated.

14   BY MR. CHAKRAVARTY:

15   Q.   Agent Knapp, you described earlier that some mockup

16   devices were made, and you said that you had constructed the

17   configuration of these mockup devices to comport to the devices

18   that you've spoken about that were -- evidence of which was

19   found in this case.  Is that right?

04:59 20   A.   Yes, that's correct.

21   Q.   Did you bring those into court with you today?

22   A.   Yes.

23   Q.   And so do you have a mockup device for the Scene A

24   pressure cooker bomb?

25   A.   Correct.

```
 1   Q.   And that we'll call 1568.  And for the Scene B pressure
 2   cooker bomb, is that 1569?
 3   A.   Correct.
 4   Q.   And then for the materials that -- the inert explosive
 5   materials that were in the Rubbermaid container that was found
 6   in Watertown, did you bring an inert facsimile of that
 7   substance?
 8   A.   Yes.
 9   Q.   Okay.  And for the facsimile of that substance, we're
10   going to mark that as 1570.  And for the pressure cooker bomb
11   at Watertown, is that 1571?
12   A.   Am I supposed to be seeing something on the screen?
13   Q.   You don't know the number.  Okay.  I'll show you.
14        Did you bring the mockup for the Watertown pressure cooker
15   bomb?
16   A.   Yes.
17   Q.   And did you also bring the mockups for the two pipe bombs
18   that were rendered safe in Watertown and you had mockups made?
19   A.   That's correct.
20   Q.   And are all of these helpful to explaining your testimony
21   about how each of these devices worked?
22   A.   For the fusing systems, yes.
23   Q.   And can you explain how you approximated how much
24   explosive material to put in?
25   A.   Before the -- we said the volume of those Fagor pressure
```

05:00 (line 10)
05:01 (line 20)

```
 1   cookers, half to full, estimated that it was about eight pounds
 2   if it was full to 16 pounds, and then of course the smaller one
 3   would have had less than the larger ones.
 4   Q.  And about -- for the pipe bombs, you actually were able to
 5   collect the unexploded material from the Watertown devices.  Is
 6   that fair to say?
 7   A.  Well, they were -- like I said, they were rendered safe
 8   and the powder was taken out of them before they came down to
 9   us.
10   Q.  And did you approximate that -- sorry.  In the mockups
11   that you made there is no powder, correct?
12   A.  There is no powder.
13           MR. CHAKRAVARTY:  Your Honor, at this point I would
14   ask permission to have SSA Knapp approach the podium with each
15   of those exhibits and demonstrate -- or to show that -- each of
16   the components of those exhibits to the jury.
17           THE COURT:  That's fine.  It's ahead of the -- I'm not
18   sure if you've worked out the lines of sight for counsel.
19           MR. WATKINS:  I'll move around if the Court doesn't
20   mind.
21           THE COURT:  Move around or move to a spot?
22           (Laughter.)
23           MR. WATKINS:  I will move to one spot and try my best
24   to stay still.
25           THE COURT:  Okay.  Go ahead.  Proceed.
```

1    BY MR. CHAKRAVARTY:

2    Q.    Agent Knapp, if you'll come to the podium here again.

3    A.    (Witness complies.)

4    Q.    Agent Knapp, just keep your voice up so everyone can hear

5    what you're saying.

6    A.    This was the pressure cookers from the mockup from Scene

7    A, a hobby fuse coming out of it.  Inside was the fusing system

8    we talked about earlier.  Now, we found fragments of cardboard

9    taped up around, and then the inside -- I mean, the

05:04 10    fragmentation was on the inside and it was with a sealant, and

11    these were where the BBs were encased inside.  We found this

12    pink-like rosin paper encasing just on the outside.  Those

13    would have been placed in here.

14         And this was the -- what we talked about before,

15    electronic speed controller.  We have the Flysky receiver here.

16    Here was the toggle switch, the power source.  And off the

17    electronic speed controller where the two outputs would go to

18    the motor and an improvised initiator was connected in.  And

19    we're representing this as the lightbulb right here.  But the

05:05 20    improvised lightbulb would have been into the main charge, the

21    low explosive.

22    Q.    So when you say it would be into the main charge, meaning

23    that --

24    A.    Yeah, this is just represented in the bag because it would

25    be pretty messy in here otherwise.

1          But anyway, this was placed inside the pot.  You know,

2    there was -- the tape was crossed over, you saw, in some of

3    those pictures there, and then it was placed in the backpack.

4    Into a backpack.

5          You know, this was found at Watertown, and this is the

6    mockup of what was found there out of a bag.  But this is

7    actually what the controller would look like.

8    Q.   For the record -- one moment.  Just for the record, you're

9    holding up two transmitters.  One appears to be a modified

05:06 10   Flysky transmitter and one is an intact Flysky --

11   A.   Yeah, this is what it would have looked like where the

12   pistol grip, the trigger control and the wheel for steering the

13   car.  That's the battery pack where it was cut off and placed

14   underneath, and all these buttons here are gone, but the dials

15   are still underneath it.  So this was how that was found.

16   Q.   Now, just to clarify, the modified device you just held

17   up, that's a mockup, not the original evidence that we saw --

18   A.   Yes, this is the mockup of the Flysky, what we found at

19   the scene.

05:07 20   Q.   Agent Knapp, could you put the pressure cooker into the

21   backpack?

22   A.   I mean, it is pretty heavy.

23          MR. CHAKRAVARTY:  Your Honor, I would ask for

24   permission -- first, with regard to all of these, I'll move

25   them in -- or make a motion to move them into evidence, but if

1    I may ask to publish them in the backpack so that the jury

2    can -- actually, maybe take it out of the backpack -- excuse

3    me -- so the jury can actually see it close up.

4          MR. WATKINS:  I object to actually admitting them.

5    Passing them around, no problem.

6          THE COURT:  I'll reserve on the admission, as we've

7    discussed, but you may exhibit them.

8    BY MR. CHAKRAVARTY:

9    Q.   Agent Knapp, if you would be so kind to pass around this

05:08 10   device.

11   A.   You want the lid --

12   Q.   Take the lid off.

13          (The exhibit is published to the jury.)

14   Q.   Agent Knapp, while the jury's looking at that, just to

15   clarify, all of the powder that you have in these exemplars is

16   inert and poses no danger from any of these devices?

17   A.   That's correct.

18          (The exhibit is published to the jurors.)

19   Q.   Agent Knapp, the configuration of the various components

05:12 20   that are in the mockup, how did you arrive at that architecture

21   given the fact that the devices that were used were actually

22   exploded and you didn't have the original to model it after?

23   A.   Well, like I said before, at the scene all the evidence

24   that was collected, the damaged electronic speed controller,

25   the Flysky, the battery parts and that really damaged toggle

1    switch, to have this operate, it has to be plugged up in such a

2    way that leads -- the power source goes to the electronic speed

3    controller in this fashion, the toggle switch was wired up

4    coming off one of the -- we found the inputs into the

5    electronic speed controller so it would basically break the

6    signal when there was an output to this improvised Christmas

7    tree.

8          So when you turn it on, where there's a slide switch here

9    that initialized what we talked about, then it doesn't send an

05:13 10   output to that light and it will trigger that light, it will

11   flash.  So there was an interruption, so a toggle switch was

12   used to break that circuit momentarily until this initialized.

13   And then this is in the off position right now as it stands,

14   and they just have to go and turn it on so it will complete the

15   circuit.

16   Q.   Okay.  Thank you.  With regard to the transmitter that was

17   modified, with the absence of the throttle and the trigger like

18   you demonstrated, what would happen when you turned that on?

19   A.   As I talked about before, the modification -- when they

05:14 20   modified it from here, what would happen is when you turn this

21   on, it would be like you were pressing this trigger full speed

22   backwards, so there would be an output as soon as you turn

23   on -- here's the power button, usually on the back.  When you

24   turn that on, it would send that output directly to the

25   receiver, which then the electronic speed controller would

1    interpret it and send it to the output where the improvised

2    initiator was going to be.

3    Q.    And this is a Flysky transmitter and a Flysky receiver in

4    this setup, correct?

5    A.    Yes, that's correct.

6    Q.    Thank you.  Can we move on to Exhibit 1569, which is the

7    Scene B exemplar?  Or I should ask:  Is there anything else

8    about this that you haven't described?

9    A.    Everything that was from the scene that we gathered up is

05:15 10   represented here in this mockup.

