1                     UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4     UNITED STATES OF AMERICA,         )
                                        )
5             Plaintiff,                )
                                        )  Criminal Action
6     v.                                )  No. 13-10200-GAO
                                        )
7     DZHOKHAR A. TSARNAEV, also        )
      known as Jahar Tsarni,            )
8                                       )
              Defendant.                )
9                                       )

10

11            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE
12

13
                        **LOBBY CONFERENCE**
14
                        **SEALED TRANSCRIPT**
15

16

17             John J. Moakley United States Courthouse
                         Courtroom No. 9
                        One Courthouse Way
18              Boston, Massachusetts  02210
                     Monday, March 30, 2015
19                         3:43 p.m.

20

21              Cheryl Dahlstrom, RMR, CRR
                    Official Court Reporter
22              John J. Moakley U.S. Courthouse
                One Courthouse Way, Room 3510
23              Boston, Massachusetts  02210
                       (617) 737-8728
24
              Mechanical Steno - Computer-Aided Transcript
25

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3              Nadine Pellegrini, Assistant U.S. Attorneys
               John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6              By:  Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
               By:  Miriam Conrad, William W. Fick and Timothy G.
10             Watkins, Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13             By:  Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15             - and -
          LAW OFFICE OF DAVID I. BRUCK
16             By:  David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25

1    (LOBBY CONFERENCE AS FOLLOWS:

2         THE COURT:  I'm principally interested in scheduling,

3    where we are.  I just want to know whether the -- there's more

4    defense evidence coming or there's a -- we had a list and the

5    government's motion with respect to it.  I don't know where

6    people are on that issue or those issues.

7         MS. CLARKE:  Well, I don't know how the Court is going

8    to rule on various witnesses, but --

9         THE COURT:  Let me just say, as a general matter, most

02:44 10    of these people on the list that you gave me seem to be

11   second-phase witnesses, not first-phase witnesses.

12        MS. CLARKE:  Our current intention, your Honor, is to

13   call Mark Spencer on computer evidence, and Mr. Fick can

14   address the narrowed focus of Mr. Spencer.

15        THE COURT:  Okay.

16        MS. CLARKE:  We were unable to reach the stipulation

17   regarding fingerprints for some reason, so the government is

18   bringing Miss Graff from Washington, D.C., for us to put on.

19   She will identify fingerprints on the items of evidence that

02:45 20   the government introduced during their case, sort of an

21   uncontroversial, I think, issue.

22        THE COURT:  Whose witness is she?

23        MR. WEINRAB:  She's --

24        MS. CLARKE:  She's now our witness.  We had proposed a

25   stipulation, and the government rejected it.  So she's

1       currently our witness.  And then --

2               THE COURT:  What's her name?

3               MR. WEINRAB:  Elena Graff, G-r-a-f-f.

4               MS. CLARKE:  There were some items of -- some

5       photographs we will seek to admit:  the boat, the remainder of

6       the photographs of Mr. Tsarnaev coming out of the boat.  You

7       may recall one got in.  The government objected to one.  One of

8       him stepping out of the boat got in.  One of him laying on the

9       ground at the end did not get in.  We intend to offer the

02:46 10  remainder of the ones getting out of the boat.

11              THE COURT:  How many are they?

12              MR. WATKINS:  I think about five total.

13              MR. WEINRAB:  We object to those as being --

14              THE COURT:  What's the probative value?

15              MR. WATKINS:  The probative value is a state of mind.

16      The government has the writings inside of the boat that are a

17      centerpiece of the case -- much of the case against him for

18      motive.  And I think the defense should be allowed to explain

19      his state of mind at that time.

02:46 20          THE COURT:  Can you send us the photos you intend to

21      use, email them to Jane?

22              MS. CLARKE:  Sure.

23              MR. WEINRAB:  We argue it's more prejudicial than

24      probative on the grounds that the uncontested testimony is that

25      the -- the bullets had been fired into the boat at least two

1    hours before he was pulled out of there.  So that it calls for

2    speculation for the jury to be drawing any connection between

3    when the note was written, which could have been eight, ten

4    hours earlier, and when he comes out of the boat.  Without them

5    laying -- the defense laying some foundation that the two

6    events were close in time, it has too great a risk of

7    misleading or confusing the jury.

8              THE COURT:  I'll look at them.

9              MR. WATKINS:  Sounds like --

02:47 10              THE COURT:  It might -- well, anyway, I'll look at

11   them.

