UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )
        Plaintiff,             )
                              )    Criminal Action
v.                            )    No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY FORTY-TWO**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, March 31, 2015
9:15 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3         Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6             By:  Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G.
10         Watkins, Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13             By:  Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

I N D E X

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| WITNESSES FOR THE DEFENSE: |        |       |          |         |
| MARK SPENCER             |        |       |          |         |
| by Mr. Fick              | 5      |       | 70       |         |
| by Mr. Chakravarty       |        | 45    |          | 75      |
| ELENA GRAFF              |        |       |          |         |
| by Mr. Watkins           |        |       |          |         |
| by Mr. Weinreb           |        |       |          |         |

E X H I B I T S

| DEFENDANT'S EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 1433 | Tamerlan Tsarnaev travel record from Customs | | 5 |
| 3308 | Spencer summary of three computers analyzed | | 14 |
| 3303-10 | Spencer summary for Sony VAIO computer | | 22 |
| 3301-01 | Summary of files and folders on 1W16 | | 27 |
| 3310-1 and 3310-2 | Copies of files from Laurel Street hard drive | | 32 |
| 3312-1 | Summary of file and folder listings | | 37 |
| 3312-02 | Summary of events re *Complete Inspire* | | 40 |
| 3313-03 | Summary of *Inspire* files on Sony VAIO computer | | 43 |
| 3302-04 | Chart re removal devices | | 56 |
| 3300-07 | Summary of MFT for 1W16 | | 57 |
| 3303-06E | Thirteen pages of Samsung history | | 73 |
| 3153 | Photo of wires, instruction manual and soldering gun | | 86 |
| 3154 | Photo of group of tools | | 90 |
| 3156 | Photo of packaging, Government's Exhibit No. 1195 | | 94 |

                      P R O C E E D I N G S

1        THE COURT:  Good morning, jurors.  Mr. Fick.

2        MR. FICK:  Good morning, your Honor.  The defense

3   calls Mark Spencer.

4        THE CLERK:  Sir, will you please rise and raise your

5   right hand.

6             MARK SPENCER, Sworn

7        THE CLERK:  Have a seat.  State your name.  Spell your

8   last name for the record.  Keep your voice up and speak into

9   the mic so everyone can hear you.

10       THE WITNESS:  Mark Spencer, M-a-r-k, S-p-e-n-c-e-r.

11  DIRECT EXAMINATION BY MR. FICK:

12  Q.   Good morning, Mr. Spencer.

13  A.   Good morning.

14       MR. FICK:  I'm going to ask to pause for a minute and

15  just do a housekeeping thing we talked about with the Court.  I

16  would move into evidence Government's Exhibit 1433, which is

17  the Tamerlan Tsarnaev certified travel record from Customs and

18  Border Protection.

19       THE COURT:  That may be admitted.

20  (Defendant's Exhibit No. 1433 received into evidence.)

21       MR. FICK:  May I just briefly publish it to the jury,

22  your Honor?

23       THE COURT:  From your computer?

24       MR. FICK:  From my computer, yes.  Thank you.  Turning

1    now to Page 2 of the document and highlighting the portion

2    reflecting Tamerlan Tsarnaev's departure from the United States

3    on January 21, 2012.

4          MR. CHAKRAVARTY:  Your Honor, the government doesn't

5    have an objection with using this exhibit with the witness, but

6    Mr. Fick shouldn't be testifying to it.

7          THE COURT:  Well, I think he was reading what it said

8    but fine.

9          MR. FICK:  Thank you, your Honor.  I will now commence

00:05 10   with my examination.

11         I'm going to display on the screen before I begin what

12   was used as a chalk with Mr. Swindon government's marked as

13   1557 if that's satisfactory.

14         THE COURT:  This is a chalk?

15         MR. FICK:  This is a chalk that was used -- shown to

16   everyone, though, with Mr. Swindon.  And I will --

17         THE COURT:  Does it have a number?

18         MR. FICK:  1557.  I'm going to actually take it off

19   the screen for the moment anyway.

00:05 20   Q.   Good morning again, Mr. Spencer.

21   A.   Good morning.

22   Q.   Could you please tell the jury where you work?

23   A.   I work for Arsenal Consulting in Chelsea, Massachusetts.

24   I'm the president.

25   Q.   What is Arsenal Consulting?

1    A.    Arsenal Consulting is a digital forensic company.  We

2    focus on digital forensics consulting and software development.

3    Q.    When you say "digital forensics consulting," what is that?

4    A.    Digital forensics involves the identification,

5    preservation, analysis and reporting on electronic evidence,

6    electronic data.

7    Q.    How long have you been the president of Arsenal

8    Consulting?

9    A.    Since mid-2009.

00:06 10    Q.    What is your educational background?

11    A.    I have a bachelor of arts from UMass Boston, which I

12    received in 2003.

13    Q.    Do you have training in digital forensics specifically

14    apart from your education, your formal university education?

15    A.    I do.  I have attended approximately 50 courses in

16    training events, courses from Guidance Software, AccessData,

17    SANS, Cytech.

18    Q.    And the companies you just mentioned, those are vendors of

19    digital forensic software, among other things?

00:07 20    A.    Or training providers, yes.

21    Q.    Do you have any certifications related to digital

22    forensics?

23    A.    I do.

24    Q.    Can you name a few of those?

25    A.    EnCase certified examiner; ProDiscover certified examiner;

1    digital forensics certified practitioner.

2    Q.   Are you familiar with an organization called the Digital

3    Forensics Certification Board?

4    A.   Yes.

5    Q.   What is that?

6    A.   That's the organization that sponsors the digital

7    forensics certified practitioner, an organization started by

8    the National Institute of Justice.

9    Q.   And so you are -- do you have a certification from that

00:07 10   board?

11   A.   Yes.

12   Q.   Do you lecture or teach on the subject of digital

13   forensics?

14   A.   I do.

15   Q.   How often?

16   A.   Frequently, approximately a hundred presentations and

17   courses between teaching for organizations at the college level

18   or at legal events, law enforcement events.

19   Q.   Have you given trainings or lectures for law enforcement?

00:08 20   A.   I have.

21   Q.   Can you give a few examples?

22   A.   RCMP.

23   Q.   RCMP, what is that?

24   A.   That's Canadian law enforcement.   Hong Kong Police

25   Department; Taiwan's MJIB.

1    Q.    What sorts of cases does Arsenal Consulting typically work

2    on?

3    A.    Typically civil cases, private sector matters,

4    intellectual property.  Theft is by far the most common type of

5    case we work on, both on behalf of defendants and plaintiffs,

6    depending on the case.

7    Q.    Have you also worked on criminal cases?

8    A.    Yes.

9    Q.    About how many cases do you work on in a given year?

00:08 10   A.    Approximately 50.

11    Q.    Can you give a ballpark estimate of how many digital

12    devices you've analyzed in the course of your career?

13    A.    Over a thousand.

14    Q.    Did you do computer forensic work prior to founding

15    Arsenal Consulting?

16    A.    I did.

17    Q.    Can you describe that history briefly?

18    A.    Yes.  Prior to founding Arsenal Consulting, I worked for

19    First Advantage Litigation Consulting from 2009 back to 2006.

00:09 20   Prior to 2006, I worked for Evident Data, from 2006 back to

21    2002, until Evident Data was acquired by First Advantage.

22    Prior to working in the private sector, I worked for the

23    Suffolk County District Attorney's Office in Boston.

24    Q.    Do you have employees at Arsenal Consulting who assist you

25    with your work?

1    A.    I do.

2    Q.    Do those employees also have relevant training and

3    certifications in digital forensics?

4    A.    Yes.

5    Q.    Does one of your employees speak a foreign language

6    relevant to work on this case?

7    A.    Yes.

8    Q.    What language is that?

9    A.    Russian.

00:09 10   Q.    Is she a native speaker of Russian?

11   A.    She is.

12   Q.    Have you previously given sworn testimony in legal

13   proceedings of various kinds?

14   A.    I have.

15   Q.    Have you previously testified in this court, before this

16   judge, about digital forensics?

17   A.    I have.

18   Q.    Does your firm have a standard billing rate that you

19   charge clients?

00:10 20   A.    We do.

21   Q.    What is that rate today?

22   A.    $425 an hour.

23   Q.    What is the rate at which you're being compensated for

24   this case?

25   A.    375.

1    Q.   What is the institution or entity from which you receive

2    payment in this case?

3    A.   The federal court.

4    Q.   Approximately how many hours has your firm billed to date

5    for work on this case?

6    A.   Approximately 400.

7    Q.   So is that approximately --

8    A.   Approximately 400 hours.

9    Q.   Right.   Is that approximately $150,000 of fees?

00:10 10    A.   Yes.

11    Q.   What were you asked to do in this case?

12    A.   We were asked to review electronic evidence and reports

13    related to that evidence.

14    Q.   When you say "reports," whose reports?

15    A.   The FBI's.

16    Q.   When you say "electronic evidence," does that include

17    forensic images of various devices?

18    A.   Yes.

19    Q.   Can you remind the jury what a forensic image of a device

00:11 20    is?

21    A.   A forensic image is essentially a copy of a storage device

22    or volume which includes deleted space.   And a fairly important

23    matter is that at any time in the future, you can authenticate

24    that forensic image.   You can authenticate that it's good data.

25    Q.   Were you here last week when Agent Swindon of the FBI

1    testified?

2    A.    Yes.

3    Q.    I'm going to put up on the screen a chalk or a chart

4    listing a number of devices that he talked about in just a

5    moment.

6          Do you remember seeing that list last week?

7    A.    Yes.

8    Q.    Now, the items pulled out here, is that three computers

9    and four storage devices?

00:12 10   A.    Three computers, three thumb drives, and an external hard

11   drive.

12   Q.    Were those among the devices you analyzed in your work on

13   this case?

14   A.    Yes.

15   Q.    Did you analyze other devices in your work on this case?

16   A.    Yes.

17   Q.    Approximately how many?

18   A.    Approximately 30.

19   Q.    Across all of the devices you analyzed, can you give a

00:12 20   ballpark estimate of how many files existed on those devices,

21   discrete files?

22   A.    In terms of active files, over five million, five million

23   files and folders.  That does not include the contents of

24   containers, like zip files, or the contents of deleted space.

25   Q.    Now, when you begin work on a case, do you do some

1    background workup on devices or images that you're going to

2    analyze?

3    A.    We do.

4    Q.    What does that initial workup include?

5    A.    We refer to it as case initiation.  But even if our own

6    clients give us a laptop, for example, we determine what users

7    exist on that laptop, when Windows was installed on that

8    laptop.

9    Q.    Do you also investigate the manufacturing date of devices

00:13 10    if that information is available?

11    A.    In some cases, yes.

12    Q.    Why do you look for information or why do you compile the

13    information about the Windows installation and the

14    manufacturing date?

15    A.    We -- in general, it's because it helps us with

16    connections between computers, between files, between data,

17    events.  More specifically, in some cases, our clients will

18    give us a laptop and say, This is our employee's laptop.  When

19    we look at it closer, we'll realize it's only been the

00:13 20    employee's laptop for three months.  And we'll have to ask the

21    question, Well, where is the previous laptop?

22    Q.    Now, did you do a workup in this case for the three

23    computers we've been hearing a lot about:  the Samsung, the

24    Sony, and the Hewlett-Packard?

25    A.    Yes.

```
 1              MR. FICK:  If I could get the screen, your Honor, just

 2      for the witness?

 3      Q.   Do you recognize the document that's on the screen, which

 4      has been previously marked as Exhibit 3308?

 5      A.   I do.

 6      Q.   What is that?

 7      A.   This is a summary of our findings related to the three

 8      computers.

 9      Q.   Is this a chart you created?

00:14 10      A.   Yes.

11      Q.   Does this gather together and compile information from a

12      variety of different forensic sources?

13      A.   It is.

14              MR. FICK:  Your Honor, I'd move into evidence 3308 and

15      ask to publish.

16              MR. CHAKRAVARTY:  The government's position is that

17      this should be a chalk.

18              THE COURT:  I'll admit it as a summary.

19              MR. FICK:  Thank you, your Honor.

00:14 20      (Defendant's Exhibit No. 3308 received into evidence.)

21      Q.   Now, the Samsung computer, you heard testimony last week,

22      didn't you, that it was recovered on Laurel Street in

23      Watertown, and the FBI called it Tamerlan's laptop?  Do you

24      recall that?

25      A.   Yes.
```

```
 1    Q.   What was the Windows installation date on that computer?

 2    A.   December 21, 2011.

 3    Q.   And what is the principal user name on that computer?

 4    A.   Umar.

 5    Q.   And when was it manufactured?

 6    A.   September 2011.

 7    Q.   Now, the Hewlett-Packard, the second one there, HP 2R14,

 8    you understand that was a computer seized from Norfolk Street

 9    in Cambridge, correct?

00:15 10   A.   Yes.

11    Q.   What was the Windows installation date on that?

12    A.   September 22, 2011.

13    Q.   What was the principal user name on that computer?

14    A.   Umar.

15    Q.   Was that created on the same day?

16    A.   Yes.

17    Q.   And down at the bottom, the Sony 1R6, seized from an

18    apartment down south in the New Bedford area, what was the

19    Windows installation date on that computer?

00:15 20   A.   February 26, 2011.

21    Q.   And what is the principal user name on that computer?

22    A.   Anzor.

23    Q.   And that was created on the same day that Windows was

24    installed?

25    A.   That's correct.
```

1    Q.    Now, did you have occasion to extract the internet search

2    history on the Samsung computer, Tamerlan's laptop?

3    A.    Yes.

4    Q.    How did you go about doing that?

5    A.    We used a combination of two tools:  Internet Evidence

6    Finder and NetAnalysis.

7    Q.    Why do you use two tools?

8    A.    The tools aren't going to have the exact same criteria for

9    what constitutes a search, so we want to have as comprehensive

00:16 10   a set of potential searches as possible.

11   Q.    Are these tools tools that are widely accepted and used in

12   the digital forensics field?

13   A.    Yes.

14        MR. FICK:  If I could get the monitor now just for the

15   witness again, your Honor, please?

16   Q.    I'm going to show you a document on the monitor previously

17   marked as Exhibit 3303-6 and ask if you recognize it.

18   A.    I do.

19   Q.    What is it?

00:17 20   A.    This is a spreadsheet.  This is essentially output from

21   NetAnalysis and IEF related to searches.

22   Q.    For the Samsung?

23   A.    For the Samsung computer.

24   Q.    Is this a document that you created using the tools that

25   you described?

1    A.    Yes.

2    Q.    I want to draw your attention now to a particular search

3    in this document from March -- first of all, before I do that,

4    time on computers is measured or stated in different formats in

5    different instances; is that fair to say?

6    A.    Yes.

7    Q.    What is UTC time?

8    A.    UTC is Universal Time.  No one is going to like this

9    explanation.  Universal Time for forensic people, some

00:18 10   technical people, is the most accurate time.  Computers,

11   generally speaking, store time either in Universal Time or in

12   local time.  The problem with local time is that we may know

13   exactly when local time really was.  It might be Eastern.  It

14   might be Pacific.  It might be some other time zone.  There are

15   situations in which we won't know exactly what local time was,

16   and there's complications which include Daylight Savings and

17   Daylight Savings happening in different years, when it started,

18   when it stopped.  So, generally speaking, Universal Time is

19   just a much simpler time for us to stay in.

00:18 20   Q.    Is there a calculable relationship between UTC and Eastern

21   Time depending on whether we're in Daylight Savings or not?

22   A.    Yes.

23   Q.    What is that relationship?

24   A.    When we are not in Daylight Savings, you would subtract

25   five hours from UTC.

1    Q.   For Eastern?

2    A.   For Eastern Time.  When we are in Daylight Savings, you

3    would subtract four.

4    Q.   Okay.  Now I'm going to show you a portion of this search

5    history in just a moment if my computer will cooperate with me.

6         MR. FICK:  Your Honor, I would ask to publish what is

7    now on the screen, a portion of the document as we discussed,

8    identifying it as Exhibit 3303-6A.

9         THE COURT:  All right.

00:19 10   Q.   Is this --

11        MR. FICK:  I would ask to publish that to the jury, if

12   I could.

13        THE COURT:  They should have it.

14        MR. FICK:  Thank you.

15   Q.   Mr. Spencer, is this a sort of blow-up of a particular

16   line entry on your search history spreadsheet?

17   A.   Yes.

18   Q.   Is this the date and time that the search was conducted in

19   UTC that I just circled there on the screen?

00:20 20   A.   Yes.

21   Q.   Can you read the search term that's there?

22   A.   It says, "Ruger P95."

23   Q.   Now, I'm going to show you another portion of the

24   document.

25        MR. FICK:  If I could just get it for the witness

```
 1   again, your Honor, briefly.
 2   Q.   Is this a portion of the document showing search terms on
 3   or about April 6 and 7 of 2013?
 4   A.   Yes.
 5   Q.   Are the search terms various versions of words including
 6   "transmitter" and "receiver" and "oscilloscope"?
 7   A.   Yes.
 8        MR. FICK:  Your Honor, I'd ask to publish this exhibit
 9   to the jury as 3303-6B.
10        THE COURT:  All right.
11   Q.   The highlighted portions that should be coming up on the
12   screen now, are these the searches and terms from Tamerlan's
13   Samsung that we just talked about on or about April 7 of 2013?
14   A.   Yes.
15        MR. FICK:  If I could get the screen just for the
16   witness again back, your Honor?
17   Q.   I'm going to page through the document for you, Mr.
18   Spencer, for a couple of other days on the screen here.  The
19   prior page, April 7th, are there terms on this screen that
20   include the terms "fireworks," "firing system," and
21   "detonator"?
22   A.   Yes.
23        MR. CHAKRAVARTY:  Your Honor, object to the leading
24   for each page.  I don't mind the signposts but just leading the
25   witness as to what to say.
```

1          MR. FICK:  I can reframe and do it a different way.

2          THE COURT:  Okay.

3          MR. FICK:  I'd ask to publish this page to the jury,

4     your Honor, as 3306-6C [sic], I think we're at.

