```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
        Defendant.                  )
                                    )



            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE
```

## JURY TRIAL - DAY FORTY-THREE

```
            John J. Moakley United States Courthouse
                        Courtroom No. 9
                       One Courthouse Way
                   Boston, Massachusetts  02210
                      Monday, April 6, 2015
                           9:59 a.m.



                  Marcia G. Patrisso, RMR, CRR
                     Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
                        (617) 737-8728

         Mechanical Steno - Computer-Aided Transcript
```

1   APPEARANCES:

2      OFFICE OF THE UNITED STATES ATTORNEY
     By: William D. Weinreb, Aloke Chakravarty and
3         Nadine Pellegrini, Assistant U.S. Attorneys
     John Joseph Moakley Federal Courthouse
4      Suite 9200
     Boston, Massachusetts  02210
5      - and -
     UNITED STATES DEPARTMENT OF JUSTICE
6      By: Steven D. Mellin, Assistant U.S. Attorney
     Capital Case Section
7      1331 F Street, N.W.
     Washington, D.C.  20530
8      On Behalf of the Government

9      FEDERAL PUBLIC DEFENDER OFFICE
     By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10         Federal Public Defenders
     51 Sleeper Street
11      Fifth Floor
     Boston, Massachusetts  02210
12      - and -
     CLARKE & RICE, APC
13      By: Judy Clarke, Esq.
     1010 Second Avenue
14      Suite 1800
     San Diego, California  92101
15      - and -
     LAW OFFICE OF DAVID I. BRUCK
16      By: David I. Bruck, Esq.
     220 Sydney Lewis Hall
17      Lexington, Virginia  24450
     On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                        I N D E X

2   INSTRUCTIONS BY THE COURT......................PAGE 4, 137

3   CLOSING ARGUMENT BY MR. CHAKRAVARTY............PAGE 52

4   CLOSING ARGUMENT BY MS. CLARKE.................PAGE 97

5   REBUTTAL ARGUMENT BY MR. WEINREB...............PAGE 121

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2     THE CLERK:  All rise for the Court and the jury.

3     (The Court and jury enter the courtroom at 9:59 a.m.)

4     THE CLERK:  Be seated.

5     THE COURT:  Good morning, counsel.

6     COUNSEL IN UNISON:  Good morning.

7     THE COURT:  Good morning, jurors.

8     THE JURORS:  Good morning, your Honor.

9     THE COURT:  I have two major responsibilities in a

10    trial such as this.  The first is almost over, and that is to

11    preside over the case and to make whatever procedural or

12    evidentiary rulings are necessary in the course of the trial.

13    And you've seen that we've been doing that.  The other major

14    responsibility is at this stage of the proceedings to give you

15    what we call these instructions in the principles of law that

16    pertain to the matters you've heard about and about which you

17    will have to make some decisions.  So I'm now going to give you

18    these instructions about the law that applies to these matters.

19    You can think of this as sort of a short course in all

20    the law you will need to know in order to decide the issues in

21    the case.  So you shouldn't have to resort to any other ideas

22    that you might have from any other sources about what the law

23    is or might be with respect to these issues, but take it that

24    what I will tell you is a complete and accurate summary of the

25    principles of law that are to be applied in the case.  It is my

1    duty to set forth these principles fully and accurately without

2    regard to any personal or private views I might have about the

3    wisdom or prudence of these principles or whether there might

4    be different or additional ones that could be applied, but

5    rather to tell you what the law is with respect to these

6    matters.

7              You have a similar duty to accept and faithfully apply

8    these principles sensibly without any regard to any personal or

9    private views you might have about the wisdom or prudence of

10   these principles or whether there might be different or

11   additional ones that could be applied.  Instead, accept that

12   these are the principles of law that apply to these matters,

13   consider these instructions sensibly as a whole and apply them

14   faithfully.

15             These instructions will be lengthy but we will give

16   you a written copy of them for the jury room so that you may

17   review them and be reminded of them any time you wish to look

18   at them while you're deliberating.

19             I'm going to talk about two general areas, and I'm

20   going to divide my time in doing it.  First I'm going to talk

21   about the principles that relate to the particular offenses or

22   crimes that are charged by the indictment in this case.  That

23   is, I will tell you what the government is required to prove in

24   order to convict the defendant of the charges that are made

25   against him.  After I've done that, the lawyers for each side

1    will have their opportunity to present their closing statements

2    to you.  I think it will be helpful to you in listening to the

3    closing statements to have understood from me what the

4    principles of law are that relate to the proof of the charges.

5    After the lawyers' closing statements, I'll have some more to

6    say to you about the manner in which you will think about the

7    evidence, discuss it and make some judgments about it.

8            Because some of the offenses that are at issue in this

9    case are rather involved, let me begin by giving you a bit of

10   introduction to federal criminal law.  Federal criminal law

11   consists of laws enacted by Congress that define certain acts

12   as criminal.  In enacting a criminal statute, Congress

13   specifies what act or acts constitute the particular crime.  At

14   a trial when it is shown by the evidence that a defendant has,

15   in fact, committed the defined conduct, then the crime may be

16   said to have been proven, and where it has not been shown by

17   the evidence that the defendant committed the defined conduct,

18   the crime has not been proven.

19           Typically, the language of a federal criminal statute

20   follows a common pattern or formula that can be stated briefly

21   this way:  Whoever does such and such shall be punished.  Let

22   me give you a silly hypothetical example to illustrate the

23   grammar of federal criminal statutes.  The statute might say,

24   hypothetically, "Whoever knowingly sells an item of apparel

25   without providing a certificate of origin, shall be punished."

1    I deliberately use a silly example because I want you to focus

2    on the structure of criminal statutes right now rather than the

3    substance.

4           In seeking to determine whether someone has committed

5    the hypothetical crime, we would look at what the evidence

6    established that the person had done and whether the person had

7    done those things outlined in the statute as necessary to

8    constitute the offense.  So in the example, there would be

9    three things -- and we would refer to them as the elements of

10   the offense -- three things that would have to be shown:  The

11   person knowingly sold an item of apparel without providing a

12   certificate of origin.

13          If those three things or elements were established as

14   facts, then the government would have proved the crime.  If all

15   three things, all three things, are not established by the

16   evidence, that is, one or more of them has not been

17   established, then the crime has not been proven.

18          Sometimes Congress wants to be sure that a particular

19   term in a statute is understood in a particular way, and it may

20   include a full or partial definition of that term; for example,

21   in our illustration, the statute might say, "The term 'item of

22   apparel' shall include any garment or thing worn as clothing or

23   adornment, but shall not include hospital gowns."  When

24   Congress provides a specific definition, then that definition

25   is what controls for the purpose of the statute.  When Congress

1   does not provide a specific definition to the terms of the

2   statute, the general rule is that words are to be understood in

3   accordance with their ordinary and usual meaning.

4       Sometimes a criminal statute will provide for

5   alternate ways in which the offense could be committed.  To

6   return to our example, the statute might say, "Whoever

7   knowingly sells an item of apparel without providing a

8   certificate of origin, or advertises for sale an item of

9   apparel for which no certificate of origin has been provided,

10  shall be punished."

11      In this formulation there are two ways the statute

12  might be violated:  First, it could be proved that a person

13  knowingly sold an item of apparel without a certificate of

14  origin; second, it could be proved that the person advertised

15  for sale an item of apparel for which no certificate of origin

16  had been given.

17      Proof of either alternative would suffice to

18  constitute the crime.  But in such a case because the verdict

19  of the jury must always be unanimous as to the elements of the

20  offense, it would be necessary for all the members of the jury

21  to agree that one or the other version had been proved beyond a

22  reasonable doubt and to be unanimous about that.

23      Sometimes a federal criminal statute will contain what

24  we call a "jurisdictional element."  The federal government has

25  those powers that are granted to it by the Constitution.  The

1    federal government's power to enact a criminal statute is

2    limited to those matters within its proper jurisdiction.  For

3    example, the Constitution grants the federal government power

4    to regulate interstate and foreign commerce, and consequently,

5    the federal government can enact criminal laws that pertain to

6    the regulation of interstate and foreign commerce.

7            But selling or advertising an item of apparel might or

8    might not have interstate or foreign effect or impact.  In

9    order to govern particular conduct that may be either federal

10   or non-federal, depending on the circumstances, Congress may

11   prescribe what we call a "jurisdictional element" to bring the

12   matter within federal jurisdiction; thus, the statute might

13   say, as some federal statutes do, "Whoever sells in interstate

14   commerce an item of apparel without a certificate of origin

15   commits the offense."  Tying it to the specific power to

16   regulate is sometimes a necessary jurisdictional element of a

17   crime.

18           So I use this oversimplified illustration because I

19   want you to see the patterns that can occur in the statutes

20   that are at issue in this case.  And I hope it will help you to

21   hear and understand the instructions about those particular

22   statutes.

23           Before I get to the instructions about the particular

24   statutes, there are some other general matters I want to

25   address.  As I mentioned in my preliminary instructions to you

1   at the beginning of this case, there are various ways in which
2   a person can be criminally liable for an offense.  The first is
3   when the person has personally and directly performed the acts
4   that constitute the offense.  A person who has actually done
5   the acts which constitute the offense is said to have
6   personally committed what we call the "substantive offense."
7   To use our example, a person who personally sold an item of
8   apparel without providing a certificate of origin would be said
9   to have directly committed the substantive offense.

10          A person who has not personally done all of the acts
11   that constitute the crime may still be criminally responsible,
12   however.  One circumstance in which this may be true is if the
13   person has aided or abetted another to commit the crime.  A
14   person may be found guilty of a federal offense if he aids or
15   abets another person in committing that offense.  In most of
16   the counts in the indictment, the defendant is charged with
17   aiding and abetting another person, namely, Tamerlan Tsarnaev,
18   to commit a substantive offense.

19          To "aid or abet" means intentionally to help someone
20   else commit the offense.  To establish aiding and abetting, the
21   government must prove beyond a reasonable doubt, first, that
22   someone else committed the charged crime; second, that the
23   defendant consciously shared the other person's knowledge of
24   the underlying criminal act intended to help him, and willfully
25   took some part in the criminal endeavor seeking to help it

1  succeed.

2        An act is done willfully if it is done voluntarily and

3  intentionally.

4        A person who aids and abets another to commit a crime

5  need not be present when the underlying criminal act is

6  performed or be aware of all the details of its commission to

7  be guilty of aiding and abetting, but a general suspicion that

8  an unlawful act may occur or that something criminal is

9  happening is not enough.

10       Mere presence at the scene of a crime and knowledge

11  that a crime is being committed are also not sufficient to

12  establish aiding and abetting.  To be guilty of aiding and

13  abetting, a person must act in some way to affirmatively assist

14  another person to commit a crime.

15       In every count where the defendant is charged both as

16  a principal actor and as an aider or abetter, you may find him

17  guilty if you unanimously conclude beyond a reasonable doubt

18  that he was either a principal or an aider or abetter or both.

19  You need not be unanimous as to whether he was a principal as

20  opposed to an aider or abetter, but to find him guilty each of

21  you must conclude that he was one or the other or both.

22       It can also be a crime to conspire or agree with one

23  or more other persons to work together to commit a substantive

24  offense.  This is the crime of conspiracy.  When proven,

25  conspiracy to commit an offense is a separate crime from the

1   substantive crime.  The objective of the conspiracy might be to

2   commit the substantive crime.

3   In our illustration, two or more people could agree or

4   conspire together to sell an item of apparel without a required

5   certificate of origin.  That would be a separate crime from the

6   act of selling.

7   In this case, three counts of the indictment present

8   allegations of the crime of conspiracy in various forms under

9   various statutes.  In each of those counts the conspiracy is

10  alleged to have had as its object the commission of certain

11  identified substantive crimes.  Specifically, the defendant is

12  charged in Counts 1, 6 and 11 of conspiring with Tamerlan

13  Tsarnaev to commit certain federal crimes.

14  A criminal conspiracy is an agreement to achieve an

15  unlawful end or a lawful end by unlawful means.  The agreement

16  can be spoken or unspoken.  It does not have to be a formal

17  agreement which the people involved have actually sat down

18  together and worked out all the details, although that might be

19  the case.

20  To prove a criminal conspiracy, the government must

21  prove beyond a reasonable doubt that those who are involved

22  shared an understanding of the unlawful nature of the crime

23  they were agreeing to commit.  Mere similarity of conduct among

24  people or the fact they may have been associated with each

25  other, and even discussed common aims in interest, does not

1    necessarily establish proof of the existence of a conspiracy

2    although, of course, you may consider those factors.

3           Each of the three conspiracy counts charges the

4    defendant with conspiring to commit a different federal crime;

5    accordingly, you must consider each of those conspiracy counts

6    separately.  You may find the defendant guilty on any

7    particular conspiracy count only if you unanimously conclude

8    beyond a reasonable doubt that the defendant conspired with

9    another to commit the federal crime charged in that particular

10   count and not some other crime.

11          Count One charges the defendant with conspiracy to use

12   a weapon of mass destruction.  For you to find the defendant

13   guilty of that charge, you must unanimously find that the

14   government has proved the following two elements beyond a

15   reasonable doubt:  First, that the defendant and another agreed

16   to use a weapon of mass destruction; and, second, that the

17   defendant knowingly and voluntarily joined in the agreement

18   intending that the crime of using a weapon of mass destruction

19   be committed.

20          Count Six charges the defendant with conspiracy to

21   bomb a place of public use.  For you to find the defendant

22   guilty of that charge, you must unanimously find the government

23   has proved the following two elements beyond a reasonable

24   doubt:  First, that the defendant agreed with another to bomb a

25   place of public use; and, second, that the defendant knowingly

1   and voluntarily joined in that agreement intending that the

2   crime of bombing a place of public use be committed.

3          Count Eleven charges the defendant with conspiracy to

4   maliciously destroy property.  For you to find the defendant

5   guilty of that charge, you must unanimously find the government

6   has proved the following two elements beyond a reasonable

7   doubt:  That the defendant agreed with another to maliciously

8   destroy property; and, second, the defendant knowingly and

9   voluntarily joined in that agreement intending that the crime

10  of malicious destruction of property be committed.

11         The government must prove both the defendant intended

12  to join the agreement and that the underlying crime be

13  committed.  The government does not have to prove that a

14  defendant knew all the details of the conspiracy, that he

15  participated in every act of the agreement, or that he played

16  any particular role.  It only needs to prove that the defendant

17  knew of and joined in the agreement with the intent that its

18  unlawful purpose be achieved.

19         A defendant's intent and knowledge can be proved with

20  either direct or circumstantial evidence, including inferences

21  from the surrounding facts and circumstances, such as the acts

22  done by the defendant that furthered or advanced a conspiracy's

23  objective.

24         A person who has no knowledge of a conspiracy but may

25  happen to act in a way somehow to further the objective of the

1   conspiracy does not become a coconspirator.  He must knowingly

2   and intentionally join in the agreement with the purpose and

3   intention to do something unlawful.

4          For the crime of conspiracy, the government does not

5   have to prove that the conspiracy succeeded or that its

6   objective was achieved.  The crime of conspiracy is complete

7   when the conspirators form their agreement to commit the

8   underlying offense.

9          Each of the three conspiracy counts in this indictment

10  also alleges a third element the government must prove beyond a

11  reasonable doubt; namely, that the charged conspiracy resulted

12  in the death of a person named in the respective count of the

13  indictment.  The government has alleged in these counts that

14  each of the charged conspiracies resulted in the death of four

15  people:  Krystle Marie Campbell, Officer Sean Collier, Lingzi

16  Lu, and Martin Richard.

17         For you to find that a charged conspiracy resulted in

18  death, the government must prove beyond a reasonable doubt that

19  the charged conspiracy resulted in the death of at least one of

20  those people.  You should consider each alleged death

21  separately, and your determination of which death, if any,

22  resulted from the charged conspiracy must be a unanimous one.

23         A death results from a charged crime if the death

24  would not have occurred if the crime had not been committed.

25         In addition to the three counts in the indictment that

1    charged the defendant with conspiracy, there are 27 counts that

2    charged the defendant with committing substantive offenses.   In

3    all of those substantive counts, the defendant is charged both

4    as a principal and as an aider and abetter.   And I've

5    instructed you as to what must be proved to prove him guilty as

6    an aider and abetter.

7           Additionally, a person may be found guilty of a

8    substantive crime by his having been a coconspirator with

9    another person who in furtherance of the conspiracy commits a

10   crime that is within the scope of the conspiracy; in other

11   words, a defendant who is found to have knowingly joined in a

12   conspiracy may be held responsible for criminal acts committed

13   by his fellow conspirators.

14          Any member of a conspiracy who commits a crime during

15   the existence or life of the conspiracy in order to further or

16   advance the objectives of the conspiracy is, in effect, acting

17   as an agent for all the other members of the conspiracy, doing

18   what they all expect to be done to achieve the results they've

19   agreed to pursue.   That person's illegal activity may therefore

20   be attributed to the other coconspirators even if they have not

21   directly participated in their fellow conspirators' illegal

22   act.

23          You may find the defendant guilty of the substantive

24   crime as charged in the indictment, even if he did not

25   personally commit or participate in the actual commission of

1    the crime, if you are convinced that the crime was committed by
2    a coconspirator of the defendant acting in furtherance of the
3    conspiracy.  For instance, if you find beyond a reasonable
4    doubt that the defendant was guilty as a member of the
5    conspiracy charged in Count One, which is conspiracy to use a
6    weapon of mass destruction resulting in death, then you may,
7    although you're certainly not required to, find the defendant
8    guilty of the substantive crime that was committed by a
9    coconspirator who was working to accomplish the objective of
10   the conspiracy.
11        To find the defendant guilty under this theory, you
12   must be convinced of five things beyond a reasonable doubt:
13   First, that the defendant was guilty of being a conspirator in
14   the unlawful conspiracy; second, that another member of the
15   conspiracy committed the substantive crime, say, use of a
16   weapon of mass destruction resulting in death as charged in the
17   particular count; third, that that coconspirator who committed
18   the crime did so in furtherance of the work of the conspiracy;
19   fourth, that the defendant was at that time still an active
20   member of the conspiracy and had not withdrawn from
21   participating in it.
22        Sometimes people may join in a conspiracy and then
23   later leave or abandon the agreement.  If that should happen,
24   the person is no longer responsible for what is done thereafter
25   by coconspirators.

1          And finally, the final element is that the defendant

2     could reasonably have foreseen that his coconspirator would

3     have committed the substantive crime in furtherance of the

4     conspiracy.

5          In sum, and the conditions are that the defendant has

6     to be guilty of the conspiracy with somebody else; somebody

7     else in the conspiracy committed the crime; the crime was

8     committed in furtherance of the joint agreement to violate the

9     law; that the defendant was then still an active participant in

10    the conspiracy; and last, that the defendant could reasonably

11    have foreseen that one of his coconspirators would have done

12    what was done to commit the crime.

13         If you find all of those things beyond a reasonable

14    doubt, then you may find one conspirator guilty both of the

15    conspiracy under the relevant counts and of the substantive

16    offenses committed by the coconspirator.

17         I will now explain the elements for each of the

18    substantive counts.  Each count of the indictment charges the

19    defendant with having committed a separate offense.  Each count

20    and the evidence relating to it should be considered

21    separately, and a separate verdict will be returned as to each

22    count.  Your verdict of guilty or not guilty of an offense

23    charged in one count should not control your decision on any

24    other count.

25         I'm going to group the counts by the nature of the

1    charge that is made because many of them repeat the same

2    statutory basis for asserting the fact of the crime.

3           Counts Two, Four, Twenty-Three, Twenty-Five,

4    Twenty-Seven and Twenty-Nine charge the defendant with the

5    crime of using a weapon of mass destruction.  As you've heard,

6    the defendant is charged in Count One with conspiracy to use a

7    weapon of mass destruction.  He's also charged in six counts

8    with using a weapon of mass destruction and/or aiding and

9    abetting Tamerlan Tsarnaev's use of a weapon of mass

10   destruction.  So these are the substantive offenses related to

11   the conspiracy that is charged in Count One.

12          To find the defendant guilty of the use of a weapon of

13   mass destruction either by direct commission or as an aider and

14   abetter, you must unanimously find the government has proved

15   each of the following three elements beyond a reasonable doubt:

16   First, the defendant knowingly used a weapon of mass

17   destruction; second, that it was knowingly used against a

18   person or against real or personal property within the United

19   States; and, third, that such property was used in interstate

20   or foreign commerce or in an activity that affects interstate

21   or foreign commerce; or, alternatively, that the offense or the

22   results of the offense affected interstate or foreign commerce.

23          So you'll see from that third element there's a

24   jurisdictional element, as I previously described it, and it is

25   pled in the alternative.  There are two ways of proving the

1    third element, which is that property was used in interstate or

2    foreign commerce or in an activity that affected it, or that

3    the offense or its results affected interstate or foreign

4    commerce.  If you choose an alternative, you must be unanimous

5    as to which you choose.

6            Some of the defined terms:  A "weapon of mass

7    destruction" for these purposes means a destructive device

8    which is defined by statute as any explosive bomb.  "Knowingly"

9    in this context, as in others, means that the act was done

10   voluntarily and intentionally and not because of a mistake or

11   an accident.  "Interstate commerce" means commerce between any

12   point in a state and any point outside that state.  It is only

13   necessary the government prove beyond a reasonable doubt that

14   the crime had some minimal effect on interstate commerce.  It

15   is not necessary to find the defendant knew or intended that

16   his actions would affect interstate commerce.

17           Each of the six counts that charge the defendant with

18   the use of a weapon of mass destruction relates to a different

19   alleged destructive device.

20           Count Two charges the defendant used a weapon of mass

21   destruction and/or aided and abetted the use of a weapon of

22   mass destruction in front of Marathon Sports on April 15, 2013.

23   The indictment and verdict form both refer to the bomb alleged

24   as Pressure Cooker Bomb No. 1.

25           Count Two alleges an additional element the government

must prove beyond a reasonable doubt; namely, the offense
resulted in the death of Krystle Marie Campbell.

Count Four charges the defendant used and/or aided and
abetted the use of a weapon of mass destruction in front of the
Forum restaurant on April 15, 2013.  The indictment and verdict
form refer to the bomb alleged as Pressure Cooker Bomb No. 2.

Count Four also alleges an additional element the
government must prove beyond a reasonable doubt; namely, that
the offense resulted in the death of Lingzi Lu and/or Martin
Richard.

For you to find the defendant guilty of the additional
element, you must unanimously find beyond a reasonable doubt
that the offense charged in Count Four resulted in the death of
at least one of these two people, and you should consider each
separately.  Your determination of which death, if either,
resulted from the offense must be unanimous.

Count Twenty-Three charges the defendant with use of a
weapon of mass destruction and/or aiding and abetting the use
of a weapon of mass destruction that is alleged to have
exploded on Laurel Street on April 19th, 2013.  The indictment
and verdict form refer to the bomb alleged as Pressure Cooker
Bomb No. 3.

Count Twenty-Five charges that the defendant used a
weapon of mass destruction and/or aided and abetted the use of
a weapon of mass destruction that is alleged to have exploded

on Laurel Street on April 19th, 2013.  The indictment and
verdict form refer to this bomb alleged as Pipe Bomb No. 1.

Count Twenty-Seven charges the defendant used a weapon
of mass destruction and/or aided and abetted the use of a
weapon of mass destruction that is alleged to have exploded on
Laurel Street on April 19, 2013.  The indictment and verdict
form refer to the bomb alleged as Pipe Bomb No. 2.

Count Twenty-Nine alleges the defendant used a weapon
of mass destruction and/or aided and abetted the use of a
weapon of mass destruction on Laurel Street on April 19, 2013,
that did not explode.  The indictment and verdict form refer to
the bomb alleged as Pipe Bomb No. 3.

Counts 3, 5, 24, 26, 28 and 30 charge the defendant
with the crime of using or carrying a firearm during and in
relation to a crime of violence.  In addition to being charged
with six counts of using a weapon of mass destruction as I've
just summarized, the defendant is charged with six
corresponding counts of using and carrying a firearm during and
in relation to that crime of violence.  I will refer to these
as the "use and carry counts."

The use and carry counts separately charge that the
defendant used and carried a bomb, a pistol or both during and
in relation to each charged offense of the use of a weapon of
mass destruction.

Although the use and carry charges and the

corresponding use of a weapon of mass destruction charges

involve some overlapping conduct, under the law they are two

different crimes.

To find the defendant guilty as a principal of a count

charging that he used or carried a firearm during and in

relation to a crime of violence, you must unanimously find the

government has proved the following two elements beyond a

reasonable doubt:  First, the defendant committed the

underlying crime of violence specified in the count that you're

considering; and, second, that the defendant knowingly used or

carried a firearm -- the firearm specified in the particular

count during and in relation to that underlying crime.

To find the defendant guilty of aiding and abetting

the use and carrying of a firearm during and in relation to the

crime of violence, you must unanimously find the government has

proved the following four elements beyond a reasonable doubt:

First, another person committed the underlying crime of

violence specified in the count you're considering; that the

person knowingly used or carried a firearm during and in

relation to the commission of that underlying crime; third, the

defendant facilitated either the use of the firearm or the

commission of the underlying crime; and, fourth, that the

defendant did so with the advance knowledge that the other

person would commit the underlying crime and would use or carry

a firearm during and in relation to it.

1          Again, to do something knowingly in this context means

2     to do it voluntarily and intentionally and not because of

3     mistake or accident.

4          A "firearm" in this context means any weapon which

5     will or is designed to expel a projectile by the action of an

6     explosive.  A pellet or BB gun is not a firearm under the

7     relevant statute.  A firearm includes a destructive device

8     which in turn means any explosive bomb.  To use a firearm means

9     to employ the firearm actively, such as to brandish, display,

10    strike with, fire or attempt to fire, or detonate or attempt to

11    detonate.  To carry a firearm means to move or transport the

12    firearm on one's person or in a vehicle or a container.  A

13    firearm need not be immediately accessible.

