UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT AND FOR NEW TRIAL**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this Reply to the Government's Opposition ("Opp.") [DE 1542] to his Motion [DE 1490] for Judgment Notwithstanding Verdict and for New Trial. Contrary to the government's arguments, the totality of the record shows that venue in Boston was improper, and none of the section 924(c) counts of conviction can survive the recent Supreme Court decision in *Johnson v. United States,* 135 S. Ct. 2551 (2015) ("Johnson II").

## I.   VENUE IN BOSTON PRECLUDED IMPARTIAL ADJUDICATION IN BOTH FACT AND APPEARANCE.

In response to the defendant's venue-related arguments and evidence, the government erects and then tries to demolish a "straw man," claiming that the defense has failed to prove "that any juror was actually prejudiced or engaged in any misconduct." Opp. at 1. This fundamentally misapprehends the nature and basis of the defense submission.

In the Memorandum in Support of Motion for Judgment of Acquittal and for New Trial ("Def. Mem.") [DE 1506], the defense supplemented the record on the issues underlying the multiple motions for change of venue filed prior to and at the commencement of trial with additional evidence and information concerning ongoing

1

publicity and community connections surrounding the Boston Marathon Bombing and this case during the trial through the present time.  For that claim, the issue was and remains whether such publicity and community connections created a *presumption* of prejudice, not whether any particular seated juror may have *actually* been prejudiced. [1] *See, e.g., Skilling v. United States*, 561 U.S. 358 (2010).

  The government also argues that the defense memorandum is untimely.  But it cites no authority for expecting the defense — having filed numerous unsuccessful challenges to the venue, including after the completion of jury selection — to have continued piecemeal litigation once the challenges had been turned aside, the jury sworn, and the trial commenced. The additional evidence submitted in support of a post-trial challenge to the verdict, the next logical opportunity to supplement the claim, confirms exactly what the defense predicted in its prior filings.

The totality of ongoing publicity and community connections, as revealed by the cumulative record from the pretrial proceedings and the defense's supplemental presentation, warrants vacatur of the convictions and sentences and a new trial in a different venue.

### A. Local Events and Press Coverage.

In response to additional evidence documenting press coverage and community events during the trial, Def. Mem. at 2-12 & Ex. A, the government complains that the defense has "offered no evidence that the jurors actually attended any of those events or

---

[1] Thus too, whether any seated juror may have engaged in misconduct during the trial is not the issue before this Court, and is not one that counsel are in a position to explore or litigate here.

viewed any of the press coverage, despite being instructed not to do so." Opp. at 3.   But again, that misapprehends the nature of Mr. Tsarnaev's venue claim.   The purpose of the submission was to show, with concrete examples, that the intense pretrial publicity and widespread community connections identified prior to trial continued and, if anything, intensified as the trial unfolded.

Whether or not any juror was personally exposed to a particular story or event, the publicity, events, and connections prejudiced the community at large from which the jurors are drawn.  The media sampling of stories concerning "One Boston Day," for example, was designed to show that the story was carried by a wide diversity of outlets, whatever their individual "circulation" or number of online "hits," from national internet media to local newspapers, TV, and radio, to social media.  In short, coverage of One Boston Day was ubiquitous.

The government's invitation that the Court ignore this record and "make a finding . . . from its own experience" that "media coverage . . . was neither inflammatory nor pervasive," is not well founded, Opp. at 4, particularly in light of the Court's refusal to hold evidentiary hearings on the nature, extent, and reach of pretrial publicity in connection with pretrial motions for change of venue.   The defense objects to any such personal "finding" by the Court.

With regard to the submission concerning family witnesses from Russia, the point was not that they "would have testified more favorably under other conditions." Opp. at 6. Rather, the law enforcement leaks and resultant media circus that erupted upon their arrival provide yet another vivid illustration of the intense attention and community

3

sentiment surrounding the case in greater Boston.  The FBI quickly determined that it was necessary to move the witnesses to a hotel out-of-state to escape the local frenzy. Ironically, the FBI recognized that a "change of venue" was necessary to ensure the safety and security of the witnesses while the defendant, with life quite literally at stake, was required to face trial at the center of the maelstrom in Boston.[2]

With regard to the photographs described in the defense submission (Def. Mem. at 12) and submitted on disc (Ex. A) as examples of the physical surroundings jurors and the larger community would have experienced, the government complains that the defense did not identify the dates or locations of the images. Opp. at 7.  Not so.  Exhibit A contained the photos in computer file format clearly labeled by date (also embedded in "properties" of the files in *.jpg format) and location (which also is apparent from many of the photographs themselves).  The government's suggestion that the same types of "items" might have surrounded a Courthouse in an alternative venue such as New York or Washington, D.C., Opp. at 7, is simply fanciful.

---

[2] The government's efforts to characterize the parole and treatment of the witnesses as an act of grace for the defendant's benefit, Opp. at 6, are misplaced.  In fact, the witnesses were paroled pursuant to a Court order.  Failure of the government to cooperate in securing their attendance would have violated the Constitution.  *See United States v. Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) (holding that failure to assist in obtaining parole for foreign witnesses would violate 5th and 6th Amendments).   The frenzy of attention and resultant security concerns were of law enforcement's own making.  Entry into the country as normal travelers, with an escort by the defense team, could have been accomplished without undue attention, just as other U.S.-based family and friends of the defendant did not provoke a similar reaction.  The suggestion that conditions of "hotel arrest" for more than a week could be anything other than oppressive strains credulity.

**B. Social Media.**

The government argues that the Court should ignore the presentation of Facebook information because it was "untimely" and also "completely speculative" because the defense "has not shown, and cannot show, that the 'inflammatory' posts ever actually appeared in the jurors' Facebook News Feeds" or that the jurors actually noticed them. Opp. at 8. The government again misunderstands the nature and purpose of the defense submission.

The social media evidence was presented as additional support for the argument that there was a presumption of prejudice in Boston, making venue here impermissible and thus now requiring a new trial in a different venue. Just as the Marathon figured prominently in traditional mass media and public events in the physical world inhabited by the jurors, so too in their social media communities. Whether or not a juror viewed an individual friend's posts, they provide another marker of salience in the community.

