UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR
ORDER TO MAINTAIN PROTECTION OF PRIVILEGED AND
CONFIDENTIAL DEFENSE INFORMATION AND
WORK PRODUCT (LEAVE TO FILE GRANTED 10/30/15)**

Defendant, Dzhokhar Tsarnaev, respectfully submits this reply to the Government's Opposition [DE 1555] to Defendant's Motion for an Order to Maintain Protection of Privileged and Confidential Defense Information and Work Product [DE 1579].[1]

This Court's decisions regarding the Special Administrative Measures ("SAMs") and their impact on the defense function relied, in part, on the government's representations that the parties were negotiating agreements to address some of the defense concerns. The Court's resolution of these issues included approval of an agreement that prevented anyone associated with the prosecution team from monitoring, or learning about, what the Court found to be legal meetings between Tsarnaev and his attorneys and witnesses. The government now, without justification or authority, seeks to

---

[1] To be clear, the defense motion does not challenge Mr. Tsarnaev's conditions of confinement and does not request any new accommodations. It was prompted by the government's letter, dated August, 25, 2015 and attached as Exhibit 1, in which it repudiated its agreements within the defense.

renege on its agreements and to upend the Court's ruling, with which it continues to disagree, but never asked the Court to reconsider.

In doing so, it ignores the sequence of events that led to the agreements, including this Court's rulings, flouts principles of contract law, and disregards applicable privileges. And it ignores the current posture of the proceedings — pretending that the case, and Tsarnaev's need for representation, is over. It offers nothing to warrant upending the status quo, to which it agreed either expressly or by not challenging the Court's orders at the time they were made.

## I. THE AGREEMENT IS ENFORCEABLE.

The government's opposition depends heavily on its claim that the agreement does not have — and, apparently, in its view, never had — any legal force. The government's claim cannot withstand scrutiny.

### A. The Agreement is a Binding Contract.

The government's argument that the agreement is void because there was no consideration, Govt. Opp. at 6, is factually and legally wrong.

"A promise or agreement with reference to a pending judicial proceeding, made by a party to the proceeding or his attorney, is binding without consideration." Restatement 2d of Contracts, § 94. The comments to that section recognize that such agreements "serve the convenience of the parties to litigation and often serve to simplify and expedite the proceeding." *Id.*, cmt. a.

Such agreements are made throughout the course of litigation and include agreements on motions to continue, to exclude time under the Speedy Trial Act, to extend

filing deadlines, and to forego certain evidence. The government's view would wreak havoc with judicial proceedings.

But in this case, there was consideration: the avoidance by the government of restrictions more limiting than the ones to which they agreed. "It is well-settled that 'abandonment of a claim believed to be well founded . . . is the surrender of a thing of value and is a sufficient consideration for a contract.'" *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 202 (1st Cir. 2004) (quoting *Blair v. Cifrino*, 355 Mass. 706, 247 N.E.2d 373, 375 (Mass. 1969)).

Moreover, the defense relied on the agreement negotiated with the government and that reliance provides valid consideration. "A promisee's reasonable and detrimental reliance on a promise may serve as a substitute for consideration and render the promise 'enforceable pursuant to a traditional contract theory[.]'" *Kiely v. Raytheon Co.,* 105 F.3d 734 (1st Cir. 1997) (quoting *Rhode Island Hosp. Trust Nat. Bank. v. Varadian*, 418 Mass. 841 (1995)). "While consideration often takes the shape of a benefit conferred on another party to the agreement, a detriment suffered voluntarily is also recognized as valid consideration." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 397 (D.R.I. 1998).

**B. The Agreement was Endorsed by the Court.**

The government denies that the Agreement "has the force of the Court's acceptance," Govt. Opp. at 6, citing Def. Mot. at 9, arguing that the Court did not require, review, accept or approve the agreement. Govt. Opp. at 6. The record – including the government's own words – contradicts this claim.

The government agreed to use a firewalled agent to monitor Mr. Tsarnaev's sisters' visits after the Court proposed two alternatives: either no monitor or one independent of the prosecution team.   Tr. 4/16/14 at 12-13.

At a conference on June 18, 2014, the Court endorsed the agreement to use a firewalled agent and firewalled prosecutor.

> MS. PELLEGRINI:  Your Honor, as the government suggested in its proposal, we agreed that we would wall off and have essentially a taint agent.   In the interim since the government filed that proposal, there has (sic) also been discussions between the defense and the government regarding a potential agreement where there would be a further walling off, if you will; that is, that the agent would only communicate with an assistant United States attorney who is not part of the prosecution team.  And there would only be discussions with the prosecution team if by a preponderance of the evidence the taint agent and the taint USA felt that there would be a violation of the SAMs.
>
> . . .
>
> THE COURT:   Okay.  I think the government's proposal as amended is satisfactory.