11   Q.    Thank you.  Can we move on, then, to the Scene B exemplar?

12   A.    Once again, there was a backpack that was concealing the

13   device.  Same-type pot, the Fagor.  It had hobby fuse going

14   into it as a second form of initiation if the R/C fusing system

15   didn't work.

16       Like we talked about, at the scene what was collected,

17   there was a power source which is basically just another Sub-C

18   pack power source for a hobby car.  This was the electronic

19   speed controller and this would be the receiver.  And this

05:16 20   electronic speed controller, you know, the slide switch to

21   initialize in this position here.  There were -- the two

22   outputs that would normally go to the motor is going to the

23   improvised initiator, same type.

24       And the only difference is, you know, there was -- besides

25   the BBs, there were these small steel nails that was embedded

1    into the -- with the BBs.

2    Q.   But the fragmentation sleeve, that's in the sealant

3    against the interior walls of the pressure cooker?

4    A.   Right.  And we saw that with the red rosin paper again and

5    the fragmentation, and then it was also -- had tape on it again

6    consistent with Scene A.

7    Q.   Thank you.

8         MR. CHAKRAVARTY:  Again, your Honor, I would ask to

9    publish 1569, the Scene B exemplar.

05:18 10        THE COURT:  All right.

11        THE WITNESS:  And as far as demonstration purposes,

12   there was a transmitter that, you know, we purchased off of

13   those receipts that we talked about, the transmitter, receiver,

14   and I have an unmodified transmitter here today.

15   BY MR. CHAKRAVARTY:

16   Q.   That's because the transmitter for the Scene B device was

17   not actually located, correct?

18   A.   That is correct.

19   Q.   So you bought one that was -- married the receipt that we

05:18 20   saw earlier?

21   A.   Yes.

22   Q.   Please publish the -- this device.  If you can hand it to

23   Juror No. 1.

24        (The exhibit is published to the jurors.)

25   Q.   Now, significantly, Agent Knapp, there's no toggle switch

1   on this device.  Is that correct?

2   A.   Yeah.  Like we talked about earlier, that once you

3   initialized it, it didn't have enough output, or there was no

4   current going to that improvised initiator, so there was none

5   needed.

6   Q.   Thank you, Agent Knapp.

7        If we could move on to Exhibit 1570.  This is the

8   Watertown evidence -- sorry -- Watertown mockups.

9        Agent Knapp, let's first start with the pressure cooker

05:23 10  device, Exhibit 1571.  Can you explain the architecture of that

11  mockup?

12  A.   Yeah, it was a Fagor.  There was cardboard -- circular

13  cardboard found, that was burnt and charred, at the scene also.

14  There was a toggle switch with wire found, basically a 9-volt

15  battery.  Like I said before, there was no improvised initiator

16  attached to this, but there was a length of wire with just a

17  simple flip up on-and-off toggle switch.

18  Q.   None of the circuitry that we saw in the other two devices

19  existed in the Watertown pressure cooker?

05:24 20  A.   No.  And there was the same type of construction with the

21  BBs, pink/red -- the pink rosin paper was found at the scene

22  with the fragmentation.

23  Q.   And was there also an alternate fusing system?

24  A.   Well, there were holes poked through here, through the

25  cardboard which was damaged and burnt.  And basically, hobby

1    fuse, when it burns, it's going to go away.  So the primary

2    means of initiation would have been this hobby fuse, and you

3    have that as a secondary type of initiation.

4    Q.    Okay.  And how does this device compare in relative weight

5    to the other two devices that the jury just saw?

6    A.    Half the weight.

7    Q.    Fair enough.  Thank you.

8          Let's move on to the two pipe bomb exemplars, 1572.

9          Agent Knapp, just one more question on that Watertown

05:26 10   device as you're opening that bag.  The pieces of the Watertown

11   pressure cooker were more intact than those on Boylston Street.

12   How would you attribute that?  How would you explain that?

13   A.    That is correct.  I mean, pretty much the whole base of

14   that pot was just crumbled and crushed.  But as far as -- an

15   explosion happened, but that could have been due to

16   confinement.  That was more than likely thrown and the lid

17   probably was -- came un- -- I mean, we found no evidence of any

18   tape around it.  So if the lid did come unseated, you know,

19   it's still intact and it's almost acting like a projectile.

05:26 20   And it just basically violently flew in one direction, and I

21   believe that was found embedded --

22              MR. WATKINS:  I'm going to object, your Honor.

23              THE WITNESS:  -- in pictures --

24              THE COURT:  That's all right.  Overruled.  Go ahead.

25   You can continue.

```
 1              THE WITNESS:  -- into a car.
 2    BY MR. CHAKRAVARTY:
 3    Q.   Thank you.  Please move on to the pipe bombs.
 4    A.   It's simple.  Your loads are Home Depot 2-inch-diameter
 5    pipes.  You can put any powder in, but basically it was
 6    fragmentation.  And in some of the ones that did go off, you
 7    can see the circular impressions in some of the pieces that
 8    they also had fragmentation in the pipe.  It was just a simple
 9    hobby fuse lighted and you throw it.
05:27 10   Q.   Now, there's some tape on the threads of the end caps.  Is
11    that --
12    A.   Right.  I mean, usually -- yeah, we -- in our training
13    we'll make what -- we use Vaseline basically so you cause no
14    friction.  A possible low explosive can ignite it.  Like we
15    read in that manual before, that Inspire, about be careful, you
16    know, threads.  So Teflon just to ease so there's no friction
17    buildup between the threads.
18    Q.   And just speaking of tape, were there various tapes
19    submitted as evidence in this investigation?
05:28 20   A.   Yeah, there was numerous types of tape:  black electrical
21    tape, this Teflon tape, duct tape, clear packing tape.  Just
22    commonly available items seen over the years of being put in a
23    device, like I'm taping up the hobby fuse or taping up wires
24    together, but it's just available material used to construct a
25    device.
```

1    Q.    And in addition to that tape, there's some electrical

2    tape, it looks like, on both of these devices?

3    A.    When it came in, there was electrical tape on the

4    initial -- or the actual devices, yes.

5    Q.    And each of these mockups represents a rendered-safe

6    intact device?

7    A.    That is correct.

8    Q.    So we don't know exactly what the other pipe bombs that

9    exploded may have looked like?

05:29 10   A.    Right.  They were just fragmentation, pieces of the pipe.

11   Q.    And is the elbow, 90-degree elbow pipe, similar in terms

12   of construction?

13   A.    Yeah, just they -- a 90-degree pipe.

14        MR. CHAKRAVARTY:  Your Honor, I would ask to publish

15   1572.

16        THE COURT:  Okay.

17   BY MR. CHAKRAVARTY:

18   Q.    I'm sorry.  "Publish" means to give it to the jury.

19   A.    The pot too?

05:30 20   Q.    No, just those two -- the pipes; not the pot.

21        (The exhibit is published to the jurors.)

22   Q.    While they're doing that, let's set up the next one.

23   Exhibit 1570 is the plastic bag of powder that you just placed

24   on counsel table.  If you wouldn't mind retrieving a piece of

25   evidence in the Rubbermaid container.

1    A.    (Witness complies.)

2    Q.    You just picked up Exhibit 854 which was the -- well, what

3    is it?

4    A.    This is the container that approximately three pounds of

5    low explosives were recovered in, and it had -- in the lid it

6    had a hole in it and it had three pieces of hobby fuse coming

7    out of it.

8    Q.    All right.  And if you wouldn't mind just placing the --

9    1570, the bag, into the container and holding it up?

05:31 10    A.    (Witness complies.)

11    Q.    Agent Knapp, if you would hold up Exhibit 854 containing

12    Item 1570.  Would you take off the lid just so the jury can get

13    a sense of how much of that Rubbermaid container was filled.

14    A.    And of course, there was all the hobby fuse that was

15    packed in here amongst the powder.

16    Q.    And was the hobby fuse lying on top of the powder?

17    A.    Yes.

18    Q.    And the hobby fuse itself has some explosive material in

19    it.  Is that correct?

05:35 20    A.    That's correct.

21    Q.    And was the strand of hobby fuse sticking out through the

22    top of that lid?

23    A.    Yeah, there was three pieces.

24    Q.    Thank you.  And, Agent Knapp, we're done showing

25    the -- these exhibits to the jury.  I just wanted to ask you to

        1   put that away, and then we'll do a demonstration of the exhibit

        2   1568 and 1569, with the Court's permission.

        3           MR. CHAKRAVARTY:  I'm seeking the Court's permission

        4   to do that demonstration.