12              MS. CLARKE:  There's a travel document for Tamerlan

13   Tsarnaev that I believe was a government exhibit that we intend

14   to move in in connection with Mr. Spencer's --

15              MR. FICK:  It's a certification of a public record

16   from Immigration and Customs just indicating Tamerlan

17   Tsarnaev's departure date from the U.S. and return date to the

18   U.S. to orient the jury to some of the events and things that

19   are happening on the digital devices.

02:47 20              MR. WEINRAB:  We'd object to that.  Basically, it just

21   simply shows that in the summer of 2012 Tamerlan Tsarnaev took

22   a trip to Russia.  That has nothing to do with this phase of

23   the trial and can only confuse and mislead the jury into

24   believing it does have something to do with this phase of the

25   trial.

1        MR. FICK:  Your Honor, there already was testimony

2   about the dates in general.  The specific date particularly of

3   his departure is important because certain things happened on

4   the Sony computer associated with Mr. Tsarnaev and other

5   digital devices on that day, literally on the eve of the day of

6   Tamerlan's departure that go to the travel of documents between

7   the devices, the origin of documents on the devices, which is

8   all of a piece with helping the jury understand and evaluate

9   whether he self-radicalized or whether there was a flow of

02:48 10   material and what that flow was.  All we want is the dates, and

11   it's a public document that has the date.

12        MR. WEINRAB:  Yet none of that has anything to do with

13   guilt or innocence, just with penalty.

14        MR. FICK:  Well, the government has put in though

15   extensive information about what happened and what is on

16   various digital devices, tried to tie that to the defendant.

17   And so I would suggest we're entitled to rebut misleading

18   inferences that may be left from that information about did he

19   self-radicalize; where did the documents come from; when did

02:49 20   they arrive on the various devices and how that fits into the

21   rest of the case.  Again, it's a very discrete point.  We don't

22   intend to belabor it.  But it is of a piece with rebutting the

23   presentation the government has made.

24        MR. BRUCK:  I should say that right before Dr. Levitt

25   testified we were advised by the government that he was not

1    going to go into the subject of radicalization, and then he

2    went straight into it.  And so the door has been opened at this

3    phase of the trial, and I think it's a little late for the

4    government to say, No, no, that's a subject for the penalty

5    phase.  We're here.

6            THE COURT:  I'm not sure I understand exactly what

7    you're talking about because you're being general about it.

8            MR. FICK:  So let me be a little more specific.  I

9    think this is a gateway into talking about the narrow scope of

02:49 10   our intended use of Mr. Spencer in the guilt phase of the

11   trial.  We want to rebut some specific inferences the

12   government has suggested in the case about who did what and

13   about how certain materials appeared and when they appeared.

14   To be specific, we would like to put in Tamerlan Tsarnaev's

15   computer's search history to really establish three facts at

16   this point in the trial:  the fact that shortly before the

17   events of the case, Tamerlan's computer searched for "Ruger

18   P95."  There's no search on the Sony.  Tamerlan's computer

19   searched for a gun store in New Hampshire.  No such search on

02:50 20   the Sony.  And Tamerlan's computer searched for "Boston

21   Marathon" before the events.  No such search on the Sony.

22   Again, simply to rebut the inference that the government has

23   been trying to encourage the jury to make about who had the

24   gun, who was most interested in the gun, who the gun was for,

25   et cetera.  Those three discrete pieces of information from

1    Tamerlan's search history we'd like to establish.

2         The second thing we'd like to establish through Mr.

3    Spencer is to introduce a single bar graph breaking down the

4    web history on the Sony in the form of where was most of the

5    traffic, single graph, simply again to establish a point we

6    tried to make through cross-examination in a way that is

7    objective and visual about what the predominate activity on the

8    computer was.

9         The third thing we want to establish through Mr.

02:51 10   Spencer in the guilt phase is to establish the ownership and

11   creation of the content of the hard drive recovered on Laurel

12   Street.  The government tried to suggest a connection to Jahar

13   Tsarnaev because there was a deleted copy of a classmate's

14   English paper on the drive.  We want to put in forensic

15   evidence showing that essentially Tamerlan Tsarnaev's computer

16   formatted the drive.  Tamerlan Tsarnaev's computer created

17   every single file on the drive including a plethora of radical

18   information that we see elsewhere on other devices in the case.

19        In addition, we seek to put in two additional

02:52 20   documents that were found on that hard drive, the two Russian

21   language bomb-building documents the government did not put in

22   that were found on that hard drive.