5     Q.   Does this reflect certain search terms that were used on

6     Tamerlan's Samsung on April 7 of 2013?

7     A.   Yes.

8     Q.   Can you read the two search terms that are highlighted?

9     A.   "Fireworks firing system" and "detonator."

00:23 10          MR. FICK:  If I could get the screen back again just

11     for the witness, your Honor?

12     Q.   Showing you a portion of the exhibit, does this page of

13     the exhibit reflect certain search terms and -- from the

14     Samsung computer on April 10 and 11 of 2013?

15     A.   Yes.

16          MR. FICK:  Your Honor, I'd ask to publish this page to

17     the jury as 3303-6D.

18          THE COURT:  Okay.

19     Q.   If I could just ask you, Mr. Spencer, to read each of the

00:24 20     highlighted search terms on this page at least until you hit

21     the foreign language at the bottom?

22     A.   "Gun stores in N.H."; "gun stores in N.H., Salem"; "gun

23     stores in N.H.," "Boston Marathon."

24     Q.   What's the date of the search for the term "Boston

25     Marathon"?

1   A.   April 10, 2013.

2   Q.   Now, did you also extract the web search history from the

3   Sony VAIO computer?

4   A.   Yes.

5   Q.   Did the search term "Ruger" appear anywhere in the search

6   history of the Sony VAIO computer?

7   A.   No.

8   Q.   Did the search term "gun store" appear anywhere in the

9   history of the Sony VAIO computer?

00:25 10   A.   No.

11   Q.   Did the terms "transmitter," "receiver," "firework" or

12   "detonator" appear anywhere in the search history of the Sony

13   VAIO computer?

14   A.   No.

15   Q.   Was the search term "Boston Marathon" evident in the

16   search history of the Sony VAIO computer prior to the bombings

17   on April 15th of 2013?

18   A.   There were references to the Boston Marathon bombing on

19   the Sony.  There were no references to the Boston Marathon

00:25 20   without the context of the bombing.

21   Q.   In other words, there were no searches using the term

22   "Boston Marathon" prior to the bombing?

23   A.   Correct.

24        MR. FICK:  If I could get the screen, your Honor,

25   again just for the witness?

```
 1   Q.   I'm going to show you, Mr. Spencer, what we've previously
 2   identified as Exhibit 3303-10.  Do you recognize what this is?
 3   A.   Yes.
 4   Q.   What is it?
 5   A.   This is an output from the tool I referred to earlier
 6   called NetAnalysis.
 7   Q.   What does it depict?
 8   A.   This is a visual representation of hits, the number of
 9   times a domain name exists in the internet history, the web
10   browser history.
11   Q.   How is it created?
12   A.   The tool basically will look at the total number of
13   occurrences of the domain name in the internet history.
14   Q.   Is this a tool that's widely used and accepted among
15   computer forensics examiners?
16   A.   Yes.
17        MR. FICK:  Your Honor, I'd move this exhibit into
18   evidence, 3303-10.
19        MR. CHAKRAVARTY:  Your Honor, same position.  I think
20   this should be a chalk.
21        THE COURT:  All right.  I'll admit it as an exhibit as
22   a summary.
23   (Defendant's Exhibit No. 3303-10 received into evidence.)
24        MR. FICK:  And if I can publish it, please?
25   Q.   What are the top two domains on this chart?
```

```
 1   A.    www.facebook.com and vk.com.

 2   Q.    Do you have an understanding of what vk.com is?

 3   A.    Yes.

 4   Q.    What is your understanding?

 5   A.    My understanding is it's a Russian social networking site.

 6   Q.    Kind of similar to Facebook?

 7   A.    As far as I know, yes.

 8   Q.    What is the total number of hits that the tool found for

 9   facebook.com?

10   A.    1,378.

11   Q.    And what's the total number of hits for vk.com?

12   A.    1,275.

13   Q.    Now, last week there was -- do you recall hearing

14   testimony about an external hard drive recovered at Laurel

15   Street in Watertown?

16   A.    Yes.

17   Q.    This is a device identified as 1W16 by the FBI, is that

18   right?

19   A.    Correct.

20   Q.    What is an external hard drive as compared to, say, a

21   thumb drive?

22   A.    Generally, an external hard drive is going to be a larger

23   device, both in terms of physical size and in terms of storage

24   capacity.

25   Q.    Does the file system on an external hard drive frequently
```

1    differ from the file system on a thumb drive?

2    A.    It many cases, yes.  A thumb drive normally will have an

3    older type of file system known as FAT, or file allocation

4    table.  External hard drives, being generally much larger

5    devices, will have a more advanced file system on them, either

6    NTFS or something known as HFS.

7    Q.    Can you glean more forensic information from a hard drive

8    that has the NTFS file system on it?

9    A.    Yes.

00:29 10    Q.    What does it mean to format a hard drive, an external hard

11    drive?

12    A.    From a laymen's perspective, format means to reset the

13    hard drive, start fresh.  More specifically or more

14    technically, you're creating a new file system on that device.

15    Q.    What is the consequence of that or an effect of that from

16    an end user's perspective?

17    A.    A user who engages in a format isn't going to see the

18    previous files and folders that were on that drive.

19    Q.    Is it possible to recover specific forensic information

00:30 20    about what computer and what user on that computer formatted an

21    external hard drive?

22    A.    It is.

23    Q.    How do you go about doing that?

24    A.    Based on the way NTFS works, the file system, you can

25    identify the owner of files and folders that are on that drive,

1    including critical files and folders that allow the file system

2    to operate.  That file system information includes security

3    information about not only the computer that, by default, was

4    responsible but the user.

5    Q.   The user on that computer?

6    A.   Correct.

7    Q.   Can you also recover information about what computer

8    created individual files on an external hard drive?

9    A.   Yes.

00:31 10   Q.   Is that done in a similar manner to what you just

11   described for the format question?

12   A.   It is.

13   Q.   Now, you talked about security streams or security

14   identifiers, something like that.  What is a security

15   identifier?

16   A.   The actual information, the security information, stored

17   on the hard drive that contains the NTFS file system includes

18   things called security descriptors.  Basically, these are

19   things that tell the operating system what access various users

00:31 20   should have to the various device and what types of auditing

21   are correct on that device.  It's basically a big index, and it

22   says, This user can do this thing.  This user can do that

23   thing.  This user is the owner of a certain thing.

24   Q.   So when you talk about the security identifier, what is it

25   exactly?  What does it look like?  How is it depicted?

1    A.    It looks like a long string of numbers and letters.  It's

2    a globally unique identifier designed by Microsoft.  So it's a

3    long list.

4    Q.    Essentially a lengthy stream of letters and numbers?

5    A.    Yes.

6    Q.    Do any two computers or users in the world have the same

7    security identifier?

8    A.    Well, the intent of a global unique identifier is so that

9    they don't.  You could force a collision but in practice, no,

00:32 10    in our experience, no.

11    Q.    Did you make efforts to determine the security identifier

12    associated with various files on the 1W16 hard drive recovered

13    at Laurel Street in this case?

14    A.    Yes.

15    Q.    Were you able to associate the security identifiers on

16    that hard drive with another piece of evidence in this case?

17    A.    We were.

18    Q.    What association or relationship did you find?

19    A.    The security identifier for the files and folders on the

00:33 20    Laurel Street hard drive was related to the Samsung laptop and

21    the Umar user.

22    Q.    When you say "related to," what does that mean with

23    respect to the security identifier?

24    A.    Specifically, the owner of the files and folders was the

25    Umar user on the Samsung laptop.

1    Q.   Did you create a chart to summarize your review and the

2    results of the information that you took from various sources?

3    A.   Yes.

4         MR. FICK:  Your Honor, if I could get the screen for

5    the witness only?

6    Q.   Do you recognize the document I've put on the screen here?

7    A.   Yes.

8    Q.   What is it?

9    A.   This is a listing of the files and folders currently on

00:34 10   Laurel 1W16, the Laurel hard drive, which includes the SID

11   information, which user --

12   Q.   Let me stop you.  SID is?

13   A.   Security identifier.

14   Q.   Ownership information, which computer, which owner, is

15   associated with each file and folder in this list.  And do we

16   know what that SID is?  What does SID, security identifier,

17   relate to?

18        MR. FICK:  Your Honor, I'd ask to admit and publish

19   this Exhibit 3301-01 as a summary.

00:34 20        THE COURT:  Is this a single page?

21        MR. FICK:  It's actually got a few pages.  It's about

22   four or five pages.

23        MR. CHAKRAVARTY:  No objection, your Honor.

24   (Defendant's Exhibit No. 3301-01 received into evidence.)

25        THE COURT:  No.  Do they all look like this since I'm

1    only seeing the first one?

2              MR. FICK:  Yes.  But they're all similar to that.

3              THE COURT:  No objection?

4              MR. FICK:  If we could publish this.

5              THE COURT:  3301.

6              MR. FICK:  3301-0 1, that's correct.

7    Q.    What does the first column on the left here that I've

8    highlighted, what does that depict?

9    A.    Those are objects related to the file system itself that a

00:35 10  -- a normal user would not see these.

11   Q.    These are the names of files on the Laurel Street hard

12   drive?

13   A.    Essentially, yes.

14   Q.    Are there particular files that are associated with the

15   formatting of the hard drive?

16   A.    There are.

17   Q.    For example, what is -- I've just highlighted the file

18   name "$MFT."  What is that?

19   A.    That stands for master file table.  That's a critical

00:36 20  database that's used for the file system to function.  It

21   tracks the files and folders on that device.

22   Q.    What is the relationship of that file to the formatting

23   process of a hard disk?  In other words, is that a file that is

24   associated with the process of formatting a hard disk?

25   A.    Yes.

1    Q.   Can you describe what you mean by that?

2    A.   When you format a storage device, thumb drive or an

3    external hard drive, if you're using the NTFS file system,

4    there's going to be a suite of objects that have to be created

5    for it to function properly.  This $MFT is one of those objects

6    that is required for it to operate properly.

7    Q.   This second column, the long string of a letter and some

8    numbers here that I've just circled, what is that?

9    A.   That's the security identifier.

00:36 10    Q.   In this particular line, does this reflect the security

11    identifier for this file we were just talking about?

12    A.   Yes.

13    Q.   And then were you able to associate that security

14    identifier with a particular item of evidence?

15    A.   Yes.

16    Q.   Is that what's reflected here in the third column?

17    A.   It is.

18    Q.   So, in other words, the file here, the security ID owner

19    of that file is the user Umar on the Samsung computer?

00:37 20    A.   Correct.

21    Q.   Now, in addition to system files, you undertook similar

22    analysis for sort of ordinary user files that a user would see

23    on this hard drive, is that right?

24    A.   Yes.

25    Q.   I'm going to page ahead.  Up on the screen now from a

1   further page into this document, do you see file names on the

2   -- in the left column?

3   A.   Yes.

4   Q.   Are those various file names that have "Awlaki" in them?

5   A.   Not all of them; minus two.

6   Q.   Were you able to find the security identifier information

7   associated with those files?

8   A.   Yes.

9   Q.   Did that match another device in the case?

00:38 10   A.   It did.

11   Q.   Was that the Samsung?

12   A.   Yes.

13   Q.   And that's what's reflected here in the graph?

14          MR. CHAKRAVARTY:  Objection to the leading, your

15   Honor.

16          MR. FICK:  Just trying to be quick, but I'll refrain.

17          THE COURT:  Go ahead.

18          MR. FICK:  Thank you.

19   Q.   Moving ahead to another page just as a few more examples,

00:38 20   for those files listed on the left side, did you similarly --

21   did you reach a similar conclusion about what computer and user

22   was the owner of those files on this hard drive?

23   A.   Yes, the same conclusion.

24   Q.   Were there any files on this hard drive that were not

25   owned by the security identifier associated with the Samsung?

1    A.   Other than system files, which do not have traditional

2    security identifiers like this, no.

3    Q.   Now, I'm going to show you a government exhibit already in

4    evidence, Exhibit 1475-02A, which is -- one moment.

5         Do you recognize this as being the blowup of the

6    government's exhibit which listed all the files on the Laurel

7    Street hard drive?

8    A.   I really can't see much of that other than what you've

9    blown up, but it looks similar.

00:40 10   Q.   The two file names highlighted there in Cyrillic letters,

11   did you have occasion to verify whether those two files, in

12   fact, exist on the Laurel Street hard drive?

13   A.   Yes.

14   Q.   Do those files exist on the Laurel Street hard drive?

15   A.   They do.

16   Q.   And the documents, were you able to verify that the

17   documents previously marked as Exhibits 3310-1 and 3310-2 are

18   correct copies of those two files?

19   A.   Could you say that again?

00:40 20   Q.   Did you verify whether the exhibits previously marked as

21   3310-1 and 3310-2 are true and accurate copies of those two

22   files off the Laurel Street hard drive?

23   A.   Yes.  We compared the actual files to make sure that the

24   content was the same.

25              MR. FICK:  Your Honor, I would move into evidence

 1    3310-1 and 3310-2 as well as the translations which I believe

 2    are agreed upon.

 3              THE COURT:  Okay.

 4              MR. CHAKRAVARTY:  No objection, your Honor.

 5              THE COURT:  All right.

 6    (Defendant's Exhibit Nos. 3310-1 and 3310-2 received into

 7    evidence.)

 8    Q.   Now, first of all, as a general matter, do you have an

 9    understanding of what the English meaning of those two file

00:41 10    names are from your employee's assistance?

11    A.   I do.

12              MR. CHAKRAVARTY:  Objection, your Honor.

13              THE COURT:  Well, we have the translation, don't we?

14              MR. CHAKRAVARTY:  We do have the files.  I'm not sure

15    that the file names are also translated.  It sounds like he's

16    getting it from his employee.

17              MR. FICK:  I believe the government witness did the

18    same thing.

19              THE COURT:  My point -- you're right, strictly

00:41 20    speaking.  But is it inevitable that we're going to get it

21    anyway?  The objection is sustained.  Go ahead.

22    Q.   I'm going to pull up on the screen what's now in evidence

23    two different items.  On the left side of the screen is Exhibit

24    3310-01, a document in a foreign language; and on the right

25    side of the screen is 1475-21, a copy of *Complete Inspire*, a

 1    particular page.  Do you see that on the screen in front of

 2    you?

 3    A.   I do.

 4              MR. FICK:  Oops.  It's not the -- here we go.

 5              MR. CHAKRAVARTY:  Your Honor, the government doesn't

 6    object to the authenticity of either of these documents, but

 7    this witness is not -- it's not in his expertise to be

 8    testifying about comparing those documents.

 9              THE COURT:  That seems to be right.

00:42 10              MR. FICK:  I just want to show a few contents next to

11    each other, your Honor, on the screen.  I'm not going to ask

12    him to analyze them.

13              MR. CHAKRAVARTY:  This seems argumentative, your

14    Honor.

15              THE COURT:  The exhibits are in evidence.  Okay.  Go

16    ahead.  I guess what can be absorbed is the pictures, is that

17    it?

18              MR. FICK:  For this particular purpose, yes, on the

19    screen.

00:43 20              THE COURT:  Okay.

21              MR. FICK:  And I'll move on.

22    Q.   I'll now put up on the screen the translation of 3310-01A,

23    which is the translation of the first of those two files.

24         Can you just read this paragraph of the translation that I

25    highlighted there, the full paragraph?

1  A.   "Your task is to make use of this material which is

2  translated into Russian from *Inspire*, the mujahideen magazine

3  of the Arabian Peninsula.  The text was translated into Russian

4  so that our Russian brothers and sisters could make use of it.

5  And let Allah help you.  Amen."

6        MR. FICK:  I'm now going to put up on the screen the

7  translation, 3310-02A, the other of those two files.  I'll move

8  ahead a page.

9  Q.   Can I just ask you to read the first couple sentences of

00:44 10  this paragraph?  You can skip, I guess, the foreign language in

11  the first clause if you'd like.  "Good article."

12  A.   "As-salaam aleikum Ali Abu (ph).  Good article but novices

13  will not be able to understand.  They were somewhere around

14  video lessons in three parts on how to make a bomb."

15  Q.   Can you continue a little bit?

16  A.   "And the refrigerator temperature should be between 3 and

17  5 degrees to make the powder."

18  Q.   And one more sentence.

19  A.   "And also, when you are making the bomb, get rid of all

00:45 20  metal things as they might detonate the powder.  Work only with

21  wooden and plastic things."

22  Q.   Now, did you have occasion to investigate whether -- first

23  of all, what kind of files were these original files, the two

24  that we just talked about and were entered into evidence, not

25  the translations but the originals?

1    A.    These files were in Word document format.

2    Q.    Did you have occasion to determine whether those files

3    were ever opened in Microsoft Word on any of the computers

4    available in evidence in this case?