14         The words "during" and "in relation to" are to be

15    given their ordinary and usual meaning.  At a minimum, it means

16    the firearm must have had some purpose or effect with respect

17    to the underlying crime of violence.  If a firearm is present

18    simply as a result of coincidence or accident, it cannot be

19    said that it was used or carried in relation to the underlying

20    crime of violence.  A firearm must have facilitated or have had

21    the potential to facilitate the underlying offense.

22         To have advance knowledge that another person will use

23    or carry a firearm during and in relation to the crime of

24    violence means knowledge at a time when the individual could

25    have attempted to alter the plan or withdrawn from the

1    enterprise.  Knowledge of the firearm may, but does not have

2    to, exist before the underlying crime commences.  It is

3    sufficient if the knowledge is gained in the midst of the

4    underlying crime as long as the individual continues to

5    participate in the crime and has a realistic opportunity to

6    withdraw after acquiring the necessary knowledge.

7         You may but are not required to infer that an

8    individual had sufficient advance knowledge if you find the

9    individual continued his participation in the crime after

10   learning of the other person's possession of a firearm.

11        Most of the use and carry counts include additional

12   elements as to which the government bears the burden of proof

13   beyond a reasonable doubt.  For example, some counts charge

14   that the firearm was brandished or that it was discharged or

15   that it was a destructive device or that the defendant caused

16   and/or aided another person in causing someone's death through

17   the use of the firearm, and the killing was a murder.  So I'll

18   define some of those terms for you.

19        To brandish a firearm means to display all or part of

20   the firearm or otherwise to make the presence of the firearm

21   known to another person in order to intimidate that person

22   regardless of whether the firearm was directly visible to the

23   person.  A destructive device, as I've told you, is any

24   explosive bomb.

25        "Murder" in this context is the unlawful killing of a

1   human being with malice aforethought.  "Malice aforethought"

2   means an intent at the time of the killing willfully to take

3   the life of a human being or an intent willfully to act in a

4   callous and wanton disregard of the consequences to human life.

5   Malice aforethought does not necessarily imply ill will, spite

6   or a hatred toward the individual killed.

7        In determining whether a victim was unlawfully killed

8   with malice aforethought, you should consider all the evidence

9   concerning the facts and circumstances preceding, surrounding

10  and following the killing which may shed light on the question

11  of intent.

12       A willful, deliberate, malicious and premeditated

13  killing is a murder.  A killing committed in the perpetration

14  of or an attempt to perpetrate any arson, robbery or other

15  murder is a murder.  A killing perpetrated from premeditated

16  design unlawfully and maliciously to affect the death of any

17  human being other than the person who is killed is also a

18  murder.  Premeditation contemplates a temporal dimension which

19  need only be an appreciable amount of time.  This may vary from

20  case to case.  The key element is the fact of deliberation of

21  second thought.

22       If in accordance with these instructions you find the

23  defendant guilty of using or carrying a firearm during and in

24  relation to a particular crime of violence or of aiding and

25  abetting another to do so, you may also find the defendant also

1    aided and abetted that other person in causing someone's death

2    through the use of the firearm even if the defendant did not

3    personally use the firearm or encourage the killing.

4         To find this, you must unanimously find beyond a

5    reasonable doubt the defendant was a willing participant in the

6    underlying crime of violence, the defendant intended the

7    killing take place, and that a co-participant caused the

8    victim's death through the use of a firearm.

9         You may also find the defendant aided and abetted

10   another in causing someone's death through the use of a firearm

11   if you unanimously find beyond a reasonable doubt that, A, the

12   defendant was a willing participant in the underlying crime,

13   the underlying crime of violence was an arson, robbery or

14   murder, and a co-participant caused the victim's death through

15   the use of a firearm.

16        Count Three charges the defendant knowingly used or

17   carried a firearm during and in relation to the crime of

18   violence that is charged in Count Two.  You'll see that these

19   several use and carry counts all relate to one of the

20   substantive counts of the use of a weapon of mass destruction,

21   as I've told you.  So you'll see them paired:  Three goes with

22   two, Five with Four and so on.

23        So as to Count Three, the indictment and verdict form

24   identify the firearm for the use counts as Pressure Cooker Bomb

25   No. 1.  The crime charged in Count Two, use of a weapon of mass

1    destruction, qualifies as a crime of violence.

2        In Count Three, the government also alleges additional

3    elements that must be proved beyond a reasonable doubt:  that

4    the alleged firearm was discharged, that the alleged firearm

5    was a destructive device, and that the defendant in the course

6    of committing the offense charged in Count Three caused the

7    death of Krystle Marie Campbell through the use of the firearm

8    and the killing was a murder, or aided and abetted another in

9    causing the death of Krystle Marie Campbell through the use of

10   the firearm and the killing was a murder.

11       Count Five charges the defendant knowingly used or

12   carried a firearm during and in relation to the crime charged

13   in Count Four and/or aided and abetted another in doing so.

14       The indictment and verdict form identify the firearm

15   for these counts as Pressure Cooker Bomb No. 2.  The crime

16   charged in Count Four qualifies as a crime of violence.

17       In Count Five, the government alleges three additional

18   elements that it must prove beyond a reasonable doubt:  That

19   the alleged firearm was discharged, that the alleged firearm

20   was a destructive device, and that the defendant in the course

21   of committing the offense charged in Count Five caused the

22   death of Lingzi Lu and/or Martin Richard through the use of the

23   firearm and the killing was a murder, and/or aided and abetted

24   another in causing the death of Lingzi Lu and/or Martin Richard

25   through the use of the firearm and the killing was a murder.

1    Your finding as to which death, if either, was caused through

2    the use of the firearm must be unanimous.

3         Count Twenty-Four charges the defendant knowingly used

4    or carried a firearm during and in relation to the crime

5    charged in Count Twenty-Three and/or aided and abetted another

6    in doing so.  The crime charged in Count Twenty-Three qualifies

7    as a crime of violence.

8         The indictment alleges that two firearms were used

9    and/or carried during and in relation to the offense charged in

10   Count Twenty-Three.  They're identified in the indictment and

11   the verdict form as Pressure Cooker Bomb No. 3, and a Ruger P95

12   9mm semiautomatic handgun.  To find the defendant guilty of

13   this use and carry charge, you must unanimously find beyond a

14   reasonable doubt that the defendant used or carried at least

15   one of the two alleged firearms during and in relation to the

16   underlying crime of violence and/or aided and abetted another

17   in doing so.  You must be unanimous as to which if either of

18   the two alleged firearms the defendant used or carried during

19   and in relation to the underlying offense.

20        If you're unanimously convinced beyond a reasonable

21   doubt that Pressure Cooker Bomb No. 3 is a firearm and that the

22   defendant used or carried it during and in relation to the

23   crime charged in Count Twenty-Three, and/or aided and abetted

24   another in doing so, you will then determine whether the

25   government has proved either of the following two additional

elements beyond a reasonable doubt:  that the alleged firearm
was discharged or that the alleged firearm was a destructive
device.

If you unanimously find beyond a reasonable doubt that
the Ruger P95 9mm semiautomatic handgun is a firearm, as I've
defined the term for you, and the defendant used or carried it
during and in relation to the crime charged in Count
Twenty-Three, and/or aided and abetted another in doing so, you
will then determine whether the government has also proved the
following additional element beyond a reasonable doubt:  that
the firearm was discharged.

Count Twenty-Six charges the defendant knowingly used
or carried a firearm during and in relation to the crime
charged in Count Twenty-Five and/or aided or abetted another in
doing so.  The crime charged in Count Twenty-Five qualifies as
a crime of violence.

The indictment alleges that two firearms were used and
carried during and in relation to the offense charged in Count
Twenty-Five.  They're identified in the indictment on the
verdict form as Pipe Bomb No. 1 and a Ruger P95 9mm
semiautomatic handgun.

To find the defendant guilty, you must unanimously
find beyond a reasonable doubt that the defendant used or
carried at least one of these two alleged firearms during and
in relation to the underlying crime of violence and/or aided

1    and abetted another in doing so.  You must be unanimous as to

2    which, if either, of the two alleged firearms the defendant

3    used or carried during and in relation to the underlying crime

4    of violence.

5         If you unanimously find beyond a reasonable doubt that

6    Pipe Bomb No. 1 is a firearm and the defendant used or carried

7    it during and in relation to the crime charged in Count

8    Twenty-Five, and/or aided and abetted another in doing so, you

9    will then determine whether the government has proved either of

10   the two following additional elements beyond a reasonable

11   doubt:  that the alleged firearm was discharged and that the

12   alleged firearm was a destructive device.

13        If you unanimously conclude beyond a reasonable doubt

14   that the Ruger P95 9mm semiautomatic handgun is a firearm and

15   the defendant used or carried it during and in relation to the

16   crime charged in Count Twenty-Five, or aided and abetted

17   another to do so, you will then determine whether the

18   government has proved the following additional elements beyond

19   a reasonable doubt:  that the alleged firearm was discharged.

20        Count Twenty-Eight charges the defendant knowingly

21   used or carried a firearm during and in relation to the crime

22   charged in Count Twenty-Seven and/or aided and abetted another

23   in doing so.  The crime charged in Count Twenty-Seven qualifies

24   as a crime of violence.  The indictment alleges that two

25   firearms were used and carried during and in relation to the

1   offense charged in Count Twenty-Seven.  They're identified in

2   the indictment and the verdict form as Pipe Bomb No. 2 and a

3   Ruger P95 9mm semiautomatic handgun.

4        To find the defendant guilty, you must unanimously

5   find beyond a reasonable doubt that the defendant used or

6   carried at least one of these two alleged firearms during and

7   in relation to the underlying crime of violence and/or aided

8   and abetted another in doing so.  You must be unanimous as to

9   which, if either, of the two alleged firearms the defendant

10  used or carried during and in relation to the underlying crime

11  of violence.

12        If you unanimously find beyond a reasonable doubt that

13  Pipe Bomb No. 2 is a firearm and the defendant used or carried

14  it during and in relation to the crime charged in Count

15  Twenty-Seven, or aided and abetted another in doing so, you'll

16  then determine whether the government has also proved either of

17  the following two elements beyond a reasonable doubt:  that the

18  alleged firearm was discharged and that the alleged firearm was

19  a destructive device.

20        If you unanimously find beyond a reasonable doubt that

21  the Ruger P95 9mm semiautomatic handgun is a firearm and the

22  defendant used or carried it during and in relation to the

23  crime charged in Count Twenty-Seven, and/or aided and abetted

24  another in doing so, you will then determine whether the

25  government has also proved the following additional element

beyond a reasonable doubt:  that the alleged firearm was discharged.

Count Thirty charges the defendant knowingly used or carried a firearm during and in relation to the crime charged in Count Twenty-Nine or aided and abetted another in doing so. The crime charged in Count Twenty-Nine qualifies as a crime of violence.  The indictment alleges that two firearms were used or carried during and in relation to the offense charged in Count Twenty-Nine.  They're identified in the indictment and the verdict form as Pipe Bomb No. 3 and a Ruger P95 9mm semiautomatic handgun.

To find the defendant guilty of this count, you must unanimously find beyond a reasonable doubt that the defendant used or carried at least one of these two alleged firearms during and in relation to the underlying crime of violence and/or aided and abetted another to do so.  You must be unanimous as to which, if either, of the two alleged firearms the defendant used or carried during and in relation to the underlying crime of violence.

If you unanimously find beyond a reasonable doubt that the Pipe Bomb No. 3 is a firearm and the defendant used or carried it during and in relation to the underlying crime charged in Count Twenty-Nine, and/or aided and abetted another in doing so, you will then determine whether the government has also proved either of the following two additional elements

1   beyond a reasonable doubt:  that the alleged firearm was

2   brandished intentionally and that the alleged firearm was a

3   destructive device.

4         If you unanimously find beyond a reasonable doubt that

5   the Ruger P95 9mm semiautomatic handgun is a firearm and the

6   defendant used or carried it during and in relation to the

7   crime charged in Count Twenty-Nine and/or aided and abetted

8   another in doing so, you will determine whether the government

9   has also proved the following additional element beyond a

10  reasonable doubt:  that the alleged firearm was discharged.

11        Counts Seven and Nine charge the defendant with the

12  crime of bombing a place of public use.  You'll recall that I

13  have instructed you that Count Six charges the defendant with

14  conspiracy to bomb a place of public use.  Counts Seven and

15  Nine charge the defendant with the substantive crime of bombing

16  a place of public use and/or aiding and abetting another to do

17  so.

18        To find the defendant guilty of the crime of bombing a

19  place of public use, you must find that the government has

20  proved each of the following four elements beyond a reasonable

21  doubt:  First, the defendant knowingly delivered, placed,

22  discharged or detonated an explosive in, into or against a

23  place of public use; second, that the defendant did so

24  intending to cause death or serious bodily injury, or

25  alternatively, that the defendant did so with the intent to

1    cause extensive destruction of such place when such destruction

2    resulted -- where such destruction results in or is likely to

3    result in major economic loss.

4          You need not find the government has proved both of

5    these types of intent, but you must unanimously find the

6    government has proved at least one of them beyond a reasonable

7    doubt.  The third element is that the offense took place in the

8    United States, and the fourth element is that the offense was

9    committed in an attempt to compel the United States to do or to

10   abstain from doing any act.

11         A "place of public use" means those parts of any

12   building, land, street or other location that are accessible or

13   open to members of the public whether continuously,

14   periodically or occasionally, and encompasses any commercial,

15   business, cultural, historical, entertainment, recreational or

16   similar place that is so accessible and open to the public.

17         "Serious bodily injury" means bodily injury which

18   involves:  A, a substantial risk of death; B, extreme physical

19   pain; C, protracted and obvious disfigurement; or, D,

20   protracted loss or impairment of the function of a bodily

21   member, organ or mental faculty.

22         For these purposes, an explosive means gunpowders,

23   powders used for blasting, blasting materials, fuses other than

24   electric circuit breakers, detonators and any chemical

25   compounds, chemical mixture or device that contains any

1    oxidizing or combustible units or other ingredients in such

2    proportions, quantities or packing that ignition by fire or by

3    detonation of the compound, mixture or device or any part

4    thereof may cause an explosion in so far that it is designed or

5    has the capability to cause death, serious bodily injury or

6    substantial material damage.

7         Count Seven charges the defendant placed a bomb in

8    front of Marathon Sports on Boylston Street in Boston causing

9    extensive destruction to Marathon Sports and other places of

10   public use and/or aided and abetted another in doing so.  The

11   indictment and verdict form refer to this alleged explosive as

12   Pressure Cooker Bomb No. 1.  In Count Seven, the government

13   alleges an additional element that it must prove beyond a

14   reasonable doubt:  that the offense resulted in the death of

15   Krystle Marie Campbell.

16        Count Nine charges the defendant bombed a place of

17   public use by placing a bomb in front of the Forum restaurant

18   causing extensive destruction to the Forum restaurant and other

19   places of public use and/or aided and abetted another in doing

20   so.  The indictment and verdict form refer to this alleged

21   explosive as Pressure Cooker Bomb No. 2.

22        In Count Nine, the government alleges an additional

23   element that it must prove beyond a reasonable doubt; namely,

24   that the offense resulted in the death of Lingzi Lu and/or

25   Martin Richard.  For you to find the defendant guilty of this

additional element, you must unanimously find beyond a

reasonable doubt that he committed the offense -- that the

offense resulted in the death of at least one of these two

people, and you should consider each separately.  And your

determination of which death, if either, resulted must be

unanimous.

Counts Eight and Ten charge the defendant with the

crime of using and carrying a firearm during and in relation to

a crime of violence.  We went through this with respect to the

crime of violence of use of a weapon of mass destruction.  Each

of those counts was paired with a count of using and carrying a

firearm during and in relation to the crime of violence.  This

is similar with respect to the crimes charged in Counts Seven

and Nine, is the bombing of a public place.  Counts Eight and

Ten allege use of and carrying a firearm during and in relation

to those crimes.

So Count Eight charges the defendant knowingly used

and/or carried a firearm during and in relation to the crime

charged in Count Seven and/or aided and abetted another in

doing so.  The indictment and verdict form identify the bomb as

Pressure Cooker Bomb No. 1.  The crime charged in Count Seven

qualifies as a crime of violence.

In Count Eight, the government also alleges three

additional elements, each of which it must prove beyond a

reasonable doubt:  that the alleged firearm was discharged,

that the alleged firearm was a destructive device, and that the

defendant in the course of committing the offense charged in

Count Eight caused the death of Krystle Marie Campbell through

the use of the firearm and the killing was a murder, and/or

aided and abetted another in causing the killing of Krystle

Marie Campbell through the use of the firearm, and the killing

was a murder.

Count Ten charges the defendant knowingly used or

carried a firearm during and in relation to the crime charged

in Count Nine and/or aided and betted another in doing so.  The

indictment and verdict form identify this bomb as Pressure

Cooker Bomb No. 2.  The crime charged in Count Nine is a crime

of violence.

In Count Ten, the government also alleges three

additional elements that it must prove beyond a reasonable

doubt:  that the alleged firearm was discharged, that the

alleged firearm was a destructive device, and that the

defendant in the course of committing the offense charged in

Count Ten caused the death of Lingzi Lu and/or Martin Richard

through the use of the firearm and that the killing was a

murder, and/or aided and abetted another in causing the death

of Lingzi Lu and/or Martin Richard through the use of the

firearm and the killing was a murder.

For you to find the defendant guilty of the last

element, you must unanimously find beyond a reasonable doubt

1    that the charged offense resulted in the death of at least one

2    of the two people identified.  You should consider each

3    separately, and your determination of which death, if either,

4    resulted from the offense must be an unanimous one.

5           Counts Twelve and Fourteen charge the defendant with

6    malicious destruction of property.  I have already instructed

7    you that Count Eleven charges the defendant with the conspiracy

8    to maliciously destroy property.  Counts Twelve and Fourteen

9    charge the defendant with the substantive offense of malicious

10   destruction of property.

11          To find the defendant guilty of the malicious

12   destruction of property, you must find the government has

13   proved each of the following elements beyond a reasonable

14   doubt:  First, the defendant damaged or destroyed or attempted

15   to damage or destroy by means of fire or an explosive any

16   building, vehicle or other real or personal property; second,

17   that the defendant did so maliciously; third, he did so by

18   means of a fire or explosion; and, fourth, that the building,

19   vehicle or other real or personal property was used in

20   interstate or foreign commerce or in any activity affecting

21   interstate or foreign commerce.

22          Let me define some of those terms.  I told you what

23   "explosive" means.  To act maliciously means to act

24   intentionally or with deliberate disregard of the likelihood

25   that damage or injury will result.  Use in interstate or

1   foreign commerce or in any activity affecting interstate or

2   foreign commerce means current active employment for commercial

3   purposes, not merely a passive passing or past connection to

4   commerce.  The property's function must affect interstate

5   commerce.

6           Count Twelve charges the defendant placed an explosive

7   bomb in the vicinity of Marathon Sports on Boylston Street in

8   Boston resulting in a premature end to the Boston Marathon and

9   damage to Marathon Sports and other business property, and/or

10  aided and abetted another in doing so.  The indictment and

11  verdict form refer to this alleged explosive as Pressure Cooker

12  Bomb No. 1.

13          In Count Twelve, the government alleges two other

14  elements it must prove beyond a reasonable doubt:  that the

15  defendant as a result of his conduct directly or proximally

16  caused personal injury or created a substantial risk of injury

17  to any person, and/or aided and abetted another in doing so;

18  and, second, that the defendant as a result of his conduct

19  directly or proximally caused the death of Krystle Marie

20  Campbell and/or purposely aided and abetted another in doing

21  so.

22          Count Fourteen charges the defendant placed a bomb in

23  the vicinity of the Forum restaurant on Boylston Street in

24  Boston resulting in a premature end to the Boston Marathon and

25  damage to the Forum restaurant and other business property,

and/or aided and abetted another in doing so.  The indictment
and verdict form refer to this bomb as Pressure Cooker Bomb
No. 2.

In Count Fourteen, the government also alleges two
other elements it must prove beyond a reasonable doubt:  that
the defendant as a result of his conduct directly or proximally
caused personal injury or created a substantial risk of injury
to any person and/or aided and abetted another in doing so, and
the defendant as a result of his conduct directly or proximally
caused the death of any person.

For you to find the defendant guilty of this
additional element, you must find unanimously beyond a
reasonable doubt that the defendant, through his conduct,
directly or proximally caused the death of Lingzi Lu and/or
Martin Richard.  You should consider each separately, and your
decision as to which, if either, death resulted from the
defendant's conduct must be a unanimous one.

Counts Thirteen and Fifteen charge the defendant with
using and carrying a firearm during and in relation to the
crime of violence alleged in Counts Twelve and Fourteen.  Count
Thirteen charges the defendant knowingly used or carried a
firearm during and in relation to the crime charged in Count
Twelve and/or aided and abetted another in doing so.  The
indictment and verdict form identify this bomb as Pressure
Cooker Bomb No. 1.  The crime charged in Count Twelve is a

1   crime of violence.

2          In Count Thirteen, the government also alleges three

3   additional elements it must prove beyond a reasonable doubt:

4   that the alleged firearm was discharged, that the alleged

5   firearm was a destructive device, and that the defendant in the

6   course of committing the offense charged in Count Thirteen

7   caused the death of Krystle Marie Campbell through the use of

8   the firearm, and the killing was a murder, and/or aided and

9   abetted another in causing the death of Krystle Marie Campbell

10  through the use of the firearm, and the killing was a murder.

11         Count Fifteen charges the defendant knowingly used or

12  carried a firearm during and in relation to the crime of

13  violence charged in Count Fourteen, and/or aided and abetted

14  another in doing so.  The indictment and verdict form identify

15  this bomb as Pressure Cooker Bomb No. 2.  The crime charged in

16  Count Fourteen is a crime of violence.

17         In Count Fifteen, the government also alleges three

18  additional elements it must prove beyond a reasonable doubt:

19  that the alleged firearm was discharged, that the alleged

20  firearm was a destructive device, and that the defendant in the

21  course of committing the offense charged in Count Fifteen

22  caused the death of Lingzi Lu and/or Martin Richard through the

23  use of the firearm, and the killing was a murder, and/or aided

24  and abetted another in causing the death of Lingzi Lu and/or

25  Martin Richard through use of the firearm, and the killing was

1  a murder.

2          For you to find the defendant guilty of this

3  additional element, you must unanimously find beyond a

4  reasonable doubt that the defendant through his conduct

5  directly or proximally caused the death of Lingzi Lu and/or

6  Martin Richard.  You should consider each separately, and your

7  determination as to which, if either, was caused by -- either

8  death was caused by the defendant, your decision must be a

9  unanimous one.

10          Counts Sixteen, Seventeen and Eighteen charge the

11  defendant with using and carrying a firearm during and in

12  relation to a crime of violence.  Count Sixteen charges the

13  defendant knowingly used or carried a firearm identified as a

14  Ruger P95 9mm semiautomatic handgun during and in relation to

15  the crime of conspiracy to use a weapon of mass destruction

16  that is charged in Count One, and/or aided and abetted another

17  in doing so.  The crime charged in Count One qualifies as a

18  crime of violence.

19          In Count Sixteen, the government also alleges two

20  additional elements, each of which it must prove beyond a

21  reasonable doubt:  that the alleged firearm was discharged, and

22  that the defendant caused the death of Officer Sean Collier

23  through the use of the firearm, and the killing was murder,

24  and/or that he aided and abetted another in causing the death

25  of Officer Sean Collier through the use of the firearm, and the

1  killing was a murder.

2       Count 17 likewise charges the defendant knowingly used

3  or carried a firearm identified as a Ruger P95 9mm

4  semiautomatic handgun during and in relation to the crime of

5  conspiracy to bomb a place of public use as charged in Count

6  Six, and/or aided or abetted another in doing so.  The crime

7  charged in Count Six qualifies as a crime of violence.

8       Like Count Sixteen, Count Seventeen charges two

9  additional elements the government must prove beyond a

10 reasonable doubt:  that the alleged firearm was discharged, and

11 that the defendant caused the death of Officer Sean Collier

12 through the use of the firearm, and the killing was a murder,

13 and/or that he aided and abetted another in causing the death

14 of Officer Sean Collier through the use of the firearm, and the

15 killing was a murder.

16      Similarly, Count Eighteen charges the defendant

17 knowingly used or carried a firearm identified as a Ruger P95

18 9mm semiautomatic handgun during and in relation to the crime

19 of conspiracy to maliciously destroy property as alleged in

20 Count Eleven, and/or aided and abetted another in doing so.

21 The crime charged in Count Eleven is a crime of violence.

22      Like Counts Sixteen and Seventeen, Count Eighteen

23 charges the additional elements that the government must prove

24 beyond a reasonable doubt:  that the alleged firearm was

25 discharged and that the defendant caused the death of Officer

1    Sean Collier through the use of the firearm and the killing was

2    a murder, and/or that he aided and abetted another in causing

3    the death of Officer Sean Collier through the use of the

4    firearm and the killing was a murder.

5         My instructions I've already given regarding the

6    elements of the crime of using and carrying a firearm during

7    and in relation to a crime of violence apply to these Counts

8    Sixteen, Seventeen and Eighteen, as do my instructions

9    regarding aiding and abetting.  The meaning of the word

10   "discharge" and the requirements for finding that the firearm

11   caused the death of a person and the killing was a murder, all

12   of those instructions apply to Counts Sixteen, Seventeen and

13   Eighteen.

14        And I remind you, of course, that to find the

15   defendant guilty of an offense, you must be unanimously

16   convinced the government has proved each and every element of

17   the offense beyond a reasonable doubt.