The government's lengthy description of the workings of a Facebook News Feed, Opp. at 8-12, boils down to sheer speculation about the likelihood that any particular juror would have actually read any particular Marathon-related post from one of their "friends." But again, that misapprehends the nature of Mr. Tsarnaev's venue claim, to which the posts are relevant because they demonstrate that Marathon-related topics were highly salient within the jurors' social networks, that is, among the people with whom jurors interact.

The chart created by the government purporting to show that Facebook posts identified by the defense as problematic represent a vanishingly small proportion of posts

by the jurors' friends, Opp. at 11, also lacks foundation and is misleading. First, the numbers in the column representing the total number of problematic posts (the "numerator" in the government's calculations) are necessarily understated. As noted in its original submission, Def. Mem. at 13 n.1, the defense simply identified a *sample* of salient postings from the *publicly available* pages of jurors' friends. The defense has no access to social media postings of juror friends who may have privacy settings that limit public access to some or all of their activity. Second, the numbers in the column representing the total number of posts by friends during the approximately 70 days of trial (the "denominator" in the government's calculations) are entirely without foundation. The government has provided no basis or support for the predicate assumption that every friend would make at least one posting per day during that period. For those reasons, it is the government's table that is "entirely speculative."

The government contends that jurors in other jurisdictions might well also have friends posting about the Marathon because Facebook friends could "live anywhere in the United States or the world" and that there is no evidence the jurors' friends were "immersed in the sequelae of the Marathon bombing." Opp. at 12. The government is incorrect. First, not surprisingly, an examination of available information about the location of jurors' friends reveals that as to 10 of 12 jurors, most hail from greater Boston. *See* Exhibit A. In that sense, the jurors' electronic social networks largely reflect the actual physical communities in which the jurors actually live. As to the other two jurors, one is a transplant to the Boston area and the other includes over 1000 "friends," among which over half appear to be representatives of certain special interest

6

subcultures throughout the world.  Second, the government's argument ignores the actual substance of the Marathon-related social media postings that the defense submitted, which includes numerous personal connections to runners in the Marathon and even social and familial connections to a bombing victim and trial witness.

The social media information was submitted to support the broader record concerning media coverage and community connections to the sequelae of the Marathon. The totality of information and circumstances demonstrate that Boston was an improper venue for this trial.

## II.   THE RECENT SUPREME COURT DECISION IN *JOHNSON II* REQUIRES ACQUITTAL ON 924(C) COUNTS OF CONVICTION AND A NEW PENALTY TRIAL.

Mr. Tsarnaev was convicted of 15 counts of possession and use of a firearm during and in relation to an underlying "crime of violence," in violation of 18 U.S.C. § 924(c).   Under that statute, a "crime of violence" is defined as a felony offense that (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another (the "force" clause) or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing an offense (the "residual" clause).   The defense has argued that because the "residual" clause is invalid under *Johnson II*, and since none of the predicate offenses categorically satisfy the "force" clause, all of the 924(c) counts of conviction must be vacated.

In the wake of *Johnson II* effectively erasing the "residual" clause, the remaining issue is *not* whether the conduct underlying Mr. Tsarnaev's predicate offenses was

"violent" in some ordinary or lay sense of the term, but whether the criminal *statutes* underlying the section 924(c) convictions are *categorically* "crimes of violence" — that is, whether *all* of the conduct covered by those statutes *necessarily* entails the use of *violent physical force*.

Contrary to the government's contentions, Opp. at 13-26, the *Johnson II* argument was timely, none of the predicate offenses satisfies the "force" clause of section 924(c), and the "residual" clause of section 924(c) is unconstitutionally vague.

Notably, the government does not deny that a failure of any of the 924(c) counts would undermine the death verdict and require a new penalty trial. *See* Def. Mem. [DE 1506] at 29.

## A. The *Johnson II* Argument Was Not Waived.

The government claims that the *Johnson II* argument is a species of defense or objection that must be brought prior to trial under Fed. R. Crim. P. 12 and therefore has been waived. Opp. at 14-15. In effect, the government is saying that even if 15 of the 30 counts of conviction are based on an unconstitutionally vague statutory provision — 18 U.S.C. § 924(c)(3)(B) — those convictions should be upheld anyway and Mr. Tsarnaev should nevertheless be put to death because the defense did not anticipate *Johnson II* prior to trial. The government's argument cannot withstand scrutiny.

The Supreme Court decided *Johnson v. United States*, 135 S. Ct. 2551 (2015) (*Johnson II*), on June 26, *after* the verdict and sentencing hearing in this case. An argument based on *Johnson II* therefore was not "reasonably available" prior to trial, Fed. R. Crim. P. 12(b)(3), and the defense has raised it at the first opportunity in post-trial

motions.   Even before the "reasonably available" language was added to Rule 12 in December 2014, courts had held that an intervening change in the law provided "good cause" for failure to raise an issue prior to trial.  *See, e.g., United States v. Aguilera-Rios*, 754 F.3d 1105, 1109 (9th Cir. 2014) (finding no waiver and "good cause" under Rule 12 where caselaw prior to intervening Supreme Court decision had "foreclosed the argument [defendant] now makes.").

The cases cited by the government, Opp. at 14, do not address the circumstance of a change in the law wrought by the Supreme Court.  Nor do they even remotely suggest that a defendant must ritually raise every conceivable then-futile, legally foreclosed argument before trial in order to secure later review *while still in the district court* should the law change.  *United States v. Rodriguez*, 738 F.2d 13 (1st Cir. 1984) involved an untimely motion to dismiss based on government misconduct in the grand jury that could have been brought before trial.  *Flying Eagles Pub., Inc. v. United States*, 273 F.2d 799 (1st Cir. 1960) involved an argument that the indictment was duplicitous raised for the first time in a motion for new trial.  *United States v. Smith*, 866 F.2d 1092 (9th Cir. 1989), held that a particular affirmative defense was *not* required to be asserted before trial under Rule 12.  As the *Smith* court explained, Rule 12 timing requirements are aimed at "defenses based on procedural or formal defects" in the indictment that can be "cured by prosecutorial action."  *Id*. at 1098.  In contrast, like the affirmative defense at issue in *Smith*, a charge based on an statute that is unconstitutional, as is the case with the "residual clause" of section 924(c), cannot be "cured."