Tr.  6/18/14 at 6.  The Court further suggested that the firewalled prosecutor should come from outside Massachusetts.  *Id.*

The government  recognized the Court's adoption of the agreement in a pleading filed on August 8, 2014, writing, "In addition, on June 18, 2014, the Court accepted the government's proposal that a firewalled agent and AUSA be utilized to monitor in-person visits between Tsarnaev and his sisters."  Government's Opposition to Defendant's Motion for Setting of Firewall Procedures ("Govt. Opp. to Mtn. re Firewall") [DE 448] at 2.  In the same pleading, the government outlined the terms of the separate, written agreement regarding defense materials and visitors.  *Id.* at 1-2.

The discussion at the June 2014 conference and the filing of the August 2014 pleading occurred in the context of defense requests for additional restrictions on government monitoring, which the Court declined to impose in light of the parties' agreements. Clearly, the Court believed that the agreements were adequate to protect the parties' respective interest and therefore endorsed them.

## II. THE COURT HAS AUTHORITY TO ENFORCE ITS OWN ORDERS AND AGREEMENTS MADE DURING PRETRIAL LITIGATION.

The government attempts to couch the defendant's efforts to keep it from breaching its agreement, violating the Court's order, and obtaining privileged information as a request for the Court "to make orders respecting Tsarnaev's conditions of confinement[.]" Govt. Opp. at 7. [2] But nothing in the defense motion addresses Mr. Tsarnaev's current conditions of confinement. Instead it seeks to protect information provided under a prior order and agreement. The defense seeks no new accommodations, simply enforcement of the existing ones.

## III. THE AGREEMENT DID NOT CONTEMPLATE LATER DISCLOSURE OF INFORMATION OBTAINED BY THE FIREWALLED AGENT AND PROSECUTOR.

The language of the written agreement clearly contemplates *prospective* protection: "No one on the Prosecution Team . . . shall receive or be provided with any information regarding materials" shown to Mr. Tsaranev, provided to him, or reviewed with him by defense team members. Agreement, Paragraph 1.

---

[2] The government's claim that the Court's authority to make such orders is confined to pretrial matters is inconsistent with its efforts to convince the jury that prisoners could seek court modification of SAMs. *See, e.g.,* May 11, 2015 Tr. at 24-25 (testimony of Michelle Nicolet).

Neither of the agreements contemplated later disclosure of any information acquired by the firewalled agent or prosecutor. The government's description of them in the August 2014 filing makes that clear: "[T]he firewalled AUSA may never, at any time, become a member of the prosecution team[.]" Govt. Opp. to Mtn. re Firewall, at 2.

The sole circumstance under which the agreements would permit disclosure to the prosecution, as AUSA Pellegrini stated at the June 2014 conference, was if a disagreement arose concerning defense materials or visits and "(1) disclosure is necessary to determine whether a violation of the SAMs or of BOP policies and regulations has actually occurred or (2) the designated Assistant U.S. Attorney determines by a preponderance of the evidence" that such a violation has occurred. Agreement, paragraph 4. None of those circumstances is present.

### IV. THE INFORMATION THAT THE GOVERNMENT SEEKS IS COVERED BY THE ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES.

The government asserts that it should be able to obtain information about Mr. Tsarnaev's visits with his sisters because those visits are not protected by any privilege. Govt. Opp. at 11.[3] This claim contradicts this Court's ruling that those visits were legal visits, a ruling cited in the Government's Opposition. Govt. Opp. at 6, quoting DE 254, entered on April 16, 2014. The Court's ruling is the law of this case. The government

---

[3] The government's position regarding information obtained during Mr. Tsarnaev's visits from his sisters — which was, after all, the subject of a court order that the government has not asked the Court to modify or revoke — is unclear. Rather than claiming a right to directly access the firewalled agents notes or memoranda, it suggests that it could acquire "anything that might have made it into the 'firewalled' AUSA's file." This attempt at an end run violates the letter and intent of the Court's rulings and the agreements themselves.

never sought reconsideration of it or challenged it any way.

The Court required that the visits be monitored by someone unconnected to the prosecution team.  The defense never anticipated that, once the trial ended, the government could learn what had transpired during those meetings.  In its August 2014 the prosecution  wrote, "The sole purpose of having a firewalled AUSA is to wall off certain information from the prosecution team." *Id.* at 2.  This purpose would be defeated by later disclosure.

The attorney-client privilege does not end with a verdict; indeed, it is not even extinguished by the death of the client. *See In Re John Doe Grand Jury Investigation*, 408 Mass. 480, 483 (1990).  Thus, disclosure of information regarding those visits to the prosecution would breach the attorney-client and work product privileges.

In *United States v. Mastroianni*, 749 F.2d 900, 905-906 (1st Cir. Mass. 1984), the First Circuit held that the government may only intrude into attorney-client meetings when it can "create a substantial record  to justify intrusion into this otherwise constitutionally protected domain."   The First Circuit upheld the presence of an informant at a joint defense meeting but held that the government's decision to later debrief the informant about the meeting was improper. *See id.* at 906, 908.