        5           THE COURT:  Okay.

        6           MR. CHAKRAVARTY:  Thank you.

        7           THE COURT:  I don't know what the demonstration

        8   entails.  It's kind of a blank check.

        9           (Laughter.)

05:36  10   BY MR. CHAKRAVARTY:

       11   Q.   So, Agent Knapp, if you would take the remote control

       12   transmitter for each of those mockups and perhaps resume the

       13   witness stand.  And you place each of these devices either on

       14   the podium or I can hold one.

       15           (Pause.)

       16   A.   Like I said before --

       17           THE COURT:  Why don't we have a question.

       18           MR. CHAKRAVARTY:  Yeah, thank you.

       19   BY MR. CHAKRAVARTY:

05:37  20   Q.   Thank you.  Agent Knapp, first of all, you've taken off

       21   the lid of Exhibits 1568 and 1569, correct?

       22   A.   Yes, correct.

       23   Q.   And each of the -- each of those receivers for each of

       24   those radio-controlled devices has been bound to the respective

       25   transmitters.  Is that accurate?

1    A.    Yes, that's correct.

2    Q.    And how did you learn to do that?

3    A.    Basically, R/C hobby model cars, there's instructions out

4    there widely available, there's manual -- instruction manuals

5    that come.  And based on the evidence collected, as I said

6    before, I put it into the appropriate configuration as the

7    fusing system would have been in Scene A.

8    Q.    Do the instruction manuals for each of those devices also

9    have the binding procedures?

05:38 10    A.    It's a simple process where you bind the receiver to the

11    transmitter, you turn on the power on the receiver, and then

12    there's a bind -- there's this little bind button up here that

13    you press in and then you turn the power on, and then there's a

14    blinking light.  And then once it's bound, it stays solid.  And

15    then you remove the little binding plug and you put the plugs

16    into the appropriate channel in the receiver and get ready

17    to -- you know, if you had a hobby car, you would get ready to

18    drive, steer it, move it.

19    Q.    And is the Flysky receiver bound to the Flysky transmitter

05:39 20    that you brought?

21    A.    The modified, yes.

22    Q.    The modified transmitter?  And the Spektrum receiver is

23    bound to the Spektrum exemplar that you had purchased as well?

24    A.    That is correct.

25    Q.    In your experience in making these mockups and testing

1    them, was one transmitter capable of activating the other

2    receiver?

3    A.   As I said, they use two different forms to communicate.

4    Spektrum uses a digital sequencing and the Flysky uses

5    sequencing hopping.  So the transmitter and the receiver have

6    to have that type of technology so they can communicate with

7    each other.  That has the digital sequencing and the Flysky has

8    the frequency hopping.

9    Q.   So they don't communicate?

05:40 10   A.   No.

11   Q.   You described an arming procedure that's required for each

12   of the receivers, for the receiver-electronic speed controller

13   combination.

14   A.   But you have to initialize each one.  Basically there's a

15   little slide switch from the electronic speed control you turn

16   on and it powers it up, and then it goes through its little

17   sequence, and then it's waiting for the signal from the

18   transmitter to receive an input.

19   Q.   And so can you position the Christmas tree light for each

05:40 20   of these devices in a way that the jury can see whether the

21   light turns on.

22   A.   (Witness complies.)

23   Q.   Now, in the improvised explosive device, that Christmas

24   tree light filament would be embedded in the explosive

25   material.  Is that right?

1    A.   Yes.

2    Q.   So now, if you can arm each of the devices and then resume

3    the witness stand with the respective transmitters?

4    A.   Okay.

5    Q.   I'm sorry.  Is there anything else that you need to

6    describe about what you're doing?

7    A.   No.  Basically, it's turned on.  You can see there's power

8    coming to it.  And right now it's in the safe-arm position.  So

9    when you turn it on, it wouldn't get a little blink on the

05:41 10   light.  And if it was on -- do you see that blink -- that would

11   cause the power to detonate it.

12   Q.   Agent Knapp, you're going to have to get back to a

13   microphone.

14   A.   So I'm going to go to the safe arm -- I'm going to take it

15   off the safe arm -- I'm going to put it on safe.  It's

16   initializing, and in a couple of seconds, and then I'm turning

17   it on.  Now all I have to do is press this button to turn the

18   receiver on.

19   Q.   Okay.  And you've pressed the modified Flysky transmitter

05:42 20   and it's activated, the device, 1568, the Scene A mockup?

21   A.   Correct.

22   Q.   Now, please go on to 1569, the Scene B mockup.

23   A.   Once again, there's a slide switch here.  But we didn't

24   know the configuration of this transmitter, the controller.

25   But the slide switch is on and it's armed.  And then you just

```
 1   have to put an input from this transmitter to it.
 2   Q.   And you've depressed the transmitter in the exemplar,
 3   Spektrum transmitter, and it has activated the Christmas tree
 4   light on the 1569, Scene B mockup.  Is that right?
 5   A.   Correct.
 6   Q.   Now, you obviously did that here at close range.  And you
 7   don't know the exact range of each of these devices.  Is that
 8   right?
 9   A.   That's correct.
05:44 10   Q.   When you activated one of the transmitters, it did not
11   activate the Christmas tree light on the other receiver.  Is
12   that correct?
13   A.   That's correct.
14        MR. CHAKRAVARTY:  That's all I have, your Honor.
15        THE COURT:  Mr. Watkins, do you want the witness there
16   or on the stand?
17        MR. WATKINS:  I would like to start off there.
18        THE COURT:  Okay.  Fine.
19                     CROSS-EXAMINATION
05:44 20   BY MR. WATKINS:
21   Q.   Good afternoon, Agent Knapp.
22   A.   Good afternoon.
23   Q.   1568 is this one, correct, from Scene A?
24        I'm going to move this over to counsel table.
25        THE COURT:  Mr. Watkins, you stay near the microphone
```

1    too, please.

2              MR. WATKINS:  I will.  I know I have a soft voice.

3              THE COURT:  It's not just for the room; it's for

4    transmission to other rooms as well.

5    BY MR. WATKINS:

6    Q.   Now, Agent Knapp, as I understand it, it's -- the two

7    switches on here, right, this one has to be turned on.  The

8    problem is when this one turns on, this immediately does a

9    little cycle that would light up the Christmas tree light and

05:45 10   that would ignite, right?

11   A.   Correct.

12   Q.   And that's why it needed this added feature of this arming

13   switch, right?

14   A.   That's a safe-and-arm toggle switch.

15   Q.   Safe-and-arm toggle switch.  Because then it runs its

16   cycle, you can put that switch on, and then it's ready to go,

17   right?

18   A.   It's waiting for input from the transmitter.

19   Q.   From the transmitter.

05:45 20        Now, this battery pack here, this doesn't last forever.

21   Like any other battery pack, you have to recharge it.  It will

22   lose power over time, correct?

23   A.   That's correct.

24   Q.   And not only will it lose power, but if it's on all the

25   time, it will drain the battery.  The battery will go dead,

1    right?

2    A.   Well, if you're not putting an input and you're running

3    the motor and the battery is then being drained because you're

4    speeding around on your hobby car.

5    Q.   Correct.  Or it's just the electronic speed controller

6    takes a certain amount of energy itself, right?

7    A.   There's a little bit of energy.  But not like taking it

8    and driving the car on the motor.

9    Q.   Of course.  So in order for this to work, this has to be

05:46 10   charged up.  It has to have a charge in it, right?

11   A.   That's correct.

12   Q.   And then it would go into this pressure cooker pot.

13        Now, I saw -- I think the jury saw there are actually two

14   pieces of cardboard in each of these pressure cooker bombs,

15   right?

16   A.   Right.

17   Q.   And that is consistent with what you found on the street

18   at each scene, there were two kind of -- I mean, there were

19   shards but you could identify two of these, right?

05:47 20   A.   There was -- yes, there was two.  Well, there was

21   cardboard, very fragmented, with duct tape around it of a

22   circular nature, yes.

23   Q.   And two pieces at each site, right?

24   A.   Well, and then Watertown, I think there was three without

25   duct tape on it.

1    Q.    So you put both of these in.  But you don't know what the

2    order, for example, of these pieces of cardboard were in there,

3    right?

4    A.    No.

5    Q.    And indeed, this one could be on top and -- where did our

6    lid go?  There it is.  Go on top like that?

7    A.    Sure.

8    Q.    So going back, then, to this arming switch, you could turn

9    this on, but at some point when you're getting to use it, this

05:48 10   safe arm switch is the last thing that's going to happen to

11   make it operational, correct?