23        And then the third thing -- the final thing we want to

24   do with Mr. Spencer is to talk a little bit about the origin

25   and travel of some of the files the government has focused on

1     in the case.  In particular, we expect to be able to show that

2     the documents existed -- this particular document existed first

3     on Tamerlan Tsarnaev's Samsung computer and then by means of

4     the missing Patriot thumb drive that there was some discussion

5     about.

6          On January 21, 2012, the day Tamerlan Tsarnaev leaves,

7     that thumb drive goes into Tamerlan's computer.  The file is

8     created on the thumb drive.  It then goes into the Sony

9     computer associated with Jahar.  The file is created on the

02:52 10    Sony, and then it goes into the Hewlett-Packard home computer

11    and then is never seen from again, all on the day Tamerlan

12    departs the country, just hours before he does so.

13         So, narrowly focused, those are essentially what we

14    would proffer would be the things that we would want to do with

15    Mr. Spencer in the guilt phase of the case.  All of the other

16    materials, the extensive contexts of Tamerlan's computer, et

17    cetera, we understand, based on the Court's ruling, it's not

18    the time for that now.  We'll do that in the penalty.

19         MR. WEINRAB:  Your Honor, virtually everything we've

02:53 20    just heard has to do not with the question of whether Dzhokhar

21    Tsarnaev became radicalized, which is what the government has

22    argued from the start and only what it has argued.  The

23    government refrained from stating that -- saying anything about

24    the source -- the ultimate source of the materials that he

25    read.

1        The government stated, for example, in opening -- and

2   no witness has ever said more -- that the defendant read

3   terrorist writings, that he looked at terrorist videos, that he

4   listened to terrorist songs without ever suggesting who gave

5   them to him, if anyone, where he got them from, if any specific

6   place.  The narrative that the defense is seeking to tell here

7   is one narrative.  It came from Tamerlan.  Tamerlan gave it to

8   the defendant; Tamerlan gave it to the defendant; Tamerlan gave

9   it to the defendant.

02:54  10        That may or may not be relevant in the penalty phase

11   to -- relevant to the defendant's history and character, but it

12   has nothing to do with whether defendant is guilty or innocent

13   of these charges.  And yet all this evidence coming in in the

14   guilt phase can't help but suggest to the jury that it is

15   relevant to whether he's guilty or innocent of the charges;

16   that jurors have a lay understanding of guilt.  There are

17   degrees of guilt.  They don't necessarily understand that there

18   are complicated, you know, legal concepts under conspiracy,

19   joint venture, Pinkerton liability.  It's hard enough for them

02:54  20   to get that.  To be confused with all of this information about

21   relative culpability and made to believe that it matters is

22   unhelpful and detrimental to the -- the integrity of the

23   process.

24        I would also say that every single thing that we are

25   hearing about now we are hearing about for the very first time

1     in this room.  We did not get any of these files, not a single

2     one of them, until Friday, this past Friday, so we --

3               THE COURT:  You're talking about Spencer files?

4               MR. WEINRAB:  Yes.  We had zero business days to

5     review them, to determine their accuracy, to show them to our

6     experts so that our expert could review them.

7               This complicated story about how something came from

8     -- that it was loaded onto a thumb drive and then into one

9     computer and then to another computer and tracing the history

02:55 10   of it, that requires some pretty complicated forensic analysis,

11    which we have had absolutely no time to review with our own

12    expert because we just heard about it for the very first time

13    in this room.  We didn't even have the files in our possession

14    they intended to put -- obviously, we had them in the sense of

15    having them as a whole, but we had no indication of what the

16    actual exhibits would be that the defense is seeking to

17    introduce until last Friday.

18              Given that this is really penalty phase information

19    anyway, it will serve the dual purpose of keeping the jury

02:56 20   focused on their actual task in the guilt phase and giving us a

21    little time to prepare for this evidence, potentially move to

22    exclude it or at least be ready to cross-examine their expert

23    if we do it in the penalty phase, which, if there is a penalty

24    phase, is going to be soon so that there's really no great

25    delay where things can stew in the jury's mind for weeks on end

1      until they get this evidence in.

2             MR. FICK:  On the notice point, the notice of the

3      content of the -- the expert's summary, so to speak, was almost

4      an identical mirror image of the expert summary that the

5      government provided.  We litigated months ago whether that was

6      sufficient.  The Court ruled it was sufficient.  We provided

7      then a mirror image notice.