5    A.    We did.

6    Q.    What did you find?

7    A.    We found event log records.  Windows event logs are

8    diagnostic logs kept by Microsoft in some applications.  In

9    this particular case, Microsoft Office recorded some alerts

00:46 10   related to when files were saved, these files in particular.

11   Q.    On what computer did you find those artifacts?

12   A.    On the Samsung.

13   Q.    The Samsung from Laurel Street identified as Tamerlan's?

14   A.    Yes.

15   Q.    Did you find any such artifacts on the Sony?

16   A.    No.

17   Q.    Now, I'm going to put up on the screen a couple of pages

18   of what is in evidence as 1475-21, which is a PDF document

19   called *Complete Inspire*.  Do you recall seeing this PDF and

00:47 20   hearing testimony about it last week when you were observing

21   Mr. Swindon?

22   A.    Yes.

23   Q.    Did you undertake any analysis across the forensic devices

24   or the images available to you to trace the history and origin

25   of this file across those devices?

```
 1   A.   Yes.

 2   Q.   What did you do exactly?  Can you describe a little bit

 3   what you did?

 4   A.   At the most basic level, we looked to see where this

 5   document existed, when it was created.

 6   Q.   Okay.  And did you create a couple of charts to summarize

 7   your findings?

 8   A.   Yes.

 9        MR. FICK:  If I could get the screen just for the

10   witness, your Honor?

11   Q.   Mr. Spencer, do you recognize this chart?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a summary of our findings related to the created

15   date and times of this document.

16   Q.   Is it a summary of information taken from a variety of

17   different forensic sources across the images you had in your

18   possession?

19   A.   Yes, essentially file and folder listings.

20        MR. FICK:  Your Honor, I'd move this document into

21   evidence and ask to publish.

22        MR. CHAKRAVARTY:  Same objection, your Honor.

23        THE COURT:  Okay.  All right.  I'll admit it as an

24   exhibit.

25        MR. FICK:  Thank you, your Honor.
```

1            THE COURT:  The number?

2            MR. FICK:  It's 3312-1.

3    (Defendant's Exhibit No. 3312-1 received into evidence.)

4    Q.    So can you just describe briefly for the jury what the

5    different columns of this chart represent?

6    A.    The first column represents the piece of evidence we were

7    referring to it.  The second column, if the value is not in

8    italics, that's the Universal Time for the created date, for

9    that item.  If it's in italics, then it's in local time.

00:49 10    Q.    What is the -- what is the created date of a file on a

11   device?  What does it mean?  What's its significance?

12   A.    The created date normally refers to when a file was

13   originally created in its current location.  So that could mean

14   copied there.  It could also mean originally created there, or

15   it could refer to when a file was moved there.  The reference

16   would be to its creation time in its original location if it

17   was moved there.

18   Q.    Now, some of these entries are in italic, which meant you

19   left them in local time.  Why did you do that?

00:49 20   A.    Again, that's because the local time in these cases, it's

21   -- that is how the value was stored by the operating system, by

22   the file system.  In many cases we can assume that we're

23   referring to Eastern Time, and we can simply -- if we wanted to

24   go back to Universal Time, we could add hours.  If we wanted to

25   come back from Universal Time, we would subtract them.  But the

1   Eastern Time is an assumption.  We know that laptops can

2   travel.  Time zones can change.  We may not know exactly when a

3   time zone was set one way versus another way.

4   Q.   In other words, where your data was in local time, you

5   left it in local time?  Is that essentially what you're saying?

6   A.   If the data was originally stored by the file system or

7   the operating system in local time, we left it that way here,

8   yes.

9   Q.   So across all the evidence you had available to you, did

00:50 10  you find any sign of or reference -- any evidence of the

11  *Complete Inspire* PDF being created prior to the circled date

12  here, December 21, 2011?

13  A.   Creation time, no.

14  Q.   And on the Samsung, Tamerlan's Samsung, documents TC, what

15  does that stand for?

16  A.   That refers to an encrypted container, a TrueCrypt

17  container on the Samsung laptop.

18  Q.   Was the name of the TrueCrypt container "documents"?

19  That's why that's in quotes?

00:51 20  A.   Yes.

21  Q.   And so that's among all -- across all of the evidence you

22  had available, that is the -- was that the first reference to

23  creation of *Complete Inspire* that you could find?

24  A.   Yes.

25  Q.   Now, the second reference here, this Patriot VSN, what is

1    that device?

2    A.    That's a Patriot thumb drive.  We do not have a forensic

3    image for it, so we refer to it with its known volume serial

4    number.

5    Q.    Do you recall testimony from Agent Swindon where he also

6    referred to it or agreed with me referring to it as the missing

7    Patriot thumb drive?

8    A.    Yes.

9    Q.    And so the second reference -- so how do -- where did you

00:52 10   come up with the reference to the file being created on the

11   Patriot thumb drive on that date, the thumb drive itself?

12   A.    This particular entry came from target information of a

13   jump list.  A jump list is similar to a shortcut that you've

14   heard about before.  It's data that points somewhere else.

15   This jump list data will contain specific information about the

16   thing it points at including the thing it points at, its

17   created time, its last access time, its last modified time.

18        In this case, a jump list on one of the computers pointed

19   at Complete Inspire, on this Patriot thumb drive, and recorded

00:52 20   at that time that its created date was as you see, January 21,

21   2012.

22   Q.    Again, that's the created date on the Patriot itself,

23   correct?

24   A.    Correct.

25   Q.    Did you undertake further analysis of exactly what may

1  have happened to *Complete Inspire* on January 21 of 2012?

2  A.   Yes.

3        MR. FICK:  If I could get the screen just for the

4  witness, your Honor?

5  Q.   I'm going to put up on the screen what's previously been

6  marked as 3312-02.  Do you recognize this document?

7  A.   Yes.

8  Q.   What is it?

9  A.   This is a summary of events that are in some way related

00:53 10 to *Complete Inspire* on this particular day.

11  Q.   Where is the information taken from that is put into this

12  summary?

13  A.   This information comes from three sources:  the jump list

14  information I mentioned, file system information; the file and

15  folder listings; and Windows registry information.

16  Q.   Those are all -- fair to say those are all sort of sources

17  of forensic digital information in the various images you

18  looked at?

19  A.   Yes.  All of this information exists within the forensic

00:54 20 images.

21        MR. FICK:  Your Honor, I'd move this into evidence as

22  3312-02.

23        THE COURT:  All right.  On the same basis, I will

24  allow it.

25  (Defendant's Exhibit No. 3312-02 received into evidence.)

1          MR. FICK:  If we could publish that?

2     Q.   Can you just explain for the jury what this slide depicts

3     and sort of go through step by step the events that are listed

4     here?

5     A.   The first line indicates that we see an attachment event

6     of this Patriot, this particular Patriot, January 21, 2012,

7     6:22 a.m.

8     Q.   I'm sorry.  To what was the Patriot attached at that time?

9     A.   The Samsung laptop.

00:55 10    Q.   How do you know that?  Where did that information come

11    from?

12    A.   Windows registry information.

13    Q.   Inside the Samsung?

14    A.   That's correct.

15    Q.   Now, the second line, January 21, 2012, about two seconds

16    or so later, explain what that is.

17    A.   Two minutes later.

18    Q.   I'm sorry, two minutes later.  I apologize.

19    A.   That is information from a jump list, which pointed at the

00:55 20    Patriot, actually pointed at completeinspire.pdf on the

21    Patriot, which indicates that that file was created in that

22    location, on that device, on January 21, 2012, 6:24:18.

23    Q.   And then the next event, what is that?

24    A.   That's an attachment event, which shows the attachment of

25    this Patriot to the Sony laptop.

1   Q.   And that's about two minutes -- less than a minute later,

2   also on January 21 of 2012?

3   A.   Correct, less than a minute later.

4   Q.   And then the last line, what does that depict?

5   A.   That's the file creation time on the Sony of

6   completeinspire.pdf.

7   Q.   What, if anything, can you infer from this data about how

8   Complete Inspire wound up on the Sony?

9   A.   The window is very, very tight here in terms of the

00:56 10   attachment of this device onto which we know this particular

11   file was copied and then its creation onto another device.  So

12   this would appear to indicate that completeinspire.pdf was

13   copied from the Samsung laptop and then copied to the Sony

14   laptop.  There's also the issue of evidence which does not

15   reflect anything else occurring.  There was very, very little

16   activity around these times on either of these computers.

17   Q.   So to put that another way, did you find, for example, any

18   indication whatsoever that Complete Inspire came off the

19   internet at this time?

00:57 20        MR. CHAKRAVARTY:  Objection, your Honor.  It's

21   argumentative.

22        THE COURT:  No, overruled.  You may answer that.

23   A.   No.

24   Q.   Did you find any information to suggest that Complete

25   Inspire was created at this time from any other source?

A.   No.

Q.   Now, did you have occasion to investigate whether other
copies of *Inspire* -- when they were created on the Sony, other
copies of *Inspire Magazine*?

A.   Yes.

          MR. FICK:  If I could get the screen just for the
witness, your Honor?

Q.   Showing to the witness what's been premarked as 3313-03,
what does this chart depict?

A.   This chart is a little bit more general than the last one
in terms of file creation.  This is the creation -- essentially
shows the creation of all issues of *Inspire* on the Sony on
January 21, 2012.

Q.   Is it a summary compiled from other sources in the
forensic data you looked at?

A.   Multiple sources from the forensic images, yes.

          MR. FICK:  Your Honor, I'd move this into evidence as
3313-03.

          THE COURT:  All right.  Admitted.

(Defendant's Exhibit No. 3313-03 received into evidence.)

          MR. FICK:  And if we could publish that?

Q.   Can you describe for the jury what this chart depicts?

A.   The first line shows an attachment event on the Samsung
laptop of the Patriot that we've been discussing.  The second
line shows a file creation of completeinspire.pdf on that

1    Patriot device.  Third line shows an attachment of that Patriot

2    thumb drive to the Sony laptop.  Then the next four lines

3    depict file creation date and times for multiple issues of

4    *Inspire* on the Sony laptop.

5    Q.   What's the time window in which all those events occurred,

6    roughly speaking?

7    A.   This was between 6:22:31, again, Universal Time, and

8    6:26:10.

9    Q.   All within a couple of minutes?

01:00 10   A.   A few minutes.

11   Q.   Do you understand the date of January 21, 2012, to have

12   other significance in the case?

13              MR. CHAKRAVARTY:  Objection, your Honor.

14              MR. FICK:  Well --

15              THE COURT:  Sustained.

16   Q.   Do you recall at the beginning, right before I started

17   asking you questions, we put up a travel document showing

18   Tamerlan's departure from the United States on January 21,

19   2012?

01:00 20              MR. CHAKRAVARTY:  Objection, your Honor.

21              THE COURT:  Sustained.

22   Q.   After January 21, 2012, is there any evidence across any

23   of the forensic images at your disposal to suggest or to show

24   the Patriot, the missing Patriot, ever being attached to a

25   device again that we're aware of?

1    A.    No.

2    Q.    So what was the last date in all the evidence that you

3    have available to you where we see indicia of the Patriot being

4    attached to something?

5    A.    Later in the day on January 21, 2012.

6           MR. FICK:  I have nothing further.

7    CROSS-EXAMINATION BY MR. CHAKRAVARTY:

8    Q.    Good morning, Mr. Spencer.

9    A.    Good morning.

01:02 10   Q.    We've met before?

11   A.    Yes.

12   Q.    That other case that you testified in, I had the privilege

13   of cross-examining you in that case, correct?

14   A.    Yes.

15   Q.    That was another case where you testified for the defense,

16   right?

17   A.    That's correct.

18   Q.    Now, you said that you had spent about 400 hours so far on

19   this case?

01:02 20   A.    That's correct.

21   Q.    Is that how much you've billed for or how much your firm

22   has spent on the case?

23   A.    That's how much we've billed for in this case.

24   Q.    You still have another bill, I hope, to submit?

25   A.    That's correct.

     1    Q.   About how much do you expect to be billing for it?

     2         MR. FICK:  Objection.

     3         THE COURT:  Overruled.  You may answer.

     4    A.   I do not know, but I believe it will be higher than the

     5    monthly bills prior because of the amount of time that we spent

     6    this month.

     7    Q.   And that's getting ready for trial.  And you digging into

     8    each of these materials that Mr. Fick asked you about takes a

     9    lot of time, right?

01:02 10   A.   Yes.

    11    Q.   And that's both your time as well as the other people in

    12    your firm?

    13    A.   Correct.

    14    Q.   Do you think it's going to be more than 400 hours

    15    additional?

    16         MR. FICK:  Objection.

    17         THE COURT:  Overruled.

    18    A.   No.

    19    Q.   So just in terms of the limitations of your science, you

01:03 20   can't tell who is actually using a computer at any given time;

    21    is that fair to say?

    22    A.   I think, generally speaking, that's fair to say.

    23    Q.   Unless you have a video camera or some other way to have

    24    some extrinsic evidence saying that Mark Spencer is using a

    25    computer, then you just have to infer it from the activity on

```
 1   the computer, right?

 2   A.    Correct.

 3   Q.    And one of the ways that you do that is you check to see

 4   if the person is logging into his email account, for example?

 5   A.    Yes.

 6   Q.    Or his Twitter account, that kind of thing, right?

 7   A.    (Nodding.)

 8   Q.    Having looked at the computers, you recognize that the

 9   Sony VAIO computer, the 1R6, was the defendant's computer,

01:04 10   Dzhokhar Tsarnaev's, right?

11   A.    Correct, yes.

12   Q.    So the fact that the user account name was called Anzor

13   was simply what the user of the computer decided to name his

14   computer, correct?

15   A.    Correct.  That's arbitrary, yes.

16   Q.    In fact, the full name on the Windows information was that

17   it was -- Jahar was the full name of the user?

18   A.    Correct.

19   Q.    Through similar analysis, you gleaned that the Samsung

01:04 20   computer that was found in Watertown, what was called the 1W3

21   today, that was Tamerlan's computer, correct?

22   A.    That would be a portion of the analysis, yes.

23   Q.    And some of the other devices, it's less clear, right?

24   A.    Correct.

25   Q.    Because those are not complete computer operating systems
```

1    in which one person was the exclusive user.  There were

2    actually -- if it was a removable media, it was put into many

3    different devices?

4    A.   Correct, right.  Many of them are meant to be mobile

5    devices.

6    Q.   And I think some of the exhibits you pointed to today

7    actually showed that there were migrating files between

8    devices, right?

9    A.   Correct.

01:05 10    Q.   And, in addition, there was a desktop computer found at

11    the 410 Norfolk Street residence in the defendant's room that

12    was used by a lot of different people, right?

13          MR. FICK:  Objection to the characterization of the

14    room, which he has no knowledge of certainly.

15          THE COURT:  Go ahead.  You may answer it.

16    A.   Multiple users, yes.

17    Q.   There were some children's shows on that as well as some

18    jihad-related materials as well as innocuous materials,

19    correct?

01:05 20          MR. FICK:  Objection to the generalizations.

21          THE COURT:  Overruled.

22    A.   I would agree that there was all kinds of material on that

23    computer, yes.

24    Q.   Now, both the defendant's computer and his brother's

25    computer had searches for the Boston Marathon explosions after

1   the Boston Marathon, correct?

2   A.   Correct.

3   Q.   And both of them had the *Inspire* magazines, some of the

4   collection which you pointed out today as well as some

5   additional issues, correct?

6   A.   Yes.

7   Q.   Both of them had other radical Islamist extremist material

8   as well, correct?

9         MR. FICK:  Again, objection to this witness'

01:06 10   foundation of what that means.

11         THE COURT:  Overruled.

12   A.   Material that I understand to be jihadi-related, yes.

13   Q.   You pointed out that there was a search on Tamerlan's

14   computer in March of 2013 for a Ruger P95; do you remember

15   that?

16   A.   Yes.

17   Q.   And that was -- from the internet history, you saw that

18   somebody plugged into Google or something "Ruger P95," right?

19   A.   Correct.

01:06 20   Q.   And so do you also know that that is after the defendant

21   had already obtained the P95?

22         MR. FICK:  Objection.

23         THE COURT:  Sustained.

24   Q.   Were there searches for other guns on Tamerlan's computer?

25   A.   I do not recall.  If you show me the internet history, I

1    can look through it.

2    Q.   And the -- you also were shown a search on Tamerlan's

3    computer on April 7, 2013 -- this is about a week before the

4    Marathon -- for "fireworks" and "detonation" -- or "detonator,"

5    is that right?

6    A.   Sounds correct.

7    Q.   So that was only a week before the Marathon is when the

8    "detonator" and "fireworks" were sought, according to your

9    analysis?

01:07 10    A.   That search term, correct.

11    Q.   And do you know that the defendant had actually returned

12    to Cambridge the week before the Marathon?

13          MR. FICK:  Objection.

14          THE COURT:  Sustained.

15    Q.   Now, on the Sony VAIO computer, the defendant's computer,

16    there were also some additional searches of interest; is that

17    fair to say?  You looked at some of the searches on the Sony

18    VAIO computer?

19    A.   Yes, yeah, many searches.

01:08 20          MR. CHAKRAVARTY:  Mr. Bruemmer.