18        As I've previously described, there is another method

19   by which you may evaluate whether the defendant is guilty under

20   Counts Sixteen, Seventeen or Eighteen.  If you find the

21   defendant is guilty of one or more of the underlying

22   conspiracies that are referred to in Count Sixteen, Seventeen

23   and Eighteen, that is, the conspiracies alleged in Counts One,

24   Six and Eleven, if you find the defendant guilty of those

25   conspiracy charges, you may, but of course are not required to,

1    find him guilty of using and carrying a firearm during and in

2    relation to the crime of conspiracy of which you found him

3    guilty provided you find beyond a reasonable doubt the

4    following elements:  First, the defendant was guilty of being a

5    conspirator in the underlying unlawful conspiracy; second, that

6    his coconspirator used or carried the firearm during and in

7    relation to the conspiracy; third, the coconspirator did so in

8    furtherance of the conspiracy; and, fourth, that the defendant

9    was at the time still an active member of the conspiracy and

10   had not withdrawn from it; and, fifth and finally, that the

11   defendant could have reasonably foreseen that the coconspirator

12   might use or carry the firearm during and in relation to the

13   conspiracy.

14         If you find all five of those elements to exist beyond

15   a reasonable doubt, especially the fifth which is important,

16   the defendant's state of mind, then you may find the defendant

17   guilty of using and carrying a firearm during and in relation

18   to the conspiracy even if he did not personally commit the acts

19   constituting the crime of using and carrying a firearm during

20   and in relation to the underlying conspiracy.  However, if you

21   are not satisfied of the existence of any one of the five

22   elements that I've outlined, then you may not find the

23   defendant guilty under this theory.

24         The same holds true for the additional element that is

25   charged in Counts Sixteen, Seventeen and Eighteen, namely, that

1    the defendant through the use of the firearm caused the death

2    of Officer Sean Collier; that is, you may, but are not required

3    to, find the defendant guilty of that element if you

4    unanimously conclude beyond a reasonable doubt that the

5    defendant joined the underlying conspiracy charged in each

6    count, that a coconspirator used and carried the firearm during

7    and in relation to the underlying conspiracy, that the firearm

8    was used to cause the murder of Officer Collier, the killing

9    was in furtherance of the conspiracy, and the defendant was a

10   member of the conspiracy at the time the killing occurred, and

11   the killing was reasonably foreseeable to the defendant.

12          Count Nineteen charges the defendant with carjacking,

13   specifically alleges the defendant carjacked a Mercedes SUV

14   from Dun Meng and/or aided and abetted another in doing so.

15   For you to find the defendant guilty of carjacking, you must

16   unanimously conclude that the government has proved the

17   following four elements beyond a reasonable doubt:  First, the

18   defendant took a motor vehicle from Dun Meng; second, the

19   defendant took the motor vehicle through the use of force,

20   violence or intimidation; third, the defendant intended to

21   cause death or serious bodily harm at the time he took the

22   motor vehicle; and fourth, that the motor vehicle was

23   transported, shipped or received in interstate or foreign

24   commerce.

25          A person who takes a motor vehicle from the person or

1    presence of another acts with the intent to cause death or

2    serious bodily harm if the person intends to seriously harm or

3    kill the driver, if necessary, to steal the car.  You may

4    infer, although you are not required to do so, that a person

5    acted with such intent if he demanded the car at gunpoint or

6    used verbal threats.  You may also infer, although you're not

7    required to do so, the person acted with such intent if he

8    willfully and knowingly participated in the initiation of the

9    carjacking knowing that another intended to demand the car at

10   gunpoint.

11          As to Count Nineteen, the government also alleges and

12   must prove beyond a reasonable doubt that the carjacking

13   resulted in the serious bodily injury to Officer Richard

14   Donohue.  "Serious bodily injury" means bodily injury that

15   involves a substantial risk of death or extreme physical pain

16   or protracted and obvious disfigurement or protracted loss or

17   impairment of the function of a bodily member, organ or mental

18   faculty.  Injury may be said to have resulted from a carjacking

19   even if it did not result from the taking of the car so long as

20   it was caused by the carjacker while he still retained the car.

21          Count Twenty charges the defendant with the crime of

22   using and carrying a firearm during and in relation to the

23   crime of violence that is charged in Count Nineteen, that is

24   carjacking.  Specifically, Count Twenty charges the defendant

25   knowingly used or carried a firearm identified as a Ruger P95

1    9mm semiautomatic handgun during and in relation to the crime

2    of carjacking that is charged in Count Nineteen, and/or aided

3    and abetted another in doing so.  The crime charged in Count

4    Nineteen qualifies as a crime of violence.

5           The instructions I previously gave you with respect to

6    using and carrying a firearm during and in relation to a crime

7    of violence apply with equal force to this count.

8           With respect to Count Twenty, the government seeks to

9    prove an additional element beyond a reasonable doubt, namely,

10   that the firearm was brandished.  My previous instruction about

11   the definition of "brandished" applies here.

12          Count Twenty-One charges the defendant with robbery

13   affecting interstate commerce.  Specifically, Count Twenty-One

14   charges the defendant committed a robbery affecting interstate

15   commerce by withdrawing $800 from Dun Meng's bank account on

16   April 18, 2013, at an ATM in Watertown, and/or aided and

17   abetted another in doing so.  To find the person guilty of this

18   charge, you must unanimously find beyond a reasonable doubt

19   that the government has proved the following elements:  First,

20   that the defendant knowingly and willfully took property from

21   Dun Meng; second, that he did so by robbery; third, that the

22   robbery affected interstate commerce.

23          To act willfully in this context is to act voluntarily

24   and intelligently with the specific intent that the

25   underlying -- that the crime be committed, that is, with a bad

1    purpose either to disobey or disregard the law and not by

2    accident, ignorance or mistake.

3           Robbery in this context means unlawfully taking or

4    obtaining personal property from another against his or her

5    will by means of actual or threatened force or violence or fear

6    of injury to the person or property or to property in his

7    custody or possession.

8           It is only necessary the government prove beyond a

9    reasonable doubt that there is a realistic probability that the

10   acts committed by the defendant as charged in the indictment

11   had some minimal effect on interstate commerce.  It is not

12   necessary for you to find the defendant knew or intended that

13   his actions would affect interstate commerce.

14          Count Twenty-Two charges the defendant with using and

15   carrying a firearm during and in relation to a crime of

16   violence, in this case, the crime of robbery affecting

17   interstate commerce that is charged in Count Twenty-One, or

18   aiding and abetting another in doing so.  The crime charged in

19   Count Twenty-One, the robbery, is a crime of violence.  I've

20   previously instructed you the elements of the crime of using

21   and carrying a firearm during and in relation to a crime of

22   violence, and those apply here as well.

23          With respect to Count Twenty-Two, the government seeks

24   to prove an additional element beyond a reasonable doubt;

25   namely, that the firearm was brandished.  And I've previously

1   instructed you about brandishing.

2        Those are the elements of the offenses.  And as I say,

3   you will have the instructions with you and you can go through

4   them again as necessary as you think about each of the counts

5   in the indictment.  That concludes my opening part of my

6   instructions.  I'll have more to say later.

7        We're now going to turn to the closing arguments, or

8   closing statements, by the lawyers.  And as I say, when they're

9   finished we'll have some more to say to you about how to

10  deliberate on the evidence.

11       The order of presentation of the closing statements is

12  the government goes first, followed by the defendant.  And if

13  the government wishes, it may have the opportunity for a brief

14  rebuttal.  So we'll begin with the government's closing.

15       Mr. Chakravarty.

16       MR. CHAKRAVARTY:  Just a moment to set up, your Honor?

17       THE COURT:  For the convenience of the reporter, we're

18  going to take a five-minute break.  Please, of course, no

19  discussion of any of the matters.

20       THE CLERK:  All rise for the Court and jury.  The

21  Court will take a five-minute break.

22       (The Court and jury exit the courtroom and there is a

23  recess in the proceedings at 11:15 a.m.)

24       THE CLERK:  All rise for the Court and the jury.

25       (The Court and jury enter the courtroom at 11:31 a.m.)

1          THE CLERK:  Be seated.

2          THE COURT:  Mr. Chakravarty.

3          MR. CHAKRAVARTY:  Thank you, your Honor.

4          The defendant brought terrorism to backyards and to

5     main streets.  The defendant thought that his values were more

6     important than the people around him.  He wanted to awake the

7     mujahidin, or the holy warriors, and so he chose Patriots' Day.

8     He chose marathon Monday.  He chose a family day of

9     celebration.  He chose a day when the eyes of the world would

10    be on Boston, a sporting event celebrating human achievement.

11    He chose a day where there would be civilians on the sidewalks.

12    And he and his brother targeted those civilians, men, women and

13    children, because he wanted to make a point.  He wanted to

14    terrorize this country.  He wanted to punish America for what

15    it was doing to his people.

16         So that's what he did.  He and his brother killed two

17    young women that day.  They killed a little boy.  They maimed

18    and permanently disfigured dozens of people.  At least 17

19    amputees.  At least 240 were injured.  And after they did it,

20    he coolly, not 20 minutes later, went to the Whole Foods to

21    make sure he got the half gallon of milk that he wanted.  The

22    next day he went back down to college, joked with his friends,

23    got a workout in.  He even went back to Twitter, and he decided

24    to tweet so that everybody knew what he was feeling.

25         The defendant and his brother did this together.  He

1    planted one bomb, his brother planted the other.  It was a

2    coordinated attack to maximize the terror.  Because that was

3    the purpose.  And after they did, they went back and they laid

4    low.  But three days later, when their faces were all over the

5    news, they sprung back into action, and again in a coordinated

6    style, they went back and they said they needed to build more

7    bombs.  They needed to continue with their campaign.  But they

8    needed a gun.  So they went to MIT and there they saw Officer

9    Sean Collier.  They targeted him and they killed him.  They

10   tried to get his gun.  They couldn't.

11        Now that their car was captured on camera, now that

12   they couldn't get that extra gun, what did they decide to do?

13   They needed a new car.  So they drove over the bridge from

14   Cambridge into Brighton, and there they found Dun Meng who was

15   on the side of the road.  Dun Meng in his Mercedes SUV.  And

16   Tamerlan approached from the passenger's side and brandishes

17   the gun and carjacked the vehicle.

18        Dun Meng didn't even know that the defendant was

19   following closely until they got to Watertown.  And in

20   Watertown they transferred some things into the car.  The

21   defendant gets into the car.  What they didn't realize was that

22   the police would track down that Mercedes so fast.  And so

23   where they had been planning to go to New York with all of

24   their bombs, all their guns, they were instead encountered by

25   the Watertown police.  And when they did, they made their last

1    stand.

2          And in their last stand -- you heard about it and

3    you'll hear more about it today -- eventually Tamerlan had run

4    out of bullets and he went and charged at the police.  He was

5    subdued.  And then the defendant was all alone.  And he had

6    choices to make:  He could surrender; he could keep driving --

7    get back into the car and keep driving; he could do what his

8    brother did and charge at the police.

9          But he chose a different path altogether.  He chose to

10   get back into the Mercedes, turn it around, use it as a weapon

11   and try to mow down the police officers who had apprehended his

12   brother.  He hit his brother.  He dragged him.  He almost hit

13   Officer Colon.  And then he made his escape.

14         A short while later, about half a mile down the road,

15   he abandoned the Mercedes and he was on foot.  He was alone.

16   He was injured.  He made his way down a hill looking for a

17   place for refuge.  You heard that there were some blood marks

18   where he was trying to find some place to hide.

19         Eventually he found the winterized boat with a tarp on

20   it in Dave Henneberry's backyard.  When he saw that, he found a

21   place for refuge.  But before he climbed into that boat he took

22   his phones, he went behind the shed right next door, and he had

23   the presence of mind to smash his phones, including the phone

24   that he had coordinated the attacks with his brother with.  The

25   phone that he had used to talk to his brother after the

1    attacks, he smashed that phone.  He ditched it behind the shed

2    with his other phone and Dun Meng's bank card.  And then

3    without the help of a ladder even he pulls himself up into the

4    boat that you all saw -- he pulls himself up into the boat and

5    he lies down and he thinks about what he did and what he was

6    going to do in that boat.

7          And ultimately, he did what terrorists do after they

8    commit terrorist acts:  He wanted his actions to stand for more

9    than what people might think, so he wanted to tell the world

10   why he did what he did.  He wanted to take credit.  He wanted

11   to justify his acts.  And in that boat, when the helicopters

12   were overhead, the sirens were blaring, there were police

13   canvassing, looking for him, he was all alone, and in his voice

14   he chose to write something to the American people.

15         "I'm jealous of my brother who has received the reward

16   of jannatul Firdaus (inshallah --" remember, that's the highest

17   levels of paradise.  "-- God willing) before me.  I do not

18   mourn because his soul is very much alive.  God has a plan for

19   each person.  Mine was to hide in his boat and shed some light

20   on our actions.  I ask Allah to make me a shahied --" martyr

21   "-- inshallah, to allow me to return to him and be among all

22   the righteous people in the highest levels of heaven.

23         "He who Allah guides, no one can misguide.  Allah

24   Akbar!

25         "I bear witness that there is no God but Allah and

1    that Muhammad is his messenger.  Our actions came with a

2    message and that is La illaha illalah."  That's the statement

3    of faith you heard.

4         "The U.S. government is killing our innocent

5    civilians, but most of you already know that.  As a Muslim, I

6    can't stand to see such evil go unpunished.  We Muslims are one

7    body.  You hurt one, you hurt us all.  Well, at least that's

8    how Muhammad (peace be upon him) wanted it to be forever.

9         "The ummah," which we know is the Muslim nation, "is

10   beginning to rise and awaken...has awoken the mujahideen," the

11   holy warriors, "know you are fighting men who look into the

12   barrel of your gun and see heaven.  Now, how can you compete

13   with that?

14        "We are promised victory and we will surely get it.

15   Now, I don't like killing people innocent people.  It is

16   forbidden in Islam.  But due to said, it is allowed.  All

17   credit goes to Allah."

18        You've all sat through the evidence in this case.  You

19   know it better than anyone.  The evidence here speaks for

20   itself, and so I'm going to simply present that evidence to

21   you.  Some of it.  Because pictures speak louder than words,

22   I'm going to direct you to some of the images on your screens.

23   I have a screen here when I want to point something out to you.

24   The evidence I'm going to show you will give you the confidence

25   to conclude that the defendant did indeed commit each of the

1    crimes that are charged in the indictment.

2         THE COURT:  Jurors in the back row, you should get

3    your monitors ready.

4         They're active now.

5         MR. CHAKRAVARTY:  We'll start with a video of the

6    crime itself, at least the first crime, the marathon bombing.

7         (Video recording played.)

8         MR. CHAKRAVARTY:  You remember this clip from the

9    timeline video.  It was about 2:37 in the afternoon when

10   cameras first captured footage of the defendant and his brother

11   turning onto Boylston Street the day of the marathon.  They

12   calmly strolled down the street, each transporting the deadly

13   contents of a pressure cooker bomb concealed in a backpack.

14        You can tell by the defendant's expressions, by the

15   casual way he walks, that he is entirely untroubled by what he

16   is about to do.  That's because the terrorist literature and

17   the lectures and the songs that he had been consuming for over

18   a year had convinced him that what he was going to do was just.

19        His brother takes position down by Marathon Sports

20   and he waits to coordinate.  He's checking his phone.  The

21   defendant, on the other hand, is still up by the Forum.  After

22   all their planning and preparation, they were looking for the

23   right place to make the impact that they wanted to make.  The

24   defendant slung his bomb over his right shoulder, appearing

25   very much like a college student.  But that day they felt they

1    were soldiers.  They were the mujahidin and they were bringing

2    their battle to Boston.

3           This is the defendant finally approaching his target.

4    Compared to the crowd at Whiskey's, the crowd was much more

5    dense here.  There's a bar behind him, a restaurant.  People

6    are having fun.  There's cheering, there's clapping.  People

7    are egging on the runners.  There's a cow bell behind them.

8    There are people coming and going.  And in front of him, you

9    can't help but see them, there's a row of children on the

10   barricade.

11          He puts the bomb down as soon as he gets there right

12   behind that tree.  So he's on the grate.  Between the tree and

13   him there's no place for people to walk.  Nobody was

14   accidentally going to step on his bomb.  And there he hovers

15   over it, surveying the crowd, seeing the children again, seeing

16   the Richard family.  He's contemplating.  He's waiting for his

17   brother to get in position.  He's thinking about what he's

18   right about to do, about the plan that he and his brother have

19   set in motion.

20          It's about this time, 2:48, that he checks his bomb

21   for one last time, and then he gets ready to make his phone

22   call to his brother to tell him that things are a go.  He's

23   making his call.  Remember, ladies and gentlemen, this was a

24   19-second call.  It coordinates with his phone records.  We

25   don't know exactly what he said, but we know what he told his

 1  brother.  He told him he was in position.  He told him it was

 2  go time.

 3          He thought his cause was more important than the

 4  people around him so he picked this place because it would

 5  cause massive damage.  Look at how thick the people are there.

 6  It would cause memorable damage.  He picked this place.  And he

 7  was waiting for his brother.  He's waiting.  He knows it's

 8  coming.  And there it is.  He waits for a moment, and then like

 9  a salmon upstream, he's on his way up, and right before he

10  leaves the screen he turns his head.  This is the defendant

11  running away, pushing people out of the way.  He's got places

12  to go.

13          The fact that he exploded the bombs was devastating.

14  His bomb we have the devastation on video.  We didn't dwell on

15  it during the trial but I'm going to play a short clip for you

16  now.  I'd just ask you to focus on where the Richards' family

17  is, and I'd ask you to focus on what happens after the

18  explosion.

19          (Video recording played.)

20          MR. CHAKRAVARTY:  The defendant is over here.  He puts

21  down his phone.  Bill Richard is here, Denise Richard is over

22  here, and Martin and Jane and Henry are in front.

23          (Video recording played.)

24          MR. CHAKRAVARTY:  Remember the video that Colton

25  Kilgore shot?  Remember, he was the photographer.  He

1   reflexively just started hitting "record" after the bomb blew

2   up at Scene A.  He captured some of the sights and sounds of

3   the chaos and the terror that everybody was experiencing that

4   day.  So we're going to play some of that so you can hear it

5   for yourself and bring yourself back to it.

6           (Audio and video recording played.)

7           MR. CHAKRAVARTY:  That's Rebekah Gregory.  Remember

8   how she said she was hoisted into the air, thrown back?  She

9   immediately began searching for her son, despite the fact that

10  bones were sticking out of her hands.  Clearly you see her leg.

11  She saw terror on everybody's faces.  Finally she heard her

12  son's cries.  She was placed into a medically induced coma as a

13  result of the blast.  She's had 18 surgeries.  Foreign objects

14  are still in her body.

15          Remember Shane O'Hara?  He was the manager at the

16  Marathon Sports right there?  He said all he could do was hear

17  screaming and cries.  He heard someone say, "Stay with me.

18  Don't leave me."  He and others rushed to find materials for

19  tourniquets.  He said he never thought he would have to choose

20  who to help, whose life to try to save.

21          That's Rebekah Gregory right there.  And that's

22  Krystle Campbell screaming in pain.  She lies dying on the

23  sidewalk.

24          You'll recall Sydney Corcoran, the young lady who's

25  now a sophomore in college.  She was there with her family like

1    so many others.  She told you what it feels like to feel the

2    lifeblood slipping out of your body.  She said she started

3    feeling cold, but peaceful, as the blood left her body.

4         Karen McWatters, who spent the afternoon with Krystle

5    Campbell, described what a beautiful day it was.  She posted a

6    photo on Facebook that she and Krystle took in the public

7    garden a short time earlier.  When the bomb went off, Karen saw

8    the smoke, the chaos, confusion.  She asked herself whether she

9    was dreaming, if this nightmare was a reality.  That's Karen

10   and Krystle.

11        Officer Frank Chiola was one of the first to respond

12   to Krystle Campbell.  He described her injuries in two words:

13   Complete mutilation.  When the explosion happened there was

14   complete silence, he said, and then the screaming began.

15        And then there was Jeff Bauman.  Bauman lost both of

16   his legs.  You could see him here with his body torn apart.

17   And as he lay there with what remained of his legs in the air

18   he thought very clearly, "We're under attack."  And when he

19   later woke up in the hospital, he remembered the man who placed

20   the bomb that blew him up.  It was the defendant's brother,

21   Tamerlan Tsarnaev.

22        But nobody was able to remember the defendant at Scene

23   B, at the Forum.  That's because he blended in.  To be

24   successful, he had to lie in wait trying not to draw attention

25   to himself.  This image shows the moment after the defendant

1   called his brother to say that they were a go a moment after

2   this.  He checked on his bomb and then he made his escape.  He

3   swiveled his head around right at the last second, once he was

4   right outside of the blast radius.  This is him turning his

5   head just to make sure he has enough space, and then the bomb

6   goes off.

7          Alan Hern, the teacher from California, recalled how

8   he and his family had been lined up near Martin Richard and

9   Jane Richard and the other children.  He said the injuries that

10  he saw were something out of a war zone.  He recalled finding

11  his 11-year-old son Aaron on the ground, eyebrows singed.  His

12  legs were black.  His left thigh was mangled and bloody.  "It

13  really hurts, daddy.  It really hurts," he said.  Aaron was put

14  on a breathing tube.  And he had zipper-like wounds down his

15  legs, BB marks on his abdomen.  They found bone fragments of

16  someone else inside his body.

17         This is the defendant hiding behind the tree looming

18  over the row of children behind whom he placed his bomb.  It

19  was a heavy bag.  The decision must have weighed on him.  But

20  these children weren't innocent to him; they were American.  He

21  knew what the bag contained and what it was designed to do.

22  And of all the places that he could have placed this bomb, he

23  placed it right here.

24         He stood behind it for four minutes.  We cut some of

25  that out when we played it a moment ago.  Four minutes.  He

1    watched people come and go.  You heard that these children

2    never left.  He decided to place it here.  Bill Richard then

3    told you what happened to his family.  He told you about that

4    morning.  He told you about the fact that the marathon was a

5    family tradition and everyone hurriedly left the house in

6    excitement.  The children had participated in the youth relay,

7    and they were looking forward to the marathon and the ice

8    cream.

9          Jane was six years old when the defendant tore her leg

10   from her body.  His bomb injured her all the way up from her

11   head, behind her ear, her back, her torso, down to her legs.

12   Bill Richard saw her through the smoke, he smelled a vile

13   smell.  He just wanted to get it off his body.  You can see her

14   on that video we just saw trying to stand but not having a leg

15   to stand upon.  Bill grabbed her and his son Henry.  And then

16   do you remember what he told us?  He saw his other son through

17   the smoke.  He saw Martin Richard.  He knew he was dead.  He

18   could tell just by looking at him.  The defendant had killed

19   him.  He could not bear to lose Jane as well, and so he grabbed

20   Jane.  And with the help of Matt Patterson, they went to try to

21   stop Jane's bleeding.  They saved her life.  Patterson, you'll

22   recall, described Jane's leg looking as though it had just been

23   put through a meat grinder.  The defendant blinded Denise

24   Richard, Jane's mother, in one eye.  Of course he took Martin.

25          Jessica Kensky was a nurse.  You'll recall she was a

1    newlywed who wheeled herself up onto that witness stand.  She

2    said the medical tent where she was taken looked like it was

3    treating soldiers on a battlefield.  They were war wounds.  All

4    she could feel was terror.  Sheer terror.  She heard

5    animalistic screams.  Bomb parts, pieces of steel and dirt had

6    been blown into her body.

7         She explained that parts of her body had been blown

8    off and she had unbearable burns.  Her husband Patrick also

9    lost a leg.  Shrapnel had ripped through him, tearing apart his

10   skin and causing infection.

11        Danling Zhou was Lingzi Lu's friend.  They were also

12   at Scene B.  They were both international students who had come

13   from China to come to Boston to study at graduate school.  They

14   chose to go to the marathon that day to experience something

15   that was classic Boston but had the eyes of the world on it.

16   They made a day of it, shopping, having lunch on Newbury

17   Street, trying to get over to the Prudential Building to get

18   Danling's phone fixed at the Apple store.  And as they made

19   their way up Boylston Street, the defendant's bomb went off.

20        This is Lingzi Lu with her hands over her face.  This

21   is Danling Zhou, whose abdomen was ripped apart.  She's leaning

22   against the railing.  There's Bill Richard, Henry, Jane, Aaron,

23   Roseanne Sdoia over here.  And there are other victims.

24        Danling told you that her internal organs were

25   spilling out of her body.  She had to hold them in.  She told

 1    you that the man she saw in front of her seemed like he was

 2    yelling in slow motion.  He didn't have a leg anymore.  She

 3    looked to her friend, Lingzi Lu, who was flailing her arms.

 4    Danling thought that she was going to make it, but she didn't.

 5    The defendant killed her too.

 6         Dr. Bath said it looked like people had dropped like

 7    puzzle pieces in front of the Forum.  He tried to help whoever

 8    he could but it was too late for Lindsay.  Her leg had been

 9    flayed open.  They tried CPR.  You heard Officer Woods and

10    others cleared her airway and she vomited, but by the time the

11    paramedics arrived, it was too late.

12         Dr. Bath was surrounded by screams, parts of limbs,

13    tissue, burned clothing.  Eventually he was able to get a

14    tourniquet on one victim.  And that's how others saved others

15    that day.  First responders and others were able to get

16    tourniquets on people and they were rushed to the hospital.

17    EMS Director James Hooley told you that 30 people were given

18    red tags.

19         Do you remember the red, green and yellow tags?  The

20    red tags meant that they had life-threatening injuries, that if

21    they didn't get to the hospital in an hour, then they would

22    die.  Fortunately, except for Krystle Campbell, Lingzi Lu and

23    Martin Richard, all of them did make it to the hospital.  And

24    even so, the defendant and his brother maimed 17 more and

25    injured at least 240 others.

1           After they fled the scene they decided to lay low for

2    a while.  In fact, the defendant acted as if nothing had

3    happened.  He bought milk at the Whole Foods, calmly walking up

4    and down the aisles, and he even came back a little later to

5    replace this milk because he didn't get the one that he wanted.