Even courts of appeals, which rigorously enforce preservation and waiver rules, permit defendants to raise issues based on intervening Supreme Court decisions that were not included in the opening brief.  *See, e.g., United States v. Vazquez-Rivera*, 407 F.3d 476, 487-88 (1st Cir. 2005) (change in law "constitutes an 'exceptional circumstance' in which we will permit new issues to be raised" in supplemental brief.)  Indeed, the 11th Circuit recently permitted a *Johnson II* claim, specifically, to be raised in a supplemental brief, joining what it described as the prevailing rule in "every other circuit."  *United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) ("[W]here there is an intervening decision of the Supreme Court on an issue that overrules either a decision of that Court or a published decision of this Court that was on the books when the appellant's opening brief was filed, and that provides the appellant with a new claim or theory, the appellant will be allowed to raise that new claim or theory in a supplemental or substitute brief").  Against that backdrop, the government's argument that the defense should be barred from raising the *Johnson II* issue while still in the district court is entirely unpersuasive.[3]

---

[3] Even assuming, *arguendo*, the government were correct that the defense should have raised the *Johnson II* issue earlier, the result would be a mere failure to preserve an  issue, not a true knowing and voluntary "waiver" — intentional relinquishment — of a known right.  Notably, the 2014 amendments to Rule 12 deleted subsection (e) containing "waiver" language.  The new version of the rule simply describes a late claim as "untimely" and proceeds with the provision permitting the district court to consider the argument if "good cause" is shown.  *See* Fed. R. Crim. P. 12(c)(3).  Moreover, it is well-settled that an unpreserved Rule 12 issue is reviewable in the court of appeals under the plain error standard.  *See, e.g., United States v. O'Brien*, 617 F.2d 299 (1st Cir. 1980).  It is difficult to conceive how a legally clear *Johnson II* error rendering counts of conviction unconstitutional would not affect the defendant's "substantial rights" and therefore meet the "plain error" test under *United States v. Olano*, 507 U.S. 725 (1992).

**B. None of the Predicates is a "Crime of Violence" Under the "Force" Clause of Section 924(c).**

The government asserts that all of the predicates at issue meet the "force" clause, section 924(c)(3)(A), because the "use . . . of *physical force*" can include "use of matter or energy sufficient to cause physical pain or injury" even if there is *no* "*physical violence*" in deployment of the "matter or energy" (emphases added).  Opp. at 15-16.  There is no logic or authority behind the government's premise, which essentially reads out the violent "physical force" requirement and erroneously focuses instead on injury.

To be clear, there can be no dispute that the term "physical force" in section 924(c)(3)(A) has the meaning given to it by the Supreme Court's 2010 decision in *Johnson v. United States*, 559 U.S. 133 (2010) (*Johnson I*).[4]  In *Johnson I*, the Supreme Court held that the phrase "physical force" means "violent force," *i.e.*, "strong physical force" that is "capable of causing physical pain or injury to another person."  *Id*.

While the ability to cause injury is a *necessary* component of "violent physical force," it is not, *alone*, sufficient because non-violent, non-forceful acts can also cause injury.  Courts have held that many offenses with physical injury or even death elements do not qualify as "force" clause  "violent felonies" or  "crimes of violence."  *See, e.g.,*

_____

[4] Courts of Appeals have consistently held that 18 U.S.C. § 16(a) (which is identical to section 924(c)(3)(A)) contemplates "destructive," "violent force" — not *de minimis* force.  *See United States v. Landeros-Gonzales*, 262 F.3d 424, 426 (5th Cir. 2001); *Flores-Lopez v. Holder*, 685 F.3d 857, 864 (9th Cir. 2012) (requiring "use of violent, physical force*"); United States v. Serafin*, 562 F.3d 1105, 1109 (10th Cir. 2009); *Jobson v. Ashcroft*, 326 F.3d 367, 373 (2d Cir. 2003); *Bazan-Reyes v. INS*, 256 F.3d 600, 611 (7th Cir. 2001) (the "term 'physical force' . . . refers to actual violent force.").  Indeed the Supreme Court in *Johnson I* cited lower court opinions defining "physical force" under section 16 when defining physical force in the ACCA.  559 U.S. at 140.

*United States v. Zuniga-Soto*, 527 F.3d 1110, 1125 n.3 (10th Cir. 2008) (Texas

aggravated assault statute requiring intentionally causing physical injury); *Chrzanoski v.*

*Ashcroft*, 327 F.3d 188 (2d Cir. 2003) (Connecticut assault statute requiring intentionally

causing physical injury); *United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005)

(Colorado assault requiring defendant to cause bodily injury using deadly weapon);

*United States v. Martinez-Flores*, 720 F.3d 293, 299 (5th Cir. 2013) (New Jersey

aggravated assault requiring a defendant to cause significant bodily injury); *United States*

*v. Torres-Miguel,* 701 F.3d 165 (4th Cir. 2012) (terroristic threats); *United States v.*

*Gomez*, 690 F.3d 194 (4th Cir. 2012) (child abuse resulting in physical injury); *United*

*States v. Andino-Ortega*, 608 F.3d 305 (5th Cir. 2010) (causing physical injury to a

child); *United States v. Garcia-Perez*, 779 F.3d 278 (5th Cir. 2015) (Florida

manslaughter).

The government's opposition also loses sight of this key principle:  If the "most

innocent conduct" covered by the statute does not entail violent physical force, the

offense cannot categorically qualify as a violent felony or crime of violence.   *Torres-*

*Miguel*, 701 F.3d at 167.