*Mastroanni* is at least analogous to the government's attempt to gain information to which it is not entitled.  Here, the district court found that an agent could be present for the meetings with sisters for security purposes, but ruled that the agent could not be a member of the prosecution team.  This is comparable to the presence of an informant at

the joint defense meetings. But the government now attempts to do what the prosecution did in *Mastroanni*: gain access to privileged information for its own use.

The government's arguments ignore the plain language of the agreement, which opens by "recognizing that the defense wishes to keep certain information, including defense work product, confidential[.]" Agreement, Exhibit B to Govt. Opp. Surely that purpose is defeated by later disgorging the information to the prosecution.

Nor has the government made a showing that would justify disclosure regarding experts who may have visited Mr. Tsarnaev. The agreement provided, "No one on the prosecution team shall be provided with a copy of the visitors log until the defense has had any opportunity to redact he names of defense experts, and the dates of their visits." Agreement, paragraph 2. This agreement recognized that even the fact of meetings between experts and the defendant are protected by the work-product privilege.

The government has no need for access to this information. Its only argument in support of its position is that this information no longer needs to be protected. That is simply wrong. The work-product privilege does not end with a verdict. *See Bittaker v. Woodward*, 331 F.3d 715, 722-23 (9th Cir 2003).

V. **TERMINATION OF THE AGREEMENT IS PREMATURE.**

The government's unilateral renunciation of the agreement should not be permitted. The prosecution does not even attempt to justify it, simply proclaiming without explanation that "the time has come for the prosecution to resume full authority for maintaining the SAMs[.]" Govt. Opp. at 11.

As an initial matter, notwithstanding the government's characterizations, the case

still is being actively litigated. A motion for new trial and other matters remain pending in the district court. If this Court were to deny the new trial motion, an appeal to the First Circuit will follow, and counsel will need to meet with Tsarnaev, review record materials and drafts, materials the prosecutors should not be able to access. And, further down the road, if relief is denied on direct appeal, post-conviction attorneys, representing Tsarnaev in proceedings under 28 U.S.C. § 2255 will undertake a comprehensive review, requiring close consulting with the defendant.

The government argues repeatedly that the defense seeks to obtain protections that no other inmate in BOP has. But that misstates the issue. The SAMs, imposed and maintained by the prosecution, would permit prosecutors to interfere with the defense function going forward in ways not faced by other inmates.

Upsetting the status quo, an arrangement the government agreed to, would allow intrusion on the defense in ways other inmates do not face, contrary to the government's representations. For example, the prosecution asserts that BOP routinely engages in a cursory review of legal materials, flipping through the pages for contraband , Govt. Opp. at 2, 5, 8, but it acknowledges that, because of the SAMs, BOP engages in a more substantive review of such documents. In fact, BOP officials notified the prosecutors (before the firewall was put in place) when they believed, without justification, that a violation had occurred. Govt. Opp. at 5-6. Prosecutors in other cases do not have input into which members of the defense team can visit or communicate with their client, input that the prosecutors in this case apparently desire. Govt. Opp. at 9.

The current firewall arrangement is more than adequate to address the

government's security concerns.  The government has made no showing that it is ineffective.  The government uses its self-determined termination date as justification for access to the previously protected files, but can do no better than stating that it needs them to "responsibly" administer the SAMs.  *Id.*  It is hard to imagine how this would be true even if the files it sought were not protected.  But if the premise is correct, the solution is simple:  maintain the current arrangement, at least until such time as the Court of Appeals can address it.

## Conclusion

For the foregoing reasons, the Court should prohibit the government from renouncing the agreement and obtaining privileged information that was provided under protections ordered and approved by the Court.

> Respectfully submitted,
> DZHOKHAR TSARNAEV
> By his attorneys
>
> */s/ Miriam Conrad*
>
> David I. Bruck, Esq. (SC Bar # 967)
> 220 Sydney Lewis Hall
> Lexington, VA 24450
> (540) 460-8188
> BRUCKD@WLU.EDU
>
> Judy Clarke, Esq. (CA Bar # 76071)
> CLARKE & RICE, APC
> 1010 Second Avenue, Suite 1800
> San Diego, CA 92101
> (619) 308-8484
> JUDYCLARKE@JCSRLAW.NET

>Miriam Conrad, Esq. (BBO # 550223)
>Timothy Watkins, Esq. (BBO # 567992)
>William Fick, Esq. (BBO # 650562)
>FEDERAL PUBLIC DEFENDER OFFICE
>51 Sleeper Street, 5th Floor
>(617) 223-8061
>MIRIAM_CONRAD@FD.ORG
>TIMOTHY_WATKINS@FD.ORG
>WILLIAM_FICK@FD.ORG

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 30, 2015.

>*/s/ Miriam Conrad*