12   A.    Yes.

13   Q.    Okay.  So one would flip the switch and put it back in

14   here and then put this down on here and close it up, and then

15   all we could do is wait for the signal from the transmitter,

16   right?

17   A.    If it was on, yes.

18   Q.    So again, the last thing that actually went inside when I

19   just did that was this piece of cardboard, right?

05:48 20   A.    Yes.

21   Q.    I think I'm done here.  If you could go back to the stand,

22   I'll go back to my usual spot.

23          MR. WATKINS:  I'm actually not getting any screens at

24   this point.

25          THE COURT:  No, you're not.  What do you want, the

 1    computer?

 2             MR. WATKINS:  Yes, please.  There we are.

 3    BY MR. WATKINS:

 4    Q.    You talked a little bit about what your role became once

 5    the bombing happened on April 15th.  You stayed down in

 6    Quantico, and part of what you did was intake evidence there,

 7    right?

 8    A.    Yeah.  I was down in Quantico, in the explosives unit, and

 9    the evidence started coming down to the laboratory.

05:50 10    Q.    And so when that came in, you would identify -- or you

11    would help identify it as maybe part of an explosive item that

12    would be within your purview?  In other words, items would come

13    down, this might be involved with an explosive device, it goes

14    to Agent Knapp -- or you would decide it goes to Agent Knapp in

15    the explosives unit?

16    A.    That was decided at -- once an explosive event or

17    explosive case, it would come through our unit, and an examiner

18    was assigned.  And I was the examiner that was assigned to this

19    case.

05:50 20    Q.    And because there were -- I think you said really

21    thousands of items of evidence that were tied to the explosive

22    device, right?

23    A.    Yes, there was over 1300 individual submissions of items

24    that came in.

25    Q.    And some of those had sub-items that went to hundreds of

1    items, right?

2    A.    There was a lot, yes.

3    Q.    I'm showing you --

4          MR. WATKINS:  I think this is in evidence, your Honor,

5    but perhaps it should just go to the witness to make sure.

6    Q.    Do you recognize what is depicted on the screen?

7    A.    Fragmented remains of cardboard.

8    Q.    And that's identified as Q199?

9    A.    That's correct.

05:51 10   Q.    And was that one of the items that you listed in your

11   report as being associated with the bombs?

12   A.    Correct; it was listed in my report.

13   Q.    And now, I do believe this is in evidence as part of 623

14   because I think I've seen it there, but we don't have sub

15   numbers for that.  I'm going to ask my colleagues if they could

16   determine.  Otherwise, I'll admit it separately.

17         THE COURT:  It doesn't hurt to admit it separately.

18         MR. WATKINS:  Then I would move for admission of

19   Defendant's Exhibit 3093.

05:52 20         MR. CHAKRAVARTY:  No objection, your Honor.

21         (Defense Exhibit No. 3093 received into evidence.)

22         MR. WATKINS:  While that's being shown on the screen,

23   may I approach, please?

24   BY MR. WATKINS:

25   Q.    You, in your report, identified this as fragments of

1    cardboard collected at Scene A.  Is that correct?

2              THE COURT:  Are you getting the picture?

3              THE JURORS:  No.

4              MR. WATKINS:  Oh, I'm sorry.

5              THE COURT:  Now?  Okay.  Sometimes there's a delay.

6    BY MR. WATKINS:

7    Q.   Is that right, you identified a number of items?

8    A.   I've identified a lot of items, but I don't have my report

9    available, so...

05:53 10   Q.   Your report is 108 pages long?

11   A.   That's correct.

12   Q.   Did you -- I thought you told Mr. Chakravarty that you

13   looked over your report before you came in today?

14   A.   I looked over the report previously.

15   Q.   I'm sorry?

16   A.   I had looked over it previously, but not this morning or

17   today.

18   Q.   But just sitting here now, you know that cardboard came

19   in, and that was analyzed and found to be part of one of the

05:54 20   bombs?

21   A.   Correct.

22   Q.   And you talked about the multidiscipline -- the different

23   disciplinary areas within the FBI laboratory, right?  You

24   talked about fingerprint identification, you talked about

25   chemistry, you talked about -- what else, firearms

1    identification, I think, DNA?  There's all kinds of different

2    disciplines within the lab, right?

3    A.    Correct.  There are multiple disciplines within the

4    laboratory.

5    Q.    And part of what you do when you see something come in for

6    analysis is to also help to determine where that should go

7    next, in other words, whether it should go to another

8    discipline either after you've seen it or after you've done

9    your full analysis?

05:54 10    A.    Yes.  There's what we call an examination report where the

11    evidence is flowing through the laboratory, what disciplines

12    get certain particular pieces of items which will then

13    eventually -- once those examiners do their examinations, then

14    the evidence will be coming back over to the explosive unit, to

15    myself, to analyze the bits and pieces of the parts.

16    Q.    In the early stages of the Boston Marathon bombing case,

17    all of the disciplines communicated with each other.  There

18    were daily meetings about the evidence, right?

19    A.    Basically there was an exam plan started.  And depending

05:55 20    on what it was, it went to those examiners, and then it went to

21    the next examiner, whatever discipline that was, and -- but

22    there was other communication going on.

23    Q.    And there were, indeed, daily meetings about the evidence

24    and the -- what should be analyzed and how far people had

25    gotten with their analysis on the Boston Marathon bombing case,

1    right?

2    A.   Right.  That was a bigger picture -- I mean, the lab was

3    doing its part, but then there was these daily meetings with

4    our FBI headquarters and other FBI entities involved in this

5    case.

6    Q.   Ms. Clarke has helped me out.  Can I refresh you with your

7    report about Q199 came from?

8    A.   Sure.

9    Q.   It's on the computer here.  So you could see the heading

05:56 10   from your report.  Don't read it, but I want to point out where

11   you are.  And you recognize that as something you would do on

12   your report?

13   A.   Yeah, the various Q items, right.

14   Q.   Right.  And then if you scroll down to the next page,

15   we're looking for Q199.  Yeah, there we go.

16   A.   Right.

17   Q.   So does that refresh your recollection where Q199 came

18   from?

19   A.   From Scene A.

05:57 20   Q.   And when you're talking about Scene A, that's the Boston

21   Marathon bombing Scene A?

22   A.   Correct.

23   Q.   So to get back to Q199, these shreds, they were sent to

24   other disciplines for analysis also, right?

25   A.   Yes, that's correct.

```
 1    Q.   The shreds from Q199 which was found at Scene A was sent
 2    for fingerprint analysis.  Is that correct?
 3              MR. CHAKRAVARTY:  Objection, your Honor, to this line.
 4    Not to this question but to the --
 5              THE COURT:  Well, you can have this question.
 6    BY MR. WATKINS:
 7    Q.   Did it get sent for analysis?
 8    A.   Yes.
 9    Q.   Do you know whether positive results of a fingerprint
10    analysis were done?
11              MR. CHAKRAVARTY:  Objection, your Honor.
12              THE COURT:  Sustained.
13    BY MR. WATKINS:
14    Q.   Showing you the remains of the backpack that were found at
15    Scene B, Boylston, marathon bombing, do you recognize that and
16    do you recognize the Q number?  It's hard to read, but I think
17    Mr. Chakravarty put this up for you just before.
18    A.   That looks like Q51?
19    Q.   This would be Q11.
20    A.   Q11.
21    Q.   Do you know what --
22    A.   Remains of a backpack.
23    Q.   And inside of that backpack were remnants of pieces of
24    paper?
25    A.   Yeah, correct.
```

```
 1   Q.   Do you know whether that was sent for fingerprint
 2   analysis?
 3   A.   Yes, that was sent for analysis.
 4   Q.   And do you know whether there were results obtained?
 5           MR. CHAKRAVARTY:  Objection, your Honor.
 6           THE COURT:  Sustained.
 7   BY MR. WATKINS:
 8   Q.   Showing you a picture of Exhibit 974, do you recognize
 9   that as the lid recovered in Watertown that came to you for
10   analysis?
11   A.   Yes.
12   Q.   And that's the pressure cooker lid?
13   A.   Correct.
14   Q.   Do you know whether that item was sent for fingerprint
15   analysis?
16   A.   A lot of these items basically were sent out to the
17   various disciplines.  That one would have been sent out also
18   looking for fingerprints.
19   Q.   And the reason to send something out from an explosives
20   point of view, a metal surface like this can capture
21   fingerprints pretty easily, correct?
22           MR. CHAKRAVARTY:  Objection, your Honor.
23           THE COURT:  Sustained.
24   BY MR. WATKINS:
25   Q.   The FBI has a protocol about what order things are to be
```

1    analyzed in, a general protocol?