8             Every single one -- or almost every single one of the

9      files that we talk about introducing, whether now or in the

02:56 10   penalty phase, was listed in the defendant's exhibit list dated

11     December 29th of this year, updated on March 13th, and again on

12     March 27th.  That listed the name, by file name, of every file

13     from the Sony and Samsung, et cetera, that we wanted to

14     introduce.  It also listed by description the type of

15     derivative evidence or spreadsheet that -- it was produced by a

16     tool that we intended to use.  A few then were added after Mr.

17     Swindon's testimony last week, particularly the voluminous

18     ones, because we couldn't use the ones that he provided because

19     of the sort of scrambling of some of the data in them.  So the

02:57 20   notice issue, I would suggest, is simply not an accurate

21     statement of the situation and essentially a red herring.

22            As to the underlying content, the government has put

23     in notice evidence.  The government has put in -- I'm sorry.

24     The government has put in evidence of motive.  The government

25     said in its opening that Mr. Tsarnaev self-radicalized.  While

1    not necessarily part of the guilt determination, it's a

2    rebuttal to the presentation the government has made.  In the

3    -- one of the documents Miss Conrad filed earlier on the range

4    of the transmitter issue, she cited case law to suggest that

5    where the -- it's error to prohibit the defense from correcting

6    the record about what one defendant did versus what another

7    defendant did and to sort of not be able to set the record

8    straight on those kinds of issues.

9         So for those reasons I would suggest -- oh, the final

02:58 10  thing is that the Indictment talks about these various computer

11   files being downloaded implying, in layperson's terms at least,

12   that they came from the internet and that Mr. Tsarnaev did it

13   himself.  Again, the evidence to show the flow, the origin, and

14   the sort of means by which they moved from place to place in

15   this phase, just by way of a couple of examples, is really just

16   designed to set the record straight on that.

17        THE COURT:  All right.  I'll absorb all this and give

18   you some indication in the morning.  Really -- okay.

19        So I guess what I want is what's the maximum evidence

02:58 20  that we could have at this stage?

21        MS. CLARKE:  I think that's --

22        THE COURT:  So --

23        MR. FICK:  I think, in this narrow form, Mr. Spencer

24   would be maybe an hour.

25        MR. WEINRAB:  I think Graff would likely be an hour or

1    45 minutes?

2         MS. CLARKE:  It depends on -- you know, we had --

3    Graff is like Gamble.  She's going to answer the questions and

4    put it in.  We could still reach that stipulation, you know.

5    You know the entirety of the fingerprint evidence that we

6    propose to admit by virtue of the stipulation having been given

7    to the government.

8         There are also two items by Miss Conrad, your Honor,

9    and then I think that's it.

02:59 10       THE COURT:  For these other people, the two

11   professors, for example --

12        MS. CLARKE:  We are not calling in this phase.

13        THE COURT:  Right.  Okay.

14        MS. CLARKE:  Mr. Dolakov, frankly, we haven't been

15   able to locate and are not calling in light of the Court's

16   ruling anyway.  We would like the government to provide us with

17   his phone number so we can attempt to reach him.

18        Mosque witnesses, whom we did identify to the

19   government, just not on this list, in light of the government's

03:00 20   rulings regarding what is and isn't admissible here, we don't

21   plan to call in this phase.

22        I don't know, Bill, if there are any translation

23   issues still remaining.

24        MR. FICK:  Right.  The other issue was -- for example,

25   in regard to these Russian language bomb-making instructions on

1    the Laurel hard drive, each of them is, like, three or five

2    pages long, not very lengthy.  We've provided translations --

3    proposed translations to the government a couple of weeks ago

4    in the hope that, if there were issues or discrepancies, we

5    would be able to work them out and not have to call someone

6    just to come in and say the translations are good.  The

7    government has indicated that it doesn't like the translations

8    without really providing a basis to engage on why.  You know --

9         THE COURT:  There's time before that happens anyway,

03:00 10   right?

11         MR. FICK:  Well, I guess as to these two particular

12   documents, ideally, we would like to put these two documents

13   from the Laurel hard drive in evidence tomorrow and put the

14   translations up on the screen.

15         MS. CLARKE:  Your Honor, I think, with regard to Miss

16   Otty, her -- she has had a family matter to address, and we've

17   told her we'll defer her 'til the penalty phase.

18         THE COURT:  Okay.

19         MR. WEINRAB:  Could I just confirm that?  So

03:01 20   Professors Reynolds and Haykel will not be called in the guilt

21   phase?