21          MR. FICK:  I'm going to object to the scope grounds.

22          MR. CHAKRAVARTY:  Your Honor, the witness was asked if

23    he had searched -- had found evidence --

24          THE COURT:  Go ahead.

25          MR. CHAKRAVARTY:  -- on all the things he looked at.

```
       1              THE COURT:  Go ahead.
       2    Q.   Now, Mr. Spencer, is it true that the defendant made some
       3    searches just before the Boston Marathon, on April 11, 2013,
       4    for the -- under the search term "the call of jihad"?  Do you
       5    remember that?
       6    A.   I see that, yes.
       7    Q.   And this is a -- I'm pulling up 3303-02, which is a parsed
       8    web search from the Sony VAIO computer that you had created,
       9    correct?
01:09 10    A.   Correct.
      11              MR. CHAKRAVARTY:  Your Honor, if I could ask to
      12    publish just that search entry, just this page?
      13              THE COURT:  All right.  The whole page or the file?
      14              MR. CHAKRAVARTY:  I think just the file area.  I'll
      15    zoom in as much as I can.
      16              MR. FICK:  Again, note the objection on scope.
      17    Frankly, if we're going -- I'd rather the whole page be in if
      18    we're going to be -- to show --
      19              MR. CHAKRAVARTY:  I don't have objection to that.
01:10 20              THE COURT:  All right.  Okay.  Are you set with it now
      21    so I can --
      22              MR. CHAKRAVARTY:  Yes, please, your Honor.
      23    Q.   So this entry shows that the user of this device, the
      24    weekend before the Boston Marathon bombing, searches for "the
      25    call of jihad," correct?
```

1    A.    Correct.

2          MR. CHAKRAVARTY:  Your Honor, just for the witness

3    again, please.

4    Q.    Again, sometime before the Marathon, back in February of

5    2013, the user of this device also searched for "Jannah al

6    Firdaus," is that accurate?

7    A.    February 2, 2013?

8    Q.    February 2.

9    A.    Yes.

01:11 10        MR. CHAKRAVARTY:  Again, your Honor, I would ask to

11   publish Page 29 of this exhibit.

12          THE COURT:  All right.

13   Q.    That's this entry here that I'm just circling.

14   A.    Yes.

15   Q.    And do you know what "Jannah al Firdaus" means?

16   A.    I've seen the phrase.  I don't recall.

17          MR. CHAKRAVARTY:  Again, just for the witness, your

18   Honor.

19   Q.    This is some of the internet search history for -- that

01:12 20   include references to the Boston Marathon explosions at the

21   finish line, is that accurate?

22   A.    Yes.

23   Q.    And there are a few different pages related to the

24   searches of the Boston Marathon, correct?

25   A.    There's multiple entries related to searches of that type,

1    yes.

2    Q.   And there are multiple entries related to searches related

3    to jihad as well, correct?  We saw one of them.  I'm just

4    asking are there others in addition to the "call of jihad"

5    search.

6    A.   I believe so.

7    Q.   Now, if we could turn to the 1W16, this was the hard drive

8    that was found on the street in Watertown.  You had examined

9    that hard drive and recognized that there were a number of

01:13 10   files that were in what we call the unallocated space of that

11   hard drive; is that fair to say?

12   A.   Yes.

13   Q.   And so that means that there were -- I think there were

14   mostly MP3-type audio files, maybe somebody's song collection?

15   A.   Yes.

16   Q.   And amongst the maybe thousands of songs that had been on

17   that hard drive, there were also some files related to some

18   homework or school work of somebody named Giovanni, correct?

19   A.   Correct.

01:13 20   Q.   And all of that stuff was deleted, and it was replaced

21   with some of the files that Mr. Fick asked you about today,

22   right?

23   A.   Correct.

24   Q.   So the *Inspire* magazines, the Awlaki lectures, all that

25   stuff replaced this hard drive that had a lot of MP3 songs on

 1    it and some homework assignments, correct?

 2    A.    Correct.

 3    Q.    And so the homework assignments, did you recognize were in

 4    2012 for a UMass Dartmouth student?

 5            MR. FICK:  Objection.

 6            THE COURT:  Overruled.  You may answer it.

 7    A.    I don't think I took note of the content.

 8    Q.    In any event, those were still -- you could still see

 9    traces of those files on the computer.  That's how you know it

01:14 10    was all on there?

11    A.    Yes.

12    Q.    And after the -- those files were placed on that hard

13    drive, that hard drive was then plugged into the defendant's

14    Sony laptop, right?

15    A.    That's correct.

16            MR. FICK:  Objection as to the temporal -- I'm not

17    sure I understood the temporal --

18            THE COURT:  Maybe you could make that clear.

19    Q.    So you said that the external hard drive was plugged into

01:15 20    Tamerlan's computer, I think, back in January of 2013, correct?

21            MR. FICK:  I'm not sure there's any testimony about

22    when.

23    A.    If you could show me a list of attachment dates.

24    Q.    Sure.  Let me go to some of your exhibits.  You recognize

25    this?  This is 3302-04.

```
 1    A.    Yes.
 2    Q.    And this is a list of various removable storage devices
 3    that were plugged -- that the external hard drive that we're
 4    talking about was plugged into various devices, right?
 5    A.    Computers that it was plugged into, yes.
 6    Q.    Sorry, plugged into various computers.  In fact, there's
 7    two computers it was plugged into, according to this chart:
 8    Tamerlan's computer and the defendant's computer, right?
 9    A.    Yes.
10    Q.    According to this chart, on January 21, 2013, there was a
11    file called setupapi.dev.log.  That's a file that simply tells
12    you that this device is plugged into a computer, correct?
13    A.    Basically, yeah.  You can determine the first attachment
14    time.
15    Q.    So this is the first time that this device was plugged
16    into the -- Tamerlan's computer?
17    A.    Correct.
18    Q.    So on January 21, 2013, it was first plugged in.
19          By the way, for the benefit of the jury, is this chart
20    helpful to explain what this -- the removable storage
21    attachment sequence was?
22    A.    Yes.
23          MR. CHAKRAVARTY:  Your Honor, I would move in evidence
24    3302-04.
25          MR. FICK:  No objection.
```

```
 1              THE COURT:  Okay.
 2     (Exhibit No. 3302-04 received into evidence.)
 3              MR. CHAKRAVARTY:  And ask to publish.
 4     Q.   So this shows that on January 21, 2013, this device, which
 5     is the laptop -- excuse me, the external hard drive, was
 6     plugged into Tamerlan's computer, the Samsung 1W3, right?
 7     A.   Right.
 8     Q.   And then this chart shows that in March, again, of 2013,
 9     about a month before the Marathon, it was plugged in for the
01:17 10    first time, it looks like, into the Sony 1R6, which is the
11    defendant's computer, right?
12    A.   Correct.
13    Q.   And then a few minutes later, it goes back into Tamerlan's
14    computer, right?
15    A.   Right.
16    Q.   And then later, the next morning, it goes back into the
17    defendant's computer, right?
18    A.   Right.
19    Q.   And then it gets plugged in two more times, both times
01:18 20    into the defendant's computer, right?
21    A.   Correct.
22    Q.   In fact, the last time it goes in is about a week and a
23    half before the Marathon, correct?
24    A.   Correct.
25    Q.   And, in fact, the defendant's computer, the Sony 1R6,
```

1    actually accessed this Samsung -- excuse me, the 1W16, the

2    external hard drive, on March 18th.  It watched some videos.

3    It did some other activity on that day, correct?

4    A.   That sounds correct.  In terms of exactly what it

5    accessed, I'd need to see the -- the shortcut or jump list

6    activity.

7    Q.   Okay.  So let's go to --

8         MR. CHAKRAVARTY:  Thank you, your Honor.

9    Q.   -- 3300.  Now, I've just put up for you what you've

01:19  10  labeled as the live MFT record, Laurel 1W16.  And that is the

11   master file table drawn from Windows for that device, correct?

12   A.   Correct.

13   Q.   And so this is a six-page document?

14   A.   Yes.

15   Q.   Again, is this an extraction that you had from the

16   external hard drive that was found on Laurel Street?

17   A.   Yes.

18        MR. CHAKRAVARTY:  I would move into evidence 3300-07,

19   your Honor.

01:19  20       MR. FICK:  No objection.

21        THE COURT:  All right.

22   (Exhibit No. 3300-07 received into evidence.)

23   Q.   So this shows some of the files that were on that device,

24   correct?

25   A.   Yes.  This should be a complete listing of all the files

1    and folders on that -- currently on that device.

2    Q.   And so we were just talking about the March 18, 2013, day

3    that this device was plugged into the Sony VAIO; do you

4    remember that?

5    A.   Yes.

6    Q.   And so this first column, is this the first -- this is the

7    name of the file, and then this is the creation date, correct?

8    A.   Correct.

9    Q.   So this entry -- let's use, for example, Entry 67 -- shows

01:20 10   that that file was created on this device on March 18, 2013,

11   right?

12   A.   Correct.

13   Q.   And it was accessed on April 6, 2013, correct?

14   A.   Correct.

15   Q.   And, again, we just looked at the earlier exhibit, which

16   showed that that access, April 18th and April 6th, were both on

17   the Sony VAIO, correct?

18            MR. FICK:   Objection.   That's not the only 18th.

19            THE COURT:   The chart is --

01:21 20            MR. CHAKRAVARTY:   The chart speaks for itself.

21            THE COURT:   -- is plain, I think.

22   Q.   This also shows that some of those files that you had

23   talked about before, the *Inspire* magazines, over in this

24   section, correct?

25   A.   Correct.

Q.   And, specifically, it shows -- I'll zoom in here -- the
*Complete Inspire* magazine that Mr. Fick asked you about, that
you heard a lot about when Agent Swindon testified, that's this
entry, Exhibit 38, right?

A.   Yes.

Q.   Now, you said that this device was first plugged into
Tamerlan's computer on January 21, 2013, is that right?

A.   Correct.

Q.   And so there's a creation date of December 27, 2012, on
this file list, right?

A.   Right.

Q.   And that means that on this computer this file existed on
December 27, 2012, is that accurate?

A.   No, that is not accurate.

Q.   So then why is this date, which predates the date that the
computer was plugged in -- the device was plugged into
Tamerlan's computer, how else can you explain this December 27,
2012?

A.   Files and folders that are moved to a location as opposed
to having been copied or originally created in that location,
will retain the created date and time of the former location.

Q.   So you're suggesting then that that's the date that it
existed on Tamerlan's computer or however the file got to this
hard drive, right?  That date preexisted the existence --
creation date on this hard drive?

A.   Correct.

Q.   So that's inconsistent with what you described as the

creation date, right?

A.   The creation date of?

Q.   The creation date you said that was on this hard drive.

You described the creation date as -- you told Mr. Fick that it

was the date that the file was either created in a specific

location or it was moved to a specific location, right?

A.   If the file or folder is moved to a location as opposed to

01:24 copied or originally created there, the date and time is from

its previous location, not its current location.

Q.   Okay.  So for all of these other files, January 25, 2013,

all of the other *Inspire* magazines were January 25, 2013,

right?

A.   January 25, 2013?

Q.   Yup.  And all of these other files on the next page,

including the Awlaki lectures, were sometime in March of 2013,

right?

A.   Right.

01:24 Q.   In fact, there's no other entry for 2012 except for that

one entry, right?  That's the only entry that shows a creation

date of 2012, correct?

A.   Right.

Q.   And so you analyzed all of the devices in this case, but

you only presented some charts from -- for some of those

```
 1   devices, correct?

 2            MR. FICK:  Objection, especially given the limitations

 3   on the scope.

 4            THE COURT:  Sustained.

 5   Q.   If this hard drive actually were not plugged into

 6   Tamerlan's computer but was plugged into the Norfolk desktop

 7   that also accessed Complete Inspire around that same time, then

 8   you would expect to see a setup API log file on the desktop,

 9   correct?

01:25 10  A.   Correct.  We would expect to see this device in that log.

11   Q.   Right.  And you didn't put that into your chart, did you?

12            MR. FICK:  Objection.  The absence of a direction.

13            MR. CHAKRAVARTY:  It's the lack of completeness of the

14   chart that the defendant --

15            THE COURT:  The objection is sustained.

16   Q.   So this file could have come from any computer in which

17   the creation date that existed was December 27, 2012, correct?

18   A.   No, that's not correct.

19   Q.   So there's something on this file that tells you that it

01:26 20  had to have come from the Samsung?

21   A.   This file, completeinspire.pdf, on the Laurel external

22   hard drive --

23   Q.   Yes.

24   A.   -- the owner SID relates specifically to the Samsung

25   computer and the Umar account on that computer.
```

1    Q.   Which means that at some time that file, the origination

2    of that file, was on the Samsung computer, correct?

3    A.   Correct.

4    Q.   And then however -- wherever that files goes, that SID

5    follows it?

6    A.   No.

7    Q.   So if it goes then to the Norfolk computer, then the

8    Norfolk computer SID would be imparted into it?

9    A.   On the Norfolk computer.

01:26 10   Q.   On the Norfolk computer.

11   A.   Correct.

12   Q.   So you did recognize -- you do recognize that the Norfolk

13   computer did access on an external drive around the same time

14   the *Complete Inspire* magazine?

15   A.   A time other than January 21st?

16   Q.   On December 23rd and December 26th of 2012.

17   A.   We have a -- that could be correct.  We have a spreadsheet

18   which tracks the attachments of this device.

19   Q.   You were here for Agent Swindon's testimony, right?

01:27 20   A.   Yes.

21   Q.   You were seated here at counsel table.

22        You saw some of the charts that showed that that file was

23   accessed on an external drive on the Norfolk Street computer.

24   You have no reason to question that, right?

25   A.   No.

```
 1    Q.   Now, going back to -- I guess staying on this, there were

 2    some other files on this external hard drive that included

 3    appeared to be some movies.  One of them was a Django

 4    Unchained, right?

 5    A.   Are you --

 6    Q.   I'm sorry.  I'm looking -- I'll move it up here a little

 7    bit.  Entry 74 and 75 and 76 appear to be records of the movie

 8    Django Unchained.  It appears from -- in a folder called --

 9    that ends with -- not in a folder, excuse me -- that has a text

10    file that goes along with it called "torrent downloaded from

11    extratorrent.com," correct?

12    A.   Correct.

13    Q.   Is that all an indication that these are movies that were

14    downloaded through peer-to-peer network, some kind of torrent

15    program?

16    A.   That's what it looks like, yes.

17    Q.   Somebody downloaded those files onto this external hard

18    drive, right?

19    A.   The word "downloaded" infers that it came directly from

20    the internet.  But the files were created in a vacuum from this

21    spreadsheet.  We know that the files were created on the drive

22    at that time.

23    Q.   So they were created on the drive.  They weren't created

24    on the 1W3?

25    A.   We're looking at the spreadsheet related to Laurel 1W16.
```

01:28 (line 10)
01:29 (line 20)

1    These files were created on Laurel 1W16.

2    Q.   Okay.  So these were created -- I'm not following what you

3    mean in terms of whether a file was created on 1W16 or

4    transferred to 1W16 from another device.  I thought you just

5    said that the *Inspire* magazines were transferred from

6    Tamerlan's computer.

7         MR. FICK:  Objection.  I don't think that's what --

8    A.   I'll clarify.  The device was plugged into the Samsung.

9    That's how the owner information is populated.

01:30 10   Q.   But you don't know then whether it was downloaded from the

11   internet or downloaded from Tamerlan's computer?

12   A.   I'm confused.  It would come from -- the drive would be

13   connected to Tamerlan's computer either way.

14   Q.   I understand that the drive was connected to the computer.

15   The drive was connected to Tamerlan's computer and to the

16   defendant's computer.  I'm trying to figure out how these files

17   got onto this computer, onto this hard drive.  I'm simply

18   asking you that -- there's a creation date for *Django Unchained*

19   on March 18th.  It's fair to say that those were downloaded

01:30 20   from some source, either the internet or some computer,

21   correct?

22   A.   Right.  It came from somewhere via the computer that it

23   was attached to.

24   Q.   And that's the same date as these Anwar Awlaki lectures,

25   right?

```
 1   A.   Correct.
 2   Q.   And so you can't say with any more specificity where any
 3   of that stuff was downloaded from?  All you can say is that
 4   that's the date that they were created on this hard drive?
 5   A.   From this spreadsheet, that's correct.
 6   Q.   And then the use of that hard drive later was all on April
 7   6th or on April 19th -- or March 19th, correct?
 8   A.   You can infer some type of use.
 9   Q.   But since this hard drive was not plugged into Tamerlan's
01:31 10 computer after March 18, 2013, it's a fair inference that any
11   access that postdates April -- March 18 of 2013 was done on the
12   defendant's computer?
13        MR. FICK:  Objection.
14        THE COURT:  You may answer it.
15   A.   It's a -- you're asking me if it's a fair inference to say
16   that any activity post a certain date was related to the
17   defendant's computer?
18   Q.   You showed us 3302-04, which shows the dates that this
19   device was plugged into the various computers, the two
01:32 20 computers particularly.  It does not include the Norfolk drive.
21   It just includes the Sony laptop and the Samsung laptop, right?
22   A.   Correct.
23   Q.   And so these are the dates that those files -- that that
24   device was accessed on -- after March 18th, correct?
25   A.   This chart shows you when this device, the Laurel Street
```

```
 1    hard drive, was connected to different computers that we have,

 2    that we have access to, forensic images.

 3    Q.   So on April 6, March 21, and March 19 of 2013, this device

 4    was only plugged into the defendant's laptop?

 5    A.   As it relates to the forensic images that we have access

 6    to.  This information comes --

 7    Q.   Let me ask you a question.

 8              MR. FICK:  Let the witness finish, please.

 9              MR. CHAKRAVARTY:  I think he had answered my question.

10              THE COURT:  I think he had answered it.

11    Q.   So these accesses -- this was the simple question that I

12    was trying to get to you.  These accesses correlate to the

13    accesses on the defendant's Sony laptop, correct?

14    A.   Similar time frame.  This is not normally how forensic

15    examiners will determine document or file activity.

16    Q.   Right.  But those are the dates that this file was

17    manipulated on this hard drive?

18    A.   That's correct, some type of interaction, yes.

19    Q.   And, in fact, there is a link file -- you're aware of what

20    a link file is?

21    A.   Yes.

22    Q.   And you heard Agent Swindon talk about link files?

23    A.   Yes.

24    Q.   And they show that some user uses an application to

25    actually access a file?
```

A.   Yes.

Q.   In fact, the *Django Unchained* video was watched on the defendant's computer on March 19, 2013, as well as on another date, a couple days later?