6           You'll recall his demeanor, his strut walking up and

7    down those aisles.  He was just blending back in.  He returned

8    to UMass Dartmouth and decided to go to the gym, get a little

9    workout in.  This is him joking, laughing with his friend.

10   About an hour later he finishes his workout, just hanging out

11   with his friend.

12          After the bombing he decided to tweet about it.

13   Remember this one?  "Ain't no love in the heart of the city.

14   Stay safe, people."  How about this one?  "I'm a stress-free

15   kind of guy."  Why did he choose to post these things at this

16   time after what he had done?

17          In the days after the bombing, along with these

18   tweets, the computer evidence and the online social media

19   materials show you that the defendant was publicly pretending

20   to be just like everyone else while inside, in fact, back on

21   his computer, he was accessing the same jihad materials that he

22   had looked at before the bombings:  *Inspire* magazine.

23          In fact, on April 16th, the day after the marathon

24   bombings, he accessed this *Inspire* magazine.  This is the one

25   that talks about how to make the pressure cooker bombs and how

1    to make pipe bombs.  This picture down here is a clip from that

2    portion that you saw that shows how to make the pipe bombs.  He

3    opened it up, and a few days later you all know that they had

4    assembled five pipe bombs, another pressure cooker bomb and the

5    Rubbermaid device.

6         Also on April 16th, the day after the bombing, the

7    computer evidence shows that the defendant accessed the

8    "Effects of Intention" document.  Dr. Levitt talked about that

9    document and he told you that the essence of that document was

10   that if you're going to engage in jihad, you have to be sincere

11   about it.  You have to do it for God; you can't do it for some

12   other reason.  If you want to get the rewards, you have to be

13   sincere.

14        That same day he also accessed the fall issue of

15   *Inspire* magazine, the second issue.  And in that one, among

16   other tips about what to do in jihad, it included a declaration

17   of Anwar al-Awlaki who Dr. Levitt told you about.  And

18   Dr. Levitt read this excerpt as he went through the writing on

19   the boat.  And this is what he said:

20        "According to these scholars, we the Muslims are not

21   allowed to terrorize the Israelis or the Americans or the

22   British who are living in safety and security while millions of

23   Muslims are being terrorized by them.  We are told to never

24   mind the insecurity of the Palestinian or the Chechen or the

25   Kashmiri.  Never mind them.  We are simply never allowed to

1    terrorize, period.  No.  We do not agree with that.  We say

2    that whoever terrorizes us, we will terrorize them and we will

3    do what we can to strip them of their safety and security as

4    long as they do the same."

5         And that's precisely what the defendant wrote in the

6    boat a few days later:  "Stop killing our innocent people and

7    we will stop."

8         These were deliberate choices.  These were political

9    choices.  He thought his values were more important than

10   everyone else.  He was making a statement:  An eye for an eye.

11   You kill us, we kill you.  That's what he read, that's what he

12   said, and that's what he did.

13        Witnesses described the 12-block radius that was

14   carved out of the Boylston Street crime scene, the lockdown.

15   The FBI and other agencies gathered evidence.  They gathered

16   pieces of pressure cookers, cloth from backpacks, shrapnel from

17   the bombs.  They also gathered photographs, surveillance video.

18   The photos in the videos revealed that the defendant and his

19   brother had, in fact, exploded the bombs, although the FBI

20   didn't know who the defendant was, who his brother was.  So on

21   Thursday, three days later, April 18th, the FBI released some

22   of the images and asked for the public's help in identifying

23   the bombers.

24        The photos and the videos were broadcast all over the

25   world.  They were accessed millions of times on the FBI's

1     website.  A few hours later the defendant picks up the phone.

2     He speaks with his brother, and then he returned to Cambridge

3     from UMass.  Remember, he went back down to his dorm room with

4     his friends in the intervening three days.

5         And you know that he came back because Chad

6     Fitzgerald -- he was the FBI agent from Atlanta, who was the

7     cell site location specialist -- he showed you that the

8     defendant's cell phone pinged down in Dartmouth at first and

9     then came back to Cambridge.

10         And when he came back, he had this text message

11     exchange with one of his friends, Dias Kadyrbayev.  And in it

12     Dias asks him whether he saw the news.  And he says, "Yeah,

13     bro.  I did."  And Dias says, "For real?"  The defendant says,

14     "I saw the news.  Better not text me my friend, LOL," or laugh

15     out loud.  "You saw yourself in there?" Dias asks.  "If you

16     want, you can go to my room and take what's there.  Salaam

17     alaikum."

18         Now that their faces were all over the news, they

19     decided to move on with the rest of their plan.  He knew he

20     wasn't going back.  He gave Dias his computer and stuff in his

21     dorm room, including the backpack with the fireworks in them.

22     He and his brother loaded the pipe bombs and explosive powder

23     and the pressure cooker bomb, the CD with the jihad songs on

24     it.  They took Tamerlan's computer, that external hard drive

25     that you heard so much about, the remaining transmitter and

1   some identifying documents.  They needed these things for what

2   they planned to do next.  They were going to go to New York to

3   continue setting off bombs.

4          Most importantly, they brought the gun that the

5   defendant acquired from his friend Stephen Silva.  But there

6   were two of them and they needed two guns.  And they only had a

7   Ruger and that pellet gun, which you know looked real.  It

8   would probably work to stick somebody up.  It couldn't kill

9   like a real gun.  So they decided to go over to the MIT campus.

10  It's a short drive away from their house in Cambridge.

11         Chief DiFava told you about Sean Collier that

12  morning -- that day -- excuse me -- that evening, how they

13  chatted that evening and the chief told him to be safe.

14  Officer Collier was working the night shift, and Sergeant

15  Henninger had checked in with him earlier that evening.  About

16  10:20 p.m. the 911 call came in.  Some gunshots, some hitting

17  of trash cans.

18         And you know through surveillance video that the

19  brothers were driving their Honda Civic that night.  They may

20  have actually seen Officer Collier parked next to the Koch

21  building as they drove by.

22         There's the Koch building.  They decided to walk all

23  the way around the Koch building and approach him from the

24  rear.  They had a plan, they knew exactly what they were going

25  to do, and they just had to execute it.

1              (Video recording played.)

2              MR. CHAKRAVARTY:  They get to the car.  They

3    immediately force open the door.  They stick their gun at

4    Officer Collier, then about ten seconds you'll see Nate

5    Harriman come by on his bicycle.  There he is.

6              (Video recording played.)

7              MR. CHAKRAVARTY:  The brake lights go off, then they

8    go back on.  The defendant and his brother run away.

9              This was a purposeful mission.  They needed that gun.

10   They had already agreed on how to assassinate him and they did.

11             We can't tell who shot Officer Collier.  That's what

12   we know.  We know he was shot in the hand, possibly as he was

13   reaching for the microphone, on the radio.  We know he was shot

14   twice in the head at close range.  Remember Dr. Robinson

15   explain that there was stippling in the head wounds?  He was

16   shot between the eyes.  They assassinated him.

17             You also know that the brothers tried to get the gun

18   from Officer Collier's gun belt but they couldn't.  Remember

19   when the officers arrived on the scene, they saw the gun belt.

20   The gun itself had been smeared with blood.  And they saw that

21   the first stage of that three-part safety system had been

22   undone.  But they didn't know how to get the second and the

23   third stage out, so they left without the gun.  They had

24   failed.  They had risked being detected, they risked being

25   caught just to get that gun because they needed it for what

1    they were going to go do next.  They wanted to go out and use

2    the remainder of the bombs that they had built.  They wanted to

3    go out in a blaze of glory.

4        So we don't know who shot Officer Collier but we know

5    that Officer Collier's blood was found on the defendant's car

6    keys in the Honda Civic in the ignition with the UMass

7    Dartmouth fog.  We know that Officer Collier's blood was found

8    on the gloves that were found in the floor well of the driver's

9    seat of that same Honda Civic that the defendant was driving

10   that night.  We know that Officer Collier was shot with the

11   Ruger that the defendant procured from his friend Stephen

12   Silva.  And we know that Nate Harriman, as he passes them in

13   front of the Koch building that day, makes eye contact with the

14   defendant.  And you saw the defendant had been leaning in and

15   he comes out and he makes eye contact and then he leaves.

16       Officer Collier didn't have a chance.  You heard his

17   injuries were incompatible with life.  Just think about what

18   Nate Harriman told you.  He saw the defendant leaning in.  So

19   in those few seconds the defendant probably felt Officer

20   Collier's last breaths.  He probably heard the gasping or the

21   gurgling that his fellow officers heard a little while later.

22   That didn't deter him any more than seeing what happened on

23   Boylston Street deter him, because he felt what he was doing

24   was right.  He felt he was standing up for others.

25       They knew their time was short.  Frustrated by their

1  failure to get the gun, the brothers knew they needed another

2  car, and they went across the bridge and found Dun Meng.

3  Remember how terrified Dung Meng was but how clear-headed he

4  was, how clearly he thought through how was he going to get

5  through this.

6          And when they got to Watertown, he'd noticed the

7  defendant had been following him the whole way and that both of

8  the brothers moved things from the Honda Civic into the

9  Mercedes SUV.  And then they went back into town to try to go

10  get gas and money.  Meng describes them talking to each other,

11  like partners, in a foreign language.  They were communicating.

12  It was a team.

13          They went to the ATM in Watertown and the defendant

14  demands Meng's PIN number.  He saw the defendant coolly walk

15  into the ATM, take out the money, money he still had in his

16  wallet when he was arrested the next day.  The defendant and

17  his brother asked if the car can go out of state, go to New

18  York.  And Meng said that it could, in fact, go to New York.

19  He had gone there a couple of times -- a few times.

20          But first, before they made that long drive to New

21  York, they went back to Watertown where the Honda Civic was so

22  they could get that CD, a CD containing those jihad nasheeds on

23  it.  Meng said it was a style of music that he had never heard

24  before.  And Dr. Levitt told you what it was.  It was portable

25  inspiration, a CD full of songs, chants.

1           Finally, they go back towards Boston.  They need to go

2      to a gas station, so they stop at a gas station that the

3      defendant knew very well.  He knew it because it was across the

4      street from Stephen Silva's house.  You'll recall that he and

5      Stephen Silva would go there and get smokes occasionally.

6           He asked Meng how much gas the Mercedes could hold,

7      and they were going to go pay in cash.  And then the defendant

8      goes into the store to get some snacks for the long drive to

9      New York.

10          Now, the snacks seem trivial but they show the

11     defendant and his brother were on their way to New York for

12     purposes of doing something.  Not running away.  That's Red

13     Bull in his hand.  Those are snacks in his hands.  They needed

14     their energy for the long drive and for what they were going to

15     do when they got there.  They had more bombs and they were

16     going to use them.  They were a team.  You'll also notice that

17     this hat, it was the same hat the defendant was wearing a

18     little while earlier.  They were a team.  That's how they

19     rolled.

20          But Tamerlan turned his attention to the GPS while

21     they were waiting in the car, and that's when Meng acted.  He

22     got up -- and you saw the terror in his face, you'll see it in

23     a second.  And he ran across the street from one gas station to

24     another.  This is him pleading to call 911.  And that was more

25     significant than we might know because Meng's escape was more

1    than just a setback for the defendant and his brother.  Now the

2    police would know the car -- the new car that they were

3    driving.  So they had to go back to Watertown, they had to

4    ditch the Mercedes, they had to get back into the Civic and

5    then head back off to New York.

6         And they must not have expected that the police would

7    have reacted as quickly as they did.  In Watertown, Officer

8    Joseph Reynolds was the first on-scene.  Remember, he passes

9    first the Honda that the defendant was driving, who was in

10   front -- he was leading -- and behind him was the Mercedes.

11   And they were driving slowly around Dexter Ave. in Watertown.

12   Officer Reynolds passes them, calls it in, and they say, "Wait

13   for backup before you light him up," before you hit the

14   flashing lights.

15        But he turns around, he doesn't light them up yet, he

16   turns around, he starts to approach, and that's when Tamerlan

17   greets him with gunfire around through the windshield.  What

18   did the defendant do then?  He didn't keep going like he didn't

19   know what was happening.  He then stopped, he got out of his

20   car, he got in front of the Mercedes with his brother, and he

21   took his position.  They had planned this.

22        It was the brothers' last stand.  They go into the

23   bag, they pull out bombs, they pull out backpacks, the

24   ammunition, the extra magazines, they pull out their lighter,

25   even the pellet gun.  And the police saw two sets of muzzle

1    flashes.  While one was shooting, the other was lighting and

2    throwing the bombs.  Since we know that Tamerlan was shooting

3    many of the rounds of the Ruger, we know that the defendant was

4    the one lighting the fuses for at least two of the pipe bombs.

5         Sergeant MacLellan saw the defendant throw the second

6    and the third bomb.  Remember, he said he threw it like a hook

7    shot as opposed to like a baseball like Tamerlan threw it.  He

8    said he threw the second bomb like a hook shot and then,

9    remember, the pressure cooker bomb?  He heaved it like this.

10   And you all felt how heavy those are.

11        The officers probably saw the flashing of the lighter

12   as that second muzzle flashed, but whatever the point, the

13   defendant hurled that pressure cooker bomb, he hurled the pipe

14   bombs.  And they were in this together.  Officer Reynolds

15   screamed to Sergeant MacLellan to look out.  And then Sergeant

16   MacLellan described that explosion.  He described how it shook

17   him to his knees.  How the explosion was horrendous.  The plume

18   of smoke went up about two stories.  There was debris being

19   scattered everywhere.

20        And you saw what happened to the pressure cooker bomb.

21   It shot like a missile, embedded into that Honda where

22   MacLellan had just been standing, where his cruiser had been

23   crashed into that Honda.  The lid of the pot had gone two

24   stories up, into a house and into the neighbors' yard.

25        There were several pauses in the shooting, and now we

1    know that they also had to reload.  You'll recall the

2    ballistics evidence, Lieutenant Cahill.  The Ruger shot 56

3    rounds that they collected, the casings that they collected.

4    And the three magazines that they had with them, the

5    extended-capacity magazine and the other two magazines, between

6    them could hold 38 rounds.  That means they were refilling

7    these magazines and reloading the gun.  And it also explains

8    why the defendant's fingerprints are on the ammunition box and

9    also why there was a half-filled magazine in the Mercedes that

10   they -- that the defendant used to escape.

11         They were partners.  Each one was doing their part.

12   This shows the defendant either crouching or getting ready to

13   throw one of the pipe bombs.  James Floyd:  Remember, he was

14   one of the neighbors there?  He was the one with the newborn.

15   He had to take the newborn to the back of the house for safety.

16   And he comes back and he looks out the window.  And he said

17   they were -- both of the brothers were ducking in and out.  You

18   could barely distinguish the two.  But he did know that it was

19   the defendant who pulled something out in a bookbag and he

20   threw it.  And he showed us.

21         Sergeant Pugliese, who had been flanking, came from

22   this direction.  He felt the debris falling on him.  When he

23   emerged from that house, behind that fence, he took aim and he

24   shot at Tamerlan, first directly and then he tried to skip shot

25   him underneath to try to get him at the ankles.

1          He got Tamerlan's attention, and Tamerlan turned to

2     him and tried to shoot him, and he missed him every time.  And

3     after he ran out of bullets, he threw the gun and he charged up

4     the street at the police officers.  Tamerlan at that point was

5     done.  He wanted to commit suicide by cop.  He was ready to get

6     to heaven.

7          While the defendant -- while Tamerlan was ready, the

8     defendant had other plans.  He was still behind the Mercedes.

9     And like I said, he didn't go with Tamerlan.  He didn't go the

10    other way.  He didn't just give up.  He got back into the car,

11    he turned it around, and then James Floyd told you what he saw

12    and what he heard.  Despite the fact that there was no one in

13    front of him and he could have escaped, Floyd said that he

14    floored it.  He turned around and he floored it.  He really

15    floored it -- the engine roaring -- and he made a beeline for

16    where Tamerlan and Sergeant Pugliese and Sergeant MacLellan and

17    Officer Reynolds were.

18         The defendant drove from the right side of the road

19    straight for them.  They got out of the way just in time, as

20    you saw.  The defendant hit the brother, he dragged him down

21    the street.  When he hit Officer Reynolds' cruiser, almost

22    striking Officer Colon, Officer Colon saw him.  Remember, he

23    saw him driving like this.  The defendant still had the

24    presence of mind to avoid the gunfire as he was making his

25    escape and as he was aiming for the police.

1          Now, at some point during that escape, the defendant

2    got shot.  We know because he was bleeding sometime later.  And

3    as the police finally subdued Tamerlan, they realized that

4    Officer Donohue had also been shot.  Remember Dr. Studley

5    described that he had lost all of his blood by the time that

6    she was treating him.  Amazingly, she and others brought him

7    back, and but for the defendant's actions, carjacking this

8    vehicle, the defendant and his brother, that chain of events

9    would not have happened and Officer Donohue would not have been

10   shot.  He would not have been seriously injured.  That's why

11   it's charged in the indictment, as a result of the carjacking

12   caused serious bodily injury.  And that's what happened here.

13         The defendant abandoned the Mercedes, leaving the

14   Rubbermaid bomb and the other items in it as he fled.  And

15   since he made the decision to drive the police [*sic*], he knew

16   now that he was all alone.  His brother was gone.  He was

17   injured.  He made his way down that hill.

18         The blood marks you heard, there were some on a

19   bathroom door, on a shed, on a car, and then on the boat

20   itself.  David Henneberry's boat, the Slip Away II.  The

21   defendant could not have imagined that this was where he was

22   going to write his prophetic statements to the world.

23         But before climbing in, he wanted to do that one last

24   thing.  Remember, he had two phones.  He had that burner phone,

25   we call it, which he had just activated that SIM card on that

1    Sunday before.  He put the SIM card in and he used that phone

2    to talk to his brother about planning the bombing, executing it

3    and then what happened after.

4         His other phone was the phone he used all the time.

5    It was the phone he was using to talk to his friends.  It was

6    the phone that he was using to surf the Internet, to read

7    documents.  At his age, he lived on that phone.  Even in the

8    video you see him, you see him always fumbling with his phone.

9         So he had the presence of mind at that stage to smash

10   those phones beyond recognition.  He knew those phones could

11   track him, and he knew by smashing those phones neither the

12   FBI, the state police, the Boston police or Watertown nor

13   anybody was going to be able to extract the data that would be

14   useful in the investigation.  He takes Dun Meng's card and he

15   throws it down there.  That's Dun Meng's card, that's the

16   phone, both phones pulverized.

17        He was in the boat for a while.  And after pulling

18   himself in, he pulled out a life preserver.  You saw some of

19   the pictures and you saw the boat.  He tried to get

20   comfortable.  And he laid there probably thinking he wouldn't

21   survive.  He had been hurt.  And in those moments of all of the

22   things in the world to say, he chose to write that declaration

23   we saw.  He chose to justify what he did.

24        But even after writing those words, that well thought

25   out, cohesive narrative, he still was angry.  People were

1    looking for him, he was hiding in this boat, and he was still

2    angry.  He was so angry he had to get something.  And he had

3    etched into boards on the slat.  As if his note wasn't clear

4    enough, he had to emphasize it.  "Stop killing our people and

5    we will stop."

6          He was negotiating the terms of death with America.

7    This is what the defendant was thinking after all he had done

8    that week.  In the evening, David Henneberry noticed the blood

9    on his boat.  He investigated and saw the defendant lying in

10   it.  Minutes later, he was surrounded.  At one point the police

11   shot at the boat, not knowing whether the defendant was armed,

12   whether he still had any bombs on him.  They threw flash bangs

13   then, hoping -- convincing him to give up, and eventually he

14   was arrested.

15         The investigation of the defendant and his brother

16   lasted two years.  You saw that he first started accessing the

17   *Inspire* magazine when they were in -- approximately Christmas

18   of 2012.  We know both the defendant and his brother were

19   radicalized to believe that jihad was the solution to their

20   problems.

21         We know that both of them participated in the bombing,

22   the murder of Officer Collier, the carjacking, the robbery of

23   Dun Meng, the standoff with the police in Watertown.  The

24   fingerprint evidence showed the defendant's prints in many

25   places that you would expect them:  On the driver's side of the

1   Honda that he was driving, on the radio where he was listening

2   to his nasheeds.  His prints are on the gas tank of the

3   Mercedes where he tried to fill it up with gas.  They are also

4   on the front passenger quarter where he, as you see in that

5   picture, was holed up, taking cover in the shootout.  They're

6   also on the nasheed CD that was found in the radio of the

7   Mercedes.  His prints are on the ammo box that were found on

8   Laurel Street.  They're on the Rubbermaid bomb that was found

9   in the back of the Mercedes.  They're also on that pellet gun.

10  Tamerlan also left prints where you would expect them.

11        But the defendant was more careful.  Unlike Tamerlan,

12  the defendant had led a double life.  To the outside world he

13  showed one face and inside he harbored another.  He was

14  careful, just like *Inspire* magazine had taught him to be.

15        Explosive technicians examined every piece of evidence

16  found in Watertown and on Boylston Street and tried to

17  re-create how the devices were made.  You saw that.  Who knew

18  that making a bomb was so easy?  Well, the terrorists.  The

19  publishers of *Inspire* magazine.  That's who knew.  And they

20  were just hoping, they were wanting, they were asking for some

21  young terrorist to come by and to use their instructions.  And

22  that's what the defendant and his brother did.

23        You heard how there was no explanation for how and

24  where all the pounds of explosives that were necessary to build

25  all these bombs, where they were purchased or where they were

```
1    built.  You heard that there was some trace explosives in the
2    apartment in Cambridge, at 410 Norfolk Street, and there were
3    intact fireworks down at the dorm room in Dartmouth.  But given
4    how much explosives were necessary, much more was expected.
5         Many of the materials that were consistent with those
6    that were used to construct the devices were found at the
7    Norfolk Street apartment where Tamerlan and his family lived
8    and the defendant would visit from time to time, where he had
9    grown up.  Some of those materials were found conspicuously in
10   the defendant's bedroom there, where he had spent the weekend
11   before the bombing.
12        There was the construction paper -- the red
13   construction paper, the caulk gun, the gun-cleaning equipment.
14   You also know that from the swipe card data from UMass
15   Dartmouth that he hadn't been down at UMass for days before the
16   bombing.
17        It's clear that both the defendant and his brother
18   were partners.  They both handled the bombs.  The evidence
19   shows that the defendant and his brother transported, placed
20   and exploded the bombs on Boylston Street and in Watertown.  In
21   addition to the eyewitness testimony, people like James Floyd
22   and Sergeant MacLellan, we know that the defendant committed
23   these crimes, threw the pipe bombs, the big pressure-cooker
24   bomb in Watertown.
25        The brothers prepared for their attack.  They also
```

1    coordinated with each other, as partners do.  The investigation

2    revealed that the pressure cookers were probably bought at

3    Macy's; for the January 31st, purchased from the Square One

4    Mall in Saugus.  It was probably Tamerlan although there is no

5    video and it was a cash purchase.  But who was he texting just

6    before making that purchase?  Who was he talking to earlier

7    that day?  The defendant.

8            Tamerlan bought the backpacks on that Sunday

9    afternoon, the day before the bombing.  That same afternoon the

10   defendant went somewhere else to buy that SIM card for his

11   phone.  It may have been Tamerlan who bought BB's up in New

12   Hampshire, but there was a box of BB's in the defendant's dorm

13   room down at Dartmouth.

14           Tamerlan bought the remote control car parts on the

15   Internet, first from Flysky, and then at the other -- RC Hobby

16   Car shop for the Spectrum set.  And that was a week before the

17   bombings.  By that time, a week before the bombings, the

18   defendant and his brother were fully engaged in their

19   conspiracy to plant these bombs.  They knew what they were

20   going to do.  In fact, the same day as that transmitter

21   purchase, the defendant tweeted this:  "If you have the

22   knowledge and the inspiration, all that's left is to take

23   action."

24           They each had their roles.  Around the same time that

25   Tamerlan was ordering that first transmitter, the defendant was

1    ordering up a gun from his friend Stephen Silva.  Stephen Silva

2    had just come in to a gun, and he said he could let the

3    defendant borrow it for what the defendant said, so he could

4    rob a couple of University of Rhode Island students.

5         Remember Silva's testimony?  Silva had known him since

6    he was a kid.  Silva couldn't imagine that the defendant was

7    capable of doing something like this, but he didn't know the

8    jihadi side of the defendant.  He took the defendant at his

9    word when in January or February he asked for the gun for the

10   robbery.  The defendant also had asked him for the food for the

11   dog, which was a reference to the ammunition for the gun.

12        And obtaining this gun was the key that the defendant

13   and his brother needed for what happened after the bombings.

14   Without this gun, they wouldn't have been able to kill Sean

15   Collier.  Without this gun, they wouldn't have been able to

16   hold up Dun Meng.  Without this gun, they wouldn't have been

17   able to shoot at police officers in Watertown.  The defendant

18   had done his job well.

19        Silva didn't know that in March, spring break, the

20   defendant and his brother went back up to New Hampshire to go

21   to the gun range up there.  There they practiced shooting 9

22   millimeters.  The defendant paid, and for an hour the two of

23   them spent about $170 just shooting.  It's easy to wonder what

24   they were imagining were targets as they were shooting.

25        But in this case, ladies and gentlemen, we don't have

1    to wonder.  We know that they were imagining police officers

2    because that's what they used -- that's what they used the gun

3    to actually shoot at.

4         We've seen other evidence of the defendant's double

5    life.  There were sides of himself that he did not show to his

6    friends.  Around them, Stephen Silva told you, he was well

7    liked, he would smoke pot, he was cool, he was laid back, but

8    there were signs of another side to him.