### 1.  18 U.S.C. § 2332a — Use of Weapon of Mass Destruction.

The government's conclusory and unsupported claim, Opp. at 16, that a section

2332a offense is necessarily a "crime of violence" hinges on the sleight-of-hand

addressed above — ignoring the "violent physical force" requirement and focusing

instead on the injury that a particular weapon can cause.

Courts have expressly held that offenses criminalizing mere use or deployment of substances or objects that can cause injury are not crimes of violence and the government has offered no contrary authority. For example, in *Torres-Miguel*, at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which "will result in death or great bodily injury to another." 701 F.3d at 168. The Fourth Circuit, relying on several appellate decisions from various circuits, reasoned that there are many ways in which injury or death can result without use of "violent force." *Id*. at 168-69. "For example, as the Fifth Circuit has noted, a defendant can violate statutes like [the one at issue] by threatening to poison another, which involves no use or threatened use of force." *Id*. (citing *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)).

In reaching its decision, *Torres-Miguel* also relied on the Second Circuit's decision in *Chrzanoski*. In that case, at issue was whether a prior Connecticut conviction for third degree assault qualified as a "crime of violence" under the force clause. The Connecticut statute "require[s] the state to prove that the defendant had intentionally caused physical injury." *Chrzanoski*, 327 F.3d at 193. Nonetheless, the "Second Circuit [] held that [the statute] does not constitute a crime of violence . . . because there is a difference between causation of an injury, which is all that the Connecticut statute [] required, and an injury's causation by the use of physical force." *Torres-Migue*l, 701 F.3d at 169 (citing *Chrzanoski*, 327 F.3d at 194) (internal quotation marks omitted). The Second Circuit explained that "an individual could be convicted of intentional assault in the third degree for injury caused not by physical force, but by guile, deception, or even

13

deliberate omission." *Chrzanoski*, 327 F.3d at 195.  The Court elaborated that "human experience suggests numerous examples of intentionally causing physical injury without the use of force, such as a doctor who deliberately withholds vital medicine from a sick patient" or someone who causes physical impairment by placing a tranquilizer in the victim's drink.  *Id*. at 195-56.

For even further support, *Torres-Miguel* embraced the Tenth Circuit's decision in *Perez-Vargas*.  In that case, the Tenth Circuit "explained that although the Colorado [third degree assault] statute required [an act causing] bodily injury [by means of a deadly weapon], imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines and so the Colorado crime was not categorically a crime of violence under U.S.S.G. § 2L1.2." *Torres-Miguel*, 701 F.3d at 169 (citing *Perez-Vargas*, 414 F.3d at 1287) (internal quotation marks omitted).  The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas*, 414 F.3d at 1286.

Simply put, "use of a weapon of mass destruction" in violation of 18 U.S.C. § 2332a, is a broad statute criminalizing a variety of conduct — including use of chemicals, biological agents, radiation—  not all of which entail violent force.  Therefore, it is not categorically a "crime of violence."

### 2.   18 U.S.C. § 2332f — Bombing Place of Public Use.

The government asserts, again without citation of any authority, that  "deliver[ing] and plac[ing] a bomb" entail violent physical force because "it is the bomb itself that constitutes the violent physical force."  Opp. at 17.  However, neither delivery nor placement necessarily involves or even leads to the use of "violent physical force" if there is never an actual or attempted detonation.   Moreover, a crime under section 2332f involving a "lethal device" that, for example, employs "toxic chemicals, biological agents, or toxins," 18 U.S.C. § 2332f(e)(9), would also fail to qualify as a crime of violence under the authorities discussed above.

### 3.   18 U.S.C. 844(i) — Malicious Destruction of Property.

The government asserts that the defense "presumably could not think of" an argument that the crime does not require the use of violent physical force.   Opp. at 17. Not so.  As noted, this crime may be committed by the passive employment of fire, which, like the use of toxic chemicals discussed above, does not require violent physical force.  *See, e.g., Brown v. Caraway*, 719 F3d 583, 589 (7th Cir. 2013) (holding that arson statute "does not satisfy the elements ["force"] clause. Nothing on the face of the statute involves "the use, attempted use, or threatened use against the person of another"; also holding statute did not match enumerated crime of "arson" or meet residual clause due to "reckless" mens rea.)

In addition, section 844(i) does not necessarily require *intentional* use of violent physical force.  *See United States v. Gullett*, 75 F.3d 941, 947-48 (4th Cir. 1996) ("Because Congress did not define "maliciously" in section 844(i), we must presume

15

Congress intended to employ the common-law definition . . . . Accordingly, the first element of section 844(i) is satisfied if the defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result from his or her acts.").

It is well-settled that in order to qualify as a violent felony or crime of violence, the offense must entail the intentional use or threat of violent force; reckless or lesser mens rea will not suffice. *See, e.g., United States v. Holloway*, 630 F3d. 252, 262 (1st Cir. 2011) ("reckless" assault and battery under Massachusetts law does not qualify as a violent felony); *Garcia v. Gonzales*, 455 F.3d 465 (4th Cir. 2006) (assault including scenario where defendant recklessly causes serious physical injury using a deadly weapon does not qualify); *United States v. McMurray*, 653 F.3d 367, 374-75 (6th Cir. 2011) (aggravated assault including scenario where defendant causes serious bodily injury does not qualify); *United States v. Coronado*, 603 F.3d 706 (9th Cir. 2010) (intentional discharge of firearm in negligent manner that creates risk of injury or death does not qualify). Since a section 844(i) may be satisfied by lesser mens rea, it is not categorically a crime of violence.

### 4.  Conspiracy to Use Weapon of Mass Destruction.

With regard to the counts of conspiracy to use a weapon of mass destruction, the government cites cases for the proposition that when a conspiracy exists to commit a crime of violence, "the conspiracy itself poses as substantial risk of violence." Opp. at 17. Of course, the "risk of violence" locution tracks the now-defunct "residual" clause of the ACCA and section 924(c), not the "force" clause. Moreover, since actual use of a

weapon of mass destruction is not categorically a "crime of violence," as noted above, it follows that a conspiracy to commit that offense cannot be one.