2    A.   If they're looking for trace, possibly DNA or latent

3    fingerprints, that would -- depending on what we're looking

4    for, a combination, it could go to latents first for visuals;

5    come back if they're looking for trace evidence, hair or other

6    things; or it might end up going to DNA to take a swab and a

7    sample.  It just all depends what's the evidence, what piece

8    of -- what it is and then where it's going to go first.

9    Q.   And those were the kinds of decisions that were being made

06:02 10   at Quantico as each of these pieces of evidence came in?

11   A.   As it came into the lab and then examined, a plan was

12   established.  And evidence just kept coming in, and the various

13   disciplines and examiners were getting this evidence and doing

14   their examinations on it.

15   Q.   Now, I want to move to the transmitters that you talked

16   about as the fusing system.  There was a lot of testing done on

17   these particular transmitters, and you talked about people

18   buying exemplars and things of that nature?

19   A.   We -- the explosion unit, we ended up purchasing these

06:03 20   products, yes.

21   Q.   That's what I'm getting at.  It was a "we."  It was a

22   group effort; it wasn't you doing all of these particular

23   things, right?

24   A.   There were other examiners in our unit purchasing, and

25   some individuals going out, looking for the type of pots that

 1  were used, yes.

 2  Q.   Now -- but they also did independent testing of the

 3  circuits and tried to make sure that -- well, they came to the

 4  conclusion that you reported here about these transmitters

 5  binding to these receivers, right?

 6          MR. CHAKRAVARTY:  Objection, your Honor.  Objection.

 7          THE COURT:  Sustained.

 8  BY MR. WATKINS:

 9  Q.   And they issued a report, right, of their own about the

06:03 10  transmitters and receivers?

 11          MR. CHAKRAVARTY:  Objection.

 12          THE COURT:  Let me see you at the side.

 13          (Discussion at sidebar and out of the hearing of the

 14  jury:)

 15          MR. CHAKRAVARTY:  The government was restricted from

 16  incorporating the very same type of testimony that the defense

 17  is now attempting to elicit, but this is something beyond his

 18  expertise.  He just simply looked at results of other -- the

 19  other disciplines, and in some cases he incorporated reference

06:04 20  to the fact that other people had done their own independent

 21  tests in his report.  But he didn't adopt the findings of all

 22  of those in order to make his assessment.

 23          I mean, that would pull the sting out of whatever

 24  Mr. Watkins was going to do, had he been transparent about the

 25  strategy of first bringing it out on cross.

1        MR. WATKINS:  No, I did it in a very evenhanded way.

2   He testified on direct that he didn't know what the distance

3   that each one of them could go on was.  The report actually

4   says, quite specifically, what the distance of each of the

5   transmitter receiver pairs was.

6        That's all I was doing, was gearing up to do a kind of

7   refresh recollection with him with these reports.  And that's

8   why I was asking about the reports.  That's the one and only

9   question.

06:05 10       THE COURT:  He didn't testify to it.

11       MR. WATKINS:  No.  Mr. Chakravarty asked him "Do you

12   know what the distance is" --

13       THE COURT:  And he said no.

14       MR. WATKINS:  He said, "I don't know," but he knows

15   this report and he does know.  There were a lot of things he

16   did not know until he prepared for testimony today using those

17   kinds of reports.

18       THE COURT:  It looks like you're trying to

19   cross-examine your own evidence.  I mean, you want to get it in

06:05 20   so you can criticize it.

21       MR. WATKINS:  No.

22       THE COURT:  I'm not following this.

23       MR. WATKINS:  All I want to get in is the distance

24   that -- one of the transmitters had a distance of 572 feet; the

25   other one had 1100 feet.  The evidence is that our client kind

1     of raced away from the one scene, and it goes to his

2     sophistication concerning, you know, what he knew about the

3     particular item and its attributes.

4          MR. CHAKRAVARTY:  Any information about the range was

5     not from this witness; it was from this other expert who was

6     doing his own independent analysis.  He didn't incorporate that

7     into his findings and he didn't do it.

8          MR. WATKINS:  That's not true.  It is in his report.

9     It is in his report.

06:06 10          MR. WEINREB:  We have good reason to exclude it under

11     403 grounds because the purpose of this examination is to

12     suggest that Tamerlan Tsarnaev could have detonated that second

13     bomb, which the defense has no good-faith basis for suggesting

14     because they know that it's not --

15          THE COURT:  I don't know because he's already -- well,

16     anyway.

17          MR. WATKINS:  Your Honor, I just want to correct one

18     thing.  It is absolutely in his report.  He does adopt the

19     distances.  It's in there.

06:07 20          MR. CHAKRAVARTY:  Here's the report.  It very well may

21     be.  It's 108 pages.  If you want to find that.

22          THE COURT:  The fact that it's in the report isn't a

23     basis for admitting it, necessarily.  You need something more

24     than that.  He testified on the subject and said that he

25     doesn't know.

 1          MR. WATKINS:  And so I can refresh his recollection.

 2          THE COURT:  You could try to refresh his recollection,

 3     but that's not what you started to do.  If you want to put the

 4     report in front of him and see if that refreshes his

 5     recollection --

 6          MR. MELLIN:  But, your Honor, the problem with this is

 7     there's no good-faith basis for what -- they're trying to argue

 8     that Tamerlan had both receivers -- or both transmitters, and

 9     that is the only reason they're raising this issue.  They don't

06:07 10     have a good-faith basis and they can't argue that.

11          MR. WEINREB:  And this will just mislead and confuse

12     the jury and it should be excluded under 403 grounds.  It is a

13     critical issue in the case.  The defense knows it's not true.

14     They have no good-faith basis for suggesting it.  Introducing

15     it will mislead and confuse the issues and, therefore, it

16     should --

17          MS. CONRAD:  Judge --

18          MR. WEINREB:  -- be excluded on 403 grounds.

19          MS. CONRAD:  -- if two prosecutors can speak, can two

06:08 20     defense attorneys speak?

21          THE COURT:  Go ahead.

22          MS. CONRAD:  Thank you.  First of all, the government

23     -- and the Court has allowed the government to introduce in

24     terms of whether it's his finding or not his finding, and

25     experts rely on others' testing.  And they've been allowed to

1    introduce what he's learned from others, so it seems to me that

2    that's fair ground.

3           Second of all, it's either impeachment or refresh your

4    recollection.

5           Third of all, it seems to me whether or not we can

6    address an issue that was specifically addressed on direct

7    examination, which is the range of these -- it seems to me

8    that's a no-brainer.  We can.  And what we're going to argue

9    from it or not argue from it is for another day.  I don't think

06:08 10   the government can just put us off from addressing something

11   that's relevant.

12          THE COURT:  No, I think it's a fair Rule 403 question,

13   but I don't know the answer.  So give me something more about

14   why there's no good-faith basis.  I mean, somebody knows

15   something to the opposite?

16          MR. WEINREB:  Yes; the defendant.

17          MS. CONRAD:  That's ridiculous.  I mean, to say the

18   defense can --

19          THE COURT:  Keep your voice down.

06:09 20   MS. CONRAD:  To say that -- I don't think we're there

21   yet, first of all.  But second of all, to say that the defense

22   can't argue something that -- to which there exists -- as to

23   which there is contrary evidence is ridiculous because, first

24   of all, that's like saying that in an identification case if

25   your client told you he was guilty, you can't argue mistaken

1    identification.  That's Defense 101.  This also goes to the

2    issue that the government claims that was Jahar's apartment.

3                THE COURT:  Okay.  I will exclude it on the 403

4    grounds.

5                MS. CONRAD:  May I just have a clarification?  403 --

6                THE COURT:  For the reasons argued by Mr. Weinreb.

7                MS. CONRAD:  I don't understand.

8                (In open court:)

9    BY MR. WATKINS:

06:10 10   Q.   I'm showing you what's been identified as Exhibit 1160-02.

11   That is the receipt Mr. Chakravarty showed you for an order.

12   Do you recall that?

13   A.   Correct.

14   Q.   What is the date on that particular order?  Oh, I'm sorry.

15   This is not -- this is already in evidence?  There.  What is

16   the date on that receipt?

17   A.   February 8th of 2013.

18   Q.   And whose name is on the receipt for that R/C car that you

19   have the exemplars from?

06:11 20   A.   Tamerlan Tsarnaev.