22         MS. CLARKE:  That's right.

23         THE COURT:  So all of it -- if all of this were to

24   happen and come in, we'd still be finished by tomorrow

25   afternoon.  That's sort of my general --

1          MR. WATKINS:  Your Honor, may I interrupt there

2     because I will have to do Miss Graff tomorrow.  And now I'm

3     confused because I wouldn't have thought that she would take an

4     hour to verify that she got positive results.  Based on Miss

5     Gamble's testimony today, I'm a little bit worried that she's

6     going to show up here saying, I don't remember this case,

7     anything.  You're going to have to guide me through this by

8     presenting the actual data, the fingerprint matches, as if I

9     were doing a direct exam, as the government were.

03:02 10          It seemed -- if that is what I'm going to have to do,

11     I'm going to need another day in order to get that going to be

12     able to do that kind of analysis, to gather up the data for

13     each of these positive matches, and essentially develop an

14     exam.  If she's going to simply confirm that she made a

15     positive examination, it's quicker than an hour.  So I'm a

16     little bit concerned on that front.

17          THE COURT:  So tomorrow afternoon or Wednesday

18     morning?

19          MR. WATKINS:  I guess I'm trying to find out from the

03:02 20     government what they're going to make me do tomorrow.

21          THE COURT:  I'm just trying to get the schedule.

22          MR. WATKINS:  The two go hand and hand to some extent.

23          THE COURT:  Well, yeah, it does.  I guess I don't

24     distinguish between tomorrow afternoon and Wednesday morning

25     necessarily grossly.  That says to me we should plan for

1     closings and instructions on Monday.

2              MS. CLARKE:  Not until Monday?

3              THE COURT:  Yeah.  That's a bit of a gap.  I do it

4     because of the special nature of the weekend that's coming up

5     for people, including especially the jurors.  But also there

6     are things we have to do.  I'm still hoping to get some

7     suggested instructions and verdict slip and things like that.

8     There may be some haggling over those.  JERS is a huge project,

9     it seems.

03:03 10          MR. CHAKRAVARTY:  Your Honor, on the JERS, there are

11     some exhibits which are not JERS compatible, like the

12     interactives.  They're non-static files.  And there are a

13     volume of exhibits, like the computer evidence, which are not

14     currently but they could probably be done.  They benefit from

15     those couple extra days.  My sense is that you want anything

16     that can be in JERS to be in JERS.

17              THE COURT:  Yes, for a couple of reasons.  One, it

18     really gives good control over them to the jurors.  They can

19     manipulate that system pretty easily.  And it is also a good

03:03 20     record of what has been sent to the jury.  We, as far as I

21     know, maintain the electronic version of JERS lists for all our

22     cases in a backup file someplace.  So that's important.  So as

23     much as possible, yes.

24              MR. MELLIN:  Your Honor, the one concern about closing

25     on Monday is I know that we've submitted, through Miss Dayton,

1     some 12.2 information to the Court.  And I know from talking to

2     her before all of this started that she wanted to have next

3     week as the week to have experts test the defendant.  So

4     that's --

5              THE COURT:  I haven't read her things.

6              MR. MELLIN:  All right.

7              THE COURT:  Should you know that much?

8              MR. MELLIN:  That much we should know.  Conversations

9     about when some testing could or could not happen, yes, we had

03:04 10     discussions about when would experts be available for that type

11     of thing, not about what tests would be performed or what tests

12     have been performed or what the results of those tests are.

13              THE COURT:  I think it's close.

14              MR. WEINRAB:  Your Honor, the government has drafted

15     proposed jury instructions and a proposed verdict form and

16     given them to the defense.  They obviously have a lot on their

17     plates right now as well.  Perhaps if we knew what the date was

18     that the Court really needs these documents by will help

19     concentrate everybody's mind.

03:05 20              THE COURT:  Work back from -- I would, at least as a

21     working plan, regard it as Monday, Monday, the 6th.

22              MR. WEINRAB:  For the actual instructions?

23              THE COURT:  So the actual instructions.

24              MR. WEINRAB:  So you'll need the proposed

25     instructions --

1          THE COURT:  Not later than -- I'd like them the end of

2     the day Wednesday, I guess, and verdict slip.

3          MR. WEINRAB:  And verdict slip, both.

4          MR. MELLIN:  Does the Court have a thought on when the

5     penalty phase might start if we're closing on the 6th?

6          THE COURT:  It's fluid.  It will depend on when they

7     return with their verdict on the guilt phase.