A.   Yes.  That's normally how we would look at file access.

Q.   And that file was not accessed on Tamerlan's computer, the Samsung?  There was no such link file, right?

A.   Not that I know of.

Q.   Now, let's just get quickly to the idea of Tamerlan's computer, the 1W3.  Now, you said that you don't know whether -- you can't make conclusions about what somebody is thinking or who the person is that's actually accessing a particular file, correct?

A.   We can't say with specificity who is at that keyboard.

Q.   So no matter what computer files are on somebody's computer, you can't say, Oh, this person must have been thinking something, right?  That's beyond what a computer forensic scientist can do?

A.   Correct.

Q.   So the 1W3, what you say is Tamerlan's computer, in fact, other people used that computer as well, right?

A.   My understanding is that that is correct, yes.

Q.   In fact, the defendant used Tamerlan's computer, correct?

A.   Yes.

Q.   In fact, he logged onto his email on Tamerlan's computer?

```
 1    A.   I believe we know of one instance if you have the internet
 2    history.
 3    Q.   All right.  And I think right around the time that this --
 4    several of these files -- I think you described January 21,
 5    2013, being the date that the external hard drive was set up on
 6    Tamerlan's computer, is that right?  Let's go back to your
 7    chart.  January 21, 2013, is the date that --
 8    A.   Correct.
 9    Q.   -- the hard drive was set up?
10         This is the hard drive that had the homework assignments
11    on it.  It was cleaned, and the new jihadi material was put on
12    it, right?
13    A.   Correct.
14    Q.   And so a few days before that, during Christmas break of
15    2013, the defendant was checking his email on Tamerlan's
16    computer, is that right?
17              MR. FICK:  Objection to the time frame vagueness.
18              THE COURT:  Overruled.
19    A.   I don't know the exact date and time.  If you can pull it
20    up, I will.
21    Q.   Okay.  The exact date and time, I think, is less important
22    than the fact that the defendant was actually using the
23    defendant's -- Tamerlan's computer.
24              MR. FICK:  Objection to the commentary.
25              THE COURT:  Overruled.  You may answer it.
```

```
 1   Q.   The defendant was actually using Tamerlan's computer near
 2   the time that this hard drive was set up?
 3            MR. FICK:  Objection.
 4            THE COURT:  Overruled.
 5   A.   We don't know that with the same certainty that we
 6   discussed before, who's sitting in that chair, but that would
 7   be consistent with another user.
 8   Q.   You don't know who made the decision to download these
 9   files or where they got these files from, right?
10   A.   Which files?
11   Q.   Let's start with the Complete Inspire magazine.  You don't
12   know -- all you know is that that first appears on the Tsarnaev
13   brothers echo system on January 21, 2012?
14            MR. FICK:  Objection.
15   Q.   Excuse me, 2011.
16            THE COURT:  Overruled.
17   Q.   December of 2011.
18   A.   Correct, on the removable storage device.
19   Q.   And that means that it could have been plugged into
20   another computer that nobody has ever found, right?
21   A.   That's correct.
22   Q.   In fact, do you know that the defendant purchased a
23   computer that nobody ever found?
24            MR. FICK:  Objection.
25            THE COURT:  Sustained.
```

01:37 (line 10)
01:38 (line 20)

1          MR. CHAKRAVARTY:  I think that's all, your Honor.

2          MR. FICK:  If I may have one moment briefly?

3          Can we actually take the break, your Honor?  I may

4     have a little bit or I might not, but I'd -- I think we're

5     almost at 11:00.

6          THE COURT:  All right.  We'll take the morning recess.

7     (Recess taken at 10:51 a.m.)

8     (The Court and jury entered the courtroom at 11:24 a.m.)

9          MR. FICK:  Very briefly, your Honor.

02:12 10          THE COURT:  Okay.

11     REDIRECT EXAMINATION BY MR. FICK:

12     Q.    Good morning again, Mr. Spencer.

13     A.    Good morning.

14     Q.    Mr. Chakravarty took you through a couple of entries from

15     Exhibit 3303-02, not in evidence but published them.  That's

16     the search history from the Sony computer.  Do you remember him

17     doing that with you?

18     A.    Yes.

19          MR. FICK:  Your Honor, if I could do the same, just to

02:12 20     publish without putting in evidence, the same sections that Mr.

21     Chakravarty talked about with the Court's permission?

22          THE COURT:  What is it you wanted?

23          MR. FICK:  I just want the screen.  I want to put up

24     the same sections of this exhibit that are not moved into

25     evidence but that Mr. Chakravarty talked about in the jury's

1   presence.

2            THE COURT:  You have them?

3            MR. CHAKRAVARTY:  No objection.

4            MR. FICK:  I have them up here.  I'm going on the

5   screen right now.

6   Q.   So, Mr. Spencer, do you remember Mr. Chakravarty showing

7   you some of these?  These are like entries from the Sony search

8   entries?

9   A.   Yes.

02:13 10   Q.   Referring to the Boston Marathon.

11       Why are there no dates for those artifacts?

12   A.   Web history remnants or artifacts may not have dates, one,

13   because they were never stored in the first place, by design,

14   depending on the browser and the particular action in question

15   or the date and time may no longer be available.

16   Q.   While this information is captured by a search history

17   tool, does it actually mean that somebody sat at a keyboard and

18   typed all that in as their search?

19   A.   No, that's not necessarily what that means.

02:14 20   Q.   So is it fair to say that some of these tools will gather

21   as search history some information that's not actually a

22   search?  That's just that the tool happens to gather it that

23   way?

24            MR. CHAKRAVARTY:  Objection, your Honor.

25            THE COURT:  Overruled.  You may have it.

1    A.   That's correct.  The tools aren't perfect in terms of

2    extracting out what they feel represent search criteria.

3    Q.   Now, if I could now put on the screen -- actually, I'll

4    just -- Exhibit 3303-006, which is the Samsung search history,

5    I would just request the Court's permission to publish a small

6    portion of it in the same manner if that's okay.

7              THE COURT:  Okay.

8    Q.   Do you recognize what this document is?

9    A.   Yes.

02:15 10   Q.   What is it?

11   A.   This is a list of the web searches for the Samsung laptop.

12   Q.   And just the top one here, I mean, does this actually

13   reflect the typing in of a search in Google with that term?

14   A.   Yes.  Well, you can plainly see the search question mark Q

15   equals, which is related to a Google search.

16   Q.   What does that tell you about whoever was at the keyboard

17   of the Samsung actually typed in?

18   A.   They're searching for this phrase.

19   Q.   And I'm going to page through now.  Is it fair to say that

02:15 20   there are multiple pages -- on the Samsung, multiple pages of

21   such searches over the course of several days and times?

22   A.   There's multiple terms that are used that are similar.

23   Q.   So we're on Page 11 now of the exhibit, 12, 13.

24              MR. FICK:  If I may have one moment, your Honor?

25              I would just offer into evidence those 13 pages of

1    Exhibit 3303-06 as 3303-6 -- I think we're at E or F.

2            MR. CHAKRAVARTY:  Object to that, your Honor.  This is

3    beyond the scope of what -- certainly what the cross was.  I

4    didn't refer to this history.

5            THE COURT:  Overruled.  You may admit it.

6            MR. FICK:  Mr. Lyness, can you tell me what letter

7    that is?  It's 3303-6.

8            THE CLERK:  I believe the next one should be E.

9            MR. FICK:  Okay.  I will name it that then, 3303-6E.

02:16 10   (Defendant's Exhibit No. 3303-06E received into evidence.)

11           MR. FICK:  With that, I have nothing further.

12           MR. CHAKRAVARTY:  Just on that point.

13   RECROSS-EXAMINATION BY MR. CHAKRAVARTY:

14   Q.   Mr. Spencer, the exhibit that Mr. Fick just showed you,

15   there were several searches on April 15 and April 16, 2013,

16   correct, for the Boston Marathon explosion?

17   A.   That spreadsheet is related to the output from the tools,

18   would show that's their web search output, web-search-related

19   output.

02:17 20   Q.   On those two dates, April 15 and April 16, the day of the

21   Marathon and the day after?

22   A.   Correct.

23   Q.   Those are dates where you don't know who the actual

24   searcher was for that information?

25   A.   Correct.

1   Q.   If the defendant and Tamerlan were together, you wouldn't

2   be able to tell which one of them made those searches?

3   A.   Correct.

4        MR. CHAKRAVARTY:  That's all I have.

5        THE COURT:  All right, sir.  You may step down.

6        MR. WATKINS:  The defense calls Elena Graff.

7        THE CLERK:  Ma'am, would you step up here, please, up

8   to the box.  Remain standing.  Raise your right hand.

9        ELENA GRAFF, Sworn

02:18 10      THE CLERK:  Have a seat.  State your name.  Spell your

11  last name for the record.  Keep your voice up and speak into

12  the mic so everyone can hear you.

13       THE WITNESS:  My name is Elena Graff.  My last name is

14  spelled G-r-a-f-f.

15  DIRECT EXAMINATION BY MR. WATKINS:

16  Q.   Miss Graff, how are you employed?

17  A.   I work at the -- for the Federal Bureau of Investigation,

18  at their laboratory in Quantico.

19  Q.   What do you do for the Federal Bureau of Investigation at

02:19 20  Quantico?

21  A.   I'm a fingerprint latent examiner.

22  Q.   How long have you been a fingerprint -- latent fingerprint

23  examiner?

24  A.   Eight years.

25  Q.   Can you tell us briefly about your education?

A.    Yes.  I have a Bachelor of Arts in history from Utah State
University and a Master's in forensic science from Nebraska
Wesleyan University.

Q.    When and how did you learn the technique of identifying
fingerprints?

A.    I joined the Bureau in 2007, and after that I completed a
18-month training program in which I learned how to process
evidence and analyze and compare latent prints.

Q.    Have you testified at trial before about latent
fingerprint examination?

A.    I have.

Q.    How many times have you testified?

A.    I've testified four times.

Q.    Of any of those four times, were you ever called by the
defense to testify?

A.    I was not.

Q.    Miss Graff, have you and I met before today?

A.    No.

Q.    You were -- did a lot of work on this case, reviewed
thousands of items?

A.    That is correct.

Q.    You understood that you might be called to testify in this
case?

A.    Yes.  This is one of my duties.

Q.    In fact, a case agent has kept you updated about whether

1    or not you would be called to testify?

2    A.   That is correct.

3    Q.   And there was a point at which you understood you would

4    not have to testify?

5    A.   That is also correct.

6    Q.   And that changed yesterday?

7    A.   Yes.

8    Q.   And that's when you understood that you were going to be

9    coming up here to testify for the defense?

02:21 10    A.   Yes.

11    Q.   The examinations you did of evidence for the Dzhokhar

12    Tsarnaev case, that took place over the period of several

13    months?

14    A.   Yes.  In a case such as this, with this much evidence and

15    it needs to be turned around in a very quick manner, we

16    actually have a specialized team trained to work this kind of

17    investigation.  I was what's known as the examiner of record,

18    meaning I was in charge of that team.

19    Q.   And as -- and items kept coming in to be analyzed during

02:21 20    the course of the following year really?

21    A.   That is correct.

22    Q.   In your general career as a latent print examiner, how

23    many items have you examined trying to make comparisons of

24    fingerprints?

25    A.   Thousands.

Q.   In this case, how many items did you examine trying to
make fingerprint comparisons?

A.   I believe it was over 800.

Q.   While you were doing examinations of evidence in this case
for latent prints, you were also supplied known prints?

A.   That is correct.

Q.   And that is the standard procedure at the FBI --

A.   Yes.

Q.   -- right?

One can put prints into an automated fingerprint
identification system, but that's not what you were doing here,
right?

A.   No.  The prints -- the fingerprint cards were collected
and then brought to the lab.

Q.   In some examinations, you might have eight or nine
subjects that you are comparing to?

A.   That is correct.

Q.   Sometimes over a dozen that you are comparing to --

A.   Yes.

Q.   -- known subjects?

Constant amongst all those were the prints -- the known
prints of Dzhokhar Tsarnaev and Tamerlan Tsarnaev.  You were
always comparing to those two, right?

A.   That is correct.

Q.   And you generated reports over time about what your

1   findings were?

2   A.   Yes.

3   Q.   And multiple reports, over 20 reports?

4   A.   That is correct.

5   Q.   I'm going to take you to some specific pieces of evidence

6   that we've seen at trial and ask you if you analyzed them and

7   what the results are.  I'm putting on the screen first actually

8   two exhibits that have been admitted.

9           THE COURT:  That can be shown to everybody then?

02:23 10          MR. WATKINS:  I do believe.

11   Q.   On the left is Exhibit 853, and on the right is Exhibit

12   1122, both of which depict a Tupperware container with a hobby

13   fuse out of it.  Do you see that?

14   A.   I do.

15   Q.   The picture on the right, do you recognize where that had

16   been -- has been taken?

17   A.   Yes.  That was a picture taken at the laboratory.

18   Q.   Did you do analysis of that Tupperware container for

19   latent prints?

02:24 20   A.   Yes.  It was processed and latent prints were collected.

21   Q.   And when you compared those to Dzhokhar Tsarnaev and

22   Tamerlan Tsarnaev, first to Dzhokhar, you found his

23   fingerprints on there, is that correct?

24   A.   Yes, that's correct.

25   Q.   How many fingerprints of Dzhokhar Tsarnaev did you find?

1    A.    Two.

2    Q.    How many fingerprints of Tamerlan Tsarnaev did you find on

3    the Tupperware container that's depicted in 1122?

4    A.    Six.

5    Q.    Turning next to two exhibits that have been admitted, on

6    the left is 0948-532; on the right is Exhibit 0949.  Do you

7    recognize the photograph on the right?

8    A.    I do.

9    Q.    Where is that from?

02:25 10    A.    It's from the laboratory.

11    Q.    And can you tell from that picture whether that's before

12    or after latent print examination has been done?

13    A.    It is before latent prints.

14    Q.    So this would have been sent to you after this picture was

15    taken?

16    A.    That is correct.

17    Q.    Did you examine this item that's depicted in Exhibit 0949?

18    A.    This is the transmitter?

19    Q.    Yes.

02:25 20    A.    Yes, I did.

21    Q.    And what were the results of your analysis of 0949, the

22    transmitter, when you compared it to Dzhokhar Tsarnaev?

23    A.    The latent prints that we collected from this item were

24    not identified to Dzhokhar.

25    Q.    What did you find when you compared them to Tamerlan

1    Tsarnaev?

2    A.    They were identified to Tamerlan.

3    Q.    Putting before you Exhibit 974, which has been admitted

4    into evidence, and if I can get the Q number, can you see the Q

5    number on that item?

6    A.    I can.

7    Q.    This has been identified as a pressure cooker lid

8    recovered from Laurel Street in Watertown.  Were you able to do

9    latent -- were you able to find latent prints with sufficient

02:26 10   detail to be compared?

11   A.    I did, although I'd have to reference my report to

12   remember exactly how many.

13   Q.    If you wouldn't mind, that would be -- this is Q588.

14   A.    We collected one fingerprint.

15   Q.    Were you able to compare that to known fingerprint

16   exemplars?

17   A.    I did.

18   Q.    Whose fingerprint was that on that pressure cooker pot

19   lid?

02:27 20   A.    It belonged to Tamerlan Tsarnaev.

21   Q.    Keep that report in front of you because we're still going

22   here.  I'm showing you what has been admitted into evidence as

23   Exhibit 0975, a City of Cambridge Rindge and Latin diploma of

24   Tamerlan Tsarnaev.  Do you recognize that item?

25   A.    I do.

1    Q.   And did you -- were you able to find latent prints with

2    sufficient ridge detail to compare?

3    A.   Do you know the Q number?

4    Q.   589. -- well, 589.

5    A.   We did.  We developed five total latent impressions.

6    Q.   And those five latents, who did those come back to?

7    A.   We identified one of them with Tamerlan Tsarnaev.

8    Q.   And you also compared them to Dzhokhar Tsarnaev --

9    A.   Yes, we did.

02:28 10   Q.   -- correct?

11        Did any of those five come back to Dzhokhar Tsarnaev?

12   A.   They did not.

13   Q.   Showing you what's been admitted into evidence as Exhibit

14   0948-542, do you recognize this as an item that later you

15   examined at the laboratory?

16   A.   I do.

17   Q.   Were you able to find latent prints with sufficient ridge

18   detail to compare?

19   A.   Can you give me the Q number?

02:28 20   Q.   Yes.  It is 589.