9         Silva mentioned one time the defendant called him an

10   infidel or a kafir, another where the defendant got pissed off

11   when Silva called him a Russian refugee.  Silva rarely visited

12   him at his house.  The defendant spent most of his other life,

13   the other side, the jihadi side, in the privacy of his bedroom,

14   sometimes with his brother, sometimes with his headphones on.

15   There he descended into violent Islamist extremism.

16        The computer evidence showed you that since 2011, well

17   before the missing thumb drive that you heard about, he had

18   been accessing these jihad nasheeds and other inspirational

19   media on his laptop.  The defendant got the stuff, he read the

20   stuff, he believed the stuff, and he acted on it.  That's what

21   the computer evidence shows.  He assembled a library.  Some of

22   it Tamerlan gave him; some of it he gathered himself.  The

23   defendant would put his headphones on and lose himself in the

24   chants, the lectures, the music of jihad.  He escaped when he

25   put that music on.  And that's why he put it on all of his

1    phones, his iPods, his computer, all without his brother.

2           In fact, even after his brother left for Russia, the

3    defendant was accessing jihadi materials on his computer.  He

4    was accessing Anwar al-Awlaki.  That's why he went back to

5    Watertown to grab that CD of jihad -- nasheeds CD -- nasheeds

6    on that CD before they headed to New York.  They were doing

7    this together, just like other terrorists.  They had decided

8    that justice for them meant they were becoming holy warriors.

9           The defendant's radicalization started years before,

10   perhaps even in high school.  But you saw that no matter when

11   it started, by the time it was Patriots' Day of 2012, the year

12   before the marathon bombings, the defendant had completely

13   internalized Anwar Awlaki's message.  He posted this quote:

14   "They will spend their money, and they will regret it, and they

15   will be defeated."  Now, none of his friends would know what

16   this means unless they, too, had listened to Anwar Awlaki.

17   That day, he went to the marathon with his friend.

18          Later, he accessed some of the jihadi materials on his

19   computer.  And on Christmas break of 2012, the Christmas before

20   the bombings, he accessed the *Inspire* magazine with the

21   bomb-making instructions on the desktop computer in his bedroom

22   at 410 Norfolk.  The computer evidence shows that this complete

23   file, which is the file of that first *Inspire* magazine, was

24   accessed on December 23rd, again on December 26th, and we know

25   he was accessing his own email on that computer.

1          Of course we also know that he and his brother were
2    planning something then because he said so.  This -- sorry.
3    The cell site location also showed that he was at the dorm room
4    -- excuse me, at the 410 Norfolk Street around Christmas of
5    2012.  This is Chad Fitzgerald.
6          He even said that he was doing something with
7    Tamerlan -- this is Christmas Day back in 2012 -- doing
8    something with Tamerlan.  "I'll hit you up in a bit, bro."
9    Later, talking to that same friend, he explains that he wants
10   to bring justice for his people.  This is his mind-set at that
11   time.
12         Later, talking with the same friend in January, he
13   says, "There's one other option, bro.  Get the highest level of
14   Jannah."  His friend asks whether it's jihad.  He says that
15   he's really down with the jihad way of life, and the defendant
16   said, "Don't be hot over the phone.  LOL.  Be for that, man."
17         Then finally he says here, January 28th, "I got a
18   plan.  I'll tell you later about it."
19         He was conscious of the fact that law enforcement may
20   have actually picked up on his conversation.  He was careful.
21   That's what you do when you live a double life.  What they were
22   doing together was starting their plan to bomb the Boston
23   Marathon.  What they were doing together was planning to get a
24   gun.  What they were doing together was getting ready for what
25   unfolded.

1             During that time, the defendant starts accessing more

2    websites related to this extremist material, and he creates

3    another alter ego online.  He creates this -- another Twitter

4    account called Ghuraba.  You heard that means stranger.  In

5    fact, he says it right here.  "Ghuraba means stranger.  Out

6    here in the West, we should stand out among the non-believers."

7             He talks about the infidels and getting victory over

8    them.  He talks about the weapons of the believers.  And he

9    talks about Anwar al-Awlaki, and he encourages people, his

10   followers, to listen to Awlaki's Hereafter series.  It worked

11   on him.  He said he strives to reach Jannah, or paradise.

12            We saw from the defendant's computer witness that

13   around March of 2013 it was the defendant who was accessing

14   Awlaki files on that portable hard drive that was found in

15   Watertown.  He wished the Silva twins a happy birthday at the

16   beginning of April, he picked up some pot and then he retreated

17   to the place where he found comfort, with his headphones on,

18   with his brother, in his bedroom at 410 Norfolk, his black flag

19   on the wall.  He had found the solution for his failures.  He

20   had opportunities to make different choices along the way.

21   These are the choices that he made, and that's why we're here.

22            Now, you won't be surprised to know, as the judge

23   already explained to you, that blowing up bombs at the Boston

24   Marathon and the other places is a violation of several federal

25   laws.  And the more bombs, the more charges.  And while the

1   verdict slip may be long and sometimes confusing, you should

2   not be intimidated.  Each of the elements are straightforward,

3   and the crimes are, in the end, pretty simple.

4        Although the defendant's charged with 30 counts, 30

5   different crimes, many of them overlap.  You heard from the

6   instructions how some of them overlap, and they interrelate to

7   each other.  There are really only six sets of charges.  They

8   involve different crime scenes and different acts.

9        Many of the charges are interrelated, so that, for

10  example, using a bomb with a firearm together might be a

11  separate charge than just using the bomb or just using the

12  firearm.  And using either of those, the bomb, which is

13  technically called a firearm, in the course of one of the

14  conspiracy charges, the conspiracy to use a weapon of mass

15  destruction, conspiracy to bomb a place of public use, and the

16  other conspiracy charge, that each of those is -- also

17  constitutes a crime.

18       Some of the charges involve a conspiracy, and the

19  judge explained that to you, and it's basically when two or

20  more people agree to do something that the law forbids.  That

21  itself is a crime.  You don't actually have to go through with

22  it.  If you plan to do it, then just that agreement becomes the

23  crime.

24       In this case, there are three sets of crimes --

25  conspiracy crimes.  And they relate to the entire chain of

1    events, from the beginning to the end, because this was a

2    terrorist conspiracy; they were trying to inflict terror.  The

3    agreement was between the defendant and his brother to engage

4    in this terrorist bombing campaign.

5         And this chart helps you explain -- helps kind of

6    graphically represent how you might want to think about this.

7    I'd suggest to you the best way -- the best tool that you're

8    going to have as you deliberate is the verdict slip itself.  It

9    lays things out in a step-wise manner.  You can answer one

10   question, then move to the next.  And it tracks the language in

11   the indictment.  And you can use that as a guide.

12        But just so you have a graphic representation on how

13   to compartmentalize from 30 charges down to about six, put them

14   in this mode.  The last conspiracy was maliciously destroying

15   property.

16        The first set of counts involves the marathon bombing.

17   Judge O'Toole told you that the conspiracy is one way to find

18   liability, and the other way is to find through something

19   called aiding and abetting.  When two people who do a crime

20   together, where each has a different goal but they both intend

21   to do the same crime and act in accordance with that plan, that

22   they're equally guilty in the eyes of the law.  And that's why

23   the defendant is guilty for the crimes in front of Marathon

24   Sports just as much as he is for those in front of the Forum.

25        Each of the two bombs at the marathon killed and

1    caused grave risk of harm.  Each were weapons of mass
2    destruction and technically constituted what are called
3    firearms.
4          There's one other element that may not be
5    self-evident, and the judge touched on it, and that's that the
6    place of public use must affect interstate commerce.  Clearly
7    the stores, Marathon Sports and Forum, affects interstate
8    commerce.  The marathon itself interstate -- affects interstate
9    commerce.  And "interstate commerce" basically means that
10   they're in the stream of commerce.  And that, as you can
11   imagine, is an element because this is federal court.
12         For some of the other crimes, the interstate commerce
13   element will also come in.  That's why -- one of the reasons
14   you heard that there was a stipulation that the Mercedes, Dun
15   Meng's Mercedes, that that too had traveled in interstate
16   commerce, because as part of the carjacking you have to find
17   that that had traveled in interstate commerce.
18         You also heard that the Ruger, the gun, was
19   manufactured out of state, so that too traveled in interstate
20   commerce, again because of one of these elements.  And then
21   finally, the ATM card, going in and taking money out of Dun
22   Meng's ATM bank account, which was connected to all the other
23   banks in the country and around the world, that too affected
24   interstate commerce.  That's why that information was presented
25   to you.

1           So the first set of charges, the overall conspiracy;

2     then scene A, these are the substantive counts; then scene B,

3     these are the substantive counts at the Forum.

4           Then there are the charges of the murder of Sean

5     Collier, Counts 16 through 18.  Those involve using the firearm

6     in order to commit the crime of violence.  They're based on the

7     fact that in the course of the conspiracy they used that gun so

8     that they could continue their campaign of terror.  And since

9     we've said from the beginning it doesn't matter who pulled the

10    trigger, both the defendant and his brother are equally guilty

11    of committing this crime.

12          Third, you have the use of the -- to skip over the

13    robbery for a second, you have the use of the gun and the bombs

14    in Watertown.  These are the charges related to how this

15    defendant and his brother tried to kill the police officers in

16    Watertown.  It's hard to imagine how Officer Donohue actually

17    survived and how more officers weren't injured, but for each

18    pipe bomb that had exploded, the pressure cooker bomb and the

19    use of the Ruger -- each of those provides a basis for another

20    criminal charge.

21          And you'll see that these crimes, as you'll see in the

22    verdict slip, they're couplets.  So when you use one of

23    these device -- a firearm in the course of commanding another

24    crime of violence, then that itself is a crime, and that's why

25    you'll see two pairs of charges for each of those for

1    Watertown.

2          And then finally, the robbery of Dun Meng.  He was

3    charged with carjacking Dun Meng's car, and the fact that

4    Officer Dick Donohue was seriously injured as a result of that

5    carjacking.

6          Many of the charges involve the use of a firearm, one

7    of the bombs and the Ruger, in conjunction with the other

8    charges that I mentioned.  Because of this, you'll have to go

9    through and assess whether each of the bombs that exploded was

10   used and whether the Ruger was carried, brandished -- which the

11   judge explained means shown -- or discharged, because the

12   evidence in this case is that all of those things happened.

13   Even though these charges capture similar conduct, they involve

14   different elements, and for that reason, the defendant is

15   guilty of those crimes as well.

16         The defendant and his brother teamed up to terrorize a

17   region in 2013.  They bought bags full of bombs, planned to

18   kill even more, and by the end, they had murdered four people,

19   they had maimed 17, and they wounded hundreds, more than 240

20   others.  Martin William Richard, Krystle Marie Campbell, Lingzi

21   Lu, and Officer Sean Collier are no longer with us.  This is

22   the result of the defendant's choice to be a terrorist hero, to

23   make a statement.  These were choices that he was proud of, and

24   it devastated the lives of those who survived.

25         This is how the defendant saw his crimes.

1          (Audio and video recording played.)

2          MR. CHAKRAVARTY:  But this is the cold reality of what

3   his crimes left behind.

4          (Photographs displayed.)

5          MR. CHAKRAVARTY:  Officer Collier was shot five times,

6   at least three shots in the head, two from close range.  One

7   shot was between the eyes.  He died of his gunshot wounds.

8          Krystle Campbell received massive blast injuries to

9   her lower extremities.  Parts of her body were shredded from

10  the bomb.  She lived for up to a minute while the blood seeped

11  out of her body onto the pavement.  She told her friends that

12  her legs hurt, and she died from loss of blood.

13         Lingzi Lu received mass injuries all over her body.

14  She didn't even plan to be there on that day.  Her leg was torn

15  open, transecting her blood vessels.  She bled out as emergency

16  responders performed CPR on her.

17         And Martin Richard.  His entire body was shattered.

18  It was broken, eviscerated, burned.  There wasn't a part of

19  this boy's body that wasn't destroyed.

20         You'll probably never forget Bill Richard.  At one

21  point he said, as only he could, "I guess we were just unlucky

22  that day."  But there was nothing about this day that was a

23  twist of fate.  This was a cold, calculated, terrorist act.

24  This was intentional.  It was blood thirsty.  It was to make a

25  point.  It was, "Tell America that we will not be terrorized by

1    you anymore.  We will terrorize you.  We will punish you."

2          The Richard family happens to pass -- their path

3    happened to cross the defendant's that day, and the defendant

4    made them pay.  He was there to punish.

5          Each of the 30 criminal charges capture the criminal

6    conduct that the defendant and his brother did.  The defendant

7    ran away from Boylston Street.  He ran away from Officer

8    Collier's killing at MIT.  He fled the scene in Watertown, and

9    he hid in that boat, and he penned his last justification,

10   taking credit and being proud of what he had done.

11         Now, ladies and gentlemen, finally, it's the time to

12   hold him accountable, to find him responsible for each of the

13   charges in the indictment.  We ask you to do that now.

14         THE COURT:  I think, in light of the hour, we'll take

15   a lunch recess at this point.

16         So, jurors, we'll take the lunch recess as normal.

17   We'll resume, I guess, at two o'clock to give everybody

18   comfortable time.

19         Please, no discussion of the case, obviously, until

20   you've heard the rest of what we have to present today.  And

21   I'm sure you'll find other things to talk about and engage your

22   interest during the lunch.  Enjoy the lunch, and we'll see you

23   at two o'clock to continue the matter.

24         THE CLERK:  All rise for the Court and the jury.  The

25   Court will take the lunch recess.

1            (The Court and jury exit the courtroom and there is a

2    recess in the proceedings at 12:53 p.m.)

3            THE CLERK:  All rise for the Court and the jury.

4            (The Court and jury enter the courtroom at 2:14 p.m.)

5            THE CLERK:  Be seated.

6            THE COURT:  All right.  We're ready to continue with

7    the defendant's closing.

8            Ms. Clarke.

9            Are you using the CART computer?

10           MR. FICK:  I think it's all set up, your Honor.  Thank

11   you.

12           MS. CLARKE:  Good afternoon.

13           THE JURORS:  Good afternoon.

14           MS. CLARKE:  In the past few weeks, we have come

15   face-to-face with tragedy, suffering and grief in dimensions

16   that none of us could imagine possible.  We would never have

17   thought that this devastation would touch our lives so

18   directly.

19           We've heard words, we've heard screams, and we've

20   heard cries.  We've seen shocking videos; we've seen horrific

21   photos; we've seen the clothes of young Martin Richard.  We've

22   seen the faces of people who live daily the pain and

23   devastation that we only witnessed.

24           For this destruction, suffering and profound loss,

25   there is no excuse.  No one is trying to make one.  Planting

1    bombs at the Boston Marathon one year and 51 weeks ago was a

2    senseless act.

3           Jahar Tsarnaev followed his brother down Boylston

4    Street carrying a backpack with a pressure cooker bomb in it

5    and put it down in front of the Forum restaurant, knowing that

6    within minutes it would explode.  Three days later, Tamerlan

7    Tsarnaev murdered Officer Collier, and Jahar was right there

8    with him.

9           Within a half an hour or so, Tamerlan -- this is

10   giving me feedback -- Tamerlan Tsarnaev held a gun to Dun

11   Meng's head, demanded him to drive, and Jahar followed in the

12   Honda.  He took the ATM card, he took the code, and he stole

13   $800 from Dun Meng's ATM account.  Jahar was part of a shootout

14   in Watertown.  We know that his brother had the Ruger P95

15   because he was shooting at the police.  We know that Jahar had

16   a BB gun.

17          Still, he hurled explosives at the police, and when he

18   saw his brother walk into a hail of gunfire shooting, clearly

19   determined to go out in a blaze of glory, he ran to the

20   Mercedes and escaped as police riddled the Mercedes with

21   bullets.  And he ran over his older brother, the brother that

22   he loved, and the brother that he followed.

23          When I talked with you almost -- just over a month

24   ago, I said to you the evidence would bear out all of the

25   events that I just talked about and that they just talked

about.  And it has.  I said to you that we would not disagree
with this evidence or dispute it, challenge it, and we haven't.
I said to you that it was inexcusable, and it is.  And Jahar
Tsarnaev stands ready, by your verdict, to be held responsible
for his actions.

I also told you that while we agreed with the
prosecution on a lot, mostly the big questions in this case --
the who, what, where and when -- we very much disagreed about
the why.  In order to fully understand what happened on April
the 15th, 2013, and the four days that followed it, it's
important to know who did what and why it was done.  Tamerlan
and Jahar were brothers, but they're both individual people who
thought differently, acted differently and had a very different
role in the conspiracies charged.

The prosecution must believe that this is important to
understand their varying roles because they made an issue of it
and attempted to bring you evidence that Jahar Tsarnaev was an
equal partner with his brother and that he self-radicalized
himself.  This is simply not true.

What you heard from the government, and you heard it
again today -- they made the bombs, they killed Officer
Collier, Tamerlan didn't always lead down Boylston Street, they
said to Dun Meng certain things -- when the evidence is that
Tamerlan built the bombs, Tamerlan murdered Officer Collier,
Tamerlan led and Jahar followed, and Tamerlan talked always to

1    Dun Meng.  You remember his testimony.

2           So let's talk a little bit about what the evidence

3    does show in terms of roles.  Who researched building the

4    bombs?  Who bought the necessary materials?  Who planned this

5    series of horrific events?  And I see you don't have notes, so

6    I won't give you exhibit numbers, but I want to show you some

7    exhibits and talk with you about some of the exhibits.

8           We know that Tamerlan did Internet research about the

9    electronic parts.  And you can see it here.  The radio

10   transmitter receiver, the radio transmitter, the transmitter

11   receiver, the radio, all on April the 7th.  You can see it; I

12   think it's -- is it on your screens?  The fireworks firing

13   system.  Tamerlan did that research.

14          Tamerlan's computer -- and if we could pull up the

15   next one.

16          Tamerlan's computer had a Russian translation of the

17   *Inspire* magazine.  Remember that, the *Inspire* magazine,

18   bomb-making instructions.  He had a sort of value-added Russian

19   translation on his computer which advised search the Internet

20   with the terms "radio detonator" and "mobile detonator."  There

21   was a Russian language set of instructions on Tamerlan's

22   computer, and this is in evidence with the translations.

23          The second document was telling people how to

24   construct these bombs without blowing themselves up.  Also,

25   when you're making the bomb, get rid of all the metal things,

1    as they might detonate the powder.  Work only with wooden and

2    plastic things; for example, you should not use a metal bucket

3    and all that is connected to it.  That was on Tamerlan's

4    computer.  Those bomb-making instructions were not on Jahar's

5    computer.

6            Tamerlan bought the pressure cookers.  Now, we heard

7    evidence and I think we saw the GPS maps of the January 31st

8    purchase of pressure cookers.  Today the prosecutor suggested

9    to you that perhaps Tamerlan bought them.  Of course Tamerlan

10   bought them because here's what we know:  Tamerlan is at

11   the -- he stops at 7:45 p.m. up north of -- here's Saugus, but

12   up north, and then he comes back and he stops at 8:13 p.m., and

13   the pressure cookers are purchased at 8:38 p.m.  So he's on the

14   road at 7:45, stopping at 8:13 and buying the pressure cookers

15   at 8:38 p.m.

16           Where was Jahar?  He was in Dartmouth during those

17   time periods.  It's not that it might have been Tamerlan buying

18   the pressure cookers; it was Tamerlan buying the pressure

19   cookers.  Jahar was in Dartmouth.  Well, his telephone was in

20   Dartmouth.  Now, I don't know too many 19-year-old folks who

21   leave their phones and go without them.  In fact, the

22   prosecutor made the point of that, how they always carry their

23   phones.  And here's Jahar with an outbound text and data usage

24   on his phone making it impossible for him to have been where

25   the pressure cookers were bought and when the pressure cookers

1    were bought.

2          Tamerlan bought the -- you saw with Agent Knapp's

3    testimony that the agent that brought us the mock-up of the

4    pressure cooker bombs, and he showed you the car -- how the car

5    would be used -- the parts of the radio-controlled car would be

6    used.  Tamerlan brought -- bought a radio -- the Rally Monster

7    truck.  On February the 8th, it was shipped to his house.  And

8    we can show what he purchased at the bottom of the receipt.

9          Can you pull it up?

10          MR. FICK:  No.

11          MS. CLARKE:  Well, the bottom of the receipt shows --

12    there we go -- purchasing the Rally Monster -- Off-Road Rally

13    truck.  It has rechargeable batteries being purchased and

14    transmitters being purchased.  Tamerlan bought those.

15          Tamerlan bought the BBs that were loaded into the

16    bombs.  Now, that was another one of those series of GPS maps,

17    and then Jerry Grant, who testified, showed where Jahar's phone

18    was.

19          Here is the GPS that shows Tamerlan's journey that

20    day, and I want you to hang on in your head for a moment, if

21    you can.  The first stop was at Keller Street in Manchester,

22    New Hampshire.  Walmart in Keller Street in Manchester, New

23    Hampshire.  There's a receipt for the purchase of BBs at

24    3:22 p.m.  Keller Street.  And then there's a stop at Bedford,

25    New Hampshire, and then there's a stop in Amherst, New

1    Hampshire, and another purchase of BBs at the Amherst, New

2    Hampshire, stop.  The purchase was in the -- at 5:36 p.m.  And

3    then there's another stop in Hudson.  So there's a stop on

4    Keller Street, Bedford, Amherst, and Hudson.

5            Now, you remember Tamerlan Tsarnaev's wallet that was

6    found in the back of the Honda on Watertown.  In his wallet

7    were a variety of receipts that we helped put into evidence.

8    And one of the documents in his wallet was this, with Walmart

9    and telephones, Hudson, New Hampshire; Keller Street; Bedford.

10   He had his notes in his wallet of where he had gone to purchase

11   the BBs.

12           Where was Jahar?  Again, he was in Dartmouth.  Data

13   usage on his phone, an outbound text on his phone at about the

14   same times that the purchases were being made.

15           It's not that possibly Tamerlan bought these items; he

16   did.  Jahar wasn't with him.

17           Tamerlan bought the additional electronics on April

18   the 8th.  There's a receipt, RC Cars of Boston, that was found

19   in one of the cars parked on Norfolk Street.  And it's in

20   Tamerlan's name, RC Cars of Boston.  And I think it was Agent

21   Knapp who again told you that that was a purchase of an

22   additional transmitter and receiver.  Tamerlan did that.

23           Tamerlan searched online for the Boston Marathon.  The

24   prosecution argued to you that Jahar selected the marathon.

25   Tamerlan did.  Tamerlan searched the Boston Marathon before the

1    Boston Marathon.  There are no such searches on Jahar's

2    computers.  This is Tamerlan's Samsung laptop.

3           Tamerlan bought the backpacks.  He -- again in that

4    wallet, there's a Target receipt for purchase of the backpacks.

5           Have you got that, Bill?

6           Here's the -- it's in the wallet.  You'll see a

7    picture of all of the items that were in the wallet, and you'll

8    have the wallet as well, but in the wallet is the Target

9    backpack purchase.  And here's the picture of Tamerlan leaving

10   the store.  He was alone.

11          Now, the prosecution introduced a lot of evidence

12   found at the Norfolk Street apartment, and you would think that

13   they gave it to you because it's related in some way to bomb

14   making.  But what didn't they bring to you?  Whose prints were

15   all over those items?

16          Now, the cross-examination of Elena Graff, who was --

17   it's a first for her.  She's an FBI fingerprint analyst called

18   by the defense to testify about fingerprints, and the

19   cross-examination [*sic*] is some fingerprints disappear.  So all

20   of Jahar's fingerprints disappeared, and Tamerlan's stayed on

21   there.  You know who made these bombs.  It was Tamerlan.

22          We know from Elena Graff that Tamerlan's prints were

23   on the glass jar with the nails in it.  Tamerlan's prints were

24   on the caulk gun.  Tamerlan's prints were on -- well, you'll

25   find this caulk gun in several places.  I think actually

1    physically in evidence, but you won't be able to find

2    fingerprints on it.  I wouldn't be able to.  But prints were on

3    it.  And it's also in the interactive.  Remember that exhibit

4    that you can click on and see the room and click on a button

5    and it shows you what was found where?  It's also in that

6    exhibit.  Tamerlan's prints were on the tape.  Tamerlan's

7    prints were on the solder gun.  In fact, in Tamerlan's wallet

8    was a Home Depot receipt for the purchase of that solder gun.

9         Tamerlan's prints were on the tape inside the toolkit.

10   Tamerlan's -- and this is just a larger picture.  You can see

11   the little ring of tape where they found Tamerlan's prints and

12   the toolkit.  Tamerlan's prints are on a set of pliers in the

13   toolkit.  Tamerlan's prints were on the gun-cleaning kit.  And

14   Tamerlan's prints were on the wiring book.

15        So the items of evidence that the prosecut- -- and the

16   government -- that the investigation seized from Norfolk, those

17   items were seized because somebody thought they were relevant

18   to bomb making.  And whose prints were on them all?

19   Tamerlan's.  Whose prints were not?  Jahar's.

20        Elena Graff, though, FBI fingerprint analyst, also

21   told you that Tamerlan's prints were found on two items of

22   evidence seized on Boylston Street.  The cardboard was seized

23   from what they called Scene A, the first bomb, and the paper

24   inside an exploded backpack seized at what they call Scene B,

25   the second bomb; and Tamerlan's prints were found on the

1    cardboard, and Tamerlan's prints were found on the paper.

2    Whose prints were not found?  Jahar's.

3           There was a transmitter found at Watertown that Elena

4    Graff also analyzed, and this was the lab photo of it sort of

5    dismantled.  Tamerlan's prints were found on the transmitter.

6           There was a pressure cooker lid.  And you may remember

7    the picture.  It's like it landed far away and in somebody's

8    backyard, the pressure cooker lid.  Tamerlan's prints were

9    found on it.

10          We know that explosive residue was found on a set of

11   rubber gloves found in Tamerlan's car.  Remember the agent

12   testified about that being residue?  Found in Tamerlan's car.