Assuming, arguendo, that use of a weapon of mass destruction does somehow satisfy the force clause, it is well-settled that a conspiracy to commit such a crime does not.  For example, in *United States v. White*, 571 F.3d 365 (4th Cir. 2009),  at issue was whether the defendant's conspiracy to commit a North Carolina offense of robbery with a dangerous weapon was a "crime of violence" under the ACCA.  Although the Fourth Circuit held that the conspiracy qualified as a "crime of violence" under the now-defunct ACCA residual clause, the Court, without hesitation, also held that the conspiracy is not a "crime of violence" under the ACCA force clause, which for all relevant purposes, is identical to the § 924(c) force clause.  *See id.* at 369 ("Applying a categorical analysis to the Conspiracy Offense, we first observe that it does not have 'as an element the use, attempted use, or threatened use of physical force against the person of another.'") (citing 18 U.S.C. § 924(e)(2)(B)(i)).

In *United States v. Gore*, 636 F.3d 728 (5th Cir. 2011), the Fifth Circuit, relying on *White*, held the same with respect to a Texas offense of conspiracy to commit an aggravated robbery:  "A factfinder could convict a defendant of conspiracy to commit aggravated robbery by concluding that there was an agreement to (1) commit robbery and (2) engage in one or more of the acts enumerated in the aggravated robbery statute, without finding that physical fore against the person of another was actually used or that there was an attempted or threatened use of such force.  Accordingly, conspiracy to commit aggravated robbery does not come within the definition of 'violent felony' in [the

ACCA force clause]."  *Id*. at 731 (emphasis added).   Thus, *White* and *Gore* both dictate

that conspiracy to use a weapon of mass destruction fails to qualify as a "crime of

violence" under the force clause of section 924(c).  *See also United States v. Melvin*, No.

13-4857 (4th Cir. Oct. 26, 2015) (vacating judgment where government conceded in light

of *Johnson II* that conspiracy to commit robbery with a dangerous weapon is not ACCA

predicate); *United States v. Gonzalez-Ruiz*, 794 F.3d 832, 836 (7th Cir. 2015)

(government conceded in light of *Johnson II* that conspiracy to commit armed robbery is

not a violent felony under the ACCA).

### 5.  18 U.S.C. § 2119 — Carjacking.

Carjacking is not categorically a crime of violence under the "force" clause

because it can be accomplished by "intimidation," which does not necessarily require the

use or threat of violent physical force.  The government insists that it does, Opp. at 18,

but then cites two decisions regarding bank robbery (which has an identical

"intimidation" element) that actually support the defense argument.  In *United States v.*

*Henson*, 945 F.2d 430 (1st Cir. 1991), the court explained that intimidation means

placing an "ordinary person  in fear of bodily harm."  *Id*. at 439.  Notably, "[n]either the

actual or threatened display of a weapon, nor an explicit threat of force, is essential to

establish intimidation under the statute."  *Id*. at 440.  The court in *United States v. Kelley*,

412 F.3d 1240 (11th Cir. 2005), further clarified that "a defendant can be convicted [ ]

even if he did not intend for an act to be intimidating."  *Id*. at 1244.  The government has

offered no authority or even argument for the proposition that reckless, negligent,

unintentional, or implied "intimidation" would satisfy the "force" clause.  Nor does the

"intent to seriously harm or kill" requirement derived from *Holloway v. United States*, 526 U.S. 1 (1999) save the government's argument since one can inflict serious harm or cause death by means other than violent physical force.

Again, the Fourth Circuit's opinion in *Torres-Miguel*, discussed at length *supra*, is most instructive. *See* 701 F.3d at 168 (willfully threatening to commit crime which "will result in death or great bodily injury to another" not a crime of violence under "force" clause). Carjacking, which can be accomplished by putting another in fear of bodily harm, does not require "violent physical force." Indeed, a defendant can put another in fear of bodily harm by threatening to poison or infect that person if he does not turn over his car to the defendant, to release hazardous chemicals into the car, to place a barrier in front of the car if the person attempts to drive off, or lock the person in a car on a hot day — some of the very examples that the courts in cases cited above held not to constitute "violent force."

The government's string citation of cases from the 1990s holding that carjacking is a crime of violence, Opp. at 18, is not persuasive. All of theses cases predated the Supreme Court decisions in, *e.g.*, *Leocal* (2004), *Johnson I* (2010) and *Johnson II* (2015), which dramatically changed the law and clarified the "violent physical force" requirement. Moreover, in two of the four cases the government cites, *United States v. Singleton*, 16 F.3d 1419 (5th Cir. 1994) and *United States v. Brown*, 200 F.3d 700 (10th Cir. 1999), it is ambiguous whether the court was relying on the "force" clause or the "residual" clause ("risk of injury) or both.

### 6.  18 U.S.C. § 1951(a) — Hobbs Act Robbery.

Contrary to the government's arguments, Opp. at 19, for the same reasons

explained above, the Hobbs Act element of "generating fear of injury" does not require

the use or threat of violent force.

Moreover, even threats to inflict economic harm on an intangible asset (like shares

of stock) can constitute a threat to "injure property" under section 1951's robbery

definition.  For example, the Fourth Circuit sustained a conviction under the Hobs Act

where a union boss threatened "to slow down or stop construction projects unless his

demands were met."  *United States v. Iozzi*, 420 F2d 512, 514 (4th Cir. 1970).  Likewise,

in noting that Hobbs Act robbery, "by its terms, encompasses violence against property,"

the Second Circuit held that "[w]hile often the property involved is an existing physical

asset, the concept is not limited to tangible things, but includes intangible assets such as

rights to solicit customers and to conduct a lawful business."  *United States v. Arena*, 180

F.3d 380, 392 (2d Cir. 1999), abrogated in part on other grounds by *Scheidler v. Nat'l*

*Org. for Women, Inc.*, 537 U.S 393, 403 n.8 (2003).  Thus, Hobbs Act robbery can be

committed via threats to devalue some intangible economic interest like a contract right

or stock holding, which obviously does not entail violent physical force.[5]