21   Q.   Showing you 1431 --

22               THE COURT:  These are all in, right?

23               MR. WATKINS:  Yes.

24   BY MR. WATKINS:

25   Q.   -- which Mr. Chakravarty showed you on direct.  Let me see

```
 1    if I can find the date on this one.  Can you -- what is the
 2    date on that purchase?
 3    A.   It's 4/8/13.
 4    Q.   And that is seven days before the Boston Marathon bombing?
 5    A.   April 8th.
 6    Q.   And these are for parts that were related to the second
 7    Boston Marathon bombing, Scene 2?
 8    A.   This was the Spektrum products, I believe.
 9    Q.   And I think you testified the Spektrum was related to
10    Scene B, the second Boston Marathon bombing?
11    A.   That's correct.
12    Q.   Mr. Chakravarty showed you *Inspire* magazine and the alarm
13    clock pages from that.  Do you recall that?
14    A.   Yes.
15    Q.   And there's no mention in *Inspire* magazine about
16    radio-controlled cars as a fusing system.  Is that right?
17    A.   The portion I read at, no.
18    Q.   And what I think you've told us is that this is something
19    that can be easily found out on the Internet by searches?
20    A.   Correct.
21    Q.   Were you aware that Tamerlan Tsarnaev searched the
22    Internet for radio-controlled cars in the months leading up to
23    the Boston Marathon bombing?
24              MR. CHAKRAVARTY:  Objection, your Honor.
25              THE COURT:  Sustained.  Sustained.
```

1              And I remind the jury that unanswered questions

2    produce no evidence.

3              MR. WATKINS:  That's all I have, your Honor.

4              MR. CHAKRAVARTY:  Nothing further.

5              THE COURT:  Agent, thank you.  You may step down.

6              (The witness is excused.)

7              MR. WEINREB:  Your Honor, the United States calls Dr.

8    Jennifer Hammers.

9              MR. MELLIN:  Your Honor, if we may have a moment to

06:14 10   move the screen for Dr. Hammers for the issues we raised before

11   with the medical examiners?

12             THE COURT:  Oh, move the screens?  Yes.  I'm sorry.  I

13   didn't know which screen you were referring to.  Yes.

14             Again, as we did, there will be some autopsy

15   photographs, and so the public monitors will not display them.

16   The jury will see them.  They are vivid photographs.

17                  JENNIFER HAMMERS, M.D., duly sworn

18             THE CLERK:  State your name, spell your last name for

19   the record, keep your voice up and speak into the mic.

06:15 20        THE WITNESS:  Sure.  My name is Jennifer Hammers,

21   H-A-M-M-E-R-S.

22                     DIRECT EXAMINATION

23   BY MR. WEINREB:

24   Q.   Good afternoon.

25   A.   Good afternoon.

Q.   Where do you work?

A.   I work for the Office of Chief Medical Examiner for the City of New York.

Q.   What type of work do you do?

A.   I'm a forensic pathologist, also known as a medical examiner.

Q.   What does a forensic pathologist or medical examiner do?

A.   So a medical examiner, their duty is to investigate sudden, unexpected or unnatural deaths, to perform autopsies, and utilize that information as well as investigative information to determine why somebody passes away, and to fill out a death certificate indicating the reason that they passed away.

Q.   Where did you go to school and tell us about any degrees you earned.

A.   Sure.  So I went to college at Geneva College in Beaver Falls, Pennsylvania, where I earned a bachelor of science.  I then went to medical school at Lake Erie College of Osteopathic Medicine in Erie, Pennsylvania, where I got my degree to be a physician.  After I finished medical school, I did a residency in anatomic and clinical pathology at Allegheny General Hospital in Pittsburgh, Pennsylvania.

     I then went to the New York City medical examiner's office where I did my fellowship training in forensic pathology.  And I also stayed for a second year of fellowship, specifically in

1  neuropathology and cardiac pathology, which is a specific study

2  of the heart and the brain in forensic-related cases.

3  Q.   What jobs have you held since completing all of that

4  training?

5  A.   After I finished my fellowship in New York City, I came to

6  Massachusetts to work for the medical examiner's office for the

7  Commonwealth of Massachusetts.  I worked here for just about

8  three years before going back to the medical examiner's office

9  in New York City to work about a year and a half ago.

06:17 10  Q.   Approximately how many autopsies have you performed?

11  A.   I've performed about 2,000 -- a little over 2,000

12  autopsies.

13  Q.   Have you ever testified as an expert forensic pathologist

14  before?

15  A.   Yes, I have.

16  Q.   How many times?

17  A.   About 45 times.

18  Q.   What years did you work at the Massachusetts Office of the

19  Chief Medical Examiner?

06:17 20  A.   So I worked here in Massachusetts from around September of

21  2010 to the end of June 2013.

22  Q.   So you were working here during the time of the marathon

23  bombings?

24  A.   That is correct.

25  Q.   Was Dr. René Robinson one of your colleagues?

1    A.    Yes, she was.

2    Q.    Did you perform autopsies according to the same standards

3    and procedures as she did when she -- as she does at that

4    office?

5    A.    Yes, I do -- I did, yes.

6    Q.    On April 16, 2013, did you perform an autopsy on Krystle

7    Marie Campbell?

8    A.    Yes, I did.

9    Q.    Did you determine the manner of her death?

06:18 10   A.    Yes, I did.

11   Q.    What was the manner of death?

12   A.    The manner of death that we determined -- that I

13   determined was that she passed away from a homicide.

14   Q.    What was the cause of her death?

15   A.    The cause of death was that she passed away from blast

16   injuries to her torso and to her lower extremities.

17   Q.    What are blast injuries?

18   A.    So blast injuries are injuries that are caused from some

19   type of explosion force.  And typically there are two types of

06:18 20   injuries that occur:  One is from a wave of energy that can

21   cause injury to the body, typically, to the inside of the body,

22   mostly to organs that have air in them, like the lungs and the

23   gastrointestinal system.

24        The other way that people have injuries, blast injuries,

25   is physical injuries from objects from an explosive device or

1    the surrounding area that can actually cause injuries to the

2    body:  injuries to the skin, to the muscle and subcutaneous

3    tissue and to the organs.

4    Q.   How does the shrapnel from a bomb injure your skin, your

5    organs and so on?

6    A.   So objects that injure the body typically cause cuts and

7    tears to the body.  They can cause bruises or contusions or

8    scrapes or lacerations both to the surface of the body but also

9    deeper into the body.

06:20 10   Q.   And you mentioned that the cause of death was injury to

11   Krystle's torso and lower body, her legs, essentially?

12   A.   That's correct.

13   Q.   All right.  Did she also suffer injuries to her head?

14   A.   Yes, she did.

15   Q.   What kind of injuries?

16   A.   She suffered injuries that were blast-related to her head.

17   There was singeing of the hair over the back of her head from

18   the heat of the explosion.  She had some scrapes or abrasions

19   to her neck; she had a pellet -- it was small, like around the

06:20 20   sizes of a BB -- that was embedded into the back of her ear;

21   and she also had some contusions or bruising to both the front

22   of her tongue and the right side of her tongue adjacent to the

23   area of her teeth.

24   Q.   What injuries did she suffer to her body?

25   A.   So to her torso, she also suffered blast-related injuries

```
 1    that included thermal injuries, or heat-related injuries.  She

 2    had a large area of a burn over her back right side and a

 3    little bit over the back of the upper right arm near the armpit

 4    area.  She had evidence of small punctate abrasions and

 5    contusions, or scrapes and bruises, over the back side of her

 6    body that was consistent with small pellets that I found both

 7    outside of her body, inside of her clothes, and also inside of

 8    her body.

 9        And she had some black powder residue that was

10    particularly over the area of the back of her armpit area.  She

11    had some thermal changes, or burns to her clothes, as well as

12    defects consistent with the pellets that I found in some of her

13    clothing, particularly, her shirt and tank top and bra that she

14    was wearing.

15    Q.   Did she have any injuries to her arms and legs?

16    A.   Yes, she did.

17    Q.   Can you describe those, please?

18    A.   Sure.  So on the back of her left hand there was some

19    black powder residue that I noticed, and over the middle finger

20    of her left hand she had a somewhat elongated abrasion or

21    scrape, and around that scrape there were three punctate

22    defects in the skin, again, of a similar size to those that I

23    saw in the clothing, over her back and also in her skin over

24    her back, about the same size as the pellets that I found.

25        Most of her injuries were on the back of her right arm and
```

1    then to her lower legs.  So on the back of the right arm, in

2    addition to what I previously described, there was also a large

3    area over the back of the right arm that had stippling, or very

4    small, fine punctate abrasions or scrapes to the skin over the

5    back of the right arm.