8          MR. MELLIN:  Typically.

9          THE COURT:  My general thought is:  not very long.

03:06 10   Some time to reorganize and do the last-minute preparations

11    that you have to do for a trial, but that could be going on

12    during their deliberations as well.  You know, once the jury is

13    really working and has done the first part of what they do, if

14    it's the first part, I want to keep them going.

15         MS. CLARKE:  So verdict form and instructions to the

16    Court by close of business on Wednesday?

17         THE COURT:  Wednesday.

18         MS. CLARKE:  I think we're all trying to work off of

19    what the government has submitted.

03:06 20        THE COURT:  I don't know if it's going to be that

21    disputed.

22         MS. CLARKE:  Complicated.  We're trying to work off of

23    that with the government so the Court doesn't have --

24         THE COURT:  I'm not sure there's going to be much

25    dispute about those issues.  It's really language and format

1    basically.  They're going to be very complicated things for the

2    jury to absorb, so the more straightforward they can be, the

3    better.

4         MS. CLARKE:  As the out of -- one of the

5    out-of-towners, does the Court typically instruct before

6    closings or after?

7         THE COURT:  Both.  I typically give the substantive

8    instructions before closings so they know the elements of the

9    offenses before; and so then, when they're argued about, they

03:07 10   can follow it a little bit better.  And after the arguments, I

11   then give the evaluation of evidence kinds of instructions.

12        MR. CHAKRAVARTY:  Your Honor.

13        THE COURT:  And the burden of proof I usually put in

14   the second part because it's closer to when they begin their

15   deliberations.

16        MS. CLARKE:  Thank you.

17        MR. CHAKRAVARTY:  Your Honor said you might do a

18   PowerPoint or something explaining the elements.

19        THE COURT:  I'm thinking of that.  I will be

03:07 20   influenced in that by what I see about the verdict slip.  Maybe

21   it will be sufficient just to put -- display the verdict slip

22   to them as we were instructing.  So the verdict slip might

23   itself be the visual.  That might be just as easy.  And they

24   would be familiar with it, too.

25        MR. WEINRAB:  Would you then like the verdict for each

1    count to be on a separate page?

2            THE COURT:  Yeah, that would be -- yeah, that makes

3    sense.

4            Now, we do have the Rule 29 motion.  I'll have to get

5    a response to that.  Although, again, I'm not sure there's

6    necessarily a rush.  We can -- the rule permits the decision to

7    be made even after the verdict has been returned, so -- that's

8    there, too.

9            MR. FICK:  I think we have a concern about the number

03:08 10   of counts that go to the jury, though.  If there were some

11   basis on which certain counts --

12           THE COURT:  Right.

13           MR. FICK:  We would prefer that decision be made

14   before, if possible.

15           MS. CONRAD:  Also might shorten the length of

16   deliberations.

17           THE COURT:  Maybe.  Okay.  That's it.

18           MS. CONRAD:  Well, Judge, we have a couple issues

19   still pending with respect to guilt phase.  The first is the

03:08 20   question of the admission by a party opponent.

21           THE COURT:  Denied.

22           MS. CONRAD:  May I just say the government seems to

23   have changed its position and originally said this was legal

24   argument and now just says it's not relevant.

25           THE COURT:  I've reviewed the papers.  The motion is

1    denied.

2          MS. CONRAD:  The other thing has to do with the issue

3    with respect to the range of the transmitters that were used to

4    set off the bombs.  The government succeeded in excluding

5    cross-examination by Mr. Watkins regarding the range, which was

6    part of the report prepared by Mr. Knapp.  I filed a memorandum

7    this morning.

8          THE COURT:  I haven't seen it.

9          MS. CONRAD:  I'm sorry.  I emailed it to Mr. Lyness.

03:09 10          THE COURT:  I've been busy.

11    (Laughter.)

12          MS. CONRAD:  I filed it this morning.  But, anyway, so

13    that's still an issue because that would be guilt-phase

14    evidence.

15          THE COURT:  I'll look at it.

16          MS. CONRAD:  Thank you.

17          MR. WEINRAB:  We'll file a response by tomorrow

18    morning.

19          THE COURT:  Okay.  All right.  Good.  Thank you.  I'll

03:09 20    let you know in the morning about the matters that you were --

21    (Whereupon, at 4:10 p.m. the lobby conference concluded.)

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Cheryl Dahlstrom, RMR, CRR, and Official Reporter

4    of the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
11   Official Court Reporter

12

13
     Date:  October 27, 2015
14

15

16

17

18

19

20

21

22

23

24

25