21   A.   Yes, we did.

22   Q.   Were you able to compare those to known samples?

23   A.   We did.

24   Q.   And whose fingerprints were on this item?

25   A.   Tamerlan.

1   Q.   Now, just so the jury remembers, you and I have been

2   talking about Q numbers.  Again, that's the number that's

3   assigned when the item comes into the FBI laboratory, right?

4   A.   That is correct.

5   Q.   Used to be.  You've told me this morning that they've

6   actually now changed the system.

7   A.   Yes.  We've since moved to a digital paperwork system in

8   which evidence that comes in is received -- is given an item

9   number.  So instead of Q589, it would be Item 589.

02:29 10   Q.   When you talk about Q items, that's the way you identify

11   items?

12   A.   Right.  When these items came in, we were still on the

13   paper-based paperwork method.

14   Q.   I want to move over to an item that was recovered from a

15   car outside of 410 Norfolk.  I'm putting up what's been entered

16   into evidence as Exhibit 1431.  Again, this appears to be a

17   photograph from the FBI laboratory?

18   A.   That is correct.

19   Q.   And this receipt on the right here says RC Cars of Boston?

02:30 20   A.   Yes.

21   Q.   Were you able to develop latent prints with sufficient

22   ridge detail to be compared?

23   A.   Yes.  We developed three latent fingerprints.

24   Q.   When you compared those to the known samples that you had,

25   whose fingerprints were on this receipt?

```
 1   A.    We ID'd them to Tamerlan Tsarnaev.

 2   Q.    Moving now to what's been admitted into evidence as

 3   Exhibit 1076, this is a photograph from the laboratory?

 4   A.    It is.

 5   Q.    And do you recognize that as an item that you lifted

 6   latent prints from?

 7   A.    Yes, although we don't lift the latent prints.  We

 8   photograph them in place, but, yes, we collected a print from

 9   this item.

10   Q.    When you collected a print from this item to compare to

11   known samples, were you able to determine a match?

12   A.    Yes.  It was identified to Tamerlan Tsarnaev.

13   Q.    In front of you is a Russian language -- appears to be in

14   Cyrillic writing here.  It's a two-page letter.  Did you

15   examine this item to determine whether there were latent prints

16   of sufficient quality to be compared?

17   A.    I'm sorry.  I can't make out the Q number on this one.

18   Can you tell me what it is?

19   Q.    See if I can get it this way.  The Q number is --

20   A.    Yes, we did.

21   Q.    What were you able to determine about the latent prints

22   that were on this item?

23   A.    We developed ten latent fingerprints and three latent palm

24   impressions.

25   Q.    Were you able to compare them to a known sample?
```

```
 1    A.    Yes, and identified ten of them to Tamerlan Tsarnaev.

 2    Q.    Showing you what's been admitted as Exhibit 3152, I'll

 3    blow up the Q number there and tell you that that says 691 even

 4    if you can't read it.  Did you examine this caulk gun for

 5    latent prints?

 6    A.    We did.

 7    Q.    And were you able to develop latent prints of sufficient

 8    quality to be compared?

 9    A.    We developed one latent fingerprint on this item.

02:32 10    Q.    When you compared that to the known samples, who did it

11    match to?

12    A.    We identified it to Tamerlan Tsarnaev.

13    Q.    Showing you what's been admitted into evidence as Exhibit

14    1082, which is two rolls of tape, as part of Exhibit 1082, were

15    you able to examine these items for the presence of latent

16    prints?

17    A.    Yes.  We developed one latent fingerprint on these items.

18    Q.    Who did that compare to in the known samples?

19    A.    We identified it to Tamerlan Tsarnaev.

02:33 20    Q.    Again, you also compared it to the known fingerprints of

21    Dzhokhar Tsarnaev, right?

22    A.    Yes, I did.

23    Q.    And were there any prints on either of these items?

24    A.    No.  The only print we developed we identified to

25    Tamerlan.
```

```
 1    Q.   Showing you what's been --
 2         MR. WATKINS:  May I have just a moment?
 3    Q.   Showing you a picture of what --
 4         MR. WATKINS:  This should just go to the witness, your
 5    Honor.  I'm sorry.
 6    Q.   Miss Graff, I'm showing you a picture on the screen.  Do
 7    you recognize that?
 8    A.   Yes, I do.
 9    Q.   Can you see the Q number?
10    A.   No.  Yes.
11    Q.   How is this item described in your report?
12    A.   When we originally received it, it's a case full of
13    contents.  We then take out each portion of that and give it
14    its own sub-numbers.  For example, Q69699 is the case, so then
15    699.1 is one part of the case.  Let me see if I can find it.
16    So Q699.1 is the instruction manual that was in the case.  And
17    Q699.2 was the soldering gun.
18    Q.   So this is a picture of a soldering gun, and that, indeed,
19    is what you analyzed for latent prints?
20    A.   Yes.
21    Q.   We've heard testimony of Exhibit 1198, the actual
22    soldering gun here.  This is a soldering gun that was received
23    at the Quantico lab, correct?
24    A.   Yes.
25         MR. WATKINS:  Your Honor, I'd move for admission of
```

```
 1   3153.
 2            THE COURT:  Which is the photograph?
 3            MR. WEINREB:  No objection.
 4            THE COURT:  Okay.
 5            MR. WATKINS:  May that go to the jury?
 6   (Exhibit No. 3153 received into evidence.)
 7   Q.   So you've anticipated my questions.  This was actually
 8   three separate items that you analyzed for fingerprints?
 9   A.   Yes.
10   Q.   What were those three items contained here?
11   A.   The case with the random wires and then the instruction
12   manual and the soldering gun itself.
13   Q.   In your -- were you able to develop latent fingerprints
14   off of any of those three items?
15   A.   Yes.  We developed two latent fingerprints on the case
16   itself.  We developed ten latent fingerprints on the
17   instruction manual and two latent fingerprints on the soldering
18   gun.
19   Q.   Did you compare those latent prints to the known samples
20   of Dzhokhar Tsarnaev?
21   A.   Yes, we did.
22   Q.   And were any of those latent prints his?
23   A.   They were not.
24   Q.   Were any of the latent prints Tamerlan Tsarnaev's?
25   A.   We -- yes.  We identified looks like five latent
```

1    fingerprints across those three items to Tamerlan.

2    Q.   In your report, there's a notation derived from the

3    evidence about where that item was found.  What does your

4    report indicate about where this item was recovered from?

5    A.   It says, "Items from residence 410 Norfolk Street,

6    Apartment 3, Cambridge, Massachusetts."

7    Q.   Also from 410 Norfolk Street, I'm showing you on the left

8    Exhibit 3066 and on the right Exhibit 1099.  Do you recognize

9    both of those as pictures of items when they come into the

02:38 10   Quantico laboratory?

11   A.   I do.

12   Q.   I'm going to first to blow up the Q number here.  Oh, that

13   worked.  Do you recognize this as 725, a group of tools that

14   came into the Quantico laboratory?

15   A.   I do.

16   Q.   There are a number of items within this drawer -- I'm

17   sorry, within this collection of items?

18   A.   Yes, that is correct.

19   Q.   Now, in such a case, would the laboratory assign sub-items

02:38 20   to them?

21   A.   Yes, we would.

22   Q.   So, for example, 1099 on the right, what is the sub-item

23   it's been given there?

24   A.   It has been given Q725.4.

25   Q.   And we see a similar roll within 3066, correct?

1    A.    Correct.

2    Q.    Now, with this item that's depicted in 1099, did you

3    conduct latent print examination of that roll of plumber's

4    tape?

5    A.    We did, and we developed one latent fingerprint.

6    Q.    I'm sorry?

7    A.    One latent fingerprint was developed on that roll of tape.

8    Q.    Who did that latent print compare to?

9    A.    It was identified to Tamerlan Tsarnaev.

02:39 10   Q.    Much the same manner, there was also a roll of tape

11   included in that drawer.  You see it here, and you can see the

12   discoloration there and here in this picture.  That was also

13   assigned a sub-number?

14   A.    Yes, although I can't read it right now.

15   Q.    Q725.5 may be how it's denoted in your report?

16   A.    Yes.

17   Q.    Were you able to get fingerprints off that roll of duct

18   tape?

19   A.    Yes.  We developed 12 latent fingerprints off that roll.

02:40 20   Q.    And were any of those latent fingerprints Dzhokhar

21   Tsarnaev's?

22   A.    No.

23   Q.    And how many of them were Tamerlan Tsarnaev's?

24   A.    They were all identified to Tamerlan Tsarnaev.

25   Q.    I'm showing you what's been -- hold on.

```
         1         This has been admitted.  I'm showing you what's been
         2    previously admitted as 3066.
         3              MR. WATKINS:  Just one moment, your Honor.
         4              I do believe this has been admitted, but I'm going to
         5    have to defer, 3154.
         6              THE CLERK:  I don't know.  I have 3153, the photo of
         7    the soldering gun.  Then you talked about 3066.
         8              MR. WATKINS:  Perhaps just for the witness then at
         9    this point to be on the safe side.
02:42   10    Q.    I'm showing you Defendant's Exhibit 3154.  Do you
        11    recognize this from its Q number?
        12    A.    I do.
        13    Q.    What is depicted in that picture?
        14    A.    It's a group of --
        15              MR. WEINREB:  Objection, your Honor.  This is a
        16    fingerprint examiner, not someone with personal knowledge of
        17    what was seized where.  To allow her to testify as to that
        18    would be pure hearsay.
        19              THE COURT:  I'm not sure that's what the question was
02:42   20    calling for.  I think it was just a description of the items
        21    that appear.  If she examined them, then I think that would be
        22    all right.
        23              MR. WEINREB:  Well, without any testimony as to where
        24    they came from, anywhere in the world.
        25              THE COURT:  Without any, yes.
```

```
 1    Q.    Generally, what is this?  Can you describe what's in this
 2    picture?
 3    A.    It's a group of tools.
 4    Q.    Would it be the FBI's policy back in the time to separate
 5    these into sub-numbers?
 6    A.    Yes, it would.
 7    Q.    In this case, did that seem to have been done?
 8    A.    No, that was not done in this case.
 9    Q.    But from this set of tools, was there a particular item
02:43 10   that you examined for latent prints?
11    A.    We examined them all for latent prints.  We developed two
12    latent fingerprints on what I believe is the pliers.
13              MR. WATKINS:  Your Honor, I move to admit Exhibit
14    3154.
15              MR. WEINREB:  Your Honor, I object on relevance
16    grounds because it hasn't been established it has any
17    connection -- relevance in relation to this case.
18              THE COURT:  Overruled.  I'll admit it.
19    (Exhibit No. 3154 received into evidence.)
02:43 20   Q.    It will be coming up in a moment.
21        Are you able to here identify which of these tools it was
22    that you took a latent -- you were able to develop a latent
23    print from?
24    A.    No.  I'd have to reference my photos.
25    Q.    I'm sorry?
```

1    A.    Not without referencing my photos, I don't recall.

2    Q.    Your own photographs?

3    A.    Correct.

4    Q.    But one of these tools you developed a latent print off

5    of?

6    A.    Yes.

7    Q.    And that latent print that you developed, who did it

8    compare to?

9    A.    The two latent fingerprints that were developed were

02:44 10   identified with Tamerlan Tsarnaev.

11          MR. WATKINS:  This is just for the witness, your

12    Honor.

13    Q.    Do you recognize what's depicted in this photograph?

14    A.    I do.

15    Q.    What is it?

16    A.    It is a group of books.

17    Q.    And is there a Q number associated with that?

18    A.    Yes.  The Q number is Q708.

19    Q.    We have heard testimony of notebooks being introduced

02:45 20    physically as Exhibit 3065.  Does this picture comport with the

21    notebooks that came into the Quantico laboratory?

22    A.    It does.

23    Q.    Now, did you go through all of these notebooks?

24    A.    Yes.  Each cover and page was individually sub-numbered

25    out.  However, by the time we were processing, I believe our

1    instructions at that time were the covers and first five and

2    last five pages of each book.

3    Q.    Nevertheless, there was a lot of fingerprint examination

4    first for latent prints that might be present there and then

5    for comparison?

6    A.    That is correct.

7    Q.    Just as a general matter, how many fingerprints were you

8    able to develop off of those notebooks?

9    A.    I don't have an exact number, but it was a lot.  Dozens.

02:46 10   Q.    Dozens.  And of those fingerprints, were any of them able

11    to be compared to Dzhokhar Tsarnaev?

12    A.    They were all compared to Dzhokhar.

13    Q.    Were there any positive matches for Dzhokhar Tsarnaev?

14    A.    There were not.

15    Q.    Were there positive matches to Tamerlan Tsarnaev?

16    A.    Yes.

17    Q.    And how many of those were there in this general

18    collection of notebooks?

19    A.    Most of them were identified to Tamerlan.

02:47 20   Q.    When you say "most of them," it would be dozens?

21    A.    Yes.

22    Q.    Are you able to say, was there at least one fingerprint of

23    Tamerlan Tsarnaev in each of these items?

24    A.    Yes, that is correct.

25    Q.    Showing you now what's been admitted -- it has been

 1    admitted.

 2           THE COURT:  Well, I don't know whether it's been

 3    admitted or not but not under the number that you have it

 4    indexed as.  I know some of these look familiar.  But I don't

 5    believe we're in this range of 31-- this is 3156 by your

 6    numbering.

 7           MR. WATKINS:  This is 3156.  I believe the actual

 8    exhibit is 1195, the physical item, and this is a picture of

 9    that.

02:48 10       THE COURT:  Okay.  That doesn't appear from this.  The

11    correlation doesn't appear.  That's what I'm getting at.

12           Is 1195 in evidence, Paul?

13           MR. WATKINS:  I believe the physical exhibit is --

14           THE COURT:  I understand.  The connection wasn't being

15    made.

16           MR. WATKINS:  I'm sorry?

17           THE COURT:  The connection wasn't being made, the

18    correlation to a physical exhibit.  That's the point.

19    Q.   Showing you what's marked for -- as Defendant's 3156, do

02:48 20  you recognize this?

21    A.   I do.  Can you bring up the Q number, please?  Yes.

22    Q.   Do you see that?

23    A.   I do.

24    Q.   And this is previously -- the physical item has previously

25    been admitted as 1195.  Now, were you able to develop latent

1    prints off of this item?

2    A.    We did.  We developed three latent fingerprints.

3    Q.    Who were those able to be compared to?

4    A.    We compared them to all the named suspects in this case.

5    They were identified with Tamerlan Tsarnaev.

6    Q.    In this particular item, there were latent fingerprints

7    obtained both from the outside of this package and also on the

8    inside, an item on the inside of the packaging?

9    A.    That is correct.  Two of the latent fingerprints were from

02:49 10   the outside box, and one of them was developed on a plastic bag

11   inside.

12   Q.    Again, all of those were matched to Tamerlan Tsarnaev?

13   A.    That is correct.

14         MR. WATKINS:  If I have not already, may I move into

15   admission 3156?

16         THE COURT:  Okay.

17         MR. WEINREB:  No objection.

18   (Exhibit No. 3156 received into evidence.)

19   Q.    Again, I'm not going to make you repeat your testimony.

02:50 20   There were prints found both on the outside packaging that we

21   see here and on an item inside of this packaging?

22   A.    That is correct.

23   Q.    All of those went to Tamerlan Tsarnaev?

24   A.    That is correct.

25         MR. WATKINS:  One final item just for the witness.

1    Q.    Showing you a picture of -- a laboratory picture of Q --

2    well, it's Q716, *The Sovereign* newspaper.

3    A.    Yes.

4    Q.    Did you develop latent prints off of that item?

5    A.    I did.

6    Q.    How many latent prints were you able to develop?

7    A.    One moment.  Looks like nine latent prints were developed.

8    Q.    I'm sorry.  How many?

9    A.    Nine.

02:52 10    Q.    Were any -- nine were developed.  And who did they match

11    to?

12    A.    Tamerlan Tsarnaev.

13    Q.    Did any of the fingerprints that you were able to develop

14    there match to Dzhokhar Tsarnaev?

15    A.    No.

16          MR. WATKINS:  This next one has been admitted,

17    Defendant's Exhibit 3151.

18    Q.    Do you see that before you on the screen?

19    A.    I do.

02:52 20    Q.    This is an item that does not have a Q number, now has an

21    item number, right?

22    A.    That is correct.  This item came under our new digital

23    system.

24    Q.    But do you recognize that now as Item 3 in a particular

25    report?

```
 1   A.   I do.
 2   Q.   Were you able to develop latent fingerprints off of this
 3   particular item?
 4   A.   Yes.  We developed three latent fingerprints and one
 5   latent palm print.
 6   Q.   Were they all -- well, who did they match up to?
 7   A.   They were all identified with Tamerlan Tsarnaev.
 8           MR. WATKINS:  Almost done.  This next item has been
 9   admitted.
02:54 10   Q.   Before we get to this particular item, I'm now going to
11   the Boylston Street location, which is the scene of two blasts,
12   Scene A and Scene B.  You're familiar with those denominations?
13   A.   I am.
14   Q.   How many items altogether did you examine from the
15   Boylston Street area looking for latent prints?
16   A.   Over 500.
17   Q.   How many were you -- how many latent prints were you able
18   to develop sufficient ridge detail for comparison?
19   A.   We developed three latent fingerprints and three latent
02:54 20   palm prints.
21   Q.   First I'm talking about all together in all the scenes
22   there on Boylston Street.  Are you able to estimate how many
23   latent prints you were able to develop?
24   A.   Just from the Boylston Street scenes, correct?
25   Q.   Yes.
```

1   A.   Yes.  There were six.

2   Q.   Of the -- let me back up.  You analyzed a total of about

3   170 items that were submitted actually for fingerprint

4   examination from Scene A, correct, or was it more than that?