13          And notably missing was any residue found in Jahar's

14   dorm room where he did live.  There was some explosive residue

15   found in Norfolk where he didn't live.  And contrary to what

16   Agent Imel -- you may remember his testimony early in the days

17   of this case -- contrary to his suggestion that Tamerlan didn't

18   always lead down Boylston, he did.

19          So let's be honest about what the evidence actually

20   shows.  We are not asking you to excuse the conduct, but let's

21   look at the varying roles.  Tamerlan shot and killed Officer

22   Collier.  The prosecution argued they didn't know who did that

23   murder.  We know.  We know.  Let's look at the evidence of what

24   we know.

25          First, he confessed to Dun Meng that "I just killed a

 1    policeman."  He confessed.  You probably remember this video,

 2    and I don't think we have to play it again.  The prosecution

 3    played it for you.  This is that -- that -- you've got the

 4    distant surveillance and then the up-close surveillance.  Oh,

 5    they're playing it.

 6              (Video recording played.)

 7              MS. CLARKE:  Very clearly -- if you can stop it, Bill.

 8              Very clearly, two people walk up to the driver's side

 9    of Officer Collier's car.  Two people.  Very clearly.  I mean,

10    to the extent anything is very clear, but you can see two

11    figures, one in front of the other, walking up to Officer

12    Collier's car.

13              Now, Nate Harman, the MIT student who came in, rides

14    by on his bicycle not long after this.  He rides by on his

15    bicycle.  Remember, he's going home.  It's a little late, and

16    he's going to bike on home.  And what Nate Harman said is, "I

17    only saw one person."  And that one person was who?  Jahar.

18    And that one person stood up -- had the yellow on his

19    sweatshirt and stood up, and they locked eyes for a moment.

20    That was the only person that Nate Harman saw.

21              So where was Tamerlan?  If Jahar is standing up and

22    looking at Nate Harman, where is Tamerlan?  As the door

23    opens -- you know, here's the car, and the door opens --

24    there's a V.  Here's Jahar standing, looking at Nate Harman.

25    Where is Tamerlan?  He's got to be squatted down trying to get

 1   Officer Collier's gun.  And getting Officer Collier's gun would

 2   put blood on your hands or blood on the gloves that you were

 3   wearing.

 4         Now, remember those gloves were found in the driver's

 5   side floor with blood on them?  Whose blood?  Officer Collier's

 6   blood.  Officer Collier's blood was found on the keys, so the

 7   gloves were used to start the car.

 8         Where were the -- where was Tamerlan's personal

 9   belongings found?

10         And I don't know if we have it.  Exhibit 879.

11         Where was Tamerlan's personal items found?  Right

12   behind the driver's seat in the Honda.  The bloody gloves are

13   found on the driver's side.  Tamerlan's wallet was found on the

14   backseat driver's side.

15         Now, the prosecution put on Stephen Silva to say that

16   Jahar asked him for a gun.  But pretty clearly that gun went to

17   who?  Tamerlan.

18         In addition to the confession that he gave to Dun

19   Meng, Tamerlan did what?  He searched the Ruger P95 on the

20   Internet.  He had the gun at Watertown.  He shot at the police

21   at Watertown.  He threw the gun at the police at Watertown.

22   Tamerlan had that Ruger the entire time.  Tamerlan is the one

23   who murdered Officer Collier.  Whose prints were found on the

24   magazine that went in that gun?  Tamerlan's.

25         Now, what does any of this matter when we know that

1    Jahar walked down Boylston Street with a bomb in a backpack and

2    put it down in front of the Forum restaurant?  When he was

3    beside his brother when his brother murdered Officer Collier?

4    When we know that when Tamerlan held Dun Meng hostage, Jahar

5    took money out of his account; and we know that Jahar hurled

6    bombs at the police?  What does any of what I just discussed

7    with you matter?

8           It matters because you're entitled to know the full

9    picture.  It matters because it's important for us at this

10   stage to tell you as much as we could.  We don't deny that

11   Jahar fully participated in the events, but if not for

12   Tamerlan, it would not have happened.

13          There's some other things that we should talk about,

14   and one is radicalization.  The government wants you to believe

15   that Jahar was self-radicalized essentially from high school;

16   that he was a young extremist in the making; that he was a

17   young jihadi in high school in the making; that his tweets were

18   jihadi; and that he attended the 2012 marathon, I guess,

19   because he was planning it that much in advance.

20          They brought you Stephen Silva to suggest that there

21   was a debate in the world history class and Jahar took some

22   extreme position.  He didn't.

23          They continued to flash up onto the screen but when

24   going through the computers a paper called "The Predator

25   War" -- you'll see it -- in which there was a discussion of the

1   use of drones.  And what they seemingly just simply deny is

2   that was a class assignment, and instead use it to try to

3   promote that Jahar was a young jihadi in the making.

4        The government introduced the black Islamic flag and a

5   picture of Jahar in front of it suggesting self-radicalization

6   and suggesting perhaps a connection to a terrorist group.  They

7   just played, to tug on your heartstrings, some nasheeds while

8   looking at the flag, suggesting that there's something ominous

9   or wrong about that flag.  Their own expert, their own expert,

10  Matthew Levitt, said there's nothing radical about that flag.

11  Some groups have adopted it, but there is nothing radical about

12  the flag.  It is a religious flag.

13       The government argued to you through Stephen Silva,

14  again, that Jahar went to the 2012 marathon.  Now, going back

15  that far, it's hard to convince somebody you weren't where they

16  say you were that long ago.  But we did the best we could to

17  provide you circumstantial evidence, and I think the

18  circumstantial evidence is pretty strong that he wasn't there.

19       There is, in evidence, again, one of the swipe card

20  sheets from UMass Dartmouth on April 15th in the afternoon,

21  about four o'clock.  Jahar goes in to Maple Ridge Hall, which

22  was the dorm he was in first year.  At about five o'clock, he

23  tweets, "I'm about to sleep for 20 hours."  That sounds like a

24  19-year-old to me.

25       April 16th, the next day, the day of the 2012

marathon, at 6:42 in the morning he tweets -- and you've seen
this tweet quite a lot, actually -- "They will spend their
money, and they will regret it, and they will be defeated."
Now, that -- everybody debated the source of that and what that
meant and the context of it.

At 8:38 in the morning, Jahar tweets, "Hmm.  Get
breakfast or go back to sleep?  This is always a tough one."
It sounds like a teenager.  At 8:45 he tweets, "Sleep after
breakfast is so much sweeter."  At 8 -- at 10:56, he uses his
access card to come back into the dorm.  At almost -- 12:46,
almost one o'clock, he's tweeting again.

At 1:30 in the morning -- again, only the teenagers
can do it -- he uses his access card to enter his dorm again.
The likelihood that this kid, who was sleeping and eating
breakfast and going back to sleep and about to sleep for 20
hours, drove to Boston and went to the 2012 marathon is slim.
I don't know what it means if he did, but it sure doesn't look
like he did.

The government suggested to you deep and
self-radicalization by the -- remember the Al_Firdausia
account, the seven tweets over a two -day period of time?  Look
at them.  There is no promotion of violence in there.  There's
no promotion of extremism in there.  Looking back, somebody can
always say that you must have been thinking something evil at
the time.  There isn't.  And regardless, it went for two days

1    and ended.  Jahar lost interest in it.

2         The government then suggested that Jahar's regular

3    Twitter account -- and you may remember the agent that

4    testified and Ms. Conrad who cross-examined him about the

5    tweets.  And they're suggesting that all of these tweets had

6    some ominous, evil context to them.  The agent didn't bother to

7    investigate rap songs, to investigate Nas' and Eminem and Lil

8    Wayne and to investigate that the quotes from poems, from

9    horoscopes, from Comedy Central, instead telling you that this

10   is some evidence of a jihadi in the making.  The entire tweet

11   is in -- it's Exhibit 3,000.  It's a thick document.  And it's

12   in evidence, and you can look.

13        And the government really cherry-picked the tweets

14   that they showed you and left out the ones where it was pretty

15   much teenage, adolescent sort of tweeting about girls and

16   missing class and not doing homework and sleeping.

17        If we look in the context of the allegation of

18   self-radicalization, let's look at Jahar's Internet-browsing

19   history.  Remember Mark Spencer, the computer guy that came in

20   and testified?  And here's Jahar's browsing history.  The

21   leading candidate is -- not candidate, the leading browsing

22   search was Facebook.  The next one was VK, which is the Russian

23   Facebook.  This is a kid doing kid things.  This is an

24   adolescent -- this is a teenager doing teenage things.

25        The government suggested to you that a representative

1    sample of the documents on Jahar's computer were all jihadi,

2    and they selected a few files from 500,000 items and thousands

3    of files on a computer and brought them to you.  We do not deny

4    that he had these extremist materials on his computer.  But

5    let's be honest about how prominent they were in his life and

6    when.

7            The library of extremist materials -- you remember the

8    hard drive found in Watertown -- we called it the Laurel hard

9    drive -- and it was found inside a computer bag that had

10   Tamerlan's high school graduation certificate, a travel

11   document that -- for Tamerlan.  It had Tamerlan's computer in

12   it.  That computer bag had the hard drive in it.

13           And what we brought to you was very clear evidence

14   through Mark Spencer that that hard drive was formatted by

15   Tamerlan's Samsung; that hard drive was loaded -- all of those

16   documents on that hard drive came from Tamerlan's Samsung

17   laptop.

18           There was a lot of discussion about complete *Inspire*.

19   That's the one that has "How to Build a Bomb in the Kitchen of

20   Your Mom" in it.  A lot of discussion about that.  A lot of

21   times you were shown that document.

22           But we tried to trace the history of it for you.  We

23   know that Tamerlan got his -- activated Windows on his laptop.

24   I hope you're computer friendly, but after listening to how

25   much you know about people from computers, I think we may want

1    to never use one again.

2         But complete *Inspire* was on -- let me start this way:

3    Tamerlan's laptop opened Windows on December the 21st.

4         Have you got that, Bill?

5         MR. FICK:  Hang on.

6         MS. CLARKE:  Do you remember Mark Spencer showed you a

7    PowerPoint-slide-looking thing that had Tamerlan's laptop, the

8    Sony and the HP?  And it showed when Windows was opened on all

9    of those.  Essentially what that means is that's when the

10   computer -- somebody got it and started it up and began to use

11   it.  And Tamerlan's laptop was -- Windows was loaded --

12        Have you got it here?

13        Windows was loaded on Tamerlan's laptop on December

14   21st, 2011.  The complete *Inspire* went onto Tamerlan's laptop

15   on December 21st, 2011, almost immediately.  And then we can

16   show you the flow of this complete *Inspire* magazine because it

17   goes from Tamerlan's laptop, which is the Samsung -- there's an

18   attachment of the Patriot -- the now-missing Patriot thumb

19   drive -- to the laptop on January 21st.  And remember, January

20   21st is the day that Tamerlan left for Russia.

21        The file was created -- complete *Inspire* was created

22   on that Patriot thumb drive from the Samsung, and then it

23   attached -- the Patriot attached then to the Sony, and the file

24   was created on the Sony.  So it came from Tamerlan's laptop to

25   the Patriot thumb drive to Jahar's laptop.  That is the course

1    of the complete *Inspire* magazine.  It does not mean that Jahar

2    did not have it, but we need to understand who was leading and

3    who was following.

4         The government made a -- well, we also have a chart of

5    the other *Inspire* magazines, you know, because the one was how

6    to build a bomb in the kitchen of your mom, and then there were

7    these other *Inspire* magazines, and they follow essentially the

8    same path.  The Samsung attaches to the missing Patriot thumb

9    drive on January the 21st, the complete *Inspire* is created, and

10   the attachment also creates the remaining *Inspires*, and they go

11   onto the Sony, and you can see the time, 6:22, 6:24, 6:24, 25,

12   25.  They go from the Samsung to the Patriot to the Sony.

13        Now, the government made a big deal about the HP

14   desktop at Norfolk and, in fact, today said that Jahar accessed

15   jihadi materials over the Christmas break on that HP.  I have

16   no idea where that evidence comes from or where that suggestion

17   comes from.  We do know that at, like, two in the morning on

18   January the 1st, Jahar accesses his email on that.  He's

19   clearly home for Christmas break.  The testimony that we heard

20   about that HP was that everybody in the household used it, that

21   it was open, and that it was clear there were multiple users.

22   And I don't know why we would suggest today that it was Jahar

23   accessing those materials and not Tamerlan.

24        Two thumb drives were found, one in the dorm room and

25   one in the Crapo landfill.  Remember those?  They both had

 1    extremist materials on them.  But what else did they also both

 2    have on them?  Katherine Tsarnaev, Tamerlan's wife's paycheck

 3    stub and a rental application in her name.  Those thumb drives,

 4    fairly clearly, came from Tamerlan.

 5         Let's talk for just a minute about Jahar's actions

 6    after the bombing because the government makes a big deal about

 7    buying the milk and going to the gym.  It is bizarre.  It's

 8    about as bizarre as going back into the Mobil station to put

 9    the Doritos back down when Tamerlan comes and says, "Hurry up."

10    It's about as disconnected as that.

11         I think what it really shows is that, overall, he

12    bought into his brother's plan and his brother's actions and,

13    as the boat writing suggests, was convinced they were right.

14         We should talk about the writings in the boat.  We

15    should talk about these.  You won't find them on the verdict

16    form, but you will find them in the evidence.  The prosecution

17    sort of paints the picture of calm reflection inside the boat

18    and that Jahar had time to think and plan out what he was

19    doing.

20         Remember how he got there?  He had gotten into the

21    Mercedes, fled into a hail of gunfire, the windshield

22    bullet-riddled.  There's a series of these Mercedes pictures.

23    But you can see the bullets right at the driver's -- you can

24    see a picture where the bullets lodged into the headrest.

25    There wasn't time for calm reflection.

1          You've seen the boat.  He's in the boat, and he's

2     bleeding, and you've seen the pictures in the boat of the blood

3     all over.  And what does this 19-year-old do?  He tries to tell

4     why they did what they did.  It wasn't like it was written out

5     and ready to be distributed.  It wasn't like it was a message

6     to the world.  It was this 19-year-old's attempt to write about

7     why they did what they did.

8          And what does he say?  "I'm jealous of my brother who

9     has received the reward of paradise.  He's gone."  And he tries

10    to explain why they did what they did.  What he doesn't write

11    in here is what you might think a violent jihadi might write:

12    "Death to America."  He doesn't write that.  He doesn't

13    write -- he doesn't write, "Curse to America."  He knew it all

14    along that it was wrong to take innocent lives, and he says

15    that.  But he expressed the very twisted belief, the very

16    twisted belief, that his actions would make a difference.

17          The government tried to tie these writings to *Inspire*

18    magazine and some of the other extremist materials.  It's not

19    on your verdict form to find, but if you look at those other

20    materials, maybe some of the ideas expressed are in there, but

21    the language is not.  That's up to you to judge.  And we don't

22    know whether he got that, those ideas, from *Inspire* magazine or

23    from his brother.

24          Finally, I'd like to talk with you for just a few

25    minutes about the four minutes on Boylston.  The government --

1          Is that in your way?

2          THE COURT:  It's blocking my view of the -- some of

3     the lawyers.

4          MS. CLARKE:  How's that?

5          THE COURT:  That's much better.  Thank you.

6          MS. CLARKE:  The government argued to you in opening

7     statement, and again now, that there were four minutes, and

8     Jahar could have changed his mind.  They argued to you that

9     Jahar went to that location to target children.  They argued to

10    you in opening that after reaching -- after talking with his

11    brother, he reached a safe distance and detonated the bomb.

12    There were families there.

13         And who got killed and who got hurt and who escaped

14    was inexplicable, and Jahar's actions inexcusable, but for what

15    he saw when he arrived at that tree -- and I'm going to play

16    that video again for you to see if there was any indication

17    that he walked up to that spot and targeted children.  I think

18    you'll see on the clip on the video that Jahar walks up and the

19    selection was made because it was a tree.  So let's...

20         (Video recording played.)

21         MS. CLARKE:  You see him walking up.

22         (Video recording played.)

23         MS. CLARKE:  Okay.  Thank you, Bill.

24         You can judge for yourselves, but the video appears

25    that he walks up and he stops at the tree, not at the children.

1    The backpack was already down by the time of the 2:48 p.m.

2    photo that the government has shown us several times.  There

3    was movement by people going and coming.  It does not make it

4    better, but let's not make his intent any worse than it was.

5         The government told you in opening statement that

6    Jahar was -- when he got a safe distance away, he detonated the

7    bomb.  We heard no evidence of how the second bomb was

8    detonated and by whom.  The evidence does not show that he was

9    a safe distance away.  You've watched it again a couple of

10   times in the prosecution's argument.  What the evidence does

11   show is that he was dangerously close when the bomb exploded.

12        I'm going to stop in just a couple of minutes.  And

13   the prosecutor has an opportunity to get back up here and to

14   hammer home their story again.  We spent our time in this phase

15   of the case trying to correct misimpressions and trying to

16   complete the picture as best we could, given the issues that

17   you have to decide in this phase.

18        You now have to answer a whole lot of questions.

19   There are 30 complicated charges.  The judge spent over an hour

20   instructing you about them.  The indictment is long.  The

21   instructions are long.  The verdict form is 30 pages -- 31

22   pages long with a lot of questions for you to answer, for you

23   to discuss, for you to hear from each other about, for you to

24   express your opinions about.  And we know that you will do that

25   thoughtfully and truthfully because it's your job and it's your

1  responsibility to do it.

2      You've heard just a very little bit about who Jahar

3  was before April the 15th, 2013.  You've heard a very little

4  bit of evidence in this phase of the case about that.  He was

5  19.  You've seen that while he bought into the plan and bought

6  into the beliefs and passion that drove the plan and has now

7  changed many, many lives forever, including his own, he was an

8  adolescent and also doing adolescent things.  He was searching

9  Facebook.  He was tweeting his friends.  He was texting his

10 friends.  The prosecution says this was a double life.  He was

11 an adolescent drawn into a passion and belief of his older

12 brother and still living a teenage life.  He was flunking out

13 of school, and he was making up lame excuses about why he was

14 failing.

15     You also know from the one person who testified in

16 this phase, Stephen Silva, the one person who knew Jahar before

17 April 15, 2013, testified and told you that he never met

18 Tamerlan, but he was controlling and strict, and Jahar never

19 would introduce him to Tamerlan.

20     In the next phase of this case, you'll learn a lot

21 more.  We ask you to hold your minds open.  We asked you that

22 in the beginning of this case, to hold your minds open to what

23 more there is to hear, to what more there is to learn, and to

24 what more there is to understand.

25     We know that in the face of the heartbreak you've

1  watched and listened to and felt, and the horrific crimes that

2  you've been exposed to over the last month, that that is not an

3  easy task, but we ask you to do it.

4          And now when you go back to the jury room, we are not

5  asking you to go easy on Jahar.  We are not asking you to not

6  hold him accountable and responsible for what he did.  The

7  horrific acts that we've heard about, the death, destruction

8  and devastation that we've heard about deserve to be condemned,

9  and the time is now.  I know, and we know, that by your

10 verdict, you will do what is right and what is just, and your

11 verdict will speak the truth.

12          Thank you very much.

13          THE COURT:  The government has the opportunity for a

14 brief rebuttal.

15          MR. WEINREB:  So now you've heard the defense all

16 spelled out for you.  The defendant may be guilty, but his

17 brother is even more guilty.  The thing is, that's not a

18 defense.  That's just the defendant's effort to dodge full

19 responsibility for what he did.

20          Ms. Clarke told you in her opening statement that the

21 defendant wasn't going to try to sidestep responsibility for

22 what he did in this case, but that is exactly what he is trying

23 to do.  His defense is that his brother was the real criminal

24 and he was just going along to get along; that his brother did

25 mostly everything, he was just present.

1          Now, there's nothing wrong with him making that

2    argument.  He's entitled to try to pin the blame on somebody

3    else if that's what he wants to do.  But you should see that

4    for what it is.  It's an attempt to sidestep responsibility;

5    not to take responsibility.

6          It's up to you to hold the defendant fully

7    responsible.  You should find him guilty because he is guilty.

8    His own actions make him guilty.  And the things that his

9    brother did on his behalf also make him guilty.  Don't be

10   distracted by arguments about what the defendant did versus

11   what his brother did.  It makes no difference.  They were

12   partners in crime.  These crimes were a two-man job.  Each one

13   of them had a role to play, and each one of them played a

14   critical role in each of the crimes.  They were

15   co-conspirators.  They were partners.  And that makes them

16   equally guilty of what they did.

17          Let's take the death of Officer Collier.  Ms. Clarke

18   said that Tamerlan Tsarnaev is the one who shot him.  But

19   there's no evidence of that in this case.  That is a perfect

20   example of an effort to sidestep responsibility; not to take

21   responsibility.

22          The video doesn't show who fired the fatal shots, but

23   it does show that the defendant and his brother walked right up

24   to that car.  They approached it from behind, they walked right

25   up to the door, and they yanked it open.  They knew exactly

1   what they were going to do.  They must have planned it ahead of

2   time.  It was a cold-blooded execution.  And they couldn't have

3   done it without the defendant's Ruger.

4        The defendant leaned his whole body into the car, and

5   that's what Nate Harman saw less than ten seconds later when he

6   rode by on his bicycle.  He said he saw the defendant leaning

7   all the way inside, as if he were trying to get something.  The

8   defendant had either shot Officer Collier or was trying to get

9   his gun or both.

10       Officer Collier's blood was on the defendant's

11  keychain, the one he was using to drive the car that night, and

12  the gloves with Officer Collier's blood on them were at his

13  feet, the feet of the driver's side where he had been driving

14  the car.

15       There should be no doubt in your mind that the

16  defendant and his brother are equally guilty of shooting

17  Officer Collier, no matter who pulled the trigger.

18       Ms. Clarke says that Tamerlan Tsarnaev confessed to

19  the killing when he said to Dun Meng, "You heard about

20  the -- you know about the murder at MIT?  I did that."  Well,

21  what else was he going to say?  He was the only one talking to

22  Dun Meng.  Dun Meng didn't even know there was another person

23  in the picture.

24       She points out that Tamerlan Tsarnaev's prints were on

25  the cartridge in the gun, as if that proved that he's the one

1    who shot Officer Collier.  But Dun Meng told you that when

2    Tamerlan pointed the gun at him, he pulled the cartridge out of

3    the gun to show it to him, to show him that the gun was loaded,

4    and that happened after the murder of Officer Collier, that's

5    when his fingers were on that cartridge, that you know about.

6         She also pointed out that he searched the word "Ruger"

7    on the Internet, but he didn't search that until March of 2013,

8    and the defendant had already gotten the gun in January or

9    February.

10        My point here isn't to try to prove to you that Jahar

11   Tsarnaev pulled the trigger, because as we told you candidly

12   from the beginning, we don't know who pulled the trigger.  My

13   point is simply to point out that this is all an effort to

14   dodge responsibility; not to take responsibility.  It's an

15   effort to keep trying to point the finger at somebody else,

16   even if there's no evidence of it, because the truth is the

17   defendant isn't here -- isn't trying to accept responsibility

18   for what he did; he's trying to avoid full responsibility for

19   what he did.

20        Let's take Watertown as an example.  According to

21   Ms. Clarke, the evidence shows that Tamerlan Tsarnaev fired

22   every bullet out of that Ruger at the police in Watertown.  But

23   is that really what the evidence shows?  It seems unlikely.

24   After all, the Ruger belonged to the defendant.  He, just a

25   month or two earlier, had paid $150 up at the Manchester firing

1   range with his brother to practice firing a 9-millimeter

2   pistol.  And when he did that, he listed himself as an

3   intermediate-level shooter.  He helped kill Officer Collier in

4   order to get a second weapon.  It's obvious that both of them

5   intended to be firing guns that night.  That was the whole

6   point of killing Officer Collier.  That's the whole point of

7   training to use the Ruger.

8          Sergeant MacLellan, and James Floyd, the civilian you

9   heard from, both testified they were 100 percent sure that both

10  the defendant and his brother were throwing bombs, and it makes

11  sense that when one of them was throwing bombs, the other one

12  was providing cover with the Ruger.

13         But does it really matter?  Does it really matter

14  whether both of them were shooting the gun?  Even if Tamerlan

15  Tsarnaev was holding the Ruger the entire time, the defendant

16  was clearly doing his part.  He was lighting bombs and throwing

17  them in an effort to kill the police officers, or at least to

18  keep them at bay.  He threw the pressure cooker bomb.  Have no

19  doubt about that.  He was getting ammunition out of the bag to

20  reload the Ruger, and you know that because his fingerprints

21  were found on the ammunition box.  In Watertown, just like at

22  the marathon, just like during the kidnapping of Dun Meng, the

23  defendant and his brother were full partners.  They are equally

24  guilty.

25         And think about -- more about Watertown, something

1    that Ms. Clarke didn't even mention to you.  The three-point

2    turn the defendant made after his brother had already been

3    tackled and was on the ground.  He tried to kill three police

4    officers by running over them.  The Mercedes was pointed in the

5    other direction, away from the officers.  He could have just

6    driven that way and escaped.  But instead, he made a U-turn,

7    and he floored it, driving directly at those officers.

8            And why did he do it?  He did it in the hopes of

9    killing three more police officers and almost doubling their

10   body count.  Once again, the defense doesn't want you to

11   believe that.  They don't want you to focus on that because it

12   doesn't fit in with their portrait of the defendant as just a

13   passive follower.  But when the defendant attempted those

14   murders, Tamerlan was out of the picture.  The defendant was

15   acting entirely on his own.  It shows you how independent he

16   was.  It shows you how personally committed he was, so

17   committed that he was willing to run over his own brother in

18   order to kill a few more police officers before it was all

19   over.