---

[5] *United States v. Morales-Machuca*, 546 F.3d 13, 21 (1st Cir. 2008), cannot carry the
weight the government places on it.  Opp. at 19.  It predates both Supreme Court *Johnson*
decisions.   Further, it contains no "crime of violence" analysis and the issue does not
appear to have even been raised by the parties.  *Morales-Machuca* simply states, "A
violation of the Hobbs act is a crime of violence for purposes of " section 924(c), citing
*United States v. Rodriguez-Casiano*, 425 F.3d 12 (1st Cir. 2005).  That case, in turn,
simply noted that the defendant had been charged an convicted with a Hobbs Act 924(c)
predicate.  Again, this was apparently unchallenged; the opinion focused on an interstate

### C. The "Residual" Clause of Section 924(c) is Unconstitutionally Vague.

Both here and in other pending cases, the government has conceded that courts must use the same "ordinary case" analysis in determining whether a felony qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(B) as under the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 923(e)(ii).  Opp. at 21 (acknowledging "the need to consider the 'ordinary' version of the crime").[6]  In other words, the government agrees that a court categorizing a predicate felony under section 924(c)(3)(B) first has to determine what the "ordinary case" of the felony entails in the abstract, without examining real world facts, just like when it categorizes felonies under the ACCA's residual clause.

The government tries to downplay and bury this concession by calling the "ordinary case" analysis merely "one of those 'uncertainties'" that plague the ACCA.  Opp. at 21.  Extrapolating the "ordinary case," however, is not just one problematic "uncertainty" of the ACCA and section 924(c)(3)(B).  It is the core source of the "grave uncertainty" and "wide-ranging inquiry" that doomed the ACCA's residual clause.

---

commerce argument.  At most, then, these cases simply stand for the proposition that before the *Johnson* tandem, Hobbs Act 924(c) predicates had been charged in the First Circuit and were assumed to be valid in the absence of defense challenge.

[6] *See also, e.g.,* Supplemental Brief of the United States in *United States v. Taylor*, 09-5517 (6th Cir), DE 295 ("The United States acknowledges that, like the ACCA, § 924(c)(3)(B) involves a risk-based analysis of the "ordinary case" of a predicate offense and that the Johnson Court identified the ordinary-case analysis as one problematic feature of the ACCA's residual clause) (citing Solicitor General's Supplemental Brief in *Johnson II* , 2015 WL 1284964, *22-*24 (Mar. 20, 2015)).

*Johnson II*, 135 S. Ct. at 2555-56. Just as the "ordinary case" inquiry brought down the ACCA's residual clause, so too it topples section 924(c)(3)(B).

Despite recognizing that courts must use the same doomed "ordinary case" inquiry under section 924(c)(3)(B) as under the ACCA, the government contends that section 924(c)(3)(B) is not void for vagueness for three reasons. First, the government notes that section 924(c)(3)(B) does not include the ACCA's prefatory list of enumerated offenses and therefore does not require comparing the ordinary predicate felony with the ordinary enumerated offenses. Opp. at 21-22. Second, the government claims that section 924(c)(3)(B) "applies only when the risk of force occurs 'in the course of committing the offense'" and "does not go beyond the 'physical acts that make up the crime'" and thus is "narrower" than the ACCA's residual clause. Opp. at 23-24. And third, the government says that Supreme Court and lower court decisions on section 924(c)(3)(B) do not reflect the confusion that characterized those about the ACCA's residual clause before *Johnson II*. Opp. at 24-25.

But the government's arguments all fail. *Johnson II* holds that courts cannot discern the "ordinary case" of the predicate offense with any certainty, let alone predictability. Neither Google, common sense, statistics, nor experts can identify with sufficient precision what the ordinary case of a crime entails. *See Johnson II*, 135 S. Ct. at 2557. Most offenses involve a broad variety of factual scenarios, and a court simply is not equipped to "discern where the 'ordinary case' . . . lies along this spectrum." *Id*. at 2557. This holds true for both the ACCA's residual clause and section 924(c)(3)(B).

Since we know, after *Johnson II*, that it is an impossible task for a court to picture the ordinary case of the predicate crime, the analysis can go no further.

Nothing else cures this fundamental defect. If a court cannot determine the ordinary case of the predicate offense in the first place, it can never even progress to the next step of categorizing the offense. Thus, it makes no difference that enumerated offenses in the statute may serve as a point of comparison in subsequently determining whether that ordinary case of the predicate offense is sufficiently risky.

Indeed, a court cannot even reach the stage of figuring the type or degree of risk entailed in the ordinary case of a predicate offense — whether that be serious risk of injury as under the ACCA, or substantial risk of force being used during the crime as under section 924(c)(3)(B) — if it has no ability to picture the ordinary case in the first place. Thus, it is beside the point that the government also asserts that the determination of riskiness is somehow narrower under section 924(c)(3)(B) than under the ACCA. And, in any event, that claim is unsupported.

Finally, the Supreme Court and lower courts have applied precedent on the ACCA's residual clause to cases involving section 924(c)(3)(B) and its twin, section 16(b). Thus, confusion about those laws is subsumed within confusion about the ACCA's residual clause.

Accordingly, each of the government's arguments is just a red herring. The Supreme Court's analysis in *Johnson II* rose and fell on the ordinary-case problem. The same problem, which doomed the ACCA's residual clause, also dooms section 924(c)(3)(B).

Notably, the Solicitor General's brief to the Supreme Court in *Johnson II* expressly acknowledged that 18 U.S.C. section 16(b) — which is *identical* to 18 U.S.C. § 924(c)(3)(B) — "is equally susceptible to petitioner's central objection to the residual clause," that it was unconstitutionally vague, because, "[l]ike the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense . . ." Supplemental Brief of the United States, *Johnson v. United States*, 2015 WL 1284964, at **22-23 (Mar. 20, 2015).