6         On the lower legs, from the upper thighs down to the feet,

7    there were injuries.  So there were several very large, gaping

8    injuries to the skin, the subcutaneous tissues and the muscle

9    of both the front and the back of the lower legs.  There were

06:24 10   also several smaller injuries.  So the larger injuries measured

11   up to about ten inches, probably about from, like 5 or 6 inches

12   up to 10 inches, and the smaller injuries were about 1 to 2

13   inches in greatest dimension each.  Many of them were very

14   deep, through the whole surface of the skin, into the muscle.

15        The injuries on the surface of the skin had -- many of

16   them had smoother edges to them and some were slightly

17   irregular.  There were -- so they had a sharp aspect to them

18   but also a more blunt, or tearing aspect to them.  Some of them

19   had some material that was embedded into the wound itself.

06:24 20        So there were three pieces of flat, slightly

21   irregular -- slightly irregular-edged pieces of metal.  One I

22   found between the pants and the skin in the area of the right

23   groin, and then two I found actually embedded into the skin and

24   the muscle of the back of the left leg.

25        I also found in some of the wounds some pellets that were

```
 1   similar to what I had found on the outside of the body, and

 2   also some clear silicone-type material that had -- some of

 3   which had pellets embedded into the material and then some of

 4   which I could see that pellets had been embedded into the

 5   material but were no longer present.

 6        There was a fracture of the femur bone on the left side,

 7   which is the bone in the thigh, and there was also a fracture

 8   and a laceration, or a tear, to the skin over the area of the

 9   bunion in the -- on the left foot.

10   Q.   So her left foot and her femur in that same leg were

11   shattered?

12   A.   Well, the femur was broken completely through at the lower

13   aspect of the femur, so closer to the knee than to the hip, and

14   the bone in the foot had multiple small fractures in that area

15   of where the bunion is.

16   Q.   Is that consistent with blast injuries?

17   A.   Yes, both of those actually are.  Yes.

18   Q.   How does a blast shatter bone?

19   A.   So the injury to the foot appeared like -- so the skin had

20   a long, like, laceration or tear to the skin, and it -- what it

21   appeared to be was that something had grazed up against the

22   skin and deep enough to reach the bone of the foot as it was

23   traveling along the foot.

24        The fracture to the leg, to the bone in the thigh, can

25   occur from many types of different injuries, but certainly from
```

1    a blast type of injury where a force is put onto the body, that

2    can cause a break to the bone.

3    Q.   Is that painful?

4    A.   A fracture to the femur?

5    Q.   Yes.

6    A.   Yes, that would be very painful.

7    Q.   I'd like to show you a photo that has been marked as

8    Exhibit 652 for identification.  Do you see that?

9    A.   Yes, I see it.

06:27 10   Q.   Do you recognize that?

11   A.   Yes, I do.

12   Q.   What is it?

13   A.   This is a photograph of Ms. Campbell's body, from

14   approximately her shoulders down to her feet, showing some of

15   the injuries that I've already discussed.

16   Q.   Was that taken during the autopsy?

17   A.   Yes, it was.

18          MR. WEINREB:  The government offers 652.

19          MR. BRUCK:  Noting our prior objection.

06:28 20          THE COURT:  All right.  Admitted.  I will display it

21   to the jury.

22          (Government Exhibit No. 652 received into evidence.)

23   BY MR. WEINREB:

24   Q.   Can you point out the sites of the injuries that you just

25   described?

1   A.   Sure.

2   Q.   And if you like, if you press hard on this screen with

3   your finger, you can circle things and then clear them by

4   pressing in the upper right-hand corner.

5   A.   Okay.  So on the legs, I had described some of the larger,

6   gaping injuries that went through the skin and also through the

7   subcutaneous tissues, or fat, and into the muscle.  You can see

8   one of the larger wounds that I just circled in yellow.

9   There's another here, and then there's another also on the back

06:29 10   of the leg here that we can see in this picture.

11       So these wounds show that the edges along the skin have a

12   slightly -- have a somewhat smooth surface to them, and so the

13   object causing these would have somewhat smooth edges, but also

14   deep within the wound in the muscle, you can see that the

15   muscle is actually -- doesn't have a smooth wound through it

16   but, rather, it has more of a lacerated defect, or an irregular

17   tearing of the muscle as opposed to being just from a smooth

18   object.

19       On the right leg, which is closest to the yellow arrow

06:30 20   that I circled, you can see that the edges of the wound are

21   slightly more irregular and not quite as smooth as the injury

22   on the left thigh that I just described.

23       So these are three of the wounds that I had previously

24   described.  There's one more injury that I did not yet

25   describe, which I'll circle.  It's this long, or linear area,

1    of contusion or bruise.  This was present on both her right

2    inner thigh and her left inner thigh.  It's in the area of the

3    seam of her jeans.  And this can occur when the legs are

4    pressed up against each other in a forceful way where the seam

5    actually causes a pattern bruise in the area of the -- on the

6    skin in the area of the seam of the jeans.

7    Q.   Okay.

8         MR. WEINREB:   655 for the witness, please.

9    Q.   Do you recognize that photo?

06:31 10   A.   Yes, I do.

11   Q.   Is that also a photo that was taken during the autopsy?

12   A.   Yes, it is.

13        MR. WEINREB:   The government offers 655.

14        THE COURT:   Okay.

15        (Government Exhibit No. 655 received into evidence.)

16        MR. BRUCK:   As previously noted.

17        THE COURT:   Yes, of course.

18   BY MR. WEINREB:

19   Q.   What's this a photo of?

06:31 20   A.   So this is the photo of the back side of Ms. Campbell,

21   showing again her back and the back aspect of her arms and legs

22   from her shoulders down to her feet.

23   Q.   The big red mark on her back, what is that?

24   A.   So the large red area on her back is the burn that I had

25   previously described to her skin.

```
 1    Q.    What level of burn is that?

 2    A.    So this burn appeared to be a third-degree burn.

 3    Q.    Is that the most severe kind?

 4    A.    Essentially, beyond a third-degree burn, there would be

 5    charring of the skin or actual burning of the tissue.  So

 6    without that, yes, this is the most severe.

 7    Q.    And the wounds, the big, gaping holes in her legs, were

 8    those the wounds you described earlier?

 9    A.    Yes, they are.

06:32 10   Q.    And was it in there that you found shrapnel and metal

11    pieces and the BB-sized objects that you described earlier?

12    A.    Yes, that's correct.

13              MR. WEINREB:  Exhibit 654 for identification, please.

14    Q.    Do you recognize that?

15    A.    Yes, I do.

16    Q.    What is that a picture of?

17    A.    This is a very close up picture of some of the wounds on

18    the back of her leg that I previously described.  And the

19    smaller wound that's to the left side of the screen -- it's in

06:33 20   the middle but just to the left -- has a piece of that flat,

21    slightly irregular but slightly sharp metal embedded into the

22    wound that I had described that I had recovered from some of

23    the wounds.

24              MR. WEINREB:  The government offers 654.

25              THE COURT:  All right, with the same conditions, yes.
```

1          MR. BRUCK:  Thank you.

2          THE COURT:  Published.

3          (Government Exhibit No. 654 received into evidence.)

4     BY MR. WEINREB:

5     Q.   Can you please indicate -- just by tapping the screen it

6     will leave an arrow -- where you found that metal shard?

7     A.   Sure.  So the piece of metal is in the wound that the

8     arrow is pointing to.  It's sort of on end, so that in the

9     photograph you're seeing the thin aspect of it.

06:34 10          MR. WEINREB:  May I have Exhibit 656 for the witness,

11    please.

12    Q.   Do you recognize that?

13    A.   Yes, I do.

14    Q.   And just I'm going to show you two more.

15          MR. WEINREB:  659 for the witness, please.

16    Q.   Do you recognize those?

17    A.   Yes, I do.

18          MR. WEINREB:  And 651 for the witness.

19    Q.   Do you recognize those?

06:34 20    A.   Yes, I do.

21    Q.   What are they?

22    A.   So they're three photographs of the material that I've

23    previously described that I collected from the wounds in the

24    body.

25    Q.   These are FBI laboratory photos, not your own photos.  Is

1    that right?

2    A.   I believe the second two are.   The first one may be as

3    well.

4    Q.   But you had an opportunity to review them and compare them

5    to your notes and to the evidence, and these are accurate

6    photos of the items you removed from Krystle's body?