5   A.   You just want to know the ones from Scene A?

6   Q.   Yes, how many altogether from Scene A?

7   A.   I believe it's four.

8   Q.   Well, directing you now to Item 1 -- Defendant's Exhibit

9   3093, which is Q199, we've been told cardboard collected from

02:55 10   the vicinity of the Scene A blast.

11   A.   Yes, that is correct.

12   Q.   This cardboard is in pieces when it came into the lab?

13   A.   Yes.

14   Q.   Because it was in pieces, was it assigned sub-numbers?

15   A.   Yes.  Each individual piece was assigned its own number.

16   Q.   Were you able to develop prints on some of these

17   sub-items?

18   A.   Yes.  We developed one latent fingerprint on Q199.26 and

19   one latent palm print on Q199.27.

02:56 20   Q.   And those would be two of these pieces that we see

21   depicted here in this picture?

22   A.   That is correct.

23   Q.   When you compared those latent prints to the known samples

24   you have, who did they come back to?

25   A.   They were identified with Tamerlan Tsarnaev.

1    Q.   Were any of the prints that you were able to develop at
2    Scene A come back to Dzhokhar Tsarnaev?
3    A.   No, they did not.
4    Q.   Showing you two pictures here, both of which have been
5    admitted -- one is 3090; the other one is 3091 -- do you
6    recognize these?
7    A.   I do.
8    Q.   These are denoted as the remains of a backpack and a piece
9    of paper within it?
02:57 10    A.   That is correct.
11    Q.   And the piece of paper within it is denoted by the
12    sub-number Q11.1?
13    A.   That is correct.
14    Q.   Were you able to develop a latent print from Q11.1, the
15    piece of paper that was in the destroyed backpack?
16    A.   We developed two latent palm prints.
17    Q.   And when you compared them against the known samples, who
18    did they compare to?
19    A.   They were identified with Tamerlan Tsarnaev.
02:58 20    Q.   At Scene B, the site of the Forum blast, were you able to
21    develop any prints and match them to Dzhokhar Tsarnaev?
22    A.   No, I did not.
23         MR. WATKINS:   That's all I have, your Honor.
24    CROSS-EXAMINATION BY MR. WEINREB:
25    Q.   Good afternoon.

1    A.    Good afternoon.

2    Q.    So let's start with Scene A and Scene B, Boylston Street.

3    How many items did you say on Boylston Street were tested for

4    fingerprints?

5    A.    Over 500.

6    Q.    Specifically, they were all tested for Dzhokhar Tsarnaev's

7    fingerprints and Tamerlan Tsarnaev's fingerprints?

8    A.    That is correct.

9    Q.    And those items included many, many pieces of the bomb

02:59 10   that exploded at Scene A, correct?

11   A.    That is correct.

12   Q.    And many pieces of the components that was in that bomb?

13   A.    That is correct.

14   Q.    It included pieces of the backpack that the bomb was

15   carried in?

16   A.    That is correct.

17   Q.    Yet, you found usable prints from Tamerlan Tsarnaev or the

18   defendant on only a single item, a piece of cardboard that was

19   in many pieces?

02:59 20   A.    Two pieces of cardboard.

21   Q.    Two pieces of cardboard that were all stuck together and

22   you separated them?

23   A.    By the time they got to my unit, they were pretty much

24   already in separate pieces.

25   Q.    And hundreds of items from Scene B were also examined for

1  fingerprints, correct?

2  A.   That is correct.

3  Q.   And those were also tested for Tamerlan Tsarnaev's and

4  Dzhokhar Tsarnaev's fingerprints?

5  A.   Yes.

6  Q.   And those, again, included many, many pieces of the bomb

7  that exploded in front of the Forum restaurant?

8  A.   Yes.

9  Q.   And components that were inside -- were inside that bomb?

03:00 10  A.   That is correct.

11  Q.   And the backpack that the bomb was carried in?

12  A.   That is correct.

13  Q.   And, yet, once again, you only found a single fingerprint

14  from Tamerlan Tsarnaev or Dzhokhar Tsarnaev on only a single

15  item, which was a piece of paper inside the shreds of the

16  backpack?

17  A.   There were two palm prints, but, yes.

18  Q.   But it was just on that single item?

19  A.   That is correct.

03:00 20  Q.   Now, the bombs didn't build themselves, did they?

21  A.   I would assume not.

22  Q.   The backpacks didn't carry themselves onto the scene?

23       MR. WATKINS:  I object, your Honor.

24       THE COURT:  Sustained.  It's argumentative.

25  Q.   So what could explain the absence of Tamerlan Tsarnaev's

1    and Dzhokhar Tsarnaev's fingerprints on more of these items?

2             MR. WATKINS:  I'm going to object, your Honor.

3             THE COURT:  Overruled.  You may answer that.

4    A.   Because latent prints are usually left in sweat or the oil

5    that covers your fingerprints, they're very fragile especially

6    if they're on a nonporous item such as a metal or plastic.  So,

7    for example, if I touch this coffee pot right here, the

8    impression left behind by my latent prints rests on the top of

9    the surface.  Therefore, they can be easily wiped off or

03:01 10   smudged or, because they're made of sweat, they can evaporate.

11   Due to the extreme temperatures and force in an explosion, it

12   is not unusual to not find fingerprints on items.

13   Q.   So the bottom line is that the presence of a person's

14   fingerprints on an item tell you that at some time that person

15   touched the item?

16   A.   That is correct.

17   Q.   But the absence of a person's fingerprints on an item

18   doesn't tell you that that person never touched the item?

19   A.   That is also correct.

03:01 20   Q.   For example, the person might have touched it but might

21   have been wearing gloves?

22   A.   Yes.

23   Q.   And, in fact, as you said, the person might have touched

24   it but -- and left a fingerprint but the fingerprint vaporized?

25   A.   Yes.

1    Q.   Or got rubbed off by somebody else's fingerprints?

2    A.   Yes.

3    Q.   Or if the person touched it but didn't have sweaty fingers

4    at the time, they just might not have left a fingerprint?

5    A.   That is correct.  If there's not enough matrix on the

6    ridges, it won't always transfer.

7    Q.   In fact, it's even true that some people, just by nature

8    of their own biology, are more prone to leaving fingerprints on

9    things than other people?

03:02 10    A.   Yes, if your fingers are more sweaty, yes.

11    Q.   You were asked about many items, all of which, except for

12    a bunch of tools, were identified as coming from 410 Norfolk

13    Street, correct?

14    A.   Yes.

15    Q.   Nearly 150 items from 410 Norfolk Street were tested for

16    fingerprints, correct?

17    A.   Yes.

18    Q.   And you found numerous fingerprints of Tamerlan Tsarnaev

19    from his apartment on 410 Norfolk Street?

03:02 20    A.   That is correct.

21    Q.   Would you expect to find a person's fingerprints all over

22    the residence where he lives full time with his wife and

23    daughter?

24    A.   Yes, I would expect that.

25    Q.   In fact, if a person just, let's say, picked up a glass

1      jar and moved it from one shelf to another shelf, you might

2      leave fingerprints on it?

3      A.    Yes, that is true.

4      Q.    If you picked up a magazine or some notebooks to put them

5      aside so that the floor could be cleaned, he might leave

6      fingerprints on them, correct?

7      A.    Yes.

8      Q.    But if a person who once lived full time in an apartment

9      became an adult, moved out, and only went back there on

03:03 10   vacations or in the summer, would you necessarily expect to

11     find their fingerprints all over the apartment?

12               MR. WATKINS:  Objection.

13               THE COURT:  Sustained.

14     Q.    If a person did not live full time in a residence, would

15     you necessarily expect to find their fingerprints on things?

16     A.    No, I would not.

17     Q.    Now, among the items in 410 Norfolk Street that you found

18     Tamerlan Tsarnaev's fingerprints on were a nail clipper,

19     Q680.2?

03:03 20   A.    I believe so, yes.

21     Q.    And a bag of curtain rod brackets, for example?

22     A.    Yes.

23     Q.    A letter?  That would be Q685.1.

24     A.    Probably.  Yes, that is correct.

25     Q.    A fan, Q97.3?

```
 1    A.    97.3?

 2    Q.    Yes.

 3    A.    I don't have that.

 4    Q.    Let's try a brush, Q712.3.

 5    A.    Q712.3?

 6    Q.    Yes.

 7    A.    I didn't develop latent fingerprints on that either.

 8    Q.    So -- but as a practical matter, you only found Tamerlan's

 9    fingerprints all over the objects in his own apartment?

10    A.    For the most part, yes.

11    Q.    But --

12          MR. WEINREB:  Can we have Exhibit 852, please?  This

13    is in evidence, your Honor.

14    Q.    But when it came to the bomb that was found in the back of

15    the Mercedes abandoned on Laurel Street in Watertown, on that

16    one you found both Dzhokhar Tsarnaev's and Tamerlan Tsarnaev's

17    fingerprints?

18    A.    That is correct.

19          MR. WEINREB:  I have no further questions.

20          MR. WATKINS:  Just one.

21    REDIRECT EXAMINATION BY MR. WATKINS:

22    Q.    Referring back to Q199, which is the pieces of

23    cardboard --

24          MR. WEINREB:  Your Honor, I object to this.  Can we be

25    scene at sidebar?
```

1           THE COURT:  Okay.

2     (SIDEBAR CONFERENCE AS FOLLOWS:

3           MR. WEINREB:  I believe that Mr. Watkins is about to

4     show this witness a component from the bomb and ask her to

5     essentially speculate on whether she believes that it's the

6     same or consistent with the piece of cardboard that she saw in

7     the lab.  She's not a bomb expert.  She's a fingerprint expert.

8     It might have been appropriate to ask Ed Knapp that question.

9     He's somebody who tests bombs, sees them explode, know what

03:06 10    things look like after they've exploded.  She's not an

11    appropriate witness to ask.

12          MR. WATKINS:  The two things I'm going to do with this

13    is hold up a piece of cardboard where Mr. Weinreb talked about

14    the kinds of surfaces where fingerprints can be found and not

15    found.  I think it's appropriate to say that they can be found

16    on cardboard.

17          The second aspect of it is he mentioned -- the witness

18    mentioned -- he elicited from the witness about high

19    temperatures perhaps evaporating fingerprints.  Clearly, that

03:06 20    did not happen in this case.  I think I'm allowed to rebut that

21    particular part of the testimony.

22          MR. WEINREB:  I think holding up the cardboard is an

23    example of the surface.  There's no --

24          THE COURT:  I think you can ask the questions without

25    holding the cardboard.  It's a testimonial gesture.

```
 1    .  .  .  END OF SIDEBAR CONFERENCE.)

 2    Q.   You testified -- when Mr. Weinreb was asking about

 3    surfaces that retain fingerprints and the fragility of some

 4    surfaces and fingerprints, in regard to 199, that was several

 5    pieces of cardboard, correct?

 6    A.   That is correct.

 7    Q.   And that is a surface that will retain fingerprints,

 8    right?

 9    A.   Right.  Cardboard and paper are what we call a porous

03:07 10    item, and what happens there is, when you touch it, the sweat

11    from your fingers is actually absorbed into the paper which

12    helps preserve them.

13    Q.   Also, if a piece of cardboard is encased in something

14    else, it's less likely that the fingerprint is going to get

15    accidentally or just disappear in some way?

16    A.   That is correct.

17    Q.   You talked about the high temperatures affecting

18    fingerprints in some cases?

19    A.   Yes.

03:08 20    Q.   199, you developed Tamerlan Tsarnaev's fingerprints off of

21    the pieces of cardboard that were collected on Boylston Street

22    after the blast, correct?

23    A.   That is correct.

24         MR. WATKINS:  I have nothing further.

25         MR. WEINREB:  I do, your Honor, just on that one
```

1    point.

2            THE COURT:  All right.

3    RECROSS-EXAMINATION BY MR. WEINREB:

4    Q.   So because things like pieces of cardboard and paper

5    absorb sweat, fingerprints last on them better and longer than

6    on other items?

7    A.   That is correct.

8    Q.   So, for example, the pieces of cardboard and the pieces of

9    paper from Scene A and Scene B that you testified about, the

03:08 10   fingerprints on those items could have been there for months or

11   even years?

12   A.   That is also true.  I can only tell if someone touched an

13   item.  I can't tell when that contact happened.

14           MR. WEINREB:  No further questions.

15           THE COURT:  All right.  Thank you, Miss Graff.  You

16   may step down.  Okay.

17           MR. WATKINS:  Your Honor, that is all the witnesses

18   that the defense will present.  There's a series of pictures

19   that the Court indicated could be shown to the jury, and I

03:09 20   would do that now with the Court's permission.

21           MR. WEINREB:  I object, your Honor.  There was a

22   series of pictures the Court did not exclude on one ground, but

23   they have not been authenticated and should be excluded on that

24   ground.  There's no witness here.

25           THE COURT:  Let me see you briefly at the side.

1    (SIDEBAR CONFERENCE AS FOLLOWS:

2          THE COURT:  All right.  I think that's right.  You

3    still may need a witness in the absence of a stipulation.

4          MS. CLARKE:  They've told us all along --

5          THE COURT:  The objection to their admission was

6    overruled but that --

7          MR. WEINREB:  It was on relevance and 403 grounds.

8    The only representation that I made to the defense was that

9    items of evidence that were collected at Scene A and Scene B in

03:10 10    Watertown, we would not object to them on authenticity and

11    chain-of-custody grounds.  This is something different.  These

12    are arrest photos.  We're not stipulating to anything that was

13    not an item of evidence.

14          MS. CLARKE:  That was not our understanding.  Our

15    understanding, authentication was not an issue.  It was the

16    relevance claim that the government made.  So that's why we

17    didn't have a witness here, because we've always been led to

18    believe that authentication was not the issue.

19          THE COURT:  I guess, if authentication is not an

03:11 20    issue, then you don't need somebody to provide the usual

21    foundation.

22          MR. WEINREB:  Well, I don't know what you mean by

23    "authentication is not an issue."  Normally, each side is

24    entitled to --

25          THE COURT:  These are what they purport to be.  That

1   is, they're photographs of the defendant getting out of the

2   boat.

3          MR. WEINREB:  Well, there's nobody for us to

4   cross-examine about how long he was in the boat before the

5   photographer took the pictures, whether -- what the lighting

6   issues -- respecting the lighting issues, respecting other

7   things the photographer may have seen when --

8          THE COURT:  That's all true, but I think you probably

9   waived it by not raising an authentication or insisting on a

03:11 10  foundation.  In other words, if you agree --

11          MR. WEINREB:  I'm insisting on it now.  I never waived

12   it.  If the defense heard that, they misunderstood.  Our

13   agreement was items of evidence that were collected at the

14   scenes.  There was no need -- we were willing to waive any

15   authenticity questions with respect to those because we don't

16   -- we were not interested in cross-examining any of the people

17   who collected them or were in the chain of custody.

18          But with respect to these pictures, because we have

19   objections to them, we are entitled to insist on the normal --

03:12 20  that the normal Rules of Evidence be followed and that they

21   bring a witness who actually can authenticate them and,

22   therefore, be subject to cross-examination about how various

23   aspects of the scene may affect whether they are, indeed -- not

24   so much whether they're what they purport to be in the sense of

25   being photographs but, as the defense is constantly doing with

1    our evidence, putting it in context, as they say, what each

2    side has with respect to the other's evidence.

3              MS. CLARKE:  Judge, one of those photos is in.  This

4    is the rest of these series.  We would have had a witness here

5    had we known that was an objection.  We were clearly told

6    authentication was not the issue, that it was simply a question

7    of relevance.

8              THE COURT:  Who would you have --

9              MS. CLARKE:  We would have to go find the

03:13 10   photographer --

11             THE COURT:  The photographer --

12             MS. CLARKE:  -- or one of the police officers who was

13   on the scene.  We simply didn't do that because of the nature

14   of the objection that was raised.

15             MR. WEINREB:  Who the photographer is is a matter of

16   public knowledge, but we'll give them the name and --

17             MS. CLARKE:  Come on.  These were provided to us in

18   discovery.  It's the next in the series of photographs.  It's

19   about seven photographs that the government gave to us.

03:13 20             MR. WEINREB:  But that doesn't address the objection

21   that, without the witness who took the photographs, we can't

22   put them into context to help the jury know what weight to give

23   them, not just the admissibility.  They may appear much

24   weightier to the jury than they otherwise would if they just

25   come in as if they spoke for themselves.  In fact, there was a

1    person who was there who can speak about them, and that will

2    affect the way the jury takes them.

3            THE COURT:  Okay.  I think you need a witness, so

4    maybe you can get one.

5            MS. CLARKE:  They're Mass. State Police photos.

6            THE COURT:  There is an identified person, I assume.

7            MS. CLARKE:  I assume the government --

8            MR. WEINREB:  There is.

9            THE COURT:  We'll take a break, and we'll see -- come

03:14 10    back at 2.

11            MS. CLARKE:  Should we do any other work while we're

12    up here?

13            MS. CONRAD:  We have a couple of pending matters still

14    in terms of -- before we rest.  There's our motion to

15    reconsider regarding the range issue and also renew the request

16    regarding the admission by the party opponent in light of the

17    repeated questions by Mr. Chakravarty referring to that as the

18    defendant's bedroom.