20           Let's talk about the carjacking and the robbery.  It's

21   true, according to Dun Meng, Tamerlan Tsarnaev did most of the

22   talking in the car, but the defendant, as always, played a

23   crucial role.  When the time came, he's the one who demanded

24   Dun Meng's ATM card and robbed him of $800.  That money was

25   still in his wallet the next day.  And it wasn't until the

1    defendant left the car that Dun Meng was able to escape.  Like

2    all the other things the brothers did that night, this was a

3    two-man job.  They needed both of them to pull it off, and the

4    moment the defendant was out of the picture, the plot fell

5    apart.  Tamerlan wasn't able to do it on his own.  He needed

6    his brother's help.  And the defendant, he needed Tamerlan's

7    help.  That's what it means to be partners.

8         Who built the pressure cooker bombs and the pipe

9    bombs?  The defense says it was entirely Tamerlan, but the

10   evidence suggests otherwise.  Both brothers had the

11   instructions for building the bombs on their computers.  You

12   heard that a lot of explosive powder was needed to build those

13   bombs, and you know that a bunch of emptied-out fireworks were

14   found in the defendant's backpack that his friends removed from

15   his dorm room and threw out that night.

16        There certainly is evidence that the bombs may have

17   been built, at least in part, at 410 Norfolk Street, and it's

18   true that Tamerlan lived there full-time in 2013, but the

19   defendant stayed there on holidays and during the summer.  He

20   didn't have to spend a lot of time there to help build those

21   bombs.

22        It's also true that Tamerlan's fingerprints were found

23   on things all over his own apartment, but that's what you would

24   expect from somebody who lived in an apartment full-time.  And

25   you wouldn't expect to see the same thing from somebody who was

1   just there on holidays and on weekends.

2          Also, as you heard from the fingerprint expert, the

3   presence of somebody's fingerprint on something means that they

4   touched it, but the absence of somebody's fingerprint on

5   something doesn't mean that they didn't touch it.  It may just

6   mean that they didn't have sweaty fingers when they touched it.

7          Or, more likely in this case, it could simply mean

8   that the defendant was wearing gloves when he touched these

9   things.  *Inspire* magazine specifically advises that you wear

10  gloves when you are building bombs.  And you wear gloves for a

11  couple of reasons.  One is not to leave fingerprints.  One is

12  because of all the messy powder that comes out of the fireworks

13  before you put them in the bomb.

14         And you heard that surgical gloves with powder on them

15  were found on the passenger side of Tamerlan Tsarnaev's CR-V,

16  his car, the place where the defendant would have sat if they

17  were using that car to help build the bombs.

18         But more important, really, is how they used the

19  bombs.  They decided to explode the bombs on Boylston Street.

20  The defendant had been there the year before.  He knew how

21  crowded it would be.  He decided where to plant his own bomb.

22  He chose the place where it would do the most damage.

23  Ms. Clarke has suggested to you that when he walked up there,

24  he planted it there because there was a tree.  But as you could

25  see from the video, he passed numerous trees on his way to that

1    spot.  It wasn't just that there was a tree.  He was looking

2    for the most crowded spot he could find, one where he would do

3    the most damage.

4         And even if he didn't plant it there because there was

5    a line of kids along the railing, you know for an absolute

6    certainty that he was well aware that those children were

7    there.  He's staring straight at them in the picture you saw,

8    and he looks at them many, many times in the video you saw.  He

9    could, at any time, have picked up that knapsack and moved it

10   somewhere else, but he didn't, because that wouldn't have fit

11   in with the plan.  The plan was to make this bombing as

12   memorable as it could possibly be, and he succeeded.

13        He's the one who called Tamerlan Tsarnaev to give him

14   the go-ahead.  The defense struggled mightily in

15   cross-examination of the witnesses to try to suggest to you

16   that the 19-second phone call that's from the defendant to

17   Tamerlan Tsarnaev isn't the call that took place right before

18   the bombings, but you didn't hear Ms. Clarke talk about it in

19   her closing argument because it's obvious that that's the call

20   that took place right before the bombings.

21        You didn't hear about it because, again, it doesn't

22   fit in with the narrative of the defendant just being the

23   passive, go-along-to-get-along guy.

24        What you heard during the trial was a perfect example

25   of trying to sidestep full responsibility for what the

defendant did, but this one failed so clearly that it wasn't

worth mentioning in closing argument, from their point of view.

It's an inconvenient fact for them.  It's something they don't

want you to believe.  And you should view all their other

claims about the defendant's lack of involvement with the bombs

with the same skepticism that you bring to that claim and some

of these other claims.

         The defense argues that Tamerlan is the one who chose

the marathon as the site for the bombing.  Where is the

evidence of that?  There's no evidence of that.  The fact that

he searched for it a few days ahead of time on the Internet

doesn't tell you anything.  He may have typed in the search on

his computer, but you have no idea whose idea it was in the

first place.  There's no need to research the marathon if

you've been there before, and Stephen Silva testified that his

own twin brother and the defendant were at the marathon the

year before.  And you have no reason to doubt that he's telling

you the truth.  And he told you part of the reason he knew that

was that the defendant told him he had been at the marathon.

         Now, the defense has tried, again mightily, to

convince you that he couldn't have been there because he

tweeted several times during that day, and he didn't tweet that

he was going to the marathon.  If you were going down to the

Boston Marathon to case it out for a possible bombing, would

you tweet that?  Of course not.

1        Once again, there's no evidence that Tamerlan Tsarnaev

2   picked the marathon as the site of the bombing.  But it's

3   important for them that you think that because they don't want

4   you to hold the defendant accountable for everything that he

5   actually did in this case.

6        Ms. Clark argued that the defendant wasn't actually

7   radicalized.  So how deep did his jihadi beliefs go?  What's

8   the actual evidence in the case about that?  Well, he had

9   terrorist writings and songs and lectures not just on his

10  computer but on every electronic device he owned:  his iPods,

11  his thumb drives, the CD that he drove all the way back to

12  Watertown to get before their trip to New York.  He had been

13  reading and listening to them for well over a year.

14       And you know that he had absorbed their teachings.  He

15  had absorbed them well enough to tweet them to others.  He had

16  absorbed them well enough to summarize them on the inside wall

17  of that boat.  When he wrote that message in the boat, he

18  didn't have any books to crib from.  He didn't have anyone

19  whispering in his ear what to say.  He wrote about them like

20  somebody who had read and listened to and studied the material

21  over and over and over again until he really had fully absorbed

22  its lessons and was convinced of it.  And you know that he had

23  absorbed his lessons and was convinced of it because he

24  believed in it enough to murder people.  He believed in it

25  enough to execute a police officer in cold blood.  His actions

1    speak louder than words.

2         Same thing about the defendant's tweets and his

3    searches.  What do they show you?  They show you the defendant

4    had two sides.  Yes, he was a young man with a young man's

5    interests and beliefs and habits.  That's the side that he

6    revealed to his friends.  But he was also a true believer in

7    violent extremism.  That's the side that he kept mostly hidden.

8    The fact that he borrows quotes from songs that he's heard to

9    express his beliefs doesn't mean he doesn't have those beliefs;

10   just the opposite.  He's just finding a creative way to express

11   them.

12        And of course we didn't show you every single file on

13   his computer.  We didn't show you the thousands and thousands

14   of files that -- operating system files or some random thing he

15   might have downloaded from the Internet.  We showed you the

16   ones that are relevant to the charges in this case.  The jihadi

17   materials on his computer weren't any less convincing to him

18   because they were outnumbered by other files on his computer,

19   and you know that because he actually carried out the bombings

20   that are recommended in those writings.

21        Ms. Clarke suggested to you that you shouldn't pay

22   much attention to what the defendant wrote in the boat because

23   of his state of mind.  So what do you think was his state of

24   mind when he wrote that message to the world?  Well, think

25   about it.  Two days earlier, three days earlier, he had pulled

 1   off an extremely successful terrorist attack, an attack that

 2   received worldwide attention.  After the attack, he had

 3   escaped.  He had then been able to hide in plain sight until

 4   the time was right to attack again.

 5         But by the time he snuck into that boat, things were

 6   different.  He had been shot, and he was bleeding.  He knew the

 7   police were looking for him.  He knew it was just a matter of

 8   time before they caught him, if he didn't die first.  So he

 9   knew this could be his last chance to voice his true beliefs.

10   He revealed his true self when there was no longer any reason

11   to keep it a secret.

12         The whole point of committing a terrorist attack is to

13   send a message, and the defendant wanted to send a message to

14   America that Americans are destined to lose the fight against

15   violent extremism.  And he wanted to send a message to his

16   fellow jihadis.  He wanted to inspire them with his words and

17   with his actions.  You know that these words, the ones he wrote

18   that night as he lay there in that boat, are his deepest and

19   truest beliefs.  He thought they were his final words.  They

20   are how he wanted to be remembered.  They are the words that he

21   thought would give meaning both to his life and to his death.

22         You know he was clear-headed and strong when he got

23   into that boat.  He was clear-headed enough to smash his cell

24   phones first and to hide them.  He was clear-headed enough to

25   pick the boat as a hideout.  He was strong enough to climb into

1    it without a ladder, despite how high it was off the ground.

2    He was strong enough to carve words into the planks of the boat

3    that you saw.

4         The message he wrote on the wall of that boat is

5    perfectly clear.  It's grammatical.  It doesn't wander.  It

6    makes sense.  He probably wrote it as soon as he got in there.

7    You can be confident that those words are his truest beliefs

8    because when he wrote them, he had no reason to tell anything

9    other than the truth.  But now that he's survived and he's on

10   trial for his life, he has every reason to back away from the

11   truth.

12        And you'll note in that message, he didn't write "we."

13   He didn't say, "This is why we did this," or "This is why we

14   did that."  He said "I."  It was a note about him, about who he

15   was and what he had intended to accomplish and the message he

16   wanted to send to the world and to be remembered by.

17        Ms. Clarke said that all the jihadi materials on the

18   defendant's computer came from Tamerlan in January 2012 right

19   before Tamerlan then left to take a six-month trip to Russia.

20   Even if that's true, which I'll get back to, what does it show?

21   It shows that the conspiracy dates back all the way to January

22   2012.  It shows that when Tamerlan decided to go to Russia for

23   six months, the plot didn't go with him.  It stayed home with

24   the defendant.

25        As Dr. Levitt told you, many, many, many people read

1    jihadi materials.  They are easy to find.  They're all over the

2    Internet.  Many are probably exposed to them by family members,

3    by brothers, by sisters, by friends.  Most people read the

4    materials and reject them.  Only a tiny, tiny number read them

5    and become true believers, and only a tiny fraction of those

6    true believers actually decide to kill people.

7         Tamerlan Tsarnaev didn't turn the defendant into a

8    murderer by giving him a bunch of magazines and then

9    disappearing for six months.  To shred the bodies of young

10   women and children with a homemade bomb, you've got to be

11   different from other people.  And if you are the type of person

12   who can adopt a philosophy of hate and commit multiple murders

13   based on reading magazines and listening to lectures, does it

14   really matter if you got them from your brother or from some

15   other terrorist or from the Internet?

16        If you are capable of such hate, such callousness that

17   you could murder and maim nearly 20 people and then drive to

18   Whole Foods and buy milk, can you really blame it on your

19   brother for giving you some propaganda to believe?

20        In any event, there's no actual evidence of where

21   those materials came from originally.  The defense's computer

22   expert acknowledged that.  All you know is that some of them

23   were on many devices, including all of the defendant's

24   electronic devices.  Their origin remains obscure, but he read

25   them and he believed them and he was one of those tiny few who

1    decided to act on them.

2         When two people commit a crime together, it's always

3    possible for one to point the finger at the other.  Don't get

4    distracted by that.  The defendant and his brother were

5    partners.  Each acted on his own behalf and on the other's

6    behalf.  They are equally guilty, and that's why we ask you to

7    return the only fair and just verdict in this case, which is a

8    guilty verdict on all 30 counts in the indictment.

9         Thank you.

```
 1           MS. CONRAD:  Your Honor, may we approach?

 2           THE COURT:  I'll see you after I finish my

 3   instructions.

 4           So, jurors, you've been very patient and attendant.

 5   We appreciate that.  I'd ask you to bear with me for just a few

 6   more minutes while I complete my instructions to you.  I want

 7   to talk now about how you should go about assessing the

 8   evidence in the case in fulfilling your responsibility to

 9   resolve the issues that are presented.

10           There are two aspects to your deliberations.  First,

11   you've heard a good deal of evidence over the course of the

12   trial.  You now have to decide what that evidence has proved or

13   not.  It is your responsibility to determine what facts have

14   been established by the evidence.  After you've made those

15   determinations, you must consider what those facts mean in

16   light of the principles regarding the elements of the charged

17   offenses that I gave to you in the earlier part of my

18   instructions; that is, do the facts as you find them establish

19   that any given charge has been proved or not?

20           It's often said that jurors such as yourselves are the

21   sole and exclusive judges of the facts of the case.  You

22   determine the weight, the value, and the effect of the evidence

23   that you've heard and seen.  And where there are factual

24   disputes, you try to decide on the evidence what conclusions

25   you should draw about those matters.
```

1          Your oath as jurors requires you to determine the

2     facts of the case without fear or favor, based solely on a fair

3     consideration of the evidence.  That fundamental proposition

4     means two things:  First of all, of course it means you are to

5     be completely fair-minded and impartial, swayed neither by

6     prejudice nor sympathy, by personal likes or dislikes toward

7     anybody involved in the case.  Your responsibility is simply to

8     judge the true meaning of the evidence fairly and impartially.

9          It would be improper for you, for example, in reaching

10    your decision as to whether the government has sustained its

11    burden of proof to consider any feelings you might have about

12    the defendant's race, religion, national origin, sex, age.  It

13    would be equally improper for you to allow any emotional

14    responses you might have to the nature of the crimes charged to

15    interfere with your decision-making in this proceeding.

16         In particular, you've seen a number of graphic

17    photographs.  Photographs were admitted in evidence for the

18    purpose of helping you to understand the testimony such as by

19    showing you the conditions at a particular scene or by showing

20    the nature of the wounds received by persons.  Those are, of

21    course, difficult to look at, but you should not let the

22    photographs stir up any emotions to the extent that they

23    override your careful and rational assessment of the evidence.

24         The second important point about your fair

25    consideration of the evidence is that your judgment must be

1    based solely on the evidence that has been presented in the

2    course of the case.  You may not go beyond the evidence by

3    speculating or guessing what other things might be true that

4    were not shown.  Your responsibility is to resolve the issues,

5    so far as you can, by your consideration of the evidence that

6    has been presented, and your conclusions should be those that

7    the evidence directs you to.  If there should be issues as to

8    which the evidence is insufficient or inconclusive so that

9    you're not able to draw a firm conclusion, then you have to

10   leave any conclusion undrawn.  You may only draw those

11   conclusions that the evidence supports.

12           I'm going to talk a little bit more about the evidence

13   in a minute, but let me remind you what is not evidence.  I

14   told you at the beginning of the case that the lawyers'

15   summaries of the evidence in their openings, when they're

16   telling you what they expect the evidence will be, and now in

17   their closings when they try to recall it for you, those

18   summaries are not part of the evidence, which is why we don't

19   have you take notes during that period of time.  They are an

20   attempt to marshal the evidence for you, to try to persuade you

21   to understand in a way that is consistent with their view of

22   the case, but to the extent your collective appreciation of the

23   evidence differs in any way from what the lawyers have said in

24   predicting it or arguing it, it is your understanding and your

25   assessment that controls.  What the lawyers say cannot add or

1    subtract from the evidence.  You have heard the evidence, and

2    it is your judgment on that evidence that matters.

3         I told you at the outset, and you have seen that I

4    would be ruling on questions of the admissibility of evidence

5    as they have arisen.  I remind you there is no significance for

6    your purposes to any of the rulings either admitting or

7    excluding evidence.  Those considerations are wholly separate

8    from the kinds of decisions you'll have to make, and you should

9    give no consideration or significance to evidence rulings.

10        I remind you that evidence that is offered but not

11   admitted is not to be considered by you.  Similarly, questions

12   by the attorneys which are not answered by the witness produce

13   no evidence.

14        The indictment is not evidence.  You must refer to it

15   so that you can see what the proposed charges are that you have

16   to -- because you have to test those against the evidence in

17   the case, but the indictment only proposes you, the jury,

18   decide based on the evidence whether what is proposed has been

19   proved.

20        As I've said on many occasions, you must completely

21   disregard any reports you may have read in the press, seen on

22   television, heard on the radio or viewed online.  You've

23   repeatedly assured me that you have abided by my instructions

24   to avoid any such information which is not part of the

25   evidence, obviously, in the case.

1          To the extent you had any prior impressions of the

2     facts of the case from the time before you were called to be

3     jurors, you must completely set aside any such impressions now.

4     Again, in the jury selection process you assured me that you

5     could do that.  And, frankly, if I had not trusted your answers

6     in that respect, you would not be sitting here today.  Your

7     focus must be entirely and exclusively on the body of evidence

8     produced in the course of the trial, and it would be unfair and

9     a violation of your jurors' oath to do otherwise.

10         Now, let me address some of the things that are

11    evidence in the case.  You have a very large number of

12    exhibits.  Some are documents, some are audio recordings, some

13    videos, some are pictures, some are tangible objects.  You'll

14    have access to all the exhibits that have been admitted in

15    evidence, and you may consider those exhibits and give them

16    whatever weight, value or significance you think they are

17    fairly entitled to receive.  The judgment is entirely yours.

18         We are able to have many of the exhibits presented to

19    you -- presentable to you in digital form.  You have, no doubt,

20    seen the screen on the wall in the jury room.  You will get to

21    use it.  It is part of what we call the "Jury Evidence

22    Recording System," or J-E-R-S.  The parties put their exhibits

23    in digital form into a drive, and it is fed into the monitor.

24    You will have complete control over it.  When you activate the

25    touchscreen when you go in to deliberate, you will see a prompt

1   for a brief tutorial.  There's a four-minute, approximately,

2   tutorial that teaches you how to use the systems.  It's very

3   simple, and similar to using an iPad or other tablet.  You can

4   scroll through the exhibits, you can zoom in and out on some

5   exhibits.  There is an index.  And you can call up an exhibit

6   by entering the exhibit number on a keypad.  You will also have

7   a paper index that will give you the listing of the exhibits.

8   You will have some video and audio recordings which are

9   playable through the JERS system.

10          Based on certain technical limitations, not all of the

11   exhibits can be displayed through JERS.  For some exhibits, we

12   will give you a laptop which will hold those exhibits for your

13   use in the deliberations.  It only has a very few of the trial

14   exhibits, and it otherwise does not have any programs or

15   capabilities that a laptop might otherwise have, such as

16   word-processing or access to the Internet.  It's simply a

17   result of the technical limitation on the types of the files

18   that can be used on JERS.  There's no special significance to

19   those that are on the laptop as opposed to those that are on

20   JERS; it's just a means by which we can present them to you.

21   Essentially, they are the interactive exhibits that you've seen

22   during the course of the trial.

23          We'll give you binders with paper versions of many of

24   the exhibits for you to use if you find it more convenient to

25   resort to the paper files than to files on the screen.

1          Many exhibits in the case have been physical objects,

2     actual items.  Those are available to you as well.  If you

3     would like to view any of the physical exhibits, you should

4     simply write a note indicating which exhibit or exhibits you

5     would like to view and give it to the court security officer,

6     and we will make arrangements for you to see those physical

7     objects.

8          Sometimes a particular item of evidence is received

9     for a limited purpose rather than for general consideration;

10    for example, some matters may have been admitted under a

11    limitation that they could be considered as evidence that a

12    particular event occurred, for example, rather than -- for

13    example, if somebody had said something on a particular

14    occasion or written something -- but not as evidence that any

15    affirmative assertion that was contained in it was actually

16    true or accurate.

17         As an illustration, evidence that a person said, "I'm

18    unhappy," for example, under this limitation could be used to

19    consider the fact that the person had said that, but not to

20    affirmatively prove that she was, in fact, unhappy.  And I

21    remind you of that limitation, with regard to the rather few

22    circumstances when it was imposed.

23         In addition to the exhibits, of course, you have the

24    testimony of the witnesses who appeared here in the courtroom

25    to answer questions that were put to them.  You ought to give

1     the testimony of each witness whatever weight, value or

2     significance in your judgment it is fairly entitled to receive.

3           With respect to each witness, you should think about

4     the testimony and decide how much value or meaning it should

5     have to fair-minded people like yourselves who are looking for

6     the truth.  You may find, as you think about the evidence from

7     any particular witness, that you find credible, reliable or

8     meaningful just about everything that that witness has said,

9     perhaps just about nothing that that witness has said, or

10    perhaps something in between.  Maybe there are some things from

11    a witness you find credible and reliable and other things from

12    that same witness that you are more skeptical or doubtful

13    about.  There's no automatic rule.  You don't have to accept

14    any given witness's testimony in total or reject it in total.

15    You should think about the testimony and accept what is

16    meaningful and reliable and reject what is not.

17          Let me suggest some useful considerations in

18    evaluating witnesses' testimony.  They involve three aspects:

19    perception, memory and narration.

20          Perception:  How good were the witnesses' observations

21    or perceptions of events in the first place?  What were the

22    circumstances under which the witness participated things,

23    observed things and so on?  And how did those circumstances

24    affect, if they did, the witness's ability later to tell you

25    reliably what had happened?

1           Memory:  How accurate and reliable is the witness's

2    recollection of events?  People may have varying abilities to

3    remember things accurately and to recall them.  And you may

4    take that into account.  Sometimes the way things happen, the

5    circumstances surrounding an event may affect the ability of

6    people to remember things accurately and reliably.  For

7    example, sudden, unexpected events may be perceived and

8    remembered in a different way from events that unfold in an

9    orderly way and at a slower pace.

10           Narration:  How accurate and reliable is the witness

11   in narrating or telling here in the courtroom what happened?

12   Is the testimony truthful?  Is it complete?  Is the witness

13   careful in describing things?  Is the witness himself or

14   herself confident or perhaps uncertain about the testimony?  Is

15   the witness's testimony consistent with itself or does it vary?

16           You may take into account any partiality or bias that

17   a witness may have towards one side or the other.  Does the

18   witness have any reason or motive or interest in the outcome of

19   the case or anything else that would affect the witness to

20   favor one side or the other in the testimony?

21           A tendency to favor one side or the other might be

22   deliberate, an intentional effort to favor one side, or it

23   might be unconscious, arising out of some affiliation or

24   affinity with one side or the other.  Again, such tendencies

25   could affect the reliability of the testimony.  You ought to

1   consider whether there has been any such effect in the

2   testimony that you've heard.

3         Again, keep in mind that in every case there are

4   people who are associated with or have a connection with one

5   side or the other, and it is certainly not automatic that

6   people must, therefore, be distrusted for that reason.  But

7   potential bias or partiality, conscious or not, by a witness is

8   a factor you can think about in evaluating the evidence.

9         You heard testimony from a witness, Mr. Silva, who was

10  convicted of certain crimes after pleading guilty pursuant to a

11  plea agreement that he entered into with the government.  That

12  agreement is in evidence for you to review.  You've heard that

13  in return for his entry of a guilty plea, the government agreed

14  to take his cooperation with the prosecution into account in

15  recommending a sentence in his criminal case with the prospect

16  that he might receive a sentence lower than what might

17  otherwise have been imposed if he had not agreed to testify

18  here.

19        It is legitimate for the government to enter into plea

20  agreements of this kind to obtain testimony from persons who

21  otherwise would be unwilling to testify.  You may accept and

22  rely on the testimony of a person who testifies after entering

23  into such an agreement, and you may make factual conclusions

24  based on your acceptance of that testimony if you decide it is

25  warranted.

1           However, you should bear in mind that such a witness

2     who has entered into an agreement with the government in return

3     for the prospect of a lower sentence or other favorable

4     considerations, may have a motive to tell the government what

5     he thinks it wants to hear.  And accordingly, you should

6     consider such evidence with great care and caution.  However,

7     after evaluation you may, if you judge it to be appropriate,

8     accept and rely on that testimony.  You may, of course, also

9     choose not to accept or rely on it.

10          You've heard testimony from witnesses who have been

11    described as experts.  An expert witness has special knowledge

12    or experience that allows the witness to testify about matters

13    within that expertise and to give an opinion about issues in

14    the case based on his or her knowledge or experience.  You

15    should evaluate the testimony of an expert witness with the

16    same care that you employ in evaluating the testimony of any

17    other witness.  You may accept and rely on the testimony of the

18    expert, or you may reject it as you judge appropriate.

19          In weighing expert testimony, you should consider the

20    factors that generally bear upon the credibility of witnesses

21    as well as the particular experts' qualifications, such as

22    education and experience, the soundness of the reasons given

23    for any opinion, and any other evidence in the case that you

24    think is pertinent.

25          Remember that you alone decide how much of a witness's

1    testimony to believe and how much weight it should be given,

2    and that applies to experts as well as other witnesses.

3         You've heard the testimony from a number of law

4    enforcement officials.  The fact that a witness may be employed

5    as a law enforcement official does not mean that his or her

6    testimony is deserving of either more or less consideration or

7    greater or lesser weight than any other witness.

8         It is legitimate for defense counsel to question the

9    credibility or reliability of a law enforcement witness on the

10   ground that his or her testimony may be colored by a personal

11   or professional interest in the outcome of the case.  As with

12   any other witness, it is up to you after considering the matter

13   whether or not to accept and rely on the testimony of a law

14   enforcement witness just as with any other witness.

15        Some evidence in the case was obtained by means of

16   various investigative techniques including searches of various

17   premises.  The government is permitted to use investigative

18   techniques such as these.  You should not consider whether it

19   was proper or not to conduct the searches.  If the techniques

20   had been improperly used, the evidence would not have been

21   permitted to be presented in the case.