Moreover, on October 19, 2015, the Ninth Circuit held that section 16(b) is void for vagueness in light of *Johnson II. See United States v. Dimaya*, ___ F.3d ___, 2015 WL 6123546 (2015). The *Dimaya* court held that section 16(b) "suffers from the same indeterminacy as ACCA's residual clause." *Id*. at *1. "Specifically, courts considering both § 16(b) and the [ACCA] residual clause must decide what a usual or ordinary violation of the statute entails and then determine how great a risk of injury that 'ordinary case' presents." *Id*. at *3 (internal quotation marks omitted).

The *Dimaya* court further observed that, "[n]otwithstanding the undeniable identity of the constitutional defects in the two statutory provisions, the government … offer[s] several unpersuasive arguments in an attempt to save" section 16(b). *Id*. at *5. The court then went on to list and reject several of the very same arguments that the government raises here. The existence of enumerated offenses in ACCA? Opp. at 21. "*Johnson* [ ] made plain that the residual clause was void for vagueness in and of itself for the reasons stated in reaching its decision, and not because of the clause's relation to the four listed offenses." *Id*. The Government's argument that section 924(c)(3)(B) is

"narrower" than ACCA's residual clause? Opp. at 23. The *Dimaya* court doubted that section 16(b)'s reference to conduct "in the course of committing the offense" "actually creates a distinction between the two clauses" at issue. *Id*. at *6. But "even if such a distinction did exist, it would not save [section 16(b)'s] definition of a crime of violence from unconstitutionality." *Id*. Finally, the *Dimaya* court rejected the Government's argument, Opp. at 24, that the residual clause here "has not generated the same degree of confusion among courts that ACCA's residual clause generated." *Id*. As the first Court of Appeals to analyze the post-*Johnson II* constitutionality of the statutory text at issue here, the Ninth Circuit concluded:

> Although the government can point to a couple of minor distinctions between the text of the residual clause and that of [section 16(b)'s] definition of a crime of violence, none undermines the applicability of *Johnson's* fundamental holding to this case. As with ACCA, section 16(b) … requires courts to 1) measure the risk by an indeterminate standard of a "judicially imagined 'ordinary case,'" not by real world-facts or statutory elements and 2) determine by vague and uncertain standards when a risk is sufficiently substantial. Together, under *Johnson*, these uncertainties render the [ ] provision unconstitutionally vague.

*Id*. at *7. For the reasons elaborated below, the *Dimaya* court was correct to find that the government's arguments about section 16(b) — and thus its arguments here about the identical language of section 924(c)(3)(B) — amount to distinctions without a difference.

1.  **The list of enumerated offenses preceding the ACCA's residual clause was not material to the Supreme Court's decision in *Johnson II*. Indeed, if anything, the absence of such a list in section 924(c)(3)(B) only exacerbates the difficulty of describing "the idealized ordinary case."**

Contrary to what the government argues, Opp. at 21-22, the Supreme Court's decision in *Johnson II* did not hinge on the list of enumerated offenses that precedes the residual clause in the ACCA.  The ordinary-case problem exists in any event.  As the Court recognized, the list bears only on the determination of "how much risk it takes for a crime to qualify as a violent felony." *Johnson II*, 135 S. Ct. 2558.  But a lower court must determine the idealized ordinary case of the predicate offense before it can even begin to evaluate the type and level of risk presented by that offense.  *Id.* at 2557. Because courts cannot answer the threshold question with any certainty, it necessarily follows, from that alone, that the residual clause is constitutionally void.  If a court cannot determine the ordinary case of the predicate offense, then a court cannot proceed with its analysis — enumerated offenses or not.

It is true, as the government says, that in parrying Justice Alito's dissenting concern about invalidating similar laws, the Court in *Johnson II* initially noted that no other statutes include the ACCA's enumerated list.  But the Court then made clear that the "ordinary case" problem is really the central distinguishing feature: "*More importantly*, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion . . . . The residual clause,

however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime." *Id.* at 2561 (emphasis added).

In any event, the absence of the enumerated offenses actually cuts against the government's argument.  Their presence in the ACCA at least offered some benchmark for quantifying risk, though it did not suffice to rescue the ACCA.  Section 924(c)(3)(B), on the other hand, provides no benchmark.  Here, quantifying risk is even more abstract, lacking any point of comparison. While the enumerated offenses could not save the ACCA, their absence is, if anything, even more damning to section 924(c)(3)(B).

## 2.  Section 924(c)(3)(B) is not Temporally "Narrower" than the ACCA.

The government also claims that section 924(c)(3)(B) is temporally "narrower" than the ACCA's residual clause because it looks to the risk of force only "in the course of committing the offense."  Opp. at 23.  But, like the absence of enumerated offenses, this simply has no bearing on the threshold inquiry that the Supreme Court determined is impossibly arbitrary, the determination of what the "ordinary case" of the predicate crime looks like at the outset of its commission.  *Johnson II*, 135 S. Ct. at 2557.  Federal courts have no reliable standard for deciding whether, for example, "the ordinary instance of witness tampering involve[s] offering a witness a bribe . . . . [o]r threatening a witness with violence."  Or whether "the ordinary burglar invade[s] an occupied home by night or an unoccupied home by day."  Or whether "the typical extortionist threaten[s] his victim in person with the use of force, or . . . by mail with the revelation of embarrassing personal information."  *Id.* at 2557-58.  Or whether the "ordinary case of vehicular flight" is "the person trying to escape from police by speeding or driving recklessly" or "the

person driving normally who, for whatever reason, fails to respond immediately to a police officer's signal" *Sykes v. United States*, 131 S. Ct. 2267, 2291 (2011) (Kagan & Ginsburg, JJ., dissenting).  If a court cannot hypothesize the "idealized" "typical" scenario in which an offender embarks on a predicate crime, it cannot proceed to determine how an offense is likely to "play[] out," and thus it cannot gauge the riskiness of the probable ensuing conduct.  *Johnson II*, 135 S. Ct. at 2558.