7    A.   Yes, they are.

8          MR. WEINREB:   The government offers those three

9    exhibits.

06:35 10          THE COURT:   All right.

11          (Government Exhibit Nos. 651, 656 and 659 received

12    into evidence.)

13          MR. WEINREB:   If we could have Exhibit 656, please.

14    BY MR. WEINREB:

15    Q.   So could you describe where you found that item?

16    A.   Yes.   So this is one of the flat pieces of metal.

17          THE COURT:   Just one second.   I have to resend it.

18          THE WITNESS:   Oh, I'm sorry.

19          THE COURT:   Did you get it?

06:35 20          THE JURORS:   No.

21          THE COURT:   Okay.   Go ahead.

22    BY MR. WEINREB:

23    Q.   Go ahead.

24    A.   Okay.   So this is one of the flat pieces of metal taken

25    from one of the wounds in the back of the leg that has slightly

1   sharp, but also slightly irregular, margins.

2   Q.   I'm going to hand you what's been marked as several

3   exhibits.  While I do, do you want to put on some gloves?

4   A.   Sure.

5   Q.   We've marked these as 660-A, 659-A, 658-A, 657-A, and

6   661-A for identification.  I'm going to ask you to open those

7   and tell me if you recognize the objects inside, if you don't

8   mind.

9   A.   Sure.  Do you have a particular order you want me to do it

06:36 10  in?

11  Q.   No, you can do it in any order.

12  A.   Okay.

13        (Pause.)

14  A.   This is 658-A.

15  Q.   Just continue.

16  A.   Oh, sure.

17        (Pause.)

18  A.   Would you like me to pull all of these out?

19  Q.   Yes, please.

06:39 20       (Pause.)

21  A.   I think I have them all open.

22  Q.   All right.  Dr. Hammers, do you recognize those items?

23  A.   I do.

24  Q.   What are they?

25  A.   They're multiple envelopes that contain swabs/foreign

1    material that I collected at the time that I did the autopsy on

2    Ms. Campbell.

3    Q.   Okay.  And what's pictured in 656, is that one of the

4    items that you removed from her body?

5    A.   It is -- so in the photograph, that is an item that I took

6    from her body at the time of autopsy, yes.

7            MR. WEINREB:  And can we have 659 on the screen,

8    please.

9    Q.   Do you recognize those items?

06:40 10   A.   Yes, I do.

11   Q.   What are they?

12   A.   These are the three larger flat pieces of metal that I

13   recovered at the time of the autopsy.

14   Q.   And 661, please.  Do you recognize that?

15   A.   Yes, I do.

16   Q.   What's that?

17   A.   This is one of the envelopes -- the contents of an

18   envelope that I collected at the time of the autopsy.  It shows

19   multiple pellets and the white silicone-type material both that

06:41 20   contains some pellets but also contains imprints of where

21   pellets used to be.

22   Q.   Okay.  So you said earlier that the cause of death was

23   blast injuries, but how does that actually cause someone to

24   die?  How did it cause Krystle Campbell to die?

25   A.   So Ms. Campbell passed away because she received injuries

1    not only to the surface of her skin and her muscle, but also in

2    the process of those injuries occurring, blood vessels in her

3    lower legs were cut or transected which caused bleeding.  So

4    the reason that she passed away is because she lost a

5    significant amount of blood in a short enough period of time

6    that her body couldn't make more blood in order for her to

7    survive.

8    Q.   And based on the nature of the injuries that you observed

9    during the autopsy, can you estimate how long it took her to

06:42 10   bleed out, how long she lived?

11   A.   I can in a general kind of way.

12   Q.   What's the estimate?

13            MR. BRUCK:  I'd like to be heard, your Honor.

14            THE COURT:  You want to be heard, is that it?

15            MR. BRUCK:  Yes.

16            THE COURT:  All right.  I'll see you at the side.

17            (Discussion at sidebar and out of the hearing of the

18   jury:)

19            MR. BRUCK:  The only expert opinion that was provided

06:43 20   in discovery under Rule 16 was that her death would not have

21   been instantaneous.  There is no estimate of the period of

22   time.  We would like to know what the estimate is and see if we

23   would object to it.  I don't think we've been provided notice.

24            THE COURT:  What do you expect her answer to be?

25            MR. WEINREB:  I expect her answer to be up to one

1    minute.  And given the nature of the particular injuries in

2    this case, it was probably closer to the one-minute side than

3    the zero side.

4         However, I would like to state that first, the

5    indictment in this case is not something that the defendant

6    murdered people, it was that he actually committed a terrorist

7    act.  He terrorized the entire population, and causing people

8    to die in a particular manner, a manner that caused them to

9    bleed to death, to suffer pain while they were dying.  And that

06:43 10   the disclosure that the death was not instantaneous subsumes

11   the idea that she was alive at least some seconds after

12   the -- I mean, we're not going to say that she lived for days

13   or for hours or something that will obviously require --

14        THE COURT:  Okay.

15        MR. WEINREB:  -- more elaborate disclosure.

16        THE COURT:  Okay.  I think "up to a minute" is

17   consistent with "not instantaneous."

18        MR. BRUCK:  Well, we then further object to the

19   speculation that it was probably more closer to one minute than

06:44 20   closer to -- we don't think that that's -- there's any likely

21   basis for it.

22        There's also -- it's speculative because there's no

23   telling how soon she would have passed out for other reasons

24   having to do with blast injuries.  It's just complete guesswork

25   and it's inflammatory.  There's nothing to base it on.

```
 1              MR. WEINREB:  That's what cross-examination is for.

 2              THE COURT:  Your objection is noted, but I'll allow

 3     it.

 4              MR. BRUCK:  Okay.

 5              (In open court:)

 6     BY MR. WEINREB:

 7     Q.   So, Dr. Hammers, do you remember the question?

 8     A.   Yes, I do.

 9     Q.   Okay.  So what's your estimate of how long Ms. Campbell

10     likely lived?

11     A.   So Ms. Campbell would have been able to survive for a

12     period of time from seconds up to even approximately a minute

13     or so after she sustained the injuries.

14     Q.   And is there anything about the nature of the injuries

15     that allows you to offer a medical opinion on whether it was

16     closer to seconds or closer to a minute?

17     A.   Yes.

18     Q.   What is that?

19     A.   So people who pass away from blood loss, they have to live

20     for a period of time in order for their heart to keep pumping

21     for them to continue to bleed.  So people who have injuries to

22     smaller blood vessels take a longer period of time to lose a

23     sufficient amount of blood.  They need to lose about half of

24     their blood volume quickly.

25              So if there's injuries to smaller blood vessels as opposed
```

```
 1   to larger blood vessels, a person would be able to survive for
 2   a longer period of time, closer to the minute mark, as opposed
 3   to closer to the few seconds mark.
 4   Q.   And in Ms. Campbell's case, what injuries did you observe?
 5   A.   So in Ms. Campbell's case, she had injuries to both the
 6   arteries and the veins in her lower extremities.  So while
 7   these certainly aren't extremely small vessels, they aren't
 8   some of the largest blood vessels in the body.
 9   Q.   And so based on the nature of those injuries, you would
10   estimate that she could have lived for up to a minute?
11   A.   That's correct.
12          MR. WEINREB:  No further questions.
13          MR. BRUCK:  Thank you, Dr. Hammers.  We have no
14   questions.
15          THE COURT:  No examination?
16          All right, Doctor.  Thank you.  You may step down.
17          MR. WEINREB:  Your Honor, if I neglected to offer the
18   exhibits that I listed earlier, then I offer them at this time.
19          THE COURT:  The A exhibits?
20          MR. WEINREB:  The A exhibits.
21          THE COURT:  Yes, all right.  You did not but they'll
22   be admitted.
23          (Government Exhibit Nos. 657-A, 658-A, 659-A, 660-A
24   and 661-A received into evidence.)
25          THE COURT:  That's as far as we'll go today, jurors.
```

1    It's Thursday.  You have the next three days to yourself.  I

2    hope you enjoy them.

3            Again, please avoid any discussion of the case, any

4    interaction with people in person or on the Internet or

5    whatever, and avoid news accounts as much as you can.  We'll

6    resume on Monday morning with the evidence in the case.

7            THE CLERK:  All rise for the Court and the jury.  The

8    Court will be in recess.

9            (The Court and jury exit the courtroom and the

10   proceedings adjourned at 4:02 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3              We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date:   10/19/15
16

17

18

19

20

21

22

23

24

25