19            I also want to add, with respect to that, that I have

03:14 20    conducted a thorough search of all of the discovery we've

21    received.  We never -- contrary to Mr. Weinreb's

22    representation, never received any 302 reports or anything else

23    that identified the source of the information set forth in

24    Docket No. 350 as factual statements about occupancy and use of

25    that apartment and particularly of the defendant's room being

1    used as a storage and computer room.  We'd ask to be provided

2    with that so we can call that source as a witness in the

3    alternative if the Court will not permit us to offer the

4    government's own statement under *United States v. Cotter* and

5    under Federal Rule of Evidence 801(d)(2).

6              THE COURT:  Okay.  The ruling stands.  As to the other

7    matter, we'll address that later.

8              MS. CLARKE:  Could you just give us two minutes?  And

9    we'll make a decision whether we're going to delay this thing

03:15 10    for those pictures.

11             MS. CONRAD:  On the other ruling, you're talking about

12    the range?

13             THE COURT:  Yes.

14             MS. CONRAD:  But what about the discovery issue?

15             THE COURT:  The discovery issue.

16             MS. CONRAD:  With respect to the statements in Docket

17    No. 350.

18             THE COURT:  No, not germane.

19             MS. CLARKE:  Could you play music for a couple

03:16 20    minutes?

21             MS. CONRAD:  It's not germane who occupied that room?

22             THE COURT:  We'll take a ten-minute break for the jury

23    and --

24             MS. CONRAD:  Judge, are you saying who occupied that

25    room is not relevant?

1          THE COURT:  That's not what I said.

2          MS. CONRAD:  Well, that's what it sounded like.

3          THE COURT:  The ruling -- we've been over it three

4     times.

5          MS. CONRAD:  I'm sorry.  I think it's relevant and

6     it's admissible.

7          THE COURT:  We'll take a ten-minute break.

8     . . .  END OF SIDEBAR CONFERENCE.)

9          THE COURT:  Jurors, we'll take just a brief recess.

03:16 10          THE CLERK:  All rise for the Court and jury.  The

11     Court will take a very brief recess.

12     (Recess taken at 12:29 p.m.)

13     (The Court entered the room at 12:50 p.m.)

14          THE COURT:  See you at the side.

15     (SIDEBAR CONFERENCE AS FOLLOWS:

16          MR. WEINREB:  I just wanted to put something on the

17     record.  I'm sorry.  I thought I had requested --

18          THE COURT:  I wanted the answer.

19          MS. CLARKE:  And the answer is we're not going to

03:37 20     delay the proceedings further to call a witness.

21          THE COURT:  That's it?

22          MS. CLARKE:  That's it.

23          THE COURT:  The motion for reconsideration of the

24     distance ruling is denied as well.

25          MR. WEINREB:  So --

1          THE COURT:  So I think that's it.  And your rebuttal?

2          MR. WEINREB:  Well, that depends on what I'm about to

3    say.  So the defense filed a Rule 29 motion.  One of the

4    arguments that they make is that -- just by way of preface,

5    there are two counts predicated on 18 U.S.C. 2332(f), one

6    relating to the bomb that exploded at Scene A and one relating

7    to the bomb that exploded at Scene B.  That statute is known as

8    bombing a place of public use.  The statute has certain

9    elements.  It has a jurisdictional requirement, and then it

03:38 10   also has exemptions from jurisdiction.  The defense --

11          THE COURT:  Let me just read it for a second.

12          Okay.

13          MR. WEINREB:  So the defense has argued in their

14   papers, in effect, that one of the exemptions applies and that

15   the government has not essentially disproved that it applies.

16   The government's position is that exemptions to jurisdiction

17   are an affirmative defense that the defense has to raise in a

18   timely fashion and that they waived it.

19          Secondly, that even if it were deemed to have been

03:40 20   raised in a timely fashion that the defense bears the burden of

21   proof just like it does with all affirmative defenses.  And we

22   have just offered the defense an opportunity, if they wish, to

23   take some time to try and prove that there were no foreign

24   nationals at Scene A.  But I can proffer that there were

25   several foreign nationals at Scene A, and I don't believe the

1    defense could ever prove there weren't, and I don't believe

2    they're going to try.

3            In the event the Court were to rule that it is either

4    not an affirmative defense and needed to be raised in a timely

5    fashion or that it is an affirmative defense, yet it's still

6    somehow the government's burden to disprove it, then we would

7    seek to disprove it in our rebuttal case by putting on evidence

8    that an individual at Scene A who was injured was, in fact, a

9    foreign national.  That's where the rebuttal case is

03:41 10    implicated.

11            MS. CLARKE:  Well, we'll rest on our legal arguments,

12    your Honor, and I don't think the --

13            THE COURT:  Do you disagree with the proposition that

14    it's an affirmative defense as to which the defense bears the

15    burden?

16            MS. CLARKE:  We disagree with the government's

17    positions, both of them.

18            THE COURT:  I don't know the answer.

19            MR. WEINREB:  Right.  And I don't think that an answer

03:41 20    needs to be made now.  The only issue is I think that if

21    there's -- if the Court is not going to rule out the

22    possibility that it is an affirmative defense, yet one on which

23    we bear the burden of proof, then we would like the opportunity

24    to put on a witness.  It would probably be a five-minute

25    witness on Monday morning before we close.  That would simply

1     establish that there was a foreign national injured at Scene A.

2              MS. CONRAD:  It's not --

3              MR. WEINREB:  That way the record will have the

4     information in it.  If it turns out that, as a legal matter, it

5     was unnecessary, it's hardly --

6              THE COURT:  Could you do that this afternoon or

7     tomorrow morning?

8              MR. WEINREB:  Tomorrow morning?  We could probably do

9     it by tomorrow morning.  I didn't think you were going to bring

03:42 10    the jury in tomorrow.

11             THE COURT:  Well --

12             MR. WEINREB:  Just for five minutes?

13             THE COURT:  You couldn't do it this afternoon?

14             MR. WEINREB:  We could try.  They're --

15             THE COURT:  They're going to get lunch anyway, so --

16             MR. WEINREB:  We could try.  I'm not sure we could

17    succeed, but we'll do our best.

18             THE COURT:  I guess, not knowing the answer to the

19    questions, my reaction is that it may be the most prudent thing

03:42 20    to do to cover the bases, that's all.  And if it's not hard to

21    do, then I guess that makes a prudential argument stronger.

22             MS. CLARKE:  It's certainly not a rebuttal case, and

23    we made the Rule 29 at the close of our case.

24             MR. WEINREB:  I believe that if it is an affirmative

25    defense and it wasn't raised until after the government's case

```
 1   closed, then it is a rebuttal matter.

 2           THE COURT:  Yeah, it probably is under those

 3   circumstances.  Well, I don't know.  I'm not sure it is.  I'm

 4   not sure of any of this.  But even if it's not strictly

 5   rebuttal, I could grant leave to do it for the argument raised

 6   in the papers and the timing.

 7           MS. CLARKE:  We would -- just for the record, we would

 8   object.

 9           THE COURT:  So I think we will adjourn, and we'll
```
03:43
```
10   reconvene at 2:00 after the jurors have had lunch, and we'll

11   figure out what we're going to do.  Meanwhile, you can find out

12   what your logistical issue might be.

13           MS. CLARKE:  Then we'll rest, renew the 29, and talk

14   some --

15           THE COURT:  And then talk some logistics probably.

16   We'll take the noon recess -- lunch recess.

17   .  .  .  END OF SIDEBAR CONFERENCE.)

18           THE CLERK:  Court will take the lunch recess.

19   (Luncheon recess taken at 12:56 p.m.)
```
04:49
```
20           (After the recess:)

21           THE CLERK:  All rise for the Court.

22           (The Court enters the courtroom at 2:12 p.m.)

23           THE COURT:  I'll see counsel at the side.

24           (Discussion at sidebar and out of the hearing of the

25   public:)
```

1            THE COURT:  Somebody wanted this.

2            MS. CLARKE:  Yes, I did.

3            Judge, I understand that they are not calling a police

4     officer but intend to call an actual victim.  We think that's

5     incredibly prejudicial.

6            First of all, the indictment alleges that -- they

7     allege the jurisdictional component, that a victim of the

8     offense was a national of another state.  They did not prove

9     it.  They knew they had to prove jurisdiction but did not

05:00 10    establish it, and they waited until after our case and after

11    our Rule 29 was raised to ask to reopen the case and put on an

12    actual victim of the offense, which we think is incredibly

13    prejudicial if they're allowed to reopen.

14           MR. MELLIN:  Your Honor, in response, this is a

15    rebuttal witness in response to the argument that we have

16    failed on this front, on the exemption front.  In fact, in the

17    indictment that is surplusage, because the first section covers

18    the issue.  It was committed in an attempt to compel the United

19    States to do and abstain from doing an act.  So that would be

05:01 20    the jurisdictional --

21           THE COURT:  Well, these are alternatives, right?

22           MR. MELLIN:  Correct.  No, it's not --

23           THE COURT:  The first jurisdictional provision.

24           MR. MELLIN:  Yes, there are four or five

25    alternatives --

1        THE COURT:  The exemption then excludes the second

2   alternative unless there's a substantial effect on interstate

3   commerce.

4        MR. MELLIN:  Correct.  Correct.

5        So we would first say that we have already shown that

6   there is an effect on interstate commerce based on the

7   testimony in this case.  But to the extent that the defense is

8   claiming that we have an obligation to prove this point -- and

9   we do think it is their obligation to prove this affirmative

05:01 10   defense.  But if they're claiming that we have not, we are

11   putting on this witness in rebuttal to show that, in fact,

12   there are foreign nationals who were affected, non-U.S.

13   citizens.

14        THE COURT:  Well, I think we should do this:

15   Reserving the argument, we'll hear from the witness, but the

16   argument is not waived and it may still be defective, that they

17   failed in their case-in-chief.

18        MS. CLARKE:  In light of that preservation, your

19   Honor, we would want to preserve the issue, but we just cannot

05:02 20   bear the prejudice of the government coming back with a victim

21   of the offense when we put on nothing in our case.  It's not a

22   rebuttal case.  And it allows them to end on a note of a

23   victim, and that's not fair.

24        MR. MELLIN:  Your Honor, it would be one thing if this

25   victim was somebody who suffered an amputation or something

1    like that.  That is not the case.  This is someone who is from

2    Holland, who is here now, a green card holder who suffered

3    hearing loss from this.  He was very close to Scene A at the

4    time the bomb went off, he is still suffering from partial

5    deafness in his left ear.  It's not someone who's going to come

6    in here like Jess Kensky or some other witness who is going to

7    come in here with a prosthetic device.

8            THE COURT:  And it will be brief?

9            MR. MELLIN:  It will be incredibly brief.

05:03 10         THE COURT:  I understand, but I'll take it -- the

11   legal argument is preserved.

12           MS. CLARKE:  Well, Judge, if the legal argument is

13   preserved, we really just can't have them end on a victim, and

14   we would offer a stipulation to the extent they want to do

15   that, to that --

16           THE COURT:  All right.  Stipulate to the fact.

17           MS. CLARKE:  Without waiving the argument -- the

18   arguments that we made.

19           THE COURT:  And we'll resolve --

05:03 20         MR. WEINREB:  Just so we're clear, so the stipulation

21   is that one of the victims of the offense was a foreign

22   national.

23           THE COURT:  Since that's a new idea, why don't we just

24   take a -- let everybody think about this carefully.  So let's

25   take another recess and think that through.  I think we should

1    be careful we do it the right way to preserve both interests

2    here, which includes the defense argument that having failed to

3    do it before the government rested, they cannot repair it.

4            MS. CLARKE:  Right.

5            THE COURT:  That should be preserved as well.  Okay?

6    So figure out how to do that.

7            MS. CLARKE:  Thank you.

8            (In open court:)

9            THE COURT:  All right.  We'll take another short

05:04 10    recess.

11            THE CLERK:  All rise for the Court.  The Court will

12    take another brief recess.

13            (The Court exits the courtroom and there is a recess

14    in the proceedings at 2:17 p.m.)

15            THE CLERK:  All rise for the Court.

16            (The Court enters the courtroom at 2:40 p.m.)

17            THE COURT:  All right.  I'll see counsel.

18            (Discussion at sidebar and out of the hearing of the

19    public:)

05:28 20            THE COURT:  This is fine.  I think it could be read to

21    the jury on the understanding that all legal arguments about

22    these issues, both as to the sufficiency of the proof of the

23    count in the first place and the applicability of the

24    exemption, all arguments on both sides are preserved so you can

25    think this through.

1          MS. CLARKE:  And the right of the United States to

2     rebut.  We're objecting to them putting on a rebuttal case.

3          THE COURT:  Correct.  All of those issues.  So if they

4     failed in their original case, whether it should be rebuttal or

5     whether it should be reopening or whether it should happen at

6     all, we'll just take our time to figure that out.  So you can

7     read the stipulation.  But the consequence would be, if the

8     defense arguments were to prevail, that the jurors would be

9     instructed to forget this.  But I think it's small enough.

05:28 10          MR. WEINREB:  So our request would be that the defense

11     rest and then the Court read the stipulation to the jury.

12          THE COURT:  Fine.

13          MS. CLARKE:  We'll rest, renew our Rule 29, and then I

14     guess the Court reads the stipulation at the request of the

15     government?

16          MR. WEINREB:  Yes.

17          THE COURT:  That concludes the evidence.

18          MS. CLARKE:  And then we will -- we'll renew our Rule

19     29 then.

05:29 20          THE COURT:  All right.  So we'll send the jury home

21     with instructions to return on Monday, okay?

22          MR. WEINREB:  Okay.  Are you going to see us

23     afterwards?

24          THE COURT:  Yeah.  I think you'd better.

25          MR. WEINREB:  We'll stick around.

1              (In open court:)

2              THE CLERK:  All rise for the jury.

3              (The jury enters the courtroom at 2:44 p.m.)

4              THE CLERK:  Be seated.

5              THE COURT:  Jurors, thank you for your patience.  We

6    had a few things we had to work on without you.  Welcome back.

7              Ms. Clarke?

8              MS. CLARKE:  Your Honor, at this point we rest.

9              THE COURT:  All right.  Do you want to be seen briefly

05:33 10    or --

11             MS. CLARKE:  Sidebar or --

12             THE COURT:  I don't care if you want to do it in open

13    court.

14             MS. CLARKE:  We would renew our Rule 29.

15             THE COURT:  All right.  Same reservation.

16             Jurors, the defense has rested its presentation of

17    evidence for this trial.  The parties have asked that I read

18    you this stipulation:  "The parties stipulate and agree that a

19    victim of the offense charged in Count 7 was a national of

05:34 20    another state and not a United States citizen."

21             With that stipulation, which is an agreement by the

22    parties, the evidence is concluded.  We will proceed to the

23    next stage of the case, which will be closing statements by the

24    lawyers, my instructions to you, and you'll begin your

25    deliberations thereafter.  We will do that on Monday, this

                1    coming Monday.  We have to take a few days to organize and make

                2    sure we have everything ready for that stage of the case.  But

                3    beginning on Monday you will begin deliberating on the case.

                4    So make your plans accordingly.  We'll go day to day as

                5    necessary.  A typical -- we might go a little past four

                6    o'clock, nine to four-thirty, for example, on a day-to-day

                7    basis until you've concluded your work and reached a verdict,

                8    all right?

                9            It is imperative that you speak nothing of this case

05:35   10    to anyone including yourself in the mirror, all right?  Am I

               11    making myself clear?

               12            (Laughter.)

               13            THE JURORS:  Yes, sir.

               14            THE COURT:  There will be some family gatherings,

               15    perhaps, this weekend.  There are some holidays.  People will

               16    want to know things.  You can't tell them.  Nothing.  Please.

               17    Okay?  Enjoy it.  Enjoy the weekend, and we'll see you on

               18    Monday, ready to continue with this matter.  Thank you.

               19            We will be in general recess.

05:35   20            THE CLERK:  All rise for the Court and jury.  The jury

               21    will be dismissed.

               22            (The jury exits the courtroom at 2:48 p.m.)

               23            THE COURT:  Briefly.

               24            MS. CLARKE:  We would renew our Rule 29.

               25            THE COURT:  All right.  The matter is reserved.

```
 1            MR. WEINREB:  Your Honor, there is actually one thing
 2   we would like to briefly put on the record, and I think in an
 3   excess of caution, we should do it at the sidebar.
 4            THE COURT:  Okay.
 5            (Discussion at sidebar and out of the hearing of the
 6   public:)
 7            MR. WEINREB:  I'd just note that the Court did not
 8   inquire of the defendant personally whether he was waiving his
 9   Fifth Amendment right to testify on his own behalf, and I'd
10   just ask that the record reflect that the defense [sic] has no
11   reason to believe that the defendant is not fully informed of
12   his Fifth Amendment right to testify on his own behalf and has
13   knowingly and voluntarily chosen to waive that.
14            MS. CLARKE:  We are not calling him as a witness and
15   he agrees with that.
16            THE COURT:  That's a matter you've discussed with him?
17            MS. CLARKE:  Yes.
18            THE COURT:  Fine.  Okay.  I'll leave it at that.
19            Okay.  I'd like to have a scheduling conference in the
20   back when people get organized.
21            (In open court:)
22            THE CLERK:  Court will be in recess.
23            (The Court exits the courtroom and the proceedings
24   adjourned at 2:50 p.m.)
25
```

1                    C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date:  10/28/15
16

17

18

19

20

21

22

23

24

25