22        Consider the evidence as a whole.  You ought to

23   consider the evidence from each witness not only by itself in

24   isolation as if that witness were the only person to testify,

25   but also in the context of all the evidence you've heard.  For

example, there might be a piece of evidence about which you
originally are a bit skeptical, and then you might hear other
evidence that leads you to re-examine your initial impression,
and you begin to trust the questioned evidence a bit more.  The
opposite may happen, of course.  You might tend to accept
something that sounds pretty good at first, and then as you
consider other pieces of evidence, you might begin to doubt
what you'd first accepted.  So again, think of the evidence
sensibly as a whole as you make your judgments about it.

You may make inferences from the evidence.  We say
that a fact in a case like this can be proved by either two
kinds of evidence, direct evidence of the fact or
circumstantial evidence of the fact.  Direct evidence is when
there is a piece of evidence or a group of pieces of evidence
which, if accepted, tend themselves to directly prove a fact.
Often it might be simply an assertion by a witness.

Suppose somebody came into the courtroom now and said,
"It's raining out."  You would consider and decide whether the
person who said it had any basis for knowing what the weather
was, whether they could be trusted to tell you accurately what
was going on.  But if you were satisfied as to those matters,
you could accept the assertion as true and believe as a result
of accepting it what the weather was:  that it was raining out.

Similarly, an exhibit or a piece of physical evidence
might be direct evidence of a fact.  Suppose, however, that

1    instead of having somebody tell you directly what the weather

2    was like outside, the person came into the courtroom now

3    wearing a wet raincoat and folding up a wet umbrella.  Without

4    any direct assertion being made about what the weather was

5    like, you would have some observation, some evidence, we might

6    say, from which you might draw the conclusion or inference that

7    it was raining out because in your common experience, wet

8    raincoats and umbrellas are evidence of that fact.

9         An inference is simply a conclusion that you might

10   draw from the available information that you have found to be

11   reliable.  I take the trouble to point this out because

12   sometimes you will hear people say in casual conversation,

13   "That's just circumstantial evidence.  That doesn't prove

14   anything."  Well, that goes too far because, in fact,

15   circumstantial evidence can be relied on to prove things if

16   properly used.

17        If you think about it, everyone probably relies on

18   circumstantial evidence routinely through the day.  You walk

19   into the kitchen and see the teakettle steaming on the stove,

20   you know enough not to put your finger on the burner because

21   you've drawn an inference about the burner being hot.

22        You must be careful, however, that the inferences you

23   draw are those that are generally supported by the information

24   that you're basing the inference on.  An inference, and

25   consequently, proof of a fact by circumstantial evidence cannot

1    be an excuse for guessing or speculating.  If there are

2    alternative possible inferences from the evidence, you can't

3    just pick one you happen to like.  You have to be persuaded

4    that any inference you make is superior to other possible

5    inferences based on the evidence and information that you have.

6    And, of course, to the extent that you rely in a criminal case

7    on inference by circumstantial evidence, in the end your

8    conclusions still must be those that convince you beyond a

9    reasonable doubt.

10          As I reminded you at the outset of the trial, the

11   defendant is presumed to be innocent of the crimes he's charged

12   with unless and until the government proves by the evidence at

13   trial that he's guilty, and proves that beyond a reasonable

14   doubt.  The burden of proof rests with the government.  A

15   defendant assumes no burden to prove that he is innocent.

16          A defendant in a criminal case has a right guaranteed

17   by the Bill of Rights in our Constitution to choose not to

18   testify in the case.  There may be many reasons why a defendant

19   would choose to invoke and exercise that right.  You are not

20   under any circumstances to draw any inference or presumption

21   against the defendant for his decision to invoke the right and

22   to decline to testify.  You should not discuss the matter.  You

23   are to decide the issues in the case solely from your

24   consideration of that evidence that has been given in the case.

25          The defendant is, of course, entitled to present

evidence other than his own testimony.  It is important for you
to keep in mind, however, that by presenting evidence, a
defendant does not presume any burden or obligation to prove
that he's not guilty, or to put it more colloquially, to
explain things.

A defendant's evidence is subject to the same
standards of scrutiny and evaluation that you give to all
evidence, but the burden of proof never shifts from the
government.  The question is never:  Which side has convinced
me; but rather, has the government convinced me beyond a
reasonable doubt that the defendant is guilty?  If the answer
to that question is yes, the government is entitled to your
verdict of conviction.  If the answer is no, then the defendant
is entitled to be, and must be, acquitted.

The burden placed upon the government to prove a
defendant's guilt beyond a reasonable doubt is a strict and
heavy burden but it is not an impossible one.  It does not
require the government to prove a defendant's guilt beyond all
possible hypothetical or speculative doubt.  There are probably
very few, if any, things in human affairs that can be proved to
an absolute certainty, and the law does not require that.  But
the evidence must exclude in your minds any reasonable doubt
about the defendant's guilt of any crimes he's accused of.

A reasonable doubt may arise from the evidence
produced or from a lack of evidence.  If you conclude the

1    evidence may reasonably permit either of two conclusions with

2    respect to a particular charge, one that the defendant is

3    guilty as charged and the other the defendant is not guilty, if

4    that's the case, then you must, in those circumstances, find

5    him not guilty.

6            Reasonable doubt exists when, after you've considered,

7    compared and weighed all the evidence using your reason and

8    common sense, you cannot say that you have a settled conviction

9    that the charge is true.  Conversely, we say the fact is proved

10   beyond a reasonable doubt if, after careful consideration of

11   all the evidence, you are left with a settled conviction that

12   the charge is true.  A reasonable doubt is not speculation or

13   supposition or suspicion, it is not an excuse to avoid an

14   unpleasant duty, and it is not sympathy.

15           While the law does not require proof that overcomes

16   every conceivable or possible doubt, it is not enough for the

17   government to show that a defendant's guilt is probable or

18   likely even if it seems a strong probability.  The government

19   must establish each element of an offense charged by proof that

20   convinces you and leaves you with no reasonable doubt, and

21   thus, satisfies you that you can, consistently with your oath

22   as jurors, base your verdict upon it.

23           Again, if you are so convinced, then it is your duty

24   to return a verdict of guilty.  If, on the other hand, you have

25   a reasonable doubt about whether the defendant is guilty of the

1    crime charged, you must give the defendant the benefit of that

2    doubt and find him not guilty.

3            Your verdict must be a unanimous one, whether it is

4    guilty or not guilty.  And as I have previously told you, where

5    there are alternate ways to prove an offense under the relevant

6    statute, you must be unanimous as to the theory on which you

7    base any guilty verdict.

8            Finally, remember that in determining the guilt or

9    innocence of the defendant, the jury should not give any

10   consideration at this point to the matter of punishment.  Your

11   function is to weigh the evidence in the case and to determine

12   whether the defendant is guilty or not guilty as to the charges

13   presented in the indictment based solely on the evidence.

14   Under your oath as jurors, you must not allow any possible

15   punishment which may be imposed upon the defendant to influence

16   your verdict as to guilt or not in your deliberations.

17           I'll wrap up in a minute, but let me see counsel at

18   the side.

19           (Discussion at sidebar and out of the hearing of the

20   jury:)

21           MS. CONRAD:  Okay.  Before I begin with the

22   instructions, may I address the government's closing and

23   rebuttal?  First of all, I would like -- a portion of the

24   government's presentation, that was sort of the photo montage

25   with the nasheed playing in the background, to be made part of

1    the record in this case.  And I'm moving for a mistrial based

2    on that.  The apparent purpose of that, I can't imagine any

3    other purpose, is essentially to try and inflame religious or

4    ethnic prejudice.  There was no relevance to any of the charges

5    here.

6            As we argued in Docket No. 279, in which we

7    successfully sought to strike betrayal of the United States as

8    an nonstatutory aggravating factor, 18 U.S.C. Section 3593(f)

9    prohibits and requires a jury to form that any penalty,

10   essentially, is not based on race, religion or national origin.

11           In this case, the government played this haunting

12   music over a photograph of the Shahada, the black flag with

13   Arabic writing, which the government's own expert testified was

14   not jihadi but was a sign of Islamic faith.  It's an Islamic

15   motto.  They followed that with a picture of the defendant, a

16   selfie, presumably, with one finger up, which is the Muslim

17   finger for one god, which is an expression of religious belief.

18   And then on top of that, they immediately followed that with

19   scenes of the devastation of the marathon bombing.  It was

20   clearly an effort to portray the defendant as an alien and to

21   deem him as -- not just him, but his religion.  And I move for

22   a mistrial based on that.

23           In addition, during Mr. Weinreb's reply, he said at

24   one point that the defendant is not trying to take

25   responsibility, suggesting that the defendant should have

1     gotten up and himself taken responsibility, which is both

2     counter to the presumption of innocence and the government

3     proof, as well as to the defendant's right not to testify.  And

4     it's an improper comment on the defendant's right not to

5     testify, as was a number of comments Mr. Weinreb made in his

6     rebuttal, including, for example, "We don't know whose idea it

7     was to search for these terms."

8             As the First Circuit has made perfectly clear,

9     whenever a prosecutor says we don't know something, where the

10    only person who could address that issue is the defendant, it

11    is considered burden-shifting and an improper comment on the

12    defendant's right not to testify.

13            Mr. Weinreb also stated that there were emptied-out

14    fireworks found in Mr. Tsarnaev's dorm room.  There was no

15    evidence of that.  The government chose not to call Azamat to

16    testify to that, and that would be entirely improper.

17            So for all of those reasons we move for a mistrial,

18    and if the Court denies that, we would ask that the video

19    montage be made part of the record.

20            THE COURT:  How do you respond to the First Amendment?

21            MR. CHAKRAVARTY:  There were any number of

22    non-national origin -- and I assume what I'm hearing from

23    Ms. Conrad is it's both national origin as well as

24    religious-based attack on other people.  These are items in

25    evidence which the defendant both had, and the government

1    simply juxtaposed the evidence with some of those photos.  That

2    was the only -- in terms of practical -- because the record is

3    not clear as to what was actually shown.  I took one piece of

4    evidence which happened to be a flag, which was in the

5    defendant's room, and as the government's own expert said, it

6    is not exclusively a Jihadi flag but that it has been corrupted

7    and it can be expressed to show a statement of deep and abiding

8    faith.

9         The audio file, which was also entitled "Ghuraba,"

10   which is "Stranger," which is a theme that we've heard

11   throughout the entire case, and it echoes the fact that the

12   defendant believes that he was one of these few Mujahid who,

13   amongst the people within the faith, a small percentage which

14   we've said throughout, including in the rebuttal, a small

15   percentage of people in the faith who believes in terrorism as

16   a means to an end, that this defendant believed, and he

17   consumed these audio files on all of his media.

18        Together it allows the jury to determine that what

19   they are viewing, as we all are, as horrific acts of terrorism,

20   that they get the perspective from what the defendant's state

21   of mind was of the same acts.  That was the purpose for which

22   it was put together.  It was a legitimate purpose.  That was

23   evidence in the case.  Evidence of his state of mind, his

24   radicalization.  They were combined together and the fact that

25   it was effectual and it didn't sanitize each of these things

1    independently doesn't change the probative value of what the

2    materials were themselves, neither does it make it a backhanded

3    attack on his national origin.

4         The language of -- both the flag as well as the audio

5    file were in Arabic, not a language that the defendant speaks.

6    There's nothing inherently religious about the audio file at

7    all.  Dr. Levitt explained the significance of this portable

8    inspiration, the audio files, amongst especially the radical

9    sect, and I think the evidence bears out that not only do the

10   terrorism materials talk about these nasheeds and the Shahada

11   and the statement of faith, but that the defendant himself

12   believed that.  That's exactly what he wrote in the note in the

13   boat and that's exactly what he did in terms of the terrorist

14   attack.  So frankly, it's --

15        THE COURT:  All right.  I think it was -- arguments

16   were the government's radicalization position and it was not

17   improper.

18        MS. CONRAD:  Well, I still ask it be made a part of --

19        THE COURT:  You may preserve it for the record.

20        MR. BRUCK:  One of the last points to be made about

21   this, too, that the effect, we submit, was heightened by the

22   decision not simply to give the content of the Ghuraba, but to

23   play the actual chant, which was, as Dun Meng said, weird only

24   because of the fact that it comes from a foreign culture, which

25   is unfamiliar.  This is exactly the sort of exacerbating a

1    national and cultural --

2         THE COURT:  I understand the point.  It is in

3    evidence, though.  The jurors can listen to it on their --

4         MS. CONRAD:  But it's the juxtaposition --

5         THE COURT:  So let me go on to something else.

6         MR. WEINREB:  Yes, your Honor.  In the defense's

7    opening statement, Ms. Clarke stated that the defendant was not

8    going to sidestep responsibility for these crimes, and in the

9    very beginning of her closing argument she again emphasized

10   that the defendant accepts responsibility for these crimes.

11   That invited a response from the government that the defendant

12   was, in fact, portraying himself as accepting responsibility

13   for the crimes when, in fact, he was dodging responsibility for

14   them by attempting to shift the blame elsewhere.

15        And the government's rebuttal arguments on those two

16   points, first, on pointing that fact out to the jury, that this

17   was really an attempt to avoid responsibility, not to accept

18   responsibility, and second, by disputing the facts that

19   according to the defense, Tamerlan Tsarnaev was responsible for

20   the radicalization of the defendant.

21        As to the reference of the fireworks, I did not say

22   that the emptied-out fireworks were found in the defendant's

23   dorm room; I said that they were found in the backpack that the

24   defendants removed from his dorm room and threw away --

25        THE COURT:  Right.  That's what I recall.

1          MS. CONRAD:  Well, there's been no evidence that

2    emptied-out fireworks were recovered from the landfill, at

3    which point it had been bulldozed at that point.

4          THE COURT:  The motion for a mistrial is denied.

5          Do you have anything that you want to -- are there any

6    objections to the substantive instructions?

7          MS. CONRAD:  There are.  First of all --

8          MR. MELLIN:  You asked, your Honor.

9          MS. CONRAD:  How much time do you have?  I'm just

10   kidding.  The first --

11         THE COURT:  I'm getting sick of hearing this song.

12         MS. CONRAD:  Right?  I know.

13         With respect to conspiracy, we object to not including

14   willfulness as the requirement of the mens rea required to join

15   the conspiracy as set forth in the First Circuit pattern jury

16   instructions which we provided to the Court.

17         We also object to the omission of the language from

18   the First Circuit pattern jury instructions which we also

19   submitted, that the government must prove beyond a reasonable

20   doubt that the defendant knew the essential features and

21   general aims of the conspiracy.

22         We also object to the omission of language from the

23   pattern jury instructions that proof must be based on the

24   defendant's -- proof that the defendant willfully joined the

25   conspiracy must be based on the defendant's own words and

1    actions.

2         With respect to the portion regarding the use of

3    carrying of firearms offenses, we object in relation to the

4    weapons of mass destruction.  We object, as we raised in our

5    Rule 29 motion, to the notion that these were two different

6    offenses when, in fact, we believe they encompassed the same

7    offense.

8         With respect to aiding and abetting -- well, actually,

9    throughout the instructions the Court, as the government did in

10   its proposed instructions, in recounting what the charges were

11   also charges the defendant conspired with another person.  It

12   also charges the defendant aided and abetted another person.

13   The other person was Tamerlan Tsarnaev.  And in recounting what

14   is charged in the indictment, we believe that it should specify

15   Tamerlan Tsarnaev.  The government did not -- or the indictment

16   did not say "and other persons known and unknown"; they

17   specified Tamerlan Tsarnaev, and that's what they have to

18   prove.

19        With respect to "during and in relation to" as relates

20   to use and carrying a firearm, we object to the omission of the

21   First Circuit's language; in particular, the language that it

22   must have -- the firearm must have placed a role in the crime

23   or been intended by the defendant to play a role in the crime.

24        The Court's instruction took the

25   defendant -- defendant's intent out of that and simply said

1    that it must have facilitated or have the potential to

2    facilitate the crime, eliminating the requirement of the

3    defendant's intention that it play a role.

4         We also object to the instruction generally regarding

5    advanced knowledge, but also in particular, to the language

6    that said that advanced knowledge can be inferred from the fact

7    that the person continued participation after learning about

8    the other person's possession.  And I would note in particular

9    that it's confusing and inarguably diluting the government's

10   burden to say in the other person's possession when, in fact,

11   the view here was use and carry.

12        So now it seems that it is sufficient for the

13   government to prove that another person possessed or -- rather

14   than used and carried.  And then leaving out, of course, the

15   "in furtherance of" element that would be required if the

16   government was relying on a possession theory.

17        Also, we would object to -- the instruction that the

18   jury may find advanced knowledge if the defendant continued his

19   participation is burden-shifting.

20        Regarding Count 7 and 9, a bomb in public places

21   count, we submit that the -- as we did on March 29, that the

22   government must still prove or disprove the exemption; in other

23   words, they must prove that a victim is a national of another

24   state.  Even if they proved the jurisdictional element of

25   trying to compel the United States to act differently, the

1    exemption is not confined to one particular jurisdictional

2    theory.

3         With respect to Count 19, which is the carjacking

4    count, we object to eliminating the word "knowingly" from the

5    First Circuit pattern jury instructions which are that the

6    first element is the defendant knowingly took the car as

7    opposed to just took the car, which is what the Court said.

8         With respect to "resulted in" in terms of bodily

9    injury, the Court did not define the causal relationship, and

10   we would ask the Court to instruct, as we did in our papers,

11   that it must be a but-for cause as specified by the Supreme

12   Court in *Burrage*.

13        We also object to saying that any injury that was

14   sustained while the defendant retained the car should be "while

15   retained control over the car and victim of the carjacking."

16   And I would note in particular that none of the cases the

17   government has cited, none of the cases that I have found

18   specify that the injury resulting can be to someone other than

19   the victim of the carjacking.  There are cases that address

20   this in the context of sentencing guidelines.  The government

21   called one of those dicta.  But, in fact, it's just a

22   completely different standard because it focuses on relevant

23   conduct as opposed to the direct and proximate result of the

24   offense itself.

25        We object to the inclusion of the instruction about

1    the lawfulness of the search, and particularly, the instruction

2    that essentially suggests to the jury that the Court has

3    already passed on the propriety of the search.  This is

4    unnecessary.  It was not raised by the evidence nor was it

5    requested by the government.

6            And finally, just because -- oh, no.  I

7    would -- sorry.  I'm almost there.

8            With respect to the instruction regarding the graphic

9    nature of the photos, I just want to state for the record that

10   in light of our motion in limine, we do not believe that that

11   instruction is sufficient to cure the prejudice created.

12           And if I could just have one moment to confer with

13   co-counsel.

14           (Counsel confer off the record.)

15           MS. CONRAD:  That's what I have.

16           MR. WEINREB:  Your Honor, those are all legal

17   arguments.

18           THE COURT:  Yeah, I don't see any need to change it.

19   There's only one thing I wanted to change -- or add to the

20   instructions that I gave, which I think is satisfactory.  With

21   respect to Count 7 and the foreign national, that's in the

22   indictment.  It seems to have been withdrawn by the government

23   because it's not in the form instruction.

24           I used the form basically proposed by the government

25   which was just to persuade the United States, (b) in the

1    statute rather than (f).

2            Is it correct that (f) is withdrawn, because they

3    weren't instructed on it.  And if so, I should make clear that

4    in looking at that, that they should not consider that part of

5    Count 7.

6            MR. WEINREB:  Or we could just redact from the --

7            THE COURT:  Do you have the verdict slip?

8            MS. CONRAD:  Your Honor, we don't have an objection, I

9    don't think, to changing --

10           THE COURT:  It just asks the general question about

11   Count 7.  It's in the body of the offense so that it doesn't

12   get highlighted.

13           MS. CONRAD:  Of course we don't think either of those

14   approaches cures the issue that we raise in our Rule 29 motion.

15           THE COURT:  Right.  Let me just say on that, I regard

16   the exemption as an affirmative defense.

17           MS. CONRAD:  I'm sorry?

18           THE COURT:  I regard the exemption as an affirmative

19   request.

20           MS. CONRAD:  And we disagree with that.

21           THE COURT:  Yeah, okay.  But I want to solve the

22   problem if they don't -- they note -- they focus on the first

23   alternative under --

24           MS. CONRAD:  Well, that's the instructions.

25           MR. WEINREB:  So, your Honor --

1          THE COURT:  It may have flown over their head, is the

2   point, without seeing --

3          MS. CONRAD:  If we start going down that road, there's

4   a lot of things we can take out.  The indictment also says

5   "possession" as opposed to "use and carry."

6          MR. WEINREB:  So the indictment -- I mean, the

7   instructions specify that the --

8          THE COURT:  Right.  Okay.  Then I will have that.

9   Okay.  All right.

10         MR. WEINREB:  Although I do -- we would have no

11  objection to redacting the additional language.

12         THE COURT:  I think that's a good idea.

13         MS. CONRAD:  Well, if they're going to do that, maybe

14  they should -- the "possession in furtherance" is also in the

15  indictment and that's essentially been withdrawn by the

16  government as well and the jury hasn't been instructed on that.

17  So we certainly don't want them to start speculating about what

18  "possession in furtherance" is.

19         MR. WEINREB:  If it can be redacted --

20         THE COURT:  I don't see why it can't.  I don't see why

21  it can't.  It will take a little while to do it.

22         That will appear in every "use and carry" count?

23         MR. WEINREB:  Yes.

24         THE COURT:  Okay.

25         (In open court:)

1           THE COURT:  I have a few final comments.

2           How you arrange your deliberations is really up to

3      you, but one of the things I suggest you do first is to select

4      one of your members to be the foreman of the jury.  That person

5      will have the responsibility to, among other things, organize

6      things, but also to communicate with us when you have reached a

7      verdict.

8           You will have, as I said this morning, a written copy

9      of the instructions with you in the jury room to consult as you

10     feel necessary during the deliberations to help guide you as to

11     what the legal principles are.  But if you have any questions

12     about my instructions to you about the law that you're unable

13     to answer after looking at and reviewing those instructions,

14     then you may send us a note and ask us that question.  We'd

15     rather have you ask a question about a point of law and get a

16     correct answer than for you to guess or to be unsure about what

17     principles of law you should apply.

18          We cannot, however, answer any questions about the

19     facts of the case or the meaning of the evidence.  Those

20     matters are entirely and exclusively matters for you, the jury,

21     to determine.

22          I note for the record that as you know you will not

23     have your cell phones or electronic devices with you during the

24     deliberations.  They are collected and they'll be returned at

25     the end of the day for you.  And of course overnight it will be

1    improper for you to use any of those to communicate with each

2    other or anybody else about the case, about the issues in the

3    case and, of course, to use them -- as we've been talking

4    throughout, to use them to conduct any research online or

5    otherwise.

6           By law, a deliberating jury will consist of 12 jurors.

7    Typically in longer trials such as this one, we empanel a

8    larger number than 12 to be sure that because of illness or

9    other reasons we don't lose jurors, so that we might end up

10   with fewer than 12 to deliberate at the end of the case.  So we

11   must now separate from the 18 of you six who will be the

12   alternate jurors and the other 12 will deliberate.

13          So I will now reduce the jury from 18 to 12 by

14   separating by identification of those who have been selected by

15   the method that's applicable to these matters to be determined

16   to be alternate jurors.

17          You'll separate physically once you leave the room.

18          Those jurors -- those alternate jurors are still

19   important to the case because they will be available in case

20   something happens during deliberations to one of the

21   deliberating jurors and it's necessary to make a substitution.

22   In addition, the alternates will also participate in the -- any

23   second phase of the trial, if there is one, again, for the same

24   purpose of being available for service, if necessary.

25          The six alternate jurors by juror number are Juror

1    No. 552, Juror No. 567, Juror No. 588, Juror No. 598, Juror

2    No. 608 and Juror No. 638.  The other jurors whose numbers I've

3    not read will be the deliberating jury.

4         For those, you will all have the notes you've taken

5    during the deliberations.  Please be respectful of each other's

6    note-taking abilities and memories.  Perhaps you might remember

7    from your school experiences that not everything you write down

8    is necessarily completely accurate as to what was said.  So

9    when you are in the room to discuss the case, do not assume

10   that simply because something appears in somebody's notes that

11   it necessarily must have been said or presented exactly that

12   way in court.  It's an aid to discussion, but principally use

13   your recollections.  It's your collective memory that must

14   control as you deliberate on the verdict.

15        Deliberate with a mind towards hearing each other out,

16   considering the evidence seriously as a group, and if you can,

17   coming to an agreement.

18        Each juror is entitled to his or her own opinion and

19   each should render, in the end, a verdict which represents that

20   juror's own conscientious view of the evidence.  However, that

21   doesn't mean you don't listen to each other as you deliberate,

22   present your views, consult with one another, and see whether

23   you can, without violence to your individual conscientious

24   judgment, come to a unanimous resolution of the issues

25   presented.

1          With that, jurors, we ask you now to withdraw to

2     deliberate upon the evidence and to return with your verdict.

3     We will have you get organized for a few minutes.  We won't go

4     too long today.  It's been a long day.  And we will -- as a

5     matter of fact, I think maybe we won't do anything.

6          We'll get you organized in the back, separate the

7     alternates, and very shortly after that -- I think it's been

8     long enough -- we'll send you home.  Turn the switch off.  What

9     we'll do in the morning is when everybody's here at nine

10    o'clock, we'll call you into the room to record formally for

11    the record that you have returned and will begin deliberations

12    in the case, and then you'll immediately go -- that will take

13    two or three minutes to do, and then you'll begin your

14    deliberations tomorrow morning, okay?

15         So save it until then.  Think of other things tonight.

16    There's a basketball game on you could probably watch.  And

17    we'll get to work in the morning, all right?

18         So if all the jurors would exit, and we'll separate

19    the alternates from the jurors.

20         THE CLERK:  All rise for the Court and the jury.

21    Court will be in recess.

22         (The Court and jury exit the courtroom and the

23    proceedings adjourned at 4:18 p.m.)

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  10/29/15
13

14

15

16

17

18

19

20

21

22

23

24

25