In any event, by focusing on the risk during the predicate offense, section 924(c)(3)(B) does not call for any narrower an inquiry than does the ACCA's residual clause.  The Supreme Court's determinations of whether certain crimes were sufficiently risky under the ACCA also focused on the risk during the commission of the offense, rather than at some time later after it had ended.  *See, e.g., James*, 550 U.S. at 203-04, 210 (2007) (looking to conduct that typically occurs "while the crime [attempted burglary] is in progress," "while the break-in is occurring," and "during attempted burglaries"); *Sykes*, 131 S. Ct. at 2273-74 (same, for crime of vehicular flight from police).

Likewise, the supposedly "typical" conduct the Court found sufficiently risky in the ACCA cases now repudiated by *Johnson II* involved the kind that occurs during the predicate crime, rather than at some time later.  *See, e.g., James*, 550 U.S. at 211-12 ("An armed would-be burglary may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program.  Or a homeowner . . . may give chase"); *Sykes*, 131 S. Ct. at 2274 (driver's knowingly fleeing law enforcement officer held a

violent felony given risk that, during the pursuit, driver might cause an accident or commit another crime to avoid capture).

In no case did the Supreme Court actually rely on "post-offense conduct" to find a predicate crime sufficiently risky under the ACCA's residual clause. And it expressed doubt about whether that would ever be a statutorily permissible basis to qualify an offense as a "crime of violence." *See Chambers*, 555 U.S. at 128 (questioning, though assuming for argument's sake, "the relevance of violence that may occur long after" crime of failing to report for penal confinement is complete).

The government relies on the Supreme Court's description of the ACCA inquiry as one that goes "beyond evaluating the chances that the physical acts that make up the crime will injure someone," and the Court's citation of burglary and extortion as examples, Opp. at 23, where the "could arise in a burglary after the breaking and entering had occurred, and an extortionist might become violent after making his demand." *Johnson II*, 135 S. Ct. at 2557. But in assessing riskiness, section 924(c)(3)(B) and its twin, section 16(b), just like the ACCA, look not just at the initiation of the predicate crime (*e.g.*, the burglar's climbing through the window), but beyond that, through the entire "course" of the offense to its completion (*e.g.*, while the burglar is in the house, until he successfully flees). *See Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) ("A burglary would be covered under § 16(b) . . . because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime"); *Stout*, 706 F.3d at 708-09 (escape from a secured facility is crime of violence under section 16(b) because of risk that force will be used before "completion of the crime," for example,

"that armed law enforcement will seek [the escapee] out, potentially ending in a violent

confrontation") (citation omitted).

### 3. The same level of confusion surrounds section 924(c)(3)(B) as surrounded the ACCA's residual clause.

The government argues that section 924(c)(3)(B), unlike the ACCA's residual

clause, is not shrouded in confusion.  It notes that, before *Johnson II*, several dissenting

Supreme Court opinions criticized the ACCA's residual clause, yet justices have not

made similar comments about section 924(c)(3)(B) or section 16(b).

But cases addressing the residual clauses of section 924(c)(3)(B) and section 16(b)

regularly rely on ACCA cases, and *vice-versa*.  Courts use the same body of precedent.[7]

Thus, controversy surrounding the ACCA necessarily reflects difficulties with

section 924(c)(3)(B) and § 16(b), even without the same explicit chorus of criticism.  And

confusion about the meaning of the residual clause in section 924(c)(3)(B) and

section 16(b) is subsumed in the confusion surrounding the ACCA.

Moreover, the judges of the First Circuit  Court of Appeals have sharply disagreed

over how to interpret section 16(b) and its interplay with the ACCA.  *See, e.g., United

States v. Fish*, 758 F.3d 1 (1st Cir. 2014) (2-1 decision distinguishing "crime of violence"

---

[7] In ACCA cases prior to *Johnson*, the Supreme Court treated 18 U.S.C. § 16(b), a
provision identical to section 924(c)(3)(B), as the functional equivalent of the ACCA's
residual clause.  Thus in performing or describing "ordinary case" analysis under the
ACCA, it has cited *Leocal v. Ashcroft*, 543 U.S. 1 (2004), in which the Court conducted a
similar analysis under section 16(b).  *See Begay v. United States*, 553 U.S. 137, 143, 145
(2008); *James v. United States*, 550 U.S. 192, 216, 219, 224 (2007) (Scalia, Stevens &
Ginsburg, JJ., dissenting); *see also Chambers v. United States*, 555 U.S. 122, 133 n.2
(2009) (Alito & Thomas, JJ., concurring) (citing cases under section 16(b) because it
"closely resembles ACCA's residual clause").

under section 16(b) from "violent felony" under ACCA).  And other circuits have also frequently split over how to apply § 16(b) and § 924(c)(3).  *See, e.g., Chambers*, 555 U.S. at 131-32 (Alito & Thomas, JJ., concurring) (citing illustrative cases); *Evans v. Zych*, 644 F.3d 447, 450-51 (6th Cir. 2011) (discussing different analytic approaches that produced a circuit split).

### D. *Johnson II* Makes Clear that a Facial Challenge to section 924(c)(3)(B) is Appropriate.

Finally, the government argues that the defense has failed to show that section 924(c)(3)(B) is vague "as applied" to his particular predicate offenses.  Opp. at 25-26. Not so.  *Johnson II* held the residual clause of the ACCA void for vagueness on its face, without first determining if it was vague "as applied."  135 S. Ct. at 2560.  Moreover, in response to Justice Alito's dissenting criticism that the Court should have used an "as applied" approach, *id*. at 2580-81 (Alito, J. dissenting) — the same argument the government levels here — the Court explained that such a hopelessly indeterminate statute is unconstitutional even if "there is some conduct that clearly falls within the provision's grasp."  135 S. Ct. at 2561.  As explained above, the very same analysis applies to section 924(c)(3)(B).

### Conclusion

For the foregoing reasons, as well as those set forth in previous submissions, the Court should enter judgment notwithstanding the verdict or, in the alternative, order a new trial.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

_/s/ William W. Fick_

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 30, 2015.

_/s/  William W. Fick_